**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

UNITED STATES, *et al.*,

                    *Plaintiffs,*

     vs.

GOOGLE LLC,

                  *Defendant.*

No: 1:23-cv-00108-LMB-JFA

**DEFENDANT GOOGLE LLC'S**
**<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS</u>**

## **TABLE OF CONTENTS**

FACTUAL BACKGROUND ................................................................................................ 2

LEGAL STANDARD ....................................................................................................... 5

ARGUMENT .................................................................................................................... 6

I.   Plaintiffs Fail To Allege Plausible Relevant Markets. ........................................ 6

    A.   Plaintiffs Fail To Plead A Plausible
        Market For Publisher Ad Servers. .............................................................. 7

    B.   Plaintiffs Fail To Plead A Plausible
        Market For Ad Exchanges. ....................................................................... 10

    C.   Plaintiffs Fail To Plead A Plausible Market
        For Advertiser Ad Networks. ................................................................... 14

II.  Plaintiffs Fail To Allege That Google Has Ever
    Had Monopoly Power In A Market For Ad Exchanges. ..................................... 16

III. Plaintiffs Fail To Plead That Google's Acquisitions
    Of Doubleclick And Admeld Harmed Competition............................................ 19

    A.   Plaintiffs Fail To Allege That The DoubleClick
        Acquisition Was Anticompetitive. ........................................................... 20

    B.   Plaintiffs Fail To Allege That The Admeld
        Acquisition Was Anticompetitive. ........................................................... 22

IV.  Plaintiffs Fail To Plead That Restricting Google
    Ads Demand To Google's Products Is Anticompetitive. .................................... 23

V.   Plaintiffs Fail To Plead That Certain Product
    Designs Harmed Competition In The Market For Publisher Ad Servers............................ 25

VI.  The United States' Damages Claim Should Be
    Dismissed For Failure To Allege That It Directly Purchased Digital
    Advertising. ......................................................................................................... 26

CONCLUSION................................................................................................................ 28

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Am. Online, Inc. v. GreatDeals.Net*,
　49 F. Supp. 2d 851 (E.D. Va. 1999) ............................................................7, 11, 14

*Apple v. Pepper*,
　139 S. Ct. 1514 (2019) ............................................................................................26

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ...........................................................................................6, 28

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
　472 U.S. 585 (1985) ................................................................................................24

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
　603 F.2d 263 (2d Cir. 1979) ...................................................................................19

*Cavalier Tel., LLC. v. Verizon Virginia, Inc.*,
　330 F.3d 176 (4th Cir. 2003) ....................................................................................6

*CollegeNet, Inc. v. Common Application, Inc.*,
　355 F. Supp. 3d 926 (D. Or. 2018) ...........................................................................8

*Concord Assocs., L.P. v. Ent. Properties Trust*,
　817 F.3d 46 (2d Cir. 2016)........................................................................................9

*Coolmath.com, LLC v. Coolmathgames.com*,
　2015 WL 12570901 (E.D. Va. 2015)........................................................................6

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*,
　637 F.3d 435 (4th Cir. 2011) ........................................................................6, 7, 16

*Eastman v. Quest Diagnostics Inc.*,
　724 F. App'x 556 (9th Cir. 2018) ...........................................................................22

*In re Elevator Antitrust Litig.*,
　502 F.3d 47 (2d Cir. 2007)......................................................................................24

*First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.*,
　2013 WL 6234598 (D. Md. Nov. 13, 2013) ...........................................................16

*FTC v. Facebook, Inc.*,
　2021 WL 2643627 (D.D.C. June 28, 2021)............................................................24

*FTC v. Meta Platforms Inc.*,
 2023 WL 2346238 (N.D. Cal. Feb. 3, 2023) ..........................................................................21

*FTC v. Qualcomm, Inc.*,
 969 F.3d 974 (9th Cir. 2020) ................................................................................................24

*In re Google Digit. Advert. Antitrust Litig.*,
 2021 WL 2021990 (N.D. Cal. May 13, 2021) ................................................................11, 14

*In re Google Digit. Advert. Antitrust Litig.*,
 2022 WL 4226932 (S.D.N.Y. Sept. 13, 2022) ......................................................5, 16, 21, 25

*Hack v. President & Fellows of Yale Coll.*,
 237 F.3d 81 (2d Cir. 2000) ......................................................................................................7

*Hawaii v. Standard Oil Co. of Cal.*,
 405 U.S. 251 (1972) ...............................................................................................................27

*HDC Med., Inc. v. Minntech Corp.*,
 474 F.3d 543 (8th Cir. 2007) ................................................................................................19

*Hicks v. PGA Tour, Inc.*,
 897 F.3d 1109 (9th Cir. 2018) ....................................................................................9, 11, 14

*Honickman v. BLOM Bank SAL*,
 6 F.4th 487 (2d Cir. 2021) ......................................................................................................7

*Illinois Brick Co. v. Illinois*,
 431 U.S. 720 (1977) ....................................................................................................2, 26, 28

*Intel Corp. v. Fortress Inv. Grp., LLC*,
 511 F. Supp. 3d 1006 (N.D. Cal. Mar. 20, 2020) ................................................................21

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
 2013 WL 6682981 (E.D. Va. Dec. 18, 2013) .......................................................................21

*It's My Party, Inc. v. Live Nation, Inc.*,
 811 F.3d 676 (4th Cir. 2016) ..........................................................................................6, 7, 9

*It's My Party, Inc. v. Live Nation, Inc.*,
 88 F. Supp. 3d 475 (D. Md. 2015),
 *aff'd*, 811 F.3d 676 (4th Cir. 2016) .......................................................................................16

*Katyle v. Penn Nat'l Gaming, Inc.*,
 637 F.3d 462 (4th Cir. 2011) ................................................................................................20

*Kloth v. Microsoft*,
 444 F.3d 312 (4th Cir. 2006) ...........................................................................................26, 27

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) ................................................................21, 24

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
    981 F.2d 160 (4th Cir. 1992) ......................................................................18

*McArthur v. Brabrand*,
    610 F. Supp. 3d 822 .....................................................................................20

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ....................................................................15

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
    670 F. Supp. 1313 (D. Md. 1986),
    *aff'd*, 831 F.2d 537 (4th Cir. 1987) ...........................................................15

*In re Pool Prod. Distrib. Mkt. Antitrust Litig.*,
    2016 WL 3567059 (E.D. La. July 1, 2016) ................................................18

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
    199 F. Supp. 2d 362 (M.D.N.C. 2002),
    *aff'd*, 67 F. App'x 810 (4th Cir. 2003)......................................................16

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993).......................................................................................18

*Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*,
    133 F.3d 103 (1st Cir. 1997)........................................................................18

*Taylor Pub. Co. v. Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000) ......................................................................19

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
    57 F.3d 1317 (4th Cir. 1995) ................................................................12, 13

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*,
    540 U.S. 736 (2004)......................................................................................27

*United Mag. Co. v. Murdoch Mags. Distrib., Inc.*,
    146 F. Supp. 2d 385 (S.D.N.Y. 2001),
    *aff'd sub nom. United Mag. Co. v. Curtis Circulation Co.*, 279 F. App'x 14
    (2d Cir. 2008).................................................................................................13

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945).........................................................................8

*United States v. AT&T Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018),
   *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ...........................................................21

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956)............................................................................................6

*United States v. Sungard Data Sys.*,
   172 F. Supp. 2d 172 (D.D.C. 2001) ..................................................................9

*United States v. UnitedHealth Grp. Inc.*,
   2022 WL 4365867 (D.D.C. 2022) ...............................................................21, 23

*Verizon Commc'ns., Inc. v. L. Offs. of Curtis V. Trinko*,
   LLP, 540 U.S. 398 (2004)............................................................................21, 23

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1975)............................................................................................6

*Warren v. Clasp*,
   2023 WL 1864871 (E.D. Va. Feb. 9, 2023)........................................................6

**Statutes**

Clayton Act § 4a, 15 U.S.C. § 15(a) ....................................................21, 26, 27

Sherman Act § 2, 15 U.S.C. § 2 ..................................................6, 7, 21, 23

**Other Authorities**

101 Cong. Rec. 9165 (1955) ..............................................................................27

Fed. R. Civ. P. 12(b)(6)........................................................................................5

Fed. Trade Comm'n, FTC File No. 071-0170, *Statement Concerning
   Google/DoubleClick* (Dec. 20, 2007) ..............................................................19

U.S. Dep't of Just., *Statement of the Dep't of Just. Antitrust Div. on Its Decision
   to Close Its Investigation of Google Inc.'s Acquisition of Admeld Inc.* (Dec. 2,
   2011) ................................................................................................................20

Over the past 15-plus years, Google has achieved success in digital display advertising by making significant investments in developing innovative and effective digital display advertising technology ("ad tech") tools. Google's ad tech tools have attracted publishers seeking to monetize their online advertising space and advertisers seeking the best return on their advertising dollars. U.S. antitrust laws encourage, reward, and protect success earned through innovation, investment in research and development, vigorous competition, and hard work.

Success in the digital advertising marketplace depends on placing advertisements on the most relevant publisher webpages or mobile applications in ways that most appeal to viewers. So in developing its ad tech tools, Google considers the interests of advertisers, publishers, and internet users. Plaintiffs misconstrue Google's efforts to compete to serve the interests of all of these customers as a "corruption of legitimate competition." Plaintiffs characterize Google's every business decision over the past 15 years as evidence of a long-term scheme to amass power and choke out competition, ignoring the competitive pressures and customer interests driving Google in a dynamic and multi-sided digital marketplace.

In the more than three years that it has been investigating Google's ad tech business, the United States has received more than two million documents from Google and taken over thirty depositions of Google witnesses; it also has obtained documents and deposition testimony from numerous third parties. Yet Plaintiffs remain unable to find support for their claimed antitrust harms. Instead, they repeat conclusory statements to concoct exceedingly narrow relevant markets as a basis for their claims of (1) monopolization of the market for publisher ad servers (First Claim), (2) monopolization or attempted monopolization of the market for ad exchanges (Second Claim), (3) monopolization of the market for advertiser ad networks (Third Claim), and (4) tying of Google's ad server and ad exchange (Fourth Claim). In gerrymandering markets, Plaintiffs cast

aside obvious substitutes with only perfunctory explanation.  The lack of plausible allegations for why these substitutes are not reasonably interchangeable provides the first ground for dismissing these four claims, as well as the dependent claim for damages incurred by the United States (Fifth Claim).

Claim Two also should be dismissed because Plaintiffs fail to allege that Google ever had monopoly power in the market for ad exchanges.  In addition, Claims One and Two each falter when revisiting the 15-year-old and 12-year-old DoubleClick and Admeld transactions that, prior to their closing, were extensively investigated and not challenged by the Federal Trade Commission ("FTC") and Department of Justice ("DOJ") respectively.  Plaintiffs' allegations solely address post-acquisition conduct and fail to support a claim that either acquisition was anticompetitive.  Further, certain conduct alleged in Claims One, Two, and Four either rests upon a claimed duty to deal or amounts to a challenge to procompetitive product designs, neither of which constitute antitrust violations as a matter of established law.

Finally, Claim Five fails to allege that the U.S. government is a direct purchaser of any of the products at issue.  *Illinois Brick* bars indirect purchasers from recovering damages in these circumstances.

Accordingly, for the reasons set forth herein, Google respectfully requests that the Court dismiss Claims One through Five of the Complaint.

## FACTUAL BACKGROUND

Like "newspaper, radio, and television organizations" before them, publishers of online content ("publishers") help fund their creation of content by selling advertising space (also referred to as "ad inventory").  Compl. ¶¶ 1, 42.  The internet has provided advertisers, whether "business, agencies of federal and state governments, charitable organizations, political candidates, [or]

2

public interest groups," with many choices for where and how to place ads to maximize their return on investment.  *See id.* ¶¶ 3 n.1, 43 n.4.

Advertisers may choose from a variety of online advertising formats, including **search advertising**, which are ads displayed on search engine results in response to user queries, and **display advertising**, which include images, text, or multimedia ads displayed on a website or mobile application.  *Id.* ¶ 43 & n.4.  Many online display ads are sold through "old-fashioned, bilateral contract negotiation" between publishers and advertisers—these are known as **direct sales**.  *Id.* ¶¶ 1, 45.  Some publishers, like Facebook or Snapchat, facilitate direct sales by offering advertisers the ability to purchase ad space on their websites or mobile apps through proprietary in-house technology tools.  *Id.* ¶ 43 & n.4.  Online display ads can also be sold through proprietary or third-party tools that connect advertisers and publishers to buy and sell ad inventory, and those sales are referred to as **indirect sales**.  *Id.* ¶¶ 43 n.4, 45-46.  Regardless of the sales channel, every display ad transaction involves a "match between a publisher selling ad space and advertisers looking to buy it."  *Id.* ¶ 3.

Plaintiffs refer to publishers who use their own proprietary tools to sell their ad inventory as employing a **"closed web"** model, whereas they refer to publishers that sell their ad inventory through tools that are also available to other publishers as employing an **"open web"** model.  *Id.* ¶¶ 43 n.4, 45.  Collectively, ad tech facilitates the purchase and sale of online advertising through "lightning-fast automated processes," sometimes referred to as **programmatic** buying.  *Id.* ¶¶ 42, 46.  Some ad tech tools known as **"buy-side"** tools help advertisers buy ad inventory on publisher websites and apps, while others known as **"sell-side"** tools help publishers sell their ad inventory.  *Id.* ¶¶ 48, 54.  Both sell-side and buy-side tools come in many forms and interact with one another in a variety of ways, but Plaintiffs allege that "most programmatic [open web, display] ad

transactions" involve sell-side tools called **"publisher ad servers"** and **"ad exchanges"** and buy-side tools called **"demand side platforms"** or **"DSPs"** and **"advertiser ad networks**." *Id.* ¶¶ 46, 49, 50.

According to Plaintiffs, advertisers use DSPs and ad networks to determine which ad inventory to bid on, to place the bids, and to track performance against the advertiser's goals for its advertising campaigns. *Id.* ¶¶ 48, 55. Google offers a DSP called **"Display and Video 360"** or **"DV360"** and an ad network known as **"Google Ads**." *Id.* ¶¶ 49, 50. Publishers use an ad server to "evaluate[] potential ads from different advertising sources and appl[y] a decision-making logic to determine which ad will be displayed to the user opening a website." *Id.* ¶ 44. Google offers a product called **"Google Ad Manager"** that offers publisher ad-serving functionality, formerly known as **"DoubleClick for Publishers"** or **"DFP**." *Id.* When a user opens a website, a publisher ad server may send requests for bids on ad inventory to an ad exchange. *Id.* ¶ 46. In that scenario, the exchange, in turn, solicits bids on behalf of advertisers from DSPs and ad networks, runs an auction to determine the winning bid, and relays that winning bid back to the publisher ad server. *Id.* ¶¶ 46, 56. Many publishers use a methodology known as **header bidding** to run (via HTML code on their website) a real-time auction of ad exchanges and ad networks before the website loads. *Id.* ¶¶ 164, 189. Google offers an alternative to header bidding called **"Open Bidding**." *Id.* ¶ 177. Google Ad Manager also offers ad exchange functionality, formerly known as **"AdX**." *Id.* ¶ 46.

Plaintiffs focus their Complaint on display advertising, and in particular, only on those display advertising sales transactions that involve static images, text, or "multimedia" ads (but not "video ads") displayed only on websites (not on mobile applications) and purchased only through the use of third-party intermediary technology (not in-house proprietary technology or directly).

4

*Id.* ¶ 43 & n.4.  Specifically, Plaintiffs allege that Google has monopolized or attempted to monopolize the markets for (i) "publisher ad servers for open web display advertising," (ii) "ad exchanges for indirect open web display advertising," and (iii) "advertiser ad networks for open web display advertising" through a sprawling series of allegedly anticompetitive conduct, and has tied its ad server, DFP, to its ad exchange, AdX.  *Id.* ¶¶ 282, 290, 297, 312, 319, 326, 332, 338.

These allegations largely mirror those in *In re Google Digital Advertising Antitrust Litigation*, the multi-district litigation overseen by Judge P. Kevin Castel in the Southern District of New York.  *See* Def's Mem. of Law Supp. Mot. to Transfer Venue, *United States v. Google LLC*, 2023 WL 2486605 (E.D. Va. Feb. 17, 2023), ECF No. 44-2, at 10.  Google filed a motion to dismiss the State plaintiffs' Third Amended Complaint on January 21, 2022, arguing, *inter alia*, that the plaintiff States had not plausibly alleged that Google engaged in anticompetitive conduct. Def's Mem. of Law Supp. Mot. to Dismiss, *In re Google Digit. Advert. Antitrust Litig.*, 2022 WL 4226932, at 16-27 (S.D.N.Y. Jan. 21, 2022), ECF No. 218.  In a ruling entered on September 13, 2022, Judge Castel granted in part and denied in part Google's motion.  *In re Google Digit. Advert.*, 2022 WL 4226932 (S.D.N.Y. Sept. 13, 2022), ECF No. 308.  Judge Castel dismissed claims of anticompetitive conduct as to certain alleged product markets but not others.  *Id.* at *21-40.  This Court has instructed that if Google chose to file a motion to dismiss it should not "repeat the same arguments that [Judge Castel] has already definitively resolved."   ECF No. 59, at 23:4-5. Accordingly, Google, without waiving any rights, only presents arguments here that Judge Castel did not resolve.

## LEGAL STANDARD

A complaint should be dismissed under Rule 12(b)(6) if it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "To do so, the complaint must allege specific facts in support of each element of each claim it raises; 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,' do not suffice."  *Warren v. Clasp*, 2023 WL 1864871, at *2 (E.D. Va. Feb. 9, 2023) (Brinkema, J.) (quoting *Ashcroft*, 556 U.S. at 678).

## ARGUMENT

"To state a monopolization claim under § 2 [of the Sherman Act, 15 U.S.C. § 2], a plaintiff must allege (1) that the defendant possesses monopoly power in the relevant market and (2) that the defendant willfully acquired or maintained that power 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *Cavalier Tel., LLC. v. Verizon Virginia, Inc.*, 330 F.3d 176, 183 (4th Cir. 2003) (internal citation omitted).  Both an attempted monopolization claim under Section 2 of the Sherman Act and a tying claim under either Section 1 or 2 also require a plaintiff to define a relevant market.  *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016).

## I.  PLAINTIFFS FAIL TO ALLEGE PLAUSIBLE RELEVANT MARKETS.

"Without a definition of [the] market, there is no way to measure [defendant's] ability to lessen or destroy competition."  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1975).  To properly allege a relevant market, a plaintiff must include all products "reasonably interchangeable by consumers for the same purposes."  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  Where a plaintiff does not define a market in those terms or excludes reasonable substitutes, the alleged market is deficient as a matter of law.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 443 n.3, 444 (4th Cir. 2011) (relevant markets must not be drawn in an "unreasonably and implausibly narrow manner");  *Coolmath.com, LLC v. Coolmathgames.com*, 2015 WL 12570901, at *2 (E.D. Va. 2015) (granting

6

dismissal where plaintiff did not attempt to show the market was "composed of products that have reasonable interchangeability"); *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999) (dismissing complaint because the alleged market of "e-mail advertising" omitted "reasonable substitutes" including direct mail, television, newspaper, and radio advertising).

Despite the extensive discovery obtained from Google and third parties during the course of the United States' three-plus year investigation, ECF No. 60, at 12; ECF No. 59, at 25:5-26:2, Plaintiffs have failed to allege plausible relevant markets because they have excluded obvious reasonable substitutes from their market definitions. Plaintiffs instead allege, without support, gerrymandered market definitions that serve to artificially increase Google's purported market shares. *See*, *e.g.*, *It's My Party, Inc.*, 811 F.3d at 683 (finding that plaintiffs "cast[] sound economics aside" by engaging in "precise line-drawing" to magnify the defendant's market power). Because Plaintiffs have failed to plausibly allege any relevant product markets, all of their Claims for Relief should be dismissed. *See Kolon Indus.*, 637 F.3d at 441 (a plaintiff must allege a relevant product market to state a Sherman Act § 2 claim); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000) ("To survive a motion to dismiss . . . the alleged tying product market must be plausible[.]"), *abrogation on other grounds recognized by Honickman v. BLOM Bank SAL*, 6 F.4th 487, 502 (2d Cir. 2021).

### A.  Plaintiffs Fail To Plead A Plausible Market For Publisher Ad Servers.

Plaintiffs' First Claim for Relief ("Monopolization of the Publisher Ad Server Market") should be dismissed because Plaintiffs do not plausibly allege a relevant market for publisher ad servers. Plaintiffs attempt to define a market limited to third-party "[p]ublisher ad servers for open web display advertising." Compl. ¶ 282. They allege that these products "manage the sale of display ads" on "open web" webpages; provide "delivery, reporting, and forecasting of availability across direct deals and indirect advertising sales"; "evaluate potential sources of advertising

demand"; and determine "which ad is selected to fill designated inventory slots on an [open web] publisher's webpage." *Id.* ¶ 283; *see also id.* ¶ 43 n.4. While Plaintiffs acknowledge the existence of proprietary (i.e., in-house) publisher ad serving tools, as well as publisher ad serving tools for video and in-app ads, they exclude those substitutes from their alleged relevant market. This exclusion is implausible given Plaintiffs' own allegations.

*Plaintiffs Improperly Exclude In-House Tools from their Alleged Publisher Ad Server Market.* While they label them "closed system" tools, mere labels cannot change the competitive reality. Plaintiffs acknowledge that proprietary (i.e., in-house) tools allow publishers to sell ad inventory on their websites "directly to individual advertisers," *id.* ¶ 43 n.4, just as "open web" publisher ad servers do, *id.* ¶¶ 45, 283. When customers produce a product in-house,[1] instead of sourcing it from vendors, in-house products are substitutes that should be included in the relevant market. *See CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 957 (D. Or. 2018) ("As a matter of law, courts have generally recognized that . . . 'captive output' . . . should be included in the same market [as externally sourced products].") (quoting *United States v. Sungard Data Sys.*, 172 F. Supp. 2d 172, 187-88 (D.D.C. 2001)); *see also United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (including self-supplied ingot in the market because Alcoa's manufactured end-products relied on self-supplied ingot and so reduced demand for ingot purchased on the open market).

Plaintiffs identify two examples of publishers, Facebook and Snapchat, that opted not to use Google or other "open web" publisher ad servers and instead built proprietary tools. Compl. ¶ 43 n.4. The fact that publishers elect to build proprietary ad servers in lieu of using third-party vendors like Google demonstrates that the former are a competitive constraint on the latter. *See,*

---

[1] Also referred to in case law as "self-supply," "captive demand," or "captive output."

*e.g.*, *Sungard*, 172 F. Supp. 2d at 187-89 (declining to exclude internal solutions from the relevant market where customers could switch to in-house offerings).

Plaintiffs assert that proprietary closed web tools "offer different functionality, serve distinct needs for publishers, use different pricing structures, and/or monetize different types of digital ad inventory," Compl. ¶ 284, than "open web" publisher ad servers. This is a mere conclusory recitation of legal factors without any alleged facts supporting those factors. Plaintiffs do not explain how the functionality of proprietary tools is any different from that of open web publisher ad servers, how the needs proprietary tools serve are different from those served by open web publisher ad servers, or how pricing structures differ. *See It's My Party*, 811 F.3d at 683 (rejecting a market definition limited to amphitheaters where plaintiffs did not address reasonably interchangeable venues such as similarly sized arenas or stadiums). Nor do Plaintiffs allege any differences between proprietary tools and third-party publisher ad servers in terms of the types of digital ad inventory they help monetize. *See Concord Assocs., L.P. v. Ent. Properties Trust*, 817 F.3d 46, 54 (2d Cir. 2016) (a plaintiff must plausibly allege why other options differ from the products in their proposed market, not "[m]erely assert[] that a commodity is in some way unique" (citation omitted)). Plaintiffs also have not alleged why any differences between proprietary tools and open web publisher ad servers matter to publishers. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1122-23 (9th Cir. 2018) (holding alleged market deficient on motion to dismiss where plaintiffs failed to explain why purported product differences mattered to the consumers).

***Plaintiffs Improperly Exclude Video and Mobile App Ad Publisher Ad Servers from their Alleged Publisher Ad Server Market.*** Plaintiffs take a similar approach to addressing publisher ad servers for video and mobile app ads. After asserting, without factual support, that "video ads" and "mobile app ads" are "distinct from open web display advertising," Compl. ¶ 43 n.4, Plaintiffs

repeat the same conclusory assertion that "alternative products—such as . . . mobile app ad mediation platforms—offer different functionality, serve distinct needs for publishers, use different pricing structures, and/or monetize different types of digital ad inventory," *id.* ¶ 284. Plaintiffs allege no specific facts concerning the ways in which these tools differ from publisher ad servers for open web ads in terms of their functionality, the publisher needs they serve, or their pricing structure.

For these reasons, the alleged market for "publisher ad servers for open web display advertising" is implausible, and Plaintiffs' First Claim for Relief that Google monopolized the alleged market for publisher ad servers should be dismissed.

### B.  Plaintiffs Fail To Plead A Plausible Market For Ad Exchanges.

Plaintiffs' Second ("Monopolization [or in the alternative "Attempted Monopolization"] of the Ad Exchange Market") and Fourth ("Unlawful Tying") Claims for Relief should also be dismissed because Plaintiffs do not allege a plausible relevant market.  Plaintiffs allege a market confined to ad exchanges that run "open auctions" for "indirect open web display advertising transactions" between advertisers and publishers.  *Id.* ¶¶ 290-91, 293.  Their own allegations show that this market excludes reasonably interchangeable substitutes and is unrealistic.

*Plaintiffs Improperly Exclude Social Media Ads, Mobile Ads, and Video Ads from their Alleged Exchange Market.*  By confining their ad exchange market definition to "open web display advertising," Plaintiffs exclude any exchanges or platforms where advertisers can purchase other types of ads, such as mobile app ads and video ads.  *See id.* ¶¶ 43 n.4, 290.  Plaintiffs also exclude "closed web platforms" like social media companies such as Facebook and Snapchat.  *Id.* ¶ 43 n.4.

Yet Plaintiffs do not allege any facts explaining why these are not reasonable substitutes to open web ad exchanges for advertisers looking to purchase ad inventory.[2]  To the contrary, Plaintiffs' own allegations recognize advertisers' willingness to move their dollars from one type of advertising to another, and from an open to a closed web ad platform.  For example, Plaintiffs allege that the same advertisers buy both static image and YouTube video ad inventory.  *Id.* ¶ 64.  They similarly allege that the same advertisers buy both Facebook or Instagram mobile app ad inventory and "open web" ad inventory.  *Id.* ¶¶ 188-89.  Plaintiffs further allege that Facebook was able to "satisfy [] unmet advertising demand" by offering its advertiser customers access to "open web" inventory when demand for ads on Facebook's "closed" properties "threatened to outpace available inventory."  *Id.* ¶¶ 43 n.4, 188-89.  And Plaintiffs recognize that return on investment is how advertisers judge advertising performance, *id.* ¶¶ 58, 174, which confirms that advertisers spend where they find greatest returns, regardless of the type of ad or ad platform.

Plaintiffs' artificial "open web display" limitation therefore makes their ad exchange market definition implausible.  *See, e.g.*, *Am. Online*, 49 F. Supp. 2d at 858; *see also In re Google Digit. Advert. Antitrust Litig.*, 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021) (finding the advertiser plaintiffs' alleged market for "online display advertising services" on the "open web" deficient where it excluded "social-media display advertising and direct negotiations"); *Hicks*, 897 F.3d at 1121-22 (rejecting plaintiffs' alleged markets as implausible for excluding various forms of substitutable digital and non-digital advertising).

***Plaintiffs Improperly Exclude Display Ad Sales Negotiated Directly Between Publishers and Advertisers from Their Alleged Exchange Market.***  By confining their ad exchange market

---

[2] As in their other market definitions, Plaintiffs offer only a bare assertion that these substitutes differ in terms of "inventory type, use cases, functionality, inventory constraints, and/or monetization" without providing any facts that describe how.  Compl. ¶ 291.

definition to "indirect" display ads sold in "open auctions," Plaintiffs improperly exclude any display ad sales that are directly negotiated between advertisers and publishers or made through exchange auctions that are not "open" to all buyers.  *See* Compl. ¶¶ 201, 286, 290-91.

Plaintiffs do not allege specific facts to explain why direct sales are not reasonable substitutes for ads sold in exchanges.  Plaintiffs offer that direct sales are done "outside of open auctions," *id.* ¶ 286, but their allegations show that direct sales and open auctions serve the same purposes: both facilitate display ad transactions; both allow "programmatic" ad purchasing; and both provide access to ad inventory offered through publisher ad servers.  *Id.* ¶¶ 46, 286.  Plaintiffs also acknowledge that publishers substitute between direct and indirect sales channels depending on demand from each.  In fact, Plaintiffs' allegations show that one of Google's ad server product features at issue in the case—Enhanced Dynamic Allocation—promotes competition between direct and indirect sales channels.  *See id.* ¶ 120 ("Enhanced dynamic allocation allowed Google's ad exchange to win the impression as long as it was willing to pay more than Google's own estimate of the 'value' of fulfilling the terms of the direct contract.").  Plaintiffs similarly fail to explain why advertisers' direct purchases of display ad inventory through publishers' in-house ad tech tools are not reasonable substitutes for indirect purchases of display ad inventory through ad exchanges.  Indeed, that proposition is inconsistent with other allegations in the Complaint.  For example, Plaintiffs allege that Facebook enables advertisers to use its in-house ad tech tool both to directly purchase ad inventory on Facebook properties (e.g., Instagram) and to indirectly purchase ad inventory on properties of third-party publishers sold through ad exchanges.  *See id.* ¶¶ 188-89.

Plaintiffs' exclusion of "direct" ad sales therefore makes their exchange market definition implausible.  *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1326-27 (4th Cir.

1995) (describing a market for "advertising dollars" and rejecting a market limited to services provided by cable television sales representatives where such representatives competed against other interchangeable media for advertiser spend); *United Mag. Co. v. Murdoch Mags. Distrib., Inc.*, 146 F. Supp. 2d 385, 401 (S.D.N.Y. 2001) (a plaintiff attempting to limit a market to one method of distribution must "allege that enough customers do not view other methods of distribution as viable substitutes to the distribution method in question" (internal marks omitted)), *aff'd sub nom. United Mag. Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008).

*Plaintiffs Improperly Exclude Auctions With Fewer Buyers from Their Alleged Exchange Market.*  Plaintiffs confine their alleged exchange market to auctions that are open to all buyers (which they call "open auctions").  They exclude auctions that are "limited to a small set of buyers."[3]  Compl. ¶¶ 201, 286.  But Plaintiffs allege no facts to show why auctions "limited to a small set of buyers" are not reasonable substitutes for those open to a larger number of participants.  To the contrary, Plaintiffs acknowledge both types of auctions are offered on Google's ad exchange and other third-party ad exchanges.  *See id.* ¶¶ 286-87.  As with their limitation only to indirect ad sales, Plaintiffs' limitation only to "open auctions" makes their exchange market definition deficient.  *See, e.g.*, *Thompson Everett, Inc.*, 57 F.3d at 1326-27; *United Mag. Co.*, 146 F. Supp. 2d at 401.

For the foregoing reasons, Plaintiffs' alleged relevant market for "ad exchanges for indirect open web display advertising" is implausible.  On that basis alone, Plaintiffs' Second and Fourth Claims for Relief should be dismissed.

---

[3] Plaintiffs allege that AdX's share of wins is more than 50% of "open web advertisements sold via open auctions."  Compl. ¶ 292.  This reflects that Plaintiffs are shrinking their already narrow market to "ad exchanges for indirect open web display advertising" *that is sold via open auction*.

### C.  Plaintiffs Fail To Plead A Plausible Market For Advertiser Ad Networks.

Plaintiffs' Third Claim for Relief ("Monopolization of the Advertiser Ad Network Market") should be dismissed because Plaintiffs do not plausibly allege a relevant market for advertiser ad networks.  Plaintiffs allege a market for "[a]dvertiser ad networks for open web display advertising," which they describe as "easy-to-use, self-service bidding tools that facilitate ad placement on open web display ad inventory."  Compl. ¶ 297.  Plaintiffs' alleged market excludes, among other alternatives, ad networks that facilitate the sale of social media or in-app ads, *id.* ¶ 300.  Like their other two market definitions, this alleged market is implausible.

***Plaintiffs Improperly Exclude Social Media and Mobile Ads from their Alleged Ad Network Market.***  As with Plaintiffs' ad exchange market definition, one fatal defect in Plaintiffs' alleged advertiser ad network market is that it is confined to networks facilitating "open web display" ad transactions.  That limitation excludes ad networks or other platforms enabling advertisers to purchase other types of ad inventory.  Yet, as discussed above, Plaintiffs' own allegations indicate that advertisers actually do substitute between "open web display" inventory and other types of ad inventory.  *See, e.g.*, *Am. Online*, 49 F. Supp. 2d at 858; *see also In re Google Digit. Advert.*, 2021 WL 2021990, at *3.  Plaintiffs allege no facts supporting their assertion that advertisers would not move their dollars from "open web" ad inventory to, for example, ad inventory on social media or in mobile apps, other than suggesting that social media or app ad networks have "more limited reach" (i.e., there are fewer users viewing social media properties).  *See* Compl. ¶ 300.  Plaintiffs offer no support for that allegation, nor any explanation for their implausible alleged market, which suggests that users on social media sites are "distinct for advertising purposes" from users on the "open web."  *Hicks*, 897 F.3d at 1122.

Plaintiffs' allegations regarding competition between Google's and Facebook's respective advertiser ad networks also undercut Plaintiffs' alleged "open web" advertiser ad network market.

14

Compl. ¶¶ 187-95.  Plaintiffs allege that Google viewed Facebook's Audience Network ("FAN") as a "unique competitive challenge" to its Google Ads ad network with "a massive amount of valuable data."[4]  *Id.* ¶ 191.  That kind of head-to-head competition means that providers belong in the same relevant market.  *See Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1322 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987) (holding that the relevant market should include competitors' products where there was "evidence of customers switching service" from defendant's products to competitors'); *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("[T]he relevant market must include the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." (internal marks and citation omitted)).

Plaintiffs' failure to plausibly allege a market for advertiser ad networks provides a ground for dismissal of their Third Claim for Relief that alleges Google has monopolized the advertiser ad network market.

For each of the alleged relevant markets discussed above, Plaintiffs have failed to make the kind of specific factual allegations necessary to survive a motion to dismiss, despite significant pre-complaint discovery.  Because all of Plaintiffs' claims depend on their deficient market definitions, their entire complaint should be dismissed.

---

[4] Indeed, Plaintiffs allege that Facebook's ad network served millions of advertisers, while Google's ad network served only two million advertisers, suggesting that Facebook's ad network is the larger of the two.  *Compare* Compl. ¶ 190 (FAN is a "large ad network connected to millions of Facebook advertisers"), *with id.* ¶ 77 (Google Ads represents "over two million advertisers").  That also undercuts Plaintiffs' claim that Google's ad network has market power.

## II.   PLAINTIFFS FAIL TO ALLEGE THAT GOOGLE HAS EVER HAD MONOPOLY POWER IN A MARKET FOR AD EXCHANGES.[5]

Plaintiffs' Second Claim for Relief should be dismissed because, in addition to failing to plausibly allege a relevant market for ad exchanges, Plaintiffs have not alleged sufficient facts to show that Google possesses monopoly power (or the dangerous probability of monopoly power) in such a market.  To the contrary, they allege only that Google's AdX ad exchange was "nascent" when it "relaunch[ed]" in 2009 and that, over the next 14 years, its market share grew to "more than 50%" today.  Compl. ¶¶ 103, 292.

These allegations do not plausibly allege monopoly power in the ad exchange market because the Fourth Circuit has consistently held that monopoly power is established only where the defendant controls "'seventy to one-hundred per cent of the relevant market.'"  *Kolon Indus.*, 637 F.3d at 450 (quoting *White Bag Co. v. Int'l Paper Co.*, 579 F.2d 1384, 1387 (4th Cir. 1974)).  Indeed, market shares greater than 50% but less than 70% have regularly been rejected by courts in the Fourth Circuit as evidence of monopoly power.  *It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 499-500 (D. Md. 2015) (60-66% share insufficient), *aff'd*, 811 F.3d 676 (4th Cir. 2016); *First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.*, 2013 WL 6234598, at *12 (D. Md. Nov. 13, 2013) (dismissing monopolization claim where allegations "f[e]ll short" of 70% share); *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 394 (M.D.N.C. 2002)

---

[5] While Judge Castel found that the States in *In re Google Digital Advertising Antitrust Litigation* had adequately pled that Google possesses monopoly power in the ad exchange market under Second Circuit law, 2022 WL 4226932, at *7, Plaintiffs' allegations here are far different, as is Fourth Circuit law.  First, as discussed in this Section, Plaintiffs' 50% market share allegations are dramatically below the standard 70% threshold in this Circuit such that they cannot plausibly infer monopoly power.  Plaintiffs' shares also are materially below the 60% share alleged by the States.  Third Am. Compl. ¶¶ 151-53, *In re Google Dig. Advert.*, 2022 WL 4226932 (S.D.N.Y. Jan. 14, 2022), ECF No. 195.  Second, Judge Castel's decision was based exclusively on market shares.  As discussed in this Section, not only do Plaintiffs fail to allege adequate market shares, they also do not plausibly allege other factors that would support an allegation of monopoly power in the face of such low shares.

(51.3% share insufficient), *aff'd*, 67 F. App'x 810 (4th Cir. 2003).  Having never alleged that Google's share of a purported ad exchange market approaches anywhere close to 70%, Plaintiffs' claim that Google monopolized that market fails out of the gate.

Plaintiffs' other allegations cannot make up for their failure to claim that Google's share of the alleged ad exchange market exceeds 70%.  For instance, Plaintiffs allege that "another approximately 7% of all U.S. advertising impressions" are won through Google's Open Bidding system.  Compl. ¶ 293.  But as Plaintiffs acknowledge, Google's Open Bidding system is a tool used by *rival exchanges* to purchase ad inventory.  *See id.* (describing Open Bidding as a "system through which other ad exchanges may purchase publisher ad inventory").  Plaintiffs provide no basis to attribute transactions won by its rivals to Google.  Plaintiffs also seek to support an inference that Google possesses monopoly power in the ad exchange market by alleging that Google has relationships with "publishers representing more than 90% of all open web display advertisements available for auction."  *Id.* ¶ 294.  But those relationships arise from Google's purported position in the alleged *ad server market*, which Plaintiffs allege to be distinct from their alleged ad exchange market.  *See id.* ¶¶ 282-96, 337.  And Plaintiffs' other allegations about AdX's alleged advantages—such as its "access to unique sources of demand," "connect[ion] to both a publisher ad server and advertiser buying tool owned by the same company," and alleged conduct that purportedly causes publishers not to "rely[] exclusively on alternative ad exchanges," *id.* ¶¶ 295-96—all fail to show monopoly power because, under Plaintiffs' own theory, competing ad exchanges continue to win nearly half of all impressions, notwithstanding those alleged advantages.  *See id.* ¶ 292 (implying that non-Google ad exchanges win about 50% of impressions because Google's exchange wins "more than 50%").

Plaintiffs' claims of attempted monopolization of the ad exchange market likewise fail. Although attempted-monopolization claims require them to "demonstrat[e] the dangerous probability of monopolization" with allegations of "the defendant's economic power in that market," *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993), Plaintiffs claim only that AdX's share grew from essentially zero when it "relaunched in 2009" to "more than 50%" today. Compl. ¶¶ 103, 292. Plaintiffs have not provided enough specific factual allegations to show when, if ever, Google supposedly came dangerously close to monopolizing the alleged ad exchange market. *See M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992) (endorsing view that "claims of less than 30% market shares should presumptively be rejected" and claims "involving between 30% and 50% shares should usually be rejected, except when conduct is very likely to achieve monopoly"). Indeed, that AdX today allegedly wins only about half of impressions after 14 years of supposed exclusionary conduct suggests that Google is nowhere close to monopolizing the alleged ad exchange market. *See, e.g.*, *Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 110 (1st Cir. 1997) ("'We would find attempt claims presumptively implausible if the challenged conduct has been in place for at least two years and the remaining market remains robustly competitive.'" (internal citation omitted)); *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 2016 WL 3567059, at *10 (E.D. La. July 1, 2016) (concluding that the "lack of movement in [the defendant's] market share suggests that its conduct did not make it likely to achieve monopoly").

Finally, even if Plaintiffs had alleged facts showing that Google possesses monopoly power (or a dangerous probability of achieving monopoly power) *today*, large swaths of Claim Two should still be dismissed because Plaintiffs have failed to allege that Google possessed monopoly power (or a dangerous probability of achieving it) in the alleged ad exchange market *at the time*

that Google engaged in much of the conduct that they claim "establish[ed] or maintain[ed] an ad exchange monopoly."  *See* Compl. ¶ 319 (identifying 10 types of alleged exclusionary conduct).[6] For example, Plaintiffs allege no facts showing that Google even participated in the ad exchange market at the time it acquired DoubleClick in 2008, much less that it had monopoly power or was dangerously close to it then.  *Id.* ¶¶ 16, 103.  While Google had "relaunch[ed]" AdX by the time it acquired Admeld in 2011, *id.* ¶¶ 103, 146, Plaintiffs' Complaint includes no allegations about whether AdX had monopoly power (or a dangerous probability of achieving it) in the alleged ad exchange market by then.

## III.   PLAINTIFFS FAIL TO PLEAD THAT GOOGLE'S ACQUISITIONS OF DOUBLECLICK AND ADMELD HARMED COMPETITION.

In Claims One and Two, Plaintiffs list Google's acquisitions of DoubleClick and Admeld as two types of supposedly "exclusionary conduct" supporting their claims for monopolization (or attempted monopolization) of the alleged ad server and ad exchange markets.  Compl. ¶¶ 312(1), 312(6), 319(1), 319(6), 326(1), 326(6).  Yet they do not make factual allegations that the acquisitions were themselves anticompetitive.  And for good reason.  When the FTC and DOJ reviewed those acquisitions prior to their closing, the federal antitrust enforcement agencies chose not to challenge them after conducting in-depth investigations of their likely competitive consequences.  *Id.* ¶¶ 81-82, 151.[7]  The factual allegations in the Complaint fail to show that the

---

[6] *See HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 550 (8th Cir. 2007) ("Dangerous probability of successes should be evaluated as of when the alleged anticompetitive events occurred.") (internal quotation marks omitted); *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 474-75 (5th Cir. 2000) (same); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979) (noting that the same conduct that might be unlawful when taken by a monopolist "might be considered harmless or even 'honestly industrial'" if it were taken by a smaller firm (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 431 (2d Cir. 1945)).
[7] In reviewing the DoubleClick acquisition, the FTC conducted "over 100 interviews," reviewed "more than 2 million pages of documents" from the parties and thousands more documents obtained from third parties.  App. A, Fed. Trade Comm'n, FTC File No. 071-0170, *Statement Concerning Google/DoubleClick* (Dec. 20, 2007), at 1 n.2.  Similarly, the DOJ "obtained extensive

agencies should have sought to block the DoubleClick and Admeld transactions when they reviewed them the first time.

### A.  Plaintiffs Fail To Allege That TheDoubleClick Acquisition Was Anticompetitive.

Plaintiffs allege that the DoubleClick acquisition "set the stage for . . . later exclusionary conduct," Compl. ¶ 16; *see also id.* ¶¶ 80, 88, but they offer no factual allegations to show that the DoubleClick transaction was anticompetitive on its own.  For instance, Plaintiffs do not allege that the DoubleClick transaction eliminated any competition between Google and DoubleClick.  *See, e.g.*, *id.* ¶ 78 (alleging that Google's ad server had "failed to gain traction" before the DoubleClick acquisition).

Nor do Plaintiffs' allegations show that the DoubleClick acquisition caused Google to restrict rivals' access to Google Ads advertisers.  To the contrary, Plaintiffs recognize that, from its beginnings in 2003, Google Ads bids were not available to rivals.  *See id.* ¶ 77-78.  After acquiring DoubleClick, Google allegedly kept in place the restriction on "Google Ads' purchasing of display inventory to sources controlled by Google."  *See id.* ¶ 91.  Plaintiffs also contend that Google, several years after the acquisition, "disadvantaged" bids that Google Ads made on rival ad exchanges when it "finally allowed Google Ads" to submit bids to Google rivals in some circumstances.  *See id.* ¶ 100.  In other words, Plaintiffs offer no facts to support the notion that, if

_____

information from Google, Admeld and a wide range of market participants in connection with its merger investigation of the [Admeld] transaction," concluding it was "not likely to substantially lessen competition in the sale of display advertising."  App. B, U.S. Dep't of Just., *Statement of the Dep't of Just. Antitrust Div. on Its Decision to Close Its Investigation of Google Inc.'s Acquisition of Admeld Inc.* (Dec. 2, 2011), at 1.  The Court can take judicial notice of facts contained in documents referred to in the Complaint without converting Google's motion to dismiss into a motion for summary judgment.  *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011); *McArthur v. Brabrand*, 610 F. Supp. 3d 822, 831 n.2, 841 n.12 (E.D. Va. 2022) (courts can take judicial notice of facts contained in government agency statements not "subject to reasonable dispute").

only it had not acquired DoubleClick, Google would have suddenly made Google Ads advertisers more available to rivals when Google had never done so before.[8]  Without that type of detail, courts have been rightly skeptical of antitrust agencies' unfounded speculation about how firms would have behaved or how markets would have developed absent an acquisition.  *See United States v. UnitedHealth Grp. Inc.*, 2022 WL 4365867 at *16 (D.D.C. 2022) (identifying "the central problem" with claim as its reliance "on speculation rather than real-world evidence that events are likely to unfold as the Government predicts"); *FTC v. Meta Platforms Inc.*, 2023 WL 2346238 at *27 (N.D. Cal. Feb. 3, 2023) (rejecting government's argument as "impermissibly speculative"); *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 246 (D.D.C. 2018) (describing government's theory as "overly speculative"), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).

Plaintiffs cannot plausibly allege that the DoubleClick acquisition was anticompetitive based on allegations of Google's subsequent conduct.  In a case with parallels to this one, Judge Trenga dismissed a Clayton Act challenge to an acquisition (of patents) when "the complained-of anticompetitive effects do not arise from [an] acquisition . . . but from conduct that post-dates the acquisition."  *See Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 2013 WL 6682981, at *9 (E.D. Va. Dec. 18, 2013).  And the DOJ recognizes that the same reasoning should apply to a Sherman Act claim, explaining that "[d]ismissal is proper" when a plaintiff fails to "allege facts that would allow a court to conclude Defendants actually reduced competition through" the acquisition itself.[9]

---

[8] Plaintiffs' invitation to speculate that Google would have departed from its prior course of declining to provide Google Ads bids to rivals—and, on that basis, find the DoubleClick acquisition anticompetitive—ignores the Supreme Court's holding that refusals to deal with rivals are not anticompetitive when a company has had no prior course of dealing with rivals.  *See Verizon Commc'ns., Inc. v. L. Offs. of Curtis V. Trinko*, LLP, 540 U.S. 398, 409 (2004); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012); *In re Google Digit. Advert.*, 2022 WL 4226932, at *22-23.

[9] U.S. Dep't of Just. Amicus Brief at 5, 16-17, *Intel Corp. v. Fortress Inv. Grp., LLC*, 511 F. Supp. 3d 1006 (N.D. Cal. Mar. 20, 2020) (emphasis removed).

As explained above, that is exactly what Plaintiffs have failed to do here: they have alleged no facts showing that the DoubleClick acquisition on its own reduced competition in any market. To the contrary, Plaintiffs' own allegations show that the DoubleClick acquisition was procompetitive: they recognize that the transaction gave advertisers using Google Ads "access to more advertising opportunities," Compl. ¶ 14, and "benefited" them by "increasing their access to inventory," *id.* ¶ 78.

### B.   Plaintiffs Fail To Allege That The Admeld Acquisition Was Anticompetitive.

Plaintiffs fail to allege that Google's acquisition of Admeld eliminated competition between Google and Admeld because Plaintiffs allege that Admeld operated a yield manager, while Google operated a publisher ad server and an ad exchange. *Id.* ¶ 23. Plaintiffs do not allege that Admeld operated a publisher ad server or ad exchange. *See, e.g., id.* ¶ 146. Moreover, Plaintiffs allege that yield managers are not part of the same antitrust market as publisher ad servers or ad exchanges. *See, e.g., id.* ¶ 284 ("there are no reasonable substitutes for publisher ad servers"); *id.* ¶ 291 ("there are no reasonable substitutes for ad exchanges").

Although Plaintiffs contend that Admeld's yield management technology threatened Google's publisher ad server, *id.* ¶ 146, they fail to allege facts showing that the Admeld acquisition in particular harmed competition. For that theory to be plausible, Plaintiffs would need to establish at a minimum that, but for the acquisition, yield managers would have developed into meaningful competitors to publisher ad servers, but their allegations show the opposite. For instance, Plaintiffs concede that, in addition to Admeld, there were at least two other "[k]ey [yield manager] competitors" at the time of the acquisition, *id.* ¶ 148, and they fail to explain why, after Google acquired Admeld, the two remaining "key" yield managers did not continue to threaten Google's ad server. *Cf. Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 559 (9th Cir. 2018) (affirming dismissal because plaintiffs failed to sufficiently "demonstrate how the acquisitions

22

unreasonably restricted competition" when "a significant competitor" remained after the acquisitions).  Nor do Plaintiffs provide any reason to believe that Admeld would have succeeded where these other two "key" firms apparently (in Plaintiffs' view) did not.  In the absence of such allegations, Plaintiffs' speculation about how markets might have evolved fails to show that the Admeld transaction was anticompetitive, *see, e.g.*, *UnitedHealth Grp. Inc.*, 2022 WL 4365867 at *16, particularly when it contradicts DOJ's own contemporaneous assessment of the transaction, *see* Compl. ¶ 151.

## IV.   PLAINTIFFS FAIL TO PLEAD THAT RESTRICTING GOOGLE ADS DEMAND TO GOOGLE'S PRODUCTS IS ANTICOMPETITIVE.

Claims One, Two, and Four should be dismissed to the extent they are based on Google's purported refusal to deal with rivals.  Plaintiffs allege that "Google restricted Google Ads' purchasing of display inventory to sources controlled by Google," with the goal of "lock[ing] publishers into its ad exchange and publisher ad server, and block[ing] competing ad exchanges and publisher ad servers from accessing" Google Ads' advertisers.  Compl. ¶ 91.

As "a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Trinko*, 540 U.S. at 408 (*quoting United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  The Supreme Court has explained that "[c]ompelling . . . firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law" because it "may lessen the incentive for the monopolist, the rival, or both to invest in . . . economically beneficial facilities"; courts are "ill suited" to act as "central planners" enforcing required dealing; and compelling cooperation between competitors "may facilitate the supreme evil of antitrust: collusion."  *Trinko*, 540 U.S. at 407-08.

Courts have recognized an exception to the general rule that firms have no duty to deal with rivals grounded in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), where "'[t]he unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end.'" *Loren Data*, 501 F. App'x at 283 (quoting *Trinko*, 540 U.S. at 409).

But because Plaintiffs do not allege that Google terminated a voluntary, profitable prior practice of granting rival ad servers or ad exchanges access to Google Ads advertisers, Plaintiffs have not plausibly alleged an unlawful refusal to deal. Unlike in *Aspen Skiing*, where the defendant had a long-term, voluntary, and profitable pre-merger course of dealing with a rival, which it terminated after it grew by acquiring another rival, *Aspen Skiing*, 472 U.S. at 603, Plaintiffs do not allege that Google has ever tightened the restrictions on where Google Ads could purchase ad inventory. If anything, they allege that Google loosened the alleged restrictions over time, first expanding from "advertising space on Google's search results page. . . [to] advertising space on non-Google websites," Compl. ¶¶ 77-78, and then (sometime after the acquisition of DoubleClick) to non-Google exchanges, *id.* ¶ 99. That does not describe an unlawful refusal to deal. *See Loren Data*, 501 F. App'x at 283; *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52-53 (2d Cir. 2007); *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993 (9th Cir. 2020); *FTC v. Facebook, Inc.*, 2021 WL 2643627, at *17 (D.D.C. June 28, 2021) ("Facebook's general policy of [refusing to interoperate its products with those of] competitors . . . was plainly lawful to the extent it covered rivals with which it had no previous, voluntary course of dealing."). As such, Claims One, Two, and Four should be dismissed to the extent they rely on this conduct.

**V.    PLAINTIFFS FAIL TO PLEAD THAT CERTAIN PRODUCT DESIGNS HARMED COMPETITION IN THE MARKET FOR PUBLISHER AD SERVERS.**

In *In re Google Digital Advertising Antitrust Litigation*, Judge Castel ruled on allegations regarding Dynamic Revenue Sharing (DRS), 2022 WL 4226932, at *29-30, Poirot, *id.* at *35-36, and Unified Pricing Rules (UPRs), *id.* at *38-39.  He found that the States in that case plausibly alleged that these product designs harmed competition in the alleged ad exchange market.  However, Judge Castel held that the States' DRS allegations did not plausibly allege harm in the alleged publisher ad server market, and he did not rule on whether their allegations concerning Poirot or UPRs plausibly alleged harm in that market.  Because Plaintiffs' Complaint does not allege facts showing how DRS, Poirot, or UPRs harmed the alleged publisher ad server market, Claim One should be dismissed to the extent it is based on DRS, Poirot, or UPRs.

***Dynamic Revenue Sharing***.  Plaintiffs allege that, through DRS, Google "used the competitive data" from its publisher ad server to "adjust its fees—and in turn its ad exchange's bids . . . to increase the number of competitive transactions won by Google's ad exchange. . . ." Compl. ¶ 198.  Judge Castel held that the States' DRS allegations, which amounted to "how publishers were misled about [DRS'] implementation," did not show harm to an alleged publisher ad server market.  *See In re Google Digit. Advert.*, 2022 WL 4226932, at *30.  Plaintiffs here similarly fail to allege harm to the alleged publisher ad server market.  While they allege that DRS pushed more transactions "through the Google ad exchange and away from rival ad exchanges," Compl. ¶ 198, and "doubled down on the benefits Google afforded its ad exchange," *id.* ¶ 199, they do not allege that DRS caused the exclusion of rival publisher ad servers.

***Poirot.***  Plaintiffs allege that Google's Project Poirot was "designed to reduce the flow of DV360 advertiser spend to rival ad exchanges engaged in header bidding and redirect that spend

back to Google's ad exchange," *id.* ¶ 212, by "systematically lowering all DV360 bids to rival ad exchanges that no longer employed second-price auctions," *id.* ¶ 217, and that "[r]ival ad exchanges lost significant transaction volume from Poirot," *id.* ¶ 229.  By contrast, Plaintiffs do not allege that Poirot caused the exclusion of rival publisher ad servers.  *Id.* ¶ 229.

    ***Unified Pricing Rules***.  Plaintiffs allege that, through UPRs, Google removed the "feature in its publisher ad server that allowed publishers to set different floor prices" for different ad exchanges and buying tools.  *Id.* ¶ 236.  They also allege that the "true driver of Unified Pricing Rules" was "preventing publishers from preferencing rival ad exchanges," not rival publisher ad servers, and nowhere do they allege that UPRs excluded rival publisher ad servers or coerced publishers to use Google's publisher ad server.  *Id.* ¶ 242.

    Without allegations that DRS, Poirot, and UPRs harmed competition in the alleged market for publisher ad servers, Plaintiffs' Claim One should be dismissed as to those alleged product designs.

## VI.  THE UNITED STATES' DAMAGES CLAIM SHOULD BE DISMISSED FOR FAILURE TO ALLEGE THAT IT DIRECTLY PURCHASED DIGITAL ADVERTISING.

    In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court "established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers" for damages under § 4 of the Clayton Act.  *Apple v. Pepper*, 139 S. Ct. 1514, 1520 (2019); *Kloth v. Microsoft*, 444 F.3d 312, 319 (4th Cir. 2006) ("[O]nly direct purchasers of products affected by anti-competitive activity can seek treble damages under § 4 of the Clayton Act.  Those who purchase indirectly or through intermediaries are barred from recovering for antitrust injuries.").

    The Supreme Court articulated two practical rationales for this rule.  "First, allowing indirect purchasers to recover damages at each level down the economic chain 'would create a serious risk of multiple liability for defendants.'"  *Kloth*, 444 F.3d at 320 (quoting *Illinois Brick*

*Co.*, 431 U.S. at 730).  "Second, courts would be required to engage in highly complicated calculations to 'apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge.'"  *Id.* (quoting *Illinois Brick Co.*, 431 U.S. at 737).

The United States seeks money damages for indirect purchases under § 4a of the Clayton Act, 15 U.S.C. § 15(a).[10]  It seeks to recover damages as a "buyer[] of open web display advertising" because "United States departments and agencies . . . purchase open web display advertising using Google and non-Google ad tech tools."  Compl. ¶¶ 278, 341.  Nothing in those vague allegations directly connects the United States to sellers of open web display advertising.  To the contrary, Plaintiffs describe a multi-layered "stack" of intermediaries that operate between publishers and advertisers to facilitate display advertising transactions.  *Id.* ¶ 53.  Within that stack, Plaintiffs claim that Google monopolized three layers: publisher ad servers, ad exchanges, and advertiser ad networks.  But Plaintiffs fail to allege that the United States is a direct purchaser in any of these alleged markets.

To start with, Plaintiffs cannot allege that the United States participates directly in either the publisher ad server or the ad exchange markets.  *See id.* ¶¶ 42, 46-48, 53.  As the Complaint acknowledges, publisher ad servers directly interact only with website publishers and ad exchanges, *id.* ¶¶ 42, 46-47, and ad exchanges directly interact only with publisher ad servers (on the sell-side) and DSPs and ad networks (on the buy-side).  *Id.* ¶¶ 42, 48-53.  Because there is no

---

[10] The indirect purchaser bar applies with equal force to the United States.  Passage of § 4a of the Clayton Act was merely intended to overcome a Supreme Court decision omitting the United States from the definition of a "person" under federal antitrust laws. *See U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 745 (2004) (explaining that 15 U.S.C. § 15a was created to allow the United States to sue for damages); *see also* 101 Cong. Rec. 9165 (1955) (statement of Sen. Kilgore) (discussing closure of a "present loophole in the law").  Other than swapping out "person" for "United States," the language of § 4 and § 4a is nearly "identical." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 265 (1972).

allegation that advertisers such as the United States directly interact with publisher ad servers or ad exchanges, any indirect damages flowing from alleged monopolization of those markets are barred by *Illinois Brick*.

While advertisers do sometimes directly interact with ad networks and DSPs, Plaintiffs do not allege either that Google monopolized the market for DSPs or that the United States purchases digital ads directly through ad networks.  Instead, Plaintiffs vaguely claim only that the United States "purchase[d] open web display advertising using Google and non-Google ad tech tools." *Id.* ¶ 278.  That allegation does not allow the United States to pursue damages for monopolization of a DSP market because Plaintiffs assert no such claim.  Nor does it allow the United States to pursue damages for monopolization of the alleged ad network market because it does not indicate that the United States directly purchased digital ads using ad networks.  *Id.* ¶¶ 50, 55.  Indeed, the Complaint suggests that the United States purchased through Google's DSP, rather than Google Ads, because it asserts that DSPs are more commonly used by large advertisers.  *Id.* ¶¶ 49, 209.

The link between the United States and the purchase of any actual digital ad is further attenuated by Plaintiffs' recognition that advertisers often use ad agencies as intermediaries to purchase impressions.  *Id.* ¶ 49.  Where, as here, "a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft*, 556 U.S. at 678 (internal quotation marks and citation omitted).  Because Plaintiffs fail to allege that the United States purchases digital ads directly through ad networks as required by *Illinois Brick*, their damages claim should be dismissed.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that this Court dismiss Claims One through Five of Plaintiffs' Complaint in full.

Dated: March 27, 2023

Respectfully submitted,

Eric Mahr (*admitted pro hac vice*)
Andrew Ewalt (*pro hac vice forthcoming*)
Julie Elmer (*pro hac vice forthcoming*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com
andrew.ewalt@freshfields.com
julie.elmer@freshfields.com
tyler.garrett@freshfields.com

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
CRAIG C. REILLY, ESQ.
209 Madison Street
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Daniel Bitton (*pro hac vice forthcoming*)
AXINN, VELTROP & HARKRIDER LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
Koren Wong-Ervin (*pro hac vice forthcoming*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendant Google LLC*