**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| **UNITED STATES**, *et al.,* | |
| *Plaintiffs*, | |
| - against - | **Civil Action No. 1:23-cv-00108-LMB-JFA** |
| **GOOGLE LLC,** | |
| *Defendant*. | |

## GOOGLE LLC's FIRST SET OF REQUESTS FOR PRODUCTION TO THE UNITED STATES

Pursuant to Federal Rules of Civil Procedure 26 and 34 ("Federal Rules"), Defendant Google LLC hereby requests that Plaintiff United States produce documents responsive to the requests set forth below.

## INSTRUCTIONS

1.     In addition to the specific instructions set forth below, these Requests incorporate the instructions set forth in Federal Rules 26 and 34, the Local Rules of the United States District Court for the Eastern District of Virginia ("Local Rules"), the Stipulation and Order Regarding Discovery Procedure ("ESI Order") (to be entered), and the Confidentiality Order (to be entered), or the operative version of those Orders in place at the time production is made. Subject to a valid claim of privilege, please produce the entire document if any part of that document is responsive.

2.     Please produce all requested documents in Your possession, custody, or control, or available to You, or to which You may gain access through reasonable effort, including

1

information in the possession of Your past and present attorneys, representatives, investigators, consultants, agents, or other persons directly or indirectly employed or retained by You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name, or otherwise under Your control.

3.      Pursuant to Federal Rule 34, documents must be produced either: (a) as they are kept in the usual course of business (in which case they must be produced in such fashion as to identify the agency, department, or office in whose possession the document was found or the server or central file in which it was found, and the address of each document's custodian(s)), or (b) segregated as responsive to a specific Request enumerated herein, with such specific Request identified.

4.      If any portion of any document is responsive to any Request, a legible version of the entire document must be produced, together with all non-identical copies, versions, and drafts of that document, including all attachments and enclosures.

5.      You must retain all of the original documents for inspection or copying throughout the pendency of this Action, any appeal(s), and any related proceedings.

6.      You must produce all documents and associated metadata according to the Federal Rules, Local Rules, and, when entered, the governing ESI Order for this Action. Provide instructions and all other materials necessary to use or interpret Your data compilations, such as a data dictionary, with Your production.

7.      Data and materials that are stored electronically or in machine-readable form should be produced in accordance with the governing ESI Order for this Action.

8.      If You object to all or any portion of any of the below Requests, You must identify the objectionable Request or portion thereof, and the nature and basis of the objection.

Notwithstanding any objection to any portion of any Request, You must produce all documents and information to which such objection does not apply.

9.      If any document responsive to a particular Request no longer exists for reasons other than Your document retention policy, describe the circumstances under which it was lost or destroyed, describe the information lost or destroyed, identify the Request to which it was responsive, and identify persons with knowledge of the document.

10.     If You are unable to produce a document that is responsive to a Request, describe the document, state why it cannot be produced and, if applicable, state the whereabouts of such document when last in Your possession, custody, or control.

11.     If there are no documents or information responsive to all or any portion of any Request, so state in writing.

12.     Other than redactions of privileged information, documents are to be produced in full. If any requested document cannot be produced in full, or if You withhold production of any document or portion of any document responsive to these Requests based upon any privilege, protection, or immunity, produce it to the extent possible and provide the privilege log information set forth in the governing ESI Order, once entered.

13.     In construing the Requests herein:

   a.  Terms not specifically defined shall be given their ordinary meaning as You understand them to be used in the trade;

   b.  The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, whenever necessary, to bring within the scope of any Request all information that might otherwise be construed to be outside its scope;

c. The use of the singular form of any word includes the plural and vice versa;

d. Words in the masculine, feminine, or neutral gender shall include each of the other genders;

e. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope;

f. The terms "all," "any," and "each" shall each be construed as encompassing any and all.

14.    None of the Definitions or Requests set forth herein shall be construed as an admission relating to the existence of any evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in the Definitions or the Requests.

15.    These Requests are continuing in nature. In the event that You become aware of responsive documents or information in addition to, or in any way inconsistent with, that which You previously have produced, prompt supplementation of Your responses is required.

16.    Google specifically reserves the right to seek supplementary responses and the additional supplementary production of documents before trial.

17.    Unless otherwise stated, the Requests call for the production of documents from the Relevant Period.

**DEFINITIONS**

1.    To the extent the terms defined below are used in the Requests, they should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the

Federal Rules and the Local Rules. These Definitions are provided solely for the purposes of these Requests for Production.

2.       The term "**Action**" refers to the above-captioned litigation, *United States, et al. v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.).

3.       The term "**Ad Blocking Tool**" shall mean any browser extension or software that prevents ads from being displayed to Users through their web browser.

4.       The term "**Ad Buying Tool**" shall mean any third-party or In-House software, application, service, tool, or other interface (including DSPs and Ad Networks) through which an Advertiser Purchased or can Purchase Inventory.

5.       The terms "**Ad Exchange**" or "**Supply-Side Platform**" or "**SSP**" shall mean a third-party or In-House product or service through which two or more Ad Buying Tools (at least one of which is not owned or controlled by the entity operating the Ad Exchange) placed or can place Bids in real-time auctions for Inventory offered for sale by or on behalf of two or more Publishers (at least one of which is not owned or controlled by the entity operating the Ad Exchange).

6.       The term "**Ad Network**" shall mean a third-party or In-House product or service (other than an Ad Exchange) through which two or more Advertisers (at least one of which is unaffiliated with the entity operating the Ad Network) Purchased or can Purchase Inventory offered for sale by two or more Publishers (at least one of which is unaffiliated with the entity operating the Ad Network).

7.       The term "**Ad Selling Tool**" shall mean any third-party or In-House software, application, service, tool, or other interface (including Publisher Ad Servers, Ad Exchanges, Ad

Networks, SSPs, Header Bidding, or Header Bidding Wrappers) through which a Publisher sold or can sell Inventory.

8.      The terms **"Ad Tech"** or **"Ad Tech Product"** shall mean a product, service, application, tool, solution, or other interface that facilitates or is involved in the Purchase or sale of Inventory, including but not limited to a Publisher Ad Server, Ad Exchange, Ad Network, Header Bidding, Header Bidding Wrapper, DSP, SSP, other Ad Buying Tool, or other Ad Selling Tool. For the avoidance of doubt, this term includes In-House Ad Tech Products, as well as products or services offered by social media outlets (including but not limited to, for example, Facebook.com and Twitter.com) and certain other Publishers that enable the Purchase of Inventory on their Properties via their own In-House Ad Tech Products. This term does not include general-purpose software or systems on which an Ad Tech Product relies.

9.      The term **"Ad Tech Provider"** shall mean a person, firm, association, or other entity selling, reselling, licensing, or otherwise providing at least one Ad Tech Product, whether or not for a fee or other compensation.

10.     The term **"Advertiser"** shall mean a person or entity that, directly or through one or more intermediaries, places one or more Display Advertisements intended to advertise or promote a good or service offered by that person or entity, or otherwise convey such person or entity's desired message, on a Publisher's Property so that it is viewed by at least one User visiting such Property. For the avoidance of doubt, Advertisers typically, but need not, pay for the placement of such Display Advertisements.

11.     The term **"Agency"** shall mean an advertising agency or similar consulting firm that is hired by an Advertiser to manage the Purchase of Inventory for one or more Campaigns.

For the avoidance of doubt, although an Agency may use DSPs or other tools to manage such Campaigns, an entity operating a DSP shall not, solely on that basis, be deemed an Agency.

12.     The term **"Attributed Clicks"** shall mean the number of Clicks determined or estimated by an Advertiser, DSP, Ad Network, Ad Exchange, or other person or entity, in the ordinary course of its business, to have resulted from the display of one or more given Impressions to Users.

13.     The term **"Attributed Conversions"** shall mean the number of instances in which an Advertiser (or a person or entity acting on behalf of such Advertiser) identifies a specific User action that it has defined as valuable to its business, such as an online purchase or phone call, and determines or estimates that action to have resulted, in whole or in part, from the display of one or more Impressions to such User.

14.     The term **"Attributed Sales"** shall mean the total amount of sales of products or services that an Advertiser determines or estimates resulted, in whole or in part, from the display of one or more Impressions to Users.

15.     The term **"Bid"** shall mean an offer, made in response to a Query, to pay a specified amount in exchange for the right to render a Display Advertisement in a unit of Inventory.

16.     The terms **"Bidder"** or **"Buyer"** shall mean an Advertiser submitting a Bid directly to an Ad Exchange or Publisher Ad Server (without an intermediary), or shall mean a DSP, Ad Network, or other person or entity submitting a Bid to an Ad Exchange or Publisher Ad Server on behalf of an Advertiser, whether known at the time or to be subsequently determined. For the avoidance of doubt, an Ad Exchange shall not be deemed a Buyer even if it forwards a Bid it received on to another Ad Exchange or Publisher Ad Server.

17.     The term **"Campaign"** shall mean one or more Display Advertisements that are targeted to particular types of Inventory, Users, or objectives.

18.     The term **"Campaign ID"** shall mean a code (such as an alphanumeric string) used to record, track, or distinguish between different Campaigns.

19.     The term **"Click"** shall mean an instance of a User clicking on a Display Advertisement, thereby causing the rendering of the associated landing page, but excluding instances in which the click was deemed fraudulent, inadvertent, spam, a bot, or otherwise non-genuine.

20.     The term **"communication"** shall mean the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

21.     The term **"Compulsory Process"** means any Civil Investigative Demand, Subpoena, or any other executive or court procedure whereby a person is compelled to respond through testimony, production of documents or other means.

22.     The term "**concerning**" shall mean relating to, referring to, describing, evidencing or constituting.

23.     The term **"Connected Television"** shall mean devices or services that allow Users to watch television content served over the internet on a television screen, such as smart TVs (e.g., Samsung, TCL, Sony), media streaming devices (e.g., Roku Streaming Stick, Apple TV, Chromecast), or video game consoles (e.g., Xbox, PlayStation).

24.     The term **"Cookie Matching"** shall mean the process of mapping a browser to internet browsing activity using a unique ID.

25.     The term **"Cost Type"** shall refer to the basis on which an Advertiser pays for Display Advertising, such as, but not limited to, cost-per-thousand Impressions ("CPM"), cost-per-Click ("CPC"), or cost-per-action ("CPA").

26.     The terms **"Demand-Side Platform"** or **"DSP"** shall mean an Ad Buying Tool, that enables an Advertiser to automatically buy Inventory sold via Ad Selling Tools in real-time on an Impression-by-Impression basis. For the avoidance of doubt, an Agency trading desk shall be deemed a DSP for purposes of this definition.

27.     The term **"Direct Transaction"** shall mean a sale or placement of Display Advertising the price of which was determined through a contractual agreement between an Advertiser (or an Agency acting on an Advertiser's behalf) and a Publisher (without an intervening Ad Tech intermediary), including for the avoidance of doubt an agreement to set such price through an auction conducted by the Publisher itself or an affiliate thereof.

28.     The terms "**Display Advertisement**" or "**Display Advertising**" shall mean Online Advertising *other than* Search Advertising, and shall include Native, banner, in-app, or Video advertising, whether social or non-social.

29.     The term **"document"** shall be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Federal Rule 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

30.     The term **"documents sufficient to show"** means documents sufficient to provide a true and correct disclosure of the factual matter requested.

31.     The term "**Domain Spoofing**" shall mean a practice in which Inventory is misrepresented as being from a different web domain than it actually is.

32.     The term **"Environment"** shall mean the electronic environment in which an Impression is served, meaning in a desktop web browser, in a mobile web browser, in a mobile app (other than a mobile web browser), or via Connected Television.

33.     The term **"Feature"** shall mean any design, feature, limitation, policy, mechanism, innovation, improvement, optimization, or strategy related to how Ad Tech Products buy, sell, price, bid, or auction Inventory, how Ad Tech Products improve ad quality or Match Quality, how Ad Tech Products measure, or report on the effectiveness of Display Advertising, or how Ad Tech Products integrate or interoperate with other Ad Tech Products, whether owned or operated by the same entity or different entities.

34.     The term "**Fees**" shall mean any money retained by a provider of Ad Tech Products, including via Take Rates, for services related to the purchase of Display Advertisements.

35.     The term **"Floor Price"** shall mean the limitation on how low an Advertiser or Ad Buying Tool can Bid for Inventory while still being eligible to win the Impression.

36.     The term **"Format"** shall mean the general makeup or layout of an ad. Different types of Display Advertising Formats include Native Advertising, Instream Video Advertising, Outstream Video Advertising, and Static Advertising.

37.     The term **"Google"** shall mean Google LLC, any current or former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, employees, agents or representatives, and any other person acting on their behalf.

38.     The term "**Guaranteed Transaction**" shall mean a transaction where a specified amount of inventory is purchased.

39.     The term **"Header Bidding"** shall mean the use by a Publisher of code that is directly or indirectly called during the web browser's processing or rendering of the HTML header

of a webpage (and prior to the invocation of a Publisher Ad Server) and that causes Queries to be sent to one or more Ad Exchanges, Ad Networks, DSPs, or other sources of demand.

40.      The term **"Header Bidding Wrapper"** shall mean a Header Bidding management system.

41.      The term "**identify,**" when referring to a person, shall mean to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

42.      The term "**identify,**" when referring to documents, shall mean to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

43.      The terms **"impact"** and **"effect"** shall include both qualitative and quantitative, direct and indirect meanings of those terms.

44.      The term **"Impression"** shall mean the service of a single Display Advertisement to a single User.

45.      The term **"In-House Ad Tech Product"** shall mean an Ad Tech Product created for a Publisher's, Advertiser's, or Agency's internal use.

46.      The term **"including"** shall mean including but not limited to.

47.      The term **"Indirect Transaction"** shall mean a sale or placement of Display Advertising other than a Direct Transaction, including an Open Auction Transaction or Private Auction Transaction conducted by an Ad Exchange or a Purchase of Inventory by an Ad Network for resale to one or more Advertisers.

48.     The term **"Instream Video Advertising"** shall mean Online Advertising in which the advertisement is displayed within a stream of video content that the User is viewing, e.g., before, in the middle of, or after the video content.

49.     The term **"Inventory"** shall mean space offered by Publishers for the sale or placement of Display Advertising.

50.     The term **"Investigation"** means Your investigation into Google's Ad Tech Products or Display Advertising business.

51.     The term "**Linear Television**" shall mean television delivered in a live broadcast, as opposed to Connected Television.

52.     The term **"Malicious Ad"** shall mean an ad, when clicked on, that spawns a forced redirect to an unintended destination or loads a secondary, or tertiary, payload for malicious purposes (including without limitation phishing scams).

53.     The term "**Match Quality**" shall mean the effectiveness of matching customer information parameters to a website event.

54.     The term **"Native Advertising"** shall mean Online Advertising that follows the natural form and function of the User experience in which it is placed (such as sponsored ads within a User's Facebook feed).

55.     The terms **"Online Advertisement"** or **"Online Advertising"** shall mean advertising via the internet, including on websites, apps, and Connected Television. For example, both Display Advertising and Search Advertising are forms of Online Advertising.

56.     The term **"Open Auction Transaction"** shall mean an Indirect Transaction for which all, or substantially all, of the Buyers eligible to Bid on the relevant Ad Exchange are or were eligible to submit Bids.

57.     The term **"Other Direct Transaction"** shall mean a Direct Transaction other than a Programmatic Guaranteed Transaction, Preferred Deal Transaction, or Publisher-Automated Transaction.

58.     The term **"Other Indirect Transaction"** shall mean an Indirect Transaction other than an Open Auction Transaction or a Private Auction Transaction.

59.     The term **"Outstream Video Advertising"** shall mean Online Advertising, other than Instream Video Advertising, that includes a video or animation.

60.     The term **"person"** shall mean any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

61.     The term **"Preferred Deal Transaction"** shall mean a Programmatic Direct Transaction where the Inventory is not guaranteed. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Preferred Deal Transaction.

62.     The term **"Private Auction Transaction"** shall mean an Indirect Transaction for which only a set of Buyers expressly identified by the Publisher (or an agent or employee thereof) are or were eligible to submit Bids.

63.     The term "**Programmatic Direct Transaction**" shall mean a Direct Transaction (other than a Publisher-Automated Transaction) that is or was negotiated, transacted, or finalized through an Ad Tech Product, provided that, for the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such

transaction a Programmatic Direct Transaction if such transaction was not otherwise negotiated through such Publisher Ad Server.

64.     The term **"Programmatic Guaranteed Transaction"** shall mean a Programmatic Direct Transaction where the Inventory is guaranteed. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server shall not be sufficient to render such transaction a Programmatic Guaranteed Transaction.

65.     The term **"Programmatic Transaction"** shall mean a Display Advertising transaction, other than a Publisher-Automated Transaction, that is or was negotiated, transacted, or finalized through Ad Tech Products.

66.     The term **"Property"** shall mean a website, mobile application, or other product or service containing space that is sold or offered for sale for the placement of Display Advertising.

67.     The term **"Publisher"** shall mean a person or entity operating a Property. For the avoidance of doubt, the owner of the Property shall be deemed the Publisher, even if it has out-sourced the sale of its associated Inventory, in whole or in part, to a third party.

68.     The term **"Publisher Ad Server"** shall mean a third-party or In-House product, service, or system that is responsible for selecting (or attempting to select), on behalf of a Publisher, the Display Advertisement (or source from which such Display Advertisement shall be obtained) for a unit of Inventory. For the avoidance of doubt, a Publisher Ad Server may be owned and/or operated by a third-party Ad Tech Provider, or may be owned, developed, or operated by the Publisher or by a third party on behalf of or under contract with the Publisher. For the further avoidance of doubt, a system that creates or manages mediation chains constitutes a Publisher Ad Server for purposes of these Requests.

69.     The term **"Publisher-Automated Transaction"** shall mean a Direct Transaction that is or was negotiated, transacted, or finalized through one or more automated services, whether or not auction-based, that is controlled by the Publisher or an affiliate thereof (other than an Ad Network, Ad Exchange, or SSP). This would include, for example, the Publisher's self-service website for Advertisers to create Campaigns or place advertisements, such as that described at https://facebook.com/business/ads. For the avoidance of doubt, the mere fact that the Impression associated with a Direct Transaction was served by, or that information with respect to such transaction was entered into, a Publisher Ad Server (including one operated by the Publisher) shall not be sufficient to render such transaction a Publisher-Automated Transaction.

70.     The term **"Purchase,"** when used in connection with Inventory or Impressions, shall mean to obtain, directly or indirectly through one or more intermediaries, the right to render or display a Display Advertisement in a unit of Inventory, typically but not necessarily in exchange for a monetary payment.

71.     The term **"Query"** shall mean a request to provide, or Bid to provide, a Display Advertisement to be rendered in a unit of Inventory, whether denominated as an "ad request," "Bid request," or otherwise. A Query may, but need not, request a Bid that will be considered before awarding the right to actually display a Display Advertisement to a particular Advertiser.

72.     The term **"reflecting"** shall mean illustrating or describing.

73.     The term "**Relevant Period**" shall mean January 1, 2013 to present.

74.     The term **"Remarketing Campaign"** shall mean one or more Display Advertisements that are targeted to particular Users in whole or substantially in part based on their prior visits to or behavior on a Property.

75.     The term **"Search Advertising"** shall mean Online Advertising that is displayed in response to a User's search intent or search terms.

76.     The term **"Static Advertising"** shall mean Online Advertising consisting solely of static (i.e., non-moving or -changing) text, images, or graphics.

77.     The term "**Take Rate**" shall mean the proportion of total revenue generated from Purchased Inventory that an Ad Tech Provider collects as part of its fee arrangement in connection with the Purchased Inventory.

78.     The term **"Third-Party Cookie"** shall mean a browser cookie created and stored by a domain other than the domain to which the User navigated.

79.     The term **"Transaction Type"** shall mean Programmatic Guaranteed Transaction, Preferred Deal Transaction, Publisher-Automated Transaction, Other Direct Transaction, Open Auction Transaction, Private Auction Transaction, or Other Indirect Transaction.

80.     The term **"User"** shall mean an end user visiting or using a Property, or a proxy for that end user (including, but not limited to, cookie identifiers or mobile ad identifiers).

81.     The terms **"You"** and **"Your"** refer to "the United States and its various agencies and departments" that "are buyers of open web display advertising," as alleged in Paragraph 341 of Your complaint, or have used Ad Tech Products or Display Advertising during the Relevant Period, and all agents and representatives of the foregoing.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:** All documents and data, aside from documents produced by Google during the Investigation, concerning the claims You are asserting in this Action.

**REQUEST FOR PRODUCTION NO. 2:** All documents and data, aside from documents produced by Google during the Investigation, on which You intend to rely to support Your claims in this Action.

**REQUEST FOR PRODUCTION NO. 3:** All documents, aside from documents produced by Google during the Investigation, that tend to weigh against or refute any of the claims You are asserting in this Action.

**REQUEST FOR PRODUCTION NO. 4:** All documents concerning any complaints received by You regarding Google's Ad Tech Products or Display Advertising business.

**REQUEST FOR PRODUCTION NO. 5:** All documents, aside from documents produced by Google during the Investigation, concerning the Investigation or the subject matter of this Action, including:

   a. all Compulsory Process issued in connection with the Investigation;

   b. all documents concerning any such Compulsory Process, including all responses, objections, modifications, and other correspondence related thereto;

   c. all informal requests for documents, data, or information to any person;

   d. all documents and data obtained from any person;

   e. all documents shown or made available by You to any person;

   f. all correspondence with any person concerning the Investigation or the subject matter of this Action;

   g. all documents concerning any statements provided by any person related to the Investigation or the subject matter of this Action, including written statements, affidavits, declarations, depositions, transcripts, summaries of interviews, and notes of interviews and/or conversations;

h.  all advocacy received from any person other than Google, including correspondence, white papers, and presentations;

i.  all documents and communications concerning Google's Ad Tech Products, Google's Display Advertising business, or the subject matter of this Action exchanged between You and any state, state agency or representative thereof;

j.  all documents and communications concerning Google's Ad Tech Products, Google's Display Advertising business, or the subject matter of this Action exchanged between You and the Federal Trade Commission;

k.  all documents and communications concerning Google's Ad Tech Products, Google's Display Advertising business, or the subject matter of this Action exchanged between You and any member of the United States Congress or anyone working for a member of the United States Congress;

l.  all documents and communications concerning Google's Ad Tech Products, Google's Display Advertising business, or the subject matter of this Action exchanged between You and the President of the United States or anyone working for the President of the United States; and

m.  all documents and communications concerning Google's Ad Tech Products, Google's Display Advertising business, or the subject matter of this Action exchanged between You and any foreign government agency or authority, or any representatives thereof.

**REQUEST FOR PRODUCTION NO. 6:** All documents and data supporting the claim for damages in Paragraph 342(5) of Your complaint.

**REQUEST FOR PRODUCTION NO. 7:** All documents on which You have relied in responding to Google's Interrogatories in this Action.

**REQUEST FOR PRODUCTION NO. 8:** All documents concerning the claims, including claims for damages, of "the various agencies and departments" of the United States who are "buyers of open web display advertising," as alleged in Paragraph 341 of Your complaint.

**REQUEST FOR PRODUCTION NO. 9:** All documents concerning the use of Ad Tech Products or Display Advertising by the United States, including documents sufficient to show the Ad Tech Products or Display Advertising used by each agency and department of the United States during the Relevant Period.

**REQUEST FOR PRODUCTION NO. 10:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all contracts and Terms of Service for each Google Ad Tech Product used and all communications concerning those contracts and Terms of Service.

**REQUEST FOR PRODUCTION NO. 11:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all contracts and Terms of Service for each non-Google Ad Tech Product used and all communications concerning those contracts and Terms of Service.

**REQUEST FOR PRODUCTION NO. 12:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce documents and data sufficient to show the (i) Impressions Purchased; (ii) Attributed

Clicks for such Impressions; (iii) Attributed Conversions for such Impressions; (iv)  Attributed

Sales for such Impressions; (v) gross amount paid for such Impressions; (vi) total Fees paid to Ad

Tech Providers (net of any discounts or rebates received) for such Impressions;  (vii) the return on

investment for such Impressions; (viii) the return on advertising spend for such Impressions; and

(ix) the name of the Agency (if any) involved in Purchasing such Impressions – all aggregated (at

a monthly level for each month since January 1, 2013) separately for each unique combination of

the following parameters:

      a.   Publisher of the Inventory on which the Impressions were displayed;

      b.   Property on which the Impressions were displayed;

      c.   Ad Buying Tool (if any) through which the Impressions were Purchased;

      d.   Ad Exchange, Ad Network, or Ad Selling Tool through which the Impressions were
         Purchased;

      e.   Transaction Type through which the Impressions were Purchased;

      f.   Environment in which the Impressions were displayed;

      g.   Format of the Impressions;

      h.   whether or not the Impression was a part of a Remarketing Campaign;

      i.   Cost Type that was specified for purchasing the Impressions;

      j.   account ID; and

      k.   Campaign ID associated with the Impressions.

Providing data in a spreadsheet in the format of Exhibit A to these Requests, and consistent

with the examples therein will be deemed a sufficient response to this Request. Data and

documents produced in response to this Request shall be limited to information pertaining to

transactions taking place in the United States. For any data and documents which You are unable

to restrict by geography (for example, the geography is ambiguous or unknown), such data and documents shall be treated as responsive to this Request.

**REQUEST FOR PRODUCTION NO. 13:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce documents sufficient to show for every Campaign ID identified in response to Request No. 12(k), the goals and objectives of that Campaign.

**REQUEST FOR PRODUCTION NO. 14:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce documents sufficient to show how return on advertising spend, return on investment, and other Campaign objectives (such as views, Clicks, downloads, or conversions) are measured.

**REQUEST FOR PRODUCTION NO. 15:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting costs, profits, return on investment, return on advertising spend, and revenue associated with the Purchase of Display Advertising via or by:

a. Direct Transactions or Indirect Transactions;

b. Programmatic or non-Programmatic Transactions;

c. an Agency or on the agency or department's own account;

d. an Ad Exchange or an Ad Network;

e. a Private Auction or marketplace;

f. each Environment;

      g.  each Format; and

      h.  each Publisher or Property or type of Publisher or Property (such as social media and retail media).

**REQUEST FOR PRODUCTION NO. 16:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting how costs, profits, return on investment, return on advertising spend, and revenue are impacted by Purchasing Display Advertising via or by:

      a.  Direct Transactions or Indirect Transactions;

      b.  Programmatic or non-Programmatic Transactions;

      c.  an Agency or on the agency or department's own account;

      d.  an Ad Exchange or an Ad Network;

      e.  a Private Auction or marketplace;

      f.  each Environment;

      g.  each Format; and

      h.  each Publisher or Property or type of Publisher or Property (such as social media and retail media).

**REQUEST FOR PRODUCTION NO. 17:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting the relative costs and benefits of Display Advertising versus other forms of advertising (such as Search Advertising, Linear or Connected Television advertising, email, print, or radio advertising).

**REQUEST FOR PRODUCTION NO. 18:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents concerning Clicks, Impressions, conversions, return on advertising spend, or return on investment for Display Advertising received from any Ad Tech Provider, including any breakdowns by Transaction Type.

**REQUEST FOR PRODUCTION NO. 19:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting strategic plans, executive presentations, budgets, and financial statements relating to Display Advertising.

**REQUEST FOR PRODUCTION NO. 20:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting how and why it sets, monitors, and adjusts its Display Advertising budget, including:

a. how and why it does so across its Campaigns;

b. how and why it does so across Ad Tech Products;

c. how and why it determines the objectives for its particular Campaigns;

d. which metrics it uses to determine advertising effectiveness; and

e. how much of its advertising budget goes to Display Advertising.

**REQUEST FOR PRODUCTION NO. 21:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of

Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting how it attributes conversions and any analyses of attribution (including internal and commissioned analyses purchased from an Agency, vendor, or consultant).

**REQUEST FOR PRODUCTION NO. 22:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce documents sufficient to show how and why it shifts its advertising budget across various forms of advertising (such as Display Advertising, Search Advertising, Linear or Connected Television advertising, email, print, or radio advertising).

**REQUEST FOR PRODUCTION NO. 23:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce documents sufficient to show how and why it shifts its advertising budget across Ad Tech Providers (including actual or potential providers of In-House Ad Tech Products).

**REQUEST FOR PRODUCTION NO. 24:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce documents sufficient to show why and how often it shifts Display Advertising spend among Formats, between Direct and Indirect Transactions, among Environments, among social media and non-social media Properties, and between Inventory Purchases using Agencies and not using Agencies.

**REQUEST FOR PRODUCTION NO. 25:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of

Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting its consideration, evaluation, or comparison of Ad Tech Products or Ad Tech Providers (including actual or potential In-House Ad Tech Products), and their Features, effectiveness, and pricing.

**REQUEST FOR PRODUCTION NO. 26:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting its actual or considered switching from one Ad Tech Product to another Ad Tech Product, including its reasons for switching (or not doing so), the costs of switching, and the actual or potential impact of switching on its return on advertising spend.

**REQUEST FOR PRODUCTION NO. 27:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting its consideration, evaluation, or comparison of Publishers or other direct or indirect sources of Inventory, including their Features, cost, or quality (including but not limited to incidence of Domain Spoofing, fraudulent Inventory, forced redirects, criminal scams, Malicious Ads, and fake software updates).

**REQUEST FOR PRODUCTION NO. 28:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting contracts or agreements (whether executed or draft) and negotiations concerning contracts or agreements related to Ad Tech, Ad Tech Providers or Display Advertising, including those related to Direct Transactions (and if no contract is available for a

Direct Transaction, documents sufficient to show the date, parties, and material terms of the Direct Transaction).

**REQUEST FOR PRODUCTION NO. 29:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting contracts or agreements (whether executed or draft) with each Agency it uses, has used, or has considered using for Display Advertising, including documents reflecting the services each Agency provides and how each Agency is compensated for its services.

**REQUEST FOR PRODUCTION NO. 30:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents concerning the effect on its Display Advertising strategy or the cost effectiveness of its Display Advertising of the availability or use of User identifiers or proxy identifiers (including but not limited to, for example, Apple Identifier for Advertisers (IDFA), Android AdID, Third-Party Cookies, and logged-in account) or other User tracking mechanisms.

**REQUEST FOR PRODUCTION NO. 31:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce documents sufficient to show whether and why it uses multiple Ad Buying Tools to Purchase Display Advertising, including the reasons why it may or may not use multiple Ad Buying Tools to place Bids on a single Impression.

**REQUEST FOR PRODUCTION NO. 32:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of

Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents concerning the impact of Header Bidding on its Display Advertising strategy or the cost effectiveness of its Display Advertising.

**REQUEST FOR PRODUCTION NO. 33:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce documents sufficient to show the factors (such as whether the auction is first- or second-priced, expected Floor Price, manual or automated Bid optimization strategies, and available post-auction report information) that influence its choice of bidding strategies and the effect of those bidding strategies on return on investment or return on advertising spend.

**REQUEST FOR PRODUCTION NO. 34:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting the impact of Ad Blocking Tools on its Display Advertising strategy or the effectiveness thereof.

**REQUEST FOR PRODUCTION NO. 35:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting communications about Google, including commentary, praise for, or complaints about Google with respect to any of Google's Ad Tech Products or its Display Advertising business.

**REQUEST FOR PRODUCTION NO. 36:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of

Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents reflecting its document retention policies and any changes thereto.

**REQUEST FOR PRODUCTION NO. 37:** Separately for each agency and department of the United States that is a "buyer[] of open web display advertising" (as alleged in Paragraph 341 of Your complaint) or has used Ad Tech Products or Display Advertising during the Relevant Period, produce all documents concerning information and advice about Display Advertising (including studies, analyses, and reports) received from advertising consultants or Agencies and information shared with advertising consultants or Agencies about Display Advertising.

**REQUEST FOR PRODUCTION NO. 38:** All documents that You received from the Federal Trade Commission concerning any investigation, whether formal or informal, that You or the Federal Trade Commission have considered or conducted since 2007 into Google's Ad Tech Products or Display Advertising business, including documents concerning Google's acquisitions of DoubleClick, AdMob, Invite Media, or AdMeld.

**REQUEST FOR PRODUCTION NO. 39:** All documents You exchanged with the Federal Trade Commission concerning the initiation of any investigation, whether formal or informal, related to Google's Ad Tech Products or Display Advertising business, including preliminary investigation memoranda and communications concerning the clearance process.

**REQUEST FOR PRODUCTION NO. 40:** All documents concerning any questions, concerns, inquiries, or complaints, whether formal or informal, related to Assistant Attorney General Jonathan Kanter's participation in the Investigation and/or this Action, including the decision to bring this Action, in light of his (a) prior representation of providers of Ad Tech Products and/or organizations connected to Display Advertising; or (b) actual or perceived adversity to Google.

Dated: March 27, 2023                    Respectfully Submitted,

_____
Eric Mahr (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
Email: eric.mahr@freshfields.com

CRAIG C. REILLY (VSB # 20942)
209 Madison Street
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
Email: Craig.reilly@ccreillylaw.com

*Counsel for Google LLC*

# Exhibit A

**EXHIBIT A**

**ILLUSTRATIVE EXAMPLES OF DATA DEEMED SUFFICIENT TO RESPOND TO REQUEST NO. 12**

| Month | Year | (a) Publisher Name | (b) Property | (c) Ad Buying Tool | (d) Ad Exchange, Ad Network, or Ad Selling Tool | (e) Transaction Type | (f) Environment | (g) Format |
|---|---|---|---|---|---|---|---|---|
| January | 2021 | New York Times | nytimes.com | NULL | NULL | Other Direct Transaction | Web Browser | Display Non-Social Static |
| January | 2021 | Disney | espn.com | DV360 | AdX | Open Auction Transaction | Mobile App | Display Non-Social Video |
| January | 2021 | News Corp | wsj.com | Criteo | Index Exchange | Private Auction Transaction | Web Browser | Display Non-Social Static |
| January | 2021 | Amazon | amazon.com | Amazon | NULL | Publisher-Automated Transaction | Web Browser | Display Non-Social Static |
| February | 2021 | New York Times | nytimes.com | NULL | NULL | Other Direct Transaction | Web Browser | Display Non-Social Static |
| February | 2021 | Disney | espn.com | DV360 | Pubmatic | Open Auction Transaction | Mobile App | Display Non-Social Video |
| February | 2021 | News Corp | wsj.com | Criteo | Index Exchange | Private Auction Transaction | Web Browser | Display Non-Social Static |
| February | 2021 | Amazon | amazon.com | Amazon | NULL | Publisher-Automated Transaction | Web Browser | Display Non-Social Static |
| March | 2021 | Disney | espn.com | Criteo | AdX | Open Auction Transaction | Mobile App | Display Non-Social Video |
| March | 2021 | News Corp | wsj.com | NULL | NULL | Other Direct Transaction | Web Browser | Display Non-Social Static |

**EXHIBIT A**

**ILLUSTRATIVE EXAMPLES OF DATA DEEMED SUFFICIENT TO RESPOND TO REQUEST NO. 12**

| Month | Year | (a) Publisher Name | (h) Remarketing or Non-Remarketing Campaign | (i) Cost Type | (j) Account ID | (k) Campaign ID | (i) Total Purchased Impressions | (ii) Attributed Clicks |
|---|---|---|---|---|---|---|---|---|
| January | 2021 | New York Times | Non-Remarketing | CPM | ABC12345 | 987654321A | 495,000 | 100 |
| January | 2021 | Disney | Remarketing | CPA | DEF6789 | 1357911 | 100,000 | 500 |
| January | 2021 | News Corp | Remarketing | CPM | HIJ77 | 2468101 | 1,000,000 | 10,000 |
| January | 2021 | Amazon | Non-Remarketing | CPM | XYZ22222 | C0000001 | 500,000 | 100 |
| February | 2021 | New York Times | Non-Remarketing | CPM | ABC12345 | 987654321A | 495,000 | 150 |
| February | 2021 | Disney | Remarketing | CPA | DEF6789 | 1357911 | 130,000 | 525 |
| February | 2021 | News Corp | Remarketing | CPM | HIJ77 | 2468101 | 1,100,000 | 9,000 |
| February | 2021 | Amazon | Non-Remarketing | CPM | XYZ22222 | C0000001 | 410,000 | 125 |
| March | 2021 | Disney | Remarketing | CPA | HIJ77 | JCS345 | 115,000 | 550 |
| March | 2021 | News Corp | Non-Remarketing | CPM | ABC12345 | 987654321A | 985,000 | 300 |

**EXHIBIT A**

**ILLUSTRATIVE EXAMPLES OF DATA DEEMED SUFFICIENT TO RESPOND TO REQUEST NO. 12**

| Month | Year | (a) Publisher Name | (iii) Attributed Conversions | (iv) Attributed Sales | (v) Gross Amount You Paid | (vi) Total Fees Paid | (vii) Return on Investment | (viii) Return on Advertising Spend | (ix) Advertising Agency |
|---|---|---|---|---|---|---|---|---|---|
| January | 2021 | New York Times | 20 | $0 | $1,500 | $0 | NULL | NULL | Own Account |
| January | 2021 | Disney | 100 | $80 | $210 | $10 | -150% | 38% | Omnicom |
| January | 2021 | News Corp | 1,000 | $0 | $1,620 | $120 | NULL | NULL | Omnicom |
| January | 2021 | Amazon | 20 | $2,449.99 | $2,000 | $0.00 | 105% | 122% | Own Account |
| February | 2021 | New York Times | 25 | $0 | $1,500 | $0 | NULL | NULL | Own Account |
| February | 2021 | Disney | 100 | $90 | $220 | $20 | -200% | 41% | Omnicom |
| February | 2021 | News Corp | 775 | $0 | $1,575 | $140 | NULL | NULL | Omnicom |
| February | 2021 | Amazon | 20 | $2,299.00 | $0 | $0 | 100% | 115% | Own Account |
| March | 2021 | Disney | 110 | $90 | $190 | $15 | -150% | 47% | Omnicom |
| March | 2021 | News Corp | 40 | $0 | $1,800 | $0 | NULL | NULL | Own Account |