**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS[1]

While digital advertising sustains the modern internet, one company, Google LLC ("Google"), has monopolized, or attempted to monopolize, key technologies that make that advertising possible. Plaintiffs brought this action to hold Google accountable for 15 years of anticompetitive conduct that has thwarted competition and stifled innovation in digital display advertising technology ("ad tech").

Having already lost in substantial part its motion to dismiss a related case pending in the Southern District of New York,[2] Google now moves to dismiss this complaint, *see* Def. Mot. Dismiss, ECF No. 73 ("Mot."), on equally meritless grounds. The complaint alleges plausible relevant markets, asserts meritorious claims for monopolization and tying in the ad tech markets at issue, and establishes the United States as a direct purchaser of digital advertising. The Court should deny Google's motion because it: (1) attempts to adjudicate fact-intensive market definition questions at the motion to dismiss stage; (2) misstates the law on market share for Sherman Act monopolization claims; (3) seeks premature opinions about specific allegations in

---

[1] On or before April 17, 2023, Plaintiffs intend to file an amended complaint for the sole purpose of adding additional plaintiff states. The factual allegations of the complaint will otherwise remain unchanged, and therefore should not affect the briefing on the pending motion to dismiss.
[2] *In re Google Dig. Advert. Antitrust Litig.*, 21-md-3010-PKC, --F. Supp. 3d.--, 2022 WL 4226932, at *3 (S.D.N.Y. Sept. 13, 2022).

the complaint rather than dismissal of whole claims; and (4) wrongly characterizes the United States as an indirect purchaser of digital advertising.

## BACKGROUND

### I.     Background on Open Web Display Advertising

The sale of open web display advertising works by auction, with advertisers bidding for impressions, i.e., the viewing of a single advertisement by a single internet user. Complaint, ECF No. 1, ¶¶ 42-57.[3] When an internet user opens a website, a series of transactions occurs almost instantaneously that decides what advertisements the user will see.[4] ¶ 42. First, the website uses a publisher ad server to manage the available ad slots on the webpage. ¶¶ 43-46. Google owns the ad tech industry's leading publisher ad server, Google Ad Manager, also known as DoubleClick for Publishers. ¶ 44. Next, the publisher ad server sends an auction request to an ad exchange with information about the impression for sale such as the type of website and the type of ad space available. ¶ 47. Google also owns the industry's leading ad exchange, AdX. ¶ 46. The ad exchange then sends a bid request to advertiser buying tools, called demand side platforms and advertiser ad networks. ¶ 48. Google owns the leading demand side platform in the United States (DV360) and the industry's leading ad network (Google Ads). ¶¶ 49-50. If the advertiser buying tool determines that the bid request meets the advertiser's criteria (such as a targeted audience or website category), the tool determines an amount to bid on the impression. ¶ 55.

After receiving bids from the advertiser buying tools, the ad exchange holds the auction, determines a winning bidder, and then relays that information to the publisher ad server, which makes the final decision on which ad to show to the particular internet user. ¶ 56. Billions of

---

[3] All citations to "¶" refer to the complaint at ECF No. 1.
[4] This action concerns open web display advertising, "meaning websites whose inventory is sold through ad tech intermediaries that offer inventory from multiple websites." ¶ 43 n.4.

transactions like this play out each day, in the fractions of a second that it takes for a website to load. ¶ 168. Google makes money by extracting fees—either flat or as a percentage of spend—as money makes its way through the stack from advertisers to website publishers. ¶58 & Fig. 4. The diagram at paragraph 75 of the complaint summarizes the components of the ad tech stack, including Google's approximate market shares across the stack. *See* ¶ 75, Fig. 5.

## II. Google's Efforts to Dominate the Ad Tech Stack

Over the past 15 years, Google has established and maintained monopolies over the markets for publisher ad servers, ad exchanges, and advertiser ad networks. Google first began to participate in these markets as a bidder when it enabled search advertising customers on Google Ads to buy advertising inventory on third party websites. ¶¶ 76-77. In 2008, Google acquired DoubleClick for Publishers ("DFP"), the industry-leading publisher ad server after Google's own attempt at developing a publisher ad server failed. ¶¶ 78-84. Through the DoubleClick acquisition, Google obtained access to premium advertising inventory from third-party websites and also acquired a nascent ad exchange, AdX. *Id.* After acquiring DoubleClick, Google began consolidating its control across the ad tech stack by: (1) imposing high costs on publishers looking to use another ad server by maintaining exclusivity requirements linking Google Ads to AdX and AdX to DFP, ¶ 91, 104, and (2) imposing rules on DFP transactions that made it more difficult for its advertiser and publisher customers to work with competing ad tech companies, denying these rivals the scale necessary to challenge Google's dominance, *e.g.*, ¶¶ 231-47.

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), the court "accept[s] as true all well-pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff." *Philips v. Pitt Cnty Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also Al Shimari v. CACI Premier Tech., Inc.*, 324 F. Supp. 3d 668, 687 (E.D. Va. 2018). To survive a Rule 12(b)(6) motion to

dismiss, a plaintiff need only "nudge[] [its] claims across the line from conceivable to plausible." *Campbell ex rel. Equity Units Holders v. Am. Int'l Gr.*, 86 F. Supp. 3d 464, 469 (E.D. Va. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A Rule 12(b)(6) motion to dismiss 'does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses.'" *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (citation omitted)).

## ARGUMENT

### I. The Complaint's Definitions of Relevant Markets Reflect Commercial Realities.

Before Judge Castel, Google declined to challenge the market definitions for publisher ad servers, ad exchanges, or advertiser ad networks. *See In re Google Dig. Advert. Antitrust Litig.*, 2022 WL 4226932, at *3 (S.D.N.Y. Sept. 13, 2022). In largely denying Google's motion to dismiss, Judge Castel held that the complaint at issue there plausibly alleged Google engaged in a wide variety of anticompetitive acts that harmed competition in each of these three markets. *See generally id.* Yet Google now argues that *none* of these alleged product markets are plausible. Defining markets "is a fact-intensive exercise centered on the commercial realities of the market and competition," and thus "'courts hesitate to grant motions to dismiss for failure to plead a relevant product market'" absent "glaring deficiencies." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442-44 (4th Cir. 2011) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.))[5]; *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (dismissal inappropriate "unless it is apparent from the face of the

---

[5] *Kolon* involved a disputed geographic market, but as the Fourth Circuit recognized, the product-market analysis is "essentially similar." *Id*. at 443 n.3 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). Google does not contest the alleged geographic markets in its motion to dismiss.

complaint that the alleged market suffers a fatal legal defect"). Because each of the complaint's product markets reflect "commercial realities," all of its claims should proceed.

"The 'market,' as most concepts in economics, cannot be measured by metes and bounds," *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953), and "there is some artificiality in any boundaries, but . . . such fuzziness is inherent in bounding any market," *United States v. Bertelsmann SE & Co. KGaA*, 2022 WL 16949715, at *18 (D.D.C. Nov. 15, 2022) (citation omitted). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325.[6] Within a broad market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes" and can be identified through "practical indicia" such as "industry or public recognition . . . , the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*; *see also FTC v. Meta Platforms Inc.*, 2023 WL 2346238, at *9 (N.D. Cal. Feb. 3, 2023) ("Courts have used both qualitative and quantitative tools to aid their determinations of relevant markets."). "[I]t is critical to remember that the goal of the exercise is to enable and facilitate the examination of competitive effects," *Bertelsmann*, 2022 WL 16949715, at *18, and "proof of actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects," *FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 460 (1986) (cleaned up).

---

[6] "An analytical method often used by courts to define a relevant market is to ask hypothetically whether it would be profitable to have a monopoly over a given set of substitutable products. If so, those products may constitute a relevant market." *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011).

Google claims that because there are potential substitutes outside each of the three product markets at issue, the relevant markets must be too narrowly defined. Of course, "[f]or every product, substitutes exist." *Times-Picayune*, 345 U.S. at 612 n.31. If the price of cars rose enough, some people would switch to riding horses, but "a relevant market cannot meaningfully encompass [an] infinite range." *Id*. Instead, markets "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Id*. "Thus, products which are interchangeable to some degree, but do not share *significant* cross-elasticity of demand, are not in the same relevant antitrust product market." *In re Zetia (Ezetimibe) Antitrust Litig.*, 587 F. Supp. 3d 356, 361 (E.D. Va. 2022) (emphasis added); *see also FTC v. Surescripts*, -- F. Supp. 3d --, 2023 WL 2707866, *12 (D.D.C. Mar. 30, 2023) (relevant markets include only "products that a significant percentage of consumers could substitute for [products in the relevant market] without incurring substantial costs" (cleaned up)).

Applying these standards, courts routinely engage in fact-intensive inquiries—ill-suited to the motion to dismiss stage—asking whether potential substitutes are properly excluded from antitrust product markets. *See, e.g.*, *id*. at *13 (analog and electronic prescribing are distinct markets); *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 35 (S.D.N.Y. 2016) ("in-store, shelf-based advertisements" distinct market from TV, radio, magazines, and billboards). At the pleading stage, the alleged relevant markets need only be plausible in light of any facts alleged regarding substitution and "practical indicia" of market definition.

Here, Plaintiffs' definitions for the publisher ad server, ad exchange, and ad network markets are all recognized by industry participants and supported by Google's own documents. *See, e.g.*, ¶¶ 17, 84, 98, 102, 104, 105, 107; *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 n.4 (D.C. Cir. 1986) ("[W]e assume that economic actors usually have

accurate perceptions of economic realities."). Each product fills a distinct, well-defined function in the ad tech stack, as reflected in Google's own diagram of the ad tech stack. ¶ 39, Fig. 1. And because none of the theoretical substitutes Google identifies renders Plaintiffs' markets implausible, Google's attempts to litigate the degree or "significance" of substitutability must wait for a full record.

**Publisher Ad Server Market.** Website publishers rely on publisher ad servers for the critically important function of "manag[ing] the sale of display ads." Among other functions, publisher ad servers evaluate potential sources of advertising demand and serve as the "final arbiters" of which ad fills a given inventory slot. ¶ 283. Publishers generally use a single publisher ad server to avoid discrepancies in tracking revenue and impressions. Google's market share for its publisher ad server is over 90%, and the complaint alleges that there is no reasonable substitute for a publisher ad server. ¶¶ 14, 60, 284-85.

First, Google contends that proprietary, in-house tools are substitutes for publisher ad servers. Mot. 8. The Court should reject this contention because whether enough publishers have the resources or incentive to "self-supply" is a fact-intensive question. *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 574 (1966) (concluding that proprietary security systems "can be used only by a very large business or by government and are not realistic alternatives for most concerns," and thus are not interchangeable with "central station" services); *H & R Block*, 833 F. Supp. 2d at 54-60 (concluding that "digital do-it-yourself" tax preparation services were not substitutes for either assisted or manual tax preparation services).[7] The facts alleged in the

---

[7] Google cites no case in which a claim was dismissed on the pleadings for failing to allege the absence of self-supply. *See United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 179, 189 (D.D.C. 2001) (ruling after 10-hour evidentiary hearing); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 421, 424 (2d Cir. 1945) (post-trial determination).

complaint indicate that self-supply is an unlikely substitute for most publishers. For example, "the cost to build a publisher ad server is significant." ¶ 288; *see also* ¶ 67 (because publisher ad servers are "relatively . . . expensive to build," a large-scale base of publishers allows an ad server to "spread the fixed costs over more publishers"). For this reason, the vast majority of website publishers lack the scale needed to make self-supply feasible.

Additionally, the incentive for a significant number of web publishers to turn to self-supply is particularly weak for two reasons: Google's ad server fees are priced low, as Google collects its monopoly rents elsewhere in the stack, ¶¶ 20, 122, and an in-house publisher ad server would be unable to access Google's large, unique advertiser demand because Google's ad network only bids into Google's exchange, which in turn is tied to Google's publisher ad server, ¶¶ 17, 104. Google mentions two examples of firms that created their own "walled garden" advertising ecosystems—social media giants Facebook and Snapchat, ¶ 43 n.4, whose "closed web platforms" are "not reasonable substitutes for publisher ad servers," ¶ 284—but these unique examples provide no reason to believe that a significant number of websites could or would incur the time and costs to build their own publisher ad servers.

Second, Google argues that video and mobile-app publisher ad servers should have been included in the publisher-ad-server market. Mot. 9-10. But publishers looking to sell display advertising on their websites cannot use video or mobile-app ad servers *at all* to do so, even if they separately use those products to sell advertising within any video content or mobile apps they create. Google's argument is also inconsistent with Plaintiffs' allegations that mobile app ad mediation platforms "offer different functionality" and "monetize different types of digital ad inventory" compared to publisher ad servers. ¶ 284. Because video ads (which "play before, during, or after a streaming video") and mobile-app ads (which are displayed "within a game or

other non-browser app" on a mobile device) are "distinct from open-web display advertising" ¶ 43 n.4, with different "characteristics and uses," *Brown Shoe*, 370 U.S. at 325, publisher ad servers that specialize in these ad formats are in different markets than publisher ad servers.

**Ad Exchange Market.** Publishers use ad exchanges to auction their display ad inventory, and advertisers use ad exchanges to bid on that inventory. ¶ 291. Ad exchanges solicit advertiser bids, select the winning bid, and transmit information on the winning bid back to the publisher ad server. ¶ 46. Ad exchanges can also provide additional information about the user viewing the ad, such as browsing history, location, and age, which helps the advertiser value the impression. ¶ 47. Google's ad exchange (AdX) is the largest on the market and *four times larger* than its closest competitor. ¶ 292. "[A]lternative methods and products for transacting ad inventory are not reasonable substitutes for advertisers and publishers" because they have different "inventory type, use cases, functionality, inventory constraints, and/or monetization." ¶ 291. Once again, Google's only objection to the complaint's market definition is that it excludes potential substitutes, but that is simply not the market reality.

Google first argues that Plaintiffs improperly exclude from their definition of the ad exchange market certain "platforms" that facilitate the purchase of non-display ads, namely mobile-app ads, video ads, and social media ads. Mot. 10-11. Notably, Google does not suggest that any such platforms serve as substitutes for *publishers*. Mobile-app, video, and social media platforms are designed to facilitate transactions for specialized ad formats, not the types of display ads on the open web that are the subject of this complaint. Because these platforms could not be used by publishers seeking to sell open web display inventory, they are not available as a potential substitute for an ad exchange that performs this function. ¶¶ 46, 291.

Instead, Google argues that these specialized platforms for non-display ads are possible substitutes from the perspective of ad exchanges' *advertiser* customers. Mot. 10-11. This argument is premised on the incorrect assumption that all forms of digital advertising—or perhaps all advertising of any kind—must be substitutes. (Tellingly, Google does not argue that search ads are plausible substitutes for display ads, *cf.* ¶ 43 n.4 (describing search ads), which makes Google's proposed line-drawing regarding digital display ad substitutes convenient, at best.) The fact that Google itself tracks its performance in display advertising as distinct from other ad formats is strong evidence to the contrary and more than sufficient to survive a motion to dismiss. *See* ¶ 103 (Google touting that it was the "#1 player" since 2011 in display advertising); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 194 (D.D.C. 2017), *aff'd* 855 F.3d 345 (D.C. Cir. 2017) ("defendants' business records are strong evidence for defining the relevant product market" (quotation marks omitted)).

And even from an advertiser's perspective, display ads have distinct "characteristics and uses" from mobile-app, video, or social-media ads. For example, display ads are formatted to be viewed on websites in an internet browser, ¶ 43, rather than in video format or on apps with small mobile device screens. Advertisers also value the fact that display ads can be placed on websites other than social media sites, which have a "distinct, more limited reach" than the open web. ¶ 300.

The degree to which advertisers can substitute away from the $20-billion-per-year, 13-billion-ads-per-day ecosystem for open web display ads, ¶ 2, is a factual question that cannot be determined on the pleadings. *See, e.g.*, *Times-Picayune*, 345 U.S. at 612 n.31 ("The advertising industry and its customers . . . markedly differentiate between advertising in newspapers and in other mass media."); *Omni Outdoor Advert., Inc. v. Columbia Outdoor Advert., Inc.*, 891 F.2d

1127, 1140-42 (4th Cir. 1989), *rev'd on other grounds sub. nom. City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365 (1991) ("outdoor advertising" (i.e., billboards) distinct from television, newspaper, and radio); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 781-85 (N.D. Cal. 2022) (social media advertising distinct from "banner" advertising at the motion-to-dismiss stage).

Google cites several cases that identified certain broad advertising markets. For example, in *America Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999), the court held that it was "improper to define a market simply by identifying a group of consumers who have purchased a given product" (AOL)—something Plaintiffs have not done here—and concluded that there were substitutes to email advertising to AOL subscribers, "including use of the Word Wide Web, direct mail, billboards, television, newspapers, radio, and leaflets, to name a few." While it is true that every product has substitutes—including forms of advertising—the relevant market-definition question at the motion to dismiss stage is whether, based on the pleadings, the cross-elasticity of demand between the relevant market and any possible substitute is so high that significant substitution can be assumed *as a matter of law*. *See Kolon*, 637 F.3d at 441-44. As described above, mobile-app, video, and social platforms are not substitutes *at all* from a web publisher's perspective (one that the *America Online* court did not have to consider when evaluating substitutes for e-mail advertising). The facts alleged in the complaint show that alternative forms of advertising are far-enough removed from open web display that an ad exchange operator would feel empowered to raise its rates above competitive levels without losing customers to other forms of advertising.[8]

---

[8] Google also cites *In re Google Digital Advertising Antitrust Litig.*, 2021 WL 2021990 (N.D. Cal. May 13, 2021), which is now consolidated with the MDL before Judge Castel. In that case, three advertisers alleged a market that "encompasses the overall system that connects display

The contrast with *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018), is illustrative. There, the court held that defining a market of "'in-action' advertising during professional golf tournaments (i.e., between commercial breaks)" that excludes regular television advertising during commercials was "artificial" and "contorted to meet [plaintiffs'] litigation needs." *Id.* at 1121. Here, however, the ad exchange is a well-recognized product that fulfills a distinct function in the ad tech stack and that Google itself recognizes in various contexts. *See, e.g.*, ¶¶ 39 Fig. 1, 98, 104, 105, 113, 228.

Google next argues that ad sales negotiated directly between publishers and advertisers should be included as a reasonable substitute for ad exchanges. Mot. 11-13. But the complaint alleges that "indirect" sales conducted through real-time auctions with large numbers of bidders offer distinct advantages over directly-negotiated sales. "Direct" sales require "one-on-one negotiations between website publishers and advertisers," and thus are impractical for many publishers and advertisers (especially smaller ones). ¶ 45. Medium-to-large publishers use "indirect" sales "for any ad space *not* filled through direct sales." *Id.* (emphasis added). Ad exchanges thus enable a publisher to find efficiently the best advertiser "match" (i.e., the advertiser that most highly values the specific impression) for inventory that major publishers, by definition, *could not* sell via "direct" channels. ¶ 61.

Ad exchanges also provide valuable services that help advertisers bid on an impression-by-impression basis in real time based on the unique characteristics of the inventory and the user,

---

advertisers and publishers"—i.e., the entire ad tech stack in one market—as well as submarkets for various layers in the stack. *Id.* at *2. The court dismissed the claim with leave to amend so that the plaintiffs could allege additional facts distinguishing social-media ads and ads sold through direct negotiations, which would "serve to crystalize [the] theory of liability and the relevant market definition." *Id.* at *3. For the reasons described above, Plaintiffs here have alleged facts that make it plausible that neither social-media advertising platforms nor direct sales are substitutes for ad exchanges. *Cf. Klein*, 580 F. Supp. 3d at 783.

including by providing "detailed information concerning the user's location and browsing history" that may not be available to "direct" ad buyers. ¶ 47.

The Enhanced Dynamic Allocation policy Google references, Mot. 12, is not contradictory. That *some* publishers sell *some* inventory "direct," does not change the commercial reality that publishers and advertisers also independently rely on the distinct advantages offered by ad exchanges that make indirect matches between buyers and sellers of digital advertising in fractions of a second. Google's mandatory policy that trumped publishers' expectations by allowing *some* impressions that would have been sold "direct" to be bought indirectly by advertisers using Google's ad exchange does not alter this commercial reality. ¶ 120. The existence of Google's own policy does not address the relevant question, which is whether substantial numbers of publishers and advertisers could—let alone would—substitute "direct" sales for ad-exchange-facilitated sales if given the choice.[9] The complaint clearly alleges otherwise, ¶ 45, and the arguments raised by Google fail to make the complaint's allegations implausible.

Finally, Google contends that ad exchanges conducting auctions open only to a limited subset of advertisers (*e.g.*, "programmatic direct" auctions) should be substitutes for ad exchanges that offer fully open auctions to all participants. Programmatic direct auctions,

_____

[9] The cases Google cites in support of its second and third ad-exchange arguments do not call the ad exchange market into doubt. *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317 (4th Cir. 1995), which was decided on summary judgment, dates from when "[c]able television advertising [was] a relatively new medium" and "not widely accepted by advertisers," and thus its post-discovery analysis of advertising-adjacent markets has little bearing on the commercial realities that exist today. And while the plaintiff in *United Mag. Co. v. Murdoch Mags. Distrib., Inc.*, 146 F. Supp. 2d 385, 401 (S.D.N.Y. 2001), failed to allege that alternative distribution methods were not viable substitutes, Plaintiffs here have done just that. *See* ¶ 291 (alleging that "direct deals" and "programmatic guaranteed" sales are "no[t] reasonable substitutes for ad exchanges").

however, are a form of "direct" advertising transaction negotiated directly between a publisher and an advertiser, so the same factors distinguishing "direct" sales from broad, open auctions discussed above apply here as well—including the fact that "indirect" sales are used for ad space "not filled through direct sales." ¶ 45. The complaint also alleges that large, open auctions can offer several advantages over programmatic direct auctions. For example, advertisers benefit from "exposure to as much advertising inventory as possible" because this "increase[s] the likelihood of reaching the advertisers' intended targets . . . at the lowest cost." ¶¶ 61-62; *see also* ¶ 67 ("An ad exchange with more advertisers—and more unique advertisers—will be more attractive to publishers."). Programmatic direct auctions are not a reasonable substitute for fully open indirect auctions.

**Advertiser Ad Networks.** Advertiser ad networks are self-service bidding tools that facilitate ad placement on open web display ad inventory. ¶ 297. Ad networks bid impression-by-impression using proprietary targeting data that values inventory on behalf of advertisers. ¶ 50. Ad networks are the only viable option for advertisers that are small, prefer a "hands-off" approach, rely on the ad network's targeting data, or lack the expertise to use a demand side platform. ¶¶ 50-52, 299-300.

Google argues that social and mobile-app ad-buying products must be in the same market as ad networks for display ads, Mot. 14-15, but this argument once again disregards the allegations that social and mobile-app ads have different "characteristics and uses," *Brown Shoe*, 370 U.S. at 325, than display ads, ¶ 43 n.4. Networks that facilitate the sale of social media ads (and mobile-app ads) also have a "distinct, more limited reach" than networks for display ads, which allow advertisers to reach users accessing almost any website on the open web rather than the subset of users on social media sites or mobile-device apps. ¶ 300; *see also* ¶ 301 (noting that

Google's ad network alone reaches 90% of internet users). Alternative ad-buying products cannot offer advertising space on websites (such as the Wall Street Journal or Weather.com) that advertisers value for their reach. The ability of ad networks to buy inventory on the open web also gives advertisers the chance to target their purchases based on factors like "the substance of the website" and "the location on the webpage," ¶ 72, which offer advertisers more options in where they reach users than ad-buying tools limited to a single "walled garden." ¶ 43 n.4.

Google points to "competition" between Google's ad network and the Facebook Audience Network ("FAN")—which allowed Facebook's advertisers to buy ads on non-Facebook properties like third-party mobile apps—as an indication that the advertiser ad network market should be expanded. Mot. 15. It is true that FAN at one point allowed advertisers to purchase open-web display ads on mobile devices, and thus was included in the advertiser ad network market for a time. ¶¶ 189-95. But Google misidentifies the nature of the "unique competitive challenge," ¶ 191, presented by FAN. The "existential threat" from FAN was to DFP's position as the dominant publisher ad server, not to Google's position in the ad network market. *See* ¶¶ 191-92 (discussing the risk of "[d]isintermediation" of Google's publisher ad server if FAN successfully promoted header bidding); ¶ 190 (describing Google's concern that FAN would "lock up available *publisher inventory*" through direct deals—not that FAN would compete with Google for *advertisers*) (emphasis added).[10]

---

[10] Google's cited cases on this point are unavailing. *Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1319 (D. Md. 1986), decided on summary judgment, involved a purported market of reagents usable only on defendant's instruments. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481-82 (1992), held that single-brand aftermarkets are viable, but the ad network market here is not limited to Google Ads. In *Newcal*, 513 F.3d at 1045, the court noted that only sellers able to deprive each other of "significant levels of business" are in the same market. Here, open web, social media, and in-app advertising are distinct, *e.g.*, ¶ 300, so Google has not shown that an ad network focused on social media or in-app ads would constrain a monopolist of the display ad network market.

Moreover, in the ordinary course of business, Google conducted experiments that found that it could profitably increase its take rate on its ad network demand in excess of 5%—notwithstanding advertisers' ability to turn to alternative ad-buying tools like FAN. ¶ 301. This experiment is strong evidence that "advertisers would not substitute away from Google Ads to any alternative ad buying tool in sufficient volume to defeat a price increase," *id.*, and thus that advertisers do not consider non-display ad networks to be substitutes.

## II. The Complaint Sufficiently Alleges Monopoly Power in the Ad Exchange Market.

"Monopoly power is the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Axiomatically, evidence of sustained supracompetitive prices is probative of monopoly power. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) ("higher-than-competitive profits [are] a strong indication of market power"). As the court noted in *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001), "a firm is a monopolist if it can profitably raise prices substantially above the competitive level," so "[w]here evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear." *See also Geneva Pharms. Tech. Corp. v. Barr Labs Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (monopoly power "can be proven directly through evidence of control over prices or the exclusion of competition"). The complaint contains numerous allegations establishing direct evidence of Google's power to exclude competition in the ad exchange market and sustain supracompetitive prices. For example:

- Google gave AdX a key advantage over competing ad exchanges when it made Google Ads' crucial source of advertiser demand exclusive to AdX. ¶¶ 91-92.

- Through dynamic allocation and enhanced dynamic allocation, Google created a special set of rules for bidding by AdX compared to other exchanges, ensuring that AdX would win auctions more often than the competition. ¶¶ 21, 25, 113, 119-25.

- Dynamic Revenue Share allowed Google to manipulate AdX's bids (after seeing competitors' bids) to ensure that AdX won more of the most valuable auctions without the need to compete aggressively. ¶¶ 138-43.

- Under Project Bell, Google punished publishers who tried to partner with Google's rivals. ¶ 162.Through Project Poirot, Google lowered the bids of Google's demand-side platform into rival exchanges—but not AdX—to increase the chances that AdX would win impressions. ¶¶ 216-17.

- Google's Unified Pricing Rules prevented publishers using Google's publisher ad server to impose different price thresholds for different ad exchanges and sources of advertising demand, making it more difficult for publishers to preference bids coming from a rival ad exchange over a bid from AdX. ¶¶ 232-39.

Google's ability to take these anticompetitive acts in the ad exchange market without triggering an exodus of its customers to competing ad exchanges demonstrates Google's monopoly power. As a result of this course of anticompetitive behavior, Google has persistently been able to charge supracompetitive prices in the ad exchange market, amounting to a 20% revenue-share fee of impressions sold on AdX since 2009, while many of AdX's "rivals charged only a fraction of that amount." ¶ 266; *see also* ¶ 224 (referring to AdX's fee as "one of the highest in the industry"); ¶ 230 (explaining that "Poirot's success enabled Google to maintain the 20% revenue share fee it has charged on its ad exchange since 2009," even though "Google's employees expected the fee to drop to 5%" before implementing Poirot). Even if the complaint contained no allegations of market share, these allegations—demonstrating Google's blatant exclusionary conduct and its ability to maintain an anomalously high revenue share percentage— would still state a claim for monopolization of the ad exchange market because market share is just a "shorthand method" for proving monopoly power when direct evidence is unavailable. *See R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 394 (M.D.N.C. 2002).

On top of this direct evidence of monopoly power, the complaint alleges that Google maintains an ad exchange market share of more than 50%, a share that is "approximately four

times larger than the next largest ad exchange, . . . and has been for at least several years." ¶¶ 75 Fig. 5, 292. Plus, through a mechanism called Open Bidding, Google collects a fee and has partial control over "another approximately 7% of all U.S. advertising impressions won via open auction," even though the winning bid did not come from AdX. ¶¶ 176-86, 293. These allegations are sufficient to state a claim for monopolization of the ad exchange market based on market share. Indeed, Judge Castel reached a similar conclusion with respect to the similar allegations in the matter pending before him, where the plaintiffs alleged a 60% market share. *See In re Google Dig. Advert. Antitrust Litig.*, 2022 WL 4226932, at *7 (stating that there was no "bright line rule" for market share in the Second Circuit, and that "Google's market share and other relevant market characteristics outlined above permit a plausible inference of monopoly power in the ad exchange market").

Google resists this conclusion, claiming that the Fourth Circuit established a bright-line rule that market share of at least 70% is necessary to establish monopoly power. Mot. 16-17. This is not so. While courts have observed that market shares at that level suffice, *see E.I. du Pont de Nemours and Co.*, 637 F.3d at 450 ("[W]hen monopolization has been found the defendant controlled seventy to one hundred per cent of the relevant market.") (quoting *White Bag Co. v. Int'l Paper Co.*, 579 F.2d 1384, 1387 (4th Cir. 1974)), these cases do not establish a bright-line rule requiring an allegation of a 70% percent (or greater) market share to state a claim for monopolization. Indeed, *E.I. du Pont* favorably cites *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984), and its observation that "Supreme Court cases, as well as cases from this court, suggest that absent special circumstances, a defendant must have a market share of at least 50 percent before he can be guilty of monopolization." 637 F.3d at 450-51. Moreover, these cases discussing 70% market shares were not about digital technology

platform markets (like ad exchanges or computer operating systems) where scale and network effects play a particularly important role. *See, e.g.*, ¶ 71 (noting the "strong 'indirect network effects'" in the "various markets that make up the ad tech stack"), *see also* ¶¶ 21, 23, 24, 34, 66-70, 73, 74, 102, 103, 107, 117, 123, 125, 144, 151; *Microsoft*, 253 F.3d at 55 (approving the trial court's findings that dominance in the computer operating system market included a "structural barrier that protects the [monopolist] company's future position" because software developers and consumers will tend to flock to the already-dominant operating system).[11]

Finally, even if the Court were to conclude that the complaint fails to state a claim for monopolization of the ad exchange market, the claim for *attempted* monopolization should remain. Google's conduct summarized above reflects: "(1) a specific intent to monopolize the relevant market; (2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success." *M & M Med. Supplies and Serv. Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992). Market share of more than 50% is sufficient to show attempted monopolization, especially given the complaint's allegations showing that Google's conduct in the ad exchange market is so bold as to be "invidious." *See id.* (noting that attempted monopolization claims with market shares above 50% "should be treated as attempts at monopolization when the other elements for attempted monopolization are also satisfied").

## III. Google Cannot Seek Dismissal of Individual Allegations on a Motion to Dismiss and Its Arguments Lack Merit in Any Event.

Even if the underlying arguments had merit (which they do not), Google's challenge to certain allegations contained in the complaint's first, second, and fourth claims are insufficient.

---

[11] The remaining cases that Google cites were summary judgment cases, *see It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 500 (D. Md. 2015); *R.J. Reynolds*, 199 F. Supp. 2d at 394, and one in which plaintiffs failed to allege market shares at all, *see First Data Merchant Servs. Corp. v. SecurityMetrics, Inc.*, 2013 WL 6234598, *12-13 (D. Md. Nov. 13, 2013).

A Rule 12(b)(6) motion allows a defendant to argue that a complaint fails "to state a *claim* upon which relief can be granted." Fed. R. Civ. P. 12(b)(6) (emphasis added). "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original); *accord FTC v. Nudge, LLC*, 430 F. Supp. 3d 1230, 1246 (D. Utah 2019) ("As many courts have recognized, parties may not use rule 12(b)(6) to dismiss only parts of a claim."). "[C]ourts may not dismiss only some of the claim's allegations if the claim otherwise survives." *Redwind v. Western Union, LLC*, 2019 WL 3069864, *4 (D. Or. June 21, 2019) (collecting cases).

Google does not (and cannot) argue that Plaintiffs have failed to allege *any* anticompetitive conduct to support its claims; rather, Google appears to seek a premature opinion from the Court as to whether some of the conduct alleged in the complaint is anticompetitive or had an anticompetitive effect in certain markets. Motions to dismiss do not serve that function. *See, e.g.*, *BBL*. 809 F.3d at 325. Google's tactic is doubly inappropriate here, considering that the complaint alleges an anticompetitive "course of conduct," which calls for a holistic look at all of the allegations of the complaint, not scrutiny of individual allegations in isolation. *See, e.g.*, *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[W]e agree that it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."). The Court can and should reject all of Google's arguments about the acquisitions of DoubleClick and AdMeld, purported refusals to deal, and product design, *see* Mot. 19-26, on this basis alone. Even if Google could challenge individual allegations in the complaint rather than whole claims, these challenges fail, as explained below.

**A.** **Dynamic Revenue Share, Project Poirot, and Unified Pricing Rules Harmed Competition in the Publisher Ad Server Market by Reinforcing Google's Dominance of the Ad Exchange Market.**

Google wrongly contends that three of the anticompetitive acts alleged in the complaint—Dynamic Revenue Share, Project Poirot, and Unified Pricing Rules—did not have an anticompetitive effect in the publisher ad server market. Mot. 25-26. The complaint clearly links Google's publisher ad server and its exchange, and its exchange with Google Ads' advertisers. The complaint alleges that AdX is the dominant exchange, ¶ 292, and DFP is "the only way to [effectively] access AdX as a publisher," ¶ 104. Thus, tactics that reinforce and maintain AdX's dominance as the indispensable ad exchange necessarily reinforce and maintain DFP's dominance as the indispensable publisher ad server. *See, e.g.,* ¶ 264 (discussing the "flywheel effects" of Google's conduct).[12]

Moreover, the complaint alleges that Google sought to prevent rival ad exchanges from gaining sufficient scale because Google believed that a sizeable ad exchange competitor might "enter the publisher ad server market (or facilitate the entry of a new publisher ad server)," and thereby pose a competitive threat to Google in the publisher ad server market as well as the ad exchange market. ¶ 273. Thus, Google's anticompetitive conduct directed at the ad exchange market had a direct, intentional impact on the potential viability of rival publisher ad servers. *See Microsoft*, 253 F.3d at 79 ("We may infer causation when exclusionary conduct is aimed at producers of nascent competitive technologies as well as when it is aimed at producers of established substitutes.").

---

[12] As Google acknowledges, Mot. 25, Judge Castel found that each of these three tactics was anticompetitive with respect to the ad exchange market. *See In re Google Dig. Advert. Antitrust Litig.*, 2022 WL 4226932, at *29, *35-36, *38-39.

## B. The DoubleClick and AdMeld Acquisitions Enabled Google's Monopolistic Course of Conduct.

The DoubleClick acquisition "vaulted Google into a commanding position over the tools publishers use to sell advertising opportunities . . . and set the stage for Google's later exclusionary conduct across the ad tech industry." ¶ 16. For example, the DoubleClick acquisition allowed Google to "forge[] an exclusive link between Google Ads and DFP through the AdX ad exchange," requiring publishers to use DFP and AdX if they "wanted access to exclusive Google Ads' advertising demand." ¶ 17. As a result, DFP now commands 90% of the publisher ad server market, with no real competition. ¶ 18. None of this would have been possible without the DoubleClick acquisition.

The acquisition of AdMeld was another foundational move to entrench Google's monopoly in ad exchanges and publisher ad servers. *See* ¶¶ 23, 146-53. AdMeld was a "yield management" tool developed to work around Google's restrictions on real-time bidding for DFP publishers. ¶¶ 87,146-149. Google recognized the "critical threat" that AdMeld posed to "disintermediate" both DFP and AdX by allowing publishers to obtain real-time bids outside of Google's ad tech tools. ¶¶ 146, 149. Google did not want to compete on fair terms, so it bought AdMeld, migrated all of its customers to AdX, and shut AdMeld down, erasing its potential to compete away AdX's advantages. ¶ 152. Google then changed its AdX contract terms to prohibit publishers from using any other platform or yield manager[13] that would force AdX to compete head-to-head for ad impressions. ¶ 23.

---

[13] Google argues that Plaintiffs "fail to explain why, after Google acquired Admeld, the two remaining 'key' yield managers did not continue to threaten Google's ad server." Mot. at 22. On the contrary, the complaint alleges that changes to Google's publisher ad server contract "prohibited publishers from using non-Google ad servers, *or the remaining yield management solutions,* to compare bids from Google's ad exchange with bids from other ad exchanges in real time." *See* ¶ 155 (emphasis added).

Google also argues for "partial dismissal" of the complaint's first and second claims, asserting (incorrectly) that the acquisitions of DoubleClick and AdMeld were not anticompetitive when viewed in isolation. The Court should reject this argument for three reasons.

First, this case is not a challenge to a merger under Section 7 of the Clayton Act, so the question is not whether one of these acquisitions, "on its own," Mot. 20, or "in particular," *id.* at 22, is anticompetitive. Rather, the complaint looks back at Google's behavior and alleges that these acquisitions were part of an anticompetitive course of conduct giving rise to a violation of Section 2 of the Sherman Act. *See, e.g, Grinnell.*, 384 U.S. at 576 ("By those [three] acquisitions [the defendant] perfected the monopoly power to exclude competitors and fix prices."); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 469 (7th Cir. 2020) ("[T]he focus . . . must remain on whether, when viewing the monopolist's conduct as a whole, it has unreasonably maintained or enhanced its monopoly position." (cleaned up)). Google compounds this error by citing several inapposite cases concerning *prospective* merger challenges, and where the court found the plaintiff's prediction of the likely effects of a merger to be too speculative.[14] Google effectively asks the Court to review these acquisitions without the benefit of hindsight, as if it were 2007 (for DoubleClick) or 2011 (for AdMeld).

Second, what antitrust enforcers did or did not do at the time of these acquisitions is irrelevant to this case, which encompasses years of Google's unlawful conduct occurring after—

---

[14] Likewise, Google miscites antitrust cases involving patents, where the nature of patent law makes it inappropriate to consider post-acquisition activity. In this regard, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 2013 WL 6682981 (E.D. Va. Dec. 18, 2013), relied on *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1211-12 (2d Cir. 1981), which states, "Whatever the meaning that may be ascribed to § 7 in other contexts, the patent laws circumscribe the scope of the provision [regarding post-acquisition activity] here." Google's reliance on a Statement of Interest filed by the United States in *Intel Corp. v. Fortress Inv. Grp., LLC*, Case No. 3:19-cv-7651 (N.D. Cal.), is misplaced for the same reason.

and partly flowing from—those acquisitions. The Clayton Act codifies this concept, providing that "any failure of the Federal Trade Commission or the [Antitrust Division] to take any action under [the Clayton Act] shall not bar any proceeding or any action with respect to such acquisition at any time under any other section of this Act or any other provision of law." 15 U.S.C. § 18a. In that sense, the law forecloses Google's attempt to make hay out of prior exercises of enforcement discretion. If anything, to the extent the Court is inclined to grant Google's request to take judicial notice of Federal Trade Commission and Department of Justice documents regarding these acquisitions, the enforcers' cautionary statements are noteworthy. *See* Mot. App. A, at 13 ("We . . . will closely watch these markets and, should Google engage in unlawful tying or other anticompetitive conduct, the Commission intends to act quickly."); Mot. App. B. at 1 ("Although the Antitrust Division concluded that this particular transaction was unlikely to cause consumer harm, the division will continue to be vigilant in the enforcement of the antitrust laws to protect competition in display . . . advertising.").

Third, acquisitions can prove anticompetitive after the transaction closes regardless of their anticipated effects when first consummated. It sometimes takes years for an acquisition "to ripen into a prohibited effect," *E.I. du Pont*, 353 U.S. at 597 (challenging acquisition 30 years after the fact), because an acquisition can facilitate or give rise to anticompetitive conduct later through the "use" of the purchased assets, *see United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 241-42 (1975) (observing that "there can be a violation at some time later even if there was clearly no violation—no realistic threat of restraint of commerce or creation of a monopoly—at

the time of the initial acts of acquisition"). For this reason, actions to challenge the effects of past acquisitions are permissible under both the Clayton Act and the Sherman Act.[15]

### C. Google Incorrectly Characterizes the Claims As Refusals to Deal.

Google argues "Claims One, Two and Four should be dismissed to the extent they are based on Google's purported refusal to deal with rivals." Mot. 23. The Court should reject this argument because this case is not about Google's refusal to deal, it is about *how* Google *dealt* with other actors in the ad tech business, including Google's own customers, as part of a larger course of monopolistic and tying conduct. *See Eastman Kodak,* 504 U.S. at 463 & n.8 (rejecting characterization of conduct as refusal-to-deal claim where the defendant was dealing with rivals, but in an anticompetitive manner). This case focuses on the terms and conditions Google imposed on its dealings with *its own customers* that constrained or interfered with their customers' ability to engage with Google's competitors. That is not a unilateral refusal to deal, it is anticompetitive conduct.[16] Further, Google engaged in this conduct knowing that it was not in the best interests of its customers. Indeed, at every point in the ad tech stack, Google abused its market power *at the expense of its own customers* in order to foreclose its competitors and maintain its monopolies. *See, e.g.*, ¶¶ 312, 319 (Claims One and Two). In tying AdX to DFP,

---

[15] *See, e.g.*, *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021) (challenge by private plaintiffs under Section 7 of Clayton Act based on evidence of anticompetitive conduct that occurred post-merger); *Grinnell*, 384 U.S. at 567 ("By those [three] acquisitions [the defendant] perfected the monopoly power to exclude competitors and fix prices.").

[16] Google's reliance on *Verizon Communications v. Trinko LLP*, 540 U.S. 398, 407-08 (2004), *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. Dec. 26, 2012), and *FTC v Facebook*, 2021 WL 2643627, at *17 (D.D.C. June 28, 2021) is misplaced. *Trinko* and *Loren* were about a company's decision whether to deal meaningfully with others *at all*, and *Facebook* involved deal conditions that placed no restrictions on others' ability to continue to do business with Facebook's competitors. Here, Google chose to deal with others, but it combined exclusivity rules with tying and other conditions across multiple layers in the ad tech stack that prevented rivals from effectively competing.

Google conditioned its customers' use of one product in one market on the use of another product in a different market. *See, e.g.*, ¶¶ 337-338 (Claim Four).

Google employed exclusionary tactics throughout the ad tech stack to force competitors, publishers and advertisers to use Google's ad tech tools, and to make it more difficult for publishers and advertisers to use competitors' tools. Advertisers who wanted to purchase inventory through Google Ads had to use AdX and DFP. Publishers who wanted access to Google Ads faced similar limits. Restrictions like these violate Section 2 of the Sherman Act. *See, e.g.*, *Lorain Journal Co. v. United States,* 342 U.S. 143, 149 (1951) (monopolist newspaper violated Section 2 by refusing to accept advertisements from customers that also advertised with rival radio station); *Microsoft*, 253 F.3d at 75 (Microsoft required software vendors "to make their Java applications reliant on Windows-specific technologies and to refrain from distributing to Windows users [Java Virtual Machines] that complied with [a rival's] standards"). The complaint's allegations are not properly analyzed as refusals to deals—but instead under generally applicable principles for assessing exclusionary conduct.[17]

## IV. The United States Is a Direct Purchaser of Google Ad Tech Services Under the *Illinois Brick Doctrine*.

The United States is not barred from seeking damages under the indirect purchaser doctrine of *Illinois Brick Co. v. Illinois*, 41 U.S. 720 (1977). "[D]irect purchasers—that is, those who are 'the immediate buyers from the alleged antitrust violators'—may sue." *Apple v. Pepper*,

---

[17] But even if they were (improperly) analyzed as a refusal to deal, Google is further incorrect in suggesting that the claims fail for lack of a termination of a prior course of dealing. Such behavior is informative in determining whether the activity had an exclusionary purpose, *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985), but prior dealing is unnecessary if the monopolist's anticompetitive purpose is evident from other facts, *see Otter Tail Power Co. v. United States*, 410 U.S. 366, 377-78 (1973) (monopolist's refusal to sell to new municipal customers seeking to compete with it was designed to prevent them "from eroding its monopolistic position").

139 S. Ct. 1514, 1521 (2019) (quoting *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199, 207 (1990)). Here, the complaint alleges that the United States is a direct purchaser. Even if it that were not true, two exceptions to the indirect purchaser bar would apply in any event.

The complaint alleges that "United States departments and agencies . . . purchase open web display advertising using Google and non-Google ad tech tools." ¶ 278. Google contends that this allegation does not "directly connect[] the United States to sellers of open web display advertising." Mot. 27. But the only reasonable inference to be drawn from this allegation is that the United States purchased advertising from a seller of advertising space, such as a website publisher. The real problem is that Google's argument conflates the advertising purchase with Google's provision of ad tech services to facilitate that purchase (which advertisers pay for via "take rates" pulled directly from the purchase payment). ¶ 57. The provision of ad tech services is what matters for the *Illinois Brick* analysis.

Regardless, the complaint alleges a direct relationship between the advertiser and publisher, as well as between the advertiser and each intermediary along the way that provides ad tech services, from the demand-side platforms and ad networks all the way through the ad exchange, the publisher ad server, and the publisher. *See, e.g.*, ¶¶ 57-59. Google is incorrect to suggest that the ad tech stack is similar to the vertical distribution chain envisioned by *Illinois Brick*, which addressed a conventional, multi-step supply chain of a physical product rather than the instantaneous sale of a digital commodity. In modern commerce, particularly e-commerce, few transactions occur without the involvement of facilitating "intermediaries" providing payment, web hosting, and other services ancillary to the transaction, but these intermediaries do not create new links in the distribution chain that would trigger the indirect purchaser bar of

*Illinois Brick*. *See Pepper*, 139 S. Ct. at 1525 ("*Illinois Brick* did not purport to bar multiple liability that is unrelated to passing an overcharge down a chain of distribution.").

This is not a case involving multiple harmed parties that occupy successive links in a chain of distribution that "passed on" an overcharge to the next party in line. *See Pepper*, 139 S. Ct. at 1524-25. Neither the complaint nor Google's motion characterizes any of the "intermediaries" involved in facilitating the purchase of open web display advertising as a reseller of advertising or advertising services. There is no entity sitting between Google and the purchases that flow through Google tools that would have standing to sue for the take rates pulled directly out of advertisers' pockets up to and including at the ad exchange. *See Soskel v. Texaco, Inc*., 514 F. Supp. 578, 580 (1981) (finding *Illinois Brick* inapplicable where plaintiffs did not allege overcharge in a prior transaction passed onto them). Rather, Google caused harm directly to federal agencies through the agencies' (or their agents') direct purchases of open web display advertising services from Google, not from an overcharge passed down from another buyer. That the complaint alleges that other market participants like publishers and competing ad exchanges were also harmed by Google's anticompetitive conduct does not lessen the harm that Google inflicted on the federal agency victims.

Finally, even if the United States were an indirect purchaser under the *Illinois Brick* doctrine (and it is not), two exceptions to the doctrine prevent dismissal of any portion of the damages claims at this stage. First, the cost-plus contract exception applies when purchasers use an agent to buy the product or service, where the agent does not play a role in setting the price for the good or service. *See, e.g.*, *Illinois Brick*, 431 U.S. at 736 & n.16. Here, to the extent that Google is arguing that the federal government is not a direct purchaser of ad tech services because it used ad agencies to purchase advertising, Mot. 28, that argument fails because an ad

agency is acting as an agent of the advertiser, not a reseller of a good or service. *See, In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 24-25 (D.D.C. 2001); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 505 (S.D.N.Y. 1996).

Second, the control exception applies when the antitrust defendant controls all of the links in the supply chain from the purchaser to the market where the antitrust violation is occurring. *See Dee-K Enters. v. Heveafil SDN. Bhd.*, 982 F. Supp. 1138, 1153 (E.D. Va. 1997). While theoretically the purchaser of advertising must buy the impression through many layers in the ad tech stack, starting with a demand-side platform or ad network, the complaint alleges that Google controls each of these layers. *See, e.g.*, ¶¶ 270-274, 293. Thus, a purchase that is routed through DV360, then to AdX, and then to DFP is no less a direct purchase than if the agency went directly to DFP. *See Dee-K Enters.*, 982 F. Supp. at 1153. That is, even if demand-side platforms and ad networks could be viewed as supply chain intermediaries between advertisers and ad exchanges, which they are not, *Illinois Brick* would not bar recovery for harm inflicted by AdX where the "direct purchaser" on the advertiser side was a Google-controlled tool.

For these reasons, the complaint need not allege that "the United States purchases digital ads directly through ad networks," Mot. 28, in order to satisfy *Illinois Brick*, as neither the complaint nor the law supports this narrow interpretation of potential antitrust damages in this case. The complaint characterizes advertisers as directly interacting with buying tools and ad exchanges, and characterizes buy-side tools as service providers assisting advertisers in making ad purchases, not as resellers. *See* ¶ 48. The complaint also alleges that Google owns the leading demand-side platform, DV360. Google argues that purchases through DV360 cannot support the United States' claim for damages, Mot. 28, because the complaint does not include a claim for monopolization of a demand-side platform market. Google's argument rests on a faulty premise

that a demand-side platform is a link in a supply chain of advertising sales under *Illinois Brick*

and ignores Google's control of the end-to-end stack of tools. *See, e.g.,* ¶¶ 270-74, 293. Federal

agencies buying advertising through DV360 are still direct purchasers of ad tech services from

Google with standing to sue for harm caused by Google through each of its products in the stack.

## <u>CONCLUSION</u>

The Court should deny the motion to dismiss. To the extent that the Court is inclined to

dismiss any of the claims in the complaint, Plaintiffs respectfully request leave to amend.

Dated: April 10, 2023

Respectfully submitted,

JESSICA D. ABER
United States Attorney

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Julia Tarver Wood
JULIA TARVER WOOD
KAITLYN E. BARRY
CRAIG L. BRISKIN
KATHERINE E. CLEMONS
DANIEL S. GUARNERA
AARON M. TEITELBAUM

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov

Attorneys for the United States

JASON S. MIYARES
Attorney General of Virginia

/s/ Andrew N. Ferguson
ANDREW N. FERGUSON
Solicitor General
STEVEN G. POPPS
Deputy Attorney General
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for the Commonwealth of
Virginia and local counsel for the
States of California, Colorado,
Connecticut, New Jersey, New York,
Rhode Island, and Tennessee