**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

UNITED STATES, *et al.*,

                  *Plaintiffs,*

     vs.

GOOGLE LLC,

                  *Defendant.*

No: 1:23-cv-00108-LMB-JFA

**DEFENDANT GOOGLE LLC'S REPLY**
**<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I.    Plaintiffs' Gerrymandered Market Definitions Fail As A Matter Of Law. ......................... 2

    A.    Plaintiffs' Alleged "Publisher Ad Servers for Open Web Display Advertising" Market Is Conclusory and Implausible. .................................................. 2

    B.    Plaintiffs' Alleged "Ad Exchanges for Indirect Open Web Display Advertising" Market Is Conclusory and Implausible. .................................................. 5

    C.    Plaintiffs' Alleged "Advertiser Ad Networks for Open Web Display Advertising" Market Is Conclusory and Implausible. .................................................. 8

II.    Plaintiffs Fail To Allege Monopoly Power In A Market For Ad Exchanges ...................... 9

III.    Plaintiffs Have Alleged Various Types Of Conduct That Do Not Support Their Monopolization Claims. .......................................................... 11

    A.    The DoubleClick and Admeld Acquisitions Do Not Support Plaintiffs' Monopolization Claims. .......................................................... 12

    B.    Plaintiffs' Google Ads Exclusivity Allegations Do Not Support Their Monopolization Claims. .......................................................... 16

    C.    Plaintiffs' Project Poirot, DRS, and UPR Allegations Do Not Support Their Publisher Ad Server Monopolization Claims. .......................................................... 17

IV.    Plaintiffs Fail To Allege That The United States Is A Direct Purchaser In Any Alleged Market. .......................................................... 18

Conclusion .......................................................................................... 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Online, Inc. v. GreatDeals.Net*,
 49 F. Supp. 2d 851 (E.D. Va. 1999) ......................................................................2

*Apple, Inc. v. Psystar Corp.*,
 586 F. Supp. 2d 1190 (N.D. Cal. 2008) .................................................................4

*CertusView Techs., LLC v. S & N Locating Servs., LLC*,
 107 F. Supp. 3d 500 (E.D. Va. 2015) ...................................................................12

*City of Groton v. Conn. Light & Power*,
 662 F.2d 921 (2d Cir. 1981)..................................................................................13

*Copperweld Corp. v. Indep. Tube Corp.*,
 467 U.S. 752 (1984) ..............................................................................................11

*Dee-K Enters. v. Heveafil Sdn. Bhd.*,
 982 F. Supp. 1138 (E.D. Va. 1997) ......................................................................20

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
 608 F. Supp. 3d 298 (W.D.N.C. 2022) .................................................................11

*Duty Free Ams., Inc. v. Estee Lauder Cos.*,
 797 F.3d 1248 (11th Cir. 2015) ............................................................................10

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*,
 637 F.3d 435 (4th Cir. 2011) ..........................................................................2, 4, 6

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
 504 U.S. 451 (1992)...............................................................................................17

*FTC v. Actavis, Inc.*,
 570 U.S. 136 (2013)...............................................................................................10

*FTC v. Facebook, Inc.*,
 560 F. Supp. 3d 1 (D.D.C. 2021) ..........................................................................17

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
 386 F.3d 485 (2nd Cir. 2004).................................................................................10

*In re Google Digit. Advert. Antitrust Litig.*,
 2021 WL 2021990 (N.D. Cal. May 13, 2021) ........................................................9

*In re Google Digit. Advert. Antitrust Litig.*,
    2022 WL 4226932 (S.D.N.Y. Sept. 13, 2022)...........................................................12, 13, 18

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
    423 F.3d 374 (3d Cir. 2005)........................................................................................10

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) .....................................................................................6

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
    2013 WL 6682981 (E.D. Va. Dec. 18, 2013) ...........................................................13

*Intergraph v. Intel Corp.*,
    195 F.3d 1346 (Fed. Cir. 1999)..................................................................................13

*JTH Tax, Inc. v. Williams*,
    310 F. Supp. 3d 648 (E.D. Va. 2018) ...............................................................3, 5, 7

*Klein v. Facebook, Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022) .........................................................................5

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951)....................................................................................................17

*In re Microsoft Corp. Antitrust Litig.*,
    127 F. Supp. 2d 702 (D. Md. 2001),
    *aff'd sub nom. Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006) ......................... *passim*

*MLW Media LLC v. World Wrestling Ent. Inc.*,
    2023 WL 1975241 (N.D. Cal. Feb. 13, 2023) ...........................................................9

*Newcal Indus. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) .....................................................................................7

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)................................................................................................10

*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973)....................................................................................................17

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)....................................................................................................16

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
    940 F. Supp. 2d 367 (E.D. La. 2013)..........................................................................10

*Retractable Techs., Inc., v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) .....................................................................................13

*SCM Corp. v. Xerox Corp.*,
   645 F.2d 1195 (2d Cir. 1981)...................................................................................13

*Steves and Sons, Inc. v. JELD-WEN, Inc.*,
   988 F3d 690 (4th Cir. 2021) ....................................................................................15

*In re Surescripts Antitrust Litig.*,
   2020 WL 4905692 (N.D. Ill. Aug. 19, 2020) ..........................................................19

*Tabb v. Bd. of Educ. of Durham Pub. Sch.*,
   29 F.4th 148 (4th Cir. 2022) ....................................................................................12

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956)....................................................................................................9

*United States v. E.I. du Pont de Nemours & Co.*,
   353 U.S. 586 (1957)..................................................................................................15

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966).............................................................................................14, 15

*United States v. ITT Cont'l Baking Co.*,
   420 U.S. 223 (1975)..................................................................................................15

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ..........................................................................11, 17, 18

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)..................................................................................................16

**Statutes**

Clayton Act § 7, 15 U.S.C. § 18 ...................................................................................15

Sherman Act § 2, 15 U.S.C. § 2.........................................................................10, 11, 15, 17

**Other Authorities**

Fed R. Civ. P. 12(b)(6)............................................................................................11, 12

iv

Google's ad tech investments and innovations have allowed publishers to better monetize their content, have helped advertisers to obtain better, more cost-effective advertising, and have made users' experience on the Internet safer and more enjoyable. Plaintiffs' misguided case hinges on artificial market definitions gerrymandered to exclude Google's most powerful rivals. This and other defects warrant dismissal of Plaintiffs' Complaint.[1] Plaintiffs' attempts to salvage those fatal defects by alleging new facts in their Opposition are improper, especially because Plaintiffs have had three years of pre-complaint discovery.

First, Plaintiffs argue that Google's challenges to their market definitions raise factual questions that cannot be resolved on a motion to dismiss. But that argument fails because the Complaint itself identifies several major competitive alternatives to Google yet pleads no facts to plausibly exclude them from the relevant markets.

Second, Plaintiffs cannot satisfy their obligation to plead monopoly power in the ad exchange market by bootstrapping on their allegations of anticompetitive conduct. Further, their argument that Google's purportedly high fees for its ad exchange demonstrate monopoly power is undercut by their own allegation that Google's exchange accounts for only about half of certain open web ad exchange transactions. Plaintiffs cite no case in which a firm was found to have a monopoly when its rivals account for nearly 50% of the alleged market, as they concede here.

Third, Plaintiffs' argument that the Court cannot adjudicate certain conduct claims is contrary to Fourth Circuit law and conflicts with Judge Castel's approach in the MDL. Plaintiffs concede that the DoubleClick and Admeld acquisitions were not anticompetitive, and their attempt

---

[1] Plaintiffs filed an amended complaint, ECF No. 120, at 5:05 p.m. ET, on April 17, 2023 adding nine new plaintiffs. Because all defects in Plaintiffs' first Complaint remain in the Amended Complaint, Defendant's motion to dismiss applies to it with equal force, *Bey v. Michael*, 2021 WL 865805, at *5 (E.D. Va. Mar. 8, 2021), and further amendment appears futile. Google will refer to Plaintiffs' Amended Complaint as "Complaint" throughout this Reply.

to turn the acquisitions into something unlawful by throwing them in a grab bag with other, subsequent conduct fails as a matter of law.  Their attempt to walk away from their refusal to deal claim related to Google Ads, by relabeling it as something else without any support, is also unavailing.  Likewise, Plaintiffs fail to connect their allegations about various product designs to any alleged anticompetitive effects in their alleged publisher ad server market.

Finally, Plaintiffs' damages claim fails because they do not plead facts necessary to avoid the Supreme Court's prohibition against recovery by indirect purchasers.

## I.   PLAINTIFFS' GERRYMANDERED MARKET DEFINITIONS FAIL AS A MATTER OF LAW.

Plaintiffs must plausibly plead relevant markets.  Mot. 6-7.  Plaintiffs argue their alleged markets reflect competitive realities, Opp. 5-7, but their "open web display" markets are an invention for litigation, designed to exclude Google's most significant rivals in ad tech, such as Facebook, Amazon, TikTok, and Comcast.  While Plaintiffs attempt to sidestep this defect by asserting that Google's arguments raise issues of fact inappropriate for resolution at the motion to dismiss stage, Opp. 4, 6-7, dismissal is warranted when a plaintiff fails to allege a factual basis for the exclusion of obvious competitive alternatives they themselves identify in their Complaint, as is the case here.  *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011) (dismissal is appropriate when plaintiffs define markets "in an unreasonably and implausibly narrow manner" (citation omitted)); *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858-59 (E.D. Va. 1999) (dismissal "appropriate" where the market was "'not even *alleged* to encompass all interchangeable substitute products'").  Because Plaintiffs fail to allege plausible relevant markets all of their claims should be dismissed.  *See* Mot. 7.

### A.   Plaintiffs' Alleged "Publisher Ad Servers for Open Web Display Advertising" Market Is Conclusory and Implausible.

Plaintiffs' alleged open web display publisher ad server market is implausibly narrow

because it excludes, without factual explanation, reasonable substitutes recognized in Plaintiffs' Complaint.  Mot. 7-10.  For example, Plaintiffs add the qualifier "open web display" to their market definition to attempt to exclude various obvious alternatives for publishers, including internally-developed ("in-house") publisher ad servers, publisher ad servers for video ads, and publisher ad servers for app ads.  Compl. ¶¶ 43 n.4, 45, 283; Mot. 7-10.[2]  This label cannot explain away the alternatives identified in their Complaint.

*Plaintiffs' Exclusion of In-house Publisher Ad Servers.*  Plaintiffs concede that "some websites . . . like Facebook and Snapchat" use a "proprietary tool" to sell their inventory, rather than sourcing a publisher ad server from a vendor.  ¶ 43 n.4; Opp. 8.  Plaintiffs do not provide any plausible reason why in-house ad servers are not, therefore, a competitive alternative for publishers.  Plaintiffs point to the allegation that "[t]he cost to build a publisher ad server and achieve the scale necessary to compete effectively are significant."  ¶ 288; Opp. 8.  This allegation does not support excluding in-house alternatives from the market because it speaks to the costs of building a product capable of serving a large base of third-party publishers (i.e., "achieve . . . scale").  ¶¶ 67, 288.  The allegation says nothing about the cost of building an in-house publisher ad server that needs to serve ads for only one publisher.  *See id.*[3]  And any purported costs have not stopped website publishers from building and using in-house publisher ad servers.  ¶ 43 n.4.

Plaintiffs also argue that publishers have "weak" incentives to deploy in-house publisher ad servers because Google's publisher ad server is priced low.  Opp. 8.  But Google's low prices

---

[2] The Complaint allegations to which Plaintiffs cite do not support their "open web display" market definition.  *See, e.g.,* ¶ 39, Fig. 1.  All citations to "¶" refer to the Complaint.

[3] Plaintiffs cannot fix this pleading defect by arguing in their Opposition that "the vast majority of website publishers lack the scale needed to make self-supply feasible."  Opp. 8.  *See JTH Tax, Inc. v. Williams,* 310 F. Supp. 3d 648, 654 (E.D. Va. 2018) ("[A] complaint may not be amended by briefs in opposition to a motion to dismiss[.]" (internal citation omitted)).

do not imply that in-house publisher ad servers should be excluded from the alleged market. *See, e.g.*, *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1199 (N.D. Cal. 2008) ("[t]he mere existence of a price differential" does not mean that a product is "unconstrained by competition" when products are reasonably interchangeable "despite the price difference").  To the contrary, allegations that Google's publisher ad server is priced low and has "heavily discount[ed]" fees, ¶ 122, suggest that competitive pressure—including from in-house publisher ad servers—constrains Google's ability to charge higher prices.[4]  If Plaintiffs' market definition were correct, and Google faced no meaningful publisher ad server competition, one would expect Google to charge monopoly prices for ad serving, not the "low" prices alleged in the Complaint.[5]

Plaintiffs' case law suggesting that some courts, based on different allegations, have excluded in-house alternatives from the relevant market, Opp. 7, does not control here because Plaintiffs' own Complaint identifies in-house solutions as alternatives but then fails to offer any plausible explanation for excluding them from the relevant market.  *See Kolon*, 637 F.3d at 444 (dismissals are warranted where a plaintiff defines a market "in an unreasonably and implausibly narrow manner" or alleges a "contradictory and vague delineation" (citation omitted)).

***Plaintiffs' Exclusion of Video and App Ad Publisher Ad Servers.***  Plaintiffs also draw artificial lines to keep publisher ad servers for video and app ads out of their alleged market for "open web" publisher ad servers.  Opp. 8-9.  But beyond conclusions, Plaintiffs fail to allege why publishers, who can display both image ads and video ads on their websites, ¶¶ 43, 64, would not

---

[4] Plaintiffs' argument that Publishers have less incentive to use an in-house ad server because they need Google's publisher ad server to receive demand from Google's ad network, Opp. 8, is contradicted by their Complaint.  *See* ¶ 99 (alleging Google Ads bids into rival exchanges today).
[5] Plaintiffs argue that Google "collects its monopoly rents elsewhere in the stack," Opp. 8, but it would not make economic sense for Google to charge high prices in a more competitive ad exchange market (where Plaintiffs allege Google has a roughly 50% share) and low prices in a less competitive publisher ad server market (where they allege Google's share exceeds 90%).

simply serve more video ads if serving other types of display ads were to become more expensive or less appealing. Indeed, in addition to referring to websites displaying video ads like the "YouTube website," ¶ 64, Plaintiffs acknowledge that a "display ad" includes "multimedia" ads, such as video ads, in addition to "image[]" ads, ¶ 43. Plaintiffs' unsupported assertion that "publishers looking to sell display advertising on their websites cannot use video . . . ad servers *at all* to do so," Opp. 8,[6] thus is contrary to their own allegations. Likewise, Plaintiffs do not allege facts to explain why publishers would not serve more ads in their apps if serving ads on their websites becomes more expensive or otherwise less appealing.

### B. Plaintiffs' Alleged "Ad Exchanges for Indirect Open Web Display Advertising" Market Is Conclusory and Implausible.

Plaintiffs' alleged indirect open web display ad exchange market is likewise contrived to exclude substitutes recognized in their Complaint, including (a) ad exchanges that facilitate the sale of app, social, and video ads, (b) direct sales between publishers and advertisers, and (c) ad exchanges that run auctions for a select group of bidders.

*Plaintiffs' Exclusion of App, Social, and Video Ad Exchanges.* Plaintiffs' own allegations confirm that advertisers switch between different types of digital advertising, including static image, video, app, "open web," and closed web advertising. Mot. 11 (citing ¶¶ 43 n.4, 64, 188-89). Multiple courts, including this one, have granted dismissal where it is clear from the complaint that a plaintiff excluded substitutable advertising formats and channels. *See* Mot. 11.[7]

---

[6] *See JTH Tax*, 310 F. Supp. 3d at 654 ("a complaint may not be amended by briefs . . .").

[7] Plaintiffs argue that advertisers' ability to substitute away from open web display ads is a "factual question." Opp. 10. But cases they cite show that is only true when a plaintiff actually pleads enough facts to make it a plausible factual question, *see*, *e.g.*, *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 781-85 (N.D. Cal. 2022), which Plaintiffs have not done here.

Plaintiffs' attempts to support their defined market fall flat.  First, they point to an ordinary course document that allegedly describes Google as the top player in "display" advertising, Opp. 10 (citing ¶ 103), but as their own allegations show, the term "display" in the ordinary course includes various forms of digital advertising, including app, web, and video advertising.  *See*, *e.g.*, ¶ 308 (Google's "non-search display advertising revenue" includes revenue from AdMob, a mobile app advertising product); ¶¶ 43 n.4, 49 (describing Google's "Display & *Video* 360" (emphasis added) as part of the "open web" display ecosystem).[8]

Next, the format distinction between video and app ad exchanges on which Plaintiffs rely is meaningless.  Opp. 9-10.  Plaintiffs fail to allege why such distinction matters to advertisers, who Plaintiffs recognize are focused on the return on investment from their ad dollars, regardless of ad format.  *See*, *e.g.*, ¶¶ 58, 62, 102, 174; *Kolon*, 637 F.3d at 442 (defining markets "center[s] on the commercial realities of the market and competition").[9]  Moreover, Plaintiffs allege that video ads (like image ads) are viewed on websites, and that both web display and app ads can be viewed on "small mobile device screens."  Opp. 10; ¶¶ 64, 189.

Finally, Plaintiffs attack Google's purported focus on advertisers, rather than publishers, in arguing ad exchange substitutes.  Opp. 9.  Plaintiffs' point is undermined by their own allegations recognizing that ad exchanges serve both publishers and advertisers, the latter through advertiser buying tools.  ¶ 291.

---

[8] By Plaintiffs' own definition, a video ad on Facebook.com is a "display ad."  ¶ 43 (a "display ad" contains "images, text, or *multimedia*" and is "displayed on a website that is viewed in an internet browser" (emphasis added)).

[9] Plaintiffs argue the alleged market in *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1221 (9th Cir. 2018) was "contorted to meet . . . litigation needs," as opposed to reflecting industry realities, Opp. 12, but Plaintiffs' "open web display" market definitions are similarly contorted—nowhere do they allege that Google or other industry actors recognize an "open web display" market.

***Plaintiffs' Exclusion of Direct Sales.***  Plaintiffs acknowledge that publishers directly sell ad inventory to advertisers as well as using ad exchanges, ¶¶ 45, 120, 188-89, 201; Mot. 11-13, yet they fail to allege why direct sales are not reasonable substitutes for ad exchanges.  Relying on Complaint ¶ 45, Plaintiffs argue that direct sales are "impractical," Opp. 12, but that paragraph merely observes that some websites do not sell ad space directly, without alleging that it would be impractical for them to do so.  They also claim to have alleged that publishers use ad exchanges to sell inventory they "*could not* sell via direct channels," Opp. 12 (citing ¶ 61), but the Complaint actually alleges that ad exchanges are used when publishers *do not* sell the inventory directly, without any suggestion that they could or would not sell directly if selling indirectly through ad exchanges became more costly, ¶ 45.  Indeed, Plaintiffs concede the Enhanced Dynamic Allocation ("EDA") feature in Google's publisher ad server opens all inventory up to being sold on exchanges because it allows "inventory potentially covered by direct contracts between publishers and advertisers," ¶ 120, to be sold indirectly.[10]  *See* Mot. 12; *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (relevant market "must include" sellers with ability to "deprive each other of significant levels of business" (quotation omitted)).

***Plaintiffs' Exclusion of Limited Auctions.***  Plaintiffs argue that ad exchange-based auctions limited to a subset of advertisers ("limited auctions") should not be included in the same market as "open auctions" on ad exchanges because limited auctions are the same as direct sales.  Opp. 13.  Their Complaint, however, nowhere equates limited auctions and direct sales,[11] and even

---

[10] Plaintiffs suggest that only "some" subset of this inventory is affected by EDA, Opp. 13, but this proposition is nowhere in their Complaint.  *See JTH Tax*, 310 F. Supp. 3d at 654.

[11] Plaintiffs do not cite a single allegation about limited auctions in arguing in favor of their exclusion from the market.  *See* Opp. 14 (citing ¶¶ 61-62, which concern using multiple ad exchanges, and ¶ 67, which describes a purported quality of ad exchanges).  Limited auctions also cannot be considered direct because they are not "one-on-one" sales, Opp. 12, but sales with a "small set" of advertisers.  Mot. 13.  Plaintiffs cannot fix pleading defects in their Opposition.

if it had, as discussed above, their allegations fail to show that direct sales should be excluded from the market.  Moreover, Plaintiffs never explain why publishers already using ad exchanges for open auctions would not also use those exchanges to participate in limited auctions.  *See* Mot. 13.

### C.  Plaintiffs' Alleged "Advertiser Ad Networks for Open Web Display Advertising" Market Is Conclusory and Implausible.

Plaintiffs' alleged market for "open web display" advertiser ad networks also unjustifiably excludes reasonable substitutes identified in the Complaint, such as ad networks and platforms that facilitate the sale of social and mobile ads.  Mot. 10-11.

Plaintiffs allege competitive overlap between advertiser ad networks for open web display ads and advertiser ad networks or platforms for other types of ads.  For example, Plaintiffs allege that social "giant" Facebook offers an ad network that has competed in the "advertiser ad network market."  Opp. 8, 15.  Their allegations also show that Facebook launched its ad network to offer advertisers interested in buying ad space on Facebook.com or the Instagram app (so-called "closed web" properties, Opp. 8), the alternative of buying ad space on properties of third-party publishers (so-called "open web" properties like the Wall Street Journal or Weather.com), because Facebook had excess advertiser demand.  ¶¶ 188-89.

These allegations show that ad networks selling open web inventory compete with ad networks selling social or mobile inventory.  They also show that Facebook's ad network is highly competitive with and has similar features to Google's ad network.  Opp. 15 (citing ¶¶ 191-92); *see also* ¶¶ 94, 188-90, 301.  Plaintiffs concede that Facebook's advertiser ad network competes with Google but try to cabin that competition to the alleged publisher ad server market.  Opp. 15.  This concession undercuts Plaintiffs' publisher ad server and advertiser ad network market definitions by suggesting that publishers could substitute between Google's publisher ad server and Facebook's advertiser ad network to sell their inventory.  *Id.* (citing ¶ 190).

Plaintiffs point to purported ad format differences between social media, mobile, and open web display ads.  Opp. 14-16.[12]  But they do not allege why such differences matter in terms of substitutability for advertisers, other than the conclusory assertion, contradicted elsewhere in the Complaint, that social ad networks have "more limited reach."  ¶ 300.[13]  Indeed, Plaintiffs admit that advertisers are focused on return on investment from their ad dollars, ¶ 62, regardless of whether those returns come from open web, social, or app advertising.  *See* Mot. 11.  Another court rejected an alleged market with the same "open web" limitation.  *See In re Google Digit. Advert. Antitrust Litig.*, 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021) ("[T]he alleged market for online display advertising services on the open web improperly excludes other ways for advertisers to reach publishers without using Google's services.").

## II. PLAINTIFFS FAIL TO ALLEGE MONOPOLY POWER IN A MARKET FOR AD EXCHANGES.

Plaintiffs assert that, after 14 years of allegedly anticompetitive conduct, Google has achieved a share of "more than 50%" of "open auctions" in the alleged "ad exchanges for indirect open web display advertising" market.  ¶ 292.  In other words, Google's ad exchange allegedly accounts for about half of that contrived market.  In contrast, monopoly power implies that a firm faces little to no meaningful competition in a market.  *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  Because Plaintiffs concede that nearly half of all "indirect open web display ad exchange" transactions run on rival exchanges, they have failed to plausibly allege

---

[12] In support of their market definition, Plaintiffs also argue that an alleged experiment indicates that Google Ads *could* "profitably increase its take rate on its ad network demand in excess of 5%," Opp. 16; ¶ 301, but they do not allege Google *actually* increased its price, which suggests that Google could not profitably do so due to competitive constraints.  *Cf. MLW Media LLC v. World Wrestling Ent. Inc.*, 2023 WL 1975241, at *4 (N.D. Cal. Feb. 13, 2023) (concluding that plaintiff had not plausibly alleged monopoly power when it only alleged defendant had the ability to raise prices, not that defendant had actually done so).

[13] Contrary to that assertion, Plaintiffs allege that Facebook alone (not counting other competitors like SnapChat, Microsoft, and Amazon) reaches over "a billion users."  ¶ 191.

that Google has monopoly power.  *See, e.g.*, *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1268 (11th Cir. 2015) (complaint alleging that defendant had "captured half the market" failed to allege defendant was a "monopolist"); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 382 (E.D. La. 2013) ("[I]t would be rare indeed to find that a firm with half of a market could individually control price over any significant period." (quotations omitted)).  Courts in this Circuit regularly dispose of monopolization claims when shares are below 70%, *see* Mot. 16-17, and Plaintiffs have not cited any case where a court found market shares of 50% sufficient to support a monopolization claim.

Attempting to sidestep this admission in their Complaint, Plaintiffs argue that they have alleged "direct evidence" of the effects of monopoly power.  *See* Opp. 16-17.  But the Supreme Court has held that a plaintiff can only substitute direct evidence of anticompetitive effects for a showing of monopoly power in Sherman Act cases involving horizontal restraints among competitors.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018).  The Court explained that relying on direct evidence is not appropriate in other Sherman Act cases because "[v]ertical restraints often pose no risk to competition unless the entity imposing them has market power." *Id.*  Plaintiffs nevertheless argue that, despite an alleged share of only about 50%, their allegation of monopoly power is plausible because prices for AdX are higher than prices for competing ad exchanges.  Opp. 16-17.  Not so.  *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("[A] firm's comparatively high price may simply reflect a superior product.").  Their argument is not supported by the cases they cite, which involved supracompetitive *profits*[14]

---

[14] *See FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) ("higher-than-competitive profits [are] a strong indication of market power"); *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 500 (2nd Cir. 2004) (finding plaintiffs' "direct proof . . . at best ambiguous" because unknown "whether the allegedly elevated prices led to an abnormally high price-cost margin").

or profitable price *increases* to supracompetitive levels,[15] neither of which are alleged here.

Plaintiffs' argument that Google's allegedly anticompetitive conduct is sufficient to support their monopoly power allegation, Opp. 16-17, likewise fails because it conflates the two distinct elements that a plaintiff must allege separately to state a Section 2 monopolization claim: monopoly power and exclusionary conduct. *See, e.g.*, *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 775 (1984) (recognizing that the monopoly power screen is important in Section 2 cases to reduce risk that judicial scrutiny "threaten[s] to discourage the competitive enthusiasm that the antitrust laws seek to promote"); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 608 F. Supp. 3d 298, 318 (W.D.N.C. 2022).

Finding no support in established antitrust law, Plaintiffs ask the Court to craft a new rule for "digital technology platform markets." Opp. 18-19. They provide no support for such a novel approach other than to point to the *Microsoft* case, Opp. 19, which involved allegations of a 95% market share. 253 F.3d at 51. Alternatively, Plaintiffs argue that a 50% market share should at least be sufficient for an attempted monopolization claim. Opp. 19. Yet, attempted monopolization requires a "dangerous probability of success," which again, is implausible here because Plaintiffs allegations show that after 14 years of allegedly anticompetitive conduct, Google's ad exchange only wins about 50% of all open auction transactions in the alleged exchange market. ¶ 292; *see* Mot. 18.

## III.   PLAINTIFFS HAVE ALLEGED VARIOUS TYPES OF CONDUCT THAT DO NOT SUPPORT THEIR MONOPOLIZATION CLAIMS.

Plaintiffs argue that Rule 12(b)(6) does not permit the Court to dismiss "*parts* of claims." Opp. 20. This ignores Fourth Circuit law and that their Complaint asserts that each of the alleged

---

[15] *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) ("[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level.").

acts "is anticompetitive in its own right."  ¶¶ 313, 320, 327.  In effect, Plaintiffs ask this Court to allow them to avoid scrutiny under Rule 12(b)(6) by simply collapsing ten discrete acts into one claim.  But Fourth Circuit courts routinely exercise their authority under Rule 12(b)(6) to dismiss deficient allegations even if they did not dismiss the entire claim.  *See, e.g.*, *Tabb v. Bd. of Educ. of Durham Pub. Sch.*, 29 F.4th 148, 153-54 (4th Cir. 2022) (affirming partial dismissal of discrimination claim based on certain conduct allegations); *CertusView Techs., LLC v. S & N Locating Servs., LLC*, 107 F. Supp. 3d 500, 509, 523 (E.D. Va. 2015) (assessing "each subset of allegations" comprising the defendants' inequitable conduct counterclaim and granting dismissal on one of the three sets of allegations).

In the multidistrict litigation, Judge Castel did just that.  Judge Castel ruled that certain alleged conduct did not plausibly support the monopolization claims, dismissing the States' allegations regarding: (1) Google's use of encrypted user IDs, *In re Google Digit. Advert. Antitrust Litig.*, 2022 WL 4226932, at *22-23 (S.D.N.Y. Sept. 13, 2022); (2) Google's use of reserve price optimization, *id.* at *30-32; (3) certain aspects of exchange bidding, *id.* at *32-34; and (4) Google's alleged conduct relating to mobile web page development, *id.* at *36-37.  Nothing precludes the Court from doing the same here and ruling on Plaintiffs' conduct allegations that do not plausibly support their monopolization or attempted monopolization claims.[16]  Indeed, given the compressed discovery period, pruning defective claims from the Complaint takes on even greater importance.

### A.  The DoubleClick and Admeld Acquisitions Do Not Support Plaintiffs' Monopolization Claims.

After in-depth investigations, the FTC and DOJ concluded Google's acquisitions of

---

[16] In fact, if it were not possible for Google to challenge the sufficiency of Plaintiffs' various conduct allegations, then Google would not be able to adhere to this Court's instruction to confine its arguments to those Judge Castel has not yet addressed.  ECF No. 59, at 23:4-5.

DoubleClick and Admeld were not anticompetitive.  Mot. 19.  Consistent with those conclusions, Plaintiffs concede they are not challenging either acquisition standing on its own, but instead contend that the acquisitions are anticompetitive because of allegedly anticompetitive conduct that occurred later.   Opp. 23-24.   This Court has previously rejected attempts to plead that an acquisition was anticompetitive based on purportedly anticompetitive subsequent behavior.  *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 2013 WL 6682981, at *9 (E.D. Va. Dec. 18, 2013). Plaintiffs try to distinguish *Intellectual Ventures* because it involved a patent acquisition but do not explain why that distinction matters to the analysis here.  Opp. 23 n.14.  This Court held that the plaintiff's failure to allege a theory of harm for the acquisitions themselves was sufficient for dismissal.  *Intell. Ventures*, 2013 WL 6682981 at *9.[17]

Plaintiffs attempt to turn lawful acquisitions from years ago into actionable conduct by arguing that "the complaint alleges an anticompetitive 'course of conduct,' which calls for a holistic look at all of the allegations of the complaint, not scrutiny of individual allegations in isolation."  Opp. 20.  Plaintiffs' argument is contrary to well-established legal principles and Judge Castel's approach in the MDL.  As Judge Castel did, *In re Google Digit. Advert.*, 2022 WL 4226932 at *39-40, each theory of exclusionary conduct "must be separately analyzed in light of settled principles of antitrust law."  *Retractable Techs., Inc., v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016); *City of Groton v. Conn. Light & Power*, 662 F.2d 921, 928 (2d Cir. 1981) ("Even though many of the issues the [plaintiffs] raise are interrelated and interdependent, however, we must . . . analyze the various issues individually.");  *Intergraph v. Intel Corp.*, 195

---

[17] Plaintiffs' attempt to distinguish *Intellectual Ventures* by pointing to *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1211-12 (2d Cir. 1981) fails.  *SCM* is not factually similar, and whereas *SCM* concerned post-acquisition conduct that was protected by the patent law, *Intellectual Ventures* analyzed post-acquisition conduct potentially subject to the antitrust laws.  *Intell. Ventures*, 2013 WL 6682981 at *9.

F.3d 1346, 1367 (Fed. Cir. 1999) (adopting Second Circuit's approach).  The cases Plaintiffs cite are very different from this case and, in any event, do not hold otherwise.[18]

Plaintiffs argue that "acquisitions can prove anticompetitive after the transaction closes" because they "can facilitate or give rise to anticompetitive conduct later through the 'use' of the purchased assets."  Opp. 24.  In other words, Plaintiffs seem to argue that the acquisitions are problematic because, without them, Google would not have owned the assets that it allegedly put to subsequent anticompetitive use.  Not only does that argument go against *Intellectual Ventures*, but it is akin to saying that the lawful purchase of a sports car becomes unlawful if the car was subsequently involved in a speeding violation.

Moreover, Plaintiffs do not plausibly allege how the purchased assets were put to misuse.[19] In particular, Plaintiffs fail to allege a plausible causal connection between Google's acquisition of DoubleClick and its alleged restriction of rivals' access to Google Ads advertising demand. Plaintiffs concede that Google never made that demand available to rivals prior to the acquisition, and they fail to plausibly allege why, absent the acquisition, Google would have changed course. To the contrary, Plaintiffs allege that Google's plan was always to make that demand available only through Google products.  ¶¶ 77-78.

Similarly, Plaintiffs fail to allege that, in the absence of the Admeld acquisition, Google's publisher ad server or ad exchange would have faced greater competition.  Plaintiffs concede that

---

[18] Plaintiffs rely on *United States v. Grinnell Corp.*, 384 U.S. 563, 567 (1966), but that case is distinguishable because it involved unlawful market allocations among several competitors followed by serial stock acquisitions consolidating those competitors under the same ownership. *Id*. at 567-68.  By contrast, Plaintiffs here have alleged two acquisitions, neither of which involved a competitor of Google, and certainly have not alleged a market allocation agreement.

[19] To the contrary, Plaintiffs allege that the DoubleClick acquisition gave advertisers using Google Ads "more advertising opportunities," ¶ 14, and "benefitted" them by "increasing their access to inventory," ¶ 78, which is procompetitive.

Admeld was neither an ad server nor an ad exchange and that there were at least two other "key competitors" like Admeld at the time of the acquisition.  Mot. 22-23.  Although Plaintiffs argue that Google's post-acquisition agreements "prohibited publishers from using" the remaining key competitors "to compare bids from Google's ad exchange with bids from other ad exchanges in real time, " Opp. 22 n.13, they fail to allege how that purported conduct is tied to the acquisition or that Google would have done anything different if it had not acquired Admeld.

Plaintiffs incorrectly argue that cases concerning prospective merger challenges are "inapposite" because the Court here has the "benefit of hindsight."  Opp. 23.  As noted, Plaintiffs have failed to plead facts to plausibly show the markets would have been more competitive absent the DoubleClick or Admeld acquisition.  And, assessing that with hindsight involves *more* speculation than in a prospective merger challenge because it requires predictions about how market participants would have responded over the course of more than a decade, while a prospective challenge focuses on shorter-term predictions.  While claiming that the Sherman Act authorizes them to challenge vertical acquisitions like DoubleClick and Admeld long after closing, Opp. 24-25 & n.15, Plaintiffs do not cite any precedent in the statute's 130-year history for a challenge like this one.[20]

---

[20] Plaintiffs rely on *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 597 (1957), but that case was not analyzed under the Sherman Act.  Its reasoning depended on the text and legislative history of Section 7 of the Clayton Act.  Moreover, it involved an acquisition causing the acquired firm to stop or reduce a pre-merger practice of buying from rivals of the acquiring firm, while Plaintiffs concede that the DoubleClick acquisition did not stop or reduce any pre-merger supply relationship with rivals.  *Id.* at 596, 602.  *United States v. ITT Cont'l Baking Co.* addressed the imposition of civil penalties for violations of a consent decree and did not discuss the Sherman Act.  420 U.S. 223, 225 (1975).  *Steves and Sons, Inc. v. JELD-WEN, Inc.*, was another Section 7 case and, unlike this case, involved a horizontal acquisition of a rival.  988 F.3d 690, 698 (4th Cir. 2021).  *Grinnell* was a Sherman Act case, but it involved serial horizontal acquisitions of competitors, unlike the vertical acquisitions at issue here.  384 U.S. at 567.

**B.  Plaintiffs' Google Ads Exclusivity Allegations Do Not Support Their Monopolization Claims.**

Plaintiffs contend that restricting Google Ads demand to Google's own products was "not a unilateral refusal to deal" with rivals because the "terms and conditions Google imposed on its dealings [were] with *its own customers*."  Opp. 25.  But their Complaint contains no allegations about the "terms and conditions" that Google imposes on its advertiser or publisher customers related to Google Ads' alleged exclusivity.  *Id.*[21]  Tellingly, the only support for this argument in their brief comes from conclusory allegations in the Complaint's "Violations Alleged" section.  *Id.* at 25-26 (citing ¶¶ 312, 319, 337-38).

Contrary to these arguments, Plaintiffs' actual allegations describe a straightforward and lawful refusal to deal with rival ad exchanges and publisher ad servers.  Mot. 23-24.  Plaintiffs allege that "Google restricted Google Ads' purchasing of display inventory to sources controlled by Google," with the goal of "lock[ing] publishers into its ad exchange and publisher ad server, and block[ing] competing ad exchanges and publisher ad servers from accessing" Google Ads' advertisers.  ¶ 91.  In other words, Plaintiffs allege Google Ads refused to bid into competing auctions.  These allegations fit squarely within traditional refusal to deal case law.  *See, e.g.*, *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004) ("Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents."); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009) ("[P]laintiffs alleged that the defendants (upstream monopolists) abused their power in the wholesale market to prevent rival firms from competing effectively in the retail market.  *Trinko* holds that such claims are not cognizable under the

---

[21] Plaintiffs cannot fix pleading defects by adding new facts in their Opposition.

Sherman Act in the absence of an antitrust duty to deal.").[22]

The cases cited by Plaintiffs are inapposite.  Opp. 25-26.  In *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, Kodak conditioned the sale of its parts to third parties on their purchase of service from Kodak.  504 U.S. 451, 463 (1992).  The Court held that this was unlawful tying, disagreeing that it qualified as a refusal to deal.  *Id.* at 463 & n.8.  Plaintiffs' tying claim in this case does not involve Google Ads, but only AdX and DFP.  ¶ 337.  The alleged conduct regarding Google Ads is solely Google's refusal to bid on rival ad exchanges and ad servers.  This case is also unlike *Lorain Journal Co. v. United States*, 342 U.S. 143, 149 (1951), where a monopolist newspaper refused to accept advertisements from customers that also advertised with a rival radio station, and unlike *Microsoft*, 253 F.3d at 75, where Microsoft required software vendors to refrain from distributing to Windows users software that complied with a rival's standards.  Unlike those cases, Plaintiffs have not alleged that Google restricted advertisers' ability to use rival ad buying tools to Google Ads; they claim only that Google declined to open its own systems to competitors.  *See FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 29 (D.D.C. 2021) (distinguishing *Lorain Journal* because defendant's challenged policy "applied only to apps designed for use within [its] website").

### C.  Plaintiffs' Project Poirot, DRS, and UPR Allegations Do Not Support Their Publisher Ad Server Monopolization Claims.

Plaintiffs' Complaint does not make a single allegation that Google excluded rival ad

---

[22] Plaintiffs also argue that a viable Section 2 refusal to deal claim does not require termination of a prior course of dealing with a rival, Opp. 26 n.17, but courts, including the Fourth Circuit, hold otherwise.  Mot. 21 n.8, 24.  And, *Otter Tail Power Co. v. United States*—the only case on which Plaintiffs rely for their argument—is inapposite and itself involved a prior course of dealing.  The defendant power system prevented delivery of wholesale power to municipal customers it previously served when those customers decided to build competitive power systems instead of renewing contracts with the defendant.  410 U.S. 366, 368 (1973).

servers through its Dynamic Revenue Sharing (DRS), Poirot, and Unified Pricing Rules (UPRs) features.  Mot. 25-26.  And Plaintiffs cannot salvage their failure to allege harm to the publisher ad server market by arguing in their brief that because Google used its ad exchanges to favor its publisher ad server, any conduct affecting the ad exchange market necessarily affects the publisher ad server market.  Opp. 21.  *Microsoft* does not support their argument because that case involved "nascent *competitive* technologies," Opp. 21 (emphasis added), and Plaintiffs allege that publisher ad servers and ad exchanges do not compete.  ¶ 284.  Moreover, Judge Castel has already rejected that kind of loose logic, concluding that conduct that affected only the ad exchange market cannot support publisher ad server monopolization claims.  *See, e.g.*, *In re Google*, 2022 WL 4226932 at *29-30 (finding that plaintiffs' allegations regarding DRS did not "describe anticompetitive conduct in the market for publisher ad servers").

## IV.   PLAINTIFFS FAIL TO ALLEGE THAT THE UNITED STATES IS A DIRECT PURCHASER IN ANY ALLEGED MARKET.

Plaintiffs concede the "provision of ad tech services is what matters for the *Illinois Brick* analysis."  Opp. 27.  Plaintiffs' damages claim should therefore be dismissed because they fail to allege the United States (as an advertiser) directly purchased ad tech services in the alleged markets for open web display: (1) publisher ad servers; (2) ad exchanges; or (3) ad networks.

Plaintiffs do not allege the United States or *any* advertisers are direct purchasers of the ad tech services provided by publisher ad servers or ad exchanges.  Instead, Plaintiffs allege publisher ad servers are a tool used by *publishers* to manage their online advertising sales and that "[t]he publisher ad server generally charges the *publisher* a fee based on the number of impressions served." ¶¶ 14, 57 (emphasis added).  Although Plaintiffs allege the ad exchange "solicits" bids from buying tools (not directly from advertisers), the allegations make clear that publishers are the only parties that directly *purchase* ad exchange services.  ¶ 53.

18

Plaintiffs' vague assertion that "United States departments and agencies... purchase open web display advertising using Google and non-Google ad tech tools," ¶ 278, fails to allege the United States directly purchases ad tech services from Google's advertiser ad network. Their assertion leaves open the possibilities that the federal government purchases through DSPs (which Plaintiffs do not allege Google monopolized), that purchases are made through non-Google ad networks or DSPs, and that the United States, like other large advertisers, purchases indirectly through advertising agencies. ¶ 49.

Plaintiffs cannot skirt their pleading burden by casting *Illinois Brick* as a relic, applicable only to vertical distribution chains for physical products. Opp. 27. Courts regularly apply the indirect purchaser bar to complex businesses and technologies involving intermediaries.[23] Plaintiffs' argument would exempt much of the digital economy from *Illinois Brick* analysis, but the Supreme Court has admonished "against enlarging market-based exceptions that would undermine the indirect-purchaser rule." *Kloth*, 444 F.3d at 321 (citation omitted).

Finally, Plaintiffs argue that even if the United States was an indirect purchaser, two exceptions to *Illinois Brick* prevent dismissal of its damages claim, Opp. 28-29, but neither exception applies here. First, Plaintiffs fail to allege facts showing that the cost-plus contract exception applies. The Complaint contains no allegations that the United States pays its advertising agencies on a cost-plus basis, so there is no basis to apply that exception here.

Second, Plaintiffs invoke the control exception. That narrow exception allows a plaintiff to seek damages from a defendant that controls multiple links in a supply chain as long as the

---

[23] *In re Surescripts Antitrust Litig.*, 2020 WL 4905692, at *6 (N.D. Ill. Aug. 19, 2020); *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 709-10 (D. Md. 2001), *aff'd sub nom. Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006).

plaintiff purchases the relevant services directly from the defendant at some point in the chain.[24] Plaintiffs seek to take advantage of this exception by recasting their allegations as challenging conduct in the overall purchase and sale of one product: digital advertising.  *See id*. at 29 ("[T]heoretically the purchaser of advertising must buy *the impression* through many layers in the ad tech stack." (emphasis added)).  But that theory contradicts Plaintiffs' allegations that there are three separate relevant markets (publisher ad servers, ad exchanges, advertiser ad servers) in which ad tech companies provide distinct services.  Because Plaintiffs allege Google monopolizes the provision of each of those services, the *Illinois Brick* analysis should focus on whether the United States alleges that it directly purchased any of them from Google.  *See id*. at 27 ("The provision of ad tech services is what matters for the *Illinois Brick* analysis.").  As explained above, the complaint fails to do so.  Having alleged there are separate relevant markets for publisher ad servers, ad exchanges, and advertiser ad networks, Plaintiffs cannot combine them into a single market for "impressions" to try to take advantage of the control exception.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court dismiss Claims One through Five of Plaintiffs' Complaint in full.

---

[24] *See Dee-K Enters. v. Heveafil Sdn. Bhd.*, 982 F. Supp. 1138, 1152 (E.D. Va. 1997) (explaining that the exception is only applicable when "the direct purchaser is owned or controlled by the [alleged monopolist]" because "in such instances, the price charged by the 'middleman' would be dictated by the [alleged monopolist] and not by market forces." (quotations omitted)); *see also In re Microsoft*, 127 F. Supp. 2d at 713 ("Courts that have adopted the control exception have emphasized that it must be narrowly construed.").

Dated: April 17, 2023

Eric Mahr (*admitted pro hac vice*)
Andrew Ewalt (*admitted pro hac vice*)
Julie Elmer (*admitted pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com
andrew.ewalt@freshfields.com
julie.elmer@freshfields.com
tyler.garrett@freshfields.com

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
CRAIG C. REILLY, ESQ.
209 Madison Street
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Daniel Bitton (*admitted pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
Koren Wong-Ervin (*admitted pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com
kwongervin@axinn.com

*Counsel for Defendant Google LLC*