# Exhibit A

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 19, 2022          Decided April 27, 2023

No. 21-7078

STATE OF NEW YORK, ET AL.,
APPELLANTS

v.

META PLATFORMS, INC.,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-03589)

———

*Barbara D. Underwood*, Solicitor General, Office of the Attorney General for the State of New York, argued the cause for appellants.  With her on the briefs were *Letitia James,* Attorney General, *Steven C. Wu*, Deputy Solicitor General, *Anisha S. Dasgupta*, Deputy Solicitor General, *Philip J. Levitz*, Assistant Solicitor General of Counsel, *Karl A. Racine*, Attorney General, Office of the Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Megan D. Browder*, Assistant Attorney General, *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *Paula L. Blizzard,* Supervising Deputy Attorney General, *Mina Noroozkhani*, Deputy Attorney General, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the

2

State of Colorado, *Jeffrey H. Blattner,* Special Assistant Attorney General, *Diane R. Hazel,* Attorney, *Carla J. Baumel*, Assistant Attorney General, *Ashley Moody*, Attorney General, Office of the Attorney General for the State of Florida, *Nicholas D. Niemiec,* Attorney, *Thomas J. Miller*, Attorney General, Office of the Attorney General for the State of Iowa, *Max M. Miller,* Assistant Attorney General, *Douglas J. Peterson*, Attorney General, Office of the Attorney General for the State of Nebraska, *Shereece Dendy-Sanders,* Assistant Attorney General, *Joseph M. Conrad,* Assistant Attorney General, *Joshua H. Stern*, Attorney General, Office of the Attorney General for the State of North Carolina, *Sarah G. Boyce*, Deputy Solicitor General, *Dave Yost*, Attorney General, Office of the Attorney General for the State of Ohio, *Jennifer L. Pratt*, Chief, Antitrust Section, *Herbert H. Slatery, III*, Attorney General and Reporter, Office of the Attorney General for the State of Tennessee, at the time the brief was filed, *J. David McDowell,* Deputy Attorney General, *Treg R. Taylor*, Attorney General, Office of the Attorney General for the State of Alaska, *Mary Hunter Gramling,* Assistant Attorney General, *Mark Brnovich*, Attorney General, Office of the Attorney General for the State of Arizona, *Drew Ensign,* Section Chief Counsel, *Leslie Rutledge*, Attorney General, Office of the Attorney General for the State of Arkansas, *Johnathan R. Carter*, Assistant Attorney General, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Clare E. Kindall*, Solicitor General, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Michael A. Undorf,* Deputy Attorney General, *Leevin Taitano Camacho*, Attorney General, Office of the Attorney General for the Territory of Guam, *Holly T. Shikada,* Attorney General, Office of the Attorney General for the State of Hawaii, *Rodney I. Kimura*, Deputy Attorney General, *Lawrence G. Wasden*, Attorney General, Office of the Attorney General for the State of Idaho, *David B. Young,* Deputy Attorney General, *Kwame Raoul*, Attorney General, Office of

3

the Attorney General for the State of Illinois, *Alex Hemmer,* Deputy Solicitor General, *Todd Rokita*, Attorney General, Office of the Attorney General for the State of Indiana, *Matthew Michaloski*, Deputy Attorney General, *Scott Barnhart,* Chief Counsel and Director of Consumer Protection, *Derek Schmidt*, Attorney General, Office of the Attorney General for the State of Kansas, *Jeffrey A. Chanay,* Chief Deputy Attorney General, *Daniel Cameron*, Attorney General, Office of the Attorney General for the Commonwealth of Kentucky, *Jonathan Farmer,* Deputy Executive Director, *Jeff Landry*, Attorney General, Office of the Attorney General for the State of Louisiana, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Christina M. Moylan,* Assistant Attorney General, *Brian E. Frosh*, Attorney General, Office of the Attorney General for the State of Marlyand, *Adam D. Snyder,* Deputy Chief, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Michael B. MacKenzie,* Deputy Division Chief, *Dana Nessel*, Attorney General, Office of the Attorney General for the People of the State of Michigan, *Scott A. Mertens,* Assistant Attorney General, *Keith Ellison,* Attorney General, Office of the Attorney General for the State of Minnesota*, Lynn Fitch*, Attorney General, Office of the Attorney General for the State of Mississippi, *Elisabeth Hart Pepper Martin,* Special Assistant Attorney General, *Eric Schmitt*, Attorney General, Office of the Attorney General for the State of Missouri, *Stephen M. Hoeplinger*, Assistant Attorney General, *Austin Knudsen*, Attorney General, Office of the Attorney General for the State of Montana, *Mark W. Mattioli,* Chief Deputy, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of Nevada, *Marie W. L. Martin,* Assistant Attorney General, *John M. Formella*, Attorney General, Office of the Attorney General for the State of New Hampshire, *Andrew Bruck*, Attorney General, Office of the Attorney General for the State of New Jersey, at the time the brief was filed, *Isabella R. Pitt,*

4

Deputy Attorney General, *Hector H. Balderas*, Attorney General,  Office of the Attorney General for the State of New Mexico, *Brian E. McMath,* Assistant Attorney General, *Wayne Stenehjem*, Attorney General, Office of the Attorney General for the State of North Dakota, at the time the brief was filed, *Parrell D. Grossman*, Assistant Attorney General, *John O'Connor*, Attorney General, Office of the Attorney General for the State of Oklahoma, *Caleb J. Smith,* Assistant Attorney General, *Ellen F. Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Cheryl F. Hiemstra*, Assistant Attorney General, *Josh Shapiro,* Attorney General, Office of the Attorney General for the Commonwealth of Pennsylvania, *Abigail U. Wood*, Deputy Attorney General, *Tracy W. Wertz,* Chief Deputy Attorney General, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Michael W. Field*, Assistant Attorney General, *Ken Paxton*, Attorney General, Office of the Attorney General for the State of Texas, *William J. Shieber*, Assistant Attorney General, Sean *D. Reyes*, Attorney General, Office of the Attorney General for the State of Utah, *Melissa A. Holyoak,* Solicitor General, *Thomas J. Donovan, Jr.*, Attorney General, Office of the Attorney General for the State of Vermont, at the time the brief was filed, *Benjamin D. Battles,* Solicitor General, *Mark R. Herring*, Attorney General, Office of the Attorney General for the Commonwealth of Virginia, at the time the brief was filed, *Sarah Oxenham Allen,* Assistant Attorney General, *Tyler T. Henry,* Assistant Attorney General, *Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *Amy N.L. Hanson*, Assistant Attorney General, *Patrick Morrisey*, Attorney General, Office of the Attorney General for the State of West Virginia, *Tanya L. Godfrey,* Assistant Attorney General, *Joshua L. Kaul*, Attorney General, Office of the Attorney General for the State of Wisconsin, *Gwendolyn J. Cooley*, Assistant Attorney General, *Bridget Hill*, Attorney General, Office of the Attorney General for the State

5

of Wyoming, *Amy A. Pauli,* Assistant Attorney General, and *Melissa Westby,* Executive Management.  *Brian V. Church*, Deputy Attorney General, Office of the Attorney General for the State of Idaho, *Margaret I. Olson*, Assistant Attorney General, Office of the Attorney General for the State of North Dakota, *Amber C. Wessels-Yen*, Assistant Attorney General, Office of the Attorney General for the  State of New York, *Bryan C. Yee*, Deputy Attorney General, Office of the Attorney General for the  State of Hawaii, *Michael T. Kahler*, Senior Assistant Attorney General, Office of the Attorney General for the State of Wyoming, *Bryce A. Pashler,* Assistant Attorney General, Office of the Attorney General for the State of Iowa, *Rachel E. Smith,* Deputy Solicitor General, Office of the Attorney General for the State of Vermont, *Steven M. Sullivan*, Assistant Attorney General, Office of the Attorney General for the State of Maryland, and *Judith Vale,* Assistant Deputy Solicitor General, Office of the Attorney General for the State of New York, entered appearances.

*Sharon Robertson* and *Jessica Weiner* were on the brief for *amici curiae* Economists in support of appellants.

*David Golden* was on the brief for *amici curiae* Former State Antitrust Enforcement Officials and Antitrust Law Professors in support of appellants.

*Daniel E. Haar*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* the United States in support of appellants.  With him on the brief were *Nickolai G. Levin, Adam D. Chandler,* and *Cecilia Y. Cheng*, Attorneys.

*Randy M. Stutz* was on the brief for *amicus curiae* the American Antitrust Institute in support of appellants.

*David H. Weinstein* was on the brief for *amicus curiae* The

6

Committee to Support the Antitrust Laws in support of appellants.

*Aaron M. Panner* argued the cause for appellee.  With him on the brief were *Mark C. Hansen, Julius P. Taranto,* and *Alex A. Parkinson.  Geoffrey M. Klineberg* entered an appearance.

*George L. Paul, Andrew Black,* and *Jaclyn Phillips* were on the brief for *amicus curiae* International Center for Law and Economics and Scholars of Law and Economics in support of appellee.

*Deanne E. Maynard* and *Adam L. Sorensen* were on the brief for *amicus curiae* Former Federal Antitrust Enforcer in support of appellee.

*Noel J. Francisco, James M. Burnham, Brinton Lucas, Stephanie A. Joyce*, and *Craig E. Stewart* were on the brief for *amici curiae* The Chamber of Commerce of the United States of America, et al. in support of appellee.

*Nicole A. Saharsky* and *Minh Nguyen-Dang* were on the brief for *amici curiae* J. Gregory Sidak and David J. Teece in support of appellee.

*Richard P. Bress* and *Charles S. Dameron* were on the brief for *amici curiae* Former Federal Antitrust Enforcers in support of appellee.

*Cory L. Andrews, John M. Masslon II,* and *Zachary D. Tripp* were on the brief for *amici curiae* Washington Legal Foundation and Information Technology & Innovation Foundation in support of appellee.

Before: HENDERSON and WILKINS, *Circuit Judges*, and

7

RANDOLPH, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: Meta Platforms, Inc. owns and operates the social media network Facebook.[1] Forty-six states, the District of Columbia, and the Territory of Guam joined in a civil complaint charging Facebook with violating the antitrust laws. The States, as we shall call the plaintiffs, alleged that Facebook committed these violations as a result of its acquisitions of several actual or potential competitors and its restrictions on developers of applications that linked to Facebook. The States sought equitable relief. The district court, Boasberg, J., dismissed their Complaint and issued a comprehensive and persuasive opinion. *New York v. Facebook, Inc. (Facebook I)*, 549 F. Supp. 3d 6 (D.D.C. 2021).

I.

The States' Complaint consists of 277 numbered paragraphs and three counts. We assume that the allegations of fact relevant to the States' claims are true.

The States alleged that many millions of Americans and others throughout the world were on Facebook sharing thoughts, opinions, videos and photographs with others on the network. Complaint ¶ 1, 66. Facebook users not only responded to other users, but also created their own messages and images. Facebook users also viewed postings such as newspaper articles

---

[1] In October 2021, the parent company of Facebook changed its name from Facebook, Inc., to Meta Platforms, Inc. Because the events at issue in this case took place before the name change, we refer to the company as "Facebook."

8

and advertisements.  Facebook connected to other websites and applications (or "apps"), both inside and outside of Facebook itself.  Complaint ¶ 191.  Within Facebook, users gained access to applications that allowed them to play a game or take a personality quiz – what Facebook called "canvas apps." Complaint ¶ 190.  Outside of Facebook, a variety of external websites connected to Facebook in one way or another. Complaint ¶¶ 81-82, 191.  Some Facebook users maintained a list of "friends" – people the user designated as those they know, or want to know.  Complaint ¶¶ 44, 58, 77.

At the time of the States' Complaint, Facebook users were not charged anything to join. And after they joined they were not charged for software design or server space or anything else. Complaint ¶¶ 2–3.  Facebook derived its revenue from advertisers who paid to have their advertisements displayed on users' interfaces (or "newsfeeds," as they were sometimes called).  Complaint ¶¶ 3, 250.  Advertisers were attracted to Facebook because it offered "access to a large, highly engaged user base, and finely targeted advertising audiences derived from the vast quantity of user data the company has amassed." Complaint ¶ 48.

Between 2012 and 2020, while the number of Facebook users significantly increased, Facebook acquired "dozens of companies."  Complaint ¶ 105.  The States' Complaint focused on two of those acquisitions: Instagram, acquired in 2012, and WhatsApp, acquired in 2014.  Complaint ¶¶ 119, 166, 263–72.

Instagram began in 2010 as a smartphone app that allowed users to edit and share photographs with each other.  Complaint ¶¶ 107–09.  Instagram grew rapidly in its first year and a half of operation, and attracted Facebook's attention.  Complaint ¶¶ 110–13.  At the time, Facebook was developing its own photo-sharing feature – "Facebook Camera."  Complaint ¶ 113.

9

Facebook viewed Instagram as a potential rival in photo-sharing. Complaint ¶¶ 111–17.   In mid-2012, Facebook purchased Instagram.   Complaint ¶¶ 118–19.   After the acquisition, Facebook matched Instagram and Facebook accounts "so that Facebook could use information that users had shared with [Facebook] to serve ads to those users on Instagram." Complaint ¶ 127.  Facebook also discontinued development of Facebook Camera.  Complaint ¶ 124.

In 2014 Facebook acquired WhatsApp, a messaging app that let users communicate through text messages, voice calls, and video calls.  By that year, WhatsApp had more than 400 million active users worldwide and was particularly popular in Europe.  Complaint ¶ 155.  As WhatsApp's popularity grew, Facebook's leadership became concerned that WhatsApp could add social-networking features and leverage its success in the messaging space to compete with Facebook.   Complaint ¶¶ 158–64.   Eventually, in mid-2014 Facebook acquired WhatsApp for about $19 billion.   Complaint ¶¶ 165–67. Thereafter, Facebook utilized WhatsApp user data to "promote its core platform" – by, for instance, linking users' accounts on WhatsApp with their accounts on Facebook and using the linked data to help attract additional users to Facebook.  Complaint ¶ 176.

Although the States' Complaint focuses on Instagram and WhatsApp, it briefly mentions that Facebook acquired other companies between 2012 and 2016 – Onavo, Glancee, and EyeGroove – and either leveraged the technology of those companies to gain an advantage in the social networking market, Complaint ¶¶ 143–48, or shelved the companies' technology, Complaint ¶ 184.

At about the same time as these acquisitions, Facebook also transformed how it interacted with users and application

10

developers. Facebook allowed users to interact both with applications on Facebook itself – so-called "canvas" apps – and outside applications and websites. Complaint ¶¶ 190–91. For instance, a Facebook user could take a personality test located directly on Facebook's website and could use a tool embedded in an article on The Wall Street Journal's outside website to post a link to that article on Facebook. Complaint ¶¶ 190–93.

Facebook enabled these connections between Facebook and other apps and websites through a "suite" of software tools collectively called "Facebook Platform." Complaint ¶ 188. Facebook Platform enabled users of canvas apps and outside apps to "easily and seamlessly interact with all their Facebook friends" at once through those other apps. Complaint ¶ 190. Facebook Platform relied on what are called "application programming interfaces," or "APIs" for short, software that allows two different applications – for instance, Facebook and an outside application – to communicate with one another and share information. One key API, "Find Friends," allowed users who had a profile on Facebook and on another app to find all users of that app with whom they were also "friends" on Facebook. Complaint ¶¶ 190, 214.

Facebook Platform brought significant benefits to both Facebook and outside app developers. For Facebook, Platform-enabled canvas apps attracted new users and kept old users on Facebook for longer lengths of time. Complaint ¶ 195. Also, the links of outside apps and websites to Facebook funneled users back to Facebook from those outside sites. Complaint ¶ 191. For app developers, connections to Facebook "boost[ed] their apps' growth" and "dr[o]ve traffic and engagement." Complaint ¶¶ 194, 197. Developers of canvas apps turned their growing user bases into revenue, either by selling advertising space within the app or by selling in-app goods to users. Developers of outside apps also capitalized on their greater

11

visibility when connected to Facebook. Complaint ¶¶ 196–97. Over time, Facebook made changes to Facebook Platform and its published statements of its Facebook Platform Policies.

Originally, Facebook "welcome[d] developers with competing applications" to use Facebook Platform and integrate with Facebook. Complaint ¶ 189. But in 2011, Facebook "adopted a policy aimed at forbidding . . . any apps that linked or integrated with competing social platforms[] from accessing" Facebook Platform. Complaint ¶ 199. This policy – the competitor integration policy – allegedly "discouraged developers from creating apps that bridged" different social media networks. *Id.* These cross-network apps "would have reduced switching costs for users." *Id.* In economic terms, "switching costs" refers not to financial disincentives, but to the burdens of time spent and the annoyance a user would experience in switching social media networks: re-building a list of friends; re-posting and saving photographs; recapturing the posts of friends and saving them again, and so forth. Complaint ¶ 43.

Two years later, in 2013, Facebook amended its Platform Policies to forbid "applications that" – here the Complaint quotes – "replicate[ Facebook's] core functionality." Complaint ¶ 201. (We discuss later the full text of this policy amendment, which the Complaint omits.) Without access to Facebook Platform, the users of competing apps – so the States charged – "would no longer be able to bring their friend list to the new app" using Find Friends. Complaint ¶ 202. And these competing apps would have a "sudden loss of functionality": when their Platform-enabled features ceased to work properly, apps were left "broken or buggy." *Id.*

Facebook removed this core functionality policy in December 2018, and removed the competitor integration policy

12

from its Platform Policies by at least that year.[2]  *See Fed. Trade Comm'n v. Facebook, Inc. (Facebook II)*, 560 F. Supp. 3d 1, 11 (D.D.C. 2021).

The States filed their Complaint on December 9, 2020, and the Federal Trade Commission (FTC) filed a complaint on the same day.

Two of the three counts in the States' Complaint alleged that Facebook's acquisition of Instagram and WhatsApp violated § 7 of the Clayton Act which prohibits mergers that may "substantially . . . lessen competition, or . . . tend to create a monopoly."  15 U.S.C. § 18.  Complaint ¶¶ 263–72.  The other count alleged that these acquisitions, as well as Facebook's Platform policy changes, formed a "buy-or-bury" strategy that harmed competition and violated the prohibition of § 2 of the Sherman Act against the unlawful creation or maintenance of a monopoly.  *See* Complaint ¶¶ 256–62; 15 U.S.C. § 2. As a remedy, the States invoked § 16 of the Clayton Act, which authorizes "person[s]" to sue for "injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26.  The FTC's complaint contained only one count. FTC Complaint ¶¶ 169–73.  This alleged that Facebook's acquisitions and policies together constituted unlawful maintenance of monopoly under § 2 of the Sherman Act.  *Id.*

The district court granted Facebook's motions to dismiss the States' lawsuit and the FTC's complaint, though the court gave the FTC leave to amend its complaint.  *See Facebook I*, 549 F. Supp. 3d at 49; *Facebook II*, 560 F. Supp. 3d at 32.  The

---

[2] The States' Complaint did not mention Facebook's termination of its policies but the district court properly took judicial notice of this development based on the States' briefing and attached documents. *See Facebook I*, 549 F. Supp. 3d at 20.

13

FTC then filed an amended complaint. The district court did not dismiss the FTC's acquisition-related allegations in the amended complaint (although it refused to allow the FTC to conduct discovery on, or otherwise proceed with, its policy-related allegations). *See Fed. Trade Comm'n v. Facebook*, 581 F. Supp. 3d 34, 60–61, 65 (2022).

## II.

A preliminary observation is in order.

The States' lawsuit is not only odd, but old.

"Odd" because the States' suit concerns an industry that, even on the States' allegations, has had rapid growth and innovation with no end in sight.

"Old" for the reasons we now explain.

The States' Complaint, filed in December 2020, charged Facebook with having violated the federal antitrust laws in acquiring and then absorbing Instagram in 2012 and WhatsApp in 2014. The States sought an injunction requiring Facebook to dismantle these acquisitions and to divest itself of both companies.

In response, Facebook raised "laches." "The defense of laches 'requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Kansas v. Colorado*, 514 U.S. 673, 687 (1995) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121–22 (2002).

The original Sherman Act permitted only the federal

14

government to bring actions for injunctions.  *See Paine Lumber Co. v. Neal*, 244 U.S. 459, 471 (1917).  An "amendment was necessary to permit suit for an injunction" by other plaintiffs. *Georgia v. Evans*, 316 U.S. 159, 162 (1942).  The "amendment" – § 16 of the Clayton Act – made injunctive relief available in suits by private parties.  *See* 15 U.S.C. § 26.

Section 16 of the Clayton Act, passed in 1914, specified no time limit for the newly authorized private antitrust actions seeking injunctions.  The omission is understandable.  In that era, statutes setting time limits on when suits could be brought usually applied only to actions at law (for damages and penalties) and to criminal prosecutions.[3]  For actions in equity, such as suits for injunctions, the judicially-devised doctrine of laches, developed in the 18th century English Chancery Court and imported into our laws, took care of long-delayed claims for relief.  *See* 1 Dan Dobbs, *Law of Remedies* § 2.4(4), at 104 (2d ed. 1993); *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678–79 (2014).

The distinctions just mentioned, between actions at law and suits in equity, long ago disappeared in most of federal law.  *See* Fed. R. Civ. P. 2.  Yet the equitable doctrine of laches still applies in some federal cases.  The doctrine continues to apply

---

[3] For example, Chief Justice Marshall wrote: "In a country where not even treason can be prosecuted, after a lapse of three years, it could scarcely be supposed, that an individual would remain for ever liable to a pecuniary forfeiture."  *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341 (1805).  Justice Story, sitting as a circuit justice in a civil penalty case, made the same point: "it would be utterly repugnant to the genius of our laws, to allow such prosecutions a perpetuity of existence."  *United States v. Mayo*, 26 F. Cas. 1230, 1231 (C.C.D. Mass. 1813); *see also H.P. Lambert Co. v. Secretary of the Treasury*, 354 F.2d 819, 822 (1st Cir. 1965); *United States v. Maillard*, 26 F. Cas. 1140, 1142–43 (S.D.N.Y. 1871).

15

because federal courts have interpreted federal statutes, at least older statutes containing equitable causes of action such as § 16 of the Clayton Act, as having incorporated – *sub silentio* – traditional doctrines of equity. *See, e.g.*, *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33 (1958); *Hecht Co. v. Bowles*, 321 U.S. 321, 328 (1944).

In § 16 of the Clayton Act, the entities entitled to sue for an antitrust injunction are any "person," "firm," "corporation," or "association." If these entities sue, they will be subject to "the same conditions and principles" for injunctive relief applicable in courts of equity. 15 U.S.C. § 26. One of those "conditions" or "principles" is laches. *See, e.g., Aurora Enterprises, Inc. v. National Broadcasting Co., Inc.*, 688 F.2d 689, 694 (9th Cir. 1982); *Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 277 (8th Cir. 2004); *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 716–17 (4th Cir. 2021).

The States do not deny any of what we have just written about § 16. That is, they do not deny that under § 16, any natural "person" authorized to sue for an injunction is subject to laches. And they do not deny that laches would forbid, after a time, what might have been a plaintiff's valid cause of action if it had been brought earlier.

Rather, the States' argument is that as "sovereigns" they are exempt from laches. That proposition, essential to the States' argument, is rather shaky. As Judge Posner pointed out, "the availability of laches in at least some government suits is supported by Supreme Court decisions, notably *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 373 (1977); *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60–61 (1984), and *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95–96 (1990), that refuse to shut the door completely to the invocation of laches or estoppel (similar

16

doctrines) in government suits." *United States v. Admin. Enterprises, Inc.*, 46 F.3d 670, 672–73 (7th Cir. 1995). To this list we add *United States v. Diamond Coal & Coke Co.*, 255 U.S. 323, 333–34 (1921); *Kansas v. Colorado*, 514 U.S. 673, 687–89 (1995), and the antitrust case of *California v. American Stores Co.*, 495 U.S. 271, 296 (1990); *see also id.* at 297–98 (Kennedy, J., concurring).

The States' claim of immunity from laches encounters another difficulty – it tends to place the States on the horns of a dilemma. To be entitled to sue for an injunction under the antitrust laws the States must be – again in the words of § 16 – any "person, firm, corporation, or association." We know that a State is not a "firm" and that a State is not a "corporation"[4] or an "association." All that remains is the prospect that a State is a "person." But under § 16, a "person," as we have already mentioned, is clearly subject to laches. *See, e.g.*, 15 U.S.C. § 26; 2 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 320g, at 390 (5th ed. 2021); *Aurora Enterprises*, 688 F.2d at 694; *Midwestern Mach. Co.*, 392 F.3d at 277; *Steves and Sons*, 988 F.3d at 716–17.

On the other horn, the States come close to arguing themselves out of court when they insist on being treated not as natural "persons," but instead as "sovereigns." If they are correct, how is it that § 16 authorizes them to sue for an injunction? When a comparable issue arose in another antitrust case – not about "sovereign" States but about the "sovereign" United States – the Supreme Court in *United States v. Cooper*

---

[4] Unless perhaps if the State sued its proprietary capacity. *See Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 469 (1945) (C.J. Stone, dissenting, joined by Justices Roberts, Frankfurter and Jackson).

17

*Corp.*, 312 U.S. 600 (1941), answered that the United States as a "sovereign" was therefore not "[a]ny person" entitled to sue for treble damages under § 7 of the Sherman Act,[5] *id.* at 604, 614; *see also infra* note 8.

The Supreme Court has also decided that a federal agency is not a "person" entitled to challenge the issuance of a patent. *See Return Mail, Inc. v. United States Postal Service*, 139 S.Ct. 1853, 1867 (2019). And in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), the Court held that neither a State nor a State agency was "any person" subject to an action under the False Claims Act.[6] *See id.* at 787–88. In each of these cases, the Court applied its "longstanding interpretive presumption that 'person' does not include the sovereign." *Id.* at 780; *Return Mail*, 139 S.Ct. at 1861–62. This presumption, the Court wrote, reflects "common usage," *United States v. Mine Workers*, 330 U. S. 258, 275 (1947), as well as the express directive in the Dictionary Act, 1

_____

[5] In its current form, the relevant portion of § 7 (15 U.S.C. § 15(a)) provides:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee . . ..

[6] The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability on "any person" who, inter alia, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

18

U.S.C. § 1.[7]

Despite this substantial body of law, two Supreme Court decisions in the 1940s treated a State as a "person" entitled to sue pursuant to the federal antitrust laws.[8]  *See Pennsylvania R. Co.*, 324 U.S. at 447; *Evans*, 316 U.S. at 162–63.  The States cite these two cases as authority.  But the States cannot explain how either case advances their objection to laches.  *Evans* decided that a State, claiming a direct injury in its proprietary capacity, qualified as a "person" entitled to sue for damages pursuant to § 7 of the Sherman Act.  *See* 316 U.S. at 160, 162–63.[9] *Georgia v. Pennsylvania Railroad* held that a State, appearing as *parens patriae*, qualified as a "person" entitled to sue for an injunction under § 16.  *See* 324 U.S. at 447.  Neither opinion parsed the language of the pertinent statutes or offered any analysis of them.  But we take each decision as a starting point, as we must.

Unlike the State in *Georgia v. Evans*, the States here are not

---

[7] The Dictionary Act, 1 U.S.C. § 1, provides that in "determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  States are not included in the definition of "person."

[8] Sometimes but not always.  *See Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 219 (1990); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 252–53 (1972).

[9] The Court's opinion in that case simply announced that Congress could not possibly have meant to exclude States from being able to sue for damages suffered in their proprietary capacity.  *See Evans*, 316 U.S. at 162–63.

19

suing in their proprietary capacity.  When Facebook challenged the States' standing in the district court, the States defended on the ground that they were suing as *parens patriae*, as in *Georgia v. Pennsylvania Railroad.*

The concept of *parens patriae* "is murky and its historic credentials are of dubious relevance." *In re Gault*, 387 U.S. 1, 16 (1967), *abrogated on other grounds by Allen v. Illinois*, 478 U.S. 364 (1986).  "The phrase was taken from chancery practice, where, however, it was used to describe the power of the state to act *in loco parentis* for the purpose of protecting the property interests and the person of the child."[10]  *Id.*  That history has "little" – or more accurately, nothing – "to do with the concept of *parens patriae* standing that has developed in American law." *Alfred L. Snapp & Son*, 458 U.S. at 600.

In the *Georgia v. Pennsylvania Railroad* opinion, the Court wrote that "we are of the opinion that Georgia as parens patriae . . . asserts a claim within judicial cognizance. The complaint of Georgia in those respects is not of a political or governmental character." 324 U.S. at 445.  By this the Court necessarily meant that a § 16 State *parens patriae* suit is a private action – if it is not of "governmental" or "political" character, the obvious character left is "private."

---

[10] More history of *parens patriae* as it developed in this country is set forth in *Standard Oil Co.*, 405 U.S. at 257–60; *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600–08 (1982); J. Ratliff, Parens Patriae*: An Overview*, 74 Tulane L. Rev. 1847 (2000); and G. B. Curtis, *The Checkered Career of* Parens Patriae*: The State as Parent or Tyrant*, 25 DePaul L. Rev. 895 (1976).
The Court in the *Hawaii* case held that a State, suing as *parens patriae* , was not a "person" entitled to recover treble damages.  405 U.S. at 265.  Congress amended the Clayton Act to allow State *parens patriae* actions for damages, but "only on behalf of resident natural persons." *Utilicorp United, Inc.*, 497 U.S. at 216.

20

That is how the Supreme Court treated such a case decades later in *California v. American Stores*. Like the States here, California brought a *parens patriae* suit invoking § 16 of the Clayton Act. *See id.* at 274–75. The Supreme Court's opinion repeatedly and consistently referred to California as a "private part[y]," and to California's lawsuit as a "private suit," and to State § 16 suits as "private enforcement." *American Stores*, 495 U.S. at 285, 294, 296 (quoting *Graves v. Cambria Steel Co.*, 298 F. 761, 762 (S.D.N.Y. 1924) (Hand, J.)). After describing California's suit as a private action, the Court added that "equitable defenses such as laches . . . may protect consummated transactions from belated attacks by private parties when it would not be too late for the Government to vindicate the public interest." *Id.* at 296. This quotation suggests that, with respect to laches, the Court may have been drawing a line between State *parens patriae* antitrust actions and antitrust suits by the federal government. But it may be that we are reading too much into the Court's words. Justice Kennedy, on the other hand, made it fairly plain that he would apply laches to State antitrust suits as *parens patriae*. *See id.* at 298 (Kennedy, J., concurring).

The States' counter-arguments are that in § 16, Congress could not have meant laches to apply to them because, after all, they are sovereign governments and are very busy protecting their residents and their citizens and others arriving at their borders. Therefore, because States are so busy and have so much to do, they should not be subjected to time constraints on when they have to take action against antitrust violations by national companies operating in their State so they can protect their constituents. The States have a point, but it does not differentiate them from "any person" who might suffer from any antitrust violation, "persons" who have far fewer resources than State governments, and who are doubtless busy on other matters, and yet are clearly subject to laches. And it does not explain

21

why a later Congress subjected States to the same four-year limitation period for bringing *parens patriae* antitrust suits for damages. *See* 15 U.S.C. §§ 15b, 15c(a)(1).

We are dealing with what is ultimately a matter of "statutory interpretation." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). The States insist that they are "persons" under § 16. Nothing in the language of that provision, or in its history, indicates that they are exempt from the equitable constraints that § 16 imposes on "[a]ny person," or that the States should be treated as "special persons." For these reasons, we agree with the district court that under § 16, laches applies to a State's *parens patriae* suit such as this one. *See Facebook I*, 549 F. Supp. 3d at 40.

The question thus becomes whether the district court correctly held that Facebook established its laches defense.

Delay in laches is measured by the length of time "between accrual of the claim and suit." *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982). The States' causes of action accrued in 2012 when Facebook acquired Instagram and in 2014 when Facebook acquired WhatsApp. Yet the States did not file their Complaint until December 2020.

The district court held that "the States' long delays were unreasonable and unjustified as a matter of law." *Facebook I*, 549 F. Supp. 3d at 36. Relying on antitrust cases from other circuits, the court used the four-year statute of limitations for damage actions (15 U.S.C. § 15b) as a "guideline" for determining what amounted to undue delay. *Id.* at 34 (quoting *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 (9th Cir. 2014)). This is consistent with the practice acknowledged in *Holmberg v. Armbrecht*, 327 U.S. 392 (1946): statutes of limitation "have been drawn upon by equity solely for the light

22

they may shed in determining that which is decisive for the chancellor's intervention, namely, whether the plaintiff has inexcusably slept on his rights so as to make a decree against the defendant unfair."  *Id.* at 396.  As the district court explained, using the four-year limitation period in this way is "particularly appropriate for challenges to acquisitions" because the typical remedy of divestiture, "if ordered well after the merger has closed, will usually prejudice the defendant."[11]  *Facebook I*, 549 F. Supp. 3d at 35.

The States were on notice of Facebook's two major acquisitions.  Both were publicized.  The Federal Trade Commission conducted a lengthy, publicly reported, investigation to determine whether Facebook's acquisition of Instagram would violate the antitrust laws.[12]  *Id.* at 36.  As to WhatsApp, the States' Complaint acknowledges both that the FTC investigated the acquisition and that analysts at the time of its acquisition indicated that Facebook was trying to eliminate a potential competitor, "which" – as the district court correctly stated – "perfectly summarizes Plaintiffs' exact theory of the case against the WhatsApp acquisition."  *Id.*  And as the district court noted, the States never argued below that their delay was

---

[11] A leading antitrust treatise concludes that when a plaintiff seeks divestiture (or other relief that is "retroactive in nature"), the four-year time limit derived from the statute of limitations "should be absolute." 2 Areeda & Hovenkamp, *supra*, ¶ 320g, at 392.

[12] The FTC closed this investigation without taking action.  *See* Press Release, Federal Trade Comm'n, FTC Closes Its Investigation Into Facebook's Proposed Acquisition of Instagram Photo Sharing Program (Aug. 22, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/08/ftc-closes-its-investigation-facebooks-proposed-acquisition-instagram-photo-sharing-program [https://perma.cc/U7Y7-VT6S].

23

reasonable because "they 'had good reason for not' suing earlier." *Facebook I*, 549 F. Supp. 3d at 41 (quoting *Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 532 (D.C. Cir. 2010)).

We thus agree with the district court that the States unduly delayed in bringing suit.[13] The remaining question is whether Facebook was prejudiced as a result of the 8 year and 6 year delay.

For laches purposes, prejudice may arise for the same reasons we have statutes of limitation. "There comes a time when [the defendant] ought to be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations, and [the defendant] ought not to be called to resist a claim when 'evidence has been lost, memories have faded, and witnesses have disappeared.'" Note, *Developments in the Law: Statutes of Limitation*, 63 Harv. L. Rev. 1177, 1185 (1950) (quoting *Ord. of R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 349 (1944)).

The "prejudice" Facebook asserts is related. It is the effect of the States' delaying their suit until years after Facebook had absorbed and merged with the acquired companies. Mergers "normally lead to progressive integration of the assets and operations of the merged firms, and to investment and other

---

[13] For the reasons the district court stated, *see Facebook I*, 549 F. Supp. 3d at 44–48, we reject the States' argument that the Instagram and WhatsApp acquisitions remain "subject to challenge now" because they are part of a "course of conduct [that] remains ongoing." Appellants' Br. at 40. *See also* Douglas H. Ginsburg & Korin Wong-Ervin, Challenging Consummated Mergers Under Section 2, Comp. Pol'y Int'l, May 2020, at 6–7.

24

business decisions that are contingent on the new situation."[14] The more the merged firms are joined together, the more costly and difficult to separate. Here, the States alleged that Facebook spent years before the States' suit working to "integrate" Instagram, Complaint ¶ 115; that Facebook "combined" WhatsApp data "across all Facebook products," Complaint ¶ 177; and that, as one would expect, Facebook modified its own products and services in reliance on the acquisitions,[15] Complaint ¶¶ 124, 127, 176–77. And so now an injunction breaking up Facebook, ordering it to divest itself of Instagram and WhatsApp under court supervision, would have severe consequences, consequences that would not have existed if the States had timely brought their suit and prevailed.

The district court summed up this way. "The facts alleged in the Complaint, moreover, confirm the existence of economic prejudice here. According to the States, for the last five-plus years [since 2016 and before] Facebook has made business decisions and allocated firm resources based on holding Instagram and WhatsApp, and it has also integrated their

_____

[14] 2 Areeda & Hovenkamp, *supra*, ¶ 320g, at 392. This is why the authors add that "the laches period should certainly be no longer than the limitation period for damages . . .." *Id.* at 393.

[15] Allegations in the States' Complaint, although offered as an example of Facebook's anti-competitive conduct, illustrate the prejudice of untangling companies when suits against mergers are long delayed. For instance, Facebook decided to "scale back or cancel" its plans to develop Facebook Camera, a photo-sharing feature, "since [Facebook was] acquiring Instagram." Complaint ¶ 124. Facebook thus "allowed [Facebook Camera] to die, discontinuing it entirely in 2014." *Id.*

25

offerings to some extent into its core business."[16]  549 F. Supp. 3d at 37.   To be sure, a "complaint seldom will disclose undisputed facts clearly establishing the defense" of laches. *Menominee Indian Tribe*, 614 F.3d at 532.   Under the facts alleged here, however, we agree with the district court that the defense applies.

This dispenses with Counts 2 and 3, and with the portions of Count 1 that refer to the Instagram and WhatsApp acquisitions.

III.

Another portion of Count 1 deals with Facebook's Platform and its practices and policies, adopted years ago and now abandoned.   One of the two Facebook policy statements to which the States object was adopted in 2011.   The other in 2013. The States' Complaint quotes a snippet of each.   As we shall discuss, the States' quotations are accurate.   The messages they seek to convey are not.

Over the years Facebook promulgated and amended a list of "Platform Policies."   Complaint ¶ 73.   The company's statements, disseminated to third-party developers of

———————————

[16] The ongoing FTC lawsuit (and the possibility that the district court may order divestiture in that suit) does not prevent the States' suit from causing prejudice. The outcome of the FTC suit is uncertain. Even if the FTC persuades the district court that the WhatsApp and Instagram acquisitions were anti-competitive, Facebook "can still prevent divestiture by showing that the balance of hardships . . . tips in its favor." *Steves & Sons*, 988 F.3d at 717.  So permitting the States to proceed would still risk creating additional prejudice for Facebook relative to the FTC suit.  The States point to no authority suggesting that dilatory plaintiffs can shield their own lawsuits from laches by pointing to other suits that seek similar relief of the same defendant.

26

applications, informed them of what Facebook expected if it were to permit their products to interact with Facebook Platform.

The app developers paid nothing to gain access to Facebook Platform. It was a privilege, and one highly sought. According to the States' Complaint, more than "10 million apps and websites had integrated with Facebook by May 2013." Complaint ¶ 194.

The States assert that Facebook's imposition of two aspects of its Platform Policies over the years violated § 2 of the Sherman Act. Sherman Act § 2 makes it unlawful for a firm to "monopolize" or "attempt to monopolize," but it does not make having a monopoly in itself unlawful. 15 U.S.C. § 2. "A firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)); *see also id.* ("The successful competitor, having been urged to compete, must not be turned upon when he wins." (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) (Hand, J.))). Thus, the "mere possession of monopoly power . . . is not only not unlawful; it is an important element of the free-market system."[17] *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

Facebook urges us to affirm "the district court's dismissal

_____

[17] *See generally* Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 58–62 (1978).

27

of the Platform-based claims . . . on the ground that, like the acquisition-related clams, they are barred by laches." Appellee's Brief at 54. We will not decide whether laches bars those claims. The district court expressed no opinion on that issue because Facebook, in its Motion to Dismiss, did not raise the affirmative defense of laches with respect to the Platform Count. *Cf.* Fed. R. Civ. P. 8(c)(1).

Nevertheless, we agree again with Judge Boasberg's comprehensive and well-reasoned opinion determining that the States' Platform-based allegations failed to state a cause of action.[18]

A.

In summary, the States' allegations about Facebook's competitor integration policy did not set forth a violation of § 2 of the Sherman Act, for the reasons Judge Boasberg stated in his opinion. S*ee Facebook I*, 549 F. Supp. 3d at 33. The States quoted a part of this Facebook "policy" regarding "access to its Platform APIs." Complaint ¶ 199. Now in this appeal they protest that the district court's opinion wrongly relied on a full quotation of the full policy in the FTC's complaint against Facebook, filed on the same day as the States'.

The States' Complaint alleged this:

"In 2011, Facebook adopted a policy aimed at forbidding 'competing social platforms,' and any apps that linked or integrated with competing social

---

[18] We may, as did the Supreme Court in a similar case, reject the States' allegations on their merits before addressing antitrust standing, which is a matter of statutory not constitutional jurisdiction. *See Trinko*, 540 U.S. at 416 n.5.

28

platforms, from accessing its APIs." Complaint ¶ 199

The FTC's complaint, filed on the same day, alleged this:

"On July 27, 2011, Facebook introduced a new policy that 'Apps on Facebook may not integrate, link to, promote, distribute, or redirect to any app on any other competing social platform.'" FTC Complaint ¶ 139.

There is a difference between these two versions, a legal difference, and the district court noticed it.

As a result, the district court "d[id] not accept" the States' claim that Facebook's policy applied to "any apps that linked or integrated with competing social platforms," and not just to "canvas apps," because that claim was "inconsistent with the text of the 2011 policy, which the FTC quote[d]." *Facebook I*, 549 F. Supp. 3d at 19.

On appeal, the States do not dispute the accuracy of the FTC's quotation of Facebook's 2011 policy. (Nor does the United States as amicus curiae question the district court's conclusion that the FTC's complaint accurately quotes Facebook's 2011 policy. *See* United States Amicus Br. at 16–17.) We agree with the district court that it was proper to consider the actual text of Facebook's 2011 policy, as quoted in the FTC's complaint.

"A federal court may take judicial notice of 'a fact that is not subject to reasonable dispute'" if the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Hurd v. D.C., Gov't*, 864 F.3d 671, 686 (D.C. Cir. 2017) (quoting Fed. R. Evid. 201(b)). Both requirements are satisfied here.

29

The FTC's complaint is particularly suitable for judicial notice because we often take "judicial notice of facts on the public record . . . as a court may do upon a motion to dismiss." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005); *see also Mack v. S. Bay Beer Distrib., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). Moreover, multiple other sources corroborate that the text of Facebook's 2011 policy is precisely what the FTC's complaint asserts, confirming that the FTC's complaint is accurate.

An archived webpage showing "Facebook Platform Policies" as of July 27, 2011, contains the identical text. *See* Facebook Platform Policies, *Facebook* (July 27, 2011), h t t p s : / / d e v e l o p e r s . f a c e b o o k . c o m / p o l i c y / [https://web.archive.org/web/20110805092701/https://develop ers.facebook.com/policy/]. The "contents of webpages available through the Wayback Machine" constitute "facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021) (quotation omitted). The archive also confirms what one might expect from a platform policy meant to guide the actions of outside app developers: the policy that the States challenge here was publicly posted and was just one of many that Facebook issued.

Multiple news articles from the summer of 2011 quote the identical policy text from the FTC's complaint and the archived webpage. *See Facebook Quietly Updates Platform Policies - Developers, No Linking To Its Competitors!*, TechCrunch (Aug. 12, 2011, 3:12 PM EDT), https://techcrunch.com/2011/08/12/ facebook-quietly-updates-platform-policies-developers-take-n ote/ [https://perma.cc/X82X-FTPJ]; Brandy Shaul, *Have Facebook's Platform Policy Changes Killed Free Cash Promotions?* Yahoo! (Aug. 12, 2011), https://www.yahoo.com/ video/2011-08-12-facebook-platform-policy-changes.html [https://perma.cc/WR3H-MKKS]; Josh Constine, *Facebook Prohibits Promotion of Apps on Competing Social Platforms, Unapproved Soft Offers*, AdWeek (Aug 12, 2011),

30

https://www.adweek.com/performance-marketing/
prohibit-promotion-competing-social-platforms/
[https://perma.cc/6WSD-YGCP].

These sources render the actual text of Facebook's 2011
policy "accurately and readily determined" and confirm that the
FTC's complaint is a "source[] whose accuracy cannot
reasonably be questioned." *Hurd*, 864 F.3d at 686 (quoting Fed.
R. Evid. 201(b)).  By the same token, the text of that 2011
policy is "not subject to reasonable dispute."  *Id.*  (quoting Fed.
R. Evid. 201(b))*.*

The district court thus properly considered the actual text of
Facebook's 2011 policy as quoted in the FTC's complaint and
properly disregarded the States' allegations where those
allegations were contrary to the policy's text.

In light of the complete text of Facebook's competitor
integration policy, we reject the States' challenge to that policy.
The States refer to Facebook's policy as a form of "conditional
dealing" but the district court correctly analyzed the policy
under cases discussing "exclusive dealing."  *Facebook I*, 549 F.
Supp. 3d at 31; *see also BRFHH Shreveport, LLC v.
Willis-Knighton Med. Ctr.*, 49 F.4th 520, 529 (5th Cir. 2022).
As the district court explained, the competitor integration policy
is nothing like the exclusive dealing from *Lorain Journal Co. v.
United States*, 342 U.S. 143 (1951), the case on which the States
rely.  There, a newspaper prohibited its advertising customers
from also advertising on the local radio station.  *See id.* at 149.
Here, the competitor integration policy limits only how canvas
apps on Facebook operate, and leaves app developers entirely
free to develop applications for Facebook's competitors.  The
district court correctly found that the States' exclusive dealing
theory fails as a matter of law.[19]

---

[19] It appears that by at least 2013, Facebook's Platform Policies
omitted the competitor integration policy.  *See supra* note 2 and
accompanying text.  If Facebook terminated this policy by 2013, this
would militate against the Court's exercise of its equitable discretion
in the States' favor.  *See Penthouse Int'l, Ltd. v. Meese*, 939 F.2d

31

In addition, for an exclusive dealing claim to survive a motion to dismiss the plaintiffs must adequately allege that the exclusive contract "caused substantial market foreclosure." *BRFHH Shreveport*, 49 F.4th at 530; *see also Microsoft Corp.*, 253 F.3d at 69; *Vazquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 301 (1st Cir. 2022). Here, the States allege only that the competitor integration policy "discouraged developers from creating apps that bridged" multiple social networks. Complaint ¶ 199. Their allegation does not explain, for instance, the importance of cross-network apps to Facebook's competitors, what fraction of developers were discouraged, or whether network-bridging apps were the "most efficient channels" for Facebook's competitors to acquire users. *Microsoft*, 253 F.3d at 70. The States thus have not adequately alleged that this policy substantially foreclosed Facebook's competitors, giving us an additional reason to reject their exclusive dealing theory.[20]

B.

This brings us to the States' claim that Facebook published in its 2013 list of Platform Policies for app developers a policy that "forbid applications that 'replicat[e] [Facebook's] core functionality.'" Complaint ¶ 201 (alterations in original).

Here too the States' quotation is accurate but incomplete and so is misleading. The full text of this Platform policy statement in 2013 was:

> Reciprocity and Replicating core functionality: (a) Reciprocity: Facebook Platform enables developers to build personalized, social experiences via the Graph API and related APIs. If you use any Facebook APIs to

---

1011, 1019 (D.C. Cir. 1991).

[20] We would reach the same conclusion even if we accepted the States' interpretation of Facebook's competitor integration policy. Either way, the States have failed to adequately allege substantial foreclosure on these allegations.

32

build personalized or social experiences, you must also enable people to easily share their experiences back with people on Facebook. (b) Replicating core functionality: *You may not use Facebook Platform* to promote, or to export user data to, a product or service that replicates a core Facebook product or service without our permission.

The words we have put in italics are critical. The full text shows that Facebook was prohibiting developers from using Facebook's Platform to duplicate Facebook's core products.

The States' basic allegation – that Facebook "cut off" competitors from "access to . . . [Facebook's] immensely valuable network," Complaint ¶ 13 – thus amounts to a "claim based upon the defendant's refusal to cooperate with its competitor[s]." *Covad Commc'ns*, 398 F.3d at 673.

To consider Facebook's policy as a violation of § 2 would be to suppose that a dominant firm must lend its facilities to its potential competitors. That theory of antitrust law runs into problems under the Supreme Court's *Trinko* opinion. *See* 540 U.S. at 407–15. We note in particular that courts should proceed cautiously when asked to deem novel products or practices anti-competitive. Many innovations may seem anti-competitive at first but turn out to be the opposite, and the market often corrects even those that are anti-competitive. Similarly, if courts required firms to lend their facilities to competitors, courts would have to manage corporations' business affairs, a role for which the judiciary is ill suited. The Supreme Court in *Trinko* thus held "that a firm with no antitrust duty to deal with its rivals at all is under no obligation to provide those rivals with a 'sufficient' level of service." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 444 (2009) (quoting *Trinko*, 540 U.S. at 410).

The *Trinko* Court further stated that there are only a "few existing exceptions from the proposition that there is no duty to aid competitors," one of which results from *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), a case "at

33

or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409, 411.  To fit itself within that exception, a plaintiff must allege that, among other things, before the defendant refused its competitors access the defendant "voluntarily engaged in a course of dealing with its rivals, or would . . . have done so absent statutory compulsion."   *Trinko*, 540 U.S. at 409. Facebook's core functionality policy, as quoted above, does not fit *Aspen Skiing*'s exception to the extent it applied to apps with which Facebook had no prior course of dealing.

The States also cite specific examples when Facebook applied the core functionality policy to disconnect potential rivals, and claims  that "ongoing violations" require injunctive relief.  Appellants' Br. at 44.  But under § 16, injunctions are available "under the same conditions and principles as injunctive relief . . . is granted by courts of equity," 15 U.S.C. § 26, and such "equitable relief[] is discretionary," *Meese*, 939 F.2d at 1019.

The States cite seven instances when Facebook allegedly banned rivals from Facebook Platform under the core functionality policy.  Complaint ¶¶ 207–29.  Those seven were but a drop in the bucket of the "10 million apps and websites" that "had integrated with Facebook by May 2013."  Complaint ¶ 194.  Facebook banning these seven, even if the States' allegations are correct, would not amount to any "continuing harm" to the States' constituents, Complaint ¶ 245, and a court order to Facebook would serve no antitrust purpose. *De minimis non curat lex.  Cf. Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992).  As the district court put it, we "cannot turn back the clock to 2013, 2014, or 2015." *Facebook I*, 549 F. Supp. 3d at 30.  It makes no sense to require Facebook to foreswear a policy that ended in 2018, or to provide Facebook Platform access to a handful of companies which are either defunct or have changed their business model ever since Facebook banned them.  Injunctive relief would be unwarranted even if the States could prove their allegations.

The States also allege that Facebook used its control over Platform to  "degrade the functionality and distribution of

34

potential rivals' content." Complaint ¶ 205. This is another way of saying that Facebook refused to deal with its rivals on the rivals' preferred terms. In *Trinko* the defendant telephone company sometimes "failed to fill" its rivals' orders "at all," but other times only failed to fill its rivals' orders "in a timely manner" or filled its rivals' orders "after filling those for its own local phone service." 540 U.S. at 404–05. Yet the Supreme Court treated all of the company's actions, and inactions, as refusals to deal. *See id.* at 406–411. And in a later case the Court added that as "a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co.,* 555 U.S. at 448.

The United States as amicus curiae argues that the States' policy-related allegations are "fundamentally different from challenges to unilateral refusals to deal." United States Amicus Br. at 15. This is so, the United States argues, because refusals to deal harm competition by "withhold[ing] valuable access from rivals," and may leave "them weakened and less competitive," whereas Facebook's policies had different effects. *Id.* We disagree. The States alleged that when Facebook banned a rival under the core functionality policy, the rival "suddenly lost access" to Facebook Platform, "devastating" the rival and leaving it with "broken or buggy features." Complaint ¶ 202. The policy thus accomplished what the United States admits unilateral refusals do as well: "withhold valuable access from rivals" "leaving them weakened and less competitive." United States Amicus Br. at 15.

*Affirmed.*