```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3     --------------------------x
       UNITED STATES, et al.,     :     Civil Action No.:
 4                                :     1:23-cv-108
                   Plaintiffs,    :
 5          versus               :     Friday, April 28, 2023
                                  :     Alexandria, Virginia
 6     GOOGLE LLC,                :
                                  :     Pages 1 - 31
 7                 Defendant.     :
       --------------------------x
 8
                The above-entitled motion to dismiss was heard
 9     before the Honorable Leonie M. Brinkema, United States
       District Judge.  This proceeding commenced at 10:00 a.m.
10
                        A P P E A R A N C E S:
11
       FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
12                            OFFICE OF THE UNITED STATES ATTORNEY
                              2100 Jamieson Avenue
13                            Alexandria, Virginia  22314
                              (703) 299-3700
14
                              JULIA WOOD, ESQUIRE
15                            DANIEL GUARNERA, ESQUIRE
                              AARON TEITELBAUM, ESQUIRE
16                            UNITED STATES DEPARTMENT OF JUSTICE
                              ANTITRUST DIVISION
17                            450 Fifth Street, NW
                              Washington, D.C.  20530
18                            (202) 894-4266
19                            TYLER HENRY, ESQUIRE
                              OFFICE OF THE ATTORNEY GENERAL
20                            OFFICE OF THE SOLICITOR GENERAL
                              202 North Ninth Street
21                            Richmond, Virginia  23219
                              (804) 786-7704
22

23

24

25
                                                              1
```

```
 1                     A P P E A R A N C E S:

 2    FOR THE DEFENDANT:     CRAIG REILLY, ESQUIRE
                             LAW OFFICE OF CRAIG C. REILLY
 3                           209 Madison Street
                             Suite 501
 4                           Alexandria, Virginia  22314
                             (703) 549-5354
 5
                             ERIC MAHR, ESQUIRE
 6                           SARA SALEM, ESQUIRE
                             FRESHFIELDS BRUCKHAUS DERINGER, LLP
 7                           700 13th Street, NW
                             10th Floor
 8                           Washington, D.C.  20005
                             (202) 777-4500
 9
                             DANIEL BITTON, ESQUIRE
10                           AXINN, VELTROP & HARKRIDER LLP
                             55 Second Street
11                           Suite 200
                             San Francisco, California  94105
12                           (415) 490-2000

13    COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
                             Official Court Reporter
14                           United States District Court
                             401 Courthouse Square
15                           Alexandria, Virginia  22314
                             (571) 298-1649
16                           S.AustinReporting@gmail.com

17        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

18

19

20

21

22

23

24

25
                                                              2
```

```
 1                      P R O C E E D I N G S

 2              THE DEPUTY CLERK:  Civil Action 23-108, United

 3     States of America, et al. versus Google LLC.

 4              Would counsel please note their appearances for

 5     the record.

 6              MR. MENE:  Good morning, Your Honor.  Gerard Mene

 7     with the U.S. Attorney's Office.

 8              THE COURT:  Good morning.

 9              MS. WOOD:  Good morning, Your Honor.  Julia Tarver

10     Wood on behalf of the United States.  With me today are my

11     colleagues, Aaron Teitelbaum and Mr. Dan Guarnera.

12              MR. TEITELBAUM:  Good morning, Your Honor.

13              THE COURT:  And I recognize we probably have a

14     fair number of other attorneys in the courtroom.

15              MS. WOOD:  We do, Your Honor.

16              THE COURT:  I'm only going to hear from the main

17     spokespeople which are from the federal government and the

18     Commonwealth of Virginia.

19              MS. WOOD:  Yes.

20              THE COURT:  All right.  Is there someone here from

21     Virginia?

22              MR. HENRY:  Good morning, Your Honor.  Tyler Henry

23     from the Office of the Attorney General of Virginia on

24     behalf of the plaintiff states.

25              THE COURT:  Good morning.  All right.
```

3

1          And for the defense.

2          MR. REILLY:  Good morning, Your Honor.

3   Craig Reilly here for the defendant Google, together with my

4   co-counsel Eric Mahr, Sara Salem and Daniel Bitton.  And

5   with the Court's permission, Mr. Mahr will address the

6   Court.

7          THE COURT:  Very good.  Thank you, Mr. Reilly.

8   Good morning.

9          All right.  This is before the Court on the

10  defendant's motion to dismiss.  Obviously this has been a

11  well-briefed motion.  So I had a chance to go over the

12  papers, but I'm going to give each side a brief opportunity

13  to focus on any of the highlights that they really want to

14  stress today.

15         And Mr. Mahr, you, I believe, filed early this

16  morning some new authority.  I don't know if the plaintiff

17  had a chance yet to respond to that.  So they should also,

18  if they feel they need to respond, as well; all right?

19         MR. MAHR:  Yes, Your Honor.

20         THE COURT:  The podium is yours.

21         MR. MAHR:  Thank you, Your Honor.  And again,

22  Eric Mahr on behalf of Google.

23         We appreciate your time, especially since Google's

24  motion to dismiss is really directed to the critical

25  gatekeeping function that the district court plays in all

                                                        4

1  cases, but we think especially in complex antitrust cases,

2  and especially critical as that function in a district where

3  we obviously move so quickly.  Certainly there's not a

4  different standard for antitrust cases under 12(b)(6), but

5  the Supreme Court in *Twombly* made clear that in general and

6  particularly in antitrust cases, a district court must

7  retain the power to insist on some specificity in pleading

8  before allowing a potentially massive factual controversy to

9  proceed.

10         In words that directly address what we think is

11  the let's-just-wait-and-see-what-happens-in-discovery

12  approach that the plaintiffs are asking you to take in this

13  case, the Supreme Court in *Twombly* went on to say:  "It's no

14  answer to say that a claim just shy of a plausible

15  entitlement to relief can, if groundless, be weeded out

16  early in discovery."  We're just going too fast here.

17         The first time we met with you, you said -- you

18  talked about running shoes, but you also talked about laser

19  focus on the issues that matter.  And we think, especially

20  after a three-and-a-half-year investigation, the Department

21  of Justice ought to be able to provide the detail this

22  circuit requires with respect to their alleged market

23  shares, ought to be able to plead the minimum market share

24  to meet the Fourth Circuit's threshold for monopoly power,

25  and ought to be able to plead, in a straightforward manner,

5

1   facts as simple as whether any of the federal agency

2   advisers on -- advertisers on whom they seek relief are

3   actually direct purchasers entitled to damages.

4          With the Court's permission, I'd like to first

5   focus on three issues which -- I guess before turning to the

6   more comprehensive one, market definition, which would

7   result in the complaint's dismissal completely, but we have

8   three points that, while not complete dismissals, I think

9   are very clear on the face of the complaint, very different

10  than the Southern District of New York cases, and would

11  significantly narrow the issues in the case.

12         The first I mentioned earlier is the complaint's

13  admission that Google's market share in AdX -- this is the

14  ad exchange, the kind of middle part of the ad tech stack --

15  is only around 50 percent, nowhere close to the Fourth

16  Circuit's 70 percent threshold for monopoly power.

17         THE COURT:  Well, you know, I think you

18  overemphasize this bright-line or threshold matter.

19         I agree with you that the case law strongly

20  suggests that it's unusual to find illegal monopolization if

21  there's not at least a 70 percent, if not more, market

22  share.

23         At the same time, however, as I've looked at that

24  issue, and New York also looked at that similar type of

25  argument, these types of complex cases look at multiple

6

1    factors.  And so there are factors other than simply market

2    share that could result in a finding of illegal monopolistic

3    activity, such as, you know, really rapacious conduct with

4    rivals, destruction of rivals, for no good economic reason.

5              And, I mean, there are allegations in this

6    complaint that Google went out and specifically targeted and

7    purchased rivals and then cannot show that there was a good

8    economic reason for doing so other than to basically

9    eliminate the rival.

10             Again, whether the evidence will support that at

11   the end of the day is a totally different matter.  But in

12   terms of pleading, you know, you've got over 300 paragraphs.

13   It's a horrendously long complaint.  And I certainly don't

14   disagree with you that probably a good portion of that

15   complaint frankly could be cut.  But obviously knowing that

16   this would be a robust motion to dismiss in this case, I

17   think that the plaintiff, you know, loaded up that complaint

18   with an awful lot of detail.

19             And so the argument about the market share, I

20   don't believe that the case law actually supports the

21   argument that you've made.  And certainly this is an issue

22   which I think is sufficiently fact-specific, that it would

23   not be appropriate to resolve it on a motion to dismiss.

24             MR. MAHR:  If I can make just two points in

25   response, and then I'll move to my next point, having heard

7

```
 1   you.

 2           THE COURT:  All right.

 3           MR. MAHR:  The first point is, I think when you

 4   talk about -- there are two elements here, it's monopoly

 5   power --

 6           THE COURT:  Right.

 7           MR. MAHR:  -- and then conduct.  And when you

 8   refer to rapacious conduct, which we obviously contest,

 9   that's a separate element.  And part of what the plaintiffs

10   do, they try to conflate the two elements.  But monopoly

11   power is a separate element.

12           With respect to monopoly power, I agree,

13   70 percent is not like an absolute barrier, but there's no

14   case that I'm aware of where these other factors have done

15   the work to get a share of 50 percent up to 70 percent.

16   That's kind of something that when it's close, these other

17   factors can come in and affect how you look at the market

18   share, but to make that kind of jump, there's no case out

19   there that does it.

20           Moreover, the points that they try to say are

21   additional factors are like super competitive pricing.  But

22   that's exactly the kind of conclusory statement that *Twombly*

23   said, it's not enough.  You just can't say super competitive

24   pricing when other places in the complaint, like

25   paragraph 224, Google -- they say Google's AdX price is only
```

8

 1    one of the highest in the industry.

 2            One of the highest in the industry is not super

 3    competitive monopolistic prices above everybody else; it

 4    just means some have high prices, some have lower prices,

 5    and Google has the higher prices.  So they can't do the work

 6    with that.

 7            The same on this point they stress about we've had

 8    a 20 percent price on AdX for 15 years.  Well, the complaint

 9    itself said we started that 20 percent price in 2008 when

10    AdX, the ad exchange, was nascent.  So when you have

11    nothing, we charge 20 percent.

12            The fact that in 15 years of allegedly unlawful

13    conduct, that -- and alleged going from a nascent to a

14    50 percent market share, Google hasn't been able to raise

15    price once.  That's an indication of the lack of market

16    power; not the existence of it.

17            I appreciate you --

18            THE COURT:  All right.

19            MR. MAHR:  -- giving me time on that.

20            The other two points -- or the second point is

21    plaintiffs' attempt to re-examine two transactions the

22    federal government cleared well over a decade ago.

23            THE COURT:  And they admit in the complaint -- at

24    least from the Department of Justice's standpoint, they

25    admit mea culpa that they made a mistake.

                                                              9

1              You know, I don't think that argument -- it may --
2    whether or not it's permitted during the trial, should we
3    have a trial, whether I would allow that to come in, but the
4    fact that a decision is made at one point, and then as
5    things evolve problems occur, I don't think that makes a big
6    difference.  I mean, at the time, what, the FTC and the --
7    at the time the Department of Justice approved those two
8    purchases or mergers, the evidence was different than it is
9    now.
10             So, looking back, I mean, the Government has
11   admitted that the Department of Justice made a mistake in
12   letting you purchase AdMeld.  I think that's the one that
13   they were talking about.  Yeah.
14             MR. MAHR:  Well, take DoubleClick back to 2008.
15   What they're doing is extending discovery back from 2013 to
16   2016, which is really where the crux of the anticompetitive
17   conduct they allege took place.  And they're stretching
18   discovery back to 2008 to ask you essentially to re-examine
19   transactions that were found lawful after an eight-month
20   investigation in the case of DoubleClick, and a six-month
21   investigation in the case of AdMeld.  And so this
22   eight-month and six-month, we're going to go back and look
23   at them 15 years later when we don't have contemporaneous
24   documents, we don't have a contemporaneous understanding of
25   the market then.  That's what those mergers would be judged

10

```
 1    on then.

 2            There's no problem to say they've set the stage.

 3    Of course.  And we give a very simple, but I think very apt,

 4    analogy that you buy a fancy sports car, you're setting the

 5    stage for maybe reckless driving and speeding years later,

 6    but that doesn't make the purchase of the sports car

 7    unlawful.  It's still the reckless driving that's unlawful.

 8    And they haven't explained why -- the transactions

 9    themselves.  They haven't alleged it.  They just said it's

10    table setting and setting the stage.

11            We think, on that basis, that there's no reason to

12    go back -- to have the parties go back and try to redo what

13    the Department of Justice and the Federal Trade Commission

14    already comprehensively addressed 15 years ago.

15            THE COURT:  All right.

16            MR. MAHR:  The third point, the *Illinois Brick*

17    indirect purchaser bar.

18            The plaintiffs do not contest that the indirect

19    purchaser bar applies to the federal government, and yet all

20    they said for their damages claims is in paragraph 278.

21    "United States departments and agencies, including ones in

22    this district such as the Army, purchased open web display

23    advertising using Google and non-Google ad tech tools."

24    That is not an allegation that they directly purchased

25    anything from Google.  And they don't even say they
```

                                                          11

1  purchased from Google, but just that the display advertising

2  uses those tools.

3          We think that to -- you know, we think this

4  matters, because, as you obviously know, lawyers preparing a

5  case for a jury compared to preparing a case for an

6  experienced sophisticated federal judge, it's a very

7  different question, especially in cases as complex as this

8  and an injury as complex as this.  And the fact that they

9  can't make a simple, straightforward allegation that we

10 directly purchased X from Google, I think is really telling.

11 They obviously know this is a requirement for damages; it's

12 black-letter antitrust law, and, yet, they haven't said it.

13         Now, they also admit -- and this is important --

14 that you -- that the key for *Illinois Brick* is to look at

15 every stage of the ad tech products.  Well, there is no way

16 an advertiser -- and that's what the federal government

17 agency advertisers are, advertisers.  Advertisers don't

18 purchase anything from publisher ad servers.  And

19 advertisers don't publish -- purchase anything from ad

20 exchanges.  They are on the other end of the ad tech stack.

21 And so there can be no direct purchaser relationship with

22 those two parts of the stack at all.

23         And when you get to the publisher -- the buyer's

24 side, the advertising side, the advertising tools in the ad

25 tech stack, they don't do any better there.  Theoretically,

12

```
 1    an advertiser could work -- purchase directly from a
 2    demand-side platform, but there's no allegations here of
 3    monopolization in demand-side platforms, so that's out.
 4              And that leaves them with ad networks.  And,
 5    again, theoretically, they could purchase directly from ad
 6    networks, but they haven't said.  That requires us to spend
 7    a large part of our five-and-a-half months with these eight
 8    federal agency advertisers finding out what they bought,
 9    from whom, when.  What kind of relationship did they have.
10    Were they direct purchasers.  Was there an ad agency in
11    between.  Did the ad network from which they purchased take
12    ownership of the inventory and then resell it, or were
13    they -- it's a mystery, and they could have easily pled it,
14    and they failed to.
15              So, again, we think this matters, we think this is
16    a way of narrowing the case, and it's an important ground
17    for dismissal.
18              THE COURT:  All right.
19              MR. MAHR:  With that, I'll turn to market
20    definition.
21              Now, this is obviously -- there's a lot of
22    complexity, three market definitions.  They have put a lot
23    of adjectives in front of their market definition, and there
24    are different reasons for each of the markets as to why
25    those aren't valid.  But I'm going to try to focus on just a
```

13

1    few of the fundamental cross-cutting flaws in their market

2    definitions.

3           And, first, we recognize that, more times than

4    not, market definition is a fact issue.  But that doesn't

5    change the fact that the Fourth Circuit has recognized

6    dismissal is appropriate when the complaint fails to even

7    attempt to plausibly explain why a proposed market should be

8    limited in a particular way.

9           And if that weren't enough, and if *Twombly*'s

10   general direction for specific facts and conclusions were

11   not enough, the plaintiffs in this case had the benefit of

12   the first motion to dismiss in the ad tech constellation of

13   the case -- the cases, and that was a ruling by

14   Judge Freeman.  And Judge Freeman could not have been

15   clearer that the market alleged in that case, which was

16   online display advertising services on the open web, like

17   here, particularly concerned her because they excluded

18   social media advertising and direct negotiations.  And she

19   ruled that if plaintiffs wanted to make -- to exclude those

20   obvious substitutes -- and there might be a basis to exclude

21   them, but they have to plead under *Twombly* additional facts

22   that indicate that the categories accepted from the

23   identified market are not economic substitutes.

24          They haven't even tried here.  They --

25   Judge Labson so -- Labson Freeman also specifically

                                                              14

1    admonished plaintiffs in that case that it is not sufficient

2    for plaintiffs to allege, for example, that close-ended

3    advertising services like Facebook, Amazon, Twitter, we can

4    add TikTok and Snapchat to that, are not reasonable

5    substitutes by just saying it's so.  Instead, they have to

6    explain, with factual allegations, not conclusions, why it's

7    so.

8            I think the plaintiffs completely ignored -- and I

9    know they're not bound by it, but they completely ignored

10   that these obvious substitutes need to be -- you have to

11   explain at least why they -- you don't believe that they're

12   in the market.

13           And one reason we didn't challenge market

14   definition in the Texas case in the Southern District of

15   New York is there were twice as many paragraphs devoted to

16   market definition that made those explanations.  We don't

17   agree with them, we think they're absolutely wrong, but we

18   can't fight the allegations at a motion to dismiss stage.

19   We can fight, under *Twombly*, the complete lack of any

20   allegations, is what we have here.

21           Just to take a couple of these.  You know, they

22   exclude web -- they tried to limit it to web, that's one of

23   the adjectives.  That excludes advertisers that placed

24   advertising on mobile apps as opposed to the Internet.

25           So take the New York Times.  If you're a New York

                                                              15

```
 1    Times reader, you can access the New York Times either by
 2    doing a search for it.  If you can find a search engine, you
 3    could do a search for it and go onto the New York Times web
 4    page and read the New York Times there.  Or you can have the
 5    app on your phone, which is also the New York Times, and you
 6    can read it through the app.
 7            If an advertiser is looking to seek a New York
 8    Times reader, there's no explanation in the complaint as to
 9    why they would find advertising on the Internet site any
10    different than advertising on the app.  No explanation at
11    all.  We're just supposed to take their word for it, and
12    they get a free pass into discovery.
13            Same with open.  That one little adjective,
14    "open," limits, very transparently -- excludes, very
15    transparently, Facebook, TikTok, Amazon, the very companies
16    Judge Freeman said if you're going to take this market
17    definition seriously, you've got to at least explain why
18    these people aren't included, and they ignored it all.
19            All of these are addressed in basically a
20    footnote, Footnote 4, where they lay out all the different
21    competitive constraints and all these other methods of
22    digital advertising, and then say, but our focus is open web
23    advertising.  Markets aren't defined by the plaintiffs'
24    focus; markets are defined by reasonable substitutes.  And,
25    again, the law is clear that if you're going to exclude
```

16

1   reasonable substitutes, you need to explain, in facts, not

2   conclusions, why.

3            So those are my main points, Your Honor.  I

4   could -- I could talk more, but I think that's --

5            THE COURT:  I think you've done a good job of

6   focusing on what are the key points.

7            So now we'll give Ms. Wood a chance to respond.  I

8   assume you're going to be the main spokesperson.

9            MS. WOOD:  Actually, Mr. Guarnera is going to

10  respond, Your Honor.

11           THE COURT:  All right.  That's fine.

12           Start with the last question first, because that,

13  obviously, is the absolutely core central issue, and that is

14  the market.

15           MR. GUARNERA:  The market definition issue, Your

16  Honor?

17           THE COURT:  Yes.

18           MR. GUARNERA:  Yes, Your Honor.

19           So Google's arguments on market definition fail

20  because we've taken the three markets -- the three markets

21  at issue as they exist in the real world, as they are

22  recognized by industry participants, including Google's own

23  employees and Google's own internal documents, as we cite in

24  the complaint.  Figure 1, for example, lays out the ad tech

25  stack exactly as we've pleaded it, Your Honor.

1              Google questions and quibbles with the precise

2     degree of substitution that might be possible in our

3     markets, but that's a fact-intensive question that does not

4     approach the kind of glaring deficiency that the Fourth

5     Circuit has said would be needed to grant a motion to

6     dismiss on market definition.

7              Google referenced mobile advertising, for example,

8     as an alternative form of digital advertising, but Google

9     has a different product to -- Google, itself, uses a

10    different product to sell -- to sell advertising on mobile

11    apps, AdMob, as we allege.

12             And, Facebook, Your Honor, we -- firstly, it's

13    important to note that all of Google's arguments about the

14    markets assume the advertiser perspective.  But here, the ad

15    exchange, for example, it has to attract and appeal to both

16    publishers and advertisers.  And Google doesn't even allege

17    that publishers, for example -- it would be an alternative

18    for a publisher to use Facebook's ad tech products, because,

19    of course, Facebook's products are just for Facebook.  A

20    publisher has no alternative to turn to if a monopolist were

21    to raise the cost of a publisher ad server or an ad

22    exchange.

23             We also allege that there are differences from an

24    advertiser's perspective with respect to social media, for

25    example.  Such as the fact that social media has different

                                                              18

1    reach.  Again, if you are buying into Facebook, that means

2    your ad will appear on Facebook as opposed to the thousands

3    upon thousands of other websites that are on the Internet,

4    which allow opportunities for advertisers to reach -- to

5    reach potential customers in a broad range of settings,

6    including, you know -- again, on different types of

7    websites, at different times, depending on, for example, if

8    a customer just visited an advertiser's own website and the

9    advertiser wants to target that user again in the near term.

10   If that user is not on Facebook, then the advertiser won't

11   be able to reach them at the time that doing so would be

12   most valuable to the advertiser.

13          Google also mentioned Judge Freeman's opinion in

14   the Northern District of California.  Obviously that case is

15   now a part of the broader MDL in front of Judge Castel.  And

16   the key distinction in that case, from our point of view,

17   Your Honor, is that the advertiser plaintiffs in that case

18   alleged an online display ad services on the open web

19   market.  In other words, they combined all of the ad tech

20   products in one market.  And when Judge Freeman asked them

21   to replead, it appears that she essentially asked them to

22   replead more facts about the specific products that the

23   advertisers used in the ad tech stack.  In other words, the

24   products that we've already alleged.

25          Again, Your Honor, all of Google's market

19

1    definition arguments are ultimately fact-specific questions

2    that are premature on a motion to dismiss.

3            THE COURT:  All right.  Then he raised several

4    other issues of the direct purchase argument.

5            MR. GUARNERA:  Yes, Your Honor.

6            We've alleged that the federal agency advertisers

7    purchased display ads using Google's tools.  And this

8    allegation is sufficient because federal agency advertisers

9    are, therefore, direct purchasers of Google services and

10   are, therefore, entitled to recover the overcharges that

11   Google imposed on them as a result of its monopolies.

12           In other words, the 20 percent take rate, the

13   super competitive take rate that Google charges for its ad

14   exchange, for example, that's money that is paid by the

15   advertiser.  It's taken out of the advertiser's payments.

16           *Apple v. Pepper*, Your Honor, provides a similar

17   situation where there was a platform, in this case, Apple,

18   that was charging an allegedly super competitive take rate,

19   and the buyers on that platform were entitled, according to

20   the Supreme Court, to seek damages as direct purchasers

21   because they were the ones who were paying the overcharge.

22   And it's -- it's the same situation here, Your Honor.

23           THE COURT:  Well, I think the Supreme Court

24   bricklayer case, which is the one everybody cites for this

25   concept of direct versus indirect purchaser, the facts in

20

1    that case are so different from what they are here.

2            Again, the Court was properly concerned about the

3    multiple layers between the anticompetitive conduct, I guess

4    the manufacturer of the bricks themselves, and the ultimate

5    purchaser.  That there was a masonry contractor, who then

6    would sell to the general contractor, who then would sell to

7    the State of Illinois.  And the problem is, you know, who

8    does Illinois sue?  I mean, yes, Illinois is being -- when

9    they pay their general contractor at an inflated rate, but

10   that inflation is due two or three steps back.

11           This is, in my view, a completely different

12   situation.  As you said, you pay Google.  Whether it's

13   Google, you know, ad server or Google exchange or Google

14   publisher, it's still all Google.

15           I think the only argument that defendants might

16   have down the road -- which, again, is a fact situation --

17   is if you all had used a real middleman, then there might be

18   a problem, or two middlemen.  So, unfortunately, that will

19   require discovery.  But, I mean, discovery shouldn't be that

20   difficult.  You ought to have that data at your hands right

21   now.  I would think probably almost a request for admissions

22   and a couple of quickie interrogatories should probably

23   flesh that out rather quickly.

24           So I don't think the direct/indirect issue has any

25   real clout on this one.

21

1              Go ahead.  Let me hear you respond to the other

2    ones then.  Market share.

3              MR. GUARNERA:  Yes, Your Honor.

4              As Your Honor indicated, we completely agree that

5    the Supreme Court has been explicit that there is no

6    50 percent cutoff.  And I think a careful reading of the

7    Fourth Circuit cases proves that the Fourth Circuit doesn't

8    think there's a hard cutoff either.

9              Rather, when a plaintiff has alleged direct

10   evidence of the ability to control price and exclude

11   competitors, that's the ultimate question.  That is the

12   functional test of whether a defendant has monopoly power,

13   and we've pleaded both here.

14             Google claimed that our allegations that Google

15   charges super competitive prices are conclusory, that is

16   certainly not true.  I would direct the Court to

17   paragraphs 149, 196, 224, 230, 266, where, for example, we

18   allege that real-time bidding technology has become largely

19   commoditized.  In fact, Google itself is concerned that it's

20   become commoditized.  And, additionally, paragraph 149 where

21   we describe AdMeld which charged a 7 percent fee to provide

22   similar real-time bidding technology.  These allegations,

23   again, are more than sufficient on a motion to dismiss.

24             And, similarly, we also allege extensive examples

25   of how Google has used -- has rigged auctions, has excluded

1    competitors in order to, again, control its monopoly

2    positions in each of these markets.  And that, again -- all

3    the various forms of conduct that we have alleged are

4    unlawful, show direct evidence that Google has been able to

5    exclude competitors from the ad exchange market.

6             THE COURT:  All right.  And the last issue is the

7    use of -- or reference in the complaint to the acquisition

8    of DoubleClick and AdMeld, which were events that occurred,

9    you know, quite a few years ago in a different context,

10   frankly.  The Internet was, you know, different then than it

11   is now.  The online commerce was different then than it is

12   now.  And so I am curious as to how, if the case were to go

13   to trial, you intend to focus on those two acts.  I mean,

14   they occurred.  The Government, at the time they occurred,

15   approved them, did not see an anticompetitive problem, and

16   things changed.

17            I sort of agree on this one with defense counsel,

18   that there shouldn't be a whole lot of time spent, other

19   than this is a historical event, it sort of led us to where

20   we are today.

21            Do you expect to do more than that with those two

22   events?

23            MR. GUARNERA:  I think so, Your Honor.

24            Firstly, I -- it's not -- when an agency reviews

25   an acquisition, it does not approve the acquisition.  It's

                                                            23

1   not a blank check to get out of jail free on any subsequent

2   use of the acquired asset.

3          The question here in a Section 2 case allows the

4   Court, allows the jury to look back and to see what Google

5   has actually done with the assets that it acquired.  Google

6   is just at war with the Supreme Court's precedent on this

7   point to say that the use of an acquired asset, after it's

8   been acquired, is not actionable under Section 2.

9          There are numerous Supreme Court decisions that

10  look back on acquisitions as evidence of a course of

11  anticompetitive conduct, as enabling anticompetitive

12  conduct.  The 1957 *du Pont* case, *ITT Continental Baking,*

13  *Grinnell*.  All these cases involve, again, mergers that had

14  occurred, acquisitions that had happened in the past, but

15  were still considered relevant to the -- to causes of

16  actions, to anticompetitive conduct subsequently.

17         With respect to the significance of the agency

18  review, Your Honor, just a few years ago, the Fourth Circuit

19  in *Steves & Sons v. Jeld-Wen* specifically agreed with the

20  district court who had prohibited the jury from hearing any

21  evidence that the Department of Justice had investigated the

22  merger previously because it was considered irrelevant.

23         And the HSR Act, which permits the agencies to

24  conduct premerger review, has a provision that specifically

25  says that the agencies, in fact, anyone, can challenge a

24

1   merger at any time after it closes, even if the agency

2   reviewed it prior to closing.

3          And in this case, Your Honor, the DoubleClick and

4   AdMeld conduct itself had significant effects on Google's

5   ability to control and maintain monopolies in these three

6   markets.

7          On AdMeld, for example, AdMeld offered a competing

8   technology that would have undermined the power of AdX, and,

9   therefore, given publishers the ability to substitute other

10  technologies that would allow broad real-time bidding for

11  Google's otherwise must-have ad exchange.  And when Google

12  acquired AdMeld, it shut down that competing technology,

13  taking it out of the market, taking away a nascent

14  competitor that publishers could have turned to as an

15  alternative to Google's monolithic control of the ad tech

16  stack.

17         And, similarly, DoubleClick.  Google, which

18  already had incredible power on the ad network side of the

19  stack, acquired DoubleClick, which had 60 percent share on

20  the publisher ad server side, as well as an ad exchange, and

21  then, through that acquisition, had, again, a leading

22  position across the entire ad tech stack, which Google

23  proceeded to reinforce and cement by making Google ads

24  demand, advertiser demand, exclusive to Google's own

25  products.

1           So we think that both of these forms of conduct

2    are important to the overall case and do play an important

3    role, both as a history of how Google came to be the

4    dominant player that it is, but also because the

5    acquisitions themselves were anticompetitive.

6           THE COURT:  All right.  Thank you.

7           MR. GUARNERA:  Thank you, Your Honor.

8           THE COURT:  All right.  Mr. Mahr, do you want to

9    respond to any of that?

10           MR. MAHR:  I do, Your Honor.  I'll be brief, but

11    I'll take them in reverse order.

12           The last point, that's exactly why we provided you

13    with the *New York Meta* decision that was handed down

14    yesterday by the D.C. circuit, in which they make clear that

15    past transactions don't become part of the course of conduct

16    just because there was allegedly later anticompetitive

17    conduct.

18           If they have an anticompetitive conduct case, they

19    can bring that -- they're going to bring that

20    anticompetitive conduct case.  But the difference in

21    treating the original mergers as an independently

22    anticompetitive act as part of the course of conduct versus

23    just a stage-setting fact is significant here because it

24    requires us to go back five extra years in an already

25    15-year scope of discovery just to try to redo what the

26

1    federal government did comprehensively 15 years ago.

2              On the monopoly power, I heard something about

3    real-time bidding being commoditized.  But, again, that

4    doesn't say anything about monopoly power.  Fifteen years

5    Google has had the ad exchange.  Fifteen years it hasn't

6    been able to raise its price from 20 percent.  After

7    15 years, it only has a 50 percent market share, which means

8    it loses one out of every two, and after 15 years, its

9    prices are only among the higher prices in the market,

10   according to paragraph 224.  That is not monopoly power.

11             In terms of the *Illinois Brick* argument, I

12   understand that in the *Brick* case, one company creates the

13   materials for the bricks, then makes the bricks, and then

14   sells the bricks.  It's all the same company controlling the

15   whole time, and that's why *Illinois Brick* only looked at the

16   direct purchaser in that case.

17             But, in this case, it's not an ineluctable path

18   from publisher to advertisers.  Among other things, we know

19   that there's only a 50 percent market share at that ad

20   exchange level.  So half of the sales from any publisher are

21   going through things other than Google's ad exchange.  So

22   it's not like the *Illinois Brick* facts where they're all

23   going through the same actor, but, instead, 50 percent are

24   going through ad exchange.  And then when you get to the

25   advertiser tools, they don't even seek monopoly power, even

27

```
 1   under their strained and narrow market definitions for
 2   demand-side platforms, because there's so many of them.  So
 3   there's just not this direct line that was present in
 4   Illinois Brick.
 5            Finally, on the market definition, I hear that --
 6   criticism that we are assuming the advertising perspective.
 7   First, the DOJ comes here to you on behalf of the United
 8   States as advertisers.  They're the federal agency
 9   advertisers.  And then they say, well, don't look at the
10   advertiser perspective, but that is the perspective that
11   they come to you as.
12            And, again, we think after a three-and-a-half-year
13   investigation, with Judge Freeman specifically saying that
14   if you're going to talk about these markets, you've got to
15   be able to deal with these obvious substitutes that are
16   throughout the complaint -- mentioned throughout the
17   complaint.  You can't just say, we've decided to focus on
18   something else.
19            They've come to the rocket docket, they want to
20   move faster than any other court in the country moves, they
21   want to leap in front of the Southern District of New York
22   cases, they had a three-and-a-half year investigation, and
23   we think they need to be held to a higher standard and not
24   given a pass on a motion to dismiss.
25            THE COURT:  All right.  Well, I appreciate the
```

1    argument, and I recognize that the discovery burden is

2    heavy, but I know that Judge Anderson is working with you to

3    make sure that, Number 1, their discovery requests are

4    appropriate; and, Number 2, that the responses are coming in

5    promptly and appropriately.

6              But I've looked carefully at this case, and, as I

7    said, it's a very, very long and technical complaint.  At

8    this point, though, the Court must draw all inferences in

9    favor of the plaintiff, even though it's an antitrust case,

10   and I am satisfied that there are enough specific

11   allegations, including various quotes from people within

12   Google, you know, referring to some competitors as

13   presenting existential threats.

14             Now, again, a business has a right, in our, you

15   know, competitive capitalistic society, to try to protect

16   itself and to try to maximize profits.  You know, that's our

17   economic system.

18             But, at the same time -- this is, again -- as

19   almost all cases that ultimately wind up in this court, it's

20   a balance.  There's a balance between trying to encourage

21   innovation and reward people and companies that are able to

22   come up with new ways of doing things, to reward them by

23   making a good profit.

24             At the same time, sometimes programs that begin

25   completely benignly, perfectly appropriately, we want to

                                                            29

```
 1   maximize our profit.  Nothing wrong with that.  But because
 2   of the way things evolve, at some point, it goes over the
 3   line, and it now becomes so successful that it's basically
 4   stifling innovation and competition, and the market is
 5   closing down.
 6           I mean, that's the essence of antitrust law is to
 7   try to keep -- you know, nothing is static, to try to keep
 8   the system working by recognizing that, at certain points,
 9   some companies may get too big for their own good, they're
10   self-imploding, or the technology may become so dominant
11   that it's just crushing all other elements where there can
12   be innovation.  And whether or not, at the end of the day,
13   the plaintiff that has the burden of proof can show that,
14   that's another question.
15           Obviously whether the market has been properly
16   described here or defined here is a very legitimate
17   question, but I'm still satisfied, at this point, it's been
18   adequately alleged; and B, that it's fact-specific.  And
19   whether these other markets are equivalent is going to be a
20   question of fact, in my view; it's not a question of law.
21           Again, on the direct/indirect, there -- I think,
22   at least as the allegations are, there's a very strong case
23   that this was a direct purchase because of the nature of how
24   the Google system is set up.  Again, how much damages, if
25   any, result from that is a completely different question.
```

30

1   And so, I'm satisfied.

2          Now, some things, like the degree to which

3   discussion about DoubleClick and AdMeld and the way in which

4   they were first -- when it thought about in terms of, you

5   know, Google's planning about acquiring them and whether or

6   not back then it had an improper anticompetitive intent, I

7   don't know what the evidence is going to show.  Motions in

8   limine can address how, if at all, that is going to be

9   addressed during a trial, should we get to that point.

10         But, at this point, I'm going to deny the

11  defendant's motion to dismiss.  I'm finding that the

12  complaint read as we must with the deference given to the

13  allegations are sufficiently specific to support all five of

14  the claims, which are three specific claims as to each of

15  these three markets, the fourth claim being the tying

16  allegation, and the fifth claim being the one for direct

17  damages to the federal plaintiff.

18         So I'm denying the motion, and I hope that you all

19  can continue to work well on the discovery issues.

20         We'll recess court for the day.

21              (Proceedings adjourned at 10:40 a.m.)
                ----------------------------------
22  I certify that the foregoing is a true and accurate

23  transcription of my stenographic notes.

24                          _Stephanie Austin_

25                          Stephanie M. Austin, RPR, CRR

                                                        31