```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3     --------------------------x
       UNITED STATES, et al.,     :     Civil Action No.:
 4                                 :     1:23-cv-108
                    Plaintiffs,    :
 5        versus                   :
                                   :     Friday, June 2, 2023
 6     GOOGLE LLC,                 :     Alexandria, Virginia
                                   :     Pages 1-37
 7                   Defendant.    :
       --------------------------x
 8

 9          The above-entitled motions hearing was heard before
       the Honorable John F. Anderson, United States Magistrate
10     Judge.  This proceeding commenced at 11:02 a.m.

11                     A P P E A R A N C E S:

12     FOR THE PLAINTIFFS:    KRISTIN STARR, ESQUIRE
                              OFFICE OF THE UNITED STATES ATTORNEY
13                            2100 Jamieson Avenue
                              Alexandria, Virginia  22314
14                            (703) 299-3700

15                            KELLY GARCIA, ESQUIRE
                              JULIA TARVER WOOD, ESQUIRE
16                            UNITED STATES DEPARTMENT OF JUSTICE
                              ANTITRUST DIVISION
17                            450 Fifth Street, NW
                              Washington, D.C.  20530
18                            (202) 894-4266

19                            TYLER HENRY, ESQUIRE
                              OFFICE OF THE ATTORNEY GENERAL
20                            OFFICE OF THE SOLICITOR GENERAL
                              202 North Ninth Street
21                            Richmond, Virginia  23219
                              (804) 786-7704

22

23

24

25
                                                                1
```

```
 1                    A P P E A R A N C E S:

 2   FOR THE DEFENDANT:     ANDREW EWALT, ESQUIRE
                            SARA SALEM, ESQUIRE
 3                          FRESHFIELDS BRUCKHAUS DERINGER, LLP
                            700 13th Street, NW
 4                          10th Floor
                            Washington, D.C.  20005
 5                          (202) 777-4500

 6                          JOSEPH BIAL, ESQUIRE
                            AMY MAUSER, ESQUIRE
 7                          PAUL, WEISS, RIFKIND,
                            WHARTON & GARRISON LLP
 8                          2001 K Street, NW
                            Washington, D.C.  20006
 9                          (202) 223-7300

10                          CRAIG REILLY, ESQUIRE
                            LAW OFFICE OF CRAIG C. REILLY
11                          209 Madison Street
                            Suite 501
12                          Alexandria, Virginia  22314
                            (703) 549-5354
13
     COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
14                          Official Court Reporter
                            United States District Court
15                          401 Courthouse Square
                            Alexandria, Virginia  22314
16                          (571) 298-1649
                            S.AustinReporting@gmail.com
17
            COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
18

19

20

21

22

23

24

25
                                                                    2
```

```
 1                    P R O C E E D I N G S
 2              THE DEPUTY CLERK:  United States of America, et
 3     al. versus Google LLC, Civil Action Number 23-cv-108.
 4              MS. STARR:  Good morning, Judge Anderson.
 5     Kristin Starr from the U.S. Attorney's Office.  And with me
 6     are my colleagues from the Department of Justice, Kelly
 7     Garcia and Julia Tarver Wood.
 8              I'll let the counsel from the State AG's Office
 9     introduce themselves.
10              THE COURT:  Who's going to be arguing for the
11     United States?
12              MS. STARR:  Kelly Garcia will be arguing for the
13     United States, Your Honor.
14              THE COURT:  Thank you.
15              MS. GARCIA:  Good morning, Your Honor.
16              THE COURT:  Good morning.
17              MS. TARVER WOOD:  Good morning, Your Honor.
18              MR. HENRY:  Good morning, Your Honor.  Ty Henry
19     from the Virginia Attorney General's Office on behalf of the
20     plaintiff states.
21              THE COURT:  Thank you.
22              MR. EWALT:  Good morning, Your Honor.
23     Andrew Ewalt from Freshfields on behalf of Google.  I'm
24     joined by Joseph Bial from Paul, Weiss, who will be arguing
25     this morning; as well as Sara Salem from Freshfields;
```

                                                            3

```
 1    Amy Mauser from Paul, Weiss; and, of course, Craig Reilly.

 2              THE COURT:  Okay.  Thank you.  All right.

 3              Well, I got a motion that has two parts in front

 4    of it.  I want to deal with the custodian issue first and

 5    deal with that completely, and then we'll get to the other

 6    issue after that.

 7              So let's go ahead -- and I've read what everybody

 8    submitted.  You know, it -- I appreciate your trying to keep

 9    the briefs brief, but there's -- and this goes to both of

10    the issues, but it relates a little less so to the custodian

11    issue.

12              A significant amount of substantive information

13    really hasn't been provided to me.  You talk about we

14    identified 63 custodians.  There's no information

15    relating -- at least provided to me, I assume you all know

16    it -- as to, you know, who these custodians really were,

17    what they really did, what their role really was based on

18    the information that you provided.  And, you know, they

19    provided some information as to those 63, and you've gotten

20    some information, you haven't gotten some information.

21    They've agreed to produce custodians or follow-on custodians

22    for some but not the others.

23              But I don't have any real substance behind the

24    numbers, and that's a little concerning.  And I know your

25    argument is, you know, they had information back in -- or
```

                                                                4

```
 1    the person who was in this position back in 2020, it was
 2    agreed that they had substantive information and their
 3    material issue had been reviewed and looked at.  And I -- I
 4    take it from your argument it is -- I am to assume that that
 5    position, or whatever the person did in that position in
 6    2020, has an ongoing relationship, need or involvement in
 7    the issues in this case.  But, I mean, that's an assumption;
 8    not something that has really been shown to me at this
 9    point.
10            You know, clearly, Google has acknowledged that in
11    some respects, and that some of the successor custodians
12    they've agreed to either are already on the list and are
13    currently doing jobs, functions, responsibilities that
14    are -- they acknowledge are -- but I'm at a little bit of a
15    loss as to how is it that I just assume a custodian in 2020,
16    a new person in that job duties and responsibilities is
17    going to have information between October of 2020 and now.
18            MS. GARCIA:  Your Honor, good morning.
19    Kelly Garcia for the United States.
20            So today we're coming before you on only one
21    remaining issue.  With respect to the issue of successor
22    custodians, this morning we received an email from Google's
23    counsel in which they agreed to identify the remaining
24    successor custodians in order to cover the post-October 2020
25    time period and add those custodians to their list.  As we
```

```
 1   responded this morning, we consider this issue resolved.
 2            THE COURT:  Okay.  Well then, that whole
 3   discussion was for nothing.  I guess I should have asked if
 4   there any updates on that issue before I came in.
 5            Well, that's -- so they're going to provide you
 6   the information on the 18 of the 63 that you didn't have.
 7   The 11 that they said, you know, we have successors for,
 8   they're going to be looking at their documents and providing
 9   information from October of 2020 to the present; is that
10   your understanding?
11            MS. GARCIA:  Exactly, Your Honor.
12            THE COURT:  Is that consistent with what -- I had
13   a hearing at 10.  I didn't see any filings or anything to
14   indicate that that got worked out.
15            But is that the agreement for --
16            MR. BIAL:  Your Honor, yes.  Joseph Bial for
17   Google.  That is the agreement.
18            THE COURT:  Okay.  Well, thank you very much.
19            Let's move to the next issue, which is, honestly,
20   even more confusing to me.  And my concerns with what I have
21   in front of me today, you know, you've got the document
22   requests, you've got an -- well, first of all, have you
23   worked it out, I guess should be my first question, and if
24   not, then I'll continue to have some discussions.
25            MS. GARCIA:  I appreciate that, Your Honor.  We're
```
                                                              6

1    still at an impasse, so this is still an issue that we would

2    like resolution on today.

3            THE COURT:  Okay.  Well, whether you're able to

4    get a decision from me today will be -- we'll find out.

5            But the thing that I am -- again, I'm not sure I

6    fully understand based on the briefing.  And, again, I

7    recognize you've got a lot of people who are dedicating

8    their full time and attention to this case and know a lot

9    more about this case than I do.

10           The issue -- overarching issue is they have agreed

11   to provide you with 9 of the 12 source code requests.  The

12   three, the last three, they've said, you know, either we

13   understand, we don't think it's relevant, we don't really --

14   you know, too hard to figure out what it is.

15           I don't understand when they say they're going to

16   be producing all the source code as to a particular project,

17   tool, whatever, what it is that's in the remaining amounts

18   that is not included in the first amount here.

19           So, help me understand what it is in those three

20   areas that seem to be at issue.  And I know there are more

21   than just that, but I think that's a key issue that we need

22   to address.

23           So -- and, again, you know, the first nine are

24   pretty specific.  "This project," they know what that

25   project is, they can go look.  The others are a little

                                                              7

```
1    bit -- you know, source code that relates to -- pretty

2    amorphous.  You know, how you do X, Y, Z, as opposed to a

3    particular project, proposal, whatever.

4            So let me hear about that; okay?

5            MS. GARCIA:  Yes, Your Honor.

6            As counsel acknowledged on a meet-and-confer

7    yesterday, the way in which we described the last three

8    categories of our RFP may not be how Google's own engineers

9    describe it.  What we've tried is -- tried to do is

10   describe, with good-faith efforts, other information that we

11   believe would be relevant, although we have no code name or

12   specific other identifier in order to be able to give more

13   information at this time.

14           THE COURT:  Well, you know, this Project Bernanke

15   or Poirot or the dynamic revenue share or the predictive

16   highest bidder, the Smart Bidding, do they encompass what

17   you're asking for in any other requests or not?

18           MS. GARCIA:  Your Honor, they may.  And if I --

19   with this opportunity, I would like to be able to describe

20   those three remaining requests in plain language.

21           So with respect to -- with respect to RFP 39

22   Part 10, we've given a functional description here asking

23   for the source code or algorithms that choose what

24   exchanges, DSPs and Ad Networks are called on by each of the

25   Google products at issue in this case, Google Ad Manager,
```

8

```
 1   DV360 and Google Ads.
 2          To the extent those are covered by any of the code
 3   names that we've identified, we appreciate Google's efforts
 4   to search for and identify responsive information, but our
 5   concern is that if we don't already know a certain name of a
 6   project, particularly a newer project that perhaps postdates
 7   several documents and depositions that happened during the
 8   investigation, we don't want to suggest that those -- that
 9   source code or those algorithms are not relevant here.
10          THE COURT:  So, I mean, the document request that
11   you have served -- and that's what's in front of me, to some
12   extent -- and looking at 10:  "Any curation function for the
13   related products that determine which exchanges, DSPs and Ad
14   Networks to call."
15          MS. GARCIA:  Yes, Your Honor.
16          THE COURT:  So go back and tell me again what that
17   really means.
18          MS. GARCIA:  So by "curation function," we're
19   simply referring to the function of the algorithm that
20   chooses which exchanges, DSPs or Ad Networks are called by
21   the program.  We're limiting our request to algorithms and
22   source code that are specific to Google Ad Manager, DV360
23   and Google Ads.
24          THE COURT:  Okay.  All right.  What about 11?
25   "Any bid, price floor or auction optimization algorithm" --
```

9

```
1    any -- "product or feature."

2            MS. GARCIA:  Yes, Your Honor.

3            With respect to Subsection 11, we believe we've --

4    we're asking for source code for any Google bid, price floor

5    or auction optimization algorithm, product or feature, and

6    we've provided counsel and in the papers some references to

7    complaint paragraphs in an attempt to give as much

8    information as we possibly could.

9            THE COURT:  Why don't you think that's already

10   included in the, you know, other project information and

11   other things that you've asked for in 1 through 9?

12           MS. GARCIA:  Your Honor, it may very well be

13   included in those responses, but given the information that

14   we have to date and the information that we have from

15   Google, we cannot say for sure that it is.

16           THE COURT:  All right.  And 12.

17           MS. GARCIA:  Twelve asks for source code

18   pertaining to any automated means or manner of bidding,

19   whether on individual bids or a campaign-level basis.

20           Again, the complaint discusses these issues, and,

21   unfortunately, we don't have specific code names or other

22   identifiers that we can provide to Google based on the

23   information that we've been able to gather up to this point;

24   however, we believe that this is sufficient information for

25   Google to be able to take back to its client.  You know, the
```
                                                                    10

1    teams of engineers that work at Google, we suspect that they

2    have more information on what exactly these automated means

3    are called, and, unfortunately, we cannot provide any more

4    information other than what we have.

5                THE COURT:  Okay.  Well, what efforts have you

6    taken, other than good-faith consultation with counsel, to

7    figure out what it is?  I mean, have you taken a 30(b)(6) on

8    a very narrow area as to, you know, what is it that we need

9    to do to, you know, figure out about, you know, curation

10   function for products that determine the exchanges?  Or the

11   bid floor price auction optimization algorithm, product or

12   feature?  Or try and figure out something specific?

13               I mean, the problem is, if you're asking me to

14   order them to do something that is vague -- well, if it's

15   something they're already going to be providing, that's not

16   a problem, and I'll hear whether it really is, these three

17   things are subsumed in 1 through 9 or not.  And I understand

18   your concerns.  If a -- you know, if a directed reading of

19   some of these projects or programs or code names is limited,

20   if they limit it to that particular thing, and it also does

21   or relates to other things that you want to get some other

22   information that relates to that, but 1 through 9 seem very

23   specific; 10, 11 and 12 seem pretty broad, maybe vague,

24   sometimes catch-all.  Those are all terms that come to mind

25   when you read those three compared to the first nine.  And I

                                                           11

```
1    don't want to be in a position of ordering somebody to do
2    something that isn't specific.
3            So what have you done in order to get specific
4    information from Google other than through lawyers and
5    communications with counsel?
6            MS. GARCIA:  Your Honor, during the course of our
7    investigation, we took several depositions, as you know.  We
8    posed these questions to individuals who we understood were
9    involved in the creation of this code, and those individuals
10   were not able to give us a complete understanding of the
11   code itself.  A lot of the testimony that we received
12   suggested that there are several engineers across Google who
13   work on issues like this.  For that reason, we have not
14   pursued a 30(b)(6) at this time.
15           This case is -- at its core, it's about
16   programmatic digital advertising tools, which is its code.
17   We've done our best to identify code names, and we have in 1
18   through 9, but, otherwise, we've done our best to articulate
19   what we are looking for.
20           What we told Google yesterday on a meet-and-confer
21   was that if Google's engineering teams have made good-faith
22   efforts to find responsive source code and cannot find it,
23   we would accept an affidavit from a Google employee with
24   knowledge explaining that they've taken steps to identify
25   this information and that it doesn't exist.
```

12

 1          We've also made clear that, in addition to the

 2   affidavit, we would ask that Google stipulate that neither

 3   party would rely on source code if it comes to light later

 4   on that this information does, in fact, exist.

 5          THE COURT:  Okay.  There's a fair amount of

 6   discussion in your papers about your experts, him or her,

 7   needing additional information and needing roadmaps and

 8   guidelines and those kinds of things.  I don't have anything

 9   from an expert; I only have you saying your experts may need

10   this kind of information.

11          What's the basis for your statement, and why is it

12   that you think what they have agreed to provide -- and they

13   have, you know, outlined in their opposition some

14   information they've agreed to search for and provide

15   relating to source code that they've agreed to provide, and

16   why is any more necessary?

17          MS. GARCIA:  Your Honor, the basis for this

18   request was from -- it was a request from our expert teams

19   and their consultation teams.

20          How they explained it to us -- I'm not someone who

21   has a degree in computer science, so I can't pretend to have

22   firsthand knowledge of this.  But the way that they

23   explained it to us was that they expect, having done this

24   type of work before, that there exists data dictionaries,

25   user manuals and other explanatory materials in the ordinary

                                                              13

1  course of business at Google.  They told us that since

2  Google is a large organization and no one person is likely

3  to have a full understanding of all of the relevant code

4  across the company, they expect manuals exist to explain

5  these materials to someone within the organization who works

6  in a different department or someone who is new to the

7  organization, for example, a new hire.

8          THE COURT:  Well, why do they need that

9  information?  I understand they say they may have that

10  information, they're a big company, and they may have

11  guidelines and things, but why is it that your experienced

12  team of experts would need, you know, a roadmap from Google

13  to look at the information that they --

14          MS. GARCIA:  Your Honor --

15          THE COURT:  -- have gotten or will be getting?

16          MS. GARCIA:  Thank you, Your Honor.

17          From what we have agreed to with plaintiffs in

18  order to protect source code and respect the confidentiality

19  of the source code, our experts will be subject to

20  significantly restrictive provisions when they do access the

21  source code.  They can only go in from a certain point in

22  the morning to a certain point in the night.  They can only

23  go in and be observed by someone else.  They can take notes,

24  but they can't write down any portion of the source code.

25  All of these strict conditions are agreed to already by the

                                                          14

```
 1   parties in the protective order.
 2             THE COURT:  And they're usual.  I mean, there's
 3   nothing really unusual about that when you're dealing with
 4   source codes.
 5             MS. GARCIA:  So, Your Honor, what we're attempting
 6   to do is arm our experts with the information that they've
 7   told us they would need in order to understand, as
 8   outsiders, not as Google engineers, the information that
 9   they're reviewing when they go in to look at the source
10   code.
11             They are also doing this rather quickly.  And part
12   of the reason why we've asked for Your Honor's intervention
13   at this stage is that we've -- you know, to date, we haven't
14   had a discussion about concrete timing, when our experts
15   will have access to this source code, when everything will
16   be up and ready.  The proposal that we've seen was a bit
17   ambiguous with respect to whether Google has identified any
18   of the source code to this date.
19             Yesterday on the meet-and-confer, I put the
20   question to Google and was told that they cannot confirm
21   that they've identified any of the responsive source code.
22             THE COURT:  Not even for the nine items that
23   they've agreed?
24             MS. GARCIA:  That's my understanding, Your Honor.
25             THE COURT:  Okay.  Well -- all right.
```

```
 1              Well, what else would you like to say before I
 2    hear from Google's counsel?
 3              MS. GARCIA:  Your Honor, I'd like the opportunity
 4    to address any other specific questions you have with
 5    respect to, you know, our efforts to reach agreement up to
 6    this point, any questions you have with respect to why we
 7    believe the source code is so crucial to our case, or any
 8    other questions you have in general.
 9              THE COURT:  Well, I mean, I need to hear from
10    Google's counsel about what is not in 1 through 9 that may
11    be covered by the -- if you give a fair reading to 10, 11
12    and 12 and not a broad interpretation of that.  I think
13    you've tried to explain to them what it really is that
14    you're looking for and want to have, and I think, you know,
15    are entitled to get that kind of information.
16              MS. GARCIA:  Thank you, Your Honor.
17              THE COURT:  So let me hear from counsel.  Thank
18    you.
19              MS. GARCIA:  Thank you.
20              THE COURT:  First, I want to hear about the --
21    there are nine areas in which you have agreed to provide
22    source code from.
23              MR. BIAL:  That's correct, Your Honor.
24              THE COURT:  And where are you in the process of
25    getting that so that can start being looked at?
```

```
1              MR. BIAL:  Sure.  So let me just take a step back.

2              The way that we identify that, and you mentioned

3    those seem to be less vague, and that's Request for

4    Production Number 39 that includes the 12 categories.

5              THE COURT:  Right.

6              MR. BIAL:  So we work with the folks at the

7    company to, you know, find out what does that mean, and, in

8    those instances, as you mentioned, those are projects and so

9    forth.  So we're able to identify those.  And then it's

10   still -- obviously it's the company's secret sauce, if you

11   will, but we've got the protocol here for source code.  So I

12   think it's just going through the mechanics of that in order

13   to produce 1 through 9.

14             THE COURT:  Okay.  I understand that.

15             Where are we in the mechanics of doing that --

16             MR. BIAL:  Oh, it's --

17             THE COURT:  -- so that we can actually, you know,

18   start doing something -- that is, the plaintiffs can start

19   seeing that information and making a determination as to

20   whether, you know, the information that you're providing is

21   going to be sufficient or not?

22             MR. BIAL:  Correct.  No, Your Honor.  That's a

23   fair question.

24             So that's actually -- right now we're in the

25   process of getting that prepared for production, but we're
```

17

```
 1    still going to have to figure out who is going to receive
 2    it, and that might take, you know, a bit of time because
 3    we've got to go through paragraphs 2 and 3 of the --
 4              THE COURT:  "Prepared for production," let's focus
 5    on that issue now.
 6              MR. BIAL:  Right.
 7              THE COURT:  When is it that you are anticipating,
 8    if all of the other items get worked out, that you will be
 9    in a position to allow somebody to go into the room and
10    start looking at this source code?
11              MR. BIAL:  A couple weeks.
12              THE COURT:  A couple of weeks?
13              MR. BIAL:  Well, here's the thing, Your Honor --
14              THE COURT:  You've had these requests for how long
15    now?
16              MR. BIAL:  Yeah, no.  And it's really not that
17    part of it; it's really Sections 2 and 3 of the protocol.
18    They have to provide names to us, and then we have to vet
19    those names.
20              THE COURT:  You may not have understood my
21    question.
22              Assuming all -- and I want to know on the Google
23    side, when has that -- when will you be prepared to have all
24    the source code that you have agreed to produce available to
25    be reviewed?
```

                                                                  18

```
 1              MR. BIAL:  Within a week.

 2              THE COURT:  Okay.  All right.  So, that, I see as

 3    being acceptable.  You know, the idea that it's going to be

 4    weeks or months --

 5              MR. BIAL:  No, I didn't intend to --

 6              THE COURT:  You know, we've got a process, we've

 7    got a procedure, we've got to work through things, we're

 8    preparing.  You know, I -- we don't have enough time in this

 9    case to not be doing what you have agreed to do.  You know,

10    if we talk about a timetable for things that I order you to

11    do that you agreed to do, it may be different than that.

12    But -- okay.

13              So assuming the other issues, you know, who's

14    going to look at it, get the room set up and those kinds of

15    things, you would be in a position to have their experts be

16    able to start the process of looking at this information

17    within around a week; is that accurate?

18              MR. BIAL:  That's correct.

19              THE COURT:  All right.  So tell me what the

20    problem is with 10, 11 and 12.

21              MR. BIAL:  Yeah.  It's -- the question on 10, 11

22    and 12, I think is, it's not that -- I mean, these are

23    intelligent individuals that are trying to help identify

24    what we would be producing.  And let me give an example.  So

25    in the meet-and-confer that we had yesterday, Ms. Garcia
```

19

1   mentioned bidding, which -- for 10, 11 and 12.  We went to

2   the client yesterday, and we're in a position to produce

3   that, if that's what they're actually intending to receive.

4   I think a meet-and-confer was probably the way to go, but we

5   are where we are.

6        But that -- once we understood it's, you know,

7   potentially bidding, then we were in a position to go and

8   start collecting that for production.  But, again, that is a

9   question about is that all they want, or are there other

10  things they want, and we don't know.

11       THE COURT:  Okay.  In these meet-and-confer

12  sessions, is it just the lawyers, or are technical people

13  involved?  And I don't mean that lawyers can't also have

14  technical skills and capabilities, but I'm talking about

15  in-house technical people involved in the discussions to try

16  and have a fair exchange of information as to what we need

17  and how can you get it together.

18       MR. BIAL:  These have been counsel.

19       THE COURT:  Okay.  Have you all explored the

20  possibility of having the people who really understand

21  things completely -- without things being lost in

22  translation to some extent -- having a discussion with

23  counsel to try and flesh some of these issues out?

24       MR. BIAL:  No, we have not yet done that.  I think

25  we would be open to doing that.  I think to the extent that

                                                          20

1    they have more information or can give us more color, then

2    we could find the right individual.  But I think we could

3    probably do that in a very short order as well.

4            THE COURT:  Well, I assume, not only before this

5    motion got filed, but certainly after this motion got filed,

6    there have been some efforts to try and figure out what

7    could be captured in 10, 11 and 12 that isn't already

8    captured in 1 through 9.

9            MR. BIAL:  Right.  And I think if you look at some

10   of what's cited in the reply brief to the complaint, it

11   does, for some of those, when we're talking about 10, 11 and

12   12, cite back to precisely the ones that you mentioned

13   earlier, Bernanke, Poirot.  So there is some of that in 10,

14   11 and 12.  But I don't believe -- my understanding of the

15   government's position is that they're not limiting it to

16   that kind of thing.  I think, you know, again, bidding was

17   mentioned, so that's the one that's on the table right now,

18   and we've gotten that one cleared.

19           THE COURT:  Well, bidding is mentioned in 11 and

20   12.  It seems to be the primary focus of 12.  It says:  "Any

21   automated means or manner of bidding, whether on individual

22   bids or on a campaign-level basis."  So that seems to be

23   bidding.

24           Eleven is:  "Bid, price floor or auction

25   optimization algorithm, product or feature."  So 11 seems to

                                                          21

```
 1   be -- I don't know whether price floor or auction

 2   optimization is part of bid or not.  But 10 just talks about

 3   relating to products that determine which exchanges are.  So

 4   that isn't -- is that -- how does that relate to bidding?

 5              MR. BIAL:  Well, I don't know that it does.  I

 6   mean, we had a conversation yesterday about those three, and

 7   that was the one thing that was identified.  And it was a

 8   discussion of the three as a whole rather than going one by

 9   one.

10              THE COURT:  Okay.

11              MR. BIAL:  And I should just mention --

12              THE COURT:  Where are you on --

13              MR. BIAL:  I didn't mean to interrupt.

14              THE COURT:  Go ahead.

15              MR. BIAL:  It's never been the case that we don't

16   want to provide the information; it's really more of having

17   the back-and-forth, which we were having until -- or we

18   continue to have it, actually, after the motion to compel

19   was filed.  And I think that's what we were trying to

20   accomplish.  And I thought yesterday was a very productive

21   step at that because we now heard bidding was of interest,

22   and we were able to actually go with something specific like

23   you see in 1 through 9.

24              THE COURT:  Well, it's a little hard to understand

25   how bidding just came to light as something of interest when
```

                                                                    22

1   you look at 10 -- or certainly 11 and 12 that you've had in

2   your possession for a couple of months now; right?  That

3   they were interested in bidding information.  But that

4   obviously seems to be something that is more focused at this

5   point.

6          What about the guidebooks, dictionaries, that kind

7   of information?  Where are you on that issue?

8          MR. BIAL:  Yes.  So let me answer that in two

9   ways.

10         First, we have a set of search terms.  I mean, I

11  didn't -- we didn't attach it to our complaint.  It's

12  20 pages and smaller than single-spaced.  It's probably

13  Size 8 font.

14         THE COURT:  I probably wouldn't understand them

15  either.

16         MR. BIAL:  So it's pretty comprehensive.

17         We have that, and so they can run that.  So I

18  would think that those would hit on these manuals.  So

19  that's Number 1.

20         I think Number 2 -- and Your Honor put your finger

21  on this.  For better or for worse, I do antitrust; that's

22  all I do.  So when I'm working with an expert, I'm seeing

23  their models, their code.  I've never heard them ask for a

24  how-to guide.  I mean, they're the experts.

25         So, you know, I think they could be -- they have

23

```
 1      that skill set.  And I think Your Honor said in the
 2      March 26th hearing that experts can be working before they
 3      get the information.  So presumably they can do that.
 4              THE COURT:  Yeah.  But that, to some extent,
 5      counters your argument, that if an expert has some roadmap
 6      as to what this source code is intended to do or doing, when
 7      they get into the, you know, safe space room or whatever it
 8      is that they are limited in access and having information,
 9      they have a base of knowledge to start work on and they're
10      not going in cold.
11              So there is some substance behind the request of,
12      you know, help me understand -- give me a primer on what I'm
13      going to be going in and looking at when I go in and start
14      seeing -- I assume it's not a small set of information in
15      the source code documents.  I don't know how large it is.
16      But it's something that, you know, an expert probably would
17      want to have some general familiarity with what the process
18      is or what terminology is being used or those kinds of
19      things.
20              Why wouldn't that be of help to them and of need
21      to them?
22              MR. BIAL:  Well, I think it could be.  And I'm not
23      denying that a guidebook before you -- you know, you go into
24      the secure room wouldn't be helpful to get you up to speed
25      in advance.
```

1           We were asked that question, and we did run it to

2    ground, and it was not this kind of guidebook.  I mean, I

3    guess there's -- I don't think they're talking about a basic

4    guidebook; I think they're talking about something more

5    complex than that to go into that room and be looking at the

6    code in a short amount of time.

7           For that exercise, at least in the back-and-forth

8    that we had, which was not insignificant, we were not able

9    to locate those.  Again, I would point back to the search

10   terms, which I think -- if that doesn't turn something up, I

11   think it probably really doesn't exist.  But at least for

12   the purposes of our collection and talking to the various

13   individuals who we thought would have knowledge of that, we

14   did not come across such a how-to guide.

15          THE COURT:  Okay.  Well, give me your

16   understanding of where the parties are based on the

17   conversation that you had yesterday.

18          MR. BIAL:  Sure.  I think in terms of the overall

19   motion to compel, clearly we've resolved the successor

20   custodians.  And had we not done that this morning, I was

21   going to tell you exactly that I thought we did and we

22   would.  So that was always going to be taken care of

23   irrespective of the fact that we got it done this morning.

24          With respect to the source code, I think 1 through

25   9, I think we can also agree that those are -- you know,

                                                              25

1    those are behind us.  I think those are a meeting of the

2    minds on those nine.

3            And 10 through 12, as I mentioned earlier, I

4    think, you know, additional discussions between the parties

5    on a short leash -- because I understand from what you said

6    earlier, we don't have time for that -- would probably make

7    the most sense.  And I think if that meet-and-confer is not

8    successful, that you'll hear from the government in very

9    short order.

10           THE COURT:  Okay.  What about in -- you know,

11   you're talking I think more directly about 39, but the other

12   requests that are part of the guidebook dictionary --

13           MR. BIAL:  Right.  The materials.

14           THE COURT:  -- and the materials.

15           MR. BIAL:  Right.  Right.

16           Again, same thing.  I mean, originally I think the

17   search terms were more geared toward that, but I think

18   obviously if they collect that material, then the

19   guidebooks, it would be helpful to them.  And, as you

20   pointed out, if they had something like that, it's helpful;

21   it's not unhelpful.  That process would turn that up.

22           THE COURT:  Well, explain to me why it would be

23   difficult for Google to find out whether there are -- and

24   absent -- putting search terms aside and, you know,

25   automatic -- you know, one would -- again, I don't know

                                                              26

1   Google, don't know how complicated all of this is, but it

2   doesn't seem that difficult to find somebody at Google that

3   would know whether they have such things as dictionaries or

4   guidebooks or other kinds of information that one would, you

5   know, want to -- even if they don't get hit on search terms,

6   would be in a position to produce if they're there and

7   exist.

8           MR. BIAL:  Right.  Well, let me give you an

9   example.  So pseudocode -- they asked for pseudocode central

10  repository, and if that existed -- I mean, we absolutely

11  went to the client, and they were not aware of such a thing.

12          And so I think, you know, the best answer to that

13  is really going to those search terms.  And if something

14  were to turn up and we found out about it, we didn't know

15  about it -- I think they're obviously doing good-faith

16  searches -- we would turn it over immediately.  They've made

17  it clear that they want that sort of information.  If we

18  came across it, we would turn it over immediately.

19          THE COURT:  Well, the problem you face -- and,

20  again, I'm giving you a scenario that I hope would never

21  happen -- is that you don't produce that kind of

22  information, and that in the middle of a deposition,

23  somebody talks about a dictionary, glossary or cultural

24  guide that is well known within the Google team and the

25  plaintiffs look at each other and say, did we get that?  And

27

```
1    they say, no.  I mean, that's why I'm asking you.  Again,
2    this is to make sure that you don't get yourself in
3    trouble --
4              MR. BIAL:  Correct.
5              THE COURT:  -- is not just relying on these, you
6    know, pages of search terms, but on some specific
7    information, going out and making an individualized inquiry
8    about does that kind of information exist, and, if so, where
9    is it.
10             MR. BIAL:  Right.  Understood.
11             I mean, again, we would know as well once we do
12   those searches and before the depositions begin.  And if
13   something turns up, they would get it.  But I think you've
14   made very clear that that's something that is expected and
15   that would be something ordinarily pursued in discovery.
16             THE COURT:  Okay.  All right.  Well, let me just
17   hear a little bit more from government counsel.
18             MR. BIAL:  Thank you, Your Honor.
19             THE COURT:  Thank you.
20             Was the meet-and-confer yesterday in person or
21   over the phone or Zoom or how was that done?
22             MS. GARCIA:  Yesterday's meet-and-confer was on
23   Microsoft Teams, Your Honor.
24             THE COURT:  Okay.
25             MS. GARCIA:  It was the, I want to say ninth
```

28

1    meet-and-confer we have had since the outset of our

2    litigation since we were -- since we received Google's

3    objections to our RFPs, including our source code RFPs in

4    mid-April.  That same week, we met and conferred with

5    counsel -- not counsel from this firm, but counsel from

6    another firm representing Google -- and began good-faith

7    discussions about how Google could go about responding to

8    this -- these requests.

9         During the course of that time, we had discussions

10   about how Google's concerns with respect to source code had

11   to do a lot with the fact that it was very highly sensitive,

12   and we proposed an alternative if it existed.

13        We asked that Google go back to its client -- this

14   was in early May -- and search for and ask if there was a

15   central repository for pseudocode.  Our understanding is

16   that pseudocode is a plain-language explanation of source

17   code.

18        We proposed that if Google could do this within a

19   reasonable time and get our experts that material within a

20   reasonable time -- which we would have discussed had they

21   discovered a central repository -- we would take only two

22   weeks with that source code and come back to them and say

23   whether or not there is more information that we need or

24   whether or not what they've provided should suffice.  After

25   three weeks, we were told there was no central repository

                                                            29

```
 1    for pseudocode.

 2            We continued to have good-faith discussions.

 3    Yesterday's discussion with Mr. Bial was the first that he

 4    had joined, but it was not the first time that we have

 5    discussed this.  We told counsel that -- going back to an

 6    earlier point, we told counsel that we would be prepared --

 7    if they told us that they were prepared to have our experts

 8    come in and examine the source code, that same day we would

 9    get them a list of names of individuals who could come in as

10    soon as possible.

11            We would welcome the opportunity to speak with

12    their data scientists about these issues.  We haven't heard

13    anything from counsel about that opportunity.  But to the

14    extent they're willing to have data scientists -- and I say

15    "scientists" because I strongly believe that there's not

16    going to be one person at the company who has this

17    information.

18            THE COURT:  Right.

19            MS. GARCIA:  But if they're willing to have prompt

20    discussions with those individuals, we would welcome that

21    opportunity.

22            The first time that they told us that there wasn't

23    clarity with respect to 10 -- Numbers 10 through 12 was

24    May 26th in a letter that was --

25            THE COURT:  What did the objections to those
```

                                                                    30

```
 1   requests say?
 2           MS. GARCIA:  Well, the objections, I'll say
 3   without looking, did describe -- object that they are vague.
 4           THE COURT:  I don't have the objections in front
 5   of me, but I suspect I know that they would talk about being
 6   vague or indefinite --
 7           MS. GARCIA:  Yes, they're --
 8           THE COURT:  -- or whatever; so ...
 9           MS. GARCIA:  Pardon me, Your Honor.  Yes.
10           THE COURT:  So, I mean, obviously you were put on
11   notice within 15 days after you served it that that was a
12   potential issue relating to what you had served.
13           MS. GARCIA:  That's fair, Your Honor.
14           What we've tried to do is get to the heart of --
15   to the extent that these vagueness objections were
16   objections made to every single RFP that we posed, what it
17   is that we can do in order to come to a meeting of the minds
18   as to what these terms mean.  And we've made good efforts
19   with respect to several other RFPs.
20           THE COURT:  All right.
21           MS. GARCIA:  We haven't received a single document
22   from anyone's custodial files responsive to any search terms
23   to date.  This information about manuals and data
24   dictionaries and other important information that our
25   experts need in order to have sufficient context to read the
```

31

1    code may not be in custodial files.  It may be, but it may

2    not be.

3           One concern that we raised yesterday was that we

4    do not know when we will receive a production from Google of

5    any documents that hit on any of the search terms in the

6    exhibit that Mr. Bial brought today.  So we can't tell you

7    one way or the other whether or not the search terms are

8    going to be sufficient.

9           We suspect that, given the tight timeline that our

10   experts will be facing and the very strict rules in which

11   they have to oblige in order to review the code, that

12   they'll want this information more quickly than we would

13   be -- otherwise be able to get if we waited for a production

14   from Google responsive to search terms.

15          With respect to the central repository, that was

16   part of our attempt to reach resolution and have a

17   compromise that perhaps would have worked for Google.  It's

18   unfortunate that there is no central repository, but we

19   don't mean to suggest that that should be the end of the

20   inquiry.  I think there are other good-faith steps that

21   Google can and should take in order to identify any manuals

22   or documents, which may not be one specific manual but may

23   be a series of manuals or may be a series of dictionaries,

24   or, you know, a compendium of information that other -- that

25   others at Google have access to but that we just don't know

                                                              32

```
 1    whether or not it exists.

 2            We hope that the search terms we've agreed to in

 3    good faith with Google will be an effective and efficient

 4    way to obtain the information we need, but we don't

 5    understand why it is burdensome for Google to ask its own

 6    people whether or not this information exists and run that

 7    to ground.  So we have concerns about timing.

 8            THE COURT:  And we all have concerns about timing.

 9    I mean, I think we all know the schedule that Judge Brinkema

10    has set for us, and we all have to work within that

11    schedule.  And I'm sympathetic to both sides in this case.

12    And I mean that.  You have a lot on your plate getting ready

13    to present a very large case against a very large company,

14    and a very large company has a lot at stake in defending

15    this case.  But it's got to be done fairly and efficiently.

16    And, you know, honestly, you all have worked together really

17    very well to date.  And I want to express my personal and

18    the Court's appreciation for you all continuing to work

19    together.  I mean, I know I've got requests for a joint

20    order yesterday that I need to look at before I enter it.

21    But, you know, those are the kinds of things that the

22    parties should be doing.  It's in the interests of the

23    United States to do that; it's in the interests of Google to

24    do that, and I want to encourage you all to continue to do

25    that.
```

1          This one, while I think very substantive
2    meet-and-confers -- sometimes the numbers don't mean much;
3    it's more of how the substance is going.  You know, the
4    substance of the meet-and-confer sounds like it started late
5    last week and continued into this week, I mean, the real
6    back-and-forth on exchanging some information.
7          You know, I've expressed to you all some concerns
8    that I had on what was presented to me in the pleadings
9    themselves as to not having a clear understanding of
10   what's -- what you're moving to have them do that they
11   haven't already agreed to produce, and I think you've
12   provided me with some explanation as to that.  I think I've
13   explained why, you know, that kind of information is
14   important and needs to be produced.  Whether it is word for
15   word what you have asked for in your document requests or
16   not, I'm still uncomfortable with saying.
17         My suggestion with having more technical people
18   involved in the discussion -- and, again, this is just -- I
19   have done it in the past and have seen it to be successful;
20   I've done it in the past and it hasn't been successful.  I
21   just want you to think about it and consider whether that is
22   a way that -- you know, sometimes technical people
23   understand what technical people need more than lawyers
24   hearing from a technical person as to what he or she needs
25   and then passing that information along and back and forth.

                                                           34

1          I'm going to defer ruling on this issue today.

2    I'm going to give you two options, and you all can talk

3    about which of the two options you want and how we go

4    forward.

5          Option 1 is that we have another hearing next

6    Friday on this issue and that you all report to me by the

7    end of the day on Wednesday of next week as to where we are,

8    and then I will decide it next Friday.  One way or the

9    other, somebody's going to be happy, and somebody's going to

10   be sad.

11         The other issue -- and this would give you a

12   little bit more time -- is that I would hear -- and it's

13   unrelated but connected.  It's probable that I am going to

14   move the hearing that's set for two weeks from today to the

15   day before, that is Thursday, at 2:00.  There's some issues

16   with some conflicts and things like that.  So -- and I think

17   that is a -- it would be specially set at 2:00 and will go

18   as long as we may need depending on the issues there.  And I

19   think I'm going to get the opposition to that motion today.

20   I think I have that calendared right.  So the reply would

21   come in at the end of next week.

22         So your two options are either decide whether you

23   want me to hear this next Friday at 10:00 or the following

24   week on Thursday at 2:00 in conjunction with the other

25   motion to compel that has already been noticed that I'm

                                                          35

1    going to be moving to Thursday at 2:00.  And if there's a

2    problem with that Thursday at 2:00, let me know.  I won't

3    enter the order until Monday.  So if there's some issue as

4    to that, then maybe let me know by Monday which of the two

5    options you would rather pursue.

6              There are benefits to both, and that's why I'm not

7    picking one.  I think the earlier, the better, but I'm

8    giving you the opportunity.  And, again, if you're inclined

9    to have technical people involved in the discussions, you've

10   got to schedule it and do it.  So next week may be pushing

11   it, but, again, we don't want to delay getting a decision so

12   that we can keep things on track.

13             Any questions at this point?

14             MS. GARCIA:  No.  Thank you, Your Honor.

15             THE COURT:  Anything else from the government?

16             MS. TARVER WOOD:  Thank you, Your Honor.  We

17   appreciate it.

18             THE COURT:  Anything else from Google?

19             MR. BIAL:  No, Your Honor.

20             THE COURT:  Okay.  Well, thank you all very much.

21   I appreciate it.  You all have a nice weekend.  Court will

22   be adjourned.

23             (Proceedings adjourned at 11:53 a.m.)

24             ---------------------------------

25   I certify that the foregoing is a true and accurate

                                                             36

1  transcription of my stenographic notes.

2  _Stephanie Austin_

3  Stephanie M. Austin, RPR, CRR

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37