```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION


 3      --------------------------x
        UNITED STATES, et al.,     :     Civil Action No.:
 4                                 :     1:23-cv-108
                     Plaintiffs,   :
 5           versus                :
                                   :     Thursday, June 15, 2023
 6      GOOGLE LLC,                :     Alexandria, Virginia
                                   :     Pages 1-50
 7                   Defendant.    :
        --------------------------x
 8

 9           The above-entitled motions hearing was heard before
        the Honorable John F. Anderson, United States Magistrate
        Judge.  This proceeding commenced at 2:00 p.m.
10

11                     A P P E A R A N C E S:

12      FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                               OFFICE OF THE UNITED STATES ATTORNEY
13                             2100 Jamieson Avenue
                               Alexandria, Virginia  22314
                               (703) 299-3700
14
                               JULIA TARVER WOOD, ESQUIRE
15                             DAVID TESLICKO, ESQUIRE
                               UNITED STATES DEPARTMENT OF JUSTICE
16                             ANTITRUST DIVISION
                               450 Fifth Street, NW
17                             Washington, D.C.  20530
                               (202) 894-4266
18
                               JONATHAN HARRISON, ESQUIRE
19                             OFFICE OF THE ATTORNEY GENERAL
                               OFFICE OF THE SOLICITOR GENERAL
20                             202 North Ninth Street
                               Richmond, Virginia  23219
21                             (804) 786-7704

22

23

24

25
                                                                 1
```

```
 1                    A P P E A R A N C E S:

 2   FOR THE DEFENDANT:      ANDREW EWALT, ESQUIRE
                             JULIE ELMER, ESQUIRE
 3                           CLAIRE LEONARD, ESQUIRE
                             FRESHFIELDS BRUCKHAUS DERINGER, LLP
 4                           700 13th Street, NW
                             10th Floor
 5                           Washington, D.C.  20005
                             (202) 777-4500
 6
                             SCOTT EISMAN, ESQUIRE
 7                           FRESHFIELDS BRUCKHAUS DERINGER, LLP
                             601 Lexington Avenue
 8                           New York, New York  10022
                             (212) 277-4000
 9
                             CRAIG REILLY, ESQUIRE
10                           LAW OFFICE OF CRAIG C. REILLY
                             209 Madison Street
11                           Suite 501
                             Alexandria, Virginia  22314
12                           (703) 549-5354

13   COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
                             Official Court Reporter
14                           United States District Court
                             401 Courthouse Square
15                           Alexandria, Virginia  22314
                             (571) 298-1649
16                           S.AustinReporting@gmail.com

17        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

18

19

20

21

22

23

24

25
                                                              2
```

<u>P R O C E E D I N G S</u>

1

2          THE DEPUTY CLERK:  United States of America, et

3   al. versus Google LLC, Civil Action Number 22-cv-108.

4          MR. MENE:  Good morning [sic], Your Honor.

5   Gerard Mene with the U.S. Attorney's Office.

6          MS. WOOD:  Good afternoon, Your Honor.

7   Julia Wood.  Good to see you.  My colleague, David Teslicko,

8   from the Department of Justice will be arguing today.

9          MR. EWALT:  Good afternoon, Your Honor.

10   Andrew Ewalt from Freshfields on behalf of Google.  I'm

11   joined by my colleagues, Julie Elmer, Scott Eisman,

12   Claire Leonard and Craig Reilly.  Ms. Elmer will be arguing

13   on behalf of Google this afternoon.

14          THE COURT:  Okay.  Thank you.

15          Just a couple of preliminary matters before we get

16   into the argument.

17          First of all, thank you all for working together

18   to get the other motion to compel resolved and custodial

19   issues and the other things.  I appreciate you all doing

20   that and working together to be able to do that.

21          I also want to just highlight that I am concerned

22   a little bit about the motions to seal that have been filed

23   for all three sets of the pleadings relating to this current

24   motion.

25          As you know, the documents will remain under seal

3

1  until I issue an order dealing with those things, but there

2  may be some further briefing that may need to be done, or I

3  may just decide it on the papers.  But I think it's unlikely

4  that everything that everybody is asking to be sealed will

5  remain under seal.

6          And I understand that there are two standards that

7  are put into place, and we're dealing with the lesser

8  standard on these discovery-related matters.  But as you

9  probably know, Judge Brinkema is one of the judges in our

10  court that is very sensitive about what gets to remain under

11  seal, and so I am tasked with the order to make sure that we

12  don't over seal information.  So I want to highlight that.

13          And I also want to remind you -- and I think I had

14  indicated to the parties earlier when we were talking about

15  overall scheduling -- that neither Judge Brinkema or I will

16  be here on the 30th of June.  The Fourth Circuit judicial

17  conference is going on that Friday, so there will be no

18  motions heard in this case on June 30th.

19          Okay.  I have read all the papers, all the

20  exhibits, including the 250-page transcript of the 30(b)(6)

21  deposition.  I understand most of the issues.  I do have

22  some factual questions that I really want to get sort of

23  sorted out before I hear the legal argument.  And so I'll

24  ask counsel for the government to come forward first.  And

25  to the extent that you can answer my factual questions,

4

```
 1    that's good; if not, I may ask Ms. Elmer to pitch in and
 2    help out.
 3            So, as I understand it -- and I guess before we
 4    go -- nothing else has been worked out other than the two
 5    documents that have been produced and some lesser redactions
 6    on four documents; is that right?
 7            MR. TESLICKO:  That's correct, Your Honor.  Two
 8    documents were produced without redactions; four documents
 9    were produced with more limited redactions.
10            THE COURT:  All right.  I didn't want to get all
11    wound up and find out I didn't need to do that like last
12    time period, so thank you for that.
13            There seems to be some disconnect between your
14    briefing and their briefing on the number of documents that
15    are related to the Remedy Projects.  You know, I'll just use
16    that as the term, because I think that's the term that the
17    parties have both used to some extent.  At least in your
18    chart, you have 14, and in their briefing and declaration
19    and all that, they have it as 17.  The difference is
20    Documents 2, 10 and 16.
21            Do you agree that 2, 10 and 16 were related to the
22    Remedy Projects, or do you not.
23            MR. TESLICKO:  So, Your Honor, I think the simple
24    answer is we don't know because those documents were
25    withheld in full.  When we identified in the appendix to our
```

5

1   motion which documents were based on code-named projects, we

2   did that based on a letter we had previously received from

3   Google during the course of the pre-complaint investigation.

4          So for the documents you identified where we

5   previously didn't identify them as code-named projects, it's

6   either because we -- it's because they were not identified

7   in that letter from Google, which was the basis for our

8   chart.

9          THE COURT:  Well, if you look at 16 -- I can see

10  that maybe for 2 and 10.  But 16 says:  "Project undertaken

11  in anticipation of litigation in response to active

12  government investigations."

13         Why did you not cross the code-named project when

14  the privilege log description says that directly?

15         MR. TESLICKO:  Because the code-named projects are

16  very specific projects.  It was unclear from this

17  description whether the document related specifically to a

18  code-named project or was more generally a communication in

19  anticipation of litigation.

20         THE COURT:  Okay.

21         MR. TESLICKO:  I don't think we're factually

22  disagreeing with Google's assertion that it relates to --

23         THE COURT:  Well, you've seen the Lazarus

24  declaration where he outlines that and indicates what those

25  were.  Okay.

6

1          And just to make sure I am clear -- it wasn't

2    necessarily in the briefing and I just want to make sure --

3    because I think it has some significance.  Some of the

4    Remedy Project documents were produced with redactions and

5    others were withheld completely; is that accurate?

6          MR. TESLICKO:  So I -- Your Honor, I would clarify

7    that to say that some documents that were produced with

8    redactions involved Remedy Projects.  The unredacted

9    portions of those documents do not discuss or disclose the

10   Remedy Projects.

11         To our knowledge, any document describing the

12   substance of the Remedy Project was fully withheld.  So if

13   the document was solely about our project, it was completely

14   withheld.  If a portion of the document related to a

15   code-named project but a portion did not, Google redacted

16   everything related to the code-named project.

17         THE COURT:  Okay.  So just so I have a better

18   sense going through the list, 1 was redacted, 2 was withheld

19   completely, is that right?

20         MR. TESLICKO:  Correct.

21         THE COURT:  And I'm just going through the ones

22   that I understand were related to the Remedy Projects.

23         Five was withheld completely, 6, 8, 9, 10 and 11

24   were withheld completely.  12 withheld completely, 13 was

25   redacted, 14 was withheld completely, 15 was redacted, 16

7

1    was redacted, 18 and 19 were redacted, and 20 was withheld

2    in total.

3              MR. TESLICKO:  That's correct, Your Honor.

4              THE COURT:  Okay.  Okay.  All right.  I think that

5    probably takes care of my just overall factual questions

6    about what I wanted to make sure we were -- I was dealing

7    with when we talk about the various issues.

8              And I will say that there -- the real issue, as I

9    understand it that you're presenting to me, is should I look

10   at these documents in camera.  And I guess there is a

11   question as to whether you've made the adequate factual

12   showing that at least some of the information contained in

13   the documents may be subject to disclosure is what you say

14   that you need to do on page 11 of your memo.

15             I think it's going to be significant for you to

16   discuss that in two parts.  One is the factual showing for

17   the Remedy Projects; and the other is the factual showing

18   for the, arguably two, maybe more, documents that aren't

19   Remedy Projects that are still in dispute, which I think

20   would be 3 and 7.

21             So I'm seeing them through different lenses, to be

22   honest with you, and so I want to make sure I understand

23   what your argument is as to both of them and not putting

24   them all together.  Okay.

25             So let me hear what you've got to say.

8

 1          MR. TESLICKO:  Sure.  Thank you, Your Honor.

 2          After many months of conferring with Google on its

 3     privilege assertions, plaintiffs --

 4          THE COURT:  Years.  I mean --

 5          MR. TESLICKO:  Yes.

 6          THE COURT:  -- you knew about this in 2021.

 7          MR. TESLICKO:  That's correct.

 8          THE COURT:  Google sent you a letter in August of

 9     2021, or I think that's right.  August of 2021, they said we

10     think these are privileged materials.

11          MR. TESLICKO:  That's correct.

12          We met and conferred extensively since that time

13     to try to narrow a variety of privilege disputes.  As Google

14     acknowledged, they did produce tens of thousands of

15     documents as part of that meet-and-confer process, but we

16     still have some outstanding disputes, especially related to

17     the project documents.  And, as a result, we filed a present

18     motion to compel, seeking an in-camera inspection of 21

19     documents that we created as a sample of certain categories

20     of documents we had discussed with Google.  Those are

21     supposed to be somewhat representative, not statistically

22     significant, but a general sample of the main categories of

23     documents that Google continues to withhold, either for

24     attorney/client privilege or for attorney work product.

25          And we picked those categories because they

9

1    represent both the greatest concerns to the government in

2    terms of the privilege claims that Google's asserted, and

3    also we believe they're the most relevant, or some of the

4    most relevant documents, to the main issues in this case.

5    They involved -- they appear to involve key business

6    decisions, business strategies that are at the heart of the

7    government's complaint.  And --

8              THE COURT:  Help me understand the factual basis

9    for what you just said.  You took a lengthy deposition of a

10   30(b)(6) deponent who testified about, in broad terms, these

11   five projects, and, as I understand it, other than the

12   Banksy one, nothing ever came of it.  Is that -- I mean,

13   that's what he said.  Is that different than what -- do you

14   have any factual information that no decisions were made

15   based on those projects?

16             MR. TESLICKO:  We do not have any factual

17   information that decisions were made based on those

18   projects.  I would point out that certain projects, such

19   as -- I think this is -- the names of the projects are not

20   being withheld here.

21             THE COURT:  I mean, in their opposition -- I mean,

22   at least the brief in their opposition, as I understand it,

23   only withheld the names of deponents or names of

24   individuals.

25             MR. TESLICKO:  For example, Project SingleClick

                                                              10

1   and Project Stonehenge evolved into a non-privileged

2   code-named project called 1Door that continues to -- at

3   least as of the time of the deposition was still continuing.

4          So I don't know if ultimately business decisions

5   were made that stem from those earlier projects.  But to

6   answer your question specifically, no, we don't have any

7   information that a particular business decision was made,

8   only that they were considered as part of these code-named

9   projects.

10         THE COURT:  Okay.  And presentations were made,

11  and then either the project moved from SingleClick to

12  Stonehenge or Sunday to Monday or whatever, but -- okay.

13  All right.

14         So, you know, you mentioned business decisions,

15  and that's why I was trying to understand if my

16  understanding, from based on the deposition transcript and

17  other information, that there were actual decisions made as

18  a result of this.  Okay.

19         Keep going.

20         MR. TESLICKO:  Sure.  Just to clarify, Your Honor,

21  I don't think we have any evidence that decisions were made

22  coming out of that project to take particular actions,

23  except for Project Banksy and possibly Project 1Door, but

24  there were, you know, the negative inferences that decisions

25  were made not to change certain policies that are within the

                                                              11

1    scope of the government's complaint today.

2           Going back to the purpose of the motion, you know,

3    as Your Honor already noted, we filed the motion, Google has

4    withdrawn two of its claims and narrowed four.  The other

5    thing I would point, though, in addition to narrowing its

6    claims or abandoning those particular claims, it also

7    abandoned its attorney/client-privileged claims for 13 of

8    the remaining documents.  Those were on the log.  Google is

9    assigning attorney/client privilege over 13 documents.  It's

10   not advanced those claims in its opposition brief.  And, in

11   fact, for five of those documents in those logs, they never

12   asserted work product.  So the first time they asserted work

13   product was in the opposition brief.

14          The bulk of the remaining dispute, as Your Honor

15   has focused on, are the 17 project-related documents where

16   Google asserts privilege, and so I'll start there.

17          In our view -- or we understand that Google's

18   taken the view that because it faced frankly a tsunami of

19   domestic and international investigations into its business

20   decisions, that key strategic and commercial discussions and

21   analysis related to those can be walled out by attorney work

22   product protection, and we think that that would lead

23   ultimately to a perverse result.  That large companies

24   subject to substantial litigation because of their business

25   practices are able to potentially wall off key portions of

                                                            12

1    their business.  By contrast, smaller companies that are not

2    subject to litigation are not able to avoid the wide breadth

3    of discovery.

4            And I also want to make clear at the outset

5    before -- sorry, Your Honor.

6            THE COURT:  If you look at what the evidence is in

7    front of me, these projects would not have been initiated if

8    there hadn't been the investigations that were ongoing.

9    They were initiated as a result of those.  Are you saying

10   that's right or not right?

11           MR. TESLICKO:  I think, respectfully, we would

12   disagree, Your Honor, at least with some of the projects.

13           So, for example, Project Sunday, according to the

14   deposition testimony of the 30(b)(6) deposition testimony,

15   the corporate representative there did say that litigation

16   was one of the animating reasons for Project Sunday.  But

17   when asked if regulatory matters also led to the creation of

18   Project Sunday, the deponent testified that many countries

19   or regions that -- have put into effect some either privacy

20   or antitrust regulations.  So that list is going to be much

21   longer here when he was asked what animated Project Sunday.

22           So I think that's one small piece of evidence.

23   That, in addition to litigation reasons.  There may have

24   been commercial reasons or regulatory reasons that led to

25   the initiation of Project Sunday.

13

1          And just to take a step back, Your Honor, the
2    government is at a disadvantage here, as anyone challenging
3    privilege claims is.  We haven't seen the underlying
4    documents.  And I want to be clear that if Your Honor
5    reviews those documents in camera and it turns out that, on
6    their face, they clearly reflect litigation strategy, the
7    legal opinion work product of counsel, the government's not
8    seeking that.  But based on the scraps of evidence that we
9    have compiled about why these projects were initiated and
10   what they covered, we think there's a reasonable basis to
11   believe that portions of those documents involve business
12   discussions that occurred before the project began, or
13   business discussions that would have occurred irrespective
14   of the anticipated litigation.
15          THE COURT:  Okay.  Go ahead.
16          MR. TESLICKO:  So I think the main portion -- or
17   point where Google and the plaintiffs seem to disagree with
18   respect to work product is whether it is relevant that the
19   documents have a nexus to business discussions or business
20   decisions.
21          Google, in its opposition at page 13, takes the
22   view that whether there's a nexus between the documents and
23   business decisions is irrelevant.  And they represented that
24   because the projects --
25          THE COURT:  It's not dispositive, I think is what

                                                              14

```
 1    they really are arguing.
 2            MR. TESLICKO:  I would agree with that, Your
 3    Honor.  And that's the position we're taking.  It's not
 4    dispositive one way or the other, but it's certainly
 5    relevant.  And I think Your Honor's decision in the Capital
 6    One security breach litigation, the Zetia decision as well,
 7    reflect the reality that the analysis is a totality of the
 8    circumstances consideration that looks at who was involved,
 9    the nature of the documents, the purpose of the documents,
10    the use of the documents at issue.
11            And that's why, Your Honor, the United States and
12    plaintiff states have requested in-camera review to shed
13    light on that question, because we tried to take a 30(b)(6)
14    deposition and got very little information about the nature,
15    scope, purpose of the documents at issue, or, frankly, who
16    was involved in creating them.
17            THE COURT:  Well, you got direct answers from the
18    person about who was involved telling you, you know, this
19    person was on the team, this person didn't do anything, this
20    person was an engineer, this person was that, that we spent
21    10 hours, 30 hours, 50 hours.  And you make the argument
22    these are major business decisions, that Google spends
23    20 hours on a project, and you seem to think that's a
24    significantly major business decision that Google is making
25    seems to be a little bit of a stretch.
```

15

1          But, I mean, you know, not only the letter that

2     you got before the deposition, but the deposition itself

3     also clearly outline what lawyers were involved, you know,

4     who was on the work team and who was on the supervisory team

5     and those kinds of things.  So I don't understand why you

6     say you don't have any idea who was doing anything.

7          MR. TESLICKO:  I think we know, Your Honor, who

8     was involved generally in the project.  Those people were

9     identified in the letters and in the depositions.  But even

10    Google's corporate representative pointed out that there was

11    a difference between people who worked on the project and

12    people who were just generally aware.  And the letter, for

13    example, as he testified, covered both.

14         When we tried to get more information about who

15    actually created these documents, what their roles were, we

16    did not get that information.  I think that type of

17    information is important as the Court considers the totality

18    of the circumstances, whether these documents would have

19    been created for business reasons, for regulatory reasons,

20    for any other reason besides litigation.

21         And not to say that litigation wasn't one of the

22    reasons.  I think we all agree that those were multipurpose

23    documents.  They may have served a litigation purpose, but

24    the evidence available to us that we've identified in

25    pages 18 to 22 of our motion, our opening brief, suggest

                                                           16

1    that these were either continuations of the types of

2    business discussions that occurred beforehand.

3            Banksy is a great example because Google has

4    acknowledged there was a Banksy project that considered the

5    exact same product changes under the exact same code name.

6    One's privileged; one's not.  Their deprivileging of one of

7    the documents where they had redacted the word "Banksy" kind

8    of illustrates that it's really hard for them to even police

9    the line between the privileged and non-privileged version

10   of Banksy.  And their deponent at the 30(b)(6) recognized

11   that the non-privileged Banksy court had morphed into the

12   privileged Banksy.

13           And that's not -- and so I think, you know, in

14   light of the evolution of some of these projects from

15   privileged to non-privileged, which is SingleClick and

16   Stonehenge evolving into 1Door, and Banksy evolving from a

17   non-privileged project to a privileged project, there's some

18   reasonable basis to believe that these were ongoing business

19   discussions that would have occurred in substantially

20   similar form, which is the standard, but for litigation.

21           I think the other piece of evidence we would point

22   to is the little information we have about some of these

23   projects further confirms that there were commercial

24   purposes driving this analysis.

25           So, for example, in our opening brief, we identify

                                                              17

1    that one of the projects, per Google's own documents, was

2    initiated because of competitive pressure on margins, and as

3    part of that project, they consider changes to prices,

4    policies.  Those are the kinds of discussions you would see

5    in the ordinary course of business, and they're precisely

6    the types of changes to policies or existing policies that

7    are at issue in the government's complaint here.

8            And, again, we're not saying that litigation had

9    no bearing on this.  Certainly anticipated litigation was

10   relevant to what was going on in these business discussions.

11   But it wasn't the driving force, as the Fourth Circuit has

12   said the standard is, and we don't think that every portion

13   of every document would not have been created in

14   substantially similar form.

15           What we're asking the Court to do, and what we've

16   asked Google to do, is to take a narrower view of work

17   product that's more consistent with the narrow view of

18   privilege articulated by the Fourth Circuit.  And that

19   answer is, go through the documents, redact out litigation

20   strategy, redact out legal opinions, but produce the other

21   business analysis that's contained in those documents.

22           THE COURT:  Well, if I was going to accept the

23   statements under oath by the 30(b)(6) deponent -- and one is

24   stronger than the others, but I'll take the strongest --

25   that this project would never have been undertaken if we did

18

```
 1    not anticipate litigation.  So help me understand how
 2    anything done with a project in which the statement is "this
 3    project would have never been undertaken unless there had
 4    been litigation" doesn't fall within the parameters of
 5    something that should be protected.
 6              MR. TESLICKO:  So two answers, Your Honor.
 7              First, I think the question -- the work -- the
 8    question about whether a document is covered by work product
 9    centers on that particular document.  And one of the faults
10    we identified with the declaration was, it makes those
11    statements -- it parrots the work product standard at the
12    project level.  It says the documents are related to the
13    project and kind of skips a step.  Because the real question
14    is, were these specific documents in whole, because they've
15    been withheld in full, created because of litigation, and
16    would the entire document -- no portion of the document have
17    been created in substantially the similar form but for
18    litigation.
19              So I think --
20              THE COURT:  If you accept the fact that this would
21    have never been created unless there was litigation, then
22    shouldn't everything in the document be protected?  If you
23    start a project, and I would have never started the project
24    unless there had been litigation or anticipation of
25    litigation, then the reason that it was started was
```

1    anticipation of litigation; right?

2            MR. TESLICKO:  So that is correct, Your Honor.

3    But I think it depends what gets shoehorned into that

4    project.

5            So to play on that hypothetical, you know, but for

6    litigation, would there have been a project called Project

7    Sunday?  Maybe not.  Probably not.  But there's a separate

8    question about whether once you create Project Sunday, if

9    you feed into that broader project, commercial discussions,

10   regulatory discussions that were already ongoing or would

11   have occurred anyway, does that mean that the work product

12   protection now encompasses all of those discussions that

13   would have been going on at the company more generally?

14           On your question specifically about the

15   declaration, though, I would direct the Court to *Zetia* where

16   the declarants there, three declarants, in fact, had similar

17   statements, if not stronger statements, that none of the

18   documents would have been created but for litigation in any

19   form.  And even then, the Court undertook an in-camera

20   review.  It did uphold the work product protection for the

21   documents at issue, but it also went out of its way to

22   clarify that financial analyses or projections -- standalone

23   financial analyses or projections contained in those

24   documents, if they're responsive to discovery requests,

25   must, nonetheless, be produced separately.

                                                              20

1              THE COURT:  How would a review of the documents

2    reveal the intent behind the preparation of the documents?

3              MR. TESLICKO:  Your Honor, without seeing the

4    documents, it's hard for me to say.

5              THE COURT:  I know.

6              MR. TESLICKO:  I will acknowledge it's possible

7    that Your Honor could review the documents and it's not

8    clear.  It could look like the entire document was created

9    because of litigation, it all reflects litigation strategy,

10   and then Your Honor would probably uphold the claim.  But we

11   think there's also a reasonable chance that Your Honor looks

12   at the documents, and at least portions of the documents

13   clearly have nothing to do with litigation strategy, legal

14   opinion of counsel, and are simply considerations of changes

15   to the business that would have occurred in the ordinary

16   course.

17             THE COURT:  All right.  So let me just pose this

18   hypothetical.

19             So project -- pick one, I don't care which one --

20   says, you know, go off, and can we do X?  And if we do X,

21   what's going to happen to our business?  One technical, one

22   business.  And the lawyers and the client need to know both

23   because they need to know whether we're going to pursue a

24   remedy of proposing it will do X.

25             You're telling me that making an analysis of

                                                              21

 1   making a change to X should be produced even though, by

 2   producing that information, you're disclosing what X would

 3   have been?

 4         MR. TESLICKO:  I think, Your Honor, we're arguing

 5   something slightly different.  And not to change your

 6   hypothetical, but maybe to distinguish the two cases, I

 7   think there's a difference between what -- the type of

 8   document Your Honor reviewed in the *Capital One* security

 9   breach case where there was no dispute there, a report was

10   commissioned because of litigation, no one disputed that

11   litigation was anticipated, and the core question is,

12   looking at those documents, would something like this have

13   been created in the ordinary course anyway?  Versus a

14   settlement proposal, like in *Zetia*, where the only question

15   there is should we settle, and is this economically

16   feasible?

17         I think there's a very large gap in between those

18   two worlds.  I think we are -- we believe that at least

19   portions of the documents and portions of these projects are

20   closer to the Mandiant report in the *Capital One* security

21   breach case where, you know, the type of business analysis

22   was ongoing and would have occurred anyway, but it got

23   rehoused in light of anticipation of litigation under a

24   project.  And there it was directed by counsel, and

25   nonetheless, Your Honor ordered it produced.  And I think --

                                                            22

1              THE COURT:  Well, that was -- that case is much

2    different than this case.

3              MR. TESLICKO:  Recognizing --

4              THE COURT:  You've got an enormous data breach

5    that comes -- immediately comes about.  The people at

6    Capital One are under strict regulatory guidelines of what

7    they need to do.  They already had a company on call that

8    was there for their business purposes.  They used the same

9    contract, they just brought them in to start something

10   there.

11             If you go to the second part of my decision in the

12   *Capital One* case, you see it's much different.  You know, it

13   was a different set of people, different things, you know,

14   lawyers were involved, lawyers were directing it.  You know,

15   that -- and I said you didn't need to produce that one.  So

16   you're picking one, but there's another one out there that

17   analyzes things in a little bit of a different light.

18             MR. TESLICKO:  I understand, Your Honor.  And that

19   also involved, you know, an outside vendor.  I think there

20   is analogy here, though.  Google took an existing team that

21   does this work all the time in the ordinary course of

22   business.  You know, again Banksy, it's the same employees

23   who were working on the same product changes, they took the

24   same team, asked them to continue the work they were already

25   doing, with an eye towards part of it addressing a

                                                          23

1   regulator's concern, but as the 30(b)(6) deponent testified,

2   they also went out to customers, discussed how the product

3   change would work with them, commercialized it.

4          That sounds like a commercial-type discussion,

5   that, again, relevant to litigation, relevant to settlement,

6   no dispute there.  But at least a portion of that, for

7   example, seems like an ordinary course business discussion

8   and analysis that would occur at Google.

9          And that may be true of these other projects.  As

10  I indicated, some of the few documents we have on these

11  projects suggest that it was commercial concerns driving

12  some of these analyses around margin pressure.  And Your

13  Honor might be able to review the documents and see, you

14  know, this half of a deck talks about the commercial

15  considerations and why we may or may not, irrespective of

16  litigation, want to change the way our products work or the

17  margins we're charging, here's a separate part of the

18  document that deals with the United States government's

19  investigation, the State of Texas' investigation, here's how

20  this proposed changes could be used as a remedy in that

21  case, or here's our analysis of the strength of those

22  claims, do we need to do this business project for that

23  separate purpose.

24          THE COURT:  But by disclosing the financial

25  analysis of this change that's under consideration, it would

                                                          24

1    disclose what the change was under consideration.  I assume

2    that's what it would.  Again, I haven't seen it.

3          But, you know, again, if it's -- you know, if the

4    team is tasked with think about doing X and let me know

5    what's going to happen, can we do X, and, if so, what's

6    going to happen, and they spend a week or two or a month,

7    maybe, in some of these, six weeks for one, you know,

8    brainstorming, coming up, getting some information together

9    and saying, yes, we can do X, and if we do X, then the

10   impact financially is Y.  If I give you the impact of X

11   financially is Y, then you're getting information relating

12   to the remedy that was under consideration.  You understand

13   what I'm asking?

14         MR. TESLICKO:  I understand what you're asking,

15   Your Honor.  I think hypothetically a document could look

16   like that.  I think also hypothetically a document could

17   consider a range of different prices Google was going to

18   charge on its products, and based on its market power in

19   these markets, whether it could or could not charge certain

20   of those.  And if the document is portraying a range of

21   prices, a range of product changes, I don't think that

22   necessarily discloses at all what Google was planning to

23   propose.  And, to our knowledge, Google didn't propose most

24   of those remedies.  As Your Honor noted in the 30(b)(6),

25   decisions didn't come out of many or most of those projects.

25

1    So I'm not sure they ever got to a final Remedy proposal.

2    But we are very interested in the business analysis that was

3    ongoing separate and apart from any kind of Remedy proposal

4    that was or wasn't made.

5              THE COURT:  Help me understand how you think that

6    would be divorced from the proposal that is being

7    analyzed -- the proposal that is under consideration if you

8    look at what the financial impact that would have.

9              MR. TESLICKO:  So I -- I don't think that --

10   again, it's hard to talk in abstract without seeing the

11   documents, of course, but I don't think it's necessarily the

12   case that a business analysis of we are charging X margin on

13   these products right now, we think we could charge more, we

14   could charge less.  These would be the commercial outcomes

15   of doing so, this is what our competitors would do or force

16   us to do.  I don't think a general analysis necessarily

17   discloses Google's attorneys' views of the strengths or

18   weaknesses of the government's case, of what the remedy

19   proposal will be.

20             Now, if there is no separate slide like that and

21   there's only a slide or a document that says this is the

22   proposal, here's how much it will cost us, I don't think we

23   would argue that that should be produced.  But given

24   Google's broad view of every single reference to these

25   projects as privileged, we think there might be something

                                                              26

1    less that Google could produce.

2         THE COURT:  Well, talk about the other two

3    documents.

4         MR. TESLICKO:  So the other two documents, Your

5    Honor, where Google continues to assert attorney/client

6    privilege, one is Document 3 where they've removed most of

7    the redactions.  I think they --

8         THE COURT:  So there's only one redaction left; is

9    that right?

10        MR. TESLICKO:  Yes.  Yes.

11        And, Your Honor, we wouldn't press that claim.  I

12   mean, we do think that in light of their decision previously

13   as part of a clawback -- so this was an intentional decision

14   to clawback the document and make those redactions, we think

15   those prior redactions were clearly unsupported, and that

16   would frankly give Your Honor a sufficient basis to exercise

17   the discretion to look at the remaining redaction.  But

18   we're not pressing that particular document at this time for

19   in-camera review, because the redactions had been narrowed

20   to remove those from the finance section, from the top

21   partner section and to just focus on the legal section,

22   which seems relatively appropriate.

23        The other document, Your Honor, where Google

24   continues to assert an attorney/client privilege claim --

25        THE COURT:  Number 7.

27

 1            MR. TESLICKO:  Number 7.  So they did remove some

 2    of those redactions -- one set of redactions in that

 3    document.

 4            The rest of that document describes -- deals with,

 5    again, similar to the code-named projects, changes to

 6    product policies, changes to revenue shares and margins.  It

 7    was created by a non-lawyer, and I would note that the

 8    privilege basis identified in their log is providing legal

 9    advice -- providing legal advice regarding legal aspects of

10    product development.  That, in fact, is the same type of

11    privilege basis they used in Document 21, which they

12    withdrew the redaction for.

13            Just to us, in light of all the other documents

14    that they've produced, including the ones they've produced

15    in response to our motion, the fact that there's no lawyer

16    actively participating from the face of the document that we

17    can see, combined with the broader discussion of revenue

18    shares and changes to buying doors, we think the Court

19    should engage in an in-camera review of that document to

20    confirm that that redaction just cannot be narrowed.

21            THE COURT:  Okay.  What else would you like to say

22    in your opening salvo here?

23            MR. TESLICKO:  The only thing I would add, Your

24    Honor, is because Google deprivileged, in full, two

25    documents that were withheld for a substantial period of

                                                              28

```
 1    time on the basis of attorney/client privilege, we did

 2    request in our reply that the Court supplement --

 3                THE COURT:  We're not substituting.

 4                MR. TESLICKO:  Okay.  Understood, Your Honor.  I

 5    just wanted to raise it.

 6                THE COURT:  Okay.

 7                MR. TESLICKO:  Thank you, Your Honor.

 8                THE COURT:  All right.  We'll hear from you.

 9                One issue I want you to address initially is what

10    impact, if at all, does the protective order that was

11    negotiated, agreed to and entered by the Court have on the

12    issue of whether I should be doing in-camera review.  Just

13    to maybe refresh your recollection as to what the protective

14    order provides, is that -- and this is in the -- basically

15    the clawback provision.

16                It says once they had been asked to claw it back,

17    what you need to do, must not use or disclose the

18    information of the claim as resolved, must take reasonable

19    steps to retrieve the information and may promptly present

20    the information to the Court under seal for determination of

21    the claim in camera.

22                What -- if you read that language, it doesn't seem

23    like, you know, anything's in there.  You know, subject to

24    the preexisting law that you have to show certain facts or

25    circumstances; it sounds like it was negotiated by the
```

 1   parties.  If you claw this back, they will not use it, but

 2   they may promptly present the information to the Court under

 3   seal for determination of the claim in camera.

 4        MS. ELMER:  Your Honor, I admit, I had not focused

 5   on that particular part of the protective order.  I had been

 6   focused on 12(a), which stated that, you know, clawbacks of

 7   documents are an inadvertent production or a production of

 8   material.  Whether inadvertent or otherwise is not a waiver

 9   of the privilege.  And I was looking at that particular

10   provision particularly in light of some of the arguments

11   that the DOJ had made in their brief.

12        But if you'll indulge me, Your Honor --

13        THE COURT:  Okay.

14        MS. ELMER:  -- I'll take a look at the other

15   provision.

16        Yes.  So my understanding, Your Honor, is that

17   that provision is if they do not want to sequester the

18   document or give the document back upon our request that

19   they claw it back, then they may present it to Your Honor.

20   I think, so far, we've been able to manage our --

21        THE COURT:  It's not "or," it says "and."  These

22   are all things that are required.  One, will promptly

23   notify -- after being notified, the party must promptly

24   return, sequester, destroy the information.  Must not use

25   the information until the claim is resolved.  Must take

                                                              30

1      reasonable steps to retrieve it, and may promptly present

2      the information to the Court under seal for determination of

3      claim in camera.

4              MS. ELMER:  So the clawbacks that were made that

5      we're here about today, Your Honor, were clawbacks that were

6      made two years ago.

7              THE COURT:  Okay.  All right.  So go ahead and

8      tell me what you want to tell me based on what their

9      argument was.

10             MS. ELMER:  So Google's position in this dispute

11     is based on factual information, information in the record.

12             We have a deposition of a corporate witness,

13     30(b)(6), who sat for a full day of testimony to answer

14     questions about these Remedy Project documents, and he

15     answered all of the questions that he could without waiving

16     the privilege or waiving work product protection for those

17     documents.

18             The plaintiffs' position, on the other hand, is

19     based on speculation.  For example, they alerted that

20     Project SingleClick and Project Stonehenge evolved into

21     1Door.  That is not true.  They have not supported that

22     assertion with any evidence.

23             To the contrary, Google has produced 3 million --

24     nearly 3 million documents in the investigation phase alone.

25     32 Google witnesses provided testimony in the investigation

                                                              31

```
 1    alone.  We've produced another 330,000 documents last week.
 2    We have another 90,000 coming to them this week.  And in
 3    those documents is ample evidence about Project 1Door
 4    because it wasn't a Remedy Project, and we produced that
 5    information.
 6            Similarly, with Project Banksy, Google was so
 7    careful in how it conducted its privilege review and so
 8    cautious about making sure that we were not overclaiming
 9    privilege or overusing work product, that we agreed with the
10    DOJ in early 2021 to run Banksy as a search term for our
11    document production, because we knew there was a portion of
12    it that was ordinary course, and we produced all of that.
13            We also knew that in agreeing to run that term, we
14    were taking on a very heavy burden of a nuanced privilege
15    review, and a difficult one.  But we knew that we needed to
16    take that on because we needed to be sure that we were not
17    hiding behind a work product or overclaiming a privilege.
18            So I do think that, you know, plaintiffs are
19    overstepping here, and they're asking you, Your Honor, to
20    completely disregard the sworn testimony of a corporate
21    representative.  I really don't know what more could have
22    been said.  I mean, he specifically testified, these
23    projects would not have been undertaken but for these
24    government investigations.
25            THE COURT:  He only said that as to one of the
```

32

1    projects.  That was his strongest testimony as to that.

2    Others he said that they were started, but he never said

3    they would have never been done absent litigation.

4          MS. ELMER:  He was asked, I believe, on page 73

5    about Project Sunday.  Was Project Sunday any other purpose,

6    said no.  It was not a dual-purpose project, it was not a

7    business project, it was a project that was undertaken

8    because of seven, later eight, active government

9    investigations, all of which he identified in his

10   deposition.  And because of those investigations, he further

11   testified that Google anticipated litigation, which we are

12   now here doing.

13         THE COURT:  The language in the declaration, help

14   me understand.  It can be interpreted in a couple of ways,

15   and I was a little surprised at the way that it was crafted.

16   "It would not have occurred in substantially similar form."

17   That doesn't necessarily mean that it wouldn't have

18   occurred; it's just the form in which it was done.  Is that

19   what that means?

20         I mean, that's completely different than we only

21   did -- I mean, that is contrary to the testimony that the

22   30(b)(6) deponent gave about SingleClick that, you know,

23   would never have been undertaken if we did not anticipate

24   litigation.

25         MS. ELMER:  I think a good way to understand that,

33

1   Your Honor, is that there are certain topics that may have

2   come up in the context of some of these Remedy Projects that

3   also may have been addressed in ordinary course projects.

4           In the ordinary course -- any ordinary course

5   document that addresses those topics, Google has produced or

6   is in the process of producing.  And, in fact, the 30(b)(6)

7   witness himself testified about some of these topics.

8   You'll see, Your Honor, toward the back of the deposition,

9   there is a section where he is testifying in his individual

10  capacity about certain subject matters.  And that's because

11  some subject matters were discussed in the ordinary course,

12  and then they were also discussed in the context of some of

13  these Remedy Projects.

14          The nature of the Remedy Project documents, if

15  you're thinking about a topic in the context of what would

16  it take to resolve a government -- an active government

17  investigation, the concept of what would it take to resolve

18  it is revealing the mental processes of a lawyer.  And it is

19  very difficult to separate out, you know, a topic or subject

20  matter that might arise also in an ordinary course situation

21  from the overall legal thinking of what would it take to

22  resolve or put to bed this particular investigation.  And

23  that's why Google has been very careful to produce any

24  ordinary course document that deals with a wide range of

25  topics, any topic, really, relating to its ad tech business,

34

1    but it is only refusing to produce these specific Remedy

2    documents where the topics were considered in the context of

3    what would it take to resolve this government investigation.

4            THE COURT:  Why are some of these Remedy Project

5    documents redacted and others withheld completely?

6            MS. ELMER:  So the documents that were created for

7    the Remedy Project documents, those have been withheld in

8    their entirety.  There are other documents in this

9    particular set that aren't Remedy Project documents, per se.

10   We're calling them that, we label them that for shorthand in

11   our briefing.  But as the brief explains and the declaration

12   explains, too, I think, they reveal the substantive details

13   of the Remedy Project documents.  But, for example, I think

14   two of the documents at issue are employee evaluations where

15   the employee, either himself or his boss, is describing what

16   the employee worked on that year, and the description

17   reveals the substantive nature of the Remedy Project

18   document that the employee assisted the legal department

19   with.  The rest of the employee evaluation is left

20   unredacted because the evaluation itself is not a Remedy

21   Project document.

22           The same is true of a couple of email threads

23   where you have employees who are discussing other topics,

24   but then they bring up a particular topic, and then they

25   refer to the Remedy Project document.  Some of these are the

                                                          35

1    Remedy Projects.  Some of these employees were in the

2    need-to-know group for the Remedy Projects, and by revealing

3    the name of the project, they are revealing the substance of

4    the project because of the context in which they are raising

5    it.

6              THE COURT:  And, again, I'm reading in between the

7    lines, to some extent, but, you know, I read the MDL

8    decision by Judge Castel.  It looks like Google agreed to

9    produce those documents in camera.  Why didn't you do that

10   here?

11             MS. ELMER:  Those I'm trying to remember --

12             THE COURT:  Four documents at least.

13             MS. ELMER:  -- what happened in that.

14             In that particular dispute, I believe that there

15   was an agreement -- a prior agreement between the parties

16   where the discovery committee in that case was going to

17   select at random, by their choosing, four documents to

18   submit to the Court in camera.  So it was sort of a previous

19   negotiation among the discovery committee and the parties in

20   that particular case.

21             Here, Your Honor, respectfully we believe that in

22   particular with respect to the Remedy Project documents, the

23   record is so strong, we have a declaration, we have a

24   deposition, we don't have any evidence from the plaintiffs

25   that -- to the contrary; we have assertions from them.  We

                                                          36

1    also don't have any showing from them that they have a

2    substantial need for this material.

3            What facts are contained in these Remedy Project

4    documents that are not in the millions of pages of documents

5    that have already been produced to them?

6            THE COURT:  They don't know, and I don't know.

7    So, I mean, that's always the problem, you don't know what

8    you don't have.  And so you coming in here and saying they

9    can't point to what they're missing because they haven't

10   seen it isn't going to be a very strong argument; is it?

11           MS. ELMER:  Well, respectfully, Your Honor, I

12   think they have seen these.  These are clawback documents.

13   And I think that's part of the issue here is that they are

14   trying to reconstruct what they have already seen.

15           THE COURT:  Well, put in perspective for me -- I

16   mean, I read the deposition again, and the estimate of the

17   amount of time that was put into these Remedy Projects, I

18   was not overly impressed by the number of hours that were

19   put into any -- Banksy may be different.  I mean, obviously

20   that was multitudes more than anything else.  But, you know,

21   I'm just trying to get a sense as to how many documents

22   would have been prepared if people only worked on something

23   for ten hours.

24           MS. ELMER:  And I believe, Your Honor, the -- the

25   representative testified in specifics on some of these, you

                                                              37

1    know, that there was one presentation that was created for

2    Sunday.  I think that that was maybe given twice, so there

3    might be three slide decks out there.  He testified that one

4    or two presentations were created for the other projects.

5          There were not a ton of documents that were

6    produced because these were projects that were taken up.

7    They worked on them for a couple of months, and then they

8    let them die on the vine.

9          Banksy is different, of course, because it is

10   something that actually progressed toward a settlement that

11   the French Competition Authority accepted.

12         THE COURT:  Okay.  Well, let's talk about the

13   other document -- or Documents 3 and 7.

14         MS. ELMER:  So Document Number 3, there's a legal

15   section there that reflects the legal advice of an attorney,

16   Matthew King.  I don't think the DOJ is pressing that

17   document forward.

18         Document Number 7 is a document that is a slide

19   deck, and the redactions are mostly from a comment page that

20   follows a slide deck.  The way that Google Slides works, you

21   can call out other employees in comments, and so the

22   comments that are redacted are either a comment that is

23   discussing a conversation that the employees had with an

24   attorney, an in-house attorney, and repeating the advice

25   that that attorney gave, or one of the comments is from an

38

1    attorney himself, and then another one is restating the

2    advice of an attorney.

3            And then there is a bullet on one slide that is a

4    redaction of what legal -- its feedback from legal, and that

5    is what the redaction is.  And then there is another slide

6    where two bullets are redacted, and those redactions relate

7    to the legal risks of undertaking a decision.

8            And the comment slides that are redacted, they're

9    all identical.  So there's three slides that are fully

10   redacted, and all of those are those comments, the

11   back-and-forth comments, and they're all the same.  I don't

12   know why they have, you know, duplicates of the slides in

13   there.

14           That is an example of the type of document that

15   was very common in this review set.  These very complex

16   documents where there are call-outs to lawyers, and they

17   really do require, you know, very careful and sort of

18   tedious review and redaction.

19           THE COURT:  Well, and there was one redaction that

20   was removed that appeared twice; is that right?  I think it

21   was that Document Number 7.

22           MS. ELMER:  Document Number 7.

23           THE COURT:  I know that you've removed some

24   redactions in Document Number 7, or produced a revised

25   version of Document Number 7.

                                                              39

1              MS. ELMER:  Oh, that's right.  There is a full
2    slide, You Honor, I believe it is.  Yeah.  A full slide was
3    removed.  And what it was is a restatement of what the
4    language is in Google's contracts.  I think an overzealous
5    reviewer thought that this is kind of contract language,
6    attorney language, I need to redact it.  You know, we took
7    another look at it, as we are always happy to do, and, you
8    know, no, anyone reading a contract would see this, this is
9    not legal advice, and we unredacted it.  I think it's Slide
10   Number 34.
11             THE COURT:  Okay.  Thank you.
12             MS. ELMER:  Thank you, Your Honor.
13             THE COURT:  Thank you.
14             MR. TESLICKO:  If I could address a couple of your
15   questions to Google's counsel, Your Honor.
16             So, first, on the protective order point, we did
17   raise this at the end of our opening brief.  Our protective
18   order is modeled on the MDL protective order.  It contains
19   that same exact provision.  There is a slight distinction in
20   that the MDL plaintiffs also have this separate privilege
21   committee, but the language around submitting disputes over
22   privilege for in-camera review in the face of a clawback is
23   the same.  And to the extent that Google is arguing somehow
24   that provision doesn't apply to prior clawbacks, our
25   understanding is they are taking the position that the

                                                          40

1    protective order applies to prior clawbacks for waiver

2    purposes, so certainly it should apply to clawbacks with

3    respect to in-camera review.

4            Going to your --

5            THE COURT:  Well, I mean, my question was really

6    does that really change the law.  I mean, obviously the

7    standard is that you have -- you don't just ask for it; you

8    have to show a reason to do it.  And, you know, my concern

9    is that if I went down that road, I would be looking at, you

10   know, 4,000 clawback documents, or 3,900.

11           MR. TESLICKO:  That's correct, Your Honor.  And I

12   will -- we will spare you that.

13           With that said, the fact that there was a clawback

14   is at least one consideration that the Court's -- that this

15   Court's considered before in whether there's a basis for

16   in-camera review.  I suspect that's partially why this

17   provision is in the protective order in the clawback

18   section, not that there's a waiver via the clawback, but

19   there's some indicia that, you know, a reviewer -- and in

20   this case, these clawbacks, or for multiple clawbacks,

21   multiple reviewers thought that the substance was not

22   privileged.

23           I'll jump to the end where counsel left off, which

24   is Document 7.  And I have copies of Document 7, because

25   it's one of the few privileged documents that I could hand

                                                            41

 1   up if Your Honor would like.  But, just to clarify,

 2   continuing redactions exist on slides that discussed

 3   commercial risks at the top, discussed a section called

 4   decisions needed on whether to provide direct access to

 5   advertisers for one of Google's products.

 6            So these are not -- if you look at the slide on

 7   its face, there's not obvious indicia that this is a legal

 8   section or a legal discussion.  Unlike in Document 3 where

 9   they limited the redaction to the legal risks section.  So I

10   point that out just to clarify that this document,

11   Document 7, is different than Document 3.

12            You asked how many project documents were created

13   in light of the short nature of the documents.  We have a

14   partial list of the documents that Google's provided to us,

15   which is Exhibit 17 to our opening brief.  There's about 250

16   or so total across all projects.

17            I will note that, based on the information

18   provided in the opposition, it seems like that list is

19   incomplete because Google's asserted privilege over

20   additional documents not on that list.  But to give you a

21   sense of volume, Exhibit 17 has that information broken down

22   by project.

23            Google's counsel mentioned that we haven't

24   demonstrated substantial need.  We're not seeking a waiver

25   of work product, and the substantial need standard applies

                                                          42

```
 1    to waiver; we are merely seeking documents that are not
 2    subject to the attorney work product protection, and those
 3    would be documents not created in the ordinary course.  All
 4    we need to do to be eligible to receive that -- or entitled
 5    to receive those documents is merely show relevance.  And I
 6    don't think there's any dispute here that the documents are
 7    at least relevant to the plaintiffs' claims.
 8             THE COURT:  It all comes down to whether they're
 9    privileged or not.
10             MR. TESLICKO:  Correct.  Correct.  I just wanted
11    to clarify, we're not seeking to overcome the privilege,
12    therefore we don't need to show separately a substantial
13    need for the documents; it's merely relevance.
14             The last point I wanted to come to was the
15    deposition testimony on Project Sunday.  And I think there's
16    a bit of semantics going on.  And, to be honest, the
17    corporate designee was not a lawyer.  But it does appear
18    that he conflated regulatory actions with litigation and
19    just regulations.  And just to take you back to a point that
20    I made earlier, on 89 at 11 to 12, he says Project Sunday
21    was begun because of a host of global regulatory actions
22    across privacy and antitrust.  And when we followed up to
23    ask what he meant by some of those things, at page 95,
24    starting at 8, we asked:  What investigations, litigation or
25    regulatory matters was Project Sunday initiated in response
```

1    to?  And he said we need to separate that out.  You're

2    asking for regulatory matters as well.  And then he goes on

3    to say that there are many countries or regions that have

4    regulatory issues related to antitrust and privacy.

5        I don't think Google's contending they anticipated

6    litigation from any of those other separate regulatory

7    concerns.  And I draw out that point to say that I think you

8    could read the 30(b)(6) testimony to say litigation was one

9    of the reasons, but regulatory concerns across the globe

10   were another consideration, especially on privacy issues.

11   That's not anticipation of litigation; that's a separate

12   regulatory concern, in addition to the commercial

13   considerations we think were at stake.

14       And then lastly --

15       THE COURT:  Well, he does say, you know, what

16   government investigations form the basis for Project Sunday.

17   I mean, that was the question that was asked, form the basis

18   for Project Sunday, and he said basically the same one that

19   we've talked about, the list which you'll find on page 2 of

20   the letter.

21       MR. TESLICKO:  I agree.

22       What I'm pointing out is that investigations --

23   government investigations he identified were a basis, but

24   not the sole basis.  And I think what he's identifying or

25   explaining in 95 is that regulatory concerns, across a host

44

1   of countries that are not contained in that list, also were

2   bases for initiating Project Sunday.

3          And the last point I'll make on that is, in

4   particular with respect to Project Sunday, you've seen in

5   the briefing, Google's, in our view, walked away from the

6   representations that the testimony, given by their senior

7   vice president for many of their commercial lines of

8   business, where he said he -- Google identified him as an

9   initiator of the project originally in their letters.  He

10  said he never instructed an attorney to work on the project;

11  attorneys never instructed him.

12         Again, not dispositive, but the fact that the

13  senior vice president at Google is giving that testimony and

14  saying that attorneys were not involved in -- actively in

15  that project, or at least in his initiation of the project,

16  I think provides some basis to think that this project had

17  more than one purpose, and those are commercial, regulatory

18  or anything else other than anticipated litigation.

19         And I think, at a minimum, that provides a factual

20  basis for Your Honor to look at the documents, consider

21  whether it's clear on their face that they were created --

22  they would not have been created in substantially similar

23  form, irrespective of litigation, and if they would have,

24  order the production of those parts that don't reflect legal

25  opinions, litigation strategy or the like.

45

1            And if Your Honor doesn't have any other

2    questions, I --

3            THE COURT:  I think I understand the issues.

4    Thank you very much.  And, you know, the briefing was very

5    good on this.  I did have a few questions I needed to get

6    addressed -- and you can go ahead and have a seat.  Thank

7    you.

8            You know, as I commented earlier, you know, there

9    are, I think, two separate issues in front of me.  One has

10   to do with the project documents, Remedy documents, whatever

11   you want to call them, the 17 that have been identified by

12   the defendant in their opposition, and the other document

13   now.

14           There's a lot more meat on the bones, so to speak,

15   on the project documents as far as the 30(b)(6) deposition.

16   The declaration only addresses those documents for the most

17   part, and so I think -- you know, I have a record in front

18   of me that, you know, honestly has surmised, may be wrong,

19   may be this, may be that, but I don't think I have enough

20   factual information in front of me to make the finding that

21   it isn't protected or that I would need to do an in-camera

22   review of those documents.

23           I think, read broadly and, you know, fairly, that

24   the 30(b)(6) deponent indicated that all five of these

25   projects, I guess, or at least the four in the second part

                                                           46

1    of the Banksy projects were all done as a result of

2    government investigations and the concern of future

3    litigation anticipation.

4            You know, I am accepting Google's representation

5    that if we task somebody to go focus on something quickly

6    about making change A, but there's some other group out

7    there that's working on change A that got a much broader

8    base, and, you know, more involved in doing things like

9    that, that they're not holding that back because, you know,

10   of changes to products or platforms or whatever are a part

11   of an ongoing business investigation.

12           But it sounds to me in reading the record, that,

13   at various points in time, lawyers were involved, thoughts

14   were being made about how can we resolve certain things, and

15   people were tasked with investigating that, and those were

16   the specific projects.

17           And, you know, again these were projects that, at

18   least based on the information that's been presented to me,

19   were modest in nature and seemed to be one-offs, to some

20   extent.  And obviously if you spend, you know, 30 hours,

21   45 hours, 50 hours or 10 hours on a project, that is not

22   indicative of something that is of a major undertaking by a

23   corporation like Google.  And that includes, as I read the

24   deposition testimony, of all the individuals involved,

25   counting up all their time, including the presentations.

47

```
 1    And there were a lot of people that were at some of these
 2    presentations.
 3             So, you know, this is an issue that I think was
 4    tied -- these projects themselves were tied to particular
 5    issues having to do with trying to resolve, address some
 6    concerns with ongoing investigations or remedies.  So I do
 7    think that, you know, the assertion of the privilege on
 8    those documents, given the record that I have of the 17 --
 9    and, again, I'm only addressing the 17 that are in front of
10    me.  So I'm not, as Judge Castel said, making advisory
11    opinions as to any of the other documents.  If there's a
12    different factual record for them, then I would have to deal
13    with them.  But as to those 17 documents, I'm not going to
14    require them to be produced for in-camera review and
15    inspection.  I don't think that a showing has been made
16    that's sufficient for me to make them to do that.  And, you
17    know, I'll be honest with you, I think part of that is
18    having gone through this process before in some big cases.
19             Reading a document doesn't tell me the intent of
20    the document.  And it's a difficult way -- I mean, you know,
21    it doesn't -- they don't typically say I am producing this
22    document as a result of, you know, you're so-and-so and
23    directions and those kinds of things, although, it appears
24    that there's some instructions from people to do certain
25    things.  But I think under the circumstances, I'm not going
```

48

1    to -- I do think I should look at Number 7, though.  I

2    think, you know, there's enough going around with Number 7

3    that it probably is appropriate for me to at least review

4    both the current redacted version and an unredacted version

5    of Document Number 7.  I'll look at it, and I don't need any

6    further briefing, argument or discussion on that.  I'll look

7    at it.  I have the list of the people involved, and so I'll

8    be able to make a decision on that hopefully fairly

9    promptly.  But get me that sometime by tomorrow, if you

10   could, and I'll look at it and get you a decision on

11   Document Number 7 early next week.

12            Okay.  Anything else on this case today?

13            MS. ELMER:  Thank you, Your Honor.

14            MR. TESLICKO:  Thank you.

15            THE COURT:  Mr. Reilly.

16            MR. REILLY:  Yes, Your Honor.  Just quickly.

17            You had mentioned some concerns about the sealing,

18   and we would -- I don't know what the Court had in mind.

19   For example, if you wanted to identify particular exhibits

20   you were thinking of unsealing or that could be resubmitted

21   in redacted form.  We could then address those and see how

22   many we could work out in advance and whether we would

23   request further briefing.

24            THE COURT:  Yeah.  I am inclined, just given the

25   nature of this case, before denying a motion to seal

                                                          49

```
 1    outright, probably requesting further briefing on that issue
 2    to get the parties to look at it a little bit closer and do
 3    things.  But, I mean, I was focusing on the substantive
 4    motions, but also --
 5              MR. REILLY:  Understood.
 6              THE COURT:  -- in doing that was looking at some
 7    of the information that had been redacted in that version,
 8    and I have some concerns of whether it's going to meet the
 9    appropriate standard.
10              But I think, under the circumstances, it's
11    probably better for me to give you a warning and one more
12    opportunity to address it before I just say the clerk is
13    directed to unseal something.  Okay.
14              MR. REILLY:  Thank you, Your Honor.
15              THE COURT:  Thank you.  Anything else?
16              MS. WOOD:  Thank you, Your Honor.
17              THE COURT:  Okay.  Thank you.  Court will be
18    adjourned.
19              (Proceedings adjourned at 3:07 p.m.)
20              ---------------------------------
21    I certify that the foregoing is a true and accurate
22    transcription of my stenographic notes.
23                                _____
                                       Stephanie Austin
24                                Stephanie M. Austin, RPR, CRR
25
```

50