```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION

 3   --------------------------x
     UNITED STATES, et al.,     :    Civil Action No.:
 4                              :    1:23-cv-108
                 Plaintiffs,    :
 5        versus                :
                                :    Friday, August 25, 2023
 6   GOOGLE LLC,                :    Alexandria, Virginia
                                :    Pages 1-67
 7                 Defendant.   :
     --------------------------x
 8

 9        The above-entitled motions hearing was heard before
     the Honorable John F. Anderson, United States Magistrate
10   Judge.  This proceeding commenced at 11:01 a.m.

11                   A P P E A R A N C E S:

12   FOR THE PLAINTIFFS:   MATTHEW TROY, ESQUIRE
                           OFFICE OF THE UNITED STATES ATTORNEY
13                         2100 Jamieson Avenue
                           Alexandria, Virginia  22314
14                         (703) 299-3700

15                         JULIA TARVER WOOD, ESQUIRE
                           KATHERINE CLEMONS, ESQUIRE
16                         MICHAEL WOLIN, ESQUIRE
                           UNITED STATES DEPARTMENT OF JUSTICE
17                         ANTITRUST DIVISION
                           450 Fifth Street, NW
18                         Washington, D.C.  20530
                           (202) 894-4266
19
                           TYLER HENRY, ESQUIRE
20                         OFFICE OF THE ATTORNEY GENERAL
                           OFFICE OF THE SOLICITOR GENERAL
21                         202 North Ninth Street
                           Richmond, Virginia  23219
22                         (804) 786-7704

23

24

25
                                                              1
```

```
 1                          A P P E A R A N C E S:

 2   FOR THE DEFENDANT:      CRAIG REILLY, ESQUIRE
                             LAW OFFICE OF CRAIG C. REILLY
 3                           209 Madison Street
                             Suite 501
 4                           Alexandria, Virginia  22314
                             (703) 549-5354
 5
                             KAREN DUNN, ESQUIRE
 6                           ERICA SPEVACK, ESQUIRE
                             MARTHA GOODMAN, ESQUIRE
 7                           PAUL, WEISS, RIFKIND, WHARTON &
                             GARRISON LLP
 8                           2001 K Street, NW
                             Washington, D.C.  20006
 9                           (202) 223-7300

10                           ANDREW EWALT, ESQUIRE
                             ERIC MAHR, ESQUIRE
11                           FRESHFIELDS BRUCKHAUS DERINGER, LLP
                             700 13th Street, NW
12                           10th Floor
                             Washington, D.C.  20005
13                           (202) 777-4500

14   COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
                             Official Court Reporter
15                           United States District Court
                             401 Courthouse Square
16                           Alexandria, Virginia  22314
                             (571) 298-1649
17                           S.AustinReporting@gmail.com

18          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

19

20

21

22

23

24

25
                                                                2
```

```
 1                    P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Calling Civil Action Matter

 3   Number 23-cv-108, United States, et al. versus Google LLC.

 4          THE COURT:  Okay.  Counsel need to introduce

 5   themselves, please.

 6          MR. TROY:  Good morning, Your Honor.

 7   Matthew Troy, Assistant U.S. Attorney, United States

 8   Attorney's Office.

 9          MS. WOOD:  Good morning, Your Honor.  Good to see

10   you.  Julia Wood for the United States.  My colleague,

11   Katherine Clemons, will be arguing today.

12          THE COURT:  Clemons; is that correct?  I just want

13   to make sure I have the name right.  Okay.

14          MR. HENRY:  Good morning, Your Honor.  Ty Henry

15   from the Office of the Attorney General of Virginia on

16   behalf of the plaintiff states.

17          THE COURT:  Thank you.

18          MR. WOLIN:  And good morning, Your Honor.

19   Michael Wolin from the Antitrust Division on behalf of the

20   United States.

21          MR. REILLY:  Good morning, Your Honor.

22   Craig Reilly here for Google, together with my co-counsel,

23   Karen Dunn.

24          MS. DUNN:  Good morning, Your Honor.

25          THE COURT:  Good morning.
```

1           MR. REILLY:  And Erica Spevack from the Paul,

2    Weiss firm.  Ms. Dunn, with the Court's permission, will

3    address the Court.

4           Also here in the well of the Court is Eric Mahr

5    and Andrew Ewalt, who the Court has met.  We expect one

6    other attorney may be joining us, not to present, but to be

7    present, Martha Goodman.  And I would just request the

8    Court's permission to allow her to take a seat at counsel

9    table when she arrives.

10           THE COURT:  Okay.

11           MR. REILLY:  But we can proceed without her.

12           THE COURT:  Okay.

13           MR. REILLY:  Thank you, Your Honor.

14           THE COURT:  Well, Ms. Dunn, let me have you come

15    up first.

16           You know, just a couple of things initially.  I

17    think at least multiple times I have suggested to the

18    parties that the expedited briefing schedule should be used

19    judicially.  I think in my comments in that regard, I

20    highlighted that motions involving privilege issues are ones

21    that require extra time for the parties and for the Court.

22           You filed yesterday, at 4:00, 200 pages in a reply

23    brief and exhibits on a motion that you filed last Friday

24    and want me to decide today.  I want to hear why it was a

25    decision to do this on an expedited briefing schedule with

                                                        4

1   the understanding that you're going to end up filing a reply

2   brief with close to 200 pages at the end of the day

3   yesterday.

4        MS. DUNN:  Your Honor, first of all, we obviously

5   understand the Court's concern, and I want to assure the

6   Court that we take very seriously Your Honor's caution that

7   we only bring matters to this Court on an expedited basis

8   extremely judicially.

9        This issue of privilege goes really to the heart

10  of this case, to the heart of -- and to the heart of the

11  damages case the government has brought.

12       THE COURT:  In what way does it go to the heart of

13  the case?  They either have a damages case, or they don't

14  have a damages case.  Whether they started the investigation

15  on December 22nd of last year or December 22nd of 2021,

16  either they do or don't have a damages case.

17       So what do you mean by it goes to the heart of the

18  damages case?

19       MS. DUNN:  So, Your Honor, there are three things

20  that I want to put --

21       THE COURT:  Answer my question first --

22       MS. DUNN:  Yes, I will do that.

23       THE COURT:  -- and then you can expand upon it all

24  you want.

25       MS. DUNN:  Your Honor, the first piece is that it

5

1    goes to whether they have a damages case at all.

2          THE COURT:  Okay.  And what evidence relating to

3    communications between December 22nd and January 22nd goes

4    to whether they do or don't have a damages case?

5          MS. DUNN:  So that period of time was the only

6    period of time where they gathered factual information from

7    the agencies on whose behalf they now claim damages and

8    other agencies on whose behalf they do not claim damages.

9          THE COURT:  You don't think they've been trying to

10   get information from the agencies since January 22nd to the

11   present and aren't continuing to investigate and prepare

12   their damages case?

13         MS. DUNN:  Your Honor, we agree they're continuing

14   to prepare their damages case, and we are not seeking those

15   communications.  But the communications -- first of all, the

16   communications that we have seen that have already been

17   clawed back show the immediate reactions of these agencies

18   to the government's outreach.

19         THE COURT:  Okay.  So --

20         MS. DUNN:  Which, first of all, said they

21   didn't --

22         THE COURT:  But, again, Ms. Dunn, let me just

23   understand this.

24         The damages case will be presented at a trial that

25   will happen next year.  You understand that.  Whether they

                                                        6

```
1   had a weak damages case at one point and then they turned it
2   into a strong damages case as the case progresses will be
3   determined at the trial; not determined at the time the
4   complaint gets filed.
5           You said in your brief -- I mean you started,
6   factual information that's crucial to the defense of this
7   case.  You will be defending this case at a trial next year.
8   What communications that happen between one month before the
9   lawsuit got filed, you know, isn't going to be what this
10  case is tried on.  This case is going to be tried on their
11  complete damages case.
12          So, again, I'm trying to understand what is so
13  crucial and so important about this information for the
14  defendant.
15          MS. DUNN:  Yeah.  And, Your Honor, first of all,
16  if they don't have damages, they can't have a jury.
17          THE COURT:  Okay.
18          MS. DUNN:  So that needs to be decided before a
19  trial.
20          THE COURT:  And Judge Brinkema will do that, but
21  that issue isn't in front of me right now, and that -- once
22  that issue gets teed up, they'll be able to present what
23  evidence they have on their damages case.
24          MS. DUNN:  Second of all, Your Honor, there is the
25  issue of relevant market.  And when the government reached
```

7

```
 1   out to these agencies, their responses were often, we don't
 2   understand what you're talking about, that's not how ad
 3   purchasing works.  And those documents, we feel confident --
 4   and we hope Your Honor will review them in camera if there's
 5   any indecision -- will demonstrate that the market of the
 6   actual only agencies that they are here representing don't
 7   agree with their version of the market.  They say that
 8   that's not how ad buying works, and so these documents --
 9              THE COURT:  Well, that -- what their opinion --
10              MS. CLEMONS:  Your Honor, could I object to her
11   referring to documents that are privileged and have been
12   withheld or clawed back that counsel has seen prior to those
13   clawbacks?
14              THE COURT:  Well, whatever an employee of an
15   agency thinks is not going to be crucial to your case.
16   Whether a marketing person at one agency thinks something or
17   isn't familiar with the term or doesn't think that's right,
18   you know, that is one person's testimony about what he or
19   she thinks.
20              MS. DUNN:  Your Honor, these are the plaintiffs in
21   the case.  These are the people on behalf of whom DOJ is
22   bringing the case.  We are examining these witnesses as
23   30(b)(6) of the agency plaintiffs.  They are the plaintiffs
24   in this case.  And they don't --
25              THE COURT:  The plaintiff in this case is the
```

8

 1    United States.

 2         MS. DUNN:  The United States has identified eight

 3    agencies on behalf of whom it asserts that it's bringing

 4    this case and bringing this case for damages.  Those

 5    30(b)(6) depositions are incredibly important.

 6         This is a case that -- where the government seeks

 7    to reframe an entire industry that is a multibillion dollar

 8    industry.  They've brought the case on behalf of eight

 9    agencies.  The 30(b)(6) deponents, our testimony and

10    documents will undermine their market definition, which, in

11    a civil antitrust case, is a threshold issue before you even

12    get to trial.

13         THE COURT:  A very important issue, but not an

14    issue that someone who is boots-on-the-ground necessarily

15    understands.  A legal issue of market share is something

16    that is legal, not necessarily something in the advertising

17    industry.

18         So I'm just --

19         MS. DUNN:  Your Honor, respectfully, market share

20    is different than market definition and relevant market.

21    Market share is a totally different thing, and I agree,

22    experts can testify to market share.

23         Market definition, the standard for that is the

24    commercial reality of the marketplace, and the only people

25    in the commercial reality of the marketplace on the

                                                              9

1    government's side are these agency buyers of ads and their

2    ad agencies.  These are crucial witnesses.  That's why we

3    are spending our very small number of depositions on these

4    agencies because they are going to define the commercial

5    reality that defines the relevant market.

6          Second of all, Your Honor, there's an issue of

7    whether they are direct purchasers, and that's an issue

8    under *Illinois Brick*.  So if they can't establish that

9    they're direct purchasers, another reason that we need these

10   documents, then --

11         THE COURT:  Well, why do you need these documents?

12   That's the part that I don't understand in your argument

13   both that you filed last Friday and that you filed last

14   night.

15         No one is saying that you can't get testimony

16   about how they buy their advertising.  That you can go

17   through and you can say, you know, do you buy it directly?

18   Do you buy it through this entity?  Or through that entity?

19   What goes -- the whole process of how they purchase their

20   advertising is -- no one has said you can't get testimony

21   about that.

22         MS. DUNN:  Your Honor, we commend to the Court the

23   *Booz Allen* case where that court looked at a very similar

24   issue.  And it was said expressly by that Court that the

25   defendant was entitled -- this was a case where the ATR

                                                          10

1   Division was the plaintiff, they brought the same arguments

2   they're bringing here, and they lost because the defendant

3   is entitled to test that testimony.  And we -- the documents

4   from that --

5            THE COURT:  Where did it say that in the *Booz*

6   *Allen* case?

7            MS. DUNN:  What?

8            THE COURT:  Where did it say that in the *Booz*

9   *Allen* case that they get to test the testimony?  You're

10  talking about the decision by Judge Blake in Maryland?

11           MS. DUNN:  Yes, Your Honor.

12           THE COURT:  Okay.  So it discusses deliberative

13  process in the first three pages.  It has two paragraphs on

14  the attorney/client privilege.  It has two paragraphs on the

15  work product doctrine where it finds that it is information

16  that's covered by the work product doctrine but in good

17  faith.

18           MS. DUNN:  Your Honor, that's not -- no, this is

19  not the case.

20           First of all, just to take a step back, Your

21  Honor.  The question is not -- the first question is, are

22  these documents privileged, and we are seeking to

23  discover --

24           THE COURT:  Let's get into that argument in a

25  minute.  I'm just trying to understand what it is that you

                                                          11

1    think you can't have that deals with, one, your damages

2    case.  That is, how do they buy their advertising, what the

3    process is, what the contractual relationship is, what their

4    involvement is.  Do they, you know, know that they're doing

5    it through various processes and procedures, or is that

6    their advertising agency making those decisions?  So whether

7    they're a direct purchaser or not.

8              MS. DUNN:  Yes, Your Honor.

9              THE COURT:  You're getting all that information;

10   right?

11             MS. DUNN:  Your Honor, in the *Booz Allen* case --

12             THE COURT:  Well, again, I'll let you make your

13   argument.  I just want to know -- I want you to answer my

14   questions.

15             MS. DUNN:  Because we're not getting this -- first

16   off, we're not getting this testimony because some amount of

17   it has been clawed back.  That's Point 1.

18             THE COURT:  Well, that's relating in the

19   communications.

20             MS. DUNN:  But the witnesses are being examined

21   about their purchases based on those documents.  Those are

22   documents that we --

23             THE COURT:  Why are you using those documents?

24   Why don't you just ask them about their purchases?  How do

25   you buy advertising?  What is the contract?  Who is it that

12

1   you buy from?  How do you know about certain things?  Not

2   look at a document that they've clawed back and say, well,

3   didn't you say this?  Didn't you say that?

4          MS. DUNN:  Well, Courts, including the *Booz Allen*

5   Court and the *FEC v. Christian Coalition* Court in this

6   district recognized that witnesses, first of all, often need

7   the documents to refresh their recollection, to remember and

8   to respond to.  That's one thing.

9          And the second thing is that --

10          THE COURT:  Again, let me understand that.

11          MS. DUNN:  Yeah.

12          THE COURT:  You don't think that in a 30(b)(6)

13   deposition where the topic is how do you buy your

14   advertising, that they're not going to come in prepared to

15   talk about how they buy their advertising?

16          MS. DUNN:  We have been deposing these witnesses,

17   Your Honor, and it is true -- and it is in our briefs --

18   that when the witnesses are shown the documents, they recall

19   things that they didn't recall before they are shown the

20   documents.  That's the first thing.

21          The second thing is, we are limited -- and this

22   has been recognized also in *Booz Allen* and other cases -- in

23   the number of depositions that we can take.  So we need to

24   take 30(b)(6) depositions of these agency plaintiffs, and we

25   are entitled to test their testimony.

                                                            13

```
 1              The other thing that's happening is now that
 2     we're -- we've deposed four of these witnesses, the
 3     witnesses have started to testify differently because
 4     they've been prepared for the questions that we're going to
 5     ask.  So we need the documents that are prefiling, fact work
 6     product, fact -- and having -- not under the influence of
 7     preparing testimony for a litigation to test the testimony
 8     that we're getting.  There's really no substitute for
 9     documents where something is written on a page.  When you're
10     in trial and you're examining a witness, they often are
11     hemmed in by the words they wrote in the document.  So --
12     and that has gone to the substantial need query that Courts
13     have looked at.
14              THE COURT:  So it's crucial to your case whether
15     they know that a meeting was on January 3rd or January 8th?
16     They know they had a meeting, they don't remember the
17     particular date, but you need to have the documents so they
18     can say whether it was on the 3rd or the 8th, and that's
19     crucial to your case?
20              MS. DUNN:  Your Honor, the testimony and the
21     documents, we believe, go well beyond the question of what's
22     the date.  It's how they purchased, what they purchased,
23     where they purchased it, what the market is that they
24     operate in.
25              All of -- this is going to be -- a key issue in
```

1   this case is how are these purchasers purchasing their ads.

2   They are going to be -- there's two kinds of witnesses who

3   understand the commercial realities.  One are the third

4   parties who were also part of the government's investigation

5   and investigative file, and they've turned over those

6   documents.

7          The other are these agencies where those documents

8   they concede are part of the investigative file or part of

9   their investigation.  We are entitled to that under statute

10  and under the Antitrust Division's manual, and those have

11  been withheld improperly under privilege.

12         So the first question is, are they privileged.

13  And what the government is essentially saying is, every time

14  an Antitrust Division lawyer reaches out and communicates

15  with a federal employee -- lawyer or non-lawyer agency -- to

16  investigate to gather facts, and then that person, even

17  though they're not a client, they're not a party at the

18  time, if that person reaches out to other people, their

19  contractors -- and in this case, the ad agencies -- who the

20  department has insisted are independent, they have no

21  control over them, that's privileged, too.

22         That would make any time the government reached

23  out to any government employee and that employee reached out

24  to any other contractor all within the universe of

25  privilege, which is directly contrary to how the Fourth

15

1   Circuit directs that we treat the privilege.

2          THE COURT:  All right.  Let's step back.

3          January 24th, 2023, someone from the Department of

4   Justice writes to a federal agency and says I want

5   information, and they then reach out to a representative or

6   their contractor to get information.

7          You're saying that wouldn't be covered by a

8   privilege?

9          MS. DUNN:  You're speaking about after filing?

10         THE COURT:  Right.  I'm just trying to figure out

11  what -- why, in your mind, is the magic date the filing of

12  the complaint.

13         MS. DUNN:  It's not just in my mind, Your Honor.

14  These are parts of the investigative file that DOJ collects,

15  and to which we are entitled pursuant to statute and

16  pursuant to the DOJ manual.  DOJ acknowledges that these are

17  communications from its investigative file, and they say in

18  the Wolin declaration, which are their evidence, it's their

19  burden, they say that this is communications for

20  information-gathering purposes about digital advertising

21  purchases by federal agencies to aid in the Antitrust

22  Division's investigation.

23         So that is only what we're asking for.  We're not

24  asking for any opinion work product, any attorney mental

25  impressions.  And this is -- the entire point of work

                                                              16

1   product is to provide a zone of privacy for an attorney.  So

2   by the time that a suit is brought, there is a distinction

3   made.  And, actually, the government itself made this

4   distinction in the *Booz Allen* case.  And I think it is worth

5   reading what the Court said in that case.

6          THE COURT:  I have it in front of me.  Just tell

7   me where you are.

8          MS. DUNN:  It's at page 3.

9          THE COURT:  Where they decided at some point to

10  not turn it into a deliberative process or not call it

11  attorney work product, but they called it not

12  attorney/client privilege but work product; is that what

13  you're talking about?

14         MS. DUNN:  Your Honor, not exactly.

15         At first what the government did is it said that

16  these were privileged documents prefiling of the complaint

17  because the NSA was DOJ's client.  Then after -- between the

18  first and second privilege log, it changed its view, which

19  the Court agreed with, and then also took this position in

20  the hearing.  This is, by the way, only a year ago.  It's

21  the same Antitrust Division.  And it said that the

22  government drew a line between the DOJ's initial inquiries

23  with the agency where DOJ first played the role of an

24  investigator and the time when the DOJ decided to file the

25  present lawsuit where --

                                                        17

```
 1              THE COURT:  Decided to file --

 2              MS. DUNN:  -- the DOJ became counsel.

 3              THE COURT:  Decided to file the present lawsuit.

 4         On December 22nd, I have an affidavit saying a

 5    draft complaint had been filed, prepared.

 6              MS. DUNN:  Your Honor, if that were the case and

 7    that is what applied, it would apply to all of the

 8    communications in the investigative file after that date and

 9    before the filing.  But it doesn't.  And DOJ has turned

10    those over.  It kept turning over investigative file

11    material until the complaint was filed.  It, itself, drew

12    that line.  And if the DOJ's position about privilege is

13    accepted here, it is going to apply -- it would apply

14    equally to all of these third-party communications that they

15    had -- that they already turned over and that they're

16    required to turn over.

17              There's no distinction between the rest of the

18    material in the investigative file where the government is

19    reaching out to get information from third parties than

20    there is when they reached out to get information from the

21    agencies.

22              And actually at the time of filing, Your Honor,

23    they weren't even claiming damages for seven out of the

24    eight agencies.  So that's all later, too.  We are only

25    asking for the facts to which we are entitled that are not
```

                                                            18

```
 1    privileged, and documents that, if Your Honor reviews them
 2    in camera, we feel very confident you will see that they
 3    just have to do with the facts; the how, what, when and
 4    where of the agencies' purchases.
 5          And I -- Your Honor, I completely understand that
 6    these are complicated issues and we are on an expedited
 7    schedule, but this is a crucially important case, and
 8    this -- these communications with -- they are the plaintiffs
 9    in the case.  They are the people -- they are the entities
10    claiming damages here.  So -- and they are -- they are the
11    only evidence that the government is going to put forward to
12    support its damages and that we have to test about the
13    market that exists in this case.  So we wouldn't bring this
14    to Your Honor if it wasn't crucially important.
15          THE COURT:  Well, again, circle back around to
16    what evidence about them purchasing advertising do you think
17    you're not going to have?  That is, the contracts, the way
18    that it's done, the amount that's been purchased, how it was
19    used, all of that, the substantive information about how
20    they actually buy it.  What is it that you're not getting
21    that you think you would get in these, you know -- you know,
22    we're looking for information, can you help me gather some
23    information.
24          MS. DUNN:  Your Honor, there -- so, first of all,
25    we -- there are documents that we cannot see, so I can't
```

```
 1    tell you what's in the documents that we can't see, but --

 2              THE COURT:  What is it -- what is it you think

 3    might be there other than --

 4              MS. DUNN:  Yes.

 5              THE COURT:  -- your knowing -- and, again, you

 6    know, this is --

 7              MS. DUNN:  Yes.  So, Your Honor, there is an

 8    analogous document that we've pointed Your Honor to, and

 9    that is between one of the agency's OIGs and --

10              THE COURT:  I read it.

11              MS. DUNN:  Okay.  So we expect to see more of

12    that.  What happened in that case --

13              THE COURT:  Again, you're not answering my

14    question.  Whether they understand certain things, whether,

15    you know, this term is familiar or not familiar.  I'm asking

16    you a very specific question, and if you don't understand

17    it --

18              MS. DUNN:  I understand it, Your Honor.

19              The government puts forward a market for open web

20    display advertising.  When it went out to these third

21    parties, they did not understand what that meant.  And that

22    meant that the people on behalf of -- on whose behalf the

23    suit is being brought, and some of the only witnesses that

24    can testify to the commercial realities of the market, did

25    not understand the DOJ's relevant market, they didn't
```

                                                            20

1   understand what they were talking about.  When they talked

2   about buying from third parties, they didn't know what that

3   was.  And also you're going to find that the -- that the

4   agencies thought about the market much more broadly.  They

5   thought about the market as including Facebook and TikTok

6   and Amazon and all of the things that the government

7   gerrymanders out of its market.  That's one thing.

8          The second thing that we expect to find is

9   information directly relevant to whether the agencies are

10  direct purchasers.  And we have very limited depositions

11  that we can take in this case.  Non-party depositions have

12  to apply, not just to these agencies, but also to all the

13  many third parties.  And other courts that have looked at

14  substantial need have found that that is -- even a much

15  greater number of depositions available have been too

16  limited to get the information.

17         But the truth is that, you know, we are seeing the

18  witnesses evolve their testimony now after preparation with

19  DOJ.  And the documents that pin these agencies in to the --

20  to the information that they provided when they were first

21  asked these questions about how they buy and what the market

22  is and the whole underpinning of this entire case is about

23  how entities buy advertising.  That is extremely valuable

24  evidence to us or else we would not be here.

25         We are going to spend an enormous amount of time,

21

1    both at summary judgment and perhaps at trial, on this issue

2    of relevant market.  It just couldn't be more important.

3    It's the threshold issue and the core to every civil

4    antitrust case.  And we -- the testimony -- there's been

5    clawbacks of testimony on this topic and documents on these

6    topics, and not only the immediate testimony of the federal

7    agency advertisers, the communications between the agency

8    advertisers and the ad agencies.

9          These are ad agencies that the Department of

10   Justice has insisted this entire time they have no control

11   over.  How can there be any privilege between the federal

12   agency advertiser, who's in no client relationship with the

13   Justice Department at this time, only gathering facts, not

14   opinion, reaching out to the agencies with whom they have

15   the existing contract with?  There's no way that that could

16   be privileged.

17         THE COURT:  Why wouldn't that be work product?

18         MS. DUNN:  Well, first of all --

19         THE COURT:  All right.  Let me put it in the

20   scenario of on January 28th of this year, an agency asked

21   for their advertiser to prepare information for them for the

22   purposes of this lawsuit at the direction of their lawyer,

23   and they aid them in preparing information and providing it

24   to their lawyer, do you say that isn't work product?

25         MS. DUNN:  I think it may be work product if it

                                                              22

```
 1    was at the direction of counsel in anticipation of a

 2    litigation; however --

 3              THE COURT:  All right.  Well, let's just assume

 4    the date that I said, January 28th, was after this lawsuit

 5    got filed.

 6              MS. DUNN:  Right.

 7              THE COURT:  That's why I picked that date.

 8              MS. DUNN:  I think there would still be a close

 9    call about the agency relationship in that circumstance.

10    And that is the same conversation that happens in cases

11    where a lawyer directly hires a PR firm or an investigator

12    or an accountant.

13              I think in this instance, it's actually not a

14    close call at all.  The witnesses in this case have

15    expressly testified that they understood that the Department

16    of Justice was gathering information, that they didn't

17    anticipate litigation, that the time when they began to

18    anticipate litigation was when the complaint was filed.

19              One of them said this was a standard request for

20    information; another said it was a routine request for

21    information.  And the witnesses that have testified so far,

22    which is what we have to go on, have uniformly testified --

23              THE COURT:  Let me -- we're not going to have any

24    note passing anymore.  It's very distracting.  I'm sorry.

25              MS. DUNN:  Apologies, Your Honor.
```

                                                             23

```
 1              THE COURT:  Five times is enough.

 2              MS. DUNN:  The agencies have uniformly

 3     testified -- the agencies have uniformly testified that they

 4     did not anticipate litigation at this time, that this was

 5     purely investigatory, that's how they regarded it, and

 6     there's no contrary evidence in the record.

 7              The only -- now, first of all, it is their burden,

 8     as I'm sure we can all agree, and so they have put forward

 9     the Wolin declaration.

10              Now, the Wolin declaration is one of the best

11     documents I think for Google in this record, and that's for

12     what it doesn't say.  It doesn't say that these agencies

13     were seeking legal advice.  It doesn't say that the

14     information is opinion or mental impressions.  In fact, it

15     says it's factual information-gathering.  And it doesn't say

16     that any information was conveyed to the agencies such that

17     they would anticipate litigation.  And it doesn't say that

18     Mr. Wolin directed the agencies.

19              Instead what it says is it says what the agencies

20     did were communications made in direct response to my

21     questions.  Now, there is no direct response to my questions

22     standard of privilege.  It cannot be that a government DOJ

23     employee reaches out, somebody does something in response to

24     that request for information, and that all of a sudden is

25     within the very narrow zone of privacy that the privilege
```

1   cases recognize.

2          The entire point of this is to protect lawyers who

3   go out and hire agents to do part of their litigation work.

4   And that on the record we have, which is what the Court must

5   consider, and it's their burden.

6          We have agencies that say DOJ was not my lawyer, I

7   was not seeking legal advice, I didn't anticipate

8   litigation, the first time I knew about a complaint was when

9   it was filed, I didn't know I would be a witness in this

10  case and have no knowledge of being directed.  They say it

11  was a standard request for information and a routine request

12  for information.  None of that is privileged, Your Honor.

13         And I want to be very -- I want to be --

14         THE COURT:  Let me go back to that.

15         MS. DUNN:  Yeah.

16         THE COURT:  At least the testimony that I have

17  seen is this wasn't a standard request for information, I

18  have never gotten a request for that kind of information,

19  I've never dealt with them in the past.  Is there contrary

20  testimony?

21         MS. DUNN:  Yes, Your Honor, there is.

22         This is on pages 9 and 10 of our brief -- of our

23  reply brief, and on pages 10 and 11 of our reply brief.  And

24  I have the pages in the depositions marked here.  I can pull

25  the cites for you, but they're in the brief.

                                                        25

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

```
1              THE COURT:  I'm looking -- I mean, I read the

2   depositions that you provided me last Friday.

3              MS. DUNN:  Okay.

4              THE COURT:  And the ones that were there last

5   Friday said, out of the blue, don't have dealings with them,

6   don't know about them, you know, this was not something that

7   I ordinarily do, this was unusual.

8              So you're saying that's --

9              MS. DUNN:  I'm saying that two out of the four

10  witnesses testified.  One said it was -- they felt it was a

11  standard request; the other uses the phrase "routine request

12  for information."

13             But also the point is, they weren't anticipating

14  litigation; it was a request from one agency to another.

15  Whether or not they hear from DOJ regularly, all of these

16  witnesses have said they weren't anticipating litigation.

17  And they've all said that -- they've uniformly testified

18  they didn't think they were harmed by Google.  This is not a

19  circumstance where in order to create an attorney/client

20  privileged relationship, the client has to be seeking legal

21  advice.  They have to be communicating in a confidential way

22  with a lawyer for the purpose of seeking legal advice and to

23  know that they are seeking to be a client.

24             THE COURT:  Or involved in a legal proceeding.  It

25  doesn't necessarily have to be legal advice.  Information
```

                                                             26

1    relating to the legal proceedings.

2              MS. DUNN:  Right.  But the client has -- it's the

3    client's privilege, and they have to show that they are the

4    client, and they have to be seeking information from the

5    lawyer.  That's the exact opposite of what was happening

6    here.

7              These are the same kinds of communications as when

8    the government went out to myriad third parties, who we also

9    are deposing, as they did here.

10             And, Your Honor, just to be clear, the government

11   didn't make this outreach to these agencies, who are the

12   plaintiffs in their case and relevant for market and

13   damages, until that three- to four-week period from December

14   to January.

15             So we're just seeking the investigative material

16   to which we're entitled, and that's the same as in the rest

17   of the investigative file.  It's not -- we're not -- you

18   know, if they had reached out to the agencies before to

19   gather information, we would want that, too.  But we

20   completely understand that at the time after the complaint

21   is filed, everybody should anticipate litigation, there's

22   been a publicly-filed complaint, and that is what the

23   witnesses testified to.

24             I think if you look, Your Honor, at the cases

25   on -- that focus on the idea of work product, this is not

                                                              27

```
 1   really a close call.  Like, the challenging cases are where

 2   the attorney has gone out to hire a PR firm or something

 3   like this, or an accountant, or somebody to assist where

 4   there's a direct retention.  It's not a case where there's a

 5   third party who has a preexisting relationship to do some

 6   sort of contracting work providing facts, which is what we

 7   have here.  And we have cases that are cited in the brief as

 8   to that.

 9           But the DOJ's words speak the best themselves,

10   which is they have sent us correspondence saying these

11   agencies are independent.  They are not under our control.

12   We need Rule 45 subpoenas.  So it can't possibly be that

13   this is a situation akin to the harder cases where the

14   lawyer directly goes out and hires somebody to do their

15   legal work for them.  And even in those cases, the fact --

16   the facts are accessible to the other party, and what is

17   redacted is the opinion work product.

18           We have no problem with any redaction of mental

19   impressions.  We do not think there will be any because this

20   is not a circumstance where the agencies are making

21   conclusions and recommendations for the legal work; they're

22   just providing information.

23           And, Your Honor, I'm concerned that I haven't

24   convinced you that we need this information, and we really,

25   really --
```

1          THE COURT:  Well --

2          MS. DUNN:  Yeah.  We really, really do.

3          I think it doesn't -- if no privilege applies,

4    we're entitled to it anyway.

5          THE COURT:  Well, you're the one who's saying it's

6    crucial.  And, again, I am, again, at a loss, honestly, as

7    to the substantive information about how they purchase their

8    advertising, whether they're a direct purchaser, what it is

9    and those kinds of things.  That --

10         MS. DUNN:  This is the -- sorry.

11         THE COURT:  No, I'll let you go.  Interrupt me all

12   you want.

13         MS. DUNN:  No.  No.  No.  I just can't -- I just

14   couldn't hear.  I couldn't hear.  Go ahead.

15         THE COURT:  The information concerning how they

16   purchased their advertising, whether it's directly or

17   through an agency, how that is done and how the process is

18   done to get whatever advertising that they do, that's all

19   information that is discoverable, and you should be getting

20   that.  And whether -- if you're not getting that kind of

21   information, that is substantive information about how they

22   get their advertising, then you should be coming in on a

23   motion to compel that.

24         The question is, you know, whether you get these

25   documents about some investigative information that they

29

 1    then determine whether to bring a claim or not.  And whether

 2    they have a claim or not, you'll be able to litigate that

 3    when you get the substantive information about how they get

 4    their advertising, what kind of advertising they get, the

 5    process that's been followed.

 6            The same goes with the defamation.  You know, that

 7    is going to be a legal issue that one has to get determined.

 8    And what one person's agency thinks -- you know, you're

 9    going to have experts; they're going to have experts.  You

10    know people don't understand this; they don't understand

11    that.  Somebody's going to have to make a decision.

12            But, again, I'm at a loss as to how you think that

13    is so crucial to your case.

14            MS. DUNN:  Your Honor, the information that was

15    gathered -- which, again, is not privileged, and so we are

16    entitled to it, regardless of substantial need in the first

17    instance -- is what the agencies said when they were asked

18    for facts in the first instance.  And when it's -- and it

19    also is their communications with their ad agencies.  So

20    that has a probative value that is unlike after-the-fact

21    testimony.

22            What they said initially to the DOJ about the

23    market, what they said in thoughtful responses about how

24    they purchase their ads and what markets they operate in,

25    and then the conversations they had with their own

                                                               30

1   contractors with whom they work all the time about the ad

2   buying.  That is what we expect to find, and it is only

3   factual information to which we are entitled.  And we

4   believe it is important for the following reasons, which I

5   will re-enumerate, because I believe that they are so

6   important.

7          One is, market definition isn't just a legal

8   concept.  The legal standard is commercial realities.  So

9   the commercial realities that the government has injected in

10  this case is how these agencies are buying their ads and

11  what they consider to be the market and their interactions

12  with their advertisers.

13         And, by the way, we don't have enough depositions

14  to depose all those advertisers or all the agencies that the

15  government reached out to.  We just don't have enough, even

16  if we use them all for that.  Okay.  So that is going to be

17  the relevant market, and these are the parties that the

18  government has inserted as the commercial reality.  That's

19  the first thing.

20         The second thing is, if they don't -- if they are

21  not direct purchasers, there's no damages case as a legal

22  matter.  And that information we expect will also be found

23  in what they provided to the government in the investigatory

24  stage.  Only facts.  We only want to know who's the

25  purchaser in that circumstance; we don't want opinions.  And

                                                            31

1    those are the kinds of questions we expect that they were

2    asked.

3            So it's possible that the government will have no

4    damages case, and on this basis alone, no entitlement to a

5    jury trial.  So we can't get to trial and test that.

6            THE COURT:  Okay.  Why don't you get those facts

7    through the normal course of discovery?  And, again, you

8    still haven't answered that question, I don't think --

9            MS. DUNN:  Well --

10           THE COURT:  -- whether they are or aren't a direct

11   purchaser.

12           MS. DUNN:  I will tell you, Your Honor, first of

13   all, we are trying to get those facts through the normal

14   course of discovery.  But, first of all, the normal course

15   of discovery in every case like this, the government hands

16   over its investigative file.  That is the normal course of

17   discovery, and the government, as in the *FEC v. Christian*

18   *Coalition* has cited, the government is not allowed to take

19   advantage of privilege to keep back documents that would

20   ordinarily be given in discovery.  That gives the government

21   unfair advantage, and the cases say that that is not okay.

22   So, first of all, we -- this is the ordinary course of

23   discovery.

24           Second of all, we're taking depositions, but

25   testimony is being clawed back.  So anything that was told

                                                              32

1    to the government in this investigative stage, just the

2    facts, is not available to us, and that would be the normal

3    course of discovery.

4           Now, we can ask these questions, but as we point

5    out in our brief, sometimes the witnesses don't remember.

6    The documents, as recognized by the *Booz Allen*, other

7    courts, are important to refresh the recollections and to

8    remind, and also, frankly, Your Honor, for impeachment

9    purposes, because now the witnesses are being better

10   coached.  They know what questions we're going to ask, and

11   the answers have started to change.

12          So we need the documents in order to establish the

13   testimony and test the testimony that's going to go to the

14   very threshold issues of relevant market, of direct

15   purchasers and the not insignificant issue of damages and

16   whether they even exist and whether there should even be a

17   trial with a jury impaneled.  All of that has to happen

18   before the trial.

19          And so I desperately want to convince you of this

20   because I know how valuable this evidence would be.  And I

21   also think if Your Honor is unsure, we can submit to you in

22   camera the documents.  But I don't even think you get to the

23   inquiry -- if I haven't convinced you, I don't even think

24   you get to the inquiry of how crucial it is, even though it

25   is, and we're so limited in our discovery if this is not

                                                              33

1    privileged.

2            And, at this time, the agencies themselves

3    disclaim any attorney/client relationship.  They disclaim

4    knowledge of anticipation of litigation.  They disclaim any

5    harm.  They say that they don't know of any anticompetitive

6    acts on behalf of Google.  They don't think that.  So this

7    is not a case where this extends the lawyer's zone of

8    privacy.

9            And I will remind everybody that, you know, it is

10   their burden to prove, and so in many cases in these

11   depositions, they instructed witnesses not to answer

12   questions that would have laid a predicate for privilege.

13   Were you directed by the DOJ?  Did you get instructions from

14   the DOJ?  Instruct not to answer.

15           And so all the Court really has, as far as

16   evidence -- we have, on our part, the testimony of the

17   witnesses that disclaim these bases of privilege, but what

18   the Court has is the Wolin declaration.

19           So with respect to the first category we're asking

20   for, which is communications between the DOJ and the FAA

21   lawyers and non-lawyers, what the Wolin declaration says is

22   that this is information for information-gathering purposes

23   for the investigation.  Okay.  It does not say opinion, it

24   does not say mental impressions.  So Category 1 is not

25   privileged.  It's the same as what has been handed over for

34

```
1   any third party in the investigative file which was handed
2   over until the date of filing.  That's Category 1.
3           Category 2, what the Wolin declaration offers the
4   Court is the coms made in direct response to my questions
5   standard.  Note, does not say he directed their work.  And
6   witnesses were instructed not to answer that question.
7           There is no case that is findable by the DOJ where
8   the work product doctrine is used to shield fact-gathering
9   efforts from third parties not retained by counsel, much
10  less a third party previously retained not by counsel
11  expressly for a different non-litigation purpose.  You
12  cannot find a case that --
13          THE COURT:  That was a lot of -- go through that
14  one more time so I make sure I understand what your point
15  is.
16          MS. DUNN:  Okay.  Well, first of all, Your Honor,
17  I want to make sure, because there are three categories of
18  documents.
19          THE COURT:  Right.
20          MS. DUNN:  On Category 1, which is the
21  communications between DOJ Antitrust Division and FAA
22  lawyers and non-lawyers.  That's Category 1.  So there, what
23  we're saying is, we only seek the prefiling fact-gathering
24  communications; not the kinds of material that work product
25  is meant to protect like opinion or mental impressions.  If
```

                                                             35

1   there's any, it can be redacted.

2           And DOJ concedes two things that is relevant to

3   the first category.  Okay.  Thing 1 is, the coms are from

4   its investigative file.  That's their opposition, page 3,

5   they concede that.  And the Antitrust Civil Process Act and

6   the Antitrust Manual say we're entitled to this -- to the

7   stuff in that file.  Okay.

8           The second concession that they make -- this is

9   Wolin paragraph 8 -- is that these coms are for

10  information-gathering purposes about digital advertising

11  purchases by federal agencies to aid in the Antitrust

12  Division's investigation.  Okay.

13          THE COURT:  So that's work product, to aid in

14  their investigation as to whether to bring a lawsuit.

15  That's the DOJ's -- they are getting information to make

16  considerations as to whether to file the lawsuit that

17  they've drafted.

18          MS. DUNN:  Your Honor, respectfully, it is not

19  work product --

20          THE COURT:  Why not?

21          MS. DUNN:  -- and I'll tell you why.

22          It is work product when the preparer of the

23  work -- so if you think about hiring like an accountant or a

24  PR agency, the preparer of the work has to face a claim or

25  potential claim.  So the preparer has to anticipate

                                                          36

1    litigation.  And, here, that is not the case.  Here, the

2    agencies have universally testified they are not

3    anticipating litigation at this stage.  And there's no

4    evidence that the DOJ told them that we're anticipating

5    litigation.  These are factual inquiries.  And if the DOJ's

6    theory was right and that was work product, it would extend

7    to the entire investigative file, and there wouldn't be

8    statutes and manuals that say we can have it.  It is not

9    work product.

10           Work product is when a lawyer -- and these are

11   closed cases.  When a lawyer hires a PR person, an

12   accountant, some agent to go do something for them, and that

13   person gathers information, and sometimes even then the

14   facts they've gathered are discoverable.  And, here, that

15   is, you -- they are the preparer -- and this is in *RLI* and

16   *National Union* and all of the cases on this -- that the

17   preparer has to face a claim or potential claim.

18           Now, the main point I'm making on this, Your

19   Honor, is that these cases are just an ill fit.  Like, the

20   investigatory stage is not the stage when the agencies are

21   being deployed as if they're agents of the DOJ lawyers.

22   That is not what's going on.  And I think if you reviewed

23   the coms, you would see that they're just saying, hey, we're

24   looking for information.  They're not saying, please, we're

25   going to litigate, do our work for us and report back.

                                                              37

1   That's not -- that was not the purpose, and that's not the

2   relationship between the preparer of information and the

3   Antitrust Division.

4          And, in any event, there's -- all the evidence in

5   the record is to the contrary, that they're not anticipating

6   litigation at this stage.  And the same Justice Department

7   division expressly made this exact distinction in *Booz Allen*

8   where they say there's an investigative stage and a

9   post-filing stage.  It was exactly the same thing.  And if

10  you look at the Judge's conclusions on work product in that

11  case, as I know you have, she doesn't take a long time with

12  them.  She says the other party -- in this case the Google

13  analog -- was seeking only the fact work product.  Only the

14  fact work product.  And so that's similar here.

15         THE COURT:  I mean, in that case, the Judge found

16  it was work product and that there was a substantial need

17  for it.

18         MS. DUNN:  Actually, in that case -- I apologize,

19  Your Honor.  In that case, she did not find it was work

20  product.  What she did was under -- let's look --

21         THE COURT:  "The defendants have established a

22  substantial need and inability to secure factual information

23  about alternative needs.  They do not need to get opinion or

24  work product."

25         MS. DUNN:  She doesn't really decide.  She

                                                              38

1   assumes -- at the beginning of the case, she assumes without

2   deciding about deliberative process and goes through the

3   substantial need analysis, which is very similar to this

4   case.  It's an issue of relevant market.  The litigation

5   proceeds at breakneck pace.  Oh, the other factor is, is the

6   DOJ a party.  Right.

7           And then -- and so she concludes in the context of

8   the deliberative process privilege that there's substantial

9   need.  And so by the time she gets to work product, all she

10  really says is that the defendants do not seek opinion work

11  product and do not challenge any redactions for mental

12  impressions.  And then she offers to look at anything

13  questionable for mental impressions in camera.

14          There's another case, Your Honor, I just want to

15  flag for Your Honor on the same topic, because a lot of this

16  I think does hinge on this distinction of opinion versus

17  fact.

18          *In Re: Lumber Liquidators*, in that case, there

19  were special tests performed during an investigation by

20  previously hired agent, and even those did not qualify as

21  opinion; those still qualified as facts.  Here, we're not

22  even asking for recommendations or opinions; we're just

23  asking for the factual information that the agencies gave.

24          So that's Category 1, and I'm glad, actually, to

25  have looked at the *Booz Allen* case on substantial need,

                                                              39

1    because I think this issue of the government being a party

2    is obviously present here and relevant to that -- to that

3    calculus.  The same with the limited depositions and the

4    need -- she goes into detail about why you would want

5    documents for use in depositions.  That's Category 1.

6         Category 2 is communications between the FAAs --

7    oh, I should also say, Category 1 includes communications

8    with FAAs and non-FAAs.  They're agencies that don't even

9    end up being damages-seekers or parties in this case.  So

10   they're just third parties.  So that seems -- you know,

11   obviously very hard to distinguish that from any third

12   party.

13        Category 2 is communications between the FAAs and

14   their ad agencies.  Now, this is -- this is where I was

15   saying that there's no case where the work product doctrine

16   will be used to shield a third party's fact-gathering

17   efforts that are not retained by counsel, and when the agent

18   is previously retained not by counsel for an entirely other

19   purpose.  And the DOJ has communicated to us that these ad

20   agencies are not under their control, they're independent,

21   and that the only contract that exists is for digital ad

22   purchases.

23        So this -- you couldn't -- they have not cited

24   any, and I can't actually imagine a case where an agency

25   previously hired for a non-litigation purpose, not by a

                                                           40

1    lawyer, not doing anything having to do with the litigation

2    that's gathering facts at an agency's request, somehow that

3    ends up being privileged.

4            THE COURT:  Well, privileged or protected under

5    the work product doctrine.  That's the issue, and there are

6    cases --

7            MS. DUNN:  Your Honor --

8            THE COURT:  -- that do that.

9            MS. DUNN:  -- I'm unaware of any case.  I mean, I

10   would be happy to discuss any case, but I have not seen any

11   case.  And I am talking about work product -- that was a

12   very good correction; I apologize -- where there's an agency

13   previously hired for a non-litigation purpose by a

14   non-lawyer that's just gathering facts, not opinions and not

15   recommendations, and that that is somehow attorney work

16   product within the zone of privacy.  And I think when you

17   layer on that -- this investigative phase and the fact that,

18   you know, the investigative file is required to be turned

19   over, I don't -- it's very hard to imagine that that could

20   be work product.

21           The third category is a small category, it's

22   interagency communications with no lawyer on them.  So we

23   are not seeking any interagency communications between the

24   agency lawyer and the agency employees.  Those would

25   obviously be privileged.  But, here, there are some

                                                         41

 1   communications which are coms between agency non-lawyers

 2   that would not be privileged.  And that's not a huge number.

 3             For both Category 2 and Category 3, the record is

 4   the Wolin declaration where he says coms made in direct

 5   response to my questions.  And this is a very sweeping

 6   concept of work product and privilege that somehow the DOJ

 7   can call -- the Antitrust Division can call somebody up, ask

 8   for facts, and then anything that that triggers -- if that

 9   triggers a call to a contractor to get facts, that that is

10   within the zone of privacy of the attorney work product,

11   especially in the Fourth Circuit where every case -- as I'm

12   sure Your Honor is aware, as every case stresses how the

13   privilege is narrowly construed and limitedly recognized.

14             And so this is -- you know, it's sort of like a

15   seriatim theory of privilege where if they ask for facts in

16   their investigative stage, don't say, you know, not in

17   anticipation of litigation from the point of view of the

18   preparer, that those communications and then every

19   communication down the line ends up being privileged.

20             I don't know if Your Honor is interested in

21   hearing about the deliberative process privilege, but the

22   cases on that are *Ethyl Corp. v. EPA*, *Moore-McCormack Lines*,

23   both Fourth Circuit cases.  And those make clear that to be

24   within the deliberative process, it really -- the

25   deliberative process privilege is really concerned with the

                                                                42

1    exercise of policy discretion.  And this is also an issue

2    that the *Booz Allen* Court confronted.  And she went through

3    an entire balancing test that the government just entirely

4    ignores.  They say that the *Booz Allen* case is only about

5    the need for documents in a deposition.  That's Footnote 8

6    of their brief.  But she cites to *Ethyl Corp.*, which says

7    that the materials at issue have to bear on formulation or

8    exercise of policy-oriented judgment.  And that's, you know,

9    how the deliberative process privilege is generally

10   understood.

11           THE COURT:  Okay.  Anything else?

12           MS. DUNN:  Not if Your Honor does not have any

13   questions.  I also do not know if it is helpful for me to

14   enumerate for Your Honor at some point what we are seeking.

15   We have --

16           THE COURT:  Well, you've said that in your briefs;

17   right?

18           MS. DUNN:  Yeah.  Thank you.

19           THE COURT:  I'll hear from the government.

20           MS. CLEMONS:  Thank you, Your Honor.

21           The Department of Justice is empowered by statute

22   and regulation to be counsel to the United States and its

23   component agencies.  And the Attorney General is vested with

24   the authority to bring claims on behalf of the United States

25   and has delegated that authority to the Antitrust Division

43

```
1    for the purposes of bringing antitrust claims, specifically

2    at issue in this particular motion, the antitrust claims for

3    damages on behalf of the United States and its component

4    federal agencies when it's injured in its business or

5    property by antitrust violations.

6              So counsel for Google mentioned that they agree

7    that intra-agency counsel, the in-agency counsel,

8    communicating with employees of a federal agency are

9    attorneys for that federal agency and that those

10   communications are privileged but compares the Department of

11   Justice, which is statutorily retained, essentially, to be

12   the lawyers for the United States and its agencies,

13   discounts that relationship, that attorney/client

14   relationship, between the Department of Justice and the

15   agencies.

16             The Department of Justice was providing advice and

17   counsel to these federal agencies regarding damages in this

18   case.

19             THE COURT:  Where do I have that in the record?

20   Other than what -- I mean, you've got testimony of people

21   who say out of the blue, didn't know anything about it,

22   never heard anything about this lawsuit until it got filed.

23             MS. CLEMONS:  Certainly.  Your Honor, they're the

24   individual employees.

25             THE COURT:  Well, these were taken -- it wasn't
```

```
 1    clear, but counsel for Google represented that these were

 2    30(b)(6) deponents.  Is that not right?

 3            MS. CLEMONS:  Your Honor, the first 30(b)(6)

 4    deposition of any federal agency occurred this morning.  I

 5    was on my way to the courthouse.

 6            THE COURT:  So these are not 30(b)(6) depositions?

 7            MS. CLEMONS:  These are not 30(b)(6) depositions;

 8    these are depositions of individual employees.

 9            And, in any case, I imagine that the individual

10    employees working at Google that may have gathered facts and

11    information and communicated with counsel for various

12    purposes related to this litigation were not aware -- fully

13    aware of Google's counsel's strategy with respect to this

14    litigation.

15            But that does not change the fact that these were

16    communications by counsel for the United States with

17    employees of the United States to gather information to

18    provide legal advice to the United States as to the scope of

19    its damages claims after a complaint was already drafted, as

20    is mentioned in the Wolin declaration, and it was after

21    there was already an exploration into whether and to what

22    extent the government would be seeking damages for injury to

23    its business or property.

24            These -- every single communication and material

25    that Google is requesting be compelled with this motion is
```

45

 1    within that time frame, was made for not just the purpose of

 2    litigation, but for the purpose of this specific litigation,

 3    these specific damages claims, and for the purpose of the

 4    United States to be able to -- or the Department of Justice

 5    to be able to advise the United States and its component

 6    agencies with respect to the scope of those damages claims.

 7              THE COURT:  Well, help me understand the

 8    difference as to why that isn't just part of the

 9    investigative file that you turned over for everything else.

10    I mean, if that's -- if that's the argument you're making,

11    why doesn't it include the entire investigative file?

12              MS. CLEMONS:  So the entire investigative file is

13    information gathered throughout the course of the

14    investigation, but the information gathered from these

15    specific agencies that were the subject or could have been

16    the subject of the damages claims in this case is classic

17    attorney/client communication, not broad investigation.

18    There's no allegation from Google or information anywhere in

19    the record that these were just general investigatory

20    processes, right, that we --

21              THE COURT:  The heading of the emails that are in

22    the privilege log says request for information, something

23    vague like that.  It's not like give me some factual

24    information about certain topics.

25              MS. CLEMONS:  Many of them do, Your Honor, yes,

                                                              46

```
1    but that does not change the fact that those

2    communications -- the information was being gathered for the

3    purposes of providing legal advice to the United States; it

4    was being gathered about --

5              THE COURT:  When did the attorney/client

6    privileged -- when do you say that there was an

7    attorney/client relationship with these agencies?  When was

8    that established in your view?

9              MS. CLEMONS:  So the United States Department of

10   Justice has an attorney/client relationship with the United

11   States.  It specifically has an attorney/client relationship

12   with the United States for the purposes of advising on

13   damages and potential damages, injury to the United States

14   business or property and whether that supports a damages

15   claim under the Clayton Act, Section 4A.

16             You know, there's no need for Your Honor to get to

17   the broader question of when, under a bunch of hypothetical

18   circumstances, attorney/client privilege may or may not

19   attach, because attorney/client privilege was definitely

20   attached at the point that the Department of Justice was

21   speaking with these federal agencies about these specific

22   claims and formulating and determining the scope of damages.

23             THE COURT:  How do I know that?  You're just

24   telling me it's true, so it is true?  I mean, I don't know.

25   I'm trying to understand.
```

47

1          I know you ended up filing a lawsuit on their

2     behalf in January, but I don't know when it was that that

3     relationship actually was consummated, so-to-speak.

4          MS. CLEMONS:  That relationship already existed,

5     Your Honor.

6          THE COURT:  Well, you know, obviously you

7     represent agencies in a lot of different matters.

8          MS. CLEMONS:  Yes.

9          THE COURT:  And the attorney/client relationship

10    in one matter doesn't necessarily carry over to every matter

11    that you're being investigated at any point in time.  So,

12    you know, there has to be some point where you, I guess,

13    make a determination that, you know, you're now, you know,

14    stopping the investigation and starting the trial

15    preparation material and we're having attorney/client --

16    and, you know, the *Booz Allen* case is one that, you know, I

17    think is favorable to Google in that regard.  Because DOJ at

18    that point said, okay, maybe not attorney/client up until

19    the time the lawsuit was filed, but certainly you've got

20    work product and deliberative -- you know, these other

21    things that are involved here.

22          So I'm just trying to understand what it is that

23    your position is as far as why those communications would

24    necessarily be attorney/client information.

25          MS. CLEMONS:  Because the United States Department

                                                              48

1    of Justice, specifically the Antitrust Division, is charged

2    with developing and identifying and advising the United

3    States and its component agencies with respect to whether

4    there are claims for damages for antitrust violations.  And

5    so when the United States Department of Justice determines

6    that there may be a violation that has damaged the United

7    States and its business or property, the communications in

8    order to provide legal advice with respect to whether those

9    claims exist and the scope of those claims is communication

10   within the attorney/client relationship.

11          THE COURT:  Even though the client doesn't know

12   what you're doing or asking for the information?  How could

13   it be an attorney/client relationship if the client doesn't

14   know what the reason is behind the request?

15          MS. CLEMONS:  The client in this case, Your Honor,

16   is the United States, and the client, the United States, was

17   well aware of the reason behind the request.  And the -- you

18   know, the Wolin declaration testifies to that fact, but --

19          THE COURT:  Well, who's the -- if the client is

20   the United States, then who -- I mean, DOJ is the lawyer,

21   and the United States is the client?  Is that what your

22   analysis is?

23          MS. CLEMONS:  Yes, Your Honor.  And that is --

24   that is set out in 23 U.S.C. 516 that the Attorney General

25   is the lawyer for the United States.

                                                           49

1               And for this specific purpose of evaluating

2    whether -- whether and to what extent damages claims could

3    be brought on behalf of the United States, the

4    communications between the United States' counsel and the

5    components of the United States that may have been injured

6    are classic attorney/client communications and investigation

7    of claims that the United States was seeking to bring.

8               THE COURT:  What are your requirements to turn

9    over information in the investigative file?

10              MS. CLEMONS:  So we do have -- under the Antitrust

11   Division Manual and Civil Process Act, we do have

12   obligations to turn over facts gathered -- certain facts

13   gathered during the investigative phase, but there is no

14   obligation to turn over attorney work product or

15   attorney/client communications.

16              I think it's worth noting, Your Honor, that every

17   single document and set of materials that Google has

18   challenged would not have been created, not only but for

19   this litigation, but, but for the very specific need for the

20   Department of Justice to provide counsel to the United

21   States and these specific agencies regarding the scope of

22   potential damages claims in this case.

23              THE COURT:  And why -- help me understand your

24   argument about those that you're not seeking damages being

25   different from those you're seeking damages.  What's your

                                                              50

1   position there?  Because they're obviously not parties,

2   so-to-speak.

3          MS. CLEMONS:  They are not parties, but the reason

4   that they are not parties is because of strategic decisions

5   made by counsel for the United States and advice provided to

6   the United States and those agencies with respect to whether

7   or not they should be parties.  Parties for the purposes --

8   sort of purposes for purpose of discovery in this case.

9          THE COURT:  What limitations, if any, has the

10  United States put on the ability of Google to obtain

11  information about how ads were purchased, the relationship,

12  whether, you know, the agencies are direct purchasers?  And,

13  again, I'm sort focusing on the substantive information as

14  to how that advertising process works.

15         MS. CLEMONS:  None, Your Honor.  And the

16  depositions that have been taken of individuals so far have

17  focused in large part on information such as the ordinary

18  course of their advertising purchases and their

19  relationships with their ad agencies.

20         The government -- the federal agencies have

21  produced, through the United States Department of Justice,

22  millions of pages of documents that describe the ordinary

23  course, use and understanding of their purchases of

24  advertising.

25         The facts that Google is claiming are just facts

                                                            51

1    are really work product material that they're seeking that

2    show the mental impressions of counsel and the strategic

3    decision-making of counsel regarding which facts to gather

4    in order to assess the specific damages claims on behalf of

5    those agencies, which facts were important to that

6    determination.

7           There is -- Google has not, you know, met its

8    burden to show that these facts, facts about market

9    definition, for example, are not otherwise available.  They

10   have asked questions during depositions.  I presume they

11   will continue to ask questions during depositions that go to

12   those very issues.  And they have been receiving information

13   not only from the United States and those federal agencies,

14   but from countless third parties related to this litigation

15   as well.

16          THE COURT:  Let me just ask you this scenario.

17          If you have a document request -- and I think it's

18   Number 12 that asks about ad buys and things like that.  If

19   you have been provided information from an advertising

20   agency about ad buys and it's within your -- and it just

21   shows this is the information about ad buys, why wouldn't

22   that be information that should be produced and provided to

23   the defendant in this case?

24          MS. CLEMONS:  Where that information was very

25   specifically requested by counsel of its client, not by

                                                              52

1    counsel just going out to the ad agency asking for general

2    information, but information the client was gathering for

3    counsel in order to render legal advice.  The composition of

4    that information, the scope of what information was

5    requested, and the format in which that was requested, do

6    reveal the strategy, the legal impressions of counsel as to

7    what is important.

8            There is -- there is not a clear black-and-white

9    line between fact work product and opinion work product when

10   the -- when counsel is asking for compilation of certain

11   facts in certain ways in order to render legal advice.  And,

12   in this case, the ad agencies -- the very limited

13   communications with ad agencies by the federal agency

14   employees about the types of information that those ad

15   agencies were contracted to retain and be knowledgeable

16   about on behalf of those federal agencies.

17           THE COURT:  Well, I'm not sure I understand that

18   completely.  Help me -- go back over that again.

19           Request Number 12, you know, purchase of open web

20   display advertising and the use of the advertising.  So you

21   have information that has been provided to you by your

22   advertising agencies relating to that request.

23           You say you don't have to produce that

24   information?

25           MS. CLEMONS:  Your Honor, anything provided in the

53

```
 1    ordinary course of business -- and there are millions of
 2    documents provided in the ordinary course of business -- is
 3    being turned over through discovery.  This is a very, very
 4    small subset of information, information gathered with the
 5    assistance of an advertising agency to put together
 6    responses by the federal agent client for counsel at -- made
 7    at the request of counsel.
 8         THE COURT:  You still have the obligation to
 9    provide that information; right?
10         MS. CLEMONS:  That information --
11         THE COURT:  The information is now within your
12    possession, custody or control.  You've reached out and
13    you've gotten that information, and it's now within your
14    possession, custody or control, they're asking for it.
15         MS. CLEMONS:  They are asking for it, Your Honor,
16    but it is -- it is protected work product, and we have -- we
17    have obligations to log protected work product, and if there
18    are facts that Google believes that it cannot get any other
19    way -- facts, not opinions, not discussions with counsel,
20    not determinations of what counsel thought was important in
21    that moment to assess its claims, but facts -- then those --
22    then those facts -- they have to show that they can't get
23    those facts in any other way.
24         And if the fact is the amount of purchases,
25    there's innumerable sources of evidence for the amount of
```

54

1   purchases.  The real fact -- they're not just asking for

2   the -- just the numbers, right, or something like that.

3   They are asking for all of the communications, all of the

4   documents created at the request of counsel by federal

5   agencies with the assistance of their ad agencies.  And this

6   is a very, very limited subset of information gathered, not

7   for the purpose of generally investigating the case, but for

8   the purpose of assessing with respect to that federal agency

9   whether and to what extent the United States was injured in

10  its business or property.

11          THE COURT:  So you're saying that any time a

12  lawyer asks for someone to get them information and it's

13  sent to the lawyer, that lawyer doesn't have the obligation

14  to then provide that information, whether in the same format

15  or whatever, in response to a discovery request?

16          MS. CLEMONS:  To be clear, Your Honor, it's not

17  any time a lawyer asks for any information and any

18  circumstance.  Right.  All of these privilege and

19  work-product issues are very fact-specific and

20  circumstance-specific.

21          But the compilation and curation of specific

22  pieces of information that reveal the counsel's strategy and

23  information that they thought was particularly important for

24  assessing a particular legal issue, that is work product.

25          It's the -- it's -- the underlying facts are not

55

1    themselves protected outside of that circumstance, but when

2    they've been put together into a piece of work product that

3    cannot be separated from the request of counsel and the

4    purpose of counsel, then they are protected.

5         And the questions that have -- many of the

6    questions that have been asked during the depositions that

7    have occurred so far have not just been did the Department

8    of Justice direct you with respect to information-gathering;

9    they've been specific questions about what the Department of

10   Justice wanted.

11        THE COURT:  Well, you've told them not to answer

12   those questions, too, some of them.

13        Did you get instructions -- you instructed them

14   not to answer those kinds of questions; right?

15        MS. CLEMONS:  When the questions were about

16   specific pieces of information.  Right.  So a document

17   sitting in front of a witness saying did your -- did your

18   counsel direct you to get this document or this specific

19   information from some specific source.

20        But I want to -- I want to emphasize, Your Honor,

21   that these are -- these -- you know, this issue of facts

22   gathered under these very limited narrow circumstances for

23   these limited narrow purposes from ad agencies is only a

24   very small portion of what Google is seeking to compel here,

25   which is all of the communications between the Department of

56

1    Justice and its clients, between -- and work product and

2    information created for the purpose of assessing the damages

3    claims in this lawsuit.

4              THE COURT:  Okay.

5              MS. CLEMONS:  Google is also requesting that we

6    now log -- this is part of their motion, that the Department

7    of Justice log every communication with just counsel for

8    these agencies to the same ends, presumably, so that they

9    can try to determine what counsel's strategy was and opinion

10   work product.

11             THE COURT:  Thank you.

12             Ms. Dunn, anything else you would like to add?

13             MS. DUNN:  Yes, Your Honor.

14             Your Honor, with the Court's indulgence, I'll

15   start with the government started, which is it sounds like

16   their position is that all federal agencies are clients all

17   the time.  And there are two cases that we cite with respect

18   to that.  One is *Cayuga Nation*, an opinion by Amy Berman

19   Jackson; and the other is the *Stonehill* case.  And in both

20   of those cases, they recognize that the Department of

21   Justice, when there's a suit brought, is the lawyer for the

22   agency, but the *Cayuga Nation* case in particular recognizes

23   that the statute is permissive as to whether the Department

24   of Justice may be sent to attend to the interests of the

25   United States.  And so it is simply not the case that at all

                                                            57

1  times all agencies are in a client relationship with the

2  Department of Justice for the purpose of the attorney/client

3  privilege.  And, in fact, the cases say that the test that

4  normally applies has to be applied where the client has to

5  be knowing that it's seeking legal advice, a confidential

6  relationship.

7         Now, the Department also said that the DOJ was

8  providing advice.  The Wolin declaration never says this,

9  and this is nowhere in the record.  Again, this is their

10  burden.  If the DOJ does provide advice, they could redact

11  that.  I don't think that's what will be found in these

12  documents.  But that's not what we're seeking; we don't want

13  their advice.  But, again, it's their burden.  Nowhere in

14  the record is there evidence.

15         And, in fact, the Wolin declaration is very

16  particular in not saying that.  It talks about these were

17  information-gathering exercises.  It does not say these

18  are -- you know, it doesn't even say there's an

19  attorney/client relationship.  It does not say those things

20  because -- presumably because it wasn't the case.  I think

21  if they could say those things, they would be in the

22  declaration.

23         Now, with respect to anticipating litigation, the

24  Department's responsible.  The United States was aware.

25  Well, under the cases, that's not sufficient.  So, first of

                                                        58

```
 1    all, the rule itself says it's the party's representative --
 2    either the party or the party's representative, right, is
 3    going out to create this work product.  And one thing that
 4    has struck me as I've read all these cases, Your Honor, is
 5    it talks about work product being prepared.  It's always
 6    about it being prepared.  So the cases National Union and
 7    RLI that are in the Fourth Circuit, they talk about the
 8    preparer needing to anticipate a claim, anticipate
 9    litigation.
10            So these cases are even an ill fit, and the rule
11    is an ill fit because it's not -- here we don't have a party
12    representative going out to do work for the attorney, as the
13    case generally applied to; we have an information-gathering
14    exercise from an entity that -- where the witnesses have
15    uniformly testified they are not anticipating litigation.
16            So it's -- even by -- even if Your Honor decides
17    the work product rule applies, notwithstanding the fact that
18    these are not party representatives out to do work for the
19    lawyer, the preparer has to be aware under Fourth Circuit
20    precedent.
21            I think the other statement by the DOJ that
22    highlights the untenability of their position under the law
23    is the idea that non-party agencies are clients.  These are
24    third parties.  They're not parties to the lawsuit; they
25    were really sources of information.
```

                                                                    59

1           Now, I do think it is helpful that -- I heard the

2    Department counsel acknowledge their obligation to hand over

3    the investigatory file, and --

4           THE COURT:  Non-privileged information in the

5    investigatory file.

6           MS. DUNN:  Yes, Your Honor.  Except for

7    information that is privileged.

8           But there is no argument from the Department that

9    contradicts the record evidence that they have provided that

10   this is fact-gathering.  There's really been nothing that's

11   been pointed to in the record -- again, it's their burden --

12   that says these are anything beyond facts that are being

13   gathered.

14          Now, I want to also point out, we are not aware of

15   any compilation of a unique mix of information that counsel

16   just referred to.  We really believe these agencies were

17   just responding with information that they had based on

18   their experience and that their agencies had.  And the Wolin

19   declaration sets out the standard of comments made in direct

20   response to my questions.  So we don't expect that these

21   will be compilations by agency lawyers designed for

22   litigation; they're really just the facts, and that's what

23   we're interested in.

24          To Your Honor's question about has the government

25   been providing us with all the information that we need, we

                                                              60

1   have asked three times for them to supplement Rog.

2   Number 14, which is about direct purchases of open web

3   display advertising from counsel.  And to date, the DOJ's

4   response is, FAAs purchase ad tech services.

5           So we are not getting all the information that we

6   need, and I -- but I do stand by my prior argument that

7   given that we are going to have a trial in this case, and we

8   are going to have -- these are our witnesses.  These are the

9   eight agencies that they have injected into this lawsuit.

10  They are who we have.  And their experience in the ad

11  market -- and these are the -- you know, these are the

12  people we have, they're on the correspondence.  These are

13  the people that are going to establish what the basis of the

14  government's case is as far as ad purchases and ad buying.

15          So we can ask questions of them, and we do,

16  obviously, but I really don't think it can be overstated the

17  importance of documents and communications and facts that

18  were -- that were provided -- to which we're statutorily

19  entitled -- when asked these questions in the first

20  instance, and the communications of the agencies that are

21  responding.  I mean, we have to have a way to hem the

22  witnesses in, and we have to have a way to remind the

23  witnesses what they're talking about.

24          So I do think that, you know, we can just have

25  examinations without documents, but, Your Honor, documents

61

1    are very important when you're examining witnesses on the

2    stand, as I know Your Honor knows.  And here is going to be

3    no exception when these are witnesses prepared by the

4    government seeking damages.  We need to be able to examine

5    them.

6              So I -- one other piece I want to respond to is

7    this idea of opinion work product, because it did sound like

8    the Department of Justice is taking the position that when

9    their lawyer asked a question, everything that came back

10   reflected his mental impressions and his decision-making.

11             Their Opp. 7 says:  "Information in the

12   communications included the nature and extent of purchases

13   of digital advertising by agencies."  "Nature and extent of

14   purchases."  That's from their opposition.  That's what

15   we're looking for.  That is not mental impressions.

16             Wolin paragraph 8:  "Communications undertaken to

17   gather information about digital advertising."  And I will

18   say, one of the reasons that the balancing test that the

19   Court goes through for the deliberative process privilege

20   and that the *Booz Allen* Court did talks about whether the

21   government is a party.  And that's because when any party

22   gathers information, that is discoverable by the other

23   party, and they don't want to give the government a leg up

24   because it's -- just because it's the government when it's a

25   litigant.  And here in this case, it's not just a litigant;

                                                              62

```
 1    it's a damages-seeking litigant.  This is a civil case for
 2    damages; these are the damage-seekers.
 3          So, in any other case, if we were not sitting
 4    across the table from the Department of Justice and the
 5    agencies who are seeking damages, we are just a
 6    damages-seeker and they had information that was the facts,
 7    we would be entitled to that.  And so we should not be
 8    disadvantaged in this civil litigation, and that is why that
 9    is a part of the balancing test of substantial need, in
10    addition to the idea that, you know, as Judge Brinkema said
11    when this case set off, it's breakneck pace.  We are in
12    depositions all the time.  We don't have that many of them.
13    And we can't possibly depose all the federal agencies that
14    gave information to the DOJ, we can't possibly depose all
15    the ones that aren't parties, as well as the ones that are
16    parties, and we truly cannot possibly depose all the ad
17    agencies as well.  I mean, we have 20 non-party depositions.
18    So it's just not feasible to do that.
19          So, Your Honor, those are the primary points I
20    wanted to get to in rebuttal.  I'm happy to answer obviously
21    any additional questions.  But I really want to end where I
22    began, which is, I assure you, Your Honor, we would not be
23    here if we didn't think this was crucial and if we thought
24    we could just make up for all of this at trial.
25          It's -- you know, in order for experts to opine on
```

                                                                 63

1    relevant market, they need facts in the record at trial.  In

2    order to present the issue to the Judge eventually upon

3    relevant market -- which if their relevant market is wrong,

4    this whole case goes away.  The whole case goes away.  And

5    those communications where, you know, the one analogous

6    communication we have by the OIG, the one you saw, the

7    government is saying to the agency, the agency doesn't know

8    what they're talking about when they say third parties, and

9    the government says, no, we're not asking about Facebook or

10   Amazon or TikTok -- they mention at least two of those

11   three, maybe all three -- we don't want your information

12   about those, even though that's what the agency might think.

13        That communication goes directly to what we need

14   to show about relevant market.  These are people in the

15   market, and they're -- it's not going to be every witness in

16   the market.  These agencies are in the market.  Okay.  And

17   that's who we have, and that's who they have put into this

18   case.

19        And so if there are more documents like that in

20   this pile -- which I hope, Your Honor, if there's any

21   ambiguity, would review them in camera.  If there are

22   documents that are saying by the government, we don't care

23   about Facebook, that's not something that we conclude in the

24   market, that goes directly to our contesting the market that

25   they have established.  And when the agencies say that's not

                                                              64

```
 1   who we think of when we think about third parties, that's
 2   not how we go about ad buying.  And when the agencies come
 3   back who ad buy for a living -- who we can't depose all of
 4   them because of limited depositions -- and they say the same
 5   thing, that is critical evidence that we need for this case,
 6   Your Honor.
 7           Look, it's a hard case, and the critical issues --
 8   and it's not just a hard case; it's a case that is going to
 9   define permanently -- it's a path-breaking case that will
10   define permanently what this market looks like.  And as you
11   know, the government is seeking to break up the company.
12           So this is not a light ask that we're making.
13   These documents go directly to that, to that critical issue
14   of market.  It goes directly to whether a jury is even
15   available to them.  We can't even get to trial and work this
16   out.  We need to know beforehand whether or not they hire
17   direct purchasers, information we cannot get, apparently,
18   through our interrogatories.
19           So I don't want Your Honor to think that these are
20   not -- what we said is true; there's a reason we put it in
21   the first paragraph.  It is crucial, we believe, to our
22   defense of the case on both the damages component and also
23   the case overall, because there's no civil antitrust case
24   that can go forward without the government proving its
25   relevant market.  And so far in the analogous documents
```

                                                        65

1    we've seen, they can't.

2              And having one document between one OIG and one

3    agency is fine, we're happy to have that one, but if there

4    are more out there for these agencies and how they reacted

5    when they were presented with, you know, this concept,

6    that's, like, you know -- that's extraordinarily probative

7    for us.

8              And we really appreciate Your Honor's time today.

9              THE COURT:  Were the depositions we were talking

10   about 30(b)(6) depositions or not?

11             MS. DUNN:  I apologize, Your Honor.  We are

12   taking -- I was incorrect about the --

13             THE COURT:  That's all I have.

14             MS. DUNN:  Yeah.  I apologize.

15             THE COURT:  Okay.  Well, I think I have a slight

16   better understanding of what the issues are in this case.

17             MS. CLEMONS:  Your Honor, if I could just --

18             THE COURT:  No.  No.  They're the movant.

19             MS. CLEMONS:  Okay.

20             THE COURT:  You had your argument; they had their

21   reply.

22             I'm going to end up having to take this under

23   advisement.  If I want to have additional argument next

24   week, I'll let you know by Wednesday, otherwise I'll try and

25   rule on the papers at some point, but I'm not prepared to do

                                                           66

1   it today.  There's too many open issues to try and figure

2   out what you all are really getting at in this case.

3           So I'll let you know by Wednesday if, in fact, I

4   need more argument on this in addition to the other motions

5   that are currently scheduled for next Friday as well.

6   Hopefully they may not be necessary, but just let me know on

7   that front.

8           I also want to let you know, I'm not hearing

9   motions on the 8th of September.  So to the extent you have

10  planning purposes or things like that, I'm not having court

11  on Friday the 8th.

12          I'm going to take a five-minute recess to take up

13  my other matter.  Thank you.

14              (Proceedings adjourned at 12:33 p.m.)

15              ----------------------------------

16  I certify that the foregoing is a true and accurate

17  transcription of my stenographic notes.

18                  _Stephanie Austin_

19                  Stephanie M. Austin, RPR, CRR

20

21

22

23

24

25

                                                            67