# EXHIBIT 14
# FILED UNDER SEAL

FILED PURSUANT TO COURT ORDER DOC. 354

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

UNITED STATES, et al.,        ) 1:23-cv-00108-LMB-JFA
                              )
    Plaintiffs,               )
                              )
vs.                           )
                              )
GOOGLE LLC,                   )
                              )
    Defendants.               )
_____)


VIDEOTAPED DEPOSITION OF

KENDALL OLIPHANT

August 9, 2023

9:32 a.m.


Reported by: Bonnie L. Russo
Job No. 6031956

HIGHLY CONFIDENTIAL

Page 2

1  Videotaped Deposition of Kendall Oliphant
2  held at:
3
4
5
6      Paul, Weiss, Rifkind, Wharton & Garrison, LLP
7           2001 K Street, N.W.
8              Washington, D.C.
9
10
11
12
13
14
15
16
17
18  Pursuant to Notice, when were present on behalf
19  of the respective parties:
20
21
22

Page 3

1  APPEARANCES:
2
3  On behalf of the Plaintiffs:
4     RACHEL ZWOLINSKI, ESQUIRE
5     VICTOR LIU, ESQUIRE
6     ALVIN CHU, ESQUIRE
7     UNITED STATES DEPARTMENT OF JUSTICE
8     1331 Pennsylvania Avenue, N.W.
9     Washington, D.C. 20005
10    rachel.zwolinski@usdoj.gov
11
12 On behalf of the Defendant:
13    MARTHA L. GOODMAN, ESQUIRE
14    ANNELISE CORRIVEAU, ESQUIRE
15    PAUL, WEISS, RIFKIND, WHARTON &
16    GARRISON, LLP
17    2001 K Street, N.W.
18    Washington, D.C. 20006
19    mgoodman@paulweiss.com
20    acorriveau@paulweiss.com
21
22

Page 4

1  APPEARANCES (CONTINUED):
2
3
4  Also Present:
5  Glen Fortner, Videographer
6  Michael A. Cannon, Chief Counsel for Economic
7  Affairs, United States Department of Commerce
8
9  Also Present Via Remotely:
10 Julia Wood, DOJ
11 Jeannie S. Rhea, Paul, Weiss, Rifkind, Wharton
12 & Garrison, LLP
13
14
15
16
17
18
19
20
21
22

Page 5

1           I N D E X
2  EXAMINATION OF KENDALL OLIPHANT          PAGE
3  BY MS. GOODMAN                    12
4
5
6
7
                  EXHIBITS
8
9  Exhibit 13  E-Mail Chain dated 1-17-23    48
10         CENSUS-ADS-0000244816-818
11
12 Exhibit 14  Integrated Communications    79
13         Contract
14         Version 2
15         10-5-18
16         CENSUS-ADS-0000387420-490
17
18 Exhibit 15  E-Mail dated 9-14-22         90
19         Attachment
20         CENSUS-ADS-0000248031-186
21
22

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

EXHIBITS (CONTINUED):

Exhibit 16  E-Mail Chain dated 6-9-20     149
    Attachment
    CENSUS-ADS-0000168193-195

Exhibit 17  Order 15 - Media Strategy     154
    2020 Census Integrated
    Communications Contract
    11-5-18
    CENSUS-ADS-0000709936-991

Exhibit 18  2020 Census     165
    Integrated Communications
    Campaign Update
    Congressional Staff Briefing
    5-1-20
    CENSUS-ADS-0000094975-010

Page 8

EXHIBITS (CONTINUED):

Exhibit 23  Order 15:  Media Buying     261
    Process for Census PMO
    CENSUS-ADS-0000696413-417

Exhibit 24  Department of Commerce     268
    U.S. Census Bureau
    Determination and Findings
    CENSUS-ADS-0000243622-625

Exhibit 25  E-Mail Chain dated 3-3-20     296
    CENSUS-ADS-0000204155-156

Exhibit 26  E-Mail Chain dated 7-7-22     274
    CENSUS-ADS-0000709244-246

Exhibit 27  E-Mail Chain dated 9-2-22     279
    Attachment
    CENSUS-ADS-0000710075-081

Page 7

EXHIBITS (CONTINUED):

Exhibit 19  Campaign Optimization     182
    Daily Report
    4-3-20
    Day 23 of Self-Response
    CENSUS-ADS-0000709885-897

Exhibit 20  2020 Census Integrated     199
    Communications Plan
    Final Report
    5-27-21

Exhibit 21  Award/ Contract     221
    8-24-16
    CENSUS-ADS-0000273284-378

Exhibit 22  2020 Census Integrated     244
    Communications Contract
    Acquisition Plan
    Master Contract YA1323-16-CQ-0003
    CENSUS-ADS-0000724090-113

Page 9

EXHIBITS (CONTINUED):

Exhibit 28  Order 15:  2020 Census     288
    Paid Media Campaign Final
    Buy List
    10-30-20
    CENSUS-ADS-0000080950-016

Exhibit 29  United States Census 2020     309
    2020 Census Evaluation Report
    CENSUS-ADS-0000074490-542

Exhibit 30  2020 Census Program Internal     312
    Memorandum Series:
    2023i.01.20c
    1-6-23
    CENSUS-ADS-0000074369-414

Exhibit 31  E-Mail Chain dated 12-7-22     322
    CENSUS-ADS-0000245053-055

Exhibit 32  Order for Supplies or     330
    Services
    CENSUS-ADS-0000075450-493

(Exhibits bound separately.)

3 (Pages 6 - 9)

Veritext Legal Solutions
800-567-8658                                                                 973-410-4098

FILED PURSUANT TO COURT ORDER DOC. 354

HIGHLY CONFIDENTIAL

Page 50

1 about agreeing to the terms of service for
2 Google ads?
3    A.   Yes.
4    Q.   Okay.  Mr. Benson -- well, first of
5 all, Mr. Benson, he is at Reingold.  What is
6 Reingold?
7    A.   Reingold is a small business that
8 was a subcontractor on the integrated
9 communications contract, specifically focused
10 on the purchase of digital advertising.
11    Q.   And when you say "they are a
12 subcontractor," who are they a subcontractor
13 of?
14    A.   The prime contractor of record was
15 VMLY&R.
16    Q.   So is it accurate to say there was
17 no contract directly between the census bureau
18 and Reingold?
19        MS. ZWOLINSKI:  Objection.  Form.
20 Foundation.
21        THE WITNESS:  Yes, that is correct.
22        BY MS. GOODMAN:

Page 51

1    Q.   Mr. Ryan -- Mr. Benson of Reingold
2 writes back:  "Kendall, please see attached
3 media authorization form example per our
4 conversation just now."
5        Do you recall a conversation with
6 Mr. Benson with respect to this request to him?
7    A.   Yes.
8    Q.   And what did you and Mr. Benson
9 discuss?
10    A.   Exactly the media authorization
11 form.
12    Q.   And -- and so what -- well, what did
13 Mr. Benson say in response to your questions?
14    A.   He said that every media
15 authorization form had that -- that disclaimer
16 in there -- or I'm not sure if it is called a
17 disclaimer but had that note in there
18 authorizing the particular agency to purchase
19 advertising.
20        As a subcontractor to VMLY&R, they
21 had the authority to purchase advertising on
22 behalf of the census bureau.

Page 52

1    Q.   Okay.  And does anything in the
2 media authorization form that is attached to
3 that e-mail say anything about Google?
4        MS. ZWOLINSKI:  Objection.  Form.
5        THE WITNESS:  Media authorization
6 forms only provide an authorization to expend
7 money in a specific media category, not to a
8 specific vendor.
9        BY MS. GOODMAN:
10    Q.   And so is it accurate that this
11 media authorization form does not say anything
12 about Google?
13    A.   Correct.
14    Q.   And is it accurate that this media
15 authorization form does not say anything about
16 what vendor to use for the purchase of, in this
17 instance, digital display, programmatic,
18 digital paid social, and digital add-opts, ad
19 serving?
20        MS. ZWOLINSKI:  Objection.  Form.
21        THE WITNESS:  That is correct.
22        BY MS. GOODMAN:

Page 53

1    Q.   Why doesn't it say anything about
2 what vendor he used for the purchase of these
3 categories of advertising?
4        MS. ZWOLINSKI:  Objection.  Form.
5 Foundation.
6        THE WITNESS:  If we are so
7 restrictive to direct funding to a specific
8 vendor -- well, let me change that.
9        We don't direct payment to a
10 specific vendor.  We ask the agencies to buy
11 media in that -- with that -- buy that type of
12 media, and we trust that our agencies who
13 negotiate the best price with whichever vendors
14 will give us or meet the requirements that we
15 need for that particular type of media to reach
16 the audience in the way we need to reach them.
17        That does not mean it has to be
18 Google.  It could have been somebody else.  So
19 we do not tie their hands by specifically
20 stating Google.
21        BY MS. GOODMAN:
22    Q.   In your conversation with Mr. Benson

14 (Pages 50 - 53)

Page 54

1  with respect to this document we're looking at,
2  Exhibit 13, did you say anything about the
3  request from Department of Commerce about the
4  use of Google ads?
5      MS. ZWOLINSKI: Objection. Form.
6      THE WITNESS: The only thing I said
7  was in here. He did not ask any further
8  questions. I did not offer any additional
9  information, but I like to clarify why I am
10 asking a question.
11     BY MS. GOODMAN:
12   Q.  Okay. Do you know why the
13 Department of Commerce was asking about the use
14 of Google ads and digital advertising in the
15 2020 census on January 17, 2023?
16     MS. ZWOLINSKI: Objection. Form.
17 Foundation.
18     THE WITNESS: I -- this would have
19 had to have come out of a conversation I had
20 with Mike and --
21     MS. ZWOLINSKI: Objection.
22 Objection. Privilege.

Page 55

1      The conversation -- so the
2  conversation, this came out of a conversation
3  between you and Mike, your attorney?
4      THE WITNESS: Yes.
5      MS. ZWOLINSKI: Yeah. Objection.
6  Privilege.
7      BY MS. GOODMAN:
8    Q.  Without answering with respect to --
9  I am not asking for my particular
10 communications between you and Mr. Cannon.
11     My question is as what this e-mail
12 says: "DOC is asking whether we use Google ads
13 in our digital advertising for 2020."
14     What is your understanding of why
15 DOC was asking that question?
16     MS. ZWOLINSKI: Objection. Form.
17 Foundation.
18     THE WITNESS: DOC asked a lot of
19 questions. It could have been anything. I
20 think it was -- my understanding is, it was
21 just what was said. Did we actually
22 understand, were we given -- did they give us

Page 56

1  the ultimate -- did we agree to the terms and
2  my understanding was that we did on the -- on
3  the media authorization form or MAF.
4      I -- yes, that was my understanding
5  of the conversation.
6      BY MS. GOODMAN:
7    Q.  Okay. Do you know why that question
8  was being asked in and around January 17, 2023?
9      MS. ZWOLINSKI: Objection. Form.
10 Privilege.
11     MS. GOODMAN: It's not calling for
12 privileged communications. I'm --
13     MS. ZWOLINSKI: It depends on which
14 -- where is her basis for knowing what question
15 was being asked, right? You are asking for the
16 reason the question is being asked, and I don't
17 -- that could be calling for privileged
18 information.
19     MS. GOODMAN: The way that I am
20 asking the question is not calling for a
21 privileged communication between Ms. Oliphant
22 and any counsel at the Department of Commerce.

Page 57

1      BY MS. GOODMAN:
2    Q.  My question to you is your personal
3  understanding. Do you have a personal
4  understanding one way or another about why this
5  question was posed to you in and around January
6  17, 2023?
7    A.  My understanding it was posed to me
8  because of my involvement with the media buying
9  for the 2020 census.
10   Q.  And do you know why Department of
11 Commerce was asking about Google ads and
12 digital advertising for the 2020 -- 2020 census
13 in January of 2023?
14     MS. ZWOLINSKI: Objection.
15 Privilege. If --
16     BY MS. GOODMAN:
17   Q.  If you can answer that question
18 without relying on privileged communications --
19 on communications between yourself and lawyers
20 for the Department of Commerce, that's what I
21 am asking for in your answer.
22   A.  I can't answer.

15 (Pages 54 - 57)

Page 58

1  Q. Is that because you only have an
2  understanding based on privileged
3  communications?
4  A. Yes.
5  Q. Okay. And with whom are those --
6  did those privileged communications take place?
7  A. Commerce lawyer, Mike Cannon.
8  Q. Any lawyers from the Department of
9  Justice?
10  A. No.
11  Q. Okay. Do you know what date this
12  lawsuit was filed?
13  A. Honestly, no.
14  Q. It was filed on January 24, 2023.
15  A. Okay.
16  Q. I will state that for the record.
17     So with that sort of time period in
18  mind, do you recall any conversations prior to
19  January 24, 2023, with any lawyers for the
20  Department of Justice with respect to using
21  Google in the census's digital advertising paid
22  media for the 2020 census?

Page 59

1     MS. ZWOLINSKI: Objection. Form.
2     THE WITNESS: I don't recall.
3     BY MS. GOODMAN:
4  Q. Is it typical in your day-to-day
5  work to speak with lawyers from the Department
6  of Justice?
7     MS. ZWOLINSKI: Objection. Form.
8     THE WITNESS: I do not speak to
9  anybody from Justice that -- I don't -- no, it
10  is not.
11     BY MS. GOODMAN:
12  Q. And so if you did speak with lawyers
13  from the Department of Justice, is that
14  something you might remember because it is not
15  usual in the course of your work?
16     MS. ZWOLINSKI: Objection. Form.
17     THE WITNESS: I may remember
18  speaking to them. I may not necessarily
19  remember timing.
20     BY MS. GOODMAN:
21  Q. Okay. And do you have any
22  recollection of a timing -- the timing during

Page 60

1  -- strike that.
2     What is your best recollection of
3  when, if at all, you spoke with lawyers from
4  the Department of Justice about the census
5  bureau's use of Google in the 2020 census?
6     MS. ZWOLINSKI: Objection. Form.
7     THE WITNESS: It would have had to
8  have been somewhere in the time frame of when
9  the -- when the suit was filed.
10     BY MS. GOODMAN:
11  Q. Do you recall any conversations
12  prior to January of 2023?
13     MS. ZWOLINSKI: Objection. Form.
14     THE WITNESS: I don't recall.
15     BY MS. GOODMAN:
16  Q. I will represent to you that the
17  United States Department of Justice has been
18  investigating Google's advertising practices
19  for the last three years. So over that --
20  meaning the '21 -- 2021, 2022, 2023.
21     In the years 2021 or 2022, do you
22  recall any conversation with any lawyer from

Page 61

1  the Department of Justice about census bureau's
2  use of Google for the 2020 census?
3  A. No.
4     MS. ZWOLINSKI: Objection. Form.
5     BY MS. GOODMAN:
6  Q. So as of January 17, 2023, that we
7  -- that you sent this e-mail to Mr. Benson, at
8  this time, did you anticipate participating in
9  litigation on behalf of the United States
10  against Google?
11     MS. ZWOLINSKI: Objection. Form.
12     THE WITNESS: I did not.
13     BY MS. GOODMAN:
14  Q. At this time in January of 2023, did
15  you have any knowledge or awareness of any
16  investigation by the Department of Justice of
17  -- of Google with respect to its advertising
18  businesses?
19     MS. ZWOLINSKI: Objection. Form.
20     THE WITNESS: Can you be more
21  specific?
22     BY MS. GOODMAN:

Page 62

1  Q.  Have you ever -- strike that.
2     To what extent, if any, were you
3  aware in January of 2023, that the Department
4  of Justice Antitrust Division was investigating
5  Google?
6     MS. ZWOLINSKI: Objection. Form.
7     THE WITNESS: I guess when they
8  actually filed the suit.
9     BY MS. GOODMAN:
10  Q.  And so prior to January 24, 2023,
11  when the Department of Justice filed the
12  lawsuit, you were not aware of any
13  investigation that the antitrust division was
14  doing of Google, correct?
15     MS. ZWOLINSKI: Objection. Form.
16     THE WITNESS: I honestly -- I don't
17  recall.
18     BY MS. GOODMAN:
19  Q.  You don't recall any awareness of an
20  investigation; is that right?
21     MS. ZWOLINSKI: Objection. Form.
22     THE WITNESS: I didn't recall when

Page 63

1  the lawsuit was filed, so the timing, I can't
2  -- no. I don't recall. I don't -- I'm not
3  aware.
4     BY MS. GOODMAN:
5  Q.  Prior to -- strike that.
6     In the course of your work as the
7  COR for Order 15, did you ever form a view that
8  Google's -- Google was engaging in
9  anticompetitive conduct?
10     MS. ZWOLINSKI: Objection. Form.
11     THE WITNESS: No, I did not.
12     BY MS. GOODMAN:
13  Q.  And did you ever seek the legal
14  advice of the antitrust division with respect
15  to any anticompetitive conduct on the part of
16  Google?
17     MS. ZWOLINSKI: Objection. Form and
18  privileged.
19     MS. GOODMAN: It's a yes or no
20  question. It's not privileged. I am asking
21  whether she sought legal advice.
22     MS. ZWOLINSKI: Objection. Form.

Page 64

1     THE WITNESS: No.
2     BY MS. GOODMAN:
3  Q.  So for the record, your testimony is
4  that you never sought the legal advice of the
5  antitrust division with respect to
6  anticompetitive on the part of --
7  anticompetitive conduct on the part of Google;
8  is that correct?
9  A.  That is correct.
10  Q.  Have you received a litigation hold
11  in this case?
12  A.  Yes.
13  Q.  And approximately when did you
14  receive that hold?
15  A.  For context. We have a lot going
16  on. I can't honestly tell you when I first
17  started hearing about it or when I first
18  started -- when I got the litigation hold.
19     If I go through my e-mail, I can
20  tell you, but off the top of my head, we have
21  way too many deadlines that we are trying to
22  meet for this to be -- until it became a big

Page 65

1  thing, a real thing, for it -- it just -- it
2  just seemed like it was information seeking, so
3  I don't know.
4     MS. ZWOLINSKI: Counsel, we've been
5  going over -- we've been going for over an
6  hour. Can we take a break.
7     MS. GOODMAN: Yeah, once I finish
8  this line of questioning, I am happy to break.
9     MS. ZWOLINSKI: How much time do you
10  anticipate that line of questioning taking?
11     MS. GOODMAN: A few more minutes.
12     MS. ZWOLINSKI: Okay.
13     BY MS. GOODMAN:
14  Q.  You -- in your prior answer, you
15  said that it seemed like it was just
16  information seeking.
17     What did you mean by that?
18     MS. ZWOLINSKI: Objection. Form.
19     THE WITNESS: We get asked questions
20  all the time. It was just responding to a
21  request.
22     BY MS. GOODMAN:

17 (Pages 62 - 65)

Page 66

1  Q. When you say "it was just responding
2  to a request," you are talking about what
3  specifically?
4  A. We can go back to the e-mail that
5  you provided, Bates census ad 0000244816. I
6  was asked a question. I followed up to make
7  sure that my answer -- that the answer I
8  thought was correct was actually correct. This
9  is standard procedures.
10  Q. And when you say "standard
11  procedures," can you elaborate?
12  A. If I am unsure of the answer -- we
13  don't purchase media. So if I am unsure of the
14  answer, I go back to the media buyers to
15  clarify before I provide an answer to whoever
16  is requesting that information.
17  Q. And when you receive a request from
18  the Department of Commerce, is that a standard
19  occurrence as well?
20  MS. ZWOLINSKI: Objection. Form.
21  THE WITNESS: For clarity, are you
22  asking is it -- is it a standard occurrence for

Page 67

1  me to receive requests from the Department of
2  Commerce?
3  BY MS. GOODMAN:
4  Q. Yes.
5  A. Yes.
6  Q. And is it a standard occurrence to
7  receive -- strike that.
8  Earlier in a prior answer, you also
9  said that -- when I asked you when you received
10  a litigation hold, you said that you receive
11  multiple requests and lots of things are going
12  on and you don't recall, but you -- do you
13  recall that testimony?
14  MS. ZWOLINSKI: Objection to form.
15  THE WITNESS: That was when I was
16  giving you context.
17  BY MS. GOODMAN:
18  Q. Okay. And you also said "until it
19  became a big thing, a real thing."
20  What -- what were you referring to
21  there?
22  MS. ZWOLINSKI: Objection. Form.

Page 68

1  THE WITNESS: Until the lawsuit was
2  filed and I was asked to participate --
3  formally asked to participate.
4  BY MS. GOODMAN:
5  Q. And so is it fair to say you were
6  formally asked to participate after the lawsuit
7  was filed?
8  MS. ZWOLINSKI: Objection. Form.
9  THE WITNESS: I don't recall.
10  BY MS. GOODMAN:
11  Q. And do you recall who asked you to
12  participate in the lawsuit?
13  MS. ZWOLINSKI: Objection.
14  Foundation.
15  THE WITNESS: Small group, but I'm
16  not sure who.
17  BY MS. GOODMAN:
18  Q. When you say "a small group," is
19  there sort of a group of potential people that
20  you are thinking of, it might have been one of
21  them?
22  A. No. I am really thinking about

Page 69

1  this.
2  It would have been legal counsel
3  through commerce, Mike Cannon.
4  Q. And as of January 17, 2023, in
5  Exhibit 13 that we are looking at, had you been
6  asked to formally participate in the lawsuit by
7  that -- around that time?
8  MS. ZWOLINSKI: Objection. Form.
9  THE WITNESS: I don't recall.
10  BY MS. GOODMAN:
11  Q. When you say you don't recall, do
12  you mean, I don't recall being asked prior to
13  January 17, 2023 to participate in this
14  lawsuit?
15  A. Define "participation."
16  Q. Well, how do you understand it?
17  A. Anytime -- my understanding of
18  participation is actually getting to the point
19  where I am here doing a deposition. That is
20  what I am considering participation.
21  Q. Would you also consider
22  participation in signing off on interrogatory

Page 70

1  responses?
2  A. Yes.
3  Q. Okay.
4      MS. ZWOLINSKI: Objection.
5      THE WITNESS: Sorry.
6      BY MS. GOODMAN:
7  Q. Would you also consider
8  participation collecting documents?
9  A. I consider collecting documents
10 responding to a request which is what we do all
11 the time. That does not necessarily mean
12 participation.
13 Q. Do you respond -- have you responded
14 to any requests to collect documents where the
15 requests were made by the Department of
16 Justice?
17     MS. ZWOLINSKI: Objection. Form,
18 and objection. Privilege.
19     MS. GOODMAN: I am asking whether
20 she had -- whether Ms. Oliphant has had to
21 collect documents at the request of the
22 antitrust division of the Department of

Page 71

1  Justice. That is not -- it's a yes or no
2  question. It does not call for privileged
3  legal advice or any fact or opinion or work
4  product. She can answer that question.
5      MS. ZWOLINSKI: You can answer.
6      THE WITNESS: Yes.
7      BY MS. GOODMAN:
8  Q. And when approximately in time do
9  you recall receiving any requests to collect
10 documents from the antitrust division of the
11 Department of Justice?
12 A. I don't know.
13 Q. Okay. Sitting here today, do you
14 recall any request to you to participate in
15 this lawsuit in the way that we have described
16 it prior to January 24, 2023?
17     MS. ZWOLINSKI: Objection. Form.
18     THE WITNESS: I don't recall.
19     MS. GOODMAN: Okay. We can take a
20 break now.
21     THE VIDEOGRAPHER: Going off the
22 record. The time is 10:49.

Page 72

1      (A short recess was taken.)
2      THE VIDEOGRAPHER: Going back on the
3  record. The time is 11:08.
4      BY MS. GOODMAN:
5  Q. Ms. Oliphant, did you discuss the
6  substance of your deposition with your counsel
7  on the break?
8      MS. ZWOLINSKI: You can say that --
9  just one second. Sorry.
10     MS. GOODMAN: It's again a yes or no
11 question.
12     MS. ZWOLINSKI: That isn't really
13 the relevant factor. Let me -- you can answer
14 that question but don't discuss the substance
15 of anything that we discussed.
16     You can answer whether or not you
17 discussed your deposition during the break, but
18 none of the substance.
19     THE WITNESS: Can you be more
20 specific in -- what do you mean. What do you
21 mean by discussing the deposition?
22     BY MS. GOODMAN:

Page 73

1  Q. Did you discuss with your counsel on
2  the break the matters to which you had
3  testified in the previous hour sitting here in
4  this deposition?
5  A. No.
6  Q. So earlier, we talked about a master
7  contract.
8      Do you -- what is the official name
9  of that master contract for the 2020 census?
10 A. It is the 2020 census integrated
11 communications contract.
12 Q. For shorthand, can we call that the
13 master contract today?
14 A. You sure can.
15 Q. And that contract -- the master
16 contract was issued to Young & Rubicam; is that
17 correct?
18 A. Yes. And you'll note that at some
19 point, they changed their name to VMLY&R.
20 Q. What is the best acronym to use
21 today for --
22 A. Prime.

Page 74

1  Q.  Prime contractor?
2  A.  Just prime contractor. That's easy.
3  Q.  Okay. And we'll refer to Young &
4  Rubicam which is also known as VMLY&R as the
5  prime contractor?
6  A.  Prime or Y&R, whichever works for
7  you.
8  Q.  Y&R?
9  A.  Yeah.
10  Q.  And various task orders were issued
11  under the master contract, correct?
12  A.  Yes.
13  Q.  And Order 15 which relates to paid
14  media, that was also issued to Y&R, correct?
15  A.  Yes.
16  Q.  And Order 8 under the master
17  contract, which relates to recruiting of census
18  workers, that was also issued to Y&R, correct?
19  A.  Yes.
20  Q.  Okay. Order 15, describe for me at
21  a high level what Order 15 covers.
22  A.  Order 15 covered the development of

Page 75

1  the media strategy, plans, purchasing -- I am
2  looking forward, strategy, plan, purchasing and
3  evaluation. By evaluation, that is comparing
4  planned versus actual.
5  Q.  When you say "planned versus
6  actual," are you referring to planned media
7  spend as compared to actual media spend?
8  A.  Yes.
9  Q.  Okay. And did Order 15 contemplate
10  Y&R entering into subcontracting relationships?
11  MS. ZWOLINSKI: Objection. Form.
12  THE WITNESS: For context. When the
13  communications contract was competed, Y&R --
14  when they were awarded the contract, the
15  contract -- they came with their entire team in
16  place.
17  The RFP for the contract
18  specifically requested the ability to create
19  messaging to reach numerous languages in their
20  native tongue.
21  The previous census -- well -- so
22  Y&R came to the table with their contractors

Page 76

1  already as part of their team with the
2  understanding that each contractor had a role.
3  You had a number of contractors that were
4  audience-specific and they were required --
5  their role was to create communications to
6  reach their audience because that was their
7  specialty, and in some cases, they also bought
8  media.
9  Most of the media they purchased was
10  local and hyper local. Y&R, the agency itself,
11  did not buy media. They brought subcontractors
12  on to plan and purchase the media.
13  BY MS. GOODMAN:
14  Q.  And that was permitted under Order
15  15, correct?
16  A.  Yes, it was.
17  Q.  And as a result, the census bureau
18  did not contract directly with any of the
19  subcontractors or entities who were purchasing
20  the media; is that correct?
21  MS. ZWOLINSKI: Objection. Form.
22  THE WITNESS: The census bureau

Page 77

1  contracted with Y&R and to -- to perform all
2  the requirements under the communications
3  contract, which included planning and
4  purchasing media. As such, Y&R contracted --
5  subcontracted with other agencies to assist
6  them. They were purchasing media on behalf of
7  the census bureau.
8  BY MS. GOODMAN:
9  Q.  And so those other agencies who were
10  purchasing media on behalf of the census
11  bureau, with respect to those agencies, there
12  is no contract between the census bureau and
13  those agencies who were purchasing media on
14  behalf of the census bureau, correct?
15  MS. ZWOLINSKI: Objection. Form.
16  THE WITNESS: No direct contracts,
17  yes, correct.
18  BY MS. GOODMAN:
19  Q.  And so after the master contract was
20  awarded, the communications contract, I think
21  you also referred to it, then Order 15 was
22  agreed to; is that correct?

20 (Pages 74 - 77)

Page 78

1   MS. ZWOLINSKI: Objection. Form.
2   THE WITNESS: Yes. It was awarded.
3   BY MS. GOODMAN:
4   Q.  And that was also as awarded to
5   Young & Rubicam?
6   A.  For context. The prime contract was
7   awarded to Young & Rubicam, and thus, all
8   orders under the prime contract are
9   automatically awarded to Young & Rubicam.
10  Q.  And Order 15 pertains to media
11  planning and buying, correct?
12  A.  Correct.
13  Q.  And so by virtue of Order 15,
14  pertaining to media planning and buying being
15  awarded to Young & Rubicam, there was no
16  separate order between the census bureau and
17  any other agency on whose -- who was making
18  paid media purchases, correct?
19      MS. ZWOLINSKI: Objection. Form.
20      THE WITNESS: Correct.
21      BY MS. GOODMAN:
22  Q.  And as part of agreeing to Order 15

Page 79

1   with Y&R, they had to complete a technical
2   proposal; is that correct?
3       MS. ZWOLINSKI: Objection. Form.
4       THE WITNESS: That is correct.
5       BY MS. GOODMAN:
6   Q.  And what does the technical proposal
7   entail?
8   A.  The government, the census bureau in
9   this case, defines the requirements. The
10  requirements are shared with Y&R and they
11  provide a proposal in response to those
12  requirements.
13      The census bureau or the government
14  reviews their proposal to make sure it's in
15  line with the requirements. If negotiations
16  are required, they are done between the
17  contractor, the contracting officer -- Y&R, the
18  contracting officer and the CORs before a final
19  proposal is accepted.
20      (Deposition Exhibit 14 was marked
21  for identification.)
22      BY MS. GOODMAN:

Page 80

1   Q.  So I am going to hand you what I
2   have marked as Exhibit 14,
3   CENSUS-ADS-0000387420 through 387490.
4       And take a look at it, and just --
5   can you confirm for me that this is the
6   technical proposal that Y&R submitted for Order
7   15?
8       Ms. Oliphant, you see the first page
9   says: "Integrated communication contract,
10  revised technical proposal, Version 2, October
11  5, 2018"?
12  A.  Yes, I do.
13  Q.  Okay. Any reason to doubt that this
14  is the technical proposal submitted by Y&R?
15  A.  I have no doubt this is the
16  technical proposal submitted from Y&R. For
17  context, every -- multiple technical proposals
18  were received as additional work was added. I
19  am verifying this was for the first initial
20  technical proposal.
21  Q.  Okay.
22  A.  That's --

Page 81

1   Q.  And sitting here today, do you
2   recall technical proposals issued with respect
3   to Order 15 after October 5, 2018?
4   A.  Yes. They would -- ideally, they
5   would be considered modifications, so it would
6   be -- if we wanted to do additional work for
7   some reason that was in scope of the order but
8   was in addition to what had already been
9   planned, approved and funded, Y&R would -- we
10  would have to provide the requirements to Y&R.
11      They would still have to provide a
12  technical and a price proposal. We would still
13  go through the same process. It should be
14  adequately or appropriately marked. I am just
15  making sure.
16  Q.  Okay. I want to direct your
17  attention to Page 6 of this document,
18  Bates-labeled 25 at the end.
19  A.  Uh-huh.
20  Q.  And in the first full paragraph
21  beginning: "Supplementing these workshops."
22      Do you see where I am?

Page 318

1  to reach people in the next census does it
2  matter to you to understand how effective open
3  web display advertising was in reaching your
4  campaign goals?
5      MS. ZWOLINSKI: Objection. Form.
6      THE WITNESS: Yes.
7      BY MS. GOODMAN:
8   Q.  And why is that?
9      MS. ZWOLINSKI: Objection. Form.
10     THE WITNESS: In the over -- we have
11 to evaluate every type of media and how
12 effective it was.
13     Again, most people do not remember
14 where they heard an ad. What the digital ads
15 that the -- the clickable ads allowed you to do
16 was to actually trace their steps. So it's a
17 little bit easier to determine if it generated
18 the action you wanted it to generate.
19     You can't do that necessarily
20 through TV or print or radio or out of home,
21 but that does not mean they were not as
22 effective at driving engagement.

Page 319

1      BY MS. GOODMAN:
2   Q.  And for purposes of understanding
3  the effectiveness of digital ads, nothing in
4  this document speaks specifically to open web
5  display advertising; is that correct?
6      MS. ZWOLINSKI: Objection. Form.
7  Foundation.
8      THE WITNESS: Not using the
9  terminology, no.
10     BY MS. GOODMAN:
11  Q.  And you don't use that terminology
12 because it's not something you've encountered
13 in the industry; is that right?
14     MS. ZWOLINSKI: Objection. Form.
15     THE WITNESS: It may -- I may have
16 encountered it in the industry, but in order to
17 ensure that everybody understood what we were
18 talking about, we used plain language and tried
19 to steer away from industry jargon, and that
20 would be considered industry jargon because
21 it's too broad of a category and doesn't -- we
22 understand digital way easier than we

Page 320

1  understand open display, if that makes sense.
2      In order to -- plain language is
3  extremely important, extremely important. And
4  to get the buy in internally and externally, we
5  need to be able to understand what we did and
6  be able to discuss what we did. And that
7  discussion could be held by anybody, so it
8  needs to be terminology that they can relate
9  to.
10     BY MS. GOODMAN:
11  Q.  And to your -- is it your testimony
12 that open web display advertising is
13 terminology that is not relatable?
14     MS. ZWOLINSKI: Objection. Form.
15     THE WITNESS: It depends on the
16 audience. It's not that it's not relatable.
17 It's just that you have to consider the
18 audience.
19     The bulk of those reviewing these
20 have no media background. They don't
21 understand. They understand digital. Their
22 watches are digital. Their clocks are digital.

Page 321

1  Their thermostats are digital. They don't
2  understand open web advertising.
3      BY MS. GOODMAN:
4   Q.  Okay. And if we turn to page ending
5  in Bates 86, this includes a table of
6  advertisement formats, correct?
7      MS. ZWOLINSKI: Objection. Form.
8      THE WITNESS: Yes.
9      BY MS. GOODMAN:
10  Q.  And none of the types listed -- none
11 of the formats listed here are specifically
12 identified as open web display advertisements;
13 is that correct?
14     MS. ZWOLINSKI: Objection. Form.
15     THE WITNESS: That is correct.
16     BY MS. GOODMAN:
17  Q.  And can you -- of the -- of the
18 items here in Table 2, which, from your point
19 of view, constitute open web display
20 advertising, if any?
21     MS. ZWOLINSKI: Objection. Form.
22 Foundation.

Page 322

1       THE WITNESS:  I don't know.
2       MS. GOODMAN:  And, Counsel, for the
3   record, we've not found the data underlying
4   this study in your productions, so we'd ask you
5   to produce it or direct us to the Bates number
6   where it's produced.
7       Okay.  Handing you Exhibit 31,
8   CENSUS-ADS-245053 through 55.
9       (Deposition Exhibit 31 was marked
10  for identification.)
11      BY MS. GOODMAN:
12   Q.   And this is an e-mail exchange with
13  yourself, Lizannette Vélez, and Steven Scheid,
14  correct?
15   A.   Scheid.
16   Q.   Scheid?
17   A.   Scheid.
18   Q.   And Steven Scheid is the author of
19  the digital study we were just looking at?
20   A.   He was one of them, yes.
21   Q.   And if I direct your attention to
22  your December 6, 2022 e-mail on the second

Page 323

1   page --
2    A.   Uh-huh.
3    Q.   -- you write that -- well, strike
4   that.
5       Mr. Scheid is asking if there is a
6   way to include in the requirements contract
7   specific data that you would want to receive in
8   order to analyze it, correct?
9       MS. ZWOLINSKI:  Objection.  Form.
10      THE WITNESS:  Yes.
11      BY MS. GOODMAN:
12   Q.   And your response to him is:  "The
13  limitation is we are asking for information
14  five years before it is needed, and so much can
15  change in that time frame."
16      Do you see that?
17   A.   Yes.
18   Q.   What did you mean by that?
19      MS. ZWOLINSKI:  Objection.  Form.
20      THE WITNESS:  We conducted market
21  research for the 2020 ICC in 2015.  That's five
22  years before the media runs.  A lot changes in

Page 324

1   five years.
2       So if we stick to the same schedule
3   for 2030, assuming we are doing a paid
4   communications effort in 2030, we would be
5   seeking requirements in Year 5, 2025, again,
6   five years before the actual census is done and
7   before the ads run.
8       We will reach out to him for the
9   requirements, but we will have to be very clear
10  in that the requirements he is asking for in
11  2025 may not make sense in 2030.  It may be --
12  what's -- what's collected may be different in
13  2030 than what he is -- because it may be a
14  completely different way of doing things,
15  different -- industry standards change based
16  upon the type of media and how media is
17  deployed on a regular basis.
18      So this is managing expectations
19  that we will absolutely reach out in a
20  requirements gathering session, because we
21  reach out across the bureau, but there is no
22  guarantee that what he is asking for he will

Page 325

1   get because things change.
2       BY MS. GOODMAN:
3    Q.   And with respect to digital
4   advertising specifically, what have you
5   observed in the course of your time at the
6   census bureau in terms of the pace of change?
7       MS. ZWOLINSKI:  Objection.  Form.
8       THE WITNESS:  Well, in 2000 we did
9   not use any digital advertising.  In 2010 we
10  used a very small percentage of digital
11  advertising.  In 2020 we used a significantly
12  more percentage of -- of the media buy for
13  digital advertising.
14      The way digital is evolving and,
15  just based upon my observations, with print
16  becoming more obsolete and moving to digital,
17  with TV moving to more digital- and
18  streaming-type deliveries, with radio moving
19  more from -- more from terrestrial to digital
20  or satellite, it would appear that the
21  trajectory for the use of digital would be
22  growing exponentially.

Page 326

1 But that is my opinion.  It's not
2 based on any real data that I can quote, and we
3 will do market research when we're ready to
4 start the process to determine.  And part of
5 that market research is reaching out to
6 industry experts about the direction of -- of
7 advertising and vehicles to use.  We don't
8 purport to know that ourselves.  We always ask
9 those questions.
10     BY MS. GOODMAN:
11     Q.   And Lizannette writes as well on
12 Page 1, and her second -- sorry.  In her third
13 paragraph, she writes:  "Since digital planning
14 analytics is something that is constantly
15 changing and evolving, my suggestion is to have
16 the staff from DSSD that will be working
17 directly with 2030 ICC sit down with the CNMP
18 analytics team."
19     Do you see that?
20     A.   Yes.
21     Q.   Do you agree with Mr. Vélez that
22 digital planning and analytics is something

Page 327

1 that is constantly changing and evolving?
2     A.   Absolutely.
3         MS. ZWOLINSKI:  Objection.  Form.
4         THE WITNESS:  Absolutely.
5         BY MS. GOODMAN:
6     Q.   And I'm sorry.  Flipping back to
7 your e-mail in the third paragraph, you write:
8 "We do not direct them in the solution because
9 given the speed with which this industry
10 changes, the contractor may be able to provide
11 a better solution than that which we have
12 determined."
13     What industry are you referring to
14 here?
15         MS. ZWOLINSKI:  Objection.  Form.
16         THE WITNESS:  The advertising
17 industry.
18         BY MS. GOODMAN:
19     Q.   Okay.  And are you referring to
20 anything more specifically than the advertising
21 industry?
22         MS. ZWOLINSKI:  Objection.  Form.

Page 328

1         THE WITNESS:  No.
2         BY MS. GOODMAN:
3     Q.   Okay.  And in your last paragraph,
4 you write:  "We may have the opportunity to
5 conduct additional market research specifically
6 around the characteristics of digital ads."
7     Do you see that?
8     A.   Yes.
9     Q.   What kinds of market research around
10 the characteristics of digital ads were you
11 contemplating could possibly be performed?
12         MS. ZWOLINSKI:  Objection.  Form.
13         THE WITNESS:  When we conduct market
14 research, what we have done in the past is we
15 formulate the questions that we are seeking
16 answers to, and in addition to -- what is it?
17 We post them because this is -- it's -- it's
18 like an FRN.  I can't remember what that stands
19 for.  Federal Register Notice.
20     We -- we're not specific -- we don't
21 pick and choose to whom we send the questions.
22 We post the questions through a Federal

Page 329

1 Register Notice and ask industry to respond.
2 What I was saying there is we have in the past
3 done pretty generic around what do you think is
4 the best structure for the contract, do you
5 think this is something that can be done by a
6 small business as the prime, things like that,
7 where do you see advertising, what new trends
8 are available.
9     We could actually do one
10 specifically around digital media focusing on
11 what DSSD is interested in learning and
12 formulate questions around what kind of data
13 are available to help assist in understanding
14 X, Y, and Z.
15     And then we take that information,
16 and we include it, one, in our market research
17 report but also as -- we take parts of that to
18 help write the requirements for the master
19 contract in a way that is not specific but
20 provides the flexibility to -- that does not
21 lock them into statistics or formats -- types
22 of data that are available in 2025 that may

83 (Pages 326 - 329)

Page 330

1  change in 2030.
2      Does that --
3      BY MS. GOODMAN:
4  Q.  That does make sense.  Thank you.
5      And so the market research report
6  for the 2020 census, is it correct that that
7  was facilitated through a Federal Register
8  Notice and industry participants responding?
9      MS. ZWOLINSKI:  Objection.  Form.
10     THE WITNESS:  I believe so.
11     MS. GOODMAN:  Okay.  Let's take a
12 break.
13     THE VIDEOGRAPHER:  Going off the
14 record.  The time is 18:04.
15     (A short recess was taken.)
16     THE VIDEOGRAPHER:  Going back on the
17 record.  The time is 18:19.
18     (Deposition Exhibit 32 was marked
19 for identification.)
20     MS. GOODMAN:  Ms. Oliphant, I am
21 handing you Exhibit 32, CENSUS-ADS-75450
22 through 75493.

Page 331

1      BY MS. GOODMAN:
2  Q.  And do you recognize this document
3  as the final Order 15 contract?
4      And I can direct your attention the
5  page ending in Bates 52 at the top.
6  A.  I think this -- I believe this was
7  the original.  There have been multiple
8  modification since then, so I wouldn't say this
9  is the final because the final would include
10 all the modifications.
11 Q.  Okay.  At least this version of
12 the -- or this original contract did not fix
13 the price for any particular media buy; is that
14 correct?
15     MS. ZWOLINSKI:  Objection.  Form.
16     THE WITNESS:  No media buys were
17 only fixed price.  Only labor.
18     BY MS. GOODMAN:
19 Q.  And it didn't fix the quantity of
20 media to be purchased, correct?
21 A.  No, it did not.
22     MS. ZWOLINSKI:  Objection.

Page 332

1      BY MS. GOODMAN:
2  Q.  All right.  Setting that document
3  aside, I want to circle back to just ask you
4  one more question with respect to your
5  participation in this lawsuit, sort of just to
6  reorient you to that portion of the day during
7  your deposition.  Okay.
8      And my question to you is whether --
9  did you ever seek legal advice from an attorney
10 at the antitrust division in and around January
11 of 2023?
12     MS. ZWOLINSKI:  Objection.  Form.
13     THE WITNESS:  Can you be more
14 specific.
15     BY MS. GOODMAN:
16 Q.  I can try.
17     Have you ever sought the counsel --
18 or sought legal advice from an attorney at the
19 antitrust division of the Department of
20 Justice?
21     MS. ZWOLINSKI:  Objection.  Form.
22     THE WITNESS:  No.

Page 333

1      BY MS. GOODMAN:
2  Q.  Okay.  And if you need to seek legal
3  advice in the course of your work, to whom do
4  you turn?
5      MS. ZWOLINSKI:  Objection.  Form.
6      THE WITNESS:  Department of
7  Commerce.
8      BY MS. GOODMAN:
9  Q.  And has the antitrust division
10 provided you any legal advice in the course of
11 your participation in this lawsuit?
12     MS. ZWOLINSKI:  Objection.  Form.
13 And --
14     THE WITNESS:  How do you define --
15     MS. ZWOLINSKI:  You can answer.
16     THE WITNESS:  How do you define
17 "legal advice"?
18     BY MS. GOODMAN:
19 Q.  If you have a -- if there is a legal
20 issue that you are confronting in the course of
21 your work or need counsel on or you have a
22 legal question, has the antitrust division

Page 334

1  provided you legal advice?
2       MS. ZWOLINSKI: Objection. Form.
3       THE WITNESS: No.
4       BY MS. GOODMAN:
5    Q.  Okay. And is your answer the same
6  in January of 2023?
7       MS. ZWOLINSKI: Objection. Form.
8       THE WITNESS: Yes.
9       BY MS. GOODMAN:
10   Q.  Okay. And in the course of your
11 participation in this lawsuit if you've had
12 questions about your participation in this
13 lawsuit, have you turned to the attorneys at
14 the antitrust division with your questions?
15      MS. ZWOLINSKI: Objection. Form.
16      THE WITNESS: No.
17      BY MS. GOODMAN:
18   Q.  To whom have you turned, if anyone?
19   A.  Commerce.
20   Q.  And is that Mr. Cannon?
21   A.  That's Mr. Cannon, yes.
22   Q.  Do you consider the lawyers for the

Page 335

1  antitrust division to be lawyers for the census
2  bureau?
3       MS. ZWOLINSKI: Objection. Form.
4  Foundation.
5       THE WITNESS: I do not.
6       BY MS. GOODMAN:
7    Q.  Why not?
8       MS. ZWOLINSKI: Objection. Form.
9  Foundation.
10      THE WITNESS: Since census has their
11 own lawyers and we have commerce lawyers, and I
12 believe the commerce lawyers would be more --
13 more sort of categorized in that way versus
14 DOJ.
15      BY MS. GOODMAN:
16   Q.  Okay. And is your answer the same
17 with respect to your participation in this
18 lawsuit as a representative of the census
19 bureau?
20      MS. ZWOLINSKI: Objection. Form.
21 Foundation.
22      THE WITNESS: Yes.

Page 336

1       MS. GOODMAN: I have no further
2  questions. I'll pass the witness.
3       MS. ZWOLINSKI: We have no
4  questions.
5       MS. GOODMAN: Okay. Thank you so
6  much for your time, Ms. Oliphant. I very much
7  appreciate it.
8       THE WITNESS: You're welcome. Thank
9  you.
10      THE VIDEOGRAPHER: Off the record.
11      MS. GOODMAN: Yes.
12      THE VIDEOGRAPHER: This marks the
13 end of the deposition of Kendall Oliphant. We
14 are going off the record at 18:24.
15      (Whereupon, the proceeding was
16 concluded at 6:24 p.m.)

Page 337

1       CERTIFICATE OF NOTARY PUBLIC
2       I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10 record of the testimony given by said witness;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this deposition was taken; and further,
14 that I am not a relative or employee of any
15 attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.
18
19      *Bonnie L Russo*
20      Notary Public in and for
21      the District of Columbia
22 My Commission expires: August 14, 2025

85 (Pages 334 - 337)

HIGHLY CONFIDENTIAL

Page 338

```
 1       ACKNOWLEDGMENT OF DEPONENT
 2    I, KENDALL OLIPHANT, do hereby certify that
 3    I have read the foregoing transcript of my
 4    testimony taken on 8/9/23, and further certify
 5    that it is a true and accurate record of my
 6    testimony (with the exception of the
 7    corrections listed below):
 8    Page   Line     Correction
 9    ____   ____   _____
10    ____   ____   _____
11    ____   ____   _____
12    ____   ____   _____
13    ____   ____   _____
14    ____   ____   _____
15    ____   ____   _____
16    ____   ____   _____
17    ____   ____   _____
18           _____
             KENDALL OLIPHANT
19
      SUBSCRIBED AND SWORN TO BEFORE ME
20    THIS ____DAY OF _____, 2023.
21
      _____   _____
22    (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
      Job No. CS6031956
```

Page 339

```
 1  Rachel Zwolinski, Esq.
 2  rachel.zwolinski@usdoj.gov
 3            August 10, 2023
 4  RE:   United States, Et Al v. Google, LLC
 5     8/9/2023, Kendall Oliphant (#6031956)
 6     The above-referenced transcript is available for
 7  review.
 8     Within the applicable timeframe, the witness should
 9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25
```

86 (Pages 338 - 339)

Veritext Legal Solutions
800-567-8658                                              973-410-4098

FILED PURSUANT TO COURT ORDER DOC. 354