# EXHIBIT 19
# FILED UNDER SEAL

FILED PURSUANT TO COURT ORDER DOC. 362

```
               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
                    ALEXANDRIA DIVISION


    _____
                                    :
    UNITED STATES OF AMERICA,       :
    et al.,                         :
                                    :
          Plaintiffs                :
                                    :
          v.                        :  No.  1:23-cv-00108
                                    :
    GOOGLE, LLC,                    :
                                    :
          Defendants.               :
    _____ :
```

                    Friday, August 18, 2023

          Video Deposition of COL. JOHN HORNING,

    taken at the Law Offices of Paul, Weiss,

    Rifkind, Wharton & Garrison LLP, 2001 K St NW,

    Washington, DC, beginning at 9:34 a.m. Eastern

    Standard Time, before Ryan K. Black, Registered

    Professional Reporter, Certified Livenote

    Reporter and Notary Public in and for the

    District of Columbia




    Job No. CS6060378

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   UNITED STATES DEPARTMENT OF JUSTICE
     ANTITRUST DIVISION
 4   BY:  JIMMY MCBIRNEY, ESQ.
          CHASE PRITCHETT, ESQ.
 5       ALVIN CHU, ESQ.
          MARK SOSNOWSKY, ESQ. - Via Zoom
 6       KATHERINE CLEMONS, ESQ - Via Zoom
     450 5th Street, N.W
 7   Washington, DC 20530
     202.514.2414
 8   jimmy.mcbirney@usdoj.gov
     chase.pritchett@usdoj.gov
 9   alvin.chu@usdoj.gov
     mark.sosnowsky@usdoj.gov
10   katherine.clemons@usdoj.gov
11   Representing - The United States of America
12
13   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP,
     BY:  MARTHA L. GOODMAN, ESQ.
14       LEAH HIBBLER, ESQ.
     2001 K St NW,
15   Washington, DC
     202.223.7341
16   mgoodman@paulweiss.com
     lhibbler@paulweiss.com
17
     Representing - Google LLC
18
19
20
21
22
23   ALSO PRESENT:
24   Glenn Fortner - Legal Videographer
     Major Mohamed Al-Darsani - United States Army
25   Edwin Farley - USDOJ Intern
```

Page 3

```
 1                 I N D E X
 2   TESTIMONY OF:  COL. JOHN HORNING        PAGE
 3   By Ms. Goodman............................6, 244
 4   By Mr. McBirney.............................245
 5              E X H I B I T S
 6   EXHIBIT       DESCRIPTION           PAGE
 7   Exhibit 61    a privilege log dated June 26th,
                   2023, provided by the United
 8                 States DOJ.......................11
 9   Exhibit 62    a document Bates Numbered
                   ARMY-ADS336340 through 336638...154
10
     Exhibit 63    a document Bates Numbered
11                 ARMY-ADS329948 through 329970...165
12   Exhibit 64    a document Bates Numbered
                   ARMY-ADS187047 through 187077...211
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1 THE VIDEOGRAPHER: Good morning.
2 We're going on the record at 9:34 on August 18th,
3 2023. Please note that the microphones are
4 sensitive and may pick up whispering and private
5 conversations. Please mute your phones at this
6 time. Audio and video recording will continue to
7 take place unless all parties agree to go
8 off the record.
9     This is Media Unit 1 of the
10 video-recorded deposition of Colonel John Horning
11 in the matter of United States, et al., v. Google
12 LLC. The location of the deposition is Paul
13 Weiss.
14     My name is Glenn Fortner, representing
15 Veritext, and I'm the videographer. The court
16 reporter is Ryan Black from the firm Veritext.
17 I'm not related to any party in this action, nor
18 am I financially interested in the outcome.
19     If there are any objections to
20 proceeding, please state them at the time of your
21 appearance. Counsel and all present, including
22 remotely, will now state their appearances and
23 affiliations for the record beginning with the
24 noticing attorney.
25     MS. GOODMAN: Martha Goodman, from the

Page 5

1 law firm Paul Weiss, on behalf of Google LLC.
2 I'm joined by my colleague Leah Hibbler.
3     MR. MCBIRNEY: Jimmy McBirney, with the
4 Unites Staes Department of Justice, on behalf of
5 the United States and the witness.
6     MR. PRITCHETT: Chase Pritchett, on
7 behalf of the United States.
8     MR. CHU: Alvin Chu on behalf of the
9 United States.
10     MR. SOSNOWSKY: Mark Sosnowsky on behalf
11 of the United States.
12     MAJOR AL-DARSANI: Moe Al-Darsani,
13 United States Army.
14     MR. FARLEY: Edwin Farley, United
15 States.
16     THE VIDEOGRAPHER: Okay. Will the court
17 reporter please swear in the witness and then
18 counsel may proceed.
19     MR. CHU: Oh, also, just to let you
20 know, I have Katherine Clemons -- she'll be --
21 from the DOJ that will also joining in and out.
22        *   *   *
23 Whereupon --
24     COL. JOHN HORNING,
25 called to testify, having been first duly sworn

2 (Pages 2 - 5)

Page 6

1 or affirmed, was examined and testified as
2 follows:
3           *   *   *
4              EXAMINATION
5 BY MS. GOODMAN:
6     Q.  Good morning, Colonel Horning.
7     A.  Good morning.
8     Q.  Have you been deposed before?
9     A.  I have not.
10    Q.  Do you understand your purpose here
11 today is to provide truthful and accurate
12 testimony to the best of your testimony and
13 knowledge?
14    A.  I do.
15    Q.  Is there any reason you cannot do that
16 today?
17    A.  No.
18    Q.  Okay.  Because the court reporter is
19 writing everything down, it's important that we
20 not talk over one another, so please let me
21 finish my question before you begin your answer.
22 Okay?
23    A.  Okay.
24    Q.  And because he's again taking a written
25 transcript, the -- you have to speak verbally as

Page 7

1 opposed to with sounds like uh-huh or huh-uh
2 so that it can be accurately reflected in the
3 transcript.  Okay?
4     A.  I understand.
5     Q.  If you don't understand my question,
6 please let me know.  Okay?
7     A.  Yes.
8     Q.  Otherwise I assume you'll understand.
9 Okay?
10    A.  Yes.
11    Q.  In the normal course of your work, do
12 you consider the Department of Justice Antitrust
13 Division to be your counsel?
14    A.  I'm not sure that I'm qualified to
15 answer, within the legal constructs of the U.S.
16 government, who our actual counsel is or is not.
17    Q.  I'm not asking for you to provide a
18 legal opinion.  I'm asking for your personal
19 understanding and your considerations, your
20 personal opinions.  So do you consider the
21 Department of Justice Antitrust Division to be
22 your counsel in the normal course of your work?
23    A.  I don't believe that I have a personal
24 opinion on who our counsel is.  I only know
25 what's -- yeah.  I -- I don't have an opinion on

Page 8

1 that.
2     Q.  Have you ever requested legal advice
3 from the Department of Justice Antitrust
4 Division?
5         MR. MCBIRNEY:  Objection.  Calls for
6 privileged information.  Instruct the witness not
7 to answer.
8         MS. GOODMAN:  You're asking him -- the
9 information that would appear on a privilege log
10 with a request for legal advice that's required
11 for you as the privilege -- the party asserting a
12 privilege to establish the proprietary of the
13 privilege and meet your burden of proof and
14 persuasion that the privilege applies, you're
15 instructing him not to answer that question?
16        MR. MCBIRNEY:  You are asking the
17 witness whether he has requested legal advice
18 from the Department of Justice Antitrust
19 Division?
20        MS. GOODMAN:  Yeah.
21        MR. MCBIRNEY:  You can answer that yes
22 or no.
23        THE WITNESS:  No.
24 BY MS. GOODMAN:
25    Q.  To what extent has anybody at the

Page 9

1 Department of Justice ever asked you to provide
2 information about the Army's advertising
3 business?
4         MR. MCBIRNEY:  Objection.  Privileged.
5 Instruct the witness not to answer.
6 BY MS. GOODMAN:
7     Q.  Are you going to follow that
8 instruction, sir?
9     A.  Yes.
10    Q.  Okay.  When did you first have any
11 conversations with anybody at the Department of
12 Justice Antitrust Division?
13    A.  As best that I can recall, our first
14 interaction would have been in early spring of
15 2023 or late winter.  I -- I can't recall the
16 specific date.
17    Q.  So sometime between late winter of what
18 year?
19    A.  2023.
20    Q.  Okay.  And early spring of 2023?
21    A.  Correct.
22    Q.  Okay.  What was your understanding
23 of the reason for your conversations with the
24 Department of Justice Antitrust Division?
25        MR. MCBIRNEY:  Objection.  Calls for

3 (Pages 6 - 9)

Page 10

1  privileged information. Instruct the witness not
2  to answer.
3  BY MS. GOODMAN:
4      Q. Are you following that instruction?
5      A. Yes.
6      Q. Has the Department of Justice ever
7  requested information about digital advertising
8  purchases by the United States Army?
9      MR. MCBIRNEY: Objection. Calls for
10 privileged information. Instruct the witness not
11 to answer.
12 BY MS. GOODMAN:
13     Q. Are you following that instruction?
14     A. Yes.
15     Q. Do you -- in the course of your work,
16 do you routine -- do you field requests for
17 information from the Department of Justice on
18 an ordinary basis?
19     A. I do not.
20     Q. Are you aware of anybody else within
21 the AEMO who re -- regularly fields requests for
22 information from the Department of Justice?
23     A. I'm not personally aware of anything
24 like that.
25     MS. GOODMAN: I'm marking Exhibit 61, a

Page 11

1  privilege log dated June 26th, 2023, provided by
2  the United States in this litigation. I'm
3  handing it to the witness.
4      (Exhibit No. 61, a privilege log dated
5  June 26th, 2023, provided by the United States
6  DOJ, was introduced.)
7  BY MS. GOODMAN:
8      Q. Now, Colonel Horning, this is not a
9  document I would normally show a percipient
10 witness, but I'm essentially hamstrung and must
11 do so here today for reasons that don't pertain
12 to you, per se. But I would like you to turn to
13 Page 11 of this document.
14     Let me know when you're there.
15     A. Okay. I am on Page 11.
16     Q. Okay. And if you look back at Page 1,
17 actually, you see there is a heading at the top
18 that indicate what each of the columns are.
19     A. Okay.
20     Q. Okay. So you see that in the, one, two,
21 three, four, five -- fifth column over on Page
22 23, which is the To column, your name is
23 listed --
24     A. On? I'm sorry. Could you say what page
25 again? I thought you said Page 23.

Page 12

1      Q. I'm sorry. I meant Page 11.
2      A. Okay.
3      Q. It's line entry 23 on Page 11.
4      A. Okay.
5      Q. So one, two, three, four, five columns
6  over, you're listed in the To column. Do you see
7  that?
8      A. I do.
9      Q. And do you see the date in the few-more
10 columns over of January 5th, 2023?
11     A. Okay.
12     Q. Does that refresh your recollection of
13 the time period where you first had conversations
14 with the Department of Justice Antitrust
15 Division?
16     A. Can you help me understand what it is
17 I'm actually looking at here?
18     Q. Yeah. So this is what's called a
19 privilege log.
20     A. I'm not familiar with what one of those
21 are.
22     Q. Okay. A privilege log is a
23 document that parties are required to provide
24 to the opposing side when they're asserting
25 attorney-client or attorney work product or other

Page 13

1  privilege over communications --
2      A. Okay.
3      Q. -- that they are not providing to
4  the other side in litigation. So that's what a
5  privilege log is. And so by virtue of this
6  entry, on Line 23 the United States is asserting
7  a privilege, as described in the last column, --
8      A. Okay.
9      Q. -- over your communication with
10 Mr. Wessels and others --
11     A. Okay.
12     Q. -- listed on this page.
13     A. Okay.
14     Q. Do you understand now?
15     MR. MCBIRNEY: Objection. Assumes facts
16 not in evidence. Form of the question.
17 BY MS. GOODMAN:
18     Q. Do you understand -- do you have an
19 appropriate understanding now of what a privilege
20 log is?
21     A. I do understand what this document is
22 now.
23     Q. Okay. So having now looked at this
24 document and understanding what it is, does it
25 refresh your memory at all that -- as to the

Page 14

1  timing of your conversations with the Antitrust
2  Division?
3      MR. MCBIRNEY: Objection; foundation,
4  and to form.
5      THE WITNESS: It does not refresh my
6  recollection, but I have no reason to believe
7  this is not true.
8  BY MS. GOODMAN:
9    Q. Okay. And you see in the column next to
10 the date, which is the subject -- if you look
11 back at Page 1, you can see that that is the
12 subject column.
13   A. Yes.
14   Q. Okay. Can you read the subject to me
15 here?
16   A. The subject on Item 23 of the privilege
17 log says, brackets, "external DOJ-Army interview
18 on Google-Meta advertising products used by DOD."
19   Q. Okay. Do you recall who was interviewed
20 -- who at the Army was interviewed on Google-Meta
21 advertising products used by DOD on or around
22 this date of January 5th, 2023?
23      MR. MCBIRNEY: You can answer that yes
24 or no.
25      THE WITNESS: I do not recall.

Page 15

1  BY MS. GOODMAN:
2    Q. Okay. Do you recall yourself being
3  interviewed on this topic?
4    A. I recall being interviewed, but I do not
5  recall that this was the date for it.
6    Q. Okay. Do you recall who interviewed
7  you?
8    A. I only recall -- I didn't -- there was
9  likely more than one person. I only recall one
10 by name.
11   Q. Who do you recall by name?
12   A. Mr. Chase Pritchett.
13   Q. Okay. How long did the interview last?
14   A. I can't be certain. I think it was,
15 likely, 60 to 90 minutes, perhaps.
16   Q. And this is a yes or no question: Did
17 the United States Antitrust Division lawyers
18 present explain to you the purpose of the
19 interview?
20      MR. MCBIRNEY: Objection. Calls for
21 privileged communication. Instruct the witness
22 not to answer.
23 BY MS. GOODMAN:
24   Q. Are you following that instruction?
25   A. Yes.

Page 16

1    Q. What was your understanding of the
2  purpose of the interview?
3      MR. MCBIRNEY: Objection. Calls for
4  privileged information. Instruct the witness not
5  to answer.
6  BY MS. GOODMAN:
7    Q. Are you following that instruction?
8    A. Yes.
9    Q. What facts -- strike that.
10     At the time reflected here on this
11 log, --
12   A. Mm-hmm.
13   Q. -- January 5th, 2023, were you aware of
14 any anticompetitive conduct on the part of Google
15 affecting the Army's advertising --
16     MR. MCBIRNEY: Objection.
17 BY MS. GOODMAN:
18   Q. -- practices?
19     MR. MCBIRNEY: Objection. Calls for a
20 legal conclusion.
21 BY MS. GOODMAN:
22   Q. You may answer.
23   A. I'm not sure that I have -- am
24 qualified to know or would have been made
25 available any infor -- or would have had any

Page 17

1  information available to me on that topic.
2    Q. Around this time of January 5th, 2023,
3  were you aware of any conduct on the part of
4  Google that was causing the Army to pay prices
5  for advertising that were too high?
6    A. I had not been made aware of anything
7  like that at the time frame that you're asking.
8    Q. Okay. How about prior to the time frame
9  that I'm asking?
10   A. Not that I can recall, no.
11   Q. Okay. What's your understanding of the
12 word anticompetitive?
13     MR. MCBIRNEY: Objection. Calls for
14 legal conclusion, and foundation.
15     THE WITNESS: I only know the common
16 language terminology. I don't understand the
17 actual legal definitions or implications.
18 Anticompetitive: Not competitive.
19 BY MS. GOODMAN:
20   Q. So what is your common language
21 understanding of the word anticompetitive?
22   A. I understand it in the context of
23 business practices meaning not adhering to a
24 competitive, fair practice.
25   Q. Okay. So using your definition of

5 (Pages 14 - 17)

Page 18

1  anticompetitive, which is in the context of
2  business practicing -- practices meaning "not
3  adhering to a competitive, fair practice," at
4  this time, January 5th of 2023, were you aware
5  of any anticompetitive practices on the part of
6  Google affecting the Army's advertising?
7      MR. MCBIRNEY: Object to the form of the
8  question.
9      THE WITNESS: I was not aware.
10 BY MS. GOODMAN:
11     Q. At the time of this discussion with the
12 DOJ, what was your understanding, if any, as to
13 the possibility of litigation?
14     MR. MCBIRNEY: Objection. Calls for
15 privileged information. You can answer that
16 question if you can answer it without divulging
17 any privileged information. If you cannot, then
18 I'll instruct you not to answer.
19     THE WITNESS: Can you repeat the
20 question?
21 BY MS. GOODMAN:
22     Q. At the time of the discussion with DOJ
23 on or around January 5th, 2023, what was your
24 understanding, if any, as to the possibility of
25 litigation?

Page 19

1      MR. MCBIRNEY: Same instruction. If
2  you can answer that without disclosing privileged
3  information, you may. Otherwise, I instruct you
4  not to answer.
5      THE WITNESS: None.
6  BY MS. GOODMAN:
7      Q. Around the time of this meeting
8  -- strike that.
9          Around the time of these communications
10 with the Department of Justice about Google-Meta
11 advertising products used by DOD, what were your
12 personal views on having to participate in those
13 discussions?
14     MR. MCBIRNEY: Objection; vague.
15     THE WITNESS: Can you clarify the
16 question to the extent what was my personal view
17 of being involved in a meeting?
18 BY MS. GOODMAN:
19     Q. Yes. What was your personal view of
20 being involved in a meeting or discussions with
21 the Antitrust Division about Google advertising
22 -- Meta advertising products used by DOD?
23     MR. MCBIRNEY: Same objection. And
24 caution the witness not to divulge confidential
25 information in your answer.

Page 20

1      MS. GOODMAN: Confidential information?
2      MR. MCBIRNEY: I'm sorry. Privileged
3  information.
4      MS. GOODMAN: Thank you.
5      THE WITNESS: I have no personal opinion
6  about attending a meeting. As a soldier, I
7  received an order. I do what I'm told.
8  BY MS. GOODMAN:
9      Q. Okay. From whom did you receive an
10 order, if anyone?
11     A. From AEMO leadership.
12     Q. Who in AEMO leadership?
13     A. As best as I re -- can recall, the AEMO
14 chief of staff.
15     Q. Who's that?
16     A. Colonel Matt Weinrich.
17     Q. Why did Mr. Weinrich -- I'm sorry,
18 Colonel Weinrich order you to participate in this
19 meeting?
20     MR. MCBIRNEY: Objection. Calls for
21 speculation.
22     THE WITNESS: Yeah. I -- I can't answer
23 as to why he chose me.
24 BY MS. GOODMAN:
25     Q. Okay. Did he explain to you why he

Page 21

1  chose you?
2      A. No.
3      Q. When did he order you to -- to
4  participate in these discussions?
5      A. I can't recall a -- a specific date. As
6  best as I can recall, it was via an email saying
7  that there was going to be individuals who needed
8  to ask questions and I should make myself
9  available, but I don't remember when.
10     Q. Okay. Anything else you remember about
11 that email and what it said?
12     A. No, I don't.
13     Q. Did you have any discussions outside of
14 email with Colonel Weinrich about this request?
15     A. No.
16     Q. And setting aside the fact that you
17 received an order to participate in discussions
18 with the Department of Justice on this topic,
19 is it your testimony you had no personal view
20 whatsoever as to your participation in such
21 meetings?
22     MR. MCBIRNEY: Object to the form and
23 asked and answered.
24     THE WITNESS: Yeah. I have no personal
25 opinion on -- on attending the meeting.

6 (Pages 18 - 21)

Page 30

1  ads. And I -- I certainly -- I can't recall a
2  specific instance that would answer your question
3  without it being a little more specific.
4  BY MS. GOODMAN:
5      Q.  Okay. Have you asked anybody at the
6  advertising agency DDB to give you volume of ads
7  purchased, cost, cost of such ads, dates of such
8  purchases, vendors, whether it be Google or
9  some other vendor through which the ads were
10 purchased, as to the Army's -- and I'll narrow
11 it further -- digital advertising purchases?
12     MR. MCBIRNEY: Again, I'm going to
13 instruct the witness if you're able to answer
14 that question without disclosing privileged
15 communications from counsel, you may do so. If
16 you are not, then I instruct you not to answer.
17     THE WITNESS: Okay. On the advice of
18 counsel, I'm not going to answer that question.
19 BY MS. GOODMAN:
20     Q.  Okay. To your knowledge -- has anybody
21 at AEMO, so not yourself, but anybody else with
22 whom you work or know, to your knowledge has
23 anybody else at AEMO asked the advertising agency
24 DDB to give you -- to give AEMO volumes of ad
25 purchased, cost, dates, vendors or other

Page 31

1  information in that nature regarding the Army's
2  digital advertising purchases?
3      MR. MCBIRNEY: I object to the form of
4  the question and instruct the witness that if
5  you can answer the question without disclosing
6  privileged information, you may do so. If you
7  cannot, then I instruct you not to answer.
8      THE WITNESS: To the best of my
9  knowledge, yes.
10 BY MS. GOODMAN:
11     Q.  Okay. Who at AEMO, to your knowledge,
12 has asked DDB for such information?
13     MR. MCBIRNEY: Again, I'm going to
14 instruct the witness if you can answer that
15 question without disclosing privileged
16 information, you may do so. Otherwise,
17 instruct the witness not to answer.
18     THE WITNESS: Okay. On the advice of
19 counsel, I'm not going to answer that question.
20 BY MS. GOODMAN:
21     Q.  To your knowledge -- well, strike that.
22     Has anybody at DDB provided you,
23 personally, with information about the Army's
24 digital advertising purchases of the kind that we
25 just described, dates, cost, vendor?

Page 32

1      MR. MCBIRNEY: Again, I'm going to
2  instruct the witness if he can answer that
3  without disclosing privileged information, you
4  may do so. Otherwise, I would instruct you not
5  to answer.
6      THE WITNESS: Can you repeat the
7  question?
8  BY MS. GOODMAN:
9      Q.  Has anybody at DDB provided you
10 personally with any information about the Army's
11 digital advertising purchases of the kind that we
12 just described, such as dates of purchase, cost,
13 vendor?
14     MR. MCBIRNEY: Same instruction.
15     THE WITNESS: Not that I can recall.
16 BY MS. GOODMAN:
17     Q.  Okay. To your knowledge, has anybody at
18 DDB provided anybody else, other than yourself at
19 AEMO, with information about the Army's digital
20 advertising purchases of the kind that we just
21 described, such as dates of purchase, cost or
22 vendor?
23     MR. MCBIRNEY: Object to the form of the
24 question. Calls for speculation. And instruct
25 the witness that if you can answer the question

Page 33

1  without disclosing privileged information, you
2  may do so. If not, I would instruct you not to
3  answer.
4      THE WITNESS: I have no personal
5  knowledge of that occurring.
6  BY MS. GOODMAN:
7      Q.  Okay. Do you have knowledge other than
8  personal knowledge of that occurring?
9      MR. MCBIRNEY: Objection; foundation.
10 Calls for speculation. And same instruction.
11     THE WITNESS: I don't know what
12 "knowledge other than personal" means.
13 BY MS. GOODMAN:
14     Q.  Okay. At the time that you first became
15 involved in discussions with the Department of
16 Justice in the late winter 2023 time period, did
17 you consider their inquiries to be a routine
18 request for information?
19     MR. MCBIRNEY: Objection; vague.
20     THE WITNESS: At the time I first became
21 aware, I had no indication the purpose at all.
22 BY MS. GOODMAN:
23     Q.  Okay. Did you have a -- did you have
24 a view -- so setting aside the Department's
25 purpose, which I'm not asking about, I'm asking

9 (Pages 30 - 33)

|  | Page 34 |  | Page 36 |
|---|---|---|---|
| 1 | about your personal reactions to receiving | 1 | Q. So, Colonel Horning, I'll ask you again |
| 2 | an inquiry -- inquiry from the Department of | 2 | so that I can get an answer or your -- well, get |
| 3 | Justice, how did you view it? As a routine | 3 | a clean record, I should say. |
| 4 | request for information? As fact-gathering? | 4 | Has anybody at the Department of |
| 5 | What was your personal view of the nature of the | 5 | Justice asked you to get any information from |
| 6 | inquiry? | 6 | your advertising agency DDB? |
| 7 | MR. MCBIRNEY: Object to the form of the | 7 | MR. MCBIRNEY: Objection. Calls for |
| 8 | question and vague. | 8 | privileged communication. Instruct the witness |
| 9 | THE WITNESS: I viewed it as a routine | 9 | not to answer. |
| 10 | request for information. | 10 | BY MS. GOODMAN: |
| 11 | BY MS. GOODMAN: | 11 | Q. Are you following that instruction? |
| 12 | Q. Okay. Has the Department of Justice | 12 | A. Yes. |
| 13 | asked you to get information from the advertising | 13 | Q. Okay. Has anybody at the Department of |
| 14 | agency DDB? | 14 | Justice asked you to have any conversations with |
| 15 | MR. MCBIRNEY: Obj -- | 15 | any person from your advertising agency DDB? |
| 16 | BY MS. GOODMAN: | 16 | MR. MCBIRNEY: Objection. Calls for |
| 17 | Q. Yes or no. | 17 | privileged information. Instruct the witness not |
| 18 | MR. MCBIRNEY: Objection. Calls for | 18 | to answer. |
| 19 | privileged information. I instruct the witness | 19 | BY MS. GOODMAN: |
| 20 | not to answer. | 20 | Q. Are you following that instruction? |
| 21 | THE WITNESS: I'm not going to answer | 21 | A. Yes. |
| 22 | the question on advice of question. | 22 | Q. Okay. To your knowledge, has anybody |
| 23 | MS. GOODMAN: That question is | 23 | at the Department of Justice asked any other |
| 24 | completely proper because it goes to your | 24 | employee of AEMO to obtain information from the |
| 25 | assertion to which you bear a burden of proof and | 25 | advertising agency DDB? |

|  | Page 35 |  | Page 37 |
|---|---|---|---|
| 1 | persuasion as to your claim of privilege. | 1 | MR. MCBIRNEY: Objection. Calls for |
| 2 | MR. MCBIRNEY: You are asking | 2 | privileged information. Instruct the witness not |
| 3 | the witness to disclose communications of a | 3 | to answer. |
| 4 | particularized nature from counsel, which is | 4 | BY MS. GOODMAN: |
| 5 | clearly work product. So that instruction is | 5 | Q. Are you following that instruction? |
| 6 | entirely proper, and I'm instructing the witness | 6 | A. Yes. |
| 7 | not to answer. | 7 | Q. To your knowledge, has anybody at the |
| 8 | BY MS. GOODMAN: | 8 | Department of Justice asked any other employee of |
| 9 | Q. Okay. Has the Department of Justice -- | 9 | AEMO to have any conversations with any person |
| 10 | anybody at the Department of Justice asked you | 10 | from the advertising agency DDB? |
| 11 | to participate in any conversations with your | 11 | MR. MCBIRNEY: Objection. Calls for |
| 12 | advertising agency? | 12 | privileged information, and instruct the witness |
| 13 | MR. MCBIRNEY: Same objection. Instruct | 13 | not to answer. |
| 14 | the witness not to answer. | 14 | BY MS. GOODMAN: |
| 15 | You are asking the witness for | 15 | Q. Are you following that instruction? |
| 16 | particular communications from counsel. | 16 | A. Yes. |
| 17 | MS. GOODMAN: No. They're very | 17 | Q. Are you aware of any investigation by |
| 18 | generalized communications. We've talked about | 18 | the Department of Justice into Google? |
| 19 | the term "information" being very generalized. | 19 | MR. MCBIRNEY: You can answer that yes |
| 20 | MR. MCBIRNEY: Even if they're | 20 | or no. |
| 21 | generalized, they're communications from counsel. | 21 | THE WITNESS: Yes. |
| 22 | MS. GOODMAN: Of the kind that appear on | 22 | BY MS. GOODMAN: |
| 23 | privilege log. This is exactly what you have to | 23 | Q. When did you first become aware of that |
| 24 | put on a privilege log. | 24 | investigation? |
| 25 | BY MS. GOODMAN: | 25 | MR. MCBIRNEY: I'm going to instruct the |

Page 38

1  witness that if you can answer that question
2  without disclosing privileged information you may
3  do so. If you cannot, then I instruct you not to
4  answer.
5       THE WITNESS: I'm not going to answer
6  that question on the advice of counsel.
7  BY MS. GOODMAN:
8     Q. Okay. Prior to late winter 2023, as
9  we've discussed, had anybody from anyone within
10 the government reached out to you inquiring about
11 the Army's digital advertising purchases?
12      MR. MCBIRNEY: Objection; vague and
13 instruct the witness that if you can answer
14 that question without disclosing privileged
15 information, you may do so. If you cannot,
16 then I instruct the witness not to answer.
17      THE WITNESS: I don't recall any
18 communication previous to what we already
19 discussed.
20 BY MS. GOODMAN:
21    Q. Okay. And how about prior to late
22 winter 2023, did you have any outreach from
23 anybody within the United States government about
24 any anticompetitive conduct on the part of Google
25 affecting the United States Army? And when I use

Page 39

1  the word anticompetitive, I'm using your
2  definition?
3       MR. MCBIRNEY: Objection; vague.
4  Instruct the witness that if you can answer
5  that question without disclosing privileged
6  communication you may do so. If not, I instruct
7  the witness not to answer.
8       THE WITNESS: I cannot recall a
9  time prior to then when anyone from the U.S.
10 government reached out to me on any topic related
11 to any practice of any vendor or company involved
12 in advertising.
13 BY MS. GOODMAN:
14    Q. And that includes Google?
15      MR. MCBIRNEY: Objection; vague.
16      THE WITNESS: My recollection, as
17 previously stated, would include Google.
18 BY MS. GOODMAN:
19    Q. Okay. Have you received a litigation
20 hold?
21      MR. MCBIRNEY: Objection. Calls for
22 privileged information. Instruct the witness not
23 to answer.
24 BY MS. GOODMAN:
25    Q. Are you following that instruction?

Page 40

1     A. Yes.
2     Q. When did you receive a litigation hold,
3  if any?
4       MR. MCBIRNEY: Objection. Assumes
5  facts not in evidence and calls for privileged
6  information. Instruct the witness not to answer.
7  BY MS. GOODMAN:
8     Q. Are you following that instruction?
9     A. Yes.
10    Q. Who sent you a litigation hold, if any?
11      MR. MCBIRNEY: Same objections.
12 Instruct the witness not to answer.
13 BY MS. GOODMAN:
14    Q. Are you following that instruction?
15    A. Yes.
16    Q. When did you first become aware that
17 your participation in this lawsuit would be re --
18 necessary?
19      MR. MCBIRNEY: Objection. Assumes facts
20 not in evidence. Vague.
21      THE WITNESS: I first became aware that
22 I would be a participant within the last two
23 weeks.
24 BY MS. GOODMAN:
25    Q. Prior to the last two weeks, have you

Page 41

1  assisted anybody in the Department of Justice
2  with gathering information related to this
3  litigation?
4       MR. MCBIRNEY: Objection; vague and
5  calls for privileged information. Instruct the
6  witness not to answer.
7  BY MS. GOODMAN:
8     Q. Have you gathered any information in
9  order to provide discovery to Google in this
10 litigation?
11      MR. MCBIRNEY: You can answer that yes
12 or no.
13      THE WITNESS: No.
14 BY MS. GOODMAN:
15    Q. Are you aware one way or another if your
16 emails have been searched or produced to Google?
17      MR. MCBIRNEY: You can answer.
18      THE WITNESS: I'm not aware if it has or
19 has not occurred.
20 BY MS. GOODMAN:
21    Q. Okay. Do you recall providing any
22 information for the purpose of answering written
23 questions called interrogatories in this
24 litigation?
25      MR. MCBIRNEY: Ob -- you can answer that

11 (Pages 38 - 41)

|  | Page 186 |  | Page 188 |
|---|---|---|---|
| 1 | uses more than one provider of display | 1 | distribution of our message, I don't see how |
| 2 | advertising? | 2 | Google has a role in protecting, considering it's |
| 3 | A. I do not know who or how many are even | 3 | available to so many. I wouldn't think they have |
| 4 | available. I don't know the answer to that. | 4 | a role in protecting anybody's. That's our |
| 5 | Q. Okay. Let's go to Estimated Potential | 5 | responsibility to look at and assess where any |
| 6 | for Efficient ROI. Have you formed an assessment | 6 | distribution platform, channel, site that we may |
| 7 | of Google's potential for efficient ROI? | 7 | be -- any -- any of those things, any of these |
| 8 | MR. MCBIRNEY: Objection; vague. | 8 | actual media networks or properties are a fit for |
| 9 | THE WITNESS: Again, any assessment | 9 | brand safety. |
| 10 | would be not of Google as a whole, but of | 10 | BY MS. GOODMAN: |
| 11 | depending on the channel product itself. | 11 | Q. I see. |
| 12 | BY MS. GOODMAN: | 12 | A. So I don't think Google is a yes or a no |
| 13 | Q. Okay. So let's talk first about Search. | 13 | specifically. |
| 14 | What is your view on the potential for efficient | 14 | Q. Do you view Google as a risky |
| 15 | ROI with respect to Search? | 15 | distribution channel for the brand safety of the |
| 16 | A. The information that I've seen | 16 | Army? |
| 17 | throughout our quarterly MMMs has indicated or | 17 | MR. MCBIRNEY: Objection; vague and |
| 18 | given me the impression that Search has been an | 18 | foundation. |
| 19 | efficient channel for us. | 19 | THE WITNESS: During the time that I've |
| 20 | Q. Same question as to YouTube. | 20 | been at AEMO, I'm certainly not aware of anything |
| 21 | A. Generally speaking, as I can best recall | 21 | that would give me pause or concern with respect |
| 22 | from the MMM reports, YouTube tends to perform | 22 | to working with Google being a risk to brand |
| 23 | fairly well comparatively on an efficiency | 23 | safety. |
| 24 | standpoint relative to the various channels in | 24 | BY MS. GOODMAN: |
| 25 | the marketing mix. | 25 | Q. And then the last criteria, flexible |

|  | Page 187 |  | Page 189 |
|---|---|---|---|
| 1 | Q. And how about with respect to Discovery? | 1 | cancellation terms adherence to industry-standard |
| 2 | A. I don't know the answer to that one. | 2 | contractual out clauses, do you have any ability |
| 3 | Q. Okay. And how about with respect to | 3 | to assess Google's flexible cancellation terms, |
| 4 | display? | 4 | one way or another? |
| 5 | A. I don't know which all partners may or | 5 | A. I do not. |
| 6 | may not be involved in display. I know that our | 6 | Q. Okay. Do you recall attending a Google |
| 7 | MMM results have shown that display, in general, | 7 | Marketing Live event? |
| 8 | has not performed at the same efficient rate as | 8 | MR. MCBIRNEY: Objection; vague. |
| 9 | other options available to us. | 9 | THE WITNESS: Can you be specific about |
| 10 | Q. Okay. What is your assessment of | 10 | the timing? |
| 11 | Google's ability to maintain expected levels of | 11 | BY MS. GOODMAN: |
| 12 | brand safety? | 12 | Q. Sure can. Give me a sec. |
| 13 | MR. MCBIRNEY: Objection; vague and | 13 | Summer of 2022. |
| 14 | foundation. | 14 | A. Is there a document that I can review? |
| 15 | THE WITNESS: I think there's a measure | 15 | Q. I do not have it, no. I'm sorry. |
| 16 | of risk assessment involved in that that we have | 16 | A. I have recollection of attending events |
| 17 | to constantly assess and reassess in light of | 17 | with Google, but I can't attest to the date, |
| 18 | current market conditions and activities or | 18 | specifically. |
| 19 | events in the information sphere and that may | 19 | Q. Okay. What -- how many events do you |
| 20 | change from time period to time period. | 20 | recall attending with Google? |
| 21 | BY MS. GOODMAN: | 21 | A. Two. |
| 22 | Q. And does Google, in your view, help | 22 | Q. What were those two events that you are |
| 23 | protect the brand safety of the Army? | 23 | recalling? |
| 24 | MR. MCBIRNEY: Objection; foundation. | 24 | A. One was in Chicago at the local office |
| 25 | THE WITNESS: As a platform for the | 25 | -- I assume to be the local office of -- of |

Page 190

1  Google.  And the other was in California at the
2  headquarters.
3      Q.  Okay.  Starting with the first event you
4  recall at the local office of Google, what was
5  that event?  What -- what took place at that
6  event?
7      A.  That was an educational event hosted
8  by Google to inform Army marketers on Google
9  products, how other customers have been able to
10 be successful or not, TTPs or what we say in the
11 Army, tactics, technique, procedures, meaning
12 just generally how you go about things, so to
13 share with us information about how we might
14 either perform better or continue to perform
15 well or use products effectively.
16     Q.  Did you find that event informative?
17     A.  Yes.
18     Q.  Did you find it useful?
19     A.  I found the discussion stimulating.
20 I can't recall me specifically going back and
21 -- and then using something from there in the
22 course of my routine duties.
23     Q.  Did that educational event provide any
24 value, from your point of view, to the Army?
25     A.  I would say in that knowledge and

Page 191

1  education is always valuable, I certainly
2  couldn't ascribe a particular quantity or figure
3  or dollar figure of value.
4      Q.  Sure.  But the knowledge and education
5  that Google provided you at that event, did you
6  consider that valuable?
7          MR. MCBIRNEY:  Objection.  Asked and
8  answered.
9          THE WITNESS:  At the time, I felt
10 the information and the conversations that it
11 generated were helpful to the marketing team.
12 BY MS. GOODMAN:
13     Q.  Do you know who from Google was at that
14 event?  Do you recall?
15     A.  There were a number of presenters, and,
16 frankly, I don't remember everyone's name.
17     Q.  Do you remember anybody's name?
18     A.  No.
19     Q.  Okay.
20     A.  I know that there was an individual who
21 had government in their portfolio.  But as far
22 as all their names, I -- unfortunately, I don't
23 recall.
24     Q.  Is there anything else that you, sitting
25 here today, recall about that event?

Page 192

1      A.  I mean, I generally recall the room and
2  that we had slides and that there were a number
3  of presenters on a number of topics.  I don't
4  recall what all the topics were specifically,
5  but --
6      Q.  Do you recall any of the topics?
7      A.  No, I don't.
8      Q.  Okay.  Let's turn to the event at the
9  California -- in California at HQ -- was that at
10 Google's headquarters?
11     A.  It was.
12     Q.  Okay.  And did other marketing
13 professionals from the other branches of the
14 military attend that, to your recollection?
15     A.  Yes.
16     Q.  Okay.  What -- what was the purpose of
17 that event?
18     A.  I was attending on behalf of
19 Major General Fink.  My understanding of the
20 purpose, it was similar to the earlier meeting
21 in Chicago, but a year later and, more broadly,
22 participation from the other services, whereas
23 the first was Army only.  And this had other
24 services, all, in my perception, with the same
25 intent to educate the audience on certain aspects

Page 193

1  of Google's product line and give examples of
2  how some of their customers have used them
3  effectively.
4      Q.  Did you find that event to be
5  informative?
6      A.  I did.  And I found it useful because
7  it's one of the first events I was at where the
8  other services were also there, and so it also
9  enabled some cross-service discussion on
10 challenges, successes.
11     Q.  Did you find that event to provide value
12 to the Army?
13     A.  It did in that I actually was able to
14 provide some -- or -- or put some face to names
15 of my counterparts in the Air Force and Navy,
16 which has facilitated some dialogue post that
17 meeting.
18     Q.  What dialogue has that facilitated?
19 What dialogue has that meeting facilitated with
20 your counterparts in the other branches of the
21 armed services?
22     A.  I'll occasionally reach out and ask
23 something that they may be doing or see if there
24 might be an opportunity for us to do something
25 together, or just ask questions about approaches

|  | Page 194 |  | Page 196 |
|---|---|---|---|
| 1 | they may be taking. It's never anything specific | 1 | conversation with that individual on that topic |
| 2 | in nature, other than general information-share. | 2 | was focused around what he and his team were |
| 3 | Q. Do you recall who attended from -- who | 3 | doing to try to track down what had been |
| 4 | from Google attended the event in California that | 4 | occurring. It was new, so we didn't know, |
| 5 | you're recalling? | 5 | they didn't know. We just knew something was |
| 6 | A. There were a number of presenters, | 6 | happening. |
| 7 | and they were from different divisions, | 7 | That was the -- that was, essentially, |
| 8 | organizations. I'm not sure how they're -- | 8 | the crux of that discussion. |
| 9 | Google organizations is what we would call them, | 9 | Q. Okay. The individual that you're |
| 10 | but from different areas of the business who came | 10 | recalling having this conversation with, did that |
| 11 | and presented on various topics. Some of them | 11 | person indicate to you that Google would take |
| 12 | were somewhat creative in nature. Some of the | 12 | steps to address the problem? |
| 13 | topics were more, I don't know, say analytic in | 13 | A. I don't recall if that was ever said. |
| 14 | nature, I mean, although we weren't talking | 14 | But I have no reason to believe that -- most |
| 15 | about how to do regression models but some | 15 | likely, that was probably assumed on my part at |
| 16 | certainly were more focused on the creative | 16 | the time, that, given a business relationship, |
| 17 | aspect of what you might be showing and others | 17 | it's generally understood, even though I don't |
| 18 | more about how you might be using tools. I think | 18 | have access to terms of any kinds of contracts or |
| 19 | -- you know, I don't know for sure -- actually, I | 19 | not, that good business partners will certainly |
| 20 | know I don't know the names -- yeah -- of who | 20 | try to do what they can to make good or to figure |
| 21 | presented. | 21 | out what's been going on. |
| 22 | Q. Okay. Do you know an individual at | 22 | Q. And do you have any -- what -- what |
| 23 | Google named Sean Harrison? | 23 | -- what happened? What was the outcome of the |
| 24 | A. That name is familiar to me. He might | 24 | -- of the effort to -- to get to the bottom of |
| 25 | have been one of the individuals at one of the | 25 | this false hit issue? |

|  | Page 195 |  | Page 197 |
|---|---|---|---|
| 1 | meetings, but I -- I don't know him and have | 1 | A. Yeah. I can't state with certainty, |
| 2 | never had an interaction with him outside of -- | 2 | only as I recall the information now. Because |
| 3 | if that's the same person, outside of one of | 3 | once it was also being handled by the -- the data |
| 4 | those meetings. | 4 | team, as well, I didn't look too much more deeply |
| 5 | Q. Okay. So sitting here today, can you | 5 | into a hundred percent technical answer of here's |
| 6 | recall ever having any conversation with Sean | 6 | what happened. But, as I recall, there was some |
| 7 | Harrison about -- about -- well, about anything? | 7 | kind of a -- I don't know if the right term is |
| 8 | A. Well, given that I'm not a hundred | 8 | a bot farm, or at least some malicious intent |
| 9 | percent sure if that's the name of the person who | 9 | emanating, at least as was trackable, out of |
| 10 | I think it is, I can't say with certainty. | 10 | an Asian country that I believe to be the |
| 11 | Q. Okay. Are you recalling a conversation | 11 | Philippines, if I recall correctly, but I |
| 12 | with some individual at Google, but you just | 12 | could be mistaken. And somehow it was getting in |
| 13 | don't know that person's name? | 13 | through a MAC code, which is a Marketing Activity |
| 14 | A. I am. | 14 | Code, that was assigned to Google efforts. And |
| 15 | Q. Okay. What conversation are you | 15 | it was generating fake leads, or false -- or just |
| 16 | recalling? | 16 | it was submitting leads with false names and |
| 17 | A. The conversation I'm recalling was on | 17 | -- and -- and giving us the impression of an |
| 18 | the sidelines of the presentation in California, | 18 | effectiveness of whichever of the products it |
| 19 | where we were notified of a number of false leads | 19 | was coming from. I don't recall which one. |
| 20 | that were coming into the Army system through a | 20 | But -- but, essentially, that was the crux of it; |
| 21 | Google product, in the thousands, which obviously | 21 | we had some false leads emanating from some |
| 22 | would throw off a lot of our data systems in | 22 | malicious activity from some third country. |
| 23 | terms of false attribution. And also, | 23 | Q. And do you know if Google took any steps |
| 24 | potentially, our concern of being charged for | 24 | to put a stop to that malicious activity coming |
| 25 | things that weren't really happening. And the | 25 | from a third country? |

Page 246

1  for information relevant to this lawsuit?
2      A.  I did not.
3      MS. GOODMAN:  I reserve the remainder of
4  my time for this deposition based on the improper
5  privilege assertions made at the outset of the
6  deposition.  So I close the dep -- I'm holding
7  the deposition open.
8      MR. MCBIRNEY:  Can I get a time check?
9      THE VIDEOGRAPHER:  We are at 5:55
10  minutes.
11      MR. MCBIRNEY:  Okay.  The government
12  does not agree with your position that the
13  deposition should remain open, but we understand
14  your position.
15      MS. GOODMAN:  Okay.
16      MR. MCBIRNEY:  Off the record.
17      THE VIDEOGRAPHER:  Anything else for the
18  record?
19      MS. GOODMAN:  Thank you, Colonel.
20      THE WITNESS:  Thank you very much.
21      THE VIDEOGRAPHER:  This marks the end of
22  the deposition of Colonel John Horning.  We're
23  going off the record at 1753.
24      (Deposition concluded -- 5:53 p.m.)
25

Page 247

1           C E R T I F I C A T E
2
3      I do hereby certify that I am a Notary
4  Public in good standing, that the aforesaid
5  testimony was taken before me, pursuant to
6  notice, at the time and place indicated; that
7  said deponent was by me duly sworn to tell the
8  truth, the whole truth, and nothing but the
9  truth; that the testimony of said deponent was
10  correctly recorded in machine shorthand by me and
11  thereafter transcribed under my supervision with
12  computer-aided transcription; that the deposition
13  is a true and correct record of the testimony
14  given by the witness; and that I am neither of
15  counsel nor kin to any party in said action, nor
16  interested in the outcome thereof.
17
18      WITNESS my hand and official seal this
19  21st day of
20
21                  _____
22                  Notary Public
23
24
25

Page 248

1  Jimmy McBirney, Esq.
2  jimmy.mcbirney@usdoj.gov
3              August 21, 2023
4  RE:   United States, Et Al v. Google, LLC
5      8/18/2023, John Horning (#6060378)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 249

1  United States, Et Al v. Google, LLC
2  John  Horning (#6060378)
3           E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  John  Horning                 Date
25

```
                                           Page 250
 1  United States, Et Al v. Google, LLC
 2  John Horning (#6060378)
 3          ACKNOWLEDGEMENT OF DEPONENT
 4      I, John Horning, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____   _____
12  John Horning                      Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
```

64 (Page 250)

FILED PURSUANT TO COURT ORDER DOC. 362

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

FILED PURSUANT TO COURT ORDER DOC. 362

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

FILED PURSUANT TO COURT ORDER DOC. 362