# EXHIBIT 22
# FILED UNDER SEAL

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION

3

     _____
4                                   :
     UNITED STATES OF AMERICA, :
5    et al.,                        :
                                    :
6           Plaintiffs              :
                                    :
7        v.                         : No.  1:23-cv-00108
                                    :
8    GOOGLE, LLC,                   :
                                    :
9           Defendants.             :
     _____:

10

11               HIGHLY CONFIDENTIAL
12
                  Monday, August 21, 2023
13

14          Video Deposition of CHRISTOPHER KOEPKE,
15    taken at the Law Offices of Paul, Weiss,
16    Rifkind, Wharton & Garrison LLP, 2001 K St NW,
17    Washington, DC, beginning at 9:35 a.m. Eastern
18    Standard Time, before Ryan K. Black, Registered
19    Professional Reporter, Certified Livenote
20    Reporter and Notary Public in and for the
21    District of Columbia
22
23
24
25      Job No. CS6043164

FILED PURSUANT TO COURT ORDER DOC. 362

Page 2

1  A P P E A R A N C E S :
2
3  UNITED STATES DEPARTMENT OF JUSTICE
   ANTITRUST DIVISION
4  BY:  KATHERINE CLEMONS, ESQ.
         VICTOR LIU, ESQ.
5        ALVIN CHU, ESQ.
         MARK SOSNOWSKY, ESQ. - Via Zoom
6  450 5th Street, N.W
   Washington, DC 20530
7  202.514.2414
   katherine.clemons@usdoj.gov
8  victor.liu@usdoj.gov
   alvin.chu@usdoj.gov
9  mark.sosnowsky@usdoj.gov
10 Representing - The United States of America
11
12 PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP,
   BY:  MARTHA L. GOODMAN, ESQ.
13       HEATHER C. MILLIGAN, ESQ.
   2001 K St NW,
14 Washington, DC
   202.223.7341
15 mgoodman@paulweiss.com
   hmilligan@paulweiss.com
16
   Representing - Google LLC
17
18
19
20
21
22
23 ALSO PRESENT:
24 Orson Braithwaite - Legal Videographer
   Kenneth Whitley - Department of Health and Human
25             Services
26

Page 3

1       I N D E X
2  TESTIMONY OF:  CHRISTOPHER KOEPKE        PAGE
3  By Ms. Goodman................................6
4       E X H I B I T S
5  EXHIBIT       DESCRIPTION            PAGE
6  Exhibit 65   a document Bates Numbered
                CMS-ADS-11906 through 11974...117
7
   Exhibit 66   a document Bates Numbered
8                CMS-ADS-23248 through 23337...136
9  Exhibit 67   a document Bates Numbered
                CMS-ADS-59892 through 59893...151
10
   Exhibit 68   a document Bates Numbered
11               CMS-ADS-593107 through 593110...167
12 Exhibit 69   a document Bates Numbered
                CMS-ADS-183807 through 183811...181
13
   Exhibit 70   a document Bates Numbered
14               CMS-ADS-529199 through 529200..190
15 Exhibit 71   a document Bates Numbered
                CMS-ADS-189390.................251
16
   Exhibit 72   a document Bates Numbered
17               CMS-ADS-64968 through 64971....258
18 Exhibit 73   a document Bates Numbered
                CMS-ADS-440295.................265
19
   Exhibit 74   a document Bates Numbered
20               CMS-ADS-531032 through 531072..268
21 Exhibit 75   a document Bates Numbered
                CMS-ADS-569654 through 569667..273
22
23
24
25

Page 4

1          THE VIDEOGRAPHER:  Good morning.  We are
2  going on the record at 9:35 a.m. on August 21st,
3  2023.  Please note that the microphones are
4  sensitive and may pick up whispering and private
5  conversations.  Please mute your phones at this
6  time.  Audio and video recording will continue to
7  take place unless all parties agree to go off the
8  record.
9          This is Media Unit 1 of the
10 video-recorded deposition of Mr. Christopher
11 Koepke in the matter of United States, et al.,
12 versus Google, LLC, filed in the United States
13 District Court Eastern District of Virginia
14 Alexandria Division, Case Number
15 1:23-cv-00108-LMB-JFA.
16         My name is Orson Braithwaite,
17 representing Veritext Legal Solutions, and I'm
18 the videographer.  The court reporter is Ryan
19 Black, from the firm Veritext Legal Solutions.
20         Counsel will now state their appearances
21 and affiliations for the record.
22         MS. GOODMAN:  Martha Goodman, from Paul
23 Weiss, on behalf of Google LLC.
24         MS. MILLIGAN:  Heather Milligan, also on
25 behalf of Paul Weiss, for Google.

Page 5

1          MS. CLEMONS:  Katherine Clemons, with
2  the Department of Justice, on behalf of the
3  United States of America, CMS and the witness.
4          MR. LIU:  Victor Liu, also with the
5  Department of Justice, on behalf of the United
6  States and CMS.
7          MR. CHU:  Alvin Chu, on behalf of United
8  States.
9          MR. WHITLEY:  Kenneth Whitley, Office of
10 General Counsel, Department of Health and Human
11 Services.
12         MS. GOODMAN:  And could the folks
13 attending remotely please state your presence?
14         MR. SOSNOWSKY:  Mark Sosnowsky,
15 Department of Justice, and I will be in and out
16 of this deposition remotely.  So if you lose me,
17 please don't -- you can continue.
18         THE VIDEOGRAPHER:  Thank you.
19         Would the court reporter please swear in
20 the witness?
21              *    *    *
22 Whereupon --
23         CHRISTOPHER KOEPKE,
24 called to testify, having been first duly sworn
25 or affirmed, was examined and testified as

2 (Pages 2 - 5)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 6

1  follows:
2          *   *   *
3              EXAMINATION
4  BY MS. GOODMAN:
5      Q.  Good morning, Mr. Koepke.
6      A.  Good morning.
7      Q.  Have you been deposed before?
8      A.  I think once. I'm not exactly sure it
9  was a formal deposition, --
10      Q.  Okay.
11      A.  -- but yes.
12      Q.  Was there a court reporter taking down
13  everything you were saying?
14      A.  No, there was not.
15      Q.  Okay. So in this deposition,
16  it's important that you allow me to finish my
17  question before you answer, because our court
18  reporter, Mr. Black, is taking down everything
19  we're saying --
20      A.  All right.
21      Q.  -- and he can't take two people talking
22  at the same time. Okay?
23      A.  All right.
24      Q.  So please let me finish my question
25  before you begin your answer. Okay?

Page 7

1      A.  Okay.
2      Q.  Okay. And the court reporter also
3  cannot record nonverbal answers or half verbal
4  answers, like uh-huh or huh-uh, so please make
5  sure to speak in a -- answer the questions
6  verbally. Okay?
7      A.  Okay.
8      Q.  Okay. And I will assume that you
9  understand my questions unless you ask me for a
10  clarification. Okay?
11      A.  Okay.
12      Q.  And is there any reason you're unable to
13  provide your truthful and accurate testimony here
14  today?
15      A.  No.
16      Q.  Okay. What is your current title?
17      A.  Director of the Strategic Marketing
18  Group in the Office of Communications at the
19  Centers for Medicare and Medicaid Services.
20      Q.  And what are your responsibilities as
21  the director of the Strategic Marketing Group at
22  the Office of Communications at the Centers for
23  Medicare and Medicaid Services?
24      A.  When -- this federal agency is
25  responsible for Medicare, Medicaid and other

Page 8

1  healthcare programs. When we need people,
2  citizens of America to take an action, it is my
3  job to do outreach to help them know what actions
4  they need to take. I could probably go on for
5  the rest of the day with details on that.
6      Q.  I'm sure we'll get to it. How long have
7  you been the director -- is the strategic
8  marketing -- strike that.
9          Is the Strategic Marketing Group
10  abbreviated SMG?
11      A.  Yes, it is.
12      Q.  Okay. How long have you been director
13  of SMG?
14      A.  Approximately nine to ten years.
15      Q.  And prior to serving as director of SMG,
16  what -- what job did you have, if any?
17      A.  I was the deputy director of the
18  Creative Services Group in the Office of
19  Communications at the Centers for Medicare and
20  Medicaid Services.
21      Q.  And how long were you the deputy
22  director of the Creative Services Group?
23      A.  I would say three to four years.
24      Q.  In your role as director of SMG, who do
25  you report to?

Page 9

1      A.  I report to the deputy director of the
2  Office of Communications.
3      Q.  And what is that individual's name?
4      A.  Mary Wallace.
5      Q.  How long has Mary Wallace been the
6  person to whom you've -- who you report?
7      A.  Nine to ten years.
8      Q.  And to whom does Ms. Wallace report?
9          MS. CLEMONS: Objection; foundation.
10          THE WITNESS: Many people, but the
11  administrator of CMS.
12  BY MS. GOODMAN:
13      Q.  And who is the current administrator of
14  CMS?
15      A.  Chiquita Brooks-LaSure.
16      Q.  And how long has Ms. LaSure been the
17  administrator at CMS?
18          MS. CLEMONS: Objection; foundation.
19          THE WITNESS: I don't know when she was
20  confirmed.
21  BY MS. GOODMAN:
22      Q.  Okay. How many administrators of CMS
23  have you worked under over the course of your
24  time as director of SMG?
25      A.  I could give you an approximate number.

3 (Pages 6 - 9)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 10

1  I'm sure I might be forgetting someone.  Five or
2  six.
3      Q.   And how about in the time period of 2019
4  to 2023, how many administrators have you worked
5  under in that time period?
6      A.   There's one detail I can't remember, but
7  from confirmed administrators by the Senate would
8  be two.
9      Q.   And what is the one detail you can't
10  remember?
11     A.   Usually in between confirmed
12  administrators there is a career administrator,
13  and I cannot remember who that was or how many
14  there were between the last two confirmed ones.
15     Q.   Okay.  And are the -- those career
16  officials, are they serving in an acting
17  capacity, in your experience?
18     A.   That is correct.
19     Q.   And how many presidential
20  administrations have you served under?
21         MS. CLEMONS:  Objection; vague.
22         THE WITNESS:  Five.
23  BY MS. GOODMAN:
24     Q.   And are those both republican and
25  democratic administrations?

Page 11

1      A.   Yes.
2      Q.   Are you also an adjunct -- oh, strike
3  that.
4          Who reports to you in your role as
5  director of SMG?
6          MS. CLEMONS:  Objection; form.
7          THE WITNESS:  Do you want the entire
8  list of people or my immediate reports?
9  BY MS. GOODMAN:
10     Q.   Let's go with your direct reports,
11  please.
12     A.   Okay.  There would be three division
13  directors, a special assistant, a deputy director
14  and an office administrator.
15     Q.   And has that -- those one, two, three,
16  four, five -- have you always had six direct
17  reports in your time as director of SMG?
18     A.   I'm not sure.
19     Q.   How about in the time period of 2019 to
20  2023, have you always had six direct reports?
21     A.   Yes.
22     Q.   Okay.  Who are the -- what are the three
23  divisions which report up to you as director of
24  SMG?
25     A.   One of them is the Division of Research.

Page 12

1  Another is the Division of Digital Marketing.
2  And the other one is the Division of Campaign
3  Management.
4      Q.   Who is the head -- who is the division
5  director of the Research Division?
6      A.   Clarese Astrin.
7      Q.   How long has Ms. Astrin been the
8  director of the Research Division?
9      A.   I'm not sure exactly how many years it's
10  been.
11     Q.   Can you approximate?
12     A.   About 10 years.
13     Q.   Okay.  Who is the director of Digital
14  Marketing?
15     A.   Mark Krawczyk.
16     Q.   How long has Mr. Krawczyk been the
17  director of Digital Marketing?
18     A.   I'm not sure.
19     Q.   Can you approximate?
20     A.   I can.
21     Q.   What's your approximate --
22     A.   Six to seven years.
23     Q.   Who is the director of the Campaign
24  Management Division?
25     A.   Barbara Johanson.

Page 13

1      Q.   And how long has Ms. Johanson been the
2  director of the Campaign Management Division?
3      A.   I'm not sure.
4      Q.   How about an approximation?
5      A.   Three years.
6      Q.   Prior to serving as director of the
7  Campaign Management Division, did Ms. Johanson
8  have a role in the SMG?
9      A.   Yes.
10     Q.   What was her role prior to becoming
11  director of the Campaign Management Division?
12     A.   She was an analyst within that division
13  that she now directs.
14     Q.   And who is the deputy director that
15  reports to you?
16     A.   Laura Salerno.
17     Q.   How long has she been the direct
18  -- deputy director at SMG?
19     A.   I'm not sure.
20     Q.   How about an approximation?
21     A.   Three to four years.
22     Q.   Prior to being the deputy director, did
23  Ms. Salerno have a job in the SMG?
24     A.   Yes, she did.
25     Q.   What was her role prior to becoming the

4 (Pages 10 - 13)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 14

1  deputy director?
2      A.  She was the division director at the
3  division of Campaign Management.
4      Q.  Ah.  So Ms. Johanson succeeded
5  Ms. Salerno in that role; is that correct?
6      A.  There would be points of clarification
7  on that, but for this purpose, yes.
8      Q.  What are the points of clarification
9  that you're -- you're referencing?
10     A.  Immediately following Laura becoming the
11  deputy director, we went through a few people on
12  detail to -- as it takes time to post a
13  position --
14     Q.  Got it.
15     A.  -- and for people to compete.
16     Q.  What are the responsibilities of the
17  Campaign Management Division?
18     A.  There are many.  Is there -- would -- do
19  you want to be more specific?
20     Q.  Could you please start with a summary of
21  the responsibilities of the Campaign Management
22  Division?
23         MS. CLEMONS:  Objection to form.
24         THE WITNESS:  I could, but I'm wondering
25  what part you would like me to summarize.

Page 15

1  BY MS. GOODMAN:
2      Q.  I want to understand at first a
3  high-level summary of what the Campaign
4  Management respons -- division's responsibilities
5  are.
6         MS. CLEMONS:  Objection to form.
7  BY MS. GOODMAN:
8      Q.  And then I can ask further questions
9  from there to drill down on what I'm hoping to
10  learn from your testimony here today.  Okay?
11     A.  Okay.  They manage the campaigns that
12  we conduct to serve people who need access to
13  healthcare.
14     Q.  And by "campaigns," what do you mean?
15     A.  Programs designed to reach our audiences
16  and inform them of the actions they need to take
17  so that they can access healthcare.
18     Q.  And same -- same question for the
19  Digital Marketing Division.  What as a -- can
20  you provide a high-level summary of the Digital
21  Marketing di -- division's responsibilities?
22         MS. CLEMONS:  Objection; form.
23         THE WITNESS:  Digital Marketing is
24  responsible for most of the agency's social media
25  and our direct response digital marketing

Page 16

1  campaigns.
2  BY MS. GOODMAN:
3      Q.  What are "direct response digital
4  marketing campaigns"?
5      A.  That's when you reach to individuals
6  directly, not through advertising, so, say,
7  email, texting, maybe auto dials.
8      Q.  And so the Digital Marketing Division's
9  direct response campaigns do not involve
10  advertising agencies.  Is that accurate?
11         MS. CLEMONS:  Objection; form.
12         THE WITNESS:  You know, there's gray
13  area for everything.  I wouldn't -- could you
14  rephrase the question, please?
15  BY MS. GOODMAN:
16     Q.  In order to execute their direct
17  response marketing campaigns, does the Digital
18  Marketing Division engage with advertising
19  agencies via a contract?
20         MS. CLEMONS:  Objection to form.
21         THE WITNESS:  Yes.
22  BY MS. GOODMAN:
23     Q.  What advertising agencies do they engage
24  with?
25     A.  Weber Shandwick, Elevation, and my other

Page 17

1  one would be a guess.
2      Q.  Okay.
3      A.  So I'm not a hundred percent sure.  In
4  fact, I don't think so.
5      Q.  The services that Weber Shandwick
6  and Elevation provide to the Digital Marketing
7  Division, are those under the same contracts
8  between CMS and those advertising agencies that
9  the Campaign Management Division uses?
10         MS. CLEMONS:  Objection to form.
11         THE WITNESS:  I'm trying to think
12  through time periods.  Sorry.
13         No.
14  BY MS. GOODMAN:
15     Q.  So is it accurate that the Digital
16  Marketing Division goes through a separate
17  contract with Weber Shandwick, for example, in
18  order to use advertising services for its work as
19  compared to the Campaign Management Division?
20         MS. CLEMONS:  Objection to form.  Calls
21  for a legal conclusion.
22         THE WITNESS:  No.
23  BY MS. GOODMAN:
24     Q.  Okay.
25     A.  The purpose there is not to actually do

5 (Pages 14 - 17)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 110

1  But it demonstrated that the outreach resulted in
2  -- and this is the number I'm not -- but resulted
3  in many people getting health coverage.
4  BY MS. GOODMAN:
5      Q.  As compared to the prior year?
6      A.  We did not do Mixed Media Modeling the
7  private -- prime -- the previous year, so as
8  related to the number of uninsured people, --
9      Q.  Got it.
10     A.  -- the audience at that time.  And other
11 factors that could also increase enrollment.
12     Q.  What are the other factors that could
13 also increase enrollment to which you're
14 referring?
15     A.  For a set number of years, a law was
16 passed that impacted the tax breaks that people
17 could get for having health insurance, thereby
18 reducing their premiums for the health insurance.
19     Q.  So over the time period at issue, or
20 that I'm focusing on in this case, 2019 to 2023,
21 it's fair to say that the budget available for
22 advertising and outreach has increased, correct?
23     MS. CLEMONS:  Objection; form.
24     THE WITNESS:  Yes.
25 BY MS. GOODMAN:

Page 111

1      Q.  Okay.  And how have you, in the
2  Strategic Marketing Group, made decisions about
3  how to spend those additional dollars over that
4  time period?
5      MS. CLEMONS:  Objection; form.
6      THE WITNESS:  We considered the audience
7  and how best to reach them, and we -- and we
8  distribute the funds accordingly.
9  BY MS. GOODMAN:
10     Q.  And what changes have you observed with
11 respect to how best to reach the audiences you're
12 trying to reach over the 2019 to '23 time period
13 as part of the Open Enrollment campaigns?
14     MS. CLEMONS:  Objection; form.
15 Foundation.
16     THE WITNESS:  I'm not sure the channel
17 mix for most effectively reaching the audience
18 during that time period, based on my observations
19 of what would be best for reaching that audience,
20 has changed significantly, more subtle changes.
21 BY MS. GOODMAN:
22     Q.  And what are the subtle changes that you
23 have observed?
24     A.  Over a time period, and this could be
25 beyond the time period that you're mentioning, so

Page 112

1  that could be the problem with my thinking, but
2  display advertising has actually appeared, in my
3  memory, from best that I can recall, to become
4  more impactful.
5      Q.  In what ways that you can recall has
6  display advertising become more impactful?
7      A.  Best of my recollection, return on
8  investment appears to be higher.
9      Q.  And what return on investment are you
10 tracking with respect to display advertising in
11 the Open Enrollment campaigns?
12     MS. CLEMONS:  Objection to form.
13     THE WITNESS:  We have primarily three
14 methods for looking at the role of display.
15 Method Number 1 is looking at the people who
16 directly interact with the ad, so what we often
17 call last-click attribution.  Method Number 2 is
18 multi-source attribution; still within the
19 digital realm.  And Method Number 3 is the Mixed
20 Media Modeling.
21 BY MS. GOODMAN:
22     Q.  And so in what ways has the return on
23 investment according to those methods gotten
24 higher?  Like, what changes are you seeing in
25 those metrics vis-a-vis return on investment?

Page 113

1      MS. CLEMONS:  Objection; form.
2  Foundation.
3      THE WITNESS:  To the best of my
4  recollection, we are seeing an ability to
5  attribute more application starts, and that is
6  the number of people who would actually be
7  applying for the tax break to help them pay for
8  their health insurance, and more enrolling due to
9  display ads, to the best of my recollection.
10 BY MS. GOODMAN:
11     Q.  Have you observed any changes with
12 respect to meeting the audience you're trying to
13 reach with respect to video advertising in the
14 2019 to '23 time period?
15     MS. CLEMONS:  Objection; form.
16     THE WITNESS:  I don't recall.
17 BY MS. GOODMAN:
18     Q.  Are there any other subtle changes that
19 you have observed over the 2019 to 2023 time
20 period with respect to reaching the audience
21 you're trying to reach for health -- Open
22 Enrollment?
23     MS. CLEMONS:  Objection to form.
24     THE WITNESS:  I don't recall.
25 BY MS. GOODMAN:

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1  Q.  Okay.  How about the -- have you
2  observed any changes in the availability of
3  advertising providers that you could use to reach
4  your audience over the 2019 to 2023 time period?
5  MS. CLEMONS:  Objection to form.
6  THE WITNESS:  I don't recall.
7  BY MS. GOODMAN:
8  Q.  So earlier we talked about a lot of the
9  different programmatic providers that CMS has
10  used.
11  A.  Mm-hmm.
12  Q.  Do you recall that testimony?
13  A.  Yes, I do.
14  Q.  Okay.  With respect to those providers,
15  were they all available to CMS in the 2019 year
16  as compared to the 2023 year?
17  MS. CLEMONS:  Objection; form.
18  THE WITNESS:  I don't recall.
19  BY MS. GOODMAN:
20  Q.  Are you aware of any advertising
21  providers who were not available to CMS in
22  2019 but who are available to CMS in 2023?
23  MS. CLEMONS:  Objection to form.
24  THE WITNESS:  I am not.
25  BY MS. GOODMAN:

Page 115

1  Q.  Okay.  So one of the subtle changes
2  that you said you observed was that display has
3  become more impactful, correct?  And when you say
4  "display," can you be more detailed about what
5  kind of display advertising you mean that has
6  become more impactful as in having a higher
7  return on investment?
8  MS. CLEMONS:  Objection to form.
9  THE WITNESS:  So kind of display really
10  covers a lot of categories, because there's
11  creative, there's delivery systems, there's
12  targeted.  Do you have anything particularly in
13  mind?
14  BY MS. GOODMAN:
15  Q.  No.  I want to understand what you mean
16  by "display being more impactful."
17  A.  All right.
18  MS. CLEMONS:  Objection to form.
19  THE WITNESS:  So to the best of my
20  recollection, display ads that -- what we would
21  call -- I don't know.  Let me see.  I've gotta
22  think of the term here -- prospecting.  So those
23  are the ads that go out and find people who could
24  benefit from the program, who may or may not have
25  ever interacted with the program before.  To the

Page 116

1  best of my recollection, that type of display
2  ad has increased in its value to us.
3  BY MS. GOODMAN:
4  Q.  And how does CMS go about -- what
5  methods does CMS use to place these kinds of
6  prospecting display ads?
7  MS. CLEMONS:  Objection to form.
8  THE WITNESS:  We direct our contractors
9  to do it on our behalf.
10  BY MS. GOODMAN:
11  Q.  And do you direct them to use any
12  particular provider?
13  MS. CLEMONS:  Objection to form.
14  Foundation.
15  THE WITNESS:  We will direct them to use
16  particular providers.
17  BY MS. GOODMAN:
18  Q.  Okay.  So with respect to the increasing
19  effectiveness of prospecting display ads, what
20  providers have you used?
21  MS. CLEMONS:  Objection to form.
22  THE WITNESS:  Off the top of my mind, I
23  can think of two --
24  BY MS. GOODMAN:
25  Q.  Which are those?

Page 117

1  A.  Which does not mean that there aren't
2  others.
3  Q.  Sure.
4  A.  So Google and MIQ.
5  MS. GOODMAN:  Shall we take a break for
6  lunch?
7  MS. CLEMONS:  Yeah.
8  THE WITNESS:  I'm good with whatever.
9  THE VIDEOGRAPHER:  The time is 12:22
10  p.m.  This ends Unit 2.  We're off the record.
11  (Lunch recess taken.)
12  (Exhibit No. 65, a document Bates
13  Numbered CMS-ADS-11906 through 11974, was
14  introduced.)
15  THE VIDEOGRAPHER:  The time is 1:14 p.m.
16  This begins Unit Number 3.  We're on the record.
17  BY MS. GOODMAN:
18  Q.  Mr. Koepke, I'm going to hand you a
19  document marked Exhibit 65, CMS-ADS-11906 through
20  11974.
21  And this is a technical proposal from
22  Weber Shandwick for Healthcare.gov 2010 Open
23  Enrollment campaign, correct?
24  A.  I'm not sure.  It's going to take me a
25  minute to look at it.

30 (Pages 114 - 117)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 118

1    Q.   Sure.
2    A.   It appears as such.
3    Q.   Okay.  And what is the purpose of a
4  technical proposal, to your knowledge?
5        MS. CLEMONS:  Objection; form.
6        THE WITNESS:  A technical proposal is
7  part of a contracting process.  So the offerers,
8  which are the different ad agencies who might be
9  interested in contracting with the federal
10  government, would write a technical proposal to
11  show their abilities to meet the standards that
12  the federal government has set forward.
13  BY MS. GOODMAN:
14    Q.   And did multiple different contractors
15  compete each year for the Open Enrollment
16  campaign, or was it only Webber Shandwick?
17        MS. CLEMONS:  Objection to form.
18        THE WITNESS:  Each year?
19  BY MS. GOODMAN:
20    Q.   Each year.
21    A.   Okay.  It was not always only Weber
22  Shandwick, to the best of my knowledge.  I'm
23  actually not a hundred percent sure, but -- so I
24  don't know.
25    Q.   Okay.  As the director of the Strategic

Page 119

1  man -- Marketing Group, did you review technical
2  proposals?
3    A.   No, I did not.
4        MS. CLEMONS:  Objection to form.
5        THE WITNESS:  I'm so sorry.
6  BY MS. GOODMAN:
7    Q.   Have you ever had occasion to read
8  them?
9        MS. CLEMONS:  Objection to form.
10        THE WITNESS:  Have I ever had the
11  occasion to read a technical proposal of any
12  sort?
13  BY MS. GOODMAN:
14    Q.   Of -- related to any advertising
15  campaign handled by the Strategic Marketing Group
16  at CMS.
17    A.   You had a lot of very specific details
18  in that question that would lead me to say no.
19    Q.   What are the specific details in my
20  question that would lead you to say no?
21    A.   One of them was the "Strategic Marketing
22  Group."
23    Q.   Did I state that incorrectly?
24        MS. CLEMONS:  Objection to form.
25        THE WITNESS:  You did not say "Strategic

Page 120

1  Marketing Group" incorrectly.  It sounded correct
2  to me.
3  BY MS. GOODMAN:
4    Q.   Okay.  I don't understand what the
5  detail with respect to the Strategic Marketing
6  Group led you to say no to my question.
7        MS. CLEMONS:  Objection to form.
8  BY MS. GOODMAN:
9    Q.   Can you explain that to me?
10    A.   Your question had three parts:  Have I
11  ever read a technical proposal.  Is it about
12  advertising.  And is it for the Strategic
13  Marketing Group at CMS.  I guess that's four
14  parts.
15        The Strategic Marketing Group did not
16  exist when I read the technical proposals.
17    Q.   When did you read the technical
18  proposals?
19        MS. CLEMONS:  Objection to form.
20        THE WITNESS:  The early 2000s.
21  BY MS. GOODMAN:
22    Q.   So since the early 2000s, is it accurate
23  that you have not read the strat -- the technical
24  proposals submitted by ad agencies?
25        MS. CLEMONS:  Objection to form.

Page 121

1        THE WITNESS:  The technical proposals
2  are written by -- are read and judged by trained
3  staff who work for me.
4  BY MS. GOODMAN:
5    Q.   Okay.  And so your trained staff read
6  and review them, but you do not; is that correct?
7    A.   That is correct.
8    Q.   Okay.  Do you discuss the technical
9  proposals with your staff?
10    A.   I do not.
11    Q.   Why not?
12    A.   Because it is inappropriate for people
13  judging a technical proposal to talk with other
14  people about it in the process of an acquisition.
15    Q.   Why is that improper or inappropriate?
16    A.   I would only be doing conjecture, but
17  it's -- the government has a goal to be fair to
18  all businesses.  And so, therefore, the people
19  who read the proposals and judge them are doing
20  so in a non-biased sense.  And discussing with
21  anyone else could -- could increase or add bias
22  to a process.
23    Q.   And which of your staff reviewed
24  technical proposals for the Healthcare.gov Open
25  Enrollment campaigns in the '19 to '23 time

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 218

1    thing.  And -- and just describe other products
2    and ask us what our goals are, and what have you,
3    so that they would have a better understanding
4    about how -- about how their products could be
5    used, because, of course, they're trying to sell
6    their products.
7        Q.  Did you find those meetings to be
8    valuable?
9        MS. CLEMONS:  Objection to form.
10       THE WITNESS:  Valuable in what way?
11   BY MS. GOODMAN:
12       Q.  Valuable to the work that you do at CMS
13   in advertising.
14       MS. CLEMONS:  Objection; form.
15       THE WITNESS:  I find them valuable, in
16   part, because it's really interesting to me to
17   see how people do their work.  And, yes, some of
18   the data analytics that we've actually requested
19   that they've done for us have been valuable.
20   BY MS. GOODMAN:
21       Q.  Despite these meetings also being an
22   opportunity for Google to explain how their
23   products could be used, because, of course,
24   they're trying to sell their products, does CMS
25   still make an independent decision about which

Page 219

1    advertising products or services to use?
2        A.  Absolutely, yes.
3        Q.  Okay.  Anything else, sitting here
4    today, that you can recall about any
5    conversations you have had with any individual
6    from Google --
7        MS. CLEMONS:  Objection; form.
8    BY MS. GOODMAN:
9        Q.  -- relative to CMS's advertising?
10       MS. CLEMONS:  Same objection.
11       THE WITNESS:  That's a lot to try to
12   recall.  So it -- true specifics?  No.
13   Conversations?  Yes.
14   BY MS. GOODMAN:
15       Q.  Any other types of conversations, other
16   than what we've discussed which you recall having
17   with Google?
18       A.  Yes.  Thank you.
19       Q.  You're welcome.
20       A.  In the search ad -- in the search ad
21   arena, Google accepts ads -- or has accepted ads,
22   from people who try to look like the government.
23   And we discover these ads sometimes.  And every
24   time I see one, I would send it to Kunal, to
25   Michelle.  And -- because most digital companies,

Page 220

1    including Google, have a policy that an ad should
2    not -- what's the word I'm looking for -- mimic
3    -- that's not the word I'm looking for, but it's
4    like that, mimic some other existing
5    organization, or mimic the government when you're
6    not the government, basically.
7        So, you know, an ad that says they're
8    Medicare, and they're not actually Medicare, is
9    misleading to people, and there are a lot of
10   those ads on Google.  And so when we find them,
11   we send them and they -- we have conversations
12   about that.
13       Q.  And what steps, if any, do you ask
14   Google to take with respect to these ads -- these
15   search ads you're describing?
16       A.  Take them down immediately.  Asked for
17   some monitoring support.  I've asked for it.
18   That is what I've asked for.
19       Q.  And what -- what has Google, in return,
20   provided to you with respect to these search ads?
21       A.  Google has taken ads down when we find
22   them, and that is Whac-A-Mole because anybody can
23   put up an ad on Google if they've got a credit
24   card.  Google has created new policies about
25   taking out ads for health insurance, and have met

Page 221

1    with us about those policies.
2        Q.  So is it fair to say that Google is
3    taking steps to address CMS's concerns with
4    respect to search ads that mimic the government?
5        MS. CLEMONS:  Objection to form.
6        THE WITNESS:  It is fair to say Google
7    has taken steps with regard to search ads.
8    BY MS. GOODMAN:
9        Q.  How about with respect to display ads?
10   Are you aware of any conduct on the part of
11   Google with respect to display ads that has
12   negatively impacted CMS's advertising?
13       MS. CLEMONS:  Objection to form.  And I
14   would caution the witness not to -- to answer the
15   question if your answer would reveal privileged
16   communications with counsel.
17   BY MS. GOODMAN:
18       Q.  Are you able to answer that question?
19       A.  No.
20       Q.  Prior to having any conversation with
21   any lawyer with respect to display ads, any lawyer
22   from the government, did you ever have any
23   concerns that Google was engaging in
24   anticompetitive conduct related to display
25   advertising?

56 (Pages 218 - 221)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 222

1       MS. CLEMONS:  Objection to form.  Calls
2   for a legal conclusion.
3       THE WITNESS:  No.
4   BY MS. GOODMAN:
5       Q.   And prior to any conversation with any
6   lawyer for the government, did you ever have any
7   concerns that Google was causing CMS to pay more
8   for display advertising than it should have been
9   paying?
10       A.   Could you rephrase that, please -- or
11   not rephrase.  Just repeat it.  That's what I
12   meant.  I'm so sorry.
13       Q.   That's okay.
14       A.   I used the wrong word.
15       Q.   Prior to any conversation with any
16   lawyer for the government, did you ever have any
17   concerns that Google was causing CMS to pay more
18   for display advertising than it should have been
19   paying?
20       MS. CLEMONS:  Objection; form.
21       THE WITNESS:  The tough part here is
22   "should have been paying."  That's an -- a really
23   -- that suggests a lot of information.
24       That being said, yes.
25   BY MS. GOODMAN:

Page 223

1       Q.   And what -- what concerns did you have
2   with respect to Google causing CMS to pay more
3   for display advertising than it should have been
4   paying prior to any conversation with a lawyer
5   for the government?
6       A.   It is possible -- in fact, indeed,
7   probable, that when you are purchasing ads on a
8   cost-per-impression basis, that you're buying
9   things that are not useful to you.
10       Q.   And so in what ways has Google, to your
11   knowledge, caused you to buy things that are not
12   useful to you on a cost-per-impression basis?
13   And when I say you, I mean CMS.
14       MS. CLEMONS:  Objection to form.
15       THE WITNESS:  It has been a concern that
16   we have discussed.  Whether it is -- the way you
17   put the question was, like, pure knowledge.
18   Because other ways to potentially buy, which we
19   have not been able to do, would be to buy based
20   on outcomes instead of impressions.
21   BY MS. GOODMAN:
22       Q.   And is Google the only provider that you
23   buy ads on an impression basis for, or are there
24   other providers --
25       MS. CLEMONS:  Objection to form.

Page 224

1   BY MS. GOODMAN:
2       Q.   -- who charge on such a basis, to your
3   knowledge?
4       MS. CLEMONS:  Same objection.
5       THE WITNESS:  There are other providers.
6   BY MS. GOODMAN:
7       Q.   And do you have the same concerns with
8   respect to providers other than Google who charge
9   on a cost-per-impression basis?
10       MS. CLEMONS:  Objection to form.
11       THE WITNESS:  Yes.
12   BY MS. GOODMAN:
13       Q.   Okay.  Has anybody at any advertising
14   agency with whom CMS works ever told you that
15   Google was engaging in anticompetitive conduct
16   related to display advertising?
17       A.   Not that I recall.
18       Q.   Okay.  So sitting here today, and prior
19   to any conversation with any lawyer for the
20   government, can you recall any concerns you've
21   ever had with respect to Google's conduct and its
22   affect on CMS's display advertising purchases?
23       MS. CLEMONS:  Objection to form.
24       THE WITNESS:  Extremely informal
25   conversations between me and my colleagues.

Page 225

1   BY MS. GOODMAN:
2       Q.   And what extremely informal
3   conversations between you and your colleagues are
4   you referencing?
5       A.   Ones where we notice that all
6   the digital ads that we place go through
7   double-click; that the analytics come through
8   Google analytics.  There just seems to be a lot
9   of Google along the ways.  And we've had those
10   comments, conversations and we just move on.
11   Because, in the end of the day, we're just doing
12   our jobs.
13       Q.   And have you rai -- ever raised those
14   conversations with anybody outside of your
15   colleagues?
16       MS. CLEMONS:  Objection to the extent
17   that question calls for privileged communications
18   with counsel.  If you're -- if you can answer
19   without referencing or being informed by
20   privileged communications with counsel, you
21   may do so.
22       THE WITNESS:  Sorry.  I'm just trying to
23   think and remember.  It's mental gymnastics at
24   this point.  So --
25   BY MS. GOODMAN:

FILED PURSUANT TO COURT ORDER DOC. 362

Veritext Legal Solutions
800-567-8658                                    973-410-4098

HIGHLY CONFIDENTIAL

Page 250

1    Q.   Was it in 2023 or 2022?
2    A.   I believe it was in 2023.
3    Q.   And how did you become aware in 2023 of
4  an investigation by the Department of Justice
5  into Google?
6         MS. CLEMONS:  Objection; privileged.
7  And I'm going to instruct the witness not to
8  answer to the extent that your answer would be
9  informed by or reveal privileged communications
10  with counsel.
11  BY MS. GOODMAN:
12    Q.   Are you able to answer that question,
13  sir?
14    A.   No.
15    Q.   Okay.  So is it fair to say, then, you
16  became aware of an investigation by DOJ through
17  lawyers?
18         MS. CLEMONS:  Objection.  Calls for
19  privileged information.  I'm going to instruct
20  the witness not to answer.
21         MS. GOODMAN:  I'm not asking for the
22  communications.  I'm asking for how he learned of
23  something.  The fact of learning it from lawyers
24  is not privileged, one way or another.  I'm not
25  asking for the communications by which he learned

Page 251

1  of it.  I'm not asking for the substance of any
2  discussions.  I'm asking for how he learned this
3  fact.
4         MS. CLEMONS:  You are assuming that he
5  learned something and then asking whether he
6  learned that fact through communications with
7  counsel, which is the topic of the communication
8  with counsel through which someone would learn
9  something.
10         MS. GOODMAN:  And it's the same kind of
11  thing that would appear on a privilege log.  It
12  doesn't delve into the substance of the
13  communications.
14         MS. CLEMONS:  I'm going to instruct the
15  witness not to answer.
16  BY MS. GOODMAN:
17    Q.   Okay.  Are you going to follow that
18  instruction?
19    A.   Yes.
20    Q.   Okay.
21         MS. GOODMAN:  Can I have Tab 3?
22         (Exhibit No. 71, a document Bates
23  Numbered CMS-ADS-189390, was introduced.)
24  BY MS. GOODMAN:
25    Q.   Exhibit 71, CMS-ADS-189390.  This is a

Page 252

1  Microsoft Teams invite for a meeting.  Subject:
2  DOJ HHS CMS call regarding online advertising
3  purchasing, which you are on in the "To" line,
4  correct?
5    A.   I'm trying to get the subject.  I will
6  say what is correct is that I am on the "To"
7  line.
8         Ah, there's the subject.  Sorry.
9         DOJ HHS CMS call regarding online
10  advertising purchasing, so, yes, correct.
11    Q.   And this -- did you recall -- do you
12  recall participating in this call on January 6th,
13  2023?
14    A.   Yes.
15    Q.   Okay.  And to your recollection, did the
16  call last the 30 minutes between 3 and 3:30 p.m.
17  as reflected on this meeting invite?
18    A.   I do not recollect.
19    Q.   Okay.  Do you think it lasted longer or
20  shorter than that amount of time?
21    A.   I do not recollect.
22    Q.   Okay.  Did you understand the purpose of
23  this call to -- for DOJ to understand how CMS
24  buys online ads?
25         MS. CLEMONS:  Objection.  To the

Page 253

1  extent that question calls for privileged
2  communications with counsel, I'm going to
3  instruct the witness not to answer if your answer
4  would be informed by communications with counsel.
5  BY MS. GOODMAN:
6    Q.   Are you able to answer that question?
7    A.   I'm going to take counsel's direction.
8    Q.   Okay.  So the only knowledge you have as
9  to the purpose of this call is from lawyers; is
10  that correct?
11         MS. CLEMONS:  You can answer yes or no.
12         THE WITNESS:  I don't recall.
13  BY MS. GOODMAN:
14    Q.   Okay.  Sitting here today, can you think
15  of any other source, other than communications
16  with counsel, that informed your understanding of
17  the purpose of this call in Exhibit 71 on January
18  6th, 2023?
19         MS. CLEMONS:  I'm going to object to the
20  extent it calls for communications with other CMS
21  employees that were directed by counsel.  So you
22  may answer so long as your answer would not
23  reveal privileged communications with counsel or
24  directed by counsel.
25  BY MS. GOODMAN:

64 (Pages 250 - 253)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 254

1    Q.  Can you answer that question?
2    A.  I'm going to take counsel's instruction.
3    Q.  Okay.  Well, she said you may answer as
4  long as your answer would not reveal privileged
5  communications with counsel or directed by
6  counsel, so can you answer?
7    A.  By saying I'm taking the instruction,
8  I'm taking the second half of that, that it is
9  privileged communication.
10    Q.  Okay.  How do you know if any
11  communications that you have had with any
12  CMS employee are directed by counsel?
13        MS. CLEMONS:  Objection to the
14  extent that your answer would be informed by
15  communications with counsel, or communications
16  with other CMS employees that were directed by
17  counsel, I'm going to instruct the witness not to
18  answer.
19  BY MS. GOODMAN:
20    Q.  Can you answer that question, sir?
21    A.  I cannot.
22    Q.  Okay.  At the time of this meeting,
23  January 6th, 2023, did you have any personal
24  view on participating in a conversation with the
25  Department of Justice on the topic of online

Page 255

1  advertising purchasing?
2        MS. CLEMONS:  Objection to form.  And
3  I'm also going to instruct the witness not to
4  answer if your answer would reveal the
5  com -- privileged communications with counsel.
6        THE WITNESS:  No.
7  BY MS. GOODMAN:
8    Q.  So setting aside any conversations with
9  any lawyer, I'm asking for your personal view on
10  having to participate in a conversation with
11  regard to online advertising purchasing.  Did you
12  have a personal view one way or the other?
13        MS. CLEMONS:  Objection to form.
14        THE WITNESS:  No.
15  BY MS. GOODMAN:
16    Q.  Did you want to participate in that
17  call?
18    A.  That's a different question.
19    Q.  Okay.  What's the answer to that
20  question?
21    A.  Sort of.
22    Q.  Why do you say "sort of"?
23    A.  I'm a curious person.
24    Q.  Is there any reason you did not want to
25  participate in that call?

Page 256

1        MS. CLEMONS:  Objection; form.
2  Foundation.
3        THE WITNESS:  Not particularly.
4  BY MS. GOODMAN:
5    Q.  Okay.  When -- at the time of this
6  communication in January 2023, did you anticipate
7  that CMS would be involved in a lawsuit against
8  Google?
9        MS. CLEMONS:  Objection.  I'm going
10  to instruct the witness not to answer to the
11  extent that your answer would be informed by
12  communications with counsel or at the direction
13  of counsel.
14  BY MS. GOODMAN:
15    Q.  Can you answer that question?
16    A.  I cannot.
17    Q.  Okay.  Did anybody -- this is a yes or
18  no question.  Did any lawyer direct you to have
19  any conversations about online advertising in the
20  time period of January 2023?
21        MS. CLEMONS:  Objection.  I'm going to
22  instruct the witness not to answer as that calls
23  for privileged communications that counsel and
24  their substance.
25  BY MS. GOODMAN:

Page 257

1    Q.  Are you following that instruction?
2    A.  Yes, I am.
3    Q.  Okay.
4        MS. GOODMAN:  Can I have Tab 4?
5  BY MS. GOODMAN:
6    Q.  Much earlier in the day we talked about
7  weekly meetings that you have with your team.  Do
8  you recall that testimony?
9    A.  I do.
10    Q.  Okay.  Has the subject of CMS's online
11  advertising purchases ever been a topic of such
12  weekly meetings in the January 2023 time period
13  to your recollection?
14    A.  I do not --
15        MS. CLEMONS:  Objection to the extent
16  that it would call for conversations directed by
17  counsel, or made at the request of counsel.
18        You may answer if the answer would not
19  be informed by conversations with counsel or
20  directed by counsel.
21        THE WITNESS:  I do not recall.  We
22  clearly talk about online advertising a lot.  So
23  whether we talked about it in January or not, the
24  odds are high, yes.
25  ///

65 (Pages 254 - 257)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 258

1    (Exhibit No. 72, a document Bates
2    Numbered CMS-ADS-64968 through 64971, was
3    introduced.)
4    BY MS. GOODMAN:
5    Q.   Okay.  I'm going to hand you Exhibit 72,
6    CMS-ADS-64968 through 64971.  And this is an
7    email that was sent to you on January 11th, 2023,
8    correct?
9    A.   Yes.
10   Q.   Okay.  And the subject is SMG Weekly
11   Agenda.  Do you see that?
12   A.   Yes.
13   Q.   Is this the weekly agenda for the
14   full Strategic Marketing Group meetings that we
15   discussed at the beginning of the deposition?
16   A.   No, it is not.
17   Q.   Okay.  For what group -- for what weekly
18   meeting is this the agenda?  What category of
19   weekly meeting?
20   A.   This is the agenda for a meeting between
21   me and my boss.
22   Q.   Okay.  How do you know that?
23   A.   The SMG Weekly Meeting is the title of
24   the meeting between my boss and I.
25   Q.   Okay.  And your boss is not on this

Page 259

1    email, correct?
2    A.   That is correct.
3    Q.   Okay.  Who puts together this weekly
4    agenda for your meeting with your boss?
5    A.   It is put together by me and my team.
6    Q.   Okay.  And you see the second bullet
7    here, Antitrust Online Advertising - Google
8    Banner Ads.  What is that a reference to?
9    MS. CLEMONS:  Objection.  Calls for
10   privileged information.  I'm going to instruct
11   the witness not to answer.
12   BY MS. GOODMAN:
13   Q.   Are you following that instruction?
14   A.   Yes, I am.
15   Q.   Okay.  Does this bullet exist on this
16   agenda at the direction of any lawyer?
17   A.   I don't recall.
18   Q.   Okay.  Did any lawyer ask you to discuss
19   antitrust online advertising with your boss --
20   MS. CLEMONS:  Objection.
21   BY MS. GOODMAN:
22   Q.   -- at this time period?
23   MS. CLEMONS:  Calls for privileged
24   communications with counsel.  I'm going to
25   instruct the witness not to answer.

Page 260

1    BY MS. GOODMAN:
2    Q.   Are you following that instruction?
3    A.   Yes, I am.
4    Q.   Okay.  Did you discuss antitrust online
5    advertising with any of the individuals on this
6    email, the individuals in the "From" or the "cc"
7    or the "To" line?
8    MS. CLEMONS:  Objection.  Calls for
9    privileged information and communications.  I'm
10   going to instruct the witness not to answer to
11   the extent that your answer would be informed or
12   directed by privileged communications with
13   counsel.
14   BY MS. GOODMAN:
15   Q.   Are you able to answer that question,
16   sir?
17   A.   No, I am not.
18   Q.   Mm-hmm.
19   And is that because, to the extent you
20   discussed antitrust online advertising with any
21   of the individuals on this email, that it was
22   done -- that it was informed or directed by
23   communications with counsel?
24   MS. CLEMONS:  Objection.  I'm going
25   to instruct the witness not to answer as that

Page 261

1    question calls for the substance of privileged
2    communications with counsel.
3    BY MS. GOODMAN:
4    Q.   Are you following that instruction?
5    A.   Yes, I am.
6    MS. GOODMAN:  Okay.  Ms. Clemons,
7    you understand that these questions are all
8    directed at establishing whether you've met the
9    evidentiary basis for invoking a privilege?  And
10   so by preventing the witness from answering the
11   questions, you have actually precluded any record
12   on whether a privilege applies.
13   MS. CLEMONS:  What you are asking is for
14   the witness to tell you what he talked to or did
15   not talk to counsel about.  And we are perfectly
16   capable of establishing a record outside of you
17   asking the witness to describe his communications
18   with counsel.
19   MS. GOODMAN:  I'm not asking him
20   to describe with any detail that reveals any
21   substance of any communications.  I am asking for
22   the kind of information that would appear on a
23   privilege log that is necessary for you to
24   support a claim of privilege.  And so I would
25   ask you to revisit your objections so that the

66 (Pages 258 - 261)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 262

1  witness can provide his under oath, sworn
2  testimony about whether a privilege applies.
3          MS. CLEMONS:  And I'm going to instruct
4  the witness not to reveal the substance of
5  communications with counsel, --
6          MS. GOODMAN:  Okay.
7          MS. CLEMONS:  -- or communications at
8  the direction of counsel.
9          MS. GOODMAN:  Or communications informed
10  by counsel, correct?
11          MS. CLEMONS:  Yes.
12          MS. GOODMAN:  So anything within the
13  penumbra of communications with counsel you will
14  instruct the witness not to answer, correct?
15          MS. CLEMONS:  I'm not sure exactly what
16  you mean by "penumbra of communications with
17  counsel," but, yes.
18          MS. GOODMAN:  Okay.
19  BY MS. GOODMAN:
20      Q.  Did you speak to Debra Hoffman about
21  antitrust online advertising?
22          MS. CLEMONS:  Objection.  I'm going to
23  instruct the witness not to answer as that
24  question calls for the substance of privileged
25  communications with counsel or communications

Page 263

1  directed by counsel.
2  BY MS. GOODMAN:
3      Q.  Did anybody direct you to speak to Debra
4  Hoffman about antitrust online advertising?
5          MS. CLEMONS:  Same objection.
6  BY MS. GOODMAN:
7      Q.  Yes or no.
8          MS. CLEMONS:  Instruct the witness not
9  to answer.
10  BY MS. GOODMAN:
11      Q.  It's a yes or no question.  Did anybody
12  direct you to have a conversation with Debra
13  Hoffman about antitrust online advertising?
14          MS. CLEMONS:  Objection.  I'm going to
15  instruct the witness not to answer.
16  BY MS. GOODMAN:
17      Q.  Are you following that instruction, sir?
18      A.  Yes, I am.
19      Q.  Okay.  And will you answer, sir, one way
20  or another, whether you had any conversations
21  with Debra Hoffman about online antitrust
22  advertising?
23          MS. CLEMONS:  You could answer that yes
24  or no.
25          THE WITNESS:  Yes.

Page 264

1  BY MS. GOODMAN:
2      Q.  Okay.  So, sir, did you have any
3  conversations with Debra Hoffman about online
4  antitrust advertising?
5      A.  Yes.
6      Q.  Okay.  What were the conversations you
7  had with Ms. Hoffman about antitrust online
8  advertising?
9          MS. CLEMONS:  Objection.  I'm going
10  to instruct the witness not to answer to the
11  extent that your answer would be informed by
12  communications with counsel or reveal the
13  substance of directions of counsel.
14  BY MS. GOODMAN:
15      Q.  Are you following that instruction?
16      A.  Yes, I am.
17      Q.  Okay.
18          MS. GOODMAN:  Can I have Tab 6?
19          MS. CLEMONS:  We've actually been going
20  over an hour, so it might be time for a break.
21          THE WITNESS:  Just kind of split it up.
22  What, we've got about an hour left, then?
23          MS. GOODMAN:  Sure.  Let's take a break.
24          THE VIDEOGRAPHER:  The time is 5:25 p.m.
25  This ends Unit 5.

Page 265

1          (Recess taken.)
2          THE VIDEOGRAPHER:  Time is 5:40 p.m.
3  This begins Unit Number 6.  We're on the record.
4          (Exhibit No. 73, a document Bates
5  Numbered CMS-ADS-440295, was introduced.)
6  BY MS. GOODMAN:
7      Q.  Mr. Koepke, I'm handing you Exhibit 73,
8  CMS-ADS-440295.
9      A.  Thank you.
10      Q.  You're welcome.
11          And this is an email you received on
12  January 18th, 2023.  Subject: Barb's two
13  -- two-on-one agenda, correct?
14      A.  Yes.
15      Q.  The third bullet, Antitrust, do you know
16  what that's a reference to?
17          MS. CLEMONS:  Objection.  I'm going to
18  instruct the witness not to answer to the extent
19  your answer would be informed by privileged
20  communications with counsel.
21  BY MS. GOODMAN:
22      Q.  Are you able to answer that question
23  without relying on privilege communications with
24  counsel?
25      A.  No, I'm not.

67 (Pages 262 - 265)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 266

1    Q.  Okay.  Did you have discussions on the
2    topic of antitrust online advertising with any
3    individuals within the Strategic Marketing Group?
4         MS. CLEMONS:  Objection.  And I'm going
5    to instruct the witness not to answer to the
6    extent your answer would reveal communications
7    with counsel or actions taken at the direction of
8    counsel.
9    BY MS. GOODMAN:
10        Q.  So my question is a simple yes or no
11   question:  Did you have discussions on the
12   topic of antitrust online advertising with any
13   individuals within the Strategic Marketing Group?
14        Based on your client -- your counsel's
15   instruction, are you able to answer that question
16   yes or no?
17        MS. CLEMONS:  You can answer yes or no.
18        THE WITNESS:  Now you just asked
19   me two questions.  I'm so sorry.  What one do you
20   want me to ask -- answer?
21   BY MS. GOODMAN:
22        Q.  Did you have discussions on the
23   topic of antitrust online advertising with any
24   individuals within the Strategic Marketing Group?
25   Yes or no.

Page 267

1    A.  Yes.
2    Q.  Which individuals?
3         MS. CLEMONS:  I'm going to caution the
4    witness not to answer if your answer would reveal
5    communications with counsel or actions taken at
6    the direction of counsel.
7    BY MS. GOODMAN:
8         Q.  Are you able to answer that question,
9    sir?
10   A.  No, I am not.
11   Q.  So you cannot answer the names of
12   the people who you spoke with within Strategic
13   Marketing Group on the topic of antitrust online
14   advertising?
15   A.  That is correct.
16   Q.  Okay.  Did you have discussions with
17   anybody at any advertising agency working for CMS
18   on the topic of antitrust online advertising?
19        MS. CLEMONS:  I'm going to instruct the
20   witness not to answer to the extent that your
21   answer would reveal privileged communications
22   with counsel or actions taken at the direction of
23   counsel.
24   BY MS. GOODMAN:
25        Q.  You can't answer that question yes or

Page 268

1    no?
2    A.  I cannot answer that question.
3    Q.  Okay.
4         MS. GOODMAN:  I'll take 57 -- 58.
5         (Exhibit No. 74, a document Bates
6    Numbered CMS-ADS-531032 through 531072, was
7    introduced.)
8    BY MS. GOODMAN:
9         Q.  I'm handing you Exhibit 74,
10   CMS-ADS-531032 through 531072.  And this is an
11   email you sent on January 12th, 2023, to Holly
12   Baier, correct?
13   A.  Holly Baier, yes.
14   Q.  Holly Baier.  Okay.  Who is Holly Baier?
15   A.  Holly Baier is the special assistant in
16   the Strategic Marketing Group.
17   Q.  Okay.  And the second email down in the
18   thread you write, "Hi, guys.  I think we share
19   this information.  D1 shows how we account for
20   funds.  I just think we should see if we could
21   block out names and their respective hourly
22   rates.  What do you think."  Do you see that?
23   A.  I do see that.
24   Q.  Okay.  When you say, "I think we share
25   this information," who are you referring to

Page 269

1    sharing this information with?
2         MS. CLEMONS:  I'm going to object.  To
3    the extent that your answer would be informed by
4    communications with counsel or reveal the
5    direction of counsel, and if you have any
6    questions about where those lines might be or
7    whether something would reveal the directions of
8    counsel, we could take a break, if you need to.
9         THE WITNESS:  I do not need to take a
10   break, so many questions on the table.
11        I'm taking advice of counsel.
12   BY MS. GOODMAN:
13        Q.  Okay.  So you cannot answer the question
14   who are you -- you cannot answer, one way or the
15   other, based on the instruction of your lawyer,
16   who you are referring to when you say, "I think
17   we share this information."  Is that acc -- am I
18   getting that correct?
19   A.  That is correct.
20   Q.  Okay.  Why did you want to block out
21   names and their respective hourly rates?
22   A.  Let's see.  What was the date on this?
23   Q.  January 12th, 2023.
24   A.  January 12th.
25        At this time, January 12th, we were

68 (Pages 266 - 269)

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 290

1  deposition is over and that Google does not have
2  grounds to hold the deposition open.
3         MS. GOODMAN:  Okay.  Thank you for your
4  time, Mr. Koepke.
5         THE WITNESS:  It was my pleasure.  This
6  was fun.
7         THE VIDEOGRAPHER:  Time is 6:23 p.m.
8  We're off the record.
9         (Deposition concluded -- 6:23 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 291

1         C E R T I F I C A T E
2
3         I do hereby certify that I am a Notary
4  Public in good standing, that the aforesaid
5  testimony was taken before me, pursuant to
6  notice, at the time and place indicated; that
7  said deponent was by me duly sworn to tell the
8  truth, the whole truth, and nothing but the
9  truth; that the testimony of said deponent was
10  correctly recorded in machine shorthand by me and
11  thereafter transcribed under my supervision with
12  computer-aided transcription; that the deposition
13  is a true and correct record of the testimony
14  given by the witness; and that I am neither of
15  counsel nor kin to any party in said action, nor
16  interested in the outcome thereof.
17
18  WITNESS my hand and official seal this
19  22nd day o
20
21
22         Notary Public
23
24
25

Page 292

1  Katherine Clemons Esq
2  Katherine.clemons@usdoj.gov
3         August 22nd, 2023
4  RE:   United States, Et Al v. Google, LLC
5     8/21/2023, Christopher Koepke (#6043164)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  (erratas-cs@veritext.com).
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25

Page 293

1  United States, Et Al v. Google, LLC
2  Christopher Koepke (#6043164)
3         E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Christopher Koepke              Date
25

74 (Pages 290 - 293)

Veritext Legal Solutions
800-567-8658                                              973-410-4098

FILED PURSUANT TO COURT ORDER DOC. 362

HIGHLY CONFIDENTIAL

Page 294

1  United States, Et Al v. Google, LLC

2  Christopher Koepke (#6043164)

3         ACKNOWLEDGEMENT OF DEPONENT

4    I, Christopher Koepke, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Christopher Koepke           Date

13  *If notary is required

14         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15         _____ DAY OF _____, 20___.

16

17

18         _____

19         NOTARY PUBLIC

20

21

22

23

24

25

75 (Page 294)

FILED PURSUANT TO COURT ORDER DOC. 362

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the

deponent or a party before the deposition is

completed, the deponent must be allowed 30 days

after being notified by the officer that the

transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to

sign a statement listing the changes and the

reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.

The officer must note in the certificate prescribed

by Rule 30(f)(1) whether a review was requested

and, if so, must attach any changes the deponent

makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.


FILED PURSUANT TO COURT ORDER DOC. 362

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

FILED PURSUANT TO COURT ORDER DOC. 362

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

FILED PURSUANT TO COURT ORDER DOC. 362