**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

---

**UNITED STATES, *et al.*,**

                                        ***Plaintiffs*,**

          **- against -**

**GOOGLE LLC,**

                                        ***Defendant*.**

**Civil Action No. 1:23-cv-00108
(LMB) (JFA)**

---

**GOOGLE LLC'S OPPOSITION TO THE UNITED STATES'
MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS OR,
<u>IN THE ALTERNATIVE, A PROTECTIVE ORDER</u>**

REDACTED VERSION

## I.    __INTRODUCTION__

The Antitrust Division of the Department of Justice ("DOJ") seeks to cut off inquiry into the biases of its prosecutor and witnesses by filing an untimely motion on two defenses.  DOJ argues both that Google fails to plead enough facts, but also that Google cannot be allowed to gather those facts.  This contradiction perfectly illustrates the frailty of DOJ's position and its ultimate motive.  DOJ's challenge to Google's defenses is untimely and improper, and DOJ has failed to show "good cause" to avoid Google's relevant and narrowly tailored discovery requests.

As the record already establishes, DOJ is seeking at least $300 million in damages, before trebling, on behalf of eight federal agencies.  Notwithstanding its multi-year investigation, DOJ's initial outreach to these federal agencies did not begin in earnest until just weeks before it filed its complaint, and there is hardly any mention of the federal agencies in the complaint.  In addition, federal agency witnesses have testified that they do not view Google's conduct as anticompetitive or harmful.  Quite the opposite, federal agency witnesses have testified to the benefits Google has created for them.  The federal agencies did not ask DOJ to file a complaint on their behalf; nor did they understand that they would be participating in this litigation until sometime after the complaint was filed.  These facts demonstrate that the federal agencies are not the parties on whose behalf DOJ is bringing this case.

So on whose behalf is DOJ bringing this lawsuit?  Discovery to date has shown that DOJ's investigation focused on two categories of allegedly aggrieved industry participants: (1) big industry publishers; and (2) competitors of Google.  These two categories of industry participants—big publishers and Google's ad tech competitors—have something in common: many of them were clients of Assistant Attorney General Jonathan Kanter ("AAG Kanter") while he was in private practice, paying him millions of dollars over a period of fifteen years to advocate that DOJ and other antitrust enforcers bring antitrust cases against Google.  The

1

REDACTED VERSION

allegations in DOJ's complaint contain many of the same or similar phrases that AAG Kanter included in advocacy pieces he prepared on behalf of private paying clients for DOJ and other antitrust enforcers.  It is these big publishers and Google competitors—previously represented by AAG Kanter while he was in private practice—on whose behalf this case was filed.

"A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions."  *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 248 (1980).  AAG Kanter's deep-seated bias against Google—pre-judging Google even before he assumed public office—violates Google's Due Process right to a neutral prosecutor.  Since assuming office, AAG Kanter has also treated his former clients differently than Google, reflecting selective enforcement of the antitrust laws.  The detailed facts in this opposition—demonstrating how AAG Kanter is using public office to accomplish what he was unable to do in private practice on behalf of his paying clients—are largely based on publicly available information.  As the events leading up to the filing of this case become clearer, Plaintiffs, as well as former clients of AAG Kanter, have tried to block Google from learning more about their roles in orchestrating this lawsuit.  This evidence is relevant both to Google's defenses, and the motives and biases of witnesses DOJ is likely to call at trial.

Plaintiffs should not be permitted to escape further discovery through a motion for judgment on the pleadings or a motion to strike.  Plaintiffs' deadline for filing a motion to strike was June 2, 2023—a deadline that has long passed—and a motion for judgment on the pleadings, as the Fourth Circuit has stated, "generally cannot reach the merits of an affirmative defense" except in the "relatively rare circumstances where facts sufficient to rule on the affirmative defense are alleged in the complaint."  *Goodman* v. *Praxair, Inc.*, 494 F.3d 458, 468 (4th Cir.

2

REDACTED VERSION

2007) (en banc).  And because the discovery that Google seeks relates not only to its defenses, but also the biases, motives, and credibility of parties that are likely to be key DOJ witnesses, DOJ has failed to establish the "good cause" required for issuance of a protective order foreclosing further discovery on its defenses and witness biases.

## II.   FACTUAL BACKGROUND

### A.   For Over 15 Years in Private Practice, Google's Rivals Paid AAG Kanter to Persuade DOJ to File Ad Tech Litigation.

When President Biden nominated Jonathan Kanter to be the U.S. Department of Justice's Assistant Attorney General for Antitrust, the *New York Times* headline read, "*Biden to Name a Critic of Big Tech as the Top Antitrust Cop*," and described AAG Kanter as "an antitrust lawyer who has made a career of representing rivals of American tech giants like Google."[1]  When AAG Kanter was confirmed by the Senate, *Bloomberg* announced, "*Senate Confirms Google Foe as DOJ's Antitrust Chief*," pointing out his work in private practice as "a lawyer for companies like Microsoft Corp., Yelp Inc. and News Corp that advocated for antitrust enforcement against Google."[2]  And when AAG Kanter brought this action against Google's ad tech business, the *Wall Street Journal* reported, "*DOJ Suit to Break Up Google Was Years in the Making for Antitrust Chief*," explaining that AAG Kanter "has been one of Google's main legal foes for nearly 15 years," and highlighting his work for several of Google's rivals, including Microsoft, Yelp, and News Corp, among others.[3]

In his Senate Questionnaire, AAG Kanter described his private practice as working

---

[1] Lauren Hirsch & David McCabe, *Biden to Name a Critic of Big Tech as the Top Antitrust Cop*, N.Y. Times (originally published July 20, 2021), https://nyti.ms/3DnL1Yi.

[2] David McLaughlin, *Senate Confirms Google Foe Jonathan Kanter as DOJ's Antitrust Chief*, Bloomberg (Nov. 16, 2021), http://tiny.cc/ic0avz.

[3] Dave Michaels, *DOJ Suit to Break Up Google Was Years in the Making for Antitrust Chief*, Wall St. J. (Jan. 29, 2023), http://tiny.cc/7h1avz.

REDACTED VERSION

behind the scenes to persuade federal and state antitrust agencies to bring cases against his clients' business rivals.  He highlighted his paid work "on behalf of clients to oppose mergers, acquisitions, and joint ventures, including Google's acquisition of DoubleClick,"[4] which is now a central allegation of this lawsuit.

Publicly available information demonstrates that AAG Kanter spent more than 15 years of his private practice career trying to persuade DOJ and other antitrust enforcers to bring litigation against Google's ad tech business on behalf of his clients, many of which are Google's top business rivals.

### B.   AAG Kanter Has Been Adverse to Google in His Representation of Microsoft.

In 2007, to help grow its display ads business, Google sought to acquire DoubleClick.[5] The Federal Trade Commission ("FTC") reviewed the transaction and cleared it.[6]  That clearance came despite stiff opposition from one of Google's chief ad tech rivals, Microsoft, which engaged in an extensive, months-long campaign to lobby internet companies, consumers, and regulators to oppose the transaction.[7]  (Notably, reports stated that Microsoft had itself tried to purchase DoubleClick, but that Google had beaten its offer.[8])  AAG Kanter, then a partner at

---

[4] U.S. Senate Comm. on the Judiciary Questionnaire for Non-Judicial Nominees: Jonathan Kanter 24, http://tiny.cc/eh1avz (accessed August 30, 2023) ("Kanter Judiciary Questionnaire").

[5] Louise Story & Miguel Helft, *Google Buys DoubleClick for $3.1 Billion*, N.Y. Times (Apr. 14, 2007), http://tiny.cc/eodavz.

[6] Fed. Trade Comm'n, FTC File No. 071-0170, *Statement of the Federal Trade Commission Concerning Google/DoubleClick* 1 (Dec. 20, 2007), http://tiny.cc/wg1avz.

[7] Elizabeth Montalbano, *Microsoft launches campaign against Google-DoubleClick merger*, Computerworld (Sept. 24, 2007), http://tiny.cc/godavz; *EU: Microsoft's Last Stand Against Google's Acquisition of DoubleClick*, TechCrunch (Dec. 26, 2007), http://tiny.cc/iodavz.

[8] Steve Lohr, *Microsoft Urges Review of Google-DoubleClick Deal*, N.Y. Times (Apr. 16, 2007), https://www.nytimes.com/2007/04/16/technology/16soft.html.

REDACTED VERSION

Cadwalader, Wickersham & Taft, was heavily involved in Microsoft's anti-Google advocacy.[9]

AAG Kanter's anti-Google work on behalf of Microsoft continued after the FTC cleared the DoubleClick transaction.  In 2009, AAG Kanter helped lobby regulators on behalf of Microsoft in its attempt to acquire Yahoo! Inc.'s search business.[10]  And although they have not yet been produced, Microsoft has indicated its intent to produce two papers "related to" AAG Kanter's "representation of Microsoft" in 2010 and 2011, which have been described as "Google's Acquisition of Ad Mob: An Anticompetitive Deal to Combine the Top Two Firms in Mobile Advertising (2010)," and "Anticompetitive Concerns of Google's Proposed Acquisition of Admeld (2011)."[11]  Microsoft, a well-established Google competitor, also paid AAG Kanter to lobby the FTC to investigate Google in 2012 over conduct relevant to Google's search business (which the FTC determined not to be anticompetitive).[12]  He "was a member of the team[s]" that filed antitrust complaints against Google on behalf of TradeComet and MyTriggers,[13] litigations that Microsoft reportedly spearheaded as part of a "proxy war" against Google.[14]  AAG Kanter

---

[9] Kanter Judiciary Questionnaire at 24; Legal Week, *US briefing: The Google slayers*, Law.com (May 19, 2010), http://tiny.cc/95favz; John Hendel, *Biden's Trustbuster Streak Continues with Kanter Pick*, POLITICO (July 21, 2021, 10:00 AM), https://politi.co/3jZDhnB; Steve Lohr & Cecilia Kang, *A Star Corporate Lawyer Now Set to Take On Corporate America*, N.Y. Times (Oct. 28, 2021), http://tiny.cc/kc0avz.

[10] Legal Week, *supra* note 9; *see also* Sharon Gaudin, *Antitrust Attorney: Microsoft-Yahoo Deal Won't Pass Regulatory Muster*, Computerworld (Aug. 24, 2009, 6:00 AM), http://tiny.cc/lh1avz.

[11] Ex. 24 (excerpt of Microsoft's Responses & Objections to Google's Document Subpoena).

[12] Hendel, *supra* note 9 (describing Kanter as "a key figure in the FTC's 2012 antitrust investigation of Google, in which he represented Microsoft"); *see also* Fed. Trade Comm'n, FTC File No. 111-0163, Statement of the Federal Trade Commission Regarding Google's Search Practices, *In re Google Inc.* (Jan. 3, 2013), http://tiny.cc/nh1avz.

[13] Kanter Judiciary Questionnaire at 20-21.

[14] *Antitrust Rhetoric Heats Up Between Google, Microsoft*, Reuters (Mar. 1, 2010, 9:34 PM), http://tiny.cc/oh1avz ("A variety of news outlets and blogs are reporting on allegations that

REDACTED VERSION

listed these matters as two of the top ten "most significant" matters he handled in his career.[15]

### C.     AAG Kanter's Anti-Google Public Statements Between 2006-2019.

AAG Kanter's public statements prior to his confirmation as AAG show that he has long pre-judged that Google has violated the antitrust laws.  He publicly stated that he has been waiting years for DOJ and the FTC to "act swiftly" against Google for its acquisitions of DoubleClick, AdMob, and Admeld—acquisitions at issue in this suit.[16]  He has elsewhere referred to Google as a "monopol[y]" that "stifle[s] innovation" and "economic growth" (despite expressly stating such an opinion was solely his own).[17]  He has called for a movement of antitrust action to "stop" Google.[18]  And public reports have labeled him an "architect of the EU's antitrust case against Google."[19]

AAG Kanter also published an op-ed speculating that Google would violate the antitrust

---

Microsoft may be engaging in a proxy war against Google, using smaller companies to fight its battles.").

[15] Kanter Judiciary Questionnaire, at 20-21.  Both lawsuits were dismissed.  Geoffrey Manne, *TradeComet's Antitrust Complaint Against Google is Dismissed*, Forbes (Mar. 9, 2010), http://tiny.cc/apdavz; Ron Knox, *Google wins motion to dismiss myTriggers lawsuit*, Global Competition Review (Sept. 2, 2011), https://globalcompetitionreview.com/article/google-wins-motion-dismiss-mytriggers-lawsuit.

[16] Open Markets Institute Conference: The New Gatekeepers: Journalism in the Era of Platform Monopoly (Panel Session 1) at 33:42-36:55 (June 14, 2018), https://youtu.be/40HXpi0IzDk?t=2022.

[17] Conference of Western Attorneys General: Competition and Innovation in Online Markets (Panel Session 6) at 13:15-13:51, 15:55-16:22 (Aug. 21, 2017), http://tiny.cc/jf1avz; *see also* Jonathan Kanter, *Don't Hand Our TVs Over to Google*, N.Y. Times: Opinion (May 30, 2016), https://nyti.ms/3ly4aQM; Legal Week, *supra* note 9.

[18] Adam Satariano & Jack Nicas, *E.U. Fines Google $5.1 Billion in Android Antitrust Case*, N.Y. Times (July 18, 2018), http://tiny.cc/kf1avz.

[19] Roger McNamee, *Biden Has to Play Hardball with Internet Platforms*, WIRED (July 24, 2021), http://tiny.cc/lf1avz.

REDACTED VERSION

laws if given the chance.[20]  He also accused Google of having "a long history of harming content providers."  *Id.*  The questionnaire he completed for the U.S. Senate Committee on the Judiciary reflects that AAG Kanter has regularly spoken out against Google on panels, at other public-speaking events, and in the press.[21]

In July 2020, AAG Kanter emailed DOJ about a presentation that he and Susan Athey, then Microsoft's Chief Economist, had prepared to encourage DOJ to take antitrust enforcement action against Google.  The email made clear that "Susan and I will each participate on our own behalf (not for any specific client)."[22]

### D.    AAG Kanter, on Behalf of His Private Clients, Urged DOJ to Sue Google Relating to Its Ad Tech Business.

In August 2019, DOJ opened an antitrust investigation into Google's ad tech business. DOJ received documents and advocacy materials from many third parties, a number of whom were represented by AAG Kanter.  These Kanter-represented third parties included Google's ad tech rivals—Magnite (formerly known as Rubicon), OpenX, and Roku—as well as a number of large publishers (including News Corp)—some of whom were claiming to experience declining revenues as consumers were shifting to non-traditional media sources.[23] ████████████

████████████████████ each retained AAG Kanter and Susan Athey to persuade DOJ to

---

[20] Kanter, *Don't Hand Our TVs Over to Google*, *supra* note 16.

[21] Kanter Judiciary Questionnaire at 4-13 (listing written publications, speeches & panel participation, and statements to press).

[22] Ex. 1 (DOJ-ADS-B-0000001123).

[23] *E.g.*, Ex. 2 (DOJ-ADS-B-0000024792, with attached DOJ-ADS-B-0000024793 (███████)); Ex. 3 (DOJ-ADS-0000030221 (██████)); Ex. 4 (DOJ-ADS-0000037533 (██████)); Miles Kruppa & Sam Schechner, *Google Critic Is Cleared to Work on U.S. Antitrust Matters Involving Search Giant*, Wall Street Journal (Jan. 13, 2023, 2:34 pm), http://tiny.cc/updavz (referring to Kanter's work for Magnite (f/k/a Rubicon), OpenX, and News Corp); Claude Marx, *Kanter gets bipartisan backing from past DOJ antitrust heads*, MLex (Oct. 4, 2021), https://www.mlexwatch.com/articles/13641/print?section=ftcwatch (referring to AAG Kanter's work for Roku).

REDACTED VERSION



sue Google for alleged anticompetitive conduct affecting digital advertising.[24]          also paid AAG Kanter to advocate to the                                                and to foreign regulators (including                                                the French Competition Authority) that they should take antitrust action against Google's ad tech business.[25]

> **E.    Microsoft, Through Acquisitions, Including the Xandr Acquisition, Has Developed an Ad Tech Business Substantially Similar to Google's Ad Tech Stack.**

Microsoft has been building its own comprehensive ad tech offering and is one of the foremost competitors to Google.   In 2019, it acquired PromoteIQ, a retail media ad tech company, and renamed Bing Ads to Microsoft Advertising.[26]   Then on June 6, 2022, Microsoft acquired Xandr (formerly AppNexus), providing Microsoft—just like Google—with a full ad tech stack comprising both demand- and sell-side platforms.   As a result of Microsoft's acquisition of Xandr, Microsoft's ad tech stack now includes Microsoft Advertising (an ad buying tool substantially similar to Google Ads); Xandr Invest, which is a demand side platform (an ad buying tool substantially similar to Google's DV360); and Xandr Monetize, which consists of both a publisher ad server and supply-side platform (an ad selling tool substantially

---

[24] *E.g.*, Ex. 5 (DOJ-ADS-B-0000021660 (          )); Ex. 6 (DOJ-ADS-B-0000002223          Ex. 7 (DOJ-ADS-B-0000040065 (                    Ex. 8 (DOJ-ADS-0000037484 (          )); Ex. 9 (DOJ-ADS-B-0000001433 (          )).

[25] Ex. 10 (NEWSCORP-DOJCID-00002354); Ex. 11 (NEWSCORP-DOJCID00003628); Ex. 12 (NEWSCORP-DOJCID-00003558); Ex. 13 (DOJ-ADS-0000066206); *see also* Natasha Lomas, *France fines Google $268M for adtech abuses and gets interoperability commitments*, TechCrunch (June 7, 2021, 7:46 AM), http://tiny.cc/8e0avz ("The publishing groups that made the original complaint against Google in France [included] News Corp Inc.").

[26] Jordan Novet, *Microsoft buys retail advertising start-up PromoteIQ*, CNBC (Aug. 5, 2019 12:11 pm), http://tiny.cc/4qdavz; Rik van der Kooi, *Bing Ads is now Microsoft Advertising*, Microsoft Advertising Blog (Apr. 29, 2019), http://tiny.cc/0qdavz.

REDACTED VERSION

similar Google Ad Manager).[27]  In short, Microsoft offers a suite of ad tech products and services just like Google's, and in direct competition with Google, on both the buy and sell side.  Yet, to Google's knowledge, Microsoft's acquisition of Xandr was not challenged by antitrust regulators and did not face any of the same scrutiny that had been directed at Google at the time of its DoubleClick acquisition.  In 2022, "armed with adtech unit Xandr and a global ad sales force," Microsoft became "the tech and sales provider for" Netflix's "new ad-supported streaming service over the presumed favorites Google and NBCUniversal parent Comcast."[28]  At the close of 2022, Microsoft had advertising revenues of over $11.5 billion, a 25 percent increase over the preceding year.[29]  Microsoft has also reportedly begun leveraging its ad tech stack to promote its first-party products and integrations, including its owned and operated platforms.[30]

**F.      This Suit Was Filed Shortly After AAG Kanter Completed His Recusal and Cooling Off Period.**

When AAG Kanter took office, he became subject to the standards of ethical conduct for employees of the executive branch, including 5 C.F.R. § 2635.502(b)(1)(iv).  This regulation precluded his participation in matters involving "any person for whom [he] has, within the last year, served as" an "attorney."  Pursuant to this regulation, he recused himself from the ad tech matter "because he had, while in private practice, represented third parties in connection with the

---

[27]   Lucinda Southern, *AT&T Sells Xandr to Microsoft*, AdWeek (Dec. 21, 2021), http://tiny.cc/6qdavz.    The allegation in the Complaint that Google was "the lone conflicted representative of both buyers and sellers," Am. Compl. ¶ 39, ignores that Microsoft—one of Google's chief tech rivals, a former client of AAG Kanter—likewise represents both buyers and sellers across its suite of ad tech tools.

[28] R. Joe, H. Langley, A. Stewart, *How Microsoft won Netflix, the ad prize of the year — and why Google lost it*,  Business Insider (July 14, 2022), http://tiny.cc/7qdavz.

[29] Microsoft 2022 Annual Report, http://tiny.cc/8qdavz.

[30]   James Hercher, *Microsoft Is Deprioritizing Third-Party Ad Tech Amid Reorgs And Layoffs*, Ad Exchanger (June 6, 2023), http://tiny.cc/9qdavz.

REDACTED VERSION

investigations of Google's search and ad tech businesses."  Mot. 5.  In addition, AAG Kanter had

to sign the Biden administration's Ethics Pledge, which contractually committed him to conduct

himself in a manner "that upholds the independence of law enforcement and precludes improper

interference with investigative or prosecutorial decisions of the Department of Justice."[31]

Specifically, "as a condition, and in consideration, of [his] employment in the United States

Government in a position invested with the public trust," he committed to the "revolving door

ban," which he agreed would be "binding on [him] and [ ] enforceable under law":

> Revolving Door Ban — All Appointees Entering Government.  I will not for a period of
> 2 years from the date of my appointment participate in any particular matter involving
> specific parties that is directly and substantially related to my former employer *or former
> clients*, including regulations and contracts.[32]

Based on this pledge and general ethics practice, many members of the press and public

inferred that the nature and extent of AAG Kanter's previous representations would bar him from

working on Google matters because allowing him to remain in a supervisory role would create,

at a minimum, the appearance of partiality.[33]

On November 7, 2022, one year following his appointment, AAG Kanter assumed

leadership of DOJ's ad tech investigation, citing 5 C.F.R. § 2635.502(b)(1)(iv), Mot. 6, even

though the Revolving Door Ban requires a two-year recusal period for any matter "involving

specific parties that is directly and substantially related to" his "former clients."  AAG Kanter

---

[31] Exec. Order No. 13989, 86 Fed. Reg. 7029-35 (Jan. 20, 2021).

[32] *Id.*

[33] *E.g.*, Hirsch & McCabe, *supra* note 1 ("Mr. Kanter's critics are likely to question whether his previous work is a conflict of interest that should keep him out of investigations into the tech giants."); Ben Brody, *What Can't Jonathan Kanter Do?*, Protocol (July 23, 2021), https://www.protocol.com/policy/kanter-recusals ("[H]is prior work as a corporate lawyer going after tech giants may require him to recuse himself from some of the DOJ's marquee investigations and cases, including those involving Google").

REDACTED VERSION

placed lawyers and economists around him who share his connections to Microsoft and an anti-Google history of work; for example, he hired Susan Athey, who worked for Microsoft since 2007,[34] to serve as the Antitrust Division's Chief Economist.

Google does not know the extent to which AAG Kanter maintains contact with his former clients concerning this litigation, although he was disclosed as the point of contact for three of them—Magnite, OpenX, and News Media Alliance—in the State Plaintiffs' Initial Disclosures in a parallel proceeding.[35]  That topic is the subject of pending discovery requests and would cast even more light on the degree to which AAG Kanter's public role in bringing this litigation was inappropriately infected with his previous private practice and financial incentives.  It would also cast light upon the biases of AAG Kanter's former clients, many of which are percipient fact witnesses in this litigation given their status as industry participants.

### G.    DOJ Sued Google Only After AAG Kanter Began Working on the Case.

In December 2020, when Texas and nine other states sued Google, alleging that its ad tech business was an illegal monopoly under the federal antitrust laws, DOJ did not file suit, even though its investigation into Google's ad tech practices had been pending for over a year.[36] In the five months following the Texas suit, 18 additional actions by various private plaintiffs were filed asserting similar claims against Google.[37]  One of these suits was brought by the Daily Mail, whose attorneys worked closely with AAG Kanter to lobby DOJ to file suit against

---

[34] Susan Athey Trial Testimony at 1798-99, *Epic Games, Inc.* v. *Apple, Inc.*, No. 4:20-cv-05640 (N.D. Cal. May 11, 2021), ECF No. 782.

[35] Ex. 14 at A-13, A-16, A-17 (excerpt of State Plaintiffs' Initial Disclosures, *In re Google Digit. Advert. Antitrust Litig.*, 1:21-md-03010 (S.D.N.Y.)).

[36] Compl., *Texas* v. *Google, LLC*, 4:20-CV-957-SDJ (E.D. Tex. Dec. 16, 2020), ECF No. 1.

[37] *See* ECF No. 44-2 at 6; *see also* Schedule of Actions, *In re Google Digit. Advert. Antitrust Litig.*, MDL No. 3010 (J.P.M.L. Apr. 30, 2021), ECF No. 1-2;  *In re Digit. Advert. Antitrust Litig.*, 555 F. Supp. 3d 1372, 1380 (J.P.M.L. 2021).

REDACTED VERSION

Google.[38]  DOJ still did not file suit, nor did it do so, in August 2021, when the Judicial Panel on Multidistrict Litigation centralized the Texas action with the 18 other private actions in the Southern District of New York.[39]

Despite AAG Kanter's efforts on behalf of his former clients, and the roughly two million documents produced by Google, five million third-party documents, and 31 depositions of Google witnesses conducted by the end of February 2022, DOJ did not bring an ad tech complaint against Google.  Nor did DOJ sue in the nine months that followed, during AAG Kanter's "cooling off period" when he was effectively recused from the case, despite the fact that DOJ had access to virtually all of the materials relevant to deciding whether to sue Google.  In sum, DOJ did not bring an ad tech complaint against Google during the three years that AAG Kanter was not the decisionmaker in the matter.

Despite having been paid by well-established Google rivals to agitate for this lawsuit while in private practice, on November 7, 2022, AAG Kanter was authorized to lead this action on behalf of the federal government he had been lobbying.  Mot. 6.  As soon as AAG Kanter was "cleared" to lead the matter, a complaint was prepared that asserted the same antitrust theories that AAG Kanter had been paid to press for years on behalf of his private practice clients.  The below chart provides illustrative examples of those antitrust theories advanced by AAG Kanter on behalf of private clients, and how those theories were incorporated into DOJ's Complaint:

---

[38] Ex. 15, DOJ-ADS-B-0000006124 ███████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

[39] *See In re Digit. Advert. Antitrust Litig.*, 555 F. Supp. 3d 1372, 1380 (J.P.M.L. 2021).

REDACTED VERSION

| Antitrust Theory Advanced by Kanter on Behalf of Prior Clients | DOJ Complaint Allegations |
|---|---|
| J. Kanter Letter █████████ (10/17/19): ████████████████████████████████████████ Ex. 10 (NEWSCORP-DOJCID-00002354, at -55). | "Rather than innovate and compete, Google found a shortcut.  In 2007, Google announced that it would buy **DoubleClick** for $3.1 billion."  Compl. ¶ 79. "[I]n 2009, Google paid $750 million to purchase **AdMob**." *Id.* ¶ 85.  "In 2010, Google acquired **Invite Media** for approximately $81 million." *Id.* ¶ 86.  "In 2011, Google bought **AdMeld** for approximately $400 million." *Id.* ¶ 87.  "The DoubleClick, Invite Media, and AdMeld acquisitions helped Google achieve **dominant positions at each level of the open web ad tech stack.**" *Id.* ¶ 88. |
| J. Kanter Letter █████████ (10/17/19): Google's ████████████████████████████████████████ Ex. 10 (NEWSCORP-DOJCID-00002354, at -56). | "When combined with the various advantages Google had afforded its ad exchange within Google's publisher ad server, this approach potentially could achieve all of Google's goals: **inhibit advertisers from transacting through rival exchanges** engaged in header bidding while allowing **Google to redirect revenue and transactions back to Google's ad exchange**, where it could charge **supra-competitive fee**s." Compl. ¶ 215. |
| J. Kanter email ████████ (9/12/19): ████████████████████████████████ Ex. 2 (DOJ-ADS-B-0000024792, with attached DOJ-ADS-B-0000024793, at -798). | "Google, and Google alone, had control over both the leading source of advertiser demand and the dominant publisher ad server.  So, Google programmed its advertiser buying tool to **advantage its ad exchange**." Compl. ¶ 34. |
| J. Kanter email ████████ (9/12/19): ████████ | "At the time of the DoubleClick acquisition, **Google's privacy policies prohibited the company from combining user data obtained from its own properties,** e.g., Search, Gmail, and YouTube, with data |

REDACTED VERSION



| | |
|---|---|
| Ex. 2 (DOJ-ADS-B-0000024792, with attached DOJ-ADS-B-0000024793, at -804). | obtained from non-Google websites. **But in 2016,** as part of Project Narnia, **Google changed that policy**, combining all user data into a single user identification that proved invaluable to Google's efforts to build and maintain its monopoly across the ad tech industry. Over time, **Google used this unique trove of data to supercharge the ability of Google's buying tools**."  Compl. ¶ 37 n.3. |
| J. Kanter email (9/12/19): Ex. 2 (DOJ-ADS-B-0000024792, with attached DOJ-ADS-B-0000024793, at -811). | "Previously, Google used dynamic allocation in its publisher ad server to exclude rival exchanges from meaningful competition.  By only **permitting Google's own ad exchange to bid in real time—ahead of any other exchange—for impressions**, Google was unfairly advantaged and competitors were effectively stymied from competing."  Compl. ¶ 161 n.17. |
| J. Kanter Letter (10/17/19): Ex. 10 (NEWSCORP-DOJCID-00002354, at -57). | "Critically, through dynamic allocation, **Google's ad exchange always received this 'last look' advantage**, essentially a right to buy any impression as long as it had at least one advertiser willing to match the competing bid price . . . ."  Compl. ¶ 164. |
| J. Kanter Letter (10/17/19): Ex. 10 (NEWSCORP-DOJCID-00002354, at -56). | "Dynamic allocation was a means by which Google manipulated its publisher ad server to **give the Google-owned AdX** (and only AdX) the **opportunity to buy publisher inventory before it was offered to any other ad exchange, and often to do so at artificially low prices**."  Compl. ¶ 21. |
| J. Kanter email (9/12/19): | "In 2014, Google expanded and further entrenched its artificial advantages by introducing **'enhanced' dynamic allocation,** which remains in place today.  This update **allowed Google's ad exchange to obtain the** |



| | |
|---|---|
| <br><br><br><br><br><br>Ex. 2<br>(DOJ-ADS-B-0000024792, with attached DOJ-ADS-B-0000024793, at -813). | benefits of dynamic allocation over inventory potentially covered by direct contracts between publishers and advertisers." Compl. ¶ 120. |
| J. Kanter email <br>(9/12/19):<br><br><br><br><br><br><br>Ex. 2<br>(DOJ-ADS-B-0000024792, with attached DOJ-ADS-B-0000024793, at -816). | "Because of the way Google configured DFP, the **winning bid from the header bidding auction was then sent to Google's ad exchange to see if it could beat that price.** Critically, through dynamic allocation, **Google's ad exchange always received this 'last look' advantage,** essentially a right to buy any impression as long as it had at least one advertiser willing to match the competing bid price from the header bidding auction." Compl. ¶ 164. |
| J. Kanter<br>10/17/19:<br><br><br><br><br>Ex. 10<br>(NEWSCORP-DOJCID-00002354, at -57). | "**Google was able to increase its data advantage by obtaining access to the bids of its rivals for each impression** . . . even when other ad exchanges opted to participate in Open Bidding, they initially did not have access to the same data: they were forced to share their bids with Google without any reciprocity." Compl. ¶ 184. |
| J. Kanter email <br>(9/12/19):<br><br><br><br><br>Ex. 2 (DOJ-ADS-B-0000024792, with attached DOJ-ADS-B-0000024793, at -817). | "Google imposed a 5% fee on rival ad exchanges' transactions through Open Bidding, **effectively lowering the net bid of Open Bidding ad exchange participants by 5% relative to AdX's bid.** This additional 5% charge effectively amounted to a 25% or more increase in the average ad exchange fee, **making bids from rival ad exchanges much less attractive** to publishers." Compl. ¶ 181. |

REDACTED VERSION

| | |
|---|---|
| J. Kanter Letter [redacted] (9/25/2019): Google's  Ex. 13 (DOJ-ADS-0000066206, at -06, -07, -08). | "Google degraded the data it made available to publishers that previously allowed them to monitor how Google's ad exchange was competing against rival ad exchanges.  **Prior to late 2019, Google made available to publishers a 'data transfer file' that allowed eligible publishers to see** on an impression-by-impression basis the individual **bids from competition among ad exchanges** and certain advertising demand sources for the publishers' inventory.  Publishers could then respond to changes in the nature of competition by tweaking the way in which they made their inventory available to their ad tech partners. . . .  **Following the shift to Unified Pricing Rules** and the introduction of Smart Bidding, **Google altered the files to prevent publishers from linking the bids** from Google's advertising products to those from rivals using header bidding for the same impression.  This has **made it more difficult for publishers to make informed choices about how and where to make inventory available and to monitor Google's bidding behavior for potential anticompetitive conduct.**"  Compl. ¶¶ 260-61. |
| J. Kanter Letter [redacted] (9/25/2019): [redacted] Ex. 13 (DOJ-ADS-0000066206, at -09). | "Of course, any purported **concern about user privacy was purely pretextual**; Google was more than happy to exploit its users' privacy when it furthered its own economic interests." Compl. ¶ 95. |

## H.   Evidence from FAAs Demonstrates that DOJ Did Not File the Case on Behalf of the FAAs.

DOJ purports to bring its complaint on behalf of federal agencies,[40] specifically the eight

---

[40] Am. Compl. ¶ 278, ECF No. 120 ("The United States is among the advertisers harmed by Google's anticompetitive conduct.  United States departments and agencies, including ones in this district such as the Army, purchase open web display advertising using Google and non-Google ad tech tools."); *Justice Department Sues Google for Monopolizing Digital Advertising Technologies*, Office of Public Affairs, U.S. Dep't of Justice Press Release (Jan. 24,

REDACTED VERSION

Federal Agency Advertisers ("FAA"), but discovery from the FAAs has demonstrated that they do not believe they have been harmed by Google's practices.  To date, Google has deposed five FAA managing agents responsible for digital ad buying: (1) Kendall Oliphant, chief of the contract program office in the communications directorate of the Census Bureau, Ex. 16 (Oliphant Dep. 33:7-34:3); (2) Christopher Karpenko, senior director of customer marketing for the United States Postal Service ("USPS"), Ex. 17 (Karpenko Dep. 13:20-16:14, 17:16-18:5, 20:4-21); (3) Allen Owens, director of marketing, Navy recruiting command, Ex. 18 (Owens Dep. 50:13-51:6); (4) John Horning, director for the strategy, innovation, and data directorate at the Army Enterprise Marketing Office, Ex. 19 (Horning Dep. 62:14-63:5); and (5) Christopher Koepke, Director of the Strategic Marketing Group in the Office of Communications at the Centers for Medicare and Medicaid Services ("CMS"), Ex. 20 (Koepke Dep. 7:16-19).

Each of the FAA witnesses who has been deposed to date testified that they did not view Google's conduct as anticompetitive within the context of the normal course of their work.  Ex. 16 (Oliphant Dep. 63:6-11); Ex. 17 (Karpenko Dep. 139:3-8);  Ex. 18 (Owens Dep. 210:22-211:23, 214:5-12, 216:9-13);  Ex. 19 (Horning Dep. 17:25-18:9, 229:2-5, 229:14-16); Ex. 20 (Koepke Dep. 221:20-222:3, 224:13-17).[41]  Not only have the FAA witnesses testified that they do not view Google's conduct as harmful, each has testified to the benefits Google has created for them.   Ex. 16 (Oliphant Dep. 298:12-299:21) (Google helped the census bureau

---

2023), http://tiny.cc/eqdavz (DOJ seeks "treble damages for losses sustained by federal government agencies that overpaid for web display advertising").

[41] Given that none of the FAAs believed they had been harmed by Google, it is unsurprising that multiple FAA witnesses also testified that they had never sought DOJ's legal advice relating to Google's conduct. Ex. 16 (Oliphant Dep. 63:13-64:9) ███████████████████████████

████████████████); Ex. 18 (Owens Dep. 88:25-89:7) (never requested legal advice from DOJ prior to learning about lawsuit when it was filed); Ex. 19 (Horning Dep. 8:2-23) ███████████████████████████████████████████████████████████.

REDACTED VERSION

reach its advertising goals for the 2020 census); Ex. 17 (Karpenko Dep. 314:22-315:5) ███

███████████████████████████████████████████████████████████████

███████████████████); Ex. 18 (Owens Dep. 212:8-214:4) (Navy has ████████████ in

Google ad buying services Navy uses); Ex. 19 (Horning Dep. 182:25-183:11, 183:22-184:19,

186:13-25, 188:14-23, 231:3-23) (Google digital advertising offerings have provided value to the

Army); Ex. 20 (Koepke Dep. 66:9-73:5, 116:18-117:4, 145:25-146:7) (Google's digital ad

buying tools ████████████ and increase the effectiveness of CMS's display ads).

In a declaration submitted by DOJ in opposing a motion to compel filed by Google, the

government represented that "a draft complaint had been prepared" prior to December 23, 2022.

Wolin Dec. ¶ 5, ECF 328-1.  FAA testimony to date demonstrates that DOJ did not reach out to

the FAAs until after this draft was prepared, undermining any claim that the complaint was

brought on their behalf as the parties in interest.  Ex. 16 (Oliphant Dep. 46:1-11, 58:17-59:2,

60:16-61:3);  Ex. 17 (Karpenko Dep. 49:7-14);  Ex. 18 (Owens Dep. 39:11-20, 49:2-17);  Ex. 19

(Horning Dep. 38:8-39:17); *cf.* Ex. 20 (Koepke Dep. 282:24-283:22).  Moreover, many of the

FAA witnesses testified that they were unaware they would be participating in this lawsuit until

around or after the time the Complaint was filed.  Ex. 16 (Oliphant Dep. 61:6-12, 71:13-18); Ex.

17 (Karpenko Dep. 50:18-51:4, 53:5-9); Ex. 19 (Horning Dep. 18:22-19:5, 45:5-10); Ex. 20

(Koepke Dep. 280:20-281:10).

## IV.   THERE IS NO BASIS TO STRIKE OR GRANT JUDGMENT ON THE PLEADINGS AS TO GOOGLE'S DUE PROCESS AND SELECTIVE PROSECUTION DEFENSES.

### A.   Legal Standard

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment

on the pleadings only when the pleadings, construing the facts in the light most favorable to the

REDACTED VERSION

non-moving party, (1) fail to state any cognizable claim for relief; and (2) the matter can be decided as a matter of law.  *Zeran* v. *Am. Online, Inc.*, 129 F.3d 327, 329 (4th Cir. 1997); *O'Ryan* v. *Dehler Mfg. Co., Inc.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).  A Rule 12(c) motion "generally cannot reach the merits of an affirmative defense." *Goodman* v. *Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *Sherrod* v. *Harkleroad*, 674 F. App'x 265, 266 (4th Cir. 2017) (courts apply the same standard applied to Rule(b)(6) motions to Rule 12(c) motions); *see also Cohen* v. *SunTrust Mortg., Inc.*, 2017 WL 1173581, at *2 (D.S.C. 2017) ("The court rejects any argument a party may challenge the sufficiency of a defense (other than on grounds the defense is legally unavailable) under Rule 12(c).").

Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Rule 12(f) motions are generally viewed with disfavor "because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings, Inc.* v. *Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001). "Even where technically appropriate and well-founded, motions to strike defenses as insufficient are often denied in absence of a showing of prejudice to the moving party." *Riviera* v. *City of Chesapeake*, 2023 WL 3571930, at *2 (E.D. Va. 2023) (citation omitted). Accordingly, "in reviewing motions to strike defenses, federal courts have traditionally 'view[ed] the pleading under attack in a light most favorable to the pleader." *Haley Paint Co.* v. *E.I. Du Pont De Nemours & Co.*, 279 F.R.D. 331, 336 (D. Md. 2012).  A motion to strike must be filed "within 21 days of being served with [a] pleading." Fed. R. Civ. P. 12(f)(2).

**B.      Plaintiff's Motion Is Procedurally Improper.**

Google filed its Answer to the First Amended Complaint on May 12, 2023, ECF No. 208. Plaintiffs considered filing a timely Rule 12(f) motion to strike; they reached out to Google on

REDACTED VERSION

May 31, 2023—19 days after Google filed its Answer—to meet and confer on such a motion. Ex. 21.[42]  The next day, however, they canceled the meet and confer and informed Google they would not be filing any motion.  Ex. 22.  Plaintiffs waited until August 18, 2023 to request that the Court strike Google's defenses, ECF No. 317—98 days after receiving Google's answer. Given that such a request is untimely under the Federal Rules, Plaintiffs try to avoid Rule 12(f)'s time bar by seeking alternative relief under Rule 12(c).

Plaintiffs' Motion should be denied, on the basis that its Rule 12(f) motion is untimely, and its Rule 12(c) motion is procedurally improper because it is the wrong procedural vehicle for Plaintiff's partial challenge to Google's affirmative defenses.

*i. Plaintiffs' Motion Is Untimely Under Rule 12(c).*

A motion for judgment on the pleadings is untimely when filed near the close of fact discovery, when resolution of the claims at issue depends on a fact-intensive inquiry.  *E.g., Grajales* v. *Puerto Rico Ports Authority*, 682 F.3d 40, 46 (1st Cir. 2012) ("Applying the plausibility standard to [a pleading's claims or defenses] after discovery is nearly complete would defeat" the purpose of a Rule 12(c) or Rule 12(f) motion because such motions are "by [] nature, a threshold inquiry, and logic strongly suggests that it occur prior to discovery."); *cf. Herring* v. *Lapolla Indus., Inc.*, 2013 WL 12148769, at *1 (D.S.C. 2013) (denying Plaintiff's motion to stay discovery for resolution of Plaintiffs' end-of-discovery Rule 12(c) motion because "Plaintiff . . . could have filed his motion for judgment on the pleadings earlier in the case"). Because "once the parties have invested substantial resources in discovery, a district court should

---

[42] Google's Request for Production Number 40, seeking documents relating to the affirmative defenses at issue, was served on March 27, 2023.  Ex. 23 (excerpt of Google's First RFP to the United States) (Request 40 seeks documents related to AAG Kanter's "participation in the Investigation and/or this Action, including the decision to bring this Action, in light of his (a) prior representation of providers of Ad Tech Products and/or organizations connected to Display Advertising; or (b) actual or perceived adversity to Google.").

REDACTED VERSION

hesitate to entertain a Rule 12(c) motion." *Grajales*, 682 F.3d at 46.  Claims should be decided on an evidentiary record, either based on a motion for summary judgment or at trial.

This court's analysis in *Biniaris* v. *Hansel Union Consulting, PLLC* is instructive, though the ruling ultimately turned on other grounds.  There, a party brought a Rule 12(c) motion nearly four months after the answer was filed, after the court had held the Rule 16(b) conference, and mid-way through discovery.  *Biniaris*, 382 F. Supp. 3d 467,  471 (E.D. Va. 2019).  The court questioned whether the movants' motion was timely under Rule 12(c), and held that Rule 12(c) motions were improper after the parties had engaged in substantial discovery.  The court reasoned that "it is not clear that [the] Motion was made 'early enough not to delay trial,' considering the potential delay that would arise if [the] Motion was granted and Biniaris was permitted leave to amend her pleadings, thus requiring a new responsive pleading from Hansel and potentially a new Rule 16(b) Scheduling Conference." *Id.*

*ii. Rule 12(c) is an improper vehicle to challenge Google's affirmative defenses.*

A Rule 12(c) motion on a defense should only be granted if it appears that the non-moving party cannot prove "any set of facts in support of his claim" and the claim may be resolved as a matter of law.  *Priority Auto Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 139 (4th Cir. 2014).  That standard is not met here.

While Plaintiffs cite the *Iqbal/Twombly* standard as a ground for granting judgment on the pleadings for Google's due process and selective enforcement defenses, "the trend in this District in recent years has been not to apply the [*Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544 (2007), and *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009)] standard to affirmative defenses." *Van Vleck* v. *Sallyport Global Holdings, Inc.*, 2019 WL 13297195, at *3 (E.D. Va. 2019); *ISK Biocides, Inc.* v. *Pallet Mach. Grp. Inc.*, 2022 WL 19976453, at *2 n.1 (E.D. Va. 2022) (declining to apply

REDACTED VERSION

*Twombly/Iqbal* heightened pleading standard to affirmative defenses). Therefore, "[a]n affirmative defense may be pleaded in general terms and will be held to be sufficient . . . as long as it gives plaintiff fair notice of the nature of the defense." *Clem v. Corbeau*, 98 F. App'x 197, 203 (4th Cir. 2004). Fair notice is provided where the "challenged defenses are contextually comprehensible and possibly related to the controversy." *Van Vleck*, 2019 WL 13297195, at *3.

More importantly, Plaintiffs cite no authority for applying the *Iqbal/Twombly* standard to defenses, near the close of fact discovery, when the plaintiff has "fair notice of the factual basis" of Google's defenses.  *Cf. Bradshaw* v. *Hilco Receivables, LLC*, 725 F. Supp. 2d 532, 536 (D. Md. 2010) (*Iqbal/Twombly* pleading standard is "intended to ensure that an opposing party receives fair notice of the factual basis for an assertion contained [in] a claim or defense"). Plaintiffs are unquestionably on notice of the factual basis for Google's defenses, as demonstrated by the extensive factual arguments in their brief.  The appropriate remedy, if any, at this juncture is not to strike the defenses or grant judgment on the pleadings, but rather to allow Google to amend its defenses to conform to the evidence in discovery.  *E.g.*, *Composite Resources, Inc.* v. *Alphapointe Combat Medical Sys., LLC*, 2018 WL 3822468, at *4 (W.D.N.C. 2018) ("Typically, courts favor amendments that conform to evidence seen as fair without placing a burden on the opposing party.").[43]

What Plaintiffs really seek here is a premature summary judgment decision on the merits of the defenses, seeking to preempt Google from obtaining the full benefit of discovery to defend its position. That is not the purpose of Rule 12(c).  A motion for judgment on the pleadings

---

[43] Courts usually allow amendment of a pleading in response to a Rule 12(c) motion.  *E.g.*, *Scott* v. *Fam. Dollar Stores, Inc.*, 733 F.3d 105, 108 (4th Cir. 2013) (reversing district court's denial of motion to amend following opposing party's 12(c) and 12(f) motion); *Drapkin* v. *Mjalli*, 441 F. Supp. 3d 145, 159 (M.D.N.C. 2020) (granting motion to amend in response to 12(c) motion). There would be no prejudice to Plaintiff from such an amendment because it already knows the factual basis for Google's defenses.

REDACTED VERSION

"generally cannot resolve the merits of an affirmative defense" except in the "relatively rare circumstances where facts sufficient to rule on the affirmative defense are alleged in the complaint." *Goodman*, 494 F.3d at 464; *see also CertusView Techs., LLC* v. *S&N Locating Servs., LLC*, 111. F. Supp. 3d 688, 703 (E.D. Va. 2015) ("a court may not consider matters outside the pleadings without converting a Rule 12(c) motion into a motion for summary judgment under Rule 56").

Here, as the parties' briefs demonstrate, resolution of Google's defenses is dependent on a "fact-intensive" inquiry and therefore is "ill suited to judgment on the pleadings." *Colon Health Centers of Am., LLC* v. *Hazel*, 733 F.3d 535, 546 (4th Cir. 2013). *E.g.*, *Lewis* v. *Excel Material LLC*, 2013 WL 4585873, at *3 (D.S.C. 2013) (where "the pleadings do not resolve all the factual issues in this case" a trial "on the merits would be more appropriate than an attempt at resolution of certain issues of the case on a Rule 12(c) motion"); *Raynor* v. *G4S Secure Sols. (USA) Inc.*, 283 F. Supp. 3d 458, 465 (W.D.N.C. 2017) (denying motion for judgment on pleadings because "factual issues are more appropriately resolved after discovery at summary judgment"); *Scales* v. *Webb*, 2016 WL 1267756, at *5 (M.D.N.C. 2016) (denying 12(c) motion where it was "simply premature" because court could not "resolve factual issues").

### C.   Google's Due Process Defense Depends on the Resolution of Factual Issues that Cannot Be Resolved on a Rule 12(c) Motion.

"The requirement of fundamental fairness assured by the Due Process Clause" prevents a prosecutor from "attempting at once to serve two masters." *Granger* v. *Peyton*, 379 F.2d 709, 714 (4th Cir. 1967). Due Process bars a prosecutor from bringing a case in order to advance personal−rather than public−interests. *Id.* "A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Marshall* v.

23

REDACTED VERSION

*Jerrico, Inc.*, 446 U.S. 238, 249-50 (1980).

Lawyers for the government are "the representative[s] not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Young* v. *United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803 (1987) (quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935)); *accord Freeport-McMoRan Oil & Gas Co.* v. *FERC*, 962 F.2d 45, 47 (D.C. Cir. 1992) (quoting *Berger*, 295 U.S. at 88). In this representative capacity, a government lawyer's interest is not that the government "shall win a case, but that justice shall be done." *Berger*, 295 U.S. at 88 (government lawyer "is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer"); *accord Young*, 481 U.S. at 803; *Wright* v. *United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (a prosecutor is "not disinterested if he has, or is under the influence of others who have, an ax to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged"). This neutrality principle implicates Due Process because it ensures fairness to the investigated party.

This neutrality principle is enshrined in, among other things, the Biden Ethics Pledge,[44] described above, as well as the International Competition Networks' ("ICN") Ethics Rules in Competition Agencies, applicable ABA Standards, and accepted norms:

---

[44] Other Executive Office officials have sought limited waivers of the Biden Ethics Pledge in circumstances not nearly as concerning as those present here, and have been precluded from participating in decision making relating to prior advocacy work. *E.g.*, Ex. Limited Waiver for Vanita Gupta (Sept. 2, 2021), http://tiny.cc/lqdavz (limited waiver precluded participation in "decisions to initiate investigations in matters on which she lobbied the Department"); Limited Waiver for Raina Thiele (Feb. 16, 2022), http://tiny.cc/mqdavz ("limited waiver does not permit you to participate in matters in which you previously participated personally and substantially as a consultant"); Limited Waiver for Marianne Engelman-Lado (Apr. 14, 2021), http://tiny.cc/qqdavz (granted limited waiver but required to remain recused from matters in which she "participated personally and substantially previously").

REDACTED VERSION

- ABA Standards: "The prosecutor should not permit the prosecutor's professional judgment or obligations to be affected by the prosecutor's personal, political, financial, professional, business, property, or other interests or relationships. A prosecutor should not allow interests in personal advancement or aggrandizement to affect judgments regarding what is in the best interests of justice in any case." ABA Standards for the Prosecution Function, Standard 3-1.7(f).

- ICN Standards: "Agency officials should not have relational or financial conflicts of interest relating to the investigations and proceedings they participate in or oversee. To help ensure the impartiality of investigations and decision making, agencies should have ethics rules to prevent potential conflicts, e.g. recusals or 'cooling-off' periods." International Competition Network's Recommended Practices for Investigative Process, Section V.8.1.

Through its due process defense, Google will show the influence that AAG Kanter's anti-Google bias—shared by former clients of AAG Kanter while he was in private practice—has had on the filing of this case. That bias has shaped and infected this entire proceeding, and reflects an improper predisposition to find against Google, rather than ensure that justice is done. *Marshall*, 446 U.S. at 242-43. As discovery to date establishes, industry participants—who were not represented by AAG Kanter—view the marketplace as competitive, with Google providing significant benefits to the advertising ecosystem. Even managing agents of the FAAs, each of whom has the job of advertising for the FAAs, have testified in depositions that Google's products and services have benefited them, and they do not feel aggrieved by anything Google has done. Rather than reflecting commercial realities, the allegations and claims in the case are based on the positions that AAG Kanter advanced on behalf of his private clients. As reflected in the above side-by-side chart comparing AAG Kanter's advocacy for private paying clients with the allegations in the complaint, AAG Kanter's advocacy provided the foundation for many of the allegations in the complaint. His influence on shaping the complaint's allegations has infected this entire proceeding. The decision to prosecute this case was therefore not that of a prosecutor who is not "motivated by improper factors." *Marshall*,

REDACTED VERSION

446 U.S. at 250.  Those facts distinguish the present case from *FTC* v. *Facebook, Inc.* where Facebook did not argue that FTC Chair Khan was pursuing the interests of former paying clients. 581 F. Supp. 3d 34, 61-62 (D.D.C. 2022).  Instead, Facebook alleged that Chair Khan's past personal views regarding Facebook's monopoly power made it improper for her to serve as the deciding vote in a 3-2 decision to refile a lawsuit the FTC had previously brought before her tenure at the FTC even began. *Id.*

The evidence Google has presented demonstrates Google's due process defense cannot be resolved on the basis of the pleadings, and Plaintiffs' motion to strike the defense or for judgment on the pleadings should be denied.

### D.    Google's Selective Enforcement Defense Depends on the Resolution of Factual Issues that Cannot Be Resolved on a Rule 12(c) Motion.

Selective enforcement is a defense in a civil enforcement action.  Plaintiff does not point to any authority (binding or otherwise) categorically barring a selective enforcement defense. On the contrary, multiple courts have recognized the availability of the defense, denying similar motions brought by government enforcers. *See, e.g.*, *City of Chicago* v. *DoorDash, Inc.*, 636 F. Supp. 3d 916, 922 (N.D. Ill. 2022) (denying motion to strike defendant's selective prosecution affirmative defense); *SEC* v. *Lemelson*, 334 F.R.D. 359, 362 (D. Mass. 2020) (denying SEC's motion for protective order relating to defendant's selective enforcement and bias affirmative defenses); *United States* v. *McGraw-Hill Cos., Inc.*, 2014 WL 1647385, at *10-13 (C.D. Cal. 2014) (denying United States' motion to strike selective prosecution affirmative defense and permitting discovery); *United States* v. *Am. Elec. Power Serv. Corp.*, 218 F. Supp. 2d 931, 940-41 (S.D. Ohio 2002) (denying United States' motion to strike selective prosecution affirmative defense).

Selective enforcement contains two elements: (1) discriminatory effect, and

REDACTED VERSION

(2) discriminatory purpose. *Central Radio Co. Inc.* v. *City of Norfolk*, 811 F.3d 625, 634-35 (4th Cir. 2016).

    ***Discriminatory effect.*** The discriminatory effect of a prosecutor's selective enforcement may be shown by the non-prosecution of similarly-situated parties. *United States v. Hastings*, 126 F.3d 310, 313 (4th Cir. 1997). This only requires "some evidence tending to show the existence" of "different treatment of similarly situated persons." *McGraw-Hill*, 2014 WL 1647385, at *12; *see also Hastings*, 126 F.3d at 313.

    The circumstances here show that the United States has singled out Google. Despite general public comments about his intention to heighten scrutiny of "big tech," such as stating that he has been a "strong proponent of vigorous antitrust enforcement in the technology area" at his November 2021 nomination hearing, AAG Kanter has done little to step up antitrust enforcement against any other "big tech" companies besides Google.[45] While Google's acquisition of DoubleClick received intensive antitrust scrutiny, and was challenged by Microsoft—then represented by Kanter—Microsoft's acquisition of Xandr did not receive any antitrust review, to Google's knowledge, even though the transaction resulted in Microsoft obtaining an ad tech stack strikingly similar to the Google ad tech stack, with features and characteristics that DOJ criticizes. And, even though the DoubleClick acquisition was approved by the FTC 16 years ago, AAG Kanter is now seeking to unravel the transaction. AAG Kanter has provided no indication that he has similar plans to unravel the Microsoft ad tech stack. In a similar case, the defendant made a sufficient showing of discriminatory effect where it was the only one of the three major credit rating agencies to face a government enforcement action. *McGraw-Hill*, 2014 WL 1647385, at *1-2, 12 ("Of the three major ratings agencies," United

---

[45] Cat Zakrzewski & Rachel Lerman, *Tech Adversary Kanter Tells Senators He Will Pursue 'Vigorous' Antitrust Enforcement in Nomination Hearing*, Wash. Post (Oct. 6, 2021), http://tiny.cc/tqdavz.

REDACTED VERSION

States sought civil penalties "against only S&P" for deliberately misrepresenting integrity of credit ratings of certain structured debt securities at the center of the 2008 financial crisis). While the court recognized that the "Government may indeed have many good reasons for its decisions," it found that the defendant was nonetheless "entitled to test the Government's case through discovery." *Id.* at 12.

Plaintiffs' cases involved remarkably weaker showings of discriminatory effect. For example, in *AT&T*—a merger challenge—the defendants pointed the court to a comparator merger where the government *did file* an enforcement action to enjoin the merger. 290 F. Supp. 3d at 4. In *SEC* v. *Western International Securities, Inc.*, the defendants were challenging enforcement of a new regulation, believing that "the mere fact it [was] the subject of the SEC's first-ever lawsuit to enforce" the new regulation "means that it [was] the victim of selective enforcement." 2023 WL 2480732, at *9 (C.D. Cal. 2023). Google's situation is nothing like those cases: DOJ has not brought an enforcement action against Microsoft nor is DOJ bringing its "first-ever" lawsuit under the Sherman Antitrust Act.

**Discriminatory purpose.**   The discriminatory-purpose prong may be satisfied by showing the decision to prosecute was "invidious or made in bad faith."   *Hastings*, 126 F.3d at 313. Several factors are probative of this element, including: "the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures." *Central Radio*, 811 F.3d at 635.

AAG Kanter's long history of critical comments of Google and advocacy on behalf of third-parties critical to this litigation satisfies the "some evidence" requirement of discriminatory intent.   *McGraw-Hill*, 2014 WL 1647385, at *12.   In *McGraw-Hill*, the Treasury Secretary made multiple statements to the defendant corporation expressing his displeasure with the company's

REDACTED VERSION

downgrade of the United States' credit rating.  *Id.* (United States opened civil investigation in 2009 but did not bring an enforcement action until after S&P downgraded United States' credit rating in 2011). While the court recognized that the Secretary's statements were "susceptible to several interpretations" and it was "unclear whether there [was] a nexus between his displeasure and the Department of Justice's litigation decisions," it found that "such open questions are properly *answered after—not before—discovery.*" *Id.* (emphasis added). Even more probative here, unlike in *McGraw-Hill*, AAG Kanter controls the Department of Justice's antitrust enforcement decisions—there is a direct, not a dotted line, between the circumstantial evidence of AAG Kanter's animus towards Google and this lawsuit. Like in *McGraw-Hill*, Google is "entitled" to discovery on its selective enforcement claim.  *Id.*

## V.   INDEPENDENT OF GOOGLE'S DEFENSES, THE REQUESTED DISCOVERY IS RELEVANT TO THE BIASES, MOTIVES, AND CREDIBILITY OF PARTIES THAT ARE LIKELY TO BE KEY DOJ WITNESSES.

Plaintiff cannot meet its burden of demonstrating good cause for issuance of a protective order, precluding document and deposition testimony from the United States. "Good cause generally requires 'demonstrating that specific prejudice or harm will result if no protective order is granted.'" *In re Zetia (Ezetimibe) Antitrust Litig.*, 2022 WL 18109999, at *2 (E.D. Va. 2022). "Protective orders are 'sparingly used and cautiously granted.'" *Id.*

Apart from its defenses, the Federal Rules allow discovery to challenge witness credibility "not otherwise relevant to the claims or defenses."  Amendments to Federal Rules of Civil Procedure, 192 F.R.D. 340, 389 (2000).  "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States* v. *Abel*, 469 U.S. 45, 52 (1984).  Courts regularly grant discovery of evidence to challenge

REDACTED VERSION

credibility.  *See, e.g.*, *Minor* v. *Bostwick Lab'ys, Inc.*, 2012 WL 13028138, at *2 (E.D. Va. 2012) (granting motion to compel because discovery included "documents . . . that impact [potential witness'] credibility").

While Google cannot know, for example, what documents responsive to Request 40 will show, at a minimum, those documents should provide Google with material to use on cross-examination to bring out the biases of witnesses, including biases of former AAG Kanter clients who are likely to be key DOJ witnesses.  Establishing a witness's "partiality" is "always relevant," "affecting the weight of his testimony."  *United States* v. *Turner*, 198 F.3d 425, 429 n.2 (4th Cir. 1999); *see also e.g.*, *Dorman v. Annapolis OB-GYN Assocs., P.A.*, 781 F. App'x 136, 144 (4th Cir. 2019) ("[T]he second major function of cross examination is to show that the witness is biased, prejudiced, or untrustworthy for any reason." (ellipsis and quotation marks omitted)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

REDACTED VERSION

Dated: August 31, 2023

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
 CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Julie Elmer (*pro hac vice*)
Lauren Kaplin (*pro hac vice*)
Scott A. Eisman (*pro hac vice*)
Jeanette Bayoumi (*pro hac vice*)
Claire Leonard (*pro hac vice*)
Sara Salem (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

*Counsel for Defendant Google LLC*

REDACTED VERSION