1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION

 3   UNITED STATES, et al.,      )   Case 1:23-cv-108
                                 )
 4              Plaintiffs,      )
                                 )
 5        v.                     )   Alexandria, Virginia
                                 )   September 1, 2023
 6   GOOGLE LLC,                 )   10:58 a.m.
                                 )
 7              Defendant.       )
     _____)   Pages 1 - 88
 8

 9              TRANSCRIPT OF MOTIONS HEARING

10        BEFORE THE HONORABLE JOHN F. ANDERSON

11           UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

Rhonda F. Montgomery    OCR-USDC/EDVA    (703) 299-4599

1  APPEARANCES:

2  FOR THE PLAINTIFFS:

3       GERARD J. MENE, ESQUIRE
        OFFICE OF THE UNITED STATES ATTORNEY
4       2100 Jamieson Avenue
        Alexandria, Virginia  22314
5       (703) 299-3777

6       AARON TEITELBAUM, ESQUIRE
        JULIA T. WOOD, ESQUIRE
7       KATHERINE E. CLEMONS, ESQUIRE
        UNITED STATES DEPARTMENT OF JUSTICE
8       ANTITRUST DIVISION
        450 Fifth Street, NW
9       Washington, D.C.  20530
        (202) 894-4266
10

        TYLER T. HENRY, ESQUIRE
11      OFFICE OF THE ATTORNEY GENERAL
        OFFICE OF THE SOLICITOR GENERAL
12      202 North 9th Street
        Richmond, Virginia  23219
13      (804) 786-7704

14  FOR THE DEFENDANT:

15      CRAIG C. REILLY, ESQUIRE
        LAW OFFICE OF CRAIG C. REILLY
16      209 Madison Street, Suite 501
        Alexandria, Virginia  22314
17      (703) 549-5354

18      KAREN DUNN, ESQUIRE, *PRO HAC VICE*
        ERICA SPEVACK, ESQUIRE, *PRO HAC VICE*
19      PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        2001 K Street, NW
20      Washington, D.C.  20006
        (202) 223-7300
21

        ANDREW J. EWALT, ESQUIRE, *PRO HAC VICE*
22      JULIE S. ELMER, ESQUIRE, *PRO HAC VICE*
        CLAIRE L. LEONARD, ESQUIRE, *PRO HAC VICE*
23      TYLER A. GARRETT, ESQUIRE, *PRO HAC VICE*
        FRESHFIELDS BRUCKHAUS DERINGER, LLP
24      700 13th Street, NW, 10th Floor
        Washington, D.C.  20005
25      (202) 777-4500

1                  P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Calling *United States,*

3   *et al. v. Google LLC*, Civil Action No. 23-cv-108.

4              MR. MENE:  Gerard Mene with the U.S.

5   Attorney's Office, Your Honor.

6              MR. TEITELBAUM:  Good morning, Your Honor.

7   Aaron Teitelbaum for the United States from the

8   Antitrust Division.

9              MR. HENRY:  Good morning, Your Honor.  Ty

10  Henry from the Virginia Attorney General's Office on

11  behalf of the plaintiff states.

12             MS. CLEMONS:  Good morning, Your Honor.

13  Katherine Clemons from the Antitrust Division on behalf

14  of the United States.

15             MS. WOOD:  Good morning, Your Honor.  Julie

16  Wood from the United States.  Ms. Clemons is going to

17  continue argument on the privilege motion, and

18  Mr. Teitelbaum is going to address the other issues

19  before the Court today.  Thank you.

20             THE COURT:  Okay.  Thank you.

21             MR. REILLY:  Good morning, Your Honor.  Craig

22  Reilly here for the defendant, Google, together with my

23  cocounsel, Karen Dunn and Erica Spevack.  Ms. Dunn will

24  address the Court on the privilege issue if the Court

25  has questions or it wants further argument.  Also,

1  Andrew Ewalt, Julie Elmer, Claire Leonard, and Tyler

2  Garrett.  Mr. Ewalt will address the Court on the other

3  matters before the Court this morning.

4          THE COURT:  Okay.  Well, here's the order

5  that I'm going to take them up on so just to let y'all

6  know.  I'm going to take up the remaining issue on the

7  plaintiffs' motion for leave to depose very briefly,

8  and I'll take up the Google motion for a protective

9  order, the United States' motion for a protective

10 order, and then I'll end with our final discussions on

11 the motion to compel the claims and the motion for *in*

12 *camera* review of the documents.

13         MR. REILLY:  Thank you, Your Honor.

14         THE COURT:  Mr. Ewalt, let me hear from you

15 first.

16         You know, the remaining issue on this motion

17 for need to take depositions -- why don't you come on

18 up.  You're handling that one, right?

19         MR. EWALT:  Yes, Your Honor.

20         THE COURT:  Okay.  As I understand it, this

21 was a deposition that was noticed in the MDL proceeding

22 for August 3, but the engineering director for Google's

23 Ad Manager product, and the issue is whether that

24 deposition can be considered taken as of September 8

25 since it was noticed on the 3rd but not really set to

1   take place until the 21st.  And Google has objected to

2   that.  Help me understand why and what the real impact

3   of that is.  Really, they're not going to be able to

4   ask questions either way, right?

5            MR. EWALT:  Right.

6            THE COURT:  So it's just whether they can use

7   it for impeachment purposes or for any other purposes

8   under the Federal Rules of Evidence; is that right?

9            MR. EWALT:  That's the practical effect of

10  the Court's ruling, yes, Your Honor.

11           THE COURT:  Why shouldn't I allow them to do

12  that?

13           MR. EWALT:  Because the Court has established

14  a process here where there's a limit on ten depositions

15  per side.  The United States had notice of the

16  deposition, as Your Honor noted, on August 3.  They

17  decided to not use one of their ten depositions to

18  cross-notice this one.  As a result, under the

19  coordination order, because they don't have any right

20  then to insist on when the deposition will be taken and

21  then no right to insist on what purposes it would be

22  available for use.

23           THE COURT:  Well, so if it was taken within a

24  month of when it was noticed, we wouldn't be here.  Is

25  that right?

1          MR. EWALT:  That's correct.  If the

2    deposition was taken before September 8, then that

3    provision of the coordination order would apply.

4          THE COURT:  And if Google delayed in giving

5    dates or coordinating it, then they hadn't taken

6    advantage of a procedural issue that may impact the

7    United States' ability in this case.  Is that right or

8    wrong?

9          MR. EWALT:  Well, just to be clear, Google

10   did not delay here.  We were trying to find dates that

11   would accommodate everyone.  But Your Honor is correct

12   that if the deponent had been available for

13   September 8, then this deposition presumably would have

14   taken place before then.

15          THE COURT:  Well -- and I understand your

16   concerns that there may be a bunch of depositions

17   getting noticed now and they try and bring them in the

18   backdoor going forward.  But I think under the facts

19   and circumstances of this particular motion -- that is,

20   it was noticed on August 3.  I think the plaintiff --

21   again, not knowing all what's going on in the MDL

22   proceeding -- had a reasonable expectation that it

23   would have been taken before September 8, decided

24   obviously not to use one of its very precious

25   deposition notices.

1                 I'll just note that, that I said that.  And

2      nobody needs to tell me four or five times in the rest

3      of this hearing how little number of depositions you

4      get and those kinds of things.  We'll just set the

5      stage for that.

6                 But I am going to go ahead and allow them for

7      that deposition and only that deposition under the

8      facts and circumstances of this case to use that

9      deposition and treat it as if conducted on or before

10     September 8.

11                Okay.  Thank you.

12                All right.  Well, going now to the Google

13     protective order.  Have there been any updates since

14     5:02 last night on this one?  And I appreciate the

15     updates on this.  So where are we on that one?

16                MR. EWALT:  Well, Your Honor, actually, I do

17     have some good news on that one.  So the United States

18     submitted its status report yesterday highlighting that

19     there were remaining disputes at that time related to

20     topics 13 through 16 and topics 25 through 27.  I'm

21     pleased to report the parties have continued to meet

22     and confer in good faith, and we have been able to

23     reach agreement as to topics 13 through 16.  So the

24     remaining issues relate only to topics 25 through 27.

25                THE COURT:  I guess the topic 26 is only the

1   definition of "covered employees."  Is that what the

2   issue is?

3          MR. EWALT:  Precisely, Your Honor.

4          And 25 and 27, I think we are also in

5   agreement on as long as we can figure out what we --

6   what covered employees are in scope here.  And so

7   that's really the heart of this remaining issue after

8   all of the negotiations, the good work of both parties

9   from both sides to try and reach agreement.  We're down

10  to the definition of "covered employees."

11         THE COURT:  And what is wrong with the

12  definition that they have proposed of all current and

13  former Google employees listed on either side's initial

14  disclosures?  And I don't know how many that may be,

15  but that is a defined number of people.  And then you

16  subtract from them the Google employees who were

17  noticed for a deposition in this case who have not yet

18  testified.  So the precious depositions taken of those

19  people.  That wouldn't include them or who previously

20  testified and, I guess, were asked questions about the

21  chats.

22         So what's wrong with that definition?

23         MR. EWALT:  So just to set some context here,

24  by our estimate, their definition would pull in 70 or

25  so employees.

1            THE COURT:  How many?

2            MR. EWALT:  Seventy.

3            THE COURT:  Seventy.

4            MR. EWALT:  And we have proposed -- I don't

5    think this was in the status report.  But Google's

6    proposal was for the plaintiffs to identify ten current

7    employees from either side's initial disclosures, and

8    that would be -- those would be the ten that would be

9    covered employees.

10            So I think what the dispute at this point is,

11    Your Honor, 10 or 70 or something in the middle.

12            And so I want to return to Your Honor's

13    question about how do we resolve that remaining

14    disagreement between the parties.  And I wanted to

15    start with one important point here, which is what this

16    particular topic is asking is for Google to go out and

17    do many depositions essentially of however many

18    employees are at issue here.

19            This is very different from what's covered in

20    topic 25, for example, asking about the company's

21    policies, which is more in the heartland of what

22    Rule 30(b)(6) is all about.  Going out and requiring us

23    to take this many depositions of 70 or 10 or whatever

24    number of employees is not, in our view, an appropriate

25    use of 30(b)(6) at all.  Nevertheless, we have offered

1    to do it for ten employees as a way to try and bridge

2    the gap here going forward.

3              THE COURT:  They outline for each of the

4    employees whether the employee used chats to discuss

5    matters relevant to this case.  So email to these

6    however many employees says, "Did you use chats to

7    discuss matters relevant to this case?  And if so, then

8    the employee's chat history setting at times when the

9    employee discussed matters relevant to this case and

10   any nonprivileged direction or statements that Google

11   provided to its employees about conducting chats with

12   history off."

13             So (c) is Google, and I assume (c) might be

14   subsumed in some respects in 25, right.  It asks for

15   any nonprivileged direction or statements that Google

16   provided to its employees about conducting chats with

17   history off.

18             MR. EWALT:  Apologies, Your Honor.  There's

19   been a lot of text going back and forth.  If you could

20   just tell me what you're reading from.

21             THE COURT:  Yeah.  I'm just -- I'm reading

22   from the most recent file.  It's the one from last

23   night.

24             MR. EWALT:  Yes.  Are you reading from

25   topic 25, Your Honor?

1               THE COURT:  No.  I'm reading from topic 26.

2               MR. EWALT:  Okay.

3               THE COURT:  That's the one we're talking

4  about, right?

5               MR. EWALT:  Yes.

6               THE COURT:  Okay.  So what they ask is that

7  you provide a written response describing, based on a

8  reasonable inquiry (a) for each of the covered

9  employees whether the employees used chats.  Okay.  Did

10 they use chats to talk about this case?

11              And if so, the employee's chat history

12 setting at times when the employee discussed matters

13 relevant to this case.

14              So one, did they do it?  If they did it, the

15 timing of when they did it.

16              And then (b) is nonprivileged direction or

17 statements that Google provided to its employees about

18 conducting chats with history off.

19              So the (b) part is really not having to reach

20 out to whatever number of employees.  It's just what

21 was Google's statements or directions about, you know,

22 conducting chats with history off.

23              MR. EWALT:  Yes, Your Honor, we agree.  The

24 definition of "covered employees" we read is only

25 implicated for part (a) of topic 26 and not for part

1  (b).

2          THE COURT:  And why do you think going and

3  getting (a)(i) and (ii) require many depositions as

4  opposed to just contacting them and asking them those

5  questions?

6          MR. EWALT:  So we do think -- I would think

7  that it does require going and contacting everyone that

8  we're talking about in this universe, asking those

9  questions, pulling it all together, and packaging it

10  up.  And we think that that is not an appropriate use

11  of 30(b)(6) discovery for that.

12          There is also some practicalities involved

13  here.  In particular, we'd note that the definition

14  proposed by plaintiffs includes current and former

15  Google employees and is obviously much more difficult

16  for us to conduct such an inquiry of former employees

17  who we don't have any obligation -- they don't have any

18  obligation to take our calls, for example, certainly

19  not on --

20          THE COURT:  Upon a reasonable inquiry.  If

21  you make an inquiry and can't get a response, so be it.

22          I think I understand your point.  Let me hear

23  from the plaintiffs as to why some number less than 70

24  would be appropriate, whether it be 10 or some other

25  number, why each and every one needs to be inquired

1  into.

2          MR. TEITELBAUM:  Thank you, Your Honor.

3          I think it might be worth just providing a

4  little bit of context for why the plaintiffs care about

5  chats first of all.

6          THE COURT:  I think I know.  I've read a lot

7  of stuff about that in this case and other cases.  So I

8  understand the issue.

9          MR. TEITELBAUM:  Okay.

10          THE COURT:  Why every employee?

11          MR. TEITELBAUM:  So I think, really, from the

12  plaintiffs' perspective -- there are over 160 document

13  custodians in this case where -- who by definition have

14  evidence that's relevant to the plaintiffs' claims.

15          And so from the plaintiffs' perspective, we

16  have already agreed for the purposes -- in the spirit

17  of compromise and to try to reach a resolution, to

18  reduce that number from a body of people that we know

19  have relevant documents in this case down to the 60 or

20  70 people who are on each side's initial disclosures,

21  which would be, you know, a narrow universe of people

22  with relevant information.

23          And I think we are in a position where we do

24  not know who Google is going to call as a trial witness

25  at this point.  And so what we need is to have an

1    understanding of what the chat preservation was for the

2    universe of people who could show up as trial

3    witnesses.  Either the plaintiffs' call --

4                Oh, I'm sorry.

5                THE COURT:  I mean, (b) is not defined

6    necessarily to covered employees.  (b) says

7    "nonprivileged direction or statements that Google

8    provided to its employees."  So you're going to get

9    what Google says with their chat history in response to

10   (b).

11               The question is, did Sally or Joe or Sam use

12   chats to talk to Google?  I'm not trying to undo it,

13   but I'm just saying it's a little hard to talk about

14   "matters relevant to this case," what that really means

15   and what makes a reasonable inquiry into somebody

16   talking about matters relevant to this case.

17               MR. TEITELBAUM:  I think advertising

18   technology matters, you know, related to Google's

19   business in the ad tech space.

20               THE COURT:  Well, I mean, I think you have

21   probably become familiar enough with the 70 people that

22   maybe on the initial disclosures, that you know that

23   some may be more important than others in that space.

24   Some are finance people or some may be this or some may

25   be that.  So, again, I'm just trying to understand why

1    there wouldn't be some ability to at least decrease the
2    number.  Seventy people is not earth shattering, but it
3    does seem to be -- you would get a sense as to what's
4    going on.  You're going to get what Google's directions
5    are for all of its employees.
6              MR. TEITELBAUM:  I think the reason that
7    we're in this situation is because of the nature of the
8    directions that Google -- that we know Google gave to
9    its employees, which was basically, "We are trusting
10   individual employees to implement litigation holds
11   based on their own judgment."  As a result, we need an
12   individualized inquiry for each person.
13             I do want to emphasize that, really, if we
14   were trying to provide ourselves with full coverage, I
15   do think that the document custodian number is the
16   number, which is 160 plus.  And so we have come down by
17   more than 50 percent in an effort to be reasonable.
18             And I agree with what the Court said earlier,
19   that this is not a mini deposition.  It is one or two
20   phone calls about the nature of chat usage for each
21   employee.  And not all of these people on the initial
22   disclosures are former employees.  Some of them are.
23   But the current employees, it should be even easier to
24   accomplish that.
25             THE COURT:  Well, that's difficult.  These

1  are less difficult than the current employees.

2            MR. TEITELBAUM:  I can accept the less

3  difficult characterization as well, Your Honor.

4            THE COURT:  Okay.  Well, I think I understand

5  the issues there.  Again, there's no rocket science to

6  this.  I'll just have to make a decision that you-all

7  have to live with.  I think giving a number of 35 --

8  pick 35 off the initial disclosure list, submit it to

9  them.  There will need to be an inquiry for those 35

10 people as to topics 26(a)(i), little I.

11            Again, to the extent that they reach out to

12 former employees who are not being cooperative or

13 providing information, they've made a reasonable

14 inquiry.  Try to contact them and get the information.

15 So you may want to keep that in mind.  Obviously, they

16 can control their covered employees.  So you may want

17 to skew it a little bit more towards covered than

18 noncovered when picking your precious 35.  Okay.

19            MR. TEITELBAUM:  Understood, Your Honor.

20            THE COURT:  Thank you.

21            All right.  So let's take up the United

22 States' motion for a protective order as to the --

23 where I read this, we're talking about two hours of

24 deposition for the United States.  Is that right?  You

25 carved out the 30(b)(6), that they're going to be --

1   the agency is going to be deposed for one-and-a-half

2   hours each for the 12 hours and then 2 hours reserved

3   for any deposition for the United States requisite.

4         MR. TEITELBAUM:  There's been some movement

5   on that, Your Honor.  It's now up to 3 hours per

6   federal agency advertiser, and it's for a total of 14

7   hours, all of those federal agency advertisers

8   together.

9         And in an effort to try to narrow the areas

10  of dispute here, the United States has actually agreed

11  that if it does not prevail on this motion and the

12  Court orders that the deposition needs to go forward,

13  then we would agree to sit a United States DOJ designee

14  for three-and-a-half hours standalone.

15        THE COURT:  All right.  So the notice was

16  sent to the United States.  The United States is the

17  one who is obligated to pick a representative to

18  testify on information known to the United States.

19        You say throughout your papers that they're

20  trying to depose attorneys.  How do you get to the

21  United States gets to pick a representative who comes

22  in and testifies on the binding information to the

23  United States where they're actually trying to depose

24  an attorney?

25        MR. TEITELBAUM:  The way that this notice

1  started out was that the definition of "you" included

2  all the federal agency advertisers and the Department

3  of Justice.  But through discussions with Google, we've

4  learned that there are specific topics that are, in

5  fact, directed to not just the United States but the

6  United States Department of Justice's Antitrust

7  Division, which is --

8              THE COURT:  They're part of the United

9  States, right?

10             MR. TEITELBAUM:  It is, but as a practical

11 matter, the United States Department of Justice's

12 Antitrust Division is the law firm for this case, and

13 it's run by lawyers.  The business of the Antitrust

14 Division is lawyer led and lawyer conducted.  And so

15 this is the functional equivalent for those topics

16 where Google is seeking deposition testimony from the

17 Antitrust Division asking for a 30(b)(6) deposition of

18 opposing counsel.

19             THE COURT:  Well, they're asking for

20 information that may be maintained at the Antitrust

21 Division, collected, processed, all of that.  But all

22 of that was done on behalf of the United States, right.

23             So going back to the law firm, client and law

24 firm.  You have a client.  You've got a law firm.  The

25 law firm does a lot of work for the client in a case,

1  right.  It may be handing off a lot of work.  When you

2  depose the client, the client has to pick a

3  representative that is able to testify and bind the

4  client as to information within the client's

5  possession, custody, or control.

6       And they get to pick who it is.  It could be

7  somebody within the client, or it could be somewhere

8  not within the client.  It's not someone who has to

9  have personal information, personal knowledge of

10 information.  It just has to be somebody who can give

11 testimony that is binding on behalf of the party.

12      So the idea that they're trying to depose --

13 and I think you're right when you talk about who is

14 you.  You is also the Department of Justice's Antitrust

15 Division, DOJ, or whatever.  But the notice is really

16 to the United States.  So the United States has to, you

17 know, put up a representative.

18      MR. TEITELBAUM:  What I want to emphasize,

19 Your Honor, is we've -- with respect to the federal

20 agency advertisers who are part of the United States,

21 we've done that and agreed to do that.  Those

22 depositions are in progress.  We've provided 30(b)(6)

23 designees from all of the federal agency advertisers,

24 agreed to sit those people, and provide testimony that

25 binds the United States.

1            So the United States is not trying to say

2    that we're not subject to 30(b)(6) testimony.  All of

3    those other disputes really have been resolved without

4    the Court's intervention.

5            The dispute -- the only remaining dispute

6    here is whether Google should also get to depose either

7    the United States' actual trial or litigation counsel

8    or the practical equivalent of that.  Because anyone --

9    even if we found somebody without a law degree who is

10   going to be the designee, that person is going to have

11   to be endued with all of the knowledge collectively of

12   the United States' trial and litigation counsel

13   because --

14           THE COURT:  Isn't that the same in any

15   context where you have a client and a law firm?  The

16   law firm does work for the client preparing information

17   for the client to get and have to support its case.

18   When the client gets deposed -- just because the law

19   firm has, you know, developed a case, that doesn't mean

20   that the client doesn't have to at least testify in

21   some respects as to what it is, the facts and

22   circumstances supporting your claim.

23           MR. TEITELBAUM:  So to take the client and

24   law firm analogy, the FAA are -- in this instance are

25   the client, and the DOJ's Antitrust is the law firm.

1  And so I think --

2          THE COURT:  The client is the United States.

3  The lawsuit is the *United States v. Google*, right?

4          MR. TEITELBAUM:  Absolutely.

5          And so one of the points that I'd like to

6  make is that there's a reason why the framework in

7  *Shelton v. American Motors Corporation* exists, which is

8  that we have produced the information that Google is

9  looking for in those topics that are directed at the

10 Department of Justice.  And any additional testimony

11 that they are seeking through these topics would

12 necessarily invade our primarily opinion work product,

13 but also fact work product.  That's why this proposed

14 deposition of the United States' counsel is so

15 problematic.  Because we have produced third-party

16 communications and third-party documents.

17          THE COURT:  Well, *Shelton* really applies to

18 when you're noticing a deposition of a lawyer, not of

19 an entity, right?

20          MR. TEITELBAUM:  Well, I think that the cases

21 are mostly dealing with SEC 30(b)(6) depositions say is

22 that when you are noticing a deposition of an

23 attorney-run investigative agency, like the Department

24 of Justice's Antitrust Division, then noticing a

25 deposition of that entity is the functional equivalent

1   of noticing a deposition of opposing counsel.

2              And Google really has not -- you know, even

3   going to sort of a nuts-and-bolts discussion of how

4   this deposition would play out without immediately

5   sparking 35 additional privilege or work product

6   disputes, Google has still not articulated how it would

7   propose to conduct a deposition of the Antitrust

8   Division's 30(b)(6) designee without having any

9   potentially relevant question be an opinion work

10  product question.

11             Because the Department of Justice's

12  recollections about an interview that occurred three

13  years ago would necessarily be coming from some

14  attorney's recollection of what was important and what

15  was material and what was that attorney's impression

16  about what was said during that interview.  And so it's

17  really -- it's going to be a work product --

18             THE COURT:  The fact of the interview would

19  not be privileged, right?

20             MR. TEITELBAUM:  That's correct.

21             THE COURT:  And did you meet with anybody

22  there?  Yes.

23             MR. TEITELBAUM:  And the Antitrust Division

24  has produced its investigative file, which includes

25  120,000-plus pages of third-party communications, which

1   includes calendar invites and the like indicating when

2   or whether a meeting occurred.

3           And so given that this is the functional

4   equivalent of trying to depose opposing counsel, I

5   think that the consensus within this district and

6   within the Fourth Circuit says that trying to depose

7   the Antitrust Division is a deposition of opposing

8   counsel.  Google would have to explain why the fact

9   that we've already produced our investigative file,

10  including third-party communications, over a million

11  pages of third-party documents in addition to those

12  communications is not somehow a sufficient means for

13  them to get this information.

14          Just because they feel that speaking to the

15  other side's lawyers would be helpful to them, that's

16  not enough in this instance.

17          THE COURT:  And, again, to parse through, I

18  really do appreciate y'all working things out as best

19  you can.  Sometimes I start off with reading names, and

20  then it gets narrowed and narrowed.  Am I right that

21  we're really talking about possibly six topics that are

22  still in dispute, three of which may have gotten

23  resolved before today or not?

24          MR. TEITELBAUM:  So I want to emphasize that

25  the United States very much believes it's nine topics

1  because the three topics, 31, 37, and 38, Google's

2  position is that because we've separately moved for a

3  protective order in front of the district judge that

4  could potentially affect those topics, that this Court

5  should somehow not consider that.  But really, it's two

6  completely separate issues.  We view nine topics as

7  still being in dispute because they are all an

8  attempted deposition of opposing counsel.

9          THE COURT:  Well, I'm going to let Judge

10  Brinkema deal with 31, 37, and 38, and if necessary,

11  she can bring that back to me when she makes a decision

12  on the substantive part having to do with that.  So she

13  will deal with all of those issues next week.  But for

14  my purposes, I'm at this point going to deal with 29,

15  33, 34, 36, 39, and 40.

16          MR. TEITELBAUM:  Could I ask for

17  clarification just briefly on what the Court just said?

18          THE COURT:  Well, you have a motion pending

19  in front of Judge Brinkema, a partial summary judgment

20  or a protective order to individuals from being

21  deposed, correct?

22          MR. TEITELBAUM:  The fact that it may -- I

23  think I want to clarify that.  If the United States

24  prevails on its motion for partial judgment on the

25  pleadings or a protective order that's in front of

1   Judge Brinkema, one of the collateral consequences of

2   that would be that those depositions do not go forward.

3   And similarly, one of the collateral consequences would

4   be that Google could not depose anyone about topics 31,

5   37, or 38.

6           But that motion does not address the separate

7   issue that's before this Court, which is whether or not

8   Google should also be precluded from taking a

9   deposition on those three topics because it's a

10  deposition of opposing counsel.

11          And so, for instance, if the United States

12  only partially prevailed or didn't prevail before Judge

13  Brinkema, that question would land right back here with

14  respect to those three topics.  So that's why we'd urge

15  the Court to take up all nine here.  Because there's no

16  risk of overlapping or contradictory rulings with what

17  we've asked Judge Brinkema to decide.

18          THE COURT:  All right.  Well, what about 33,

19  34, the responses to interrogatories and responses to

20  request for admissions and the remedies sought?

21          MR. TEITELBAUM:  So the interrogatories and

22  request for admissions, I think -- first of all, it

23  would be Google's burden to explain why it's necessary

24  to ask opposing counsel about those questions.

25          THE COURT:  It's asking a client, the party

1  in the lawsuit, to provide information as to, you know,

2  their answer to an interrogatory or their denial or

3  admission of a request for admissions.

4         MR. TEITELBAUM:  Well, I think a federal

5  agency advertiser 30(b)(6) witness would absolutely be

6  happy to answer those questions.  That's -- but the

7  problem is that what Google is asking to do is asking

8  the United States' litigation counsel about its --

9  necessarily, it would have to be its preparation, its

10 thought process, the reasons behind why it responded to

11 request for admissions and interrogatories in the

12 manner that it did.

13        As I said before, the United States is not

14 suggesting that it's immune from 30(b)(6) testimony.

15 All of the federal agency advertisers stand ready to

16 answer those questions.  It's just that to ask the

17 other side's lawyer about their request for admission

18 response that Google already has in its possession,

19 there's no way to conduct that examination without it

20 being about opinion work product.

21        THE COURT:  Okay.  What else would you like

22 to say for the record?

23        MR. TEITELBAUM:  Well, with respect to

24 remedies, once again, the remedies that the United

25 States is seeking to ask the Antitrust Division lawyers

1   or other personnel, those questions necessarily go to

2   what our legal strategy and our legal theories are.

3   There's no way for someone from the Antitrust Division

4   to answer that question without it being opinion work

5   product.

6           Now, of course, once again, Google is free to

7   ask FAA witnesses those questions.  And --

8           THE COURT:  Well, is any agency making a

9   decision in the overall remedy that's going to be

10  sought by the United States?

11          MR. TEITELBAUM:  I think it would be -- I

12  don't think, as I stand here, I can answer that

13  question partly because --

14          THE COURT:  The postal service isn't going to

15  ask for something and another agency not ask for

16  something.  A decision is going to be made on behalf of

17  the United States collectively as to what the United

18  States wants to do as far as a remedy goes.

19          MR. TEITELBAUM:  I think, as a practical

20  matter, that's probably correct.

21          THE COURT:  So why can't they ask the United

22  States -- and, again, whether we defer that or not --

23  which I thought was what everybody had sort of agreed

24  to -- they're going to defer the whole thing with

25  remedies.

1          But, you know, Google should be entitled to
2    ask the United States:  What is it you want out of this
3    lawsuit?  And somebody needs to tell them what they
4    want out of this lawsuit.  What are the damages sought?
5    What are the remedies, equitable remedies?  So come in
6    and tell them.

7          MR. TEITELBAUM:  I think, first of all, the
8    United States agrees that the most efficient way of
9    addressing that particular topic on remedies would be
10   to defer it based on the Court's prior ruling about
11   addressing certain remedies issues if there's been a
12   finding of liability.

13         But otherwise, I think the Court used the
14   word "decision" about remedies, and I think that goes
15   exactly to why asking the Antitrust Division about its
16   decision-making or thought processes about a remedy
17   is -- that is a core legal theory, legal strategy
18   question.

19         THE COURT:  Well, again, they're going to
20   take eight FAA depositions, and none of them are going
21   to be able to say what the United States is going to be
22   seeking in this lawsuit as far as equitable remedies,
23   right?  I'm just trying to be realistic here.  They're
24   looking out for their intents and purposes.  They will
25   testify what they do, but they're not -- you know,

1  they're not going to be deep into the weeds in this

2  case.  And so I'm, again, trying to understand how

3  Google, who is entitled to that kind of information, is

4  going to get that information through these eight

5  agency depositions.

6          MR. TEITELBAUM:  I think the answer is it

7  resides in the *Shelton* test also, which is that there

8  are many written discovery tools that are open to

9  Google to ask those questions of the United States.

10 But the one thing that they cannot do is ask that the

11 United States' lawyers sit for a deposition and answer

12 questions about our legal strategy, legal theories,

13 plans for a remedy.  They can ask those questions in

14 another format just as they would with all of the other

15 written discovery that the United States has responded

16 to thus far.

17          THE COURT:  Okay.  I understand your

18 position.

19          Mr. Ewalt.

20          MR. EWALT:  If I could begin just with the

21 point that my friend for the plaintiffs made about -- a

22 couple of times he indicated that it was Google's

23 burden to explain exactly what questions might be asked

24 at a deposition, provide them essentially a preview of

25 our deposition outline.

1              You know, this -- this is sort of the wrong
2    way to frame it, as Your Honor sort of recognized
3    already with your questions.  The United States is
4    subject to discovery like any other party.  They're
5    subject to 30(b)(6) discovery just like any other party
6    in the litigation.  The *Shelton* test is an extremely
7    narrow exception when one party notices a deposition of
8    a lawyer, which is not what happened here.

9              The questions and the topics that we intend
10   to ask are about facts.  We don't intend to ask about
11   litigation strategy.  Those are not covered by the
12   topics.  We don't intend to ask about opinion work
13   product.

14             I can't guarantee that someone might not ask
15   an unartful question during the deposition.  If that
16   happens, the proper way to address it would be for the
17   plaintiffs' lawyers to object to it.  We can go forward
18   at that point.

19             But it is our intention only to try to get at
20   the facts here that are just proper discovery for any
21   other party, and the United States shouldn't be excused
22   from providing that discovery because of the fact that
23   the Antitrust Division is run by lawyers.

24             THE COURT:  All right.  Well, what's your
25   position on whether 31, 37, and 38 are part of this

1   motion or not?

2           MR. EWALT:  I would say that we agree that a

3   decision on those should be deferred until we have the

4   benefit of Judge Brinkema's ruling and that those

5   issues would be much more easily decided at that point.

6           THE COURT:  Obviously, if she decides one

7   way, they don't have to have any further discussion.

8   If she decides another way, she may deal with them

9   directly in the motion, or I would have to deal with

10  it.

11          All right.  Thank you.

12          MR. TEITELBAUM:  I think I would just

13  emphasize, Your Honor, that the United States is not

14  trying to say that it isn't subject to 30(b)(6)

15  discovery.  It's just that it's -- it is and should be

16  entitled to the same protections that any other

17  litigant in a civil lawsuit has, which is that its

18  lawyers do not have to sit for depositions absent

19  extraordinary circumstances.  And a deposition cannot

20  just be noticed directed at the United States' lawyers

21  and then it's our burden to try to explain why that

22  shouldn't happen in a particular case.

23          THE COURT:  Well, again, this is -- I

24  appreciate the briefing on this and the argument.

25          I'm coming at this as, you know -- and the

1  United States has talked about the law firm-client

2  relationship.  And, one, even if you have in-house

3  counsel as a client that does certain work and the

4  client gets deposed, factual information relating to

5  the claims and defenses in the case need to be

6  produced, what they're relying on in the case, what

7  they're going to be asking for in the case, those kinds

8  of things.

9          You know, as you read the notice of

10 deposition itself, it was to the United States.  I do

11 feel that the United States has an obligation to

12 respond to certain questions.  The agencies play a

13 substantial part in this case.  I understand that, but

14 that's not the whole picture.

15         Under the record before me today, I cannot

16 find that these topics that are being sought -- again,

17 I'm going to defer on 31, 37, and 38 to Judge Brinkema.

18 The other topics that we're talking about, you know, I

19 can't make a finding that these topics seek information

20 that wouldn't be relevant to a claim or defense and not

21 protected.

22         Google has made representations that they're

23 not seeking opinion work product, only factual

24 information relating to the claims being asserted,

25 which treating just like any other party, they're

1  entitled to get.

2          So I'm going to deny the motion for a

3  protective order.  I think that the United States -- it

4  can be a lawyer that they put up, or it can be somebody

5  else.  The Antitrust Division has a lot of nonlawyers,

6  bright nonlawyers.  Pick a representative, and he or

7  she has to be prepared to the best they can be.

8          And, again, I think every side knows that

9  topics on 30(b)(6) notices are often not worded

10 precisely.  You have to be reasonable.  This is not an

11 I-got-you game where you can get somebody on there and

12 they can't answer some, you know, very esoteric issue

13 that could be covered by a topic.

14         You've just got to work it out.  There's a

15 lot of topics.  The parties have worked and narrowed it

16 down.  There are a lot of things to be done.  Overall,

17 I mean, the motion is the United States doesn't need to

18 produce a witness.  I assume the United States needs to

19 produce a witness over and above the advertising

20 agencies' eight witnesses.

21         Okay.  Thank you.

22         All right.  So I guess that leaves the last

23 motion.  You know, I was true to my word that privilege

24 issues always give me a pause, and it takes me a while

25 to understand them, to refresh my recollection on the

1   law relating to them, and how -- and this one is a

2   little bit different than the typical privilege issue

3   reviewed that I run across fairly routinely.  And then

4   getting a reply brief several hundred pages to look at

5   even before sort of threw me off.

6           I've had a chance to review everything now

7   and, thankfully, the transcript that came in too.  But

8   I do have some questions that I just want to pose to

9   both sides first.

10          I'm going to ask the United States first to

11  respond to a few questions.  Okay.  And, again, you did

12  this a little bit last week.  But I just want to make

13  sure I understand the role of the Antitrust Division's

14  counsel and how that is to the United States and to the

15  agencies.

16          MS. CLEMONS:  Yes, Your Honor.  The Antitrust

17  Division under 28 C.F.R. 0.40 has been delegated

18  authority from the attorney general, who is lead

19  counsel to the United States, to enforce the antitrust

20  laws, including civil actions to recover forfeitures or

21  damages for injuries sustained by the United States as

22  a result of antitrust law violations.

23          So with respect to claims for damages for

24  injury to the United States, the Antitrust Division is

25  the attorney for the United States in determining

1    whether and when to file claims for such injuries.  And

2    the only way the United States can be injured in its

3    business or property is by injury to the components of

4    the United States, which include its federal agencies.

5           And so when the United States is -- when the

6    United States' counsel, the Antitrust Division, is

7    advising the United States with respect to whether and

8    to what extent it has been injured and can seek damages

9    for those injuries, it is necessary for that counsel to

10   communicate with the parts of the United States that

11   may or may not have been injured in order to scope out

12   those claims.  And that is the situation that is the

13   case for all of the documents, all of the different

14   categories of documents that Google is seeking in its

15   motion.

16           THE COURT:  Is it your position that you have

17   an attorney-client relationship with individual

18   agencies or with the United States?

19           MS. CLEMONS:  In this case, both because we

20   do have an attorney-client relationship with the United

21   States, and we have --

22           THE COURT:  That's statutory.  I mean, that's

23   in the regulations as set out.

24           MS. CLEMONS:  Exactly.

25           And then we have a relationship with the

1  components of the United States, the agencies of the

2  United States that are involved in these claims for the

3  purpose of this lawsuit.

4          And that includes agencies that may have been

5  involved and there was a strategic decision on behalf

6  of the United States not to involve those particular

7  agencies with respect to the damages claims.  Right.

8          And I think it is important to make clear

9  that we're not talking about the -- you know, the

10 three-year investigation into Google's conduct.  This

11 is really a two-week period leading up to the filing of

12 the complaint where the United States' counsel was

13 talking to parts of the United States that may have

14 been injured about the scope of those injuries and the

15 claims that could be brought.

16         THE COURT:  A four-week period, right?

17         MS. CLEMONS:  Yeah, I think it was roughly

18 four, December --

19         THE COURT:  December 23 to January 24 was

20 when the lawsuit got filed?

21         MS. CLEMONS:  Right.

22         The vast majority of the communications were

23 in the two-week period leading up to the filing of the

24 complaint.  In either event, there was a draft

25 complaint already put together.  The United States was

1    determining whether and to what extent to bring damages

2    claims as a part of that much larger draft complaint,

3    and these communications took place for the purpose of

4    counsel providing legal advice to the United States and

5    to the agencies that may or may not have been injured.

6         THE COURT:  And, again, Google makes a lot of

7    the idea that the agencies didn't know anything about

8    the lawsuit or they were not asking for legal advice.

9    Help me understand that, at least during the time

10   period in December and January that these agencies

11   weren't seeking legal advice.  Somehow that plays an

12   important role in determining whether the work product

13   or attorney-client privilege protections apply.

14        MS. CLEMONS:  The agencies do not need to

15   come to the United States and say, "We think we might

16   have a claim," precisely because the United States has

17   counsel statutorily on retainer to look for and put

18   together claims for damages to the United States and

19   its injury or property.

20        So the Clayton Act, Section 4(a),

21   specifically states that whenever the United States is

22   injured in its business or property by reason of

23   anything forbidden in the antitrust laws, it may sue

24   there -- for and shall recover the damages by him

25   sustained and the cost of suit.

1           If the United States' counsel charged with

2    bringing those claims were not able to talk to the

3    components of the United States that may have those

4    claims, that may be the subject of the injury that

5    underlie those claims, then that would essentially be a

6    statement that the United States is not entitled to

7    counsel with respect to these claims because those

8    injuries can only happen to agencies of the United

9    States.

10          THE COURT:  So I take it your argument is

11   it's the United States that is seeking the legal

12   advice, not the agency that's seeking the legal advice.

13          MS. CLEMONS:  In that four-week period

14   leading up to the filing of the complaint, we, the

15   Antitrust Division, are the ones who decide whether or

16   not to bring those claims.

17          And so, yes, we were advising the United

18   States.  We were also advising the -- counsel to -- or

19   counsel and the employees for those agencies with

20   respect to those claims, not because they independently

21   sought to bring the claims.  They don't have the

22   authority or the ability to decide to bring those

23   claims.  That is charged to the Antitrust Division.

24          And so once there was a potential claim and

25   the United States and its component agencies that may

1   have been injured needed advice with respect to that
2   potential claim, at the very least, then there was
3   definitely an attorney-client relationship.  And all of
4   the communications that are the subject of this motion
5   were within that very specific attorney-client
6   relationship and purpose.
7          THE COURT:  Well, in the main claim that I
8   understand that you're making is work product for the
9   ones that were in the privilege log related to the
10  communication with the agencies, the 57 documents in
11  that privilege log.  Is that right?
12         MS. CLEMONS:  Yeah, there are 57 documents in
13  that privilege log.  There are other documents as well.
14  Everything in that privilege log is work product.  Much
15  of it is also attorney-client communications.
16         And then there are other documents that
17  Google is seeking outside of those 57 -- I actually
18  think all of those were attorney-client communications
19  in the 57.  Apologies.  But Google is seeking --
20         THE COURT:  I think the -- at least confirm
21  my understanding of that.  I thought the privilege
22  log -- I guess it does include attorney-client work
23  product and deliberative process nomenclatures.  But I
24  thought that that had gotten narrowed down to where you
25  were really focused more on work product protection for

1  those documents as having been asked for by an attorney

2  providing legal advice.

3       I was just trying to look out because the

4  various components of DOJ, the Antitrust Division being

5  the lawyer, the individuals perceived as being the part

6  of a client, a client of the United States, asking for

7  them to provide you information so that you can provide

8  legal advice to the United States.

9       MS. CLEMONS:  Yes, Your Honor.  But also to

10  those agencies, to the extent they are involved or

11  might have been involved in this lawsuit -- because it

12  is not the agency's decision when a matter has been

13  sent to the Department of Justice's Antitrust Division

14  by the United States, right.  It is not those agencies'

15  decision whether and which lawyers to hire.  Their

16  lawyers for the purposes of this litigation are the

17  Antitrust Division, and that's a decision made by the

18  United States.

19       This idea that the agencies are somehow

20  completely separate, right -- they argue that we were a

21  plaintiffs' firm in search of a plaintiff.  It just

22  doesn't square with the way that the United States is

23  structured with the statutes and with the necessity of

24  the agencies being involved any time there might be a

25  claim for damages.

1          Any other decision would render the United

2     States without counsel until after it's already filed a

3     complaint and the strategic decision surrounding

4     whether and to what extent to file those damages claims

5     have already been made.

6          And to be clear, we have not taken --

7     narrowed any of the claims of attorney work product or

8     of attorney-client privilege.  There are separate sets

9     of documents.  One set of documents we're only claiming

10    attorney work product for, and the other set of

11    documents are -- we are stating the basis for privilege

12    for attorney-client privilege, attorney work product,

13    and deliberative process privilege.

14         THE COURT:  Well, Google makes the argument

15    that the things that you're claiming privilege on now

16    are the same as many documents that you've produced in

17    the investigative file.  Why should these documents be

18    treated when the millions of documents which you have

19    produced in the investigative -- this is information

20    being, you know, sought by the United States to provide

21    legal advice to its client.  So why isn't everything in

22    the investigative file work product?

23         MS. CLEMONS:  It has been the practice of the

24    Antitrust Division to turn over all of those

25    communications with third parties to defendants in

1  litigation as part of the investigatory file,

2  communications with third parties and documents

3  produced by third parties.

4        But it has never been the practice of the

5  Antitrust Division to turn over its attorney work

6  product created through the investigation.  While there

7  may be an argument that the entire investigatory file

8  is work product, that is not -- that's not what's

9  before the Court right now, which is that the

10  communications with third parties, right --

11        Google has made this analogy between an email

12  three years ago to a market participant saying "We'd

13  like to speak to somebody about these issues," to an

14  email to a federal agency saying, "We need to speak

15  with somebody who has expertise in this area."  Those

16  emails may look alike, but the circumstances under

17  which they were communicated are vastly different.  And

18  those circumstances are the key to the analysis under

19  both attorney-client privilege and the work product

20  doctrine.

21        THE COURT:  Well, is there a time period

22  where that isn't necessarily so?  So let's say three

23  years ago, trying to decide how to define the market,

24  let's say, and you ask clearly third parties, people

25  who were no relationship to -- nongovernmental entities

1    information about how to use Google market.  And you

2    asked the same kind of information to others in the

3    market, the United States' agencies, about what are

4    their views before there was any decision made to

5    pursue this case or not.

6            Why would a communication to the agency be

7    any different than you were just seeking information

8    from people who are part of the market as to how they

9    view the market?

10           MS. CLEMONS:  I think in the event that that

11   were to be the case, there would probably be a similar

12   analysis looking at all of the different facts.  I

13   can't, standing here today, tell you whether that

14   hypothetical would be attorney-client privilege or not.

15   But that's -- what we do know is that is not the case

16   here.

17           THE COURT:  I'm just trying to understand.

18   Was part of this -- and I know you have the obligations

19   to produce the investigative file and nonprivileged

20   information.  I don't think anybody has told me -- and

21   you may have and I overlooked it -- as to whether

22   information that was produced in the investigative file

23   included communications with agencies that predated

24   December 22, 2022, that is, what do you know about

25   so-and-so?  What do you know about this, or can I talk

1    to somebody about that?  Is it then hands off with any

2    communication to any agency throughout the entire

3    investigation, or are parts of the investigation

4    produced having to do with communications with

5    agencies?

6              MS. CLEMONS:  Your Honor, to my

7    understanding, no communications with agencies took

8    place during the investigatory period, and I -- you

9    know, there are no documents in the investigatory file

10   and there are no logged documents in the privilege log

11   for the investigatory file reflecting communications

12   with federal agencies.

13             THE COURT:  So the Antitrust Division

14   investigated this for three years and didn't

15   communicate with their constituent parts of the United

16   States, the agencies, about these claims up until

17   December of 2022?

18             MS. CLEMONS:  Not to my knowledge, Your

19   Honor, and that is -- it makes sense because the

20   damages claims don't arise until --

21             THE COURT:  Damages is only one part of this.

22   Defining the market is a very big part of this case as

23   well, right?

24             MS. CLEMONS:  It is, Your Honor.  It is a

25   very fact-intensive inquiry, defining the market.  And

1  it typically is the practice of the Antitrust Division

2  to talk to participants in the market that have the

3  most knowledge about how the market works, the business

4  realities, and that is not individual federal agency

5  advertisers.

6        But even if Your Honor -- you know, we were

7  talking.  If you look at the *Booz Allen Hamilton* case

8  that Google wants to rely on, that judge made a very

9  clear distinction and made it clear that once the

10  litigation -- once the decision had been made to

11  litigate, then the communications to provide legal

12  advice to the NSA were communications made within the

13  attorney-client relationship.

14        THE COURT:  I mean, it does say, again, at

15  the time in which the DOJ decided to file the present

16  lawsuit.  It's not when the lawsuit was filed.  It was

17  when it had been decided to file the lawsuit.

18        MS. CLEMONS:  Right, exactly.  The United

19  States had decided to file a lawsuit.  The only issue

20  was whether and to what extent there may be damages to

21  the United States included in that lawsuit, and those

22  communications were to provide legal advice to both

23  those agencies that may or may not have been injured

24  and the United States writ large.

25        THE COURT:  All right.  I think that's the

1  questions I had for that.

2          MS. CLEMONS:  Thank you, Your Honor.

3          THE COURT:  Ms. Dunn, let me ask you a few.

4  First of all, 26(b)(3)(A), looking at the language of

5  that, "A party may not discover documents and tangible

6  things that are prepared in anticipation of

7  litigation."  The language isn't during or while

8  litigating.  It's in anticipation of litigation.  I'm

9  trying to get a better understanding as to why it's

10  Google's position that the lawsuit gets filed and it's

11  work product.  But the day before the lawsuit gets

12  filed, it's not work product.  The rule particularly

13  says "in anticipation of litigation."

14          MS. DUNN:  Yes, Your Honor.  So the way that

15  the case is put in anticipation of litigation is that

16  the document has to be prepared in anticipation of

17  litigation and that the preparer of the document has to

18  be anticipating litigation.

19          So the inquiry that is most important for the

20  Court under the precedents, including *National Union*

21  and *RLI*, is whether the document itself is prepared in

22  anticipation of litigation.  So that's one thing that

23  goes to this point.

24          The reason that this distinction -- and we

25  posit that with regard to these documents, none of them

1  can fall into that category because the preparers,

2  including at the time of the preparation of the

3  document, were not anticipating litigation, and there's

4  no record evidence to the contrary.

5       THE COURT:  Why do they need to anticipate

6  litigation?  The United States is the one who's

7  anticipating litigation, and they are arguably part

8  of -- they're employees of the United States

9  government.

10      MS. DUNN:  Right.  So the reason is, Your

11  Honor, that the entire work product doctrine is --

12  which is supposed to be very narrow, is designed to

13  make sure that an opposing party doesn't have access to

14  the attorney's mental impressions.

15      So if an attorney from the United States

16  knows that a litigation will be brought or thinks it

17  might -- and I want to get back to this dividing line

18  in a second.  But if an attorney for the United States

19  is anticipating litigation but does not convey that --

20  and there's no evidence here that anybody ever did

21  convey that -- then the person who is preparing the

22  work product or rather preparing -- I won't even call

23  it work product because we don't think it is --

24  preparing the communication, the document, the item

25  that the Court must rule upon doesn't have the benefit

 1   of the attorney's mental impressions.

 2              And so there's --

 3              THE COURT:  It depends on what they're asking

 4   for.  Doesn't asking for certain information provide an

 5   avenue as to what the attorneys are -- let me just take

 6   this up now.  Someone within a large organization, like

 7   Google, is involved in a lawsuit, and they ask someone

 8   down the totem pole to gather information and prepare

 9   that information and send it to me.

10              You're saying to me that when I ask that

11   person to do that for me, I have to tell them that, "I

12   want you to prepare A, B, and C because this is in

13   anticipation of litigation," or is it just, "I want you

14   to prepare this and provide it to me because my lawyer

15   wants me to give him the information"?

16              MS. DUNN:  I understand Your Honor's

17   question.  The first distinction is you have an express

18   attorney-client relationship in that circumstance where

19   you have an in-house lawyer communicating with an

20   employee.

21              The second thing that you don't have is the

22   DOJ's Antitrust Division requirement that it produce

23   documents in the investigatory file, which the

24   Department of Justice has taken the position, both in

25   this litigation and last year in the *Booz Allen* case,

1  that the investigative file continues up until the date

2  of filing.  And in this case, Your Honor, they have

3  produced documents all the way up until the date of

4  filing, and so they don't embrace that dividing line

5  themselves.

6          The other distinction here, Your Honor -- and

7  I just -- I want to go through it because it's probably

8  my failure, but I didn't do this systematically last

9  time.  The privilege log -- and I'm talking about the

10  June privilege log which goes to category 1, the

11  communications between the Department of Justice and

12  the agencies.  The subject lines in that privilege log

13  are all inquiry from the Department of Justice,

14  requests for information of the Department of Justice.

15  And so if we accept the government's position, any time

16  they send an inquiry for information during this

17  investigative period, whatever they get back is work

18  product.  So that is not the case.

19          In the depositions, as you know, Your Honor,

20  every single agency witness has testified it didn't

21  anticipate --

22          THE COURT:  Every single person who testified

23  who is an agency employee -- and we need to be very

24  specific about that.  I've got to tell you that when

25  you represent that these are 30(b)(6) depositions and

1 they are not -- a deposition of an employee is

2 completely different than a deposition of an agency.

3          MS. DUNN:  I agree, and that was my fault,

4 Your Honor.  I'll explain it.  Thank you for the

5 opportunity.

6          The same employees are being deposed as

7 30(b)(1)'s and 30(b)(6)'s.  So that was my confusion.

8 They were selected as 30(b)(6)'s because they are the

9 managing agents in charge of the market.  All of their

10 titles are senior titles, senior director, chief of

11 marketing, all the way down to agencies.  They are not

12 just random employees, and they are the 30(b)(6) and

13 the 30(b)(1).

14          Just yesterday there was testimony from the

15 VA 30(b)(6) that there was no anticipation of

16 litigation until February after the litigation was

17 filed.

18          Another employee has testified that there was

19 no anticipated anticipation of litigation even until

20 March, which obviously is after litigation was filed.

21          So I appreciate Your Honor raising this, and

22 I felt very badly last time because that was my

23 mistake.  But these are the 30(b)(6) witnesses.

24 They're testifying as both.

25          The Wolin declaration, that's the other piece

1  of evidence.  It doesn't say they conveyed any

2  litigation purpose to the agencies or that the

3  agencies, to their knowledge, anticipated litigation.

4          Even the complaint -- by the time of filing,

5  the complaint says only U.S. departments and agencies.

6  The only agency it names at that point is the Army.

7          The press release DOJ issued does not specify

8  any agencies, and DOJ didn't identify these FAAs to

9  Google until sometime in March.

10          So the idea that somehow these documents

11  prepared by the FAA -- these particular FAA employees

12  are somehow in anticipation of a litigation that they

13  had no idea about, Your Honor, is just not plausible.

14          And I will say that this also is a real

15  wrinkle for the idea of the dividing line of which

16  there is also no evidence that the department is now

17  trying to advance at the Court.  First of all, there is

18  public reporting as of the summer that they were going

19  to file a lawsuit.  So the idea that somehow they

20  decided on the day before they started reaching out to

21  agencies that they were going to file a lawsuit is also

22  not plausible.

23          In any event, they have specifically taken

24  the position that this whole period is a period of time

25  where they are required to hand over their

1   investigative file.

2          And I will also say, if you look at the DOJ

3   manual, it cites a House report provision, which is

4   called Our Right to Discover CID Information.  It is a

5   right.  And the DOJ Antitrust Division manual expressly

6   says that defendants are thus able to be able to fully

7   protect their rights at trial by interrogating,

8   cross-examining, and impeaching CID witnesses.

9          Because the other thing that's going on here,

10  Your Honor, is these agency employees, who are both

11  30(b)(6) and 30(b)(1)'s, they are witnesses at trial.

12  They are not -- this is what I was talking to Your

13  Honor about last time.  They are not deployed

14  litigation agents in anticipation of litigation.  They

15  are witnesses.

16         The Wolin declaration acknowledges that they

17  are witnesses, and we are entitled to the

18  communications of these witnesses that would allow us

19  to impeach them and cross-examine them, for example, on

20  the idea of relevant market.

21         THE COURT:  So your position is that that

22  regulation or House whatever completely does away with

23  attorney-client or work product privileges?

24         MS. DUNN:  That's not our position, Your

25  Honor.

1          THE COURT:  It sure sounds like it from what
2  you just said.

3          MS. DUNN:  Your Honor --

4          THE COURT:  They're required to produce the
5  file but not privileged information within that file.
6  And if they can establish a privilege, then it doesn't
7  have to be produced.

8          MS. DUNN:  I agree with that, Your Honor.

9          The manual goes to this point of the dividing
10 line.  Two things we're talking about.  One is
11 attorney-client privilege, and the other is work
12 product.  So with respect to attorney-client privilege,
13 we referred Your Honor in the last hearing to the
14 *Cayuga Nation* case.

15         THE COURT:  Yes, let's talk about that case.

16         MS. DUNN:  Great.

17         THE COURT:  This is where the U.S. Attorney
18 goes in and has a meeting in a FOIA case, right?

19         MS. DUNN:  Yes, Your Honor.

20         THE COURT:  It's a FOIA case, and they are
21 trying to keep it excluded from the FOIA case, and
22 there's no information presented that the U.S. Attorney
23 was providing the agency with advice or guidance.

24         In this case, we have a declaration from the
25 United States saying that, "I was sending this

1   information out to these agency employees asking them

2   for information for me to provide legal advice to the

3   United States."

4          So that's a completely different scenario

5   than, you know, the U.S. Attorney or former U.S.

6   Attorney, I guess, at the time going and meeting with

7   people and then trying to do a FOIA request and saying,

8   you know, "This was to provide legal advice."  There's

9   no relationship whatsoever.

10         MS. DUNN:  The reason we highlight this case,

11  Your Honor, is to demonstrate that the attorney-client

12  relationship between the Department of Justice and the

13  agencies is not automatic.  And the statute that Judge

14  Berman Jackson relies on is 28 U.S.C. 517.

15         Similarly, in the *Stonehill* case, which is --

16  it says that the DOJ -- this is about the Tax

17  Division -- may be the lawyer but still needs to

18  satisfy the standard for attorney-client relationship.

19         THE COURT:  So in that case, it says,

20  "Although the Court could assume that the DOJ Tax

21  attorneys on the email were members of the bar, there

22  is nothing indicating that the IRS employee was a

23  client or the attorneys were acting in their capacity

24  as lawyers, or that the communication was confidential

25  or even legal in nature."

1          In this case, we've got a privilege log that

2   indicates that this information was requested for legal

3   advice, issued by legal, and the United States is the

4   person who was authorizing that action.

5          MS. DUNN:  But just because a lawyer asks a

6   question -- Your Honor, I think we're talking about two

7   different things.  One is attorney-client privilege,

8   and the other is work product.

9          THE COURT:  Right.

10         MS. DUNN:  So attorney-client privilege, I

11  point to these two cases, *Cayuga Nation* and *Stonehill*,

12  only for the proposition that there's not an automatic

13  attorney-client relationship between the United States

14  and the agencies.  That's important.  That's just one

15  point.

16         *Stonehill* makes clear -- and I'm just going

17  to stay on attorney-client privilege at this time.

18  *Stonehill* makes clear -- which I don't think there

19  would be disagreement about -- that the standard for

20  attorney-client privilege still needs to be satisfied.

21         Okay.  So if we look at that standard, it has

22  to be the communication or leads to a fact which the

23  attorney was informed by his client without the

24  presence of strangers for the purpose of securing

25  primarily an opinion on law or legal services or

1   assistance in some legal proceeding and the privilege

2   has been claimed and not waived by the client.

3           The agencies at this point are not informing

4   the lawyer of any facts because they are seeking

5   assistance in some legal proceeding or legal services.

6   That's not how these -- why these facts are being

7   conveyed, and there's testimony to this fact, that

8   these agencies get requests from other agencies all the

9   time.  It's a request for information.

10          At this point -- and there's testimony to

11  this fact too -- they don't think they're in a client

12  relationship.  And if you don't think -- the cases of

13  attorney-client privilege well establish it's the

14  client's privilege.  The client has to believe it is in

15  an attorney-client relationship, and they have to be

16  making a confidential communication for precisely that

17  purpose.

18          So just staying with attorney-client, what we

19  are saying is that when DOJ in an investigative stage

20  reaches out to -- sometimes lawyers and sometimes

21  nonlawyers, by the way, at agencies and says "request

22  for information," "inquiry for information," that does

23  not establish an attorney-client relationship.  And no

24  such relationship is automatic.  That's just

25  attorney-client --

1          THE COURT:  Let me just question this.

2          MS. DUNN:  Yes.

3          THE COURT:  So the United States, who has the

4   authority to bring the claims on behalf of the agency,

5   has people going out and looking to investigate whether

6   the United States is going to bring a claim on behalf

7   of an agency.  You're saying that there is no

8   attorney-client relationship involved in any way

9   whatsoever because the agency hasn't signed a retainer

10  agreement or agreed that they're seeking legal advice,

11  that only the United States is seeking legal advice on

12  a claim that it is going to bring on behalf of the

13  agency?

14          MS. DUNN:  Your Honor, I'm not saying a

15  retainer agreement is required obviously.  But what I

16  am saying is that on this record where there is no

17  evidence that satisfies the standard of attorney-client

18  privilege, it is not sufficient just that the

19  government -- that the DOJ is the government that

20  represents the United States when a claim needs to be

21  brought and the agencies are agencies of the United

22  States government.  There has to be -- there has to be

23  something, evidence in the record -- and, again, their

24  burden where they have to show that there is an

25  attorney-client relationship.

1            Now, also I should mention:  Some of these
2   agencies are not -- are not even parties in the case.
3   They are --
4            THE COURT:  They're parts of the United
5   States though.
6            MS. DUNN:  I agree with that.
7            My only point, Your Honor, is it's not
8   automatic.  There has to be something that establishes
9   an attorney-client relationship between the DOJ's
10  Antitrust Division and the agencies, and here at this
11  time there is nothing at all other than the --
12           THE COURT:  You don't think that the United
13  States investing its enormous resources behind the
14  investigation in this case is different than a
15  situation in which as to whether to pursue a case, an
16  entity, is different than a U.S. Attorney showing up at
17  a meeting on an Indian reservation where an email being
18  sent to a tax person --
19           MS. DUNN:  Your Honor, obviously, those are
20  different circumstances, but the --
21           THE COURT:  Well, I know, but you're talking
22  about an attorney-client relationship.
23           MS. DUNN:  Right.
24           THE COURT:  The United States is the client,
25  right?  They're the ones who brought the lawsuit, and

1  their lawyers are the Antitrust Division of the United

2  States.  On the face of the complaint, that's what it

3  says, right?

4         MS. DUNN:  Right.  But what we're actually

5  talking about is the documents.  So the Court's inquiry

6  in all of these cases -- and by the way, I feel like

7  it's a rare case.  I may have come across one where the

8  documents were not reviewed *in camera*, which we believe

9  we've met the standard for that.

10         But this is about the documents, and the

11  question is are these documents documents shared by a

12  client to a lawyer where the client believes that

13  they're seeking legal advice and assistance in a legal

14  proceeding, and the testimony shows they're not.  The

15  privilege log shows they're not.  There's nothing --

16         THE COURT:  What in the privilege log shows

17  that they're not?  The privilege log says they are.

18  That's what the privilege log says, attorney-client

19  privilege, work product.

20         MS. DUNN:  I agree they're asserting those

21  things.  But all it really says is request for

22  information, and there's -- we haven't gotten to

23  category 2 yet.  That's obviously the communications

24  between the FAA employees, often nonlawyers, and the ad

25  agencies.  That's a whole separate thing that we can

1   get to.

2           But in the privilege log that I'm talking

3   about, which is the June privilege log, they just say

4   request for information.  They don't say anything that

5   would indicate that there's an attorney-client

6   relationship where the agency that's the client is

7   asking for information or asking for legal advice.

8           THE COURT:  I think I understand your

9   distinction in that regard.

10          MS. DUNN:  Okay.

11          THE COURT:  I mean, if it said request for

12  information relating to a lawsuit or a potential

13  lawsuit, then it would be different.  Is that what

14  you're saying?

15          MS. DUNN:  Yeah, perhaps.  Because then the

16  preparer of the document, which is what *National Union*

17  and *RLI* and all the cases are concerned about would

18  potentially -- under the Court's review, potentially

19  include an indication of the attorney's mental

20  impressions.

21          But here there is no -- there is no

22  suggestion that these documents are being prepared --

23  that they would reveal the attorney's mental

24  impressions.

25          I mean, the way that the case law puts this

1   is the burden on the government is exacting and heavy.

2   Those are the words that the Fourth Circuit has used,

3   and the point is that it's supposed to protect the way

4   that the attorney is thinking about the case.  So if

5   the preparer of the document does not know that there's

6   going to be a claim, then that does not -- then it is

7   not work product.

8           The separate -- the second category, I think,

9   maybe even easier to talk about though, is, first of

10  all, the nonFAAs.  They never -- I guess the DOJ would

11  probably say they're automatically clients, but they're

12  not parties to this case.  The DOJ does not say they're

13  bringing the suit on behalf of them for damages.  Many

14  of the communications on that June 26 log are for

15  nonFAAs.  They're not even part of our --

16          THE COURT:  They're agencies of the United

17  States government that the United States government was

18  communicating with to determine whether to include them

19  as parties or involved in this lawsuit.

20          MS. DUNN:  Well -- but from their

21  perspective, they were -- and we think the documents

22  will bear this out and, again, urging *in camera* review.

23  We think from their perspective, as preparers of the

24  responses to the DOJ, they are agencies where the DOJ

25  is reaching out for information.

1          THE COURT:  In relation to legal advice to

2    the United States as to who to include and not to

3    include in the United States' lawsuit against Google.

4          MS. DUNN:  That would make -- every time that

5    a DOJ lawyer reaches out to any employee of a federal

6    agency, that would make it work product, and it is our

7    position that that cannot possibly be.

8          Category 2, communications between the FAAs

9    and the ad agencies, third parties.  The government

10   here is simultaneously saying that these ad agencies

11   are independent, not under their control, industry

12   actors.  And yet in asserting work product, they are

13   also saying they were the litigation agents of the

14   attorney who originally asked the question.

15         THE COURT:  Or a representative providing

16   information in response to a client request for

17   information that was directed from a lawyer that the

18   specifics of that information could disclose what the

19   lawyer was thinking about in the case.  That's their

20   real involvement, right?

21         MS. DUNN:  How?  How could it possibly --

22         THE COURT:  When a lawyer asks a client, "I

23   need to know A, B and C -- and A, B, and C is what the

24   lawyer is looking into and investigating in the case --

25   and the client says, "I don't have that information.

1  I've got to get that from my accountant, advertising

2  firm, banker, some third party."  And so the client

3  reaches out to their representative, this third party,

4  and says either directly or indirectly, "My lawyer

5  wants A, B, and C.  Can you send it to him?"  And the

6  representative then prepares A, B, and C, sends it to

7  the client who then sends it to the lawyer.

8          MS. DUNN:  So, Your Honor --

9          THE COURT:  Not done in the normal course of

10 business, one off.  It's not routine monthly reports.

11 It's not, you know, things that would be done in the

12 normal course of events.  It is a lawyer asking the

13 client for information, the client reaching out to its

14 representative to ask for that information so that the

15 client can then provide it back to the lawyer.

16         MS. DUNN:  Your Honor, let me just take this

17 step by step.  First of all, there's no -- there's

18 nothing in the record that suggests that the request to

19 the ad agency, who is previously retained for a

20 nonlitigation purpose and is -- actually answers

21 questions from these marketing directors all the time,

22 that they --

23         THE COURT:  Well, where is that in the

24 record?

25         MS. DUNN:  It's in the depositions.

1          THE COURT:  You talk about what is in the

2    record.

3          MS. DUNN:  Well, I was trying not to bring up

4    our inability to depose all the ad agencies, but there

5    are 20 of them.  And the -- but the marketing

6    directors, who are representatives of the agencies,

7    have an ongoing relationship with the ad agencies.

8          THE COURT:  Right.

9          MS. DUNN:  And we cite in the papers the *In*

10   *re Grand Jury* proceedings case where the employee was a

11   nonlawyer hired previously for an entirely different

12   purpose.

13         Now, I don't want to have -- to just rely on

14   the formalism of that case.  Although, I think that

15   case is right, and I think the application of the rule

16   is right.  But the reason I think in these cases that

17   it is correct is because the point is is the

18   information that they're preparing, is that something

19   that is in anticipation of litigation.

20         And this ad agency, who is just responding to

21   requests, doesn't know about the litigation because the

22   FAA doesn't know about the litigation, may not even

23   know it was a lawyer who made the request.  They are

24   just getting a request for information from the person

25   they worked with at the agency.

1          And I think we're getting to a universe of

2    sort of *ad absurdum* where just a lawyer request for

3    information by the DOJ has this *seriatim* effect where

4    anything it triggers is all of a sudden work product.

5          And I will also say, Your Honor, that, you

6    know, some of these documents -- in particular this

7    category of documents between the FAA and the ad

8    agency, these have been clawed back during depositions.

9    Thirteen of them were clawed back yesterday.  These are

10   documents with no lawyers on them, nothing --

11          THE COURT:  That doesn't make a difference.

12          MS. DUNN:  Well --

13          THE COURT:  There's no requirement that a

14   lawyer be on a document for it to either be protected

15   by attorney work product or attorney-client privilege

16   if it's done at the direction of a lawyer.

17          MS. DUNN:  Right.  But there's nothing to

18   indicate that the information that's being prepared is

19   at the direction of a lawyer.

20          We would submit to Your Honor even if you

21   want to look at a narrow slice --

22          THE COURT:  This is at least the third, if

23   not more times, you've raised this *in camera* review.

24          My question was -- and really, the only

25   question I've really been able to ask, at least

1  initially, was anticipation of litigation and why

2  something other than the date the lawsuit was filed

3  wouldn't fall within the zone of anticipation.

4        There has to be a reason for me to want to

5  look at these documents.  When a privilege log has a

6  lot of communication from lawyer to client and then

7  soon thereafter client to third party, you know, it

8  doesn't take rocket science to figure out that that

9  document or that communication from lawyer to client,

10  client to third party, is related to the conversation

11  that the lawyer had.

12        You know, the United States or any party has

13  an obligation to look at documents and only withhold

14  them for a basis.  I assume that if you depose and, you

15  know, subpoena an advertising firm, that you will get a

16  lot of documents from them that are not

17  privilege-related documents or protected documents.  If

18  they're providing their monthly reports, they have to

19  provide their monthly reports if they do those kinds of

20  things.  But it's only a communication that is directed

21  by or instituted by a lawyer providing legal advice

22  relating to a matter that is anticipated at the time.

23        MS. DUNN:  Your Honor, respectfully, the

24  document has to be at the lawyer's direction, and by

25  the time you're getting to the agency, I think there

1    can be no argument that the lawyer has directed that.

2              THE COURT:  Okay.  Lawyer says, "Provide me a

3    list.  I want a list of something."

4              The client says, "Okay, I'll provide you a

5    list."

6              The client then asks a representative to

7    provide me a list.

8              How do you say that can't be at the direction

9    of the lawyer?

10             MS. DUNN:  Well, first of all, there's no

11   evidence that that's what happened here.  The Wolin

12   declaration doesn't even say at his direction.

13             So they have a problem at time one, which

14   there's nothing in this record that says this was at

15   their direction.

16             The second qualification is that the preparer

17   had to anticipate litigation.  There's nothing in the

18   record to say that they anticipated litigation either

19   at the FAA or at the ad agency, and all testimony is to

20   the contrary.

21             THE COURT:  Again, how specific is the

22   preparer?  So does everybody who is preparing

23   information in response to attorney's requests have to

24   know that it's for an attorney?

25             MS. DUNN:  I think that's a great question.

1  Let me --

2          THE COURT:  Answer yes or no, and then

3  explain it.

4          MS. DUNN:  Does everybody need to know --

5          THE COURT:  Right.  So you ask someone down

6  the totem pole to get a piece of information that's

7  going to go into a puzzle that I'm then going to put

8  together and give to the lawyer.  Does the person who

9  is preparing that small piece of the puzzle, preparing

10 information, have to know that this is at the direction

11 of a lawyer in anticipation of litigation?  The answer

12 is no.

13         MS. DUNN:  Have to know for --

14         THE COURT:  What you're saying and just what

15 you said, that the preparer, that is, the person who is

16 putting the information together, has to know that it's

17 in anticipation of litigation and at the direction of a

18 lawyer.

19         MS. DUNN:  It's that the document has to

20 reflect that it's for use in litigation, and the reason

21 is -- this is where this concept in substantially

22 similar form comes in irrespective of litigation.  So

23 what the cases are trying to prevent against is unfair

24 revelation to the other side of the attorney's mental

25 impressions.

1              So if the person down the totem pole is just

2    pulling together a list and that's now in the

3    attorney's custody and control but it's just a list,

4    then it may well be not work product.  Alternatively,

5    it could be fact work product, and then I would like to

6    discuss also with Your Honor --

7              THE COURT:  We talked a lot about that.

8    That's not one of the questions I've got, whether

9    there's substantial need.  We had a long discussion

10   about that last time.  This isn't a reargument.  This

11   is responding to my questions.  Okay.  You had your

12   shot last week on that.

13             You mentioned this.  Why should I look at

14   these documents?

15             MS. DUNN:  That does go to substantial need,

16   but I don't want to overstep my bounds, Your Honor.

17             THE COURT:  Well, I kind of opened the door a

18   little bit.

19             MS. DUNN:  You did?

20             THE COURT:  I did.

21             MS. DUNN:  Okay.  Here's why.  I mentioned

22   Interrogatory 14 yesterday -- or last week where we've

23   asked a question that goes directly to information and

24   data re the FAA purchasers.  We have gotten a response.

25   It doesn't identify the purchases, the fees paid,

1  whether the fees were paid directly, and if not

2  directly, how they were paid.  We've asked for that to

3  be supplemented four times.  No response.

4           THE COURT:  File a motion to compel.  That's

5  your remedy for that.  Filing a motion to compel,

6  right?

7           MS. DUNN:  Yes, Your Honor.

8           In the depositions, we asked for -- I am just

9  going to give a couple of examples.  When we asked the

10  deponent from the Navy about his communications with

11  the ad agencies, he said an ad agency had provided him

12  with data.  We asked the United States to produce the

13  data.  We followed up twice in writing.  No response,

14  and that's obviously responsive.

15          Yesterday, one day before the Army 30(b)(6)

16  and (1) depositions, the DOJ clawed back 13 documents

17  saying they reflected request for information, ad

18  agency personnel and Army personnel responsible just

19  for day-to-day ad work, nothing to indicate these

20  documents would reflect any attorney mental

21  impressions.

22          Similarly, there's been clawbacks of

23  unobjected to testimony in the Navy and postal service

24  depositions.

25          We've been unable to get a direct response to

1  our RFA 1, which is about direct purchasing.  We asked

2  the question whether the FAAs purchased open web

3  display advertising directly from Google, and the

4  department responded that that's impossible even though

5  that's the exact language they use in their own

6  complaint.  Because Google doesn't sell open web

7  display.  Advertising publishers do.  So we've been

8  unable to get that.

9          And then when asked -- when we asked about

10 this at the deposition, there have been objections on

11 the basis of calls for a legal conclusion and other

12 objections and instructions not to answer.

13         There are many examples in the depositions

14 that I can get the Court about witnesses not

15 remembering how the agency buys display ads, including

16 in the postal service deposition, the Navy deposition,

17 and the CMS deposition.

18         So one of the reasons we are urging you, Your

19 Honor, to look at the documents is because we think you

20 will see that they are not privileged and because they

21 are going to fill the gaps where we have not been able

22 to get the discovery to which we are entitled.

23         Two other things.  The HTR manual does say

24 that we are entitled to the material in the

25 investigative file to cross-examine witnesses.  These

1    are witnesses in the case.  Again, this is the

2    difference between hiring an investigator or an

3    accountant or something.  These are witnesses in the

4    case.

5            And so if when the DOJ reached out to them

6    requesting information they said, "We look at the

7    market in a totally different way," that is, under the

8    DOJ's manual, something that we are entitled to have.

9    If the DOJ asked that very same question to another

10   company or some other third party, we would be getting

11   that information about the market reality.  And counsel

12   was correct.  Prior to the time where these

13   communications start in December '22, there's no other

14   communications from these agencies about how they

15   experienced the market.

16           So we have seen over the course of these

17   depositions the testimony evolve.  In the first couple

18   of depositions about the market, we had witnesses

19   answer the questions, and now the witnesses are giving

20   answers that are more coached.  So we believe that we

21   are entitled to these documents that don't reflect the

22   attorneys' views.  They reflect the agencies and the ad

23   agency's views of how they view the market, which, as

24   Your Honor said, is going to be incredibly important.

25   Now Your Honor last week raised the contracts, and I

1  took that to heart.  We looked at the contracts.  They

2  don't help here.  They are multiyear indefinite

3  delivery, indefinite quantity contracts.  They don't

4  set price.  They don't talk about any type of

5  advertising, let alone open web display advertising,

6  and they don't budget out ad types to buy, which would

7  give you some indicator of the market.

8        So I appreciate Your Honor opening up the

9  door to this, but there are numerous important issues

10  in this case having to do with direct purchase under

11  *Illinois Brick*, damages, relevant market, all of which

12  is really, as we discussed last time, core to the case

13  where we are not getting any information, including not

14  getting information in depositions for a whole host of

15  reasons and because of the clawbacks.

16        The other point that I will make is there are

17  some agencies that are not parties.  So they're -- you

18  know, JSA and HSS and OMB.  There are 18 ad agencies

19  and other FAAs.  And so we just can't depose all of

20  them as discussed.

21        So that's -- this is why I think Your Honor

22  should look at the documents.  Because even if they are

23  fact work product -- which obviously we don't think

24  that they are -- we do think we've established a

25  standard for substantial need.  And maybe Your Honor

1 will look at the documents and disagree with us.  But

2 at least the clawback documents that we saw and thought

3 were not privileged, we would commend to the Court to

4 look at.

5          The government just simply has not met its

6 very exacting burden to show Your Honor that these

7 documents are work product and privileged.  And I think

8 if you look at the Wolin declaration, as I said last

9 time -- but I think it bears repeating -- it is most

10 notable for what it doesn't say.  It doesn't say he

11 directed these agencies to prepare litigation work

12 product.  It says he was gathering facts about the

13 nature and extent of ad purchases.  He does not say

14 that the witnesses acted at his direction, and many

15 instructions not to answer have been given during the

16 depositions about that.  He does not say that he gave

17 the agencies any reason to anticipate litigation, and

18 they all say they didn't.  And he doesn't say that any

19 agency ever came to him for assistance in a legal

20 proceeding or seeking legal advice.  In fact, all the

21 testimony in the record is to the contrary.

22          THE COURT:  Thank you.

23          MS. DUNN:  Thank you.

24          THE COURT:  There's one remaining issue

25 having to do with the deposition transcripts that were

1   provided to me for *in camera* review.  That motion is

2   still pending.  You know, I looked at -- there were

3   several items put out in the Karpenko deposition for me

4   to look at and two parts of the Owens deposition

5   transcript.

6           What was indicated to me in the Owens

7   deposition transcript -- that is page 47, line 13, to

8   page 250, line 10, and 254, line 9, to page 255,

9   line 5.  I don't understand why that clawback is

10  appropriate.  Anybody prepared to address that?

11          MS. CLEMONS:  I don't have the transcript

12  with me today, Your Honor, but I'm happy to -- I was

13  at -- I was virtually at the deposition, and I'm happy

14  to provide additional answers if you have questions.

15          THE COURT:  Obviously, I've got that motion

16  here from last week, and it's got the exhibits that

17  were filed under seal.  It's got those specific

18  requests for me to look at those areas, which I've

19  tried to do.  But one of them -- and I'm pretty sure

20  I'm not exposing any real -- it's talking about -- and

21  this was in the Owens deposition -- about the Google

22  marketing live event and attending the Google marketing

23  live event and speaking to people at the event.

24          MS. CLEMONS:  Yeah.  I apologize, Your Honor.

25  I don't believe that that is part of what we intended

1  to claw back at least, and if that's an error, I will

2  definitely look back and check.

3         The section that we -- the clawback had to do

4  with Mr. Owens was being asked about interrogatories

5  without the benefit of a document in front of him, and

6  he did not understand the interrogatory is not just a

7  word for questions but that it actually refers to a

8  specific document in a legal proceeding.  And so he was

9  answering with respect to communications that had been

10 directed by counsel, but counsel did not realize that

11 he wasn't speaking about the interrogatory response

12 preparation at that time.

13         THE COURT:  Well, just dealing with that

14 issue, I mean, I guess I need to -- in fact, there's

15 going to be an issue as to my upcoming ruling as to

16 these snippets of the depositions.  Again, I looked at

17 the ones that are on page 2 of Google's memorandum in

18 support of its motion for *in camera* review.  It

19 specifically asks for *in camera* review of those things.

20 I have looked at the ones of Karpenko.  The reasons

21 I'll state a little bit, and I think they're

22 appropriate.

23         The Owens ones, I may have not been able to

24 translate the page numbers right.  You-all need to look

25 at that and see if you can't get that resolved.

1          MS. CLEMONS:  We will definitely do that,

2    Your Honor.  It may be a reconciliation issue between a

3    rough transcript and a final transcript based on when

4    the motion was filed.

5          THE COURT:  All right.  So on the request to

6    produce the privileged information, again, we've had

7    about two rounds of argument and substantial briefing

8    on the issue.  You know, my questions today, I think

9    you can see why I was doing -- 26(b)(3)(A) talks about

10   "a party may not discover documents and tangible things

11   that are prepared in anticipation of litigation or for

12   trial by or for another party or its representative,

13   including, but not limited to, but including the other

14   party's attorney, consultant, surety, indemnitor,

15   insurer, or agent."

16          You know, again, it's anticipation of

17   litigation.  It's not during.  I understand the

18   Antitrust Division at the Department of Justice has

19   certain obligations to turn over an investigative file.

20   I think that is limited to information that's in the

21   file that is not otherwise protected client privileged

22   or attorney work product.

23          I think under the facts and circumstances

24   that have been presented to me in this motion, that the

25   plaintiff, the United States, is entitled to claim work

1   product protection for documents that were created

2   prior to the filing of the lawsuit.  It just doesn't

3   seem to be that hard to understand that "in

4   anticipation of litigation" doesn't mean after the

5   litigation is filed.  I think including up to the time

6   period of December 23, 2022, is appropriate.

7            I have a declaration saying that at that

8   point in time, the lawsuit was imminent, not just

9   anticipated but imminent.  It's also supported by some

10  other information that, you know, litigation hold

11  letters were being sent out in early January before the

12  lawsuit got filed and those kinds of things.

13           So, you know, taking that into consideration,

14  that there is no hard and fast deadline from -- it's

15  only from the lawsuit.  Anything before the lawsuit is

16  fair game.  Anything afterwards is to be protected.  I

17  think it's not a valid argument.

18           The privilege logs that have been provided to

19  me and reviewed state -- again, lawyers have

20  obligations to provide accurate information -- you

21  know, that the communications were done in anticipation

22  of litigation and for the purpose of providing legal

23  advice.

24           Again, this is unusual in that you have the

25  United States, who is seeking the legal advice.  It's

1   the ultimate decider as to whether to bring this case

2   or not.  And so they're asking for information in

3   anticipation of this litigation as to whether to pursue

4   claims against Google in this case.

5           I do find that those communications have been

6   supported sufficiently in the privilege log and in the

7   declarations.  The privilege log outlines that, the

8   information.  The Wolin declaration I think supports

9   that, and the United States has the obligation to

10  assert it in certain circumstances.  And I think under

11  the facts and circumstances they've done so.

12          I also find -- and, again, I appreciate the

13  argument about communications to the client and the

14  client going out to someone else to get specific

15  information that has been requested by the lawyer.  You

16  know, there are a lot of cases out there that have to

17  do with a lawyer hires an investigative firm or the

18  client hires him or this or that.

19          But this is a situation -- and I think what

20  you can tell from the privilege log and the timing of

21  the information is that this is an avenue in which a

22  lawyer on behalf of the United States and its relevant

23  agencies is asking people in agencies to prepare

24  information to provide to the lawyer to provide legal

25  advice to the United States whether to bring a claim on

1  behalf of the United States and its agencies.

2          When that client agency personnel reaches out

3  and asks for specific advice as directed or as

4  requested by an attorney to an advertising agency, I

5  think that discloses the attorney request.  And the

6  information itself is producible, that is, if you ask

7  in another form:  I want the same kind of information

8  as asked by the lawyer.  You're entitled to get it, but

9  you're just not entitled to get it as a result of a

10 lawyer asking.

11         So, again, circle around this back to

12 substantial need.  Obviously, work product is not

13 absolute.  If you show a substantial need, you can at

14 least get the facts.

15         While you may still be trying to get it,

16 you're entitled to that information.  If you're not

17 getting it, you file a motion to compel.  You know,

18 give me the document that you sent in response to a

19 lawyer's request.  But if you want information about

20 how advertising is purchased, obtained, however it's

21 done, about the facts and circumstances of how it's

22 directed and those types of things, that's information

23 that you're entitled to.  It's just not at the

24 direction of a lawyer providing advice from the client

25 to the lawyer about specifics relating to that lawyer's

1   investigation.

2           So I really can't find that, based on the

3   record before me and the understanding that I have

4   provided to the United States, that that information is

5   obtainable through discovery whether -- it's the facts

6   in that information but not in relationship of having

7   been directly asked for by a lawyer.

8           So at this point in time -- and the same, not

9   just the damages, but it also goes to the extent to

10  what the agency's view is on -- their view of open web

11  display advertising and what -- that that standalone

12  kind of question and asking them, you know, well, what

13  does it mean to you or those kinds of things is

14  appropriate.  But not what did you tell your lawyer

15  when you first met with your lawyer what it meant to

16  you.  It really isn't.

17          So I'm going to deny the motion to produce

18  the privileged information.  I think in this case the

19  law is adequate.  I think they have asserted a

20  privilege.  They have supported the privilege.

21          You know, just because somebody wants me to

22  look at documents and thinks I should look at documents

23  and they think it's going to be helpful if I look at

24  documents, there has to be a reason.  That's the way

25  the rules have been set up.  You assert a privilege.

1   You support a privilege.  The lawyers have obligations

2   to do it in a responsible manner.  So I'm not going to

3   look at all the documents *in camera.*

4            I will look, again, to the extent Karpenko

5   testimony was clawed back or whatever you want to call

6   it.  In those instances, I think, given the documents,

7   that those are appropriate.

8            The Owens one I'm unclear about.  So that

9   can't get resolved.

10           Okay.  Thank you.

11           MS. DUNN:  Your Honor, I apologize.

12           I appreciate Your Honor's ruling and

13  obviously the time we had to argue.  Would it be

14  possible, if you're willing to look at the documents

15  that were clawed back in those depositions, whether you

16  would look at the documents clawed back in other

17  depositions, for example, the one yesterday where there

18  are 13 of them?

19           THE COURT:  Well, I haven't seen to see

20  whether the log is appropriate and the reasons why for

21  clawing them back.  I don't know.  You're asking me to

22  look at something that I have no factual basis to think

23  that there's a reason to go behind what the asserter of

24  the privilege has said other than, you know, like --

25  it's got to be more than that.

1              MS. DUNN:  All right.  We will hope to --

2              THE COURT:  If you want to file a motion on

3   that, you can file a motion on that, and I'll look at

4   it and see.

5              But, again, you know, it just doesn't work

6   for you to every time you think someone has been

7   asserting a privilege that they shouldn't assert that

8   you ask a judicial officer to look at it.  There have

9   to be reasons for a judicial officer to go behind them

10  and do that other than, "We think it's wrong."

11             MS. DUNN:  Understood, Your Honor.

12             THE COURT:  They're entitled to assert

13  privileges in certain time frames and in certain

14  circumstances.  You know, if for some reason you think

15  the ones they're asserting now go beyond that, you're

16  free to raise that issue.  Hopefully, I've provided

17  some guidance.

18             I do want to say that in these depositions,

19  there have been questions asked that, I think, are too

20  restrictive in dealing with whether there was a

21  communication with a lawyer.  I think, you know, in the

22  light of day instead of in the heat of the deposition,

23  we all understand that.  Did you have a conversation?

24  Yes.

25             It's probably an appropriate question.  What

1    was the conversation about, depending on was it legal

2    advice or something?  Maybe.

3                Was it about X, Y, Z?

4                There are zones in which -- and, again, you

5    know, I hope that people who are defending these

6    depositions and taking them understand that just

7    because it may have to do with a communication that may

8    or may not involve the lawyer, you shut it all down.

9    There has to be some ability for Google to probe it to

10   some extent.

11               I don't say there was a lot, but there were a

12   few instances.  And obviously, Google has a right to

13   get some basic information about communications, not

14   the substance of it, but whether there was, in fact, a

15   communication, who was involved in it, and those kinds

16   of things may or may not be.  So try and be a little

17   bit more understanding as to only doing it for time

18   periods.  Okay.

19               MS. DUNN:  Thank you, Your Honor.

20               THE COURT:  Okay.  Thank you.

21               We'll be adjourned.

22               MR. EWALT:  Your Honor, if I may.  With the

23   Court's indulgence.  I really appreciate the time that

24   you've given both sides to present their position.  My

25   partner, Julie Elmer, has one item she would like to

1  bring to the Court's attention.

2          MS. ELMER:  With your indulgence, Your

3  Honor --

4          THE COURT:  What is it?

5          MS. ELMER:  -- I'll be brief.

6          This is an issue that I've shared with

7  plaintiffs' counsel, but I think it's important enough

8  to raise it to the attention of the Court.  We've

9  recently become aware of an issue with Google's

10 document production that, we believe, is going to

11 impact our ability to complete the production of all of

12 our documents by the close of fact discovery.

13         And so I wanted to share this with the Court.

14 Obviously, we'll be meeting and conferring about this

15 issue with plaintiffs' counsel over the next several

16 days.  But we do believe that Google will be producing

17 a substantial number of additional documents in this

18 case.  Google, of course, agreed to apply search terms

19 to agreed-upon custodians over an agreed-upon time

20 period.

21         What Google does is when it collects

22 information from custodians, it stores that information

23 in ingestion sites.  And because of how long Google has

24 been under investigation for the last four years, there

25 are multiple ingestion sites where the custodians'

1   documents are stored.  And it has come to our attention

2   that the search terms that Google agreed to use for

3   this litigation were mistakenly not run over all of the

4   ingestion sites where the custodians' documents are

5   stored.

6           So we are working as fast as we can to get

7   our arms around how big the problem is and to produce

8   the documents to the plaintiffs as soon as possible.

9   We are prioritizing the deponents' productions right

10  now, and there are two depositions that could be

11  impacted.

12          There is one that is scheduled for Tuesday.

13  We've let plaintiffs know that we expect to make

14  another production from that custodian's files.  We

15  expect to do so on Sunday.  We expect that production

16  to be about 10,000 documents.

17          There is another deposition that is scheduled

18  for Friday, and we expect to make a production of

19  documents for that custodian.

20          The other two depositions that are

21  forthcoming next week we do not expect to be materially

22  impacted by this issue.

23          But I thought it was important to bring it to

24  Your Honor's attention because of the potential impact

25  on discovery deadlines.

1          THE COURT:  Well, it's very unfortunate.

2          MS. ELMER:  I agree.  We'll do our best to

3 work with --

4          THE COURT:  Again, I don't understand how

5 mistakenly so-and-so wasn't done.  You know, we'll try

6 and figure that out at some point and what the

7 consequences of that will be.

8          Obviously, if the United States wants to

9 proceed with the deposition, it would have to reopen

10 the deposition at a later time due to Google's

11 inability to do what the Court ordered it to do.

12          I'll consider requiring -- or if they want to

13 delay it and take the deposition after the discovery,

14 it has to be after discovery for me to consider that.

15          Obviously, that's an unfortunate situation

16 Google has gotten itself into.  We'll deal with it as

17 appropriate.

18          You can agree on what you want me to do.

19 I'll deal with that issue later this month.

20          MS. ELMER:  I understand, Your Honor.  Thank

21 you for your indulgence in letting me share this issue.

22          THE COURT:  Okay.  Thank you.

23          We'll be adjourned.

24          ------------------------------------
                    Time:  12:58 p.m.
25

1      I certify that the foregoing is a true and

2  accurate transcription of my stenographic notes.

3

4                              _____
                                        /s/
5                              Rhonda F. Montgomery, CCR, RPR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25