IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES, *et al.*, | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| *Defendant*. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTIONS TO COMPEL RESPONSES TO VARIOUS DISCOVERY REQUESTS**

Google's motion to compel, filed on the last day of the fact discovery period, seeks to compel further responses to a grab bag of requests transcending the duration of fact discovery in this case, from Plaintiffs' initial disclosures to responses to requests that were not even due yet when Google filed its motion. Google made little attempt to confer with the United States to resolve its concerns prior to filing its motion. The result is predictable; Google raised several alleged deficiencies that have since been addressed. As to the remainder of Google's arguments, Google misstates the applicable standards and case law, and seeks to apply standards to the United States which it has not met itself. Accordingly, the Court should deny Google's motion in its entirety.

**ARGUMENT**

**I.    Google Seeks to Compel Discovery Responses Without Adequately Meeting and Conferring, in Contravention of Local Civil Rule 37(E)**

Local Civil Rule 37(E) requires that "no motion concerning discovery matters may be filed until counsel shall have conferred in person or by telephone to explore with opposing counsel the possibility of resolving the discovery matters in controversy." Despite representing in its motion that "counsel certifies that a good faith effort to narrow or eliminate the dispute was undertaken

1

prior to the filing of this motion.," Dkt. No. 406 at 1, Google provides scant evidence of any attempts to resolve the issues raised in its motion—and for good reason. Google filed this motion on the eve of the conclusion of fact discovery and seeks relief both on discovery responses which were not even due, and which Google had not even seen, when Google filed its motion (RFAs Nos. 4-12 and Interrogatories Nos. 22-29)—or on requests which the parties never discussed during a telephonic meet-and-confer (Interrogatories Nos. 18-21). "E.D. Va. Local Civil Rule 37(E) provides that before any motion to compel is filed, parties must meet and confer either in person or by telephone to resolve any dispute." *Butler v. Kroger Ltd. P'ship I,* 2020 U.S. Dist. LEXIS 241307, *39 (E.D. Va. Nov. 30, 2020). While Google's arguments all fail on the merits— as discussed below—Google's failure to fully comply with Local Civil Rule 37(E) also weighs in favor of denying Google's motion. *See id.* (denying motion pursuant to Rule 37(E) because "all Butler's counsel had to do to obtain a proper response to document request 8 was call Kroger's counsel on the phone and explain exactly what type of documents he sought," and holding that "counsel's failure to do so cannot now justify imposing some type of sanction against Kroger for a deficient discovery response which Butler did not protest at the time it was made").

II. **Google's Motion Fails on the Merits**

A. The United States' Initial Disclosures on Damages Satisfy Rule 26.

Rule 26(a)(1)(A) requires only a "computation of each category of damages claimed by the disclosing party" and provides that "[a] party must make its initial disclosures based on the information then reasonably available to it." Fed. R. Civ. P. 26(a)(1)(A)(iii), (E). Based on the information available to the United States at the time, the United States provided an adequate disclosure. Because of the nature of the advertising technology industry, much of the information required to prepare a final computation of the damages suffered by the United States belongs

exclusively to Google or other third parties. The United States has endeavored, throughout discovery, to obtain this information, and in many instances Google has objected to providing relevant information on the grounds that it is unduly burdensome or inconsistent with how Google stores its financial records in the ordinary course of business.

Now that discovery is drawing to a close—excluding the millions of documents Google failed to produce, in clear violation of the Court's orders—the United States' experts are working diligently to prepare their reports, which will detail the damages that the United States has suffered. If Google had not put the current schedule in jeopardy through its discovery misconduct, it would be assured of receiving the United States' expert reports in only a matter of weeks. There is no prejudice to Google from waiting to obtain a more detailed computation, and relying on expert reports in complex damages cases to provide such a computation is consistent with relevant authority.

The cases Google cites do not support the proposition that a damages computation must be disclosed prior to expert discovery in a case such as this one where damages are the product of highly complex modeling and calculation that must be conducted on detailed data not in the possession of the plaintiff. Indeed, the court in *Silicon Knights, Inc. v. Epic Games, Inc.*, specifically acknowledged that "a party may supplement its Rule 26(a)(1)(A)(iii) 'computation' by producing an expert report (including documents) that complies with Rule 26(a)(1)(A)(iii)" and rejected a motion to exclude the report for late disclosure, finding it to be a supplemental disclosure in line with the Rules. 2012 WL 1596722, at *1 (E.D.N.C. May 7, 2012); *see also Albert S. Smythe Co. Inc. v. Motes*, 2019 WL 10959830, at 1 (D. Md. May 9, 2019) (discussing interrogatory responses, not initial disclosures, and specifically allowing "future supplementation" of damages calculation); *Advanced Training Grp. Worldwide, Inc. v.*

*ProActive Techs. Inc.*, 2020 WL 4574493, at *4-*8 (E.D. Va. Aug. 7, 2020) (considering different situation where damages calculation was never provided "at any point in th[e] litigation"). *Cf.* Memo. at 14-15 (citing same).

      B.  <u>The United States' Has Made a Reasonable Production in Response to RFP No. 12.</u>

The Court should reject Google's request to compel additional data that the United States does not maintain in response to RFP No. 12, which seeks detailed information concerning the FAAs' purchases of advertising, because: (1) the United States' production of reports and documents received from the FAAs' advertising agencies in the ordinary course of business satisfies RFP No. 12 as written; (2) the bespoke data sets Google now seeks are not within the possession, custody, or control of the United States, except in the form of documents already produced to Google; and (3) such data *is* in the possession, custody, or control of Google and/or third parties from whom both Google and the United States have sought discovery.

Google is seeking to retroactively rewrite RFP No. 12 as a bespoke data request, even though the request seeks "data or documents sufficient to show," which the United States has provided to the best of its ability, limited only by the FAAs' lack of access to structured data sets containing the types of information both the United States and Google are seeking concerning the FAAs' purchases.

The United States has been fully transparent with Google regarding its lack of practical access to data of the sort Google seeks in RFP No. 12 since early in discovery, as well as its efforts to obtain such data from advertising agencies via third-party subpoenas. *See* Ex. 1 at 1-2 (May 22, 2023 Letter from S. Eisman to K. Clemons) (describing United States' representations on a May 9 call concerning RFP 12). Notably, Google's position at the time was that it needed the information not to support the United States' purchases from Google, but rather to understand

4

"FAA advertising from non-Google channels" and "comparing advertising across all platforms." *Id.* at 2.

On June 9, 2023, the United States explained the information available to it with respect to RFP 12 in detail, noting that one FAA, Army, has contractual rights to the types of data described in RFP 12 maintained by its advertising agency, DDB. Ex. 2 (June 12, 2023 Letter from K. Clemons to M. Goodman) at 12 ("[W]e have explained that the FAAs do not maintain data in structured databases that can be pulled in the format the Google is requesting, and instead has such information, if at all, in the form of documents provided over time by their ad agency contractors. The exception to this is Army, which has contractual rights to data maintained on its behalf by its ad agency contractor, DDB."). We also stated in that letter that "[w]e have asked ad agencies to produce data via Rule 45 subpoenas, and where we have a contractual right to 'direct' production of such data, we are seeking it via the government contracting process." *Id.* at 12.

Even though Army owns all of the data generated through its advertising contract, the data itself resides in the ad agency's systems, and the existing contract did not provide for a mechanism by which Army could have that data transferred out of the ad agency's systems and into Army's possession. The United States worked through the government contracting process to seek a contract modification under Army's contract with its advertising agency, that would require the ad agency to produce the data sought in RFP No. 12, to the extent that it exists, as a deliverable under the contract. When the initial contract modification proposal from the contractor appeared not to be sufficiently tailored to meet the needs of the discovery request, counsel for DOJ met with counsel for and employees of the ad agency, in order to gain a better understanding of the available data and what responding to RFP No. 12 would entail.

As part of that process, the ad agency provided a data sample showing the fields available in its systems housing Army data that would fall into the categories listed in RFP No. 12. This data sample revealed that the sources of these data fields were two Google systems: DV360 and Campaign Manager. In addition, the contractor's proposal for the time required to pull the data would have fallen well past the close of fact discovery under the scheduling order. The United States determined that time and expense to procure this data set was unduly burdensome in light of the inability to obtain it in time for it to be used in the litigation and the existence of duplicative data in Google's systems that was already the subject of pending data requests to Google, and promptly communicated that determination to Google. *See* Ex. 3 (Aug. 7, 2023 Letter from K. Clemons to M. Goodman).

The United States also served an additional request (RFP No. 76) on Google seeking data from Campaign Manager related to FAA purchases. Even though such data would have been responsive to both Google's and the United States' discovery requests, Campaign Manager had not been previously identified by Google as a source of relevant data responsive to other RFPs, but the negotiations with DDB regarding RFP No. 12 data demonstrated the relevance of this Google data source.

Despite this extended back and forth detailing the unavailability of data in the format contemplated by RFP No. 12 and confirmation that the best data is in Google's own systems, Google now moves, more than a month since the last correspondence on this issue, to compel production of data from the Army's ad agency. In support of its motion, Google mischaracterizes the testimony of the 30(b)(6) designee for Omnicom, the ad agency's parent company, as somehow establishing that Omnicom's "data is within Plaintiff's control." To the contrary, the Omnicom designee's testimony shows that the witness did not have personal or prepared corporate

knowledge necessary to support the conclusions that Google seeks to draw to undermine the United States' representations regarding Army's access to data. *See* Ex. 4 (Omnicom Dep.) 256:12-16, 257:10-258:1;256:23-257:9, 258:3-15; 258:16-20; 258:21-24; 256:17-22. As described in the discovery correspondence, the United States was in fact requesting data from the ad agency but, after receiving a data sample, the expected delivery date was well past September 8, 2023, just as the United States had communicated to Google more than a month before it filed the instant motion. As such, the United States does not have the practical ability to obtain the data from the ad agency that Google seeks within the confines of the case schedule, and the burden of continuing to pursue this data would far outweigh its utility to either Google or the United States, particularly in light of the fact that Google already has the most complete data about FAA purchases via Google's own products and is ostensibly working to provide it to Plaintiffs.

The other data Google seeks in response to RFP No. 12, Wavemaker data, was the subject of clawed back testimony regarding communications from counsel and work product prepared at the request of counsel. The testimony was clawed back during the deposition and confirmed in written correspondence, and as such counsel for Google's repeated references to such testimony to support follow up requests for documents are improper under the protective order. In addition, after months of intense negotiations, the parties previously agreed that the United States would not produce FAA documents that post-dated the filing of the Complaint on January 24, 2023. The United States has produced responsive, non-privileged documents that hit on agreed upon search terms and were created or modified within the agreed upon time period for document discovery. Further, the United States does not possess data from Wavemaker of the kind contemplated by RPF No. 12 other than the data Wavemaker has already produced to both the United States and Google. Any initial requests to Wavemaker from Navy that were made at the request of counsel to

provide legal advice in connection with the complaint are protected attorney work product, as the Court already concluded, and the United States does not intend to rely upon that information to support its case. The best source of evidence about the purchases made via Google's ad tech products is Google's own systems that facilitated those purchases (DV360, Google Ads, AdX) and Google's Campaign Manager 360 product, a web-based application Google describes as, "Centralized cross-channel ad management helps you maximize insights and optimize media and creative performance across all your digital campaigns." *See* Google Marketing Platform, Campaign Manager 360, https://marketingplatform.google.com/about/campaign-manager-360/benefits/ (last visited Sept. 13, 2023). The Court should not countenance Google's repeated attempts to obtain early work product prepared at the direction of counsel to evaluate the United States' damages claims under the guise of a need for data Google already maintains in more granular and comprehensive form than any FAA or ad agency.

        C.  <u>The United States' Responses to Google's RFAs Are Sufficient</u>

The United States has fully responded to Google's RFAs Nos. 1-12. It has admitted or denied each request, including admitting to certain facts as appropriate. That Google does not like the substance of the United States' responses is not a sufficient reason to compel additional responses, or deem any request admitted.

To start, Google takes issue with RFA No. 1, which was the subject of a previous Google motion that was withdrawn by Google after receiving the United States' response. *See* Dkt. No. 291. RFA No. 1, rather than seeking facts as suggested by Judge Brinkema, instead seeks admission of a legally conclusive statement concerning whether the FAAs "purchased…directly." As the court acknowledged, the issue of whether the FAAs are direct purchasers is an inherently factual inquiry concerning how purchases are made and the roles and responsibilities of any

8

entities involved in a transaction. *See* Apr. 28, 2023 Hr'g Tr. 21:15-18 (Dkt. No. 163) ("I think the only argument that defendants might have down the road -- which, again, is a fact situation -- is if you all had used a *real* middleman, then there might be a problem, or two middlemen." (emphasis added)); *see also* Memo. at 11 (quoting the Court's statements during the September 1 hearing that Google is entitled to "information about how advertising is purchased, obtained, however it's done, about the *facts and circumstances* of how it's directed and those types of things"). Google's RFA No. 1, however, does not seek information about facts and circumstances, but rather seeks only legal conclusions. The United States objected to RFA No. 1 as calling for a legal conclusion because "requests that seek legal conclusions are not allowed under Rule 36." *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 210 F.R.D. 100, 108 (D. Del. 2002); *see United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009) (finding that requests the seek purely legal conclusions are not permitted under Rule 36); *Lakehead Pipe Line Co. V. Am. Home Assur. Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997) (stating "a request for admission which involves a pure matter of law, that is, requests for admissions of law which are related to the facts of the case, are considered to be inappropriate").

Aside from adding the item purchased and identity of the party alleged to have caused the harm, neither of which is the type of fact that might assist the court in resolving disputes of fact with respect to antitrust standing, Google's RFA No. 1 is no different from an RFA asking the United States to admit that jt is not a direct purchaser, which is a naked legal conclusion and not the proper subject of an RFA. *See Benson Tower Condominium Owners Ass'n v. Victaulic Co.*, 105 F.Supp.3d 1184, 1196 (D. Ore. 2015) (finding that objections to RFAs were not improper because "[a]lthough Plaintiff has nominally tied its RFAs to the facts of the case, the request remains a legal conclusion"); *Disability Rights Council v. Wash. Metro. Area*, 234 F.R.D. 1, 3

(D.D.C. 2006) ("[I]t would be inappropriate for a party to demand that the opposing party ratify legal conclusions that the requesting party has simply attached to operative facts."); *Reichenbach v. City of Columbus*, 2006 WL 143552 at *2 (S.D. Ohio 2006) (finding that an RFA requesting a party to "admit that the curb ramp at issue was not compliant with current federal accessibility design standards" was improper as it sought only a conclusion of law); *Davi v. Roberts*, 2018 WL 4636805 at *1 (E.D.N.Y. 2018) (finding an RFA asking defendant to admit that the plaintiff's social media postings were "on a matter of public concern" improper because "whether speech addresses a matter of public concern is a question of law").

In response to the United States' objections to this RFA, Google attempted to claim that it was only seeking a "lay" usage of the term "purchase . . . directly," but when pressed on what "directly purchase" means to Google in a lay sense, Google's counsel recited a number of facts and circumstances that have been relied upon in cases assessing direct purchaser status under *Illinois Brick*. Google later followed up with a letter referring to the dictionary definition of those words, but a reference to the dictionary does not convert a legal conclusion into a factual one. The United States nonetheless answered RFAs Nos. 1-3, providing additional explanation to address both this issue and to clarify what the FAAs do and do not purchase from Google, which was necessary in light of Google's vague use of "open web display advertising,"

The RFA on its face appears to refer to the purchase of advertising inventory on publisher websites, but Google now argues that the term was also intended to refer to the ad tech services Google provides to facilitate purchases of open web display advertising. Google uses this post-hoc reconfiguration of its poorly constructed RFA to argue that somehow the United States' reading of the plain language of the RFA and attempt to provide additional clarity in the response regarding what it purchases from whom is evading the request Google meant to, but did not, serve.

Google's apparent confusion and surprise as to the distinction between purchases of advertising and purchases of ad tech services and contention that this is somehow a new attempt to obfuscate damages by the United States is wholly unfounded and contradicted by the record in this case. As the United States argued in April in opposition to Google's motion to dismiss, "Google's [*Illinois Brick*] argument conflates the advertising purchase with Google's provision of ad tech services to facilitate that purchase (which advertisers pay for via "take rates" pulled directly from the purchase payment). The provision of ad tech services is what matters for the Illinois Brick analysis." Dkt. No. 101 (Pls.' Opp'n to Mot. to Dismiss), at 27.

The United States' responses to RFAs Nos. 1 through 3 are both responsive and necessarily detailed in light of the vagueness of Google's language, including circular definitions of pay and purchase, repeated use of the word "directly," and the phrase "paid . . . for the use of," which could encompass a number of different types of contractual and payment arrangements that would have very different implications for the direct purchaser analysis. As a result, the United States provided more detail regarding the facts of what it actually does with respect to payment and purchases of open web display advertising. Google may be upset that the United States will not admit to a legal conclusion that is incorrect in light of facts not covered by the RFA, but that is not a basis to find that an RFA that was admitted or denied with an explanation is unresponsive. There are dozens of facts going to the analysis of whether an entity can be considered a direct purchaser under *Illinois Brick* (and therefore has antitrust standing) that Google could have included in its RFAs, but Google chose not to do so, opting instead to try to play "gotcha" with unclear language and legal terms of art couched as "lay" terms.

RFAs Nos. 4 through 12 suffer from the same legally conclusory and vague use of the terms at issue in RFAs Nos. 1 through 3, but without the conflation of advertising with the services

11

used to purchase advertising creating a scenario in which the conclusion would differ depending on the subject of the purchase, the United States was able to deny the legal conclusions, and did so. As such, the Court should deny Google's motion to overrule the objections to those RFAs as moot.

### D. The United States' Responses to Interrogatories No. 4, 9, 14, and 17 are Sufficient.

With respect to Interrogatories Nos. 4 and 17, the United States has been diligently supplementing its responses by reference to documents in the FAA productions under Rule 33(d). *Mills v. Gen. Motors, LLC*, 2017 WL 4279651 (D.S.C. Sept. 26, 2017) (holding that Rule 33(d) permitted defendant to respond to plaintiffs' interrogatories by providing "document numbers for 1,000 pages rather than direct answers to the interrogator[ies]"). After determining that the answers to the information sought by these interrogatories exists at the FAAs, if at all, in specific types of ordinary course documents exchanged between the FAAs and their ad agencies, including invoices and media plans, the United States and the FAAs have undertaken significant effort to compile and identify those documents for Google, despite having repeatedly notified Google since the outset of discovery negotiations that the FAAs do not maintain centralized or structured data of the sort Google would like to receive in response to these interrogatories. In response to Interrogatory No. 17, the FAAs have provided, where available, centralized data showing payments made, as well as invoices from ad agencies as maintained in the ordinary course, and a number of the FAAs' advertising agencies have produced similar data. Google's complaints about the difficulty of extracting the data it seeks from the documents identified apply equally to the United States and the breadth of the identified documents stems primarily from the broad scope of Google's interrogatories. *In re Urethane*, 2006 WL 1895456 (D. Kan. July 7, 2006) (plaintiffs' reference to Bates-stamped documents that encompassed "nearly the entire range of documents produced" satisfied Rule 33(d) when their document production "consisted mainly of invoices and

purchasing data"; the "fact that [plaintiffs] have referred Defendants to a large number of documents does not in and of itself render their responses insufficient under Rule 33(d)," especially when the "interrogatories at issue call for a vast amount of information, such as 'to provide the dates, quantities, prices, and terms of sale for each purchase[.]'"); *cf. Umbach v. Carrington Inv. Partners (US), LP*, 2009 WL 3287537 (D. Conn. Oct. 9, 2009) (finding that defendants' response to a burdensome interrogatory complied with Rule 33(d) when it "specifically identifies the documents by Bates Number, which enables plaintiff to locate and identify the responses").

With respect to Interrogatory No. 4, in particular, the burden of doing more than the substantial work already done to find and specifically identify the invoices and media plans among millions of documents is entirely out of proportion to the needs of the case, because, as discussed above, the best source for the information is Google's own systems. Google claims to need more detailed responses to Interrogatory No. 4 in order to have the information forming the factual basis for the United States' damages, but with respect to detailed information about the type of ad tech product, ad tech provider, amount of monthly ad spend, provider fees and take rates, and dates, Google has all of that information with respect to purchases that underlie Plaintiffs' damages claims, as the purchases upon which Plaintiffs' claims are based by definition were made through Google platforms, and may also have been recorded in Campaign Manager. The FAAs do not have practical access to the information other than through tedious scraping of documents, but Google does. Indeed, this lack of access to comprehensive and structured data about FAA purchases going back to the beginning of the damages period of the type that would permit creation of a chart detailing all of the information requested by Interrogatory No. 4 is one of the reasons that the United States served RFPs 60 and 76 on Google in May and early August, respectively, and ultimately moved to compel production of this data on August 25, 2023. Given this imbalance of

information of the type necessary to provide more detailed responses to Interrogatory No. 4 without undue burden, and the fact that Google still owes the United States data under the relevant RFPs, the Court should deny Google's motion as to Interrogatory No. 4.

Interrogatory No. 9 seeks detailed computations of damages, which similarly must await Google's production of data necessary to complete those computations. For the same reasons discussed above in regards to the United States' disclosures under Rule 26, the Court should deny Google's motion as to Interrogatory No. 9 as a premature attempt to obtain expert disclosures before Google has even provided all the data the experts need to prepare the reports. In addition, although Google argues that there is some information that the United States should be required to provide now in advance of expert discovery, we note that the United States' responses to Interrogatories Nos. 22 through 29 provide information about the types of purchases underlying the United States' claims for damages from which Google can as easily (or more easily given the data disparities still at play) identify those purchases in its own data.

Interrogatory 14 seeks information about all "purchases of 'open web display advertising' that were purchased by the Federal Agency Advertiser directly from Google during the Damages Period." As discussed above with respect to RFA No. 1, the United States later clarified that it "is unaware of the extent to which Google sells 'open web display advertising' inventory on its owned-and-operated websites" and that the United Stated does not believe that Google is a publisher of open web display advertising. As such, the United State does not believe there are any purchases to identify, and in any event is not seeking damages based on Google's sale of its owned and operated inventory, rendering any response to this Interrogatory irrelevant. The United States has responded to subsequent interrogatories focused on purchases of ad tech services from Google, which are the subject of the United States' claims for damages and therefore relevant. As such, the

Court should deny Google's motion to compel Interrogatory No. 14 because there is nothing relevant to compel, an issue that could have been resolved through a meet and confer prior to this motion.

> E. <u>Google's Challenges to the United States' Objections to Interrogatories No. 22-29 are Meritless and Moot</u>

The United States responded to Interrogatories Nos. 22 through 29 on the due date for those responses, after Google had already filed the instant motion. These responses address the concerns raised during the meet-and-confer process, as well as the concerns raised in Google's motion. Google states in its briefing that it "will promptly advise the Court if Plaintiff's responses narrow the issues on which Google seeks the Court's intervention." But as of the time of this filing, Google has not done so, nor has Google provided the United States with any other clarification as to its concerns with our responses to those interrogatories. Therefore, the Court should deny this portion of Google's motion.

> F. <u>Google's Request that the United States Supplement its Responses to Interrogatories Nos. 18, 19, and 20, on Market Share Allegations, is Moot and No Further Supplementation Should be Ordered.</u>

Google served its Interrogatories Nos. 18, 19, and 20 on July 5, and the United States served timely objections on July 20 and responses on August 4. Google neither asked to meet-and-confer on the United States' objections between July 20 and August 4 nor raised any concern with the United States' responses after receiving them, up until a letter Google sent on September 5, more than a month later and mere days before the deadline for concluding fact discovery. That alone undercuts Google's assertion that it has been "stymied and stonewalled" in its ability to obtain needed discovery on market share allegations. In the time since receiving Google's motion, the United States has prepared and served supplemental responses to these interrogatories that provide

15

Google the information which it claims is lacking and to which it is entitled, and, therefore, fully moot this portion of Google's motion.

Google asserts it is entitled to "the factual basis for DOJ's market share calculations" including "if there are no calculations underlying the allegations if they are instead based on some other facts" and "an explanation of the calculations underlying the alleged market share percentages should such calculations exist." Memo. at 25-26. The United States' initial responses to these interrogatories provided identification of the specific documents and data files that provided evidentiary support for the allegations in the complaint that are the subject of these interrogatories, and the United States' recent supplement makes clear whether each allegation is supported by documentary evidence, calculations, or both, and explains how each market share calculation was performed. *See* Ex. 5 (Plaintiffs' Supp. Resp. to Interrogatories Nos. 18-20) at 5-6, 9-10, 12-13.

Relevant authority makes clear this response is sufficient and that further detail crosses over into attorney work product or premature expert discovery. Neither case cited by Google in its motion (Memo. at 26) are applicable to this situation. Both *Jones v. Varsity Brands, LLC*, 2022 WL 1124951 (W.D. Tenn. Apr. 14, 2022) and *Morley v. Square, Inc.*, 2015 WL 6796832 (E.D. Mo. Nov. 6, 2015) were situations where the plaintiff sought market share calculations that the defendant prepared *in the ordinary course of running its business*—not situations where market share allegations were prepared in preparation for filing a Federal antitrust enforcement action. *See Jones*, 2022 WL 1124951, at *6 ("Although the court finds that Varsity should not be required to manufacture market share data in order to respond to this interrogatory, to the extent that Varsity has previously made any market share evaluations or calculations, Varsity is directed to respond to this interrogatory based on the market share assessments previously made."); *Morley*, 2015 WL

6796832, at *3 ("Finally, plaintiffs' Interrogatory 10 seeks 'Square's market share in the mobile payments industry on a monthly basis since its inception.' Defendants responded that although it did not have market share information for every month, Square had at one time determined certain statistics related to its business in relation to various markets.").

Instead, the decision in *United States v. Anthem, Inc.*, another Federal antitrust enforcement action addresses this specific situation and undercuts Google's position. *See* 2016 WL 11755527 (D.D.C. Sep. 30, 2016). There, as here, the defendant sought to compel interrogatory responses regarding market share allegations in the complaint. *Id*. at *1. The Special Master considering the motion found that this information "is protected by the work product doctrine" because "[b]oth the market share calculations and the methodology that the United States used to determine these shares are likely to reveal or provide insights into the mental processes of the attorney in the analysis and preparation of this case" and "are the product of legal and economic analyses performed by counsel to the United States and/or their agents in preparation for this litigation." *Id*. at *5 (cit. and quot. omit.). "Likewise, the methodology and/or models upon which the United States relied in performing these calculations is also protected opinion work product." *Id*. The United States was compelled only to provide the defendant with "the data referenced in its response" because "[a]ssuming that [defendant] has the data sets at issue, it is free to provide that data to its own experts and to break it out or manipulate it into any way it chooses." *Id*. at *6. The same is true here, and Google does not dispute that it already possesses all the data identified in the United States' responses, much of which came from Google initially.[1] Therefore, no further supplementation is required.

---

[1] The Special Master further noted, which is also applicable here: "Notwithstanding the calculation in the Complaint on market share, ultimately it will be the expert evidence that controls." *Anthem*, 2016 WL 11755527, at *7.

G. Likewise, Google's Request that the Court Compel Further Responses to Interrogatory No. 21 or RFP No. 44 is Moot, and No Further Supplementation Should be Ordered.

Throughout discovery, the United States has attempted to negotiate a mutual, reasonable agreement on the cut-off date for collection of communications with non-parties. Google, instead of engaging in these negotiations, has unilaterally set its own cut-off date, refused to produce documents after that, and then, in pure gamesmanship, reversed its own position in secret. Like with Interrogatories Nos. 18, 19, and 20, Google never raised concern with the United States' objections or responses to Interrogatory No. 21 until mere days before the scheduled conclusion of fact discovery. Google served its Interrogatory No. 21 on July 26, and the United States served timely objections on August 10 and responses on August 25, and then supplemented its responses on September 8.

Google's central argument is that the United States has not produced documents or provided information post-dating March 27, 2023—the document collection cut-off that Google itself insisted upon. (*See* Google App'x A, at 23 (plaintiff's objection quoting Google's position).) Google now argues that it is now, instead, "producing its outside counsels' communications with third parties through August 25." Memo. at 28. Importantly, Google's brief omits key context, which was confirmed by Google's counsel via email on September 13, that this production is limited to only communications regarding "subpoenas, and any modifications thereto." Ex. 6 (September 13, 2023 Email from S. Salem to M. Wolin). The United States has now agreed to produce the same set of communications as Google has done, communications with third parties through August 25 that relate to "subpoenas, and any modifications thereto." Ex. 7 (Sept. 13, 2023 Letter from M. Wolin to M. Goodman). With regards to production of the specific communications at issue, those between litigation counsel and non-parties occurring after the date of the complaint,

18

the relevance and burden of producing these communications is equal for both parties. Therefore, no further relief on Google's RFP No. 44 is justified.

Similarly, Google's complaints regarding Interrogatory No. 21 are moot because the United States has supplemented its response since receiving Google's motion and has agreed to further supplement its response upon completing its additional document production. *See* Ex. 8 (United States' Second Supp. Resp. to Interrogatory No. 21); Ex. 9 (Sept. 13, 2023 Letter from M. Wolin to M. Goodman). The United States' recent supplement addresses Google's other arguments by providing more detail on the subject matter of the communications covered by the interrogatory and designates additional documents, including the ones Google argues were missing and which made the "response incomplete on its face." Memo. at 28.

Google's other arguments are also unavailing. Google complains that the United States' response incorporates by reference its response to Interrogatory No. 3 but ignores that the subject matter of Interrogatory No. 3 (seeking the identify of persons communicated with during the investigation) falls within the subject matter of Interrogatory No. 21 (seeking identification all communications from the start of the investigation). Google asserts that the United States has designated its "entire investigative file" making the response "overinclusive," which is untrue because the investigative file produced to Google contains over 4 million documents and dozens of data files, none of which were listed in the United States' response. And the number of documents designated as part of the United States' response is solely a product of the vast scope of Google's request, which asks that the United States identify every communication with hundreds of third-party companies over an almost four-year period.

As supplemented in response to Google's concerns, the United States' response to Interrogatory No. 21 is sufficient, and no further relief is warranted.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny in full Google's Motion to Compel Responses to Various Document Requests.

Dated: September 13, 2023

Respectfully submitted,

JESSICA D. ABER
United States Attorney

s/ Gerard Mene
Gerard Mene
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Julia Tarver Wood
JULIA TARVER WOOD
/s/ Michael Wolin
Michael Wolin
/s/ Katherine Clemons
Katherine Clemons
/s/ Michael J. Freeman
MICHAEL J. FREEMAN


United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Michael.Freeman@usdoj.gov

Attorneys for the United States