```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION

 3   --------------------------x
     UNITED STATES, et al.,      :    Civil Action No.:
 4                               :    1:23-cv-108
                  Plaintiffs,    :
 5        versus                 :
                                 :    Friday, September 15, 2023
 6   GOOGLE LLC,                 :    Alexandria, Virginia
                                 :    Pages 1-80
 7                Defendant.      :
     --------------------------x
 8

 9        The above-entitled motions hearing was heard before
     the Honorable John F. Anderson, United States Magistrate
10   Judge.  This proceeding commenced at 10:50 a.m.

11                  A P P E A R A N C E S:

12   FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                            OFFICE OF THE UNITED STATES ATTORNEY
13                          2100 Jamieson Avenue
                            Alexandria, Virginia  22314
14                          (703) 299-3700

15                          JULIA TARVER WOOD, ESQUIRE
                            KATHERINE CLEMONS, ESQUIRE
16                          MICHAEL WOLIN, ESQUIRE
                            UNITED STATES DEPARTMENT OF JUSTICE
17                          ANTITRUST DIVISION
                            450 Fifth Street, NW
18                          Washington, D.C.  20530
                            (202) 894-4266
19
                            TYLER HENRY, ESQUIRE
20                          OFFICE OF THE ATTORNEY GENERAL
                            OFFICE OF THE SOLICITOR GENERAL
21                          202 North Ninth Street
                            Richmond, Virginia  23219
22                          (804) 786-7704

23

24

25
                                                            1
```

```
 1                    A P P E A R A N C E S:

 2   FOR THE DEFENDANT:      CRAIG REILLY, ESQUIRE
                             LAW OFFICE OF CRAIG C. REILLY
 3                           209 Madison Street
                             Suite 501
 4                           Alexandria, Virginia  22314
                             (703) 549-5354
 5
                             JULIE ELMER, ESQUIRE
 6                           CLAIRE LEONARD, ESQUIRE
                             ANDREW EWALT, ESQUIRE
 7                           FRESHFIELDS BRUCKHAUS DERINGER, LLP
                             700 13th Street, NW
 8                           10th Floor
                             Washington, D.C.  20005
 9                           (202) 777-4500

10                           MARTHA GOODMAN, ESQUIRE
                             ANNELISE CORRIVEAU, ESQUIRE
11                           PAUL, WEISS, RIFKIND,
                             WHARTON & GARRISON LLP
12                           2001 K Street, NW
                             Washington, D.C.  20006
13                           (202) 223-7300

14   COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
                             Official Court Reporter
15                           United States District Court
                             401 Courthouse Square
16                           Alexandria, Virginia  22314
                             (571) 298-1649
17                           S.AustinReporting@gmail.com

18      (PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING,
        TRANSCRIPT PRODUCED BY COMPUTERIZED TRANSCRIPTION.)
19

20

21

22

23

24

25
                                                              2
```

```
1                    P R O C E E D I N G S

2           THE DEPUTY CLERK:  Calling Civil Action Matter

3  23-cv-108, United States, et al. versus Google LLC.

4           MR. MENE:  Good morning, Your Honor.  Gerard Mene

5  from the U.S. Attorney's Office.

6           MS. WOOD:  Good morning, Your Honor.  Julia Wood

7  on behalf of the United States.  My colleague,

8  Katherine Clemons, is here as well.

9           MR. HENRY:  Good morning, Your Honor.  Tyler Henry

10  from the Virginia Attorney General's Office here on behalf

11  of the plaintiff states.

12           MR. WOLIN:  Michael Wolin as well.  I'm from the

13  Antitrust Division on behalf of the United States.

14           MR. REILLY:  Good morning, Your Honor.

15  Craig Reilly for defendant, Google, together with my

16  co-counsel, Julie Elmer, Claire Leonard and Andrew Ewalt

17  from the Freshfields firm.  Ms. Ewalt [sic], with the

18  Court's permission, will address the Court on the motion to

19  modify.  Also with me are Martha Goodman and Annelise

20  Corriveau from the Paul, Weiss firm.  And with the Court's

21  permission, Ms. Goodman will address the Court on the motion

22  to compel.

23           THE COURT:  Who is going to be arguing on behalf

24  of the plaintiff on each of the two motions?

25           MS. WOOD:  Your Honor, I'll be addressing the
```

3

```
 1   plaintiffs' motion to modify, and Ms. Clemons will be
 2   addressing the motion to compel.
 3          THE COURT:  All right.  I want to take up the
 4   motion to compel first, and then we'll deal with the issues
 5   having to do with the motion to modify.
 6          MS. GOODMAN:  Good morning, Your Honor.
 7   Martha Goodman from Paul, Weiss for Google.
 8          We've brought this motion to compel because we're
 9   here at the close of fact discovery, and while the United
10   States has made clear from the outset of the case it's
11   pursuing a claim for damages of some amount of money, we are
12   at the close, and we still don't know what it is.
13          The United States served initial disclosures, as
14   it was required to do under the Court's order, and
15   supplemented it multiple times over the course of fact
16   discovery, and, to date, we still don't have a disclosure
17   that complies with Rule 26.  So I can start with that
18   particular issue, Your Honor, and then move through the
19   other --
20          THE COURT:  Yeah.  I'm going to take it up.  I'll
21   do the damages issue first, I'll hear from you, I'll hear
22   from the United States, and then I'll take up the direct
23   purchaser issues on that, and then I guess we'll deal with
24   the final communications issues.  So let's do it -- I'll
25   hear from you, I'll hear from them; hear from you, hear from
```

4

1   them, and do it that way.

2          MS. GOODMAN:  Understood.  And when you want to

3   address the damages issues, shall I talk about both initial

4   disclosures and the interrogatories related to that?

5          THE COURT:  Correct.  And the document request.

6          MS. GOODMAN:  Okay.

7          THE COURT:  So I understand it, it's the initial

8   disclosures, Interrogatories 4, 9, 14, 17 and Document

9   Request Number 12, and then you've got some follow-on

10  interrogatories that are a part of that.

11         MS. GOODMAN:  That's correct.

12         So I think our point is simple on the initial

13  disclosures issue, Your Honor.  We don't have a disclosure

14  that complies with Rule 26.  It requires a computation of

15  each category of damages and a disclosure of the documents

16  or other evidentiary material on which each computation is

17  based.  We have simply a disclosure that says the United

18  States spent $300 million on open web display advertising.

19         THE COURT:  Isn't that the same as what you've

20  asked for in Interrogatory Number 9?

21         MS. GOODMAN:  It is, Your Honor.  It is.

22         THE COURT:  Why don't we just focus on the

23  interrogatories then.

24         MS. GOODMAN:  Okay.

25         THE COURT:  You get it signed under oath.  It's

                                                        5

1    much better than an initial disclosure.  If you want the

2    information, you should follow up.  You've followed up with

3    an interrogatory, you haven't gotten, as you claim, a direct

4    response to the interrogatory.  Okay.  So let's talk about

5    the interrogatories.

6           MS. GOODMAN:  Okay.  So Interrogatory 9, as Your

7    Honor notes, requests a computation of damages.  We

8    appreciate that their expert is performing that calculation

9    and is working on that now, and we understand, from other

10   communications we've had with respect to data they are

11   seeking from us in order to, to use a euphemism, tie it up

12   in a bow, they have done substantial work to provide some

13   kind of computation of damages.  And while we don't -- are

14   not seeking their expert work in this motion, we are asking

15   for some basics about what their damages computations are

16   going to be based on.

17          Is it, for example, on purchases of open web

18   display advertising from Google?  Or from a third-party

19   vendor that also bids into a Google Ad Exchange, for

20   example?  Is it based on a take rate?  Take rate's applied

21   throughout the advertising tech stack as something that the

22   FAAs ultimately paid under their theory.  We don't know

23   which one it is.

24          In a patent case, you would know from the

25   beginning, is somebody pursuing a reasonable royalty?  Is

                                                              6

1   somebody pursuing lost profits?  You would have some

2   understanding of their --

3         THE COURT:  You wouldn't necessarily know that at

4   the beginning.  That can change during the course of the

5   case.  They can make a decision to go one way or the other.

6         MS. GOODMAN:  Yes, it can.

7         And we are now five months through fact discovery.

8         THE COURT:  Well, officially, fact discovery is

9   over.

10        MS. GOODMAN:  That's right.

11        And we don't have information available that --

12   from our point of view, we are in the same position that we

13   were at the beginning of the case.  So that's

14   Interrogatory 9.

15        Interrogatories 4 and 17 ask us -- ask the United

16   States to identify the transactions or purchases that

17   underlie their claim of damages.  We're not asking for some

18   kind of forensic accounting or tracing of that money through

19   payments to Google or through various other intermediaries;

20   we're just asking for a simple understanding of what

21   transactions are at issue.  And while we waited for the

22   United States to supplement interrogatory responses here,

23   they did so under Rule 33(d), as they're permitted to do,

24   but they haven't satisfied their showing of showing that it

25   is any more burdensome for them to identify the transactions

7

```
 1    than it is for us.

 2            And I have spent many hours looking at those

 3    invoices, Your Honor.  There are invoices for purchases of

 4    radio ads, invoices for purchases in local newspapers,

 5    invoices for purchases of social media influencer content.

 6    That is not what is at issue in this case.  What is at

 7    issue, to our understanding at least, is purchases of open

 8    web display advertising using Google ad tech tools, and I

 9    cannot look at those invoices and understand which

10    transactions or purchases are at issue.  So their supplement

11    does not comply with Rule 33(d).  So that is 4 and 17.

12            And I'll go to 14 now, which ties a bit into the

13    direct purchaser issue, but where we asked for the plaintiff

14    to identify all purchases of open web display advertising

15    directly from Google.  And the answer we've received, and

16    which we asked for a supplement, I believe five times, was

17    that the federal agency advertisers pay fees for ad tech

18    services provided by Google that facilitate purchases of

19    open web display advertising from publishers.  That is not

20    an answer to the question posed.  If the answer is there are

21    no direct purchases, they need to so state in a verified

22    response.

23            THE COURT:  Well, I'll probably deal with that

24    more in the second argument.

25            MS. GOODMAN:  Okay.
```

1          THE COURT:  But I don't quite understand why that

2    doesn't tell you what you need to know.

3          MS. GOODMAN:  Do you want me to address that now

4    or wait until --

5          THE COURT:  Well, we'll deal with that in that

6    direct purchaser portion.

7          MS. GOODMAN:  Okay.  And then finally with respect

8    to Interrogatories 22 through 29, we served these, Your

9    Honor, you know, within the time permitted for fact

10   discovery, and we received responses on September 8th.

11         I read the government's responses when they came

12   in, I read their motion when it came in, and their position

13   that their answers do not -- are sufficient, I don't agree

14   with.  And with Your Honor's indulgence, I would -- we moved

15   on the objections, we now have the responses, we think it is

16   efficient to address the responses here.  But of course if

17   Your Honor would prefer us to meet and confer, we can do

18   that.

19         THE COURT:  And that -- I mean, honestly, my plan,

20   unless you or the plaintiff can convince me otherwise, is

21   for those that were served and you just got the responses

22   this week, to defer ruling on that, to have you do a

23   good-faith consultation based on the responses that you've

24   got, and my rulings on some issues relating to matters that

25   are somewhat similar to the requests in those request for

                                                              9

1    admissions and interrogatories.  So let's hold off on any

2    arguments on the Interrogatories 22 through 29 at this

3    point.

4            MS. GOODMAN:  Understood, Your Honor.  And I think

5    your approach makes a lot of sense.

6            THE COURT:  Talk about the document requests,

7    though, Number 12.

8            MS. GOODMAN:  Yeah.  So we heard from the United

9    States at the beginning of fact discovery that their -- the

10   ad agencies do not maintain structure data or, you know,

11   large spreadsheets or databases of data in the ordinary

12   course, with the exception of the Army, where they told us

13   in somewhat general terms that they have a contractual right

14   from their ad agency to get data.  And then we waited for

15   that data, we looked for it in productions, we didn't see

16   it, and of course in the flurry of fact discovery, we

17   waited, we continued to wait and then received a letter on

18   August 7th, I believe, saying that they couldn't produce the

19   data in time, and then they also served RFP 76 for Google's

20   data.

21           We took them at their word in that letter and did

22   not pursue it further at that time; however, when we took

23   the deposition of the ad agency that works with the Army,

24   Omnicom -- actually, it's one of their subsidiaries works

25   with the Army -- that witness explained to us that they had

                                                              10

1  multiple conversations with the Department of Justice about

2  this data that the United States claims to own and have a

3  contractual right to obtain.

4      And now we are learning for the first time in

5  their papers that there was a proposal for a contract

6  modification, that the proposal -- that the data would not

7  come in in time from Army, and that the United States made a

8  unilateral determination that it was unduly burdensome to

9  obtain the data that appears to be responsive to RFP 12.

10     THE COURT:  So what do we do?  I mean, I know you

11 made a lot of argument about that.  So what are you asking

12 me to do?

13     MS. GOODMAN:  I'm asking the Court to compel

14 production of the data that they have a contractual right to

15 obtain from their ad agency.  Because that data is relevant,

16 not only to damages, but also relevant to the relevant

17 market determination about how the Army -- who is sort of

18 FAA Number 1, if you will, the only FAA mentioned in the

19 complaint.  How they spend their advertising dollars is

20 highly relevant to the relevant market determination, and

21 our experts can use that data to analyze shifting of spend

22 across different channels, for example, for the relevant

23 market analysis, as well as trying to understand the claims

24 for damages.  It's highly relevant data.

25     Finally, on RFP 12 with respect to the Wavemaker

1   data, as I'm calling it, which we understood to be something

2   that the ad agency for the Postal Service has provided to

3   DOJ, we don't have that data.  We asked for it multiple

4   times; we did not receive a response.

5           I appreciate the United States' position and Your

6   Honor's rulings last week with respect to communications as

7   part of the attorneys' work product, but the underlying

8   data, which is at issue, is not protected work product as we

9   understood Your Honor's ruling.

10          THE COURT:  Okay.  All right.  Okay.  I'll hear

11  from the government now.

12          MS. CLEMONS:  Thank you, Your Honor.  This is --

13  United States' discovery responses with respect to damages

14  are -- satisfy the Federal Rules standards.

15          THE COURT:  How?  How do they do that?  Tell me

16  the amount of damages that the government is seeking in this

17  case.  Fact discovery is over, and you need to tell me, and

18  you need to tell the defendant in this case how much money

19  the government is seeking in this case and what -- how you

20  compute those damages.  I haven't seen a single number in

21  all your answers to interrogatories.  Initial, supplement,

22  supplement, supplement, not a single number.

23          So tell me how that complies with the Federal

24  Rules of Civil Procedure.

25          MS. CLEMONS:  There are a few reasons, Your Honor.

                                                            12

```
 1    First, fact discovery, while it -- the fact discovery

 2    deadline passed, Google requested additional time to produce

 3    data relevant to --

 4              THE COURT:  Well, this is your damages.

 5              MS. CLEMONS:  Yes.

 6              THE COURT:  Okay.  So, in a typical case, a

 7    plaintiff doesn't need to get information from someone else

 8    to determine what their damages are.  If you buy something,

 9    you pay for it, you know what you paid for it, you know what

10    you bought.

11              You're trying to tell me now that none of your

12    plaintiffs in this case know what they bought, how much they

13    paid for it and what it was, and so you can't compute your

14    damages?  Is that the government's position?

15              MS. CLEMONS:  We're working to compute the

16    damages, Your Honor, but this is not a typical case.  This

17    is a case in which you had the monopolist that owns the buy

18    side, the exchange in the middle, and the sell side and --

19              THE COURT:  You buy -- you say you bought

20    something.

21              MS. CLEMONS:  Yes.

22              THE COURT:  What did you buy, and how much did you

23    pay for it?

24              MS. CLEMONS:  So the -- that is why, Your Honor,

25    the United States disclosed the amount of open web display
```

                                                            13

```
 1   advertising.

 2             THE COURT:  Okay.  So that's --

 3             MS. CLEMONS:  But the fees --

 4             THE COURT:  I assume that's one component of what

 5   it is that you're now seeking.  Apparently you've only --

 6   you know, that was what you said in your initial

 7   disclosures, 300 million for, you know, open display, and

 8   that's the only number that the United States has provided

 9   to the defendant in this case throughout this discovery.

10             MS. CLEMONS:  Because, Your Honor, the defendant

11   in this case is in the unique position of being the only

12   party, the only entity to know for sure where it took money

13   out of the FAA's bids into its own exchange and into its --

14   into its tools.  Right.

15             THE COURT:  Well, you know how much you paid or

16   paid through someone, you know how much you paid to your

17   advertising agencies for certain services; right?

18             MS. CLEMONS:  We know how much we paid for media,

19   Your Honor.

20             THE COURT:  Okay.  Have you --

21             MS. CLEMONS:  But as the Omnicom designee

22   testified during that 30(b)(6) deposition, there are a lack

23   of transparency into what Google is charging with respect to

24   purchases made through its Ad Exchange.

25             This is a situation in which Google is the record.
```

14

1    Right.  This is not a situation in which plaintiffs uniquely

2    have access to the information about how much plaintiffs

3    were overcharged for those services.  This is a situation in

4    which you have a company, because of their monopoly, because

5    of their unique access on all sides of the transaction, can

6    take money for individual transactions that may vary from

7    transaction to transaction, and the only actual record, at

8    least with respect to AdX, of exactly how much was taken out

9    and how much that would have been overcharged compared to a

10   but-for market, but-for world, is Google.  Right.  And --

11            THE COURT:  No, that's not right.

12            MS. CLEMONS:  It is, though, Your Honor, because

13   the entire -- the way that Google takes its fees for the Ad

14   Exchange is by pulling them from the bid of the advertiser

15   before they then pay out a smaller portion of that to the

16   publisher.  And there's not an invoice for that.  Right.  It

17   all gets wrapped up into the total cost of the media.  And

18   that lack of transparency is stated in the complaint; this

19   is not news to Google.  Neither is it news to Google that we

20   are claiming damages based on the purchase of ad tech

21   services and not the purchase of advertising inventory from

22   the --

23            THE COURT:  Why didn't you put that in your

24   initial disclosures then?  You didn't say that in your

25   initial disclosures; did you?

15

1          MS. CLEMONS:  Your Honor, the information

2    available to us at the time in the initial disclosures is

3    the amount that we paid in total, including the ad tech

4    services.  Right.  Where the money -- the ad tech services,

5    Google pulls the money out of the amount for the media.

6          In total, the FAA spent $300 million on this type

7    of advertising.  Google knows which purchases went through

8    Google pipes.  And it is something that the United States

9    needed to discover and is continuing to need to discover

10   exactly which transactions on which -- at which times went

11   through which Google pipes and had how much taken out of

12   them.  And that is why there is a need for complex expert

13   calculations in order to come up with a total.

14          It's clear in the complaint that we are seeking

15   damages for overcharge based on the take rates.  That was

16   clear as well in the opposition to the motion to dismiss.

17   None of this is news to Google.  It's -- but it is

18   information uniquely held by Google that has been very

19   difficult to get from them.  So we have provided what we

20   have, which is the invoices for the media.

21          In addition, Google's complaints about the breadth

22   of the documents, the invoices being provided goes to

23   Interrogatory Number 17, which is not that Google is saying

24   now this is the only reason they needed it is in order to

25   look at Google purchases.  Right.  It is not limited to an

                                                            16

1    open web display advertising purchase through Google tools.

2    It is a very broad interrogatory that asks for all ad spend

3    through an ad agency.  And so they have received all of the

4    records that we have on ad spend through the ad agency.

5            We've separately been seeking discovery from third

6    parties, all of the ad agencies and from Google and from

7    other ad tech providers that were involved in purchases that

8    the FAAs made through Google pipes, but it's a lot of

9    information.

10           With respect to the Army data that --

11           THE COURT:  Well, let's go back to 17.  You just

12   said 17 was -- for each campaign identified in response to

13   Interrogatory Number 15, identify all amounts paid by the

14   federal agency advertiser to Google or by the federal agency

15   advertiser to any agency in connection with the campaign.

16           MS. CLEMONS:  Yes, Your Honor.

17           THE COURT:  So have you identified those specific

18   documents that relate to the campaigns identified in

19   Number 15 in your response to this interrogatory?

20           MS. CLEMONS:  Yes, Your Honor.

21           THE COURT:  I mean specific documents; not all

22   documents with large Bates ranges.

23           MS. CLEMONS:  Yes.  And it is a large number of

24   documents because it is the monthly invoices for each

25   campaign.  Right.  It is the backup invoices that go with

17

1    those.  But that is the record.  Unfortunately, the FAAs
2    don't have a perfect database from which they can pull this
3    kind of information out in a neat form like Google might be
4    looking for.  But the record of the payments made and for
5    what, right, is in those documents.  We've also provided
6    financial data that those invoices were paid by the FAAs.
7            We've explained to Google from the very beginning
8    that we lack this information.  And the information that
9    Google has been retained, right, to be the -- to use their
10   campaign manager product and to use their ad tech purchasing
11   tools in part so that they had -- they had the information
12   regarding those purchases.  They facilitated those
13   purchases.
14           THE COURT:  It's the plaintiffs' burden to
15   establish damages.  You understand that; right?
16           MS. CLEMONS:  I do, Your Honor.
17           THE COURT:  All right.  And you understand that
18   burden starts at the beginning of the discovery and can't
19   just wait until the time period that you're going to serve
20   your expert reports.  You can supplement information, but
21   when initial disclosures are required, when answers to
22   interrogatories are required, you need to provide the
23   information that you currently have available that is
24   responsive or required under the initial disclosures or the
25   interrogatories.

18

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

1          MS. CLEMONS:  Yes, Your Honor.  And we have

2    provided, and we continue to provide information.  We are

3    still waiting on information from Google in order to

4    supplement that.  We've pointed in the interrogatory

5    responses that we served last week.

6          THE COURT:  What specific information have you

7    provided to them?

8          MS. CLEMONS:  We have provided a record of all of

9    the invoices that we can find.  We have sought from third

10   parties, from the ad agencies, records that they have.

11   We've pointed -- in response to certain interrogatories,

12   we've pointed Google to its own documents to show where

13   there is information that we are pulling some of this

14   information from.

15         THE COURT:  And how does that comply with any

16   computation of damages?

17         MS. CLEMONS:  The computation -- the problem is,

18   the computation cannot be done until we have the information

19   about all of the different purchases, and we've been seeking

20   that information.  We can provide them information that --

21   the information that we were using to compute those damages,

22   but they already have it, Your Honor.

23         Google is trying to argue that they have no idea

24   what our -- what our claims are, what our damages claims

25   are, but they were alleged in the complaint, they were

                                                          19

1    argued in the motion to dismiss.  We've pointed them out in

2    response to interrogatories which purchases through which

3    tools are the subject of our claims.

4            And so it's difficult because the United States is

5    not in a position until it has all the information from the

6    systems through which we made those purchases and the

7    amounts that were pulled out of those purchases and put into

8    Google's pocket.  It's not possible to say exactly how much

9    the overcharge was until we have the information from which

10   you can calculate that overcharge.

11           We do, however, have evidence -- might have

12   provided evidence and have put forward from the complaint

13   until now evidence and information regarding the reason that

14   we are alleging that it was overcharged, which has to do

15   with all of the evidence going to Google's monopolization of

16   these markets.  And that -- the evidence that we have

17   regarding whether Google is a monopolist in a position to

18   charge more than it would in a competitive market, that

19   information is something that we've also provided to Google.

20   But the specific computation is something that is still a

21   work in progress, in part because we are waiting on

22   information that Google asked for extra time to provide.

23           THE COURT:  What are you going to do with that

24   information?  I mean, you haven't even told them what you're

25   going to do.  If they say it's X dollars, what happens then?

20

```
1    You haven't told them how you intend to compute your damages

2    once you get this information you said you've got to get

3    from Google that your own clients don't know.

4              MS. CLEMONS:  The damages calculation will then

5    derive from the economic model being worked on by other

6    experts.

7              THE COURT:  Too late.  I mean, you know ...

8              MS. CLEMONS:  In a complex antitrust case, Your

9    Honor -- I mean, this is not a situation in which there is

10   a -- some overcharge that can be pointed to that's written

11   out in a document.  This is not a situation in which we have

12   a bill for a medical claim in a personal injury case, for

13   example.

14             This is a situation in which the allegations are

15   that a monopolist charged super competitive prices, and the

16   only way to calculate how much those were -- those prices

17   were overcharged is through economic modeling.  That's why

18   the Court agreed -- or presumably that's why the Court

19   agreed to have a separate expert discovery period.  Right.

20   Fact discovery is not yet closed because Google has asked

21   for additional time with respect to the data, and expert

22   discovery is part of discovery and a necessary part of

23   discovery in an antitrust case where this level of

24   complexity is involved.

25             The damages, the information, the key to all of
```

21

1    the specific overcharges, it lives in Google's systems.  And

2    while it is reflected in some documents that we have

3    obtained from third parties and that were sent to FAAs in

4    the ordinary course of business, the best and certainly most

5    convenient way to see all of those is with respect to

6    Google's systems.  And the lack of transparency as to

7    exactly what they've charged with respect to its specific

8    transactions and what they bid in specific -- what was bid

9    in specific transactions on behalf of the FAAs is part of

10   the reason that we are bringing the claims in the way that

11   we are bringing them.  That lack of transparency is the

12   same -- the same issue that is making it difficult for us to

13   calculate damages.

14          So without that information and without an

15   economic model that is complete, we would just be guessing

16   as to what the exact percentage of overcharges is, or a

17   range of the percentage of overcharge.

18          THE COURT:  Why haven't you given them the

19   documents that you have in your possession that relate to

20   your damages claims?

21          MS. CLEMONS:  We have, Your Honor.

22          THE COURT:  Okay.  You've given them the raw data

23   that you got from Wave whatever?

24          MS. CLEMONS:  So with respect to the Wavemaker

25   data, Your Honor, it's not voluminous data.  Right.  This is

22

```
 1    part of what Your Honor ruled on last week, which is that --
 2              THE COURT:  Yes or no --
 3              MS. CLEMONS:  -- there was a very specific
 4    request.
 5              THE COURT:  -- have you given them that raw data?
 6              MS. CLEMONS:  No, because it's work product.
 7              THE COURT:  Have you given your experts that raw
 8    data?
 9              MS. CLEMONS:  No, because it's work product, Your
10    Honor.
11              THE COURT:  Well --
12              MS. CLEMONS:  It was for the purposes of
13    determining whether and how the claims should be brought on
14    behalf of Navy.
15              THE COURT:  All right.  I want that data delivered
16    to my chambers before the end of the day today.  I'll look
17    at it and see whether that raw data should be produced;
18    okay?
19              MS. CLEMONS:  Okay.  To be clear, Your Honor, it
20    is not raw data.  It is -- my understanding --
21              THE COURT:  I'll see what it is --
22              MS. CLEMONS:  It's a request from counsel.
23              THE COURT:  -- and I'll make a determination.
24              MS. CLEMONS:  Okay.
25              THE COURT:  I thought I was clear in my ruling.
```

23

1            And, you know, I've got to tell you, the
2  government's claim for damages is in jeopardy in this case
3  given their lack of responsiveness in discovery.  And, you
4  know, I want you to understand the seriousness of the way
5  that I'm concerned about your responses to these
6  damages-related questions.
7            A defendant in any case is entitled to know what
8  the plaintiff is asking for and how they need to supplement
9  it at a later time, but at least needs to know, in some
10  respects, as to how the damages are being calculated, what
11  the elements are, what you intend to be going after, and
12  it's not going to come in an expert report and they then
13  have 30 days from when they get your expert report to get
14  their expert, to get everything lined up, to know how to
15  respond to that.  It's not fair.  And I want to make sure
16  this case is tried on a fair basis, and hiding the ball as
17  to how you're going to calculate the damages or what the
18  damages are, you know, what the elements are going to be,
19  you know, if the model isn't complete, the model isn't
20  complete.  But you need to explain to them that you're
21  working on a model that's going to be doing X, Y and Z, and
22  that when you get the information, this is going to be it,
23  and you can supplement it at a later time.  But the idea
24  that you're going to wait until an expert report gets served
25  to tell them what you're seeking in this case and how it's

                                                          24

```
 1    calculated and how it all came out isn't fair.
 2              So I'm going to require you to provide
 3    supplemental responses to Interrogatories 4, 9, 14, 17.
 4    I'll look at this expert data.  I assume what you have
 5    provided to the government -- or provided to the defendant,
 6    I'm going to say, if you have not provided them that
 7    information as of the close of discovery, you cannot use it.
 8    Is that fair or not fair?
 9              MS. CLEMONS:  Absolutely fair, Your Honor, and we
10    don't intend to use it because it was an initial
11    determination for very specific information requested by
12    counsel to assess claims, and then we sought actual
13    discovery.
14              THE COURT:  I'm talking about in broad range.  If
15    you haven't provided them with the documents upon which you
16    rely to support your claim for damages in this case, you're
17    not going to be able to use it.
18              MS. CLEMONS:  Yes, Your Honor.
19              THE COURT:  Other than --
20              MS. CLEMONS:  We completely agree.
21              THE COURT:  -- information that you're getting
22    from Google.  I'll carve that out, obviously.
23              But, I mean, it's only fair that in the fact
24    discovery part of this case that you provide them with the
25    information that you intend to rely upon in order to claim
```

                                                                    25

```
 1   your damages.
 2            MS. CLEMONS:  Understood, Your Honor.  And we
 3   have.  And when we get it back from Google, we'll give it
 4   back to them if that's what needs to happen.  But we are in
 5   a situation where, you know, the defendant is the entity
 6   that was retained to conduct these transactions and has the
 7   information we need in order to prove the details of those
 8   transactions.
 9            THE COURT:  But you were the buyer of those
10   transactions; you're the one who paid the -- you know, you
11   or the -- you paid a check to the advertising agencies who
12   then passed the check on to Google or whatever.
13            MS. CLEMONS:  Yes.
14            THE COURT:  So you know how much you paid.  You
15   know whether it was for radio advertising -- or you should
16   know whether it was for radio advertising or for other kinds
17   of advertising.  You shouldn't, you know, be including that
18   kind of information in your damages analysis.  You need to
19   tell them how you're going to break the information out,
20   what you intend to do with it.  You know, if the computation
21   isn't done yet, it isn't done yet, but you need to provide
22   them with some basic information about what the claims are,
23   what it is you're going to be asking for and how you intend
24   to develop that information.
25            MS. CLEMONS:  Understood, Your Honor.  And we will
```

26

1   provide additional information.

2           THE COURT:  Okay.

3           MS. CLEMONS:  With respect to the Army -- the Army

4   data, we did provide the contract modification documents

5   last week.  We provided the sample data that was provided by

6   Army's ad agency.  Google will see that it -- the only thing

7   it will tell them is what fields are available in Google's

8   own products, whether it be DV360 and Campaign Manager.

9           So to the extent that we know, or we can know what

10  was paid for each different kind of advertising on what

11  dates through what systems, it is Google that is the source

12  of that information, even in the ordinary course of

13  business.

14          THE COURT:  Well, maybe I misunderstood what was

15  in the briefs about the Army situation, that the agency had

16  the opportunity to get specific information and they

17  declined that opportunity.  Is that right or wrong?

18          MS. CLEMONS:  So Army had the opportunity to get

19  specific information.  We kept Google apprised throughout

20  the process, May 9th, June 9th, August, that we were trying

21  to get it through the government contracting process,

22  because while Army may own the data and can say what may or

23  may not be done with it, Army does not have a right to just

24  obtain the data for free.  Right.  It is held by someone

25  else, and if that's not a contract deliverable, then that's

                                                          27

 1   not something that Army can just say give us this today.  It

 2   has to be done through the government procurement process.

 3            So we went through that process, and the proposal

 4   came back from the contractor that it was going to not --

 5   they were not going to be able to pull the data until eight

 6   weeks later, nine weeks later, which was past the end of

 7   fact discovery.  And in light of that and in light of the

 8   fact that the data that they were pulling was data from

 9   DV360 and Campaign Manager, two Google products, that we

10   would only end up with Google data through all of that time

11   period.

12            So I think if it's not clear, Your Honor, it

13   should be clear that this is not a fairness issue.  Google

14   has the data right now to look at which FAA purchases were

15   which and when and for what products and through what

16   systems.  That's the data that we're trying to get.  So

17   they've been sitting on that data for much longer than we

18   will have it by the time we get it.

19            THE COURT:  Okay.  Well, within two weeks, I want

20   you to provide supplemental responses to Interrogatories 4,

21   9, 14 and 17.  I do want to look at this document that we've

22   talked about or report or whatever it is, and I'll see

23   whether that's something that, based on my earlier rulings,

24   whether the format in which it is is a way that can be

25   severed from raw data versus protected information, make a

```
 1    determination on that.

 2            But to the extent that you have documents and have

 3    not provided them -- and this is as of the close of

 4    discovery and didn't provide them to Google -- you're not

 5    going to be able to use them in your damages analysis.  You

 6    know, just ...

 7            MS. CLEMONS:  Understood.  And we absolutely, Your

 8    Honor.

 9            THE COURT:  All right.  Thank you.  So that deals

10    with the damages issue.

11            Let me take up the direct purchaser issue now.

12            MS. GOODMAN:  Martha Goodman, Your Honor.

13            Obviously a very important issue in this case is

14    whether the United States is a direct purchaser under

15    Illinois Brick, and that is a legal question to be sure, but

16    there are a variety of facts that we can develop in

17    discovery in order to make -- and take those facts and apply

18    it to the law and then, of course, Judge Brinkema will

19    decide the question of whether the United States is a direct

20    purchaser.

21            THE COURT:  But what fact it is that really -- and

22    I understand some frustration in reading their responses.

23    There are a lot of words, and then they get down to the real

24    point.  The real point that they say consistently, I think,

25    and hear is that the agencies purchase the advertising from
```

29

1   Google on the agency's behalf, and the agencies then

2   reimburse the -- the agency then reimburses the advertising

3   agencies for those purchases.

4          Isn't that what you really need to know, and

5   that's what they say in these responses?  That the agencies

6   themselves use advertising agencies to purchase this, they

7   purchase it, and they pay the advertising agencies; they

8   don't pay Google?

9          MS. GOODMAN:  That is -- if Your Honor's -- if

10  what Your Honor just recited was consistent and clear across

11  all of these discovery requests, I think I would agree with

12  you that we would have the answers we need.

13         But, for example, in the responses to RFAs 4

14  through 12, they've now denied questions about whether they

15  are direct -- whether there is a direct transaction between

16  Google and the FAA, which is, in my view, inconsistent with

17  what Your Honor just recited.

18         If somebody is buying on behalf of another party,

19  that's not a direct transaction, and that is also an

20  important fact in the *Illinois Brick* analysis and whether

21  any exceptions to it are met.  But what Your Honor has said

22  is not consistent across their interrogatory or RFA

23  responses.

24         THE COURT:  Well, the fact -- and, again, you

25  know, this issue is getting lawyered to death, and, I

1    mean -- and I don't mean that in a positive manner.

2          You know, the fact is -- and I don't -- I'm

3    assuming from the responses or my common sense reading of

4    the responses is that the agencies themselves have

5    advertising agencies that they contract with to obtain

6    advertisements and other services from those advertising

7    agencies.  Those advertising agencies then, on behalf of the

8    government agencies, do certain things.  That the agencies

9    themselves don't make payments, don't have contracts, don't

10   have relationships with Google, but their advertising

11   agencies do.

12         And, I mean, I think a fair reading of their

13   responses -- and, again, there are some that are a little

14   more squirrely where they talk about we directly pay Google,

15   which I think is, you know, inconsistent with the broad

16   range of what they keep saying is that they pay the

17   advertising agencies who then pay the agencies on behalf --

18   so -- but, you know, when this issue gets presented to

19   Judge Brinkema, she will know the facts and circumstances of

20   that issue.  And, you know, you'll have to argue, you know,

21   the -- what are the consequences of that, whether it does or

22   doesn't fall under, you know, *Illinois Brick* or whether they

23   are or not direct purchasers.

24         But what -- I'm just trying to get to the point of

25   what is it that is really in dispute about the direct

31

1    purchaser issue?

2         MS. GOODMAN:  From our point of view and

3    consistent with what Your Honor just said, we think what you

4    said is correct.  But because of these squirrely answers,

5    because of these equivocal answers, because of the

6    prevaricating that is going on in the answers, we are being

7    hamstrung in having a record that is not what should be a

8    very simple issue to present to Judge Brinkema on summary

9    judgment from our point of view.

10        How are these transactions completed?  How is

11   Google paid?  Through what agencies?  Through what mediums?

12   Through what intermediaries?  Those facts, which our

13   interrogatories seek to discover, and in which our RFAs are

14   sought to narrow for trial, do not provide the answer

15   that -- are not responsive to the questions as posed and are

16   seeking to get around what is a very significant legal issue

17   and problem in the government's case in order for us to keep

18   kind of playing Whac-A-Mole about how they are attempting to

19   prove that they are a direct purchaser and providing answers

20   that try to -- that are frankly, as you said, overlawyered

21   and are not clear and concise and clear to the questions as

22   posed and are evasive, and that is why these responses that

23   we have received should be supplemented.

24        Particularly with respect to the RFAs, I would

25   direct Your Honor to a case we cited in our reply brief

                                                              32

1    filed yesterday, *KQC [sic] v. Kia* -- I think I messed up the

2    first initials there -- but that case makes very clear and

3    cites a variety of cases from across the country, district

4    courts across the country that show you cannot answer RFAs

5    subject to these objections without -- because we are left

6    in no clear position as to whether they have admitted or

7    denied part of or all of the RFA when you answer subject to

8    objections, which they have done on all of the RFAs at

9    issue.

10             And for the same reason that we seek supplemental

11   responses to our Phase 1 through 3, we think 4 through 12

12   are also ripe for your Court's determination and

13   consideration now.

14             And I think Your Honor made a very good point that

15   with respect to the prevaricating we're seeing in these

16   responses, there are places where they say that they did buy

17   things directly.  If that is true, I would like to know what

18   those transactions are so that we can examine them and look

19   at them.  Because if they're right about that -- and we

20   don't know because our data, despite what Ms. Clemons said,

21   it is not perfect data, and it is completely -- is dependent

22   on multiple iterations of humans putting together

23   information from which we can then pull data out of our

24   system.  So we do not have -- we are not the source of truth

25   for their damages claims.  And, for example, the Army is the

                                                              33

 1    source of truth for their damages claims because it is the

 2    ad agency who knows all of the accounts that they use to

 3    purchase advertising on behalf of the Army.  Google cannot

 4    do that, cannot figure that out on our own with any

 5    perfection, but the Army can.

 6              And with respect to Interrogatory 14 -- which I

 7    appreciate Your Honor has ordered the government to

 8    supplement -- again, if there are direct purchases, please

 9    identify them; if there are not, so state.

10              THE COURT:  Okay.  All right.  Let me hear from

11    Ms. Clemons.

12              MS. GOODMAN:  Thank you.

13              THE COURT:  So the statement that the FAA's

14    practice is for the FAA's agencies to pay Google for any

15    advertising purchased on the FAA's behalf and for the FAA to

16    fully reimburse the FAA agencies for those purchases.  That

17    is a true and accurate statement?

18              MS. CLEMONS:  Yes, Your Honor.

19              THE COURT:  And why is that being made subject to

20    any objections?

21              MS. CLEMONS:  Because the --

22              THE COURT:  I mean, that's your language; right?

23              MS. CLEMONS:  It is, Your Honor.  The term -- the

24    question -- the RFA that that's in response to is basically

25    simply asking for a naked legal conclusion.  Right.  The

                                                            34

1  number of times that counsel just stood up and said buy

2  directly, purchase directly, if they do purchase directly,

3  we want to know what that is.

4       The question of whether a purchase is a direct

5  purchase under antitrust laws, which is what is an issue

6  that goes to antitrust standing, it is a core legal issue in

7  this particular case.  The question of whether something is

8  a direct purchase is a highly factual analysis that -- where

9  the fact is not whether it's a direct purchase; the fact is

10  all of the different facts and circumstances that go into

11  the purchase.  And so it's in response -- there's a couple

12  of reasons.  It's in response to a request for whether there

13  are direct purchases.  Right.  Which is, itself, a legal

14  conclusion, and, therefore, requires more explanation.  We

15  also have this issue where there is conflation of ad tech

16  services and the actual inventory purchased through those ad

17  tech services.

18       As is stated throughout our complaint, the

19  inventory at issue, the open web display advertising

20  purchased pragmatically in this case is all purchased

21  through Google.  Right.  That's the whole point of these ad

22  tech tools is that they allow an advertiser and publisher to

23  be matched up algorithmically.  Right.  And so whether we

24  purchase open web display advertising directly is a very

25  separate issue from whether we purchase ad tech services

35

1    from Google directly under *Illinois Brick*.

2             THE COURT:  Well, the advertising agencies are the

3    only ones involved.  Is that -- I mean, the -- the agency

4    itself uses the advertising agencies for all of its

5    advertising purposes; right?

6             I'm trying to understand why you're trying to make

7    a difference as to payment source, let's just say that.  I

8    mean, to the extent that Google is benefited through any

9    practices that you're complaining of here, the money that

10   they received on behalf of the agencies came through the

11   advertising agencies and not from a check from the agency;

12   is that --

13            MS. CLEMONS:  Yes, Your Honor.

14            THE COURT:  Okay.  So why are you trying to make

15   that distinction as far as when they ask about who paid for

16   or, you know, were any payments made.  The payments were all

17   made by the advertising agencies.

18            MS. CLEMONS:  Presumably the payments were made by

19   the advertising agencies' banks, Your Honor.  Right.  This

20   becomes more complicated.  The question of who ultimately

21   paid, who purchased, those are questions that go to the

22   *Illinois Brick* analysis.  You know, where the money came

23   from, it all affects that question.

24            Google wants this to be very clean.  They want us

25   to say, no, we didn't make any direct purchases, and then

                                                              36

```
1    the whole situation goes away.  But it's already been

2    determined by Judge Brinkema that this is a complex factual

3    situation.  She asked them to look into the facts

4    surrounding whether and how intermediaries might be used.

5              THE COURT:  Right.

6              MS. CLEMONS:  Knowing that the federal agencies

7    use ad agencies, that was still Judge Brinkema's ruling.

8              And so this isn't a simple issue.  This isn't

9    something that will go away with an RFA.  This is a complex

10   issue involving a lot of facts that is -- that is more

11   complicated than did you directly purchase; yes or no.

12             THE COURT:  I know it's very complicated, but the

13   core fact isn't that complicated, and you're trying to make

14   it more complicated than it needs to be, I think, or trying

15   to cloud it up.

16             Whether the fact that the agencies use advertising

17   agencies is an impediment to you getting damages is a legal

18   issue.  But, you know, I think you need to acknowledge that

19   your -- that your agencies use advertising agencies to

20   procure their advertising services.  And, you know --

21             MS. CLEMONS:  Yes.

22             THE COURT:  -- you can, you know, present all the,

23   you know, issues and this and that to Judge Brinkema and

24   she'll make a decision.

25             But, I mean, the idea that you are objecting and
```

                                                              37

1    answering subject to certain objections, and then, you know,

2    whether this, what seems to me to be a clear and accurate

3    statement that the FAA's practices for the agencies to

4    pay -- for the advertising agencies to pay Google, and, you

5    know, they then -- the agencies then reimburse the

6    advertising agencies is just, you know, a core fact that

7    then one then has to deal with, you know, is that a direct

8    purchaser or isn't that a direct purchase.

9         But my concern is that you're not being -- by

10   answering these same subject to objections and not having

11   that core fact, I think, out there and known so you can then

12   argue whether it's direct or not, it's a little bit of a

13   problem.

14        I mean, I read this as, you know, you're

15   acknowledging on behalf of the agencies that they use

16   advertising agencies to provide their services, and, you

17   know, you're not admitting that that doesn't mean it's a

18   direct purchaser, but that's just the process that is used,

19   and you still are entitled to get damages.  They say no

20   you're not, it's an intermediary, you're not a direct

21   purchaser.  Okay.

22        But that core fact I think you need to

23   acknowledge, and need to acknowledge that without any

24   objections.  You understand what I'm meaning by that?

25        MS. CLEMONS:  I do.  I do understand what you

                                                          38

```
 1    mean, Your Honor.

 2              Our concern is really that they didn't ask for the

 3    core fact.  Right.  There are all sorts of facts that go to

 4    the indirect purchaser analysis and the direct purchaser

 5    analysis, and they didn't ask that; they asked, did you

 6    directly purchase, and they asked it in a bunch of different

 7    ways, and so we simply tried to explain what we actually do.

 8              And with respect to -- with respect to open web

 9    display advertising versus advertising services, it's

10    complicated because the answer is yes or no depending on

11    what Google is defining that to mean.

12              So we're happy to answer these --

13              THE COURT:  How does it ever become yes, that you

14    paid for them -- that the agency itself wrote a check for

15    it?  I mean, any -- any transaction -- monetary transaction

16    on behalf of the agencies is made through the advertising

17    agencies; is that right?

18              MS. CLEMONS:  Yes, Your Honor.  Some cases --

19              THE COURT:  You're not aware of any -- any

20    relationship in which the government then transfers funds to

21    Google for advertising agencies without the use of -- or

22    without going through their advertising agency; is that

23    right or not right?

24              MS. CLEMONS:  Yes, Your Honor.

25              THE COURT:  Okay.
```

 1          MS. CLEMONS:  But we are aware of situations, for

 2     example, where the federal agency provides funds upfront for

 3     the advertising agency to use.  Right.  The advertising

 4     agency holds on to federal money and then spends it.  Right.

 5     So there are -- it's just a nuanced, complicated situation

 6     that can't really be boiled down into, yes or no, did you

 7     directly purchase.

 8          THE COURT:  Okay.  Well, again, the confusion I

 9     think comes up in that you're using the term that the FAAs

10     purchased directly from Google certain things.

11          Help me understand your -- you complain about them

12     using the term, and then you used the term.  So help me

13     understand why it's okay for you to use it and not okay for

14     them, as opposed to the FAA's obtained services from Google

15     as opposed to purchased directly.

16          MS. CLEMONS:  So because, Your Honor, a direct

17     purchase, that is a term of art in antitrust law.  Right.

18     What is a direct purchase is a purchase that is sufficiently

19     direct under all of the case law that is pursuant to

20     *Illinois Brick*.  Right.  That confers antitrust standing

21     based on proximity.  That, a direct purchase, is a very

22     complex issue of fact.

23          And so our contention is -- and has been or we

24     wouldn't have brought the case -- that we are, in fact,

25     direct purchasers of these services.  One way in which --

                                                              40

1    and we argued this in opposition to their motion to dismiss.

2    One way in which we are direct purchasers is that our bids,

3    bids on our behalf, noted in Google's systems as being on

4    our behalf, right, go through Google's systems, and Google

5    takes its take rates directly from those bid amounts.  They

6    don't separately, you know, bill out later, you know, to the

7    ad agency for sort of everything it did that month.  Those

8    take rates are calculated and pulled from the bids of the

9    advertiser.  And so there is nothing sitting in between

10   Google and the advertiser's earmarked bid.  When Google

11   takes its take rate out, it's revenue share in the Ad

12   Exchange, for example.

13          And so that is one example of how there is a

14   direct connection between a bid owned by the federal agency

15   and Google whose services that federal agency is using and

16   who is taking its payment directly from the bid amount.

17          THE COURT:  Okay.  All right.  I think I

18   understand the issues there.  But let me just hear from

19   Ms. Goodman briefly on that issue and then ...

20          MS. GOODMAN:  Thank you, Your Honor.

21          I want to make one factual clarification to what

22   Ms. Clemons said.

23          My understanding of how these transactions work

24   with the ad agencies, we have an FAA who contracts with an

25   advertising agency.  In many, many, many instances, there

                                                              41

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

```
 1    are further subcontractors who do the actual media vying.
 2    Those further subcontractors sometimes use a third-party
 3    competitor product of Google's who then go out into a Google
 4    Ad Exchange.  So I just wanted to make sure Your Honor
 5    understood those -- that factual nuance.
 6            Second, these interrogatories and RFAs do not call
 7    for a legal conclusion.  I spent yesterday thinking, is
 8    there any other word I could use than direct to understand
 9    the shortest point between two people on either side of a
10    transaction.  I can't think of another word in the English
11    language that happens to have a legal meaning, which, I
12    agree, we can argue about before Judge Brinkema.  But the
13    fact remains that "direct" means without something in
14    between it, without an intermediary.  That's what the Oxford
15    English Dictionary says.
16            And so the answers, if there is no such direct
17    exchange, direct provision of dollars from Google to --
18    sorry.  From an ad agency to Google, from the federal agency
19    advertisers to Google, that is a relevant fact, I agree, to
20    the direct purchaser analysis.
21            We think it's dispositive; the government does
22    not.  We can argue about that -- the legal conclusions to be
23    drawn from that fact later, but I need -- I am entitled now
24    to the factual information, as we all understand the word
25    direct to mean, the shortest point between two people.  And
```

                                                                42

1    the exchange of money for services, is that done directly,

2    or is that done through an intermediary?  And the answers

3    that we are receiving do not squarely answer that question.

4    And I would again direct Your Honor to the *Kia* case, because

5    that case also discusses this question of whether the RFAs

6    call for a legal conclusion or not.  And, in that case, they

7    talked about patentability of issues, and the Court held

8    that it did not call for a legal conclusion when clearly it

9    is an application of law -- a fact of law that is going to

10   have a legal significance, but we can -- and we can argue

11   about that later.

12           But I am just trying to understand the factual

13   situation, and I have heard from Ms. Clemons that there

14   are -- she is not aware of any purchase -- or any payment of

15   dollars from an FAA to Google, but I don't have that

16   anywhere in a sworn interrogatory response or in any other

17   sort of clearly stated written discovery response to which I

18   am entitled to present to Judge Brinkema to make this far

19   simpler for her when we come to argue summary judgment.

20           THE COURT:  Okay.  Well, I think -- and, again,

21   what I'm going to do with this is I'm going to require the

22   government to provide a response to you that is not subject

23   to any objections, that is consistent with the responses

24   that are embedded in responses that are subject to

25   objections and, in essence, that the FAA's practice is for

43

1   the FAA's agencies to pay Google.

2          And you all can argue whether, you know, the other

3   stuff is direct or not.  I mean, that -- I've been on the

4   fence as to whether it is a legal conclusion or isn't a

5   legal conclusion.  It is a term of art in the antitrust

6   world.  It's not a term of art to everybody else who's

7   trying to read this in common sense.  But, you know, the

8   parties are trying to protect their positions, and I can

9   respect that.

10         But I do think you're entitled to know the core

11  fact, and the core fact is that agency uses advertising

12  agency, advertising agency obtains services on behalf of the

13  agency and pays for them.  And so that, I think, will be

14  clear with a supplementation as to that, so I'm not going to

15  require any further responses other than that indication

16  that that's the way that this works.  So that's the way I'm

17  going to deal with the direct purchasers issues.

18         Now, this remaining issue about communications and

19  the timetable for it being I guess expanded upon, help me

20  understand why that is and why you think my earlier ruling

21  somehow or another makes this clear that I should be

22  granting it.

23         MS. GOODMAN:  So Your Honor ruled that Google may

24  take a 30(b)(6) deposition of the Department of Justice,

25  part of which is to understand their communication.  And one

                                                           44

1    of the topics that is fair game for that deposition is

2    communications between the Department of Justice and third

3    parties and the European Commission related to the subject

4    matter of this investigation and this action.

5              We know, for example, from public reporting that

6    there are communications continuing to go on between the

7    government and the European Commission.  The European

8    Commission has its own similar investigation proceeding with

9    respect to the very same services here or issues at issue

10   here.  And the government has decided to cut off those

11   communications at March of 2023, but that's sort of

12   precisely before we've seen public reporting about these

13   communications taking place.  And to have these written

14   communications when the government has approached us and

15   said wouldn't it be easier for you to take this deposition

16   if you had something in writing, we -- we haven't further

17   discussed that with the government at this time, but they're

18   resisting providing the written discovery that they have

19   argued is what should be done in order to avoid invading

20   their work product.

21             So we're entitled to the written discovery

22   responses because we've timely served them and we've moved

23   to compel.  And I would think that the government would have

24   to provide them to us precisely to avoid the situation that

25   they were so concerned about in our agreeing in the motion

45

1    for the protective order last week about invading their

2    attorney/client privilege or their work product.  These

3    writings, these written communications, will aid in that

4    process.

5              THE COURT:  Well, I mean, obviously the objection

6    talks about this March 27, 2023 date and agreements that

7    were reached and understandings.

8              Why does that not apply to these documents as

9    well?

10             MS. CLEMONS:  So the understanding -- so discovery

11   is not a -- it's not -- there's not a rule of reciprocal

12   discovery that applies here.

13             THE COURT:  Well --

14             MS. CLEMONS:  Just because --

15             THE COURT:  -- there can be.  I mean, the parties

16   often agree that, you know, we're not going to be doing

17   privilege logs for dates from, you know, the day the lawsuit

18   was filed.  That's reciprocal.  If you agree to something,

19   you agree to something, and it goes for both sides.

20             So what --

21             MS. CLEMONS:  The -- what I meant by that is just

22   because we have requested something doesn't mean that the --

23   that it always has to be a mirror image.

24             We have moved to compel.  We have a deposition

25   that we need to take in an orderly manner, in an orderly

                                                              46

 1    fashion that uses our three and a half hours under -- you

 2    know, efficiently and without having to call Your Honor's

 3    chambers to resolve privilege disputes or other things.  And

 4    these communications going through the date of our RFP,

 5    which was August 25th, will aid in that process.

 6         Understanding who the government is speaking to,

 7    who is directly relevant to our arguments that this case was

 8    brought in a biased manner that I understand we're now

 9    permitted to have some limited amount of discovery into.

10         So having an understanding of who they are

11    communicating with is what we are hoping to achieve by

12    asking for this supplementation of RFP 44 and

13    Interrogatory 21 so that the deposition will go more

14    smoothly.

15         THE COURT:  Well, what documents have you gotten

16    from what date range?

17         MS. CLEMONS:  We have received communications

18    between the Department of Justice and third parties, I

19    believe going through January.

20         THE COURT:  The filing of the lawsuit, is that

21    the --

22         MS. CLEMONS:  Right.  Right.

23         And I believe that they have supplemented that

24    response by providing their communications between

25    themselves and third parties with respect to subpoenas that

                                                            47

1    were served by the United States.

2              I haven't had the opportunity to review those yet,

3    but to the extent that there are communications that are not

4    about the subpoenas but that are ongoing and are not

5    privileged between the Department of Justice and third

6    parties about this lawsuit, that is what we're seeking to

7    discover, precisely so that we can avoid invading any work

8    product or attorney/client privileges when we take the

9    deposition.

10             THE COURT:  Okay.  Help me understand the time

11   frames of what we're talking about here.

12             You have produced documents through the filing of

13   the lawsuit relating to communications with European

14   Commissions and other third parties; is that right?

15             MS. GOODMAN:  Yes, Your Honor.  And we've actually

16   produced not just the filing of the lawsuit, but two months

17   after the March 27th date that was part of our reciprocal

18   agreement in negotiating discovery responses.  And it

19   includes over 30,000 documents, these communications with

20   enforcers and with third parties.  So it's not a small

21   amount of information.

22             The United States has also agreed to produce

23   communications with third-party industry participants

24   between March 27th and August 25th because Google, in sort

25   of a last-second surprise, decided to produce those as well.

                                                            48

1   So we are trying to produce those, and we sent out the first

2   production yesterday.  So Google hasn't -- our position is

3   that Google hasn't explained specifically why it needs

4   additional documents beyond what we've agreed to produce.

5           And to be clear, Judge Brinkema just ruled this

6   morning that the issue of whether this case was brought in a

7   biased manner is off the table; she dismissed those

8   defenses.  And so if that is their reason, it's not a reason

9   that is valid in this case any longer.

10          THE COURT:  Well, it probably goes a little beyond

11  that, but I would say the case has already been brought

12  between the time that you produced documents and the

13  timetable that they're looking at there, but it does have

14  some modest impact from that angle, I assume.  Okay.  All

15  right.  Thank you.

16          You know, I've looked at that.  I think the

17  parties -- and again, you know, I -- I'm trying to

18  understand what is indicated in the various communications

19  relating to this issue, but I think the parties pretty much

20  have taken the position that, for whatever reason, that

21  March date was a date that the parties had agreed to.  I

22  don't find that there's good cause to change that.  I'm not

23  going to require any supplemental responses to either

24  Interrogatory 21 or Request for Production of Documents 44.

25  So I think that takes care of the motion to compel issues.

49

 1    Thank you.

 2            Now, turning to the other motion.  I want to hear

 3    first from Google's representative about this issue.

 4            MS. ELMER:  Good morning, Your Honor.  Julie Elmer

 5    for Google.

 6            Your Honor, we are committed --

 7            THE COURT:  Well, first let me ask you -- I am

 8    concerned about the way this issue has been presented to the

 9    Court, and there's been no discussion about the law firms'

10    responsibilities in making certifications to the Court and

11    in dealing with this issue.  There's a lot of discussion as

12    to what internal people at Google did or didn't do, and the

13    declaration talks about, you know, how it was an inadvertent

14    error or mistake, whatever.  But law firms, being officers

15    of the Court, representing clients, have responsibilities to

16    make sure that things are done properly, and you can't off

17    source that to a client.

18            I want to hear what the law firms'

19    responsibilities have been in dealing and making sure that

20    these discovery issues were being addressed appropriately,

21    thoroughly by the client, because you're the one who's

22    representing the client in this court.

23            Is it your firm that's in charge of the discovery?

24            MS. ELMER:  Yes, Your Honor.

25            THE COURT:  Okay.  So help me understand why I

                                                              50

1    haven't heard anything about what your law firm did to make

2    sure that these responses, that the document production was

3    being done properly, thoroughly and timely.

4            MS. ELMER:  Your Honor, the breakdown occurred at

5    the place where the person within the company who was

6    running the search terms ran them over the litigation

7    ingestion sites.  So those are the sites where the documents

8    that were collected for this litigation, the refresh

9    productions, the additional custodians that were added, the

10   additional search terms that were added for the refreshed

11   period and for those custodians.  That was -- so that

12   representative ran the search terms over those and provided

13   us with hit counts, and those hit counts --

14           THE COURT:  But you, the lawyer, have a

15   responsibility to make sure that the searches are being done

16   thoroughly.  And I haven't heard anything yet or seen

17   anything where the law firm was involved in doing anything

18   on the front end.  And, you know, it is difficult to

19   understand, given what I would have thought to Google that

20   this case would have been a fairly high priority for them

21   and a case in which they would be taking seriously, that

22   somehow or another, whoever they put in charge of running

23   search terms on ingestion sites runs them on two, but

24   doesn't run them on five.  That is, one, that there's no

25   oversight internally for Google to make sure that who is

                                                              51

 1   doing that knows what he or she needs to do, a check and
 2   balance to make sure that it's done thoroughly on the
 3   client's side; but even more importantly, on the lawyer's
 4   side, because it's the lawyer who's representing the client
 5   and is responsible ultimately for everything in this case.
 6            So, again, help me understand what happened in
 7   this regard and how those mistakes could have happened to
 8   cause what is a very significant problem in this case.
 9            MS. ELMER:  The search term counts that were
10   reported to us from the client's in-house discovery team
11   were very large, and there were no reasons to suspect that
12   there were ingestion sites that were not searched.  Outside
13   counsel was not aware of the existence of the other
14   ingestion sites.
15            We are -- we flagged the issue when we were
16   preparing for depositions and noticed that for a particular
17   deponent for whom a large number of documents had been
18   produced at the investigative phase, the hit counts for that
19   particular deponent were smaller than should be expected.
20   When we were preparing for a deposition, we flagged the
21   issue.
22            THE COURT:  In the middle part of August -- you
23   know, substantial production was supposed to be done in
24   July.  I assume you didn't start preparing witnesses or
25   talking to witnesses and looking at documents until mid

                                                              52

 1    August.  Is that when you really started preparing

 2    witnesses?

 3              MS. ELMER:  Your Honor, the DOJ did not start

 4    noticing depositions until late July, and depositions -- I

 5    think this particular deponent's deposition was not -- the

 6    notice did not issue until sometime in August, so it was a

 7    very compressed time frame.  All of the deposition notices

 8    were flowing out in the late July and August time frame.

 9    And so it was in getting down to that single deponent level

10    that red flags were raised.

11              The numbers that we're talking about here are so

12    big.  You know, this matter flows from four years of

13    overlapping investigations, and the amount of material that

14    has been stored in these iterative collections over time is

15    massive.  And, you know, there had been a review population

16    at the investigative phase.

17              It's not like there have been no documents that

18    were produced from the ingestion sites that we're here about

19    today.  During the investigation phase, Google ran very, you

20    know, broad search terms over those documents, and that

21    related in a production of approximately 3 million documents

22    to the DOJ, and they have those documents.

23              Many of the litigation search terms are based on

24    those broad search terms.  So there is a lot of overlap

25    between the documents that we're here about today.  That's

                                                              53

1   why we're seeing very high deduplication rates as those

2   documents are being exported to the vendor and processed and

3   deduplicated.

4          THE COURT:  Again, I'm not understanding how this

5   could happen with what should have been at least two levels

6   of oversight.  One internal level that when someone's given

7   the responsibility to do this, that the person who is

8   assigning them that responsibility, make sure that person

9   knows all the avenues that has to be done.  So just because

10  somebody came in and you're told to do this, you know,

11  management or someone who is assigning that job I think

12  would have the responsibility to make sure that you've got

13  to search A, B, C, D, E and F, not just A and B.  There's no

14  explanation for that in the declaration.

15         MS. ELMER:  I --

16         THE COURT:  And then on top of that and again, at

17  least in my mind, very importantly, is the lawyers'

18  responsibility to make sure things are done right, and to

19  make sure that you have sufficient information to know what

20  document sources there are that -- and, you know, that these

21  search terms are being done on all the sources.  And I

22  haven't heard a peep about what the law firm did to make

23  sure that things were done properly when apparently you

24  certified -- at least a lawyer from Google, as I understand

25  it, certified that substantial completion was done on

                                                          54

July 7th.

How -- what did you do in order to assure yourself that substantial -- that substantial completion had been done by them?

MS. ELMER:  So, Your Honor, I mean obviously we were basing the substantial completion on the documents that we had in our review platform at that time, and it now has turned out to be the case that there were ingestion sites that were not searched.  And that --

THE COURT:  With 16 million documents; right?

MS. ELMER:  So I want to be clear that the 16 million number represents search term hits.  As those documents are being loaded into the vendor's review platform, processed and deduplicated, we're seeing a deduplication rate as of today of 67.81 percent.  So it is not going to end up adding 16 million documents.

THE COURT:  Okay.  So one-third of 16 million is 5 million documents; right?  Rough math.  You produced how many documents since the filing of this lawsuit?  1 million.  So you're talking about potentially five times what you've produced, and you're saying you thought there was substantial completion done?  It's false.  It wasn't; was it?

MS. ELMER:  Your Honor, I think there is not perfect visibility into the internal processes.  Each person

55

1    is playing a role in the litigation.  We have outside

2    vendors, we have the internal discovery team, we have

3    outside counsel.  We have had different outside counsel over

4    the course of the litigation and the investigations.  This

5    has been going on for four years.  It is -- there have been

6    a lot of iterations, a lot of new people that have come on,

7    people who have gone.  It is a --

8         THE COURT:  It's no excuse.  And the lawyer is the

9    one -- the law firm is the one who's ultimately responsible

10   when you're representing someone in court.  That's just the

11   way it is.  I mean, you have the responsibility to make sure

12   the client does what the client is supposed to do,

13   particularly when you represent things to the Court.  It's a

14   very difficult situation.

15        Tell me what the law firm has now done to make

16   sure that the client is being fully compliant with its

17   obligations to provide responsive documents in this case.

18        MS. ELMER:  So what we have done is, we have

19   talked with all of the people who are involved in the

20   collection of documents at the client.  We have -- the

21   client has conducted an analysis of -- to make sure that all

22   of the litigation search terms have been run across all of

23   the ad tech custodian's documents for the agreed time

24   period, and the law firm has double checked that analysis to

25   ensure that we've covered all of the places where unique

                                                          56

1    documents from these ad tech custodians are stored.  And we

2    have brought on a new vendor to assist with reviewing the

3    documents more quickly, and we have started up a new

4    database, a duplicate database so that we can have more

5    reviewers in the documents reviewing at the same time so the

6    database doesn't crash when you have many hundreds of

7    reviewers in them.

8           And so those are some of the steps that we have

9    taken to make sure that this problem will be addressed and

10   that the documents will be produced to plaintiffs quickly.

11          We have focused on, you know, determining the

12   first cause, the direct cause.  We have that.  Will there be

13   more postmortem and, you know, thinking about how we can

14   improve, you know, best processes?  Yes.  But our focus, our

15   Number 1 priority has been on, you know, assessing the size

16   of the issue and then getting the documents produced to the

17   plaintiffs as quickly as possible.

18          THE COURT:  Well, it's not rocket science.  You've

19   got six, seven ingestion sites.  You have to run the search

20   terms on those ingestion sites.  I mean, postmortem isn't

21   going to be that difficult.  It's, you know, we have

22   documents stored, we've got to do what we need to do on all

23   the sites.

24          I mean, that's why this inadvertent, honest,

25   whatever, is hard to understand those adjectives being used

57

1    in something like that.  Maybe it wasn't malicious, maybe it

2    wasn't in bad faith, but it clearly was not being done under

3    proper supervision, either internally or externally.  And

4    you've put everyone in an unfortunate situation by your

5    failure to do that.

6              Tell me, as of right now, what is the status?

7              MS. ELMER:  So the status is that as of right now,

8    we have gotten the universe of documents that are impacted.

9    The documents are being exported to the vendor and

10   deduplicated.  The vendor has determined that --

11             THE COURT:  Well, let's take it step by step.

12             MS. ELMER:  Okay.

13             THE COURT:  How have you determined that you now

14   have the universe of documents?

15             MS. ELMER:  As I've stated earlier, the client has

16   performed an analysis where we're looking at each, you

17   know -- here is the date range for Custodian A.  Have we

18   accounted for all of Custodian A's documents for the full

19   date range over these ingestion sites?  Are all of the

20   unique documents that cover those date ranges for that

21   custodian encompassed within the ingestion sites -- the

22   eight ingestion sites that we've described in the

23   declaration?  And then outside counsel has checked that

24   analysis, and so we have, you know, the client checking the

25   internal, and then we have the external check.  And we

                                                            58

1    completed that analysis on Wednesday.

2             And then now the documents are being exported to

3    the vendor.  The vendor is in the process of deduplicating.

4    They have deduplicated more than half with a dedupe rate of

5    67.81 percent.  So far 3 million documents -- 3.1 --

6    approximately 3.1 have been added to the review population.

7    So you can see that those numbers come down.  I concede that

8    they are still large, but they have come down dramatically.

9             And we've proposed what I think is a realistic

10   modification to the schedule.  We are committed to meeting

11   that date of November 8th.  We will ramp up the resources in

12   whatever way needs to be done, but it is not technologically

13   feasible as a practical matter for us to be able to get the

14   documents all produced -- reviewed, produced, processed to

15   plaintiffs by September the 29th, as they've asked for in

16   their reply.

17             THE COURT:  Why not?

18             MS. ELMER:  The main issue is simply machine --

19             THE COURT:  You've known about this for a month

20   now.  You knew about it starting on August 18th.  You knew

21   there was a real issue.  There didn't seem to be a call to

22   arms then.  The first time I heard about it was September 1,

23   and it was this, you know, like, whoops, we've got a

24   problem.  It wasn't as clear as I now know how egregious

25   this is.  But, you know, you don't just get a do-over.  It

                                                              59

1    seems to be what you're thinking you're entitled to do.

2            MS. ELMER:  Your Honor, we do not feel that we're

3    entitled to a do-over.  We understand and appreciate the

4    gravity of the mistake.  It was absolutely not intentional.

5    We do think we can get the case back on track by committing

6    to this deadline, and I think we have a good plan in place

7    to do so.

8            And, you know, you asked why the documents

9    couldn't be produced by the 29th.  You know, the reason it

10   has taken the company so long to, you know, provide details

11   about this issue is it has taken that long to really

12   understand the scope of the issue, the cause of the issue.

13   We have investigated the cause of the issue, and we are --

14   and who it impacts.  At first it appeared that it might just

15   impact a deponent and then more deponents.  We were focused

16   on the depositions at the time.  Then it became clear, no,

17   no, it affects a broader set of custodians, and we brought

18   it to the attention of the plaintiffs and the Court as soon

19   as we had enough information to provide some sort of

20   reliable description of what was happening.

21           And, you know, plaintiffs in their brief have

22   complained when a number that we've provided ends up

23   changing.  That's because we're erring on the side of

24   transparency, and we're providing updates in real time as we

25   have them, even though our work is still continuing.  And,

                                                          60

1    yes, those numbers are going to continue to change as we

2    check and double-check the work to make sure that it is

3    accurate and that it is nailed down.

4          I can assure you that the client and outside

5    counsel have people who are working literally full bore,

6    seven days a week to correct this issue.  It is our Number 1

7    priority.  It is my Number 1 priority.

8          THE COURT:  So you've indicated that there are

9    3.1 million documents that have currently gone through the

10   deduplication phase; is that right?

11         MS. ELMER:  That's correct.

12         THE COURT:  And what does that mean, they've gone

13   through the deduplication phase?

14         MS. ELMER:  That means they're ready to go to the

15   review platform for review for relevance --

16         THE COURT:  Okay.

17         MS. ELMER:  -- and privilege.

18         Those documents are reviewed, and then the result

19   is produced to the plaintiffs.

20         THE COURT:  So the deduplication takes care of any

21   documents that have already been produced in the case?

22         MS. ELMER:  That is correct.

23         THE COURT:  Okay.

24         MS. ELMER:  And only exact duplicates are

25   deduplicated.

                                                          61

1           THE COURT:  And if those numbers hold up, there

2      are going to end up being 6 million documents that need to

3      be reviewed?  So it's about half?

4           MS. ELMER:  That is our best estimate at this

5      time.

6           THE COURT:  Give me a ballpark of the million

7      documents that you did produce, what percentage of that came

8      from the review -- so how many documents did you end up

9      going through the review process that ended up being

10     produced in a million?  Was it half?  A third?  Whatever.

11          MS. ELMER:  The responsiveness rate on average has

12     been around 25 percent.  So if you have -- yeah, just do the

13     math.  I think we had a similar population.  Roughly similar

14     population.

15          THE COURT:  Roughly similar to what?

16          MS. ELMER:  To the 6 million that we're talking

17     about right now.

18          THE COURT:  Well, 25 percent of 6 million is a lot

19     more than a million documents.

20          MS. ELMER:  Okay.  20.

21          THE COURT:  I mean, I'm just trying to understand.

22     You're the one who seems to know the numbers; I'm just

23     trying to do the math.

24          MS. ELMER:  Yeah.  So as the declaration states,

25     the hit counts that were pulled from the litigation search

                                                              62

1   terms being run over the litigation ingestion sites resulted

2   in a population of 5.87 million documents that were loaded

3   onto the review platform; so ...

4           THE COURT:  Okay.  How many documents have you

5   produced from --

6           MS. ELMER:  From the set?

7           THE COURT:  -- in the last 14 days?

8           MS. ELMER:  I don't know the answer to that, Your

9   Honor.  My understanding is that so far, about 52,000

10  documents have been produced from these other ingestion

11  sites, but that was before we've added another team of

12  reviewers.  We've added over 200 reviewers to start moving

13  this process more quickly.  And we were still waiting for

14  documents to be loaded onto the review platform.  That does

15  take machine time, both on Google's side, you know, from

16  exporting the documents to their vendor, and then there's

17  machine time at the vendor to actually process the documents

18  and deduplicate the documents.

19          THE COURT:  Okay.  I don't have any further

20  questions.

21          Let me hear from Ms. Wood.

22          MS. ELMER:  Thank you, Your Honor.

23          MS. WOOD:  Your Honor, if I might just start with

24  my own question for counsel.

25          The 5.87 million from the previous review, was

                                                            63

1   that a deduped number, or was that after deduping?

2          MS. ELMER:  That was after deduplication had been

3   applied.

4          MS. WOOD:  Okay.  Your Honor, as you know, the

5   words on the front of this courthouse read:  Justice

6   Delayed, Justice Denied.

7          We are very deeply concerned about this discovery

8   failure, and also, as we noted in our papers, very deeply

9   concerned that this is not the first time that this has

10  happened where this exact defendant has found itself

11  producing material numbers of documents after the close of

12  fact discovery.  And, indeed, this is a situation where,

13  back in May, we asked the question, are you sure everything

14  is okay with respect to document issues and collection and

15  review of documents in this case.  Because we hear from the

16  case that is happening across the river in the *Search*

17  litigation that there are serious problems.  Can you assure

18  us that we're not going to see those problems here.  And we

19  were told all's well; we're fine.

20         To us, that degree of repeated recidivism in terms

21  of failure to take basic precautions to ensure that

22  documents are produced merits very significant consequences.

23  We are not yet in a position on behalf of the United States

24  to articulate the precise scope of those requested

25  consequences, but we are very concerned that the case get

                                                            64

1    back on track as quickly as possible so that justice does

2    not continue to be delayed and denied.

3           We have made what we believe to be an entirely

4    appropriate and conservative request to this Court for a

5    modicum of relief to address -- or to begin to address the

6    prejudice we have suffered by defendant's failure.

7           We believe that those requests are appropriate and

8    fully justified by what has occurred.  And, again, once we

9    have more information about the very questions Your Honor

10   has been asking, how it can be that one individual at a

11   company of this size can make a mistake of this significance

12   and gravity without any supervision, either internally or

13   externally, those are precisely the questions that we have,

14   Your Honor, and only once we get answers to those questions

15   do we feel that we are in a position to assess the full

16   scope of relevant consequences.

17          But we would seek, as we've asked in our motion --

18   they have indicated that they are capable of hiring hundreds

19   of contract attorneys to review these materials.  They are

20   one of the largest financial defendants in the world, and

21   they can -- they have the resources to ramp up their review.

22          I think that what is disturbing to us is that they

23   would talk about their need for two months to review

24   documents for responsiveness, and then somehow assume in

25   30 days we are able to review all of those new documents,

65

1    decide who to depose, issue any additional written discovery

2    that is relevant based on those newly-produced documents,

3    and all turn around and do that in a matter of 30 days.

4    That is not a reasonable framework for moving forward.  That

5    would be punishing the victim and not the perpetrator.

6              So, at the very least, we would ask that this

7    court give us a reasonable amount of time to review the

8    documents once they are produced, to give us the ability to

9    notice four additional depositions based on the complete

10   production, not a production that, as Your Honor noted, is

11   one sixth of -- or one fifth, perhaps, of the total universe

12   of documents.

13             THE COURT:  Well, you've got 3 million documents

14   before this lawsuit got filed.

15             MS. WOOD:  That is correct, Your Honor.

16             THE COURT:  I mean, you got an additional million

17   documents now.

18             MS. WOOD:  That is also correct.  Which even two

19   together is less than half of what we expect to come.

20             THE COURT:  Well, no.  What you can expect to come

21   is about what you've got right now, if her numbers are

22   right, or maybe twice what you've got right now.  And -- but

23   the -- I don't know why you think you get a do-over on

24   the -- and I agree with most of what you're asking for.

25             The four additional depositions is one that I

66

1    don't really understand.  You've taken four, you'll be able

2    to retake them to the extent, I assume, you took them

3    initially because you thought that they were some of the

4    more important witnesses that you needed to get taken care

5    of.  I don't think that's going to change.  I don't think if

6    we turn back the clock and you had these other documents

7    that you wouldn't depose the four people that you deposed

8    right now.  If you can convince me later, then maybe so.

9    But giving you carte blanche to redo four I think is a

10   little bit aggressive.

11           MS. WOOD:  Well, Your Honor, I think you made

12   somewhat joking reference when we were last before you to

13   the fact that these deposition slots, these ten deposition

14   slots are viewed by both parties as, I think you used the

15   word, precious.

16           THE COURT:  You all have used -- I mean, you keep

17   telling me how precious they are and how few there are.

18           MS. WOOD:  There are very precious.

19           THE COURT:  So --

20           MS. WOOD:  And when you have a limited number, a

21   very precious limited number of depositions that you can

22   use, it matters if you have a complete document production

23   to base that difficult strategic choice on.

24           I can't promise you that we wouldn't have deposed

25   any of them, but I would be very surprised if those are

                                                              67

1   exactly the four that we would choose based on a document

2   population that is vastly different.  And so -- and, again,

3   I think anything less than that and some appropriate

4   sanction is really just allowing this defendant to grant

5   itself a three- or four-month extension of the discovery

6   schedule with virtually no consequences.

7            It wants to have exactly the same amount of time

8   it had before, it wants to proceed on the same rules as

9   before, but just get a three- or four-month continuance.

10  Why wouldn't they do that in every case?  How that

11  incentivizing them to stop this continual process they seem

12  to have of looking for documents after the close of fact

13  discovery and not before?

14           And so I think asking for four depositions to be

15  added to our limited set of ten is not an unreasonable

16  request when, A, the document population is different; and,

17  B, there has to be some consequence.  And simply moving

18  dates on the calendar, they would have preferred to have a

19  later trial date to begin with, so that's certainly not a

20  consequence to them.  So we think there needs to be an

21  appropriate consequence.  We haven't fully --

22           THE COURT:  Well, we're not talking about

23  penalties here.  And, you know, you've reserved your right

24  to come back.  And I'm not going to make them do depositions

25  as a penalty.  The only reason I'm dealing with this issue

                                                            68

```
 1    right now is to try and get this case back on track and to
 2    establish what is necessary, not what is a penalty.
 3              MS. WOOD:  Understood, Your Honor.
 4              THE COURT:  I don't want you to be misinterpreting
 5    what I'm saying, but, you know, we're dealing with the
 6    we-need-to-get-the-case-back-on-track issues right now.
 7              MS. WOOD:  Agreed, Your Honor.  And that's why we
 8    brought this motion on our own initiative, you know, last
 9    week to make sure it would be heard today because we very
10    much want this case back on track.  But we do think it would
11    be an equitable resolution given the fact that those four
12    deposition slots were strategically chosen based on an
13    incomplete data set that we be at least allowed the
14    opportunity to come back and apply to the Court for
15    additional depositions based on the newly-produced
16    documents.
17              THE COURT:  Okay.
18              MS. WOOD:  As well as the other relief we've
19    identified in our motion.
20              THE COURT:  All right.  Thank you.
21              Well, I spent a lot of time reading through this
22    trying to figure out with calendars and other things, and,
23    you know, I will say the Court shares the plaintiffs' desire
24    to get this case back on track, both on my floor and upper
25    floors.  And, you know, as painful as it is to have to
```

69

1    extend time periods in this court, given what I consider to

2    be the failure on behalf of Google to comply with its

3    responsibilities in this case, both attorneys and client,

4    I'm required to do that.

5            But, you know, I -- and I understand this is going

6    to be a tough road for Google, but it's a road of their own

7    making, honestly, and they're going to need to make sure

8    that there are no slipups on this, and that they do what I

9    tell them they need to do, or the consequences could be

10   serious.  And so I'm going to set out a few things.

11           First, I just want to talk about some of the broad

12   structure, and then I'll talk about dates.  I think I'll

13   know -- as far as the items that were outlined, I think in

14   the government's motion, I think clearly to the extent that

15   documents are being produced that -- after September 8th, so

16   after the discovery cutoff date, that relate to any of the

17   four Google witnesses that have currently been deposed, so

18   there are documents that are being produced that relate to

19   those witnesses, I'll allow you to reopen those depositions,

20   but for a period of two hours.  I think some sort of time

21   period is appropriate.  Two hours is probably right.  Not

22   that it matters much, but I think Google needs to pay the

23   costs of reopening that deposition to the extent that there

24   are any appearance fees for court reporters or videographers

25   for that.  There shouldn't be an additional cost to the

                                                              70

 1    government for having to reopen a deposition for Google's

 2    failure to provide documents in a timely manner.

 3         The request to have the government redesignate any

 4    of the five remaining, you know, I think Google hasn't had

 5    any objection to that.  I think that certainly is

 6    appropriate under the circumstances that you can pick

 7    another card out of the deck, so to speak, for those five

 8    and put one back into the deck if you need to.

 9         At this point, you know, I'm not saying no to you

10    being able to pick one or two or whatever that you think may

11    be necessary, but you're going to have to come back and ask

12    me for it and show me why, as opposed to just giving you a

13    number now.  It may be that once the situation gets in, you

14    know, that can be an agreed order or not.  And, if not,

15    obviously you all know how to be here on a Friday, so we'll

16    be able to deal with that fairly quickly.  But, at this

17    point, I'm not going to grant you carte blanche another

18    four.

19         I think -- and, again, I've kind of expressed that

20    before.  I think you probably were pretty judicious in

21    picking those four, and while you may not have gotten

22    everything you've wanted out of those four, you've probably

23    gotten some very useful information.  And, again, if you

24    need to redepose them at some point in time, that probably

25    would diminish my desire to give you additional depositions,

                                                              71

1    if you know what I mean.  If they were important enough for

2    you to depose and redepose them, it's probably unlikely

3    you're going to get another go-around with another person.

4            For Google employees -- and I don't know whether

5    the ones that you're noticing are or are not currently

6    Google employees, but to the extent that they are Google

7    employees, you know, the ten business days notice of them

8    being here in Virginia is appropriate.  You've got to do

9    what you've got to do.  You know, this is -- and certainly

10   for Google employees, I think they can find a way to get

11   that done.

12           If they're not Google employees, you all need to

13   talk about the parameters of doing that and whether they're

14   still under some sort of agreements, cooperation or

15   whatever, but -- and to the extent that shortened time

16   period affects the, you know, MDL proceeding, they're going

17   to have to live with it.  Sorry.  But, you know, the MDL

18   plaintiffs there, if we want to redesignate a -- whatever

19   they need to do under a coordination order, they need to do

20   that.  I know there was typically some extended period of

21   time there, but we need to keep this case on track, and

22   that's the only way I can see doing that is to give the ten

23   business days notice.

24           I am also going to require counsel to provide a

25   written verification five days before the deposition, as

                                                          72

1    requested by the plaintiff, that the deponent's documents

2    have been reviewed, produced, whatever.  So I don't want

3    this happening again, but I want verification from counsel.

4    And they better not just make that verification based on

5    what somebody at Google told them.  You need to make sure

6    that you have some independent justification for making a

7    verification.  So it's not just did you; it's are you sure?

8    What did you do?  You know, some independent oversight

9    there.

10            I am not extending fact discovery.  I just -- and

11   to the extent that anyone thinks this is what we're doing,

12   we're not doing it.  I am carving out things that can be

13   done that relate to factual discovery in this case.  So to

14   the extent that anyone thinks that they get permission to

15   serve third-party subpoenas or anything like that, you know,

16   that time has come and gone absent a specific order from the

17   Court.  So fact discovery is not extended in any period of

18   time.  Google may not do any new discovery in this case.  To

19   the extent discovery that was served, they can follow

20   through with the discovery that was served in an appropriate

21   manner.

22            The depositions that we will be taking -- that the

23   United States will be taking going forward, you know, can be

24   designated as having been taken prior to September -- I've

25   been doing that in some other instances, but I think just

73

1    for the sake of clarity and the need, if, you know, you do a

2    deposition in the November time frame, that deposition can

3    be used for the purposes as if it had been taken prior to

4    the September 8th date.

5            I'm going to defer ruling, as I did on the

6    additional depositions, on the need for any other

7    interrogatories or request for admissions.  You know, I

8    don't know whether you're going to need them.  We'll have to

9    see how many documents there are, how relevant the documents

10   are, whether they're, you know, of any real significance or

11   not.  But I'm open to doing that.  Obviously if there are

12   interrogatories or requests for admissions, I'm likely to

13   shorten the time period for responding from 30 to 15.  So

14   there would be objections and responses due within 15 days

15   if I agree to allow any additional interrogatories or

16   request for admissions.  And the same goes for if there

17   is -- if you can show cause for the need to do any

18   third-party discovery, you can present that to me, and I

19   will consider it.

20           Okay.  So the timetable that I have come up with

21   is somewhat consistent with what was suggested by the

22   government with one or two little tweaks there.  I'm going

23   to require that Google complete its document production no

24   later than October 6th.  Whatever it takes needs to be done,

25   but it's got to be done by October 6th.

                                                              74

1          I want you to provide and file with the Court a

2   weekly status report as to -- you know, starting today, so I

3   want it here today.  And part of this you've provided to me

4   orally, but I want it in writing in the file so everyone can

5   see as to what the status of the review process is, the

6   number of documents that have been produced that week.  And

7   for this one, I want to know the number of documents that

8   have been produced since September 8th to now to be after

9   the close of fact discovery to date.  And I want that filed

10  every Friday so that I can keep track of how this process is

11  going.

12          I want to make it clear, this is not going to be

13  you produce them all on October 6th.  And that's why I want

14  to monitor this, because, you know, you need to produce them

15  as they are ready to be produced.  And this is not a slow

16  rolling production; this is as soon as they're ready, you

17  need to get them out the door.  And, you know, whether it's

18  daily, every other day, whatever, I don't know.  But I don't

19  want you waiting and then sending big batches of them,

20  because they need to start looking at them and provide them

21  with enough information to use them in an appropriate

22  manner.

23          I'm going to extend the time period for the

24  plaintiff to conduct depositions in this case to

25  November 17.  I've shortened the time period between the

75

1   documents and now, but I'm going to be making sure you're

2   getting documents consistently between now and October 6th.

3   So it's not like you can only have a week or 30 days to do

4   something.  So you'll have plenty of time to do that.

5            Again, part of that is that, you know, the

6   government has spent three years investigating this before

7   it filed its lawsuit.  It knows this case, it knows most of

8   what's going on in this case.  I understand you don't know

9   what you don't have, information, and that's why I'm trying

10  to be fair in that regard, and I want to give you the

11  opportunity to do that.  But I do think that the depositions

12  that we have discussed and any other things that I may allow

13  individually, other than the depositions that we've already

14  talked about, all that's going to need to be done by

15  November 17th.  Okay.

16           I'm going to adopt the expert report timetable

17  that was proposed.  The plaintiffs' expert reports are going

18  to be due on December 22nd.  Defendant's expert reports on

19  January 23rd.  Rebuttal reports on February 13.  And expert

20  depositions will need to be done by March 8th of 2024.  This

21  is, in essence, you know, basically a two-month change in

22  most of these dates.  Unfortunate, but I think probably

23  necessary under the facts and circumstances.

24           I'm going to go ahead and tentatively set a status

25  conference for you all with Judge Brinkema on March 15th,

76

1    it's a Friday, at 10:00.  We'll see what her calendar is,

2    but I figured the Ides of March would be a good day for the

3    parties to have to come in and see Judge Brinkema, and it's

4    also the Friday after the experts are done.

5           So I'll enter an order today that will reflect the

6    changes in the dates that I have just discussed there.  I'll

7    leave up to you all to deal with the details as to

8    redesignating the depositions and those kinds of things.

9    But the order will be, you know, granting the government's

10   motion in part for that and then outline the dates, that you

11   all have that in the record.

12          Any other questions at this time?

13          MS. WOOD:  I just want to raise one point, and I

14   don't think it will be a problem, and we'll do our very

15   best.  But it is a shorter period of time, and I just wanted

16   the Court to be aware that from the moment the document

17   leaves Google and comes to us, the technological process

18   with productions of this size are that it can be up to a

19   week for it to get loaded on our system and reviewed.

20         So we're going to do our absolute best to meet

21   that November 17th time frame, but to the extent you've

22   carved a week out of that, I just feel like I would be

23   remiss if I didn't explain that I -- I'm a little bit

24   concerned.  We will do our best to meet it.  If we feel we

25   can't, we will obviously come back to the Court.

77

```
 1              THE COURT:  Well, let's hope we don't have to deal
 2    with that issue.  Hopefully you can start talking to IT
 3    people to cut that --
 4              MS. WOOD:  Oh, we have.
 5              THE COURT:  -- one week down to a lesser period of
 6    time.
 7              MS. WOOD:  We have.  Unfortunately, we are not the
 8    only case that the Antitrust Division has, but we have been
 9    in extensive communication with our IT folks, and we're
10    doing everything we can in that regard, Your Honor.
11              THE COURT:  Okay.  Thank you.  Mr. Reilly.
12              MR. REILLY:  Yes, Your Honor.  It's probably lost
13    in all the paperwork going back and forth.  The parties had
14    submitted a joint motion to complete certain third-party
15    productions on a schedule specified in the proposed order.
16    This is Document Number 414.
17              THE COURT:  And it was filed on Monday; is that
18    right?
19              MR. REILLY:  I think it was filed on the 8th, Your
20    Honor.  And it's possibly just lost in all of what was going
21    on.
22              THE COURT:  Well --
23              MR. REILLY:  I just wanted to bring it to your
24    attention, Your Honor.  Thank you.
25              THE COURT:  I saw it in the footnote of your
```

1   brief.  We'll look at it.  It's not necessarily drive-by

2   service here, you know.

3            MR. REILLY:  Understood.

4            THE COURT:  You know, I just -- you need to

5   understand that this is not my only case, and it has taken a

6   lot of time and attention, so I will try and look at that

7   and deal with it.

8            MR. REILLY:  Thank you, Your Honor.

9            THE COURT:  Okay.  Anything else?

10           MS. WOOD:  Your Honor, I'll just raise that at the

11  end of this conference in front of Judge Brinkema, there was

12  one issue that she did defer to you.  I think we should have

13  an opportunity to meet and confer with counsel to see if we

14  can resolve it without the need to bring it to your

15  attention, but I just wanted to make you aware of that.

16           THE COURT:  Okay.  Well, I've not been alerted to

17  that, but I will hopefully hear that that isn't an issue.

18  If it is, I'll deal with it at the appropriate time.

19           MS. WOOD:  That's our hope as well, Your Honor.

20           THE COURT:  Okay.  Thank you.  I thank everyone

21  for their patience.  Court will be adjourned.

22            (Proceedings adjourned at 12:52 p.m.)

23

24

25

```
 1              -----------------------------------
     I certify that the foregoing is a true and accurate
 2
     transcription of my stenographic notes.
 3
 4                              Stephanie Austin
                               _____
 5                        Stephanie M. Austin, RPR, CRR

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                              80
```