# EXHIBIT 5

HIGHLY CONFIDENTIAL

Page 1

1

2          H I G H L Y   C O N F I D E N T I A L

3     IN THE UNITED STATES DISTRICT COURT

      FOR THE EASTERN DISTRICT OF VIRGINIA

4     ALEXANDRIA DIVISION

      -----------------------------x

5     UNITED STATES, et al.,

6                    Plaintiffs,

7            vs.                    Case No.

                                    1:23-cv-000108

8     GOOGLE LLC,

9                    Defendant.

      -----------------------------x

10

11

12                 HIGHLY CONFIDENTIAL

13        VIDEOTAPED DEPOSITION OF LUKE LAMBERT

14               New York, New York

15             Tuesday, August 29, 2023

16                    9:37 a.m.

17

18

19

20

21

22

23     Reported by:

       Jennifer Ocampo-Guzman, CRR, CLR

24     Job No. CS6079449

25

HIGHLY CONFIDENTIAL

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8                   August 29, 2023
 9                   9:37 a.m.
10
11
12          HIGHLY CONFIDENTIAL
13          Videotaped Deposition of LUKE
14      LAMBERT, held at the offices of Latham
15      & Watkins, LLP, 1271 Avenue of the
16      Americas, New York, New York, pursuant
17      to subpoena, before Jennifer
18      Ocampo-Guzman, a Certified Realtime
19      Shorthand Reporter and Notary Public of
20      the State of New York.
21
22
23
24
25
```

Page 3

```
 1
 2      A P P E A R A N C E S :
 3
 4      UNITED STATES DEPARTMENT OF JUSTICE
 5      Attorneys for Plaintiff United States
 6          450 5th Street, NW, Suite 7000
 7          Washington, DC 20530
 8      BY:  KATHERINE E. CLEMONS, ESQ.
 9          RACHEL ZWOLINKSKI, ESQ.
10          ALVIN CHU, ESQ., (via Zoom)
11
12      PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
13      Attorneys for Defendant Google LLC
14          1285 Avenue of the Americas
15          New York, New York 10019
16      BY:  ERIN J. MORGAN, ESQ.
17          LEAH HIBBLER, ESQ.
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2      APPEARANCES (Continued):
 3
 4      LATHAM & WATKINS
 5      Attorneys for Omnicom Holdings and the
 6      Deponent
 7          505 Montgomery Street, Suite 2000
 8          San Francisco, California 94111
 9      BY:  NIALL LYNCH, ESQ.
10          AARON CHIU, ESQ.
11          KAILEN MALLOY, ESQ., (via Zoom)
12
13      ALSO PRESENT:
14          MARCELO RIVERA, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          HIGHLY CONFIDENTIAL
 2          THE VIDEOGRAPHER:  Good morning.
 3      We are going on the record at 9:37 a.m.,
 4      on August 29, 2023.  Please note that
 5      the microphones are sensitive and may
 6      pick up whispering and private
 7      conversations.  Please mute your phones
 8      at this time.  Audio and video recording
 9      will continue to take place unless all
10      parties agree to go off the record.
11      This is the media unit 1 of the
12      video-recorded deposition of Mr. Luke
13      Lambert, in the matter, United States,
14      et al., versus Google LLC.  This
15      deposition is being held at Latham &
16      Watkins, located at 1271 Avenue of the
17      Americas, New York, New York.  My name
18      is Marcelo Rivera, representing Veritext
19      Legal Solutions, and I am the
20      videographer.  The court reporter is
21      Jennifer Ocampo-Guzman in association
22      with Veritext Legal Solutions.
23          I am not related to any party in
24      this action, nor am I financially
25      interested in the outcome.  If there are
```

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

```
1         LAMBERT - HIGHLY CONFIDENTIAL
2   billing and maintenance tool.
3       Q.  When you send the insertion order
4   to yourselves, is there a pay term that you
5   are obligated to pay Google?
6       A.  It is the pay term.  There is no
7   change in the pay term.
8       Q.  To your knowledge, does the Army
9   contract directly with Google for the
10  services that Omnicom uses from Google on the
11  Army's behalf?
12          MS. CLEMONS:  Objection, form.
13      A.  To my knowledge, no.
14      Q.  Do invoices for Google services
15  provided to Omnicom for the Army --
16          MS. MORGAN:  Let me ask that a
17      different way.
18      Q.  Do invoices for Google services
19  used by Omnicom agencies on behalf of the
20  Army come to Omnicom?
21      A.  Yes.
22      Q.  Does Omnicom pass those costs on to
23  the Army?
24      A.  Yes.
25      Q.  And does Omnicom pay Google for the
```

```
1         LAMBERT - HIGHLY CONFIDENTIAL
2   services Google provides to Omnicom customers
3   under the evergreen Google agreement?
4          MS. CLEMONS:  Objection, form.
5       A.  Omnicom pays Google.
6       Q.  Does Omnicom pay Google for
7   services used by Omnicom on the Army's
8   behalf?
9       A.  Omnicom pays Google.
10      Q.  Are you familiar with the contracts
11  between Omnicom agencies and CMS?
12      A.  No.
13      Q.  Do you have any reason to think
14  that -- well, do the Omnicom agencies that
15  work with CMS use Google products on behalf
16  of CMS?
17          MS. CLEMONS:  Objection, form,
18      foundation.
19      A.  Yes.
20      Q.  What products?
21      A.  DV360 and Campaign Manager and Ads
22  360.  So programmatic, ad serving and search.
23      Q.  Do the Omnicom agencies that work
24  with CMS contract directly with Google for
25  use of those services on CMS' behalf?
```

```
1         LAMBERT - HIGHLY CONFIDENTIAL
2          MS. CLEMONS:  Objection, form,
3      foundation.
4       A.  Yes.
5       Q.  Are the Omnicom agencies that work
6   with CMS billed by Google for the services
7   that Omnicom agencies use on behalf of CMS?
8          MS. CLEMONS:  Objection, form,
9      foundation.
10      A.  Is your question, does Google bill
11  Omnicom?
12      Q.  Yes.
13      A.  Yes.
14      Q.  Thank you.
15          Does Omnicom pay Google directly
16  for the services used on behalf of CMS?
17          MS. CLEMONS:  Objection, form.
18      A.  Yes.
19      Q.  And does Omnicom pass on those
20  costs to CMS?
21      A.  Yes.
22      Q.  I'm going to ask you the same
23  questions about NHTSA.
24          Are you familiar with the NHTSA
25  contracts between -- are you familiar with
```

```
1         LAMBERT - HIGHLY CONFIDENTIAL
2   the contracts between NHTSA and the Omnicom
3   agencies that work with NHTSA?
4       A.  I do not know the scopes.
5       Q.  Do you know if NHTSA -- or if
6   Omnicom uses Google products on behalf of
7   NHTSA?
8       A.  They do.
9       Q.  And what are the products?
10      A.  DV360, Ads and Campaign Manager.
11      Q.  Does Google, does Omnicom contract
12  directly with Google for use of those tools
13  on NHTSA's behalf?
14      A.  Yes.
15          MS. CLEMONS:  Objection, form.
16      Q.  Does Omnicom pay Google directly
17  for use of those tools on NHTSA's behalf?
18          MS. CLEMONS:  Objection, form.
19      A.  Yes.
20      Q.  Does Omnicom pass those costs on to
21  NHTSA?
22      A.  Yes.
23      Q.  Do you know whether NHTSA or CMS
24  contracts directly with Google for use of any
25  Google tools?
```

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 222

LAMBERT - HIGHLY CONFIDENTIAL
1
2     A.  I don't know what their GMP
3   contract entails.
4     Q.  Are you aware that between the fall
5   of 2019 through 2021, the Department of
6   Justice conducted an investigation into
7   Google's ad tech business?
8       MS. CLEMONS:  Objection, form.
9     A.  I'm sorry.  Can you --
10    Q.  New topic.
11      Are you aware that between the fall
12  of 2019 throughout 2021, the Department of
13  Justice conducted an investigation into
14  Google's ad tech business?
15      MS. CLEMONS:  Same objection.
16    A.  Yes.
17    Q.  Did you meet with the Department of
18  Justice on a voluntary basis at any time
19  between 2019 and 2021?
20      MS. CLEMONS:  Objection, form.
21    A.  No.
22    Q.  Do you know if anyone at Omnicom
23  met with the Department of Justice during
24  that two-year period, between 2019 and 2021?
25    A.  I do not know.

Page 223

LAMBERT - HIGHLY CONFIDENTIAL
1
2     Q.  You don't know one way or the other
3   or --
4     A.  I just don't know.
5     Q.  Did Omnicom produce documents to
6   the Department of Justice during that period
7   of time, from 2019 to 2021?
8     A.  Yes.
9     Q.  Were those documents produced in
10  response to a subpoena or other legal
11  process?
12    A.  Yes.
13    Q.  Did Omnicom produce any documents
14  voluntarily without a subpoena?
15    A.  I do not know.
16    Q.  Do you know what the documents are
17  that were produced to the Department of
18  Justice in connection with that
19  investigation?
20    A.  In total?
21    Q.  Do you have a sense of what topics
22  they covered?
23    A.  Yes.
24    Q.  What did they cover?
25    A.  Communications on Google, any

Page 224

LAMBERT - HIGHLY CONFIDENTIAL
1
2   contracts I believe that we had.  You have
3   some of my e-mails from that time period.
4     Q.  Did you participate in the process
5   of collecting documents for the DOJ
6   investigation?
7     A.  Yes.
8     Q.  What was your role?
9     A.  Saving my documents.
10    Q.  Good one.
11      Are you aware that the Department
12  of Justice has brought a litigation against
13  Google in the Eastern District of Virginia
14  related to its ad tech business?
15    A.  I don't know what that means.
16    Q.  Do you know that the Department of
17  Justice sued Google related to its ad tech
18  business?
19    A.  Yes.
20    Q.  We talked about whether you met
21  with the Department of Justice between 2019
22  and 2021.  Have you met with the Department
23  of Justice since 2021?
24    A.  Yes.
25    Q.  How many times?

Page 225

LAMBERT - HIGHLY CONFIDENTIAL
1
2     A.  Two.
3     Q.  When was the first time?
4     A.  Within the last three months.
5     Q.  How long was that meeting?
6     A.  Maybe 45 minutes.
7     Q.  Was it in person?
8     A.  No.
9     Q.  Was it over the phone?
10    A.  No.
11    Q.  Was it on videoconference?
12    A.  It was.
13    Q.  Who else attended the interview?
14    A.  Myself, Megan Frisbie, Danielle
15  Atanda.
16    Q.  Who is Megan Frisbie?
17    A.  Megan Frisbie is the Annalect lead
18  for The U.S. Army business at Team DDB.
19    Q.  And who is Danielle Atanda?
20    A.  Danielle Atanda is the client
21  business lead for OMD on Team DDB at The U.S.
22  Army.
23    Q.  How many -- well, were there
24  lawyers from the DOJ there?
25    A.  Yes.

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL

Page 226

1    LAMBERT - HIGHLY CONFIDENTIAL
2        Q.   Do you know how many?
3        A.   No.
4        Q.   More than one?
5        A.   I don't know.
6        Q.   Do you remember who any of the DOJ
7    lawyers were that were there?
8        A.   I don't.
9        Q.   Do you remember if there was anyone
10   there from the states there are plaintiffs in
11   this case?
12       A.   I do not believe there was anyone
13   from states that were plaintiffs.
14       Q.   Was there anyone there besides the
15   people you've mentioned from Omnicom,
16   yourself, Megan Frisbie, Danielle Atanda and
17   lawyers from the Department of Justice?
18       A.   Yes.
19       Q.   Who else was there?
20       A.   There was a gentleman that was
21   presented as either an economist or at least
22   a data analyst.
23       Q.   And what was his name?
24       A.   I don't recall.
25       Q.   Did he speak in the meeting or just

Page 227

1    LAMBERT - HIGHLY CONFIDENTIAL
2    listened?
3        A.   The meeting was effectively a
4    conversation between us and him.
5        Q.   Did you have a lawyer there?
6        A.   Yes.
7        Q.   Who was there with you?
8        A.   These two gentleman to my left.
9        Q.   I'm not surprised.
10           What did you talk about in that
11   meeting?
12       A.   Campaign reporting.
13       Q.   What kinds of questions did the
14   Department of Justice ask you about campaign
15   reporting?
16       A.   Can you provide campaign reports
17   across all Google investments and
18   activations.
19       Q.   Is that specifically in connection
20   with the Army?
21       A.   It was.
22       Q.   Do you think that was in the last
23   three months, so some time between May and
24   now?
25       A.   That feels accurate.

Page 228

1    LAMBERT - HIGHLY CONFIDENTIAL
2        Q.   Did the Department of Justice ask
3    you about anything besides campaign reports
4    related to the Army?
5        A.   Yes.
6        Q.   What else did they ask you about?
7        A.   General ecosystem, to understand
8    what would be in the columns of these
9    campaign reports.
10       Q.   Did they ask you questions about
11   Google products?
12       A.   Only those that were in headers of
13   the campaign report.
14       Q.   What products were in headers of
15   the campaign report?
16       A.   DV360 would be a product that would
17   be in there.  Ads would be in there.  The ad
18   server would be in there.
19       Q.   Did you take documents with you for
20   that meeting, or did you give the Department
21   of Justice documents in connection with that
22   meeting?
23       A.   This is the first meeting?
24       Q.   Yeah.
25       A.   We did not bring any documentation

Page 229

1    LAMBERT - HIGHLY CONFIDENTIAL
2    to that meeting.  We brought our brains.
3        Q.   Did the Department of Justice
4    already have campaign reports?
5        A.   Yeah.
6        Q.   Did you look at any campaign
7    reports during the meeting?
8        A.   With the Department of justice,
9    like looked at them on screen?
10       Q.   Yes, like on screen.
11       A.   No.
12       Q.   Did the Department of Justice
13   reference any specific campaign reports that
14   they were asking you about?
15       A.   They didn't know what campaign
16   reports were.
17       Q.   What did they ask you about, the
18   general ecosystem besides the headers in the
19   campaign reports?
20       A.   Similar to this conversation, how
21   we buy, what we buy, specifically for The
22   U.S. Army activations.
23       Q.   Then did they show you any
24   documents during that meeting at all?
25       A.   Not to my recollection.

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

LAMBERT - HIGHLY CONFIDENTIAL
1
2    Q.   Let's talk about the second
3 meeting.  When was that?
4    A.   Within I believe a week or two,
5 maximum.
6    Q.   Of the first meeting?
7    A.   Yes.
8    Q.   So the first meeting and a week
9 or two later you had a second meeting?
10    A.   That's correct.
11    Q.   How long was that meeting?
12    A.   Again maybe 45 minutes, under an
13 hour.
14    Q.   Was it also on video conference?
15    A.   It was.
16    Q.   Was it attended also by Megan
17 Frisbie and Danielle Atanda?
18    A.   I don't know if Danielle joined.  I
19 wanna say, yes.  And definitely Megan
20 Frisbie.
21    Q.   Were there lawyers for the
22 Department of Justice also at that meeting?
23    A.   I want to say, yes, because I
24 assume these people were lawyers, but I
25 cannot recall being introduced to lawyers.

LAMBERT - HIGHLY CONFIDENTIAL
1
2    Q.   Were there people from the
3 Department of Justice there?
4    A.   Yeah.
5    Q.   Was the economist/data analyst that
6 you mentioned also there?
7    A.   Yep.
8    Q.   Were there any other experts like
9 that?
10    A.   No.
11    Q.   Was anyone else there besides your
12 counsel?
13    A.   No.
14    Q.   No one from the states?
15    A.   No.
16    Q.   What did you talk about in that
17 meeting?
18    A.   The volume of data and how we could
19 actually produce what they really needed.
20    Q.   What data were they looking for?
21    A.   All of it.
22    Q.   When you say "All of it," what do
23 you mean?
24    A.   I'm talking about terabytes of
25 data, of line items, campaigns over the

LAMBERT - HIGHLY CONFIDENTIAL
1
2 course of the history of the client.
3    Q.   And you're talking about data
4 specifically related to Omnicom's
5 relationship with the Army?
6    A.   Yes.
7    Q.   And the data that they were looking
8 for covered the entirety of the relationship,
9 so going all the way back like five years?
10    A.   Yes.
11    Q.   When was the first time that they
12 asked you for this data?
13    A.   In the first meeting.
14    Q.   Did they serve you with a document
15 subpoena before the first meeting?
16    A.   I was not served.
17    Q.   Do you know if Omnicom received a
18 document subpoena before the first meeting?
19    A.   I do not know.
20    Q.   Besides the volume of data, what
21 else did you discuss in the second meeting?
22    A.   How the volume of data would not
23 provide them the insight that I think they
24 were looking for, nor could they tell us what
25 they needed so that we can make it easy on

LAMBERT - HIGHLY CONFIDENTIAL
1
2 them.
3    Q.   What is the insight you think they
4 were looking for?
5    A.   I quite literally think they wanted
6 to know, column by column, what impressions
7 were being, quite literally a campaign
8 report, where were the dollars moving and
9 why.
10    Q.   Did you take documents to that
11 meeting?
12    A.   We did.
13    Q.   What documents did you take?
14    A.   We brought a template to see if the
15 template would be something that would
16 suffice.
17    Q.   And when you say "a template," are
18 you talking about a template campaign report?
19    A.   Yes.
20    Q.   And when you refer to "a template,"
21 are you talking about something that didn't
22 exist but that you created for the meeting?
23    A.   We did create this template for
24 this meeting, but templates like this do
25 exist.

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

Page 234
LAMBERT - HIGHLY CONFIDENTIAL
1  LAMBERT - HIGHLY CONFIDENTIAL
2     Q.  Did you provide the template to the
3  Department of Justice, or did you give it to
4  them?
5     A.  Yes.
6     Q.  Did you give it also to the
7  economist?
8     A.  Yes.
9     Q.  Did they ask you for additional
10 documents after that meeting?
11    A.  They never even asked us to fill in
12 the template.
13    Q.  Did they ask you any questions
14 about Google at the second meeting?
15    A.  It was -- the crux of the
16 conversation was Google templates, Google
17 data, campaign data, campaign reports.
18    Q.  Did they ask you for any
19 information about Google that was not data
20 related?
21    A.  No.
22    Q.  Did they ask you for opinions about
23 Google?
24    A.  No.
25    Q.  Did the Department of Justice ever

Page 236
1  counsel.
2     Q.  Do you know if your counsel spoke
3  about it with the Department of Justice?
4     A.  I do not know, but I do not think
5  so.
6     Q.  Did you have a conversation about,
7  if your counsel had any meetings with the
8  Department of Justice without you?
9     MR. LYNCH:  Wait.  Hold on.  I just
10 want to make sure you're not asking for
11 any attorney-client communications
12 between us.
13    MS. MORGAN:  I'm not asking for any
14 privileged communications.
15    Q.  I'm just asking about, do you know
16 whether, it's a yes or no question:  Do you
17 know whether your counsel met with the
18 Department of Justice without you at any
19 point?
20    A.  No.
21    Q.  No, you don't know.
22    MS. MORGAN:  I think I'm about to
23 wrap up.  Can we go off the record for
24 like three minutes so we can go talk and

Page 235
1  LAMBERT - HIGHLY CONFIDENTIAL
2  talk to you about the possibility of being a
3  witness at the trial in this case?
4     A.  Yes.
5     Q.  What was that conversation?
6     A.  We are talking about -- two
7  different meetings, I want to make sure that
8  I know which -- you are talking about the
9  Army portion or the thing that we are doing
10 today, that was all today?  Are they have the
11 same thing?  I don't know.
12    Q.  I guess let me try to like zoom out
13 for a second.
14    You said that the Department of
15 Justice spoke to you at some point about
16 potentially being a trial witness in this
17 case.  When did that conversation happen?
18    A.  I asked counsel within the last two
19 weeks what the next kind of procedural step
20 is after a deposition.
21    Q.  Did you talk about whether you
22 would be a trial witness with the Department
23 of Justice, or did you only talk about it
24 with your counsel?
25    A.  I only spoke about it with my

Page 237
1  LAMBERT - HIGHLY CONFIDENTIAL
2  get all of Leah's insights?
3     MR. LYNCH:  Do you want us just to
4  hang out here then?
5     MS. MORGAN:  You can take a break
6  or whatever you want to do really.
7     THE VIDEOGRAPHER:  The time is
8  3:39 p.m.  We are going off the record.
9     (A brief recess was taken.)
10    THE VIDEOGRAPHER:  The time is
11 3:46 p.m.  We are going back on the
12 record.
13    Q.  Before we took our break, we were
14 talking about a conversation you had with the
15 department -- or two conversations you had
16 with the Department of Justice about data.
17 To be clear, did Omnicom have data that shows
18 purchases on Army's behalf through Google
19 products?
20    A.  Yes.
21    Q.  How far back does that data go?
22    A.  Since the start of the contract.
23    Q.  And is that maintained on Army's
24 behalf so Army can access it?
25    MS. CLEMONS:  Objection to form.

60 (Pages 234 - 237)

Veritext Legal Solutions
800-567-8658                                973-410-4098

HIGHLY CONFIDENTIAL

Page 238

LAMBERT - HIGHLY CONFIDENTIAL
1
2    A.  It is.
3         And I also want to edit my answer.
4  I believe they purge after three years on
5  data.
6         And I wanted to clarify, we had a
7  question with like a bit of a hanging chat on
8  did I talk to them about being a witness.
9    Q.  Oh, yeah.
10    A.  I talked with my counsel about
11  being in the next stage in this, about could
12  I be called as a witness for whatever that
13  next round is, and they said, yes, Google or
14  the DOJ could do that and I said okay.
15    Q.  Thank you for the clarification.
16         So you have data, Omnicom has data
17  going back at least three years that shows
18  purchases on Army's behalf for Google's
19  products?
20    A.  Yes.
21    Q.  Did you offer that data to the
22  Department of Justice?
23    A.  That would be the template we were
24  speaking about.
25    Q.  And you said that after the second

Page 239

1    LAMBERT - HIGHLY CONFIDENTIAL
2  meeting you had with the Department of
3  Justice, they never followed up with you on
4  getting that template?
5    A.  That's correct.
6         MS. CLEMONS:  Objection, form,
7  foundation.
8    A.  That's correct.
9    Q.  Do you know if DOJ has tried to get
10  that data from Omnicom since your meeting?
11    A.  I do not believe they have.
12         MS. MORGAN:  I have no further
13  questions for now.  I'll just reserve
14  the rest of my time.
15         MR. LYNCH:  Do you want take
16  another break?
17         MS. CLEMONS:  If we could take like
18  ten minutes, that would be helpful.
19         MR. LYNCH:  Sure.
20         THE VIDEOGRAPHER:  The time is
21  3:49 p.m. and we are going off the
22  record.
23         (A brief recess was taken.)
24         THE VIDEOGRAPHER:  The time is
25  4:09 p.m.  We are back on the record.

Page 240

1    LAMBERT - HIGHLY CONFIDENTIAL
2  EXAMINATION BY
3  MS. CLEMONS:
4    Q.  Mr. Lambert, I am going to ask you
5  to refer back to Exhibit 1, if you have that
6  somewhere available.
7         THE WITNESS:  I gave them all to
8  the court reporter.
9         Thank you.
10    Q.  Do you recall testifying earlier
11  about this document?
12    A.  I do.
13    Q.  And you described this document as
14  a tactical recommendation or reco I think is
15  the term you used; is that right?
16    A.  That's correct.
17    Q.  So is it fair to say, based on the
18  title of this document and the use of
19  recommendation throughout, that this was not
20  a final approved plan at the time that DDB
21  created the document?
22    A.  That's exactly --
23         MS. MORGAN:  Objection, form.
24         MR. LYNCH:  You can answer.
25    A.  That's exactly right.

Page 241

1    LAMBERT - HIGHLY CONFIDENTIAL
2    Q.  So could DDB or OMD execute any of
3  the recommendations in this document without
4  Army's approval?
5    A.  No.
6    Q.  How often does your team at OMD
7  communicate with representatives of Army?
8         MS. MORGAN:  Objection, form.
9    A.  Daily.
10    Q.  What kinds of communications do you
11  have daily with representatives of Army?
12    A.  Should I speak just to OMD or Team
13  DDB?
14    Q.  Start with OMD.
15    A.  I don't think there's much
16  difference.  I just want to be clear.
17         OMD has, you know, standing
18  statuses.  They have reviews.  We have, you
19  know, retrospectives and scrums.  There is
20  just standing meetings, and then there is
21  review meetings that happen as well.
22    Q.  What kinds of topics are discussed
23  at the review meeting?
24    A.  Tactical recommendations are
25  discussed, current performance and trends are

61 (Pages 238 - 241)

Federal Rules of Civil Procedure

Rule 30

(e)  Review  By  the  Witness;  Changes.

(1)  Review;  Statement  of  Changes.  On  request  by  the
deponent  or  a  party  before  the  deposition  is
completed,  the  deponent  must  be  allowed  30  days
after  being  notified  by  the  officer  that  the
transcript  or  recording  is  available  in  which:

(A)  to  review  the  transcript  or  recording;  and

(B)  if  there  are  changes  in  form  or  substance,  to
sign  a  statement  listing  the  changes  and  the
reasons  for  making  them.

(2)  Changes  Indicated  in  the  Officer's  Certificate.
The  officer  must  note  in  the  certificate  prescribed
by  Rule  30(f)(1)  whether  a  review  was  requested
and,  if  so,  must  attach  any  changes  the  deponent
makes  during  the  30-day  period.

DISCLAIMER:  THE  FOREGOING  FEDERAL  PROCEDURE  RULES
ARE  PROVIDED  FOR  INFORMATIONAL  PURPOSES  ONLY.
THE  ABOVE  RULES  ARE  CURRENT  AS  OF  APRIL  1,
2019.  PLEASE  REFER  TO  THE  APPLICABLE  FEDERAL  RULES
OF  CIVIL  PROCEDURE  FOR  UP-TO-DATE  INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.