# EXHIBIT 10

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2001 K STREET, NW       WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019-6064
TELEPHONE (212) 373-3000

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

HONG KONG CLUB BUILDING, 12TH FLOOR
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

WRITER'S DIRECT DIAL NUMBER

(202) 223-7317

WRITER'S DIRECT FACSIMILE

(202) 204-7359

WRITER'S DIRECT E-MAIL ADDRESS

jkanter@paulweiss.com

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
PO BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

October 17, 2019

**HIGHLY CONFIDENTIAL**
**CONFIDENTIAL TREATMENT REQUESTED**

To the Members of the Subcommittee on Antitrust, Commercial and Administrative Law:

I am writing on behalf of my client, News Corporation ("News Corp") in response to your request for information dated September 13, 2019. We thank the Committee for this opportunity to provide information regarding its investigation.

We are providing the information in this letter and the attached documents to respond to those requests for which News Corp has useful information. We will also follow up with additional information. For this submission, we have prioritized relevant information regarding: (1) several submissions that News Corp has made to authorities in other jurisdictions, including Australia, the United Kingdom, France, and Texas; (2) more detailed explanations of Google's anticompetitive conduct (a very brief overview of which is provided in this letter); and (3) details about the impact of Google's behavior has had on the news media.

Congress has consistently recognized that the news media is not just a consumer product but a cornerstone of democracy. Functioning markets must encourage investment and reward companies for developing and introducing high quality and innovative products. In the news media, this means rewarding companies for investments in original journalism.

As the enclosed documents reflect, the marketplace for digital platforms and ad tech space has become distorted such that, instead of the enterprising news organizations benefiting from their investments, the dominant online platforms like Google benefit instead.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

To help to try to restore fair competition to the marketplace, News Corp has supported the Journalism Competition and Preservation Act (JCPA) proposed by several members of this Committee. The JCPA would address some of the downside effects of dominant platform monopolies by allowing news publishers to collectively negotiate with the platforms like Google to help to restore fair competition to the marketplace.

Even the JCPA, however, will not address the core problem, which is that dominant platforms have established durable monopoly power. More vigorous and vigilant antitrust enforcement is needed. To that end, News Corp has also recommended that Congress consider creating a new department within the Federal Trade Commission to focus on the unique challenges that digital platforms present to traditional antitrust analysis. The Commission has already developed a task force to address these types of issue, and it should be commended, but a more permanent solution is necessary.

Below we provide additional context regarding the content of documents enclosed with this information request.

1. **Overview of Google's threat to ad tech competition**

Google relies on a multi-sided, ad-funded business model, providing "free" services to users, and then monetizing the data it collects from those users through advertising. Google monetizes user data both by selling ads that appear on its own services, such as its dominant online search service, and through its full suite of ad tech products that it sells to digital advertisers and publishers. That suite of ad tech products includes publisher and advertiser ad servers, ad networks, and an exchange.

Google did not acquire its dominant suite of ad tech products through competition on the merits. Rather, Google first bought the leading ad tech product at each point in the stack, acquiring DoubleClick in 2007, AdMob and Invite Media in 2010, and AdMeld in 2011. In each case, federal antitrust regulators approved Google's acquisitions. They repeatedly dismissed concerns that Google would begin tying different products, use its new acquisitions to steer inventory into its own distribution channels, or combine its user data with its new ad tech tools to exclude competitors.[1] In short time,

---

[1] See, e.g., U.S. Federal Trade Commission, Statement of the Federal Trade Commission concerning Google/DoubleClick (Dec. 20, 2007), https://www.ftc.gov/system/files/documents/public_statements/418081/071220googledc-commstmt.pdf:

> [I]t has been suggested that Google could bundle or tie DoubleClick's ad serving technology with its AdSense product in an effort to force publishers to use AdSense. It also has been suggested that Google could manipulate the DoubleClick software in an effort to steer publishers to AdSense. Finally, it also has been suggested that Google would gain

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3

however, those concerns proved to be well-founded. Google began to engage in each of these types of practices to the detriment of competitor.

Over the same period that it was making its ad tech acquisitions, Google also acquired various consumer-facing products and services—such as YouTube, Keyhole (now Google Maps), Waze, Android, and others. Google has been able to harvest data from those services for ad targeting. Originally, after the DoubleClick acquisition, Google had promised to keep DoubleClick's massive database of web-browsing records separate by default from the names and other personally identifiable information Google collected from its consumer-facing services. But in summer 2016, Google quietly erased the lines in its privacy policy that promised to keep the two sets of data separate. In its place, Google substituted new language that says browsing habits "may be" combined with what the company learns from the use Gmail and other tools.[2]

Google has engaged in a variety of other anticompetitive practices to expand its leading ad tech positions into a monopoly. Google has altered its exclusionary ad tech strategies over the past decade. Its current practices focus primarily on using its dominant publisher ad server (which publishers use to decide how to monetize their ad inventory) to drive ad impressions to its own exchange and to disadvantage or exclude rivals. into its own ad exchange (a clearing house where advertisers bid on ad inventory). Google thus is able to extract a supracompetitive share of advertising revenues and undermine publishers' ability to monetize their content.

For instance, Google steers publishers' inventory into its ad exchange through a feature in its former DoubleClick for Publishers (DFP)[3] product known as "Dynamic Allocation." Dynamic Allocation and its successor, "Enhanced Dynamic Allocation" essentially tweaks the logic of DFP to give systematic preference to Google's DoubleClick Ad Exchange (AdX). While DFP prevents Google's rivals from bidding on DFP inventory in real-time, Dynamic Allocation gives AdX the ability to do so. As a result, AdX can win ad impressions at will—often at artificially low prices—ahead of other intermediaries.

---

      access to competitively sensitive information in this acquisition that it could use to its advantage in the ad intermediation market. These arguments would raise antitrust concern if the evidence supported the conclusion that such conduct is likely to provide Google market power in the ad intermediation market. However, we have found that the evidence does not support that conclusion.

[2] Julia Angwin, *Google Has Quietly Dropped Ban on Personally Identifiable Web Tracking*, ProPublica (Oct. 21, 2016), https://www.propublica.org/article/google-has-quietly-dropped-ban-on-personally-identifiable-web-tracking

[3] Google has since merged DFP into DoubleClick Ad Exchange (AdX), branding both Google Ad Manager. For clarity, we refer to them separately here as DFP and AdX.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

4

For digital publishers, the only way to avoid the revenue-decreasing effects of Dynamic Allocation is to sign themselves up for another DFP feature known as "Exchange Bidding." Google claims that Exchange Bidding allows rival demand sources to compete with AdX on equal footing, but Google's non-transparent auction continues to give AdX a systematic advantage. Because Google controls the bidding process, it can use competitors' bidding data to inform its own bids. Google's AdX has also enjoyed a "last look" advantage, giving it the final say on each ad impression.

These practices, among many others, have had a devastating impact on competition in ad tech both individually and collectively. Google has established durable monopoly positions, aided by the presence of strong network effects in ad tech markets. Thanks to those network effects, Google now controls so much inventory and demand that even if it stopped all of its anticompetitive practices, its monopoly power could survive indefinitely. As a result, many ad tech companies have already left the market, and others are just barely surviving. Publishers and advertisers thus have nowhere else to turn for ad tech.

Today, publishers and advertisers are stuck in an ad tech ecosystem controlled by a monopolistic provider with severe conflicts of interest. Not only does Google control the dominant tools on both the buy-side and sell-side of the digital advertising market, but Google is also the world's biggest buyer and seller of ad inventory on that market. From that position, Google has the ability to manipulate supply and demand to structure the market in a way that maximizes its own profits. The situation is analogous to one in which a monopolistic financial exchange also controlled all the important brokerages and was unrestrained by any rules against self-dealing or manipulation. We would never allow that kind of situation to persist in financial markets, and we should not allow it in digital advertising markets either.

2. **The Journalism Competition and Preservation Act**

Even with more vigorous antitrust enforcement, the ad tech market must struggle with the interim question of how news publishers survive in an online world where Google takes up to 70 percent of advertising revenues for itself. One solution, proposed by Representatives Cicilline, Collins, and others, has been the JCPA.

The JCPA would establish a limited, 48-month-long safe harbor for publishers, during which they can cooperate and coordinate with one another before negotiating against the dominant online platforms, such as Google. The Act requires that the benefits of any collective negotiation extend to all news content creators, not just those directly involved in the negotiations.

The JCPA serves both the interests of the antitrust laws—which aim to preserve competition in markets—and the First Amendment—which aims to promote the spread of information. It is narrowly tailored to address the imbalance in bargaining power between news publishers and dominant platforms, which itself is the product of

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

5

anticompetitive conduct. The JCPA thus re-levels the playing field in a way that will allow news publishers to survive until the digital advertising market becomes more competitive.

### 3. Digital Bureau of Technology

News Corp also endorses the formation of a new digital bureau of technology at the FTC to address the varied and novel issues presented by digital platforms. New resources are necessary to address the special antitrust and consumer protection challenges that digital platforms present. Because of the diverse nature of digital platforms, it is difficult to offer a "one-size-fits-all" approach for analyzing possibly anti-competitive conduct, offering remedies, and providing guidance for enforcement of these remedies.

Among other things, such a bureau department could help the Commission assess whether traditional antitrust analysis, with its focus on price and output, is optimal for evaluating anticompetitive behavior in the digital platform context. It could also be valuable in helping the Commission survey the competitive landscape in a complicated tech market and properly balance benefits and anticompetitive harms, while also monitoring non-price and output variables, such as quality and innovation.

\*   \*   \*

We urge the Committee to consider seriously the impact that Google's conduct has had on news publishers and by extension, the news media generally. Aside from the impact the online platform's dominance has had on the bottom lines of many news publishers, Google has more importantly severely impacted the ability to operate of one of the few industries protected by our Constitution.

Sincerely,

*[signature]*

Jonathan S. Kanter