# EXHIBIT 16

HIGHLY CONFIDENTIAL

Page 1

1

2               IN THE UNITED STATES DISTRICT COURT

               FOR THE EASTERN DISTRICT OF VIRGINIA

3                    ALEXANDRIA DIVISION

4        _____

5     UNITED STATES,        )1:23-cv-00108-LMB-JFA

      et al.,               )

6                           )

          Plaintiffs,       )

7                           )

      vs.                   )

8                           )

      GOOGLE LLC,           )

9                           )

          Defendants.       )

10       _____)

11

12

                     VIDEOTAPED DEPOSITION OF

13

                     KENDALL OLIPHANT

14

                     August 9, 2023

15

                     9:32 a.m.

16

17

18

19

20

21

         Reported by:  Bonnie L. Russo

22       Job No. 6031956

HIGHLY CONFIDENTIAL

Page 2

1  Videotaped Deposition of Kendall Oliphant
2  held at:
3
4
5
6      Paul, Weiss, Rifkind, Wharton & Garrison, LLP
7           2001 K Street, N.W.
8              Washington, D.C.
9
10
11
12
13
14
15
16
17
18  Pursuant to Notice, when were present on behalf
19  of the respective parties:
20
21
22

Page 4

1  APPEARANCES (CONTINUED):
2
3
4  Also Present:
5  Glen Fortner, Videographer
6  Michael A. Cannon, Chief Counsel for Economic
7  Affairs, United States Department of Commerce
8
9  Also Present Via Remotely:
10  Julia Wood, DOJ
11  Jeannie S. Rhea, Paul, Weiss, Rifkind, Wharton
12  & Garrison, LLP
13
14
15
16
17
18
19
20
21
22

Page 3

1  APPEARANCES:
2
3  On behalf of the Plaintiffs:
4     RACHEL ZWOLINSKI, ESQUIRE
5     VICTOR LIU, ESQUIRE
6     ALVIN CHU, ESQUIRE
7     UNITED STATES DEPARTMENT OF JUSTICE
8     1331 Pennsylvania Avenue, N.W.
9     Washington, D.C. 20005
10    rachel.zwolinski@usdoj.gov
11
12  On behalf of the Defendant:
13     MARTHA L. GOODMAN, ESQUIRE
14     ANNELISE CORRIVEAU, ESQUIRE
15     PAUL, WEISS, RIFKIND, WHARTON &
16     GARRISON, LLP
17     2001 K Street, N.W.
18     Washington, D.C. 20006
19     mgoodman@paulweiss.com
20     acorriveau@paulweiss.com
21
22

Page 5

1           I N D E X
2  EXAMINATION OF KENDALL OLIPHANT        PAGE
3  BY MS. GOODMAN                12
4
5
6
7
          EXHIBITS
8
9  Exhibit 13  E-Mail Chain dated 1-17-23    48
10          CENSUS-ADS-0000244816-818
11
12  Exhibit 14  Integrated Communications    79
13          Contract
14          Version 2
15          10-5-18
16          CENSUS-ADS-0000387420-490
17
18  Exhibit 15  E-Mail dated 9-14-22        90
19          Attachment
20          CENSUS-ADS-0000248031-186
21
22

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1  EXHIBITS (CONTINUED):
2  Exhibit 16  E-Mail Chain dated 6-9-20      149
3        Attachment
4        CENSUS-ADS-0000168193-195
5
6  Exhibit 17  Order 15 - Media Strategy      154
7        2020 Census Integrated
8        Communications Contract
9        11-5-18
10        CENSUS-ADS-0000709936-991
11
12  Exhibit 18  2020 Census      165
13        Integrated Communications
14        Campaign Update
15        Congressional Staff Briefing
16        5-1-20
17        CENSUS-ADS-0000094975-010
18
19
20
21
22

Page 7

1  EXHIBITS (CONTINUED):
2  Exhibit 19  Campaign Optimization      182
3        Daily Report
4        4-3-20
5        Day 23 of Self-Response
6        CENSUS-ADS-0000709885-897
7
8  Exhibit 20  2020 Census Integrated      199
9        Communications Plan
10        Final Report
11        5-27-21
12
13  Exhibit 21  Award/ Contract      221
14        8-24-16
15        CENSUS-ADS-0000273284-378
16
17  Exhibit 22  2020 Census Integrated      244
18        Communications Contract
19        Acquisition Plan
20        Master Contract YA1323-16-CQ-0003
21        CENSUS-ADS-0000724090-113
22

Page 8

1  EXHIBITS (CONTINUED):
2  Exhibit 23  Order 15:  Media Buying      261
3        Process for Census PMO
4        CENSUS-ADS-0000696413-417
5
6  Exhibit 24  Department of Commerce      268
7        U.S. Census Bureau
8        Determination and Findings
9        CENSUS-ADS-0000243622-625
10
11  Exhibit 25  E-Mail Chain dated 3-3-20      296
12        CENSUS-ADS-0000204155-156
13
14  Exhibit 26  E-Mail Chain dated 7-7-22      274
15        CENSUS-ADS-0000709244-246
16
17  Exhibit 27  E-Mail Chain dated 9-2-22      279
18        Attachment
19        CENSUS-ADS-0000710075-081
20
21
22

Page 9

1  EXHIBITS (CONTINUED):
2  Exhibit 28  Order 15:  2020 Census      288
3        Paid Media Campaign Final
4        Buy List
5        10-30-20
6        CENSUS-ADS-0000080950-016
7
8  Exhibit 29  United States Census 2020      309
9        2020 Census Evaluation Report
10        CENSUS-ADS-0000074490-542
11
12  Exhibit 30  2020 Census Program Internal  312
13        Memorandum Series:
14        2023i.01.20c
15        1-6-23
16        CENSUS-ADS-0000074369-414
17  Exhibit 31  E-Mail Chain dated 12-7-22      322
18        CENSUS-ADS-0000245053-055
19  Exhibit 32  Order for Supplies or      330
20        Services
21        CENSUS-ADS-0000075450-493
22  (Exhibits bound separately.)

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1     P R O C E E D I N G S
2          (9:32 a.m.)
3
4          THE VIDEOGRAPHER:  Good morning.
5     We are going on the record at 9:32
6     on August 9, 2024 -- 2023.
7          Please note that the microphones are
8     sensitive and may pick up whispering and
9     private conversations.  Please mute your phones
10    at this time.  Audio and video recording will
11    continue to take place unless all parties agree
12    to go off the record.
13         This is Media Unit 1 of the
14    video-recorded deposition of Kendall Oliphant
15    in the matter of United States, et al. v.
16    Google LLC.  The location of the deposition is
17    Paul Weiss.
18         My name is Glen Fortner representing
19    Veritext, and I am the videographer.  The court
20    reporter is Bonnie Russo from the firm
21    Veritext.
22         I am not related to any party in

Page 11

1     this action, nor am I financially interested in
2     the outcome.  If there are any objections to
3     proceeding, please state them at the time of
4     your appearance.
5          Counsel and all present, including
6     remotely, will now state their appearances and
7     affiliations for the record beginning with the
8     noticing attorney.
9          MS. GOODMAN:  Martha Goodman of Paul
10    Weiss on behalf of the defendant, Google LLC,
11    and I am joined colleague Annelise Corriveau.
12         MS. ZWOLINSKI:  Rachel Zwolinski on
13    behalf of the United States.
14         MR. LIU:  Victor Liu on behalf of
15    the United States.
16         MR. CHU:  Alvin Chu on behalf of the
17    United States.
18         MR. CANNON:  Michael Cannon on
19    behalf of the United States.
20         MS. GOODMAN:  And do we have any
21    remote attendees?
22         MS. RHEE:  This is Jeannie Rhee from

Page 12

1     Paul Weiss.
2          MS. WOOD:  And Julia Wood from DOJ.
3     I will be in and out throughout the day.
4          THE VIDEOGRAPHER:  Will the court
5     reporter please swear in the witness, and then
6     counsel may proceed.
7
8          KENDALL OLIPHANT,
9     being first duly sworn, to tell the truth, the
10         whole truth and nothing but the truth,
11         testified as follows:
12    EXAMINATION BY COUNSEL FOR DEFENDANT
13         BY MS. GOODMAN:
14    Q.   Good morning, Ms. Oliphant.
15    A.   Good morning.
16    Q.   Was your last name previously
17    Johnson?
18    A.   Yes, it was.
19    Q.   Okay.  So if we look at documents
20    here today that refer to Kendall Johnson, that
21    is yourself, correct?
22    A.   That is myself, yes.

Page 13

1     Q.   Have you been deposed before?
2     A.   Once.
3     Q.   And was that in connection with your
4     work at the census bureau?
5     A.   No, it was not.
6     Q.   Okay.  When was that deposition?
7     A.   Thinking.  Maybe 2002, 2001, 2002.
8     Q.   So it's been 20-some odd years?
9     A.   Yes.
10    Q.   Okay.  Just some basic rules of the
11    road.
12         Your counsel may object.  Unless
13    they instruct you not to answer the question,
14    you should permit your counsel to object and
15    then proceed to answer the question.  Okay?
16    A.   Okay.
17    Q.   And to help Bonnie, our court
18    reporter, please wait for me to finish my
19    question, wait for your counsel to object, if
20    any, and then proceed with your answer so that
21    we're not talking over each other.  Sound good?
22    A.   Sounds good.

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 30

BY MS. GOODMAN:

2    Q.  And --

3    A.  -- that would relate to paid media.

4    Q.  So am I understanding your testimony
correctly that Deb made a comment to you that
sometimes it's not good -- it's good not to be
aware of things or be an expert in things and
that that related to paid media; is that right?

9    MS. ZWOLINSKI: Objection. Form.
Foundation.

11    THE WITNESS: It was an
acknowledgement of the suit in that I was
involved, and that's it. I am characterizing
based on a vague menu -- I mean memory, just
being honest.

16    Q.  Do you recall when this comment was
made?

19    A.  I honestly don't.

20    Q.  And do you recall the context or the
conversation in which it came up?

22    MS. ZWOLINSKI: Objection. Form.

Page 31

THE WITNESS: I honestly don't. It
was appropriate, but I can't recall what else
was discussed.

4    BY MS. GOODMAN:

5    Q.  And did you understand her comment
to mean that it's good for you not to
necessarily be an expert in paid media or for
who not be an expert in paid media?

9    MS. ZWOLINSKI: Objection. Form.

10    THE WITNESS: I would -- I can't
assume what she thought. My interpretation was
that she was not, so that -- I don't know. No
one wants to be here.

14    BY MS. GOODMAN:

15    Q.  Did you understand that in any way
as to your expertise in paid media or...?

17    MS. ZWOLINSKI: Objection. Form.

18    THE WITNESS: Yes.

19    BY MS. GOODMAN:

20    Q.  And what did you understand her to
mean with respect to your expertise in paid
media?

Page 32

MS. ZWOLINSKI: Objection. Form.

2    THE WITNESS: That I manage that
order. I was the one that had the -- the most
knowledge of it.

5    BY MS. GOODMAN:

6    Q.  I see. Based on what you can recall
sitting here today, is it correct or incorrect
to say that the side comment that we're
discussing came up in the context of a
conversation with respect to who from the census
bureau would be tasked with
participating in this lawsuit?

13    MS. ZWOLINSKI: Objection. Form.

14    THE WITNESS: Can you repeat that,
please.

16    BY MS. GOODMAN:

17    Q.  Did the side comment that we're
discussing -- and I am using "side comment" as
a shorthand -- did that come up in the context
of a conversation about who from the census
bureau would participate in this lawsuit?

22    A.  I don't believe so. That's not -- I

Page 33

don't -- that's not correct.

2    Q.  Okay. And just for the record, best
recollection sitting here today, any more
details about the context in which the side
comment came up?

6    A.  Not that I can recall.

7    Q.  Okay. What is your title?

8    A.  Chief of the contract management --
contract program office in the communications
directorate of the census bureau.

11    Q.  And for how long have you held that
position?

13    A.  Since October of 2021.

14    Q.  And prior to October 2021, what
position did you hold at the census bureau?

16    A.  I was chief of the integrated
communications, contract program management
office.

19    Q.  And what time period did you hold
the position of chief of the integrated
communications, contract program management
office?

HIGHLY CONFIDENTIAL

Page 34

1    A.   It began in 2016.  I don't know the
2   exact date or month, but it was through
3   September of 2021.
4    Q.   With respect to your current role as
5   chief of the contract management -- sorry.  The
6   contract program office and the communications
7   directorate of the census bureau, do you
8   understand the United States lawsuit to be
9   based on any work you do in that role?
10        MS. ZWOLINSKI:  Objection.  Form.
11        THE WITNESS:  I understand it to be
12   based on work that was conducted in my previous
13   role, not in my current role.
14        BY MS. GOODMAN:
15    Q.   And so we'll focus our time here
16   today on your time as the chief of the ICC
17   contract program management office.
18    A.   ICC PMO.
19    Q.   ICC PMO?
20    A.   Yes.
21    Q.   All right.  We'll use that
22   shorthand.  Thank you.

Page 35

1        To whom did you report when you were
2   chief of the ICC PMO?
3    A.   Originally I directly reported to
4   Stephen Buckner.  He was the assistant director
5   for communications.
6        And then I reported to Burton Reist,
7   who was the other assistant director for
8   communications.  We had two.
9    Q.   And in your role as chief, who
10   reported to you?
11    A.   I had a staff of approximately 15,
12   16 people at any given time.
13    Q.   What -- describe your job
14   responsibilities as chief of the ICC PMO.
15    A.   I oversaw all things related to -- I
16   oversaw the communications contract not as the
17   contracting officer's representative but as the
18   program officer as well as anything related to
19   it.  That included program management reports,
20   stakeholder engagement, budget, et cetera.
21    Q.   And did your role as chief of the
22   ICC PMO include responsibilities for all of the

Page 36

1   task orders under the main contract?
2        MS. ZWOLINSKI:  Objection.  Form.
3        THE WITNESS:  For context only -- I
4   am trying to figure out how best to explain.
5        In terms of government contracts,
6   management of a contract is actually done --
7   you have a contracting officer who is
8   ultimately responsible for the contract, and
9   they can make decisions that impact scope.
10        But then you have a contracting
11   officer representative, or COR, who
12   administrates the contract.
13        The communications contract was so
14   large, you had a COR that administered the
15   master contract and was ultimately responsible
16   for all the -- all the orders, but each order
17   had a separate COR.
18        BY MS. GOODMAN:
19    Q.   I am following you.
20    A.   Okay.
21    Q.   In your role, however, in terms of
22   program management of the master contract, did

Page 37

1   you have responsibility for managing all of the
2   orders issued under that master contract?
3        MS. ZWOLINSKI:  Objection.  Form.
4        THE WITNESS:  I had the
5   responsibility of understanding and providing
6   guidance and reporting up and down and out, but
7   I did not have responsibility for managing the
8   orders.  Only the COR on the contract can
9   manage the orders.
10        BY MS. GOODMAN:
11    Q.   Okay.  Sitting here today, what --
12   what's your understanding of which task orders
13   are relevant to the lawsuit brought by the
14   United States?
15        MS. ZWOLINSKI:  Objection.  Form.
16   Foundation.
17        THE WITNESS:  Order 8, which was
18   recruitment advertising, and Order 15, which
19   was media planning and buying.
20        BY MS. GOODMAN:
21    Q.   And what were your responsibilities
22   with respect to Order 8?

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1    A.   I was aware.  I provide guidance,
2  and I worked directly with the COR for that
3  order to -- I said this already but provide
4  guidance in how best to approach certain
5  things.
6    Q.   And is your answer with -- the same
7  with respect to Order 15?
8        MS. ZWOLINSKI:  Objection.  Form.
9        THE WITNESS:  With Order 15 I was
10  the COR, so I had the responsibility of
11  managing or administrating or administering
12  that particular order.
13        BY MS. GOODMAN:
14    Q.   And who was the COR, contracting
15  office representative --
16    A.   Yes.
17    Q.   -- for Order 8?
18    A.   James Cole.
19    Q.   And have you had any discussions
20  with Mr. Cole about your participation in this
21  lawsuit?
22        MS. ZWOLINSKI:  Objection.  Form.

Page 39

1        THE WITNESS:  Other than telling him
2  I had provided his name and that he might be
3  contacted, but no detail.
4        BY MS. GOODMAN:
5    Q.   And are you aware one way or another
6  whether Mr. Cole has been contacted with
7  respect to this lawsuit?
8        MS. ZWOLINSKI:  Objection.  Form.
9        THE WITNESS:  I believe he was
10  contacted, and it was -- yes, I believe he was
11  contacted.
12        BY MS. GOODMAN:
13    Q.   And do you know why he was
14  contacted?
15        MS. ZWOLINSKI:  Objection.
16  Foundation.
17        THE WITNESS:  Because he was the COR
18  on Order 8 and there was media, paid media,
19  associated with that effort.
20        BY MS. GOODMAN:
21    Q.   And have you discussed the paid
22  media at all with James Cole that was -- fell

Page 40

1  under his role as COR for Order 8?
2    A.   No need.
3        MS. ZWOLINSKI:  Objection.  Form.
4        THE WITNESS:  No need.
5        BY MS. GOODMAN:
6    Q.   When you say "no need," what do you
7  mean?
8    A.   It was paid media.  I knew all about
9  it.
10    Q.   Okay.  And so as chief of the ICC
11  PMO, did you have any responsibilities
12  pertaining to paid media?
13    A.   In that position it was to be aware,
14  to understand, and to be able to report out
15  about decisions that were being made,
16  strategies used, and direction and timing and
17  funding.
18    Q.   And how about with respect to your
19  role as the contracting officer representative
20  for Order 15 --
21        MS. ZWOLINSKI:  Objection.  Form.
22        BY MS. GOODMAN:

Page 41

1    Q.   -- what were your responsibilities
2  in that role with respect to paid media?
3    A.   As the COR -- I'm going to help you.
4  COR makes it easier on the tongue -- my job was
5  to make sure that the order -- all the
6  requirements of the order were met, that they
7  were met on time within scope and within
8  budget.
9    Q.   Were you also detailed to the
10  department of health and human services in the
11  past few years?
12    A.   Yes.
13    Q.   And what did you do on detail to
14  HHS?
15    A.   I served as the strategic director
16  for the public -- public education campaign for
17  COVID-19, and I also served as the COR on the
18  contract for the period of time I was there.
19    Q.   Who -- who -- strike that.
20        Did anybody take over your role as
21  COR on the contract at HHS for COVID-19?
22    A.   After I left?

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1    Q.   Correct.
2    A.   Yes.
3    Q.   Who was that?
4    A.   Teresa Bills, B-I-L-L-S.
5    Q.   And what time period were you
6    detailed to HHS?
7    A.   November 2021 through July 2022.
8    Q.   And the contract for which you were
9    the COR at HHS, what was the length of the term
10   for that contract?
11   A.   So when I started at HHS, it was the
12   end of -- the contracts were in six-month
13   increments.
14        When I started there were -- there
15   was a month and a half left in the contract.
16   The new contract began in January, and it went
17   January through June -- January through June.
18   And then the next contract started in July --
19   Q.   Okay.
20   A.   -- or the extension.  There was an
21   extension.
22   Q.   And do you know how long that

Page 43

1    extension from July of 2022 went?
2         MS. ZWOLINSKI:  Objection.  Form.
3         THE WITNESS:  I don't.
4         BY MS. GOODMAN:
5    Q.   Okay.  You also hold the title of
6    FAC-P/PM, Level 3 certified program manager; is
7    that correct?
8    A.   That's a certification, not a title.
9    Q.   Fair.  What is that certification?
10   A.   That is a required certification to
11   manage a program above a certain budget
12   threshold.
13   Q.   And do you know what the budget
14   threshold is?
15   A.   High.  It was required for me to
16   serve as the -- to oversee the contract, the
17   ICC contract.
18   Q.   So that was a required certification
19   in your role as chief of the ICC PMO, correct?
20   A.   Yes.
21   Q.   And what does that certification
22   entail?  What -- what expertise do you have as

Page 44

1    a result of that certification?
2         MS. ZWOLINSKI:  Objection.  Form.
3         THE WITNESS:  You have to prove that
4    you have the ability to manage programs and
5    effect change, that you can -- you can forecast
6    budget, you can manage budget, that -- I'm
7    sorry.  I am trying to remember the
8    application.  That you had the training
9    required.  It does not mean you are a COR, but
10   if you are a COR, it's -- they're very
11   interrelated.
12        BY MS. GOODMAN:
13   Q.   And is it correct you also have a
14   Level 3 FAC COR certification?
15   A.   Yes.
16   Q.   And what is that?
17   A.   That means I can manage contracts
18   over $10 million.
19   Q.   And what did you do to obtain both
20   of these certifications?
21        MS. ZWOLINSKI:  Objection.  Form.
22        THE WITNESS:  Lots of training and

Page 45

1    experience.
2         BY MS. GOODMAN:
3    Q.   And when did you obtain these
4    certifications?
5    A.   The COR -- been a COR for so long.
6    Level 3 COR had to have been -- I was a COR for
7    the 2000 communications contract, so it had to
8    have been maybe 1998, 1999.
9         And for the FAC-P/PM, I had to have
10   it by August 2016, so mid 2016.
11   Q.   How did you come to be involved in
12   this lawsuit?
13        MS. ZWOLINSKI:  Objection.  Form.
14        THE WITNESS:  My serving as a COR on
15   the media planning and buying order under the
16   ICC contract required the oversight of all
17   media planned and bought for the contract.  And
18   to promote and encourage participation and
19   self-response in the 2020 census, that included
20   purchasing traditional, nontraditional digital
21   media of which Google falls within that bucket.
22        BY MS. GOODMAN:

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1    Q.   Is it accurate to say that you first
2    were contacted with respect to a potential
3    lawsuit in early January of 2023?
4         MS. ZWOLINSKI: Objection. Form.
5         THE WITNESS: I honestly don't
6    recall.
7         BY MS. GOODMAN:
8    Q.   Okay. Do you think it was before
9    January of 2023?
10        MS. ZWOLINSKI: Objection.
11        THE WITNESS: I don't know.
12        BY MS. GOODMAN:
13   Q.   What is your -- are you aware of any
14   investigation -- not a lawsuit. I am talking
15   about an investigation -- by the United States
16   Department of Justice into Google?
17        MS. ZWOLINSKI: Objection. Form.
18        THE WITNESS: The only thing I'm
19   aware of is this.
20        BY MS. GOODMAN:
21   Q.   And when you say "this," what do you
22   mean?

Page 47

1    A.   This -- this particular lawsuit.
2    Q.   Okay. And did anybody at the
3    Department of Commerce ask you about the census
4    bureau's use of digital advertising for the
5    2020 census?
6         MS. ZWOLINSKI: Objection. Form.
7         THE WITNESS: In terms of...?
8         BY MS. GOODMAN:
9    Q.   In 2023.
10   A.   Okay.
11   Q.   Let's put it there. Did anybody ask
12   you from -- did anybody from the Department of
13   Commerce ask about the bureau's use of Google
14   in digital advertising for the 2020 census?
15   A.   Yes.
16        MS. ZWOLINSKI: Objection to form.
17        THE WITNESS: Sorry.
18        BY MS. GOODMAN:
19   Q.   Who at the census -- sorry. At the
20   Department of Commerce posed those questions to
21   you?
22   A.   It would have been Mike Cannon.

Page 48

1    Q.   And who is Mike Cannon?
2    A.   Mike Cannon is -- I don't know your
3    title. I'm sorry.
4         He is -- he is one of the lawyers at
5    Commerce.
6         (Deposition Exhibit 13 was marked
7    for identification.)
8         BY MS. GOODMAN:
9    Q.   Okay. I am going to hand you what
10   is marked as Exhibit 13. This is an e-mail
11   chain on which you are on bearing the Bates
12   label CENSUS-ADS-0000244816.
13        Do you recall receiving this e-mail?
14   A.   Yes.
15   Q.   Okay. And why were you writing to
16   Jack Benson with the question: "DOC is asking
17   whether we used Google ads in our digital
18   advertising for 2020. If so, Google's terms of
19   service contemplate that an ad agency needs to
20   get the ultimate advertising client to agree to
21   the terms of service for Google ads. Can you
22   confirm that census was notified of these terms

Page 49

1    and actually agreed"?
2         Why did you send that e-mail to Mr.
3    Benson?
4    A.   I sent the e-mail to -- to Mr.
5    Benson because Reingold was the subcontractor
6    on the ICC contract that was ultimately
7    responsible for purchasing digital ads, and I
8    wanted clar- -- I wanted verification that what
9    I thought was that particular agreement was
10   actually -- for context, because this exhibit
11   has multiple pages, on -- I guess it's a Bates
12   number -- CensusAds0000244817 between the two
13   boxes, there is a statement that talked about
14   final approval of the Order 15 media buying and
15   planning -- Media Plan Version 2.0. Hereby --
16   hereby authorizes VMLY&R to purchase and
17   finalize all paid media for the 2020 census,
18   paid media campaign.
19        I needed to make sure that was the
20   authorization that met this requirement.
21   Q.   When you say "this requirement," are
22   you referring to your e-mail to Mr. Benson

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1   about agreeing to the terms of service for
2   Google ads?
3       A.   Yes.
4       Q.   Okay.  Mr. Benson -- well, first of
5   all, Mr. Benson, he is at Reingold.  What is
6   Reingold?
7       A.   Reingold is a small business that
8   was a subcontractor on the integrated
9   communications contract, specifically focused
10  on the purchase of digital advertising.
11      Q.   And when you say "they are a
12  subcontractor," who are they a subcontractor
13  of?
14      A.   The prime contractor of record was
15  VMLY&R.
16      Q.   So is it accurate to say there was
17  no contract directly between the census bureau
18  and Reingold?
19          MS. ZWOLINSKI:  Objection.  Form.
20  Foundation.
21          THE WITNESS:  Yes, that is correct.
22          BY MS. GOODMAN:

Page 51

1       Q.   Mr. Ryan -- Mr. Benson of Reingold
2   writes back:  "Kendall, please see attached
3   media authorization form example per our
4   conversation just now."
5           Do you recall a conversation with
6   Mr. Benson with respect to this request to him?
7       A.   Yes.
8       Q.   And what did you and Mr. Benson
9   discuss?
10      A.   Exactly the media authorization
11  form.
12      Q.   And -- and so what -- well, what did
13  Mr. Benson say in response to your questions?
14      A.   He said that every media
15  authorization form had that -- that disclaimer
16  in there -- or I'm not sure if it is called a
17  disclaimer but had that note in there
18  authorizing the particular agency to purchase
19  advertising.
20          As a subcontractor to VMLY&R, they
21  had the authority to purchase advertising on
22  behalf of the census bureau.

Page 52

1       Q.   Okay.  And does anything in the
2   media authorization form that is attached to
3   that e-mail say anything about Google?
4           MS. ZWOLINSKI:  Objection.  Form.
5           THE WITNESS:  Media authorization
6   forms only provide an authorization to expend
7   money in a specific media category, not to a
8   specific vendor.
9           BY MS. GOODMAN:
10      Q.   And so is it accurate that this
11  media authorization form does not say anything
12  about Google?
13      A.   Correct.
14      Q.   And is it accurate that this media
15  authorization form does not say anything about
16  what vendor to use for the purchase of, in this
17  instance, digital display, programmatic,
18  digital paid social, and digital add-opts, ad
19  serving?
20          MS. ZWOLINSKI:  Objection.  Form.
21          THE WITNESS:  That is correct.
22          BY MS. GOODMAN:

Page 53

1       Q.   Why doesn't it say anything about
2   what vendor he used for the purchase of these
3   categories of advertising?
4           MS. ZWOLINSKI:  Objection.  Form.
5   Foundation.
6           THE WITNESS:  If we are so
7   restrictive to direct funding to a specific
8   vendor -- well, let me change that.
9           We don't direct payment to a
10  specific vendor.  We ask the agencies to buy
11  media in that -- with that -- buy that type of
12  media, and we trust that our agencies who
13  negotiate the best price with whichever vendors
14  will give us or meet the requirements that we
15  need for that particular type of media to reach
16  the audience in the way we need to reach them.
17          That does not mean it has to be
18  Google.  It could have been somebody else.  So
19  we do not tie their hands by specifically
20  stating Google.
21          BY MS. GOODMAN:
22      Q.   In your conversation with Mr. Benson

14 (Pages 50 - 53)

1  with respect to this document we're looking at,
2  Exhibit 13, did you say anything about the
3  request from Department of Commerce about the
4  use of Google ads?
5  　　　MS. ZWOLINSKI: Objection. Form.
6  　　　THE WITNESS: The only thing I said
7  was in here. He did not ask any further
8  questions. I did not offer any additional
9  information, but I like to clarify why I am
10  asking a question.
11  　　　BY MS. GOODMAN:
12  　　　Q.  Okay. Do you know why the
13  Department of Commerce was asking about the use
14  of Google ads and digital advertising in the
15  2020 census on January 17, 2023?
16  　　　MS. ZWOLINSKI: Objection. Form.
17  Foundation.
18  　　　THE WITNESS: I -- this would have
19  had to have come out of a conversation I had
20  with Mike and --
21  　　　MS. ZWOLINSKI: Objection.
22  Objection. Privilege.

1  　　　The conversation -- so the
2  conversation, this came out of a conversation
3  between you and Mike, your attorney?
4  　　　THE WITNESS: Yes.
5  　　　MS. ZWOLINSKI: Yeah. Objection.
6  Privilege.
7  　　　BY MS. GOODMAN:
8  　　　Q.  Without answering with respect to --
9  I am not asking for my particular
10  communications between you and Mr. Cannon.
11  　　　My question is as what this e-mail
12  says: "DOC is asking whether we use Google ads
13  in our digital advertising for 2020."
14  　　　What is your understanding of why
15  DOC was asking that question?
16  　　　MS. ZWOLINSKI: Objection. Form.
17  Foundation.
18  　　　THE WITNESS: DOC asked a lot of
19  questions. It could have been anything. I
20  think it was -- my understanding is, it was
21  just what was said. Did we actually
22  understand, were we given -- did they give us

1  the ultimate -- did we agree to the terms and
2  my understanding was that we did on the -- on
3  the media authorization form or MAF.
4  　　　I -- yes, that was my understanding
5  of the conversation.
6  　　　BY MS. GOODMAN:
7  　　　Q.  Okay. Do you know why that question
8  was being asked in and around January 17, 2023?
9  　　　MS. ZWOLINSKI: Objection. Form.
10  Privilege.
11  　　　MS. GOODMAN: It's not calling for
12  privileged communications. I'm --
13  　　　MS. ZWOLINSKI: It depends on which
14  -- where is her basis for knowing what question
15  was being asked, right? You are asking for the
16  reason the question is being asked, and I don't
17  -- that could be calling for privileged
18  information.
19  　　　MS. GOODMAN: The way that I am
20  asking the question is not calling for a
21  privileged communication between Ms. Oliphant
22  and any counsel at the Department of Commerce.

1  　　　BY MS. GOODMAN:
2  　　　Q.  My question to you is your personal
3  understanding. Do you have a personal
4  understanding one way or another about why this
5  question was posed to you in and around January
6  17, 2023?
7  　　　A.  My understanding it was posed to me
8  because of my involvement with the media buying
9  for the 2020 census.
10  　　　Q.  And do you know why Department of
11  Commerce was asking about Google ads and
12  digital advertising for the 2020 -- 2020 census
13  in January of 2023?
14  　　　MS. ZWOLINSKI: Objection.
15  Privilege. If --
16  　　　MS. GOODMAN:
17  　　　Q.  If you can answer that question
18  without relying on privileged communications --
19  on communications between yourself and lawyers
20  for the Department of Commerce, that's what I
21  am asking for in your answer.
22  　　　A.  I can't answer.

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1    Q.   Is that because you only have an
2    understanding based on privileged
3    communications?
4    A.   Yes.
5    Q.   Okay.  And with whom are those --
6    did those privileged communications take place?
7    A.   Commerce lawyer, Mike Cannon.
8    Q.   Any lawyers from the Department of
9    Justice?
10   A.   No.
11   Q.   Okay.  Do you know what date this
12   lawsuit was filed?
13   A.   Honestly, no.
14   Q.   It was filed on January 24, 2023.
15   A.   Okay.
16   Q.   I will state that for the record.
17       So with that sort of time period in
18   mind, do you recall any conversations prior to
19   January 24, 2023, with any lawyers for the
20   Department of Justice with respect to using
21   Google in the census's digital advertising paid
22   media for the 2020 census?

Page 59

1    MS. ZWOLINSKI:  Objection.  Form.
2    THE WITNESS:  I don't recall.
3    BY MS. GOODMAN:
4    Q.   Is it typical in your day-to-day
5    work to speak with lawyers from the Department
6    of Justice?
7    MS. ZWOLINSKI:  Objection.  Form.
8    THE WITNESS:  I do not speak to
9    anybody from Justice that -- I don't -- no, it
10   is not.
11   BY MS. GOODMAN:
12   Q.   And so if you did speak with lawyers
13   from the Department of Justice, is that
14   something you might remember because it is not
15   usual in the course of your work?
16   MS. ZWOLINSKI:  Objection.  Form.
17   THE WITNESS:  I may remember
18   speaking to them.  I may not necessarily
19   remember timing.
20   BY MS. GOODMAN:
21   Q.   Okay.  And do you have any
22   recollection of a timing -- the timing during

Page 60

1    -- strike that.
2        What is your best recollection of
3    when, if at all, you spoke with lawyers from
4    the Department of Justice about the census
5    bureau's use of Google in the 2020 census?
6    MS. ZWOLINSKI:  Objection.  Form.
7    THE WITNESS:  It would have had to
8    have been somewhere in the time frame of when
9    the -- when the suit was filed.
10   BY MS. GOODMAN:
11   Q.   Do you recall any conversations
12   prior to January of 2023?
13   MS. ZWOLINSKI:  Objection.  Form.
14   THE WITNESS:  I don't recall.
15   BY MS. GOODMAN:
16   Q.   I will represent to you that the
17   United States Department of Justice has been
18   investigating Google's advertising practices
19   for the last three years.  So over that --
20   meaning the '21 -- 2021, 2022, 2023.
21       In the years 2021 or 2022, do you
22   recall any conversation with any lawyer from

Page 61

1    the Department of Justice about census bureau's
2    use of Google for the 2020 census?
3    A.   No.
4    MS. ZWOLINSKI:  Objection.  Form.
5    BY MS. GOODMAN:
6    Q.   So as of January 17, 2023, that we
7    -- that you sent this e-mail to Mr. Benson, at
8    this time, did you anticipate participating in
9    litigation on behalf of the United States
10   against Google?
11   MS. ZWOLINSKI:  Objection.  Form.
12   THE WITNESS:  I did not.
13   BY MS. GOODMAN:
14   Q.   At this time in January of 2023, did
15   you have any knowledge or awareness of any
16   investigation by the Department of Justice of
17   -- of Google with respect to its advertising
18   businesses?
19   MS. ZWOLINSKI:  Objection.  Form.
20   THE WITNESS:  Can you be more
21   specific?
22   BY MS. GOODMAN:

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1     Q.   Have you ever -- strike that.
2          To what extent, if any, were you
3    aware in January of 2023, that the Department
4    of Justice Antitrust Division was investigating
5    Google?
6          MS. ZWOLINSKI:  Objection.  Form.
7          THE WITNESS:  I guess when they
8    actually filed the suit.
9          BY MS. GOODMAN:
10    Q.   And so prior to January 24, 2023,
11   when the Department of Justice filed the
12   lawsuit, you were not aware of any
13   investigation that the antitrust division was
14   doing of Google, correct?
15         MS. ZWOLINSKI:  Objection.  Form.
16         THE WITNESS:  I honestly -- I don't
17   recall.
18         BY MS. GOODMAN:
19    Q.   You don't recall any awareness of an
20   investigation; is that right?
21         MS. ZWOLINSKI:  Objection.  Form.
22         THE WITNESS:  I didn't recall when

Page 63

1    the lawsuit was filed, so the timing, I can't
2    -- no.  I don't recall.  I don't -- I'm not
3    aware.
4          BY MS. GOODMAN:
5     Q.   Prior to -- strike that.
6          In the course of your work as the
7    COR for Order 15, did you ever form a view that
8    Google's -- Google was engaging in
9    anticompetitive conduct?
10         MS. ZWOLINSKI:  Objection.  Form.
11         THE WITNESS:  No, I did not.
12         BY MS. GOODMAN:
13    Q.   And did you ever seek the legal
14   advice of the antitrust division with respect
15   to any anticompetitive conduct on the part of
16   Google?
17         MS. ZWOLINSKI:  Objection.  Form and
18   privileged.
19         MS. GOODMAN:  It's a yes or no
20   question.  It's not privileged.  I am asking
21   whether she sought legal advice.
22         MS. ZWOLINSKI:  Objection.  Form.

Page 64

1          THE WITNESS:  No.
2          BY MS. GOODMAN:
3     Q.   So for the record, your testimony is
4    that you never sought the legal advice of the
5    antitrust division with respect to
6    anticompetitive on the part of --
7    anticompetitive conduct on the part of Google;
8    is that correct?
9     A.   That is correct.
10    Q.   Have you received a litigation hold
11   in this case?
12    A.   Yes.
13    Q.   And approximately when did you
14   receive that hold?
15    A.   For context.  We have a lot going
16   on.  I can't honestly tell you when I first
17   started hearing about it or when I first
18   started -- when I got the litigation hold.
19         If I go through my e-mail, I can
20   tell you, but off the top of my head, we have
21   way too many deadlines that we are trying to
22   meet for this to be -- until it became a big

Page 65

1    thing, a real thing, for it -- it just -- it
2    just seemed like it was information seeking, so
3    I don't know.
4          MS. ZWOLINSKI:  Counsel, we've been
5    going over -- we've been going for over an
6    hour.  Can we take a break.
7          MS. GOODMAN:  Yeah, once I finish
8    this line of questioning, I am happy to break.
9          MS. ZWOLINSKI:  How much time do you
10   anticipate that line of questioning taking?
11         MS. GOODMAN:  A few more minutes.
12         MS. ZWOLINSKI:  Okay.
13         BY MS. GOODMAN:
14    Q.   You -- in your prior answer, you
15   said that it seemed like it was just
16   information seeking.
17         What did you mean by that?
18         MS. ZWOLINSKI:  Objection.  Form.
19         THE WITNESS:  We get asked questions
20   all the time.  It was just responding to a
21   request.
22         BY MS. GOODMAN:

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1    Q.   When you say "it was just responding
2  to a request," you are talking about what
3  specifically?
4    A.   We can go back to the e-mail that
5  you provided, Bates census ad 0000244816.  I
6  was asked a question.  I followed up to make
7  sure that my answer -- that the answer I
8  thought was correct was actually correct.  This
9  is standard procedures.
10   Q.   And when you say "standard
11  procedures," can you elaborate?
12   A.   If I am unsure of the answer -- we
13  don't purchase media.  So if I am unsure of the
14  answer, I go back to the media buyers to
15  clarify before I provide an answer to whoever
16  is requesting that information.
17   Q.   And when you receive a request from
18  the Department of Commerce, is that a standard
19  occurrence as well?
20       MS. ZWOLINSKI:  Objection.  Form.
21       THE WITNESS:  For clarity, are you
22  asking is it -- is it a standard occurrence for

Page 67

1  me to receive requests from the Department of
2  Commerce?
3       BY MS. GOODMAN:
4    Q.   Yes.
5    A.   Yes.
6    Q.   And is it a standard occurrence to
7  receive -- strike that.
8       Earlier in a prior answer, you also
9  said that -- when I asked you when you received
10  a litigation hold, you said that you receive
11  multiple requests and lots of things are going
12  on and you don't recall, but you -- do you
13  recall that testimony?
14       MS. ZWOLINSKI:  Objection to form.
15       THE WITNESS:  That was when I was
16  giving you context.
17       BY MS. GOODMAN:
18   Q.   Okay.  And you also said "until it
19  became a big thing, a real thing."
20       What -- what were you referring to
21  there?
22       MS. ZWOLINSKI:  Objection.  Form.

Page 68

1       THE WITNESS:  Until the lawsuit was
2  filed and I was asked to participate --
3  formally asked to participate.
4       BY MS. GOODMAN:
5    Q.   And so is it fair to say you were
6  formally asked to participate after the lawsuit
7  was filed?
8       MS. ZWOLINSKI:  Objection.  Form.
9       THE WITNESS:  I don't recall.
10       BY MS. GOODMAN:
11   Q.   And do you recall who asked you to
12  participate in the lawsuit?
13       MS. ZWOLINSKI:  Objection.
14  Foundation.
15       THE WITNESS:  Small group, but I'm
16  not sure who.
17       BY MS. GOODMAN:
18   Q.   When you say "a small group," is
19  there sort of a group of potential people that
20  you are thinking of, it might have been one of
21  them?
22    A.   No.  I am really thinking about

Page 69

1  this.
2       It would have been legal counsel
3  through commerce, Mike Cannon.
4    Q.   And as of January 17, 2023, in
5  Exhibit 13 that we are looking at, had you been
6  asked to formally participate in the lawsuit by
7  that -- around that time?
8       MS. ZWOLINSKI:  Objection.  Form.
9       THE WITNESS:  I don't recall.
10       BY MS. GOODMAN:
11   Q.   When you say you don't recall, do
12  you mean, I don't recall being asked prior to
13  January 17, 2023 to participate in this
14  lawsuit?
15    A.   Define "participation."
16   Q.   Well, how do you understand it?
17    A.   Anytime -- my understanding of
18  participation is actually getting to the point
19  where I am here doing a deposition.  That is
20  what I am considering participation.
21   Q.   Would you also consider
22  participation in signing off on interrogatory

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1  responses?
2      A.   Yes.
3      Q.   Okay.
4          MS. ZWOLINSKI:  Objection.
5          THE WITNESS:  Sorry.
6      BY MS. GOODMAN:
7      Q.   Would you also consider
8  participation collecting documents?
9      A.   I consider collecting documents
10  responding to a request which is what we do all
11  the time.  That does not necessarily mean
12  participation.
13      Q.   Do you respond -- have you responded
14  to any requests to collect documents where the
15  requests were made by the Department of
16  Justice?
17          MS. ZWOLINSKI:  Objection.  Form,
18  and objection.  Privilege.
19          MS. GOODMAN:  I am asking whether
20  she had -- whether Ms. Oliphant has had to
21  collect documents at the request of the
22  antitrust division of the Department of

Page 71

1  Justice.  That is not -- it's a yes or no
2  question.  It does not call for privileged
3  legal advice or any fact or opinion or work
4  product.  She can answer that question.
5          MS. ZWOLINSKI:  You can answer.
6          THE WITNESS:  Yes.
7      BY MS. GOODMAN:
8      Q.   And when approximately in time do
9  you recall receiving any requests to collect
10  documents from the antitrust division of the
11  Department of Justice?
12      A.   I don't know.
13      Q.   Okay.  Sitting here today, do you
14  recall any request to you to participate in
15  this lawsuit in the way that we have described
16  it prior to January 24, 2023?
17          MS. ZWOLINSKI:  Objection.  Form.
18          THE WITNESS:  I don't recall.
19          MS. GOODMAN:  Okay.  We can take a
20  break now.
21          THE VIDEOGRAPHER:  Going off the
22  record.  The time is 10:49.

Page 72

1          (A short recess was taken.)
2          THE VIDEOGRAPHER:  Going back on the
3  record.  The time is 11:08.
4          BY MS. GOODMAN:
5      Q.   Ms. Oliphant, did you discuss the
6  substance of your deposition with your counsel
7  on the break?
8          MS. ZWOLINSKI:  You can say that --
9  just one second.  Sorry.
10          MS. GOODMAN:  It's again a yes or no
11  question.
12          MS. ZWOLINSKI:  That isn't really
13  the relevant factor.  Let me -- you can answer
14  that question but don't discuss the substance
15  of anything that we discussed.
16          You can answer whether or not you
17  discussed your deposition during the break, but
18  none of the substance.
19          THE WITNESS:  Can you be more
20  specific in -- what do you mean.  What do you
21  mean by discussing the deposition?
22          BY MS. GOODMAN:

Page 73

1      Q.   Did you discuss with your counsel on
2  the break the matters to which you had
3  testified in the previous hour sitting here in
4  this deposition?
5      A.   No.
6      Q.   So earlier, we talked about a master
7  contract.
8          Do you -- what is the official name
9  of that master contract for the 2020 census?
10      A.   It is the 2020 census integrated
11  communications contract.
12      Q.   For shorthand, can we call that the
13  master contract today?
14      A.   You sure can.
15      Q.   And that contract -- the master
16  contract was issued to Young & Rubicam; is that
17  correct?
18      A.   Yes.  And you'll note that at some
19  point, they changed their name to VMLY&R.
20      Q.   What is the best acronym to use
21  today for --
22      A.   Prime.

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 294

1  explain what you mean by that?
2      MS. ZWOLINSKI: Objection. Form.
3      THE WITNESS: Most -- the site
4  directs, we had a pretty good understanding of
5  which sites they were going to directly because
6  it was -- they -- we worked hard for
7  integrations and added value and thing like --
8  and things like that. If it was a site that
9  didn't ring a bell, it was an obscure site, by
10 obscure, I mean I just don't know about the
11 site, not like I know every site, but it would
12 be safe to assume it was -- it doesn't matter.
13     Really didn't matter how they got
14 the ad. It was on this site, and this is the
15 audience that it was trying to reach.
16     BY MS. GOODMAN:
17     Q.  To your knowledge, did the census
18 bureau ever obtain a list of all of the
19 websites on which any census ad was placed?
20     MS. ZWOLINSKI: Objection. Form.
21     THE WITNESS: I don't recall.
22     BY MS. GOODMAN:

Page 295

1      Q.   Is that something that would have
2  been something -- is that the kind of list you
3  would want to have in your role as order
4  manager on Order 15?
5      MS. ZWOLINSKI: Objection. Form.
6      THE WITNESS: It -- given the sheer
7  volume, no.
8      BY MS. GOODMAN:
9      Q.   And to your knowledge, did the
10 subcontractor responsible for media buys, buy
11 the advertising placement directly from those
12 websites?
13     MS. ZWOLINSKI: Objection. Form.
14     THE WITNESS: The subcontractor
15 responsible for digital media buys would buy
16 directly from the sites if it was site direct.
17 If it was programmatic, it would go through an
18 ad serving thing.
19     BY MS. GOODMAN:
20     Q.   And so if it's programmatic, to your
21 knowledge, does the subcontractor pay money to
22 the site owner on which the ad is served, or

Page 296

1  does it pay money to an ad exchange or serving
2  platform who then disseminates the ads?
3      MS. ZWOLINSKI: Objection. Form.
4  Foundation.
5      THE WITNESS: It may go both ways.
6  I'm not sure.
7      BY MS. GOODMAN:
8      Q.   Okay. I will hand you Exhibit 25.
9  I am going out of order. Sorry.
10 CENSUS-ADS-204155 through 156.
11     (Deposition Exhibit 25 was marked
12 for identification.)
13     BY MS. GOODMAN:
14     Q.   Okay. This is an e-mail you
15 received from Mr. Benson on March 3, 2020.
16     Do you see that?
17     A.   Yes.
18     Q.   And he is forwarding to you and
19 others an e-mail he received from Michael
20 Westervelt at Google.
21     Do you see that?
22     A.   Yes.

Page 297

1      Q.   Okay. And Mr. Benson thought it --
2  you might find it interesting that Google is
3  saying: "We have reached 214 million unique
4  users, approximately 65 percent of the
5  population, on average four-plus times since we
6  launched digital."
7      Do you see that?
8      MS. ZWOLINSKI: Objection. Form.
9  Foundation.
10     THE WITNESS: Yes.
11     BY MS. GOODMAN:
12     Q.   Do you recall receiving this e-mail?
13     A.   No, but --
14     Q.   And you see in the chart at the
15 bottom, that shows DV360 reaching 214 million
16 individuals and then Twitter, U.S. Today,
17 Nextdoor, NBC and Facebook also reaching
18 various numbers of unique users, right?
19     MS. ZWOLINSKI: Objection to form.
20     THE WITNESS: Yes.
21     BY MS. GOODMAN:
22     Q.   Is it -- so looking at this

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL

Page 298

1  document, do you have an understanding now of
2  what DV360 is?
3          MS. ZWOLINSKI: Objection. Form.
4          THE WITNESS: My understanding would
5  be it's used to serve ads.
6      BY MS. GOODMAN:
7      Q.   Okay.
8      A.   Google uses it to serve ads.
9      Q.   Okay. And so do you see in this
10  document then that the reach for the census --
11  strike that.
12          What is your reaction to the news
13  that Google is saying you have reached 214
14  million unique users as of March 3, 2020?
15          MS. ZWOLINSKI: Objection. Form.
16          THE WITNESS: That's a good thing.
17      BY MS. GOODMAN:
18      Q.   I'm sorry?
19      A.   That's a good thing.
20      Q.   And did Google help the census
21  bureau obtain its advertising goals?
22          MS. ZWOLINSKI: Objection. Form.

Page 299

1          THE WITNESS: The combination of
2  Google and all of our advertisers helped us
3  obtain our goals.
4      BY MS. GOODMAN:
5      Q.   Okay. And was there any one digital
6  tool in your toolkit from your point of view
7  that particularly aided in the meeting of the
8  goals?
9          MS. ZWOLINSKI: Objection. Form.
10          THE WITNESS: They all had a part in
11  helping us reach our goals.
12      BY MS. GOODMAN:
13      Q.   Did any one of them have a greater
14  role than others?
15          MS. ZWOLINSKI: Objection. Form.
16          THE WITNESS: Well, at this point in
17  time, it is clearly Google, but this is just a
18  snapshot in time so -- and this is before
19  pandemic, so no, I have no -- I can't speak to
20  any time later without a similar type of
21  report.
22          BY MS. GOODMAN:

Page 300

1      Q.   Okay. But just in terms of the
2  course of your experience working on Order 15,
3  does any one particular advertising mechanism
4  stand out to you as one that was particularly
5  effective in helping the census bureau obtain
6  its goals?
7          MS. ZWOLINSKI: Objection. Form.
8          THE WITNESS: They really all -- if
9  they didn't work together, because they all
10  bring something different to the table to reach
11  audiences in a different way, and each audience
12  receives or utilizes different media. It is --
13  it is hard to point to one particular vendor
14  and say, you know, they are responsible or they
15  had the greatest impact because while it may
16  have an impact here, it may not have, overall,
17  it may not have had as high of an impact.
18      BY MS. GOODMAN:
19      Q.   If you needed to figure out how much
20  money was paid to Google through funds
21  allocated under the Order 15 contract, how
22  would you go about doing that?

Page 301

1          MS. ZWOLINSKI: Objection. Form.
2          THE WITNESS: I would contact the
3  buying agency. I would call Reingold.
4          BY MS. GOODMAN:
5      Q.   Have you had to call Reingold in the
6  course of this litigation to figure out how
7  much money has been paid to Google?
8          MS. ZWOLINSKI: Objection.
9          THE WITNESS: No.
10          BY MS. GOODMAN:
11      Q.   And to your knowledge, is there a
12  way to figure out how much money was paid to
13  Google for programmatic advertising?
14          MS. ZWOLINSKI: Objection. Form.
15          THE WITNESS: I don't have those
16  means. Census doesn't have that. We would go
17  directly to Reingold.
18          BY MS. GOODMAN:
19      Q.   So sitting here today, if you could
20  only rely on the census bureau to figure out
21  how much money was paid to Google through funds
22  allocated in Order 15, how would you do that?

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL

Page 302

1     MS. ZWOLINSKI: Objection. Form.
2  Foundation.
3     THE WITNESS: The only thing we have
4  is the post-buy analysis but it provides by
5  category, so anything that you devise, you --
6  you determine based upon the amount spent in
7  that category. I mean, I don't know that
8  anybody could come up with that efficiently,
9  you know, come up -- it would be a really rough
10  estimate.
11     BY MS. GOODMAN:
12     Q.   And using that post-buy analysis,
13  would you be able to determine the various
14  specific products or specific vendors used to
15  purchase that type of ad?
16     MS. ZWOLINSKI: Objection. Form.
17     THE WITNESS: No. The post-buy
18  analysis gives you information by audience, by
19  media type, by -- in some cases, geography, but
20  it does not specify vendors.
21     BY MS. GOODMAN:
22     Q.   And does it specify price?

Page 303

1     MS. ZWOLINSKI: Objection. Form.
2     THE WITNESS: Price by vendor?
3     BY MS. GOODMAN:
4     Q.   Sure.
5     A.   No. It is all aggregate
6  information.
7     Q.   Okay. And sitting here today, do
8  you have an understanding that the United
9  States is seeking to obtain damages from Google
10  in this lawsuit?
11     MS. ZWOLINSKI: Objection. Form.
12     THE WITNESS: I'm not sure what the
13  United States is trying to get from Google.
14     BY MS. GOODMAN:
15     Q.   Have you -- do you have any
16  understanding as to whether the census bureau
17  overpaid Google in the course of the 2020
18  census?
19     MS. ZWOLINSKI: Objection. Form.
20  Foundation.
21     THE WITNESS: I have no basis of
22  comparison.

Page 304

1     BY MS. GOODMAN:
2     Q.   So in the course of Order 15, to
3  your knowledge, did the census bureau purchase
4  any product directly from Google?
5     MS. ZWOLINSKI: Objection. Form.
6  Foundation.
7     THE WITNESS: Under Order 15 the
8  census bureau did not purchase anything
9  directly from Google.
10     BY MS. GOODMAN:
11     Q.   And under Order 15, did the census
12  bureau purchase any particular ad tech service
13  directly from Google?
14     MS. ZWOLINSKI: Objection. Form.
15  Foundation.
16     THE WITNESS: Under Order 15 the
17  census bureau did not purchase any particular
18  ad-serving technology -- I think that's what
19  you used -- from Google.
20     BY MS. GOODMAN:
21     Q.   And did the census bureau under
22  Order 15 purchase any open web display

Page 305

1  advertising directly from Google?
2     MS. ZWOLINSKI: Objection. Form.
3  Foundation.
4     THE WITNESS: No.
5     BY MS. GOODMAN:
6     Q.   And under Order 15, did the census
7  bureau pay Google directly for the use of
8  DV360?
9     MS. ZWOLINSKI: Objection. Form.
10  Foundation.
11     THE WITNESS: No.
12     BY MS. GOODMAN:
13     Q.   Did the census bureau pay Google
14  directly for the use of Google display network?
15     MS. ZWOLINSKI: Objection. Form.
16  Foundation.
17     THE WITNESS: No.
18     BY MS. GOODMAN:
19     Q.   And did the census bureau pay Google
20  directly for the use of Google marketing
21  platform?
22     MS. ZWOLINSKI: Objection. Form.

HIGHLY CONFIDENTIAL

Page 334

1   provided you legal advice?
2       MS. ZWOLINSKI:  Objection.  Form.
3       THE WITNESS:  No.
4       BY MS. GOODMAN:
5    Q.   Okay.  And is your answer the same
6   in January of 2023?
7       MS. ZWOLINSKI:  Objection.  Form.
8       THE WITNESS:  Yes.
9       BY MS. GOODMAN:
10   Q.   Okay.  And in the course of your
11  participation in this lawsuit if you've had
12  questions about your participation in this
13  lawsuit, have you turned to the attorneys at
14  the antitrust division with your questions?
15      MS. ZWOLINSKI:  Objection.  Form.
16      THE WITNESS:  No.
17      BY MS. GOODMAN:
18   Q.   To whom have you turned, if anyone?
19   A.   Commerce.
20   Q.   And is that Mr. Cannon?
21   A.   That's Mr. Cannon, yes.
22   Q.   Do you consider the lawyers for the

Page 335

1   antitrust division to be lawyers for the census
2   bureau?
3       MS. ZWOLINSKI:  Objection.  Form.
4   Foundation.
5       THE WITNESS:  I do not.
6       BY MS. GOODMAN:
7    Q.  Why not?
8       MS. ZWOLINSKI:  Objection.  Form.
9   Foundation.
10      THE WITNESS:  Since census has their
11  own lawyers and we have commerce lawyers, and I
12  believe the commerce lawyers would be more --
13  more sort of categorized in that way versus
14  DOJ.
15      BY MS. GOODMAN:
16   Q.   Okay.  And is your answer the same
17  with respect to your participation in this
18  lawsuit as a representative of the census
19  bureau?
20      MS. ZWOLINSKI:  Objection.  Form.
21  Foundation.
22      THE WITNESS:  Yes.

Page 336

1       MS. GOODMAN:  I have no further
2   questions.  I'll pass the witness.
3       MS. ZWOLINSKI:  We have no
4   questions.
5       MS. GOODMAN:  Okay.  Thank you so
6   much for your time, Ms. Oliphant.  I very much
7   appreciate it.
8       THE WITNESS:  You're welcome.  Thank
9   you.
10      THE VIDEOGRAPHER:  Off the record.
11      MS. GOODMAN:  Yes.
12      THE VIDEOGRAPHER:  This marks the
13  end of the deposition of Kendall Oliphant.  We
14  are going off the record at 18:24.
15      (Whereupon, the proceeding was
16  concluded at 6:24 p.m.)
17
18
19
20
21
22

Page 337

1       CERTIFICATE OF NOTARY PUBLIC
2       I, Bonnie L. Russo, the officer before
3   whom the foregoing deposition was taken, do
4   hereby certify that the witness whose testimony
5   appears in the foregoing deposition was duly
6   sworn by me; that the testimony of said witness
7   was taken by me in shorthand and thereafter
8   reduced to computerized transcription under my
9   direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.
18
19      _Bonnie L. Russo_
20      Notary Public in and for
21      the District of Columbia
22  My Commission expires:  August 14, 2025

85 (Pages 334 - 337)

HIGHLY CONFIDENTIAL

Page 338

1      ACKNOWLEDGMENT OF DEPONENT
2      I, KENDALL OLIPHANT, do hereby certify that
3    I have read the foregoing transcript of my
4    testimony taken on 8/9/23, and further certify
5    that it is a true and accurate record of my
6    testimony (with the exception of the
7    corrections listed below):
8    Page   Line      Correction
9    _____  _____     _____
10   _____  _____     _____
11   _____  _____     _____
12   _____  _____     _____
13   _____  _____     _____
14   _____  _____     _____
15   _____  _____     _____
16   _____  _____     _____
17   _____  _____     _____
18          _____
           KENDALL OLIPHANT
19
     SUBSCRIBED AND SWORN TO BEFORE ME
20   THIS _____DAY OF _____, 2023.
21
     _____  _____
22   (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
     Job No. CS6031956

Page 339

1    Rachel Zwolinski, Esq.
2    rachel.zwolinski@usdoj.gov
3           August 10, 2023
4    RE:   United States, Et Al v. Google, LLC
5      8/9/2023, Kendall Oliphant (#6031956)
6      The above-referenced transcript is available for
7    review.
8      Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   erratas-cs@veritext.com
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19    If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

86 (Pages 338 - 339)

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.