# EXHIBIT 17

# PUBLIC REDACTED VERSION

Page 1

```
 1
 2            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
 3                   ALEXANDRIA DIVISION
 4       _____
 5   UNITED STATES,        )1:23-cv-00108-LMB-JFA
     et al.,               )
 6                         )
           Plaintiffs,     )
 7                         )
     vs.                   )
 8                         )
     GOOGLE LLC,           )
 9                         )
           Defendants.     )
10       _____)
11
12
              - HIGHLY CONFIDENTIAL -
13
14         VIDEOTAPED DEPOSITION OF
15            CHRISTOPHER KARPENKO
16             August 10, 2023
17                9:35 a.m.
18
19
20
21
22       Reported by:  Bonnie L. Russo
         Job No. 6031969
```

---

Page 2

```
 1   Videotaped Deposition of Christopher Karpenko
 2   held at:
 3
 4
 5
 6       Paul, Weiss, Rifkind, Wharton & Garrison, LLP
 7              2001 K Street, N.W.
 8               Washington, D.C.
 9
10
11
12
13
14
15
16
17
18   Pursuant to Notice, when were present on behalf
19   of the respective parties:
20
21
22
```

---

Page 3

```
 1       APPEARANCES:
 2
 3   On behalf of the Plaintiffs:
 4       JAMES RYAN, ESQUIRE
 5       DAVID GROSSMAN, ESQUIRE
 6       ALVIN CHU, ESQUIRE
 7       UNITED STATES DEPARTMENT OF JUSTICE
 8       450 5th Street, N.W.
 9       Washington, D.C. 20530
10       james.a.ryan@usdoj.gov
11       david.grossman@usdoj.gov
12       alvin.chu@usdoj.gov
13
14   On behalf of the Defendant:
15       MARTHA L. GOODMAN, ESQUIRE
16       ANNELISE CORRIVEAU, ESQUIRE
17       PAUL, WEISS, RIFKIND, WHARTON &
18       GARRISON, LLP
19       2001 K Street, N.W.
20       Washington, D.C. 20006
21       mgoodman@paulweiss.com
22       acorriveau@paulweiss.com
```

---

Page 4

```
 1       APPEARANCES (CONTINUED):
 2
 3
 4   Also Present:
 5   Glen Fortner, Videographer
 6   Michael Weaver, United States Postal Service
 7
 8
 9   Also Present Via Remotely:
10   Julia Wood, DOJ
11   Sean Carman, DOJ
12   Katherine Clemens, DOJ
13   Jeannie S. Rhee, Paul, Weiss, Rifkind, Wharton
14   & Garrison, LLP
15
16
17
18
19
20
21
22
```

Page 5

```
              I N D E X

 1

 2   EXAMINATION OF CHRISTOPHER KARPENKO    PAGE

 3   BY MS. GOODMAN                         11

 4

 5

 6

                  EXHIBITS
 7

 8   Exhibit 33  E-Mail Chain dated 1-9-23   53

 9               USPS-ADS-0000140586-588

10

11   Exhibit 34  (CLAWED BACK)              --

12

13   Exhibit 34A E-Mail Chain dated 1-11-23  125

14               USPS-ADS-0000043815-816

15

16   Exhibit 35  Text Messages              93

17               USPS-ADS-0000899149-151

18

19   Exhibit 36  (CLAWED BACK)              --

20

21   Exhibit 36A E-Mail Chain dated 1-11-23  135

22               USPS-ADS-0000041965
```

Page 6

```
 1   EXHIBITS (CONTINUED):

 2   Exhibit 36B Attachment to Exhibit 36A   315

 3

 4   Exhibit 37  E-Mail Chain dated 3-8-23   135

 5               USPS-ADS-0000040943

 6

 7   Exhibit 38  NIC+ZOE August 2023        168

 8               Advertisement

 9

10   Exhibit 39  The U.S. Postal Service    175

11               Five-Year Strategic Plan

12               FY2020-FY2024

13

14   Exhibit 40  E-Mail Chain dated 3-29-22  199

15               Attachment

16               USPS-ADS-0000592851-863

17

18   Exhibit 41  Meeting Invite dated 4-30-20  211

19               Attachment

20               USPS-ADS-0000661829-869

21

22
```

Page 7

```
 1   EXHIBITS (CONTINUED):

 2   Exhibit 42  E-Mail Chain dated 6-18-21  227

 3               USPS-ADS-0000713476-481

 4

 5   Exhibit 43  E-Mail dated 4-20-20        238

 6               Attachment

 7               USPS-ADS-0000492772-780

 8

 9   Exhibit 44  E-Mail Chain dated 2-14-23  245

10               Attachment

11               USPS-ADS-0000042055-181

12

13   Exhibit 45  E-Mail Chain dated 4-26-22  262

14               Attachment

15               USPS-ADS-0000016395-463

16

17   Exhibit 46  E-Mail Chain dated 9-14-22  280

18               USPS-ADS-0000620144-145

19

20   Exhibit 47  E-Mail Chain dated 11-16-21  281

21               USPS-ADS-0000029221-226

22
```

Page 8

```
 1   EXHIBITS (CONTINUED):

 2   Exhibit 48  E-Mail dated 6-23-20        287

 3               USPS-ADS-0000447582-583

 4

 5   Exhibit 49  E-Mail dated 6-15-20        293

 6               Attachment

 7               USPS-ADS-000227880-968

 8

 9   Exhibit 50  Order/Solicitation/         299

10               Offer/Award

11               12-30-21

12               USPS-ADS-0000529112-186

13

14   Exhibit 51  Order/Solicitation/         301

15               Offer/Award

16               USPS-ADS-0000529380-412

17

18

19

20

21

22   (Exhibits bound separately.)
```

Page 9

```
 1              P R O C E E D I N G S
 2                 (9:36 a.m.)
 3
 4         THE VIDEOGRAPHER:  Good morning.
 5     We are going on the record at
 6  on August 10, 2023.
 7              Please note that the microphones are
 8  sensitive and may pick up whispering and
 9  private conversations.  Please mute your phones
10  at this time.  Audio and video recording will
11  continue to take place unless all parties agree
12  to go off the record.
13              This is Media Unit 1 of the
14  video-recorded deposition of Christopher
15  Karpenko in the matter of United States, et
16  al., v. Google LLC.  The location of the
17  deposition is Paul Weiss.
18              My name is Glen Fortner representing
19  Veritext, and I am the videographer.  The court
20  reporter is Bonnie Russo from the firm
21  Veritext.  I am not related to any party in
22  this action, nor am I financially interested in
```

Page 10

```
 1  the outcome.
 2              If there are any objections to
 3  proceeding, please state them at the time of
 4  your appearance.
 5              Counsel and all present, including
 6  remotely, will now state their appearances and
 7  affiliations for the record beginning with the
 8  noticing attorney.
 9         MS. GOODMAN:  Martha Goodman from
10  Paul Weiss on behalf of Google LLC, and I am
11  joined by my colleague Anneliese Corriveau.
12         MR. RYAN:  Good morning.  James Ryan
13  on behalf of the United States and the witness.
14         MR. GROSSMAN:  David Grossman on
15  behalf of the United States.
16         MR. CHU:  Alvin Chu on behalf of the
17  United States.
18         MR. WEAVER:  Michael Weaver for the
19  United States Postal Service.
20         MR. KARPENKO:  Chris Karpenko with
21  the United States Postal Service.
22         MS. GOODMAN:  Is anybody on Zoom who
```

Page 11

```
 1  needs to state their appearance, please?
 2         MS. WOOD:  I don't need to state an
 3  appearance, but I'll be in and out throughout
 4  the day.  Julia Wood from the Department of
 5  Justice.
 6         MS. CLEMENS:  Same for -- this is
 7  Katherine Clemens with the Department of
 8  Justice.
 9         MR. CARMAN:  And Sean Carman from
10  the Department of Justice.
11         MS. GOODMAN:  We did not hear the
12  last person who spoke.  Can you repeat
13  yourself, please.
14         MR. CARMAN:  Yeah.  Sean Carman for
15  the Department of Justice, S-E-A-N C-A-R-M-A-N.
16         MS. GOODMAN:  Okay.
17
18              CHRISTOPHER KARPENKO,
19  being first duly sworn, to tell the truth, the
20     whole truth and nothing but the truth,
21           testified as follows:
22     EXAMINATION BY COUNSEL FOR DEFENDANT
```

Page 12

```
 1         BY MS. GOODMAN:
 2     Q.   Good morning, Mr. Karpenko.
 3     A.   Good morning.
 4     Q.   Have you been deposed before?
 5     A.   I have.
 6     Q.   How recently?
 7     A.   Possibly within the last two years.
 8     Q.   And was that in connection with your
 9  work at the U.S. Postal Service?
10     A.   It was.
11     Q.   And what was it regarding?
12     A.   Specifically it was in regards to
13  contested environment for picture permit
14  stamps.
15     Q.   Okay.  For -- for purposes of this
16  deposition, I want to make sure that you take a
17  pause before I finish my question so that I can
18  complete my question, allow your counsel to
19  object, and then you can answer the question.
20  Okay?
21     A.   Okay.
22     Q.   And can you also speak up a little
```

Page 13

1  bit.  Sometimes it's a bit hard to hear you,
2  and we want to make sure the court reporter is
3  getting everything down.  Okay?
4      A.   Sure.
5      Q.   Okay.  And if you don't understand
6  my question, please let me know.  Okay?
7      A.   Okay.
8      Q.   Otherwise, I will assume you
9  understand my question.  Sound good?
10     A.   Yes.
11     Q.   And the court reporter cannot really
12 transcribe uh-huh or huh, uh-uhs because they
13 are hard to understand what you mean, so can
14 you please answer a question with a yes or no
15 or another verbal manner.  Okay?
16     A.   Yes.
17     Q.   And is there any reason you cannot
18 provide truthful and accurate testimony today?
19     A.   No.
20     Q.   And what is your current title at
21 the United States Postal Service?
22     A.   As of today, it's senior director

Page 14

1  customer marketing.
2      Q.   And for how long have you held the
3  role of senior director for customer marketing?
4      A.   Maybe three months.
5      Q.   And what do you do as the senior
6  director for customer marketing?
7      A.   I'm responsible with my team to
8  represent the postal service to perform
9  marketing initiatives, messaging, and create a
10 positive brand for the United States Postal
11 Service.
12     Q.   And prior to taking on the role of
13 senior director for customer marketing, what
14 was your role at the postal service?
15     A.   Executive director of brand
16 marketing.
17     Q.   And what is the difference between
18 your role of senior director of customer
19 marketing and executive director of brand
20 marketing?
21          MR. RYAN:  I'll object to
22 foundation, but it's fine.

Page 15

1          THE WITNESS:  There are several
2  nuances of reporting structure where some of my
3  directs have been moved.  We've elevated those
4  groups as we have grown them to make them more
5  of a larger autonomous group.
6          BY MS. GOODMAN:
7      Q.   How about with respect to your job
8  responsibilities?  Have those changed in the
9  course of moving from the executive director to
10 the senior director position?
11     A.   I don't have specific
12 responsibilities tied to licensing and
13 intellectual property.  The other move -- moved
14 to what we would call our digital group under
15 Kim Workinger.  That encompasses all our -- our
16 own USPS.com site.
17     Q.   So the digital group under Kim
18 Workinger encompasses the USPS.com site.  Am I
19 understanding you correctly?
20     A.   Yes.
21     Q.   And when you were executive director
22 for brand marketing, you had responsibilities

Page 16

1  tied to licensing and intellectual property.
2  Am I understanding that correctly?
3      A.   Yes.
4      Q.   How about with respect to
5  advertising?  How, if at all, have your
6  responsibilities changed from being executive
7  director to senior director?
8          MR. RYAN:  Objection.  Form.
9          THE WITNESS:  I still have the
10 responsibilities to develop campaigns and
11 execute them.  We have a marketing operations
12 team that answers under our insights group.
13 That's probably the only other difference that
14 I can think of at the moment --
15          BY MS. GOODMAN:
16     Q.   And --
17     A.   -- other than what you were stating
18 before.
19     Q.   So in your capacity -- in your prior
20 capacity as executive director and in your
21 current capacity as senior director, please
22 describe what your responsibilities are with

HIGHLY CONFIDENTIAL

Page 17

1  respect to advertising.

2          MR. RYAN:  Objection.  Vague.

3          THE WITNESS:  Could you clarify for

4  me.

5          BY MS. GOODMAN:

6      Q.   What do you understand the term

7  "advertising" to mean?

8      A.   Advertising for me is to be able to

9  position messaging in whatever format that

10  might be to our potential customers, whether

11  they be consumer or businesses, and the postal

12  service -- and my role in the postal service is

13  to help place proper messaging for our various

14  campaigns that we are going to be executing for

15  the year.

16      Q.   Okay.  And so with respect to the

17  understanding of advertising that you have just

18  stated for the record, can you please describe

19  what your responsibilities are with respect to

20  advertising.

21      A.   My role is to determine what

22  campaigns to run for the year, take the

HIGHLY CONFIDENTIAL

Page 18

1  insights that are provided to us, take the

2  target audience that we're trying to reach, and

3  make creative and place that creative or

4  content in the appropriate way for our desired

5  outcome.

6      Q.   And when you say "place that

7  creative or content in the appropriate way for

8  our desired outcome," what do you mean?

9      A.   Proper messaging can be placed or

10  positioned in a variety of ways.  We use media,

11  variety of different media types.  We also use

12  materials that we provide to our salespeople.

13      Q.   When you say that you -- you use

14  media in a variety of different media types,

15  can you elaborate on that, please.

16      A.   Can you clarify what you mean by --

17  what you're looking for.

18      Q.   Well, when you say media, that you

19  use a variety of different media types, what do

20  you mean?

21      A.   So we have a variety of different

22  media channels that we use.  Those media

HIGHLY CONFIDENTIAL

Page 19

1  channels are fairly broad, so not all

2  inclusive.  Top of mind you would see the

3  traditional TV, radio, print, direct mail,

4  digital, which would have subsets within that

5  that might fall under social media, banner

6  advertising, e-mail marketing, and then we, of

7  course, have our own messaging that we use

8  within our own postal infrastructure.

9      Q.   And so your role includes then

10  determining the kind of media to use when

11  seeking to get your message out to your target

12  audience; is that correct?

13          MR. RYAN:  Objection.  Foundation.

14          THE WITNESS:  Myself and my group

15  have responsibility for rolling out campaigns

16  that would include a variety of different media

17  types, and we assess what those media types

18  may -- may work in combination with each other

19  to optimize our results.

20          BY MS. GOODMAN:

21      Q.   Okay.  And you have -- do you have a

22  direct role in selecting the variety of

HIGHLY CONFIDENTIAL

Page 20

1  different media types that are used for a

2  particular campaign?

3      A.   Yes.

4      Q.   How long have you been at the United

5  States Postal Service?

6      A.   Over 35 years.

7      Q.   And what -- prior to -- well, strike

8  that.

9          How long -- for what time period

10  were you executive director of brand marketing

11  for the USPS?

12      A.   I was in that role eight-plus years,

13  I believe.

14      Q.   How did you come to be the executive

15  director of brand marketing?

16      A.   I was selected by the chief

17  marketing officer.

18      Q.   Do you report to the chief marketing

19  officer?

20      A.   I report to the VP of marketing

21  today.

22      Q.   And who is the VP of marketing?

Page 21

1    A.    Sheila Holman, H-O-L-M-A-N.

2    Q.    When you were executive director,

3    did you also report to Ms. Holman?

4    A.    For a short period of time, yes.

5    Q.    What period of time did you report

6    to Ms. Holman?

7    A.    I believe she was hired while we

8    were in COVID, so 2021, I believe.

9    Q.    And prior to Ms. Holman being hired,

10    to whom did you report while you were executive

11    director of brand marketing?

12    A.    The name was Steve Monteith.

13    Q.    Is that M-O-N-T-E-I-T-H --

14    A.    T-E-I-T-H, yes.  With a V, I

15    believe.  Steve Monteith.

16    Q.    And what -- was Mr. Monteith the VP

17    of marketing?

18    A.    He was.

19          MR. RYAN:  Objection.  Form.

20          THE WITNESS:  Sorry.

21          MS. GOODMAN:  What is the form

22    objection?

Page 22

1          MR. RYAN:  Sorry.  I meant

2    foundation.

3          BY MS. GOODMAN:

4    Q.    And how many direct reports do you

5    have as senior director?

6    A.    I have three directors along with an

7    administrative assistant.

8    Q.    And while you were executive

9    director, how many direct reports did you have?

10    A.    Seven, I believe.

11    Q.    How did -- what changed in the

12    structure of the organization where you said at

13    the postal service causing you to go from seven

14    direct reports to three direct reports?

15    A.    We have a Postmaster General Louis

16    DeJoy.  He has been revamping the organization.

17    We have been working on investing in developing

18    different groups.  He has a style that works

19    with a flatter layer of an organization.

20          We have elevated two groups within

21    my former team:  The digital team and the IP

22    and licensing.  The creative team now falls

Page 23

1    under licensing and IP, and we took marketing

2    operations and moved it over to insights.

3          In addition to that, we are going

4    through another restructure, so we are in the

5    midst of having that assessed.

6    Q.    Is that stressful?

7    A.    That's probably a great question..

8    Not as stressful as the first restructure I

9    went through --

10    Q.    Okay.

11    A.    -- back in 1992.

12    Q.    The digital team you said has been

13    elevated.  What's the digital team?

14    A.    The digital team encompasses what we

15    do on our dot-com site.  It's known as

16    USPS.com.  It's our site that most everyone

17    will go to to find information on a variety of

18    different things.

19          It's historically mission based.

20    People go there for purpose, for reason.  You

21    can do anything from identifying where your

22    local post office is and their hours, services

Page 24

1    that are available, and in some cases, you can

2    conduct transactions such as creating a --

3    creating a label for shipping.  You can go to

4    USPS.com store to transact and purchase stamps

5    online, P.O. Box renewal.  There are probably

6    30-plus applications one can do within the

7    USPS.com site, track a package so...

8    Q.    And prior to the restructuring that

9    came along with your change from executive to

10    senior director, was the digital team reporting

11    to you?

12    A.    Yes.

13    Q.    And what team within your portfolio

14    of responsibilities is responsible for

15    advertising for the United States Postal

16    Service?

17          MR. RYAN:  Objection to foundation.

18          THE WITNESS:  All of my team has

19    some level of responsibility for advertising

20    for the postal service.

21          BY MS. GOODMAN:

22    Q.    And what team more specifically has

Page 25

1   responsibility for disseminating the message to
2   the target audience the postal service is
3   seeking to reach through a variety of media
4   channels?
5       MR. RYAN:  Objection to foundation.
6       THE WITNESS:  All of my team has
7   some role within that.
8       BY MS. GOODMAN:
9       Q.   Okay.  And so when the digital team
10  was within your remit, what role did they have
11  with respect to advertising?
12      MR. RYAN:  Objection.  Vague.
13      THE WITNESS:  The digital team had
14  responsibility for messaging on dot-com.  They
15  also, from a prior restructure probably in
16  2019, 2020, had a senior marketing specialist
17  position taking on COR, contracting officer
18  representative, roles for our media agency of
19  record.
20      BY MS. GOODMAN:
21      Q.   And is that media agency of record
22  Universal McCann?

Page 26

1       A.   Yes.
2       Q.   And throughout your tenure as
3   executive director of brand marketing and now
4   while you are a senior director of customer
5   marketing, is Universal McCann the media agency
6   of record?
7       A.   They are the media agency of record,
8   yes.
9       Q.   And they were for the 2019 to -- at
10  least as of 2019, they were also the media
11  agency of record; is that correct?
12      A.   Yes.
13      Q.   Are there any other media agencies
14  of record for the United States Postal Service?
15      MR. RYAN:  Objection to form.
16      MS. GOODMAN:  What's the form
17  objection?
18      MR. RYAN:  That the -- I'm sorry.
19  The foundation.  Sorry.  I get them confused
20  sometimes.  Just the --
21      MS. GOODMAN:  I'll rephrase the
22  question.

Page 27

1       BY MS. GOODMAN:
2       Q.   Mr. Karpenko, do you know whether
3   there are any other media agencies of record
4   for the United States Postal Service?
5       A.   We have agencies.  I'm not aware of
6   any other agency specifically as our media
7   agency of record.
8       Q.   Okay.  Do you recall what month you
9   -- your title changed from executive director
10  to senior director?
11      A.   Specifically, no.  I think it was
12  March or April.
13      Q.   So at least for the time period of
14  January 2019 through February of 2023, you were
15  the executive director of brand marketing?
16      A.   Yes.
17      Q.   Okay.  Now, and while you were
18  executive director of brand marketing, what
19  other teams reported up to you?  We talked
20  about the digital team.  We talked about the
21  licensing team.  What other teams were within
22  your remit?

Page 28

1       A.   So the digital team.  We had the
2   licensing team, as you stated.  I had the
3   creative art team, creative services team, the
4   same.  I had the brand mail team, the brand
5   shipping team, the brand retail team.  I had a
6   marketing -- marketing operations position.
7   Prior to 2019 it was a team, and an
8   administrative assistant.  I believe that's
9   all.
10      Q.   I'll do my best not to interrupt
11  you.  I'm sorry.
12      A.   No.  That's okay.
13      Q.   What -- what was the
14  responsibilities of the brand mail team?
15      A.   The brand mail team is a group that
16  has a purpose of providing messaging about mail
17  and about mail to a variety of different target
18  audiences and customers.  It primarily focuses
19  on a business environment, commercial use.
20  Those businesses could be independents, small,
21  micro, small, medium, large enterprise as such.
22      We do -- there is some -- there is

Page 45

1          MR. RYAN:  Objection to this line.
2    I mean, you can't ask questions like this.  Are
3    you asking which attorneys he has talked with?
4          MS. GOODMAN:  Yes.  It's an entirely
5    proper question.
6          BY MS. GOODMAN:
7          Q.    So my question to you, Mr. Karpenko,
8    is:  What attorneys have you spoken with this
9    year regarding a government investigation of
10   digital advertising and Google?
11         A.    Michael Weaver has been my primary
12   contact.  There may be others within the law
13   department present.  I -- I'm not specifically
14   recalling anyone over another.  It was very
15   much just an interaction conversation.
16         Q.    And when you say "the law
17   department," is that within the postal service?
18         A.    My reference to the law department
19   is the USPS law department.
20         Q.    How about any lawyers affiliated
21   with the Department of Justice?
22         MR. RYAN:  Objection --

Page 46

1          BY MS. GOODMAN:
2          Q.    Have you spoken this year with any
3    lawyers from the Department of Justice
4    regarding an investigation of digital
5    advertising and Google?
6          MR. RYAN:  Objection to form and
7    foundation.
8          THE WITNESS:  Yes.
9          BY MS. GOODMAN:
10         Q.    And what lawyers at the Department
11   of Justice have you spoken with regarding an
12   investigation of digital advertising and
13   Google?
14         MR. RYAN:  Objection to foundation.
15         MS. GOODMAN:  Mr. Karpenko has said
16   that he spoke with Department of Justice
17   lawyers.  I have asked the foundation -- I have
18   laid the foundation and now --
19         MR. RYAN:  It's not a memory test.
20         MS. GOODMAN:  -- I am following on
21   the question.
22         MR. RYAN:  It's not a memory test.

Page 47

1          MS. GOODMAN:  Of course not.  If he
2    doesn't recall, he can provide that answer, but
3    the foundation objections are not proper so --
4          MR. RYAN:  But you're asking the
5    attorney -- you're asking him to list out all
6    the attorneys he has spoken with and --
7          MS. GOODMAN:  If he can do that,
8    yes.  I am entitled to ask the question.  If he
9    is not able to recall those names from his
10   memory --
11         MR. RYAN:  You are getting into
12   communications with counsel, so I just --
13         MS. GOODMAN:  No.  No, I'm not.
14         MR. RYAN:  If -- he can try to
15   answer questions about who he has talked with
16   to the extent he knows or recalls and when
17   those communications -- you're entitled to ask
18   those questions, but I think the questions are
19   going into the line of communications with
20   counsel.
21         MS. GOODMAN:  Okay.  Well, I am very
22   mindful of that line, and I am -- I am not

Page 48

1    intending to impede into privileged
2    conversations.  I am asking for the identities
3    of the lawyers as well as the time period.  The
4    kind of things that would occur -- appear --
5    appear on a privilege log.  So that's what my
6    questions are designed at.  Okay.
7          BY MS. GOODMAN:
8          Q.    Mr. Karpenko, to the extent you
9    recall, which attorneys at the Department of
10   Justice have you spoken with regarding the
11   government investigation into digital ads and
12   Google?
13         A.    I can't recall them all.  There are
14   three attorneys representing the Department of
15   Justice here that I have engaged with
16   privileged conversation with.
17         There is one on the Zoom that shows
18   up as the one screen that we have engaged -- I
19   believe I have engaged with.
20         Q.    And is that Mr. Carman?
21         A.    I believe so.
22         Q.    Okay.

Page 49

1    A.    There are probably others.  I didn't
2   keep a list of them.  I would have to go back
3   and refer to maybe a meeting invite that people
4   were on, but I wouldn't be able to tell you
5   specifically who off the top of my head, and
6   even some I wouldn't even remember their names.
7    Q.    In what time period do you recall --
8   what was the first time you recall speaking
9   with a lawyer from the Department of Justice
10   regarding a digital -- regarding an
11   investigation into digital ads and Google?
12    A.    The -- it was similar to the time
13   that it became publicly published out into the
14   world.
15    Q.    And when you came across the
16   publication of the lawsuit in the course of
17   your work -- well, strike that.
18         Is that how you came to learn of the
19   lawsuit in the course of your work as executive
20   director of brand marketing?
21    A.    I became aware --
22         MR. RYAN:  Objection to foundation.

---

Page 50

1         THE WITNESS:  I became aware of --
2   of the complaint through a news feed that came
3   through my iPhone as well as through our
4   lawyers reaching out to us through some
5   contact, I believe, with Department of Justice.
6         BY MS. GOODMAN:
7    Q.    And prior to learning of the
8   complaint through a news feed that came from
9   your iPhone, had you anticipated being involved
10   in a lawsuit regarding Google and digital
11   advertising?
12         MR. RYAN:  Object to the form.
13   Mischaracterizing the witness's prior
14   testimony.
15         THE WITNESS:  Could you clarify that
16   for me.
17         BY MS. GOODMAN:
18    Q.    Sure.  Before you learned of the
19   lawsuit through a news feed that came through
20   your iPhone, did you know a lawsuit would be
21   coming?
22         MR. RYAN:  Object to the form.

---

Page 51

1         THE WITNESS:  I only knew of the
2   complaint as a complaint.  I did not know if
3   postal would be involved nor if I would be
4   involved in any of the complaint.
5         BY MS. GOODMAN:
6    Q.    And so it was subsequent to the
7   filing of the complaint that you came to be
8   involved in this lawsuit; is that accurate?
9         MR. RYAN:  Objection.  Foundation.
10   Objection.  Form and foundation.
11         THE WITNESS:  I am trying to
12   remember if information was asked for from the
13   postal service tied to our media spend and our
14   media process.
15         BY MS. GOODMAN:
16    Q.    But prior to the filing of the
17   complaint, did you have any knowledge or
18   awareness that the postal service would be
19   involved as an entity for which the United
20   States would seek monetary damages from Google?
21         MR. RYAN:  Objection to form.
22         THE WITNESS:  I wouldn't have

---

Page 52

1   specific information as to DOJ's specific
2   intent.
3         BY MS. GOODMAN:
4    Q.    So you --
5    A.    I didn't -- I didn't write the
6   complaint.
7    Q.    Have you read the complaint?
8    A.    I have.
9    Q.    And have you seen the United States
10   Postal Service mentioned anywhere in it?
11    A.    I believe so.
12    Q.    Okay.  And when you read the -- did
13   you read the complaint around the time that it
14   was filed?
15    A.    Yes.
16    Q.    Okay.  Did you read it as a result
17   of the news alert that you got?
18         MR. RYAN:  Objection.  Foundation.
19         THE WITNESS:  I believe it was
20   provided under privilege while we were having
21   discussions.
22         MS. GOODMAN:  Okay.  Can I have Tab

Page 53

1     6.
2              (Deposition Exhibit 33 was marked
3     for identification.)
4              BY MS. GOODMAN:
5         Q.   Prior to the filing of the
6     complaint, did you anticipate being a witness
7     in this lawsuit?
8         A.   There was nothing for me to think
9     that I would be a witness for the complaint.
10        Q.   And is that -- strike that.
11             I am handing you Exhibit 33,
12    USPS-ADS-140586 through 588.
13             I will ask you to take a look and
14    see if you recognize this as an e-mail you
15    received in January of 2023.
16             Did you receive this e-mail?
17        A.   Yes.
18        Q.   And it is with an individual at the
19    United States Postal Service, Office of
20    Inspector General; is that right?
21        A.   Yes.
22        Q.   And to the best of your

Page 54

1     recollection, was January 9, 2023, the first
2     time you received any outreach with respect to
3     an inquiry that sought to determine whether the
4     U.S. Postal Service purchased any advertising
5     on the open web in third-party websites, such
6     as New York Times.com, CNN.com or
7     Bloomberg.com?
8              MR. RYAN:  Objection to form and
9     foundation.
10             THE WITNESS:  Could you repeat the
11    question again, please.
12             BY MS. GOODMAN:
13        Q.   Sure.  I just want to know if -- and
14    I was reading from Mr. Gardener's e-mail to you
15    on January 9 at the bottom of the document.
16        A.   Yes.
17        Q.   Was that the first outreach you
18    received from anybody within the government
19    about an inquiry, as he uses, to determine
20    whether the postal service purchased any
21    advertising on the open web and third-party
22    websites, such as New York Times.com, CNN.com

Page 55

1     or Bloomberg.com?
2              MR. RYAN:  Objection to form.
3              THE WITNESS:  The e-mail above --
4     component above Matthew Gardner does say
5     coincidently we have a meeting with another
6     group, DOJ, tied to something very similar.
7              BY MS. GOODMAN:
8         Q.   And that's you writing; is that
9     right?
10        A.   That is me writing, yes.
11        Q.   To Mr. Gardner.
12             And do you recall when you received
13    any outreach from the DOJ tied to something
14    very similar?
15        A.   I do not.  No.  I do not.
16        Q.   You write to Mr. Gardner:  "Our team
17    really handles the paid media and most of that
18    media is acquired through our media agency for
19    USPS."
20             MR. RYAN:  Martha, can you specify
21    where you are?
22             MS. GOODMAN:  I am reading Mr.

Page 56

1     Karpenko's e-mail dated January 9, 11:12 a.m.,
2     in the middle of page Bates ending 87.  First
3     paragraph.
4              BY MS. GOODMAN:
5         Q.   What did you mean that:  "Most of
6     that media is acquired through our media agency
7     through USPS"?
8         A.   I am just looking for it here.
9         Q.   I'm sorry.  Page 2.
10        A.   Page 2.
11        Q.   Middle of the page.
12             MR. RYAN:  I mean, you can take your
13    time to look at the document.
14             MS. GOODMAN:  Yeah.
15             BY MS. GOODMAN:
16        Q.   It's in the same paragraph where
17    you --
18        A.   "Since our team really handles the
19    paid media," about midway on the page.
20        Q.   Yes.
21        A.   Thank you.  We do.  So your question
22    was:  What does that mean?

Page 57

```
1        Q.    Yes.  You can answer.
2        A.    Our team manages a contract, we have
3   a contract with Universal McCann and that we
4   instruct them to help us provide and place
5   media for our initiatives.
6        Q.    And Universal McCann purchased that
7   -- purchases that media; is that correct?
8        A.    Yes.
9        Q.    Now, in your third paragraph, where
10  you say --   when you say "third-party
11  websites."
12         Do you see that?
13       A.    Yes.
14       Q.    Why were you asking Mr. Gardner the
15  clarifying questions contained within this
16  third paragraph?
17       A.    I didn't quite understand what he
18  was asking for.  I was looking for clarity.
19       Q.    And you see --
20       A.    Apologize.
21       Q.    At the top of the Page 2, Mr.
22  Gardner responds:  "Thank you for the quick
```

Page 58

```
1   response.  I am probably using terms
2   differently than what" you -- "is commonly used
3   in advertising."
4          Do you see that?
5        A.    I do.
6        Q.    Was he using terms differently than
7   what are commonly used in advertising?
8        A.    I don't think he was using uncommon
9   terms.  I was looking for clarity though.
10       Q.    What was unclear about his request
11  from your point of view?
12       A.    Context.
13       Q.    What do you mean?
14       A.    That's my answer.  It seemed to be a
15  general ask and I was unclear of what he was
16  looking -- or trying to look for, and as such,
17  I did ask for clarity so that we could be
18  thorough in his ask for whatever data he may be
19  looking for.
20       Q.    And turning to the first page
21  continuing in the e-mail chain, you write that:
22  "Fox, CNBC, Times, et cetera, are platforms to
```

Page 59

```
1   advertise on for the USPS."
2          Do you see that?
3        A.    I do.
4        Q.    What did you mean by that?
5        A.    Those are areas where we provide
6   content.  Fox, CNBC, Times, et cetera, are all
7   potential areas where we put advertising
8   towards.
9        Q.    Are there a variety of different
10  ways that the postal service could place
11  advertisements on these platforms?
12       MR. RYAN:  Objection to form.
13       THE WITNESS:  We might have various
14  ways of advertising with these groups.  They
15  could be physical, for example, with the New
16  York Times and their paper.  It could be in the
17  form of video, either through, for example, Fox
18  or CNBC's networks, and it could also be put as
19  a digital or digital display on their sites.
20       BY MS. GOODMAN:
21       Q.    And could they -- those kinds of
22  advertisements that you described be purchased
```

Page 60

```
1   through a direct deal with that platform?
2          MR. RYAN:  Objection to form.
3          THE WITNESS:  The postal service
4   contracts with UM to act as an agent for us to
5   make purchases like this.
6          BY MS. GOODMAN:
7        Q.    And could UM then make such a
8   purchase through a direct deal between it and
9   Fox or CNBC?
10         MR. RYAN:  Objection to foundation.
11         THE WITNESS:  Possibly.
12         BY MS. GOODMAN:
13       Q.    And are there other ways that UM
14  could make a purchase to place USPS advertising
15  on these platforms beyond a direct deal?
16         MR. RYAN:  Objection to form.
17         THE WITNESS:  Possibly.
18         BY MS. GOODMAN:
19       Q.    Can you think of any other possible
20  ways beyond a direct deal that UM could make a
21  purchase to place USPS advertising on these
22  platforms?
```

Page 137

1    January of 2023 regarding ad spend?

2        A.    That may be difficult for me to

3    answer because the UM team is about media and

4    ad spend and it could encompass almost anything

5    tied to our advertising efforts.

6        Q.    Is it a normal part of your daily

7    work -- is it a routine part in your work to

8    have a one-on-one conversation with Ms. Catucci

9    about ad spend?

10        A.    It would not be an exception.

11        Q.    Okay.  And subsequent to January of

12    2023, have you requested information from

13    United -- Universal McCann based on a

14    conversation with your counsel?

15        A.    I'm not sure -- I'm not sure about

16    the question.  Could you help me.

17        Q.    Yeah.  After the complaint in this

18    case was filed in January of 2023, have you

19    made requests to Universal McCann for

20    information in order to participate in this

21    lawsuit?

22            MR. RYAN:  Counsel, I'm going to

Page 138

1    object.  That's calling for privileged -- it's

2    calling for privileged communication.  I would

3    --

4            MS. GOODMAN:  It is precisely the

5    same kind of testimony you've already permitted

6    him to provide.  I am not asking for an

7    instance --

8            MR. RYAN:  Well, that was a mistake

9    on my part.

10            MS. GOODMAN:  -- I am asking a

11    yes-or-no question, which is whether he has

12    asked -- and I'll restate my question.

13            BY MS. GOODMAN:

14        Q.    Mr. Karpenko, after January of 2023,

15    have you requested information from Universal

16    McCann as a result of a conversation with your

17    counsel?

18        A.    I would say I have requested and

19    received various information from Universal

20    McCann both tied to privilege and not tied to

21    privilege.

22            MS. GOODMAN:  We're going to move to

Page 139

1    compel on those communications too.

2            BY MS. GOODMAN:

3        Q.    Prior to January of 2023 in the

4    course of your work at the United States Postal

5    Service, did you ever develop any concerns that

6    Google was engaging in anticompetitive conduct?

7        A.    I was unaware of any anticompetitive

8    conduct from Google.

9        Q.    And in the course of your work as a

10    -- the executive director for brand marketing

11    at the postal service, did you ever develop any

12    concerns that you paid super-competitive prices

13    for Google products?

14        A.    Can you clarify the -- the question.

15        Q.    Yeah.  In the course of your work as

16    executive director for brand marketing and

17    participating as an advertiser in the

18    advertising space, did you ever develop any

19    concerns that the postal service was paying too

20    much money for products or services from

21    Google?

22            MR. RYAN:  Object to the form.

Page 140

1            THE WITNESS:  In my role I have a

2    responsibility for hundreds of millions of

3    dollars of budget, so I am always keeping top

4    of mind that we're spending our investments or

5    our moneys appropriately and getting the best

6    value for that.

7            So from a macro perspective, we're

8    always looking at trying to get the best value.

9            BY MS. GOODMAN:

10        Q.    I appreciate that answer.  And my

11    question is a bit more specific.

12            Understanding that context that

13    you're always trying to get the best value for

14    USPS ad spend, my question is:  Did you ever

15    develop any concerns in the course of your work

16    as executive director for brand marketing that

17    the postal service was paying too much money

18    for products or services offered by Google?

19        A.    So --

20            MR. RYAN:  Object to form.

21            THE WITNESS:  So whether it's Google

22    or another entity, we -- ███████████

Page 141



```
19          BY MS. GOODMAN:
20      Q.   All right.  So based on your prior
21  two answers, I'm understanding your testimony
22  that you never developed a specific concern
```

Page 142

```
1   that the postal service was paying too much
2   money for products or services offered by
3   Google.
4           Am I understanding your testimony
5   correctly that you never had such a specific
6   concern as to Google?
7           MR. RYAN:  Objection to form and
8   foundation.
9           THE WITNESS:  So Google offers a lot
10  of products and services.  Our interaction with
11  Google is fairly vast at the postal service.
12  We do things beyond advertising and marketing
13  with them.
14          So when you're asking about products
15  and services it's a pretty broad ask for me.
16  So could you help narrow it down for me.
17          BY MS. GOODMAN:
18      Q.   Yes.  My question is specific to
19  Google products or services relating -- with
20  respect to digital advertising.  Okay.  So I
21  don't care about Gmail or Google Workspace or
22  Google Drive.
```

Page 143

```
1           Specific to products and services
2   related to digital advertising, did you, in
3   your capacity as executive director for brand
4   marketing at the postal service, based on your
5   knowledge and experience executing ad
6   campaigns, ever develop a specific concern that
7   the postal service was paying too much money
8   for Google products or services related to
9   digital advertising?
10      A.   So I might refrain that to say we --
11      Q.   Sir, I'm sorry to interrupt you, but
12  my question is my question, and I am asking you
13  to answer it as I have posed it rather than
14  reframing it and answering a different
15  question.
16          So can you please try to --
17          MR. RYAN:  The witness is trying to
18  answer your question, Martha.
19          BY MS. GOODMAN:
20      Q.   -- to answer my question as to any
21  specific concern as to Google specifically and
22  the prices paid for the use of Google products
```

Page 144

```
1   or services for digital advertising.
2           MR. RYAN:  I'm going to object to
3   form.  And the witness -- let the witness try
4   to answer the question.
5           THE WITNESS:  The postal service
6   doesn't directly use products from Google such
7   as DV360 for placement of advertising.  We pay
8   to place advertising on Google's environment so
9   that we can reach our customers.  I can't -- I
10  can't evaluate their products that enable one
11  to put media onto the various sites.
12          BY MS. GOODMAN:
13      Q.   And why can't you evaluate Google's
14  products that enable one to put media onto the
15  various sites?
16      A.   The postal service created a
17  contract with UM as a media agency of record
18  for media.
19          UM then places on behalf of the
20  postal service media in various environments,
21  and if they are utilizing Google's products to
22  do that, we don't -- we don't dictate that and
```

Page 305

1    provision does not commit the postal service

2    to, in fact, spend ████████ on media buys,

3    correct?

4        A.    Correct.

5              MR. RYAN:  Objection to form and

6    foundation.

7        BY MS. GOODMAN:

8        Q.    Okay.  And if you flip to Page 388,

9    do you see that this is attaching -- or

10   including within this contract, the UM SOW

11   contract year 2022.

12             Do you see that?

13       A.    Yes, that's the Universal McCann

14   statement of work, contract year 2022.

15       Q.    And is it accurate to say that the

16   statement of work in the subsequent pages

17   outlines the work that Universal McCann would

18   perform in this contract year on behalf of the

19   postal service?

20             MR. RYAN:  Objection to form.

21             THE WITNESS:  Yes.

22        BY MS. GOODMAN:

Page 306

1        Q.    And if you turn to page ending in

2    11411.

3        A.    11411.

4        Q.    Under Item 4:  "Addressable

5    technology."

6              Do you see where I am?

7        A.    Yes.

8        Q.    Do you know what Kinesso is in 4A?

9        A.    Kinesso is another group that UM has

10   used for our marketing efforts.

11       Q.    And are they similar to Matterkind?

12             MR. RYAN:  Objection to form.

13             THE WITNESS:  Similar in the sense

14   that they are another entity that UM works with

15   us to help place media for our effectiveness.

16             BY MS. GOODMAN:

17       Q.    And in No. 5 where it says:

18   "Private marketplace curation and management,"

19   what is that a reference to, to your knowledge?

20       A.    I don't know.

21       Q.    Okay.  And if we go -- I'm sorry.

22             If we turn back to Page 390 in the

Page 307

1    chart here where the columns are:  "Assumed

2    efforts, assumed media channels," and assume

3    spend -- "assumed spend."

4              Does this chart reflect at a high

5    level the plans that the postal service had

6    with respect to advertising efforts for this

7    particular contract year?

8              MR. RYAN:  Objection to form.

9              THE WITNESS:  This is more a

10   guidance than an estimate.  We would be firming

11   up our campaigns and budget later in the year.

12             BY MS. GOODMAN:

13       Q.    And under the column:  "Assumed

14   media channels," do you see anywhere listed on

15   Pages 390, 391 or 392, open web display?

16       A.    No.

17       Q.    You can put that to the side.

18             With respect to United States Postal

19   Service's digital advertising efforts, did the

20   postal service purchase any display advertising

21   directly from Google to your knowledge?

22       A.    Not to my knowledge.

Page 308

1        Q.    And did the postal service purchase

2    any open web display advertising directly from

3    Google?

4        A.    Not to my knowledge.

5        Q.    Did the postal service pay Google

6    directly for the use of DV360 to your

7    knowledge?

8              MR. RYAN:  Objection to foundation.

9              THE WITNESS:  I don't know if the

10   postal service paid for access to use Google's

11   DV360 tool.

12             BY MS. GOODMAN:

13       Q.    To your knowledge, did the postal

14   service pay Google directly for the use of

15   Google ads?

16             MR. RYAN:  Objection to foundation.

17             THE WITNESS:  I'm unaware of us

18   paying for any Google ads from the postal

19   service.

20             BY MS. GOODMAN:

21       Q.    To your knowledge and in your

22   capacity as the executive director for brand

Page 309

```
1     marketing from 2019 to 2023 time period, did
2     the postal service purchase any ad tech
3     services directly from Google?
4            MR. RYAN:  Objection to form and
5     foundation.
6            THE WITNESS:  I'm unaware of the
7     postal service purchasing any ad tech services
8     from Google.
9            BY MS. GOODMAN:
10       Q.    And are you unaware of the postal
11    service purchasing any ad tech services
12    directly from Google?
13           MR. RYAN:  Objection to form and
14    foundation.
15           THE WITNESS:  I am not aware of it.
16           BY MS. GOODMAN:
17       Q.    Are you aware of any contract
18    between the United States Postal Service and
19    Google related to digital advertising?
20       A.    Not to digital advertising.
21       Q.    Do you know whether any money has
22    been paid to Google through any contract
```

Page 310

```
1     between the postal service and Universal
2     McCann?
3            MR. RYAN:  Objection to form and
4     foundation.
5            THE WITNESS:  Can you repeat that
6     again.
7            BY MS. GOODMAN:
8        Q.    Do you know whether any money has
9     been paid to Google through funds awarded under
10    the contract between the postal service and
11    Universal McCann?
12           MR. RYAN:  I'll repeat the
13    objection.
14           THE WITNESS:  Yes.
15           BY MS. GOODMAN:
16       Q.    Okay.  And how do you know that
17    money has been paid to Google through those
18    funds?
19       A.    For example, we spend ███████
20    ███████████████████████████████████████
21    ███████████
22       Q.    And if you were -- how would you
```

Page 311

```
1     figure out how much money has been paid to
2     Google under the UM USPS contract?
3            MR. RYAN:  Objection to foundation
4     and form.
5            THE WITNESS:  We at least have
6     visibility on investment that we have asked UM
7     to pay or to use for media, the big one is
8     Google Search.  If there are others, it would
9     be a bit more in the weeds and I don't have
10    that visibility.
11           BY MS. GOODMAN:
12       Q.    And does anybody, to your knowledge,
13    in the postal service have that visibility?
14       A.    I don't believe so.
15       Q.    Okay.  Earlier, we were talking
16    about how the postal service helps connect
17    brands with customers, correct?
18           MR. RYAN:  Objection to form.
19           THE WITNESS:  Yes.
20           BY MS. GOODMAN:
21       Q.    And does Google also help connect
22    brands with their customers?
```

Page 312

```
1            MR. RYAN:  Objection to foundation
2     and form.
3            THE WITNESS:  Google is an
4     organization that offers up a number of
5     products and services that help customers --
6     and reach customers in a variety of ways.
7            BY MS. GOODMAN:
8        Q.    The U.S. Postal Service is also an
9     organization that offers up a number of
10    products and services that help businesses
11    reach customers in a variety of ways; is that
12    accurate?
13           MR. RYAN:  Objection to form.
14           THE WITNESS:  There is value to
15    both.
16           BY MS. GOODMAN:
17       Q.    But it is true that the postal
18    service is also an organization that offers up
19    a number of products and services that help
20    businesses reach customers in a variety of
21    ways?
22           MR. RYAN:  Objection to form.
```

HIGHLY CONFIDENTIAL

Page 313

```
 1         THE WITNESS:  Yes, with probably
 2   some -- some caveats in that.
 3         BY MS. GOODMAN:
 4     Q.    Okay.  And so with respect to
 5   helping businesses reach their customers, does
 6   the postal service compete with Google?
 7         MR. RYAN:  Objection to form and
 8   foundation.
 9         THE WITNESS:  I think they offer
10   different products and services.
11         BY MS. GOODMAN:
12     Q.    So is your answer no, that the
13   postal service does not compete with Google
14   with respect to helping businesses reach their
15   customers?
16         MR. RYAN:  Objection to form and
17   foundation.
18         THE WITNESS:  Probably depends on
19   what the customers are wanting or looking for.
20   They have similar approaches.  The postal
21   service has the ability to offer products and
22   services, but doesn't limit who can enter in
```

HIGHLY CONFIDENTIAL

Page 314

```
 1   utilizing those products and services, so you
 2   could do it as an individual or you could do it
 3   as a -- you could have an entity or business do
 4   it for you.  Google has products and services
 5   that you could do something as an individual
 6   potentially, or you are required to use
 7   particular -- potential products and tools to
 8   be able to accomplish what you need to for
 9   them.
10         BY MS. GOODMAN:
11     Q.    So is it at least fair to say that
12   the postal service provides a way for customers
13   -- businesses to reach their customers that is
14   complementary to services that Google offers
15   businesses in order to reach their customers?
16         MR. RYAN:  Objection to form and
17   foundation.
18         THE WITNESS:  I think both entities
19   have value to them and Google has provided
20   value to customers.
21         BY MS. GOODMAN:
22     Q.    And has Google provided value to the
```

HIGHLY CONFIDENTIAL

Page 315

```
 1   United States Postal Service from your point of
 2   view?
 3     A.    We have used Google because they do
 4   provide a value for the postal service for
 5   certain efforts that we are trying to make.
 6     Q.    Okay.
 7         MS. GOODMAN:  We can take a break.
 8         THE VIDEOGRAPHER:  Going off the
 9   record.  The time is 18:50.
10         (A short recess was taken.)
11         THE VIDEOGRAPHER:  Going back on the
12   record.  The time is 19:01.
13         MS. GOODMAN:  For the record, I am
14   ripping off the cover e-mail to Exhibit 36,
15   handing it to opposing counsel since he clawed
16   it back and marking the attachment as 36B.  I
17   will just hand that to the witness but I don't
18   have any questions about it.
19         (Deposition Exhibit 36B was marked
20   for identification.)
21         BY MS. GOODMAN:
22     Q.    Mr. Karpenko, have you had any
```

HIGHLY CONFIDENTIAL

Page 316

```
 1   conversations with Brian Pasco about this
 2   lawsuit?
 3     A.    Brian worked for me, and yes, I did
 4   have conversations about the information.
 5     Q.    Subsequent to Brian Pasco leaving
 6   the postal service, have you had any
 7   conversations with him about this lawsuit?
 8     A.    I have not spoken to Brian since he
 9   left.
10     Q.    And so what conversations have you
11   had with -- did you have with Brian while he
12   was still at the postal service with respect to
13   this lawsuit?
14     A.    To provide any information that
15   might be needed.
16     Q.    Did he provide you any information?
17     A.    He gathered up -- in general, he
18   gathered up all of his information because he
19   was leaving and he put it on a share drive.
20     Q.    And was that for purposes of this
21   lawsuit or because it's a records management?
22     A.    Both.
```

HIGHLY CONFIDENTIAL

Page 317

```
 1        Q.    And any other -- did he provide you
 2   -- other than putting all of his information on
 3   a share drive, did he provide you with any
 4   other information in connection with this
 5   lawsuit?
 6             MR. RYAN:  Just to the extent that
 7   it doesn't communicate -- this was not -- did
 8   not involve communications with counsel.
 9             THE WITNESS:  Nothing more that I'm
10   aware of.
11             BY MS. GOODMAN:
12        Q.    Than putting the information on a
13   share drive before he left; is that accurate?
14        A.    I don't recall him specifically
15   giving me any additional information, other
16   than making sure that he had his information
17   put onto a drive.
18        Q.    Got it.
19             MS. GOODMAN:  I have no further
20   questions for you at this time, Mr. Karpenko.
21   I will reserve the remainder of my time for the
22   questions that I was not permitted to ask the
```

HIGHLY CONFIDENTIAL

Page 318

```
 1   witness based on what we view as improper
 2   assertions of privilege.
 3             So I'll hold the deposition open for
 4   the record and I will pass the witness.
 5             MR. RYAN:  Any questions?  I would
 6   like to just note at this point, we would like
 7   -- it might be automatic, but just for the
 8   record, I just want to note that we want to
 9   designate the entire transcript -- treat it --
10   have it treated as highly confidential for the
11   time allotted in the protective order, to allow
12   portions of the transcript to be -- the proper
13   portions to be designated and any exhibits that
14   are highly confidential.
15             MS. GOODMAN:  Okay.
16             MR. RYAN:  No questions for the
17   witness.
18             MS. GOODMAN:  Thank you,
19   Mr. Karpenko.
20             THE WITNESS:  Thank you.
21             THE VIDEOGRAPHER:  This marks the
22   end of the deposition of Mr. Karpenko.  Going
```

HIGHLY CONFIDENTIAL

Page 319

```
 1   off the record at 19:05.
 2             (Whereupon, the proceeding was
 3   concluded at 7:05 p.m.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

HIGHLY CONFIDENTIAL

Page 320

```
 1             CERTIFICATE OF NOTARY PUBLIC
 2             I, Bonnie L. Russo, the officer before
 3   whom the foregoing deposition was taken, do
 4   hereby certify that the witness whose testimony
 5   appears in the foregoing deposition was duly
 6   sworn by me; that the testimony of said witness
 7   was taken by me in shorthand and thereafter
 8   reduced to computerized transcription under my
 9   direction; that said deposition is a true
10   record of the testimony given by said witness;
11   that I am neither counsel for, related to, nor
12   employed by any of the parties to the action in
13   which this deposition was taken; and further,
14   that I am not a relative or employee of any
15   attorney or counsel employed by the parties
16   hereto, nor financially or otherwise interested
17   in the outcome of the action.
18
19
                    Notary Public in and for
20                  the District of Columbia
21
22   My Commission expires:  August 14, 2025
```

---

HIGHLY CONFIDENTIAL

Page 321

1   Sean Carman

2   sean.carman@usdoj.gov

3                           August 11, 2023

4   RE:   United States, Et Al v. Google, LLC

5     8/10/2023, Christopher Karpenko (#6031969)

6     The above-referenced transcript is available for

7   review.

8     Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12    The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  erratas-cs@veritext.com.

16

17   Return completed errata within 30 days from

18  receipt of testimony.

19    If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22                Yours,

                  Veritext Legal Solutions

---

HIGHLY CONFIDENTIAL

Page 322

1   United States, Et Al v. Google, LLC

2   Christopher Karpenko (#6031969)

3         E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19

20

21  _____        _____

22  Christopher Karpenko                  Date

---

HIGHLY CONFIDENTIAL

Page 323

1   United States, Et Al v. Google, LLC

2   Christopher Karpenko (#6031969)

3         ACKNOWLEDGMENT OF DEPONENT

4     I, Christopher Karpenko, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____        _____

12  Christopher Karpenko                  Date

13  *If notary is required

14         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  _____ DAY OF _____, 20____.

16

17

18         _____

19              NOTARY PUBLIC

20

21

22

---

HIGHLY CONFIDENTIAL

[& - 2.1]                                    Page 1

| & | 0000899149-... | 12-30-21  8:11 | 16463  262:18 |
|---|---|---|---|
| **&**  2:6 3:17 4:14 | 5:17 | **120**  268:19 | **168**  6:7 |
| 39:10 253:20 | **000227880-9...** | **125**  5:13 | **16:47**  245:10 |
| 254:8 293:6,11 | 8:7 | **127**  205:16 | **16:54**  245:13 |
|  | **00108**  1:5 | 304:9,12 305:2 | **16:57**  247:22 |
| **0** |  | **12:23**  115:21 | **16:59**  248:3 |
| **0000016395-...** | **1** | **12:36**  116:4 | **17**  264:1 |
| 7:15 | **1**  9:13 65:2 | **12:42**  122:3 | **17.51**  264:19 |
| **0000029221-...** | 187:22 206:7,8 | **13**  193:21 | **175**  6:10 |
| 7:21 | 206:11 216:6 | 194:18 251:13 | **17:51**  287:2 |
| **0000040943**  6:5 | 296:5 299:19 | **130**  268:21 | **18**  227:14 |
| **0000041965** | 300:1 303:12 | **135**  5:21 6:4 | 252:21,22 |
| 5:22 | 304:1 | **137,021,402** | 253:1,1 300:1 |
| **0000042055-...** | **1,000**  254:12 | 203:6 | 302:18 303:5,7 |
| 7:11 | **1,465**  255:22 | **13:39**  122:6 | **186**  301:13 |
| **0000043815-...** | **1,701**  254:13 | **13:42**  125:10 | **187**  301:8,12 |
| 5:14 | **1-11-23**  5:13,21 | **13:43**  125:13 | **18:09**  287:5 |
| **0000140586-...** | **1-9-23**  5:8 | **14**  177:6 | **18:50**  315:9 |
| 5:9 | **10**  1:16 9:6 | 182:16 320:22 | **18th**  233:16 |
| **0000447582-...** | 268:15 294:19 | **140**  197:14 | **19**  303:17 |
| 8:3 | 295:6,7 298:4 | **140586**  53:12 | **199**  6:14 |
| **0000492772-...** | 298:10 | **145**  280:3 | **1992**  23:11 |
| 7:7 | **10:56**  69:11 | **14:25**  160:1 | **19:05**  315:12 |
| **0000529112-...** | **11**  5:3 72:2 | **14:38**  160:4 | **19:05**  319:1 |
| 8:12 | 219:18 220:1 | **15**  252:17,19 | **1:23**  1:5 |
| **0000529380-...** | 228:9 321:3 | **15:41**  210:19 | **2** |
| 8:16 | **11-16-21**  7:20 | **15s**  242:22 | **2**  56:9,10 57:21 |
| **0000593851-...** | **110**  268:20 | **16**  126:22 | 70:4 101:9 |
| 6:16 | **11411**  306:2,3 | 282:5 | 105:5 106:6 |
| **0000620144-...** | **11937**  320:19 | **1600**  210:22 | 208:5,20 |
| 7:18 | **11:12**  56:1 | **161**  163:7 | **2-14-23**  7:9 |
| **0000661829-...** | **11:17**  69:14 | **162**  162:5 | **2.0**  206:7 |
| 6:20 | **11:28**  80:1 | 163:7,14 | **2.1**  200:3,17,19 |
| **0000713476-...** | **11:41**  80:4 | **16395**  262:18 | 203:6 299:14 |
| 7:3 | **11th**  89:16 |  | 302:7 303:1 |
|  | 90:15 92:3,15 |  |  |

| | | | |
|---|---|---|---|
| 183:12 184:3 | 263:7,18 264:7 | **wood**  4:10 11:2 | 198:9 199:13 |
| 184:22 185:13 | 265:5,13 266:1 | 11:4 | 201:12 202:2 |
| 187:21 190:1 | 267:7 268:2 | **word**  219:1 | 202:18 204:13 |
| 190:14 191:5 | 271:4 272:9,19 | **words**  65:14 | 204:20 205:15 |
| 191:17 192:12 | 274:4,16 275:6 | 128:20 132:17 | 212:3 216:17 |
| 192:19 193:16 | 275:16 277:4 | 134:11 218:18 | 234:17 242:8 |
| 194:12 195:1 | 277:12 278:5 | 218:21 236:21 | 244:6,21 245:6 |
| 195:11,21 | 278:11,22 | 267:16 | 264:9,10 |
| 196:8,16 200:4 | 280:4,21 | **work**  12:9 | 265:16 269:4 |
| 200:6 201:3,16 | 281:21 282:14 | 19:18 29:1 | 285:10 292:1 |
| 202:4,12 | 284:4,21 | 35:5 38:9,12 | 293:4 301:10 |
| 203:13 204:17 | 285:13 286:2 | 39:2 49:17,19 | 305:14,16,17 |
| 205:6,20 | 289:1 290:2,7 | 62:1 66:18 | **worked**  71:21 |
| 206:18 207:5 | 294:17 295:2 | 68:1 71:8 | 226:1 291:22 |
| 207:17 209:14 | 295:12,20 | 72:18 73:12,17 | 316:3 |
| 210:4,11 | 296:12 298:8 | 74:15 76:6 | **working**  22:17 |
| 211:12,21 | 299:12 301:1 | 80:19 83:20,21 | 29:14 67:21,21 |
| 212:16 214:1 | 301:12 302:11 | 84:16 91:2,14 | 67:22 68:16 |
| 214:11 215:19 | 302:20 303:19 | 110:1,7,16,22 | 166:11 167:13 |
| 216:12 218:3 | 304:17 305:21 | 114:10 116:10 | 173:9,21 174:2 |
| 219:15 220:12 | 306:13 307:9 | 117:12,16,19 | 187:19 197:13 |
| 221:6,14,20 | 308:9,17 309:6 | 118:20 119:14 | 198:3 214:7,13 |
| 223:4 224:17 | 309:15 310:5 | 119:18 120:6 | 214:16 215:13 |
| 225:15 227:7 | 310:14 311:5 | 120:13,15 | 253:18 |
| 229:2,20 230:5 | 311:19 312:3 | 122:22 123:2 | **workinger** |
| 232:13 234:14 | 312:14 313:1,9 | 124:14 125:1 | 15:15,18 |
| 235:15 237:10 | 313:18 314:18 | 137:7,7 139:4 | **works**  22:18 |
| 238:4,11 | 315:17 317:9 | 139:9,15 | 97:7 99:15 |
| 240:22 241:11 | 318:1,4,17,20 | 140:15 141:1 | 114:9 218:3 |
| 245:4 246:18 | 320:4,6,10 | 149:8 171:2,9 | 306:14 |
| 247:1,12 | 321:8,10,12,19 | 171:10 182:5 | **workspace** |
| 248:13,22 | **witness's**  50:13 | 183:6 184:4 | 142:21 |
| 249:11 251:10 | **wondering** | 188:19 193:6 | **world**  39:3 |
| 251:19 252:5 | 231:16 | 196:5,10,14,19 | 49:14 98:4,8 |
| 257:5,21 262:9 | | 196:19 198:2,3 | 114:14 167:14 |

| | | | |
|---|---|---|---|
| 167:18 174:3 | **x** | | 248:15 255:6 |
| 179:21 238:14 | | | 268:4 286:6,7 |
| 256:14 268:17 | **x**  5:1 188:10,11 | | 302:7 303:1,1 |
| 269:19,21 | 188:18 195:4 | | 303:1 305:11 |
| 275:22 | 236:1 253:15 | | 305:14,18 |
| **worldwide** | 259:5 268:14 | | 307:7,11 |
| 294:2,8 297:20 | **y** | | **years**  12:7 20:6 |
| **worries**  301:16 | | | 20:12 106:19 |
| **worry**  256:9 | **yahoo**  260:10 | | 106:22 166:19 |
| **wrap**  245:22 | 260:16 261:13 | | 167:19 175:7 |
| 246:3,5 259:11 | **yeah**  11:14 | | 195:3,5,7 |
| 259:13 | 31:22 36:11 | | 207:6,7 249:17 |
| **write**  52:5 | 38:21 56:14 | | 297:17 |
| 55:16 58:21 | 63:15 107:6 | | **york**  54:6,22 |
| 76:19 85:8 | 124:9 131:8 | | 59:16 270:14 |
| 95:22 101:8,18 | 134:17 137:17 | | 270:17,19 |
| 105:10 106:5 | 139:15 199:9 | | 271:1 272:3,7 |
| 108:8 152:22 | 208:11 214:4 | | 272:11,14 |
| 228:6 | 220:6 227:15 | | 273:10,10 |
| **writes**  68:18 | 231:16 267:10 | | 274:8,10,11,16 |
| 95:12,14 100:8 | 279:21 | | **z** |
| 105:4 126:8 | **year**  6:11 17:15 | | |
| 233:18 281:4 | 17:22 42:2 | | **zoe**  6:7 168:21 |
| 288:2 | 44:10,11 45:9 | | 169:13 170:7 |
| **writing**  29:2,5 | 46:2 94:7 | | 200:10 10:22 |
| 55:8,10 70:5 | 166:19 175:6 | | 48:17 136:4,15 |
| 70:11 149:1 | 175:12,22 | | 247:18 |
| 226:21 | 194:13 196:5,9 | | |
| **written**  176:14 | 196:14,19 | | |
| **wrote**  77:5 | 197:20 198:6 | | |
| 107:3,5 126:18 | 198:18 200:2 | | |
| 228:9 280:21 | 200:17 203:6 | | |
| | 204:21 205:12 | | |
| | 206:22 207:1 | | |
| | 226:22 242:11 | | |
| | 242:12 243:5 | | |

---

          Federal Rules of Civil Procedure

                    Rule 30

   (e)  Review By the Witness; Changes.

   (1)  Review; Statement of Changes. On request by the

deponent or a party before the deposition is

completed, the deponent must be allowed 30 days

after being notified by the officer that the

transcript or recording is available in which:

   (A)  to review the transcript or recording; and

   (B)  if there are changes in form or substance, to

sign a statement listing the changes and the

reasons for making them.

   (2)  Changes Indicated in the Officer's Certificate.

The officer must note in the certificate prescribed

by Rule 30(f)(1) whether a review was requested

and, if so, must attach any changes the deponent

makes during the 30-day period.


   DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

---

            VERITEXT LEGAL SOLUTIONS

     COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

   Veritext Legal Solutions represents that the

   foregoing transcript is a true, correct and complete

   transcript of the colloquies, questions and answers

   as submitted by the court reporter. Veritext Legal

   Solutions further represents that the attached

   exhibits, if any, are true, correct and complete

   documents as submitted by the court reporter and/or

   attorneys in relation to this deposition and that

   the documents were processed in accordance with

   our litigation support and production standards.

   Veritext Legal Solutions is committed to maintaining

   the confidentiality of client and witness information,

   in accordance with the regulations promulgated under

   the Health Insurance Portability and Accountability

   Act (HIPAA), as amended with respect to protected

   health information and the Gramm-Leach-Bliley Act, as

   amended, with respect to Personally Identifiable

   Information (PII). Physical transcripts and exhibits

   are managed under strict facility and personnel access

   controls. Electronic files of documents are stored

   in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.