# EXHIBIT 18

## Page 1

```
                                              UNITED STATES DISTRICT COURT
                                              EASTERN DISTRICT OF VIRGINIA
                                                  ALEXANDRIA DIVISION

        _____
                                 :
        UNITED STATES OF AMERICA, :
        et al.,                   :
                                 :
              Plaintiffs          :
                                 :
              v.                  : No.  1:23-cv-00108
                                 :
        GOOGLE, LLC,              :
                                 :
              Defendants.         :
        _____:

                          Tuesday, August 15, 2023

                Video Deposition of ALLEN OWENS,

        taken at the Law Offices of Paul, Weiss, Rifkind,

        Wharton & Garrison LLP, 2001 K St NW, Washington,

        DC, beginning at 9:37 a.m. Eastern Standard Time,

        before Ryan K. Black, Registered Professional

        Reporter, Certified Livenote Reporter and Notary

        Public in and for the District of Columbia




    Job No. CS6037511
```

## Page 2

```
    A P P E A R A N C E S:

    UNITED STATES DEPARTMENT OF JUSTICE
    ANTITRUST DIVISION
    BY:  JIMMY MCBIRNEY, ESQ.
         CHASE PRITCHETT, ESQ.
         ALVIN CHU, ESQ.
         MARK SOSNOWSKY, ESQ. - Via Zoom
         KATHERINE CLEMONS, ESQ - Via Zoom
         JULIA TARVER-WOOD, ESQ. - Via Zoom
    450 5th Street, N.W
    Washington, DC 20530
    202.514.2414
    jimmy.mcbirney@usdoj.gov
    chase.pritchett@usdoj.gov
    alvin.chu@usdoj.gov
    mark.sosnowsky@usdoj.gov
    katherine.clemons@usdoj.gov
    julia.tarver-wood@usdoj.gov
    Representing - The United States of America

    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP,
    BY:  MARTHA L. GOODMAN, ESQ.
         LEAH HIBBLER, ESQ.
    2001 K St NW,
    Washington, DC
    202.223.7341
    mgoodman@paulweiss.com
    lhibbler@paulweiss.com

    Representing - Google LLC




    ALSO PRESENT:

    Orson Braithwaite - Legal Videographer
    Ann Bruck - Department of the Navy
```

## Page 3

```
                        I N D E X
    TESTIMONY OF:  ALLEN OWENS                        PAGE
    By Ms. Goodman...............................6
                      E X H I B I T S
    EXHIBIT        DESCRIPTION                       PAGE
    Exhibit 52     a document Bates Numbered
                   NAVY-ADS174029 through
                   NAVY-ADS174060..................62
    Exhibit 53     a document Bates Numbered
                   NAVY-ADS256935 through
                   NAVY-ADS257031..................97
    Exhibit 54     a document Bates Numbered
                   NAVY-ADS12756 through
                   NAYV-ADS12800..................102
    Exhibit 55     a document Bates Numbered
                   NAVY-ADS241136 through
                   NAVY-ADS241143.................111
    Exhibit 56     a document Bates Numbered
                   NAVY-ADS15543 through
                   NAVY-ADS15622..................130
    Exhibit 57     a document Bates Numbered
                   NAVY-ADS19114 through
                   NAVY-ADS19182..................146
    Exhibit 58     a document Bates Numbered
                   NAVY-ADS45197 through
                   NAVY-ADS45206..................172
    Exhibit 59     a document Bates Numbered
                   NAVY-ADS103897 through
                   NAVY-ADS103900.................182
    Exhibit 60     a document Bates Numbered
                   NAVY-ADS28530 through
                   NAVY-ADS28531..................187
```

## Page 4

THE VIDEOGRAPHER:  Good morning.  We're going on the record at 9:37 a.m. on August 15th, 2023.  Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Mr. Allen Owens in the matter of United States, et al., versus Google LLC, filed in the United States District Court, Eastern District of Virginia, Alexandria Division.  Case Number 1:23-cv-00108-LMB-JFA.

My name is Orson Braithwaite, representing Veritext Legal Solutions, and I'm the videographer.  The court reporter is Ryan Black from the firm Veritext Legal Solutions.

Counsel will now state their appearances and affiliations for the record.

MS. GOODMAN:  Martha Goodman of the law firm Paul Weiss on behalf of Google LLC, and I'm joined by my colleague Leah Hibbler.

MR. MCBIRNEY:  Jim McBirney on behalf of the Department of Justice on behalf of the United

Page 33

1   certain of was Mr. Chase.
2       Q.  Okay.  Any others?
3       A.  No.  I -- I can't recall any others.
4       Q.  Were there any lawyers from the Navy
5   involved in these communications?
6       A.  I don't recall.
7       Q.  Do you recall speaking with anybody
8   within the Navy Recruiting Command who are your
9   subordinates about this lawsuit?
10      A.  Yes.
11      Q.  Who?
12      A.  Ms. Dean Stewart-Curry, my director of
13  resources.
14      Q.  Anyone else?
15      A.  No.
16      Q.  How about Adelina Lozzi, did you speak
17  with her about this lawsuit?
18      A.  Yeah.  She's not one of my employees,
19  but, yes.
20      Q.  So whether they're your subordinate or
21  not, we've talked about the individuals in your
22  chain of command, Ms. Stewart-Curry and
23  Ms. Lozzi.  Is there anybody else at the Navy
24  Recruiting Command that you've spoken with about
25  this lawsuit?

Page 34

1       A.  Not that I recall.
2       Q.  And what did you and Ms. Stewart-Curry
3   discuss about this lawsuit?
4       A.  Responses to DOJ inquiries for
5   information.
6       Q.  Okay.  And when did you have these
7   discussions with Ms. Stewart-Curry?
8       A.  At various times.
9       Q.  What's your best recollection of such
10  various times that you had these discussions with
11  Ms. Stewart-Curry?
12      A.  Throughout earlier this year.
13      Q.  Any conversations with her about this
14  lawsuit prior to February of 2023 that you
15  recall?
16          MR. MCBIRNEY:  Objection; foundation.
17          THE WITNESS:  Not that I recall.  I
18  -- I'm -- just earlier this year.  I don't recall
19  specific dates.
20  BY MS. GOODMAN:
21      Q.  Okay.  And same questions with respect
22  to Ms. Lozzi.  When do you -- when did you have
23  conversations with her about this lawsuit?
24      A.  I don't recall specific dates.  Earlier
25  this year.

Page 35

1       Q.  Okay.  What did you and Ms. Lozzi
2   discuss about this lawsuit?
3           MR. MCBIRNEY:  Caution the witness not
4   to disclose communications with counsel or
5   directions relayed from counsel.  If you could
6   answer the question without disclosing those
7   communications, you can answer.  Otherwise, I
8   instruct you not to answer.
9   BY MS. GOODMAN:
10      Q.  Can you answer the question?
11      A.  I cannot.  I will follow counsel's
12  direction.
13      Q.  So every conversation you've had with
14  Ms. Lozzi in connection with this lawsuit are --
15  were in the presence of an attorney or at the
16  direction of counsel.  Is that your testimony?
17      A.  I don't know.
18      Q.  Okay.  Do you recall any conversation
19  sitting here today that did not involve an
20  attorney or that were not at the direction of
21  counsel with Ms. Lozzi?
22      A.  Sitting here today, I -- I cannot recall
23  any that would have been outside of the direction
24  of counsel.
25      Q.  Okay.  Did you tell Ms. Lozzi you were

Page 36

1   being deposed?
2       A.  I don't recall.
3       Q.  Did you tell Ms. Stewart-Curry that you
4   were being deposed?
5       A.  Yes.
6       Q.  Okay.  So this is another individual
7   with whom you've discussed your deposition; is
8   that correct?
9           MR. MCBIRNEY:  Objection; argumentative.
10          THE WITNESS:  The discussions that I had
11  with Ms. Stewart-Curry were gathering responses
12  to my counsel.  So I believe that the content
13  that -- with what we would have discussed would
14  have been privileged.
15  BY MS. GOODMAN:
16      Q.  Okay.  But with respect to the
17  individuals that you spoke about your deposition
18  with, Ms. Lozzi is one such individual, correct?
19      A.  I -- I can't recall.
20      Q.  Okay.  So we've talked about two
21  individuals at the ad agency, individuals
22  within your chain of command, your subordinate
23  Ms. Stewart-Curry and another individual, Ms.
24  Lozzi at the Navy Recruiting Command, with whom
25  you've had conversations about this lawsuit.  Is

Page 37

1  that a fair summary of what you've testified to
2  so far?
3         MR. MCBIRNEY:  Object to the form of the
4  question.
5         THE WITNESS:  I've testified that I have
6  had discussions with my chain of command.  I've
7  had discussions with Ms. Stewart-Curry.  I've had
8  conversations with Ms. Lozzi, although I don't
9  recall the specifics of those conversations and
10 whether or not they was -- they were related to
11 the deposition.  And that's my testimony.
12 BY MS. GOODMAN:
13     Q.  And your testimony also includes your
14 conversations with individuals at the ad agency;
15 is that correct?
16        MR. MCBIRNEY:  Object to the form of the
17 question.
18        THE WITNESS:  My testimony is I
19 had conversations with Ms. Sandra Mouio and
20 Mr. Edmondson.
21 BY MS. GOODMAN:
22     Q.  About this lawsuit, correct?
23     A.  Yes.
24     Q.  Okay.  And with respect to all of the
25 individuals that we've gone over today, are there

Page 38

1  any other individuals with whom you have spoken
2  about this lawsuit?
3      A.  Not that I recall.
4      Q.  With respect to all of the individuals
5  we've gone over so far today, at what point in
6  time did you first have a conversation about this
7  lawsuit with any of them, to the best of your
8  recollection?
9      A.  Earlier this year, to the best of my
10 recollection.  I don't recall a specific date.
11     Q.  Okay.  Do you have any reason to believe
12 you had any conversations about this lawsuit with
13 any of the individuals we've discussed here today
14 prior to February of 2023?
15        MR. MCBIRNEY:  Objection; foundation,
16 and to form.
17        THE WITNESS:  As I stated earlier, I
18 don't recall the earliest conversations that I
19 had about this lawsuit.  I -- I don't recall
20 specific dates.
21 BY MS. GOODMAN:
22     Q.  Okay.  Do you recall any conversation
23 about this lawsuit with any of the individuals
24 that we've discussed here today taking place in
25 2022?

Page 39

1         MR. MCBIRNEY:  Objection.  Asked and
2  answered.  Foundation.
3         THE WITNESS:  And as I stated earlier,
4  I don't recall the earliest dates of having
5  conversations about the lawsuit.
6  BY MS. GOODMAN:
7      Q.  Well, your testimony was that you
8  recalled having conversations earlier this year,
9  meaning 2023, correct?
10     A.  Correct.
11     Q.  Okay.  So earl -- other than earlier
12 this year, can you pinpoint in time your first
13 conversations with anybody in connection with
14 this lawsuit?
15        MR. MCBIRNEY:  Objection.  Asked and
16 answered.  Foundation.
17        THE WITNESS:  As I stated earlier,
18 I cannot recall the earliest dates, other than
19 sometime earlier this year of 2023, of where I
20 had conversations about this lawsuit.
21 BY MS. GOODMAN:
22     Q.  Okay.  What is your understanding of
23 what this lawsuit is about?
24        MR. MCBIRNEY:  Instruct the witness not
25 to disclose communications with counsel.  If you

Page 40

1  can answer that question without disclosing
2  privileged communications, you can answer.
3  Otherwise, I instruct you not to answer.
4         THE WITNESS:  My only knowledge is via
5  privileged communications with counsel and I have
6  no knowledge outside of that.
7  BY MS. GOODMAN:
8      Q.  Did you read the complaint filed in this
9  matter?
10     A.  I did not.
11     Q.  Why not?
12        MR. MCBIRNEY:  Object to form.
13        THE WITNESS:  I --
14        MS. GOODMAN:  What's the form objection?
15        MR. MCBIRNEY:  Vague.
16        MS. GOODMAN:  Okay.
17 BY MS. GOODMAN:
18     Q.  Why didn't you read the complaint filed
19 in this lawsuit?
20     A.  I don't have a reason for not reading
21 it.  I just didn't seek it out.
22     Q.  Do you have any interest, sitting here
23 today, in reading the complaint filed in this
24 lawsuit?
25     A.  No.

Page 41

```
 1          Q.   Why not?
 2              MR. MCBIRNEY:  Objection; vague.
 3              THE WITNESS:  Can you be more specific
 4     with the question?
 5     BY MS. GOODMAN:
 6          Q.   Why do you not have any interest,
 7     sitting here today, in reading the complaint
 8     filed in this lawsuit?
 9              MR. MCBIRNEY:  Same objection.
10              THE WITNESS:  I just don't.
11     BY MS. GOODMAN:
12          Q.   Is it important to you what the
13     complaint says?
14          A.   It won't -- it won't affect my truthful
15     testimony, so, no.
16          Q.   Okay.  For purposes of the work you do
17     for the Navy Recruiting Command, is it important
18     for you to understand what the complaint says?
19              MR. MCBIRNEY:  Objection; foundation.
20              THE WITNESS:  I don't think -- well, can
21     -- can you rephrase that question?  I'm not sure
22     I understand.
23     BY MS. GOODMAN:
24          Q.   For the purposes of the work you do at
25     Navy Recruiting Command, is it important for you
```

Page 42

```
 1     to understand what the complaint says?
 2              MR. MCBIRNEY:  Same objection.
 3              THE WITNESS:  No.
 4     BY MS. GOODMAN:
 5          Q.   Okay.  For the purposes of the work you
 6     do at Navy Recruiting Command, is it important
 7     for you to understand what this lawsuit is about?
 8              MR. MCBIRNEY:  Objection; foundation.
 9              THE WITNESS:  No.
10     BY MS. GOODMAN:
11          Q.   Why is it not important for you to
12     understand what the complaint says for the
13     purposes of the work you do at the Navy
14     Recruiting Command?
15              MR. MCBIRNEY:  Objection; foundation.
16              THE WITNESS:  I don't believe it has an
17     impact on my work.
18     BY MS. GOODMAN:
19          Q.   And why is it not important for you to
20     understand what this lawsuit is about for the
21     purposes of the work you do at Navy Recruiting
22     Command?
23              MR. MCBIRNEY:  Objection; foundation.
24              THE WITNESS:  Is that -- is that the
25     same question you just asked?  I apologize.  Can
```

Page 43

```
 1     you rephrase that?  I understand it to be the
 2     same the questions question you just asked.
 3     BY MS. GOODMAN:
 4          Q.   Sure.  My first question was what the
 5     complaint says, and my next question is why is it
 6     not important for you to understand what this
 7     lawsuit is about for the purposes of your work at
 8     Navy Recruiting Command.
 9              MR. MCBIRNEY:  Same objection.
10              THE WITNESS:  I don't believe it would
11     impact my work.
12     BY MS. GOODMAN:
13          Q.   And why do you think that understanding
14     what the complaint says or would what this
15     lawsuit is about would not impact your work?
16              MR. MCBIRNEY:  Objection; foundation.
17     And asked and answered.
18              THE WITNESS:  I just don't believe it
19     would impact my work.
20     BY MS. GOODMAN:
21          Q.   And my question is why wouldn't it
22     impact your work?
23              MR. MCBIRNEY:  Same objections.
24              THE WITNESS:  It would not change how I
25     operate.
```

Page 44

```
 1     BY MS. GOODMAN:
 2          Q.   Okay.  And so am I correct -- is it your
 3     testimony that your only understanding of what
 4     this lawsuit is about comes from conversations
 5     with lawyers?  Is that accurate?
 6          A.   That is accurate.
 7          Q.   Okay.  And, to your knowledge, what is
 8     the role of the Navy in this lawsuit?
 9          A.   To my knowledge, the role of Navy
10     is that we purchase media, some of which from
11     Google.
12          Q.   And what is the significance of the
13     media that the Navy purchases, some of which is
14     from Google, to this lawsuit?
15              MR. MCBIRNEY:  Objection; foundation.
16     And to the extent it calls for privileged
17     information, I'd instruct you not to answer.
18     If you can answer without disclosing privileged
19     information, you can answer the question.
20              THE WITNESS:  Yeah.  I cannot answer
21     that question without disclosing privileged
22     information.
23     BY MS. GOODMAN:
24          Q.   And so we've talked about the Navy's
25     role in this lawsuit.  What is your role in this
```

Page 45

1  lawsuit?
2        MR. MCBIRNEY:  Objection; vague.
3        THE WITNESS:  Yeah.  Can you be more
4  specific?
5  BY MS. GOODMAN:
6     Q.  Why are you participating in this
7  lawsuit?
8        MR. MCBIRNEY:  Objection.  Assumes facts
9  not in evidence, and vague.
10       THE WITNESS:  Yeah.  I'm here at the --
11  the request of my counsel to be here to give this
12  deposition.
13  BY MS. GOODMAN:
14    Q.  Had counsel not requested your
15  participation, would you seek to participate in
16  this lawsuit?
17       MR. MCBIRNEY:  Objection.  Calls for
18  speculation.
19       THE WITNESS:  Can -- can you be more
20  specific with that question?
21  BY MS. GOODMAN:
22    Q.  Is the only reason you're participating
23  in this lawsuit because counsel requested your
24  participation?
25    A.  I'm participating in this -- in this

Page 46

1  lawsuit because of my role with the Navy and that
2  I've been requested to be here.
3     Q.  Okay.  So other than your role with the
4  Navy and that you've been requested to be here,
5  is there any other reason you're participating in
6  this lawsuit?
7        MR. MCBIRNEY:  Object to the form of the
8  question.
9        THE WITNESS:  There's no other reason
10  that I'm here.
11  BY MS. GOODMAN:
12    Q.  When, to your knowledge -- strike that.
13        How did you learn about this lawsuit?
14    A.  I believe it was via email.
15    Q.  From who?
16    A.  I don't recall.
17    Q.  Do you recall what agency sent you an
18  email about this lawsuit?  Was it within the
19  Navy?  Was it DOJ?  Was it somewhere -- was it
20  the ad agency?
21    A.  No.  It -- it was from -- it was from a
22  government source.  I don't recall if it was DOJ
23  or my chain of command.  I -- I -- I don't
24  recall.
25    Q.  Okay.  And approximately when did you

Page 47

1  receive this email from which you learned about
2  this lawsuit?
3     A.  I don't recall the exact date.
4     Q.  How about approximately?
5     A.  I believe it was earlier this year, --
6     Q.  Okay.
7     A.  -- but I don't recall an exact date.
8     Q.  Other than earlier this year, can you
9  pinpoint in time, more specifically, when you
10  learned about this lawsuit from an email?
11    A.  I cannot.
12    Q.  Do you know who made the decision for
13  the Navy to participate in this lawsuit?
14    A.  I do not.
15    Q.  Based on your knowledge and
16  understanding of the organizational structure of
17  the Navy, what is your best understanding of who
18  would need to be involved in making a decision
19  about the Navy's participation in this lawsuit?
20       MR. MCBIRNEY:  Objection; foundation.
21  Calls for speculation.
22       THE WITNESS:  I have no idea who would
23  need to make that decision.
24  BY MS. GOODMAN:
25    Q.  When you first learned about this

Page 48

1  lawsuit from an email, were you asked to
2  participate in the lawsuit --
3        MR. MCBIRNEY:  Objection; foundation.
4  BY MS. GOODMAN:
5     Q.  -- at that time?
6     A.  I don't recall the contents of the email
7  and what it -- what it said or asked of me.
8     Q.  When you received an email about this
9  lawsuit, you said it was from a government
10  source, correct?
11    A.  I believe so.
12    Q.  Okay.  To the best of your recollection,
13  was it from an attorney?
14    A.  Ma'am, I don't recall who sent the
15  email.
16    Q.  What was your reaction upon receiving
17  this email?
18       MR. MCBIRNEY:  Objection; foundation.
19       THE WITNESS:  Yeah.  I -- I don't
20  recall.
21  BY MS. GOODMAN:
22    Q.  Prior to learning of this lawsuit,
23  sometime in early 2023, have you been aware of
24  any investigation by the Department of Justice
25  into Google's digital advertising businesses?

Page 49

1  A. I was not aware.
2  Q. So is it accurate to say that the first
3  time you became aware of any DOJ investigation
4  into Google's digital advertising business was
5  upon learning of this lawsuit?
6  A. The first time I had any knowledge into
7  that was receiving the email notifying me of the
8  lawsuit.
9  Q. And that was sometime in 2023, correct?
10  A. I don't recall the exact date, but I
11  believe it to be earlier this year in 2023.
12  Q. Okay. And so prior to learning of this
13  lawsuit in 2020 -- 20 -- 2023, had you received
14  any outreach from the Department of Justice
15  inquiring about the Navy's digital advertising
16  purchases?
17  A. Not that I recall.
18  Q. How about -- have you had any
19  conversations with anybody at any state attorney
20  generals offices about this lawsuit?
21  A. No.
22  Q. Do you understand that other states are
23  participating in this lawsuit?
24  A. I don't understand what states are
25  participating in the lawsuit.

Page 50

1  Q. Okay. And so prior to the com --
2  the learning of this lawsuit, had you had any
3  discussions with any individuals from state
4  attorney generals' offices about Google's digital
5  advertising businesses?
6  A. Can you ask that question again? I'm
7  sorry.
8  Q. Prior to learning of this lawsuit, did
9  you have any conversations with any individual
10  representing a state attorney general about
11  Google's digital advertising businesses?
12  A. No.
13  Q. Okay. What's your title?
14  A. Director of marketing, Navy Recruiting
15  Command.
16  Q. How long have you had that title?
17  A. Since February of 2021.
18  Q. So your LinkedIn page says that your
19  title is chief marketing officer. Is that
20  accurate?
21  A. Yes. That's one and the same.
22  Q. So director of marketing for Navy
23  Recruiting Command is the same thing as the chief
24  marketing officer. Is that your testimony?
25  A. Yes.

Page 51

1  Q. Okay. Prior to February 2021, what was
2  your title?
3  A. Deputy director of marketing.
4  Q. And how long did you have the job of
5  deputy director of marketing?
6  A. Since March of 2020.
7  Q. And prior to March of 2020, what was
8  your title?
9  A. Prior to March of 2020, I was retired.
10  Q. For how long were you retired prior to
11  March of 2020?
12  A. Approximately eight months.
13  Q. And so -- so sometime in the summer of
14  the 2019 you retired. Is that accurate?
15  A. Yes. That -- that's accurate.
16  Q. Okay. And from what did you retire in
17  the summer of 2020 -- 2019?
18  A. From the Navy.
19  Q. Okay. How long were you in the Navy?
20  A. Approximately 21 years.
21  Q. I speak a bit as a layperson when I say
22  "in the Navy," but what's the difference between
23  being in the Navy, as I've just used that term,
24  and your job now at the Navy? Can you help me
25  understand that?

Page 52

1  A. Sure. In general terms, if someone says
2  they're "in the Navy," they're wearing a uniform.
3  They're a service member, active duty or
4  reserves.
5  Q. And so you retired from being a service
6  member or active duty or in the reserves sometime
7  in the summer of 2019?
8  A. Yes.
9  Q. Okay. How did you come to work as the
10  deputy director of marketing for the Navy
11  Recruiting Command?
12  A. I applied for a GS federal job that was
13  open for the deputy director and was hired.
14  Q. Okay. Prior to serving as -- or prior
15  to taking on the role of deputy director of
16  marketing, did you have experience -- work
17  experience in advertising or in marketing?
18  A. Prior to -- can -- can you repeat that
19  question?
20  Q. Prior to serving as the deputy director
21  of marketing, what, if any, work experience did
22  you have in advertising or marketing?
23  A. I worked in the N9 Department,
24  the marketing and advertising department, from
25  approximately August of '15 to the summer of '19.

Page 53

1  Q. And what -- that was while you were
2  -- were you active duty during that time or
3  reserve, or what was your status at that time?
4  A. Active duty.
5  Q. Okay. So when you worked in the N9
6  Department, what was your job?
7  A. I was the marketing operations officer.
8  Q. What did your job duties entail as the
9  marketing operations officer?
10  A. It was -- the job generally entailed
11  ensuring that filming productions were completed
12  on time, creative work was completed on time.
13  Generally, executing the marketing operations.
14  Q. Did your job duties entail purchasing
15  digital media?
16  A. No.
17  Q. Okay. Did it involve purchasing any
18  media when you were the marketing operations
19  officer?
20  A. No.
21  Q. And prior to serving as the marketing
22  operations officer, did you have any work
23  experience in advertising or marketing?
24  A. No.
25  Q. Okay. So let's go to your role as

Page 54

1  deputy director of marketing. What were your job
2  duties in that role?
3  A. The job duties were to assist the
4  director to manage the staff, and to be the
5  contracting officer representative, the COR.
6  Q. For what contract were you the COR when
7  you served as deputy director of marketing?
8  A. The marketing and advertising contract
9  with VMLY&R.
10  Q. Did you receive any training or
11  certifications in order to serve as a COR?
12  A. Yes.
13  Q. What training or certification did you
14  receive in order to serve as a COR?
15  A. I don't recall the exact course name.
16  I believe it was CLC 222. But there's a COR
17  training that -- that's mandated, and I believe
18  that was it.
19  Q. When did you take that training, to the
20  best of your recollection?
21  A. It would have been in the March of
22  -- the March of 2020 time frame, to the best of
23  my recollection.
24  Q. Who offers that CLC 222 training?
25  A. My understanding it's offered by Defense

Page 55

1  Acquisition University, DAU.
2  Q. What is Defense Acquisition University?
3  A. It's an online -- and sometimes
4  in-person -- training that -- for Department of
5  Defense jobs and specialties.
6  Q. When you were deputy director of
7  marketing, to whom did you report?
8  A. To the director of marketing.
9  Q. What is that individual's name?
10  A. Captain Matt Boren, B-o-r-e-n.
11  Q. Is Captain Boren still employed with the
12  Navy Recruiting Command?
13  A. No.
14  Q. Did he retire?
15  A. Yes.
16  Q. And was it his retirement that led
17  to your being -- serving as the director of
18  marketing for Navy Recruiting Command?
19  A. No.
20  Q. Okay. How did you get the job of
21  director of marketing for the Navy Recruiting
22  Command?
23  A. In February of 2021, Captain Boren was
24  moved to be -- moved jobs to be the chief of
25  staff, and the Admiral at the time moved me into

Page 56

1  the director job at that time.
2  Q. Okay. And now as the director of
3  marketing, do you report to the chief of staff?
4  A. I report to the Admiral.
5  Q. For how long have you reported to the
6  Admiral -- Admiral in your role as director of
7  marketing?
8  A. Since February of 2021.
9  Q. Okay. So the entire time you've been
10  director of marketing, you've reported to the
11  Admiral; is that correct?
12  A. Yes.
13  Q. Okay. Earlier you mentioned an
14  executive director, Dr. Sullivan. What is his
15  job?
16  A. He is the senior civilian at that
17  command, and the -- the Admiral's assistant.
18  Q. Do you have an -- an informal reporting
19  relationship to Dr. Sullivan?
20  A. I -- I wouldn't say -- I wouldn't
21  characterize it informal.
22  Q. How would you characterize it?
23  A. Formal.
24  Q. Okay. So other than to the Admiral, do
25  you report to anybody in your role as director of

Page 85

```
 1    may be an occasion where I might have, but not to
 2    my recollection.
 3    BY MS. GOODMAN:
 4        Q.   So it is possible that you've deleted
 5    documents in 2023 related to work, correct?
 6             MR. MCBIRNEY:  Object to the form of the
 7    question.
 8             THE WITNESS:  There's a possibility.
 9    BY MS. GOODMAN:
10        Q.   Okay.  Under Navy's -- are you aware of
11    any document retention policies at the Navy?
12        A.   Yes.
13        Q.   And what do those policies provide?
14        A.   Sitting here today, I don't recall the
15    exact stipulations in those policies.
16        Q.   How about generally?  What do you recall
17    as to what those document retention policies
18    state?
19        A.   Sitting here today, I -- I don't recall.
20        Q.   Okay.  To your knowledge, do the
21    document retention policies permit you to delete
22    files?
23             MR. MCBIRNEY:  Objection; vague.
24             THE WITNESS:  Yeah.  Sitting here today,
25    I don't recall the stipulations of that policy.
```

Page 86

```
 1    BY MS. GOODMAN:
 2        Q.   And thus you don't recall whether they
 3    permit you to delete files, correct?
 4             MR. MCBIRNEY:  Objection.  Asked and
 5    answered.
 6             THE WITNESS:  Yeah.  My testimony is,
 7    sitting here today, I do not recall the exact
 8    stipulations of that policy.
 9    BY MS. GOODMAN:
10        Q.   And, therefore, correct, you don't
11    recall whether those policies permit you to
12    delete files?
13             MR. MCBIRNEY:  Objection.
14    BY MS. GOODMAN:
15        Q.   Is that accurate?
16             MR. MCBIRNEY:  Objection.  Asked and
17    answered.
18             THE WITNESS:  Yeah.  So my testimony is,
19    sitting here today, I do not recall the exact
20    stipulations of that policy.
21    BY MS. GOODMAN:
22        Q.   Okay.  And so you can't answer whether,
23    as a result of your inability to recall the exact
24    stipulations of this -- of the policy, you cannot
25    an -- you don't recall whether or not that policy
```

Page 87

```
 1    permits you to delete files.  Is that accurate?
 2             MR. MCBIRNEY:  Objection.  Asked and
 3    answered.
 4             THE WITNESS:  So it's my testimony that,
 5    sitting here today, I don't recall the specific
 6    stipulations of that policy.
 7    BY MS. GOODMAN:
 8        Q.   Okay.  And, therefore, you can't testify
 9    one way or another to what that policy says with
10    respect to the deletion of files, correct?
11             MR. MCBIRNEY:  Objection.  Asked and
12    answered.
13             THE WITNESS:  Yeah.  Those were not my
14    words.  I said, sitting here today, I don't
15    remember the exact stipulations of the policy.
16    BY MS. GOODMAN:
17        Q.   Other than a lawyer, has anybody told
18    you anything about preserving documents with
19    respect to this litigation?
20             THE WITNESS:  I'm not sure of the
21    communications I received, whether those would be
22    privileged or not.
23             MR. MCBIRNEY:  If you received
24    communications regarding preserving documents
25    that were either from a lawyer or at the
```

Page 88

```
 1    direction of a lawyer, that's privileged and I'd
 2    instruct you not to answer.  If you received
 3    communications about preserving documents that do
 4    not fall into those categories and you are
 5    confident that they do not come from counsel, you
 6    can answer.
 7             THE WITNESS:  Yeah.  Then I cannot
 8    answer the question without revealing privileged
 9    conversations.
10    BY MS. GOODMAN:
11        Q.   And for the record -- and this is a yes
12    or no question -- have you received any direction
13    from anybody with respect to preserving documents
14    related to this litigation?
15             MR. MCBIRNEY:  You can answer that yes
16    or no.
17             THE WITNESS:  Yes.
18    BY MS. GOODMAN:
19        Q.   When did you receive such direction?
20        A.   I don't recall the exact time frame.
21    Earlier this year in 2023.
22        Q.   Was it before or after you learned about
23    this lawsuit?
24        A.   I don't recall.
25        Q.   Prior to this lawsuit, have you ever
```

Page 89

1  requested legal advice from the Department of
2  Justice Antitrust Division?
3       A.   No.
4       Q.   Prior to learning about this lawsuit,
5  have you ever requested legal advice from the
6  Department of Justice Antitrust Division?
7       A.   No.
8       Q.   Since receiving instructions with
9  respect to preserving documents related to this
10 litigation, have you deleted any documents on any
11 of your devices?
12      A.   Not to my knowledge.
13      Q.   So you've testified that VMLY&R is the
14 ad agency for the Navy; is that correct?
15      A.   That is correct.
16      Q.   And they have been the ad agency for the
17 Navy since, approximately, 2016.  Is that
18 accurate?
19      A.   They have been the ad agency since
20 approximately 2016, yes.
21      Q.   Okay.  And their contract with the Navy
22 was renewed or reentered into in 2021.  Is that
23 accurate?
24      A.   Yes, it was renewed in 2021.
25      Q.   Okay.  Other than the VMLY&R, is there

Page 90

1  any other agency -- ad agency engaged by the
2  Naval -- Navy Recruiting Command related to
3  advertising?
4            MR. MCBIRNEY:  Objection; foundation.
5            THE WITNESS:  Our contract is with
6  VMLY&R.  It's my understanding they have other
7  businesses and agencies that work with them.  But
8  our contract is with VMLY&R.
9  BY MS. GOODMAN:
10      Q.   And are you aware of any contract
11 between the Navy and any other ad agency related
12 to advertising?
13      A.   No.
14      Q.   Were you involved in the selection of
15 VMLY&R when their contract was renewed in 2021?
16           THE WITNESS:  Am I allowed to discuss
17 contractual selection items?
18           MR. MCBIRNEY:  You can answer that
19 question yes or no and we'll go from there.
20           THE WITNESS:  Okay.  Can you ask that
21 question again?
22 BY MS. GOODMAN:
23      Q.   Were you involved in the selection of
24 VMLY&R when their contract was renewed in 2021?
25      A.   Yes.

Page 91

1       Q.   What was your involvement?
2       A.   I was on the panel of folks reviewing
3  the non-price proposals from all vendors.
4       Q.   And when you say "reviewing the
5  non-price proposals," what do you mean by that?
6       A.   So to review -- so when a contract is
7  renewed, multiple businesses can apply for that
8  contract, and non-price proposals are part of
9  that bidding process.  And then a board of people
10 will look at that and review those, and I was on
11 that panel.
12      Q.   What are the kinds of non-price
13 proposals that are put forward as part of that
14 bid -- bidding process?
15           MR. MCBIRNEY:  Object to the form of the
16 question.
17           THE WITNESS:  You'd have to be more
18 specific.  I'm sorry.
19 BY MS. GOODMAN:
20      Q.   Well, what do you mean by non-price
21 proposals?  What do those entail?
22      A.   Those are proposals of how the vendor or
23 the business would satisfy the requirements given
24 in the work statement in the RFQ.
25      Q.   And so specifically with respect to

Page 92

1  selecting an advertising agency, what are the
2  things that you looked for in the non-price
3  proposals that mattered to you in selecting a
4  business to contract with?
5       A.   Sure.  I don't recall the specific
6  criteria.  That was a few years ago.
7       Q.   How about generally?  What do you
8  recall what mattered to you in terms of non-price
9  proposals when selecting an ad agency?
10      A.   In general, that they demonstrated in
11 their write-up a thorough understanding of the
12 requirement and ability to meet the requirement.
13      Q.   And what was the requirement that the
14 Navy put forward with respect to finding a
15 contractor related to advertising?
16      A.   Sure.  It was a -- a work statement that
17 was issued -- multi-page work statement.
18      Q.   What are the kinds of things that the
19 Navy wanted from an advertiser?
20           MR. MCBIRNEY:  Objection; vague.
21           THE WITNESS:  Yeah.  Sitting here today,
22 I -- I don't recall the specifics contained in
23 that work statement, --
24 BY MS. GOODMAN:
25      Q.   How about generally?

Page 205

1  A. I -- sitting here today, I do not know
2  who makes that realtime optimization.
3  Q. Okay. Do you know, not their name, but
4  the company for which they work?
5     MR. MCBIRNEY: Objection; vague.
6     THE WITNESS: Yeah. I -- sitting here
7  today, I can't be certain if it would be VMLY&R
8  or Wavemaker.
9  BY MS. GOODMAN:
10  Q. Okay. And could it be somebody at the
11  Trade Desk making those realtime optimization
12  decisions?
13     MR. MCBIRNEY: Objection; foundation.
14     THE WITNESS: Sitting here today, I
15  don't know.
16  BY MS. GOODMAN:
17  Q. Okay. Let's go back to that spreadsheet
18  attached to Exhibit 58. I just have one question
19  at the end of it.
20  A. Sure.
21  Q. When we were looking at the
22  Recommended Partners, the one on the first page
23  of this spreadsheet, --
24  A. Yes.
25  Q. -- it's accurate that these are all

Page 206

1  partners that the Navy is using at the same
2  time with respect to digital ad spend. Is that
3  accurate?
4  A. Maybe not exactly the way you described,
5  because it's broken down into months.
6  Q. Okay.
7  A. So, for instance, YouTube Masthead looks
8  to appear in September but not July and August.
9  Q. Okay. So the -- the companies or part
10  -- partners who have dollars allocated to them in
11  the month of September, those are all being used
12  at the same time. Is that accurate?
13  A. Sitting here today, to the best of my
14  knowledge, yes.
15     MS. GOODMAN: Okay. Shall we take a
16  break?
17     MR. MCBIRNEY: Sure.
18     THE VIDEOGRAPHER: The time is 4:37 p.m.
19  This ends Unit 4. We're off the record.
20     (Recess taken.)
21     THE VIDEOGRAPHER: The time is 4:54 p.m.
22  This begins Unit Number 5. We're on the record.
23  BY MS. GOODMAN:
24  Q. Mr. Owens, have you heard the term Open
25  Web Display advertising?

Page 207

1  A. I have heard that term.
2  Q. What do you understand it to mean?
3  A. I'm not certain the exact meaning of
4  Open Web Display advertising.
5  Q. Aside from its exact meaning, what do
6  you generally understand that term to mean?
7  A. I generally understand it to mean
8  display advertising.
9  Q. And when you say "display advertising,"
10  what do you mean by that?
11  A. Placement of display ads.
12  Q. And does display advertising include
13  placement of display ads on the New York Times,
14  if they're purchased directly from the New York
15  Times?
16     MR. MCBIRNEY: Objection; foundation.
17     THE WITNESS: Yeah. I -- again, I don't
18  have a -- a firm enough understanding of that
19  term specifically to -- to answer in any more
20  detail than that.
21  BY MS. GOODMAN:
22  Q. Okay. Are you aware of any different
23  kinds of display ads or -- when you -- strike
24  that.
25     Can you give any examples of display

Page 208

1  advertising?
2  A. Sure. Display advertising could be ads
3  placed on unique individual websites.
4     (Whereupon realtime feed froze due to
5  internet disconnection.)
6     THE REPORTER: I think it stopped. Can
7  we --
8     MS. GOODMAN: Yeah. Let's take a break.
9     THE VIDEOGRAPHER: The time is 4:57 p.m.
10  We're going off the record.
11     (Recess taken.)
12     THE VIDEOGRAPHER: The time is 5:03 p.m.
13  We're on the record.
14  BY MS. GOODMAN:
15  Q. Mr. Owens, does the term Display
16  Advertising, as you understand it, include
17  placing ads on websites through a direct deal
18  between the publisher and the advertiser?
19     MR. MCBIRNEY: Objection; foundation.
20     THE WITNESS: Display Advertising, as I
21  know it, is advertising by the use of display
22  ads, to my knowledge.
23  BY MS. GOODMAN:
24  Q. Okay. And, to your knowledge, just
25  again for the record, what is your understanding

Page 209

1  of the term Open Web Display Advertising?
2        MR. MCBIRNEY:  Objection; foundation.
3  Asked and answered.
4        THE WITNESS:  As I testified, I'm
5  familiar with the term; however, I don't know the
6  definition of Open Web Display Advertising.
7  BY MS. GOODMAN:
8     Q.   How are you familiar with the term Open
9  Web Display Advertising?
10    A.   I've -- I've seen the term.  But,
11 again, I -- I can't describe to you exactly the
12 definition of that.  But, in general terms, I
13 understand it to be, as stated earlier, Display
14 Advertising.
15 BY MS. GOODMAN:
16    Q.   Okay.  Where have you seen the term Open
17 Web Display Advertising?
18    A.   I can't recollect exactly where I saw
19 it.
20    Q.   Generally speaking, can you describe
21 anywhere you've seen the term Open Web Display
22 Advertising, such as in emails or documents
23 with your ad agency, on -- on other websites
24 discussing the advertising industry, any place
25 that you recall seeing that term?

Page 210

1        MR. MCBIRNEY:  Object to form.
2        THE WITNESS:  Sitting here today, I -- I
3  cannot remember where I've seen that term.
4  BY MS. GOODMAN:
5     Q.   Do you recall ever seeing it in any
6  documents provided to you by VMLY&R?
7     A.   As mentioned a moment ago, I cannot
8  recall where I've seen the term.
9     Q.   And, thus, you don't know whether you've
10 seen it in any documents provided by VMLY&R,
11 correct?
12       MR. MCBIRNEY:  Objection.  Asked and
13 answered.  Mischaracterizes the testimony.
14       THE WITNESS:  Yeah.  As I -- as I
15 testified, I don't recollect where I've seen the
16 term.
17 BY MS. GOODMAN:
18    Q.   Okay.  Have you had any discussions
19 with anybody about the term Open Web Display
20 Advertising and what it means?
21    A.   Not to my knowledge.
22    Q.   Prior to the filing of this lawsuit
23 in January of 2023, were you aware of any
24 anticompetitive conduct on the part of Google
25 affecting Navy's advertising?

Page 211

1        MR. MCBIRNEY:  You can answer that
2  question to the extent it does not disclose
3  communications with counsel.
4        THE WITNESS:  To my knowledge, no.
5  BY MS. GOODMAN:
6     Q.   And how about prior to this lawsuit,
7  did you ever have any concerns in your capacity
8  as the director of marketing for the Navy
9  Recruiting Command that Google was engaging in
10 anticompetitive conduct related to digital
11 advertising?
12       MR. MCBIRNEY:  Object to foundation.
13       THE WITNESS:  Prior to this, I had no
14 knowledge of nor reason to suspect that of
15 Google.
16 BY MS. GOODMAN:
17    Q.   Prior to this lawsuit, did you have
18 ever -- did you ever have any concerns that
19 Google was engaging in any conduct that was
20 causing the Navy harm with respect to its digital
21 advertising?
22    A.   Sitting here today, I can -- I can think
23 of no reason to believe that.
24    Q.   You described Google, in fact, as a
25 partner of the Navy, right?

Page 212

1        MR. MCBIRNEY:  Objection.  Assumes
2  facts.
3        THE WITNESS:  Oftentimes, a lot of the
4  businesses that we use will be referred to as a
5  partner if we're doing business with them, so
6  I -- I may have referred to Google as a partner.
7  BY MS. GOODMAN:
8     Q.   Has Google helped the Navy with respect
9  to recruiting more sailors to join?
10       MR. MCBIRNEY:  Objection; foundation.
11       THE WITNESS:  We have found lots of
12 value in many of the Google buys that we've done.
13 BY MS. GOODMAN:
14    Q.   And the Google buys that you've done
15 that you've found value in, does that relate to
16 YouTube buys?
17    A.   Yes.
18    Q.   Okay.  And how about with respect to
19 search?
20    A.   Yes.
21    Q.   Okay.  Can you describe in any more
22 detail the value that you have found in many of
23 the Google buys that the Navy has done?
24    A.   In particular, some of the YouTube
25 activations we've had have had extremely high

Page 213

1  video completion rates.
2      Q.  Any other --
3          THE VIDEOGRAPHER:  Counsel, the Zoom's
4  offline.
5          MS. GOODMAN:  Let's take a break.
6          MR. MCBIRNEY:  We're going to be here a
7  while.
8          THE VIDEOGRAPHER:  The time is 5:07 p.m.
9  We're going off the record.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  Time is 5:14 p.m.
12 We're on the record.
13 BY MS. GOODMAN:
14     Q.  Mr. Owens, can you describe any other
15 instances that the Navy has found value in any of
16 the Google buys that it has done?
17     A.  Paid search, as well.  We've found value
18 there.
19         I don't have a list at the ready, but
20 -- but there's -- it's been on many occasions.
21     Q.  Can you approximate the number of
22 occasions that you've found value in Google buys
23 for the Navy?
24         MR. MCBIRNEY:  Objection; foundation.
25         THE WITNESS:  Yeah.  I -- I can't

Page 214

1  provide an exact number or even a general number.
2  BY MS. GOODMAN:
3      Q.  Just many?
4      A.  Yes.
5      Q.  Has anybody at VMLY&R ever told you that
6  Google was engaging in anticompetitive conduct
7  with respect to digital advertising?
8      A.  No.
9      Q.  Did anybody at Wavemaker ever tell you
10 that Google was engaging in anticompetitive
11 conduct with respect to digital advertising?
12     A.  No.
13     Q.  Has anyone ever told you that Google is
14 engaging in anticompetitive conduct with respect
15 to digital advertising.
16         MR. MCBIRNEY:  I interpret that to mean
17 anyone other than the attorneys.  You can answer
18 to the extent --
19         MS. GOODMAN:  The question is the
20 question.
21         MR. MCBIRNEY:  Okay.  Well, then I would
22 instruct the witness not to answer to the extent
23 it requires divulging privileged communication.
24         THE WITNESS:  I'm going to listen to my
25 counsel --

Page 215

1          MS. GOODMAN:  Okay.
2          THE WITNESS:  -- and not provide the
3  privileged communication.
4  BY MS. GOODMAN:
5      Q.  Okay.  Yes or no question:  Has
6  anyone ever told you that Google is engaging in
7  anticompetitive conduct with respect to digital
8  advertising.
9          MR. MCBIRNEY:  If you want to ask him
10 whether anyone other than his attorneys told him
11 that, he can answer that question.  But I'm not
12 -- I'm instructing him not to answer that
13 question.
14 BY MS. GOODMAN:
15     Q.  I'm not asking for the identity of who.
16 It's a -- it's a yes or no question as to whether
17 any human on this earth --
18         MR. MCBIRNEY:  I understand.
19 BY MS. GOODMAN:
20     Q.  -- has ever told you, Mr. Owens, that
21 Google has engaged in anticompetitive conduct
22 with respect to digital advertising?
23         MR. MCBIRNEY:  And I'm going to instruct
24 the witness not to answer that question.  If you
25 want to limit your question to exclude counsel --

Page 216

1          MS. GOODMAN:  Make your instruction.
2  Don't tell me how to ask my questions, please.
3          MR. MCBIRNEY:  I'm instructing the
4  witness not to answer your improper question.
5  BY MS. GOODMAN:
6      Q.  Are you following that instruction, sir?
7      A.  I'm following the instruct of my
8  counsel.
9      Q.  Okay.  Other than any lawyer, has
10 anybody ever told you, Mr. Owens, that Google has
11 engaged in anticompetitive conduct with respect
12 to digital advertising?
13     A.  No.
14     Q.  To the extent you have any knowledge of
15 any anticompetitive conduct on the part of Google
16 with respect to digital advertising, does it come
17 only through conversations with lawyers?
18         MR. MCBIRNEY:  Objection.  I'm going to
19 instruct the witness not to answer that question.
20         THE WITNESS:  I'm going to listen to my
21 counsel.
22 BY MS. GOODMAN:
23     Q.  Okay.  Sitting here today, do you have
24 any concerns that the Navy -- strike that.
25         Sitting here today, do you have any

Veritext Legal Solutions
800-567-8658    973-410-4098

Page 217

```
 1   concerns that Google has harmed the Navy?
 2           MR. MCBIRNEY:  Objection; vague.
 3           THE WITNESS:  Can you be more specific
 4   with the question?
 5   BY MS. GOODMAN:
 6       Q.  Sitting here today, do you have any
 7   concerns that Google has engaged in any conduct
 8   that hurt -- harms the Navy?
 9           MR. MCBIRNEY:  Objection; vague.
10           THE WITNESS:  Aside from the reason why
11   I'm here today, I have no reason to believe that
12   Google has harmed the Navy in any other way.
13   BY MS. GOODMAN:
14       Q.  Okay.  And when you say "the reason why
15   I'm here today," what do you mean?
16       A.  In relation to this deposition.
17       Q.  Okay.  Can you tell me any reasons
18   -- strike that.
19           Can you tell me any information about
20   how, if at all, Google has harmed the Navy?
21           MR. MCBIRNEY:  Objection to the form and
22   foundation.
23           THE WITNESS:  I guess am I able to
24   answer that question without divulging any
25   privileged communication?
```

Page 218

```
 1           MR. MCBIRNEY:  Well, if you are able to
 2   answer that question without divulging privileged
 3   information, you can answer the question.  If you
 4   are not able to answer the question without
 5   divulging privileged information, then I'd
 6   instruct you not to answer.
 7           THE WITNESS:  Can you ask the question
 8   again?
 9   BY MS. GOODMAN:
10       Q.  Can you tell me any information about
11   how, if at all, Google has harmed the Navy?
12           MR. MCBIRNEY:  And, again, same
13   objections to form and foundation.
14           THE WITNESS:  I cannot answer that
15   question without divulging a privileged
16   communication.
17   BY MS. GOODMAN:
18       Q.  Okay.  To your knowledge, did the Navy
19   purchase any display advertising directly from
20   Google?
21           MR. MCBIRNEY:  Objection.  Calls for a
22   legal conclusion.
23           MS. GOODMAN:  Read the RFA briefing.
24   BY MS. GOODMAN:
25       Q.  You may answer.
```

Page 219

```
 1           MR. MCBIRNEY:  And lack of foundation.
 2           THE WITNESS:  So the Navy has purchased
 3   display advertising via our contract with VMLY&R,
 4   and we've asked them to purchase that on our
 5   behalf.
 6   BY MS. GOODMAN:
 7       Q.  Okay.  But my question is did the
 8   Navy -- to your knowledge, as director of
 9   marketing for the Navy Recruiting Command and as
10   the Contracting Officer Representative, did the
11   Navy purchase any display advertising directly
12   -- not through VMYL&R or any other intermediary
13   -- did the Navy purchase any display advertising
14   directly from Google?
15           MR. MCBIRNEY:  Objection.  Asked and
16   answered.  Calls for a legal conclusion, and lack
17   of foundation.
18           THE WITNESS:  We have purchased our
19   marketing and advertising and media from Google,
20   as well as other companies, through our ad agency
21   contract.
22   BY MS. GOODMAN:
23       Q.  Okay.  You're -- sir, you're not
24   answering my question, which is whether you've
25   purchased any display advertising -- meaning when
```

Page 220

```
 1   I say you, the Navy, to your knowledge, have any
 2   purchases been made directly, meaning between you
 3   -- the Navy -- and Google, as the two parties to
 4   the transaction, has Google -- has the Navy made
 5   any purchases of display advertising directly
 6   from Google?
 7           MR. MCBIRNEY:  Objection.  Asked and
 8   answered.  Calls for a legal conclusion.  Lack of
 9   foundation.
10           THE WITNESS:  Yeah.  I'm -- I'm
11   not a lawyer, so I'm not certain of the legal
12   definition of "purchase directly."  But I can
13   tell you that, through our contract with VMLY&R,
14   we have asked them to purchase media on our
15   behalf from Google as well as other businesses.
16   BY MS. GOODMAN:
17       Q.  Okay.  What do you mean -- what do you
18   understand the term "purchase" to mean just in
19   ordinary use?
20       A.  I would define "purchase" as an exchange
21   of resources for a good or service.
22       Q.  Okay.  What do you understand the term,
23   in ordinary use, "directly" to mean?
24           MR. MCBIRNEY:  Objection.  Calls for a
25   legal conclusion in this context.
```

Page 221

```
 1   BY MS. GOODMAN:
 2       Q.  I'm asking for the plain language,
 3   ordinary meaning, that you, Mr. Owens, understand
 4   the term "directly" to mean?
 5           MR. MCBIRNEY:  Same objections, and
 6   vague.
 7           THE WITNESS:  Can I answer the question?
 8           MR. MCBIRNEY:  You can answer if you
 9   can, yeah.
10           THE WITNESS:  I would think -- I would
11   understand directly to mean either -- I mean,
12   between two parties.
13   BY MS. GOODMAN:
14       Q.  Okay.  So with your under -- with the
15   definitions that you've provided, based on your
16   ordinary understanding of these words of the term
17   "purchase" and "directly," I'm going to ask you a
18   series of questions, and I would ask you to
19   please give me a yes or no answer.
20           Did the Navy purchase any display
21   advertising directly from Google?
22           MR. MCBIRNEY:  Objection.  Asked and
23   answered.  Calls for a legal conclusion.  Lack of
24   foundation.
25           THE WITNESS:  The Navy purchased
```

Page 222

```
 1   advertising from Google via our contract with
 2   VMLY&R.
 3   BY MS. GOODMAN:
 4       Q.  So, no, the Navy did not purchase
 5   anything directly from Google, correct?
 6           MR. MCBIRNEY:  Objection.  Asked
 7   and answered.  Calls for a legal conclusion.
 8   Mischaracterizes the witness's testimony.
 9           THE WITNESS:  Yeah.  That was not
10   my testimony.  My testimony is that the Navy
11   purchased advertising from Google via our
12   contract with VMLY&R.
13   BY MS. GOODMAN:
14       Q.  Using your term -- your understanding
15   of the term "directly"; that is, between two
16   parties, I'll ask you a series of questions.
17           Was there any transaction between the
18   Navy and Google for the purchase of display
19   advertising, --
20           MR. MCBIRNEY:  Objection.  Asked --
21   BY MS. GOODMAN:
22       Q.  -- that you are aware of.
23           MR. MCBIRNEY:  Objection.  Asked and
24   answered.  Lack of foundation.  Calls for a legal
25   conclusion.
```

Page 223

```
 1           THE WITNESS:  Our purchase was from
 2   Google via our contract with VMLY&R.
 3   BY MS. GOODMAN:
 4       Q.  You have no other answer that you can
 5   provide to my questions?
 6           MR. MCBIRNEY:  Objection; argumentative.
 7           THE WITNESS:  Well, without knowing what
 8   your other questions are, I can't --
 9   BY MS. GOODMAN:
10       Q.  I'm asking whether you can answer my
11   question in a yes or no manner, and, if you
12   cannot, why you are unable to answer it in a yes
13   or no manner based on the definitions in your
14   understanding of the term "purchase" and of the
15   term "directly."
16           MR. MCBIRNEY:  Objection.
17   Argumentative.  Harassment.
18           THE WITNESS:  It's my understanding that
19   I should have the ability to provide complete
20   answers, --
21   BY MS. GOODMAN:
22       Q.  Mm-hmm.
23       A.  -- and I don't want my answer to be
24   mischaracterized, so that's why I'm -- I'm being
25   complete.
```

Page 224

```
 1           In order for me to certify invoices
 2   for payment, I have to see what went where, so
 3   that includes what went to Google, what went to
 4   Facebook, et cetera.  So our purchases are from
 5   those entities, but it's via our contract with
 6   VMLY&R.
 7       Q.  And you don't send dollars directly to
 8   Google, correct?
 9           MR. MCBIRNEY:  Objection.  Calls for
10   legal conclusion.  Asked and answered.  Lack of
11   foundation.
12   BY MS. GOODMAN:
13       Q.  Do you ever write a check or issue a
14   payment via electronic bank transfer from a Navy
15   account to Google?
16           MR. MCBIRNEY:  Objection; vague.
17   Foundation.
18           THE WITNESS:  We pay for our purchases
19   from various vendors through our contract with
20   the agency.
21   BY MS. GOODMAN:
22       Q.  And so when you need to pay Google, you
23   don't pay Google directly.  Rather, you pay
24   VMLY&R, correct?
25           MR. MCBIRNEY:  Objection.  Asked and
```

```
                                              Page 281
 1   Jimmy McBirney, Esq.
 2   jimmy.mcbirney@usdoj.gov
 3                    August 17, 2023
 4   RE:   United States, Et Al v. Google, LLC
 5      8/15/2023, Allen Owens (#6037511)
 6      The above-referenced transcript is available for
 7   review.
 8      Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   erratas-cs@veritext.com
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19     If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22                  Yours,
23                  Veritext Legal Solutions
24
25
                        Veritext Legal Solutions
800-567-8658                                      973-410-4098
```

```
                                              Page 282
 1   United States, Et Al v. Google, LLC
 2   Allen Owens (#6037511)
 3            E R R A T A  S H E E T
 4   PAGe_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____    _____
24   Allen Owens                         Date
25
                        Veritext Legal Solutions
800-567-8658                                      973-410-4098
```

```
                                              Page 283
 1   United States, Et Al v. Google, LLC
 2   Allen Owens (#6037511)
 3            ACKNOWLEDGEMENT OF DEPONENT
 4      I, Allen Owens, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10
11   _____    _____
12   Allen Owens                        Date
13   *If notary is required
14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15           _____ DAY OF _____, 20___.
16
17
18             _____
19                  NOTARY PUBLIC
20
21
22
23
24
25
                        Veritext Legal Solutions
800-567-8658                                      973-410-4098
```

**[& - 3]**                                                              Page 1

| & | | | |
|---|---|---|---|
| **&** 1:14 2:14 97:23,25 114:14 115:21 | **146** 3:17 **15** 1:11 52:25 **15566** 132:13 132:19 **15583** 133:18 **15586** 134:17 136:15 **15622** 131:3 **15th** 4:2 **16** 172:23 198:3,4 200:18 **17** 281:3 **172** 3:19 **17a** 97:22 **17th** 280:19 **182** 3:21 **187** 3:23 **19** 52:25 **19122** 149:4 **19129** 149:11 **19182** 146:7 **1:23** 1:7 4:14 **1:25** 111:23 **1st** 250:3 | **2001** 1:14 2:15 **2002** 100:5 173:11 **201** 198:6 **2015** 183:11 **2016** 27:18,18 89:17,20 **2017** 182:15 184:1,8 185:3 185:11,13,16 186:7 **2018** 183:11,14 **2019** 51:14,17 52:7 262:6 **202.223.7341** 2:16 **202.514.2414** 2:8 **2020** 49:13 51:6,7,9,11,17 54:22 60:7,10 60:13,18 95:20 95:24 96:1 150:20 **2021** 50:17 51:1 55:23 56:8 89:22,24 90:15,24 95:11 97:8,16 146:11 **2022** 20:3 38:25 131:9 173:6,20 174:16 187:8 187:18 188:1 | **2023** 1:11 4:3 20:2,13 28:1 32:17 34:14 38:14 39:9,19 48:23 49:9,11 49:13 84:21 85:5 88:21 152:13 169:15 169:22 170:4 170:18 171:15 171:25 210:23 262:6 280:19 281:3 **20530** 2:7 **206** 181:7,12 **21** 51:20 135:18,22 136:1 **22** 96:24 131:10 249:4 **222** 54:16,24 **22nd** 173:6,11 173:19 174:9 174:16 **241143** 112:3 **24th** 146:11 **257031** 97:1 **26** 64:23 **28531** 187:6 **2:53** 159:18 |
| **0** | | | |
| **00108** 1:7 4:14 | | | |
| **1** | | | |
| **1** 4:9 62:12 103:25 194:5 202:21,22 203:19 **10** 243:4 **102** 3:11 **103900** 182:9 **10:53** 62:11 **111** 3:13 **11516** 280:21 **11:31** 81:8 **122** 148:12,13 **12765** 104:20 **12780** 105:15 107:13 **12781** 108:3 **12800** 102:6 **12:33** 111:17 **12:45** 174:16 **13** 181:8,13 182:6 **130** 3:15 **138** 112:16 113:6 **14** 186:25 258:25 | | | |
| | | **2** | **3** |
| | | **2** 62:18 98:23 99:6 103:25 108:5 111:18 112:16,22 113:6,12 174:13 199:17 200:3 **20** 26:25 27:3 49:13 181:12 283:15 | **3** 103:25 104:3 104:9,14 111:24 114:15 159:19 |

Veritext Legal Solutions
800-567-8658                                      973-410-4098

## [witness - workflow] — Page 66

| | | | |
|---|---|---|---|
| 118:21 119:5 | 191:16 192:9 | 246:11,16 | 30:9 31:3 |
| 119:23 120:11 | 193:8,23 194:9 | 252:16 253:5,8 | 41:16,24 42:5 |
| 121:6,19 122:2 | 196:5,16 197:8 | 254:2,9 255:8 | 42:13,17,21 |
| 122:18 123:19 | 198:16 199:5 | 255:15 256:4,8 | 43:7,11,15,19 |
| 125:3,24 127:5 | 199:17 201:3 | 256:17 257:1,2 | 43:22 52:9,16 |
| 134:4 135:10 | 201:23 203:3 | 257:11,13 | 52:21 53:12,22 |
| 135:21 137:4 | 203:13,25 | 258:6,8,23 | 60:22 61:1,20 |
| 137:11,18 | 204:8 205:6,14 | 259:12,13,21 | 63:1 66:24 |
| 138:15 139:4 | 207:17 208:20 | 263:16 264:6 | 67:10 68:15,24 |
| 139:13 140:20 | 209:4 210:2,14 | 264:17 265:4 | 69:5,16,23 |
| 141:1 142:1,11 | 211:4,13 212:3 | 265:12,24 | 70:4,8,11,18 |
| 143:3,19 | 212:11 213:25 | 266:8,18 267:6 | 71:14,19 72:4 |
| 144:22 145:10 | 214:22,24 | 268:14 269:2 | 72:5 73:7 74:6 |
| 145:24 148:5 | 215:2,24 216:4 | 269:19 270:10 | 74:10,16 75:1 |
| 148:22 150:6 | 216:19,20 | 270:12,14,22 | 75:5 82:2,7,15 |
| 150:16 151:10 | 217:3,10,23 | 271:15 272:8 | 83:17 84:11 |
| 153:2,12 | 218:7,14 219:2 | 273:2,12,14,20 | 85:5 90:7 |
| 156:14 157:1,8 | 219:18 220:10 | 274:7,10,22 | 91:24 92:16,17 |
| 157:18 158:18 | 221:7,10,25 | 277:23 278:6 | 92:23 93:10,13 |
| 159:3,10 160:8 | 222:9 223:1,7 | 278:15 280:14 | 94:11 101:19 |
| 160:19 163:24 | 223:18 224:18 | 280:18 281:8 | 103:11 106:2 |
| 164:15 165:2 | 225:2,13 226:9 | 281:10,12,19 | 107:10 113:21 |
| 166:12 167:1 | 226:17 227:1,9 | **witness's**  222:8 | 133:16 137:24 |
| 167:13,24 | 227:17 228:4 | **witnesses**  12:23 | 139:8 145:3,15 |
| 168:14,24 | 228:21 229:4 | **wmglobal.com** | 179:4 180:18 |
| 169:10 170:15 | 229:16 231:6,8 | 146:10 | 188:12 190:17 |
| 171:11,20 | 232:9 233:12 | **wood**  2:6,11 | 191:22 205:4 |
| 172:8,21 175:4 | 233:23 234:12 | 5:16,17,18 | 251:7,14 259:4 |
| 175:22 176:6 | 236:19 237:7 | 8:12 | **worked**  52:23 |
| 176:19 177:3 | 237:14 238:5 | **words**  87:14 | 53:5 81:17 |
| 178:17 181:11 | 239:12,18 | 194:4 221:16 | 82:21 187:17 |
| 181:20 182:5 | 240:23 241:6 | **work**  12:18 | 187:25 |
| 184:10,25 | 242:2,18 | 22:7 24:19,25 | **workflow** |
| 185:19 186:2 | 244:15 245:2 | 25:1 28:18 | 243:19 |
| 186:16 191:6 | 245:14 246:1 | 29:18,23,24 | |

## [workforce - zoom's] — Page 67

| | | | |
|---|---|---|---|
| **workforce** | 72:19 73:2,13 | 270:10,22 | 168:18 176:14 |
| 76:12 | 74:1 75:18 | 273:2,14 278:6 | 176:24 177:3 |
| **working**  64:23 | 77:4,22 80:15 | **year**  20:10 | 177:11,17,21 |
| 65:1 95:18 | 84:23 85:24 | 27:25 32:16 | 178:14 181:17 |
| 96:2 191:19 | 86:6,18 87:13 | 34:12,18,25 | 181:17,18,22 |
| 204:23 234:1 | 88:7 92:21 | 38:9 39:8,12 | 181:25 192:5 |
| 236:4 | 93:16 94:5 | 39:19 47:5,8 | 192:16,17 |
| **works**  22:9 | 96:10,20 99:18 | 49:11 82:18,19 | 194:5 195:2,7 |
| 146:19,20 | 101:3 106:4,19 | 84:25 88:21 | 196:22,24 |
| 204:12 275:21 | 107:6 108:24 | 100:9,15,17,19 | 202:2 206:7 |
| **wrap**  196:17 | 114:19 116:21 | 112:25 137:19 | 212:16,24 |
| **write**  92:11 | 118:9,21 | 147:7 152:13 | **z** |
| 184:22 224:13 | 120:11,19 | 171:15 175:5 | **z**  250:8 |
| 275:23,25 | 134:4 136:4 | 191:8 250:1,3 | **zoom**  2:5,6,6 |
| 277:6,9 | 137:4,11,18 | 255:1 | 8:11 11:6,8 |
| **writes**  183:19 | 140:20 148:15 | **yearly**  249:24 | **zoom's**  213:3 |
| 190:23 276:8 | 151:10 153:2 | **years**  51:20 | |
| **writing**  6:13 | 155:4 158:18 | 92:6 93:17 | |
| **written**  193:16 | 159:14 160:19 | 100:8 101:6,10 | |
| **wrong**  84:3 | 164:15 165:2 | 158:6 181:1 | |
| **wrote**  184:18 | 165:17 166:23 | 182:18 204:24 | |
| **x** | 169:10 170:15 | **yep**  98:4 | |
| **x**  3:1,4 | 172:8 176:6,19 | 252:15 | |
| **y** | 182:17 187:19 | **yesterday**  7:15 | |
| | 191:6,24 | 7:18 | |
| **y**  57:19 | 202:14 204:8 | **york**  207:13,14 | |
| **y&r**  97:19,22 | 205:6 207:17 | **young**  97:23,25 | |
| 98:2 122:9 | 208:8 210:14 | 114:14 115:21 | |
| **yeah**  19:2,9 | 213:25 220:10 | **youtube**  117:9 | |
| 25:17,19 28:13 | 221:9 222:9 | 134:10,20,25 | |
| 29:6 33:18 | 229:4 235:13 | 135:1,6,23 | |
| 44:20 45:3,10 | 235:14 251:6 | 136:23 137:1,8 | |
| 48:19 58:5,21 | 254:2,9 255:15 | 149:7,9 161:14 | |
| 63:22 65:11,21 | 257:2,17 258:8 | 161:18,21,22 | |
| 66:15 67:5,21 | 259:13 265:4 | 161:25 162:2 | |

---

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

---

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.