# EXHIBIT 19

Page 1

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
2                  ALEXANDRIA DIVISION
3
        _____
4                                   :
    UNITED STATES OF AMERICA, :
5   et al.,                         :
                                    :
6          Plaintiffs              :
                                    :
7       v.                         : No.  1:23-cv-00108
                                    :
8   GOOGLE, LLC,                    :
                                    :
9          Defendants.             :
        _____:
10
11                 Friday, August 18, 2023
12
13              Video Deposition of COL. JOHN HORNING,

        taken at the Law Offices of Paul, Weiss,
14
        Rifkind, Wharton & Garrison LLP, 2001 K St NW,
15
        Washington, DC, beginning at 9:34 a.m. Eastern
16
        Standard Time, before Ryan K. Black, Registered
17
        Professional Reporter, Certified Livenote
18
        Reporter and Notary Public in and for the
19
        District of Columbia
20
21
22
23
24
25    Job No. CS6060378

Page 2

```
1    A P P E A R A N C E S :
2
3    UNITED STATES DEPARTMENT OF JUSTICE
     ANTITRUST DIVISION
4    BY: JIMMY MCBIRNEY, ESQ.
        CHASE PRITCHETT, ESQ.
5       ALVIN CHU, ESQ.
        MARK SOSNOWSKY, ESQ. - Via Zoom
6       KATHERINE CLEMONS, ESQ - Via Zoom
     450 5th Street, N.W
7    Washington, DC 20530
     202.514.2414
8    jimmy.mcbirney@usdoj.gov
     chase.pritchett@usdoj.gov
9    alvin.chu@usdoj.gov
     mark.sosnowsky@usdoj.gov
10   katherine.clemons@usdoj.gov
11   Representing - The United States of America
12
13   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP,
     BY: MARTHA L. GOODMAN, ESQ.
14      LEAH HIBBLER, ESQ.
     2001 K St NW,
15   Washington, DC
     202.223.7341
16   mgoodman@paulweiss.com
     lhibbler@paulweiss.com
17
     Representing - Google LLC
18
19
20
21
22
23   ALSO PRESENT:
24   Glenn Fortner - Legal Videographer
     Major Mohamed Al-Darsani - United States Army
25   Edwin Farley - USDOJ Intern
```

Page 3

```
1              I N D E X
2    TESTIMONY OF:  COL. JOHN HORNING        PAGE
3    By Ms. Goodman.............................6, 244
4    By Mr. McBirney.............................245
5            E X H I B I T S
6    EXHIBIT      DESCRIPTION             PAGE
7    Exhibit 61   a privilege log dated June 26th,
             2023, provided by the United
8            States DOJ......................11
9    Exhibit 62   a document Bates Numbered
             ARMY-ADS336340 through 336638...154
10
     Exhibit 63   a document Bates Numbered
11           ARMY-ADS329948 through 329970...165
12   Exhibit 64   a document Bates Numbered
             ARMY-ADS187047 through 187077...211
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1         THE VIDEOGRAPHER:  Good morning.
2    We're going on the record at 9:34 on August 18th,
3    2023.  Please note that the microphones are
4    sensitive and may pick up whispering and private
5    conversations.  Please mute your phones at this
6    time.  Audio and video recording will continue to
7    take place unless all parties agree to go
8    off the record.
9         This is Media Unit 1 of the
10   video-recorded deposition of Colonel John Horning
11   in the matter of United States, et al., v. Google
12   LLC.  The location of the deposition is Paul
13   Weiss.
14        My name is Glenn Fortner, representing
15   Veritext, and I'm the videographer.  The court
16   reporter is Ryan Black from the firm Veritext.
17   I'm not related to any party in this action, nor
18   am I financially interested in the outcome.
19        If there are any objections to
20   proceeding, please state them at the time of your
21   appearance.  Counsel and all present, including
22   remotely, will now state their appearances and
23   affiliations for the record beginning with the
24   noticing attorney.
25        MS. GOODMAN:  Martha Goodman, from the
```

Page 5

```
1    law firm Paul Weiss, on behalf of Google LLC.
2    I'm joined by my colleague Leah Hibbler.
3         MR. MCBIRNEY:  Jimmy McBirney, with the
4    Unites Staes Department of Justice, on behalf of
5    the United States and the witness.
6         MR. PRITCHETT:  Chase Pritchett, on
7    behalf of the United States.
8         MR. CHU:  Alvin Chu on behalf of the
9    United States.
10        MR. SOSNOWSKY:  Mark Sosnowsky on behalf
11   of the United States.
12        MAJOR AL-DARSANI:  Moe Al-Darsani,
13   United States Army.
14        MR. FARLEY:  Edwin Farley, United
15   States.
16        THE VIDEOGRAPHER:  Okay.  Will the court
17   reporter please swear in the witness and then
18   counsel may proceed.
19        MR. CHU:  Oh, also, just to let you
20   know, I have Katherine Clemons -- she'll be --
21   from the DOJ that will also joining in and out.
22             *   *   *
23   Whereupon --
24        COL. JOHN HORNING,
25   called to testify, having been first duly sworn
```

2 (Pages 2 - 5)

Page 6

1  or affirmed, was examined and testified as
2  follows:
3              *   *   *
4           EXAMINATION
5  BY MS. GOODMAN:
6      Q.  Good morning, Colonel Horning.
7      A.  Good morning.
8      Q.  Have you been deposed before?
9      A.  I have not.
10     Q.  Do you understand your purpose here
11 today is to provide truthful and accurate
12 testimony to the best of your testimony and
13 knowledge?
14     A.  I do.
15     Q.  Is there any reason you cannot do that
16 today?
17     A.  No.
18     Q.  Okay.  Because the court reporter is
19 writing everything down, it's important that we
20 not talk over one another, so please let me
21 finish my question before you begin your answer.
22 Okay?
23     A.  Okay.
24     Q.  And because he's again taking a written
25 transcript, the -- you have to speak verbally as

Page 7

1  opposed to with sounds like uh-huh or huh-uh
2  so that it can be accurately reflected in the
3  transcript.  Okay?
4      A.  I understand.
5      Q.  If you don't understand my question,
6  please let me know.  Okay?
7      A.  Yes.
8      Q.  Otherwise I assume you'll understand.
9  Okay?
10     A.  Yes.
11     Q.  In the normal course of your work, do
12 you consider the Department of Justice Antitrust
13 Division to be your counsel?
14     A.  I'm not sure that I'm qualified to
15 answer, within the legal constructs of the U.S.
16 government, who our actual counsel is or is not.
17     Q.  I'm not asking for you to provide a
18 legal opinion.  I'm asking for your personal
19 understanding and your considerations, your
20 personal opinions.  So do you consider the
21 Department of Justice Antitrust Division to be
22 your counsel in the normal course of your work?
23     A.  I don't believe that I have a personal
24 opinion on who our counsel is.  I only know
25 what's -- yeah.  I -- I don't have an opinion on

Page 8

1  that.
2      Q.  Have you ever requested legal advice
3  from the Department of Justice Antitrust
4  Division?
5          MR. MCBIRNEY:  Objection.  Calls for
6  privileged information.  Instruct the witness not
7  to answer.
8          MS. GOODMAN:  You're asking him -- the
9  information that would appear on a privilege log
10 with a request for legal advice that's required
11 for you as the privilege -- the party asserting a
12 privilege to establish the proprietary of the
13 privilege and meet your burden of proof and
14 persuasion that the privilege applies, you're
15 instructing him not to answer that question?
16         MR. MCBIRNEY:  You are asking the
17 witness whether he has requested legal advice
18 from the Department of Justice Antitrust
19 Division?
20         MS. GOODMAN:  Yeah.
21         MR. MCBIRNEY:  You can answer that yes
22 or no.
23         THE WITNESS:  No.
24 BY MS. GOODMAN:
25     Q.  To what extent has anybody at the

Page 9

1  Department of Justice ever asked you to provide
2  information about the Army's advertising
3  business?
4          MR. MCBIRNEY:  Objection.  Privileged.
5  Instruct the witness not to answer.
6  BY MS. GOODMAN:
7      Q.  Are you going to follow that
8  instruction, sir?
9      A.  Yes.
10     Q.  Okay.  When did you first have any
11 conversations with anybody at the Department of
12 Justice Antitrust Division?
13     A.  As best that I can recall, our first
14 interaction would have been in early spring of
15 2023 or late winter.  I -- I can't recall the
16 specific date.
17     Q.  So sometime between late winter of what
18 year?
19     A.  2023.
20     Q.  Okay.  And early spring of 2023?
21     A.  Correct.
22     Q.  Okay.  What was your understanding
23 of the reason for your conversations with the
24 Department of Justice Antitrust Division?
25         MR. MCBIRNEY:  Objection.  Calls for

3 (Pages 6 - 9)

Page 10

1    privileged information.  Instruct the witness not
2    to answer.
3    BY MS. GOODMAN:
4         Q.  Are you following that instruction?
5         A.  Yes.
6         Q.  Has the Department of Justice ever
7    requested information about digital advertising
8    purchases by the United States Army?
9         MR. MCBIRNEY:  Objection.  Calls for
10   privileged information.  Instruct the witness not
11   to answer.
12   BY MS. GOODMAN:
13        Q.  Are you following that instruction?
14        A.  Yes.
15        Q.  Do you -- in the course of your work,
16   do you routine -- do you field requests for
17   information from the Department of Justice on
18   an ordinary basis?
19        A.  I do not.
20        Q.  Are you aware of anybody else within
21   the AEMO who re -- regularly fields requests for
22   information from the Department of Justice?
23        A.  I'm not personally aware of anything
24   like that.
25        MS. GOODMAN:  I'm marking Exhibit 61, a

Page 11

1    privilege log dated June 26th, 2023, provided by
2    the United States in this litigation.  I'm
3    handing it to the witness.
4         (Exhibit No. 61, a privilege log dated
5    June 26th, 2023, provided by the United States
6    DOJ, was introduced.)
7    BY MS. GOODMAN:
8         Q.  Now, Colonel Horning, this is not a
9    document I would normally show a percipient
10   witness, but I'm essentially hamstrung and must
11   do so here today for reasons that don't pertain
12   to you, per se.  But I would like you to turn to
13   Page 11 of this document.
14        Let me know when you're there.
15        A.  Okay.  I am on Page 11.
16        Q.  Okay.  And if you look back at Page 1,
17   actually, you see there is a heading at the top
18   that indicate what each of the columns are.
19        A.  Okay.
20        Q.  Okay.  So you see that in the, one, two,
21   three, four, five -- fifth column over on Page
22   23, which is the To column, your name is
23   listed --
24        A.  On?  I'm sorry.  Could you say what page
25   again?  I thought you said Page 23.

Page 12

1         Q.  I'm sorry.  I meant Page 11.
2         A.  Okay.
3         Q.  It's line entry 23 on Page 11.
4         A.  Okay.
5         Q.  So one, two, three, four, five columns
6    over, you're listed in the To column.  Do you see
7    that?
8         A.  I do.
9         Q.  And do you see the date in the few-more
10   columns over of January 5th, 2023?
11        A.  Okay.
12        Q.  Does that refresh your recollection of
13   the time period where you first had conversations
14   with the Department of Justice Antitrust
15   Division?
16        A.  Can you help me understand what it is
17   I'm actually looking at here?
18        Q.  Yeah.  So this is what's called a
19   privilege log.
20        A.  I'm not familiar with what one of those
21   are.
22        Q.  Okay.  A privilege log is a
23   document that parties are required to provide
24   to the opposing side when they're asserting
25   attorney-client or attorney work product or other

Page 13

1    privilege over communications --
2         A.  Okay.
3         Q.  -- that they are not providing to
4    the other side in litigation.  So that's what a
5    privilege log is.  And so by virtue of this
6    entry, on Line 23 the United States is asserting
7    a privilege, as described in the last column, --
8         A.  Okay.
9         Q.  -- over your communication with
10   Mr. Wessels and others --
11        A.  Okay.
12        Q.  -- listed on this page.
13        A.  Okay.
14        Q.  Do you understand now?
15        MR. MCBIRNEY:  Objection.  Assumes facts
16   not in evidence.  Form of the question.
17   BY MS. GOODMAN:
18        Q.  Do you understand -- do you have an
19   appropriate understanding now of what a privilege
20   log is?
21        A.  I do understand what this document is
22   now.
23        Q.  Okay.  So having now looked at this
24   document and understanding what it is, does it
25   refresh your memory at all that -- as to the

4 (Pages 10 - 13)

Page 14

1   timing of your conversations with the Antitrust
2   Division?
3        MR. MCBIRNEY:  Objection; foundation,
4   and to form.
5        THE WITNESS:  It does not refresh my
6   recollection, but I have no reason to believe
7   this is not true.
8   BY MS. GOODMAN:
9        Q.  Okay.  And you see in the column next to
10  the date, which is the subject -- if you look
11  back at Page 1, you can see that that is the
12  subject column.
13       A.  Yes.
14       Q.  Okay.  Can you read the subject to me
15  here?
16       A.  The subject on Item 23 of the privilege
17  log says, brackets, "external DOJ-Army interview
18  on Google-Meta advertising products used by DOD."
19       Q.  Okay.  Do you recall who was interviewed
20  -- who at the Army was interviewed on Google-Meta
21  advertising products used by DOD on or around
22  this date of January 5th, 2023?
23       MR. MCBIRNEY:  You can answer that yes
24  or no.
25       THE WITNESS:  I do not recall.

Page 15

1   BY MS. GOODMAN:
2        Q.  Okay.  Do you recall yourself being
3   interviewed on this topic?
4        A.  I recall being interviewed, but I do not
5   recall that this was the date for it.
6        Q.  Okay.  Do you recall who interviewed
7   you?
8        A.  I only recall -- I didn't -- there was
9   likely more than one person.  I only recall one
10  by name.
11       Q.  Who do you recall by name?
12       A.  Mr. Chase Pritchett.
13       Q.  Okay.  How long did the interview last?
14       A.  I can't be certain.  I think it was,
15  likely, 60 to 90 minutes, perhaps.
16       Q.  And this is a yes or no question:  Did
17  the United States Antitrust Division lawyers
18  present explain to you the purpose of the
19  interview?
20       MR. MCBIRNEY:  Objection.  Calls for
21  privileged communication.  Instruct the witness
22  not to answer.
23  BY MS. GOODMAN:
24       Q.  Are you following that instruction?
25       A.  Yes.

Page 16

1        Q.  What was your understanding of the
2   purpose of the interview?
3        MR. MCBIRNEY:  Objection.  Calls for
4   privileged information.  Instruct the witness not
5   to answer.
6   BY MS. GOODMAN:
7        Q.  Are you following that instruction?
8        A.  Yes.
9        Q.  What facts -- strike that.
10       At the time reflected here on this
11  log, --
12       A.  Mm-hmm.
13       Q.  -- January 5th, 2023, were you aware of
14  any anticompetitive conduct on the part of Google
15  affecting the Army's advertising --
16       MR. MCBIRNEY:  Objection.
17  BY MS. GOODMAN:
18       Q.  -- practices?
19       MR. MCBIRNEY:  Objection.  Calls for a
20  legal conclusion.
21  BY MS. GOODMAN:
22       Q.  You may answer.
23       A.  I'm not sure that I have -- am
24  qualified to know or would have been made
25  available any infor -- or would have had any

Page 17

1   information available to me on that topic.
2        Q.  Around this time of January 5th, 2023,
3   were you aware of any conduct on the part of
4   Google that was causing the Army to pay prices
5   for advertising that were too high?
6        A.  I had not been made aware of anything
7   like that at the time frame that you're asking.
8        Q.  Okay.  How about prior to the time frame
9   that I'm asking?
10       A.  Not that I can recall, no.
11       Q.  Okay.  What's your understanding of the
12  word anticompetitive?
13       MR. MCBIRNEY:  Objection.  Calls for
14  legal conclusion, and foundation.
15       THE WITNESS:  I only know the common
16  language terminology.  I don't understand the
17  actual legal definitions or implications.
18  Anticompetitive:  Not competitive.
19  BY MS. GOODMAN:
20       Q.  So what is your common language
21  understanding of the word anticompetitive?
22       A.  I understand it in the context of
23  business practices meaning not adhering to a
24  competitive, fair practice.
25       Q.  Okay.  So using your definition of

5 (Pages 14 - 17)

Page 18

1  anticompetitive, which is in the context of
2  business practicing -- practices meaning "not
3  adhering to a competitive, fair practice," at
4  this time, January 5th of 2023, were you aware
5  of any anticompetitive practices on the part of
6  Google affecting the Army's advertising?
7        MR. MCBIRNEY:  Object to the form of the
8  question.
9        THE WITNESS:  I was not aware.
10  BY MS. GOODMAN:
11     Q.  At the time of this discussion with the
12  DOJ, what was your understanding, if any, as to
13  the possibility of litigation?
14        MR. MCBIRNEY:  Objection.  Calls for
15  privileged information.  You can answer that
16  question if you can answer it without divulging
17  any privileged information.  If you cannot, then
18  I'll instruct you not to answer.
19        THE WITNESS:  Can you repeat the
20  question?
21  BY MS. GOODMAN:
22     Q.  At the time of the discussion with DOJ
23  on or around January 5th, 2023, what was your
24  understanding, if any, as to the possibility of
25  litigation?

Page 19

1        MR. MCBIRNEY:  Same instruction.  If
2  you can answer that without disclosing privileged
3  information, you may.  Otherwise, I instruct you
4  not to answer.
5        THE WITNESS:  None.
6  BY MS. GOODMAN:
7     Q.  Around the time of this meeting
8  -- strike that.
9        Around the time of these communications
10  with the Department of Justice about Google-Meta
11  advertising products used by DOD, what were your
12  personal views on having to participate in those
13  discussions?
14        MR. MCBIRNEY:  Objection; vague.
15        THE WITNESS:  Can you clarify the
16  question to the extent what was my personal view
17  of being involved in a meeting?
18  BY MS. GOODMAN:
19     Q.  Yes.  What was your personal view of
20  being involved in a meeting or discussions with
21  the Antitrust Division about Google advertising
22  -- Meta advertising products used by DOD?
23        MR. MCBIRNEY:  Same objection.  And
24  caution the witness not to divulge confidential
25  information in your answer.

Page 20

1        MS. GOODMAN:  Confidential information?
2        MR. MCBIRNEY:  I'm sorry.  Privileged
3  information.
4        MS. GOODMAN:  Thank you.
5        THE WITNESS:  I have no personal opinion
6  about attending a meeting.  As a soldier, I
7  received an order.  I do what I'm told.
8  BY MS. GOODMAN:
9     Q.  Okay.  From whom did you receive an
10  order, if anyone?
11     A.  From AEMO leadership.
12     Q.  Who in AEMO leadership?
13     A.  As best as I re -- can recall, the AEMO
14  chief of staff.
15     Q.  Who's that?
16     A.  Colonel Matt Weinrich.
17     Q.  Why did Mr. Weinrich -- I'm sorry,
18  Colonel Weinrich order you to participate in this
19  meeting?
20        MR. MCBIRNEY:  Objection.  Calls for
21  speculation.
22        THE WITNESS:  Yeah.  I -- I can't answer
23  as to why he chose me.
24  BY MS. GOODMAN:
25     Q.  Okay.  Did he explain to you why he

Page 21

1  chose you?
2     A.  No.
3     Q.  When did he order you to -- to
4  participate in these discussions?
5     A.  I can't recall a -- a specific date.  As
6  best as I can recall, it was via an email saying
7  that there was going to be individuals who needed
8  to ask questions and I should make myself
9  available, but I don't remember when.
10     Q.  Okay.  Anything else you remember about
11  that email and what it said?
12     A.  No, I don't.
13     Q.  Did you have any discussions outside of
14  email with Colonel Weinrich about this request?
15     A.  No.
16     Q.  And setting aside the fact that you
17  received an order to participate in discussions
18  with the Department of Justice on this topic,
19  is it your testimony you had no personal view
20  whatsoever as to your participation in such
21  meetings?
22        MR. MCBIRNEY:  Object to the form and
23  asked and answered.
24        THE WITNESS:  Yeah.  I have no personal
25  opinion on -- on attending the meeting.

6 (Pages 18 - 21)

Page 22

1   BY MS. GOODMAN:
2       Q.  Do you have any personal opinion
3   about your involvement in this -- in discussions
4   -- setting aside just a meeting, but throughout
5   the month of January 2023, did you have any
6   personal opinion about your involvement in
7   discussions or information-gathering with
8   the Department of Justice at that time?
9           MR. MCBIRNEY:  Object to form.
10          THE WITNESS:  No.
11          MR. MCBIRNEY:  Make sure you give me
12  time to object.
13  BY MS. GOODMAN:
14      Q.  Was anybody else, to your knowledge,
15  involved in discussions with the Department of
16  Justice in and around March -- sorry, June
17  -- January 5th, 2023, about the Army's use of
18  advertising products from Google or Meta?
19      A.  Yes.
20      Q.  Who else?
21      A.  The only other individual that I can
22  recall by name is Lieutenant Colonel Lennox
23  Morris.
24      Q.  And what was his involvement?
25          MR. MCBIRNEY:  Objection.  Calls for

Page 23

1   speculation.
2           THE WITNESS:  Yeah.  I wasn't in the
3   room during his discussion, so I don't know.
4   BY MS. GOODMAN:
5       Q.  Did he have separate discussions with
6   the Department of Justice, to your knowledge?
7       A.  They were separate from any discussion
8   that I had.
9       Q.  And were -- these discussions that you
10  had, were they over email, by phone, by Zoom, by
11  Teams, what was the mode of communication?
12      A.  Face-to-face.
13      Q.  Face-to-face.
14          And where face-to-face?  In what town or
15  city or --
16      A.  In Chicago.
17      Q.  Okay.  And were they at AEMO HQ?
18      A.  That's correct.
19      Q.  And did Department of Justice lawyers
20  travel to Chicago to attend?
21      A.  Yes.
22      Q.  Okay.  What's your best recollection
23  of when that -- when a meeting at AEMO HQ took
24  place?
25      A.  Late winter.

Page 24

1       Q.  In 2023?
2       A.  In 2023.
3       Q.  Any other in-person meetings that you
4   recall?
5       A.  No.
6       Q.  So from January 5th, as we're seeing
7   on this privilege log, to the present, how many
8   in-person face-to-face meetings have you had with
9   any lawyers from the Department of Justice?
10      A.  I'm sorry.  Could you repeat the modes
11  once again, or the methods?
12      Q.  This question is specific to in-person,
13  face-to-face meetings.
14      A.  Okay.  The one that we just mentioned
15  and then not again until yesterday.
16      Q.  Okay.  How about video conferences?
17  How many video conferences do you recall having
18  with lawyers from the Antitrust Division of the
19  Department of Justice in the year 2023?
20      A.  Two.
21      Q.  When did those take place?
22      A.  Within the last two weeks.
23      Q.  Who attended those meetings -- those
24  video conferences?
25      A.  Myself, Mr. Pritchett, Mr. Chu, Major

Page 25

1   Al-Darsani.  And there might have been another
2   one or two in or out of the meeting at a
3   particular time, but I don't recall particularly
4   who that was.
5       Q.  Okay.  How long did the video
6   conferences last?
7       A.  Maybe two hours.
8       Q.  So -- so am I correct that you've had
9   two video conferences in the last two weeks that
10  lasted approximately two hours with attorneys
11  from the Department of Justice?  Is that a fair
12  summary?
13      A.  Yes.
14      Q.  Okay.  Was that in connection with
15  preparing for your deposition in this case?
16      A.  Yes.
17      Q.  Did it cover topics related to this
18  litigation -- and this is a yes or no question
19  -- did it cover topics related to this litigation
20  other than your deposition?
21          MR. MCBIRNEY:  I'm going to object to
22  that as privileged and instruct the witness not
23  to answer.
24          MS. GOODMAN:  Why is he permitted to
25  answer about whether he had a meeting with you

7 (Pages 22 - 25)

Page 34

1 about your personal reactions to receiving
2 an inquiry -- inquiry from the Department of
3 Justice, how did you view it? As a routine
4 request for information? As fact-gathering?
5 What was your personal view of the nature of the
6 inquiry?
7         MR. MCBIRNEY: Object to the form of the
8 question and vague.
9         THE WITNESS: I viewed it as a routine
10 request for information.
11 BY MS. GOODMAN:
12     Q. Okay. Has the Department of Justice
13 asked you to get information from the advertising
14 agency DDB?
15         MR. MCBIRNEY: Obj --
16 BY MS. GOODMAN:
17     Q. Yes or no.
18         MR. MCBIRNEY: Objection. Calls for
19 privileged information. I instruct the witness
20 not to answer.
21         THE WITNESS: I'm not going to answer
22 the question on advice of question.
23         MS. GOODMAN: That question is
24 completely proper because it goes to your
25 assertion to which you bear a burden of proof and

Page 35

1 persuasion as to your claim of privilege.
2         MR. MCBIRNEY: You are asking
3 the witness to disclose communications of a
4 particularized nature from counsel, which is
5 clearly work product. So that instruction is
6 entirely proper, and I'm instructing the witness
7 not to answer.
8 BY MS. GOODMAN:
9     Q. Okay. Has the Department of Justice --
10 anybody at the Department of Justice asked you
11 to participate in any conversations with your
12 advertising agency?
13         MR. MCBIRNEY: Same objection. Instruct
14 the witness not to answer.
15         You are asking the witness for
16 particular communications from counsel.
17         MS. GOODMAN: No. They're very
18 generalized communications. We've talked about
19 the term "information" being very generalized.
20         MR. MCBIRNEY: Even if they're
21 generalized, they're communications from counsel.
22         MS. GOODMAN: Of the kind that appear on
23 privilege log. This is exactly what you have to
24 put on a privilege log.
25 BY MS. GOODMAN:

Page 36

1     Q. So, Colonel Horning, I'll ask you again
2 so that I can get an answer or your -- well, get
3 a clean record, I should say.
4         Has anybody at the Department of
5 Justice asked you to get any information from
6 your advertising agency DDB?
7         MR. MCBIRNEY: Objection. Calls for
8 privileged communication. Instruct the witness
9 not to answer.
10 BY MS. GOODMAN:
11     Q. Are you following that instruction?
12     A. Yes.
13     Q. Okay. Has anybody at the Department of
14 Justice asked you to have any conversations with
15 any person from your advertising agency DDB?
16         MR. MCBIRNEY: Objection. Calls for
17 privileged information. Instruct the witness not
18 to answer.
19 BY MS. GOODMAN:
20     Q. Are you following that instruction?
21     A. Yes.
22     Q. Okay. To your knowledge, has anybody
23 at the Department of Justice asked any other
24 employee of AEMO to obtain information from the
25 advertising agency DDB?

Page 37

1         MR. MCBIRNEY: Objection. Calls for
2 privileged information. Instruct the witness not
3 to answer.
4 BY MS. GOODMAN:
5     Q. Are you following that instruction?
6     A. Yes.
7     Q. To your knowledge, has anybody at the
8 Department of Justice asked any other employee of
9 AEMO to have any conversations with any person
10 from the advertising agency DDB?
11         MR. MCBIRNEY: Objection. Calls for
12 privileged information, and instruct the witness
13 not to answer.
14 BY MS. GOODMAN:
15     Q. Are you following that instruction?
16     A. Yes.
17     Q. Are you aware of any investigation by
18 the Department of Justice into Google?
19         MR. MCBIRNEY: You can answer that yes
20 or no.
21         THE WITNESS: Yes.
22 BY MS. GOODMAN:
23     Q. When did you first become aware of that
24 investigation?
25         MR. MCBIRNEY: I'm going to instruct the

10 (Pages 34 - 37)

1  witness that if you can answer that question
2  without disclosing privileged information you may
3  do so.  If you cannot, then I instruct you not to
4  answer.
5       THE WITNESS:  I'm not going to answer
6  that question on the advice of counsel.
7  BY MS. GOODMAN:
8    Q.  Okay.  Prior to late winter 2023, as
9  we've discussed, had anybody from anyone within
10 the government reached out to you inquiring about
11 the Army's digital advertising purchases?
12      MR. MCBIRNEY:  Objection; vague and
13 instruct the witness that if you can answer
14 that question without disclosing privileged
15 information, you may do so.  If you cannot,
16 then I instruct the witness not to answer.
17      THE WITNESS:  I don't recall any
18 communication previous to what we already
19 discussed.
20 BY MS. GOODMAN:
21   Q.  Okay.  And how about prior to late
22 winter 2023, did you have any outreach from
23 anybody within the United States government about
24 any anticompetitive conduct on the part of Google
25 affecting the United States Army?  And when I use

1  the word anticompetitive, I'm using your
2  definition?
3       MR. MCBIRNEY:  Objection; vague.
4  Instruct the witness that if you can answer
5  that question without disclosing privileged
6  communication you may do so.  If not, I instruct
7  the witness not to answer.
8       THE WITNESS:  I cannot recall a
9  time prior to then when anyone from the U.S.
10 government reached out to me on any topic related
11 to any practice of any vendor or company involved
12 in advertising.
13 BY MS. GOODMAN:
14   Q.  And that includes Google?
15      MR. MCBIRNEY:  Objection; vague.
16      THE WITNESS:  My recollection, as
17 previously stated, would include Google.
18 BY MS. GOODMAN:
19   Q.  Okay.  Have you received a litigation
20 hold?
21      MR. MCBIRNEY:  Objection.  Calls for
22 privileged information.  Instruct the witness not
23 to answer.
24 BY MS. GOODMAN:
25   Q.  Are you following that instruction?

1    A.  Yes.
2    Q.  When did you receive a litigation hold,
3  if any?
4       MR. MCBIRNEY:  Objection.  Assumes
5  facts not in evidence and calls for privileged
6  information.  Instruct the witness not to answer.
7  BY MS. GOODMAN:
8    Q.  Are you following that instruction?
9    A.  Yes.
10   Q.  Who sent you a litigation hold, if any?
11      MR. MCBIRNEY:  Same objections.
12 Instruct the witness not to answer.
13 BY MS. GOODMAN:
14   Q.  Are you following that instruction?
15   A.  Yes.
16   Q.  When did you first become aware that
17 your participation in this lawsuit would be re --
18 necessary?
19      MR. MCBIRNEY:  Objection.  Assumes facts
20 not in evidence.  Vague.
21      THE WITNESS:  I first became aware that
22 I would be a participant within the last two
23 weeks.
24 BY MS. GOODMAN:
25   Q.  Prior to the last two weeks, have you

1  assisted anybody in the Department of Justice
2  with gathering information related to this
3  litigation?
4       MR. MCBIRNEY:  Objection; vague and
5  calls for privileged information.  Instruct the
6  witness not to answer.
7  BY MS. GOODMAN:
8    Q.  Have you gathered any information in
9  order to provide discovery to Google in this
10 litigation?
11      MR. MCBIRNEY:  You can answer that yes
12 or no.
13      THE WITNESS:  No.
14 BY MS. GOODMAN:
15   Q.  Are you aware one way or another if your
16 emails have been searched or produced to Google?
17      MR. MCBIRNEY:  You can answer.
18      THE WITNESS:  I'm not aware if it has or
19 has not occurred.
20 BY MS. GOODMAN:
21   Q.  Okay.  Do you recall providing any
22 information for the purpose of answering written
23 questions called interrogatories in this
24 litigation?
25      MR. MCBIRNEY:  Ob -- you can answer that

11 (Pages 38 - 41)

Page 42

1  question if you can do so without disclosing
2  privileged information.  If not, I instruct the
3  witness not to answer.
4      THE WITNESS:  Can you restate the
5  question?
6  BY MS. GOODMAN:
7      Q.  Do you recall providing any information
8  for the purpose of answering written questions
9  called interrogatories in this litigation?
10     A.  I do not recall.
11     Q.  Okay.  What's your understanding of what
12  this lawsuit is about?
13         MR. MCBIRNEY:  Objection; vague.
14  Instruct the witness you can answer that question
15  if you can do so without disclosing privileged
16  information.  Otherwise, I'd instruct you not to
17  answer.
18         THE WITNESS:  I don't know that I have a
19  full legal understanding of -- of the issues at
20  play to say that I know what the lawsuit is
21  actually about.
22  BY MS. GOODMAN:
23     Q.  Okay.  Do you have any understanding
24  of the issues in play to have any level of
25  understanding whatsoever about what the lawsuit

Page 43

1  is about?
2          MR. MCBIRNEY:  Objection; vague and same
3  instruction.  You can answer if you can do so
4  without disclosing privileged information.
5          THE WITNESS:  I can only make
6  assumptions.
7  BY MS. GOODMAN:
8      Q.  What do you mean by that?
9      A.  I can make an assumption based on
10  your inquiry to me if I understand the word
11  anticompetitive, and I make an assumption based
12  on the information that's been presented and that
13  the Department of Justice Antitrust Division is
14  involved.
15     Q.  Okay.  Have you read any documents filed
16  in this case -- documents filed with the Court?
17     A.  I'm not sure that I can answer that,
18  because I don't know what has been filed.
19     Q.  Okay.  Well, there's a document called
20  the complaint that initiates a lawsuit.  Have you
21  read that document?
22     A.  I have not.
23     Q.  Is there a reason why you have not read
24  it?
25         MR. MCBIRNEY:  Objection.  Calls for

Page 44

1  speculation.
2          THE WITNESS:  It's not part of my normal
3  duties.  I'm not a -- I'm not a lawyer.  I'm not
4  normally involved in legal matters.
5  BY MS. GOODMAN:
6      Q.  Okay.  What is your understanding of the
7  Army's role in this lawsuit?
8          MR. MCBIRNEY:  Objection; vague.
9  You can answer the question if you can do so
10  without disclosing privileged information.  If
11  you cannot, then I'd instruct you not to answer.
12         THE WITNESS:  I'm not sure that I
13  understand, within the context of how these
14  lawsuits may or may not work, what the Army's
15  role actually is other than I'm here providing a
16  deposition.
17  BY MS. GOODMAN:
18     Q.  Okay.  Is there any other -- other than
19  your role in providing a deposition, is there any
20  other purpose to your understanding for the
21  Army's involvement in this lawsuit?
22         MR. MCBIRNEY:  Again, objection;
23  vague.  If you can answer that question without
24  disclosing privileged information, you may do so.
25  If you cannot, I instruct you not to answer.

Page 45

1          THE WITNESS:  I'm sorry.  The question
2  was a little bit hard for me to understand.  Can
3  you -- can you restate it?
4  BY MS. GOODMAN:
5      Q.  Sure.  Other than your providing a
6  deposition, are you aware of any other role that
7  the Army has in this lawsuit?
8          MR. MCBIRNEY:  Same objection.  Same
9  instruction.
10         THE WITNESS:  I'm not aware.
11  BY MS. GOODMAN:
12     Q.  Okay.  How did you learn of a lawsuit
13  being filed?
14         MR. MCBIRNEY:  Objection.  Again, if
15  you can answer that question without disclosing
16  privileged information, you may do so.
17  Otherwise, I'd instruct not to answer.
18         THE WITNESS:  I'm -- I'm not a lawyer so
19  I don't know what the steps of a lawsuit being
20  filed are, and you talking about the complaint is
21  the first time that I might assume that I know a
22  lawsuit has now been filed.
23  BY MS. GOODMAN:
24     Q.  So is it fair to say, prior to the
25  questions that I've asked you, --

12 (Pages 42 - 45)

Page 46

1      A.  Mm-hmm.
2      Q.  -- you had no understanding one way or
3   another if a lawsuit had been filed?
4      A.  That is correct.
5      Q.  Okay.  Who, if anybody, have you
6   discussed your participation in this lawsuit
7   with?
8      A.  My supervisors and peers at the
9   office, the Department of Justice team, and one
10   individual from my ad agency.
11      Q.  Let's start at the top.  Who -- which
12   supervisors and peers at the office have you
13   discussed your participation in this lawsuit
14   with?
15      A.  Mr. Mavridis, the current acting chief;
16   Colonel Weinrich, the chief of staff; Sergeant
17   Major Alexander, the command sergeant major;
18   Colonel Shannon Johnson.  Colonel Erica Iverson.
19   And, perhaps, another person that I don't -- I
20   can't recall if they may have been in a room or
21   in a meeting at the time or not.
22      Q.  And who is the other person that --
23      A.  I -- I -- I can't recall their -- I
24   don't --
25      Q.  Oh, you don't know their name?

Page 47

1      A.  I don't want to state factually that
2   there were or were not and then maybe, perhaps,
3   another person.  I can't recall.  Those are the
4   individuals that I can't recall specifically.
5      Q.  Mr. Mavridis, the acting chief, what did
6   you discuss with him?
7      A.  That I would be out of the office TDY in
8   order to be here today.
9      Q.  What is "TDY"?
10      A.  Temporary duty.
11      Q.  What else, if anything, did you discuss
12   with him about your --
13      A.  That's -- that's the full extent.
14      Q.  Okay.  What did he say in response?
15      A.  I can't recall a specific response other
16   than probably to acknowledge that I would be out
17   of office.
18      Q.  Okay.  How about -- well, Mr. Mavridis
19   is the acting chief.  He's the acting chief of
20   what?  What's that title mean?
21      A.  Chief Army Enterprise Marketing.
22   That's the leader position in our organization.
23   Our former chief has just retired, and the
24   incoming has not arrived yet.
25      Q.  Okay.

Page 48

1      A.  Mr. Mavridis is the acting chief in the
2   interim.
3      Q.  Who is the former who retired?
4      A.  Major General Alex Fink.
5      Q.  And who is the incoming who has not yet
6   arrived?
7      A.  Brigadier General Gant.
8      Q.  okay.  Colonel Weinrich, what did you
9   discuss with him about this lawsuit?
10      MR. MCBIRNEY:  Caution the witness in
11   all of these responses not to disclose privileged
12   information.
13      THE WITNESS:  The same as with
14   Mr. Mavridis as it was all the attendees at the
15   same meeting; essentially, that I was going to
16   need to be traveling on temporary duty to attend
17   these proceedings.
18   BY MS. GOODMAN:
19      Q.  Okay.  Any other conversations you had
20   with Mr. Rein -- Weinrich about -- sorry, Colonel
21   Weinrich, about this lawsuit?
22      A.  No.
23      Q.  Any conversations you recall with
24   Mr. -- Colonel Weinrich about the Department of
25   Justice's investigation?

Page 49

1      A.  I don't recall having any conversations
2   about that with him.
3      Q.  Okay.  How about with Mr. Mavridis,
4   any conversations with him about the DOJ's
5   investigation?
6      A.  None that I can recall.
7      Q.  Okay.  Command Sergeant Major Alexander,
8   what conversations, if any, about your
9   participation in this lawsuit have you had
10   with that individual?
11      A.  Again, only that I would be out of
12   office traveling to participate in these
13   proceedings.
14      Q.  Okay.  How about with respect to the
15   Department of Justice's investigation?  Any
16   Conversations with that individual on that topic?
17      A.  None that I recall.
18      Q.  Okay.  Colonel Johnson, what
19   conversations with that individual have you
20   had about your participation in this lawsuit?
21      A.  Only that I would be traveling and be
22   out of office for a few days to participate in
23   these proceedings.
24      Q.  Okay.  What conversations, if any, have
25   you had with Colonel Johnson about the Department

13 (Pages 46 - 49)

Page 50

1    of Justice's investigation?
2        A.  None that I recall.
3        Q.  Okay.  Colonel Iverson, what
4    conversations, if any, have you had with this
5    individual about your participation in this
6    lawsuit?
7        A.  Only that I would be traveling to
8    Washington, D.C., for these because she's
9    stationed here and we might get together
10   following proceedings.
11       Q.  Was she in the meeting that you
12   described earlier where this was -- your -- your
13   needing to be on TDY was discussed?
14       A.  It's possible, but I don't recall
15   specifically.
16       Q.  Okay.  So do you have a -- a separate
17   recollection of a conversation with Colonel
18   Iverson on your participation in this lawsuit?
19       A.  I do.
20       Q.  Okay.  When did that occur?
21       A.  Within the last week.
22       Q.  Okay.  Have you seen Colonel Iverson
23   while you've been here in Washington?
24       A.  Not yet.
25       Q.  Are you planning to?

Page 51

1        A.  Yes.
2        Q.  Okay.  Do you plan to discuss your
3    participation in this lawsuit when you meet with
4    Colonel Iverson?
5            MR. MCBIRNEY:  Objection.  Calls for
6    speculation.
7            THE WITNESS:  Don't have any plans to
8    talk about it.
9    BY MS. GOODMAN:
10       Q.  Okay.  Have you had any conversations
11   with Colonel Iverson about the Department of
12   Justice's investigation?
13       A.  None that I recall.
14       Q.  Do you recall having any conversations
15   with any other individual within AEMO about the
16   Department of Justice's investigation?
17           MR. MCBIRNEY:  You can answer that yes
18   or no.
19           THE WITNESS:  Yes.
20   BY MS. GOODMAN:
21       Q.  Who have you had conversations with
22   within AEMO about the Department of Justice's
23   investigation?
24       A.  The only individual that I can recall
25   would have been Lieutenant colonel Morris.

Page 52

1        Q.  Okay.  And what did you discuss with
2    Lieutenant Colonel Morris about the Department of
3    Justice's investigation?
4            MR. MCBIRNEY:  You can answer that
5    question if you can do so without disclosing
6    privileged information.  If not, I instruct you
7    not to answer.
8            THE WITNESS:  The only conversation that
9    I can recall would have been on or around the
10   time of the email and/or meetings as described
11   on Page 11 of this privilege log where we
12   both shared with each other that we would be
13   participating in a discussion with Department of
14   Justice.
15   BY MS. GOODMAN:
16       Q.  Okay.  Anything else you recall about
17   that conversation?
18       A.  No.
19       Q.  How about with Glenna Wood, have you had
20   any conversations with her about the Department
21   of Justice's investigation?
22       A.  No.
23       Q.  Have you had any conversations with
24   Glenna Wood about your participation in this
25   lawsuit?

Page 53

1        A.  No.
2        Q.  Have you had any conversations with
3    Major Austin DZ, whose last name I will not
4    attempt to pronounce, about the Department of
5    Justice's investigation?
6        A.  No.
7        Q.  Have you had any conversations with
8    Major DZ about your par -- your participation in
9    this lawsuit?
10       A.  None that I can recall.
11       Q.  Have you had any conversations with
12   Heather Green-Trueblood about the Department of
13   Justice's investigation?
14       A.  No.
15       Q.  Have you had any conversations with
16   Heather Green-Trueblood about your participation
17   in this lawsuit?
18       A.  No.
19       Q.  Have you had any conversations with
20   Richard Stanforth about the Department of
21   Justice's investigation?
22       A.  No.
23       Q.  Have you had any conversations with
24   -- have you had any communications with Richard
25   Stanforth about the department -- about your

14 (Pages 50 - 53)

1    involvement in this lawsuit?

2        A.   No.

3        Q.   Have you had any communications with

4    Major Daniel Flynn about the Department of

5    Justice's investigation?

6        A.   No.

7        Q.   Have you had any communications with

8    Major Daniel Flynn about your participation in

9    this lawsuit?

10       A.   Only that I would be traveling TDY.

11   Major Flynn now is one of the individuals that

12   reports to me, so to let him know I would be out

13   of office.

14       Q.   And was he in the meeting that --

15       A.   He was not.

16       Q.   Okay.   When did you let him know you

17   would be out of office?

18       A.   As best I can recall, late last week or

19   early this week.

20       Q.   Have you had any conversations with

21   Major Lee-Ann Craig about the Department of

22   Justice's investigation?

23       A.   No.

24       Q.   Have you had any conversation

25   -- communications with Major Lee-Ann Craig about

1    your participation in this lawsuit?

2        A.   No.

3        Q.   Of the individuals that we've gone

4    over --

5        A.   Mm-hmm.

6        Q.   -- who -- at AEMO, have you had any

7    conver -- communications with any of them about

8    the Army's purchases of digital advertising from

9    Google in 2023?

10           MR. MCBIRNEY:   You can answer that

11   question if you can do so without disclosing

12   privileged information.   If not, then I instruct

13   you not to answer.

14           THE WITNESS:   None that I can recall.

15   BY MS. GOODMAN:

16       Q.   Okay.   You mentioned that you've spoken

17   or communicated with an individual at DDB about

18   your participation in this lawsuit.   Do you

19   recall that?

20       A.   Yes.

21       Q.   Who is that individual?

22       A.   Ms. Holly Springer.

23       Q.   What did you dis -- what did you and

24   Ms. Springer communicate about?

25       A.   That I would be --

1            MR. MCBIRNEY:   Caution the witness you

2    can answer that question if you can do so without

3    disclosing privileged communication.

4            THE WITNESS:   That I would be traveling

5    and unable to attend our typical weekly

6    directors' meeting.

7    BY MS. GOODMAN:

8        Q.   How did you let her know that?

9        A.   I don't recall.   I don't recall the

10   exact means now.

11       Q.   Okay.   Any conversations with

12   Ms. Springer -- strike that.

13           Any communications with Ms. Springer

14   about the Department of Justice's investigation?

15       A.   No.

16       Q.   Any conver -- communications with

17   Ms. Springer about the Army's digital advertising

18   purchases using Google products or services?

19       A.   None that I can recall.

20       Q.   Have you spoken with Chris Pultorak at

21   DDB about your participation in this lawsuit?

22       A.   No.

23       Q.   Have you spoken with Maria -- or have

24   you communicated with Maria Stuckel about your

25   participation in this lawsuit?

1        A.   No.

2        Q.   Have you communicated with Ron Davis

3    about your participation in this lawsuit?

4        A.   No.

5        Q.   Have you communicated with any of

6    those three individuals about the Department of

7    Justice's investigation?

8        A.   No.

9        Q.   Have you communicated with any of those

10   three individuals about the Army's purchases of

11   digital ads using Google products or services?

12       A.   No.

13       Q.   Are there any other individuals at

14   DDB who you communicated with about your

15   participation in this lawsuit?

16       A.   I'm sorry.   Can -- can you say that

17   again?   I -- I didn't quite make out the first

18   part of the question.

19       Q.   Can you recall any other individual at

20   DDB with whom you've communicated about your

21   participation in this lawsuit?

22       A.   No.

23       Q.   Can you think of any other individual at

24   DDB who you have communicated with about the

25   Department of Justice's investigation?

15 (Pages 54 - 57)

Page 58

1    A.  I cannot.
2    Q.  Are there any other individuals at
3  DDB who you recall communicating with about the
4  Army's purchases of digital ads using Google
5  products or services?
6    A.  I don't recall any.
7    Q.  Okay.  If you had a choice, would you be
8  participating in this lawsuit?
9    MR. MCBIRNEY:  Objection; vague.  And
10  calls for speculation.
11    THE WITNESS:  I -- I don't have a
12  choice.
13  BY MS. GOODMAN:
14    Q.  Okay.  I'm asking if you had a choice,
15  would you personally wish to be here today?
16    MR. MCBIRNEY:  Objection.  Calls for
17  speculation and vague.
18    THE WITNESS:  Yeah.  I don't -- I don't
19  know that I have an -- an answer to that.  I
20  can't speculate what would happen if I had the
21  option, as I don't have the option.
22  BY MS. GOODMAN:
23    Q.  What's your understanding as to why you
24  don't have the option?
25    A.  Because I'm in the Army and the

Page 59

1  government has directed me to participate in this
2  and that's my duty.
3    Q.  And when you say, "the government has
4  directed you to participate in this," who in the
5  government has directed your participation?
6    A.  I don't know that I can answer that
7  specifically.
8    Q.  Can you answer it generally?
9    MR. MCBIRNEY:  Objection; vague.
10    THE WITNESS:  No.
11  BY MS. GOODMAN:
12    Q.  Do you have any knowledge of who
13  within the Army agreed to participate in this
14  litigation?
15    A.  I don't have any knowledge of that.
16    Q.  Okay.  And you have no knowledge of who
17  in the government has directed your participation
18  in this litigation.  Is that a fair summary?
19    MR. MCBIRNEY:  Objection.  Asked and
20  answered.
21    THE WITNESS:  Yeah.  I personally do not
22  know.
23  BY MS. GOODMAN:
24    Q.  Okay.  So you don't know -- nobody
25  -- nobody came to you and said you're required to

Page 60

1  participate?  No human did that?
2    MR. MCBIRNEY:  Object to form.
3    THE WITNESS:  My best recollection
4  is receiving a notice from Mr. Chase that Google
5  had requested me, and my understanding of the
6  communication was that the government was
7  required to produce me because of the request.
8  And so I'm not aware of there being either a need
9  or a specific "someone ordering me."  I
10  understood my duty as to comply and make myself
11  available to -- to Google's request that I be
12  here.
13  BY MS. GOODMAN:
14    Q.  Okay.  And in providing that answer, are
15  you relying on communications that you had with
16  the Department of Justice?
17    A.  I am.
18    MS. GOODMAN:  So those communications he
19  can testify to but none other?
20    MR. MCBIRNEY:  That he was told to
21  comply he had to comply with a deposition notice?
22  Sure.
23    MS. GOODMAN:  You're --
24  BY MS. GOODMAN:
25    Q.  If -- to your knowledge, will the United

Page 61

1  States request your attendance at any trial in
2  this matter?
3    MR. MCBIRNEY:  Objection.  Calls for
4  speculation.
5    THE WITNESS:  I don't know the answer to
6  that.
7  BY MS. GOODMAN:
8    Q.  Have you had any discussions with
9  anybody about your participation at a trial in
10  this matter?
11    MR. MCBIRNEY:  Objection.  You can
12  answer that if it does not disclose
13  communications with counsel.
14    THE WITNESS:  I have not.
15  BY MS. GOODMAN:
16    Q.  Okay.  Have you discussed this lawsuit
17  with any individual from a state attorney general
18  office?
19    A.  I have not.
20    Q.  Have you discussed an investigation of
21  Google's digital advertising business with any
22  individual from a state attorney general office?
23    A.  I have not.
24    Q.  Have you discussed the Army's purchases
25  of digital ads using Google products or services

16 (Pages 58 - 61)

Page 62

1  with any individual from a state attorney general
2  office?
3      A.  I have not.
4      MS. GOODMAN:  Shall we take a break?
5      MR. MCBIRNEY:  Sure.
6      THE VIDEOGRAPHER:  Going off the record.
7  The time is 10:47.
8      (Recess taken.)
9      THE VIDEOGRAPHER:  Going back on the
10  record.  The time is 11:12.
11  BY MS. GOODMAN:
12      Q.  Colonel, what's your title -- well,
13  funny question, isn't it?
14      Colonel, what is your role at the Army
15  Enterprise Marketing Office?
16      A.  I am the director for the strategy,
17  innovation and data directorate.
18      Q.  How long have you held -- held that
19  role?
20      A.  Since June 1st of 2022.
21      Q.  And prior to June 1st of 2022, what
22  was your role at the Army Enterprise Marketing
23  Office?
24      A.  I was the director for marketing
25  execution.

Page 63

1      Q.  And how long did you hold that role?
2      A.  I was in that position from,
3  approximately, 8th of July through 31 May
4  -- correction.  8th of July 2021 through 8th
5  of -- 31st of May 2022.
6      Q.  And prior to the 8th of July 2021, did
7  you work at the Army Enterprise Marketing Office?
8      A.  I did not.
9      Q.  Okay.  Were you active duty during that
10  time --
11      A.  Yes.
12      Q.  -- elsewhere?
13      And you took a break in service to work
14  in the private sector.  Is that accurate?
15      A.  That's correct.
16      Q.  When did you do that?
17      A.  That was end of September 1999 through,
18  on or about, May 31st, 2004.
19      Q.  Okay.  Why did you decide to take a
20  break in active service between September 1999
21  and May 31st, 2004?
22      A.  Because at that time in my then short
23  period on active duty, I had three deployments
24  already, all in -- in Yugoslavia, and I was
25  looking for something different.

Page 64

1      Q.  Okay.  And during that time period of
2  September '99 through May 2004, is it accurate
3  you worked at Proctor & Gam -- Proctor & Gamble
4  and Warsteiner USA?
5      A.  That is correct.
6      Q.  Are there any other places you worked in
7  that time period?
8      A.  I was also self-employed for a short
9  period of time coaching high school lacrosse.
10      Q.  What did you do at Proctor & Gamble?
11      A.  I was an assistant brand manager.
12      Q.  What did your job duties entail as
13  assistant brand manager at Proctor & Gamble?
14      A.  Developing marketing plans for Cheer
15  laundry detergent, and also working in new
16  business development investigating the
17  possibility of new product launches.
18      Q.  As an assistant brand manager for
19  Cheer, what role did you have in determining an
20  advertising strategy for that product?
21      A.  I was part of a -- a small team that
22  developed the overall marketing plan for Cheer.
23  And so my contributions, as any other member
24  of the team, would have been research with the
25  consumer, understanding market penetration, share

Page 65

1  data, and then developing plans as to how we
2  might, you know, grow share or -- or improve the
3  business overall.
4      Q.  Did you have any role in determining
5  what advertising tactics to use?
6      A.  Yes.
7      Q.  Okay.  Can you describe that for me,
8  your role in that regard?
9      A.  My role was, I think, primarily as
10  a -- as a contributor, again, to a -- a team
11  effort in either the development of a specific
12  creative materials.  Also, at that time, I had
13  led a small project to develop a -- a Cheer
14  website.  And then I also handled a lot of, like,
15  promotional activities from the standpoint of
16  coupons, and things like that, that are common in
17  that category.
18      Q.  In this time period of 1999 to 2004,
19  what advertising channels did you consider in
20  your role as assistant brand manager for
21  promoting Cheer?
22      A.  At that time, primarily TV.  But also
23  magazine, print, coupons, which would typically
24  be delivered in -- in Sunday papers and out of
25  home.  And then, again, as I said, the

17 (Pages 62 - 65)

Page 66

1    development of our -- of our own website.  There
2    -- there may have been other channels considered,
3    but this far along I -- I don't recall which
4    others those might have been.
5       Q.   Okay.  Were any digital channels other
6    than developing a website considered at that
7    time?
8       A.   I don't recall there being any other
9    digital channels really available to be a part of
10   the plan at that point.
11      Q.   And what -- what time period did you
12   work at Proctor & Gamble as a assistant brand
13   manager?
14      A.   From September of '99.  May of 2002.
15   I -- I'm not entirely certain, but it would have
16   been on or around then.
17      Q.   Okay.  Why did you leave Proctor &
18   Gamble?
19      A.   I had an opportunity to pursue a brand
20   manager position at Warsteiner Importers.
21      Q.   Okay.  And what were your job duties as
22   a brand manager at Warsteiner Importers?
23      A.   It was to develop basic marketing plans
24   for a line of beers that Warsteiner Importers
25   imported into the United States.

Page 67

1       Q.   Which line of beers?
2       A.   Warsteiner.  König Ludwig.  Two others
3    that, frankly, escape my mind right now.  They
4    were all part of the same brewery operation,
5    though, in Germany, so they were all,
6    essentially, part of the same family of -- of
7    brands.
8       Q.   And what role did you have with respect
9    to determining the advertising strategy for those
10   beer brands?
11      A.   Mm-hmm.  I had a role in making
12   recommendations to the president; however, what
13   I found was it was primarily -- primarily the
14   president's desired strategy was around
15   on-premise promotional activities, and so there
16   were only a few what we would -- might, you know,
17   consider typical advertising, actually.
18      Q.   And of the few kinds of typical
19   advertising, what were they, that you worked on?
20      A.   There was -- there was a promotional
21   event around the Western Southern Tennis Open.
22   So it was some sponsorship, along with some TV
23   placement that was associated with that
24   sponsorship buy.  And then it was largely, sort
25   of as I mentioned, on-premise, but maybe event

Page 68

1    participation, like the local city Octoberfest
2    or -- or that nature of -- that nature of thing.
3    And then packaging redesign is one of the things
4    that we did.
5       Q.   Did you consider any digital advertising
6    strategies in your role as brand manager for
7    Wa -- Warsteiner Importers?
8       A.   Not particularly.  I think that once I
9    got there and found -- the -- the president was
10   a former route salesman, who had ascended to the
11   position, that his focus ended up being much more
12   on what are we doing in the bar than -- than I
13   had maybe been led to believe.  And so there
14   wasn't a lot of advertising in the sense of what
15   someone who's involved in brand management might
16   be familiar with, and it was more along the lines
17   of his interest in on-premise promotions.
18      Q.   Okay.  And what -- when did you leave
19   that job?
20      A.   Perhaps February or March of the
21   next year.  I -- I can't -- I can't recall
22   specifically.
23      Q.   Do you think it was -- you were in that
24   job for less than a year?
25      A.   Perhaps less than full 12 months.  That

Page 69

1    might be accurate.
2       Q.   Okay.
3       A.   I can't recall that for sure.
4       Q.   And so then were you self-employed
5    in between leaving that job at Warsteiner and
6    May 31st, 2004?
7       A.   That's correct.
8       Q.   Okay.  In the time period between May
9    31st, 2004, and when you joined AEMO in July of
10   2021, did you have any job responsibilities
11   related to marketing or advertising?
12      A.   No.
13      Q.   Okay.  In that time period, what were
14   your principal job responsibilities in the United
15   States Army?
16      A.   That's a very broad time period.  Can
17   you be more specific?
18      Q.   What did you do during that time period
19   for the Army?
20      A.   I had many jobs during that time period
21   over many locations, as a typical Army officer in
22   the Armor and Cavalry branch in typical career
23   progression.
24      Q.   Okay.  And for -- for the benefit of the
25   record, what is the -- what are the different

18 (Pages 66 - 69)

1    jobs you had during that time period?

2        A.   I -- I was a company commander.  I was

3    a battalion assistant staff officer.  I was a

4    battalion operations officer.  I was a brigade

5    operations officer.  I was an OC at JMRC.  I

6    was a student in the Commanding General Staff

7    College.  I was a squadron executive officer.  I

8    was a chief of plans.  I was squadron commander.

9    I was an OC at the JRTC.  I was a student at the

10   Army War College.  And then, eventually at AEMO.

11   And at the very beginning of that time I was a

12   member of the Ohio Army National Guard.

13       Q.   What's the JMRC?

14       A.   The Joint Multinational Readiness

15   Center.

16       Q.   What is the JRTC?

17       A.   The Joint Readiness Training Center.

18       Q.   What does an OC mean?

19       A.   That's an observer/controller.  It's

20   an individual who observes/controls training

21   exercises and also teaches or trains your peer

22   to help Army units improve in their tactical

23   abilities and operations.

24       Q.   Okay.  What did you study at the general

25   staff college -- the Commanding General Staff

1    College?

2        A.   I pursued the typical standard course of

3    study along with some added emphasis in history

4    and in the Balkan Region.

5        Q.   What is the typical course of study

6    offered at the Commanding General Staff College?

7        A.   There are courses in history,

8    in leadership, in defense processes, in

9    operational-level tactics and maneuvers.  And

10   there are some elective courses, as well, that

11   you can take advantage of.

12       Q.   Did you take any classes with respect to

13   marketing or advertising?

14       A.   No.

15       Q.   When you were a student at the Army War

16   College, what did you study?

17       A.   I also took the standard course of

18   -- the standard offering.

19       Q.   Which is what?

20       A.   Classes in history.  Classes in

21   leadership.  Classes in defense processes.  Some

22   elective classes.  I can't recall all the -- the

23   name or title of every class, but those are all

24   what every student predominantly takes.

25       Q.   Did you take any marketing or

1    advertising or brand management classes?

2        A.   No.

3        Q.   So is it fair to say that --

4        A.   Let me make a correction.  There was a

5    class -- I don't remember the exact title, but

6    there was an elective opportunity to be in a

7    class that talked about, more or less, recruiting

8    in the Army.  I don't know that it was -- I -- as

9    a student and a participant then, I wouldn't say

10   it was truly a marketing class, but it was at

11   least related.

12       Q.   How did you come to obtain your position

13   as the director of marketing execution in July of

14   2021 at AEMO?

15       A.   In summer of 2019, as I was moving from

16   Fort Stewart to Fort Polk, leaving squadron

17   command to take on the assignment as the Senior

18   Calvary OC at JRTC, I received a call from an

19   individual I had known from a previous

20   assignment, Greg Campion, who worked in the

21   Assistant Secretary of the Army for Manpower and

22   Reserve Affairs Office, saying that they were

23   beginning a new office and they had reviewed the

24   information in my soldier record brief and -- and

25   resume within the Army's personnel data systems

1    and asked if I would be interested.  And I had

2    just arrived at JRTC, and we were just about to

3    start a rotation; and my departure would have

4    left the organization short-handed.  And I was a

5    classmate of my boss and didn't want to leave him

6    hanging so I said -- I politely declined.  I'm

7    here at JRTC; I need to stay here; you should

8    have called me a couple months ago.

9             Then later that year, same calendar

10   year, 2019 December, if I recall correctly, the

11   Army published a MLPR, which is a -- I don't

12   know the exact military personnel notice that

13   the Army was establishing a new functional area,

14   Functional Area 58, Marketing and Behavioral

15   Economics; and that officers who met the basic

16   application requirements were encouraged to

17   apply.

18            I spoke with my family about it and went

19   ahead and put an application in, went through the

20   application process.  Was eventually selected and

21   notified, and then I was actually changed in my

22   branch from Armor to Functional Area 58; however,

23   I was going to the War College still.  And as far

24   as being assigned to the position as I finished

25   War College, I was just assigned the position by

Page 178

1  1600 today unless you object," would it be your
2  normal practice by this time to have already
3  consulted with Major Morris and concurred with
4  his recommendation as reflected here?
5      MR. MCBIRNEY:  Object to form.
6      THE WITNESS:  I'm sorry.  I -- could you
7  repeat that?
8  BY MS. GOODMAN:
9      Q.  Yeah.  Let me ask it a bit differently.
10     A.  Okay.
11     Q.  With when he says, "We concur with their
12  recommendation," --
13     A.  Mm-hmm.
14     Q.  -- based on your practices with respect
15  to consulting with Major Morris, are you included
16  in the "we"?
17     MR. MCBIRNEY:  Objection.  Calls for
18  speculation.
19     THE WITNESS:  Based on the addressee,
20  the addresser, no.  We -- I infer Major Morris
21  -- then Major Morris's email to indicate his
22  team, composed of Major Nelson, himself and Major
23  Flynn; that is the "we," the paid media
24  team.
25  BY MS. GOODMAN:

Page 179

1      Q.  And all those individuals on the cc
2  line, are they all part of the paid media team?
3      A.  At that time that this was written,
4  Major Nelson was, Major Flynn was, Major
5  Dziengelewski was not, but he is the -- he was
6  the data and performance.  And that -- actually,
7  at that time I believe he was still the CPH lead.
8      Q.  I see.  But as CPH lead, he had a role
9  with respect to analyzing performance and making
10  recommendations for optimizations.  Is that a
11  fair --
12     A.  At that time in his role in that
13  position was directly with the MMM production.
14     Q.  Okay.  How do you say his last name
15  again?
16     A.  Dziengelewski.
17     Q.  Dziengelewski.  He also goes by Major
18  DZ?
19     A.  He goes by Major DZ, because he feels
20  most people can't pronounce it in proper Russian,
21  which he's probably correct.
22     Q.  Yes.
23         Okay.  Do you recall any instance
24  where did you -- where you did not agree with a
25  recommendation with respect to an optimization

Page 180

1  plan?
2      A.  I don't recall a specific time where I
3  did not agree with a recommendation.
4      Q.  Okay.  Can we go back to Exhibit 63,
5  please?
6      A.  Mm-hmm.
7      Q.  And I would like to direct your
8  attention to Page --
9      A.  I'm sorry.  Do you mean 62?
10     Q.  I'm sorry.  Yes.  Yes.
11         Page 390.
12     A.  Okay.
13     Q.  And you see the first subline beginning
14  Investment Approaching Key Selection Criteria?
15     A.  Yes, ma'am.
16     Q.  Okay.  Now I just want to turn to the
17  next page where it discusses that in more depth.
18  Based on your review of this slide and your role
19  as the director of marketing execution, do you
20  understand this slide to be depicting DDB's
21  efforts at finding partners for the Army's
22  advertising?
23     MR. MCBIRNEY:  Objection; foundation.
24     THE WITNESS:  I interpret this slide to
25  be a layout of what the paid media team has

Page 181

1  determined to be five evaluation criteria and
2  then how collectively the paid media team and
3  contractor at DDB has assessed each of these
4  various vendors as aligning with the evaluation
5  criteria.
6  BY MS. GOODMAN:
7      Q.  I see.  And to the right you see it says
8  "40-plus"?
9      A.  I do.
10     Q.  And that means that DDB evaluated more
11  than 40 vendors according to these criteria.  Is
12  that accurate?
13     MR. MCBIRNEY:  Objection; foundation.
14     THE WITNESS:  Yeah.  I don't know the
15  answer to that.  It's unclear to me what the
16  "40-plus" refers to on this slide.
17  BY MS. GOODMAN:
18     Q.  Okay.
19     A.  The five is clear.  The 40-plus is not
20  clear to me.
21     Q.  Under the box Getting Us To Goal,
22  where it says cross-platform scalability
23  -- scalability, what do you understand that
24  to mean?
25     MR. MCBIRNEY:  Objection; foundation.

46 (Pages 178 - 181)

1          THE WITNESS: I'm sorry. Which box?
2     Oh, is that the large box?
3     BY MS. GOODMAN:
4          Q.   Yeah. Getting Us To Goal.
5          A.   I understand the word scalability.
6     I would probably have to ask the briefer what
7     they mean by "cross-platform scalability."
8          Q.   Okay. Looking at the evaluation
9     criteria, do you have a view with respect to
10    Google's performance on the first item for -- on
11    the first criteria, Army Brand and Audience
12    Alignment?
13         MR. MCBIRNEY: Objection; vague.
14         THE WITNESS: I'm not sure that
15    Google has a performance. I'm not sure that that
16    particular evaluation criteria is a performance,
17    per se. You would have to define performance
18    alignment. I think that's more an assessment
19    of whether we believe there is a brand fit and
20    whether that particular platform can deliver our
21    desired audience given this particular media
22    plan.
23    BY MS. GOODMAN:
24         Q.   Got it.
25         And did -- have you ever formed an

1     assessment of the alignment between Google and
2     the Army with respect to this evaluation criteria
3     -- this particular criteria we're discussing?
4          A.   I've never been provided any information
5     which would make me believe that, from an Army
6     brand and Google perspective, that there would be
7     an issue. I can't recite specific numbers on
8     audience alignment and Google, but I've never
9     been prevented -- presented any information which
10    would make me think that Google cannot deliver
11    the audience that we're looking for.
12         Q.   Okay. And have you ever formed a view
13    of Google's historical performance as reflected
14    in the second criteria?
15         MR. MCBIRNEY: Objection; vague.
16         THE WITNESS: Given that there's
17    different Google products, can you be more
18    specific?
19    BY MS. GOODMAN:
20         Q.   Let's start with Search.
21         A.   Okay.
22         Q.   Have you formed a view of Google's
23    performance -- historical performance for the
24    Army on Search?
25         A.   I have.

1          Q.   What's your view?
2          A.   Search has been a positive performer in
3     lead-generation.
4          Q.   Okay. Same question as to YouTube.
5          A.   I don't know that I have a positive
6     or negative assessment of YouTube, other than I
7     understand that there's quite a bit of traffic
8     and we've assessed its inclusion as a channel
9     even separate, that's why there's YouTube and
10    non-YouTube video, because of just quantity of
11    -- of views or impressions. So my assessment or
12    impression formed is that it's a viable channel.
13         Q.   How about Discovery? Same question as
14    to Discovery.
15         A.   I -- I honestly can't recall specific
16    Discovery performance in the same way as Search.
17    So I don't have an opinion one way or the other
18    on -- or that I can recall the specific numbers
19    on performance of -- of Discovery.
20         Q.   And then how about with respect to
21    Display?
22         A.   I have formed an opinion on Display.
23         Q.   Okay. What is your opinion on Google's
24    Display per -- historical performance vis-a-vis
25    Display?

1          A.   My opinion formed after viewing several
2     quarters of MMM results is that Display has been
3     an inefficient channel for the Army to deliver
4     its recruiting message.
5          Q.   And is that a view you formed which is
6     specific to Google's Display offerings or extend
7     beyond Google?
8          A.   I don't know specifically who else might
9     provide that, so my assessment's not necessarily
10    with full knowledge of the options that might be
11    or the providers that may exist, only that
12    -- that the channel/tactic itself just did not
13    bear out in our reports that it was working as
14    well as some other efforts were.
15         Q.   And did you ever discuss that with
16    anybody at Google, the inefficiencies of dIsplay?
17         A.   I don't recall a time where we had
18    occasion to discuss our actual performance, or
19    that I was involved in with Google.
20         Q.   Okay. Have you been involved in any
21    discussions about using a different provider of
22    display advertising than Google?
23         A.   I have not been involved in a discussion
24    like that.
25         Q.   Do you know whether the Army, in fact,

47 (Pages 182 - 185)

1    uses more than one provider of display

2    advertising?

3        A.  I do not know who or how many are even

4    available. I don't know the answer to that.

5        Q.  Okay. Let's go to Estimated Potential

6    for Efficient ROI. Have you formed an assessment

7    of Google's potential for efficient ROI?

8        MR. MCBIRNEY: Objection; vague.

9        THE WITNESS: Again, any assessment

10   would be not of Google as a whole, but of

11   depending on the channel product itself.

12   BY MS. GOODMAN:

13       Q.  Okay. So let's talk first about Search.

14   What is your view on the potential for efficient

15   ROI with respect to Search?

16       A.  The information that I've seen

17   throughout our quarterly MMMs has indicated or

18   given me the impression that Search has been an

19   efficient channel for us.

20       Q.  Same question as to YouTube.

21       A.  Generally speaking, as I can best recall

22   from the MMM reports, YouTube tends to perform

23   fairly well comparatively on an efficiency

24   standpoint relative to the various channels in

25   the marketing mix.

1        Q.  And how about with respect to Discovery?

2        A.  I don't know the answer to that one.

3        Q.  Okay. And how about with respect to

4    display?

5        A.  I don't know which all partners may or

6    may not be involved in display. I know that our

7    MMM results have shown that display, in general,

8    has not performed at the same efficient rate as

9    other options available to us.

10       Q.  Okay. What is your assessment of

11   Google's ability to maintain expected levels of

12   brand safety?

13       MR. MCBIRNEY: Objection; vague and

14   foundation.

15       THE WITNESS: I think there's a measure

16   of risk assessment involved in that that we have

17   to constantly assess and reassess in light of

18   current market conditions and activities or

19   events in the information sphere and that may

20   change from time period to time period.

21   BY MS. GOODMAN:

22       Q.  And does Google, in your view, help

23   protect the brand safety of the Army?

24       MR. MCBIRNEY: Objection; foundation.

25       THE WITNESS: As a platform for the

1    distribution of our message, I don't see how

2    Google has a role in protecting, considering it's

3    available to so many. I wouldn't think they have

4    a role in protecting anybody's. That's our

5    responsibility to look at and assess where any

6    distribution platform, channel, site that we may

7    be -- any -- any of those things, any of these

8    actual media networks or properties are a fit for

9    brand safety.

10   BY MS. GOODMAN:

11       Q.  I see.

12       A.  So I don't think Google is a yes or a no

13   specifically.

14       Q.  Do you view Google as a risky

15   distribution channel for the brand safety of the

16   Army?

17       MR. MCBIRNEY: Objection; vague and

18   foundation.

19       THE WITNESS: During the time that I've

20   been at AEMO, I'm certainly not aware of anything

21   that would give me pause or concern with respect

22   to working with Google being a risk to brand

23   safety.

24   BY MS. GOODMAN:

25       Q.  And then the last criteria, flexible

1    cancellation terms adherence to industry-standard

2    contractual out clauses, do you have any ability

3    to assess Google's flexible cancellation terms,

4    one way or another?

5        A.  I do not.

6        Q.  Okay. Do you recall attending a Google

7    Marketing Live event?

8        MR. MCBIRNEY: Objection; vague.

9        THE WITNESS: Can you be specific about

10   the timing?

11   BY MS. GOODMAN:

12       Q.  Sure can. Give me a sec.

13       Summer of 2022.

14       A.  Is there a document that I can review?

15       Q.  I do not have it, no. I'm sorry.

16       A.  I have recollection of attending events

17   with Google, but I can't attest to the date,

18   specifically.

19       Q.  Okay. What -- how many events do you

20   recall attending with Google?

21       A.  Two.

22       Q.  What were those two events that you are

23   recalling?

24       A.  One was in Chicago at the local office

25   -- I assume to be the local office of -- of

1    Google.  And the other was in California at the
2    headquarters.
3        Q.  Okay.  Starting with the first event you
4    recall at the local office of Google, what was
5    that event?  What -- what took place at that
6    event?
7        A.  That was an educational event hosted
8    by Google to inform Army marketers on Google
9    products, how other customers have been able to
10   be successful or not, TTPs or what we say in the
11   Army, tactics, technique, procedures, meaning
12   just generally how you go about things, so to
13   share with us information about how we might
14   either perform better or continue to perform
15   well or use products effectively.
16       Q.  Did you find that event informative?
17       A.  Yes.
18       Q.  Did you find it useful?
19       A.  I found the discussion stimulating.
20   I can't recall me specifically going back and
21   -- and then using something from there in the
22   course of my routine duties.
23       Q.  Did that educational event provide any
24   value, from your point of view, to the Army?
25       A.  I would say in that knowledge and

1    education is always valuable, I certainly
2    couldn't ascribe a particular quantity or figure
3    or dollar figure of value.
4        Q.  Sure.  But the knowledge and education
5    that Google provided you at that event, did you
6    consider that valuable?
7            MR. MCBIRNEY:  Objection.  Asked and
8    answered.
9            THE WITNESS:  At the time, I felt
10   the information and the conversations that it
11   generated were helpful to the marketing team.
12   BY MS. GOODMAN:
13       Q.  Do you know who from Google was at that
14   event?  Do you recall?
15       A.  There were a number of presenters, and,
16   frankly, I don't remember everyone's name.
17       Q.  Do you remember anybody's name?
18       A.  No.
19       Q.  Okay.
20       A.  I know that there was an individual who
21   had government in their portfolio.  But as far
22   as all their names, I -- unfortunately, I don't
23   recall.
24       Q.  Is there anything else that you, sitting
25   here today, recall about that event?

1        A.  I mean, I generally recall the room and
2    that we had slides and that there were a number
3    of presenters on a number of topics.  I don't
4    recall what all the topics were specifically,
5    but --
6        Q.  Do you recall any of the topics?
7        A.  No, I don't.
8        Q.  Okay.  Let's turn to the event at the
9    California -- in California at HQ -- was that at
10   Google's headquarters?
11       A.  It was.
12       Q.  Okay.  And did other marketing
13   professionals from the other branches of the
14   military attend that, to your recollection?
15       A.  Yes.
16       Q.  Okay.  What -- what was the purpose of
17   that event?
18       A.  I was attending on behalf of
19   Major General Fink.  My understanding of the
20   purpose, it was similar to the earlier meeting
21   in Chicago, but a year later and, more broadly,
22   participation from the other services, whereas
23   the first was Army only.  And this had other
24   services, all, in my perception, with the same
25   intent to educate the audience on certain aspects

1    of Google's product line and give examples of
2    how some of their customers have used them
3    effectively.
4        Q.  Did you find that event to be
5    informative?
6        A.  I did.  And I found it useful because
7    it's one of the first events I was at where the
8    other services were also there, and so it also
9    enabled some cross-service discussion on
10   challenges, successes.
11       Q.  Did you find that event to provide value
12   to the Army?
13       A.  It did in that I actually was able to
14   provide some -- or -- or put some face to names
15   of my counterparts in the Air Force and Navy,
16   which has facilitated some dialogue post that
17   meeting.
18       Q.  What dialogue has that facilitated?
19   What dialogue has that meeting facilitated with
20   your counterparts in the other branches of the
21   armed services?
22       A.  I'll occasionally reach out and ask
23   something that they may be doing or see if there
24   might be an opportunity for us to do something
25   together, or just ask questions about approaches

49 (Pages 190 - 193)

1      MR. MCBIRNEY:  Objection.  Calls for a
2  legal conclusion and lack of foundation.
3      MS. GOODMAN:  What is the legal
4  conclusion that the question "how does money get
5  paid out to vendors" --
6      MR. MCBIRNEY:  You asked --
7      MS. GOODMAN:  -- call for a legal
8  conclusion?
9      MR. MCBIRNEY:  You asked how it gets
10  paid out under a contract, so I assume you're
11  asking how the contract dictates certain forms of
12  payment.  If you want to ask him how does money
13  get paid out, that's a different question.
14  BY MS. GOODMAN:
15      Q.  Okay.  Colonel, do you know how money
16  is paid for the purchase of display ad -- any
17  advertising?
18      A.  The only thing that I understand in
19  the process is that an invoice is received, the
20  COR verifies that the government received the
21  services or the benefits of and that that
22  information is transmitted to finance individuals
23  or resource management in the business management
24  directorate, who then affect whatever is required
25  to actually transfer funds.

1      Q.  Do you know who sends -- who issues the
2  invoices that you're referencing?
3      A.  I -- not necessarily, I don't.
4      Q.  Okay.  To your knowledge, did the
5  Army purchase any ad tech services directly from
6  Google?
7      MR. MCBIRNEY:  Objection.  Calls for a
8  legal conclusion, and lack of foundation.
9      THE WITNESS:  I don't have any knowledge
10  of -- of that occurring.
11  BY MS. GOODMAN:
12      Q.  To your knowledge, did the Army purchase
13  any display advertising directly from Google?
14      MR. MCBIRNEY:  Objection.  Calls for a
15  legal conclusion.  Lack of foundation.
16      THE WITNESS:  I don't have any personal
17  knowledge of that.
18  BY MS. GOODMAN:
19      Q.  To your knowledge, did the Army purchase
20  any open web display advertising directly from
21  Google?
22      MR. MCBIRNEY:  Objection.  Calls for a
23  legal conclusion.  Lack of foundation.
24      THE WITNESS:  I don't have any personal
25  knowledge of that.

1  BY MS. GOODMAN:
2      Q.  To your knowledge, did the Army purchase
3  any Open Web Display Advertising from Google?
4      MR. MCBIRNEY:  Objection.  Calls for a
5  legal conclusion.  Lack of foundation.
6      MS. GOODMAN:  What's the legal
7  conclusion that question called for?
8      MR. MCBIRNEY:  I'm sorry.  I withdraw
9  that objection.  Lack of foundation.
10  BY MS. GOODMAN:
11      Q.  Okay.  Colonel, to your knowledge,
12  did the Army purchase any Open Web Display
13  Advertising from Google?
14      MR. MCBIRNEY:  Same objection.
15      THE WITNESS:  I don't have any direct
16  knowledge of that.
17  BY MS. GOODMAN:
18      Q.  To your knowledge, did the Army pay
19  Google directly for the use of DV360?
20      MR. MCBIRNEY:  Objection.  Calls for a
21  legal conclusion.  Lack of foundation.
22      THE WITNESS:  I don't have any knowledge
23  of that.
24  BY MS. GOODMAN:
25      Q.  To your knowledge, did the Army pay

1  Google directly for the use of Google Ads?
2      MR. MCBIRNEY:  Objection.  Calls for a
3  legal conclusion.  Lack of foundation.
4      THE WITNESS:  I don't have any knowledge
5  of that.
6  BY MS. GOODMAN:
7      Q.  To your knowledge, did the Army pay
8  Google directly for the use of AdWords?
9      MR. MCBIRNEY:  Objection.  Calls for a
10  legal conclusion.  Lack of foundation.
11      THE WITNESS:  I don't have any knowledge
12  of that.
13  BY MS. GOODMAN:
14      Q.  To your knowledge, did the Army pay
15  Google directly for the use of Google Display
16  Network?
17      MR. MCBIRNEY:  Objection.  Calls for a
18  legal conclusion.  Lack of foundation.
19      THE WITNESS:  I don't have any knowledge
20  of that.
21  BY MS. GOODMAN:
22      Q.  To your knowledge did the Army pay
23  Google directly for the use of Google Marketing
24  Platform?
25      MR. MCBIRNEY:  Objection.  Calls for a

57 (Pages 222 - 225)

Page 226

1  legal conclusion. Lack of foundation.
2      THE WITNESS: I don't have any knowledge
3  of that.
4  BY MS. GOODMAN:
5      Q. To your knowledge, did the Army pay
6  Google directly for the use of Campaign Manager?
7      MR. MCBIRNEY: Objection. Calls for a
8  legal conclusion. Lack of foundation.
9      THE WITNESS: I don't have any knowledge
10 of that.
11 BY MS. GOODMAN:
12     Q. To your knowledge, did the Army pay
13 Google directly for the use of Google Ad Manager?
14     MR. MCBIRNEY: Objection. Calls for a
15 legal conclusion. Lack of foundation.
16     THE WITNESS: I don't have any knowledge
17 of that.
18 BY MS. GOODMAN:
19     Q. To your knowledge, did the Army pay
20 Google directly for the use of DoubleClick for
21 Publishers?
22     MR. MCBIRNEY: Objection. Calls for a
23 legal conclusion. Lack of foundation.
24     THE WITNESS: I don't have any knowledge
25 of that.

Page 227

1  BY MS. GOODMAN:
2      Q. To your knowledge, did the Army pay
3  Google directly for the use of DoubleClick Ad
4  Exchange?
5      MR. MCBIRNEY: Objection. Calls for a
6  legal conclusion. Lack of foundation.
7      THE WITNESS: I don't have any knowledge
8  of that.
9  BY MS. GOODMAN:
10     Q. To your knowledge, did the Army pay
11 Google directly for the use of AdSense?
12     MR. MCBIRNEY: Objection. Calls for a
13 legal conclusion. Lack of foundation.
14     THE WITNESS: I don't have any knowledge
15 of that.
16 BY MS. GOODMAN:
17     Q. To your knowledge, did the Army pay
18 Google directly for the use of AdMob?
19     MR. MCBIRNEY: Objection. Calls for a
20 legal conclusion. Lack of foundation.
21     THE WITNESS: I don't have any knowledge
22 of that.
23 BY MS. GOODMAN:
24     Q. Okay. Do you have any knowledge one way
25 or another of any direct exchange of money for

Page 228

1  products or services between the Army and Google?
2      MR. MCBIRNEY: Objection. Calls for a
3  legal conclusion and vague.
4      THE WITNESS: I don't have any knowledge
5  of money exchanges.
6  BY MS. GOODMAN:
7      Q. Okay. And when I say "direct," I'm
8  using the term that you -- the way that you
9  defined it meaning the way -- I think it was the
10 closest distance between two points; is that
11 right?
12     A. I --
13     MR. MCBIRNEY: Objection; vague.
14     THE WITNESS: I don't have any knowledge
15 of any payments or how we make payments or who we
16 make payments to.
17 BY MS. GOODMAN:
18     Q. Okay. Are you of -- aware of any
19 agreement between the Army and Google with two
20 parties to that agreement?
21     MR. MCBIRNEY: Objection. Calls for a
22 legal conclusion. Lack of foundation.
23     THE WITNESS: I'm not aware of the
24 existence of an agreement, if there is one or
25 not.

Page 229

1  BY MS. GOODMAN:
2      Q. Okay. Has anybody at your ad agency,
3  DDB, ever told you that Google was engaging in
4  anticompetitive conduct?
5      A. No.
6      Q. Did anybody at your ad agency, DDB, ever
7  tell you that Google was causing you to pay more
8  for digital advertising?
9      A. No.
10     Q. Did anybody at your ad agency, DDB, ever
11 tell that you Google was causing the Army to pay
12 more for Open Web Display Advertising?
13     A. No.
14     Q. Did anybody at OMD ever tell you that
15 Google was engaging in anticompetitive conduct?
16     A. No.
17     Q. Did anyone at OMD ever tell you that
18 Google was causing the Army to pay more for
19 digital advertising?
20     A. No.
21     Q. Did anybody at OMD ever tell you that
22 Google was causing the Army to pay more for Open
23 Web Display Advertising?
24     A. No.
25     Q. Sitting here today, do you have any

58 (Pages 226 - 229)

1    concerns that Google has harmed the Army?
2        A.   I suppose I have some concern by the
3    fact that I'm here participating in a deposition
4    about it even though the fact that I may not
5    understand the extent or the breadth or how that
6    harm occurred, as certainly not being an expert
7    in law or contracts, but there must be a reason
8    I'm here.
9        Q.   And do you know the reason that you're
10   here?
11       MR. MCBIRNEY:  Objection; vague.
12       THE WITNESS:  I only know the reason I'm
13   here is to provide a deposition and -- and try to
14   be helpful in answering accurately as best I can.
15   BY MS. GOODMAN:
16       Q.   Okay.  So other than the fact of your
17   deposition here -- strike that.
18       Is there any other reason beside the
19   fact of your being here for a deposition that you
20   have any concerns that Google has harmed the
21   Army?
22       MR. MCBIRNEY:  Object to the form of the
23   question.
24       THE WITNESS:  I have not previously
25   been provided any information that would cause me

1    concern.
2    BY MS. GOODMAN:
3        Q.   And sitting here today, is it accurate
4    to say that Google has, in fact, helped the Army?
5        MR. MCBIRNEY:  Objection; foundation.
6        THE WITNESS:  I think it's fair to say
7    that Google, like other networks or providers,
8    have been engaged with the Army and our
9    enterprise to attract potential enlistees
10   or officer candidates to the Army.
11   BY MS. GOODMAN:
12       Q.   And in the course of Google's engagement
13   with the Army to attract potential enlistees, has
14   Google helped the Army --
15       MR. MCBIRNEY:  Objection; foundation.
16   BY MS. GOODMAN:
17       Q.   -- achieve that goal?
18       MR. MCBIRNEY:  Sorry.  Objection.  Asked
19   and answered and foundation.
20       THE WITNESS:  I think Google has
21   provided a service that the Army has used as a
22   part of our overall marketing plan to attract
23   potential new enlistees and officer candidates.
24   BY MS. GOODMAN:
25       Q.   And the service that Google has

1    provided, which the Army has used as part of your
2    overall marketing plan, was that a valuable
3    service?
4        MR. MCBIRNEY:  Objection; foundation.
5        THE WITNESS:  The service is necessary
6    given few options else -- elsewhere.
7    BY MS. GOODMAN:
8        Q.   When you say "few options elsewhere,"
9    what do you mean?
10       A.   There's really not an efficient
11   -- there's really not an effective way to
12   achieve, for example, reach and search, other
13   than must -- using Google.  Other competitive
14   search engines don't provide the same reach.  So
15   the Army's not necessarily in a position to not
16   use it.
17       Q.   Does -- with respect to DB
18   -- programmatic display ads you have no knowledge
19   or awareness however of any other competitors
20   that provide such a service; is that correct?
21       MR. MCBIRNEY:  Object to the form of the
22   question.
23       THE WITNESS:  If there are competitors
24   in that particular offering, I -- I'm not aware
25   of them by name or that they even exist.

1    BY MS. GOODMAN:
2        Q.   You just don't know one way or another
3    if they are competitors; is that correct?
4        A.   I do not know one way or the other with
5    respect to that particular service.
6        Q.   Okay.  Do you use Google yourself?
7        A.   I do.
8        Q.   What -- what do you use Google for
9    yourself?
10       A.   Currently for news.
11       Q.   Do you use Google Search?
12       A.   I do.
13       Q.   Do you use Gmail?
14       A.   I have a Gmail account, but I wouldn't
15   say that I use it routinely.
16       Q.   Do you have a different personal email
17   account --
18       A.   I do.
19       Q.   -- that you use?  Do you use it for work
20   purposes?
21       A.   No.
22       Q.   Are you aware of any document retention
23   policies at AEMO?
24       A.   Can you be more specific?
25       Q.   Are you aware of any policy that applies

59 (Pages 230 - 233)

1  to the keeping, maintaining or deletion of
2  documents at AEMO?
3      A.  I'm not aware of a specific AEMO policy
4  that covers those topics.
5      Q.  Okay.  Are you aware of an Army policy
6  that covers those topics?
7      A.  Not in any specific detail I'm not.
8      Q.  Okay.  Do you know if there are any
9  rules or policies that apply to when it is
10  appropriate to delete documents at AEMO?
11     A.  No, I'm not aware of any rules.
12     Q.  Okay.  Do you have any pol -- practice
13  of deleting documents?
14     A.  I will occasionally delete documents.
15     Q.  For what re -- under what circumstances
16  do you delete documents?
17     A.  Unfortunately, there's too many people
18  who are too liberal with the "reply all," and
19  I'll have the same message with the message
20  thanks.  And I'll end up deleting the nonrelevant
21  messages that just fill the inbox.
22     Q.  Any other circumstances that you delete
23  documents?
24     A.  I may go back and look at things that
25  are years old from units where I no longer serve

1  or jobs I no longer have and remove emails to
2  just free up storage space.
3      Q.  Do you ever delete documents to free up
4  storage -- strike that.
5          Do you ever delete documents to free up
6  storage space -- space even if the documents
7  pertain to your current work?
8          MR. MCBIRNEY:  Objection; vague.
9          THE WITNESS:  I may delete an email if
10  it wasn't intended for me or if I'm just a cc on
11  somebody else's email who thought everyone in the
12  office should know about something that wasn't
13  relevant to me.
14  BY MS. GOODMAN:
15     Q.  Okay.  The circumstances that you have
16  described with respect to deleting documents,
17  have you prac -- have you engaged in that kind of
18  deletion in the year 2023?
19     A.  No.
20     Q.  Why not?
21     A.  I've generally set for myself a
22  couple-of-year policy of looking back.  And,
23  frankly, sometimes I just forget and haven't done
24  it.
25     Q.  So it's your testimony that you haven't

1  deleted any "reply all" emails this year that say
2  "thanks"?
3      A.  That's not my testimony.
4      Q.  Okay.  Have you ever deleted any "reply
5  all" emails this year --
6      A.  I'm sure that I have.
7      Q.  -- that you've described?
8          Okay.  Have you ever deleted any emails
9  on which you were just a cc this year?
10     A.  I'm sure that I have.
11     Q.  What other kinds of documents have you
12  deleted this year?
13         MR. MCBIRNEY:  Objection.  Assumes
14  facts.
15         THE WITNESS:  I've described as best as
16  I can describe.
17  BY MS. GOODMAN:
18     Q.  Do you have a work-provided mobile
19  device?
20     A.  I do.
21     Q.  What device do you have that's provided
22  by work?
23     A.  I have an iPhone.
24     Q.  And how do you use your iPhone for work
25  purposes?

1      A.  I use it for phone calls, for text
2  and for WhatsApp communication for daily status
3  report in the sense of our team reports, hey, I'm
4  present for duty today; I'm TDY today; I'm on
5  leave today.
6      Q.  How do you use text messaging at work?
7      A.  Infrequently.
8      Q.  And when you use it infrequently, what
9  do you -- for what purpose do you use it?
10     A.  For quick exchanges.  Questions.  Are
11  you available for something?  Are you going to be
12  in the office today?  Basic information between
13  colleagues.
14     Q.  Have you had occasion to look back at
15  your text messages this year in order to provide
16  them to attorneys at the Department of Justice?
17     A.  No.  I didn't look back at them.
18     Q.  Nobody's asked you to go look at your
19  text messages for anything potentially relevant
20  to this lawsuit.  Is that accurate?
21         MR. MCBIRNEY:  I'm going to object to
22  the extent this calls for protected
23  attorney-client privileged.  If you can answer
24  without disclosing privileged communications, you
25  may do so.  Otherwise, I instruct the witness not

60 (Pages 234 - 237)

Page 246

1  for information relevant to this lawsuit?
2     A.  I did not.
3        MS. GOODMAN:  I reserve the remainder of
4  my time for this deposition based on the improper
5  privilege assertions made at the outset of the
6  deposition.  So I close the dep -- I'm holding
7  the deposition open.
8        MR. MCBIRNEY:  Can I get a time check?
9        THE VIDEOGRAPHER:  We are at 5:55
10  minutes.
11        MR. MCBIRNEY:  Okay.  The government
12  does not agree with your position that the
13  deposition should remain open, but we understand
14  your position.
15        MS. GOODMAN:  Okay.
16        MR. MCBIRNEY:  Off the record.
17        THE VIDEOGRAPHER:  Anything else for the
18  record?
19        MS. GOODMAN:  Thank you, Colonel.
20        THE WITNESS:  Thank you very much.
21        THE VIDEOGRAPHER:  This marks the end of
22  the deposition of Colonel John Horning.  We're
23  going off the record at 1753.
24        (Deposition concluded -- 5:53 p.m.)
25

Page 247

1           C E R T I F I C A T E
2
3        I do hereby certify that I am a Notary
4  Public in good standing, that the aforesaid
5  testimony was taken before me, pursuant to
6  notice, at the time and place indicated; that
7  said deponent was by me duly sworn to tell the
8  truth, the whole truth, and nothing but the
9  truth; that the testimony of said deponent was
10  correctly recorded in machine shorthand by me and
11  thereafter transcribed under my supervision with
12  computer-aided transcription; that the deposition
13  is a true and correct record of the testimony
14  given by the witness; and that I am neither
15  counsel nor kin to any party in said action, nor
16  interested in the outcome thereof.
17
18        WITNESS my hand and official seal this
19  21st day o
20
21
22             Notary Public
23
24
25

Page 248

1     Jimmy McBirney, Esq.
2     jimmy.mcbirney@usdoj.gov
3              August 21, 2023
4  RE:   United States, Et Al v. Google, LLC
5     8/18/2023, John  Horning (#6060378)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 249

1  United States, Et Al v. Google, LLC
2  John  Horning (#6060378)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24  John  Horning              Date
25

63 (Pages 246 - 249)

Page 250

1  United States, Et Al v. Google, LLC

2  John  Horning (#6060378)

3        ACKNOWLEDGEMENT OF DEPONENT

4     I, John  Horning, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____  _____

12  John  Horning            Date

13  *If notary is required

14        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15        _____ DAY OF _____, 20___.

16

17

18        _____

19        NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions

800-567-8658                                                              973-410-4098

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.