# EXHIBIT 20
# PUBLIC REDACTED VERSION

Case 1:23-cv-00108-LMB-JFA   Document 453-13   Filed 09/24/23   Page 2 of 28 PageID# 65061

Page 1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF VIRGINIA
2              ALEXANDRIA DIVISION
3

     _____
4                                  :

     UNITED STATES OF AMERICA, :
5    et al.,                       :
                                   :
6          Plaintiffs              :
                                   :
7          v.                      : No.  1:23-cv-00108
                                   :
8    GOOGLE, LLC,                  :
                                   :
9          Defendants.             :
     _____:
10
11              HIGHLY CONFIDENTIAL
12
                Monday, August 21, 2023
13
14          Video Deposition of CHRISTOPHER KOEPKE,
15     taken at the Law Offices of Paul, Weiss,
16     Rifkind, Wharton & Garrison LLP, 2001 K St NW,
17     Washington, DC, beginning at 9:35 a.m. Eastern
18     Standard Time, before Ryan K. Black, Registered
19     Professional Reporter, Certified Livenote
20     Reporter and Notary Public in and for the
21     District of Columbia
22
23
24
25     Job No. CS6043164

APPEARANCES:

UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
BY: KATHERINE CLEMONS, ESQ
    VICTOR LIU, ESQ
    ALVIN CHU, ESQ
    MARK SOSNOWSKY, ESQ - Via Zoom
450 5th Street, N W
Washington, DC 20530
202 514 2414
katherine clemons@usdoj gov
victor liu@usdoj gov
alvin chu@usdoj gov
mark sosnowsky@usdoj gov
Representing - The United States of America

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP,
BY: MARTHA L GOODMAN, ESQ
    HEATHER C MILLIGAN, ESQ
2001 K St NW,
Washington, DC
202 223 7341
mgoodman@paulweiss com
hmilligan@paulweiss com

Representing - Google LLC

ALSO PRESENT:
Orson Braithwaite - Legal Videographer
Kenneth Whitley - Department of Health and Human
    Services

I N D E X
TESTIMONY OF: CHRISTOPHER KOEPKE          PAGE
By Ms Goodman                      6
E X H I B I T S
EXHIBIT       DESCRIPTION         PAGE
Exhibit 65    a document Bates Numbered
              CMS-ADS-11906 through 11974  117

Exhibit 66    a document Bates Numbered
              CMS-ADS-23248 through 23337  136
Exhibit 67    a document Bates Numbered
              CMS-ADS-59892 through 59893  151

Exhibit 68    a document Bates Numbered
              CMS-ADS-593107 through 593110  167
Exhibit 69    a document Bates Numbered
              CMS-ADS-183807 through 183811  181

Exhibit 70    a document Bates Numbered
              CMS-ADS-529199 through 529200  190
Exhibit 71    a document Bates Numbered
              CMS-ADS-189390          251

Exhibit 72    a document Bates Numbered
              CMS-ADS-64968 through 64971  258
Exhibit 73    a document Bates Numbered
              CMS-ADS-440295          265

Exhibit 74    a document Bates Numbered
              CMS-ADS-531032 through 531072  268
Exhibit 75    a document Bates Numbered
              CMS-ADS-569654 through 569667  273

THE VIDEOGRAPHER:  Good morning.  We are
going on the record at 9:35 a.m. on August 21st,
2023.  Please note that the microphones are
sensitive and may pick up whispering and private
conversations.  Please mute your phones at this
time.  Audio and video recording will continue to
take place unless all parties agree to go off the
record.

This is Media Unit 1 of the
video-recorded deposition of Mr. Christopher
Koepke in the matter of United States, et al.,
versus Google, LLC, filed in the United States
District Court Eastern District of Virginia
Alexandria Division, Case Number
1:23-cv-00108-LMB-JFA.

My name is Orson Braithwaite,
representing Veritext Legal Solutions, and I'm
the videographer.  The court reporter is Ryan
Black, from the firm Veritext Legal Solutions.

Counsel will now state their appearances
and affiliations for the record.

MS. GOODMAN:  Martha Goodman, from Paul
Weiss, on behalf of Google LLC.

MS. MILLIGAN:  Heather Milligan, also on
behalf of Paul Weiss, for Google.

MS. CLEMONS:  Katherine Clemons, with
the Department of Justice, on behalf of the
United States of America, CMS and the witness.

MR. LIU:  Victor Liu, also with the
Department of Justice, on behalf of the United
States and CMS.

MR. CHU:  Alvin Chu, on behalf of United
States.

MR. WHITLEY:  Kenneth Whitley, Office of
General Counsel, Department of Health and Human
Services.

MS. GOODMAN:  And could the folks
attending remotely please state your presence?

MR. SOSNOWSKY:  Mark Sosnowsky,
Department of Justice, and I will be in and out
of this deposition remotely.  So if you lose me,
please don't -- you can continue.

THE VIDEOGRAPHER:  Thank you.

Would the court reporter please swear in
the witness?

*  *  *

Whereupon --

CHRISTOPHER KOEPKE,
called to testify, having been first duly sworn
or affirmed, was examined and testified as

HIGHLY CONFIDENTIAL

Page 6

1    follows:
2            *   *   *
3            EXAMINATION
4    BY MS. GOODMAN:
5        Q.  Good morning, Mr. Koepke.
6        A.  Good morning.
7        Q.  Have you been deposed before?
8        A.  I think once. I'm not exactly sure it
9    was a formal deposition, --
10       Q.  Okay.
11       A.  -- but yes.
12       Q.  Was there a court reporter taking down
13   everything you were saying?
14       A.  No, there was not.
15       Q.  Okay. So in this deposition,
16   it's important that you allow me to finish my
17   question before you answer, because our court
18   reporter, Mr. Black, is taking down everything
19   we're saying --
20       A.  All right.
21       Q.  -- and he can't take two people talking
22   at the same time. Okay?
23       A.  All right.
24       Q.  So please let me finish my question
25   before you begin your answer. Okay?

Page 7

1        A.  Okay.
2        Q.  Okay. And the court reporter also
3    cannot record nonverbal answers or half verbal
4    answers, like uh-huh or huh-uh, so please make
5    sure to speak in a -- answer the questions
6    verbally. Okay?
7        A.  Okay.
8        Q.  Okay. And I will assume that you
9    understand my questions unless you ask me for a
10   clarification. Okay?
11       A.  Okay.
12       Q.  And is there any reason you're unable to
13   provide your truthful and accurate testimony here
14   today?
15       A.  No.
16       Q.  Okay. What is your current title?
17       A.  Director of the Strategic Marketing
18   Group in the Office of Communications at the
19   Centers for Medicare and Medicaid Services.
20       Q.  And what are your responsibilities as
21   the director of the Strategic Marketing Group at
22   the Office of Communications at the Centers for
23   Medicare and Medicaid Services?
24       A.  When -- this federal agency is
25   responsible for Medicare, Medicaid and other

Page 8

1    healthcare programs. When we need people,
2    citizens of America to take an action, it is my
3    job to do outreach to help them know what actions
4    they need to take. I could probably go on for
5    the rest of the day with details on that.
6        Q.  I'm sure we'll get to it. How long have
7    you been the director -- is the strategic
8    marketing -- strike that.
9            Is the Strategic Marketing Group
10   abbreviated SMG?
11       A.  Yes, it is.
12       Q.  Okay. How long have you been director
13   of SMG?
14       A.  Approximately nine to ten years.
15       Q.  And prior to serving as director of SMG,
16   what -- what job did you have, if any?
17       A.  I was the deputy director of the
18   Creative Services Group in the Office of
19   Communications at the Centers for Medicare and
20   Medicaid Services.
21       Q.  And how long were you the deputy
22   director of the Creative Services Group?
23       A.  I would say three to four years.
24       Q.  In your role as director of SMG, who do
25   you report to?

Page 9

1        A.  I report to the deputy director of the
2    Office of Communications.
3        Q.  And what is that individual's name?
4        A.  Mary Wallace.
5        Q.  How long has Mary Wallace been the
6    person to whom you've -- who you report?
7        A.  Nine to ten years.
8        Q.  And to whom does Ms. Wallace report?
9            MS. CLEMONS:  Objection; foundation.
10           THE WITNESS:  Many people, but the
11   administrator of CMS.
12   BY MS. GOODMAN:
13       Q.  And who is the current administrator of
14   CMS?
15       A.  Chiquita Brooks-LaSure.
16       Q.  And how long has Ms. LaSure been the
17   administrator at CMS?
18           MS. CLEMONS:  Objection; foundation.
19           THE WITNESS:  I don't know when she was
20   confirmed.
21   BY MS. GOODMAN:
22       Q.  Okay. How many administrators of CMS
23   have you worked under over the course of your
24   time as director of SMG?
25       A.  I could give you an approximate number.

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1  I'm sure I might be forgetting someone. Five or
2  six.
3      Q.  And how about in the time period of 2019
4  to 2023, how many administrators have you worked
5  under in that time period?
6      A.  There's one detail I can't remember, but
7  from confirmed administrators by the Senate would
8  be two.
9      Q.  And what is the one detail you can't
10  remember?
11     A.  Usually in between confirmed
12  administrators there is a career administrator,
13  and I cannot remember who that was or how many
14  there were between the last two confirmed ones.
15     Q.  Okay.  And are the -- those career
16  officials, are they serving in an acting
17  capacity, in your experience?
18     A.  That is correct.
19     Q.  And how many presidential
20  administrations have you served under?
21         MS. CLEMONS:  Objection; vague.
22         THE WITNESS:  Five.
23  BY MS. GOODMAN:
24     Q.  And are those both republican and
25  democratic administrations?

Page 11

1      A.  Yes.
2      Q.  Are you also an adjunct -- oh, strike
3  that.
4         Who reports to you in your role as
5  director of SMG?
6         MS. CLEMONS:  Objection; form.
7         THE WITNESS:  Do you want the entire
8  list of people or my immediate reports?
9  BY MS. GOODMAN:
10     Q.  Let's go with your direct reports,
11  please.
12     A.  Okay.  There would be three division
13  directors, a special assistant, a deputy director
14  and an office administrator.
15     Q.  And has that -- those one, two, three,
16  four, five -- have you always had six direct
17  reports in your time as director of SMG?
18     A.  I'm not sure.
19     Q.  How about in the time period of 2019 to
20  2023, have you always had six direct reports?
21     A.  Yes.
22     Q.  Okay.  Who are the -- what are the three
23  divisions which report up to you as director of
24  SMG?
25     A.  One of them is the Division of Research.

Page 12

1  Another is the Division of Digital Marketing.
2  And the other one is the Division of Campaign
3  Management.
4      Q.  Who is the head -- who is the division
5  director of the Research Division?
6      A.  Clarese Astrin.
7      Q.  How long has Ms. Astrin been the
8  director of the Research Division?
9      A.  I'm not sure exactly how many years it's
10  been.
11     Q.  Can you approximate?
12     A.  About 10 years.
13     Q.  Okay.  Who is the director of Digital
14  Marketing?
15     A.  Mark Krawczyk.
16     Q.  How long has Mr. Krawczyk been the
17  director of Digital Marketing?
18     A.  I'm not sure.
19     Q.  Can you approximate?
20     A.  I can.
21     Q.  What's your approximate --
22     A.  Six to seven years.
23     Q.  Who is the director of the Campaign
24  Management Division?
25     A.  Barbara Johanson.

Page 13

1      Q.  And how long has Ms. Johanson been the
2  director of the Campaign Management Division?
3      A.  I'm not sure.
4      Q.  How about an approximation?
5      A.  Three years.
6      Q.  Prior to serving as director of the
7  Campaign Management Division, did Ms. Johanson
8  have a role in the SMG?
9      A.  Yes.
10     Q.  What was her role prior to becoming
11  director of the Campaign Management Division?
12     A.  She was an analyst within that division
13  that she now directs.
14     Q.  And who is the deputy director that
15  reports to you?
16     A.  Laura Salerno.
17     Q.  How long has she been the direct
18  -- deputy director at SMG?
19     A.  I'm not sure.
20     Q.  How about an approximation?
21     A.  Three to four years.
22     Q.  Prior to being the deputy director, did
23  Ms. Salerno have a job in the SMG?
24     A.  Yes, she did.
25     Q.  What was her role prior to becoming the

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 62

1  audiences, we are taking into consideration those
2  that are more mobile-reliant. And we direct our
3  contractors to place more mobile programmatic
4  ads.
5  BY MS. GOODMAN:
6      Q. How does CMS go about placing
7  programmatic ads on desktop devices --
8          MS. CLEMONS: Objection; form.
9  BY MS. GOODMAN:
10     Q. -- or in a desktop format?
11         MS. CLEMONS: Objection; form.
12 Foundation.
13         THE WITNESS: The same.
14 BY MS. GOODMAN:
15     Q. And then same question as to video. How
16 does CMS go about placing programmatic video ads?
17         MS. CLEMONS: Objection; form.
18 Foundation.
19         THE WITNESS: We think about our
20 audience, how they're gonna interact with the
21 information. And we direct our contractors to
22 place the ads accordingly.
23 BY MS. GOODMAN:
24     Q. Do you direct your contractors to use
25 any particular video -- programmatic provider --

Page 63

1          MS. CLEMONS: Objection to form.
2  BY MS. GOODMAN:
3      Q. -- for mobile, video or desktop?
4          MS. CLEMONS: Same objection.
5          THE WITNESS: Yes.
6  BY MS. GOODMAN:
7      Q. What direction do you provide your
8  contractors with respect to the programmatic
9  providers CMS -- they should use on your behalf?
10         MS. CLEMONS: Objection; form.
11         THE WITNESS: There are two factors.
12 Programmatic providers that are likely to
13 reach our audience, and program -- programmatic
14 providers for whom we have done a privacy
15 analysis.
16 BY MS. GOODMAN:
17     Q. What does the privacy analysis entail?
18         MS. CLEMONS: Objection to form.
19         THE WITNESS: We -- the government as a
20 whole, and -- and we're very important to us, we
21 -- the finished product is what we call a TPWA,
22 Third-party WA. And it is published for everyone
23 to see and read.
24         We go through a process of analyzing how
25 that company -- that programmatic company, uses

Page 64

1  data. And we develop mechanisms for people to
2  choose, for their own privacy. And we -- and we
3  then publish it.
4  BY MS. GOODMAN:
5      Q. So is it accurate that I should be able
6  to find, publicly, any TPWA analysis for any
7  Google programmatic tool --
8          MS. CLEMONS: Objection; form.
9  BY MS. GOODMAN:
10     Q. -- done by CMS?
11     A. Yes.
12     Q. Okay. You said that one fact -- the
13 other factor is likelihood of reaching your
14 audience. How do you evaluate a programmatic
15 provider's likelihood of reaching your intended
16 audience?
17         MS. CLEMONS: Objection to form.
18         THE WITNESS: There are really two
19 factors, depending on the audience. Massive
20 reach is actually a very good factor. Another
21 is that there are some -- some programmatic
22 providers through which data can be used to try
23 to target specific audiences.
24 BY MS. GOODMAN:
25     Q. Who are the programmatic providers

Page 65

1  you're thinking of that -- through which data can
2  be used to try to target specific audiences?
3      A. All of them. And they will develop
4  products that could be useful, or, more or less,
5  useful, for specific audiences.
6      Q. I see. So are you aware of any
7  programmatic providers who are more useful at
8  serving a minority or diverse population as
9  compared to the general market?
10         MS. CLEMONS: Objection; form.
11 Foundation.
12         THE WITNESS: There are those that
13 develop products for that purpose.
14 BY MS. GOODMAN:
15     Q. Can you think of any sitting here today?
16     A. I don't see any of them sitting here
17 today.
18     Q. I'm asking if you can -- can you name
19 any of these programmatic providers by name that
20 you're thinking of?
21     A. Resonate.
22     Q. What does Resonate do?
23         MS. CLEMONS: Objection; form.
24         THE WITNESS: I can't say I'm an expert
25 in everything the company does.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

1   BY MS. GOODMAN:
2       Q.   What does Resonate do with assisting CMS
3   in its programmatic advertising?
4           MS. CLEMONS:  Objection; form.
5   Foundation.
6           THE WITNESS:  We have historically used
7   them for targeting Spanish-speaking audiences.
8   BY MS. GOODMAN:
9       Q.   Any other examples of programmatic ad
10  providers that you can think of which CMS has
11  used?
12          MS. CLEMONS:  Objection to form.
13          THE WITNESS:  Yes.
14  BY MS. GOODMAN:
15      Q.   Which ones?
16          MS. CLEMONS:  Same objection.
17          THE WITNESS:  MIQ.
18  BY MS. GOODMAN:
19      Q.   And for what purpose do you use MIQ --
20          MS. CLEMONS:  Objection to form.
21  BY MS. GOODMAN:
22      Q.   -- relative to any other programmatic
23  provider?
24      A.   There are two things that we would use
25  MIQ for relative to a programmatic provider.  One

1   is by investing in two different programmatic
2   providers, or more than one, we can track
3   their ROI, so we can use taxpayer dollars most
4   efficiently.  So we're not just locked into one
5   all the time.  And MIQ has developed a product to
6   try to identify, as best as possible, people who
7   would make a good target who might be looking for
8   health insurance.
9       Q.   Can you think of any other programmatic
10  providers that CMS has used besides MIQ and
11  Resonate?
12          MS. CLEMONS:  Objection; form.
13          THE WITNESS:  There are others, and at
14  the moment I'm drawing a blank.
15  BY MS. GOODMAN:
16      Q.   Okay.  Have you heard the name the Trade
17  Desk?
18      A.   Yes.
19      Q.   Is that a programmatic provider you
20  recall CMS using?
21      A.   Yes.
22          MS. CLEMONS:  Objection to form.
23  BY MS. GOODMAN:
24      Q.   And do you know why CMS would choose the
25  Trade Desk relative to any other programmatic

1   provider?
2           MS. CLEMONS:  Objection to form.
3   Foundation.
4           THE WITNESS:  We would invest in more
5   than one programmatic provider in an effort to
6   see how the return on investment goes across them
7   and to most efficiently use the taxpayer dollars.
8   BY MS. GOODMAN:
9       Q.   Have you heard of Huddled Masses?
10      A.   Yes.
11      Q.   Is that another programmatic provider
12  CMS has used?
13      A.   Yes.
14      Q.   And why does CMS choose to use Huddled
15  Masses relative to any other programmatic
16  provider?
17          MS. CLEMONS:  Objection to form.
18          THE WITNESS:  We invest in more than
19  one pro -- programmatic provider so we can track
20  their return on investment so we can best use
21  taxpayer dollars -- be most efficient.
22  BY MS. GOODMAN:
23      Q.   How about Digilant?  Have you heard that
24  name before?
25      A.   Yes, I have.

1       Q.   Is that a programmatic provider that CMS
2   has used?
3           MS. CLEMONS:  Objection; form.
4           THE WITNESS:  To the best of my
5   knowledge, yes.
6   BY MS. GOODMAN:
7       Q.   And why does CMS choose to use Digilant
8   relative to any other programmatic provider?
9           MS. CLEMONS:  Objection; form.
10          THE WITNESS:  We invest in Digilant as
11  we would other programmatic providers for the
12  purpose of tracking the ROI and assessing who is
13  providing the best return on investment for the
14  taxpayer.
15          MS. CLEMONS:  We've been on the record
16  for about 90 minutes.  Do you need a break or --
17          THE WITNESS:  I could use a little more
18  water.  Yeah.  Probably the restroom then.
19          MS. GOODMAN:  Can I just ask a couple
20  more questions.
21          THE WITNESS:  Did you record that?
22          MS. GOODMAN:  Can I just finish with a
23  few more other examples to see if you've heard of
24  them?
25          THE WITNESS:  I feel -- I feel I can

18 (Pages 66 - 69)

Page 70

1  keep going.
2       MS. CLEMONS:  Okay.
3  BY MS. GOODMAN:
4       Q.  Thank you.  I appreciate it.  And then
5  we can take a break.
6          GumGum.  Have you heard of GumGum?
7       A.  Yes.
8       Q.  Is that a programmatic provider CMS has
9  used.
10      MS. CLEMONS:  Objection to form.
11      THE WITNESS:  We usually use GumGum,
12  yes.
13  BY MS. GOODMAN:
14      Q.  And how do you -- why does CMS use
15  GumGum relative to any other programmatic
16  provider?
17      MS. CLEMONS:  Objection; form.
18      THE WITNESS:  We invest in multiple
19  programmatic providers so we can track their ROI,
20  their return on investment, to be as efficient as
21  possible.
22  BY MS. GOODMAN:
23      Q.  And what about Adsmovil?  Have you heard
24  of Adsmovil?
25      A.  Yes.

Page 71

1       Q.  Is that a programmatic provider that CMS
2  has used.
3       MS. CLEMONS:  Objection; form.
4       THE WITNESS:  Yes.
5  BY MS. GOODMAN:
6       Q.  Why do you use Adsmovil relative to any
7  other programmatic provider?
8       MS. CLEMONS:  Objection; form.
9       THE WITNESS:  We use multiple
10  programmatic providers to track the return on
11  investment on a particular campaign to be most
12  efficient to achieve our goals for the American
13  taxpayer.
14  BY MS. GOODMAN:
15      Q.  And last one.  Have you heard of
16  QuantiCast?
17      A.  Yes.
18      Q.  Is that a programmatic provider that CMS
19  has used?
20      MS. CLEMONS:  Objection; form.
21      THE WITNESS:  I am not sure.
22  BY MS. GOODMAN:
23      Q.  Okay.  Have you heard of MNI?
24      A.  Yes.
25      Q.  Is that a programmatic provider CMS has

Page 72

1  used?
2       MS. CLEMONS:  Objection to form.
3       THE WITNESS:  Yes.
4  BY MS. GOODMAN:
5       Q.  And why has CMS used MNI relative to any
6  other programmatic provider?
7       MS. CLEMONS:  Objection; form.
8       THE WITNESS:  We invest in multiple
9  programmatic providers so we can track their
10  return on investment so we can see what is most
11  efficient at achieving our goals.
12  BY MS. GOODMAN:
13      Q.  Okay.  And then can you think of any
14  Google programmatic services that CMS has used?
15      MS. CLEMONS:  Objection; form.
16      THE WITNESS:  Yes.
17  BY MS. GOODMAN:
18      Q.  Which ones?
19      A.  Google Display Network and DV360.
20      Q.  [REDACTED]
21  [REDACTED]
22  [REDACTED]
23      MS. CLEMONS:  Objection; form.
24      THE WITNESS:  [REDACTED]
25  [REDACTED]

Page 73

1  [REDACTED]
2  [REDACTED]
3  BY MS. GOODMAN:
4       Q.  Okay.
5       A.  [REDACTED].
6       MS. GOODMAN:  Okay.  We can take a
7  break.
8       THE VIDEOGRAPHER:  The time is 11:03
9  a.m.  This ends unit 1.  We're off the record.
10      (Recess taken.)
11      THE VIDEOGRAPHER:  The time is 11:20
12  a.m.  This begins Unit Number 2.  We're on the
13  record.
14  BY MS. GOODMAN:
15      Q.  Mr. Koepke, have you -- can you think of
16  any other places CMS has placed ads that would be
17  in the bucket of ads within a logged-in
18  experience?
19      MS. CLEMONS:  Objection to form.
20      THE WITNESS:  Not off the top of my
21  head.
22  BY MS. GOODMAN:
23      Q.  And another kind of digital ad we've
24  discussed was OTT ads.  Do you recall that?
25      A.  Yes.

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1     Q.   What -- what places has CMS placed OTT
2  ads?
3           MS. CLEMONS:  Objection to form.
4           THE WITNESS:  Hulu.  I'm pulling a blank
5  on a couple of the others.  Competitors to Hulu.
6  BY MS. GOODMAN:
7     Q.   And do you know what mechanism CMS uses
8  to place ads on Hulu or other competitors to
9  Hulu?
10          MS. CLEMONS:  Objection to form.
11          THE WITNESS:  We provide direction to
12  our contractors to place ads on OTT to reach
13  audiences of interest for our programs.
14  BY MS. GOODMAN:
15    Q.   And do you provide any direction in what
16  particular way to place OTT ads in order to reach
17  audiences of interest?
18          MS. CLEMONS:  Objection to form.
19          THE WITNESS:  We provide direction as to
20  the tactics and the channels that will reach the
21  audiences of our interest.
22  BY MS. GOODMAN:
23    Q.   Do you -- do you direct them to use any
24  particular ad-buying tool in order to place ads
25  on OTT?

Page 75

1           MS. CLEMONS:  Objection to form.
2  Foundation.
3           THE WITNESS:  We do.
4  BY MS. GOODMAN:
5     Q.   And what ad-buying tools do you direct
6  the ad agencies to use in order to place ads on
7  OTT?
8           MS. CLEMONS:  Objection; form.
9           THE WITNESS:  I'm not sure.
10  BY MS. GOODMAN:
11    Q.   Okay.  So how do you know that you
12  direct them to use particular ad-buying tools?
13    A.   In our media plans, we approve the
14  entire media plan, which included ad-buying
15  tools.
16    Q.   And do all of the ad-buying tools used
17  by ad agencies for CMS need to go through the
18  privacy analysis that we talked about earlier?
19          MS. CLEMONS:  Objection; form.
20  Foundation.
21          THE WITNESS:  To the degree that there
22  is a data exchange with our website.  That's the
23  key.
24  BY MS. GOODMAN:
25    Q.   Are you aware of any digital ad provider

Page 76

1  who did not make it through the privacy analysis
2  and was not approved for use?
3           MS. CLEMONS:  Objection; form.
4  Foundation.
5           THE WITNESS:  I am not.
6  BY MS. GOODMAN:
7     Q.   So we've talked about a variety of types
8  of digital ads, YouTube, programmatic mobile,
9  programmatic video, programmatic display, ads
10  with publishers, website takeovers, ads within a
11  logged-in experience, including Google Discovery,
12  Facebook, Instagram, Twitter and LinkedIn,
13  Search, including Google and Bing and
14  over-the-top ads, including Hulu and competitors
15  of Hulu.  How does CMS decide which of those
16  digital categories to use when making decisions
17  about advertising?
18          MS. CLEMONS:  Objection; form.
19  Foundation.
20          THE WITNESS:  We consider the audience
21  that we try to reach, the behavior we want them
22  to do, and the size of the budget that we have at
23  our disposal.
24  BY MS. GOODMAN:
25    Q.   Anything else that you consider in

Page 77

1  making a decision on which advertising -- digital
2  advertising category to use?
3           MS. CLEMONS:  Objection; form.
4           THE WITNESS:  That might vary by
5  campaign, but off the top of my head I can't say.
6  What I said was the most important.
7  BY MS. GOODMAN:
8     Q.   Does CMS try to create an appropriate
9  mix of advertising across all of the categories
10  that we've discussed?
11          MS. CLEMONS:  Objection; form.
12          THE WITNESS:  What would be your
13  definition of appropriate mix?
14  BY MS. GOODMAN:
15    Q.   For whatever is -- CMS deems to be
16  appropriate for a given campaign.  So do you
17  decide to use multiple different channels, and,
18  if so, how do you make those decisions?
19          MS. CLEMONS:  Objection; form.
20          THE WITNESS:  We assess the goal of
21  the campaign, the audience that we're trying to
22  reach, how we can best reach them, and the amount
23  of resources we have.
24  BY MS. GOODMAN:
25    Q.   And in the course of those

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 110

1 But it demonstrated that the outreach resulted in
2 -- and this is the number I'm not -- but resulted
3 in many people getting health coverage.
4 BY MS. GOODMAN:
5 Q. As compared to the prior year?
6 A. We did not do Mixed Media Modeling the
7 private -- prime -- the previous year, so as
8 related to the number of uninsured people, --
9 Q. Got it.
10 A. -- the audience at that time. And other
11 factors that could also increase enrollment.
12 Q. What are the other factors that could
13 also increase enrollment to which you're
14 referring?
15 A. For a set number of years, a law was
16 passed that impacted the tax breaks that people
17 could get for having health insurance, thereby
18 reducing their premiums for the health insurance.
19 Q. So over the time period at issue, or
20 that I'm focusing on in this case, 2019 to 2023,
21 it's fair to say that the budget available for
22 advertising and outreach has increased, correct?
23 MS. CLEMONS: Objection; form.
24 THE WITNESS: Yes.
25 BY MS. GOODMAN:

Page 111

1 Q. Okay. And how have you, in the
2 Strategic Marketing Group, made decisions about
3 how to spend those additional dollars over that
4 time period?
5 MS. CLEMONS: Objection; form.
6 THE WITNESS: We considered the audience
7 and how best to reach them, and we -- and we
8 distribute the funds accordingly.
9 BY MS. GOODMAN:
10 Q. And what changes have you observed with
11 respect to how best to reach the audiences you're
12 trying to reach over the 2019 to '23 time period
13 as part of the Open Enrollment campaigns?
14 MS. CLEMONS: Objection; form.
15 Foundation.
16 THE WITNESS: I'm not sure the channel
17 mix for most effectively reaching the audience
18 during that time period, based on my observations
19 of what would be best for reaching that audience,
20 has changed significantly, more subtle changes.
21 BY MS. GOODMAN:
22 Q. And what are the subtle changes that you
23 have observed?
24 A. Over a time period, and this could be
25 beyond the time period that you're mentioning, so

Page 112

1 that could be the problem with my thinking, but
2 display advertising has actually appeared, in my
3 memory, from best that I can recall, to become
4 more impactful.
5 Q. In what ways that you can recall has
6 display advertising become more impactful?
7 A. Best of my recollection, return on
8 investment appears to be higher.
9 Q. And what return on investment are you
10 tracking with respect to display advertising in
11 the Open Enrollment campaigns?
12 MS. CLEMONS: Objection to form.
13 THE WITNESS: We have primarily three
14 methods for looking at the role of display.
15 Method Number 1 is looking at the people who
16 directly interact with the ad, so what we often
17 call last-click attribution. Method Number 2 is
18 multi-source attribution; still within the
19 digital realm. And Method Number 3 is the Mixed
20 Media Modeling.
21 BY MS. GOODMAN:
22 Q. And so in what ways has the return on
23 investment according to those methods gotten
24 higher? Like, what changes are you seeing in
25 those metrics vis-a-vis return on investment?

Page 113

1 MS. CLEMONS: Objection; form.
2 Foundation.
3 THE WITNESS: To the best of my
4 recollection, we are seeing an ability to
5 attribute more application starts, and that is
6 the number of people who would actually be
7 applying for the tax break to help them pay for
8 their health insurance, and more enrolling due to
9 display ads, to the best of my recollection.
10 BY MS. GOODMAN:
11 Q. Have you observed any changes with
12 respect to meeting the audience you're trying to
13 reach with respect to video advertising in the
14 2019 to '23 time period?
15 MS. CLEMONS: Objection; form.
16 THE WITNESS: I don't recall.
17 BY MS. GOODMAN:
18 Q. Are there any other subtle changes that
19 you have observed over the 2019 to 2023 time
20 period with respect to reaching the audience
21 you're trying to reach for health -- Open
22 Enrollment?
23 MS. CLEMONS: Objection to form.
24 THE WITNESS: I don't recall.
25 BY MS. GOODMAN:

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1    Q.  Okay.  How about the -- have you
2    observed any changes in the availability of
3    advertising providers that you could use to reach
4    your audience over the 2019 to 2023 time period?
5         MS. CLEMONS:  Objection to form.
6         THE WITNESS:  I don't recall.
7    BY MS. GOODMAN:
8    Q.  So earlier we talked about a lot of the
9    different programmatic providers that CMS has
10   used.
11   A.  Mm-hmm.
12   Q.  Do you recall that testimony?
13   A.  Yes, I do.
14   Q.  Okay.  With respect to those providers,
15   were they all available to CMS in the 2019 year
16   as compared to the 2023 year?
17        MS. CLEMONS:  Objection; form.
18        THE WITNESS:  I don't recall.
19   BY MS. GOODMAN:
20   Q.  Are you aware of any advertising
21   providers who were not available to CMS in
22   2019 but who are available to CMS in 2023?
23        MS. CLEMONS:  Objection to form.
24        THE WITNESS:  I am not.
25   BY MS. GOODMAN:

Page 115

1    Q.  Okay.  So one of the subtle changes
2    that you said you observed was that display has
3    become more impactful, correct?  And when you say
4    "display," can you be more detailed about what
5    kind of display advertising you mean that has
6    become more impactful as in having a higher
7    return on investment?
8         MS. CLEMONS:  Objection to form.
9         THE WITNESS:  So kind of display really
10   covers a lot of categories, because there's
11   creative, there's delivery systems, there's
12   targeted.  Do you have anything particularly in
13   mind?
14   BY MS. GOODMAN:
15   Q.  No.  I want to understand what you mean
16   by "display being more impactful."
17   A.  All right.
18        MS. CLEMONS:  Objection to form.
19        THE WITNESS:  So to the best of my
20   recollection, display ads that -- what we would
21   call I don't know.  Let me see.  I've gotta
22   think of the term here -- prospecting.  So those
23   are the ads that go out and find people who could
24   benefit from the program, who may or may not have
25   ever interacted with the program before.  To the

Page 116

1    best of my recollection, that type of display
2    ad has increased in its value to us.
3    BY MS. GOODMAN:
4    Q.  And how does CMS go about -- what
5    methods does CMS use to place these kinds of
6    prospecting display ads?
7         MS. CLEMONS:  Objection to form.
8         THE WITNESS:  We direct our contractors
9    to do it on our behalf.
10   BY MS. GOODMAN:
11   Q.  And do you direct them to use any
12   particular provider?
13        MS. CLEMONS:  Objection to form.
14   Foundation.
15        THE WITNESS:  We will direct them to use
16   particular providers.
17   BY MS. GOODMAN:
18   Q.  Okay.  So with respect to the increasing
19   effectiveness of prospecting display ads, what
20   providers have you used?
21        MS. CLEMONS:  Objection to form.
22        THE WITNESS:  ██████████████████████
23   ██████████████████
24   BY MS. GOODMAN:
25   Q.  Which are those?

Page 117

1    A.  ██████████████████████████
2    ████████
3    Q.  Sure.
4    A.  ██████████████████████
5         MS. GOODMAN:  Shall we take a break for
6    lunch?
7         MS. CLEMONS:  Yeah.
8         THE WITNESS:  I'm good with whatever.
9         THE VIDEOGRAPHER:  The time is 12:22
10   p.m.  This ends Unit 2.  We're off the record.
11        (Lunch recess taken.)
12        (Exhibit No. 65, a document Bates
13   Numbered CMS-ADS-11906 through 11974, was
14   introduced.)
15        THE VIDEOGRAPHER:  The time is 1:14 p.m.
16   This begins Unit Number 3.  We're on the record.
17   BY MS. GOODMAN:
18   Q.  Mr. Koepke, I'm going to hand you a
19   document marked Exhibit 65, CMS-ADS-11906 through
20   11974.
21        And this is a technical proposal from
22   Weber Shandwick for Healthcare.gov 2010 Open
23   Enrollment campaign, correct?
24   A.  I'm not sure.  It's going to take me a
25   minute to look at it.

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1　Q. Sure.
2　A. It appears as such.
3　Q. Okay. And what is the purpose of a
4　technical proposal, to your knowledge?
5　　MS. CLEMONS: Objection; form.
6　　THE WITNESS: A technical proposal is
7　part of a contracting process. So the offerers,
8　which are the different ad agencies who might be
9　interested in contracting with the federal
10　government, would write a technical proposal to
11　show their abilities to meet the standards that
12　the federal government has set forward.
13　BY MS. GOODMAN:
14　Q. And did multiple different contractors
15　compete each year for the Open Enrollment
16　campaign, or was it only Webber Shandwick?
17　　MS. CLEMONS: Objection to form.
18　　THE WITNESS: Each year?
19　BY MS. GOODMAN:
20　Q. Each year.
21　A. Okay. It was not always only Weber
22　Shandwick, to the best of my knowledge. I'm
23　actually not a hundred percent sure, but -- so I
24　don't know.
25　Q. Okay. As the director of the Strategic

Page 119

1　man -- Marketing Group, did you review technical
2　proposals?
3　A. No, I did not.
4　　MS. CLEMONS: Objection to form.
5　　THE WITNESS: I'm so sorry.
6　BY MS. GOODMAN:
7　Q. Have you ever had occasion to read
8　them?
9　　MS. CLEMONS: Objection to form.
10　　THE WITNESS: Have I ever had the
11　occasion to read a technical proposal of any
12　sort?
13　BY MS. GOODMAN:
14　Q. Of -- related to any advertising
15　campaign handled by the Strategic Marketing Group
16　at CMS.
17　A. You had a lot of very specific details
18　in that question that would lead me to say no.
19　Q. What are the specific details in my
20　question that would lead you to say no?
21　A. One of them was the "Strategic Marketing
22　Group."
23　Q. Did I state that incorrectly?
24　　MS. CLEMONS: Objection to form.
25　　THE WITNESS: You did not say "Strategic

Page 120

1　Marketing Group" incorrectly. It sounded correct
2　to me.
3　BY MS. GOODMAN:
4　Q. Okay. I don't understand what the
5　detail with respect to the Strategic Marketing
6　Group led you to say no to my question.
7　　MS. CLEMONS: Objection to form.
8　BY MS. GOODMAN:
9　Q. Can you explain that to me?
10　A. Your question had three parts: Have I
11　ever read a technical proposal. Is it about
12　advertising. And is it for the Strategic
13　Marketing Group at CMS. I guess that's four
14　parts.
15　　The Strategic Marketing Group did not
16　exist when I read the technical proposals.
17　Q. When did you read the technical
18　proposals?
19　　MS. CLEMONS: Objection to form.
20　　THE WITNESS: The early 2000s.
21　BY MS. GOODMAN:
22　Q. So since the early 2000s, is it accurate
23　that you have not read the strat -- the technical
24　proposals submitted by ad agencies?
25　　MS. CLEMONS: Objection to form.

Page 121

1　　THE WITNESS: The technical proposals
2　are written by -- are read and judged by trained
3　staff who work for me.
4　BY MS. GOODMAN:
5　Q. Okay. And so your trained staff read
6　and review them, but you do not; is that correct?
7　A. That is correct.
8　Q. Okay. Do you discuss the technical
9　proposals with your staff?
10　A. I do not.
11　Q. Why not?
12　A. Because it is inappropriate for people
13　judging a technical proposal to talk with other
14　people about it in the process of an acquisition.
15　Q. Why is that improper or inappropriate?
16　A. I would only be doing conjecture, but
17　it's -- the government has a goal to be fair to
18　all businesses. And so, therefore, the people
19　who read the proposals and judge them are doing
20　so in a non-biased sense. And discussing with
21　anyone else could -- could increase or add bias
22　to a process.
23　Q. And which of your staff reviewed
24　technical proposals for the Healthcare.gov Open
25　Enrollment campaigns in the '19 to '23 time

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 138

1    Q.  Yes.

2       What "record-breaking enrollment"

3 occurred in OE9, if any?

4       MS. CLEMONS:  Objection; foundation.

5       THE WITNESS:  I did not write this, so I

6 am not certain what they meant by it.

7 BY MS. GOODMAN:

8    Q.  Are you aware of any records being

9 broken with respect to OE9?

10    A.  In OE9, we had excellent enrollment

11 success.

12    Q.  How did you attain excellent enrollment

13 success in OE9?

14       MS. CLEMONS:  Objection; form.

15       THE WITNESS:  By understanding our

16 audience and what motivates them, and delivering

17 the campaign to help them understand the value of

18 Healthcare.gov's plans for them.

19 BY MS. GOODMAN:

20    Q.  Did Google assist in any way in

21 obtaining ex -- excellent enrollment success in

22 OOE9?

23       MS. CLEMONS:  Objection; form.

24 Foundation.

25       THE WITNESS:  Google was, in OE9, a

Page 139

1 media partner that was part of the mix that

2 helped us obtain our excellence.

3 BY MS. GOODMAN:

4    Q.  Do you have any recollection of Google

5 assisting in any particular way in obtaining your

6 excellence in OE9?

7    A.  Specifics would be a little difficult

8 for me to remember right now; however, delivery

9 of display ads, search ads, are two ways that I'm

10 certain.  And, most likely, video ads, as well.

11    Q.  And can you please turn to Page 259?

12    A.  I'll try to remember to read the header

13 this time.

14    Q.  This one should be easy.  Top of the

15 page.  Well, the paragraph at the top of the

16 page.

17    A.  See, you're -- you're changing it

18 already.

19    Q.  Where it says Display Media.

20    A.  I see Display Media.

21    Q.  Okay.  It says, "Display media will

22 play an important role for both prospecting and

23 retargeting audiences."  What is your

24 understanding of the difference between

25 prospecting and retargeting audiences?

Page 140

1       MS. CLEMONS:  Objection; form.

2 Foundation.

3       THE WITNESS:  So prospecting is a series

4 of ads that are sent out to a broader public

5 that fit our target audience to talk about

6 Healthcare.gov.  Retargeting ads are ads from

7 people who have been to our website, then

8 receiving an ad reminding them of when the

9 deadline's coming, things like that.

10 BY MS. GOODMAN:

11    Q.  Over the course of your tenure in the

12 Strategic Marketing Group, have display ads

13 always been able to do re -- to achieve a

14 retargeting purpose?

15       MS. CLEMONS:  Objection; form.

16 Foundation.

17       THE WITNESS:  Yes.

18 BY MS. GOODMAN:

19    Q.  Okay.  Have their capabilities at

20 retargeting improved over the course of your

21 tenure in the Strategic Marketing Group?

22       MS. CLEMONS:  Objection; form.

23       THE WITNESS:  I think the concept of how

24 they work for retargeting ads is very similar in

25 the entire --

Page 141

1 BY MS. GOODMAN:

2    Q.  Okay.

3    A.  -- nine to 10 years.

4    Q.  How about with respect to prospecting

5 ads, have display ads capabilities at prospecting

6 an audience improved over the course of your

7 tenure in the Strategic Marketing Group?

8       MS. CLEMONS:  Objection; form.

9       THE WITNESS:  It's not a question I ask

10 myself.  And as a person who likes to look at

11 data to think about it, it's not a question I've

12 tracked over the last 10 years as a -- you know,

13 as an industry.

14       So in the general sense of the question

15 that you asked, I'd have to say I don't know.

16 BY MS. GOODMAN:

17    Q.  Okay.  In the second paragraph here on

18 Page 259, can you read the first sentence?

19    A.  ██████████████

20    ████████████████████████

21    ████████████████████████

22    ███████████████

23    Q.  What do you understand that sentence to

24 mean based on your experience as the director of

25 the Strategic Marketing Group?

36 (Pages 138 - 141)



**Page 142**

1   MS. CLEMONS: Objection; foundation.
2   THE WITNESS: Given the context of
3   that sentence, it is an argument written by the
4   company seeking business from us, that this
5   would be a tactic that they were successful
6   at improving the tactic to -- that we were
7   successful at improving the tactic from OE -- now
8   I forgot if I'm looking at -- ah, from OE8 to
9   OE9, yes.
10  BY MS. GOODMAN:
11  Q.  And you said you're somebody who likes
12  to look data; is that correct?
13  A.  That is correct.
14  Q.  And you do, in fact, like to look at
15  data?
16  A.  I do, in fact, like to look at data.
17  Q.  Do you recall ever seeing any data about
18  the efficiency of Google's in-market for health
19  insurance targeting capability between OE8 and
20  OE9?
21  MS. CLEMONS: Objection; form.
22  THE WITNESS
23
24  BY MS. GOODMAN:
25  Q.

**Page 143**

1
2
3
4
5   MS. CLEMONS: Objection; form.
6   Foundation.
7   THE WITNESS: The only reason I would
8   doubt -- and, to be clear, this is because I'm a
9   person who likes to confirm all the time -- is
10  that people make mistakes, drawing a conclusion
11  that they summarize in one sentence from a set of
12  data over two years; and in the enthusiasm of
13  writing a proposal for business, that -- that can
14  also create interpretation of data.
15  BY MS. GOODMAN:
16  Q.  Mm-hmm.
17  A.  So I would confirm. It's the kind of
18  person I am. I'm not suggesting that anyone
19  actually did make a mistake here, or that I would
20  know that they've made a mistake. I would just
21  confirm. It's the type of person I am.
22  Q.
23
24
25

**Page 144**

1   MS. CLEMONS: Objection; form.
2   THE WITNESS: I do.
3   BY MS. GOODMAN:
4   Q.
5
6
7
8
9
10
11
12
13  MS. CLEMONS: Objection; form.
14  Foundation.
15  THE WITNESS: Over the course of the
16  entire 10 years in this position have I seen that
17  sentence -- data -- data like that sentence
18  -- now, I haven't been reading that sentence
19  obviously. So I think what you're asking
20  -- could you please repeat the question? I'm
21  sorry. I'll put words in your mouth, and that's
22  not right.
23  BY MS. GOODMAN:
24  Q.
25

**Page 145**

1
2
3
4
5
6
7
8
9   MS. CLEMONS: Objection; form.
10  Foundation.
11  THE WITNESS:
12
13
14  BY MS. GOODMAN:
15  Q.
16  A.
17
18
19
20
21  Q.  Okay.
22  A.
23
24
25  Q.

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1 ████████████████████████████
2 ████████████████████████████
3 ████████████████████████
4　　　　MS. CLEMONS:  Objection; form.
5 Foundation.
6　　　　THE WITNESS: ████████████████
7 ████████████████
8 BY MS. GOODMAN:
9　　　　Q. █████████████████████████
10 ██████████████████████████
11 ████████████████████████
12 ██████████████████████████
13 ███████████
14　　　　MS. CLEMONS:  Objection; form.
15 Foundation.
16　　　　THE WITNESS:  I would say -- I think the
17 simple answer is I don't know.
18 BY MS. GOODMAN:
19　　　　Q.  Okay.  Can you turn to page ending in
20 261?  Under OE10 Base Task 1, the last sentence
21 of the paragraph reads, "Performance channels
22 like display and social media will be optimized
23 in realtime to drive email signup and enrollment
24 conversions."  Do you see that?
25　　　　A.  I do.

Page 147

1　　　　Q.  Okay.  What do you understand that
2 sentence to mean?
3　　　　MS. CLEMONS:  Objection; foundation.
4　　　　THE WITNESS:  I didn't write the
5 sentence.  But if I used the sentence, I would
6 mean it to mean, as we've already talked about
7 optimization, as you -- maybe we'll talk about it
8 again -- that channels like display, like display
9 and social media, so not only display and social
10 media, will be optimized in realtime to drive two
11 of our main goals, which is email signup or
12 enrollment conversions.
13 BY MS. GOODMAN:
14　　　　Q.  And is an example of realtime
15 optimization moving money between display and
16 social media channels?
17　　　　MS. CLEMONS:  Objection; form.
18 Foundation.
19　　　　THE WITNESS:  It could be.
20 BY MS. GOODMAN:
21　　　　Q.  Okay.  Can you turn to Page 264?
22　　　　Under the Channel and Placement Overview
23 section on this page, five paragraphs down begins
24 Display Media.  Do you see where I am?
25　　　　A.  Yes.

Page 148

1　　　　Q.  Okay.  And then in the middle of
2 paragraph it states, "We will continue to partner
3 with Google where we have continuously seen
4 efficient engagement and reach among individuals
5 who are in the market for health insurance."
6 What do you understand that sentence to mean in
7 your capacity as the director of the Strategic
8 Marketing Group?
9　　　　MS. CLEMONS:  Objection; foundation.
10 Form.
11　　　　THE WITNESS:  That CMS will work with
12 Weber Shandwick to purchase display services from
13 Google in the next Open Enrollment period.
14 BY MS. GOODMAN:
15　　　　Q.  And what connection, if any, does that
16 have to this efficient engagement that Weber
17 Shandwick has continuously seen with Google?
18　　　　MS. CLEMONS:  Objection; foundation.
19　　　　THE WITNESS:  In this case, we would
20 have to talk to the person who wrote the proposal
21 to get their full understanding of that.
22 BY MS. GOODMAN:
23　　　　Q.  In your experience, has CMS continuously
24 seen efficient engagement and reach using Google
25 products or services?

Page 149

1　　　　MS. CLEMONS:  Objection to form.
2　　　　THE WITNESS:  I would say we have seen
3 significant reach, and we -- I don't generally
4 use the term "efficient engagement," so I would
5 not say that.
6 BY MS. GOODMAN:
7　　　　Q.  What term would you use instead of
8 "efficient engagement"?
9　　　　MS. CLEMONS:  Objection to form.
10 Foundation.
11　　　　THE WITNESS:  I'd have to understand
12 what they mean by "efficient engagement" in order
13 to say what term I would use for that.
14 BY MS. GOODMAN:
15　　　　Q.  Okay.  So do you have an un -- any
16 understanding of what "efficient engagement"
17 means in this sentence?
18　　　　A.  It would be purely conjectural on my
19 part.
20　　　　Q.  Okay.  Can you turn to Page ending in
21 269?
22　　　　A.  Yes.
23　　　　Q.  In the paragraph under Driving Media
24 Value and Savings, the author states that "They
25 will work closely with Magna, the centralized

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

| Page 150 | Page 152 |
|---|---|
| 1  IPG network resource that provides marketplace | 1  Q.  I'm handing you Exhibit 67, |
| 2  intelligence, investment strategies and | 2  CMS-ADS-59892 through 59893. |
| 3  negotiation innovation for agency teams and | 3  A.  Thank you. |
| 4  clients."  Do you see that? | 4  Q.  You're welcome. |
| 5  A.  I do. | 5  And this is an email you received on |
| 6  Q.  Okay.  This paragraph also says, | 6  November 24th, 2020; is that correct? |
| 7  "Magna harnesses the aggregate power of all IPG | 7  MS. CLEMONS:  Objection; foundation. |
| 8  media investments, 23 billion in the U.S. and | 8  THE WITNESS:  This is an email that was |
| 9  42.6 billion worldwide, and utilizes powerful | 9  sent on 11-24-2020 at 3:06 in the afternoon. |
| 10  insights, market forecasts and strategic | 10  BY MS. GOODMAN: |
| 11  relationships to provide marketplace advantage." | 11  Q.  And it was sent to you at that time, |
| 12  Do you see that? | 12  correct? |
| 13  A.  I do. | 13  A.  I am in the To line. |
| 14  Q.  Okay.  What do you understand this | 14  Q.  Do you have any reason to doubt that you |
| 15  paragraph to mean with respect to the services | 15  received this message? |
| 16  Magna provides? | 16  A.  And your definition of received is? |
| 17  MS. CLEMONS:  Objection; form. | 17  Q.  What's your definition of received? |
| 18  Foundation. | 18  A.  Opened, read, processed the information. |
| 19  THE WITNESS:  I read this as sales | 19  Q.  What is your practice with respect to |
| 20  boilerplate from a corporation trying to | 20  opening, reading and processing the information |
| 21  demonstrate a tool of a type that we request | 21  in every email that you -- that is sent to you? |
| 22  for media planning. | 22  A.  I do -- |
| 23  BY MS. GOODMAN: | 23  MS. CLEMONS:  Objection; form. |
| 24  Q.  What kind of -- what tool do you request | 24  THE WITNESS:  I do not have one practice |
| 25  for media planning that you're referring to in | 25  for every email that is open -- that is sent to |

| Page 151 | Page 153 |
|---|---|
| 1  your answer? | 1  me. |
| 2  MS. CLEMONS:  Objection. | 2  BY MS. GOODMAN: |
| 3  Mischaracterizes the witness's testimony. | 3  Q.  What are your general practices with |
| 4  THE WITNESS:  We expect our advertising | 4  respect to emails that are sent to you? |
| 5  agencies to have tools that evaluate reach | 5  MS. CLEMONS:  Objection to form. |
| 6  of different channels.  And even closer than | 6  Foundation. |
| 7  channels, which would be different television | 7  THE WITNESS:  My general practices vary |
| 8  programs, for instance, so a finer level of | 8  depending on where the email came to and who else |
| 9  detail, to understand as we're planning a media | 9  was addressed on it. |
| 10  buy whether or not we are likely to hit the | 10  BY MS. GOODMAN: |
| 11  audiences where we are targeting. | 11  Q.  Okay.  Can you please describe in more |
| 12  BY MS. GOODMAN: | 12  detail how your general practices vary depending |
| 13  Q.  And then of the last -- second-to-last | 13  on who the email came to and who else was |
| 14  sentence says, "In addition, we have strategic | 14  addressed on it? |
| 15  partnerships with Google, NBCU, Warner Media, | 15  MS. CLEMONS:  Objection; form. |
| 16  Disney, Amazon and Roku."  Do you know what | 16  THE WITNESS:  I get many cold call |
| 17  "strategic partnership" is being referred to | 17  emails from media companies, and those would be |
| 18  here with Google? | 18  the lowest priority that I -- that I look at. |
| 19  A.  My understanding would be conjecture. | 19  They're sales emails.  It's, like, whether JC |
| 20  Q.  Okay. | 20  Penney sends you a sales email. |
| 21  MS. GOODMAN:  Can I have Tab 26? | 21  I get emails that are addressed to my |
| 22  (Exhibit No. 67, a document Bates | 22  staff on the projects that they are running, and |
| 23  Numbered CMS-ADS-59892 through 59893, was | 23  I attend to them as I can based on how busy I am |
| 24  introduced.) | 24  that day. |
| 25  BY MS. GOODMAN: | 25  Then I have emails that are addressed to |

39 (Pages 150 - 153)

1  So we are trying to figure that out.
2      Q.  When you say, "when we explicitly said
3  not to use that network," what -- what networks
4  are you referring to?
5      A.  I'm going to get the names wrong, so
6  please forgive me.  But there are different
7  products, if you will, that Google offers for
8  placing video ads, and I just can't think of the
9  names of them right now.  It's late afternoon.
10  The -- and not even caffeine will bring that back
11  alive right now.  But when looking at our ad buys
12  and the different possibilities, we instructed
13  Weber and Weber instructed Google to not use the
14  one that ProPublica's talking about.  Because
15  it's not all YouTube ads and all YouTube
16  placements that are a problem.  It's this one
17  product line.
18      And -- and we have discovered that they
19  actually did place some ads there.
20      Q.  Okay.  What -- what discussions have you
21  had with Google salespeople about this issue?
22      MS. CLEMONS:  Objection to form.
23      THE WITNESS:  We've had -- I'll say I
24  have had one meeting with them.  It was their
25  desire to explain to us their take on the story.

1  BY MS. GOODMAN:
2      Q.  Who from Google did you meet with?
3      A.  I do not know all the names of people.
4  I know the person who set it up.
5      Q.  Who is that?
6      A.  Her last name -- boy, I'm trying to
7  think of her first name now.  She is our main
8  sales contact.  H-i-n-k-e [sic] would be her last
9  name.
10      Q.  Okay.
11      A.  Oh my goodness.  Michelle.
12      Q.  And did that take place -- did that
13  meeting that you're recalling take place in
14  January of 2023, to the best of your
15  recollection?
16      A.  No, it did not take place in January of
17  2023.
18      Q.  When did it take place, to the best of
19  your recollection?
20      A.  Sometime in the last three months.
21      Q.  Okay.
22      A.  After the ProPublica report was
23  published.  So that will at least give you that
24  end of the date.
25      Q.  Okay.  Do you know an individual by the

1  name Sean Harrison?
2      A.  Yes.
3      Q.  Is he somebody that you've met with from
4  Google?
5      A.  Yes.
6      Q.  Was he at this ProPublica meeting, we'll
7  call it?
8      A.  I'm not sure.  There's about four people
9  from Google, and I'm just -- sorry.
10      Q.  Okay.  Have you ever met Sean Harrison?
11      A.  Unless I'm getting my Seans mixed up,
12  which is a hundred percent possible, I would say
13  yes.
14      Q.  Okay.  Under what circumstances did you
15  meet with Sean Harrison from Google?
16      A.  If I'm talking about the right Sean, so
17  I say -- I realize that I could be mis -- so when
18  Michelle sets up the meetings, she invites Shawn
19  at times.
20      Q.  Can you -- sitting here today, do you
21  recall any specific -- any particular meeting
22  that you and Sean Harrison were at together?
23      A.  I -- I wish I could pull it up on my
24  -- on my email so I'd make sure I'm -- we're
25  talking about the same Sean.  But, if we are, he

1  is a person who has access to and does analytics
2  of Google data that Google does not give us
3  access to do analytics for.  And he would have
4  done some analytics at our request.
5      Q.  Okay.  Do you know an individual by the
6  name of Kunal Khanna from Google?
7      A.  I do.
8      Q.  And is that a person that you have had
9  occasion to communicate with relating to CMS's
10  advertising work with Google?
11      A.  Yes.
12      Q.  Do you have -- remember any meetings
13  with Mr. Khanna?
14      A.  Yes.
15      Q.  What meetings do you remember?
16      A.  So he's been moved to an account,
17  and I don't remember exactly when that happened.
18  Michelle was his placement [sic].  But they were
19  of the same type.  They -- Google definitely
20  reaches out to us as a -- as a client, which I
21  imagine they would think we're an important
22  client.  And those meetings would be -- they
23  provide analytics that they did on their own on
24  our campaigns, usually to suggest that running
25  more ads on Google networks were a -- was a good

HIGHLY CONFIDENTIAL

Page 218

1  thing. And -- and just describe other products
2  and ask us what our goals are, and what have you,
3  so that they would have a better understanding
4  about how -- about how their products could be
5  used, because, of course, they're trying to sell
6  their products.
7       Q. Did you find those meetings to be
8  valuable?
9       MS. CLEMONS: Objection to form.
10      THE WITNESS: Valuable in what way?
11 BY MS. GOODMAN:
12      Q. Valuable to the work that you do at CMS
13 in advertising.
14      MS. CLEMONS: Objection; form.
15      THE WITNESS: I find them valuable, in
16 part, because it's really interesting to me to
17 see how people do their work. And, yes, some of
18 the data analytics that we've actually requested
19 that they've done for us have been valuable.
20 BY MS. GOODMAN:
21      Q. Despite these meetings also being an
22 opportunity for Google to explain how their
23 products could be used, because, of course,
24 they're trying to sell their products, does CMS
25 still make an independent decision about which

Page 219

1  advertising products or services to use?
2       A. Absolutely, yes.
3       Q. Okay. Anything else, sitting here
4  today, that you can recall about any
5  conversations you have had with any individual
6  from Google --
7       MS. CLEMONS: Objection; form.
8  BY MS. GOODMAN:
9       Q. -- relative to CMS's advertising?
10      MS. CLEMONS: Same objection.
11      THE WITNESS: That's a lot to try to
12 recall. So it -- true specifics? No.
13 Conversations? Yes.
14 BY MS. GOODMAN:
15      Q. Any other types of conversations, other
16 than what we've discussed which you recall having
17 with Google?
18      A. Yes. Thank you.
19      Q. You're welcome.
20      A. In the search ad -- in the search ad
21 arena, Google accepts ads -- or has accepted ads,
22 from people who try to look like the government.
23 And we discover these ads sometimes. And every
24 time I see one, I would send it to Kunal, to
25 Michelle. And -- because most digital companies,

Page 220

1  including Google, have a policy that an ad should
2  not -- what's the word I'm looking for -- mimic
3  -- that's not the word I'm looking for, but it's
4  like that, mimic some other existing
5  organization, or mimic the government when you're
6  not the government, basically.
7       So, you know, an ad that says they're
8  Medicare, and they're not actually Medicare, is
9  misleading to people, and there are a lot of
10 those ads on Google. And so when we find them,
11 we send them and they -- we have conversations
12 about that.
13      Q. And what steps, if any, do you ask
14 Google to take with respect to these ads -- these
15 search ads you're describing?
16      A. Take them down immediately. Asked for
17 some monitoring support. I've asked for it.
18 That is what I've asked for.
19      Q. And what -- what has Google, in return,
20 provided to you with respect to these search ads?
21      A. Google has taken ads down when we find
22 them, and that is Whac-A-Mole because anybody can
23 put up an ad on Google if they've got a credit
24 card. Google has created new policies about
25 taking out ads for health insurance, and have met

Page 221

1  with us about those policies.
2       Q. So is it fair to say that Google is
3  taking steps to address CMS's concerns with
4  respect to search ads that mimic the government?
5       MS. CLEMONS: Objection to form.
6       THE WITNESS: It is fair to say Google
7  has taken steps with regard to search ads.
8  BY MS. GOODMAN:
9       Q. How about with respect to display ads?
10 Are you aware of any conduct on the part of
11 Google with respect to display ads that has
12 negatively impacted CMS's advertising?
13      MS. CLEMONS: Objection to form. And I
14 would caution the witness not to -- to answer the
15 question if your answer would reveal privileged
16 communications with counsel.
17 BY MS. GOODMAN:
18      Q. Are you able to answer that question?
19      A. No.
20      Q. Prior to having any conversation with
21 any lawyer with respect to Google Ads, any lawyer
22 from the government, did you ever have any
23 concerns that Google was engaging in
24 anticompetitive conduct related to display
25 advertising?

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 222

1      MS. CLEMONS:  Objection to form.  Calls
2  for a legal conclusion.
3      THE WITNESS:  No.
4  BY MS. GOODMAN:
5      Q.  And prior to any conversation with any
6  lawyer for the government, did you ever have any
7  concerns that Google was causing CMS to pay more
8  for display advertising than it should have been
9  paying?
10      A.  Could you rephrase that, please -- or
11  not rephrase.  Just repeat it.  That's what I
12  meant.  I'm so sorry.
13      Q.  That's okay.
14      A.  I used the wrong word.
15      Q.  Prior to any conversation with any
16  lawyer for the government, did you ever have any
17  concerns that Google was causing CMS to pay more
18  for display advertising than it should have been
19  paying?
20      MS. CLEMONS:  Objection; form.
21      THE WITNESS:  The tough part here is
22  "should have been paying."  That's an -- a really
23  -- that suggests a lot of information.
24      That being said, yes.
25  BY MS. GOODMAN:

Page 223

1      Q.  And what -- what concerns did you have
2  with respect to Google causing CMS to pay more
3  for display advertising than it should have been
4  paying prior to any conversation with a lawyer
5  for the government?
6      A.  It is possible -- in fact, indeed,
7  probable, that when you are purchasing ads on a
8  cost-per-impression basis, that you're buying
9  things that are not useful to you.
10      Q.  And so in what ways has Google, to your
11  knowledge, caused you to buy things that are not
12  useful to you on a cost-per-impression basis?
13  And when I say you, I mean CMS.
14      MS. CLEMONS:  Objection to form.
15      THE WITNESS:  It has been a concern that
16  we have discussed.  Whether it is -- the way you
17  put the question was, like, pure knowledge.
18  Because other ways to potentially buy, which we
19  have not been able to do, would be to buy based
20  on outcomes instead of impressions.
21  BY MS. GOODMAN:
22      Q.  And is Google the only provider that you
23  buy ads on an impression basis for, or are there
24  other providers --
25      MS. CLEMONS:  Objection to form.

Page 224

1  BY MS. GOODMAN:
2      Q.  -- who charge on such a basis, to your
3  knowledge?
4      MS. CLEMONS:  Same objection.
5      THE WITNESS:  There are other providers.
6  BY MS. GOODMAN:
7      Q.  And do you have the same concerns with
8  respect to providers other than Google who charge
9  on a cost-per-impression basis?
10      MS. CLEMONS:  Objection to form.
11      THE WITNESS:  Yes.
12  BY MS. GOODMAN:
13      Q.  Okay.  Has anybody at any advertising
14  agency with whom CMS works ever told you that
15  Google was engaging in anticompetitive conduct
16  related to display advertising?
17      A.  Not that I recall.
18      Q.  Okay.  So sitting here today, and prior
19  to any conversation with any lawyer for the
20  government, can you recall any concerns you've
21  ever had with respect to Google's conduct and its
22  affect on CMS's display advertising purchases?
23      MS. CLEMONS:  Objection to form.
24      THE WITNESS:  Extremely informal
25  conversations between me and my colleagues.

Page 225

1  BY MS. GOODMAN:
2      Q.  And what extremely informal
3  conversations between you and your colleagues are
4  you referencing?
5      A.  Ones where we notice that all
6  the digital ads that we place go through
7  double-click; that the analytics come through
8  Google analytics.  There just seems to be a lot
9  of Google along the ways.  And we've had those
10  comments, conversations and we just move on.
11  Because, in the end of the day, we're just doing
12  our jobs.
13      Q.  And have you rai -- ever raised those
14  conversations with anybody outside of your
15  colleagues?
16      MS. CLEMONS:  Objection to the extent
17  that question calls for privileged communications
18  with counsel.  If you're -- if you can answer
19  without referencing or being informed by
20  privileged communications with counsel, you
21  may do so.
22      THE WITNESS:  Sorry.  I'm just trying to
23  think and remember.  It's mental gymnastics at
24  this point.  So --
25  BY MS. GOODMAN:

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL

1    Q.  So you can't answer -- you are unable
2  to answer that question without relying on
3  privileged communications; is that correct?
4    A.  That is correct.
5    Q.  So you've never raised those concerns
6  with anybody at your advertising agencies, for
7  example.  Is that accurate?
8    A.  As part of the informal conversations
9  with colleagues, I can't recall.
10   Q.  Okay.  You referenced DoubleClick.  What
11  is DoubleClick?
12   A.  DoubleClick is a tool that allows us to
13  track ad performance and our websites together.
14   Q.  So it's a -- -- it's an -- a data
15  monitoring tool.  Is that accurate?
16   A.  From my understanding, that's partially
17  accurate.  It's also a data-creating tool.
18   Q.  And Google Analytics, has CMS decided
19  not to use Google Analytics anymore --
20       MS. CLEMONS:  Objection; form.
21  BY MS. GOODMAN:
22   Q.  -- within the Strategic Marketing Group,
23  at least?
24   A.  The Strategic Marketing Group did not
25  decide not to use Google Analytics.

1    Q.  Did somebody else decide not to use
2  Google Analytics?
3       MS. CLEMONS:  Objection; form.
4  Foundation.
5       THE WITNESS:  By "somebody else,"
6  would -- could you give me a little more on that?
7  BY MS. GOODMAN:
8    Q.  Is the Strategic Marketing Group -- has
9  the Strategic Marketing Group transitioned from
10  using Google Analytics to an Adobe product?
11   A.  The Strategic Marketing Group is in the
12  process of that right now.
13   Q.  Okay.  Why are you in that process now?
14   A.  The people who manage the websites,
15  which is different from the Strategic Marketing
16  Group, made a decision to go from Google
17  Analytics to the Adobe product.
18   Q.  Okay.  So under the agency -- the
19  CMS's contracts with advertising agencies, is it
20  accurate that the advertising agency negotiates
21  the prices to be paid for advertising?
22       MS. CLEMONS:  Objection to form.
23  Foundation.
24       THE WITNESS:  In an ad agency, there
25  are buyers who get on the phones, like, with TV

1  networks and talk about the price of what's
2  available.
3  BY MS. GOODMAN:
4    Q.  And do you participate in discussions
5  between advertising agencies and any vendors over
6  price for ad buys on behalf of CMS?
7       MS. CLEMONS:  Objection to form.
8       THE WITNESS:  We participate in
9  conversations with the ad agencies over price and
10  what they've done to negotiate, and we provide
11  direction when we think there's other
12  negotiations that should be done.
13  BY MS. GOODMAN:
14   Q.  Okay.  But you -- but does any
15  individual from CMS actually participate in the
16  negotiations over price?
17       MS. CLEMONS:  Objection to form.
18  Foundation.
19       THE WITNESS:  To the extent that we
20  direct our ad agencies on negotiating a price, we
21  do participate.
22  BY MS. GOODMAN:
23   Q.  Okay.  Beyond -- aside from the
24  extent to which you direct your ad agencies on
25  negotiating a price, is there any other way in

1  which you participate in such negotiations?  And
2  when I say "you," I mean CMS individuals.
3       MS. CLEMONS:  Objection to form.
4  Foundation.
5       THE WITNESS:  Our participation is
6  through the direction of those who work for us.
7  BY MS. GOODMAN:
8    Q.  Okay.  The advertising purchases which
9  your ad agency makes on behalf of CMS are part of
10  a bundle of services that the ad agency provides,
11  correct?
12       MS. CLEMONS:  Objection; form.
13  Foundation.
14       THE WITNESS:  I'm not sure what you mean
15  by "bundle."
16  BY MS. GOODMAN:
17   Q.  A group of services that the ad agency
18  provides includes buying ads, as well as other
19  services, correct?
20       MS. CLEMONS:  Objection to form.
21  Foundation.
22       THE WITNESS:  I would say that we
23  contract with the ad agencies to help us
24  implement our ad campaigns.
25  BY MS. GOODMAN:

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

Page 278

1  and, two, that as the -- that advertisers,
2  therefore, have spent more money than might be
3  necessary in a noncompetitive -- in -- well, let
4  -- I screwed up my words. The advertisers,
5  therefore, spent more money than they would in a
6  competitive environment.
7  BY MS. GOODMAN:
8      Q.  When did you read the complaint?
9      A.  I -- 10 days ago.
10     Q.  Did you have any occasion to read the
11  complaint in the course -- as re -- strike that.
12         Why didn't you read it sooner than 10
13  days ago?
14     A.  And I'm really sorry, because I just
15  can't recall having read it before then. I am
16  -- I am certain I did, but I just don't know
17  when. So I gave you the answer that I know is
18  the most accurate, which is 10 days ago.
19     Q.  Okay.
20     A.  But I -- I apologize. I should have
21  said both.
22     Q.  Okay. Do you recall whether the Center
23  for Medicare and Medicaid Services is referenced
24  at all in the complaint as a purchaser of
25  advertising?

Page 279

1      A.  I do not recall.
2      Q.  Okay. Would it surprise you to learn
3  that CMS is not mentioned in the complaint?
4         MS. CLEMONS: Objection; form.
5         THE WITNESS: No, it would not surprise
6  me.
7  BY MS. GOODMAN:
8      Q.  Why would it not surprise you to learn
9  that CMS is not mentioned in the complaint as a
10  purchaser of advertising even though you are
11  here sitting, providing testimony today, in your
12  capacity as the strategic marketing director for
13  CMS --
14         MS. CLEMONS: Ob --
15  BY MS. GOODMAN:
16     Q.  -- about your digital advertising
17  purchases?
18         MS. CLEMONS: Objection to form. I will
19  caution the witness not to answer if your answer
20  would reveal the substance of privileged
21  communications with counsel.
22         THE WITNESS: The complaint lays out
23  arguments as to the monopoly status of Google.
24  And I'm not an expert in legal proceedings, so I
25  don't necessarily question why something may or

Page 280

1  may not be put in a document that I reviewed.
2  BY MS. GOODMAN:
3      Q.  Okay. When did you first learn that you
4  would be involved in this lawsuit?
5         MS. CLEMONS: Objection to form. Also
6  caution the witness not to answer to the extent
7  that your answer would reveal the substance of
8  privileged communications with counsel.
9  BY MS. GOODMAN:
10     Q.  And the question is when did you learn,
11  not from who, not how. It's simply when did you
12  learn you would be involved in this lawsuit. Can
13  you answer that question without relying on any
14  communications with lawyers?
15     A.  Now I've got confused about the
16  question. Is it when I learned without relying
17  on -- on communications with lawyers, or when did
18  I learn and answer the question without relying
19  on communications by lawyers?
20     Q.  Well, from my point of view, the
21  question is very simple. It doesn't at all
22  depend on communications with lawyers. And my
23  question to you is when did you learn that you
24  would be participating in this lawsuit?
25         MS. CLEMONS: Objection to form.

Page 281

1         THE WITNESS: What is your definition of
2  "participation"?
3  BY MS. GOODMAN:
4      Q.  Providing documents. Providing
5  information. Providing testimony.
6      A.  I am not certain of the first time when
7  all of that was clear. If I was to do a paper
8  trail, I would say the document that you handed
9  would be a possible, which would suggest early
10  January.
11     Q.  Okay. Which documents are you referring
12  to?
13     A.  There's a series of them here in early
14  January that would suggest to me that during the
15  course of that time is when I learned.
16     Q.  Okay. And it's possible that you
17  learned during that time, but you don't know for
18  certain?
19     A.  I would go as far as saying probable.
20     Q.  Why?
21         MS. CLEMONS: Objection. I'll instruct
22  the witness not to answer to the extent that your
23  answer would reveal the substance of privileged
24  communications with counsel.
25  BY MS. GOODMAN:

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL

Page 282

1    Q.  Are you able to answer that question?
2    A.  No.
3    Q.  Okay.  Did you receive a litigation
4    hold?
5    A.  Yes.
6         MS. CLEMONS:  Objection.  I'm going to
7    instruct the witness not to answer that question.
8    BY MS. GOODMAN:
9    Q.  Are you following that instruction?
10   A.  Yes.
11   Q.  To the extent you received a litigation
12   hold, was it before or after January 24th, 2023?
13        MS. CLEMONS:  I'm going to object
14   that that calls for privileged information and
15   instruct the witness not to answer.
16   BY MS. GOODMAN:
17   Q.  Are you following that instruction?
18   A.  Yes, I am.
19   Q.  Prior to 2000 -- January of 2023, did
20   anybody from the Department of Justice ever reach
21   out to you inquiring about CMS's online
22   advertising purchases?
23   A.  I'm sorry.  From where?
24   Q.  Prior to January of 2023, did anybody
25   from the Department of Justice ever reach out to

Page 283

1    you inquiring about CMS's online advertising
2    purchases?
3         MS. CLEMONS:  I'm going to instruct the
4    witness not to answer to the extent that your
5    answer would be informed by privileged
6    communications with counsel.
7    BY MS. GOODMAN:
8    Q.  Are you following that instruction?
9    A.  Yes, I am.
10   Q.  So you have no independent recollection,
11   one way or another, of whether anybody from the
12   Department of Justice reached out to you about
13   CMS's online advertising purchases prior to
14   January of 2023?
15        MS. CLEMONS:  Again, I'm objecting to
16   privilege -- on privilege grounds.  Counsel is
17   asking for the substance of communications with
18   counsel, and I'm going to instruct the witness
19   not to answer.
20   BY MS. GOODMAN:
21   Q.  Are you following that instruction?
22   A.  Yes, I am.
23        MS. GOODMAN:  Okay.  Every other witness
24   that I've asked this question to has answered it
25   without an instruction of your colleagues

Page 284

1    providing -- telling them not to answer the
2    question.  So do you want to reconsider?
3         MS. CLEMONS:  I'm going to instruct
4    the witness not to answer a question that
5    specifically asks what he did or did not speak
6    to the Department of Justice about.
7         MS. GOODMAN:  Okay.  Well, Counsel,
8    obviously I reserve all of my rights to reask all
9    of these questions of this witness, because they
10   are not calling for privileged information, as
11   our motion makes clear.
12   BY MS. GOODMAN:
13   Q.  Prior to January -- have you ever spoken
14   with anybody from a state attorney general office
15   about CMS's online advertising purchases?
16        MS. CLEMONS:  I'm going to instruct the
17   witness not to answer to the extent that the
18   answer would reveal privileged communications
19   with counsel.  Otherwise, you may answer yes or
20   no.
21        THE WITNESS:  No.
22   BY MS. GOODMAN:
23   Q.  Okay.  And so even prior to January of
24   2023 you have never spoken with anybody from a
25   state attorney general office about CMS's online

Page 285

1    advertising purchases, correct?
2    A.  I believe my answer to the question
3    answered that.
4    Q.  So the answer is no, correct?
5    A.  Correct.
6    Q.  Okay.  Has anything about this lawsuit
7    changed how CMS conducts its ad purchasing?
8         MS. CLEMONS:  I'm going to object to the
9    extent that question calls for information -- the
10   substance of communications of counsel or actions
11   taken at the direction of counsel.  But if you
12   can answer without reference to communications
13   with counsel, you had may do so.
14        THE WITNESS:  No.
15   BY MS. GOODMAN:
16   Q.  Has anything about this lawsuit changed
17   whether you will use Google products or services
18   in connection with CMS's advertising?
19        MS. CLEMONS:  Same objection.  Same
20   instruction.
21        THE WITNESS:  No.
22   BY MS. GOODMAN:
23   Q.  Do you use chat, like Teams chat,
24   iMessage, other forms of chat for work purposes?
25        MS. CLEMONS:  Objection to form.

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL

Page 286

1        THE WITNESS:  No, I do not.
2    BY MS. GOODMAN:
3        Q.  Okay.  Does anybody within Strategic
4    Marketing Group use chat for work purposes, to
5    your knowledge?
6        MS. CLEMONS:  Objection to form.
7        THE WITNESS:  I do not know.
8    BY MS. GOODMAN:
9        Q.  Okay.  Do you ever use your personal
10   email for work purposes?
11       A.  No.
12       Q.  Do you have a work-provided cell phone
13   or other mobile device?
14       A.  Yes.
15       Q.  Okay.  Do you use that for work
16   purposes?
17       A.  Yes.
18       Q.  Okay.  Do you know whether any documents
19   have been collected from your personal devices
20   -- I'm sorry, your mobile devices provided by
21   work for purposes of this litigation?
22       A.  There are no documents on my mobile
23   device.
24       Q.  Do you use -- is your mobile device an
25   iPad, an iPhone, an Android?  What is it?

Page 287

1        A.  It's an iPhone.
2        Q.  Okay.  Do you use iMessage on your
3    iPhone for work purposes?
4        A.  Not in relationship to advertising.
5        Q.  For what work purposes do you use
6    iMessage on your iPhone?
7        A.  To get a senior leader's attention who
8    didn't read an email where the substance of the
9    work exists.
10       Q.  Could the substance of that email relate
11   to advertising that you're trying to get a senior
12   leader's attention about?
13       MS. CLEMONS:  Objection to form.
14       THE WITNESS:  Extremely unlikely.
15   BY MS. GOODMAN:
16       Q.  But it's possible?
17       A.  No.
18       Q.  Why not?
19       A.  Advertising is a complex topic and,
20   therefore, requires a larger format to con -- to
21   converse on.
22       Also, I'm old school.  I just like
23   email.  It's all there.  And it's there for you
24   now.
25       Q.  Do you ever delete emails?

Page 288

1        MS. CLEMONS:  Objection to form.
2        THE WITNESS:  It's basically an
3    irrelevant question for this top -- for this
4    context.  In my level of management, all emails
5    are immediately archived.
6    BY MS. GOODMAN:
7        Q.  How do you know that?
8        A.  Because I've been informed it as a
9    person in my level of management.  I've been told
10   by the agency.
11       Q.  Who at the agency has told you that all
12   of your emails are immediately archived?
13       A.  That would have actually occurred in the
14   email, and the exact person I don't know.
15       Q.  Okay.  How about the position of the
16   person?
17       A.  This is an org chart issue.  It's either
18   OIT or SORA.
19       Q.  Okay.  And so notwithstanding the fact
20   that somebody has told you all of your emails are
21   immediately archived, do you ever delete emails?
22       MS. CLEMONS:  Objection to form.
23       THE WITNESS:  I delete two types of
24   emails.
25   BY MS. GOODMAN:

Page 289

1        Q.  What are those?
2        A.  The ones where my staff tell me they
3    started work and ended work, which are only used
4    so I don't call them outside of that time, unless
5    it's a real emergency.  And the incredible load
6    of advertisements I get in my email.
7        Q.  And since January of 2023, have you
8    deleted any work emails?
9        MS. CLEMONS:  Objection to form.
10       THE WITNESS:  Only of the style that
11   I've talked -- mentioned.
12       MS. GOODMAN:  Okay.  Let's take a break.
13       THE VIDEOGRAPHER:  Time is 6:11 p.m.
14   We're off the record.
15       (Recess taken.)
16       THE VIDEOGRAPHER:  The time is 6:22 p.m.
17   We're on the record.
18       MS. GOODMAN:  I have no further
19   questions at this time and reserve the remainder
20   of my time to ask the questions over which
21   improper instructions not to answer have been
22   provided.
23       Pass the witness.
24       MS. CLEMONS:  We have no questions,
25   although it is our position that the -- the

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL

Page 290

1 deposition is over and that Google does not have
2 grounds to hold the deposition open.
3         MS. GOODMAN:  Okay.  Thank you for your
4 time, Mr. Koepke.
5         THE WITNESS:  It was my pleasure.  This
6 was fun.
7         THE VIDEOGRAPHER:  Time is 6:23 p.m.
8 We're off the record.
9         (Deposition concluded -- 6:23 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 292

1  Katherine Clemons Esq
2  Katherine.clemons@usdoj.gov
3          August 22nd, 2023
4  RE:   United States, Et Al v. Google, LLC
5   8/21/2023, Christopher Koepke (#6043164)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 (erratas-cs@veritext.com).
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 291

1        C E R T I F I C A T E
2
3      I do hereby certify that I am a Notary
4 Public in good standing, that the aforesaid
5 testimony was taken before me, pursuant to
6 notice, at the time and place indicated; that
7 said deponent was by me duly sworn to tell the
8 truth, the whole truth, and nothing but the
9 truth; that the testimony of said deponent was
10 correctly recorded in machine shorthand by me and
11 thereafter transcribed under my supervision with
12 computer-aided transcription; that the deposition
13 is a true and correct record of the testimony
14 given by the witness; and that I am neither of
15 counsel nor kin to any party in said action, nor
16 interested in the outcome thereof.
17
18      WITNESS my hand and official seal this
19 22nd day o
20
21
22        Notary Public
23
24
25

Page 293

1 United States, Et Al v. Google, LLC
2 Christopher Koepke (#6043164)
3       E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5   _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8   _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11   _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14   _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17   _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20   _____
21 REASON_____
22
23  _____ _____
24 Christopher Koepke          Date
25

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL

Page 294

1  United States, Et Al v. Google, LLC

2  Christopher Koepke (#6043164)

3          ACKNOWLEDGEMENT OF DEPONENT

4    I, Christopher Koepke, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Christopher Koepke          Date

13  *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15          _____ DAY OF _____, 20___.

16

17

18          _____

19          NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions

800-567-8658                                    973-410-4098

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.