# EXHIBIT 3
# FILED UNDER SEAL

HIGHLY CONFIDENTIAL

Page 1

1

2                   IN THE UNITED STATES DISTRICT COURT

                  FOR THE EASTERN DISTRICT OF VIRGINIA

3                        ALEXANDRIA DIVISION

4        _____

5        UNITED STATES,         )1:23-cv-00108-LMB-JFA

         et al.,                )

6                               )

             Plaintiffs,        )

7                               )

         vs.                    )

8                               )

         GOOGLE LLC,            )

9                               )

             Defendants.        )

10       _____ )

11

12

                      - HIGHLY CONFIDENTIAL -

13

14                 VIDEOTAPED DEPOSITION OF

15                  CHRISTOPHER KARPENKO

16                    August 10, 2023

17                     9:35 a.m.

18

19

20

21

22           Reported by:  Bonnie L. Russo

             Job No. 6031969

HIGHLY CONFIDENTIAL

| | Page 2 | | Page 4 |
|---|---|---|---|
| 1 | Videotaped Deposition of Christopher Karpenko | 1 | APPEARANCES (CONTINUED): |
| 2 | held at: | 2 | |
| 3 | | 3 | |
| 4 | | 4 | Also Present: |
| 5 | | 5 | Glen Fortner, Videographer |
| 6 | Paul, Weiss, Rifkind, Wharton & Garrison, LLP | 6 | Michael Weaver, United States Postal Service |
| 7 | 2001 K Street, N.W. | 7 | |
| 8 | Washington, D.C. | 8 | |
| 9 | | 9 | Also Present Via Remotely: |
| 10 | | 10 | Julia Wood, DOJ |
| 11 | | 11 | Sean Carman, DOJ |
| 12 | | 12 | Katherine Clemens, DOJ |
| 13 | | 13 | Jeannie S. Rhee, Paul, Weiss, Rifkind, Wharton |
| 14 | | 14 | & Garrison, LLP |
| 15 | | 15 | |
| 16 | | 16 | |
| 17 | | 17 | |
| 18 | Pursuant to Notice, when were present on behalf | 18 | |
| 19 | of the respective parties: | 19 | |
| 20 | | 20 | |
| 21 | | 21 | |
| 22 | | 22 | |

| | Page 3 | | Page 5 |
|---|---|---|---|
| 1 | APPEARANCES: | 1 | I N D E X |
| 2 | | 2 | EXAMINATION OF CHRISTOPHER KARPENKO    PAGE |
| 3 | On behalf of the Plaintiffs: | 3 | BY MS. GOODMAN              11 |
| 4 | JAMES RYAN, ESQUIRE | 4 | |
| 5 | DAVID GROSSMAN, ESQUIRE | 5 | |
| 6 | ALVIN CHU, ESQUIRE | 6 | |
| 7 | UNITED STATES DEPARTMENT OF JUSTICE | | EXHIBITS |
| 8 | 450 5th Street, N.W. | 7 | |
| 9 | Washington, D.C. 20530 | 8 | Exhibit 33  E-Mail Chain dated 1-9-23    53 |
| 10 | james.a.ryan@usdoj.gov | 9 | USPS-ADS-0000140586-588 |
| 11 | david.grossman@usdoj.gov | 10 | |
| 12 | alvin.chu@usdoj.gov | 11 | Exhibit 34  (CLAWED BACK)         -- |
| 13 | | 12 | |
| 14 | On behalf of the Defendant: | 13 | Exhibit 34A E-Mail Chain dated 1-11-23    125 |
| 15 | MARTHA L. GOODMAN, ESQUIRE | 14 | USPS-ADS-0000043815-816 |
| 16 | ANNELISE CORRIVEAU, ESQUIRE | 15 | |
| 17 | PAUL, WEISS, RIFKIND, WHARTON & | 16 | Exhibit 35  Text Messages        93 |
| 18 | GARRISON, LLP | 17 | USPS-ADS-0000899149-151 |
| 19 | 2001 K Street, N.W. | 18 | |
| 20 | Washington, D.C. 20006 | 19 | Exhibit 36  (CLAWED BACK)         -- |
| 21 | mgoodman@paulweiss.com | 20 | |
| 22 | acorriveau@paulweiss.com | 21 | Exhibit 36A E-Mail Chain dated 1-11-23    135 |
| | | 22 | USPS-ADS-0000041965 |

2 (Pages 2 - 5)

Page 6

EXHIBITS (CONTINUED):

Exhibit 36B Attachment to Exhibit 36A    315

Exhibit 37  E-Mail Chain dated 3-8-23    135
    USPS-ADS-0000040943

Exhibit 38  NIC+ZOE August 2023    168
    Advertisement

Exhibit 39  The U.S. Postal Service    175
    Five-Year Strategic Plan
    FY2020-FY2024

Exhibit 40  E-Mail Chain dated 3-29-22    199
    Attachment
    USPS-ADS-0000592851-863

Exhibit 41  Meeting Invite dated 4-30-20  211
    Attachment
    USPS-ADS-0000661829-869

Page 8

EXHIBITS (CONTINUED):

Exhibit 48  E-Mail dated 6-23-20    287
    USPS-ADS-0000447582-583

Exhibit 49  E-Mail dated 6-15-20    293
    Attachment
    USPS-ADS-000227880-968

Exhibit 50  Order/Solicitation/    299
    Offer/Award
    12-30-21
    USPS-ADS-0000529112-186

Exhibit 51  Order/Solicitation/    301
    Offer/Award
    USPS-ADS-0000529380-412

(Exhibits bound separately.)

Page 7

EXHIBITS (CONTINUED):

Exhibit 42  E-Mail Chain dated 6-18-21    227
    USPS-ADS-0000713476-481

Exhibit 43  E-Mail dated 4-20-20    238
    Attachment
    USPS-ADS-0000492772-780

Exhibit 44  E-Mail Chain dated 2-14-23    245
    Attachment
    USPS-ADS-0000042055-181

Exhibit 45  E-Mail Chain dated 4-26-22    262
    Attachment
    USPS-ADS-0000016395-463

Exhibit 46  E-Mail Chain dated 9-14-22    280
    USPS-ADS-0000620144-145

Exhibit 47  E-Mail Chain dated 11-16-21    281
    USPS-ADS-0000029221-226

Page 9

P R O C E E D I N G S
    (9:36 a.m.)

    THE VIDEOGRAPHER:  Good morning.
We are going on the record at
on August 10, 2023.
    Please note that the microphones are
sensitive and may pick up whispering and
private conversations.  Please mute your phones
at this time.  Audio and video recording will
continue to take place unless all parties agree
to go off the record.
    This is Media Unit 1 of the
video-recorded deposition of Christopher
Karpenko in the matter of United States, et
al., v. Google LLC.  The location of the
deposition is Paul Weiss.
    My name is Glen Fortner representing
Veritext, and I am the videographer.  The court
reporter is Bonnie Russo from the firm
Veritext.  I am not related to any party in
this action, nor am I financially interested in

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 42

1  they believe are happening or could be
2  forecasted for for the coming year.
3      Q.   And do you view -- is -- strike
4  that.
5          Is Magna a source to which you would
6  turn if you were trying to understand the
7  trends going on in the advertising industry?
8      A.   It is one source that we would look
9  at.
10     Q.   And do you consider Magna's
11  publications to be reliable?
12     A.   I believe what they publish is as
13  accurate as I -- as I can -- you know, tell.
14  Like, I wouldn't have any reason not to believe
15  what their information is.
16     Q.   And from your point of view, are
17  Magna's publications -- strike that.
18         Do Magna's publications accurately
19  represent the state of the advertising industry
20  from your point of view?
21         MR. RYAN:  Objection.  Form.
22         THE WITNESS:  I believe they provide

Page 43

1  a position.  I believe they try to substantiate
2  that within their -- their research.
3          And we use them as one of many of
4  the groups that are out there to understand
5  where trends are going.
6          BY MS. GOODMAN:
7      Q.   Okay.  When did you come to be
8  involved in a government investigation
9  regarding digital advertising?
10         MR. RYAN:  Objection to foundation.
11  I am going to instruct --
12         MS. GOODMAN:  The question is asking
13  for a time period.  It's not calling for any
14  communications with a lawyer.
15         MR. RYAN:  I'm just going to caution
16  the witness not to talk about -- to the extent
17  that your answer would reflect anything that
18  would depend upon communications with counsel,
19  just caution the witness.
20         THE WITNESS:  Could you clarify your
21  description of what you just said.  It's --
22  it's -- I am interpreting it as broad.

Page 44

1          BY MS. GOODMAN:
2      Q.   Okay.  I'll -- I'll -- I'll be more
3  specific.
4          Are you aware of a Department of
5  Justice investigation with respect to digital
6  advertising and Google?
7      A.   Yes.
8      Q.   When did you become aware of that
9  investigation?
10     A.   This year.
11     Q.   And when you say "this year," can
12  you pinpoint it any more specifically?
13     A.   It came in on a news feed for me as
14  well as a conversation with -- I would guess it
15  would be privileged conversation with counsel.
16     Q.   And which counsel are you referring
17  to?
18     A.   The postal service.
19     Q.   And is that individual in the room
20  here?
21     A.   One of them is, yes.
22     Q.   Any others?

Page 45

1          MR. RYAN:  Objection to this line.
2  I mean, you can't ask questions like this.  Are
3  you asking which attorneys he has talked with?
4          MS. GOODMAN:  Yes.  It's an entirely
5  proper question.
6          BY MS. GOODMAN:
7      Q.   So my question to you, Mr. Karpenko,
8  is:  What attorneys have you spoken with this
9  year regarding a government investigation of
10  digital advertising and Google?
11     A.   Michael Weaver has been my primary
12  contact.  There may be others within the law
13  department present.  I -- I'm not specifically
14  recalling anyone over another.  It was very
15  much just an interaction conversation.
16     Q.   And when you say "the law
17  department," is that within the postal service?
18     A.   My reference to the law department
19  is the USPS law department.
20     Q.   How about any lawyers affiliated
21  with the Department of Justice?
22         MR. RYAN:  Objection --

12 (Pages 42 - 45)

Page 46

BY MS. GOODMAN:

1    Q.   Have you spoken this year with any
2  lawyers from the Department of Justice
3  regarding an investigation of digital
4  advertising and Google?
5       MR. RYAN:  Objection to form and
6  foundation.
7       THE WITNESS:  Yes.
8       BY MS. GOODMAN:
9    Q.   And what lawyers at the Department
10 of Justice have you spoken with regarding an
11 investigation of digital advertising and
12 Google?
13      MR. RYAN:  Objection to foundation.
14      MS. GOODMAN:  Mr. Karpenko has said
15 that he spoke with Department of Justice
16 lawyers.  I have asked the foundation -- I have
17 laid the foundation and now --
18      MR. RYAN:  It's not a memory test.
19      MS. GOODMAN:  -- I am following on
20 the question.
21      MR. RYAN:  It's not a memory test.

Page 47

1       MS. GOODMAN:  Of course not.  If he
2  doesn't recall, he can provide that answer, but
3  the foundation objections are not proper so --
4       MR. RYAN:  But you're asking the
5  attorney -- you're asking him to list out all
6  the attorneys he has spoken with and --
7       MS. GOODMAN:  If he can do that,
8  yes.  I am entitled to ask the question.  If he
9  is not able to recall those names from his
10 memory --
11      MR. RYAN:  You are getting into
12 communications with counsel, so I just --
13      MS. GOODMAN:  No.  No, I'm not.
14      MR. RYAN:  If -- he can try to
15 answer questions about who he has talked with
16 to the extent he knows or recalls and when
17 those communications -- you're entitled to ask
18 those questions, but I think the questions are
19 going into the line of communications with
20 counsel.
21      MS. GOODMAN:  Okay.  Well, I am very
22 mindful of that line, and I am -- I am not

Page 48

1  intending to impede into privileged
2  conversations.  I am asking for the identities
3  of the lawyers as well as the time period.  The
4  kind of things that would occur -- appear --
5  appear on a privilege log.  So that's what my
6  questions are designed at.  Okay.
7       BY MS. GOODMAN:
8    Q.   Mr. Karpenko, to the extent you
9  recall, which attorneys at the Department of
10 Justice have you spoken with regarding the
11 government investigation into digital ads and
12 Google?
13      A.   I can't recall them all.  There are
14 three attorneys representing the Department of
15 Justice here that I have engaged with
16 privileged conversation with.
17      There is one on the Zoom that shows
18 up as the one screen that we have engaged -- I
19 believe I have engaged with.
20      Q.   And is that Mr. Carman?
21      A.   I believe so.
22      Q.   Okay.

Page 49

1       A.   There are probably others.  I didn't
2  keep a list of them.  I would have to go back
3  and refer to maybe a meeting invite that people
4  were on, but I wouldn't be able to tell you
5  specifically who off the top of my head, and
6  even some I wouldn't even remember their names.
7       Q.   In what time period do you recall --
8  what was the first time you recall speaking
9  with a lawyer from the Department of Justice
10 regarding a digital -- regarding an
11 investigation into digital ads and Google?
12      A.   The -- it was similar to the time
13 that it became publicly published out into the
14 world.
15      Q.   And when you came across the
16 publication of the lawsuit in the course of
17 your work -- well, strike that.
18      Is that how you came to learn of the
19 lawsuit in the course of your work as executive
20 director of brand marketing?
21      A.   I became aware --
22      MR. RYAN:  Objection to foundation.

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1    THE WITNESS: I became aware of --
2  of the complaint through a news feed that came
3  through my iPhone as well as through our
4  lawyers reaching out to us through some
5  contact, I believe, with Department of Justice.
6    BY MS. GOODMAN:
7    Q.  And prior to learning of the
8  complaint through a news feed that came from
9  your iPhone, had you anticipated being involved
10  in a lawsuit regarding Google and digital
11  advertising?
12    MR. RYAN: Object to the form.
13  Mischaracterizing the witness's prior
14  testimony.
15    THE WITNESS: Could you clarify that
16  for me.
17    BY MS. GOODMAN:
18    Q.  Sure.  Before you learned of the
19  lawsuit through a news feed that came through
20  your iPhone, did you know a lawsuit would be
21  coming?
22    MR. RYAN: Object to the form.

Page 51

1    THE WITNESS: I only knew of the
2  complaint as a complaint.  I did not know if
3  postal would be involved nor if I would be
4  involved in any of the complaint.
5    BY MS. GOODMAN:
6    Q.  And so it was subsequent to the
7  filing of the complaint that you came to be
8  involved in this lawsuit; is that accurate?
9    MR. RYAN: Objection.  Foundation.
10  Objection.  Form and foundation.
11    THE WITNESS: I am trying to
12  remember if information was asked for from the
13  postal service tied to our media spend and our
14  media process.
15    BY MS. GOODMAN:
16    Q.  But prior to the filing of the
17  complaint, did you have any knowledge or
18  awareness that the postal service would be
19  involved as an entity for which the United
20  States would seek monetary damages from Google?
21    MR. RYAN: Objection to form.
22    THE WITNESS: I wouldn't have

Page 52

1  specific information as to DOJ's specific
2  intent.
3    BY MS. GOODMAN:
4    Q.  So you --
5    A.  I didn't -- I didn't write the
6  complaint.
7    Q.  Have you read the complaint?
8    A.  I have.
9    Q.  And have you seen the United States
10  Postal Service mentioned anywhere in it?
11    A.  I believe so.
12    Q.  Okay.  And when you read the -- did
13  you read the complaint around the time that it
14  was filed?
15    A.  Yes.
16    Q.  Okay.  Did you read it as a result
17  of the news alert that you got?
18    MR. RYAN: Objection.  Foundation.
19    THE WITNESS: I believe it was
20  provided under privilege while we were having
21  discussions.
22    MS. GOODMAN: Okay.  Can I have Tab

Page 53

1  6.
2    (Deposition Exhibit 33 was marked
3  for identification.)
4    BY MS. GOODMAN:
5    Q.  Prior to the filing of the
6  complaint, did you anticipate being a witness
7  in this lawsuit?
8    A.  There was nothing for me to think
9  that I would be a witness for the complaint.
10    Q.  And is that -- strike that.
11    I am handing you Exhibit 33,
12  USPS-ADS-140586 through 588.
13    I will ask you to take a look and
14  see if you recognize this as an e-mail you
15  received in January of 2023.
16    Did you receive this e-mail?
17    A.  Yes.
18    Q.  And it is with an individual at the
19  United States Postal Service, Office of
20  Inspector General; is that right?
21    A.  Yes.
22    Q.  And to the best of your

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1  recollection, was January 9, 2023, the first
2  time you received any outreach with respect to
3  an inquiry that sought to determine whether the
4  U.S. Postal Service purchased any advertising
5  on the open web in third-party websites, such
6  as New York Times.com, CNN.com or
7  Bloomberg.com?
8      MR. RYAN: Objection to form and
9  foundation.
10     THE WITNESS: Could you repeat the
11 question again, please.
12     BY MS. GOODMAN:
13     Q. Sure. I just want to know if -- and
14 I was reading from Mr. Gardener's e-mail to you
15 on January 9 at the bottom of the document.
16     A. Yes.
17     Q. Was that the first outreach you
18 received from anybody within the government
19 about an inquiry, as he uses, to determine
20 whether the postal service purchased any
21 advertising on the open web and third-party
22 websites, such as New York Times.com, CNN.com

Page 55

1  or Bloomberg.com?
2      MR. RYAN: Objection to form.
3      THE WITNESS: The e-mail above --
4  component above Matthew Gardner does say
5  coincidently we have a meeting with another
6  group, DOJ, tied to something very similar.
7      BY MS. GOODMAN:
8      Q. And that's you writing; is that
9  right?
10     A. That is me writing, yes.
11     Q. To Mr. Gardner.
12        And do you recall when you received
13 any outreach from the DOJ tied to something
14 very similar?
15     A. I do not. No. I do not.
16     Q. You write to Mr. Gardner: "Our team
17 really handles the paid media and most of that
18 media is acquired through our media agency for
19 USPS."
20        MR. RYAN: Martha, can you specify
21 where you are?
22        MS. GOODMAN: I am reading Mr.

Page 56

1  Karpenko's e-mail dated January 9, 11:12 a.m.,
2  in the middle of page Bates ending 87. First
3  paragraph.
4      BY MS. GOODMAN:
5      Q. What did you mean that: "Most of
6  that media is acquired through our media agency
7  through USPS"?
8      A. I am just looking for it here.
9      Q. I'm sorry. Page 2.
10     A. Page 2.
11     Q. Middle of the page.
12        MR. RYAN: I mean, you can take your
13 time to look at the document.
14        MS. GOODMAN: Yeah.
15        BY MS. GOODMAN:
16     Q. It's in the same paragraph where
17 you --
18     A. "Since our team really handles the
19 paid media," about midway on the page.
20     Q. Yes.
21     A. Thank you. We do. So your question
22 was: What does that mean?

Page 57

1      Q. Yes. You can answer.
2      A. Our team manages a contract, we have
3  a contract with Universal McCann and that we
4  instruct them to help us provide and place
5  media for our initiatives.
6      Q. And Universal McCann purchased that
7  -- purchases that media; is that correct?
8      A. Yes.
9      Q. Now, in your third paragraph, where
10 you say -- when you say "third-party
11 websites."
12        Do you see that?
13     A. Yes.
14     Q. Why were you asking Mr. Gardner the
15 clarifying questions contained within this
16 third paragraph?
17     A. I didn't quite understand what he
18 was asking for. I was looking for clarity.
19     Q. And you see --
20     A. Apologize.
21     Q. At the top of the Page 2, Mr.
22 Gardner responds: "Thank you for the quick

HIGHLY CONFIDENTIAL

Page 58

1  response. I am probably using terms
2  differently than what" you -- "is commonly used
3  in advertising."
4      Do you see that?
5      A. I do.
6      Q. Was he using terms differently than
7  what are commonly used in advertising?
8      A. I don't think he was using uncommon
9  terms. I was looking for clarity though.
10     Q. What was unclear about his request
11  from your point of view?
12     A. Context.
13     Q. What do you mean?
14     A. That's my answer. It seemed to be a
15  general ask and I was unclear of what he was
16  looking -- or trying to look for, and as such,
17  I did ask for clarity so that we could be
18  thorough in his ask for whatever data he may be
19  looking for.
20     Q. And turning to the first page
21  continuing in the e-mail chain, you write that:
22  "Fox, CNBC, Times, et cetera, are platforms to

Page 59

1  advertise on for the USPS."
2      Do you see that?
3      A. I do.
4      Q. What did you mean by that?
5      A. Those are areas where we provide
6  content. Fox, CNBC, Times, et cetera, are all
7  potential areas where we put advertising
8  towards.
9      Q. Are there a variety of different
10  ways that the postal service could place
11  advertisements on these platforms?
12     MR. RYAN: Objection to form.
13     THE WITNESS: We might have various
14  ways of advertising with these groups. They
15  could be physical, for example, with the New
16  York Times and their paper. It could be in the
17  form of video, either through, for example, Fox
18  or CNBC's networks, and it could also be put as
19  a digital or digital display on their sites.
20     BY MS. GOODMAN:
21     Q. And could they -- those kinds of
22  advertisements that you described be purchased

Page 60

1  through a direct deal with that platform?
2      MR. RYAN: Objection to form.
3      THE WITNESS: The postal service
4  contracts with UM to act as an agent for us to
5  make purchases like this.
6      BY MS. GOODMAN:
7      Q. And could UM then make such a
8  purchase through a direct deal between it and
9  Fox or CNBC?
10     MR. RYAN: Objection to foundation.
11     THE WITNESS: Possibly.
12     BY MS. GOODMAN:
13     Q. And are there other ways that UM
14  could make a purchase to place USPS advertising
15  on these platforms beyond a direct deal?
16     MR. RYAN: Objection to form.
17     THE WITNESS: Possibly.
18     BY MS. GOODMAN:
19     Q. Can you think of any other possible
20  ways beyond a direct deal that UM could make a
21  purchase to place USPS advertising on these
22  platforms?

Page 61

1      MR. RYAN: Objection to form.
2      MS. GOODMAN: What's your form
3  objection?
4      MR. RYAN: You are basically asking
5  him to speculate as to how UM would do this.
6      MS. GOODMAN: He is responsible for
7  advertising.
8      MR. RYAN: If he --
9      MS. GOODMAN: -- on the postal
10  service marketing brands messaging. If he does
11  not know the answer, he can so state, but it is
12  not calling for speculation.
13     BY MS. GOODMAN:
14     Q. So based on your experience as the
15  executive director of brands marketing and the
16  senior director for customer marketing at the
17  postal service, are you aware of any other ways
18  beyond a direct deal between UM and these
19  platforms that a purchase could be made to
20  place advertising on these platforms?
21     MR. RYAN: Same objection.
22     THE WITNESS: Possibly. There are -

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1  from a 50,000 foot level, UM might work with a
2  company like a Magna or other entity that might
3  buy larger amounts of media and package that up
4  with their clients to get better buys for media
5  or better packages. The specificities of what
6  those deals are, I am not aware of.
7      BY MS. GOODMAN:
8      Q.  Are you familiar with the term
9  "programmatic advertising"?
10     A.  Yes.
11     Q.  What does that mean to you?
12     A.  Programmatic provides an opportunity
13 for brands or advertisers to serve up content
14 to potential target audiences or individuals
15 that a brand or advertiser might want to reach
16 specifically versus a more general approach
17 that may cover a broader range of audience.
18     Q.  And to your knowledge, would UM --
19 strike that.
20         To your knowledge, is UM able to
21 purchase advertising on behalf of the United
22 States Postal Service on these platforms

Page 63

1  mentioned in your e-mail in Exhibit 33, through
2  a programmatic mechanism?
3      MR. RYAN:  Objection to form.
4      THE WITNESS:  UM is able to purchase
5  programmatic buys for the postal service. I
6  couldn't tell you specifically how or -- how
7  they go about doing that within the ones
8  mentioned here or others.
9      BY MS. GOODMAN:
10     Q.  Okay. Turning to your third
11 paragraph, you mention the inquiry from the
12 Department of Justice Antitrust Division.
13         Do you see that?
14     A.  First page?
15     Q.  Yeah, bottom, third paragraph.
16     A.  The inquiry from --
17     Q.  Yes.
18     A.  With Michael above -- below it?
19     Q.  Correct.
20     A.  Yes.
21     Q.  You say:  "We will have our counsel
22 on as well."

Page 64

1      Q.  Who are you referring to when you
2  say "our counsel"?
3      A.  That would be representatives of the
4  USPS law department.
5      Q.  And when you had -- strike that.
6         Do you recall having this meeting
7  with the Department of Justice Antitrust
8  Division in and around the time of January 9,
9  2023?
10     A.  I don't specifically remember the
11 date.
12     Q.  But do you recall the meeting?
13     A.  I believe we had some level of
14 interaction with the Department of Justice and
15 our counsel. I think I'd consider it
16 privileged.
17     Q.  Okay. At this time, did you
18 consider the Department of Justice Antitrust
19 Division to be your lawyers for the United
20 States Postal Service?
21     A.  The Department of Justice does
22 represent the United States Postal Service.

Page 65

1      Q.  In connection with this meeting that
2  is discussed on Page 1 of this e-mail chain,
3  did you consider the Department of Justice to
4  be lawyers for the United States Postal Service
5  in that meeting?
6      MR. RYAN:  Objection to form.
7      THE WITNESS:  I have always
8  considered the Department of Justice the postal
9  service's representation, regardless of time
10 and when, where.
11     BY MS. GOODMAN:
12     Q.  When you -- strike that.
13         So what was the purpose of having,
14 to use your words, "our counsel" on the
15 particular meeting with the Department of
16 Justice Antitrust Division?
17     MR. RYAN:  That seems to be striking
18 into privileged territory. If you are asking
19 why he is -- why various counsel have been at a
20 meeting.
21     BY MS. GOODMAN:
22     Q.  To your knowledge, why was counsel

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1   for the United States Postal Service
2   participating in a meeting with the Department
3   of Justice Antitrust Division if you consider
4   the Department of Justice to be your lawyer?
5       A.   I consider our USPS law department,
6   counsel for the postal service.  They represent
7   us in a number of different perspectives.  I
8   think there are maybe close to 400 lawyers at
9   the postal service that handle everything from
10  employment law to IP protection, patent,
11  corporate business, regulatory, I am using
12  layperson's terms so I apologize, and the DOJ
13  also represents the postal service.
14          If the DOJ was to e-mail me
15  directly, I would include representatives from
16  our USPS legal group to be on the call.  To me,
17  it's considered a privileged environment and
18  both -- both groups, DOJ and USPS work
19  together.
20      Q.   So turning -- going up to the next
21  e-mail in the chain, Mr. Gardner says:  "Okay,
22  great, and thank you for the clarification."

Page 67

1           Do you see where I am?
2       A.   Yes.
3       Q.   He says:  "Let me get back to you
4   after I speak to DOJ out west.  They may want
5   to deconflict first."
6           Do you know -- what is your
7   understanding of deconflict, what deconflicting
8   means in this context?
9       A.    The understanding I came away from,
10  from this e-mail, was that the OIG was doing
11  some type of analysis or investigation.  It may
12  have been similar to what DOJ, the Department
13  of Justice, was looking at.
14          I can't speak as to what they were
15  looking for, looking at.  Hence, my mention to
16  the office of inspector general contact, that
17  there was a -- another -- there were other
18  inquiries tied around media, and I feel like I
19  merely provided visibility to the OIG and to
20  the other counsels here to clarify what they
21  were working on, whether they were working on
22  something separate or they were working on

Page 68

1   something that they need to work on together
2   potentially.
3       Q.   And have you heard of the term
4   "deconflict" before?
5       A.   Yes.
6       Q.   What is your understanding of what
7   that means?
8       A.   Again, in this context, this was
9   interpreted by me that the office of inspector
10  general was doing something, potentially DOJ
11  was doing something, and in order to ensure
12  there were not duplicative efforts or
13  conflicting efforts, they had an opportunity to
14  have conversation with themselves, with each
15  other, and understand just exactly what each
16  side was working on.
17      Q.   And now going to the top e-mail on
18  the chain, Mr. Gardner writes to you that he
19  will be in touch soon.
20          Do you see that?
21      A.   Yes.
22      Q.   And did he get back in touch with

Page 69

1   you?
2       A.   I don't recall.
3       Q.   After January 9, 2023, do you have
4   any recollection of any conversations with
5   anybody from the OIG with respect to digital ad
6   spend by the postal service?
7       A.   I don't recall.
8           MS. GOODMAN:  Shall we take a break?
9           MR. RYAN:  Sure.
10          THE VIDEOGRAPHER:  Going off the
11  record.  The time is 10:56.
12          (A short recess was taken.)
13          THE VIDEOGRAPHER:  Going back on the
14  record.  The time is 11:17.
15          BY MS. GOODMAN:
16  ███  ███  ████████████████████████
17  ███  ███████████████████████████████
18  ███  ██████████████████████████
19  ███  █████████████████
20  ███  ████████████████████
21  ███  ████  ████████████████████
22  ███  ██████████████████████████████

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL



Page 70

Page 71

Page 72

22      MR. RYAN:  I think the answer to --

Page 73

1      it sounds as if this is as a result of
2      privileged communications.  To the extent that
3      this e-mail was as a result of privileged
4      communications you had with counsel, I would
5      object on privileged grounds.
6              MS. GOODMAN:  And what is the nature
7      of the attorney-client privilege?
8              MR. RYAN:  I don't know if this is
9      -- you can ask.  I don't know if this is --
10     that's why I was careful to instruct the
11     witness if this is a result of attorney-client
12     communications, it would be work product.
13             MS. GOODMAN:  This is not prepared
14     by an attorney.
15             MR. RYAN:  But if it's at the
16     direction of counsel, it would be, right, it
17     would be work product.
18             BY MS. GOODMAN:
19     Q.   Was this ask made at the direction
20     of a lawyer?
21             MR. RYAN:  If you recall.
22             THE WITNESS:  Specifically to reach

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

1    out to UM?
2           BY MS. GOODMAN:
3    ▮  ▬ ▬▬▬▬▬▬▬▬▬▬▬
4    ▮     ▬▬▬▬▬▬▬▬▬▬
5    ▮      ▬▬▬▬▬▬▬▬▬▬▬▬
6           MR. RYAN:  Counsel, you are asking
7    -- you're asking -- that's a question -- if you
8    ask it the other way around, it would be not
9    privileged.  Just ask --
10          MS. GOODMAN:  State your objection.
11   State your objection.
12          MR. RYAN:  Privileged
13   communications.
14          MS. GOODMAN:  Okay.
15          MR. RYAN:  And attorney-client work
16   product unless we know otherwise.  Why don't
17   you ask it so it's not -- it does not show up
18   as -- just ask, you know, if there was some
19   reason other than --
20          MS. GOODMAN:  No.  No.  I will ask
21   the question the way I choose.
22          MR. RYAN:  Then I will continue to

1    object.
2           MS. GOODMAN:  Okay.
3           BY MS. GOODMAN:
4       Q.  Mr. Karpenko, did you make this
5    request to Lisa Catucci and Mr. Knopf at UM at
6    the direction of your lawyer?
7           MR. RYAN:  I am going to object.
8           BY MS. GOODMAN:
9       Q.  Yes or no.
10          MR. RYAN:  I am going to -- I am
11   going to instruct the witness not to answer
12   that question because it then reveals
13   communication with counsel.
14          MS. GOODMAN:  No, it doesn't.  It is
15   a yes-or no question.
16          MR. RYAN:  Well, I'm instructing --
17   I am going to instruct the witness not to
18   answer the question.  If you want, we can divvy
19   it out, dish it out later, but for that
20   question, I'm going to instruct the witness not
21   to answer.
22          BY MS. GOODMAN:

1       Q.  Are you following that instruction?
2       A.  I will go with his guidance today.
3           MS. GOODMAN:  Obviously, I reserve
4    our rights to move to compel to get an answer
5    to that question, because it is an improper
6    assertion of the attorney work product --
7           MR. RYAN:  Based on --
8           MS. GOODMAN:  -- privilege.
9           MR. RYAN:  Based on the testimony
10   that the witness has give -- this appears to
11   be, it would be a privileged communication, so
12   we might -- I will just notify you for the
13   record that we might be clawing this document
14   back.
15          MS. GOODMAN:  Okay.  Have fun with
16   that.
17          BY MS. GOODMAN:
18      Q.  Let's go back to Exhibit 33.
19          You write to Mr. Gardner:  "I will
20   look for the list of third parties on our end."
21          On January 9 in the second e-mail in
22   the thread, right?

1           MR. RYAN:  Counsel, where are you?
2    THE WITNESS:  First page.
3           MR. RYAN:  If you can just --
4           BY MS. GOODMAN:
5       Q.  Do you see where you wrote that?
6       A.  I do, yes.
7    ▮    ▬▬▬▬▬▬▬▬▬▬▬▬
8    ▮  ▬▬▬▬▬▬▬▬▬▬▬
9    ▮    ▬▬▬▬▬▬▬▬▬▬▬▬▬
10   ▮  ▬
11   ▮      ▬▬▬▬▬
12   ▮    ▬▬▬▬▬▬▬▬▬▬
13   ▮  ▬▬▬▬▬▬▬▬▬▬
14   ▮    ▬▬▬▬▬▬▬▬▬▬▬
15   ▮   ▬▬▬▬▬▬▬▬
16          MR. RYAN:  Counsel --
17          MS. GOODMAN:  He is in the middle of
18   an answer.  He needs to finish the answer.  Do
19   not interrupt the witness during his testimony.
20          BY MS. GOODMAN:
21      Q.  You may proceed, Mr. Karpenko.

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

<table>
<tr><td>

Page 78

1    MR. RYAN:  Are you finished
2  answering the question? I was going to -- I
3  want -- I was going to let the witness proceed
4  with his answer to this question, but then I
5  want to take a brief break to review this
6  document.
7    MS. GOODMAN:  Please do not
8  interrupt the witness in the middle of his
9  testimony.
10    MR. RYAN:  Counsel --
11    MS. GOODMAN:  If you need to make
12  that statement, you wait for him to finish his
13  answer before you do that.
14    MR. RYAN:  Counsel, I was, as a
15  courtesy, I was trying to wait for the witness
16  to finish answering the question, but at this
17  point, I would like to take a break and confer
18  with the witness.
19    MR. CHU:  We need to go off.
20    MS. GOODMAN:  Excuse me.  You don't
21  get to unilaterally determine that we are going
22  off the record.

</td><td>

Page 80

1  record.  The time is 11:28.
2    (A short recess was taken.)
3    THE VIDEOGRAPHER:  Going back on the
4  record.  The time is 11:41.
5    MS. GOODMAN:  Counsel, prior to the
6  break, we were discussing -- sorry.
7    BY MS. GOODMAN:
8  ████ ████████
9  ████████████████████
10  ██████████████████████
11  ██████████████████████
12  ████████████████████████
13  ████████████████████
14  ████████████████
15    Do you recall that testimony?
16    MR. RYAN:  And, Counsel, at this
17  time, I'm going to claw -- we are going to claw
18  back Exhibit 34 as privileged communication --
19  privileged work product as a result of
20  communication with counsel.
21    MS. GOODMAN:  I need to ask the
22  witness some questions to lay the predicates

</td></tr>
<tr><td>

Page 79

1    BY MS. GOODMAN:
2    Q.  Mr. Karpenko, it looks like you said
3  -- it looks like in Exhibit 34, I am asking UM
4  for information.
5    Did you have anything else to add to
6  your answer?
7    MR. RYAN:  Martha.
8    MS. GOODMAN:  And then we can take a
9  break.
10    MR. RYAN:  Martha, I just -- I will
11  instruct the witness not to answer so we can
12  confer on whether this is privileged
13  communication.  You can ask -- if it is not,
14  you can ask the question immediately after the
15  break, but we need to take a break to confer
16  with counsel -- to confer with the witness
17  about this individual communication.
18    So can we go off the record, please?
19    MS. GOODMAN:  Sure.  How many
20  minutes?
21    MR. RYAN:  Just a couple.
22    THE VIDEOGRAPHER:  Going off the

</td><td>

Page 81

1  for that assertion of privilege.  So I'm going
2  to go ahead and do that.  Okay?
3    MR. RYAN:  So, Counsel, we are
4  clawing the document back --
5    MS. GOODMAN:  Okay.  I don't need --
6    MR. RYAN:  -- I will instruct the
7  witness not to answer any questions about the
8  document.
9    MS. GOODMAN:  Okay.
10    BY MS. GOODMAN:
11    Q.  So, Mr. Karpenko --
12    MR. RYAN:  And you can ask --
13    MS. GOODMAN:  Please let me make my
14  record.
15    MR. RYAN:  -- when we -- when we
16  talked and everything.
17    MS. GOODMAN:  Please let me make my
18  record.  Thank you.
19    MR. RYAN:  I'm not going to ask --
20  allow the witness to answer questions about the
21  exhibit.
22    MS. GOODMAN:  Please let me make my

</td></tr>
</table>

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1  record.
2        BY MS. GOODMAN:
3     Q.   With respect to Exhibit 34, which
4  you are looking at but I am not -- for the
5  record I have covered up Exhibit 34 while I ask
6  you these questions.
7        MS. GOODMAN:  Does everybody agree?
8        BY MS. GOODMAN:
9     Q.   Mr. Karpenko, do you see me, that I
10  am not looking at Exhibit 34?
11        MR. RYAN:  I am not going to let the
12  witness answer questions about Exhibit 34
13  whether you're looking at it or not.  It
14  doesn't really make a difference, but --
15        MS. GOODMAN:  Okay.
16        MR. RYAN:  -- there you go.
17  Appreciate you.  Appreciate --
18        MS. GOODMAN:  Please let me make my
19  record.
20        MR. RYAN:  -- appreciate it.
21        MS. GOODMAN:  Thank you.
22        BY MS. GOODMAN:

Page 83

1     Q.   So do you agree that I am not
2  looking at Exhibit 34 right now?
3     A.   You are looking at me.
4     Q.   Thank you.
5        And you are looking at Exhibit 34,
6  correct, or you have it in front of you?
7        MR. RYAN:  I am going to instruct
8  the witness not to answer any questions about
9  Exhibit 34.
10        BY MS. GOODMAN:
11     Q.   So you won't answer whether you have
12  Exhibit 34 in front of you?  Do you follow that
13  instruction?
14     A.   I will follow my instruction.
15  ████    ██ ████████████████████
16  █████████████████████████████
17  ███████████████████████
18        MR. RYAN:  I'm going to object
19  privileged communicate -- that's privileged
20  work -- that would be privileged communication
21  and work product.
22        BY MS. GOODMAN:

Page 84

1     Q.   Are you going to answer the
2  question?
3        MR. RYAN:  And I am going to
4  instruct the witness not to answer.
5        BY MS. GOODMAN:
6     Q.   Are you going to follow that
7  instruction?
8     A.   I will follow the instruction.
9     Q.   Okay.  And did you make the request
10  for a list of third parties to -- make the
11  request of Universal McCann for a list of third
12  parties in order to respond to the office of
13  attorney -- Office of Inspector General's
14  inquiry that we looked at in Exhibit 33?
15        MR. RYAN:  I'm -- I'm going to
16  object as that would be work product, but if
17  you have questions on 33.
18        BY MS. GOODMAN:
19     Q.   Okay.  My question on Exhibit 33 is
20  the e-mail we looked at between yourself and
21  the office of the inspector general, correct?
22     A.   Correct.

Page 85

1     Q.   Okay.  And in that e-mail, the OIG
2  is asking about the third-party sites on which
3  the United States Postal Service places
4  advertisements, correct?
5     A.   They were inquiring about
6  third-party -- about third-party sites.
7     Q.   Okay.  And in the e-mail on the
8  first page, you write to OIG stating:  "I will
9  look for the list of third parties," correct?
10     A.   Yes.
11     Q.   Okay.  So my question to you, Mr.
12  Karpenko, is whether part of the reason you
13  requested or you sent an e-mail to Universal
14  McCann inquiring about a list of third parties
15  was because the OIG asked you for such a list
16  and you told the OIG that you would look for
17  such a list.
18        MR. RYAN:  Objection to form and
19  foundation.
20        THE WITNESS:  I did say I would look
21  for a list.
22        BY MS. GOODMAN:

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1      Q.   And was one way that you looked for
2    the list by asking Universal McCann in your
3    e-mail in Exhibit 34?
4          MR. RYAN:  Objection to form and
5    foundation.
6          THE WITNESS:  It appears I did not
7    find anything on my end at the postal service
8    when I first looked on my own system.
9          BY MS. GOODMAN:
10     Q.   And so in order to respond to the
11   OIG inquiry reflected in Exhibit 33, once you
12   could not find anything on your end, did you
13   ask Universal McCann for such information in --
14   as reflected in Exhibit 34, which I am not
15   looking at?
16         MR. RYAN:  Objection to form and
17   foundation.  And I will again instruct the
18   witness not to answer questions regarding
19   Exhibit 34.
20         MS. GOODMAN:  Okay.  I will
21   rephrase.
22         BY MS. GOODMAN:

Page 87

1      Q.   So in order to respond to the OIG
2    inquiry reflected in Exhibit 3 -- 33 after you
3    could not find anything on your end, did you
4    ask Universal McCann for a list of third-party
5    sites?
6          MR. RYAN:  Objection to form and
7    foundation.
8          THE WITNESS:  The e-mail was sent to
9    me on January 9th.  I did not ask anyone other
10   than, on my end, postal.  For me looking at it
11   on January 9th, I didn't find anything.
12         BY MS. GOODMAN:
13     Q.   And how about subsequent to January
14   9th?  Did you ask anybody at Universal McCann
15   to help you find a list of third-party sites on
16   which the United States Postal Service places
17   digital ads?
18         MR. RYAN:  Objection to form and
19   foundation.
20         THE WITNESS:  I believe that's when
21   it would fall under privileged conversation.
22         BY MS. GOODMAN:

Page 88

1      Q.   Why do you think that?
2          MR. RYAN:  Objection to form and
3    foundation.
4          If it's --
5          MS. GOODMAN:  There is a question
6    pending to the witness.
7          MR. RYAN:  If the -- you have asked
8    why does he think it's privileged.
9          MS. GOODMAN:  I am entitled for
10   his --
11         MR. RYAN:  If it's --
12         MS. GOODMAN:  -- view as to why he
13   gets to --
14         MR. RYAN:  If it's communication --
15   if it involved a communication with counsel,
16   you're not to answer the question.
17         BY MS. GOODMAN:
18     Q.   Okay.  My question is to you, Mr.
19   Karpenko:  After January 9th did you ask anyone
20   at Universal McCann to help you find a list of
21   third-party sites on which the United States
22   Postal Service places digital ads?

Page 89

1          THE VIDEOGRAPHER:  If you could,
2    your mic, Mr. Ryan.
3          MR. RYAN:  Oh, sorry.
4          THE WITNESS:  I believe subsequent
5    to me looking any further, I had privileged
6    conversations with our attorneys.
7          BY MS. GOODMAN:
8      Q.   Which attorneys?
9      A.   Attorneys that represent the postal
10   service.
11     Q.   Who are those?
12     A.   I don't have the meeting invite in
13   front of me, so I wouldn't be able to tell you
14   which one specifically.
15     Q.   And do you know that this meeting
16   took place between January 9th and January 11th
17   of 2023 that you are referencing with
18   attorneys?
19         MR. RYAN:  I am going to instruct
20   the witness not to answer.
21         MS. GOODMAN:  As to the timing of
22   the meeting, you're instructing him not to

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1  answer?
2      MR. RYAN:  You're -- you're tieing
3  e-mails to a meeting and then, therefore,
4  extracting the substance of the meetings as
5  a -- as a result.  So, yes, I'm going to
6  instruct the witness not to answer.
7      MS. GOODMAN:  Only at the level that
8  is placed on a privilege log.
9      BY MS. GOODMAN:
10     Q.  So, Mr. Karpenko, for the record,
11 you were referencing a meeting with attorneys
12 for the United States Postal Service.  And my
13 question to you is whether that meeting
14 occurred, to the best of your recollection,
15 some time between January 9th and January 11th
16 of 2013 [sic].
17     MR. RYAN:  And I have instructed the
18 -- I am instructing the witness not to answer.
19     BY MS. GOODMAN:
20     Q.  Are you following that instruction?
21     A.  I am following that instruction.
22     MS. GOODMAN:  Okay.  Counsel, for

Page 91

1  the record, I vehemently disagree with your
2  assertions of attorney work product and
3  attorney-client privilege with respect to this
4  line of communications.
5      And we will reserve all of our
6  rights to move to compel, and we will be
7  following up with you on these improper
8  objections.
9      I'm going to move on to another
10 exhibit.
11     MR. RYAN:  Can you hand back --
12 since we've clawed them back --
13     MS. GOODMAN:  No.  It has all of my
14 attorney work product over it as well, so I'll
15 destroy it.
16     MR. RYAN:  Fair enough.
17     MS. GOODMAN:  For the record, let me
18 just ask this one more time because I
19 misspoke -- misstated the date.
20     BY MS. GOODMAN:
21     Q.  When you were referencing a meeting
22 with attorneys for the United States Postal

Page 92

1  Service, Mr. Karpenko, to the best of your
2  recollection, did that meeting occur some time
3  between January 9th and January 11th of 2023?
4      MR. RYAN:  Objection to form and
5  foundation.
6      MS. GOODMAN:  May he answer that
7  question?
8      THE WITNESS:  Could you repeat it
9  one more time.  Thank you.
10     BY MS. GOODMAN:
11     Q.  Sure.  When you were referencing a
12 meeting with attorneys for the United States
13 Postal Service, Mr. Karpenko, to the best of
14 your recollection, did that meeting occur some
15 time between January 9th and January 11th of
16 2023?
17     MR. RYAN:  I'll restate the
18 objection.
19     THE WITNESS:  I don't know for sure.
20     BY MS. GOODMAN:
21     Q.  So your best testimony is you don't
22 know whether the meeting that prompted you --

Page 93

1  strike that.
2      Was there a meeting that prompted
3  you to reach out to Universal McCann for a list
4  of third-party sites with attorneys for the
5  United States Postal Service?
6      MR. RYAN:  I am going to object to
7  that question and instruct the witness not to
8  answer as it would call for privileged
9  communications with counsel.
10     BY MS. GOODMAN:
11     Q.  Are you following that instruction?
12     A.  I am.
13     Q.  Okay.
14     MS. GOODMAN:  I am handing you
15 Exhibit 35, USPS-ADS-899149 through 899151.
16     (Deposition Exhibit 35 was marked
17 for identification.)
18     BY MS. GOODMAN:
19     Q.  And this is a series of text
20 messages between yourself and the phone number
21 301-437-7574 on January 9th, correct?
22     A.  I do see it, yes.

24 (Pages 90 - 93)

Page 102

1    A.   I look at it as the postal service
2 is in a good place, good standing, has good
3 processes, good rigor and that what we do is
4 accurate, lawful, and appropriate.
5    Q.   And so at this time in January of
6 2023 when you received this outreach from the
7 OIG about placement on third-party sites, were
8 you at all concerned about -- were you at all
9 concerned that that inquiry was in relation to
10 whether the postal service was using digital
11 media appropriately?
12       MR. RYAN:  Objection to form and
13 foundation.
14       THE WITNESS:  I believe the postal
15 service purchases media through the proper
16 procedures and tries to maximize its return on
17 investment.
18       BY MS. GOODMAN:
19    Q.   Okay.  Let me ask it a bit
20 differently.
21       When you received the outreach from
22 the OIG, did it raise in your mind a concern

Page 103

1 that the OIG was investigating the postal
2 service?
3    A.   Historically --
4       MR. RYAN:  Objection to form.
5       THE WITNESS:  Historically the
6 postal service ends up having -- historically
7 the OIG for the postal service engages with the
8 postal service tied to fraud, waste, and abuse.
9       My interaction with the OIG has
10 always been collaborative, cooperative, and
11 they were asking for question -- asking
12 questions that I was trying to understand
13 context to provide them with the correct or
14 accurate information if possible.
15       BY MS. GOODMAN:
16    Q.   And so at the time you received the
17 outreach from the OIG on January 9, 2023, did
18 it raise in your mind a question as to whether
19 they were investigating waste, fraud, or abuse
20 within the postal service as pertaining to
21 digital advertising?
22       MR. RYAN:  Objection to form and

Page 104

1 foundation.
2       THE WITNESS:  Historically OIG would
3 have -- has come to our group to ask about our
4 purchasing, our process, and our rigor in how
5 we determine effectiveness in our advertising
6 dollars towards our return or our expectation.
7       BY MS. GOODMAN:
8    Q.   So my question is specific at the
9 time of the January 9, 2023 outreach.  Did you
10 form a belief that the reason for that outreach
11 was connected to any investigation with respect
12 to waste, fraud, or abuse within the postal
13 service as pertaining to digital advertising?
14       MR. RYAN:  Objection to form and
15 foundation.
16       THE WITNESS:  I wouldn't be able to
17 answer that.  It would have only been
18 speculation on my part.
19       BY MS. GOODMAN:
20    Q.   Okay.  And at the time of the
21 January 9, 2023 outreach from the OIG, did you
22 have any reason to believe at that time that

Page 105

1 the outreach was connected to any antitrust
2 investigation of Google?
3    A.   No.
4    Q.   Okay.  And so Ms. Catucci writes on
5 Page 2 of this text message chain in the middle
6 of the page:  "We have a list.  We aren't just
7 buying on any site out there."
8       Do you see that?
9    A.   Yes, in the middle.
10    Q.   Okay.  And you write:  "I think that
11 would be helpful," correct?
12    A.   Uh-huh.
13    Q.   And she says:  "Knowing that or
14 seeing the list?  It's long."
15       Do you see that?
16    A.   Yes.
17    Q.   Do you have any idea of how long the
18 list of third-party sites is on which postal
19 service places digital advertising?
20    A.   I'm sorry.  Could you repeat that
21 again.
22    Q.   Do you have any idea how entity --

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1  how many web sites are on the list of
2  third-party sites on which postal service
3  places digital advertising?
4     A.   I do not.
5     Q.   And then you write -- and this sort
6  of was cut off on Page 2 but continues on Page
7  3 -- "I have a bit of OIG and DOJ activity
8  around media."
9     Do you see that?
10     A.   Yes.
11     Q.   What did you mean when you said: "I
12  think a bunch of players are bad actors"?
13     A.   Historically when you have questions
14  coming from the OIG or the DOJ or some law
15  enforcement environment, it implies that they
16  are looking at something for something.
17     I did not have context as to what
18  that was.  And I referred to a prior incident a
19  number of years ago where DOJ took to task a
20  number of media entities on not passing through
21  rebates which was a prior case that happened a
22  number of years ago.

Page 107

1     Q.   Now do you -- is it -- did you -- is
2  it accurate that you thought a bunch of players
3  are bad actors where you wrote:  "I think a
4  bunch of players are bad actors"?
5     A.   I -- I wrote the text.
6     Q.   Yeah.
7     A.   And it was me surmising or making a
8  purely guess.  It was just a conversation.
9     Q.   And when you say "surmising and
10  making purely a guess," are you referring to
11  the purpose for the OIG and DOJ's activity
12  around media?
13     MR. RYAN:  Objection to form and
14  foundation.
15     THE WITNESS:  I was making a
16  statement back to Ms. Catucci that there could
17  be a number of players that could be bad
18  actors.
19     BY MS. GOODMAN:
20     Q.   At the time of this text, are you --
21  were you -- did you have any particular bad
22  actor in mind --

Page 108

1     A.   No.
2     Q.   -- when you were sending this text?
3     A.   No.  No.
4     Q.   And for the record, at the time of
5  sending this text on January 9, 2023, did you
6  think Google was a bad actor?
7     A.   No.
8     Q.   Okay.  And you write:  "I will send
9  an e-mail to you and Michael.  I won't really
10  provide the why for context."
11     Why did you say that?
12     A.   I see it right here.  I am just
13  reading it here.
14     This was tied to potentially asking
15  for the list of third-party providers.
16     Q.   So the e-mail you sent after --
17  strike that.
18     The e-mail you reference in your
19  text with Ms. Catucci is the e-mail we were
20  looking at in Exhibit 34; is that correct?
21     MR. RYAN:  Objection to form and
22  foundation.

Page 109

1     THE WITNESS:  I don't know.
2     BY MS. GOODMAN:
3     Q.   And so did you send an e-mail to
4  Ms. Catucci and Mr. Knopf making a request for
5  a list of third-party sites?
6     A.   I may have --
7     MR. RYAN:  Objection to foundation.
8     THE WITNESS:  I may have.  I don't
9  recall specifically if I did or not.
10     BY MS. GOODMAN:
11     Q.   And did you look at any documents
12  here today thus far, such as Exhibit 34, where
13  you sent a request to Universal McCann for a
14  list of third-party sites?
15     MR. RYAN:  I'm going to object and
16  instruct the witness not to answer questions
17  related to what you -- what you were referring
18  to as Exhibit 34.
19     BY MS. GOODMAN:
20     Q.   Are you following that instruction?
21     A.   I am.
22     MR. RYAN:  And that's -- we'll claw

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1   that back as a privileged communication, work
2   product and privileged communication.
3        MS. GOODMAN: Are you claiming the
4   attorney-client privilege over Exhibit 34?
5        MR. RYAN: Yes -- yes.
6        MS. GOODMAN: Are you claiming the
7   attorney work product privilege over Exhibit
8   34?
9        MR. RYAN: Haven't I --
10       MS. GOODMAN: Those are two
11  different privileges. You understand that,
12  right?
13       MR. RYAN: We are clawing back
14  Exhibit 34.
15       MS. GOODMAN: On what grounds?
16       MR. RYAN: That's privileged work
17  product based on communications with counsel.
18       MS. GOODMAN: So are you invoking
19  both the attorney-client --
20       MR. RYAN: Yes.
21       MS. GOODMAN: -- privilege and the
22  attorney work product privilege?

Page 111

1        MR. RYAN: Yes.
2        MS. GOODMAN: Are you invoking the
3   deliberative process privilege?
4        MR. RYAN: You think -- no.
5        MS. GOODMAN: No. Okay.
6        We disagree, and we'll take that up
7   with the Court, of course.
8        BY MS. GOODMAN:
9        Q.   Did you obtain a list of third-party
10  sites, to your knowledge, from Universal
11  McCann?
12       A.   I -- I obtained -- we, the postal
13  service, obtained a list of purchases,
14  investment that UM had made with a variety of
15  different entities.
16       Q.   And the list that you're referencing
17  that you obtained, a list of purchases,
18  investments that UM had made with a variety of
19  different entities, when did you obtain such a
20  list?
21       A.   I don't know off the top of my head.
22       Q.   Can you approximate?

Page 112

1        A.   It would be a guess, but some time
2   in January.
3        Q.   And what did that list -- can you
4   describe in more detail what was reflected on
5   that list.
6        A.   If I remember correctly, the -- it
7   came in as an Excel spreadsheet. It had a list
8   of entities or organizations and investment
9   made, monies that the postal service had
10  directed to be used for media.
11       Q.   And was that list sent to you by
12  Universal McCann?
13       A.   I believe so.
14       Q.   Okay. Were any attorneys on that
15  communication?
16       A.   I believe that list was sent to me
17  and potentially people on my team.
18       Q.   Would the people on your team have
19  been attorneys?
20       A.   Not -- I do not believe an attorney
21  received it from Universal McCann.
22       Q.   Okay. And did you send that list on

Page 113

1   to attorneys after receiving it from Universal
2   McCann?
3        A.   I shared that file with our
4   attorneys.
5        Q.   Which attorneys did you share it
6   with?
7        A.   I know there were postal attorneys,
8   Michael Weaver. It could -- it could have
9   included Maria Voetsch on that as well as
10  others. I just don't know. I'd have to look
11  at the sent e-mail.

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL



Page 114

Page 116

1    (The witness was excused from the

2  conference room.)

3    THE VIDEOGRAPHER:  Going back on the

4  record.  The time is 12:36.

5    MR. RYAN:  So, Counsel, the cover as

6  we discussed earlier, the cover e-mail to

7  Exhibit 36 is part of the privileged

8  communication -- part of a communication

9  that results from a communication with counsel,

10  so we are claiming work product privilege on

11  Exhibit 34.

12    The cover e-mail to Exhibit 36 is

13  part of that Exhibit 34 that we clawed back.

14  So at this time, we are also clawing back the

15  cover e-mail of Exhibit 36.  The attachment to

16  the cover e-mail is not privileged and you can

17  ask questions about that.  We have no objection

18  to that.

19    MS. GOODMAN:  So for the record,

20  please state your objections and explain them

21  for -- strike that.

22    Please state for the record your

Page 115

Page 117

1  reasons for clawing back Exhibit 34 in their

2  entirety, so we have it for the record, because

3  I have heard a variety of different things

4  today with respect to the privileges you are

5  invoking and on what basis, so I would just

6  like your full and completion explanation of

7  why you are clawing back Exhibit 34.

8    MR. RYAN:  Okay.  So Exhibit 34 --

9  Exhibit 34 is attorney -- is based -- is a

10  communication that results from communications

11  with counsel and therefore, is -- we are

12  claiming work product privilege for it.

13    MS. GOODMAN:  Are you claiming any

14  other privilege for it?

15    MR. RYAN:  Any other privilege, no,

16  just work product.

17    MS. GOODMAN:  Okay.  And is the

18  entirety of Exhibit 34 the result of attorney

19  work product privilege or only a portion of it

20  such that it should be redacted?

21    MR. RYAN:  The first sentence of the

22  reply is not privileged, I think, so in terms

15    BY MS. GOODMAN:

16    Q.   Okay.

17    MR. RYAN:  Counsel, I need to take a

18  break.

19    MS. GOODMAN:  Okay.

20    THE VIDEOGRAPHER:  Off the record.

21  The time is 12:23.

22    (A short recess was taken.)

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1  of saying when they will be around, but the
2  rest of it, yes, so...
3       MS. GOODMAN:  Well, I am not looking
4  at the document in front of me, so do you want
5  to apply redactions for it -- to it for me
6  during the deposition so that I can examine the
7  witness on it to the extent it is not protected
8  by the privilege that you are claiming with
9  which I disagree?  Thank you for allowing me to
10 finish.
11      MR. RYAN:  Certainly.  Martha, the
12 only part of the communication that is not
13 privileged would be just the discussion
14 revolving around when they would be able to
15 talk essentially, so we can -- if you want to
16 ask about that, I, you know, it's hard to
17 redact this in real time.  We don't have the
18 redaction tools.
19      MS. GOODMAN:  I could give you a
20 Sharpie.  Would that work?
21      MR. RYAN:  And -- I mean, it seems
22 like it's a waste of time, Martha, frankly.

Page 119

1       MS. GOODMAN:  Could you provide me a
2  redacted copy with a Sharpie and I can
3  determine whether I wish to examine the witness
4  on the redacted version?
5       MR. RYAN:  Why don't we do that.  We
6  will do that during the break and -- we will
7  try to do that during the break.
8       MS. GOODMAN:  Okay.  And now, let's
9  go to Exhibit 36, the cover e-mail to Exhibit
10 36.  Please state your reasons for clawing that
11 document back.
12      MR. RYAN:  The exact same reasons,
13 it's part of Exhibit 34 that we have identified
14 as attorney work product.
15      MS. GOODMAN:  And the only privilege
16 over which you -- the only privilege you are
17 asserting over Exhibit 34 -- sorry, Exhibit 36
18 is the attorney work product privilege; is that
19 accurate?
20      MR. RYAN:  Correct.
21      MS. GOODMAN:  Okay.  And will you
22 provide me a redacted copy of Exhibit 36, the

Page 120

1  cover e-mail as well?
2       MR. RYAN:  Yes, but it will be
3  heavily redacted.  I mean, the majority of the
4  document.
5       MS. GOODMAN:  Okay.  And can you
6  explain the basis for your attorney work
7  product privilege assertion over Exhibits 34
8  and 36?
9       MR. RYAN:  Again, it is a
10 communication that resulted -- again, the --
11 it's a communication that results from a
12 request from DOJ as part of -- and so,
13 therefore, it is DOJ work product.
14      MS. GOODMAN:  So are you claiming
15 any protection under the work product doctrine
16 around communications between nonattorneys and
17 media agencies for the federal agency
18 advertisers?
19      MR. RYAN:  I'm going to stop you
20 right there.  How many questions -- how many
21 times do I have to assert the same privilege.
22 We've clawed it back.  I stated the reasons

Page 121

1  why.
2       THE VIDEOGRAPHER:  Can we go off the
3  record for a second so I can fix Mr. Ryan's
4  microphone.
5       MR. RYAN:  Sorry.  If you want to
6  use your time on this, that's fine, but I think
7  we have stated our reasons for our -- for why
8  we are clawing these documents back.
9       MS. GOODMAN:  Okay.  I just wanted
10 to give you the opportunity to make your record
11 because we will put it before the Court when we
12 move to compel, and it is your job -- it is the
13 United States's burden of proof and persuasion
14 to invoke this privilege, so I just want to
15 provide you the full opportunity to do that on
16 the record.
17      MR. RYAN:  Appreciate it.
18      MS. GOODMAN:  Do you have anything
19 more to say?
20      MR. RYAN:  I don't have anything
21 more to say, no.
22      MS. GOODMAN:  Thank you, Mr. Ryan.

31 (Pages 118 - 121)

Page 122

1    We can go off the record.
2    THE VIDEOGRAPHER: Off the record.
3  The time is 12:42.
4    (A short recess was taken.)
5    THE VIDEOGRAPHER: Going back on the
6  record. The time is 13:39.
7    (The witness was excused from the
8  conference room.)
9    MR. RYAN: All right. Counsel,
10  thank you for giving me a minute just to
11  explain the basis of our privilege claims on 34
12  and -- what was Exhibits 34 and 36 and the
13  e-mails that are contained in them.
14    So 34A, what we've got now are
15  redacted copies of these e-mails, and I just
16  want to clarify the basis of the privilege.
17    So there were two separate requests
18  that the witness had. There's a request from
19  OIG, which we are not claiming privilege over,
20  but there is also a request from DOJ, and that
21  -- for that we are claiming privilege because
22  the -- when he came out and when he did work on

Page 123

1  -- culled up and gathered information, that
2  would be work product. So we're claiming
3  privilege on DOJ portion. So that's why there
4  is this sort of distinction why we had to then
5  redact these pages.
6    So -- so 36, what is now marked as
7  36B, we didn't claim the attachment as
8  privilege because it's part of the OIG request.
9  But we just want to clarify that that was the
10  distinction.
11    So that's all I wanted to state on
12  the record. Thank you.
13    MS. GOODMAN: And --
14    MR. RYAN: I am not going to argue
15  or debate the exhibit, you know, the basis of
16  our privilege. That is the basis of our
17  privilege, and I just want to clarify that for
18  the record.
19    MS. GOODMAN: I just would like to
20  ask one clarifying question --
21    MR. RYAN: So I'm not going -- I'm
22  not going -- that will have to come out of your

Page 124

1  time then.
2    MS. GOODMAN: My clarifying question
3  is to make your record better for you --
4    MR. RYAN: I appreciate that, but
5  I'm not -- I'm not going to engage with you
6  on -- on -- on this.
7    MS. GOODMAN: We can't talk over one
8  another because our court reporter needs to --
9    MR. RYAN: Yeah. I'm not the
10  deponent, but thank you, Martha.
11    MS. GOODMAN: You're welcome, Mr.
12  Ryan.
13    My question is: Is it remaining the
14  attorney work product privilege, or are there
15  any other --
16    MR. RYAN: I'm not going to -- I'm
17  not going to engage further with you on this.
18  Why don't we bring the witness back in and you
19  can resume your examination.
20    MS. GOODMAN: All right. And so you
21  will not let me state for the record my
22  question to you which is: Is your privilege

Page 125

1  assertion limited to the Attorney Work Product
2  Doctrine?
3    MR. RYAN: I'm not going -- yes, but
4  that's -- I'm not going to go any further on
5  this with you. Okay.
6    MS. GOODMAN: That's all I wanted
7  you to make clear. Thank you, Mr. Ryan.
8    We can go off the record.
9    THE VIDEOGRAPHER: Going off the
10  record. The time is 13:42.
11    (A short recess was taken.)
12    THE VIDEOGRAPHER: Going back on the
13  record. The time is 13:43.
14    (The witness returned to the
15  conference room.)
16    (Deposition Exhibit 34A was marked
17  for identification.)
18    MS. GOODMAN: Mr. Karpenko, I am
19  handing you what is marked as Exhibit 34A,
20  USPS-ADS-43815 through 43816, which has been
21  redacted as a result of the United States
22  clawing back this document.

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1       BY MS. GOODMAN:
2       Q.   And I would like to ask you --
3   well --
4       A.   Oh, I'm sorry.
5           MS. GOODMAN:  I -- I handed the
6   marked copy to the witness.
7       BY MS. GOODMAN:
8       Q.   Mr. Knopf writes to you:  "To be
9   sure you have the information you need, are you
10  free to share the story behind this ask?"
11          Do you see that in the middle of the
12  page?
13      A.   Yes.
14      Q.   Okay.  And you say:  "Not sure,"
15  correct?
16      A.   That is stated underneath my name in
17  this e-mail copy.
18      Q.   And you wrote that?
19      A.   I believe so.
20      Q.   Okay.  Why were you not sure whether
21  you could share the story behind the ask, which
22  is redacted on Page 16 in the initial e-mail

Page 127

1   chain initiating this thread?
2           MR. RYAN:  So, Martha, A, I don't
3   think you should be asking questions about the
4   redacted portion of a document.
5           MS. GOODMAN:  I'm not.
6           MR. RYAN:  But, B, I'm going to
7   instruct the witness not to answer the question
8   to the extent it would involve communications
9   with counsel or the product of communications
10  with counsel.
11          BY MS. GOODMAN:
12      Q.   So, Mr. Karpenko, why were you not
13  sure whether you were free to share the story
14  behind this ask?
15      A.   I'm not sure how to answer that;
16  meaning, I don't know what I was -- where I was
17  at that particular point in time.
18      Q.   And did you ever share the story
19  behind the ask with Mr. Knopf?
20      A.   I don't believe so.
21      Q.   Did you share the story behind the
22  ask with Ms. Catucci?

Page 128

1       A.   I don't -- I don't recall.
2       Q.   We looked at text messages you had
3   exchanged with Ms. Catucci earlier.  Was
4   that -- in that text chain, were you sharing
5   with her the story behind the ask?
6           MR. RYAN:  Does the witness need to
7   reference the -- the exhibit?
8           THE WITNESS:  Is that the prior
9   exhibit?
10          BY MS. GOODMAN:
11      Q.   If you would like to look at that,
12  yes.  I don't have the exhibit number in front
13  of me, but it's the text messages.
14          In that chain are you sharing the
15  story behind the ask?
16      A.   I will refer to Exhibit 35.
17      Q.   Okay.
18      A.   It's a very general synopsis of why
19  I was asking for the perspective of what third
20  party meant in her -- in her words.
21      Q.   Okay.  And did you ever have further
22  conversations with Ms. Catucci about your

Page 129

1   request to her for a list of third-party sites?
2           MR. RYAN:  I'm going to object to
3   foundation.
4           THE WITNESS:  I believe I had
5   additional conversations with Lisa Catucci.
6           BY MS. GOODMAN:
7       Q.   And what were those additional
8   conversations you are recalling?
9           MR. RYAN:  Objection to form and
10  foundation.
11          MS. GOODMAN:  What is the basis for
12  your objection?
13          MR. RYAN:  What conversations are
14  you referring to?  You haven't even --
15          MS. GOODMAN:  He -- he is saying he
16  believes -- that he believes he had
17  conversations, so I am asking him to elaborate.
18          MR. RYAN:  If you can.
19          THE WITNESS:  I'm not sure I am able
20  to tell you in specific what conversations
21  occurred with Lisa Catucci or others, but it
22  wouldn't be uncommon for me to engage in

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1 conversation with Lisa Catucci and others from
2 UM.
3       BY MS. GOODMAN:
4    Q.   And so my question, Mr. Karpenko,
5 is:  Do you recall any other conversations,
6 besides the text message chain, with
7 Ms. Catucci about the request you posed to her
8 for a list of third-party sites?
9    A.   I don't specifically recall, but
10 there may be something there, but I don't have
11 anything -- you may have something in
12 discovery, but I don't recall anything
13 specific.
14    Q.   Do you recall anything generally?
15    A.   I think what I would consider
16 interaction would be perhaps asking for clarity
17 on any information that may have been provided
18 to me from UM, asking for specificity or
19 clarity on what some of the files may have in
20 them.
21    Q.   And did you -- are you -- are you
22 recalling specific instances where you did ask

Page 131

1 for clarity on information that UM provided you
2 with respect to this ask for a list of
3 third-party sites?
4       MR. RYAN:  Objection to form.
5       THE WITNESS:  Are you referring to
6 this particular list in section --
7       BY MS. GOODMAN:
8    Q.   Yeah.
9    A.   -- Exhibit 36?
10    Q.   Yes.
11    A.   I don't believe I had -- I can't
12 remember if I had additional conversations
13 about the list versus conversations about other
14 files or things that might be sent.
15    Q.   And in the January 2023 time period,
16 did you make any other requests to UM for
17 information regarding U.S. Postal Service's
18 digital ad purchases made by UM?
19       MR. RYAN:  I will caution the
20 witness not to reveal -- just not to answer to
21 the extent it would involve communications with
22 counsel or were the result of communications

Page 132

1 with counsel.
2       THE WITNESS:  For clarity,
3 January -- I think you were asking for January.
4 I believe other asks potentially would have
5 been tied under interaction with privilege.
6       BY MS. GOODMAN:
7    Q.   And so I want to be very clear for
8 the record.  Is your testimony that you made
9 other requests for information from Universal
10 McCann under interaction with privilege?
11       MR. RYAN:  Objection to form and
12 foundation.
13       THE WITNESS:  When you say
14 "interaction with privilege," could you help
15 clarify that for me.
16       BY MS. GOODMAN:
17    Q.   I was using your words, so I just
18 want to make sure I am using the same way
19 you're speaking so --
20    A.   Got it.  Okay.
21    Q.   -- if you want to elaborate on what
22 you mean by that, I can tailor my questions

Page 133

1 accordingly.
2       MR. RYAN:  Counsel, I'm not sure --
3 I don't know what -- what's your -- I don't
4 know what -- what's -- I'm going to object to
5 form.  I don't understand what you're asking
6 him.
7       MS. GOODMAN:  Okay.  Say your
8 objection, please.
9       MR. RYAN:  Vague.
10       BY MS. GOODMAN:
11    Q.   Is it your testimony that you made
12 other requests for information from Universal
13 McCann under what -- you used the phrase --
14 interaction with privilege?
15    A.   My asks --
16       MR. RYAN:  Objection to form.
17       THE WITNESS:  My asks with or
18 interactions with UM to ask for information was
19 for information and done with what I believe --
20 interaction prior of having a conversation with
21 our counsel.
22       BY MS. GOODMAN:

34 (Pages 130 - 133)

1    Q.   And so is it your testimony that to
2    the extent you requested information from UM in
3    the January 2023 time period, it was -- your
4    requests for information were based on a
5    conversation with your counsel?
6        MR. RYAN: Objection to form and
7    foundation.
8        And, Counsel, you've asked the same
9    question three times, and you keep restating --
10   trying to get the witness to restate it in your
11   own words.
12       MS. GOODMAN: You can state your
13   objection. No speaking objections.
14       THE WITNESS: Could you repeat it
15   again. Thank you.
16       BY MS. GOODMAN:
17   Q.   Yeah. Is it your testimony that
18   when you asked for information from UM in the
19   January 2023 time period, you did so based on a
20   conversation with your counsel?
21       MR. RYAN: Objection to form and
22   foundation.

1        THE WITNESS: The information that
2    -- some of the information that I may have
3    asked for from UM was tied to privileged
4    conversation with counsel.
5        MS. GOODMAN: Okay. And I will hand
6    you Exhibit 36A.
7        THE WITNESS: Thank you.
8        (Deposition Exhibit 36A was marked
9    for identification.)
10       BY MS. GOODMAN:
11   Q.   For the record this is a redacted
12   version of Exhibit 36. Do you recognize that
13   as such?
14   A.   I believe it's a portion of 36 that
15   you handed me earlier.
16       MS. GOODMAN: Okay. All right. I
17   just wanted to mark that for the record. You
18   can put that to the side.
19       I am handing you Exhibit 37
20   USPS-ADS-40943.
21       (Deposition Exhibit 37 was marked
22   for identification.)

1        THE WITNESS: Thank you.
2        BY MS. GOODMAN:
3    Q.   And is this a calendar invite for a
4    Zoom meeting between yourself and Ms. Catucci
5    on March 8th of 2023?
6    A.   Yes, it looks that way.
7    Q.   And the subject is: "Ad Spend."
8        Do you see that?
9    A.   Yes.
10   Q.   Do you recall this meeting between
11   yourself and Ms. Catucci on March 8th of 2023
12   regarding ad spend?
13   A.   Specifically, no, but it's there.
14   Q.   What, if anything, do you recall
15   about a Zoom meeting with Ms. Catucci in or
16   around this time about ad spend?
17   A.   I don't recall specific --
18   specifically the conversation.
19   Q.   Do you recall generally?
20   A.   If I did, I would be guessing.
21   Q.   Okay. Do you recall having any
22   conversations with Ms. Catucci subsequent to

1    January of 2023 regarding ad spend?
2    A.   That may be difficult for me to
3    answer because the UM team is about media and
4    ad spend and it could encompass almost anything
5    tied to our advertising efforts.
6    Q.   Is it a normal part of your daily
7    work -- is it a routine part in your work to
8    have a one-on-one conversation with Ms. Catucci
9    about ad spend?
10   A.   It would not be an exception.
11   Q.   Okay. And subsequent to January of
12   2023, have you requested information from
13   United -- Universal McCann based on a
14   conversation with your counsel?
15   A.   I'm not sure -- I'm not sure about
16   the question. Could you help me.
17   Q.   Yeah. After the complaint in this
18   case was filed in January of 2023, have you
19   made requests to Universal McCann for
20   information in order to participate in this
21   lawsuit?
22       MR. RYAN: Counsel, I'm going to

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1  object. That's calling for privileged -- it's
2  calling for privileged communication. I would
3  --
4      MS. GOODMAN: It is precisely the
5  same kind of testimony you've already permitted
6  him to provide. I am not asking for an
7  instance --
8      MR. RYAN: Well, that was a mistake
9  on my part.
10     MS. GOODMAN: -- I am asking a
11 yes-or-no question, which is whether he has
12 asked -- and I'll restate my question.
13     BY MS. GOODMAN:
14     Q. Mr. Karpenko, after January of 2023,
15 have you requested information from Universal
16 McCann as a result of a conversation with your
17 counsel?
18     A. I would say I have requested and
19 received various information from Universal
20 McCann both tied to privilege and not tied to
21 privilege.
22     MS. GOODMAN: We're going to move to

Page 139

1  compel on those communications too.
2      BY MS. GOODMAN:
3      Q. Prior to January of 2023 in the
4  course of your work at the United States Postal
5  Service, did you ever develop any concerns that
6  Google was engaging in anticompetitive conduct?
7      A. I was unaware of any anticompetitive
8  conduct from Google.
9      Q. And in the course of your work as a
10 -- the executive director for brand marketing
11 at the postal service, did you ever develop any
12 concerns that you paid super-competitive prices
13 for Google products?
14     A. Can you clarify the -- the question.
15     Q. Yeah. In the course of your work as
16 executive director for brand marketing and
17 participating as an advertiser in the
18 advertising space, did you ever develop any
19 concerns that the postal service was paying too
20 much money for products or services from
21 Google?
22     MR. RYAN: Object to the form.

Page 140

1      THE WITNESS: In my role I have a
2  responsibility for hundreds of millions of
3  dollars of budget, so I am always keeping top
4  of mind that we're spending our investments or
5  our moneys appropriately and getting the best
6  value for that.
7      So from a macro perspective, we're
8  always looking at trying to get the best value.
9      BY MS. GOODMAN:
10     Q. I appreciate that answer. And my
11 question is a bit more specific.
12     Understanding that context that
13 you're always trying to get the best value for
14 USPS ad spend, my question is: Did you ever
15 develop any concerns in the course of your work
16 as executive director for brand marketing that
17 the postal service was paying too much money
18 for products or services offered by Google?
19     A. So --
20     MR. RYAN: Object to form.
21     THE WITNESS: So whether it's Google
22 or another entity, we -- we have a fixed budget

Page 141

1  and we have to work within what those rates are
2  offered for our -- for media. It could be in
3  any media format.
4      We take that budget. We take our
5  desired outcome, and we try to apply an
6  omni-channel approach to maximize or efforts.
7  If we find that something isn't giving us the
8  return on our investment or we are finding
9  other channels that might be more conducive, we
10 reallocate, and then we assign it to the UM
11 to -- to purchase for us.
12     We use a term called "return on ad
13 spend" that helps us try to maximize our
14 efforts in a way that if we're given a rate, we
15 are not necessarily able to negotiate with, so
16 we have to figure out how to have the same
17 impact within our campaigns for the limited
18 amount of dollars that we have.
19     BY MS. GOODMAN:
20     Q. All right. So based on your prior
21 two answers, I'm understanding your testimony
22 that you never developed a specific concern

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1    that the postal service was paying too much
2    money for products or services offered by
3    Google.
4        Am I understanding your testimony
5    correctly that you never had such a specific
6    concern as to Google?
7        MR. RYAN:  Objection to form and
8    foundation.
9        THE WITNESS:  So Google offers a lot
10   of products and services.  Our interaction with
11   Google is fairly vast at the postal service.
12   We do things beyond advertising and marketing
13   with them.
14       So when you're asking about products
15   and services it's a pretty broad ask for me.
16   So could you help narrow it down for me.
17       BY MS. GOODMAN:
18       Q.   Yes.  My question is specific to
19   Google products or services relating -- with
20   respect to digital advertising.  Okay.  So I
21   don't care about Gmail or Google Workspace or
22   Google Drive.

Page 143

1        Specific to products and services
2    related to digital advertising, did you, in
3    your capacity as executive director for brand
4    marketing at the postal service, based on your
5    knowledge and experience executing ad
6    campaigns, ever develop a specific concern that
7    the postal service was paying too much money
8    for Google products or services related to
9    digital advertising?
10       A.   So I might refrain that to say we --
11       Q.   Sir, I'm sorry to interrupt you, but
12   my question is my question, and I am asking you
13   to answer it as I have posed it rather than
14   reframing it and answering a different
15   question.
16       So can you please try to --
17       MR. RYAN:  The witness is trying to
18   answer your question, Martha.
19       BY MS. GOODMAN:
20       Q.   -- to answer my question as to any
21   specific concern as to Google specifically and
22   the prices paid for the use of Google products

Page 144

1    or services for digital advertising.
2        MR. RYAN:  I'm going to object to
3    form.  And the witness -- let the witness try
4    to answer the question.
5        THE WITNESS:  The postal service
6    doesn't directly use products from Google such
7    as DV360 for placement of advertising.  We pay
8    to place advertising on Google's environment so
9    that we can reach our customers.  I can't -- I
10   can't evaluate their products that enable one
11   to put media onto the various sites.
12       BY MS. GOODMAN:
13       Q.   And why can't you evaluate Google's
14   products that enable one to put media onto the
15   various sites?
16       A.   The postal service created a
17   contract with UM as a media agency of record
18   for media.
19       UM then places on behalf of the
20   postal service media in various environments,
21   and if they are utilizing Google's products to
22   do that, we don't -- we don't dictate that and

Page 145

1    we don't -- we don't really have a lot of
2    visibility on that part of the business.
3        Q.   In your capacity as executive
4    director for brand marketing for the postal
5    service, do you have any basis to know how much
6    money the postal service has paid to Universal
7    McCann for the use of Google products or
8    services related to digital advertising?
9        A.   I don't have knowledge of the fees
10   associated to use the products as much as our
11   organization has visibility on the media spent
12   in place for our various campaigns.
13       Q.   And so am I understanding you
14   correctly that you do not know at a more
15   granular level the fees paid by Universal
16   McCann, if any, directly to Google for the
17   placement of USPS digital advertising?
18       MR. RYAN:  I'm going to object to
19   form and foundation.
20       THE WITNESS:  I'm unaware of the
21   specific fees that UM and Google may take or
22   share in -- in that sense.  I am more aware of

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1  the media dollars spent that we -- we control
2  when we give over to Universal McCann.
3      BY MS. GOODMAN:
4      Q.   Okay.  Prior to January of 2023, had
5  you been aware of any investigation by the
6  Department of Justice into Google's advertising
7  businesses?
8      MR. RYAN:  Objection to form.
9      THE WITNESS:  I was not aware of
10 anything.
11     BY MS. GOODMAN:
12     Q.   Okay.  Have you received a
13 litigation hold related to this lawsuit?
14     A.   I believe I've received a litigation
15 hold for this effort.
16     Q.   Do you recall when you received a
17 litigation hold for this effort?
18     A.   I don't.
19     Q.   Do you recall whether it was before
20 or after the filing of the complaint?
21     A.   I don't know.
22     Q.   So do you know whether it was before

Page 147

1  or after January 24th of 2023?
2      A.   I don't know.
3      Q.   Okay.  What is your understanding of
4  what this lawsuit is about?
5      A.   It appears there's a complaint that
6  has been filed alleging Google having a
7  monopolistic market in being able to provide
8  and purchase media.
9      Q.   And what is your understanding of
10 the United States Postal Service's role in this
11 lawsuit?
12     A.   Postal service is a part of the
13 federal government.  Postal service has
14 purchased media.
15         I am here today to answer your
16 questions.
17     Q.   Do you have an understanding whether
18 the United States Postal Service would gain to
19 recover any money as a result of this lawsuit?
20     MR. RYAN:  I am going to instruct
21 the witness -- to the extent that you have
22 knowledge solely because of conversations with

Page 148

1  counsel, not to answer the question.
2      THE WITNESS:  I can't answer that
3  question.
4      BY MS. GOODMAN:
5      Q.   And is that because you only could
6  answer it based on conversations with counsel?
7      A.   I also am not the person assessing
8  damages, so I -- I wouldn't -- I wouldn't be
9  able to tell you what that expectation is.
10     Q.   Okay.  You read the complaint in
11 this -- filed in this lawsuit.  Am I correct in
12 that?
13     A.   Yes.
14     Q.   Did you understand it?
15     A.   To the best of a layperson's
16 perspective.
17     Q.   You're not just a layperson,
18 however, right?  You are participating in the
19 buying of digital advertising on behalf of the
20 U.S. Postal Service, right?
21     A.   I participate in buying the --
22 buying media for the postal service, but I am

Page 149

1  not counsel, so I -- I am not the one writing
2  the -- complaint.
3      Q.   Okay.  Did you understand -- strike
4  that.
5          Do you think that the complaint
6  accurately depicted the digital advertising
7  industry as you understand it from the course
8  of your work as executive director --
9      MR. RYAN:  I'm going to --
10     BY MS. GOODMAN:
11     Q.   -- of marketing for the United
12 States Postal Service?
13     MR. RYAN:  I'm going to object as to
14 form.  You're asking for his legal conclusions
15 essentially.
16     MS. GOODMAN:  No.  I am asking for
17 his lay witness testimony as to whether he
18 thought it accurately reflected what happens in
19 the advertising industry.
20     MR. RYAN:  Well, I will repeat my
21 object to form and foundation.
22     THE WITNESS:  From a high level, it

38 (Pages 146 - 149)

Page 150

1  appears to be a range.
2      BY MS. GOODMAN:
3      Q.  It appears to be a range.  What do
4  you mean by that?
5      A.  I -- I didn't see anything for me to
6  interpret that it would be too into the weeds
7  or, rather, too high of a perspective where it
8  wasn't succinct enough to where the complaint
9  was driving towards digital advertising.
10      Q.  Mr. Karpenko, I am not -- I
11  apologize, but I do not quite understand your
12  answer.
13      A.  Okay.
14      Q.  So what do you mean that you didn't
15  see anything for you to interpret that would be
16  too into the weeds or, rather, too high of a
17  perspective where it wasn't succinct enough to
18  where the complaint was driving towards digital
19  advertising?
20      MR. RYAN:  So I'm going to object to
21  form and foundation.
22      And to the extent that your answer

Page 151

1  would depend on communications with counsel, I
2  am going to instruct you not to answer.
3      THE WITNESS:  I have been instructed
4  not to answer, and I won't.
5      BY MS. GOODMAN:
6      Q.  He didn't instruct you not to
7  answer.  He just said if you had to rely on
8  communications with counsel, not to rely on
9  such communications.
10      And for the record, I don't believe
11  my question is asking you to rely on anything
12  that you learned in communications with
13  counsel --
14      MR. RYAN:  I'm going to object --
15      BY MS. GOODMAN:
16      Q.  -- I am going to trying to
17  understand your reaction to the complaint from
18  the perspective of your participation in the
19  advertising industry as a buyer of advertising
20  on behalf of the United States Postal Service.
21      MR. RYAN:  All right.  I'm going to
22  object to form and foundation.  You're arguing

Page 152

1  with the witness, and he gave you an answer,
2  and now you're arguing with him.
3      MS. GOODMAN:  Please state your
4  objection for the record, and no speaking --
5      MR. RYAN:  That you're arguing with
6  the -- you're arguing with the witness.
7      MS. GOODMAN:  No speaking
8  objections.
9      MR. RYAN:  You asked me to state my
10  objection for the record.
11      MS. GOODMAN:  Succinctly:  Object.
12  Form.
13      BY MS. GOODMAN:
14      Q.  You may proceed, Mr. Karpenko.
15      MS. GOODMAN:  I don't appreciate the
16  laughter at me, Mr. Ryan.
17      MR. RYAN:  Ryan.
18      MS. GOODMAN:  That's what I said,
19  Mr. Ryan.
20      MR. RYAN:  Okay.  I thought you said
21  Brian.
22      THE WITNESS:  I didn't write the

Page 153

1  complaint.  I read the complaint.  I don't have
2  enough visibility on the details within -- that
3  encompass that complaint to properly weigh in
4  on that.
5      BY MS. GOODMAN:
6      Q.  Okay.  So are you able to state
7  whether or not the complaint accurately --
8  accurately reflects what goes on in the digital
9  advertising space?
10      MR. RYAN:  Objection to form and
11  foundation.
12      THE WITNESS:  I'm not sure.
13      BY MS. GOODMAN:
14      Q.  Okay.  Other than lawyers for the
15  postal service or the Department of Justice,
16  have you discussed this lawsuit with anybody?
17      MR. RYAN:  Just to be clear, I
18  will -- I want to instruct the witness.  That
19  does not include conversations you've had with
20  counsel with other people, if there were other
21  people in the room.
22      THE WITNESS:  With other people.

39 (Pages 150 - 153)