# EXHIBIT 4
# FILED UNDER SEAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3

    _____
 4                                :
    UNITED STATES OF AMERICA, :
 5  et al.,                       :
                                  :
 6          Plaintiffs            :
                                  :
 7        v.                      : No.  1:23-cv-00108
                                  :
 8  GOOGLE, LLC,                  :
                                  :
 9          Defendants.           :
    _____:
10

11               Tuesday, August 15, 2023

12

             Video Deposition of ALLEN OWENS,
13
    taken at the Law Offices of Paul, Weiss, Rifkind,
14
    Wharton & Garrison LLP, 2001 K St NW, Washington,
15
    DC, beginning at 9:37 a.m. Eastern Standard Time,
16
    before Ryan K. Black, Registered Professional
17
    Reporter, Certified Livenote Reporter and Notary
18
    Public in and for the District of Columbia
19

20

21

22

23

24

25  Job No. CS6037511
```

Page 2

1  A P P E A R A N C E S :
2
3  UNITED STATES DEPARTMENT OF JUSTICE
   ANTITRUST DIVISION
4  BY: JIMMY MCBIRNEY, ESQ
      CHASE PRITCHETT, ESQ
5     ALVIN CHU, ESQ
      MARK SOSNOWSKY, ESQ  - Via Zoom
6     KATHERINE CLEMONS, ESQ  - Via Zoom
      JULIA TARVER-WOOD, ESQ  - Via Zoom
7  450 5th Street, N W
   Washington, DC 20530
8  202 514 2414
   jimmy mcbirney@usdoj gov
9  chase pritchett@usdoj gov
   alvin chu@usdoj gov
10 mark sosnowsky@usdoj gov
   katherine clemons@usdoj gov
11 julia tarver-wood@usdoj gov
12 Representing - The United States of America
13
14 PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP,
   BY: MARTHA L  GOODMAN, ESQ
15     LEAH HIBBLER, ESQ
   2001 K St NW,
16 Washington, DC
   202 223 7341
17 mgoodman@paulweiss com
   lhibbler@paulweiss com
18
   Representing - Google LLC
19
20
21
22
23
   ALSO PRESENT:
24
   Orson Braithwaite - Legal Videographer
25 Ann Bruck - Department of the Navy

Page 3

1        I N D E X
2  TESTIMONY OF:  ALLEN OWENS        PAGE
3  By Ms. Goodman...............................6
4      E X H I B I T S
5  EXHIBIT     DESCRIPTION        PAGE
6  Exhibit 52   a document Bates Numbered
                NAVY-ADS174029 through
7               NAVY-ADS174060.................62
8  Exhibit 53   a document Bates Numbered
                NAVY-ADS256935 through
9               NAVY-ADS257031.................97
10 Exhibit 54   a document Bates Numbered
                NAVY-ADS12756 through
11              NAVYV-ADS12800.................102
12 Exhibit 55   a document Bates Numbered
                NAVY-ADS241136 through
13              NAVY-ADS241143.................111
14 Exhibit 56   a document Bates Numbered
                NAVY-ADS15543 through
15              NAVY-ADS15622.................130
16 Exhibit 57   a document Bates Numbered
                NAVY-ADS19114 through
17              NAVY-ADS19182.................146
18 Exhibit 58   a document Bates Numbered
                NAVY-ADS45197 through
19              NAVY-ADS45206.................172
20 Exhibit 59   a document Bates Numbered
                NAVY-ADS103897 through
21              NAVY-ADS103900.................182
22 Exhibit 60   a document Bates Numbered
                NAVY-ADS28530 through
23              NAVY-ADS28531.................187
24
25

Page 4

1        THE VIDEOGRAPHER:  Good morning.  We're
2  going on the record at 9:37 a m. on August 15th,
3  2023.  Please note that the microphones are
4  sensitive and may pick up whispering and private
5  conversations.  Please mute your phones at this
6  time.  Audio and video recording will continue to
7  take place unless all parties agree to go
8  off the record.
9        This is Media Unit 1 of the
10 video-recorded deposition of Mr. Allen Owens
11 in the matter of United States, et al., versus
12 Google LLC, filed in the United States District
13 Court, Eastern District of Virginia, Alexandria
14 Division.  Case Number 1:23-cv-00108-LMB-JFA.
15       My name is Orson Braithwaite,
16 representing Veritext Legal Solutions, and I'm
17 the videographer.  The court reporter is Ryan
18 Black from the firm Veritext Legal Solutions.
19       Counsel will now state their appearances
20 and affiliations for the record.
21       MS. GOODMAN:  Martha Goodman of the law
22 firm Paul Weiss on behalf of Google LLC, and I'm
23 joined by my colleague Leah Hibbler.
24       MR. MCBIRNEY:  Jim McBirney on behalf of
25 the Department of Justice on behalf of the United

Page 5

1  States and the witness.
2        MR. PRITCHETT:  Chase Pritchett on
3  behalf of the United States.
4        MR. CHU:  Alvin Chu on behalf of the
5  United States.
6        MS. GOODMAN:  And then will any
7  attorneys appearing remotely please state your
8  presence.
9        MR. SOSNOWSKY:  Mark Sosnowsky, U.S.
10 Department of Justice.
11       MS. CLEMONS:  Katherine Clemons,
12 Department of Justice.
13       MS. GOODMAN:  Is there any --
14       MS. BRUCK:  Ann Bruck, Department of
15 Navy.
16       THE VIDEOGRAPHER:  We have a Ms. Wood.
17       MS. TARVER-WOOD:  Yes.  This is Julia
18 Tarver-Wood from DOJ.  I'm not officially
19 entering an appearance.  I'll be in and out
20 throughout the day.
21       THE VIDEOGRAPHER:  Thank you.  Will the
22 court reporter please swear in the witness?
23             *   *   *
24 Whereupon --
25       ALLEN OWENS,

2 (Pages 2 - 5)

1    A.  Yes.
2    Q.  Was there anybody else in person?
3    A.  No.
4    Q.  Did anybody -- did Ms. Ann attend by
5  phone or virtually this meeting on Monday?
6    A.  Yes.
7    Q.  Was she present the whole time?
8    A.  I'm not certain.
9    Q.  Okay.  For what period of time are you
10  certain that Ms. Ann was in attendance at the
11  meeting on Monday?
12    A.  There were multiple technical glitches,
13  so, again, I'm -- I'm not certain.
14    Q.  How about on Sunday, did Ms. Ann attend
15  the meeting all of Sunday?
16    A.  Again, I'm not certain on that either,
17  for the same reason.
18    Q.  Okay.  Did you review documents on
19  Monday?
20    A.  Yes.
21    Q.  Approximately how many?
22    A.  I -- I don't recall an exact number of
23  documents.
24    Q.  Did any of the documents that you
25  reviewed help you remember things that you hadn't

1  remembered prior to reading the document?
2    A.  No more so than anytime you review
3  anything.  There was nothing forgotten that was
4  then remembered.
5    Q.  Okay.  And on Sunday approximately how
6  many documents did you review?
7    A.  I don't recall an exact number.
8    Q.  Can you give an estimate of the number
9  of documents you reviewed on Sunday or Monday?
10    A.  I can't.  I -- I don't recall an exact
11  number, so I don't want to guess.
12    Q.  Was it more than a hundred documents --
13    A.  No.
14    Q.  -- that you reviewed on Sunday or
15  Monday?
16    A.  No.
17    Q.  Okay.  Was it more than 50 documents
18  that you reviewed on Sunday or Monday?
19    A.  I don't recall.
20    Q.  So your best recollection sitting here
21  today is somewhere less than a hundred but you
22  can't specify any further; is that correct?
23    A.  That is correct.
24    Q.  Okay.  Other than the counsel you have
25  identified, have you discussed your deposition

1  with anybody else?
2    A.  No.
3    Q.  So you have not discussed the fact of
4  your deposition with your supervisor, for
5  example?
6    A.  The fact of my deposition, yes, for
7  logistics scheduling purposes.
8    Q.  Okay.  So who have you discussed the
9  fact of your deposition with, if anyone?
10    A.  Sure.  It would be my immediate chain of
11  command at Navy Recruiting Command.
12    Q.  And who is your immediate chain of
13  command at Navy Recruiting Command?
14    A.  It would be the chief of staff, Captain
15  Reyes; the executive director, Dr. Sullivan; and
16  the Admiral, Lex Walker.
17    Q.  And you spoke with each of these
18  individuals about the fact of your deposition;
19  is that correct?
20    A.  Yes.
21    Q.  And what did you tell them?
22    A.  That I would be out of office.
23    Q.  What did they say in response?
24    A.  They understood.
25    Q.  Do they know why you are -- for what

1  purpose you are out of office?
2    A.  For the deposition.
3    Q.  Do they know what the deposition is
4  connect -- in connection with?
5    A.  I'm not certain what they do or don't
6  know, other than what I've told them.
7    Q.  Okay.  And did you tell them what the
8  purpose of the deposition was?
9    A.  In very general terms.
10    Q.  And so what did you tell them in very
11  general terms that the purpose of this deposition
12  was?
13    A.  I don't recall specifically what I told
14  them.
15    Q.  How about generally, as you -- as you
16  said, you recall in general -- you said something
17  in general terms?
18    A.  That it involved Google and Department
19  of Justice and they needed my information.
20    Q.  Anything else that you told anybody in
21  your chain of command about the purpose of this
22  deposition?
23    A.  Not that I recall.
24    Q.  What did they say in response?
25    A.  That they understood.

Page 18

1    Q.  Did you say anything more about how
2  -- what the -- what information you needed to
3  provide in this deposition that involved Google
4  and the Department of Justice?
5      MR. MCBIRNEY:  Objection.  Asked and
6  answered.
7  BY MS. GOODMAN:
8    Q.  You may answer.
9    A.  I don't recall any additional
10  information that I may have given them at this
11  time.
12    Q.  Okay.  Did you say anything about it
13  being an antitrust lawsuit?
14    A.  I don't recall.
15    Q.  Aside from the fact of your deposition,
16  is anybody in your chain of command aware of the
17  Navy's involvement in this lawsuit?
18      MR. MCBIRNEY:  Objection; foundation.
19      THE WITNESS:  I don't understand the
20  question. Can you clarify?
21  BY MS. GOODMAN:
22    Q.  The individuals you've identified in
23  your chain of command, with respect to those
24  individuals, to your knowledge, do they know
25  about the Navy's involvement in this lawsuit?

Page 19

1      MR. MCBIRNEY:  Same objection.
2      THE WITNESS:  Yeah.  I'm -- I'm not
3  certain what they do or don't know.
4  BY MS. GOODMAN:
5    Q.  Okay.  Have you discussed fact of this
6  lawsuit with anybody in your chain of command?
7      MR. MCBIRNEY:  Objection.  Asked and
8  answered.
9      THE WITNESS:  Yeah.  As I stated
10  earlier, I spoke to them in general terms about
11  what I was going to do.
12  BY MS. GOODMAN:
13    Q.  And when did you speak with the
14  individuals in your chain of command about what
15  you were going to do?
16    A.  At various times.  I don't recall exact
17  dates and times.
18    Q.  How about generally?  Can you describe
19  generally when you spoke with individuals in your
20  chain of command about your participation in this
21  lawsuit?
22    A.  I can't give any specific dates, because
23  I -- I don't recall specific dates.
24    Q.  I'm not asking for specific dates, sir.
25  I'm asking for general recollection of the time

Page 20

1  frame.  Was it the fall?  Winter?  Spring?
2  Was it April?  May?  June?  Was it 2023?  Was
3  it 2022?  What's your best recollection of the
4  approximate time that you recall speaking with
5  individuals in your chain of command about your
6  participation in this lawsuit?
7      MR. MCBIRNEY:  Objection to the form of
8  the question.
9      THE WITNESS:  My best recollection is
10  that it was earlier this year.
11  BY MS. GOODMAN:
12    Q.  Would it have been as early an January
13  2023?
14    A.  I don't recall.  I don't recall how
15  early it was.
16    Q.  Okay.  Going back to the first time you
17  recall speaking with anybody in your chain of
18  command about your participation in this lawsuit,
19  what was discussed?
20      MR. MCBIRNEY:  Objection; foundation.
21      THE WITNESS:  I don't recall the
22  particulars of what was discussed.
23  BY MS. GOODMAN:
24    Q.  How about the generals of what was
25  discussed?

Page 21

1    A.  I -- I don't recall the details of what
2  was discussed either in general terms or direct
3  terms.
4    Q.  So other than the fact of this lawsuit,
5  can you say anything about what you discussed
6  with anybody in your chain of command about your
7  participation in this lawsuit?
8    A.  I cannot.
9    Q.  Okay.  Other than individuals in your
10  chain of command, is there anybody else that you
11  have discussed this lawsuit with, other than
12  lawyers?
13    A.  Yes.
14    Q.  Who?
15    A.  In the gathering of -- in the gathering
16  of information, at the direction of counsel, I
17  spoke with a few members of the ad agency, the
18  VMLY&R.
19    Q.  Which members of the ad agency VMYLR
20  [sic] did you speak with?
21    A.  Sandra Mouio.  That's the one I can
22  remember directly having a conversation with.
23    Q.  Anybody else that you remember having
24  any conversation with at the ad agency?
25    A.  Not that I recall.

6 (Pages 18 - 21)

Page 22

1    Q.  How about Chris Edmondson?
2    A.  Potentially Chris Edmondson.
3    Q.  Why did you say potentially?
4    A.  Because he's the supervisor of the Navy
5  account, so I may have spoke to him before I
6  spoke to Sandra.
7    Q.  And does Sandra work for VMYLR [sic] or
8  a different agency?
9    A.  She works under VMLY&R, but I believe
10  her company is Wavemaker.
11   Q.  What did you speak about with Sandra in
12  connection with this lawsuit?
13       MR. MCBIRNEY:  Caution the witness not
14  to disclose communications that were at the
15  direction of counsel.
16  BY MS. GOODMAN:
17   Q.  You may answer.
18       MR. MCBIRNEY:  If you can answer the
19  question without disclosing communications or
20  actions taken at the direction of counsel, you
21  can answer the question.  If you can't, then I
22  instruct you not to answer.
23       THE WITNESS:  Sure.  Can you repeat the
24  question then?
25  BY MS. GOODMAN:

Page 23

1    Q.  What did you speak with and Sandra about
2  in connection with this lawsuit?
3        MR. MCBIRNEY:  Same instruction.
4        THE WITNESS:  In gathering information
5  at the request of counsel, I spoke with her about
6  certain data that I understand to be privileged
7  information since it was at the direction of
8  counsel.
9  BY MS. GOODMAN:
10   Q.  So is it your position that data in
11  possession of VMLY&R is privileged information?
12       MR. MCBIRNEY:  Objection.  Calls for a
13  legal conclusion.  Argumentative.
14       THE WITNESS:  It's my understanding that
15  in the gathering of information from VMLY&R at
16  the direction of counsel that that would be
17  privileged information.
18  BY MS. GOODMAN:
19   Q.  Okay.  And what is that understanding
20  based on?
21       MR. MCBIRNEY:  Objection.  Instruct
22  witness not to answer.
23  BY MS. GOODMAN:
24   Q.  Can you answer that question without
25  revealing any attorney-client privileged

Page 24

1  communications?
2    A.  I'm going to follow the direction of
3  counsel.
4    Q.  My question is a different one, --
5    A.  I'm sorry.
6    Q.  -- which is whether you can answer
7  the question I posed without relying on any
8  attorney-client communications?
9    A.  I cannot.
10   Q.  Okay.  So prior -- have you ever
11  received any training on the attorney-client
12  privilege?
13   A.  Not that I recall.
14   Q.  Okay.  So is your understanding of the
15  attorney-client privilege only as a result of
16  your participation in this lawsuit?
17   A.  Yes.
18   Q.  Okay.  How about with respect to the
19  Attorney Work Product Doctrine?  Do you have any
20  understanding of what that doctrine covers,
21  outside of your participation in this lawsuit?
22   A.  No, I've never had any legal training so
23  I -- I do not.
24   Q.  How about training in the course of your
25  work at the Naval Recruiting Command about the

Page 25

1  attorney-client privilege or the Attorney Work
2  Product Doctrine?
3    A.  Not that I recall.
4    Q.  Okay.  Did Ms. -- did Sandra provide you
5  any data?
6    A.  Yes.
7    Q.  What kind of data did she provide you?
8        MR. MCBIRNEY:  Objection.
9        THE VIDEOGRAPHER:  Counsel, your
10  microphone.
11       MR. MCBIRNEY:  Sorry.  I guess we're
12  pausing.
13       MS. GOODMAN:  I was just covering my
14  microphone.
15       MR. MCBIRNEY:  Oh, okay.  Objection.
16  Sorry.  Can you reask the question?
17       MS. GOODMAN:  Yeah.  Why don't we do
18  that.
19       MR. MCBIRNEY:  Yeah.
20  BY MS. GOODMAN:
21   Q.  Did Sandra provide you any data?
22   A.  Yes.
23   Q.  What kind of data did she provide you?
24       MR. MCBIRNEY:  Objection.  Privileged.
25  Instruct not to answer.

7 (Pages 22 - 25)

Page 26

1    BY MS. GOODMAN:
2        Q.  All right.  Well, are you going to
3    follow that instruction?
4        A.  Yes.
5        Q.  Did she provide you any facts?
6        A.  Yes.
7        Q.  And what facts did she provide you?
8        A.  The information she provided me is, my
9    understanding, would be privileged information.
10   And I'm following my counsel's instruction not
11   to -- not to disclose that.
12       Q.  Okay.  Was any attorney present during
13   your conversation with Sandra?
14       A.  No.
15       Q.  Was anybody, other than yourself and
16   Sandra, a participant in this conversation?
17       A.  Not that I recall.
18       Q.  How many conversations did you have with
19   Sandra in connection with this lawsuit?
20       A.  I don't recall.
21       Q.  Can you approximate?
22       A.  No.
23       Q.  Was it more than a hundred?
24       A.  No.
25       Q.  Was it more than 20?

Page 27

1        A.  I don't recall an exact number.
2        Q.  Can you -- can you answer whether it was
3    more than 20?
4        A.  I don't want to guess at a number, so
5    I -- I can't recall the exact number.  In -- in
6    general terms, I can't recall.
7        Q.  So it's somewhere less than a hundred,
8    but besides less than a hundred conversations
9    with Sandra at Wavemaker you can't recall how
10   many times you spoke with her in connection with
11   this lawsuit; is that correct?
12       A.  That's correct.
13       Q.  Okay.  When do you recall
14   first -- what's your first recollection of a
15   conversation with Sandra?  When did that occur?
16       MR. MCBIRNEY:  Objection; vague.
17       THE WITNESS:  She joined the agency in
18   2016.  It would have been in 2016.
19   BY MS. GOODMAN:
20       Q.  Okay.  How about in connection with this
21   lawsuit?  When did you first have a conversation
22   with Sandra in connection with this lawsuit?
23       A.  I don't recall the exact date.
24       Q.  What's your best recollection?
25       A.  Earlier this year.

Page 28

1        Q.  Was it before February of 2023?
2        MR. MCBIRNEY:  Objection; foundation.
3        THE WITNESS:  I don't recall.
4    BY MS. GOODMAN:
5        Q.  Did you exchange emails with Sandra in
6    connection with this lawsuit?
7        A.  I may have, but I don't recall.
8        Q.  Was it your practice to pick up the
9    phone and call her in connection with this
10   lawsuit rather than exchanging emails?
11       A.  I --
12       MR. MCBIRNEY:  Objection; foundation.
13       THE WITNESS:  Yeah.  I didn't have an
14   established practice.  I -- sometimes I call.
15   Sometimes I text.  Sometimes I email.
16   BY MS. GOODMAN:
17       Q.  Okay.  And so is it accurate to say that
18   you text Sandra in connection with the work she
19   provides -- or that she performed for the Naval
20   Recruiting Command?
21       A.  No.
22       Q.  Okay.  Well, --
23       A.  Can you --
24       Q.  -- you said sometimes you text, so I
25   want to understand --

Page 29

1        A.  Sure.
2        Q.  -- under what circumstances do you text
3    Sandra?
4        MR. MCBIRNEY:  Object to the form of the
5    question.
6        THE WITNESS:  Yeah.  I was speaking
7    -- you asked if I -- in general terms how I
8    conducted business.  So what I was saying is,
9    in general terms, those are the methods of
10   communication.  That wasn't in reference to
11   Sandra directly.
12   BY MS. GOODMAN:
13       Q.  Okay.  So with respect to Sandra, how do
14   you communicate with Sandra?
15       A.  Phone.  Email.
16       Q.  But you don't text her?
17       A.  I have texted Sandra, yes.
18       Q.  In connection with work purposes?
19       A.  Not in regards to this.
20       Q.  When you say "this," what do you mean?
21       A.  To this deposition or this case.
22       Q.  Okay.  How about with respect to the
23   work that Wavemaker conducts as an ad agency for
24   the Navy, do you text her about that work?
25       A.  No.

8 (Pages 26 - 29)

1    Q.  So what do you text Ms. Sandra about?
2    A.  If I texted Ms. Sandra, I don't recall
3  specifically what it would be about, but usually
4  it's just general logistics stuff.
5    Q.  What do you mean by "general logistics"?
6    A.  "Gonna be late to a meeting."  That type
7  of stuff.
8    Q.  Anything substantive with respect to the
9  work that Ms. Sandra performs on behalf of the
10  Navy Recruiting Command?
11    A.  No.
12    Q.  When you spoke with Sandra in connection
13  with this lawsuit, did you tell her that the
14  conversation was privileged?
15    A.  I don't recall.
16    Q.  Did you tell her why you were asking her
17  for information?
18    A.  I -- I don't recall.
19    Q.  What do you recall telling Sandra in
20  your conversations in connection with this
21  lawsuit?
22    MR. MCBIRNEY:  Objection.  Calls for
23  privileged information.  Instruct the witness not
24  to answer.
25    MS. GOODMAN:  Can you explain the basis

1  of your objection, please?
2    MR. MCBIRNEY:  Absolutely.  It is the
3  attorney-client work product.  He's already
4  testified that he spoke with Sandra at the
5  request of counsel to obtain information at the
6  request of counsel.  The specifics of that
7  communication are protected.
8    MS. GOODMAN:  And so is it your
9  position that I cannot ask Sandra about these
10  communications, as well?
11    MR. MCBIRNEY:  That would be our
12  position, correct.
13    MS. GOODMAN:  Okay.  Well, we're going
14  to take that up with the Court.
15  BY MS. GOODMAN:
16    Q.  Sir, you mentioned also Chris Edmondson,
17  that you potentially spoke with him.  Do you
18  recall that testimony?
19    A.  Yes.
20    Q.  Okay.  What, if anything, do you recall
21  speaking about with Mr. Edmonson with respect to
22  this litigation?
23    A.  I don't recall the details of the
24  conversation.
25    Q.  How about generally?  What do you

1  recall?
2    A.  Generally, all I recall is needing
3  information to answer the questions for the DOJ
4  attorneys.
5    Q.  And did you tell Mr. Edmondson why you
6  were asking him for information?
7    A.  I -- I don't recall what I exactly told
8  him.
9    Q.  What is -- when do you first recall
10  speaking with Mr. Edmondson in connection
11  -- about this lawsuit?
12    MR. MCBIRNEY:  Objection; foundation.
13  Assumes facts not in evidence.
14  BY MS. GOODMAN:
15    Q.  You may answer.
16    A.  Earlier -- earlier this year.
17    Q.  Okay.  Was it before February of 2023?
18    A.  I don't recall.
19    Q.  What counsel directed you to have these
20  conversations with individuals at your ad agency?
21    A.  I don't recall.  I don't recall exactly
22  which counsel was -- was on the conversations.
23    Q.  Can you recall generally what lawyers
24  were involved in these communications?
25    A.  Sure.  The -- the only attorney I'm

1  certain of was Mr. Chase.
2    Q.  Okay.  Any others?
3    A.  No.  I -- I can't recall any others.
4    Q.  Were there any lawyers from the Navy
5  involved in these communications?
6    A.  I don't recall.
7    Q.  Do you recall speaking with anybody
8  within the Navy Recruiting Command who are your
9  subordinates about this lawsuit?
10    A.  Yes.
11    Q.  Who?
12    A.  Ms. Dean Stewart-Curry, my director of
13  resources.
14    Q.  Anyone else?
15    A.  No.
16    Q.  How about Adelina Lozzi, did you speak
17  with her about this lawsuit?
18    A.  Yeah.  She's not one of my employees,
19  but, yes.
20    Q.  So whether they're your subordinate or
21  not, we've talked about the individuals in your
22  chain of command, Ms. Stewart-Curry and
23  Ms. Lozzi.  Is there anybody else at the Navy
24  Recruiting Command that you've spoken with about
25  this lawsuit?

9 (Pages 30 - 33)

1    A.   Not that I recall.
2    Q.   And what did you and Ms. Stewart-Curry
3  discuss about this lawsuit?
4    A.   Responses to DOJ inquiries for
5  information.
6    Q.   Okay.  And when did you have these
7  discussions with Ms. Stewart-Curry?
8    A.   At various times.
9    Q.   What's your best recollection of such
10  various times that you had these discussions with
11  Ms. Stewart-Curry?
12    A.   Throughout earlier this year.
13    Q.   Any conversations with her about this
14  lawsuit prior to February of 2023 that you
15  recall?
16    MR. MCBIRNEY:  Objection; foundation.
17    THE WITNESS:  Not that I recall.  I
18  -- I'm -- just earlier this year.  I don't recall
19  specific dates.
20  BY MS. GOODMAN:
21    Q.   Okay.  And same questions with respect
22  to Ms. Lozzi.  When do you -- when did you have
23  conversations with her about this lawsuit?
24    A.   I don't recall specific dates.  Earlier
25  this year.

1    Q.   Okay.  What did you and Ms. Lozzi
2  discuss about this lawsuit?
3    MR. MCBIRNEY:  Caution the witness not
4  to disclose communications with counsel or
5  directions relayed from counsel.  If you could
6  answer the question without disclosing those
7  communications, you can answer.  Otherwise, I
8  instruct you not to answer.
9  BY MS. GOODMAN:
10    Q.   Can you answer the question?
11    A.   I cannot.  I will follow counsel's
12  direction.
13    Q.   So every conversation you've had with
14  Ms. Lozzi in connection with this lawsuit are --
15  were in the presence of an attorney or at the
16  direction of counsel.  Is that your testimony?
17    A.   I don't know.
18    Q.   Okay.  Do you recall any conversation
19  sitting here today that did not involve an
20  attorney or that were not at the direction of
21  counsel with Ms. Lozzi?
22    A.   Sitting here today, I -- I cannot recall
23  any that would have been outside of the direction
24  of counsel.
25    Q.   Okay.  Did you tell Ms. Lozzi you were

1  being deposed?
2    A.   I don't recall.
3    Q.   Did you tell Ms. Stewart-Curry that you
4  were being deposed?
5    A.   Yes.
6    Q.   Okay.  So this is another individual
7  with whom you've discussed your deposition; is
8  that correct?
9    MR. MCBIRNEY:  Objection; argumentative.
10    THE WITNESS:  The discussions that I had
11  with Ms. Stewart-Curry were gathering responses
12  to my counsel.  So I believe that the content
13  that -- with what we would have discussed would
14  have been privileged.
15  BY MS. GOODMAN:
16    Q.   Okay.  But with respect to the
17  individuals that you spoke about your deposition
18  with, Ms. Lozzi is one such individual, correct?
19    A.   I -- I can't recall.
20    Q.   Okay.  So we've talked about two
21  individuals at the ad agency, individuals
22  within your chain of command, your subordinate
23  Ms. Stewart-Curry and another individual, Ms.
24  Lozzi at the Navy Recruiting Command, with whom
25  you've had conversations about this lawsuit.  Is

1  that a fair summary of what you've testified to
2  so far?
3    MR. MCBIRNEY:  Object to the form of the
4  question.
5    THE WITNESS:  I've testified that I have
6  had discussions with my chain of command.  I've
7  had discussions with Ms. Stewart-Curry.  I've had
8  conversations with Ms. Lozzi, although I don't
9  recall the specifics of those conversations and
10  whether or not they was -- they were related to
11  the deposition.  And that's my testimony.
12  BY MS. GOODMAN:
13    Q.   And your testimony also includes your
14  conversations with individuals at the ad agency;
15  is that correct?
16    MR. MCBIRNEY:  Object to the form of the
17  question.
18    THE WITNESS:  My testimony is I
19  had conversations with Ms. Sandra Mouio and
20  Mr. Edmondson.
21  BY MS. GOODMAN:
22    Q.   About this lawsuit, correct?
23    A.   Yes.
24    Q.   Okay.  And with respect to all of the
25  individuals that we've gone over today, are there

Page 38

1　any other individuals with whom you have spoken
2　about this lawsuit?
3　　A.　Not that I recall.
4　　Q.　With respect to all of the individuals
5　we've gone over so far today, at what point in
6　time did you first have a conversation about this
7　lawsuit with any of them, to the best of your
8　recollection?
9　　A.　Earlier this year, to the best of my
10　recollection.  I don't recall a specific date.
11　　Q.　Okay.  Do you have any reason to believe
12　you had any conversations about this lawsuit with
13　any of the individuals we've discussed here today
14　prior to February of 2023?
15　　　　MR. MCBIRNEY:  Objection; foundation,
16　and to form.
17　　　　THE WITNESS:  As I stated earlier, I
18　don't recall the earliest conversations that I
19　had about this lawsuit.  I -- I don't recall
20　specific dates.
21　BY MS. GOODMAN:
22　　Q.　Okay.  Do you recall any conversation
23　about this lawsuit with any of the individuals
24　that we've discussed here today taking place in
25　2022?

Page 39

1　　　　MR. MCBIRNEY:  Objection.  Asked and
2　answered.  Foundation.
3　　　　THE WITNESS:  And as I stated earlier,
4　I don't recall the earliest dates of having
5　conversations about the lawsuit.
6　BY MS. GOODMAN:
7　　Q.　Well, your testimony was that you
8　recalled having conversations earlier this year,
9　meaning 2023, correct?
10　　A.　Correct.
11　　Q.　Okay.  So earl -- other than earlier
12　this year, can you pinpoint in time your first
13　conversations with anybody in connection with
14　this lawsuit?
15　　　　MR. MCBIRNEY:  Objection.  Asked and
16　answered.  Foundation.
17　　　　THE WITNESS:  As I stated earlier,
18　I cannot recall the earliest dates, other than
19　sometime earlier this year of 2023, of where I
20　had conversations about this lawsuit.
21　BY MS. GOODMAN:
22　　Q.　Okay.  What is your understanding of
23　what this lawsuit is about?
24　　　　MR. MCBIRNEY:  Instruct the witness not
25　to disclose communications with counsel.  If you

Page 40

1　can answer that question without disclosing
2　privileged communications, you can answer.
3　Otherwise, I instruct you not to answer.
4　　　　THE WITNESS:  My only knowledge is via
5　privileged communications with counsel and I have
6　no knowledge outside of that.
7　BY MS. GOODMAN:
8　　Q.　Did you read the complaint filed in this
9　matter?
10　　A.　I did not.
11　　Q.　Why not?
12　　　　MR. MCBIRNEY:  Object to form.
13　　　　THE WITNESS:  I --
14　　　　MS. GOODMAN:  What's the form objection?
15　　　　MR. MCBIRNEY:  Vague.
16　　　　MS. GOODMAN:  Okay.
17　BY MS. GOODMAN:
18　　Q.　Why didn't you read the complaint filed
19　in this lawsuit?
20　　A.　I don't have a reason for not reading
21　it.  I just didn't seek it out.
22　　Q.　Do you have any interest, sitting here
23　today, in reading the complaint filed in this
24　lawsuit?
25　　A.　No.

Page 41

1　　Q.　Why not?
2　　　　MR. MCBIRNEY:  Objection; vague.
3　　　　THE WITNESS:  Can you be more specific
4　with the question?
5　BY MS. GOODMAN:
6　　Q.　Why do you not have any interest,
7　sitting here today, in reading the complaint
8　filed in this lawsuit?
9　　　　MR. MCBIRNEY:  Same objection.
10　　　　THE WITNESS:  I just don't.
11　BY MS. GOODMAN:
12　　Q.　Is it important to you what the
13　complaint says?
14　　A.　It won't -- it won't affect my truthful
15　testimony, so, no.
16　　Q.　Okay.  For purposes of the work you do
17　for the Navy Recruiting Command, is it important
18　for you to understand what the complaint says?
19　　　　MR. MCBIRNEY:  Objection; foundation.
20　　　　THE WITNESS:  I don't think -- well, can
21　-- can you rephrase that question?  I'm not sure
22　I understand.
23　BY MS. GOODMAN:
24　　Q.　For the purposes of the work you do at
25　Navy Recruiting Command, is it important for you

11 (Pages 38 - 41)

Page 42

1 to understand what the complaint says?
2    MR. MCBIRNEY:  Same objection.
3    THE WITNESS:  No.
4 BY MS. GOODMAN:
5    Q.  Okay.  For the purposes of the work you
6 do at Navy Recruiting Command, is it important
7 for you to understand what this lawsuit is about?
8    MR. MCBIRNEY:  Objection; foundation.
9    THE WITNESS:  No.
10 BY MS. GOODMAN:
11    Q.  Why is it not important for you to
12 understand what the complaint says for the
13 purposes of the work you do at the Navy
14 Recruiting Command?
15    MR. MCBIRNEY:  Objection; foundation.
16    THE WITNESS:  I don't believe it has an
17 impact on my work.
18 BY MS. GOODMAN:
19    Q.  And why is it not important for you to
20 understand what this lawsuit is about for the
21 purposes of the work you do at Navy Recruiting
22 Command?
23    MR. MCBIRNEY:  Objection; foundation.
24    THE WITNESS:  Is that -- is that the
25 same question you just asked?  I apologize.  Can

Page 43

1 you rephrase that?  I understand it to be the
2 same the questions question you just asked.
3 BY MS. GOODMAN:
4    Q.  Sure.  My first question was what the
5 complaint says, and my next question is why is it
6 not important for you to understand what this
7 lawsuit is about for the purposes of your work at
8 Navy Recruiting Command.
9    MR. MCBIRNEY:  Same objection.
10    THE WITNESS:  I don't believe it would
11 impact my work.
12 BY MS. GOODMAN:
13    Q.  And why do you think that understanding
14 what the complaint says or would what this
15 lawsuit is about would not impact your work?
16    MR. MCBIRNEY:  Objection; foundation.
17 And asked and answered.
18    THE WITNESS:  I just don't believe it
19 would impact my work.
20 BY MS. GOODMAN:
21    Q.  And my question is why wouldn't it
22 impact your work?
23    MR. MCBIRNEY:  Same objections.
24    THE WITNESS:  It would not change how I
25 operate.

Page 44

1 BY MS. GOODMAN:
2    Q.  Okay.  And so am I correct -- is it your
3 testimony that your only understanding of what
4 this lawsuit is about comes from conversations
5 with lawyers?  Is that accurate?
6    A.  That is accurate.
7    Q.  Okay.  And, to your knowledge, what is
8 the role of the Navy in this lawsuit?
9    A.  To my knowledge, the role of Navy
10 is that we purchase media, some of which from
11 Google.
12    Q.  And what is the significance of the
13 media that the Navy purchases, some of which is
14 from Google, to this lawsuit?
15    MR. MCBIRNEY:  Objection; foundation.
16 And to the extent it calls for privileged
17 information, I'd instruct you not to answer.
18 If you can answer without disclosing privileged
19 information, you can answer the question.
20    THE WITNESS:  Yeah.  I cannot answer
21 that question without disclosing privileged
22 information.
23 BY MS. GOODMAN:
24    Q.  And so we've talked about the Navy's
25 role in this lawsuit.  What is your role in this

Page 45

1 lawsuit?
2    MR. MCBIRNEY:  Objection; vague.
3    THE WITNESS:  Yeah.  Can you be more
4 specific?
5 BY MS. GOODMAN:
6    Q.  Why are you participating in this
7 lawsuit?
8    MR. MCBIRNEY:  Objection.  Assumes facts
9 not in evidence, and vague.
10    THE WITNESS:  Yeah.  I'm here at the --
11 the request of my counsel to be here to give this
12 deposition.
13 BY MS. GOODMAN:
14    Q.  Had counsel not requested your
15 participation, would you seek to participate in
16 this lawsuit?
17    MR. MCBIRNEY:  Objection.  Calls for
18 speculation.
19    THE WITNESS:  Can -- can you be more
20 specific with that question?
21 BY MS. GOODMAN:
22    Q.  Is the only reason you're participating
23 in this lawsuit because counsel requested your
24 participation?
25    A.  I'm participating in this -- in this

12 (Pages 42 - 45)

Page 46

1  lawsuit because of my role with the Navy and that
2  I've been requested to be here.
3      Q.  Okay.  So other than your role with the
4  Navy and that you've been requested to be here,
5  is there any other reason you're participating in
6  this lawsuit?
7          MR. MCBIRNEY:  Object to the form of the
8  question.
9          THE WITNESS:  There's no other reason
10 that I'm here.
11 BY MS. GOODMAN:
12     Q.  When, to your knowledge -- strike that.
13         How did you learn about this lawsuit?
14     A.  I believe it was via email.
15     Q.  From who?
16     A.  I don't recall.
17     Q.  Do you recall what agency sent you an
18 email about this lawsuit?  Was it within the
19 Navy?  Was it DOJ?  Was it somewhere -- was it
20 the ad agency?
21     A.  No.  It -- it was from -- it was from a
22 government source.  I don't recall if it was DOJ
23 or my chain of command.  I -- I -- I don't
24 recall.
25     Q.  Okay.  And approximately when did you

Page 47

1  receive this email from which you learned about
2  this lawsuit?
3      A.  I don't recall the exact date.
4      Q.  How about approximately?
5      A.  I believe it was earlier this year, --
6      Q.  Okay.
7      A.  -- but I don't recall an exact date.
8      Q.  Other than earlier this year, can you
9  pinpoint in time, more specifically, when you
10 learned about this lawsuit from an email?
11     A.  I cannot.
12     Q.  Do you know who made the decision for
13 the Navy to participate in this lawsuit?
14     A.  I do not.
15     Q.  Based on your knowledge and
16 understanding of the organizational structure of
17 the Navy, what is your best understanding of who
18 would need to be involved in making a decision
19 about the Navy's participation in this lawsuit?
20         MR. MCBIRNEY:  Objection; foundation.
21 Calls for speculation.
22         THE WITNESS:  I have no idea who would
23 need to make that decision.
24 BY MS. GOODMAN:
25     Q.  When you first learned about this

Page 48

1  lawsuit from an email, were you asked to
2  participate in the lawsuit --
3          MR. MCBIRNEY:  Objection; foundation.
4  BY MS. GOODMAN:
5      Q.  -- at that time?
6      A.  I don't recall the contents of the email
7  and what it -- what it said or asked of me.
8      Q.  When you received an email about this
9  lawsuit, you said it was from a government
10 source, correct?
11     A.  I believe so.
12     Q.  Okay.  To the best of your recollection,
13 was it from an attorney?
14     A.  Ma'am, I don't recall who sent the
15 email.
16     Q.  What was your reaction upon receiving
17 this email?
18         MR. MCBIRNEY:  Objection; foundation.
19         THE WITNESS:  Yeah.  I -- I don't
20 recall.
21 BY MS. GOODMAN:
22     Q.  Prior to learning of this lawsuit,
23 sometime in early 2023, have you been aware of
24 any investigation by the Department of Justice
25 into Google's digital advertising businesses?

Page 49

1      A.  I was not aware.
2      Q.  So is it accurate to say that the first
3  time you became aware of any DOJ investigation
4  into Google's digital advertising business was
5  upon learning of this lawsuit?
6      A.  The first time I had any knowledge into
7  that was receiving the email notifying me of the
8  lawsuit.
9      Q.  And that was sometime in 2023, correct?
10     A.  I don't recall the exact date, but I
11 believe it to be earlier this year in 2023.
12     Q.  Okay.  And so prior to learning of this
13 lawsuit in 2020 -- 20 -- 2023, had you received
14 any outreach from the Department of Justice
15 inquiring about the Navy's digital advertising
16 purchases?
17     A.  Not that I recall.
18     Q.  How about -- have you had any
19 conversations with anybody at any state attorney
20 generals offices about this lawsuit?
21     A.  No.
22     Q.  Do you understand that other states are
23 participating in this lawsuit?
24     A.  I don't understand what states are
25 participating in the lawsuit.

13 (Pages 46 - 49)

Page 50

```
1        Q.   Okay.  And so prior to the com --
2   the learning of this lawsuit, had you had any
3   discussions with any individuals from state
4   attorney generals' offices about Google's digital
5   advertising businesses?
6        A.   Can you ask that question again?  I'm
7   sorry.
8        Q.   Prior to learning of this lawsuit, did
9   you have any conversations with any individual
10  representing a state attorney general about
11  Google's digital advertising businesses?
12       A.   No.
13       Q.   Okay.  What's your title?
14       A.   Director of marketing, Navy Recruiting
15  Command.
16       Q.   How long have you had that title?
17       A.   Since February of 2021.
18       Q.   So your LinkedIn page says that your
19  title is chief marketing officer.  Is that
20  accurate?
21       A.   Yes.  That's one and the same.
22       Q.   So director of marketing for Navy
23  Recruiting Command is the same thing as the chief
24  marketing officer.  Is that your testimony?
25       A.   Yes.
```

Page 51

```
1        Q.   Okay.  Prior to February 2021, what was
2   your title?
3        A.   Deputy director of marketing.
4        Q.   And how long did you have the job of
5   deputy director of marketing?
6        A.   Since March of 2020.
7        Q.   And prior to March of 2020, what was
8   your title?
9        A.   Prior to March of 2020, I was retired.
10       Q.   For how long were you retired prior to
11  March of 2020?
12       A.   Approximately eight months.
13       Q.   And so -- so sometime in the summer of
14  the 2019 you retired.  Is that accurate?
15       A.   Yes.  That -- that's accurate.
16       Q.   Okay.  And from what did you retire in
17  the summer of 2020 -- 2019?
18       A.   From the Navy.
19       Q.   Okay.  How long were you in the Navy?
20       A.   Approximately 21 years.
21       Q.   I speak a bit as a layperson when I say
22  "in the Navy," but what's the difference between
23  being in the Navy, as I've just used that term,
24  and your job now at the Navy?  Can you help me
25  understand that?
```

Page 52

```
1        A.   Sure.  In general terms, if someone says
2   they're "in the Navy," they're wearing a uniform.
3   They're a service member, active duty or
4   reserves.
5        Q.   And so you retired from being a service
6   member or active duty or in the reserves sometime
7   in the summer of 2019?
8        A.   Yes.
9        Q.   Okay.  How did you come to work as the
10  deputy director of marketing for the Navy
11  Recruiting Command?
12       A.   I applied for a GS federal job that was
13  open for the deputy director and was hired.
14       Q.   Okay.  Prior to serving as -- or prior
15  to taking on the role of deputy director of
16  marketing, did you have experience -- work
17  experience in advertising or in marketing?
18       A.   Prior to -- can -- can you repeat that
19  question?
20       Q.   Prior to serving as the deputy director
21  of marketing, what, if any, work experience did
22  you have in advertising or marketing?
23       A.   I worked in the N9 Department,
24  the marketing and advertising department, from
25  approximately August of '15 to the summer of '19.
```

Page 53

```
1        Q.   And what -- that was while you were
2   -- were you active duty during that time or
3   reserve, or what was your status at that time?
4        A.   Active duty.
5        Q.   Okay.  So when you worked in the N9
6   Department, what was your job?
7        A.   I was the marketing operations officer.
8        Q.   What did your job duties entail as the
9   marketing operations officer?
10       A.   It was -- the job generally entailed
11  ensuring that filming productions were completed
12  on time, creative work was completed on time.
13  Generally, executing the marketing operations.
14       Q.   Did your job duties entail purchasing
15  digital media?
16       A.   No.
17       Q.   Okay.  Did it involve purchasing any
18  media when you were the marketing operations
19  officer?
20       A.   No.
21       Q.   And prior to serving as the marketing
22  operations officer, did you have any work
23  experience in advertising or marketing?
24       A.   No.
25       Q.   Okay.  So let's go to your role as
```

14 (Pages 50 - 53)

Page 54

1   deputy director of marketing.  What were your job
2   duties in that role?
3      A.   The job duties were to assist the
4   director to manage the staff, and to be the
5   contracting officer representative, the COR.
6      Q.   For what contract were you the COR when
7   you served as deputy director of marketing?
8      A.   The marketing and advertising contract
9   with VMLY&R.
10      Q.   Did you receive any training or
11   certifications in order to serve as a COR?
12      A.   Yes.
13      Q.   What training or certification did you
14   receive in order to serve as a COR?
15      A.   I don't recall the exact course name.
16   I believe it was CLC 222.  But there's a COR
17   training that -- that's mandated, and I believe
18   that was it.
19      Q.   When did you take that training, to the
20   best of your recollection?
21      A.   It would have been in the March of
22   -- the March of 2020 time frame, to the best of
23   my recollection.
24      Q.   Who offers that CLC 222 training?
25      A.   My understanding it's offered by Defense

Page 55

1   Acquisition University, DAU.
2      Q.   What is Defense Acquisition University?
3      A.   It's an online -- and sometimes
4   in-person -- training that -- for Department of
5   Defense jobs and specialties.
6      Q.   When you were deputy director of
7   marketing, to whom did you report?
8      A.   To the director of marketing.
9      Q.   What is that individual's name?
10      A.   Captain Matt Boren, B-o-r-e-n.
11      Q.   Is Captain Boren still employed with the
12   Navy Recruiting Command?
13      A.   No.
14      Q.   Did he retire?
15      A.   Yes.
16      Q.   And was it his retirement that led
17   to your being -- serving as the director of
18   marketing for Navy Recruiting Command?
19      A.   No.
20      Q.   Okay.  How did you get the job of
21   director of marketing for the Navy Recruiting
22   Command?
23      A.   In February of 2021, Captain Boren was
24   moved to be -- moved jobs to be the chief of
25   staff, and the Admiral at the time moved me into

Page 56

1   the director job at that time.
2      Q.   Okay.  And now as the director of
3   marketing, do you report to the chief of staff?
4      A.   I report to the Admiral.
5      Q.   For how long have you reported to the
6   Admiral -- Admiral in your role as director of
7   marketing?
8      A.   Since February of 2021.
9      Q.   Okay.  So the entire time you've been
10   director of marketing, you've reported to the
11   Admiral; is that correct?
12      A.   Yes.
13      Q.   Okay.  Earlier you mentioned an
14   executive director, Dr. Sullivan.  What is his
15   job?
16      A.   He is the senior civilian at that
17   command, and the -- the Admiral's assistant.
18      Q.   Do you have an -- an informal reporting
19   relationship to Dr. Sullivan?
20      A.   I -- I wouldn't say -- I wouldn't
21   characterize it informal.
22      Q.   How would you characterize it?
23      A.   Formal.
24      Q.   Okay.  So other than to the Admiral, do
25   you report to anybody in your role as director of

Page 57

1   marketing?
2      A.   Yes.
3      Q.   Who else do you report to?
4      A.   The chief of staff.
5      Q.   Okay.  And that's Mr. Reyes?
6      A.   Captain Reyes.
7      Q.   Captain Reyes?
8      A.   Yes.
9      Q.   Has Captain Reyes been the chief of
10   staff the entire time you've been director of
11   marketing?
12      A.   No.
13      Q.   Okay.  Who else served in the chief of
14   staff role to whom you reported while you've been
15   the director of marketing?
16      A.   Prior to Captain Reyes, it was Captain
17   Bayungan.
18      Q.   Can you spell that, please?
19      A.   Sure.  B-a-y-u-n-g-a-n.
20      Q.   And then other than Dr. Sullivan, has
21   there been any executive director to whom you've
22   reported while you have held the job of director
23   of marketing?
24      A.   No.
25      Q.   Okay.  How about any other admiral

15 (Pages 54 - 57)

1    -- admirals to whom you've reported while you've
2    been the director of marketing?
3      A.   Yes.
4      Q.   Who are those admirals?
5      A.   Admiral Velez.   Yeah.
6      Q.   Beyond the Admirable -- Admiral --
7    strike that.
8      Is the Admiral -- does the Admiral sit
9    at the top of the Navy Recruiting Command?
10      A.   Yes.
11      Q.   Okay.   Who is the Admiral's boss?
12      A.   That would be referred to as NETC,
13    N-E-T-C, which is the commander Naval Education
14    and Training Command.
15      Q.   I've read some documents that you've
16    produced entitled -- meaning the Navy has
17    produced -- entitled the Commander's Report.
18    Who's the commander referred to in those
19    documents?
20      MR. MCBIRNEY:   Objection; foundation.
21      THE WITNESS:   Yeah.   I -- I would need
22    to see the documents just to make sure that I'm
23    -- that I give you an accurate answer.
24    BY MS. GOODMAN:
25      Q.   Okay.   What are your job

1    responsibilities as the director of marketing for
2    the Navy Recruiting Command?
3      A.   Sure.   My overall responsibilities as
4    director of marketing is to set the strategy for
5    our marketing and to ensure that -- that the
6    marketing is effective at producing leads and
7    increasing Navy awareness.
8      Q.   When you say "producing leads," what do
9    you mean?
10      A.   Producing actionable lists of people
11    with their contact information who are both
12    qualified and interested to join the Navy.
13      Q.   What responsibilities, if any, do you
14    have as director of marketing with respect to
15    purchasing media?
16      A.   Sure.   So setting the strategy and
17    approving the tactics employed to purchase media.
18      Q.   When you say "tactics employed," what do
19    you mean?
20      A.   I mean to approve recommended media
21    plans for execution.
22      Q.   Are you the COR on the VMLYR [sic]
23    contract in your role as director of marketing?
24      A.   Yes.
25      Q.   Okay.   So is it accurate that the entire

1    time you have been the deputy director or the
2    director that you served as the COR on the VMLYR
3    [sic] contract?
4      MR. MCBIRNEY:   Object to form.
5      THE WITNESS:   Yes.
6    BY MS. GOODMAN:
7      Q.   Okay.   Prior to March of 2020, who was
8    the COR, to you -- if you know, on the VMLYR
9    [sic] contract?
10      A.   Prior to 2020, it would have been the
11    outgoing deputy, Mr. John Byrd.
12      Q.   And did Mr. Byrd leave Navy Recruiting
13    Command in March of 2020?
14      A.   No.
15      Q.   Where did he go?
16      A.   He -- he retired.
17      Q.   So did he leave the Navy Recruiting
18    Command in March of 2020 when he retired?
19      A.   I don't believe so.   I believe it was
20    earlier than that.
21      Q.   I see.
22      Do you use your personal email for work
23    purposes?
24      A.   No.
25      Q.   Have you ever used your personal email

1    for work purposes?
2      A.   The only time I can recollect using
3    any personal email was if there are videos that
4    wouldn't play on the NMCI, so, for review, I may
5    have sent them to my personal email so that I
6    could view them because of connectivity issues.
7      Q.   What is the "NMCI"?
8      A.   I'm sorry, the Navy Marine Corps
9    Internet system.
10      Q.   Is that, like, a special intranet within
11    the Navy?
12      A.   Yes.
13      Q.   Okay.   And is that the only internet
14    system that you can use at -- in your job at the
15    Navy?
16      A.   Yes.
17      Q.   And using your personal email so that
18    you could view videos because of connectivity
19    issues, do you have any other recollection of
20    using your personal email for work purposes?
21      A.   Not that I recall.
22      Q.   Okay.
23      MR. MCBIRNEY:   Martha, if we're going to
24    start going into documents, is now a good time
25    for a break?

16 (Pages 58 - 61)

Page 74

1      THE WITNESS:  Yeah.  I -- I -- I don't
2  have any reason to believe that it would have
3  documents related to this case.
4  BY MS. GOODMAN:
5      Q.  Why is that?
6      A.  The majority of the work that I do in
7  regards to media purchasing would have occurred
8  on my PC.
9      Q.  And you say "the majority."  How about
10  the minority of the work that you do with regards
11  to media purchasing, where would that take place?
12  On what device?
13      A.  Again, as -- as mentioned earlier, it
14  could be something like reviewing a deck on the
15  iPad.
16      Q.  Mm-hmm.  The minority of the work that
17  you do with regards to media purchasing, could
18  that -- did that take place on any other device
19  than your iPad?
20      MR. MCBIRNEY:  Object to the form of the
21  question.
22      THE WITNESS:  Not to my knowledge.
23  BY MS. GOODMAN:
24      Q.  So not on your personal cell phone?
25      A.  Correct.

Page 75

1      Q.  And not on your work-provided cell
2  phone?
3      A.  Correct.
4      Q.  Okay.  Do you use any other mode of
5  communication to conduct your work other than
6  text, email, that we've discussed so far?
7      A.  Microsoft Teams.
8      Q.  Okay.  Anything else?
9      A.  Not to my knowledge.
10      Q.  Okay.  Do you do chat on Microsoft
11  Teams?
12      A.  Very rarely.
13      Q.  In the rare occasions where you use chat
14  on Teams, what do you chat about related to media
15  purchasing?
16      MR. MCBIRNEY:  Objection; foundation.
17  Assumes facts.
18      THE WITNESS:  Yeah.  Can -- can you
19  rephrase the question?
20  BY MS. GOODMAN:
21      Q.  Sure.
22      On the occasions where you use chat on
23  Microsoft -- Microsoft Teams, what are you
24  chatting about?
25      A.  The only recollection I have of using

Page 76

1  chat on Teams was with my personal N9 team -- or
2  my -- my business N9 team, my department, just
3  letting everyone know that I was up on the net.
4  So we used it as, like, a -- we used it as, like,
5  a -- a standing room where people can come in and
6  out to -- for people teleworking with people in
7  the office to be able to communicate.  So nothing
8  in relation to media purchasing.
9      Q.  Okay.  When you say "a standing room
10  where people can come in and come out," what do
11  you mean by that?
12      A.  A portion of the workforce is
13  teleworking.  So by having Teams open in the
14  background it can minimize the need for phone
15  calls and things like that.  Someone can just go
16  into the chat room and ask a question, if they
17  have it --
18      Q.  And so --
19      A.  -- for Teams coordination.
20      Q.  So is it accurate that you participate
21  in a chat room for those members of the team who
22  are teleworking so that they can reach you?
23      A.  Yes.
24      Q.  Okay.  And when you're in the chat room
25  talking with members of your team -- talking to

Page 77

1  members of your team via chat, what do you chat
2  about?
3      MR. MCBIRNEY:  Objection; vague.
4      THE WITNESS:  Yeah.  I -- I can't
5  recollect any specific chat topics.  Usually it's
6  people checking in, "hey, I'm up on the net if
7  anyone needs me today."  That type of very vague
8  conversation.
9  BY MS. GOODMAN:
10      Q.  Any other types of "vague conversations"
11  you can recall?
12      A.  No.
13      Q.  Do you recall ever discussing media
14  purchasing via chat?
15      A.  I do not, no.
16      Q.  Do you ever recall discussing media
17  strategy via chat?
18      A.  I do not.
19      Q.  What happens to the chats after you
20  close out of Teams?
21      MR. MCBIRNEY:  Objection; foundation.
22      THE WITNESS:  Yeah.  I -- I'm not a
23  Teams IT expert.  I have no idea.
24  BY MS. GOODMAN:
25      Q.  Okay.  Have you ever gone back to look

20 (Pages 74 - 77)

Page 78

1   at old chats to refresh your memory about
2   something?
3       A. No.
4       Q. Have you ever gone back to see if old
5   chats exist?
6       A. No.
7       Q. Okay. Did you collect any documents for
8   purposes of this litigation from your own files?
9       A. No.
10      Q. Did you look within your house for any
11  paper documents that might be related to this
12  case?
13      A. No.
14      Q. Did you look in your email for any
15  documents that might be related to this case?
16      A. No.
17      Q. Did you provide any direction to any
18  attorney with respect to where to find documents
19  related to this case within your files?
20      MR. MCBIRNEY: I'm going to object to
21  that.
22      MS. GOODMAN: It's a yes or no question.
23      MR. MCBIRNEY: I understand it's a yes
24  or no question, but I'm going to instruct the
25  witness not to answer. That's privileged.

Page 79

1   BY MS. GOODMAN:
2       Q. Are you going to follow that
3   instruction?
4       A. Yes.
5       Q. Did you participate in any way, shape or
6   form in the collection of documents from your own
7   files for purposes of this litigation?
8       A. Can you be more specific?
9       Q. I'm -- I was being more specific before,
10  so now I'm going to start a bit more generally so
11  that I can understand what, if anything, you did
12  with respect to collecting documents for purposes
13  of this litigation. So my question is whether
14  you participated at all in collecting documents
15  from your files for purposes of this litigation?
16      MR. MCBIRNEY: Object to the form of the
17  question.
18      THE WITNESS: Not to my recollection.
19  BY MS. GOODMAN:
20      Q. Okay. Do you know who, if anybody
21  within the Navy, helped collect documents from
22  your files for purposes of this litigation?
23      A. I'm not certain if that would be
24  privileged information.
25      MR. MCBIRNEY: Hold on one second.

Page 80

1   That's a yes or no question. You can
2   answer that yes or no.
3       THE WITNESS: Okay. Can you ask it one
4   more time?
5   BY MS. GOODMAN:
6       Q. Do you know who, if anybody, within the
7   Navy helped collect documents from your files for
8   purposes of this litigation?
9       A. Yes.
10      Q. Who?
11      MR. MCBIRNEY: Okay. If that reveals
12  privileged information, I'd instruct you not to
13  answer. If you can answer that question without
14  revealing privileged information, you can answer.
15      THE WITNESS: Yeah. I can't answer that
16  without revealing privileged information.
17      MS. GOODMAN: So, Counsel, it is your
18  position that the identity of a person who
19  participated in collecting documents from
20  Mr. Owens' files is a privileged fact?
21      MR. MCBIRNEY: If that was
22  -- potentially, yes, is my answer.
23      If you want me to take a break, I can
24  talk to him and figure out what's going on.
25  But at this point I think it's potentially

Page 81

1   privileged, so I'm instructing him not to answer
2   based on his understanding that it may be
3   privileged.
4       THE WITNESS: Could I have a break to
5   discuss this?
6       MR. MCBIRNEY: Is that all right?
7       MS. GOODMAN: Sure.
8       THE VIDEOGRAPHER: Time is 11:31 a.m.
9   We're off the record.
10      (Recess taken.)
11      THE VIDEOGRAPHER: The time is 11:37
12  a.m. We're on the record.
13  BY MS. GOODMAN:
14      Q. Mr. Owens, who within the Navy helped
15  collect documents from your files for purposes of
16  this litigation?
17      A. To my knowledge, the DOJ counsel worked
18  with my IT department to capture emails as well
19  as files.
20      Q. And did you discuss that on the break
21  with your counsel?
22      MR. MCBIRNEY: You could answer that yes
23  or no.
24      THE WITNESS: Yes.
25  BY MS. GOODMAN:

21 (Pages 78 - 81)

Page 82

1    Q.   And, to your knowledge, did it search
2   your work iPad for responsive documents?
3        MR. MCBIRNEY:  Objection; foundation.
4        THE WITNESS:  Not to my knowledge.
5   BY MS. GOODMAN:
6    Q.   Okay.  How about with respect to your
7   work cell phone?
8        MR. MCBIRNEY:  Same objection.
9        THE WITNESS:  Not to my knowledge.
10  BY MS. GOODMAN:
11   Q.   How about with respect to your personal
12  email?
13   A.   Not to my knowledge.
14   Q.   To your knowledge, when did the DOJ
15  counsel work with IT to capture emails as well as
16  files?
17   A.   I don't remember exact time frames.
18  Earlier this year.
19   Q.   Other than earlier this year, do you
20  have any more specific recollection of when DOJ
21  worked with IT to collect documents from your
22  files?
23   A.   I do not.
24   Q.   Have you ever -- have you received a
25  litigation hold related to this lawsuit?

Page 83

1        MR. MCBIRNEY:  I'm going to instruct the
2   witness not to answer that question.  That's
3   privileged information.
4        MS. GOODMAN:  Whether he received a
5   litigation hold when your obligations are to
6   preserve relevant documents?
7        MR. MCBIRNEY:  You can ask him if he
8   preserved relevant documents.  I think you have.
9   Whether he received from counsel a litigation
10  hold is privileged.
11       MS. GOODMAN:  That is not.  That is the
12  same thing that would be on a privilege log, and,
13  in fact, I've seen it on privileged logs produced
14  by the Department of Justice on behalf of ATR
15  as well as on behalf of the federal agency
16  advertisers.  The fact of receiving a litigation
17  hold is not a privileged fact or work product.
18       MR. MCBIRNEY:  First of all, the fact
19  that the privilege may not be invoked in every
20  instance does not mean that it is not privileged.
21  Whether he received a litigation hold from
22  counsel is a privileged communication.  You can
23  ask him what he did to preserve documents.  You
24  can ask him what was done to collect documents.
25  I think you have.  But whether counsel directed

Page 84

1   him to preserve documents is privileged.
2        MS. GOODMAN:  You're just absolutely
3   wrong on that.  You really are.
4        MR. MCBIRNEY:  I appreciate your
5   position.
6   BY MS. GOODMAN:
7    Q.   What is your practice with respect to
8   retaining documents?
9    A.   Can you be more specific?
10   Q.   Do you delete documents in the course of
11  your work?
12       MR. MCBIRNEY:  Objection; vague.
13       THE WITNESS:  On occasion I may delete
14  documents.
15  BY MS. GOODMAN:
16   Q.   What occasions do you delete documents?
17   A.   If a file's extremely large and no
18  longer needed.
19   Q.   Okay.  Have you maintained the practice
20  of poten -- occasionally deleting documents
21  throughout 2023?
22       MR. MCBIRNEY:  Objection; vague.
23       THE WITNESS:  Yeah.  As a standard
24  practice, I don't believe I've deleted many
25  documents this year as -- but -- there -- there

Page 85

1   may be an occasion where I might have, but not to
2   my recollection.
3   BY MS. GOODMAN:
4    Q.   So it is possible that you've deleted
5   documents in 2023 related to work, correct?
6        MR. MCBIRNEY:  Object to the form of the
7   question.
8        THE WITNESS:  There's a possibility.
9   BY MS. GOODMAN:
10   Q.   Okay.  Under Navy's -- are you aware of
11  any document retention policies at the Navy?
12   A.   Yes.
13   Q.   And what do those policies provide?
14   A.   Sitting here today, I don't recall the
15  exact stipulations in those policies.
16   Q.   How about generally?  What do you recall
17  as to what those document retention policies
18  state?
19   A.   Sitting here today, I -- I don't recall.
20   Q.   Okay.  To your knowledge, do the
21  document retention policies permit you to delete
22  files?
23       MR. MCBIRNEY:  Objection; vague.
24       THE WITNESS:  Yeah.  Sitting here today,
25  I don't recall the stipulations of that policy.

22 (Pages 82 - 85)

Page 86

BY MS. GOODMAN:
Q. And thus you don't recall whether they
permit you to delete files, correct?
MR. MCBIRNEY: Objection. Asked and
answered.
THE WITNESS: Yeah. My testimony is,
sitting here today, I do not recall the exact
stipulations of that policy.
BY MS. GOODMAN:
Q. And, therefore, correct, you don't
recall whether those policies permit you to
delete files?
MR. MCBIRNEY: Objection.
BY MS. GOODMAN:
Q. Is that accurate?
MR. MCBIRNEY: Objection. Asked and
answered.
THE WITNESS: Yeah. So my testimony is,
sitting here today, I do not recall the exact
stipulations of that policy.
BY MS. GOODMAN:
Q. Okay. And so you can't answer whether,
as a result of your inability to recall the exact
stipulations of this -- of the policy, you cannot
an -- you don't recall whether or not that policy

Page 87

permits you to delete files. Is that accurate?
MR. MCBIRNEY: Objection. Asked and
answered.
THE WITNESS: So it's my testimony that,
sitting here today, I don't recall the specific
stipulations of that policy.
BY MS. GOODMAN:
Q. Okay. And, therefore, you can't testify
one way or another to what that policy says with
respect to the deletion of files, correct?
MR. MCBIRNEY: Objection. Asked and
answered.
THE WITNESS: Yeah. Those were not my
words. I said, sitting here today, I don't
remember the exact stipulations of the policy.
BY MS. GOODMAN:
Q. Other than a lawyer, has anybody told
you anything about preserving documents with
respect to this litigation?
THE WITNESS: I'm not sure of the
communications I received, whether those would be
privileged or not.
MR. MCBIRNEY: If you received
communications regarding preserving documents
that were either from a lawyer or at the

Page 88

direction of a lawyer, that's privileged and I'd
instruct you not to answer. If you received
communications about preserving documents that do
not fall into those categories and you are
confident that they do not come from counsel, you
can answer.
THE WITNESS: Yeah. Then I cannot
answer the question without revealing privileged
conversations.
BY MS. GOODMAN:
Q. And for the record -- and this is a yes
or no question -- have you received any direction
from anybody with respect to preserving documents
related to this litigation?
MR. MCBIRNEY: You can answer that yes
or no.
THE WITNESS: Yes.
BY MS. GOODMAN:
Q. When did you receive such direction?
A. I don't recall the exact time frame.
Earlier this year in 2023.
Q. Was it before or after you learned about
this lawsuit?
A. I don't recall.
Q. Prior to this lawsuit, have you ever

Page 89

requested legal advice from the Department of
Justice Antitrust Division?
A. No.
Q. Prior to learning about this lawsuit,
have you ever requested legal advice from the
Department of Justice Antitrust Division?
A. No.
Q. Since receiving instructions with
respect to preserving documents related to this
litigation, have you deleted any documents on any
of your devices?
A. Not to my knowledge.
Q. So you've testified that VMLY&R is the
ad agency for the Navy; is that correct?
A. That is correct.
Q. And they have been the ad agency for the
Navy since, approximately, 2016. Is that
accurate?
A. They have been the ad agency since
approximately 2016, yes.
Q. Okay. And their contract with the Navy
was renewed or reentered into in 2021. Is that
accurate?
A. Yes, it was renewed in 2021.
Q. Okay. Other than the VMLY&R, is there

23 (Pages 86 - 89)

Page 90

1    any other agency -- ad agency engaged by the
2    Naval -- Navy Recruiting Command related to
3    advertising?
4         MR. MCBIRNEY:  Objection; foundation.
5         THE WITNESS:  Our contract is with
6    VMLY&R.  It's my understanding they have other
7    businesses and agencies that work with them.  But
8    our contract is with VMLY&R.
9    BY MS. GOODMAN:
10        Q.  And are you aware of any contract
11   between the Navy and any other ad agency related
12   to advertising?
13        A.  No.
14        Q.  Were you involved in the selection of
15   VMLY&R when their contract was renewed in 2021?
16        THE WITNESS:  Am I allowed to discuss
17   contractual selection items?
18        MR. MCBIRNEY:  You can answer that
19   question yes or no and we'll go from there.
20        THE WITNESS:  Okay.  Can you ask that
21   question again?
22   BY MS. GOODMAN:
23        Q.  Were you involved in the selection of
24   VMLY&R when their contract was renewed in 2021?
25        A.  Yes.

Page 91

1         Q.  What was your involvement?
2         A.  I was on the panel of folks reviewing
3    the non-price proposals from all vendors.
4         Q.  And when you say "reviewing the
5    non-price proposals," what do you mean by that?
6         A.  So to review -- so when a contract is
7    renewed, multiple businesses can apply for that
8    contract, and non-price proposals are part of
9    that bidding process.  And then a board of people
10   will look at that and review those, and I was on
11   that panel.
12        Q.  What are the kinds of non-price
13   proposals that are put forward as part of that
14   bid -- bidding process?
15        MR. MCBIRNEY:  Object to the form of the
16   question.
17        THE WITNESS:  You'd have to be more
18   specific.  I'm sorry.
19   BY MS. GOODMAN:
20        Q.  Well, what do you mean by non-price
21   proposals?  What do those entail?
22        A.  Those are proposals of how the vendor or
23   the business would satisfy the requirements given
24   in the work statement in the RFQ.
25        Q.  And so specifically with respect to

Page 92

1    selecting an advertising agency, what are the
2    things that you looked for in the non-price
3    proposals that mattered to you in selecting a
4    business to contract with?
5         A.  Sure.  I don't recall the specific
6    criteria.  That was a few years ago.
7         Q.  How about generally?  What do you
8    recall what mattered to you in terms of non-price
9    proposals when selecting an ad agency?
10        A.  In general, that they demonstrated in
11   their write-up a thorough understanding of the
12   requirement and ability to meet the requirement.
13        Q.  And what was the requirement that the
14   Navy put forward with respect to finding a
15   contractor related to advertising?
16        A.  Sure.  It was a a -- a work statement that
17   was issued -- multi-page work statement.
18        Q.  What are the kinds of things that the
19   Navy wanted from an advertiser?
20        MR. MCBIRNEY:  Objection; vague.
21        THE WITNESS:  Yeah.  Sitting here today,
22   I -- I don't recall the specifics contained in
23   that work statement, --
24   BY MS. GOODMAN:
25        Q.  How about generally?

Page 93

1         A.  -- but it was for advertising services.
2         Q.  Okay.  And so what kind of things are
3    important to you when you're selecting a ad
4    agency to provide advertising services?
5         MR. MCBIRNEY:  Objection; form and asked
6    and answered.
7         THE WITNESS:  In general, that they
8    have a demonstrated ability to perform and an
9    understanding of those requirements that are
10   contained in the work statement document.
11   BY MS. GOODMAN:
12        Q.  What requirements, if any, do you
13   recall that were contained in the work statement
14   document put out by the Navy with respect to
15   advertising?
16        A.  Yeah.  That was -- that was a large
17   document over two years ago.  I don't recall the
18   specifics of that document.
19        Q.  How about generally?
20        A.  Generally, as I testified a moment ago,
21   that they have a thorough understanding of -- of
22   the requirements in there and that they have a
23   demonstrated ability to perform those
24   requirements.
25        Q.  Right.  My question is what, if

24 (Pages 90 - 93)

Page 94

1 anything, do you generally recall about what the
2 requirements were?
3      MR. MCBIRNEY:  Objection.  Asked and
4 answered.
5      THE WITNESS:  Yeah.  I would be
6 assuming, and -- and I don't want to do that.
7 I -- I can't -- I can't remember specifics from
8 that document.
9 BY MS. GOODMAN:
10     Q.   And can you remember anything generally
11 with respect to the work requirements the Navy
12 -- that the Navy put out with respect to
13 selecting an advertiser -- ad agency, I should
14 say?
15     A.   I cannot.
16     Q.   Okay.  Who was involved in evaluating
17 the price proposal as part of the process to
18 select an ad agency?
19     A.   It's my understanding that that was
20 done at the FLC, Fleet Logistics Center --
21     Q.   And who --
22     A.   -- by the contracting officer.
23     Q.   Who was the contracting officer at the
24 Fleet Logistics Center evaluating the price
25 proposal?

Page 95

1      A.   I believe it was Ms. Lozzi.
2      Q.   Did you have any conversations with
3 Ms. Lozzi with respect to the price proposal put
4 forward by various businesses at this time?
5      A.   No.
6      MR. MCBIRNEY:  Object to the form of the
7 question.
8      Make sure you wait for me.
9 BY MS. GOODMAN:
10     Q.   Did you review the price proposal
11 submitted by VMYL&R as part of the 2021 contract
12 selection process?
13     A.   I do not believe so.
14     Q.   Did you review the non-price proposal
15 put forward by them?
16     A.   Yes.
17     Q.   Prior to the contract selection process,
18 you had experience working with VMYL&R, correct?
19     A.   Can you be more specific?
20     Q.   So in March of 2020 when you took on the
21 job as deputy director of marketing, VMYL&R was
22 the contractor providing ad services, correct?
23     A.   Yes.  VMYL&R was the contractor at -- at
24 the time when I took over in March of 2020, yes.
25     Q.   Okay.  And so as a result of your

Page 96

1 taking over that role in March of 2020, you had
2 experience working with VMYL&R, correct?
3      A.   Yes.
4      Q.   Okay.  And so what -- what, if
5 anything, based on that experience, did you find
6 significant with respect to selecting VMLY&R for
7 a contract renewal?
8      MR. MCBIRNEY:  Objection.  Assumes
9 facts.  Vague.
10     THE WITNESS:  Yeah.  I -- I don't
11 recall the specifics of the review of the
12 non-price proposals and what was considered and
13 what was put down there.
14 BY MS. GOODMAN:
15     Q.   Is there a reason you were not involved
16 in evaluating the pricing proposal for this
17 contract selection?
18     MR. MCBIRNEY:  Objection.  Assumes
19 facts.
20     THE WITNESS:  Yeah.  I -- I'm not
21 certain why that's the case.  I just know that to
22 be the case, is that we were reviewing the
23 non-price proposal.
24     MS. GOODMAN:  Can I have 22?
25     I'm marking Exhibit 53 NAVY-ADS256935

Page 97

1 through 257031.
2      (Exhibit No. 53, a document Bates
3 Numbered NAVY-ADS256935 through NAVY-ADS257031,
4 was introduced.)
5 BY MS. GOODMAN:
6      Q.   And, sir, do you recognize this as the
7 contract entered into between the Navy and VMYL&R
8 in 2021?
9      A.   I'm going to need a moment to just
10 review this.
11     Q.   Sure.
12     A.   (Reviews document.)
13     Okay.  Can you ask that question again?
14     Q.   Yes.  Do you recognize Exhibit 53 as the
15 contract entered into between the Navy and VMYL&R
16 in 2021?
17     A.   Yes.
18     Q.   Okay.
19     A.   Except it may be that it was with Y&R
20 at the time.  I believe there was a name change
21 during the course.
22     Q.   So Y&R, you're referring to in Box 17a.
23 where it says Young & Rubicam; is that right?
24     A.   Correct.
25     Q.   And Young & Rubicam at some point became

25 (Pages 94 - 97)

Page 202

1 wanted to change that 520k from Trade Desk to
2 either YouTube, Amazon or anything else, --
3 BY MS. GOODMAN:
4 Q. Okay.
5 A. -- but that within the realms of the
6 Trade Desk they would be able to allocate it
7 according to how this reads.
8 Q. And if they wanted to make adjustments
9 in realtime to switch, for example, between
10 Connected TV on the Trade Desk and banner ads on
11 the Trade Desk, they had authority to do that
12 so long as they stayed within the $520,000
13 authorized. Is that accurate?
14 A. Yeah. My -- my testimony is that if
15 they were going to deviate from the Trade Desk to
16 any of the other companies, they would need to
17 seek approval. But, otherwise, they would not.
18 Q. And so, therefore, in the circumstance
19 I'm describing, which is limited to spending
20 money via the Trade Desk, okay, if VMLY&R thought
21 it best to move $1 from Connected TV on the Trade
22 Desk to $1 on banner ads on the Trade Desk as
23 they are watching how the campaign is performing,
24 they had the authority to do so without seeking
25 your approval, correct?

Page 203

1 MR. MCBIRNEY: Objection. Asked and
2 answered.
3 THE WITNESS: My testimony, as I've
4 stated, is that if the ad agency, VMLY&R, was to
5 deviate from this approved plan they would need
6 to seek my approval; however, if they are not
7 deviating from what's stated in this approved
8 plan, they would not need to seek my approval.
9 BY MS. GOODMAN:
10 Q. So the answer is yes.
11 MR. MCBIRNEY: Objection. Asked and
12 answered. Mischaracterizes the testimony.
13 THE WITNESS: Again, my testimony is if
14 they're going to deviate from an approved plan,
15 they would seek my approval. Otherwise, they
16 would not have to seek my approval.
17 BY MS. GOODMAN:
18 Q. Okay. Therefore, they don't need
19 to seek your approval in order to move $1 from
20 Online Banner ads to Connected TV so long as that
21 single dollar is within the $520,000 approved in
22 this particular instance. Is that accurate?
23 MR. MCBIRNEY: Objection. Asked and
24 answered. Mischaracterizes testimony.
25 THE WITNESS: So it's my testimony that

Page 204

1 so long as VMLY&R adheres to the approved plan,
2 they do not need to seek my approval.
3 BY MS. GOODMAN:
4 Q. And do you know, is it VMLY&R who
5 are -- who is making these realtime optimization
6 decisions, or is it somebody else?
7 MR. MCBIRNEY: Objection; vague.
8 THE WITNESS: Yeah. I don't know the
9 exact person who's making optimizations.
10 BY MS. GOODMAN:
11 Q. Do you know what company that the person
12 who makes the optimizations works for, whether it
13 be VMLY&R or Wavemaker or somebody else?
14 A. I'm not privy to the exact legal
15 business relationship between Wavemaker and
16 VMLY&R, but I know that per my contract with
17 VMLY&R that they would have someone on the team
18 making these realtime optimizations.
19 Q. Okay. I'm not asking about the business
20 relationship or the legal relationship. I'm
21 asking whether you know, in your capacity as the
22 director of marketing based on your experience
23 working in that job on these digital ad buys over
24 the last three-plus years, do you know who makes
25 the realtime optimization decisions?

Page 205

1 A. I -- sitting here today, I do not know
2 who makes that realtime optimization.
3 Q. Okay. Do you know, not their name, but
4 the company for which they work?
5 MR. MCBIRNEY: Objection; vague.
6 THE WITNESS: Yeah. I -- sitting here
7 today, I can't be certain if it would be VMLY&R
8 or Wavemaker.
9 BY MS. GOODMAN:
10 Q. Okay. And could it be somebody at the
11 Trade Desk making those realtime optimization
12 decisions?
13 MR. MCBIRNEY: Objection; foundation.
14 THE WITNESS: Sitting here today, I
15 don't know.
16 BY MS. GOODMAN:
17 Q. Okay. Let's go back to that spreadsheet
18 attached to Exhibit 58. I just have one question
19 at the end of it.
20 A. Sure.
21 Q. When we were looking at the
22 Recommended Partners, the one on the first page
23 of this spreadsheet, --
24 A. Yes.
25 Q. -- it's accurate that these are all

Page 206

1 partners that the Navy is using at the same
2 time with respect to digital ad spend. Is that
3 accurate?
4     A. Maybe not exactly the way you described,
5 because it's broken down into months.
6     Q. Okay.
7     A. So, for instance, YouTube Masthead looks
8 to appear in September but not July and August.
9     Q. Okay. So the -- the companies or part
10 -- partners who have dollars allocated to them in
11 the month of September, those are all being used
12 at the same time. Is that accurate?
13     A. Sitting here today, to the best of my
14 knowledge, yes.
15     MS. GOODMAN: Okay. Shall we take a
16 break?
17     MR. MCBIRNEY: Sure.
18     THE VIDEOGRAPHER: The time is 4:37 p.m.
19 This ends Unit 4. We're off the record.
20     (Recess taken.)
21     THE VIDEOGRAPHER: The time is 4:54 p.m.
22 This begins Unit Number 5. We're on the record.
23 BY MS. GOODMAN:
24     Q. Mr. Owens, have you heard the term Open
25 Web Display advertising?

Page 207

1     A. I have heard that term.
2     Q. What do you understand it to mean?
3     A. I'm not certain the exact meaning of
4 Open Web Display advertising.
5     Q. Aside from its exact meaning, what do
6 you generally understand that term to mean?
7     A. I generally understand it to mean
8 display advertising.
9     Q. And when you say "display advertising,"
10 what do you mean by that?
11     A. Placement of display ads.
12     Q. And does display advertising include
13 placement of display ads on the New York Times,
14 if they're purchased directly from the New York
15 Times?
16     MR. MCBIRNEY: Objection; foundation.
17     THE WITNESS: Yeah. I -- again, I don't
18 have a -- a firm enough understanding of that
19 term specifically to -- to answer in any more
20 detail than that.
21 BY MS. GOODMAN:
22     Q. Okay. Are you aware of any different
23 kinds of display ads or -- when you -- strike
24 that.
25     Can you give any examples of display

Page 208

1 advertising?
2     A. Sure. Display advertising could be ads
3 placed on unique individual websites.
4     (Whereupon realtime feed froze due to
5 internet disconnection.)
6     THE REPORTER: I think it stopped. Can
7 we --
8     MS. GOODMAN: Yeah. Let's take a break.
9     THE VIDEOGRAPHER: The time is 4:57 p.m.
10 We're going off the record.
11     (Recess taken.)
12     THE VIDEOGRAPHER: The time is 5:03 p.m.
13 We're on the record.
14 BY MS. GOODMAN:
15     Q. Mr. Owens, does the term Display
16 Advertising, as you understand it, include
17 placing ads on websites through a direct deal
18 between the publisher and the advertiser?
19     MR. MCBIRNEY: Objection; foundation.
20     THE WITNESS: Display Advertising, as I
21 know it, is advertising by the use of display
22 ads, to my knowledge.
23 BY MS. GOODMAN:
24     Q. Okay. And, to your knowledge, just
25 again for the record, what is your understanding

Page 209

1 of the term Open Web Display Advertising?
2     MR. MCBIRNEY: Objection; foundation.
3 Asked and answered.
4     THE WITNESS: As I testified, I'm
5 familiar with the term; however, I don't know the
6 definition of Open Web Display Advertising.
7 BY MS. GOODMAN:
8     Q. How are you familiar with the term Open
9 Web Display Advertising?
10     A. I've -- I've seen the term. But,
11 again, I -- I can't describe to you exactly the
12 definition of that. But, in general terms, I
13 understand it to be, as stated earlier, Display
14 Advertising.
15 BY MS. GOODMAN:
16     Q. Okay. Where have you seen the term Open
17 Web Display Advertising?
18     A. I can't recollect exactly where I saw
19 it.
20     Q. Generally speaking, can you describe
21 anywhere you've seen the term Open Web Display
22 Advertising, such as in emails or documents
23 with your ad agency, on -- on other websites
24 discussing the advertising industry, any place
25 that you recall seeing that term?

53 (Pages 206 - 209)

Page 210

1    MR. MCBIRNEY:  Object to form.
2    THE WITNESS:  Sitting here today, I -- I
3  cannot remember where I've seen that term.
4  BY MS. GOODMAN:
5    Q.  Do you recall ever seeing it in any
6  documents provided to you by VMLY&R?
7    A.  As mentioned a moment ago, I cannot
8  recall where I've seen the term.
9    Q.  And, thus, you don't know whether you've
10  seen it in any documents provided by VMLY&R,
11  correct?
12    MR. MCBIRNEY:  Objection.  Asked and
13  answered.  Mischaracterizes the testimony.
14    THE WITNESS:  Yeah.  As I -- as I
15  testified, I don't recollect where I've seen the
16  term.
17  BY MS. GOODMAN:
18    Q.  Okay.  Have you had any discussions
19  with anybody about the term Open Web Display
20  Advertising and what it means?
21    A.  Not to my knowledge.
22    Q.  Prior to the filing of this lawsuit
23  in January of 2023, were you aware of any
24  anticompetitive conduct on the part of Google
25  affecting Navy's advertising?

Page 211

1    MR. MCBIRNEY:  You can answer that
2  question to the extent it does not disclose
3  communications with counsel.
4    THE WITNESS:  To my knowledge, no.
5  BY MS. GOODMAN:
6    Q.  And how about prior to this lawsuit,
7  did you ever have any concerns in your capacity
8  as the director of marketing for the Navy
9  Recruiting Command that Google was engaging in
10  anticompetitive conduct related to digital
11  advertising?
12    MR. MCBIRNEY:  Object to foundation.
13    THE WITNESS:  Prior to this, I had no
14  knowledge of nor reason to suspect that of
15  Google.
16  BY MS. GOODMAN:
17    Q.  Prior to this lawsuit, did you have
18  ever -- did you ever have any concerns that
19  Google was engaging in any conduct that was
20  causing the Navy harm with respect to its digital
21  advertising?
22    A.  Sitting here today, I can -- I can think
23  of no reason to believe that.
24    Q.  You described Google, in fact, as a
25  partner of the Navy, right?

Page 212

1    MR. MCBIRNEY:  Objection.  Assumes
2  facts.
3    THE WITNESS:  Oftentimes, a lot of the
4  businesses that we use will be referred to as a
5  partner if we're doing business with them, so
6  I -- I may have referred to Google as a partner.
7  BY MS. GOODMAN:
8    Q.  Has Google helped the Navy with respect
9  to recruiting more sailors to join?
10    MR. MCBIRNEY:  Objection; foundation.
11    THE WITNESS:  We have found lots of
12  value in many of the Google buys that we've done.
13  BY MS. GOODMAN:
14    Q.  And the Google buys that you've done
15  that you've found value in, does that relate to
16  YouTube buys?
17    A.  Yes.
18    Q.  Okay.  And how about with respect to
19  search?
20    A.  Yes.
21    Q.  Okay.  Can you describe in any more
22  detail the value that you have found in many of
23  the Google buys that the Navy has done?
24    A.  In particular, some of the YouTube
25  activations we've had have had extremely high

Page 213

1  video completion rates.
2    Q.  Any other --
3    THE VIDEOGRAPHER:  Counsel, the Zoom's
4  offline.
5    MS. GOODMAN:  Let's take a break.
6    MR. MCBIRNEY:  We're going to be here a
7  while.
8    THE VIDEOGRAPHER:  The time is 5:07 p.m.
9  We're going off the record.
10    (Recess taken.)
11    THE VIDEOGRAPHER:  Time is 5:14 p.m.
12  We're on the record.
13  BY MS. GOODMAN:
14    Q.  Mr. Owens, can you describe any other
15  instances that the Navy has found value in any of
16  the Google buys that it has done?
17    A.  Paid search, as well.  We've found value
18  there.
19    I don't have a list at the ready, but
20  -- but there's -- it's been on many occasions.
21    Q.  Can you approximate the number of
22  occasions that you've found value in Google buys
23  for the Navy?
24    MR. MCBIRNEY:  Objection; foundation.
25    THE WITNESS:  Yeah.  I -- I can't

54 (Pages 210 - 213)

Page 214

1  provide an exact number or even a general number.
2  BY MS. GOODMAN:
3      Q.  Just many?
4      A.  Yes.
5      Q.  Has anybody at VMLY&R ever told you that
6  Google was engaging in anticompetitive conduct
7  with respect to digital advertising?
8      A.  No.
9      Q.  Did anybody at Wavemaker ever tell you
10  that Google was engaging in anticompetitive
11  conduct with respect to digital advertising?
12      A.  No.
13      Q.  Has anyone ever told you that Google is
14  engaging in anticompetitive conduct with respect
15  to digital advertising.
16      MR. MCBIRNEY:  I interpret that to mean
17  anyone other than the attorneys.  You can answer
18  to the extent --
19      MS. GOODMAN:  The question is the
20  question.
21      MR. MCBIRNEY:  Okay.  Well, then I would
22  instruct the witness not to answer to the extent
23  it requires divulging privileged communication.
24      THE WITNESS:  I'm going to listen to my
25  counsel --

Page 215

1      MS. GOODMAN:  Okay.
2      THE WITNESS:  -- and not provide the
3  privileged communication.
4  BY MS. GOODMAN:
5      Q.  Okay.  Yes or no question:  Has
6  anyone ever told you that Google is engaging in
7  anticompetitive conduct with respect to digital
8  advertising.
9      MR. MCBIRNEY:  If you want to ask him
10  whether anyone other than his attorneys told him
11  that, he can answer that question.  But I'm not
12  -- I'm instructing him not to answer that
13  question.
14  BY MS. GOODMAN:
15      Q.  I'm not asking for the identity of who.
16  It's a -- it's a yes or no question as to whether
17  any human on this earth --
18      MR. MCBIRNEY:  I understand.
19  BY MS. GOODMAN:
20      Q.  -- has ever told you, Mr. Owens, that
21  Google has engaged in anticompetitive conduct
22  with respect to digital advertising?
23      MR. MCBIRNEY:  And I'm going to instruct
24  the witness not to answer that question.  If you
25  want to limit your question to exclude counsel --

Page 216

1      MS. GOODMAN:  Make your instruction.
2  Don't tell me how to ask my questions, please.
3      MR. MCBIRNEY:  I'm instructing the
4  witness not to answer your improper question.
5  BY MS. GOODMAN:
6      Q.  Are you following that instruction, sir?
7      A.  I'm following the instruct of my
8  counsel.
9      Q.  Okay.  Other than any lawyer, has
10  anybody ever told you, Mr. Owens, that Google has
11  engaged in anticompetitive conduct with respect
12  to digital advertising?
13      A.  No.
14      Q.  To the extent you have any knowledge of
15  any anticompetitive conduct on the part of Google
16  with respect to digital advertising, does it come
17  only through conversations with lawyers?
18      MR. MCBIRNEY:  Objection.  I'm going to
19  instruct the witness not to answer that question.
20      THE WITNESS:  I'm going to listen to my
21  counsel.
22  BY MS. GOODMAN:
23      Q.  Okay.  Sitting here today, do you have
24  any concerns that the Navy -- strike that.
25      Sitting here today, do you have any

Page 217

1  concerns that Google has harmed the Navy?
2      MR. MCBIRNEY:  Objection; vague.
3      THE WITNESS:  Can you be more specific
4  with the question?
5  BY MS. GOODMAN:
6      Q.  Sitting here today, do you have any
7  concerns that Google has engaged in any conduct
8  that hurt -- harms the Navy?
9      MR. MCBIRNEY:  Objection; vague.
10      THE WITNESS:  Aside from the reason why
11  I'm here today, I have no reason to believe that
12  Google has harmed the Navy in any other way.
13  BY MS. GOODMAN:
14      Q.  Okay.  And when you say "the reason why
15  I'm here today," what do you mean?
16      A.  In relation to this deposition.
17      Q.  Okay.  Can you tell me any reasons
18  -- strike that.
19      Can you tell me any information about
20  how, if at all, Google has harmed the Navy?
21      MR. MCBIRNEY:  Objection to the form and
22  foundation.
23      THE WITNESS:  I guess am I able to
24  answer that question without divulging any
25  privileged communication?

55 (Pages 214 - 217)

Page 218

1      MR. MCBIRNEY:  Well, if you are able to
2   answer that question without divulging privileged
3   information, you can answer the question.  If you
4   are not able to answer the question without
5   divulging privileged information, then I'd
6   instruct you not to answer.
7      THE WITNESS:  Can you ask the question
8   again?
9   BY MS. GOODMAN:
10     Q.  Can you tell me any information about
11  how, if at all, Google has harmed the Navy?
12     MR. MCBIRNEY:  And, again, same
13  objections to form and foundation.
14     THE WITNESS:  I cannot answer that
15  question without divulging a privileged
16  communication.
17  BY MS. GOODMAN:
18     Q.  Okay.  To your knowledge, did the Navy
19  purchase any display advertising directly from
20  Google?
21     MR. MCBIRNEY:  Objection.  Calls for a
22  legal conclusion.
23     MS. GOODMAN:  Read the RFA briefing.
24  BY MS. GOODMAN:
25     Q.  You may answer.

Page 219

1      MR. MCBIRNEY:  And lack of foundation.
2      THE WITNESS:  So the Navy has purchased
3   display advertising via our contract with VMLY&R,
4   and we've asked them to purchase that on our
5   behalf.
6   BY MS. GOODMAN:
7      Q.  Okay.  But my question is did the
8   Navy -- to your knowledge, as director of
9   marketing for the Navy Recruiting Command and as
10  the Contracting Officer Representative, did the
11  Navy purchase any display advertising directly
12  -- not through VMYL&R or any other intermediary
13  -- did the Navy purchase any display advertising
14  directly from Google?
15     MR. MCBIRNEY:  Objection.  Asked and
16  answered.  Calls for a legal conclusion, and lack
17  of foundation.
18     THE WITNESS:  We have purchased our
19  marketing and advertising and media from Google,
20  as well as other companies, through our ad agency
21  contract.
22  BY MS. GOODMAN:
23     Q.  Okay.  You're -- sir, you're not
24  answering my question, which is whether you've
25  purchased any display advertising -- meaning when

Page 220

1   I say you, the Navy, to your knowledge, have any
2   purchases been made directly, meaning between you
3   -- the Navy -- and Google, as the two parties to
4   the transaction, has Google -- has the Navy made
5   any purchases of display advertising directly
6   from Google?
7      MR. MCBIRNEY:  Objection.  Asked and
8   answered.  Calls for a legal conclusion.  Lack of
9   foundation.
10     THE WITNESS:  Yeah.  I'm -- I'm
11  not a lawyer, so I'm not certain of the legal
12  definition of "purchase directly."  But I can
13  tell you that, through our contract with VMLY&R,
14  we have asked them to purchase media on our
15  behalf from Google as well as other businesses.
16  BY MS. GOODMAN:
17     Q.  Okay.  What do you mean -- what do you
18  understand the term "purchase" to mean just in
19  ordinary use?
20     A.  I would define "purchase" as an exchange
21  of resources for a good or service.
22     Q.  Okay.  What do you understand the term,
23  in ordinary use, "directly" to mean?
24     MR. MCBIRNEY:  Objection.  Calls for a
25  legal conclusion in this context.

Page 221

1   BY MS. GOODMAN:
2      Q.  I'm asking for the plain language,
3   ordinary meaning, that you, Mr. Owens, understand
4   the term "directly" to mean?
5      MR. MCBIRNEY:  Same objections, and
6   vague.
7      THE WITNESS:  Can I answer the question?
8      MR. MCBIRNEY:  You can answer if you
9   can, yeah.
10     THE WITNESS:  I would think -- I would
11  understand directly to mean either -- I mean,
12  between two parties.
13  BY MS. GOODMAN:
14     Q.  Okay.  So with your under -- with the
15  definitions that you've provided, based on your
16  ordinary understanding of these words of the term
17  "purchase" and "directly," I'm going to ask you a
18  series of questions, and I would ask you to
19  please give me a yes or no answer.
20     Did the Navy purchase any display
21  advertising directly from Google?
22     MR. MCBIRNEY:  Objection.  Asked and
23  answered.  Calls for a legal conclusion.  Lack
24  foundation.
25     THE WITNESS:  The Navy purchased

56 (Pages 218 - 221)

Page 246

1    THE WITNESS:  Can you be more specific
2  with the question?
3  BY MS. GOODMAN:
4    Q.  Can you think of any scenario or
5  circumstance where one of your vendors for
6  advertising services can come directly to the
7  Navy and ask for payment and the Navy be required
8  to make such a payment?
9    MR. MCBIRNEY:  Objection.  Calls for
10  speculation.  Calls for a legal conclusion.
11    THE WITNESS:  In that scenario, was that
12  vendor purchased via VMLY&R?
13  BY MS. GOODMAN:
14    Q.  Yes.
15    MR. MCBIRNEY:  Same objections.
16    THE WITNESS:  I mean, the vendor may
17  come to Navy, but the Navy will only certify
18  invoices for payment to VMLY&R as per the task
19  order.
20  BY MS. GOODMAN:
21    Q.  Okay.  Have you heard of the term
22  Campaign Manager 360?
23    A.  I believe -- I believe I may have heard
24  of that term, but I can't remember in what
25  context.

Page 247

1    Q.  Have you seen it on any invoice
2  provided to you under the VMLY&R contract?
3    A.  I don't know.
4    Q.  Do you know what Campaign Manager 360
5  -- what services that provides?
6    A.  Sitting here today, I can't recollect.
7    Q.  Do you recall attending a Google
8  Marketing Live event?
9    A.  Yes.
10    MR. MCBIRNEY:  Ob -- sorry.
11  BY MS. GOODMAN:
12    Q.  What do you recall about that event?
13    A.  I don't recall the specifics of the
14  event.
15    Q.  How about generally?
16    A.  Generally, I remember learning about
17  the -- the graduation cliff that's forthcoming,
18  where we're going to have a loss of a lot of
19  people in our target market range.  I think that
20  was one of the big takeaways from that event.
21    Q.  Do you recall learning anything
22  about Google Ad products or services?
23    A.  I do remember that there were
24  discussions about the various products.
25    Q.  Do you have any more specific

Page 248

1  recollection as to what was discussed about the
2  various products?
3    A.  I don't recall specifics, no, ma'am.
4    Q.  Did you enjoy the Google Marketing Live
5  event?
6    A.  I thought it was very useful.
7    Q.  Why was it useful?
8    A.  Again, one of the major takeaways was
9  learning about the -- the enrollment cliff coming
10  away, which had not previously been on our radar.
11  So it was taking what was already a recruiting
12  crisis and kind of shov -- enabled us to look at
13  it through another lens of what the forthcoming
14  problems may be.
15    Q.  So is it fair to say that the Google
16  Marketing Live event that you attended was
17  another way in which Google provided value to the
18  Navy?
19    A.  Yes.  I would say that that was valuable
20  to the Navy.
21    Q.  Okay.  Do you recall any discussions at
22  the Google Marketing Live event about costs in
23  the marketing and advertising industry?
24    A.  I don't recollect that.
25    Q.  Okay.  Do you have a recollection of

Page 249

1  when this occurred, meaning this Google Marketing
2  Live event?
3    A.  I believe it was during the summer of
4  '22.
5    Q.  Do you recall speaking with anybody from
6  Google at that event?
7    A.  I spoke with lots of people.  I'm
8  terrible at remembering names, though.
9    Q.  So sitting here today, no specific
10  recollection of any particular Google person,
11  whether by name or role or title, that you recall
12  speaking with?
13    A.  No, I don't recollect anyone specific.
14    Q.  Okay.  Other than individuals from
15  Google, do you recall speaking with anybody at
16  this event?
17    A.  I can't -- I can't recollect speaking
18  with anyone in particular.
19    Q.  Okay.  The AMAP, what does that stand
20  for again?
21    A.  Sure.  The AMAP -- we call it the AMAP
22  -- is the Annual Marketing and Advertising Plan.
23    Q.  And is that determined over a -- the --
24  or is that -- is the AMAP set through a yearly
25  conference or event?

63 (Pages 246 - 249)



Page 250

1    A.   Roughly, yes.  Each year it's held in
2  the August time frame to help prepare for the new
3  fiscal year which starts October 1st.
4    Q.   Okay.  Do you have any recollection of
5  Google participating in any AMAP?
6    A.   Yes.  I believe there was a Google
7  speaker who came and provided information
8  on, I believe it was, Gen Z information,
9  but information on our target market.
10   Q.   Okay.  Anything else you recall about
11 the Google speaker who came and provided
12 information at the AMAP?
13   A.   Not that I can recollect.  It's
14 a -- it's a vague recollection of that.
15   Q.   Okay.  Do you recall any discussions
16 about any Google products or services when that
17 Google speaker was at that event?
18   A.   I don't recollect any specific product
19 or service that was discussed.
20   Q.   Okay.  Do you have any recollections of
21 any conversations you've had -- you've had with
22 anybody from Google about digital advertising?
23   A.   Not that I can recollect.
24   Q.   Do you know anybody by name at Google?
25   A.   Yes.

Page 251

1    Q.   Who do you know?
2    A.   I'll call him Mr. Sean.  I don't
3  remember the last name.
4    Q.   Would that be Sean Harrison?
5    A.   I think so.
6    Q.   Yeah.  How do you know Mr. Sean?
7    A.   From -- from the various work that we've
8  done.
9    Q.   What do you understand Mr. Sean's job to
10 be?
11   A.   My recollection is that he was over
12 government services, but I think he went into
13 another division.  I don't know what it was.
14   Q.   And do you remember any work that
15 Mr. Sean has engaged in or pro -- any serve
16 -- any -- let me start over.  Long day.
17     Are you -- to the best of your
18 recollection, how, if at all, has Mr. Sean helped
19 the Navy with respect to digital advertising?
20   A.   My recollection is Mr. Sean has helped
21 with ad hoc information on various aspects of our
22 target market and providing information to us and
23 our agency about that.
24   Q.   Do you have any knowledge or
25 recollection of any ways in which Mr. Sean has

Page 252

1  not helped the Navy?
2    A.   I do not.
3        MS. GOODMAN:  Okay.  All right.  Let's
4  take a break.
5        THE VIDEOGRAPHER:  Time the 6:06 p.m.
6  This ends Unit 5.  We're off the record.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  The time is 6:14 p m.
9  We're on the record.
10 BY MS. GOODMAN:
11   Q.   Mr. Owens, do you recall reviewing
12 interrogatory responses in this case?
13   A.   I can answer that question without --
14       MR. MCBIRNEY:  You can answer yes or no.
15 Yep.
16       THE WITNESS:  Yes.
17 BY MS. GOODMAN:
18   Q.   And you signed a document saying that
19 you believed them to be truthful and accurate,
20 correct?
21   A.   That is correct.
22

Page 253



Page 254

Page 256

1  -- telephonic conversations with anybody at
2  Wavemaker with respect to verifying the accuracy
3  of your interrogatory responses?
4       MR. MCBIRNEY:  Caution the witness to
5  make sure you're not divulging information that
6  is unrelated to the interrogatories that is
7  privileged.
8       THE WITNESS:  Can you ask the question
9  again?
10  BY MS. GOODMAN:
11      Q.  Did you have any telephonic
12  conversations with anybody at Wavemaker that
13  pertained to your verifying the accuracy of
14  information provided in interrogatory responses?
15      MR. MCBIRNEY:  And that's a yes or no
16  question.
17      THE WITNESS:  I did not have
18  conversations to verify accuracy of interrogatory
19  responses, to my recollection.
20  BY MS. GOODMAN:
21      Q.  Okay.  Did you have any other form
22  of communication with anybody at Wavemaker
23  pertaining to the accuracy of information
24  provided in interrogatory responses?
25      MR. MCBIRNEY:  And, again, caution the

Page 255

Page 257

1  witness not to divulge privileged information.
2       THE WITNESS:  Yeah.  Outside of the
3  privileged information, I -- I don't believe I
4  can answer that question.
5  BY MS. GOODMAN:
6       Q.  How about VMLY&R, did you have any
7  communications in any form with anybody at that
8  agency pertaining to the accuracy of information
9  provided in interrogatory responses?
10      MR. MCBIRNEY:  Same caution to the
11  witness.  If you're confused about privilege
12  issues, we can take a break.
13      THE WITNESS:  Let's take a break,
14  because I want to make sure that I can answer the
15  question, if I can.  But I want to make sure I
16  understand what would be covered.
17      MR. MCBIRNEY:  Okay.  Yeah.  Let's take
18  a quick break.
19      THE VIDEOGRAPHER:  Time is 6:21 p.m.
20  We're off the record.
21      (Recess taken.)
22      THE VIDEOGRAPHER:  The time is 6:33 p.m.
23  We're on the record.
24  BY MS. GOODMAN:
25      Q.  Mr. Owens, did you have any

19  BY MS. GOODMAN:
20      Q.  Any other information that you requested
21  from Wavemaker that you can recall with respect
22  to preparing your interrogatory responses and
23  verifying their accuracy?
24      A.  No.  I can't recall any additional.
25      Q.  Okay.  Did you have any conver

65 (Pages 254 - 257)

Page 258

1  conversations in any form with anybody at
2  VMLY&R pertaining to the accuracy of information
3  provided in interrogatory responses?
4          MR. MCBIRNEY:  I'm going to object to
5  that as calling for privileged information, and I
6  believe the witness has something he'd like to
7  clarify.
8          THE WITNESS:  Yeah.  I would like to
9  clarify that for the past few questions you've
10  been asking about interrogatories, I was
11  understanding an interrogatory to mean a question
12  issued to me from the DOJ attorneys.  So in my
13  references to having discussions with VMLY&R,
14  I was talking about the early data pool of
15  information we were putting together at the
16  beginning of this.  So the official
17  Interrogatories, now that I understand that that
18  is a specific name given to a specific document,
19  my answers would be different.  So I -- I -- I
20  apologize for my misunderstanding, but I think
21  that's why everyone was confused.
22          MR. MCBIRNEY:  And based on what the
23  witness just said, the government is going to
24  move to strike everything from the question that
25  occurred at Line 14 at 6:15, "Okay.  What did you

Page 259

1  do to verify their truthfulness and accuracy," on
2  the grounds that all responses following that
3  were non-responsive to the questions and were
4  privileged work product information.  And we will
5  be filing a motion, if that's not agreeable.
6          MS. GOODMAN:  It's not agreeable.
7  BY MS. GOODMAN:
8      Q.  Mr. Owens, what data did Wavemaker
9  provide you with respect to programmatic
10  advertising?
11          MR. MCBIRNEY:  Objection.  Privileged.
12  Instruct the witness not to answer.
13          THE WITNESS:  Yeah.  I'm going to follow
14  my counsel's advice.
15  BY MS. GOODMAN:
16      Q.  Okay.  Do you know whether the
17  Department of Justice has provided that data to
18  Google.
19          MR. MCBIRNEY:  Objection; foundation.
20          You can answer yes or no.
21          THE WITNESS:  I'm not aware of that.
22  BY MS. GOODMAN:
23      Q.  One way or the other?
24      A.  Right.
25          THE VIDEOGRAPHER:  Counsel, put your

Page 260

1  microphone on.
2          MR. MCBIRNEY:  Oh, I'm sorry.
3  ████████████████████████████████████
4  █████████████████████████████████████
5  ████████████████████████████████████
6  ██████████████████████████████████████
7  █████████████████████████████████████████
8  ███████████████████████████████████████████
9  ███████████████████████████████████████
10 ████████████████████████████████████
11 ████████████████████████████████████████
12 █████████████████████████████████
13 ███████████████████████████████████████
14 MR. MCBIRNEY:  We will note that we are
15          MR. MCBIRNEY:  We will note that we are
16  essentially clawing back and moving to strike all
17  of that testimony.  But with regards to your
18  particular request for production of responsive
19  information, we will take that request under
20  advisement.
21          MS. GOODMAN:  Okay.  So have you
22  produced that information to us, to your
23  knowledge, sitting here today?
24          MR. MCBIRNEY:  I'm not in a position to
25  answer that question, but we will look into that

Page 261

1  and provide you a response.
2          MS. GOODMAN:  Okay.
3  BY MS. GOODMAN:
4      Q.  So my original question that you
5  misunderstood is what did you do with respect
6  to verifying the information provided in the
7  interrogatory responses, now that you understand
8  what I mean by that.
9      A.  I appreciate you asking me the
10  question again now that I understand that
11  "interrogatory" is that formal document and not
12  just questions being asked.
13          For the interrogatories, in our
14  responses, we simply answered the questions as
15  truthfully and transparent as possible and
16  attested to that.
17      Q.  And my question to you, sir, is what did
18  you do to make sure that the information was
19  truthful and accurate?
20      A.  Read the question and provided a
21  response that -- that was complete and
22  transparent.
23      Q.  And how did you make sure that the
24  answer was "complete and transparent"?
25      A.  By utilizing my knowledge in this role.



66 (Pages 258 - 261)

Page 262

1    Q.  Okay.  So one of the questions that
2  we asked the Navy in interrogatories that you
3  verified was to "identify all purchases of Open
4  Web Display Advertising that were purchased by
5  the Navy directly from Google during the damages
6  period," which is 2019 to 2023.  So what did you
7  do to verify the accuracy of the answer provided
8  in response to that interrogatory?
9    A.  Directed my director of resources to go
10 and find all the applicable documents in that
11 time frame.
12    Q.  Okay.  And did she follow your
13 instruction?
14    A.  To the best of my knowledge, yes.
15    Q.  And then what did you do with the
16 documents?
17    A.  Provided them to the DOJ attorneys.
18    Q.  Did you review them?
19    A.  The -- did I go to each document and
20 review them or what -- can -- can you be more
21 specific with the question?
22    Q.  Yes.  So you've asked -- you asked
23 your director of resources to find all of the
24 applicable documents in the time frame.  My
25 question is did you look at them?  Did you review

Page 263

1  them before verifying the accuracy of your
2  interrogatory responses?
3    A.  I reviewed the list of documents.  I did
4  not go to each document and review the internals
5  of that document, but the document itself.
6    Q.  What was on the list of documents?
7    A.  Sitting here today, I don't recall.
8    Q.  What's your best recollection of what
9  was on that list of documents?
10    MR. MCBIRNEY:  Objection.  The document
11 speaks for itself.  Are we referring to the list
12 on the interrogatories?
13    MS. GOODMAN:  No.  He's testifying
14 that an individual provided him with a list of
15 documents, and I'm asking what was on that list.
16    THE WITNESS:  Sure.  To the best of my
17 recollection, it was a list of all of the digital
18 media task orders.
19 BY MS. GOODMAN:
20    Q.  Okay.  Did you review any other
21 documents in order to verify the accuracy of the
22 information provided in the Navy's interrogatory
23 responses?
24    A.  I can't recall specifically without
25 having the document in front of me.

Page 264

1    Q.  Okay.  Did you do anything to determine
2  any purchases of Open Web Display Advertising for
3  purposes of verifying the accuracy of your
4  interrogatory responses?
5    MR. MCBIRNEY:  Objection; foundation.
6    THE WITNESS:  So any purchases of that
7  type of advertising would have been a digital
8  media purchase, and so it would have been
9  included in that list of the digital media task
10 orders.
11 BY MS. GOODMAN:
12    Q.  Okay.  And to the best of your
13 recollection, do any of the digital media task
14 orders refer to any purchases of Open Web Display
15 Advertising?
16    MR. MCBIRNEY:  Objection to foundation.
17    THE WITNESS:  Again, without -- without
18 having them in front of me now, I -- I wouldn't
19 be able to -- to -- to say.
20 BY MS. GOODMAN:
21    Q.  Okay.  Well, before we talked about
22 how you've heard the term Open Web Display
23 Advertising.  Have you heard -- have you seen
24 that term in the course of reviewing any task
25 orders for media purchases under the VMLY&R

Page 265

1  contract?
2    MR. MCBIRNEY:  Objection; foundation.
3  Asked and answered.
4    THE WITNESS:  Yeah.  And sitting here
5  today, I -- I don't recall.
6  BY MS. GOODMAN:
7    Q.  Okay.  What, if anything, did you do to
8  identify all amounts of money paid by the Navy to
9  Google for purposes of verifying the accuracy of
10 the Navy's interrogatory responses?
11    MR. MCBIRNEY:  Objection; foundation.
12    THE WITNESS:  I spoke with my director
13 of resources and ensured that all digital media
14 task orders that were applicable were included on
15 the list.
16 BY MS. GOODMAN:
17    Q.  Okay.  But we've talked about the task
18 orders.  They don't actually effectuate any
19 purchase, correct?  They just set a ceiling for
20 the amount of digital -- money that could be
21 spent on digital advertising.  Is that fair?
22    MR. MCBIRNEY:  Objection.  Asked and
23 answered.
24    THE WITNESS:  It's -- so it gives the
25 authority to the agency to spend that amount on

67 (Pages 262 - 265)

Page 266

1  digital advertising.
2  BY MS. GOODMAN:
3      Q.  And -- but it does not, therefore, state
4  any amount of money paid by the Navy to Google,
5  correct.
6          MR. MCBIRNEY:  Objection.  Asked and
7  answered.  And the document speaks for itself.
8          THE WITNESS:  The amount paid to Google
9  would be on the invoices.
10  BY MS. GOODMAN:
11      Q.  Okay.  So my question to you, sir, is
12  what, if anything, did you do with respect to
13  determining the amounts paid by the Navy to
14  Google for purposes of verifying your
15  interrogatory responses?
16          MR. MCBIRNEY:  Objection.  Asked and
17  answered.
18          THE WITNESS:  I had my director of
19  resources put that list together.
20  BY MS. GOODMAN:
21      Q.  What is "the list" you're referring to
22  with respect to identifying the amount of money
23  paid by the Navy to Google?
24      A.  The list of digital media task orders.
25      Q.  Okay.  Did you have your director of

Page 267

1  resources put together any list of invoices that
2  would actually identify the amounts of money
3  invoiced by Google?
4          MR. MCBIRNEY:  Object to the form of the
5  question.
6          THE WITNESS:  Sitting here today,
7  without having the document in front of me, I
8  can't recollect.
9  BY MS. GOODMAN:
10      Q.  When you say "that document in front of
11  me," which document are you referring to?
12      A.  The interrogatories.
13      Q.  Okay.  Do you recall reviewing
14  interrogatory responses that list documents
15  produced in this litigation?
16      A.  Can you ask the question again?
17      Q.  Do you recall reviewing any
18  interrogatory responses from the Navy that
19  provide a list, by Bates Number, of documents
20  that were produced in this litigation?
21      A.  I don't know what a Bates Number is.
22      Q.  It's that little number at the bottom of
23  the document that identifies it.
24      A.  I -- I can't recollect without seeing
25  the document.

Page 268

1      Q.  Okay.  I'm showing you my binder with
2  this big chart of Navy documents by Bates Number.
3  Do you see that?
4      A.  Yes.
5      Q.  Okay.  Do you recall seeing anything
6  like this list of documents produced to Google in
7  this litigation as part of an interrogatory
8  response?
9          MR. MCBIRNEY:  I'm going to object to
10  referencing something that we're not marking for
11  the record.  The record's not going to reflect
12  what you just showed him.
13          MS. GOODMAN:  That's my problem.
14          THE WITNESS:  Yes.  I recollect seeing
15  something similar to that.
16  BY MS. GOODMAN:
17      Q.  Okay.  Did you review, to your
18  knowledge, any of the documents listed on these
19  charts that you recalled seeing for purposes of
20  verifying the interrogatory responses?
21          MR. MCBIRNEY:  Objection; vague and
22  unclear what charts we're referring to.
23          You can answer if you understand what's
24  being asked.
25          MS. GOODMAN:  Keep your speaking

Page 269

1  objections out.  Just object to form and move on.
2          THE WITNESS:  So I do not recall going
3  to each of those individual documents and looking
4  at them.
5  BY MS. GOODMAN:
6      Q.  Do you recall looking at any of the
7  documents listed on the interrogatory responses
8  prior to verifying the accuracy of the
9  interrogatory responses?
10      A.  I recall reviewing the interrogatory
11  responses, but I did not go to each individual
12  item on there to -- to open it up.
13      Q.  Did you look at any sampling of
14  item -- of any sample of documents listed on
15  interrogatory responses prior to verifying the
16  accuracy of them?
17          MR. MCBIRNEY:  Objection.  Assumes facts
18  not in evidence.
19          THE WITNESS:  I relied on my experts in
20  my resources division to put that together.
21  BY MS. GOODMAN:
22      Q.  So is it your testimony that the experts
23  in your resources division provide -- put
24  together a list of documents to put in
25  interrogatory responses?

68 (Pages 266 - 269)

1          MR. MCBIRNEY: Objection. Again, he
2    doesn't -- he has no documents in front of him.
3    I -- I don't know what you're asking him about.
4    This is confusing.
5          It's not even clear there is a list that
6    he's referring to. So if you want to show him a
7    document, you can ask him questions about the
8    document. At this point he has no idea what
9    you're asking about.
10         THE WITNESS: Yeah. I --
11         MS. GOODMAN: Please do not coach the
12   witness.
13         MR. MCBIRNEY: I'm not coaching the
14   witness. You are trying to create a confusing
15   record --
16         MS. GOODMAN: That's my problem.
17         MR. MCBIRNEY: -- by asking questions
18   about a document that you're not putting in front
19   of him. So we don't know what you're talking
20   about here.
21         MS. GOODMAN: Okay.
22         THE WITNESS: Yeah. Again, I don't know
23   without looking at the document in front of me
24   what exactly you're asking about.
25   BY MS. GOODMAN:

1       Q.   Okay. To your knowledge, did anybody
2    within your resources division put together a
3    list of documents, beyond the task orders for
4    media purchases, for use in interrogatory
5    responses?
6       A.   Not to my knowledge.
7       Q.   Okay. Do you know what media task
8    orders the United States is seeking damages for
9    in this litigation vis-a-vis the Navy?
10         MR. MCBIRNEY: Objection; vague.
11   Foundation.
12         You could answer to the extent it does
13   not involve divulging confidential communications
14   with counsel.
15         THE WITNESS: I can't answer that
16   question outside of divulging con -- privileged
17   communications.
18   BY MS. GOODMAN:
19      Q.   Okay. So one of the interrogatories
20   we asked the Navy, and that you verified, is to
21   identify each campaign forming the basis of your
22   claim for damages. And in response to that
23   interrogatory you verified a list of task order
24   numbers. And the document states that, "Below
25   is a list of task order numbers for the Navy's

1    advertising campaigns for which the United
2    States may seek damages in this action."
3          What, if anything, did you do to
4    determine the task order numbers for which the
5    United States may seek damages in this action?
6          MR. MCBIRNEY: Objection. Assumes facts
7    not in evidence. Calls for speculation.
8          THE WITNESS: I ensured that my
9    resources division put together a list of all
10   task orders that were requested of us that met
11   the criteria we were requesting.
12   BY MS. GOODMAN:
13      Q.   What met the criteria requested?
14      A.   I -- I don't recall the exact time
15   frames, but the -- the time frame criteria.
16      Q.   Any other criteria?
17      A.   Not that I can recollect.
18      Q.   Okay. Another question we asked the
19   Navy is to identify any account IDs associated
20   with any account used to purchase display
21   advertising on behalf of the Navy. What steps
22   did you do -- did you take, if any, to identify
23   account IDs associated with any account used to
24   purchase display advertising on behalf of the
25   Navy?

1          MR. MCBIRNEY: Same objections.
2          THE WITNESS: Yeah. With -- without the
3    document in front of me, I can't recollect.
4    BY MS. GOODMAN:
5       Q.   Okay. Well, I'll represent to you that
6    no account IDs are listed in this interrogatory
7    response on behalf of the Navy. And so my
8    question to you, sir, is what did you do, if
9    anything, to identify any account IDs?
10         MR. MCBIRNEY: Objection. Assumes facts
11   and asked and answered. And I again object to
12   the witness being questioned without access to
13   the document.
14         THE WITNESS: Yeah. Again, I can't
15   recollect.
16   BY MS. GOODMAN:
17      Q.   Do you recall doing anything to identify
18   account IDs?
19         MR. MCBIRNEY: Same objections.
20         THE WITNESS: I -- I can't recollect
21   what was done.
22   BY MS. GOODMAN:
23      Q.   And when you say "what was done," are
24   you referring to your own actions or somebody
25   else?

69 (Pages 270 - 273)

Page 274

1    A.  I'm referring to my personal actions.
2    Q.  Okay.  Did you have any conversations
3  with Mr. Edmondson at VMLY&R, or Sandra Mouio
4  at Wavemaker, with respect to identifying any
5  account IDs associated with the purchase of
6  advertising on the behalf of the Navy?
7        MR. MCBIRNEY:  Instruct the witness
8  not to answer to the extent it would divulge
9  privileged information.
10       THE WITNESS:  I'm going to listen to my
11  counsel.
12  BY MS. GOODMAN:
13   Q.  You can't answer that question without
14  relying on conversations with counsel?
15   A.  I cannot answer that question without
16  divulging information that's privileged
17  communications with counsel.
18   Q.  And what are the privileged
19  communications that -- that you're recollecting?
20       MR. MCBIRNEY:  Objection.  Instruct not
21  to answer.
22       THE WITNESS:  I'm going to listen to my
23  counsel.
24       MS. GOODMAN:  Okay.
25       (Whereupon Mr. McBirney's realtime feed

Page 275

1  was interrupted.)
2        MR. MCBIRNEY:  Did it freeze?
3        THE REPORTER:  Hit the red "reconnect."
4        MR. MCBIRNEY:  I don't see a red
5  "reconnect."
6        MS. GOODMAN:  Top right.
7        THE REPORTER:  I'm sorry.
8        Oh ...
9  BY MS. GOODMAN:
10   Q.  Mr. Owens, what -- so another question
11  we asked the Navy in their interrogatories was to
12  provide a computation of damages that the Navy
13  seeks in the course of this litigation.  And the
14  answer that you verified provides a table of the
15  names and email addresses of individuals with
16  relevant knowledge at the Navy, okay?  And you're
17  on that list.  And my question to you, sir, is
18  what relevant knowledge does Cheryl Aimestillman
19  have with respect to any damages that the Navy
20  seeks in this litigation?
21   A.  Cheryl Aimestillman works in my
22  resources division, and she holds a warrant as
23  a -- to write contracts, as well.  Previously
24  when I mentioned that threshold, she's the one
25  that can write contracts for NRC below a certain

Page 276

1  threshold.
2    Q.  Okay.  Same question as to Adelina
3  Lozzi.  What relevant knowledge does Ms. Lozzi
4  have with respect to any damages that the Navy is
5  seeking in this litigation?
6    A.  So as mentioned previously, Ms. Lozzi,
7  or Lozzi, is the warranted contracting officer at
8  FLC who writes the contracts above that
9  threshold.
10   Q.  Do Ms. Lozzi or Ms. Aimestillman have
11  any knowledge of amounts paid via invoices to
12  Google?
13   A.  Yes.  Ms. Cheryl helps to manage the
14  invoicing process, as well, as they come in.
15   Q.  How about Ms. Lozzi?
16   A.  I can't speak on Ms. Lozzi's processes
17  because she's at a different command.
18   Q.  Kevin Clausen, what knowledge does he
19  have relevant to damages?
20   A.  He is the supervisor of Ms. Lozzi, I
21  believe.
22   Q.  Anything else that you can
23  test -- testify to, to your knowledge, about
24  Mr. Clausen and his visibility into any damages
25  incurred by the Navy?

Page 277

1    A.  Not that I can think of, no.
2    Q.  Okay.  Bridget Blaney, what relevant
3  knowledge does she have with respect to any
4  damages incurred by the Navy?
5    A.  It's my understanding that Ms. Blaney
6  had a warrant to write contracts in excess of
7  a threshold that Ms. Lozzi couldn't.  So,
8  basically, if it surpassed a certain threshold,
9  then Ms. Blaney would write the contract.
10   Q.  So she has control over the most money?
11   A.  So to speak.
12   Q.  Okay.  Any other relevant knowledge
13  you're aware of Ms. Blaney having with respect to
14  damages?
15   A.  Not to my knowledge.
16   Q.  Okay.  Another question that we asked
17  was all -- to identify all persons who provided
18  information that assisted in responding to these
19  interrogatories.  You're the only individual
20  listed.  Is that accurate?
21       MR. MCBIRNEY:  Objection.  Document
22  speaks for itself, and vague.
23       THE WITNESS:  Can you ask the question
24  again?
25  BY MS. GOODMAN:

70 (Pages 274 - 277)

Page 278

1    Q.  Other than yourself, was there
2    any person who is not a lawyer who provided
3    information that assisted in responding to the
4    interrogatories that you verified?
5        MR. MCBIRNEY:  Objection to foundation.
6        THE WITNESS:  Yeah.  As I -- as I
7    testified earlier, I did have members of my
8    team assist me in providing my response to the
9    interrogatories.
10   BY MS. GOODMAN:
11   Q.  Okay.  Anybody outside of members of
12   your team assist in providing information to help
13   in res -- responding to the interrogatories?
14       MR. MCBIRNEY:  Same objection.
15       THE WITNESS:  Not that I recall.
16   BY MS. GOODMAN:
17   Q.  Anybody at Wavemaker provide information
18   that assisted in responding to these
19   interrogatories?
20   A.  Not that I recall.
21   Q.  Same question as to VMLY&R.
22   A.  Not that I recall.
23   Q.  Did Mr. Edmondson provide any
24   information that was -- that assisted in
25   responding to the interrogatories that you

Page 279

1    verified?
2    A.  I would consider him to be covered under
3    the question of VMLY&R, so not that I recall.
4    Q.  Same question as to Sandra Mouio?
5    A.  And same response.  I would consider her
6    to be part of the Wavemaker entity, so not that I
7    recall.
8        MR. MCBIRNEY:  Can I get a check on the
9    time?
10       THE VIDEOGRAPHER:  7:02.
11       MR. MCBIRNEY:  I guess that's time.
12       MS. GOODMAN:  Thank you for your time,
13   Mr. Owens.
14       THE VIDEOGRAPHER:  Off the record,
15   Counsel?
16       MS. GOODMAN:  Yes.
17       MR. MCBIRNEY:  Off the record.
18       THE VIDEOGRAPHER:  The time is 7:03 p.m.
19   We're off the record.
20       (Deposition concluded -- 7:02 p.m.)
21
22
23
24
25

Page 280

1            C E R T I F I C A T E
2
3        I do hereby certify that I am a Notary
4    Public in good standing, that the aforesaid
5    testimony was taken before me, pursuant to
6    notice, at the time and place indicated; that
7    said deponent was by me duly sworn to tell the
8    truth, the whole truth, and nothing but the
9    truth; that the testimony of said deponent was
10   correctly recorded in machine shorthand by me and
11   thereafter transcribed under my supervision with
12   computer-aided transcription; that the deposition
13   is a true and correct record of the testimony
14   given by the witness; and that I am neither of
15   counsel nor kin to any party in said action, nor
16   interested in the outcome thereof.
17
18       WITNESS my hand and official seal this
19   17th day o
20
21
22            Notary Public
23
24
25

Page 281

1  Jimmy McBirney, Esq.
2  jimmy.mcbirney@usdoj.gov
3           August 17, 2023
4  RE:  United States, Et Al v. Google, LLC
5  8/15/2023, Allen Owens (#6037511)
6  The above-referenced transcript is available for
7  review.
8  Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12 The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17 Return completed errata within 30 days from
18 receipt of testimony.
19 If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

71 (Pages 278 - 281)