# EXHIBIT D



August 20, 2018

## Comments of News Media Alliance
## Before the Federal Trade Commission
## Regarding the Hearings on Competition and
## Consumer Protection in the 21st Century

*Re:    Topic 1: The state of antitrust and consumer protection law and enforcement, and their development, since the Pitofsky hearings*

In response to the Federal Trade Commission's ("FTC") request for comments dated June 20, 2018, the News Media Alliance ("Alliance")[1] respectfully submits the following comments. At the outset, the Alliance would like to express its appreciation to the Commission for taking the initiative to call these hearings on Competition and Consumer Protection in the 21st Century. The Alliance and its members believe the issues at the heart of these hearings are of critical importance to the Commission's mission to protect competition and consumers. For nearly a decade, a small cadre of technology giants has exerted unprecedented influence and control over the U.S. news industry to the detriment of competition, consumers, and our democratic society.

The audience for news is larger than ever. But as news moves online, it has become clear that the digital deck is stacked against quality journalism. The two most important questions digital publishers must answer center on distribution and monetization: How will the publisher get its content to consumers? And how will it monetize that content? Today, when publishers try to answer those questions, they face a nearly impossible situation: tech giants—especially Google and Facebook—now control both the distribution and monetization of online news content.

The tech giants' dominance makes it extremely difficult for news publishers to build sustainable digital business models. Dominant platforms use secret, unpredictable algorithms to determine whether and how content is delivered to readers.

---

[1] The Alliance is a nonprofit organization serving the U.S. newspaper industry. The Alliance works with its 2,000 member publishers, as well as other partner organizations, to address the key challenges and opportunities of today's news environment: freedom of the press, public policy and legal matters, advertising growth, new revenue streams and audience development.

At the same time, they suppress publishers' brands, control their data, and refuse to recognize and support quality. The platforms also now take the vast majority of online ad revenue through their advertising services, leaving publishers with little to reinvest in high-quality, original journalism. Ultimately, these practices reduce the output of high-quality journalism—news publishers who cannot monetize their content produce less of it.

The effects that tech giants are having on the news industry are of critical importance to our nation. As a democratic society, we rely on a healthy news media to keep us informed and to ensure transparency from our leaders. If news publishers continue to be beholden to a small number of powerful tech giants, however, they will be unable to perform those vital functions. This is why we are asking the FTC (and other antitrust regulators) to act.

The platforms did not obtain their dominant positions in news distribution and monetization solely through competition on the merits. They have grown with the assistance of serial acquisitions and exclusionary conduct aimed at nascent competitors and technologies that threaten to supplant their positions. Action by the FTC is thus needed and justified to rein in the tech giants' anticompetitive conduct.

In Section I below, we first note the importance of the news industry to a democratic society and explain why the FTC should prioritize news publishers among the many different victims of the platforms' dominance. In Section II, we illustrate how the platforms exercise their market power to control both the distribution and monetization of news content. Finally, in Section III, we ask the FTC to ensure that it is using the correct framework for analyzing the platforms' conduct, and to use both its antitrust and consumer protection authority to scrutinize the dominant platforms. We also offer recommendations regarding important legal questions that are likely to arise in any case involving the platforms.

I. **The news industry is critical to a functioning democratic society**

The dominant tech platforms are using their power to disrupt many different industries. Antitrust and consumer protection authorities thus face the difficult task of deciding how best to allocate limited investigatory resources to keep the platforms in check. When prioritizing its enforcement agenda, the FTC should consider the special role of the news industry, which is essential to a healthy and functioning democracy.

Our participatory form of government is premised on the existence of a well-informed citizenry. Quality journalism is thus critical because it can help the public to understand what is happening in the world and expose practices that might otherwise go undetected. For example, vivid reporting from several publishers about the separation

of migrant children from their parents helped humanize the effects of policies that are far removed from the lives of most Americans.[2] In another example, *The Indianapolis Star*'s four-month investigation former USA Gymnastics team doctor Larry Nassar exposed a sexual predator and ultimately resulted in his prosecution.[3] These and countless other stories show how—more than any other form of media—news content has real impacts on world events.

If the news industry is permitted to continue deteriorating as the technology platforms take over, it is almost impossible to exaggerate the consequences. This is about more than just the price of a newspaper or an online subscription. The Alliance appreciates that the FTC is not a panacea for every problem relating to online platforms and the news industry, but there are many issues that fall squarely within the Commission's core antitrust and consumer protection missions and that deserve attention. When scrutinizing the technology platforms for potentially anticompetitive conduct, the FTC should consider whether their conduct restricts the output of quality journalism and misappropriates content.

## II. The dominant tech platforms are using their market power to force policies and practices on the news industry that threatens its viability

### A. Relative to other content producers, news publishers are especially vulnerable to dominant platforms

Before describing how the dominant platforms abuse news publishers, it is useful to understand why the news industry is especially vulnerable to such abuse. In short, individual publishers lack bargaining power vis-à-vis the dominant platforms. One of the key reasons is the disaggregated nature of the news industry, especially compared to the highly-concentrated nature of the tech platforms. But another reason for the unequal bargaining power is that it is difficult for news publishers to protect their content through current intellectual property ("IP") protections, so platforms can threaten (expressly or implicitly) to get similar content from other sources.

In other industries that sell information or content, producers are able to protect their work from exploitation through copyright or technology. IP protections preserve producers' incentives to generate content, which is how journalists innovate every day, by preventing others from piggybacking on their work.  News publishers'

---

[2] Miriam Jordan, *A Migrant Boy Rejoins His Mother, but He's Not the Same*, N.Y. Times (July 31, 2018), https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html.

[3] Marisa Kwiatkowski, Mark Alesia & Tim Evans, *A blind eye to sex abuse: How USA Gymnastics failed to report cases*, Indianapolis Star (Aug. 4, 2016), https://www.indystar.com/story/news/investigations/2016/08/04/usa-gymnastics-sex-abuse-protected-coaches/85829732/.

primary business, however, is uncovering facts, and facts are not copyrightable. If a reporter spends years uncovering a story and publishes what she discovers online, there is nothing to prevent a rival publication from immediately publishing the exact same information on its site or an aggregator to capture traffic by providing snippets.

U.S. Courts have also deeply eroded any potential benefit that news publishers could gain from copyright laws because of their repeatedly expansive interpretation of the Fair Use defense to copyright infringement.[4] In particular, the interpretation of the "transformative use" factor—which allows for a weighing in favor of a fair use if the purpose of the secondary use is different and transforms the essence of the work—has been interpreted so expansively that any misappropriation of content when found through a search capability provided by the platforms is deemed permissible.[5]

This blind spot in U.S. IP law is relevant to the market power of tech platforms because it deprives publishers of leverage they might otherwise have when dealing with the tech giants. For example, the tech platforms have so far been unwilling to prioritize and identify the original source of news content, even for a limited time.[6] This solution would greatly benefit news publishers who spend significant time and resources on long-term investigative journalism that is then repackaged and distributed by those who do not make similar investments.

There have been some legislative efforts to put news publishers on more equal footing to negotiate for better business arrangements by creating a limited safe harbor under the antitrust laws for them to collectively negotiate with big tech platforms.[7] Until any such bills become law, the need for vigorous FTC enforcement remains paramount.

B. **The tech platforms control news distribution**

1. **Distribution in the system is flawed**

When news was solely a print business, a news publisher had a direct relationship with its readers. The relationship was built on trust and an understanding that if the reader did not like or agree with what she was reading, she knew where to go to

---

[4] Copyright Act of 1976 § 107, 17 U.S.C. § 107.

[5] *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 216-17 (2d Cir. 2015), *cert. denied* 136 S.Ct. 1658 (2016).

[6] George Thuronyi, *Copyright and a Free Press*, Library of Congress (May 31, 2018), https://blogs.loc.gov/copyright/2018/05/copyright-and-a-free-press/?loclr=eacop.

[7] News Media Alliance, Press Release: Congressman David Cicilline Introduces Journalism Competition and Preservation Act of 2018 (Mar. 7, 2018), https://www.newsmediaalliance.org/release-cicilline-journalism-competition-preservation-act-2018/.

complain. The news business has a long history of adhering to a set of standards and codes of conduct that strive to demonstrates the principles of verification, accuracy, and fidelity to facts.

Today, the distribution of online content is controlled by two dominant players: Google and Facebook. The vast majority of consumers find online news content through one of two sources: search engines and social media. Google and Facebook are monopolists in those two markets, which puts them in control of the two main online news distribution channels. Together, they account for over **80%** of referrals to digital news publications.[8] By way of comparison, the next biggest referrer, Twitter, accounts for only 2% of news referral traffic.

In effect, Google and Facebook now control what news consumers around the country see. This puts them in a position of enormous—indeed, unprecedented—power. While the First Amendment prohibits the government from restricting the public's access to particular sources of information, there is nothing stopping either Google or Facebook from doing the same thing.

The two tech giants exploit this lack of oversight by steering users to specific sources of news content. They use secret, opaque AI-run algorithms to decide which news articles appear in a user's search results and social media feed based on priorities they impose (e.g., speed, free, links), and they have the power to manipulate these algorithms to suit any purpose. Google and Facebook can use their algorithms to promote particular political ideas, pundits, or candidates, or they can promote their own commercial interests. There is strong evidence that Google and Facebook are doing both. In doing so, they make editorial judgements about news publishers' accuracy, relevance, newsworthiness, and many other criteria. Neither consumers nor regulators, however, have any insight into how the platforms' algorithms are deciding what the public sees.

2. **The platforms use the threat of demotion to force publishers to serve their commercial interests**

Google and Facebook exercise their control over news distribution though a liberal use of "demotion," the practice of presenting content in a way that makes users less likely to find or notice it. In this context, demotion takes many forms, such as relegating content lower on a page or presenting it in a less attractive, eye-catching format compared to other items on the page (e.g., plain text links vs. links accompanied with graphics and snippets).

---

[8] Parse.ly, *External referrals in the Parse.ly network* (last accessed July 10, 2018), https://www.parse.ly/resources/data-studies/referrer-dashboard/.

Today, news publishers live under the constant threat of demotion because it can have catastrophic consequences for a site's traffic. For example, one source shows that Google's top three search results get 30%, 15%, and 10% of all desktop clicks respectively, with 75% of all clicks going to the first page of search results.[9] The implication is that the lower a webpage falls in Google's search results, the less likely it becomes that a user will find and click on the link.

*The Wall Street Journal* experienced the effects of demotion firsthand when it decided in 2017 not to implement First-Click-Free, a policy Google imposed on subscription-based news publishers that required them to give up their content for free to Google users or face demotion in Google's search results. After *The Wall Street Journal* pulled out of First Click Free, its Google traffic plunged **44%**. The message to news publishers was clear: fail to implement the platforms' preferred business practices and you will lose vital referral traffic.[10]

The platforms have developed products that further cement their control over distribution, promising users faster upload speeds and a better experience. While users may experience faster speeds, the true winners are the platforms who have invented an additional gateway to further control readers' data, advertising, monetization, and branding—benefits that previously belonged to news publishers who rely on that revenue to reinvest in journalism.

For example, Google's Accelerated Mobile Pages (AMP), offers publishers the ability to convert their webpages to accommodate AMP specifications, which is then hosted through Google's servers via their Content Delivery Network (CDN).[11]  The reader remains inside the Google platform and off the publisher's website, severing the direct relationship between the news publisher and its reader. Google collects the first-party data and determines how the news content is monetized; for example, Google just recently began allowing subscriptions for AMP articles but limitations on advertising revenue still remain.  In exchange for control over publishers' revenue and data, Google promises more traffic by uplifting AMP articles into a "carousel" at the top of the page where most users spend their time. Publishers then hope to get enough traffic that outweighs the ability to maintain control over revenue and data.

---

[9] Advanced Web Ranking, *CTR Study: June 2018* (last accessed July 30, 2018), https://www.advancedwebranking.com/ctrstudy/.

[10] Danny Sullivan, *Wall Street Journal's Google traffic drops 44% after pulling out of First Click Free*, Search Engine Land (June 5, 2017), https://searchengineland.com/wsj-google-traffic-down-276387.

[11] AMP requirements include removing JavaScript, constrained analytics, style and layout limitations, etc. https://www.ampproject.org/docs/getting_started/quickstart#getting-started-with-amp

It is a false choice: the publisher may opt out of AMP, but at the risk of losing traffic from being demoted by Google.

Facebook furthers its distribution stronghold through Instant Articles. It basically provides the same intermediation between content producer and reader as AMP, with the implied arrangement that if the publisher wants its content to be found on the platform, it will relinquish control over distribution and benefits therefrom. Instant Articles has similar limitations on publishers' access to data, branding, and monetization, with less insight into the prioritization that Instant Articles are given over other traffic. The main benefit of Instant Articles to Facebook is having the user remain inside the social media network's walled garden so that it can continue to collect user data.

The platforms use demotion to force publishers to adopt business models and practices that run counter to their own interests, but that serve the platforms' commercial goals. As shall be explained in the next section, those commercial goals most often center around tying publishers even more tightly to the platforms' monetization engines, ultimately resulting in them being able to extract even more revenue from publishers.

### C.  The tech platforms control news monetization

#### 1. The tech platforms use their advertising market power to deprive news publishers of revenue

As news consumption has moved online over the past two decades, publishers have had to find new ways to monetize their content. Many saw the answer in online advertising, and most adopted an entirely ad-funded model for their online content.[12] This was also due in part to Google's First-Click-Free policy, as demonstrated by the number of publishers that added a pay wall since the end of the policy in October 2017. Under the advertising model, users can visit a publisher's site and freely browse the content. Instead of charging visitors, publishers monetize their content by selling ads that appear alongside it.

Originally, publishers sold their online ad inventory through a process similar to how traditional print media ads are sold. The publishers formed direct

---

[12] For example, *The New York Times* did not introduce digital subscriptions until March 2011. Jeremy W. Peters, *The Times Announces Digital Subscription Plan*, N.Y. Times (Mar. 17, 2011), https://www.nytimes.com/2011/03/18/business/media/18times.html. *The Washington Post* did not follow suit until 2013. Steven Mufson, *The Washington Post to charge frequent users of its Web site*, Wash. Post (Mar. 18, 2013), https://www.washingtonpost.com/business/economy/the-washington-post-to-charge-frequent-web-users/2013/03/18/adc0ba46-8fe5-11e2-bdea-e32ad90da239_story.html?utm_term=.b8aba52f5db9.

relationships with advertisers and sold them a specified number of "impressions" (instances of an ad being displayed to a user). Over time, however, this direct sale model has fallen out of favor. In its place, "programmatic" advertising has arisen as the new model by which most digital ads are bought and sold.

Programmatic advertising refers to the use of automated software algorithms to buy and sell ad impressions in real time. In this context, "in real time" means that when a user navigates to a webpage, the ad space on that page is auctioned, sold, and filled in milliseconds as the page loads.

The programmatic advertising model offers several advantages. It allows publishers to reliably sell their inventory without having to worry about unsold impressions. It also allows advertisers to precisely target ads to specific users, which increases the efficacy of those ads and, as a result, the value of each impression.

Given these advantages it is no surprise that analysts predict that 83% of digital ad impressions will have been sold programmatically in 2018.[13] But despite the fact that programmatic advertising has dramatically increased the value of the ads that appear on news publishers' pages, it has not translated into more ad revenue for publishers. Indeed, annual advertising revenue for news publishers has actually fallen to one third of its 2006 levels, even while digital audiences continue to grow.[14]

A key feature of programmatic advertising is that it requires the use of ad software ("ad tech") that sits between publishers and advertisers and intermediates their transactions. These ad tech solutions include ad exchanges, ad servers, demand-side platforms, data management platforms, and many more. Each of these types of software serves its own unique purpose, but at the end of the day they all purport to help match ad impressions to the right advertiser to ensure their highest value use.

The problem for news publishers is that the major tech platforms control the ad tech that makes modern online advertising possible. Given that they also control the distribution of publishers' content, the platforms can thus impose exploitative terms on the use of their ad tech, and publishers have little choice but to acquiesce. This dynamic explains why publishers' ad revenue continues to decrease, even while their

---

[13] eMarketer, *More than 80% of Digital Display Ads Will Be Bought Programmatically in 2018* (Apr. 9, 2018), https://www.emarketer.com/content/more-than-80-of-digital-display-ads-will-be-bought-programmatically-in-2018.

[14] Barthel, *Despite subscription surges for largest U.S. newspapers, circulation and revenue fall for industry overall*, Pew Research Center (June 1, 2017), http://www.pewresearch.org/fact-tank/2017/06/01/circulation-and-revenue-fall-for-newspaper-industry/; Pew Research Center, *Newspapers Fact Sheet* (June 1, 2017), http://www.journalism.org/fact-sheet/newspapers/.

audiences grow. It also explains why the two most dominant platforms—Google and Facebook—are able to capture **73%** of *all* U.S. digital ad revenue and account for **83%** of the revenue *growth*.[15] The platforms' ad-tech dominance was built thanks to multiple acquisitions approved on erroneous assumptions. For example, when the FTC approved the acquisition of DoubleClick by Google in 2007, it could not know that programmatic technologies would become so prevalent in advertising.

### 2. The platforms undermine alternative ways of monetizing news content, such as through subscriptions

Recognizing the problems inherent to an online advertising ecosystem dominated by an intermediary, some news publishers have sought out alternative monetization models. Increasingly, they are turning to subscriptions as a way to reduce their reliance on the tech giants.[16] The platforms, however, have used their control over the distribution of news content to make it difficult for publishers to switch to a subscription-based model.

The platforms engage in several distribution practices that undermine the subscription-based business model. One frequently used strategy is to co-opt publishers' content. The platforms will either present publishers' content directly on their platform, or they will link to it in ways that encourage users to return back to the platform. These practices can obviate the need for users to subscribe to a publication to view its content. At the same time, these practices can reduce users' direct engagement with the publisher, thereby reducing the likelihood of the user subscribing and the ability for publishers to sell direct targeted advertising.

Another strategy used by the platforms involves efforts to "commoditize" news content. In short, the platforms use their power as distributors to force publishers to present their content in prescribed ways. The effect is to "flatten" news publications in the eyes of users, making it harder for them to distinguish between one brand and another. This flattening has major consequences for consumers, such as making it harder from them to distinguish credible sources from dishonest ones. It also results in a more homogenized, stale user experience. But the platforms force it on publishers and users because in a world of commoditized content, the intermediary holds the power.

---

[15] Jillian D'Onfro, *Google and Facebook extend their lead in online ads, and that's reason for investors to be cautious*, CNBC (Dec. 20, 2017), https://www.cnbc.com/2017/12/20/google-facebook-digital-ad-marketshare-growth-pivotal.html.

[16] Erin Griffith, *If Ads Don't Work, Can Publishers Strike Subscription Gold?* Wired (Oct. 7, 2017), https://www.wired.com/story/ads-dont-work-can-publishers-strike-subscription-gold/.

### 3. The platforms control publishers' access to their own data

Data is the lifeblood of digital news. Publishers rely on data to sell targeted, programmatic advertising. They also rely on it to connect with their audiences, discover their interests, and bring them the kinds of content they want to see. As with distribution and monetization, however, publishers are forced to rely on the digital platforms as intermediaries for their data needs.

Through their control of distribution, the platforms control vital data about who views news content. The platforms can then connect that information with other personal data they gather through their consumer-facing services, giving them unparalleled insight into publishers' audiences. Publishers, however, often have only limited insight into their own audiences that they then monetize across content.[17] They can only capture data about users when the users actually navigate to their sites, which is happening less and less often as the platforms seek to lock users into their platforms. It is thus becoming impossible for publishers to develop close relationships with their audiences because of their limited points of contact with users. Ultimately, the publishers' lack of control over their own data exacerbates their other monetization problems, both by making them more reliant on the platforms' data-powered ad tech, and by making the subscription-based business model even more futile.

## III. The FTC should use both its antitrust and consumer protection authority to scrutinize the dominant tech platforms

As the previous sections have explained, the digital platforms—particularly Google—are monopolists that control both the distribution and monetization of news content. Given the dire consequences the further erosion of quality news will have for society, the FTC should modernize its antitrust framework to ensure that it properly considers all of the relevant welfare effects in the news industry, especially those relating to quality and innovation in news reporting, product, distribution, and monetization. Using this framework, the Commission should use its antitrust authority to scrutinize potentially anticompetitive conduct that reduces output and innovation in news. It should also use its consumer protection authority to ensure that dominant aggregators

---

[17] *"Well, and NBC, which was one of our investors, had a dinner and we each stood up and said a few words. But we were seated next to the head of this advertising company, who said to me something like, "Well, I really always liked AllThingsD and in your first week I think Recode's produced some really interesting stuff." And I said, "Great, so you're going to advertise there, right? Or place ads there." And he said, "Well, let me just tell you the truth. We're going to place ads there for a little bit, we're going to drop cookies, we're going to figure out who your readers are, we're going to find out what other websites they go to that are way cheaper than your website and then we're gonna pull our ads from your website and move them there."* https://www.recode.net/2016/5/9/11636082/walt-mossberg-code-conference-preview-recode-relaunch

do not mislead consumers as to how they rank, place, promote, and distribute news content.

As the Commission considers whether the platforms are harming competition and consumers, there are legal considerations that should be kept in mind. First, in the antitrust context, the Commission should recognize a distinction between conditional and unconditional refusals to deal. Second, the Commission should properly weigh non-price consumer harms. And third, the Commission should pay close attention to effects on nascent competition. In the following subsections, we explain each of these points in more detail and explain how they connect to a potential antitrust case against one or more platforms.

### A. The Commission should recognize the distinction between conditional and unconditional refusals to deal

First, the Commission should resist efforts by the platforms to frame any potential claim as a refusal to deal or an essential facilities case. The obvious intent behind any such characterization would be for the platform to take advantage of permissive case law that tends to give monopolists the benefit of the doubt when it comes to excluding rivals from accessing their products or services.[18] But the platforms typically do not engage in unconditional, unilateral refusals to deal. Instead, platforms like Google and Facebook refuse to deal with competitors *unless* they adopt business practices that, in effect, reinforce their monopoly positions.

Even the Department of Justice's 2008 report on single-firm conduct under Section 2, which was criticized by some for taking too narrow a view of exclusionary conduct, recognized that *conditional* refusals to deal are distinct from unconditional refusals.[19] In cases involving conditional refusals, the proper focus is not on the refusal to deal, "but on the competitive consequence of whatever conduct this leads other parties to engage in."[20] The platforms thus should not be permitted to build their businesses on a decision to deal and then hide behind a permissive unilateral refusal to deal doctrine.

In Google's case, for example, the primary abuse is not that Google excludes certain publishers from its search page or particular elements on it (*e.g.*, the AMP carousel). Instead, the abuse is that Google forces publishers to adopt practices

---

[18] *See, e.g.*,

[19] U.S. Dept. of Justice, *Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act*, ch. 7 p. 1 (2008), https://www.justice.gov/sites/default/files/atr/legacy/2009/05/11/236681.pdf.

[20] *Id.* (quoting Dennis W. Carlton & Ken Heyer, *Appropriate Antitrust Policy Towards Single-Firm Conduct* 13 (2008), http://www.usdoj.gov/atr/public/eag/231610.pdf).

(e.g., First Click Free, AMP, eschewing certain ad types, etc.) that benefit Google's monopoly positions in search and ad tech. Facebook imposes similarly anticompetitive conditions, such as by refusing to feature articles in its newsfeed unless the publisher implements Facebook's preferred Instant Articles format, which keeps users within the Facebook ecosystem and forces publishers to monetize through Facebook.

These situations are directly analogous to the conduct at issue in the preeminent case on conditional refusals to deal, *Lorain Journal Co. v. United States*.[21] In that case, a newspaper publisher that enjoyed a local monopoly on both news distribution and advertising refused to carry ads for clients who also advertised through an upstart local radio station. As with Google and Facebook, the newspaper monopolist did not unilaterally refuse to deal with advertisers—instead, it imposed conditions on the advertisers designed to competitively harm a third-party competitor. The Supreme Court correctly recognized that the right claimed by the publisher to refuse advertisers "is neither absolute nor exempt from regulation."[22] Because the purpose of the conditions imposed by the newspaper was to restrict competition, they were unlawful.[23] The same argument should apply to the conditions Google, Facebook, and other platforms impose on publishers.

### B. The Commission should assign sufficient weight non-price consumer harms

#### 1. Non-price consumer harm includes impact on the newspaper industry's ability to sustain quality journalism

The dominant tech platforms offer most of their consumer-facing services free-of-charge, which can make it difficult to evaluate their conduct under the prevailing antitrust paradigm, which focuses first-and-foremost on price effects as a measure of consumer harm. For the most part, the platforms' anticompetitive conduct does not directly result in higher prices being charged to consumers. That does not mean, however, that their conduct does not harm consumers or the competitive process. Courts have consistently recognized that consumer harm can take many forms, and the Commission should assign appropriate weight to the non-price related harms that emanate from the

---

[21] 342 U.S. 143 (1951).

[22] *Id.* at 155.

[23] *Id.*

platforms' conduct. Specifically, in the context of news, they pay attention to conduct that leads to a restriction of output, a reduction of quality, and a loss of innovation.

The restriction of output is regularly cited as one the quintessential consumer harms that the antitrust laws were designed to prevent.[24] As explained above, Google's and Facebook's exercise of its control over news distribution and monetization ultimately reduces news output. Generating news content is an expensive endeavor. It requires an investment in journalists, editors, photographers, training, equipment, travel, and many other inputs. Moreover, due to the short shelf life of news content, publishers must continuously reinvest in generating more—last week's news is not what most readers are looking for when they visit a news website. Publishers who cannot monetize their content effectively, however, cannot afford to make the necessary reinvestments in new content, and many have been forced to cut back. Indeed, in 2018 alone, several major publishers have already announced significant cutbacks to their journalism businesses:

- **January 2018:** *The Charleston Gazette-Mail* announces that it will enter Chapter 11 bankruptcy.[25]

- **February 2018:** *The Richmond Times-Dispatch* announces that it will eliminate 21 positions.[26]

- **March 2018:** *The Denver Post* announces that it will cut 30% of its newsroom staff.[27]

- **April 2018:** *The Tampa Bay Times* announces that it will cut 50 jobs throughout its organization. The size of its newsroom had already halved between 2006 and 2015.[28]

---

[24] *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("Direct evidence of anticompetitive effects would be 'proof of actual detrimental effects [on competition],' such as reduced output….").

[25] Kenny Kemp, *Gazette-Mail declaring bankruptcy; Wheeling Newspapers is planned buyer*, Charleston Gazette-Mail (Jan. 29, 2018), https://www.wvgazettemail.com/news/gazette-mail-declaring-bankruptcy-wheeling-newspapers-is-planned-buyer/article_5a0e1ede-29aa-5866-ab47-7b9655a0d3bb.html.

[26] Megan Woo, *Times-Dispatch announces layoffs, increases newspaper prices*, NBC 12 (Feb. 21, 2018), http://www.nbc12.com/story/37556497/times-dispatch-announces-layoffs-increases-newspaper-prices.

[27] Editorial, *The Denver Post announces newsroom staff reductions*, Denver Post (Mar. 14, 2018), https://www.denverpost.com/2018/03/14/denver-post-layoffs/.

[28] Jacqueline Thomsen, *Tampa Bay Times to lay off dozens of staff in response to Trump tariffs*, The Hill (Apr. 19, 2018), http://thehill.com/homenews/media/383879-tampa-bay-times-to-lay-off-dozens-of-staff-in-response-to-trump-tariffs.

13

- **May 2018:** *The Salt Lake Tribune* announces that it will lay off 38% of its newsroom staff.[29]

- **July 2018:** *The New York Daily News* announces that it will lay off half of its newsroom staff.[30]

Indeed, according to Pew Research, at least 36% of newspapers and 23% of digital-native news publications have experienced layoffs since January 2017, and the number of newspaper newsroom employees has fallen 45% nationwide since 2008.[31] While several factors undoubtedly played into each one of these cutbacks, one overarching issue has affected each of these organizations. Dominant online intermediaries are capturing more and more of the revenue generated by the publishers' content. The resulting loss of news output is a serious consumer harm.

The reduction of the quantity of news content is not the only (or even the most significant) consequence of the platforms' control over news distribution and monetization. The way that they force publishers to conform their businesses to the tech giants' commercial interests has also had disastrous effects on the *quality* of news content. As with output restrictions, courts frequently cite reductions in product quality as a type of consumer harm that may emanate from anticompetitive conduct.[32]

Much has been written over the past few years over the proliferation of click-bait journalism and fake news and its pernicious effects,[33] but an underappreciated

---

[29] Jasen Lee, *Salt Lake Tribune lays off 38 percent of newsroom staff*, Deseret News (May 14, 2018), https://www.deseretnews.com/article/900018570/salt-lake-tribune-lays-off-38-percent-of-newsroom-staff.html.

[30] Jaclyn Peiser, *Daily News Newsroom Cut in Half by Tronc as Top Editor Is Ousted*, N.Y. Times (July 23, 2018), https://www.nytimes.com/2018/07/23/business/media/tronc-daily-news-layoffs.html.

[31] Elizabeth Grieco et al., *About a third of large U.S. newspapers have suffered layoffs since 2017*, Pew Research Ctr. (July 23, 2018), http://www.pewresearch.org/fact-tank/2018/07/23/about-a-third-of-large-u-s-newspapers-have-suffered-layoffs-since-2017/; Elizabeth Grieco et al., "Newsroom employment dropped nearly a quarter in less than 10 years, with greatest decline at newspapers," Pew Research Ctr. (July 30, 2018), http://www.pewresearch.org/fact-tank/2018/07/30/newsroom-employment-dropped-nearly-a-quarter-in-less-than-10-years-with-greatest-decline-at-newspapers/.

[32] *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("Direct evidence of anticompetitive effects would be 'proof of actual detrimental effects [on competition],' such as … decreased quality in the relevant market.").

[33] *See, e.g.*, Jason Daley, *New Study Finds Fake News Spreads Faster and Deeper Than Verified Stories on Twitter*, Smithsonian.com (Mar. 12, 2018), https://www.smithsonianmag.com/smart-news/fake-news-spreads-faster-and-deeper-verified-stories-180968443/#KSEoYquCcZ0K1zQY.99; Alex Hern, *Google accused of spreading fake news*, The Guardian (Mar. 6, 2017), https://www.theguardian.com/technology/2017/mar/06/google-accused-spreading-fake-news; Daisuke Wakabayashi & Mike Isaac, *In Race Against Fake News, Google and Facebook Stroll to the Starting Line*,

14

aspect of this phenomenon has been the central role played by the dominant tech platforms. As explained above, the platforms use their control over news distribution to force publishers into the platforms' preferred monetization models. These monetization models center around programmatic advertising, a key feature of which is that advertisers pay to reach particular users rather than to have their ads appear alongside specific content. In other words, instead of paying for quality content, advertisers now simply pay for eyeballs. This shift creates new incentives for platforms to promote whatever content they think will attract the most attention. Forming relationships with audiences and developing a reputation for quality, trustworthy journalism takes a backseat. Due to the platforms' flattening of publisher brands (discussed above in Section II.C) it is becoming more difficult for consumers to separate the wheat from the chaff. This degradation of news quality threatens our democratic discourse just as much as the restriction of news output.

Finally, the Commission should pay special attention to how the platforms' practices inhibit innovation in the news industry. The platforms often like to tout their own creative technologies and services, but they are not the only companies capable of innovating. News publishers and their partners can also innovate, if they are not prevented from doing so by restrictive platforms.

In the news context, innovation is about more than just redesigning the user interface. News publishers invest heavily in their newsrooms to find new ways of covering world events in real time. They also invest in finding creative ways to present information and data in engaging, interactive formats. There is also the potential for needed innovation in terms of business models and distribution channels.

The platforms' restrictive distribution and monetization practices, however, slow news innovation. By forcing publishers into rigid, platform-controlled distribution practices, the platforms narrow the scope for innovation. They also undermine the publishers' ability and incentive to invest in innovations by capturing the majority of revenue. The result is a stagnating digital news market, in which the only innovations are those that serve the platforms' commercial interests.

### 2. Non-price consumer harm includes abuse of consumer data

One particular type of non-price consumer harm is especially prevalent in tech platform markets with dominant players: the aggregation and misuse of personal information. At their core, each of the dominant tech platforms is a data company. They

---

N.Y. Times (Jan. 25, 2017), https://www.google.com/search?q=fake+news+is+spreading&rlz=1C1GCEA_enUS787US787&tbs=cdr:1,cd_min:1/1/2017,cd_max:3/1/2018&tbm=nws&ei=igZlW_TGN4__zgLW4ZvoBQ&start=10&sa=N&biw=1284&bih=585&dpr=1.5&safe=active&ssui=on.

15

either monetize user data directly (i.e., by selling it) or indirectly (i.e., by incorporating that data into their products and services such as ad tech that they then sell). The ways that dominant tech platforms abuse their positions thus reflect their roles as data merchants.

Despite being "free of charge" to consumers, the platforms' use of user data, however, imposes a cost on consumers, sometimes without consumers' knowledge or against their expectation or even their choice. Users value their privacy and the security of their data, and they are only willing to let some of it go in exchange for access to the platforms' services at no cost. Data is thus the currency that users use to pay the platforms. But just as a traditional market dominance companies will raise prices above the competitive level, a data-centric platform with a dominant position will demand more data from users than they would agree to in a competitive market. They also will afford users' data less security than a competitive market would provide.

Recent reports dramatically illustrate how little regard the dominant platforms have for their users' privacy. For example, it was revealed earlier this year that Facebook allowed Cambridge Analytica, to improperly access and use data on tens of millions of Facebook users.[34] The Associated Press also reported in August 2018 that many Google services on both Android and iOS devices store users' location data even when users activate the privacy setting saying that Google will not do so.[35]

At the end of the day, these kinds of privacy and security abuses persist because the platforms know that they are safe from competition in their respective markets. Their monopoly positions allow them to charge super-competitive data "prices" to consumers, who have no choice but to pay, sometimes without their knowledge or simply against their will. Antitrust regulators should not ignore these "price increases" when weighing the procompetitive justifications and anticompetitive harms stemming from the platforms' conduct.

### 3. The Commission should be especially cognizant of the effects of the tech platforms' conduct on nascent competition

Finally, the Commission must understand how competitive dynamics in the tech industry are unique. New competitive threats usually take the form of a new entrant changing the way a particular market works rather than an established competitor

---

[34] Deepa Seetharaman & Katherine Bindley, *Facebook Controversy: What to Know About Cambridge Analytica and Your Data*, Wall St. J. (Mar. 23, 2018), https://www.wsj.com/articles/facebook-scandal-what-to-know-about-cambridge-analytica-and-your-data-1521806400.

[35] Ryan Nakashima, *AP Exclusive: Google tracks your movements, like it or not*, Assoc'd Press (Aug. 13, 2018), https://apnews.com/828aefab64d4411bac257a07c1af0ecb.

beating the market leader at its own game. The existing dominant tech platforms all understand this dynamic—indeed, it is the way that they reached their current positions. But they also understand that, to prevent themselves from being similarly supplanted by an upstart, they must squelch nascent competition in adjacent markets who might upset the existing paradigm. In other words, Google does not have to worry about another search engine beating it at its own game. Google has to worry about a new rival in a market adjacent to search changing the competitive paradigm so as to make search less relevant.

From a practical standpoint, what this means for the Commission is that it must be willing to entertain theories of anticompetitive harm that focus on effects on nascent competition. Indeed, it is a well-established tenant of antitrust law that nascent competition must be protected so that it might grow into a mature competitive restraint, but it is rare that regulators bring a case based on that theory. The reason for that disconnect likely is that it is often difficult to recognize competitive threats in their early stages, or to prove that they are capable of growing into legitimate threats to existing monopolists. The D.C. Circuit Court's opinion in *United States v. Microsoft*, however, provides an excellent example for how to factor nascent competition into a Section 2 analysis.[36]

In *Microsoft*, the Department of Justice alleged that Microsoft was targeting middleware providers as part of a strategy to kill in its infancy a nascent threat to its operating system monopoly. Microsoft argued that the Department had failed to prove a causal link between the harm to middleware providers and the maintenance of its monopoly position.[37] The court, however, rejected Microsoft's argument, concluding that "[t]o require that § 2 liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action."[38] Instead, the court *inferred* causation from the fact that Microsoft directed its anticompetitive conduct toward the nascent threat:

> We may infer causation when exclusionary conduct is aimed at producers of nascent competitive technologies as well as when it is aimed at producers of established substitutes. Admittedly, in the former case there is added uncertainty, inasmuch as nascent threats are merely potential substitutes. But the underlying proof problem is the same—neither

---

[36] *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).

[37] *Id.* at 78.

[38] *Id.* at 79.

17

> plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct. To some degree, "the defendant is made to suffer the uncertain consequences of its own undesirable conduct."[39]

The Commission should follow the same approach. When a dominant tech platform aims its conduct at companies in adjacent markets that pose only a nascent—even hypothetical—competitive threat, the burden should be on the platform to show that no real threat would have emerged even absent its conduct. This view is much more consistent with the realities of dynamic technology markets, where competition can arise from unexpected places if given the chance to do so.

- - -

Once again, we would like to thank the Commission for considering these comments. The Alliance is eager to participate in the upcoming hearings, and we stand ready to assist the Commission in whatever way we can.

Sincerely,

David Chavern
President and CEO
News Media Alliance

---

[39] *Id.*(citing 3 Areeda & Hovenkamp, Antitrust Law ¶ 651c, at 78).