# EXHIBIT 6

HIGHLY CONFIDENTIAL

Page 1

1            IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
2                   ALEXANDRIA DIVISION
3       ---------------------------:
        UNITED STATES, et al.,       :
4                                    :
                 Plaintiff,          :
5                                    :
            vs.                      : Case No.:
6                                    : 1:23-CV-00108-LMB-JFA
        GOOGLE, LLC,                 :
7                                    :
                 Defendant.          :
8       ---------------------------:
9
10
11      HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF
12                  ABRANTES-METZ, PH.D.
13
14      DATE:           March 7, 2024
15      TIME:           9:12 a.m.
16      LOCATION:       U.S. Department of Justice
                        Antitrust Division
17                      450 Fifth Street, Northwest
                        Washington, D.C. 20530
18
        REPORTED BY:    Shari R. Broussard, RPR, CSR
19                      Reporter, Notary
20      Job No. CS6456952
21
22

HIGHLY CONFIDENTIAL

Page 2

1          A P P E A R A N C E S
2   On behalf of Plaintiff:
3      JULIA TARVER WOOD, ESQUIRE
        ANDREW KLINE, ESQUIRE
4      VICTOR LIU, ESQUIRE
        U.S. Department of Justice
5      450 Fifth Street, Northwest
        Washington, D.C. 20530
6      julia.tarver.wood@usdoj.gov
7   On behalf of Defendant:
8      WILLIAM A. ISAACSON, ESQUIRE
        ERICA A. SPEVACK, ESQUIRE
9      LEAH HIBBLER, ESQUIRE
        Paul, Weiss, Rifkind,
10        Wharton & Garrison, LLP
        2001 K Street, Northwest
11     Washington, D.C. 20006-1047
        (202) 223-7341
12     wisaacson@paulweiss.com
13        - and -
14     CHRIS ERICKSON, ESQUIRE
        Axinn, Valtrop & Harkrider, LLP
15     114 West 47th Street
        New York, New York 10036
16     (212) 784-5420
        erickson@axinn.com
17
    ALSO PRESENT:
18     Glenn Fortner, Video Technician
        Zach Mozenter, Economist, DoJ
19     Colleen Dugan, Paralegal, DoJ
        Sofie Schendel, Paralegal, Paul Weiss
20     Lauren Pomperoy, Esquire, DoJ   (Via Zoom)
        Emily Reed, Paralegal, DoJ    (Via Zoom)
21     Sophia Casten, Paralegal, DoJ   (Via Zoom)
        Jeff Brennan, Esquire, DoJ    (Via Zoom)
22     Albert Metz, BRG         (Via Zoom)

Page 3

C O N T E N T S

1
2   EXAMINATION BY:                      PAGE
3      Counsel for Defendant        8
4
5   ABRANTES-METZ DEPOSITION EXHIBITS:   *     PAGE
6    1 Abrantes-Metz Expert Report, 12/22/23     8
7    2 Abrantes-Metz Expert Rebuttal Report,
        2/13/24                  8
8
     3 Ramamoorthi Ravi Deposition Transcript,
9       2/20/24                  25
10   4 Lee Expert Report, 12/22/23        30
11   5 Complaint                39
12   6 Israel Expert Report, 1/23/24        162
13   7 Abrantes-Metz Rebuttal Report Figure 1
        Hypothetical             173
14
     8 Figure 75: Ad Exchange Average Fees,
15      2020-2022              178
16   9 About Index Exchange: A Programmatic Ad
        Marketplace             208
17
     10 Criteo Form 10-K              217
18
     11 AWBid AdSpam/Publisher Quality
19       Investigation           222
20   12 e-mails, Bates GOOG-DOJ-07807539 to 42   245
21   13 e-mails, Bates GOOG-DOJ-14156104 to 07   251
22

Page 4

1   ABRANTES-METZ DEPOSITION EXHIBITS:   *    PAGE
2   14 Google Mediation Update, Bates
        GOOG-DOJ-13202550 to 58        259
3
     15 e-mails, Bates GOOG-DOJ-17763947 to 53   261
4
     16 Last Look Advantage, Bates
5       GOOG-DOJ-13494286 to 94        283
6   17 AdMeld Product and Client Migration -
        Comms Doc, Bates GOOG-DOJ-03606441
7       to 49                 292
8   18 e-mails, Bates GOOG-DOJ-14248558 to 61   297
9   19 AdX Comms: Server Side Interface for 3rd
        party ad server dynamic allocation,
10      Bates GOOG-DOJ-03610002 to 04     300
11   20 Changes to Ad Manager, AdMob auction,
        Bates GOOG-DOJ-AT-02204351 to 91    309
12
     21 Overall Pub Yield With DRS(v2), Bates
13      GOOG-DOJ-13235100 to 20        330
14   22 DRS and RPO interaction in Simulation,
        Bates GOOD-AT-MDL-007375273        334
15
16
17
18
19
20
21
22   (* Exhibits attached to transcript.)

Page 5

P R O C E E D I N G S

1
2       VIDEO TECHNICIAN:  Good morning.  We are
3   going on the record at 9:12 on March 7th, 2024.
4       Please note that the microphones are
5   sensitive and may pick up whispering and private
6   conversations.  Please mute your phones at this
7   time.  Audio and video recording will continue to
8   take place unless all parties agree to go off the
9   record.
10      This is Media Unit 1 of the video
11  recorded deposition of Rosa Abrantes-Metz in the
12  matter of United States, et al. v. Google, LLC,
13  filed in the U.S. District Court for the Eastern
14  District of Virginia, Case Number 1:23-cv-00108.
15      My name is Glenn Fortner representing
16  Veritext and I'm the videographer.  The court
17  reporter is Shari Broussard from the firm
18  Veritext.
19      I'm not related to any party in this
20  action nor am I financially interested in the
21  outcome.
22      If there are any objections to

HIGHLY CONFIDENTIAL

Page 18

1    Q   All right.  And in paragraph eight,
2  which is on page three, you say in the second
3  sentence, "Among other things, over the last 20
4  years I have developed empirical methods which I
5  call 'screens' to flag the possibility of such
6  practices," and that's referring back to the first
7  sentence which refers to market abuses such as
8  collusion, manipulation, various types of fraud,
9  and anticompetitive conduct.  And then you go on
10  to say, "and more general anticompetitive, and to
11  estimate the impact on market outcomes."
12       So the empirical screens that you -- the
13  empirical -- the screens which you describe in
14  paragraph eight of your report, have you applied
15  any of those screens in this case?
16    A   No.  As I explained previously, the
17  screens I'm referring to are typically screens
18  that I used when I am as an outsider looking into
19  a particular market and collect publicly-available
20  data and try and understand whether the
21  patterns -- whether its bids, prices, whatever it
22  is -- seem to be suspicious.

Page 19

1       That was not the position I had here.  I
2  was not attempting to uncover collusion.  I did
3  not -- I was not an external observer of the
4  market without inside knowledge of what may be
5  going on.  So that's a very different application
6  of screens.
7    Q   Well, when you've applied screens in the
8  past, as I understand it, you've applied them when
9  there are market abuses such as collusion,
10  manipulation, various types of fraud, and
11  anticompetitive conduct, correct?
12    A   No, that is not correct.  I did not
13  apply them when there are those situations, I
14  applied them to try and determine whether the
15  patterns are suspicious so that someone should
16  take a closer look.
17    Q   And --
18    A   And just about all, though I've been
19  doing this for 20 years, I don't -- I can't recall
20  every application, but just about all applications
21  that I have done on screens relate to collusion
22  and manipulation such as LIBOR, foreign exchange,

Page 20

1  catering, bid rigging is the fix, many of the
2  financial and commodities benchmarks that were
3  found to be rigged, and they all had accusations
4  or suspicious of manipulation.  Most of them also
5  had suspicion of -- of collusion.
6    Q   All right.  When you've used empirical
7  methods, which you called screens in the past,
8  you've used them to flag more general
9  anticompetitive conduct and to estimate the impact
10  on market outcomes, as stated in your paragraph
11  eight, correct?
12       MS. WOOD:  Objection to form,
13  foundation.
14       THE WITNESS:  Well, as I explained, my
15  work has been focusing on collusion and
16  manipulation and in all of the papers I have
17  written and all of the work in which I apply
18  screens that I can recall are in that context.
19  But that does not mean that screens cannot be
20  applied in other contexts.  And when I describe
21  screens in generally -- in general, I try not to
22  narrow their application to collusion,

Page 21

1  manipulation, or fraud because they can, in
2  principle, be used for other situations.  For
3  example, they can be used internally to the
4  companies to enhance antitrust compliance in a
5  variety of other situations that don't necessarily
6  relate to collusion.
7       So screens can be applied in many
8  different ways.  I discuss that in my papers.  I
9  personally have used screens primarily for
10  collusion, manipulation, and other types of fraud.
11  BY MR. ISAACSON:
12    Q   And do you consider the statements that
13  you've made in paragraph eight to be accurate?
14       MS. WOOD:  Objection to the form.
15       THE WITNESS:  Yes.
16  BY MR. ISAACSON:
17    Q   And you have -- just to be clear, in
18  this case you have not tried to apply the
19  empirical methods you call screens?
20       MS. WOOD:  Objection to the form.
21       THE WITNESS:  No, that was not the
22  assignment that I was requested.

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1       Again, to do -- again, when I use
2   screens, I typically am an outsider to a case.
3   This is prior to discovery happening.  And I may
4   be interested in looking closer to a market.  I
5   collect what is publicly available, I study the
6   market and I make a recommendation.  I think
7   there's a chance there's something wrong here or I
8   don't think there is, so I don't think it is worth
9   to try to open an investigation.
10      In this case an investigation had been
11  opened so there was no need to try to screen the
12  markets.
13  BY MR. ISAACSON:
14      Q   The -- and looking at paragraph 22 of
15  your report, you say, "In conducting my analysis,
16  I have been instructed by counsel to rely on
17  certain findings and opinions offered by other
18  experts engaged by the Department of Justice in
19  this matter."
20      When you say -- when you refer to I've
21  been instructed by counsel, that would be counsel
22  for the United States?

Page 23

1       A   Yes.
2       Q   And the -- the certain findings and
3   opinions offered by other experts, those
4   experts -- that would include the expert report of
5   Gabriel Weintraub?
6       A   Yes.
7       Q   That would include --
8       A   Everywhere I cite his report in my
9   reports.
10      Q   The -- that includes the expert report
11  of Robin Lee?
12      A   Yes.
13      Q   It includes the expert report of Timothy
14  Simcoe?
15      A   I read his reports.  I don't recall
16  exactly that I necessarily rely on his findings.
17  I may in something minor.  But it was primarily
18  Professor Lee, Weintraub and Ravi.
19      Q   All right.  Well, just look at paragraph
20  23.  "I rely upon" -- in the second sentence.  "I
21  rely upon the expert report produced by Professors
22  Ravi," and I apologize for not saying his first

Page 24

1   name, "Gabriel Weintraub, Timothy Simcoe, and
2   Robin Lee," and in each you refer to their
3   reports, "for details regarding online advertising
4   products, specifics related to the alleged
5   conduct, quantitative analyses, and definitions of
6   the relevant markets."
7       All right.  That's a correct statement,
8   that's -- that's what you relied on those other
9   expert reports for, correct?
10      A   Yes.
11      Q   Did you review the deposition transcript
12  of Dr. Ravi?
13      A   No.
14      Q   In looking at paragraph 39 of your
15  report you say that "Publishers that sell their
16  web ad inventory via third-party ad tech tools are
17  referred to as open web publishers."  Open web
18  publishers is in italics.  And then you have a
19  footnote 20.  So the -- and one of the -- for that
20  term "open web publishers" in footnote 20, one of
21  the things you're relying on there is the report
22  of Dr. Ravi, right?

Page 25

1       A   Yes.
2       Q   Before this case, had you heard the term
3   "open web display advertising"?
4       A   I don't recall that I have.
5       Q   Before this case, had you heard the term
6   "open web publishers"?
7       A   I don't recall that I have heard that
8   term exactly before.
9       Q   If we can mark as Exhibit 3 to this
10  deposition -- this would be the deposition
11  transcript of Dr. Ravi.
12      (Abrantes-Metz Exhibit Number 3 was
13      marked for identification.)
14  BY MR. ISAACSON:
15      Q   All right.  If I can ask you to look at
16  page 62 beginning at line 2 he's asking -- I'm
17  asking him a question about the term "open web
18  display" and go on to ask him about open web
19  display advertising and at line 8, "Have you heard
20  those four words together before this case?
21      "ANSWER:  I believe I should have come
22  across that before this case.

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1      "QUESTION:  Do you remember where?"
2      "ANSWER:  Open auctions versus private
3  auctions is something I heard about early on.
4      "QUESTION:  All right.  So you were
5  familiar with the term 'open web display
6  advertising' because you were familiar with open
7  auctions versus private auctions; is that right?"
8      There's an objection and then answer:
9  "That -- that's the connection I made to open web
10  display advertising."
11      Is that discussion of open web
12  advertising consistent with your understanding of
13  what open web display advertising is?
14      MS. WOOD:  Again, I'm going to note that
15  obviously the testimony on this subject continues
16  on and you should read whatever portion you
17  consider relevant to answer the question, but
18  obviously it's a long deposition, so...
19      THE WITNESS:  Could you please ask the
20  question again.
21  BY MR. ISAACSON:
22      Q   Sure.  The -- is Dr. Ravi's description

Page 27

1  of open web advertising consistent with your
2  knowledge of the term?
3      MS. WOOD:  Objection to the form.
4      THE WITNESS:  Well, the term is simply a
5  name -- a name that was given to the relevant
6  antitrust market delineated for this case and
7  Professor Lee delineated the relevant market, I
8  did not.
9      In general, it is consistent in the
10  sense that it is an open -- it is an open web
11  display advertising in contrast with closed web
12  display advertising.  So various different tools
13  can be applied to process this web advertising
14  under open web from different sources.  In closed
15  web there are restrictions as to what tools can be
16  applied where.  And that is consistent with his
17  description of open auctions versus private
18  auctions.
19      I don't exactly know what he means by
20  that.  I -- I -- without reading the whole
21  relevant portion of the deposition, which seems to
22  be going for a little while, if he refers to open

Page 28

1  auction as an auction when many different parties
2  from different sources can participate versus a
3  closed private auction where that is not true,
4  then yes, that is consistent with my
5  understanding.
6  BY MR. ISAACSON:
7      Q   All right.  So his testimony is
8  consistent with your understanding if he's
9  referring to an open auction as one where many
10  different sources participate versus a closed
11  private auction where that isn't true --
12      MS. WOOD:  Objection.
13  BY MR. ISAACSON:
14      Q   -- is that correct?
15      MS. WOOD:  Objection to the form,
16  foundation, misstates the prior testimony.
17      THE WITNESS:  In the sense that -- in an
18  open web display world let's contrast, for
19  example, with Amazon, where not all the tools in
20  order to advertise on Amazon you need to use their
21  buy-side tools, that is not true in open web.  So
22  the Amazon world is -- is walled off from many

Page 29

1  other types of tools being used in the auction.
2      I don't know if that is the
3  determination that is how he's classifying open
4  versus closed auction -- auctions, but open web
5  display allows the participation of many different
6  tools in order to access those auctions and the
7  placement of web advertising while closed-web
8  auctions -- closed web digital advertising do not.
9  BY MR. ISAACSON:
10      Q   The -- you said that open web display
11  advertising is a name that was given to the
12  relevant antitrust market delineated for this
13  case.  Who gave it that name?
14      MS. WOOD:  Objection to the form.
15      THE WITNESS:  I don't know.
16  BY MR. ISAACSON:
17      Q   If we can look at paragraph 245 of your
18  report, Exhibit 1, and in the second to the last
19  sentence of that paragraph you say, "I identify
20  five separate acts by Google which had the effect
21  of harming the competitiveness of rivals in the
22  Publisher Ad Server, Ad Exchange, or Advertiser Ad

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

1 Network markets."  And if we can mark as Exhibit 4
2 this document, the report -- opening report of
3 Dr. Robin Lee.
4     (Abrantes-Metz Exhibit Number 4 was
5     marked for identification.)
6 BY MR. ISAACSON:
7   Q   And if we turn to paragraph 12 of that
8 and there's a subparagraph 3 under 12 and you see
9 there he has listed five acts.  And what I'd like
10 to understand is you say you've identified five
11 acts, he's identified five acts here.
12     Are we talking about the same acts?  Are
13 you talking about the same five acts as Dr. Lee?
14     MS. WOOD:  Objection to the form.
15     THE WITNESS:  I actually here condensed
16 five.  There's actually six.  I just called that
17 one of them -- grouped two of them into one.  So
18 literally there are six distinct acts.  Two of
19 them are -- are very, very related.  That's why I
20 called five.
21 BY MR. ISAACSON:
22   Q   And I'll interrupt you.  There you're

1 referring to first look and last look?
2   A   So --
3   Q   Those are the two you combined.
4   A   I was referring to that, yes, a
5 combination, but in my summary of opinions I do --
6 I do disentangle them all.  So there's the Google
7 Ads exclusivity, there's exclusive first and last
8 look where also last look is not just for DFP
9 publishers but they are also for third-party
10 publishers.  There's -- there's the AdMeld
11 acquisition, there's unifying pricing rules, and
12 there's the Google restriction AdX to provide
13 realtime feeds exclusively to DFP.
14     So I -- in there I had combined the
15 exclusive first look, exclusive last look together
16 and the exclusive last look was referring to both
17 DFP and third parties.
18   Q   All right.  So looking at what Dr. Lee
19 has summarized, I'm trying to understand whether
20 you were talking about the same acts.
21     He's listed five.  His -- his third one
22 put together into one first look and last look,

1 right?
2     So whether you make number three one act
3 or two acts, looking at Dr. Lee's list, are those
4 the same five, or if you divide one of them into
5 two, six acts, that you are describing?
6     MS. WOOD:  Objection to the form.
7     THE WITNESS:  They are similar.  I'm not
8 sure they're all exactly the same, but I'm
9 testifying on my opinions, not his.  So I cannot
10 recall the details of his opinions on these acts.
11 BY MR. ISAACSON:
12   Q   Well --
13   A   I don't rely on them.  I rely on his
14 market definition and market power work and -- and
15 not on his work on conduct.
16   Q   As part of your work in this case, you
17 have been able to study his work on conduct,
18 correct?
19     MS. WOOD:  Objection to the form.
20     THE WITNESS:  I had access to his report
21 to the extent that I wanted to review with a focus
22 on market definition and market power.

1     My opinions on -- my opinions are
2 independent of his opinions on the conduct.  He
3 may have found some conduct that may have been
4 problematic for him in terms of anticompetitive
5 effect and I may not or the other way around.
6 BY MR. ISAACSON:
7   Q   All right.  When he identifies as the
8 first act, "Providing unrestricted access to
9 Google Ads' advertiser demand exclusively to its
10 AdX ad exchange, and denying comparable access to
11 rival ad exchange," is that conduct that you also
12 found to be anticompetitive in this case?
13     MS. WOOD:  Objection to the form.
14     THE WITNESS:  I don't know everything
15 that he analyzes within his sub-bullet two.
16 BY MR. ISAACSON:
17   Q   I'm sorry, I'm on sub-bullet one.
18   A   Oh, I'm sorry.
19     Again, I don't know the details of what
20 he is analyzing in each of these sub-bullets.
21     In general, while we may have some
22 differences, in general, yes, I opine that the

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

1 exclusivity between Google Ads and AdX is
2 anticompetitive.
3    Q   All right.  With respect to the second
4 item, "Providing access to use of realtime bids
5 from AdX" -- "AdX exclusively to its DFP publisher
6 ad server, and denying comparable access to rival
7 publisher ad service" -- "servers," in general is
8 that also something that you opine is an
9 anticompetitive act?
10       MS. WOOD:  Objection to the form.
11       THE WITNESS:  I don't know the
12 specifics.  I can't recall the specifics of
13 everything he analyzed under that sub-bullet point
14 two.
15       I do opine that AdX having granted this
16 type of information to those accessing AdX through
17 DFP but not to other publishers outside of DFP had
18 anticompetitive effects.
19 BY MR. ISAACSON:
20    Q   All right.  With respect to the third
21 item that he lists there, "Providing access to a
22 feature known as 'Dynamic Allocation' exclusively

1 to AdX within DFP, granting AdX valuable
2 'first-look' and 'last-look' advantages over rival
3 ad exchanges," generally is that also something
4 that you have opined is anticompetitive conduct?
5       MS. WOOD:  Objection to the form.
6       THE WITNESS:  So I do not provide an
7 opinion as to whether the access to overall
8 dynamic allocation only in and of itself is
9 anticompetitive.  I focused only on exclusivity of
10 first and last look to AdX.  I also focused on --
11 on the last look that the third-party publishers
12 had to grant to AdX.  I don't believe that
13 last-look aspect is part of his point three.
14 BY MR. ISAACSON:
15    Q   It says "last-look" --
16    A   At least -- yeah, but it says last look
17 within dynamic allocation.  So he talks about
18 accessing dynamic allocation and granting first
19 and last look.  I assume that granting that first
20 and last look is within dynamic allocation.
21       Without reviewing his entire report on
22 this point, I don't know whether he has additional

1 concerns about the access to dynamic allocation
2 beyond the ones that I put forward.  I put forward
3 not the access to dynamic allocation and dynamic
4 allocation in and of itself, but the fact that
5 first and last look were exclusively granted to
6 AdX.  And then -- and I don't see -- I -- I seem
7 to see his opinion in point three as potentially,
8 I don't know that for a fact, of potentially being
9 broader than mine in that way.
10       But then I also think that it is
11 possible, and I would have to read his whole
12 section, that at least his summary does not
13 mention the -- the last look granted by
14 third-party publishers, which I focus on.
15       So while point three is similar to the
16 conduct that I analyzed and deemed to be
17 anticompetitive, it doesn't seem to be -- our
18 opinions may not be exactly the same.
19    Q   All right.  I'm going to move to strike
20 the answer because all I asked you was does that
21 paragraph refer to last look.
22       MS. WOOD:  Objection.  Obviously this is

1 in the context of multiple questions and that
2 motion is completely unfounded.
3       MR. ISAACSON:  Answering questions based
4 on previous questions I'm not -- I'm not -- I
5 don't think is appropriate.
6 BY MR. ISAACSON:
7    Q   With respect to item four in Dr. Lee's
8 report, "Eliminating publishers' ability to use
9 variable pricing within DFP, impairing their
10 ability to work with rival ad exchanges and exert
11 competitive pressures on AdX," is that -- is that
12 also something that you found generally to be an
13 anticompetitive act?
14       MS. WOOD:  Objection to the form.
15       THE WITNESS:  Without reading his entire
16 section in his report relating to point four, I do
17 not know for a fact how our opinions differ and
18 this applies to all of the points in the summary.
19       That said, to the extent that point four
20 is referring to unified -- UPR, unified pricing
21 rules, I do opine that -- that that conduct was
22 anticompetitive.

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

BY MR. ISAACSON:

1    Q    And I believe you've also said with
2    respect to point five, "Acquiring an emergent
3    competitor, AdMeld, and eliminating as a
4    competitive threat to Google's AdX and DFP
5    products," that's also conduct you found to be
6    anticompetitive?
7        MS. WOOD:  Objection to the form.
8        THE WITNESS:  Yes, I opine there were --
9    there was an anticompetitive effect coming out of
10   this merger that affected directly the relevant
11   markets.
12   BY MR. ISAACSON:
13   Q    All right.  And with respect to those
14   five acts, based on your testimony today am I
15   correct to understand that you don't -- you would
16   not be able to tell me what your reasons that
17   those are anticompetitive where your reasons would
18   be any different from Dr. Lee's?
19       MS. WOOD:  Objection to the form.
20       THE WITNESS:  I didn't base my opinions
21   on Dr. Lee's.  I don't know his reasons.  I am

Page 39

1    testifying on my reasons.
2        MR. ISAACSON:  All right.  If we can
3    mark as Exhibit 5 the complaint in this case.
4        (Abrantes-Metz Exhibit Number 5 was
5    marked for identification.)
6    BY MR. ISAACSON:
7    Q    And if you look at pages 132 and 133 of
8    the complaint -- and you -- you have reviewed the
9    complaint before, haven't you?
10   A    Yes.  A while back, but I have.
11   Q    And if you look at paragraph 312,
12   there's a list of ten items there.
13   A    Yes.
14   Q    Okay.  That are -- that are alleged to
15   be exclusionary conduct.  The first one refers to
16   Google's acquisition of DoubleClick.
17       Am I correct that is not conduct that
18   you have expressed an opinion about in this case
19   as to whether it's competitive or anticompetitive?
20   A    That is correct.
21   Q    And with respect to item seven, Google's
22   use of Project Bell, am I correct that you are not

Page 40

1    expressing an opinion in this case as to whether
2    Project Bell was competitive or anticompetitive?
3    A    Correct, I have not provided an opinion.
4    Q    And with respect to item eight, Google's
5    deployment of sell-side Dynamic Revenue Share, am
6    I correct that you have not expressed an opinion
7    in this case as to whether that conduct was
8    competitive or anticompetitive?
9        MS. WOOD:  Objection to the form.
10       THE WITNESS:  I do not provide an
11   opinion that -- let's call it DRS -- in and of
12   itself is anticompetitive.
13       The opinion I provide that relates to
14   DRS is that it would have exacerbated the effects
15   of other conduct that I found to be
16   anticompetitive.
17   BY MR. ISAACSON:
18   Q    When you say something exacerbated
19   conduct, does that mean it's anti- -- I'm sorry,
20   let me start the question over.
21       When you say something exacerbated other
22   conduct that you found was anticompetitive, does

Page 41

1    that mean that you're saying that the conduct that
2    you say was exacerbating was itself
3    anticompetitive?
4        MS. WOOD:  Objection to the form.
5        THE WITNESS:  No.  I am saying that
6    there's a conduct that is anticompetitive, it had
7    anticompetitive effects, those effects are larger
8    because of DRS.
9    BY MR. ISAACSON:
10   Q    But DRS you have no opinion standing
11   alone -- let me start over.
12       You have no opinion whether DRS standing
13   alone was competitive or anticompetitive?
14       MS. WOOD:  Objection to the form.
15       THE WITNESS:  As of now, I do not
16   provide an opinion as to whether DRS just in and
17   of itself is or is not anticompetitive.
18   BY MR. ISAACSON:
19   Q    And item nine listed in the complaint
20   refers to Project Poirot.
21       Am I correct that you are not expressing
22   an opinion as to whether Project Poirot was

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1 competitive or anticompetitive?
2       MS. WOOD:  Objection to the form.
3       THE WITNESS:  That is correct.  As of
4 now, given information I have, I -- I am not
5 providing an opinion as to whether Poirot is or is
6 not competitive by itself.
7 BY MR. ISAACSON:
8    Q   And with respect to item four, "Google's
9 limitation of dynamic allocation bidding
10 techniques exclusively to AdX," is that also
11 conduct that you are not expressing an opinion
12 about as to whether it was competitive or
13 anticompetitive?
14       MS. WOOD:  Objection to the form.
15       THE WITNESS:  Well, it depends on -- on
16 what item four has.  I have not really broken it
17 out that way.
18       These relate potentially to whether --
19 whether prices were sent back to publishers only
20 through the context of dynamic allocation, and
21 therefore through DFP, and not to third-party
22 publishers and/or whether third-party publishers

Page 43

1 accessing AdX outside of DFP could have sent
2 dynamic floors to AdX or not and contrasting with
3 the fact that they could within dynamic
4 allocation.  So I have opinions that relate to
5 point four, but I -- I think point four seems to
6 be broad and unspecified on what bidding
7 techniques mean exclusively to AdX.
8       It...
9 BY MR. ISAACSON:
10    Q   Now, with respect to Google providing
11 unrestricted access to Google Ads' advertiser
12 demand exclusively to its AdX exchange and denying
13 comparable access to rival ad exchanges, your
14 report expresses opinions that that action was
15 taken in an alleged ad exchange market; is that
16 correct?
17       MS. WOOD:  Objection to the form.
18       THE WITNESS:  Could you please repeat
19 the question.
20 BY MR. ISAACSON:
21    Q   Sure.  If it helps you, I'm just using
22 the language in item one of Professor Lee,

Page 44

1 paragraph 12 that we were looking at.
2       MS. WOOD:  What?  Do you want to use
3 the -- her report instead or do you want to ask
4 her about his report?
5       MR. ISAACSON:  No, I -- I'm going to --
6 the -- no, I'm referring to item one in the
7 paragraph 12 little 3.
8       MS. WOOD:  So you want to ask her about
9 her opinion, not Lee's opinions, but you want to
10 use Lee's report to ask her about her opinion?
11       MR. ISAACSON:  Right, I've got -- I've
12 got these on the same page here, so I'm going to
13 do that.
14       MS. WOOD:  I think she's --
15 BY MR. ISAACSON:
16    Q   So item one there, which is, you said,
17 was conduct you had generally discussed as well,
18 does that conduct in your report take place in the
19 ad exchange market?
20       MS. WOOD:  Objection to the form and I
21 am going to object to using Lee's report to ask
22 her about her opinion.  I think if you want to ask

Page 45

1 her about her opinion, you should use her report
2 and the description of the conduct in her report
3 and not ask her about her opinions --
4       MR. ISAACSON:  This is going to be a
5 long speaking objection.  Let's just keep it --
6       MS. WOOD:  Well --
7       MR. ISAACSON:  -- to objection.
8       MS. WOOD:  -- it's -- no.  It's --
9 it's --
10       MR. ISAACSON:  Let's just keep it to
11 objection.
12       MS. WOOD:  -- object not to the -- to
13 the question alone but to the process.  It's an
14 objection to using -- asking her --
15       MR. ISAACSON:  We don't --
16       MS. WOOD:  -- to keep in her mind --
17       MR. ISAACSON:  We don't do speaking
18 objections to process.
19       MS. WOOD:  Well, we do when the process
20 is this unorthodox.  When --
21       MR. ISAACSON:  I don't think --
22       MS. WOOD:  When the report you're asking

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1   her about is not her report, but yet you want to
2   have her answer be based on her report and her
3   opinions, I think that's inherently confusing to
4   everybody.
5        MR. ISAACSON:  Okay.  Thank you for the
6   speaking objection.
7   BY MR. ISAACSON:
8     Q   All right.  Does the conduct that
9   Dr. Lee describes in -- about providing
10  unrestricted access to Google Ad's advertising
11  demand exclusively to AdX and denying comparable
12  access to rival ad exchanges about which you also
13  have generally opined on, when you opine on it,
14  does that conduct take place in the ad exchange
15  market?
16       MS. WOOD:  Object to the form and to the
17  use of the report in this fashion.
18       THE WITNESS:  So my Summary of Opinions,
19  paragraph 25.a.i talks about the Google Ads
20  exclusivity with respect to AdX.
21       To the extent that Professor Lee is
22  talking about the same conduct, this seems to be

Page 47

1   the comparable paragraph in my report.  But your
2   question relates to whether the conduct takes
3   place.  My opinion is to where -- which market did
4   the conduct have an anticompetitive effect.
5   BY MR. ISAACSON:
6     Q   Yes.
7     A   And as you can see from paragraph 25.a.i
8   of my Summary of Opinions, the exclusivity of
9   Google Ads to AdX would have helped Google
10  maintain market power in the AdX -- in the ad
11  exchange market.
12    Q   Okay.  And then with respect to your
13  opinion that there was an exclusive first look
14  granted at DFP inventory, that was also conduct
15  that you say had an anticompetitive effect in an
16  ad exchange market, correct?
17       MS. WOOD:  Objection to the form.
18       THE WITNESS:  Yes.
19  BY MR. ISAACSON:
20    Q   And that's also true with respect to
21  your discussion of last look, that also took place
22  in an ad exchange market?

Page 48

1        MS. WOOD:  Objection to the form.
2        THE WITNESS:  Not necessarily taking
3   place because it is DFP that sets these rules and
4   DFP is a publisher ad server, so the conduct is
5   taking place in a different market, but with --
6   but it's harming competition in the ad exchange
7   market.
8   BY MR. ISAACSON:
9     Q   Okay.  The conduct with respect to Ad-
10  -- the AdMeld acquisition, you say that -- that
11  anticompetitive effects took place in both the ad
12  exchange market and the publisher ad server
13  market, correct?
14       MS. WOOD:  Objection to the form.
15       THE WITNESS:  Again, it is not -- I do
16  not focus necessarily where the conduct took
17  place.  I focus where the conduct had an
18  anticompetitive effect.  And as stated in my
19  Summary of Opinions, yes, AdMeld had an
20  anticompetitive effect both in the ad exchange
21  market and the publisher ad server market.
22  BY MR. ISAACSON:

Page 49

1     Q   All right.  And with respect to your
2   discussion of uniform -- uniform pricing rules,
3   you find anticompetitive effects there in an
4   exchange market and an advertiser ad network
5   market, correct?
6     A   Yes, as in -- as summarized in my
7   report, paragraph 25.c.i.
8     Q   All right.  And -- now, with respect
9   to -- and then with respect to your consideration
10  of providing exclusive access to realtime bids to
11  DFP, that was conduct that took place in the ad
12  server market, correct?
13       MS. WOOD:  Objection to the form.
14       THE WITNESS:  Again, I do not focus
15  necessarily where the conduct took place.  That
16  conduct would have taken place in the exchange
17  market because it is an AdX conduct.  But I
18  focused instead where the conduct had an
19  anticompetitive effect and that was the publisher
20  ad server market.
21  BY MR. ISAACSON:
22    Q   Now, then returning to Google

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1   restricting its Google Ads to purchase exclusively
2   on AdX and not on other exchanges, did you attempt
3   to quantify any adverse effect on advertisers from
4   that conduct?
5      A   Which adverse effect on advertisers?
6      Q   Any adverse effect.
7      A   On which advertisers?
8      Q   On any advertisers.
9      A   Well, I'm focusing on Google Ads'
10  advertisers in that conduct and, as described
11  extensively in my reports, both of them, Google
12  itself deemed that those advertisers were losing
13  from not being able to multi-home on other
14  exchanges.
15     Q   Did you attempt to quantify any of --
16  any of that effect that you're describing?
17     A   I did not have to quantify it because my
18  determination doesn't have to put a number to it,
19  it just has to address whether it was
20  anticompetitive.  And Google has explained in its
21  own internal documents that it leveraged this
22  exclusivity to the detriment of Google Ads'

Page 51

1   advertisers and in order to enhance AdX and
2   ultimately also DFP.
3      Q   All right.  So -- so that I understand
4   your process.  You say "I didn't have to quantify
5   it because my determination doesn't have to put a
6   number to it."
7          When you are looking at the issue of an
8   anticompetitive effect on advertisers or
9   publishers, is it my understanding that you don't
10  think you need to put a number on it to quantify
11  that effect?
12         MS. WOOD:  Objection to the form.
13         THE WITNESS:  No, I do not.  I don't
14  need to put a number to know, for example, that
15  once supply is restricted in a product prices tend
16  to go up.
17         I applied economic principles.  I
18  reviewed the evidence on record.  Google itself in
19  2011 and '12 considered whether it should allow
20  Google advertisers -- Google Ad advertisers to
21  multi-home.  It decided -- it analyzed and decided
22  that it wouldn't because whatever was gained

Page 52

1   potentially there in terms of additional revenues
2   for Google Ads' advertisers would have been lost a
3   whole lot more in terms of AdX because, per
4   Google's words, Google Ads was the advantage that
5   AdX had.
6          And, in fact, without it, they -- for
7   example, on paragraph 122 of my rebuttal report,
8   they explain "'if we didn't have sellside issues,
9   we would make gdn x-change beyond remarketing.'
10  Given the sell-side issues, Google proposed even
11  in April 2016 'gating AWBid announcement on our
12  ability to come up with a new competitive
13  advantage for AdX.'  And 'Topic 1' on a proposed
14  agenda for a meeting of Google executives in April
15  2016 solving most urgent buyside competitive gaps
16  without hurting AdX.'"
17         So clearly, and this is one of many
18  examples, Google understands that the competitive
19  advantage of AdX was its exclusivity with Google
20  Ads and that while relaxing Google Ads'
21  exclusivity would have brought in more revenues to
22  advertisers also quantified by Google, it would

Page 53

1   hurt AdX and potentially DFP a whole lot more
2   than -- than that and, therefore, they decided not
3   to do because apparently they didn't figure out
4   any other advantage to have on AdX besides that
5   exclusivity.
6   BY MR. ISAACSON:
7      Q   All right.
8      A   So the record is clear with regards to
9   this but even as an economist, and from the
10  perspective of the advertisers, the advertisers
11  could not lose by multi-homing on exchanges.  At
12  worst they would be made the same.  But to the
13  extent that there's a probability that is nonzero,
14  that a better opportunity to sell exists somewhere
15  else, those advertisers would only be made better
16  off and Google did put a number to that.
17         MR. ISAACSON:  I'm going to move to
18  strike the answer after "I applied economic
19  principles and reviewed the evidence on the
20  record."
21  BY MR. ISAACSON:
22     Q   The -- in paragraph --

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1    MS. WOOD:  I would object to that
2 obviously.
3 BY MR. ISAACSON:
4    Q    In paragraph 122, which is the -- the
5 paragraph you choose to use as an example of your
6 analysis, is there anything in there that
7 quantifies an adverse effect on an advertiser or
8 publisher?
9    A    Not in that paragraph, but in other --
10 very many paragraphs in my opening report where I
11 analyzed the Google exclusivity.  Starting on page
12 155 or so there are paragraphs discussing numbers.
13 I recall hundreds of millions of dollars that
14 would have been added.
15       There are other places where I -- where
16 Google also -- I can't recall if it is in my
17 opening or closing -- estimates that if they were
18 to lose Google Ads' demand fully, they would lose
19 70 percent of the revenues on AdX.  So those
20 numbers are spread through my report.
21    Q    I'm being specific here to adverse
22 effects on advertisers or publishers, not on

Page 55

1 Google.
2    A    And I am being specific as to the
3 quantification of those effects to Google
4 advertisers and publishers.
5       As I told you, it is in my report -- I
6 don't have the -- the -- the paragraphs memorized,
7 but we can walk through them and find out -- that
8 Google would have lost -- had it let Google Ads'
9 advertisers multi-home, it would have lost X where
10 X is hundred of millions of dollars -- I'm sorry,
11 Google advertisers would have been able to win X,
12 where X was hundreds of millions of dollars more.
13 But then Google estimated how much that would have
14 cost in terms of business lost on AdX and
15 potentially at DFP and figured out that it was a
16 whole lot more than X.  And that X is somewhere in
17 my report.  And so they did that quantification
18 for themselves.
19    Q    Right.
20    A    And that is consistent with various
21 other documents where not always that
22 quantification may show up.

Page 56

1    Q    Is there any point where you quantify
2 the exclusive -- the exclusivity of Google Ads'
3 demand having an adverse effect on advertisers as
4 opposed to what would happen to Google if you
5 removed it?
6       MS. WOOD:  Objection to the form, asked
7 and answered.
8       THE WITNESS:  I personally did not put a
9 number to it.  I determined that it was
10 anticompetitive.  It hurt Google's advertisers --
11 Google Ads' advertisers to the extent that AdX
12 leveraged the -- that restriction, that
13 exclusivity.  May have harmed publishers in the
14 sense that they could only access it through DFP
15 and potentially may even have been harmed in terms
16 of the higher supracompetitive fee that existed in
17 AdX, but the publishers had no choice but to pay.
18 If Google Ads had instead been available in other
19 exchanges of lower cost, those publishers would
20 potentially have been able to access that demand
21 in lower-cost exchanges and, therefore, have
22 benefited from that.

Page 57

1 BY MR. ISAACSON:
2    Q    All right.  And the question was about
3 adverse -- quantifying adverse effect on
4 advertisers and I'll move to strike the discussion
5 of publishers.
6       MS. WOOD:  Objection.
7 BY MR. ISAACSON:
8    Q    Having said that, I'm now going to ask
9 did you quantity any adverse effect on publishers
10 from the exclusivity of Google Ads' demand?
11       MS. WOOD:  Objection to the form, asked
12 and answered.
13       THE WITNESS:  So that question you -- I
14 believe you had asked me already before and I -- I
15 have -- have answered.  I may repeat it again.
16       To the extent that Google leveraged its
17 exclusivity of Google Ads with AdX, that
18 exclusivity, as we discussed before harmed Google
19 Ads' advertisers, benefited AdX, but is also
20 likely to have harmed publishers.
21       Publishers had no choice but to use the
22 only channel, AdX, to access Google Ads.  And

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1 according to Google Ads -- according to Google's
2 documents, Google Ads' exclusivity was a key
3 reason why AdX could keep a supracompetitive rate.
4       Publishers were being deducted that rate
5 out of the revenue they received from their
6 inventory; therefore, publishers would have been
7 harmed by this conduct.
8 BY MR. ISAACSON:
9   Q   All right.  And did you do any analysis
10 to attempt to identify to what extent rates were
11 supracompetitive to publishers from the
12 exclusivity of Google Ads' demand?
13       MS. WOOD:  Objection to the form.
14       THE WITNESS:  So at the end of my
15 opening report I used the data selected by
16 Professor Lee to compare Google -- Google's
17 rate -- take rate -- I'm sorry, AdX's take rate to
18 comparable competitors.
19       I have not separately identified how
20 much of the -- first, how -- by how much is it
21 supracompetitive.  I have not quantified that.
22 That -- other experts opine on that.  But part of

Page 59

1 that analysis also contains several quotes from
2 Google itself explaining that they themselves
3 believe that rate is too high and that if they
4 didn't have the exclusivity with Google Ads, they
5 wouldn't be able to get away with a rate that is
6 several times higher than maybe should have been
7 or even higher than 10 percent or so.
8       So all of the evidence that I have in my
9 report and that I have seen out of all the
10 evidence I collected supports the opinion and the
11 view that Google Ads' exclusivity was a key driver
12 of Google's -- of AdX's take rate.
13       I'm referring to, for example, to all of
14 the quotes starting on paragraph 471 of my report.
15 Here they are summarized, but they exist also
16 throughout other parts of my opening report.
17 BY MR. ISAACSON:
18   Q   So what would need to be done so that
19 Google Ads' demand could be made available to
20 non-AdX -- AdX exchanges?
21       MS. WOOD:  Objection to the form.
22       THE WITNESS:  I'm sorry, you meant

Page 60

1 non-ad exchanges or non-AdX exchanges?
2 BY MR. ISAACSON:
3   Q   Non-AdX exchanges.
4   A   The same kind of process that Google
5 undertook to connect DV360 to very many exchanges.
6   Q   So there would have to be technical work
7 done to connect DV360 to very many exchanges?
8       MS. WOOD:  Objection to the form.  I
9 think you misspoke.
10       THE WITNESS:  Whatever work had to be
11 done, Google had done it with respect to DV360.
12 Google had already at some point, though it did
13 take a while, to launch AWBid, which allowed
14 Google Ads to multi-home for very specific
15 remarketing impressions, so it was feasible, it
16 was ready much earlier, AWBid, than it actually
17 launched.  Apparently from the records it was
18 ready to be launched years ahead.  Early on they
19 were considering the multi-homing aspect beyond
20 just remarketing, so yes, I expect there would be
21 some work that had to done.  I don't expect it
22 would be work that would be infeasible because it

Page 61

1 had already been done even within -- either within
2 Google Ads or -- and DV360 by Google or any other
3 exchanges that connected to other businesses that
4 multi-homed across exchanges.
5 BY MR. ISAACSON:
6   Q   Okay.
7   A   It was pretty common at that time that
8 multi-homing was widely undertaken in the
9 industry.
10   Q   In order to make Google Ads' demand
11 available to other exchanges, it would be the type
12 of technical work in your understanding that was
13 done with AWBid and it would have to be done for
14 all the other exchanges; is that right?
15       MS. WOOD:  Objection to the form.
16       THE WITNESS:  I am not speaking to the
17 exact type of work that had to be done, I am just
18 speaking to whatever work had to be done in terms
19 of cost doesn't seem like it was, first, too
20 costly because Google was already doing this in
21 other contexts; second, completely feasible
22 technologically because Google was already doing

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1  it and many others were doing it.  So it was
2  feasible.
3       There are documents from way before the
4  AWBid official launch in 2015 that talk about how
5  they were even getting ready to potentially allow
6  Google to multi-home more broadly, not just for
7  remarketing impressions.  So nothing on the record
8  made me believe that this was technologically
9  impractical or not feasible.
10 BY MR. ISAACSON:
11     Q   All right.  And you didn't do any cost
12 estimate of -- for the technical work that you're
13 saying would have needed to be done to make Google
14 Ads' demand available to other exchanges.
15     MS. WOOD:  Objection to the form.
16     THE WITNESS:  Correct, I did not
17 undertake a cost analysis, but by the evidence
18 available at the time that others were
19 multi-homing, that Google was putting forward that
20 possibility and had even quantified how much more
21 they would bring back, that it was allowing Google
22 Ads to multi-home across exchanges already over

Page 63

1  AWBid, that DV360 was multi-homing, that others
2  outside of Google allowed others to multi-home,
3  it -- all of the evidence supports an opinion that
4  it doesn't seem that the technical difficulties
5  would have been prohibitive of that happening or
6  the cost associated with it.
7       MR. ISAACSON:  All right.  I'll move to
8  strike after, "Correct, I did undertake a cost
9  analysis" because I wasn't asking about the
10 technical work.
11 BY MR. ISAACSON:
12     Q   The --
13     MS. WOOD:  Again, that's totally
14 inappropriate in the context of your question.
15 BY MR. ISAACSON:
16     Q   -- so do I understand it's your
17 opinion in this case that as long as it was
18 technically feasible for Google to make Google
19 Ads' demand accessible to other exchanges, that
20 that was exclusive conduct that was
21 anticompetitive?
22     MS. WOOD:  Objection to the form.

Page 64

1       THE WITNESS:  No, I did not provide that
2  opinion.  You did not ask me that question before.
3       The opinion I'm providing is that the
4  evidence is such that multi-homing was feasible
5  and not overly costly for Google Ads, google Ads'
6  advertisers were being harmed by Google Ads, who
7  should have been acting in the best interest of
8  its advertisers.  But the advertisers were not
9  monetizing as much as they could have if they
10 multi-homed but Google knew that.
11      And the reason it was harming its
12 advertisers was because it was gaining more than
13 the loss for advertisers by leveraging the market
14 power it had in the -- in -- with Google Ads into
15 the ad exchange and would gain, by even Google's
16 calculations, more by harming advertisers and not
17 acting in its interest in -- in Google Ads
18 punishing them and using them as leverage to gain
19 market power in the exchange market and also in
20 addition protect DFP.
21 BY MR. ISAACSON:
22     Q   The -- when you're referring to

Page 65

1  multi-homing in the context of Google Ads' demand,
2  you're referring to making Google Ads' demand
3  available to other exchanges; is that right?
4       MS. WOOD:  Objection to the form.
5       THE WITNESS:  Yes, to competing -- to
6  competitors of AdX.
7  BY MR. ISAACSON:
8      Q   All right.  And when you're referring to
9  acting in the best interest of advertisers in
10 this -- about Google Ads' demand, you're referring
11 to Google should make the -- their advertiser
12 customers available to their competitor
13 advertiser -- ad exchanges?
14     A   There are two -- at least two
15 different -- separate companies here.  Each one of
16 them should act -- act in the best interest of its
17 clients.
18     Q   All right.  And --
19     A   Google Ads -- Google Ads' clients are
20 advertisers.  Google -- Google knew that its
21 advertisers would be made better off by
22 multi-homing, but it decided not to act in the

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1　best interest of those advertisers to allow them
2　to reach as broad as an inventory as they possibly
3　could across multiple exchanges so that it could
4　benefit its other business.  That business was
5　AdX.  To let AdX grow to leverage that exclusivity
6　with Google Ads.
7　　　　And it calculated that it would gain a
8　whole lot more by harming and not acting in the
9　best interest of its advertisers on the Google Ads
10　end so that it could grow an adjacent business at
11　their expense, but that also -- that conduct also
12　potentially protected DFP.
13　　Q　All right.  So when you're referring to
14　Google Ads not acting in the best interest of its
15　advertisers, you are referring to Google should
16　have made that demand available to its -- to
17　competitors to Google's AdX, correct?
18　　　　MS. WOOD:  Objection to the form.
19　　　　THE WITNESS:  Competitors of Google AdX,
20　not competitors of Google advertisers.
21　　　　　Advertisers seek supply.  It is in the
22　best interest of advertisers to try and find that

Page 67

1　inventory in as many ways as possible.
2　　　　And if Google Ads had been acting in the
3　best interest of its own customers, the
4　advertisers, it would have been to their benefit
5　to let them multi-home as Google itself
6　acknowledged.
7　　　　Now, why did that not happen?  Because
8　Google advertisers were being used instead, their
9　exclusivity with AdX, to benefit and grow in the
10　exchange market.
11　　　　So that is a sense in which I say that
12　Google Ads harmed the interest of its own
13　advertisers and it should have let them seek out
14　all the opportunities they could have potentially
15　had of inventory outside of AdX and it didn't.
16　　　　MR. ISAACSON:  All right.  I'm going to
17　move to strike after "Competitors of Google AdX,
18　not competitors of Google advertisers."
19　　　　MS. WOOD:  I'm going to object also that
20　it was directly called for by the question and
21　unfortunately you don't get to select the answers
22　that you like and -- and reject the ones that you

Page 68

1　don't.
2　BY MR. ISAACSON:
3　　Q　With regards to the exclusivity of
4　realtime bids from AdX being exclusive to the DFP
5　publisher, the -- sorry, I'm moving topics now.
6　　　　Did you attempt to quantify any adverse
7　effect on advertisers from Google's limitation of
8　realtime bids from AdX to DFP?
9　　　　MS. WOOD:  Objection to the form.
10　　　　THE WITNESS:  So I did not have to
11　provide a quantitative -- independent quantitative
12　analysis by how much were -- were they harmed.
13　There are numbers discussed in my reports of -- of
14　publishers being harmed and how when they tried to
15　access AdX through other sources, they lost
16　revenue.  And when they decided to finally go
17　through DFP, which actually did access AdX more
18　fully, all of their revenues went up sometimes by
19　a large factor.  So there's various such examples
20　of specific calculations by -- by publishers.
21　　　　MR. ISAACSON:  All right.  My question
22　was about advertisers, so I'll move to strike her

Page 69

1　answer with respect to -- where she begins
2　discussing "There are numbers discussed in my
3　reports of publishers being harmed."
4　　　　MS. WOOD:  And again --
5　BY MR. ISAACSON:
6　　Q　Now I will ask you about publishers.
7　　　　MS. WOOD:  -- I'm going to object to
8　that motion.
9　　　　THE WITNESS:  Well, I would like to --
10　my recollection, I apologize if I misunderstood,
11　was that you asked about publishers, so if that
12　was not the question could -- could I please get
13　the question back.
14　BY MR. ISAACSON:
15　　Q　Sure.  With regards to the exclusivity
16　of realtime bids from AdX being exclusive to DFP,
17　did you attempt to quantify any adverse effect on
18　advertisers from Google's limitation of realtime
19　bids from AdX to DFP?
20　　　　MS. WOOD:  Objection to the form.
21　　　　THE WITNESS:  So I did not conduct an
22　independent analysis of the quantification of the

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1   harm to advertisers from the conduct you posed.
2           That said, it would have been in the
3   best interest of advertisers on AdX to access all
4   inventory they possibly could in -- in fairly
5   equal terms.  And the reality is that if you were
6   not a DFP publisher or if you didn't go through
7   DFP, it was more difficult for advertisers to be
8   able to connect to inventory.  And because that
9   conduct, their options, their choices were
10  limited, potentially better offers could have
11  occurred, advertisers were harmed due to the
12  conduct that you mentioned.
13          MR. ISAACSON:  I'm going to move to
14  strike her answer after she responded to the
15  question and then "That said," continuing from
16  that point.
17          MS. WOOD:  Objection.
18  BY MR. ISAACSON:
19    Q   The -- am I correct that with respect to
20  the -- that you -- am I correct that you did not
21  provide a quantitative analysis of how much
22  publishers were harmed by Google's limitation of

Page 71

1   realtime bids from AdX to DFP?
2           MS. WOOD:  Objection to the form, asked
3   and answered.
4           THE WITNESS:  So that was actually the
5   answer that I gave a couple of answers ago, which
6   is I did not conduct an independent analysis to
7   put an exact number as to the size of the harm.  I
8   did opine that there was harm to publishers.  And
9   I provide various examples in the -- in my own
10  reports of publishers who said that their revenues
11  were drastically impaired when they were not going
12  through DFP because of this difficulty in fully
13  accessing AdX outside of DFP.
14  BY MR. ISAACSON:
15    Q   And when you refer to your report
16  talking about examples of publishers who said that
17  they were harmed, you did not attempt to do any
18  analysis across the group of publishers of any --
19  of any extent of harm, correct?
20          MS. WOOD:  Objection to form.
21          THE WITNESS:  What -- what are the
22  publishers you are referring to?

Page 72

1   BY MR. ISAACSON:
2     Q   All of them.
3     A   All the --
4           MS. WOOD:  Same objection.
5   BY MR. ISAACSON:
6     Q   Right.  You told me you gave examples.
7   When you gave examples, you did not attempt to
8   actually do an analysis of all the publishers who
9   would have been at issue in this case, right?
10          MS. WOOD:  Objection to the form.
11          THE WITNESS:  There are many different
12  types of publishers and groups.  I provided
13  examples of third-party publishers who explained
14  how their revenue suffered even, for example, in
15  the context of when they were using dual ad
16  servers.  So those examples are just illustrative
17  of what happened when they did not go directly
18  through DFP and those publishers would have been
19  harmed.
20          To the extent that they could not obtain
21  a realtime bid from AdX -- unless they were going
22  through DFP, they could not put AdX in realtime

Page 73

1   competition.  I do not need to quantify to know
2   that not being able to do so enables -- impairs
3   their ability to monetize their inventory.
4           Then there's the publishers within DFP
5   that would potentially also be harmed to the
6   extent that this conduct also contributed to a
7   supracompetitive take rate of AdX.  Even the DFP
8   publishers would have been harmed eventually
9   because they were financing a take rate at AdX
10  that was higher than it should have been.
11          So both sets of publishers, DFP -- call
12  it DFP publishers versus third-party publishers,
13  would have been harmed.
14  BY MR. ISAACSON:
15    Q   You say "I do not need to quantify to
16  know that being able to do so impairs their
17  ability to monetize their inventory."
18          When you say that the exclusivity to DFP
19  impaired their ability to monetize their
20  inventory, you are not providing any opinions
21  quantifying how much money you're talking about,
22  correct, across publishers?

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1    MS. WOOD: Objection to the form.
2    THE WITNESS: I did not quantify by
3 exactly how much the different sets of publishers
4 were harmed, only that they -- they were harmed as
5 I explained in my previous answers.
6 BY MR. ISAACSON:
7    Q   The -- and then you referred to the
8 supracompetitive take rates of AdX.
9       Did you do any analysis trying to
10 isolate the effect of exclusivity of -- with
11 respect to realtime bidding of AdX on DFP -- on
12 DFP on any supracompetitive take rates?
13   A   Could you please repeat the question.
14   Q   Sure.  Did you do any analysis trying to
15 isolate the effect of exclusivity with respect to
16 realtime bidding of AdX on DFP on any -- on any
17 alleged supracompetitive take rates?
18   A   Well, to the extent that the conduct
19 allowed the enhancement of market power, it
20 contributed to a supracompetitive take rate.  I
21 did not quantify by how much that contribution
22 was.

Page 75

1    Q   All right.  Did you attempt to -- did
2 you attempt to quantify the contribution to what
3 you say were supracompetitive take rates from the
4 exclusivity of Google Ads' demand?
5    MS. WOOD: Objection to the form, asked
6 and answered.
7    THE WITNESS: We discussed earlier in
8 previous questions that while I did not have to
9 undertake a quantification of -- of the impact of
10 specific conduct individually into the -- AdX's
11 take rate, Google itself put numbers -- for
12 example, with respect to Google Ads' exclusivity
13 that I mentioned previously in the section a few
14 answers ago in the section in my report,
15 section -- page 244 starting on paragraph 471,
16 "Google Acknowledged the AdX Take Rate Would Not
17 Be Supported in a Competitive Market," and there
18 are several comments here -- quotes from Google
19 and throughout my report that directly ties the
20 ability of Google -- Google's AdX to charge a
21 supracompetitive fee to exclusivity to Google Ads.
22 BY MR. ISAACSON:

Page 76

1    Q   The -- if DFP and AdX were offered as
2 separate products by Google, but AdX still did not
3 provide access to Google Ad's demand to rival
4 publisher ad servers -- no, I misspoke there.
5       If Google offered DFP and AdX as
6 separate products, but AdX still did not provide
7 access to rival publisher ad servers, would the
8 conduct still be in your mind exclusive conduct
9 that would have an anticompetitive effect?
10   MS. WOOD: Objection to the form.
11   THE WITNESS: So these are two different
12 products.
13 BY MR. ISAACSON:
14   Q   Yes.
15   A   It's not if they were offered the
16 separate products, they are separate products.  So
17 DFP -- the DFP customers are publishers.  AdX
18 customers are buy-side and sell-side tools.  You
19 can simplify them as -- as -- as AdX's customers
20 being advertisers and publishers.  And given that
21 and the fact that the products are independent,
22 they -- and they have somehow a different set of

Page 77

1 customers, AdX should work on behalf of its
2 customers.
3       Now, one side of its customers are the
4 advertisers.  The advertisers on AdX would like to
5 try and have access to as broad as an inventory as
6 they can.  That includes the inventory provided by
7 third-party publishers, those outside of DFP.
8       To the extent that AdX impaired the
9 ability to reach that part of the sell side, AdX
10 would have been harming its advertisers.
11   Q   The AdX customers are publishers to your
12 mind?
13   MS. WOOD: Objection to the form,
14 misstates.
15   THE WITNESS: So I explained that AdX
16 connects to tools on the buy and on the sell side.
17 You have advertiser ad networks, for example,
18 publisher ad servers.  Those connect directly to
19 AdX, but ultimately they work on behalf of
20 publishers and advertisers.
21 BY MR. ISAACSON:
22   Q   Now, looking at your -- page ten of your

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1 opening report, b.i, "Google restricted AdX to
2 real-" -- "to provide realtime bids exclusively to
3 DFP," which we've been discussing.
4      Do you see that?
5   A   Yes.
6   Q   All right.  So am I correct that it
7 doesn't matter to you whether AdX and DFP are
8 separate products or joint products, what matters
9 is whether AdX provides realtime bids access to
10 rival ad exchanges?
11      MS. WOOD:  Objection to the form.
12      THE WITNESS:  So I -- I -- I didn't say
13 whether it matters or not.  I didn't provide any
14 answer to that question because that was not your
15 question.  Professor Lee delineated the relevant
16 markets and has established that these are
17 separate products.
18      And what happens is that if the products
19 were not tied directly to each other, AdX would
20 have had the incentive to let its advertiser side
21 of the platform to access as much of the supply
22 side as they possibly could in as best of a

Page 79

1 condition as -- as -- as physical, but AdX did not
2 do so.  It provided only realtime feeds to those
3 publishers who went through DFP and not to those
4 who went outside.
5      So DFP was the only source that could
6 put AdX in realtime competition with other
7 exchanges and if you as a publisher elected not to
8 go through DFP, you wouldn't have the opportunity
9 to put AdX in realtime competition.  But that, in
10 and of itself, would have harmed the advertisers
11 and the advertiser side, the buying tools that
12 serve the advertisers that are connected to AdX.
13 BY MR. ISAACSON:
14   Q   The -- so just to get on simple terms
15 here, Google -- when you say, "Google restricted
16 AdX to provide realtime bids exclusively to DFP,"
17 you -- you were giving the opinion that's
18 exclusionary conduct, right?
19      MS. WOOD:  Objection to the form.
20      THE WITNESS:  That not being able to
21 access and put AdX in realtime competition outside
22 of DFP did harm competition in -- in relevant

Page 80

1 markets.
2 BY MR. ISAACSON:
3   Q   And when you say not -- not providing
4 access out of -- outside of DFP, you're talking
5 about providing access to who?
6   A   I'm talking about realtime competition.
7 I'm talking about, for example, whether you're
8 able to -- you know, for example, after header
9 bidding, as a publisher, if you decide to inquire
10 on your options by obtaining and running header
11 bidding options and obtaining the winning bid and
12 then going to AdX and see whether AdX could place
13 a better offer.  That was a difficult process to
14 undertake, at least according to the evidence, to
15 undertake outside of DFP.
16      There was evidence that a floor, for
17 example, from header bidding that was impression
18 specific was not possible to be passed to AdX
19 and/or that AdX would not provide a price back to
20 whatever floor even if a more static floor was
21 passed on by the third-party publisher.  And so
22 AdX was not actually being put in realtime

Page 81

1 competition because either a dynamic floor was not
2 feasible to be passed and therefore what AdX was
3 confronting when it received that floor was not so
4 much a floor related to that impression, but
5 something else more generic and therefore there was not
6 a realtime computation with respect to that
7 particular impression.
8      Or when the publisher submitted that --
9 whatever floor he was able to submit to AdX
10 through AdX direct, for example, AdX did not
11 provide a price back and simply had to decide --
12 simply decided I take this impression or I don't
13 and I serve the ad and, therefore, was not placed
14 in competition with other sources.
15      Those difficulties did not exist through
16 DFP.  Through DFP a publisher could put AdX in
17 realtime competition, but it would have been to
18 the benefit of advertisers on AdX to have had
19 similar access to all inventory whether it came
20 through DFP or not DFP publishers.
21      MS. WOOD:  I would just ask at some
22 point we take a break.

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1      MR. ISAACSON:  All right.  I'm going to
2   move to strike the answer.
3   BY MR. ISAACSON:
4      Q   I asked about who -- when you -- when
5   you say not providing access outside of DFP,
6   you're talking about providing access to who?  I
7   still don't know who.  I would like to know before
8   the break, if it's possible, who you're talking
9   about providing access to.  Rival ad exchanges?
10      MS. WOOD:  Objection to the purported
11   motion to strike as completely unfounded, but you
12   can answer the question.
13      Objection also to the form of that
14   question.
15      THE WITNESS:  Could you please restate
16   the question that -- that you believe I have not
17   answered.
18   BY MR. ISAACSON:
19      Q   All right.  When you -- when you say
20   that access was not provided outside of DFP,
21   you're talking about providing access to who?
22      A   Publishers.

Page 83

1      Q   Okay.  The -- all right.  Let's take a
2   break.
3      VIDEO TECHNICIAN:  Going off the record.
4   The time is 10:49.
5      (Brief recess.)
6      VIDEO TECHNICIAN:  Going back on the
7   record.  The time is 11:04.
8   BY MR. ISAACSON:
9      Q   With respect to your opinions about the
10   exclusive first look, did you do any work in your
11   reports to quantify any adverse effect on
12   publishers of first look?
13      MS. WOOD:  Objection to the form.
14      THE WITNESS:  Could you please repeat.
15   BY MR. ISAACSON:
16      Q   Did you do any work in your reports to
17   quantify any adverse effect on publishers of the
18   exclusive first look described in your reports?
19      MS. WOOD:  Same objection.
20      THE WITNESS:  So while I have not
21   conducted an exact quantification of the harm, it
22   is expected that when you give exclusive first

Page 84

1   look to AdX and AdX therefore completely
2   forecloses competition at that level, there's
3   nonzero chance that there would have been better
4   opportunities for other publishers outside of AdX
5   that the publisher was unable to monetize.
6      Professor Milgrom's experiment though --
7   that I'm not here just by mention- -- mentioning
8   his experiment.  I'm not saying that I necessarily
9   agree with him, but they illustrate the fact that,
10   some of them, when the advertisers are free to
11   choose who they want to take first, only at 7.8,
12   or 8 percent of the time they chose AdX and that's
13   because the rest of the times they found better
14   options elsewhere and they would have preferred to
15   go elsewhere.
16      MR. ISAACSON:  All right.  I'll move to
17   strike after "While I've not conducted an exact
18   quantification of the harm."
19   BY MR. ISAACSON:
20      Q   The --
21      MS. WOOD:  Objection to the motion.
22   BY MR. ISAACSON:

Page 85

1      Q   Have you in your work attempted to
2   quantify any adverse effect on advertisers of
3   first look?
4      MS. WOOD:  Objection.
5      THE WITNESS:  I'm sorry, could you
6   please repeat.
7   BY MR. ISAACSON:
8      Q   Have you attempted to quantify any
9   adverse effect on advertisers on the exclusive
10   first look described in your reports?
11      MS. WOOD:  Same objection.
12      THE WITNESS:  Well, to the extent that
13   advertisers on a particular impression do not
14   necessarily adjust their bids to that one
15   particular floor, the bids are the same for that
16   particular impression.  Those advertisers may on a
17   particular impression not have been directly
18   harmed, but they would also not have benefited
19   from it.
20      All that said, to the extent that the
21   advertiser is keeping on getting -- the advertiser
22   on AdX is keeping on getting directed to AdX as

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1 the exclusive first look and doesn't have as many
2 opportunities to look what's after the first look,
3 to the extent that AdX frequently executes first
4 look, then that advertiser lacks the ability to
5 potentially try new inventory opportunities.
6 BY MR. ISAACSON:
7     Q.  Okay.  Have you attempted to quantify
8 any of the adverse effects on advertisers from an
9 exclusive first look?
10    A.  I did not quantify, but as I said, on
11 per impression basis to the extent that their bids
12 are not answering and being immediately changed
13 depending on the floor and the evidence I have
14 seen on the record that is also confirmed by
15 Professor Milgrom's view that the bids are
16 typically not being adjusted to the floors on the
17 impression-by-impression basis, those advertisers
18 would not have gained, neither lost, from that
19 point of view.
20        MR. ISAACSON:  I'll move to strike after
21 "I did not quantify."
22 BY MR. ISAACSON:

Page 87

1     Q.  The -- have you --
2        MS. WOOD:  Objection.
3 BY MR. ISAACSON:
4     Q.  -- you attempted to quantify any adverse
5 effect on publishers from the exclusive last look
6 discussed in your report?
7        MS. WOOD:  Objection to the form.
8        THE WITNESS:  I did not quantify -- I
9 did not have to quantify in order to determine
10 that publishers would have likely been harmed and
11 that at the end of the day last look exclusively
12 benefited AdX.
13 BY MR. ISAACSON:
14    Q.  Did you attempt to quantify any adverse
15 effect of advertisers from the exclusive last look
16 discussed in your report?
17        MS. WOOD:  Objection to the form.
18        THE WITNESS:  I did not have to quantify
19 neither did I quantify an exact effect of last
20 look on to advertisers.  That was not necessary
21 for the opinion that I put forward.
22 BY MR. ISAACSON:

Page 88

1     Q.  What's your understanding of any
2 technical work that would need to be done for the
3 first look that you've described in your reports
4 to not be exclusive?
5        MS. WOOD:  Objection to the form.
6        THE WITNESS:  I do not know what you
7 mean by "technical work."
8 BY MR. ISAACSON:
9     Q.  Well, you describe a first look that's
10 exclusive.  If you made it nonexclusive, what
11 technical work would Google have had to have done
12 to achieve that?
13        MS. WOOD:  Same objection.
14        THE WITNESS:  I am not aware that --
15 that insurmountable technical work would have to
16 be done because in the situation of whether you
17 give exclusive first look to AdX or,
18 alternatively, you let the publisher choose who to
19 place first in terms of first look, at the end of
20 the day I expect, and it seems to be the case,
21 that DFP was already connected to the remaining
22 exchanges going down the sequential process.

Page 89

1 Because eventually if AdX did not take the
2 impression on exclusive first look, somebody else
3 would, let's say the second in line exchange, and
4 DFP would already have been connected to the
5 second in line exchange and, therefore, I -- I --
6 I think that it is not unreasonable to expect that
7 if the publisher had chosen to put the second in
8 line instead first, that DFP would have to incur
9 insurmountable technological work and cost that
10 would not have allowed it to move the second in
11 line, for example, to first in line.
12 BY MR. ISAACSON:
13    Q.  All right.  So am I correct that you
14 agree that in order to make the first look
15 nonexclusive, that would take some technical work
16 on the part of Google?
17        MS. WOOD:  Objection to the form.
18        THE WITNESS:  My testimony and my answer
19 was that even if there is such work, I don't think
20 it is insurmountable.  I don't know whether such
21 work exists because given that DFP was already
22 plugged into the remaining exchanges and parties

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1  down the sequential process, I would not
2  reasonably expect that it would be technologically
3  prohibitive to put the second in line connection
4  into a first in line connection.
5  BY MR. ISAACSON:
6      Q   All right.
7      A   The -- the -- the reality is that
8  eventually there were already realtime bidding
9  happening outside of DFP and so those connections
10  were feasible already in realtime bids across
11  multiple sources at that moment in time.
12         So the evidence is that it doesn't seem
13  that even if there were technological work that
14  had to be done, that it would be prohibitive.
15         MR. ISAACSON:  All right.  So my
16  question was whether that would take some
17  technical work and the answer is "My testimony and
18  my answer was that even if there is such work,"
19  then it goes on from there.  So I'll move to
20  strike the answer.
21         MS. WOOD:  Objection to the motion.
22  BY MR. ISAACSON:

Page 91

1      Q   Now, with respect to the uniform pricing
2  rules, did you do any work to quantify any adverse
3  effect on advertisers of Google's unified pricing
4  rules discussed in your report?
5         MS. WOOD:  Objection to the form.
6         THE WITNESS:  I'm sorry, could you
7  please repeat.
8  BY MR. ISAACSON:
9      Q   Did you do any work to quantify any
10  adverse effects on advertisers from Google's
11  unified pricing rules?
12         MS. WOOD:  Same objection.
13         THE WITNESS:  I did not conduct a
14  quantification of the exact effect on advertisers
15  due to UPR.  That was not necessary for the
16  opinion that I provide.
17  BY MR. ISAACSON:
18      Q   Did you do any work to quantify any
19  adverse effect on publishers from Google's unified
20  pricing rules?
21         MS. WOOD:  Objection to form.
22         THE WITNESS:  While I did not conduct an

Page 92

1  independent analysis of -- of the exact harm, my
2  reports document publishers' views of those harms
3  being -- having limited choice of how they decide
4  to choose the floors, whether -- prior to UPR
5  setting equal floors was also a possibility.  To
6  the extent that they chose not to do so and were
7  then forced to do it, they were harmed by that
8  limited choice, ability to divert transactions
9  away from AdX to other preferred options.  And
10  even just simply lower ability, they would have to
11  bargain with AdX for potential better take rates.
12         So while I didn't conduct an exact
13  quantification of that overall harm to publishers,
14  and that was not needed for my opinion, I do
15  provide various examples of -- several of them,
16  discussing how that impacted their monetization.
17         MR. ISAACSON:  All right.  So I'll move
18  to strike other than -- "So while I didn't conduct
19  an exact quantification of that overall harm to
20  publishers, that was not needed for my opinion."
21         MS. WOOD:  Objection to the motion.
22  BY MR. ISAACSON:

Page 93

1      Q   With respect to the AdMeld acquisition,
2  did you in your reports quantify any adverse
3  effect on advertisers from that acquisition?
4         MS. WOOD:  Objection.
5         THE WITNESS:  I did not have to quantify
6  the -- the harm of AdMeld to advertisers to
7  understand and be able to put an opinion forward
8  as I did as to how certain features that were
9  deprecated following AdMeld's harmed competition.
10         Naturally they, in particular, benefited
11  AdX, not only also DFP, but through the benefit of
12  AdX and the cutting out the ability of additional
13  sources of supply to be placed in competition with
14  AdX, they harmed advertisers.
15         I did not put forward an exact number of
16  how much, but I didn't have to put forward that
17  number to provide the opinion that it was harmful.
18         MR. ISAACSON:  Okay.  I'll move to
19  strike other than "I did not put forward an exact
20  number of how much, but I didn't have to put
21  forward that number to provide the opinion that it
22  was harmful."

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 230

1  Ads than any other buying platform, including
2  Google's, neither that the cost was necessarily
3  expected to be meaningfully higher to implement
4  these measures for Google Ads than DV360 or any
5  other buying tooling at the same moment in time.
6  BY MR. ISAACSON:
7      Q   And the number of exchanges that you are
8  talking about Google connecting to and offering
9  its Google -- the Google Ads' demand would be over
10 a hundred exchanges, correct?
11     A   I do not put forward an opinion on the
12 number of exchanges.
13     Q   Do you have any idea the magnitude of
14 exchanges that you were talking about that need to
15 be connected to?
16     A   I know there are many exchanges that
17 are -- there are dozens of exchanges that are
18 competitors in the relevant market, but DV360
19 would, in principle, also connect to very many
20 exchanges and so would very many other buying
21 tools.
22     I do not see -- I haven't seen any

Page 231

1  evidence that that type of risk or necessarily the
2  number of exchanges would have to be any different
3  between Google Ads or DV360 or any other buying
4  tools.
5      MR. ISAACSON:  I move to strike
6  everything beginning with "But DV360 would, in
7  principle."
8      MS. WOOD:  Objection.
9  BY MR. ISAACSON:
10     Q   The -- am I correct that you have not
11 done any analysis of the incremental risk of fraud
12 or contact with inappropriate conduct such as
13 pedophilia from connecting Google Ads' demand to
14 these dozens of ad exchanges?
15     MS. WOOD:  Objection to the form.
16     THE WITNESS:  I have not put forward an
17 empirical analysis to quantify that, but it's not
18 always necessary because the economic evidence at
19 the time this -- this document refers to 2014, is
20 consistent with everybody else was multi-homing.
21 Therefore, since I do not have evidence to believe
22 that Google Ads would be a particularly high

Page 232

1  target for this fraud or any other type of fraud
2  and/or would have to incur significantly higher
3  costs to prevent this type of conduct compared to
4  other similar buying tools at the exact same
5  moment in time, I did not have to assess
6  separately how high were the costs involved with
7  these frauds because the reality is that the
8  market has already shown me that, to the extent
9  those existed, they were overcome and implemented
10 by everybody else and I have no reason to believe
11 they couldn't also be implemented by Google Ads.
12     MR. ISAACSON:  I'll move to strike
13 everything "I have not put forward" -- after, "I
14 have not put forward an empirical analysis to
15 quantify," where she begins to say, "But it's not
16 necessary."
17     MS. WOOD:  Objection.
18 BY MR. ISAACSON:
19     Q   You consider Exhibit -- the data that
20 you're reviewing in Exhibit 11 with the reports
21 about fraud or pedophilia to be consistent with
22 the existence of multi-homing in these different

Page 233

1  exchanges; is that right?
2      MS. WOOD:  Objection to the form.
3      THE WITNESS:  Which data am I --
4  BY MR. ISAACSON:
5      Q   The data we were looking at, 439 from
6  the 2014 document.
7      A   Like could you please repeat the
8  question.
9      Q   Sure.  Do you consider these sorts of
10 reports in this document to be consistent with the
11 existence of multi-homing in the exchanges that
12 are at issue here?
13     MS. WOOD:  Objection to the form.
14     THE WITNESS:  I don't understand what
15 you mean by be consistent with multi-homing of
16 exchanges.  The multi-homing we are referring to
17 is the multi-homing of Google Ads.
18 BY MR. ISAACSON:
19     Q   All right.  I'm just trying to
20 understand when you said this document -- or this
21 document refers to, in 2014, is consistent with
22 everything else with multi-homing?

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

Page 234

1      MS. WOOD:  Objection to the form.
2      THE WITNESS:  So I'll -- I'll elaborate
3  on that if it was not clear.
4      To the extent that any of these risks
5  exist, the evidence -- I haven't seen any evidence
6  that these risks would have been higher for Google
7  Ads than any other buying tools at the same --
8  around the same moment in time, including Google's
9  own DV360.
10      The reality of the market at the time
11  shows that other buying tools were multi-homing.
12  Therefore, to the extent that these risks did
13  exist and even if some measures had to be put in
14  place that involved some level of cost to minimize
15  these risks, others overcame those risks and those
16  costs and were able to multi-home.
17      I have no -- I've seen no evidence that
18  led me to believe that the risks would either be
19  higher and/or more costly to prevent on Google Ads
20  than anybody else in terms of buying tools at that
21  same moment in time and that would have been
22  prohibitive and the key reason why Google Ads

Page 235

1  would not be multi-homing because the others were,
2  including Google's own DV360.
3  BY MR. ISAACSON:
4      Q   For the dozen of exchanges that would be
5  connected to here, do you have any information as
6  to whether how many, if any of them, adopted
7  measures to mitigate the risks of fraud and
8  content such as pedophilia or porn?
9      MS. WOOD:  Objection to the form,
10  foundation.
11      THE WITNESS:  I do not know and do not
12  need to know for a fact of how many of them have
13  undertaken it.
14      Certainly the exchanges, if they want to
15  effectively compete, would have -- would have been
16  in their own interest to implement at least some
17  of these measures to minimize these risks.  But I
18  have no reason to believe that -- that incentive
19  and that reality would be different for exchanges
20  that would eventually be multi-homing with Google
21  Ads than it is for exchanges in which DV360
22  multi-homes or other buying tools multi-home.

Page 236

1      So when I compare Google Ads' situation
2  against others similarly at the same moment in
3  time, I do not have reason to believe that Google
4  Homes -- that Google Ads faced an insurmountable
5  barrier to multi-homing which others at the same
6  moment in time were apparently not facing.
7  BY MR. ISAACSON:
8      Q   The -- from your review in this case,
9  have you seen competitors of Google in these
10  market -- in any of the three markets that say
11  that they have unique advertiser demand?
12      MS. WOOD:  Objection to the form.
13      THE WITNESS:  Well, there are several
14  competitors and there are three markets.  Could
15  you narrow -- would it be possible to narrow your
16  question?
17  BY MR. ISAACSON:
18      Q   Sure.  Let's talk about the ad exchange
19  market.
20      Are you familiar with any of the
21  competitors there that say they have unique
22  advertiser demand?

Page 237

1      A   Not that I immediately recall, but a
2  demand being unique in one source does not mean
3  that another source cannot have a different type
4  of unique demand.
5      All that means is that the demand for
6  this particular exchange cannot be found elsewhere
7  and maybe there's demand for another exchange that
8  can also not be found else- -- elsewhere.  The
9  uniqueness of one demand does not cut out
10  potentially on the uniqueness of somebody else's
11  demand available somewhere else.
12      Q   So you've referred to Google documents
13  and other documents referring to Google Ads'
14  demand being unique.
15      Would you expect that Microsoft Xandr
16  would also say they have unique demand?
17      A   I don't have an expectation whether they
18  have or not.  They probably will say they do.  I
19  don't know whether they have or not.  But to the
20  extent that they don't have market power, they
21  would not be able to produce an anticompetitive
22  effect even if they were to exclusively tie some

60 (Pages 234 - 237)

Page 238

1  sort of demand to their own exchange.
2      Q   So even if you have unique -- even if a
3  company the size of Microsoft has unique demand --
4  well, let me strike that.
5          Even if a company says they have unique
6  demand, that doesn't mean they have market power?
7      A   It all depends on how large that demand
8  is, how important that demand is in that market,
9  how that company is leveraging that demand into
10  potentially expanding in another market.
11          Now, I'm not talking about the overall
12  size of Microsoft as you discussed, a company like
13  Microsoft, I'm -- I'm focusing on its exchange.
14  And the fact is that Google AdX is many orders of
15  magnitude larger than even the second largest
16  competitor in the relevant market.  So when you
17  have unique demand that is large and important on
18  the demand side and you tie it exclusively to --
19  to another -- to an exchange that is large as
20  well, that may have anticompetitive conduct and
21  that is part of the conduct that I analyzed.
22      Q   All right.  So even if a company says

Page 239

1  they have large unique demand, that alone doesn't
2  mean they have market power; is that correct?
3          MS. WOOD:  Objection to the form.
4          THE WITNESS:  It depends on the market
5  that is being analyzed, it depends on the ability
6  to deter any potential anticompetitive conduct due
7  to the leveraging of unique demand to other
8  markets.  It depends on a variety of factors.
9  BY MR. ISAACSON:
10      Q   So when you say --
11      A   All of which I analyzed in the context
12  of the conduct at hand here where relevant.
13      Q   Right.  And when you say "leveraging of
14  unique demand," right, that is conduct that you're
15  accusing Google of doing here, leveraging unique
16  demand for Google Ads in a -- and doing that in
17  the ad exchange market for example?
18          MS. WOOD:  Objection to the form.
19          THE WITNESS:  I am not accusing Google
20  of anything.  The complaint accuses Google of
21  certain conduct.  I just assess the competitive
22  effects of that conduct.

Page 240

1  BY MR. ISAACSON:
2      Q   The conduct that they are engaged with
3  that unique demand is leveraging that unique
4  demand in the ad exchange market; is that correct?
5          MS. WOOD:  Objection to the form.
6          THE WITNESS:  With respect to Google
7  Ads, that is an exclusive tie that was completely
8  exclusive in terms of exchanges to AdX change --
9  to AdX prior to AWBid, which was always a small
10  portion, which is there's a very unique demand
11  that is only accessible through AdX and as a
12  publisher, if you want to reach that demand, you
13  have no choice but to go through one channel, AdX.
14  And the lever- -- that is the leveraging I'm
15  discussing.  And according to Google's internal
16  documents, that was the differentiating factor of
17  AdX compared to its competitors.
18  BY MR. ISAACSON:
19      Q   All right.  Let's go -- just to get back
20  to basics.  Google Ads' demands refers to demand
21  from advertisers, right?
22          MS. WOOD:  Objection to the form.

Page 241

1          THE WITNESS:  Google Ads is the demand
2  from advertisers in open web display.
3  BY MR. ISAACSON:
4      Q   All right.  And those are advertisers
5  who want to place ads?
6      A   Yes.
7      Q   And when you say that -- that that's an
8  exclusive tie, what is the tying product or
9  service that you're referring to?
10          MS. WOOD:  Objection to the form.  It
11  calls for a legal conclusion.
12          THE WITNESS:  I do not put forward an
13  opinion as to the tie in any legal form.  I
14  mentioned a tie as an exclusivity -- as
15  exclusionary conduct in which exchange -- AdX is
16  excluding competitors from accessing Google Ads.
17  BY MR. ISAACSON:
18      Q   Right.  And when you were referring to a
19  tying arrangement, was the tying product or
20  service the Google demand of advertisers who
21  wanted to buy ads?
22          MS. WOOD:  Objection to the form, calls

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

Page 242

1  for a legal conclusion.
2       THE WITNESS:  I am not offering an
3  opinion as to any legal sense of tying.  In fact,
4  in my report you will not find that word.
5       It is an exclusivity arrangement where
6  anyone -- any publisher wanting to reach Google
7  Ads has to go through AdX and that's the
8  exclusivity that is at hand in this case.
9  BY MR. ISAACSON:
10      Q   All right.  And do you have an
11  understanding of a market in which the advertisers
12  who want to place ads on open web display are in?
13      MS. WOOD:  Objection to the form.
14      THE WITNESS:  I don't understand your
15  question.
16  BY MR. ISAACSON:
17      Q   All right.  So if you have a -- are you
18  aware of any market that's been defined in this
19  case that includes advertisers who want to place
20  ads on open web display?
21      MS. WOOD:  Same objection.
22      THE WITNESS:  The market is the market

Page 243

1  for advertiser ad networks and the relevant
2  transactions are those for open web display.
3  BY MR. ISAACSON:
4       Q   All right.  But that is -- does the
5  market involve -- is there any market that's been
6  defined in this case where an advertiser is paying
7  to place an ad?
8       MS. WOOD:  Objection to the form.
9       THE WITNESS:  I don't understand your
10  question.  Advertisers is the one who ultimate- --
11  ultimately pays for the ad to be placed.
12  BY MR. ISAACSON:
13      Q   Right.  And they -- they are paying
14  ultimately a publisher, correct?
15      MS. WOOD:  Objection to the form.
16      THE WITNESS:  They pay the publisher and
17  the intermediaries keep a part of it.
18  BY MR. ISAACSON:
19      Q   Right.  And the three markets in this
20  case pertain to the intermediaries, correct?
21      MS. WOOD:  Objection to the form.
22      THE WITNESS:  How do the three markets

Page 244

1  necessarily only, they involve -- at the end of
2  the day, at the end of every channel you have
3  either a publisher or an advertiser.
4       The three relevant markets are publisher
5  ad servers, advertising ad networks, and
6  exchanges.
7  BY MR. ISAACSON:
8       Q   Are ad exchanges an intermediary between
9  advertisers and publishers?
10      MS. WOOD:  Objection to the form.
11      THE WITNESS:  Ad exchanges connect
12  pub- -- publisher ad servers to the buying tools
13  through advertiser ad networks.  That's what they
14  directly connect to.  Those are their clients
15  essentially, their direct clients.
16      Are they intermediaries in the overall
17  process of connecting the inventory for sale from
18  the publisher to the purchase of that inventory by
19  the ultimate advertiser, yes, they are one of the
20  intermediaries throughout that whole process.
21  BY MR. ISAACSON:
22      Q   The -- I think I've been going an hour

Page 245

1  and-a-half.  Do you want --
2       MS. WOOD:  How long do you think that
3  document is?
4       MR. ISAACSON:  I make no
5  representations.
6       MS. WOOD:  Well, is it lengthy or is it
7  short?
8       MR. ISAACSON:  No, I think it's probably
9  short.
10      MS. WOOD:  Well, let's just finish it.
11      MR. ISAACSON:  This will be 12.
12      (Abrantes-Metz Exhibit Number 12 was
13      marked for identification.)
14  BY MR. ISAACSON:
15      Q   Now, if you look at paragraph 314 of
16  your opening report and footnote 477.
17      All right.  Do you see that, footnote
18  477?
19      A   Yes.
20      Q   All right.  You are quoting -- you
21  are -- you are citing Exhibit 12, which is
22  GOOGLE-DOJ-07807539 to 741 dated April 19th, 2011.

62 (Pages 242 - 245)

Page 246

1 And you say in your report "indicating that Google
2 would lose 20 to 30 percent of its AdX publishers
3 and 20 percent of DFP's publishers if it allowed
4 Google Ads bids on other exchanges." And then if
5 you look at the document, it has three dark bullet
6 points on the first page.
7 Do you see that?
8 A Yes.
9 Q All right. And the first bullet point
10 says, "AdX will lose 20 to 30 percent of its
11 publishers," as you -- which is what you reference
12 in your footnote. It says, "DFP will lose
13 20 percent of its publishers in 2012 from an AWBid
14 integration." And then it says, "With the
15 following features in AdX all risk from AWBid is
16 mitigated," and it mentions three features that
17 could be adopted that would mitigate all that
18 risk: Advanced Reporting and Analysis Features,
19 Advanced Data Features, Controls, including
20 granular differential minutes.
21 Who decided to cite in your report that
22 Google would lose 20 to 30 percent of its AdX

Page 247

1 publishers and 20 percent of DFP publishers
2 without referencing that all of that could be
3 mitigated as stated in the document? Who decided
4 to do that?
5 MS. WOOD: Objection to the form.
6 THE WITNESS: I don't know who decided,
7 but ultimately I reviewed all of these and I
8 agreed with it.
9 BY MR. ISAACSON:
10 Q All right. So --
11 A Somebody in my team or I read the
12 document as evidence that the sell-side pressure
13 from AWBid integration, that meaning because of
14 AWBid, Google Ads is going to multi-home and that
15 will provide competition to AdX that had not
16 existed before. That's the sell side. That would
17 put pressure of 20 to 30 percent of its
18 publishers.
19 The -- the -- so the quote is being
20 added in my report as evidence of the importance
21 and the impact of multi-homing. Not necessarily
22 whether later on something else can be done to

Page 248

1 mitigate that, but only to point that multi-homing
2 could lead, according to Google, to AdX losing a
3 significant percentage of its publishers.
4 Q All right. So my question was who made
5 the decision not to cite the fact that these risks
6 could be mitigated, so I'm going to move to strike
7 everything after "I don't know who decided, but
8 ultimately I agreed all of these" -- "I agreed
9 with all these and I agreed with it. Somebody in
10 my team or I read the document."
11 Now --
12 MS. WOOD: Objection.
13 BY MR. ISAACSON:
14 Q -- I just want to know the process here.
15 All right?
16 So somebody put this document in here
17 and didn't cite that these -- that these
18 percentage reductions that are cited there could
19 be mitigated and that was either you who made that
20 initial decision or you later reviewed the
21 document and you agreed with leaving that out; is
22 that correct?

Page 249

1 MS. WOOD: Objection to the form.
2 THE WITNESS: Yes, it is correct because
3 what I am addressing is not whether it can be
4 mitigated, it's whether the moving to multi-homing
5 is impactful and clearly this document states that
6 it is. If nothing else is put in place, there's a
7 risk of AdX to lose 20 to 30 percent of its
8 publishers due to the sell-side pressure put
9 forward due to the existence of AWBid.
10 BY MR. ISAACSON:
11 Q And you say clearly it shows that --
12 that there was a risk to AdX of losing 20 to
13 30 percent even though Google wrote no, we can
14 mitigate all of that risk?
15 MS. WOOD: Objection to the form,
16 foundation.
17 THE WITNESS: So as I explained
18 previously, the quote is relating to whether
19 there -- there is a risk to the sell-side coming
20 out of multi-homing, not what Google necessarily
21 did about it or not afterwards. And because of
22 that, the second part, what you claim was -- well,

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL

Page 262

1  BY MR. ISAACSON:
2      Q   All right.  Exhibit 15 is Bates stamped
3  GOOGLE-DOJ-11763947 through 953.
4          The -- this is quoted in footnote 505 of
5  your report on that same page we were looking at.
6  At paragraph 332 you say, "In fact, header bidding
7  was an innovation designed to circumvent the link
8  between DFP and AdX.  It was used to 'dodge EDA,'"
9  referring to enhanced dynamic allocation.
10         What you are quoting there is on page
11  949, which says -- do you see a paragraph that
12  begins "In EMEA," Europe, Middle East, Africa,
13  right?
14     A   (Nodding.)
15     Q   So in Europe, Middle East, Africa the
16  paragraph begins and it's talking about partner
17  questions and it says that "We hear that buyers
18  are demanding their header bidder LIs" -- line
19  items; is that how you would understand that?
20     A   I don't know where -- where you are.
21     Q   The last sentence of the paragraph
22  about -- about partners in Europe, Middle East and

Page 263

1  Africa.
2      A   Oh.
3          MS. WOOD:  The third paragraph --
4          THE WITNESS:  But I -- I --
5          MS. WOOD:  -- from the bottom of page
6  949.
7          THE WITNESS:  Okay.  So I see.  I was
8  still reading the whole paragraph.
9  BY MR. ISAACSON:
10     Q   All right.  LIs you would refer -- you
11  would understand to refer to line items, right?
12     A   That was my understanding.
13     Q   Okay.  So the document says, "We hear
14  that buyers," referring back to the Europe, Middle
15  East and Africa, "are demanding their header
16  bidder line items be trafficked as standard with
17  high delivery goals to dodge enhanced dynamic
18  allocation."
19         Those two words, "dodge EDA," are what
20  you chose to quote in your report saying that
21  header bidding was an innovation designed --
22  they're talking about header bidder as an

Page 264

1  innovation, correct?
2      A   No, it -- it is talking about header
3  bidding as something -- an -- an innovation -- not
4  necessarily innovation in this one sentence.
5      Q   Okay.  So --
6      A   As -- header bidding as a way to go
7  around EDA.
8      Q   Right.  So -- and actually I'll be very
9  specific.  Your sentence begins "It."  That refers
10  to header bidding, right, it was used to dodge
11  EDA?
12     A   Yes.
13     Q   Okay.  So you write in your report that
14  header bidding was used to "dodge EDA," enhanced
15  dynamic allocation, and you pulled those two words
16  from a paragraph about buyers in Europe, Middle
17  East, and Africa who wanted their line items to be
18  trafficked as standard with high delivery goals to
19  dodge EDA, right?
20     A   Yes --
21         MS. WOOD:  Objection to the form.
22         THE WITNESS:  -- that is an example

Page 265

1  of -- of a communication that goes straight to
2  this point.  That doesn't mean that these were the
3  only buyers that were worried about dodging EDA.
4          In fact, header bidding was developed to
5  try and go around AdX's exclusive first look.
6  This is just an illustration of, for these
7  particular buyers, how they also saw that the same
8  way.
9          MR. ISAACSON:  All right.  I move to
10  strike everything after "That is an example of a
11  communication that goes straight to this point."
12         MS. WOOD:  Objection.
13  BY MR. ISAACSON:
14     Q   The point -- the sentence you actually
15  wrote there was that header bidding was used to
16  dodge EDA and you left out that what you were
17  quoting were some buyers outside the United States
18  were asking for their line items in header bidding
19  to be trafficked, which I read as adjusted, so
20  that then once you changed the line items, they
21  could dodge EDA.  That's what happened here,
22  right?

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL

Page 266

1      MS. WOOD:  Objection to the form.

2      THE WITNESS:  Could you please repeat

3  the question.

4  BY MR. ISAACSON:

5      Q   When you wrote the sentence saying

6  header bidding was used to dodge EDA, you left out

7  that you were quoting from some buyers outside the

8  United States who were asking for their line items

9  in header bidding to be adjusted so that they

10  could dodge EDA, correct?

11      MS. WOOD:  Objection to the form,

12  misstates, foundation.

13      THE WITNESS:  I left it out, but I have

14  the quote with the correct reference, so anyone

15  who wishes to check where the quote is coming from

16  can do so and that's exactly what you did.

17      It is an example of how header bidding

18  was being used to -- to circumvent in the EDA.  I

19  could have chosen other examples.  Not always

20  there was direct evidence from different types of

21  buyers, so I selected one example.

22  BY MR. ISAACSON:

Page 267

1      Q   All right.  But you didn't say it was an

2  example, did you?

3      A   Well --

4      Q   You didn't say there was an example of

5  buyers in -- in Europe, the Middle East, or Africa

6  who were adjusting line items of header bidding to

7  dodge EDA?  You didn't write that, did you?  You

8  wrote header bidding was used to dodge EDA?

9      MS. WOOD:  Objection to form.

10      THE WITNESS:  Well, there's a variety of

11  evidence on the record that, consistent with that

12  being the fact, that header bidding was an

13  innovation to go around first-look exclusivity of

14  AdX and this is just one example of such

15  communications referring to that fact.

16      MR. ISAACSON:  No, I asked what you

17  chose to write, so I move to strike the answer as

18  nonresponsive.

19      MS. WOOD:  Objection.

20  BY MR. ISAACSON:

21      Q   If you move to the first page of the

22  document, at the bottom there's an e-mail dated

Page 268

1  July 23rd, 2015 from Jan Sehrt at Google.

2      Do you see that?

3      A   At the bottom?  The July 23rd e-mail?

4      Q   Yes.

5      A   Yes, I see that.

6      Q   And it's discussing header bidding.

7      Do you see that?

8      A   Yes.

9      Q   All right.  The document says, referring

10  to header bidding, "As it is a very bad user

11  experience it is likely to decrease long-term

12  revenue."

13      The document says that, correct?

14      A   Yes, it does say that.

15      Q   And then below that it says, "As the

16  thread earlier stated, we believe this is bad for

17  users and therefore bad for publishers in the long

18  term."

19      The document also says that, correct,

20  about header bidder?

21      A   It says that, yes.

22      Q   The -- for your opinions on dynamic

Page 269

1  allocation including first look or last look, you

2  relied on Professor Ravi's report, correct?  I'm

3  sorry, Dr. Ravi's report, correct?

4      MS. WOOD:  Objection to form.

5      THE WITNESS:  In what way?

6  BY MR. ISAACSON:

7      Q   Well, he's heavily cited in your report

8  to -- to support your descriptions of first look,

9  last look, and dynamic allocation, correct?

10      A   Well, my opinions are on exclusive first

11  look and exclusive last look and the fact that

12  those was -- were exclusive to AdX is a documented

13  fact that does not necessarily rely on his report.

14      Q   You did consider his descriptions of

15  dynamic allocation to be reliable and accurate,

16  correct?

17      MS. WOOD:  Objection to the form.

18      THE WITNESS:  I reference to some of his

19  report here or there, but I've also read documents

20  on how dynamic allocations and enhanced dynamic

21  allocation work.

22      MR. ISAACSON:  All right.  I move to

68 (Pages 266 - 269)

**Page 270**

1  strike the answer as nonresponsive.
2  BY MR. ISAACSON:
3    Q  I'll ask you again.
4    You did consider Dr. Ravi's descriptions
5  of dynamic allocation to be reliable and accurate,
6  correct?
7    MS. WOOD:  Objection to form and
8  objection to the motion.
9    THE WITNESS:  I reviewed his opinions.
10  They were consistent with my review of -- my
11  direct review of the documents that talked about
12  dynamic allocation and enhanced dynamic allocation
13  and my opinions on exclusive first and exclusive
14  last look do not depend on Professor Ravi's views
15  of how EDA or DA necessarily worked.  They're
16  consistent with the documents I have seen.
17  BY MR. ISAACSON:
18    Q  The -- now, when you refer to exclusive
19  first look, exclusive last look, do I understand
20  generally you're not disputing that dynamic
21  allocation was good for publishers, you're saying
22  dynamic allocations should not have been combined

**Page 271**

1  with an exclusive first look or an exclusive last
2  look?
3    MS. WOOD:  Objection to the form.
4    THE WITNESS:  I do not put forward an
5  opinion as to whether dynamic allocation was or
6  was not good as a whole system.  The opinion I put
7  forward is on exclusive first look and exclusive
8  last look granted to AdX.
9  BY MR. ISAACSON:
10    Q  All right.  Now, with respect to first
11  look, you say in paragraph 150 of your rebuttal
12  report in the last sentence, "What is in dispute
13  is whether the decision to grant AdX an exclusive
14  and privileged position at the top of the remnant
15  waterfall was anticompetitive."
16    And so you're not disputing that dynamic
17  allocation as a whole was good for publishers.
18  What you are disputing is whether dynamic
19  allocation should have included whether it was --
20  whether it was exclusive -- whether an exclusive
21  first look was anticompetitive?
22    MS. WOOD:  Objection to the form.

**Page 272**

1    THE WITNESS:  I do not have an opinion
2  as to whether dynamic allocation was good or bad
3  for publishers aside from the two features of
4  exclusive first look and exclusive last look to
5  AdX.
6  BY MR. ISAACSON:
7    Q  And focusing on first look, without
8  first look -- I'm trying to understand how
9  Google's dynamic allocations would have worked.
10  Without -- without an exclusive first look, would
11  that have meant that Google's dynamic allocation
12  would have been designed to put its competitors
13  first in the waterfall if publishers chose them?
14    MS. WOOD:  Objection to the form.
15    THE WITNESS:  Without exclusive first
16  look to AdX, publishers at DFP would have been
17  able to select which exchange they wanted to put
18  at the top and that would have maximized the
19  expected revenue that publishers would have had.
20  Exclusive first look and exclusive last look were
21  a policy of DFP and that policy, to the extent
22  that -- those policies, to the extent that they

**Page 273**

1  harmed publishers, were not in the best interest
2  of publishers.  They had nothing to do with
3  competitors of DFP necessarily.  It hurt DFP
4  publishers.
5    Now, it did enhance AdX in the exchange
6  market, but the policy originates at DFP and DFP
7  as a publisher ad server should have worked on
8  the -- serving the best interest of its own
9  publishers and, therefore, specifically in the
10  context of these two conducts, have allowed them
11  at the least to choose which exchange they would
12  want to get -- give the exclusive first or last
13  look.  And in fact, as Professor Milgrom shows
14  under his own simulations that I am not rubber
15  stamping as being completely accurate, but his own
16  simulations do show that when publishers had the
17  opportunity to do so, they only put AdX at the top
18  about 8 percent of the time.
19    So, again, it's consistent with
20  publishers would have made -- would have earned
21  higher revenue if there wasn't an exclusive first
22  look in that simulation to AdX.

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL

Page 274

BY MR. ISAACSON:

Q   My question was only about who -- who would have been first in the waterfall without the exclusive first look, so I'll move to strike everything after "Without exclusive first look at AdX, publishers at DFP would have been able to select which exchange they wanted to put at the top."

Now --

MS. WOOD:  Objection.

BY MR. ISAACSON:

Q   -- am I correct that when you say "without exclusive first look at AdX, publishers at DFP would have been able to select which exchanges they wanted to be put up at the top," and those exchanges would be competitors of AdX?

MS. WOOD:  Wait, wait, wait.

THE WITNESS:  Is that a question?

BY MR. ISAACSON:

Q   Yes.

A   I'm sorry, I didn't follow the question.

MS. WOOD:  You're missing a verb or

Page 275

something.

BY MR. ISAACSON:

Q   Am I correct then when you say "without exclusive first look at AdX, publishers would have been able to select which exchanges they wanted to put at the top" even if those exchanges were competitors of AdX?

MS. WOOD:  Objection to the form.

THE WITNESS:  Well, with respect to your first -- to your previous question, the question was also whether there would be competitors to AdX.  So it was not just about part of the question that you repeated.

But, again, the whole of the conduct is that DFP instituted exclusive last -- let's talk about the first look -- exclusive first look to AdX.  That exclusive first look to AdX harmed DFP's publishers.  Therefore, DFP would not normally have had the incentive to do so and harm its customers.  Why would DFP do that?  Because it was benefiting AdX, not necessarily its own customers, but AdX's -- but AdX itself to the

Page 276

detriment of AdX's competitors.

MR. ISAACSON:  All right.  I move to strike the answer as nonresponsive.

MS. WOOD:  Objection.

BY MR. ISAACSON:

Q   I'll try again.

Am I correct that -- that without an exclusive first look, publishers would have been able to select which exchanges they wanted to put at the top of the waterfall even if those exchanges were competitors of AdX?

A   As I explained previously, yes.  If there is to be an exclusive first look, there's no reason that exclusive first look should be to AdX when this is a DFP policy because DFP is supposed to act in the best interest of its publishers and that would mean placing them with the highest possible expected revenues and that would mean that sometimes publishers may have believed those were -- those lied outside of AdX.  And to the extent that there should -- that there would have been an exclusive first look, it would not

Page 277

necessarily have to be in the best interest of the publishers that that exclusive first look was going to be granted to AdX.  And in that case, yes, it would have opened up competition in the ad exchange market and that's part of the anticompetitive effect that I determined in this conduct.

Q   So in order to not be exclusionary, Google had to allow other exchanges to potentially benefit from having a first look; is that right?

MS. WOOD:  Objection to the form.

THE WITNESS:  This is a DFP policy.  A DFP policy should be in the interest of DFP's customers.  This policy harmed DFP's customers, the publishers.  But the reason DFP did it was because it benefited another market in which Google also operated, which is the ad exchange -- the exchange market.

DFP -- I guess Google may have done the calculation that it -- whatever harm its publishers got on DFP due to this policy, the foreclosure -- complete foreclosure of competition

HIGHLY CONFIDENTIAL

Page 278

1    at -- at the level of the first look exclusively
2    to AdX blocked competition in the exchange market
3    to a point where the payoff was larger than
4    harming DFP's customers.
5         MR. ISAACSON:  I'll move to strike as
6    nonresponsive.
7         MS. WOOD:  Objection.
8    BY MR. ISAACSON:
9      Q   With respect to last look, to not be
10   exclusionary is it your opinion Google had to
11   allow other exchanges to potentially benefit from
12   having a last look at header bidding inventory?
13        MS. WOOD:  Objection to the form.
14        THE WITNESS:  It would have been in the
15   best interest of -- of AdX's customers, namely
16   advertisers, to have been able to have -- and
17   publishers -- to have been able to have at least
18   last look being -- exclusive last look being
19   chosen by themselves.
20   BY MR. ISAACSON:
21     Q   And those other exchanges we're
22   referring to are competitors of Google's AdX,

Page 279

1    correct?
2      A   Yes, they are competitors of Google AdX
3    and that was the -- the -- the effect of this
4    conduct was to lessen and harm competition in an
5    exchange market by having DFP follow a policy that
6    is contradictory with respect to the best interest
7    of DFP's customers, its publisher.
8         MR. ISAACSON:  I move to strike
9    everything after "Yes, they are competitors of
10   Google AdX."
11        MS. WOOD:  Objection.
12   BY MR. ISAACSON:
13     Q   The -- and as I understand, it's your
14   opinion that failure to design a product to allow
15   your rivals to be given a last look was
16   exclusionary?
17        MS. WOOD:  Objection to the form.
18        THE WITNESS:  The conduct that was
19   exclusionary was to act against willing customers
20   and to not act in the best interest of the willing
21   customers so that you can benefit a different
22   business in a different market by harming

Page 280

1    competition in that adjacent market.
2    BY MR. ISAACSON:
3      Q   And what you say was against the
4    interest of customers was a different product
5    design.
6         In order to not be exclusionary and
7    benefit customers according to you, you had to
8    allow your competitors to be given a last look?
9         MS. WOOD:  Objection to the form.
10        THE WITNESS:  I have explained that the
11   policy is by DFP.  If DFP had been acting in the
12   best interest of its customers, the publishers, it
13   would have had an interest to maximize their
14   expected revenue.  That would have meant at least
15   not to give exclusive last look to AdX and if
16   exclusivity of last look had to happen, the
17   publishers should have been able to choose who to
18   give the last look to.  Therefore, this policy did
19   not benefit the customers of the entity that
20   designed the policy.  It did benefit, though,
21   another company owned by the same firm, AdX, in an
22   adjacent market by lessening competition and

Page 281

1    producing anticompetitive effects.  But the
2    competitors that are being blocked are not
3    competitors of DFP, they are competitors in the
4    exchange market.
5         MR. ISAACSON:  The -- I'll move to
6    strike everything from "Therefore" after.
7         MS. WOOD:  Objection.
8    BY MR. ISAACSON:
9      Q   The -- you referred to a policy by DFP.
10   It was also part of the -- the last look was
11   part of the technical design of DFP, wasn't it?
12        MS. WOOD:  Objection to the form.
13        THE WITNESS:  I do not know what that
14   means.
15   BY MR. ISAACSON:
16     Q   Well, let me put it differently.  In
17   order to -- to provide a last look to competitors
18   of Google -- of Google, you would have had to have
19   a different technical design, correct?
20        MS. WOOD:  Objection to the form,
21   foundation.
22        THE WITNESS:  I don't know whether you

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL

Page 282

1   have to have a different technical design.  It is
2   a design of DFP.  It is a strategic choice of DFP
3   to harm its own customers, the publishers, to the
4   benefit of another Google company, AdX, and the
5   detriment of AdX competitors.  It is their choice
6   to do so.
7           It may involve something different about
8   making that choice in order to benefit another
9   Google company, it may, but to my opinion as to
10  what the competitive effects are, it's not
11  relevant.
12          MR. ISAACSON:  I'll move to strike
13  everything after "I don't know whether you have to
14  have a different technical design."
15  BY MR. ISAACSON:
16      Q   If we -- if we look at paragraph 366 --
17          MS. WOOD:  Objection.
18  BY MR. ISAACSON:
19      Q   -- 366 of your opening report.  So
20  paragraph 366 of your opening report refers to a
21  Google presentation titled "Last Look Advantage."
22          Do you see that?

Page 283

1       A   Yes.
2       Q   It says, "As a Google presentation
3   titled, 'Last Look Advantage' demonstrated by way
4   of an auction simulation, 'Last look can even lead
5   to inefficient market outcomes' by allowing an AdX
6   bidder to win an impression despite having a lower
7   value for the impression than a bidder on a
8   different exchange."
9           And here is Exhibit 16.
10          (Abrantes-Metz Exhibit Number 16 was
11          marked for identification.)
12  BY MR. ISAACSON:
13      Q   Exhibit 16 is the document you cite at
14  both footnote 557 and 558.  It's Bates stamped
15  GOOGLE-DOJ-13494286 through 294.
16          And -- all right.  And so you quote page
17  294, the last of -- the last page of the document,
18  Conclusion.  And the last sentence says, "Last
19  look can even lead to inefficient market" --
20  "market outcomes."  And that's the -- that's what
21  you quote in your report.  And what you leave out
22  is the first line of the conclusion that "Last

Page 284

1   look maximizes advertiser surplus in all cases."
2           So as I understand your process, you
3   reviewed this document, you reviewed this
4   conclusion, you approved quoting "Last look can
5   even lead to inefficient market outcomes" and
6   leaving out that it says that "Last look maximizes
7   advertiser surplus in all cases," am I correct?
8           MS. WOOD:  Objection to the form.
9           THE WITNESS:  Yes, because I was opining
10  on whether last look leads to inefficient market
11  outcomes and the relevant quote for that is the
12  quote that I included.  And, in fact, I didn't
13  have to even quote to the document because it is
14  clear that to the extent that last look provided
15  AdX the ability of trading a transaction at a
16  lower price than it normally would have in the
17  absence of an exclusive last look, that there was
18  going to be an enhanced probability of inefficient
19  market outcomes as described -- as described in --
20  in -- in my paragraph 366.
21          MR. ISAACSON:  I will move to strike
22  everything beginning with "In fact, I didn't even

Page 285

1   have to quote to the document" and the words that
2   follow after that.
3           MS. WOOD:  Objection.
4   BY MR. ISAACSON:
5       Q   Now, with respect to the acquisition of
6   AdMeld, following that acquisition it's your
7   understanding that Google integrated some of
8   AdMeld's functionality to AdX but not all of its
9   features; is that correct?
10      A   Yes, my understanding is that Google
11  deprecated the ability that AdMeld had to provide
12  realtime bids.
13      Q   Well, is that accurate or is that they
14  deprecated the ability to provide realtime bids to
15  rival publisher ad servers?
16      A   They deprecated the ability that
17  publisher ad servers could obtain realtime bids
18  from a variety of demand services because if they
19  were to have integrated that, they would
20  potentially have been able to obtain realtime bids
21  from AdX and Google wanted to maintain that
22  capability within DFP.

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL

Page 286

1    MR. ISAACSON:  I'll move to strike
2  everything after -- from "because" and afterwards.
3    MS. WOOD:  Objection.
4  BY MR. ISAACSON:
5    Q   Now, after the acquisition of AdMeld,
6  Google continued to have realtime bidding on AdX,
7  correct?
8    A   Accessible only through DFP and not
9  through other parties -- other publishers who
10  had -- who would have potentially provided
11  additional inventory to AdX's willing customers,
12  the advertisers.
13    Q   And when you say Google deprecated the
14  feature which provided realtime bids to rival
15  publisher ad servers, how many rival publisher ad
16  servers are you talking about?
17    A   The ones that were signed up to AdMeld.
18    Q   How many were signed up?
19    A   I don't know how many were signed up
20  exactly, but I know there were several and the --
21  the capabilities that AdMeld was developing in
22  terms of collecting realtime bids were the driving

Page 287

1  force at the time already of AdMeld's business.
2    Q   Were every -- were all of the customers
3  at AdMeld signed up for this feature?
4    A   I don't know for a fact.  Probably not
5  all of them, but that was a feature that was
6  increasing significantly over time.  In fact, I
7  have seen documents that show how -- the
8  percentage of revenues for AdMeld coming out of
9  the realtime capabilities versus their more
10  traditional daisy chain waterfall.  Those
11  differences were very large.  The growth of RTB
12  capabilities was very large in a very small window
13  of time and Google saw this as a threat of this
14  intermediation to DFP and to AdX's business.
15    MR. ISAACSON:  All right.  I move to
16  strike everything after "in fact."
17    MS. WOOD:  Objection.
18  BY MR. ISAACSON:
19    Q   The -- you said several were signed up.
20    What do you mean by several?
21    A   Several.  I don't recall out of the top
22  of my head how many there were.

Page 288

1    Q   I think of several of a handful.  Do you
2  mean something different than that?
3    MS. WOOD:  Objection to form.
4    THE WITNESS:  I don't recall the exact
5  number.
6  BY MR. ISAACSON:
7    Q   The -- and the feature that you're
8  talking about you're saying would have provided
9  realtime bids to rival publisher ad servers,
10  correct?
11    A   Yes.  And -- and -- and Google chose
12  instead to integrate them into DFP.
13    Q   And so we're talking about Google did
14  not provide this feature which would have provided
15  realtime bidding to publisher ad servers that were
16  competitors to DFP, correct?
17    A   But who ultimately would be additional
18  sources of demand for AdX's own customers, at
19  least some of them, the advertisers.
20    MR. ISAACSON:  And I move to strike as
21  nonresponsive.
22  BY MR. ISAACSON:

Page 289

1    Q   Am I correct --
2    A   And --
3    Q   Am I correct --
4    MS. WOOD:  Wait, wait, wait.  Slow down.
5  If you're moving -- or did you finish moving?
6    MR. ISAACSON:  Yeah.
7    MS. WOOD:  I'm objecting to that.
8    Let him ask his next question.
9  BY MR. ISAACSON:
10    Q   Am I correct this -- this feature that
11  you say was deprecated would have provided
12  realtime bidding to publisher ad servers that were
13  competitors to DFP?
14    MS. WOOD:  Objection to the form.
15    THE WITNESS:  And would have provided a
16  real threat to AdX and its ability to gather --
17  keep more transactions within AdX because these
18  other publisher -- publishers were being able to
19  access in realtime a variety of demand sources.
20  Potentially if they had been integrated, they may
21  have been able to obtain realtime biddings for AdX
22  outside of the DFP context.

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL

Page 290

1   BY MR. ISAACSON:
2      Q   All right.
3      A   And Google did not want that to be the
4   case because that would represent this
5   intermediation for DFP, but it was contrary to
6   AdX's advertisers, customers, who would have
7   wanted to have accessed more inventory outside of
8   DFP.
9      Q   Okay.  I'll try one more time.
10         MR. ISAACSON:  I move to strike the
11  answer as nonresponsive.
12         MS. WOOD:  Objection.
13  BY MR. ISAACSON:
14     Q   Am I correct that the feature that you
15  say was deprecated would have provided realtime
16  bidding to publisher ad servers that were
17  competitors to DFP?
18         MS. WOOD:  Objection to form.
19         THE WITNESS:  They were -- they
20  eventually competitors -- they were competitors to
21  DFP, but they were also sources of inventory for
22  AdX's advertisers and that was one of the main

Page 291

1   threats that Google perceived with respect to
2   AdMeld.
3          MR. ISAACSON:  All right.  I will move
4   to strike after everything "But they were also" --
5   or including "that they were also."
6          MS. WOOD:  Objection.
7   BY MR. ISAACSON:
8      Q   The -- all right.  If we look at
9   paragraph 382 of your report --
10     A   Which report?
11     Q   Your opening report.
12         THE REPORTER:  I'm sorry, can you just
13  face this way a little bit.
14         MR. ISAACSON:  Sure.
15         THE REPORTER:  Your voice is going that
16  way.
17         MR. ISAACSON:  Understandable.
18  BY MR. ISAACSON:
19     Q   In paragraph 382 you say, "Specifically,
20  Google did not integrate AdMeld's ability to
21  provide realtime bids into rival publisher ad
22  servers."  Rival publisher ad servers, that refers

Page 292

1   to competitors to Google's ad server, correct?
2      A   Yes, DFP competitors.
3      Q   And then you say, "a 2012 Google
4   document indicated that Google did not plan to
5   adopt AdMeld's ad-server-level API integrations
6   that would 'pass realtime AdX pricing into a
7   non-DFP ad server.'"
8          And then in footnote 593, which we'll
9   mark as Exhibit 17.
10         (Abrantes-Metz Exhibit Number 17 was
11         marked for identification.)
12  BY MR. ISAACSON:
13     Q   Exhibit 17 is Bates stamped
14  GOOGLE-DOJ-03606441 to 451.  It's dated
15  September 1st, 2012, and -- and you are -- you are
16  citing to page 448 about these APIs.  And it
17  says -- do you see that the -- the section titled,
18  "AdMeld has nonstandard means"?  It's in bold in
19  the first bolded section.  Do you see that?
20     A   Yes.
21     Q   And it says, "AdMeld can be called via
22  API to serve an ad.  There are" -- "There are a

Page 293

1   small handful of AdMeld" -- "AdMeld sellers that
2   currently have API integrations in place at the ad
3   server level."
4          So the -- the ad server level API
5   integrations that you say that Google did not plan
6   to adopt were being used by a small handful of
7   AdMeld sellers, correct?
8      A   According to this document, yes, but I
9   guess that important enough for Google to see
10  AdMeld as the largest threat amongst yield
11  managers.
12         MR. ISAACSON:  I'll move to strike
13  everything after "According to this document,
14  yes."
15         MS. WOOD:  Objection.
16  BY MR. ISAACSON:
17     Q   And as I understand your process, you
18  reviewed this document because you were citing it
19  in your report and you reviewed this sentence
20  about a Google 2012 document that indicated that
21  Google did not plan to adopt these API
22  integrations and you made the decision not to

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL

Page 294

1  include the fact that these API integrations were
2  being used by a small handful -- handful of AdMeld
3  sellers, correct?
4      MS. WOOD:  Objection.
5      THE WITNESS:  Yes.  And the fact that it
6  is stressed that they pass realtime AdX pricing
7  into a non-DFP is consistent with the concerns
8  that I have seen expressed by Google in other
9  documents, that that is the reason these functions
10  were not integrated, or at the very least AdX --
11  AdX -- Google could have let AdMeld run as it
12  previously was before even after the acquisition,
13  but there would have been the danger that even
14  that way such servers would have received a
15  realtime price from AdX.  And that was consistent
16  with Google wanting to protect such information
17  from existing outside of DFP so that DFP would be
18  the only -- the only publisher ad server being
19  able to put AdX in realtime competition with
20  others, which is -- would have been to the
21  detriment of AdX's advertisers.
22      MR. ISAACSON:  I'll move to strike

Page 295

1  everything after "Yes."
2      MS. WOOD:  Objection.
3  BY MR. ISAACSON:
4      Q   The -- on page 442 of the document do
5  you see the section, "What you need to know in 30
6  seconds"?  And do you see the first bullet,
7  "Almost all the great AdMeld functionality is
8  moving into AdX?"
9      Do you dispute that following the
10  AdMeld -- AdMeld acquisition Google moved almost
11  all of the AdMeld functionality into AdX excluding
12  these API integrations that were being used by a
13  small handful of AdMeld sellers?
14      MS. WOOD:  Objection to the form.
15      THE WITNESS:  I know there were
16  functionalities that were integrated, but the
17  functionality that, according to Google, presented
18  a competitive threat and ability potential to
19  disintermediate DFP from being the only publisher
20  ad server that can put AdX in competition, those
21  are the features that I focused on and those are
22  the features that in my opinion led to

Page 296

1  anticompetitive effects.
2      MR. ISAACSON:  I'll move to strike
3  everything after "I know there were
4  functionalities that were integrated."
5      MS. WOOD:  Objection.
6      MR. ISAACSON:  The -- I've got less than
7  an hour left, so I'm going to take a break.
8      MS. WOOD:  Yeah.
9      VIDEO TECHNICIAN:  Off the record.  The
10  time is 16:36.
11      (Brief recess.)
12      VIDEO TECHNICIAN:  Going back on the
13  record.  The time is 16:50.
14  BY MR. ISAACSON:
15      Q   All right.  In your opening report at
16  paragraph 383 you quote a 2013 e-mail and do you
17  see it begins, "This was a strategic decision"?
18      A   In 383 I don't see the strategic --
19      Q   If you turn the page for the block
20  quote.
21      A   Yes.
22      Q   All right.  And this is now, again, on

Page 297

1  the subject of deprecating AdMeld functionality
2  after the acquisition.
3      All right.  Now, this document is
4  footnoted at 595, so if I can have this -- this
5  would be Exhibit 18.
6      (Abrantes-Metz Exhibit Number 18 was
7      marked for identification.)
8  BY MR. ISAACSON:
9      Q   And Exhibit 18 is GOOGLE-DOJ-14248558
10  through 61 dated March 22nd, 2013, and on the
11  first page there's at the bottom an e-mail from
12  Scott Spencer.  And in your report at paragraph
13  383 you have quoted the language of that e-mail
14  that begins "This was a strategic decision" and
15  then quoted the next paragraph, correct?
16      MS. WOOD:  Objection to the form.
17      THE WITNESS:  Yes.
18  BY MR. ISAACSON:
19      Q   And then what you left out from the
20  quote was the very next sentence, "In addition,
21  such a scenario is bad for buyers because every
22  impression could potentially go through multiple

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL

Page 294

1 include the fact that these API integrations were
2 being used by a small handful -- handful of AdMeld
3 sellers, correct?
4          MS. WOOD:  Objection.
5          THE WITNESS:  Yes.  And the fact that it
6 is stressed that they pass realtime AdX pricing
7 into a non-DFP is consistent with the concerns
8 that I have seen expressed by Google in other
9 documents, that that is the reason these functions
10 were not integrated, or at the very least AdX --
11 AdX -- Google could have let AdMeld run as it
12 previously was before even after the acquisition,
13 but there would have been the danger that even
14 that way such servers would have received a
15 realtime price from AdX.  And that was consistent
16 with Google wanting to protect such information
17 from existing outside of DFP so that DFP would be
18 the only -- the only publisher ad server being
19 able to put AdX in realtime competition with
20 others, which is -- would have been to the
21 detriment of AdX's advertisers.
22          MR. ISAACSON:  I'll move to strike

Page 295

1 everything after "Yes."
2          MS. WOOD:  Objection.
3 BY MR. ISAACSON:
4     Q    The -- on page 442 of the document do
5 you see the section, "What you need to know in 30
6 seconds"?  And do you see the first bullet,
7 "Almost all the great AdMeld functionality is
8 moving into AdX?"
9          Do you dispute that following the
10 AdMeld -- AdMeld acquisition Google moved almost
11 all of the AdMeld functionality into AdX excluding
12 these API integrations that were being used by a
13 small handful of AdMeld sellers?
14          MS. WOOD:  Objection to the form.
15          THE WITNESS:  I know there were
16 functionalities that were integrated, but the
17 functionality that, according to Google, presented
18 a competitive threat and ability potential to
19 disintermediate DFP from being the only publisher
20 ad server that can put AdX in competition, those
21 are the features that I focused on and those are
22 the features that in my opinion led to

Page 296

1 anticompetitive effects.
2          MR. ISAACSON:  I'll move to strike
3 everything after "I know there were
4 functionalities that were integrated."
5          MS. WOOD:  Objection.
6          MR. ISAACSON:  The -- I've got less than
7 an hour left, so I'm going to take a break.
8          MS. WOOD:  Yeah.
9          VIDEO TECHNICIAN:  Off the record.  The
10 time is 16:36.
11          (Brief recess.)
12          VIDEO TECHNICIAN:  Going back on the
13 record.  The time is 16:50.
14 BY MR. ISAACSON:
15     Q    All right.  In your opening report at
16 paragraph 383 you quote a 2013 e-mail and do you
17 see it begins, "This was a strategic decision"?
18     A    In 383 I don't see the strategic --
19     Q    If you turn the page for the block
20 quote.
21     A    Yes.
22     Q    All right.  And this is now, again, on

Page 297

1 the subject of deprecating AdMeld functionality
2 after the acquisition.
3          All right.  Now, this document is
4 footnoted at 595, so if I can have this -- this
5 would be Exhibit 18.
6          (Abrantes-Metz Exhibit Number 18 was
7          marked for identification.)
8 BY MR. ISAACSON:
9     Q    And Exhibit 18 is GOOGLE-DOJ-14248558
10 through 61 dated March 22nd, 2013, and on the
11 first page there's at the bottom an e-mail from
12 Scott Spencer.  And in your report at paragraph
13 383 you have quoted the language of that e-mail
14 that begins "This was a strategic decision" and
15 then quoted the next paragraph, correct?
16          MS. WOOD:  Objection to the form.
17          THE WITNESS:  Yes.
18 BY MR. ISAACSON:
19     Q    And then what you left out from the
20 quote was the very next sentence, "In addition,
21 such a scenario is bad for buyers because every
22 impression could potentially go through multiple

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL

Page 338

1    VIDEO TECHNICIAN:  We're going off the
2  record at 17:43 p.m.
3        (Whereupon, at 5:43 p.m., the
4        deposition of ROSA ABRANTES-METZ, PH.D.
5        was concluded.)
6            * * * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 339

1       CERTIFICATE OF NOTARY PUBLIC
2      I, SHARI R. BROUSSARD, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing deposition was duly sworn by me;
6  that the testimony of said witness was taken by me
7  in stenotype and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness;
10  that I am neither counsel for, related to, nor
11  employed by any of the parties to the action in
12  which this deposition was taken; and, further,
13  that I am not a relative or employee of any
14  counsel or attorney employed by the parties
15  hereto, nor financially or otherwise interested in
16  the outcome of this action.
17
18
                _Shari R. Broussard_
19        SHARI R. BROUSSARD
        Notary Public in and for the
20            District of Columbia
21
   My commission expires:
22  August 14, 2025

Page 340

1    A C K N O W L E D G E M E N T
2        O F  D E P O N E N T
3
4
   I, ROSA ABRANTES-METZ, PH.D., do hereby
5
   acknowledge I have read and examined the foregoing
6
   pages of testimony, and the same is a true,
7
   correct and complete transcription of the
8
   testimony given by me, and any changes or
9
   corrections, if any, appear in the attached errata
10
   sheet signed by me.
11
12
13
14
15
16
17
18
19
20
   _____   _____
21  Date              ROSA ABRANTES-METZ, PH.D.
22  Job No. CS6456952

Page 341

1  Julia Wood, Esq.
2  Julia.tarver.wood@usdoj.gov
3        March 11, 2024
4  RE:   United States, Et Al v. Google, LLC
5    3/7/2024, Rosa  Abrantes-Metz , Ph.D. (#6456952)
6    The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16   Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25

86 (Pages 338 - 341)