# EXHIBIT 12

HIGHLY CONFIDENTIAL

Page 1

1

2               IN THE UNITED STATES DISTRICT COURT

           FOR THE EASTERN DISTRICT OF VIRGINIA

3                   ALEXANDRIA DIVISION

4      _____

5      UNITED STATES,        )1:23-cv-00108-LMB-JFA

       et al.,               )

6                            )

           Plaintiffs,       )

7                            )

       vs.                   )

8                            )

       GOOGLE LLC,           )

9                            )

           Defendants.       )

10     _____)

11

12

                   VIDEOTAPED DEPOSITION OF

13

                   KENDALL OLIPHANT

14

                    August 9, 2023

15

                     9:32 a.m.

16

17

18

19

20

21

       Reported by:  Bonnie L. Russo

22     Job No. 6031956

HIGHLY CONFIDENTIAL

| | Page 2 | | Page 4 |
|---|---|---|---|
| 1 | Videotaped Deposition of Kendall Oliphant | 1 | APPEARANCES (CONTINUED): |
| 2 | held at: | 2 | |
| 3 | | 3 | |
| 4 | | 4 | Also Present: |
| 5 | | 5 | Glen Fortner, Videographer |
| 6 | Paul, Weiss, Rifkind, Wharton & Garrison, LLP | 6 | Michael A. Cannon, Chief Counsel for Economic |
| 7 | 2001 K Street, N.W. | 7 | Affairs, United States Department of Commerce |
| 8 | Washington, D.C. | 8 | |
| 9 | | 9 | Also Present Via Remotely: |
| 10 | | 10 | Julia Wood, DOJ |
| 11 | | 11 | Jeannie S. Rhea, Paul, Weiss, Rifkind, Wharton |
| 12 | | 12 | & Garrison, LLP |
| 13 | | 13 | |
| 14 | | 14 | |
| 15 | | 15 | |
| 16 | | 16 | |
| 17 | | 17 | |
| 18 | Pursuant to Notice, when were present on behalf | 18 | |
| 19 | of the respective parties: | 19 | |
| 20 | | 20 | |
| 21 | | 21 | |
| 22 | | 22 | |

| | Page 3 | | Page 5 |
|---|---|---|---|
| 1 | APPEARANCES: | 1 | I N D E X |
| 2 | | 2 | EXAMINATION OF KENDALL OLIPHANT        PAGE |
| 3 | On behalf of the Plaintiffs: | 3 | BY MS. GOODMAN                12 |
| 4 | RACHEL ZWOLINSKI, ESQUIRE | 4 | |
| 5 | VICTOR LIU, ESQUIRE | 5 | |
| 6 | ALVIN CHU, ESQUIRE | 6 | |
| 7 | UNITED STATES DEPARTMENT OF JUSTICE | 7 | |
| 8 | 1331 Pennsylvania Avenue, N.W. | 8 | EXHIBITS |
| 9 | Washington, D.C. 20005 | 9 | Exhibit 13  E-Mail Chain dated 1-17-23    48 |
| 10 | rachel.zwolinski@usdoj.gov | 10 | CENSUS-ADS-0000244816-818 |
| 11 | | 11 | |
| 12 | On behalf of the Defendant: | 12 | Exhibit 14  Integrated Communications    79 |
| 13 | MARTHA L. GOODMAN, ESQUIRE | 13 | Contract |
| 14 | ANNELISE CORRIVEAU, ESQUIRE | 14 | Version 2 |
| 15 | PAUL, WEISS, RIFKIND, WHARTON & | 15 | 10-5-18 |
| 16 | GARRISON, LLP | 16 | CENSUS-ADS-0000387420-490 |
| 17 | 2001 K Street, N.W. | 17 | |
| 18 | Washington, D.C. 20006 | 18 | Exhibit 15  E-Mail dated 9-14-22      90 |
| 19 | mgoodman@paulweiss.com | 19 | Attachment |
| 20 | acorriveau@paulweiss.com | 20 | CENSUS-ADS-0000248031-186 |
| 21 | | 21 | |
| 22 | | 22 | |

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

| | Page 2 | | | Page 4 |
|---|---|---|---|---|
| 1 | Videotaped Deposition of Kendall Oliphant | | 1 | APPEARANCES (CONTINUED): |
| 2 | held at: | | 2 | |
| 3 | | | 3 | |
| 4 | | | 4 | Also Present: |
| 5 | | | 5 | Glen Fortner, Videographer |
| 6 | Paul, Weiss, Rifkind, Wharton & Garrison, LLP | | 6 | Michael A. Cannon, Chief Counsel for Economic |
| 7 | 2001 K Street, N.W. | | 7 | Affairs, United States Department of Commerce |
| 8 | Washington, D.C. | | 8 | |
| 9 | | | 9 | Also Present Via Remotely: |
| 10 | | | 10 | Julia Wood, DOJ |
| 11 | | | 11 | Jeannie S. Rhea, Paul, Weiss, Rifkind, Wharton |
| 12 | | | 12 | & Garrison, LLP |
| 13 | | | 13 | |
| 14 | | | 14 | |
| 15 | | | 15 | |
| 16 | | | 16 | |
| 17 | | | 17 | |
| 18 | Pursuant to Notice, when were present on behalf | | 18 | |
| 19 | of the respective parties: | | 19 | |
| 20 | | | 20 | |
| 21 | | | 21 | |
| 22 | | | 22 | |

| | Page 3 | | | Page 5 |
|---|---|---|---|---|
| 1 | APPEARANCES: | | 1 | I N D E X |
| 2 | | | 2 | EXAMINATION OF KENDALL OLIPHANT          PAGE |
| 3 | On behalf of the Plaintiffs: | | 3 | BY MS. GOODMAN                    12 |
| 4 | RACHEL ZWOLINSKI, ESQUIRE | | 4 | |
| 5 | VICTOR LIU, ESQUIRE | | 5 | |
| 6 | ALVIN CHU, ESQUIRE | | 6 | |
| 7 | UNITED STATES DEPARTMENT OF JUSTICE | | 7 | |
| 8 | 1331 Pennsylvania Avenue, N.W. | | | EXHIBITS |
| 9 | Washington, D.C. 20005 | | 8 | |
| 10 | rachel.zwolinski@usdoj.gov | | 9 | Exhibit 13  E-Mail Chain dated 1-17-23     48 |
| 11 | | | 10 | CENSUS-ADS-0000244816-818 |
| 12 | On behalf of the Defendant: | | 11 | |
| 13 | MARTHA L. GOODMAN, ESQUIRE | | 12 | Exhibit 14  Integrated Communications     79 |
| 14 | ANNELISE CORRIVEAU, ESQUIRE | | 13 | Contract |
| 15 | PAUL, WEISS, RIFKIND, WHARTON & | | 14 | Version 2 |
| 16 | GARRISON, LLP | | 15 | 10-5-18 |
| 17 | 2001 K Street, N.W. | | 16 | CENSUS-ADS-0000387420-490 |
| 18 | Washington, D.C. 20006 | | 17 | |
| 19 | mgoodman@paulweiss.com | | 18 | Exhibit 15  E-Mail dated 9-14-22          90 |
| 20 | acorriveau@paulweiss.com | | 19 | Attachment |
| 21 | | | 20 | CENSUS-ADS-0000248031-186 |
| 22 | | | 21 | |
| | | | 22 | |

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 90

1    2020 as compared to what is depicted on the
2    2010 chart here?
3        A.   I honestly -- I do not recall what
4    EDI means or DDS, so I'm not sure if those were
5    systems that may have changed between 2010 and
6    2020.  But the gist of this is -- yes.
7        MS. GOODMAN:  Okay.  All right.  You
8    can put that document to the side, and I would
9    like to hand you another document which is
10   marked Exhibit 15, Census Ads0000248031 through
11   248185.
12       (Deposition Exhibit 15 was marked
13   for identification.)
14       BY MS. GOODMAN:
15       Q.   And this is an e-mail from yourself
16   to Kia Anderson dated September 14, 2022.
17       Do you see that?
18       A.   Yes.
19       Q.   Okay.  And the subject is:  "Census
20   Media 101 Deck," right?
21       A.   Yes.
22       Q.   Okay.  And you're sending the paid

Page 91

1    Media 101 training that Y&R provided to the
2    census bureau to Ms. Anderson, correct?
3        A.   Yes.
4        Q.   And why were you sending this deck
5    to Ms. Anderson?
6        A.   She wanted -- she wanted to know
7    more about -- for context.  Kia Anderson was
8    detailed to HHS working on the public education
9    campaign.  She wanted to have a better
10   understanding of media buying.
11       Every agency buys media differently,
12   but there are still some basic -- there is
13   still some basic information that is just the
14   same -- that's the same.
15       She had no experience with media
16   buying, and in order to have a better
17   understanding of the conversations that were
18   taking place in the room, she asked if I had
19   anything that could provide, you know, just a
20   basic understanding.
21       And this is what I sent.  It
22   explained all the different types of media,

Page 92

1    what they are used for, how things have changed
2    or at least as of the time of this document
3    so...
4        Q.   And so you thought that this was a
5    really good educational tool for Ms. Anderson,
6    correct?
7        MS. ZWOLINSKI:  Objection.  Form.
8        THE WITNESS:  I thought -- it was
9    what I had that I could send that would at
10   least get her started.
11       BY MS. GOODMAN:
12       Q.   And you endeavored to send her what
13   you thought would be the most appropriate and
14   informative material, correct?
15       MS. ZWOLINSKI:  Objection.  Form.
16       THE WITNESS:  That was my goal.
17   This is what I got to first.
18       BY MS. GOODMAN:
19       Q.   Okay.  So let's go through this deck
20   a little bit.  And you recall this was
21   presented at the Media 101 training by Y&R,
22   correct?

Page 93

1        A.   Yes.
2        Q.   And you attended?
3        A.   Yes.
4        Q.   Let's turn to Page 11,
5    CENSUS-ADS-248042.
6        What is this slide depicting?
7        A.   This slide depicts rudimentary
8    visuals of various media channel options that
9    are out there for use.
10       Q.   And how do you understand -- what's
11   your -- strike that.
12       What do you mean by "media channel
13   options"?
14       A.   Television is a channel.  Radio is a
15   channel.  Out of home, which includes
16   billboards, bus -- sides of buses, sides of
17   buildings, anything out of the -- out of the
18   home, print, all of those.
19       And then bottom row is the different
20   -- a few of the different options within
21   digital.  So these are options or -- you know,
22   of different media channels that can be used

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1    and how they're classified.
2        Q.   Would it also be accurate to refer
3    to these different channels as different kind
4    of types of products?
5            MS. ZWOLINSKI: Objection. Form.
6            THE WITNESS: I don't know that I
7    would consider them products.
8            BY MS. GOODMAN:
9        Q.   Why not?
10       A.   Because within each there is so
11   much. Print is a category. Out of home is a
12   category. Paid social is a category. They are
13   not products themselves.
14       Q.   But -- okay. Within paid social
15   what are the options that you're referring to?
16       A.   Well, there are examples given here
17   on the page: Social sharing platforms, chat
18   apps, those are options. Those are other --
19   you know, different options within paid social,
20   and those are just a couple of options. Every
21   day options increase --
22       Q.   Okay.

Page 95

1        A.   -- in all of these categories.
2        Q.   And how about with respect to
3    programmatic? What are the options that you
4    understand to be available within that
5    category?
6            MS. ZWOLINSKI: Objection. Form.
7            THE WITNESS: Within programmatic on
8    this particular page, it really just gives you
9    an idea of what programmatic is. It doesn't
10   get into any of the options so when you're
11   talking to somebody and you say programmatic
12   versus paid search, you understand what the
13   difference is between the two.
14           BY MS. GOODMAN:
15       Q.   And what are the differences between
16   the two?
17       A.   My understanding is with paid search
18   you are actually choosing search terms that you
19   are paying for -- so when I am searching for
20   something, no matter what platform I am on,
21   what comes to the top of my search, the
22   responses to my query, the very top entries are

Page 96

1    those that have been paid for. They are paid
2    to move up to the top.
3            So -- or you want to make sure -- so
4    when we want it -- we wanted everything we did,
5    anything that had census -- a question about
6    census, we wanted the census bureau to pop up.
7    So it could be a million and one different
8    terms, but those terms triggered -- I don't
9    know what you call it -- in the list that the
10   census site is the first site that you go to.
11       Q.   Okay. So what -- I want to re-ask a
12   question I think I already asked, but see if I
13   can get a different answer, which is: What are
14   the kinds of different options by name, by
15   type, by provider within the programmatic
16   category?
17           MS. ZWOLINSKI: Objection. Form.
18           THE WITNESS: I don't know.
19           BY MS. GOODMAN:
20       Q.   Did you have occasion to learn those
21   throughout -- learn the various options within
22   that category during your time as COR for Order

Page 97

1    15?
2            MS. ZWOLINSKI: Objection. Form.
3            THE WITNESS: No. What we learned
4    is the different -- that there is a difference
5    between these, and working together, they help
6    extend our message. All of these are
7    components of what were required for us to
8    reach -- our goal was to reach almost
9    everybody. We had a very short time frame, and
10   we didn't -- we had to use every possible tool
11   there was.
12           So programmatic did not replace --
13   replace paid search, did not replace digital,
14   did not replace paid social, did not replace
15   any of these. They all worked together like a
16   team.
17           BY MS. GOODMAN:
18       Q.   And how did they -- how did you --
19   how did the census bureau, from your point of
20   view, execute on making sure that they worked
21   together to reach all Americans to participate
22   in the census?

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1    MS. ZWOLINSKI:  Objection.  Form.
2    THE WITNESS:  Well, we start with a
3  media plan.  The ad agency provides a
4  recommended media plan based upon the agreed
5  upon strategies that we've all come to agree
6  upon.
7    All the agencies purchasing media
8  present the media plan to the census bureau.
9  We evaluate it.  We ask questions.  We provide
10  comments.  Revisions are made based upon those.
11  A final media plan is approved, and we -- while
12  it is just a plan, it is an iterative plan that
13  forms the base of what we do, and as needed, we
14  will add to it.
15    Every -- if you are blasting the
16  message, all of these work.  But as you move
17  further into the actual event, there may be
18  segments of the population or segments of the
19  country that are not responding at the rate
20  that you anticipated.  So you go back into your
21  tool chest to determine what is the best tool
22  to use to help encourage, and that tool may not

Page 99

1  be paid media.  It may be boots on the ground,
2  which is not included in this because it's not
3  paid media.
4    But we had a lot of tools in our
5  chest.  So we would determine if there were --
6  you know, paid -- use site directory, you go
7  directly to a site.  What is the -- what is
8  the -- so we created -- we segmented the
9  audience.  We had an audience segmentation.  We
10  did a lot of research around messaging, and we
11  took all that research, and we had an ongoing
12  survey.
13    We took all of that information.  We
14  talked to the people on the ground, and we
15  determined if we needed to change anything and
16  how -- what that change included.
17    BY MS. GOODMAN:
18    Q.   And so with respect to -- let's try
19  to focus only on paid media --
20    A.   Uh-huh.
21    Q.   -- understanding there are many
22  other tools.

Page 100

1    But with respect to paid media,
2  would you -- sorry.
3    During the course of the execution
4  of the campaign, did you make adjustments from
5  moving money spent from one category to another
6  category in order to reach your goal of
7  targeting whichever particular audience you
8  were not seeing the response rate from?
9    MS. ZWOLINSKI:  Objection.  Form.
10    THE WITNESS:  In terms of moving
11  from one category to another, can you be more
12  specific.
13    BY MS. GOODMAN:
14    Q.   So if programmatic advertising was
15  not delivering the result that you were hoping
16  to see in terms of reach, would you shift some
17  of the money spent on programmatic advertising
18  to another category such as paid search,
19  digital, or paid social?
20    MS. ZWOLINSKI:  Objection.  Form.
21  Foundation.
22    THE WITNESS:  So when we approve

Page 101

1  spending -- and I'm sure you have looked at the
2  media authorization forms because we had an
3  example previously -- it is by audience, and
4  there are funds allocated to the different
5  media -- media channel options.
6    In terms of digital, it is broken
7  out by paid search -- paid social, site direct,
8  paid search, and programmatic.  We approve the
9  total amount on that form for digital, and as
10  we are evaluating effectiveness if there is --
11  if we find that a particular audience is more
12  predisposed to one type versus another, we do
13  have that ability to move money.
14    I can't necessarily say how often
15  that happened because we normally within the
16  bureau and within the presentations for the
17  most part, we talk about digital as a whole.
18  We don't talk about the differences between the
19  categories.  We want our ad agencies to use the
20  options in the digital tool chest as
21  appropriately as possible to help us reach our
22  goal.

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1         BY MS. GOODMAN:
2       Q.   Now, you said within the bureau you
3 talk about digital as a whole. Why is that?
4        MS. ZWOLINSKI: Objection. Form.
5        THE WITNESS: Because most people
6 don't care about the difference. We -- we are
7 not media buyers. We are looking at
8 categories.
9       So the vast people -- unless you are
10 right up in this, and even if people who were
11 right close to it, we didn't evaluate each
12 individual piece of digital, right. We're like
13 would digital work.
14       We might ask whether or not we need
15 to adjust our search terms. You might -- that
16 might be a conversation, but -- or do we need
17 to put more in social but in terms of site
18 direct and programmatic, that fell within the
19 digital moniker.
20        BY MS. GOODMAN:
21       Q.   And so from your point of view, were
22 site direct and programmatic sort of -- not

Page 103

1 that they were the same thing, but you thought
2 about them in the same way?
3        MS. ZWOLINSKI: Objection. Form.
4        THE WITNESS: We did not think about
5 them. We trusted our ad agencies to -- once we
6 had approved the plan, to reach our audience
7 the best way they could within that plan,
8 within the -- within the integrity of the plan
9 or the spirit of the plan.
10        BY MS. GOODMAN:
11       Q.   If you turn to Page 13 of the deck,
12 Bates ending 44. Is it fair to say that this
13 slide shows that what matters to the census
14 bureau is reaching a consumer wherever they may
15 be found?
16        MS. ZWOLINSKI: Objection. Form.
17        THE WITNESS: That is safe to say.
18        BY MS. GOODMAN:
19       Q.   And so just as you might reach a
20 consumer through a display banner in the first
21 bullet, you also need to consider whether you
22 can reach them by Googling a product to learn

Page 104

1 more, correct?
2        MS. ZWOLINSKI: Objection. Form.
3        THE WITNESS: For context most
4 people have no idea where they get their
5 messages. So you cannot rely on one form of
6 media for the message to seed. You've got to
7 surround them with the messaging so that the
8 first few times it may not really click.
9       You've watched a commercial. It may
10 be four -- the fourth time you heard that
11 commercial before something in it makes you
12 really look up and pay attention, or you might
13 like something in the commercial but still not
14 know what that commercial is advertising
15 because you're only focused on one piece.
16       In order to effectively reach the
17 number of people that we needed to reach and --
18 and -- and -- and -- and -- and -- and -- and
19 encourage response for a complete census, we
20 needed a holistic -- we needed a holistic
21 approach. We needed to hit them -- serve
22 messaging from every possible angle.

Page 105

1       And so you get up in the morning.
2 It might be on the morning news, or it might be
3 a commercial -- it might be a story on the
4 morning news, right. That's earned media. For
5 paid media it may be on TV. It might be -- you
6 might be -- if -- it all depends on how you
7 take your media, how you receive your media.
8 That's where it hits you the most. But I can't
9 count on that being the only source of you
10 accepting the message.
11        BY MS. GOODMAN:
12       Q.   And turning to Page 17 ending in 48,
13 how -- how is the optical -- strike that.
14       I am reading in the second bullet
15 where it begins: "Paid media." My question
16 is: How is the optimal mix for efficient and
17 effective performance for paid media determined
18 for the -- you know, as census was executing on
19 the 2020 campaign?
20        MS. ZWOLINSKI: Objection. Form.
21        THE WITNESS: So as the sentence
22 reads, we have many research tools and

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1  resources.  So we conduct a lot of research.
2  We conducted the -- we conducted research with
3  each audience group to determine what their
4  motivations were to respond, what their
5  barriers were to respond, who did they accept
6  messages from, how did they receive their
7  media, what did they like to see in an ad,
8  what -- what motivated them in an ad that would
9  encourage them to even seek out additional
10 information and hopefully, ultimately, respond.
11      We segmented the population to
12 determine those that are most likely to respond
13 and those that are least likely to respond on a
14 spectrum of a whole -- of numerous number of
15 segments and, within each segment,
16 understanding that audience cross -- audiences
17 cross segments.  What is the best way to reach
18 them?  What's an optimal mix?  It depends upon
19 that particular audience that we're trying to
20 reach.  It's not one size fits all.
21      BY MS. GOODMAN:
22  Q.   And so in -- that respect

Page 107

1  determining an optimal -- optimal mix among,
2  let's say, digital search, digital social,
3  digital programmatic, digital site direct, do
4  you need to allocate among those four
5  categories to reach the audience you're
6  attempting to reach; is that right?
7      MS. ZWOLINSKI:  Objection.  Form.
8      THE WITNESS:  It depends on the
9  audience.  Different audiences encounter or
10 experience digital in different ways.  Half of
11 them don't even realize.
12      Example:  There are people that you
13 will ask if they search the Internet or do they
14 have access to the Internet, and they will say
15 no.  Then you ask them do they use Facebook,
16 and they will say yes not understanding that
17 Facebook is an Internet based app.
18      So you don't -- there is no way to
19 sit and say that you only use this, this, or
20 this.  Within each audience there is a mix.
21      There are people within diverse
22 mass, that is anyone who consumes English

Page 108

1  language media.  Some people call it general
2  audience.  Within that grouping there are all
3  age ranges, and just because you're older,
4  most -- many older people, depending upon where
5  they are in age, do not engage with digital
6  media fully or they don't even know how they're
7  engaging.  So you're not going to not serve
8  them digital ads, but you may not serve as much
9  to that audience -- that -- that age range as
10 you serve to a younger age range.
11      But even with the younger age range,
12 it depends upon the audience and access.  So it
13 doesn't make sense if I am in the middle of
14 nowhere with no Internet access to have my
15 media plan to reach anyone living there only be
16 digital because they're not going to get it.
17      So an optimal mix has a lot of
18 factors:  Location, audience, media -- media
19 inputs, media -- what -- how they experience
20 media, what they want to see, what they are
21 aware of.  It takes the holistic approach in
22 order for you to actually reach people in a way

Page 109

1  that -- and there are still people now that
2  will tell you they never saw a census ad.
3      BY MS. GOODMAN:
4  Q.   And so, you know, you talked about
5  the example of within diverse mass, older
6  people, many of whom might not consume as much
7  digital media as somebody in a younger range?
8  A.   Or more tech -- I'm sorry.
9  Q.   That's okay.
10      And so when you are considering how
11 to serve the different age groups within the
12 diverse mass audience, do you consider the
13 kinds of digital access that those audiences
14 engage in to make allocations between, for
15 example, paid social, programmatic, site
16 direct?
17      MS. ZWOLINSKI:  Objection.  Form.
18      THE WITNESS:  It's not that simple.
19 It's not just about the age group.  The target
20 may -- what defines a target audience may not
21 necessarily be age.  Within a target audience
22 and within -- within a segment of the

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 122

1    don't -- we don't trust -- we trust but verify.
2    I have to prove that -- before my name goes to
3    sign off on payment of an invoice, that there
4    is proper documentation.
5         So Y&R had on their SharePoint site
6    documentation for every invoice we received,
7    and there is a lot of documentation.
8         So we would go to their site.  We
9    would review the invoice line by line, look at
10   all the documentation for every invoice, and if
11   it matched -- if we had any questions, we would
12   contact them.  If we didn't understand
13   anything, we would contact them.  But as long
14   as everything was in order, we would approve
15   the invoice for payment.
16        BY MS. GOODMAN:
17   Q.   And do you recall any instance in
18   which you did not approve an invoice for
19   payment for digital ad purchases?
20        MS. ZWOLINSKI:  Objection.  Form.
21        THE WITNESS:  I cannot recall
22   specifically for digital, no.

Page 123

1         BY MS. GOODMAN:
2    Q.   Okay.  What would you -- what would
3    your process be if you did not approve an
4    invoice for payment?
5    A.   Ideally because most of your --
6    well, because Reingold was a small business --
7    even though the prime was a large business, our
8    goal was to make sure the small business gets
9    paid as quickly as possible.
10        If there were any discrepancies, we
11   worked directly with Y&R and Reingold to see if
12   we could correct those discrepancies.  If there
13   was missing documentation, we'd see if they
14   could send it forward or upload it to their
15   SharePoint site so we could check it.  If it
16   was -- it could be something simple; like on
17   the cover sheet that lists out every invoice
18   with the amount, that the amount on the cover
19   sheet did not match the amount on the invoice.
20   If it was small, we could do a pen-and-ink
21   change and alter the bottom line only if it was
22   less, never if it was more.

Page 124

1         If we could not do any of that, we
2    would completely reject the invoice.  We would
3    let Y&R know it was rejected, why it was
4    rejected and ask them to fix it and send it
5    back as a revised -- with a new invoice number.
6         BY MS. GOODMAN:
7    Q.   If Y&R did not agree with your
8    reasoning for rejecting an invoice, did Y&R
9    still have to pay out to the subcontractor or
10   to the vendor --
11        MS. ZWOLINSKI:  Objection --
12        BY MS. GOODMAN:
13   Q.   -- even if the census bureau had
14   rejected the invoice?
15        MS. ZWOLINSKI:  Objection.  Form.
16   Foundation.
17        THE WITNESS:  My understanding is
18   Y&R did not pay the subs until the invoice was
19   approved and -- and funding was either -- had
20   been received or was on the way.
21        So they did not reject payment -- it
22   was up to the media vendor.  All vendors were

Page 125

1    informed upfront before they agreed to run our
2    ads.  It was part of the agreement, the
3    contract they signed, what they had to provide
4    in order to receive payment.  It was very
5    clear.
6         And if they did not provide it, it
7    was up to the -- the buying agency that
8    purchased the ad to go back and get it.  Right.
9    So we're going to keep going back and forth.
10   Our goal is never to not pay for what ran.  We
11   are trying our best to pay, but we need that
12   documentation.
13        So it may take -- ideally, it
14   shouldn't take but a few days, but sometimes it
15   might take months, you know.
16        And then with COVID, it was
17   difficult because a lot of vendors just weren't
18   there, depending on audience, depending on the
19   type of media.  So digital wasn't one of them.
20   Digital was booming during COVID.
21        But, yeah, if there was -- we
22   would -- if we had to short-pay, we would, but

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1  we would always explain why, what we were
2  doing, and what we did not pay and why we did
3  not pay it so as to not hold up the -- the
4  invoice. It was never our goal to -- in some
5  cases we rejected invoices totally, and then it
6  just got to a point where we've got to pay.
7  You can't hold up an invoice for, you know --
8  it's -- the goal is to pay the vendors. So we
9  would do everything we can working with Y&R and
10 the subcontractor to get what we needed to
11 approve payment.
12      BY MS. GOODMAN:
13      Q.   Okay. You used the term
14 "short-pay." What does that mean?
15      A.   Short-pay means when you don't pay
16 the full amount invoice. In one example I gave
17 you where an amount may be higher here on a --
18 on the -- on the list of invoices but in the
19 actual documentation it was lower, we would do
20 the pen and ink and we would change it. It
21 would be lower, and we would provide
22 documentation as to why.

Page 127

1      Q.   And do you recall ever short-paying
2  any invoices for digital media purchases?
3      A.   For context, we never got invoices
4  that said just digital. I don't doubt that
5  there were some that were just digital, but
6  oftentimes, an invoice would have multiple
7  agencies and multiple media types, so the
8  answer is I don't recall.
9      Q.   Okay. And so in the course of your
10 -- were you responsible for approving invoices
11 for payments?
12      A.   Yes.
13      Q.   Okay. And in the course of your
14 work doing that in connection with the 2020
15 census, do you recall ever seeing invoices at
16 the level of granularity like an invoice from
17 Google?
18      MS. ZWOLINSKI: Objection. Form.
19      THE WITNESS: We would have to see
20 the original invoice from Google that was sent
21 to the -- I guess it would go to Reingold, and
22 then there would be Reingold's cover sheet on

Page 128

1  top of it that would go to Y&R, and Y&R's cover
2  sheet would go on top of it. So we would get a
3  stack of invoices like that, but yes.
4      BY MS. GOODMAN:
5      Q.   Okay. And did you maintain copies
6  of all of those invoices, or did you rely only
7  on the SharePoint site of Y&R?
8      MS. ZWOLINSKI: Objection. Form.
9      THE WITNESS: The invoices that --
10 the backup documentation was so voluminous,
11 census could not maintain it on its site. It
12 has been three years since I've really looked
13 at a census -- one of these invoices.
14      I -- I don't -- I don't think so
15 because that would be considered backup
16 documentation, and we didn't really -- the
17 backup documentation was on Y&R's SharePoint
18 site.
19      BY MS. GOODMAN:
20      Q.   So I just want to make sure we're
21 talking about the same thing and understand --
22 that I am understanding correctly.

Page 129

1      An invoice from a vendor to Reingold
2  in the example of Google sending an invoices to
3  Reingold, that is considered backup
4  documentation that would be in the possession
5  of Rein- -- of Y&R --
6      A.   Yes.
7      Q.   -- is that correct?
8      A.   Yes.
9      MS. ZWOLINSKI: Objection. Form.
10     THE WITNESS: Sorry.
11     MS. ZWOLINSKI: That's okay.
12     BY MS. GOODMAN:
13     Q.   Turning to Page 37 of the deck we're
14 looking at, what does the bullet "changing
15 video landscape" refer to?
16     A.   When I look at it, I remember when
17 Vine was out, right. That's -- am I dating
18 myself? But Vine was only here for a minute.
19     Everything online changes. There
20 are new sites popping up, sites disappearing.
21 Just because there is a site that everybody is
22 using doesn't mean we use it. TikTok would

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1  fall under the changing video landscape. We
2  did not advertise on TikTok.
3       But it's just -- it's just
4  considering the fact that people are -- they
5  are consuming video content in different ways
6  and using sites that are not always approved by
7  the federal government despite the fact that
8  they are very popular sites.
9     Q.   And how about the bullet "shift in
10 digital buying process and technology"?  What
11 does that mean?
12    A.   If you compare 2020 to 2010 digital
13 has evolved at an enormous rate.  What we were
14 used to in 2010 is completely different from
15 what it is now or what it was in 2020.  The
16 number of sites has -- have grown
17 exponentially.
18       So in order to reach all the people
19 or people that would visit obscure sites, what
20 I might consider an obscure site, the digital
21 world -- I'm -- they've created ways to help
22 you target based on behaviors, based on age,

Page 131

1  based on race, based on consumption habits, all
2  kinds of thing.
3       So as of -- this is really to
4  explain to us in this document it's not the way
5  it was.  You've got to take a second look at
6  how digital operates, and because digital has
7  changed so much in ten years, how you buy it is
8  different as well.
9       I honestly do not recall if in 2010
10 you could do programmatic buying.  You probably
11 could.  I don't know.  I don't remember
12 learning anything about the difference between
13 programmatic and site direct, and the digital
14 was such a minimal part of our budget in 2010.
15 Considering the size of our budget, we needed
16 to be sure we understood why it was important
17 to put more money towards digital.
18    Q.   And what are the -- the different
19 buying processes referred to in this bullet to
20 your knowledge?
21    A.   I don't recall.
22    Q.   Can you turn to Page 51.

Page 132

1     A.   Uh-huh.
2     Q.   Do you see the bullet, the last
3  bullet, beginning "realtime bidding"?
4     A.   Yes.
5     Q.   To your knowledge, how did the
6  census bureau engage in realtime bidding under
7  its contracts with Y&R for purposes of the 2020
8  census?
9       MS. ZWOLINSKI:  Objection.  Form.
10      THE WITNESS:  Y&R and their
11 subcontractors that were responsible for
12 purchasing media space on behalf of the census
13 bureau were empowered to manage this.  The
14 census bureau, while they were working on our
15 behalf, we did not participate in this
16 directly.
17 BY MS. GOODMAN:
18    Q.   Okay.  So did the census bureau have
19 a role in selecting, for example, what ad
20 exchanges to use as part of realtime bidding?
21      MS. ZWOLINSKI:  Objection.  Form.
22      THE WITNESS:  The census bureau

Page 133

1  relied on their buying agencies, who are buying
2  on behalf of the census bureau, to determine
3  the best ad exchanges based upon what would be
4  best for the campaign, what was most efficient
5  and effective.
6  BY MS. GOODMAN:
7     Q.   And did the census bureau permit the
8  ad agencies to use multiple ad exchanges if
9  they determined that was in the best interest
10 of the bureau?
11    A.   Absolutely.
12    Q.   And did you direct the ad agencies
13 to use any Google ad exchanges or Google-owned
14 ad exchanges?
15      MS. ZWOLINSKI:  Objection.  Form.
16      THE WITNESS:  We did not direct the
17 ad agencies to focus on any one media vendor.
18      BY MS. GOODMAN:
19    Q.   And do you agree that realtime
20 bidding permitted your contractors to obtain
21 the best price possible for media inventory?
22    A.   I don't know.

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1    MS. ZWOLINSKI:  Objection to form.
2    BY MS. GOODMAN:
3    Q.   Okay.  Do you agree -- or what's
4  your understanding of whether realtime bidding
5  succeeds in obtaining the best price as
6  possible for media inventory?
7    MS. ZWOLINSKI:  Objection.  Form.
8    THE WITNESS:  I don't have one.
9    BY MS. GOODMAN:
10    Q.   I would like to go to 107.  So --
11  actually, why don't we turn to page -- we're
12  losing page numbers.
13    A.   I was going to say.
14    Q.   1 -- Bates ending 134.
15    A.   Yes.
16    Q.   Okay.  So now we're in a section of
17  the deck called: "Understanding Digital Media
18  Channels."
19    Do you see that?
20    A.   Yes.
21    Q.   Okay.  And if we go now to Slide
22  107, which is Bates ending 138, the slide is

Page 135

1  titled: "Expanding Formats and Channels."
2    What is the difference between a
3  format and a channel?
4    MS. ZWOLINSKI:  Objection.  Form.
5    THE WITNESS:  I don't recall.
6    BY MS. GOODMAN:
7    Q.   Okay.  And so what you see here are
8  a variety of different digital ads that exist
9  in the world, fair?
10    A.   Uh-huh.
11    MS. ZWOLINSKI:  Objection.  Form.
12    BY MS. GOODMAN:
13    Q.   Okay.  And -- so let's look at the
14  Spotify example here.
15    Did the -- did the census bureau
16  advertise on Spotify?
17    A.   I don't recall.
18    Q.   Okay.  And do you recall -- well,
19  strike that.
20    Looking at the slide, can you
21  determine which kind of digital ad these are?
22  In other words, paid social, site direct,

Page 136

1  programmatic --
2    MS. ZWOLINSKI:  Objection.
3    BY MS. GOODMAN:
4    Q.   -- search?
5    MS. ZWOLINSKI:  Objection.  Form.
6    THE WITNESS:  They clearly do not
7  look like search, but that's the only
8  determination I can make for you.
9    BY MS. GOODMAN:
10    Q.   And when you use -- when the census
11  bureau -- strike that one.
12    Turning to 128, we are talking about
13  programmatic here.
14    Do you see that?
15    A.   Yes.
16    Q.   And does programmatic advertising
17  refer -- strike that.
18    In what way -- then if you look at
19  Page 129, where it says: "Increases in mobile
20  streaming and publisher offerings."
21    Do you see that?
22    A.   Yes.

Page 137

1    Q.   Is it fair to say that programmatic
2  bidding -- programmatic advertising can be
3  purchased in a variety of internet means, such
4  as mobile, streaming or different publisher
5  offerings?
6    MS. ZWOLINSKI:  Objection.  Form.
7    THE WITNESS:  I can't say.
8    BY MS. GOODMAN:
9    Q.   What's your understanding of what
10  programmatic advertising is?
11    A.   My understanding of programmatic
12  advertising, it is -- it's an opportunity for
13  the ad -- our ad to be -- an ad to be served to
14  multiple sites as opposed -- at one time, based
15  upon criteria that is provided as opposed to,
16  like, site direct, you know for sure you are
17  going to ESPN or you know you are going to
18  BuzzFeed or you know you are going to the BUMP
19  or something like that.
20    Programmatic allows your ad -- I
21  don't remember what the system is that they put
22  everything in, but you put it in -- you feed it

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1  all of your criteria and then it will find
2  sites that meet that criteria and chances are
3  sites you have never, ever, ever, ever, ever
4  heard of but it serves your ad, and it's -- it
5  gives -- is the opportunity to reach audiences
6  in a way that you wouldn't have normally
7  thought to reach them.
8      Q.   And can you do programmatic
9  advertising in mobile applications or for
10  mobile ads?
11     A.   My understanding is that the ads are
12  -- are served to different sites, if the site
13  is optimized for mobile, and you are accessing
14  that site on your mobile, then the answer is
15  yes.  You are not buying by mobile.  The site
16  is served -- access -- whoever is using the
17  mobile to access that site has the ability to
18  see that ad.
19     Q.   And how about with respect to video
20  or streaming?  Is there programmatic
21  advertising with respect to video or streaming
22  ads?

Page 139

1      MS. ZWOLINSKI:  Objection.  Form.
2      THE WITNESS:  My understanding is
3  that is just another type of ad that can be
4  served through programmatic buying.
5      BY MS. GOODMAN:
6      Q.   And if you turn to Page 134 ending
7  in Bates 65.
8          Is this slide depicting the variety
9  of ways in which the census bureau could engage
10  in programmatic advertising?
11     MS. ZWOLINSKI:  Objection.  Form.
12     THE WITNESS:  What this slide is
13  showing are the different options so that we
14  understand that there are options.  It doesn't
15  necessarily say that this is what was
16  recommended for the census campaign.
17     BY MS. GOODMAN:
18     Q.   Got it.  But you are aware these are
19  options for programmatic bidding -- strike
20  that -- for programmatic advertising available
21  to the census bureau at least in 2018?
22     MS. ZWOLINSKI:  Objection.  Form.

Page 140

1      THE WITNESS:  We know they exist.
2  We didn't get this deep in the weeds, but this
3  was just an overview, this whole deck is an
4  overview of the media landscape so that you can
5  understand the different terminologies and the
6  different types of media there are.
7      BY MS. GOODMAN:
8      Q.   And from your point of view, whether
9  Y&R or Reingold determined using real-time
10  bidding versus a private marketplace versus
11  programmatic guaranteed, that was a decision
12  left to them; is that correct?
13     MS. ZWOLINSKI:  Objection.  Form.
14     THE WITNESS:  Again, whatever we
15  used was determined by a whole lot of different
16  data points.  I mean, if you look at the first
17  row under options is programmatic guarantee.
18  If you go to pros, it says it allowed buyers to
19  guarantee delivery to a specific audience
20  across publishers.
21         If we are going for a specific
22  audience, there is a possibility that is what

Page 141

1  they are using.  That's -- I can't say for sure
2  that they did, but whatever they determined to
3  use would be based upon the audience that they
4  were trying to reach.
5      BY MS. GOODMAN:
6      Q.   And so you relied on the ad agencies
7  to make the appropriate determination of which
8  of these options to use, if any, when trying to
9  reach a particular audience, correct?
10     MS. ZWOLINSKI:  Objection.  Form.
11     THE WITNESS:  Yes.
12     BY MS. GOODMAN:
13     Q.   Okay.  And if we go on to Page 150
14  -- we are losing a page number, 182 at the
15  bottom, 248182.
16         This is a slide depicting the
17  variety of channels through which advertising
18  could be obtained, correct?
19     A.   Some of them, yes.
20     Q.   Meaning not all of the channels
21  through which advertising could be -- could be
22  obtained are on this slide, right?

36 (Pages 138 - 141)

Page 142

1    MS. ZWOLINSKI:  Objection.  Form.
2        THE WITNESS:  I'm sorry.  I am
3    thinking.  These are -- okay.  I will say yes.
4        BY MS. GOODMAN:
5    Q.    Okay.  The types of advertising that
6    you would consider digital fall under the
7    heading of digital.
8        Which one of those are depicted
9    here?
10        MS. ZWOLINSKI:  Objection.  Form.
11        THE WITNESS:  Well, the interesting
12    thing here is that you have digital, but then
13    you are very clearly saying social, you are
14    very clearly saying programmatic, and you're
15    very clearly saying search, so given that those
16    three have been teased out here and we have
17    only been talking about four types under the
18    digital, it would seem that they're thinking --
19    no.
20        My impression, my understanding is
21    that it's more site-direct because the other
22    three are very specific.

Page 143

1        BY MS. GOODMAN:
2    Q.    And if we look in the strength under
3    those four, do all of them contain a notation
4    that they permit targeting of a specific
5    audience?
6        MS. ZWOLINSKI:  Objection.  Form.
7        THE WITNESS:  Yes.  They all mention
8    target or targeting.  They don't discuss -- so
9    yes.
10        BY MS. GOODMAN:
11    Q.    And under measurements, digital and
12    programmatic both have the terms "viewability
13    and impressions," right?
14    A.    Yes.
15    Q.    And what does measurement mean here?
16    A.    It's important to get the most
17    number of impressions as possible within the
18    realm of reaching your audience and doing it
19    efficiently and effectively, so when we look at
20    the post-buy analysis, the plan, the -- there
21    is a plan number of impressions they expect to
22    get, and we -- then you have your actual, so

Page 144

1    impression is how many times it's seen or it's
2    a brand -- I mean, it is an industry standard
3    measurement.
4    Q.    And so in terms of how programmatic
5    measurements are made and how digital
6    advertisements are made, they are both with
7    respect to impressions, at least according to
8    this chart; is that right?
9    A.    According to --
10        MS. ZWOLINSKI:  Objection to form.
11        THE WITNESS:  According to this
12    chart, yes.
13        BY MS. GOODMAN:
14    Q.    Okay.  And so if you are evaluating
15    -- well, when you were evaluating what kinds of
16    channels to use in the course of your work for
17    the 2020 census, do you consider the fact that
18    each of these mechanisms were able to be
19    deployed to target a particular audience?
20        MS. ZWOLINSKI:  Objection to form.
21        THE WITNESS:  For the 2020 census,
22    while everybody is supposed to -- every

Page 145

1    household should respond, it is necessary to
2    target, you know, it is not one size fits all.
3    You've got to be able to talk to people
4    differently.
5        You want to be authentic and -- and
6    real and you want to know that I am speaking
7    directly to you and not to a room of people who
8    look like you but don't think like you.  That's
9    why targeting was very important in all the
10    media that we purchased.
11        BY MS. GOODMAN:
12    Q.    And so could you substitute the use
13    of digital site direct with social, for
14    example, in order to reach the audience you
15    needed to reach?
16        MS. ZWOLINSKI:  Objection to form.
17        THE WITNESS:  No.  They are all
18    tools in the toolbox.  They have to work
19    together.
20        BY MS. GOODMAN:
21    Q.    And you could make allocations
22    within each of those categories based on what

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

1   was the most effective way to reach your
2   audience; is that correct?
3        MS. ZWOLINSKI:  Objection to form.
4        THE WITNESS:  That is what we
5   expected our agencies to do.
6        BY MS. GOODMAN:
7        Q.   Okay.  And on the second page of
8   this, turning to 152, do you see that the time
9   to -- well, what does the media channel
10   creative timeline here mean?
11       A.   My understanding of this is how long
12   it takes -- so for digital, if it's a standard
13   ad, standard ad -- they needed at least -- we
14   have to allow them two weeks from the time we
15   get it for them to post it.  That is my
16   understanding of this.  I thought it was
17   shorter, but two weeks.  If it is custom, six
18   weeks from creation to airing.
19       Q.   And you see that digital and
20   programmatic have the same time to airing; is
21   that right?
22       A.   Yes.

1        Q.   And search also has at least for --
2   has two weeks here as well?
3        MS. ZWOLINSKI:  Objection to form.
4        THE WITNESS:  Yes.
5        BY MS. GOODMAN:
6        Q.   And social is a little bit faster
7   than programmatic, search or digital; is that
8   right?
9        MS. ZWOLINSKI:  Objection.
10   Foundation.
11       THE WITNESS:  Yes.
12       BY MS. GOODMAN:
13       Q.   Okay.  And so in looking at the
14   media channel summary slide, just one page
15   back, is it fair to say that digital, social,
16   programmatic and search have similar
17   characteristics depicted here?
18       MS. ZWOLINSKI:  Objection to form.
19       THE WITNESS:  Well, some of the
20   strengths may be similar, they are not the
21   same.  Thus, you cannot substitute one for the
22   other.

1        BY MS. GOODMAN:
2        Q.   So you can't use digital to the
3   exclusion of social, but you can make
4   appropriate allocations between the two; is
5   that fair?
6        MS. ZWOLINSKI:  Objection to form.
7        THE WITNESS:  For the 2020 census,
8   we needed a holistic approach and the agencies
9   buying media on behalf of the census bureau
10   used all the tools in their toolbox so that we
11   made sure that whether or not -- it doesn't
12   matter if you see the ad ten times across
13   different platforms, you are seeing the ad, and
14   we did not substitute digital for social or
15   programmatic.  It all depended upon what we
16   were trying to achieve and the audience we were
17   trying to reach.
18       MS. GOODMAN:  Shall we take a break?
19       MS. ZWOLINSKI:  Yes.
20       THE VIDEOGRAPHER:  Going off the
21   record.  The time is 12:46.
22       (A short recess was taken.)

1        THE VIDEOGRAPHER:  Going back on the
2   record.  The time is 13:39.
3        (Deposition Exhibit 16 was marked
4   for identification.)
5        BY MS. GOODMAN:
6        Q.   Ms. Oliphant, I am going to hand you
7   Exhibit 16, CENSUS-ADS-168193 through 195.
8        MS. ZWOLINSKI:  Do you have a copy?
9        MS. GOODMAN:  Oh, sorry.
10       MS. ZWOLINSKI:  Thank you.
11       BY MS. GOODMAN:
12       Q.   And this is an e-mail you received
13   from Jack Benson at Reingold on June 9, 2020.
14       Do you see that?
15       A.   Yes.
16       Q.   And he is following if up on our
17   recent click-to-call conversations.
18       Do you see that in the first line?
19       A.   Yes.
20       Q.   And what's your understanding of
21   click-to-call in this context?
22       A.   This had to do with -- so

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

1  click-to-call means you could click on the ad
2  and it would -- it would immediately dial
3  whatever number was associated with that ad.
4      This was all around questionnaire
5  assistance specifically in non-English
6  languages.
7      Q.   And you see he writes: "We would
8  recommend implementing both scenarios below
9  immediately."
10     And then he continues: "We looked
11 into options across platforms, and search seems
12 to make the most sense, as programmatically we
13 cannot deliver call ads in DV360 and we've
14 tested social with FB."
15     Do you see it that?
16     A.   Uh-huh.
17     Q.   What do you understand him to mean
18 in that sentence?
19     A.   That for click-to-call, search is
20 the best option.  I would assume -- I --
21 reading this DV360 seems to be something they
22 were using to serve programmatic ads.

Page 151

1      And I don't know what he means,
2  like, we tested with social with F- -- I'm
3  sure -- I know FB is Facebook.  When this was
4  written, I could have told you exactly what
5  everything meant.  But, yeah, that's pretty
6  much it.
7      Q.   And so with respect to achieving
8  the -- the goal of serving click-to-call ads,
9  the ad agency considered a variety of channels,
10 including programmatic, social, and search; is
11 that correct?
12     MS. ZWOLINSKI:  Objection to form.
13     THE WITNESS:  Yes.
14     BY MS. GOODMAN:
15     Q.   And did you routinely have
16 conversations or e-mail communications with
17 Mr. Benson with respect to the best channel
18 through which to serve a particular ad?
19     MS. ZWOLINSKI:  Objection.  Form.
20     THE WITNESS:  No.
21     BY MS. GOODMAN:
22     Q.   So this e-mail was unusual to

Page 152

1  receive?
2      MS. ZWOLINSKI:  Objection.  Form.
3      THE WITNESS:  This was a last-minute
4  request, and we were trying to honor the
5  request.  I don't know that we approved this,
6  but they did -- he did provide options.
7      BY MS. GOODMAN:
8      Q.   And what you have -- my question is:
9  Did you have discussions with Mr. Benson or
10 others at Reingold about the various digital
11 channels that they considered with respect to a
12 particular ad they were going to place and --
13 and what their considerations with respect to
14 each of those channels?
15     MS. ZWOLINSKI:  Objection to form.
16     THE WITNESS:  Our normal -- what we
17 do is a performance-based contract.  We provide
18 -- we state the problem, and we ask them to
19 come back with a recommendation to solve that
20 problem, to address that problem.
21     In this case it was adding this CQA,
22 consensus questionnaire assistance, phone

Page 153

1  number on specific ads and how would that be
2  done in a digital format through digital ads --
3      BY MS. GOODMAN:
4      Q.   Okay.
5      A.   -- but we also had the same
6  conversation happening through the other types
7  of media.
8      Q.   And so from your point of view as
9  the advertiser, did it matter to you what
10 channel -- programmatic, search, or social --
11 this particular ad was served through?
12     MS. ZWOLINSKI:  Objection.  Form.
13     THE WITNESS:  What would matter to
14 me is if I was asked why it's only on -- why
15 are we only addressing this through search and
16 no other means.  This would serve as a -- the
17 background for why that was the way we went.
18     Those are the kinds of questions we
19 would have to respond to from stakeholders if
20 that actually did come up, but this is what I
21 would call a general approach to a request that
22 was made about adding the call-in number.

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1    BY MS. GOODMAN:
2    Q.   And you expected Reingold to
3    consider a variety of options and channels
4    available to the census to -- to serve that
5    particular ad; is that right?
6        MS. ZWOLINSKI:  Objection.  Form.
7        THE WITNESS:  Series -- it's a
8    series of ads.  It's not just one add, so yes,
9    and it's multiple audiences, so yes.
10       MS. GOODMAN:  All right.  Let's see.
11   77.
12       (Deposition Exhibit 17 was marked
13   for identification.)
14       BY MS. GOODMAN:
15   Q.   I am going to hand you Exhibit 17,
16   CENSUS-ADS-709936 through 709990 -- 991.
17   And this is a deck titled:  "Order
18   15, Media Strategy, 2020 Census Integrated
19   Communications Contract, November 5, 2018."
20       Do you see that?
21   A.   Yes.
22   Q.   Okay.  And was this a deck you have

Page 155

1    seen before?
2    A.   Yes.
3    Q.   Okay.  And did you attend any
4    meetings in which this deck was discussed?
5    A.   Yes.
6    Q.   And what do you recall of that
7    meeting?
8        Let me ask more specifically.  When
9    did this -- when did this meeting take place?
10   A.   Likely on November 5, 2018.
11   Q.   And what was the purpose of it?
12   A.   This was, again, like, the Media
13   101, this was an opportunity -- well, this is a
14   meeting where we actually discussed their
15   recommended strategy for each phase of the
16   campaign in terms of messaging and media.
17   Q.   Okay.  And if you turn to page
18   ending in 956, we are headed into a section on
19   media strategies by channel.
20       Do you see that?
21   A.   Yes.
22   Q.   And now I would like you to turn to

Page 156

1    Page 25 ending in 960, and here we are talking
2    about the TV -- the slide is talking about the
3    TV channel; is that correct?
4    A.   Yes.
5    Q.   Okay.  And you see a bullet on
6    connected TV penetration?
7    A.   Yes.
8    Q.   Okay.  And it says: "Connected TV
9    penetration has increased 208 percent since
10   2010 resulting in a more fragmented video
11   landscape."
12       What is connected TV?
13   A.   I would like to say that it is
14   cable, streaming, because they're connected to
15   the Internet or connected in some -- yeah.
16   Q.   And why was it important to take
17   into account that connected TV penetration has
18   increased 208 percent since 2010 in developing
19   a media strategy for the TV channel?
20       MS. ZWOLINSKI:  Objection.  Form.
21       THE WITNESS:  This was to help
22   manage expectations.  The misconception is that

Page 157

1    you can get -- you can get so many people when
2    you -- when you do TV advertising.  From a
3    national perspective, you can, but when you're
4    reaching specific audiences, regular TV is not
5    always the best option.
6        When you -- when you're looking at
7    the recommended program or the recommended
8    channels on cable, so to speak, you've got to
9    understand that their share of the market is so
10   much smaller.  They reach -- we need to reach,
11   but their share of the market is very small.
12       Or, for example, when you're looking
13   at media vehicles, TV media vehicles, TV cable
14   media vehicles to reach ethic audiences, like
15   Black African-American, the misconception is
16   BETT has a large share of the market, but in
17   reality, the share is so incredibly small.  Do
18   we -- do we actually buy them?  Is it worth our
19   money to buy them?
20       So you have to look at not only the
21   share of the market, the cost of the media, the
22   audience that you're trying to reach, whether

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

1  or not you can achieve that some other way, and
2  then, to make it worse, the perception if you
3  don't use them.
4       BY MS. GOODMAN:
5       Q.  And would connected TV include
6  advertising on, for example, Hulu or Fubo TV,
7  other streaming apps?
8       MS. ZWOLINSKI:  Objection.  Form.
9       THE WITNESS:  I'm not sure.
10      BY MS. GOODMAN:
11      Q.  Do you see the second bullet below
12  sort of indented under "connected TV"?
13      A.  Uh-huh.
14      Q.  And it talks about new digital
15  viewing options, such as OTT and short-,
16  long-form content across the web.
17      Do you see that?
18      A.  Yes.
19      Q.  What does that mean?  What did you
20  understand that to mean?
21      A.  I cannot remember -- let me pause.
22      I cannot remember what OTT stands

Page 159

1  for, over the something.  But you go back --
2  TikTok, YouTube, a lot of advertisers are using
3  these because they offer the ability to have
4  short -- short -- short-form videos.  I mean,
5  TikTok is all short-form videos, but YouTube,
6  you can have short-form or long-term videos.
7  It all depends, and it depends on the audience
8  that you're trying to reach and the way those
9  vehicles are segmented for the different
10  audiences.
11      Q.  And the last few words here talk
12  about across the web.  Can you think of other
13  kinds of connected TV channels across the web
14  through which, as an advertiser, the census
15  bureau wanted to use?
16      MS. ZWOLINSKI:  Objection.  Form.
17      THE WITNESS:  I don't recall.
18      BY MS. GOODMAN:
19      Q.  Would Hulu constitute a connected TV
20  channel?
21      A.  I don't recall.
22      Q.  And can you think of any new digital

Page 160

1  viewing options that are referenced or that
2  would fall within this bullet on --
3      A.  Twitter.
4      MS. ZWOLINSKI:  Objection.  Form.
5      THE WITNESS:  I'm sorry.
6      It's supports video, usually in
7  short form.  No, not off the top -- no, I
8  can't.
9      BY MS. GOODMAN:
10      Q.  And if we turn to Page 36 ending in
11  971, here we are talking about the programmatic
12  digital channel.
13      Do you see that?
14      A.  Yes.
15      Q.  And is it accurate that programmatic
16  advertising can deliver ads on online sites and
17  apps and in more ways, as reflected in the
18  second bullet?
19      A.  That is my understanding.
20      Q.  Okay.  And you see one of the -- the
21  third bullet says:  "One of the biggest content
22  consumption trends is the increase in time

Page 161

1  spent per day with digital video."
2      Do you see that?
3      A.  Yes.
4      Q.  And can video ads be served
5  programmatically?
6      A.  I believe they can, yes.
7      Q.  And so on Page 37, the next page,
8  where it talks about programmatic strategies in
9  the -- in the box.
10      A.  Yes.
11      Q.  The first bullet says:  "Use
12  streaming video, rich media, and banner ads
13  driving to the 2020 census website to educate
14  and motivate low-response audiences in areas."
15      Do you see that?
16      A.  Yes.
17      Q.  And so did the census bureau use
18  programmatic advertising through -- with
19  streaming video, rich media, and banner ads in
20  the course of the advertising campaign for the
21  census?
22      MS. ZWOLINSKI:  Objection.  Form.

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1    THE WITNESS:  Yes.
2    BY MS. GOODMAN:
3    Q.   And do you know specifically how
4    your advertising agencies delivered these kinds
5    of programmatic ads?
6    MS. ZWOLINSKI:  Objection.  Form.
7    THE WITNESS:  No.
8    BY MS. GOODMAN:
9    Q.   In the e-mail we were looking at
10   earlier -- I can't recall what exhibit number
11   it was -- yes.
12   A.   16.
13   Q.   It mentioned DV360.
14   A.   Yes.
15   Q.   Do you know what that is?
16   A.   I recall seeing -- seeing it.  I
17   could not -- I can't describe exactly what it
18   is.  My assumption -- well, no.  I don't know
19   what it is.
20   Q.   Do you know what it stands for?
21   A.   No, I do not.
22   Q.   Do you know what company owns or

Page 163

1    operates or offers -- offers it to the public?
2    MS. ZWOLINSKI:  Objection.  Form.
3    THE WITNESS:  No.
4    BY MS. GOODMAN:
5    Q.   Okay.  Back at 17, the big deck from
6    the November 8th deck.  I think that's the one
7    you have in front of you.
8    A.   Oh.
9    MS. ZWOLINSKI:  Is it November 5th?
10   BY MS. GOODMAN:
11   Q.   Sorry.  November 5, 2018?
12   A.   This one?
13   Q.   Yes.  Okay.  Turn to Page 40,
14   please, ending in 975.  And in the first
15   bullet, it talks about more and more people
16   using ad blockers to limit advertising showing
17   as they browse the Internet.  This particularly
18   affects programmatic display.
19   What did people's use of -- how did
20   people's use of ad blockers inform this
21   media-buying strategy for the 2020 census?
22   MS. ZWOLINSKI:  Objection to form.

Page 164

1    THE WITNESS:  It just -- it was
2    another piece of information to prove that we
3    needed to use all the tools in our toolbox and
4    not just focus on one.
5    BY MS. GOODMAN:
6    Q.   And did site direct provide a way to
7    reach audiences that have ad blockers?
8    A.   It was one way, yes.
9    Q.   Can you think of other ways that the
10   census reached people who have ad blockers
11   through digital means?
12   MS. ZWOLINSKI:  Objection.  Form.
13   THE WITNESS:  Through social.
14   BY MS. GOODMAN:
15   Q.   And how about search?
16   A.   Search.  We did not serve ads.  We
17   just made sure census bureau was at the top of
18   the list when somebody searched on any of the
19   -- on any of the key words that we agreed upon.
20   Q.   Are you referring to search engine
21   optimization?
22   MS. ZWOLINSKI:  Objection.  Form.

Page 165

1    THE WITNESS:  Sounds good.
2    BY MS. GOODMAN:
3    Q.   But you don't think that the census
4    bureau bought search ads to place upon somebody
5    searching for a census key word and seeing the
6    first ads that pop up on a -- in a search
7    engine?
8    MS. ZWOLINSKI:  Objection.  Form.
9    THE WITNESS:  I don't recall.
10   MS. GOODMAN:  Okay.  Okay.  Can I
11   have 29.
12   (Deposition Exhibit 18 was marked
13   for identification.)
14   MS. GOODMAN:  I am going to hand you
15   Exhibit 18, CENSUS-ADS-94975 through 95010.
16   BY MS. GOODMAN:
17   Q.   And you see this is a congressional
18   staff briefing on the 2020 census integrated
19   communication campaign update dated May 1,
20   2020, right?
21   A.   Yes.
22   Q.   Did you attend any congressional

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 182

1    MS. ZWOLINSKI:  Objection.  Form.
2    THE WITNESS:  We had a -- an order
3    specifically devoted to campaign optimization,
4    and so please define what you mean by campaign
5    optimization reports.
6    MS. GOODMAN:  I think I have an
7    easier way of going about it, and I'm going to
8    hand you Exhibit 19, CENSUS-ADS-0000709885
9    through 897.
10    (Deposition Exhibit 19 was marked
11    for identification.)
12    BY MS. GOODMAN:
13    Q.    And my question is whether this is a
14    kind of document titled:  "Campaign
15    Optimization Daily Report," you have seen in
16    the course of your work in the 2020 census?
17    A.    Yes.
18    Q.    Okay.  And so what was the purpose
19    of these reports?
20    A.    Every day the campaign optimization
21    team met to look at where we were in terms of
22    self-response and to deploy various

Page 183

1    communication methods or to utilize various
2    communication methods to encourage
3    self-response, specifically in areas where the
4    response was not at the level anticipated.
5    Q.    And so is the national response rate
6    here, is that -- what is that measuring?
7    A.    How many people have responded
8    nationwide or how many households, because it's
9    based on households.
10    Q.    And do you know what the P2E means?
11    A.    I do.  Allow me.  Plan -- percent to
12    expected.
13    Q.    Percent to expected?
14    A.    Yes.
15    Q.    I see.  So it's taking the actual
16    and expected on the left-hand side and showing
17    how well you're performing relative to what is
18    expected?
19    A.    Yes.
20    Q.    Okay.  And what -- on Page 2 where
21    it says:  "Priority issues and
22    recommendations," what was this section of the

Page 184

1    campaign optimization daily report used for?
2    MS. ZWOLINSKI:  Objection.  Form.
3    THE WITNESS:  It was used to
4    evaluate any issues that were being encountered
5    that were hindering self-response or -- or
6    contributing to lower than expected
7    self-response rates and then recommendations to
8    mitigate.
9    BY MS. GOODMAN:
10    Q.    And would paid -- would digital
11    advertising -- would issues with respect to
12    digital advertising be depicted in campaign
13    optimization daily reports if it was an issue
14    needing to be a priority issue?
15    MS. ZWOLINSKI:  Objection.  Form.
16    THE WITNESS:  If by some -- for some
17    reason digital advertising was impeding
18    self-response, then that would be reported
19    here.
20    BY MS. GOODMAN:
21    Q.    So here in the first issue where it
22    says:  "Need for campaign adjustments in

Page 185

1    response to COVID and operational changes,"
2    there are various recommendations listed on the
3    right-hand side, some of which mention media,
4    correct?
5    A.    Can --
6    MS. ZWOLINSKI:  Objection.  Form.
7    THE WITNESS:  Can you verify which
8    page you are looking at again.
9    BY MS. GOODMAN:
10    Q.    86, ending in 86.
11    A.    And you just -- oh, you're over
12    here.  Okay.  I'm sorry.  I couldn't find it on
13    the page.
14    Q.    That's okay.
15    A.    Would you repeat your question,
16    please.
17    Q.    Yeah.  I just want to make sure
18    you're -- we're looking at the same thing which
19    is with respect to addressing the issue of need
20    for campaign adjustments in response to COVID
21    and operational changes, the recommendations
22    column on the right-hand side includes various

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

1    web, digital, and media recommendations,
2    correct?
3            MS. ZWOLINSKI:  Objection.  Form.
4            THE WITNESS:  Can you repeat your
5    question one more time.  I'm sorry.
6        BY MS. GOODMAN:
7        Q.    That's okay.  We'll try it another
8    way.
9            You see on the right-hand side under
10   "recommendations," third bullet down:  "Media,
11   reprogramming TV, radio, inventory for
12   canceled, postponed sporting events."
13           Do you see that?
14       A.    Yes.
15       Q.    And that was one recommended way to
16   address the need for campaign adjustments in
17   response to COVID in operational changes; is
18   that right?
19       A.    It was a recommendation that was
20   already in progress.
21       Q.    Okay.  And one of the
22   recommendations that was complete was web,

Page 187

1    published statements on operational updates.
2            Do you see that?
3        A.    Yes.
4        Q.    And what is web referring to there?
5        A.    The -- the 2020 census website.
6        Q.    And is that -- that's different from
7    the general census bureau website; is that
8    right?
9        A.    It's -- it is -- yes, it's
10   different, but that doesn't mean this wasn't on
11   both sites.
12       Q.    And digital where it says:  "Deploy
13   key word search ads for census plus coronavirus
14   directing to EPK."
15           Do you see that?
16       A.    I do.
17       Q.    What is EPK?
18       A.    I do not know.
19       Q.    Okay.  And why was -- do you know
20   why the recommendation was completed to deploy
21   key word search ads for census and coronavirus?
22       A.    Can we back up?

Page 188

1        Q.    Uh-huh.
2        A.    EPK is electronic press kit.
3        Q.    Okay.  And so do you know why key
4    word search ads for census plus coronavirus
5    directing to the electronic press kit was a
6    recommendation completed in order to address
7    campaign adjustments in response to COVID?
8            MS. ZWOLINSKI:  Objection.  Form.
9            THE WITNESS:  Because electronic
10   press kit provided all of our statements about
11   how we were adjusting operations in light of
12   everything -- all the changes due to COVID.
13           BY MS. GOODMAN:
14       Q.    Okay.  And -- okay.  And from your
15   point of view, did the campaign optimization
16   daily reports ever address issues with respect
17   to the use of programmatic advertising?
18           MS. ZWOLINSKI:  Objection.  Form.
19           THE WITNESS:  Not that I recall.
20           BY MS. GOODMAN:
21       Q.    Okay.  What is the CORT/X -- I am on
22   Page 86, right under "priority issues and

Page 189

1    recommendations."
2            There is an acronym CORT/X.  What
3    does that mean?
4        A.    So CORT is -- campaign optimization
5    review team or response team, I don't know what
6    the R was, but there was a primary team and the
7    CORT/X was elevating it to a higher level so it
8    included persons like myself, the -- maybe not
9    -- so the assistant directors for
10   communications, the associate director for
11   communications, the assistant and associate
12   director for field division -- field
13   operations, assistant -- I don't know.
14   Somebody higher up in the decennial.
15           I don't remember what -- which
16   position it was, but in some cases, it was the
17   associate director for decennial operations.
18   But it elevated -- the X, the CORT/X was a team
19   that was elevated because it would -- the
20   issues and recommendations would require
21   sign-off from a higher power -- people in
22   higher authority.

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

1    Q.   Fair to say senior leadership?
2    A.   Yes.
3    Q.   Okay.  And so did you receive these
4  campaign optimization daily reports because you
5  were a member of the CORT/X team?
6        MS. ZWOLINSKI:  Objection.  Form.
7        THE WITNESS:  I received it because
8  I was part of CORT/X.  I received it because
9  oftentimes, media was involved, so I was the
10  COR for media and I received it because I was
11  the chief of the PMO.
12       BY MS. GOODMAN:
13   Q.   So if we look at Page 87, in the
14  middle of the page, right -- sorry, left-hand
15  side:  "Low response in U/L geos."
16       What does that mean?
17   A.   Update lead geographies, so in some
18  cases, the census is conducted by the census
19  taker actually going to the residence and
20  leaving a form and then you have
21  update/enumerate, which would be U/E, where
22  they actually go to the home and they enumerate

Page 191

1  on the spot.
2    Q.   Meaning complete the census on the
3  spot?
4    A.   Yes.
5    Q.   Okay.  And you see in the overview
6  section:  "TYR is working to deploy digital
7  advertising for U/L geos acknowledging the
8  reminder letter."
9        What does that mean?
10   A.   There was a reminder letter that was
11  sent to households that fell within the update
12  leave areas, asking -- reminding them that the
13  census was still ongoing and that once field
14  operations resumed, they would be visited by an
15  enumerator to complete their census.
16   Q.   And how did they deploy digital
17  advertising with respect to that pursuit?
18       MS. ZWOLINSKI:  Objection.  Form.
19       THE WITNESS:  It would depend upon
20  the area and what -- however they could.
21       BY MS. GOODMAN:
22   Q.   And to your knowledge, is digital

Page 192

1  advertising able to be targeted based on
2  geography?
3        MS. ZWOLINSKI:  Objection.  Form.
4        THE WITNESS:  Yes.
5        BY MS. GOODMAN:
6    Q.   And so one thing that you had to do
7  -- that the census bureau had to do in order to
8  address low response in update leave areas, was
9  to use digital advertising; is that right?
10       MS. ZWOLINSKI:  Objection.  Form.
11       THE WITNESS:  Yes.
12       BY MS. GOODMAN:
13   Q.   And from your point of view as a
14  representative of the census working in
15  advertising, did it matter to you how T Y&R
16  deployed that digital advertising?
17       MS. ZWOLINSKI:  Objection.  Form.
18       THE WITNESS:  No.
19       BY MS. GOODMAN:
20   Q.   So we have looked at this media
21  buying 101 deck, we saw the media strategy 2018
22  deck.

Page 193

1        Do you consider those documents to
2  accurately depict what advertising looks like
3  from an advertiser's -- within the industry?
4        MS. ZWOLINSKI:  Objection.  Form.
5        THE WITNESS:  I think that they
6  include a lot of terminology that are standard
7  in the industry but the approach -- definitely
8  the strategy was tailored to our needs.
9        BY MS. GOODMAN:
10   Q.   And with respect to the strategy
11  being tailored to the census bureau's needs, in
12  your view, did the strategy deck incorporate
13  standard industry terms, practices, and
14  channels?
15       MS. ZWOLINSKI:  Objection.  Form.
16       THE WITNESS:  Yes.
17       BY MS. GOODMAN:
18   Q.   Okay.  Are you familiar with the
19  term "open web display advertising"?
20       MS. ZWOLINSKI:  Objection.  Form.
21       THE WITNESS:  Yes, I have heard it.
22       BY MS. GOODMAN:

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

1    Q.   Where have you heard it?
2    A.   It was in the filing, the suit.
3    Q.   Had you heard it prior to the filing
4  of the suit?
5    A.   Not that I recall.
6    Q.   Did you see it at all in any deck
7  that Y&R presented to you in the course of your
8  work?
9    A.   I don't recall.
10   Q.   Okay.  But if it was there, I could
11 find it in the documents that the census bureau
12 has produced, correct?
13       MS. ZWOLINSKI:  Objection.  Form.
14       THE WITNESS:  Yeah.
15       BY MS. GOODMAN:
16   Q.   Okay.  Prior to reading the filing
17 of the lawsuit -- strike that.
18       Did you read the -- the lawsuit that
19 was filed?
20   A.   I tried.
21   Q.   When you say you tried, did you
22 succeed?

Page 195

1        MS. ZWOLINSKI:  Objection.  Form.
2        THE WITNESS:  There -- it's not
3  written like a census ad, it is not written for
4  the average person to understand.  It's a lot
5  of legal terminology that -- it's frustrating
6  for a nonlegal person.
7        BY MS. GOODMAN:
8    Q.   When did you read the lawsuit?
9        MS. ZWOLINSKI:  Objection.  Form.
10       THE WITNESS:  After it was filed and
11 I was -- I was made aware that it had been
12 filed.
13       BY MS. GOODMAN:
14   Q.   Do you think it was close in time to
15 when it was filed on January 24, 2023?
16   A.   I would think so, yes.
17   Q.   Okay.  And am I -- is it correct
18 that the first time you recall hearing the term
19 "open web display advertising" was upon reading
20 that lawsuit?
21       MS. ZWOLINSKI:  Objection.  Form.
22       THE WITNESS:  I can't recall.

Page 196

1        BY MS. GOODMAN:
2    Q.   What is your earliest recollection
3  of encountering the term "open web display
4  advertising"?
5        MS. ZWOLINSKI:  Objection.  Form.
6        THE WITNESS:  That is my most recent
7  recollection, because previously, I wouldn't
8  have committed that to memory.
9        BY MS. GOODMAN:
10   Q.   Why wouldn't you have committed it
11 to memory previously?
12   A.   Because it was not terminology we
13 used in the course of what we were doing.
14   Q.   And what is your understanding of
15 the term "open web display advertising"?
16   A.   I'm not sure.
17   Q.   And in the course of your work as
18 the COR for contract -- Order 15 for paid media
19 for the 2020 census, did you develop any
20 understanding of the term "open web display
21 advertising"?
22       MS. ZWOLINSKI:  Objection.  Form.

Page 197

1        THE WITNESS:  I don't recall it
2  being used in any of the introductory
3  documents.  I don't recall it being used in any
4  of the media plan documents.
5        BY MS. GOODMAN:
6    Q.   Do you consider open web display
7  advertising to be a particular channel through
8  which the census bureau could advertise for the
9  2020 census?
10       MS. ZWOLINSKI:  Objection.  Form.
11       THE WITNESS:  My -- my
12 interpretation is that it includes multiple
13 options.
14       BY MS. GOODMAN:
15   Q.   That -- that open web display
16 advertising includes multiple options?  Is that
17 what you mean?
18   A.   Yes.  I don't -- my -- my
19 interpretation is, it's not focused on only one
20 thing but I am not sure.
21   Q.   Okay.  What multiple options are you
22 interpreting -- or do you think fall within the

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

Page 198

1   term "open web display advertising"?
2        MS. ZWOLINSKI:  Objection.  Form.
3        THE WITNESS:  Anything on the web.
4   Any -- well, clearly programmatic.  I don't --
5   that's all I can say would be included.  I
6   don't know if it includes anything else.
7        BY MS. GOODMAN:
8    Q.   Okay.  And with respect to
9   programmatic, would it include all of the kinds
10  of programmatic options that are available,
11  such as real-time bidding and private
12  marketplaces for example?
13       MS. ZWOLINSKI:  Objection.  Form.
14       THE WITNESS:  I don't know.
15       BY MS. GOODMAN:
16   Q.   Would you consider advertising on
17  Amazon to be open web display advertising?
18       MS. ZWOLINSKI:  Objection.  Form.
19       THE WITNESS:  I don't know.
20       MS. GOODMAN:  Want to take a break?
21       THE WITNESS:  Yes.  I was waiting
22  for you to pause and pull out another.

Page 199

1        THE VIDEOGRAPHER:  Going off the
2   record.  The time is 14:42.
3        (A short recess was taken.)
4        THE VIDEOGRAPHER:  Back on the
5   record.  The time is 15:01.
6        (Deposition Exhibit 20 was marked
7   for identification.)
8        BY MS. GOODMAN:
9    Q.   Ms. Oliphant, I handed you Exhibit
10  20, which is titled:  "The 2020 Census
11  Integrated Communications Plan Final Report,"
12  dated May 27, 2021.
13       Is this the document that is
14  publicly available on the census bureau's
15  website to your knowledge?
16   A.   I believe so.
17   Q.   Okay.  And I will represent to you
18  that's where I found it and it is in beautiful
19  color and I thought that that was a better use
20  of -- better way to read this document than how
21  it gets produced without color.
22       So I want to -- what is this

Page 200

1   document?
2    A.   This is -- we developed a
3   communications plan that we shared publicly and
4   then we did an interim plan which was also
5   shared publicly.  This was to come back and
6   close the loop, while it is not inclusive of
7   every single thing we did, it is to give --
8   really, the public and our stakeholders -- it
9   is raining -- the public and our stakeholders
10  an opportunity to see some of the -- get a
11  final view of some of the things that we did,
12  yes.
13   Q.   So would it be accurate to say this
14  is an accurate summary of all of the things
15  related to the communications plan for the 2020
16  census that actually occurred?
17       MS. ZWOLINSKI:  Objection to form.
18       THE WITNESS:  I would say it's very
19  broad.  It might touch on some of the com- -- I
20  will say complexities or issues we encountered,
21  and how we worked around them, but it's not
22  overly detailed.

Page 201

1        BY MS. GOODMAN:
2    Q.   And -- so while it does not cover
3   every day moment decision in time for the 2020
4   integrated communications plan, does it
5   accurately -- to the extent it discusses
6   something, is it a true and accurate discussion
7   of what took place?
8        MS. ZWOLINSKI:  Objection.  Form.
9        THE WITNESS:  Yes.
10       BY MS. GOODMAN:
11   Q.   Okay.  So let's go to Page 14, and
12  in the third bullet:  "Advertising and media
13  buying," is it an accurate statement that:
14  "The campaign also deployed a broad range of
15  digital paid social e-mail marketing and
16  keyword search advertisements that could be
17  easily tailored, targeted and adapted to reach
18  distinct audience groups"?
19   A.   Yes.
20   Q.   And if you turn to Page 21 under:
21  "Use of technology and data-driven
22  optimization," you see the sentence beginning:

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL

Page 202

1    "For example," kind of in the middle of the
2    paragraph?
3        A.   Yes.
4        Q.    And you see that this section
5    discusses the use of digital and social media
6    channels, correct?
7            MS. ZWOLINSKI: Objection. Form.
8            THE WITNESS: Correct.
9            BY MS. GOODMAN:
10       Q.    And is it -- is this section at all
11   specific to open web display advertising to the
12   extent you understand that term?
13           MS. ZWOLINSKI: Objection. Form.
14           THE WITNESS: I would not say it's
15   specific to it but portions of it.
16           BY MS. GOODMAN:
17       Q.   Okay.  And what portions of it?
18       A.    Well, based upon my interpretation
19   of what open web that term means, I don't know
20   that I would include social media platforms,
21   but I'm not sure, in the way that they -- not
22   the advertising on them, but the use of them by

Page 203

1    partners to encourage the partner serving as
2    trusted voices and using their own properties,
3    social media -- own social media properties to
4    encourage participation, so that's not
5    advertising.
6        Q.   I see.  So who are the partners
7    referenced in this paragraph?
8        A.    Anybody and everybody that wanted to
9    ensure an accurate census, so they were
10   official partners of the census bureau but also
11   a lot of unofficial partners of the census
12   bureau.
13       Q.   I see.  Okay.  Now turning to Page
14   22, first paragraph at the top, there is a
15   sentence beginning -- that reads: "By tracking
16   and analyzing this data alongside census
17   response rates, the census bureau could quickly
18   adjust campaign elements during campaign
19   execution if issues were noted.  More broadly,
20   the advanced technology helps us optimize the
21   campaign enabling us to reach audiences with
22   messages that were likely to appeal to them

Page 204

1    through channels with which they were likely to
2    engage."
3            Did I read that accurately?
4        A.   Yes.
5        Q.    And what advanced digital and social
6    media ad serving platforms were used by the
7    census bureau alongside other data on census
8    response rates in order to adjust campaign
9    elements during the campaign execution?
10           MS. ZWOLINSKI: Objection. Form.
11           THE WITNESS: I don't know.
12           BY MS. GOODMAN:
13       Q.   To your knowledge, did, in fact, the
14   census bureau adjust campaign elements with the
15   aid of advanced digital and social media ad
16   serving platforms?
17           MS. ZWOLINSKI: Objection. Form.
18           THE WITNESS: To my knowledge, the
19   census bureau did adjust campaign elements.  I
20   can't necessarily say they were all done
21   through ad serving platforms, advanced digital
22   and social media ad serving platforms.

Page 205

1            BY MS. GOODMAN:
2        Q.   Do you know what that is a reference
3    to?
4        A.   The advanced digital and social
5    media ad serving platforms?
6        Q.   Correct.
7        A.   I -- my interpretation is that it is
8    how the ads were served through digital
9    properties.
10       Q.    And would that include, to your
11   knowledge, sites like Facebook, Amazon, Hulu,
12   Pinterest, Google?
13           MS. ZWOLINSKI: Objection. Form.
14           THE WITNESS: I'm not sure.
15           BY MS. GOODMAN:
16       Q.    Would it be limited to any
17   particular type of display -- digital
18   advertising?
19           MS. ZWOLINSKI: Objection to form.
20           THE WITNESS: My interpretation is
21   if you are using ad serving platforms, that's
22   more akin to programmatic as opposed to site

52 (Pages 202 - 205)

1　explain what you mean by that?

2　　　MS. ZWOLINSKI: Objection. Form.

3　　　THE WITNESS: Most -- the site

4　directs, we had a pretty good understanding of

5　which sites they were going to directly because

6　it was -- they -- we worked hard for

7　integrations and added value and thing like --

8　and things like that. If it was a site that

9　didn't ring a bell, it was an obscure site, by

10　obscure, I mean I just don't know about the

11　site, not like I know every site, but it would

12　be safe to assume it was -- it doesn't matter.

13　　　Really didn't matter how they got

14　the ad. It was on this site, and this is the

15　audience that it was trying to reach.

16　　　BY MS. GOODMAN:

17　　Q. To your knowledge, did the census

18　bureau ever obtain a list of all of the

19　websites on which any census ad was placed?

20　　　MS. ZWOLINSKI: Objection. Form.

21　　　THE WITNESS: I don't recall.

22　　　BY MS. GOODMAN:

1　　Q. Is that something that would have

2　been something -- is that the kind of list you

3　would want to have in your role as order

4　manager on Order 15?

5　　　MS. ZWOLINSKI: Objection. Form.

6　　　THE WITNESS: It -- given the sheer

7　volume, no.

8　　　BY MS. GOODMAN:

9　　Q. And to your knowledge, did the

10　subcontractor responsible for media buys, buy

11　the advertising placement directly from those

12　websites?

13　　　MS. ZWOLINSKI: Objection. Form.

14　　　THE WITNESS: The subcontractor

15　responsible for digital media buys would buy

16　directly from the sites if it was site direct.

17　If it was programmatic, it would go through an

18　ad serving thing.

19　　　BY MS. GOODMAN:

20　　Q. And so if it's programmatic, to your

21　knowledge, does the subcontractor pay money to

22　the site owner on which the ad is served, or

1　does it pay money to an ad exchange or serving

2　platform who then disseminates the ads?

3　　　MS. ZWOLINSKI: Objection. Form.

4　Foundation.

5　　　THE WITNESS: It may go both ways.

6　I'm not sure.

7　　　BY MS. GOODMAN:

8　　Q. Okay. I will hand you Exhibit 25.

9　I am going out of order. Sorry.

10　CENSUS-ADS-204155 through 156.

11　　　(Deposition Exhibit 25 was marked

12　for identification.)

13　　　BY MS. GOODMAN:

14　　Q. Okay. This is an e-mail you

15　received from Mr. Benson on March 3, 2020.

16　　　Do you see that?

17　　A. Yes.

18　　Q. And he is forwarding to you and

19　others an e-mail he received from Michael

20　Westervelt at Google.

21　　　Do you see that?

22　　A. Yes.

1　　Q. Okay. And Mr. Benson thought it --

2　you might find it interesting that Google is

3　saying: "We have reached 214 million unique

4　users, approximately 65 percent of the

5　population, on average four-plus times since we

6　launched digital."

7　　　Do you see that?

8　　　MS. ZWOLINSKI: Objection. Form.

9　Foundation.

10　　　THE WITNESS: Yes.

11　　　BY MS. GOODMAN:

12　　Q. Do you recall receiving this e-mail?

13　　A. No, but --

14　　Q. And you see in the chart at the

15　bottom, that shows DV360 reaching 214 million

16　individuals and then Twitter, U.S. Today,

17　Nextdoor, NBC and Facebook also reaching

18　various numbers of unique users, right?

19　　　MS. ZWOLINSKI: Objection to form.

20　　　THE WITNESS: Yes.

21　　　BY MS. GOODMAN:

22　　Q. Is it -- so looking at this

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL

Page 298

1  document, do you have an understanding now of
2  what DV360 is?
3      MS. ZWOLINSKI:  Objection.  Form.
4      THE WITNESS:  My understanding would
5  be it's used to serve ads.
6      BY MS. GOODMAN:
7      Q.   Okay.
8      A.   Google uses it to serve ads.
9      Q.   Okay.  And so do you see in this
10  document then that the reach for the census --
11  strike that.
12      What is your reaction to the news
13  that Google is saying you have reached 214
14  million unique users as of March 3, 2020?
15      MS. ZWOLINSKI:  Objection.  Form.
16      THE WITNESS:  That's a good thing.
17      BY MS. GOODMAN:
18      Q.   I'm sorry?
19      A.   That's a good thing.
20      Q.   And did Google help the census
21  bureau obtain its advertising goals?
22      MS. ZWOLINSKI:  Objection.  Form.

Page 299

1      THE WITNESS:  The combination of
2  Google and all of our advertisers helped us
3  obtain our goals.
4      BY MS. GOODMAN:
5      Q.   Okay.  And was there any one digital
6  tool in your toolkit from your point of view
7  that particularly aided in the meeting of the
8  goals?
9      MS. ZWOLINSKI:  Objection.  Form.
10      THE WITNESS:  They all had a part in
11  helping us reach our goals.
12      BY MS. GOODMAN:
13      Q.   Did any one of them have a greater
14  role than others?
15      MS. ZWOLINSKI:  Objection.  Form.
16      THE WITNESS:  Well, at this point in
17  time, it is clearly Google, but this is just a
18  snapshot in time so -- and this is before
19  pandemic, so no, I have no -- I can't speak to
20  any time later without a similar type of
21  report.
22      BY MS. GOODMAN:

Page 300

1      Q.   Okay.  But just in terms of the
2  course of your experience working on Order 15,
3  does any one particular advertising mechanism
4  stand out to you as one that was particularly
5  effective in helping the census bureau obtain
6  its goals?
7      MS. ZWOLINSKI:  Objection.  Form.
8      THE WITNESS:  They really all -- if
9  they didn't work together, because they all
10  bring something different to the table to reach
11  audiences in a different way, and each audience
12  receives or utilizes different media.  It is --
13  it is hard to point to one particular vendor
14  and say, you know, they are responsible or they
15  had the greatest impact because while it may
16  have an impact here, it may not have, overall,
17  it may not have had as high of an impact.
18      BY MS. GOODMAN:
19      Q.   If you needed to figure out how much
20  money was paid to Google through funds
21  allocated under the Order 15 contract, how
22  would you go about doing that?

Page 301

1      MS. ZWOLINSKI:  Objection.  Form.
2      THE WITNESS:  I would contact the
3  buying agency.  I would call Reingold.
4      BY MS. GOODMAN:
5      Q.   Have you had to call Reingold in the
6  course of this litigation to figure out how
7  much money has been paid to Google?
8      MS. ZWOLINSKI:  Objection.
9      THE WITNESS:  No.
10      BY MS. GOODMAN:
11      Q.   And to your knowledge, is there a
12  way to figure out how much money was paid to
13  Google for programmatic advertising?
14      MS. ZWOLINSKI:  Objection.  Form.
15      THE WITNESS:  I don't have those
16  means.  Census doesn't have that.  We would go
17  directly to Reingold.
18      BY MS. GOODMAN:
19      Q.   So sitting here today, if you could
20  only rely on the census bureau to figure out
21  how much money was paid to Google through funds
22  allocated in Order 15, how would you do that?

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL

Page 302

1      MS. ZWOLINSKI: Objection. Form.
2  Foundation.
3      THE WITNESS: The only thing we have
4  is the post-buy analysis but it provides by
5  category, so anything that you devise, you --
6  you determine based upon the amount spent in
7  that category. I mean, I don't know that
8  anybody could come up with that efficiently,
9  you know, come up -- it would be a really rough
10 estimate.
11     BY MS. GOODMAN:
12     Q.   And using that post-buy analysis,
13 would you be able to determine the various
14 specific products or specific vendors used to
15 purchase that type of ad?
16     MS. ZWOLINSKI: Objection. Form.
17     THE WITNESS: No. The post-buy
18 analysis gives you information by audience, by
19 media type, by -- in some cases, geography, but
20 it does not specify vendors.
21     BY MS. GOODMAN:
22     Q.   And does it specify price?

Page 303

1      MS. ZWOLINSKI: Objection. Form.
2      THE WITNESS: Price by vendor?
3      BY MS. GOODMAN:
4      Q.   Sure.
5      A.   No. It is all aggregate
6  information.
7      Q.   Okay. And sitting here today, do
8  you have an understanding that the United
9  States is seeking to obtain damages from Google
10 in this lawsuit?
11     MS. ZWOLINSKI: Objection. Form.
12     THE WITNESS: I'm not sure what the
13 United States is trying to get from Google.
14     BY MS. GOODMAN:
15     Q.   Have you -- do you have any
16 understanding as to whether the census bureau
17 overpaid Google in the course of the 2020
18 census?
19     MS. ZWOLINSKI: Objection. Form.
20 Foundation.
21     THE WITNESS: I have no basis of
22 comparison.

Page 304

1      BY MS. GOODMAN:
2      Q.   So in the course of Order 15, to
3  your knowledge, did the census bureau purchase
4  any product directly from Google?
5      MS. ZWOLINSKI: Objection. Form.
6  Foundation.
7      THE WITNESS: Under Order 15 the
8  census bureau did not purchase anything
9  directly from Google.
10     BY MS. GOODMAN:
11     Q.   And under Order 15, did the census
12 bureau purchase any particular ad tech service
13 directly from Google?
14     MS. ZWOLINSKI: Objection. Form.
15 Foundation.
16     THE WITNESS: Under Order 15 the
17 census bureau did not purchase any particular
18 ad-serving technology -- I think that's what
19 you used -- from Google.
20     BY MS. GOODMAN:
21     Q.   And did the census bureau under
22 Order 15 purchase any open web display

Page 305

1  advertising directly from Google?
2      MS. ZWOLINSKI: Objection. Form.
3  Foundation.
4      THE WITNESS: No.
5      BY MS. GOODMAN:
6      Q.   And under Order 15, did the census
7  bureau pay Google directly for the use of
8  DV360?
9      MS. ZWOLINSKI: Objection. Form.
10 Foundation.
11     THE WITNESS: No.
12     BY MS. GOODMAN:
13     Q.   Did the census bureau pay Google
14 directly for the use of Google display network?
15     MS. ZWOLINSKI: Objection. Form.
16 Foundation.
17     THE WITNESS: No.
18     BY MS. GOODMAN:
19     Q.   And did the census bureau pay Google
20 directly for the use of Google marketing
21 platform?
22     MS. ZWOLINSKI: Objection. Form.

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL

Page 306

1  Foundation.
2      THE WITNESS:  No.
3      BY MS. GOODMAN:
4      Q.   To your knowledge, did the census
5  bureau pay Google directly for the use of
6  Google ads?
7      MS. ZWOLINSKI:  Objection.  Form.
8  Foundation.
9      THE WITNESS:  No.
10     BY MS. GOODMAN:
11     Q.   Are you aware of a census digital ad
12 study that is in the process of being prepared
13 at the census bureau?
14     MS. ZWOLINSKI:  Objection.  Form.
15     THE WITNESS:  Yes.
16     BY MS. GOODMAN:
17     Q.   What is the census digital ad study?
18     A.   The research arm or research
19 division of the decennial directorate utilized
20 any available data to determine whether or not
21 digital advertising -- I think -- digital
22 advertising was effective.

Page 307

1      Q.   And did you facilitate that
2  provision of data to the research division for
3  purposes of that study?
4      MS. ZWOLINSKI:  Objection.  Form.
5      THE WITNESS:  Yes.
6      BY MS. GOODMAN:
7      Q.   And what data was provided?
8      A.   A lot of things that I probably --
9  let's see.  A lot of industry terminology, so
10 whatever they were asking for, Reingold
11 understood it.  That's all that mattered, and
12 they provided it.  Census ID numbers, names of
13 ads, it's -- I don't -- it was a myriad of
14 information.  Any kind of identifier they could
15 -- that's -- I don't know.
16     Q.   Okay.
17     A.   It's a lot.
18     Q.   Did it include pricing data to your
19 knowledge?
20     MS. ZWOLINSKI:  Objection.  Form.
21     THE WITNESS:  I -- they may have
22 asked for it, but I don't think we provided it.

Page 308

1      BY MS. GOODMAN:
2      Q.   Why is that?
3      A.   Pricing data is proprietary to
4  the -- to the buying agencies, and they would
5  have only gotten aggregate.  There wouldn't
6  have been a price per ad, price -- we
7  wouldn't -- we didn't have that kind of
8  information to share.
9      Q.   Okay.  But Reingold was directed to
10 provide this data to the research division,
11 correct?
12     MS. ZWOLINSKI:  Objection.  Form.
13     THE WITNESS:  Anything that was not
14 proprietary, yes.
15     BY MS. GOODMAN:
16     Q.   And you've read the draft report; is
17 that correct?
18     MS. ZWOLINSKI:  Objection.  Form.
19     THE WITNESS:  Yes, some time ago.
20     BY MS. GOODMAN:
21     Q.   Back to the data, do you know
22 whether that data has been collected in

Page 309

1  connection with this litigation?
2      MS. ZWOLINSKI:  Objection.  Form.
3      THE WITNESS:  Not specifically.  It
4  would have been in whatever they -- if it was
5  -- if the draft report was in the share drive,
6  then -- or in my e-mail then -- or in my files,
7  then the answer would be yes but not
8  specifically.
9      BY MS. GOODMAN:
10     Q.   Okay.  But with respect to the
11 actual underlying data that is analyzed by the
12 research division, do you have access to that
13 data?
14     MS. ZWOLINSKI:  Objection.  Form.
15     THE WITNESS:  I am thinking.  I
16 honestly don't recall.
17     MS. GOODMAN:  Okay.  I will hand you
18 Exhibit 29, CENSUS-ADS-74490 through 42.
19     (Deposition Exhibit 29 was marked
20 for identification.)
21     BY MS. GOODMAN:
22     Q.   Okay.  This is the draft of the

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL

Page 310

1   census digital ad study, correct?
2        A.   Yes.
3        Q.   Okay.  And if you flip through at
4   least on page -- let's turn to Page 74509.  Do
5   you see a comment bubble with KBJ --
6        MS. ZWOLINSKI:  Are you on the
7   page --
8        BY MS. GOODMAN:
9        Q.   -- in the right-hand margin?
10       A.   509?
11       Q.   Yes.
12       A.   Yes.
13       Q.   And is that a comment bubble
14   authored by you, KBJ?
15       A.   That is me.
16       Q.   Okay.  And here you're stating that
17   there are public documents disclosing the
18   rounded amount for digital advertising but
19   providing exact numbers will lead the curious
20   to identify how much was spent per digital ad
21   for paid media.
22        Do you see that?

Page 311

1        A.   Yes.
2        Q.   So based on this comment, does it
3   sound accurate to you that there is pricing
4   data that was analyzed in connection with this
5   study but that it should not be publicly
6   reported?
7        MS. ZWOLINSKI:  Objection.  Form.
8        THE WITNESS:  Reading the
9   methodology cited on the page ending in 496,
10  second paragraph under methodology, they
11  mention response per impression rate, which
12  describe the percent of people who clicked on
13  the advertisement and the percent of people who
14  clicked and responded to the census after
15  seeing the advertisement.
16        That seems to be -- is that what I
17  was looking at?  I do not believe we gave them
18  actual cost data.
19        BY MS. GOODMAN:
20       Q.   Okay.  I will hand you CENSUS-ADS --
21  well, before I do that, you had an opportunity
22  in the course of the author of this report to

Page 312

1   review it and comment upon it, correct?
2        MS. ZWOLINSKI:  Objection.  Form.
3        THE WITNESS:  I'm sorry.  Can you
4   repeat.
5        BY MS. GOODMAN:
6        Q.   You had the opportunity to review
7   and comment on this draft report, correct?
8        A.   Yes.
9        Q.   And if there was anything that you
10  disagreed with, you would have indicated as
11  much in your comments?
12        MS. ZWOLINSKI:  Objection.  Form.
13        THE WITNESS:  Yes.
14        MS. GOODMAN:  Okay.  So I will hand
15  you Exhibit 30, CENSUS-ADS-74369 through 74414.
16        (Deposition Exhibit 30 was marked
17  for identification.)
18        MS. ZWOLINSKI:  Can I have a copy of
19  the document.
20        MS. GOODMAN:  Oh, I'm so sorry.
21        MS. ZWOLINSKI:  That's okay.
22        BY MS. GOODMAN:

Page 313

1        Q.   And this is a memo --
2        MS. ZWOLINSKI:  Just one second.
3   Sorry.
4        BY MS. GOODMAN:
5        Q.   -- for the record documenting the
6   release of the final version of the 2020 census
7   investigating digital advertising and online
8   response evaluation report, correct?
9        A.   Yes.
10        MS. ZWOLINSKI:  Objection.  Form.
11        THE WITNESS:  If I may, going back
12  to the previous question about cost data and my
13  comment, we did not provide cost data to them,
14  but by saying how many a ads ran and the total
15  amount spent, a curious person could try to do
16  some math to determine the act of cost.  That's
17  what my comment was referring to.  That's why
18  we rounded it versus being very specific.
19        BY MS. GOODMAN:
20       Q.   And this study advertises --
21  evaluates the effectiveness of digital
22  advertising, correct?

79 (Pages 310 - 313)

HIGHLY CONFIDENTIAL

Page 334

1   provided you legal advice?
2          MS. ZWOLINSKI: Objection. Form.
3          THE WITNESS: No.
4          BY MS. GOODMAN:
5      Q.   Okay.  And is your answer the same
6   in January of 2023?
7          MS. ZWOLINSKI: Objection. Form.
8          THE WITNESS: Yes.
9          BY MS. GOODMAN:
10     Q.   Okay.  And in the course of your
11  participation in this lawsuit if you've had
12  questions about your participation in this
13  lawsuit, have you turned to the attorneys at
14  the antitrust division with your questions?
15         MS. ZWOLINSKI: Objection. Form.
16         THE WITNESS: No.
17         BY MS. GOODMAN:
18     Q.   To whom have you turned, if anyone?
19     A.   Commerce.
20     Q.   And is that Mr. Cannon?
21     A.   That's Mr. Cannon, yes.
22     Q.   Do you consider the lawyers for the

Page 336

1          MS. GOODMAN: I have no further
2   questions.  I'll pass the witness.
3          MS. ZWOLINSKI: We have no
4   questions.
5          MS. GOODMAN: Okay.  Thank you so
6   much for your time, Ms. Oliphant.  I very much
7   appreciate it.
8          THE WITNESS: You're welcome.  Thank
9   you.
10         THE VIDEOGRAPHER: Off the record.
11         MS. GOODMAN: Okay.
12         THE VIDEOGRAPHER: This marks the
13  end of the deposition of Kendall Oliphant.  We
14  are going off the record at 18:24.
15         (Whereupon, the proceeding was
16  concluded at 6:24 p.m.)
17
18
19
20
21
22

Page 335

1   antitrust division to be lawyers for the census
2   bureau?
3          MS. ZWOLINSKI: Objection. Form.
4   Foundation.
5          THE WITNESS: I do not.
6          BY MS. GOODMAN:
7      Q.   Why not?
8          MS. ZWOLINSKI: Objection. Form.
9   Foundation.
10         THE WITNESS: Since census has their
11  own lawyers and we have commerce lawyers, and I
12  believe the commerce lawyers would be more --
13  more sort of categorized in that way versus
14  DOJ.
15         BY MS. GOODMAN:
16     Q.   Okay.  And is your answer the same
17  with respect to your participation in this
18  lawsuit as a representative of the census
19  bureau?
20         MS. ZWOLINSKI: Objection. Form.
21  Foundation.
22         THE WITNESS: Yes.

Page 337

1          CERTIFICATE OF NOTARY PUBLIC
2      I, Bonnie L. Russo, the officer before
3   whom the foregoing deposition was taken, do
4   hereby certify that the witness whose testimony
5   appears in the foregoing deposition was duly
6   sworn by me; that the testimony of said witness
7   was taken by me in shorthand and thereafter
8   reduced to computerized transcription under my
9   direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.
18
19         *[signature: Bonnie L. Russo]*
20         Notary Public in and for
21            the District of Columbia
22  My Commission expires: August 14, 2025

85 (Pages 334 - 337)