# EXHIBIT 15

Page 1

1            UNITED STATES DISTRICT COURT

             EASTERN DISTRICT OF VIRGINIA

2                  ALEXANDRIA DIVISION

3      - - - - - - - - - - - - - - - x

4        UNITED STATES, et al.,      :

5             Plaintiffs,            :

6          v.                        : Case No.

7        GOOGLE, LLC,                : 1:23-cv-00108

8             Defendant.             :

9      - - - - - - - - - - - - - - - x

                                  Monday, March 4, 2024

10                                       Washington, D.C.

11

        Job No. CS6484199

12     Videotaped Deposition of:

13                   WAYNE D. HOYER, Ph.D.,

14     called for oral examination by counsel for the

15     Defendant, pursuant to notice, at the United States

16     Department of Justice, Antitrust Division, 450 Fifth

17     Street, Northwest, Suite 11-248, Washington,

18     D.C. 20001, before Christina S. Hotsko, RPR, CRR, of

19     Veritext Legal Solutions, a Notary Public in and for

20     the District of Columbia, beginning at 8:33 a.m.,

21     when were present on behalf of the respective

22     parties:

Page 2

```
 1            A P P E A R A N C E S
 2   On behalf of Plaintiffs:
         AARON SHEANIN, ESQUIRE
 3   U.S. Department of Justice
     Antitrust Division
 4   450 Golden Gate Avenue, Suite 10-0101
     San Francisco, California
 5   (415) 229-2930
     aaron.shearnin@usdoj.gov
 6
         CHASE PRITCHETT, ESQUIRE
 7   United States Department of Justice
     Antitrust Division
 8   450 Fifth Street, Northwest, Suite 11-248
     Washington, D.C. 20001
 9   (202) 307-0924
     chase.pritchett@usdoj.gov
10
11   On behalf of Defendant:
         MEREDITH R. DEARBORN, ESQUIRE
12   Paul Weiss Rifkind Wharton & Garrison, LLP
     535 Mission Street, 24th Floor
13   San Francisco, California 94105
     (628) 432-5113
14   mdearborn@paulweiss.com
15       ANITA Y. LIU, ESQUIRE
     Paul Weiss Rifkind Wharton & Garrison, LLP
16   2001 K Street, Northwest
     Washington, DC 20006-1047
17   (202) 223-4363
     aliu@paulweiss.com
18
19   Also Present:
         Warren Brey, Video Technician
20       Suzanne Majewski, Economist, DOJ Antitrust Division
         Elizabeth Aramayo, DOJ Antitrust Division
21       Claire Cushman, DOJ Antitrust Division
         Marie Lise Levry, DOJ Antitrust Division
22
```

Page 3

```
 1                C O N T E N T S
 2   EXAMINATION BY:                              PAGE
 3     Counsel for Defendant                      06
 4     Counsel for Plaintiffs                    457
 5
 6
 7   HOYER DEPOSITION EXHIBITS:                   PAGE
 8   Exhibit 1   Hoyer Expert Report and Errata   04
 9   Exhibit 2   Simonson Expert Report           04
10   Exhibit 3   Research Article                 198
11   Exhibit 4   Advertiser Perceptions Website Printout   238
12   Exhibit 5   Article, Service brand relationship   328
                 quality:  Hot or cold?
```

Page 4

```
 1               P R O C E E D I N G S
 2         (Hoyer Deposition Exhibits 1 and 2
 3         premarked for identification and attached
 4         to the transcript.)
 5         VIDEO TECHNICIAN:  Good morning.  We're
 6   going on the record at 8:33 a.m. on March 3rd --
 7   I'm sorry, March 4th, 2024.
 8         This is media 1 of the video-recorded
 9   deposition of Professor Wayne Hoyer, taken by
10   counsel for the plaintiff in the matter of United
11   States --
12         MR. SHEANIN:  Counsel for defendant.
13         VIDEO TECHNICIAN:  I'm sorry.
14         -- by counsel for defendant in the matter
15   of United States, et al., versus Google, LLC,
16   filed in the District Court of the Eastern
17   District of Virginia, case
18   number 1:23-CV-00108-LMB-JFA.
19         The location of the deposition is at the
20   DOJ Antitrust Division Offices, 450 Fifth Street,
21   Northwest, Washington, D.C.
22         My name is Warren Brey representing
```

Page 5

```
 1   Veritext Legal Solutions.  I'm the videographer.
 2   The court reporter is Christina Hotsko from the
 3   firm of Veritext Legal Solutions.
 4         Counsel, please introduce yourselves for
 5   the record.
 6         MS. DEARBORN:  Meredith Dearborn,
 7   Paul Weiss, for Google.
 8         MS. LIU:  Anita Liu from Paul Weiss for
 9   Google.  L-i-u.
10         MR. SHEANIN:  Aaron Sheanin on behalf of
11   the United States.
12         MR. PRITCHETT:  Chase Pritchett on behalf
13   of the United States.
14         MS. MAJEWSKI:  Suzanne Majewski on behalf
15   of the United States.
16         VIDEO TECHNICIAN:  And court reporter,
17   please swear in the witness.
18   Whereupon,
19             WAYNE D. HOYER, Ph.D.,
20   being first duly sworn or affirmed to testify to
21   the truth, the whole truth, and nothing but the
22   truth, was examined and testified as follows:
```

2 (Pages 2 - 5)

Page 374

1  at 3:28 p.m.
2       (A recess was taken.)
3       VIDEO TECHNICIAN: We're now back on the
4  record at 3:42 p.m. You may proceed.
5       MS. DEARBORN: Thank you.
6  BY MS. DEARBORN:
7    Q. Welcome back, Dr. Hoyer.
8       Okay. When we broke, I had just turned
9  to paragraph 76 in your report. Do you have that
10 in front of you?
11   A. I do.
12   Q. The second sentence in this paragraph
13 says, "When the cost of a display ad tool
14 increases, a key (and perhaps the most common)
15 option for advertisers is to switch to another
16 display ad tool."
17      Do you see that?
18   A. I do.
19   Q. I notice there's no citation in that
20 sentence.
21      What is that statement based on?
22   A. It's based on my opinion. The key thing,

Page 375

1  whether it's the most common option or not, is
2  that it's not included as an option. And so it is
3  a -- by -- "perhaps the most common" meant just
4  that that's something -- there's different
5  competitors that you might switch to, but that's
6  not an option here.
7    Q. So you say it's -- that the statement is
8  based on your opinion.
9       What is the basis of your opinion?
10   A. Well, based on my knowledge of marketing,
11 that when -- if the cost of one alternative
12 increases, it is also a distinct possibility --
13 and I say perhaps; I didn't say it is -- that
14 perhaps it could be a very common option to switch
15 to a different programmatic display tool.
16   Q. What is your basis for believing that
17 switching between display ad tools is more common
18 or less common than switching to a different
19 display ad type?
20   A. I have no evidence. I'm simply trying to
21 point out that it is an option, a very viable
22 option that could occur.

Page 376

1    Q. And I think I botched my question, so let
2  me ask it again just to get a clean record.
3       What is your basis for believing that
4  switching between display ad tools is more common
5  or less common than switching to a different
6  advertising type?
7       MR. SHEANIN: Objection to form. Asked
8  and answered.
9       THE WITNESS: Yes, as I say, based on my
10 expert opinion, that's not the key aspect of my
11 criticism. My key criticism is that that is a
12 very viable option that is not given in the
13 survey.
14 BY MS. DEARBORN:
15   Q. Okay. I'm so sorry to do this. This is
16 literally just for a clean record. I have to ask
17 this, because you actually gave different answers
18 to the two questions that I asked, and I just
19 asked it to clean up the record.
20      My question is, what is your basis for
21 believing that switching between display ad tools
22 is more common or less common than switching to a

Page 377

1  different advertising type for advertisers?
2       MR. SHEANIN: Objection. Form. Asked
3  and answered.
4       THE WITNESS: And as I said, the key to
5  my opinion or my criticism is not whether or not
6  it's the most common. It's that it is an option
7  and it's a viable option and it's not an option in
8  the survey.
9  BY MS. DEARBORN:
10   Q. But you don't have a basis to say one way
11 or another what options available to advertisers
12 are more common than other options?
13      MR. SHEANIN: Objection. Form.
14      THE WITNESS: I'm not -- again, that's
15 not central to my opinion. That's why it's in
16 parentheses.
17 BY MS. DEARBORN:
18   Q. Okay. I understand it's not central to
19 your --
20   A. The key option for advertisers to switch
21 to another display tool.
22   Q. I'm just trying to get to the basis for

Page 378

1 your opinions, Dr. Hoyer, regardless of whether
2 it's central or not.
3     Is it fair to say that you have no basis
4 to say one way or the other what the most common
5 options are for advertisers?
6     MR. SHEANIN: Objection to form.
7     THE WITNESS: Again, most common is not
8 the critical thing. The key thing: It's a viable
9 option, as it says in my response. Whether it's
10 most common or not doesn't matter. The fact that
11 it is a viable option and it's not included makes
12 the question biased.
13 BY MS. DEARBORN:
14    Q. And you haven't done an evaluation one
15 way or the other as to what the most common
16 options are for advertisers in response to an
17 increase in the cost of a display ad tool, right?
18     MR. SHEANIN: Objection to form.
19     THE WITNESS: I mean, anyone that knows
20 anything about advertising could tell you that
21 it's an option that they have. It's common sense.
22 Are you saying they would never switch to another

Page 379

1 ad display tool?
2 BY MS. DEARBORN:
3    Q. I'm using your words, Dr. --
4    A. Yes.
5    Q. -- Hoyer, and I'm attempting to
6 understand the basis for them. That's really all
7 I'm asking. All right?
8     So you haven't done an evaluation one way
9 or another as to what the most common options are
10 in response to an increase in the cost of a
11 display ad tool for advertisers, correct?
12     MR. SHEANIN: Objection to form. And
13 asked and answered.
14     THE WITNESS: I have not, but it doesn't
15 matter in terms of my opinion.
16 BY MS. DEARBORN:
17    Q. Okay. Is it your opinion that it would
18 be impossible to test advertisers' diversion to
19 another advertising type because it is an option
20 for them to switch to another display ad tool?
21     MR. SHEANIN: Objection to form.
22     THE WITNESS: I'm not sure I understand

Page 380

1 that question.
2 BY MS. DEARBORN:
3    Q. Sure. Well, this is a -- you are
4 claiming that this question is biased because the
5 most common -- or a key option for advertisers is
6 to switch to another display ad tool and not to a
7 different advertising type, right?
8     MR. SHEANIN: Objection. Form.
9     THE WITNESS: Well, as I just said, it's
10 a viable option. So what is your question?
11 BY MS. DEARBORN:
12    Q. Right.
13     Is it your opinion that it would be
14 impossible to test advertisers' diversion to
15 another advertising type because it is also an
16 option for them to switch to another display ad
17 tool?
18     MR. SHEANIN: Objection to form.
19     THE WITNESS: You can do it. He did it,
20 but it's not reliable. It's not what reflects the
21 realistic marketplace condition.
22

Page 381

1 BY MS. DEARBORN:
2    Q. Do you think it's unrealistic for the
3 cost of something to go up?
4    A. I think it's unrealistic for the cost of
5 the entire -- all of programmatic display
6 advertising at the same time, yes, which is what
7 the question states.
8    Q. What other display ad tools are available
9 to advertisers in addition to those provided by
10 Google?
11    A. Well, there's a whole list of them in
12 Simonson's report.
13     You've already asked me that, and I don't
14 remember the names.
15    Q. We've talked about your experience
16 teaching marketing courses over the course of the
17 day, right?
18    A. Yes.
19    Q. Based on what you know, is it possible
20 that a company wanting to advertise its services
21 would use both a banner ad on a website and also
22 an ad on Facebook to advertise their products?

96 (Pages 378 - 381)

Page 382

1    MR. SHEANIN: Objection to form.
2    THE WITNESS: Sure. That's good
3  advertising. You use different tools to reach
4  different aspects of your target market.
5  BY MS. DEARBORN:
6    Q. Based on your experience, is it fairly
7  common for advertisers to use multiple advertising
8  types to reach their customers?
9    A. Yes. But that's not my -- the
10  understanding of the case. The case is switching
11  between different ad tools, not to other
12  advertising types.
13    Q. And again, you're -- strike that.
14    All right. Looking at paragraph 77 in
15  your report.
16    So in this paragraph, you question the
17  sort of order of Dr. Simonson's questions, right?
18    A. Yes.
19    Q. Do any of the sources that you cite in
20  footnote 133 -- I'm sorry, 143 here state that
21  respondents would have been more likely to select
22  that they would substantially increase spending

Page 383

1  because they were first asked a question about
2  whether they would divert spending?
3    MR. SHEANIN: Objection. Form.
4  Foundation.
5    THE WITNESS: The sources are not in the
6  context of that specific question, but they talk
7  specifically about priming effects, which is
8  what's occurring here.
9  BY MS. DEARBORN:
10    Q. And I believe I know the answer to this
11  question, but you didn't conduct a survey that
12  would eliminate what you call the priming effects
13  of these questions, correct?
14    MR. SHEANIN: Objection to form.
15    THE WITNESS: As I said, it was not part
16  of my assignment, but it would have been incumbent
17  upon Simonson to demonstrate that in his survey if
18  he had pretested properly.
19  BY MS. DEARBORN:
20    Q. Okay. Now, you take issue with the fact
21  that respondents were first asked if they would
22  divert spending and then asked them to which types

Page 384

1  of digital advertising they would divert spending
2  and then asked them how much they would divert,
3  right?
4    A. Yes.
5    Q. Is it your opinion that Professor
6  Simonson should not have asked three questions
7  about diversion?
8    A. I would have to give thought to that.
9  But yes, it's telling them -- it's focusing them
10  on spending, which increases their likelihood of
11  increasing their spending later on.
12    Q. Are you --
13    A. Perhaps he could have separated with
14  other questions to divert them away from that, but
15  I would need to give some thought of how to
16  accomplish that.
17    Q. Is your issue that three questions is
18  just too many?
19    A. It's not too many. It's in a row, you
20  know, spend, spend, spend. And it primes them, as
21  I say, to increase their advertising spending.
22  And related to the demand effects, it's cluing me

Page 385

1  in: Ah, they want me to increase my spending.
2  And so that's -- the demand effect works in there
3  as well.
4    Q. Are --
5    A. That's part of the priming effect.
6    Q. Are you suggesting that Professor
7  Simonson should have asked about the extent of
8  diversion before asking respondents whether they
9  would divert?
10    MR. SHEANIN: Objection. Form.
11    THE WITNESS: No. I'm just saying that
12  perhaps he could have -- and again, I would need
13  to give this some thought. He could have asked
14  questions in between that so that it breaks up the
15  sequence of spend, spend, spend.
16  BY MS. DEARBORN:
17    Q. Earlier in your report you critique
18  Dr. Simonson for switching between perspectives,
19  right?
20    A. Yes.
21    Q. Wouldn't asking questions about diverting
22  and then switching to a different topic and then

97 (Pages 382 - 385)

Page 386

1  switching back to diversion also be confusing or
2  taxing to respondents?
3      MR. SHEANIN:  Objection to form.
4      THE WITNESS:  The prospective issue is
5  about, is it my unit, is it me, is it my company?
6  This is not -- it's still focused on what you
7  would do here, so it's not changing perspective.
8  BY MS. DEARBORN:
9      Q.  So it's taxing to change perspectives in
10 questions but not to change topics?
11     A.  Well, every question changes topics in
12 the survey.  I'm just saying the sequence here is
13 that it's priming responding, and it's suggesting
14 to them that increasing my spending is important
15 and, therefore, that could have inflated their
16 answers.
17     Q.  How would you have designed a survey that
18 asked respondents whether they would do something
19 and then tests how much they would do it --
20     MR. SHEANIN:  Objection to form.
21 BY MS. DEARBORN:
22     Q.  -- without priming them?

Page 387

1      A.  As I said --
2      MR. SHEANIN:  Same objection.
3      THE WITNESS:  Sorry.
4      You could perhaps break it up and ask a
5  simple question in between.  I haven't given it
6  extensive thought, but -- I would need some time
7  to develop that.  But I would be concerned about
8  that.
9      And by the way, I believe it also extends
10 to later questions, too.  Like I believe question
11 9 is -- 8 and 9 further are along the same lines,
12 if I remember correctly.
13 BY MS. DEARBORN:
14     Q.  In your experience as a marketing expert,
15 have you ever seen a survey that asks three
16 questions in a row about a particular topic?
17     A.  Yes, I have.  And it would be a criticism
18 of my review.  That's why we talk about priming in
19 research, because it is an issue.
20     Q.  Have you ever conducted a survey that
21 asks three questions in a row about a particular
22 topic, to your knowledge?

Page 388

1      A.  I -- not to my -- I can't tell you.
2  There's hundreds of studies I've done.  I would
3  hope I did not, but I can't remember.
4      Q.  Okay.  In paragraph 77(b), you take issue
5  with Professor Simonson's slider in the answer
6  choices for high spend, question 7, and then the
7  corresponding ones in the low spend in the agency
8  survey, right?
9      A.  Correct.
10     Q.  You take issue with the fact that it
11 starts -- the slider starts with keep the same as
12 zero?
13     A.  Yes.  Well, two issues.  That it starts
14 with zero and it's not the full continuum.  They
15 don't -- he doesn't have the ability to decrease.
16     Q.  Right.  So you think that the zero in
17 that sliding scale should have been labeled
18 decrease?
19     A.  No.  It -- well, it shouldn't have
20 been -- I'd have to -- there should be a scale
21 that goes from decrease up to increase.  In the
22 middle -- it could be a bipolar scale where it's

Page 389

1  negative numbers and zero is the middle.  But it
2  wouldn't need ten points in that case.
3      Q.  In order to get to question 7,
4  respondents had to answer that they would have
5  diverted spending to another advertising type,
6  right?
7      A.  Yes.
8      Q.  So why would it have made sense to label
9  one end of the slider as decreased if they had
10 already indicated that they would divert spending?
11     A.  Because the set of ad tools is a whole
12 set that -- it might be, if you're suddenly not
13 going to use display advertising, you could
14 possibly increase some and decrease others.  You
15 could completely re-evaluate your entire set of
16 tools, and it may be some of the other tools you
17 also -- you decide to decrease and increase
18 others, put more emphasis on YouTube ads or -- and
19 then allocate spending less to other tools.
20     It doesn't automatically mean you
21 increase everything that you're going to divert
22 to.

Page 458

1  Q. How would you go about determining
2 whether or not different people from the same
3 company or from different business units within
4 the same company took the survey?
5  A. You would need a question or data on
6 that. And in his instructions, he -- it is
7 completely anonymous. And looking back at the
8 backup data, there was no question on what company
9 they were from, so there's no way to evaluate
10 that.
11     MR. SHEANIN: Thank you. I have no
12 further questions.
13     MS. DEARBORN: Nothing further.
14     VIDEO TECHNICIAN: Okay. This now ends
15 the deposition of Dr. Wayne Hoyer. We're off the
16 record at 5:16 p.m.
17     (Whereupon, at 5:16 p.m., the videotaped
18     deposition of WAYNE D. HOYER, Ph.D., was
19     concluded.)
20
21
22

Page 459

1     CERTIFICATE OF NOTARY PUBLIC
2     I, CHRISTINA S. HOTSKO, the officer before
3 whom the foregoing deposition was taken, do hereby
4 certify that the witness whose testimony appears in
5 the foregoing deposition was duly sworn by me; that
6 the testimony of said witness was taken by me in
7 stenotypy and thereafter reduced to typewriting under
8 my direction; that said statement is a true record of
9 the proceedings; that I am neither counsel for,
10 related to, nor employed by any of the parties to the
11 action in which this statement was taken; and,
12 further, that I am not a relative or employee of any
13 counsel or attorney employed by the parties hereto,
14 nor financially or otherwise interested in the
15 outcome of this action.
16 Dated: March 6, 2024
17
18     CHRISTINA S. HOTSKO
19     Notary Public in and for the
20         District of Columbia
21 My commission expires:
22 1 January 2027

116 (Pages 458 - 459)