# EXHIBIT 16

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

UNITED STATES,              ) 1:23-cv-00108-LMB-JFA
et al.,                     )
                            )
    Plaintiffs,             )
                            )
vs.                         )
                            )
GOOGLE LLC,                 )
                            )
    Defendant.              )
_____)


VIDEOTAPED DEPOSITION OF
LARA STOTT
September 18, 2023
9:33 a.m.




Reported by:  Bonnie L. Russo
Job No. 6097869

Page 2

1  Videotaped Deposition of Lara Stott held at:
2
3
4
5
6    Paul Weiss Rifkind Wharton & Garrison, LLP
7    2001 K Street, N.W.
8    Washington, D.C.
9
10
11
12
13
14
15
16
17
18  Pursuant to Notice, when were present on behalf
19  of the respective parties:
20
21
22

Page 4

1  APPEARANCES (CONTINUED):
2
3  Also Present:
4  Captain Michael Ellis, Deputy Staff Advocate,
5  Air Force Recruiting
6  Lieutenant Grant Wahlquist, Air Force
7  Commercial Law, Field Support Center
8  Orson Braithwaite, Videographer
9
10  Also Present Via Remotely:
11  Katherine Clemons, DOJ
12
13
14
15
16
17
18
19
20
21
22

Page 3

1  APPEARANCES:
2
3  On behalf of the Plaintiffs:
4    MARK H.M. SOSNOWSKY, ESQUIRE
5    RACHEL ZWOLINSKI, ESQUIRE
6    ALVIN CHU, ESQUIRE
7    UNITED STATES DEPARTMENT OF JUSTICE
8    450 Fifth Street, N.W.
9    Washington, D.C. 20530
10   mark.sosnowsky@usdoj.gov
11   rachel.zwolinski@usdoj.gov
12   alvin.chu.liu@usdoj.gov
13
14  On behalf of the Defendant:
15   HEATHER MILLIGAN, ESQUIRE
16   MARTHA L. GOODMAN, ESQUIRE
17   PAUL, WEISS, RIFKIND, WHARTON &
18   GARRISON, LLP
19   2001 K Street, N.W.
20   Washington, D.C. 20006
21   hmilligan@paulweiss.com
22   mgoodman@paulweiss.com

Page 5

1              I N D E X
2  EXAMINATION OF LARA STOTT          PAGE
3  BY MS. MILLIGAN                      9
4
5              EXHIBITS
6  Exhibit 118    LinkedIn Profile of   15
7                 Lara Stott
8  Exhibit 119    E-Mail Chain          36
9                 dated 9-14-22
10                USAF-ADS-0000860595-602
11 Exhibit 120    Article entitled      37
12                "Recruiting is hard.
13                these YouTubers may have
14                cracked the code"
15 Exhibit 121    E-Mail Chain          86
16                dated 6-14-22
17                Attachment
18                USAF-ADS-0000861537-609
19 Exhibit 122    E-Mail Chain         122
20                dated 9-18-22
21                Attachment
22                USAF-ADS-0000001422-476

2 (Pages 2 - 5)

Page 50

1  those events as well.
2       BY MS. MILLIGAN:
3       Q.  And where -- where does he post
4  those videos?
5       A.  On his YouTube channel, and then I
6  believe -- again, I'm not entirely sure, but I
7  believe that he is also going to be posting
8  cut-downs of those videos on his social media
9  accounts.  Whether that be Facebook or
10  Instagram, I'm not sure.
11      Q.  All right.  And just so I
12  understand, his -- his contract is with GSD&M;
13  is that right?
14      MR. SOSNOWSKY:  Objection.  Form.
15  Foundation.
16      THE WITNESS:  Yes, it is.
17      BY MS. MILLIGAN:
18      Q.  Did -- did the overall message of
19  this article come as a surprise to you when you
20  first read it?
21      MR. SOSNOWSKY:  Objection.  Form.
22      THE WITNESS:  So the message of the

Page 51

1  article is not surprising.  The -- some of the
2  conclusions that the author makes I disagree
3  with.
4       BY MS. MILLIGAN:
5       Q.  Okay.  For example what -- I'm
6  sorry.  Strike that.
7       Could you give me an example of one
8  of the conclusions that you disagree with.
9       A.  And, again, it has been several
10  months since I read this article in full, but
11  some of the influencers that she was
12  interviewing, while I agree with them that
13  content needs to be authentic and be relevant
14  to social media users, in this instance,
15  Generation Z, I do not necessarily buy into the
16  notion that people who are outside the air
17  force can necessarily tell an accurate air
18  force story unless they have a personal
19  connection to the air force.
20      Q.  Understood.  Did this article,
21  Exhibit 120, and in the questions that arose
22  out of it, for example, with the TMT, change

Page 52

1  how air force recruiting service uses social
2  media to recruit?
3       MR. SOSNOWSKY:  Objection.
4  Foundation.
5       THE WITNESS:  No.  We were already
6  using social media like this before this
7  article came out.
8       BY MS. MILLIGAN:
9       Q.  Okay.  And when you say "like this,"
10  what do you mean?
11      A.  Using airmen ambassadors as
12  influencers on our social media channels and
13  partnering with external organizations, such as
14  the UFC, to work with people who have large
15  social media followings.
16      Q.  And to the best of your knowledge,
17  is that what the BBP -- is that the message
18  the --
19      A.  The bullet background paper.
20      Q.  -- the bullet background paper
21  conveyed?
22      A.  Without seeing the bullet background

Page 53

1  paper, it's hard for me to answer that.
2       Q.  Okay.  Fair.
3       Has the way that AFRS uses social
4  media to recruit changed at all since you first
5  joined AFRS?
6       MR. SOSNOWSKY:  Objection.  Form.
7       THE WITNESS:  I don't believe it has
8  changed.  It has probably continued to evolve,
9  but it hasn't -- I believe AFRS was already
10  kind of on this path before.
11      What we are trying to do right now
12  is to kind of tweak, refine, and make sure that
13  the content that we're putting on social media
14  continues to be authentic, trying some new
15  methods in terms of how we capture that content
16  so that it's not always polished, you know, the
17  difference in the quality of the video, if you
18  will, to make things be more authentic, whether
19  that's capturing it with someone's phone.
20      We continue to try to tell real
21  stories of airmen, to answer questions like can
22  I have a dog in the air force or can I get

14 (Pages 50 - 53)

Page 54

1  married or, you know, can I continue to compete
2  on a volleyball team or, you know, whatever
3  that particular prospect's question might be
4  that is really misinformed by their stereotype
5  of serving in the military.
6      BY MS. MILLIGAN:
7      Q.   And has -- has the amount that the
8  air force recruiting service invests in social
9  media to recruit increased in the time that you
10 have been there?
11     MR. SOSNOWSKY:  Objection.
12 Foundation.
13     THE WITNESS:  Are you talking about
14 organic social media or paid social media at
15 this point?
16     BY MS. MILLIGAN:
17     Q.   Let's start with paid social media.
18     A.   The first time I actually asked how
19 much we were spending on digital platforms, not
20 specifically paid social, but digital in
21 general, we were over 80 percent, and the last
22 time I checked it, we were at 84 percent.

Page 55

1  So it has not significantly changed.
2  It would be within a few percentage points.
3      Q.   And what is your definition of paid
4  social media?
5      A.   What is my definition of paid social
6  media?
7      Q.   Yes.  When you used the term "paid
8  social media," what are you referring to?
9      A.   That's actually a media buy on a
10 social media channel.
11     Q.   Okay.  And what are -- what are
12 social media channels?
13     A.   Facebook, Instagram, Twitter,
14 LinkedIn.
15     Q.   What about Reddit?
16     A.   Yes.
17     Q.   Twitch?
18     A.   Yes.  I would really call that more
19 of a media platform but...
20     Q.   And when you -- what would you be
21 differentiating between there by calling Twitch
22 a media platform versus a --

Page 56

1      A.   I would compare Twitch more --
2      MR. SOSNOWSKY:  Hold on.  Sorry.
3  Just let her finish the question.
4      THE WITNESS:  I'm sorry.
5      MR. SOSNOWSKY:  That's okay.
6      BY MS. MILLIGAN:
7      Q.   -- versus a social media platform?
8      A.   I would compare Twitch more to like
9  a YouTube because it's really more content that
10 people are going and viewing.  Yes, they are
11 able to comment on it, but it's not purely
12 driven by people posting content to one
13 another.
14     It's -- that's probably more of a
15 personal observation than anything, but that's
16 how I think about it.
17     Q.   All right.  And then TikTok, is that
18 an example of a social media platform?
19     A.   Yes.  TikTok is a social media
20 platform but it's not one that we are allowed
21 to be on.
22     Q.   Understood.  Okay.  I'll come back

Page 57

1  -- oh, what about Snapchat?
2      A.   Yes.
3      Q.   Snapchat is a social media platform?
4      A.   Correct.
5      Q.   Okay.  And then what do you mean
6  when you use the word "organic social"?
7      A.   The way air force recruiting service
8  talks about organic social, that is when we are
9  actually posting content to our owned
10 platforms, so that would be the air force
11 recruiting service channel of Facebook,
12 Twitter, et cetera.
13     Q.   And does it cost money for air force
14 recruiting services to post on organic social
15 media?
16     MR. SOSNOWSKY:  Objection.
17 Foundation.
18     THE WITNESS:  It does not cost us
19 money to post on our own channels, but we do
20 work through GSD&M and they post on our behalf.
21     BY MS. MILLIGAN:
22     Q.   Why is that?

Page 58

1  A.  Primarily, it's a manpower issue.
2  Q.  Okay. And does air force recruiting
3  service compensate GSD&M for the use of its
4  manpower as it relates to posting on organic
5  social media?
6      MR. SOSNOWSKY: Objection.
7  Foundation.
8      THE WITNESS: Yes, we do. We have a
9  task order with them specifically for organic
10 social media.
11     BY MS. MILLIGAN:
12 Q.  All right. And then a few minutes
13 ago, you said that the first time that you
14 actually asked about how much you were
15 spending, I had asked about your spend on
16 social media -- strike that.
17     I had asked about your spend on
18 social media and you said that the first time
19 you actually asked how much you were spending,
20 you asked about spending on digital platforms
21 not specifically social.
22     Do you recall saying that?

Page 59

1      MR. SOSNOWSKY: Objection. Form.
2      THE WITNESS: Yes.
3      BY MS. MILLIGAN:
4  Q.  Okay. So what is encompassed in
5  digital platforms that is -- that is not the
6  paid social platforms we just discussed?
7      MR. SOSNOWSKY: Objection. Form.
8      THE WITNESS: That would also be any
9  type of online advertising, streaming, well,
10 websites are online, so I don't mean to be
11 redundant, but we would consider digital
12 anything that isn't linear broadcast or cinema,
13 if we have to go through a digital platform to
14 deliver the message.
15     In this day and age, you can't think
16 of it anymore as the -- as the, you know, piece
17 of equipment somebody is viewing it from
18 because they can view television on their iPad,
19 also, right. So it has more to do with the --
20 where the platform sets I guess so...
21     BY MS. MILLIGAN:
22 Q.  And is that how -- in doing your

Page 60

1  media planning, is that -- do you think about
2  it from that platform basis as opposed to the
3  device basis?
4      MR. SOSNOWSKY: Objection. Form.
5      THE WITNESS: We try to look at it
6  in terms of where our specific target audiences
7  are spending the most amount of time. So when
8  we look at a specific target audience, we are
9  looking at how much time they are spending on a
10 desktop, on a mobile device, on a traditional
11 television, you know, so different I guess
12 delivery methods of that media.
13     BY MS. MILLIGAN:
14 Q.  Do the ads that air force recruiting
15 services run for a given media plan change
16 whether they are being viewed on a -- let's
17 say, iPad pad versus an iPhone?
18     MR. SOSNOWSKY: Objection. Form.
19     THE WITNESS: No. No. It is more
20 about the platform that the -- the target
21 audience is visiting from whatever device they
22 are using.

Page 61

1      BY MS. MILLIGAN:
2  Q.  Okay. And so the same question
3  about whether it's on laptop versus tablet
4  versus iPhone?
5      MR. SOSNOWSKY: Objection. Form.
6      THE WITNESS: Yes. We would -- we
7  would be more considerate of the platform as
8  opposed to the device.
9      BY MS. MILLIGAN:
10 Q.  Turning back to Exhibit 119, this is
11 the e-mail with the TMT, and if you look
12 actually now at the last two pages, so this is
13 860601 and 860602, do you see that there are
14 two messages that begin: "RSM Comments?
15 A.  No -- yes. Okay.
16 Q.  Are these similar to the TMTs?
17     MR. SOSNOWSKY: Objection. Form.
18     THE WITNESS: One minute.
19     BY MS. MILLIGAN:
20 Q.  I can ask a more specific question.
21     At least the request in the first
22 RSM comment message appears to be similar to

16 (Pages 58 - 61)

Page 254

1   MS. MILLIGAN: This is prior to
2   outreach by counsel, so --
3   MR. SOSNOWSKY: I understand that,
4   but I'm -- well, I can still instruct her just
5   because she has already asked several questions
6   about the time line. Okay. She says when she
7   was with somebody that reached out --
8   MS. MILLIGAN: Or you can just give
9   the -- instruct -- just give the instruction to
10  the witness.
11  MR. SOSNOWSKY: Okay. So I'm going
12  to instruct you not to reveal privileged
13  communications or information or activities
14  that were done at the instruction of counsel
15  that came from counsel.
16  THE WITNESS: Okay. Then, no, I
17  can't answer that question.
18  BY MS. MILLIGAN:
19  Q.  Okay. So your only knowledge of --
20  of the air force's involvement in this
21  litigation came from counsel or communications
22  that were done at the direction of counsel?

Page 255

1   That's a yes-or-no question.
2   MR. SOSNOWSKY: Object to form.
3   But you can answer that yes or no.
4   THE WITNESS: Yes.
5   BY MS. MILLIGAN:
6   Q.  Prior to this lawsuit in your -- in
7   your role at the air force, were you aware of
8   any anticompetitive conduct on the part of
9   Google affecting U.S. Air Force's advertising?
10  MR. SOSNOWSKY: Objection to form.
11  Foundation.
12  THE WITNESS: No, I don't believe I
13  was.
14  BY MS. MILLIGAN:
15  Q.  Prior to this lawsuit, did you have
16  any concerns that Google was engaging in
17  anticompetitive conduct related to digital
18  advertising?
19  MR. SOSNOWSKY: Objection to form.
20  Foundation.
21  THE WITNESS: Again, I just -- I
22  want to be clear when you use words like "have

Page 256

1   concerns with."
2   My primary function is to make sure
3   that we are executing an efficient marketing
4   plan in order to achieve an end recruiting
5   mission. So insomuch as any vendor would be
6   performing or not performing, that's really
7   what I am looking at.
8   BY MS. MILLIGAN:
9   Q.  So you did not have specific
10  concerns as to Google?
11  MR. SOSNOWSKY: Objection to form.
12  THE WITNESS: I don't recall any
13  specific issues or challenges or concerns with
14  respect specifically to Google. But, again, it
15  would have been as a part of a broader
16  marketing program in order to meet an end
17  recruitment mission.
18  BY MS. MILLIGAN:
19  Q.  And earlier you said that you were
20  not worrying about the lawsuit on a day-to-day
21  basis.
22  Are you worrying about it at all?

Page 257

1   MR. SOSNOWSKY: Objection to form.
2   THE WITNESS: Am I worrying about a
3   lawsuit at all; is that what you're asking?
4   BY MS. MILLIGAN:
5   Q.  Yeah. Yes.
6   MR. SOSNOWSKY: Same objections.
7   THE WITNESS: No. Again, I have
8   such a long list of things to do that this is
9   not high on that priority list.
10  BY MS. MILLIGAN:
11  Q.  Prior to this lawsuit -- sorry.
12  Strike that.
13  Where on the priority list is it?
14  MR. SOSNOWSKY: Objection to form.
15  THE WITNESS: Well down below all of
16  those other things that get us to meeting
17  mission requirements and any other special
18  projects that I get assigned to in order to
19  make things at air force recruitment service
20  marketing work better.
21  BY MS. MILLIGAN:
22  Q.  And earlier we mentioned

Page 258

1  communications with counsel and communications
2  at the direction of counsel.
3        So setting aside that first
4  category, how did you know that certain
5  communications were at the direction of
6  counsel?
7        MR. SOSNOWSKY: Objection to form.
8        THE WITNESS: Yeah. I'm not sure I
9  understand the question.
10       BY MS. MILLIGAN:
11    Q.  Did you ever receive a communication
12 related to this litigation that you understood
13 was at the direction of counsel but did not
14 include a lawyer on the communication?
15       MR. SOSNOWSKY: Objection to form.
16 Foundation.
17       THE WITNESS: I don't recall.
18       BY MS. MILLIGAN:
19    Q.  Did anyone at GSD&M ever tell you
20 that Google was engaging in anticompetitive
21 conduct?
22    A.  No.

Page 259

1     Q.  Did anyone at GSD&M ever tell you
2  that Google was causing you to pay more for
3  digital advertising?
4        MR. SOSNOWSKY: Objection to form.
5        THE WITNESS: We look at how each of
6  the vendors are performing against benchmark,
7  how they're performing against those key
8  performance indicators that we've talked about,
9  whether that be impressions, engagements, or
10 new contacts.
11       So any context where we would have
12 had a conversation about how any vendor was
13 performing would have been, again, in the
14 context of performance only and efficiency
15 insomuch as the -- the channel or the vendor or
16 the tactic was performing against either a
17 previous year or a benchmark.
18       BY MS. MILLIGAN:
19    Q.  Okay. And so did anyone at GSD --
20 GSD&M ever tell you that Google was causing air
21 force to pay more for open web display
22 advertising?

Page 260

1        MR. SOSNOWSKY: Objection. Form.
2        THE WITNESS: I had not heard the
3  term that you just said, open web whatever,
4  until I read the lawsuit, so no.
5        BY MS. MILLIGAN:
6     Q.  What do you -- do you understand
7  what that term means?
8     A.  It's really not kind of what I am
9  doing on a day-to-day basis because, again, I
10 am not a media buyer and I don't have that
11 background or knowledge.
12       We refer to it as programmatic
13 display or data-driven display. So those terms
14 I have a little bit of understanding or better
15 understanding of but not the one that -- I've
16 already forgotten what you said. Sorry. Open
17 web whatever.
18    Q.  Did you ever heard -- did you ever
19 hear the term "open web display advertising"
20 used when you were responsible for the Weber
21 Shandwick contract with the army?
22       MR. SOSNOWSKY: Objection to form.

Page 261

1        THE WITNESS: No. Like I said, I'd
2  never heard that term before.
3        BY MS. MILLIGAN:
4     Q.  Do you have a practice of encrypting
5  your e-mails?
6        MR. SOSNOWSKY: Objection.
7        THE WITNESS: I don't think that
8  there is a way to encrypt e-mails unless it's
9  already encrypted through the government
10 system, but that's way beyond my knowledge
11 base.
12       BY MS. MILLIGAN:
13    Q.  Okay. So you personally -- you
14 don't have a practice of encrypting your
15 e-mails at work?
16    A.  No. I am not even sure I would know
17 how to do that if there was a way to do it.
18    Q.  Do you use your personal e-mail for
19 work purposes?
20    A.  Not generally, no.
21    Q.  Have you ever used your personal
22 e-mail for work purposes?

Page 262

1  A. I did go back and look to see if I
2  had ever done that, and I counted a total of
3  six e-mails in the two and a half years. Three
4  of them were about manning a position that we
5  were getting ready to hire that had nothing to
6  do with media buying. Two of them were me
7  sending something to myself to print out at
8  home. It was like a W-2 and pay stub. And one
9  of them was an e-mail I sent while on vacation
10 to a colleague who was having a bad day.
11     Q. Okay. So those are e-mails that you
12 sent from your personal e-mail to your work
13 e-mail?
14     A. Yes.
15     Q. Okay. Do you know if you have ever
16 -- so you mentioned those six e-mails. Do you
17 know if you ever deleted anything from your
18 personal e-mail that related to work?
19     A. No. They are all still there.
20     Q. Meaning could there have been more
21 than those six e-mails?
22         MR. SOSNOWSKY: Objection to

Page 263

1  foundation.
2         THE WITNESS: It's possible, but it
3  would have only been, like, maybe in the first
4  couple of days that I was working and I hadn't
5  gotten an e-mail -- e-mail address set up at
6  work yet.
7         BY MS. MILLIGAN:
8      Q. And do you know if your personal
9  e-mail was collected for purposes of this
10 litigation?
11     A. I am not aware that it was, no.
12     Q. Are you -- do you know whether your
13 work e-mail was collected for purposes of this
14 litigation?
15     A. It's my understanding that it was,
16 yes.
17     Q. Do you use Teams chat?
18     A. We use Teams for, like, video
19 conference calls, and there are -- there are
20 chats open in that, and I know that there is a
21 chat function on Teams, but I typically don't
22 use Teams in a chat function. I would e-mail

Page 264

1  before I would do that.
2      Q. Do you know if the chats within the
3  videos are saved at -- once the video closes?
4      A. I don't know. You would have to ask
5  our IT folks for that.
6      Q. And you said you know there is a
7  chat function in Teams separate from the video.
8         Have you ever used that chat
9  function for work purposes?
10     A. It is certainly possible. We have
11 lots of cross-functional teams all the time
12 that are, you know, working on various
13 initiatives. So I am sure at some point that I
14 have used it.
15     Q. What about your personal phone? Do
16 you use your personal phone for work purposes?
17     A. I will use it to send a text message
18 typically about, you know, if somebody is
19 running late or something like that, but that's
20 really about it.
21     Q. And do you use any other messaging
22 platforms in the course of your work?

Page 265

1      A. Like -- give me an example.
2      Q. Skype?
3      A. Oh, no.
4         MS. MILLIGAN: Can we take a break?
5         MR. SOSNOWSKY: Sure.
6         THE VIDEOGRAPHER: The time is 4:31
7  p.m. We are off the record.
8         (A short recess was taken.)
9         THE VIDEOGRAPHER: The time is 4:41
10 p.m. This begins Unit 5. We are on the
11 record.
12        MS. MILLIGAN: Ms. Stott, I don't
13 have any further questions. I want to thank
14 you for your time.
15        Subject to any further questioning
16 from your counsel, I won't have any further
17 questions.
18        MR. SOSNOWSKY: No -- no questions
19 on our side but we would like to read and sign.
20        MS. MILLIGAN: Okay. Great. Thank
21 you.
22        MR. SOSNOWSKY: Thank you.

67 (Pages 262 - 265)

Page 266

1  THE VIDEOGRAPHER: The time is 4:42
2  p.m. We are off the record.
3      (Whereupon, the proceeding was
4  concluded at 4:42 p.m.)

Page 267

1           CERTIFICATE OF NOTARY PUBLIC
2      I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10 record of the testimony given by said witness;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this deposition was taken; and further,
14 that I am not a relative or employee of any
15 attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.
18
19      _____
20          Notary Public in and for
21           the District of Columbia
22  My Commission expires: August 14, 2025.

Page 268

1  Mark Sosnowsky, Esq.
2  mark.sosnowsky@usdoj.gov
3              September 19, 2023
4  RE:   United States, Et Al v. Google, LLC
5    9/18/2023, Lara Stott (#6097869)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25

Page 269

1  United States, Et Al v. Google, LLC
2  Lara Stott (#6097869)
3         E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 Lara Stott                    Date
25

68 (Pages 266 - 269)