# EXHIBIT 17

HIGHLY CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
 2                 ALEXANDRIA DIVISION
 3
     _____
 4                              :
     UNITED STATES OF AMERICA,   :
 5   et al.,                     :
                                 :
 6         Plaintiffs            :
                                 :
 7         v.                    :  No.  1:23-cv-00108
                                 :
 8   GOOGLE, LLC,                :
                                 :
 9         Defendants.           :
     _____ :
10
11                 HIGHLY CONFIDENTIAL
12
                Monday, August 21, 2023
13
14         Video Deposition of CHRISTOPHER KOEPKE,
15   taken at the Law Offices of Paul, Weiss,
16   Rifkind, Wharton & Garrison LLP, 2001 K St NW,
17   Washington, DC, beginning at 9:35 a.m. Eastern
18   Standard Time, before Ryan K. Black, Registered
19   Professional Reporter, Certified Livenote
20   Reporter and Notary Public in and for the
21   District of Columbia
22
23
24
25   Job No. CS6043164
```

HIGHLY CONFIDENTIAL

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   UNITED STATES DEPARTMENT OF JUSTICE
     ANTITRUST DIVISION
 4   BY: KATHERINE CLEMONS, ESQ.
        VICTOR LIU, ESQ.
 5      ALVIN CHU, ESQ.
        MARK SOSNOWSKY, ESQ. - Via Zoom
 6   450 5th Street, N.W
     Washington, DC 20530
 7   202.514.2414
     katherine.clemons@usdoj.gov
 8   victor.liu@usdoj.gov
     alvin.chu@usdoj.gov
 9   mark.sosnowsky@usdoj.gov
10   Representing - The United States of America
11
12   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP,
     BY: MARTHA L. GOODMAN, ESQ.
13      HEATHER C. MILLIGAN, ESQ.
     2001 K St NW,
14   Washington, DC
     202.223.7341
15   mgoodman@paulweiss.com
     hmilligan@paulweiss.com
16
     Representing - Google LLC
17
18
19
20
21
22
23   ALSO PRESENT:
24   Orson Braithwaite - Legal Videographer
     Kenneth Whitley - Department of Health and Human
25               Services
26
```

Page 3

```
 1              I N D E X
 2   TESTIMONY OF: CHRISTOPHER KOEPKE        PAGE
 3   By Ms. Goodman................................6
 4         E X H I B I T S
 5   EXHIBIT     DESCRIPTION          PAGE
 6   Exhibit 65   a document Bates Numbered
              CMS-ADS-11906 through 11974...117
 7
     Exhibit 66   a document Bates Numbered
 8            CMS-ADS-23248 through 23337...136
 9   Exhibit 67   a document Bates Numbered
              CMS-ADS-59892 through 59893...151
10
     Exhibit 68   a document Bates Numbered
11            CMS-ADS-593107 through 593110..167
12   Exhibit 69   a document Bates Numbered
              CMS-ADS-183807 through 183811..181
13
     Exhibit 70   a document Bates Numbered
14            CMS-ADS-529199 through 529200..190
15   Exhibit 71   a document Bates Numbered
              CMS-ADS-189390.................251
16
     Exhibit 72   a document Bates Numbered
17            CMS-ADS-64968 through 64971....258
18   Exhibit 73   a document Bates Numbered
              CMS-ADS-440295.................265
19
     Exhibit 74   a document Bates Numbered
20            CMS-ADS-531032 through 531072..268
21   Exhibit 75   a document Bates Numbered
              CMS-ADS-569654 through 569667..273
22
23
24
25
```

Page 4

```
 1        THE VIDEOGRAPHER: Good morning. We are
 2   going on the record at 9:35 a.m. on August 21st,
 3   2023. Please note that the microphones are
 4   sensitive and may pick up whispering and private
 5   conversations. Please mute your phones at this
 6   time. Audio and video recording will continue to
 7   take place unless all parties agree to go off the
 8   record.
 9        This is Media Unit 1 of the
10   video-recorded deposition of Mr. Christopher
11   Koepke in the matter of United States, et al.,
12   versus Google, LLC, filed in the United States
13   District Court Eastern District of Virginia
14   Alexandria Division, Case Number
15   1:23-cv-00108-LMB-JFA.
16        My name is Orson Braithwaite,
17   representing Veritext Legal Solutions, and I'm
18   the videographer. The court reporter is Ryan
19   Black, from the firm Veritext Legal Solutions.
20        Counsel will now state their appearances
21   and affiliations for the record.
22        MS. GOODMAN: Martha Goodman, from Paul
23   Weiss, on behalf of Google LLC.
24        MS. MILLIGAN: Heather Milligan, also on
25   behalf of Paul Weiss, for Google.
```

Page 5

```
 1        MS. CLEMONS: Katherine Clemons, with
 2   the Department of Justice, on behalf of the
 3   United States of America, CMS and the witness.
 4        MR. LIU: Victor Liu, also with the
 5   Department of Justice, on behalf of the United
 6   States and CMS.
 7        MR. CHU: Alvin Chu, on behalf of United
 8   States.
 9        MR. WHITLEY: Kenneth Whitley, Office of
10   General Counsel, Department of Health and Human
11   Services.
12        MS. GOODMAN: And could the folks
13   attending remotely please state your presence?
14        MR. SOSNOWSKY: Mark Sosnowsky,
15   Department of Justice, and I will be in and out
16   of this deposition remotely. So if you lose me,
17   please don't -- you can continue.
18        THE VIDEOGRAPHER: Thank you.
19        Would the court reporter please swear in
20   the witness?
21           *   *   *
22   Whereupon --
23        CHRISTOPHER KOEPKE,
24   called to testify, having been first duly sworn
25   or affirmed, was examined and testified as
```

2 (Pages 2 - 5)

Page 202

1  term, do you view that -- the different products
2  and services for reaching your intended audience
3  to be reasonably interchangeable?
4       MS. CLEMONS: Objection; form. Calls
5  for a legal conclusion.
6       THE WITNESS: No.
7  BY MS. GOODMAN:
8     Q. Why not?
9     A. Well, number one, they reach different
10 audiences.
11      I'll also say, I should have predicated
12 my response on, are we talking about a particular
13 campaign, because it does change from campaign to
14 campaign.
15    Q. Okay. Let's -- let's pick Open
16 Enrollment general market. In the circumstance
17 where you optimize your advertising spend during
18 that campaign intending to reach the general
19 market audience, do you view the different
20 vendors or providers of advertising that you are
21 optimizing among is reasonably interchangeable?
22      MS. CLEMONS: Objection; form. Calls
23 for a legal conclusion.
24      THE WITNESS: I just have to ask you,
25 what Open Enrollment are you talking about? I'm

Page 203

1  sorry. I just have so many different projects.
2  BY MS. GOODMAN:
3     Q. Yeah. Sure. It doesn't really matter
4  for purposes of my question. Any Open Enrollment
5  period -- well, strike that. Let's go back to an
6  example.
7     A. You know what, my ask was, just to you
8  up a little bit --
9     Q. Okay.
10    A. -- Medicare or Healthcare.gov.
11    Q. I see, I meant Healthcare.gov.
12    A. Okay.
13    Q. So if you're making optimizations for
14 Open Enrollment Healthcare.gov across vendors or
15 providers of advertising services, do you view
16 those vendors or -- as reasonably interchangeable
17 with one another?
18      MS. CLEMONS: Objection to form. Calls
19 for a legal conclusion.
20      THE WITNESS: No.
21 BY MS. GOODMAN:
22    Q. Okay. Why not?
23    A. Well, I have many places to start on
24 this answer, but just what we've been talking
25 about for the last few hours, or however long --

Page 204

1  it felt longer than this, I know it's only been
2  an hour -- the optimizations. The mere fact that
3  we make optimizations means that, on any given
4  moment on any given campaign, some of these
5  vendors, tactics, channels, are reaching and
6  giving us a better return on investment. So
7  that -- that alone right there.
8       If you took a step higher, you would say
9  most logged-in experiences; say, Facebook, have a
10 limited audience. Part of that audience might be
11 engaged. It might be worthwhile for us to -- to
12 -- to buy some ads there. And if we look at our
13 performance reports, over the years, and still
14 holds up, Facebook tends to give us emails. With
15 things like Google Display, it has a much broader
16 audience. It's more likely to help us find
17 people who are -- who need healthcare -- who need
18 access to healthcare, because it's a very diverse
19 group of people. And Google -- Google Display
20 can deliver ads to a more diverse group because
21 it goes everywhere.
22      And so as such, they're just not the
23 same. Plus the way the different places like
24 Instagram and Facebook, they have rules about
25 what their ads look like, as do displays, and

Page 205

1  those ads don't actually look the same. The
2  messaging you put in there can be different and
3  is different. So what you can explain to your
4  audience is different in those different
5  platforms, as well. So, no, they are not
6  interchangeable. That's just two examples.
7     Q. Okay. And each channel can perform
8  differently based on your intended audience or
9  goals, correct, for any given campaign?
10      MS. CLEMONS: Objection to form.
11      THE WITNESS: Each -- as -- I'm sorry.
12 It was a long question. Each --
13 BY MS. GOODMAN:
14    Q. Let me rephrase.
15    A. Okay. I'm so sorry.
16    Q. It's okay. No --
17    A. The first half is what I forgot, yes.
18    Q. That's okay.
19      No one channel always performs the same
20 for every campaign, correct?
21      MS. CLEMONS: Objection to form.
22      THE WITNESS: I would agree with that.
23 BY MS. GOODMAN:
24    Q. Okay. And so what channels you choose
25 depends on your campaign goals, correct?

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

Page 206

1  A.  Among other things, yes.
2  Q.  Okay. And how each channel is
3  performing during the life of a campaign varies
4  across campaigns, correct?
5      MS. CLEMONS: Objection to form.
6      THE WITNESS: What was the first part
7  that varies across campaigns?
8  BY MS. GOODMAN:
9  Q.  How each channel is performing during
10 the life of a campaign varies between campaigns,
11 correct?
12     MS. CLEMONS: Objection to form.
13     THE WITNESS: I -- that's kind of a
14 vague question, but I -- I think, yes, is --
15 BY MS. GOODMAN:
16 Q.  In other words, you can't expect a
17 channel to perform exactly the same way in every
18 campaign that the Strategic Marketing Group runs,
19 correct?
20     MS. CLEMONS: Objection to form.
21     THE WITNESS: I think looking at the
22 word "exactly," I focus on that and agree. But
23 there are certain ways that they perform that we
24 do expect; --
25 BY MS. GOODMAN:

Page 207

1  Q.  Okay.
2  A.  -- we do track that and see if our
3  expectations are met.
4  Q.  And how do you track that to see if your
5  expectations are met?
6  A.  Well, some of the emails here that we've
7  -- we've gone over today give examples of, mostly
8  in this case, last-click attribution. We also
9  talked about the cross-channel report. So in
10 real life we can -- we can see certain things
11 that allow to us make optimizations.
12 Q.  Okay.
13     MS. CLEMONS: We've been going for about
14 90 minutes.
15     THE WITNESS: Does anybody need a break?
16 How much time do we have left before we hit seven
17 hours?
18     MS. GOODMAN: Well, why don't we just
19 take a break for a moment.
20     THE WITNESS: Okay. I'm happy to give
21 you a break.
22     THE VIDEOGRAPHER: The time is 3:47 p.m.
23 This ends Unit 4. Off the record.
24     (Recess taken.)
25     THE VIDEOGRAPHER: The time is 4:06 p.m.

Page 208

1  This begins Unit Number 5. We're on the record.
2  BY MS. GOODMAN:
3  Q.  Mr. Koepke, in the course of your work
4  at CMS in the Strategic Marketing Group, have you
5  become familiar with a term Open Web Display
6  Advertising?
7  A.  That is not a word that we generally
8  use. So in the course of the work, no, I have
9  not become familiar.
10 Q.  Okay. How about in any conversations
11 with your advertising agencies, have you heard
12 them use the term Open Web Display Advertising?
13 A.  Not that I recall.
14 Q.  Okay. Do you recall ever reading any
15 documents in the course of your work at CMS using
16 the term Open Web Display Advertising?
17     MS. CLEMONS: Objection to
18 the extent that it calls for privileged
19 communications with counsel. If you can
20 answer without being informed by privileged
21 communications with counsel, you can answer.
22 BY MS. GOODMAN:
23 Q.  Are you able to answer now?
24 A.  I cannot.
25 Q.  Okay. And so to be clear, my question

Page 209

1  was, in the course of your work, your day-to-day
2  job at CMS in the Strategic Marketing Group, have
3  you read any documents using the term Open Web
4  Display Advertising?
5  A.  Not to my recollection.
6  Q.  Okay. Based on your experience
7  directing advertising campaigns for CMS, do you
8  have an understanding of what the term Open Web
9  Display Advertising means?
10     MS. CLEMONS: Objection; foundation.
11     THE WITNESS: Based on my advertising
12 work, my understanding of that term would be
13 conjecture.
14 BY MS. GOODMAN:
15 Q.  Why would it be conjecture -- gen -- why
16 would your understanding of the term Open Web
17 Display Advertising, based on the -- your
18 advertising work, be conjecture?
19 A.  Because we haven't used that term based
20 on my advertising work. But I understand English
21 pretty well, so I would parse the words. But
22 that parsing would be mine and not who wrote it.
23 Q.  Based on your advertising work, is the
24 term Open Web Display Advertising one commonly
25 used in the advertising industry?

Page 210

1  MS. CLEMONS: Objection; foundation.
2  THE WITNESS: I can't speak to common
3  use in the advertising industry. But I can speak
4  to our work, and we do not commonly use it.
5  BY MS. GOODMAN:
6  Q. So sitting here today -- well, other
7  than my asking you, sitting here today, about the
8  term Open Web Display Advertising, have you ever
9  heard it before?
10  MS. CLEMONS: Objection. To the extent
11  that you can answer without revealing privileged
12  communications, you may do so.
13  BY MS. GOODMAN:
14  Q. Are you able to answer that question,
15  sir?
16  A. No.
17  Q. Okay. And is that because the only
18  place you've otherwise heard the term Open Web
19  Display Advertising is in privileged
20  communications with counsel?
21  MS. CLEMONS: Objection. I'm going to
22  instruct the witness not to answer that question
23  which calls for privileged communications with
24  counsel and their substance.
25  BY MS. GOODMAN:

Page 211

1  Q. Are you going to answer that question
2  -- follow that instruction?
3  A. Yes, I am.
4  Q. Okay. So sitting here today, do you
5  have any understanding of what the term Open Web
6  Display Advertising means?
7  A. Only the conjecture we discussed
8  earlier.
9  Q. Okay. No other understanding, correct.
10  MS. CLEMONS: Objection to the extent
11  that question calls for the -- for -- for
12  privileged communications with counsel.
13  You can answer if your answer would not
14  be informed by privileged communications.
15  BY MS. GOODMAN:
16  Q. May -- are you able to answer that
17  question?
18  A. No.
19  Q. Okay. In the course of your work as
20  strategic marketing director at CMS, have you
21  ever become aware of any conduct by Google that
22  negatively impacted CMS's advertising?
23  MS. CLEMONS: Objection to form.
24  THE WITNESS: In all my work as a
25  director of Strategic Marketing Group, yes.

Page 212

1  BY MS. GOODMAN:
2  Q. And what -- what conduct by Google are
3  you -- were you -- have you become aware of that
4  has negatively impacted CMS's advertising?
5  MS. CLEMONS: Objection to the extent
6  that question calls for the substance of
7  privileged communications with counsel. If your
8  question -- if you can answer the question
9  without being informed by privileged
10  communications, you may do so.
11  THE WITNESS: This year there was a
12  report on Google Video Network suggesting that
13  Google was placing videos on not prime properties
14  or publishers when advertisers have been
15  expecting other types of placements. And to the
16  degree that that report is true -- that's still
17  being debated by many people, including our group
18  -- then there could be some negative impact.
19  BY MS. GOODMAN:
20  Q. So do you know, one way or another, that
21  -- whether this report to which you're referring
22  is true?
23  MS. CLEMONS: Objection to form.
24  THE WITNESS: No, I don't.
25  BY MS. GOODMAN:

Page 213

1  Q. And do you know where this report was
2  published? What outlet?
3  A. I do, but it's, like, lost in the
4  recesses of my brain. I could pull it up in my
5  emails.
6  Q. Was it ProPublica?
7  A. Yes.
8  Q. Okay.
9  A. Thank you.
10  Q. You're welcome.
11  What steps, if any, have you taken to
12  figure out if the reporting in this ProPublica
13  article is true?
14  A. First, we looked into whether or not we
15  placed ads in the -- the type of service that
16  ProPublica was talking about. And I do have to
17  correct one of my answers, because one thing we
18  discovered was that when we explicitly said not
19  to use that network, Google used it anyway. And
20  so there are some negotiations going on about
21  that right now. And so there's that. But then
22  when we placed it in that network on purpose, we
23  are still trying to assess, and we, indeed, have
24  met with Google salespeople who, of course, have
25  argued that the ProPublica report is not correct.

Case 1:23-cv-00108-LMB-JFA   Document 581-17   Filed 04/26/24   Page 7 of 8 PageID# 8677

HIGHLY CONFIDENTIAL

Page 214

1  So we are trying to figure that out.
2     Q.  When you say, "when we explicitly said
3  not to use that network," what -- what networks
4  are you referring to?
5     A.  I'm going to get the names wrong, so
6  please forgive me.  But there are different
7  products, if you will, that Google offers for
8  placing video ads, and I just can't think of the
9  names of them right now.  It's late afternoon.
10 The -- and not even caffeine will bring that back
11 alive right now.  But when looking at our ad buys
12 and the different possibilities, we instructed
13 Weber and Weber instructed Google to not use the
14 one that ProPublica's talking about.  Because
15 it's not all YouTube ads and all YouTube
16 placements that are a problem.  It's this one
17 product line.
18    And -- and we have discovered that they
19 actually did place some ads there.
20    Q.  Okay.  What -- what discussions have you
21 had with Google salespeople about this issue?
22    MS. CLEMONS:  Objection to form.
23    THE WITNESS:  We've had -- I'll say I
24 have had one meeting with them.  It was their
25 desire to explain to us their take on the story.

Page 215

1  BY MS. GOODMAN:
2     Q.  Who from Google did you meet with?
3     A.  I do not know all the names of people.
4  I know the person who set it up.
5     Q.  Who is that?
6     A.  Her last name -- boy, I'm trying to
7  think of her first name now.  She is our main
8  sales contact.  H-i-n-k-e [sic] would be her last
9  name.
10    Q.  Okay.
11    A.  Oh my goodness.  Michelle.
12    Q.  And did that take place -- did that
13 meeting that you're recalling take place in
14 January of 2023, to the best of your
15 recollection?
16    A.  No, it did not take place in January of
17 2023.
18    Q.  When did it take place, to the best of
19 your recollection?
20    A.  Sometime in the last three months.
21    Q.  Okay.
22    A.  After the ProPublica report was
23 published.  So that will at least give you that
24 end of the date.
25    Q.  Okay.  Do you know an individual by the

Page 216

1  name Sean Harrison?
2     A.  Yes.
3     Q.  Is he somebody that you've met with from
4  Google?
5     A.  Yes.
6     Q.  Was he at this ProPublica meeting, we'll
7  call it?
8     A.  I'm not sure.  There's about four people
9  from Google, and I'm just -- sorry.
10    Q.  Okay.  Have you ever met Sean Harrison?
11    A.  Unless I'm getting my Seans mixed up,
12 which is a hundred percent possible, I would say
13 yes.
14    Q.  Okay.  Under what circumstances did you
15 meet with Sean Harrison from Google?
16    A.  If I'm talking about the right Sean, so
17 I say -- I realize that I could be mis -- so when
18 Michelle sets up the meetings, she invites Shawn
19 at times.
20    Q.  Can you -- sitting here today, do you
21 recall any specific -- any particular meeting
22 that you and Sean Harrison were at together?
23    A.  I -- I wish I could pull it up on my
24 -- on my email so I'd make sure I'm -- we're
25 talking about the same Sean.  But, if we are, he

Page 217

1  is a person who has access to and does analytics
2  of Google data that Google does not give us
3  access to do analytics for.  And he would have
4  done some analytics at our request.
5     Q.  Okay.  Do you know an individual by the
6  name of Kunal Khanna from Google?
7     A.  I do.
8     Q.  And is that a person that you have had
9  occasion to communicate with relating to CMS's
10 advertising work with Google?
11    A.  Yes.
12    Q.  Do you have -- remember any meetings
13 with Mr. Khanna?
14    A.  Yes.
15    Q.  What meetings do you remember?
16    A.  So he's been moved to another account,
17 and I don't remember exactly when that happened.
18 Michelle was his placement [sic].  But they were
19 of the same type.  They -- Google definitely
20 reaches out to us as a -- as a client, which I
21 imagine they would think we're an important
22 client.  And those meetings would be -- they
23 provide analytics that they did on their own on
24 our campaigns, usually to suggest that running
25 more ads on Google networks were a -- was a good

55 (Pages 214 - 217)

Veritext Legal Solutions
800-567-8658                                                                                           973-410-4098

HIGHLY CONFIDENTIAL

Page 290

1  deposition is over and that Google does not have
2  grounds to hold the deposition open.
3       MS. GOODMAN:  Okay.  Thank you for your
4  time, Mr. Koepke.
5       THE WITNESS:  It was my pleasure.  This
6  was fun.
7       THE VIDEOGRAPHER:  Time is 6:23 p.m.
8  We're off the record.
9       (Deposition concluded -- 6:23 p.m.)

Page 292

1  Katherine Clemons Esq
2  Katherine.clemons@usdoj.gov
3         August 22nd, 2023
4  RE:   United States, Et Al v. Google, LLC
5     8/21/2023, Christopher Koepke (#6043164)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 (erratas-cs@veritext.com).
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions

Page 291

1           C E R T I F I C A T E
2
3     I do hereby certify that I am a Notary
4  Public in good standing, that the aforesaid
5  testimony was taken before me, pursuant to
6  notice, at the time and place indicated; that
7  said deponent was by me duly sworn to tell the
8  truth, the whole truth, and nothing but the
9  truth; that the testimony of said deponent was
10 correctly recorded in machine shorthand by me and
11 thereafter transcribed under my supervision with
12 computer-aided transcription; that the deposition
13 is a true and correct record of the testimony
14 given by the witness; and that I am neither of
15 counsel nor kin to any party in said action, nor
16 interested in the outcome thereof.
17
18     WITNESS my hand and official seal this
19 22nd day o
20
21        [signature]
22           Notary Public

Page 293

1  United States, Et Al v. Google, LLC
2  Christopher Koepke (#6043164)
3         E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 Christopher Koepke              Date