# EXHIBIT 18

HIGHLY CONFIDENTIAL

Page 1

```
 1
 2            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 3                    ALEXANDRIA DIVISION
 4      _____
 5   UNITED STATES,       )1:23-cv-00108-LMB-JFA
     et al.,              )
 6                        )
         Plaintiffs,      )
 7                        )
     vs.                  )
 8                        )
     GOOGLE LLC,          )
 9                        )
         Defendants.      )
10      _____)
11
12              - HIGHLY CONFIDENTIAL -
13
14            VIDEOTAPED DEPOSITION OF
15               CHRISTOPHER KARPENKO
16               August 10, 2023
17                  9:35 a.m.
18
19
20
21
22      Reported by:  Bonnie L. Russo
        Job No. 6031969
```

---

HIGHLY CONFIDENTIAL

Page 2

```
 1      Videotaped Deposition of Christopher Karpenko
 2      held at:
 3
 4
 5
 6      Paul, Weiss, Rifkind, Wharton & Garrison, LLP
 7                2001 K Street, N.W.
 8                Washington, D.C.
 9
10
11
12
13
14
15
16
17
18      Pursuant to Notice, when were present on behalf
19      of the respective parties:
20
21
22
```

---

HIGHLY CONFIDENTIAL

Page 3

```
 1      APPEARANCES:
 2
 3      On behalf of the Plaintiffs:
 4         JAMES RYAN, ESQUIRE
 5         DAVID GROSSMAN, ESQUIRE
 6         ALVIN CHU, ESQUIRE
 7         UNITED STATES DEPARTMENT OF JUSTICE
 8         450 5th Street, N.W.
 9         Washington, D.C. 20530
10         james.a.ryan@usdoj.gov
11         david.grossman@usdoj.gov
12         alvin.chu@usdoj.gov
13
14      On behalf of the Defendant:
15         MARTHA L. GOODMAN, ESQUIRE
16         ANNELISE CORRIVEAU, ESQUIRE
17         PAUL, WEISS, RIFKIND, WHARTON &
18         GARRISON, LLP
19         2001 K Street, N.W.
20         Washington, D.C. 20006
21         mgoodman@paulweiss.com
22         acorriveau@paulweiss.com
```

---

HIGHLY CONFIDENTIAL

Page 4

```
 1      APPEARANCES (CONTINUED):
 2
 3
 4      Also Present:
 5      Glen Fortner, Videographer
 6      Michael Weaver, United States Postal Service
 7
 8
 9      Also Present Via Remotely:
10      Julia Wood, DOJ
11      Sean Carman, DOJ
12      Katherine Clemens, DOJ
13      Jeannie S. Rhee, Paul, Weiss, Rifkind, Wharton
14      & Garrison, LLP
15
16
17
18
19
20
21
22
```

HIGHLY CONFIDENTIAL

Page 137

```
1    January of 2023 regarding ad spend?
2        A.    That may be difficult for me to
3    answer because the UM team is about media and
4    ad spend and it could encompass almost anything
5    tied to our advertising efforts.
6        Q.    Is it a normal part of your daily
7    work -- is it a routine part in your work to
8    have a one-on-one conversation with Ms. Catucci
9    about ad spend?
10       A.    It would not be an exception.
11       Q.    Okay.  And subsequent to January of
12   2023, have you requested information from
13   United -- Universal McCann based on a
14   conversation with your counsel?
15       A.    I'm not sure -- I'm not sure about
16   the question.  Could you help me.
17       Q.    Yeah.  After the complaint in this
18   case was filed in January of 2023, have you
19   made requests to Universal McCann for
20   information in order to participate in this
21   lawsuit?
22             MR. RYAN:  Counsel, I'm going to
```

HIGHLY CONFIDENTIAL

Page 138

```
1    object.  That's calling for privileged -- it's
2    calling for privileged communication.  I would
3    --
4              MS. GOODMAN:  It is precisely the
5    same kind of testimony you've already permitted
6    him to provide.  I am not asking for an
7    instance --
8              MR. RYAN:  Well, that was a mistake
9    on my part.
10             MS. GOODMAN:  -- I am asking a
11   yes-or-no question, which is whether he has
12   asked -- and I'll restate my question.
13             BY MS. GOODMAN:
14       Q.    Mr. Karpenko, after January of 2023,
15   have you requested information from Universal
16   McCann as a result of a conversation with your
17   counsel?
18       A.    I would say I have requested and
19   received various information from Universal
20   McCann both tied to privilege and not tied to
21   privilege.
22             MS. GOODMAN:  We're going to move to
```

HIGHLY CONFIDENTIAL

Page 139

```
1    compel on those communications too.
2              BY MS. GOODMAN:
3        Q.    Prior to January of 2023 in the
4    course of your work at the United States Postal
5    Service, did you ever develop any concerns that
6    Google was engaging in anticompetitive conduct?
7        A.    I was unaware of any anticompetitive
8    conduct from Google.
9        Q.    And in the course of your work as a
10   -- the executive director for brand marketing
11   at the postal service, did you ever develop any
12   concerns that you paid super-competitive prices
13   for Google products?
14       A.    Can you clarify the -- the question.
15       Q.    Yeah.  In the course of your work as
16   executive director for brand marketing and
17   participating as an advertiser in the
18   advertising space, did you ever develop any
19   concerns that the postal service was paying too
20   much money for products or services from
21   Google?
22             MR. RYAN:  Object to the form.
```

HIGHLY CONFIDENTIAL

Page 140

```
1              THE WITNESS:  In my role I have a
2    responsibility for hundreds of millions of
3    dollars of budget, so I am always keeping top
4    of mind that we're spending our investments or
5    our moneys appropriately and getting the best
6    value for that.
7              So from a macro perspective, we're
8    always looking at trying to get the best value.
9              BY MS. GOODMAN:
10       Q.    I appreciate that answer.  And my
11   question is a bit more specific.
12             Understanding that context that
13   you're always trying to get the best value for
14   USPS ad spend, my question is:  Did you ever
15   develop any concerns in the course of your work
16   as executive director for brand marketing that
17   the postal service was paying too much money
18   for products or services offered by Google?
19       A.    So --
20             MR. RYAN:  Object to form.
21             THE WITNESS:  So whether it's Google
22   or another entity, we -- we have a fixed budget
```

HIGHLY CONFIDENTIAL

Page 141

1    and we have to work within what those rates are

2    offered for our -- for media.  It could be in

3    any media format.

4          We take that budget.  We take our

5    desired outcome, and we try to apply an

6    omni-channel approach to maximize or efforts.

7    If we find that something isn't giving us the

8    return on our investment or we are finding

9    other channels that might be more conducive, we

10   reallocate, and then we assign it to the UM

11   to -- to purchase for us.

12         We use a term called "return on ad

13   spend" that helps us try to maximize our

14   efforts in a way that if we're given a rate, we

15   are not necessarily able to negotiate with, so

16   we have to figure out how to have the same

17   impact within our campaigns for the limited

18   amount of dollars that we have.

19         BY MS. GOODMAN:

20   Q.    All right.  So based on your prior

21   two answers, I'm understanding your testimony

22   that you never developed a specific concern

---

HIGHLY CONFIDENTIAL

Page 142

1    that the postal service was paying too much

2    money for products or services offered by

3    Google.

4          Am I understanding your testimony

5    correctly that you never had such a specific

6    concern as to Google?

7          MR. RYAN:  Objection to form and

8    foundation.

9          THE WITNESS:  So Google offers a lot

10   of products and services.  Our interaction with

11   Google is fairly vast at the postal service.

12   We do things beyond advertising and marketing

13   with them.

14         So when you're asking about products

15   and services it's a pretty broad ask for me.

16   So could you help narrow it down for me.

17         BY MS. GOODMAN:

18   Q.    Yes.  My question is specific to

19   Google products or services relating -- with

20   respect to digital advertising.  Okay.  So I

21   don't care about Gmail or Google Workspace or

22   Google Drive.

---

HIGHLY CONFIDENTIAL

Page 143

1          Specific to products and services

2    related to digital advertising, did you, in

3    your capacity as executive director for brand

4    marketing at the postal service, based on your

5    knowledge and experience executing ad

6    campaigns, ever develop a specific concern that

7    the postal service was paying too much money

8    for Google products or services related to

9    digital advertising?

10   A.    So I might refrain that to say we --

11   Q.    Sir, I'm sorry to interrupt you, but

12   my question is my question, and I am asking you

13   to answer it as I have posed it rather than

14   reframing it and answering a different

15   question.

16         So can you please try to --

17         MR. RYAN:  The witness is trying to

18   answer your question, Martha.

19         BY MS. GOODMAN:

20   Q.    -- to answer my question as to any

21   specific concern as to Google specifically and

22   the prices paid for the use of Google products

---

HIGHLY CONFIDENTIAL

Page 144

1    or services for digital advertising.

2          MR. RYAN:  I'm going to object to

3    form.  And the witness -- let the witness try

4    to answer the question.

5          THE WITNESS:  The postal service

6    doesn't directly use products from Google such

7    as DV360 for placement of advertising.  We pay

8    to place advertising on Google's environment so

9    that we can reach our customers.  I can't -- I

10   can't evaluate their products that enable one

11   to put media onto the various sites.

12         BY MS. GOODMAN:

13   Q.    And why can't you evaluate Google's

14   products that enable one to put media onto the

15   various sites?

16   A.    The postal service created a

17   contract with UM as a media agency of record

18   for media.

19         UM then places on behalf of the

20   postal service media in various environments,

21   and if they are utilizing Google's products to

22   do that, we don't -- we don't dictate that and

Page 145

1    we don't -- we don't really have a lot of
2    visibility on that part of the business.
3        Q.    In your capacity as executive
4    director for brand marketing for the postal
5    service, do you have any basis to know how much
6    money the postal service has paid to Universal
7    McCann for the use of Google products or
8    services related to digital advertising?
9        A.    I don't have knowledge of the fees
10   associated to use the products as much as our
11   organization has visibility on the media spent
12   in place for our various campaigns.
13       Q.    And so am I understanding you
14   correctly that you do not know at a more
15   granular level the fees paid by Universal
16   McCann, if any, directly to Google for the
17   placement of USPS digital advertising?
18       MR. RYAN:  I'm going to object to
19   form and foundation.
20       THE WITNESS:  I'm unaware of the
21   specific fees that UM and Google may take or
22   share in -- in that sense.  I am more aware of

Page 146

1    the media dollars spent that we -- we control
2    when we give over to Universal McCann.
3        BY MS. GOODMAN:
4        Q.    Okay.  Prior to January of 2023, had
5    you been aware of any investigation by the
6    Department of Justice into Google's advertising
7    businesses?
8        MR. RYAN:  Objection to form.
9        THE WITNESS:  I was not aware of
10   anything.
11       BY MS. GOODMAN:
12       Q.    Okay.  Have you received a
13   litigation hold related to this lawsuit?
14       A.    I believe I've received a litigation
15   hold for this effort.
16       Q.    Do you recall when you received a
17   litigation hold for this effort?
18       A.    I don't.
19       Q.    Do you recall whether it was before
20   or after the filing of the complaint?
21       A.    I don't know.
22       Q.    So do you know whether it was before

Page 147

1    or after January 24th of 2023?
2        A.    I don't know.
3        Q.    Okay.  What is your understanding of
4    what this lawsuit is about?
5        A.    It appears there's a complaint that
6    has been filed alleging Google having a
7    monopolistic market in being able to provide
8    and purchase media.
9        Q.    And what is your understanding of
10   the United States Postal Service's role in this
11   lawsuit?
12       A.    Postal service is a part of the
13   federal government.  Postal service has
14   purchased media.
15             I am here today to answer your
16   questions.
17       Q.    Do you have an understanding whether
18   the United States Postal Service would gain to
19   recover any money as a result of this lawsuit?
20       MR. RYAN:  I am going to instruct
21   the witness -- to the extent that you have
22   knowledge solely because of conversations with

Page 148

1    counsel, not to answer the question.
2        THE WITNESS:  I can't answer that
3    question.
4        BY MS. GOODMAN:
5        Q.    And is that because you only could
6    answer it based on conversations with counsel?
7        A.    I also am not the person assessing
8    damages, so I -- I wouldn't -- I wouldn't be
9    able to tell you what that expectation is.
10       Q.    Okay.  You read the complaint in
11   this -- filed in this lawsuit.  Am I correct in
12   that?
13       A.    Yes.
14       Q.    Did you understand it?
15       A.    To the best of a layperson's
16   perspective.
17       Q.    You're not just a layperson,
18   however, right?  You are participating in the
19   buying of digital advertising on behalf of the
20   U.S. Postal Service, right?
21       A.    I participate in buying the --
22   buying media for the postal service, but I am

Page 189

1    media channels for that.
2           Depending on what the campaign is,
3    we may use different mixes of those media
4    channels and we might not use all of those
5    media channels.  We use variations of those.
6    And then we assess based on our KPIs if that
7    campaign is being successful.
8        Q.    When you use physical mail as part
9    of your advertising efforts, does the postal
10   service pay for that use?
11       A.    Yes.
12       Q.    Okay.
13       A.    We have to allocate those costs.  We
14   can't frank it.
15       Q.    Not like our senators in congress?
16       A.    Different.
17       Q.    Congressional representatives?
18       A.    Yes, we allocate our costs.
19       Q.    Is the postal service a two-sided
20   platform?
21           MR. RYAN:  Objection to form and
22   foundation.

Page 190

1           THE WITNESS:  Could you help clarify
2    what you are referring to?
3           BY MS. GOODMAN:
4        Q.    Fair.  Have you heard the term
5    "two-sided platform"?
6        A.    Not enough to just come off and
7    answer -- to give you an answer, so that's why
8    I am asking.
9        Q.    Sure.  A two-sided platform is one
10   that mediates between two sides of the market
11   connecting business with consumer for example.
12          MR. RYAN:  Objection to form and
13   foundation.
14          THE WITNESS:  Could you help clarify
15   that more.
16          BY MS. GOODMAN:
17       Q.    Yes.
18       A.    Sorry.
19       Q.    So using the definition that a
20   two-sided market is one that mediates between
21   two sides of a market connecting, in the case
22   of the postal service, a business with a

Page 191

1    consumer, would you agree that the postal
2    service is a two-sided platform?
3           MR. RYAN:  Objection to form and
4    foundation.
5           THE WITNESS:  The postal service is
6    an infrastructure that connects people to
7    people, businesses to businesses, businesses to
8    people, people to businesses.  So I'm not sure
9    if that constitutes two sided as much as
10   environment where it enables connectivity.
11          BY MS. GOODMAN:
12       Q.    And is that similar to like the
13   social networks of today, like, Facebook that
14   talks about enabling connectivity among people?
15          MR. RYAN:  Objection to form and
16   foundation.
17          THE WITNESS:  I am thinking through
18   that.  Environments such as social media and
19   network have people that opt in and, you know,
20   those environments have algorithms and networks
21   that connect people, so you have friends or
22   family that do that.

Page 192

1           The postal service is more universal
2    in that sense.  We will deliver to an address.
3    We will deliver to an address, but we haven't
4    decided who is who in that sense.  We don't --
5    we don't pick and choose who we receive your
6    mail from.
7           BY MS. GOODMAN:
8        Q.    Can advertisers use direct mail to
9    specifically target a particular audience they
10   are trying to reach?
11          MR. RYAN:  Objection to foundation.
12          THE WITNESS:  Mail can be targeted,
13   yes.
14          BY MS. GOODMAN:
15       Q.    And digital advertising can be
16   targeted as well, correct?
17          MR. RYAN:  Objection to form and
18   foundation.
19          THE WITNESS:  Digital advertising
20   does have the ability to reach specific
21   audiences or potentially down to individuals.
22          BY MS. GOODMAN:

Page 193

1     Q.   All right.  So we talked a little

2   bit about your contract with your media agency

3   of record, Universal McCann, so let's shift a

4   bit to that.

5        How does the contracting process

6   work with Universal McCann to your knowledge?

7     A.   Could you -- could you help me

8   understand where in the contracting component

9   you want to -- you'd like to start.

10     Q.   Sure.  Let's start at the top, where

11   the postal service enters into a contract with

12   Universal McCann.

13        Is that -- that is a multiyear

14   contract, right?

15        MR. RYAN:  Objection to foundation.

16        THE WITNESS:  Yes.  The postal

17   service puts out an RFP, competitive bid for --

18   in this case, an agency of record for media

19   spend and is successful awarding.  In this

20   case, Universal McCann received that award, I

21   will say around 2012, '13 depending on when you

22   award and sign.

---

Page 194

1        It is handled through our supply

2   management team for contractual obligations and

3   parameters around what that is, so marketing is

4   the business owner and it's supply management

5   and acts as the contract for us.

6        BY MS. GOODMAN:

7     Q.   And the multiyear contract with

8   Universal McCann, that was renegotiated or

9   reentered into in 2022; is that correct?

10        MR. RYAN:  Objection to form and

11   foundation.

12        THE WITNESS:  UM has -- potentially,

13   it was a five-year extension from the original

14   contract.

15        BY MS. GOODMAN:

16     Q.   So when you're referencing the

17   original contract, you are referencing the one

18   from 2012, '13?

19     A.   Yes.

20     Q.   And how long did that contract last?

21     A.   It was --

22        MR. RYAN:  Objection.  Foundation.

---

Page 195

1        THE WITNESS:  It was -- the contract

2   for UM was awarded in -- it's roughly ten

3   years.  Within that though, there were every --

4   every X amount of period, there were renewal

5   options that we could enact up to ten years.

6        BY MS. GOODMAN:

7     Q.   And so the ten years from 2012/13,

8   that expired when?

9        MR. RYAN:  Objection to form and

10   foundation.

11        THE WITNESS:  That contract was up

12   on its extensions somewhere around '20,

13   '22-ish.

14        BY MS. GOODMAN:

15     Q.   Okay.  And somewhere around

16   2022-ish, the postal service entered into

17   another contract with Universal McCann,

18   correct?

19        MR. RYAN:  Objection.  Form and

20   foundation.

21        THE WITNESS:  We ultimately extended

22   that contract without competitive bid.

---

Page 196

1        BY MS. GOODMAN:

2     Q.   Okay.  Now, under the multiyear

3   contract with Universal McCann, the postal

4   service and Universal McCann agreed to a scope

5   of work roughly every year; is that correct?

6        MR. RYAN:  Objection to form and

7   foundation.

8        THE WITNESS:  We agreed upon --

9   every year we do review what type of scope of

10   work we might be having with McCann or UM.

11        BY MS. GOODMAN:

12     Q.   Is there a contracting process

13   associated with the review of that scope of

14   work every year with UM?

15        MR. RYAN:  Objection.  Foundation.

16        THE WITNESS:  So the postal service

17   has a main contract, in this case with

18   Universal McCann, and then we have a scope of

19   work that we work with for the year.  That ties

20   into what we would like to do tied to our media

21   buying.

22        They are, in a general sort of way,

Page 197

1    a broken out into two elements, one is the
2    infrastructure of support that we get from the
3    COR group of people at UM.  It's tied to people
4    on staff there that engage with the postal
5    service.
6         It talks about -- we talk about
7    strategy and we talk about how we are going to
8    optimize the budget that we get from our CFO to
9    use towards purchasing media for our various
10   campaigns.  That part is probably the biggest
11   swing, the media buy is probably the bigger
12   swing than the base of employees that we have
13   working for us as suppliers or the UM team.
14        Our budget could be 140 million or
15   it could be a hundred million, and that creates
16   an opportunity for us to figure out how are we
17   going to do what campaigns and if we can do the
18   campaigns, to what level of investment we can
19   make and what channels we will use for that for
20   the year.
21        So there is a contract component
22   with supply management that we have to

Page 198

1    contractually have, and then -- with a CO, and
2    then we have a COR who makes sure that we work
3    through the scope of work that we are working
4    through, and the rest of the team engages with
5    UM to direct how we are going to leverage and
6    use media for the fiscal year.
7         BY MS. GOODMAN:
8         Q.   And the supply management
9    representative at postal that you work with on
10   the UM contract, is that Mark Guilfoil?
11        A.   Mark Guilfoil is the head of all of
12   supply management.  Mark Guilfoil signs off on
13   large contracts.  The Universal McCann contract
14   is a large contract for the postal service.
15   Probably a top ten.
16        Fuel, you know, air fleet, you know,
17   that we source out to, billions of dollars a
18   year, but advertising is a large portion of a
19   budget.
20        Q.   Okay.  Are you familiar with a task
21   order placement memorandum?  Is that a type of
22   document you are familiar with?

Page 199

1         A.   Yes.
2         Q.   Okay.  And what in your -- to your
3    knowledge, is an order placement memorandum?
4         A.   It's a task order or it's a
5    modification to the task order.
6         Q.   Just task order?
7         A.   Is there a particular one you want
8    me to look at?
9         Q.   Yeah, sure, since you are familiar.
10   I just tried to --
11        A.   We issue a task order for -- we
12   issue -- the postal service issues a task order
13   for work to be done by -- by a supplier, and we
14   do have modifications to those as well,
15   depending on the needs of what we are trying to
16   do.
17        (Deposition Exhibit 40 was marked
18   for identification.)
19        BY MS. GOODMAN:
20        Q.   And so I will hand you Exhibit 40,
21   USPS-ADS-592851 through 592863.
22        A.   Thank you.

Page 200

1         Q.   And this is an e-mail you received
2    attaching an order placement memo for UM Year
3    2.1, correct?
4         MR. RYAN:  Can the witness have a
5    few minutes to examine the document.
6         Martha, while the witness is
7    examining the document after you finish asking
8    questions on this document, is that a
9    convenient time to take a break?  Can we take a
10   break then?
11        MS. GOODMAN:  Well, a question is
12   pending right now.
13        MR. RYAN:  Sorry.
14        BY MS. GOODMAN:
15        Q.   This is an e-mail you received
16   attaching an order placement memo for the UM
17   Year 2.1, correct?
18        A.   2.1.
19        Q.   2.1, correct?
20        A.   2.1.  Yes.
21        Q.   And what is the purpose of an order
22   placement memorandum?

HIGHLY CONFIDENTIAL

Page 237

1    entity to see maybe if we could raise our cap
2    to become something that is actually seen when
3    somebody goes to search, so it would depend.
4         Q.    So could you optimize -- when you
5    are monitoring a campaign and its performance
6    against your KPIs, could you optimize that
7    campaign's performance by moving money from,
8    for example, paid social into display?
9         MR. RYAN:  Objection to foundation.
10        THE WITNESS:  Possibly.
11        BY MS. GOODMAN:
12        Q.    Why do you say -- when you say
13   "possibly," what do you mean?
14        A.    I think it depends on the amount of
15   money that we have, how the channel is
16   performing, and does it make sense to move over
17   from one to another.
18        Q.    Okay.  You said historically, you
19   monitor your campaign's performance
20   approximately every two weeks.
21             Is that -- did you receive e-mails
22   from UM attaching what I saw labeled hot

HIGHLY CONFIDENTIAL

Page 238

1    sheets.  Does that sound familiar to you?
2         A.    I recall --
3         MR. RYAN:  Objection.  Form.
4         THE WITNESS:  I recall hot sheets.
5    I would have to see it though.
6         BY MS. GOODMAN:
7         Q.    And how about flowcharts?  Did UM
8    prepare flowcharts for postal service showing
9    campaign performance?
10        MR. RYAN:  Objection to form.
11        THE WITNESS:  I'd probably want to
12   see what your terminology is for flowcharts.  I
13   have a whole different operational background
14   in my world that runs with that too.
15        BY MS. GOODMAN:
16        Q.    Sure.  I will hand you
17   USPS-ADS-492772 through 492780.
18        A.    Thank you.
19             (Deposition Exhibit 43 was marked
20   for identification.)
21        BY MS. GOODMAN:
22        Q.    And then --

HIGHLY CONFIDENTIAL

Page 239

1         A.    Oh, yes.
2         Q.    So is this an e-mail attaching --
3    strike that.
4              Is the first attachment to this
5    e-mail a colored spreadsheet, a flowchart that
6    you have seen before?
7         A.    Yes.  It is historically in
8    electronic format and a little easier to
9    maneuver around, but yes, I am familiar with
10   this -- with this output.
11        Q.    What is the purpose of this output
12   from your perspective?
13        A.    This is part of our effort to flow
14   what our -- what some of our media will be for
15   timing and expenses based on campaigns that we
16   may be running, whether they're equity
17   campaigns or regional campaigns.
18        Q.    And is it showing the -- sorry.
19             Let's just go to the third page of
20   the document with "display" at the top.
21        A.    Okay.
22        Q.    It has a pink and blue and orange

HIGHLY CONFIDENTIAL

Page 240

1    box?
2         A.    Yes.  This is displaying as GM.  It
3    is a general market.
4         Q.    Okay.
5         A.    HA is Hispanic and AA is African
6    American.
7         Q.    And so you see under GM, there are a
8    lot of different companies named here.
9              What -- what services are these
10   companies providing the postal service through
11   Universal McCann?
12        A.    Ultimately, they are enabling us to
13   provide some type of display advertising.
14        Q.    So just one provider of display
15   advertising is Amazon, correct?
16        A.    Amazon provides their own closed
17   system, so yes.
18        Q.    And Media iQ, they are another
19   provider of display advertising that UM uses on
20   your behalf?
21        MR. RYAN:  Objection as to form.
22        THE WITNESS:  I believe so.  I just

HIGHLY CONFIDENTIAL

Page 241

1   don't know how specifically they use them.
2         BY MS. GOODMAN:
3         Q.   Okay.  And ad serving, the last in
4   that list, what does that mean to your
5   knowledge?
6         A.   If I remember correctly, I believe
7   it was a cost to process and serve up the ads.
8         Q.   And do you know to whom Universal
9   McCann was paying any ad service costs?
10        MR. RYAN:  Objection to foundation.
11        THE WITNESS:  Specifically, I
12  couldn't tell you how that was broken out.
13        BY MS. GOODMAN:
14        Q.   And as part of your responsibilities
15  as executive director for brand marketing at
16  the postal service, was it important to you to
17  know specifically to whom Universal McCann was
18  paying any ad serving costs?
19        A.   It was important for the postal
20  service to understand that that ad serving cost
21  was legitimate.  To whom it went to, I wouldn't
22  be able to tell you and it was more of was it a

HIGHLY CONFIDENTIAL

Page 242

1   legitimate fee to place maybe.
2         Q.   As opposed to what provider they
3   selected?
4         A.   As opposed to what provider, yes,
5   correct.
6         Q.   And were these -- did you regularly
7   receive flowcharts like the one we are looking
8   at, in the course of your work as executive
9   director for brand marketing?
10        A.   These would be modified throughout
11  the year specifically because our budgets might
12  get flexed throughout the year.  Depending on
13  what campaigns we were running and how long we
14  wanted to run them, we might have had to shift,
15  if a particular product wasn't ready, started
16  later, started earlier, and the bad example
17  would be this idea around video.
18        You will see the GRPs, gross rating
19  points of what we are trying to accomplish, you
20  can see the mixes where we looked to optimize
21  so everything isn't a 30-second commercial.  We
22  actually use 40s, 15s, and I don't know if it

HIGHLY CONFIDENTIAL

Page 243

1   has it in this example, but six-second
2   commercials.
3         Q.   And so did the flowcharts, you know,
4   as they are updated regularly throughout the
5   course of the year, do they accurately reflect
6   at that moment in time the amount of money
7   spent on a particular form of advertising as
8   reflected in the chart?
9         A.   It's the plan of what we expect to
10  spend.
11        Q.   So this is a plan, not actual?
12        A.   Correct.
13        Q.   And then let's go to the last
14  section of this document ending in Bates 75.
15        You see it is titled:  "USPS account
16  hot sheet as of 4-20-2020"?
17        A.   Yes.
18        Q.   What is your understanding of what a
19  hot sheet is?
20        A.   UM has used a hot sheet for the
21  postal service to give a synopsis of where we
22  are at and where we may need to be, if there's

HIGHLY CONFIDENTIAL

Page 244

1   something already in place, will we still need
2   to approve or they need to still put things
3   together.
4         Q.   Is it --
5         A.   It ties to a variety of different
6   work that Universal McCann might be doing for
7   us.  They have grouped it into our equity at
8   the top, equity is the big brand awareness
9   effort, and then subsets of that is tied to,
10  for example, our holiday campaign which is an
11  equity effort but it is a -- during the holiday
12  period, about six, maybe eight weeks.
13        We run into lead gen marketing
14  campaigns here.  You'll see that we have other
15  things for political mail, political mail gives
16  us between 700 and 900 million dollars of
17  postage alone.  Political mail is not a
18  product.  It is a type of market if you will.
19        Q.   Is it fair to say that the hot sheet
20  would represent, as of the date of it, the sort
21  of -- a summary of the work ongoing that
22  Universal McCann was performing on behalf of --

HIGHLY CONFIDENTIAL

Page 245

1    on behalf of the postal service?

2         MR. RYAN:  Objection as to form and

3    foundation.

4         THE WITNESS:  This covers a number

5    of efforts that UM does for us and the status

6    of that work.

7         MS. GOODMAN:  Okay.  Let's go on a

8    break.

9         THE VIDEOGRAPHER:  Going off the

10   record.  The time is 16:47.

11        (A short recess was taken.)

12        THE VIDEOGRAPHER:  Going back on the

13   record.  The time is 16:54.

14        (Deposition Exhibit 44 was marked

15   for identification.)

16   BY MS. GOODMAN:

17        Q.    Mr. Karpenko, I am handing you

18   USPS-ADS-42055 through 42181, marked Exhibit

19   44.

20        A.    Thank you.

21        Q.    And this is an e-mail you received

22   attaching an FY 2022 USPS DFA connect wrap up

HIGHLY CONFIDENTIAL

Page 246

1    report, correct?

2         A.    Yes.

3         Q.    And what is a wrap up report to your

4    knowledge?

5         A.    This wrap up report comes from

6    Universal McCann to give us an assessment of

7    how the variety of media performed for our

8    campaign or our messaging.

9         Q.    And DFA, is that Delivering for

10   America, is that what that stands for?

11        A.    It's tied to Delivering for America,

12   yes.

13        Q.    And if you look to Page 4 of the

14   deck ending in Bates 60, this sets out the

15   measurement parameters and objectives for the

16   particular campaign, correct?

17        MR. RYAN:  Objection.  Form.

18        Also, the witness needs a few

19   minutes to look at the document.

20        MS. GOODMAN:  I have allowed him

21   plenty of time to look at his documents, as you

22   know, Mr. Ryan.

HIGHLY CONFIDENTIAL

Page 247

1         THE WITNESS:  Yes.  So Page 4 does

2    talk about the parameters that we provided for

3    UM so they understood what we were trying to

4    accomplish and then they validated again in the

5    -- in this deck.

6    BY MS. GOODMAN:

7         Q.    And if you look at Page 6, this

8    slide shows the funds allocated across a

9    variety of media channels for this particular

10   campaign, correct?

11        MR. RYAN:  Objection to form.

12        THE WITNESS:  It shows the flight

13   dates, meaning in-market dates and the spend

14   that we had for -- for our media.

15        If you look at Page 5, we do show a

16   little bit of the channels in here.

17        THE VIDEOGRAPHER:  Counsel, we were

18   just knocked off the Zoom.  Do you want to go

19   off the record to reset up?

20        MS. GOODMAN:  Sure.

21        THE VIDEOGRAPHER:  Going off the

22   record.  The time is 16:57.

HIGHLY CONFIDENTIAL

Page 248

1         (A short recess was taken.)

2         THE VIDEOGRAPHER:  Back on the

3    record.  The time is 16:59.

4    BY MS. GOODMAN:

5         Q.    Okay.  So, Mr. Karpenko, we are

6    looking at Exhibit 44, Page 6, Bates ending in

7    62.

8         A.    Yes.

9         Q.    And so this shows the channel

10   through which this particular campaign USPS

11   advertised, correct?

12        MR. RYAN:  Objection to form.

13        THE WITNESS:  This was our campaign

14   that ran from the middle of February through

15   the end of the fiscal year for us, which ends

16   September 30.

17   BY MS. GOODMAN:

18        Q.    And this shows the various channels

19   through which media was placed for this

20   campaign, right?

21        MR. RYAN:  Objection to form.

22        THE WITNESS:  This shows the

HIGHLY CONFIDENTIAL

Page 265

1  return on ad spend for specific categories of
2  media after the all media column, correct?
3        MR. RYAN:  Objection to form.
4  Foundation.
5        THE WITNESS:  Could you say that
6  again.
7        BY MS. GOODMAN:
8     Q.    You see here, there is an analysis
9  of a return on ad spend -- ad spend in the
10  categories of TV, search, display, social, OLV,
11  radio, audio and print, yes?
12        MR. RYAN:  Objection to form.
13        THE WITNESS:  Yes.  It does not
14  include other media channels like our mail,
15  direct mail and such, but this is what the
16  investment is tied to UM's work with us.
17        BY MS. GOODMAN:
18     Q.    And in the display category here,
19  are there particular -- are there more specific
20  channels of display advertising that are
21  comprised within this bucket?
22        MR. RYAN:  Objection to form.

HIGHLY CONFIDENTIAL

Page 266

1        THE WITNESS:  Could you help clarify
2  for me.
3        BY MS. GOODMAN:
4     Q.    Yes.  Within display in this chart,
5  what kinds of display advertising are included
6  to your knowledge?
7     A.    It would be the entire range of
8  display, whether that's static or programmatic
9  and anything else that might fall there.
10     Q.    Would that include, for example, if
11  the U.S. Postal Service -- strike that.
12        Would that include an ad placed by
13  UM on NewYorkTimes.com, for example?
14     A.    Most likely, yes.
15     Q.    And you recall we saw a very lengthy
16  chart in Exhibit 36 in your stack of exhibits
17  that provided a list of third-party sites.
18     A.    Yes.
19     Q.    Would this category of display
20  include any ads placed on those third-party
21  sites?
22     A.    It could.

HIGHLY CONFIDENTIAL

Page 267

1     Q.    Beyond the category of display
2  advertising, are you aware of any further --
3  more specific categories of display advertising
4  that comprise the entirety of the display
5  advertising channel?
6        MR. RYAN:  Objection to form.
7        THE WITNESS:  I'm not sure I
8  understand.
9        BY MS. GOODMAN:
10     Q.    Yeah.  It's not a great question.
11     A.    Sorry.
12     Q.    That's okay.  What categories --
13  what specific categories of display advertising
14  comprise, from your point of view, the display
15  advertising channel?  Is there any more
16  specificity, in other words, that you
17  understand the display advertising channel to
18  encompass?
19     A.    In how the question is being asked,
20  I can't think of any.
21     Q.    How often do you perform media
22  marketing methodology analyses?

HIGHLY CONFIDENTIAL

Page 268

1        MR. RYAN:  Objection to foundation.
2        THE WITNESS:  I'm not sure.
3        BY MS. GOODMAN:
4     Q.    Is it more than once a year that you
5  see these MMM kinds of analyses?
6     A.    Yes.  We have historically gone with
7  one large one, because it's a fairly large buy.
8  We can -- we can say with a reasonable level of
9  accuracy how our media will perform, based on
10  what we want to do for a campaign and we do
11  that because we have got some historical data
12  along with some pretty rigorous regression
13  analyses that we use, that allow us to say that
14  if we use X amount of media, we are -- plus or
15  minus, let's say hypothetically, 10 percent, we
16  know that we can be somewhat effective in that
17  world.
18        If we were to go from -- and let's
19  say there was a $120 million media spend.  If
20  we needed to cut something down to 110 or go up
21  to 130, we think we know where the abilities
22  are to be successful, because of the media mix

HIGHLY CONFIDENTIAL

Page 269

```
1    modeling that we are able to do.
2              If you were to give me $500 million,
3    it throws the media mix modeling analysis out
4    the window because it's -- it doesn't work well
5    for us.  We don't historically spend that sort
6    of money and we -- also would see different
7    levels of return potentially.
8         Q.   Have you ever heard of the term
9    "open web display advertising"?
10        A.   I have.
11        Q.   Where have you heard that term?
12        A.   I have heard it here.
13        Q.   When you say "here," what do you
14   mean?
15        A.   Here today.
16        Q.   Okay.
17        A.   I believe it's been referred to in
18   the complaint and it has been mentioned to some
19   degree in our marketing world.
20        Q.   When you say "to some degree in our
21   marketing world," what do you mean?
22        A.   Historically it's not a term that
```

HIGHLY CONFIDENTIAL

Page 270

```
1    we -- we discuss.  Even in some of these
2    documents that we have with UM, we don't --
3    don't refer to it as such.
4         Q.   Do you have an understanding of what
5    the term "open web display advertising" means?
6         A.   I believe so.
7         Q.   What is your understanding of that
8    term?
9         A.   It's the ability to place a content
10   or advertising on various web sites and do so
11   in an environment where you could do it
12   directly or have someone do it for you.
13        Q.   And would it include placing
14   advertisements directly on The New York Times,
15   for example?
16        A.   Possibly.  I don't know off the top
17   of my head what The New York Times has as
18   parameters.
19        Q.   So let's say The New York Times
20   wants to only do direct deals with an
21   advertiser.  In such an instance, would you
22   consider those direct deals for ad space on The
```

HIGHLY CONFIDENTIAL

Page 271

```
1    New York Times to be encompassed within the
2    category of open web display advertising?
3              MR. RYAN:  Objection to form.
4              THE WITNESS:  The stronger examples
5    for me would be eBay and Amazon.
6              BY MS. GOODMAN:
7         Q.   And why is that?
8         A.   Their -- we've had experience --
9    I've had personal experience with eBay and
10   Amazon and that they are closed.  They do not
11   allow for others to come in to place
12   advertising with them.  You have to -- it's
13   with them and only them.
14             So UM, as our supplier, would have
15   to deal directly with historically Amazon or
16   eBay for that sort of advertising.
17        Q.   Okay.  But so is the advertising
18   that postal service could place on eBay and
19   Amazon, is that -- does that constitute open
20   web display advertising from your point of
21   view?
22        A.   It would not be.
```

HIGHLY CONFIDENTIAL

Page 272

```
1         Q.   How about with respect to
2    advertising that the United States Postal
3    Service could place on The New York Times?
4    Does that constitute open web display
5    advertising from your point of view in the
6    context of a direct deal whereby UM directly
7    negotiates with The New York Times?
8              MR. RYAN:  Objection to form.
9              THE WITNESS:  I would say possibly,
10   but I don't have intimate knowledge of The New
11   York Times.
12             BY MS. GOODMAN:
13        Q.   Okay.  So for purposes of my
14   hypothetical, let's assume that The New York
15   Times only allows ads to be placed on their
16   website through a direct deal as opposed to a
17   programmatic buying.  Okay?
18             MR. RYAN:  Objection as to form.
19             THE WITNESS:  I think those are two
20   different things.
21             BY MS. GOODMAN:
22        Q.   Right.
```

HIGHLY CONFIDENTIAL

Page 273

1      A.    When you talk about programmatic,
2    programmatic to me is that we place on -- on
3    sites and we serve up our advertising, our
4    marketing to a particular audience at a
5    particular time, and that you can do
6    programmatic multiple locations.  That doesn't
7    exclude -- that's different than or at least I
8    am interpreting it as then the other part of
9    can you place an open web advertisement on The
10   New York Times versus not on The New York Times
11   directly.
12     Q.    Okay.
13     A.    I apologize.  But that -- to me, I
14   am interpreting it very differently.
15     Q.    Okay.  That's fair.
16           So let's approach it this way:  With
17   respect to the third-party sites on which
18   postal service ads may appear when they are
19   served with the aid of Matterkind?
20     A.    Yes.
21     Q.    Okay.  Let's -- that's one kind of
22   mechanism to put out display ads on the web,

---

HIGHLY CONFIDENTIAL

Page 274

1    yes?
2           MR. RYAN:  Objection.  Form.
3    Foundation.
4           THE WITNESS:  Could be, yes.
5           BY MS. GOODMAN:
6      Q.    Okay.  In a scenario where we are
7    putting -- where the postal service is having
8    their ads placed on The New York Times website
9    not through the aid of Matterkind but rather UM
10   entering into a direct deal with The New York
11   Times, in such a scenario with The New York
12   Times that I am describe, do you consider that
13   to be open web display advertising?
14           MR. RYAN:  Objection to form.
15   Foundation.
16           THE WITNESS:  I do if New York Times
17   is -- is accepting advertising from others as
18   well.  I think that's -- that's where I
19   would -- I would say yes if that's the case.
20           BY MS. GOODMAN:
21     Q.    Okay.  So earlier you said that open
22   web display advertising is -- is not a term

---

HIGHLY CONFIDENTIAL

Page 275

1    that we discuss, and then some of the documents
2    that we have with UM, we don't refer to it as
3    such.
4           Do you recall that testimony?
5           MR. RYAN:  Objection to form.
6           THE WITNESS:  I recall saying that
7    earlier.
8           BY MS. GOODMAN:
9      Q.    You recall it?
10     A.    I recall saying it earlier, yes.
11     Q.    Okay.  And why do you not refer to
12   advertising in documents with UM as open web
13   display advertising?
14           MR. RYAN:  Objection to form and
15   foundation.
16           THE WITNESS:  Historically we at the
17   postal service, UM, and -- and others refer to
18   display as display and programmatic as
19   programmatic.  We -- we have historically not
20   gotten I suppose down into those weeds of what
21   that means or how to use or how to gain access
22   into that world.  It's probably done more with

---

HIGHLY CONFIDENTIAL

Page 276

1    a publisher.
2           BY MS. GOODMAN:
3      Q.    Okay.  And you said "historically we
4    at the postal service, UM, and others refer to
5    display as display and programmatic."
6           Who are the others you are
7    considering in your answer?
8      A.    Colleagues in the marketing
9    industry.
10     Q.    And without -- you don't have to
11   name names for purposes of this question, but
12   just where are you -- what colleagues -- what
13   kinds of colleagues are you referring to in the
14   marketing industry in your answer?
15     A.    It would be similar entities that
16   are tied to being members of the ANA, for
17   example.
18     Q.    And so in any -- the postal service
19   is a member of the ANA; is that correct?
20     A.    Yes.
21           MR. RYAN:  Objection to form.
22           BY MS. GOODMAN:

HIGHLY CONFIDENTIAL

Page 277

```
 1        Q.   And you participate in ANA events;
 2   is that accurate?
 3             MR. RYAN:  Objection to form.
 4             THE WITNESS:  We participate in a
 5   number of things with the ANA, yes.
 6             BY MS. GOODMAN:
 7        Q.   And ANA is one of the sources that
 8   you consider to be reliable with respect to
 9   trends in the advertising industry; is that
10   correct?
11             MR. RYAN:  Objection to form.
12             THE WITNESS:  We'd have no reason
13   not to believe that ANA is -- is a legitimate
14   well thought of entity with a good reputation.
15             BY MS. GOODMAN:
16        Q.   Can you recall any instance where
17   you have seen or heard the term open web
18   display advertising put out by the ANA?
19        A.   I can't recall any.  That doesn't
20   mean that they haven't.
21        Q.   Same question with respect to Magna,
22   another source that we talked about earlier
```

HIGHLY CONFIDENTIAL

Page 278

```
 1   that you consider reliable.  Have you seen the
 2   term open web display advertising used by Magna
 3   ever?
 4             MR. RYAN:  Objection to form.
 5             THE WITNESS:  If I have, it hasn't
 6   triggered for me as something significant.
 7             BY MS. GOODMAN:
 8        Q.   And I think you mentioned Adweek as
 9   well.  Same question as to Adweek.
10             MR. RYAN:  Objection to form.
11             THE WITNESS:  Similar answer.  If
12   I -- if it was in a particular article that I
13   may or may not have read, it didn't -- didn't
14   spark or flag for me.  Didn't pop out.
15             BY MS. GOODMAN:
16        Q.   And it didn't pop out because it's
17   not a term that you use yourself as an
18   advertiser for the postal service; is that fair
19   to say?
20             MR. RYAN:  Objection to form and
21   foundation.
22             THE WITNESS:  I look at -- at
```

HIGHLY CONFIDENTIAL

Page 279

```
 1   display advertising as display advertising.
 2             BY MS. GOODMAN:
 3        Q.   Now, earlier you also said you read
 4   the complaint, correct --
 5        A.   I had --
 6        Q.   -- in this -- filed in this lawsuit?
 7        A.   Yes.
 8        Q.   Did you see the term open web
 9   display advertising in the complaint?
10        A.   Yes.
11        Q.   Did you understand -- what did you
12   understand the term open web display
13   advertising to mean as used in the complaint?
14        A.   As -- as defined --
15             MR. RYAN:  Objection to form.
16             MS. GOODMAN:  I am asking for his
17   understanding.
18             BY MS. GOODMAN:
19        Q.   Go ahead.
20        A.   As defined in the complaint?
21        Q.   Yeah.
22        A.   I would -- I believe it was what I
```

HIGHLY CONFIDENTIAL

Page 280

```
 1   had described earlier.
 2             MS. GOODMAN:  Okay.  I am handing
 3   you Exhibit 46, USPS-ADS-620144 through 145.
 4             THE WITNESS:  Thank you.
 5             (Deposition Exhibit 46 was marked
 6   for identification.)
 7             BY MS. GOODMAN:
 8        Q.   And I know you're not here as a
 9   recipient on this e-mail --
10        A.   Uh-huh.
11        Q.   -- but I would like you to review
12   it.  Let me know when you've had a chance to
13   review it, and then I will ask you a question.
14        A.   I've reviewed.
15        Q.   Okay.  In this e-mail -- does this
16   e-mail contain a discussion about shifting
17   advertising dollars from display -- sorry --
18   from social to display for the avoid surcharge
19   campaign?
20             MR. RYAN:  Objection to foundation.
21             THE WITNESS:  Laura Bacco wrote to
22   our postal person, Mike Bottenberg,
```

HIGHLY CONFIDENTIAL

Page 281

1    recommending a shift.
2         BY MS. GOODMAN:
3         Q.    And Mike recommends -- sorry.  Mike
4    writes: "Hi, Laura.  Let's make the shift into
5    display."
6         Do you see that?
7         A.    Yes.
8         Q.    And earlier we were talking about
9    campaign optimization.  Do you recall that
10   testimony?
11        A.    Yes.
12        Q.    Is this an example of campaign
13   optimization?
14        A.    This is an example of how one might
15   do that.
16        MS. GOODMAN:  Okay.  Can I get 35.
17        (Deposition Exhibit 47 was marked
18   for identification.)
19        MS. GOODMAN:  I am handing you
20   USPS-ADS-29221 through 29226.
21        THE WITNESS:  This one is done?
22        BY MS. GOODMAN:

HIGHLY CONFIDENTIAL

Page 282

1         Q.    Yes.
2         A.    Thanks.
3         Q.    And you see this is an e-mail you
4    received from Tiye McLeod at Universal McCann
5    on November 16, 2021, correct?
6         A.    Yes.
7         Q.    Okay.  And the subject is:  "Flash
8    POV Q3 Digital Earnings in Facebook's Rebrand."
9         Do you see that?
10        A.    I do.
11        Q.    What is a flash POV?
12        MR. RYAN:  Objection to form.
13   Foundation.
14        THE WITNESS:  UM has sent out these
15   quick sort of industry assessments or an FYI
16   with a point of view.
17        BY MS. GOODMAN:
18        Q.    Okay.
19        A.    In this particular case it's --
20   covered, you know, Quarter 3 digital earnings
21   in Facebook's rebrand.
22        Q.    And if you look at the first bullet

HIGHLY CONFIDENTIAL

Page 283

1    of "key takeaways," do you see where I am?
2         A.    I do.
3         Q.    It says:  "The combined ad sales of
4    Google, Facebook, and Amazon, 80 percent of the
5    total U.S. digital ad market, reach 29.6
6    billion in 3Q21, a 40 percent growth versus
7    3Q20."
8         In this bullet what do you
9    understand the term "U.S. digital ad market" to
10   mean?
11        A.    When I look at that, it's their
12   overall advertising on their sites.
13        Q.    And --
14        A.    Their sites and their products.
15        Q.    Are there other digital -- are there
16   other providers within the U.S. digital ad
17   market that you're aware of?
18        A.    Yes.
19        Q.    And could you name any of those.
20        A.    Matterkind would be an example in my
21   mind.
22        Q.    From your point of view, would it be

HIGHLY CONFIDENTIAL

Page 284

1    appropriate to break down the digital ad market
2    into any more specific categories?
3         MR. RYAN:  Objection to the form.
4         THE WITNESS:  When you say
5    "categories" for these, are we looking at -- so
6    you have Google, Facebook, Amazon.  You
7    could -- one could argue or add in Target and
8    Walmart.  They have their own digital ad space
9    that they use, their digital commerce space.
10        I guess could you help me -- help
11   clarify for me, I guess.
12        BY MS. GOODMAN:
13        Q.    Sure.  When you -- let me ask it
14   this way:  When you think about where to spend
15   your digital advertising dollars, do you think
16   about -- do you approach that question with
17   respect -- by thinking about how to allocate
18   your funds across platforms such as Google,
19   Facebook, and Amazon?
20        MR. RYAN:  Objection as to form.
21        THE WITNESS:  We look at how to
22   place our media across all environments.

HIGHLY CONFIDENTIAL

Page 285

1    Google, Facebook, and Amazon are large
2    entities.  They have -- they have large
3    market -- large customer bases.  But we are not
4    limited to those three.
5         I would note something like a
6    Snapchat we wouldn't use.  We haven't --
7    haven't used.  We're required to memorialize
8    our advertising, and Snapchat is designed to
9    put something up and make it go away.  It
10   doesn't work for us under the federal umbrella.
11        THE COURT REPORTER:  Under the
12   federal...?
13        THE WITNESS:  Federal umbrella.
14   We're required to have records of things that
15   we do and retain those records.
16        BY MS. GOODMAN:
17   Q.   And looking at this Exhibit 47 --
18   A.   47.
19   Q.   -- do you consider this to be a
20   reliable summary of what's going on in the ad
21   industry as of the date of the e-mail?
22        MR. RYAN:  Objection to foundation

HIGHLY CONFIDENTIAL

Page 286

1    and form.
2         THE WITNESS:  So it looks like Magna
3    provided the information.  It provides a
4    snapshot of what some of these groups have
5    reported for -- for revenue or some
6    implications of where they have been year over
7    year.  On the back Magna has applied
8    implications for various teams and brands.
9         I don't know if this makes a
10   difference for me at this point.  You know,
11   nothing new about the three big partners
12   continue to grow their share of U.S. digital
13   advertising dollars.
14        Alphabet and Amazon are less
15   affected by the IOS changes due to the strength
16   of their search advertising business.  So it
17   tells us some general information of where
18   they're at, and it keeps us apprised of the
19   pulse of where the big players are and where
20   their trends may be going that might adjust
21   within the marketplace.
22        MS. GOODMAN:  Let's take a break.

HIGHLY CONFIDENTIAL

Page 287

1         THE VIDEOGRAPHER:  Going off the
2    record.  The time is 17:51.
3         (A short recess was taken.)
4         THE VIDEOGRAPHER:  Going back on the
5    record.  The time is 18:09.
6         (Deposition Exhibit 48 was marked
7    for identification.)
8         MS. GOODMAN:  Mr. Karpenko, I am
9    handing you USPS-ADS-447582 through 83, marked
10   Exhibit 48.
11        BY MS. GOODMAN:
12   Q.   And this is also a document that
13   you're not on, but I would like you to read it,
14   and then I will ask you a few questions.  So
15   let me know when you've had a chance to read
16   it.
17   A.   Yes.
18   Q.   Okay.  And you see this is an e-mail
19   from an employee at Universal McCann to Brian
20   Pasco, correct?
21   A.   Yes.
22        MR. RYAN:  Objection.  Form.

HIGHLY CONFIDENTIAL

Page 288

1         BY MS. GOODMAN:
2    Q.   Okay.  And he writes to Brian that
3    Matterkind has been running into scale issues
4    through DV360, so they optimized by moving over
5    DSPs into TTD.
6         Do you see that?
7    A.   I do.
8    Q.   What is your understanding of what
9    Mr. Lockhart is describing here?
10   A.   Well, the subject is tied to our
11   spring digital video for the Hispanic market.
12        And as far as scale issues running
13   through a particular tool, I don't know the
14   particulars to that, and I don't know if Brian
15   had additional correspondence with him over it,
16   but this is another example of us trying to
17   optimize our -- our media.
18   Q.   And in this particular example, are
19   you optimizing your media by moving from DV360
20   into TTD?
21        MR. RYAN:  Objection to foundation
22   and form.

HIGHLY CONFIDENTIAL

Page 289

```
1          THE WITNESS:  I'm not familiar with
2   the TTD, so I don't know if I would be able to
3   answer well enough about context about this.
4          BY MS. GOODMAN:
5      Q.    Okay.  Have you heard of The Trade
6   Desk?
7      A.    Yes.
8      Q.    What is The Trade Desk?
9      A.    Trade desk is another entity that
10  helps place advertising.
11     Q.    And you see here the reference to
12  DV360.  What is your understanding of DV360?
13     A.    DV360 is a Google tool that is used
14  for placing advertising.
15     Q.    And so is it fair to say that Mr.
16  Lockhart here is reporting that Matterkind ran
17  into scale issues with the Google tool DV360
18  and so they moved over into The Trade Desk --
19          MR. RYAN:  Objection --
20          BY MS. GOODMAN:
21     Q.    -- TTD?
22          MR. RYAN:  Objection to form and
```

HIGHLY CONFIDENTIAL

Page 290

```
1   foundation.
2          THE WITNESS:  I'm not sure.
3          BY MS. GOODMAN:
4      Q.    Okay.  Do you know what DSP stands
5   for here?
6          MR. RYAN:  Objection to foundation.
7          THE WITNESS:  I don't.
8          BY MS. GOODMAN:
9      Q.    Okay.  You can put that to the side.
10     A.    Thank you.
11     Q.    At some point you decided to do an
12  audit of Universal McCann; is that accurate?
13     A.    Yes.
14          MR. RYAN:  Objection to form.
15          BY MS. GOODMAN:
16     Q.    And why did you decide to do an
17  audit of Universal McCann?
18     A.    As part of our due diligence.
19     Q.    And how did you go about selecting
20  the auditor for this project?
21     A.    We were trying to do this a number
22  of ways.  First attempt was to put it out for
```

HIGHLY CONFIDENTIAL

Page 291

```
1   RFP.  It came back to us fairly expensive.
2   The -- I think there was maybe only one that
3   responded.
4          And because it was a seven-figure
5   fee, it's fairly significant, not our --
6   against our media budget.  We did not award
7   because it did not -- didn't make it cost
8   effective for us to do.
9          We did a follow-up after an OIG
10  discussion.  OIG wanted to understand how we
11  purchased media and how effective it would be.
12  So I have had -- in essence, there's a couple
13  steps here, but I'll say larger how do we
14  validate media spend through an audit group.
15  It was super expensive, wasn't cost effective
16  for us, limited entity to do it.
17          The second one was the Office of the
18  Inspector General across the river from us in
19  Rosslyn came over and asked us how we assess
20  and evaluate the success of and effectiveness
21  of our media spend, which we provided data to
22  them.  We worked with them.  We provided our --
```

HIGHLY CONFIDENTIAL

Page 292

```
1   our UM investment teams and analysts to work
2   with the OIG's team of analysts to validate our
3   investment was -- was solid.
4          That passed through a number of
5   processes, which was great.  Their
6   recommendation was that we should also, again,
7   try to have a third party validate the media
8   spend.
9          Our third phase in that was to look
10  at whether or not there were other companies
11  that had done similar audits within UM,
12  Universal McCann.  There were one or two
13  companies that did that.  And we did it -- we did an analysis with
15  one of those companies.  We -- we contracted
16  with one of those companies to do that.
17     Q.    And was that company DG2?
18     A.    I am -- I do not remember the name
19  of the company.  I apologize.
20     Q.    Okay.  That's okay.
21          And the company that you ended up
22  selecting for purposes of this audit, did you
```

Page 301

1        THE WITNESS:  As I flip through it,
2    I am not seeing that.  I do see labor rates for
3    the -- for the staffing, but I don't see any
4    specific thing that we put in for pricing
5    tagged to media.
6        BY MS. GOODMAN:
7        Q.   And if you turn the page ending in
8    Bates 187.
9        At the top, it says:  "Attachment,
10   one final statement of work."
11       MR. RYAN:  Do we have that?
12       THE WITNESS:  You said 187?  I end
13   up at 186.
14       BY MS. GOODMAN:
15       Q.   Okay.  I think we are missing an
16   attachment then.  All right.  No worries.
17       A.   Okay.
18       Q.   You can put that to the side.
19       A.   Okay.
20       MS. GOODMAN:  Can I get 78.
21       (Deposition Exhibit 51 was marked
22   for identification.)

Page 302

1        BY MS. GOODMAN:
2        Q.   I am handing you USPS-ADS-529380
3    through 529412.  I have marked it as Exhibit --
4        A.   51.
5        Q.   -- 51.
6        A.   5-1.
7        Q.   And this is the Base Year 2.1
8    contract between the postal service and
9    Universal McCann, correct?
10       MR. RYAN:  Objection to form.
11       THE WITNESS:  Yes.
12       BY MS. GOODMAN:
13       Q.   And you see at the back -- at the
14   top, Box 4, it lists a master contract number.
15   Do you see that?
16       A.   Yes.
17       Q.   Okay.  Does that match the contract
18   number in Exhibit 50 reflected in Box 18?
19       MR. RYAN:  Objection to form.
20       THE WITNESS:  Yes.
21       BY MS. GOODMAN:
22       Q.   Okay.  So this is sort of a one

Page 303

1    year, the Base Year 2.1 for one year of
2    services under that master contract we looked
3    at?
4        A.   Box 4 of Exhibit 51 matches the same
5    contract number in Box 18.
6        Q.   Okay.  Great.
7        A.   Box 18 in Exhibit 51 has the C on it
8    instead of a B.  There is a differentiation
9    there just to --
10       Q.   Got it.  And in this contract,
11   looking on Page 529382, there is a -- Line Item
12   1 is media purchased on behalf of the postal
13   service.
14       Do you see that?
15       A.   I do.
16       Q.   And it does not fix a quantity or a
17   unit in Columns 19 or 20, correct?
18       MR. RYAN:  Objection to form.
19       THE WITNESS:  It does not.
20       BY MS. GOODMAN:
21       Q.   And then if you go back to Page 381,
22   just the prior page, and it says -- sort of in

Page 304

1    the middle there, Line Item 1 is the
2    out-of-pocket costs that the supplier may incur
3    on behalf of the USPS and media purchases.
4        Do you see that?
5        A.   Not yet.
6        I see it now, yes.
7        Q.   Okay.  And so -- and then the next
8    sentence says: "The not-to-exceed amount for
9    the out-of-pocket costs is $127 million."
10       A.   Yes.
11       Q.   Okay.  And so this contract sets a
12   ceiling of $127 million but does not commit the
13   postal service to actually make any particular
14   media buys; is that correct?
15       MR. RYAN:  Objection to form and
16   foundation.
17       THE WITNESS:  I believe the contract
18   somewhere earlier says there is a minimum that
19   we potentially would owe the supplier and a max
20   over the term of the entire contract.
21       BY MS. GOODMAN:
22       Q.   Okay.  But at least this particular

Page 305

1    provision does not commit the postal service

2    to, in fact, spend $127 million on media buys,

3    correct?

4         A.    Correct.

5         MR. RYAN:  Objection to form and

6    foundation.

7         BY MS. GOODMAN:

8         Q.    Okay.  And if you flip to Page 388,

9    do you see that this is attaching -- or

10   including within this contract, the UM SOW

11   contract year 2022.

12        Do you see that?

13        A.    Yes, that's the Universal McCann

14   statement of work, contract year 2022.

15        Q.    And is it accurate to say that the

16   statement of work in the subsequent pages

17   outlines the work that Universal McCann would

18   perform in this contract year on behalf of the

19   postal service?

20        MR. RYAN:  Objection to form.

21        THE WITNESS:  Yes.

22        BY MS. GOODMAN:

Page 306

1         Q.    And if you turn to page ending in

2    11411.

3         A.    11411.

4         Q.    Under Item 4:  "Addressable

5    technology."

6         Do you see where I am?

7         A.    Yes.

8         Q.    Do you know what Kinesso is in 4A?

9         A.    Kinesso is another group that UM has

10   used for our marketing efforts.

11        Q.    And are they similar to Matterkind?

12        MR. RYAN:  Objection to form.

13        THE WITNESS:  Similar in the sense

14   that they are another entity that UM works with

15   us to help place media for our effectiveness.

16        BY MS. GOODMAN:

17        Q.    And in No. 5 where it says:

18   "Private marketplace curation and management,"

19   what is that a reference to, to your knowledge?

20        A.    I don't know.

21        Q.    Okay.  And if we go -- I'm sorry.

22        If we turn back to Page 390 in the

Page 307

1    chart here where the columns are:  "Assumed

2    efforts, assumed media channels," and assume

3    spend -- "assumed spend."

4         Does this chart reflect at a high

5    level the plans that the postal service had

6    with respect to advertising efforts for this

7    particular contract year?

8         MR. RYAN:  Objection to form.

9         THE WITNESS:  This is more a

10   guidance than an estimate.  We would be firming

11   up our campaigns and budget later in the year.

12        BY MS. GOODMAN:

13        Q.    And under the column:  "Assumed

14   media channels," do you see anywhere listed on

15   Pages 390, 391 or 392, open web display?

16        A.    No.

17        Q.    You can put that to the side.

18        With respect to United States Postal

19   Service's digital advertising efforts, did the

20   postal service purchase any display advertising

21   directly from Google to your knowledge?

22        A.    Not to my knowledge.

Page 308

1         Q.    And did the postal service purchase

2    any open web display advertising directly from

3    Google?

4         A.    Not to my knowledge.

5         Q.    Did the postal service pay Google

6    directly for the use of DV360 to your

7    knowledge?

8         MR. RYAN:  Objection to foundation.

9         THE WITNESS:  I don't know if the

10   postal service paid for access to use Google's

11   DV360 tool.

12        BY MS. GOODMAN:

13        Q.    To your knowledge, did the postal

14   service pay Google directly for the use of

15   Google ads?

16        MR. RYAN:  Objection to foundation.

17        THE WITNESS:  I'm unaware of us

18   paying for any Google ads from the postal

19   service.

20        BY MS. GOODMAN:

21        Q.    To your knowledge and in your

22   capacity as the executive director for brand

HIGHLY CONFIDENTIAL

Page 309

1    marketing from 2019 to 2023 time period, did

2    the postal service purchase any ad tech

3    services directly from Google?

4         MR. RYAN:  Objection to form and

5    foundation.

6         THE WITNESS:  I'm unaware of the

7    postal service purchasing any ad tech services

8    from Google.

9         BY MS. GOODMAN:

10      Q.   And are you unaware of the postal

11    service purchasing any ad tech services

12    directly from Google?

13         MR. RYAN:  Objection to form and

14    foundation.

15         THE WITNESS:  I am not aware of it.

16         BY MS. GOODMAN:

17      Q.   Are you aware of any contract

18    between the United States Postal Service and

19    Google related to digital advertising?

20      A.   Not to digital advertising.

21      Q.   Do you know whether any money has

22    been paid to Google through any contract

---

HIGHLY CONFIDENTIAL

Page 310

1    between the postal service and Universal

2    McCann?

3         MR. RYAN:  Objection to form and

4    foundation.

5         THE WITNESS:  Can you repeat that

6    again.

7         BY MS. GOODMAN:

8      Q.   Do you know whether any money has

9    been paid to Google through funds awarded under

10    the contract between the postal service and

11    Universal McCann?

12         MR. RYAN:  I'll repeat the

13    objection.

14         THE WITNESS:  Yes.

15         BY MS. GOODMAN:

16      Q.   Okay.  And how do you know that

17    money has been paid to Google through those

18    funds?

19      A.   For example, we spend multiple

20    millions of dollars on paid search through

21    Google.

22      Q.   And if you were -- how would you

---

HIGHLY CONFIDENTIAL

Page 311

1    figure out how much money has been paid to

2    Google under the UM USPS contract?

3         MR. RYAN:  Objection to foundation

4    and form.

5         THE WITNESS:  We at least have

6    visibility on investment that we have asked UM

7    to pay or to use for media, the big one is

8    Google Search.  If there are others, it would

9    be a bit more in the weeds and I don't have

10    that visibility.

11         BY MS. GOODMAN:

12      Q.   And does anybody, to your knowledge,

13    in the postal service have that visibility?

14      A.   I don't believe so.

15      Q.   Okay.  Earlier, we were talking

16    about how the postal service helps connect

17    brands with customers, correct?

18         MR. RYAN:  Objection to form.

19         THE WITNESS:  Yes.

20         BY MS. GOODMAN:

21      Q.   And does Google also help connect

22    brands with their customers?

---

HIGHLY CONFIDENTIAL

Page 312

1         MR. RYAN:  Objection to foundation

2    and form.

3         THE WITNESS:  Google is an

4    organization that offers up a number of

5    products and services that help customers --

6    and reach customers in a variety of ways.

7         BY MS. GOODMAN:

8      Q.   The U.S. Postal Service is also an

9    organization that offers up a number of

10    products and services that help businesses

11    reach customers in a variety of ways; is that

12    accurate?

13         MR. RYAN:  Objection to form.

14         THE WITNESS:  There is value to

15    both.

16         BY MS. GOODMAN:

17      Q.   But it is true that the postal

18    service is also an organization that offers up

19    a number of products and services that help

20    businesses reach customers in a variety of

21    ways?

22         MR. RYAN:  Objection to form.

HIGHLY CONFIDENTIAL

Page 313

1    THE WITNESS:  Yes, with probably
2    some -- some caveats in that.
3    BY MS. GOODMAN:
4    Q.    Okay.  And so with respect to
5    helping businesses reach their customers, does
6    the postal service compete with Google?
7    MR. RYAN:  Objection to form and
8    foundation.
9    THE WITNESS:  I think they offer
10   different products and services.
11   BY MS. GOODMAN:
12   Q.    So is your answer no, that the
13   postal service does not compete with Google
14   with respect to helping businesses reach their
15   customers?
16   MR. RYAN:  Objection to form and
17   foundation.
18   THE WITNESS:  Probably depends on
19   what the customers are wanting or looking for.
20   They have similar approaches.  The postal
21   service has the ability to offer products and
22   services, but doesn't limit who can enter in

HIGHLY CONFIDENTIAL

Page 314

1    utilizing those products and services, so you
2    could do it as an individual or you could do it
3    as a -- you could have an entity or business do
4    it for you.  Google has products and services
5    that you could do something as an individual
6    potentially, or you are required to use
7    particular -- potential products and tools to
8    be able to accomplish what you need to for
9    them.
10   BY MS. GOODMAN:
11   Q.    So is it at least fair to say that
12   the postal service provides a way for customers
13   -- businesses to reach their customers that is
14   complementary to services that Google offers
15   businesses in order to reach their customers?
16   MR. RYAN:  Objection to form and
17   foundation.
18   THE WITNESS:  I think both entities
19   have value to them and Google has provided
20   value to customers.
21   BY MS. GOODMAN:
22   Q.    And has Google provided value to the

HIGHLY CONFIDENTIAL

Page 315

1    United States Postal Service from your point of
2    view?
3    A.    We have used Google because they do
4    provide a value for the postal service for
5    certain efforts that we are trying to make.
6    Q.    Okay.
7    MS. GOODMAN:  We can take a break.
8    THE VIDEOGRAPHER:  Going off the
9    record.  The time is 18:50.
10   (A short recess was taken.)
11   THE VIDEOGRAPHER:  Going back on the
12   record.  The time is 19:01.
13   MS. GOODMAN:  For the record, I am
14   ripping off the cover e-mail to Exhibit 36,
15   handing it to opposing counsel since he clawed
16   it back and marking the attachment as 36B.  I
17   will just hand that to the witness but I don't
18   have any questions about it.
19   (Deposition Exhibit 36B was marked
20   for identification.)
21   BY MS. GOODMAN:
22   Q.    Mr. Karpenko, have you had any

HIGHLY CONFIDENTIAL

Page 316

1    conversations with Brian Pasco about this
2    lawsuit?
3    A.    Brian worked for me, and yes, I did
4    have conversations about the information.
5    Q.    Subsequent to Brian Pasco leaving
6    the postal service, have you had any
7    conversations with him about this lawsuit?
8    A.    I have not spoken to Brian since he
9    left.
10   Q.    And so what conversations have you
11   had with -- did you have with Brian while he
12   was still at the postal service with respect to
13   this lawsuit?
14   A.    To provide any information that
15   might be needed.
16   Q.    Did he provide you any information?
17   A.    He gathered up -- in general, he
18   gathered up all of his information because he
19   was leaving and he put it on a share drive.
20   Q.    And was that for purposes of this
21   lawsuit or because it's a records management?
22   A.    Both.

HIGHLY CONFIDENTIAL
Page 321

```
1   Sean Carman
2   sean.carman@usdoj.gov
3                      August 11, 2023
4   RE:    United States, Et Al v. Google, LLC
5        8/10/2023, Christopher Karpenko (#6031969)
6        The above-referenced transcript is available for
7   review.
8        Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com.
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
                       Yours,
22              Veritext Legal Solutions
```

Veritext Legal Solutions
800-567-8658                          973-410-4098

---

HIGHLY CONFIDENTIAL
Page 322

```
1   United States, Et Al v. Google, LLC
2   Christopher Karpenko (#6031969)
3        E R R A T A   S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19
20
21  _____    _____
22  Christopher Karpenko                Date
```

Veritext Legal Solutions
800-567-8658                          973-410-4098

---

HIGHLY CONFIDENTIAL
Page 323

```
1   United States, Et Al v. Google, LLC
2   Christopher Karpenko (#6031969)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Christopher Karpenko, do hereby declare that I
5   have read the foregoing transcript, I have made any
6   corrections, additions, or changes I deemed necessary as
7   noted above to be appended hereto, and that the same is a
8   true, correct and complete transcript of the testimony
9   given by me.
10
11  _____    _____
12  Christopher Karpenko                Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19              NOTARY PUBLIC
20
21
22
```

Veritext Legal Solutions
800-567-8658                          973-410-4098

---

HIGHLY CONFIDENTIAL
[& - 2.1]                                   Page 1

| & | 0000899149-... 5:17 | 12-30-21  8:11 | 16463  262:18 |
|---|---|---|---|
| **& ** 2:6 3:17 4:14 39:10 253:20 254:8 293:6,11 | **000227880-9...** 8:7 | **120**  268:19 | **168**  6:7 |
| | **00108**  1:5 | **125**  5:13 | **16:47**  245:10 |
| **0** | **1** | **127**  205:16 | **16:54**  245:13 |
| **0000016395-...** 7:15 | **1**  9:13 65:2 187:22 206:7,8 | 304:9,12 305:2 | **16:57**  247:22 |
| **0000029221-...** 7:21 | 206:11 216:6 296:5 299:19 | **12:23**  115:21 | **16:59**  248:3 |
| **0000040943**  6:5 | 300:1 303:12 | **12:36**  116:4 | **17**  264:1 |
| **0000041965** 5:22 | 304:1 | **12:42**  122:3 | **17.51**  264:19 |
| **000042055-...** 7:11 | **1,000**  254:12 | **13**  193:21 | **175**  6:10 |
| **0000043815-...** 5:14 | **1,465**  255:22 | **130**  268:21 | **17:51**  287:2 |
| **0000140586-...** 5:9 | **1,701**  254:13 | **135**  5:21 6:4 | **18**  227:14 |
| **0000447582-...** 8:3 | **1-11-23**  5:13,21 | **137,021,402** 203:6 | 252:21,22 |
| **0000492772-...** 7:7 | **1-9-23**  5:8 | **13:39**  122:6 | 253:1,1 300:1 |
| **0000529112-...** 8:12 | **10**  1:16 9:6 268:15 294:19 | **13:42**  125:10 | 302:18 303:5,7 |
| **0000529380-...** 8:16 | 295:6,7 298:4 | **13:43**  125:13 | **186**  301:13 |
| **0000593851-...** 6:16 | 298:10 | **14**  177:6 | **187**  301:8,12 |
| **0000620144-...** 7:18 | **10:56**  69:11 | 182:16 320:22 | **18:09**  287:5 |
| **0000661829-...** 6:20 | **11**  5:3 72:22 219:18 220:1 | **140**  197:14 | **18:50**  315:9 |
| **0000713476-...** 7:3 | 228:9 321:3 | **140586**  53:12 | **18th**  233:16 |
| | **11-16-21**  7:20 | **145**  280:3 | **19**  303:17 |
| | **11s**  242:22 | **14:25**  160:1 | **199**  6:14 |
| | **110**  268:20 | **14:38**  160:4 | **1992**  23:11 |
| | **11411**  306:2,3 | **15**  252:17,19 | **19:01**  315:12 |
| | **11937**  320:19 | **15:41**  210:19 | **19:05**  319:1 |
| | **11:12**  56:1 | **15s**  242:22 | **1:23**  1:5 |
| | **11:17**  69:14 | **16**  126:22 | **2** |
| | **11:28**  80:1 | 282:5 | **2**  56:9,10 57:21 |
| | **11:41**  80:4 | **1600**  210:22 | 70:4 101:9 |
| | **11th**  89:16 90:15 92:3,15 | **161**  163:7 | 105:5 106:6 |
| | | **162**  162:5 163:7,14 | 208:5,20 |
| | | **16395**  262:18 | **2-14-23**  7:9 |
| | | | **2.0**  206:7 |
| | | | **2.1**  200:3,17,19 203:6 299:14 302:7 303:1 |

Veritext Legal Solutions
800-567-8658                          973-410-4098