# EXHIBIT 20

```
                                                              Page 1

 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION
 3

 4       _____
                                      :
         UNITED STATES OF AMERICA,    :
 5       et al.,                      :
                                      :
 6            Plaintiffs              :
                                      :
 7          v.                        :  No.  1:23-cv-00108
                                      :
 8       GOOGLE, LLC,                 :
                                      :
 9            Defendants.             :
         _____:
10
11              Tuesday, August 15, 2023
12
                Video Deposition of ALLEN OWENS,
13
         taken at the Law Offices of Paul, Weiss, Rifkind,
14
         Wharton & Garrison LLP, 2001 K St NW, Washington,
15
         DC, beginning at 9:37 a.m. Eastern Standard Time,
16
         before Ryan K. Black, Registered Professional
17
         Reporter, Certified Livenote Reporter and Notary
18
         Public in and for the District of Columbia
19
20
21
22
23
24
25       Job No. CS6037511
```

Page 2

1   A P P E A R A N C E S :
2
3   UNITED STATES DEPARTMENT OF JUSTICE
    ANTITRUST DIVISION
4   BY: JIMMY MCBIRNEY, ESQ
       CHASE PRITCHETT, ESQ
5      ALVIN CHU, ESQ
       MARK SOSNOWSKY, ESQ - Via Zoom
6      KATHERINE CLEMONS, ESQ - Via Zoom
       JULIA TARVER-WOOD, ESQ - Via Zoom
7   450 5th Street, N W
    Washington, DC 20530
8   202 514 2414
    jimmy mcbirney@usdoj gov
9   chase pritchett@usdoj gov
    alvin chu@usdoj gov
10  mark sosnowsky@usdoj gov
    katherine clemons@usdoj gov
11  julia tarver-wood@usdoj gov
12  Representing - The United States of America
13
14  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP,
    BY: MARTHA L GOODMAN, ESQ
15     LEAH HIBBLER, ESQ
    2001 K St NW,
16  Washington, DC
    202 223 7341
17  mgoodman@paulweiss com
    lhibbler@paulweiss com
18
    Representing - Google LLC
19
20
21
22
23     ALSO PRESENT:
24
    Orson Braithwaite - Legal Videographer
25  Ann Bruck - Department of the Navy

Page 3

1           I N D E X
2   TESTIMONY OF:  ALLEN OWENS            PAGE
3   By Ms. Goodman................................6
4           E X H I B I T S
5   EXHIBIT      DESCRIPTION         PAGE
6   Exhibit 52   a document Bates Numbered
                NAVY-ADS174029 through
7               NAVY-ADS174060..................62
8   Exhibit 53   a document Bates Numbered
                NAVY-ADS256935 through
9               NAVY-ADS257031..................97
10  Exhibit 54   a document Bates Numbered
                NAVY-ADS12756 through
11              NAYV-ADS12800..................102
12  Exhibit 55   a document Bates Numbered
                NAVY-ADS241136 through
13              NAVY-ADS241143.................111
14  Exhibit 56   a document Bates Numbered
                NAVY-ADS15543 through
15              NAVY-ADS15622..................130
16  Exhibit 57   a document Bates Numbered
                NAVY-ADS19114 through
17              NAVY-ADS19182..................146
18  Exhibit 58   a document Bates Numbered
                NAVY-ADS45197 through
19              NAVY-ADS45206..................172
20  Exhibit 59   a document Bates Numbered
                NAVY-ADS103897 through
21              NAVY-ADS103900.................182
22  Exhibit 60   a document Bates Numbered
                NAVY-ADS28530 through
23              NAVY-ADS28531..................187
24
25

Page 4

1           THE VIDEOGRAPHER:  Good morning.  We're
2   going on the record at 9:37 a m. on August 15th,
3   2023.  Please note that the microphones are
4   sensitive and may pick up whispering and private
5   conversations.  Please mute your phones at this
6   time.  Audio and video recording will continue to
7   take place unless all parties agree to go
8   off the record.
9           This is Media Unit 1 of the
10  video-recorded deposition of Mr. Allen Owens
11  in the matter of United States, et al., versus
12  Google LLC, filed in the United States District
13  Court, Eastern District of Virginia, Alexandria
14  Division.  Case Number 1:23-cv-00108-LMB-JFA.
15          My name is Orson Braithwaite,
16  representing Veritext Legal Solutions, and I'm
17  the videographer.  The court reporter is Ryan
18  Black from the firm Veritext Legal Solutions.
19          Counsel will now state their appearances
20  and affiliations for the record.
21          MS. GOODMAN:  Martha Goodman of the law
22  firm Paul Weiss on behalf of Google LLC, and I'm
23  joined by my colleague Leah Hibbler.
24          MR. MCBIRNEY:  Jim McBirney on behalf of
25  the Department of Justice on behalf of the United

Page 5

1   States and the witness.
2           MR. PRITCHETT:  Chase Pritchett on
3   behalf of the United States.
4           MR. CHU:  Alvin Chu on behalf of the
5   United States.
6           MS. GOODMAN:  And then will any
7   attorneys appearing remotely please state your
8   presence.
9           MR. SOSNOWSKY:  Mark Sosnowsky, U.S.
10  Department of Justice.
11          MS. CLEMONS:  Katherine Clemons,
12  Department of Justice.
13          MS. GOODMAN:  Is there any --
14          MS. BRUCK:  Ann Bruck, Department of
15  Navy.
16          THE VIDEOGRAPHER:  We have a Ms. Wood.
17          MS. TARVER-WOOD:  Yes.  This is Julia
18  Tarver-Wood from DOJ.  I'm not officially
19  entering an appearance.  I'll be in and out
20  throughout the day.
21          THE VIDEOGRAPHER:  Thank you.  Will the
22  court reporter please swear in the witness?
23              *   *   *
24  Whereupon --
25          ALLEN OWENS,

Page 86

1  BY MS. GOODMAN:
2      Q.  And thus you don't recall whether they
3  permit you to delete files, correct?
4          MR. MCBIRNEY:  Objection.  Asked and
5  answered.
6          THE WITNESS:  Yeah.  My testimony is,
7  sitting here today, I do not recall the exact
8  stipulations of that policy.
9  BY MS. GOODMAN:
10     Q.  And, therefore, correct, you don't
11 recall whether those policies permit you to
12 delete files?
13         MR. MCBIRNEY:  Objection.
14 BY MS. GOODMAN:
15     Q.  Is that accurate?
16         MR. MCBIRNEY:  Objection.  Asked and
17 answered.
18         THE WITNESS:  Yeah.  So my testimony is,
19 sitting here today, I do not recall the exact
20 stipulations of that policy.
21 BY MS. GOODMAN:
22     Q.  Okay.  And so you can't answer whether,
23 as a result of your inability to recall the exact
24 stipulations of this -- of the policy, you cannot
25 an -- you don't recall whether or not that policy

Page 87

1  permits you to delete files.  Is that accurate?
2          MR. MCBIRNEY:  Objection.  Asked and
3  answered.
4          THE WITNESS:  So it's my testimony that,
5  sitting here today, I don't recall the specific
6  stipulations of that policy.
7  BY MS. GOODMAN:
8      Q.  Okay.  And, therefore, you can't testify
9  one way or another to what that policy says with
10 respect to the deletion of files, correct?
11         MR. MCBIRNEY:  Objection.  Asked and
12 answered.
13         THE WITNESS:  Yeah.  Those were not my
14 words.  I said, sitting here today, I don't
15 remember the exact stipulations of the policy.
16 BY MS. GOODMAN:
17     Q.  Other than a lawyer, has anybody told
18 you anything about preserving documents with
19 respect to this litigation?
20         THE WITNESS:  I'm not sure of the
21 communications I received, whether those would be
22 privileged or not.
23         MR. MCBIRNEY:  If you received
24 communications regarding preserving documents
25 that were either from a lawyer or at the

Page 88

1  direction of a lawyer, that's privileged and I'd
2  instruct you not to answer.  If you received
3  communications about preserving documents that do
4  not fall into those categories and you are
5  confident that they do not come from counsel, you
6  can answer.
7          THE WITNESS:  Yeah.  Then I cannot
8  answer the question without revealing privileged
9  conversations.
10 BY MS. GOODMAN:
11     Q.  And for the record -- and this is a yes
12 or no question -- have you received any direction
13 from anybody with respect to preserving documents
14 related to this litigation?
15         MR. MCBIRNEY:  You can answer that yes
16 or no.
17         THE WITNESS:  Yes.
18 BY MS. GOODMAN:
19     Q.  When did you receive such direction?
20     A.  I don't recall the exact time frame.
21 Earlier this year in 2023.
22     Q.  Was it before or after you learned about
23 this lawsuit?
24     A.  I don't recall.
25     Q.  Prior to this lawsuit, have you ever

Page 89

1  requested legal advice from the Department of
2  Justice Antitrust Division?
3      A.  No.
4      Q.  Prior to learning about this lawsuit,
5  have you ever requested legal advice from the
6  Department of Justice Antitrust Division?
7      A.  No.
8      Q.  Since receiving instructions with
9  respect to preserving documents related to this
10 litigation, have you deleted any documents on any
11 of your devices?
12     A.  Not to my knowledge.
13     Q.  So you've testified that VMLY&R is the
14 ad agency for the Navy; is that correct?
15     A.  That is correct.
16     Q.  And they have been the ad agency for the
17 Navy since, approximately, 2016.  Is that
18 accurate?
19     A.  They have been the ad agency since
20 approximately 2016, yes.
21     Q.  Okay.  And their contract with the Navy
22 was renewed or reentered into in 2021.  Is that
23 accurate?
24     A.  Yes, it was renewed in 2021.
25     Q.  Okay.  Other than the VMLY&R, is there

Page 90

1   any other agency -- ad agency engaged by the
2   Naval -- Navy Recruiting Command related to
3   advertising?
4       MR. MCBIRNEY:  Objection; foundation.
5       THE WITNESS:  Our contract is with
6   VMLY&R.  It's my understanding they have other
7   businesses and agencies that work with them.  But
8   our contract is with VMLY&R.
9   BY MS. GOODMAN:
10      Q.  And are you aware of any contract
11  between the Navy and any other ad agency related
12  to advertising?
13      A.  No.
14      Q.  Were you involved in the selection of
15  VMLY&R when their contract was renewed in 2021?
16      THE WITNESS:  Am I allowed to discuss
17  contractual selection items?
18      MR. MCBIRNEY:  You can answer that
19  question yes or no and we'll go from there.
20      THE WITNESS:  Okay.  Can you ask that
21  question again?
22  BY MS. GOODMAN:
23      Q.  Were you involved in the selection of
24  VMLY&R when their contract was renewed in 2021?
25      A.  Yes.

Page 91

1       Q.  What was your involvement?
2       A.  I was on the panel of folks reviewing
3   the non-price proposals from all vendors.
4       Q.  And when you say "reviewing the
5   non-price proposals," what do you mean by that?
6       A.  So to review -- so when a contract is
7   renewed, multiple businesses can apply for that
8   contract, and non-price proposals are part of
9   that bidding process.  And then a board of people
10  will look at that and review those, and I was on
11  that panel.
12      Q.  What are the kinds of non-price
13  proposals that are put forward as part of that
14  bid -- bidding process?
15      MR. MCBIRNEY:  Object to the form of the
16  question.
17      THE WITNESS:  You'd have to be more
18  specific.  I'm sorry.
19  BY MS. GOODMAN:
20      Q.  Well, what do you mean by non-price
21  proposals?  What do those entail?
22      A.  Those are proposals of how the vendor or
23  the business would satisfy the requirements given
24  in the work statement in the RFQ.
25      Q.  And so specifically with respect to

Page 92

1   selecting an advertising agency, what are the
2   things that you looked for in the non-price
3   proposals that mattered to you in selecting a
4   business to contract with?
5       A.  Sure.  I don't recall the specific
6   criteria.  That was a few years ago.
7       Q.  How about generally?  What do you
8   recall what mattered to you in terms of non-price
9   proposals when selecting an ad agency?
10      A.  In general, that they demonstrated in
11  their write-up a thorough understanding of the
12  requirement and ability to meet the requirement.
13      Q.  And what was the requirement that the
14  Navy put forward with respect to finding a
15  contractor related to advertising?
16      A.  Sure.  It was a -- a work statement that
17  was issued -- multi-page work statement.
18      Q.  What are the kinds of things that the
19  Navy wanted from an advertiser?
20      MR. MCBIRNEY:  Objection; vague.
21      THE WITNESS:  Yeah.  Sitting here today,
22  I -- I don't recall the specifics contained in
23  that work statement, --
24  BY MS. GOODMAN:
25      Q.  How about generally?

Page 93

1       A.  -- but it was for advertising services.
2       Q.  Okay.  And so what kind of things are
3   important to you when you're selecting a ad
4   agency to provide advertising services?
5       MR. MCBIRNEY:  Objection; form and asked
6   and answered.
7       THE WITNESS:  In general, that they
8   have a demonstrated ability to perform and an
9   understanding of those requirements that are
10  contained in the work statement document.
11  BY MS. GOODMAN:
12      Q.  What requirements, if any, do you
13  recall that were contained in the work statement
14  document put out by the Navy with respect to
15  advertising?
16      A.  Yeah.  That was -- that was a large
17  document over two years ago.  I don't recall the
18  specifics of that document.
19      Q.  How about generally?
20      A.  Generally, as I testified a moment ago,
21  that they have a thorough understanding of -- of
22  the requirements in there and that they have a
23  demonstrated ability to perform those
24  requirements.
25      Q.  Right.  My question is what, if

24 (Pages 90 - 93)

Page 94

1  anything, do you generally recall about what the
2  requirements were?
3      MR. MCBIRNEY: Objection. Asked and
4  answered.
5      THE WITNESS: Yeah. I would be
6  assuming, and -- and I don't want to do that.
7  I -- I can't -- I can't remember specifics from
8  that document.
9  BY MS. GOODMAN:
10     Q. And can you remember anything generally
11  with respect to the work requirements the Navy
12  -- that the Navy put out with respect to
13  selecting an advertiser -- ad agency, I should
14  say?
15     A. I cannot.
16     Q. Okay. Who was involved in evaluating
17  the price proposal as part of the process to
18  select an ad agency?
19     A. It's my understanding that that was
20  done at the FLC, Fleet Logistics Center --
21     Q. And who --
22     A. -- by the contracting officer.
23     Q. Who was the contracting officer at the
24  Fleet Logistics Center evaluating the price
25  proposal?

Page 95

1      A. I believe it was Ms. Lozzi.
2      Q. Did you have any conversations with
3  Ms. Lozzi with respect to the price proposal put
4  forward by various businesses at this time?
5      A. No.
6          MR. MCBIRNEY: Object to the form of the
7  question.
8          Make sure you wait for me.
9  BY MS. GOODMAN:
10     Q. Did you review the price proposal
11  submitted by VMYL&R as part of the 2021 contract
12  selection process?
13     A. I do not believe so.
14     Q. Did you review the non-price proposal
15  put forward by them?
16     A. Yes.
17     Q. Prior to the contract selection process,
18  you had experience working with VMYL&R, correct?
19     A. Can you be more specific?
20     Q. So in March of 2020 when you took on the
21  job as deputy director of marketing, VMYL&R was
22  the contractor providing ad services, correct?
23     A. Yes. VMLY&R was the contractor at -- at
24  the time when I took over in March of 2020, yes.
25     Q. Okay. And so as a result of your

Page 96

1  taking over that role in March of 2020, you had
2  experience working with VMYL&R, correct?
3      A. Yes.
4      Q. Okay. And so what -- what, if
5  anything, based on that experience, did you find
6  significant with respect to selecting VMLY&R for
7  a contract renewal?
8          MR. MCBIRNEY: Objection. Assumes
9  facts. Vague.
10         THE WITNESS: Yeah. I -- I don't
11  recall the specifics of the review of the
12  non-price proposals and what was considered and
13  what was put down there.
14  BY MS. GOODMAN:
15     Q. Is there a reason you were not involved
16  in evaluating the pricing proposal for this
17  contract selection?
18         MR. MCBIRNEY: Objection. Assumes
19  facts.
20         THE WITNESS: Yeah. I -- I'm not
21  certain why that's the case. I just know that to
22  be the case, is that we were reviewing the
23  non-price proposal.
24         MS. GOODMAN: Can I have 22?
25         I'm marking Exhibit 53 NAVY-ADS256935

Page 97

1  through 257031.
2      (Exhibit No. 53, a document Bates
3  Numbered NAVY-ADS256935 through NAVY-ADS257031,
4  was introduced.)
5  BY MS. GOODMAN:
6      Q. And, sir, do you recognize this as the
7  contract entered into between the Navy and VMYL&R
8  in 2021?
9      A. I'm going to need a moment to just
10  review this.
11     Q. Sure.
12     A. (Reviews document.)
13         Okay. Can you ask that question again?
14     Q. Yes. Do you recognize Exhibit 53 as the
15  contract entered into between the Navy and VMYL&R
16  in 2021?
17     A. Yes.
18     Q. Okay.
19     A. Except it may be that it was with Y&R
20  at the time. I believe there was a name change
21  during the course.
22     Q. So Y&R, you're referring to in Box 17a.
23  where it says Young & Rubicam; is that right?
24     A. Correct.
25     Q. And Young & Rubicam at some point became

25 (Pages 94 - 97)

|  | Page 98 |  | Page 100 |
|---|---|---|---|
| 1 | VY -- VMLY&R? | 1 | THE WITNESS: Not to my knowledge. |
| 2 | A. VMLY&R. The Y&R remained from this. | 2 | BY MS. GOODMAN: |
| 3 | Q. VMLY&R. | 3 | Q. And then if you turn to page ending in |
| 4 | A. Yep. | 4 | 948 where it sees -- where it says Item Number |
| 5 | Q. And is it in -- as part of your job as | 5 | 2002 on the left-hand side, -- |
| 6 | the contracting officer representative or the COR | 6 | A. Mm-hmm. |
| 7 | on this contract, are you familiar with the terms | 7 | Q. -- is this the not-to-exceed price for |
| 8 | of the contract? | 8 | subsequent years of this contract? |
| 9 | A. Yes. | 9 | A. For a subsequent year of the contract, |
| 10 | Q. And if you look at the fifth page of | 10 | yes. |
| 11 | the document -- I'm sorry. My copy doesn't have | 11 | Q. Fair. |
| 12 | Bates Numbers at the bottom, but -- sorry. Go | 12 | And so where we -- if you flip a few |
| 13 | back a page. | 13 | pages, where it -- ending in 953, option Line |
| 14 | Thank you. | 14 | Item 3002 where it says "option," that's for |
| 15 | Bates ending in 937. | 15 | another subsequent year, correct? |
| 16 | A. I'm sorry? | 16 | A. Yes. |
| 17 | Q. 937, the bottom -- the numbers at | 17 | Q. And so each subsequent year is denoted |
| 18 | the bottom of the page, those are called Bates | 18 | by a different line item number beginning with |
| 19 | Numbers, I want to direct your attention to the | 19 | two, three or four, depending on the year of the |
| 20 | page ending in 937. | 20 | contract option, correct? |
| 21 | A. Okay. | 21 | MR. MCBIRNEY: Object to the form. |
| 22 | Q. Okay. You see where it says Item Number | 22 | THE WITNESS: Give me just one moment to |
| 23 | 2? | 23 | look at this. I want to make sure I give you an |
| 24 | A. Yes. | 24 | accurate answer. |
| 25 | Q. Okay. And where it says "Max Amount" on | 25 | Okay. Can you ask that question again? |

|  | Page 99 |  | Page 101 |
|---|---|---|---|
| 1 | the right-hand side you see it says "NTE"? | 1 | I'm sorry. |
| 2 | A. Yes. | 2 | BY MS. GOODMAN: |
| 3 | Q. Does that mean not to exceed? | 3 | Q. Yeah. So the numbers one, two, three |
| 4 | A. That's my understanding, yes. | 4 | and four in front of these various line items, |
| 5 | Q. Okay. And so in particular Line Item | 5 | those represent the contract terms for subsequent |
| 6 | Number 2 is for media placement not to exceed the | 6 | years under this contract, correct? |
| 7 | approximately $56 million amount listed on this | 7 | MR. MCBIRNEY: Same objection. |
| 8 | page; is that right? | 8 | THE WITNESS: To my knowledge, those |
| 9 | A. Yes. That would appear correct. | 9 | first -- that first digit number denotes |
| 10 | Q. Okay. And so this contract does not set | 10 | subsequent years. |
| 11 | the amount of media that must be bought; is that | 11 | BY MS. GOODMAN: |
| 12 | correct? | 12 | Q. Okay. And if you flip to the page |
| 13 | A. That is correct. | 13 | ending in 7028, I want to direct your |
| 14 | Q. And this contract does not set the price | 14 | attention to where it says "Attachments to |
| 15 | at which media should be bought, correct? | 15 | solicitation/contract." Do you see that? |
| 16 | MR. MCBIRNEY: Objection. Calls for a | 16 | A. Yes. |
| 17 | legal conclusion. | 17 | Q. Okay. Have you ever reviewed the |
| 18 | THE WITNESS: Yeah. I mean, I don't | 18 | attachments referenced here as a result of your |
| 19 | have the legal expertise to answer that question. | 19 | work as the contracting officer representative on |
| 20 | BY MS. GOODMAN: | 20 | this contract? |
| 21 | Q. This contract doesn't have anything in | 21 | A. Yes. |
| 22 | it that says what price to be paid for any | 22 | Q. And those attachments are -- would you |
| 23 | particular media purchase, correct? | 23 | consider those attachments part of this contract? |
| 24 | MR. MCBIRNEY: Same objection. The | 24 | A. I would consider them attachments to the |
| 25 | document speaks for itself. | 25 | contract. |

26 (Pages 98 - 101)

Page 118

1  placing ads with using -- utilizing a specific
2  partner or considering alternate -- alternate
3  spends. But there's nothing -- there's nothing
4  routine or specific.
5  BY MS. GOODMAN:
6      Q.  Okay. Is it often the case that you
7  approve their recommended plan without edit?
8         MR. MCBIRNEY: Objection; vague.
9         THE WITNESS: Yeah. I can't recall
10 the -- the number of edits that I would issue to
11 them.
12 BY MS. GOODMAN:
13     Q.  Do you -- have you ever approved a
14 recommended plan without making an edit?
15     A.  Sitting here today, I -- I don't recall.
16     Q.  One way or another?
17     A.  Right.
18     Q.  How does VMLY&R go about purchasing ads?
19        MR. MCBIRNEY: Objection; foundation.
20 And vague.
21        THE WITNESS: Yeah. So we have the
22 contract with VMLY&R. And we set the strategy
23 and have them come to us with those recommended
24 tactics. But we don't tell them how to go and
25 purchase it, so ...

Page 119

1  BY MS. GOODMAN:
2      Q.  So sitting here today, do you know how
3  VMLY&R goes about purchasing ads?
4         MR. MCBIRNEY: Objection; vague.
5         THE WITNESS: Sitting here today, I
6  don't know their exact process of purchasing the
7  ads on our behalf.
8  BY MS. GOODMAN:
9      Q.  Okay. How about at a more general
10 level? Rather than their exact process, do you
11 know generally how they go about purchasing ads?
12     A.  Sitting here today, it's my testimony
13 that I am not aware of their process to go and
14 purchase the ads.
15     Q.  Okay. What does Wavemaker do?
16     A.  It's my understanding that Wavemaker is
17 the arm of VMLY&R which purchases the ads.
18     Q.  Okay. So do you have an understanding
19 with respect to Wavemaker and VMLY&R with respect
20 to purchasing of ads?
21        MR. MCBIRNEY: Object to the form of the
22 question.
23        THE WITNESS: So our contract is with
24 VMLY&R, and I'm not privy to their exact business
25 relationships with -- with their companies.

Page 120

1  BY MS. GOODMAN:
2      Q.  Okay. So you don't know anything about
3  any contractual relationships between VMLY&R and
4  Wavemaker. Is that accurate?
5      A.  I don't know the exact legal business
6  relationship between the two.
7      Q.  Do you have any understanding about the
8  contractual relationship between the two?
9         MR. MCBIRNEY: Objection. Assumes
10 facts.
11        THE WITNESS: Yeah. As stated, I do
12 not know the specific legal business definition
13 or arrangement between the two.
14 BY MS. GOODMAN:
15     Q.  Okay. Do you have any understanding
16 about any relationship between VMLY&R and
17 Wavemaker with respect to digital ad purchases
18 on behalf of the Navy?
19     A.  Yeah. Sitting here today, I -- I don't
20 know that -- that specific legal business
21 arrangement.
22     Q.  Okay. Do you know if any contract
23 exists between VMLY&R and Wavemaker?
24     A.  Sitting here today, I don't have the
25 specific business contractual relationship

Page 121

1  between the two.
2      Q.  So you don't know if any contract
3  exists; is that correct?
4         MR. MCBIRNEY: Objection. Asked and
5  answered.
6         THE WITNESS: Sitting here today, I am
7  unaware of the specific, exact legal business
8  arrangement between those two entities.
9  BY MS. GOODMAN:
10     Q.  Okay. I understand you don't know
11 the exact legal business arrangement between
12 Wavemaker and VMLY&R.
13     A.  Mm-hmm.
14     Q.  I want to know whether you have any
15 knowledge or awareness of any contract between
16 the two?
17        MR. MCBIRNEY: Objection. Asked and
18 answered.
19        THE WITNESS: I'm aware of our contract
20 with VMLY&R, and I'm unaware of the specific
21 arrangement between them and Wavemaker.
22 BY MS. GOODMAN:
23     Q.  Have you ever seen a contract between
24 VMLY&R and Wavemaker?
25        MR. MCBIRNEY: Objection. Asked and

Page 122

1 answered.
2 THE WITNESS: I do not recall seeing the
3 specific contract between the two.
4 BY MS. GOODMAN:
5 Q. Okay. Is it important to you to
6 understand what the specific legal arrangement is
7 between VMLY&R and Wavemaker in your capacity as
8 the contracting officer representative for the
9 contract with Y&R?
10 A. No.
11 Q. Why not?
12 A. That specific legal arrangement would be
13 important to the contracting officer issuing the
14 contract with VMLY&R.
15 Q. And why do you say it would be important
16 to the contracting officer?
17 MR. MCBIRNEY: Objection; foundation.
18 THE WITNESS: That is a contractual
19 issue of which the contracting officer handles
20 those issues.
21 BY MS. GOODMAN:
22 Q. Okay. So do you know one way or another
23 if the contracting officer has any knowledge or
24 awareness of a legal arrangement between VMLY&R
25 and Wavemaker?

Page 123

1 A. I can't speak on behalf of someone else.
2 Q. Okay. So you don't know if the
3 contracting officer has any knowledge or
4 awareness of such a contractual arrangement,
5 correct?
6 A. My testimony is that I'm not going to
7 speak on behalf of someone else of what they do
8 or don't know.
9 Q. Okay. Have you ever had any
10 conversations with the contracting officer
11 about any legal arrangement between VMLY&R and
12 Wavemaker?
13 A. Not that I recall.
14 Q. Okay. So to your knowledge, what
15 -- what does Wavemaker do with respect to the
16 contract between VMLY&R and the Navy?
17 MR. MCBIRNEY: Object to the form of the
18 question.
19 THE WITNESS: To my knowledge, as I
20 testified a moment ago, it's my understanding
21 that they do the media purchasing for the Navy as
22 part of that contract.
23 BY MS. GOODMAN:
24 Q. Okay. Do you know anything about how
25 Wavemaker goes about the media purchasing for the

Page 124

1 Navy under the contract?
2 A. As I testified earlier, I don't know
3 their exact process of how they go about
4 purchasing the media.
5 Q. Okay. Do you ever discuss with
6 Wavemaker what prices they have negotiated for
7 any particular media purchase?
8 A. I have on occasion.
9 Q. What occasions are you recalling sitting
10 here today?
11 A. Sitting here today, I can recollect
12 vaguely some conversations of asking for
13 clarifications on CPMs if either the math
14 didn't add up or the cost seemed a little high.
15 Q. And when you say "CPM," what do you
16 mean?
17 A. The cost per impressions or cost per
18 mille.
19 Q. How many conversations are you
20 recollecting with respect to seeking
21 clarification on CPMs with Wavemaker?
22 A. I can't recollect an exact amount.
23 Q. Approximately how many?
24 A. I don't know.
25 Q. Okay. Do you know how Wavemaker gets

Page 125

1 paid?
2 MR. MCBIRNEY: Objection; vague.
3 THE WITNESS: I don't know how they get
4 paid.
5 BY MS. GOODMAN:
6 Q. Do you know if Wavemaker is paid before
7 or after Navy makes any payment to VMLY&R under
8 the contract?
9 A. I don't know how Wavemaker gets paid.
10 Q. And you don't know when they get paid
11 relative to the Navy's payments under the
12 contract. Is that accurate?
13 A. I am unaware how or when they get paid.
14 Q. What are the Key Performance Indicators
15 that are important to the Navy with respect to
16 digital media buys?
17 A. So KPIs important to -- to the Navy
18 could range from impressions, engagements, gross
19 leads, program-eligible leads, qualified and
20 interested leads, contracts, website views,
21 click-through rates --
22 MS. GOODMAN: I haven't marked the
23 document yet.
24 THE WITNESS: I'm sorry.
25 BY MS. GOODMAN:

32 (Pages 122 - 125)

Page 126

1  Q. I was talking to your counsel.
2  A. Oh.
3  Q. Go ahead. I'm sorry.
4  A. I mean, those are some of the top-line
5  items.
6  Q. What are Gross Leads?
7  A. A Gross Lead is anyone who raises their
8  hand, whether that be via taking the call to
9  action on an ad and/or completing an RFI, or
10 Request For Information, on Navy.com. But it's
11 an unfiltered lead that hasn't been looked at for
12 qualification.
13 Q. And so what is a Qualified and
14 Interested Lead?
15 A. A Qualified and Interested Lead is a
16 lead that has passed the basic qualifications
17 of age, citizenship and education and has also
18 positively answered a number of what we call
19 blueprinting questions, which are questions
20 that ask more in-depth about the person, height,
21 weight, felony and criminal use -- drug use,
22 those types of questions, and have been found to
23 meet all of those qualifications and has still
24 indicated interest in talking to a recruiter.
25 Q. And what -- when you were speaking

Page 127

1  about KPIs, describe for me what the contract KPI
2  means?
3       MR. MCBIRNEY: Objection to the extent
4  it calls for a legal conclusion.
5       THE WITNESS: Can you be more specific?
6  BY MS. GOODMAN:
7  Q. Well, you said one of your KPIs is
8  contracts, correct?
9  A. Okay.
10 Q. What do you mean?
11 A. Sure. What I mean by that is two
12 items: One, the overall number of contracts
13 that we get at Navy Recruiting Command. And a
14 contract is putting someone in the Navy, them
15 contracting to join the Navy. The second is the
16 number of contracts derived from marketing and
17 advertising efforts directly.
18 Q. And how do you -- how does the Navy, to
19 your knowledge, go about calculating the number
20 of contracts derived from marketing and
21 advertising efforts directly?
22 A. Sure. There's two ways. One, there's
23 a lead source indicator on the record of that
24 person. And if it's accurately captured, it
25 would say that they came in as a -- as a lead

Page 128

1  source from a national advertising lead. And
2  then additionally, what we do is look at our
3  NALTS system, which is the National Advertising
4  Lead Tracking System, and compare it to all the
5  names of the people who contracted for the month
6  and look to see if there was an earlier date in
7  NALTS.
8  Q. So is it possible for a digital ad to be
9  the source from which a contract is derived?
10 A. Yes.
11 Q. Can you give an example of where a
12 digital ad may be the source from which a
13 contract is derived?
14 A. Sure. If someone clicks on an ad and
15 they're taken to Navy.com to fill out the RFI,
16 the Request For Information, that person could
17 become a lead and could then become a contract
18 and then it could be tied back to that ad via the
19 DEC code that's embedded, the -- I don't remember
20 the exact acronym, but it's a code that's
21 embedded so we're able to tell where the person
22 came from.
23 Q. Okay. What kinds of digital ads, from
24 your point of view, have been most successful in
25 leading to contracts?

Page 129

1  A. I can't list a specific type of ad,
2  because it's the marketing mix that brings in
3  leads. Ads by themselves may just be creating
4  awareness and may or may not result in someone
5  deciding to walk into a recruiting station,
6  in which case we'd never be able to directly
7  attribute that. So it's the marketing mix
8  overall that we look at.
9  Q. So before you described that somebody
10 could click on an ad, go to Navy.com, fill out
11 the RFI, become a lead and then become a contract
12 and you talked about a DEC code --
13 A. Mm-hmm.
14 Q. -- that's embedded, so you're able to
15 tell where the person came from. So in that
16 particular scenario where you can tell what kind
17 of digital ad the person came from, do you have a
18 view as to which kinds of digital ads are most
19 successful in leading to a contract?
20 A. I do not, because those numbers are
21 -- are extremely small, usually. So sitting here
22 today, I cannot -- I cannot answer that question.
23 Q. Okay. And you also talked about the
24 marketing mix that brings in leads. What do you
25 mean by that?

33 (Pages 126 - 129)

Page 130

1  A. So we know that someone's decision to
2  join the Navy is not based off of seeing an ad
3  or, you know, one thing in particular, but that
4  it's multiple touch points. And so we look at
5  our marketing mix as providing all of those touch
6  points to influence someone's decision to join.
7  Q. And what are the kinds of touch points
8  that you consider as part of your marketing mitch
9  -- mix when influencing somebody's decision to
10 join the Navy?
11 A. Sure. It could be seeing a commercial,
12 seeing a display ad. It could be seeing a
13 recruiter in their high school. It could be
14 attending an air show and seeing the Blue Angels;
15 a piece of direct mail that tells them about a
16 bonus. Those types of things.
17 Q. Okay. How about social media? Is that
18 a touch point?
19 A. Yes.
20 Q. And how about online video? Is that a
21 touch point?
22 A. Yes.
23       (Exhibit No. 56, a document Bates
24 Numbered NAVY-ADS15543 through NAVY-ADS15622, was
25 introduced.)

Page 131

1  BY MS. GOODMAN:
2  Q. Okay. I'm handing you Exhibit 56,
3  NAVY-ADS15543 through 15622. And because it is
4  a lengthy document, I will guide you through it
5  in my questioning. And I just want to start at
6  the cover email, which is from Timorie Belk to
7  Jennifer Kelly, yourself, Suzanne Ray, Demetra
8  Sangster, and others, attaching a Data Czar Bible
9  and an October 2022 Analytics Assessment and
10 October '22 Channel Summary.
11      My question to you, sir, is what is a
12 Data Czar Bible?
13 A. Sure. The Data Czar Bible is a
14 spreadsheet that has all of the raw data that
15 supports the figures that are put together in the
16 end of month report.
17 Q. The -- sorry. I missed -- I may not
18 have heard that fully. The raw data in the Data
19 Czar Bible are -- support the figures that are
20 put together in what report?
21 A. The end-of-month, EOM, report.
22 Q. Okay. Is it important to you to see the
23 figures in the Data Czar Bible on a regular basis
24 in your role as director of marketing at the
25 Navy?

Page 132

1  A. It's important to me that my team sees
2  those figures so they can look at it, analyze it
3  and identify any discrepancies or questions. But
4  I myself don't routinely look at that
5  spreadsheet.
6  Q. And so this document -- this email also
7  attaches the EOM reports. Are those the
8  end-of-month reports?
9  A. Yes, they are.
10 Q. Okay. And do you routinely review the
11 end-of-month reports as director of marketing?
12 A. Yes, I do.
13 Q. Okay. If you turn to Page 15566, what
14 are priority channel reviews reflected on this
15 page?
16 A. Give me just a moment to --
17     (Reviews document).
18     So the priority channel reviews on Page
19 15566 are showing a few different things. To the
20 left-hand side, you're looking at the cyber
21 qualified and interested lead trends, as well as
22 the gross new contract trends. In the middle
23 you're looking at walk-ins. And as I testified
24 earlier, we know that our marketing has an
25 indirect impact on folks deciding to walk into a

Page 133

1  recruiting station, so that's why that's being
2  looked at, as well as PDC, which stands for
3  Personally Developed Contact. So it's usually
4  another way that the recruiter will record if
5  they meet someone.
6      If someone walks up to them at an
7  event, they'll record it as a PDC. If that's
8  a marketing event, that could be considered a
9  marketing lead. So that's where there's a line
10 that gets blurred.
11 Q. So in this slide, what does "cyber"
12 mean? What are some of the examples of how
13 somebody is a cyber-qualified and interested lead
14 or a cyber GNC?
15 A. Sure. Cyber is a team of recruiters
16 that work for me that answer when someone wants
17 to chat on Navy -- excuse me -- on Navy.com.
18 Q. Okay. Please turn to 15583. And I'm
19 looking under Highlights by Channel where it says
20 Story-telling Channels.
21 A. Mm-hmm.
22 Q. You see it says Digital/Video?
23 A. Yes.
24 Q. First question is, do you have any
25 understanding as to why digital and video are

Page 202

1  wanted to change that 520k from Trade Desk to
2  either YouTube, Amazon or anything else, --
3     BY MS. GOODMAN:
4       Q.  Okay.
5       A.  -- but that within the realms of the
6  Trade Desk they would be able to allocate it
7  according to how this reads.
8       Q.  And if they wanted to make adjustments
9  in realtime to switch, for example, between
10 Connected TV on the Trade Desk and banner ads on
11 the Trade Desk, they had authority to do that
12 so long as they stayed within the $520,000
13 authorized.  Is that accurate?
14      A.  Yeah.  My -- my testimony is that if
15 they were going to deviate from the Trade Desk to
16 any of the other companies, they would need to
17 seek approval.  But, otherwise, they would not.
18      Q.  And so, therefore, in the circumstance
19 I'm describing, which is limited to spending
20 money via the Trade Desk, okay, if VMLY&R thought
21 it best to move $1 from Connected TV on the Trade
22 Desk to $1 on banner ads on the Trade Desk as
23 they are watching how the campaign is performing,
24 they had the authority to do so without seeking
25 your approval, correct?

Page 203

1       MR. MCBIRNEY:  Objection.  Asked and
2  answered.
3       THE WITNESS:  My testimony, as I've
4  stated, is that if the ad agency, VMLY&R, was to
5  deviate from this approved plan they would need
6  to seek my approval; however, if they are not
7  deviating from what's stated in this approved
8  plan, they would not need to seek my approval.
9     BY MS. GOODMAN:
10      Q.  So the answer is yes.
11      MR. MCBIRNEY:  Objection.  Asked and
12 answered.  Mischaracterizes the testimony.
13      THE WITNESS:  Again, my testimony is if
14 they're going to deviate from an approved plan,
15 they would seek my approval.  Otherwise, they
16 would not have to seek my approval.
17    BY MS. GOODMAN:
18      Q.  Okay.  Therefore, they don't need
19 to seek your approval in order to move $1 from
20 Online Banner ads to Connected TV so long as that
21 single dollar is within the $520,000 approved in
22 this particular instance.  Is that accurate?
23      MR. MCBIRNEY:  Objection.  Asked and
24 answered.  Mischaracterizes testimony.
25      THE WITNESS:  So it's my testimony that

Page 204

1  so long as VMLY&R adheres to the approved plan,
2  they do not need to seek my approval.
3     BY MS. GOODMAN:
4       Q.  And do you know, is it VMLY&R who
5  are -- who is making these realtime optimization
6  decisions, or is it somebody else?
7       MR. MCBIRNEY:  Objection; vague.
8       THE WITNESS:  Yeah.  I don't know the
9  exact person who's making optimizations.
10    BY MS. GOODMAN:
11      Q.  Do you know what company that the person
12 who makes the optimizations works for, whether it
13 be VMLY&R or Wavemaker or somebody else?
14      A.  I'm not privy to the exact legal
15 business relationship between Wavemaker and
16 VMLY&R, but I know that per my contract with
17 VMLY&R that they would have someone on the team
18 making these realtime optimizations.
19      Q.  Okay.  I'm not asking about the business
20 relationship or the legal relationship.  I'm
21 asking whether you know, in your capacity as the
22 director of marketing based on your experience
23 working in that job on these digital ad buys over
24 the last three-plus years, do you know who makes
25 the realtime optimization decisions?

Page 205

1       A.  I -- sitting here today, I do not know
2  who makes that realtime optimization.
3       Q.  Okay.  Do you know, not their name, but
4  the company for which they work?
5       MR. MCBIRNEY:  Objection; vague.
6       THE WITNESS:  Yeah.  I -- sitting here
7  today, I can't be certain if it would be VMLY&R
8  or Wavemaker.
9     BY MS. GOODMAN:
10      Q.  Okay.  And could it be somebody at the
11 Trade Desk making those realtime optimization
12 decisions?
13      MR. MCBIRNEY:  Objection; foundation.
14      THE WITNESS:  Sitting here today, I
15 don't know.
16    BY MS. GOODMAN:
17      Q.  Okay.  Let's go back to that spreadsheet
18 attached to Exhibit 58.  I just have one question
19 at the end of it.
20      A.  Sure.
21      Q.  When we were looking at the
22 Recommended Partners, the one on the first page
23 of this spreadsheet, --
24      A.  Yes.
25      Q.  -- it's accurate that these are all

Page 206

1  partners that the Navy is using at the same
2  time with respect to digital ad spend. Is that
3  accurate?
4      A. Maybe not exactly the way you described,
5  because it's broken down into months.
6      Q. Okay.
7      A. So, for instance, YouTube Masthead looks
8  to appear in September but not July and August.
9      Q. Okay. So the -- the companies or part
10 -- partners who have dollars allocated to them in
11 the month of September, those are all being used
12 at the same time. Is that accurate?
13     A. Sitting here today, to the best of my
14 knowledge, yes.
15         MS. GOODMAN: Okay. Shall we take a
16 break?
17         MR. MCBIRNEY: Sure.
18         THE VIDEOGRAPHER: The time is 4:37 p m.
19 This ends Unit 4. We're off the record.
20         (Recess taken.)
21         THE VIDEOGRAPHER: The time is 4:54 p m.
22 This begins Unit Number 5. We're on the record.
23 BY MS. GOODMAN:
24     Q. Mr. Owens, have you heard the term Open
25 Web Display advertising?

Page 207

1      A. I have heard that term.
2      Q. What do you understand it to mean?
3      A. I'm not certain the exact meaning of
4  Open Web Display advertising.
5      Q. Aside from its exact meaning, what do
6  you generally understand that term to mean?
7      A. I generally understand it to mean
8  display advertising.
9      Q. And when you say "display advertising,"
10 what do you mean by that?
11     A. Placement of display ads.
12     Q. And does display advertising include
13 placement of display ads on the New York Times,
14 if they're purchased directly from the New York
15 Times?
16         MR. MCBIRNEY: Objection; foundation.
17         THE WITNESS: Yeah. I -- again, I don't
18 have a -- a firm enough understanding of that
19 term specifically to -- to answer in any more
20 detail than that.
21 BY MS. GOODMAN:
22     Q. Okay. Are you aware of any different
23 kinds of display ads or -- when you -- strike
24 that.
25         Can you give any examples of display

Page 208

1  advertising?
2      A. Sure. Display advertising could be ads
3  placed on unique individual websites.
4         (Whereupon realtime feed froze due to
5  internet disconnection.)
6         THE REPORTER: I think it stopped. Can
7  we --
8         MS. GOODMAN: Yeah. Let's take a break.
9         THE VIDEOGRAPHER: The time is 4:57 p m.
10 We're going off the record.
11        (Recess taken.)
12        THE VIDEOGRAPHER: The time is 5:03 p m.
13 We're on the record.
14 BY MS. GOODMAN:
15     Q. Mr. Owens, does the term Display
16 Advertising, as you understand it, include
17 placing ads on websites through a direct deal
18 between the publisher and the advertiser?
19        MR. MCBIRNEY: Objection; foundation.
20        THE WITNESS: Display Advertising, as I
21 know it, is advertising by the use of display
22 ads, to my knowledge.
23 BY MS. GOODMAN:
24     Q. Okay. And, to your knowledge, just
25 again for the record, what is your understanding

Page 209

1  of the term Open Web Display Advertising?
2         MR. MCBIRNEY: Objection; foundation.
3  Asked and answered.
4         THE WITNESS: As I testified, I'm
5  familiar with the term; however, I don't know the
6  definition of Open Web Display Advertising.
7  BY MS. GOODMAN:
8      Q. How are you familiar with the term Open
9  Web Display Advertising?
10     A. I've -- I've seen the term. But,
11 again, I -- I can't describe to you exactly the
12 definition of that. But, in general terms, I
13 understand it to be, as stated earlier, Display
14 Advertising.
15 BY MS. GOODMAN:
16     Q. Okay. Where have you seen the term Open
17 Web Display Advertising?
18     A. I can't recollect exactly where I saw
19 it.
20     Q. Generally speaking, can you describe
21 anywhere you've seen the term Open Web Display
22 Advertising, such as in emails or documents
23 with your ad agency, on -- on other websites
24 discussing the advertising industry, any place
25 that you recall seeing that term?

Page 210

1    MR. MCBIRNEY: Object to form.
2    THE WITNESS: Sitting here today, I -- I
3 cannot remember where I've seen that term.
4    BY MS. GOODMAN:
5    Q. Do you recall ever seeing it in any
6 documents provided to you by VMLY&R?
7    A. As mentioned a moment ago, I cannot
8 recall where I've seen the term.
9    Q. And, thus, you don't know whether you've
10 seen it in any documents provided by VMLY&R,
11 correct?
12    MR. MCBIRNEY: Objection. Asked and
13 answered. Mischaracterizes the testimony.
14    THE WITNESS: Yeah. As I -- as I
15 testified, I don't recollect where I've seen the
16 term.
17    BY MS. GOODMAN:
18    Q. Okay. Have you had any discussions
19 with anybody about the term Open Web Display
20 Advertising and what it means?
21    A. Not to my knowledge.
22    Q. Prior to the filing of this lawsuit
23 in January of 2023, were you aware of any
24 anticompetitive conduct on the part of Google
25 affecting Navy's advertising?

Page 211

1    MR. MCBIRNEY: You can answer that
2 question to the extent it does not disclose
3 communications with counsel.
4    THE WITNESS: To my knowledge, no.
5    BY MS. GOODMAN:
6    Q. And how about prior to this lawsuit,
7 did you ever have any concerns in your capacity
8 as the director of marketing for the Navy
9 Recruiting Command that Google was engaging in
10 anticompetitive conduct related to digital
11 advertising?
12    MR. MCBIRNEY: Object to foundation.
13    THE WITNESS: Prior to this, I had no
14 knowledge of nor reason to suspect that of
15 Google.
16    BY MS. GOODMAN:
17    Q. Prior to this lawsuit, did you have
18 ever -- did you ever have any concerns that
19 Google was engaging in any conduct that was
20 causing the Navy harm with respect to its digital
21 advertising?
22    A. Sitting here today, I can -- I can think
23 of no reason to believe that.
24    Q. You described Google, in fact, as a
25 partner of the Navy, right?

Page 212

1    MR. MCBIRNEY: Objection. Assumes
2 facts.
3    THE WITNESS: Oftentimes, a lot of the
4 businesses that we use will be referred to as a
5 partner if we're doing business with them, so
6 I -- I may have referred to Google as a partner.
7    BY MS. GOODMAN:
8    Q. Has Google helped the Navy with respect
9 to recruiting more sailors to join?
10    MR. MCBIRNEY: Objection; foundation.
11    THE WITNESS: We have found lots of
12 value in many of the Google buys that we've done.
13    BY MS. GOODMAN:
14    Q. And the Google buys that you've done
15 that you've found value in, does that relate to
16 YouTube buys?
17    A. Yes.
18    Q. Okay. And how about with respect to
19 search?
20    A. Yes.
21    Q. Okay. Can you describe in any more
22 detail the value that you have found in many of
23 the Google buys that the Navy has done?
24    A. In particular, some of the YouTube
25 activations we've had have had extremely high

Page 213

1 video completion rates.
2    Q. Any other --
3    THE VIDEOGRAPHER: Counsel, the Zoom's
4 offline.
5    MS. GOODMAN: Let's take a break.
6    MR. MCBIRNEY: We're going to be here a
7 while.
8    THE VIDEOGRAPHER: The time is 5:07 p m.
9 We're going off the record.
10    (Recess taken.)
11    THE VIDEOGRAPHER: Time is 5:14 p.m.
12 We're on the record.
13    BY MS. GOODMAN:
14    Q. Mr. Owens, can you describe any other
15 instances that the Navy has found value in any of
16 the Google buys that it has done?
17    A. Paid search, as well. We've found value
18 there.
19    I don't have a list at the ready, but
20 -- but there's -- it's been on many occasions.
21    Q. Can you approximate the number of
22 occasions that you've found value in Google buys
23 for the Navy?
24    MR. MCBIRNEY: Objection; foundation.
25    THE WITNESS: Yeah. I -- I can't

Page 278

1  Q. Other than yourself, was there
2  any person who is not a lawyer who provided
3  information that assisted in responding to the
4  interrogatories that you verified?
5      MR. MCBIRNEY: Objection to foundation.
6      THE WITNESS: Yeah. As I -- as I
7  testified earlier, I did have members of my
8  team assist me in providing my response to the
9  interrogatories.
10 BY MS. GOODMAN:
11 Q. Okay. Anybody outside of members of
12 your team assist in providing information to help
13 in res -- responding to the interrogatories?
14     MR. MCBIRNEY: Same objection.
15     THE WITNESS: Not that I recall.
16 BY MS. GOODMAN:
17 Q. Anybody at Wavemaker provide information
18 that assisted in responding to these
19 interrogatories?
20 A. Not that I recall.
21 Q. Same question as to VMLY&R.
22 A. Not that I recall.
23 Q. Did Mr. Edmondson provide any
24 information that was -- that assisted in
25 responding to the interrogatories that you

Page 279

1  verified?
2  A. I would consider him to be covered under
3  the question of VMLY&R, so not that I recall.
4  Q. Same question as to Sandra Mouio?
5  A. And same response. I would consider her
6  to be part of the Wavemaker entity, so not that I
7  recall.
8      MR. MCBIRNEY: Can I get a check on the
9  time?
10     THE VIDEOGRAPHER: 7:02.
11     MR. MCBIRNEY: I guess that's time.
12     MS. GOODMAN: Thank you for your time,
13 Mr. Owens.
14     THE VIDEOGRAPHER: Off the record,
15 Counsel?
16     MS. GOODMAN: Yes.
17     MR. MCBIRNEY: Off the record.
18     THE VIDEOGRAPHER: The time is 7:03 p.m.
19 We're off the record.
20     (Deposition concluded -- 7:02 p.m.)

Page 280

CERTIFICATE

I do hereby certify that I am a Notary Public in good standing, that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 17th day o

_____
Notary Public

Page 281

Jimmy McBirney, Esq.
jimmy.mcbirney@usdoj.gov
                August 17, 2023
RE: United States, Et Al v. Google, LLC
    8/15/2023, Allen Owens (#6037511)
    The above-referenced transcript is available for review.
    Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.
    The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com

Return completed errata within 30 days from receipt of testimony.
    If the witness fails to do so within the time allotted, the transcript may be used as if signed.

        Yours,
        Veritext Legal Solutions