# EXHIBIT 21

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

UNITED STATES, et al.,            ) 1:23-cv-00108-LMB-JFA
                                  )
    Plaintiffs,                   )
                                  )
vs.                               )
                                  )
GOOGLE LLC,                       )
                                  )
    Defendants.                   )
_____)

- HIGHLY CONFIDENTIAL -

VIDEOTAPED 30(b)(6) DEPOSITION OF

UNITED STATES DEPARTMENT OF VETERANS AFFAIRS

through the testimony of

KOBY SMITH

August 31, 2023

4:09 p.m.

Reported by: Bonnie L. Russo
Job No. CS6074125

Veritext Legal Solutions
800-567-8658                                                    973-410-4098

HIGHLY CONFIDENTIAL

Page 2

1  Videotaped 30(b)(6 Deposition of United States
2  Department of Veterans Affairs through the
3  testimony of Koby South held at:
4
5
6     Paul Weiss Rifkind Wharton & Garrison, LLP
7     2001 K Street, N.W.
8     Washington, D.C.
9
10
11
12
13
14
15
16
17
18  Pursuant to Notice, when were present on behalf
19  of the respective parties:
20
21
22

Page 3

1  APPEARANCES:
2  On behalf of the Plaintiffs:
3    SEAN CARMAN, ESQUIRE
    VICTOR LIU, ESQUIRE
4    ALVIN CHU, ESQUIRE
    KATHERINE E. CLEMONS, ESQUIRE
5    UNITED STATES DEPARTMENT OF JUSTICE
    450 Fifth Street, N.W., Suite 700
6    Washington, D.C. 20530
    sean.carman@usdoj.gov
7    victor.liu@usdoj.gov
    alvin.chu@usdoj.gov
8    katherine.clemons@usdoj.gov
9
  On behalf of the Defendant:
10
    ERIN J. MORGAN, ESQUIRE
11    PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON, LLP
12    1285 Avenue of the Americas
    New York, New York 10019
13    ejmorgan@paulweiss.com
14      -and-
15    HEATHER MILLIGAN, ESQUIRE
    ANNELISE CORRIVEAU, ESQUIRE
16    MARTHA L. GOODMAN, ESQUIRE (Via Remote)
    PAUL, WEISS, RIFKIND,
17    WHARTON & GARRISON, LLP
    2001 K Street, N.W.
18    Washington, D.C. 20006
    hmilligan@paulweiss.com
19    acorriveau@paulweiss.com
    mgoodman@paulweiss.com
20
21  Also Present:
    Orson Braithwaite, Videographer
22  Laura Reass, Department of Veterans Affairs

Page 4

1          I N D E X
2  EXAMINATION OF KOBY SOUTH     PAGE
3  BY MS. MORGAN            7
4
5
6
          EXHIBITS
7
          (NONE.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 5

1        P R O C E E D I N G S
2        (4:09 p.m.)
3
4      THE VIDEOGRAPHER: We are going on
5  the record at 4:09 p.m. on August 31, 2023.
6      This is Media Unit 1 of the
7  video-recorded deposition of Mr. Koby South in
8  the matter of United States, et al., versus
9  Google LLC filed in the United States District
10  Court, Eastern District of Virginia, Alexandria
11  Division, Case No. 1:23-cv-00108-LMB-JFA.
12      My name is Orson Braithwaite
13  representing Veritext Legal Solutions, and I am
14  the videographer. The court reporter is Bonnie
15  Russo from the firm Veritext Legal Solutions.
16      Counsel will now state their
17  appearances and affiliations for the record.
18      MS. MORGAN: I'm Erin Morgan. I'm
19  from the law firm Paul Weiss, and we represent
20  Google. I am here with my two colleagues,
21  Heather Milligan and Annelise Corriveau.
22      MR. CARMAN: Sean Carman for the

HIGHLY CONFIDENTIAL

Page 22

1  contract is not buying that paid media," are
2  you referring to the District Communications
3  Group buying paid media from Google?
4      A.  Yes.
5      Q.  Okay.  And does the District
6  Communications Group invoice the Office of
7  Public Health within the Department of Veterans
8  Affairs for the purchase of paid media from
9  Google?
10         MR. CARMAN:  Objection.  Form.
11         THE WITNESS:  I would assume, yes.
12         BY MS. MORGAN:
13      Q.  And does the Office of Public Health
14  within the Department of Veterans Affairs pay
15  the District Communications Group for the paid
16  media purchases that the District
17  Communications Group makes from Google in
18  connection with the Airborne Hazards and Open
19  Burn Pit Registry campaign?
20         MR. CARMAN:  Object to form.
21         THE WITNESS:  I lost you on that
22  one.

Page 23

1         BY MS. MORGAN:
2      Q.  Does the Office of Public Health pay
3  Direct Communications Group --
4      A.  District.
5      Q.  Sorry.  District Communications
6  Group for paid media purchases that the
7  District Communications Group makes from Google
8  in connection with the Airborne Hazards and
9  Open Burn Pit Registry campaign?
10     A.  I wouldn't categorize it that way.
11  They are not paying them for it.  It's a
12  transfer of funds in that it's being passed
13  through -- it's being passed through the
14  contractor to whatever ad tech platform the ads
15  are being purchased from.  You're not paying
16  the District Communications Group with the paid
17  media dollars.  You're passing it through.
18     Q.  Does the Office of Public Health
19  transfer funds to the District Communications
20  Group for purchases of paid media from Google?
21         MR. CARMAN:  Object to form.
22         THE WITNESS:  Yes.

Page 24

1         BY MS. MORGAN:
2      Q.  Does the District Communications
3  Group ever transfer funds directly to Google --
4         MR. CARMAN:  Objection --
5         BY MS. MORGAN:
6      Q.  -- for purchases of paid media?
7         MR. CARMAN:  Objection to form and
8  calls for a legal conclusion.
9         THE WITNESS:  Yeah.  I think that --
10  I would say can you -- the way you asked it,
11  no.
12        BY MS. MORGAN:
13     Q.  Does the District Communications
14  Group -- you testified that District
15  Communications -- or, sorry.  That the Office
16  of Public Health transfers funds to the
17  District Communications Group.
18        Do you remember that?
19     A.  Yes.
20     Q.  Okay.  What did you understand
21  "transfer of funds" to mean when you answered
22  that question?

Page 25

1      A.  They are moving it from one place to
2  another place.
3      Q.  Does the Office of Public Health
4  transfer funds or move funds from the Office of
5  Public Health into Google with no middleman?
6      A.  No.
7         MR. CARMEN:  I meant to object to
8  the form to that last question.  Sorry.
9         BY MS. MORGAN:
10     Q.  In your preparation did you prepare
11  to testify about the Veterans Health
12  Administration Recruitment Marketing and
13  Advertising campaign?
14     A.  Yes.
15     Q.  What office within the VA is in
16  charge of that campaign?
17     A.  I think it's VHA workforce
18  management.
19     Q.  Who did you talk to in preparing to
20  testify about that campaign?
21     A.  Darren Sherrard.
22     Q.  Who is Darren Sherrard?

Page 26

1  A. I don't know his exact title. He is
2  a project program manager for workforce
3  recruiting.
4  Q. Is he the contracting officer for
5  that campaign?
6  A. No.
7  Q. Did you talk to the contracting
8  officer for that campaign?
9  A. I'm not sure it was the exact
10 contracting officer for that campaign.
11 Q. Did you talk to anyone besides
12 Darren Sherrard.
13 A. There were two other people on that
14 call. I don't actually remember their names.
15 Q. Are you familiar with Aptive
16 Resources LLC?
17 A. Yes.
18 Q. What is Aptive Resources LLC?
19 A. They are a service, disabled
20 veteran-owned, small business, woman-owned,
21 small business that provides boutique strategic
22 communication products and services to

Page 27

1  government agencies and corporations and stuff.
2  Q. Does Aptive Resources have a -- a
3  contract with the VHA in connection with the
4  Veterans Health Administration Recruitment
5  Marketing and Advertising Campaign?
6  A. Yes.
7  Q. What does that contract cover? What
8  services are provided under that contract?
9  A. It's a broad contract to secure and
10 recruit hard-to-reach healthcare professionals
11 in a nutshell.
12 Q. Does that contract -- is that a
13 firm-fixed-price contract?
14 A. Yes.
15 Q. Under that contract is Aptive
16 Resources LLC responsible for developing media
17 plans for the Veterans Health Administration
18 Recruitment Marketing and Advertising Campaign?
19    MR. CARMAN: Objection to form.
20    THE WITNESS: Yes.
21    BY MS. MORGAN:
22 Q. Under that contract does Aptive

Page 28

1  Resources purchase media to support the
2  Veterans Health Administration Recruitment
3  Marketing and Advertising Campaign?
4     MR. CARMAN: Object to form and
5  foundation.
6     THE WITNESS: I would say again
7  under that contract the government is
8  authorizing Aptive Resources to securitize
9  advertisements in the pursuit of recruiting
10 hard-to-find, hard to -- hard-to-recruit
11 healthcare professionals at the direction of
12 the United States Government.
13    BY MS. MORGAN:
14 Q. Does Aptive Resources secure --
15 secure or purchase media from Google in
16 connection with the Veterans Health
17 Administration Recruitment Marketing and
18 Advertising Campaign?
19    MR. CARMAN: Objection. Form.
20 Foundation.
21    THE WITNESS: I would say that
22 Aptive secures paid advertising for the United

Page 29

1  States Government under the bounds of the
2  contract.
3     BY MS. MORGAN:
4  Q. Do you know if it secures paid
5  advertising under that contract from Google?
6     MR. CARMAN: Objection. Form.
7  Foundation.
8     BY MS. MORGAN:
9  A. As I recall, I think it does.
10 Q. Do you know what Google products it
11 uses? Does it use any Google ad tech products?
12 A. I don't recall that the -- the
13 information I collected cited any specific
14 Google ad tech products that were used.
15 Q. And are you able to name any Google
16 ad tech products that are used in connection
17 with the Veterans Health Administration
18 Recruitment Marketing and Advertising Campaign?
19    MR. CARMAN: Objection. Form.
20    THE WITNESS: I am not.
21    BY MS. MORGAN:
22 Q. Did you ask anyone what Google

Page 30

1  products were used in connection with that
2  campaign as you were preparing to testify on
3  behalf of the Department of Veterans Affairs?
4      A.   Again, we asked specifically about
5  ad tech products, not Google ad tech products.
6  And once again it was -- in this instance
7  Darren Sherrard referenced making decisions on
8  how their paid media is authorized and spent
9  based on the populations that they are pursuing
10 as opposed to the processes or products that
11 are used.
12      So what's going to work best for me
13 to recruit a bunch of nurses?  Is it going to
14 be LinkedIn, or is it going to be banner and
15 badge ads?  So they're more concerned about the
16 results as opposed to the mechanism for getting
17 there, which is pretty similar for most
18 campaigns of this nature at the Department of
19 Veterans Affairs.  We are looking for results
20 and performance as opposed to dictating exactly
21 what ad tech products an agency must use.
22      Q.   So am I correct in understanding

Page 31

1  that in your conversations preparing to testify
2  about the Veterans Health Administration
3  Recruitment Marketing and Advertising Campaign,
4  no one identified for you any specific ad tech
5  that was used in connection with that campaign?
6          MR. CARMAN:  Object to form.
7          THE WITNESS:  Unless you would
8  consider something like LinkedIn or Facebook or
9  Twitter an ad tech product, which was
10 identified specifically to this.
11         BY MS. MORGAN:
12     Q.   Would you consider those to be ad
13 tech products?
14         MR. CARMAN:  Object to form.
15         THE WITNESS:  I mean, I think an
16 argument can be made since you're buying them
17 directly from there.
18         BY MS. MORGAN:
19     Q.   And when we were talking about the
20 District Communications Group, we talked about
21 the transfer of funds between the District
22 Communications Group, the Office of Public

Page 32

1  Health, and the ad tech providers that -- from
2  whom the District Communications Group secures
3  media.
4      Do you remember those questions that
5  we were just going through a few minutes ago?
6      A.   Uh-huh.  Yes.
7      Q.   Do you know whether Aptive Resources
8  buys any kind of media space from Google in
9  connection with the Veterans Health
10 Administration Recruitment Marketing and
11 Advertising Campaign?
12         MR. CARMAN:  Object to form and
13 foundation.
14         THE WITNESS:  Again, I wouldn't
15 characterize it as Aptive buying advertising
16 products directly.  They are -- again, they are
17 operating under the approval of the United
18 States Government and the paid media plan and
19 purchasing or securing advertising at the
20 direction of the VA program manager.
21         BY MS. MORGAN:
22     Q.   Do you know whether media is

Page 33

1  purchased from Google in connection with the
2  Veterans Health Administration Recruitment
3  Marketing and Advertising Campaign?
4          MR. CARMAN:  Object to form and
5  foundation.
6          THE WITNESS:  As I recall, yes.
7          BY MS. MORGAN:
8      Q.   From where at Google is that media
9  purchased?
10         MR. CARMAN:  Object to form and
11 foundation.
12         THE WITNESS:  I don't think that was
13 specified.
14         BY MS. MORGAN:
15     Q.   Are there particular tools at Google
16 that are used to purchase media for the
17 Veterans Health Administration Recruitment
18 Marketing and Advertising Campaign?
19         MR. CARMAN:  Object to form and
20 foundation.
21         THE WITNESS:  I don't recall that
22 being discussed.

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1  BY MS. MORGAN:
2  Q. If media is bought from Google in
3  connection with the Veterans Health
4  Administration Recruitment Marketing and
5  Advertising Campaign, does the Veterans Health
6  Administration pay for that media through a
7  middleman?
8      MR. CARMAN: Object to form and
9  foundation. Calls for a legal conclusion.
10     THE WITNESS: I would not call it a
11 middleman. Advertising is being secured
12 through a contract.
13     BY MS. MORGAN:
14 Q. Does the Office of Public -- of
15 the -- sorry.
16     Does the Office of the VHA transfer
17 or move funds into Google without a middleman?
18     MR. CARMAN: Objection. Form.
19 Foundation. Calls for a legal conclusion.
20     THE WITNESS: Money for paid media
21 is moved through a representative of the United
22 States Government under the bounds of a

Page 35

1  legally-binding contract.
2      BY MS. MORGAN:
3  Q. Is the representative of the United
4  States Government you are referring to Aptive
5  Resources LLC?
6  A. Yes, in this specific instance.
7  Q. Yes, I am asking specifically about
8  this campaign.
9  A. Workhorse, yeah.
10 Q. Did you prepare to testify today
11 about the ChooseVA outreach and strategic
12 communications campaigns to expand awareness of
13 VA resources and support recruitment and
14 employee retention efforts?
15 A. Yes.
16 Q. Will you -- will you --
17 A. Can you say that again.
18 Q. Did you prepare to testify today
19 about the ChooseVA outreach and strategic
20 communications campaigns to expand awareness of
21 VA resources and support recruitment and
22 employee retention efforts?

Page 36

1  A. Okay. Yes.
2  Q. Is there a shorter way that we can
3  agree to refer to that campaign that will make
4  sense to you?
5  A. ChooseVA will be acceptable.
6  Q. Okay. I'm going to refer to -- I'm
7  going to say ChooseVA, but I'm going to be
8  referring to that whole description I just gave
9  you. Do you understand?
10 A. I do.
11 Q. What did you do to prepare to
12 testify about ChooseVA?
13 A. I talked to Gary Tallman and Lyndon
14 Johnson in the Office of Public and
15 Intergovernmental Affairs.
16 Q. Is the ChooseVA campaign with --
17 does the ChooseVA campaign fall under the
18 umbrella of the Office of Public --
19 A. And Intragovernmental Affairs.
20 Q. Office of Public what?
21 A. And Intragovernmental Affairs.
22 Q. Intergovernmental Affairs?

Page 37

1  A. I think it's intra.
2  Q. Intra.
3      Does the ChooseVA campaign fall
4  within that office?
5  A. Yes.
6  Q. Did you talk to the contracting
7  officer for that campaign?
8  A. I don't recall that she was the
9  contracting -- I talked to a contracting
10 officer. I don't recall that she was the exact
11 contracting officer for that campaign. I -- I
12 think she was.
13 Q. Okay. And what's her name?
14 A. Lindi, L-I-N-D-I, Johnson. I don't
15 recall her exact name. I -- yeah.
16 Q. Okay. Does Aptive Resources do any
17 work in connection with the ChooseVA campaign?
18 A. Yes.
19 Q. What does Aptive Resources do in
20 connection with the ChooseVA campaign?
21 A. They provide strategic communication
22 services for that office.

10 (Pages 34 - 37)

Page 38

1  Q.  Did you review the contract under
2  which those services are provided?
3  A.  I don't remember or recall that
4  contract.
5  Q.  Do you know if it's a firm, fixed --
6  firm-fixed-price contract?
7  A.  It's highly likely that it's a
8  firm-fixed-price contract.
9  Q.  When you say "it's highly likely,"
10 do you just mean that you don't specifically
11 remember?
12     MR. CARMAN:  Object.
13 Mischaracterizes his testimony.
14     THE WITNESS:  It is.
15     BY MS. MORGAN:
16 Q.  In connection with the ChooseVA
17 campaign, does Aptive Resources develop media
18 plans for that campaign?
19 A.  Yes.
20 Q.  Does Aptive Resources purchase media
21 for that campaign?
22 A.  Aptive Resources secures paid media

Page 39

1  advertisements under the guidance and approval
2  of the program managers for that program.
3  Q.  Does Aptive --
4     MR. CARMAN:  For the record I wanted
5  to object to the last question.  Sorry.
6     BY MS. MORGAN:
7  Q.  Does Aptive Resources secure paid
8  media for the ChooseVA campaign from Google?
9     MR. CARMAN:  Again, object to form
10 and foundation to the last two questions.
11     THE WITNESS:  Under the guidance and
12 under the boundaries of the contract and at the
13 direction of the program manager and the
14 contracting officer's representative, yes.
15     BY MS. MORGAN:
16 Q.  What -- does it use any -- does
17 it -- does it secure paid media through any
18 Google ad tech tools?
19     MR. CARMAN:  Object to form and
20 foundation.
21     THE WITNESS:  Not that the two
22 individuals I referenced that I spoke to

Page 40

1  recalled.  You said Google specifically.  Not
2  that they were aware of.
3     BY MS. MORGAN:
4  Q.  Did they recall any other ad tech
5  tools that are used to secure paid media for
6  the ChooseVA outreach?
7     MR. CARMAN:  Object to form and
8  foundation.
9     THE WITNESS:  I think they
10 referenced again Facebook or Instagram or
11 things like that.
12     BY MS. MORGAN:
13 Q.  Do you know whether the ChooseVA
14 outreach campaign uses banner ads?
15 A.  I think they do.
16 Q.  Do you know whether the Veterans
17 Health Administration Recruitment Marketing and
18 Advertising campaign uses banner ads?
19 A.  I think occasionally they do.
20 Q.  Why do you say occasionally for that
21 one?
22 A.  I think they do, yes.

Page 41

1  Q.  For -- do you know whether the
2  Airborne Hazards and Open Burn Pit Registry
3  campaign uses banner ads?
4  A.  I don't recall.
5  Q.  Do you know where the banner ads
6  that are used in the Veterans Health
7  Administration Recruitment Marketing and
8  Advertising campaign appear?
9  A.  Specifically?
10 Q.  Or generally.  Just what do you know
11 about it based on your prep?
12 A.  Banner badge ads.  Again, this was
13 workforce management.
14 Q.  Veterans Health Administration
15 Recruitment Marketing --
16 A.  Yeah.
17 Q.  -- and Advertising campaign?
18 A.  As Darren mentioned and I mentioned
19 at the beginning of talking about him, they
20 follow audiences, and so stating specifically
21 where a banner ad would appear would be, from
22 my perspective, almost impossible.

11 (Pages 38 - 41)

Page 54

1  BY MS. MORGAN:
2  Q. Well, I am just trying to understand
3  why you're -- why you're referencing American
4  Express. But let me ask the question a
5  different way.
6  A. Because you're asking about transfer
7  of funds.
8  MR. CARMAN: I don't think there is
9  a pending question.
10  BY MS. MORGAN:
11  Q. I am -- what I am trying to
12  understand is whether funds are transferred --
13  well, let me ask this: Does Google invoice --
14  send an invoice to the Office of Mental Health
15  and Suicide Prevention for paid media purchased
16  for suicide prevention campaigns?
17  MR. CARMAN: Object to form.
18  THE WITNESS: No.
19  BY MS. MORGAN:
20  Q. Does the Office of Mental Health and
21  Suicide Prevention pay for services that are
22  never invoiced?

Page 55

1  MR. CARMAN: Object to form.
2  THE WITNESS: Can you repeat that.
3  BY MS. MORGAN:
4  Q. Yeah. Would the Office of Mental
5  Health and Suicide Prevention ever just
6  transfer money to a company if it did not
7  receive an invoice from that company?
8  MR. CARMAN: Object to form.
9  THE WITNESS: I mean, that's a very
10  hypothetical. I'm going to -- no. No.
11  BY MS. MORGAN:
12  Q. Did you prepare to testify today
13  about campaigns to promote use of secure
14  storage for firearms to prevent suicide
15  including but not limited to Keep It Secure and
16  Lethal Means Safety?
17  A. Yes.
18  Q. If I refer to that group of
19  campaigns as firearm --
20  A. Lethal Means.
21  Q. Lethal Means. Okay. I will refer
22  to that as Lethal Means, and you will

Page 56

1  understand me to mean the full description I
2  just read. Can we agree on that?
3  A. Yes.
4  Q. What did you do to prepare to
5  testify about the Lethal Means campaigns?
6  A. I spoke to a representative from the
7  suicide prevention program.
8  Q. Who did you speak to?
9  A. Dr. Todd Burnett and Juliana
10  Hallows.
11  Q. Are those the same two people you
12  spoke to in connection with the suicide
13  prevention campaigns?
14  A. Yes.
15  Q. Are the Lethal Means campaigns also
16  under the umbrella of the Office of Mental
17  Health and Suicide Prevention?
18  A. Yes.
19  Q. Are you familiar with an entity
20  called Trilogy Federal, LLC?
21  A. To a limited extent.
22  Q. What is Trilogy Federal based on

Page 57

1  your understanding?
2  A. A service, disabled veteran-owned
3  small business that provides strategic
4  communication service.
5  Q. Does Trilogy Federal provide
6  strategic communication services in connection
7  with the Lethal Means campaigns?
8  A. Yes.
9  Q. Is there a contract between Trilogy
10  Federal and the Office of Mental Health and
11  Suicide Prevention that covers that, those
12  campaigns?
13  A. Currently?
14  Q. Yes.
15  A. Not that I'm aware of.
16  Q. Was there a prior contract between
17  Trilogy Federal and the Office of Mental Health
18  and Suicide Prevention that covered Lethal
19  Means campaigns?
20  A. Yes.
21  Q. Do you know when that contract -- if
22  that contract has expired?

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1  A.  I do not.
2  Q.  Do you know why there is no longer a
3  contract in place between Trilogy Federal and
4  Lethal Means?
5      MR. CARMAN:  Object to form.
6      BY MS. MORGAN:
7  Q.  Do you know why there is no longer a
8  contract in place between Trilogy Federal and
9  the Office of Mental Health and Suicide
10 Prevention in connection with the lethal means
11 campaign?
12 A.  That program is looking to
13 consolidate and refine how it does contracting.
14 Q.  Does that mean they're using a
15 different contractor?
16 A.  Or attempting to create a new
17 contract.
18 Q.  Did you review the preexisting
19 contract between Trilogy Federal and the Office
20 of Mental Health and Suicide Prevention that
21 covers the Lethal Means campaigns?
22     MR. CARMAN:  Object to form.

Page 59

1      THE WITNESS:  Yes.
2      BY MS. MORGAN:
3  Q.  Do you know whether that was a
4  firm-fixed-price contract?
5  A.  Yes.
6  Q.  Do you know whether that contract
7  directed Trilogy Federal to develop media plans
8  for the Lethal Means campaigns?
9  A.  As I recall, yes.
10 Q.  Do you know whether that contract
11 directed Trilogy Federal to purchase media to
12 support the campaign -- the Lethal Means
13 campaigns?
14     MR. CARMAN:  Object to form.
15     THE WITNESS:  Can you repeat the
16 question.
17     BY MS. MORGAN:
18 Q.  Yeah.  Do you know whether the
19 contract between Trilogy Federal and the Office
20 of Mental Health and Suicide Prevention
21 directed Trilogy Federal to secure paid media
22 for the Lethal Means campaigns?

Page 60

1      MR. CARMAN:  Same objection.
2      THE WITNESS:  As I recall, that
3  contract, yes, authorized that entity to
4  purchase paid media under the direction of the
5  government.
6      BY MS. MORGAN:
7  Q.  Do you know if banner ads were
8  included in the paid media purchased for the
9  Lethal Means campaigns?
10     MR. CARMAN:  Object to form.
11     THE WITNESS:  To the -- I think so.
12 I'm not entirely sure.  I think they were.
13     BY MS. MORGAN:
14 Q.  Do you know where those banner ads
15 appeared?
16 A.  This would have been similar to all
17 the other campaigns we have spoken of.  They
18 would have, you know, targeted at-risk veterans
19 and would have looked for mechanisms to get
20 those ads in places where they thought they
21 would do the most good, you know.
22 Q.  Does Trilogy Federal invoice the

Page 61

1  Office of Mental Health and Suicide Prevention
2  for paid media that is purchased in connection
3  with the Lethal Means campaigns?
4      MR. CARMAN:  Object to form.
5      THE WITNESS:  Yes.
6      BY MS. MORGAN:
7  Q.  Does the Office of Mental Health and
8  Suicide Prevention pay those invoices?
9      MR. CARMAN:  Object to form.
10     THE WITNESS:  Yes.
11     BY MS. MORGAN:
12 Q.  Do you know if Trilogy Federal uses
13 Google to secure paid media for the Lethal
14 Means campaigns?
15     MR. CARMAN:  Object to form.
16     THE WITNESS:  I do not.
17     BY MS. MORGAN:
18 Q.  Did you ask anyone if the Lethal
19 Means campaigns -- if media -- paid media is
20 secured through Google in connection with the
21 Lethal Means campaigns?
22     MR. CARMAN:  Object to form.

Page 62

1  THE WITNESS: We asked specifically
2  about ad tech products, and again, they did not
3  have a strong understanding of the ad tech
4  product but mentioned that they give direction
5  on goals and what they would like to achieve.
6    And the contractor then uses that to
7  create recommendations that everyone agrees
8  upon, and then those ads are placed in places
9  that will achieve those goals.
10   BY MS. MORGAN:
11   Q. When you spoke to people about the
12  Lethal Means campaigns, did anyone name any ad
13  tech product to you that is used to purchase
14  paid media for the Lethal Means campaign?
15   MR. CARMAN: Object to form.
16   THE WITNESS: Again, they would have
17  referenced maybe some platforms that could also
18  be, you know, argued as being ad tech
19  platforms. So I would say possibly.
20   BY MS. MORGAN:
21   Q. Do you know whether DV360 is used to
22  purchase paid media for the Lethal Means

Page 63

1  campaign?
2    MR. CARMAN: Object to form.
3    THE WITNESS: I would have to look
4  at an invoice. I -- I would feel semiconfident
5  saying that it likely is.
6    BY MS. MORGAN:
7    Q. Do you know if Google issues an
8  invoice to the Office of Mental Health and
9  Suicide Prevention for any, media that is
10  secured for the lethal means campaign using
11  Google products?
12   MR. CARMAN: Object to form.
13   THE WITNESS: Google would not
14  invoice the United States Government that I am
15  aware of, and I am not aware of the Department
16  of Veterans Affairs having a contract directly
17  with Google.
18   BY MS. MORGAN:
19   Q. We talked earlier about the suicide
20  prevention campaign. Do you know whether
21  banner ads are a part of the suicide prevention
22  campaign?

Page 64

1  A. That was the Veterans Crisis Line,
2  Suicide Prevention Line, there was a couple
3  others.
4  Q. Yeah. It was Veterans Crisis Line,
5  be there more than ever before, reach and
6  prevent.
7  A. I think they were likely used at
8  some point during the length of all of those
9  efforts.
10  Q. Do you know whether banner ads are
11  still used today in connection with any of
12  those campaigns?
13  A. Most of those campaigns have been
14  sunsetted for other things, like, lethal means
15  -- other than the crisis line, and I think, you
16  know, what they use varies. I think they do
17  use some banner ads.
18   Be there, reach, prevents, no longer
19  exists.
20  Q. Did you do any preparation to
21  testify about general mental health and suicide
22  prevention awareness in education outreach

Page 65

1  support services campaign, to reduce the stigma
2  associated with mental health conditions,
3  increase mental health literacy and connect
4  veterans with VA mental healthcare?
5  A. No.
6  Q. Did you not prepare to testify on
7  that subject because that is within the scope
8  of your ordinary course of business in your
9  job?
10  A. Yes, ma'am.
11  Q. You testified in your 30(b)(1)
12  deposition that Reingold is a contractor that
13  provides communication services for those
14  campaigns.
15   Do you remember that?
16  A. Yes, ma'am.
17  Q. Does Reingold invoice -- well, does
18  Reingold provide media planning services for
19  those campaigns?
20  A. Reingold creates media plans, along
21  with the -- the VA employees that are then, you
22  know, deliberated and discussed and then

17 (Pages 62 - 65)

Page 66

1  eventually approved.
2      Q.  Does Reingold secure a paid media
3  for the general mental health campaigns?
4          MR. CARMAN:  Objection.  Form.
5  Foundation.
6          BY MS. MORGAN:
7      Q.  Do you understand what I mean when I
8  say "general mental health campaign"?
9      A.  Yes, the big long title you
10  referenced earlier, yes, ma'am.
11         Reingold, under the direction of the
12  government, within the boundaries of the
13  contract, secures paid media in accordance with
14  an approved paid media plan at the direction of
15  the government.
16     Q.  Does Reingold invoice the Office of
17  Mental Health and Suicide Prevention for media
18  that it secures in connection with general
19  mental health campaigns?
20         MR. CARMAN:  Objection to form.
21         THE WITNESS:  Yes.
22         BY MS. MORGAN:

Page 67

1      Q.  Does the Office of Mental Health and
2  Suicide Prevention pay those invoices?
3          MR. CARMAN:  Object to form.
4          THE WITNESS:  Yes.
5          BY MS. MORGAN:
6      Q.  Does Reingold use any Google
7  products to secure paid media for general
8  mental health campaigns?
9          MR. CARMAN:  Object to form.
10         THE WITNESS:  To the best of my
11  knowledge, I think they use DV360.
12         BY MS. MORGAN:
13     Q.  Does Google send an invoice directly
14  to the Office of Mental Health and Suicide
15  Prevention for the use of DV360 in securing
16  paid media for mental health campaigns?
17         MR. CARMAN:  Object to form.
18         THE WITNESS:  No.  The Office of
19  Mental Health and Suicide Prevention does not
20  receive invoices from Google.
21         BY MS. MORGAN:
22     Q.  Is the contract between -- is there

Page 68

1  a contract between Reingold and the Office of
2  Mental Health and Suicide Prevention for the
3  services provided by Reingold in connection
4  with general mental health campaigns?
5      A.  Didn't we ask that at the beginning?
6  Is there a contract between Reingold and the
7  Office of Mental Health and Suicide Prevention
8  for general mental health outreach and support
9  services basically?
10     Q.  Yes.
11     A.  Yes, there is a contract between
12  them.
13     Q.  Is that -- is that a
14  firm-fixed-price contract?
15     A.  That is a firm-fixed-price contract.
16     Q.  All right.  Sitting here today, do
17  you know any Google products besides DV360 for
18  which -- that have been used -- sorry.
19         Sitting here today, do you know any
20  Google products besides DV360 that have been
21  used to secure paid media for any Department of
22  Veterans Affairs' campaign that we just

Page 69

1  discussed?
2          MR. CARMAN:  Object to form.
3          THE WITNESS:  I am not aware of any,
4  no.
5          BY MS. MORGAN:
6      Q.  Is it your understanding that the
7  Department of Veterans Affairs has paid fees
8  for ad tech services provided by Google through
9  DV360?
10         MR. CARMAN:  Object to form.
11         THE WITNESS:  I have, in a limited
12  capacity, I have seen invoices that include
13  fees related to using DV360.
14         BY MS. MORGAN:
15     Q.  Who sent those invoices?
16     A.  Those invoices were submitted to the
17  Office of Mental Health and Suicide Prevention,
18  by a contractor by Reingold and I think by
19  Reingold.
20     Q.  Any other contractors?
21     A.  It was likely that Aptive and
22  District Communications Group would have

18 (Pages 66 - 69)

Page 70

1  included listings for fees of DV360, but I
2  can't be positive.
3      Q.   What is the amount of fees that the
4  Department of Veterans Affairs has paid to
5  Google for use of DV360 or other Google
6  products to secure paid media?
7          MR. CARMAN:  Object to form.
8          BY MS. MORGAN:
9      Q.   Sorry, let me strike the question.
10         What is the amount of -- do you know
11 what "open web display advertising" is?
12     A.   I would be hazarding a guess.  I
13 would not be able to give you an exact industry
14 standard definition.
15     Q.   When did you first hear the term
16 "open web display advertising"?
17         MR. CARMAN:  Objection to form.
18 Also, I want to object that I believe this is
19 outside of the scope of the deposition topics.
20         MS. MORGAN:  The topics cover the
21 manners in which the Department of Veterans
22 Affairs secures paid media.

Page 71

1          The Department of Veterans Affairs
2  has alleged that it is damaged by paid media
3  related to open web display advertising.
4          MR. CARMAN:  Okay.  I made my
5  objection.  You can answer the question if you
6  understand it.
7          THE WITNESS:  I -- I --
8          MR. CARMAN:  If you know.
9          THE WITNESS:  Yeah, I could not give
10 you an exact day or date or time.  I mean, a
11 lot of it will just run across on Reddit.
12         BY MS. MORGAN:
13     Q.   Do you think you ran across it on
14 Reddit?
15     A.   Probably not.
16     Q.   Do you think you knew what open web
17 display advertising was before this year?
18     A.   No.
19     Q.   In your 30(b)(1) testimony, you said
20 that you were -- you did not know what open web
21 display advertising was.
22         Does the Department of Veterans

Page 72

1  Affairs have an understanding of what open web
2  display advertising is?
3          MR. CARMAN:  Object to form.
4          THE WITNESS:  I think probably not.
5          BY MS. MORGAN:
6      Q.   What is the amount of fees that the
7  Department of Veterans Affairs has paid for use
8  of DV360 or other Google products to secure
9  paid media?
10     A.   I don't think that was a data point
11 that was asked to be collected and that was --
12 and during what period of time and under what
13 contracts.  I have no idea.
14     Q.   Do you know that the Department of
15 Veterans Affairs is alleging money damages in
16 this case for the fees that it has paid for use
17 of DV360 or other Google products to secure
18 paid media?
19         MR. CARMAN:  I object to the form of
20 the question.  The United States is making that
21 allegation in this case.
22         BY MS. MORGAN:

Page 73

1      Q.   Do you know that the United States
2  is alleging that the Department of Veterans
3  Affairs is entitled to money damages for fees
4  that the Department of Veterans Affairs has
5  paid for use of DV360 or other Google products
6  to secure paid media?
7          MR. CARMAN:  Object to form.
8          THE WITNESS:  I am aware that the
9  United States Government is trying to return --
10 recapture, get refunded fees.
11         BY MS. MORGAN:
12     Q.   As the representative of the
13 Department of Veterans Affairs, sitting here
14 today, you have no assessment of how much the
15 fees are that the department has paid for use
16 of DV360 or other Google products to secure
17 paid media; is that right?
18         MR. CARMAN:  Object to the form of
19 the question and mischaracterizes the
20 testimony.
21         I also want to object that this is
22 outside the scope of the deposition topics.

Page 74

1  MS. MORGAN: We can address that off
2  the record. I don't think that's right.
3  BY MS. MORGAN:
4  Q. We talked in your 30(b)(1)
5  deposition about when you learned about the
6  lawsuit that Google filed in the -- sorry,
7  strike that.
8  We talked in your 30(b)(1)
9  deposition about when you personally learned
10 about the lawsuit the Department of Justice
11 filed against Google in the Eastern District of
12 Virginia.
13 Do you remember that?
14 A. Yes.
15 Q. I want to talk to you in your role
16 as the representative of the Department of
17 Veterans Affairs about when the Department of
18 Veterans Affairs learned of that lawsuit.
19 Do you know when that was?
20 A. February of this year.
21 Q. At the time that the Department of
22 Veterans Affairs learned that the Department of

Page 75

1  Justice had filed a lawsuit in the Eastern
2  District of Virginia against Google, had that
3  lawsuit already been filed?
4  A. I don't know the specific date when
5  the lawsuit was filed.
6  Q. But in your prep for this deposition
7  as the representative of the VA, you understand
8  that they learned -- that the VA learned of the
9  lawsuit in February?
10 A. Correct.
11 Q. Do you know if anyone from the
12 Department of Justice spoke to anyone inside
13 the Department of Veterans Affairs before
14 filing the lawsuit?
15 MR. CARMAN: So I object to the
16 extent this calls for attorney-client
17 communication and instruct you in your answer
18 not to disclose any conversations between
19 lawyers from the Department of Justice and the
20 Veterans Administration.
21 MS. MORGAN: I was not done asking
22 the question, so I'm going to say the question

Page 76

1  again and then you can make your objection
2  again.
3  BY MS. MORGAN:
4  Q. Do you know if anyone from the
5  Department of Justice spoke to anyone inside
6  the Department of Veterans Affairs in advance
7  of filing the lawsuit against Google in the
8  Eastern District of Virginia?
9  MR. CARMAN: Objection. Calls --
10 objection. Because it seeks communications
11 between attorneys at the Department of Justice
12 and Veterans Administration and others, so I
13 instruct you not to answer to the extent your
14 answer would reveal communications between
15 lawyers at the Department of Justice and
16 individuals at the VA.
17 BY MS. MORGAN:
18 Q. Were you prepared to testify today
19 about your involvement in -- the Department of
20 Veterans Affairs' involvement in communications
21 -- sorry, scratch that.
22 Were you prepared to testify today

Page 77

1  about the Department of Veterans Affairs, the
2  circumstances that led to the Department of
3  Veterans Affairs to be involved in the lawsuit,
4  including any efforts that the Department of
5  Veterans Affairs undertook to investigate the
6  Department of Justice's claims?
7  Were you prepared to testify about
8  how the Department of Veterans Affairs got
9  involved in the lawsuit today?
10 MR. CARMAN: Objection as to form.
11 THE WITNESS: I don't -- I don't
12 understand the question.
13 MS MORGAN: It's a topic that was
14 agreed upon in this notice, that the Department
15 of Veterans Affairs would testify about the
16 circumstances that led the department to be
17 involved in this lawsuit, and I understand you
18 now to be saying that he can't testify on that
19 topic because it's privileged. Am I right
20 about that?
21 MR. CARMAN: No, that is not -- that
22 is not correct. He testified as to when the

HIGHLY CONFIDENTIAL

Page 78

1  Veterans Administration learned of the lawsuit
2  and that was an answer to your question about
3  the circumstances that led VA to be involved in
4  the lawsuit.
5      BY MS. MORGAN:
6      Q.   Tell me everything you know that is
7  not from a lawyer, about the circumstances that
8  led the Department of Veterans Affairs to be
9  involved in this lawsuit.
10     MR. CARMAN:  Okay.  So I will have
11 -- object again to attorney-client privilege.
12     You can answer.
13     THE WITNESS:  I do not know anything
14 other than what I have discussed with -- with
15 lawyers related to the Department of Veterans
16 Affairs being involved in this lawsuit.
17     BY MS. MORGAN:
18     Q.   Is it the Department of Justice's
19 position that the only responsive information
20 to noticed Topic No. 30 is the date on which
21 the Department of Veterans Affairs learned of
22 the lawsuit?

Page 79

1      MR. CARMAN:  Before we answer that
2  question, can I confer with my colleague.
3      MS. MORGAN:  Sure.  Let's go off the
4  record.
5      MR. CARMAN:  Okay.
6      THE VIDEOGRAPHER:  The time is
7  p.m.  We are off the record.
8      (A short recess was taken.)
9      THE VIDEOGRAPHER:  The time is
10 p.m.  This begins Unit 2.  We are on the
11 record.
12     MR. CARMAN:  So following --
13 following our break, I wanted to clarify two
14 things.  The first is that with regard to
15 questions to Mr. South about -- sorry.
16     This is -- Topic 30, the
17 circumstances that led you, capital Y-O-U, to
18 be involved in the lawsuit including any
19 efforts you undertook to investigate your
20 claim.
21     The United States is taking the
22 position that Mr. South can testify about the

Page 80

1  dates of such conversation between DOJ and VA
2  occurred, and the people involved in those
3  conversations, but we will fall back on our
4  objection or we will reiterate our objection
5  about not disclosing the substance of those
6  conversations or any attorney work product.
7      And then with respect to Topic 26 in
8  the notice, I wanted to put on the record that
9  we have -- our understanding is, we have agreed
10 with Google that questioning along this typic
11 will be subject to our standing objection, that
12 this topic is not an appropriate topic for a
13 30(b)(6) inquiry, because the United States is
14 going to rely on expert testimony to
15 demonstrate these facts.
16     MS. MORGAN:  Understood.  And
17 Google, I think not surprisingly, does not
18 agree with the Department of Justice's
19 position, reserves all rights in that regard,
20 but we understand how you want to proceed.
21     MR. CARMAN:  Thank you.
22     BY MS. MORGAN:

Page 81

1      Q.   Mr. South, you testified that the
2  Department of Veterans Affairs learned of the
3  Department of Justice's lawsuit against Google
4  in February of 2023.
5      Do you remember that?
6      A.   Yes.
7      Q.   Do you know who was involved in that
8  conversation from the Department of Veterans
9  Affairs?
10     A.   I don't know about the initial
11 communication that was made.  There was a
12 meeting established later that involved the
13 Department of Justice and, you know, the
14 Department of Veteran Affairs.
15     It was during that same month,
16 February 2023.  I hadn't -- unfortunately, had
17 some notes on this and I misplaced them, so
18 some of the names I have are just going to be
19 first names.
20     From the VA, it was definitely
21 Laura.  And Jason Fergosa, F-E-R-G-O-S-A, I
22 think.  From the Department of Justice, I think

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 90

1  the record that Google was informed last night
2  by the Department of Justice that there were
3  several thousand documents of Mr. South's that
4  were not produced in advance of this
5  deposition.
6      So we reserve the right to reopen
7  the deposition should that become necessary
8  based on the documents we reviewed.
9      I will also reserve the right to
10  reopen the deposition as necessary on the
11  topics on which Mr. South is not prepared to
12  testify, including certain campaigns that were
13  listed earlier in the deposition and whether
14  Google products were used in connection with
15  other campaigns.
16      And I am going to -- and also, I'll
17  reserve rights on the Court's determination
18  about standing privilege objection.
19      In other words, I will reserve the
20  balance of my time for after the department
21  asks any questions if it wants to do that.
22      MR. CARMAN:  Okay.  Can we take a

Page 91

1  brief -- just a brief break?
2      MS. MORGAN:  Of course.
3      MR. CARMAN:  And then we will
4  resume.  I don't think we even have to leave
5  the room.  But we can go off the record.
6      THE VIDEOGRAPHER:  The time is
7  p.m.  Off the record.
8      (A short recess was taken.)
9      THE VIDEOGRAPHER:  The time is
10  p.m.  On the record.
11      MR. CARMAN:  Okay.  We just want to
12  say for the record that we don't agree that
13  there is a record in this deposition that
14  demonstrates that Mr. South was not prepared to
15  testify on any topic in the deposition notice,
16  and with that, we have no further questions.
17      MS. MORGAN:  Great.  I think we can
18  close the record.
19      THE VIDEOGRAPHER:  The time is
20  p.m.  Off the record.
21      (Whereupon, the proceeding was
22  concluded at 5:44 p.m.)

Page 92

1       CERTIFICATE OF NOTARY PUBLIC
2       I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.
18
19  _____
20       Notary Public in and for
21       the District of Columbia
22  My Commission expires:  August 14, 2025.

Page 93

1       ACKNOWLEDGMENT OF DEPONENT
2       I, KOBY SOUTH, do hereby certify that I have
3  read the foregoing transcript of my testimony
4  taken on 8/31/23, and further certify that it
5  is a true and accurate record of my testimony
6  (with the exception of the corrections listed
7  below):
8  Page    Line      Correction
9  ____   ____    _____
10 ____   ____    _____
11 ____   ____    _____
12 ____   ____    _____
13 ____   ____    _____
14 ____   ____    _____
15 ____   ____    _____
16 ____   ____    _____
17 ____   ____    _____
18         _____
             KOBY SOUTH
19
   SUBSCRIBED AND SWORN TO BEFORE ME
20 THIS ____DAY OF _____, 2023.
21
   _____    _____
22 (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
   Job No. CS6074125

24 (Pages 90 - 93)