# EXHIBIT 22

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

UNITED STATES, et al.,               ) 1:23-cv-00108-LMB-JFA
                                     )
    Plaintiffs,                      )
                                     )
vs.                                  )
                                     )
GOOGLE LLC,                          )
                                     )
    Defendants.                      )
_____)

- HIGHLY CONFIDENTIAL -

VIDEOTAPED DEPOSITION OF
KOBY SOUTH
August 31, 2023
9:06 a.m.

Reported by: Bonnie L. Russo
Job No. CS6074125

HIGHLY CONFIDENTIAL

Page 2

1  Videotaped Deposition of Koby South held at:
2
3
4
5
6     Paul Weiss Rifkind Wharton & Garrison, LLP
7     2001 K Street, N.W.
8     Washington, D.C.
9
10
11
12
13
14
15
16
17
18  Pursuant to Notice, when were present on behalf
19  of the respective parties:
20
21
22

Page 4

1                    I N D E X
2  EXAMINATION OF KOBY SOUTH                PAGE
3  BY MS. MORGAN                              7
4
5
6
7                      EXHIBITS
8  Exhibit 82  Solicitation/Contract/Order   75
              for Commercial Items
9             VET-AF-ADS-0000461239-287
10 Exhibit 83  E-Mail dated 6-16-21         151
              VET-AF-ADS-0000-122732-742
11
    Exhibit 84  E-Mail dated 11-1-19        210
12              Attachment
                VET-AF-ADS-0000126694-697
13
    Exhibit 85  E-Mail dated 6-13-22        227
14              Attachment
                VET-AF-ADS-0000027906-909
15
    Exhibit 86  E-Mail dated 6-14-21        242
16              Attachment
                VET-AF-ADS-0000027459-467
17
18
19
20
21
22

Page 3

1  APPEARANCES:
2  On behalf of the Plaintiffs:
3    SEAN CARMAN, ESQUIRE
     VICTOR LIU, ESQUIRE
4    ALVIN CHU, ESQUIRE
     KATHERINE E. CLEMONS, ESQUIRE
5    UNITED STATES DEPARTMENT OF JUSTICE
     450 Fifth Street, N.W., Suite 700
6    Washington, D.C. 20530
     sean.carman@usdoj.gov
7    victor.liu@usdoj.gov
     alvin.chu@usdoj.gov
8    katherine.clemons@usdoj.gov
9
   On behalf of the Defendant:
10
     ERIN J. MORGAN, ESQUIRE
11   PAUL, WEISS, RIFKIND,
     WHARTON & GARRISON, LLP
12   1285 Avenue of the Americas
     New York, New York 10019
13   ejmorgan@paulweiss.com
14     -and-
15   HEATHER MILLIGAN, ESQUIRE
     ANNELISE CORRIVEAU, ESQUIRE
16   MARTHA L. GOODMAN, ESQUIRE (Via Remote)
     PAUL, WEISS, RIFKIND,
17   WHARTON & GARRISON, LLP
     2001 K Street, N.W.
18   Washington, D.C. 20006
     hmilligan@paulweiss.com
19   acorriveau@paulweiss.com
     mgoodman@paulweiss.com
20
21 Also Present:
     Orson Braithwaite, Videographer
22   Laura Reass, Department of Veterans Affairs

Page 5

1                  P R O C E E D I N G S
2                      (9:06 a.m.)
3
4         THE VIDEOGRAPHER:  Good morning.
5  We are going on the record at
6  a.m. on August 31, 2023.
7         Please note that the microphones are
8  sensitive and may pick up whispering and
9  private conversations.  Please mute your phones
10 at this time.
11        Audio and video recording will
12 continue to take place unless all parties agree
13 to go off the record.
14        This is Media Unit 1 of the
15 video-recorded deposition of Mr. Koby South in
16 the matter of United States, et al., versus
17 Google LLC filed in the United States District
18 Court, Eastern District of Virginia, Alexandria
19 Division.  Case No. 1:23-cv-00108-LMB-JFA.
20        My name is Orson Braithwaite
21 representing Veritext Legal Solutions.  I am
22 the videographer.  The court reporter is Bonnie

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 58

1 anything that you do in your job?
2    A.   Yes.
3    Q.   What kinds of things can they veto?
4    A.   Anything related to external
5 communications to veterans.
6    Q.   Why does the VA decide to -- well,
7 do you have an understanding of why the VA
8 would decide to start an ad campaign?
9    A.   I would be speculating.  It varies
10 greatly.
11    Q.   Do you think that it's because the
12 VA has a particular message or theme that it
13 wants to communicate to the public or a segment
14 of the public?
15    A.   Again, I would be speculating
16 because it varies greatly.
17    Q.   Have you ever initiated an ad
18 campaign?
19    A.   I have started communication
20 programs for observance -- or campaigns where a
21 paid media was part of the strategy of that
22 effort.

Page 59

1    Q.   Do you think that anything defined
2 as an ad campaign necessarily incorporates paid
3 media?
4       MR. CARMAN:  Objection.  Form.
5       THE WITNESS:  Hi.
6       MS. MORGAN:  TikTok.
7       THE WITNESS:  Can you repeat the
8 question?
9       BY MS. MORGAN:
10    Q.   Yeah.  I asked you if you had ever
11 initiated an ad campaign, and you said I
12 started communication programs for observing or
13 campaigns where paid media was part of the
14 strategy of that effort and I asked:  Do you
15 think that anything defined as an ad campaign
16 necessarily incorporates paid media.
17       MR. CARMAN:  Objection to form.
18       THE WITNESS:  Personally, I would
19 say yes.
20       BY MS. MORGAN:
21    Q.   Did you initiate the ad campaign for
22 Make a Connection [sic]?

Page 60

1    A.   I don't think that that would be an
2 accurate characterization of how the
3 complicated federal procurement and approval
4 bureaucracy operates, and it makes it sound,
5 like, I went, off we go.  It's much more
6 complicated.
7    Q.   Can you tell me about what your role
8 was in starting Make a Connection?
9    A.   Yeah.  I was a project manager so
10 that -- helped develop a contract, helped
11 review the proposals, helped review the
12 research that -- under that, you know, as the
13 foundation of Make the Connection, the
14 substantial public health research involved in
15 the campaign, helped to review and create the
16 products associated with that campaign,
17 including video production and social media and
18 websites and all that, and manage those
19 deliverables with the contractor to make sure
20 that, you know, the contract was successful.
21    Q.   The first thing you said was that
22 you helped develop a contract?

Page 61

1    A.   Correct.
2    Q.   What contract are you referring to?
3    A.   That was 12 years ago.  That was a
4 discrete Make the Connection campaign contract.
5    Q.   Uh-huh.  Who was that contract with
6 that you are -- that you're talking about?
7       MR. CARMAN:  Objection.  Form.
8       THE WITNESS:  It was Reingold.
9       BY MS. MORGAN:
10    Q.   So it was a contract with Reingold
11 to provide advertising-related services?
12       MR. CARMAN:  Objection.  Form.
13       THE WITNESS:  No.
14       BY MS. MORGAN:
15    Q.   What was the contract for?
16    A.   The development of a national
17 anti-stigma campaign, communication campaign.
18    Q.   Did that include paid media?
19    A.   Yes.
20    Q.   You said I think, that the contract
21 was for a limited discrete Make the Connection
22 campaign -- you said it was a discrete Make the

HIGHLY CONFIDENTIAL

Page 62

1  Connection campaign contract.
2      What did you mean when you said it
3  was a "discrete contract"?
4      MR. CARMAN: Objection to form.
5      BY MS. MORGAN:
6      Q. What did you mean by -- when you
7  said "that was a discrete Make the Connection
8  contract"?
9      A. It was focused exclusively on
10  developing Make the Connection.
11      Q. Do you have any recollection of what
12  the term was for that contract?
13      A. I'm pretty sure, but I would not --
14  it has been a while. Pretty sure it was
15  something like a base of one year with option
16  periods, for -- which would have been for one
17  year. And those are typically not to exceed
18  five years.
19      Q. As part of your role in Make a
20  Connection, did you set a budget for Reingold's
21  work on that project?
22      MR. CARMAN: Objection to form.

Page 63

1      THE WITNESS: No.
2      BY MS. MORGAN:
3      Q. Do ad campaigns typically have
4  budgets?
5      A. I would say that that would be a
6  requirement. Like, you couldn't buy ads
7  without money.
8      Q. Who sets the budget for a contract
9  with Reingold?
10      A. So it varies and it depends because
11  I -- when I answer that question, I am not
12  referring exclusively to paid media. So,
13  again, it -- these are large, national outreach
14  campaigns that include a ton of development,
15  content creation, website design, video
16  production that could be -- that could exclude
17  paid media and continue to operate.
18      Most of the time, those budgets what
19  we would consider in our office labor hours to
20  support a website, social media developed that
21  just gets posted organically, et cetera, those
22  budgets are established by my colleague and I

Page 64

1  who are program managers. Paid media happens
2  differently.
3      Q. How does paid media happen?
4      A. In our office only, paid media is
5  generally given to us to use based off of
6  lag -- what is called "lag funding," funding
7  that -- that programs within our office, the
8  Office of Mental Health and Suicide Prevention,
9  have not used during the course of a fiscal
10  year. So it's kind of like leftovers. So we
11  don't get a specific paid media budget per year
12  at the beginning of each fiscal year.
13      Q. At the beginning of that answer, you
14  said in our office only.
15      Based on your 13 years at the VA, do
16  you have any understanding of how budgeting for
17  paid media works in other offices?
18      A. I do not.
19      Q. In the time that you were working in
20  the Office of Governmental Affairs --
21      A. Public and Intergovernmental
22  Affairs.

Page 65

1      Q. Public and Intergovernmental
2  Affairs, did you learn anything about how other
3  offices budget for paid media?
4      A. Oh, no.
5      (Interruption.)
6      (Discussion off the stenographic
7  record.)
8      THE VIDEOGRAPHER: The time is
9  a.m. This begins Unit No. 2. We are on the
10  record.
11      BY MS. MORGAN:
12      Q. Welcome back, Mr. South.
13      A. Thanks.
14      Q. Before we went on our break in the
15  middle of a question, I spilled water all over
16  the table and we had to go off the record to
17  make sure that the court reporter's equipment
18  was okay.
19      So I am going to go back -- which I
20  think the record reflects that you said, oh, no
21  in response to that. I'm going to go back to
22  the question because I don't think you meant to

Veritext Legal Solutions
800-567-8658                                                                          973-410-4098

Page 66

1  say, oh, no in response to my question, or at
2  least I haven't found out yet if that is what
3  you meant to say.  Is that okay?
4      A.   Yes.
5      Q.   Okay.  So my question was:  In the
6  time that you were working in the Office of
7  Public and Intergovernmental Affairs, did you
8  learn any information about or anything about
9  how other offices budget for paid media?
10     A.   No.
11     Q.   You said when you were testifying
12  about the Reingold -- the first Reingold
13  contract in connection with Make the Connection
14  that you thought it was a term of one year with
15  an ability to renew for up to five years.
16         Do you remember that?
17     A.   Yes.
18     Q.   After five years if the Office of
19  Mental Health and Suicide Prevention wanted to
20  continue to use Reingold's services, would it
21  have to solicit bids again?
22         MR. CARMAN:  Objection.  Form.

Page 67

1          THE WITNESS:  Yes.
2          BY MS. MORGAN:
3      Q.   When the Office of Mental Health and
4  Suicide Prevention solicits bids from
5  contractors, how does it do that?
6      A.   The short answer is request for bids
7  are posted on an electronic service today.  You
8  know, the last few years or I don't know a
9  decades or so, it has become more electronic on
10  a -- on a public-facing website where all
11  government contracts are posted and gives, you
12  know, the contract -- the solicitation, not
13  contract.  The solicitation is put up on
14  this -- FedBizOpps is the name of the website.
15  I think they may have changed the name
16  recently, though.  You can Google FedBizOpps.
17         Yeah, and so all government
18  contracts are put up there for our
19  solicitations, RFPs, RFIs, RFQs for entities to
20  bid on.
21     Q.   Is a request for a bid to provide
22  media planning services like the Reingold bid

Page 68

1  and RFP?
2          MR. CARMAN:  Objection.  Form.
3          THE WITNESS:  I am not aware of an
4  instance where there has ever been, that I have
5  been involved in, a discrete RFP posted for
6  paid media.
7          BY MS. MORGAN:
8      Q.   What RFP would result in the Office
9  of Mental Health and Suicide Prevention hiring
10  Reingold --
11         MR. CARMAN:  Objection.  Form.
12         BY MS. MORGAN:
13     Q.   -- or accepting a bid from Reingold,
14  I guess?
15         MR. CARMAN:  Same objection.
16         THE WITNESS:  Can you --
17         BY MS. MORGAN:
18     Q.   Yeah.  So when you said I'm not
19  aware of an instance where -- I'm not aware of
20  an instance where there has ever been -- that I
21  have been involved in a discrete RFP posted for
22  paid media --

Page 69

1      A.   Uh-huh.
2      Q.   -- I am just trying to understand
3  what is posted to solicit bids for the kind of
4  work that Reingold bid on and for Make the
5  Connection.
6          MR. CARMAN:  Objection.  Form.
7          THE WITNESS:  Specifically for Make
8  the Connection, it would be an RFP requesting a
9  proposal to support.  Make the Connection is a
10  large, national outreach campaign that may or
11  may not include paid media as an element of the
12  overall campaign.
13         BY MS. MORGAN:
14     Q.   If you received multiple bids for an
15  RFP, who evaluates that at the Office of Mental
16  Health and Suicide Prevention?
17         MR. CARMAN:  Objection.  Foundation.
18         BY MS. MORGAN:
19     Q.   Does someone in the Office of Mental
20  Health and Suicide Prevention evaluate bids for
21  work that is going to be performed for that
22  office?

18 (Pages 66 - 69)

Page 230

1  BY MS. MORGAN:
2  Q. Is it a --
3  A. Promoting that service is part of
4  communication outreach strategy for that
5  program.
6  Q. Does this service fall within the
7  Office of Mental Health and Suicide Prevention?
8  A. Yes.
9  Q. Okay. Are communications related to
10 that service on the mental health side of the
11 Office of Mental Health and Suicide Prevention,
12 or are they on the suicide side?
13 A. Suicide side.
14 Q. So this is, again, outside of the
15 scope of your typical remit inside mental
16 health-specific initiatives. Am I getting that
17 right?
18 A. Yes.
19 Q. And that's what you meant when you
20 said "it was in your capacity as a volunteer"?
21 A. Correct --
22    MR. CARMAN: Objection to the

Page 231

1  characterization of the earlier testimony.
2     But you can answer.
3     THE WITNESS: Yeah, that's -- that's
4  mostly correct, yes.
5     BY MS. MORGAN:
6  Q. It says: "Call, text, chat volume
7  from paid media." Do you understand what this
8  report is showing about call, text, and chat
9  volume from paid media?
10 A. Yes, mostly.
11 Q. What is it showing?
12 A. It appears to be showing volume of
13 calls, texts, and chats over a course of two
14 weeks associated with paid media.
15 Q. Are the calls, texts, and chats all
16 going to the Veterans Crisis Line to the best
17 of your knowledge?
18    MR. CARMAN: Objection. Foundation.
19    THE WITNESS: This only shows those
20 calls, texts, and chats to that number only.
21    BY MS. MORGAN:
22 Q. On the right side of the page, there

Page 232

1  is a chart that says: "Calls, texts, and chats
2  by source from paid efforts."
3     Do you see that?
4  A. I do.
5  Q. Do you know what the sources are
6  that are referred to here?
7  A. I do other than one column. I'm
8  actually not sure what that -- that one refers
9  to.
10 Q. Do you know what Google Ads refers
11 to?
12 A. Yes.
13 Q. What does that refer to?
14 A. Key word ads that would appear at
15 the top of the page.
16 Q. Does that include display ads?
17    MR. CARMAN: Objection. Foundation.
18 Form.
19    THE WITNESS: To the best of my
20 knowledge during this period of time, I'm not
21 sure that that did include display ads.
22    BY MS. MORGAN:

Page 233

1  Q. Do you know if the -- these are ads
2  that are bought through a Google service called
3  Google Ads?
4     MR. CARMAN: Objection. Form.
5  Foundation.
6     THE WITNESS: I would not know that.
7     BY MS. MORGAN:
8  Q. Next to that it says: "FB
9  click-to-call."
10    Do you see that?
11 A. Yes.
12 Q. Do you know what FB click-to-call
13 is?
14 A. Facebook.
15 Q. Next to that it says: "On-site
16 calls."
17    Do you know what that is?
18 A. Actually, I don't know what that one
19 is either, no.
20 Q. Okay. And what about the one next
21 to that? I think it says: "HID calls."
22    Do you know what that is?

HIGHLY CONFIDENTIAL

Page 234

1  A. No. That might be high display
2  maybe, but that doesn't sound right, so I'm
3  guessing.
4  Q. Do you know how frequently these
5  daily volume and spend reports are generated?
6     MR. CARMAN: Objection. Form.
7     THE WITNESS: Yeah. Right now? No.
8     BY MS. MORGAN:
9  Q. Did you know -- do you know how
10 frequently they were generated at the time that
11 you were the recipient of this in 2022?
12 A. To the best of my recollection, I
13 think it was every two weeks.
14 Q. Why would the Office of Mental
15 Health and Suicide Prevention be interested in
16 tracking calls, texts, and chats by source from
17 paid efforts?
18    MR. CARMAN: Objection. Form.
19 Foundation.
20    THE WITNESS: Under the Veterans
21 Crisis Line, you have a limited number of
22 responders, unfortunately. And so paid

Page 235

1  efforts, while you want to do your best to get
2  them in front of relevant veteran callers,
3  it's -- you know, you can't -- it's almost
4  impossible to serve an ad to somebody you know
5  definitively is a veteran. You do your best
6  with, you know, affinities and groups and stuff
7  like that, but it has to be -- you want to get
8  this service in front of veterans that need it.
9     But it has to be very tightly
10 managed because there is a capacity at the
11 Veterans Crisis Line. Once the capacity of
12 responders is reached, it rolls over to
13 SAMHSA's National Suicide Prevention Lifeline,
14 but again, that's not the Veterans Crisis Line.
15 You don't want to put people on hold. You
16 don't want the phone ringing three or four
17 times.
18    So you need to look at the sources
19 of -- of traffic to make sure for some
20 reason -- because sometimes, you know, some ad
21 you put out there just outperforms your
22 expectations grossly. And in situations like

Page 236

1  the Veterans Crisis Line, we have to keep the
2  calls and the texts -- mostly to calls, but
3  texts and chats take up a pretty significant
4  amount of responders' time to an -- to an
5  approximate, you know, number which you see
6  there at the bottom right. We try to stay
7  under 5,000, and that's why that number is
8  under 5,000 consistently when it comes to
9  calls.
10    So the volume -- the source of
11 traffic helps us ensure that we're not driving
12 too much traffic. It's sort of a challenge.
13 This is a special case.
14    BY MS. MORGAN:
15 Q. Does the Office of Mental Health and
16 Suicide Prevention make decisions based on the
17 performance of these sources about how to
18 allocate resources?
19    MR. CARMAN: Objection. Form.
20 Foundation.
21    THE WITNESS: This evidence you are
22 providing here is a very special case, but

Page 237

1  regardless, this evidence here is used to make
2  business decisions relating to paid media to
3  ensure that the Veterans Crisis Line isn't
4  overwhelmed and that veterans in need --
5  because when you open your aperture on
6  advertising and you start driving nonrelevant
7  calls to the crisis line, they might be
8  suicidal people and the Veterans Crisis Line
9  will help them. But as it starts to get
10 overwhelmed on paid ads, people start getting
11 put on hold, people start, you know, getting
12 bounced to other places. So in this case, it's
13 used for a very specific case.
14    In other cases it would likely be
15 used for something else, but it would still
16 be -- the sources of traffic would still be
17 very relevant data that people in my role would
18 want to see.
19    BY MS. MORGAN:
20 Q. When you say "in other cases it
21 would likely be used for something else," what
22 other cases are you referring to?

Veritext Legal Solutions
800-567-8658                                                     973-410-4098

HIGHLY CONFIDENTIAL

Page 238

1    A.   First, I wouldn't -- I'm not
2    necessarily saying these specific types of
3    data, but the data that we collect relating to
4    paid media would be used to make business
5    decisions.
6         In this specific case, they're used
7    to ensure that call volume aligns with the
8    capacity of the Veterans Crisis Line.
9    Q.   When you say that in other cases
10   data you collect relating to paid media would
11   be used to make business decisions, what do you
12   mean?
13   A.   Allocation of funds for different
14   sources of paid media, and in a separate case
15   outside of this when you're trying to drive
16   volume based on your key performance
17   indicators, you would look at a source that was
18   outperforming and you would want to know why
19   and you might invest more money in that if it's
20   driving the sorts of traffic that you want,
21   right.
22        It's not like you're going to go,

Page 239

1    oh, it's driving too much volume. We need to
2    reduce those ads because we're overwhelming the
3    crisis line. You would actually in many
4    instances might increase the ads related to
5    that. You might want to keep using something
6    that's driving that high volume.
7    Q.   So, for example, in this document,
8    Google ad -- based on that chart we were
9    looking at, Google Ads?
10        MR. CARMAN: Can you specify which
11   chart.
12        MS. MORGAN: Yeah. The chart that
13   says: "Calls, texts, and chats by source from
14   paid efforts." It's on the page that's
15   Bates-stamped VET-AF-ADS-000027907.
16        MR. CARMAN: Okay. Got it. Thanks.
17        BY MS. MORGAN:
18   Q.   Okay. So based on this chart if you
19   look at the grand total at the bottom, Google
20   Ads has a total of 145 call, text, and chats by
21   source.
22        Do you see that?

Page 240

1    A.   Yes.
2    Q.   Okay. And Facebook click-to-call
3    next to that has a total of 413 calls, texts,
4    and chats by source.
5         Do you see that?
6         MR. CARMAN: Object to form.
7         THE WITNESS: Yes.
8         BY MS. MORGAN:
9    Q.   My understanding is that in the
10   context of this monitoring what the Office of
11   Mental Health and Suicide Prevention is trying
12   to do is to manage the number of calls, texts,
13   and chats by source to ensure that they stay
14   within the 5,000 that the Office of Mental
15   Health and Suicide Prevention Veterans Crisis
16   Line can serve; is that right?
17        MR. CARMAN: Objection. Form.
18        THE WITNESS: I would just clarify
19   that to be per day.
20        BY MS. MORGAN:
21   Q.   Per -- okay. 5,000 per day?
22   A.   Yes.

Page 241

1    Q.   Okay. But if this was a different
2    type of media report and you saw Facebook
3    click-to-call significantly outperforming
4    Google Ads like how it is in this chart, would
5    you potentially make a business decision about
6    how much to invest in Google Ads versus how
7    much to invest in Facebook click-to-call?
8         MR. CARMAN: Objection. Form.
9    Foundation.
10        THE WITNESS: I don't recall a
11   specific instance of that --
12        BY MS. MORGAN:
13   Q.   Okay.
14   A.   -- I will say yes, but I don't
15   recall.
16   Q.   Let's look at another document. Do
17   one more document, and then we can take another
18   break.
19   A.   Sure. I mean, if you want to power
20   through --
21   Q.   Are you okay?
22   A.   Yeah. No. I'm good.

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

Page 274

1  to untangle," what do you mean?
2       MR. CARMAN:  Objection.  Form.
3  Foundation.
4       THE WITNESS:  My understanding has
5  been influenced -- not influenced, that's
6  shitty -- sorry.  Don't do that.  It's -- can
7  you repeat the question, please.
8       BY MS. MORGAN:
9    Q.  You said -- I asked you:  Outside of
10 conversations you have had with lawyers, do you
11 have an independent understanding of what the
12 Department of Veterans Affairs' role is in this
13 lawsuit.
14      You said it would be very difficult
15 to untangle at this point, and I said what you
16 -- when you said "difficult to untangle," what
17 do you mean?
18      MR. CARMAN:  And I want to object.
19 Asked and answered, I think the previous
20 answer.
21      THE WITNESS:  Considering I did not
22 know what this lawsuit was about prior to

Page 275

1  March, I would -- are you asking me if I do
2  now, based on the information that I have at my
3  disposal or are you asking me --
4       BY MS. MORGAN:
5    Q.  I am just asking if -- I think you
6  have answered the question which is that you --
7  your understanding postdates March of 20 -- is
8  from March of 2023 or after, and so you can't
9  answer without revealing communications with
10 lawyers; is that right?
11   A.  That is right.
12   Q.  Okay.  Do you -- do you have an
13 understanding from outside of conversations
14 with lawyers, of when the Department of
15 Veterans Affairs got involved in this
16 litigation?
17      MR. CARMAN:  Again, I object,
18 attorney-client, and instruct you in answering,
19 don't disclose any conversations or the
20 substance of conversations with counsel from VA
21 or DOJ.
22      THE WITNESS:  I apologize.  Will you

Page 276

1  say that again.
2       BY MS. MORGAN:
3    Q.  Yeah.  Outside of conversations with
4  lawyers, do you have an understanding of when
5  the Department of Veterans Affairs got involved
6  in this litigation?
7    A.  No.
8    Q.  To the best of your knowledge, who
9  made the decision for the Department of
10 Veterans Affairs to participate in this
11 lawsuit?
12      MR. CARMAN:  So I object.  Calls for
13 attorney-client privileged information.
14      You can answer if you know, from
15 outside of any conversations with any lawyers,
16 who made the decision.
17      THE WITNESS:  I don't know.
18      BY MS. MORGAN:
19   Q.  Was your answer qualified by your
20 counsel's instruction?  My question is -- is:
21 Do you not know who got -- who got the
22 Department of Veterans Affairs involved in the

Page 277

1  lawsuit, or do you not know outside of
2  conversations with lawyers?
3    A.  I -- I don't know outside of my
4  conversations with lawyers.
5       MS. MORGAN:  Is it your position
6  that that fact is privileged?
7       MR. CARMAN:  Which fact?
8       MS. MORGAN:  The fact of who at the
9  Department of Veterans Affairs made the
10 decision to get involved in this lawsuit?
11      MR. CARMAN:  That fact is
12 privileged, if he learned it from conversations
13 with lawyers, yes.
14      MS. MORGAN:  Is it your position
15 that it's legal advice?
16      MR. CARMAN:  I don't think the
17 Department of Justice is going to take a
18 position in this deposition as to all the
19 possible arguments we can make, but I think
20 it's a fair objection that it calls for
21 attorney-client privilege.
22      BY MS. MORGAN:

Page 278

1  Q. Have you discussed the lawsuit --
2  the Department of Justice's lawsuit against
3  Google with anyone outside of lawyers?
4  A. We discussed that this morning.
5  Q. Who did you discuss it with, outside
6  of lawyers?
7  A. My colleague, Mr. Rhett Herrera, and
8  as I mentioned this morning, very briefly at
9  the initiation of this, it was mentioned in
10 passing in normal business meetings to our
11 contractor.
12 Q. Are you familiar with the term "open
13 web display advertising"?
14 A. Not really, no.
15 Q. Do you have any understanding of
16 what "open web display advertising" is?
17 A. No.
18 Q. Have you heard the term "open web
19 display advertising"?
20 A. I cannot recall.
21 Q. Has Google caused the Department of
22 Veterans Affairs to pay more for digital

Page 279

1  advertising than was necessary?
2       MR. CARMAN: Objection. Form.
3  Foundation.
4       THE WITNESS: Probably. But do I
5  have a certificate that has been notarized by a
6  notary public? No.
7       BY MS. MORGAN:
8  Q. Do you have any specific --
9  A. I mean, we've received refunds
10 before, so that seems to be overcharging.
11 Q. When you receive the refund, isn't
12 that fixing the overcharge?
13 A. It sure is, but I assume -- again, I
14 don't have -- I have no, you know, there is --
15 you are asking me to guess, because you didn't
16 stipulate whether I have business documents
17 that demonstrate that Google has charged the
18 United States Government more than it should.
19 Q. Do you have business documents?
20 A. I do not.
21 Q. Let me finish the question.
22    Do you have business documents that

Page 280

1  demonstrate that Google has charged the
2  government more than it should?
3       MR. CARMAN: Object to form and
4  foundation.
5       THE WITNESS: Without refunding it
6  after the case?
7       BY MS. MORGAN:
8  Q. Yes.
9  A. No.
10 Q. Do you have any specific reason to
11 think that Google has charged the Department of
12 Veterans Affairs more than it should for
13 digital advertising?
14      MR. CARMAN: Object to form and
15 foundation.
16      Let me also -- sorry. Let me
17 caution you in answering, not to disclose
18 conversations with counsel from VA or DOJ.
19      THE WITNESS: In a broad sense of
20 what Google does on a normal day-to-day, pretty
21 likely from a personal standpoint to think that
22 Google is probably overcharging pretty much

Page 281

1  everybody that purchases ads from it.
2       BY MS. MORGAN:
3  Q. Do you have a specific reason to
4  think that?
5  A. No.
6  Q. Did anyone at Reingold ever tell you
7  that Google was causing the Department of
8  Veterans Affairs to pay more for digital
9  advertising?
10      MR. CARMAN: Object to form and
11 foundation.
12      THE WITNESS: Not that I recall.
13      BY MS. MORGAN:
14 Q. Sitting here today, do you have
15 concerns that Google has harmed the Department
16 of Veterans Affairs?
17      MR. CARMAN: Objection. Form.
18 Foundation.
19      THE WITNESS: Significantly no, but
20 yes.
21      BY MS. MORGAN:
22 Q. When you say "significantly no,"

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL

Page 282

1  what do you mean?
2     A.  Saying has it damaged the Department
3  of Veterans Affairs is a pretty broad
4  statement.
5     Q.  In what way do you think that Google
6  has harmed the Department of Veterans Affairs?
7        MR. CARMAN:  So again, I want to
8  just object to the question to the extent that
9  it calls for disclosure of the substance of
10 attorney-client communication or attorney work
11 product and caution you, in your answer, don't
12 disclose the substance of any conversations
13 with counsel for VA or DOJ, and don't disclose
14 any -- anything that would reveal the thoughts
15 or mental impressions of the attorneys that you
16 have talked to in this case.
17       THE WITNESS:  You referenced
18 specifically sitting here today.  I would
19 imagine this whole spectacle wouldn't be going
20 on unless there was a reason for it.
21       And I -- my personal opinion based
22 on this spectacle, but no evidence, but being a

Page 283

1  consumer and citizen of the United States of
2  America and knowing the practices of Google in
3  a broad sense, having lived in this country for
4  46 years, is that Google has likely overcharged
5  many advertisers when it comes to advertising,
6  and since I am in the advertising business, it
7  is likely that the Department of Veterans
8  Affairs, over the course of some business or
9  campaign, has been overcharged and not
10 reimbursed.  I do not have direct evidence of
11 that.
12       THE VIDEOGRAPHER:  Mr. South, bring
13 your microphone up.
14       BY MS. MORGAN:
15    Q.  I asked you about whether you think
16 Google has harmed the Department of Veterans
17 Affairs.
18       In some of your earlier answers, you
19 referenced other platforms like Amazon, or -- I
20 think you said Twitter or Facebook.
21       Do you have a view on whether Amazon
22 has harmed the Department of Veterans Affairs?

Page 284

1        MR. CARMAN:  Objection.  Lack of
2  form and lack of foundation.
3        THE WITNESS:  Probably a bad
4  example.  We don't advertise with Amazon.
5        BY MS. MORGAN:
6     Q.  Do you have a view on whether
7  Facebook has harmed the Department of Veterans
8  Affairs?
9        MR. CARMAN:  Objection.  Form.  Lack
10 of foundation.
11       THE WITNESS:  I -- without direct
12 evidence, I think that Facebook, for its very
13 specific intended purpose of being a social
14 media platform has, over the course of its
15 business development, and Make the Connection
16 has had a Facebook campaign since -- or an
17 account since 2011, has made it increasingly
18 more difficult to reach the fans of your
19 account without using paid media.
20       Therefore, they have made it more
21 expensive to reach those people, and in some
22 very indirect intangible way, and also tweaking

Page 285

1  their algorithm all the time, have likely made
2  it harder to reach veterans, which again,
3  indirectly, could have some damage to the
4  Department of Veterans Affairs, but that is a
5  social media platform.
6        BY MS. MORGAN:
7     Q.  We saw in documents earlier today,
8  that the Department of Mental Health and
9  Suicide Prevention has utilized Microsoft Bing
10 in its advertising campaigns.
11       Do you remember that?
12       Do you have a view as to whether
13 Microsoft has in some sense harmed the
14 Department of Veterans Affairs?
15       MR. CARMAN:  Objection.  Form and
16 lack of foundation.
17       THE WITNESS:  I haven't heard much
18 about Bing.  It doesn't get used very often.
19 Its market share of search is, you know, in the
20 single percentages probably.  I don't know.  I
21 think it's behind Yahoo.
22       I can't recall ever having

Veritext Legal Solutions
800-567-8658                                                         973-410-4098

HIGHLY CONFIDENTIAL

Page 290

1  THE WITNESS: Yeah, I am
2  generalizing that I think most record retention
3  policies are somewhere in the neighborhood of
4  seven years. That would include most records.
5  I highly doubt that they are deleting patient
6  records every seven years though, but most
7  business operational documents I think are
8  seven years.
9       BY MS. MORGAN:
10     Q.  Do you use any kind of chat platform
11  to communicate at work?
12     A.  We use Teams, yes.
13     Q.  And you use the chat function inside
14  Teams?
15     A.  Yes.
16         MS. MORGAN: Okay. I think we can
17  go off the record. I think I am done on the
18  30(b)(1), but I want to just talk to my team.
19         Does anyone object to taking a
20  break?
21         MR. CARMAN: No.
22         THE VIDEOGRAPHER: The time is

Page 291

1  p.m. This ends Unit 5. Off the record.
2         (A short recess was taken.)
3         THE VIDEOGRAPHER: The time is
4  -- 4:08 p.m. We are on the record.
5         MS. MORGAN: Mr. South, I am not
6  going to have further questions for you as a
7  fact witness.
8         And before we go off the record in
9  this deposition, I do want to just reserve
10  rights -- my understanding is that last night
11  the Department of Justice informed Google that
12  there were some -- like several thousand
13  documents of Mr. South's that had not been
14  produced yet. We proceeded with the deposition
15  anyways. It was scheduled. I'll just reserve
16  the right to reopen the deposition should that
17  become necessary when we look at the documents.
18         And I have no further questions on
19  this -- in this deposition.
20         MR. CARMAN: We have no questions.
21         THE VIDEOGRAPHER: The time is
22  p.m. We are off the record.

Page 292

1         (Whereupon, the proceeding was
2  concluded at 4:08 p.m.)

Page 293

1         CERTIFICATE OF NOTARY PUBLIC
2         I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.
18
           *Bonnie L. Russo*
19         _____
20         Notary Public in and for
21         the District of Columbia
22  My Commission expires: August 14, 2025.

74 (Pages 290 - 293)