# EXHIBIT 23

Page 1

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF VIRGINIA

3                ALEXANDRIA DIVISION

4     ------------------------X

      UNITED STATES, ET AL., :

5                             :

             Plaintiff,    :

6                             :  Case No.

             v.             :  1:23-cv-00108-LMB-JFA

7                             :

      GOOGLE LLC,            :

8                             :

             Defendant.     :

9     ------------------------X

10

11

12

13        VIDEOTAPED DEPOSITION OF SUSAN A. MCMEEN

14        Thursday, September 7, 2023; 9:45 a.m. EDT

15

16

17

18

      Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR,

19    CLR, RSA, NYRCR, NYACR, CA CSR 14409, NJ CCR

      30XI00244600, NJ CRT 30XR00019500, Washington State CSR

20    23005926, Oregon CSR 230105, TN CSR 998, NW CSR 589,

      Remote Counsel Reporter, LiveLitigation Authorized

21    Reporter, Notary Public

22    Job No. 6067835

Page 2

1    Videotaped Deposition of SUSAN A. MCMEEN,
2  held at the law offices of Paul, Weiss, Rifkind,
3  Wharton & Garrison LLP, 2001 K Street, Northwest,
4  Washington, D.C. 20006, before Cindy L. Sebo,
5  Registered Merit Court Reporter, Certified Real-Time
6  Reporter, Registered Professional Reporter, Certified
7  Shorthand Reporter, Certified Court Reporter, Certified
8  LiveNote Reporter, Real-Time Systems Administrator,
9  California Shorthand Reporter 14409, New Jersey
10  Certified Court Reporter 30XI00244600, New Jersey
11  Certified Realtime Reporter 30XR00019500, New York
12  Realtime Certified Reporter, New York State Association
13  Certified Reporter, Washington State CSR 23005926,
14  Oregon CSR 230105, Tennessee CSR 998, New Mexico
15  CSR 589, Remote Counsel Reporter, LiveLitigation
16  Authorized Reporter and Notary Public, beginning at
17  approximately 9:45 a.m. EDT, when were present on
18  behalf of the respective parties:
19
20
21
22

Page 3

1        A P P E A R A N C E S :
2  Attorneys for Plaintiff:
3     U.S. DEPARTMENT OF JUSTICE
4     ANTITRUST DIVISION
5     MARK H.M. SOSNOWSKY, ESQUIRE
6     DAVID GROSSMAN, ESQUIRE
7     ALVIN CHU, ESQUIRE
8     450 Fifth Street, Northwest
9     Washington, D.C. 20530
10     202.412.7316
11     mark.sosnowsky@usdoj.gov
12     david.grossman@usdoj.gov
13     alvin.chu@usdoj.gov
14
15
16
17
18
19
20
21
22

Page 4

1     A P P E A R A N C E S (Continued):
2  Attorneys for Plaintiff:
3     U.S. DEPARTMENT OF TRANSPORTATION
4     ERIN D. HENDRIXSON, ESQUIRE
5     ASHLEY SIMPSON, ESQUIRE
6     1200 New Jersey Avenue, Southeast
7     Washington, D.C. 20590
8     erin.hendrixson@usdot.gov
9     ashley.simpson@usdot.gov
10
11  Attorneys for Defendant:

11     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
12     CARTER E. GREENBAUM, ESQUIRE
13     MARTHA L. GOODMAN, ESQUIRE
14     2001 K Street, Northwest
15     Washington, D.C. 20008-1047
16     cgreenbaum@paulweiss.com
17     mgoodman@paulweiss.com
18
19
20
21  ALSO PRESENT:
22     ORSON BRAITWAITHE, Videographer

Page 5

1        --oOo--
2     INDEX OF EXAMINATION
3     SUSAN A. MCMEEN
4  United States, et al. vs. Google, LLC
5     Thursday, September 7, 2023
6        --oOo--
7
8  EXAMINATION BY              PAGE
9  Mr. Greenbaum          15, 187
10
11
12
13
14
15
     CERTIFICATE OF REPORTER          426
16
17
     ERRATA              428
18
     ACKNOWLEDGMENT OF WITNESS          429
19
20
21
22

2 (Pages 2 - 5)

1    foundation; form.
2         THE WITNESS:  Again, if I don't
3    see the list -- and you're asking me to
4    confirm a list that I don't know is -- I
5    don't know what is in that list that is
6    relevant.
7         BY MR. GREENBAUM:
8    Q.    Okay.  We'll get to that.
9    A.    Okay.
10   Q.    So I'd like to just start by
11   talking about the process that NHTSA uses to
12   advertise in general.
13        In some of your documents, I've
14   seen the term "digital advertising."
15        What do you understand digital
16   advertising to include?
17        MR. SOSNOWSKY:  Objection: form.
18        THE WITNESS:  So it has evolved
19   over time, so it depends on exactly what
20   time frame you're talking about.  So that
21   would be helpful if you could --
22

1         BY MR. GREENBAUM:
2    Q.    What do you understand the term
3    "digital advertising" to include today?
4    A.    Okay.  Thank you.
5         So digital advertising is something
6    that is provided electronically to a consumer,
7    and it can come in many different channels and
8    different ways.
9    Q.    What channels?
10   A.    It can go through the Internet; it
11   can go through streaming; and it even can go
12   through audio.
13   Q.    Does digital advertising include
14   display advertising?
15   A.    Yes.
16   Q.    Does digital advertising include
17   social media advertising?
18   A.    Yes.
19   Q.    Does it -- does digital advertising
20   include direct deals with websites, like The
21   New York Times, for example?
22   A.    I guess I'm not really clear on

1    what you mean by "direct" -- can you repeat that?
2    Q.    Does NHTSA engage in direct
3    advertising deals with individual websites or --
4    A.    So NHTSA works with the ad agency
5    on our behalf, who then works with them.  We do
6    not directly work with them.
7    Q.    Understood.
8         Are those deals included under the
9    umbrella of digital advertising?
10        MR. SOSNOWSKY:  Objection: form.
11        THE WITNESS:  Can you be a little
12   more specific about what you mean,
13   "deals"?
14        BY MR. GREENBAUM:
15   Q.    The advertising -- are the
16   advertisements that NHTSA engages in directly
17   with publishers considered part of digital
18   advertising?
19        MR. SOSNOWSKY:  Objection: form.
20        THE WITNESS:  So we don't -- we
21   don't make deals in the world.  We
22   develop media -- all right.  Let me state

1    this again.
2         I have my ad agency develop a
3    media buy plan, which then they present
4    to us and how we're going to come -- buy
5    media.  And with that plan, we review it,
6    discuss it and then eventually approve
7    it.
8         BY MR. GREENBAUM:
9    Q.    I think I'm asking a slightly
10   different question than the one you're answering.
11   I think it's much simpler.
12   A.    Okay.
13   Q.    My question is, Would an
14   advertising -- advertisements that NHTSA engages
15   on -- with involving a website be considered
16   digital advertising?
17        MR. SOSNOWSKY:  Objection: form.
18        THE WITNESS:  It's hard to answer
19   your question because it's so -- it's not
20   specific.  Because it's so broad, I -- I
21   need more specifics to be able to answer
22   it for you.

11 (Pages 38 - 41)

Page 42

```
1          BY MR. GREENBAUM:
2      Q.     And is that because the digital
3   advertising is broad?
4      A.     Yes.
5      Q.     Does digital advertising include
6   programmatic advertising?
7      A.     Yes.
8      Q.     Does it include in-app advertising?
9      A.     Yes.  And you're referring to
10  your -- the phone?
11     Q.     Yes.
12     A.     Yes.
13     Q.     Would it include connected TV?
14     A.     Yes.  It --
15            Well -- so this is where the --
16  the -- the digital space is blending and
17  blurring, because TV -- digital is part of TV in
18  some sense because of how it's delivered.
19     Q.     Is --
20     A.     Let me --
21     Q.     -- digital out-of-home included
22  under the umbrella of digital advertising?
```

Page 43

```
1          MR. SOSNOWSKY:  Objection:  form.
2          THE WITNESS:  We don't -- so the
3      way in which the media buyer explains it
4      to us and the way we address it in our
5      media buy plans, we always keep
6      out-of-home separate.  And the reason
7      being is, typically, our campaigns have
8      to be in and out in very specific times.
9      We can't -- we -- except for a couple of
10     our campaigns, the majority of them are
11     just in and out in very specific dates.
12     I can't always -- that can't always be
13     controlled like that.
14         BY MR. GREENBAUM:
15     Q.     So are there circumstances in which
16  NHTSA would consider digital out-of-home
17  advertising part of digital advertising?
18         MR. SOSNOWSKY:  Objection:  form.
19         THE WITNESS:  To the best of my
20     knowledge, the way in which we keep
21     digital out-of-home is separate.
22
```

Page 44

```
1          BY MR. GREENBAUM:
2      Q.     Is "digital advertising" a term
3   that you typically use in the daily course of
4   your business?
5      A.     We -- we do.  It does kind of get
6   interchangeable and kind of used broadly.  A lot
7   of times, it's referred to as "digital," not
8   "digital advertising."
9      Q.     Is "programmatic advertising" a
10  term that you would use regularly in your
11  business?
12     A.     So it's -- I guess when you say in
13  my business, what are you referring to?
14     Q.     In the course of your job
15  responsibilities.
16     A.     So it's referring to my
17  responsibilities when we're focusing on the media
18  buy plan and the media buy summary.  That's when
19  we discuss it.
20     Q.     So what do you understand the term
21  "programmatic advertising" to include?
22     A.     Can you give me a little bit more
```

Page 45

```
1   specifics there?
2      Q.     If I were to use the term
3   "programmatic advertising," what would you
4   understand me to mean?
5          MR. SOSNOWSKY:  Objection:  form.
6          THE WITNESS:  So in -- the way in
7      which we look at it is, it's an
8      opportunity to be able to -- on a more
9      timely basis, be able to get into various
10     different digital spaces and various
11     different -- I'm trying to think of the
12     right word for it -- organizations that
13     were able to purchase and optimize the --
14     the costs there.
15         BY MR. GREENBAUM:
16     Q.     And you're familiar with the term
17  "programmatic advertising"?
18     A.     Yes.
19     Q.     Are you familiar with the term
20  "social media advertising"?
21     A.     Yes.
22     Q.     And what would that include?
```

12 (Pages 42 - 45)

1     A.    So for us -- well, it can include
2  in the world of advertising -- it can be, like,
3  Facebook, Twitter, TikTok, Pinterest, YouTube.
4  You know, there's a long list.  Sorry.  I can't
5  remember them all, but --
6     Q.    That's fine.
7     A.    -- unfortunately, because I'm a
8  Government agency, I'm not able to advertise in
9  all those.
10     Q.    But you use the term "social media
11  advertising" in your day-to-day responsibilities
12  as a director of consumer information?
13     A.    When I'm referring to the media buy
14  plan in some creative development, yes.
15     Q.    Have you ever heard of the term
16  "walled garden"?
17     A.    No.
18     Q.    You don't use that term in the
19  regular course of your business?
20          MR. SOSNOWSKY:  Objection: form.
21          THE WITNESS:  No.
22

1          BY MR. GREENBAUM:
2     Q.    You don't use the term "walled
3  garden" in your day-to-day responsibilities as
4  director of consumer information?
5          MR. SOSNOWSKY:  Objection: form.
6          THE WITNESS:  No.
7          BY MR. GREENBAUM:
8     Q.    Have you ever heard of the term
9  "open Web display advertising"?
10     A.    I have heard of the term.
11     Q.    Do you use the term in the regular
12  course of your activities as director of consumer
13  information?
14     A.    No.
15     Q.    Without disclosing any
16  conversations with counsel, can you tell me the
17  first time you've heard that term, "open Web
18  display advertising"?
19     A.    In the spring.  I don't know
20  exactly when.
21     Q.    And that's the spring of 2023?
22     A.    Correct.

1     Q.    So with those definitions in mind,
2  I'd like to now talk about process that you used
3  to purchase media advertising.
4          Do you use an agency -- does NHTSA
5  use an agency to purchase its media advertising?
6     A.    Yes, we do.
7     Q.    What agencies do you -- does NHTSA
8  use?
9     A.    We use Stratacomm, and we use the
10  Ad Council.  And Stratacomm -- we have two
11  different contracts with them.
12     Q.    What are your two contracts with
13  Stratacomm?
14     A.    With the vehicle, and I'm going to
15  just refer to it as "behavioral."
16     Q.    Okay.
17          Do you work with Tom Brus?
18     A.    We used to.
19     Q.    And do you continue to work with
20  Tom Brus as a subcontractor of Stratacomm?
21     A.    So we do not directly work with
22  subcontractors.

1     Q.    Why do you work with two -- at
2  least two different agencies to purchase media at
3  NHTSA?
4     A.    Which -- which contracts are you
5  referring to?
6     Q.    Oh.  Let me ask it this way:  Why
7  do you work with both Stratacomm and Ad Council
8  to purchase media for NHTSA?
9     A.    So there's two different business
10  models there.  The Ad Council is a donated media.
11  Primarily, they do a very small amount of media
12  buying for us.
13     Q.    What does "donated media" mean?
14     A.    It refers to when media is provided
15  by various different channels and organizations
16  for free.
17     Q.    So NHTSA doesn't pay for media
18  that's been donated?
19     A.    Correct.
20     Q.    Is Ad Council responsible for
21  certain of your campaigns, and then Stratacomm is
22  responsible for others?

13 (Pages 46 - 49)

Page 50

1    MR. SOSNOWSKY: Objection: form.
2    THE WITNESS: Yes, they -- they
3  have different campaigns that they manage
4  versus the other contracts.
5    BY MR. GREENBAUM:
6    Q.  Which campaigns does Ad Council
7  manage?
8    A.  They manage -- well, actually, do
9  you -- can you tell me what you're -- what you
10  would like to know or be more specific about
11  that?
12    Q.  I would like to know which
13  campaigns that Ad Council manages on behalf of
14  NHTSA.
15    MR. SOSNOWSKY: Objection: form.
16    THE WITNESS: Okay. So I'll give
17  you a list. I hope to be comprehensive,
18  but I'll just give you the list --
19    BY MR. GREENBAUM:
20    Q.  Okay.
21    A.  -- it is the Buzzed Driving is
22  Drunk Driving; If You Feel Different, You Drive

Page 51

1  Different; that's our -- The Right Seat
2  [verbatim], which is our child car seat campaign;
3  our heat-stroke campaign; and our
4  Distracted Driving, which is the -- we actually
5  just changed the -- the title of the campaign to
6  Eyes Looking Forward.
7    Are you -- yeah.
8    Q.  And do they also manage the -- did
9  you say Heatstroke, Where's Baby campaign?
10    A.  Yes.
11    Q.  Okay. And for those campaigns, is
12  all media donated to NHTSA?
13    A.  So it's -- when you say it's
14  donated to NHTSA, we actually work with the
15  Ad Council, who then places the ads in donated
16  media for us --
17    Q.  But has --
18    A.  -- so they're not given -- I mean,
19  in a sense, they are, but they're not. They're
20  actually taking our ads and placing it in donated
21  space.
22    Q.  So who pays for the advertisements

Page 52

1  for those campaigns?
2    MR. SOSNOWSKY: Objection: form.
3    THE WITNESS: I'm not -- I'm not
4  understanding your question.
5    BY MR. GREENBAUM:
6    Q.  Does NHTSA pay for the
7  advertisements placed on, say, the Child Car
8  Safety, The Right Seat campaign?
9    MR. SOSNOWSKY: Objection: form.
10    THE WITNESS: So we pay -- that's
11  donated space, so we're not paying for
12  the donated space. It's donated. It's
13  free.
14    BY MR. GREENBAUM:
15    Q.  By whom --
16    A.  -- so my --
17    Q.  -- is it donated?
18    MR. SOSNOWSKY: I think -- sorry.
19  Just if you could give her a chance to
20  finish the answer. I think she was in
21  the middle of her answer, but . . .
22    THE WITNESS: I'm sorry. Repeat

Page 53

1  the question now.
2    BY MR. GREENBAUM:
3    Q.  By whom is the advertisement -- are
4  the advertisement dollars donated to NHTSA for
5  the campaign Child Car Safety, The Right Seat?
6    MR. SOSNOWSKY: Objection: form.
7    THE WITNESS: I don't believe that
8  was your last question.
9    BY MR. GREENBAUM:
10    Q.  By whom is it donated?
11    The question is, Does NHTSA pay for
12  the advertisements placed on, say, the Child Care
13  Safety, The Right Seat campaign?
14    And then, by whom is it donated?
15    A.  So I'll ask -- I -- I believe I was
16  in the process of answering the second half of
17  that question, to whom.
18    It could be anyone. It can be the
19  outdoor billboard spaces. It could be online.
20  It could be TV. It could be anywhere where a
21  organization has donated space. It can be in
22  social media. It can be influencers. It can be

14 (Pages 50 - 53)

Page 54

1  a long -- I mean, it's a long list.
2       I can't tell you exactly everything
3  that -- where it's donated, but it's in all media
4  channels.
5       Q.    But is it fair to say that NHTSA
6  does not pay for the media that is donated to the
7  child care safety, The Right Seat campaign?
8       A.    So --
9            MR. SOSNOWSKY: Objection: form.
10           THE WITNESS:  -- so that -- when I
11  say "it's donated," it means space that
12  it's going to be in.
13           I'll give you an example:  TV.
14  There's a 30-second spot available.  We
15  place -- the Ad Council, on behalf of
16  NHTSA, places that 30-second spot, and it
17  runs for free.  There's no charge to
18  NHTSA for that actual space, but there's
19  other fees associated.  Like, there may
20  be a distribution fee.  There may be fee
21  -- labor fee from Ad Council.
22           I mean, there's a lot of other

Page 55

1  background, so I'm just purely talking
2  about the space in which it goes into
3  when I say "donated."
4            And then there is -- as I
5  explained earlier, they do a very small
6  paid media buy for us for some of the
7  campaigns.
8            BY MR. GREENBAUM:
9       Q.    Okay.  And so you referred to --
10  you referred to "distribution fees."
11           Are there any other fees that you
12  would pay for media placed on, say, the Child Car
13  Safety, The Right Seat campaign?
14           MR. SOSNOWSKY: Objection: form.
15           THE WITNESS:  So -- let me go back
16  to my example, the TV spot.
17           BY MR. GREENBAUM:
18      Q.    Please do.
19      A.    So -- I'm just going to make up --
20  NBC has offered a 30-second spot --
21      Q.    Okay.
22      A.    At somewhere like 9:00 a.m.  Okay?

Page 56

1  That spot runs.  There is no charge from CPS --
2  CBS to Ad Council for that spot on behalf of
3  NHTSA.  All right?  So that space is free.  When
4  I say "donated," it's literally free.
5       Q.    Okay.
6       A.    Okay.
7       Q.    I think I understand now.
8       A.    Thank you.
9       Q.    What are the general categories of
10  advertising inventory that NHTSA purchases?
11           MR. SOSNOWSKY: Objection: form.
12           THE WITNESS: When you mean -- can
13  you explain to me what you mean by
14  inventories?
15           BY MR. GREENBAUM:
16      Q.    What type of -- how do you
17  categorize the different types of media that you
18  can purchase?
19      A.    So NHTSA, on behalf of our ad
20  agency, does -- we purchase our media.  NHTSA
21  never directly purchases media.
22      Q.    What are the -- what are the -- how

Page 57

1  would you categorize the different types of media
2  that your agency purchases on your behalf?
3       A.    Okay.  So can you give me a little
4  bit of time, because it has changed over time?
5       Q.    Well, let's start with now.
6            What are the general categories of
7  advertising inventory that NHTSA's agencies
8  purchase on its behalf today?
9       A.    Okay.  So just because of the way
10  my world works, we don't talk about inventories,
11  but we talk about space --
12      Q.    Okay.
13      A.    -- or an ad, we place an ad.
14           We buy in TV --
15      Q.    Okay.
16      A.    -- radio, digital, out-of-home
17  and -- and I may have forgotten a category, but,
18  you know, that's the best of my knowledge, those
19  buckets.  And then within those buckets, there's
20  other things.
21      Q.    Digital.  What is -- what did you
22  include in digital?

15 (Pages 54 - 57)

1    A.    Digital can run from banner ads to
2   paid social media.  It can be programmatic.  It
3   can be gaming.  You know, there's that -- that
4   world is changing so much, that's like a
5   big-bucket areas.  And as I explained earlier,
6   digital is blending with TV and radio, so it's
7   not a straightforward, just clean buckets
8   anymore.
9        Q.    Would you call those different
10  spaces "channels"?
11           MR. SOSNOWSKY: Objection: form.
12           THE WITNESS:  Are you referring to
13       the big buckets?  Yes.
14           Even the smaller buckets, too,
15       yes.
16           BY MR. GREENBAUM:
17       Q.    Does NHTSA distribute its
18  advertising spend across various channels?
19           MR. SOSNOWSKY: Objection: form.
20           THE WITNESS:  I would not use --
21       the word "spread" is -- I'm not sure
22       exactly what you mean by "spread."

1           BY MR. GREENBAUM:
2        Q.    Does NHTSA purchase display ads, or
3   does -- does NHTSA's -- strike that.
4           Does NHTSA's media agency purchase
5   display ads on behalf of NHTSA?
6        A.    Yes.
7        Q.    Does NHTSA's media agency purchase
8   connected TV ads on behalf of NHTSA?
9        A.    Yes.
10       Q.    Do they purchase social media ads
11  on behalf of NHTSA?
12       A.    Yes.
13       Q.    Do they purchase radio ads on
14  behalf of NHTSA?
15       A.    Yes.
16       Q.    So do they purchase multiple forms
17  of media on behalf of NHTSA?
18       A.    Yes.
19       Q.    Why do they purchase across these
20  multiple channels?
21       A.    I'm assuming you're referring to
22  "they" as the ad agency, correct?

1        Q.    Correct.
2        A.    All right.  They do that to
3   optimize and reach the targeted audience during
4   the particular time and budget that we have for
5   our various campaigns.
6        Q.    Within the display category, what
7   tactics or strategies does NHTSA or its ad agency
8   use to purchase display advertisements?
9           MR. SOSNOWSKY: Objection: form.
10           THE WITNESS:  Can you be a little
11       bit more -- clarify "strategies" or just
12       repeat the question and then provide a
13       little bit more specifics?
14           BY MR. GREENBAUM:
15       Q.    Well, what do you understand a
16  "strategy" to mean in the context of purchasing
17  advertisements?
18       A.    For our current campaigns?
19           Okay.  So our strategy is to get
20  the reach and frequency to get the message across
21  to our target audience.
22       Q.    And are there different ways that

1   NHTSA or its ad agency can employ to get the
2   reach and frequency it needs to get its message
3   -- message across?
4        A.    Can you repeat that?
5           It's little long, so I just want to
6   make sure I understand it.
7        Q.    Are there different ways that NHTSA
8   or its ad agency can employ to get the reach and
9   frequency it needs to get its message across?
10       A.    So the agency, on behalf of NHTSA,
11  does the media buy plan that provides the reach
12  and frequency we need for a particular campaign.
13       Q.    Within the display category, do you
14  understand the term "direct display advertising"?
15       A.    That term isn't the way we use it.
16       Q.    What would be the way you would use
17  it?
18           MR. SOSNOWSKY: Objection: form.
19           THE WITNESS:  We just use more of
20       "display advertising" or advertise -- you
21       know, "digital advertising."
22

16 (Pages 58 - 61)

Page 78

1    So, really, that is one of the
2    main purposes for that document and also
3    for us to use. But mostly, when we
4    develop it, we're doing it in such a way
5    so that the states and local communities
6    can pick it up and understand then what
7    has -- what is NHTSA planning on
8    purchasing so they can develop their own
9    plans.
10    BY MR. GREENBAUM:
11    Q.    And setting aside the, you know,
12    media buy recommendation or the deliverable that
13    you are -- your ad agency provides, do they
14    typically bundle media purchases by channel or
15    medium?
16    MR. SOSNOWSKY: Objection: form.
17    THE WITNESS: So I wouldn't want
18    to say that all of these are always
19    included. Some may, some not. They've
20    changed over time, too. So I really need
21    to know exactly when you're asking this
22    or if -- what your question -- how -- you

Page 79

1    know, specifically what you're asking.
2    BY MR. GREENBAUM:
3    Q.    Are media purchases recommendations
4    typically bundled according to the channel and
5    medium, in your experience?
6    A.    So --
7    MR. SOSNOWSKY: Objection: form.
8    THE WITNESS: -- so, as I had
9    mentioned earlier, we don't really bundle
10    things; we put them in buckets and
11    categories. So, you know, that's what --
12    how the agency will present it to us.
13    The titles may change because
14    media is changing.
15    BY MR. GREENBAUM:
16    Q.    What's in the category that's
17    listed as Custom here below?
18    MR. SOSNOWSKY: Objection:
19    foundation.
20    THE WITNESS: I don't know, given
21    just seeing this, what the intent was
22    because it could be interpreted

Page 80

1    differently depending upon a campaign.
2    Can we take a break in just a
3    few minutes?
4    MR. GREENBAUM: Now's a good time.
5    THE WITNESS: Okay. Great.
6    THE VIDEOGRAPHER: The time is
7    10:47 a.m. This ends Unit 1. We're off
8    the record.
9    --oOo--
10    (Whereupon, a recess was taken from
11    10:47 a.m. EDT to 11:02 a.m. EDT.)
12    --oOo--
13    THE VIDEOGRAPHER: The time is
14    11:02 a.m. This begins Unit Number 2.
15    We're on the record.
16    MR. SOSNOWSKY: Okay. Counsel,
17    actually, something that -- you both kind
18    of trail off in your question and your
19    answer. So if you could just both be
20    careful that one is finished before you
21    respond and that you finish your answer
22    before you ask, I'd appreciate it,

Page 81

1    because I get lost sometimes.
2    BY MR. GREENBAUM:
3    Q.    You can put the document aside for
4    a second.
5    A.    Okay.
6    Q.    Speaking generally about the
7    process NHTSA uses to purchase advertising, what
8    input does -- does your team have on which
9    channels are used to advertise on behalf of
10    NHTSA?
11    A.    Are you referring to a particular
12    time period or --
13    Q.    Let's start with today.
14    A.    Okay. So we look -- NHTSA looks to
15    the ad agency to bring forth the appropriate
16    channels to use in our paid media campaigns.
17    Q.    Does your team have any input on
18    that channel mix?
19    A.    We look to our ad agency to provide
20    us the expertise of media buying to give us the
21    best approach in how to reach our target
22    audience.

21 (Pages 78 - 81)

Page 82

1    Q.    And do you rely on your media
2  agency to recommend the right channel mix to
3  purchase advertising to reach NHTSA's goals?
4    A.    Yes, we do rely on them -- their
5  expertise in bringing the recommendations forth.
6    Q.    And are you familiar with the
7  platforms that your agencies use to purchase
8  advertising on behalf of NHTSA?
9        MR. SOSNOWSKY:  Objection: form.
10       THE WITNESS:  Can you be a little
11    more specific about "the platforms?"
12       BY MR. GREENBAUM:
13    Q.    What do you understand me to mean
14  when I use the term "platform used to purchase
15  advertising"?
16       MR. SOSNOWSKY:  Objection: form.
17       THE WITNESS:  So "platforms" can
18    mean a lot of different things.  That's
19    why I ask.
20       There are media buying tools that
21    are used.  There is research information
22    they use to determine what's happening

Page 83

1  with a particular target audience and how
2  they're consuming media.
3       BY MR. GREENBAUM:
4    Q.    Are there any other -- are there
5  any other ways that you would define "platforms
6  used to purchase advertising" other than
7  media-buying tools and research?
8    A.    At this point right now, it's what
9  I can recall to the best of my knowledge.
10   Q.    Are you familiar with the media
11  buying tools that your agencies use to purchase
12  advertising on behalf of NHTSA?
13   A.    No, I don't.
14   Q.    Okay.  Would you and your team have
15  any input into which media buying tools are used
16  by your agencies to purchase advertising?
17       MR. SOSNOWSKY:  Objection: form.
18       THE WITNESS:  So, again, I look to
19    them for their expertise in how they do
20    their job.  That's why we hire them.
21       BY MR. GREENBAUM:
22    Q.    And do you rely on your media

Page 84

1  agencies to choose the most efficient platform or
2  media-buying tool to purchase advertising for
3  NHTSA?
4        MR. SOSNOWSKY:  Objection: form.
5        THE WITNESS:  Can you repeat the
6    question?
7        BY MR. GREENBAUM:
8    Q.    I would, but the realtime -- it
9  looks like it's down.
10       MR. GREENBAUM:  Should we go off
11    the record for a second?
12       THE WITNESS:  Okay.
13       CERTIFIED STENOGRAPHER:  Yes,
14    please.
15       THE VIDEOGRAPHER:  The time is
16    11:06 a.m.  We're off the record.
17       --oOo--
18       (Whereupon, a discussion was held
19        off the record.)
20       --oOo--
21       THE VIDEOGRAPHER:  The time is
22    11:12 a.m.  We're on the record.

Page 85

1        BY MR. GREENBAUM:
2    Q.    Ms. McMeen, a moment -- a moment
3  ago, we left off with the question, Would you
4  rely on your media agency to choose the most
5  efficient media buying tools to achieve NHTSA's
6  advertising goals --
7        MR. SOSNOWSKY:  Objection --
8        BY MR. GREENBAUM:  --
9    Q.    -- to purchase advertisements?
10       MR. SOSNOWSKY:  -- objection:
11    form.
12       THE WITNESS:  We look to our --
13       (Interruption in the proceedings.)
14       THE WITNESS:  Oh, okay.
15    -- we look to our ad agency to
16    provide the expertise to prepare the
17    media buy plan and whatever tools they
18    need to use for that to do it and then to
19    execute it.
20       BY MR. GREENBAUM:
21    Q.    So when you say that you look to
22  your ad agency to -- to provide the expertise to

22 (Pages 82 - 85)

Page 86

1   prepare the media buy plan and whatever tools
2   they need to use to execute it, do -- does that
3   mean that you rely on them to use the most
4   efficient tools to execute a campaign?
5        MR. SOSNOWSKY:  Objection: form.
6        THE WITNESS:  Can you be a little
7   bit -- give me a little bit more --
8   because the -- I'm sorry.
9        Can you repeat the -- last
10   part of the question?
11        MR. GREENBAUM:  Could the court
12   reporter please read that back?
13        --oOo--
14        (Whereupon, the certified
15         stenographer read back the
16         pertinent part of the record.)
17        --oOo--
18        THE WITNESS:  I -- I have an issue
19   with "efficient" because I look to them
20   to provide the best tool to use to do
21   their job.
22

Page 87

1        BY MR. GREENBAUM:
2        Q.   What's your issue with the word
3   "efficient"?
4        A.   Because I have no way of gauging
5   efficiency.
6        Q.   But you are relying on your ad
7   agencies to use the best tools to execute a
8   campaign on behalf of NHTSA; is that accurate?
9        A.   Yes.
10        Q.   So after the recommendations are
11   made, who negotiates a purchase of advertisement
12   on behalf of NHTSA?
13        A.   Our ad agency.
14        Q.   What is NHTSA's role in purchasing
15   advertisements?
16        A.   Our role is to allow our ad agency,
17   who we've hired, to do that job.
18        Q.   Do you have any role -- does
19   NHTSA -- strike that.
20        Does NHTSA have any role in
21   negotiating purchases of ad -- advertisements?
22        A.   No.  That is the role of the media

Page 88

1   buyer to do that job.
2        Q.   Earlier, you said that NHTSA does
3   not directly purchase advertisements.
4        What did you mean when you said
5   that NHTSA does not directly purchase
6   advertisements?
7        A.   The ad agency, on our behalf,
8   purchases our paid media.
9        Q.   And what did you mean -- what do
10   you understand the word "directly" to mean?
11        A.   That we would pay a particular
12   vendor for space.
13        Q.   And in this case, it's your ad
14   agency that's paying the vendor for the space; is
15   that right?
16        A.   On our behalf --
17        MR. SOSNOWSKY:  Objection: form.
18        THE WITNESS:  -- on our behalf,
19   they do that.
20        MR. GREENBAUM:  Let's turn to
21   Tab 5 in the binder, which is
22   NHTSA-ADS-0384417.  And I'll mark that as

Page 89

1   101, Exhibit 101.
2        --oOo--
3        (Deposition Exhibit Number 101,
4         E-mail string with attachment,
5         Bates stamped
6         NHTSA-ADS-0000384417 through
7         NHTSA-ADS-0000384452, marked for
8         identification, as of this date.)
9        --oOo--
10        BY MR. GREENBAUM:
11        Q.   The top e-mail should be an e-mail
12   from you to shelbypak@verizon.net.
13        Do you see that?
14        A.   Yes.
15        Q.   Do you recognize the e-mail
16   shelbypak@verizon.net?
17        A.   Yes.
18        Q.   Whose e-mail does that belong to?
19        A.   That is my e-mail.
20        Q.   Okay.  It's dated October 25th,
21   2020 at 8:39 a.m. --
22        A.   Oh, I'm sorry.

23 (Pages 86 - 89)

1    Where is -- oh, this one up here
2  (indicating).
3      Q.    Yeah.
4      A.    Okay.
5      Q.    So --
6      A.    Is it the one at the very top
7  you're referring to?
8      Q.    That's correct.
9      A.    Okay.
10     Q.    Do you see that that top e-mail is
11 dated October 25th, 2022?
12     A.    Yes.
13     Q.    Okay.  Let's go to the second page,
14 the very bottom e-mail with Bates ending in 418.
15 It's an e-mail from Julie Vallese.  And she
16 writes, [as read] Susan, I gave you the heads up
17 this would be coming our way — and now it has.
18 Ann has asked for an HVE campaign program brief.
19     Do you know who Julie is referring
20 to, who Ann refers to?
21     A.    Yes.  Ann is our acting
22 administrator currently for the National Highway

1  Traffic Safety Administration.
2      Q.    Do you have an understanding as to
3  what an HVE campaign program brief is?
4      A.    I understand what the High
5  Visibility Enforcement is and a brief is, but I
6  don't know specifically to which one this
7  pertains to.
8      Q.    Okay.  So "HVE" stands for
9  High Visibility Enforcement?
10     A.    Correct.
11     Q.    And that's one of the campaigns
12 that NHTSA runs?
13     A.    So High Visibility Enforcement is a
14 description.
15     Q.    So it includes multiple campaigns?
16     A.    It includes separate, distinct
17 campaigns.
18     Q.    Okay.  She writes, I think we put
19 one together for James that gave him the overview
20 of our campaigns (statutory mandate, types of
21 campaigns, effectiveness, data).
22     What does "statutory mandate" refer

1  to?
2      MR. SOSNOWSKY:  Objection:
3  foundation.
4      THE WITNESS:  It is the monies
5  that the -- that Congress provides NHTSA
6  for -- to do specific campaigns.
7      BY MR. GREENBAUM:
8      Q.    Do you recall -- and who does
9  "James" refer to?
10     MR. SOSNOWSKY:  Objection:
11 foundation.
12     THE WITNESS:  James at the -- in
13 reference was the -- the acting -- I
14 believe he was the acting -- I can't
15 remember if he was the acting
16 administrator or if he was the
17 administrator at that time.
18     BY MR. GREENBAUM:
19     Q.    Do you recall giving a presentation
20 to James on the High-Visibility-Enforcement
21 campaigns that NHTSA runs?
22     A.    I cannot recall if I gave the

1  presentation or if I gave it with Julie or Julie
2  gave it at this point.
3      Q.    But you recall there was a
4  presentation --
5      A.    Yes.
6      Q.    Okay.
7      MR. SOSNOWSKY:  Just let him --
8  let him finish his questions.
9      BY MR. GREENBAUM:
10     Q.    So if you scroll up to the next
11 e-mail, Friday, September 30th, 2022, you send an
12 e-mail to Julie.  You say, Is this the
13 presentation you're referring to?
14     You see that?
15     A.    Yes.
16     Q.    Then she responds, says, No?
17     A.    Oh.  I'm sorry.
18     I see.  Let me know if this -- that
19 -- if this is what you're thinking of.
20     Is there another --
21     Q.    Oh.  It's two e-mails up.
22     A.    Oh, down below.  Okay.

24 (Pages 90 - 93)

Page 94

1  Sorry.
2      Q.   Is this -- so the first e-mail, at
3  9:22 a.m., you say, Is this the presentation you
4  are referring to?
5      A.   I see that.
6      Q.   Okay.  Julie responds at 9:25 a.m.
7  She says, No; that's the OCCI overview
8  presentation?
9      A.   I see that.
10     Q.   Okay.
11          I'm just getting context for the
12  later e-mails.
13     A.   No worries.
14     Q.   11:24 a.m., you say, Hi, Julie.
15  Let me know if this is what you were thinking of.
16          Do you see that?
17     A.   Yes.
18     Q.   Okay.  Monday, October 3rd, the
19  next e-mail up, say, Wanted to confirm that the
20  attached documents are what you wanted to use.
21          And if you keep going -- you can
22  read through yourself -- you trade e-mails with

Page 95

1  Julie with edits to the presentation.
2          Do you see that?
3      A.   I see at 12:31 and October 7th.
4          Which one are you referring to now?
5      Q.   The series of e-mails on
6  October 31st, 2022 -- or October 7th, 2022, you
7  provide --
8      A.   Right.
9      Q.   -- a version.  Then Julie responds
10  with her edits -- do you see that -- at 4:33?
11     A.   Yes.
12          MR. SOSNOWSKY:  Objection.
13          BY MR. GREENBAUM:
14     Q.   And then at 12:16 p.m. on
15  October 24th, you say -- you write to Julie,
16  Please see the attached -- the updated
17  presentation for Ann.
18     A.   Yes, I see that.
19     Q.   And "Ann" refers to the acting
20  administrator for NHTSA?
21     A.   I can't recall at this time if she
22  is the -- the deputy or the acting or her exact

Page 96

1  title at that point because it's changed.
2      Q.   Okay.  And then Julie sends you an
3  e-mail that just says, Updated, on October 24th?
4      A.   Um-hum.
5      Q.   And then you forward it to
6  yourself, right?
7      A.   Right.
8      Q.   And it's got an attachment?
9      A.   It -- it appears that it does.
10     Q.   Okay.  So the attachment is found
11  at Bates ending at 4420.
12          Do you want to go to that document?
13     A.   Yes, right here (indicating).  Yep.
14     Q.   Do you recall giving a presentation
15  to Acting Administrator Ann Carlson on NHTSA's
16  paid media campaigns?
17          MR. SOSNOWSKY:  Objection: form.
18          THE WITNESS:  I can recall that
19     we've had discussions.  I just don't know
20     exactly which presentation, at what time
21     and who was in attendance.
22

Page 97

1          BY MR. GREENBAUM:
2      Q.   Do you recall this presentation?
3      A.   I have to review it first.
4          (Whereupon, the witness reviews
5          the material provided.)
6          BY MR. GREENBAUM:
7      Q.   We can review every page as we go
8  through the questions.
9          My question at this stage is, Do
10  you recall the presentation in general terms?
11     A.   So as --
12          MR. SOSNOWSKY:  If you need more
13     time to review it to answer the question.
14          THE WITNESS:  -- because the --
15     it's hard to know, given the versions
16     here, what I'm looking at.  I can't tell
17     if the last attachment was, in fact, this
18     presentation.
19          BY MR. GREENBAUM:
20     Q.   Setting aside versions, do you
21  recall giving a presentation to Acting
22  Administrator Ann Carlson on NHTSA paid media

25 (Pages 94 - 97)

Page 98

1  campaigns?
2       MR. SOSNOWSKY: Objection: form.
3       THE WITNESS: As I referenced
4  earlier, I do not exactly recall, because
5  we have several presentations. I just
6  can't remember if this one -- actually I
7  gave it or my boss gave it or if we did
8  it together or if she did it. I just
9  can't recall.
10  BY MR. GREENBAUM:
11      Q.   That's fine. Not a memory test.
12      A.   Thank you.
13      Q.   I -- I don't mean it to be. I just
14  want to use this to help guide our conversations.
15      A.   Sure.
16      Q.   So let's go to the page Bates
17  ending in 422.
18       What, if anything, is depicted in
19  this slide about the three types of campaigns
20  that NHTSA runs?
21       (Whereupon, the witness reviews
22        the material provided.)

Page 99

1       THE WITNESS: Can you be a little
2  bit more specific about what you're
3  asking?
4  BY MR. GREENBAUM:
5       Q.   If you were to give this
6  presentation and you came to this slide, what
7  would you say?
8       MR. SOSNOWSKY: Objection: form.
9       THE WITNESS: I would say that
10  there are three different types of
11  campaigns that -- buckets that we do: one
12  is the High Visibility Enforcement, one
13  is the behavioral, and also the vehicle
14  campaigns.
15  BY MR. GREENBAUM:
16      Q.   And does NHTSA's objective for --
17  differ for each of those category of campaigns?
18      A.   So, actually, the -- within one of
19  the buckets, they can have different types of
20  objectives.
21      Q.   So here it says, [as read] High
22  Visibility Enforcement, the objective is to pair

Page 100

1  awareness with increased local enforcement to
2  prevent and deter.
3       Do you see that?
4       A.   Yes.
5       Q.   So what metrics would NHTSA use to
6  assess the success of a campaign with that kind
7  of an objective?
8       MR. SOSNOWSKY: Objection:
9  foundation.
10       THE WITNESS: So we use, like,
11  impression -- so if you're referring --
12  are you referring --
13       Can you be more specific about
14  what you're looking for with -- with
15  regards to objectives?
16  BY MR. GREENBAUM:
17      Q.   Yeah.
18       Does NHTSA analyze the success of
19  its campaigns?
20      A.   Yes, we do.
21      Q.   And do you use metrics to assess
22  the success of your campaigns?

Page 101

1       A.   Yes, we do.
2       Q.   For a High-Visibility-Enforcement
3  campaign, what are the types of metrics that you
4  would use to assess the success of your ad
5  campaigns?
6       A.   Are you referring to the actual
7  campaign or the overall objective of the
8  campaign?
9       Q.   Let's start -- let's do both, but
10  let's start with the actual campaign.
11      A.   Okay. So we look to make sure that
12  the paid media buy that was executed was executed
13  in a way in which we -- they recommended and the
14  plan was and did we achieve that with
15  High-Visibility-Enforcement --
16      Q.   And so --
17      A.   -- campaign.
18      Q.   -- what -- what metrics would you
19  use to assess whether you achieved that goal?
20      A.   Impressions --
21      Q.   Okay.
22      A.   -- view, video views, click-through

26 (Pages 98 - 101)

1  rates.

2      Q.    Any others?

3      A.    Right now, it's about what I can

4  recall.  I do believe we have a few others, but

5  right off the top of my head, that's what we look

6  at.

7      Q.    Okay.

8          For behavioral safety, what metrics

9  would be used to access the success of the

10 campaign with the objective of changing behavior

11 or social norms using media messages?

12         MR. SOSNOWSKY:  Objection: form.

13         THE WITNESS:  So this is a mix of

14     the Ad Council campaigns that I mentioned

15     earlier and also the Stratacomm

16     behavioral campaigns that we have.  So

17     they have different ways in which we

18     assess effectiveness.

19         BY MR. GREENBAUM:

20     Q.    Would you use impressions, video

21 views and CTR as well to assess the effectiveness

22 of behavioral safety campaigns?

1          MR. SOSNOWSKY:  Objection: form.

2          THE WITNESS:  So when you use

3      "CTR," can you give me what you're

4      referring to?

5          BY MR. GREENBAUM:

6      Q.    I think it's a -- a acronym that

7  you've used.

8          Do you understand that to mean

9  "click-through rate"?

10     A.    Yes.

11     Q.    Okay.

12     A.    I just want to make sure.

13         So those are some of them that we

14 use --

15     Q.    Okay.

16     A.    -- but with the Ad Council, we have

17 some additional.

18     Q.    What additional metrics would you

19 use for those campaigns?

20     A.    We do a -- tracking studies with

21 them to see if there's been a shift in behavior

22 over time.

1      Q.    Do you do that for each campaign?

2      A.    For the ad -- so for Ad Council

3  campaigns, we do.

4      Q.    Okay.  Are there different metrics

5  that are used to assess the effectiveness of

6  those campaigns in the tracking study as compared

7  to the High-Visibility-Enforcement campaigns?

8          MR. SOSNOWSKY:  Objection: form.

9          THE WITNESS:  So it depends upon

10     the campaign, which you would -- which we

11     would -- you would refer to, because they

12     are done differently; they're not all the

13     same.

14         BY MR. GREENBAUM:

15     Q.    Right.

16         So what metrics -- what other

17 metrics would be used to assess a behavioral

18 safety campaign?

19     A.    So can you be a little bit more

20 specific about which behavioral campaigns?

21     Q.    Well, let's say, Does the metric

22 used to assess the effectiveness of a campaign

1  vary by campaign?

2      A.    It does between the Ad Council and

3  the other behavioral campaigns.

4      Q.    Okay.  So for the other behavioral

5  campaigns, which would be administered by

6  Stratacomm --

7          Right?

8      A.    Correct.

9      Q.    -- what would be the metrics that

10 NHTSA uses to assess the effectiveness of those

11 campaigns?

12         MR. SOSNOWSKY:  Objection: form.

13         THE WITNESS:  So it depends upon

14     the period of time here, because the

15     heat-stroke campaign was originally with

16     Stratacomm until, most recently, we moved

17     it to Ad Council.

18         BY MR. SOSNOWSKY:

19     Q.    Okay.  So today, what metrics do

20 you use to assess the effectiveness of

21 Stratacomm's behavioral safety campaigns?

22         MR. SOSNOWSKY:  Objection: form.

27 (Pages 102 - 105)

1          THE WITNESS:  So there are --
2     okay.  There are some campaigns that have
3     concluded that we're no longer moving
4     forward today, and there are some that
5     we're continuing forward with.
6          BY MR. GREENBAUM:
7     Q.    I'm just trying to get a universal
8     what the metrics are.
9     A.    Okay.
10    Q.    So . . .
11    A.    That's fine.  It's just --
12    Q.    What would be the universe of
13    metrics that are used to assess these campaigns?
14    A.    So the behavioral --
15         MR. SOSNOWSKY:  Objection: form.
16         Go ahead.
17         THE WITNESS:  -- the behavioral
18    Stratacomm ones are similar to the
19    High-Visibility-Enforcement ones.
20         BY MR. GREENBAUM:
21    Q.    And for the Ad Council, what
22    metrics would be used to assess the effectiveness

1     of the behavioral safety campaigns?
2          MR. SOSNOWSKY:  Objection: form.
3          THE WITNESS:  Can you repeat the
4     last question?
5          BY MR. GREENBAUM:
6     Q.    For -- so you gave me the metrics
7     for Stratacomm.
8          Now for Ad Council, what metrics
9     would be used to assess the effectiveness of the
10    behavioral safety campaigns?
11         MR. SOSNOWSKY:  Same objection.
12         THE WITNESS:  So as I mentioned
13    earlier, the tracking studies is an
14    important one, plus the impressions and
15    click-through rates and video
16    impressions.
17         BY MR. GREENBAUM:
18    Q.    Okay.  And so for the last type of
19    campaign here, you've got vehicle safety.
20         What metrics would be used to
21    assess the success of the campaign -- with --
22    sorry.

1          You've got here vehicle safety, and
2     then below it says, Objective: Motivate consumers
3     to repair recalls.  Educate consumers on new
4     technologies.
5          Do you see that?
6     A.    Yes.
7     Q.    What metrics would be used to
8     assess the success of a campaign with that kind
9     of objective?
10         MR. SOSNOWSKY:  Objection: form.
11         THE WITNESS:  So I need to ask you
12    to be a little bit more specific within
13    the vehicle because there are different
14    campaigns there with different
15    objectives.
16         BY MR. GREENBAUM:
17    Q.    What would be the universe of
18    metrics that would be used to assess the success
19    of campaigns within this category?
20         MR. SOSNOWSKY:  Objection: form.
21         THE WITNESS:  In general, it would
22    be impressions, video views or

1     click-through rates.
2          BY MR. GREENBAUM:
3     Q.    If you look at the next page, Bates
4     ending in 423, it has -- it describes FY2022
5     Media Buys, Fiscal Year 2022.
6          What -- and then it has, High
7     Visibility Enforcement:  Statutorily Mandated
8     41.4 million.
9          Do you see that?
10    A.    Um-hum.
11    Q.    You discussed what that meant
12    earlier.
13         Below that is Behavioral Safety:
14    Discretionary.
15         What does "discretionary" refer to
16    here?
17    A.    Hold on a second.
18         (Whereupon, the witness reviews
19          the material provided.)
20         THE WITNESS:  So this -- this term
21    "discretionary" really is kind of like
22    just a general bucket for us to say,

28 (Pages 106 - 109)

1    basically, it's program money that's
2    given to -- that's used that the agency,
3    being NHTSA, has provided to pay for the
4    campaigns.
5         BY MR. SOSNOWSKY:
6         Q.    How does that differ from
7    statutorily mandated?
8         A.    Statutorily mandated is funds
9    provided from Congress.
10        Q.    And where do the discretionary
11   funds come from?
12        A.    The National Highway Traffic Safety
13   Administration.
14        Q.    Okay.
15             If you look at the next page, Bates
16   ending in 424, there's a reference in the middle
17   to Behavioral safety, Social Norm and Awareness,
18   and says, FY2022, Donated Media.
19             Do you see that?
20        A.    Yes.
21        Q.    Okay.  At the bottom, though, in
22   the notes, there's a reference to, Ad Council is

1    the sole organization designated by the
2    advertising industry to provide the service.
3             Do you have an understanding as to
4    what that means?
5         A.    Yes.
6         Q.    What does it mean?
7         A.    It means -- it means that they
8    provide donated media, as I described earlier,
9    but they're the ones and which receives the
10   donated media.
11        Q.    Got it.
12             So Stratacomm can't provide the
13   service to NHTSA?
14        A.    Not at the level in which the
15   Ad Council can.
16        Q.    Okay.  Let's go to Bates 435.
17             It says, Why Multichannel?  The
18   Power of the Sum of Many Parts.
19             Do you see that?
20        A.    Yes.
21        Q.    What do you understand to be
22   conveyed with the subtitle, The Power of the Sum

1    of Many Parts?
2         A.    So it's -- it's a nice market --
3    little marketing tagline, I guess, in a way
4    that's been used here to kind of just generally
5    talk then -- I guess I'd like to look through the
6    following pages.
7             Thank you.
8             (Whereupon, the witness reviews
9              the material provided.)
10        BY MR. SOSNOWSKY:
11        Q.    I see that you are in the next
12   section of the slides, 4438, in the section on
13   today's media landscape.  The section on
14   multichannel, though, I wanted to focus on, which
15   is -- starts on 435 and goes through 437.
16        A.    Okay.
17        Q.    And my question is, What do you
18   understand to be conveyed with the subtitle, The
19   Power of the Sum of Many Parts?
20        A.    So, actually, this implies all of
21   that whole section, so it all kind of builds
22   together to describe that.

1             That's why I was looking further.
2         Q.    Okay.  Setting aside the rest of
3    the presentation --
4         A.    Sure.
5         Q.    -- what do you understand to be
6    conveyed by the tagline, The power of the sum of
7    many parts?
8         MR. SOSNOWSKY:  Objection: form;
9    foundation.
10        THE WITNESS:  So that is referring
11   to, in my understanding -- that it --
12   you -- you need to build various
13   different channels together to work
14   effectively to reach a particular target
15   audience.
16        BY MR. GREENBAUM:
17        Q.    Can you reach the same target
18   audience using multiple channels?
19        MR. SOSNOWSKY:  Objection: form.
20        THE WITNESS:  Please repeat that
21   question.
22

1    MR. GREENBAUM:  Can the court
2    reporter please read that back?
3            --oOo--
4    (Whereupon, the certified
5         stenographer read back the
6         pertinent part of the record.)
7            --oOo--
8    MR. SOSNOWSKY:  Same objection.
9    THE WITNESS:  I guess I need to
10   understand what same channels you're
11   referring to.
12   BY MR. GREENBAUM:
13   Q.    I referred to multiple channels.
14       Can you reach the same target
15   audience using multiple channels?
16   MR. SOSNOWSKY:  Objection: form.
17   THE WITNESS:  Yes, you can reach
18   multiple channels -- or you can reach a
19   target audience with multiple channels.
20   BY MR. GREENBAUM:
21   Q.    Okay.  Let's go to the next page,
22   436.

1       It says, in the middle, Focus on
2    channels most successful for the target audience.
3       Then it says, High-reach cable
4    programming, Live sports.
5       What -- it does not include display
6    advertising here as a channel for reaching a
7    target audience, right?
8    A.    So, as I explained earlier, you
9    can't really take one slide on its own.  It's
10   building a story with the following slides.
11       So if I could have the opportunity
12   to read the other slides, that would be helpful.
13   Q.    Sure.
14   A.    Thank you.
15   (Whereupon, the witness reviews
16        the material provided.)
17   BY MR. GREENBAUM:
18   Q.    Ms. McMeen, I think my question
19   was --
20   MR. SOSNOWSKY:  Counsel, now,
21   multiple times, she said that -- you've
22   put this document in front of her.  She's

1    asked multiple times to be able to read
2    it.
3       I've been looking at the clock.
4    She hasn't spent 90 seconds looking at
5    this document.  You've asked multiple
6    times --
7    MR. GREENBAUM:  Counsel --
8    MR. SOSNOWSKY:  -- she said
9    multiple times that she'd like to read
10   through the document.
11       Okay --
12   MR. GREENBAUM:  -- I understand --
13   MR. SOSNOWSKY:  -- I would
14   appreciate it if you gave her that
15   opportunity to do so.
16   MR. GREENBAUM:  -- Counsel, she's
17   had approximately four minutes to go
18   through this document.  The question was:
19   Display is not included in this slide; is
20   that correct?
21   MR. SOSNOWSKY:  You asked her
22   about why isn't -- you're asking why

1    display isn't included --
2    MR. GREENBAUM:  I didn't say that.
3    MR. SOSNOWSKY:  -- in that
4    slide -- Counsel, first of all, it's not
5    correct to say that it's been
6    four minutes.  I'm looking at the clock
7    and the time here -- that's on the record
8    there --
9    MR. GREENBAUM:  You've had two
10   breaks, Counsel, in which to read this
11   entire document.
12   MR. SOSNOWSKY:  Excuse me?  Wait.
13   That is not -- that's not accurate at
14   all.
15       Okay.  We didn't go on break.  We
16   didn't -- you asked us to not take these
17   binders out of the room.  You didn't ask
18   us to read these documents on a break.
19       She asked originally if she could
20   read through the document.  You cut her
21   off in that part of the -- in that part
22   of your questioning when she -- when she

Page 118

1    went beyond the first two pages because
2    you assumed that the following section
3    was irrelevant to her answer to your
4    question about the prior section.
5         She then explained to you that
6    that's not accurate -- your assumption
7    about the document was not accurate, and
8    she asked to read it again.
9         You said, sure. She spent a
10   couple of minutes looking at the
11   document. She's trying her best to
12   answer your question. So I just ask that
13   you give her the -- have the patience to
14   give her a chance to review the document.
15        MR. GREENBAUM: You've made a
16   record. I have made mine.
17        She's spent five minutes now
18   reviewing this document.
19        MR. SOSNOWSKY: Take whatever time
20   you need.
21        THE WITNESS: Okay.
22        Can you tell me where -- which

Page 119

1    page we were on before? Sorry. I lost
2    --
3         BY MR. GREENBAUM:
4    Q.    The Bates ending in 436.
5    A.    436. Okay.
6    Q.    My question is, Display isn't
7    listed here as a channel that's most successful
8    for the target audience; is that correct?
9    A.    On that --
10        MR. SOSNOWSKY: Objection: form.
11        THE WITNESS: -- on that
12   particular page, it is not.
13        BY MR. GREENBAUM:
14   Q.    What target audience are these
15   channels most successful at reaching?
16        MR. SOSNOWSKY: Objection:
17   foundation; form.
18        THE WITNESS: Actually, that would
19   be out of context of the presentation and
20   the objective of the presentation. So I
21   can't . . .
22

Page 120

1         BY MR. GREENBAUM:
2    Q.    What target audience is most
3    important for NHTSA's advertisement campaigns?
4         MR. SOSNOWSKY: Objection: form.
5         THE WITNESS: So it depends on the
6    campaign.
7         BY MR. GREENBAUM:
8    Q.    Is the 18- to 34-year-old male
9    target audience an -- target audience an
10   important target audience for NHTSA's
11   advertisement campaigns?
12        MR. SOSNOWSKY: Objection: form.
13        THE WITNESS: It is one of those.
14        BY MR. GREENBAUM:
15   Q.    What is the most important target
16   audience for NHTSA's advertisement campaigns?
17        MR. SOSNOWSKY: Objection: form.
18        THE WITNESS: It depends on the
19   campaign.
20        BY MR. GREENBAUM:
21   Q.    What is the most important target
22   audience for NHTSA's Click It or Ticket

Page 121

1    advertisement campaign?
2         MR. SOSNOWSKY: Objection: form.
3         THE WITNESS: It would be males 18
4    to 34.
5         BY MR. GREENBAUM:
6    Q.    What is the largest media campaign
7    that NHTSA runs by total dollars spent on
8    advertising?
9         MR. GREENBAUM: Objection: form.
10        THE WITNESS: Can you give me more
11   specifics on that?
12        BY MR. SOSNOWSKY:
13   Q.    What specifics would you need to
14   tell me what the largest media campaign that
15   NHTSA runs by dollars spent on advertising?
16   A.    Can you repeat that question?
17             - - -
18        (Whereupon, the certified
19        stenographer read back the
20        pertinent part of the record.)
21             - - -
22        MR. SOSNOWSKY: Same objection.

31 (Pages 118 - 121)

Page 134

1    MR. SOSNOWSKY: Objection: form.
2    THE WITNESS: Yes.
3    BY MR. GREENBAUM:
4    Q.   Let's go to the last slide, ending
5    in 45 -- Bates 452.
6    It says, [as read] Social
7    advertisement --
8    A.   Oh, I'm sorry. 4- -- what is it?
9    Q.   The last -- the Bates ends in 452.
10   It says --
11   A.   Oh, yeah --
12   Q.   -- Social Opportunity.
13   A.   -- yep. Yep.
14   Q.   It says, [as read] Social
15   opportunity is considered the most relevant by
16   the audience, and the importance of mobile
17   devices is clear. Delivering effective messages
18   via the smartphone is imperative for the campaign
19   to ensure we've reached the target audience.
20   Do you see that?
21   A.   I do.
22   Q.   What is being conveyed on this

Page 135

1    slide about the importance of social media
2    advertising?
3    MR. SOSNOWSKY: Objection:
4    foundation.
5    THE WITNESS: That the males 18 to
6    34 see this as a relevant place for them
7    to get a mess- -- messaging.
8    BY MR. GREENBAUM:
9    Q.   Do you see the figure at the bottom
10   of the page, Figure 21, Social Site Reach
11   Potential by Target?
12   A.   Yes.
13   Q.   What, if anything, is this figure
14   depicting about the reach of social media
15   advertising?
16   MR. SOSNOWSKY: Objection:
17   foundation.
18   THE WITNESS: I don't believe the
19   figure is referring to actually
20   advertising here. It's just saying
21   social site reach potential by the
22   target.

Page 136

1    BY MR. GREENBAUM:
2    Q.   What, if anything, is this figure
3    depicting about the social site reach potential
4    of various social media sites?
5    MR. SOSNOWSKY: Objection: form.
6    (Whereupon, the witness reviews
7    the material provided.)
8    THE WITNESS: So they're using --
9    it looks like, here, from what I
10   understand from this chart, is it's
11   actually for alcohol, beer drinkers. So
12   it's a segment. It's not the overall all
13   males, and it's not even males 18 to 34.
14   It looks -- and I can't -- I
15   don't -- I'm not really sure what "HM"
16   means here at this point. I know males
17   20 -- 21 to 34, it looks like -- I'm not
18   really sure what HM is -- refers to HM.
19   So this isn't --
20   BY MR. GREENBAUM:
21   Q.   Does "HM" refer to Hispanic male?
22   A.   It could be, but I'm not -- I can't

Page 137

1    verify that.
2    Q.   In -- in the typical course of your
3    work, would you see "HM" abbreviated Hispanic
4    male?
5    MR. SOSNOWSKY: Objection: form.
6    THE WITNESS: I can't recall,
7    actually, right now how we refer it to,
8    but -- because we break it out in site --
9    sections, typically, in our plans. So we
10   title it, usually, Spanish or Hispanic.
11   BY MR. GREENBAUM:
12   Q.   The last one is M21 through 34.
13   Would you typically understand that
14   to mean male 21 through 34?
15   MR. SOSNOWSKY: Objection: form.
16   THE WITNESS: Yes.
17   BY MR. GREENBAUM:
18   Q.   What is this figure depict -- what,
19   if anything, is this figure depicting about the
20   extent of the social site reach potential within
21   the male 21 through 34 category?
22   MR. SOSNOWSKY: Objection:

35 (Pages 134 - 137)

Page 138

1  foundation.
2         THE WITNESS:  Are you referring to
3  the very top bar here on the chart?
4         BY MR. GREENBAUM:
5     Q.  Yes.
6     A.  It's -- so it's very difficult with
7  this copy, but I understand -- I'm going to
8  assume that the bottom line is the males 21 to
9  34.
10        Is that correct?
11    Q.  Yes.  I think so.
12    A.  Okay.  It's hard with the copy.
13        So, to me, that would reference --
14  estimate that it's about -- a little over
15  90 percent protect -- as a guess, of a reach for
16  males 21 to 34.
17    Q.  And, in fact, each of the
18  categories here show that your -- that the reach
19  of social site potential by target for Hispanic
20  males 21 through 24 and beer drinkers is also
21  about -- in excess of 90 percent, right?
22        MR. SOSNOWSKY:  Objection:

Page 139

1  foundation; form.
2         THE WITNESS:  So I'm going to
3  assume that's the middle bar for this
4  purpose, that that's the beer drinkers,
5  yes.
6         BY MR. GREENBAUM:
7     Q.  Okay.  We can put this aside --
8     A.  Um-hum.
9     Q.  -- get to a new topic here.
10        Do you typically use your personal
11  e-mail for work purposes?
12    A.  Not typically.
13    Q.  But have you used your personal
14  e-mail for work purposes?
15    A.  Yes.
16    Q.  Have you used your e-mail to --
17  your personal e-mail to discuss matters
18  pertaining to this case book?
19        MR. SOSNOWSKY:  Objection --
20        THE WITNESS:  I --
21        MR. SOSNOWSKY:  -- form;
22  foundation.

Page 140

1         THE WITNESS:  -- I had to sign a
2  document, and it was sent to my home
3  e-mail after my -- I spoke with my
4  attorney, Steve Hench, at my agency so I
5  could sign it --
6         BY MR. GREENBAUM:
7     Q.  So --
8     A.  -- because I had no way of printing
9  it or doing a -- a wet signature.
10    Q.  So is that a yes, that you have
11  used your personal e-mail to discuss matters
12  pertaining to this case?
13        MR. SOSNOWSKY:  Objection: form.
14        THE WITNESS:  It wasn't to
15  discuss; it was to sign a document.
16        BY MR. GREENBAUM:
17    Q.  Have you used your personal e-mail
18  to conduct NHTSA business?
19    A.  How would you refer to "conduct"?
20    Q.  Have you used your personal e-mail
21  to -- for matters pertaining to NHTSA's business?
22    A.  So to get a printed copy, if I'm

Page 141

1  working from home, I've had to send it to my home
2  e-mail to print it out.
3     Q.  Going to a new topic, are you aware
4  of what subcontractors or other entities
5  Stratacomm works with to purchase media?
6         MR. SOSNOWSKY:  Objection: form.
7         THE WITNESS:  So with
8  subcontractors, we do not have any say on
9  how they do their business.
10        BY MR. GREENBAUM:
11    Q.  Do you know how Stratacomm decides
12  which platforms to use to purchase media on
13  behalf of NHTSA?
14        MR. SOSNOWSKY:  Objection: form.
15        THE WITNESS:  Can you repeat the
16  question?
17        BY MR. GREENBAUM:
18    Q.  Do you know how Stratacomm decides
19  which platforms to use to purchase media on
20  behalf of NHTSA?
21        MR. SOSNOWSKY:  Same objection.
22        THE WITNESS:  So we rely on media

36 (Pages 138 - 141)

Page 142

1    buyers and planners to put together
2    plans.  We -- we rely on their expertise.
3         BY MR. GREENBAUM:
4         Q.   You've said that a few times, but I
5    just want to get -- see -- understand what you
6    know about how Stratacomm decides which platforms
7    to use to purchase media.
8         So my question is, Do you know how
9    Stratacomm decides which platforms to use to
10   purchase media on behalf of NHTSA?
11        A.   As I mentioned earlier, they use
12   various tools and research -- or information to
13   help them understand the target audience buying
14   behavior or -- not buying behaviors but just
15   their viewing and -- and consumption of media, so
16   we rely on them to use that to provide the
17   recommendations to us.
18        Q.   Are you aware of any subcontract
19   between Stratacomm and the Trade Desk?
20        A.   I am aware that they use them as a
21   vendor.
22        Q.   Are you aware that there's -- if

Page 143

1    there is a contract between Stratacomm and the
2    Trade Desk?
3         MR. SOSNOWSKY:  Objection:
4         foundation.
5         THE WITNESS:  So I would assume
6         that they -- I -- I cannot speculate.
7         All I know is for them to be able to
8         perch -- purchase media, they have to
9         have some type of legal document to do
10        it.
11        BY MR. GREENBAUM:
12        Q.   You've never seen the document --
13   the -- any contract between Stratacomm and the
14   Trade Desk?
15        A.   Not that I recall.
16        Q.   Are you aware of a subcontract
17   between Stratacomm and Google?
18        MR. SOSNOWSKY:  Objection: form;
19        foundation.
20        THE WITNESS:  It would be the same
21        answer as the Trade Desk.
22

Page 144

1         BY MR. GREENBAUM:
2         Q.   And that is, you aren't
3    specifically aware of any subcontract between
4    Stratacomm and Google?
5         MR. SOSNOWSKY:  Objection: form;
6         foundation.
7         THE WITNESS:  Again, that would be
8         the same answer as before.
9         BY MR. GREENBAUM:
10        Q.   And are you aware of any
11   subcontract --
12        A.   I would assume that --
13        MR. SOSNOWSKY:  Just let him
14        finish his question; let me make my
15        objection; and then you can give your
16        answer, please.
17        BY MR. GREENBAUM:
18        Q.   I just want to get the record clear
19   on your -- what you know about any subcontracts
20   here.
21        So my question is, Are you aware of
22   a subcontract between Stratacomm and Google?

Page 145

1         MR. SOSNOWSKY:  Objection: form;
2         foundation.
3         THE WITNESS:  I would assume that
4         they have one to be able to purchase the
5         media.
6         BY MR. GREENBAUM:
7         Q.   But you're not specifically aware
8    of a subcontract between Stratacomm and Google?
9         MR. SOSNOWSKY:  Objection: form;
10        foundation.
11        THE WITNESS:  Not that I can
12        recall, because we don't get into the
13        business of our subcontractors and what
14        they do.
15        BY MR. GREENBAUM:
16        Q.   Do you ever participate in
17   negotiations with vendors over the price that
18   they charge for media purchases?
19        MR. SOSNOWSKY:  Objection: form.
20        THE WITNESS:  So that's the role
21        of our media buyer, to be able to do that
22        on behalf of NHTSA.

37 (Pages 142 - 145)

Page 146

1    BY MR. GREENBAUM:
2        Q.    Do you regular -- have you ever
3    evaluated the efficacy of platforms, like the
4    Trade Desk, as compared to DB360?
5            MR. SOSNOWSKY:  Objection:
6    foundation.
7            THE WITNESS:  It is -- I don't
8    recall that.  They may have mentioned it,
9    but I don't recall that.
10           BY MR. GREENBAUM:
11       Q.    Who is "they"?
12       A.    That would be our ad agency.
13       Q.    And you say they may have mentioned
14   a comparison of efficacy between Trade Desk and
15   DB360?
16           Do you recall any comparisons
17   specifically?
18       A.    No, I do not.
19           MR. SOSNOWSKY:  Objection: form.
20           THE WITNESS:  Oh, sorry.
21           BY MR. GREENBAUM:
22       Q.    What factors do you consider when

Page 147

1    determining which channels to use for a
2    particular advertising campaign?
3            MR. SOSNOWSKY:  Objection: form.
4            THE WITNESS:  Can you repeat that
5    question?
6            MR. GREENBAUM:  Cindy, would you
7    mind repeating that back?
8            --oOo--
9            (Whereupon, the certified
10           stenographer read back the
11           pertinent part of the record.)
12           --oOo--
13           THE WITNESS:  I'm so sorry.  One
14   more time.
15           --oOo--
16           (Whereupon, the certified
17           stenographer read back the
18           pertinent part of the record.)
19           --oOo--
20           THE WITNESS:  So we work with the
21   ad agency to -- it depends on --
22   actually, it depends on a campaign.

Page 148

1    BY MR. GREENBAUM:
2        Q.    What are the universe of factors
3    that you or your ad agency would consider when
4    determining which channels to use for a
5    particular advertising campaign?
6            MR. SOSNOWSKY:  Objection: form.
7            THE WITNESS:  So the target
8    audience, it would be the budget; it
9    would be the time and -- "time" being the
10   calendar year time and also the -- the
11   length of the campaign.
12           BY MR. SOSNOWSKY:
13       Q.    Are there any other factors?
14       A.    At this point, that's what I
15   recall.  It's not -- I'm sure there's other
16   factors included in it, too.
17       Q.    In your documents, I've seen
18   references to video completion as a metric to
19   judge the effectiveness of a campaign.
20           What is that?
21           MR. SOSNOWSKY:  Objection: form.
22           THE WITNESS:  Can you repeat that

Page 149

1    question?
2            MR. GREENBAUM:  Cindy.
3            CERTIFIED STENOGRAPHER:  Okay.
4            --oOo--
5            (Whereupon, the certified
6            stenographer read back the
7            pertinent part of the record.)
8            --oOo--
9            MR. SOSNOWSKY:  Objection:
10   foundation; form.
11           THE WITNESS:  So now I need you to
12   refer to the question before that,
13   because you are leading from that
14   question to this question.  So would you
15   mind repeating that one?
16           CERTIFIED STENOGRAPHER:  I just
17   went through it.
18           MR. GREENBAUM:  Cindy -- I'll --
19   I'll say it.
20           BY MR. GREENBAUM:
21       Q.    What factors do you consider when
22   determining which channels to use for a

38 (Pages 146 - 149)

Page 270

1    Q.   Okay.  So on the vehicle side, are
2  you referring to the Recalls campaign?
3    A.   I don't know which of those
4  vehicles campaigns it is.
5    Q.   What other campaigns -- vehicle
6  campaigns are there besides the Recall?
7    A.   We have Advanced Technology
8  campaign and the 5-star rating.
9    Q.   Okay.  And you also mentioned ODI
10  as a possible -- as a campaign that you
11  potentially used DV360 before?
12       MR. SOSNOWSKY:  Objection: form.
13       THE WITNESS:  So ODI is in
14    reference to the program office within
15    NHTSA.
16       BY MR. GREENBAUM:
17    Q.   Okay.  And then you referred to
18  Ad Council as another potential -- as an agency
19  that may have used DV360; is that right?
20    A.   I just don't recall.
21    Q.   So sitting here today, you can't
22  recall whether Ad Council used DV360 to purchase

Page 271

1  advertisements on behalf of NHTSA?
2    A.   That's right.
3    Q.   Okay.  Why did you use DV360 to
4  purchase advertisements for the vehicle
5  campaigns?
6       MR. SOSNOWSKY:  Objection: form.
7       THE WITNESS:  So as I mentioned
8    earlier, I do not believe -- I don't know
9    if it's all of them, and I can't remember
10    specifically which one.
11       BY MR. GREENBAUM:
12    Q.   For the campaign that NHTSA used
13  DV360 to purchase advertisement, why did NHTSA or
14  its ad agency use DV360 for that campaign?
15    A.   So, as I explained earlier, when we
16  work with our ad agencies, they provide us a
17  recommendation for that particular campaign, that
18  particular target audience and that particular
19  time.  They provide us a recommendation.  We have
20  a discussion with them.  And after a discussion,
21  if we feel comfortable, then we will approve the
22  recommendation and then they will go develop our

Page 272

1  media buy summary.
2    Q.   And has your ad agency ever
3  discussed using DV360 with -- with you in the
4  past?
5    A.   Again, as I mentioned before, I do
6  remember one campaign on the vehicle side that
7  did use it, so we would have been -- they would
8  have provided us a recommendation.
9    Q.   Why didn't you use Trade Desk for
10  that -- for that campaign?
11       MR. SOSNOWSKY:  Objection:
12    foundation.
13       THE WITNESS:  So as I mentioned,
14    the advertising agency provided us a
15    recommendation; we felt comfortable on
16    that recommendation, so that's why we
17    would use it.
18       BY MR. GREENBAUM:
19    Q.   Has there been a shift from DV360
20  to the Trade Desk since -- between 2019 to 2023?
21    A.   I don't -- you need to be more
22  specific.

Page 273

1    Q.   Do you use -- does NHTSA or its ad
2  agencies use Trade Desk to purchase programmatic
3  advertising on behalf of NHTSA?
4    A.   Can you repeat that?
5    Q.   Does NHTSA or its ad agencies use
6  the Trade Desk to purchase programmatic
7  advertisements?
8    A.   Can you give me a specific time?  A
9  specific campaign?
10    Q.   Have you ever used the Trade Desk
11  to purchase programmatic advertising?
12    A.   And I'm assuming you refer to "you"
13  as NHTSA?
14    Q.   Correct.
15    A.   Okay.
16       Yes, we have.
17    Q.   Why did you use the Trade Desk?
18    A.   As I explained before, that we rely
19  on our advertising agencies, which it would
20  include, you know, Stratacomm -- both
21  Stratacomm's and Ad Council to provide us a
22  recommendation.  And with that recommendation,

69 (Pages 270 - 273)

Page 274

1  after we've had discussions, we would approve it
2  and then move forward with their
3  recommendation.
4      Q.    Has NHTSA's use of DV360 for the
5  vehicle campaign helped NHTSA reach its desired
6  audience for its advertising campaigns?
7          MR. SOSNOWSKY: Objection: form.
8          THE WITNESS: I do not recall.
9          BY MR. GREENBAUM:
10     Q.    Has NHTSA's use of YouTube helped
11 NHTSA reach its desired audience for its
12 advertising campaigns?
13         MR. SOSNOWSKY: Objection: form.
14         THE WITNESS: You would need to be
15 specific about the campaign, the time.
16         BY MR. GREENBAUM:
17     Q.    Speaking generally, do you believe
18 that Google provides effective products for
19 advertisers to reach their desired audience?
20         MR. SOSNOWSKY: Objection: form.
21         THE WITNESS: Would you repeat the
22 question?

Page 275

1          BY MR. GREENBAUM:
2      Q.    Do you believe that Google provides
3  effective products for advertisers to reach their
4  desired audience?
5      A.    I'm not in the position to make
6  that decision.
7      Q.    Did you use DV360 for display or
8  video ads for the vehicle campaign that we were
9  discussing earlier?
10     A.    I don't recall.
11     Q.    Have you formed a view as to the
12 effectiveness of DV360 as a platform to purchase
13 advertising?
14     A.    I'm not in the position to make
15 that decision -- or opinion.
16     Q.    Why not?
17     A.    Because we rely on our advertising
18 agency to provide us the expertise to do that
19 work and to provide us the appropriate
20 recommendation for the particular audience,
21 campaign and the time.
22     Q.    Okay. Let's put that aside for a

Page 276

1  second.
2          MR. GREENBAUM: I want to turn to
3  Tab 3, which is NHTSA-ADS-00250045.
4          THE WITNESS: Oh, hold on. Let me
5  get to 3 first.
6          MR. GREENBAUM: I'm going to mark
7  this as Exhibit 109.
8              --oOo--
9          (Deposition Exhibit Number 109,
10          E-mail string with attachment,
11          Bates stamped
12          NHTSA-ADS-0000250045 through
13          NHTSA-ADS-0000250049, marked for
14          identification, as of this date.)
15             --oOo--
16         THE WITNESS: Which page?
17         BY MR. GREENBAUM:
18     Q.    The first -- let's start with the
19 first page, the bottom e-mail -- it's actually on
20 the second page -- from Elizabeth Nilsson.
21     A.    Oh. All right.
22         Would you mind giving me a little

Page 277

1  bit of time to read this?
2      Q.    Yes. Go for it.
3      A.    Thank you.
4          (Whereupon, the witness reviews
5          the material provided.)
6          THE WITNESS: Okay.
7          BY MR. GREENBAUM:
8      Q.    Okay. Have you had an opportunity
9  to read the e-mail and the attachment?
10     A.    Yes.
11     Q.    Okay. Starting with the bottom
12 e-mail on Friday, January 20th, 2023, the Bates
13 ending in 046, Elizabeth Nilsson e-mails
14 Jennifer Flanery --
15     A.    Where -- where is the 046? Which
16 one are you referring to?
17     Q.    The next page.
18     A.    Oh, the next page.
19         All right. Thank you.
20     Q.    -- Elizabeth Nilsson e-mails
21 Jennifer Flanery and Travis Austin.
22         Do both Jennifer and Travis work at

70 (Pages 274 - 277)

Page 278

1    Stratacomm?
2        A.    Yes.
3        Q.    And she copies you.
4              Do you see that?
5        A.    Yes.
6        Q.    It says, Questions for Campaigns.
7        A.    Yes.
8        Q.    It says, We received a data call.
9              What is a data call in this
10   context?
11       A.    A request.
12       Q.    Okay.
13             Here are two questions we need you
14   to address by Tuesday:  What is the media buy
15   process and provide an example of (where we place
16   the buy — tv, radio, digital, et cetera) using
17   the impaired-driving campaign?  It doesn't need
18   to break out alcohol and drugs.
19             Do you see that?
20       A.    Yes.
21       Q.    And scroll up to -- well, the prior
22   page.

Page 279

1              I believe Jennifer Flanery asks a
2    clarifying question about what you need.  And
3    then, ultimately, Jennifer Flanery provides an
4    attachment on the top e-mail and says, Attached
5    please find a short write-up of the media
6    research and selection process, as well as some
7    further detail on reach and impression metrics.
8              Do you see that?
9        A.    I do.
10       Q.    Okay.  Turning to the attachment,
11   Media Buy Process --
12       A.    Um-hum.
13       Q.    -- it says, NHTSA media buying
14   follows a rigorous process to allocate resources
15   to maximize efficiency and impact for each buy.
16             Do you agree with that statement?
17       A.    Well, they left out reach and
18   frequency.
19       Q.    So that's helpful.
20             NHTSA -- would you agree that NHTSA
21   media buying follows a rigorous process to
22   allocate resources to maximize efficiency, reach

Page 280

1    and impression metrics?
2        A.    No -- no.  I said reach and
3    frequency --
4        Q.    Reach and frequency?
5        A.    -- but I wouldn't necessarily
6    phrase it that way.
7        Q.    How would you phrase it?
8        A.    Well, they're -- they're not
9    talking about how they're going to reach the
10   target audience, which target audience, because
11   they were supposed to be giving an example, I
12   believe, is the impaired -- oh, somewhere in
13   here, it said, using the example -- I think
14   Elizabeth may have said it in the very
15   beginning -- by using the Impaired-Driving
16   campaign.
17             So they really should have been
18   talking about how they're trying to reach the
19   males 21 to 34 for the alcohol.
20             I don't think it said they would
21   have to break -- they need to break it out.  So,
22   actually, you know -- well, they would really

Page 281

1    have to, actually.
2              So I'll just -- for this purposes,
3    I'll just say they should have mentioned in here
4    that they need to be reaching our target audience
5    with the reach and frequency that we're looking
6    for.  So they didn't really -- this is not, in my
7    eyes, sufficient enough.
8        Q.    How would you phrase how -- how
9    would you phrase this sentence in a way that
10   would be broad enough to capture -- well, strike
11   that.
12             Do you agree that NHTSA media
13   buying follows a rigorous process to allocate
14   resources to maximize efficiency and impact for
15   each buy?
16             MR. SOSNOWSKY:  Objection: form.
17             THE WITNESS:  So, as I mentioned
18   earlier, they -- they really should have
19   included more specifics here.
20             BY MR. GREENBAUM:
21       Q.    Okay.  But, generally, is it
22   accurate that NHTSA tries to allocate resources

71 (Pages 278 - 281)

Page 290

```
 1        in writing, they're not always as clear
 2    as per -- as precise.
 3            So it would -- I would have some
 4    questions back to them.
 5            BY MR. GREENBAUM:
 6        Q.    What questions would you have for
 7    them?
 8        A.    That -- for instance, they say
 9    reporting because they do not rely on
10    viewer-listener modeling for counts.  I'm not
11    really sure what they're referring to when they
12    say viewer/listener modeling for counts.
13        Q.    Go down to the fourth line from the
14    bottom.
15            It says, Digital ads are also
16    targeted by audience attributes: age, geography,
17    interests, hobbies, et cetera.
18            Do you disagree with that
19    statement?
20        A.    Again, the phrasing may not be
21    complete.
22        Q.    How is it incomplete?
```

Page 291

```
 1        A.    I think they could have written it
 2    as digital ads can target by audience.  I'm not
 3    sure what "are also" means.
 4        Q.    Okay.  So you would agree that
 5    digital ads can be targeted by audience
 6    attributes, including age, geography, interests,
 7    hobbies?
 8        A.    Yes.
 9        Q.    The next sentence says, Campaign
10    media buys can run via direct campaigns on
11    websites that index high for the demographic or
12    use a demand-side platform with vendors such as
13    the Trade Desk, to target the ads to multiple
14    sites simultaneously.
15            Do you disagree with that
16    statement?
17            MR. SOSNOWSKY:  Objection to form.
18            THE WITNESS:  I guess the word
19        "campaign" kind of holds me up here,
20        where I -- you know, it always depends
21        with our -- with campaigns.  I'm not sure
22        if they're referring -- I believe -- I'm
```

Page 292

```
 1    not sure if, when they're defining what
 2    is a media buy impression, they're
 3    referring to our campaign or not.
 4            So I guess, you know, this -- this
 5    could be written more clearly.
 6            BY MR. GREENBAUM:
 7        Q.    How would you write it -- how would
 8    you write it more clearly --
 9        A.    Well --
10        Q.    -- to be accurate?
11        A.    -- I'm not --
12            MR. SOSNOWSKY:  Objection to form.
13            Go ahead.
14            THE WITNESS:  -- I'm not the
15        expert here, so I would probably have
16        questions back to the person who wrote it
17        to get more clarification and
18        understanding.
19            BY MR. GREENBAUM:
20        Q.    What questions would you have about
21    the sentence, Campaign media buys can run via
22    direct campaigns on websites that index high for
```

Page 293

```
 1    the demographic or use a demand-side platform
 2    with vendors, such as the Trade Desk --
 3        A.    So --
 4        Q.    -- to target the ads to multiple
 5    sites simultaneously?
 6        A.    -- so when it says the campaign
 7    media buys can run via direct campaigns, I'm not
 8    exactly sure what they're referencing there.
 9        Q.    Have you ever heard the phrase
10    "direct purchase on websites"?
11        A.    But that's -- I -- I've heard of
12    that, but it doesn't say that here.
13        Q.    Do you agree that campaign media
14    buys can run via direct purchases on websites
15    that index high for the demographics or use a
16    demand-side platform with vendors, such as the
17    Trade Desk, to target the ads to multiple sites
18    simultaneously?
19            MR. SOSNOWSKY:  Objection to form.
20            THE WITNESS:  Yeah.  Again, I
21        would want to go back to my expert to ask
22        them how best to rephrase that given our
```

74 (Pages 290 - 293)

Page 294

1    campaign, because I feel like it's not
2    quite clear here.
3         BY MR. GREENBAUM:
4         Q.   What is not quite clear?
5         A.   As I mentioned to you earlier,
6    where it says, Via direct campaigns on websites,
7    I'm not really sure what they're referencing.
8    And I would hate to surmise what they are without
9    having speaking to them.
10        Q.   So replacing the word "campaign"
11   with "purchase" in the following sentence . . .
12        A.   I --
13        MR. SOSNOWSKY: That's not a
14   question pending.
15        BY MR. GREENBAUM:
16        Q.   Would you agree or disagree with
17   the following statement: Campaign media buys can
18   run via direct purchases on websites that index
19   high for the demo- -- demographic or use a
20   demand-side platform with vendors, such as the
21   Trade Desk, to target the ads to multiple sites
22   simultaneously?

Page 295

1         MR. SOSNOWSKY: Objection: form.
2         THE WITNESS: So, as I mentioned
3    before, I appreciate that you're wanting
4    to provide me a word, but I would still
5    want to have that conversation with our
6    -- our media buyer.
7         BY MR. GREENBAUM:
8         Q.   And the conversation you would want
9    to have is you would want to clarify whether they
10   meant "campaign" or "purchase"?
11        A.   And how best to phrase that,
12   correct.
13        Q.   And you wouldn't have any other
14   questions regarding that sentence?
15        MR. SOSNOWSKY: Objection to form.
16        THE WITNESS: So, again, it's not
17   very specific here because it says, For
18   the demographic.
19        I'm not sure if it's one
20   demographic or multiple demographics --
21        BY MR. GREENBAUM:
22        Q.   Do you -- please continue.

Page 296

1         A.   -- I was just going to give it a
2    little more context.
3         So the campaign is broad, and
4    especially because it's -- I believe it's in
5    reference to our drunk driving campaign, and it
6    has multiple target audiences. And those target
7    audiences you can't just put in one big bucket
8    and say all behave the same.
9         So there are different demographics
10   to make them more unique.
11        Q.   Would you typically rely on your
12   advertising agency to purchase advertisements on
13   behalf of NHTSA?
14        MR. SOSNOWSKY: Objection: form.
15        THE WITNESS: You're referring to
16   our -- I guess the question would be,
17   What are you referring to? Please be a
18   little more specific.
19        BY MR. GREENBAUM:
20        Q.   Would you typically rely on
21   Stratacomm's expertise when determining to
22   purchase advertisements on behalf of NHTSA's ad

Page 297

1    campaigns?
2         MR. SOSNOWSKY: Objection to form.
3         THE WITNESS: Yes, we -- we do
4    rely on -- in this case, you mentioned
5    Stratacomm -- Stratacomm's expertise with
6    media buying to provide us a
7    recommendation. We do have conversations
8    with them and questions.
9         And once they're fully answered
10   and we feel comfortable with that, then
11   they will move to be developing a media
12   buy recommendation for us.
13        BY MR. GREENBAUM:
14        Q.   And is it accurate that Stratacomm
15   told you that campaign media buys can run via
16   direct campaigns on websites that index high for
17   the demographic or use a demand-side platform
18   with vendors, such as the Trade Desk, to target
19   the ads to multiple sites simultaneously?
20        MR. SOSNOWSKY: Objection to form.
21        THE WITNESS: So, in this case --
22   sometimes people don't write very

75 (Pages 294 - 297)

Page 298

1    clearly.  And I feel, in this case, it
2    probably wasn't as clear as it could have
3    been.  And, again, that's why we would go
4    back and just ask them for more
5    clarification.
6        BY MR. GREENBAUM:
7        Q.    Did Stratacomm tell you that
8    campaign media buys can run via direct campaigns
9    on websites that index high for the demographic
10   or use a demand-side platform with vendors, such
11   as the Trade Desk, to target the ads to sites
12   simultaneously?
13       MR. SOSNOWSKY:  Objection to form.
14       THE WITNESS:  Yes, that's what
15   they wrote.
16       MR. GREENBAUM:  Let's turn to
17   Tab 4, which I'm going to mark as
18   Exhibit 110.  It's with Bates ending --
19   the Bates number is NHTSA-ADS-00328452.
20       --oOo--
21       (Deposition Exhibit Number 110,
22        E-mail with attachment, Bates

Page 299

1        stamped NHTSA-ADS-0000328452
2        through NHTSA-ADS-0000328455,
3        marked for identification, as of
4        this date.)
5        --oOo--
6        BY MR. GREENBAUM:
7        Q.    Now, this is an e-mail from you to
8    Julie Vallese on January 24th, 2023 at 5:14 p.m.
9        Do you see that?
10       A.    Yes, I do.
11       Q.    And you attach a document called
12   NHTSA Media Process 12423; is that correct?
13       A.    Yes.
14       Q.    And take a look at the attachment.
15       And you can take your time to read
16   through it again.
17       (Whereupon, the witness reviews
18        the material provided.)
19       BY MR. GREENBAUM:
20       Q.    Have you had an opportunity to read
21   the attachment?
22       A.    I have.  Thank you.

Page 300

1        Q.    Can you remind me who Julie Vallese
2    is?
3        A.    Julie Vallese --
4        Q.    Vallese.
5        A.    -- is my boss.
6        Q.    Okay.  And you are -- it's accurate
7    to say that the attachment, Media Buy Process,
8    slightly differs from the attachment that we
9    previously looked at in Exhibit 109, which
10   Stratacomm sent to you?
11       MR. SOSNOWSKY:  Objection to form.
12       THE WITNESS:  I have not been able
13   to compare it word for word.
14       BY MR. GREENBAUM:
15       Q.    The attachment -- if we compare
16   Tabs 3 to Tabs 4 -- have a different number of
17   pages -- is that correct -- between Tabs 3 and 4?
18       (Whereupon, the witness reviews
19        the material provided.)
20       THE WITNESS:  I see the same,
21   unless I'm counting incorrectly.  I see
22   one, two, three and then one, two, three.

Page 301

1        Am I missing something?
2        BY MR. GREENBAUM:
3        Q.    Do you see on Tab 4, at the bottom
4    of Bates ending in 328453, it says, What is a
5    media buy impression?
6        A.    No.
7        Where is that again?
8        Q.    Tab 4, NHTSA-ADS ending in 328453.
9        A.    Okay.
10       Q.    It says, What is media buy
11   impression?
12       A.    Oh.  Down here at the bottom.
13       Yes.
14       Q.    And if we compare that to Tab 3, it
15   says, at the top, the same title -- What is media
16   buy impression -- appears at the top of 250048 --
17       A.    Okay.
18       Q.    -- is that correct?
19       A.    Yes.
20       Q.    Okay.  And the attachment in Tab 3
21   is called data -- [as read] Data Call — NHTSA
22   Media Process.docx, right?

76 (Pages 298 - 301)

Page 426

```
1           C E R T I F I C A T E
2       I, Cindy L. Sebo, Nationally Certified Court
3   Reporter herein do hereby certify that the foregoing
4   deposition of SUSAN A. MCMEEN was taken before me
5   pursuant to notice; that said witness was duly sworn
6   remotely by a certified stenographer to tell the truth,
7   the whole truth, and nothing but the truth under penalty
8   of perjury; that the testimony of said witness was
9   correctly recorded to the best of my ability in machine
10  shorthand and thereafter transcribed under my
11  supervision with computer-aided transcription; that the
12  deposition is a true and accurate record of the
13  testimony given by the witness; and that I am neither of
14  counsel nor kin to any party in said action, nor
15  interested in the outcome thereof.
16
17
18  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR, CLR,
    RSA, NYRCR, NYACR, CA CSR #14409, NJ CCR
19  30XI00244600, NJ CRT 30XR00019500,
    Washington CSR 23005926, Oregon State 230105,
20  TN CSR 998, NM CSR 589, Remote Counsel
    Reporter, LiveLitigation Authorized Reporter,
21  Notary Public
22
```

Page 427

```
1           E R R A T A
2   WITNESS:  SUSAN A. MCMEEN
3   DATE:     September 7, 2023
4   CAPTION:  United States, et al. versus Google LLC
5   PAGE  LINE  REASON FOR CHANGE:
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
```

Page 428

```
1           E R R A T A
2   WITNESS:  SUSAN A. MCMEEN
3   DATE:     September 7, 2023
4   CAPTION:  United States, et al. versus Google LLC
5   PAGE  LINE  REASON FOR CHANGE:
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20
21  ____  ____  _____
22  DATE      SUSAN A. MCMEEN
```

Page 429

```
1           ACKNOWLEDGMENT OF WITNESS
2
3       I, SUSAN A. MCMEEN, do hereby certify that I
4   have read the foregoing pages herein, and that the same
5   is a correct transcription of the answers given by me of
6   the proceedings taken remotely to the questions therein
7   propounded under penalty of perjury, except for the
8   corrections or changes in form   or substance, if any,
9   noted in the attached errata sheet.
10
11
12  _____        _____
13  DATE                    SIGNATURE
14
15  Subscribed and sworn to before me
16  this _____ day of_____, 20_____.
17
18  My Commission expires:
19  _____
20
21  _____
22    Notary Public
```