# EXHIBIT 26

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## FORM 10-K

(Mark One)

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

for the Fiscal Year Ended December 31, 2022

or   ☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

for the transition period from            to

Commission file number: 001-36153

# Criteo S.A.

| | |
|---|---|
| **France** | **Not Applicable** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

(Exact name of registrant as specified in its charter)

**32 Rue Blanche, 75009 Paris—France**

(Address of principal executive offices including zip code)

Registrant's telephone number, including area code: **+33 1 75 85 09 39**

Securities registered pursuant to Section 12(b) of the Act:

| (Title of class) | (Trading Symbol(s)) | (Name of exchange on which registered) | |
|---|---|---|---|
| **American Depositary Shares, each representing one ordinary share, nominal value €0.025 per share** | CRTO | **Nasdaq Global Select Market** | |
| **Ordinary shares, nominal value €0.025 per share** | * | **Nasdaq Global Select Market** | * |

*   Not for trading, but only in connection with the registration of the American Depositary Shares.

Securities registered pursuant to Section 12(g) of the Act: **None**

EXHIBIT 1
Criteo
9/8 2023
Danielle Grant

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes x    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐    No x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  x    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes  x    No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large Accelerated Filer | ☒ | |
| | | Accelerated Filer ☐ |
| Non-accelerated Filer | ☐ | |
| | | Smaller reporting company ☐ |
| Emerging growth company | ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐    No ☒

The aggregate market value of voting stock held by non-affiliates of the registrant as of the last business day of the registrant's most recently completed second fiscal quarter was $1,605 million, based on the closing sale price of the American Depositary Shares as reported by the Nasdaq Global Select Market on June 30, 2022. Ordinary shares, nominal value €0.025 per share, held by each officer and director and by each person who owns or may be deemed to own 10% or more of the outstanding ordinary shares have been excluded since such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

As of February 10, 2023, the registrant had 55,833,562 ordinary shares, nominal value €0.025 per share, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Part III incorporates certain information by reference from the registrant's proxy statement for the 2023 Annual Meeting of Shareholders. Such proxy statement will be filed no later than 120 days after the close of the registrant's fiscal year ended December 31, 2022.

**CRITEO S.A.**
**ANNUAL REPORT ON FORM 10-K**
**For The Fiscal Year Ended December 31, 2022**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 2 |
| Item 1A | Risk Factors | 25 |
| Item 1B | Unresolved Staff Comments | 48 |
| Item 2 | Properties | 49 |
| Item 3 | Legal Proceedings | 49 |
| Item 4 | Mine Safety Disclosures | 49 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 50 |
| Item 6 | [Reserved] | 60 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 61 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 94 |
| Item 8 | Financial Statements and Supplementary Data | 94 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 95 |
| Item 9A | Controls and Procedures | 95 |
| Item 9B | Other Information | 96 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 96 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 97 |
| Item 11 | Executive Compensation | 97 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 97 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 97 |
| Item 14 | Principal Accounting Fees and Services | 97 |
| **PART IV** | | |
| Item 15 | Exhibits and Financial Statement Schedules | 98 |
| Item 16 | Form 10-K Summary | 100 |

## General

Except where the context otherwise requires, all references in this Annual Report on Form 10-K ("Form 10-K") to the "Company," "Criteo," "we," "us," "our" or similar words or phrases are to Criteo S.A. and its subsidiaries, taken together. In this Form 10-K, references to "$" and "US$" are to United States dollars. Our audited consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America, or U.S. GAAP. Unless otherwise indicated, the statistical and financial data contained in this Form 10-K are presented as of December 31, 2022.

## Trademarks

"Criteo," the Criteo logo and other trademarks or service marks of Criteo appearing in this Form 10-K are the property of Criteo. Trade names, trademarks and service marks of other companies appearing in this Form 10-K are the property of their respective holders.

**Special Note Regarding Forward-Looking Statements**

This Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), that are based on our management's beliefs and assumptions and on information currently available to our management. All statements other than present and historical facts and conditions contained in this Form 10-K, including statements regarding our future results of operations and financial position, business strategy, plans and our objectives for future operations, are forward-looking statements. When used in this Form 10-K, the words "anticipate," "believe," "can," "could," "estimate," "expect," "intend," "is designed to," "may," "might," "objective," "plan," "potential," "predict," "project," "seek," "should," "will," "would" or the negative of these and similar expressions identify forward-looking statements.

You should refer to Item 1A "Risk Factors" of this Form 10-K for a discussion of important factors that may cause our actual results to differ materially from those expressed or implied by our forward-looking statements. As a result of these factors, we cannot assure you that the forward-looking statements in this Form 10-K will prove to be accurate. Furthermore, if our forward-looking statements prove to be inaccurate, the inaccuracy may be material. In light of the significant uncertainties in these forward-looking statements, you should not regard these statements as a representation or warranty by us or any other person that we will achieve our objectives and plans in any specified time frame or at all. We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

You should read this Form 10-K and the documents that we reference in this Form 10-K and have filed as exhibits to this Form 10-K completely and with the understanding that our actual future results may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.

This Form 10-K contains market data and industry forecasts that were obtained from industry publications. These data and forecasts involve a number of assumptions and limitations, and you are cautioned not to give undue weight to such information. We have not independently verified any third-party information. While we believe the market position, market opportunity and market size information included in this Form 10-K is generally reliable, such information is inherently imprecise.

**Summary Risk Factors**

Investing in our securities involves a high degree of risk. You should carefully consider the risks and uncertainties described in "Item 1A. Risk Factors", which are summarized below:

- If we fail to innovate, enhance our brand, adapt and respond effectively to rapidly changing technology, our offerings may become less competitive or obsolete. Our investments in new solutions and technologies to address new marketing goals for our clients are inherently risky and may not be successful.
- The market in which we participate is intensely competitive, and we may not be able to compete successfully with our current or future competitors.
- The failure by Criteo AI Engine to accurately predict engagement by users could result in significant costs to us, lost revenue and diminished business opportunities.
- Regulatory, legislative or self-regulatory developments regarding internet or online matters could adversely affect our ability to conduct our business.
- If we fail to access a consistent supply of advertising inventory and expand our access to such inventory, our business and results of operations could be harmed.
- Our success depends on our ability to implement our business transformation and achieve our global business strategies.
- Our business depends on our ability to maintain the quality of content for our clients and publishers.
- We may not be able to effectively integrate the businesses we acquire, which may adversely affect our ability to achieve our growth and business objectives.
- We have substantial client concentration in certain local markets and solutions, with a limited number of clients accounting for a substantial portion of our revenues in those areas.
- Our international operations and expansion expose us to several risks.
- The ongoing conflict between Russia and Ukraine may adversely affect our business and results of operations.
- We face intense competition for employee talent, and if we do not retain and continue to attract highly skilled talent or retain our senior management team and other key employees, we may not be able to achieve our business objectives.
- Our future success will depend in part on our ability to expand into new industry verticals.
- As we expand the market for our solutions, we may become more dependent on advertising agencies as intermediaries, which may adversely affect our ability to attract and retain business.
- Our business, including our global operations and sales, faces risk and negative impacts related to public health developments, such as the COVID-19 pandemic.
- Our future success will depend in part on our ability to expand into new advertising channels.
- We operate in a rapidly evolving industry, which makes it difficult to evaluate our future prospects and may increase the risk that we will not be successful. Our historical growth rates may not be indicative of our future growth, and we may have difficulty sustaining profitability.
- We derive a significant portion of our revenue from companies in the retail, travel and classified industries, and any downturn in these industries or any changes in regulations affecting these industries could harm our business.
- We experience fluctuations in our results of operations due to a number of factors, which make our future results difficult to predict and could cause our operating results to fall below expectations or our guidance.
- Our ability to generate revenue depends on our collection of significant amounts of data from various sources, which may be restricted by consumer choice, clients, publishers, browsers or other software, changes in technology, and new developments in laws, regulations and industry standards.
- Third parties may implement technical restrictions that impede our access to data and revenue opportunities upon which we rely, which could materially impact our business and results of operations.
- Failures in the systems and infrastructure supporting our solutions and operations, including as we scale our offerings, could significantly disrupt our operations and cause us to lose clients.
- Our business involves the use, transmission and storage of personal data and confidential information, and the failure to properly safeguard such information could result in significant reputational harm and monetary damages.
- If we are unable to protect our proprietary information or other intellectual property, our business could be adversely affected.
- Our business may suffer if it is alleged or determined that our technology or another aspect of our business infringes the intellectual property rights of others.
- Our inability to use software licensed from third parties, or our use of open source software under license terms that interfere with our proprietary rights, could disrupt our business.

- The market price for the ADSs has been and may continue to be volatile or may decline regardless of our operating performance.
- Our business could be negatively impacted by the activities of hedge funds or short sellers..
- We may need additional capital in the future to meet our financial obligations and to pursue our business objectives. Additional capital may not be available on favorable terms, or at all, which could compromise our ability to meet our financial obligations and grow our business.
- We do not currently intend to pay dividends on our securities and, consequently, your ability to achieve a return on your investment will depend on appreciation in the price of the ADSs. In addition, French law may limit the amount of dividends we are able to distribute.
- Our credit agreement contains, and future debt agreements may contain, restrictions that may limit our flexibility in operating our business.
- Our by-laws and French corporate law contain provisions that may delay or discourage a sale of the Company.
- You may not be able to exercise your right to vote the ordinary shares underlying your ADSs.
- Your right as a holder of ADSs to participate in any future preferential subscription rights or to elect to receive dividends in shares may be limited, which may cause dilution to your holdings.
- You may be subject to limitations on the transfer of your ADSs and the withdrawal of the underlying ordinary shares.
- U.S. investors may have difficulty enforcing civil liabilities against our Company and directors and senior management.
- The rights of shareholders in companies subject to French corporate law differ in material respects from the rights of shareholders of corporations incorporated in the U.S.
- In periods of economic uncertainty, businesses may delay or reduce their spending on advertising, and we are exposed to the credit risk of some of our clients and customers, which could materially harm our business.
- If we fail to maintain an effective system of internal controls, we may be unable to accurately report our financial results or prevent fraud, and investor confidence and the market price of the ADSs may, therefore, be adversely impacted.
- Our failure to maintain certain tax regimes applicable to French technology companies may adversely affect our results of operations.
- We are a multinational organization faced with increasingly complex tax issues in many jurisdictions, and new taxes or laws, or revised interpretations thereof, may negatively affect our results of operations.
- U.S. holders of our ADSs may suffer adverse tax consequences if we are treated as a "passive foreign investment company" for U.S. federal income tax purposes.
- If a U.S. holder is treated as owning at least 10% of our ADSs, such person may be subject to adverse U.S. federal income tax consequences.

PART I

## Item 1.  Business

### History and Development of the Company

Criteo S.A. was initially incorporated as a *société par actions simplifiée*, or S.A.S., under the laws of the French Republic on November 3, 2005, for a period of 99 years and subsequently converted to a *société anonyme*, or S.A. We are registered at the Paris Commerce and Companies Register under the number 484 786 249. Our agent for service of process in the United States ("U.S.") is National Registered Agents, Inc.

### Business Overview

We are the global Commerce Media company that enables marketers and media owners to drive better commerce outcomes. We leverage commerce data and artificial intelligence ("AI") to connect commerce, digital marketing and media monetization to reach consumers throughout their shopping journey. Our vision is to bring richer experiences to every consumer by supporting a fair and open internet that enables discovery, innovation, and choice – powered by trusted and impactful advertising. Since 2018, and accelerating since 2020, we have deeply transformed the Company from a single-product to a multi-solution platform provider, fast diversifying our business into new solutions.

We enable brands', retailers' and media owners' growth by providing best-in-class marketing and monetization services and infrastructure on the open Internet, driving approximately $30 billion of commerce outcomes for our customers – in the form of product sales for retailers, brands and marketers and advertising revenues for media owners. We differentiate ourselves by delivering the best performing commerce audiences at scale and we deliver this value by activating commerce data in a *privacy-by-design* way through proprietary AI technology to reach and engage consumers in real time with highly relevant digital advertisements ("ads") based on shared characteristics across all stages of the consumer journey. Our data offers deep insights into consumer intent and purchasing habits.

Our focus is on commerce media. As of December 31, 2022, we served approximately 22,000 clients including many of the largest and most sophisticated consumer brands, retailers, commerce companies and media owners in the world. We partner with them to capture user activity on their websites and mobile applications ("apps"), which we define as digital properties, and leverage that data to deliver superior ad performance to help marketers, brands and agencies reach their campaign objectives from top to bottom of the marketing funnel. This includes powering the retail media ecosystem as we enable brands to reach shoppers with relevant ads near the digital point of sale on retailer and marketplace websites while enabling retailers to monetize their ad inventory and add a new, high margin revenue stream. In each of the last three years, our average client retention rate, as measured on a quarterly basis, was approximately 90%.

Demonstrating the depth and scale of our commerce data, we have exposure to over $1 trillion in online sales transactions on our clients' digital properties in the year ended December 31, 2022. Based on this data and other assets, we activated over $3 billion of media spend on behalf of our clients and delivered 1.8 trillion targeted ads in the year ended December 31, 2022.

We have established our leading market position in commerce media by focusing on three key assets that differentiate us: actionable commerce data, extensive media access, and world-class predictive AI technology. Our large dataset is uniquely focused on commerce and shoppers, our media access across our broad direct network of media owner partners provides large consumer reach as we see over 750 million daily active users, and our purpose-built AI technology activates this data and media to drive multiple commerce outcomes for our customers. We continuously innovate, broaden our reach and leverage and strengthen Criteo's Buyer Index, one of the world's biggest privacy-compliant data sets built through collaboration within our open ecosystem of marketer and media owner clients. Criteo's Buyer Index uses shopper intent data mapped to contextual signals to drive superior marketing outcomes.

Each day, we are presented with billions of opportunities to connect consumers with relevant advertising messages from our commerce and consumer brand clients in compliance with the highest privacy standards, including the General Data Protection Regulation ("GDPR") and California Consumer Privacy Act ("CCPA"). For each of these opportunities, our algorithms analyze massive volumes of shopping data to predict consumer preferences and intent, and deliver specific messaging for products or services that are likely to engage that particular consumer. The accuracy of our algorithms improves with every ad we deliver, as they incorporate new data while continuing to learn from prior interactions.

Historically, the legacy Criteo model had focused solely on converting our clients' website visitors into customers, enabling us to charge our clients when users engage with an ad we deliver, usually by clicking on it. This pay-for-performance pricing model clearly links the cost of an advertising campaign to its effectiveness and performance in driving conversions, and continues to be valued as such by our clients. We have since expanded our solutions to address a broader range of marketing and monetization goals for our clients, including audience targeting and brand awareness. We leverage pricing models consistent with industry standards that include cost-per click, cost-per-impression and cost-per-install, as well as volume-based fees for brands and large retailers using our Retail Media solutions, and, in certain cases, a set fee for the use of our platform capabilities.

In August 2022, we acquired the business of IPONWEB Holding Limited ("IPONWEB"), a market-leading AdTech company with world-class media trading capabilities, for $250 million, including approximately $180 million paid in cash and approximately $70 million paid in Criteo treasury shares at closing. The acquisition includes a potential earn-out consideration of up to $100 million to be paid in cash subject to certain financial and other performance milestones to be achieved in 2022 and 2023. This strategic acquisition is expected to accelerate our Commerce Media Platform vision by adding scale, complementary products, and stronger first-party data capabilities, further reducing our reliance on third-party cookies and other identifiers.

During 2022, we operated in 94 countries.

Our financial results include:

- Revenue of $2,017.0 million, $2,254.2 million and $2,072.6 million for the years ended December 31, 2022, 2021 and 2020, respectively;
- Gross profit of $795.2 million, $781.9 million and $688.0 million for the years ended December 31, 2022, 2021 and 2020, respectively;
- Contribution excluding Traffic Acquisition Costs, or Contribution ex-TAC, which is a non-U.S. GAAP financial measure, of $928.2 million, $920.8 million and $825.0 million for the years ended December 31, 2022, 2021 and 2020, respectively;
- Net income of $10.9 million, $137.6 million and $74.7 million for the years ended December 31, 2022, 2021 and 2020, respectively; and
- Adjusted EBITDA, which is a non-U.S. GAAP financial measure, of $267.3 million, $322.5 million and $251.0 million for the years ended December 31, 2022, 2021 and 2020, respectively.

Please see the Non-GAAP Financial Measure Reconciliation, included in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" in this Form 10-K for reconciliations from Gross Profit to Contribution ex-TAC and net income to Adjusted EBITDA, in each case the most directly comparable financial measures calculated and presented in accordance with generally accepted accounting principles in the United States or "U.S. GAAP".

**Industry Trends**

We operate in commerce media, the fourth wave in digital advertising, leveraging our performance assets along with our Retail Media expertise to deliver impactful ads and reach consumers throughout their shopping journey, when they are the most willing to purchase.

We believe the following trends are relevant in assessing our current and future business.

*Ecommerce is Booming*: According to eMarketer, global retail ecommerce penetration is expected to grow to 24% in 2025, up from 19% in 2022. The COVID-19 pandemic has accelerated the boom of ecommerce as brands and retailers rapidly transformed their ecommerce presence. Ecommerce growth creates more advertising inventory in places where commerce audiences are, and it increases our ability to attract more ad spend. We are ideally positioned to complement Amazon and enable brands, agencies and retailers to activate commerce beyond Amazon, an opportunity which represents approximately 73% of consumers' online shopping[1].

*First-Party Data Unlocks Huge Potential:* Amazon opened the way in the commerce media category, and other large retailers also leverage their shoppers' first-party data to drive momentum to their advertising revenue. Many more retailers are now following suit in creating media experiences around their content assets utilizing their first-party data to curate and monetize their audiences. Driving advertising spend to their content requires advertising technology ("AdTech") and a huge network of shared data.

*Trade Marketing Shifts to Digital:* Brands have been taking advantage of this surge in ecommerce and accelerating the shift of their trade marketing budgets to online to address consumers at the digital point of sales, recreating in-store experiences on digital shelves. According to LUMA Partners, online trade marketing represents a market opportunity of approximately $80 billion and it is growing rapidly. This potential of digital trade marketing is enabling significant growth in the supply of retail media, available for brands to bid on to promote their products.

*Brands, Retailers and Publishers Increasingly Depend on AdTech Partners*: As technology quickly evolves in today's highly competitive environment, AdTech becomes increasingly critical for marketers. Consumers' shopping journeys are fragmented across multiple environments, websites, apps, devices, and physical stores, and we believe most marketers increasingly look at diversifying their significant reliance on walled-garden digital advertising partners, as walled gardens are closed online environments where advertisers have less access to customer data and less control over how to measure success. Changes in online identity make the environment more complex for both marketers and media owners around addressability and measurement, and require brands and retailers to better leverage AdTech providers to solve these problems for them. The ability for media owners, retailers, brands and agencies to identify users, create and monetize commerce audiences, and drive sales and customer loyalty, today relies on having the right technology partner, able to activate the right data in an efficient way and measure the results in a transparent way across channels.

**Addressable Market**

Starting with Retail Media, we estimate that our serviceable available market (excluding Amazon and China), or SAM, will reach $42 billion in advertising spend that we activate on behalf of our clients by 2025. We also estimate that our serviceable available market for the broader Commerce Media opportunity is expected to reach $110 billion in advertising spend by 2025.
When including Amazon and China, the Total Addressable Market, or TAM, for Commerce Media is expected to reach $290 billion in advertising spend by 2025.

---

[1] Source: eMarketer

**Criteo's Transformation**

Since 2018, and accelerating since 2020, Criteo has deeply transformed itself from a single-product (retargeting) to a multi-solution Commerce Media platform provider, fast diversifying the business. As of Q4 2022, non-Retargeting solutions represented approximately 47% of Contribution ex-TAC, compared to 32% in Q4 2021.

**The Criteo Commerce Media Platform**

We have made significant progress in our transformation journey to meet the needs of brands, marketers, retailers, and media owners in the evolving commerce landscape. With our unique Commerce Media Platform, we offer marketer and media owner clients a single platform for first-party data-based marketing and monetization, that provides a holistic suite of solutions, powered by AI technology and activates the world's largest set of commerce data.

Our technology is optimized to drive trusted and impactful business outcomes efficiently and effectively for our brand, retailer and media owner clients. These include, for example, driving engagement for our clients' brand, shop, app, products and services, driving product sales, driving app installs and consumer visits, driving product consideration from targeted commerce audiences, or driving advertising revenue for media owners and retailers by monetizing their data and audiences with consumer brands.

The Criteo Commerce Media Platform is focused on performance, outcomes, commerce audiences, retail media and measurement. It is made available as individual products and services as part of our offering.

On the demand side:

- Commerce Max is a Commerce self-service Demand Side Platform ("DSP") used by brands, agencies and retailers, enabling media planning and buying on retailer and open internet inventories leveraging Criteo's AI atop approved retailer data and unique commerce data, all with closed-loop product-level conversion measurement. .
- Commerce Growth is a powerful, self-service performance marketing tool used by Direct-to-Consumer brands and their agencies to activate outcomes-optimized customer acquisition and retention objectives.

On the supply side:

- Commerce Yield is a Commerce Media monetization stack and ad server giving retailers and marketplaces full control to achieve maximum monetization of their digital assets through inventory and data management, packaging, and in-depth insights.
- Commerce Grid is a Commerce Media Supply Side Platform ("SSP") giving media owners the control to optimize the monetization of their inventory and data assets.



Criteo's solutions work seamlessly across digital devices (desktops, laptops, smartphones and tablets), commerce and advertising environments (browsers, apps, connected TV and physical retail stores), platforms and operating systems (Windows, Android, iOS/MacOS), advertising channels and formats (display, including social and native, online video, connected TV and ads on retailers' properties) and media environments (retail media, thousands of direct publishers and mobile app developers in the open Internet, and all major real-time bidding exchanges).

*Criteo First-Party Media Network*

Our First-Party Media Network is a component of our Commerce Media Platform and represents the combination of our unique data and media assets. It is the powerful combination of our network of direct relationships with media owners, including retailers, together with our Buyer Index dataset focused on commerce and shoppers that powers Criteo's First-Party Media Network.

Our First-Party Media Network enables consented data to interoperate across marketers, retailers and publishers to engage addressable consumers on a one-to-one basis. It also acts as our Truth set to predict how commerce audiences behave and how ads will perform and convert in the same way. We believe that the amount of addressability data we operate in environments that are deprived of third-party signals will allow us to remain effective at private, safe consumer engagement, to drive the best outcomes for our clients and to capture increasingly more advertising budgets.

Our First-Party Media Network won the 2021 Digiday Media Award for best first-party strategy.

**Our Data assets: our first-party data-based *Buyer Index***

Our data assets include privacy-safe insights derived from our **clients' proprietary commerce data about their own consumers**, such as transaction activity on their digital properties, giving us exposure to over $1 trillion in online sales on a combined basis in 2022, representing approximately 40% of the global retail ecommerce sales excluding China[1], or $2.7 billion worth of transactions per day on average.

Through direct integration with our clients' digital properties, we obtain large volumes of consented first-party data, expressed consumer shopping intent and engagement, and transactional data at individual product or service levels, which do not rely on cross-site tracking technologies, such as third-party cookies. The information we collect is anonymized and does not enable us to personally identify any individual consumer.

Our **high quality first-party data assets** help fuel the accuracy of our algorithms, which improve with the increasing quantity and quality of the data we obtain from our marketer and media owner customers and partners, as well as insights gained through our own extensive operational history. The combination of marketer data, media owner data and proprietary metadata gives us powerful insights into consumer purchasing habits that we use to price media inventory and create relevant ads to drive user engagement and impactful commerce outcomes for our customers. In addition to commerce data at the granular product SKU level, we seek to use as much relevant information as possible about the context and intent of a given user, collected from customers and media owner partners, to further refine our prediction accuracy.

We believe our access to first-party commerce data validates the trust that our clients place in us and differentiates us. Most of our clients typically provide real-time access to the products or services a visitor has viewed, researched, added to their shopping cart, or bought from them, and continuously receive updated information on over 4 billion products or services across 3,500 product categories, including pricing, images and descriptions. Many of our clients also provide us with their customers' purchase history data in formats that preserve privacy.

Over the years, we have built data collectives through data pooling amongst many of our marketer clients and media owner partners. The combination of these data collectives forms Criteo's Buyer Index. For each of these data collectives, we ask our clients to grant us the permission to mutualize a significant portion of their proprietary data in an anonymized way with other clients who also contribute data to this collective data pool. With Criteo's Buyer Index, we have built one of the world's largest and most open data sets focused on shoppers and their commerce activity across retailers and brands, and their activity on media owners' properties.

The Criteo Buyer Index is comprised of the following data collectives:

- The *Identity Graph* allows us to match user identifiers provided by clients and publishers across devices and environments, both online and offline. Our algorithms link user identifiers together when they are deemed to belong to the same user. Examples of user identifiers, collected from our customers and partners, and part of our Identity Graph include: hashed customer logins and hashed emails, first-party and third-party cookies, app identifiers such as Android's AAID, in addition to linkages such as LiveRamp's IdentityLink. The graph has billions of identifiers, which we believe cover over 750 million unique Daily Active Users globally, for whom we collect commerce data in real time. In addition, the Identity Graph allows us to leverage offline CRM data of our clients' physical stores to match it with online user profiles, based on their offline shopping history.

- The *Interest Map* collects and organizes consumer intent and purchasing data across our network of commerce clients   to build a comprehensive and accurate non-identifying shopper profile for all consumers on whom we have collected data. Our Interest Map applications include the Universal Catalog, which provides category and/or brand enrichment, as well as a unified view of the 4 billion products SKUs, across 3,500 product categories, available across the combined catalogs of our 22,000 commerce clients[2]. Every day, we have exposure to data on close to $3 billion in online sales on average through 75 million buyer journeys. With the Interest Map, we seek our clients' permission to use their data, on an aggregated and anonymized basis, to power products that are jointly offered to our clients in the collective.

The design and governance of Criteo's Buyer Index are based on strict and differentiated guiding principles:

- **Openness**: we commit to a two-way exchange of data with our marketer and media owner clients and partners, whereby all parties contributing data to the collectives, in return for their contribution, benefit from the collective dataset via the Commerce Media Platform, and access cross-device user IDs and relevant Key Performance Indicators to better inform and optimize their advertising with us.
- **Transparency**: our clients' contribution and sharing of data within the data pools are based on a clear and permission-based usage by Criteo for the mutual benefits of all participants in the data collectives.
- **Security**: we apply high levels of data security and user privacy standards to the data we hold and manage for ourselves and our clients.
- **Fairness**: our data collectives are designed and governed in ways such that the value gained by each participant largely exceeds the individual contribution to the collectives, irrespective of the participant's size.

7

Consistent with our *data minimization* principles, our technologies only rely on categories of data that are strictly necessary for the purpose of our services. This means that the user information we collect relates primarily to purchase intent. In addition, we provide consumers with easy-to-use and easy-to-access mechanisms to control their advertising experience and opt out of receiving targeted ads we deliver. This transparent, consumer-centric, and controllable approach to privacy empowers consumers to make better-informed decisions about our use of their data. We also actively encourage our clients and media owner partners to provide transparent and clear information to consumers about our collection and use of data relating to the ads we deliver and monitor.

---

[1] Source: eMarketer.
[2] Products are not unique and may appear in the catalogs of different customers.

**Our Media assets: our first-party media integrations and media buying scale**

We provide our marketer clients with extensive real-time access to advertising inventory through **direct relationships with thousands of media owner partners**, as well as selective supply side partnerships. We define inventory as the combination of desktop web, mobile web, mobile in-app display, including social and native, online video displays, connected TV, and ad inventory on major retail ecommerce properties, including standard banners, native and sponsored product formats.

In some cases, we have negotiated **direct and privileged access** with publishers, giving us the opportunity to select, buy and price, on an impression-per-impression basis and in real time: (1) inventory that a publisher might otherwise only sell subject to minimum volume commitments; and/or (2) particular ad impressions before such impressions are made available to other potential buyers. Among their multiple benefits, these direct relationships can give us privileged access to first-party publisher data which allow us to bid on impressions without using third-party cookies or other third-party identifiers.

Many of our direct publisher partners have granted us preferred access to portions of their inventory because of our ability to effectively monetize that inventory. For example, within Criteo Retail Media, we access inventory and first-party data from ecommerce sites that are generally not available to traditional advertising demand. We believe this inventory and data from ecommerce retailers is particularly valuable for consumer brands looking to advertise their products in a multi-brand retail environment.

We **price and buy inventory in real time** and typically do not pre-buy any impression. In addition, in some instances, we may commit to buying minimum volumes of impressions to certain publisher partners. Across both our direct publisher relationships and inventory purchasing done on Real-Time Bidding (RTB) exchanges, we leverage our commerce-focused machine learning technology, also called the Criteo AI Engine, to value available advertising inventory quickly and accurately, and utilize that information to bid for inventory on a programmatic, automated basis.

Alongside our existing technologies to integrate directly with publishers, we have developed *Criteo Direct Bidder*, our header-bidding technology now integrated with Iponweb's publisher SSP, The MediaGrid. Header-bidding allows publishers to make their inventory simultaneously available for public auction to several competitive bidders, including RTB exchanges. Thanks to our large scale, Criteo Direct Bidder allows us to connect directly to the ad server of publishers in situations where publishers use header bidding to monetize their inventory, allowing us, among other advantages, to bypass RTB exchanges in the bidding process and to save publishers the take-rate RTBs would typically charge them. As a result, Criteo Direct Bidder helps publishers increase the average monetization of their inventory sold through Criteo Direct Bidder, relative to our overall spend through all channels. Using Criteo Direct Bidder, we were connected to publishers globally, on both web and apps, including: IBM Watson Advertising (The Weather Channel), Globo, OLX, NBC, Forbes, The Wall Street Journal, Leboncoin, Daily Mail, Viber, Axel Springer's websites, Marktplaats, M6, AJA Japan and EstSoft.

We take a variety of **brand safety** measures to ensure that the brand equity of our clients is preserved at all possible times. These measures include determining that each publisher's inventory meets our content requirements and those of our clients to ensure their ads are not shown in inappropriate content categories, such as, for example, adult, violence, harassment or hate speech. In addition, we are an active member of the *Coalition for Better Ads*, supported by Google, and are compliant with their recommendations for user-friendly advertising formats. Criteo's AI Engine is also integrated with Oracle Contextual Intelligence, a solution providing real-time content review and page-level pre-bid classification to clients across 11 standard brand safety categories. In recognition of our efforts to combat fraud and ensure a brand safe digital ecosystem for our advertisers, Criteo has been independently certified by the Trustworthy Accountability Group for the Certification Against Fraud and the Brand Safety Certification.

We believe that our ability to efficiently access, value and monetize inventory at scale results in a **deeply liquid marketplace** for both buyers and sellers of advertising, allowing us to deliver effective ads at the right price for our clients, even as the size and complexity of the marketing campaign increases.

*Criteo AI Engine*

Criteo AI Engine consists of multiple artificial intelligence algorithms, and the proprietary global hardware and software infrastructure that enables the Commerce Media Platform to operate in real time at significant scale, and activate our commerce datasets and unique media for effective marketing and monetization.

Criteo AI Engine leverages the Buyer Index, with the goal of **maximizing consumer engagement to drive impactful business outcomes for clients** through the delivery of highly relevant and personalized ads in real time.

Criteo AI Engine consists of:

- *Lookalike finder algorithms.* These algorithms create user audiences, or groups of consumers likely to be interested in and engage with a specific category of our clients' products or services, from a predetermined audience seed based on other clients' audiences that were already targeted and exposed to similar products or services in the context of previous advertising campaigns. Once created, these audiences are used by Criteo AI Engine as targets to reach and be exposed to tailored ads for relevant products or services for the purpose of a dedicated campaign. This set of algorithms typically supports Commerce Audiences campaigns to drive new prospects to consider brands, products or services with which they have not yet engaged in the past.

- *Recommendation algorithms.* These algorithms create ads tailored to specific consumer interest and intent by determining the specific products or services to include in the ad. These products and services may be ones that the consumer has already been exposed to, or that the algorithms predict the customer could be interested in. Alternatively, these may be products and services that other consumers within Criteo Buyer Index have been interested in.

- *Dynamic Creative Optimization+ (DCO+).* Based on the results of our dynamic creative algorithms, Criteo AI Engine automatically and dynamically assembles customized creative ad content on an impression-per-impression basis in real time, by optimizing each individual creative component in the ad, from the font, color, size and format of product images to the "call to action" or price discount. Our patented *Dynamic Creative Optimization+* technology offers virtually unlimited personalization, with up to 17 trillion visual ad variations, without the need to define ad sizes or layouts upfront, while always maintaining the consistency of our clients' brand image.

- *Predictive bidding algorithms.* These algorithms predict the probability and nature of a user's engagement with a given ad. Such predicted user engagement can take the form of, for example, customer site visits, clicks, conversions, shopping basket value, specific product categories purchased, or even the gross margin of the purchased product or service that our client generates from such purchase. This prediction of engagement incorporates data from our marketer clients, our media owner clients and partners, including user intent, who our client is, the products offered in the ad, as well as data on the creative content of the ad and the media context in which the ad is displayed, as well as third-party sources. Together with our recommendation algorithms, the prediction algorithms allow us to determine the most appropriate price to pay for an ad impression, based on an individual user's predicted engagement, what our client is willing to pay for that engagement, as well as Criteo's own target margin (or economic "take rate" retained by Criteo) from placing that individual ad. Our bidding engine executes campaigns based on certain objectives set by our clients (such as cost-per-click, cost-per-order, cost-of-sales, cost-per-visit, cost-per-impression, cost-per-install or total campaign budget). After a bid for an ad impression is placed and won, Criteo AI Engine assembles and delivers individualized ads, and provides campaign reporting in near-real time.

- *Software systems and processes.* Our algorithms are supported by robust software infrastructure that allows us to operate seamlessly at a large scale through our network of approximately 45,000 servers as of the end of 2022. The architecture and processing capabilities of this technology have been designed to match the massive computational demands and complexity of our algorithms in real time. This technology enables data synchronization, storage and analysis across a large-scale distributed computing infrastructure in multiple geographies, as well as fast data collection and retrieval using multi-layered caching infrastructure.

- *Experimentation platform.* Our Research & Development team continuously tunes our Criteo AI Engine via experimentation and A/B tests. For example, in 2022, we performed about 1,500 online A/B tests and over 100,000 offline experiments and tests. We use an online/offline testing platform to improve the capabilities and effectiveness of our prediction models by measuring the correlation of specific parameters with user engagement, usually measured by consumer visits, clicks and conversions, typically in the form of sales. A dedicated team is constantly testing new types and sources of data, as well as new variables, to determine whether they help diminish the gap between, for example, predicted visits, click-throughs and conversions, and actual visits, click-throughs and conversions over the course of a live campaign.

A key attribute of Criteo AI Engine is the vast **metadata of learnings on marketing and commerce effectiveness** that we have accumulated from having delivered and measured responses to close to 12.5 trillion advertising impressions since our Company's inception.

10

We have long established and adopted *Privacy-by-design* as a central element of our technology and product design and development cycles, with a strong commitment to ensuring best practices in privacy, security and safety for consumers and our marketer and media owner customers. Since 2013, we have had a designated Data Privacy Officer along with a team of privacy experts. These experts are part of our R&D and Product organizations, and consider all facets of user privacy for the design of any new technology, solution or feature of the Commerce Media Platform. They also perform ongoing Privacy Impact Assessments to monitor potential risks during the product lifecycle and proactively mitigate those risks. The Data Privacy team delivers company-wide privacy training, enforces our privacy policies and is integral to ensuring that we build the best solutions and services. We regularly review and document our internal privacy policies, amend existing policies as necessary and enforce these policies with our clients, media owner partners and vendors.

*Our Segments*

Criteo reports its business results for three operating and reportable segments: Marketing Solutions, Retail Media and Iponweb.

- **Marketing Solutions** allow commerce companies to connect with their most valuable audiences to achieve their customer acquisition and retention goals.

  - Examples of expected business outcomes driven by Criteo Marketing Solutions include:

    - **Discovery: creating and building brand awareness** for a client's existing or new product or service, by targeting relevant high-quality consumer audiences showing intent for that particular product or service and reaching these audiences, for example, through online video ads and through Connected TV channels;

    - **Choice: driving visits from new prospects** on the website of our clients, or **driving installations of our clients' apps** by new consumers, by engaging such commerce audiences online (either on the web, in apps or on connected TV), with personalized ads offering products or services tailored to their predicted interest;

    - **Purchase: driving sales** for commerce clients by engaging consumers online, with personalized ads offering products or services for which they have already expressed shopping intent; or **driving more sales from existing customers** of our commerce clients, by accurately targeting and re-engaging these existing customers online with personalized ads offering new products or services that they have not yet purchased nor been exposed to.

  Our clients' use and consumption of Criteo Marketing Solutions is made flexible through a set of tools and services, including:

    - Access to **an integrated self-service client interface** that reduces unnecessary complexity and cost associated with manual processes of having to use multiple DSPs and sources of inventory supply.

    - We also offer **a managed-service approach to our larger clients,** providing deep business intelligence and analytics services. Our teams of advisers aid our larger clients in setting goals for: extracting insights from, and evaluating trends and performance of their various advertising campaigns with us across multiple marketing goals, sources of inventory, advertising channels and formats, and the multiple digital devices that consumers may use.

  In Marketing Solutions, our Commerce Audiences solutions are focused on attracting more customers for our marketer clients and growing their existing customer relationships with an always-on strategy, leveraging our AI engine to engage commerce audiences with the right ad for each opportunity:

    - Increase awareness and interest in a brand, product, or services;
    - Attract new consumers to an online and/or offline store;
    - Generate leads from consumers who are in market for a brand, product or services;
    - Get more shoppers and grow sales on an online and/or offline store; and
    - Encourage consumers who purchased in the past to make additional purchases.

For Criteo Marketing Solutions, we typically purchase inventory programmatically on a **CPM basis** from our direct publisher partners and RTBs, through standard terms and conditions for the purchase of advertising inventory. This means that inventory purchased for Criteo Marketing Solutions is paid to the publisher irrespective of whether the user engages, in whatever form, with the advertisement delivered on that publisher's digital property. Pursuant to such arrangements, we purchase impressions for users that Criteo recognizes on these publishers' digital properties. Such arrangements are cancellable upon short notice and without penalty.

11

- **Retail Media** assists retailers in generating high-margin advertising revenues from consumer brands looking to address multiple marketing goals, and to drive sales for themselves, by monetizing their audiences through personalized ads, either on their own digital store (also called "onsite") or on media owner properties on the open Internet (also called "offsite").

  - Examples of expected business outcomes driven by Criteo Retail Media include:

    - **generating advertising revenue for retailers** on their online store, by providing retailers with self-service access to our technology platform for them to monetize their ad inventory, commerce data, traffic and audiences directly with consumer brands across various marketing goals;

    - **driving sales for consumer brand clients** on the site of retailer partners, by connecting consumer brands and retailers and engaging consumers *on* the retailer's digital property with personalized ads offering specific brand products available on the retailer's digital store and for which consumers have expressed interest; and

    - **driving sales for consumer brand clients** on the site of retailer partners, by connecting consumer brands and retailers and engaging consumers *outside* of the retailer property on the open Internet with personalized ads offering specific brand products available on the retailer's digital store and for which consumers have expressed interest.

  - Our retailer and brand customers respectively manage their Retail Media revenues and budgets using a self-service interface. We charge retailers a negotiated supply-side platform fee and sometimes a technology fee, while brands pay us a negotiated demand-side platform fee. In addition, we may charge brands a managed-service fee and other fees for accessing additional insights.

For Retail Media onsite, we do **not incur our own media cost** as retailers use our platform to sell their inventory directly to consumer brands and we bill and collect media cost on their behalf.

We believe Criteo Retail Media is a particularly differentiated offering in the marketplace with significant growth opportunities. We will continue to roll out our Retail Media offering to new markets and adjacent verticals, making the digital stores of large retailers a key advertising channel to generate high gross margin revenue from consumer brands. In addition, we intend to grow the number of retailers we work with in the U.S. and Europe, deepen our share of wallets with existing retailer and brand customers, accelerate our geographic expansion in the APAC region, grow our offsite advertising capabilities for brands across our premium publisher network on the open Internet with our Commerce Max DSP, grow Retail Media for retailer marketplaces, bring more commerce insights to brands as a key value-added service and provide brands with an integrated view on their Retail Media spend on retailer sites.

- **Iponweb** specializes in building real-time advertising technology and trading infrastructure, delivering advanced media buying, selling, and packaging capabilities for media owners, agencies, performance advertisers, and third-party AdTech platforms. It enhances our scale and brings complementary capabilities on both the demand and the supply side to accelerate the execution of our Commerce Media Platform strategy by:

    - Integrating Iponweb's BidCore DSP for mid- and upper-funnel marketing into Commerce Max to find valuable commerce audiences on retailer sites, extend to commerce audiences that exist offsite across the open internet, and cover the entire consumer buying journey;

    - Adding The MediaGrid SSP to our Criteo Direct Bidder to expand our direct publisher footprint and enhance first-party data distribution and activation potential;

    - Strengthening our own R&D capabilities and allow platform customization for our most strategic enterprise and agency clients; and

    - Leveraging the BidSwitch media trading marketplace, connecting 126 demand and 145 supply partners, to broaden the distribution of commerce audiences on the open Internet.

12

**Our Competitive Strengths**

We believe the Commerce Media Platform is transforming digital marketing and media monetization for our clients. We enable brands' and retailers' growth by making their marketing and monetization efforts more efficient, effective and measurable by driving trusted and impactful business outcomes across multiple marketing goals. We believe the following competitive strengths, supported by our first-mover advantage and 16 years of deep machine learning and AI expertise, have enabled us and will continue to enable us to capture a significant share of our commerce media opportunity:

*Shopper Data.* Our First Party Media Network leverages massive amounts of granular first-party data focused on commerce and shopping behaviors, through data sharing among our clients. With an estimated 750 million unique Daily Active Users in our Identity Graph, we are building one of the largest data sets focused on shoppers, with a scope and scale among the largest in the industry. Close to $3 billion worth of daily transactions across 4 billion product SKUs from 3,500 product categories are incorporated into our graph, allowing us to analyze about 75 million daily buyer journeys.

*Consumer Reach, Scale and Network Effects.* Our large and loyal base of customers and first-party media owner partners provide for stability and positive network effects. As of December 31, 2022, we had approximately 22,000 clients, including some of the largest ecommerce/retailers companies in the world, and our client retention rate was approximately 90%. Our direct integrations on both the demand and supply sides ensure privacy-compliant access to first-party data, shielding from the consequences of third-party cookie deprecation. As we continue to grow our client base, we continue to grow the number of users who interact with our ads, increasing our consumer reach and allowing us to benefit from greater scale when buying inventory from publisher partners, many of whom have granted us preferred access to portions of their advertising inventory. There are also significant opportunities to cross-sell and up-sell our product portfolio within our large existing customer base. As clients spend more with us and we attract more media inventory and deliver more ads, our data assets grow, enabling us to deliver even more precisely targeted and personalized ads and generate a greater impact for our customers, both marketers and media owners. As a result, we believe more brands, commerce marketers and media owners may use our offering and potentially increase their spend with us. This, in turn, may enable us to increase monetization for media owners and retailers, further expanding our media network and increasing our ability to drive performance for all clients. This cycle of self-reinforcing network effects, based on our large scale and loyal base of marketer and media owner customers and partners, may continue to fuel our business in the future.

*Retail Media.* Our Retail Media value proposition is unique in the market today. Our offering empowers brands and agencies to find valuable audiences on retailer sites using on-site sponsored and display ads but also extend these audiences off-site, across open internet inventory with unified reporting and closed-loop measurement, including product-level sales attribution. We enable brands, agencies, and multiple retailers to buy and sell retail media using a common platform, thus benefiting from meaningful network effects due to our unique position as the technology supporting a multi-retailer ecosystem, whereas most competitors in the retail media space focus on supporting siloed retailer walled gardens. Brands and their agencies use our platform to access unique inventory at meaningful scale, and retailers get access to brand marketing budgets at a scale they would not be able to access on their own. This creates a network effect where the value for clients only increases as more brand and retailer participants join the ecosystem. In addition, our deep technical integrations with retailers, requiring meaningful engineering investment from the retailer, make us very sticky with them and enable us to offer preferred or exclusive inventory to brands and agencies, as well as a superior shopper experience to consumers. We require multi-year commitments and product ads exclusivity as part of our standard retailer services agreements. Both our unique inventory access and increasingly deep technical integrations with other advertising technology and reporting platforms provide defensible relationships with brands and agencies. For example, our API partner program embeds our technology into ad platforms that brands and agencies already use to buy search, social, and other large platforms' ad inventory. Additionally, with many major brand and agency clients, we connect our reporting data directly into client analytics and reporting platforms via our APIs.

*Superior Insights and Measurement.* We believe we have superior capabilities for Commerce Insights and measurement. Our technology provides our clients with the unique ability to measure against product sales at the product SKU level. For example, our commerce insights can bring together organic shopping data with paid media metrics for brands.

*Scaled Global Presence.* We do business in 94 countries and have a direct operating presence through 27 offices in 18 countries. We have achieved this global presence by replicating and scaling our effective business model across all geographic markets. Large businesses are increasingly seeking global advertising partners able to provide comprehensive offerings that are effective across multiple geographies. We believe we can meet this demand by leveraging our scalable AI technology and global network of relationships and are well positioned to serve our clients in virtually every market in which they seek to drive trusted, impactful and measurable business results and commerce outcomes.

*Strong Financial Model*. Our profitable, cash-generative financial model allows us to invest for growth while maintaining healthy profitability. Our company has a sustainable, robust profitability margin. In the year ended December 31, 2022, our Adjusted EBITDA as a percentage of Contribution ex-TAC was 29%, including the impact of Iponweb's lower margin profile. In addition, we manage our expense base in a disciplined way, and we have a clear plan to drive operating leverage from scaling and transitioning to more self-service solutions over time, as well as synergies with IPONWEB and optimizing our business processes. Our financial model generates a sustainable and significant amount of free cash flow. In 2022, net cash flows provided by operating activities were $256.0 million and consisted of net income of $10.9 million, $185.0 million in adjustments for non-cash and non-operating items and $60.1 million of cash flows used for working capital. For the year ended December 31, 2022, we generated free cash flow of $200.1 million. In addition, our company maintained a strong cash position of $348.2 million at the end of fiscal 2022, which, together with marketable securities and our Revolving Credit Facility, provides for financial liquidity of about $835 million, offering flexibility for executing on our strategic roadmap.

We believe having a profitable, cash-generative financial model providing financial flexibility and investment capacity is a strong competitive advantage, compared to multiple sub-scale companies in our industry.

14

**Our Business & Growth Opportunities**

Our mission is to power the world's marketers and media owners with trusted and impactful advertising. We enable our clients' business growth through commerce media, by providing best-in-class marketing and monetization services and driving measurable business outcomes at scale. Our vision is to bring richer experiences to every consumer by supporting a fair and open internet that enables discovery, innovation, and choice – powered by trusted and impactful advertising for the world's marketers and media owners.

Our overarching priority is to drive sustainable and profitable growth for our business. This involves investing in the fast-growing ecommerce space and broadening our value proposition to cover all commerce media marketing goals as part of our Commerce Media Platform driving measurable business outcomes to our marketer and media owner clients.

We are further expanding our rapidly growing retailer client base, becoming a platform of choice for agencies and brands and reinforcing our performance advantage. Other core elements of our broader business strategy include:

*Strengthen the Core.* We continuously strengthen our *retargeting* product, aimed at converting our clients' customers in both the web and apps. We intend to achieve this by leveraging our strong differentiators, including around Criteo Buyer Index and user identification thanks to our first-party media network, continuously improving Criteo's AI Engine technology and the strong performance of our core product in all environments despite the loss of third-party signals.

*Expand Our Product Portfolio.* As part of our transformation, we intend to continue to leverage our existing assets to diversify and strengthen our business outside of *retargeting*, continue to build and expand our suite of fast-growing new solutions, including Commerce Audiences and new capabilities from Iponweb and build further competitive moats around our core assets.

In fiscal year 2022, our *non-retargeting* solutions already represented close to 37% of our total business, as measured on a Contribution ex-TAC basis, including 47% in the fourth quarter 2022. We are investing in the growth of these *non-retargeting* solutions and expect them to represent close to 50% of our overall business in 2023, including of the integration of Iponweb.

*Explore Strategic Game Changers.* We look for opportunities to extend and accelerate the growth of our business by exploring and bringing strategic assets and capabilities through **partnerships** and **M&A**, in addition to executing organically.

For example, in 2022, we entered and expanded a number of partnerships.

- We expanded our efforts with leading ecommerce platforms, most notably Shopify. Criteo became a Shopify Plus partner and was included in their first AdTech partner cohort.

- We continued to invest in connecting with all the major Customer Data Platforms our client use. These enables consistent, real time 1st party customer data across our platform, including Microsoft, Salesforce, Adobe, Segment (Twilio), Klaviyo and more.

- In the fourth quarter, we launched proof of concept testing with two of the leading data clean room providers to evaluate their usage as secure environments that enable first-party data connections and syncing across marketers and media owners.

- Our growing reseller network for Commerce Growth continued to develop in APAC and has now started to roll out across EMEA.

- Over 70 agencies joined our training and incentive program, Criteo Premium Partners, showing promising signs of growth.

- Criteo's clients are using partner powered creatives like United Plankton that helps to create video assets from static images expanding our portfolio of solutions.

- We entered proof of concept tests with a leading data provider, Axciom, to explore adding demographic data to performance to enhance client campaigns.

In the future, we intend to continue to collaborate with existing and new industry partners to extend the capabilities and functionalities of our Commerce Media Platform, beyond what we currently offer on a standalone basis.

15

We continue to have an active M&A pipeline, with a critical assessment on technologies and businesses that have the potential to accelerate our Commerce Media Platform strategy by enhancing, complementing or expanding our strategic capabilities, primarily through technology and broadening our Commerce Media capabilities across all channels. Key criteria for acquisitions include demonstrated revenue traction and a proven value proposition for clients and partners and ease of integration. We believe our entrepreneurial culture, growth opportunity, global scale, financial profile, strong brand and market position enable us to be an attractive acquirer.

- In August 2022, we closed the acquisition of IPONWEB, a market-leading AdTech company with world-class media trading capabilities, for $250 million comprised of a mix of cash and treasury shares of the Company, with an earn-out consideration of up to $100 million subject to certain financial and performance milestones. This strategic acquisition is expected to accelerate our Commerce Media Platform strategy by adding scale, complementary products, and stronger first-party data capabilities, further reducing our reliance on third-party cookies and other identifiers.

*Drive Technology and Operations Excellence.* We take a portfolio management approach to managing our business, organization and expense base: right-sizing or streamlining the parts of the business with stabilizing revenue in order to enable investments on the growing parts of our business into technology innovation and other strategic priorities. We intend to continue to invest in growing our business, while driving productivity and efficiency gains through operational excellence across the company and maintaining healthy profitability. We believe these investments will feed the long-term sustainable growth of Criteo. We intend to continue to make disciplined investments in our technology innovation and new product development, including in Retail Media, our first-party media network, customer acquisition and retention solutions, online video, Connected TV and Commerce Insights. We expect these investments to further strengthen our Commerce Media Platform. Driving operational excellence through the company to self-fund for our investments involves increasing automation and the scalability of our operations.

### Infrastructure

Our ability to execute depends on our highly sophisticated global technology software and hardware infrastructure. As of December 31, 2022, our global infrastructure included approximately 45,000 servers through a global network of ten data centers, including one Hadoop cluster, that comprise to 3,000 servers hosting 800,000 processing cores, providing a storage capacity exceeding 280 petabytes and 1 petabyte of random-access memory. Our global infrastructure is divided into three independent geographic areas: Americas, Asia-Pacific and EMEA, and our services are delivered through one or more data centers that support each particular area. Within large areas, the data centers are strategically placed to be close to our clients, publishers and users. This provides the benefit of minimizing the impact of network latency within a particular geographic area, especially for time-constrained services such as RTB. In addition, we replicate data across multiple data centers to maximize availability and performance. We also generally seek to distribute workload across multiple locations to avoid overloads in our systems and increase reliability through redundancy. In addition, we consider sustainability factors as we evaluate our infrastructure footprint, including prioritizing resource efficiency and clean energy to operate sustainable data centers.

Within each data center, computing power is provided by horizontal build-outs of commodity servers arranged in multiple, highly redundant pools. Some of these pools are dedicated to handling incoming traffic and delivering ads while others are devoted to the data analytics involved in creating our ads. In particular, we use software specifically designed for processing large data sets, such as Hadoop, to run offline data analyzes and to train our AI and machine learning models. The results are then fed back to refresh and improve our prediction and recommendation algorithms.

We use multiple-layered security controls to protect Criteo AI Engine and our data assets, including hardware- and software-based access controls for our source code and production systems, segregated networks for different components of our production systems and centralized production systems management.

16

**Our Clients**

On the demand side for media activation, our diversified client base consists of more than 1,800 established brands and agencies, and more than 20,000 performance marketers, primarily in the retail, travel and classifieds verticals, and including some of the largest and most sophisticated commerce companies in the world.

On the supply side for media monetization, we power the Retail Media Networks of approximately 175 retailers, as media owners. We also partner with approximately 75% of the top 100 ComScore publishers in our largest markets.

As of December 31, 2022, we had a total of approximately 22,000 clients.

At the end of 2022, approximately 67% of our client relationships were held directly with the client and the remaining 33% with advertising agencies or other third-parties on the Criteo Marketing Solutions side of the business, whereas 37% of our Criteo Retail Media revenue comes from agencies.

We believe our business is not substantially dependent on any particular client or group of clients. In 2022, 2021 and 2020, our largest client represented 7.7%, 7.0% and 3.5% of our revenue, respectively, and in 2022, 2021 and 2020, our largest 10 clients represented 17.8%, 16.6% and 13.7% of our revenue in the aggregate, respectively.

There is no group of clients under common control or clients that are affiliates of each other constituting an aggregate amount equal to 10% or more of our consolidated revenues, the loss of which would have a material adverse effect on Criteo.

We define a client to be a unique party from whom we have received a signed contract or an insertion order and for whom we have delivered an advertisement or monetized an advertising inventory during the previous 12 months. We count specific brands or divisions within the same business as distinct clients so long as those entities have separately signed insertion orders with us. In the case of some solutions within Criteo Retail Media, we count the parent company of the brands as an individual client, even if several distinct brands pertaining to the same parent company have signed separate contracts or insertion orders with us. On the other hand, we count a client who runs campaigns in multiple geographies as a single client, even though multiple insertion orders may be involved. When the insertion order is with an advertising agency, we generally consider the client on whose behalf the advertising campaign is conducted as the "client" for purposes of this calculation. In the event a client has its advertising spend with us managed by multiple agencies, that client is counted as a single client.

Our client base is composed of two client categories: the Enterprise client category (large clients), and the Growth client category (midmarket clients). Each client category is serviced through a combination of direct and indirect approaches, including through brand agencies for the Enterprise category, and performance agencies and resellers for the Growth category.

**Research and Development**

We invest substantial resources in research and development to maintain our leading position in Commerce Media. Aside from the walled garden platform, we have the largest concentration of R&D talents in the AdTech industry. Our engineering group is primarily located in research and development centers in Paris, France, Grenoble, France and Ann Arbor, Michigan. With the acquisition of Iponweb, we also have expanded our R&D engineering centers to include Berlin, Germany, Limasol, Cyprus and Yerevan, Armenia. We expect to continue to expand capabilities of our technology in the future and to invest significantly in continued research and development and new business efforts. We had 990 employees primarily engaged in Research and Development and Product as of December 31, 2022. Research and development expenses, including expenses related to the Product group, totaled $187.6 million, $151.8 million and $132.5 million for 2022, 2021 and 2020, respectively.

**Intellectual Property**

Our intellectual property rights are a key component of our success. We rely on a combination of patent, trademark, copyright and trade secret laws, as well as confidentiality procedures and contractual restrictions, to establish, maintain and protect our proprietary rights. We generally require employees, consultants, clients, publishers, suppliers and partners to execute confidentiality agreements with us that restrict the disclosure of our intellectual property. We also generally require our employees and consultants to execute invention assignment agreements with us that protect our intellectual property rights.

Intellectual property laws, together with our efforts to protect our proprietary rights, provide only limited protection, and any of our intellectual property rights may be challenged, invalidated, circumvented, infringed or misappropriated. The laws of certain countries do not protect proprietary rights to the same extent as the laws of France and the U.S. and, therefore, in certain jurisdictions, we may be unable to protect our proprietary technology.

Agreements with our employees and consultants may also be breached, and we may not have adequate remedies to address any breach. Further, to the extent that our employees or consultants use intellectual property owned by others in their work for us, disputes may arise as to the rights to know-how and inventions relating thereto or resulting therefrom. Finally, our trade secrets may otherwise become known or be independently discovered by competitors and unauthorized parties may attempt to copy aspects of the Criteo Commerce Media Platform or obtain and use information that we regard as proprietary.

As of December 31, 2022, we held 25 patents issued by the U.S. Patent and Trademark Office and various foreign counterparts, and had filed four non-provisional patent applications in the U.S. and Europe. We also own and use registered and unregistered trademarks on or in connection with our products and services in numerous jurisdictions. In addition, we have also registered numerous internet domain names.

Our industry is characterized by the existence of a large number of patents and frequent claims and related litigation regarding patent and other intellectual property rights. In particular, leading companies in the technology industry have extensive patent portfolios. From time to time, third parties, including certain of these leading companies, have asserted and may assert patent, copyright, trademark and other intellectual property rights against us, our clients or our publishers. Litigation and associated expenses may be necessary to enforce our proprietary rights.

18

**Privacy, Data Protection and Content Control**

*Legal and Regulatory*

Privacy and data protection laws play a significant role in our business. The regulatory environment for the collection and use of consumer data by advertising networks, advertisers and publishers is frequently evolving in the U.S., Europe and elsewhere. The U.S. and foreign governments have enacted, considered or are considering legislation or regulations that could significantly restrict industry participants' ability to collect, augment, analyze, use and share personal data, such as by regulating the level of consumer notice and consent required before a company can utilize cookies or other tracking technologies.

In the U.S., at both the federal and state level, there are laws that govern activities such as the collection and use of data by companies like us. At the federal level, online advertising activities in the U.S. have primarily been subject to regulation by the Federal Trade Commission, or the FTC, which has regularly relied upon Section 5 of the Federal Trade Commission Act, or Section 5, to enforce against unfair and deceptive trade practices, including alleged violations of consumer privacy interests. Various states have also enacted legislation that governs these practices. For example, on September 27, 2013, the governor of California signed into law AB 370, an amendment to the California Online Privacy Protection Act of 2003, or CalOPPA. This amendment requires that we disclose in our privacy policy how we respond to web browser "do not track" signals. Our current privacy policy discloses that we do not respond to web browser "do not track" signals but that we do respond to opt-out requests made through our proprietary opt-out button or through industry opt-out platforms (namely Network Advertising Initiative and Digital Advertising Alliance). However, the U.S. privacy law framework may be subject to significant evolutions in the near future both at a federal and at a state level. At a federal level, lawmakers are currently considering the possibility of adopting a federal privacy law and a draft bill published in this regard in 2022 ("American Data Privacy and Protection Act"). In 2018, the State of California adopted the California Consumer Privacy Act, or the CCPA. The CCPA has been characterized as the first "GDPR-like" privacy statute to be enacted in the U.S. because its scope, and a number of the key provisions, resemble the GDPR. The CCPA establishes a new privacy framework for covered businesses by, among other requirements, creating an expanded definition of personal information, establishing new data privacy rights for consumers in the State of California, imposing special rules on the collection of personal data from minors, creating new notice obligations and new limits on the sale of personal information, and creating a new and potentially severe statutory damages framework for violations of the CCPA and for businesses that fail to implement reasonable security procedures and practices to prevent data breaches. As currently enacted, we and partners in our industry have been required to comply with these requirements since January 1, 2020, when the CCPA became effective. As with GDPR, the advertising technology marketplace may have to adapt to operating under the CCPA where it applies. Our advertising or publishing partners may impose new CCPA restrictions with which we must adapt and comply. In November 2020, the voters in California voted to pass the California Privacy Rights Act ("CPRA"), an Act that both amends and expands the scope of the CCPA. The CPRA became effective on January 1, 2023, with a look back period to January 1, 2022. The CPRA creates new criteria by which businesses can be regulated, expands the definition of "personal information" to more closely match Europe, a new audit requirement, and the creation of an agency to oversee enforcement of the CPRA. The CPRA also explicitly provides an opt-out right for cross-contextual behavioral advertising. We cannot predict the timing or outcome of this adaptation or the effect on our business. Adapting our business to the CCPA and the new requirements under the CPRA could involve substantial resources and expense, and may cause us to divert resources from other aspects of our business, all of which may adversely affect our business.

Other states in the U.S. are quickly adopting state enacted privacy laws. Virginia, Colorado and more recently, Connecticut and Utah passed consumer and privacy laws that differ slightly from the CCPA/CPRA. If other states follow suit, it could lead to a varied and complex regulatory landscape, which could result in material costs.

In addition, the Criteo Commerce Media Platform reaches users throughout the world, including in Europe, Australia, Canada, South America and Asia-Pacific. As a result, some of our activities may also be subject to the laws of foreign jurisdictions. In particular, data protection laws in Europe can be more restrictive regarding the collection and use of data than those in U.S. jurisdictions.

In the European Union, the two main pillars of the data protection legal framework are the E-Privacy Directive (Directive on Privacy and Electronic Communications) and the General Data Protection Regulation (GDPR), which was implemented in May 2018.

The E-Privacy Directive directs EU member states to ensure that accessing information on an Internet user's computer, such as through a cookie and other similar technologies, is allowed only if the Internet user has been informed about such access and given his or her consent. A recent ruling by the Court of Justice of the European Union clarified that such consent must be reflected by an affirmative act of the user, and European regulators are increasingly agitating for more robust forms of consent. These developments result in ending reliance on implied consent mechanisms that have been used to meet requirements of the E-Privacy Directive in some markets. A replacement for the E-Privacy Directive is still under discussion by EU member states to complement and bring electronic communication services in line with the GDPR and force a harmonized approach across EU member states. It is possible that the proposed e-privacy regulation could further raise the bar for the use of cookies and the fines and penalties for breach could be significant.

19

In December 2016, the EU institutions reached an agreement on the GDPR. The GDPR has updated principles drawn from the 1995 Data Protection Directive while imposing new levels of sanctions for non-compliance. The EU data protection authorities have also been granted power to impose administrative fines of up to a maximum of €20 million or 4% of the data controller's or data processor's global turnover for the preceding financial year, whichever is higher.

We believe that the regulation has no material impact on our business or the way our technologies operate. However, GDPR is still a relatively recent regulation with no established case law. Therefore interpretations of the GDPR may vary, especially with respect to the articulation between GDPR (lex generali) and E-Privacy Directive (lex speciali) and the conditions for the collection of a valid "cookie" consent, and thus there can be no assurance that this will not have any particular impact on our business, technologies or practices in the medium to long term.

Further, on October 1, 2020, the French data protection authority (*Commission Nationale de l'Informatique et des Libertés*, or CNIL) issued the final version of its guidelines on the use of cookies and other trackers and its final recommendations on modalities for obtaining users' consent to store or read non-essential cookies and similar technologies on their devices. The recommendations provide that, when required, consent must be indicated by a clear and positive action of the data subject, such as by clicking on an "accept all" button on the first layer of the consent management platform. CNIL also noted that it should be as easy to refuse consent to the use of cookies as it is to accept consent, and an equivalent to the "refuse all" button should be present on the first layer of the consent management platform. Further, the ability to withdraw consent must be readily available at all times. Companies had until March 2021 to ensure compliance with these guidelines, and CNIL is still auditing many websites in France to verify if they comply with its guidelines.

As we continue to expand into other foreign jurisdictions, we may be subject to additional laws and regulations that may affect how we conduct business.

*Self-Regulation*

In addition to complying with extensive government regulations, we voluntarily and actively participate in several trade associations and industry self-regulatory groups that promulgate best practices or codes of conduct relating to targeted advertising. For example, the Internet Advertising Bureau EU & US, the Network Advertising Initiative, the European Digital Advertising Alliance and the Digital Advertising Alliance have developed and implemented guidance for companies to provide notice and choice to users regarding targeted advertising.

We also provide consumers with notice about our use of cookies and our collection and use of data in connection with the delivery of targeted advertising, and allow them to opt out from the use of such data for the delivery of targeted advertising. In an effort to harmonize the industry's approach to internet-based advertising, these programs facilitate a user's ability to disable services of integrated providers, but also educate users on the potential benefits of online advertising, including access to free content and display of more relevant advertisements to them. The rules and policies of the self-regulatory programs that we participate in are updated from time to time and may impose additional restrictions upon us in the future.

Criteo became one of the first companies to broadly include an "Ad Choices" link in all the advertisements we deliver, which gives users access to clear, transparent, detailed and user-friendly information about personalized advertisements and the data practices associated with the advertisements they receive. In addition, we provide consumers with an easy-to-use and easy-to-access mechanism to control their advertising experience and opt out of receiving targeted advertisements we deliver.

We believe that this transparent consumer-centric approach to privacy empowers consumers to make better-informed decisions about our use of their data. We also actively encourage our clients and publishers to provide information to consumers about our collection and use of data relating to the advertisements we deliver and monitor.

*Content Control and Brand Safety*

Criteo strives to maintain a trusted advertising ecosystem aligned with the marketing goals and the brand requirements of our marketers and media owners alike. We have rigorous supply partner guidelines in place and we take a large variety of internal and external brand safety measures to ensure that the brand equity of our clients is protected. These measures include our partnership with industry recognized and MRC-accredited services from Oracle Advertising on web and Pixalate on app.

To protect our clients against invalid traffic (IVT), we have built advanced engine detection and filtration systems that will discard invalid bid requests, impressions and clicks, and we do not bill advertisers for the invalid traffic. We also leverage industry compliant blocklists from the Interactive Advertising Bureau (IAB) and Trustworthy Action Group (TAG) to filter out known sources of invalid traffic and we partner with industry recognized and MRC accredited service Pixalate to supplement our pre-bid and post-bid detection and filtration capabilities of IVT.

20

We are recognized for trust & safety and have been certified by the Trustworthy Accountability Group for Certification Against Fraud (CAF) and Brand Safety Certification (BSC) through an independent audit.

**Government Regulation**

Further to the laws and regulations governing privacy and data protection described above, we are subject to numerous domestic and foreign laws and regulations covering a wide variety of subject matters. New laws and regulations (or new interpretations of existing laws and regulations) may also impact our business. The costs of compliance with these laws and regulations are high and are likely to increase in the future and any failure on our part to comply with these laws may subject us to significant liabilities and other penalties. For additional information regarding a pending investigation into the Company's compliance with GDPR, please refer to Refer to Note 19, Commitments and Contingencies. in our audited consolidated financial statements included elsewhere in this Form 10-K.

**Competition**

We compete in the commerce media market and in the broader market for digital marketing and media monetization, primarily through Display Advertising. Our market is complex, rapidly evolving, highly competitive, still fragmented and yet rapidly consolidating. We face significant competition in this market, which we expect to intensify in the future, partially as a result of potential new entrants in our market, including but not limited to large well-established internet publishers and players, in particular as we continue to expand the breadth of the Criteo Commerce Media Platform. We currently compete with large, well-established companies, such as Amazon, Meta Platforms, Google, and Microsoft, pure play Demand-Side Platforms ("DSPs"), such as The Trade Desk, Viant Technology or Google's DV360, pure play Supply-Side Platforms ("SSPs") such as Magnite, PubMatic or Google Ad Manager, and pure play retail SSPs such as Microsoft's PromoteIQ or Publicis' CitrusAd, that focus on monetizing retailers' media, as well as smaller, privately held companies. Potential competition could emerge from large enterprise marketing platforms, like Adobe Systems Inc. ("Adobe"), Oracle Corporation ("Oracle") and Salesforce.com, Inc. ("Salesforce"), or public and private companies specialized in the Marketing Technology ("MarTech") space. In addition, web browsers, and desktop and mobile operating systems developed by large software companies like Google and Apple Inc. ("Apple") can have a significant influence and impact on the way we operate.

We believe the principal competitive factors in our industry include:

- access to granular commerce data on a large scale;
- technology-based ability to activate data, in particular commerce data, for multiple digital marketing and media monetization goals, along the entire consumer journey;
- technology-based ability to generate advertisers' desired business outcomes, including, but not limited to, high return on advertising spend at scale;
- relevance and breadth of solutions to address numerous digital marketing and media monetization goals;
- breadth and depth of consumer reach, including in all environments and devices across the open Internet;
- marketer and publisher control over the objectives, parameters and performance of their advertising campaigns through modular, flexible and easy-to-use tools and services available on a self-service interface;
- measurability of the advertising spend performance, based on clear and transparent measurement metrics;
- completeness and effectiveness of solutions across digital devices, commerce and advertising environments, platforms and operating systems, advertising channels and publisher environments;
- transparency of pricing models, aligning with the value propositions provided to marketers;
- openness, transparency, security and fairness of data sharing and data management practices;
- client trust;
- global presence;
- client service and detailed, transparent client reporting available on a self-service basis;
- commitment to data protection and user privacy; and
- ease of use.

We believe that we are well positioned in commerce media with respect to all of these factors and expect to continue to capture an increasing share of digital marketing and media monetization budgets worldwide.

22