# EXHIBIT 32

# REDACTED

Page 1

1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF VIRGINIA
2                    ALEXANDRIA DIVISION
3
        _____
4                                      :
     UNITED STATES OF AMERICA, :
5    et al.,                           :
                                       :
6            Plaintiffs                :
                                       :
7        v.                            : No.  1:23-cv-00108
                                       :
8    GOOGLE, LLC,                      :
                                       :
9            Defendant.                :
        _____:
10
11               Tuesday, February 20, 2024
12
                 Video Deposition of RAMAMOORTHI RAVI,
13
        PH.D., taken at the Offices of the United States
14
        Department of Justice, 450 Fifth Street
15
        Northwest, Washington, D.C., beginning at 9:32
16
        a.m. Eastern Standard Time, before Ryan K. Black,
17
        Registered Professional Reporter, Certified
18
        Livenote Reporter and Notary Public in and for
19
        the District of Columbia
20
21
22
23
24    Job No. CS6456599
25

Page 2

```
1    A P P E A R A N C E S :
2    UNITED STATES DEPARTMENT OF JUSTICE
     ANTITRUST DIVISION
3    BY:  MICHAEL WOLIN, ESQ.
         JAMES RYAN, ESQ.
4        JULIA TARVER-WOOD, ESQ.
     450 5th Street, N.W
5    Washington, DC 20530
     202.514.2414
6    michael.wolin@usdoj.gov
     james.a.ryan@usdoj.gov
7    julia.tarver-wood@usdoj.gov
8    Representing - The United States of America
9    NORTH CAROLINA DEPARTMENT OF JUSTICE
     BY:  JONATHAN MARX, ESQ. - Via Zoom
10   1 South Wilmington Street
     Raleigh, North Carolina 27601
11   919.716.6400
     jmarx@ncdoj.gov
12
     Representing - State Plaintiffs
13
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP,
14   BY:  WILLIAM A. ISSACSON, ESQ.
          LEAH HIBBLER, ESQ.
15   2001 K St NW,
     Washington, DC
16   202.223.7341
     wisaacson@paulweiss.com
17   lhibbler@paulweiss.com
18    - and -
19   AXINN, VELTROP & HARKRIDER, LLP
     BY:  RUSSELL M. STEINTHAL, ESQ.
20   114 West 47th Street
     New York, New York 10036
21   212.728.2200
     rsteinthal@axinn.com
22
     Representing - Google LLC
23
24
25
```

Page 3

```
1        ALSO PRESENT:
2        David Campbell - Legal Videographer
         Suzanne Majewski - USDOJ Economist
3        Elizabeth Aramayo - USDOJ paralegal
         Emily Reed - USDOJ paralegal
4        Ann Ashley Daniel - USDOJ paralegal
         James Banovetz, Ph.D - Brattle Group
5        Minjae Song, Ph.D - Brattle Group - Via Zoom
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              I N D E X
2    TESTIMONY OF:  RAMAMOORTHI RAVI, PH.D.    PAGE
3    By Mr. Isaacson...............................8
4    By Mr. Wolin................................306
5         E X H I B I T S
6    EXHIBIT    DESCRIPTION          PAGE
7    Ravi 1   Dr. Ravi's Expert Report, dated
             December 22, 2023...................6
8
9    Ravi 2   Dr. Ravi's Expert Rebuttal Report,
             dated February 13, 2024.............6
10   Ravi 3   an article from the Journal of
             Marketing Research 2021 Vol. 58(5)
11           888-907, titled First-Price Auctions
             in Online Display Advertising.......29
12
13   Ravi 4   a document Bates Numbered
             GOOG-DOJ-AT-02307442 through
14           GOOG-DOJ-AT-02307446..............115
15   Ravi 5   a textbook titled "Customer-Centric
             Marketing," A Pragmatic Framework,
16           authored by R. Ravi and
             Baohong Sun.......................177
17   Ravi 6   a document Bates Numbered
             GOOG-AT-MDL-001412832 through
18           GOOG-AT-MDL-001412884.............216
19   Ravi 7   a document Bates Numbered
             GOOG-DOJ-10806862 through
20           GOOG-DOJ-10806869.................231
21   Ravi 8   a document Bates Numbered
             GOOG-DOJ-05282625 through
22           GOOG-DOJ-05282671.................234
23   Ravi 9   a printout of an article from
             "Audience Network," Facebook.com/
24           audiencenetwork/partner-program/
             code-of-conduct...................240
25
```

Page 5

```
1               I N D E X (Cont'd)
2    EXHIBIT     DESCRIPTION           PAGE
3    Ravi 10   an article from Xandr.com titled
              "Seller Best Practices,"...........241
4
5    Ravi 11   a document Bates Numbered
              GOOG-DOJ-15044036 through
6             GOOG-DOJ-15044043.................247
7    Ravi 12   a document Bates Numbered
              GOOG-DOJ-AT-0571933 through
8             GOOG-DOJ-AT-0571935...............250
9    Ravi 13   a document Bates Numbered
              GOOG-DOJ-06842351 through
10            GOOG-DOJ-06842362.................275
11   Ravi 14   a document Bates Numbered
              GOOG-DOJ-1270489 through
12            GOOG-DOJ-1270501..................280
13   Ravi 15   a document Bates Numbered
              GOOG-DOJ-13469175 through
14            GOOG-DOJ-13469183.................281
15   Ravi 16   a document Bates Numbered
              GOOG-DOJ-15637938 through
16            GOOG-DOJ-15637940.................285
17   Ravi 17   an excerpt of the deposition
              transcript of Omri Farber, dated
18            Monday, September 18, 2023.........286
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

1    BY MR. ISAACSON:
2        Q.  Okay.  And before this case, had you
3    heard the term "open web display"?
4        A.  Do you just mean the term "open web
5    display" or "open web display advertising"?
6        Q.  Open web display advertising, yes.
7        A.  Open web display advertising, yes, I --
8        Q.  Had you heard those four words together
9    before this case?
10       A.  I believe I should have come across that
11   before this case.
12       Q.  Do you remember where?
13       A.  Open auctions versus private auctions is
14   something I heard about early on.
15       Q.  All right.  So you were familiar with
16   the term "open web display advertising" because
17   you were familiar with open auctions versus
18   private auctions; is that right?
19           MR. WOLIN:  Objection to form.
20           THE WITNESS:  That -- that's the
21   connection I made to open web display
22   advertising.
23   BY MR. ISAACSON:
24       Q.  All right.  Open web display advertising
25   is something used in open auctions as opposed to

1    private auctions?  Is that your understanding?
2            MR. WOLIN:  Objection to form.
3            THE WITNESS:  Loosely speaking.  I
4    haven't thought deeply about these terms.
5    I -- I have come across them as a way of
6    understanding what the distinction is between the
7    private and the open sale of these display ads.
8    BY MR. ISAACSON:
9        Q.  All right.  So based on your background
10   -- and you've told me before you've got some
11   expertise in the area of digital advertising,
12   correct?
13       A.  Yes.  I -- I did mention earlier that.
14       Q.  Right.  And based on your expertise in
15   the field of digital advertising, the way you
16   understood the term "open web display
17   advertising" is that's something used in
18   connection with an open auction for advertising
19   as opposed to a private auction?
20           MR. WOLIN:  Objection to form.
21           THE WITNESS:  It is one of the ways I
22   related to that term, since you were asking me
23   about my familiarity with that phrase.
24   BY MR. ISAACSON:
25       Q.  All right.  And in terms of your

1    expertise in digital advertising and your
2    writings in that area, the markets that you are
3    familiar with are display advertising market and
4    a digital advertising market that are referred to
5    in your article; is that correct?
6            MR. WOLIN:  Objection to form.
7            THE WITNESS:  The first line in the
8    article, like in many research articles, is meant
9    to motivate the importance of the aspect being
10   studied.  And that was the purpose of that first
11   sentence, that display advertising is a large
12   -- in this particular case -- a 54 percent
13   fraction of the digital advertising market,
14   as defined in that citation.
15   BY MR. ISAACSON:
16       Q.  And that -- you say it's motivated
17   -- when you say it's motivated, you're not trying
18   to say that it's incorrect, are you?
19           MR. WOLIN:  Objection to form.
20           THE WITNESS:  We have a citation to a
21   public-facing information source that --
22   BY MR. ISAACSON:
23       Q.  Right.  And -- and at the time of this
24   article, based on your expertise in digital
25   advertising, you understood there was a digital

1    advertising market.  That's the title, right,
2    there: "Evolution of Display Advertising Market"?
3    And that you also -- and that there was also a
4    digital advertising market referred to in the
5    first sentence, correct?
6            MR. WOLIN:  Objection to form.
7            THE WITNESS:  Yes.  The first sentence
8    talks about that.
9    BY MR. ISAACSON:
10       Q.  We can -- your report -- in your summary
11   of opinions, Paragraph 12(a), which is discussing
12   the Waterfall and Dynamic Allocation?
13       A.  I see that.
14       Q.  Do you see that?
15           And you see in the bolded title,
16   it says that the wat -- "The Waterfall and
17   Dynamic Allocation" -- amongst other things -
18   "Harmed Google's Own customers."  Do you see
19   that?
20       A.  Yes, it says "Potentially Harmed
21   Google's Own Customers."
22       Q.  Potentially.  Yes.  Thank you.
23           Are you reaching the conclusion that
24   it actually harmed Google's own customers, the
25   Waterfall and Dynamic Allocation?  Or was that

1    account . . .
2        A.   That was the one to three percent
3    citation earlier.
4        Q.   Oh, so the one to three percent is to
5    one rival?
6            MR. WOLIN:  Objection to form.
7            THE WITNESS:  We are looking at
8    Footnotes 499 and 498 in Page 116 of my report.
9    BY MR. ISAACSON:
10       Q.   All right.  With regards to Rubicon,
11   that's one rival, correct?
12       A.   That's correct.  That's the latter one
13   that I cited.
14       Q.   Right.
15       A.   The reduction in vendor rate, yes.
16       Q.   Did you do anything to attempt to
17   quantify the effect of Google's conduct on rivals
18   other than look at documentation about Google
19   experiments?
20           MR. WOLIN:  Objection to form.
21           THE WITNESS:  To examine the effect on
22   rivals, I had to read the -- the design documents
23   of these conducts to understand how they worked.
24   As I mentioned earlier, I had to look through
25   pseudocode, snapshots of the source code, and

1    then read the communications related to
2    experiments around these conducts that Google
3    conducted internally and the email discussion
4    about the motivations and the results of these
5    conducts.
6    BY MR. ISAACSON:
7        Q.   So but my question is more specific than
8    what did -- I'm not asking you what you did to
9    examine the effect on rivals.  I'm asking you
10   what did you do to quantify the effect of
11   Google's conduct on rivals.  So I'm going to ask
12   you the question again:  Did you do anything to
13   attempt to quantify the effect of Google's
14   conduct on rivals other than look at
15   documentation about Google experiments?
16           MR. WOLIN:  Objection to form.
17           THE WITNESS:  My main source of
18   conclusions about the -- the directional changes
19   and the magnitudes of the effect on rivals are
20   experiments on all of these conducts.
21   BY MR. ISAACSON:
22       Q.   And you're referring -- when you say
23   your main source is experiments, you mean Google
24   experiments?
25       A.   That's correct.  The Google experiment

1    that I --
2        Q.   And did you not attempt to replicate the
3    work of any of those experiments, correct?
4            MR. WOLIN:  Objection to form.
5            THE WITNESS:  I did not carry out any
6    data experiments involving simulations related to
7    these conducts.
8    BY MR. ISAACSON:
9        Q.   All right.  You -- you have not carried
10   out any experiments in this case related to the
11   Google conduct that you discuss in your reports,
12   correct?
13           MR. WOLIN:  Objection to form.
14           THE WITNESS:  As I was saying just a
15   moment ago, I did not run any simulations or
16   regressions on data in arriving at the opinions
17   in my report.
18   BY MR. ISAACSON:
19       Q.   All right.  If I can jump ahead here to
20   Paragraph 258 of your opening report.
21           And here you're discussing the subject
22   of what you say "Google's restriction of Google
23   Ads' demand primarily to AdX."  Do you see that?
24       A.   Yes.  I see Paragraph 258.
25       Q.   And as I understand your concern here

1    is that Google Ads demand would be primarily
2    available only from AdX.
3            MR. WOLIN:  Objection to form.
4            THE WITNESS:  Primarily that would be
5    the case, yes.  Google Ads, advertisements,
6    advertisers were available through AdX.
7    BY MR. ISAACSON:
8        Q.   And when you say "Google Ads demand,"
9    what do you mean?
10       A.   The requests for placing advertisements
11   that arose from buyers that were affiliated with
12   Google Ads.
13       Q.   Now, if DoubleClick for Publishers and
14   AdX were offered as completely separate products
15   but Google Ads demand was still not available to
16   non-AdX exchanges, you would have the same
17   concern, correct?
18           MR. WOLIN:  Objection to form.
19           THE WITNESS:  I did not really consider
20   the possibility of DFP and AdX being separate.
21   I think that's what you were asking about.
22   BY MR. ISAACSON:
23       Q.   Mm-hmm.  What your concern is is that
24   Google Ads demand would have to be made available
25   to non-AdX -- AdX exchanges.  That's what you

1   want, right?
2        MR. WOLIN:  Objection to form.
3        THE WITNESS:  I do not have any specific
4   wants in this case.
5   BY MR. ISAACSON:
6        Q.  Well, the -- that's fair.  But the re --
7   what you call a "restriction of Google Ads
8   demand" means that Google Ads demand is not
9   available on non-AdX exchanges, correct?
10       MR. WOLIN:  Objection to form.
11       THE WITNESS:  It is a statement of where
12  Google Ads' demand is broadly available, and it
13  was for -- and it still is mainly available
14  through AdX.
15  BY MR. ISAACSON:
16       Q.  And not available on non-AdX exchanges?
17       A.  I -- I mentioned in a footnote somewhere
18  about other programs.  It's also in my appendix
19  picture where I believe Google Ads tried to bid
20  in other exchanges for particularly valuable
21  impressions.
22       Q.  Right.  But at the end of Paragraph 258
23  you say, "As a result" -- and I believe you're
24  referring to Google's restriction of Google Ads
25  demand primarily to AdX -- "non-Google providers

1   of ad tech products would struggle to attract new
2   customers or retain existing customers."  Do you
3   see that?
4        A.  I see that sentence.
5        Q.  Right.  And so in order to avoid that
6   situation where those non-Google providers of ad
7   tech products were struggling, what would have to
8   happen is they would have to have access to
9   Google Ads demand; is that correct?
10       MR. WOLIN:  Objection to form.
11       THE WITNESS:  That would be a reasonable
12  possibility, yeah.
13  BY MR. ISAACSON:
14       Q.  And the non-Google providers of ad tech
15  products there, those are non-AdX exchanges,
16  correct?
17       A.  I think you're referring to non-AdX
18  exchanges, yes.
19       Q.  Right.  And if -- if Google Ads demand
20  was going to be made available to non-AdX
21  exchanges, what technical work would be required
22  for that?
23       MR. WOLIN:  Objection to form.
24       THE WITNESS:  I did not quite examine
25  that question that you're asking me.

1   BY MR. ISAACSON:
2        Q.  Do you have any idea as to the scope of
3   that work, how much work would be required, based
4   on your background in computer science?
5        MR. WOLIN:  Objection to form.
6        THE WITNESS:  Bidding in realtime
7   auctions via OpenRTB, I believe, became available
8   in 2010.  So, I believe there would be some
9   technology to approach that question.
10  BY MR. ISAACSON:
11       Q.  All right.  But would you have -- in
12  order to make Google Ads demand available in
13  exchanges other than Google's AdX, you would have
14  to do technical work in order to make that demand
15  available at -- at those other exchanges,
16  correct?
17       MR. WOLIN:  Objection to form.
18       THE WITNESS:  As in any other case of
19  trying to buy from a different exchange, there
20  would be technical work involved.
21  BY MR. ISAACSON:
22       Q.  Right.  You would have to take the
23  exchanges of competitors of Google and connect
24  them to Google Ads' demand in a way that was
25  compatible with the technology of those

1   competitors.
2        MR. WOLIN:  Objection to form.
3        THE WITNESS:  That's broadly true, as it
4   is true for AdX.
5   BY MR. ISAACSON:
6        Q.  All right.  And engineers -- some number
7   of engineers would actually have to go to work
8   and make sure that Google Ads' demand could be
9   sent to these other exchanges, and in a way that
10  was suitable and interoperable with those -- with
11  their technology?
12       MR. WOLIN:  Objection to form.
13       THE WITNESS:  As I believe they did with
14  AWBid, that is the case.
15  BY MR. ISAACSON:
16       Q.  Right.  And different exchanges could
17  have different technical systems, and so that
18  engineering work might have to vary from rival to
19  rival, correct?
20       MR. WOLIN:  Objection to form.
21       THE WITNESS:  What you're saying is
22  reasonable, yeah.  Trying to make yourself
23  compatible with different technical interfaces
24  requires additional work.
25  BY MR. ISAACSON:

26 (Pages 98 - 101)

Page 102

1    Q.  Right.  And --
2        MR. WOLIN:  Counsel, when you get a --
3    we've been going for an hour -- sorry to
4    interrupt -- when you get to a good spot.
5        MR. ISAACSON:  I'll wrap it up.  Yeah.
6    BY MR. ISAACSON:
7    Q.  So when you're talking about a hundred
8    or more non-Google exchanges, do you have any
9    idea how much engineering work would have to be
10   done in order to make -- for Google to say "we're
11   gonna send our Google Ads demand to all of these
12   exchanges"?
13       MR. WOLIN:  Objection to form.
14       THE WITNESS:  I did not examine that
15   particular question, but some of this work seems
16   to have been carried out by AWBid and Marple.
17       MR. ISAACSON:  Okay.
18       MR. WOLIN:  All right.  Let's take a
19   break and go off the record.
20       THE VIDEOGRAPHER:  All right.  Off the
21   record at 12:03.
22       (Recess taken.)
23       THE VIDEOGRAPHER:  Back on the record at
24   12:18.
25   BY MR. ISAACSON:

Page 103

1    Q.  Looking at Paragraph 258 again of your
2    report where we left off, --
3    A.  Yes.
4    Q.  -- you say in the middle of the
5    paragraph, "Theory from academic research on
6    two-sided platforms similarly posits that marquis
7    buyers in a platform make it more attractive to
8    sellers."
9        Do you consider the Google Ad technology
10   that you have looked at in this case to be a
11   two-sided platform?
12       MR. WOLIN:  Objection to form.
13       THE WITNESS:  Section 4(b) in my report
14   is about that and, indeed, Ad Exchange is a
15   two-sided platform.
16   BY MR. ISAACSON:
17   Q.  Have you looked at any of the Google
18   technology in this case other than Google AdX?
19   A.  I've also examined Google Ads, DV360 and
20   DFP.
21   Q.  All right.  And do you consider any of
22   them to be two-sided platforms?
23       MR. WOLIN:  Objection to form.
24       THE WITNESS:  To some extent, they are.
25   The buy-side products have as the two sides the

Page 104

1    advertisers and the exchanges, and the publisher
2    ad service have publishers and the ad exchanges,
3    if you will, and sometimes other buyers like
4    SSBs.
5    BY MR. ISAACSON:
6    Q.  All right.  The -- now, you have said in
7    your report that Google has -- Google's AdX has
8    gained scale because Google Ads bid primarily
9    into AdX.  Is that generally right?
10       MR. WOLIN:  Objection to form.
11       THE WITNESS:  Are we looking at the same
12   paragraph?
13   BY MR. ISAACSON:
14   Q.  No.  No.  I think you've said it many
15   times now.
16   A.  Generally, yes.
17       MR. WOLIN:  Objection to form.
18   BY MR. ISAACSON:
19   Q.  Your report does not quantify how much
20   scale Google gained from Google Ads bidding
21   primarily to AdX; is that correct?
22       MR. WOLIN:  Objection to form.
23       THE WITNESS:  As we were discussing
24   before the break, there are experiments that
25   reveal the increase in the number of impressions

Page 105

1    that, for example, AdX is able to win because of
2    some of these conducts.
3    BY MR. ISAACSON:
4    Q.  So other than looking at documents
5    describing Google experiments, your report does
6    not attempt to quantify how much scale Google
7    gained from Google Ads bidding primarily into
8    AdX; is that correct?
9        MR. WOLIN:  Objection to form.
10       THE WITNESS:  Again, as we were
11   discussing earlier, while I use the Google
12   documentary evidence to talk about the increase
13   in the scale of some of Google's products, I
14   don't have an explicit quantification of -- of
15   that using any data experiments that I have.
16   BY MR. ISAACSON:
17   Q.  And you -- I believe you said this
18   before the break, but I want to get this
19   straight.  You have not looked at any effects
20   from -- from any integration of DoubleClick for
21   Publisher with AdX; is that right?
22       MR. WOLIN:  Objection to form.
23       THE WITNESS:  Before the break, we were
24   talking about the availability of Google Ads
25   mainly via AdX.

27 (Pages 102 - 105)

1    THE WITNESS: I did examine that, and
2    I'm looking for that proportion in the report in
3    Appendix G.
4        (Reviews document.)
5        Yeah. I don't seem to be able to find
6    that denominator here of the -- the amount of
7    spend in third-party exchanges and their growth
8    over time.
9    BY MR. ISAACSON:
10    Q. The waterfall we've been discussing
11    today -- and you discussed that in your 20
12    -- 2021 article that we looked at also, right?
13    A. Yes, we did somewhat.
14    Q. Were you familiar with the existence of
15    the waterfall before your art -- 2021 article?
16    A. Yes, I was familiar with the waterfall
17    before I wrote that article.
18    Q. The -- the waterfall was used generally
19    by sellers or sell-side platforms. It wasn't
20    exclusive to Google, correct?
21    MR. WOLIN: Objection to form.
22    THE WITNESS: I believe the waterfall
23    existed in DFP before it was purchased by Google.
24    BY MR. ISAACSON:
25    Q. And, well, looking at Paragraph 61 of

1    your report, you say in the second sentence,
2    "Generally speaking, the waterfall describes a
3    setup where a seller or sell-side platform (in
4    this case, DFP)" . . . and then you go on to
5    describe it.
6        The waterfall was something that was
7    generally being used by sellers, sell-side
8    platforms, and including DFP, correct?
9    MR. WOLIN: Objection to form.
10    THE WITNESS: Yeah. The footnote also
11    confirms that. It was a traditional way of
12    accessing demand from several sources.
13    BY MR. ISAACSON:
14    Q. All right. The waterfall was industry
15    standard from about 2000 to 2010, correct?
16    MR. WOLIN: Objection to form.
17    THE WITNESS: The waterfall was
18    prevalent in the early days of remnant sales.
19    BY MR. ISAACSON:
20    Q. Okay. And what do you mean by "remnant
21    sales"?
22    A. Remnant is a term I use here, and also
23    in other places in the report, to refer to what
24    traditionally was remaining after satisfying
25    guaranteed contracts.

1    Q. All right. And what was remaining was
2    space available for advertising that hadn't been
3    sold?
4    A. The remnant space of digital inventory,
5    yes.
6    Q. Okay. The waterfall enables publishers
7    to get a quick and reasonably high bid for an
8    impression.
9    MR. WOLIN: Objection to form.
10    BY MR. ISAACSON:
11    Q. Do you agree with that?
12    MR. WOLIN: Same objection.
13    THE WITNESS: In the early 2000s, as
14    display advertising was coming into the fore,
15    that was the case.
16    BY MR. ISAACSON:
17    Q. All right. And -- and that -- if you
18    look at your article, Exhibit 3, you wrote in
19    2021 at Page 889 -- where is this?
20        Okay. In the middle of the first column
21    on the left -- nope. That's not it.
22        Help me out here. It -- oh, there we
23    are.
24        So, yes, on the left-hand column, the
25    first full paragraph that begins "Early methods."

1    A. Yes.
2    Q. And if you move down 10 or 12 lines you
3    start to see discussion of remnants and early
4    publisher networks.
5    A. Yes.
6    Q. And what you wrote there, "Early
7    publisher networks that process remnant inventory
8    prefer to send their requests for bids to only a
9    few reliable large advertising networks or
10    exchanges so as to get a quick and reasonably
11    high bid for the impression."
12        That's what you wrote about the
13    waterfall in 2021, correct?
14    A. Yes. That's what I wrote about early
15    publisher networks.
16    Q. All right. And I think you said that
17    the waterfall was developed by DoubleClick prior
18    to its acquisition by Google.
19    MR. WOLIN: Objection to form.
20    THE WITNESS: I believe I said that DFP
21    had implemented a waterfall prior to Google
22    acquiring it. I'm not sure if they developed it.
23    BY MR. ISAACSON:
24    Q. That's -- that's fair. So, right, the
25    waterfall existed in DoubleClick for Publishers

1    prior to its being acquired by Google?
2        A.  I believe that is the case.  I have a
3    citation for it.
4        Q.  Right.
5            And dynamic allocation you say the same
6    thing; that dynamic allocation existed in
7    DoubleClick prior to Google acquiring it, right?
8            MR. WOLIN:  Objection to form.
9            THE WITNESS:  Dynamic allocation
10   I think was reimplemented by Google after its
11   acquisition; in other words, they redesigned it
12   and deployed it.  I remember --
13   BY MR. ISAACSON:
14       Q.  So it existed in DoubleClick for
15   Publisher -- I'm sorry.  Start over.
16           Dynamic allocation existed in
17   DoubleClick prior to the acquisition by Google.
18   After the acquisition, Google made design
19   changes.
20           MR. WOLIN:  Objection to form.
21           THE WITNESS:  My understanding is that
22   they reimplemented the whole thing.  They -- they
23   just started from scratch and rebuilt that
24   feature.
25   BY MR. ISAACSON:

1        Q.  The header bidding, as I understand it,
2    was not developed until around 2014-2015; is that
3    right?
4        A.  2014 would be about right.
5        Q.  Okay.  And then at Paragraph 195 of your
6    report, you refer to the rise of header bidding
7    in 2017.  What do you mean by "the rise of header
8    bidding"?
9        A.  Its rapid adoption in those two years.
10       Q.  I don't know which two years you're
11   referring to because there's the year 2017 there.
12       A.  We talked about the header bidding being
13   introduced by publishers in 2014-15.  So it would
14   be those intervening two years.
15       Q.  Right.  But when you say the rise of
16   header bidding in 2017, what are you referring
17   to?
18       A.  Could you point me to the paragraph
19   again?  Sorry.
20       Q.  Paragraph 195.
21       A.  195.
22           As I explained in the next sentence,
23   I'm talking about the -- the strong correlation
24   between the adoption of header bidding and the
25   eventual move of ad exchanges to first-price

1    auctions.
2        Q.  I'm just referring to the phrase "The
3    rise of header bidding in 2017."  What rise of
4    header bidding took place in 2017?
5            MR. WOLIN:  Objection to form.
6            THE WITNESS:  (Reviews document.)
7            In Footnote 372 in Page 95, which
8    explains some of the context leading up to
9    Paragraph 195, there's an example of header
10   bidding growing faster than AdX impressions in
11   percentage in 2017, as reported in 2018.
12   BY MR. ISAACSON:
13       Q.  All right.  And then I think you've said
14   this, but I just want to make sure, Paragraph 268
15   of your opening report begins with the sentence,
16   "Dynamic allocation was an existing feature of
17   DoubleClick for Publisher when Google acquired
18   DoubleClick in 2008."
19           That was your -- that's a true
20   statement, to your understanding, correct?
21       A.  Yes.  625, the footnote also verifies
22   that.
23       Q.  All right.  Now, you say -- at Paragraph
24   71 of your report you refer to a preferential
25   position -- positioning in bidding which AdX

1    enjoyed through dynamic allocation.
2            No.  That's actually Paragraph 72.
3        A.  72.
4        Q.  Yeah.
5        A.  Okay.  Yes.  I see that.  Yeah.
6        Q.  And in this you say that, "Preferential
7    position in bidding may have incentivized buyers
8    to choose AdX over other exchanges," correct?
9        A.  That's what I wrote.
10       Q.  Right.  And by "buyers," who were you
11   referring to?
12       A.  The buyers that bid into the AdX
13   auction.
14       Q.  Right.  So through the technical design
15   of dynamic allocation, Google was making itself
16   more attractive to advertisers who wanted to bid
17   on an ad exchange; is that right?
18           MR. WOLIN:  Objection to form.
19           THE WITNESS:  I was pointing to the
20   technical design of the Publisher ad server,
21   which is DFP, which helped the ad exchange of
22   Google, AdX, obtain more customers.
23   BY MR. ISAACSON:
24       Q.  All right.  So, the technical design of
25   the Publisher ad server, DFP, made Google more

Page 126

1   attractive to advertisers who wanted to bid on an
2   ad exchange; is that right?
3        A.  The --
4            MR. WOLIN:  Objection to form.
5            THE WITNESS:  The preferential position
6   that DFP placed AdX in in its waterfall made
7   Google's ad exchange more attractive to the
8   buyers in exchanges.
9   BY MR. ISAACSON:
10       Q.  And the buyers in the exchanges are the
11  advertisers who wanted to bid on ads, right?
12           MR. WOLIN:  Objection to form.
13           THE WITNESS:  Among others who acted on
14  their -- on their behalf.
15  BY MR. ISAACSON:
16       Q.  And that preferential position in
17  bidding was an existing feature of DoubleClick
18  for Publisher when Google acquired DoubleClick in
19  2008, correct?
20           MR. WOLIN:  Objection to form.
21           THE WITNESS:  AdX and DFP were not under
22  common ownership -- let me think about that.
23           Let's -- I have to think through the
24  -- the common ownership issues.
25           The -- the position of AdX to be always

Page 127

1   first in the DFP waterfall was something that was
2   established and continued until 2019.
3   BY MR. ISAACSON:
4        Q.  All right.  Was it -- was it a product
5   feature -- was pref -- the preferential position
6   in bidding that you've described an existing
7   feature of DoubleClick for Publisher when
8   Google acquired DoubleClick in 2008?
9            MR. WOLIN:  Objection to form.
10           THE WITNESS:  I'm not exactly sure about
11  this point, because my memory about AdX and DFP's
12  acquisition of Google are -- I'll have to jog
13  that memory.
14           But the report points to how, in a
15  traditional waterfall, the position in the
16  waterfall is based on expected prices on that
17  type of impression.  The ordering is based on the
18  price you expect to get.  That's what the
19  traditional waterfall design dictates.
20           The preferential position here is AdX
21  being first, irrespective of the historical
22  prices it produced on those line items.
23  BY MR. ISAACSON:
24       Q.  All right.  Do you deny that DoubleClick
25  had that preferential position prior to being

Page 128

1   acquired by Google?
2            MR. WOLIN:  Objection to form.
3            THE WITNESS:  I don't have enough
4   knowledge in that matter.  I'd have to go back
5   and look at documents to see if that was the
6   case.
7            MR. WOLIN:  When we get to a good spot,
8   Bill, we're ready to take a break for lunch.
9            MR. ISAACSON:  Let me just do this
10  quickly.  If it takes long I'll bail.
11  BY MR. ISAACSON:
12       Q.  The -- in order to eliminate this
13  preferential feature that you're describing,
14  Google would have had to redesign the DoubleClick
15  technology it acquired to eliminate the product
16  -- to eliminate that preference as a product
17  feature.  Am I correct about that?
18           MR. WOLIN:  Objection to form.
19           THE WITNESS:  As we were saying, DFP had
20  the waterfall before Google acquired it, and that
21  waterfall did not have any preferential positions
22  for any of the bidders into DFP.
23  BY MR. ISAACSON:
24       Q.  Are you -- do you know whether there was
25  a preferential position prior to the acquisition

Page 129

1   by Google?
2            MR. WOLIN:  Objection to form.
3            THE WITNESS:  Yeah.  I'm not totally
4   sure about AdX's, yeah.  Mm-hmm.
5   BY MR. ISAACSON:
6        Q.  And if you assume there was a
7   preferential position prior to the acquisition,
8   in order to get rid of that, Google would have
9   had to redesign the technology to get rid of that
10  preference, right?
11           MR. WOLIN:  Objection to form.
12           THE WITNESS:  That is one of the things
13  it could have done.  There are many ways it could
14  have proceeded.
15  BY MR. ISAACSON:
16       Q.  All right.  You've been pointing to the
17  effects on rivals of that preference.  In order
18  to get rid of that effect on rivals from that
19  preference, if you assume that preference existed
20  in DoubleClick for Publisher prior to
21  acquisition, Google, upon acquiring it, would
22  have had to redesign the system they acquired to
23  get rid of that preference; is that correct?
24           MR. WOLIN:  Objection to form.
25           THE WITNESS:  There are two points

33 (Pages 126 - 129)

Page 130

1 here. One is that the waterfall in DFP with
2 AdX's preferential position made AdX the only
3 exchange that always got to run a realtime
4 auction on the impressions that DFP was
5 supplying. That's the first point.
6     The second is around 2010 we
7 talked about OpenRTB, which was a technical
8 specification for any exchange to bid into a
9 publisher ad server. So that -- that is another
10 way in which Google might have evaluated its
11 technology.
12 BY MR. ISAACSON:
13   Q. All right. You're talking about a
14 technical redesign that Google did do in 2010,
15 and you're saying that, after acquiring
16 DoubleClick for Publishers, they could have done
17 that redesign then?
18     MR. WOLIN: Objection to form.
19     THE WITNESS: Google did not support
20 the 2010 OpenRTB. But one of the eight or so
21 originators of that technical specification was
22 AdMeld, which Google acquired.
23 BY MR. ISAACSON:
24   Q. All right. Let me just get back to my
25 question and see if I can get an answer.

Page 131

1     In order to get rid of the effect
2 on rivals from the preference you've been
3 describing, do you assume that preference
4 existed in DoubleClick for Publisher, prior to
5 acquisition, Google upon acquiring it would have
6 had to redesign the system in some manner in
7 order to get rid of that preference; is that
8 correct?
9     MR. WOLIN: Objection to form.
10     THE WITNESS: If we assume that AdX had
11 a preferential position before Google acquired
12 DFP, some product changes would be necessary in
13 DFP.
14 BY MR. ISAACSON:
15   Q. All right. And just in general when you
16 talk about this preferential position, you have
17 to redesign the product to get rid of that
18 preferential position, right?
19     MR. WOLIN: Objection to form.
20     THE WITNESS: That's why I was pointing
21 to OpenRTB. OpenRTB is an example of such a
22 design.
23 BY MR. ISAACSON:
24   Q. Right. And that takes some number of
25 engineers and some amount of work. Do you know

Page 132

1 how much work that involves?
2     MR. WOLIN: Objection to form.
3     THE WITNESS: I couldn't tell you
4 exactly.
5 BY MR. ISAACSON:
6   Q. And is there some -- so after the
7 acquisition in 2008, was there some time where
8 Google needed to do that redesign in order to
9 -- in order to eli -- in order to not have these
10 harmful facts? How long did they -- how fast did
11 they have to move?
12     MR. WOLIN: Objection to form.
13     THE WITNESS: I do not have an opinion
14 about that. I have not thought about it too
15 deeply.
16 BY MR. ISAACSON:
17   Q. Do you think they needed to move, like,
18 virtually immed -- as -- as soon as the
19 acquisition happened, did they need to start
20 redesigning it to get rid of that re -- to get
21 rid of that preferential position you described?
22     MR. WOLIN: Objection to form.
23     THE WITNESS: Again, I don't have an
24 opinion about that timeline.
25     MR. WOLIN: All right. Let's go off the

Page 133

1 record.
2     THE VIDEOGRAPHER: Off the record at
3 1:04.
4     (Lunch recess taken.)
5     THE VIDEOGRAPHER: Back on the record at
6 1:45.
7 BY MR. ISAACSON:
8   Q. One of the conclusions in your report is
9 you say that Google's preferential position in
10 bidding incentivized buyers to choose AdX over
11 rival exchanges because -- and that gave Google
12 scale advantage. Is that generally --
13   A. That is generally what I write in my
14 report, yeah.
15   Q. Right.
16     Is it -- do you agree that anytime
17 Google successfully designed AdX to incentivize
18 buyers to choose AdX over its rivals that would
19 give Google scale advantages?
20     MR. WOLIN: Objection to form.
21     THE WITNESS: When Google designed its
22 products to advantage AdX in such a way that
23 advertisers found -- and other buyers through AdX
24 found it attractive, it attracted scale for AdX,
25 yes.

34 (Pages 130 - 133)

Page 134

1  BY MR. ISAACSON:
2      Q.  Right.  Anytime Google designed AdX to
3  be more attractive, that would give Google
4  more -- AdX more scale.
5      MR. WOLIN:  Objection to form.
6      THE WITNESS:  I like that DFP made AdX
7  more attractive for buyers through AdX because of
8  its preferential position.
9  BY MR. ISAACSON:
10     Q.  That's not my question.  My question
11 is any time Google designed AdX to be move more
12 attractive to buyers, that would give Google
13 -- Google's AdX more scale, right.
14     MR. WOLIN:  Objection to form.
15     THE WITNESS:  Generally speaking, when
16 a product is more attractive to its buyers, it
17 attracts more participants, which is one measure
18 of scale.
19 BY MR. ISAACSON:
20     Q.  And to avoid giving Google scale
21 advantages over its competitors, was it
22 necessary for Google to design its system
23 to not be attractive to buyers?
24     MR. WOLIN:  Objection to form.
25     THE WITNESS:  My opinion was not about

Page 135

1  the attractiveness of Google's products.  It
2  was more about the preferencing of AdX by DFP,
3  giving AdX this advantage and attractiveness to
4  its buyers.
5  BY MR. ISAACSON:
6      Q.  Yes.  The preferencing made AdX more
7  attractive to buyers.  That was your conclusion,
8  correct?
9      MR. WOLIN:  Objection --
10     THE WITNESS:  Yes.
11     MR. WOLIN:  -- to form.
12     THE WITNESS:  Yes.
13 BY MR. ISAACSON:
14     Q.  If at any time AdX was made more
15 attractive to buyers, then Google would gain
16 scale and that would benefit it versus rivals,
17 correct?
18     MR. WOLIN:  Objection to form.
19     THE WITNESS:  As I was saying earlier,
20 generally speaking, attractive products increase
21 the scale.
22 BY MR. ISAACSON:
23     Q.  Right.  And -- and to avoid that
24 happening and -- and to avoid disadvantaging
25 rivals, Google would have to design its system to

Page 136

1  be less attractive to buyers, right?
2      MR. WOLIN:  Objection to form.
3      THE WITNESS:  That was not in my
4  opinion.
5  BY MR. ISAACSON:
6      Q.  Well, how else was Google going
7  to avoid achieving scale to the disadvantage of
8  its rivals other than designing less-attractive
9  products?
10     MR. WOLIN:  Objection to form.
11     THE WITNESS:  There are many ways in
12 which an ad tech product can be made attractive.
13 I was calling out the specific preferences within
14 Google's system that made some of them
15 attractive.
16 BY MR. ISAACSON:
17     Q.  So some features that make a system
18 attractive to buyers are okay in your mind, and
19 some aren't?
20     MR. WOLIN:  Objection to form.
21     THE WITNESS:  I have no opinion about
22 specific features and other specific features.
23 BY MR. ISAACSON:
24     Q.  All right.  And returning to my
25 question, can you name any way that Google

Page 137

1  could avoid achieve -- achieving scale to the
2  disadvantage of its rivals other than designing a
3  system less attractive to buyers?
4      MR. WOLIN:  Objection; form.
5      THE WITNESS:  Could you repeat the first
6  phrase?
7  BY MR. ISAACSON:
8      Q.  Can you name any way that Google could
9  achieve -- well, I garbled that question too, so
10 that didn't help.
11     Well, no, I got it right.
12     Can you name any way that Google
13 could avoid gaining scale for itself to the
14 disadvantage of its rivals other than designing a
15 system less attractive to buyers?
16     MR. WOLIN:  Objection to form.
17     THE WITNESS:  Hmm.  That is a quite
18 contorted question there.
19     Could I name any way in which Google
20 could not disadvantage its rivals and build
21 scale?
22 BY MR. ISAACSON:
23     Q.  Yeah.
24     A.  More efficient conversion?
25     Q.  Well, no, no, no.  Actually, that's not

Page 138

1  the question.
2         Could you name a way Google could not
3  disadvantage and ri -- disadvantage its rivals
4  and build scale other than producing a lower-qual
5  -- a less-attractive product.
6         MR. WOLIN:  Objection to form.
7         THE WITNESS:  I'm sorry.  I really did
8  not get the implication here.
9  BY MR. ISAACSON:
10    Q.  So the implic -- I'm not trying to have
11  implications here.
12        You've said that -- that Google, by
13  providing this preference, created something that
14  was more attractive to buyers and builds scale;
15  and that that disadvantaged rivals.  And you said
16  that, generally, if Google makes the product more
17  attractive, that will build scale and
18  disadvantage rivals.
19        What I want to know, if you want to
20  achieve the opposite result, if you want to not
21  disadvantage rivals, or advantage rivals, okay,
22  could you think of any way of doing that if
23  you're Google other than designing a
24  less-attractive product?
25        MR. WOLIN:  Objection to form.

Page 139

1         THE WITNESS:  I really did not consider
2  deeply the various ways in which Google could not
3  disadvantage rivals.  I looked at the conducts
4  as -- you know, as the evidence indicates, and I
5  tried to opine on the -- the preferential
6  treatment, for example, that I explained.  I
7  really did not get into thinking about ways of
8  not disadvantaging rivals.  That's --
9  BY MR. ISAACSON:
10    Q.  All right.  Thank you.
11        Now, with regards to the waterfall,
12  do you -- you agree that publishers set the order
13  that exchanges were called in the waterfall?
14        MR. WOLIN:  Objection to form.
15        THE WITNESS:  In the traditional
16  waterfall, that was generally true.
17  BY MR. ISAACSON:
18    Q.  Yeah.  I'm talking about the traditional
19  waterfall right now.
20        And under the traditional wat --
21  waterfall, publishers would rank exchanges or
22  other purchasers according to a priority,
23  correct?
24        MR. WOLIN:  Objection to form.
25        THE WITNESS:  Yes.  And the priority

Page 140

1  would typically depend on the price the purchaser
2  fetched.
3  BY MR. ISAACSON:
4    Q.  All right.  And it's the publisher that
5  chose that price, correct?
6         MR. WOLIN:  Objection to form.
7         THE WITNESS:  It was the publisher or a
8  system that was representing them by -- selling
9  on their behalf.
10  BY MR. ISAACSON:
11    Q.  Right.  And if the publ -- and also
12  the publisher had the choice of not selecting by
13  price; the publisher or their agent could name
14  the order of exchanges in the waterfall.
15        MR. WOLIN:  Objection to form.
16        THE WITNESS:  That is a technical
17  possibility.
18  BY MR. ISAACSON:
19    Q.  And you agree that the waterfall was
20  inefficient?
21        MR. WOLIN:  Objection to form.
22        THE WITNESS:  That is my opinion in the
23  report.
24  BY MR. ISAACSON:
25    Q.  All right.  And -- and dynamic

Page 141

1  allocation allowed AdX advertisers to compete for
2  impressions simultaneously before the waterfall
3  was run; is that correct?
4    A.  Dynamic allocation only allowed AdX
5  buyers to compete simultaneously, not all buyers
6  buying off of DFP.
7    Q.  Right.  And so Google, through dynamic
8  allocation, allowed the buyers on AdX, which is a
9  Google product, to participate in a si -- in a si
10  -- simultaneous competition for the impressions
11  before the waterfall was run; is that correct?
12        MR. WOLIN:  Objection to form.
13        THE WITNESS:  I wouldn't characterize
14  it as "before the waterfall was run."  AdX was
15  the first in that waterfall order.
16  BY MR. ISAACSON:
17    Q.  And you think that first in the order is
18  not before?
19    A.  First in the order is first in the
20  order.
21    Q.  Yeah.  Okay.
22        The -- and -- and what you're saying is
23  that if buyers were in exchanges that weren't
24  Google products, they should have been in there
25  at the same time as the Google customers.

36 (Pages 138 - 141)

1        MR. WOLIN: Objection to form.
2        THE WITNESS: I don't have any opinion
3    about that.
4    BY MR. ISAACSON:
5        Q.  You don't have any opinion about
6    that, but that is what you are saying was the
7    preference.  The preference was Google was giving
8    a preference to its own customers and not giving
9    a preference to customers working in -- in
10   exchanges of its rivals.
11       MR. WOLIN: Objection to form.
12       THE WITNESS: I was pointing out the
13   difference from the traditional waterfall where
14   the ordering is based on historical prices.
15   BY MR. ISAACSON:
16       Q.  But the preference, sir, was to Google
17   customers over customers of Google competitors,
18   correct?
19       MR. WOLIN: Objection to form.
20       THE WITNESS: In this case, the
21   preference was to AdX.
22   BY MR. ISAACSON:
23       Q.  It was to Google customers in AdX,
24   correct?
25       MR. WOLIN: Objection to form.

1        THE WITNESS: It was to the buyers of
2    impressions through AdX.
3    BY MR. ISAACSON:
4        Q.  Right.  And those are buyers who are
5    Google customers in AdX, correct?
6        MR. WOLIN: Objection to form.
7        THE WITNESS: Those are the customers of
8    AdX.
9    BY MR. ISAACSON:
10       Q.  All right.  And you mentioned when AdX
11   was relaunched, I think -- when -- after the
12   acquisition by DoubleClick, Google relaunched
13   AdX with real-time bidding, didn't it?
14       MR. WOLIN: Objection to form.
15       THE WITNESS: I think that's generally
16   correct.  I mentioned that somewhere.
17   BY MR. ISAACSON:
18       Q.  Right.  And there were a few companies
19   during that period, 2008, 2009, 2010, who
20   launched real-time bidding at about that -- that
21   time period.  There was a handful of companies,
22   including Google, that did that, right?
23       MR. WOLIN: Objection to form.
24       THE WITNESS: That's generally correct,
25   yeah.

1    BY MR. ISAACSON:
2        Q.  Right.  So one of them was OpenX; one of
3    them was PubMatic; another one was Google,
4    correct?
5        MR. WOLIN: Objection to form.
6        THE WITNESS: I think that's about
7    right, yeah.
8    BY MR. ISAACSON:
9        Q.  Now, in your discussion of header
10   bidding, you discuss the prices that publishers
11   who used header bidding would put into DFP.
12       A.  Yes, I do discuss that.
13       Q.  Okay.  And if you look at your rebuttal
14   report at Paragraph 47, it is correct that
15   publishers got to choose what price to put into
16   DFP following the header bidding auction.
17   Correct?
18       MR. WOLIN: Objection to form.
19       THE WITNESS: That's also generally
20   correct, yes.
21   BY MR. ISAACSON:
22       Q.  And you say that "Google documents
23   suggest that publishers could, and sometimes did,
24   inflate the header bids that they entered into
25   DFP," correct?

1        A.  That's generally correct.  But I point
2    out in the rest of the sentence that Google did
3    not know how often they did that.
4        Q.  Correct.  And that's what I was about to
5    get to.
6        So have you done any investigation as
7    to how often publishers inflated header bids that
8    they put into DFP, as opposed to putting in as a
9    reserve the result of the header bid auction.
10       MR. WOLIN: Objection to form.
11       THE WITNESS: The documentary evidence
12   I've seen particularly about the implementation
13   of header bidding through Google's infrastructure
14   suggests that publishers did use, mostly, the
15   header bidding price that they fetched outside.
16   BY MR. ISAACSON:
17       Q.  You're saying that you've seen that in a
18   document?
19       A.  In several documents describing those
20   implementations.
21       Q.  All right.  The -- and you were relying
22   on those documents for your conclusion about
23   that?
24       MR. WOLIN: Objection to form.
25       THE WITNESS: Additionally, I also cite

37 (Pages 142 - 145)

Page 162

1    Q.  And what you have said is that Google
2    -- while that's not what Google launched, Google
3    explored applying Project Bell to passback
4    publishers, correct?
5        A.  Yes.  I have written that Google
6    explored.
7        Q.  All right.  And so what you found
8    through reviewing Google documents was that
9    Google knew how to disadvantage passback
10   mediation, but it did not go forward and do that,
11   correct?
12       MR. WOLIN:  Objection; form.
13       THE WITNESS:  The Google documents that
14   I reviewed and I cite here describe the design
15   of experiments of identifying these passback
16   publishers and doing what is called unconstrained
17   pool-building.  That's getting as much subsidies,
18   if you will, from these publishers and using them
19   on non-passback publishers called first-call
20   publishers.
21       In fact, the name Project Bell owes its
22   origin to the person who made the first call in
23   a -- in a sort of allusion to this distinction
24   between first-call versus passback.
25   BY MR. ISAACSON:

Page 163

1    Q.  And through those experiments, Google
2    learned how it could disadvantage passback
3    mediation, but it did not go forward with that,
4    correct?
5        MR. WOLIN:  Objection to form.
6        THE WITNESS:  I've only seen evidence
7    of these experiments where it explored and
8    understood the effects of this exploration.
9    I've not seen a fully launched version in my
10   examination of disadvantaging passback mediation.
11   BY MR. ISAACSON:
12       Q.  A fully -- you haven't seen a fully
13   launched version of what?
14       A.  Of a -- a version of some version of
15   Project Bell that disadvantaged passback
16   publishers.
17       Q.  So what you saw was that Google
18   conducted experiments that -- that helped them
19   to understand how they might build a system to
20   disadvantage passback mediation, and then Google
21   went forward with Project Bell Version 2 which
22   did not do that, correct?
23       MR. WOLIN:  Objection to form.
24       THE WITNESS:  What I saw was a
25   modification of its buy-side DRS products

Page 164

1    that came out before it named Project Bell,
2    insinuating the distinction between first-call
3    and passback publishers.  And I saw the
4    experiments that they ran on 20 publishers.
5    And then I -- I do see that in the fully launched
6    version, V2, in 2016, two years after these
7    experiments were run, the program only applied to
8    the multi-call mediators.
9    BY MR. ISAACSON:
10       Q.  So I'm concerned that -- and I know
11   you're trying to explain this -- that a Court's
12   not going to understand what you're saying; so
13   I'm going to go over this again, because I just
14   want to get down to the simple point Google did
15   conduct experiments which gave them information
16   about how they could possibly impair passback
17   mediation, correct?
18       MR. WOLIN:  Objection to form.
19       THE WITNESS:  The experiments actually
20   carried out the application of this optimization
21   on the experimented publishers, and from that
22   it -- it concluded that it would be effective,
23   yeah.
24   BY MR. ISAACSON:
25       Q.  Okay.  So Google did experiments showing

Page 165

1    a method that would be effective impairing --
2    impairing passback mediation.  But when it went
3    forward with Project Bell, it did not implement
4    any impairments on passback mediation, correct?
5        MR. WOLIN:  Objection to form.
6        THE WITNESS:  Google implemented the
7    experiments on passback mediation, but I have not
8    seen a fully launched version disadvantaging
9    passback publishers in Project Bell Version 2 in
10   2016.
11   BY MR. ISAACSON:
12       Q.  Now, the other feature that you just
13   mentioned was -- has to do with multi-call.
14       Now, multi-calling is a practice in
15   which publishers fish for better prices by
16   calling AdX multiple times, right?
17       MR. WOLIN:  Objection to form.
18       THE WITNESS:  That is the context in
19   which I've encountered it.
20   BY MR. ISAACSON:
21       Q.  And when publishers call AdX multiple
22   times, they gradually lower their asking price
23   until they submit a price for just below the
24   highest bid.  Isn't that generally the way it
25   works?

42 (Pages 162 - 165)

Page 166

1     MR. WOLIN:  Objection to form.
2     THE WITNESS:  That's, roughly speaking,
3  how it works.  These multiple calls may have
4  different sets of buyers, so it may not be
5  exactly the same.
6  BY MR. ISAACSON:
7     Q.  Right.  And the objective of
8  multi-calling was price inflation, right?  It was
9  a price inflation tactic.
10     MR. WOLIN:  Objection to form.
11     THE WITNESS:  It's characterized as
12  "price fishing," which means fishing for the best
13  price that they could fetch.
14  BY MR. ISAACSON:
15     Q.  Right.  But the -- it was also described
16  as a price inflation tactic, right?
17     MR. WOLIN:  Objection to form.
18  BY MR. ISAACSON:
19     Q.  Maybe if you look at Footnote 256 of
20  your report, at Paragraph 128.
21     A.  Yes.  That's how the Google document
22  characterizes it:  Price inflation tactics by
23  publishers and exchanges.
24     Q.  And you don't deny that multi-calling
25  as a practice would tend to raise prices for

Page 167

1  advertisers, do you?
2     MR. WOLIN:  Objection to form.
3     THE WITNESS:  Generally speaking, that
4  would be the case.
5  BY MR. ISAACSON:
6     Q.  Right.  And you're aware that
7  multi-calling also raises costs for advertisers
8  by creating multiple redundant queries that are
9  not valuable for the advertiser to have to sort
10  through?
11     MR. WOLIN:  Objection to form.
12     THE WITNESS:  It does increase the
13  work involved by having many calls for the same
14  impression.  So in that sense it would be costly
15  for everyone involved in processing that
16  information.
17  BY MR. ISAACSON:
18     Q.  All right.  Would you agree with the
19  statement that choosing for which request to
20  compete is an economically significant cost for a
21  bidder?
22     MR. WOLIN:  Objection to form.
23     THE WITNESS:  Generally speaking, that
24  is true.
25  BY MR. ISAACSON:

Page 168

1     Q.  And would you agree with the statement
2  that bidding for an impression is costly?
3     MR. WOLIN:  Objection to form.
4     THE WITNESS:  Bidding for an impression,
5  including deciding how much that bid should be,
6  is part of the cost of engaging in buying.
7  BY MR. ISAACSON:
8     Q.  And would you agree with the statement
9  that screening for the right impressions by
10  bidders takes up valuable computing resources?
11     MR. WOLIN:  Objection to form.
12     THE WITNESS:  Again, generally speaking,
13  finding the right set of buyers to choose in an
14  auction is -- it takes some effort.
15  BY MR. ISAACSON:
16     Q.  And you would agree that multi-calling
17  was harmful to advertisers, correct?
18     MR. WOLIN:  Objection to form.
19     THE WITNESS:  Multi-calling was mainly
20  a concern for publishers in terms of trying to
21  find the best price that they could for the
22  impressions.
23  BY MR. ISAACSON:
24     Q.  That wasn't my question.
25     Do you agree multi-calling was harmful

Page 169

1  to advertisers?
2     MR. WOLIN:  Objection to form.
3     THE WITNESS:  Inasmuch as the additional
4  load that we just talked about that these
5  multiple calls imposes on the ad tech system,
6  multi-calling was generally not useful for the
7  whole system.
8  BY MR. ISAACSON:
9     Q.  So -- and that's a fair point.
10     It wasn't just -- multi-calling was not
11  just harmful to advertisers.  It was harmful to
12  the whole ad tech system, correct?
13     MR. WOLIN:  Objection to form.
14     THE WITNESS:  Multi-calling as an
15  effort by publishers to find the best price for
16  themselves through the so-called "price fishing"
17  did include additional load on all the systems
18  involved in processing that impression.
19  BY MR. ISAACSON:
20     Q.  Right.  And that was generally not good
21  for the whole ad tech system, correct?
22     MR. WOLIN:  Objection to form.
23     THE WITNESS:  In general, multi-calling
24  introduced redundancies in the ad tech ecosystem.
25  BY MR. ISAACSON:

43 (Pages 166 - 169)

Page 182

1 integrated data mining and analytical decision
2 tools in software in order to understand
3 customers.
4       MR. WOLIN: Objection to form.
5       THE WITNESS: Yes. We were doing
6 that with the example of customer relationship
7 management systems, like Salesforce, which was
8 the other example.
9 BY MR. ISAACSON:
10      Q. Right. And then in the next paragraph
11 you say, CCM, which is -- what did we say CCM?
12      A. The title of the book.
13 "Customer-Centric Marketing."
14      Q. Thank you.
15      "The Customer-Centric Marketing
16 decision-making paradigm calls for even more
17 advanced software applications that integrate
18 data mining and analytical decision tools more
19 seamlessly." In other words, you need software
20 and software applications that are going to run
21 seamlessly and work together, right?
22      MR. WOLIN: Objection to form.
23      THE WITNESS: The main point of this
24 sentence is the integration of data mining and --
25 BY MR. ISAACSON:

Page 183

1      Q. Well, I'm --
2      MR. WOLIN: Let him finish the answer,
3 please.
4      MR. ISAACSON: No. I would like him to
5 answer the question.
6 BY MR. ISAACSON:
7      Q. So I didn't ask you what the main point
8 of the sentence is. What I want to know is you
9 -- based on what you write here about "the need
10 for integrated data mining and analytical
11 decision tools acting seamlessly," do you agree
12 that you need those things to -- to work
13 seamlessly and work together in order to get
14 this -- to process this data and get the
15 information that you want people to have?
16      MR. WOLIN: Objection to form.
17      THE WITNESS: We advocate the
18 integration of data mining and decision-making
19 tools.
20 BY MR. ISAACSON:
21      Q. Right. And that requires more scale and
22 more data, right?
23      MR. WOLIN: Objection to form.
24      THE WITNESS: Generally speaking, more
25 scale is helpful in these practices.

Page 184

1 BY MR. ISAACSON:
2      Q. The more scale you have, the better
3 you're gonna be able to serve these customers.
4      MR. WOLIN: Objection to form.
5      THE WITNESS: The more scale you have,
6 you are able to improve the accuracy of these
7 data mining tools, which then, integrated with
8 decision making tools, also make better
9 decisions.
10 BY MR. ISAACSON:
11      Q. All right. Let's move to the topic of
12 dynamic -- sell-side dynamic revenue share.
13 Okay?
14      And this is where -- just generally
15 you'll recall just so you're oriented about our
16 topic, Transactions -- the revenue share was
17 being modified in different transactions. And
18 you go through more specifics. I just wanted you
19 oriented to topic.
20      A. Yeah. And that's true of both the
21 buy-side and sell-side revenue share adjustments.
22      Q. Okay. Do you agree that sell-side
23 dynamic revenue share could increase matches
24 between advertisers and publishers that would
25 cause AdX bidders to clear floor price in an

Page 185

1 auction, a floor price that would not otherwise
2 have been met?
3      MR. WOLIN: Objection to form.
4      THE WITNESS: Generally speaking, that
5 is the case.
6 BY MR. ISAACSON:
7      Q. Okay. Do you agree that sell-side
8 dynamic revenue share can expand output if it is
9 used when it causes AdX bidders to clear floor
10 price in an auction, a floor price that would not
11 have otherwise been met?
12      MR. WOLIN: Objection to form.
13      THE WITNESS: Floor prices that
14 are cleared by sell-side DRS that would not
15 otherwise have been cleared does expand the
16 output of AdX.
17 BY MR. ISAACSON:
18      Q. And do you understand -- understand
19 output to be a term used in economics and
20 antitrust economics?
21      MR. WOLIN: Objection to form.
22      THE WITNESS: I was understanding output
23 here simply to be the total number of cleared
24 transactions.
25 BY MR. ISAACSON:

47 (Pages 182 - 185)

1    Q. Okay. The -- by the way, do you
2 consider yourself an expert in industrial
3 organization?
4    A. I'm not an expert in IO.
5    Q. Is it your view that dynamic revenue
6 share did not increase output?
7      MR. WOLIN: Objection to form.
8      THE WITNESS: And how are you meaning
9 "output" in this question?
10 BY MR. ISAACSON:
11    Q. However you want to mean "output."
12      MR. WOLIN: Objection to form.
13      THE WITNESS: So the question would be?
14 BY MR. ISAACSON:
15    Q. Is it your view that sell-side dynamic
16 revenue share did not increase output?
17      MR. WOLIN: Objection to form.
18      THE WITNESS: My view is that sell-side
19 dynamic revenue sharing sometimes increase the
20 volume of impressions won by AdX.
21 BY MR. ISAACSON:
22    Q. Okay. And so it would not be your
23 -- you don't have an opinion that sell-side
24 dynamic revenue share did not increase output?
25      MR. WOLIN: Objection to form.

1 BY MR. ISAACSON:
2    Q. There's a double-negative in there, but
3 the -- so I can try it again, but I think you
4 know where I'm going.
5      Would you state an opinion -- would you
6 have an opinion today that sell-side dynamic
7 revenue share did not increase output?
8      MR. WOLIN: Objection to form.
9      THE WITNESS: No, I do not have an
10 opinion about that.
11 BY MR. ISAACSON:
12    Q. All right. And have you seen documents
13 showing that -- Google documents showing that dyn
14 -- that sell-side dynamic revenue share increased
15 -- increased the overall match rate for AdX
16 publishers?
17      MR. WOLIN: Objection to form.
18      THE WITNESS: My general recollection
19 is that is the case; that there were additional
20 transactions cleared.
21 BY MR. ISAACSON:
22    Q. All right. And you did not see any
23 document that indicated to you that sell-side
24 dynamic revenue share did not increase the
25 overall match rate, correct?

1      MR. WOLIN: Objection to form.
2      THE WITNESS: That -- that is generally
3 the case, as well, yeah.
4 BY MR. ISAACSON:
5    Q. All right. And did you see documents
6 -- Google documents that indicated that sell-side
7 dynamic revenue share increased publisher
8 revenues from AdX?
9      MR. WOLIN: Objection to form.
10      THE WITNESS: In general, sell-side
11 dynamic revenue sharing increased the portion
12 that was sold through AdX.
13 BY MR. ISAACSON:
14    Q. And did that increase publisher revenue
15 on AdX?
16      MR. WOLIN: Objection to form.
17      THE WITNESS: That may have been the
18 case. Part of the revenue may have been coming
19 from a different source prior to.
20 BY MR. ISAACSON:
21    Q. All right. And did you see documents
22 -- Google documents indicating that publishers
23 on AdX were benefiting from sell-side dynamic
24 revenue share through increased revenues?
25      MR. WOLIN: Objection to form.

1      THE WITNESS: There may have been
2 documents like that. I'll have to look at the
3 appendix, perhaps.
4 BY MR. ISAACSON:
5    Q. Okay. And you did not see any Google
6 documents that said that publishers on AdX were
7 losing revenues as a result of sell-side dynamic
8 revenue share, correct?
9      MR. WOLIN: Objection to form.
10      THE WITNESS: Yeah. I'm not finding
11 any documents that talk about publisher revenue
12 changes.
13 BY MR. ISAACSON:
14    Q. By the way, how did you go about looking
15 for documents for your report?
16    A. I -- I tried -- I first read the
17 complaint, and I narrowed in on the conducts
18 and the ones that involved these optimization
19 problems associated with them. And then I -- I
20 requested documents, particularly design and
21 technical documents that would explain these
22 conducts.
23    Q. And was that from the 12 people at the
24 Brattle Group working with you?
25    A. Before they were engaged, I was doing

Page 190

1    this on my own with my contacts at DOJ. Later
2    they did help me with that, yeah.
3        Q.   Now, your report expresses the
4    opinion that sell-side dynamic revenue share
5    disadvantaged rival ad exchanges. Is it your
6    view that Google -- even if sell-side dynamic
7    revenue share was increasing matches between
8    advertisers and publishers, even if it was
9    creating more money for publishers, that
10   sell-side dynamic revenue share should not have
11   gone forward because it was disadvantaging
12   Google's rivals?
13       MR. WOLIN: Objection to form.
14       THE WITNESS: I don't have an opinion
15   about whether it should or should not have gone
16   forward.
17   BY MR. ISAACSON:
18       Q.   Well, when you say that sell-side DRS,
19   Dynamic Revenue Share, disadvantaged rivals, you
20   are saying that it disadvantaged rivals at the
21   same time as you acknowledge it did increase
22   match rates between advertisers and publishers
23   and did increase publisher revenues, correct?
24       MR. WOLIN: Objection to form.
25       THE WITNESS: I was pointing out the

Page 191

1    disadvantage to the rivals while also citing to
2    the changes in publisher revenue when
3    appropriate.
4    BY MR. ISAACSON:
5        Q.   And the changes in publisher revenue
6    that you're just referring to are increases in
7    publisher revenue, correct?
8        A.   That was generally the case, yeah.
9        Q.   Right. And -- all right.
10       MR. WOLIN: Can we take a break if
11   you're at a good spot?
12       MR. ISAACSON: Sure.
13       MR. WOLIN: We've been going for over an
14   hour.
15       MR. ISAACSON: That's fine.
16       MR. WOLIN: Let's go off the record.
17       THE VIDEOGRAPHER: We're off the record
18   at 2:54.
19       (Recess taken.)
20       THE VIDEOGRAPHER: Back on the record at
21   3:07.
22   BY MR. ISAACSON:
23       Q.   Now, in your opening report, you say
24   that "Rival exchanges have not been able to
25   implement similar features to dynamic revenue

Page 192

1    share without reducing their average fees due to
2    a lack of scale."
3        Do you remember -- generally remember
4    that topic?
5        A.   I remember that with respect to
6    sell-side dynamic revenue share.
7        Q.   Yeah. Yeah. We're still on sell-side.
8        A.   Okay.
9        Q.   Now, you did not do any investigation
10   about the specific sizes or scale of any rival
11   exchanges to AdX, correct?
12       MR. WOLIN: Objection to form.
13       THE WITNESS: I did not undertake a
14   quantification of the -- the reduction in scale.
15   BY MR. ISAACSON:
16       Q.   You don't know the scale, for example,
17   of any rival exchange to AdX?
18       MR. WOLIN: Objection to form.
19       THE WITNESS: Generally speaking, I know
20   that AdX had about 60 percent of the market. I
21   cite it somewhere. And so that already makes
22   every other rival smaller than it.
23   BY MR. ISAACSON:
24       Q.   But in terms of the amount of data that
25   rivals have, you don't know what scale of data

Page 193

1    any rival of -- of AdX had, correct?
2        MR. WOLIN: Objection to form.
3        THE WITNESS: Again, using that
4    60-person number and an estimate of the daily
5    impressions cleared, one could fathom an
6    estimate.
7    BY MR. ISAACSON:
8        Q.   But you've not looked at any specific
9    rival exchange to see how much data they have?
10       MR. WOLIN: Objection to form.
11       THE WITNESS: I have not examined
12   specific rivals' data in this case.
13   BY MR. ISAACSON:
14       Q.   And you don't know any rival exchange
15   that has not been able to implement a program
16   like sell-side dynamic revenue share due to
17   limits on their scale.
18       MR. WOLIN: Objection to form.
19       THE WITNESS: I cite deposition
20   testimony from one rival that I remember.
21   BY MR. ISAACSON:
22       Q.   Yes, you do. That's Paragraph 162, Note
23   341, --
24       A.   Thank you.
25       Q.   -- and that's ███████. And that

49 (Pages 190 - 193)

Page 206

1  is correct, yeah.
2  BY MR. ISAACSON:
3      Q.  And what do you mean by a "clean
4  second-price auction"?
5      A.  A clean second-price auction is one
6  that prices the value of the impressions sold,
7  according to the rules of a second-price auction;
8  namely, the floor or the second-highest bidder,
9  whichever was higher.
10     Q.  Right.  And the -- and if it's not a
11 clean second-price auction, are those sometimes
12 referred to as dirty auctions?
13         MR. WOLIN:  Objection to form.
14         THE WITNESS:  You could call it that,
15 just as a manner of speaking.
16 BY MR. ISAACSON:
17     Q.  Okay.  And what Poirot did was run
18 experiments on traffic to determine an amount by
19 which bids should be reduced in second-price
20 auctions that were not clean, that were
21 due -- that were dirty, right?
22         MR. WOLIN:  Objection to form.
23         THE WITNESS:  Poirot determined shading
24 amounts for exchanges that were not running these
25 clean second-price auctions, correct.

Page 207

1  BY MR. ISAACSON:
2      Q.  And just for other people, "shading"
3  sounds shady itself.  Shading just means you're
4  adjusting your bidding, right?
5          MR. WOLIN:  Objection to form.
6          THE WITNESS:  Shading in the sense of a
7  factor of less than one, --
8  BY MR. ISAACSON:
9      Q.  Right.
10     A.  -- that would be shading, like, versus
11 boosting.  I think that's where that language
12 comes from.
13     Q.  There's nothing negative about shading
14 just as a term --
15         MR. WOLIN:  Ob --
16         THE WITNESS:  Not at all.  It has
17 nothing to do with light either, yeah.
18 BY MR. ISAACSON:
19     Q.  And so DV360 altered bids in exchanges
20 that ran what could be called "dirty auctions."
21         MR. WOLIN:  Objection to form.
22         THE WITNESS:  DV360 perform this bid
23 shading on auctions that were not running clean
24 second-price auctions.
25 BY MR. ISAACSON:

Page 208

1      Q.  And DV360 didn't alter bids in exchanges
2  that ran clean second-price auctions.
3          MR. WOLIN:  Objection to form.
4          THE WITNESS:  To the extent that it
5  could determine that the auction was clean.
6  BY MR. ISAACSON:
7      Q.  Right.  And the second-price auction
8  that was not clean was an auction that called
9  itself second-price, but really functioned at
10 least somewhat like a first-price auction,
11 correct?
12         MR. WOLIN:  Objection to form.
13         THE WITNESS:  That could be one of the
14 sources of uncleanliness.
15 BY MR. ISAACSON:
16     Q.  All right.  And you agree that Google
17 developed Project Poirot again with evolving
18 versions?
19     A.  Yes.  We -- we see versions here of
20 this.
21     Q.  And the initial version of Project
22 Poirot launched in July 2017, correct?
23     A.  That sounds about right.
24     Q.  And after that there were several
25 versions as Google continued to work on it.

Page 209

1      A.  Yes.  I do remember that.
2      Q.  All right.  And, you know, for example,
3  you could look at your report at Page 352 -- I
4  mean -- not Page 352 -- I mean, Paragraph 352 in
5  May 2018 Google developed a version of Poirot for
6  private auctions?
7      A.  It extended the program, so it also
8  included the private auctions.
9      Q.  All right.  And in Paragraphs 355 in
10 September 2018, Google updated Project Poirot so
11 that you could take into account how auctions
12 self-identified themselves?
13     A.  That's correct.  The type of auction
14 format was one of the features that was
15 incorporated in that version, yeah.
16     Q.  Right.  Okay.  And -- so and you agreed
17 that Project Poirot applied to exchanges that
18 deviated from second-pricing.
19         MR. WOLIN:  Objection to form.
20         THE WITNESS:  Project Poirot applied to
21 exchanges that were experimentally verified to be
22 deviated from second-pricing.
23 BY MR. ISAACSON:
24     Q.  And those are the "not-clean" or "dirty
25 auctions"?

53 (Pages 206 - 209)

Page 210

1    MR. WOLIN: Objection to form.
2    THE WITNESS: That's how they're
3  characterized in these documents.
4  BY MR. ISAACSON:
5    Q. Yes. And are you aware of Google
6  documents that showed that advertisers increased
7  their surplus as a result of Project Poirot?
8    MR. WOLIN: Objection to form.
9    THE WITNESS: I believe there are some
10  experiments that show the increase in advertiser
11  surplus.
12  BY MR. ISAACSON:
13    Q. Right. And are you aware that there are
14  Google documents that show that Poirot increased
15  advertiser conversions per dollar on exchanges?
16    MR. WOLIN: Objection to form.
17    THE WITNESS: I believe there could be
18  documents like that.
19  BY MR. ISAACSON:
20    Q. Are you aware of any documents that
21  would dispute that Poirot benefited advertisers
22  by increasing their conversions and increases
23  their conversions per -- per dollar?
24    MR. WOLIN: Objection to form.
25    THE WITNESS: In general, Poirot

Page 211

1  documents and experiments show a -- an increase
2  in surplus for some of the advertisers.
3  BY MR. ISAACSON:
4    Q. And you agreed that by increasing
5  surplus Poirot was benefiting advertisers?
6    MR. WOLIN: Objection to form.
7    THE WITNESS: Generally speaking, these
8  bid shading programs are aimed at increasing the
9  surplus of these advertisers, and that's borne
10  out in some of the experiments.
11  BY MR. ISAACSON:
12    Q. Right. And because the -- Poirot was
13  aimed at these auctions that were not clean, or
14  "dirty," would you agree that Project Poirot was
15  also aimed at improving the ecosystem as a whole.
16    MR. WOLIN: Objection to form.
17  BY MR. ISAACSON:
18    Q. The ad tech ecosystem?
19    MR. WOLIN: Same objection.
20    THE WITNESS: Bid shading programs
21  like Poirot are -- are needed when facing
22  auctions that don't run second-price auctions.
23  So in that sense, programs like Poirot are
24  necessary to develop strategies for such
25  auctions.

Page 212

1  BY MR. ISAACSON:
2    Q. All right. And bid shading programs
3  like Poirot are needed -- when facing auctions
4  that don't run second-price auctions, they're
5  needed about the ecosystem -- for the healthy
6  ad tech ecosystem, correct?
7    MR. WOLIN: Objection to form.
8    THE WITNESS: They're mainly needed by
9  the bidders into this auction -- these unclean
10  auctions.
11  BY MR. ISAACSON:
12    Q. Right. The risk is that the bidders
13  are going to bid not knowing the truth about the
14  exchange they're bidding into, right?
15    MR. WOLIN: Objection to form.
16    THE WITNESS: They could determine, like
17  the experiments that were used to apply Poirot
18  to, the nature of the auctions that they were
19  bidding in.
20  BY MR. ISAACSON:
21    Q. Right. But if bidders have to run
22  experiments themselves to determine whether an
23  auction is clean, that's not good for a healthy
24  ad tech ecosystem, is it?
25    MR. WOLIN: Objection to form.

Page 213

1    THE WITNESS: In general, it would be
2  better to know the auction format that you're
3  bidding into. That would save a -- a lot of
4  trouble.
5  BY MR. ISAACSON:
6    Q. All right. Now, you say that Google's
7  initial purchase with Poirot were overly-simple
8  and did not reduce bids optimally, right?
9    A. Yes, I remember.
10    Q. And when you say "the initial approaches
11  with Poirot did not reduce bids optimally," what
12  do you mean by "optimally"?
13    A. So in the context of Poirot, when we
14  look at an impression that's coming up for sale
15  in one of these not-clean, second-price auctions,
16  how should we determine how much we should shade
17  the bid by? That -- that is the question that
18  Poirot and other bid shading programs address.
19    Typically, the amount of shading you
20  would perform depends on the competition. If
21  there's vigorous competition, you would shade
22  less. If there's weak competition, you would
23  shade more.
24    The competition for an impression is a
25  feature of where it arises from and which

54 (Pages 210 - 213)

1    THE WITNESS: Multi-calling was a
2 strategy that we discussed that Google identified
3 some publishers as adopting for the sake of
4 finding the best price for its impression.
5 BY MR. ISAACSON:
6    Q.   And there -- there -- there are probably
7 other ways -- well, depends what you call it, but
8 there's probably multiple ways to price-fish.  Is
9 that --
10    MR. WOLIN: Objection to form.
11    THE WITNESS: Broadly speaking, I would
12 say "price fishing" means -- could mean different
13 things to different people.
14 BY MR. ISAACSON:
15    Q.   All right.  And have you expressed any
16 opinions in your report about whether unified
17 -- Google's unified pricing rules had an impact
18 in reducing "price fishing"?
19    MR. WOLIN: Objection to form.
20    THE WITNESS: Most of the discussions
21 I've seen around unified pricing rules do not
22 talk about "price fishing."  They talk about the
23 disadvantages that AdX floors face.
24 BY MR. ISAACSON:
25    Q.   Okay.  The -- have you seen -- in

1 connection with "price fishing", have you also
2 seen the concept of self-competition, that
3 an advertiser, when it's asked to bid on an
4 impression from multiple sources, might
5 accidentally compete against its own bid?
6    MR. WOLIN: Objection to form.
7    THE WITNESS: Yes.  I've -- I've seen
8 that phenomenon.  It's sometimes called
9 second-pricing yourself.
10 BY MR. ISAACSON:
11    Q.   Yeah.  And that's also not healthy
12 for the ad tech ecosystem if advertisers
13 inadvertently start competing against their own
14 bids.
15    MR. WOLIN: Objection to form.
16    THE WITNESS: It's a part of the
17 fragmentation of the market that we were talking
18 about earlier.
19 BY MR. ISAACSON:
20    Q.   Do other ad tech tools or companies have
21 similar rules to the unified pricing rules of
22 Google?
23    MR. WOLIN: Objection to form.
24    THE WITNESS: I have not examined that
25 in detail.

1    MR. ISAACSON: Okay.  Let's see.
2 12-2-23.
3    This will be 8?  9?
4    THE REPORTER: Correct.
5    MR. ISAACSON: You would know.
6    MR. WOLIN: Nine now.
7    THE REPORTER: Nine.
8    THE WITNESS: Nine.
9    (Ravi Exhibit No. 9, a printout of an
10 article from "Audience Network," Facebook.com/
11 audiencenetwork/partner-program/code-of-conduct,
12 was introduced.)
13 BY MR. ISAACSON:
14    Q.   All right.
15    All right.  Exhibit 9 from
16 Facebook.com's Code of Conduct -- I believe
17 that's now Meta's Code of Conduct.  And have you
18 -- and for their auctions.  Have you seen -- have
19 you reviewed Facebook -- materials about Facebook
20 auctions before?
21    MR. WOLIN: Objection to form.
22    THE WITNESS: No.  Not in any detail.
23 BY MR. ISAACSON:
24    Q.   Okay.  And it says at the bottom of
25 Page 2, "Reserve price mechanisms should not be

1 updated dynamically at" -- oh, no, I'm wrong
2 -- no, I'm right about that.  "When a reserve
3 price is applied as part of the auction, it
4 should apply identically to all demand sources."
5    Does it surprise you that Meta would
6 have that in their Code of Conduct for auctions?
7    MR. WOLIN: Objection to form.
8    THE WITNESS: Yeah.  I haven't thought
9 deeply about it to cause surprise.
10 BY MR. ISAACSON:
11    Q.   All right.  The -- do you know whether
12 Google's competitors consider unified pricing
13 rules to be a best practice for publishers?
14    MR. WOLIN: Objection to form.
15    THE WITNESS: Again, I've not examined
16 that deeply, no.
17    (Ravi Exhibit No. 10, an article from
18 Xandr.com titled "Seller Best Practices," was
19 introduced.)
20    MR. ISAACSON: This will be Exhibit 10.
21    THE REPORTER: Here you go, sir.
22    MR. WOLIN: Thank you.
23    THE REPORTER: You're welcome.
24 BY MR. ISAACSON:
25    Q.   All right.  This is from Xandr.com,

61 (Pages 238 - 241)

Page 242

1    "Seller Best Practices."  And if you flip to the
2    second page, at the bottom you'll see listed as a
3    best practice "to Ensure price floor parity
4    across your tech staff."  And it says in the
5    last column, "Establishing consistent price
6    floors minimizes bidder errors and improves
7    bidder decision" -- "decisioning by eliminating
8    ambiguity."
9        All right.  Does that surprise you to
10   see that Microsoft's Xandr company lists that as
11   a -- uniform price floors as a best practice?
12       MR. WOLIN:  Objection to form.
13       THE WITNESS:  Again, I've not thought
14   deeply enough to form a impression of surprise or
15   otherwise.
16   BY MR. ISAACSON:
17       Q.  Right.  When you say you haven't thought
18   deeply about it, are you saying that while you're
19   critical of Google implementing uniform pricing
20   rules, that you have no knowledge of whether its
21   competitors consider that to be a best practice
22   in the industry?
23       MR. WOLIN:  Objection to form.
24       THE WITNESS:  My opinions about uniform
25   pricing rules of Google come from examining the

Page 243

1    context in which they were deployed, which is
2    what I describe in the report.
3        I would need to develop sufficient
4    context to understand whether these rules were
5    appropriate or not and whether I should be
6    surprised or not.
7    BY MR. ISAACSON:
8        Q.  Right.  You have not done the work to
9    date to understand whether these rules were
10   appropriate or not; is that correct?
11       MR. WOLIN:  Objection to form.
12   BY MR. ISAACSON:
13       Q.  Referring to the unified -- unified
14   pricing rules?
15       MR. WOLIN:  Same objection.
16       THE WITNESS:  I did the work related to
17   Google's platform in examining the context of its
18   unified pricing rules.
19   BY MR. ISAACSON:
20       Q.  Have you developed sufficient context to
21   understand whether these rules were Google --
22   were appropriate for Google -- well, let me put
23   it this way -- I'll start over.
24       Have you developed sufficient context by
25   looking at the entire industry to understand

Page 244

1    whether these rules were appropriate for Google
2    or any of its competitors?
3        MR. WOLIN:  Objection to form.
4    BY MR. ISAACSON:
5        Q.  Referring to the unified pricing rules.
6        MR. WOLIN:  Same objection.
7        THE WITNESS:  My general understanding
8    is that the industry supported exchange-specific
9    floors, which the publishers were used to.  And
10   that's what the publishers were complaining about
11   when unified pricing rules were introduced by
12   Google.
13   BY MR. ISAACSON:
14       Q.  All right.  So what time period are you
15   talking about where the pub -- you think that the
16   publishers were used to having exchange-specific
17   floors?
18       A.  Around the time of the introduction of
19   unified pricing rules.  That would be around
20   2019.
21       Q.  All right.  And since 2019, in the last
22   five years, do you know whether the industry has
23   moved towards unified pricing rules?
24       MR. WOLIN:  Objection to form.
25       THE WITNESS:  While I know they have

Page 245

1    moved towards the first-price auction format, I
2    don't know all the details of the floors that
3    they enforce.
4    BY MR. ISAACSON:
5        Q.  All right.  The -- do you agree with
6    the statement in the Microsoft Xandr document
7    that establishing consistent price floors
8    minimizes bidder errors?
9        MR. WOLIN:  Objection to form.
10       THE WITNESS:  Thank you.
11       I think this is referring to what you
12   were talking about earlier, the potential of
13   bidding and -- via different intermediaries.
14   BY MR. ISAACSON:
15       Q.  And do you agree with that statement,
16   that establishing consistent price floors
17   minimizes bidder error -- errors.
18       MR. WOLIN:  Objection to form.
19       THE WITNESS:  Broadly speaking, as you
20   characterized it earlier, that would be true.
21   BY MR. ISAACSON:
22       Q.  And do you agree, broadly speaking, that
23   establishing consistent price floors improves
24   bidder decisioning by eliminating ambiguity?
25       MR. WOLIN:  Objection to form.

62 (Pages 242 - 245)

Page 246

1      THE WITNESS:  That is of the same
2  nature.
3      MR. WOLIN:  Should we take a break for a
4  few minutes when you get to a good spot?
5      MR. ISAACSON:  Yeah.
6      THE VIDEOGRAPHER:  Going off the record
7  at 4:14.
8      (Recess taken.)
9      THE VIDEOGRAPHER:  Back on the record at
10  4:27.
11  BY MR. ISAACSON:
12      Q.  All right.  If you'll look at your
13  report, Paragraph 216 of your opening report.
14  You say, "Google documents and experiment results
15  suggest that UPR successfully helped shift
16  business to AdX from rival exchanges for which
17  publishers had previously set lower price
18  floors," and then you cite two documents, I
19  believe.
20      This would be -- both are from August
21  2019.  This would be Footnote 498 and 499, right?
22      A.  Yes, I see that.
23      Q.  All right.  So if we look at August 15,
24  2019 -- this will be Exhibit --
25      THE REPORTER:  11.

Page 247

1      MR. WOLIN:  11.
2      MR. ISAACSON:  11?
3      THE REPORTER:  Yes.
4      THE WITNESS:  Thank you.
5      (Ravi Exhibit No. 11, a document
6  Bates Numbered GOOG-DOJ-15044036 through
7  GOOG-DOJ-15044043, was introduced.)
8  BY MR. ISAACSON:
9      Q.  All right.  So Ravi Exhibit 11 is Bates
10  stamped GOOGLE-DOJ-15044036 through 4043.  It's
11  dated August 26th, 2019.  The footnote says
12  August 15th, but it does have the same Bates
13  stamp numbers you'll see.  And for all I know
14  that got picked up in an errata.  But the -- and
15  this is a memo from the Rubicon project that is
16  on Page 039.
17      Okay.  And -- all right.  So -- and the
18  gentleman from Rubicon reports, "We went from a
19  consistent 29 to 30 percent render rate to one
20  now closer to 23 to 24 percent."
21      And the render rate is their win rate.
22  Is that how you understand it?
23      A.  That's what the first line in the next
24  page --
25      Q.  Yes.

Page 248

1      A.  -- characterizes, yes.
2      Q.  Yes.  Okay.  And so their win rate
3  dropped about 6 percent.
4      A.  That's about right.
5      Q.  So in this one document, this is one
6  exchange saying their win rate dropped by 6
7  percent in August 2019, correct?
8      A.  That's what the document says, yes.
9      Q.  Okay.  And did you do anything to
10  evaluate the methodology behind Rubicon's
11  figures?
12      MR. WOLIN:  Objection to form.
13      THE WITNESS:  I did not do any
14  independent analysis of their characterization.
15  BY MR. ISAACSON:
16      Q.  Okay.  You did not -- you don't -- you
17  don't know how Rubicon got these figures, right?
18      A.  It seems to come from an internal chart
19  in Rubicon.
20      Q.  Right.  But you haven't -- you haven't
21  seen any of the data or you don't know how they
22  went about creating this.
23      MR. WOLIN:  Objection to form.
24      THE WITNESS:  Yeah.  I'm not privy to
25  how this chart was created.

Page 249

1  BY MR. ISAACSON:
2      Q.  And you did not evaluate the extent to
3  which any effects reported here continued after
4  August 2019, correct?
5      MR. WOLIN:  Objection to form.
6      THE WITNESS:  I have not investigated
7  that.
8  BY MR. ISAACSON:
9      Q.  And this document does not address
10  impact on any exchange other than Rubicon,
11  correct?
12      A.  This document backed up the example I
13  provided in 216.
14      Q.  And it was just one example, right?
15      MR. WOLIN:  Objection to form.
16      THE WITNESS:  It was an example in 216.
17  Yes, one example.
18  BY MR. ISAACSON:
19      Q.  And did you evaluate to what extent
20  Rubicon's figures were impacted by the unified
21  first-price auction as opposed to the unified
22  pricing rules?
23      MR. WOLIN:  Objection to form.
24      THE WITNESS:  Just to be clear, you're
25  asking the effect of the spend of the Rubicon

63 (Pages 246 - 249)

Page 306

1  before, I do not analyze any single competitor
2  for their effects on experimentation.
3      MR. ISAACSON:  All right.  I think I've
4  got five minutes left.  I cede it.
5      MR. WOLIN:  If we can go off the record
6  and just take five minutes so I can speak with my
7  colleagues, and then we'll come back and see if
8  we have any follow-up questions.
9      THE VIDEOGRAPHER:  All right.  We are
10 off the record at 6:12 p.m.
11     (Recess taken.)
12     THE VIDEOGRAPHER:  Back on the record at
13 6:16.
14         EXAMINATION
15 BY MR. WOLIN:
16  Q.  Okay.  Professor Ravi, I just have one
17 or two questions for you.
18     Could you pull out your rebuttal report,
19 please, and turn to Paragraph 120 on Page 68?
20  A.  Yes, I see it.  Yeah.
21  Q.  And the final sentence in Paragraph 120
22 reads, "The principal places where I cite source
23 code are where there's ambiguity or where the
24 code contradicts the documents."  Did I read that
25 correctly?

Page 307

1  A.  That's what I wrote in the last
2  sentence.
3  Q.  And is that a true and accurate
4  statement of the work that you did in this case?
5  A.  Yes.  The principal places.  There might
6  be one or other citations that -- to corroborate
7  other things.  But the principal places where I
8  cite them are to clarify ambiguity or
9  contradictions.
10  Q.  And if you look at the bottom of that
11 page, carrying onto the next page, do you see
12 Paragraph 123?
13  A.  Yes, I see it.
14  Q.  And specifically Subparagraph B that
15 starts, "Second, I personally conducted and
16 oversaw others."  Do you see that?
17  A.  Yes.  I remember that description.
18  Q.  And Subparagraph B explains the
19 methodology you applied in reviewing source code;
20 is that correct?
21  A.  Yes.  This paragraph was in the context
22 of my response to Professor Rinard's claims, and
23 it lays out the steps that I carried out in -- in
24 performing my own source code analysis.
25  Q.  And the steps that are written on this

Page 308

1  page are ones that you applied in analyzing the
2  conducts that you analyzed in reaching your
3  opinions; is that correct?
4  A.  Yes.  I first considered the programs
5  that were relevant to the conducts I analyzed.
6  And then, from that, I used that to narrow down
7  the portion of the snapshots of code where I
8  would analyze the -- the logic behind the code
9  itself.  And then I would use the code that I
10 saw, and any additional questions it raised, to
11 surface further documents.  And I would repeat
12 the cycle daily in my source code analysis.  Yep.
13     MR. WOLIN:  Thank you, Professor Ravi.
14 We have no further questions.
15     MR. ISAACSON:  No questions.
16     MR. WOLIN:  All right.  Thank you.  The
17 deposition has ended.
18     THE VIDEOGRAPHER:  All right.  If that
19 is everything, off the record on February 20th,
20 2024, at 6:19 p.m.
21     (Deposition concluded -- 6:19 p.m.)
22
23
24
25

Page 309

1       C E R T I F I C A T E
2
3      I do hereby certify that I am a Notary
4  Public in good standing, that the aforesaid
5  testimony was taken before me, pursuant to
6  notice, at the time and place indicated; that
7  said deponent was by me duly sworn to tell the
8  truth, the whole truth, and nothing but the
9  truth; that the testimony of said deponent was
10 correctly recorded in machine shorthand by me and
11 thereafter transcribed under my supervision with
12 computer-aided transcription; that the deposition
13 is a true and correct record of the testimony
14 given by the witness; and that I am neither of
15 counsel nor kin to any party in said action, nor
16 interested in the outcome thereof.
17
18     WITNESS my hand and official seal this
19 22nd day o
20
21
22         Notary Public
23
24
25