# EXHIBIT 54

**In the Matter Of:**

*RE: GOOGLE ANTITRUST LITIGATION 60-516110-0004*

*JONATHAN BELLACK*

*October 02, 2020*



## Page 1

```
IN RE:  GOOGLE ANTITRUST LITIGATION
60-516110-0004




           ** HIGHLY CONFIDENTIAL **
              REMOTE DEPOSITION OF
                 JONATHAN BELLACK
              FRIDAY, OCTOBER 2, 2020










Reported in Stenotype by:
Cody R. Knacke, CSR No. 13691

Job No.:  2020-91376
```

## Page 2

```
        REMOTE DEPOSITION OF JONATHAN BELLACK, taken
before Cody R. Knacke, CSR No. 13691, a Certified
Shorthand Reporter for the State of California, with
principal office in the County of Los Angeles,
commencing on Friday, October 2, 2020, at
10:07 a.m., EST.

(All Appearances Via Videoconference)
APPEARANCES OF COUNSEL:
    For the United States Department of Justice:
        UNITED STATES DEPARTMENT OF JUSTICE
        ANTITRUST DIVISION
        BY:  DAVID TESLICKO, ESQ.
             SEAN CARMAN, ESQ.
             AARON HOAG, ESQ.
        450 Fifth Street, N.W.
        Washington, D.C. 20530
        202.307.0924
        david.teslicko@usdoj.gov
        aaron.hoag@usdoj.gov
        sean.carman2@usdoj.gov
    For the State of Texas Office of the
    Attorney General:

        STATE OF TEXAS
        OFFICE OF THE ATTORNEY GENERAL
        BY:  TREVOR YOUNG, ESQ.
             DAVID ASHTON, ESQ.
        300 West 15th Street
        Austin, Texas 78701
        512.463.2057
        trevor.young@oag.texas.gov
        david.ashton@oag.texas.gov
```

## Page 3

```
APPEARANCES OF COUNSEL:  (Continued)
    For Google, Inc.:
        AXINN VELTROP AND HARKRIDER
        BY:  JOHN D. HARKRIDER, ESQ.
             DANIEL S. BITTON, ESQ.
        114 West 47th Street
        New York, New York 10036
        212.728.2210
        jharkrider@axinn.com
        dbitton@axinn.com

        WILLIAMS & CONNOLLY
        BY:  JONATHAN B. PITT, ESQ.
        725 Twelfth Street, N.W.
        Washington, D.C. 20005
        202.434.5341
        jpitt@wc.com
    Also Present:
        Tor Winston, U.S. DOJ Research Economist
        Seumas Macneil, U.S. DOJ Paralegal
        Specialist
        Shaudy Danaye-Armstrong, Esq., In-House
        Counsel for Google
        Alexander Bergersen, Esq., In-House
        Counsel for Google
        Kevin Montgomery, Deposition Monitor
```

## Page 4

```
                  I - N - D - E - X
EXAMINATION BY:                             PAGE
BY MR. TESLICKO                              5
AFTERNOON SESSION                            95

              E - X - H - I - B - I - T - S
DEPARTMENT'S        DESCRIPTION            PAGE
Exhibit 1     United States                  11
              Department of Justice Civil
              Investigative Demand 30419
Exhibit 2     Slideshow titled "Sellside    115
              Monetization and Search
              Distribution QBR Q1 2018," Bates
              Nos. GOOG-DOJ-04442323-04442372

Exhibit 3     E-mail correspondence dated   176
              6/22/2015, Bates Nos.
              GOOG-TEX-00116043-00116048

Exhibit 4     Document titled "What are the 194
              guiding principles and
              approaches for our publisher
              strategy, given the ecosystem
              changes?", Bates Nos.
              GOOG-DOJ-04004392-04004402
Exhibit 5     E-mail correspondence dated   207
              10/12/2016, Bates No.
              GOOG-TEX-00083149
Exhibit 6     E-mail correspondence dated   226
              9/25/2016, Bates Nos.
              GOOG-TEX-00093228-00093230
Exhibit 7     E-mail correspondence dated   264
              7/11/2018, Bates No.
              GOOG-DOJ-13415081
Exhibit 8     E-mail correspondence dated   280
              9/6/2016, Bates Nos.
              GOOG-DOJ-10634461-10634472
```

141
1  this point in time they were -- I just want to be
2  clear about what you're referring to.
3      Q.  So sure, sure.
4          For DFP, when it selected a winning line
5  item within the ad server, what price did the
6  advertiser pay?
7      A.  When it -- when DSP selected a line item, we
8  had no way to know what the advertiser would actually
9  pay.
10         As I mentioned, the price record in DSP was
11 declared by the publisher, and we had no
12 participation or visibility into the actual exchange
13 of monies.
14         So, you know, we would -- whatever we
15 picked, we had no idea how much money was actually
16 transacting.  And, frankly, there were some
17 publishers that didn't enter their price at all.
18 They didn't consider it important.
19         If you're talking about the Ad Exchange, the
20 Ad Exchange had to identify who the winner of that
21 particular round of decisionmaking was and tell them
22 how much money they needed to pay to the Ad Exchange,
23 and then the Ad Exchange would pay the publisher the
24 money from there.
25     Q.  And if an advertiser getting through the Ad

142
1  Exchange was selected to serve the advertisement or
2  given slot, how is the price determined that the
3  publisher would receive for that ad slot?
4      A.  I do not recall all of the details of how
5  that was determined.  Generally, if you're talking
6  about second price versus first price, it was
7  generally second price.
8      Q.  And what is your understanding of second
9  price?
10     A.  If -- let's take it really simply.  If there
11 are two participants in an auction, and one of them
12 bids $3 and the other bids $2, the person who bids $3
13 wins, but it only pays either $2 or $2 and a penny --
14 there are variations.  I'm not an auction expert,
15 but, generally, that's what it means.
16         So if that higher person bid $20 and the
17 second bid was $2, they'd still only pay $2 or
18 slightly more.
19     Q.  So taking your example, Mr. Bellack, if
20 Ad Ex bid $3, and a third-party, SSP, had a line item
21 in DFP, say Rubicon, that bid $2, what price would
22 Ad Ex pay for the particular impression?
23     A.  I don't recall exactly what it was.  It was
24 either $2 or slightly more than $2.  I would just
25 like to point out, though, that because it wasn't

143
1  precise, if you reversed that, if the manual line
2  item was booked claiming $3, and Ad Ex only had a
3  price of $2, Rubicon would win.
4          In reality, it might be that Rubicon only
5  could have paid $1, but they would still get that
6  impression.
7          So the publisher would actually make less
8  money than they could have made if Ad Ex had known
9  that Rubicon was only going to pay $1.
10     Q.  Are you familiar with the term "dynamic
11 allocation"?
12     A.  Yes.
13     Q.  What was dynamic allocation?
14     A.  More or less what we just discussed, that
15 the Ad Ex auction would also be able to see what the
16 price of the line items was when making its decision
17 about who won and what to serve.
18     Q.  And sequentially, did the Ad Ex auction
19 occur after DFP had selected the highest line item to
20 beat?
21     A.  I cannot recall the exact sequence because I
22 cannot recall if sometimes for efficiency purposes
23 Ad Ex buyers would be called when DFP was still
24 figuring out if there was an opportunity for a
25 remnant line item to serve or not.  Sorry.  This has

144
1  been a while.  I don't remember all the details.
2      Q.  Based on what you do recall, when Ad Ex was
3  called, did Ad Ex bidders receive information on the
4  price of the highest available line item?
5      A.  I cannot recall.
6      Q.  Do you have any recollection of whether that
7  did or it did not happen?
8      A.  I can't recall, because that would have
9  meant whether they got information about that as a
10 floor price to beat, and I just don't recall if that
11 was in there or not.
12     Q.  Are you familiar with the term "last look"?
13     A.  Yes.
14     Q.  Is that different than dynamic allocation?
15     A.  It's been a long time.  I cannot recall
16 enough to answer that question definitively.
17     Q.  Do you have an understanding of what the
18 term "last look" means?
19     A.  The publishers that would use that term
20 tended to refer to it to this notion that the Ad Ex
21 auction could incorporate the price of a manually
22 booked line item into the determination of who won
23 the auction.
24     Q.  Was that a correct understanding by the
25 publishers?

**145**

1  A. To my recollection, yes.
2  Q. I want to make sure I understand some of
3  what we talked about on -- actually, one more
4  question on dynamic allocation before we wrap up on
5  that.
6       Was dynamic allocation turned on
7  automatically for DFP publishers?
8  A. I can't recall how dynamic allocation got
9  started, because that was before I was responsible
10 for the Ad Exchange. I would say at the time I
11 became responsible for the Ad Exchange, I generally
12 understood that that was how the ad decision logic
13 worked.
14 Q. I want to make sure I'm understanding you
15 correctly.
16      Your understanding was that dynamic
17 allocation was used as part of the standard decision
18 logic within DFP?
19 A. Yes.
20 Q. Do you know if publishers could turn it off?
21 A. Publishers did not need to use the
22 Ad Exchange; so if they were not using the
23 Ad Exchange, then that would mean no dynamic
24 allocation.
25 Q. Sure.

**146**

1       For a publisher using the Ad Exchange as one
2  of its demand sources, could that publisher turn off
3  or disable dynamic allocation?
4  A. I don't recall a publisher ever telling us
5  they wanted to.
6  Q. That's a slightly different answer.
7       Do you know if any publishers did turn off
8  dynamic allocation?
9  A. I can't recall.
10 Q. I just want to make sure I understood your
11 testimony.
12      So because dynamic allocation was part of
13 the standard decision logic in DFP, does that mean
14 Ad Ex was able to bid on every impression that went
15 through the publisher ad server?
16 A. No.
17 Q. In which situations would Ad Ex not be able
18 to bid on an impression?
19 A. So for just about any of the considerations
20 I mentioned in the ad logic, if it was a sponsorship,
21 if there was a reservation, if there was a -- if the
22 publisher had not enabled the Ad Exchange to compete,
23 if they had put targeting restrictions around which
24 portions of their site Ad Ex could be eligible on, if
25 they put competitive restrictions in place, if

**147**

1  certain categories of advertisers were not allowed to
2  bid, at that point in time there were generally a lot
3  of constraints on when Ad Ex was eligible in DFP.
4  Q. Are you familiar with the term "enhanced
5  dynamic allocation"?
6  A. Yes.
7  Q. What was the distinction between enhanced
8  dynamic allocation and regular dynamic allocation?
9  A. In regular dynamic allocation, there was --
10 as I mentioned, there was a lot of deference in the
11 ad selection to the needs of reservation line items.
12 The ad logic was such that if there was a reservation
13 that might even slightly need an ad impression, it
14 would get in, and there wouldn't be an auction.
15      What people that I worked with identified
16 was that, in reality, there were frequently
17 opportunities to still meet the commitments of a
18 reservation and increase publisher revenue by
19 sometimes calling and serving a programmatically bid
20 impression if there was enough room in the schedule
21 and if the price offered by the programmatic buyer
22 was high enough.
23      So enhanced dynamic allocation was an
24 adjustment to say, "Hey, if there's an attractive
25 enough price that's enough higher than your declared

**148**

1  line item price in DFP, and our estimate looking
2  forward is that there's plenty of opportunity to meet
3  the terms of this deal in the future, we can make you
4  more money by serving the programmatic end.
5  Q. Did any other ad exchanges use dynamic
6  allocation for a DFP publisher?
7  A. No, we did not -- we did not build that as a
8  public feature.
9  Q. The same for enhanced dynamic allocation?
10 A. Yes.
11 Q. Thinking only of remnant line items, so
12 putting aside sponsorship and guarantees, unless a
13 publisher entered into DFP rules preventing Ad Ex
14 from bidding on that inventory, Ad Ex was able to bid
15 on every impression; is that correct?
16 A. No.
17 Q. Okay. When would Ad Ex not be able to bid?
18 A. A publisher had to explicitly set up at
19 Ad Ex to be able to compete. It was not on by
20 default.
21 Q. Okay. Let me try that again so I get it
22 right.
23      For a publisher that uses Ad Ex and has
24 Ad Ex enabled, for remnant line items where the
25 publisher has not configured a rule expressly

```
                                                              293
 1   (Fed. R. Civ. P. 30(f)(1)).
 2           Before the completion of the deposition,
 3   review of the transcript [ X ] was [ ] was not
 4   requested.  If requested, any changes made by the
 5   deponent (and provided to the reporter) during the
 6   period allowed, are appended hereto.  (Fed. R. Civ.
 7   P. 30(e)).
 8           In witness whereof, I have hereunto set my
 9   hand this day:  _____, 2020.
10
11
12
13
14
15         _____
           CODY R. KNACKE, CSR No. 13691
16
17
18
19
20
21
22
23
24
25
```

