# EXHIBIT 59

# Admeld Proposal

## Mobile Advertising Marketplace



**New York**
**February 25, 2011**

HIGHLY CONFIDENTIAL

## Executive Summary

The GSMA is at a critical point in its history, and speed is of the essence. **This project requires a partner that can move swiftly and provide maximum flexibility given the individual needs and capabilities of individual operators.** With our deep integrations across the ecosystem, our compatibility with every ad server, and our robust and secure global infrastructure, Admeld is better equipped to fulfill this role than anyone.

**What We Do**

Admeld is a global monetization platform that connects to every ad server, buyer, and data source in a transparent, real-time environment. We enable premium publishers and media owners to maximize their ad revenue by leveraging a mix of cutting-edge bidding technologies, classic tag-based yield optimization, and high-touch ad operations services.

Today the company processes over 40 billion advertisements per month for more than 500 premium publishers. Admeld is the world's largest, independent practitioner of Real Time Bidding (RTB)—we connect to more than 200 ad networks, & 35 Demand Side Platforms (DSP) and process more than 11 billion bids daily. Lastly, Admeld has extensive data integration experience. More than 20 leading data providers leverage our platform to monetize their data in a highly actionable marketplace.

**Solution**

Admeld proposes a managed solution that enables individual network operators to ramp up immediately, use their preferred ad servers, and connect their data to media owners and demand sources.

We are proposing to integrate operator data assets into the existing marketplace, which will be operated by Admeld. We will enable operators to configure the platform to their individual needs. This will include the selection of specific demand partners, ad servers, and networks. Most importantly, each network operator's data will be protected and exposed only to that operator's selected demand partners.

In addition, Admeld also handles contracts with every demand partner, technical integrations, and billing consolidation for each of its clients. As a result Admeld will be able to collect payment from demand sources, and pay media owners for the inventory and operators for the data.

We will NOT charge the network operators for the creation of the private exchange, and we will NOT take a share of the revenues network operators make monetizing their data. Admeld proposes to take a revenue share of the advertising transactions that occur on the platform.

HIGHLY CONFIDENTIAL

GOOG-DOJ-03599593

**Executive Summary Diagram**
**(Schedule 4 – Indicative Market Positing)**
The below diagram illustrates how we envision the Mobile Advertising Marketplace and the Mobile Information Exchange at the heart of it.



Admeld proposes a central hub that connects inventory supply, operator data, and demand sources. The central hub will process impressions through traditional ad networks via ad tags, Demand Side Platforms through a real-time auction (RTB), and to ad servers through APIs. In addition, it also show how data is being retrieved from a central Operator Data Personalization layer via anonymous (hashed) ID – which will likely originate from the header of the mobile page. This data will then be passed to selected demand partners in conjunction with the ad request. Each time data is being passed, it will constitute a billable event, and the operator will be paid for the data.

**A 'Future Proof' Solution**
Because this configuration leaves each network operator's core architecture intact, it enables them to rapidly evolve their strategies as new players and technologies emerge in the industry. Additional demand sources, new data providers, and additional formats can be incorporated into this setup to a greater extent than if the GSMA were to choose an individual ad server or DSP partner to build upon.

3

GOOG-DOJ-03599594

## About Admeld

Founded in 2007, Admeld's mission is to keep premium publishers on the cutting edge of advertising technology, enable them to maximize their revenue, and sell their inventory smarter and safer. Our high-tech, high-touch approach generates the maximum yield for every ad impression by giving publishers access to demand from hundreds of sources, analytics to identify new opportunities, and controls to dictate the terms of sale.

Current Admeld customers include The Guardian, MailOnline, Answers.com, FOX News, IDG TechNetwork, Hearst Television, Discovery, The Weather Channel, and more than 500 others worldwide. The company is headquartered in New York City with offices in San Francisco, London, Berlin, and Toronto. Admeld employs 95 people, and has received venture funding from Norwest Ventures, Time Warner Investments, Spark Capital, and Foundry Group. Admeld has been operational in London with a sales, support, and data center for over two years, and we were the first company to deploy real-time bidding in Europe.

The Admeld platform connects media owners with every programmatic buyer, agency trading desk, and ad network around the globe.  Each media owner can control who has access to their inventory, and our team works closely with each client to pick the demand partners that best match their needs. In addition, Admeld also handles contracts with demand partners, technical integrations, and billing consolidation for each of its clients. Admeld provides an existing marketplace that connects demand, supply, and data in a very transparent and efficient and real-time environment.

In its first eighteen months, Admeld worked primarily as an ad network optimization platform for publishers—connecting them with more than 200 ad networks. The platform processed impressions through traditional ad tags, and leveraged predictive algorithms to create network 'daisy chains' that generate the highest expected revenue values for each impression. Though the company has since evolved become a leader in Real Time Bidding and data integration, **Admeld has maintained its deep relationships and technical integrations with traditional ad networks. The result is that every impression we process has more buyers competing for it, which thereby increases the price for our clients.**

In 2009, the large ad agency conglomerates began shifting their strategies to from "buying brands" to "buying audiences" using sophisticated algorithmic buyers called Demand Side Platforms (DSPs).[1] Admeld anticipated that this flow of budgets would increase, and built the technical infrastructure to give publishers access to these spends. Over the past year, we have created tools for publishers to identify their most valuable audience segments and then package them for sale.

---

[1] A current diagram of all trading desks and corresponding DSPs is in the Appendix of this document.

4

GOOG-DOJ-03599595

RTB Auction Participants

- Supply
  Media Owners engage Admeld to maximize their revenues. Sellers
  deliver impressions via ad tags, server APIs, or mobile SDKs.

- Demand
  Advertisers and Trading Desk use high-tech platforms that execute buys
  using data.

- Data
  In an online environment, data providers utilize browser cookies to
  recognize users and create audience segments. In a mobile
  environment, reliable third party data remains elusive.

Admeld's first RTB bid was conducted in July 2009 – making Admeld one of the first companies to embrace this new ecosystem. Admeld now runs a publisher-centric auction environment that brings together supply, demand, and data in a scalable global solution. **Today over 11 billion bids are executed on the Admeld platform every day** – making Admeld the largest, independent practitioner of RTB behind Google.

In Admeld's unified auction each impression is awarded to the highest-paying qualified buyer - whether they are bidding via RTB or via traditional ad network tags. Each auction is completed within 50 milliseconds. **In this relatively early stage of the market, the fact that Admeld can pit ad networks against RTB buyers in every auction generates maximum revenue at almost a 100% fill rate.**

Over the last 12 months RTB has taken the North American agency landscape by storm. In January of 2011, 15% of Admeld's impressions were monetized through RTB. Today, over 55% of Admeld's impressions are sold via RTB and programmatic buys. We believe that this trend will continue in Europe, and also flow into mobile and video.

### Percentage of Spend on Admeld



January 2010          January 2011

5

## The Benefits of Real Time Bidding

RTB offers both sides of the transaction significant transparency and control.

**Benefits for Buyers**
- Buyers can analyze each impression and make a real time decision about the price they are willing to pay—a significant improvement over the bulk buying of the ad network days.
- Buyers can "listen" to each publisher impression, leading to greater reach and less waste.
- Refined targeting with greater data integration.

**Benefits for Publishers**
- Higher rates and access to more budgets. On average, buyers pay a 2 to 3x premium on RTB over traditional ad tags.
- Robust pricing protection through floors that preserve publishers' revenue and reduce channel conflict.
- Increased transparency through granular reports on impressions, audience segments, and individual advertisers, buyers, and individual bids.
- Greater efficiency through the elimination of passbacks.
- Reduction of discrepancies.

## Admeld RTB

The Admeld platform has three unique features to maximize the above benefits for network operators: Advertisers Level Analytics, Automated Blocklist Management, and Audience Analytics.

**Advertiser-Level Analytics**

When buyers submit a bid through Admeld, the platform requires them to reveal the corresponding advertiser. As a result, Admeld can reveal real-time and historical analytics about the buying and bidding patterns of specific advertisers. This offers an unprecedented level of transparency.

**Advertiser Report from 12/13/2010 to 12/13/2010**          Export Report

| Network | Category | Advertiser | Date | Impressions | Bid Cpm | Publisher Revenue | Publisher Close |
|---------|----------|-----------|------|-------------|---------|-------------------|-----------------|
| ⊟ **All Providers** | ⊟ **All Categories** | ⊟ **All Advertisers** | ⊟ **All Dates** | 3,433,842 | $6.03 | $12,433.48 | 1 |
| Invite Media :: 300 | ⊟ **All Categories** | ⊟ **All Advertisers** | ⊟ **All Dates** | 1,088,440 | $5.20 | $3,686.87 | 1 |
|  |  | GM :: 52 | ⊟ **All Dates** | 342,449 | $4.14 | $1,120.42 | 1 |
|  |  | SHUTTERFLY :: 829 | ⊟ **All Dates** | 107,860 | $3.75 | $352.13 | 1 |
|  |  | TD AMERITRADE :: 451 | ⊟ **All Dates** | 85,020 | $7.47 | $304.31 | 1 |
|  |  | VERIZON :: 1003 | ⊟ **All Dates** | 82,011 | $5.85 | $264.12 | 1 |
|  |  | DIRECT TV :: 1264 | ⊟ **All Dates** | 53,834 | $5.58 | $182.60 | 1 |
|  |  | BELK :: 1348 | ⊟ **All Dates** | 44,695 | $11.66 | $174.87 | 1 |
|  |  | AT&T :: 981 | ⊟ **All Dates** | 41,374 | $4.29 | $145.15 | 1 |
|  |  | US CELLULAR :: 1002 | ⊟ **All Dates** | 30,628 | $5.00 | $102.84 | 1 |
|  |  | LENOVO :: 1254 | ⊟ **All Dates** | 28,370 | $3.91 | $86.39 | 1 |

6

GOOG-DOJ-03599597

**Automated Blocklist Management**

We can automatically block specific advertisers based on publisher business rules at the time of transaction. Through a simple UI, publishers can block entire categories (e.g. automotive), or just particular advertisers (e.g. Porsche). Alternatively, media owners can set floor prices against certain advertisers/categories, thereby reducing channel conflict.



**Audience Analytics**

Admeld makes audience data actionable. Admeld has seamless integrations with more than 20 top data providers, such as BlueKai, TARGUS*info*, Peer39, and others. As the media owner's inventory passes through the platform, Admeld combines it with data and pricing information to give the seller true market intelligence on the composition and value of their inventory. In addition, we give advertisers the ability to purchase targeted audience segments based on that data. This existing infrastructure can be utilized to expose carrier data into the ecosystem in a safe and transparent fashion.

Segment data for TARGUSinfo on property: All Websites, Feb 22, 2011       Export Report

| Segment | Impressions | Uniques | % Audience | CPM | RTB Impressions | Bid CPM | Close CPM |
|---|---|---|---|---|---|---|---|
| ⊟ Age (6) | | | | | | | |
| 45-54 | 3,842,472 | 239,774 | 5.20% | $0.98 | 308,783 | $5.04 | $2.99 |
| 35-44 | 3,755,600 | 238,543 | 5.20% | $0.99 | 296,978 | $5.06 | $2.99 |
| 55-64 | 2,705,263 | 164,458 | 3.60% | $0.99 | 215,103 | $4.99 | $3.00 |
| 25-34 | 2,344,677 | 156,905 | 3.40% | $1.00 | 192,981 | $5.08 | $2.98 |
| 65+ | 1,488,793 | 92,196 | 2.00% | $0.98 | 115,835 | $5.02 | $3.00 |
| 18-24 | 658,122 | 45,149 | 1.00% | $0.97 | 47,622 | $5.06 | $2.98 |
| ⊟ Gender (2) | | | | | | | |
| Male | 10,138,942 | 630,102 | 13.70% | $0.99 | 832,606 | $5.09 | $2.99 |
| Female | 5,552,002 | 353,768 | 7.70% | $0.99 | 428,640 | $4.98 | $2.99 |
| ⊟ Individual Segments (92) | | | | | | | |
| 6 Affluent Suburban Middle Aged Home Owners Without Children | 366,725 | 21,897 | 0.50% | $1.00 | 30,771 | $5.20 | $3.02 |
| 20 Affluent Suburban Middle Aged Home Owners With Children | 351,551 | 20,911 | 0.50% | $1.03 | 32,247 | $5.19 | $3.00 |
| 71 High Income Suburban Middle Aged Home Owners With Children | 348,641 | 22,066 | 0.50% | $1.00 | 28,966 | $5.05 | $2.98 |

This data integration serves every part of the ecosystem. Publishers can use it to sell their impressions with data overlays, networks can use it to execute targeted buys, and DSPs can use it to make their buying algorithms smarter.

7

**The Birth of Secondary Premium**

The sum total of all this change has led to the emergence of a new tier of ad inventory. The black and white world of "premium" vs. "remnant" no longer applies when an ordinary impression can be enriched with audience data and sold via RTB at a $15 CPM.



Over the last few months, Admeld has witnessed initial signs that transparency and increased competition may extend RTB to all types of inventory. In December of 2010, we witnessed a guaranteed programmatic buy for $1 million, and in January of 2011 we received our first bid exceeding $50 CPM.

8

HIGHLY CONFIDENTIAL

GOOG-DOJ-03599599

## Admeld Mobile

Over the last 15 months, Admeld has been monetizing mobile in-application and mobile web impressions for publishers such as:

> Answers
> IGN
> Pandora
> Oneriot
> Citysearch
> Ask.com
> Pinger
> Topix
> Weather.com
> Demand Media
> Burst Media
> Weather.com
> Where.com
> Guardian
> eBuddy

Today Admeld already processes over 4 billion mobile impressions per month. Admeld has extended its core platform and expertise into mobile, and is now able to successfully monetize impressions across multiple mediums on a unified platform.

The core architecture remains intact, and our expertise in network integrations has helped us connect to traditional mobile networks. The connectivity to online ad networks comes in handy for those publishers that want to serve 300x250 or 728x50 banners into their tablet inventory, as these sizes are not supported by mobile networks. In addition, the existing bidding infrastructure and connectivity to 35 Demand Side Platforms gives us a clear lead in mobile RTB. We have expanded our existing bidding API to contain mobile specific fields, such as location, handset, and publisher supplied data.

Admeld has also created a handset recognition database, integrated multiple mobile ad servers, and will release a new set of ultra-lightweight SDKs in March 2011.

Finally, it is important to note that almost 80% of our impressions already contain some sort of targeting criteria. Often, these are supplied by the publisher through registration data, or from the handset itself. We have found that gender, category, and location currently seem to have the highest impact on CPM rates. Impressions that contain targeting are currently monetized 20-40% higher CPM rates.

9

GOOG-DOJ-03599600

Schedule 2 – Proposal

**The Admeld Solution**
As it relates to the GSMA request for proposal, Admeld would like to propose to create a semi-private exchange for the GSMA. This managed solution will integrate with individual network operator ad servers, the MMM, operator data sets, ***and*** bring Admeld's existing relationships with media owners, and demand sources to the table.

Admeld already integrated many of the ecosystem participants, and will bring this existing and flourishing marketplace to the GSMA. On a daily basis Admeld receives over 11 billion bids, giving the company unprecedented experience and scale with regards to the monetization of impressions, and data.

**With the Admeld solution in place, participating carriers continue to utilize their preferred, local ad server, and at the same time expose their data and inventory to any global demand source through a very secure and controlled platform.** More importantly, Admeld has experience in making data actionable, as the company enriches impressions by processing data of 20+ of the top data providers.  This allows data providers to sell their data in a highly actionable environment on a per impressions basis. (See Schedule 4 Diagram in executive summary for full illustration).

Under the overall guidance of the GSMA, network operators will be able to configure the platform to their individual needs. This will include the selection of specific demand partners, ad servers, and networks. Most importantly, each network operator data set will be protected and exposed only to that operator's selected demand partners. This setup has recently been termed a "private exchange".

Since November of last year, Admeld has rolled out some of the industry's first private ad exchanges on behalf of The Weather Channel, quadrantONE, IDG Tech Network, and CBS.  The product represents a culmination of the sell-side technology Admeld developed over the company's history. A private exchange is a highly-customized, invitation-only marketplace in which a publisher (or an allied group of publishers) can sell directly-to-buyers such as ad agency trading desks. In contrast to the large, general ad exchanges, private exchanges offer much more granular pricing controls, insights, and reporting. For instance, instead of just assigning floors and blocks to individual trading desks, DSPs, and advertisers, private exchange publishers can create rules and prioritization based on multiple combinations of those players. The proposed solution is in essence a version of a private exchange for each individual carrier.

10

## Specific Answers to Schedule 2 Questions

**1.1 Release cycles**
Admeld is already fully compliant with (R2), including integration of third party data sources and the integration of real time bidding as part of the ad decision. As such we propose to collapse the release schedule, and implement both releases at the same time.   More importantly, we believe that many of the functionalities described in (R1), and the internal and external system required to implement the user stories in section 5 should all be part of one hub to with multiple vendors connecting through API integrations.

We believe that each advertising ecosystem participant (Media Planer, Media Buyer, Creative Agency) is accustomed to utilizing their own tools to plan, book, and analyze campaigns. This is especially true for participants operating in multiple international markets. We believe that it is constraining to require the entire ecosystem, across all GSMA regions, to use a single interface. Instead of providing a single dashboard to the industry, Admeld would propose to give each buyer and planner the ability to continue to use their existing tools. Admeld is already connected to many of the tools that are currently in use by various agencies. **We propose to make supply and data accessible to any demand interface.**

We believe that agencies will use five methods to launch advertisements onto media properties:

- Direct sales which utilize publisher ad servers
- Ad Networks that buy buckets of inventory
- DSPs that execute programmatic buys
- comScore and other cross publisher planning and booking tools
- Admeld buyer interface

Admeld can be the central hub to manage the inventory and data, and connect to all these interfaces. This approach gives each operator the flexibility to continue to use their existing ad server, and it gives the industry the ability to continue to use the interfaces that they are used to. In addition, this system could be connected to a general buyer interface, such as the comScore MMM system. Admeld would be able to provide open APIs for ad serving, reporting, and buying to each ecosystem participants. Finally, it is important to note that Admeld has the ablity to open a graphical user interfaces to agencies and buyers, if they desire this.

## 2. Timescales and Key Milestones
This proposed solution will also allow each carrier to implement the solution at their own pace. The general solution will be available for the GSMA and each carrier from day one. Each network operator could specify which data, and inventory sources they want to connect to individual demand sources.  That way the GSMA does not need to wait for each carrier to be ready, but instead can implement participating carriers as they are ready.

HIGHLY CONFIDENTIAL

GOOG-DOJ-03599602

### 3. Product and Services

Instead of providing a single interface to the buy side ecosystem, various entities will perform the functions of the MAM and the MIX. Admeld will connect to these entities via API and Tags, and expose data and impressions to various system components based on individual operators configurations.

**Planning:**
Planning will occur via comScore and other census level approaches + Admeld Dashboard + Admeld API into other planning tools as needed

**Booking:**
There will not be a central booking interface, but multiple ways to book a campaign: Ad servers, Ad Networks, DSPs, comScore, Admeld Dashboard

**Ad Decisioning:**
Admeld currently provides ad decisioning on over 1.7 billion advertisements per day. We propose that Admeld becomes the central ad decision hub.

**Creative Asset Registry:**
Publisher or operator level ad servers would remain the creative asset registry. Ad servers will always receive the first call from the Admeld platform, giving first party campaigns highest priority. Only if the media owner's first party ad server has no ad, will the request be exposed to the rest of the ecosystem.

**Real-Time-Bidding:**
Admeld's core functionality. As such we propose that Admeld takes on this responsibility.

**Integration with Existing Functional System Components**
Admeld will offer its supply APIs, demand APIs, and data connector to the ecosystem.



HIGHLY CONFIDENTIAL

GOOG-DOJ-03599603

**Reporting**

Admeld offers a reporting dashboard that generates reports on a near real-time basis for impressions, clicks, revenue per impression, data usage, and advertisers. In addition, we can offer detailed APIs to any other system component (including MMM, Ad servers, and carriers). **This reporting API could be utilized to give end consumers the ability to see who advertised to them.**

**Admeld Reporting Dashboard**



**6.1 System Operations and Management**

We are proposing to integrate operator data assets into the existing marketplace, which will be operated by Admeld. We will enable operators to configure the platform to their individual needs. This will include the selection of specific demand partners, ad servers, and networks. Most importantly, each network operator data set will be protected and exposed only to that operator's selected demand partners. This setup has recently been termed a "private exchange".

Admeld will not charge the network operator for the creation of the private exchange. Instead we will take a revenue share of the transactions that occur on the platform. Network Operators will be able to monetize their data, and Admeld will not take a share of the data monetization.

**7.1 Service Levels**

The outlined availability requirements are realistic and Admeld can comply with these requirements.

13

### 7.2 Indemnification

AdMeld shall provide the standard representations and warranties that relate to its providing technology and services to the GSMA. Such representations and warranties relate to corporate good standing, compliance with law, copyright, trademark and IP rights and infringement protection, and, subject to standard negotiated carve outs and limitations, representations regarding Publisher content, data collection by AdMeld, uptime (as governed by our standard Service Level Agreement), Publisher content, and Advertisement content (to the extent we have the relationship with the Buyer). AdMeld shall also provide indemnity protection to the GSMA regarding any third party claims concerning Intellectual property, copyright, trademark rights ,and, subject to standard negotiated exclusions and limitations of liability, indemnity regarding certain representations and warranties that the parties agree best allocate the risk profile of the relationship to the appropriate parties.

### 8. Timeline

The outlined timeline requirements are realistic and Admeld can comply with these requirements.

### 9. Acceptance

9.1 Admeld had read and understood the roadmap and agrees that it is possible to execute on it

9.2 As outlined in Schedule 5, Admeld pays the operator for data that was used by the ecosystem.

9.3 Admeld will deliver a full test and acceptance plan once the MAM participating have been defined. The user journey utilized for financial reconciliation is as follows:



1. User navigates to guardian.co.uk in mobile browser or app.

2. User is directed to Admeld server by guardian.co.uk ad server.

3. Admeld retrieves carrier ID from headers and does secure data lookup to carrier server.

4. Admeld makes RTB requests to multiple DSPs. Carrier data is passed along with anonymous Admeld user ID that is not transferable.

5. Admeld select best ad and returns it to the user. Revenue information for the advertisement and the data are logged to the Admeld system.

6.) Admeld collects payments from demand source. Admeld pays the operators for the data. Admeld pays the media owner for the impressions.

14

## 10. Implementation

We accept the implementation requirements as produced in Schedule 2 Section 10, and we understand that prior to implementation of MAM Admeld will produce for approval by the GSMA the documents identified in this section.

Without knowing the individual participants in the final solution, it is difficult to produce a realistic product timeline and implementation schedule. Once we understand how the MAM will be implemented, and which ecosystem participants will participate, we can produce a detailed project plan and resource plan.

The Admeld solution is operational today. Implementation depends on the availability of carrier data, and the integration of such data. Admeld had a chance to look at the Pathfinder API for general data retrieval, and we believe that it could be integrated within a few days. Such data would then have to be test and go through a Q&A process, before it could be submitted to the ecosystem. In addition, we could integrate with the individual operator's ad server.

**In general we believe that it will take Admeld:**

> 1 week to implement new carrier
> 2 weeks to test new carrier data
> 1 week to implement new ad server
> 1 week to test new ad server
> 2 week to implement new DSP
> 2 weeks to test new DSP
> 2 days to implement new ad network
> 4 days to test new ad network

**The Dependencies for a successful implementation are:**

> Cross-vendor interoperability for data
> Unique identifier being passed to Admeld (in real-time)
> (Ideally through the header of the mobile web session)
> Ad server carrier data available in a standard API format

## 11. Data Security

Our data centers are located in 4 cities around the world – London, Somerset (NJ), San Jose (CA), and New York. The first three are used for ad serving and real time bidding. In addition, the NJ data center hosts our booking and reporting website as well as our data collection and reporting backend. The New York data center is used for internal analytics. The former three data centers are managed by DataPipe, which is a member of the PCI Security Standards Council and has successfully completed a SAS 70 audit. All of our servers are behind firewalls, with limited access to each other and to the outside network. In our past integrations with third party data providers, the information we receive about a user is non-personally identifiable. No sensitive information about a user is sent to us, nor would we store it. The request/response chain is made as either a server-to-server called with a shared cookie space (CNAME), or through piggyback pixels. In these implementations, the information shared about a user is usually obscured and is often limited to a unique user id and a segment id for a pool of users to which this user belongs. Segment definitions are shared with us off-line, and we use the mapping for analytical purposes. While the bid

15

GOOG-DOJ-03599606

response data is sent in clear text JSON, our bidders will often open firewall access to specific IP ranges corresponding to our servers. This provides a level of security for the bid information. In addition, we are building out HTTPS support for more secure real time bidding. All data in the request/response chain is logged for auditing purposes and is keyed on a request GUID, unique per impression.

## 12. Regulation and Data Privacy

### Introduction

Admeld understand and accepts the privacy regulations and requirements. Admeld has an excellent understanding of the regulatory environment that governs the MAM, particularly in the UK and the EU. The following provides a summary of that regulatory environment as it applies to the activities of the mobile network operators ("MNO"), Admeld, and other participants in the MAM.

### Overview

The interception, retention and/or processing of communications data, personal data, location data and traffic data sourced from mobile phone users (referred to here as "user data") is heavily regulated in the EU and the UK across a number of different Directives and Acts, depending on the type of data and the activity undertaken in respect of that data.

### The Data Protection Directive/Act

The activities of the MNOs and (possibly) Admeld, in addition to the data providers, publishers and advertisers who participate in the MAM, may attract the application of the EU Data Protection Directive (95/46/EEC), which was implemented in the UK by the Data Protection Act 1998 ("DPA"). Whether or not the DPA applies to the activities of the various participants in the MAM will largely depend on exactly what type of user data is collected by the MNO or on the MNO's behalf, and whether that data is truly anonymised and aggregated (i.e. is it personally identifiable by anyone in the processing chain, either alone or in combination with other data?). The RFP does not specify exactly what user data will be input into the MAM, other than to indicate (on page 17) that the user data will be segmented based on age, gender, region/location and geo-demographic classification (and other high-level segmentation variables). Admeld understands that this user data will be made available on the API as anonymised and aggregated user data, so that to all persons who access the API the user data is not personally identifiable. However, simply because the user data may appear as anonymised to participants who access the API does not mean that the user data cannot be linked back to the user by the MNO, as the MNO may be in a position to combine that data with the IP address assigned to the subscriber or user during a given session. Or where an anonymising unique identifier is assigned to a user before collecting data about their browsing history, the MNO may be in a position to combine that identifier with the IP address. In those cases, whether in combination with billing or account information, the MNO might be able to at least identify the subscriber. As such, despite the user data appearing aggregated and anonymised to all participants in the MAM who process that data, the MNO may be deemed to be processing personal data and therefore be required to comply with the DPA as a data controller. All other participants in the chain, including Admeld, will become data processors, unless they are deemed to be

16

GOOG-DOJ-03599607

co-controllers. However without further detail at this stage in the tender process, it is difficult to provide a definitive answer on this point

Admeld notes that the subscriber of a mobile phone may not be the user of a mobile browser, making it impossible to link the information derived back to a single user. However, it is the view of the Information Commissioner contained in his Personal Information Online Code of Practice published in July 2010 that all the information collected should nonetheless be treated as it were personal data.

Best practice principles would suggest that all participants in the MAM, from the MNO to the advertiser, should proceed on the basis that the user data is personally identifiable and the DPA applies. This means that data controllers, most likely the MNOs, will need to comply with the data protection principles set out in Schedule 1 to the DPA. The first principle is that data must be processed fairly and lawfully. Two of the pre-conditions to this principle are that:

- the individual has consented to the processing; or

- the processing is necessary for the legitimate interests of the data controller or a third party to whom the data is disclosed, except where it is unwarranted because it is prejudicial to the individual.

In the absence of consent, the MNO may be able to rely on the second pre-condition. However, Admeld notes that the RFP provides throughout that user consent will be obtained. Certainly if any sensitive data is obtained from the user (such as information relating to a person's race or ethnic origin, political opinions, physical or mental health and so on), and processed by participants in the MAM, then explicit consent will be required in order to use that data for the purposes of targeted marketing. Admeld, as a data processor, would be seeking guarantees from the MNO and data providers that they have obtained this consent.

Even where one or more of these pre-conditions is satisfied, there is still an obligation to ensure the processing is otherwise fair. It is unlikely this will be met if users are not informed, at the very least, that their data is to be used for targeted advertising.

The RFP is not clear as to the type of consent which will be obtained from a user or subscriber, other than to say that it will be 'appropriate'. Admeld understands that such consent will be on an "opt-in" basis, which will be obtained from the management or accounts page the subscriber has with the MNO. The DPA and the Data Protection Directive require consent to be freely given, specific and informed. Without knowing further details, Admeld considers that an express consent on an "opt-in" basis with accompanying information that specifically describes the uses for which the user data will be collected, and by whom it will be processed (so that Admeld and the other participants in the MAM are covered), should be 'appropriate' to satisfy the regulatory burden. Similarly, the user consent to the MAM must be able to be easily withdrawn.

17

GOOG-DOJ-03599608

In addition to the principle of fair and lawful processing, the data controller, most likely the MNO of a user, must comply with the other seven data protection principles set out in the DPA.

It is worth noting that the Data Protection Directive is currently under review by the EU, which wants to strengthen individual's rights by increasing transparency, increasing their control over their personal data and ensuring that consent, where provided, is given freely and informed. The European Commission is expected to introduce draft legislation this year. All participants in the MAM will need to be aware of this new legislation when enacted, and of course the implementing legislation at a local level. The European Commission's comments indicate that regulatory obligations are likely to increase in comparison to the current regulatory environment.

18

HIGHLY CONFIDENTIAL

Other Regulation

Interception/ Surveillance: the e-Privacy Directive/ RIPA

To the extent that MNOs will be using DPI or other interception or surveillance style technology in order to collect user data, they will need to comply at an EU level with the requirements of the e-Privacy Directive (2002/58/EC), and with the Regulation of Investigatory Powers Act 2000 ("RIPA") at a UK level. The e-Privacy Directive requires EU Member States to prohibit unlawful interception and surveillance unless the users concerned have consented. At present, RIPA provides that it will be an offence for a person to intentionally and without 'lawful authority' to intercept, at any place in the UK, any communication in the course of its transmission by means of a public telecommunication system. Interception is deemed to be lawful when the interceptor (i.e. the MNO) has reasonable grounds for believing that consent has been given by the sender and recipient, or that the targeting is connected with the provision or operation of the telecommunications service.

This again highlights the importance of obtaining freely given, specific and informed consent of the users prior to obtaining their data to input into the MAM, but as RIPA requires both the consent of sender and recipient, there will also be particular challenges with ensuring that the intended recipient of the communication (i.e. the website publishers in relation to the content of the website(s) being browsed by the user) have provided consent to the interception. Without knowing further detail on exactly the type of user data that will be collected by the MNO or the technical process of collection, the extent to which RIPA will apply to the activities of the participants in the MAM is not immediately apparent. It may not apply at all, as RIPA exempts the interception of data which can be categorised as "traffic data" (discussed below) in certain circumstances.

Traffic data: the e-Privacy Directive/ PEC Regulations

The MAM may incorporate and use a user's "traffic data".  The e-Privacy Directive allows public communications providers (i.e. the MNO) to use traffic data for marketing purposes with the user's consent. Traffic data, as distinguished from the content of the user data, is dealt with separately under EU and UK law. "Traffic data" is defined by the e-Privacy Directive and the Privacy and Electronic Communications (EC Directive) Regulations 2003 ("PEC Regulations") as any data processed for the purpose of the conveyance of a communication on an electronic communications network or for billing, and data relating to the routing, duration or time of a communication. "Consent" means the same as in the Data Protection Directive – it must be freely given, specific and informed. 'Prior' consent must be obtained, rather than on an "opt-out" basis.

19

GOOG-DOJ-03599610

Despite this permission to use traffic data for marketing purposes, significantly for the MAM there is a question as to whether this extends to the use of traffic data for the display of third-party advertising. Under the PEC Regulations, the provider of the public communications network (i.e. the MNO), or a processor acting under his authority (i.e. Admeld and the other MAM participants) must only process the traffic data if such processing is for the purpose of marketing electronic communications services, or for the provision of value added services to that subscriber or user, and the subscriber or user has given consent to such processing. Further, such processing is to be undertaken only for the period necessary for those purposes. The user must be provided with information prior to obtaining his/her consent which sets out the types of traffic data and the duration of such processing. As the display of third-party advertising does not normally constitute 'marketing of electronic communications services', to bring the processing of a user's traffic data in the MAM within the scope of the permission in the PEC Regulations, the MNO and other participants in the MAM would need to position the processing as 'necessary' for 'providing a value added service'. This is defined broadly to mean any service which requires the processing of traffic data or location data beyond that which is necessary for the transmission of a communication or billing. Further, as user consent is also a requirement and EU law now requires this consent to be obtained 'prior' to the collection and processing of the traffic data, Admeld considers that 'appropriate' user consent to the collection of traffic data for the purposes of the MAM should be provided on an "opt-in" basis only.

Location data: the e-Privacy Directive/ PEC Regulations

The RFP indicates (at pages 17 and 18) that user data may include location data. The processing of location data, like traffic data, is dealt with at an EU level by the e-Privacy Directive, and in the UK via Regulation 14 of the PEC Regulations. Location data is defined as any data processed which indicates the geographical position of the terminal equipment (i.e. mobile handset) of a user.

Location data may only be processed (whether it is processed by the MNO, by Admeld or by other participants in the MAM) if the user cannot be identified, or if identifiable, the location data is necessary for the provision of a value added service and consent of the user has been obtained. Even though "value-added service" is defined broadly (as discussed in the paragraph above), if it is confirmed by the GSMA that location data will make up some or all of the data input into the MAM, consideration will need to be given as to whether the user is personally identifiable (following the same line of argument as discussed in relation to the DPA above). If so, is processing of that data 'necessary' for the provision of the targeted advertising? Further, does the consent of the user cover everyone in the chain (because the restriction in Regulation 14 applies to all processors of the user data, not just the MNO)?

20

GOOG-DOJ-03599611

Additionally, if the user can be identified, the PEC Regulations also provide that prior to obtaining consent the communications provider (the MNO, not Admeld) must inform the user of the types of location data that will be processed, and the purposes for which it will be processed (amongst other things). The user must be given the opportunity to withdraw their consent each time they connect to the network or transmit a communication.

Cookies: the e-Privacy Directive/ PEC Regulations

If cookies are going to be used by the MNO to collect the user data, then depending on the type of cookie the MNO will need to comply at an EU level with the e-Privacy Directive, and with the PEC Regulations in the UK. However this regulation only relates to cookies which are stored in the "terminal equipment" (i.e. the handset) of the user, not, it would seem, to server-side cookies which are commonly used in mobile browsing.

Data Retention Directive/ Regulations

More generally, MNOs operating within the EU are compelled to comply with the Data Retention Directive (2006/24/EC). The Data Retention Directive requires MNOs (and other communication service providers) to retain a wide range of data for six to twenty-four months, so that it may be disclosed to public authorities for the purposes of the investigation, detection and prosecution of serious crime. In the UK, the Data Retention (EC Directive) Regulations 2009 implement the requirements of the Data Retention Directive. Under the Data Retention Regulations, MNOs must retain all relevant communications data (including internet communications data such as the name and address of a user and IP address or unique identifier allocated to that user per access to a mobile browser) for a period of 12 months. Some of this retained communications data, as Admeld understands it, may be used by the MNOs for the purposes of the MAM.

Obtaining consent from minors

Some consideration may need to be given to the issue of obtaining consent from users who are minors. The DPA and Data Protection Directive does not specifically deal with the issue of minor's consent, however the Information Commissioner in the UK has provided the following guidance where a user is aged 16 years or under:

> "Personal data must only be collected from children with the explicit and verifiable consent of the child's parent/guardian unless that child is aged 12 years or over, the information collected is restricted to that necessary to enable the child to be sent further but limited online communications and it is clear that the child understands what is involved."

21

GOOG-DOJ-03599612

Conclusion

Whether or not some or all of these various pieces of regulation apply to the activities of the participants in the MAM will become clearer during this tender process and also system integration and testing phase. However, what is clear is that the common tie for compliance with nearly all the applicable Directives and Acts is that consent of the user or subscriber should be obtained to cover the activities contemplated by the MAM, and such consent should be freely given, specific, informed and broad enough to cover all participants in the chain, including the MNO, data provider, Admeld, publishers and advertisers.

### 13. Corporate and Social Responsibility

Admeld is committed to making the online advertising and marketing ecosystem a better place, doing so through a combination of technology and consultative services delivered by the industry's best and brightest people.  As we develop these products and services, it is always with an eye on ensuring that our actions do not adversely affect the environment.  And in fact, when it comes to evaluating the environmental impact on our operations, it is also through a combination of technology and people that we accomplish these goals.  Admeld takes great care in ensuring that its operations are not causing negative implications for the environment.

Like our product suite, it is this blend of technology, and people driven initiatives, that we feel differentiates Admeld from others.  From technical solutions like Echosign, to our Green Team in our New York office, our efforts leverage our human capital and cutting edge technology to ensure that as Admeld's growth continues, it does not come with an environmental price tag.

A sampling of our initiatives is included below:

- In 2010, the Admeld "Green Committee" was formed to identify ways in which Admeld employees could minimize our impact on environment. Outcomes included: Reduction in ordering of paper cups for office, and increased use of ceramic, reusable mugs, replacement of individual bottles of water, with larger bottles via central location.
- In 2010, Admeld recognized that the amount of paper that was being used to send insertion orders back and forth was unacceptable.  Apart from being unproductive, it also had an impact on the environment.  Admeld invested in a new paper-free document solution called Echosign, which allowed us to virtually eliminate all paperwork required to get a campaign up and running. According to estimates from Echosign, by moving to a paperless contracting process, our average customer saves over 12,000 sheets of paper, 100 pounds of solid waste, and 1,000 gallons of water a year.  The case study conducted with Echosign is posted online.
- From a hardware perspective, we continue to re-use old machines instead of discarding them.  Typically, we utilize old laptops or desktops as test machines for troubleshooting client related issues.

22

- To reduce the amount of travel required of Toronto Admeld to NY, in 2010, Video Conferencing equipment was purchased.  This has eliminated the need for quarterly visits for up to 10 engineers.
- Early on at Admeld, the decision was made to go completely paperless in terms of publisher statements.  All statements for Admeld publishers are posted online and distributed via email.
- Admeld has partnered with green Data Center provider "Data Pipe" for 100% of our ad serving infrastructure.

**14. Business Continuity and Disaster Management**

If a major incident/disaster occurs, the Admeld Crisis Team (ACT) will be convened and the situation assessed.  It will be the responsibility of this team to decide whether or not to implement any specific Business Continuity Plans. The format of the ACT is illustrated in the following diagram:

## Admeld: Business Continuity Planning Model



This Business Continuity Plan (BCP) will be activated by the BCP Executive, as identified in the plan. When an emergency has been declared by the ACT, BCP Team Leaders will report directly to the ACT Crisis Executive for the duration of the emergency.  All ad hoc requests for decisions, assistance with facilities, acquiring outside services, etc. will be directed by the BCP Executive. It will be the BCP Team Leader's responsibility to contact all team members or their alternates and ensure that they convene (either in person, or via conference call) as mandated by the ACT Crisis Executive. The ACT Crisis Executive will be responsible for the successful implementation of this plan, with Team Leaders being held accountable for their specific sub components.

HIGHLY CONFIDENTIAL

GOOG-DOJ-03599614

**Admeld Crisis Management Locations**
In the event that the primary Admeld location is unavailable, the following strategies
will be employed to ensure continued operations during crisis:

*Alternate Sites* – Alternate sites for operations will depend on the nature of the
event, but include:
- Admeld Toronto Location
- Admeld Corporate Suite
- Remote Work (From Home)

*Communication* – To facilitate communication during crisis, the following emergency
dial-in will be used: Dial-In: 877-8**-70** Participant: 48*** Host: 37***

**Admeld Crisis Team Contact List**

| Name | Direct | Title | Ext | Mobile | Skype | Birthday | AdMeld Start |
|---|---|---|---|---|---|---|---|
| Adam Klee | 646.442.8203 | Dir. of Ops & Client Services | 8203 | 646.232.5533 | adamt5533 | 11/27/2011 | 8/28/2008 |
| Alan Davison | 646.442.8210 | CFO | 8210 | 646.228.0004 | adavison2 | 1/12/2011 | 4/1/2009 |
| Ben Barokas | 212.244.1662 | Co-Founder & CRO | 1662 | 703.338.3353 | benbarokas | 8/10/2011 | 10/3/2007 |
| Brian Adams | 212.244.1663 | Co-Founder & CTO | 1663 | 646.573.4210 | brianadamsnyc | 1/10/2011 | 10/3/2007 |
| Brian Kane | 646.442.8204 | Vice President | 8204 | 917.379.9056 | bkaneadmeld | 1/1/2011 | 1/12/2009 |
| Briann Gagnon | 646.442.1594 | Executive Asst./Office Mgr. | 1594 | 925.984.7702 | brigagnon | 1/3/2011 | 8/2/2010 |
| Chris Scott | 646.775.4807 | VP Publisher Development | 4807 | 415.215.4459 | chris_d_scott | 3/5/2011 | 4/20/2009 |
| David Hertog | 646.442.8218 | VP of Marketing | 8218 | 917.714.2885 | david.hertog | 4/9/2011 | 1/5/2009 |
| Jessica Finkelstein | 646.442.8201 | SVP, Legal Affairs | 8201 | 917.679.9252 | jessica-finkelstein | 4/9/2011 | 9/15/2010 |
| Lionel White | 646.775.4810 | Vice President, Technology Operations | 4810 | 917.544.5442 | lioneljwhite | Sept 30 | 2/1/2010 |
| Michael Barrett | 646.442.8213 | CEO | 8213 | 914.419.9776 | | 4/9/2011 | 11/3/2008 |
| Steve Low | 646.775.4811 | VP of Finance and Controller | 4811 | 917.881.1206 | steven-low2 | 9/22/2011 | |
| Susan Pierce | 917.258.1172 | Director of Engineering | 1172 | 818.571.3583 | susanbpierce | 7/10/2011 | 7/6/2009 |
| Thomas Mendrina | N/A | Country Manager (Germany) | N/A | 49.152.29393.231 | thomasmendrina | 4/6/2011 | 9/15/2010 |
| Tom Jenen | 44 (0)203 372 5799 / 646.688.5402 | EMEA Director | 5402 | 646.232.6751 | falk-tom | | 2/1/2010 |
| Conference Room | 917.258.1170 | | | | | | |
| Courtesy lines | 917.258.1174 | | | | | | |
| | 917.258.1173 | | | | | | |

24

GOOG-DOJ-03599615

## Appendix

[1] Current diagram of all trading desks and corresponding DSPs



AGENCY RTB LANDSCAPE

HIGHLY CONFIDENTIAL

GOOG-DOJ-03599616