# EXHIBIT 64

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

UNITED STATES, et al.,   ) 1:23-cv-00108-LMB-JFA
)
     Plaintiffs,   )
)
vs.   )
)
GOOGLE LLC,   )
)
     Defendant.   )
_____)

- HIGHLY CONFIDENTIAL -

VIDEOTAPED DEPOSITION OF

COLONEL LENNOX MORRIS

September 1, 2023

9:06 a.m.

Job No. CS6074135
Reported by:  Bonnie L. Russo

Veritext Legal Solutions
800-567-8658                                          973-410-4098

HIGHLY CONFIDENTIAL

Page 2

 1  Videotaped Deposition of Colonel Lennox Morris
 2  held at:
 3
 4
 5
 6      Paul Weiss Rifkind Wharton & Garrison, LLP
 7      2001 K Street, N.W.
 8      Washington, D.C.
 9
10
11
12
13
14
15
16
17
18      Pursuant to Notice, when were present on behalf
19      of the respective parties:
20
21
22

Page 3

 1  APPEARANCES:
 2  On behalf of the Plaintiffs:
 3     JIMMY McBIRNEY, ESQUIRE
        CHASE PRITCHETT, ESQUIRE
 4      ALVIN CHU, ESQUIRE
        KATHERINE E. CLEMONS, ESQUIRE (Via Remote)
 5      UNITED STATES DEPARTMENT OF JUSTICE
        450 Fifth Street, N.W., Suite 700
 6      Washington, D.C. 20530
        jimmy.mcbirney@usdoj.gov
 7      chase.pritchett@usdoj.gov
        alvin.chu@usdoj.gov
 8      katherine.clemons@usdoj.gov
 9  On behalf of the Defendant:
10     MARTHA L. GOODMAN, ESQUIRE
        LEAH HIBBLER, ESQUIRE
11      PAUL, WEISS, RIFKIND,
        WHARTON & GARRISON, LLP
12      2001 K Street, N.W.
        Washington, D.C. 20006
13      mgoodman@paulweiss.com
        lhibbler@paulweiss.com
14
15
16
    Also Present:
17  Orson Braithwaite, Videographer
    Mohamed Al-Darsani, United States Army
18
19
20
21
22

Page 4

 1              I N D E X
 2  EXAMINATION OF COLONEL LENNOX MORRIS    PAGE
 3  BY MS. GOODMAN              8
 4                              293
 5  BY MR. McBIRNEY             293
 6
 7
            EXHIBITS
 8
 9  Exhibit 63  E-Mail dated 4-25-22      178
        Attachment
10       ARMY-ADS-0000329948-970
11  Exhibit 87  E-Mail Chain dated 3-10-22    52
        Attachment
12       ARMY-ADS-0000070535-547
13  Exhibit 88  E-Mail dated 10-21-21     98
        Attachment
14       ARMY-ADS-0000177268-490
15  Exhibit 89  E-Mail dated 3-15-22      160
        Attachment
16       ARMY-ADS-0000135957-958
17  Exhibit 90  E-Mail Chain dated 9-30-22    196
        Attachment
18       ARMY-ADS-0000186428-431
19  Exhibit 91  E-Mail dated 9-24-21      207
        Attachment
20       ARMY-ADS-0000179830-831
21  Exhibit 92  E-Mail Chain dated 4-11-22    215
        Attachment
22       ARMY-ADS-0000060557-559

Page 5

 1  EXHIBITS (CONTINUED):
 2  Exhibit 93  E-Mail Chain dated 4-11-22    218
        ARMY-ADS-0000155603-604
 3
    Exhibit 94  E-Mail Chain dated 9-27-21    224
 4      Attachment
        ARMY-ADS-0000071884-947
 5
    Exhibit 95  E-Mail dated 12-13-22     229
 6      ARMY-ADS-0000126052
 7  Exhibit 96  E-Mail Chain dated 11-30-21   248
        Attachment
 8      ARMY-ADS-0000176297-415
 9  Exhibit 97  Budget Order Accepted     264
        OMD_000422
10
    Exhibit 98  Handwritten Notes         295
11      (RETAINED BY WITNESS)
        (TO BE ATTACHED)
12
    Exhibit 99  Solicitation, Offer       308
13      and Award
        1-3-17
14      ARMY-ADS-0000245462-462_134
15
16  PREVIOUSLY MARKED EXHIBITS:
17  Exhibit 63  E-Mail dated 4-25-22
        Attachment
18      ARMY-ADS-0000329948-970
19  Exhibit 64  E-Mail dated 3-3-22
        Attachment
20      ARMY-ADS-0000187047-077
21
22  (Exhibits bound separately.)

HIGHLY CONFIDENTIAL

Page 62

1  training. It's extensive. It included a lot.
2      Q.   Does that sound like something that
3  you know?
4      A.   Can you repeat it.
5      Q.   That a COR is not -- does not have
6  the authority to make any agreement with the
7  contractor that obligates public funds?
8      A.   That sounds familiar, but I would
9  have to look at the training to be for sure.
10     Q.   And did you learn in your training
11 that CORs do not have the authority to make
12 commitments that affect the price, quality,
13 quantity, delivery or any other term or
14 condition of the contract?
15     A.   I would have to review the training,
16 ma'am, to be specific on that.
17     Q.   So earlier you testified that the KO
18 is the only entity authorized to obligate the
19 government or make any modifications or changes
20 to the contract.
21         Do you recall that testimony?
22     A.   That was my previous statement.

Page 63

1      Q.   Okay. And so by virtue of that
2  understanding you have as to the fact that the
3  contracting officer is the only officer who can
4  obligate the United States Government to any
5  contract, do you now have any understanding
6  whatsoever as to whether you learned in the COR
7  training that a COR cannot make any commitment
8  that affects the price, quality, quantity,
9  delivery or any other term or condition of a
10 contract?
11         MR. McBIRNEY: Object to the form of
12 the question. Also asked and answered.
13         THE WITNESS: Again, ma'am, I can't
14 speak specifically verbatim to what is listed
15 in that COR training.
16         MS. GOODMAN:
17     Q.   Do you recall generally ever
18 learning that a COR is not authorized to make
19 commitments that affect any terms of a contract
20 between a contractor and the United States
21 Government?
22     A.   Again, I can't be certain without

Page 64

1  reviewing the training.
2      Q.   And do you recall learning that a
3  COR cannot grant any deviations or waivers of
4  contract terms and conditions even
5  inadvertently?
6          MR. McBIRNEY: Object to form.
7          THE WITNESS: Again, I would have to
8  see the training to be able to quote it to you
9  exactly.
10         BY MS. GOODMAN:
11     Q.   I am just asking if you remembered
12 learning anything like that in your COR
13 training?
14     A.   It sounds familiar, but I can't be
15 sure.
16     Q.   Okay. Are you a COR in your current
17 role?
18     A.   I am not a COR in my current role.
19     Q.   So going back to your job as the
20 branch chief of paid media can you just
21 describe for me your responsibilities in terms
22 of developing and executing advertising

Page 65

1  campaigns.
2      A.   As branch chief I am responsible for
3  our team's development of requirements that are
4  nested within AEMO's objectives and key
5  results. We communicate those requirements. I
6  think I stated previously the budget to our
7  agency in this case, DDB, and that begins a
8  process of strategic development for media and
9  then tactical development that results in a
10 media plan that is approved by the chief of
11 marketing.
12     Q.   When you say that you -- well, is it
13 correct that you work on developing the budget
14 for paid media?
15     A.   That's correct that we work on
16 developing the budget.
17     Q.   And tell me more about how you
18 develop a budget before providing it to the ad
19 agency?
20         MR. McBIRNEY: Objection.
21 Foundation.
22         THE WITNESS: Primarily our budget

17 (Pages 62 - 65)

Page 66

1  development process incorporates an
2  understanding of the objectives we want to
3  achieve, in this case a number of leads and
4  contracts, combined with a historical analysis
5  of performance in terms of our previous cost
6  per contract or lead that will help to identify
7  a budget requirement, and then that budget
8  requirement is put against the overall budget
9  available for AEMO to which we have an
10  allocation.
11       BY MS. GOODMAN:
12   Q.  So when you come up with a budget
13  for paid media do you break it down by channel
14  before providing it to the ad agency?
15   A.  The budget that we provide does not
16  include a breakdown of by channel allocation.
17   Q.  And is the budget that you provide
18  to the ad agency also reflected in a task order
19  for a given year?
20       MR. McBIRNEY:  Objection.
21  Foundation.
22       THE WITNESS:  It is reflected in the

Page 67

1  task order award amount.
2       BY MS. GOODMAN:
3   Q.  And in the task order award amount
4  it sets a total ceiling for the amount of money
5  to be spent on paid media; is that accurate?
6       MR. McBIRNEY:  Objection.
7  Foundation.
8       THE WITNESS:  That task order award
9  amount provides an initial budget amount for
10  that period of performance.
11       BY MS. GOODMAN:
12   Q.  And if the budget were to change
13  there would need to be a new task order; is
14  that accurate?
15   A.  There would not need to be a new
16  task order.  A task order modification would be
17  required.
18   Q.  Okay.  You said then you would get
19  involved in the strategic development of a
20  marketing plan is that -- am I remembering that
21  correctly?
22       MR. McBIRNEY:  Objection.  Vague.

Page 68

1       THE WITNESS:  That was in terms of
2  what -- what, ma'am?
3       BY MS. GOODMAN:
4   Q.  You, as paid media branch chief,
5  what did you do with respect to strategic
6  development of a paid media plan?
7   A.  To begin a strategic development
8  process, again, the army would provide clear
9  requirements in terms of leads and contracts
10  that we wanted to achieve that -- we have
11  talked about the budget figures that would be
12  provided, and we also might provide some
13  additional clarifying details in terms of
14  perhaps efficiency or other key items.  That
15  would then begin the agency's team -- DDB,
16  their strategic development, would which was an
17  iterative process with our team, at the
18  conclusion of which a strategy would be
19  presented to AEMO.
20   Q.  When you said that you might also
21  provide additional clarifying details in terms
22  of perhaps efficiency or other key items can

Page 69

1  you elaborate, please.
2   A.  Throughout my time as the branch
3  chief of paid media the requirements of the
4  army have continued to change.  Initially the
5  requirement of the army was related to a
6  quantity of leads only, a quantity of
7  contracts.  That evolved into a quality of
8  leads that was required.  Metrics such as that
9  would have been provided to the agency in terms
10  of a number of not only pure quantity or raw
11  quantity, but also quality of leads by type.
12   Q.  And what are the quality of leads by
13  type metrics more specifically to which you are
14  referring?
15   A.  I can't speak specifically to the
16  exact terminology that was used.  However, our
17  data team has identified multiple levels of
18  quality for leads that would identify if a lead
19  meets citizenship or medical tattoo standards,
20  et cetera, and we communicate a quantity by
21  priority that we would like to achieve.
22   Q.  And in the course of developing a

Page 70

1  strategic marketing plan did the army direct
2  the contractor to use any particular vendor of
3  advertising services?
4       MR. McBIRNEY: Objection.
5  Foundation.
6       THE WITNESS: To my knowledge, the
7  army has not specified a particular vendor or
8  ad platform that has to be used.
9       BY MS. GOODMAN:
10      Q. You have never specified to the ad
11 agency any particular vendor or platform that
12 had to be used; is that accurate?
13      A. I don't believe that I have
14 specifically have specified a vendor that has
15 to be used.
16      Q. Okay. You also mentioned that part
17 of your responsibilities included developing a
18 tactical media plan. Am I remembering that
19 correctly?
20      A. Yes, ma'am. My responsibilities
21 include the tactical media plan.
22      Q. What is the difference between the

Page 71

1  strategic media plan and the tactical media
2  plan?
3       A. Ostensibly the difference is level
4  of detail.
5       Q. What do you mean by that?
6       A. By that I mean the strategic plan,
7  in general, identifies first the army's
8  requirement, and then second, an allocation by
9  channel of our budget. The tactical plan
10 further refines that strategy and goes beyond
11 the channel level to specific media partners,
12 platforms, vendors.
13      Q. Are you aware of the term marketing
14 funnel or the concept of a marketing funnel?
15      A. I am aware of the term marketing
16 funnel.
17      Q. Do you use that in the course of
18 your work as the paid media branch at AEMO?
19      A. We did use the marketing funnel.
20      Q. Can you describe for me the
21 marketing funnel that the army used as -- while
22 you were paid media branch chief?

Page 72

1       A. In general, our marketing funnel
2  includes an upper, mid and lower level. The
3  lower level generally encompassing our overall
4  goal which is leads and contracts.
5       The top generally starts with
6  impressions or how our audience will encounter
7  army advertisements.
8       The midlevel tends to drive toward
9  number -- the number of visits to our website,
10 and, then, again, the lower level would be
11 tactics that will assist in lead generation.
12      Q. And why does AEMO use a marketing
13 funnel as you have just described?
14      MR. McBIRNEY: Objection.
15 Foundation.
16      THE WITNESS: The marketing funnel
17 helps to illustrate the prospect journey as
18 they encounter army marketing.
19      BY MS. GOODMAN:
20      Q. And is it important for AEMO to
21 reach their prospect, their potential prospects
22 at various points throughout that marketing

Page 73

1  funnel?
2       MR. McBIRNEY: Object to foundation.
3       THE WITNESS: Can you say that one
4  more time, ma'am.
5       BY MS. GOODMAN:
6       Q. Is it important for AEMO to reach
7  their prospects at various points throughout
8  the marketing funnel that you described?
9       MR. McBIRNEY: Same objection.
10      THE WITNESS: It's important for
11 AEMO to reach our target audience whether
12 prospect or influencers wherever they may be.
13      BY MS. GOODMAN:
14      Q. What do you mean by that, "wherever
15 they may be"?
16      A. The audience changes, prospects
17 change. Their consumption habits change. What
18 may have previously worked may not work in the
19 future.
20      Q. And so your audience -- when you say
21 the audience, what is the army's audience that
22 it is trying to reach?

19 (Pages 70 - 73)

Page 74

1   A.   It depends.
2   Q.   What does it depend on?
3   A.   It depends on the goals and messages
4   of the campaign in question.
5   Q.   Okay.  Can you give me an example of
6   a particular audience that in the course of
7   your work as paid media branch chief you worked
8   on trying to reach?
9   A.   Primary audiences are what we refer
10  to as a prospect audience.
11  Q.   What is a prospect audience?
12  A.   Prospect audience includes age
13  eligible men and women in the United States.
14  Q.   And when you say "age eligible men
15  and women in the United States," are you
16  referring to individuals who are eligible to
17  serve in the United States Army?
18  A.   Generally referring to men and women
19  who are eligible to serve.
20  Q.   And this prospect audience, do they
21  use multiple different channels?
22       MR. McBIRNEY:  Object to form.

Page 75

1        THE WITNESS:  The prospect audience
2   uses a variety of channels.
3        BY MS. GOODMAN:
4   Q.   What are some of the channels that
5   the prospect audience that the army is trying
6   to reach uses?
7   A.   Prospect audience may use video,
8   social media, out of home, digital channels,
9   amongst others.
10  Q.   When you say "digital channels," can
11  you be any more specific?
12  A.   Digital channels can vary in terms
13  of definition by who you are asking.
14  Obviously, you know, streaming to some extent
15  is a digital means, social media is a digital
16  platform by -- depending on who you are talking
17  about, but also it could be display
18  advertising, search advertising.
19  Q.   So when -- for purposes of today's
20  deposition well -- strike that.
21       When you refer to digital channels
22  what do you mean?  Before you said it can mean

Page 76

1   many different things to different people.  I
2   am asking for what it means to you so we are on
3   the same page in this deposition if you are
4   referring to digital channels ever.
5   A.   I would refer to digital means as
6   anything like primarily streaming, social,
7   display, search, would not include out of home
8   or print advertising.
9   Q.   What about TV?
10  A.   Depending on the type of television
11  you are referring to it could also be included
12  in digital.
13  Q.   What are the types of television?
14  A.   The two primary types are linear
15  television and streaming television.
16  Q.   What is the difference between
17  linear and streaming television, if any?
18  A.   Linear television primarily refers
19  to what would be seen as traditional television
20  providers from a platform standpoint, but also
21  referring to live TV for the most part.  Think
22  of providers as Comcast or DirecTV, et cetera,

Page 77

1   whereas streaming providers can be your Hulus
2   your HBO Maxes, your Amazons, et cetera,
3   Netflix.
4   Q.   And is it accurate that the prospect
5   audience that the army is trying to reach uses
6   all forms of these channels that you have
7   described?
8   A.   Prospect uses those forms and other
9   forms that I haven't mentioned as well.
10  Q.   So how do you go about developing a
11  media plan that reaches the prospect audience
12  across these channels?
13  A.   The development of that media plan,
14  again, it starts with the army's requirement.
15  Based on our historical performance we have an
16  understanding of where we have been successful
17  and success in this case means not only
18  quantity by efficiency in delivering leads and
19  contracts for the army.  Based on that
20  historical analysis and data that would allow
21  Team DDB to developing a media plan that could
22  achieve the requirements of the army.

20 (Pages 74 - 77)

Page 78

1   Q.   Do you -- working with DDB does the
2   army allocate money in silos across all of the
3   channels?  In other words, let me think about
4   exactly how much to spend on TV, exactly how
5   much to spend on radio, exactly how much to
6   spend on print?
7        MR. McBIRNEY:  Object to form.
8   Vague and foundation.
9        THE WITNESS:  The approved tactical
10  media plan will be specific as to the
11  allocation of funds for each channel and each
12  partner.
13       BY MS. GOODMAN:
14  Q.   And are those allocations determined
15  comprehensively or holistically or do you
16  determine them on an individualized basis?
17       MR. McBIRNEY:  Same objections.
18       THE WITNESS:  I'm not sure I
19  understand your question, ma'am.
20       BY MS. GOODMAN:
21  Q.   How do you actually decide how much
22  money goes in each channel?

Page 79

1   A.   The determination of how much to
2   invest in each channel is made based on the
3   ability of the channel to contribute to the
4   overall result the army is trying to achieve.
5   Channels that are inefficient or nonproductive
6   are reduced or eliminated and channels that are
7   efficient and productive can be scaled.
8   Q.   When you say -- this is the second
9   time I think you referred to efficiency or --
10  what do you mean by that?
11  A.   In general the efficiency that I am
12  referring to is the cost per metric that is
13  used for whatever level the funnel.  In general
14  we are looking for efficiency in terms of cost
15  per contract and cost per lead.
16  Q.   Do you compare the cost per contract
17  across channels to make a determination of what
18  channel to use in the future?
19  A.   The efficiency of each channel is
20  analyzed and helps to inform the decision of
21  how to allocate our budget.
22  Q.   And how does the efficiency of each

Page 80

1   channel inform your decision on how to allocate
2   the budget?
3   A.   The efficiency of each channel helps
4   us to understand how the intending audience is
5   responding to and interacting with that
6   channel.  The better the efficiency, the better
7   the result for the army and the closer we get
8   to achieving our lead and contract goals.
9   Q.   When you say "the better the
10  efficiency," is that another way of saying the
11  lower cost per metric?
12       MR. McBIRNEY:  Object to form.
13       THE WITNESS:  The lower the cost the
14  better.
15       BY MS. GOODMAN:
16  Q.   So the lower the cost per metric,
17  whether it be cost per contract or cost per
18  lead, the more efficient the channel is; is
19  that accurate?
20       MR. McBIRNEY:  Object to form.
21       THE WITNESS:  In general, the lower
22  the cost per lead the lower the cost per

Page 81

1   contract the better the channel has performed.
2        BY MS. GOODMAN:
3   Q.   And the more efficient the channel
4   is?
5   A.   In this case, yes, the more
6   efficient that the channel has performing.
7   Q.   So do you look at the cost per
8   metric across channels; print, out of home,
9   digital, social and see which one has a lower
10  cost per channel when making decisions about
11  where to spend advertising dollars?
12       MR. McBIRNEY:  Objection.  Form.
13       THE WITNESS:  We do look at the
14  historical performance in terms of efficiency
15  across channels.
16       BY MS. GOODMAN:
17  Q.   And why do you look at the
18  historical performance in terms of efficiency
19  across channels?
20  A.   It allows us to be good stewards of
21  taxpayer dollars and to ensure we are
22  efficiently using the budget that has been

21 (Pages 78 - 81)

Page 102

1  BY MS. GOODMAN:
2    Q.  Why is it important for the army to
3  be able to attribute to more than just the last
4  touch?
5    A.  If we attributed only to the last
6  touch that would skew the data in terms of
7  channel performance.  More than likely it would
8  skew it toward a predominance of an investment
9  and search.
10   Q.  Why is it important not to skew the
11 data in terms of channel performance?
12   A.  It's important because we know that
13 our audience is not just on search.  They are
14 on multiple channels and are encountering the
15 media in multiple ways.
16   Q.  Okay.  So this Exhibit 88 it is
17 attaching a Paid Media Tactical Recommendation
18 Presentation from October of 2021 and I am
19 looking at the attachment line on the first
20 page of the e-mail, correct?
21   A.  Give me one second, ma'am.  It
22 actually -- I don't know if you attached both

Page 103

1  of them so what is attached to this e-mail is a
2  kind of an abridged version of the full
3  presentation that was meant for briefings with
4  senior leaders and then a full presentation
5  that is much longer, maybe five times longer.
6    Q.  Was it common for DDB to prepare an
7  abridged version and a full version for AEMO?
8        MR. McBIRNEY:  Objection.
9  Foundation.
10       THE WITNESS:  Yes, I wouldn't say it
11 was unusual.
12       BY MS. GOODMAN:
13   Q.  Why -- why did -- from your point of
14 view what was the purpose of having an abridged
15 version and a full version?
16   A.  Senior leadership doesn't want to
17 read 108 slides.
18   Q.  Are senior leaders -- when you say
19 "senior leaders," who are you referring to?
20   A.  In this case I would be referring to
21 the AEMO leadership that was above me.  I can't
22 recall who was my direct report at this time.

Page 104

1  I believe it was Colonel Horning, but if that's
2  correct that would have included Colonel
3  Horning, Mr. Mavridis and Major General Fink,
4  but this also may have been a brief that went
5  to leaders beyond AEMO internal within the
6  army.
7    Q.  Okay.  For what time period did you
8  report to Colonel Horning?
9    A.  Yeah, I'm sure -- I can't recall
10 exactly, ma'am.
11   Q.  How about generally?
12   A.  I honestly can't give you a guess on
13 that because it's my recollection that when I
14 first took over the position he was -- he was
15 not at AEMO.  He arrived shortly thereafter I
16 believe and he departed -- he changed positions
17 before I did so I can't recall general dates
18 honestly.
19   Q.  So who else have you reported -- who
20 else did you report to while you were at AEMO
21 other than Colonel Horning?
22   A.  Lieutenant Colonel Shannon Johnson.

Page 105

1    Q.  Anybody else?
2    A.  You are speaking specifically as my
3  time as branch chief?
4    Q.  No, throughout your tenure at AEMO?
5    A.  At AEMO?
6    Q.  Yeah.
7    A.  I first reported to Lieutenant
8  Colonel Dave Culver when I arrived.  My next
9  leader would have been Colonel Horning and then
10 Lieutenant Colonel Johnson.
11   Q.  And Lieutenant Colonel Johnson took
12 over Colonel Horning's role; is that accurate?
13   A.  That is correct.
14   Q.  Okay.  You see that this e-mail is
15 coming from Elizabeth Bridenstine.  Do you see
16 that?
17   A.  Yes.  It appears that Beth from OMD
18 sent this e-mail.
19   Q.  What is OMD?
20   A.  OMD is the media subcontractor that
21 works for DDB.
22   Q.  Is there a contract between the army

HIGHLY CONFIDENTIAL

Page 106

1  and OMD to your knowledge?
2       MR. McBIRNEY: Objection. Calls for
3  legal conclusion.
4       THE WITNESS: To my knowledge, the
5  army's contract is with the prime contractor
6  which is DDB.
7       BY MS. GOODMAN:
8    Q.  Are you aware of any contract terms
9  between DDB and OMD?
10   A.  I'm not privileged to those contract
11 terms.
12   Q.  When you were a COR did you ever
13 come to learn of any contract terms between DDB
14 and OMD?
15   A.  I did not.
16   Q.  To your knowledge, is a contracting
17 officer aware of the terms of any agreement
18 between OMD and DDB?
19       MR. McBIRNEY: Objection. Calls for
20 speculation. Also vague.
21       THE WITNESS: I'm unaware of that,
22 ma'am.

Page 107

1       BY MS. GOODMAN:
2    Q.  Okay. So in this Exhibit 88 we are
3  looking at, Beth is writing: "We are pleased
4  to share the final FY22 tactical media
5  recommendation." That is her first sentence.
6       Do you see that?
7    A.  I do.
8    Q.  Okay. What -- after DDB, or, I
9  guess, in this case -- well, strike that.
10      Who prepares the tactical media
11 recommendation; DDB or OMD?
12      MR. McBIRNEY: Objection.
13 Foundation.
14      THE WITNESS: I would say it's fair
15 to say that OMD is the primary preparer of the
16 tactical recommendation under the supervision
17 of DDB.
18      BY MS. GOODMAN:
19   Q.  How do you -- on what knowledge or
20 experience are you basing that testimony?
21   A.  To my knowledge, while OMD is the
22 media subcontractor their recommendations to

Page 108

1  the army come through DDB as DDB is the prime
2  contractor.
3    Q.  You have described OMD as a
4  subcontractor. How do you know OMD is a
5  subcontractor?
6       MR. McBIRNEY: Objection based on it
7  calls for legal conclusion.
8       THE WITNESS: DDB provides a list of
9  partners that they work with. In this case, a
10 subcontract that provide a variety of services
11 for the army.
12      BY MS. GOODMAN:
13   Q.  How do you know that there is a
14 subcontract between DDB and OMD?
15      MR. McBIRNEY: Objection. Calls for
16 legal conclusion and speculation.
17      THE WITNESS: I have not seen said
18 contract. To my -- to my understanding, the
19 appropriate term from OMD was a subcontractor.
20      BY MS. GOODMAN:
21   Q.  And what is that understanding based
22 on?

Page 109

1    A.  The fact that OMD assists DDB by
2  providing media services.
3    Q.  And what did you observe OMD doing
4  to assist DDB in providing media services?
5       MR. McBIRNEY: Objection.
6  Foundation.
7       THE WITNESS: OMD participates in
8  the entire tactical development process from
9  strategic development to tactical planning and
10 implementation along with day-to-day
11 operations.
12      BY MS. GOODMAN:
13   Q.  Do you know why DDB has OMD
14 participate in the tactical development
15 process?
16      MR. McBIRNEY: Objection. Calls for
17 speculation.
18      THE WITNESS: They provide -- my
19 understanding is that they provide media
20 expertise to DDB.
21      BY MS. GOODMAN:
22   Q.  What is that understanding based on?

Page 110

1  A. It's based on my time working with
2  DDB and OMD.
3  Q. Have you ever come to learn why DDB
4  relies on OMD to provide the media expertise
5  that you have described?
6  A. Outside of media being the industry
7  that OMD works in, I cannot say that I have
8  seen an official document that outlines why.
9  Q. Setting aside an official document
10 outlining why, have you ever come to learn
11 through any means, formally or otherwise, why
12 DDB relies on OMD to provide media expertise
13 that you have described?
14     MR. McBIRNEY: Objection. Asked and
15 answered and lack of foundation.
16     THE WITNESS: I am trying to think
17 of a specific document, but I don't think I
18 have a specific document in mind.
19     BY MS. GOODMAN:
20 Q. Right. My question is not asking
21 you to think of a specific document. It could
22 have come in the form of a conversation or just

Page 111

1  in the course of your work. I am asking if you
2  ever learned why DDB uses OMD to provide media
3  expertise?
4      MR. McBIRNEY: Same objections and
5  assumes facts.
6      THE WITNESS: My understanding is
7  that DDB uses OMD for media services because
8  that is the industry that they specialize in.
9      BY MS. GOODMAN:
10 Q. What industry to your knowledge does
11 DDB specialize in?
12     MR. McBIRNEY: Objection. Vague.
13 And calls for speculation.
14     THE WITNESS: The honest answer is I
15 didn't spend a lot of time concerning myself
16 with what DDB specialized in. However, a
17 general understanding is the entire marketing
18 process is what DDB is providing to the army.
19     BY MS. GOODMAN:
20 Q. When you say "the entire marketing
21 process that DDB is providing to the army,"
22 what is included within the entire marketing

Page 112

1  process that DDB provides to the army?
2  A. So my understanding is that DDB
3  provides full service marketing support to
4  AEMO. That includes a leadership team that
5  works with the army's leadership team to
6  develop a core strategy, strategic development
7  from there that becomes creative, assets, media
8  planning that we have talked about a little
9  bit, data analysis, research, and local support
10 at the regional and local levels.
11 Q. And all of those services that DDB
12 provides to AEMO is that under the prime
13 contract between army and DDB?
14     MR. McBIRNEY: Objection.
15 Foundation. And calls for legal conclusion.
16     THE WITNESS: There are multiple
17 task orders that include all of those services
18 that I mentioned and some others as well.
19     BY MS. GOODMAN:
20 Q. And the task orders to which you are
21 referring those are all issued under a primary
22 contract, correct?

Page 113

1  A. The specifics of how the contract
2  breaks down from the original base contract I'm
3  unsure of.
4  Q. Okay. In your work as a COR you
5  understood that task orders are issued under a
6  contract, correct?
7  A. The task orders were issued annually
8  as the contract with DDB for that period of
9  performance.
10 Q. When you say "as the contract with
11 DDB," what do you mean by that?
12 A. So the base contract is very general
13 and overarching; however, the task order that I
14 would be dealing with for national media or
15 upfront or local would be more specific to the
16 requirements that we had for those activities.
17 Q. Got it. And so the base contract
18 provides for DDB to provide all of the services
19 that you described; is that accurate?
20     MR. McBIRNEY: Objection. Calls for
21 legal conclusion.
22     THE WITNESS: I couldn't speak with

Page 114

1  certainty with everything the base contract
2  includes.
3      BY MS. GOODMAN:
4      Q.   Have you ever reviewed the base
5  contract?
6      A.   I have reviewed the base contract
7  previously.
8      Q.   Okay.  When is the last time you
9  remember reviewing the base contract?
10     MR. McBIRNEY:  I caution the witness
11  not to disclose anything that you saw in your
12  conversations with counsel.  You can answer the
13  question independent of conversations and
14  communications you had with counsel.
15     THE WITNESS:  I can't recall the
16  exact time frame of when I reviewed the base
17  contract, but it's, to the best of my
18  knowledge, it's been more than a year or so
19  ago.
20     BY MS. GOODMAN:
21     Q.   For what purpose did you review the
22  base contract about a year or so ago?

Page 115

1      A.   I reviewed the base contract for a
2  general baseline of what is included in that
3  document.
4      Q.   And so is it accurate that in order
5  for DDB to provide the full service marketing
6  support to AEMO that you described various task
7  orders are issued under the base contract
8  enabling them to do so?
9      MR. McBIRNEY:  Objection.  Calls for
10  legal conclusion and lack of foundation.
11     THE WITNESS:  I know there are
12  multiple task orders, ma'am; however, my
13  familiarity is specifically with the national
14  media talent and furnishings upfront and local,
15  social and operational infrastructure task
16  orders.  I can't really speak to the others.
17     BY MS. GOODMAN:
18     Q.   Okay.  So looking back at Exhibit 88
19  do you provide input on the national media and
20  tactical recommendation to OMD or DDB?
21     A.   I do provide input.  My team
22  provides input.

Page 116

1      Q.   Can you describe the process by
2  which you provide input to the tactical media
3  recommendation?
4      A.   Again, I would say it goes back to
5  the beginning, which is the army's requirement
6  for media, making sure there is a clear
7  understanding of our lead and contract goals
8  and the budget limitations that we have to
9  reach those goals.  This document looks at the
10  tactical plan; however, there is a strategic
11  plan that is developed as we talked about
12  earlier that outlines channel allocations.  The
13  tactical recommendation input is really
14  iterative.  Depending on the year we would have
15  multiple review sessions with DDB where we
16  would review each -- each slide, each
17  recommendation, each channel, each partner to
18  ensure that the end product is what we want to
19  see.  And that -- that input typically would
20  come from our team in a consolidated form that
21  would outline changes that army required to the
22  deck as it had been presented by DDB.

Page 117

1      Q.   Now when you say changes that the
2  army required to the deck, is that what is sort
3  of listed in these bullets in the e-mail?
4      A.   Give me a second to review these.
5      Q.   Sure.
6      A.   So after reviewing the first page of
7  what you provided here, I would have to see any
8  additional correspondence that went along with
9  this.  To the best of my knowledge, these look
10  to be responses to AEMO input that was outlined
11  by page or by slide.
12     Q.   Okay.  So if we look at the first
13  page of the exhibit at Bates ending 68, when I
14  say Bates I am looking at the little number on
15  the right-hand side of the page, let's go just
16  to the very bottom, Slide 8/9.
17     The second bullet says:  "AEMO
18  requested to add in impressions, visits, leads
19  and contracts."
20     Do you see that?
21     A.   I see that.
22     Q.   Okay.  And the last bullet says:

Page 118

1    "AEMO asked to change black/gray shading back
2    to color."
3         Do you see that?
4    A.   I see that.
5    Q.   Okay.  So what is your best
6    understanding of what those two bullets I just
7    read to you reflect with respect to any
8    requirements that the army put on the
9    contractor with respect to the tactical media
10   presentation?
11        MR. McBIRNEY:  Object to form and
12   foundation.
13        THE WITNESS:  Can you clarify how
14   you are using the term requirements here?  What
15   are you speaking it?
16        BY MS. GOODMAN:
17   Q.   I am using it how you used it
18   earlier.  You said the army tells them, I
19   think, of required changes to be made; is that
20   accurate?  Am I remembering your testimony
21   correctly?
22   A.   I may have used it multiple ways.

Page 119

1    Requirements, again, at the start of this
2    process include the outline from AEMO of our
3    lead and contract requirements.  You are
4    talking specifically about changes to the
5    document?
6    Q.   I am talking about whether --
7    earlier you testified that input would come
8    from your team in a consolidated form that
9    would outline changes that the army required to
10   the deck as it had been presented by DDB.
11        And I guess my question to you sir
12   is whether these bullets I have just read to
13   you are the consolidated feedback that would
14   outline changes the army required to the deck?
15        MR. McBIRNEY:  Object to form.  Lack
16   of foundation.
17        THE WITNESS:  To answer that
18   completely I would have to see the feedback
19   that was provided by AEMO.  This is just the
20   e-mail from DDB.  There should be some
21   correspondence from AEMO that outlines changes
22   that we required.

Page 120

1    Q.   Let's go to Page 275 of the exhibit.
2    And on this slide is the army's marketing
3    funnel presented?
4         MR. McBIRNEY:  Objection.
5    Foundation.
6         THE WITNESS:  On this slide a
7    version of the marketing funnel is presented.
8         BY MS. GOODMAN:
9    Q.   Are you aware of any other versions
10   of the marketing funnel that the army uses?
11        MR. McBIRNEY:  Object to form.
12        THE WITNESS:  Yes.
13        BY MS. GOODMAN:
14   Q.   What is the difference between the
15   marketing funnel depicted on this slide ending
16   in 275 compared to other versions of the
17   marketing funnel that you recall?
18        MR. McBIRNEY:  Object to form.
19        THE WITNESS:  Presentation and
20   information provided.  I think if you look
21   further in the deck, 279, 280 have different
22   versions of the marketing funnel, 281.

Page 121

1         BY MS. GOODMAN:
2    Q.   Is the marketing funnel depicted on
3    each of the pages that you mentioned sort of
4    conceptually the same and just different ways
5    of presenting the same kind of information?
6         MR. McBIRNEY:  Object to form.
7         THE WITNESS:  No.
8         BY MS. GOODMAN:
9    Q.   Help me understand the difference
10   between the marketing funnel as depicted on 275
11   compared to 279, 280, 281?
12   A.   So the marketing funnel presented on
13   275 really speaks to the audience strategy in
14   this case that we were pursuing for this year.
15   They are defined here as COR and growth
16   segments and it breaks down from the top of the
17   funnel; generate awareness, create interest and
18   educate, to the lower funnel obtain contract
19   information.  The subsequent examples I
20   discussed on 279, 280 have the funnel going
21   down the left-hand side include different
22   channels and outline the investment level for

Page 314

1  And, again, we will simply reiterate
2  that the 30(b)(6) portion was not prepared to
3  start until after 6:00 p.m., and unfortunately,
4  the witness was not prepared to go this late
5  into the evening, and that was unexpected. But
6  that's where we are.
7       MS. GOODMAN: And I will also note
8  for the record that the witness took an hour
9  dinner break when everybody else was prepared
10 to move forward into the 30(b)(6) at the
11 conclusion of the day.
12      MR. McBIRNEY: And I will simply
13 note that that is because the witness believed
14 that having a dinner break would be helpful for
15 his ability to testify.
16      Evidently, that has not been how
17 things were borne out, but that is why the
18 witness had a reasonable dinner hour, asked to
19 have dinner before beginning a 30(b)(6) that
20 could go as late as three hours longer, which
21 at that point would have been 9:00 with no
22 food.

Page 315

1       MS. GOODMAN: Well, I offered you
2  snacks, as you recall, and the snacks are here
3  in the room, including Kind bars and popcorn
4  and Zbars and some super foods called almonds
5  and cashews and peanuts.
6       MR. McBIRNEY: Let the record
7  reflect that I am noticing for the first time,
8  as flagged by counsel, that there Zbars,
9  peanuts, and snacks characterized by counsel as
10 "super foods" of some sort.
11      MS. GOODMAN: All right.
12      THE VIDEOGRAPHER: The time is
13 p.m. we are off the record.
14      (Whereupon, the proceeding was
15 adjourned at 7:56 p.m.)

Page 316

1       CERTIFICATE OF NOTARY PUBLIC
2       I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10 record of the testimony given by said witness;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this deposition was taken; and further,
14 that I am not a relative or employee of any
15 attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.

                  _[signature]_
19                Notary Public in and for
20                the District of Columbia
21 My Commission expires: August 14, 2024.

Page 317

1  Jimmy McBirney Esq
2  jimmy.mcbirney@usdoj.gov
3       September 6th, 2023
4  RE:  United States, Et Al v. Google, LLC
5  9/1/2023, Lennox Morris (#6074135)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 (erratas-cs@veritext.com).
16
17   Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions