# EXHIBIT 65

```
                                                         Page 1

 1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
 2                ALEXANDRIA DIVISION
 3   ---------------------------:
     UNITED STATES, et al.,      :
 4                               :
               Plaintiff,        :
 5                               :
            vs.                  : Case No.:
 6                               : 1:23-CV-00108-LMB-JFA
     GOOGLE, LLC,                :
 7                               :
               Defendant.        :
 8   ---------------------------:
 9
10
11      VIDEOTAPED DEPOSITION OF ALLEN OWENS, JR.
12
13   DATE:           September 28, 2023
14   TIME:           9:36 a.m.
15   LOCATION:       Paul, Weiss, Rifkind,
                       Wharton & Garrison LLP
16                   2001 K Street, Northwest
                     Washington, D.C. 20006-1047
17
     REPORTED BY:    Shari R. Broussard, RPR, CSR
18                   Reporter, Notary
19
20
21
22   Job No. CS6118347
```

Page 2

1    A P P E A R A N C E S
2    On behalf of Plaintiff:
3        CHASE PRITCHETT, ESQUIRE
         KATHERINE CLEMONS, ESQUIRE
4        ALVIN CHU, ESQUIRE
         U.S. Department of Justice
5        450 5th Street, Northwest
         Washington, D.C. 20530
6
     On behalf of Defendant:
7
         MARTHA L. GOODMAN, ESQUIRE
8        LEAH HIBBLER, ESQUIRE
         Paul, Weiss, Rifkind,
9         Wharton & Garrison, LLP
         2001 K Street, Northwest
10       Washington, D.C. 20006-1047
         (202) 223- 7341
11       mgoodman@paulweiss.com
12   ALSO PRESENT:
13       Orson Braithwaite, Video Technician
14
15
16
17
18
19
20
21
22

Page 3

1              C O N T E N T S
2    EXAMINATION BY:                          PAGE
3        Counsel for Defendant               6
4        Counsel for Plaintiff              105
5
6    DEFENDANT'S DEPOSITION EXHIBITS:   *    PAGE
7    154 Navy Communications with Attorneys    17
8    155 e-mails Re: Award of M&A contract, Bates
         NAVY-ADS-219026 to 173              27
9
     156 Amendment of Solicitation/Modification of
10       Contract, No. 2, Bates NAVY-ADS-12880
         to 925                              32
11
     157 e-mails Re: Navy Advertising Contract
12       N00189-15-D-Z024, Bates NAVY-ADS-315296
         to 374                              40
13
     158 e-mail from Uhlan to Owens, 7/15/22,
14       Bates NAVY-ADS-72243                61
15   159 Digital Media Bill, Oct-22, Bates
         NAVY-ADS-374151 to 171              67
16
     160 Digital Medial Bill, Nov-22, Bates
17       NAVY-ADS-373978 to 4145             77
18   161 Digital Medial FY19 Q3 Refund, Bates
         NAVY-ADS-5844                       82
19
     162 e-mails Re: Navy Refund Checks, Bates
20       NAVY-ADS-5834 to 837                83
21   163 Plaintiff United States of America's
         Responses to Defendant Google LLC's
22       Second Set of Interrogatories to the
         United States                       99

Page 4

1    DEFENDANT'S DEPOSITION EXHIBITS:   *    PAGE
2    164 Plaintiff's Responses to Defendant
         Google LLC's Fifth Set of
3        Interrogatories to the United States    101
4
5    PREVIOUSLY MARKED/REFERRED TO:
6    55  Bates NAVY-ADS-241136 to 143
7    60  Bates NAVY-ADS-28530 to 531
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22   (* Exhibits attached to transcript.)

Page 5

1
2            P R O C E E D I N G S
3        VIDEO TECHNICIAN:  Good morning.  We are
4    going on the record at 9:36 a.m. on
5    September 28th, 2023.
6        Please note that the microphones are
7    sensitive and may pick up whispering, private
8    conversations.  Please mute your phones at this
9    time.
10       Audio and video recording will continue
11   to take place unless all parties agree to go off
12   the record.
13       This is Media Unit 1 of the
14   video-recorded deposition of Mr. Allen Owens in
15   the matter of United States, et al., versus
16   Google, LLC, filed in the United States District
17   Court, Eastern District of Virginia, Alexandria
18   Division, Case Number 1:23-cv-00108-LMB-JFA.
19       My name is Orson Braithwaite
20   representing Veritext Legal Solutions and I'm the
21   videographer.  The court reporter is Shari
22   Broussard from the firm Veritext Legal Solutions.

|  | Page 38 |
|---|---|
| 1 | Q   -- correct? |
| 2 | MR. PRITCHETT:  Objection.  Form. |
| 3 | VIDEO TECHNICIAN:  Counsel, can you |
| 4 | repeat that. |
| 5 | MR. PRITCHETT:  Objection.  Form. |
| 6 | THE WITNESS:  The COR -- as stated |
| 7 | earlier, the COR is unable to change the task |
| 8 | orders or the contract.  Only the contracting |
| 9 | officer can do that. |
| 10 | BY MS. GOODMAN: |
| 11 | Q   Right.  I'm asking about the COR's |
| 12 | authority to direct VMLY&R's performance.  Is the |
| 13 | COR permitted to direct VMLY&R's performance in |
| 14 | any specific manner? |
| 15 | MR. PRITCHETT:  Objection.  Form. |
| 16 | THE WITNESS:  The COR is not able to |
| 17 | tell the contractor exactly how to do the job. |
| 18 | BY MS. GOODMAN: |
| 19 | Q   If you go back to Exhibit 155, turning |
| 20 | to page one 1- -- 219053.  Under just above the |
| 21 | little b where it says "Contract Surveillance," |
| 22 | I'm looking at number (2). |

|  | Page 39 |
|---|---|
| 1 | Do you see where I am? |
| 2 | A   The second paragraph from the top? |
| 3 | Q   Yes. |
| 4 | A   Yes. |
| 5 | Q   Okay.  And am I reading correctly the |
| 6 | sentence which says, "The COR shall not instruct |
| 7 | the contractor how to perform"? |
| 8 | A   Yes, you are reading that correctly. |
| 9 | Q   Okay.  And then if you look under b.(1) |
| 10 | under "Contract Surveillance," am I reading |
| 11 | correctly the sentences which say, "The COR must |
| 12 | be able to distinguish between surveillance (which |
| 13 | is proper and necessary) and supervision (which is |
| 14 | not permitted).  Surveillance becomes supervision |
| 15 | when you go beyond enforcing the terms of the |
| 16 | contract.  If the contractor is directed to |
| 17 | perform the contract services in a specific |
| 18 | manner, the line is being crossed"? |
| 19 | A   That is an accurate reading. |
| 20 | Q   Okay.  And in number (2) under b.(2) -- |
| 21 | under b., did I read it -- am I reading it |
| 22 | correctly when I say, "The COR shall monitor the |

|  | Page 40 |
|---|---|
| 1 | contractor's performance to see that inefficient |
| 2 | or wasteful methods are not being used"? |
| 3 | A   That is a correct reading as well. |
| 4 | Q   You can set that aside. |
| 5 | (Defendant's Exhibit Number 157 was |
| 6 | marked for identification.) |
| 7 | BY MS. GOODMAN: |
| 8 | Q   And I'm handing you now Exhibit 157, |
| 9 | NAVY-ADS-315296.  And I want to -- I want you to |
| 10 | confirm that this is the 2015 contract between |
| 11 | VMLY&R and the Navy, correct? |
| 12 | MR. PRITCHETT:  Objection.  Form. |
| 13 | THE WITNESS:  One moment to quickly |
| 14 | review. |
| 15 | So unlike the previous document, it |
| 16 | looks like this one only has the -- the first file |
| 17 | and then it has a listing of the attachments, |
| 18 | whereas this one is more complete because it had |
| 19 | also the printed attachments from the contract. |
| 20 | BY MS. GOODMAN: |
| 21 | Q   Okay.  So is what is -- what I've marked |
| 22 | as Exhibit 157 the 2015 contract between VMLY&R |

|  | Page 41 |
|---|---|
| 1 | and the Navy? |
| 2 | MR. PRITCHETT:  Objection.  Form. |
| 3 | THE WITNESS:  With the exception of the |
| 4 | attachments, which are notated on page 77 and 78 |
| 5 | but not printed out. |
| 6 | BY MS. GOODMAN: |
| 7 | Q   Okay. |
| 8 | A   Unless I'm missing it.  I don't think |
| 9 | so. |
| 10 | Q   Is it a common practice that the Navy |
| 11 | sometimes include the attachments in the contracts |
| 12 | and sometimes not? |
| 13 | MR. PRITCHETT:  Objection.  Form. |
| 14 | THE WITNESS:  No, I -- I would say it's |
| 15 | probably more that the -- that the second file |
| 16 | maybe just wasn't attached, I don't -- I -- I |
| 17 | don't know, but -- but there should be a listing |
| 18 | of those. |
| 19 | BY MS. GOODMAN: |
| 20 | Q   And so they're not combined into a |
| 21 | single file often, is that the case, as we saw in |
| 22 | Exhibit 155, where there are two attachments to |

11 (Pages 38 - 41)

Page 42

1    the cover e-mail?
2        MR. PRITCHETT: Objection. Form.
3        THE WITNESS: Yeah, I -- I can't speak
4    to why Ms. LaCroce on the November 1st of 2018 may
5    not have attached the second file.
6    BY MS. GOODMAN:
7      Q   Okay. But at least for purposes of your
8    review here today, you can confirm that what is in
9    front of you as Exhibit 157 is the contract -- the
10   2015 contract without the attachments, correct?
11     A   That is correct.
12     Q   Okay. You can set that to the side.
13       And so then task orders are issued
14   pursuant to the contracts that we just looked at,
15   correct?
16     A   Correct, task orders are issued
17   afterwards.
18     Q   Okay. What is the cadence or frequency
19   with which task orders are issued under these
20   contracts?
21       MR. PRITCHETT: Objection. Form.
22       THE WITNESS: Yeah. So -- so task

Page 43

1    orders are issued as funds are made available.
2    BY MS. GOODMAN:
3      Q   And how are funds made available?
4      A   From Congress to the Navy, from the Navy
5    to the various echelons of command. Then once the
6    comptroller at Navy Recruiting Command gets the --
7    the marketing and advertising funding, then he
8    issues it to us -- to Navy Recruiting Command, who
9    will then go through the process of getting it
10   approved onto the task order and getting the task
11   order issued.
12   BY MS. GOODMAN:
13     Q   And what is -- with what frequency are
14   funds made available in -- in order for you to
15   issue task orders?
16     A   Sure.
17       MR. PRITCHETT: Objection. Form.
18       THE WITNESS: In a perfect scenario the
19   funds would be issued at the beginning of the
20   fiscal year, but in situations such as continuing
21   resolutions and whatnot, they can be delayed. And
22   even after they are issued, they are not always

Page 44

1    issued at once, and so each year is different. It
2    can come quarterly, in some cases it could come
3    once every other month, and then in some cases you
4    could get a four- or five-month shot at a time.
5    It really just depends on the availability of
6    funds at higher echelons of command and how they
7    see fit to issue their funds down.
8    BY MS. GOODMAN:
9      Q   Okay. I'm handing you what I've marked
10   as Exhibit 55. This is a document that we looked
11   at in your prior deposition, NAVY-ADS-241136, and
12   this is an example of a task order issued pursuant
13   to the 2021 contract, correct?
14     A   Yes, that would be correct.
15     Q   Okay. And if you look at page 241142
16   under "3. Scope" -- do you see where I am?
17     A   You said 2211?
18     Q   241142.
19     A   Yes.
20     Q   We're reading in the Performance Work
21   Statement.
22       What's the Performance Work Statement

Page 45

1    represent?
2      A   The Performance Work Statement
3    represents the Government's intent -- a statement
4    of the services they're required.
5      Q   And it reflects what the contractor, in
6    this case VMLY&R, shall do under this task order,
7    correct?
8      A   It does. It -- it lays out the -- the
9    objective, the scope, the resources available and
10   the timing.
11     Q   Okay. And under "3. Scope" the second
12   bullet, can you read the first sentence -- the
13   first -- the first -- the first sentence of the
14   second bullet?
15     A   Sure. Under "Scope"?
16     Q   Yeah.
17     A   "Young & Rubicam (VMLY&R) shall
18   research, negotiate, and purchase digital media
19   and Internet advertising for flighting from
20   Jan/Feb of 2022 through 30 June of 2022 in the
21   form of:"
22     Q   Okay. And that -- that describes a

12 (Pages 42 - 45)

Page 46

1  service that VMLY&R shall do under this task
2  order, correct?
3      MR. PRITCHETT: Objection. Form.
4      THE WITNESS: Correct. This lays out
5  the -- the purchasing that is being requested.
6  BY MS. GOODMAN:
7      Q   Okay. And this task order does not set
8  a price for the advertising that Young & Rubicam
9  shall research, negotiate, and purchase, correct?
10     MR. PRITCHETT: Objection. Form,
11 foundation.
12     THE WITNESS: That is correct.
13 BY MS. GOODMAN:
14     Q   It simply sets a ceiling that they
15 cannot exceed; is that correct?
16     MR. PRITCHETT: Objection. Form,
17 foundation.
18     THE WITNESS: It does set the ceiling
19 they cannot exceed and it does list the
20 approximate number of impressions expected to get
21 for that.
22 BY MS. GOODMAN:

Page 47

1      Q   And that's an estimate, correct?
2      A   Due to the nature of the -- the -- the
3  market price changes, then yes, that's an -- that
4  is an estimate.
5      Q   Okay. And the task order does not set a
6  quantity of advertising to buy, correct?
7      MR. PRITCHETT: Objection. Form.
8      THE WITNESS: It does provide estimated
9  quantities of what's expected.
10 BY MS. GOODMAN:
11     Q   Of the impressions; is that what you're
12 referencing?
13     A   For -- for the top two major bullets of
14 digital display and online video as well as for
15 paid search, yes -- or, excuse me, paid social,
16 yes. And then for the remaining items it lists
17 out the approximate number of leads expected to be
18 garnered for the investment.
19     Q   Okay. And those are --
20     A   Again, those are estimates.
21     Q   That's my next question.
22         So you're looking at all of the

Page 48

1  estimates in scope, number three here, correct?
2      MR. PRITCHETT: Objection. Form.
3      THE WITNESS: Yes.
4  BY MS. GOODMAN:
5      Q   And the Navy does not tell VMLY&R how to
6  purchase ads, correct?
7      MR. PRITCHETT: Objection. Form,
8  foundation.
9      THE WITNESS: The Navy does not tell the
10 contractor how to perform the job. As stated
11 earlier, that -- that would be improper.
12 BY MS. GOODMAN:
13     Q   And, therefore, you do not tell the
14 contractor how to purchase the advertising
15 requested that they go purchase in scope three?
16     MR. PRITCHETT: Objection. Form,
17 foundation.
18     THE WITNESS: In scope three we lay out
19 the items that we are looking to purchase and then
20 based on a follow-on recommended plan is where we
21 lay out the specifics of what we're looking to
22 purchase. However, as you stated, we then do not

Page 49

1  tell them how to go and purchase them.
2  BY MS. GOODMAN:
3      Q   Okay. Does the Navy tell the contractor
4  what vendors to purchase advertising from?
5      MR. PRITCHETT: Objection. Form,
6  foundation.
7      THE WITNESS: In the form of an approved
8  reco deck or an approved recommended plan, the
9  Navy does. The Navy asks for a recommended plan
10 and relies on the experience and expertise of the
11 ad agency to provide a recommended plan, but they
12 do not purchase it until the Navy has approved the
13 plan.
14 BY MS. GOODMAN:
15     Q   And under the contract and task orders
16 for the contracts that we've been talking here --
17 about here today between the Navy and VMLY&R,
18 VMLY&R uses a subcontractor to purchase ads,
19 correct?
20     MR. PRITCHETT: Objection. Form,
21 foundation.
22     THE WITNESS: Based on my discussions

13 (Pages 46 - 49)

Page 50

1  with the FLC contracting officer, the term
2  "affiliate" was used to describe WaveMaker, the
3  one who purchases the ads for Navy.
4  BY MS. GOODMAN:
5      Q   I see. So rather than describing
6  WaveMaker as a subcontractor, is it the Navy's
7  position that the more appropriate way to describe
8  them is affiliate?
9          MR. PRITCHETT: Objection. Form.
10         THE WITNESS: Again, based on my
11 conversations with FLC, yes.
12 BY MS. GOODMAN:
13     Q   And what is FLC?
14     A   The Fleet Logistics Center, the one who
15 does contracts for the Navy.
16     Q   Okay. And there's no contract between
17 Navy and WaveMaker, correct?
18         MR. PRITCHETT: Objection. Form,
19 foundation.
20         THE WITNESS: The -- the marketing and
21 -- the only marketing and advertising contract
22 Navy has is with VMLY&R.

Page 51

1  BY MS. GOODMAN:
2      Q   And thus there's not one between the
3  Navy and WaveMaker, correct?
4          MR. PRITCHETT: Same objections.
5          THE WITNESS: The contract is between
6  VMLY&R and Navy and it's my understanding that
7  WaveMaker is an affiliate of VMLY&R and -- and
8  does that purchasing on their -- on -- on behalf
9  of them.
10 BY MS. GOODMAN:
11     Q   On behalf of VMLY&R?
12     A   Right.
13         MR. PRITCHETT: Objection. Form.
14 BY MS. GOODMAN:
15     Q   And there's no contract between Google
16 and the Navy for purposes of marketing and
17 advertising, correct?
18         MR. PRITCHETT: Objection. Form,
19 foundation.
20         THE WITNESS: Correct, our contract is
21 with VMLY&R.
22 BY MS. GOODMAN:

Page 52

1      Q   Do you know -- does the Navy know how
2  WaveMaker makes purchases of ads for the Navy
3  under the contracts we've been discussing?
4          MR. PRITCHETT: Objection. Form.
5          THE WITNESS: So the Navy tells them
6  which ads or which -- approves a plan which lays
7  out which vendors to buy from, but we do not tell
8  them what methods to employ to purchase those, we
9  rely on their expertise.
10 BY MS. GOODMAN:
11     Q   And so does the Navy know how WaveMaker
12 goes about actually purchasing the media for the
13 Navy under the contracts we've been discussing?
14         MR. PRITCHETT: Objection. Form.
15         THE WITNESS: To an extent as what --
16 what would be provided in the reco deck, but as
17 far as the detailed execution of how those ads are
18 placed, again, the Navy relies on the expertise of
19 VMLY&R to do that.
20 BY MS. GOODMAN:
21     Q   Okay. So the best understand- -- the
22 best representation of the Navy's understanding of

Page 53

1  how ads are actually purchased is found in the
2  tactical recommendation decks; am I understanding
3  your testimony correctly?
4          MR. PRITCHETT: Objection. Form.
5          THE WITNESS: My testimony is that the
6  Navy's understanding of which vendors to utilize
7  would be laid out in that approved deck, but
8  the -- the method employed to go out and procure
9  the ad would -- would be something that VMLY&R
10 would -- would do themselves. We wouldn't tell
11 them how to do it.
12 BY MS. GOODMAN:
13     Q   And is something that is not known to
14 the Navy, correct?
15         MR. PRITCHETT: Objection. Form.
16         THE WITNESS: To an extent. There would
17 be an exception such as our programmatic buying
18 with The Trade Desk.
19 BY MS. GOODMAN:
20     Q   What is -- what do you mean by that?
21     A   So you're -- you're asking which methods
22 are used to employ -- or which methods are

14 (Pages 50 - 53)

Page 66

1  Q   And you said you reviewed invoices to
2  prepare for your deposition, correct?
3  A   That is correct.
4  Q   Okay. And please describe for me the
5  process by which the Navy has issued invoices?
6      MR. PRITCHETT: Objection. Form.
7      THE WITNESS: So VMLY&R is issued the
8  task order to purchase media. When a media buy is
9  to occur, the agency does an invoicing -- what we
10 call the upfront invoicing or an initial
11 invoicing, which -- which specifies a specific
12 amount. We'll call it X. They invest -- they
13 invoice us for that spend. And then once the buy
14 has been completed and all of the dollars have
15 been executed, they subsequently send us another
16 invoice which will -- if the dollars were exact,
17 they don't send us another invoice. If the -- if
18 there is any credit due because let's say that the
19 amount of spend, since it was not to exceed, the
20 amount of spend comes under, they will send us a
21 separate invoice that has a credit issued on there
22 and the invoice is uploaded -- in both of those

Page 67

1  instances, the invoice is uploaded into WAWF, Wide
2  Area Workflow, per the terms of the contract. At
3  which point the Navy goes in, pulls down the
4  invoice, verifies all the information on it,
5  verifies what was purchased, that it was in line
6  with the plan, certifies the invoice for payment
7  and then payment is issued.
8      (Defendant's Exhibit Number 159 was
9      marked for identification.)
10 BY MS. GOODMAN:
11 Q   I'm handing you Exhibit 159,
12 NAVY-ADS-374151. And my question to you, sir, is
13 whether this is an invoice that describes -- that
14 reflects the upfront payment -- or upfront
15 invoicing that you just described?
16 A   Yes.
17 Q   And if you look at page ending 374155,
18 in the middle it says, "This invoice is a
19 breakdown of the INTERACTIVE pre-bill in
20 accordance with the approval to execute plan."
21     What does that mean?
22 A   That means exactly what I described

Page 68

1  before, just using a different term, pre-bill,
2  instead of upfront, but it is the amount that's
3  billed. Since the exact amount is market
4  dependent on pricing, it won't be known until
5  afterwards. So they have the not to exceed, but
6  there will almost inevitably be cleanup that has
7  to happen after the fact to account for any funds
8  that weren't spent and those credits can be issued
9  back.
10 Q   And if you look at the page ending in
11 158 --
12 A   Yes.
13 Q   -- this is the Plan Summary -- the
14 approved Tactical Media Recommendation Plan
15 against which this upfront invoice is issued,
16 correct?
17     MR. PRITCHETT: Objection. Form,
18 foundation.
19     THE WITNESS: It looks to be, yes.
20 BY MS. GOODMAN:
21 Q   And for October of 2022, as reflected on
22 158, this Plan Summary shows 1 million 111 --

Page 69

1  $112,500 for The Trade Desk, correct?
2  A   No, it -- it shows a net cost of -- hold
3  on. I'm sorry. For October through January it
4  shows a net cost of 4.45 million.
5  Q   Okay. And in -- on the October column
6  it has roughly one quarter of that, right?
7  1.1 million approximately?
8  A   For the October portion that's what it
9  shows.
10 Q   Okay. Now, go back to page 154.
11 A   Uh-huh.
12 Q   The amount pre-billed for Trade Desk on
13 October 1, 2022 is $1,329,471.56, correct?
14     MR. PRITCHETT: Objection. Form.
15     THE WITNESS: On this task order for the
16 October through January Navy display, you are
17 correct that the pre-bill that is sent in this
18 month reflects 1,329,471.56.
19 BY MS. GOODMAN:
20 Q   Can you explain the discrepancy between
21 what is approved on the Plan Summary of
22 approximately 1.1 million and Y&R billing for

18 (Pages 66 - 69)

Page 70

1  1.3 million in the month of October?
2      MR. PRITCHETT: Objection. Form,
3  foundation.
4      THE WITNESS: Yeah, the -- the Plan
5  Summary has a net cost of 4.45 shown for The Trade
6  Desk and although the estimates here show an exact
7  split between October, November, December and
8  January of 1,112,500, that would not -- the -- the
9  task order itself is for the total amount and so
10 that would be their not to exceed amount.
11 BY MS. GOODMAN:
12     Q  And --
13     A  So it -- I'm sorry.
14     Q  You go ahead. I interrupted you.
15     A  Well, I was just going to say so if this
16 one is slightly higher, as it indicates, by about
17 200,000, the expectation is one of the other three
18 months would have to be 200,000 less because they
19 would not be able to run that for all four months
20 and, again, so long as they don't pass the
21 not-to-exceed amount. That's the -- that's the
22 concern.

Page 71

1      Q  Okay. And the ad agency here, Y&R,
2  determines how much to invoice upfront for; is
3  that accurate?
4      MR. PRITCHETT: Objection. Form,
5  foundation.
6      THE WITNESS: It would be accurate to
7  say that the ad agency in determining how to
8  execute the plan did execute the -- the 1.329.
9  BY MS. GOODMAN:
10     Q  So within that plan, that not-to-exceed
11 amount of 4.45 million net cost for The Trade
12 Desk, the ad agency, Y&R, has discretion on how to
13 invoice or when to invoice or how to spend that
14 money across those four months so long as they do
15 not exceed the 4.45 million?
16     MR. PRITCHETT: Objection. Form,
17 foundation.
18     THE WITNESS: That is correct. They
19 should -- they should stay -- they have to stay
20 within that net cost that's listed on the
21 contract -- or, excuse me, that's listed on the
22 task order and the contract specifies that -- that

Page 72

1  the agency is not to incur costs that exceed any
2  amount given on a funded task order.
3  BY MS. GOODMAN:
4      Q  Okay. And you're referencing the task
5  order, but what we're looking at in this invoice
6  is an excerpt of the Plan Summary, correct?
7      MR. PRITCHETT: Objection. Form.
8      THE WITNESS: Correct.
9  BY MS. GOODMAN:
10     Q  And the task order does not break out
11 dollars to be spent or to be allocated to each
12 individual recommended partner, correct?
13     MR. PRITCHETT: Objection. Form.
14     THE WITNESS: I don't have the specific
15 task order in front of me to see if it -- if it
16 lays that out.
17 BY MS. GOODMAN:
18     Q  Have you ever seen a task order that
19 lays out specifically a budgeted amount for a
20 specific recommended partner such as The Trade
21 Desk, Peacock, Kargo, as listed in this invoice
22 we're looking at?

Page 73

1      MR. PRITCHETT: Objection. Form
2  foundation.
3      THE WITNESS: No, I've never seen a task
4  order that specified that.
5  BY MS. GOODMAN:
6      Q  And the upfront invoice, when they are
7  issued, are they paid by the Navy before proof of
8  ads being -- have been run?
9      MR. PRITCHETT: Objection. Form,
10 foundation.
11 BY MS. GOODMAN:
12     Q  Let me -- let me rephrase the question.
13     When the Navy is issued an upfront
14 invoice or a pre-bill, as we looked at, does the
15 Navy pay that invoice, i.e. remit payment to Y&R,
16 before it has proof that any ads were purchased?
17     MR. PRITCHETT: Objection. Form,
18 foundation.
19     THE WITNESS: So the contract with
20 VMLY&R states that the Navy will reimburse the
21 agency for costs incurred in the placement and
22 purchase of media, so the -- the agency is unable

Page 74

1  to bill us until they've incurred the cost.
2      I don't have the level of detail to know
3  exactly when they make payment to the vendor,
4  whether it's on day one or -- or after that.
5  But -- but they submit us -- they submit to us an
6  invoice for the -- the pre-bill I think was the
7  term we used here -- for the pre-bill and it's
8  only upon the second invoicing is when they have
9  to provide the various proofs to substantiate the
10 final amount that is being billed to us.
11 BY MS. GOODMAN:
12    Q   Does the Navy pay the pre-bill before
13 receiving that second invoice?
14         MR. PRITCHETT:  Objection.  Form.
15         THE WITNESS:  Yes, the Navy pays the
16 pre-bill to enable the media to be purchased.
17 BY MS. GOODMAN:
18    Q   Okay.  So the Navy pays the pre-bill
19 before media is, in fact, purchased?
20         MR. PRITCHETT:  Objection.  Form,
21 foundation.
22         THE WITNESS:  Again, as I stated

Page 75

1  earlier, the Navy -- the Navy pays the pre-bill to
2  support costs incurred, but I -- just as I stated
3  earlier, we don't tell them how to execute, I'm
4  not privy to at what date they would actually
5  execute the -- the media buy.
6  BY MS. GOODMAN:
7     Q   I see.
8     A   But as they send us the pre-bill, that's
9  when we approve it and -- for payment.  And then
10 when they send us the second billing is whenever
11 we go to the penny to balance what was actually,
12 after any credits, what was actually spent and the
13 substantiating invoices from all the vendors.
14 And, again, we -- we match that up to the penny.
15 BY MS. GOODMAN:
16    Q   And the Navy is not aware of how --
17 strike that.
18        The Navy is not aware of when vendors
19 such as The Trade Desk are paid by its ad agency,
20 correct?
21         MR. PRITCHETT:  Objection.  Form,
22 foundation.

Page 76

1          THE WITNESS:  Yeah, the Navy is not
2  privy to the detailed information of exactly when
3  any of their vendors, whether it be The Trade Desk
4  or others, are paid.
5  BY MS. GOODMAN:
6     Q   Okay.  And the Navy is not privy to who
7  remits payment to vendors, meaning WaveMaker or
8  Y&R, correct?
9          MR. PRITCHETT:  Objection.  Form,
10 foundation.
11         THE WITNESS:  The Navy's contract is
12 with VMLY&R.  WaveMaker is one of their
13 affiliates.  The billing comes from VMLY&R and
14 that's who payment is remitted to.  But past
15 that -- we are not privy to the level of their
16 financial systems of how payment is executed past
17 that.
18 BY MS. GOODMAN:
19    Q   So all the Navy knows is that it pays
20 VMLY&R for media purchased on Navy's behalf,
21 correct?
22         MR. PRITCHETT:  Objection.  Form,

Page 77

1  foundation.
2          THE WITNESS:  It would be -- it would be
3  more complete to say the Navy knows all of the
4  media that's been purchased on its behalf and pays
5  VMLY&R to reimburse them the cost incurred in the
6  placement of media, yes.
7  BY MS. GOODMAN:
8     Q   And are there occasions when VMLY&R does
9  not pass on all of the costs incurred by it to the
10 Navy?
11         MR. PRITCHETT:  Objection.  Form,
12 foundation.
13         THE WITNESS:  The contract calls for
14 VMLY&R to -- to be reimbursed for those costs
15 incurred.  To the best of my knowledge, I don't
16 believe they have incurred any costs that they
17 didn't bill us for.
18        (Defendant's Exhibit Number 160 was
19         marked for identification.)
20 BY MS. GOODMAN:
21    Q   Okay.  I'm handing you Exhibit 160,
22 NAVY-ADS-373978.  This is a lengthy invoice and I

20 (Pages 74 - 77)

Page 78

1  just want to direct you to the Billing Memo on the
2  second page of it.
3      My first question is what is a Billing
4  Memo?
5    A   A Billing Memo could be used to explain
6  any type of -- any type of discrepancy or
7  something otherwise that might be noted in here
8  and to explain what that is for.
9    Q   Okay. And this Billing Memo shows that
10 VMLY&R is not charging the Navy for, in the second
11 bullet, an 8-cent fee and in the fourth bullet a
12 4-cent fee, correct?
13   A   Let's see.
14      MR. PRITCHETT: Objection. Form.
15      THE WITNESS: As I testified earlier, we
16 balance this down to the penny and when -- when
17 the Navy finds any discrepancies and notifies
18 VMLY&R, they have in the past issued a memo to --
19 such as this -- to explain that any amount under a
20 certain amount of money, and I -- I can't remember
21 if it's like $1 or 50 cents or whatever, they
22 don't -- they don't try to collect on due to it

Page 79

1  being more -- more cost in manpower to chase that
2  down and do the work than rather collect on it. I
3  don't remember the exact dollar amount, but this
4  refreshes my memory on that.
5  BY MS. GOODMAN:
6    Q   Okay. And does the Navy know whether
7  even though VMLY&R has not charged the Navy for
8  these fees -- strike that.
9      Although VMLY&R has not charged the Navy
10 for these fees, does the Navy know whether VMLY&R,
11 in fact, pays the fees to the vendors, here
12 Amazon?
13      MR. PRITCHETT: Objection. Form,
14 foundation.
15      THE WITNESS: So the -- the contract
16 with VMLY&R calls for them to only bill us for
17 costs incurred, which would include those fees,
18 and once we pay those to VMLY&R, it would be our
19 understanding that -- that they would pay those
20 vendors.
21      In this particular instance, I can't
22 confirm whether the 8 cents was paid to Amazon or

Page 80

1  the 4 in this -- in this occasion was paid to
2  Amazon in bullets two and four.
3  BY MS. GOODMAN:
4    Q   Okay. And do you have -- now that this
5  document has refreshed your recollection, do you
6  recall any other instances where VMLY&R has not
7  passed on certain charges to the Navy that it --
8      MR. PRITCHETT: Objection. I'm sorry.
9  BY MS. GOODMAN:
10   Q   -- incurred in the purchase of media for
11 the Navy?
12      MR. PRITCHETT: Objection. Form,
13 foundation.
14      THE WITNESS: Aside from this where
15 we're talking small amounts, in the -- in the --
16 in the pennies, I am unaware of any time where
17 the -- VMLY&R, you know, would not attempt to bill
18 us for costs incurred.
19 BY MS. GOODMAN:
20   Q   And any price negotiations that take
21 place for the purchase of media, does the Navy
22 participate in those?

Page 81

1      MR. PRITCHETT: Objection. Form,
2  foundation.
3      THE WITNESS: The Navy contracts with
4  VMLY&R to negotiate placement of media on our
5  behalf with the exception of one minor instance
6  I -- I can -- I can remember where the Navy was --
7  even in that instance we weren't directly involved
8  with the vendor. But there was a vendor who was
9  trying to double the -- the price, but it
10 wasn't -- it was an online tool, but it wasn't the
11 purchase of media. But, no, as a -- as a general
12 rule, the Navy does not get involved in that
13 negotiation.
14 BY MS. GOODMAN:
15   Q   And so long as your ad agency stays
16 within the not-to-exceed amount for the purchasing
17 of advertising, it has discretion to negotiate
18 pricing, correct?
19      MR. PRITCHETT: Objection. Form,
20 foundation.
21      THE WITNESS: Yeah, the contract calls
22 for them to propose, recommend and negotiate

Page 82

1  pricing on our behalf.
2       (Defendant's Exhibit Number 161 was
3       marked for identification.)
4  BY MS. GOODMAN:
5     Q   I'm handing you Exhibit 161,
6  NAVY-ADS-5844, and this is a Digital Media Refund
7  document.
8       In what instances does Y&R refund Navy
9  for the purchase of digital media?
10      MR. PRITCHETT: Objection. Form,
11 foundation.
12      THE WITNESS: Let me read this document
13 real quick.
14      Is your question pertaining to this
15 instance or just in general?
16 BY MS. GOODMAN:
17    Q   First -- first, let's keep it to this
18 instance.
19      For what purpose was the Navy issued a
20 refund, as reflected in this Exhibit 161?
21      MR. PRITCHETT: Objection. Form.
22      THE WITNESS: Yeah, so without the

Page 83

1  supporting documentation of the work statement and
2  the reco deck and the -- all the -- the other
3  substantiated documentation, it would be
4  impossible for me to determine exactly what this
5  was on itself -- why this -- why this refund
6  occurred, but I can talk in general why a refund
7  would occur.
8  BY MS. GOODMAN:
9     Q   Okay. What documentation would you look
10 at -- would you need to look at in order to figure
11 out precisely what has been refunded -- what
12 purchases have been refunded?
13    A   Sure.
14      MR. PRITCHETT: Objection. Form.
15      THE WITNESS: I would need to look at
16 the task order, the reco, the detailed invoice,
17 and then any -- any additional e-mails that
18 might -- that might be attached to that. But --
19 but from those I could get an idea of what that
20 refund was -- was due for.
21      (Defendant's Exhibit Number 162 was
22      marked for identification.)

Page 84

1  BY MS. GOODMAN:
2     Q   Okay. I'm handing you Exhibit 162,
3  which is an e-mail from VMLY&R to Cheryl
4  Aimes-Tillman, NAVY-ADS-5834 to 5837.
5       And Cheryl Aimes-Tillman, she's at the
6  Navy, what's her role?
7     A   She is a warranted contracting officer
8  who works for Ms. Dean Stewart-Curry.
9     Q   And this set of refunds attached to this
10 e-mail for the amounts of $2,500 approximately and
11 $212,000 approximately, what would you need to do
12 to figure out precisely what purchases are being
13 refunded here?
14      MR. PRITCHETT: Objection. Form.
15      THE WITNESS: Let me review this real
16 quick.
17      So I would need to -- I would need to
18 look at the same documents as referenced earlier.
19 And because this references the Army-Navy game
20 2019 and has the -- for the 212,000 amount, again,
21 I would have to -- I wouldn't want to say with
22 certainty, but I'm -- I'm supposing that that

Page 85

1  might have something to do with COVID and the
2  implications on the game. That's probably the
3  year that they didn't let anyone outside of Navy
4  and Army actually attend the game and, therefore,
5  we didn't have all the advertising that we would
6  normally have. But, again, that's just my
7  assumption without looking at documents. I would
8  have to go look at those documents that you asked
9  for earlier -- or that I mentioned to you earlier.
10 BY MS. GOODMAN:
11    Q   And so is it accurate to say that simply
12 looking at invoice amounts to the Navy is not
13 necessarily the full -- or the most accurate
14 representation of how much money the Navy actually
15 paid to VMLY&R?
16      MR. PRITCHETT: Objection. Form.
17      THE WITNESS: No, the -- the invoicing
18 remains that they submit a -- and it's mentioned
19 in the e-mail here from Cheryl actually, that "a
20 task order is closed out when all deliverables
21 have been received and accepted." So the agency
22 is supposed to submit a final task order ending

22 (Pages 82 - 85)

```
                                                                 Page 106
 1   through Google's Ad Exchange?
 2      A   No, we do not.
 3          MR. PRITCHETT:  Okay.  No further
 4   questions.
 5          MS. GOODMAN:  Okay.
 6          VIDEO TECHNICIAN:  The time is
 7   12:08 p.m.  We're off the record.
 8          (Whereupon, at 12:08 p.m., the
 9           deposition of ALLEN OWENS, JR.
10           was concluded.)
11                * * * * *
12
13
14
15
16
17
18
19
20
21
22
```

```
                                                                 Page 107
 1          CERTIFICATE OF NOTARY PUBLIC
 2      I, SHARI R. BROUSSARD, the officer before
 3   whom the foregoing deposition was taken, do hereby
 4   certify that the witness whose testimony appears
 5   in the foregoing deposition was duly sworn by me;
 6   that the testimony of said witness was taken by me
 7   in stenotype and thereafter reduced to typewriting
 8   under my direction; that said deposition is a true
 9   record of the testimony given by said witness;
10   that I am neither counsel for, related to, nor
11   employed by any of the parties to the action in
12   which this deposition was taken; and, further,
13   that I am not a relative or employee of any
14   counsel or attorney employed by the parties
15   hereto, nor financially or otherwise interested in
16   the outcome of this action.
17
18
                    [signature: Shari R. Broussard]
19              SHARI R. BROUSSARD
              Notary Public in and for the
20              District of Columbia
21
       My commission expires:
22   August 14, 2025
```

```
                                                                 Page 108
 1           A C K N O W L E D G E M E N T
 2                 O F   D E P O N E N T
 3
 4
     I, ALLEN OWENS, JR., do hereby acknowledge
 5
     I have read and examined the foregoing pages of
 6
     testimony, and the same is a true, correct and
 7
     complete transcription of the testimony given by
 8
     me, and any changes or corrections, if any, appear
 9
     in the attached errata sheet signed by me.
10
11
12
13
14
15
16
17
18
19
     _____   _____
20   Date                    ALLEN OWENS, JR.
21
22   Job No. CS6118347
```

```
                                                                 Page 109
 1   Katherine Clemons Esq.
 2   katherine.clemons@usdoj.gov
 3              October 2, 2023
 4   RE:   United States, Et Al v. Google, LLC
 5      9/28/2023, Allen Owens, Jr., Navy 30(B)(6) (#6118347)
 6      The above-referenced transcript is available for
 7   review.
 8      Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   erratas-cs@veritext.com
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19    If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25
```