# EXHIBIT 68

# REDACTED

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

---------------------------:

UNITED STATES, et al., :
:
Plaintiff, :
:
vs. : Case No.:
: 1:23-CV-00108-LMB-JFA
GOOGLE, LLC, :
:
Defendant. :
---------------------------:

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ADORIA LIM

DATE: February 29, 2024
TIME: 9:37 a.m.
LOCATION: U.S. Department of Justice
Antitrust Division
450 Fifth Street, Northwest
Washington, D.C. 20530

REPORTED BY: Shari R. Broussard, RPR, CSR
Reporter, Notary

Job No. CS6485261

APPEARANCES

On behalf of Plaintiff:

CRAIG BRISKIN, ESQUIRE
KATHERINE CLEMONS, ESQUIRE
ALVIN CHU, ESQUIRE
U.S. Department of Justice
450 Fifth Street, Northwest
Washington, D.C. 20530

On behalf of Defendant:

MARTHA L. GOODMAN, ESQUIRE
ANNELISE CORRIVEAU, ESQUIRE
BYRON BECKER, ESQUIRE
HEATHER MILLIGAN, ESQUIRE (Via Zoom)
Paul, Weiss, Rifkind,
Wharton & Garrison, LLP
2001 K Street, Northwest
Washington, D.C. 20006-1047
(202) 223-7341
mgoodman@paulweiss.com
accoriveau@paulweiss.com
bpbecker@paulweiss.com

ALSO PRESENT:

David Campbell, Video Technician
John Griffin, DoJ
Oliva Choi, DoJ
Margaret Lynn, DoJ
Dulce Nunez, DoJ
David Pearl, Esquire (Via Zoom)
Alison Forman, The Brattle Group (Via Zoom)
Jack Turner, The Brattle Group (Via Zoom)
Julie Suh, The Brattle Group (Via Zoom)
Xiaoxi Tu, Esquire (Via Zoom)

CONTENTS

EXAMINATION BY: PAGE
Counsel for Defendant 5

LIM DEPOSITION EXHIBITS: * PAGE
1 Lim Expert Rebuttal Report, 2/13/24, Respess Expert Report, 12/22/23 44
2 Letter from Pearl to Garcia, 9/23/23 109
3 Blog, "How our display buying platforms share revenue with publishers" 119
4 Digital Media Bills, Bates NAVY-ADS-249484 to 522 153
5 Declaration of Devon P. Mahoney 268

(* Exhibits attached to transcript.)

PROCEEDINGS

VIDEO TECHNICIAN: Good morning. We are going on the record on February 29th, 2024, and the time on the video monitor is 9:37 a.m.

This is Media Unit Number 1 of the video-recorded deposition of Adoria Lim in the matter of United States of America, et al., versus Google, LLC. The location of this deposition is 450 Fifth Street, Northwest, Washington, D.C. 20530.

My name is David Campbell, representing Veritext, and I'm the videographer. The court reporter today is Shari Broussard also with Veritext.

Counsel will please identify yourselves for the record after which the court reporter will please swear in the witness and we can proceed.

MS. GOODMAN: Martha Goodman on behalf of plaintiff Google -- I'm sorry, defendant Google, joined by Annelise Corriveau and Byron Becker of Paul Weiss and Ricardo -- I forgot his last name --

MR. MARCHINGIGILO: Marchingigilo.

MS. GOODMAN: -- from Analysis Group.

MR. BRISKIN: Craig Briskin from the Department of Justice for plaintiffs.

MR. CHU: Alvin Chu, Department of Justice, for plaintiffs.

MS. CLEMONS: Katherine Clemons -- Katherine Clemons, Department of Justice, for plaintiffs.

MR. GRIFFIN: John Griffin, financial analyst with the Department of Justice.

THE REPORTER: Are you ready for me to swear the witness?

MS. GOODMAN: I guess so.

WHEREUPON,

ADORIA LIM

called as a witness, and having been sworn by the notary public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. GOODMAN:

Q Good morning, Ms. Lim.

with Brent.

Q And to the best of your memory, when did you first speak with Brent?

A I don't have a more specific memory other than the spring of 2023.

Q And have you worked -- what's your best estimate of the number of hours you have billed on this matter since you began work on it sometime in the spring or late spring of 2023?

A Over 600 hours.

Q And those are billed at -- all 600 of those hours were billed at the rate of $800 an hour?

A Yes.

Q How many other individuals at The Brattle Group besides yourself have billed to this matter?

A More than 30, less than 50.

Q And how many individuals at -- at The Brattle Group have worked on the quantification of damages in this matter?

A Are you -- I need you to clarify -- or

let me ask you to clarify with regard to in support of Dr. Simcoe, in support of Dr. Respess and/or myself or are you asking about -- are you asking for the collective -- those collective -- all those people under that umbrella, or are you asking about a specific -- under a specific -- in support of a specific expert?

Q Sure. So for Dr. Respess and yourself, how many individuals at The Brattle Group have worked on what I'll call the quantification of damages that is reflected in your report and Dr. Respess' report?

A More than five, less than ten.

Q The individuals who you met with at The Brattle Group to prepare for your deposition which you named earlier, are those the individuals who worked on the quantification of damages at The Brattle Group?

A Those are a -- those individuals that I named earlier are a subset.

Q So you named seven individuals earlier. Are there any other individuals you're remembering

who worked on the quantification of damages at The Brattle Group for this matter?

A Again, in reference to -- in -- in support of either Dr. Respess or myself?

Q Yes.

A Also Gage Hornung, H-O-R-N-U-N-G.

Q Anybody else?

A There are some individuals in our IT group whose names I don't remember right now.

Q Okay. Did you review bills on this matter?

When I say "this matter," I'm referring specifically to the quantification of damages done by Dr. Respess and yourself.

A I don't review the invoices themselves. I review the time entries for those individuals who are working -- who work to support Dr. Respess and who are working to support myself.

Q Okay. And have you reviewed the time entries for the individuals who are working to support Dr. Respess and yourself throughout the entirety of Brattle Group's engagement on this

matter, meaning from the spring of 2023 to the present?

MR. BRISKIN: Let me just state that Section 515 of the expert stip protects budgets, invoices, bills, receipts, or time records concerning testifying experts, or consultants, their staff, assistants, colleagues, or associates of other companies or organizations from disclosure.

MS. GOODMAN: I am not asking about the contents of the bills, I'm asking if she reviewed bills.

MR. BRISKIN: Right. I'm instructing the witness not to testify with regard to any contents of budgets, invoices, bills, receipts, or time records.

BY MS. GOODMAN:

Q So my question again is do you review the time entries for the individuals who you named who worked to support Dr. Respess and yourself from the beginning of this -- the engagement on this matter to the present?

A Yes.
Q Okay. Did the time entries also indicate the hourly rate at which somebody bills?
MR. BRISKIN: I'll instruct the witness not to answer.
BY MS. GOODMAN:
Q How do you know the hourly rate of individuals who bill out at The Brattle Group on this matter?
A I'm involved in the budgeting process.
Q Okay. Can you approximate how many hours the eight individuals you named who have worked at The Brattle Group in support of Dr. Respess and your analyses in this matter, how many hours have those individuals billed over the life of that work?
A I couldn't tell you that. I -- I don't know.
Q Can you approximate it?
A I have not focused on that and I have not kept count.
Q Are you aware of any individual, other

than yourself, at The Brattle Group billing more than 600 hours --
A I --
Q -- on the quantification of damages?
A I haven't focused on that, so I -- I -- I don't know.
Q Do you expect your staff to work more or fewer hours than yourself?
MR. BRISKIN: Objection to the form.
THE WITNESS: Can you clarify what you mean by that question? Are you referring in a -- in a given year, just generally or --
BY MS. GOODMAN:
Q On -- on this matter do you expect your staff to work more or fewer hours than yourself?
MR. BRISKIN: Objection to form.
THE WITNESS: I don't have an expectation in that regard.
BY MS. GOODMAN:
Q Okay. Do you know how much The Brattle Group has been paid in connection with the work it has done with respect to Dr. Respess' work --

report and your report on this matter?
A I don't know.
Q Can you give an approximation?
A I'm -- as I said earlier, I'm -- I don't see the invoices when they go out and I -- I'm not in charge of collections on those invoices either, so it's not something I'm focused on.
Q Do you make a distinction between invoices and collections in your answer?
A So they're -- they're connected because you don't get collections unless you invoice. So you could invoice and not collect. But in either case -- in any case, as I said, I haven't -- I'm not in charge of the invoicing process or collection process in this matter.
Q Okay. Is it possible to -- is it possible for The Brattle Group to invoice an amount and collect less than that amount?
MR. BRISKIN: Objection to the form.
THE WITNESS: Unfortunately, yes.
BY MS. GOODMAN:
Q And it's the case that just because an

amount is invoiced doesn't mean that's the amount that's ultimately paid, correct?
A Unfortunately, correct.
Q Okay. And so you've worked you said about --
A But generally speaking again, I've almost never seen a --
Q I don't think there's a question pending.
A Sorry, I didn't finish my answer, so I was just completing my answer.
Again, I don't think I've seen an instance in which you can collect or we've collected without invoicing.
Q Okay. Are you done?
MR. BRISKIN: Objection to form.
THE WITNESS: I'm done with that last answer.
BY MS. GOODMAN:
Q Okay. You've billed you said over 600 hours on this matter, correct?
A Correct.

Q Are all 600 of those hours in connection with the quantification of damages work done in the Respess/Lim report -- reports?

A Well, the -- since the time I filed my rebuttal report, I've billed additional hours in preparing for this deposition. So the 600 hours would be an approximation of hours billed to date.

Q Okay. So of the 600 hours that you have billed to date, how many of those hours relate to the work to quantify damages in this case?

A I'm not sure what you mean by my -- by that question, but I've spent about 400 hours -- I've spent about 400 hours in support of -- in support of Dr. Respess in the preparation of his report, you know, in which he quantified damages.

Q Okay. I'm just trying to understand of the 600 hours you spent in connection with the Respess/Lim reports, including the preparation for your deposition about which we're here to -- you're here to testify -- preparation of your reports about which you're here to testify today, how many of those 600 hours go to the work related

to the profitability opinions versus the damages opinions?

A I would not be able to tell you that. I have not kept count.

VIDEO TECHNICIAN: I'm sorry. Can we go off the record one second?

MS. GOODMAN: Sure.

MR. BRISKIN: Sure.

VIDEO TECHNICIAN: Off the record at 10:03.

(Brief recess.)

VIDEO TECHNICIAN: Back on the record at 10:08.

BY MS. GOODMAN:

Q Ms. Lim, of the 600 hours that you have spent working on the topics reflected in the Respess and Lim reports, including preparing for your deposition, can you give an approximation of how many of those hours relate to the calculation of damages?

A I'm sorry, I didn't keep count.

Q When you were -- withdrawn.

I'm not asking if you kept count, I'm asking if you can give an approximation of how many hours of the 600 were spent in connection with work on the quantification of damages?

MR. BRISKIN: Objection to form.

THE WITNESS: I haven't focused on keeping track of my hours in the manner in which you described. I wouldn't be able to give you any approximation.

BY MS. GOODMAN:

Q So you can't say if you spent one hour working on the quantification of damages and 599 hours working on the accounting opinions you offer?

MR. BRISKIN: Objection to form.

THE WITNESS: I'm sorry, I just haven't kept track in the manner in which you're asking. I -- I -- I just can't give an approximation.

BY MS. GOODMAN:

Q Okay. So it's possible you've spent one hour of the 600 hours on the quantification of damages?

MR. BRISKIN: Objection to form.

THE WITNESS: I'm sure that I spent more than one hour.

BY MS. GOODMAN:

Q Okay. Have you spent more than ten hours on the approximation of damages?

A I've spent more than ten hours.

Q Have you spent more than a hundred hours on the calculation of damages?

A I'm not sure. I haven't kept count. It's quite possible.

Q Is it quite possible or probable or more likely than not? Can you say more than possible?

A It's quite possible.

Q Dr. Respess billed 348.5 hours on this matter.

Does that figure help you approximate how many hours you spent on the topic of calculating damages in this matter?

A No.

Q Is it quite possible that you billed more than 200 hours to the calculation of damages

withdrawal prior to reading his declaration yesterday.

BY MS. GOODMAN:

Q When did you learn that Dr. Respess could no longer work on the matter?

MR. BRISKIN: You can answer with a date if you know.

THE WITNESS: February 12th.

BY MS. GOODMAN:

Q Who wrote your rebuttal report?

A I wrote my rebuttal report as it is filed.

Q Did you work on your rebuttal report prior to February 12th?

MR. BRISKIN: I'd just instruct the witness not to answer with regard to the contents of the report.

THE WITNESS: Prior to Dr. Respess' withdrawal, I worked with Dr. Respess on the preparation of what was at -- what was at that time going to be his rebuttal report.

BY MS. GOODMAN:

Q Did you write any portions of the rebuttal report as filed prior to February 12th, 2024?

MR. BRISKIN: You can answer yes or no.

THE WITNESS: No.

BY MS. GOODMAN:

Q Did you -- are there any portions of the rebuttal report, which you filed on February 13th, 2024, which were written by Dr. Respess?

MR. BRISKIN: I'd just instruct the witness not to respond with regard to the contents, but you can respond yes or no.

THE WITNESS: I wrote my rebuttal report as filed.

BY MS. GOODMAN:

Q You wrote the entirety of your rebuttal report as filed; is that your testimony?

MR. BRISKIN: Objection to form.

THE WITNESS: Yes, it is my words.

BY MS. GOODMAN:

Q Did you write them out yourself?

A I'm not sure what you mean by "write

them out." Could you clarify, please.

Q Did you type every word in your rebuttal report yourself?

MR. BRISKIN: Objection to form.

THE WITNESS: If you're asking me whether I keystroked every single letter in my rebuttal report, no.

MR. BRISKIN: Aren't we getting close to an hour? Is this a good time to take a break?

MS. GOODMAN: Sure.

MR. BRISKIN: Okay.

VIDEO TECHNICIAN: Off the record at 10:37 a.m.

(Brief recess.)

(Lim Exhibit Number 1 was marked for identification.)

VIDEO TECHNICIAN: Back on the record at 10:53.

BY MS. GOODMAN:

Q Ms. Lim, you've been handed your rebuttal report marked as Lim Exhibit 1.

Do you have that in front of you?

A I do.

Before we continue, I realized that I need to clarify. I left one individual off of the list of names that I had given you with regard to other Brattle staff that assisted Dr. Respess in the preparation of his report and assisted me in the preparation of my report and that is Alison Forman.

Q Okay. So you have Exhibit 1 in front of you?

A I do.

Q And the -- the opinions you offer in this case are based on the assumption that Google has violated the antitrust laws as alleged in the amended complaint; is that accurate?

A Are you referring to a particular portion of my report?

Q I'm just asking if your opinions are based on the assumption that Google has violated the antitrust laws as alleged in the amended complaint. Is that accurate?

A Yes.

CONFIDENTIAL

Page 46

Q Okay. And you have not been asked to independently evaluate the legal claims in this matter; is that accurate?
A Yes.
Q And is it your testimony that you did not independently evaluate Dr. Simcoe's analyses in this case?
A That is correct.
Q And the only thing you do with Dr. Simcoe's analyses is use them as inputs to calculate overcharges and advertiser damages?
A That is correct.
Q Did you read Dr. Simcoe's report?
A I have.
Q Did you evaluate or study his models to understand how he arrived at the but-for take rate that he offers in his report?
MR. BRISKIN: Objection to form.
THE WITNESS: Can you ask the question again?
BY MS. GOODMAN:
Q Did you study his models to understand

Page 47

how he arrived at the but-for take rates that he offers in his report?
A I -- I read his report. I wouldn't use the word "study" to describe what I did. I read his report at a high level and did not attempt to evaluate his analyses.
Q And because you did not attempt to evaluate his analyses, you have no opinion about the strength or weakness of his analyses; is that accurate?
MR. BRISKIN: Objection to form.
THE WITNESS: I did not independently evaluate Dr. Simcoe's analyses.
BY MS. GOODMAN:
Q And is it accurate then that you have no opinion about the strength or weakness of his analyses?
A I have no opinions about that.
Q And so you have no opinion whether Dr. Simcoe's analyses are correct or incorrect, correct?
MR. BRISKIN: Objection to form.

Page 48

THE WITNESS: Correct.
BY MS. GOODMAN:
Q And you're not offering an opinion in this case as to whether the overcharge you calculate was caused by anticompetitive conduct; is that correct?
A One more time.
Q You are not offering an opinion in this case as to whether the overcharge you calculate was caused by anticompetitive conduct; is that correct?
A That is correct.
Q You are not opining in this case that Google is not in compliance with generally accepted accounting principles by treating itself as a principal, correct?
A I do not have an opinion that Google's financial statements in which Google considers itself a principal, that those financial statements are materially misstated.
Q You -- you do not offer an opinion in this case as to whether Google's internal DVAA

Page 49

product area reporting was in accordance with GAAP, correct?
MR. BRISKIN: Objection to form.
BY MS. GOODMAN:
Q Let me withdraw the question.
Your opinion in this case -- withdrawn.
You do not opine that Google's internal DVAA product area reporting was not in accordance with GAAP, correct?
MR. BRISKIN: Objection to form.
THE WITNESS: So I -- I don't -- I don't have an opinion about whether Google's internal DVAA product area reporting was in accordance with GAAP.
BY MS. GOODMAN:
Q And --
MR. BRISKIN: Did you finish your answer?
THE WITNESS: I did. Thank you.
BY MS. GOODMAN:
Q And it is accurate that you do not have an opinion about whether Google's internal DVAA

product area reporting was not in accordance with GAAP, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I think -- I think Google has stated that its DVAA internal management view reporting is not in accordance with GAAP.

BY MS. GOODMAN:

Q I'm asking for your opinion in this case. Can you please answer the question as I posed it.

You do not have an opinion about whether Google's internal DVAA product area reporting was not in accordance with GAAP, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: So as I just said, Google has said that its management view internal reporting is not in accordance with GAAP and I see no reason to -- I've not seen anything to indicate that Google is wrong in that respect.

BY MS. GOODMAN:

Q I'm just asking whether you offer an opinion one way or another in this case as to

whether Google's internal DVAA management reporting is not in accordance with GAAP and it sounds like the answer is no. Am I correct in understanding your testimony?

MR. BRISKIN: Objection to form.

THE WITNESS: I -- I just think it's a little more nuanced than that.

BY MS. GOODMAN:

Q Okay. You do not opine that Google is not in accordance with GAAP by treating itself as a principal, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: Sorry, one more -- one more time.

BY MS. GOODMAN:

Q You do not offer an opinion that Google is not in accordance with GAAP by treating itself as a principal, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I'm not sure how that question is different from the other question you asked before.

I do not have an opinion about whether Google's financial statements -- publicly-reported financial statements in which Google treats itself as a principal for most transactions is materially misstated relative to GAAP.

BY MS. GOODMAN:

Q It is accurate that you do not disagree with Google's treatment of itself as a principal in its publicly-filed financial statements reported under GAAP, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: Sorry, I'm getting a little -- little confused about the double negatives. One more time.

BY MS. GOODMAN:

Q It is accurate that you do not disagree with Google's treatment of itself as a principal in its publicly-filed financial statements reported under GAAP?

MR. BRISKIN: Objection to form.

THE WITNESS: I don't agree or disagree. I don't have an opinion about that.

BY MS. GOODMAN:

Q Okay. And you do not offer an opinion in this matter that Google misapplied ASC 606 by treating itself as a principal, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: Again, are you -- are you referring to Google's publicly-reported financial statements?

BY MS. GOODMAN:

Q Yes.

A I don't have an opinion one way or the other. I don't agree or disagree with regard to Google's treatment of itself as a principal for most transactions in those financial statements.

Q And in this line of questioning you were looking at Exhibit 1, which is your rebuttal report. Which parts of Exhibit 1 were you reading -- reading?

MR. BRISKIN: Objection to form.

THE WITNESS: You asked me some questions about whether I had performed an independent evaluation of Dr. Simcoe's work and I

in Damages Analysis"?

A The -- the avenues are the red lines or -- or, sorry, the FAA purchase avenues are the red arrows shown in Figure 4 and the FAA purchase pathways are a subset of the red avenues.

Q Okay. Did you see any evidence -- withdrawn.

And so would it be accurate to put in between the left-hand side of DV360, TTD, other DSPs, and Google Ads and the right-hand side blue bubble FAAs the advertising agencies through which FAAs purchase ads?

MR. BRISKIN: Objection to form.

THE WITNESS: I think this question was similar to the previous question you asked me before. Figure 3 just is different from -- I'm sorry, Figure 4 is different from Figure 3 in that it breaks out more binders and it shows the red arrows, which are the FAA purchase pathways, of which the -- sorry, it shows the red arrows, which are the FAA purchase avenues, of which the FAA purchase pathways are a -- are a subset. So that

I -- I -- I -- I think you're asking a very similar question with regard to Figure 3 and Figure 4. I don't -- I would have the same answer.

BY MS. GOODMAN:

Q Okay. And it's accurate that the FAAs purchased display ads from Google using various ad agencies, correct?

A Yes.

Q Did you see any evidence that FAAs purchased display ads directly from Google?

MR. BRISKIN: Objection to form.

THE WITNESS: Could you clarify what you mean by "directly"?

BY MS. GOODMAN:

Q With no other entity sitting in between the FAA and Google.

MR. BRISKIN: Objection to form.

THE WITNESS: What -- what do you -- can you clarify what you mean by "sitting in between"?

BY MS. GOODMAN:

Q Well, Mr. Briskin is sitting in between

yourself and Mr. Chu. That's what I mean. Imagine yourself to be an FAA and Mr. Chu being Google.

Is there any other entity between the FAA and Google in the course of purchasing ads that you saw?

MR. BRISKIN: Objection to form.

THE WITNESS: So I'm not -- sorry, I'm not -- I'm not sure the -- the seating -- the hypothetical -- or it's not hypothetical, but the seating diagram really helps me understand your question.

Again, the FAAs and -- the FAAs purchased display advertising from Google and, as I testified earlier, that the FAAs used ad agencies to do so.

BY MS. GOODMAN:

Q Okay. And by using the ad agencies to do so, is it accurate that the ad agencies sit between the FAAs and Google?

MR. BRISKIN: Objection to form.

THE WITNESS: Again, I'm not sure what

you mean by "sit between."

BY MS. GOODMAN:

Q So you can't answer the question?

A I think you'd have to clarify it for me.

Q Okay. What's your understanding of the word "directly"?

MR. BRISKIN: Objection to form.

THE WITNESS: I -- I -- it depends on the context.

BY MS. GOODMAN:

Q Can you give me a dictionary definition of the word "directly"?

A Probably not without the dictionary.

Q Okay.

A I'm sorry, just -- I -- I wasn't prepared on dictionary definitions today.

Q Okay. Did you see any evidence that the FAAs paid money directly to Google?

MR. BRISKIN: Objection to form.

THE WITNESS: Again, can you clarify what you mean by "directly"?

BY MS. GOODMAN:

Q Dollars went from an FAA directly to Google.

MR. BRISKIN: Objection to form.

THE WITNESS: So let me -- let me -- let me state it this way: So what I saw in the payment process was that Google invoiced the -- Google invoiced the ad agencies and the ad agencies invoiced the FAAs and the FAAs paid 100 percent of the charges invoiced by Google.

VIDEO TECHNICIAN: Sorry, ma'am, it picks up when you're touching the microphone.

THE WITNESS: Oh, sorry. I've probably just got a nervous habit there. Apologies. Do I need to say that again?

VIDEO TECHNICIAN: No, you're fine.

THE WITNESS: Okay.

BY MS. GOODMAN:

Q And so in what you saw, if I'm understanding you correctly, Google invoiced the ad agencies and the ad agencies invoiced the FAAs, correct?

A Yes.

Q Okay. And so in what you saw, can we have the common understanding that the ad agencies, therefore, sit between Google and the FAAs?

MR. BRISKIN: Objection to form.

BY MS. GOODMAN:

Q That's what I mean by "sit between." Okay?

A Are you referring to the payment process specifically when you refer to -- to "sit between"?

Q I'm referring to both the payment and purchasing process.

MR. BRISKIN: Objection to form.

THE WITNESS: I reviewed the -- I reviewed the payment process.

BY MS. GOODMAN:

Q Did you review the purchasing process?

A What do you mean by "purchasing process"?

Q What's your understanding of the difference between payment and purchase?

A I'm -- I'm -- I'm trying to actually understand what you mean by the difference between payment and purchase because you -- you asked a question about purchase, you asked a question about -- and I clarified with regard to payment. And -- and so if you could clarify what you mean by "purchase."

Q I want to use --

A I don't want to have a misunderstanding --

Q I agree.

A -- between the two of us.

Q I agree.

You used the word "purchase" throughout your report, so I want to use your understanding of purchase and I want to use your understanding of payment, which is also in your report.

So please tell me what you understand to mean the difference between those two words as used in your report and we will have that common understanding.

A So as I testified earlier, my

understanding is that based on what I saw, the FAAs purchased an advertising from Google. With regard to the payment flow process specifically, Google invoiced the ad agencies and the ad agencies invoiced the FAAs and the payments reflect the invoiced parties.

MS. GOODMAN: Move to strike as not responsive.

BY MS. GOODMAN:

Q My question to you is simply what do you understand the difference in meaning of the words "payment" and "purchase" to be in your report?

A Purchase in my mind is who is -- it's who is -- it's -- it's the advertiser buying the ad inventory. Payment refers, in -- in my mind, to the physical flow of funds.

Q Okay. So did you see any evidence that an FAA buys ad inventory directly from Google?

MR. BRISKIN: Objection to form.

THE WITNESS: As I stated earlier, the -- the FAAs purchased advertising from -- they purchased services from Google.

BY MS. GOODMAN:

Q Yes.

A I'm not -- I'm not -- again, I'm not sure what you mean by "directly." I think I've -- I think I've stated my understanding of both the -- of who's doing the purchasing and who's doing the paying in terms of the payment flow process.

Q It is accurate that some of the ad agencies used by FAAs engaged other ad agencies to execute the FAAs' ad purchases, correct?

A Yes.

MR. BRISKIN: Can we take a break in the next five minutes, whenever it's a good breaking point?

MS. GOODMAN: Yeah.

BY MS. GOODMAN:

Q Ms. Lim, did you see any evidence of an FAA buying ad inventory without the use of an advertising agency?

A It's possible that that happened. I was asked to focus my damages analysis -- or

Dr. Respess was asked to focus his damages analysis on the specific F- -- FAA purchase pathways in the -- in the Respess report.

In -- in those pathways the FAAs used ad agencies to make their purchases of Google services, but it's -- it's -- it's possible that I -- I -- so, for example, what I'm -- let me just -- what I'm thinking about is, as I mentioned in my report, there are a number of blank agency IDs and I don't know in those circumstances where -- whether an ad agency was involved or not and I -- I can't recall -- no, no. Sorry. Strike that. I do recall that there are FAAs associated with those blank agency IDs.

Q Okay. So for each of the 15 purchase pathways included in your damages analysis, did you see any evidence of any of the FAAs within those purchase pathways buying ad inventory without the use of an advertising agency?

A By definition, those purchase pathways are as I've described them in Figures 8 through 10 of the opening report and each of those -- in each

of those pathways the FAAs use ad agencies to make their purchases.

Q And so it's accurate that, for purposes of the damages which you calculate in this case, there is no instance of an FAA buying ad inventory without the use of an advertising agency?

A Yes.

MS. GOODMAN: We can take a break.

MR. BRISKIN: Thanks.

VIDEO TECHNICIAN: Off the record at 11:38.

(Brief recess.)

VIDEO TECHNICIAN: Back on the record at 11:53.

BY MS. GOODMAN:

Q Ms. Lim, if you could turn to Exhibit 1, Appendix E, paragraph 44.

A On page 17?

Q Yes.

A I'm there.

Q The first sentence reads, "The FAAs purchased display ads from Google using various ad

agencies."

Do you see that?

A Yes.

Q For purposes of your damages computation, did you see any evidence that any FAA directed the advertising agency to purchase ads using Google products or services?

MR. BRISKIN: Objection to form.

THE WITNESS: I'm not sure what you mean by "directed."

BY MS. GOODMAN:

Q Did you see any evidence that any FAA told their advertising agency please purchase ads using Google products or services?

MR. BRISKIN: Objection to form.

THE WITNESS: I wasn't -- I was focused on the payment flow process, so I -- and I -- let me -- let me start over.

So in the course of my work -- work, as I mentioned before, I reviewed probably thousands -- probably thousands of -- of documents in this matter and I don't recall the contents of

each and every one of those. What I -- what I focused on was the payment flow process.

So with regard to your question, I think -- I think my answer is I don't know. I don't -- I don't remember.

BY MS. GOODMAN:

Q Okay. So with regard to my question, you don't remember whether you saw any evidence that any FAA directed their advertising agency to use Google products or services to purchase ads; is that accurate?

A I think --

MR. BRISKIN: Objection to form.

THE WITNESS: I think you modified your question to say -- when you clarified, you said did I see any evidence that an FAA had told an ad agency. And if -- if -- if that's how you're -- what you mean by "directed," I don't recall one way or the other.

BY MS. GOODMAN:

Q Okay. That is what I mean by "directed."

So with regard to my question, you don't remember whether you saw any evidence that any FAA directed their advertising agency to use Google products or services to purchase -- to purchase ads; is that correct?

MR. BRISKIN: Objection to form.

THE WITNESS: If -- if in that question you -- you mean to replace "directed" with "told," then I don't recall one way or the other.

BY MS. GOODMAN:

Q I said that is what I mean by "directed," so I would like to get a clear answer to my question.

A Sorry, I thought I was being -- being clear.

Q There's no question pending.

A Apologies.

Q Did you see any evidence in this case that any FAA instructed their advertising agency to use Google products or services to purchase ads?

MR. BRISKIN: Objection to form.

THE WITNESS: What do you mean by "instructed"? Do you mean told again?

BY MS. GOODMAN:

Q What do you understand the word "instructed" to mean?

A It depends on the context.

Q In the context of my sentence, how do you interpret it?

A I think that's what I'm asking you, if -- if you're -- if you mean told.

Q I just want to understand how you under- -- how you interpret the word "instructed" in my question.

What do you think I mean?

Let me withdraw that.

What do you understand the word "instructed" to mean in my question?

A Told.

Q Okay. Did you see any evidence in this case that any FAA instructed their advertising agency to use Google products or services to purchase ads?

MR. BRISKIN: Objection to form.

THE WITNESS: Could you -- one -- one more time. Sorry.

BY MS. GOODMAN:

Q Did you see any evidence in this case that any FAA instructed their advertising agency to use Google products or services to purchase ads?

MR. BRISKIN: Objection to form.

THE WITNESS: Sorry, I -- I just want to be clear. Again, it's -- it's the -- it's the FAA is purchasing ads and -- and so -- so I think my answer is the -- again, I'm not sure how that question is different from your previous question, which -- which I understand you to mean did I see any evidence in this matter where the -- where an FAA told an ad agency to use Google with regard to the FAAs' purchase -- purchases of Google's services.

And my -- so my answer would be that, again, I've reviewed thousands of documents in this matter and I don't recall the -- the content

of each and every one of them, so I may have seen something, I -- I may not. I -- I don't recall one way or the other. It was not something I focused on.

MS. GOODMAN: Move to strike.

BY MS. GOODMAN:

Q It's accurate that the FAAs purchased display ads from Google using various ad agencies, correct?

MR. BRISKIN: Objection to form.

Oh, sorry.

THE WITNESS: Yes.

BY MS. GOODMAN:

Q Okay. The FAAs used the various ad agencies how to purchase ads from Google?

MR. BRISKIN: Objection to form.

THE WITNESS: I'm not sure what you mean by "how."

BY MS. GOODMAN:

Q How did the various ad agencies participate in the process of purchasing display ads from Google for the FAAs?

A So my work focused on the payment flow process. I wasn't focused on the -- I wasn't focused on exactly what the ad agencies did in facilitating the FAAs' purchases of Google services.

Q Okay. Paragraph 44 of Appendix E, page 17, the sentence I just read is from that and it cites to two documents in Exhibit 26 -- footnote 26.

Did you review those two documents cited in footnote 26?

A Yes.

Q Did you come away with an understanding of how the ad agencies participate in the process of purchasing display ads from Google?

A So a couple of clarifications. The -- I know there are two Bates stamps in footnote 26. I think it's actually the same document.

The -- the -- the document, as it's noted in the footnote, is a contract between the Air Force and GSD&M.

I was focused on -- my review of this

particular contract was to provide overall context to, for example, an FAA purchase pathway. It wasn't -- I wasn't focused on the -- I wasn't focused on what particular activities the -- the ad agencies did.

Q Okay. So sitting here today, do you have any understanding of how the ad agencies participate in the process of purchasing display ads from Google for the FAAs?

And I'm not asking for what your understanding is. I'm simply asking whether you have an understanding of how they participate.

A The -- the ad agencies facilitate the FAAs' purchases.

Q Okay. Do you know how the FAAs facilitate the ad agencies -- the FAAs' purchases?

A Again, I didn't focus on exactly what activities they did.

Q Okay. So do you have an understanding of how the ad agencies facilitate the FAAs' purchases?

A I don't have a detailed understanding.

Q Do you have an understanding?

A Yes.

Q What is your understanding of how the FA- -- how the ad agencies facilitate the FAAs' purchases?

A The -- the FAAs facilitate the FAAs' purchases -- for example, I believe that -- that -- that they're the ones that log in, so to speak, to Google Ads or DV360.

Q And what is your understanding based on that the ad agencies are the ones who log in, so to speak, to Google Ads or DV360?

A I -- I can't remember where I gained that understanding.

Q Okay. And it is your understanding sitting here today that Google sends invoices to ad agencies, correct?

A Yes.

Q And it is your understanding sitting here today that Google -- that within your damages calculations Google only sends invoices to ad agencies, not directly to the FAA, correct?

MR. BRISKIN: Objection to form.
THE WITNESS: One more time, please.
BY MS. GOODMAN:
Q Within your damages calculations, the transactions within your damages calculations, is it accurate that for all of those purchases Google sent invoices to an ad agency, not to the FAA?
MR. BRISKIN: Objection to form.
THE WITNESS: Yes.
BY MS. GOODMAN:
Q And for all of the transactions within your damages calculations, did you see any evidence that an FAA transmitted money directly to Google?
MR. BRISKIN: Objection to form.
THE WITNESS: With regard to the payment flow process, what I saw is that the FAAs cut checks to the ad agencies and the ad agencies cut checks to Google such that --
BY MS. GOODMAN:
Q What evidence --
A -- such that in the end the FAAs paid

100 percent of the charges -- of Google's charges.
Q What evidence did you see that ad agencies cut checks to Google?
A That would be in my Appendix E to the opening report.
Q What kinds of documents did you believe were sufficient evidence to form the belief that the ad agencies cut checks to Google?
MR. BRISKIN: Objection to form.
THE WITNESS: That's -- that's my understanding from the payment flow process.
BY MS. GOODMAN:
Q And I'm asking what kinds of documents is your understanding based on. I'm not asking for a specific document, but what kinds of things did you see that lead you to believe the -- or leads you to the opinion that the ad agency cut a check to Google?
A Is -- it would be, for example, the payment data and invoices that are listed in Appendix E.
Q What payment data did you see from an --

from an advertising agency, not from the FAA, but evidence of an advertising agency paying money to Google? What payment data are you referring to?
A Perhaps it would be helpful to -- let me just point that -- let me go to my Appendix E and I -- I will -- well, I will go there.
So, for example --
Q Can you -- I'm sorry to interrupt, but can you just identify what page you're looking at?
A I'm in -- I'm on pages 158 and 159.
Q Thank you.
Go ahead.
A So, for example, in the [redacted] data I saw evidence of cuts being check -- or checks being cut from an ad agency to Google.
Q Okay. And is it accurate that for no other of the payment purchase pathways reflected in your Appendix E do you include any evidence that an ad agency cut a check to Google?
A I'd -- I'd have to go through each and every one. I don't -- I don't recall specifically the -- there were many invoices and much payment

data that I looked at. I just don't recall specifically --
Q Okay.
A -- in terms of -- I -- I recall on -- for USPS we got a quite fulsome dataset, but I just -- I just don't recall specifically with regard to other pathways.
Q If you saw payment data showing payments from an advertising agency to Google, would that be reflected in your Appendix E?
MR. BRISKIN: Objection to form.
THE WITNESS: It would be reflected in my Documents Relied Upon list, the documents that I relied upon.
BY MS. GOODMAN:
Q But it wouldn't be in Appendix E?
A Appendix E is a -- are examples of walk-throughs that I performed with regard to the payment process. Appendix E includes documents related to those walk-throughs. But it's possible that I saw additional payment data outside of Appendix E.

Q And just for the record, when you say "Appendix E," you're talking about Appendix E to the initial Respess report, correct?
A Yes.
Q And Appendix E to your rebuttal report is, in fact, the initial Respess report, correct?
A Corrected for errata.
Q Yes.
A Yes. It's rather confusing.
Q Okay. So could we talk about Appendix E to the Respess report in this deposition as Appendix E/E so we know what we're talking about?
A Wait, wait, wait, wait. What do you want to call it? Wait. Sorry?
Q Withdrawn.
MR. BRISKIN: Was that a joke? Appendix 2.
BY MS. GOODMAN:
Q Did you see any evidence in this case for purposes of your damages calculation that any FAA paid Google directly for the use of DV360?
MR. BRISKIN: Objection to form.

THE WITNESS: Sorry, are we talking about the FAA purchase pathways included in my damages analysis?
BY MS. GOODMAN:
Q Yes, ma'am.
MR. BRISKIN: Same objection.
THE WITNESS: What I saw was that -- again, what I saw was that Google invoiced ad agency, ad agency invoiced FAA, FAA cut a check to the ad -- ad agency, and ad agency cut a check to Google.
BY MS. GOODMAN:
Q Okay. And so is it your testimony that you did not see any evidence of Google paying money -- strike that. Withdrawn.
Is it accurate that you did not see any evidence that any FAA paid money to Google directly for the use of DV360?
MR. BRISKIN: Objection to form.
THE WITNESS: Sorry, sorry, I'm not -- I'm not sure what you mean by "directly," but we just discussed in --

BY MS. GOODMAN:
Q May I --
A -- US- --
Q May I provide an understanding of -- let me tell you my understanding of "directly" and then maybe that will help you answer the question.
A Okay.
Q By "directly" I mean without the intervention of somebody -- of a medium or an agent.
So did you see any evidence that any FAA paid Google directly for the use of DV360 for the transactions included in your damages calculations?
MR. BRISKIN: Objection to form.
THE WITNESS: Let me -- I'm not sure how that question is different from the questions you asked before in which I referred you to the IPG data for USPS.
BY MS. GOODMAN:
Q Okay. Let me try again.
Did you see any evidence that any FAA

paid Google without the intervention of a medium or an agent for the use of DV360 for the transactions included in your damages calculation?
MR. BRISKIN: Objection to form.
THE WITNESS: So, again, my understanding is that Google invoiced the ad agencies, the ad agencies invoiced the FAAs, the FAAs cut checks to the ad agencies, and the ad agencies cut checks to Google.
BY MS. GOODMAN:
Q So based on what you saw, is it accurate that the FAAs used a medium or an agent in order to pay Google?
A I'm not sure what you mean by "medium" or "agent."
The -- the payment process by which the FAAs paid for their Google purchases -- the payment process involves ad agencies.
Q And the ad agencies are in between -- in that payment process they are in between Google and the FAA, correct?
MR. BRISKIN: Objection to form.

THE WITNESS: Again, I'm not sure what you mean by "in between," but as I testified, Google invoices the ad agencies, ad agencies invoice the FAAs, FAA -- FAAs cut checks to the ad agencies, ad agencies cut checks to Google.

BY MS. GOODMAN:

Q Okay. I'm going to ask one more time just to see if you can answer the question as I've posed it. And if you can't, that's fine and I'll move to strike your answer and I'll call the court -- I'll bring this to the judge.

But I'm asking a question to which you're not providing an answer and that is are the ad agencies in between the payment -- in the payment -- withdrawn.

In the payment process which you have described, do the ad agencies sit in between Google and the FAA in order for Google to receive money from the FAA?

MR. BRISKIN: Objection to form.

THE WITNESS: Again, I -- I think I've explained my understanding of the process. I'm

not sure what you mean by "sit in between," but I think I've been very clear that the -- Google invoices the ad agencies, ad agencies invoice the FAA, FAAs cut the checks to the ad agencies, ad agencies cut the checks to Google.

BY MS. GOODMAN:

Q And in the process which you have described --

A I mean, I -- I -- that's the way that I would describe the process.

Q Okay.

A So -- sorry.

Q In the process which you have described it is correct that the ad agencies are in between Google and the FAAs, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: You seem really -- you seem really interested in "in between" and, again, I'm not sure what "in between" means with regard to your -- your question.

The way the invoicing process works is -- is as I've explained it and that's the way I

would phrase it. I -- again, Google invoiced the ad agencies, ad agencies invoiced the FAAs, FAAs cut the checks to the ad agencies, ad agencies cut -- cut the checks to Google.

MS. GOODMAN: Okay. I'll move to strike as nonresponsive.

MR. BRISKIN: Can we take a quick break?

MS. GOODMAN: Sure.

VIDEO TECHNICIAN: Off the record at 12:21.

(Brief recess.)

VIDEO TECHNICIAN: Back on the record at 12:36.

BY MS. GOODMAN:

Q Ms. Lim, for every transaction that you include in the purchase pathways underlying your damages calculation, did you see any evidence that Google paid for the ads without the use of an ad agency? Withdrawn.

For every transaction that you include in your purchase pathways underlying your damages calculations, did you see any evidence that the

FAA paid for the ads without the use of an ad agency?

A No.

Q You relied on data produced by Google which you refer to as RFP60 data, correct?

A Yes.

Q Did you understand that the RFP60 data includes advertiser names which are input by customers?

MR. BRISKIN: Objection to form.

THE WITNESS: May I review my report to refresh my memory with regard to that?

BY MS. GOODMAN:

Q Sure. Which page of the report are you thinking of?

A It's in the area of Figures 8 through 10.

So what I observed in the RFP60 data was there was some nonstandardization in terms of the information that was input into various fields that -- I'm not sure why there's nonstandardization -- non- -- nonstandardization.

One reason could be because the -- the advertisers or the ad agencies assisting the advertisers could be putting in information into those fields in a nonstandard way.

Q Did you have an understanding of the RFP60 data that the -- the information listed in the advertiser fields is not verified, curated, or cleaned by Google?

MR. BRISKIN: Objection to form.

THE WITNESS: I do not have an understanding of the process by which Google vets or doesn't vet the information that may be input either by Google or by others into its databases.

BY MS. GOODMAN:

Q Okay. Would it be important to you for purposes of your analysis to know whether the information for the advertiser identities within the RFP60 data is not verified, curated, or cleaned by Google?

MR. BRISKIN: Objection to the form.

THE WITNESS: Which field in particular are you talking about?

BY MS. GOODMAN:

Q The fields listing the name of the advertiser customer.

MR. BRISKIN: Objection to form.

THE WITNESS: So the -- can you ask the question one more time? Sorry.

BY MS. GOODMAN:

Q Would it be important for you to know that the -- the fields including names of the advertising customer in RFP60 data is not verified, curated, or cleaned by Google?

MR. BRISKIN: Objection to the form.

THE WITNESS: The -- the -- no.

BY MS. GOODMAN:

Q Why not?

MR. BRISKIN: Same objection.

THE WITNESS: I didn't need to focus on the process of Google vetting information in the advertiser field.

BY MS. GOODMAN:

Q In paragraph 45 of Appendix E on page 17 of the Respess initial report --

A Page 17? Sorry.

Q Yes.

Do you see paragraph 45?

A I do.

Q Okay. You write, "I identified FAAs in the RFP60 data and the TTD data and then identified specific combinations of FAAs and ad agencies."

My question is what did you do to identify the FAAs in the RFP60 data?

A So that's described in the rest of the paragraph.

Q So you see a bunch of fields in the RFP60 data, and you referred to them as advertiser identifier variables, and then you used those variables to identify the FAAs.

My question is how do you use the variables to identify the FAAs?

MR. BRISKIN: Objection to form.

THE WITNESS: So my process was that, as I described in my report, I first arrived at a -- a bucket of advertisers with FAA-sounding words in

the advertiser identifier variables, and -- and this is described in my footnote 28, and I then limited my damages analysis to advertiser identi- -- identifier variables and, in fact, FAA purchase pathways, which I understand the United States is seeking damages for.

BY MS. GOODMAN:

Q Okay. So are the advertiser identifier variables, which are within your purchase pathways and which are thus within your damages calculation, those were all identified by the United States; is that right?

MR. BRISKIN: Objection to form.

THE WITNESS: I'm not -- I'm not sure I would quite phrase it that way. Let me -- let me try again.

So I reviewed the RFP60 database and I saw FAA-sounding words in the advertiser identifier variables and -- and then -- so that's like a bigger bucket -- and then the United States instructed me to limit my damages analysis to a smaller bucket of FAA purchase pathways.

report which identifies 155 pathways for potential inclusion in your damages calculations.
A I'll take your representation that that's the number.
Q Okay. And of those 155 pathways in your backup to Figure 11, it's accurate you exclude 131 pathways at the United States' request, correct?
A I -- I'll take your representation on the -- on the math. There are pathways that I excluded.
There are pathways that I included because the United States is seeking damages on those pathways and there are pathways that I excluded because I understand the United States is not seeking damages on those pathways.
Q Well, there are pathways that you -- that the United States --
A So --
Q -- asked you to -- excuse me, my question --
A Sorry.
Q -- was not complete.

A Sorry.
Q I'll restart the question.
There are pathways -- there are certain FAA purchase pathways that the United States asked you to exclude, correct?
A Yes.
Q Okay. And there are 131 pathways -- FAA purchase pathways that the United States asked you to exclude, correct?
A I'm happy to take your representation on the -- the number.
Q Okay. Did the United States tell you any facts as to why they wanted those pathways excluded?
MR. BRISKIN: Objection. I'm going to instruct the witness not to answer pursuant to the expert stipulation.
MS. GOODMAN: Can we go off the record?
MR. BRISKIN: Sure.
VIDEO TECHNICIAN: We're going off the record at 2:05.
(Brief recess.)

VIDEO TECHNICIAN: Back on the record at 2:07.
BY MS. GOODMAN:
Q Ms. Lim, did the United States give you any facts upon which you relied in support of your exclusion of certain purchase pathways from your report?
A No.
Q Okay. Did the United States tell you to assume anything for purposes of your report upon which you relied in excluding the certain purchase pathways that the United States asked you to exclude?
A That was a long one. Could you do that one again? Sorry.
Q Did you rely on any assumptions provided by the United States as to why certain purchase pathways were excluded?
A No.
Q Did you do any analysis to confirm whether it was proper to exclude certain FAA purchase pathways from your damages calculation?

MR. BRISKIN: Objection to form.
THE WITNESS: I'm not sure what you mean by "proper," but it would be -- my damages calculations include the FAA purchase pathways for which the United States is seeking damages and it seems reasonable to me that therefore I wouldn't be calculating damages on pathways that the United States is not seeking damages for.
BY MS. GOODMAN:
Q Okay. Did you do any analysis to figure out whether the United States could seek damages for the certain FAA purchase pathways that they told you to exclude from your calculations?
MR. BRISKIN: Objection to form.
THE WITNESS: What do you mean by they could seek damages for?
BY MS. GOODMAN:
Q Did you do any analysis to figure out whether the United States -- withdrawn.
Did you do any analysis to figure out whether the pathways that the United States asked you to exclude otherwise met the criteria for

purchases for which the United States is seeking damages?

MR. BRISKIN: Objection to form.

THE WITNESS: The -- the -- the criteria for inclusion is that the United States is seeking damages on included pathways in my damages calculation.

BY MS. GOODMAN:

Q So is it your testimony that the pathways for which the United States -- States is seeking damages is a result of the United States' instruction to you to include only those pathways?

MR. BRISKIN: Objection to form.

THE WITNESS: Maybe it would help if I explain my -- the process because I think that will answer the question.

So in the course of my work I looked at the RFP60 data, I identified unique combinations of FAAs and ad agencies when there was information about an ad agency. And then with regard to those unique combinations, the United States asked me to limit my damages analysis to those pathways for

which they were seeking damages and, conversely, the United States asked me to exclude those pathways for which the United States is not seeking damages.

BY MS. GOODMAN:

Q And the United States instructed you to remove amounts available for services in 2019 and 2020 from damages for the USPS Universal McCann, Matterkind, TTD pathway, correct?

A Yes.

Q And that's the USPS.2 pathway?

A Hang tight. Sorry.

Q Let me withdraw the question.

For both USPS pathways, USPS.1 and 2, the United States instructed you to remove amounts billed for services in 2019 and 2020, correct?

A Yes.

Q Did you rely on any facts provided to you by the United States for why you excluded those pathways?

A No.

Q Did they -- did you rely on the

assumptions the United States told you to make for why those pathways are excluded?

A No.

Q I'm sorry, for why those amounts billed in '19 and '20 were excluded.

A No.

Q And you excluded unknown ad agency purchase pathways from your damages analysis, correct?

A Yes.

Q And you excluded nine unknown purchase pathways, correct?

A I don't recall the -- the number.

Q And you excluded the --

A When you -- when you say "nine," are you referring to a part of my report?

Q I'm referring again to your Figure 11 backup.

Have you reviewed that backup?

A Yes.

Q When did you last review the backup to Figure 11?

A I don't recall specifically.

Q Okay. And the reason you excluded the unknown ad agency purchase pathways is because you could not confirm that the FAA paid the amounts that Google charged for ad tech services, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: One more time.

BY MS. GOODMAN:

Q The reason you excluded the unknown ad agency purchase pathways is because you could not confirm that the FAA paid amounts that Google charged for ad tech services, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: Correct.

BY MS. GOODMAN:

Q Other than the United States telling you to exclude a pathway, is there any other reason you excluded a purchase pathway from your damages calculation?

A Well, as we just discussed, there are some unknown ad agency FAA purchase pathways which I excluded.

CONFIDENTIAL

Page 138

Q Okay. Other than the United States telling you to exclude a pathway and your excluding a pathway due to the ad agency being unknown, is there any other reason you excluded a purchase pathway from your damages calculation?

A I -- I just want to be really clear here. So in coming up with the list of unique FAA purchase pathways, I'm referring to display advertising or open web display advertising. It's possible that there are other FAA purchase pathways not included in my damages analysis that relate to out-of-scope spending.

Q Okay. In paragraph 47 you write, "I refer to each unique combination of FAA, prime ad agency, and (as applicable) sub ad agency as an 'FAA Purchase Pathway.'" So my question is in reference to "FAA Purchase Pathway" as you use it here in your report in paragraph 47.

And my question is, other than the United States telling you to exclude an FAA purchase pathway and your excluding an FAA purchase pathway due to the ad agency being

Page 139

unknown, is there any other reason you excluded an -- an FAA purchase pathway from your damages calculation?

MR. BRISKIN: Objection to form.

THE WITNESS: No.

BY MS. GOODMAN:

Q Okay. Some of the FAA purchase pathways for which you calculate damages include The Trade Desk, correct?

A Yes.

Q And The Trade Desk is a DSP, correct?

A Yes.

Q For what reason did you not include any other DSP that is not Google in your damages analysis?

MR. BRISKIN: Objection to form.

THE WITNESS: I don't believe I had the data to do that.

BY MS. GOODMAN:

Q Is it your understanding that no other third-party DSP produced data from which you could estimate damages?

Page 140

MR. BRISKIN: Objection to form.

THE WITNESS: Yes.

BY MS. GOODMAN:

Q Did you ask for data produced by other third-party DSPs in the course of your work from --

MR. BRISKIN: Objection to form.

BY MS. GOODMAN:

Q -- your -- from the United States?

MR. BRISKIN: Objection to form.

THE WITNESS: I -- I asked for a lot of data. I don't recall specifically the answer to this question.

BY MS. GOODMAN:

Q Okay. Can we turn to Figure 6 of your report.

It's accurate that Figure 6 reflects [REDACTED]

A Yes.

Page 141

MR. BRISKIN: Objection to form.

BY MS. GOODMAN:

Q Okay. And [REDACTED], correct?

A Yes.

Q And [REDACTED] right?

A Yes.

Q Do you know how many other [REDACTED]?

A I don't recall.

Q Does it sound accurate to you that [REDACTED]

MR. BRISKIN: Objection to form.

THE WITNESS: I don't recall one way or the other.

BY MS. GOODMAN:

Q No reason to doubt my statement that [REDACTED]

MR. BRISKIN: Objection to form.

fractions are similar?

MR. BRISKIN: Objection. I think that really goes to a communication and I'll instruct the witness not to answer.

You can rephrase.

MS. GOODMAN: I object to that. It's exactly what she just said. I just used her exact language.

MR. BRISKIN: And you asked for a communication and I instructed her not to answer.

BY MS. GOODMAN:

Q You don't recall seeing anything provided to you that is consistent with the notion that the fractions are similar between TTD and AdX -- I'm sorry, TTD and DV360, correct?

MR. BRISKIN: Objection. Form.

THE WITNESS: I'm -- I'm not sure how this question is different from your previous questions, but let me -- let me try again just so I can be clearer.

MS. GOODMAN: Move to strike everything before she begins answering the question.

MR. BRISKIN: We'll take exception to that and all your other motions to strike which we think are not well founded.

Is there a question pending?

BY MS. GOODMAN:

Q Are you going to answer the question?

A Sorry, was there a question pending?

Q Yes.

A Sorry, I did not --

Q You don't recall seeing anything provided to you that is consistent with the notion that the fraction of AdX take is similar between TTD and DV360, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I don't recall one way or the other.

BY MS. GOODMAN:

Q So therefore you don't recall seeing anything that is consistent or inconsistent with the notion that the fraction of AdX take is similar between TTD and DV360, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I certainly didn't see anything inconsistent. I may have seen something -- documents that were consistent and may not have cited that here.

BY MS. GOODMAN:

Q But you don't recall, do you?

MR. BRISKIN: Objection to form.

THE WITNESS: Sorry, I think I answered this question. Let me -- let me try again because perhaps I wasn't clear.

MS. GOODMAN: Move to strike.

The question is withdrawn.

MR. BRISKIN: Can I take a quick break in the next five minutes, please.

MS. GOODMAN: Let's take a break.

MR. BRISKIN: Off the record at 3:03.

(Brief recess.)

VIDEO TECHNICIAN: Back on the record at 3:24.

BY MS. GOODMAN:

Q Ms. Lim, would you turn to paragraph 59 of the Respess initial report, which is on page

23.

A I'm there.

Q Okay. The last full sentence in that paragraph on this page says, "Amounts that Google refunds to its advertisers should not be included in the damages calculations and I therefore remove them."

Did I read that right?

A Yes.

Q Why is it your opinion that amounts that Google refunds to its advertisers should not be included in the damages calculations?

A If an advertiser -- for -- for example, if instead of paying a hundred dollars to purchase ads an advertiser pays $99 to purchase ads, then I would want the $99 to be the input into my damages calculation.

Q And why is that?

A Because the advertiser paid $99 instead of a hundred dollars.

Q Okay. Is it important for purposes of calculating damages to account only for what was

actually paid by the person claiming damages?

MR. BRISKIN: Objection to form.

THE WITNESS: It depends on the facts and circumstances.

BY MS. GOODMAN:

Q Do you agree that overcharge damages are a measure of the difference between the price the plaintiff actually paid and the price that they would have paid in the but-for world?

MR. BRISKIN: Objection to form.

THE WITNESS: Yes.

BY MS. GOODMAN:

Q And do you agree the proper way to calculate damages in an antitrust case is to determine the difference between the prices plaintiff actually paid and the prices the plaintiff would have paid in the but-for world?

MR. BRISKIN: Objection to form.

THE WITNESS: I think it would depend on the facts and circumstances in the particular antitrust case.

BY MS. GOODMAN:

Q Okay. How about in this antitrust case? Do you agree that in this antitrust case the proper way to calculate damages is to determine the difference between the prices the plaintiff, here the United States, actually paid and the prices the United States would have paid in the but-for world?

MR. BRISKIN: Objection to form.

THE WITNESS: So my damages calculation takes the difference between the AdX take rate -- sorry, the AdX take and the but-for take in this circumstance.

MS. GOODMAN: Okay. Move to strike as nonresponsive.

BY MS. GOODMAN:

Q Do you agree that in this case the way to actually calculate damages is to determine the difference between the prices the United States actually paid and the prices the -- the plaintiff would have paid in the but-for world?

MR. BRISKIN: Objection to form.

THE WITNESS: In -- in this case the way

I have calculated damages is the difference between the AdX take and the but-for take.

MS. GOODMAN: Move to strike as nonresponsive.

BY MS. GOODMAN:

Q Do you agree that the typical measure of damages is the difference between the actual price paid and the presumed competitive price in the but-for world?

MR. BRISKIN: Objection to form.

THE WITNESS: I'm sorry, what was your question?

BY MS. GOODMAN:

Q Do you agree that the typical measure of damages is the difference between the actual price paid and the presumed competitive price in the but-for world?

MR. BRISKIN: Objection to form.

THE WITNESS: It depends on -- it -- it -- the facts and circumstances.

BY MS. GOODMAN:

Q Are you measuring overcharge damages in

this case?

A Yes.

Q Okay. And you agree that there's a difference between -- strike -- withdrawn.

You agree that there can be a difference between an amount that is invoiced and an amount that is in fact paid, correct?

A As a general matter, yes.

Q Okay. And as a general matter, there can be differences between the amount invoiced and the amount paid for a variety of reasons, correct?

A As a general matter.

Q You agree as a general matter?

A I do.

Q Is one of the reasons that an invoice could be different from the amount paid because the person paying the invoice disputes the invoiced amount?

A That could be one reason.

Q Did you see any evidence in this case suggesting or showing that the invoice amount was not the amount paid?

CONFIDENTIAL

Page 178

A No.

Q Did you review any testimony of any federal agency advertiser in this case?

A Yes.

Q Where is that listed in your report?

A My Documents Relied Upon list is a list of documents that I relied upon in forming the opinions in my report.

In addition to the list of documents in the Documents Relied Upon list, there are many other documents that I considered in forming my conclusions and the FAA depositions would have been amongst the documents I considered.

Q Okay. But you did not rely upon any FAA deposition testimony; is that accurate?

A I think that's right.

Q Did you review the deposition testimony of the United States Army?

A Myself or my staff would have reviewed that.

Q Did you review it?

A So the way I think about my staff is

Page 179

that they are my arms and legs, so to speak, and if -- if I've directed them to review it and they've reviewed it, I mean, in my mind I've reviewed it. So I'm -- my -- I didn't personally review it if that -- if that's what you're asking me, my staff would have reviewed it.

Q Okay. So you didn't personally review the Army testimony, correct?

A I don't believe so.

Q Are you familiar with the phrase equitable -- "request for equitable adjustment"?

A It doesn't ring a bell.

Q So you aren't aware of the fact that in this case the United States Army testified -- testified about how its ad agency exceeded its authorized spending limit on advertising? You aren't aware of that, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: Sorry, could you ask the question one more time?

BY MS. GOODMAN:

Q Are you aware of any evidence in this

Page 180

case that the United States Army received a request for equitable adjustment from its ad agency because the ad agency exceeded its authorized spending limit on advertising?

MR. BRISKIN: Objection to form.

THE WITNESS: Again, the phrase -- what was it -- equitable adjustment doesn't ring a bell.

BY MS. GOODMAN:

Q Okay. Are you aware of any evidence in this case that the United States Army's advertising agency exceeded its authorized spending limit on advertising?

MR. BRISKIN: Objection to form.

THE WITNESS: That's not something I focused on in my analysis.

BY MS. GOODMAN:

Q Okay. Are you aware of any evidence whether, as I've described, whether or not you focused on it?

MR. BRISKIN: Objection to form.

THE WITNESS: Not sitting here today.

Page 181

BY MS. GOODMAN:

Q And are you aware of any evidence that in the case where the United States Army's ad agency exceeded its authorized spending limit, it was the advertising agency who had to pay the digital ad vendors, not the Army?

MR. BRISKIN: Objection to form.

THE WITNESS: What I saw in my work in the performance of my walk-throughs of each FAA purchase pathway was that all amounts charged by Google were paid by the FAAs.

MS. GOODMAN: I move to strike as nonresponsive.

BY MS. GOODMAN:

Q Are you aware of any evidence in this case that the U.S. Army's ad agency exceeded its authorized spending limit and thus the ad agency had to pay digital ad vendors, not the Army?

MR. BRISKIN: Objection to form.

THE WITNESS: I guess what I'm getting a little hung up on is you say in your question that the ad agencies paid the vendor, such as Google,

BY MS. GOODMAN:
Q It was a better fit for what you were doing?
MR. BRISKIN: Objection to form.
THE WITNESS: Yes.
BY MS. GOODMAN:
Q You calculated damages that would be owed to the United States by Google for a range of AdX but-for take rate percentages, correct?
A One more time.
Q You calculated damages that would be owed to the United States by Google for a range of AdX but-for take rate percentages, correct?
MR. BRISKIN: Objection to form.
THE WITNESS: Are you referring to something specific in my report?
BY MS. GOODMAN:
Q Not that I can immediately recall. I'm just asking if you calculated damages that would be owed to the United States by Google for a range of AdX but-for take rate percentages, correct?
MR. BRISKIN: Objection to form.

THE WITNESS: Yes.
BY MS. GOODMAN:
Q Okay. And one of those was 10 percent, right?
A Yes.
Q And one of those was 16.2 percent?
A Yes.
Q And one of those was 16.6 percent?
A Yes.
Q And you understood that Dr. Simcoe calculated a but-for take rate of 16.2 percent, correct?
A Yes.
Q And you understand he calculated a but-for take rate of 16.6 percent, correct?
A Yes.
Q And you understand Professor Simcoe did not calculate a but-for take rate of 10 percent, correct?
A Yes.
Q Did you read Dr. Simcoe's deposition testimony?

A No.
Q Without telling me what you discussed, did you discuss Dr. Simcoe's deposition testimony with anybody?
MR. BRISKIN: Objection to form.
THE WITNESS: I'm not sure if that gets into conferences -- substance of conversations with counsel or my staff.
BY MS. GOODMAN:
Q I'm not asking for the substance. I'm asking you a yes or no question.
Did you discuss Dr. Simcoe's deposition testimony with anybody?
MR. BRISKIN: Objection to form.
THE WITNESS: Yes.
BY MS. GOODMAN:
Q Okay. And you are aware that Dr. Simcoe does not opine that a 10 percent but-for take rate is appropriate on a stand-alone basis, correct?
MR. BRISKIN: Objection to form.
THE WITNESS: I'm -- I didn't read his deposition, so if you're referring to something he

said in his deposition, then I'm -- I wouldn't be -- I wouldn't be familiar with that.
BY MS. GOODMAN:
Q I'm not referring to what he said in his deposition. I'm asking are you aware that Dr. Simcoe does not opine that a 10 percent but-for take rate is an appropriate measure of a but-for take rate?
MR. BRISKIN: Objection to form.
THE WITNESS: Okay. So if -- I think if you're asking me about what's in Dr. Simcoe's reports, my understanding is that he did not -- he estimated various but-for take rates and 10 percent is not one of those take rates -- but- -- but-for take rates.
BY MS. GOODMAN:
Q Okay. Are you aware that Professor Simcoe testified in deposition that a 10 percent but-for take rate -- take rate is not a conclusion he reaches about the take rate in the but-for world?
MR. BRISKIN: Objection to form.

THE WITNESS: As I just testified, I -- I didn't read his deposition, so I don't know what he said in it.

BY MS. GOODMAN:

Q Okay. But you had conversations about his deposition with individuals, so I'm just asking if you have an awareness about what Professor Simcoe testified in deposition, that he is not offering an opinion that the but-for take rate is 10 percent?

MR. BRISKIN: Objection to form.

BY MS. GOODMAN:

Q Are you aware of that?

A I -- I don't have that awareness.

Q Okay. You have no opinion as to the appropriateness of any of the but-for take rates you apply in your damages calculation, correct?

A I did not do an independent evaluation of the but-for take rate.

Q Okay. And you have no opinion as to the appropriateness of any but-for take rate, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I do not.

BY MS. GOODMAN:

Q And so the United States instructed you to use an alternative AdX but-for take rate of 10 percent, correct?

A Yes.

Q Are you aware of any facts that support application of a 10 percent but-for take rate?

MR. BRISKIN: I'll just instruct the witness not to answer with regard to communications with counsel, but you can answer.

THE WITNESS: My understanding is that the United States intends on presenting evidence with regard to the 10 percent but-for take rate at trial, but I haven't performed an independent analysis of that 10 percent. I haven't, for example, searched in databases looking for 10 percent.

BY MS. GOODMAN:

Q So you aren't personally aware of any facts that would support application of that but-for take rate?

A Not sitting here today. It's not something I focused on.

Q Okay. Did the United States -- did you rely on any facts communicated to you by the United States in applying a 10 percent but-for take rate in your calculations?

A One more time.

Q Did you rely on any facts communicated to you by the United States in applying a 10 percent but-for take rate in your calculations?

A No.

Q Okay. Let's turn to paragraph 56 of the Respess initial report.

A Yes, I'm there.

Q And you write in the first sentence, "For each FAA Purchase Pathway except CMS.1, CMS.2, NHTSA.1, and NHTSA.2, I selected a number of transactions of open web display advertising and confirmed that the FAA paid for those transactions."

Did I read that correctly?

A Yes.

Q You did not select transactions for the CMS and NHTSA pathways to review in order to confirm that the FAA paid for those transactions, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I did not perform walk-throughs of those FAA purchase pathways because there was insufficient data/documents in the record to do so.

BY MS. GOODMAN:

Q And so is it accurate that you were not able to confirm that the FAAs paid for the transactions reflected in the two CMS and two NHTSA pathways?

MR. BRISKIN: Objection to form.

THE WITNESS: I was not able to do so.

BY MS. GOODMAN:

Q Did you attempt to verify that CMS or NHTSA paid for the transactions reflected in those four purchase pathways?

MR. BRISKIN: Objection to form.

THE WITNESS: The documents produced in

the record did not -- were insufficient to perform a walk-through as I did for the other purchase pathways.

BY MS. GOODMAN:

Q And so you didn't see any documents or data in the record to show actual transmission of payments from those FAAs to anybody; is that accurate?

MR. BRISKIN: Objection to form.

THE WITNESS: No. No, that's not accurate.

BY MS. GOODMAN:

Q Okay. What documents did you see in the record that showed that payments were made from those FAAs to an ad agency?

MR. BRISKIN: Objection to form.

THE WITNESS: I don't recall the exact documents.

BY MS. GOODMAN:

Q Okay. But it's your testimony you saw evidence in the record of payments going from CMS to an ad agency?

A That is my recollection.

Q Okay. And it's your testimony you saw evidence in the record of payments going from NHTSA to an ad agency?

A Same answer. That's my recollection.

Q So what was insufficient about what you saw in the record in order to confirm that those two FAAs paid for the transactions reflected in the four purchase pathways we're discussing?

A I don't -- I don't recall exactly what was insufficient. The -- the process of each walk-through requires at -- at least ad agency invoices and FAA payments.

My recollection is that there were -- there was missing data in -- in one of those. I don't recall exactly. I just recall that there was insufficient data.

Q When did you last look at the data available to you in order to confirm whether CMS or NHTSA paid for the transactions reflected in the four purchase pathways we're discussing?

MR. BRISKIN: Objection to form.

THE WITNESS: It would have been during the time that I was assisting Dr. Respess in preparing his report.

BY MS. GOODMAN:

Q Okay. And after you learned that you would be testifying as an expert in this case, you didn't do anything to check your recollection -- to check the work that had been done prior to your coming in as the testifying expert to figure out what was insufficient about the data that we're discussing?

MR. BRISKIN: Objection to form.

THE WITNESS: I wouldn't characterize it that way. I was very involved with Dr. Respess and Brattle staff during the preparation of his report and there was lots of -- lots of checking with regard to Dr. Respess' analyses and conclusions and statements in his report.

I felt -- I -- I felt comfortable with adopting those analyses and conclusions given my awareness of -- given my work with Dr. Respess and awareness of the entire process, not just

awareness but familiarity and -- and being part of that process, including the checking process.

BY MS. GOODMAN:

Q Would Dr. Respess be able to tell me what was insufficient about the data that -- such that he could not confirm that the FAAs paid for the transactions reflected in the four purchase pathways we're discussing?

MR. BRISKIN: Objection to form.

THE WITNESS: I don't believe he would be able to recall any better than I would. There were hundreds, maybe thousands of invoices that we reviewed and many different purchase pathways, some of which are quite complex to do the walk-throughs on.

I recall that, again, there was missing information in these pathways, but I don't recall exactly -- the exact invoices, for example, that were missing or the exact payment data on -- that were missing.

BY MS. GOODMAN:

Q And it's accurate that for none of these

purchase pathways does your report anywhere identify payment data showing that the FAAs paid for the transactions reflected in -- or included within the CMS and NHTSA purchase pathways, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: One more time.

Sorry, I just hadn't thought of my report that way. Go ahead.

BY MS. GOODMAN:

Q There is no statement in your report identifying payment data which shows CMS or NHTSA paid for the transactions included within the CMS and NHTSA purchase pathways, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I can't think of such a statement or something in my report that lists that sitting here today.

BY MS. GOODMAN:

Q Okay. In your --

A It's not something that -- it's not something that I relied upon.

Q Okay. Appendix E --

A I mean, that -- go ahead.

Q -- to Dr. Respess' initial report includes walk-throughs for various FAA purchase pathways. None of which are for CMS or NHTSA, correct?

A That -- that is correct.

Just to be clear, so as I testified before, I recall seeing some agency invoices and -- some Google invoices, some agency invoices, some FAA payment information. I didn't see anything that was inconsistent with the idea that the FAAs paid for their purchases. But I was not able to complete walk-throughs and that's why there are no walk-throughs for these transactions included in Appendix E.

MS. GOODMAN: Okay. I'm going to move to strike everything after "That is correct."

BY MS. GOODMAN:

Q Let's turn to Append- -- Figure 16 of Dr. Respess' initial report.

A Sorry, what page are you on?

Q Thirty-three of Figure 16.

A I'm there.

Q Okay. And for CMS your damages calculations include $8.4 million in AdX revenue, correct?

A You're looking at the 8478727?

Q Yes.

A I used the -- that amount in deriving my damages amount.

Q Right. And you used the amount of $1.5 million approximately for NHTSA in deriving your damages, correct?

A Yes.

Q Okay. And if you add 8.4 million to 1.5 million, it's approximately $10 million, correct?

A If you're asking me a math- -- arithmetic question, that sounds about right.

Q Okay. If you add the 8.478727 and the 1.588607, it's approximately $10 million.

A What's 607? Wait.

Q 15- --

A Where -- where -- maybe I'm just not looking at the right thing.

Q All right. Withdrawn.

A I'm looking at --

Q Withdrawn.

MR. BRISKIN: You went to a different number.

THE WITNESS: Oh.

BY MS. GOODMAN:

Q The total CMS of 8,478,727 added to the total of NHTSA of 1,588,607 equals 10,067,334, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: Again, if you're asking me an arithmetic question, I'm -- I'm -- I'm happy to take your representation about that.

BY MS. GOODMAN:

Q Okay. And 10 million --

VIDEO TECHNICIAN: Careful not to touch the mic, ma'am.

THE WITNESS: Oh, sorry, sorry.

BY MS. GOODMAN:

Q 10,067,334 divided by the total AdX revenue in your damages calculation of 41,789,429 is 24.1 percent, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I will take your representation on the arithmetic.

BY MS. GOODMAN:

Q Okay. And so for 24.1 percent of the input of AdX revenues in your damages calculations in this case you were not able to show -- you were -- you did not write anywhere in your report that CMS and NHTSA paid for those transactions, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I did not perform walk-throughs of the CMS and -- and NHTSA pathways -- purchase -- FAA purchase pathways.

Can we take a break in about five -- just a bio break in about five minutes?

BY MS. GOODMAN:

Q And so you did not -- you were not able to confirm that NHTSA and CMS paid the combined

$10 million shown in Figure 16, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: The $10 million would be a subset of what they paid. Yeah, so, again, I was unable to perform walk-throughs of the CMS and NHTSA FAA purchase -- purchase pathways whereby I -- I could gain an understanding of the payment process.

BY MS. GOODMAN:

Q The purpose of the walk-through that you do is as you describe in paragraph 56 of the Dr. Respess initial report, which was to confirm that the FAA paid for those transactions, correct?

A I would see those -- I see those words on the page. The -- I think of it as I performed the walk-throughs to -- to gain an understanding of the payment flow process and in that process I confirmed that the FAAs paid for amounts invoiced by Google.

Q And because you didn't do that walk-through for CMS or NHTSA, you had not confirmed that those FAAs paid the $10 million

reflected in Figure 16, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: Yes.

BY MS. GOODMAN:

Q Okay. And the $10 million reflected in Figure 16 is approximately 24.1 percent of the total AdX revenue going into your damages calculation, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I haven't done that math, but I'm happy to take your representation on it.

MS. GOODMAN: Okay. We can take your break now.

THE WITNESS: Great. Thank you.

VIDEO TECHNICIAN: Off the record at 5:29.

(Brief recess.)

VIDEO TECHNICIAN: Back on the record at 5:35.

BY MS. GOODMAN:

Q Okay. So continuing on your -- at your -- looking at your Figure 16 on page 33, of

the remaining approximately 31 million in AdX revenue reflected in Figure 16, how much of that 31 million were you able to trace back to proof of payment in the record?

MR. BRISKIN: Objection to form.

THE WITNESS: So Appendix E indicates the --

VIDEO TECHNICIAN: Ma'am, please don't touch it.

THE WITNESS: Oh, sorry.

Appendix E shows the FAA purchase pathways for which I performed walk-throughs.

BY MS. GOODMAN:

Q Okay. And how much in spending were you able to walk through and thus confirm purchases -- I'm sorry -- payments for?

MR. BRISKIN: Objection to form.

THE WITNESS: In the -- in the walk-throughs I performed I confirmed that the FAAs paid for 100 percent of Google's invoices.

BY MS. GOODMAN:

Q Well, you say in paragraph 56 that you

selected a number of transactions of open web display advertising and confirmed that the FAA paid for those transactions.

Is the number every single transaction which is included in your damages analysis?

MR. BRISKIN: Objection to form.

THE WITNESS: So there -- within each FAA purchase pathway there are -- there are many invoices and many purchases. I performed walk-throughs for a subset of the invoices -- of the Google invoices in each FAA purchase pathway.

BY MS. GOODMAN:

Q Okay. Let's turn to Appendix E, "Pathway Examples and Associated Documents" in Dr. Respess' initial report. It's page 141.

A I am there.

Q If I add up in each pathway example the numbers included in your Column A under "RFP76 Data," is it your testimony that number will equal all of the transactions which you included in your damages analysis except for those for CMS and NHTSA?

MR. BRISKIN: Objection to form.

THE WITNESS: No.

BY MS. GOODMAN:

Q No. If I --

A That's not my testimony.

Q Okay. If I add up each RFP76 data number reflected in Appendix E, that's approximately $7.5 million. Any reason to doubt that?

MR. BRISKIN: Objection to form.

THE WITNESS: I'm happy to take your representation on that.

BY MS. GOODMAN:

Q Okay. And the RFP76 data shows total ad spending, right? It's not just AdX revenue?

MR. BRISKIN: Objection to form.

THE WITNESS: The RFP76 data shows the amounts invoiced by Google.

BY MS. GOODMAN:

Q Right, which is not only AdX revenue, correct?

A Correct.

Q Okay. And let's turn to Figure 11 in your -- in Respess' report.

A Okay. We're -- we're leaving page 141. Can you tell me what page to go to?

Q Twenty-one.

And there's 46.4 million in Column A, which is included as in scope in your damages analysis, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: Yes.

BY MS. GOODMAN:

Q Okay. So -- and you were not able to confirm for NHTSA or CMS the 1.4 or -- million or 808,000 reflected in Figure 11, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: You're referring to the amounts in Column A?

BY MS. GOODMAN:

Q Yes.

A Yeah.

Q You were not able to confirm that those amounts for CMS and NHTSA were in fact paid for?

A Correct.

Q Okay. And so if we take those amounts out from the 46.4 million, we're still at a number that's more than $7.5 million, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: If you're asking me about the arithmetic, I'll take your representation on that.

BY MS. GOODMAN:

Q Okay. And so of the $46.4 million included in your damages analysis as reflected in Figure 11, you were able to confirm purchases for 7.5 million as reflected in your Appendix E walk-through; is that accurate?

MR. BRISKIN: Objection to form.

THE WITNESS: I was able to confirm payment for more than the sum of the RFP76 amounts shown in Appendix E.

BY MS. GOODMAN:

Q Okay. But you nowhere set out the work you did to confirm that payment for all of those amounts, right? You only set out the work you did

to confirm payment for $7.5 million in RFP76 spending numbers?

MR. BRISKIN: Objection to form.

THE WITNESS: I -- I disagree with that characterization. Appendix E shows examples of the walk-throughs that I performed for each of the FAA purchase pathways excluding the CMS and -- and NHTSA pathways. Appendix E includes all of the documents that I used in performing my walk-throughs. Although there's a -- a table at the beginning of each FAA purchase pathway in Appendix E, that table represents one example of the multiple walk-throughs that I performed and the -- the process is the same. The pattern is the same within each FAA purchase pathway for the process that I did of -- of walking through the -- the payment process, so I -- I'll stop there.

BY MS. GOODMAN:

Q Okay. And so you did not give an example -- or you did not -- your pathway figures in Appendix E do not show me all of the work that you claim to have done, correct, in order to trace

the payments?

MR. BRISKIN: Objection to form.

THE WITNESS: I disagree with that.

BY MS. GOODMAN:

Q Okay. Let me try again.

How am I supposed -- let's take -- let's take Navy. Turn to page 152.

A I am there.

Q Okay. And so your asterisks on the pathway documents, Figure 55, mean that those are the documents I should look at in order to check your work reflected in Figure 54, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: Oh, one -- one could check my work, so to speak, by reviewing the asterisked documents.

BY MS. GOODMAN:

Q Okay. So how is it that I am able -- how is it that you would suggest I look at every other document you cite in Figure 55 in order for me to check your work and confirm your testimony that you saw a hundred percent payment for all of

the Navy purchases upon which your damages calculations are based?

MR. BRISKIN: Objection to form.

THE WITNESS: So I provided the example in Figures 54 -- in Figure 54 of the walk-through that I performed for that particular invoice and it's the exact same process that I did and that one could do for the other Google invoices that would be included in the Bates stamped documents in Figure 55. So I didn't feel it was necessary to have a very repetitive -- and it would be probably over a thousand pages -- I didn't feel it was necessary to repeat -- to show every single Google invoice -- show a table -- show a table like I did in 50- -- Figure 50- -- sorry, Figure 54 for every single walk-through that I did for Navy because the -- the pattern, the process is the same.

One -- one could check my work, so to speak, by reviewing the documents that are listed in Figure 55.

BY MS. GOODMAN:

Q But you've told me that the tracing process that you've done is complex, right?

A It -- it can be.

Q Yes. And there are many, many, many documents cited in Figure 55, right?

A I don't know what you mean by "many, many." I could count those for you if you'd like.

Q All right. I'm not asking you do that.

A Just -- so to -- to clarify --

Q There's no pending question. Let me ask my question. Thank you.

A Apologies.

Q You have not set out in your report anywhere the pathway work you did to confirm payment for every invoice other than NHTSA and CMS that is included in your damages calculation, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I disagree with that.

BY MS. GOODMAN:

Q Your pathway figures that I can read in order to check your work and turn to the

CONFIDENTIAL

Page 274

MR. BRISKIN: Objection to form.
THE WITNESS: Are you talking about exchanges in general or are you talking about AdX?
BY MS. GOODMAN:
Q Did you see any evidence one way or another for any platform, any advertiser, ad network, or DSP that they may vary their platform fees based on bids into exchanges?
MR. BRISKIN: Objection to form.
THE WITNESS: I'm not really sure what you mean by "based on bids into exchanges." They may --
BY MS. GOODMAN:
Q Okay. Let me try again.
Do you cite anything in paragraph 77, in terms of documentary evidence, that supports your assumption that the actual percentage of platform fees as a fraction of AdX revenue would have remained constant absent the AdX overcharge?
MR. BRISKIN: Objection to form.
THE WITNESS: I -- I think I just explained to you that I have no data available to

Page 275

me which indicates that the actual percentage would have changed, so I make the assumption that it would have remained the same. And so with regard to that, you can't cite something that's not there.
BY MS. GOODMAN:
Q Did you ask for information that would support or refute your assumption that the actual percentage of platform fees as a fraction of AdX revenues would have remained constant absent the AdX overcharge?
MR. BRISKIN: Objection to form.
THE WITNESS: I -- I directed my staff to research this issue and to look for data and, as -- as I testified, no data was available.
BY MS. GOODMAN:
Q When you say "data," are you talking about like a spreadsheet transaction or, you know, aggregated data or are you talking about documents like e-mails and memos and things?
A Both.
Q Okay. And so your staff didn't give

Page 276

you, for example, any documents showing that Criteo sometimes charges a negative platform fee?
MR. BRISKIN: Objection to form.
THE WITNESS: Well, I was interested in the platform fees that Google charges.
BY MS. GOODMAN:
Q Okay. So you didn't see the document that I just explained?
MR. BRISKIN: Objection to form.
THE WITNESS: I'm not sure which document that is. Did you want to show that to me so I can refresh my memory?
BY MS. GOODMAN:
Q No. But do you recall sitting here today seeing any document showing that Criteo charges a negative platform fee on occasion?
MR. BRISKIN: Objection to form.
THE WITNESS: I reviewed hundreds of documents in this case. I -- I don't recall that one way or another.
BY MS. GOODMAN:
Q Okay. You conducted a profitability

Page 277

analysis in this case, right?
A I did.
Q And you understood that Professor Lee may rely on your profitability analysis, correct?
A Yes.
Q And you understand Professor Lee did not in fact rely on your profitability analysis, correct?
MR. BRISKIN: Objection to the form.
THE WITNESS: That is my understanding.
BY MS. GOODMAN:
Q And in your rebuttal report you say that you would not use a DVAA P&L excluding AdMob to reach any conclusion about the profitability -- profitability of products in the relevant product markets, correct?
MR. BRISKIN: Objection to form.
THE WITNESS: Those -- those sounds like the words I -- I used.
BY MS. GOODMAN:
Q I'm looking at paragraph 56.
A In which report?

Q The rebuttal.
A Yes.
Q And the DVAA P&L excluding AdMob to which you are referring in paragraph 56 is a figure that you created in -- or that Dr. Respess created in his initial report, correct?
A There is a figure that relates to the profitability of DVAA excluding AdMob in the Respess report.
Q Okay. And that's Figure 28 on page 49 of the Respess report, correct? If you can look at that.
A Okay. Hold on a second.
Which page?
Q Forty-nine, Figure 28.
A I see that.
Q And is that the DVAA P&L to which you are referring in paragraph 56 of your rebuttal report?
A Yes, I believe so.
Q Okay. And then looking at Figure 28 in the initial Respess report, that figure shows that

[REDACTED]
[REDACTED], correct?
MR. BRISKIN: Objection to form.
THE WITNESS: It -- it shows [REDACTED]
[REDACTED]
There is an errata version of this figure in my rebuttal report.
BY MS. GOODMAN:
Q That's what we're looking at.
A Oh, I was looking at --
Q No. You're --
A Sorry, am I looking at the errata version?
Q Yes, ma'am.
A Got it.
Q Okay. So your Figure 28, which is Lim Exhibit 1, shows [REDACTED]
[REDACTED], right?
A Sorry, there's -- I was getting confused between the errata version and the updated version. There's an updated version as well in -- in my rebuttal report. But we -- we can keep on

the errata version if you'd like.
Q Yes.
A So, sorry, ask your question again.
Q This Figure 28 shows that [REDACTED]
[REDACTED]
[REDACTED] right?
A Yes.
Q Okay. And you agree that this Figure 28 shows that [REDACTED]
[REDACTED]
MR. BRISKIN: Objection to form.
THE WITNESS: One more time.
BY MS. GOODMAN:
Q You agree that this Figure 28 shows that
[REDACTED]
MR. BRISKIN: Objection to form.
THE WITNESS: The results of this table compared to [REDACTED] suggests that [REDACTED]
[REDACTED]
BY MS. GOODMAN:
Q So you stand by the sentence in

paragraph 99 that "Operating profit margin in this
[REDACTED]
[REDACTED]
[REDACTED]
[REDACTED]," correct?
A Yes.
Q Okay. So let's go back to your paragraph 56 in your rebuttal report.
The DVAA P&L excluding AdMob that you would not use to reach any conclusion about the profitability of products in the relevant product markets, does that also include Figure 2 in your rebuttal report?
MR. BRISKIN: Objection to form.
THE WITNESS: That's the updated one I was talking about. Yes, that -- wherever that was the sentence you read me. Sorry.
BY MS. GOODMAN:
Q Paragraph 56.
A I would -- I would also not use the DVAA P&L excluding AdMob figures in Figure 2 of the rebuttal report to reach any conclusion about the

CONFIDENTIAL

Page 282

profitability of products in the relevant product markets.

Q Okay. And both Figure 2 in your rebuttal report and Figure 28 in the corrected for errata Respess report show [REDACTED], correct?

A They do.

Q And thus you would not rely on any P&L [REDACTED] to make any conclusions about the profitability of products in the relevant product markets, correct?

A Correct.

Q Okay. And Figures 2 and Figures 28 both reflect out-of-scope activity, correct?

A They --

MR. BRISKIN: Objection to form.

THE WITNESS: They both reflect -- they both include activity that is not in the relevant product markets.

BY MS. GOODMAN:

Q Okay. And are you aware of any expert

Page 283

for the plaintiffs who rely on your profitability analyses in their reports?

A I am not.

Q And Figure 2 and Figure 28 also show [REDACTED] -- withdrawn.

Figures 28 and 2 also show [REDACTED], correct?

A Yes.

Q Do you agree that the principal versus agent consideration is not -- withdrawn.

Do you agree that the principal versus agent standard in ASC 606 does not permit optionality?

MR. BRISKIN: Objection to form.

THE WITNESS: I'm not sure what you mean by "optionality." Can you explain that -- can you explain further what you mean?

BY MS. GOODMAN:

Q That it's not -- that it's not a -- it doesn't allow for both conclusions to be drawn.

MR. BRISKIN: Objection to form.

Page 284

THE WITNESS: One could not arrive at a -- a -- one could not simultaneously apply both a principal and agent treatment to the same transaction. Sorry, I'm not --

BY MS. GOODMAN:

Q Sure. Understood. Let me ask again.

And it's not possible for -- do you agree it's not possible to conclude that, on the set of facts and circumstances for any given transaction, that a registrant could treat itself as a principal or an agent?

MR. BRISKIN: Objection to form.

THE WITNESS: Sorry, can you ask your question again?

BY MS. GOODMAN:

Q Do you agree that when applying topic 606 to any set of facts and circumstances, it is not permitted under that guidance to reach a conclusion that the registrant can be either a principal or an agent?

MR. BRISKIN: Objection to the form.

THE WITNESS: I think the guidance with

Page 285

regard to principal/agent treatment requires a high level of judgment and reasonable accountants could arrive at different conclusions with regard to whether -- given the same set of facts and circumstances -- as to whether a company should be considered a principal or whether a company should be considered an agent.

BY MS. GOODMAN:

Q And you agree that the principal versus agent assessment is often fact specific and judgment based?

A It is fact specific and requires judgment.

Q And because it is fact specific and it requires judgment, do you agree that companies should be cautious about relying on benchmarking to their peer's accounting?

MR. BRISKIN: Objection to form.

THE WITNESS: I think the SEC says -- says something along -- or SEC staff has said something along the lines that one can't -- one can't look at another company's accounting with

CONFIDENTIAL

Page 286

regard to the principal/agent determination and without doing its own determination simply just copy what the other company has done.

BY MS. GOODMAN:

Q Okay. And do you agree that significant judgment does not mean that the -- the standard permits optionality?

MR. BRISKIN: Objection to form.

THE WITNESS: There's that "optionality" word again. Maybe you could rephrase that question because that's confusing me.

BY MS. GOODMAN:

Q Okay. So are you unable to answer the question as I phrased it to you?

A I'm sorry, I cannot. It's not clear to me.

Q Okay. And do you agree that an area of significant judgment does not mean that the standard permits optionality?

MR. BRISKIN: Objection to form.

THE WITNESS: It's the "optionality" word that -- that I'm getting hung up on. Maybe

Page 287

you can rephrase the question without using that word.

BY MS. GOODMAN:

Q Okay. And do you agree that in order to make the judgments needed in applying ASC 606, registrants need to roll up their sleeves to understand the nuances of the transactions they're evaluating and apply the standard to their specific set of facts and circumstances?

MR. BRISKIN: Objection to form.

THE WITNESS: I would agree with that.

BY MS. GOODMAN:

Q You -- it's your opinion it would also be reasonable to consider the specified good or service that Google provides advertisers to simply be publishers' ad inventory, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: It's my opinion that it would be reasonable to consider the good or service that an advertiser receives to be publisher inventory.

BY MS. GOODMAN:

Page 288

Q Okay. Let's look at page 52 of the Respess initial report corrected for errata.

A Okay. Okay. I'm there.

Q The last sentence of paragraph 104 says, "However, I believe it would also be reasonable to consider the specified good or service that Google provides advertisers to simply be publishers' ad inventory."

Did I read that right?

A You read that right.

Q And is that your opinion?

A I think the -- the words "Google provides advertisers" is a little ambiguous in that sentence. I believe it would be reasonable to consider the specified good or service that advertisers receive to be simply publisher ad inventory.

Q Okay. Is that what you are meant to -- is that what registrants are required to evaluate under ASC 606, whether the good or service that is received, or are they supposed to evaluate the good or services provided?

Page 289

MR. BRISKIN: Objection to form.

THE WITNESS: I don't -- I don't want to get hung up on a semantics thing, but -- but the first step is to identify the specific goods or services to be provided to the customer. I didn't -- I didn't mean anything by "received" versus "provided."

BY MS. GOODMAN:

Q Okay.

A It's just that, you know, one party provides, another party receives.

Q And ASC 606 talks about the provision of goods and services, right?

MR. BRISKIN: Objection to form.

THE WITNESS: It does.

BY MS. GOODMAN:

Q And this sentence in paragraph 104 which we just read, you don't cite any documents in support of your belief that it would also be reasonable to consider the specified good or service that Google provides advertisers to simply be publishers' ad inventory, correct?

Q When you worked at Ernst & Young -- what time period did you work at Ernst & Young?

A '95 through '98.

Q Other than in this case, have you looked at Ernst & Young audit reports since -- over the time -- over the time period of 2015 to the present let's say? In the course of your work have you had occasion to look at EY audit reports?

A For any company?

Q Yes.

A Audit opinions, yes.

Q Okay. And in the course of your work on this case you do not disagree with anything that EY concluded as to the principal/agent determination that Google made, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I -- I don't agree or disagree with EY not taking exception to Google's treatment of itself as a principal in most of its transactions.

BY MS. GOODMAN:

Q Okay.

MR. BRISKIN: Counsel, we're at five minutes over seven hours.

MS. GOODMAN: I have one more question if I may.

MR. BRISKIN: Okay.

MS. GOODMAN: Thanks.

BY MS. GOODMAN:

Q You do not recall reviewing or seeing testimony from representatives of the Navy in which they testified the only ad network or DSP that they ever used to buy open web display ads was The Trade Desk, correct?

MR. BRISKIN: Objection to form.

THE WITNESS: I -- I reviewed thousands of documents in this case. I -- I don't recall that one way or the other.

MS. GOODMAN: Okay. I pass the witness.

MR. BRISKIN: We have no questions.

VIDEO TECHNICIAN: All right. If that's everything, off the record on February 29th, 2024 at 7:28 p.m.

(Discussion off the record.)

MS. GOODMAN: We just went back on the record and I just want to note for the record that I am reserving my rights to bring Ms. Lim back for additional questioning based on the filibustering, evasive answers, and nonresponsiveness to my questions. So I just wanted to state that for the record.

MR. BRISKIN: Well, we dispute that. We don't agree with your characterizations.

MS. GOODMAN: Okay. Thank you.

(Whereupon, at 7:28 p.m., the deposition of ADORIA LIM was concluded.)

* * * * *

CERTIFICATE OF NOTARY PUBLIC

I, SHARI R. BROUSSARD, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Shari R. Broussard

SHARI R. BROUSSARD
Notary Public in and for the
District of Columbia

My commission expires:
August 14, 2025