# EXHIBIT 79

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

UNITED STATES, et al.,  ) Case No.
                        ) 1:23-cv-00108-LMB-JFA
                        )
    Plaintiffs,         )
                        )
vs.                     )
                        )
GOOGLE LLC,             )
                        )
    Defendant.          )
_____)

- HIGHLY CONFIDENTIAL -

VIDEOTAPED 30(b)(6) DEPOSITION OF
UNITED STATES ARMY
through the testimony of
COLONEL JOHN HORNING
September 29, 2023
1:06 p.m.

Reported by: Bonnie L. Russo
Job No. 6105371

HIGHLY CONFIDENTIAL

Page 2

1    Videotaped 30(b)(6) Deposition of
2    United States Army through the testimony of
3    Colonel John Horning held at:
4
5
6       Paul, Weiss, Rifkind, Wharton & Garrison, LLP
7            2001 K Street, N.W.
8            Washington, D.C.
9
10
11
12
13
14
15
16
17
18   Pursuant to Notice, when were present on behalf
19   of the respective parties:
20
21
22

Page 4

1    APPEARANCES (CONTINUED):
2
3    Also Present:
4    Mohamed Al-Darsani, United States Army
5    Orson Braithwaite, Videographer

Page 3

1    APPEARANCES:
2
3    On behalf of the Plaintiffs:
4        KATHERINE CLEMONS, ESQUIRE
5        ALVIN CHU, ESQUIRE
6        CHASE PRITCHETT, ESQUIRE
7        UNITED STATES DEPARTMENT OF JUSTICE
8        450 Fifth Street, N.W.
9        Washington, D.C. 20530
10       katherine.clemons@usdoj.gov
11       alvin.chu@usdoj.gov
12       chase.pritchett@usdoj.gov
13
14   On behalf of the Defendant:
15       MARTHA L. GOODMAN, ESQUIRE
16       LEAH HIBBLER, ESQUIRE
17       PAUL, WEISS, RIFKIND, WHARTON &
18       GARRISON, LLP
19       2001 K Street, N.W.
20       Washington, D.C. 20006
21       mgoodman@paulweiss.com
22       lhibbler@paulweiss.com

Page 5

I N D E X
EXAMINATION OF COLONEL JOHN HORNING      PAGE
BY MS. GOODMAN                  9
BY MS. CLEMONS                  104

EXHIBITS
Exhibit 165 Personnel Consulted         36
Exhibit 166 E-Mail                      64
    Attachment
    ARMY-ADS-00000064495-553
Exhibit 167 E-Mail Chain dated 7-2-21   71
    Attachment
    ARMY-ADS-0000245860-871
Exhibit 168 E-Mail Chain dated 6-21-22  80
    Attachment
    ARMY-ADS-0000007763-777
Exhibit 169 E-Mail Chain dated 8-19-22  83
    ARMY-ADS-0000069378-379

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 50

1  other companies are also acquiring ads so the
2  dynamics of the marketplace make an IDIQ a
3  little bit more appropriate of an acquisition
4  vehicle.
5      BY MS. GOODMAN:
6      Q.  Turning to the page ending in 13,
7  the little Bates numbers at the bottom.
8      A.  Okay.
9      Q.  Item No. 0023.  Do you see where I
10  am at the top of the page?
11      A.  I do.
12      Q.  And that item number is a CLIN.
13  Yes?
14          MS. CLEMONS:  Objection.  Form.
15  Foundation.
16          THE WITNESS:  One second.  Let me
17  just review.  Yes.
18      BY MS. GOODMAN:
19      Q.  And CLIN 23 applies to the purchase
20  of national and local media under this
21  contract; is that correct?
22      A.  Yes.

Page 51

1      Q.  And this contract sets -- does not
2  set a price, does not set a unit, does not set
3  a maximum of purchase, correct?
4          MS. CLEMONS:  Objection.  Form.
5          THE WITNESS:  This particular
6  section of the IDIQ does not identify, and I
7  think that's the -- that's sort of the
8  flexibility of the IDIQ because this particular
9  item here will then have a separate task order.
10  That's the national media talent and
11  furnishings task order, which is then awarded
12  at a specific amount but the IDIQ doesn't
13  indicate or designate what that would be, and
14  that's part of the -- I guess the flexibility
15  of this kind of a contract, is that it doesn't
16  have to indicate that number.
17          That can be done on the task orders
18  and the task orders are then renewed each year
19  as we previously discussed, and awarded then
20  each year and so that number could change each
21  year.  And I think that's part of the flexible
22  piece of this as well, is that it might be

Page 52

1  different from each year to year.  The only
2  thing within the IDIQ is there is just an
3  overall not to exceed.
4      BY MS. GOODMAN:
5      Q.  And that --
6      A.  -- but it could be divided into the
7  various areas or not spent at all.  It just
8  cannot exceed a certain amount over the course
9  of a number of years.
10      Q.  Is there any other line item, CLIN,
11  contract line item number --
12      A.  Uh-huh.
13      Q.  -- under which digital advertising
14  can be purchased other than 23?
15          MS. CLEMONS:  Objection.  Form.
16          THE WITNESS:  I think that depends
17  on how we're defining digital advertising.
18  Only in that some people may see like social
19  media specifically as digital advertising even
20  if we don't use it in that -- necessarily in
21  that context, and social media is a separate
22  task order.

Page 53

1          I don't -- we don't consider that
2  advertising, but some people do think
3  anything -- anything that's the on the Internet
4  is advertising or might bundle it together in
5  that.
6      BY MS. GOODMAN:
7      Q.  Okay.  Now, if you turn to page
8  ending in 51, this is the performance work
9  statement.
10          Do you see that?
11      A.  Yes.
12      Q.  And the performance -- performance
13  work statement sets out the responsibilities of
14  the contractor, correct?
15          MS. CLEMONS:  Objection.  Form.
16          THE WITNESS:  Yes.  The performance
17  work statement identifies those things that the
18  contractor will do for the army.
19      BY MS. GOODMAN:
20      Q.  And you see Number 1, that is --
21  says: "General."  Do you see where I am?
22      A.  Yes.

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1    Q.  If you go down to the first sentence
2    below the last bullet, where it says: "Army,
3    civilian personnel recruiting," so just go to
4    the sentence just below.
5        A.  Yes.
6        Q.  This says: "The government shall
7    neither supervise contractor employees nor
8    control the method by which the contractor
9    performs the required tasks."
10       A.  Uh-huh.
11       Q.  Is that a true statement of the
12   government's -- of the rules governing the --
13   the rule that applies to the government's work
14   under this contract?
15           MS. CLEMONS:  Objection to form.
16           THE WITNESS:  Yes, that's pretty
17   common to see in any contract, not just this
18   one, because ultimately a contractor who has
19   bid and won a contract has some latitude in --
20   in the performance of the work.  I can't tell
21   the contractor you need two people to do this.
22   The contractor says, well, I think I can do it

Page 55

1    with one.
2            So I can't supervise.  I also can't
3    say your person should be there eight hours a
4    day, why are they only in the office five hours
5    a day.  That's -- I can't supervise them in the
6    conduct of their work.  The contractor has the
7    ability so long as they are delivering to do
8    those things.  So I don't control, and -- and I
9    am -- and in any contract, this would be very
10   similar.  I would be surprised if this sentence
11   is not in every one where I can't tell you the
12   method or the number of people or which
13   computer system you'll use, Windows or Mac, for
14   example, or whichever.  That's up to the
15   contractor so long as they are delivering the
16   deliverables per the terms of the overall
17   contract.
18           BY MS. GOODMAN:
19       Q.  And so what else is meant by the
20   government shall not control the method by
21   which the contractor performance the required
22   task?

Page 56

1            MS. CLEMONS:  Objection to form.
2            THE WITNESS:  I'm not the
3    contracting officer, but in practice my
4    experience has been -- the examples that --
5    that I gave you I think would represent
6    examples of the method.
7            We can't tell the contractor you
8    should have this type of internal organization
9    or you should do this type of prework or you
10   should use this type of, unless it's a
11   requirement to the contract, a computer system.
12   There could be something in the contract where
13   you have to operate on a computer system.
14   Maybe that's part of the contract.
15           But sort of the administrative side
16   of it, that's the type of things where we
17   wouldn't tell them how many people, how often
18   you work, when you come or you don't come, how
19   you run your -- your leave policy or your
20   holiday policies, things like that.  That's in
21   a sense the method in which they perform it
22   that we would not dictate to them.

Page 57

1            BY MS. GOODMAN:
2        Q.  Can the government dictate the
3    method by which the advertising agency
4    purchases paid media --
5            MS. CLEMONS:  Objection to form.
6            BY MS. GOODMAN:
7        Q.  -- under this contract?
8            MS. CLEMONS:  Objection to form.
9    Foundation.
10           THE WITNESS:  Can you be specific a
11   little bit more on -- what do you mean the
12   method that we purchase?  Do you mean what kind
13   of computer system is used to purchase it, or
14   what -- if you could be a little more specific
15   I can maybe provide a better answer.
16           BY MS. GOODMAN:
17       Q.  Sure.  Can the government dictate --
18   strike that.
19           Can the government control the
20   method by which DDB goes out and buys digital
21   display advertising, for example?
22           MS. CLEMONS:  Objection to form.

15 (Pages 54 - 57)

Page 58

1  Foundation.
2      THE WITNESS: Part of what the --
3  the agency pitches or any contractor pitches in
4  pursuit of a contract is their abilities. It's
5  there capability: What they can and can't do,
6  how they do business, why the government even
7  believes you could even do this contract.
8      Obviously we wouldn't want to go
9  with somebody who was cheap and realize, well,
10 you don't even really have the capability to do
11 this.
12     And so how they purchase media is --
13 is sort of part of what was all in -- in -- I
14 don't want to say the pitch, but the process of
15 evaluating their proposal writ large, which the
16 government looked into. It looked at their
17 capability to wit that DDB as a member of
18 Omnicom Worldwide also had the ability to tap
19 into a professional agency whose strength was
20 media buying, OMD, and their processes. And we
21 were buying into their ability to deliver what
22 we needed, which was to buy media.

Page 59

1      We don't necessarily dictate that
2  you must buy it this way, on this system, on
3  this frequency, or -- but that you have the
4  capability demonstrated and -- and I think that
5  everyone would agree OMD is a demonstrated
6  capability of which to buy national media.
7      And so understanding that they
8  brought that and that was one of the supporting
9  reasons of why they were even awarded the
10 contract, because they have the capabilities,
11 we don't then go back and tell them how to
12 execute those things for which they have
13 already proven an ability to do.
14     BY MS. GOODMAN:
15   Q.   Can you turn to page ending in 60.
16     MS. CLEMONS: And we've been going a
17 little over an hour, so I think that we should
18 probably try to take a break soon.
19     MS. GOODMAN: Sure. Let's just try
20 to get through this document.
21     BY MS. GOODMAN:
22   Q.   This is Section 2 of the performance

Page 60

1  work statement definitions and acronyms.
2    A.   Uh-huh.
3    Q.   2.1.3 defines --
4    A.   Yep.
5    Q.   -- contracting officer, correct?
6    A.   Yes.
7    Q.   And it's accurate that the
8  contracting officer is the only individual who
9  can legally bind the government, correct?
10     MS. CLEMONS: Objection to form.
11     THE WITNESS: Correct. Yes. I -- I
12 believe as I stated it and what the actual
13 definition per this is largely the same and
14 intended to mean the same thing.
15     BY MS. GOODMAN:
16   Q.   You passed the test. I made you
17 smile. Okay.
18     2.1.4, contracting officer's
19 representative, the COR, this -- it is
20 accurate, sir, that the COR does not have the
21 authority to change the terms and conditions of
22 the contract, correct?

Page 61

1    A.   That's 100 percent correct.
2    Q.   And let's go to the next page, 61.
3  2.1.16, which is the definition of
4  subcontractor.
5    A.   16. Okay.
6    Q.   It's accurate, sir, that the
7  government does not have privity of contract
8  with any subcontractor, correct?
9      MS. CLEMONS: Objection to form.
10     THE WITNESS: My testimony is that
11 2.1.16, subcontractor, indeed says: "A
12 subcontractor is one that enters into a
13 contract with the prime contractor and that the
14 government does not have privity of contract
15 with the subcontractor."
16     BY MS. GOODMAN:
17   Q.   Okay. Let's go to Page 74. I am
18 looking at 5.12. I guess we should --
19   A.   Right.
20   Q.   Part 5 starts on Page 68, and it's
21 labeled: "Specific tasks."
22   A.   Correct.

HIGHLY CONFIDENTIAL

Page 62

1  Q. So 5.12.1 sets forth the
2  contractor's specific task of developing and
3  presenting a plan for participation in the
4  annual upfront media market, correct?
5       MS. CLEMONS: Objection to form.
6       THE WITNESS: I'm sorry. Could you
7  say the number again because I'm not seeing
8  what you --
9       BY MS. GOODMAN:
10  Q. 5.12.1.
11  A. Oh, Point 1. Sorry.
12     Correct.
13  Q. Okay. And under 5.12 it's the
14  contractor's obligation to provide the
15  planning, execution analysis, and stewardship
16  of all national and local media channels,
17  including traditional, online, and emerging
18  media platforms, correct?
19  A. That is indeed what this contract
20  states.
21     It's also important to note that the
22  task order itself and the performance work

Page 63

1  statement of the task order of national media
2  talent and furnishings will have more detail
3  than the base IDIQ will.
4  Q. Okay. And can you turn to page
5  ending in 99. I am looking under H.9, annual
6  marketing plan execution letters of technical
7  direction procedures.
8       Do you see where I am?
9  A. I do.
10  Q. What is a letter of technical
11  direction under this contract?
12  A. My understanding of a letter of
13  technical direction is that once a task order
14  has been awarded, funded, then our -- our
15  contracting command, MICC, at Fort Knox will
16  issue a letter of technical direction which
17  then authorizes the beginning of work under
18  that task order.
19     As the task orders are sort of
20  reauthorized or renewed each year after the
21  period of performance -- obviously the work
22  starts before a period of performance of the

Page 64

1  next one ends so that they can -- so there
2  cannot be a break. But -- but that is what
3  indicates that that next task order you're
4  authorized to begin work based on the PWS of
5  that next version.
6       MS. GOODMAN: Okay. Shall we take a
7  break.
8       MS. CLEMONS: Yeah.
9       THE VIDEOGRAPHER: The time is
10  p.m. this ends Unit No. 1. We're off the
11  record.
12     (A short recess was taken.)
13     THE VIDEOGRAPHER: The time is
14  p.m. This begins Unit No. 2. We are on the
15  record.
16     (Deposition Exhibit 166 was marked
17  for identification.)
18     BY MS. GOODMAN:
19  Q. Colonel, I am handing you Exhibit
20  166, ARMY-ADS-64495 through 64553. And this is
21  an e-mail produced by the government attaching
22  a number of task orders associated with the

Page 65

1  IDIQ base contract, correct?
2  A. Yes, that appears to be so.
3  Q. And if we turn to page ending in
4  64507.
5  A. Yes.
6  Q. And this task order is 22 pages.
7       My question is: Do you recognize
8  this as the task order -- the national media
9  talent and furnishing task order?
10     MS. CLEMONS: Objection to form.
11     THE WITNESS: Yes.
12     BY MS. GOODMAN:
13  Q. Did the army purchase via this
14  contract any digital programmatic display
15  advertising?
16     MS. CLEMONS: Objection. Form.
17  Foundation.
18     THE WITNESS: I would need to see
19  the actual media plan, whether that flowchart,
20  firm, flex, and any invoices to know for sure.
21  However, it's extremely likely that we did
22  purchase display advertising through this

17 (Pages 62 - 65)

Page 78

1   Doesn't have to be. They could be two
2   different people, and right now or even since
3   -- since maybe on or about January of 2022, we
4   had specifically divided program manager to --
5   and contracting officer's representative in
6   most all of our contracts.
7       So in this case at this time,
8   considering these dates, it's entirely
9   possible -- and indeed I believe likely -- that
10  the program manager was also the COR at the
11  time. And so, frankly, this could have been
12  one of the reasons why we had shifted to
13  changing to separate them.
14      Q.   And you said that your understanding
15  after talking with your colleagues more expert
16  within the contracting is that a government
17  contractor is required to be able to pay its
18  subs regardless of whether the government has
19  paid them yet.
20      Am I recollecting that correctly?
21      A.   Yes.
22      MS. CLEMONS: Objection to form.

Page 79

1       BY MS. GOODMAN:
2       Q.   And so what is the requirement on
3   behalf of -- what is a contractor -- strike
4   that.
5       Is a contractor thus required to pay
6   its subcontractors regardless of whether the
7   government has yet paid them, meaning the
8   contractor?
9       MS. CLEMONS: Objection to form.
10      THE WITNESS: That is my
11  understanding of the requirement.
12      BY MS. GOODMAN:
13      Q.   Okay. Is a subcontractor required
14  to pay a vendor regardless of whether the
15  government has yet paid out to the main, prime
16  contractor --
17      MS. CLEMONS: Objection.
18      BY MS. GOODMAN:
19      Q.   -- for such purchases?
20      MS. CLEMONS: Objection. Form.
21      THE WITNESS: That's not an area
22  that I asked or -- or was able to -- to

Page 80

1   research on. How far that extends below, I do
2   not know.
3       (Deposition Exhibit 168 was marked
4   for identification.)
5       BY MS. GOODMAN:
6       Q.   Okay. I am handing you Exhibit 168,
7   ARMY-ADS-7763 through 7777. And this is an
8   e-mail chain regarding the same requests for
9   equitable adjustment that we were looking at in
10  the prior exhibit.
11      Do you see that as evident by the
12  top e-mail of this document?
13      MS. CLEMONS: Objection to form.
14  Foundation.
15      THE WITNESS: Okay. I mean, I see
16  that it's -- that it's also a request for
17  equitable adjustment, though, it's a -- it's a
18  year later.
19      BY MS. GOODMAN:
20      Q.   Right.
21      A.   So I assume -- I don't want to
22  assume. It could potentially be the same one.

Page 81

1       Q.   If you turn to Page 7765.
2       A.   Okay.
3       Q.   You see that Mr. Green-Trueblood is
4   writing to Ron and her first sentence says:
5   "On July 2, 2021" --
6       A.   Yeah, I see that.
7       Q.   -- "DDB Chicago Inc. submitted a
8   request for equitable adjustment"?
9       And that's the same date as
10  reflected in the prior exhibit?
11      A.   Correct.
12      Q.   Okay. So now you agree that this
13  Exhibit 168 is talking about the same REA in
14  the prior -- as in the prior exhibit?
15      A.   Yes.
16      Q.   Okay. And you see that DDB has
17  reduced its request for equitable -- equitable
18  adjustment by $260,000, correct?
19      MS. CLEMONS: Objection. Form.
20  Foundation.
21      THE WITNESS: I see the line that
22  says DDB will decrease its request for

Page 82

1  equitable adjustment by $260,000.
2       BY MS. GOODMAN:
3       Q.   Okay.  Does -- do you know what --
4  whether the contracting officer accepted DDB's
5  REA?
6       MS. CLEMONS:  Objection to form.
7  Foundation.
8       THE WITNESS:  I do not know the
9  ultimate determination of this particular
10 request for equitable adjustment.
11      BY MS. GOODMAN:
12      Q.   And if you turn to page ending in
13 7772, this is a letter from DDB to the
14 contracting officer, correct?
15      MS. CLEMONS:  Objection.  Form.
16 Foundation.
17      THE WITNESS:  Yes.  I see it's a
18 letter from DDB to Ms. Green-Trueblood.
19      BY MS. GOODMAN:
20      Q.   And if you go under Roman I, the
21 second paragraph where it begins: "DDB
22 subcontractor," do you see where I am?

Page 83

1   A.   I do.
2   Q.   And this says: "DDB's subcontractor
3  OMD USA LLC (OMD) purchased the WYW2 media for
4  the army pursuant to the approved tactical plan
5  with a good-faith understanding that the army
6  would pay for the purchases it had authorized."
7       Do you have any reason to doubt that
8  DDB in fact -- that DDB's subcontractor OMD, in
9  fact, purchased the media as stated in this
10 sentence?
11      MS. CLEMONS:  Objection to form.
12      THE WITNESS:  Based on the -- this
13 and the other exhibits presented, I don't have
14 any reason to believe that this is not
15 accurate.
16      MS. GOODMAN:  Okay.  You can put
17 that to the side.
18      (Deposition Exhibit 169 was marked
19 for identification.)
20      BY MS. GOODMAN:
21      Q.   I am handing you 169 ARMY-ADS-69378
22 through 379.

Page 84

1       And this is an e-mail where OMD is
2  requesting that money be moved from one bucket
3  of digital advertising to another bucket
4  because DDB made an error which resulted in a
5  approximately $26,000 overspend, correct?
6       MS. CLEMONS:  Objection to form.
7  Foundation.
8       THE WITNESS:  I see the e-mail
9  and -- and recognize it as a discussion between
10 then Colonel Morris making recommendation to
11 some of the business management team on -- on
12 his perspective as the branch chief of our
13 national media team on what he recommends --
14 ultimately what he recommends, we recommend --
15 on how to deal with an expenditure that didn't
16 match the army-approved media plan.
17      BY MS. GOODMAN:
18      Q.   And what -- what do you understand
19 Mr. -- or Colonel Morris to mean when he
20 writes: "DDB made the error, and they can pay
21 for it IMO"?
22      MS. CLEMONS:  Objection to form.

Page 85

1  Foundation.
2       THE WITNESS:  So in an instance
3  like -- like this where there could be an error
4  in a particular -- not matching exactly the
5  army-approved plan, then there is some room for
6  the parties to negotiate on how to resolve.
7  26,000 out of 36 million is -- well, 26,000 is
8  a lot to me, but it's a fraction of the
9  total -- of a total award amount for national
10 media.
11      And we may determine that it could
12 be in our interest to assess that while we've
13 still received the benefit, it still got
14 actually put into the market.  Consumers still
15 saw what we were doing even.  If it wasn't the
16 exact plan that we approved, we can go back and
17 say we can work this out or we can stand on no,
18 that's your mistake, you eat the cost.
19      And that is something that would be
20 discussed with the -- with DDB and with the KO
21 in general.  In this case you have Colonel
22 Morris making his opinion known, although he is

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1  not the deciding authority on how we might
2  resolve an error.
3       BY MS. GOODMAN:
4    Q.   And when you say that's your
5  mistake, you eat the cost, that's something
6  that the army could tell one of its contractors
7  when it spends outside of what it is authorized
8  to spend; is that correct?
9       MS. CLEMONS:  Objection to form.
10      THE WITNESS:  Ultimately the
11 contractor is responsible for the terms of the
12 performance work statement.  And the
13 contracting officer's representative, in
14 surveilling and overseeing the delivery of the
15 elements of the performance work statement,
16 could make a determination that something was
17 or was not met or was or was not delivered
18 appropriately or accordingly.
19      Ultimately it would be the KO's
20 determination, but I believe it to be accurate
21 to say that in instances in which a delivery or
22 a deliverable or the manner in which something

Page 87

1  was done, if it did not meet the army's
2  requirements per the PWS, that the army, the
3  government could refuse payment for something
4  that didn't meet -- didn't meet standards.
5       BY MS. GOODMAN:
6    Q.   And when the army -- in such a
7  circumstance that the army refuses payment, is
8  it the contractor's responsibility to still pay
9  the cost to the vendor?
10      MS. CLEMONS:  Objection.  Form.
11 Foundation.
12      THE WITNESS:  It's my
13 understanding -- although I think that probably
14 gets into some other contract piece that I may
15 not be expert, but in my understanding, yes.
16      Ultimately DDB made a commitment
17 here to their subcontractor who made a
18 commitment to a vendor and funds were already
19 committed, spent.  I'm not sure that they use
20 the same sort of budget terms that we use.  And
21 that in this case, DDB itself could be told
22 that they will have to absorb that cost out of

Page 88

1  their own operating budget, expenses, profits.
2       BY MS. GOODMAN:
3    Q.   Does the army have a contract with
4  Google relative to digital advertising?
5       MS. CLEMONS:  Objection to form.
6  Foundation.
7       THE WITNESS:  I'm not aware of a
8  contract between the army and Google.  I
9  understand Google is one of the media vendors
10 that the army purchases inventory from with the
11 facilitation of our media buying agency.
12      BY MS. GOODMAN:
13   Q.   And the facilitation of your media
14 buying agency, that includes DDB and its
15 subcontractor OMD; is that correct?
16      MS. CLEMONS:  Objection to form.
17      THE WITNESS:  The army has a
18 contract with DDB.  OMD, an affiliate who is a
19 subcontractor to DDB does the labor associated
20 with the purchase and using whatever it is,
21 their media buying service, back to our earlier
22 discussion about why they, you know, were

Page 89

1  awarded the contract by their abilities and
2  capabilities system they have to purchase the
3  media, to physically conduct the transactions
4  and then also to load and traffic and send the
5  creative assets to the vendors who are giving
6  us the space or whoever, the display area,
7  wherever, TV, radio, anything, Internet as
8  well, the same.
9       And then ultimately though, the
10 costs for all of those things are still sent
11 back to the army so when we talk about the
12 invoice review, the media COR gets the invoice
13 from Google or whichever vendor and then
14 ultimately has to match that back up to the
15 media plan and pays that.
16      BY MS. GOODMAN:
17   Q.   And in the course of your review of
18 invoices in order to prepare for the deposition
19 today, you saw that invoices are issued from a
20 vendor to OMD, correct?
21      MS. CLEMONS:  Objection to form.
22 Foundation.

23 (Pages 86 - 89)

Page 90

1  THE WITNESS: So actually, as I
2  recall, looking at several invoices, the
3  invoice still had army as its To. It was
4  provided physically or e-mailed physically
5  first to OMD, who would collect all of the
6  various invoices, bundle them, provide them to
7  DDB who reviews, who then would be the
8  responsible party for entering that bundled --
9  and it could be by a couple weeks, a month,
10 whatever the time period may be. Provides that
11 bundled set of invoices after their review and
12 certification that these do represent to the
13 best of their knowledge, true and accurate,
14 into the wide area work flow system whereby
15 then the COR can see them and then review them
16 against the army's approved media plan.
17      BY MS. GOODMAN:
18  Q.  And so in -- basically, there are a
19 few steps, vendor issues invoice to OMD, OMD
20 bundled invoices to DDB and then DDB issues
21 invoices to the army, correct?
22      MS. CLEMONS: Objection to form.

Page 91

1  THE WITNESS: So for cost CLIN items
2  or in other direct expense, where it is not a
3  labor cost and it's not other type of contract
4  line item, for a cost CLIN like this. Yeah,
5  the vendor issues the invoice, although issues
6  to -- it is still to army, but provides the
7  physical invoice for routing first through OMD
8  and media.
9       First through OMD. OMD as the
10 affiliate subcontractor then bundles and sends
11 to DDB and then DDB personnel are responsible
12 for loading them into the wide area work flow.
13      BY MS. GOODMAN:
14  Q.  Okay. Does the army play any direct
15 role in negotiating the purchase of any digital
16 media?
17      MS. CLEMONS: Objection to form.
18      THE WITNESS: The army plays a role
19 in that we are the decision authority of what
20 gets placed when and where and the amount in
21 which we are spending on it. How much we are
22 dedicating to, and then of course, in the

Page 92

1  context of an approved plan, the discussion is
2  and then there is an expectation of what we are
3  getting for it as well.
4       We don't approve a plan just based
5  on dividing up the money. It's also with what
6  do we believe we are getting for each of those
7  divisions of money on the various products or
8  the various inventories, creative deliveries
9  that, you know, we may be purchasing in the
10 media plan.
11      BY MS. GOODMAN:
12  Q.  Does the army negotiate the price of
13 digital media with any vendor?
14      MS. CLEMONS: Objection to form.
15 Foundation.
16      THE WITNESS: It depends. There are
17 negotiations that occur in the context of
18 building out the plan, specifically when we are
19 talking -- we're at the level of the tactical
20 plan. And there are -- there is more than one
21 vendor out there and as we are developing a
22 tactical plan, we may receive proposals from

Page 93

1  vendors and in that proposal, hey, this is what
2  we can do, here's an example of how we will,
3  you know, support you, what we can provide, we
4  may or may not like all of the items or they
5  may be fantastic but maybe it's too much or
6  maybe it's not interesting to us.
7       So there is some negotiation from
8  the vendor and us as a team between the army,
9  the DDB mission task lead and the media for
10 this case and the OMD team to review what is
11 proposed by a vendor and maybe counter-propose
12 or accept or deny altogether until ultimately
13 we get to something that we are all comfortable
14 that this represents something we are
15 interested in and we believe it's at a fair
16 price for what is being offered, and then we
17 will move towards the actual sort of -- we'll
18 book that or we'll approve those items as a
19 part of the plan.
20      BY MS. GOODMAN:
21  Q.  Did the army purchase any display
22 advertising directly from Google?

24 (Pages 90 - 93)