Exhibit B

1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF VIRGINIA

3              ALEXANDRIA DIVISION

4              CASE NO. 1:23-cv-00108-LMB-JFA

5

6    UNITED STATES OF
     AMERICA, et al.,

7                    Plaintiffs,

8          vs.

9

10   GOOGLE, LLC,

11

12                   Defendant.

13              - HIGHLY CONFIDENTIAL -

14

15          Videotaped deposition of ANTHONY J.

16   FERRANTE, taken pursuant to notice, was held at the

17   offices of Axinn, Veltrop & Harkrider LLP, 114 West

18   47th Street, New York, New York  10036, taken

19   stenographically before MARGARET M. REIHL, RPR, CRR,

20   on  Friday, February 16, 2024, commencing at 9:34

21   a.m.

22

23

24   Job No. 92916

25

## Page 2

```
 1   A P P E A R A N C E S :
 2          US DEPARTMENT OF JUSTICE ANTITRUST
            DIVISION
 3
            BY:  JULIA TARVER WOOD, ESQUIRE
 4
                 MICHAEL FREEMAN, ESQUIRE
 5
            450 Fifth Street, NW, Suite 8700
 6
            Washington, D.C.  20530
 7
            (202) 307-0924
 8
            julia.wood@usdoj.gov
 9
            michael.freeman@usdoj.gov
10
            matthew.gold@usdoj.gov
11
            michael.wolin@usdoj.gov
12
            REPRESENTING THE UNITED STATES OF AMERICA
13
14
15          AXINN, VELTROP & HARKRIDER LLP
16          BY:  ALLISON M. VISSICHELLI, ESQUIRE
17          1901 L Street NW
18          Washington, D.C.  2003
19          (202) 469-3510
20          avissichelli@axinn.com
21          REPRESENTING THE DEFENDANT, GOOGLE
22
23
24
25
```

## Page 4

```
 1
 2                    I N D E X
 3   WITNESS                            PAGE
 4   ANTHONY J. FERRANTE
 5     By Mr. Freeman                    ^
 6                    - - -
 7                  E X H I B I T S
 8   NO.       DESCRIPTION               PAGE
 9
     Ferrante-
10   Lit-1     Expert Report of Anthony
               J. Ferrante 1/23/24        34
11
     Ferrante-
12   Lit-2     "10 Cyber Risks and Realities
               We're Seeing This Year -
13             And Beyond" dated 2/24/23  83
14   Ferrante-
     Lit-3     2021 Ads Safety Report     143
15
     Ferrante-
16   Lit-4     Digiday article, "Unraveling
               header bidding's problems
17             with user data" 3/20/17    194
18   Ferrante-
     Lit-5     "How Ads.txt Took Down 3ve,
19             As The FBI Took Down Its
               Creators" 12/3/18          207
20
     Ferrante-
21   Lit-6     Automatic Whitelisting for
               AWBid launched 12/5/13
22             GOOG-AT-MDL-012551468      212
23                    - - -
24
25
```

## Page 3

```
 1   PAUL, WEISS, RIFKIND, WHARTON &
 2   GARRISON LLP
 3   BY:  AMY J. MAUSER, ESQUIRE
 4        KATHERINE S. STEWART, ESQUIRE
 5   2001 K Street, NW
 6   Washington, D.C.  20006
 7   (202) 223-7300
 8   amauser@paulweiss.com
 9   kstewart@paulweiss.com
10   REPRESENTING THE DEFENDANT, GOOGLE
11
12
13   (VIA ZOOM):
14   OFFICE OF THE ATTORNEY GENERAL
15   BY:  JONATHAN M. HARRISON, ESQUIRE
16   202 NORTH 9TH STREET
17   RICHMOND, VIRGINIA 23219
18   (804) 786-6557
19   JHarrison@oag.state.va.us
20   REPRESENTING PLAINTIFF STATES
21
22
23   ALSO PRESENT:
24   JONATHAN PERRY, VIDEOGRAPHER
25
```

## Page 5

```
 1          THE VIDEOGRAPHER:  We are now on
 2   the record.  My name is Jonathan Perry.
 3   I am a videographer retained by Lexitas.
 4   This is a video deposition for the U.S.
 5   District Court for the Eastern District
 6   of Virginia, Alexandria Division, Case
 7   Number 1:23-cv-00108-LMB-JFA.  The date
 8   is February 16th, 2024.  The time is
 9   9:34 a.m.
10          We are at the offices of Paul
11   Weiss, 2001 K Street Northwest in
12   Washington, DC.  This deposition is
13   being taken in the matter of the United
14   States of America, et.al., versus
15   Google, LLC.  The name of the deponent
16   is Anthony Ferrante.  All counsel will
17   be noted on the stenographic record.
18   The court reporter is Peg Reihl, also
19   with Lexitas and would you please swear
20   in the witness.
21          ANTHONY FERRANTE, having been
22   duly sworn as a witness, was examined
23   and testified as follows:
24   BY MR. FREEMAN:
25          Q.    Good morning, sir.
```

Page 6

1      A.    Good morning.
2      Q.    We met off the record, but my
3  name is Michael Freeman.  I work with the
4  Department of Justice here with my colleague,
5  Julia Wood, also with Department of Justice.
6            I want to start just kind of with
7  deposition ground rules, just so we're all on
8  the same page here.  You're sworn under oath,
9  which means you are expected to tell the truth.
10 Anything you say today can be used by the DOJ in
11 any civil, criminal or administrative matter.
12           Do you understand that?
13     A.    Yes, I do.
14     Q.    And so is there anything that
15 occurred today that would prevent you from
16 telling the truth?
17     A.    No.
18     Q.    What I'm trying to get at is
19 there any medication that you're on that may
20 impair your ability to tell the truth or
21 understand why you're here today?
22     A.    Yes, I understand why I'm here,
23 and there's no reason why I cannot tell the
24 truth.
25     Q.    All right.  So this deposition is

Page 7

1  obviously recorded, and so it's important that
2  we don't talk over each one.  So I will let you
3  have full answers.  We need to make sure you
4  listen to the complete question and wait until
5  I'm done before you answer.
6            Do you understand that?
7      A.    Yes, I do.
8      Q.    And because there's a court
9  reporter, obviously it's natural -- we'll be
10 here for a few hours -- to potentially nod at
11 times.  But it's important to have verbal
12 answers, right, you understand that?
13     A.    Yes, I do.
14     Q.    All right.  And if you don't
15 understand a particular question, just please
16 let me know.  And so if you don't do that,
17 though, I'll assume you understand the question,
18 okay.
19           Do you understand that?
20     A.    Yes, sir.
21     Q.    All right.  At times your
22 attorney may make objections.  Unless they
23 instruct you not to answer, then you can still
24 answer the question.
25           Do you understand that?

Page 8

1      A.    Yes, I do.
2      Q.    We'll have breaks throughout
3  today.  So if you need a break at any point in
4  time, just let us know, and we'll do the best to
5  accommodate that.  We do typically like to break
6  every hour or so, okay?
7      A.    Yes, sir.
8      Q.    All right.  Do you agree to be
9  bound by these rules today?
10     A.    I do.
11     Q.    All right.  So I want to start
12 with just your background, starting back to your
13 education.
14           So where did you go to college,
15 sir?
16     A.    I went to Fordham University in
17 the Bronx, New York.
18     Q.    And did you graduate from Fordham
19 University?
20     A.    I did.
21     Q.    And a degree in what?
22     A.    Computer science.
23     Q.    What years did you attend Fordham
24 University for undergrad?
25     A.    I believe I arrived in 1997 and

Page 9

1  graduated in May of 2001.
2      Q.    Did you write any papers while
3  you were in college within the field of computer
4  science specifically?
5      A.    I'm sure I did.
6      Q.    Okay.  Were any of those papers
7  on the field of what I'll call "advertising
8  technology"?
9      A.    Is there a particular aspect of
10 advertising technology?
11     Q.    Well, did you write about any
12 aspect of advertising technology?
13     A.    Well, as you can appreciate,
14 advertising technology has an element of
15 security, and so I did a lot of work in
16 undergrad in the security field.
17     Q.    Were any of your papers
18 addressing publisher ad servers?
19     A.    Any of my papers publishing --
20 I'm sorry, can you repeat the question?
21     Q.    Yeah, sure.
22           Any of the papers that you wrote
23 in college, were they on the topic of or
24 incorporated publisher ad servers?
25     A.    They were not.

UNITED STATES OF AMERICA v                                    Anthony J. Ferrante
GOOGLE, LLC                          Highly Confidential

| Page 10 |
|---|

1    Q.      Were any of the papers that you
2  wrote on the topic of ad exchanges?
3    A.      From '97 to 2001, no.
4    Q.      Were any of the papers about
5  advertiser ad servers?
6    A.      No.
7    Q.      It's my understanding, then, you
8  went on and got a Master's degree; is that
9  right?
10    A.      Not immediately, but I did.
11    Q.      Okay.  So what did you do
12  immediately following graduation from your
13  undergrad from Fordham University?
14    A.      So after I graduated from Fordham
15  University in May of 2001, I continued to work
16  in private practice as a security consultant.  I
17  worked at a smaller -- through college to pay
18  for college, I worked at a smaller consultancy
19  firm where I focused on networking, web page
20  development and security.
21          It was in September of 2001 that
22  I started my new job at Ernst & Young as a
23  security consultant.  Unfortunately, my first
24  week at work -- or forgive me, the second week
25  of work, the second Tuesday of my first -- my

| Page 11 |
|---|

1  second week at Ernst & Young was September the
2  11th, which I witnessed the events of 911
3  firsthand in New York City.  And as you can
4  appreciate, it absolutely changed my life.
5          So while I did continue to work
6  at Ernst & Young for the next few months, I quit
7  my job to go back to school to get a Master's
8  degree in computer science at Fordham University
9  with the goal of joining the FBI to fight the
10  war on terrorism.
11          It was, I want to say, 2002 is
12  when I went back to school, September of 2002.
13  Or maybe it was September 2003, is when I went
14  back to graduate school.
15    Q.      So the -- if I understood you
16  correctly, you had two different employers
17  between graduating college and going back for
18  your Master's degree?
19    A.      So I worked at a small boutique
20  consultancy firm, really my sophomore year
21  through senior year of college.
22    Q.      What's the name of that
23  particular company?
24    A.      It's changed a few times since.
25  When I started working there, it was called

| Page 12 |
|---|

1  Array Technology Group.  It was a great firm.  I
2  think there were maybe 20 people there.  I was
3  the college intern.  I remember I beat the
4  streets to get the job.  I actually walked
5  around with paper resumes.  You remember what
6  those look like?  And I went to offices and
7  passed them out and got the job.
8          I worked -- I come from a very
9  blue-collar family, so I had to pay for college
10  and I worked -- when I did not have class, I
11  worked at Array Technologies in New York City
12  through my senior year.  I worked through
13  school.  The summer times, of course, I worked
14  full-time and through my senior year, which I
15  essentially had classes two days a week and
16  worked three days a week.
17          And then when I graduated in May,
18  they kept me on full-time until I started
19  full-time at E&Y -- or Ernst & Young it was
20  called at the time -- which was September 2001.
21    Q.      How long did you work at Ernst &
22  Young?
23    A.      You know, as we were talking
24  earlier, my memory is fuzzy on it.  I want to
25  say it was maybe a year, maybe 18 months.  It

| Page 13 |
|---|

1  took -- I know after 911 it was a very surreal
2  world at that point, and so it took time for me
3  to, you know, get prepared for graduate school,
4  get applications in and so -- but I do know I
5  started.  It couldn't have been the very next
6  September.  It must have been the following
7  September, I believe.  I can't recall, to be
8  honest.
9          I do know I graduated in -- from
10  graduate school with a Master's degree in
11  computer science.  I graduated, not in May, I
12  had additional courses to take.  It was more
13  like August, and it was in August 2004.  And it
14  was January 2005, is when I entered on duty to
15  the FBI academy in Quantico, Virginia,
16  January 23rd, 2005.
17    Q.      When you were at Ernst & Young,
18  was any part of your job dealing with
19  advertising technology?
20    A.      So, again, back to -- you asked
21  that question earlier.  Advertising technologies
22  have an element of security, and my focus was on
23  the security aspects of internet communications.
24  So, yes, I focused a lot on networking and
25  security of information traversing the internet.

## Page 14

```
 1        Q.      Was any of your job at Ernst &
 2   Young having to deal with publisher ad servers?
 3        A.      Not that I recall.
 4        Q.      Was any part of your job at Ernst
 5   & Young dealing with ad exchanges?
 6        A.      Not that I recall.
 7        Q.      Was any part of your job at Ernst
 8   & Young dealing with advertiser ad servers?
 9        A.      Not that I recall.
10        Q.      At your time -- so back when you
11   were at Ernst & Young, did you work with any
12   other advertising tech companies?
13        A.      That's a broad question.  Can you
14   be more specific?
15        Q.      Sure.
16               Did you work with -- let's start
17   with Google in particular -- in the sale of
18   online ads?
19               MS. MAUSER:  Object to form.  You
20          can answer.
21               THE WITNESS:  I don't really
22          recall.  I will tell you as a 21,
23          22-year-old young professional, we had
24          some really cool clients, but I don't
25          recall.
```

## Page 15

```
 1   BY MR. FREEMAN:
 2        Q.      Then backtracking just a bit, I
 3   think you called it -- the company was Array
 4   Technologies, could you spell that?
 5        A.      A-R-R-A-Y Technologies Group,
 6   ATG.
 7        Q.      When you were at Array Technology
 8   Group, did you work in the field dealing with
 9   publisher ad servers?
10        A.      So I did a lot of work doing web
11   programming and publishing, and search engine
12   optimization was a thing then.  It was in its
13   very early stages.  So I would say the early
14   adoption or the early versions of search engine
15   optimization and ad technologies existed.  And,
16   yes, I was involved with multiple clients,
17   programming their websites and leveraging the
18   1998, '99 through 2001 version of advertising
19   technologies.
20        Q.      So was search engine
21   optimization, is that the same as a publisher ad
22   server?
23        A.      Well, it's -- in order to
24   optimize your search engine results, you would
25   have to engage or utilize the advertising system
```

## Page 16

```
 1   processes.
 2        Q.      So how did you engage or utilize
 3   the advertising system processes when you were
 4   at Array Technology Group?
 5        A.      Back then, candidly it was pure
 6   programming.  It was HTML and JavaScript.
 7        Q.      When you're talking about search
 8   engine optimization, does that also include
 9   advertisements that appear in search results?
10        A.      No, not in '97, '98.  It was --
11   it was about getting the sites that I programmed
12   as high on search results as possible.
13        Q.      So I guess I'm a little unclear,
14   then, how search engine optimization is similar
15   to publisher ad servers?
16        A.      As I said earlier, it was -- my
17   work was programming the sites, the HTML and the
18   JavaScript, and programming them in a way that
19   search engines would pick them up and place them
20   in their search results.  That was the extent of
21   my programming in 1997 and 1998 through 2001.
22        Q.      Any of the websites that you
23   worked on during your time at Array Technology
24   Group, were they selling any ads on their web
25   pages?
```

## Page 17

```
 1        A.      Candidly, I'm not even sure if
 2   that was a thing back then.  I believe -- I
 3   mean, if I recall correctly, Yahoo was still
 4   finding itself.  I guess I can admit that
 5   sitting in the lunchroom with my colleagues in
 6   '98, we were talking about this really cool new
 7   search engine called Google, and I remember
 8   visiting Google and having it stamped "beta" in
 9   the corner.  So I'm not even sure if the
10   technologies you speak of, you're asking me
11   about, even existed then.
12        Q.      So do you recall any of the
13   websites that you worked on at your time at
14   Array Technology Group selling ads on their
15   particular website?
16        A.      I do not recall selling ads.  I
17   recall programming sites in a way that would
18   allow them to land higher in search results.
19        Q.      Okay.  So you went back to, I
20   think you said, Fordham University for your
21   Master's degree?
22        A.      I did.
23        Q.      And what was your Master's degree
24   in?
25        A.      Computer science.
```

## Page 18

1    Q.    Similar question to your
2 undergrad, did you write any papers as part of
3 your graduate program just in the general field
4 of computer science?
5    A.    I'm sure I did.
6    Q.    Okay.  Were any of those papers
7 that you wrote as part of your Master's program
8 dealing with publisher ad servers?
9    A.    I do not recall.
10    Q.    Were any of the papers you wrote
11 in your -- seeking your Master's degree about ad
12 exchanges?
13    A.    I do not recall.
14    Q.    Were any of your papers that you
15 wrote as part of your graduate degree part of
16 advertiser ad servers?
17    A.    Do not recall.
18    Q.    Were any of your graduate papers
19 on the topic of header bidding spelling
20 spelling?
21    A.    No.
22    Q.    So I think you said you -- I
23 think in your words was -- we were talking about
24 Quantico, right, in January, 2005?
25    A.    Correct, the FBI Academy in

## Page 19

1 Quantico, Virginia, January 23rd, 2005.
2    Q.    After you finished the academy --
3 FBI Academy in Quantico, where were you
4 assigned?
5    A.    So I graduated in May of 2005,
6 and they sent me right back to New York City.
7    Q.    So --
8    A.    Forgive me.  Sorry.  Where I
9 processed out of.  I processed out of New York.
10    Q.    You were part of the New York
11 field office?
12    A.    Correct.
13    Q.    Were you assigned to any
14 particular unit?
15    A.    Yes, I was assigned to the
16 national security cyber squad.
17    Q.    What were your duties as you were
18 a special agent at this time?
19    A.    Correct, I was a special agent
20 focusing on counter terrorism, counter
21 intelligence, matters all with a cyber nexus
22 spelling spelling.
23    Q.    I think I've heard you describe
24 this time as you were hunting down terrorists;
25 is that a fair and accurate representation?

## Page 20

1    A.    Sure.  I'm sure I've said that
2 before, and that was a lot of the work that I
3 did.  It was actually one of the first cases I
4 worked, was a terrorism matter.
5    Q.    During your time as a special
6 agent in the New York field office, how many
7 cases were filed in criminal court where you
8 were the primary case agent?
9    A.    Not many.
10    Q.    More than ten?
11    A.    I don't even recall.  Definitely
12 not many.  I was a national security cyber
13 agent, so I worked a lot of counter intelligence
14 and terrorist matters, so filing them in
15 criminal court was a rarity.
16    As a matter of fact, I remember a
17 case I worked when I did work criminal cyber
18 matters, and I met the prosecutor in Southern to
19 swear out a warrant.  And she asked me to meet
20 her at a certain place, and I said, you know,
21 I'm not familiar with the courthouse, so it
22 wasn't many.
23    Q.    Was there more than five?
24    A.    I don't recall.
25    Q.    Do you recall definitively that

## Page 21

1 there was at least one?
2    A.    I honestly don't recall.  I was
3 the case agent on hundreds of cases.  Whether or
4 not that case was a criminal case that was sworn
5 in the court, like I said, there were not many.
6 But there were many national security cases,
7 terrorism, counter intel, and there were indeed
8 criminal cases that I was a lead case agent on
9 but never any that went to court.
10    Q.    Why did the criminal cases that
11 you were the lead case agent on never go to
12 court?
13    A.    I mean, there's a myriad of
14 reasons why that can happen.
15    Q.    What are some of them?
16    A.    Leads go cold.
17    Q.    During your time as part of the
18 New York field office, how many times did you
19 testify in court as a special agent?
20    A.    I can't recall.  Very few.
21    Q.    Do you recall definitively at
22 least testifying at least once in court as a
23 special agent?
24    A.    I honestly don't recall.  I know
25 that, you know, I worked -- I certainly worked

Page 22

1  cases, like I said, terrorism, counter intel and
2  criminal matters.  But sitting in open court and
3  testifying in the witness stand, I can't recall.
4         Q.     During this time as part of the
5  New York field office, how many cases did you
6  investigate involving subjects or targets using
7  or misusing publisher ad servers?
8         A.     In my time in the New York field
9  office after arriving in 2005, we certainly saw
10  a spike in the exploitation of the advertising
11  ecosystem.  So the leveraging of the advertising
12  ecosystem as a vector in which to target users
13  was certainly on the rise.  It was something we
14  saw every single day, so it's hard for me to put
15  a number on how many cases I worked.  But I can
16  say there were many cases that involved the
17  leveraging of the ecosystem as a vector to
18  target users.
19         Q.     I want to break down, I guess,
20  the advertising ecosystem as you phrased it.
21               How many cases involved subjects
22  or targets misusing publisher ad servers?
23         A.     So let's break down your
24  question.  How many cases involving subjects or
25  targets?  That's a tough question because we

Page 23

1  don't always know the subject or target, okay,
2  but what we do know is what happened, which is
3  in some cases the exploitation of the
4  advertising ecosystem in which a -- for example,
5  a drive-by download was leveraged, a spoof
6  domain was leveraged.  And therefore, because
7  those elements of the advertising ecosystem were
8  exploited, users were affected, so I knew many
9  victims.  But who was behind it was the hard
10  part.
11         Q.     If you didn't know the identity
12  of a subject or target, how would you open that
13  case in the FBI?
14         A.     Well, the FBI has standards.
15  They had the -- I believe they call it DIOG, and
16  I mean, that's the whole point of the
17  investigation if you know who did it.  You have
18  to -- it's not as fun if you know who did it.
19  You have to conduct an investigation.
20         Q.     So how many cases did you open as
21  a special agent that involved bad actors using
22  or misusing publisher ad servers?
23         A.     I couldn't put a number on it.  I
24  couldn't put a number on it.  I would just go
25  back to my statement earlier that from when I

Page 24

1  arrived in 2005 through my time in the New York
2  City field office, it was most certainly a
3  vector that was being exploited, similar to that
4  of spam e-mail and phishing e-mail.
5         Q.     While you might not know the
6  precise number, was it more than a hundred?
7         A.     I don't know.
8         Q.     Was it definitively more than 50?
9         A.     So I will tell you -- because I
10  can appreciate you wanting to have an answer
11  here, so I will tell you that these
12  investigations are complicated.  They are not as
13  simple as we see this person has exploited the
14  advertising ecosystem and has targeted this
15  entity or these groups of users.  What we see is
16  we see the victimization of end users, and that
17  is what generates or initiates an investigation.
18               I can tell you that I ran, led,
19  contributed to hundreds if not thousands of
20  investigations, and they were not always clear
21  what had happened, how it happened, who did it,
22  how they did it, that's the point of the
23  investigation.
24               And so when you ask me to put a
25  number on it, I don't know if we're really doing

Page 25

1  justice to the fact that that's what -- that's
2  why we do investigations, is to understand that.
3  If I knew the answer and could tell you right
4  now, I'd be a really -- I'd be a really smart
5  person and, right, have a crystal ball in which
6  I can see these things.  That's what we did
7  every day in the FBI, is investigate these
8  matters.  They're complicated matters.  It was a
9  new vector, a new risk that was introduced to
10  the industry on the internet, much so like as I
11  said earlier, spam or phishing e-mails.
12               I remember my first -- some of my
13  first meetings with significant clear defense
14  contractors where I sat them down and spoke to
15  them about the risks of phishing e-mails and how
16  they're being targeted to senior executives and
17  educating them on that.  Just like I remember
18  sitting down with organizations, talking to them
19  about how advertisements can be exploited and
20  drive-by downloads can happen and spoof domains
21  can occur for the facilitation of these criminal
22  activities.
23               But, again, it wasn't always
24  clear as day when it started and throughout the
25  course of the investigation.

---

## Page 26

```
1      Q.     Do you remember any specific case
2  or investigation that you worked on while you
3  were in New York City field office involving,
4  I'll use your words, the advertising ecosystem?
5      A.     I think there's one referenced in
6  my report.
7      Q.     And which one is that?
8      A.     I forget the name of it.  If you
9  have my report, I'm happy to reference it to
10 you.  But I do remember it involved ad fraud,
11 and I know we arrested some Estonians
12 responsible for it.
13     Q.     Were you the lead case agent on
14 that particular case?
15     A.     No.
16     Q.     You were the -- a co-case agent
17 on that case?
18     A.     Can you be more clear with the
19 term "co"?
20     Q.     I'm sorry.are you familiar with
21 the phrase co-case agent?
22     A.     Of course I am.  I just want to
23 make sure we're using it in the same context.
24     Q.     Okay.  How would you define
25 "co-case agent"?
```

## Page 27

```
1      A.     So in the FBI there's a lead case
2  agent.  And for larger cases, that lead case
3  agent would partner with a colleague, and they
4  would be co-case agent.  The bigger the case,
5  the more case agents.
6      Q.     So using that definition, were
7  you a co-case agent in that particular case
8  where you arrested Estonians?
9      A.     In that particular case, I was
10 not.
11     Q.     In that particular case, were you
12 the affiant on any particular warrants related
13 to that case?
14     A.     I don't think so.
15     Q.     Did you sit at counsel's table
16 for any court proceedings related to that
17 investigation?
18     A.     I did not.
19     Q.     In that case, did the FBI use
20 assistance from private sector partners?
21     A.     I can't specifically recall, but
22 I want to say yes.  I mean, many times in these
23 technical cases the FBI partnered with private
24 industry.
25     Q.     Do you remember the FBI
```

## Page 28

```
1  partnering with Georgia Tech University?
2      A.     I don't recall -- oh, I'm sorry,
3  let's back up.  In general or on this case?
4      Q.     On this particular case?
5      A.     I don't recall.
6      Q.     I take it by that answer you
7  remember the FBI working with Georgia Tech
8  University on other cases?
9      A.     And to the more general question,
10 I don't recall.
11     Q.     Do you recall a professor at
12 Georgia Tech University by the name of Wenke
13 Lee -- and I'll spell that: W-E-N-K-E, then
14 last name Lee, L-E-E?
15     A.     Do I recall Professor Lee outside
16 of these proceedings?  I do not.
17     Q.     So do you know whether he
18 assisted in that case that resulted in the
19 Estonians being arrested?
20     A.     I don't know.
21     Q.     Why would the FBI use the
22 assistance of private sector partners to
23 investigate a case?
24     A.     I think it's very common and well
25 known talking point from the government, from
```

## Page 29

```
1  the Department of Justice, from the FBI, from
2  the Department of Homeland Security.  Majority
3  of the internet infrastructure is privately
4  owned, and we're stronger together, so
5  partnerships are critical in proactive and
6  responsive cyber threats -- combating cyber
7  threats.
8      Q.     So while you weren't case agent
9  or affiant on any warrant, so what was your role
10 in that case involving the arrest of six
11 Estonians?
12     A.     I supported my colleagues.
13     Q.     What does that mean?
14     A.     I mean in a case like that is a
15 very large case, lots of data to process.
16 Excuse me.  Lots of technologies to understand
17 and unpack.  I was one of the more technical
18 members of our group, and so I was regularly --
19 I was regularly consulted for guidance.  I was
20 also at that point a more seasoned agent.
21     Q.     What does that mean?
22     A.     It means I was more experienced
23 than the younger folks, and so I would help
24 them.
25     Q.     Did you review any data for that
```

## Page 30

1   particular case?
2       A.      Gosh, I don't recall, but I feel
3   like it was a all-hands-on-deck effort, so I'm
4   not sure how I couldn't have, but I don't recall
5   specifically.
6       Q.      For that particular case, are you
7   aware whether the FBI reached out to Google to
8   seek their assistance?
9       A.      It's my understanding that the
10  government did reach out to Google.
11      Q.      For that particular
12  investigation?
13      A.      Yes.
14      Q.      And what was Google's response?
15      A.      To be clear, again, because I was
16  not the case agent or the co-case agent, I'm not
17  sure who initiated that conversation, whether
18  Google reached out to the government or the
19  government reached out to Google.  But I do know
20  that Google was involved in the -- that
21  operation.
22      Q.      Being part of the FBI, are you
23  aware that sometimes the Department of Justice
24  do press releases in regards to big arrests?
25      A.      Yes.

## Page 31

1       Q.      Are you aware, for this
2   particular case, whether there was any press
3   release by the Department of Justice?
4       A.      I think there was.
5       Q.      As part of being a special agent,
6   have you ever been asked to contribute to the
7   substance of any press release?
8       A.      Yes.
9       Q.      As part of that are you asked
10  what other outside institutions deserve credit
11  for that particular investigation?
12      A.      You know, I can't speak directly
13  to that.  The times that I was consulted, that
14  was not a question that was asked.
15      Q.      Have you read press releases by
16  the Department of Justice about large arrests?
17      A.      I'm sure I have.
18      Q.      Is it common in those press
19  releases, then, for the Department of Justice to
20  acknowledge the assistance of outside entities
21  that helped in the investigation?
22      A.      I'm sorry, can you repeat the
23  question?
24      Q.      Sure.
25              Is it common in press releases

## Page 32

1   that are released by the Department of Justice
2   to acknowledge outside entities that helped in
3   the investigation?
4       A.      You know, I'm not sure if I can
5   answer that.  I didn't work in the press shop.
6   You say it common, are you asking that
7   question in the context of today, or are you
8   asking in the context of that investigation that
9   we were speaking about earlier?
10              I can tell you from my
11  experiences in the FBI it's a very sensitive
12  topic, and I don't know if there is a clear
13  answer there.
14      Q.      Have you ever read Department of
15  Justice press releases that acknowledges outside
16  entities in their help of the investigation?
17      A.      I'm sure I have.
18      Q.      Did you read the press release
19  for this particular case that you're citing the
20  arrest of the six Estonians?
21      A.      I'm sure I have.  I think I
22  reference it in my report.
23      Q.      Is Google referenced as one of
24  the outside entities that helped the FBI in that
25  particular investigation?

## Page 33

1       A.      I can't recall.  If you want to
2   pass me my report, we can look at it.
3       Q.      Do you remember Georgia Tech
4   University being one of the outside entities
5   that were acknowledged for assisting in that
6   investigation?
7       A.      As I sit here right now without
8   the press release in front of me, I can't
9   recall.
10      Q.      You cite another case in your
11  report that you referenced as the FBI
12  Minneapolis Division instituted case.
13              Are you familiar with what I'm
14  talking about?
15      A.      I recall referencing it in my
16  report.
17      Q.      Did you have any personal
18  involvement in that particular case?
19      A.      I don't think so.
20      Q.      Did any of the conduct that
21  occurred in that particular case occur on any
22  Google platform?
23      A.      I -- I can't answer that as I sit
24  here right now.  Can you show me my report?
25  Can we discuss it?  Can we walk through it?



Page 34

1    Q.    Sure.
2    A.    Can you be more specific?
3    Q.    Sure.
4          MR. FREEMAN:  We'll mark this as
5    Ferrante Lit Exhibit 1.
6          (Document marked for
7          identification as Ferrante-Lit
8          Deposition Exhibit No. 1.)
9    BY MR. FREEMAN:
10   Q.    So for identification what's been
11   now marked as Ferrante-Lit Exhibit Number 1 is
12   your report that you made in preparation for
13   this case; is that right?
14   A.    Correct.

19   Q.    Okay.  So my question was in
20   relationship to this case that you talked about
21   in paragraph 18, did any of this conduct that
22   you described occur on any Google platform?
23   A.    You know, I'm not sure.
24   Q.    How did you gain information or
25   knowledge about this particular case?

Page 35

1    A.    It's cited at the bottom,
2    footnote 14.
3    Q.    Just so we're clear, when you
4    talk about footnote 14, that's the press
5    release, right?
6    A.    Correct.
7    Q.    Did you have any independent
8    knowledge of this particular case outside of the
9    press release?
10   A.    Not that I recall.

21   Q.    Did you have any personal
22   involvement in that particular investigation?
23   A.    No.  I was not in the New York
24   City field office at that time.
25   Q.    How did you gather information

Page 36

1    and knowledge about that particular case?
2    A.    Research.
3    Q.    Did you research anything beyond
4    the press release that is cited in footnote 11?
5    A.    Beyond the press release?
6    Q.    Yeah.
7    A.    Yeah, of course.
8    Q.    Okay.  What did you investigate
9    beyond the press release cited in footnote 11?
10   A.    Any sort of open source reporting
11   on the operation.  I mean, a couple of them are
12   cited.
13   Q.    What other sources of information
14   beyond the press release did you rely on to get
15   information about this particular investigation?
16   A.    As I said, open source reporting.
17   Q.    My question is: what open source
18   reporting did you review and rely on to gain
19   knowledge about this particular case?
20         MS. MAUSER:  Object to form.
21         THE WITNESS:  Well, I mean,
22         footnote 10, footnote 11, footnote 12,
23         for example, are three -- three
24         examples, are three citations that are
25         in my report to talk about the point

Page 37

1          that I'm trying to make here, which is
2          organized crime members gravitate
3          towards ad fraud because the risk to
4          reward ratio, risk to reward ratio.
5    BY MR. FREEMAN:
6    Q.    Did you review any other open
7    source information about this particular case
8    other than those noted in footnotes 10, 11 and
9    12?
10   A.    I'm sure I did.
11   Q.    Okay.  What other ones did you
12   review?
13   A.    I'm not sure.  I mean, I'm sure I
14   went to the internet and did as much research as
15   possible as I try to verify my information like
16   any investigator would do.  And so I looked at
17   various sources and have highlighted, like I
18   said, three of them here to cite my points in
19   the expert report.



**Page 38**

15  BY MR. FREEMAN:
16       Q.    But you testified that you
17  reviewed other open sources about this
18  particular case to gain knowledge about it,
19  right?
20       A.    Of course.

**Page 40**

7              And, Michael, if I may, we're
8   coming up on the hour.  And at your convenience,
9   can we take a wellness break?
10       Q.    Sure.  Let me have just maybe
11  three more questions, and then we'll do it just
12  to conclude on that particular paragraph.
13       A.    Sure.
14       Q.    So any of the conduct in this
15  particular case about the King of Fraud, did
16  that conduct occur on any Google platform?
17       A.    For Methbot?
18       Q.    Correct.
19       A.    As I sit here right now, I can't
20  answer that.  Can we look at my references?

24       Q.    I'm just asking you as you sit
25  here today, do you recall whether Methbot had

**Page 41**

1   any -- occurred on any Google platform?
2        A.    And as I answered, as I sit here
3   from memory, I can't recall.  But I would be
4   interested in reading footnote 12, but I
5   understand this is -- you're asking the
6   questions, not me.
7              MR. FREEMAN:  We can take a
8        break.
9              THE WITNESS:  Want to take a
10       break?
11             MR. FREEMAN:  I thought you
12       requested a break.
13             THE WITNESS:  Earlier.  But I
14       said at your convenience.  You ready?
15             MR. FREEMAN:  We can take a break
16       now.
17             THE WITNESS:  Okay.
18             THE VIDEOGRAPHER:  Off the record
19       10:22.  This ends media unit number one.
20             (Brief recess.)
21             THE VIDEOGRAPHER:  On the record
22       at 10:34.  This begins media unit two in
23       the deposition of Anthony Ferrante.
24  BY MR. FREEMAN:
25       Q.    Did you have any other positions

## Page 42

1   within the FBI other than being a special agent
2   in the New York field office?
3        A.    Yes.
4        Q.    I want to talk about your next
5   position within the FBI going oldest to most
6   recent.
7        So after you were a special agent
8   in the New York field office, what was your next
9   position within the FBI?
10       A.    So when I was in the New York
11  City field office, again, I got there in May of
12  2005.  I want to say it was sometime in 2006 or
13  2007 I joined where -- rather I was selected to
14  be a member of the FBI's Cyber Action Team,
15  which is essentially a rapid deployment team
16  within the FBI focused on significant cyber
17  events.  So I was a member of that team.
18       A few years later I was a member,
19  noncertified member of the Crisis Negotiation
20  Team.  And then right around that period of
21  time, I became a certified special agent bomb
22  technician.
23       Q.    And just so I'm clear, I think
24  you listed three different positions within the
25  FBI that you had all at the same time as being a

## Page 43

1   special agent in the New York field office?
2        A.    So I was a member of the cyber
3   action team, yes, through my time in New York,
4   whenever I got on that.  I believe it was 2006
5   through -- actually through my time at
6   headquarters, and then I forget what year, but I
7   did become a member of the crisis negotiation
8   team.
9        I stepped down from the crisis
10  negotiation team when I joined the special agent
11  and bomb technician program.  I served on that
12  team, and I forget when but I became a certified
13  special agent bomb technician maybe in 2009.
14  And I served as a bomb technician through the
15  remainder of my time in New York City.
16       Q.    Did you work on any case as part
17  of the cyber action team relating to bad actors
18  misusing publisher ad servers?
19       A.    Not that I recall.  Not as a
20  member of the cyber action team.
21       Q.    Did you work on any case as part
22  of the cyber action team relating to bad actors
23  misusing ad exchanges?
24       MR. FREEMAN:  Can we go off just
25       for 30 seconds?

## Page 44

1        MS. MAUSER:  Something keeps
2   beeping.
3        THE VIDEOGRAPHER:  (Pause.)  Off
4   the record at 10:47.
5        THE VIDEOGRAPHER:  On the record
6   at 10:39.
7   BY MR. FREEMAN:
8        Q.    Okay.  I'm going to reask my
9   question right before we took that break.
10       A.    Sure.
11       Q.    Did you work on any case as part
12  of the cyber action team relating to bad actors
13  misusing ad exchanges?
14       A.    Not that I recall, not as a
15  member of the cyber action team.
16       Q.    Did you work on any case as part
17  of the cyber action team related to bad actors
18  misusing advertiser ad servers?
19       A.    As a member of the cyber action
20  team in that capacity, not that I recall.
21       Q.    And then am I correct that your
22  roles as a crisis negotiator or bomb tech didn't
23  relate to publisher ad servers?
24       A.    It did not.
25       Q.    Or ad exchanges?

## Page 45

1        A.    It did not.
2        Q.    Or advertiser ad servers?
3        A.    It did not.
4        Q.    Okay.  So eventually you leave
5   New York City, right?
6        A.    I did.
7        Q.    But then you're still part of the
8   FBI, right?
9        A.    Correct.
10       Q.    Okay.  So what's your next
11  position with the FBI after you leave New York
12  City?
13       A.    So in 2013, I believe it was
14  July 2013, I promoted down to FBI headquarters
15  where I started as a supervisory special agent
16  at this point, and I started as a congressional
17  liaison in the cyber division working in the
18  front office.  I was in that post, I want to
19  say, weeks, maybe a few months until I started
20  serving as the de facto chief of staff and
21  principal advisor to the assistant director in
22  charge of the cyber division.
23       Q.    I want to go back then when you
24  were a supervisor special agent and
25  congressional liaison in that timeframe.

## Page 46

1 So were you supervising any
2 special agents during that timeframe?
3 A. It's a good question. I did not
4 have a squad, but I certainly oversaw programs
5 and folks on our front office staff.
6 Q. What type of programs did you
7 oversee during this particular timeframe?
8 A. Well, at that time -- I mean when
9 I first got there it was -- I was responsible
10 for the congressional affairs portfolio. So my
11 duties involved me being intimately involved
12 with all of our matters, criminal and national
13 security and ensuring that we were doing
14 everything we could to advertise our good
15 work -- not advertise -- to make sure Capitol
16 Hill was aware of our good work. And so that
17 happened through various methods, whether they
18 were verbal briefings to various committees,
19 paper notifications, one to one meetings.
20 I worked very closely with the
21 FBI's office of congressional affairs and DOJ's
22 office of congressional affairs, but DOJ had a
23 different name for it, I forget it.
24 Q. Okay. If I caught all that,
25 during this timeframe you gave verbal briefings

## Page 47

1 to members of Congress; is that what you're
2 talking about?
3 A. Correct.
4 Q. And then similarly with -- you
5 said paper notifications that were paper
6 notifications to members of Congress?
7 A. Yeah, they called them
8 congressional notifications. They went up to
9 the Hill. Whether or not anyone read them, I
10 don't know.
11 Q. Then you said you had, at times,
12 one-on-one meetings, is that with members of
13 Congress?
14 A. Or staff, yeah, representatives
15 or staff.
16 Q. Do you recall giving any verbal
17 briefings to members of Congress or their staff
18 about bad actors misusing publisher ad servers?
19 A. I can't recall.
20 Q. What about verbal briefings to
21 members of Congress or their staff about bad
22 actors misusing ad exchanges?
23 A. I mean, the question as you ask
24 it, I'm not sure. I mean, even the previous
25 question. I want to go back to what I said

## Page 48

1 earlier that it's a very broad topic. And as I
2 said before, the advertising ecosystem, we saw
3 an uptick in it being used as a vector to which
4 consumers were being targeted.
5 And so did we give briefings to
6 members of Congress about domain spoofing, and
7 malvertising and drive-by downloads? Of course.
8 I mean, that was what we did in the cyber
9 division, was investigator those matters.
10 Whether or not we stood before members of
11 Congress and attributed it to the advertising
12 ecosystem, I can't answer that as I sit here in
13 this chair. But the threats that existed on --
14 in that ecosystem, that's all we briefed them
15 on.
16 Q. What type of products do you
17 include when you say the phrase "advertising
18 ecosystem"?
19 A. Well, when I use that phrase, I
20 am referring to from -- I mean, in this
21 particular instance, a consumer sitting at their
22 computer. And when I say "consumer," let me be
23 more specific and just say a general US citizen
24 sitting at their computer, browsing the internet
25 and visiting various websites.

## Page 49

1 When I talk about security risks,
2 I talk -- I'm referring to that US citizen
3 sitting at that computer, using that web
4 browser, browsing to different internet sites
5 and being targeted through advertisements,
6 drive-by downloads, spoof domains, scareware and
7 others. That was a new vector that we saw in
8 the government from my time in New York through
9 my time at headquarters.
10 Q. Do you include publisher ad
11 servers as part of the advertising ecosystem?
12 A. The larger ecosystem when
13 speaking about advertising?
14 Q. I'm going back to how you used
15 the phrase. You used the phrase multiple times
16 today, "advertising ecosystem," right?
17 A. Yes.
18 Q. What I'm trying to get at is when
19 you use the phrase, "advertising ecosystem," are
20 you including publisher ad servers as part of
21 that ecosystem?
22 A. Sure.
23 Q. Are you including ad exchanges as
24 part of that ecosystem?
25 A. Yes.

## Page 50

1    Q.    Are you including advertiser ad
2  servers as part of that ecosystem?
3    A.    I'm sorry, can you repeat that?
4    Q.    Yeah.
5    Are you including advertiser add
6  servers as part of that ecosystem?
7    A.    Advertiser ad servers, yes.
8    Q.    Is it possible for domain
9  spoofing to occur outside of the advertising
10  ecosystem?
11    A.    Of course.
12    Q.    Is it possible for drive-by
13  downloads to occur outside the advertising
14  ecosystem?
15    A.    That's a complicated question.
16  Can you be more specific?
17    Q.    Have you ever seen drive-by
18  downloads occur outside of publisher ad servers,
19  the ad exchange or advertiser ad servers?
20    A.    So then in your hypothetical, we
21  have a web browser?  Do we have a web browser?
22    Q.    I'm asking not in hypothetical
23  terms.
24    A.    Okay.
25    Q.    Did you see, as a member of the

## Page 51

1  FBI, drive-by downloads occur outside the
2  publisher ad servers, the ad exchange or the
3  advertiser ad servers markets?
4    MS. MAUSER:  Object to form.
5    THE WITNESS:  I think that's a
6    complicated question.
7    A drive-by download can exist
8    just sitting on a web page.  It has
9    nothing to do with the advertising.
10    Yes, I've seen that happen before.
11  BY MR. FREEMAN:
12    Q.    So I want to go back to: did you
13  give any verbal briefings to members of Congress
14  or their staff about bad actors misusing ad
15  exchanges?
16    A.    Specifically ad exchanges, I do
17  not recall.  Specifically noting and using the
18  term "ad exchanges" or even the "advertising
19  ecosystem," I do not recall.
20    I can tell you that the risks
21  that we saw that were being delivered, the pay
22  loads, the vectors being delivered to consumers,
23  to these US citizens is what we briefed because
24  that's what we did every day.
25    Q.    That included risk outside of the

## Page 52

1  advertising ecosystem, right?
2    A.    Yes.  And to be clear, I don't --
3  as you ask these questions, I don't -- yes.
4    Q.    Did you author any congressional
5  notifications about bad actors misusing
6  publisher ad servers?
7    A.    I can't recall.
8    Q.    Did you author any congressional
9  notifications about bad actors misusing ad
10  exchanges?
11    A.    I can't recall.  I have to
12  imagine they may be public.  I can tell you it
13  wasn't uncommon to issue a notification or
14  briefing on a bot net.  I can tell you
15  specifically we did extensive work in the bot
16  net -- in the bot net domain, in the bot net
17  space.
18    So as I sit here and I say I
19  can't recall, I'm happy to go back and check
20  because I'm sure some of that work was
21  associated with advertising -- the advertising
22  ecosystem.  I just can't recall right now.
23    Q.    Did you ever testify in court
24  while being a supervisory special agent with
25  also being the congressional liaison?

## Page 53

1    A.    No.
2    Q.    Did you ever testify in front of
3  Congress when you were in that particular
4  position?
5    A.    No.
6    Q.    When you were in that position,
7  did congressional members or their staff make
8  inquiries or requests to you?
9    A.    Yes.
10    Q.    Do you recall any specific
11  request from a member of Congress or their staff
12  about the advertising ecosystem?
13    A.    Specifically the advertising
14  ecosystem?
15    Q.    Yes.
16    A.    That term, "advertising"?
17    Q.    Let's start there, yes.
18    A.    The answer is no.
19    Q.    Do you recall any specific
20  request from a member of Congress or their staff
21  about publisher ad servers?
22    A.    Those exact terms?
23    Q.    Yes.
24    A.    No.
25    Q.    Do you recall any specific

Page 54

1  request from a member of Congress or their staff
2  about ad exchanges?
3         A.    Again, those specific terms?
4         Q.    That's correct.
5         A.    I cannot recall.
6         Q.    Do you recall any specific
7  request from a member of Congress or their staff
8  about advertiser ad networks?
9         A.    Those specific words, no, I
10 cannot recall.
11        Q.    So I think, then, you said the
12 next position within the FBI, you were still a
13 supervising special agent but also the chief of
14 staff; is that right?
15        A.    That is correct.
16        Q.    You were the chief of staff to
17 who?
18        A.    To the assistant director of the
19 cyber division, Joseph Demarest.
20        Q.    When did you have that particular
21 position?
22        A.    Officially, I can't recall.  As I
23 said, I got there in July of 2013.  I served in
24 that congressional liaison post for a few
25 months.  Unofficially, I became essentially the

Page 55

1  acting chief of staff.  I don't recall when I
2  was officially named, but I eventually was named
3  the 15 and the full bird chief of staff for the
4  cyber division spelling spelling.
5         Q.    When you say you were eventually
6  named -- did you say 15 like the number?
7         A.    GS15.
8         Q.    Yeah, meaning like the pay scale?
9         A.    Correct.  I was a 14 as a
10 supervisory special agent.
11        Q.    During the time that you were
12 chief of staff, did you supervise other FBI
13 special agents?
14        A.    Yes.
15        Q.    Did you have a squad?
16        A.    Yes.
17        Q.    How many members were on your
18 squad?
19        A.    That's a good question.  I don't
20 recall.  Twelve, 15, ten.  It ebbed and flowed.
21 It was essentially the front-office operations.
22        Q.    Other than supervising other
23 special agents, did you have any other role as
24 chief of staff?
25        A.    I was the principal advisor to

Page 56

1  the assistant director overseeing the
2  administratively and operationally everything
3  that was going on in the division.  There were
4  five -- four or five sections, section chiefs.
5  Within those sections, unit chiefs.
6              I mean, I was the conductor that
7  kept all the trains running on time.
8         Q.    Would you author any memos, then,
9  to the assistant director of -- in the cyber
10 division?
11        A.    That's a good question.  If I
12 could have avoided it, I would have.  I'm sure I
13 authored memos to divisional staff, to the
14 field.  But I also oversaw my colleagues
15 authoring them and pushing them out.
16        Q.    Do you recall authoring any memo
17 during this timeframe about the advertising
18 ecosystem?
19        A.    Me personally authoring?
20        Q.    Yeah.
21        A.    No, I did not author.
22        Q.    During this time how many cases
23 did you supervise where targets or subjects were
24 misusing the advertising ecosystem?
25        A.    You know, that's an excellent

Page 57

1  question.  And as I sit here right now, I can't
2  answer it.  I can tell you there were cases.
3         Q.    Do you recall the specifics of
4  any of those cases?
5         A.    No.
6         Q.    Did they result in criminal
7  prosecutions?
8         A.    I can't recall as I sit here
9  right now.
10        Q.    Were any of these cases that you
11 supervised during this timeframe involved
12 subjects or targets misusing header bidding
13 wrappers?
14        A.    Yeah, I mean, at that point in
15 time from that perspective, again, as I worked
16 in that role with the assistant director.  As I
17 said earlier, we saw more and more of those
18 security risks being exploited or used -- excuse
19 me -- as a vector to target US citizens.
20              And of course through the course
21 of our investigation, we wanted to know how it
22 was happening.  And so we saw more and more of
23 our work taking us to the advertising ecosystem.
24              So was I involved in case
25 briefings, case updates, trade craft, knowledge

1  shares, attribution?  Yeah, I was involved in
2  all of that.
3         Q.     How many cases did you supervise
4  that involved bad actors using header bidding
5  wrappers?
6         A.     So I think we should maybe level
7  set.  And when you say the term "supervise," now
8  we're not talking about the case agent or
9  co-case agent, correct?
10        Q.     If I understand you correctly,
11 during this timeframe you didn't have any
12 independent cases in which you were the case
13 agent; is that correct?
14        A.     That is correct.
15        Q.     Okay.
16        A.     At headquarters I did not serve
17 as a case agent or a co-case agent on any case.
18        Q.     So my question when we talk about
19 supervisors, my understanding you had your own
20 squad, right?
21        A.     I had a squad.
22        Q.     And just so we're clear with
23 everyone who is not in this world, "squad" means
24 other special agents?
25        A.     Other special agents and

1  professional staff, yes.
2         Q.     And you said that's roughly --
3  you had roughly -- it ebbed and flowed but with
4  roughly ten special agents?
5         A.     Yeah, ten to 12.
6         Q.     When I talk about supervise, I'm
7  talking about supervising special agents who
8  were the case agent on cases involving bad
9  actors misusing header bidding wrappers?
10        A.     So that's where I think, you
11 know, we just have to unpack it together as we
12 step through it.  As the chief of staff, my
13 responsibility was to oversee operationally,
14 administratively all cases in the FBI cyber
15 division so --
16        Q.     Let me stop you there just so
17 we're clear.
18               Including those not investigated
19 by members of your squad?
20        A.     My squad?
21        Q.     Yeah.
22        A.     The front-office squad?  None of
23 them were doing any investigations.  At the FBI
24 all investigations are done at the field level,
25 from the field office.  There are no cases run

1  out of headquarters except for very, very
2  special ones.
3               All cases are run out of the
4  field.  The field is program managed, various
5  topics from headquarters, so the field takes
6  their cases, and they report them up to their
7  program manager.  And at that time, we had
8  rolled out a new way of conducting
9  investigations where we had strategic offices
10 and tactical offices.  And so there was some --
11 there were field offices working specific cases
12 that would then report into headquarters.
13               Now, that reporting into
14 headquarters is where it fell on my desk, and
15 that choreographing and understanding of the
16 cases and making sure everybody was coordinated
17 and everybody knew what was going on, not only
18 within the field offices, other field offices
19 within head quarters; making sure that our other
20 government agencies were briefed on these
21 various cases and make sure the Hill was aware
22 of what was going on, make sure the brass within
23 the Hoover Building was aware of these cases.
24 So that was my responsibility when I say I
25 oversaw.

1               I think you're referring to the
2  term "supervising" in the traditional sense,
3  meaning like a subordinate and boss.  As the
4  chief of staff that was most certainly not my
5  role.  It was way more than that.
6         Q.     So the ten or so special agents
7  on your squad, they were not independently doing
8  investigations?
9         A.     They were not.
10        Q.     Do you recall any specific
11 investigation or case involving the misuse of
12 header bidding wrappers?
13        A.     I'm sorry, can you repeat the
14 question?
15        Q.     Yeah.
16               I think you previously testified
17 that you did recall investigations of subjects
18 or targets misusing header bidding wrappers; is
19 that right?
20        A.     That is correct.
21        Q.     So my question is: do you recall
22 specific ones that involved actors, subjects or
23 targets misusing header bidding wrappers?
24        A.     So when you say do I recall
25 specific ones, you have to be more specific.  I

|  | Page 62 |
|---|---|

1 remember cases involving header wrappers.  I
2 recall many cases involving header wrappers.
3 Who was under investigation, how it occurred is
4 a different story.  Where it occurred, that
5 is -- that is where I think we just need to
6 unpack and step through.
7      Q.     Sure.
8             Do you recall what specific field
9 offices were investigating subjects or targets
10 misusing header bidding wrappers?
11      A.     I do not.
12      Q.     Do you recall the name of any
13 individual who was a subject or target of an
14 investigation involving the misuse of header
15 bidding wrappers?
16      A.     I do not.  You have to appreciate
17 from the FBI cyber division headquarters perch,
18 I mean, there are thousands of cases.  So
19 knowing the name of the actual individual, the
20 target, it just wasn't something that I would
21 do.
22      Q.     Do you recall the name of an
23 entity that was a subject or target involving
24 the misuse of header bidding wrappers?
25      A.     I mean, not as I sit here right

|  | Page 63 |
|---|---|

1 now.
2      Q.     During this timeframe as being
3 chief of staff, did you ever testify in court?
4      A.     No, I thought we answered that
5 one.
6      Q.     Did you ever testify in front of
7 Congress --
8      A.     I did not.
9      Q.     -- in that role?
10            Did you testify in any other type
11 of proceeding that would not be criminal court
12 or Congress?
13      A.     And I assume your -- when you say
14 "testify," you are speaking the traditional
15 sense, raise-your-right-hand testimony?
16      Q.     That's correct?
17      A.     Then, no, not that I recall.  I
18 will say that I regularly walked the Hill with
19 my boss and gave briefings to members and their
20 staff.
21      Q.     Did you have any other positions
22 within the FBI that we haven't talked about?
23      A.     I became -- I took a joint duty
24 assignment and moved over to the National
25 Security Council in the Whitehouse in 2015,

|  | Page 64 |
|---|---|

1 October of 2015.
2      Q.     How long did you have that role?
3      A.     I think it was just under two
4 years.  I served for the last 18 months in the
5 Obama administration, and then a few months of
6 the Trump administration.  As an FBI employee I
7 was apolitical, so I went back to work at the
8 Whitehouse on January 21st, 2017, worked for a
9 few months there on the National Security
10 Council.  I served for the director for cyber
11 incident response and the cyber directorate.
12      Q.     Did you conduct any
13 investigations while you had this joint duty
14 assignment?
15      A.     No, I had to give up my
16 investigative work.
17      Q.     Were you supervising other
18 individuals, other special agents within the FBI
19 during this time?
20      A.     No.
21      Q.     Did you ever testify in court
22 when you held this position or this joint duty
23 assignment?
24      A.     I did not.
25      Q.     Did you ever testify in front of

|  | Page 65 |
|---|---|

1 Congress when you had this position?
2      A.     I did not.
3      Q.     Did you ever testify in any other
4 proceeding, other than court or Congress, when
5 you had this -- when you had this position?
6      A.     Again, when you say "testify,"
7 we're just going to assume that it is the
8 traditional sense raising your right hand and
9 giving testimony, correct?
10      Q.     That's correct.
11      A.     Yeah, no, I did not.
12      Q.     So during your time as an FBI --
13 I'm saying from the time you reported to
14 Quantico to the time you left the FBI, did you
15 ever testify in Federal Court?
16      A.     I can't recall.
17      Q.     Did you ever testify in State
18 Court?
19      A.     I can't recall.
20      Q.     So after you left the National
21 Security Council, what did you do next in your
22 career?
23      A.     So in April of 2017 I resigned
24 from government service and went into private
25 practice the same month.

Page 66

1        Q.      Who was your employer when you
2   left government service in April of 2017?
3        A.      Who did I leave government
4   service for?
5        Q.      Yeah, when you left, who did you
6   work for?
7        A.      When I left, I worked for the
8   U.S. government.  My next post was in private
9   practice where I started working at FTI
10  Consulting, my current employer.
11       Q.      And you've been continuously
12  employed by FTI Consulting from April of 2017 to
13  present?
14       A.      Correct.
15       Q.      Since you've been with FTI
16  Consulting, consultants, how many times have you
17  testified in court?
18       A.      I can't recall.  I can tell you
19  that the public or the unsealed cases are listed
20  in my CV.
21       Q.      Are you suggesting that there are
22  cases that you testified in that are under seal?
23       A.      In court?
24       Q.      Yeah.  My question was: how many
25  times have you testified in court?

Page 67

1        A.      Yeah, I can't recall.  I can tell
2   you -- again, I'm not an attorney, so I'm not
3   sure -- I don't pretend to know how that works.
4   But the cases that I am allowed to disclose are
5   written in my CV.  If you want to walk through
6   them, I can tell you which ones ended up in
7   court and which ones didn't.
8        Q.      So how many times have you
9   testified under oath in court?
10       A.      In a courtroom, right?  Because
11  we're under oath today, but we're not in a
12  courtroom.
13       Q.      In a courtroom?
14       A.      Okay.  Let's look.  So there are
15  two expert retentions Proofpoint, the via day
16  secure spelling spelling and then CDK Global,
17  those were in a courtroom.
18              And I can tell you that using the
19  traditional sense of being under oath, I
20  testified up on the Hill a couple years ago for
21  one of the committees.  I forget which one.
22       Q.      Let's go back, then, to that
23  before we get to your retention as an FTI
24  consultant.
25              What was the subject matter of

Page 68

1   your testimony on the Hill a couple of years
2   ago?
3        A.      I forget exactly.  I want to say
4   maybe it was the adoption of 5G and the
5   associated risks.  It should be listed.
6        Q.      Okay.  So now I want to talk
7   about the two cases that you just cited where
8   you testified in court.  Let's start with the
9   Proofpoint, Incorporated case.
10              Did a court certify you as an
11  expert witness in that particular case?
12       A.      They did.
13       Q.      And what was the field of
14  expertise in which they certified you in?
15       A.      Reasonable measures as a cyber
16  security expert.  The exact language I know is
17  on the record.
18       Q.      What were you asked to opine
19  about in that particular case?
20       A.      The reasonable measures that
21  Proofpoint took to protect their intellectual
22  property.
23       Q.      What type of intellectual
24  property did they have?
25       A.      Source code, documents.

Page 69

1        Q.      Does Proofpoint Incorporate --
2   Incorporated operate in the advertising
3   ecosystem?
4        A.      I'm not sure I can answer that
5   when you say "they operate."  I'm sure they do
6   advertisings.
7        Q.      Was part of -- was part of your
8   testimony discussing Proofpoint's intellectual
9   property as it relates to any product they have
10  in the advertising ecosystem?
11       A.      Again, can you reask the
12  question, and can we step through it?
13       Q.      Well, the source code -- let's
14  start there.  You said you testified about
15  source code.
16       A.      Source code and documents.
17       Q.      Okay.  Let's talk about just the
18  source code for a moment.
19       A.      Okay.
20       Q.      Was it source code relating to
21  the advertising ecosystem?
22       A.      I can't say for certain as I sit
23  here right now, but I will -- I will say I do
24  not think so.
25       Q.      And then similar question about

## Page 70

1  the documents as you indicated.
2         Were the documents that you
3  reference as intellectual property of Proofpoint
4  related to the advertising ecosystem?
5         A.    Again, as I sit here right now, I
6  can't say definitively, but I know it was a lot
7  of material.
8         Q.    Okay.  Then the second one in
9  which you've testified, right, is just the
10  letters C-D-K Global, right, you see that?
11         A.    Correct.
12         Q.    Did the court in that particular
13  case certify you as an expert witness?
14         A.    They did.
15         Q.    In what field?
16         A.    The security field.  The exact
17  language I don't know, but I know there's a
18  transcript.
19         Q.    "Security field," meaning cyber
20  security field?
21         A.    Cyber security.
22         Q.    What were you asked to opine
23  about?
24         A.    Sensitive data and the risks of
25  that sensitive data and how passing that

## Page 71

1  sensitive data without controls is very
2  dangerous and puts consumers, specifically US
3  consumers at risk, while in this case, Arizona
4  consumers.
5         Q.    Were you retained by CDK Global?
6         A.    I was, yes, correct.
7         Q.    And how was CDK Global passing
8  sensitive data?
9         A.    They weren't.  They were fighting
10  the -- I believe Brnovich was maybe the
11  governor.
12         Q.    Let's just spell it for the court
13  reporter?
14         A.    Sure, you want to spell it?
15         Q.    Sure B-R-N-O-V-I-C-H; is that
16  correct?
17         A.    Yes.
18         Q.    All right.  How was Brnovich
19  passing sensitive data?
20         A.    Yeah, I think you pronounced it
21  correctly.
22               Brnovich was pro passing
23  sensitive consumer -- Arizona consumer data to
24  third parties.  He wanted to make it freely
25  available and to share it with third parties

## Page 72

1  while CDK Global did not want to do that because
2  it introduced a ton of risks to consumers.
3         Q.    How was Brnovich collecting
4  sensitive data?
5         A.    He wasn't.  I believe he was
6  either the governor or secretary of state; he
7  had an official political position within the
8  state.  He wasn't collecting it.  The car
9  dealerships in his states were.
10         Q.    How were the car dealerships
11  within the state of Arizona collecting sensitive
12  data?
13         A.    Well, I learned a lot in this
14  case.  Believe it or not, from the moment you
15  visit a car dealer's website through visiting a
16  showroom to test driving a vehicle, to
17  purchasing a vehicle, dealerships collect a lot
18  of data on consumers.  And they harvest that
19  data, and they were looking to share it freely
20  and without controls.  And CDK -- CDK Global did
21  not want that to occur because of the various
22  risks that created.
23         Q.    Was any part of that case in your
24  testimony related to the advertising ecosystem?
25         A.    Yes.

## Page 73

1         Q.    What part of the case was
2  involving the advertising ecosystem?
3         A.    Like I just said, through my work
4  on that case I studied and learned how these car
5  dealerships were collecting data and then using
6  that data to target consumers for the purposes
7  of sales.
8         Q.    But how did that relate to the
9  advertising ecosystem?
10         A.    Well, I learned about a lot of
11  the data that these dealerships were collecting
12  and how they were collecting it and where they
13  were collecting it.
14         Q.    Were these car dealerships using
15  publisher ad servers to collect this data?
16         A.    My -- the scope of my work there
17  was not to unpack that aspect of it, rather just
18  the data that they were collecting and how they
19  were collecting it.
20         Q.    Is there any other time that
21  you've testified in court as an expert?
22         A.    Not that I can recall.



Page 74

14      Q.      Were any of these publications
15  that you authored in whole or in part peer
16  reviewed before publication?
17      A.      Yeah, I'm sure.  I mean, part of
18  our process is we peer review all of our work.
19      Q.      Were any of them blind peer
20  reviewed?
21      A.      No.
22      Q.      Which articles in Appendix A were
23  peer reviewed before publication?
24      A.      Again, I have to say -- I mean,
25  all of them should have been.  It's part of our

Page 75

1   practice on the team.
2       Q.      Peer reviewed by who?
3       A.      Members of our team.
4       Q.      Within FTI Consulting?
5       A.      Within FTI Consulting, yes.  In
6   the first and most instances, yes.  In some
7   instances, I may take it outside to an academic
8   or a colleague in the legal industry for peer
9   review or co-authorship.
10      Q.      Which article listed in these
11  recent publications did you take to an outside
12  academic?
13      A.      I couldn't answer that right now.
14  I'd have to go through them all.  I'm happy to
15  do that.
16      Q.      Which one of these recent
17  publications was peer reviewed by someone
18  outside of FTI Consulting?
19      A.      Let me look.  I mean, I'm not
20  really sure as I sit here.  I can tell you some
21  of these pieces I would have most certainly
22  reached out to colleagues in the industry but
23  some I wouldn't have.  So I don't know as I sit
24  here and look at the titles.
25      Q.      What percentage of the

Page 76

1   publications listed in this appendix were peer
2   reviewed by someone outside of FTI Consulting?
3       A.      Say maybe ten, 20%.
4       Q.      But you can't point to one
5   specific one that was peer reviewed by someone
6   outside of FTI Consulting?
7       A.      I mean, I want to say maybe the
8   Hill piece, "US Presidential Election is Under
9   Attack."
10      Q.      Who was that peer reviewed by?
11      A.      I don't know specific names.
12  But, I mean, that's what I do every day, and
13  most of my friends are security people.  And
14  maybe they don't work for FTI, but they work
15  either in the government or in the security
16  industry or in the security industry for the
17  government.
18              So, you know, I'm not really
19  secretive about my publications.  I enjoy
20  writing and publishing.  So if I have an
21  interesting piece in something like that, I
22  might have said -- sent it to someone and said
23  what do you think, am I crazy?
24      Q.      Were any of these publications
25  published in journals that require the pieces to

Page 77

1   be peer reviewed before publication?
2       A.      So I can't answer that.  I would
3   have to send you to our team that actually
4   facilitates that whole process.  I don't know.
5       Q.      You don't know whether any of
6   your publications were published in journals
7   that require peer review before publication?
8       A.      What I said was I don't know if
9   any of the journals I published in require peer
10  review.  I wouldn't be the person to ask that.
11  I write the piece, pass it to the team who then
12  gets it published.
13      Q.      What journals have you published
14  in?
15      A.      Everything is listed here.  You
16  say "journal," I'm thinking in the traditional
17  sense like an academic journal or something.  I
18  don't know if I've really event been published
19  in a journal.  Like I said, everything is here.
20      Q.      Have you ever been published in
21  an academic journal?
22      A.      I don't know as I sit here.  I
23  would have to go through all of these.
24      Q.      As you sit here today, do you
25  recall being published in an academic journal?

Page 78

1    A.    Again, I don't know.  I've been
2  writing for -- in this topic in the security
3  industry for -- I mean, since I was 18.  But in
4  the last ten years, I don't know if any of these
5  are academic journals.  Here you go; New York
6  Law Journal, holistic view, Insurance Journal.
7  So those are two just based on the title.
8    Q.    Is the New York Law Journal an
9  academic publication?
10    A.    I don't know.  I was making that
11  just based on New York Law Journal.
12    Q.    So is it fair to say you don't
13  remember any academic publications that you
14  authored as you sit here today; is that fair?
15    A.    I'm sorry, can you repeat the
16  question?
17    Q.    Is it fair to say you don't
18  remember any specific academic publications that
19  you authored as you sit here today?
20    A.    I just said, you know, based on
21  looking at these titles, I can't answer that
22  question right now.  I'd have to go through each
23  of them.  I mean, the New York Law Journal, I
24  read that as New York Law School, maybe you read
25  it as New York State or New York City.  Again, I

Page 79

1  don't know.  If we pull the piece, we can look
2  at it and get clarification.  I'm just not sure.
3    Q.    So that's a long way of saying
4  you don't know of any academic publications that
5  you've had as you sit here today?
6    A.    Yeah.
7    Q.    Of these publications that you've
8  had, how many have been about malvertising?
9  Just for spelling M-A-L-V-E-R-T-I-S-I-N-G; is
10  that right?
11    A.    Oh, I'm sorry.
12    Q.    Malvertising, I'm just making
13  sure we're spelling it correctly.
14    A.    Yeah, I'm sure you can spell it
15  for the court reporter.
16      You asked me a question about how
17  many were focused on malvertising.  I'd have to
18  go through them to answer your question and then
19  to answer your question clearly.
20    Q.    So, again, as you sit here today
21  do you recall authoring any publication
22  discussing malvertising?
23    A.    I mean, of the 31 pieces, as I
24  sit here today, I can't say the substance of
25  them outside -- outside their titles, but I'm

Page 80

1  sure malvertising has been referenced.
2    Q.    And which ones are you sure that
3  they've been referenced?
4    A.    I don't know.  I'd have to look
5  at them.
6    Q.    How are you sure that they've
7  been referenced?
8    A.    I mean, malvertising is a risk.
9  It's been on the rise.  It's -- it's been a risk
10  to users over the years.
11    Q.    So is it your testimony today
12  that the word "malvertising" appears in at least
13  one of the publications listed?
14    A.    No, that's not my testimony, that
15  the word "malvertising" exists in one of these.
16      What I'm saying is malvertising
17  is a threat; it's a risk.  And in my recent
18  publications, the 31 recent publications in the
19  last ten years, I don't know what I've written
20  in those.  Is the concept of malvertising
21  referenced either directly or indirectly?  I'm
22  saying it's very possible, but I don't know.
23    Q.    How many of these publications
24  discuss header bidding?
25    A.    I don't know.

Page 81

1    Q.    Have you ever published personal
2  research results from studies that you've
3  conducted in this field?
4    A.    Personal?
5    Q.    Yeah.
6    A.    I don't know of -- anything I've
7  published I have done -- I mean, personal and
8  professional lives I feel like are so blurred
9  these days.  So anything I publish I've done
10  either professionally or academically.  And I
11  don't believe I was published as an academic but
12  conducted plenty of research.
13    Q.    What type of research have you
14  conducted?
15    A.    Period?
16    Q.    I'm sorry?
17    A.    Is that your entire question?
18    Q.    You said you conducted plenty of
19  research, rye?
20    A.    I mean, that's all I do is
21  research.  I told you started in this industry
22  when I was ten years old.  I'm cognizant that
23  I'm talking to the Department of Justice.  At
24  ten years old I was hacking computers,
25  ethically, of course.  I continued -- I wrote my

Page 82

1  first program at ten.  I hacked my first program
2  at ten.  That's research.  Business BASIC was
3  the language I learned at ten years old, which
4  then I then studied as an academic; HTML,
5  JavaScript, Java, Perl, PHP.  These are all
6  computer languages that I researched, studied,
7  wrote, compiled, decompiled, engineered, reverse
8  engineered, networks that I've built.  I mean,
9  that's all I've done since the age of ten is
10  research.
11          So then did I take that research
12  and publish on it?  No, not as an official
13  academic.  Professionally, sure.  I've taken
14  research that I've done and written papers, all
15  of which should be outlined here.
16      Q.      The first publication listed
17  under this title is one titled "10 Cyber Risks
18  and Realities We're Seeing This Year - And
19  Beyond."
20          Do you see that?
21      A.      I do see that.
22      Q.      And then you even have the date
23  of February of 2023; is that right?
24      A.      Yes.
25      Q.      So about a year ago?

Page 83

1      A.      Correct.
2      Q.      Did you list malvertising as one
3  of the top ten cyber risks and realities of this
4  year and beyond?
5      A.      I can't recall.
6          MR. FREEMAN:  We'll mark this as
7      Ferrante litigation Exhibit 2.
8          (Document marked for
9          identification as Ferrante-Lit
10          Deposition Exhibit No. 2.)
11  BY MR. FREEMAN:
12      Q.      So just for identification, is
13  this the article that you published that's
14  referenced in Appendix A of your report here?
15      A.      Yes.
16      Q.      Let me know when you've had time
17  to review it.
18      A.      (Witness reviews document.)
19          Okay.
20      Q.      Do you list malvertising as one
21  of the top ten cyber security risks and
22  realities of this year and beyond?
23      A.      Based on the titles alone, no.
24      Q.      Do you make any meaningful
25  distinction between malvertising and ad fraud?

Page 84

1      A.      In this article?
2      Q.      No, just generally in your field?
3      A.      Oh, meaningful distinction
4  between malvertising and ad fraud?
5      Q.      Correct.
6      A.      Yeah, of course.
7      Q.      What's the difference between?
8      A.      Ad fraud is the exploitation of
9  the advertising process, while malvertising is
10  using the ad ecosystem to target end users and
11  try to exploit end users or devices.
12      Q.      Do you list ad fraud as one of
13  the top ten cyber risk and realities of this
14  year and beyond?
15      A.      I do not.  Hold on, actually
16  pause.  I'd like to look at this more closely.
17          (Witness reviews document.)
18          So there are two references in
19  here that you can attribute to the uptick in
20  exploitation of the advertising ecosystem.
21      Q.      Okay, which two are those?
22      A.      The first one is "The government
23  mandated orders examining cyber securities are
24  increasing"; and then the second one is "Third
25  party reliance will cause multiple data

Page 85

1  breaches."
2      Q.      But you don't directly reference
3  ad fraud in this article?
4      A.      It's a journal piece.  I mean, I
5  talk about the risks.  I could write a book on
6  each of these based on the work we're doing.  So
7  I think it's important when you're writing,
8  what, may be a four or five-page piece to keep
9  it interesting to talk about it at a high level.
10  But those are two particular points that we see
11  more and more at work every day, and the
12  advertising ecosystem is absolutely involved.
13      Q.      But you don't address the
14  advertising ecosystem explicitly in that
15  article, do you?
16      A.      We don't use the words
17  "advertising ecosystem," but we talk about
18  third-party risk, and we talk about the
19  government -- my term "government hammer" --
20  that is being dropped on organizations that are
21  not protecting user data.
22      Q.      Those also -- those risks occur
23  outside of the advertising ecosystem as well,
24  right?
25      A.      Of course they occur outside the

Page 86

1  advertising ecosystem.  But in this particular
2  paper, I'm talking about it specific to the work
3  that we are doing currently at FTI Consulting
4  relating to the advertising ecosystem.
5           MR. FREEMAN:  We've been going
6      about an hour.  This is a logical break.
7           MS. MAUSER:  Fine by me.
8           MR. FREEMAN:  We can go off the
9      record.
10          THE VIDEOGRAPHER:  Off the record
11      11:38.  This ends media unit number two.
12          (Brief recess.)
13          THE VIDEOGRAPHER:  On the record
14      at 11:55.  This begins media unit three
15      in the deposition of Anthony Ferrante.
16 BY MR. FREEMAN:
17      Q.    Just one point of clarification
18 or question of clarification.  We've been
19 talking about advertising ecosystems.  When
20 you're using that phrase, you're talking about
21 the online or digital advertising ecosystem,
22 right?
23          MS. MAUSER:  Object to form.
24          THE WITNESS:  Correct.  That's
25      what this case is about, correct.

Page 87

1  BY MR. FREEMAN:
2      Q.    I understand.  I just want a
3  point of -- we're not talking about advertising
4  in print newspaper --
5      A.    No, I'm sorry.
6      Q.    -- or magazines or anything like
7  that?
8      A.    No.  Correct, online digital.
9      Q.    So then moving -- excuse me -- to
10 this particular case, Google retained you for
11 this case?
12      A.    Google did, yes.
13      Q.    Had you ever been retained by
14 Google prior to this case?
15      A.    Yes.
16      Q.    How many times have you been
17 retained by Google prior to this case?
18      A.    I believe the answer to that,
19 prior to this case, is three times.
20      Q.    What were the subject matters
21 that you were retained prior to this case?
22      A.    Yes.  Prior to this case, the
23 three retentions, as you can appreciate, two of
24 them are confidential.  They involve the need
25 for outside independent experts to support

Page 88

1  Google.  In the third instance, while it started
2  as a confidential matter, is now public.  But
3  that matter involves us, FTI Consulting,
4  supporting Google in the takedown -- or the
5  identification and the takedown of a bot net.
6      Q.    What was your role in the taking
7  down of the bot net?
8      A.    So I am the global practice
9  leader, so I have insights into all the cases we
10 work around the globe.  And so my role in that
11 case was ensuring quality control, the right
12 team was working on it, making sure that we were
13 doing our part.
14      Q.    The two matters that you said
15 were confidential, were they in relation to or
16 involved litigation?
17      A.    I don't know.  Can you be more
18 clear when you say "litigation"?  One of them
19 was -- so I think not.
20      Q.    Were you still working on any of
21 those matters when you were retained in this
22 particular case?
23      A.    The three of them that we spoke
24 about?
25      Q.    That's correct.

Page 89

1      A.    I mean, it's possible those
2  matters were still open.  I don't know if we
3  were actively billing or conducting any type of
4  work.
5      Q.    I don't want the substance, but
6  who contacted you to be retained in this
7  particular case?
8      A.    In this particular matter?
9      Q.    Yeah.
10      A.    The gentleman's name is William
11 Isaacson.
12      Q.    Is it true, then, your hourly
13 rate for this particular case is $1,350 per
14 hour?
15      A.    I believe that is correct.  It's
16 stated in my report.
17      Q.    How many hours have you worked on
18 this case to date?
19      A.    You know, I'm not sure.  Couldn't
20 really say.
21      Q.    Well, is it more than a hundred
22 hours?
23      A.    I'm not really sure.  I can tell
24 you that since retention I met regularly with my
25 team.  I meet weekly, if not more than once a

Page 90

```
1   week.  I know the team engaged with counsel
2   pretty regularly.  So, I mean, if you go back to
3   our original retention to present date and the
4   tallying of the hours, I'm sure it's hundreds of
5   hours.
6           Q.      Had you worked with Mr. Isaacson
7   on the other matters prior to this case?
8           A.      No.
9           Q.      Have you been paid at all by
10  Google to date?
11          A.      Paid?
12          Q.      Yeah.
13          A.      That's a really good question.
14  On this matter?
15          Q.      Correct.
16          A.      I don't know.
17          Q.      When were you retained for this
18  particular matter?
19          A.      I don't recall the exact date,
20  but I want to say it was this summer; June, July
21  of 2023.
22          Q.      So in preparing -- you ultimately
23  wrote a report in this case, right?
24          A.      That is correct.
25          Q.      In preparing for this -- for that
```

Page 91

```
1   report that you authored, how many internal
2   Google documents did you personally review?
3           A.      I mean, they're definitely cited
4   in the report.  But everything cited I reviewed.
5           Q.      Understood.
6                   My question is: did you review
7   any other internal Google documents that are not
8   cited in the report?
9           A.      I can't recall.
10          Q.      Did you review any type of source
11  code?
12          A.      Source code?
13          Q.      Yeah.
14          A.      Yes.
15          Q.      What source code did you review
16  in preparation for your report?
17          A.      Well, as part of our
18  investigation as a technical expert, I mean
19  that's what we do every day in these
20  investigations, is we'll read and then do field
21  testing.  And so as part of our investigation
22  here, there was source code involved,
23  particularly JavaScript, and then server calls.
24          Q.      Where did you review that source
25  code?
```

Page 92

```
1           A.      In the lab.
2           Q.      At FTI Consulting?
3           A.      Correct.
4           Q.      You still have the report in
5   front of you?
6           A.      I do.
```

(lines 7-20 redacted)

```
21                  We very much like to, you know,
22  to use the term "peek under the hood" or "peek
23  behind the curtain" to actually see the guts of
24  what's happening because there's reading it in
25  an article, and then there's seeing it.  And
```

Page 93

```
1   when it comes to looking at the TCIP
2   connections, the server calls, the JavaScript,
3   the HTML code, it's important to actually see it
4   so you can understand how it's working.  So I
5   don't know if we would have listed it, but I
6   know we would have done it.
7           Q.      Did your review of the source
8   code for this particular case help you form your
9   opinions in the report?
10          A.      It verified our opinions.
11          Q.      What type of things did the
12  source code verify?
13          A.      The existence of certain
14  configurations, how things were written, where,
15  examples, right, looking at the source code of
16  CNN.com versus the New York Times.com.  It's
17  insightful.
18          Q.      Did you look at any of the source
19  code that's proprietary to Google?
20          A.      Oh, no.  We looked at only open
21  source, what's available on the public internet.
22          Q.      Did you ask to see any source
23  code that was proprietary to Google?
24          A.      No.
25          Q.      Did you review any datasets as
```

Page 94

1   part of your preparation for this report?
2        A.     You have to be a little bit more
3   clear.
4        Q.     Well, in Appendix B, that you
5   referenced, of materials referenced and relied
6   on, are there any things that you would specify
7   as datasets that you relied on?
8        A.     Well, Appendix B in totality is a
9   data set.  I mean, I would almost say a lot of
10  these items could be categorized as datasets.
11  That's why I asked if you could be just more
12  specific.
13       Q.     When we talk about source code,
14  how would you define it?
15       A.     Source code?
16       Q.     Yeah.
17       A.     Actual code, programming
18  languages codes, BASIC, HTML, JavaScript, Perl,
19  PHP, C++, C, Python.
20       Q.     Did you conduct any surveys as
21  part of your preparation for this report?
22       A.     A survey?
23       Q.     Yeah.
24       A.     Survey of whom?
25       Q.     Well, did you interview any

Page 95

1   publishers as part of your preparation for this
2   report?
3        A.     No.
4        Q.     Did you interview any companies
5   that have publisher ad servers as part of
6   preparation for your report?
7        A.     Not that I recall.
8        Q.     Did you interview any companies
9   that have ad exchanges as part of preparation
10  for your report?
11       A.     Can you repeat that last
12  question?
13       Q.     Sure.  Well, let's start with
14  this.
15              What companies are you aware of
16  that have ad exchanges?
17       A.     I mean, some of the big players,
18  of course Google, PubMatic.
19       Q.     Do you know of any other
20  companies that have --
21       A.     OpenX, Amazon, Prebid.
22       Q.     What companies are you aware of
23  that have publisher ad servers?
24       A.     Yeah, I can't -- as I sit here
25  right now.

Page 96

1        Q.     What companies do you know that
2   have advertising ad networks?
3        A.     I mean, I have a list of all of
4   these.  I'm just trying to bucket them.  So as I
5   sit here right now -- trying to think.  I mean,
6   there are lots of players in this space; Adobe,
7   PubMatic, OpenX.  I think I said that.
8        Q.     Any others you can think of?
9        A.     Yeah, I can't -- as I sit here
10  right now, I can't think of them.
11       Q.     What's a demand-side platform?
12       A.     Demand-side platform, that is the
13  function of inventorying the various -- let's
14  call them publishers that demand the actual ad
15  space.
16       Q.     What is an advertising ad
17  network?
18       A.     Ad network is the match maker,
19  the demand for supply, in simple terms.
20       Q.     Does Google have a demand-side
21  platform product?
22       A.     Google has AdX, AdSense, Google
23  Ad Manager.
24       Q.     Are any of those would you
25  classify as demand-side platforms?

Page 97

1        A.     I think so.
2        Q.     Which ones would you clarify as
3   demand-side platforms?
4        A.     The manager.
5        Q.     Does Google have an advertising
6   ad network?
7        A.     Yes.
8        Q.     What's the name of that?
9        A.     Google Ad Manager?
10       Q.     Do you know any other companies
11  that have a demand-side platform?
12       A.     Not off the top of my head.
13       Q.     Do you know any other company
14  that have advertising ad network?
15       A.     Advertising ad network?
16       Q.     Yeah.
17       A.     Again, back to the previous
18  question, not off the top of my head.
19       Q.     So back to when I talked about
20  surveys, did you interview anyone who worked for
21  PubMatic in preparation for your report?
22       A.     No.
23       Q.     Did you review any deposition
24  transcripts from someone who worked at PubMatic?
25       A.     Not that I recall.

## Page 98

1   Q.      Did you interview anyone who
2   worked with OpenX in preparation of your report?
3          A.      Not that I recall.
4          Q.      Did you review any deposition
5   transcript of anyone that worked at OpenX in
6   preparation of your report?
7          A.      Not that I recall.
8          Q.      Did you interview anyone who
9   worked with Amazon in preparation for your
10  report?
11         A.      No, not that I recall.
12         Q.      Did you review any deposition
13  transcript of anyone that worked at Amazon in
14  preparation of your report?
15         A.      I'm sorry, could you ask that
16  again?
17         Q.      Sure.
18                Did you review any deposition
19  transcript of anyone that worked at Amazon in
20  preparation of your report?
21         A.      Not that I recall.
22         Q.      Did you interview anyone who
23  worked at Google in preparation of your report?
24         A.      Interview anyone at Google --
25         Q.      Just for clarification, I don't

## Page 99

1   want any communication with lawyers.
2          A.      Yes, no, I understand that.
3          Q.      Okay.
4          A.      Not that I recall.
5          Q.      Did you interview anyone who was
6   a former Google employee in preparation of your
7   report?
8          A.      No, I did not.
9          Q.      Did you review the deposition
10  transcript of anyone who worked at Google in
11  preparation of your report?
12         A.      Not that I can recall.
13         Q.      Did you review the deposition
14  transcript of any person who formerly worked at
15  Google in preparation of your report?
16         A.      Not that I recall.
17         Q.      Of the Google documents that you
18  did review, did any of them have hyperlinks
19  contained within them?
20         A.      I believe so, yes.
21         Q.      Did you review those hyperlink
22  documents?
23         A.      No, I did not, outside of reading
24  the actual hyperlink itself, I was unable to
25  click on those links.

## Page 100

1   Q.      How many public Google documents
2   did you personally review in preparation of your
3   report?
4          A.      I mean, I couldn't put a number
5   on it.  I know I have a lot cited in my report.
6          Q.      Did you review any other
7   public -- Google public documents that is not
8   cited in your Appendix B?
9          A.      I mean, that's just such a broad
10  question.  I want to say I'm sure I did.
11  There's a lot of documents; there are a lot of
12  Google documents out there.  And if it wasn't
13  referenced in my report, then I certainly didn't
14  reference it in the report or rely on it.
15         Q.      Of the Google documents that
16  contained hyperlinks, did you ask to get the
17  underlying document that was hyperlinked?
18         A.      If I needed it or if I thought I
19  did, if I thought -- then I wouldn't have been
20  shy to ask.  I can't recall as I sit here if I
21  did or did not.
22                MS. MAUSER:  I can represent that
23         we did not provide Mr. Ferrante any
24         hyperlink to any document.  He only had
25         access to things as they were produced

## Page 101

1   to you.
2                MR. FREEMAN:  Thank you.
3   BY MR. FREEMAN:
4          Q.      Did you review any documents from
5   PubMatic?
6          A.      If it's not listed in my report
7   as referenced or relied upon material then, no.
8          Q.      Did you review any internal
9   documents from OpenX?
10         A.      Internal documents from OpenX?
11         Q.      Yeah.
12         A.      Not that I recall.
13         Q.      Did you review any internal
14  documents from Amazon?
15         A.      No, not that I recall.
16         Q.      Did you review any internal
17  documents from any company other than Google?
18         A.      Okay, can you reask that
19  question, please?
20         Q.      Sure.
21                Did you review any internal
22  documents from any other company other than
23  Google?
24         A.      Okay, so I just want to make sure
25  I understood you correctly.

| Page 102 | Page 104 |
|---|---|

**Page 102**

1              Internal documents, no.
2         Q.    Did you ask to see internal
3    documents of any other company?
4         A.    No.
5         Q.    Are you familiar -- excuse me.
6              Are you familiar with a company,
7    Criteo, and I'll spell it.  C-R-I-T-E-O?
8         A.    Can you give me -- is it
9    referenced in my report?
10        Q.    Not necessarily.  I'm just asking
11   if you are familiar with that company being in
12   the field?
13        A.    It sounds familiar and that's why
14   I'm wondering where you read it.
15        Q.    Do you know what type of products
16   or platforms they have in the online advertising
17   ecosystem?
18        A.    Who's "they"?
19        Q.    Criteo?
20        A.    I mean, there are thousands of
21   providers out there.  You are going to have to
22   give me a little bit more than that.  Is it in
23   my report?  Let's start there.
24        Q.    Are you familiar with a company,
25   The Trade Desk?

**Page 103**

1         A.    I've heard of the company, The
2    Trade Desk.
3         Q.    What product or platforms does
4    The Trade Desk offer in the online advertising
5    ecosystem?
6         A.    Again, as I sit here right now, I
7    can't answer that.  I'd have to familiarize
8    myself with it.
9         Q.    Are you familiar with a company
10   called Magnite?  I'll spell it again.
11   M-A-G-N-I-T-E.
12        A.    I can't recall.
13        Q.    Do you know what products or
14   platforms they offer in the digital advertising
15   ecosystem?
16        A.    With respect to Magnite, no.
17        Q.    Are you familiar with a company
18   by the name Index Exchange?
19        A.    I have heard of Index Exchange.
20        Q.    What product or platforms do they
21   offer in the online advertising ecosystem?
22        A.    As I sit right here, I couldn't
23   say.
24        Q.    Are you familiar with the company
25   Xandr, spelled X-A-N-D-R?

**Page 104**

1         A.    Yes, Xandr, I believe, is -- it's
2    a player in the space, either an exchange or a
3    network.
4         Q.    Do you know what products or
5    platforms they offer in the digital online -- or
6    digital advertising ecosystem?
7         A.    Like I just said, an exchange or
8    a network.
9         Q.    Did you interview any advertisers
10   in preparation of your report?
11        A.    No.
12        Q.    Did you interview any advertising
13   agencies in preparation of your report?
14        A.    No.
15        Q.    How many internal Google
16   documents did you review that discussed header
17   bidding?
18        A.    I can't recall as I sit here.  I
19   would say that if I relied on them, they're most
20   certainly referenced in my report.
21        Q.    Did you rely on any other
22   internal -- strike that.
23              Did you review any other internal
24   Google document that is not referenced in
25   Appendix B of your report?

**Page 105**

1         A.    I'm sorry, can you repeat that?
2         Q.    Did you review any other internal
3    Google document that is not referenced in
4    Appendix B of your report?
5         A.    Not that I recall.
6         Q.    How many public Google documents
7    did you review that discussed header bidding?
8         A.    And when you say "Google
9    documents," you mean official Google-stamped
10   publications?
11        Q.    What I mean by that is someone
12   who works for Google is the author of the
13   particular report or article?
14        A.    And it would sit on the Google
15   domain, or it's just a Google professional
16   publishing on header bidding?
17        Q.    The former, meaning how many
18   public Google documents did you review that were
19   on an owned and operated Google website?
20        A.    Yeah, so thank you for that
21   clarification.
22              As I sit here, I cannot
23   definitively say.
24        Q.    Was it more than 100?
25        A.    No.



Page 106

```
1        Q.    Was it more than 50?
2        A.    No.
3        Q.    Was it more than 20?
4        A.    I don't recall.
5        Q.    What else did you do to prepare
6  for your report to discuss header bidding?
7        A.    Can you ask the question again?
8        Q.    I'll ask it slightly different.
9        A.    Okay.
10       Q.    What are all the things you did
11 to prepare for your report to discuss header
12 bidding?
13       A.    So for this particular matter,
14 once retained I built a small investigative team
15 that reviewed a totality of documents made
16 available to us, understood them, conducted
17 extensive open source research, started to frame
18 up a report and our concepts, continued that
19 work through verifying various pieces of
20 information that we learned and finalized the
21 report.
22       Q.    How many open source -- sources
23 did you read that discussed header bidding?
24       A.    Lots.
25       Q.    More than a hundred?
```

Page 107

```
1        A.    I'm sure.  I mean, I feel like
2  since retained, again, back to my statement
3  earlier, I mean, that's all we do, and I'm just
4  one of a few members of the team.
5        Q.    Did you review any academic
6  journals that discussed header bidding?
7        A.    I couldn't say definitively.
8        Q.    You still have your report in
9  front of you?
10       A.    I do.
```

Page 108

```
21       Q.    I'm asking as you sit here today
22 what is your recollection of how Google defined
23 "Abusing the Ad Network"?
24       A.    A violation of their policy.
25       Q.    What is your understanding of
```

Page 109

```
1  what type of ads would violate a Google ad
2  policy?
3        A.    I'm sorry, could you reask the
4  question?
5        Q.    I'll phrase it slightly
6  differently.
7              Can you give me an example of a
8  type of ad that would have violated Google's ad
9  policy?
10       A.    Sure.  An ad that would look to
11 exploit the ecosystem, the ad ecosystem,
12 something that may try to conduct ad fraud.
13       Q.    How does Google determine whether
14 a particular ad violates one of their policies?
15       A.    How does Google determine that?
16       Q.    Yeah.
17       A.    Well, based on some of the
18 documentation that I've read, they -- it appears
19 they open cases and in -- adjudicate it like any
20 other technical incident responder would
21 adjudicate a matter.  They would investigate it
22 and understand what's happening, why it's
23 happening, who's responsible.
24       Q.    What documentation did you review
25 or read that discusses how they would determine
```



Page 110

1  whether an ad fit or violated one of their
2  policies?
3          A.    So I can't, as I sit here, point
4  you to the exact document.  And I can also
5  further state that the document I read was not a
6  playbook in how they determine this.  But what I
7  can tell you as a security professional, I read
8  documents that to me, as a security professional
9  who handles incidents every day and has helped
10 companies build incident response processes and
11 systems, that the documents that I viewed were
12 very clear to me that Google was investigating
13 and adjudicating an incident.
14         Q.    You used the phrase that Google
15 would open cases to make this determination; is
16 that right?
17         A.    I can't recall if I used that
18 exact term, but we can maybe -- we can either --

Page 112



Page 114

Page 116

8    Q.    How many ads that met the
9  definition of abusing the network, the ad
10 network, were not blocked or restricted by
11 Google?
12         A.    I can't answer that.
13         Q.    So to ask a slightly different
14 way.  What is the detection rate by Google for
15 ads that are abusing the ad network during this
16 period?
17         A.    You're asking me -- I'm sorry,
18 can you repeat the question?
19         Q.    What was the detection rate by
20 Google for ads that were abusing the ad network
21 during this period?
22         A.    You're asking me Google's
23 detection rate?
24         Q.    That's right.
25         A.    I'm not sure if I can answer

Page 117

4    Q.    Do you recall, as you sit here
5  today, citing an e-mail communication between
6  two Google employees discussing whether an ad
7  violated one of its policies?
8         MS. MAUSER:  Objection, asked and
9         answered.
10        THE WITNESS:  As I've said, I
11        don't recall if it's in my report, cited
12        in my report.  I do recall reviewing it.
13 BY MR. FREEMAN:

18    Q.    What did you do to confirm its
19 accuracy?
20    A.    To confirm its accuracy?  I
21 didn't do anything.  I didn't think I needed to.

1  that.
2         Q.    Why can't you answer it?
3         A.    Because I'm not sure if I've had
4  access to -- I can't recall if I had access to
5  that data.
6         Q.    So do you know what percent of
7  ads that met that definition were actually
8  blocked or restricted by Google?
9         A.    I'm not sure I'm understanding
10 your question.  We're talking about Figure I.
11 Do I know what percentage of ads that were
12 blocked --
13        Q.    That's right.
14        A.    -- that fit the policy of abusing
15 the ad network?  I just want to make sure we're
16 looking at the same page here.
17        Q.    Figure I is the sheer quantity of
18 ads that were blocked or restricted by Google
19 for abusing the ad network, correct?
20        A.    Correct.
21        Q.    And what I'm trying to figure out
22 is what percentage of ads that would fit the
23 "abusing the ad network" definition by Google
24 were not blocked or restricted?
25        A.    So you're asking me how many ads

Page 118

```
 1   made it through the network that were not
 2   blocked?
 3        Q.    That's correct.
 4        A.    I can't answer that.
 5        Q.    Why can't you answer that?
 6        A.    You're asking me how many ads
 7   went through the Google network?  I want to make
 8   sure we're speaking the same language here.
 9   You're asking me how many ads went through the
10   Google network that were not blocked?
11        Q.    That should have been.
12        A.    That should have been.  So how
13   many ads went through the Google network, Google
14   is telling us how many were blocked, but I'm --
15   you're asking me if I know how many that Google
16   didn't blocked that should have been blocked?
17        Q.    That's right.
18        A.    I can't answer that question.
19        Q.    Why can't you answer that
20   question?
21        A.    I'm confused.  You're asking me
22   how many ads go through the Google network.
23   Google has technologies and policies in place to
24   block ads, and you're asking me how many ads did
25   not get blocked by their technologies and
```

Page 119

```
 1   policies, yet still made it through the ad
 2   network?
 3        Q.    Correct.
 4        A.    I can't answer that.
```



```
12        Q.    During the same time from 2020 to
13   2022 and using the same definition, how many ads
14   were blocked or restricted for abusing the
15   network by Amazon?
16        A.    I can't answer that question.
17        Q.    Why can't you answer that
18   question?
19        A.    Actually, yeah, let me rephrase
20   my answer.
21              I can't recall.
22        Q.    During this same time period,
23   2020 to 2022, and using the same definition, how
24   many ads were blocked or restricted for abusing
25   the network by PubMatic?
```

Page 120

```
 1        A.    I can't recall.
 2        Q.    During the same timeframe and
 3   using the same definition, how many ads were
 4   blocked or restricted for abusing the network by
 5   OpenX?
 6        A.    I just want to be clear, you keep
 7   saying "the same definition."  Are we using
 8   Google's definition?
 9        Q.    Using Google's definition.
10        A.    Using Google's definition
11   PubMatic -- you're asking me how many
12   advertisements PubMatic blocked based on
13   Google's definition.  Wouldn't we use PubMatic's
14   definition?
15        Q.    Sure.  Do you know that answer?
16              How many -- during 2020 to 2022,
17   how many ads were blocked or restricted for
18   abusing the network by PubMatic using PubMatic's
19   definition?
20        A.    I can't recall.
21        Q.    You can't recall or you didn't
22   see it?
23        A.    I can't recall if I saw it.
24        Q.    During the same timeframe, how
25   many ads were blocked or restricted for abusing
```

Page 121

```
 1   the network by Amazon?
 2        A.    I can't recall if I saw that.
 3        Q.    How many ads were blocked or
 4   restricted during this timeframe for abusing the
 5   network by Criteo?
 6        A.    I can't recall if I saw that.
 7        Q.    How many ads were blocked or
 8   restricted by abusing the network by The Trade
 9   Desk?
10        A.    I can't recall if I saw that.
11        Q.    How many ads were blocked or
12   restricted for abusing the network by Index
13   Exchange?
14        A.    I can't recall if I saw that.
15        Q.    How many ads were blocked or
16   restricted for abusing the network by Xandr?
17        A.    I can't recall if I saw that.
18        Q.    How many ads were blocked or
19   restricted for abusing the network by Magnite?
20        A.    I can't recall if I saw that.
21        Q.    How many ads were blocked or
22   restricted for abusing the network by Meta?
23        A.    I can't recall if I saw that.
24        Q.    Did you try to search for
25   information that would have given answers about
```

| Page 122 | Page 124 |
|---|---|

**Page 122**

1  how many ads were blocked or restricted by any
2  of those companies?
3      A.      I'm sure I did.  I'm sure I
4  looked for it.
5      Q.      So is it fair to say that the
6  numbers listed or the graph in Figure I, you
7  don't know how those numbers compare to other
8  companies within the digital advertising
9  ecosystem; is that right?
10      A.      No.
11      Q.      No, that's not right?
12      A.      I don't agree with your
13  statement.
14      Q.      How does the amount that Google
15  blocked or restricted of ads in 2020 to 2022,
16  how does that compare to the amount of ads that
17  were blocked or restricted by any other company
18  in the digital advertising ecosystem?
19      A.      How does it compare?
20      Q.      Yeah.
21      A.      I mean, it depends how you look
22  at the data, how you unpack the data.
23      Q.      Can you testify today that Google
24  blocked the most ads for abusing the network
25  during 2020 to 2022?

**Page 124**

1  Figure I compared to any other company in the
2  market?
3      A.      We did look at numbers, but you
4  have to appreciate numbers are numbers.  The
5  question is: is how are those numbers derived,
6  the definitions of what gets you those numbers.
7              Policies are written in a way
8  that they're interpreted by each organization.
9  And so what Google may view as abusing the ad
10  network, as they've titled this graph, those
11  other companies may not use the same exact
12  definition.  And so therefore, their numbers may
13  be different.
14              And so in the interest of
15  verifying information and being clear and not
16  seeing a source, a verified source of truth with
17  consistent data and definitions, I didn't
18  include it in the report.
19      Q.      Did you look for Amazon's
20  published information about how many ads they
21  blocked in any particular year?
22      A.      Of course.  But back to my point,
23  different organizations are going to create
24  their policies and then enforce their policies
25  different.  And having worked extensively in

**Page 123**

1      A.      Can I testify today, as I sit
2  here right now, that they blocked the most?  No,
3  I can't testify to that because I don't know if
4  that's true.
5      Q.      All right.  So back to my
6  question, though, which is: would you agree that
7  you do not know how Google's numbers from 2020
8  to 2022 about blocking ads that were abusing the
9  network, how that compares to any other company?
10      A.      No, I'm not saying that.  I'm
11  saying -- what I'm saying is that there's no
12  single truth to this data.  There's a lot of
13  data out there about blocking ads.  And a lot of
14  that data, from what I gathered, is some of it
15  is self reported, some of it is looked at in
16  different chunks, different time frames.  So to
17  have an authority that states very clearly the
18  question that you're asking, it's just not that
19  clear.  It's very, very gray.
20              And so in my report I cite
21  Google's material alone because Google is my
22  client, and this was publicly available on their
23  website, and I thought it relevant to this case.
24      Q.      Did you do any sort of
25  comparative analysis of how these numbers in

**Page 125**

1  this industry and worked extensively for big
2  tech, I assure you that they all have different
3  Rosetta Stones in which they decipher this for a
4  reason.
5      Q.      Are you testifying that Figure I
6  and the underlying data to support it, it's
7  impossible to compare that to other companies?
8      A.      There's one thing I've learned in
9  my profession, there are no definitives.  What
10  I'm saying is that it's very gray.  And in the
11  interest of clarity in my report, I wasn't able
12  to find something that I thought fairly
13  evaluated them.
14              And, again, couple that with my
15  experience in the industry, the last seven years
16  I've worked extensively in big tech, their
17  policies are different, they view data
18  differently, they categorize data differently,
19  and the numbers mean different things.
20              MR. FREEMAN:  This is a good
21      breaking point.  I don't know if you
22      want -- it's almost 1:00 for lunch.
23              MS. MAUSER:  That's fine by me.
24              THE VIDEOGRAPHER:  Off the record
25      12:50.  This ends media unit three.

Page 126

```
 1              (Luncheon recess.)
 2        THE VIDEOGRAPHER:  On the record
 3     at 1:33.  This begins media unit four in
 4     the deposition of Anthony Ferrante.
 5  BY MR. FREEMAN:
13        Q.    What is the definition of adult
14  content ad?
15        A.    I'm not sure.  I would reference
16  the Google material citing the various policies
17  and their definitions.
18        Q.    How does Google determine whether
19  a particular ad fell into this category of
20  "adult content"?
21        A.    Consistent with the same -- the
22  subcategory abusing the ad network, they have a
23  policy that's written.  And when they believe --
24  they have a policy written that defines adult
25  content.  And when they believe an ad that fits
```

Page 127

```
 1  or violates that policy, is attempted to be
 2  shown, they flag it.
 3        Q.    Is that a manual process?
 4        A.    You know, I'm not sure.  I'm sure
 5  there are technologies in place, just given the
 6  volume that I would expect.
 7        Q.    Did you review any of their
 8  source code for any of their automated filters?
 9        A.    No, I did not.
10        Q.    Did you review any of the
11  underlying data supports Figure J in Appendix C?
12        A.    No, I did not.
13        Q.    How did you confirm the
14  accuracies of those particular numbers?
15        A.    How did I confirm the accuracy of
16  these numbers?
17        Q.    Yeah.
18        A.    I didn't.
19        Q.    Back to similar questions that I
20  asked you about the abusing the ad network of
21  how many ads made it through Google's platforms
22  that were shown that should have been blocked or
23  restricted?
24        A.    Are you speaking in general?
25        Q.    During this particular timeframe.
```

Page 128

```
 1  So let's be clear, right, Figure J is from the
 2  timeframe of 2020 to 2022?
 3        A.    Correct.
18        Q.    All right.  So my question is:
19  during this timeframe of 2020 to 2022, did you
20  see any information that would show how many
21  adult content ads were shown through -- that
22  went through Google's platforms?
23        A.    Adult content ads that were shown
24  through Google's advertising platform?  Are
25  these adult content ads that violated their
```

Page 129

```
 1  policy?
 2        Q.    That's right.
 3        A.    Again, no, to consistent with my
 4  answer to the last subcategory on abusing the ad
 5  network, I don't have the data or the means to
 6  even --
 7        Q.    Did you look for the data that
 8  would support how effective their filters were
 9  in filtering out the adult content ads?
10        A.    Did I look at Google's filters?
11        Q.    Not necessarily the filters
12  itself.
13              Did you look for any data that
14  would indicate how many adult content ads went
15  through their platforms but were not blocked?
16        A.    So you're asking me Google has
17  filters -- Google has technologies and policies
18  in place to flag what they deem policy
19  violations?  And in this case we're speaking
20  about adult content.  You're asking me how many
21  ads were not blocked or removed yet they should
22  have been?
23        Q.    That's right.
24        A.    I can't answer that.
25        Q.    Why can't you answer it?
```

| Page 130 | Page 132 |
|---|---|

**Page 130**

1    A.    I don't have the data.

2    Q.    Did you look for the data?

3    A.    I'm not even sure that question
4  -- I'm not even sure -- I'm not even sure if
5  that question can be answered.  What you're
6  asking is attempts, malicious activity attempts
7  at an organization that are engineered in a way
8  that bypass controls and make it through.  So
9  you're asking me to quantify bad ads that were
10 not deemed bad ads by existing policies and
11 technologies in the first instance?

12   Q.    Correct.

13   A.    I can't answer that.

14   Q.    Do you know whether Google tried
15 to analyze how effective their filters were in
16 filtering out adult content ads?

17   A.    Do I know?

18   Q.    Yeah, do you know?

19   A.    I do not know.

20   Q.    During this same time period of
21 2020 to 2022, how many ads were blocked or
22 restricted for adult content by Amazon?

23   A.    I can't recall.

24   Q.    Are you saying you had that
25 information at one point in time?

**Page 131**

1    A.    I can't recall as I sit here
2  right now.  I'm sure I saw -- again, I saw lots
3  of data related to other players in this space.

4    Q.    Then how did the data that you
5  saw from other companies compare to Figure J?

6    A.    I can't recall.

7    Q.    Did you look at how many ads were
8  blocked or restricted by Meta that were adult
9  content?

10   A.    I can't recall specifically.

11   Q.    Do you know how many ads were
12 blocked or restricted for being adult content by
13 Criteo?

14   A.    Again, I cannot recall
15 specifically.

16   Q.    During the same timeframe, do you
17 know how many ads were blocked or restricted for
18 being adult content by The Trade Desk?

19   A.    I cannot recall specifically.

20   Q.    Do you know how many ads were
21 blocked or restricted for being adult content by
22 OpenX?

23   A.    I cannot recall.

24   Q.    Do you know how many ads were
25 blocked or restricted for being adult content

**Page 132**

1  during this timeframe by Magnite?

2    A.    I cannot recall.

3    Q.    Do you know how many ads were
4  blocked or restricted for being adult content
5  during this timeframe by PubMatic?

6    A.    I cannot recall.

7    Q.    Do you know how many ads were
8  blocked or restricted for being adult content
9  during this timeframe by Index Exchange?

10   A.    I cannot recall.

11   Q.    Do you know how many ads were
12 blocked or restricted for being adult content
13 during this timeframe by Xandr?

14   A.    I cannot recall.

15   Q.    So then is it fair to say that
16 you don't know how Google's numbers compared to
17 other companies with blocking or restricting ads
18 that were adult content, right?

19   A.    Based on the information
20 available to me and through the course of my
21 investigation, I was not able to do that equal
22 comparison.  As I stated last time, this data is
23 not consistent across platforms.  And the way
24 that these organizations interpret that data or
25 set these policies and how they enforce these

**Page 133**

1  policies, it varies.

2          As I said before, my experience
3  is different tech companies view this data
4  differently.

5    Q.    Again, that you are not able to
6  make that comparison, or you just chose not to
7  make that comparison?

8    A.    I looked for data.

9    Q.    But you don't know what that --
10 as you sit here today, what that data showed?

11   A.    That data -- there was no -- that
12 I can recall, and I would have put it in my
13 report, there was no clear, verifiable source
14 that evaluated this type of data in a way that I
15 believed was understandable and I could speak to
16 as an expert in the industry.

17   Q.    Does a company like Amazon also
18 have policies and procedures of what type of
19 content is permitted in their ads?

20   A.    I'd have to imagine, yes.

21   Q.    Have you reviewed those policies?

22   A.    What is publicly available.

23   Q.    Did you do any sort of comparison
24 of how Amazon's policies and procedures related
25 to content of ads compared to that of Google's?

Page 134

```
 1         A.      Is there a specific content you
 2  want to high -- you want to speak about?
 3         Q.      Sure.
 4                 Did you compare the policies and
 5  procedures for adult content on Amazon and
 6  compared that to the definition by Google?
 7         A.      Again, what is publicly available
 8  is what I looked at.
 9         Q.      I'm saying did you compare
10  publicly available information about Amazon's
11  policies compared to Google's policies as it
12  relates to adult content in ads?
13         A.      I read both Google and Amazon and
14  others' policies that were publicly documented
15  on the web.
16         Q.      How does Amazon's policies
17  related to adult content differ from that of
18  Google's?
19         A.      I can tell you that what is
20  publicly available on the web is very high
21  level.
22         Q.      How does Amazon's policies
23  related to adult content differ from that of
24  Google's?
25         A.      I mean, as I sit here right now,
```

Page 135

```
 1  I can't tell you the comparison.
 2         Q.      How does Criteo's related to
 3  adult content differ from that of Google's?
 4         A.      As I sit here right now, I can't
 5  articulate that.
 6         Q.      What about The Trade Desk, how
 7  does The Trade Desk policies related to adult
 8  content differ from that of Google's?
 9         A.      As I sit here right now, I can't
10  articulate that.
11         Q.      How does OpenX's policies related
12  to adult content differ from that of Google's?
13         A.      As I sit here right now, I cannot
14  articulate that.
15         Q.      How does Magnite's policies
16  related to adult content differ from that of
17  Google's?
18         A.      As I sit here right now, I cannot
19  articulate that.
20         Q.      How does PubMatic's policies
21  related to adult content differ from that of
22  Google's?
23         A.      As I sit here right now, I cannot
24  articulate that.
25         Q.      How does the Index Exchange
```

Page 136

```
 1  policies differ from adult content that of
 2  Google's?
 3         A.      As I sit here right now, I cannot
 4  articulate that.
 5         Q.      How does Xandr's policies related
 6  to adult content differ from that of Google's?
 7         A.      As I sit here right now, I cannot
 8  articulate that.
```

████████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████████

```
14         Q.      What type of ad is incorporated
15  in inappropriate content?
16         A.      What type of ad?
17         Q.      I'll phrase it slightly
18  different.
19                 What type of ad violates Google's
20  policies as it relates to inappropriate content?
21         A.      An ad that Google, their
22  technologies and their -- I'll call them
23  investigators -- believe violate their policy.
24         Q.      That's what I'm asking.  What is
25  Google's definition of inappropriate content?
```

Page 137

```
 1         A.      I don't have it off the top of my
 2  head.
 3         Q.      Did you review the underlying
 4  data that supports Figure K?
 5         A.      I did not.
 6         Q.      What did you do to confirm the
 7  accuracy of the numbers that are depicted in
 8  Figure K?
 9         A.      I didn't think I needed to.
10         Q.      Why didn't you think you needed
11  to?
12         A.      Because it's publicly available
13  content on Google's site.
14         Q.      Isn't it possible that publicly
15  available content is inaccurate?
16         A.      Of course it is.
17         Q.      So why would you feel -- why
18  would you not feel the need to verify whether
19  publicly available data is correct?
20         A.      I'm not sure what your question
21  is.
22                 You said you didn't feel a need
23  to verify whether the publicly available data
24  was correct; am I right with that?
25         A.      That is correct.
```

1    Q.    My question is: why didn't you
2 feel a need to verify the publicly available
3 data that Google had?
4    A.    I reviewed a lot of material
5 throughout the course of this investigation.  In
6 addition to me, I led a team of investigators
7 who did the same.
8          When it came to published
9 statistics and material on the Google.com
10 domain, while of course we looked at it and
11 questioned it, going back to my client and
12 verifying it, I did not think was a good use of
13 our time.
14    Q.    How did you question it?
15    A.    Reading it in its totality,
16 understanding the data presented with it,
17 reading the various support documents included
18 with it.
19    Q.    You said "understanding the data
20 that was presented with it."
21          What data was presented with this
22 information as indicated in any of the charts in
23 Appendix C?
24    A.    Well, this data is pulled from
25 Google support documents as they document how

1 they do certain things, conduct certain
2 operations within Google.  And in my experiences
3 working with a lot of big tech companies, of
4 course I read -- I didn't just look at a chart.
5 I looked at the surrounding documents.  I looked
6 at what was publicly available, how they defined
7 certain things.  Of course they gave examples.
8 They talk about the work that they put into it.
9 And so when you said how did I question it?  I
10 questioned it to see if it was consistent with
11 my other clients and how they view this stuff.

████████████████████████████████████

████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

███████████████████████████████

18    Q.    Are you aware of any time where
19 Google had to correct or amend a public document
20 for being inaccurate?
21    A.    Google, the company?
22    Q.    Yeah.
23    A.    I'm sure that's happened.
24    Q.    So then why would you take the
25 numbers as reported in Google's ad safety

1 reports for these years as truth?
2    A.    Because I think in totality,
3 given the scope of my work, the fact of the
4 matter is that Google is making efforts in this
5 space.  They're talking about their policies.
6 They're talking about -- they're being
7 transparent with their statistics.  Whether or
8 not this data was a hundred percent accurate or
9 needed a correction as you pointed out doesn't
10 change my views and my findings.
11          Google is an innovator.  They're
12 a leader, and they're setting examples for the
13 industry.  I read their policy documents; they
14 were consistent with my work in this space, and
15 I moved on.
16    Q.    Are those the policy documents
17 that you can't recall what the subject matter is
18 as you sit here today?
19          MS. MAUSER:  Object to the form.
20          Mischaracterizes testimony.
21          THE WITNESS:  Excuse me?
22 BY MR. FREEMAN:
23    Q.    You said that you relied on
24 policy documents to support the graphs in
25 Appendix C, right?

1    A.    Mm-hmm.
2    Q.    What policy documents?
3    A.    I forget the name of the title.
4    Q.    What was the substance of the
5 policy documents?
6    A.    It aligned what -- you know,
7 they're publicly available definitions of what
8 each subcategory is, talks about the work they
9 do to flag this content and take it down.  I
10 forget the exact title, but it's in my report.
11 I'm sure it's referenced.  Ad Safety Report.
12    Q.    Does the Ad Safety Report define
13 the term "adult content"?
14    A.    Define the term "adult content"?
15 It describes it.  I wouldn't necessarily suggest
16 that it defines it to the exact extent that the
17 legal definition might suggest or might want it
18 to be.  I would say that it has language
19 publicly available in their document to give the
20 reader a better understanding of it.
21    Q.    What is contained in the Ad
22 Safety Reports that give you an understanding of
23 what type of ads qualify as adult content?
24          MS. MAUSER:  Object to form.
25          THE WITNESS:  Can you show me the

```
1          Ad Safety Report, and we can walk
2      through it?
3  BY MR. FREEMAN:
4          Q.    I'm asking do you remember
5  anything within the Ad Safety Report?
6          A.    You're asking me if I remember it
7  off the top of my head?
8          Q.    That's correct.
9          A.    I'd be happy to discuss the Ad
10 Safety Report with you in the publicly available
11 definitions of the subcategories if you present
12 it to me.
13         If you're asking me if I've
14 memorized the Ad Safety Report, I'm going to
15 tell you that I have not.
16         Q.    I'm asking if you know, sitting
17 here today, whether you know how Google defines
18 "adult content"?
19         A.    I've answered that question.
20         Q.    I don't think you have, sir.
21         A.    Okay.
22         Q.    Do you remember --
23         A.    We can agree to disagree.  I
24 believe I've answered the question.
25         Q.    Do you remember how Google has
```

```
1  defined "adult content"?
2              MS. MAUSER:  Object to form.
3          Asked and answered.
4  BY MR. FREEMAN:
5          Q.    You have to answer.
6          A.    I have answered.  As I sit here
7  today, I have not memorized the Ad Safety
8  Report.  I know Google has listed their publicly
9  available criteria of what they view as adult
10 content.  If you have the report, I'm happy to
11 walk through it with you.
12             MR. FREEMAN:  I'm going to
13         mark -- which is Ferrante Lit Exhibit --
14         we're at 3, correct?
15             THE WITNESS:  Correct.
16         (Document marked for
17         identification as Ferrante-Lit
18         Deposition Exhibit No. 3.)
19 BY MR. FREEMAN:
20         Q.    Just for identification this is
21 the 2021 Ad Safety Report being one of the
22 things referenced to make Appendix C charts; is
23 that correct?
24         A.    Okay.  So what's your question?
25         Q.    I'm asking is that correct?
```

```
1          A.    What's your question, is what I
2  asked.
3          Q.    That Ferrante deposition Exhibit
4  Number 3 is one of the reports that form the
5  basis of the charts as listed in Appendix C?
6          A.    I didn't create these charts.
7  Google created these charts.
8          Q.    No, did you rely -- you're saying
9  Google made these charts?
10         A.    Yes.
11         Q.    So what did you do in preparation
12 for Appendix C?
13         A.    What did I do?
14         Q.    Well, you're saying you didn't
15 make the charts.
16         A.    I reviewed the material and
17 provided it in the report.
```

```
5          Q.    Doesn't Ferrante Lit Exhibit 3
6  form part of the basis of Figure I, Figure L and
7  Figure J and Figure K?
8          A.    You're asking me if I took the
9  data from 3 and created these graphs?
10         Q.    Actually just --
11         A.    These graphs --
12         Q.    Where did the data come from to
13 make the graph of Figure I?
14         A.    I'm sure it's cited in my report.
15 I don't know exactly where.
```



Page 146

[redacted]

[redacted]

Page 148

[redacted]

MS. MAUSER: Object to form, again, to the extent this is an incomplete document.

BY MR. FREEMAN:

Q. So what -- so what language contained in the Ad Safety Report from 2021 helps a reader understand what is Google's policy as it relates to adult content?

MS. MAUSER: Object to form again. Same objection.

THE WITNESS: As I said earlier, the language is in a publicly available document for the general public to review, and this is not legally binding language. So I said it will give you an idea.

BY MR. FREEMAN:

Q. How do you have any idea of what type of ad would violate the adult content policy of Google by looking at the Ad Safety Report from 2021?

Page 149

MS. MAUSER: Object to form, to the extent this isn't the complete document.

THE WITNESS: By reading this document and then looking at the subcategories.

BY MR. FREEMAN:

Q. How do you have any idea of what type of ad would violate the adult content policy of Google by looking at the Ad Safety Report from 2021?

MS. MAUSER: Object to form again for the same reason.

THE WITNESS: I've answered the question. If you read the document and then look at the subcategories, you get an idea. You asked me how would you have any idea? You get an idea. Is it an idea that is going to be something that is debated in court? I'm not stating that; I'm not an attorney. But as an expert in the industry and having helped organizations frame these very documents, in my experiences this is enough to document their policies around

## Page 150

1    this type of material.
2  BY MR. FREEMAN:
3        Q.    During 2020 to 2022, how many ads
4  were blocked or restricted for inappropriate
5  content by Amazon?
6        A.    I can't answer that as I sit here
7  right now.
8        Q.    How many ads were blocked or
9  restricted for inappropriate content by Meta?
10       A.    I can't answer that as I sit here
11 right now.
12       Q.    How many ads were blocked or
13 restricted for inappropriate content by Criteo?
14       A.    I can't answer that as I sit here
15 right now.
16       Q.    How many ads were blocked or
17 restricted by The Trade Desk for inappropriate
18 content?
19       A.    I can't answer take as I sit here
20 right now.
21       Q.    How many ads were blocked or
22 restricted by OpenX for inappropriate content?
23       A.    I can't answer that as I sit here
24 right now.
25       Q.    How many ads were blocked or

## Page 151

1  restricted by Magnite for inappropriate content
2  during this timeframe?
3        A.    I can't answer that as I sit here
4  right now.
5        Q.    How many ads were blocked or
6  restricted for inappropriate content by PubMatic
7  during this timeframe?
8        A.    I can't answer that as I sit here
9  right now.
10       Q.    How many ads were blocked or
11 restricted by Index Exchange during this
12 timeframe for inappropriate content?
13       A.    I can't answer that as I sit here
14 right now.
15       Q.    How many ads were blocked or
16 restricted by Xandr for inappropriate content
17 during this timeframe?
18       A.    I can't answer that as I sit here
19 right now.
20       Q.    What comparative analysis did you
21 do to compare Google's rate of blocking
22 inappropriate content ads to competitors?
23       MS. MAUSER:  Object to form, to
24       the extent you're characterizing his
25       report.

## Page 152

1        THE WITNESS:  As I said before,
2        there was no clear, consistent measure
3        of that data.
4  BY MR. FREEMAN:
5        Q.    So the answer is you didn't do
6  any comparative analysis, right?
7        A.    Because the data was not
8  available to me.
9        Q.    Moving to Figure L in Appendix C,
10 what is figure L?
11       A.    Subcategory titled
12 "misrepresentation."
13       Q.    What type of ads violated
14 Google's policy as it relates to
15 misrepresentation of an ad?
16       A.    I'm sorry, can you repeat the
17 question?
18       Q.    What type of ad violated Google's
19 policy as it relates to misrepresentation of an
20 ad?
21       A.    An ad that Google technologies
22 and/or professionals deemed a violation of their
23 misrepresentation policy.
24       Q.    Did you review the underlying
25 data as it supports Figure L?

## Page 153

1        A.    I did not.
2        Q.    What did you do to confirm the
3  accuracy of those numbers?
4        A.    I did not.
5        Q.    You did not confirm the accuracy
6  of those numbers?
7        A.    Outside of pulling it from Google
8  and their publicly available domain, I did not
9  feel the need.
10       Q.    How was pulling it from Google
11 confirming the accuracy?
12       A.    The Google domain, pulling it
13 from Google's website.
14       Q.    How does pulling that information
15 from Google's domain confirm the accuracy of the
16 numbers?
17       A.    As I've said in the past, Google
18 is my client, is providing information publicly
19 available to the world via their public domain,
20 Google.com.  This was pulled from an official
21 support site, policy site.  I pulled the data, I
22 pulled the information and believed it to be as
23 accurate as possible.
24       Q.    How can you say you believe it to
25 be as accurate as possible if you did nothing to

Page 154

1  confirm the accuracy of the numbers?
2          MS. MAUSER:  Object to form.
3          THE WITNESS:  Because I have no
4      reason to doubt it.  And, again,
5      consistent with what I said earlier, the
6      scope of my investigation, this is just
7      supporting document -- documentation to
8      demonstrate Google's efforts to ensure a
9      safe and secure experience for
10     consumers.
11 BY MR. FREEMAN:
12     Q.     Are you saying you have no reason
13 to doubt any information put out by Google on
14 Google's domain?
15     A.     I didn't say that.
16         MS. MAUSER:  Object to form.
17 BY MR. FREEMAN:
18     Q.     So what makes -- what would make
19 you doubt information posted about Google by
20 Google on a Google domain?
21     A.     It depends on the circumstances.
22     Q.     What circumstances would make you
23 question it or doubt it?
24         MS. MAUSER:  Object to form.
25         THE WITNESS:  It would depend on

Page 155

1      the circumstances.  But I can tell you
2      in this particular case, it wasn't going
3      to change my views, my opinions.
4  BY MR. FREEMAN:
5      Q.     The numbers of ads blocked
6  wouldn't change your opinion about how effective
7  Google is at blocking ads?
8          MS. MAUSER:  Object to form,
9      mischaracterizes his answer.
10         THE WITNESS:  What I'm saying is
11     that I provided this material to
12     demonstrate that Google has mechanisms
13     in place.  A number of ads blocked is
14     going do go up and down; it is a cat and
15     mouse game.  That's how security works,
16     and it's going to constantly evolve and
17     change.  So you're asking me did I
18     verify the data in Figure I, J, K, L and
19     I'm assuming the others, and you're
20     going to get similar answers, that's not
21     how security works.  Security is an
22     evolving threat.
23         And so for me to spend time
24     verifying and validating this data,
25     doesn't change my views in the sense

Page 156

1      that Google is making an effort.  Again,
2      they're an innovator; they're a leader.
3      They're clearly taking steps to combat
4      this risk that their consumers -- their
5      viewers and their consumers may
6      encounter.
7          There is no silver bullet in this
8      game.  There is no perfect.  And based
9      on what I've seen, Google, compared to
10     their peers, they are leaders in the
11     space.  So for me to sit down and spend
12     time validating this particular data, it
13     -- I'm not sure -- I'm not sure how you
14     think that would change things.
15 BY MR. FREEMAN:
16     Q.     How does the number of
17 inappropriate ads removed by Google from its
18 platform compare to the number of inappropriate
19 ads removed by publishers using header bidding?
20         MS. MAUSER:  Object to form.
21         THE WITNESS:  Excuse me?
22 BY MR. FREEMAN:
23     Q.     How does the amount of
24 inappropriate ads removed by Google during 2020
25 to 2022, how does that compare to the number of

Page 157

1  inappropriate ads removed by publishers who are
2  using header bidding?
3          MS. MAUSER:  Object to form.
4          THE WITNESS:  I can't answer that
5      as I sit here right now.
6  BY MR. FREEMAN:
7      Q.     Why can't you answer it?
8      A.     Because that's a very defined
9  dataset that you're asking about.  And you're
10 asking about a single entity versus a cluster of
11 entities that are using two different
12 frameworks.  And those frameworks have been
13 implemented many different ways.  So, I mean,
14 you're asking an impossible question.
15     Q.     Why is it impossible to get data
16 from publishers about how many ads they removed
17 or blocked for being inappropriate content?
18         MS. MAUSER:  Object to form.
19         THE WITNESS:  Can you reask the
20     question?
21 BY MR. FREEMAN:
22     Q.     You said that I was asking an
23 impossible question, so my follow-up to that was
24 why is it impossible to get data from publishers
25 about how many ads they removed or blocked for

Page 158

1    being inappropriate content?
2         A.    That wasn't your exact question.
3    Your question was how many publishers who
4    leverage header bidding; did I hear that
5    correctly?
6         Q.    Correct.
7               How does the number of ads that
8    were blocked by Google during this timeframe
9    compare to the amount of ads removed by
10   publishers who are using header bidding --
11              MS. MAUSER:  Object to form.
12   BY MR. FREEMAN:
13        Q.    -- during the same timeframe?
14        A.    And how does it compare?  The
15   answer I have to that question is that is a
16   unique set of data that I do not have right in
17   front of me, so I can't answer that.
18        Q.    Have you seen any datasets
19   comparing Google's quantity of ads blocked or
20   restricted to any other company?
21        A.    I'm sure I have.  There's a lot
22   of information out there.
23        Q.    Was that information cited in
24   your report?
25        A.    If I relied on it -- if it's

Page 159

1    referenced or I relied on it then, yes, it would
2    be cited in my report.
3         Q.    Why wouldn't you have relied on a
4    comparative dataset of Google compared to other
5    companies?
6         A.    Well, I discussed it earlier.  I
7    think -- I don't believe that there's a single
8    source that actually receives the data and
9    interprets the data equally across platforms.  I
10   think that the data is confusing.  I think that
11   the way various companies collect the data and
12   report on the data varies.
13              So I didn't see anything publicly
14   available to me that I thought made -- made
15   sense or -- or I thought I could verify and sit
16   before you today and talk you through it.
17        Q.    Moving to Figure L in Appendix C,
18   what's Figure L?
19        A.    I'm sorry, of my report?
20        Q.    Yeah, that's correct.
21        A.    It is a subcategory "Bad Ads
22   Blocked or Removed by Google."  The subcategory
23   is titled "Misrepresentation."
24        Q.    Then what is Figure M right below
25   it?

Page 160

1         A.    It's a subcategory of bad ads
2    blocked or removed by Google.  The subcategory
3    is titled "Enabling Dishonest Behavior."
4         Q.    Did you review the underlying
5    data for Figure M?
6         A.    I did not.
7         Q.    What did you do to confirm the
8    accuracy of Figure M, the numbers that support
9    Figure M?
10        A.    Consistent with my earlier
11   questions of the other subcategories.
12        Q.    Do you know what -- the amount of
13   ads blocked or restricted for enabling dishonest
14   behavior by any other company?
15        A.    As I sit here right now, I can't
16   answer that.

23        Q.    Did you review the underlying
24   data that supports Figure N?
25        A.    Consistent with earlier, similar

Page 161

1    questions, I did not.
2         Q.    What did you do to confirm the
3    accuracy of the numbers that support Figure N?
4         A.    I did not.
5         Q.    Do you know how many ads or --
6    how many ads were blocked or restricted by any
7    other company for being dangerous products or
8    services?
9         A.    As I sit here right now, I can't
10   answer that.
11        Q.    What's Figure O?
12        A.    Figure O is another subcategory
13   of bad ads blocked or removed by Google.  This
14   category is titled "Counterfeit Goods."
15        Q.    Did you review the underlying
16   data to support Figure O?
17        A.    I did not.
18        Q.    What you did do to confirm the
19   accuracy of the numbers?
20        A.    Consistent with earlier, similar
21   questions and answers, I did not.
22        Q.    Do you know how many ads were
23   blocked or restricted by any other company for
24   being counterfeit goods?
25        A.    As I sit here right now, I can't



Page 162

1   answer that.

[redacted]

11       Q.      Did you review the underlying
12  data that supports Figure E?
13       A.      Yes, I did.
14       Q.      I'm sorry?
15       A.      The underlying data that supports
16  Figure E.
17       Q.      Yeah.
18       A.      Meaning citation 46, did I review
19  that?  Yes, of course.
20       Q.      Which citation in footnote 46 is
21  a dataset?
22            MS. MAUSER:  Object to form.
23            THE WITNESS:  I'm sorry, I think
24       we're talking about two different
25       things.

Page 164

1   BY MR. FREEMAN:
2        Q.      Okay.  How would you -- how would
3   you define data?
4        A.      How would I define data?  I mean,
5   that's a complicated question.  I would say data
6   is on this sheet of paper.
7        Q.      Is the Trade Press article data?
8        A.      Yes.
9        Q.      Okay.
10       A.      So that's where I think we're
11  talking about two different things.
12       Q.      Did you review the underlying
13  data collected by Google that supports Figure E?
14       A.      You're referring to the
15  statistical data?
16       Q.      That's right.
17       A.      Yes -- no, I did not.
18       Q.      What did you do to confirm the
19  accuracy of the statistical data that supports
20  Figure E?
21       A.      Again, it's -- it's data either
22  provided to me from Google or publicly available
23  from the Google domain and their various
24  official support sites documenting how Google
25  operates.  And so I reviewed that material,

Page 165

1   analyzed it, and that is my views here on page
2   19.
3        Q.      How many ads that violated
4   Google's policies and therefore would be deemed
5   a bad ad were not blocked that should have been
6   blocked by their policies?
7        A.      I can't answer that.  I don't --
8   I don't even know if that question is
9   answerable.
10       Q.      You don't think -- strike that.
11           Do you know whether Google tries
12  to evaluate the effectiveness of their filters
13  in flagging bad ads?
14       A.      So are you asking me if I know
15  that?
16       Q.      Yeah, do you know that?
17       A.      I don't know that, but I have to
18  imagine they do.
19       Q.      Did you ask to review that type
20  of information?
21       A.      I did not.
22       Q.      Why didn't you ask to review that
23  type of information?
24       A.      I didn't think that was necessary
25  for me to reach my conclusions.

Page 166

1  Q.     Don't you think that the rate at
2  which they're catching bad ads would impact any
3  of your conclusions in your report?
4         MS. MAUSER:  Object to form.
5         THE WITNESS:  You will have to
6     reask the question.
7  BY MR. FREEMAN:
8  Q.     Does the rate at which Google
9  catches and therefore restricts or block bad
10 ads, would that impact any of your conclusions
11 in your report?
12 A.     It would be a data point, but I
13 don't -- I mean, you're asking a question that I
14 don't think appreciates or takes into
15 consideration the industry.
16        As I said earlier, this is a
17 cat-and-mouse game.  And you asked me if
18 Google -- I forget how you put it -- refines
19 their filters to catch bad actors, and I said I
20 didn't know, but I have to imagine.  And so
21 you're asking me if I think the rate in which
22 they catch bad actors would sway my view.
23        It's a data point but looking at
24 the totality of data, no, it really wouldn't.
25 The fact of the matter is that Google has

Page 167

1  demonstrated that they are a leader in this
2  space, they are an innovator, they are working
3  with colleagues across the industry to protect
4  their consumers.  And so the refinement of
5  filters and the success of those filters are not
6  going to change my views because that is one
7  single data point in hundreds, if not thousands,
8  of data-points that you need to consider in
9  totality in the security industry.
10        This is complicated material.
11 And one filter or the refinement of that filter
12 or the success or failure of that filter is not
13 going to define an organization in their
14 security posture in the efforts that they've
15 taken to protect consumers.
16 Q.     Does Google block or restrict bad
17 ads at a better rate than any other company?
18        MS. MAUSER:  Object to form.
19        THE WITNESS:  As I sit here right
20     now, I'm not sure I can answer that
21     question.  I can tell you --
22 BY MR. FREEMAN:
23 Q.     Why not?
24 A.     Why not?  Because I would need
25 data.  And you said "any other company," I would

Page 168

1  need data to review that and talk through it
2  with you.  It's a complicated subject.
3         What I can tell you, though, is
4  that Google has implemented, innovated and led
5  the charge on creating and sharing technologies
6  with the industry to help protect users.
7  Q.     In going back to Figure E from
8  2014 to 2022, how many bad ads were blocked or
9  restricted by Amazon?
10 A.     As I sit here right now, I can't
11 answer that question.
12 Q.     What about Criteo?
13 A.     I can't answer that question.
14 Q.     Meta?
15 A.     As I sit here right now, I can't
16 answer that question.
17 Q.     The Trade Desk?
18 A.     As I sit here right now, I can't
19 answer that question.
20 Q.     OpenX?
21 A.     As I sit here right now, I can't
22 answer that question.
23 Q.     Magnite?
24 A.     As I sit here right now, I can't
25 answer that question.

Page 169

1  Q.     PubMatic?
2  A.     As I sit here right now, I can't
3  answer that question.
4  Q.     Index Exchange?
5  A.     As I sit here right now, I can't
6  answer that question.
7  Q.     Xandr?
8  A.     As I sit here right now, I can't
9  answer that question.
10 Q.     Compared to publishers using
11 header bidding?
12        MS. MAUSER:  Object to form.
13        THE WITNESS:  As I sit here right
14     now, I can't answer that question.
15        I do want to highlight that I
16     think -- I do not think you can quantify
17     success or failure based on the number
18     of blocked ads.  It is a data point and
19     the totality of data that you have to
20     look at.
21 BY MR. FREEMAN:
22 Q.     But not just the success rate,
23 just the sheer quantity of ads that are blocked
24 by another company; is that not a data point?
25        MS. MAUSER:  Object to form.



Page 170

1    THE WITNESS:  Can you reask the
2    question?
3  BY MR. FREEMAN:
4        Q.    Sure.
5        You said that detection rate was
6  one data point, right?
7        A.    Detection, blocking, these are
8  just single -- singular data-points.  And you're
9  making such an emphasis on these data-points,
10  which, again, they're going to ebb and flow,
11  given the period of time that we look at, given
12  between now and a year from now.
13        As we sit here for this
14  deposition, there are hundreds, if not
15  thousands, of malicious actors innovating new
16  ways to defeat in-place technologies.  These
17  filters you speak about, thousands of people are
18  sitting home finding ways to defeat them.  This
19  is the security industry.  And to view an
20  organization, success or failure, based on a
21  singular filter or failure of a filter, you're
22  just not looking at it from a security
23  perspective at all.

3        Q.    Did you create this chart?
4        A.    No, this is pulled from Google's.
5        Q.    Did you review the underlying
6  data that supports Figure F?
7        A.    The underlying statistical data,
8  no, I did not review.
9        Q.    What did you do to confirm its
10  accuracy?
11        A.    I did not, consistent with
12  similar earlier questions asked and answered.

Page 172

12        Q.    What efforts did Google take to
13  remove them from the internet?
14        A.    You'd have to ask Google that.
15        Q.    How would one go about removing a
16  web page from the internet?
17        A.    Legal action, outside counsel,
18  internal legal department, cease and desist
19  letters.  It's very common in the industry.
20        Q.    Did Google remove the websites
21  from any search results if they flagged it?
22        A.    As I sit here right now, I'm not
23  sure I can answer that.  I would say I have to
24  imagine that they took steps to do that.
25        Q.    Did you review the underlying

Page 173

1  statistical data for Figure G?
2        A.    I did not review.
3        Q.    What did you do to confirm its
4  accuracy?
5        A.    Consistent with earlier, similar
6  questions asked and answered, I did not.
7        MR. FREEMAN:  We've been going
8        about an hour.  Want to take -- we can
9        go off the record.
10        THE VIDEOGRAPHER:  Off the record
11        at 2:33.  This ends media unit number
12        four.
13        (Brief recess.)
14        THE VIDEOGRAPHER:  On the record
15        at 2:46.  This begins media unit five in
16        the deposition of Anthony Ferrante.
17  BY MR. FREEMAN:
18        Q.    I would like to move on to the
19  topic of header bidding, okay.
20        Am I correct that header bidding
21  became widely adopted by publishers in 2014 and
22  2015?
23        A.    I think that's a safe assessment.
24  2014.
25        Q.    You -- I'm sorry, you have your

Page 174

```
1    report in front of you?
2         A.    I do.
```



```
3         Q.    So when heading bidding started
4    to become widely adopted in 2014 and 2015, what
5    header bidding wrappers were used mostly by
6    publishers?
7         A.    What header bidding wrappers?
8         Q.    Yeah.
9         A.    Header bidding wrappers written
10   by the various publishers on their sites.
11        Q.    What companies had products in
12   header bidding?
13        A.    What companies?
14        Q.    Yeah, what companies offered
15   header bidding?
16        A.    In 2014 and 2015, it was becoming
17   adopted by the players in the industry.
18        Q.    So what is a header bidding
19   wrapper?
20        A.    Header bidding wrapper is
21   JavaScript code that sits in the header of a web
22   page that facilitates the bids, the bidding
23   process for ad -- advertisements on that page.
24        Q.    What companies offered header
25   bidding wrappers to publishers in 2014 and 2015?
```

Page 176

```
1         A.    I mean, the header bidding
2    wrappers were written in the web pages
3    themselves.  So when you say what companies, it
4    was code that was written by a programmer in the
5    page so --
6         Q.    And that code would take them to
7    where?
8         A.    It would connect them to SSPs.
9    It would connect them to advertisers.  That code
10   would allow them to facilitate the bidding
11   process to place bids on their ads.
12        Q.    So my question is is what
13   companies created the code to facilitate header
14   bidding?
15        A.    What companies created the header
16   bidding code?
17        Q.    Yeah.
18        A.    I don't know if there was a
19   single company that created it, or if it was --
20   just became an industry -- an industry adopted
21   code.
22        Q.    But certain companies then issued
23   a product to help publishers with header
24   bidding, right?
25        A.    Well, an entire industry was
```

Page 177

```
1    built around online advertisement.
2         Q.    I know, but I want to talk about
3    the part of online advertisement of using header
4    bidding?
5         A.    Correct.
6         Q.    Were there certain companies that
7    had products to help publishers with header
8    bidding?
9         A.    So header bidding is -- is a
10   framework, okay.  How it was implemented -- so
11   it's a technology.  How that technology was
12   implemented varied across the board.  And so,
13   yes, did that framework plug into other players
14   in the industry, SSPs, DSPs, ad networks, sure,
15   yes.  But in the end that header bidding code
16   allowed the publisher, the website, to receive
17   bids for advertisement space and then place
18   advertisements on their page.
19        Q.    But do you know or can you list
20   for me any header bidding wrappers that were
21   used in 2014 and 2015?
22        MS. MAUSER:  Object to form.  Go
23        ahead.
24        THE WITNESS:  I'm not sure --
25        you're asking me -- header bidding is
```

## Page 178

1          code.  It is JavaScript written code.  I
2          could sit down and write header bidding
3          code.  Does that make it the Ferrante
4          header bidding code?  Do you understand
5          what I'm saying?  So when you say "what
6          companies," I'm not sure I understand.
7    BY MR. FREEMAN:
8          Q.     Is header bidding different than
9    header bidding wrapper?
10         A.     "Header bidding wrapper" is the
11   code.  "Header bidding" is the term used to
12   describe the framework and the process in which
13   it occurs.
14         Q.     Okay.  And you principally make
15   three points about header bidding in security
16   vulnerabilities about bad actors can exploit,
17   right?  You talk about; one, the inability to
18   prevent fraud amongst the noise -- that's a
19   phrase that you used, "noise" in quotes of
20   multiple calls; second, the lack of -- and then
21   the phrase you used is "guardrails" to protect
22   against malvertising; and third, you say -- you
23   talk about user and publisher data leakage, in
24   particular vulnerabilities of header bidding, do
25   I have that, in broad brushes?

## Page 179

1          A.     In broad brushes.  There are also
2    others, but we can talk through them.
3          Q.     Do you make any distinction in
4    your analysis between client side and server
5    side header bidding?
6          A.     Client side or server side header
7    bidding, do I make any distinction?
8          Q.     Yeah.
9          A.     I talk about header bidding and
10   how it -- I talk about header bidding in the
11   sense of telling a story about where it came
12   from and where it is today.
13         Q.     What is the difference between
14   client side header bidder and server side header
15   bidder?
16         A.     Client side header bidding is
17   when the entire process is facilitated through
18   the client, the web browser, the actual
19   consumers' machine.  As they sit in front of
20   their machine, the code is in the page that they
21   visit, and that code functions, makes the calls,
22   receives the returns, process the returns and
23   displays the ads.  That is client side header
24   bidding.
25         Q.     How does that differ from server

## Page 180

1    side?
2          A.     Server side header bidding, which
3    is an implementation of the header bidding
4    framework.  And evolution of the header bidding
5    framework is when rather than that code
6    executing in the browser, it is calling a
7    server, connecting to that server and allowing
8    the server to do the lion's share of the
9    processing and the work and then returning
10   results.
11         Q.     One of the phrases you use is
12   kind of the distance between the advertisers and
13   the publishers and security vulnerabilities with
14   that; is that right?
15         A.     Yes.
16         Q.     When you talk about distance in
17   this context, what are you referring to?
18         A.     Can you point to my report of
19   where I reference that?
20         Q.     I'm just asking on a high level
21   of do you think there's any different security
22   concerns about the distance between advertisers
23   and publishers?
24         A.     Well, I think I know what you're
25   referring to, and I just want to confirm it, so

## Page 181

1    I want to give you the best possible answer
2    here.  So if you could point to the paragraph.
3          Q.     Do you think there's any
4    difference in terms of the distance between
5    advertisers and publishers with those who are
6    doing client side header bidding as opposed to
7    those who are doing the server side client
8    bidding?
9          A.     Okay, can you give me a second?
10                (Witness reviews document.)
11                Do you want to reask your
12   question, please?
13         Q.     Do you think there's any
14   difference in terms of the distance between
15   advertisers and publishers with those who use
16   client side header bidding as opposed to those
17   who use server side client bidding?
18                MS. MAUSER:  Object to form.
19                THE WITNESS:  So do I think
20         there's distance?
21   BY MR. FREEMAN:
22         Q.     That's right.
23         A.     Between those who facilitate
24   client side and those who facilitate server
25   side?

Page 182

```
1        Q.      Correct.
2        A.      I really don't understand the
3   question.
4        Q.      Okay.  I want to talk to you
5   about data leakage.
6        A.      Okay.
```

[REDACTED]

```
22       Q.      Did you review any statistical
23  data that supports your claim that data leakage
24  occurred as a result of simultaneous manner in
25  which calls are sent to bidders in header
```

Page 183

```
1   bidding?
2        A.      What is your question?  Can you
3   repeat that, please?
4        Q.      Did you review any statistical
5   data that supports your claim that data leakage
6   occurred as a result of -- of the simultaneous
7   manner in which calls are sent to bidders in
8   header bidding?
9        A.      I didn't need to review any
10  statistical data.
11       Q.      Why don't you need to review any
12  statistical data?
13       A.      Because I field tested it and saw
14  the data.
15       Q.      Where is your field testing
16  results in Appendix B of which you relied on?
17       A.      I don't have them.  Again, as we
18  spoke earlier, of course I looked at code.  And
19  I told you we field tested, and we looked at
20  this data.  This is one of the security concerns
21  that I cite, is that when the implementation of
22  header bidding, when bids are solicited, those
23  bids are solicited with personal data of users,
24  the sites that they're on, the previous pages
25  that they visited.
```

Page 184

```
1                In addition to that, my regularly
2   conducted security work that I do every single
3   day in the industry today, I see the same exact
4   data.
5        Q.      When did you do your field
6   testing about data leakage in header bidding?
7        A.      Through the course of this
8   investigation.
9        Q.      What investigation?
10       A.      The investigation I conducted
11  which framed the basis of this report.
12       Q.      Walk me through what steps you
13  did in your field testing to support the claim
14  that data leakage occurred with header bidding?
15       A.      We have an implementation of
16  header bidding, we visited the site, we watched
17  the code function, we watched the parameters
18  past, and we looked at them.  We saw browser
19  information, IP address, previously visited
20  site.  I mean, sensitive user data that, again,
21  that's specific to this particular
22  investigation.
23               But as I said earlier, me and my
24  team are doing this every single day in other
25  cases where these sorts of questions are
```

Page 185

```
1   called in various platforms, in various types of
2   data, various types of implementation.  Excuse
3   me.
4        Q.      How many different websites did
5   you visit to watch the code function?
6        A.      I only needed one to see it.
7   Header bidding is a framework, a framework that
8   as we stated was adopted 2014, 2015.  There are
9   significant security risks in header bidding.
10  We watched them.
11               There is the ability to conduct a
12  man-in-the-middle attack.  If you're sitting in
13  Starbucks and you're sniffing traffic, you can
14  siphon personal data from other users on that
15  network.
16               If you can get into the bidding
17  process, you can gather personalized, sensitive
18  data of users visiting the site just by hiding
19  in plain site.  Literally placing yourself in
20  the bid process with no intention of bidding,
21  you're still able to collect that data.
22               You're able to buy access to
23  users machines.  You're able to play a bid of,
24  let's say, $25, which no one would compare to
25  you, and you would get the winning bid, which
```

UNITED STATES OF AMERICA v.                                    Anthony J. Ferrante
GOOGLE, LLC                                                    Highly Confidential

## Page 186

1  then would give you an opportunity to launch
2  malware on someone's machine that would give
3  you -- essentially, you would buy access to
4  consumers' machines.
5           You would be able to collect data
6  on your competitors because in addition to you
7  being part of the bid process, you see what
8  others bid.  I mean, those are four significant
9  security concerns that I reference in my report
10 that header bidding introduced.
11         Q.    Where did you get the code to
12 insert into the website?
13         A.    It's publicly available code.
14         Q.    Where?
15         A.    I'd have to go back and check.
16         Q.    Then you relied on these field
17 test results to support your claim that data
18 leakage occurs as a result of the simultaneous
19 manner in which calls are sent to bidders?
20         A.    It's not a secret; it's very
21 well-documented.  What I wanted to do was
22 actually see it in play like we do every single
23 day.  We do this with all of our work, with all
24 of our technical investigations.  Of course we
25 want to see it in real time and --

## Page 187

1          Q.    So --
2          A.    I'm sorry to interrupt.  And it's
3  very well-documented; there are lots of articles
4  out there.  I mean, it is actually so
5  well-documented that that's where you can read
6  the story about how header bidding has evolved
7  to what it is today, which is a more secure
8  version of the earlier version -- you referred
9  to it earlier -- if done correctly, server side
10 header bidding.  But that's not -- I mean, that
11 is just such an evolution of it to where it is
12 today.
13         Q.    Just want to make sure I get the
14 time right.
15         After you were retained by Google
16 in this particular case, you ran your own field
17 test to determine how much data leakage there
18 was using the header bidding; is that right?
19         MS. MAUSER:  Object to form.
20         THE WITNESS:  So through the
21 course of this investigation, we found
22 lots of documentation highlighting the
23 risks.  Given the way we operate in the
24 industry and how we operate and conduct
25 these investigations, yes, of course, we

## Page 188

1  wanted to field test it, we wanted to
2  see it.  This is what we do every single
3  day.  We are an investigative -
4  technical investigative firm.  Of course
5  we're going to look at this.  This
6  wasn't hard to do.
7  BY MR. FREEMAN:
8          Q.    Where are your field test results
9  cited in your report?
10         A.    I mean, the results are in the
11 report.  You see it.  I mean, when you say
12 "field test results," you're talking about
13 looking at a screen.
14         Q.    Where do you say that you field
15 tested this in your report?
16         A.    You know, I'm not sure but --
17         Q.    Take your time.  Look at the
18 report in front of you and tell me where it says
19 that you field tested header bidding?
20         A.    This is what we do through the
21 course of the investigation.  We read, we
22 digest -- I talked about this earlier, how did
23 we get here?  We digested all the documents, and
24 we wear -- and we took steps to verify the
25 information that we learned.  I mean, we just

## Page 189

1  talked extensively about statistical data and
2  whether or not we validated it.  Of course we're
3  going to validate these claims.
4          Q.    How would anyone know reading
5  your report that you conducted a field test
6  about header bidding?
7          A.    I'm not sure I understand the
8  question.  I mean, my report is my report.
9  There's lots of data in my report.
10         Q.    But one of the things that you
11 said supported the claim that you said in
12 paragraph 75 was that you did your own
13 independent field test, right?
14         A.    Of course.
15         Q.    What I'm asking is where is the
16 fact that you conducted a field test in the
17 report?
18         A.    As I said earlier, I mean, it's
19 what we do through the course of our
20 investigations.  It is review, verify.
21         What sort of security researcher
22 would not want to look at this and be able to
23 verify it before they sign their name and raise
24 their right hand and swear to it?
25         Q.    Why didn't you include it in your

Page 190

1   report?
2           A.      This -- this is the -- I mean,
3   this is important.  And so I don't understand
4   why I wouldn't verify it.
5           Q.      Why wouldn't you include it in
6   your report if it supports one of the arguments
7   that you're making?
8           A.      But what do you want me to
9   include?  That's what I don't understand.  I
10  mean, this is -- this is like seconds in
11  reviewing data on a screen as it traverses the
12  wire.
13          Q.      Do you document that in any sort
14  of way?
15          A.      Do we document it?
16          Q.      Yeah, the results of your field
17  test?
18          A.      I mean, we did in the report, and
19  we cite our material.
20          Q.      Aside from the report, do you
21  document it in any fashion?
22          A.      I mean, of course we document our
23  stuff.
24          Q.      So if the results of the field
25  test were relied upon, why is it not in your

Page 191

1   Appendix B?
2                   MS. MAUSER:  Object to form.
3                   THE WITNESS:  I think -- I think
4           you're thinking this was like a massive
5           chemistry experiment with control groups
6           and noncontrol groups or whatever.  I
7           mean, this was -- this was sniffing the
8           wire for a short period of time as a
9           user visited a website and just watching
10          the data traverse.  It's seconds.  I
11          mean, that's the point of header bidding
12          being so insecure and why the need for
13          it to evolve was so critical.
14  BY MR. FREEMAN:
15          Q.      And you did this one time?
16          A.      That's all we needed to do.
17          Q.      And answer to that is yes, one
18  time?
19          A.      That's all we needed to do, is
20  one time.
21          Q.      You said that it's
22  well-documented, the fact that data leakage is a
23  result of header bidding, right?
24          A.      Yes.
25          Q.      What academic peer-reviewed

Page 192

1   journal did you cite to support that in your
2   report?
3           A.      I'm not sure.  Maybe we can look
4   in my cited sources, but it's no secret.  It's
5   well-documented.  That is why we took the steps
6   to do a quick field test.
7           Q.      Did you do any sort of
8   comparative analysis of the amount of data
9   leakage that occurs on header bidding that
10  occurs through a bid through AdX?
11          A.      So I can't recall the exact
12  players we used for the field test.  But, again,
13  I mean, separate from the field test it is very
14  well-documented.
15                  And, again, I would just
16  highlight that header bidding is a framework
17  that is implemented a myriad of different ways.
18  I mean, I would be surprised if there were two
19  identical instances of header bidding
20  implemented the same exact way at two different
21  companies.
22          Q.      But how does the amount of data
23  leakage from the use of header bidding compare
24  to the data leakage from a bid request going
25  through AdX?

Page 193

1           A.      Well, again, I'm not sure how AdX
2   has their header bidding implementation
3   configured.  But I can tell you -- I mean, let's
4   take it to the framework level.  Header bidding
5   is code that sits on the browser.  When called
6   it has the send data about that user so it can
7   conduct an accurate bidding process.  Those
8   bidders get access to that data.  They're
9   sitting there, part of the bidding process,
10  seeing that data, collecting that data.  And
11  because it is done the way it is done, if you
12  are on the network sniffing data packets, you
13  are going to see that data because it is sent in
14  clear text.
15                  Again, also, if you are hiding in
16  plain site and have no intention of bidding, you
17  can collect that data.
18                  If you are the highest bidder,
19  you can buy access to users' machines.  You can
20  also collect competitive intel on your peers in
21  that space.
22          Q.      So one of the articles that you
23  cited in footnote 80, right, is an article title
24  "Unraveling Header Bidding's Problems with User
25  Data," right?

Page 194

1          A.     Yes.
2          MS. MAUSER:  Let me show you
3    what's been marked as Ferrante-Lit
4    Exhibit 4.
5          (Document marked for
6    identification as Ferrante-Lit
7    Deposition Exhibit No. 4.)
8    BY MR. FREEMAN:
9          Q.     Is Ferrante-Lit Exhibit 4 the
10   same article that you were citing in paragraph
11   75?
12         A.     I believe so.
13         Q.     And in the first -- the third
14   paragraph on the first page of the article, it
15   says, quote, "There are some real security
16   concerns about header bidding that aren't being
17   talked about," end quote.
18         Do you see that?
19         A.     I do see that.
20         Q.     And the source of that
21   information, though, is that "Ad fraud
22   researcher requesting anonymity."
23         Do you see that?
24         A.     I do see that.
25         Q.     So we have no idea who that

Page 195

1    person is, right?
2          A.     Sure.
3          Q.     Do you see then on page 4 of the
4    document, that below would be 4 out of 9,
5    talking about same?
6          A.     I see it, yes.
7          Q.     At the very bottom of the page,
8    it says "While sources did not share any
9    first-hand experiences, data leaking can be
10   problematic for both publishers and users."
11         Is that right?
12         A.     That's what it says, yes.
13         Q.     So in this article, there is no
14   firsthand knowledge of actual data leakage being
15   a problem as a result of header bidding, right?
16         A.     I don't know if I agree with that
17   statement.
18         Q.     Why don't you agree with that
19   statement?
20         A.     Because it says "sources did not
21   share."  Doesn't say they didn't have knowledge.
22         Q.     Okay.  There's nothing within the
23   article that you cite that supports that there
24   is firsthand knowledge of data leakage as a
25   result of header bidding, right?

Page 196

1          A.     I'm sorry, can you repeat that
2    statement?
3          Q.     There's nothing within this
4    article that you cite that supports that there
5    is firsthand knowledge of data leakage as a
6    result of header bidding, right?
7          A.     No, I disagree with that
8    statement.
9          Q.     Why do you disagree with that?
10         A.     Because clearly there's knowledge
11   of it; there's an article written about it.
12   It's just no one wants to -- you've got an
13   anonymous source on page 1, and no one wants to
14   raise their hand and state it.
15         Q.     So how do you know it's accurate?
16         A.     The article?
17         Q.     Yeah.
18         A.     It's an article written about it.
19   I mean, it's got data that is -- like I said, it
20   is well-documented across the internet.
21         Q.     Then why wouldn't you cite those
22   documents as opposed to one that has the ad
23   fraud researchers requesting anonymity and
24   someone who doesn't want to share any firsthand
25   experience?

Page 197

1          A.     You know, I can't answer that as
2    I sit here right now, but I'm sure there's a
3    reason.
4          Q.     As you sit here today, can you
5    provide me a specific example of data leakage
6    that occurred in the real world that resulted
7    from the simultaneous manner in which calls are
8    sent to bidders using header bidding?
9          A.     I'm sorry, can you reask the
10   question?
11         Q.     Sure.
12         Can you provide me a specific
13   example, other than your field test, where data
14   leakage occurred as a result of a -- of the
15   simultaneous manner in which calls are sent to
16   bidders when using header bidding?
17         A.     Can I give you a single
18   example --
19         Q.     Yeah.
20         A.     -- outside of my field test of a
21   very well-documented security gap in header
22   bidding?
23         Q.     That's right.
24         A.     I mean, I could talk to you about
25   it for hours.

Page 198

```
1        Q.      That's not my question.
2        A.      It happens all the time.  Packet
3  sniffing on local networks happens all the time.
4  It is how this stuff is conducted.  It is how
5  data on users is collected.  I mean, this is
6  happening -- data leakage, okay, through header
7  bidding, it's happening all the time.  So you're
8  asking me to give you a specific example?  I
9  mean, I could talk to you about dozens of cases
10 I worked in the FBI.  I could talk to you about
11 cases I'm still working today where this data is
12 available because of improperly -- improperly
13 configured websites.  I mean, this is a common
14 risk in the industry.
15       Q.      You had dozens of cases you
16 worked on at the FBI that was data leakage in
17 regards to header bidding?
18       A.      Data leakage with respect to
19 websites.
20       Q.      Okay.
21       A.      And user data.
22       Q.      That's not what I'm talking
23 about.
24               If it's so well-documented, why
25 can't you provide me a single example, other
```

Page 199

```
1  than your field test, where data leakage
2  occurred as a result of the simultaneous manner
3  in which calls are sent to bidders?
4               MS. MAUSER:  Object to form.
5               THE WITNESS:  I think I've
6         answered the question.
7  BY MR. FREEMAN:
8        Q.      What's the example then, repeat
9  it then?
10       A.      There are -- I've worked many
11 cases where user data leaks from a website.
12       Q.      But as a result of the
13 simultaneous manner in which calls are sent to
14 bidders in header bidding?  That's my question.
15       A.      Okay.  I'm not sure if I can
16 answer that right now.
17       Q.      So as you sit here today, you
18 can't provide me a single example, other than
19 your field test, where data leakage occurred as
20 a result of the simultaneous manner in which
21 calls are sent to bidders in header bidding?
22               MS. MAUSER:  Object to form.
23               THE WITNESS:  As I sit here
24        today, I cannot reference a case right
25        now.
```

Page 200

```
1  BY MR. FREEMAN:
2        Q.      I want to move on to your topic
3  about the lack of guardrails within header
4  bidding.
5               What do you mean when you use the
6  phrase "guardrails"?
7               Sir, I'm not asking about the
8  exhibit anymore.
9        A.      I know.  I'm still reading it,
10 though.
11       Q.      I have a specific amount of time
12 I'm allotted.
13               I'm asking you when you use the
14 phrase "guardrails," what do you mean by that
15 phrase?
16       A.      I mean when you -- in the context
17 of my report, I mean when you put revenue over
18 safety, and you do not take steps to vet or
19 understand your customers.  And so you introduce
20 a lot of players, some nefarious players into
21 the ecosystem.
22 ███████████████████████████████████████████
23 ███████████████████████████████████████████
24 █████████████████████████████████████████████
25 █████████████████████████████████████████████
1  █████████████████████████████████████████████
2  ██████████████████████████████████████████
3  █████████████████████████████████████████████
4  ████████████████████████████
5  ███████████████████████████████████
6  ██████████████████████████████
7        Q.      What peer-reviewed research do
8  you have to support that claim?
9        A.      I'm wondering if it's cited.  I
10 mean, it's very well-documented.
11       Q.      Then why didn't you cite the very
12 well-documented research to support that claim
13 in your -- in your report?
14       A.      I'm not sure I didn't.  I mean,
15 going back to the Digiday piece.
16       Q.      Are you saying that you did cite
17 to a peer-reviewed journal that supports that
18 claim?
19       A.      I'm sorry what was your question?
20       Q.      Are you saying you did cite to a
21 peer-reviewed journal that supports that claim?
22       A.      A peer-reviewed journal?
23       Q.      Yeah.
24       A.      I don't think I cited a
25 peer-reviewed journal, but it's very
```

Page 202

1  well-documented.
2       Q.      If it's very well-documented, why
3  didn't you cite to any document after making
4  that statement in your report?
5       A.      I believe I did.
6       Q.      Okay.  Let's go back to it.
7       A.      I mean --
8       Q.      Paragraph 73, the statement "With
9  header bidding, there was a lack of guardrails
10  and standards for entry and participation,
11  therefore making it easier for threat actors,
12  whose tactics include malvertising, to enter and
13  participate in header bidding auctions."
14              Do you see that?
15       A.      Mm-hmm.
16       Q.      Do you have any footnote for that
17  particular statement?
18       A.      There is no footnote for that
19  statement.
20       Q.      So what are you relying on to
21  make that statement?
22       A.      My professional experience,
23  totality of data that I reviewed, the fact that
24  the statistics, further in the paragraph,
25  highlight that by implementing vetting program

Page 203

1  actually produced positive results and that
2  there are multiple articles that you can find
3  documenting how -- when the network put revenue
4  over quality, it generated -- it created risk.
5       Q.      But the statistic that you cite
6  in that paragraph, in paragraph 73, is from
7  2013, right?
8       A.      Later in the paragraph you're
9  referring to "In 2013 Google's research noted
10  that spam click rate through AWBid varied
11  anywhere from from ten to 70%, while AdX
12  remained at seven to 8%," is that what you are
13  referring to?
14       Q.      Well, you just said that based
15  off of my professional experience, totality of
16  data that I reviewed and the statistics I say
17  later in the paragraph, are those the statistics
18  you are talking about?
19       MS. MAUSER:  Object to form,
20          mischaracterizes his testimony.
21          THE WITNESS:  That's what I said.
22  BY MR. FREEMAN:
23       Q.      You said statistics further in
24  the paragraph highlight that by implementing the
25  vetting program actually produced positive

Page 204

1  results?
2       A.      Correct.
3       Q.      And the statistics that you cite
4  in paragraph 73 is from 2013, right?
5       A.      That is correct.
6       Q.      And that year, then, is before
7  header bidding was widely adopted by publishers,
8  right?
9       A.      That is.
10       Q.      So the statistic analysis that
11  you have cited in paragraph 73 has nothing to do
12  with header bidding?
13       A.      It has to do with guardrails,
14  vetting.
15       Q.      But not guardrails in the sense
16  of header bidding, right?
17       A.      Guardrails with respect to just
18  entry into the bidding process.
19       Q.      But you would agree that those
20  statistics from 2013 are not within the context
21  of header bidding?
22       A.      It's guardrails with respect to
23  entry into the bidding process and the lack of
24  guardrails introduced an uptick in malvertising,
25  which is what -- is the security risk that we're

Page 205

1  trying to mitigate.
2       Q.      But those statistics came from
3  research before header bidding was widely
4  adopted?
5       A.      We are speaking about guardrails,
6  though.  Header bidding is the framework, and it
7  is the implementation of that framework.  And
8  there are other data-points or other factors
9  that you can implement with the header bidding
10  framework.  And in this case I'm referring to
11  guardrails, guardrails in which entry into the
12  bidding process is vetted.  There are others
13  that were adopted later on due to the evolution
14  of the technologies.
15              What I'm highlighting here is
16  that in 2013, Google did research and allowed
17  nonvetted players to participate in their bids.
18  And the click rate through AWBid varied from 10
19  to 20%, while AdX remained from seven to 8%
20  highlighting that the guardrails helped.  And
21  that is another parameter, another data point
22  that should be factored.
23       Q.      But, again, guardrails, not in
24  the context of header bidding, right?
25       A.      Guardrails in the context of the

Page 206

1    bidding process, digital advertising ecosystem.
2    There's a lot involved, and this is -- this is
3    an important data point that speaks to it.
4          Q.     Did you review the document, the
5    internal Google document that cites the research
6    finding ten to 70% of a spam click rate?
7          A.     Seventy-nine?
8          Q.     That's correct.
9          A.     Yeah, I'm sure I did if I
10   footnoted it.
11         Q.     And did you see the comment that
12   says that the ten to 70%, that this was before
13   blacklisting was applied, and 70% end was before
14   blacklisting.  Its 10% or so nowadays?
15         A.     Do you want to show me the
16   document?
17         Q.     Do you remember seeing that?
18         A.     Again, I mean, we can keep going
19   back to this memory test.  I'm sure I saw it,
20   and I'm sure I read it, but we can have a better
21   discussion if you show it to me.
22                MR. FREEMAN:  Okay.  I'll mark
23   Ferrante-Lit Exhibit 5.
24                (Document marked for
25   identification as Ferrante-Lit

Page 207

1                Deposition Exhibit No. 5.)
2                THE WITNESS:  I do remember
3    seeing this document.
4    BY MR. FREEMAN:



Page 210

[redacted]

10    Q.    What is your understanding of
11 what AWBid is?
12    A.    AWBid was a pilot where they --
13 the precursor to some of the technologies that
14 have now evolved into open bidding.
15    Q.    Did you see any research after
16 2013 showing the spasm click rate for AdX?
17    A.    I can't recall as I sit here
18 right now.
19    Q.    If you would have seen something
20 like that, would that have been something you
21 would have included in your report?
22    A.    Possibly.
23    Q.    So what type of statistical
24 comparison did you do about the spam click rate
25 for header bidding as that compares to the spam

Page 211

1 click rate for AdX?
2    A.    I'm sorry, can you repeat the
3 question?
4    Q.    Did you compare the spam click
5 rate for header bidding to the spam click rate
6 for AdX?
7    A.    I did not.
8    Q.    I want to move, then, to the part
9 where you discuss noise in header bidding.
10    A.    Okay.
11    Q.    And specifically starting on
12 paragraph 70 on page 28, you cite to the IAB
13 Tech Lab Chief.
14          Do you see that in the second to
15 last sentence?
16    A.    I do.
17    Q.    With the tech lab chief saying,
18 quote, "Header bidding led to publishers being
19 more --" going on to the next page --
20 "promiscuous in their demand partnerships and
21 more willing to turn on demand partners, which
22 made it easier for bad actors to hide amongst
23 all the activity."
24          Do you see that?
25    A.    I do see that.

Page 212

1    Q.    And then you cite to a particular
2 article which has that quote, right?
3    A.    Yes.
4          MS. MAUSER:  So I'm going to show
5    you what's been marked as Ferrante-Lit
6    Exhibit -- this is 6, right?  Six.
7          THE WITNESS:  Correct.
8          (Document marked for
9    identification as Ferrante-Lit
10    Deposition Exhibit No. 6.)
11          THE WITNESS:  And Michael,
12    when -- like a three-minute warning,
13    five-minute warning?
14          MR. FREEMAN:  Let's do it now
15    before I -- we can go off the record.
16          THE VIDEOGRAPHER:  Off the record
17    3:38.
18          (Brief recess.)
19          THE VIDEOGRAPHER:  On the record
20    at 3:56.
21 BY MR. FREEMAN:
22    Q.    During our last session you had
23 talked about a field test that you did about
24 header bidding in data leakage, right?
25    A.    Correct.

Page 213

1    Q.    I just want to a little bit put
2 some more color on that in terms of what website
3 did you visit to conduct this field test?
4    A.    So you have to appreciate, again,
5 this is work that I do every single day in
6 private practice.  And as I told you earlier, I
7 was literally born and raised working in this
8 space, programming, the internet, security
9 networking.  So we talk about header bidding,
10 and when you take bits -- you take the pieces
11 that make up header bidding, and you take them
12 apart, you understand the technologies involved,
13 okay.  And so it's very easy to -- to read about
14 it and to understand it as a technology expert.
15 Again, this is what I do every single day.
16          And so when it comes to
17 conducting a field test, it's as simple as okay,
18 we have a website, we are -- user data is being
19 collected as the user visits the website, okay,
20 and how is that data being transferred?  Oh,
21 header bidding used, clear text communications.
22          Clear text communications is not
23 protected and is very much susceptible to
24 eavesdrop collection, or as we said before, data
25 leakage.  So -- so it's very easy for me and the

| Page 214 |
|---|

1 team to do this as we conducted our
2 investigative work.
3          Q.    I want, though, to understand
4 overall, but specifically for the field test
5 that you had previously talked about in this
6 case, what website did you go to conduct it?
7          A.    You know, as I sit here right
8 now, I don't recall.  But I can tell you that it
9 was an implementation of header bidding in which
10 the security gaps were present.
11          And, again, those security gaps
12 are nothing new to me based on my experience in
13 private practice, my time in the government, and
14 they're not new concepts.  I mean, that's
15 something important to know.  These security
16 gaps that existed in header bidding were not new
17 concepts.  I mean, candidly that's why they've
18 expired or been retired, and the industry has
19 evolved to newer, more enhanced, more secure
20 protocols.
21          So as I sit before you as an
22 expert in this case, I'm not telling you
23 anything unique or novel for the industry.  This
24 is well known and well-documented.  But I, of
25 course, in preparation in conducting this work,

| Page 215 |
|---|

1 I wanted to see it.
2          Q.    You said now a few times -- let's
3 talk specifically about data leakage in header
4 bidding that is well-documented.
5          Where are you referring to data
6 leakage being reported in header bidding?
7          A.    I'm telling you as the expert in
8 this case the technologies implemented, clear
9 text communication, it is well-documented
10 throughout the internet.  Everybody knows that
11 clear text communications are easily susceptible
12 to eavesdrop collection, sniffing packets on the
13 wire.  It is why the credit card industry moved
14 to encrypted communications.  I mean, it's very
15 well-documented.
16          What I've done in my report, and
17 we've gone back and forth on this, is I've cited
18 some articles to just highlight that it's very
19 well talked about by laypeople, okay, we're
20 talking VP of programmatic advertising in the
21 Digiday report, okay.
22          I'm sitting here before you as a
23 technical expert, someone who has spent their
24 entire career working in this space,
25 investigating crimes, exploiting these very

| Page 216 |
|---|

1 technologies for the U.S. government, going into
2 private practice and aiding organizations as
3 they are either exploited by malicious actors
4 themselves, or the U.S. government is hammering
5 them with some sort of regulatory action because
6 they didn't do it correctly the first time.
7          I built an entire career on this
8 exact subject matter.  So just because an
9 anonymous source was cited in Digiday, doesn't
10 mean that it's not true.  I'm telling you as
11 your expert this is true.  Clear text
12 communications, for example, is susceptible to
13 eavesdropping.  Sniffing packets on a wire is
14 putting user data at risk.  Sending user data to
15 potential bidders and looking at it
16 holistically, some of those bidders may be
17 hiding in plain site, not interested in placing
18 a single bid can still collect that data.  That
19 is risk that was introduced by header bidding.
20          I can cite work I've done in
21 private practice where a big tech company was
22 providing lots of data to their developers.  And
23 a lot of that data was collected and misused.
24 That big tech company got in a lot of trouble by
25 the U.S. government.  And in this case looking

| Page 217 |
|---|

1 at the header bidding technologies, I see
2 parallels.  And for me to be sitting before you
3 today as an expert for Google and comparing
4 header bidding to open bidding, I mean, there
5 have just been dramatic security enhancements
6 that have actually been adopted by the industry
7 and are widely used today.
8          Q.    Yeah, there's a lot to unpack
9 there.
10          So when you say -- getting back
11 to it's been well-documented that there's data
12 leakage with the use of header bidding, are you
13 aware of a peer-reviewed academic journal that
14 concludes that?
15          A.    I don't need one.  It's well
16 known that clear text communications are
17 susceptible to collection.
18          Q.    Is there --
19          A.    Header bidding utilizes clear
20 text communication in some instances.
21          Q.    Is there a peer-reviewed academic
22 journal that says clear text communications is
23 susceptible to collection?
24          A.    Of course there are.
25          Q.    What are they?

| Page 218 | Page 220 |
|---|---|

**Page 218**

1   A.   There are thousands.  It's
2   well-documented.  Clear text communications on
3   the internet are absolutely susceptible to
4   communication.
5   Q.   Can you name me one of the
6   thousands?
7   A.   Oh, that's -- that's an unfair
8   question.  That's like you asking -- that's an
9   unfair question, and you know it is.
10   Q.   Can you name one of them, one of
11   the thousands of well-documented peer-reviewed
12   academic journals that says clear text
13   communication is susceptible to collection?
14   A.   I -- Triply, I'm sure, has
15   dozens, if not hundreds, of peer-reviewed
16   academic articles on this.  You are talking
17   about a concept on the internet that has existed
18   for what, 25, 30 years.  Of course it's
19   well-documented that clear text communication is
20   susceptible to eavesdropping.  Why do you think
21   the credit card industry moved to encrypted
22   communications?  Why do you think the U.S.
23   government uses encrypted communications to
24   communicate sensitive data?  Because clear text
25   communication is susceptible to collection and

**Page 219**

1   eavesdropping.  I mean, this is like the most
2   basic concept.  So you are asking me for a
3   peer-reviewed article, like I don't have one off
4   the top of my head, but I assure you there are
5   thousands of them documenting that.
6   Q.   Nor did you cite one in your
7   report?
8   A.   I don't need to.  I don't need to
9   because I am an expert who has worked in this
10   industry for 30-plus years.
11   Q.   You are an expert in ad
12   technology?
13   A.   I'm an expert in internet,
14   security, networking.  And what I'm telling you
15   is the technologies utilized to facilitate ad
16   technologies are basic, basic common, commonly
17   used internet technologies.  They're the same
18   protocols, TCPIP, right.  It's the same protocol
19   that is used to push data from a website to, for
20   example, an ad exchange.  TCPIP.  TCPIP
21   scrambles the data, moves the data, reconfigures
22   the data, and then on the other end they read
23   it.  That data, if not encrypted is susceptible
24   to eavesdropping.
25   Q.   Do you consider yourself an

**Page 220**

1   expert in digital advertising technology?
2        MS. MAUSER:  Object to form.
3        THE WITNESS:  I consider myself
4        an expert in security and in this case
5        how it is applied in the digital
6        advertising space.
7   BY MR. FREEMAN:
8   Q.   Do you consider yourself an
9   expert in digital advertising technology?
10        MS. MAUSER:  Object to form.
11        THE WITNESS:  I consider myself
12        an expert in -- a security expert in how
13        it is applied in this particular case.
14   BY MR. FREEMAN:
15   Q.   So that answer to that is no, you
16   do not consider yourself an expert in digital
17   advertising technology, right?
18        MS. MAUSER:  Object to form.
19        THE WITNESS:  In the security
20        aspects of digital advertising.
21   BY MR. FREEMAN:
22   Q.   I want to go back to kind of
23   where we broke before taking our last break
24   about noise and specifically on paragraph 70 on
25   page 28 of your report.

**Page 221**

1        If you remember, we had went over
2   the quote from IAB tech lab chief?
3   A.   Yes, I remember that.
4   Q.   All right.  And then I showed
5   you, and I think now you still have in front of
6   you, what's been marked as Ferrante Litigation
7   Exhibit Number 6.
8        Do you have?
9   A.   I do see that, yes.
10   Q.   Just so we're clear, is
11   Ferrante-Lit investigation Exhibit Number 6 the
12   document where you got the quote that's cited in
13   paragraph 70?
14   A.   You're asking me that?
15   Q.   Correct.
16   A.   If I cited it, I'm assuming so,
17   but --
18   Q.   Here, I'll help you out.
19   A.   Let's just confirm it.
20   Q.   Go to page 2, 2 of 9.
21   A.   Okay.
22   Q.   Right below where there's a blank
23   advertisement, do you see the quote there?
24   A.   I do see it now.
25   Q.   Okay.  So is it fair that

Page 222

1   Ferrante Litigation Exhibit Number 6 is a source
2   of the quote that you put into your report?
3          A.    Yes.
4          Q.    Within this document, Litigation
5   Exhibit 6, do you see any statistical data to
6   support the claim that header bidding led to
7   publishers being more promiscuous in their
8   demand partnerships?
9          What's your question?
10         Q.    Is there any statistical data
11  that supports the claim that you quoted that
12  header bidding led to publishers being more
13  promiscuous in their demand partnerships?
14         A.    So, I'm sorry.  As I was reading
15  I was distracted.  Can you repeat your question?
16         Q.    Sure.
17         Is there any statistical data
18  cited in government -- or Plaintiffs Exhibit 6
19  that supports the claim that you quoted which
20  stated that header bidding led to publishers
21  being more promiscuous in their demand
22  partnerships?
23         A.    So this is a piece -- so in this
24  particular case, what I'm talking about here is,
25  again, speaking about the prevent ad fraud

Page 223

1   amongst the noise, right, the lack of
2   guardrails.  What I'm talking about in citing
3   this report is other leaders in the space
4   talking -- stating their views about how header
5   bidding led to publishers being more promiscuous
6   in their demand partnerships and willing to turn
7   on more demand partners, which made it easier
8   for bad actors to hide in plain site.
9          And what I'm talking about is how
10  the industry was trending in a direction that
11  was creating more risk, and then the industry
12  responding with additional security enhancements
13  to mitigate that risk.  And so I speak about --
14  I quote the gentleman in paragraph 70.  I talk
15  about the noise and how just the sheer volume
16  can allow for malicious actors to hide in plain
17  site.
18         And then I speak to the fact that
19  the industry was migrating to newer technologies
20  to help prevent that.
21         And so if you're asking me for a
22  statistic, we can look further down in page 3 of
23  9 in the article where it just talks about how
24  the adoption of the new technology is 80% of
25  risk in a certain particular malicious actor

Page 224

1   would have been mitigated if that security
2   enhancement was implemented prior.
3          Q.    But I'm asking you: did you
4   review any statistical data that supports other
5   leaders, quote, "that header bidding led to
6   publishers being more promiscuous in their
7   demand partnerships"?
8          A.    I didn't need to.  It was
9   well-documented in the industry.  This is one of
10  many cites that I read that talks about how
11  header bidding put revenue over quality, and
12  more and more users were able to get involved in
13  the bidding process, which created risk.
14         Q.    Is there academic peer-reviewed
15  articles that support the idea that header
16  bidding led to publishers being more promiscuous
17  in their demand partnerships?
18         A.    As I sit here right now, I can't
19  answer that.
20         Q.    So when you say it's
21  well-documented, it's well-documented where?
22         A.    In the data that I reviewed.
23         Q.    What data did you review?
24         A.    I've cited it in this, in this
25  report.

Page 225

1          Q.    Are you talking about Plaintiffs
2   Exhibit 6?
3          A.    Six, it was also noted in
4   Plaintiffs Exhibit 4 and through the course of
5   migration with my team.  I mean, again, I've
6   cited this piece, just so I could cite this
7   piece, and you have something to look at.  But
8   it was very clear.  And if you think about it in
9   totality, when it comes to conducting these
10  operations, in totality, in addition to having
11  technical controls, having policy controls is
12  helpful in mitigating risk.  And through the
13  course of my work every single day today, that
14  is exactly the advice that I give my clients.
15         And so when I came across this
16  data point and saw others commenting on it and
17  could see the effects of it, I thought it was a
18  very interesting and worthy data point for my
19  report.
20         Q.    We're talking about data point.
21  You're talking about an article published by
22  Trade Press, right?
23         A.    That is the cite -- that is the
24  article which I cited here, but there was
25  overwhelming material that I read.

Page 226

1      Q.      That were not Trade Press?
2      A.      Just other sources.
3      Q.      Like what?
4      A.      Again, through the course of my
5  investigation.  I mean, I've cited it here, but
6  I'm not understanding what your question is.
7      Q.      I'm asking you: did you see
8  anything other than Trade Press articles that
9  support the idea that header bidding led to
10  publishers being more promiscuous in their
11  demand partnerships, other than Trade Press
12  articles?
13      A.      The Trade Press article that
14  cites the IAB tech lab CTO, I mean, this is a
15  reputable organization, and he is quoted in this
16  article.  The source of the article, I mean,
17  AdExchanger, but he is the IAB tech lab CTO.
18      Q.      Isn't it possible to be misquoted
19  in a Trade Press article?
20      A.      I'm sure it is.
21      Q.      So what did you do to verify the
22  quote that you put in to your report that was
23  actually accurate?
24      A.      Well, like I said, I saw other
25  instances of it.  Let me flip through Exhibit 4

Page 227

1  so I can point it out to you.
2      Q.      Exhibit 4 is also Trade Press,
3  right?
4      A.      Why do you keep saying "Trade
5  Press"?  This is AdExchanger, is the source
6  here.  This is Digiday.
7      Q.      You are not familiar with the
8  phrase "Trade Press"?
9      A.      The open internet?
10      Q.      Right.  So Exhibit 6 and Exhibit
11  4 are just articles published on the open
12  internet, right?
13      A.      But there are articles citing
14  experts in the industry.  They're citing people
15  who work in this industry.
16      Q.      Exhibit 4 says on -- "ad fraud
17  researcher who wants anonymity"?
18      A.      In that one particular quote.
19      Q.      So my question is, go back to it,
20  is: have you reviewed anything other than
21  articles published on the open internet that
22  support the idea that header bidding let
23  publishers -- led publishers be more promiscuous
24  in their demand partnerships?
25      A.      Did I review -- what was your

Page 228

1  question?
2      Q.      Did you review anything other
3  than articles published on the open internet
4  that supported the idea that header bidding led
5  to publishers being more promiscuous in their
6  demand partnerships?
7      A.      Yes, in what I used was my
8  professional experience in this industry.  We
9  keep to coming back to this, but I do this work
10  every single day, looking at the totality of
11  information, understanding that through the
12  header bidding process it was well known in the
13  industry that they open the flood gates and
14  allowed revenues to take priority over quality.
15          And in my expert opinion, in my
16  expert work that I've been doing my entire
17  career that I built a career on.  I view that as
18  risk.  That's what I do.  I evaluate risk.  My
19  clients hired me to evaluate risk.  I evaluated
20  that risk for the United States Government.  And
21  I am telling you that that generated risk, and
22  that risk is easily mitigated, easily mitigated.
23  I don't need data to prove it, but easily
24  mitigated by having a proper know-your-customer
25  program in place, which is well adopted in

Page 229

1  various industries, know-your-customer mentality
2  or program at an organization and provide --
3  proves positive results.
4          And what I've done here is cite
5  articles of different -- of leaders in the
6  industry that reinforce my point.
7      Q.      Why did you say that you cited to
8  the article, which is Litigation Exhibit 6, just
9  so I could cite this piece and you have
10  something to look at?
11      A.      It's just -- I'm writing it --
12  I'm a technologist, okay, I talk ones and zeros.
13  I'm writing an expert report for a courtroom so
14  it could be understood.  And I'm citing, again,
15  pieces of information that if someone reads the
16  report and they look at the citing, it makes
17  sense to them.
18      Q.      How much of the 3ve -- just so
19  we're clear for the record, 3ve spelled the
20  number 3-V-E, right?
21      A.      Correct.
22      Q.      How much of the 3ve's actions
23  occurred with publishers using header bidding?
24      A.      You know, as I sit here right
25  now, I'm not sure I can answer that question.

Page 230

1    Q.    What specific publishers saw an
2  increase in domain spoofing as a result of using
3  header bidding?
4    A.    I mean, it was a well known,
5  well-documented risk so much so that the entire
6  industry adopted ads.txt.  So, again, I don't
7  want to talk in absolutes, but I will just say
8  that it was well known and well-documented, and
9  3ve highlighted that risk.
10   Q.    I'm asking you what specific
11 publisher saw an increase in domain spoofing as
12 a result of using header bidding?
13   A.    As I sit here right now, I can't
14 answer that.  But I can say that it was a
15 well-known security gap in the industry to the
16 point that it was widely adopted after 3ve
17 because 3ve highlighted the significant risk
18 that existed.
19   Q.    I think you talked a little bit
20 about it already or mentioned it at times in
21 terms of ads like A-D-S, period, T-X-T?
22   A.    Ads.txt, correct.
23   Q.    What is that?
24   A.    It's comparable to the SPF record
25 in e-mail.

Page 231

1    Q.    Can a publisher use ads.txt when
2  using header bidding?
3    A.    Yes, of course.
4    Q.    So that mitigation tool is not
5  unique to any particular publisher ad server?
6    A.    No, it's meant to be implemented
7  on the actual website itself.  As I said
8  earlier, think of it as SPF technology for
9  e-mail, sender policy framework, where you get
10 calls and validate the domain, the account, the
11 relationship and can actually validate that in
12 real time to make sure that you do, indeed, want
13 to speak to them or allow them to take part in
14 that process more appropriately.
15   Q.    Since being widely adopted in
16 2014 and 2015, do you know whether the use of
17 header bidding continues to grow?
18        MS. MAUSER:  Object to form
19        foundation.
20        THE WITNESS:  Okay.  Can you
21        reask the question?
22 BY MR. FREEMAN:
23   Q.    So basically since 2014, do more
24 publishers continue to use header bidding?
25   A.    Sure.  Header bidding is a

Page 232

1  framework, a framework that's widely adopted.
2  Header bidding exists today in enhanced formats
3  that have made it more secure.
4        I think what's important to note
5  is that organizations have adopted header
6  bidding and implemented it in their own unique
7  way that's best for them.
8    Q.    So if the use of header bidding
9  continues to grow, would you suspect that the
10 amount of malvertising or ad fraud would
11 increase as well?
12   A.    No, because header bidding as it
13 has grown in adoption and adopted by others in
14 the industry, it has evolved significantly since
15 it was introduced in 2014, 2015.  There have
16 been significant security enhancements.
17        The risks that I spoke to you
18 about last time, a lot of them have been adopted
19 and implemented by the various users of header
20 bidding today.  So header bidding is widely
21 used.  Amazon TAM has their version of header
22 bidding; Prebid has their own open source freely
23 available, publicly available version of header
24 bidding that lots of publishers will utilize and
25 tweak to their own liking.

Page 233

1        I mean, that's the reality of
2  this industry is that this code exists.  It's
3  evolved over years as with many things on the
4  internet.  Security has been baked in, and
5  people continue to use it and evolve and evolve
6  with it.
7    Q.    So then are you saying that the
8  rate of data leakage with the use of header
9  bidding has gone down in recent years?
10   A.    As security enhancements in
11 header bidding have evolved and been
12 implemented, been, first of all, innovative --
13 innovated, adopted and then implemented, the
14 security enhancements, specific data leakage,
15 while I cannot speak, you know, definitively
16 across the industry, has gone down as people
17 have implemented the evolved version of header
18 bidding.  It is the industry.  It is a
19 cat-and-mouse game.
20        As I said earlier, security
21 adversaries sit home and they spend all day
22 every day looking to exploit technologies as
23 innovators, leaders invest time and energy and
24 collaborate with peers in the industry to
25 mitigate those risks.  An entire profession has

| Page 234 | Page 236 |
|---|---|

**Page 234**

1  been built on the latter part, candidly on the
2  former part as well, if I'm being honest.
3         Q.      Are you familiar with a Google
4  project called YAvin, spelled Y-A-V-I-N?
5         A.      As I sit here right now, I can't
6  recall.
7         Q.      Are you familiar with AdXDirect?
8         A.      As I sit here right now, I can't
9  recall.
10        Q.      So you're not opining whether
11 those projects increased or decreased security?
12        A.      Again, if there's a document you
13 want to show me, I'm happy to look at it, but I
14 can't recall how I know those.
15        Q.      But I'm asking whether you are
16 opining about those particular projects and its
17 effect on cyber security?
18        A.      And, again, I'm responding by
19 saying I can't recall where I read that or how I
20 would know those names as I sit here right now.
21               I know that Google has taken
22 considerable steps in their open bidding
23 framework which, you know, the features of open
24 bidding, which have migrated and been adopted by
25 other players in the industry and implemented in

**Page 235**

1  header bidding.
2         Q.      So you talked about open bidding.
3               What is open bidding?
4         A.      Open bidding is a framework
5  developed by Google that, you know, closed a lot
6  of the gaps and mitigated a lot of the risks
7  that I spoke about earlier today.  It did away
8  with man-in-the-middle attacks on the wire.  The
9  sensitive user data was passed by encrypted
10 communications.  It did away with the listening
11 in plain site to nonlegitimate players in the
12 bidding process.  It did away with the ability
13 for malicious actors to buy access to users'
14 machines.  It spearheaded the effort with
15 partners in the industry to come up with the ads
16 technology, ads.txt framework.  It created a
17 know-your-customer program, a vetting process.
18 And then, again, with those technologies, it
19 helped stop the essential competitive intel
20 collected on peers in the bidding process.
21               So, I mean, those are six points
22 that open bidding and Google identified and as
23 innovators of the space, in the space, worked to
24 develop -- talked about these features and then
25 were very quickly adopted by others in the

**Page 236**

1  industry and applied them in the header bidding
2  framework.
3         Q.      Did you do any sort of field test
4  with open bidding?
5         A.      Yes.
6         Q.      When did you do open bidding
7  field testing?
8         A.      Well, again, back to what I had
9  said earlier, knowing the protocols in place,
10 for example, encrypted communications, I know
11 encrypted communications cannot be intercepted.
12 We talked about that earlier.  So conducting a
13 field test to ensure that you cannot capture
14 encrypted communications, that's easy.
15               The vetting of the program, of
16 course.  I was not able to do that, to test the
17 vetting.
18               Ads.txt, I did see in plain site.
19 That's very easy to do.  And then the data
20 leakage on the server side, I wasn't able to
21 test, of course, because I didn't have access to
22 that server side.
23        Q.      Did you do a field test as
24 preparation for your report here?
25        A.      On open bidding --

**Page 237**

1         Q.      Yeah, open bidding?
2         A.      Yeah, I just walked you through
3  it.  Again, these are basic internet protocols.
4         Q.      What I'm asking, though, it was
5  after you were retained by Google on this
6  particular case that you were conducted this
7  field test?
8         A.      Sure.  In this particular case
9  with respect to let's say ads.txt and encrypted
10 communications.  But I will highlight with the
11 exception of ads.txt that sort of testing on
12 encrypted communications is what we do every
13 day.  So -- but, yes, after being retained,
14 looking at -- sniffing the wire for technical
15 information, both encrypted and unencrypted is
16 very standard in the industry and something that
17 not only we did for this.  But candidly, I mean,
18 we're working on, I would say, a dozen cases
19 right now related to ads technology, ad
20 technology that is -- that is collecting data on
21 users with or without their consent and then
22 sending it somewhere.  So we're doing a lot of
23 test -- a lot of work in that space right now.
24               That's why when I talked earlier
25 about my predictions piece, when I talked about

Page 238

1  government -- government regulations and
2  third-party risk, that's exactly where that's
3  coming from.  You'd be surprised how many
4  publishers' websites implement different
5  technologies on their site that they just don't
6  understand how they work.  It's actually a
7  really big trend right now, third-party risk.
8       Q.    How many field tests did you
9  conduct on open bidding?  I'm sorry?
10       A.    I wanted to make sure you were
11  able to read your note.
12       Q.    I can.
13       A.    Okay.  Again, the technologies
14  are not -- they're trivial.  I mean, you are
15  talking about encrypted communication.  So how
16  many tests have I run on the encrypted
17  communications used in open bidding?  I've done
18  thousands of them because that's what I do in my
19  industry.  That's like -- that's like asking
20  Tiger Woods how many golf balls he hits in his
21  lifetime, okay?  That's what I do.  And in this
22  particular case, once retained, of course, we
23  looked and we said, okay, if header bidding is
24  clear text, let's see the clear text, and now
25  let's look at encrypted coms and make sure it is

Page 239

1  what it is.  And so we did that.
2          The ads.txt was actually quite
3  easy.  I mean, I can -- it's super easy to see
4  and to understand how it works.  So to see the
5  implementation of ads.txt is super simple.
6       Q.    I want to be clear, when you say
7  thousands of fields tests, I'm specifically
8  asking about field tests with open bidding.
9          Are you saying you did thousands
10  of field tests on open bidding?
11       A.    No, you're -- maybe I'm not doing
12  a good job of explaining myself.
13          Opening bidding is a framework
14  that uses secure communications.  And what I did
15  as an expert in the industry and know how
16  communications work, whether it's clear text or
17  encrypted communications, I, through the course
18  of my career, have conducted thousands of tests,
19  man-in-the-middle tests, packet sniffing tests
20  on encrypted communications, thousands, because
21  that what I do.  I mean, that's my job.  I did
22  it for the government; I do it here in private
23  practice.
24          Once retained by Google and
25  investigating header bidding versus open

Page 240

1  bidding, of course we looked at the
2  communication types; clear text versus
3  encrypted.  And so we demonstrated to ourselves
4  like, look, here's the difference between the
5  two.  So all we needed as was one in this
6  particular case because it confirmed what we
7  already knew.  And if I'm being honest, we did
8  it to the benefit of the younger staff.
9       Q.    Did you see any documents about
10  the detection rate of malvertising or ad fraud
11  for ads served through open or exchange bidding
12  in 2016?
13       A.    I'm sorry, can you -- can you
14  repeat that question?
15       Q.    Sure.
16          What was the detection rate of
17  malvertising or ad fraud for ads served through
18  open or exchange bidding in 2016?
19          MS. MAUSER:  Object to form.
20          THE WITNESS:  When you say "open
21          or exchange bidding," do you mean open
22          or header bidding?
23  BY MR. FREEMAN:
24       Q.    No, open and exchange bidding are
25  synonymous with Google; would you agree with

Page 241

1  that?
2       A.    Exchange bidding, I mean, I refer
3  to it as open bidding.
4       Q.    Do you know what exchange bidding
5  is in the context of Google?
6       A.    The term I've been using is "open
7  bidding."
8       Q.    Okay.
9       A.    So -- for in the interest of
10  clarity, because Google does have a habit of
11  renaming technologies, I will be referring to it
12  as "open bidding."
13       Q.    What was the detection rate of
14  malvertising or ad fraud for ads served through
15  open bidding in 2016?
16       A.    As I sit here right now, I'm not
17  sure.  I guess I would ask you if it's cited in
18  my report, I'm happy to talk through it.
19       Q.    Do you know the detection rate
20  for malvertising or ad fraud for ads served
21  through open bidding for any year?
22       A.    I would say pre ads.txt,
23  malvertising and domain spoofing, I mean, it was
24  high, it was climbing.  It was a known --
25  malvertising was a known threat.

## Page 242

1            I mean, I remember when I was in
2  the government in 20 -- 2005, 2006, 2007, we
3  were seeing more and more -- we were seeing that
4  more and more as a vector.  As I said earlier,
5  there was spam e-mail and phishing e-mail, and
6  it was migrating to malvertising, you know, in
7  the various forms of malvertising.
8            So I don't have specific data
9  right in front of me, but I can tell you that as
10 a US Government employee, as an FBI agent, we
11 were talking about it more and more in the squad
12 area, we were seeing more and more threats
13 introduced through that vector, and it was just
14 becoming commonplace.
15      Q.    You said pre ads.txt,
16 malvertising was high.
17            How do you quantify that?
18      A.    I'm just telling you based on my
19 professional experience working in the field, we
20 were talking about it more and more.
21            I remember vividly just being in
22 the squad area of the FBI, working my cyber
23 cases, and, you know, starting to talk with my
24 colleagues and learn about their cases and, you
25 know, them talking about, hey, you know, this is

## Page 243

1  something, you know, we're seeing more and more
2  of these days.  You know, at the time they
3  called it malvertising.  Of course since then,
4  it's been broken out in various aspects of
5  malvertising, but essentially pay loads or risk
6  introduced through advertising technologies.
7       Q.    Do you make any comparison of the
8  rate of malvertising or ad fraud in open bidding
9  compared to the waterfall dynamic?
10      A.    I believe I did in my report.  I
11 believe I spoke about some advantages of
12 waterfalling.  Is there something you want to
13 point me to and we can talk through it?
14      Q.    I'm not sure it's in there.
15            What I'm asking for is: do you
16 compare open bidding in the waterfall dynamic in
17 terms of malvertising or ad fraud?
18      A.    I'm not even sure I understand
19 your question.  Waterfalling is pre header
20 bidding and certainly pre open bidding.  It was
21 essentially the first iteration of -- widely
22 adopted first iteration of digital advertising.
23      Q.    And one of the arguments you make
24 is that the waterfall dynamic was more secure
25 than header bidding, right?

## Page 244

1       A.    That's what I asked you.  If
2  there's a particular point in the report, I'm
3  happy to talk through it.  And when you asked
4  the question, you jogged my memory.  Is there a
5  paragraph you want to talk through?  Because I
6  do remember making that statement.
7       Q.    But I want to talk about not
8  compared to header bidding.
9            I'm saying the waterfall dynamic
10 compared to open bidding.
11      A.    Okay.  So what's your question
12 again?
13      Q.    Do you make any comparison of the
14 rate of malvertising or ad fraud, open bidding
15 compared to the waterfall dynamic?
16      A.    I don't know if you can because
17 waterfalling was essentially retired once header
18 bidding came into play.  Or if it wasn't
19 retired, it was just, you know, wasn't widely
20 adopted, so I'm not sure if you can make that
21 comparison.
22      Q.    Could you not look at historical
23 numbers of malvertising or ad fraud from the
24 waterfall dynamic compared to statistics from
25 open bidding?

## Page 245

1       A.    Again, they didn't exist in the
2  same -- right, widely adopted, they didn't
3  exist.  Waterfalling evolved into header
4  bidding, which evolved into open bidding.  So
5  the two book ends, you know, I'm not sure if
6  there's enough data to compare that.
7       Q.    So a the answer is you didn't
8  make any comparison, though, between open
9  bidding in the waterfall dynamic in terms of
10 malvertising or ad fraud?
11      A.    The answer is I don't think it's
12 possible to make that comparison.
13      Q.    It's not possible to look at
14 historical rates of malvertising and ad fraud in
15 the waterfall dynamic, and take those historic
16 numbers and compare them to the numbers of
17 malvertising or ad fraud for open bidding?
18      A.    I mean, you're talking about
19 maybe years later.  I mean, the industry
20 completely changed.  The tools, techniques and
21 protocols of the adversaries completely changed.
22 I mean, you are not measuring apples to apples
23 here.  You're measuring apples in one era
24 towards oranges in another.  I mean, it's
25 completely different.

## Page 246

1  I can tell you what I view as the
2  advantages of waterfalling, but you're not
3  asking me that question.
4      Q.    But I'm asking for the
5  statistical support for that, of what was the
6  rate of malvertising or ad fraud when the
7  waterfall dynamic was widely adopted and used?
8      A.    It was low.
9      Q.    Like what?
10     A.    I don't know.  But I can tell you
11 that because the way the waterfalling process
12 was functioned, that the concept of
13 know-your-customer and the rating of your
14 advertiser actually, you know, organically and
15 not by design helped mitigate that particular
16 risk of malvertising.
17     Q.    You say it was "low," low using
18 what metric?
19     A.    I don't know.  I don't have data.
20 If you could point me to that particular
21 paragraph in my report, we both know it's in
22 here and in the interest -- I mean, I'm happy to
23 look for it, but it's your time.  I'm happy to
24 talk you through it.
25     Q.    I'm asking you whether you knew

## Page 247

1  or know now the rate of malvertising or ad fraud
2  when the -- waterfall dynamic was widely adopted
3  and used?
4      A.    I'm just going to take a second
5  to try to find that paragraph.
6      Q.    Okay.
7      A.    (Witness reviews document.)
8          MS. MAUSER:  It's up to you if
9      you want him to look for the paragraph.
10     It's right in front of him, he knows
11     it's there.  I can --
12         MR. FREEMAN:  Sure.  You can tell
13     him.
14         MS. MAUSER:  Anthony, I believe
15     it's paragraph 72 that you're looking
16     for.  That's the only reference I
17     recall.
18         THE WITNESS:  So much easier when
19     you can do these virtually because you
20     can search the documents.  Okay, let me
21     read paragraph 72.
22         (Witness reviews document.)
23     Okay, now, I'm sorry, what was
24     your question?
25 BY MR. FREEMAN:

## Page 248

1      Q.    You had stated that the rate of
2  malvertising or ad fraud when waterfall dynamics
3  was widely adopted was "low," was your word.
4          I'm asking you to quantify that
5  for me, what does "low" mean?
6      A.    It was just low compared to
7  header bidding.
8      Q.    How do you know if something is
9  low compared to something else if you don't know
10 the rate in which it's occurring in the
11 waterfall?
12     A.    I'm making that assessment based
13 on the totality of the information that I
14 reviewed.  And that when the waterfall technique
15 was utilized, there was a lower rate of
16 malvertising for specific reasons surrounding,
17 as I said earlier, the know -- a
18 know-your-customer organic program that wasn't
19 even -- wasn't even an intention, but it was a
20 positive by-product of the waterfall technique.
21 Because the way the waterfall technique worked
22 is only reputable people, bidders that you had
23 done business before in the past that it served
24 up legitimate, quality ads would climb to the
25 top.  And therefore, if they offered the price

## Page 249

1  that you were looking for, they would win the
2  bid and be able to place the ad.
3          That also helped protect user
4  data.  Rather than send the sensitive user data
5  to all bidders, it just went to those who
6  actually had an opportunity to bid on the
7  auction.  And so that technique, again, it was
8  an organic by-product of the technique, did
9  ensure lower malicious rates, lowest -- lower
10 malicious activity rates in the waterfall
11 technique.
12     Q.    Is it fair to say, though, you
13 can't quantify what that means?
14     A.    No, I don't think that's fair to
15 say.  I can say that in my report, I have not
16 cited any of that specific data, but I'm quite
17 certain that that can be done; waterfalling
18 compared to header bidding.
19     Q.    Isn't that one of your points
20 that you're trying to make that waterfall
21 technique was more secure than header bidding?
22     A.    In my professional opinion, I do
23 believe that.
24     Q.    So why wouldn't you cite the
25 statistical data to support that?

Page 250

1    A.    Because it's a retired
2  technology.  Paper and pen and letters are more
3  secure than e-mail, but it doesn't mean people
4  still use it.
5    Q.    Are you saying that you've seen a
6  statistical analysis of the rate of malvertising
7  when the waterfall was widely adopted?
8    A.    No, I'm not saying that at all.
9  I'm saying that in my reverse engineering and
10 understanding of waterfalling and the material
11 that I've read, again, as an organic by-product
12 of the technique, it actually was more secure
13 for the reasons I outlined than header bidding.
14        But unfortunately, the industry
15 evolved.  And don't get me wrong, there are
16 benefits, different benefits in header bidding
17 than waterfalling.  But with the introduction of
18 those other benefits, it also introduced new and
19 other risks.  That's the industry we live in;
20 that's the world we live in and how things
21 operate.  And I think that's just a reality.
22    Q.    But if you don't have a
23 statistical metric to measure the rate of
24 malvertising in the waterfall, and you don't
25 have a statistical metric of the rate of

Page 251

1  malvertising with the using of header bidding,
2  how can you say one is higher than another?
3    A.    Again, as I sit here as the
4  expert in this case just unpacking how these
5  techniques and understanding how they work, it's
6  just -- how could you not think that?  I mean,
7  you're talking about a bid going to three
8  people, three of your trusted partners, for
9  example, versus a bid going to 300 people that
10 you don't even know.  Of course there's going to
11 be more risk.
12        Do I have a statistical analysis
13 of that?  I do not.  And I'm going to say I do
14 not because you're talking about a technology
15 that's been retired for years and replaced with
16 header bidding.  And so I'm not sure where that
17 data would lie.  And even if that data did
18 exist, I'm not even sure if I would -- if I
19 would believe it was valid to the point where I
20 would want to sit before you and represent it.
21    Q.    Well, header bidding, as we've
22 already established, is still currently being
23 used, right?
24    A.    That is correct.  The evolution
25 of header bidding to where it is today with the

Page 252

1  various security enhancements is being used.
2  But, again, it is being implemented, different
3  people are implementing it in different ways.
4    Q.    And open bidding is still being
5  used, right?
6    A.    Correct.
7    Q.    So what is the current rate of
8  malvertising or ad fraud in opening bidding?
9    A.    I mean, as I sit right here in
10 this chair and I'm asked the question, I can't
11 answer it.  And I'm wondering if it was in my
12 report.
13    Q.    What is the current rate of
14 malvertising or ad fraud in header bidding?
15        MS. MAUSER:  Object to form.
16        THE WITNESS:  I'm not sure if I
17        could answer that.  I know in my report
18        I talk about ad fraud and malvertising
19        on the rise to the point of reaching a
20        hundred billion dollars by 2024.  I
21        mean, ad fraud and malvertising is only
22        going to increase.  I mean, it's the
23        world we live in.  With the adoption of
24        more bandwidth, more internet-connected
25        devices, more users.  And, of course, as

Page 253

1        I've said before is adversaries sit home
2        and cook up new ways in which to defeat
3        defenses, we're going to continue to see
4        a rise in this -- in this sort of
5        activity.
6        MR. FREEMAN:  I don't know how
7        long we've been going, yeah, it's been
8        about an hour.  We can take a break.
9        MS. MAUSER:  Sure.
10        THE VIDEOGRAPHER:  Off the record
11        at 4:54.  This ends media unit number
12        five.
13        (Brief recess)
14        THE VIDEOGRAPHER:  On the record
15        at 5:05.  This begins media unit six in
16        the deposition of Anthony Ferrante.
17 BY MR. FREEMAN:
18    Q.    I want to move to the topic of
19 3ve that you discuss in your report.
20        So when was 3ve first identified
21 as a potential problem?
22    A.    Give me one second here.
23        (Witness reviews document.)
24        Trying to find it in my report so
25 I can get the exact date.  Here we go.

Page 254

[REDACTED]

11          Q.      So is it fair to say that at some
12   point in 2016 3ve was identified as a problem?
13          A.      You know, knowing how things work
14   on the government side, it's hard to say exactly
15   when but certainly within that period.
16          Q.      Did you personally participate in
17   the investigation of 3ve?
18          A.      No, I did not.
19          Q.      Did you personally participate in
20   the prosecution of 3ve?
21          A.      No, I did not.
22          Q.      Were you ever called as a witness
23   for any court proceeding relating to the
24   prosecution?
25          A.      Of 3ve?

Page 255

1           Q.      Yeah.
2           A.      No, I was not.
3           Q.      Just so we're clear, we're
4    talking about 3ve.  It was more than just one
5    individual ultimately charged; is that right?
6           A.      I don't recall the exact details.
7           Q.      Okay.  At the time 3ve was
8    investigated, you had already left the FBI; is
9    that right?
10          A.      Again, I don't know.  I didn't
11   leave the U.S. government until April of 2017 so
12   --
13          Q.      Okay.
14          A.      I was still a government
15   employee, I'm sure, when it was being
16   investigated.  But as we talked earlier, I was
17   detailed or assigned over to the White House, so
18   I wouldn't have been privy to information like
19   this.

[REDACTED]

Page 256

[REDACTED]

8           Q.      Okay.  What percent of those
9    fraudulent bid requests generated by 3ve went
10   through AdX?
11          A.      Open bidding?
12          Q.      Sure, we can do open bidding.
13          A.      You know, I'm not sure, but I can
14   tell you that it was Google and White Ops that
15   actually uncovered open bidding, so I don't have
16   the exact statistical data.
17               MS. MAUSER:  Repeat your last
18          answer.  I think you may have misspoke
19          but just --
20               THE WITNESS:  Okay.
21               MS. WOOD:  Do you want to have
22          the court reporter read it back?
23               (The court reporter read back the
24          record as requested.)
25               THE WITNESS:  It was Google and

Page 257

1    White Ops that uncovered 3ve.
2    BY MR. FREEMAN:
3           Q.      But part of Google identifying
4    and helping with the prosecution of 3ve is
5    because that fraudulent activity was occurring
6    on their platforms?
7           A.      That is correct.  That is a safe
8    assessment to make.  I don't know the
9    statistical data, but it is safe to say.
10          Q.      Do you know, while not the
11   precise number, was it more than 50% of the
12   fraudulent bid requests were on Google platforms
13   in regards to 3ve?
14          A.      Again, I don't know the number,
15   but I do know that it was Google who was
16   instrumental in identifying it.  I also know
17   that it was Google who was instrumental in
18   developing technologies to prevent it from
19   happening again.

[REDACTED]

24          Q.      Did you review any of the
25   underlying data for this graph?

Page 258

```
1        A.     I did not review the underlying
2   data associated with this graph.  Statistical
3   data, that is.
4        Q.     Where did the -- where did this
5   graph come from?
6        A.     I'm not exactly sure.
7        Q.     Is this a graph showing bid
8   requests right before and after the takedown of
9   3ve only on Google platforms?
10       A.     Again, I'm not -- I'm not sure.
11  As I sit here right now, I just can't recall.
12       Q.     Do you have any evidence or
13  information to suggest that Google's products
14  were less vulnerable to 3ve's attacks than
15  others?
16       A.     Can you repeat the question?
17       Q.     Sure.
18              Do you have any evidence or
19  information to suggest that Google's products
20  were less vulnerable to 3ve's attacks than
21  others?
22       A.     When you say "Google's products,"
23  are you referring to a specific product?
24       Q.     I'm referring to DFP, double
25  click for publisher, and AdX, which depending on
```

Page 259

```
1   the timeframe we're talking about GAM?
2        A.     So the advertising
3   technologies -- you're asking if Google's
4   advertising technologies were less secure
5   against 3ve; is that your question?  I'm sorry.
6        Q.     Mine was slightly different.
7               Mine was: do you have any
8   evidence or information to suggest that Google's
9   products were less vulnerable to 3ve's attacks
10  than others, which I think is the opposite of
11  what you're saying.
12              Were they more -- do you have any
13  evidence to suggest that they were more secure
14  than others?
15       A.     I will say that I think the
16  entire advertising industry was susceptible to
17  the 3ve attack, and that's why I think it
18  happened at the scale that it did.  The 3ve
19  attack highlighted a security gap essentially,
20  as I said earlier, in the similar concept to the
21  SPF, the sender policy framework, that validates
22  partners that you want to conduct business with
23  in the advertising work space, in the
24  advertising space.  So I didn't look at one
25  versus the other because I viewed them both
```

Page 260

```
1   susceptible to the 3ve attack.  And when I say
2   "both," I mean open bidding and header bidding.
3   It utilized domain spoofing at such a large
4   scale programmatically, and that's exactly what
5   ads.txt as a result of the 3ve, that's exactly
6   what ads.txt was created to mitigate against.
7        Q.     So you talked about a security
8   gap that 3ve exploited, I don't know if you used
9   that word --
10       A.     Highlighted, exploited, sure.
11       Q.     But that security gap existed
12  both outside of Google's platforms and products
13  and also within Google's platforms and products,
14  right?
15       A.     You keep saying "products," but I
16  want to be really -- just because Google has so
17  many products, I want to be specific and say
18  their advertising products, fair?
19       Q.     Fair.
20       A.     Okay, yes.
21       Q.     We can be more specific.
22              That the security gap that
23  existed that 3ve exploited also was a security
24  gap within GAM, right?
25       A.     The spoofing of the domains?
```

Page 261

```
1        Q.     Correct.
2        A.     I want to be really clear because
3   3ve is a multi-faceted operation that involved
4   malware and recruitment of bots for a bot net,
5   but the actual -- okay, I want to be really,
6   really clear here, the actual creation and
7   interaction with spoofed domains was what was a
8   security gap in the advertising industry.  And
9   that aspect of 3ve was leveraged both in header
10  bidding and open bidding, that aspect of it.
11  There is so much more to 3ve, you know, the
12  exploitation of data centers, the exploitation
13  of BGP, which is, I mean, the internet, right.
14  And so in reading that, I mean, right away I
15  said these are significant Russian hackers who
16  conducted this operation.  So there was a huge
17  operation exploiting various aspects of the
18  internet.
19              But specific to your question,
20  the gap that was identified was the in -- the
21  nonverification of domains that publishers were
22  communicating with, and that's what was
23  leveraged by 3ve in both header bidding and open
24  bidding.
25              Does that make sense?
```

---

**Page 262**

1    Q.    So once Google and White Ops
2  identified this potential problem, before the
3  takedown is what I'm saying, did they seek the
4  assistance from any other entities?
5    A.    Yes, it's my understanding that
6  they reached out to government, Department of
7  Justice, the Federal Bureau of Investigation,
8  Homeland Security.  I understand they talked to
9  other security researchers in the industry.
10         I mean, the way I read it and in
11  my experience and having been involved with a
12  few of these in my time in government is they
13  created a task force to fight this problem.
14  It's a very common approach to a big problem
15  like this.
16    Q.    What did you do to understand the
17  3ve attack?
18    A.    Understand the 3ve attack?
19    Q.    Yeah.
20    A.    I read the open source material
21  on it.
22    Q.    Did you read anything that was
23  not publicly sourced about the 3ve attack?
24    A.    No.  I mean, if you're
25  specifically asking me if I read any government

---

**Page 263**

1  material on it, the answer is no.  But I also
2  only read what was publicly available on the
3  internet.
4    Q.    What is your understanding of why
5  Google and White Ops sought the assistance from
6  outside entities?
7    A.    It's very common.  It's very
8  common for entities like Google, like White Ops,
9  like Microsoft.  I mean, name the player.  I
10  mean, even smaller players identify risk or
11  identify fraud on the internet and seek the
12  assistance from government.  It is -- I mean, I
13  think it's the model we all want to strive for.
14  You know, this partnership mentality where we're
15  all in it together.
16         And as you can appreciate, Google
17  has certain insights that I know from my
18  experience the government would love.  But, of
19  course, there's -- there's checks and balances
20  in place.  However, when Google identifies fraud
21  or malicious activity in the interest of
22  protecting the overall infrastructure that we
23  all utilize every day as American citizens, they
24  do have the ability to raise their hand and
25  reach out to government for assistance.  And in

---

**Page 264**

1  those particular cases at this level, it's not
2  unusual to create this task force approach to
3  combat these threats.  It's very, very common.
4    Q.    Did Google have any financial
5  incentives to reach out to the FBI to help fight
6  the 3ve attacks?
7    A.    So I can actually answer this
8  specific to my experience in private practice
9  now for the last seven years.  There's actually
10  no financial benefit in cooperating with the
11  government.  As a matter of fact, it's extremely
12  expensive.  And in the cases that I'm working
13  today, cooperating with the government, it's a
14  lot of money for these organizations, but they
15  do it for the right reasons.  And, you know, I'm
16  grateful for that.
17    Q.    How much money did Google lose as
18  a result of 3ve?
19    A.    I'm not sure.
20    Q.    So are you really saying that
21  Google didn't have any financial incentive to
22  reach out to the FBI to help them stop the 3ve
23  attacks that were costing them money on their
24  platforms?
25         MS. MAUSER:  Object to form.  Go

---

**Page 265**

1  ahead.
2         THE WITNESS:  I'm not saying --
3  sorry.  I'm not saying -- I mean, I
4  can't answer if they had any financial
5  incentives.
6         What I'm stating is in my
7  professional experience as a security
8  expert working exactly these matters
9  every day -- right now I'm working half
10  a dozen cases with the U.S. government
11  standing shoulder to shoulder with me,
12  and I can tell you from personal, real
13  experiences that I watch these companies
14  hemorrhage cash as they work as partners
15  with the U.S. government.
16         So I don't know if they had any,
17  to use your term, financial gain, but I
18  can tell you that it's also a financial
19  burden to them as they cooperate with
20  the U.S. government.
21         And the cases I'm working are not
22  nearly the size of the 3ve takedown, so
23  I can only imagine the expenses that
24  they incurred.
25  BY MR. FREEMAN:

Page 266

```
 1        Q.     But wasn't Google hemorrhaging
 2   cash as a result of the 3ve attacks?
 3           MS. MAUSER:  Object to form.
 4           THE WITNESS:  I mean, I'm not
 5        sure of your question.
 6   BY MR. FREEMAN:
 7        Q.     You used a phrase that companies
 8   were hemorrhaging cash as they work as partners
 9   with the U.S. government?
10        A.     I was speaking to my experiences
11   as a security professional in the field today.
12   And in the last seven years, I've worked
13   multiple cases shoulder to shoulder with the
14   U.S. government, and I have watched these
15   companies, again, to use my term, hemorrhage
16   cash as they do the right thing and partner with
17   the government to create a more safe and secure
18   internet or safe and secure experience for US
19   citizens.
20           I cannot speak to Google's
21   financial gains or losses.  I'm only speaking to
22   my experiences with similar types of
23   interactions and partnerships with me and
24   companies in the U.S. government.
25        Q.     Do you know how much money Google
```

Page 267

```
 1   spent as part of their assistance in the
 2   investigation of 3ve?
 3        A.     I will tell you off the top of my
 4   head I can't recall as I sit here.  I will ask
 5   you if it's noted in my report, if you want to
 6   talk about it.
 7        Q.     I didn't see any specific number
 8   that you were attributing to Google's spending
 9   on the investigation of 3ve.  And so I was
10   asking if you knew it independent of anything
11   written in your report?
12        A.     Yeah, no, sir.  I do not have
13   that information.
14        Q.     How do you think the
15   investigation and prosecution of 3ve will assist
16   a jury in determining whether Google monopolized
17   or attempted to monopolize any product?
18           MS. MAUSER:  Object to form.
19        Outside the scope of his report and his
20        expertise.
21           THE WITNESS:  Yeah, I don't think
22        I can answer that question.
23   BY MR. FREEMAN:
24        Q.     Why don't you think you can
25   answer that question?
```

Page 268

```
 1        A.     I mean, one, I can't speculate
 2   what a jury might think.  And then, I mean, the
 3   obvious part my scope of this matter is so
 4   focused that I don't think it captures the
 5   totality of the information.
 6
```







Page 274

20 BY MR. FREEMAN:
21      Q.      Do you know how much money Criteo
22 is spending on developing standard tools to
23 bolster the security of the advertising
24 ecosystem?
25      A.      I do not.

Page 275

1           Q.      Would you consider what Criteo
2  spends to be a substantial amount of money?
3           A.      I don't know what they spend.
4           Q.      What about The Trade Desk, are
5  they spending substantial amounts of money to
6  develop standard tools in order to bolster the
7  security of the advertising ecosystem?
8           A.      As I sit here right now, I can't
9  answer that question.
10          Q.      What about OpenX?
11          A.      As I sit here right now, I can't
12 answer that question.
13          Q.      What about Magnite?
14          A.      As I sit here right here, I can't
15 answer that question.
16          Q.      So it's possible that those
17 companies are also spending substantial amounts
18 of money in developing standard tools in order
19 to bolster the security of the advertising
20 ecosystem?
21              MS. MAUSER:  Object to form.
22              THE WITNESS:  Again, as I sit
23 here right now, I can't answer that
24 question.  I would just also say that
25 you're very focused on money.  It's not

Page 276

1           only about money.  It's about time, it's
2  about knowledge, it's about sharing of
3  information.
4  BY MR. FREEMAN:
5           Q.      Are you saying it's not possible
6  that Criteo or Trade Desk or OpenX is spending
7  substantial amounts of time developing standard
8  tools -- standards and tools in order to bolster
9  the security of the advertising ecosystem?
10              MS. MAUSER:  Object to form.
11              THE WITNESS:  I'm not saying that
12 at all.  I'm just responding to your
13 question, which was specific about money
14 only.  And I'm saying that it's not only
15 about money.  It's about time, money and
16 knowledge, as I've written in my report
17 here.
18 BY MR. FREEMAN:
25          Q.      Is 100 hours a substantial amount

Page 277

1  of time?
2           A.      I wouldn't look at it as hours.
3  I would look at it as teams, right, dedicated
4  programs.
5           Q.      Time meaning teams; is that what
6  you're saying?
7           A.      Time meaning human resources
8  times.  I wouldn't look at it as 100 hours
9  versus 200 hours.  I would look at it as teams.
10              In my professional experience, in
11 my strategic consulting to my clients, it's not
12 about time.  It's about do you have teams of
13 people working on these problems?
14          Q.      Okay.  How many teams does Google
15 have dedicated to the development of standards,
16 tools in order to bolster the security of the
17 advertising ecosystem?
18          A.      As I sit here right now, I can't
19 answer that question.
20          Q.      Why not?
21          A.      I mean, it's a very complicated
22 question, and Google is an organization -- a
23 sophisticated organization, so it would take
24 sitting down and walking through each team.
25              But I can tell you from what I

Page 278

```
 1   saw and what I learned about their commitment in
 2   the space, I would quantify it as substantial.
 3   I mean, they developed ads.txt.  They outed 3ve.
 4   I mean, those are two massive operation.  That's
 5   the entire industry -- I think the number I
 6   quoted was $29 million was hemorrhaging.  I
 7   mean, those are two really great examples.
 8         Q.     They didn't do those by
 9   themselves, right?
10         A.     They found it.  They partnered.
11   Google and White Ops partnered together and
12   raised their hand.
13         Q.     That's for 3ve.  There was a
14   whole working group outside of Google that also
15   helped in the development of ads.txt, right?
16         A.     But Google led the charge on it.
17         Q.     But the answer to my question is
18   yes, there are many other groups that led to the
19   development of ads.txt, right?
20         A.     But that's exactly what I'm
21   talking about; you are making my point exactly.
22   Google is at the forefront.  They are the
23   leaders in this space and they are saying, hey,
24   everybody, come with us, let's knowledge share,
25   let's share information, let's work together.  I
```

Page 279

```
 1   mean, it is the exact concept the U.S.
 2   government wants, right, and it is the exact
 3   concept that I think the industry wants.
 4             The industry is not going to
 5   adopt technologies that one person in a vacuum
 6   develops.  They want to coalesce around an idea
 7   and crowdserve it and make it the very best it
 8   can through knowledge sharing, and that's
 9   exactly what Google is doing.  And they did it
10   so well that ads.txt was widely adopted almost
11   immediately and endorsed by the IAB.
12         Q.     Does Amazon have -- how many
13   teams does Amazon have dedicated to the
14   development of standard tools in order to
15   bolster the security of the advertising
16   ecosystem?
17         A.     As I sit here right now, I can't
18   answer that question.
19         Q.     What about Criteo?
20         A.     As I --
21             MS. MAUSER:  Objection,
22        foundation.
23   BY MR. FREEMAN:
24         Q.     You can answer.
25         A.     As I sit here right now, I can't
```

Page 280

```
 1   answer that question.
 2         Q.     Does The Trade Desk invest a
 3   substantial amount of time in the development of
 4   standard tools to bolster the security of the
 5   advertising ecosystem?
 6         A.     I don't have that information.
 7   And as I sit here right now, I can't answer that
 8   question.
 9         Q.     Did you have access to Google's
10   information about that?
11         A.     I looked at the totality of the
12   information provided to me and what was
13   available in open source.
14         Q.     But you were retained by Google
15   as an expert.  Why didn't you ask Google for
16   that information that was not publicly
17   available?
18         A.     Based on what I had, I was able
19   to form an opinion.  Again, you're talking to
20   someone who works in this industry every single
21   day and is advice advising clients in big tech
22   on this topic and actually coming to the aid of
23   these clients when they have a crisis to combat
24   these sorts of risks.
25             So when I was retained and
```

Page 281

```
 1   started reading the information provided to me,
 2   I could quantify it as an expert in this
 3   industry.  They're making a substantial
 4   investment.  That's why I used the term
 5   "substantial."
 6         Q.     Again, just to be clear you, used
 7   the phrase "substantial" without defining any
 8   particular metric or measurement, right?
 9         A.     The measurement is my
10   professional experience and my day-to-day work
11   that I'm doing every single day compared to
12   other big tech.
```

██████████████████████████

████████████████████████

██████████████

████████████████████████████

███████████████████████

████████████

█████████████████████████

████████████████

```
24         Q.     Did you look to see if any other
25   participants within the digital advertising
```

**Page 282**

1  ecosystem had certificates from TAG like Google?
2      A.    I'm sure I did.
3      Q.    Are you aware that The Trade Desk
4  has achieved certified against fraud by TAG?
5      A.    Am I aware of that?
6      Q.    Yeah, are you aware of that?
7      A.    As I sit here right now, I don't
8  recall but, okay.
9      Q.    Are you aware that The Trade Desk
10  is certified against malware by TAG?
11      A.    As I sit here right now, I don't
12  recall.
13      Q.    Are you aware that Criteo also
14  has achieved the brand safety certification by
15  TAG?
16      A.    I think that's great.  And, no, I
17  wasn't aware of that.
18      Q.    Are you aware that Criteo has
19  been certified against fraud by TAG?
20      A.    No, as I sit here right now, I
21  was not aware of that.
22      Q.    Are you aware that OpenX has the
23  brand safety certified by TAG?
24      A.    No, as I sit here right now, I
25  wasn't aware of that.  But I think these

**Page 283**

1  certifications are great, and it just speaks to
2  the evolution of the industry as everybody is
3  working together to implement enhanced
4  technologies for the safety and security of the
5  consumers.  I really do.
6      Q.    Are you aware that OpenX is
7  certified for transparency by TAG?
8      A.    No, as I sit here right now, I
9  was not aware of that.
10      Q.    Does Google have that
11  certification for transparency by TAG?
12      A.    As I sit here right now, I can't
13  recall.
14      Q.    Are you aware that Amazon
15  advertising has achieved the brand safety
16  certification by TAG?
17      A.    As I sit here right now, I can't
18  recall.
19      Q.    Are you aware that Xandr has the
20  brand safety certification by TAG?
21      A.    No, as I sit here right now, I
22  can't recall.
23      Q.    Are you aware that Magnite has
24  the brand safety certification by TAG?
25      A.    As I sit here right now, I can't

**Page 284**

1  recall.
2      Q.    Are you aware PubMatic has the
3  brand safety certification by TAG?
4      A.    No.  As I sit here right now, I
5  can't recall.
6      Q.    Are you aware of Index Exchange
7  having the brand safety certification by TAG?
8      A.    As I sit here right now, I can't
9  recall.
10      Q.    If that information were to be
11  true about these certifications of these
12  companies, does that change your opinion about
13  the value of Google's certification compared to
14  others in the market?
15          MS. MAUSER:  Object to form.
16          THE WITNESS:  Can you reask the
17      question?  Can you repeat the question?
18      I'm sorry.
19  BY MR. FREEMAN:
20      Q.    If that information were to be
21  true about these certifications of these
22  companies, does that change your opinion about
23  the value of Google's certifications compared to
24  others in the market?
25          MS. MAUSER:  Object to form.

**Page 285**

1          THE WITNESS:  As I said earlier,
2      I think it's great that these companies
3      are receiving these certifications.  I
4      think it speaks to the evolution of the
5      industry and how working together to
6      identify risk and mitigate that risk is
7      providing benefits to the consumers.
8      And these organizations are being
9      recognized for their work in this space.
10  BY MR. FREEMAN:
11      Q.    You said various iterations of
12  this throughout today, but that Google was a
13  leader in the cyber security within the
14  advertising -- digital advertising ecosystem; is
15  that right?
16      A.    I do believe that Google was an
17  innovator and leader in the space.
18      Q.    Okay.  What statistical data did
19  you review that supports the idea that Google
20  was a leader within this space?
21          MS. MAUSER:  Object to form.
22          THE WITNESS:  I wouldn't say that
23      the evidence would be in the form of
24      statistical data, rather innovative
25      data, rather in the innovation of frame

Page 286

1  works.  And, you know, the clear example
2  there is the innovation of open bidding
3  and the various features in open
4  bidding.  You don't need me to tell you
5  that they're a leader in the space and
6  that they're an innovator.  Look at all
7  the other companies that have followed
8  their lead and adopted the same
9  features.
10         Google, again, made that
11 investment in time, money and knowledge
12 and -- and as I walked through those six
13 risks that they were able to mitigate,
14 shortly after them rolling out their
15 technologies or their framework
16 enhancements header bidding, rolled out
17 many of the same features.
18         In the current implementation of
19 header bidding, server side header
20 bidding, it's very similar to Google's
21 open bidding.  And as we all know, many
22 providers today have adopted header
23 bidding and tweaked it to their own
24 liking.  Amazon TAM is a great example.
25 Prebid, which is open source.

Page 287

1          So when you say why do I consider
2          them a leader?  Well, one, because they
3          developed these new features and these
4          new protocols in which the industry
5          would operate.  But then that's further
6          endorsed by the industry complimenting
7          them by actually adopting the same
8          features and baking them into their
9          framework.
10 BY MR. FREEMAN:
11         Q.    Do you know the relative adoption
12 in the industry of header bidding compared to
13 open bidding?
14         A.    The relative adoption, I don't.
15 I don't.  I know that in the header bidding
16 space I know that when it is implemented, it's
17 very common for those organizations to implement
18 with their own proprietary or customized
19 implementation.
20         Q.    What peer-reviewed academic
21 journals did you review that supports the idea
22 that Google is a leader in cyber security in the
23 advertising ecosystem?
24         MS. MAUSER:  Object to form.
25         THE WITNESS:  I don't need a

Page 288

1  peer-reviewed journal to tell me that.
2  As I just walked through having worked
3  in this industry my entire life and
4  having, you know, work in it today,
5  Google, again, made time, money and
6  knowledge investment into a more secure
7  platform for advertising.  And the -- as
8  I said earlier, the greatest compliment
9  or indicator that they're viewed as a
10 leader is everyone else in the industry
11 adopted their innovation, their
12 approach, and it is now widely used in
13 server side header bidding.
14 BY MR. FREEMAN:
15         Q.    I understand you said you didn't
16 need one, but what peer-reviewed academic
17 research did you review that supports that idea?
18         A.    I made that opinion based on my
19 professional experiences of working in the
20 security industry my entire life.  I didn't need
21 a peer review.  I made that opinion based on my
22 experiences.
23         Q.    So the answer to my question is:
24 you did not review or rely on any peer-reviewed
25 academic research to support the idea that

Page 289

1  Google was a leader within cyber security of the
2  advertising ecosystem, right?
3          A.    The answer is no, I didn't need
4  one because I am making that -- I am forming
5  that opinion and writing that opinion based on
6  my experience as a security professional for my
7  entire life.
8          Q.    What surveys did you conduct or
9  review that supports the idea that Google is a
10 leader within cyber security in the advertising
11 ecosystem?
12         A.    Again, as I just walked through
13 with you I didn't need to conduct a survey.  I
14 see how the industry is adopting the very same
15 features Google developed that they are
16 implementing in header bidding.
17         Q.    So, again, is the answer is you
18 didn't rely on any survey or review any survey
19 that supports the idea that Google is a leader
20 in cyber security in the advertising ecosystem?
21         A.    I mean, you keep asking me about
22 surveys, but I don't understand what I would
23 survey.  The data is there, it's in front of us
24 all right now.  I mean Google innovated -- led
25 and innovated this more secure approach to

Page 290

```
1   online advertising.  They do it, they document
2   it, others read their documentation and take
3   what Google did and implement their same safe
4   and secure version of the features.
5           So while I did not interview or
6   survey, explicitly survey, implicitly, the
7   evidence is there if they -- the evidence is
8   there.
9       Q.   What led the industry to create
10  header bidding in the first place?
11      A.       Waterfall, the waterfall approach
12  was viewed to limit the amount of revenue that
13  could be generated.  And so there was a belief
14  that rather than stepping down a
15  performance-based or reputation-based ladder
16  that publishers could make more money if they
17  actually conducted bids.  I would also say that
18  the technology evolved a bit and allowed
19  publishers to reveal more information about
20  their users to allow more targeted
21  advertisements.
22      Q.   What interviews of Google
23  employees or former employees did you conduct or
24  review that supports the idea that Google is a
25  leader in cyber security in the advertising
```

Page 291

```
1   ecosystem?
2           MS. MAUSER:  Objection, asked and
3       answered.
4           THE WITNESS:  Yeah, all due
5       respect, I think I've answered that.
6   BY MR. FREEMAN:
7       Q.   The answer is you are not relying
8   on any interview of a Google employee or former
9   employee?
10      A.       I am relying on my experience as
11  a security professional.
12      Q.   What metric or metrics are you
13  opining that Google is better at than the rest
14  of their competitors in cyber security in the
15  advertising ecosystem?
16          MS. MAUSER:  Object to form, no
17      foundation.
18          THE WITNESS:  I think that's a
19      bit of a complicated question, so I
20      would ask that we can step through it.
21      When you say they're competitors, you
22      mean they're advertising competitors,
23      we're not talking about big tech or are
24      we?
25  BY MR. FREEMAN:
```

Page 292

```
1       Q.   Okay.  You've made the argument
2   that Google -- or you stated now Google was a
3   leader in cyber security in the advertising
4   ecosystem, right?
5       A.   Correct.
6       Q.   What other groups or companies
7   were they leading in cyber security in the
8   advertising ecosystem?
9       A.   What other groups was Google
10  leading?
11      Q.   You're saying they're a leader.
12  Who are they leading?
13      A.   They're leading the industry.
14      Q.   Who is in the industry?  That's
15  my question.
16      A.   I mean, you've rattled off a
17  bunch of names today.  I would say for the
18  purposes of our discussion, those folks.  I
19  mean, we're talking about a framework here, not
20  an actual company.  I mean, that is what I mean.
21  I mean, that is leadership.  That is not the
22  development of a business concept.  It's the
23  development of a framework, right.  That's like
24  saying the inventor of TCPIP, you know, built it
25  for, you know, selfish benefits.  He built it
```

Page 293

```
1   for the furtherance of internet communications.
2   And what I'm saying is what Google did was
3   develop a framework.
4           Open bidding is a framework that
5   they use today, and a framework that others -- a
6   framework, like TCPIP, a framework that others
7   saw, realized the features because of Google's
8   documentation and said we would like to develop
9   our version of that framework which led to the
10  evolution and the more secure version of header
11  bidding which is server side.  And what's more
12  is that while Google has their framework and
13  they've tweaked to the likes of the Google
14  organization, header -- those who deploy header
15  bidding have done the same thing.
16          Amazon has got their own
17  proprietary version of header bidding.  Open
18  bidding is their own -- I'm sorry -- Prebid has
19  their own free available version and people
20  download that base and tweak it to their liking
21  so I mean that's what I'm talking about with
22  leadership.  They developed a framework that is
23  now used throughout the industry.
24      Q.   Is it your testimony that they
25  have developed more products than others in the
```

Page 294

1  industry in cyber security in the advertising
2  ecosystem?
3       A.    My testimony is they've developed
4  a framework, not a product.  That's what I'm
5  talking about TCPIP, internet communications is
6  a framework that is now the backbone of the
7  internet, okay, it moves data.  What Google did
8  is they took -- they took freely available
9  concepts, right, internet concepts,
10 communication concepts and securitized them and
11 said hey, here is a more safe and secure
12 framework in which the advertising industry can
13 operate on and that framework, they use.  They
14 said this is ours, we're going to call it open
15 bidding by the by here are all the features
16 based on our lessons learned, our time, our
17 money and our knowledge investment has taught us
18 this over the years and we're going to document
19 all this and others in the industry, as the
20 industry works, see this and they say amazing,
21 we want to take this and bake these same
22 features into header bidding because we like
23 header bidding and we want to, you know, put our
24 special tweaks on it to make it our version of
25 header bidding like as Amazon has, as other

Page 295

1  organizations have.
2            It's similar to how when TCP was
3  created other engineers said is there a way to
4  make faster communication, so they came out with
5  UDP and that is what -- that is why I'm sitting
6  here as a security researcher saying that's
7  leadership.
8            MR. FREEMAN:  Want to take a
9  break?
10           THE VIDEOGRAPHER:  Off the record
11 at 5:58.
12           (Brief recess.)
13           THE VIDEOGRAPHER:  On the record
14 at 6:08.
15           MR. FREEMAN:  We have nothing
16 further at this time.
17           THE WITNESS:  Thank you.
18           MR. FREEMAN:  Okay we can go off
19 the record thank you.
20           THE VIDEOGRAPHER:  Off the record
21 6:08 p.m.  This ends today's testimony.
22           (Witness excused.)
23                 — — —
24
25

Page 296

1          C E R T I F I C A T I O N
2            I, MARGARET M. REIHL, a
3  Registered Professional Reporter,
4  Certified Realtime Reporter, Certified
5  Court Reporter, Certified LiveNote
6  Reporter, do hereby certify that the
7  foregoing is a true and accurate
8  transcript of the testimony as taken
9  stenographically by and before me at the
10 time, place, and on the date
11 hereinbefore set forth.
12           I DO FURTHER CERTIFY that I
13 am neither a relative nor employee nor
14 attorney nor counsel of any of the
15 parties to this action, and that I am
16 neither a relative nor employee of such
17 attorney or counsel, and that I am not
18 financially interested in the action.
19
20  *Margaret Reihl*
21 -------------------------------------------
    Margaret M. Reihl, RPR, CRR, CLR
22 CCR License #XI01497
    NCRA License #047425
23
24
25

Page 297

1        ACKNOWLEDGMENT OF DEPONENT
2            I, ANTHONY J. FERRANTE, do hereby
3  certify that I have read the foregoing
4  pages and that the same is a correct
5  transcription of the answers given by me
6  to the questions therein propounded,
7  except for the corrections or changes in
8  form or substance, if any, noted in the
9  attached Errata Sheet.
10
11
12 _____
    ANTHONY J. FERRANTE          DATE
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 298

```
 1              ERRATA
 2   Page    Line
 3   ------:-----------------------------------
 4   ------:-----------------------------------
 5   ------:-----------------------------------
 6   ------:-----------------------------------
 7   ------:-----------------------------------
 8   ------:-----------------------------------
 9   ------:-----------------------------------
10   ------:-----------------------------------
11   ------:-----------------------------------
12   ------:-----------------------------------
13   ------:-----------------------------------
14   ------:-----------------------------------
15   ------:-----------------------------------
16   ------:-----------------------------------
17   ------:-----------------------------------
18   ------:-----------------------------------
19   ------:-----------------------------------
20   ------:-----------------------------------
21   ------:-----------------------------------
22   ------:-----------------------------------
23   ------:-----------------------------------
24   ------:-----------------------------------
25
```











































UNITED STATES OF AMERICA v
GOOGLE, LLC

Highly Confidential

Anthony D Ferrante









UNITED STATES OF AMERICA v
GOOGLE, LLC                                                                    Anthony D. Ferrante
                                        Highly Confidential



UNITED STATES OF AMERICA v
GOOGLE, LLC

Case 1:23-cv-00108-LMB-JFA   Document 589-2   Filed 04/26/24   Page 106 of 109 PageID#
9493

Anthony D. Ferrante

Highly Confidential



Highly Confidential



Case 1:23-cv-00108-LMB-JFA   Document 589-2   Filed 04/26/24   Page 108 of 109 PageID# 9495
Anthony D. Ferrante



UNITED STATES OF AMERICA v
GOOGLE, LLC

Highly Confidential

Anthony D Ferrante

