# EXHIBIT 91

HIGHLY CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION
3
        United States of America, )
4       et al.,                   )
                                  ) Case No.
5              Plaintiffs,        ) 1:23-cv-00108-LMB-JFA
                                  )
6       v.                        )
                                  ) HON. LEONIE H.M. BRINKEMA
7       Google, LLC,              )
                                  )
8              Defendant.         )
        _____)
9
10                          * * * * * *
11                      HIGHLY CONFIDENTIAL
12                          * * * * * *
13
14        VIDEOTAPED DEPOSITION OF TIMOTHY S. SIMCOE, PH.D.
15            Friday, February 23, 2024; 9:34 a.m. EST
16
17
18
        Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR,
19      CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
        NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime
20      Court Reporter, NY Association Certified Reporter, OR
        CSR 230105, TN CSR 998, TX CSR 12778, WA CSR
21      23005926, Notary Public
22      Job No. CS 6456894

HIGHLY CONFIDENTIAL

| | Page 2 |
|---|---|
| 1 | Highly Confidential Videotaped Deposition |
| 2 | of TIMOTHY S. SIMCOE, PH.D., held at the United |
| 3 | States Department of Justice, Antitrust Division, |
| 4 | 450 Fifth Street, Northwest, Washington, D.C. 20530 |
| 5 | before Cindy L. Sebo, Registered Merit Court |
| 6 | Reporter, Certified Real-Time Reporter, Certified |
| 7 | LiveNote Reporter, Registered Professional Reporter, |
| 8 | Certified Shorthand Reporter, Certified Court |
| 9 | Reporter, Real-Time Systems Administrator, California |
| 10 | Shorthand Reporter 14409, New Jersey Certified Court |
| 11 | Reporter 30XI00244600, New Jersey Certified Realtime |
| 12 | Reporter 30XR00019500, New Mexico CSR 589, New York |
| 13 | Realtime Certified Reporter, New York Association |
| 14 | Certified Reporter, Oregon CSR 230105, Tennessee CSR |
| 15 | 998, Texas CSR 12778, Washington State CSR 23005926, |
| 16 | Remote Counsel Reporter, LiveLitigation Authorized |
| 17 | Reporter and Notary Public, beginning at |
| 18 | approximately 9:34 a.m. EST, when were present on |
| 19 | behalf of the respective parties: |
| 20 | |
| 21 | |
| 22 | |

| | Page 4 |
|---|---|
| 1 | A P P E A R A N C E S (Continued): |
| 2 | Attorneys for the Defendant: |
| 3 | PAUL WEISS RIFKIND WHARTON & GARRISON, LLP |
| 4 | MARTHA L. GOODMAN, ESQUIRE |
| 5 | HEATHER C. MILLIGAN, ESQUIRE |
| 6 | 2001 K Street, Northwest |
| 7 | Washington, D.C. 20006-1047 |
| 8 | 202.223.7341 |
| 9 | mgoodman@paulweiss.com |
| 10 | hmilligan@paulweiss.com |
| 11 | ALSO PRESENT: |
| 12 | WARREN BREY, Videographer |
| 13 | EVELYN DUROSS, Paralegal Specialist, DOJ |
| 14 | LINNAEA PETTERSON, Paralegal Specialist, DOJ |
| 15 | ANN ASHLEY DANIEL, Paralegal Specialist, DOJ |
| 16 | *PATRICK HOLDER, ESQUIRE, The Brattle Group |
| 17 | *MINJAE SONG, The Brattle Group |
| 18 | *CHARLIE NUSBAUM, The Brattle Group |
| 19 | *BRADLEY JUSTUS, ESQUIRE, Axinn, Veltrop & Harkrider LLP |
| 20 | |
| | T. CHRISTOPHER BOREK, Analysis Group, Inc. |
| 21 | |
| | RICCARDO MARCHINGIGLIO, Analysis Group, Inc. |
| 22 | |
| | *(Via Zoom Communication) |

| | Page 3 |
|---|---|
| 1 | A P P E A R A N C E S: |
| 2 | Attorneys for the Plaintiffs: |
| 3 | UNITED STATES DEPARTMENT OF JUSTICE |
| 4 | ANTITRUST DIVISION |
| 5 | AMANDA M. STRICK, ESQUIRE |
| 6 | KATHERINE CLEMONS, ESQUIRE |
| 7 | YIN JIA QIU, ESQUIRE |
| 8 | MICHAEL WOLIN, ESQUIRE |
| 9 | 450 Fifth Street, Northwest, Suite 4000 |
| 10 | Washington, D.C. 20530 |
| 11 | 202.725.0165 |
| 12 | amanda.strick@usdoj.gov |
| 13 | katherine.clemons@usdoj.gov |
| 14 | yin.jia.qiu@usdoj.gov |
| 15 | michaelwolin@usdoj.gov |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

| | Page 5 |
|---|---|
| 1 | --oOo-- |
| 2 | INDEX OF EXAMINATION |
| 3 | TIMOTHY S. SIMCOE, PH.D. |
| 4 | United States, et al. vs. Google, LLC |
| 5 | Friday, February 23, 2024 |
| 6 | --oOo-- |
| 7 | EXAMINATION BY                    PAGE |
| 8 | Ms. Goodman                    10, 171 |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | CERTIFICATE OF REPORTER              388 |
| 17 | INSTRUCTIONS TO WITNESS              389 |
| 18 | ERRATA                            390 |
| 19 | ACKNOWLEDGMENT OF WITNESS            392 |
| 20 | |
| 21 | |
| 22 | |

HIGHLY CONFIDENTIAL

Page 18

1    THE WITNESS:  Approximately, yes.
2    BY MS. GOODMAN:
3    Q.    Okay.  Can you approximate how many
4    hours you have worked on this matter at $835 an
5    hour?
6    A.    I haven't done a review to know, so
7    this will be a rough approximation.  Several
8    hundred hours.
9    Q.    When you say "several hundred," is
10   that more than 500 or less than 500, if we're
11   going in the middle of the hundreds?
12   A.    I think it would be less than 500.
13   Q.    Would it be more than 300?
14   A.    I think it's likely less than 300,
15   but it could be 300.
16   Q.    And you mentioned that
17   The Brattle Group is supporting you; is that
18   correct?
19   A.    Yes.
20   Q.    How many individuals at
21   The Brattle Group have supported you in your work
22   on this matter?

Page 19

1    MS. STRICK:  Again, you can --
2    under the expert stipulation, I can
3    instruct you to answer just as to the
4    number or the names.
5    THE WITNESS:  I think -- I can
6    think of four people with whom I've worked
7    directly.  My understanding is that there
8    are others who have worked with them
9    supporting aspects of the work I did on
10   this matter under my direction.
11   BY MS. GOODMAN:
12   Q.    Do you have a -- do you know how
13   many individuals at Brattle Group work on the
14   matter under your direction but that you haven't
15   worked with directly?
16   MS. STRICK:  So objection: form.
17   And, again, under the expert
18   stipulation, I'll instruct you to answer
19   yes or no.
20   THE WITNESS:  No.
21   BY MS. GOODMAN:
22   Q.    Okay.  Do you have a sense of how

Page 20

1    many hours individuals collectively at
2    The Brattle Group have worked on this matter in
3    supporting you in your work here on this case?
4    MS. STRICK:  Under the expert
5    stipulation, answer yes or no.
6    And, again, I'll just say
7    objection to form.
8    THE WITNESS:  I do not know.
9    BY MS. GOODMAN:
10   Q.    Do you know whether individuals at
11   The Brattle Group worked more hours than you did
12   on this matter?
13   MS. STRICK:  Again, under the
14   expert stipulation, you can answer yes or
15   no.
16   THE WITNESS:  I don't know for a
17   fact.  I haven't reviewed the number of
18   hours worked by members of The
19   Brattle Group.
20   BY MS. GOODMAN:
21   Q.    Okay.  Do you have any idea how
22   The Brattle Group is compensated for their work

Page 21

1    on this case?
2    MS. STRICK:  Under the expert
3    stipulation, you can answer yes or no.
4    THE WITNESS:  No.
5    BY MS. GOODMAN:
6    Q.    Do you share in any of the
7    compensation paid to The Brattle Group for its
8    work on this case?
9    A.    No.
10   Q.    Who are the individuals at
11   The Brattle Group with whom you've worked
12   directly on your report in this case?
13   MS. STRICK:  Again, under the
14   expert stipulation, just answer as to the
15   names.
16   THE WITNESS:  Patrick Holder,
17   H-O- -- you have his name --
18   Charlie Nusbaum, N-U-S-B-A-U-M;
19   Minjae Song, M-I-N-J-A-E Song; and
20   Angela Gunn, G-U-N-N.
21   BY MS. GOODMAN:
22   Q.    Do you know whether any of the four

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1  individuals you named support any other expert
2  for the Plaintiffs in this matter?
3  　　　　MS. STRICK: Objection.
4  　　　　Again, under the expert
5  stipulation, you can answer yes or no.
6  　　　　THE WITNESS: Yes.
7  　　　　BY MS. GOODMAN:
8  　　Q.　Who, if any -- who do they
9  support -- which other experts do they support?
10 　　　　MS. STRICK: Objection.
11 　　　　I think, under the expert
12 stipulation, I instruct the witness not to
13 answer the question.
14 　　　　MS. GOODMAN: Which provision of
15 the expert stipulation?
16 　　　　MS. STRICK: It's 5.1.1 about the
17 content of communications.
18 　　　　MS. GOODMAN: Why is that the
19 content of any communications? It's simply
20 his knowledge, which is the same thing I've
21 been inquiring into for the last
22 few minutes.

Page 23

1  　　　　MS. STRICK: I think this gets
2  into more than just simply, I mean, again,
3  knowledge. At some point, he must have
4  gotten that information through
5  communications. I think -- I think it
6  crosses into the expert stipulation.
7  　　　　BY MS. GOODMAN:
8  　　Q.　How do you know -- how did you
9  become aware of what other experts the four
10 individuals at The Brattle Group you named are
11 supporting?
12 　　A.　Through --
13 　　　　MS. STRICK: Again, doesn't this
14 come into communications with counsel?
15 　　　　MS. GOODMAN: I'm asking how he
16 became aware. I don't know that it is
17 communications. Let me ask the witness
18 that. If you're asserting that, he should
19 answer that; if not, he can answer my
20 questions.
21 　　　　MS. STRICK: So I think you can
22 answer -- again, I'll instruct the witness

Page 24

1  under the expert stipulation to answer yes or
2  of how you got that but not -- but -- but
3  just that.
4  　　　　You can answer -- answer yes --
5  in a yes-or-no capacity.
6  　　　　Sorry. To your question.
7  　　　　MS. GOODMAN: What was that?
8  　　　　MS. STRICK: Yeah -- he can
9  answer sort of yes or no to the question.
10 　　　　MS. GOODMAN: Okay.
11 　　　　BY MS. GOODMAN:
12 　　Q.　Okay. So, Professor Simcoe, how do
13 you know the fact that the four individuals you
14 named at The Brattle Group are supporting other
15 experts in this case for the Plaintiff?
16 　　A.　I know this from --
17 　　　　MS. STRICK: Objection:
18 mischaracterizes -- oh . . .
19 　　　　BY MS. GOODMAN:
20 　　Q.　Go ahead.
21 　　A.　I know this from conversations with
22 the people at The Brattle Group.

Page 25

1  　　Q.　And were those conversations in
2  connection with your -- related to your actual
3  work for your expert reports?
4  　　　　MS. STRICK: Objection.
5  　　　　I'm going to instruct the witness
6  not to answer under the expert stipulation.
7  　　　　You can answer yes or no.
8  　　　　THE WITNESS: Yes.
9  　　　　BY MS. GOODMAN:
10 　　Q.　Okay. Who -- with whom do you have
11 a -- a -- a retention letter?
12 　　A.　I believe the United States --
13 　　Q.　Are you --
14 　　A.　-- Department of Justice.
15 　　Q.　-- are you retained by any
16 Plaintiff states?
17 　　A.　No.
18 　　Q.　In the course of your work over the
19 last nine months on this matter, have you
20 communicated -- yes or no -- with any attorneys
21 for any Plaintiff states?
22 　　　　MS. STRICK: Yeah. Under the

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1    expert stipulation, yes or no.
2         THE WITNESS:  Not to my
3    knowledge.
4         BY MS. GOODMAN:
5    Q.    You submitted two expert reports in
6    this case, correct?
7    A.    Correct.
8    Q.    The first one was your opening
9    report on December 22nd, 2023, correct?
10   A.    I believe so, yes.
11   Q.    Okay.  When did you start -- well,
12   first -- strike that.
13        Who wrote that report?
14   A.    I did.
15   Q.    Who -- who did the first draft?
16   A.    I did.
17   Q.    When did you complete your first
18   draft?
19        MS. STRICK:  Again, under the
20   expert stipulation, you can answer as to
21   the date.
22        THE WITNESS:  I can't, as I sit

Page 27

1    here, give you a precise date when the
2    first draft of the report was completed.
3         BY MS. GOODMAN:
4    Q.    Can you give an approximation?
5    A.    I would say that the report is
6    something that evolves over time.  I did the
7    first draft of each section.  Different sections
8    might be completed as to a first draft at
9    different points in time.
10        It's hard to give you a precise
11   date when the first draft was completed.
12   Q.    Okay.  When did you begin drafting
13   your report?
14        MS. STRICK:  Again, to the expert
15   stipulation, you can answer as to date, but
16   don't go into communications with counsel
17   or any -- or . . .
18        THE WITNESS:  I was drafting
19   material as -- I would think by May or June
20   of 2023.
21        BY MS. GOODMAN:
22   Q.    Okay.  Did anybody else work on

Page 28

1    your opening report?
2         MS. STRICK:  Again, under the
3    expert stipulation, you can answer yes or
4    no to this question.
5         THE WITNESS:  Yes.
6         BY MS. GOODMAN:
7    Q.    Let me ask more specifically.
8         Did anybody other than yourself
9    write or edit portions of your expert report?
10        MS. STRICK:  Under the expert
11   stipulation, you can answer yes or no to
12   this question.
13        THE WITNESS:  Yes.
14        BY MS. GOODMAN:
15   Q.    Did individuals at
16   The Brattle Group edit parts of your expert
17   report?
18        MS. STRICK:  Under the expert
19   stipulation, you can answer yes or no.
20        THE WITNESS:  Yes, they assisted
21   in preparing the report.
22

Page 29

1         BY MS. GOODMAN:
2    Q.    And what did they do to assist you
3    in preparing the report?
4         MS. STRICK:  Objection.
5         Again, I think this falls under
6    5.1.1 of the expert stipulation, so I'm
7    going to instruct you not to answer.
8         BY MS. GOODMAN:
9    Q.    So you answered, "They assisted in
10   preparing the report."
11        Was one of the ways that they
12   assisted by editing parts of your expert report?
13   A.    Yes.
14   Q.    How about attorneys for the
15   United States?  Did they edit parts of your
16   report?
17        MS. STRICK:  Again, under expert
18   stipulation, you can answer yes or no.
19        THE WITNESS:  No.
20        BY MS. GOODMAN:
21   Q.    Okay.  Your rebuttal report
22   submitted -- was submitted on February 13th,

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 66

1        THE WITNESS:  I don't opine on
2    the same questions as Professor Lee.
3        BY MS. GOODMAN:
4        Q.    Okay.  And is it accurate that do
5    you not offer any independent opinions related to
6    Professor Lee's conclusions?
7        MS. STRICK: Objection: form.
8        THE WITNESS:  I believe that's
9    correct.
10        BY MS. GOODMAN:
11        Q.    Okay.  One of the aspects of
12    Professor Lee's report that you rely upon is his
13    definition of the relevant antitrust markets,
14    correct?
15        MS. STRICK: Objection: form.
16        THE WITNESS:  Yes.
17        BY MS. GOODMAN:
18        Q.    And you've done no independent work
19    on that topic, correct?
20        MS. STRICK: Objection: form.
21        THE WITNESS:  I was not asked to
22    define an "antitrust market" in this case.

Page 67

1        BY MS. GOODMAN:
2        Q.    And so is it accurate that you have
3    not offered an opinion on what a relevant
4    antitrust market in this case is?
5        A.    That's correct.
6        Q.    Okay.  And if we turn to
7    Paragraph 59 of your report, starting on Page 27.
8        CERTIFIED STENOGRAPHER:  I think
9    we have to go off the record.
10        MS. GOODMAN:  Okay.  We're going
11    off the record.
12        THE VIDEOGRAPHER:  No; we're
13    good.
14        MS. GOODMAN:  Oh.
15        CERTIFIED STENOGRAPHER:  Do you
16    hear that hum?
17        MS. STRICK:  Why don't we take a
18    break anyway and see if we can figure out
19    the hum?
20        THE WITNESS:  Are we off the
21    record?
22        THE VIDEOGRAPHER:  We're now off

Page 68

1    the record at 10:37 a.m.
2        --oOo--
3        (Whereupon, a recess was taken from
4        10:37 a.m. EST to 10:49 a.m. EST.)
5        --oOo--
6        THE VIDEOGRAPHER:  We're now back
7    on the record at 10:49 a.m.
8        You may proceed.
9        BY MS. GOODMAN:
10        Q.    Professor Simcoe, can you turn to
11    Paragraph 63 of your report on Page 28 -- your
12    opening report, Simcoe 1?
13        A.    Yes.
14        Q.    And you see you write that Lee's
15    report defines a set of relevant antitrust
16    markets for publisher ad servers, ad exchanges
17    and advertiser ad networks.
18        The remainder of this
19    Section III.A.1 stems largely from your review of
20    Professor Lee's report, correct?
21        MS. STRICK: Objection: form.
22        THE WITNESS:  Not entirely.

Page 69

1        BY MS. GOODMAN:
2        Q.    In large part, what you're doing
3    here is summarizing what Professor Lee said?
4        MS. STRICK: Objection: form.
5        THE WITNESS:  Not completely.
6        BY MS. GOODMAN:
7        Q.    I didn't ask in completely.
8        Are you, in large part,
9    summarizing what Professor Lee wrote in his
10    report?
11        MS. STRICK: Objection: form.
12        THE WITNESS:  I summarized some
13    of what Professor Lee says.  I add my own
14    remarks on these markets, and there are
15    some figures that are based on analysis
16    that I did myself.
17        BY MS. GOODMAN:
18        Q.    And setting aside your figures, you
19    say you did your -- is it accurate you're saying
20    you did some of your own analysis -- strike that.
21        You said you make your own
22    remarks on some of these markets.

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1    What are you referring to?
2    MS. STRICK:  Objection: form.
3    THE WITNESS:  This section
4    summarizes the markets defined by
5    Professor Lee; however -- I was thinking
6    particularly of the figures -- I did my own
7    analysis to provide information about these
8    markets.
9    BY MS. GOODMAN:
10   Q.    And none of the figures that you're
11   referencing -- well, first off, those are
12   Figures 4 and 5, correct?
13   A.    Yes.
14   Q.    Okay.  These figures assume that
15   the relevant markets as defined by Professor Lee
16   are the correct relevant markets in this case?
17   MS. STRICK:  Objection: form.
18   THE WITNESS:  Yes.  In
19   constructing these figures, I adopt
20   Professor Lee's definition of the relevant
21   antitrust markets.
22

Page 71

1    BY MS. GOODMAN:
2    Q.    Okay.  And let's turn to Page --
3    Paragraph 88 of your report.
4    And in Paragraph 88, are you
5    adopting Professor Lee's conclusions that
6    Google's conduct was exclusionary and resulted in
7    materially higher fees paid by advertisers in the
8    ad exchange market above the competitive rates
9    that would have been paid but for Google's
10   conduct?
11   A.    Yes, I agree with his conclusion.
12   Q.    And it's his conclusion that
13   Google's conduct was exclusionary?
14   A.    I believe --
15   MS. STRICK: Objection: form.
16   You can answer.
17   THE WITNESS:  -- I believe that
18   is an opinion in Professor Lee's report --
19   BY MS. GOODMAN:
20   Q.    And --
21   A.    -- and I agree with it.
22   Q.    Okay.  And you agree with it based

Page 72

1    on your review of Professor Lee's report?
2    A.    Yes, as well as my own review of
3    the evidence cited by Professor Lee and my work
4    that I did to def-- -- to define a but-for world
5    for the damages analysis.
6    Q.    Okay.  And Professor Lee concluded
7    as well that Google's conduct resulted in
8    materially higher fees paid by advertisers in the
9    ad exchange market above the competitive rates
10   that would have been paid but for Google's
11   conduct; is that right?
12   A.    Professor Lee did not define a
13   but-for world.  So in my answer to your last
14   question I referred to my own work in assessing
15   how this conduct relates to the but-for world
16   defined in my report --
17   Q.    So --
18   A.    -- I do believe Professor Lee
19   concluded, based on his own analysis, that
20   Google's conduct was exclusionary and resulted in
21   materially higher fees paid by advertisers in the
22   ad exchange market above competitive rates.

Page 73

1    Q.    So it is your understanding that
2    Professor Lee reached a conclusion that Google's
3    conduct resulted in material -- materially higher
4    fees paid by advertisers in the ad exchange
5    market above the competitive rates that would
6    have been paid but for Google's conduct?
7    A.    If you'd like to look at
8    Professor Lee's report, we could go discuss the
9    exact language that he uses.
10   Q.    I'm just asking what your
11   understanding of what you wrote here is, whether
12   Professor Lee, in fact, reached a conclusion that
13   the conduct resulted in materially higher fees.
14   MS. STRICK:  Objection: form.
15   THE WITNESS:  Professor Lee's
16   report concluded that the conduct was
17   anticompetitive.
18   BY MS. GOODMAN:
19   Q.    Okay.  Do you know, sitting here
20   right now, whether he reached a conclusion that
21   it resulted in materially higher fees?
22   A.    I don't know if he uses the phrase

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1  "materially higher fees" in his report.
2      Q.   Okay.  Do you recall whether he did
3  any such analysis?
4          MS. STRICK:  Objection: form.
5          THE WITNESS:  What type of
6      analysis do you have in mind?
7          BY MS. GOODMAN:
8      Q.   Some kind of analysis to conclude
9  that Google's conduct resulted in materially
10 higher fees.
11     A.   Professor Lee did not do the
12 analysis that I did, which is to define a
13 but-for world and consider the change in Google's
14 take rate relative to the as-is world.  I know
15 that.
16     Q.   Okay.  And if you look at your
17 Figure 9, this is a reproduction of a figure
18 summarizing the anticompetitive -- the alleged
19 anticompetitive acts of Google, correct?
20         MS. STRICK:  Objection: form.
21         THE WITNESS:  Yes, this is a -- a
22     reproduction of a figure from

Page 75

1  Professor Lee's report.
2          BY MS. GOODMAN:
3      Q.   And you focus on three categories
4  of conduct in your report, correct?
5          MS. STRICK:  Objection: form.
6          THE WITNESS:  I would say many
7      categories of conduct are relevant but that
8      the but-for world in my report is defined
9      as removing three categories of conduct
10     that are summarized in this figure.
11         BY MS. GOODMAN:
12     Q.   And those three categories of
13 conduct are what, sir?
14     A.   They're the tie or exclusivity
15 arrangement between Google Ads and AdX, the tie
16 or exclusivity arrangement between AdX and DFP as
17 to real-time -- access to real-time bidding, and
18 the variable floor restrictions or UPR rules that
19 DFP adopted.
20     Q.   And how did you select those three
21 con- -- categories for your but-for world?
22         MS. STRICK:  Objection: form.

Page 76

1          THE WITNESS:  I reviewed
2  Professor Lee's definition of the relevant
3  markets and the conduct.  I considered what
4  Google conduct was ongoing during the
5  damages period, and I considered my own
6  understanding of antitrust economics and
7  the feasibility of assessing a but-for take
8  rate relative to excluding different types
9  of conduct.
10         And I arrived at a conclusion
11 that these three would constitute a group
12 of conduct that allowed for a reliable
13 assessment of what the prices in a
14 competitive but-for world would look like.
15         BY MS. GOODMAN:
16     Q.   Did you do any analysis to
17 determine that the but-for world which you've
18 constructed would have, in fact, occurred but for
19 the conduct alleged?
20         MS. STRICK:  Objection: form.
21         THE WITNESS:  In my report, I
22     explain the reasons for my conclusion that

Page 77

1  but for the conduct, the AdX take rate
2  would be lower, and then I quantify that.
3          BY MS. GOODMAN:
4      Q.   Did you conclude that the other
5  anticompetitive acts alleged in this case and
6  reflected in Figure 9 would not provide for a
7  reliable assessment of what prices would look
8  like in a but-for world?
9          MS. STRICK:  Objection: form.
10         THE WITNESS:  Could you repeat
11     that question?
12         BY MS. GOODMAN:
13     Q.   Did you conclude that the other
14 anticompetitive acts alleged in this case, which
15 you did not consider, would not provide for a
16 reliable assessment of what prices would look
17 like in a but-for world?
18         MS. STRICK:  Objection: form.
19         THE WITNESS:  So I believe you
20     misstated what I earlier testified to in
21     your question.
22         I -- I have considered all of the

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1 conduct.

2      BY MS. GOODMAN:

3      Q.    Okay.  And in considering the

4 conduct not reflected by the three arrows in your

5 Figure 9, did you reach a conclusion as to those

6 conducts that constructing a but-for world

7 without them would not result in a reliable

8 assessment of what prices would look like in a

9 but-for world?

10      MS. STRICK:  Objection: form.

11      THE WITNESS:  As I mentioned

12 earlier, some of that conduct ended prior

13 to the start of the damages period, for

14 instance, the acquisitions.  They're

15 difficult to unwind in assessing a

16 but-for world.

17      As I describe in my report, all

18 of that conduct affects Google's market

19 power at the start of the damages period

20 through its scale, and that conduct is

21 relevant in that sense.

22      But I do not contemplate removing

Page 79

1 that other conduct in characterizing the

2 but-for world, that is, the but-for world I

3 use in the damages assessment.

4      BY MS. GOODMAN:

5      Q.    And why do you not contemplate

6 removing that other conduct in characterizing the

7 but-for world that you use?

8      A.    It's not necessary.

9      Q.    Why not?

10      A.    I was able to assess the damage

11 related to this type of conduct, where this type

12 of conduct is grounded in the market power

13 associated with Google's other conduct that is

14 alleged in this case.

15      Q.    Did you analyze whether the

16 first/last-look exclusivity -- strike that.

17      Did you analyze whether the

18 AdMeld acquisition contributed to a

19 supercompetitive take rate on AdX?

20      MS. STRICK:  Objection: form.

21      THE WITNESS:  As my report

22 explains, the ad -- I don't include AdMeld

Page 80

1 in the conduct that is used to define the

2 but-for world, but I consider AdMeld as

3 part of the anticompetitive conduct that

4 creates the market power that Google had at

5 the start of the damages period.

6      BY MS. GOODMAN:

7      Q.    And so how do you consider AdMeld

8 as part of the anticompetitive conduct -- strike

9 that.

10      How do you incorporate the

11 AdMeld acquisition into your analysis in this

12 case --

13      MS. STRICK:  Objection --

14      BY MS. GOODMAN:

15      Q.    -- in calculating an AdX -- but-for

16 AdX take rate?

17      MS. STRICK:  -- objection: form.

18      THE WITNESS:  The AdMeld

19 acquisition is one of the other categories

20 of conduct that leads to the initial

21 conditions of my analysis, which are that

22 Google has market power in the exchange

Page 81

1 market.  My analysis is a quantification or

2 a measurement of Google's market power

3 based on the conduct.

4      BY MS. GOODMAN:

5      Q.    So is it your testimony -- am I

6 understanding you correctly that the AdMeld

7 acquisition is incorporated in your analysis when

8 you calculate the as-is take rate?

9      MS. STRICK:  Objection: form.

10      THE WITNESS:  I think that's a

11 fair characterization that the conduct that

12 is not used to define the but-for world is

13 conduct that creates market power that

14 affects Google's as-is prices during the

15 damages period.

16      BY MS. GOODMAN:

17      Q.    And the other categories of conduct

18 which fall into that characterization include

19 first/last-look exclusivity; is that right?

20      MS. STRICK:  Objection: form.

21      THE WITNESS:  In the

22 but-for world, I consider the effect of

HIGHLY CONFIDENTIAL

Page 82

1    making exclusivity to real-time bidding on
2    DFP -- of taking away exclusivity of
3    real-time bidding on DFP. I don't recall
4    whether there's any -- you know, there may
5    be small bits of first- and last-look
6    exclusivity that are bundled into the
7    exclusive access to real-time bidding.
8        BY MS. GOODMAN:
9        Q.   When you are saying that in the
10   but-for world, you consider the effect of making
11   exclusivity to real-time bidding on DFP, that's
12   -- that's your reference to the ad exclusivity;
13   is that correct?
14       A.   Sorry. Would you repeat that?
15       Q.   Are you referring to the box here
16   in your Figure 9, AdX Exclusivity?
17       A.   Yes.
18       Q.   Okay. And the first/last-look
19   exclusivity -- that is not what you're
20   referencing in the other orange arrow, correct?
21       A.   Correct.
22       Q.   You're referencing variable floor

Page 83

1    restrictions, correct?
2        A.   That box has variable floor
3    restrictions and first and last look in it.
4        Q.   Right. And so -- but your orange
5    arrow, which corresponds to the three categories
6    of conduct that you are considering in your
7    but-for world -- that bottom orange arrow refers
8    to the variable floor restrictions listed in that
9    box, correct?
10       MS. STRICK: Objection: form.
11       THE WITNESS: Variable floor
12   restrictions are in that box. The arrow is
13   associated with the box. And I focus on
14   variable floor restrictions in my report.
15       As I said, I don't recall whether
16   there are some -- you know, I do recall
17   that last look ended with the transition to
18   unified first price auctions. I'm not sure
19   why first/last look is still inside the
20   box.
21       So my testimony was that it may
22   be that some small piece of first and last

Page 84

1        look is still tied to the exclusivity in
2    the other box. That's what -- that was my
3    thought.
4        BY MS. GOODMAN:
5        Q.   And is some of the first/last loose
6    -- last-look exclusivity also tied to the
7    variable for -- floor restriction, which is in
8    the same box?
9        A.   It depends on what you mean by
10   "tied to."
11       Q.   I'm using your words, sir.
12       What do you mean?
13       A.   Well, when I was talking about not
14   a link between variable floor restrictions and
15   first/last-look exclusivity but between AdX
16   exclusivity and first/last-look exclusivity, by
17   "tied to," I meant that the exclusive access to
18   real-time bidding from AdX into DFP might be
19   related to the other kinds of technological
20   conduct that enable first- or last-look
21   exclusivity.
22       And so it's not clear what -- to me

Page 85

1    in that context, what you mean by "tied to" in
2    the -- the case of variable floor and first/last
3    look except that they're in the same box.
4        Q.   So is it -- am I correct in
5    understanding your -- well, does your opinions
6    with respect to the variable for -- floor
7    restriction in the but-for world at all relate to
8    the other thing represented in the same box,
9    first/last-look exclusivity?
10       MS. STRICK: Objection: form.
11       THE WITNESS: My opinions are
12   focused on variable floor restrictions.
13       BY MS. GOODMAN:
14       Q.   And so when you said first/last
15   look may have some relation to AdX exclusivity,
16   does -- is that also true for first/last look
17   having some relation to variable floor
18   restrictions?
19       MS. STRICK: Objection: form.
20       THE WITNESS: Not to my
21   knowledge.
22

22 (Pages 82 - 85)

Page 154

1    is a tool that allows Google Ads advertisers to
2    bid into non-AdX exchanges, right?
3         A.    Yes, that's my understanding.
4         Q.    And so in Paragraph 94 of your
5    report, back at Exhibit 1, you -- the first few
6    words say, AdX's exclusive access to Google Ads
7    advertisers.
8              Is that accurate?
9         MS. STRICK:  Objection: form.
10        THE WITNESS:  Just a moment ago,
11   I testified that throughout my two reports,
12   I use the term "near exclusive."  And it
13   seems I left out the "near" here.  But
14   overall, I think it's accurate.
15        BY MS. GOODMAN:
16        Q.    Okay.  And do you have an opinion
17   one way or another, based on Dr. Israel's graph
18   here showing that somewhere between 11 and
19   15 percent of spending by Google Ads advertisers
20   occurs on third-party exchanges, would change
21   your analysis at all?
22        MS. STRICK:  Objection: form.

Page 155

1         THE WITNESS:  In looking at his
2    figure, I would think that in 2015,
3    99 percent of the spending occurred on
4    non-Google exchanges -- sorry, other way
5    around -- on Google and that the share of
6    spending on Google never dropped below
7    85 percent.
8         As I explained earlier, I think
9    it's likely that on an impression basis,
10   the share transacted on AdX is even higher.
11   So I see no reason to change my own
12   conclusions.
13        BY MS. GOODMAN:
14        Q.    Okay.  And so when 15 percent of
15   spending goes on third-party exchanges, is it
16   still your testimony -- still your testimony that
17   there is near-exclusive access to Google Ads
18   advertisers only through AdX?
19        MS. STRICK:  Objection: form.
20        THE WITNESS:  Yes, as I
21   explained, I would like to see what this is
22   on a volume basis, as well, before relying

Page 156

1    on Dr. Israel's chart.
2         BY MS. GOODMAN:
3         Q.    Okay.  And in your but-for world,
4    when we -- I want to focus now on the tie between
5    AdX and DFP.  It's your opinion that in such a
6    but-for world, AdX advertisers would be able to
7    submit more real-time bids into third-party
8    publisher ad servers, making alternatives to DFP
9    more attractive to publishers, correct?
10        A.    Yes.
11        Q.    Okay.  And did you do anything to
12   -- to analyze whether that, in fact, would happen
13   if there were no tie between AdX and DFP?
14        MS. STRICK:  Objection: form.
15        THE WITNESS:  I did a similar
16   analysis to the one I described in looking
17   at the first tie.
18        BY MS. GOODMAN:
19        Q.    Which is what?
20        MS. STRICK:  Objection: form.
21        THE WITNESS:  I reviewed
22   information both on my own and in

Page 157

1    Professor Lee's report related to his
2    conclusions about the effects of the tie
3    between AdX and DFP.
4         I have my own understanding of
5    the economics of two-sided markets that
6    allows me to conclude that the access to
7    the demand on AdX via third-party exchanges
8    would be attractive to third-party --
9    third-party exchanges would become more
10   attractive were they able to effectively
11   compete against DFP, and that leads me to
12   conclude that third-party -- what did I
13   say, "exchanges"? -- third-party ad servers
14   would be more competitive in a world but
15   for the tie between AdX and DFP.
16        BY MS. GOODMAN:
17        Q.    Okay.
18        A.    I apologize for messing up
19   "exchange" and "ad server."
20        Q.    It's -- it's a difficult
21   terminology.
22             What information did you review

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

1    on your own in order to conclude that third-party
2    exchanges -- that third-party ad -- sorry -- that
3    third-party -- let's try this again.
4                What information did you review
5    on your own in order to conclude that third-party
6    ad servers would be more competitive in a world
7    but for the tie between AdX and DFP?
8        A.    Well, there's two categories that
9    are relevant.  One category is background
10   economics.  I've read many, many papers about
11   markets with indirect network effects, and that
12   informs my thinking about this topic.
13               The second category is evidence
14   produced in this case.  There's -- I'm looking at
15   Section III.C.2 in my report about tying AdX to
16   DFP -- this might be in my rebuttal -- no, this
17   is in my opening report.  And I -- there are a
18   number of sources of information cited here.  I
19   couldn't tell you whether those are independent
20   from Professor Lee or not.
21       Q.    Okay.  You also reviewed
22   Professor Weintraub's report, correct?

Page 159

1        A.    Yes.
2        Q.    And what did he conclude?
3             MS. STRICK:  Objection: form.
4             THE WITNESS:  I can't recall all
5        of Professor Weintraub's conclusions, as I
6        sit here.  His report spoke to the effects
7        of Google's conduct with respect to scale
8        and the role that scale plays in the
9        relevant antitrust markets.
10            BY MS. GOODMAN:
11       Q.    And how much time did you spend
12   reviewing Professor Weintraub's report?
13       A.    Several hours.
14       Q.    Okay.  And did you do any
15   independent analysis to evaluate the same
16   question he looked at?
17            MS. STRICK:  Objection: form.
18            THE WITNESS:  It's possible.  I
19       can't say.  I was given a different
20       assignment than Professor Weintraub's, and
21       so as I sit here, I can't really
22       characterize the degree of overlap between

Page 160

1    his assignment and my own with any great
2    level of detail.
3             BY MS. GOODMAN:
4        Q.    Okay.  Did you do any work to
5    conclude whether Professor Weintraub's opinions
6    were reliable, or are you just simply finding
7    them persuasive upon reading his report?
8             MS. STRICK:  Objection: form.
9             THE WITNESS:  I -- I reviewed his
10       analysis and conclusions and, as I said, I
11       found them persuasive.  They seemed -- they
12       made sense, to me.  Where I was able to map
13       what he was doing onto things that I might
14       do.  I thought they made sense.
15            BY MS. GOODMAN:
16       Q.    And -- let me ask it this way: The
17   way that you found Professor Weintraub's report
18   persuasive, is it -- did you do the same amount
19   of work or the same kind of work with respect to
20   that report as you did with Dr. Lee's report,
21   meaning you reviewed it and found it persuasive
22   but formed no independent conclusions?

Page 161

1             MS. STRICK:  Objection: form.
2             THE WITNESS:  Sorry.  I don't --
3             BY MS. GOODMAN:
4        Q.    Yeah.  Let me try that again.
5             For Professor Lee, you wrote in
6    your report, I do not offer any independent
7    opinions related to Professor Lee's conclusions.
8             Do you offer any independent
9    opinions related to Dr. -- to
10   Professor Weintraub's opinions?
11       A.    No.
12       Q.    Okay.  And then Professor Ravi, the
13   same question:  Did you review his report?
14       A.    Yes.
15       Q.    And did you -- do you offer any
16   opinion -- independent opinions related to
17   Professor Ravi's report?
18            MS. STRICK:  Objection: form.
19            THE WITNESS:  So I think our
20       opinions are related and independent;
21       however, I was given a different assignment
22       than Professor Ravi, and I don't offer my

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1    own opinions on the issues that
2    Professor Ravi was assigned to offer
3    opinions on.
4         BY MS. GOODMAN:
5         Q.   Okay.  We've talked about the two
6    ties that underlie your but-for world analysis.
7              What is your understanding
8    based on that Google has tied the AdX exchange to
9    its advertiser ad network Google Ads?
10        MS. STRICK:  Objection: form.
11        BY MS. GOODMAN:
12        Q.   Actually, let me withdraw the
13   question.
14             You understand that in
15   antitrust economics, a tie is an arrangement in
16   which a seller will sell a product, meaning the
17   tying product, to a buyer only if the buyer
18   agrees to purchase the other product, the tied
19   product?
20        MS. STRICK:  Objection: form.
21        THE WITNESS:  That's a fair
22   characterization of tying.

Page 163

1         BY MS. GOODMAN:
2         Q.   Okay.  And in the scenario you're
3    considering of a tie between Ads and AdX, the --
4    which is the tying product and which is the tied
5    product?
6         MS. STRICK:  Objection: form.
7         THE WITNESS:  Here, the -- the
8    analogy to tying -- we also use the -- the
9    word -- or I use the word "exclusivity
10   arrangement," I think, to characterize the
11   same conduct.  But the tying product would
12   be Google Ads, and the tied product would
13   be AdX.
14        BY MS. GOODMAN:
15        Q.   Okay.  And do you understand, as a
16   matter of antitrust law, which -- what tying
17   claims the United States is asserting in this
18   case?
19        MS. STRICK:  Objection: form.
20        THE WITNESS:  I don't have a
21   legal understanding of the tying claims.  I
22   -- you know, as a matter of economics, I

Page 164

1    think it's appropriate to characterize the
2    conduct as a tie, and I do.
3         BY MS. GOODMAN:
4         Q.   Okay.  And do you know -- are you
5    aware there's only one tie as a matter of
6    antitrust legal claims that the Plaintiffs assert
7    in this case?
8         MS. STRICK:  Objection: form.
9         THE WITNESS:  My understanding is
10   that both of the pieces of conduct that I
11   characterize as a tie are alleged to be
12   anticompetitive in the case.  The precise
13   underlying law is not something I've looked
14   into.
15        BY MS. GOODMAN:
16        Q.   Okay.  And so the other tie you
17   look at is between AdX and DFP, correct?
18        A.   Correct.
19        Q.   And in that scenario, what is the
20   tying product and what is the tied product?
21        A.   In that scenario, the tying product
22   is -- I think it's shown in the arrows in the

Page 165

1    figure here -- the tie -- I get this wrong all
2    the time -- tying is AdX, right, to get -- to get
3    access to AdX, yes, and tied is DFP.
4         Q.   And do you have an understanding as
5    to which tie that you've considered is --
6    actually underlies the tying claim that the
7    Government asserts in this case?
8         MS. STRICK:  Objection: form.
9         THE WITNESS:  As I said, I
10   haven't looked into what the basis of the
11   legal claims are.  I think both pieces of
12   conduct can be characterized as ties, and I
13   understand that both are being challenged
14   as anticompetitive.
15        BY MS. GOODMAN:
16        Q.   Okay.  Have you read -- you've read
17   the Complaint?
18        A.   Yes.
19        Q.   Okay.  Do you recall from reading
20   it which of the two ties which you discuss
21   actually underlies the Government's tying claim?
22        MS. STRICK:  Objection: form.

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 170

1　that some exchanges have certain
2　characteristics that others don't have.
3　And in that sense, the relative
4　differentiation on that feature is large.
5　　　But the evidence also suggests
6　that on net -- the evidence I've seen
7　didn't make me believe that on net, there
8　were large differences in exchange quality
9　on nonscale features across the exchanges.
10　　BY MS. GOODMAN:
11　Q.　Okay.  And did that -- strike that.
12　　MS. GOODMAN:  All right.  Do you
13　want to take a lunch break now?
14　　MS. STRICK:  I'll take lunch.
15　　THE WITNESS:  Okay.
16　　THE VIDEOGRAPHER:  We're now off
17　the record at 1:02 p.m.
18　　　--oOo--
19　　(Whereupon, at 1:02 p.m. EST, a
20　　luncheon recess was taken.)
21　　　--oOo--
22

Page 171

1　A F T E R N O O N　　S E S S I O N
2　　　(1:38 p.m. EST)
3　　　--oOo--
4　TIMOTHY S. SIMCOE, PH.D.,
5　was called for continued examination and, after
6　having been previously duly sworn, was examined
7　and testified further as follows:
8　　　--oOo--
9　THE VIDEOGRAPHER:  We're now back
10　on the record at 1:38 p.m.
11　You may proceed.
12　　　--oOo--
13　EXAMINATION (CONTINUED) BY COUNSEL FOR DEFENDANT
14　　　--oOo--
15　BY MS. GOODMAN:
16　Q.　Professor Simcoe, let's turn in
17　your report to Paragraph 87.
18　　And Paragraph 87 discusses your
19　Figure 8, which is a linear -- linear regression
20　model plotting average CPM against average take
21　rate by exchange, correct?
22　　MS. STRICK:  Objection: form.

Page 172

1　　THE WITNESS:  Yes, it's a
2　regression model of the average take rate
3　regressed on average -- every CPM.  It also
4　illustrates some other things, but yes.
5　　BY MS. GOODMAN:
6　Q.　And in Paragraph 87, you write,
7　Extrapolating from the linear regression model,
8　AdX's predicted take rate based on its average
9　CPM would be 10 percent.
10　　　Correct?
11　A.　Yes.
12　Q.　And the predicted take rate that
13　you predict from Figure 8 -- that never bore out
14　in any of your analyses, correct?
15　　MS. STRICK:  Objection: form.
16　　THE WITNESS:  What do you mean by
17　bore out in any of my analyses?
18　　BY MS. GOODMAN:
19　Q.　The actual analyses that you
20　conducted to figure out AdX's but-for take rate
21　never yielded a 10 percent but-for take rate,
22　correct?

Page 173

1　　MS. STRICK:  Objection: form.
2　　THE WITNESS:  I think that there
3　are some other regressions that have -- in
4　the histogram of results and the appendix
5　to the rebuttal report that might go as low
6　as that in the robustness analyses I did.
7　　BY MS. GOODMAN:
8　Q.　But the -- but the but-for take
9　rate that you offer in this case as a reliable
10　estimate of a but-for take rate is not
11　10 percent, correct?
12　　MS. STRICK:  Objection: form.
13　　THE WITNESS:  The main figures at
14　the back of my report, where I report my
15　conclusions as to a -- I want to get this
16　right -- is upper bound on the reliable
17　but-for take rate do not report a
18　10 percent number in them.
19　　BY MS. GOODMAN:
20　Q.　And which figure are you looking
21　at?
22　A.　I believe it's Figure 22.

44 (Pages 170 - 173)

Page 174

1    Q.    Okay.  And so these are the but-for
2  take rates that you put forward should -- would
3  exist in the but-for world?
4          MS. STRICK:  Objection: form.
5          THE WITNESS:  I do a large number
6  of analyses, including some of the
7  robustness ones that I mentioned earlier,
8  but Figure 2 summarizes the baseline
9  results of my analysis.
10         BY MS. GOODMAN:
11   Q.    Okay.  And you -- you mean
12 Figure 22?
13   A.    Yes.  What -- sorry.  Figure 22.
14   Q.    Okay.  And in Figure 8, you're
15 using seven data points -- seven observations in
16 your analysis, correct?
17         MS. STRICK:  Objection: form.
18         THE WITNESS:  Where was that?
19         Here it is.
20         Yes.  I use impression weights, I
21 believe, in this regression, but the
22 regression line is fitted to the

Page 175

1  weight -- you know, it's a weighted
2  regression that's fitted to the average
3  take rate and the average CPM of the seven
4  exchanges, excluding AdX, that are shown in
5  the figure.
6          BY MS. GOODMAN:
7    Q.    And it's from that regression that
8  uses seven observations from which you say there
9  could be a predicted take rate of 10 percent?
10         MS. STRICK:  Objection: form.
11         THE WITNESS:  I said if you
12 extrapolate from that specific regression
13 model, which just means if you read off the
14 gray line, conditioning only on CPM, the --
15 the predicted value of that regression
16 would be around 10 percent if a exchange
17 had the same average CPM as AdX.
18         BY MS. GOODMAN:
19   Q.    And in Paragraph -- well -- you
20 agree that CPM is influenced by differences in
21 the nature and quality of publisher inventory?
22         MS. STRICK:  Objection: form.

Page 176

1          THE WITNESS:  Yes.  I think I say
2  that somewhere.
3          BY MS. GOODMAN:
4    Q.    In Paragraph 85, right?
5    A.    Yeah.  I'll take -- I'll take your
6  word for it, yes.
7    Q.    Okay.  And also that -- you agree
8  that CPM -- average CPM differs across exchanges
9  based on the differences in demand, cost and
10 other features of the auction process across the
11 exchanges?
12   A.    Could you repeat that one?
13 Different -- or point me to where I wrote it.
14   Q.    Paragraph 85, the first sentence.
15   A.    Yes.
16   Q.    And so your Figure 8 does not
17 consider the differences in other features of the
18 auction process across the exchanges, correct?
19         MS. STRICK:  Objection: form.
20         THE WITNESS:  That regression
21 does not control explicitly.  It simply
22 takes an average CPM -- my recollection is

Page 177

1  it's the average CPM over the same period
2  that is used to construct -- I guess the
3  earlier -- there's some earlier figures
4  that show CPMs by exchange or -- it's the
5  same as Figure 7 and Figure -- in any case,
6  my point is that it's -- it's a average
7  over many months of data that I used to
8  construct the -- the mean CPM that's then
9  used in the regression.
10         BY MS. GOODMAN:
11   Q.    And in your work as an economist,
12 do you typically draw conclusions from a
13 regression that has only seven observations?
14         MS. STRICK:  Objection: form.
15         THE WITNESS:  It depends on the
16 type of conclusions you have in mind.
17         BY MS. GOODMAN:
18   Q.    What kinds of instances is it
19 appropriate in the generally accepted standards
20 of economics to draw a conclusion from a
21 regression with only seven observations?
22   A.    I'm not sure how to interpret all

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

1   of the front end of that question, but I might do
2   something like this in -- depending on what sort
3   of data I have to understand if a line fits a set
4   of points, right.
5        So seven data points is sufficient
6   to estimate a univariant regression, like I do
7   here, that is, a regression that uses one control
8   variable.  And the answer is it depends.  You
9   know, sometimes one might draw conclusions from
10  that; other times, one might not.
11       Q.    And do you draw a conclusion from
12  this regression in Figure 8 as to what the
13  but-for world should look like or would look
14  like?
15       MS. STRICK:  Objection: form.
16       THE WITNESS:  A conclusion as to
17  what the but-for world . . .
18       Figure 8 is used to illustrate
19  the unique, say, competitive position of
20  AdX.  I think it can inform the analysis
21  that I do, but Figure 8 is not a direct
22  input into the numbers that I report in

1   Figure 22, or whatever it was that we
2   discussed earlier.
3        BY MS. GOODMAN:
4        Q.    And do you draw a conclusion from
5   the regression in Figure 8 that in a
6   but-for world, AdX's predicted but-for take rate
7   would be 10 percent?
8        MS. STRICK:  Objection: form.
9        THE WITNESS:  As I said, Figure 8
10  informs my analysis, but it's not, on its
11  own, the basis for any conclusion about the
12  take rates in the but-for world.
13       BY MS. GOODMAN:
14       Q.    So is it fair to say you are not
15  offering an opinion in this case that the but-for
16  take rate is 10 percent?
17       MS. STRICK:  Objection: form.
18       THE WITNESS:  The opinion that I
19  discussed earlier -- I -- I mentioned that
20  I view the numbers in Figure 22 as an upper
21  bound for the take rate in the
22  but-for world.

1        I haven't been asked to analyze
2   what's the lowest possible take rate.  I'm
3   not offering an opinion as to that.
4        BY MS. GOODMAN:
5        Q.    Are you offering an opinion that in
6   the but-for world you construct, the but-for take
7   rate is 10 percent?
8        MS. STRICK:  Objection: form.
9        THE WITNESS:  I have no analysis
10  -- how to say it.
11       No, I'm not offering an opinion
12  that the but-for take rate is 10 percent.
13       BY MS. GOODMAN:
14       Q.    Okay.  Would it be reliable, in
15  your view as an economist, to calculate damages
16  based on a but-for take rate of 10 percent based
17  on the work you did in this regression in
18  Figure 8?
19       MS. STRICK:  Objection: form.
20       THE WITNESS:  As I said, Figure 8
21  informs my analysis, and so Figure 8 is
22  part of what I've done here.  And in that

1   sense, it's relied upon.
2        I do not rely on Figure 8
3   standing on its own -- the regression in
4   Figure 8 standing on its own.
5        BY MS. GOODMAN:
6        Q.    And would it be, therefore,
7   inappropriate for a fact-finder to rely on a
8   10 percent but-for take rate to calculate
9   damages?
10       MS. STRICK:  Objection: form.
11       THE WITNESS:  It depends.
12       BY MS. GOODMAN:
13       Q.    What does it depend on?
14       A.    Well, your question was whether it
15  would be appropriate for them to --
16       Q.    That's fair --
17       A.    -- use 10 percent.
18       Q.    -- let me rephrase my question.
19       Would it be reliable as a
20  matter of economics for a fact-finder to rely on
21  a 10 percent but-for take rate to calculate
22  damages in this case when that 10 percent take

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

1  rate is derived solely from your regression in
2  Figure 8?
3       MS. STRICK:  Objection: form.
4       THE WITNESS:  I would, as a
5  matter of economics, look to see more than
6  Figure 8 standing on its own, though I
7  think a fact-finder can reasonably rely on
8  Figure 8 in forming a determination of the
9  but-for take rate, as I do in this report.
10      BY MS. GOODMAN:
11      Q.   And would it be reliable as a
12  matter of economics for a fact-finder to look at
13  Figure 8 standing on its own in calculating
14  damages?
15      MS. STRICK:  Objection: form.
16      THE WITNESS:  I think Figure 8
17  can form part of a reliable analysis, as it
18  does here.  So it could be used, but it
19  should be used along with all the other
20  information that I use in doing my own
21  analysis.
22

Page 183

1       BY MS. GOODMAN:
2       Q.   Okay.  And it -- thus, you agree it
3  would not be appropriate as a matter of economics
4  to use 10 percent as a but-for take rate standing
5  alone?
6       MS. STRICK:  Objection: form.
7       THE WITNESS:  It depends.
8       BY MS. GOODMAN:
9       Q.   But you don't do that in your
10  report, do you?
11      A.   I do not use Figure 8 as the
12  stand-alone basis for opinions in my report.
13      Q.   And you read Professor Chevalier's
14  report, correct?
15      A.   Yes.
16      Q.   And she calculated a p-value of
17  that -- of your regression in Figure 8, right?
18      A.   She did some -- I don't -- I don't
19  recall specifically what she did, but I think she
20  did something of that nature, yes.
21      Q.   And the p-value she calculated was
22  .375?

Page 184

1       A.   Do you know what it is a p-value
2  of?
3       Q.   The regression.
4       A.   I'm sorry --
5       MS. STRICK:  Objection: form.
6       BY MS. GOODMAN:
7       Q.   The p-value that she calculated for
8  the regression is .375.
9           You read that in her report?
10      MS. STRICK:  Objection:
11  foundation.
12      THE WITNESS:  I read her report.
13  As I said, I don't recall the specifics and
14  I know that she did some analysis that
15  could have produced a p-value.
16      BY MS. GOODMAN:
17      Q.   Okay.  And a p-value of .375 is too
18  high to be considered con- -- statistically
19  significant.
20          Do you agree with that as a
21  matter of economics --
22      MS. STRICK:  Objection:

Page 185

1  foundation --
2       BY MS. GOODMAN:
3       Q.   -- and statistics?
4       MS. STRICK:  -- objection:
5  foundation and form.
6       THE WITNESS:  The standard
7  practice -- so a p-value is -- it gives a
8  likelihood of observing the data that we
9  see under a null hypothesis.  I don't know
10  specifically what type of p-value you're
11  referring to here, so I'm speculating a
12  little.  But a standard threshold for
13  p-values is either 10 or 5 or 1 percent.
14      BY MS. GOODMAN:
15      Q.   And a p-value of .375 exceeds the
16  standard thresholds, correct?
17      MS. STRICK:  Objection:
18  foundation.
19      THE WITNESS:  Yes.
20      BY MS. GOODMAN:
21      Q.   And when a p-value exceeds a
22  standard threshold, does that make the analysis

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

1  that is being measured by that p-value unreliable
2  as a matter of statistics?
3       MS. STRICK:  Objection:
4  foundation and form.
5       THE WITNESS:  Again, we haven't
6  said what kind of p-value we're referring
7  to here.
8       BY MS. GOODMAN:
9       Q.    Are you aware of any p-value that
10  exceeds 10 percent that makes it statistically
11  significant?
12       MS. STRICK:  Objection: form.
13       THE WITNESS:  So at some level,
14  the binary decision rule that you're trying
15  to impose here, like above this threshold,
16  below this threshold, is an arbitrary
17  choice.  Those arbitrary choices are
18  typically depending on the size and quality
19  of the data that you have set at
20  10 percent, 5 percent or 1 percent, as I
21  testified.
22       Whether you would use a number

Page 187

1  from a statistical analysis that has a .375
2  attached to it depends on whether you could
3  get better data, what kind of analysis
4  you're doing, what kind of question you're
5  asking, but it has an interpretation, like
6  a one way -- you know, I'm probably not
7  going to say this exactly correct because
8  the statistics is subtle, but it's -- but
9  the data -- there's a -- a chance of .375
10  that even if there was no relationship you
11  would observe, the relationship that you
12  did measure in the data that frequently
13  under repeated random sampling.
14       Again, whether you would rely on
15  it depends on the question you're asking,
16  depends on what kind of p-value you have in
17  mind.
18       BY MS. GOODMAN:
19       Q.    And so the p-value in this case
20  that Professor Chevalier calculated as the
21  p-value of the slope of the regression, okay --
22       A.    Okay.

Page 188

1       Q.    -- so she calculated a .375 percent
2  -- or .375 p-value, which is equal to 37-1/2
3  percent, correct?
4       MS. STRICK:  Objection:
5  foundation.
6       THE WITNESS:  Correct.
7       BY MS. GOODMAN:
8       Q.    Okay.  And so that p-value exceeds
9  the standard significant tests used, correct?
10       MS. STRICK:  Objection:
11  foundation.
12       THE WITNESS:  Yes, that p-value
13  is higher than the standard threshold of,
14  say, 10 percent or 5 percent.
15       BY MS. GOODMAN:
16       Q.    And Professor Chevalier Open web
17  that your Figure 8 cannot reliably be used to
18  predict an appropriate but-for revenue share for
19  AdX.
20       You did not respond to that
21  critique in your rebuttal report, correct?
22       MS. STRICK:  Objection:

Page 189

1  foundation; form.
2       THE WITNESS:  I don't recall
3  specifically responding to that critique.
4       BY MS. GOODMAN:
5       Q.    Okay.  So now I want to talk about
6  your comparables or comparables approach.
7       It's your testimony or your
8  opinion that your comparables approach reflects a
9  yardstick method; is that correct?
10       MS. STRICK:  Objection: form.
11       BY MS. GOODMAN:
12       Q.    Or is a kind of a yardstick measure
13  of damages?
14       A.    Yes.  My rebuttal report relates
15  the comparables approach as I employed it to a
16  yardstick methodology.
17       Q.    And when you say it relates it to a
18  yardstick methodology, are you opining that --
19  that it is, in fact, a yardstick methodology?
20       MS. STRICK:  Objection: form.
21       THE WITNESS:  I explain why it is
22  a type of yardstick methodology that

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

1  produces a conservative result.
2      BY MS. GOODMAN:
3      Q.   Okay.  And in your report at
4  Paragraph 137 --
5      A.   My opening report?
6      Q.   Yes.
7           -- you say, The basic idea
8  behind your comparables approach is to find
9  transactions that were not influenced by the
10 relevant conduct and use the price of those
11 transactions as a benchmark to estimate the
12 counterfactual but-for price.
13          Do you see that?
14     A.   Yes.
15     Q.   And so in this idea, you need to
16 find transactions that were not influenced by the
17 relevant conduct, correct?
18     A.   I explain why the effect that the
19 relevant conduct could have had on the
20 transactions that I use is to increase the take
21 rate of those transactions, which leads to a
22 conservative estimate under my threshold.

Page 191

1      Q.   How are you confident that it leads
2  to a conservative estimate, when you didn't
3  measure for the increase in price allegedly
4  charged by other exchanges?
5      MS. STRICK:  Objection: form.
6      THE WITNESS:  I explain this in
7  my opening report.  It's related to this --
8  to the economic idea of strategic
9  complementarities, which is to say that in
10 -- under differentiated Bertrand
11 competition, firms respond to price changes
12 by other firms in the same direction, and
13 it's standard in economics to make
14 inferences about direction without trying
15 to measure them.
16     BY MS. GOODMAN:
17     Q.   Okay.  Do you agree that when
18 conducting yardstick damages analysis, you need
19 to control for as many differences between the
20 alleged violator and the groups against whom
21 you're comparing the alleged violator?
22     MS. STRICK:  Objection: form.

Page 192

1      THE WITNESS:  Control -- do I
2  agree that there are -- could you repeat
3  that?
4      BY MS. GOODMAN:
5      Q.   Do you agree that it is necessary
6  to control for differences, in this case, between
7  Google and those to whom you're comparing Google?
8      A.   The word "control" can have
9  different meanings; but broadly speaking, one
10 seeks to choose comparable transactions in a
11 manner that makes them similar, except for the
12 alleged conduct.
13     Q.   Okay.  Do you also need to -- so
14 what did you do in your comparables approach to
15 compare -- to control for the things that makes
16 Google similar or dissimilar to the other
17 exchanges in your comparables approach?
18     MS. STRICK:  Objection: form.
19     THE WITNESS:  So part of the
20 question's premise is wrong.  I didn't
21 select exchanges; I selected transactions.
22 This was something I spent some time on in

Page 193

1  the rebuttal report.
2      BY MS. GOODMAN:
3      Q.   Okay.  Let's set that aside for a
4  second because we'll get to that.  But I -- I --
5  I take the -- the point.
6           But I just want to know, what
7  did you do to control for any differences that
8  don't relate to the alleged misconduct in the
9  selection of your transactions or of your
10 exchanges?
11     MS. STRICK:  Objection: form.
12     THE WITNESS:  I chose
13 transactions from the same relevant
14 antitrust market, from --
15     BY MS. GOODMAN:
16     Q.   And --
17     A.   -- from -- from exchanges that
18 didn't engage in the conduct.
19     Q.   -- and is there anything else that
20 you did to evaluate the appropriateness of the
21 transactions or exchanges that you chose as
22 comparables?

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 222

1      BY MS. GOODMAN:
2      Q.    And did you consider the demand
3  characteristics of the exchanges through which
4  those comparable transactions flowed before
5  deciding that those are, in fact, comparable?
6      MS. STRICK:  Objection: form.
7      THE WITNESS:  Yes.
8      BY MS. GOODMAN:
9      Q.    How?
10     A.    As we discussed, I reviewed
11  information about differences between exchanges.
12  I reviewed discussion of the open web display
13  market in Professor Lee's report.
14         The key differentiating feature
15  that I identified in my review was scale, which
16  is related to the difference that I measure
17  between AdX and the comparables.  And after
18  finding no compelling evidence of other types of
19  differentiation that, on net, produced a net
20  quality difference, I used all of the
21  transactions that were produced by exchanges that
22  provided usable data.

Page 223

1      Q.    And the process that you just
2  testified to -- is that written in your opening
3  report anywhere?
4      A.    I think so.
5      Q.    Where do you write that you did all
6  of that work that you just described in order to
7  arrive at a set of comparable transactions?
8      MS. STRICK:  Objection: form.
9      THE WITNESS:  This is my
10  rebuttal.
11     (Whereupon, the witness reviews
12      the material provided.)
13     THE WITNESS:  So I provide a
14  brief overview of the way that comparables
15  were selected in Section IV.A.1 and more
16  details about the data and what type of
17  data makes a set of transactions provided
18  by an exchange usable in Appendix C.
19     BY MS. GOODMAN:
20     Q.    So Appendix C describes what data
21  was usable, correct?
22     A.    Yes.

Page 224

1      Q.    And your testimony is that in -- in
2  Sections -- Section IV.A.1, you're describing
3  what -- what characteristics you considered in
4  order to arrive at a set of comparable
5  transactions?
6      MS. STRICK:  Objection: form.
7      THE WITNESS:  Yes.  And then I
8  refer to Section III.A.1 for a discussion
9  of characteristics of open web display
10  advertising transactions.
11     BY MS. GOODMAN:
12     Q.    So you're looking at the
13  characteristics across all open web display
14  advertising transactions to set -- arrive at a
15  set of comparable transactions?
16     MS. STRICK:  Objection: form.
17     THE WITNESS:  Yes.
18     So I apologize for the delay.
19     The discussion's broken across
20  three parts of the report:
21         Section III.A.1 describes the
22  background research I did on display --

Page 225

1  open web display advertising transactions
2  using tools in the relevant antitrust
3  market.
4          Paragraph 138 discusses the data
5  used in the comparable approach.
6          And then what makes data usable
7  is described in Appendix C.
8      BY MS. GOODMAN:
9      Q.    Okay.  So in 138, where you say,
10  Based on relevant characteristics, what are you
11  referring to as the relevant characteristics that
12  you considered in order to choose an appropriate
13  set of comparable transactions?
14     MS. STRICK:  Objection: form.
15     THE WITNESS:  I describe the
16  background research I did when I answered
17  this question previously, but after
18  reviewing characteristics of open web
19  display transactions, I included all
20  transactions produced by exchanges in the
21  relevant antitrust market that produced
22  usable data.

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL

Page 226

1    MS. STRICK:  Tim, we've been
2    about an hour.
3        Do you want a -- need a break?
4    THE WITNESS:  Okay.
5    BY MS. GOODMAN:
6    Q.    Well, I still have a few more
7    questions, if you don't mind.
8    A.    We can go for a few more minutes.
9    Q.    Okay.  So you mentioned that
10   Google's scale is a different quality than other
11   ad exchanges, correct -- that the -- the biggest
12   quality differentiator, from your point of view,
13   was scale, correct?
14       MS. STRICK:  Objection: form.
15       THE WITNESS:  In markets with
16   indirect network effects, economics teaches
17   generally that quantity is quality.  Scale
18   matters.
19       I reviewed different kinds of
20   evidence that suggest scale is an important
21   source of demand for exchanges, and that's
22   what I was referring to when I was

Page 227

1    discussing it earlier, yes.
2    BY MS. GOODMAN:
3    Q.    And how did you control for
4    Google's scale relative to the other transactions
5    among ad -- ad exchanges that you put in your
6    comparables analysis?
7    MS. STRICK:  Objection: form.
8    THE WITNESS:  What I was trying
9    to say is that Google's scale in this case
10   is a consequence of its anticompetitive --
11   well, allegedly anticompetitive -- the
12   conduct at issue in the case.  And because
13   that conduct is a driver of scale, the --
14   the simple comparison that I do, the
15   comparison of Google's average take rate to
16   the weighted average take rate across the
17   other exchanges -- the average take rate of
18   impressions sold in the relevant market,
19   captures the scale effect.
20   BY MS. GOODMAN:
21   Q.    Is it your testimony that Google's
22   scale is all a result of anticompetitive conduct?

Page 228

1    MS. STRICK:  Objection: form.
2    THE WITNESS:  As we discussed
3    earlier, I've reviewed the reports of
4    Professor Lee and Professor Weintraub and
5    adopted their conclusions that Google's
6    conduct leads to scale or equivalently
7    denies scale to rival exchanges.
8    BY MS. GOODMAN:
9    Q.    Is it possible for Google's scale
10   to have come about through procompetitive
11   conduct?
12       MS. STRICK:  Objection: form.
13       THE WITNESS:  There -- so
14   Google's -- I think that some -- yeah, I
15   guess some aspects of scale.  But what
16   we're referring to here -- what matters is
17   differences in the relative size of the
18   exchanges.
19       And as I said, I have read the
20   reports of others who were asked to
21   specifically focus on the question of how
22   scale is related to the alleged conduct and

Page 229

1    adopted their conclusions.
2    BY MS. GOODMAN:
3    Q.    Okay.  So my question is whether
4    you controlled for scale in selecting your
5    com- -- comparables, including whether the scale
6    is as a result of anticompetitive conduct or a
7    result of procompetitive conduct.
8        Did you control for scale in
9    either of those scenarios?
10       MS. STRICK:  Objection: form.
11       THE WITNESS:  In my view, it's
12   not possible to control for scale in the
13   way that you seem to be suggesting.
14   BY MS. GOODMAN:
15   Q.    Is it possible to control for scale
16   based on procompetitive -- scale obtained as a
17   result of procompetitive conduct?
18       MS. STRICK:  Objection: form.
19       THE WITNESS:  The differences in
20   scale between Google and other exchanges
21   are reflected in their take rates and,
22   therefore, reflected in the difference in

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

Page 230

1    take rates that I examine using the
2    comparables approach.
3        BY MS. GOODMAN:
4        Q.   And where in your report do you say
5    that the differences in scale are reflected in
6    the take rate that you deduce in your comparables
7    approach?
8        A.   I'm not sure if I say that
9    explicitly in the report.
10       Q.   Okay.
11       MS. GOODMAN:  All right.  We can
12   take a break.
13       THE VIDEOGRAPHER:  We're now off
14   the record at 2:42 p.m.
15           --oOo--
16       (Whereupon, a recess was taken from
17       2:42 p.m. EST to 2:57 p.m. EST.)
18           --oOo--
19       THE VIDEOGRAPHER:  We're now back
20   on the record at 2:57 p.m.
21       You may proceed.
22

Page 231

1        BY MS. GOODMAN:
2        Q.   Professor Simcoe, you recognize in
3    the traditional yardstick approach, you are to
4    look to different -- a different market that is
5    unaffected by the alleged anticompetitive
6    conduct, right?
7        MS. STRICK:  Objection: form.
8        THE WITNESS:  If by
9    "traditional," you mean at a market level,
10   that's a standard approach.  But as I
11   explained earlier as we were discussing
12   this, one could do the analysis at the firm
13   level or the market level.
14       BY MS. GOODMAN:
15       Q.   Okay.  Did you try to identify a
16   different market to serve as a comparable?
17       A.   I did not give a lot of
18   consideration to that.  I thought about it, but I
19   -- my view is that it would be difficult.  And I
20   decided to rely on the market -- well, the -- the
21   same market and -- on the basis that it would
22   produce conservative results, as I explain in my

Page 232

1    report.
2        Q.   You say you did not give a lot of
3    consideration to identifying a different market.
4        How much -- how much time did
5    you spend thinking about that question?
6        MS. STRICK:  Objection: form.
7        THE WITNESS:  I couldn't tell
8    you.  I thought about it, but I can't give
9    you an estimate of the amount of time I
10   spent thinking about other markets that are
11   similar to this market as the basis for the
12   comparables analysis.
13       BY MS. GOODMAN:
14       Q.   And you say it was your view that
15   it would be difficult to identify another -- a
16   different market.
17       Why is that?
18       MS. STRICK:  Objection: form.
19       THE WITNESS:  In my experience
20   applying the comparables method in various
21   contexts, choosing the comparables is
22   always contentious.  And this market has

Page 233

1    various distinguishing characteristics.
2        As I thought about other markets
3    that might form the basis for a yardstick
4    or a comparables methodology, that thinking
5    didn't take me anywhere -- I wasn't able to
6    come up with alternatives that I felt would
7    be as reliable as the approach I take here.
8        BY MS. GOODMAN:
9        Q.   And do you set out in your report
10   anywhere the steps you went to to attempt to
11   identify a comparable market?
12       A.   No.
13       MS. STRICK:  Objection: form.
14       BY MS. GOODMAN:
15       Q.   Okay.  Now, you also excluded
16   impressions that you determined are not in the
17   relevant market, correct, from your comparables
18   analysis?
19       MS. STRICK:  Objection: form.
20       THE WITNESS:  Yes.  In
21   Appendix C, there's a description about
22   what specific kinds of impressions are

59 (Pages 230 - 233)

1    included in the analysis. And --
2        BY MS. GOODMAN:
3        Q.   In Paragraph 139, you write that
4    you exclude impressions that are not in the
5    relevant market, including those sold via the
6    direct channel, search, social media, instream
7    video, in-app and ads served within the walled
8    gardens.
9            Did you consider whether any of
10   those transactions were comparable?
11       MS. STRICK:  Objection: form.
12       THE WITNESS:  In deciding what
13   transactions are in the relevant market, I
14   adopted Professor Lee's definition of the
15   relevant antitrust markets.
16       BY MS. GOODMAN:
17       Q.   Right. But for purposes of coming
18   up with a yardstick or comparables approach, you
19   acknowledge that under the traditional method,
20   you would look at something outside of that
21   relevant market that's not affected by the
22   anticompetitive conduct, right?

1        MS. STRICK:  Objection: form.
2        THE WITNESS:  I think you're the
3    one who's characterizing it as the
4    traditional yardstick approach. But the
5    A-to-A way to perform a yardstick or a
6    difference in differences is to identify
7    other markets that are comparable.
8        BY MS. GOODMAN:
9        Q.   And why is it that the market --
10   markets in which other advertising formats, such
11   as search, social, instream, in-app and walled
12   gardens are not comparable?
13       MS. STRICK:  Objection: form.
14       THE WITNESS:  It varies from one
15   case to the next. But, for instance, with
16   walled gardens, the organization of or the
17   provision of the tools that are used to
18   purchase the ads is very different from the
19   open web display market.
20       BY MS. GOODMAN:
21       Q.   What about for in app? Is that
22   very different? Does that use very different

1    tools than the alleged open web display market?
2        MS. STRICK:  Objection: form.
3        THE WITNESS:  I don't recall the
4    precise distinctions in each case, but, as
5    I said, I adopted Professor Lee's
6    definition of the relevant market and,
7    after giving some consideration to
8    alternative approaches, decided to do --
9    conduct the comparables analysis in the way
10   I did.
11       BY MS. GOODMAN:
12       Q.   And my question is, Why do you --
13   why did you conclude that the types of
14   advertising reflected in 139 -- why did you
15   conclude that those were not comparable?
16       MS. STRICK:  Objection: form.
17       THE WITNESS:  Well, I relied on
18   the definition of the relevant antitrust
19   market, which is based on -- in part on the
20   idea that the ad -- the ads served in the
21   open web display market are reasonably
22   substitutable for one another.

1        And as we discussed earlier,
2    these reasonably substitutable types of
3    impressions provide good comparables for
4    other impressions sold in the same market.
5        At the end of the day, I have to
6    make some comparison to the prices that AdX
7    is charging in the market.
8        BY MS. GOODMAN:
9        Q.   Okay. I'll try asking it a little
10   bit differently.
11       In Paragraph 52, you say that
12   the market -- you say, Thus, in terms of
13   comparability, my market is the best possible
14   reference market.
15       And my question is, What
16   analysis, if any, did you do in order to reach a
17   conclusion that your reference market was the
18   best possible reference market of other potential
19   reference markets?
20       MS. STRICK:  Objection: form.
21       THE WITNESS:  Paragraph 52?
22

HIGHLY CONFIDENTIAL

Page 238

1    BY MS. GOODMAN:
2    Q.    Of your rebuttal.
3         Let me ask it a different way,
4    which is, What work did you do analyzing other
5    potential reference markets in order to determine
6    that the one you chose is the best?
7         MS. STRICK:  Objection: form.
8         THE WITNESS:  What I'm saying in
9    Paragraph 52 is that by definition, any
10    market is more comparable to itself than to
11    any other market.  And in that sense, it is
12    the best.
13        And as I explain in my opening
14    report, using that market as the market
15    where I source comparable transactions
16    leads to a conservative estimate of the
17    but-for take rate.
18        BY MS. GOODMAN:
19    Q.    And some -- the papers that you
20    cite in your rebuttal report on Page -- in
21    Paragraph -- sorry -- Footnote 75 -- none of
22    those papers say that the best possible reference

Page 239

1    market is those that include transaction -- that
2    -- that the best possible reference market is, in
3    fact, the market in which the alleged monopolist
4    operates, right?
5         MS. STRICK:  Objection: form.
6         THE WITNESS:  I do not know
7    everything that is said in these papers.
8         It's possible that -- I -- as I
9    sit here, I couldn't tell you what kinds of
10    discussion is in these papers about using
11    the same market as the source of
12    comparables except for the material that I
13    cite here, where they say that, in some
14    cases, it can be done.
15        BY MS. GOODMAN:
16    Q.    And none of the materials that you
17    cite there say that it is the best -- that the
18    best possible reference market is the same market
19    in which the monopolist operates?
20        MS. STRICK:  Objection: form.
21        THE WITNESS:  When I call it the
22    best possible, I'm not relying on these

Page 240

1    papers; I'm just relying on the simple
2    observation that a market is more
3    comparable to itself than it is to another
4    market.
5         BY MS. GOODMAN:
6    Q.    When you do an intramarket
7    observation, how do you account for the fact that
8    there's strategic complementarity, then, among
9    those products?
10        MS. STRICK:  Objection: form.
11        THE WITNESS:  When I do
12    intramarket comparisons, the strategic
13    complementarity allows me to opine that the
14    comparisons I do lead to a conservative
15    result.  But I don't explicitly quantify
16    the effect of the strategic
17    complementarity.
18        BY MS. GOODMAN:
19    Q.    And -- okay.
20        Now, some of the firms in your
21    comparables approach have a lower but-for take
22    rate -- I'm sorry -- have a lower as-is take rate

Page 241

1    than Google, correct?
2         MS. STRICK:  Objection: form.
3         THE WITNESS:  The -- to start,
4    the approach is meant to get at the average
5    price across a set of transactions, but
6    those transactions' data were provided to
7    me at the level of the exchange.
8         So I understand you to be
9    referring to average take rates of
10    exchanges.  And, yes, exchanges have lower
11    average take rates than AdX.
12        BY MS. GOODMAN:
13    Q.    And so if a firm -- if any of those
14    exchanges is trying to undercut the prices of an
15    alleged monopolist, what makes that firm an
16    appropriate comparator?
17        MS. STRICK:  Objection: form.
18        THE WITNESS:  The -- I'm not sure
19    I understand the premise of your question
20    about undercutting the prices of the
21    alleged monopolist.
22

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

Page 242

1    BY MS. GOODMAN:
2        Q.    Is it possible that any of the
3    exchanges in your comparables approach have a
4    lower as-is take rate in order to attempt to
5    undercut Google, the alleged monopolist?
6        MS. STRICK:  Objection: form.
7        THE WITNESS:  By "undercut," do
8    you mean charge a lower price than?
9        BY MS. GOODMAN:
10       Q.    Yes.
11       A.    Those exchanges do charge a lower
12   price than AdX.
13       Q.    Right.  And so what, by virtue of
14   the fact that they charge a lower price, makes
15   them an appropriate comparable?
16       MS. STRICK:  Objection: form.
17       THE WITNESS:  Their
18   appropriateness is not a function of their
19   price; their appropriateness is a function
20   of the fact that they sell Open web --
21   they're -- they sell access to tools,
22   exchanges specifically, that are used to

Page 243

1    facilitate open web display advertising
2    transactions.
3        BY MS. GOODMAN:
4        Q.    Okay.  So one of the set of
5    transactions that you excluded from your
6    comparables analysis was from Share -- the
7    exchange called Sharethrough.
8        Do you recall that?
9        A.    Yes.
10       Q.    And you say you excluded
11   Sharethrough because their data pertained only to
12   U.S. impressions?
13       A.    I believe that's correct.
14       Q.    Do you know whether Sharethrough
15   serves -- facilitates impressions on a worldwide
16   basis?
17       A.    I believe it does.
18       Q.    And so the -- the U.S. data that
19   Sharethrough produced was part of a worldwide set
20   of transactions, correct, facilitated by
21   Sharethrough?
22       MS. STRICK:  Objection: form.

Page 244

1        THE WITNESS:  I believe
2    Sharethrough provided incomplete data
3    because it couldn't provide data as to
4    worldwide transactions.  But the U.S.
5    transactions data that it provided may have
6    had, as far as I can recall, international
7    bidders or -- I mean, so there -- there may
8    have been an international dimension to
9    what they called U.S. impressions or --
10   let's go look it up.
11       (Whereupon, the witness reviews
12       the material provided.)
13       THE WITNESS:  The key point is
14   that the data were incomplete.
15       BY MS. GOODMAN:
16       Q.    Why is the data incomplete, from
17   your point of view, if it includes impressions
18   facilitated by an exchange that competes on a
19   worldwide basis?
20       MS. STRICK:  Objection: form.
21       THE WITNESS:  Sorry.  I was
22   looking for the explanation of why

Page 245

1    Sharethrough -- specifically why
2    Sharethrough was excluded.  But it's -- I
3    believe you're correct that it's on the
4    basis of their inability to report
5    worldwide transactions.
6        So with apologies, would you
7    repeat the question?
8        BY MS. GOODMAN:
9        Q.    How is it the case that the data
10   produced by Sharethrough is incomplete, when the
11   data it did produce is a result of transactions
12   it facilitates on a worldwide basis?
13       MS. STRICK:  Objection: form.
14       THE WITNESS:  The easiest way to
15   say it is, exchanges to be included in my
16   analysis had to provide complete data, data
17   on all of their transactions, and
18   Sharethrough could not.
19       BY MS. GOODMAN:
20       Q.    Is it that Sharethrough could not
21   or did not?
22       A.    You're correct.  I can't speak to

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL

Page 246

1   what Sharethrough could do, but my understanding
2   is that they did not.
3       Q.   And are you aware that
4   Professor Lee estimated Sharethrough's worldwide
5   impressions based on its U.S.-only data?
6       A.   I didn't recall that specifically,
7   but I take your word for that.
8       Q.   Okay.  And did you consider whether
9   there was any way to look at Sharethrough's data
10  to estimate worldwide transactions, impressions?
11      A.   I don't know specifically what
12  analysis Professor Lee did that you were
13  referring to --
14      Q.   I'm asking whether --
15      A.   -- but it's --
16      Q.   -- you considered any --
17      A.   -- it's --
18      Q.   -- possibility.
19      A.   -- it's possible to use incomplete
20  data for some kinds of analysis when it would be
21  appropriate for other kinds of analysis.
22      Q.   So my question is, Did you consider

Page 247

1   whether there was any way to look at
2   Sharethrough's data to estimate worldwide
3   impressions for purposes of your comparables
4   analysis?
5       A.   For my analysis, I included
6   exchanges that were able to provide complete
7   data; and Sharethrough did not.
8       Q.   Why was it important for you to
9   have complete data as opposed to using incomplete
10  data from which you could extrapolate for
11  purposes of your comparables analysis?
12      MS. STRICK:  Objection: form.
13      THE WITNESS:  Extrapolation
14  requires making certain assumptions.  I
15  don't recall specifically what the key
16  assumptions were that we were worried about
17  with Sharethrough, but the decision was
18  made to sort of only calculate average take
19  rates over worldwide impressions for
20  exchanges that could provide complete data.
21  And they couldn't provide complete data.
22  So I would have had to make assumptions to

Page 248

1   extrapolate.  Those assumptions would have
2   gone directly into the estimated but-for
3   take rate.
4       BY MS. GOODMAN:
5       Q.   And you say "the decision was
6   made."
7           Who made that decision?
8       A.   I'm responsible for that decision.
9       Q.   All right.  You did not include
10  Amazon in your comparables analysis although you
11  identify it as an ad exchange.
12          Why is it that they were not
13  included?
14      MS. STRICK:  Objection: form.
15      THE WITNESS:  Amazon -- well,
16  there's the Amazon owned-and-operated
17  business, which would be outside the
18  relevant antitrust market.  And my
19  understanding is that Amazon is not an
20  exchange in the relevant antitrust
21  market --
22

Page 249

1       BY MS. GOODMAN:
2       Q.   Okay.
3       A.   -- as defined by Professor Lee.
4       Q.   And did you consider whether Amazon
5   was a comparable firm that's not -- that could be
6   used as a comparable using the traditional
7   yardstick approach?
8       MS. STRICK:  Objection: form.
9       THE WITNESS:  As I explained
10  earlier, my analysis is at the transaction
11  level, not the firm level.
12      BY MS. GOODMAN:
13      Q.   But you say you considered using
14  firms as a potential comparable but decided not
15  to.
16          My question is, Did you
17  consider Amazon as a potential comparable?
18      MS. STRICK:  Objection: form.
19      THE WITNESS:  I don't recall
20  saying I thought of using firms as a
21  potential comparable.
22          I went through the steps

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL

Page 250

1  described in my opening report, which
2  involve first thinking about comparable
3  transactions, which are transactions in the
4  open web display market, so I didn't think
5  about characteristics of Amazon as a firm
6  is relevant to selecting the comparable
7  transactions for those open web display
8  advertisements.
9       BY MS. GOODMAN:
10      Q.   In considering an -- a reference
11  market that is unaffected by the anticompetitive
12  conduct, did you look at Amazon as a potential
13  comparable --
14      MS. STRICK:  Objection --
15      BY MS. GOODMAN:
16      Q.   -- as would be suggested under the
17  traditional yardstick approach?
18      MS. STRICK:  -- objection: form.
19      THE WITNESS:  I feel there are a
20  lot of assumptions in your hypothetical
21  about what approaches I did and didn't do.
22      As I -- as I characterize the

Page 251

1  approach I took, I explained why I didn't
2  consider Amazon as a firm.
3       BY MS. GOODMAN:
4       Q.   So let's turn to -- I'm going to
5  hand you Professor Chevalier's report --
6       MS. GOODMAN:  I may have put it
7  somewhere else.  Yeah.
8       (Sotto voce discussion between
9        cocounsel.
10      MS. GOODMAN:  It's okay.  It's
11  okay.
12      BY MS. GOODMAN:
13      Q.   -- which is Simcoe Exhibit 3.
14          --oOo--
15      (Simcoe Deposition Exhibit Number
16       3, Expert Report of Judith A.
17       Chevalier, marked for
18       identification, as of this
19       date.)
20          --oOo--
21      BY MS. GOODMAN:
22      Q.   And I'd like you to turn to

Page 252

1  Figure 10 on Page 45.  And you see that
2  Professor Chevalier calculates the as-is take
3  rates in this figure of all the exchanges within
4  your comparables approach, correct?
5       MS. STRICK:  Objection: form.
6       THE WITNESS:  It looks like this
7  is an -- a comparison of the average take
8  rate by exchange for the exchanges that
9  produce usable data that I used in the
10  comparables approach.
11      BY MS. GOODMAN:
12      Q.   Okay.  And so what permits some of
13  these exchanges to charge higher than the average
14  revenue share --
15      MS. STRICK:  Objection: form.
16      BY MS. GOODMAN:
17      Q.   -- the weighted average RevShare?
18      MS. STRICK:  Objection: form.
19      THE WITNESS:  It's a mathematical
20  property of an average that some will be
21  above and some will be below.
22

Page 253

1       BY MS. GOODMAN:
2       Q.   And what is it that enables some of
3  these exchanges in the market that you're
4  considering to charge higher-than-average shares,
5  RevShares?
6       MS. STRICK:  Objection: form.
7       THE WITNESS:  You're asking me to
8  speculate as to the causes of variation in
9  the average price across transactions on
10  these exchanges.  There could be many
11  factors, but let me just take Yieldmo.
12      My understanding -- I think I'm
13  correct in this -- that Yieldmo is a
14  exchange that does a fair amount of
15  remarketing, which is a particular kind of
16  high-priced, specialized transaction, and
17  in catering to that part of the market,
18  they may face different circumstances that
19  allow them to charge a higher take rate.
20      BY MS. GOODMAN:
21      Q.   And how about for Index Exchange?
22  What permits them to charge a higher than

64 (Pages 250 - 253)

Page 254

1 weighted -- higher than the weighted average
2 RevShare?
3     MS. STRICK: Objection: form.
4     THE WITNESS: I don't have any
5 particular ideas in mind right now about
6 why Index's average take rate is 0.5
7 percentage points above the mean, other
8 than to say its relationship to the mean is
9 a function of every other exchange's take
10 rate, which is used to compute the mean.
11     BY MS. GOODMAN:
12     Q. Is quality a reason that some firms
13 can charge higher prices than other firms?
14     MS. STRICK: Objection: form.
15     THE WITNESS: In economics and in
16 differentiated product markets, relative
17 quality is almost definitionally something
18 that can affect prices.
19     BY MS. GOODMAN:
20     Q. And are these RevShares
21 quality-adjusted?
22     MS. STRICK: Objection: form.

Page 255

1     THE WITNESS: I'm not sure what
2 you have in mind specifically for a quality
3 adjustment, but my understanding is that
4 these are simply the average prices charged
5 for transactions on these exchanges.
6     BY MS. GOODMAN:
7     Q. Going back one second to Yieldmo,
8 your testimony about why they may be able to
9 charge a higher RevShare than other exchanges.
10     Is that an example where there
11 are differences between exchanges unrelated to
12 scale that allows Yieldmo to charge a price
13 that's higher than the average?
14     MS. STRICK: Objection: form.
15     THE WITNESS: Yeah, Yieldmo is a
16 very, very small exchange that serves a
17 niche. I haven't done an investigation to
18 isolate the causes of Yieldmo's pricing.
19 But you had asked me to speculate, and so I
20 did.
21     BY MS. GOODMAN:
22     Q. Okay. I don't want you to

Page 256

1 speculate. I want to -- my understanding is you
2 were basing that off of the evidence that you
3 have seen in this case as to why Yieldmo charges
4 higher prices. Correct?
5     MS. STRICK: Objection: form.
6     THE WITNESS: I was referring to
7 evidence that I've seen in this case; but
8 as I said, I haven't done a specific
9 analysis to try and isolate the causes that
10 produce the particular variation that we
11 see here in Yieldmo's take rate, and that's
12 -- that's what I was referring to.
13     BY MS. GOODMAN:
14     Q. Okay. Are you attributing -- well,
15 never mind.
16     In your comparables analysis,
17 did you do a quality adjustment to the average
18 weighted -- the weighted average that you
19 calculated?
20     MS. STRICK: Objection: form.
21     THE WITNESS: I didn't see that
22 adjusting for quality was feasible or

Page 257

1 necessary. So this is a -- in -- in the
2 weighted average that I took across all
3 transactions in the open web display market
4 sold through these exchanges, I calculated
5 a weighted average using revenue weights,
6 using the straight average take rate, as I
7 described in my report.
8     BY MS. GOODMAN:
9     Q. And so it's -- I'm correct in
10 understanding you did not attempt any quality
11 adjustments to the average revenue share which
12 you calculated in your comparables approach?
13     MS. STRICK: Objection: form.
14     THE WITNESS: I did not do any
15 adjustments to the weighted average take
16 rate other than taking the weighted
17 average.
18     BY MS. GOODMAN:
19     Q. Okay. And the reasons that you
20 identified may be why Yieldmo is able to charge a
21 higher price than the weighted average -- could
22 Google charge higher prices for the same reasons?

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL

Page 258

1    MS. STRICK: Objection: form.
2    THE WITNESS: As I explain in the
3  rebuttal report, the analysis that I do
4  relies on pooling together all of the
5  transactions across all of the exchanges
6  that provided usable data. That means that
7  there will be a small number of
8  transactions from Yieldmo at the Yieldmo
9  average take rate and a much larger number
10 of transactions from, say, Xandr at the
11 Xandr average take rate.
12    And in averaging those together,
13 I average a variety of different kinds of
14 transactions to come up with an average
15 take rate for all sorts of different
16 transactions on different exchanges, none
17 of which engaged in the conduct that is at
18 issue in this case.
19    BY MS. GOODMAN:
20    Q.   And as a result, you calculate a
21 weighted average of 16.2 percent that you think
22 reflects a but-for world where none of the

Page 259

1  anticompetitive conduct took place?
2    MS. STRICK: Objection: form.
3    THE WITNESS: So the 16.2 percent
4  is an estimate of the but-for take rate
5  where the but-for world is as described in
6  my report.
7    BY MS. GOODMAN:
8    Q.   And the difference between Google's
9  as-is take rate and the weighted average take
10 rate which you calculate of 16.2 percent -- is it
11 correct your comparables analysis attributes that
12 difference exclusively to anticompetitive
13 conduct?
14    MS. STRICK: Objection: form.
15    THE WITNESS: My analysis
16 attributes it to the conduct that is
17 present in the as-is world and not in the
18 but-for world.
19    BY MS. GOODMAN:
20    Q.   Okay. So how do you separate out
21 in your comparables approach what amount of the
22 overcharge is due to anticompetitive conduct that

Page 260

1  is in the as-is world and is also in the
2  but-for world you consider?
3    MS. STRICK: Objection: form.
4    THE WITNESS: This is a -- an
5  estimate of the price that AdX -- it's an
6  estimate of the upper bound of the price
7  that AdX would be able to charge but for
8  the conduct that defines the but-for world.
9    I'm not sure that it's necessary
10 to apportion, but if you're explicit about
11 the other conduct you have in mind, we can
12 discuss it.
13    BY MS. GOODMAN:
14    Q.   Okay. So how have you ruled out in
15 the comparables approach any other causes to
16 explain why different exchanges charge a lower
17 RevShare than the conduct you consider in the
18 but-for world?
19    MS. STRICK: Objection: form.
20    THE WITNESS: Could you repeat
21 the question?
22

Page 261

1    BY MS. GOODMAN:
2    Q.   How have you ruled out the
3  possibility that there are other causes beyond --
4  or other reasons other exchanges -- let me try
5  that again.
6    Strike that.
7    How have you ruled out whatever
8  causes other exchanges to charge lower revenue
9  shares than Google might also explain why AdX
10 charged a revenue share of 19.8 percent?
11    MS. STRICK: Objection: form.
12    THE WITNESS: I don't think it's
13 necessary to identify causes of variation
14 in the average take rate of other exchanges
15 to perform the comparables analysis.
16    As I mentioned earlier, I view
17 the comparables analysis and the event
18 study as complementary approaches, and one
19 thing that I did in the event study to try
20 and deal with unobserved factors that may
21 be correlated with differences in average
22 take rates is to include the exchange fixed

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL

Page 262

1    effects in those regressions.
2         BY MS. GOODMAN:
3         Q.    Okay.  Why do you think it is not
4    necessary to identify causes of variation in the
5    average take rate of other exchanges?
6         MS. STRICK:  Objection: form.
7         THE WITNESS:  Because I am using
8    transactions in the open web display
9    advertising market for a wide range of
10   exchanges that cover a variety of different
11   kinds of transactions, pooling those
12   together and using that as the basis for a
13   comparison to transactions on AdX --
14        BY MS. GOODMAN:
15        Q.    So --
16        A.    -- the -- it -- it's both
17   difficult, you know, sort of identifying -- you
18   know, precisely measuring any one cause is -- is
19   very difficult, and I think it's unnecessary.
20   I'm simplifying using all of the other
21   transactions that I can get in the market to form
22   a basis of what a marketwide average competitive

Page 263

1    take rate would be.
2         Q.    And some exchanges -- and how does
3    your average -- your comparables approach
4    actually factor in the but-for conduct which you
5    are attempting to measure with it in it?
6         MS. STRICK:  Objection: form.
7         THE WITNESS:  It factors it in,
8    in that that conduct is Google-specific
9    conduct that affects the prices on AdX, but
10   that conduct is not present at other firms,
11   so the pathway through which that conduct
12   could affect prices charged by other
13   exchanges is related to the strategic
14   complementary that we discussed earlier,
15   which leads my analysis to produce
16   conservative results.
17        BY MS. GOODMAN:
18        Q.    Have you studied whether any of the
19   ad exchanges that you consider in your
20   comparables have any sort of tie to a publisher
21   ad server or to a buy-side tool?
22        MS. STRICK:  Objection: form.

Page 264

1         THE WITNESS:  I have looked at
2    the -- the right answer is, It depends what
3    you mean.
4         BY MS. GOODMAN:
5         Q.    So you're saying that your
6    comparables approach takes into account the fact
7    that the Google-specific conduct didn't occur in
8    those comparable ad exchanges, correct?
9         MS. STRICK:  Objection: form.
10        THE WITNESS:  Correct.
11        BY MS. GOODMAN:
12        Q.    My question is, Did you actually
13   look at each of those ad exchanges to figure out
14   whether they have any sort of tie to a buy-side
15   tool or a sell-side tool?
16        MS. STRICK:  Objection: form.
17        THE WITNESS:  I looked at the
18   other exchanges, and I know that the other
19   exchanges, some of them, have full-stack
20   capabilities, so they have their own tools
21   at various layers in the ad tech stack.
22        As I sit here, I don't remember

Page 265

1    the details of -- that would allow me to
2    make a determination of whether that was a
3    tie.  But for these kinds of relationships
4    to make a difference, it's also a necessary
5    condition that the tying firm possess
6    market power in the tying market.
7         BY MS. GOODMAN:
8         Q.    And that's necessary as a matter of
9    economics or a matter of antitrust law?
10        MS. STRICK:  Objection: form.
11        THE WITNESS:  Necessary as a
12   matter of economics.
13        BY MS. GOODMAN:
14        Q.    And does your comparables approach
15   assume that the average quality of transactions
16   on non-AdX exchanges is comparable to the average
17   quality of transactions on AdX?
18        MS. STRICK:  Objection: form.
19        THE WITNESS:  For purposes of
20   this question, we will have to set aside
21   scale.
22        As I've testified earlier,

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL

Page 266

1 perhaps the most important determinant of
2 perceived quality in this market is scale.
3 And AdX has a scale advantage which is not
4 separable from its conduct at issue in the
5 case.
6 Setting aside scale, I haven't
7 seen evidence that there are compelling --
8 compelling evidence that there are net
9 quality differences across other exchanges.
10 This approach treats the full set
11 -- the -- the kind of average take rate
12 across all competing exchanges as a
13 comparable quality benchmark to AdX, and
14 that is consistent with finding a very
15 similar but-for take rate in the event
16 study, where I include the fixed effects to
17 control for factors that I can't measure
18 that differ between the exchanges.
19 BY MS. GOODMAN:
20 Q. And it is accurate that you cannot
21 measure the differences between exchanges and
22 your comparables approach, right?

Page 267

1 MS. STRICK: Objection: form.
2 THE WITNESS: You haven't
3 provided any examples of the types of
4 quality differences that I'm being asked to
5 measure in this hypothetical. So I'm
6 assuming that they're unobserved. And
7 things that are not observable are not
8 measurable.
9 BY MS. GOODMAN:
10 Q. Can your comparables approach
11 measure the quality differences in terms of
12 preventing fraudulent ad -- Open web
13 transactions?
14 MS. STRICK: Objection: form.
15 THE WITNESS: I do not have data
16 on relative differences in -- what did
17 you -- you know, fraudulent transaction,
18 prevention and -- and detention --
19 detection, prevention.
20 BY MS. GOODMAN:
21 Q. And can you use your comparables
22 approach to measure the differences in quality in

Page 268

1 terms of the -- the -- the publisher inventory
2 space that is facilitated by that particular
3 exchange?
4 MS. STRICK: Objection: form.
5 THE WITNESS: That's scale, which
6 we talked about earlier.
7 BY MS. GOODMAN:
8 Q. Well, there can be two exchanges of
9 same scale that have different quality of
10 inventory, correct?
11 A. Inventory can be differentiated.
12 But as you characterized access to inventory, a
13 factor of primary importance is scale, which is
14 in many ways strongly correlated with variety.
15 Q. Well, my -- my question was: Is
16 there a difference in quality of an exchange
17 based on the type of inventory that they have?
18 MS. STRICK: Objection: form.
19 THE WITNESS: To understand if
20 the differences in inventory were driving
21 hypothetical differences in perceived
22 quality, I would have to have data that

Page 269

1 allowed me to -- well, I don't have an
2 opinion as to that other than that I've
3 reviewed information -- qualitative
4 information about differences in quality
5 and, as I described earlier, came to the
6 opinion that scale is the predominant
7 factor and that I haven't seen any
8 compelling evidence that on net, some
9 exchanges are providing a better quality
10 exchange than others.
11 It seems that some exchanges do
12 well in dimensions and some do poorly on
13 others, with respect to AdX and with
14 respect to the other exchanges.
15 BY MS. GOODMAN:
16 Q. And so the dimensions that some
17 exchanges do well on relative to AdX and that
18 other exchanges do poorly on -- does your
19 comparables approach reflect any of those
20 differences?
21 MS. STRICK: Objection: form.
22 THE WITNESS: How would -- does

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL

Page 266

1  perhaps the most important determinant of
2  perceived quality in this market is scale.
3  And AdX has a scale advantage which is not
4  separable from its conduct at issue in the
5  case.
6        Setting aside scale, I haven't
7  seen evidence that there are compelling --
8  compelling evidence that there are net
9  quality differences across other exchanges.
10       This approach treats the full set
11  -- the -- the kind of average take rate
12  across all competing exchanges as a
13  comparable quality benchmark to AdX, and
14  that is consistent with finding a very
15  similar but-for take rate in the event
16  study, where I include the fixed effects to
17  control for factors that I can't measure
18  that differ between the exchanges.
19       BY MS. GOODMAN:
20       Q.   And it is accurate that you cannot
21  measure the differences between exchanges and
22  your comparables approach, right?

Page 267

1        MS. STRICK:  Objection: form.
2        THE WITNESS:  You haven't
3  provided any examples of the types of
4  quality differences that I'm being asked to
5  measure in this hypothetical.  So I'm
6  assuming that they're unobserved.  And
7  things that are not observable are not
8  measurable.
9        BY MS. GOODMAN:
10       Q.   Can your comparables approach
11  measure the quality differences in terms of
12  preventing fraudulent ad -- Open web
13  transactions?
14       MS. STRICK:  Objection: form.
15       THE WITNESS:  I do not have data
16  on relative differences in -- what did
17  you -- you know, fraudulent transaction,
18  prevention and -- and detention --
19  detection, prevention.
20       BY MS. GOODMAN:
21       Q.   And can you use your comparables
22  approach to measure the differences in quality in

Page 268

1  terms of the -- the -- the publisher inventory
2  space that is facilitated by that particular
3  exchange?
4        MS. STRICK:  Objection: form.
5        THE WITNESS:  That's scale, which
6  we talked about earlier.
7        BY MS. GOODMAN:
8        Q.   Well, there can be two exchanges of
9  same scale that have different quality of
10  inventory, correct?
11       A.   Inventory can be differentiated.
12  But as you characterized access to inventory, a
13  factor of primary importance is scale, which is
14  in many ways strongly correlated with variety.
15       Q.   Well, my -- my question was:  Is
16  there a difference in quality of an exchange
17  based on the type of inventory that they have?
18       MS. STRICK:  Objection: form.
19       THE WITNESS:  To understand if
20  the differences in inventory were driving
21  hypothetical differences in perceived
22  quality, I would have to have data that

Page 269

1  allowed me to -- well, I don't have an
2  opinion as to that other than that I've
3  reviewed information -- qualitative
4  information about differences in quality
5  and, as I described earlier, came to the
6  opinion that scale is the predominant
7  factor and that I haven't seen any
8  compelling evidence that on net, some
9  exchanges are providing a better quality
10  exchange than others.
11       It seems that some exchanges do
12  well in dimensions and some do poorly on
13  others, with respect to AdX and with
14  respect to the other exchanges.
15       BY MS. GOODMAN:
16       Q.   And so the dimensions that some
17  exchanges do well on relative to AdX and that
18  other exchanges do poorly on -- does your
19  comparables approach reflect any of those
20  differences?
21       MS. STRICK:  Objection: form.
22       THE WITNESS:  How would -- does

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL

Page 270

1    it reflect them?
2        BY MS. GOODMAN:
3        Q.    Does it -- does your analysis
4    include those differences in coming up with an
5    average -- a -- a but-for take rate that you come
6    up with as a result of that approach?
7        MS. STRICK:  Objection: form.
8        THE WITNESS:  If there are
9    differences, as I said, the evidence
10   suggests that they're not meaningful and
11   they're averaged out when I pool together
12   all of the transactions through the non-AdX
13   exchanges in calculating a weighted
14   average.
15       BY MS. GOODMAN:
16       Q.    And so the firms that charge lower
17   prices than Google, as reflected in Chevalier
18   Figure 10, I believe, is that at all a reflection
19   of the -- that product's quality relative to
20   Google's?
21       MS. STRICK:  Objection: form.
22       THE WITNESS:  I believe scale,

Page 271

1    for sure, is reflected in the differences
2    in the average take rates in
3    Professor Chevalier's Figure 10.
4        I don't see that -- you know, as
5    I said, the qualitative evidence that I
6    have seen doesn't lead me to suggest that
7    these other dimensions of quality in
8    your -- in your question, whatever they
9    might be, are meaningful drivers of price
10   variation at the level of, you know -- so
11   what we see between AdX and the pooled
12   comparable exchanges.
13       BY MS. GOODMAN:
14       Q.    And you're relying solely on
15   qualitative evidence in rendering an opinion that
16   those other dimensions are not meaningful drivers
17   of price variation, correct?
18       MS. STRICK:  Objection --
19   objection: form.
20       THE WITNESS:  Yes, I think that's
21   a standard approach that -- in this --
22   within this methodology, unlike the event

Page 272

1    study where I cannot control for unobserved
2    dimensions of -- well, unobserved product
3    features, it would be normal to go look for
4    qualitative evidence that those features
5    are important, which is what I did.  And I
6    didn't find any.
7        BY MS. GOODMAN:
8        Q.    Is it possible that the ad
9    exchanges charge lower take rates than Google
10   because they perceive that the Google product is
11   of a higher quality, setting aside scale?
12       MS. STRICK:  Objection: form.
13       THE WITNESS:  I don't think it
14   makes sense to set aside scale.  The
15   qualitative evidence that I see is full of
16   suggestions that it's the exclusive access
17   to Google Ads' demand that provides the key
18   differentiating feature of AdX and that
19   relative to that, other differences between
20   the exchange products are not particularly
21   material.
22

Page 273

1        BY MS. GOODMAN:
2        Q.    And so what if Google -- if AdX has
3    a higher quality in terms of fraud protect --
4    fraud -- fraud prevention than the other ad
5    exchanges in your analysis, does that mean that
6    the average difference in take rate between those
7    other exchanges and the AdX take rate may be due
8    to AdX's superior fraud prevention?
9        MS. STRICK:  Objection: form.
10       THE WITNESS:  Do you mean the
11   average difference in the take rate on the
12   transactions conducted on those other
13   exchanges and the average -- and take rate
14   on transactions on AdX?
15       BY MS. GOODMAN:
16       Q.    Yes.
17       A.    And the question is, If,
18   hypothetically, Google had --
19       Q.    Superior fraud --
20       A.    -- superior fraud --
21       Q.    -- prevention methodologies as
22   compared to the other exchanges.

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL

Page 282

1   engage in similar conduct.
2         BY MS. GOODMAN:
3         Q.   But my question is about
4   19.8 percent, which you calculate in the as-is
5   world.
6             And I want to know if you can
7   attribute any of that 19,8 -- 19.8 percent to
8   scale that Google acquired as a result of
9   procompetitive conduct or anticompetitive
10  conduct.
11        MS. STRICK: Objection: form.
12        THE WITNESS: I understand that
13  your question is about trying to divide
14  scale into parts that are procompetitive
15  and anticompetitive and somehow apportion
16  the effects.
17        I haven't been asked to do an
18  analysis and I haven't done an analysis
19  that contemplates but-for world with
20  differences in Google's scale.
21        BY MS. GOODMAN:
22        Q.   And so you cannot isolate what part

Page 283

1   of the overcharge -- or what part of the
2   difference between the average of 16.2, I
3   believe, and 19.8 could possibly be attributed to
4   scale -- to what I'll call "procompetitive scale"
5   as opposed to anticompetitive scale?
6         MS. STRICK: Objection: form.
7         THE WITNESS: The apportionment
8   exercise that you're contemplating in this
9   hypothetical analysis isn't something that
10  I have seen or attempted to do or
11  consistent with my understanding of the
12  comparables analysis that I did.
13        BY MS. GOODMAN:
14        Q.   Okay.  So going back to the
15  transaction versus exchange terminology, it's
16  correct that the data you used in your
17  comparables approach is aggregated at the
18  exchange level, correct?
19        MS. STRICK: Objection: form.
20        THE WITNESS: Yes.
21        BY MS. GOODMAN:
22        Q.   And so it -- you don't see

Page 284

1   transaction-by-transaction data, correct?
2         A.   It depends.
3         Q.   You aggregated the data which you
4   saw for purposes of conducting the comparables
5   approach, correct?
6         MS. STRICK: Objection: form.
7         THE WITNESS: The -- not exactly.
8         MS. STRICK: Counsel, so we've
9   been going over an hour.  If we could take
10  a short break.
11        BY MS. GOODMAN:
12        Q.   Now, the exchanges which you
13  excluded from your comparables -- did you look at
14  any of the transaction-level data in those -- for
15  those exchanges to see whether they fit your
16  criteria for the comparables approach?
17        MS. STRICK: Objection: form.
18        THE WITNESS: I'm not sure I
19  understand the question.  I did not look at
20  characteristics of exchanges to select the
21  comparables.
22

Page 285

1         BY MS. GOODMAN:
2         Q.   Did you look at the individual
3   transactions within data -- within datasets of
4   exchanges which you excluded to see if any of
5   them -- any of that transaction-level data fit
6   the criteria you were seeking to include within
7   your comparables analysis?
8         A.   When I looked at the trans- -- the
9   transaction-level data that I have in mind that I
10  looked at was primarily provided by Google.  I
11  can't recall all of the specific numbers of the
12  data sets, but I -- I recall looking at
13  transaction-level data.
14        For other data exchanges, data was
15  provided primarily and maybe exclusively on a
16  aggregated basis to the month -- well, it depends
17  on the exchange -- different levels of
18  aggravation.
19        Q.   And so -- but none of the non-AdX
20  exchanges provided you per-transaction-level
21  data; is that accurate?
22        MS. STRICK: Objection: form.

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL

1      THE WITNESS:  I believe it's
2   correct that we do not have
3   impression-level data for any of the
4   non-Google exchanges.
5      BY MS. GOODMAN:
6      Q.   And because you didn't have
7   impression-level data, you had to compare the
8   average take rates across different exchanges,
9   correct?
10      MS. STRICK:  Objection: form.
11      THE WITNESS:  That's not exactly
12   what I did.  I did not compare the other
13   exchanges on a pairwise basis, as you
14   suggest in the question.  I pooled the data
15   and -- by taking a weighted average.
16      MS. STRICK:  Mr. Simcoe, we've
17   been going over an hour.
18      Would you like a break?
19      THE WITNESS:  May we take a
20   break?
21      MS. GOODMAN:  Sure.
22      THE VIDEOGRAPHER:  We're going

1   off the record at 4:00 p.m.
2      --oOo--
3      (Whereupon, a recess was taken from
4      4:00 p.m. EST to 4:13 p.m. EST.)
5      --oOo--
6      THE VIDEOGRAPHER:  We're now back
7   on the record at 4:13 p.m.
8      You may proceed.
9      BY MS. GOODMAN:
10      Q.   Professor Simcoe, let's go back to
11   Chevalier Figure 10, which is in Exhibit 4.  And
12   it's on Page 45.
13      And this figure shows that six
14   out of the seven exchanges in your control group
15   can charge a higher-than-average revenue share.
16      And that -- that leaves Google
17   out of the equation, correct?
18      MS. STRICK:  Objection: form.
19      THE WITNESS:  What do you mean by
20   it leaves Google out of the equation?
21      BY MS. GOODMAN:
22      Q.   Google is not -- Google's RevShare

1   is not part of Figure 10 in coming up with the
2   weighted average, right?
3      MS. STRICK:  Objection: form.
4      THE WITNESS:  Correct, Google is
5   not part of the weighted average in
6   Figure 10.
7      BY MS. GOODMAN:
8      Q.   In six of the seven firms in your
9   control group for your comparable study can
10   charge -- or do charge a
11   higher-than-weighted-average revenue share,
12   right?
13      MS. STRICK:  Objection: form.
14      THE WITNESS:  I address this
15   point in my rebuttal report.  As a matter
16   of math, any weighted average will have
17   some above and some below.  And because
18   Xandr, in particular, is lower and large,
19   it leads to more of those exchanges having
20   an above-the-average weighted average take
21   rate than below.
22

1      BY MS. GOODMAN:
2      Q.   And is it your testimony that the
3   -- that the only reason some firms can charge
4   higher than the weighted average is a matter of
5   math?
6      MS. STRICK:  Objection: form.
7      THE WITNESS:  You're talking
8   about two different kinds of possible
9   causes.
10      I'm saying it's true as a matter
11   of math that averages have the
12   characteristics that we're talking about.
13   Some will be above, and some will be below.
14      If you would like to discuss
15   potential causes of variation in price, we
16   should talk about what those causes are.
17      BY MS. GOODMAN:
18      Q.   So what permits these six out of
19   seven firms to charge higher than the weighted
20   average market price?
21      MS. STRICK:  Objection: form.
22

HIGHLY CONFIDENTIAL

Page 290

BY MS. GOODMAN:

1    BY MS. GOODMAN:
2        Q.    What are some of the reasons that
3    they can do that?
4        A.    In my experience, there's always
5    some variation within a data set.  I haven't done
6    a systematic investigation to try and tease out
7    various causes as to what explains pairwise
8    differences in the take rates charged by
9    different -- among the exchanges whose
10   transactions I use in the comparable analysis.
11       Q.    Okay.  And let's go to your report,
12   Paragraph 141.
13             And you say in the last two
14   sentences that the data you rely on do not
15   provide information about prices or take rates at
16   the level of the individual impression.  Thus, I
17   must compare the average take rates across
18   different ad exchanges, as opposed to comparing
19   take rates charged for comparable impressions.
20             And so -- that's accurate,
21   correct?
22       A.    I think it could be worded better,

Page 291

1    to be honest.  But what I mean to say here is
2    that -- well, I mean to be indicating something
3    that we discussed before.  Because the data are
4    provided at an aggregate level, I'm not able to
5    do the analysis at the impression level.
6             And I use the weighted average of
7    the aggregated data to perform a calculation that
8    will give the same results as if I averaged over
9    all the impressions.
10       Q.    And when you say "impression," is
11   that synonymous with transaction?
12       A.    Well, there's two transactions
13   taking place with an impression, at least.  You
14   know, one, the transaction where a take rate is
15   charged for use of the tool.  That's the average
16   that I'm calculating.  And then there's a
17   transaction between a buyer and a seller of the
18   open web display impression.
19             But, yes, you can think of that as
20   the relative unit of analysis that I'm talking
21   about.
22       Q.    And then let's look at your

Page 292

1    Figure 15, which I believe is on Page 90.
2             Yes.
3             This is the results of your
4    comparables approach, correct?
5        A.    Yes.
6        Q.    And you separated out in -- or
7    you -- you break it down in two different ways
8    further: one is for all third parties; and then
9    one is just for large third parties, correct?
10       A.    Correct.
11       Q.    And the large third parties is a
12   subset of all third parties, correct?
13             MS. STRICK:  Objection: form.
14             THE WITNESS:  Yes.
15             BY MS. GOODMAN:
16       Q.    And you made the selection of large
17   third parties based on the exchange, correct?
18             MS. STRICK:  Objection: form.
19             THE WITNESS:  This was one way to
20   illustrate robustness of the primary all
21   third-parties numbers.  But it's correct
22   that large third parties are large relative

Page 293

1    to the two exchanges that are not there in
2    the calculation in Row 3.
3             BY MS. GOODMAN:
4        Q.    And so do these two different
5    calculations, large third parties as compared to
6    all third parties, show that the but-for take
7    rate you hypothesize may depend on the selection
8    of exchanges in your control group?
9             MS. STRICK:  Objection: form.
10            THE WITNESS:  In performing
11   comparables analyses in other contexts,
12   it's been my experience that there's always
13   some dispute over the selection of the
14   comparables.  And so it's useful to show
15   robustness to alternative sets of
16   assumptions --
17            BY MS. GOODMAN:
18       Q.    And so is it your testimony that
19   the --
20       A.    -- and so what I sought to do here
21   was to illustrate what happens if you remove
22   exchanges that are different along salient

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL

Page 294

1 dimensions that I could observe, one of which is
2 the size of the exchange.
3      Q.   And so is it your testimony that
4 the large third party's metric you report here in
5 Figure 15 is a robustness check only?
6      MS. STRICK:  Objection: form.
7      THE WITNESS:  It was performed as
8 a check of the robustness of my baseline
9 analysis, which is in Line 2 of this
10 figure.
11      BY MS. GOODMAN:
12      Q.   Okay.  And you contend that this
13 comparables approach is conservative because of
14 the concept of strategic complements, correct?
15      MS. STRICK:  Objection: form.
16      THE WITNESS:  I believe that
17 because of strategic complementarities,
18 Google's as-is take rate encourages all the
19 third-party exchanges to set a higher take
20 rate than they would in a but-for world
21 where Google's take rate was lower.
22      Earlier, you pointed to concerns

Page 295

1 about the idea that Google's conduct could
2 affect the take rates charged by the
3 third-party exchanges, and strategic
4 complementarities provides an economic --
5 standard economic rationale for thinking
6 that those effects would lead my results to
7 be conservative.
8      BY MS. GOODMAN:
9      Q.   Okay.  And you've also heard of the
10 concept in economics of strategic substitutes,
11 correct?
12      A.   Yes.
13      Q.   And the -- are ad buying tools
14 complements to exchanges -- ad exchanges?
15      MS. STRICK:  Objection: form.
16      THE WITNESS:  Before we get too
17 far, let me clarify that the -- the idea of
18 complements is different from the idea of
19 strategic complements --
20      BY MS. GOODMAN:
21      Q.   Yes.
22      A.   -- and the idea of substitutes is

Page 296

1 different from the idea of strategic
2 substitutes --
3      Q.   Yes.
4      A.   -- having said that --
5      Q.   Are ad --
6      A.   -- yes.
7      Q.   Okay.  So ad buying tools and
8 exchanges are complements, but they're not
9 strategic complements?
10      A.   Correct.
11      Q.   Okay.  Are ad buying tools and
12 exchanges strategic substitutes?
13      MS. STRICK:  Objection: form.
14      THE WITNESS:  Not necessarily.
15      BY MS. GOODMAN:
16      Q.   Have you come across in the -- in
17 the economics literature the hypothetical example
18 of strategic substitutes of peanut butter and
19 jelly?
20      A.   No, I can't --
21      Q.   No?
22      A.   -- say I have.

Page 297

1      Q.   Okay.  You understand the strategic
2 substitute concept applying to peanut butter and
3 jelly, that if the price of peanut butter goes up
4 -- I'm sorry -- goes -- goes in one direction,
5 the price of jelly could go in the other
6 direction?
7      MS. STRICK:  Objection: form.
8      THE WITNESS:  I think I
9 understand what you're talking about.  But
10 I haven't seen the peanut butter and jelly
11 example before.
12      BY MS. GOODMAN:
13      Q.   Okay.  Applying the concept of
14 strategic substitutes to peanut butter and jelly,
15 does that make sense, to you, that if the price
16 of peanut butter goes up or down, the price of
17 jelly moves in the opposite direction?
18      MS. STRICK:  Objection: form.
19      THE WITNESS:  I mean, the
20 definition of "strategic substitutes" is
21 that the best-response function of one firm
22 is negatively sloped as opposed to

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL

Page 298

1 positively sloped.
2         The standard example is what's
3 called Cournot competition, as opposed to
4 Bertrand competition, which is the type of
5 competition that I discuss in my report
6 leading to the take rates being strategic
7 complements.
8         BY MS. GOODMAN:
9         Q.    So in the same way that you claim
10 the price of competing exchanges are strategic
11 complements, does economic theory support the
12 idea that prices of complements, like exchanges
13 in ad buying tools, are strategic substitutes?
14         MS. STRICK: Objection: form.
15         THE WITNESS: It's possible.
16         BY MS. GOODMAN:
17         Q.    And did you consider that at all in
18 your analysis in this case?
19         MS. STRICK: Objection: form.
20         THE WITNESS: In my rebuttal
21 report, I explain why the example that you
22 provided of changes in prices of ad buying

Page 299

1 tools is something that I hold fixed in
2 contemplating the -- in defining the
3 but-for world.
4         BY MS. GOODMAN:
5         Q.    So is it accurate that you did not
6 consider in your analysis whether economic theory
7 supports the idea that prices of complements like
8 exchanges and ad buying tools are strategic
9 substitutes?
10         MS. STRICK: Objection: form.
11         THE WITNESS: I did consider the
12 complementarity between ad buying tools and
13 exchanges, but for reasons explained in my
14 rebuttal report, when I'm holding fixed the
15 prices charged by the ad buying tools, it's
16 not necessary to consider best-response
17 functions as between those two products.
18         BY MS. GOODMAN:
19         Q.    But you agree that the price of ad
20 buying tools could change if the price of ad
21 exchange -- ad exchanges changes, correct, given
22 that they're complements?

Page 300

1         MS. STRICK: Objection: form.
2         THE WITNESS: In your
3 hypothetical, is there market power in the
4 ad buying tool market?
5         BY MS. GOODMAN:
6         Q.    I'm asking you a question. This is
7 not my deposition -- you're not deposing me.
8         A.    Sorry.
9         Q.    My --
10         A.    It depends.
11         Q.    Okay. And you recognize that the
12 Government alleges Google has market power in the
13 ad buying tool market?
14         A.    Yes.
15         Q.    Okay. Now, did you attempt to
16 calculate how much -- how much higher Google's
17 rivals' prices are in the as-is world based on
18 this principle of strategic complementarity?
19         MS. STRICK: Objection: form.
20         THE WITNESS: No.
21         BY MS. GOODMAN:
22         Q.    And so you don't know what the

Page 301

1 price -- what the -- what particular RevShare
2 another exchange would charge in the
3 but-for world, right?
4         MS. STRICK: Objection: form.
5         THE WITNESS: When we discussed
6 the same concept earlier today, I explained
7 it's standard in economics to use economic
8 models to think about the direction of an
9 effect without measuring it. And so, as I
10 explain in my report, strategic
11 complementarities provides a basis for the
12 conclusion that my estimates are
13 conservative, but it doesn't lead me to
14 quantify changes in the as-is take rates of
15 other exchanges.
16         BY MS. GOODMAN:
17         Q.    And is there anything in your
18 comparables approach that would lead you to
19 conclude that the but-for world means the but-for
20 price is -- everything goes to the average,
21 meaning that the but-for price is the weighted
22 average?

76 (Pages 298 - 301)

Page 302

1    MS. STRICK: Objection: form.
2    THE WITNESS: Could you repeat
3    that question?
4    BY MS. GOODMAN:
5    Q. Is there any analysis you did for
6    your comparables approach that would lead to the
7    conclusion that the but-for world would mean
8    Google's but-for price would, in fact, go to
9    16.2 percent?
10   MS. STRICK: Objection: form.
11   THE WITNESS: I'm still -- so in
12   my report, I explain why the conduct that
13   is removed in the but-for world supports
14   Google's as-is prices so that removing that
15   conduct would lead to increased competition
16   and lower take rates in the relevant
17   antitrust market.
18   And the basis of the comparables
19   approach is that one can use an average of
20   prices in transactions that are comparable,
21   except for the market power and the
22   conduct, as a benchmark -- or a yardstick,

Page 303

1    I should say, for what the -- for what AdX
2    would charge but for the conduct that
3    defines a but-for world.
4    BY MS. GOODMAN:
5    Q. And in the but-for world that
6    you're hypothesizing here, there are six out of
7    seven firms which charge higher than the average
8    take rate, correct?
9    MS. STRICK: Objection: form.
10   THE WITNESS: The weighted
11   average take rate is below the average take
12   rate for, yes, six of the exchanges that
13   provided usable data.
14   BY MS. GOODMAN:
15   Q. And so do you have any reason to
16   conclude that Google could not charge one of
17   those higher average take -- higher-than-average
18   take rates in the but-for world?
19   MS. STRICK: Objection: form.
20   THE WITNESS: I explained that
21   the comparables approach is done at the
22   level of the transactions, and so the

Page 304

1    yardstick that I use is the average price
2    across all the transactions on all of the
3    exchanges in the same market that provided
4    usable data. I think of it as a relatively
5    standard thing to do.
6    The question is whether -- you
7    know, I sort of lost track of the question.
8    But it's a standard application and, as I
9    said, I have reasons to think that the
10   results it produces are conservative based
11   on the concept of strategic
12   complementarity. And as I explained in the
13   rebuttal, what I'm doing is not based on
14   pairwise comparisons of the exchanges in
15   the data.
16   BY MS. GOODMAN:
17   Q. So is it your testimony it's
18   inappropriate to compare Google to any one
19   individual exchange?
20   MS. STRICK: Objection: form.
21   THE WITNESS: My opinion is that
22   in conducting this analysis, after you --

Page 305

1    you know, in going through the five steps
2    that I outline for performing a comparables
3    analysis --
4    BY MS. GOODMAN:
5    Q. Well, I --
6    A. -- you start by identifying the
7    comparable transactions.
8    Q. -- sir, I'm not asking you to walk
9    me through your methodology again.
10   A. Okay.
11   Q. My question is simply, Is it
12   appropriate as part of your methodology to
13   compare Google to any one of the other individual
14   competing exchanges in the comparables approach?
15   MS. STRICK: Objection: form.
16   THE WITNESS: It's more
17   appropriate to pool the data that's
18   available on comparable transactions and
19   rely on the weighted average than to do any
20   pairwise comparisons. That's why I
21   proceeded that way.
22

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL

Page 306

1          BY MS. GOODMAN:
2     Q.    Okay.  Is it inappropriate, then,
3  to compare Google to any one of the other
4  individual exchanges in the comparables approach?
5          MS. STRICK:  Objection: form.
6          THE WITNESS:  I would have to
7  consider it.
8          In other applications, I have
9  seen comparables selected in different
10  ways.  But here, my view is that the most
11  reliable way to proceed is to pool all of
12  the transactions in the relevant market and
13  use a weighted average.
14          BY MS. GOODMAN:
15     Q.    And to be clear, you didn't have
16  actual transaction-level data to pool, correct?
17          MS. STRICK:  Objection: form.
18          THE WITNESS:  My report explains
19  how the weighted average that I take
20  produces the exact same average as I --
21  would be produced if I had impression-level
22  data to calculate that average.

Page 307

1          BY MS. GOODMAN:
2     Q.    And you used sets of exchange-level
3  data to do your comparables approach?
4     A.    That's correct.  I used data from
5  exchanges that was produced at a level of
6  aggregation higher than the impression.
7     Q.    Okay.  So UPR, unified pricing
8  rules -- you understand that under UPR,
9  publishers can set different price floors on
10  parameters, such as CPM type of ad, ad size,
11  creative types or devices?
12          MS. STRICK:  Objection: form.
13          THE WITNESS:  I haven't looked
14  specifically at all of those parameters;
15  but, yes, I understand that publishers have
16  the ability to set floors in a variety of
17  ways, just not differentially across ad
18  exchanges.
19          BY MS. GOODMAN:
20     Q.    Okay.  And your report states that
21  Google introduced UPR in September of 2019 and
22  that's why you selected that time period for your

Page 308

1  event study, right?
2          MS. STRICK:  Objection: form.
3          THE WITNESS:  Yes, the event
4  study contained -- I selected a time period
5  that runs from one year prior to UPR to, I
6  think, two years after, although I looked
7  at different-sized event windows as a way
8  of checking the robustness of the
9  conclusions.
10          BY MS. GOODMAN:
11     Q.    And the event window which you
12  selected centered around the date that you
13  determined -- or you found UPR to start in
14  September of 2019, correct?
15          MS. STRICK:  Objection: form.
16          THE WITNESS:  Not centered, no.
17          BY MS. GOODMAN:
18     Q.    It's not equidistant on both sides.
19  I recognize that.  But you used that
20  September 2019 date to set the before-and-after
21  windows, correct?
22          MS. STRICK:  Objection: form.

Page 309

1          THE WITNESS:  UPR implementation
2  has to fall within the event window.  Yes.
3          BY MS. GOODMAN:
4     Q.    Okay.  And you -- did you consider
5  at all the fact that Google first launched UPR in
6  beta in May of 2019 --
7          MS. STRICK:  Objection: form.
8          THE WITNESS:  I --
9          BY MS. GOODMAN:
10     Q.    -- in -- in designing your event
11  study?
12     A.    -- I recall seeing some timing of
13  beta.  But one would normally use the full
14  implementation as the date.
15     Q.    Why do you say that One would
16  normally use the full implementation of the date?
17     A.    I guess my understanding -- well,
18  let me -- let me go back.
19          In the event study, I include some
20  coefficients for a short-run effect and a long
21  run effect.  So it's possible to imagine changes
22  over time in the effect of an event.  And I

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL

Page 334

1    Google, and that is what is done with the
2    alpha and the rho coefficients.
3         There is no effect of UPR on
4    rival exchanges excluding Google in the
5    model because it's not something that you
6    would do in this kind of a model.
7         BY MS. GOODMAN:
8         Q.   So -- okay.  Let's assume in my
9    hypothetical, output increases by 100, and let's
10   assume that all 100 of those impressions go to
11   AdX.
12        Would your model show you that
13   AdX's impressions increased over its rivals by
14   100?
15        MS. STRICK:  Objection: form.
16        THE WITNESS:  I believe the
17   predicted quantities would match up with
18   the data.  So yes.
19        BY MS. GOODMAN:
20        Q.   Okay.  And that's the -- in the
21   same way that if output remains equal or remains
22   the same and simply Google takes 50 from its

Page 335

1    rivals.
2         In that scenario, your model
3    would also show that AdX's impressions increased
4    over its rivals by 100?
5         MS. STRICK:  Objection: form.
6         THE WITNESS:  It is -- alpha and
7    rho here do measure changes in relative
8    impressions, yes.
9         BY MS. GOODMAN:
10        Q.   So in both of those hypotheticals
11   that I gave you where, in one, output stays the
12   same and, in another, output increases, your
13   model would show the same net increase for Google
14   over its rivals; is that accurate?
15        MS. STRICK:  Objection: form.
16        THE WITNESS:  I think that's
17   accurate.  As I said, the -- time-fixed
18   effects control for time trends, factors
19   that affect output overall, and the alpha
20   and the rho coefficients measure relative
21   changes; so changes in Google's impressions
22   won relative to the other exchanges, which

Page 336

1    is, I think, what you're describing in your
2    hypothetical.
3         BY MS. GOODMAN:
4         Q.   And in a scenario where the
5    market -- where output increases by 100
6    impressions, does your model -- can your model
7    predict or show whether all of those increased
8    100 impressions went to AdX?
9         MS. STRICK:  Objection: form.
10        THE WITNESS:  Can my model show
11   whether all impressions -- so in your
12   hypothetical now, there's a change over
13   time in the number of impressions as well
14   as a change in the share of impressions won
15   by each exchange; is that correct?
16        BY MS. GOODMAN:
17        Q.   Was a change in the -- yes --
18   percentagewise, yes.
19        So in a world where output
20   increases by 100 and all 100 -- well, if -- in --
21   let's assume -- let me start over.
22        Output increases marketwide by 100

Page 337

1    impressions.
2         Can your model show whether all 100
3    went to AdX or if there was any split between AdX
4    and competing exchanges in the winning of those
5    impressions?
6         MS. STRICK:  Objection: form.
7         THE WITNESS:  In -- in the
8    example, there's an overall market growth
9    of 100 impressions.
10        Did you say in the example what
11   happens to the relative shares of
12   impressions?
13        BY MS. GOODMAN:
14        Q.   No.  I simply want to know if your
15   model would predict the relative -- how much of
16   that 100 goes to Google versus an -- a competing
17   exchange.
18        MS. STRICK:  Objection: form.
19        THE WITNESS:  I believe it
20   depends on the changes in the relative
21   number of impressions, which you haven't
22   specified in the hypothetical yet.

85 (Pages 334 - 337)

HIGHLY CONFIDENTIAL

Page 338

1    BY MS. GOODMAN:
2        Q.    Well, I'm saying it goes up by 100.
3        A.    There's two things here, right?
4    There's the total number of impressions, and
5    there's the distribution of impressions across
6    exchanges.
7              And so far, I've heard you say the
8    total number of impressions increases by 100.
9    And I apologize if I'm slow.  I simply haven't
10   heard you say what happens to the relative shares
11   of impressions.
12       Q.    So in a world where -- where all
13   100 go to Google, does your model show that AdX
14   took those impressions from rival exchanges?
15             MS. STRICK:  Objection: form.
16             THE WITNESS:  I see.
17             The model -- so what happens in
18   the -- the -- model is that there is a
19   distribution of impressions across
20   exchanges that is identified by the pre-UPR
21   time period.  And the assumption of the
22   model is that that distribution of

Page 339

1    impression across exchanges would be
2    consistent over time in the post-UPR time
3    period.
4              In your hypothetical, if Google
5    wins all of the post-UPR impressions,
6    that's inconsistent with what the data is
7    telling us from the pre-UPR time period.
8    And so the -- the difference in the
9    distribution of impressions post-UPR
10   compared to pre-UPR is attributed to
11   Google's conduct, all 100.
12             BY MS. GOODMAN:
13       Q.    And what about where there's a
14   total output increase of 100, and 80 go to AdX
15   and 20 go to competing exchanges?  Would your
16   model similarly attribute that as evidence that
17   AdX took impressions from rival exchanges?
18             MS. STRICK:  Objection: form.
19             MS. CLEMONS:  We're getting
20   reports that there's audio issues on the
21   Zoom.
22             MS. GOODMAN:  Okay.  Shall we

Page 340

1    break?
2              THE VIDEOGRAPHER:  What's the
3    matter?
4              MS. CLEMONS:  The folks on Zoom
5    are saying they can't hear.
6              THE WITNESS:  Did this guy
7    (indicating) run out of battery?
8              MS. GOODMAN:  Well, let's take a
9    break, because it's my record and my time.
10             THE VIDEOGRAPHER:  We're going
11   off the record at 5:11 p.m.
12             --oOo--
13             (Whereupon, a recess was taken from
14             5:11 p.m. EST to 5:22 p.m. EST.)
15             --oOo--
16             THE VIDEOGRAPHER:  We're now back
17   on the record at 5:22 p.m.
18             You may proceed.
19             BY MS. GOODMAN:
20       Q.    So you acknowledge that the
21   introduction of UPR was accompanied by a move to
22   the first-price auction, correct?

Page 341

1              MS. STRICK:  Objection: form.
2              THE WITNESS:  Yes.
3              BY MS. GOODMAN:
4        Q.    And you say that the introduction
5    of UFPA would not have had an effect on your
6    event study; is that -- am I understanding your
7    opinion correctly?
8              MS. STRICK:  Objection: form.
9              THE WITNESS:  What my opening
10   report says is that you can think of three
11   things happening: the transition to UFPA,
12   which necessitates the removal of last look
13   and UPR; that the removal of last look,
14   based on the evidence I've seen, would have
15   made the event study results conservative;
16   and the baseline economic view of a
17   transition from a second-price to a
18   first-price auction would be neutral.
19             BY MS. GOODMAN:
20       Q.    And did you do any empirical
21   analysis to figure out whether UFPA makes the
22   event study results conservative?

86 (Pages 338 - 341)

1     MS. STRICK: Objection: form.

2          THE WITNESS: I was not able to,

3     but I looked at experiments conducted by

4     Google that provided results that are

5     consistent with that view.

6          BY MS. GOODMAN:

7          Q.    Okay. And does your event study

8     control for any increase in -- increase in

9     impressions earned by AdX being due to UFPA?

10         MS. STRICK: Objection: form.

11         THE WITNESS: The regression --

12    no. It does what I explained a moment ago.

13    The evidence I've seen suggests that UFPA

14    is neutral except for the removal of the

15    last look, which makes the results

16    conservative.

17         BY MS. GOODMAN:

18         Q.    But it doesn't control for any

19    increase in impressions due to UFPA; is that

20    accurate?

21         MS. STRICK: Objection: form.

22         THE WITNESS: In the sense of

1     including a variable that somehow captures

2     the effect of U- -- UFPA in the regression,

3     it does not.

4          BY MS. GOODMAN:

5          Q.    Okay. And is it accurate that your

6     model -- your event study model measures only

7     average differences in -- in terms of a percent

8     change of impressions by AdX and competitors?

9          MS. STRICK: Objection: form.

10         THE WITNESS: What -- what is

11    "only"? I mean, what -- I don't

12    understand.

13         Only relative to what?

14         BY MS. GOODMAN:

15         Q.    The -- there's only one measurement

16    which comes out of your regression; is that

17    accurate?

18         MS. STRICK: Objection: form.

19         THE WITNESS: No.

20         BY MS. GOODMAN:

21         Q.    Okay. And so can your model

22    disentangle output expansion from a

1     redistribution --

2          MS. STRICK: Objection: form.

3          BY MS. GOODMAN:

4          Q.    -- of AdX impressions -- of web

5     display impressions?

6          MS. STRICK: Objection: form.

7          THE WITNESS: My model controls

8     for factors that lead to expansion in the

9     size of the market through the monthly

10    fixed effects. The key param- -- the event

11    study parameters, alpha and rho, measure

12    redistribution of impressions following UPR

13    implementation relative to the

14    before-UPR-implementation time period.

15         BY MS. GOODMAN:

16         Q.    And that parameter does not measure

17    -- does not include redistribution of impressions

18    following UFPA; is that accurate?

19         MS. STRICK: Objection: form.

20         THE WITNESS: For the reasons we

21    just discussed, the results are

22    conservative in the sense that the Google

1     experiments I looked at suggests that the

2     key factors in UFPA and removal of last

3     look led to a decline in the number of

4     impressions won by Google.

5          BY MS. GOODMAN:

6          Q.    And so the answer to my question is

7     no; is that -- is that right --

8          MS. STRICK: Objection: form.

9          BY MS. GOODMAN:

10         Q.    -- that your event study parameters

11    do not measure the redistribution of impressions

12    following UFPA?

13         MS. STRICK: Objection: form.

14         THE WITNESS: I don't think

15    that's -- I'm not sure what you read back

16    from, but I don't think that that's the

17    same answer.

18         It's correct that there's no

19    parameter in this regression corresponding

20    to UFPA, but for the reasons I explained,

21    that makes, you know, sort of the effects

22    that I'm measuring here are conservative

87 (Pages 342 - 345)

HIGHLY CONFIDENTIAL

Page 346

1  relative to doing so.
2         BY MS. GOODMAN:
3         Q.   Okay.  I'm handing you
4  Simcoe Exhibit 6.
5              --oOo--
6         (Simcoe Deposition Exhibit Number
7          6, Empirical Etiquette, marked
8          for identification, as of this
9          date.)
10             --oOo--
11        BY MS. GOODMAN:
12        Q.   And I'll ask you if you recognize
13  this as your empirical etiquette, which you have
14  put on your website.
15             (Whereupon, the witness reviews
16              the material provided.)
17        THE WITNESS:  Yes.
18        BY MS. GOODMAN:
19        Q.   And did you discuss in the -- in
20  your event study section of your report what you
21  saw as the primary threat to causal inference --
22        MS. STRICK:  Objection --

Page 347

1         BY MS. GOODMAN:
2         Q.   -- as reflected in your General
3  Etiquette Number 3 on Page 1 of Exhibit 6?
4         MS. STRICK:  -- objection: form.
5         THE WITNESS:  Yes.
6         (Sotto voce discussion between
7          cocounsel.)
8         BY MS. GOODMAN:
9         Q.   And where is that in your report
10  where you discuss the primary threat, that causal
11  inference on the event study model?
12        A.   I don't, in my report, call it the
13  "primary threat to causal inference," but what I
14  discuss are differences across exchanges that
15  could be correlated with differences in take
16  rates which are controlled for by exchange fixed
17  effects and the fact that UPR is implemented at
18  the same point in time as UFPA and the removal of
19  last look.  And I discuss how the threat to
20  causal inference there leads me to estimate a
21  conservative effect of UPR.
22        Q.   And did you consider your rules of

Page 348

1  etiquette when conducting your report in this
2  case -- or constructing your models and writing
3  your report in this case?
4         MS. STRICK:  Objection: form.
5         THE WITNESS:  The etiquette rules
6  here are meant to provide guidance for
7  Ph.D. students who are getting started on
8  writing academic papers.  But, in general,
9  I try to follow the rules of etiquette in
10  all of the empirical research I do.
11        BY MS. GOODMAN:
12        Q.   And so it's your testimony that
13  your empirical rules of etiquette should apply to
14  your analysis in a litigation, correct?
15        MS. STRICK:  Objection: form.
16        THE WITNESS:  It depends.
17        BY MS. GOODMAN:
18        Q.   What does it depend on?
19        A.   Well, it depends on what's being
20  done in the litigation, and it depends on the
21  type of analysis.  As the etiquette rules here
22  show, there's different things one ought to do

Page 349

1  when reporting results depending on the kinds of
2  analysis that's performed.
3         Q.   Okay.  Did you -- do your empirical
4  -- your rules of empirical etiquette apply to
5  your analysis in this litigation?
6         MS. STRICK:  Objection: form.
7         THE WITNESS:  In doing this
8  litigation, I didn't go back and consult my
9  own list but, as I testified, I try to
10  follow good practice for reporting
11  empirical results both in my academic work
12  and when I do analysis in a litigation
13  context.
14        BY MS. GOODMAN:
15        Q.   Okay.  And so one of your best
16  practices for a diff-in-diffs and panel data --
17  let's turn to Page 2 of Exhibit 6 under
18  diff-in-diffs and Panel Data.  Number 2, Check
19  the maintained a sub -- assumption on
20  pre-/post-treatment data.  Sometimes this is
21  called pretrends test.
22             Did you check whether

88 (Pages 346 - 349)

HIGHLY CONFIDENTIAL

Page 366

1 would be captured by the error term in the
2 regression -- the event study regression model,
3 if that's what we're talking about.
4     Q.    Well, I'm asking what you're
5 talking about in your footnote.
6         What idiosyncratic factors are
7 you talking about which are not material to
8 understanding the overall difference between
9 Google's as-is and but-for take rates?
10     MS. STRICK:  Objection: form.
11     THE WITNESS:  Well, this
12 footnote is in the section of my report
13 that addresses the comparables approach, so
14 it seems we've moved from discussing the
15 event study to the comparables approach.  I
16 think -- well, let me see.
17     (Whereupon, the witness reviews
18         the material provided.)
19     THE WITNESS:  Footnote 242 just
20 refers to the idea that there are short-run
21 variations -- I think I'm referring to the
22 ones that you see in Figure 14 -- that

Page 367

1 deviate from long-run trends and that my
2 interest is in the long-run -- well, the
3 long-run difference in levels between AdX
4 and all of the other exchanges.
5     And I think I also discuss a bit
6 the long-run downward trend in the weighted
7 average take rate of all of the non-AdX's
8 exchanges.  And so for the purposes of that
9 discussion, I treat the wiggles in the blue
10 line in Figure 14 as idiosyncratic.
11     BY MS. GOODMAN:
12     Q.    Okay.  And those short-run
13 fluctuations that you see in Figure 14 -- did you
14 observe similar short-run fluctuations for
15 purposes -- in -- in designing your event study
16 that you took into account?
17     MS. STRICK:  Objection: form.
18     THE WITNESS:  These short-run
19 functions are a function of variation over
20 time across exchanges in the exchange data
21 that I use for the event study analysis.
22     In every economic -- in every

Page 368

1 regression economic model, there is
2 unobserved variability.  It's accounted for
3 by including an error term or residual in
4 the model, and that's what I did.
5     BY MS. GOODMAN:
6     Q.    Do the exchange-specific linear
7 trends that you talk about in your rebuttal
8 report -- report account for any short-run
9 fluctuations or idiosyncratic factors that could
10 -- that you observed in the exchange-level data
11 upon which your event study is based?
12     MS. STRICK:  Objection: form.
13     THE WITNESS:  They do in the
14 following sense:  Without the trends, there
15 are -- there will be more idiosyncratic
16 fluctuations.  Those fluctuations will be
17 in the residual.
18     By including the trends, I
19 explain more of the overall variability in
20 the data, making the residual smaller and,
21 in that sense, explaining the idiosyncratic
22 variations.

Page 369

1     BY MS. GOODMAN:
2     Q.    Okay.  For purposes of your
3 apportionment analysis, you conclude that the
4 FAAs are representative advertisers, correct?
5     MS. STRICK:  Objection: form.
6     THE WITNESS:  In the tax
7 incidence model or apportionment analysis,
8 I estimate supply and demand elasticities
9 for the entire market that I think that
10 I -- in my opinion, are appropriate to
11 apply to the FAAs.
12     BY MS. GOODMAN:
13     Q.    Because the FAAs, in your opinion,
14 are representative advertisers --
15     MS. STRICK:  Objection: form.
16     BY MS. GOODMAN:
17     Q.    -- is that accurate?
18     MS. STRICK:  Objection: form.
19     THE WITNESS:  I think it's more
20 accurate to say, because the FAAs are
21 buying in the market and they're a large
22 buyer that buy a variety of ads in the open

93 (Pages 366 - 369)

HIGHLY CONFIDENTIAL

Page 370

1    web display impression market than because
2    they are representative of other
3    advertisers in all of the advertiser
4    characteristics.
5        BY MS. GOODMAN:
6        Q.   So in Paragraph 127 of your opening
7    report on Page 59, you say you treat the FAAs as
8    a representative advertiser.
9            Should that sentence be
10   rewritten to say more accurately the FAAs are
11   buying in the market and they're a large buyer
12   and for that reason, they are representative?
13       MS. STRICK:  Objection: form.
14       THE WITNESS:  I wouldn't say that
15   for that reason, they are representative.
16   That wouldn't make the sentence that you're
17   interested in more accurate.
18       BY MS. GOODMAN:
19       Q.   So do you stand by what you wrote
20   in your report, that it's appropriate to treat
21   the FAAs as representative advertisers?
22       A.   In that context, the term

Page 371

1    "representative advertiser" is a term that an
2    economist would understand to mean an estimating
3    marketwide supply and demand elasticities, and so
4    I stand by my report in that sense.  And I think
5    I clarified the confusion that may have resulted
6    from using the term "representative advertiser"
7    with respect to advertiser characteristics in my
8    rebuttal report.
9        Q.   So did you consider any factors
10   that might make FAAs different from the
11   representative advertiser in reaching a con- --
12   in treating them as representative advertisers
13   for purposes of your report?
14       MS. STRICK:  Objection: form.
15       THE WITNESS:  In your question,
16   when you say I treated them as
17   representative advertisers, are we taking
18   that to mean what I just explained it
19   means, that I'm estimating marketwide
20   supply and demand elasticities?
21       BY MS. GOODMAN:
22       Q.   Well, not quite.

Page 372

1        I guess what I'm asking is, Did
2    you consider any factors that might make it
3    improper to treat an FAA as a representative
4    advertiser in the way that you've described it,
5    which is, estimating marketwide supply and demand
6    elasticities?
7        MS. STRICK:  Objection: form.
8        THE WITNESS:  I considered
9    whether marketwide supply and demand
10   elasticities would be an appropriate way to
11   -- well, provide the right inputs into the
12   tax incidence model that I used for
13   apportionment and based on the scale and
14   variety of impressions purchased by the
15   FAAs collectively, as well as the fact that
16   they're participating in this worldwide
17   market for open wide display impressions
18   that have reasonably substitutable
19   impressions in them, that that would be an
20   appropriate approach.
21       BY MS. GOODMAN:
22       Q.   Okay.  And in order for your

Page 373

1    but-for take rates to be applied to the FAAs
2    under any model that you've put forward, you have
3    to treat the FAAs as representative advertisers,
4    right?
5        MS. STRICK:  Objection: form.
6        THE WITNESS:  That question
7    started with but-for take rates and then
8    proceeded to the apportionment analysis.
9        BY MS. GOODMAN:
10       Q.   Well, the apportionment analysis is
11   based on your but-for take rates, right?
12           You're apportioning the but-for
13   take rates, right?
14       A.   It's not based --
15       MS. STRICK:  Objection: form.
16   You may go.
17       THE WITNESS:  I'm sorry.
18   -- the apportionment is not based
19   on the but-for take rates, no.
20       BY MS. GOODMAN:
21       Q.   Well, you're using the but-for take
22   rates as an input to your apportionment analysis,

94 (Pages 370 - 373)

HIGHLY CONFIDENTIAL

Page 374

1 right?
2          MS. STRICK: Objection: form.
3          THE WITNESS: I'm using the
4    but-for take rates and the tax incidence
5    model that allows for apportionment jointly
6    in the overcharge calculation -- yes, to
7    provide the -- the final output, which is
8    the percentage overcharge.
9          BY MS. GOODMAN:
10    Q.    Right. And so in order to -- for
11 your apportionment analysis to be valid, does it
12 -- is -- does it have to be the case that FAAs
13 are representative advertisers for purposes of
14 the comparables approach in the event study
15 approach which you design to come up with a
16 but-for take rate based on those marketwide
17 conditions?
18          MS. STRICK: Objection: form.
19          THE WITNESS: Again, I don't
20    understand the way that you're linking the
21    parameters that I use -- or the estimates
22    that I obtain of supply and demand

Page 375

1    elasticity, which are inputs into the tax
2    incidence model --
3          BY MS. GOODMAN:
4    Q.    Okay.
5    A.    -- which is for apportionment -- I
6 don't understand how you're linking it to the
7 but-for take rate calculations --
8    Q.    All right.
9    A.    -- they're just multiplied together
10 in the end, and that provides the final output,
11 which is the percentage overcharge.
12    Q.    So did you consider at all in your
13 analysis the fact that, for example, the Census
14 only advertises in a discrete period of time once
15 every 10 years?
16          MS. STRICK: Objection:
17    foundation; form.
18          THE WITNESS: I considered the
19    Census and the other FAAs collectively to
20    be a large set of advertisers that purchase
21    a diverse array of ads.
22

Page 376

1          BY MS. GOODMAN:
2    Q.    Okay. Did you consider the fact
3 that other than -- other than for the Postal
4 Service, none of the FAAs actually sell a product
5 that they're advertising?
6          MS. STRICK: Objection:
7    foundation; form.
8          THE WITNESS: I don't know that I
9    specifically considered the differences in
10    the products provided by the armed
11    services, the Postal Service, the Census.
12          BY MS. GOODMAN:
13    Q.    Okay. Did you consider the fact
14 that the FAAs have to go through a highly
15 regulated Government contracting process in order
16 to obtain the funds -- or the con- -- or to
17 contract with ad agencies who go out and actually
18 purchase ads on their behalf?
19          MS. STRICK: Objection:
20    foundation; form.
21          THE WITNESS: I considered the
22    FAAs as advertisers, and I explained in my

Page 377

1    rebuttal report why the advertiser-specific
2    characteristics that you're referring to
3    are not something that I needed to account
4    for in obtaining the inputs to the tax
5    incidence model that I used for
6    apportionment. Because they're buying in
7    the open web display impressions market,
8    and in that market, they're competing with
9    other advertisers who are similar to them
10    and different to them.
11          And it's -- the incidence of the
12    overcharge depends on the price of the
13    product as opposed to the attributes of the
14    advertiser.
15          BY MS. GOODMAN:
16    Q.    Okay. Do the FAAs face the same
17 demand curves?
18          MS. STRICK: Objection: form;
19    foundation.
20          THE WITNESS: At the market
21    level, buyers of open web display
22    advertising impressions that are similar

95 (Pages 374 - 377)

HIGHLY CONFIDENTIAL

1    face similar -- well, face the same demand
2    curves.  The -- they -- let me -- let me
3    step back.
4            The FAAs are buyers, right?  So
5    the FAAs have a willingness to pay --
6    they -- they're creating the demand curve
7    --
8            BY MS. GOODMAN:
9       Q.    Okay.
10      A.    -- so they don't face the demand
11   curve.
12      Q.    Do they have the same demand curves
13   --
14           MS. STRICK:  Objection --
15           BY MS. GOODMAN:
16      Q.    -- do they have -- do they generate
17   the same amount of demand --
18           MS. STRICK:  -- objection: form.
19           BY MS. GOODMAN:
20      Q.    -- compared to one another?
21      A.    The FAAs purchase different numbers
22   of impressions relative to one another.

1       Q.    Okay.  So is it fair to say that
2    means they have different demand curves?
3            MS. STRICK:  Objection: form.
4            THE WITNESS:  In my rebuttal
5        report, I explain why the
6        advertiser-specific demand curve idea isn't
7        an appropriate way to think about --
8            BY MS. GOODMAN:
9       Q.    I understand that --
10      A.    -- the tax incidence here.
11      Q.    -- I understand that.
12           My question is -- you say it's
13   not appropriate.  I just want to know if they, in
14   fact, have different demand curves.
15           MS. STRICK:  Objection: form.
16           THE WITNESS:  I would assume that
17       based on their own objectives in purchasing
18       ads, they purchase different kinds of ads
19       as well as different quantities of ads.
20       And in that sense, they're -- the demand of
21       the FAAs is different from one another --
22

1            BY MS. GOODMAN:
2       Q.    Okay.
3       A.    -- yes.
4       Q.    Okay.  And so would your but-for
5    revenue shares and apportionment analysis apply
6    to a specific FAA if it is considered -- if -- if
7    someone -- if one were to conclude it was not a
8    representative advertiser?
9            MS. STRICK:  Objection: form.
10           THE WITNESS:  Could you repeat
11       that question?
12           BY MS. GOODMAN:
13      Q.    Would your apportionment
14   analysis -- your tax incidence model apply to a
15   specific FAA if it were -- if one reached the
16   conclusion that that FAA is not a representative
17   advertiser, as you use that phrase?
18           MS. STRICK:  Objection: form.
19           THE WITNESS:  As I use the
20       phrase, it's not necessary to reach a
21       conclusion about them being a
22       representative advertiser.

1            BY MS. GOODMAN:
2       Q.    So you don't need -- in order for
3    your apportionment analysis to apply to the
4    actual FAAs in this case, it's your testimony you
5    don't have to conclude that they have similar
6    marketwide supply and demand curves as you are
7    evaluating?
8            MS. STRICK:  Objection: form.
9            THE WITNESS:  Because they're
10       buying in the same market, they do face
11       similar marketwide supply and demand
12       curves.
13           BY MS. GOODMAN:
14      Q.    But not the same ones, correct?
15      A.    In this line . . .
16           MS. STRICK:  Objection: form.
17           BY MS. GOODMAN:
18      Q.    Go ahead.
19      A.    Was there a question?
20      Q.    Yes.
21           You say they faced similar
22   marketwide supply and demand curves, and I said,

96 (Pages 378 - 381)

HIGHLY CONFIDENTIAL

Page 382

1  "But not the same ones, correct"?
2          MS. STRICK:  Objection: form.
3          THE WITNESS:  In the market for
4   open web display impressions, they face --
5   well, we talked about demand curves.
6   They generate the demand --
7          BY MS. GOODMAN:
8      Q.   Okay.
9      A.   -- I think they do face the same
10  supply curves -- residual supply curves.
11     Q.   What about demand curves?  Do they
12  generate the same demand curves?
13         MS. STRICK:  Objection: form.
14         THE WITNESS:  No.
15         BY MS. GOODMAN:
16     Q.   Okay.  And look at Figure 2 in your
17  rebuttal report, please -- it's the skinny one,
18  yeah -- on Page 19.
19         Does Figure 9 -- Figure 2 show
20  that advertisers have different demand
21  elasticities?
22         MS. STRICK:  Objection: form.

Page 383

1          THE WITNESS:  Figure 2 shows that
2   different disaggregated anonymized
3   advertiser IDs have different demand
4   elasticities, though it's unclear what that
5   means at the level of the anonymized
6   advertiser ID.
7          BY MS. GOODMAN:
8      Q.   Do you have a sense of how many
9   different advertisers are reflected in Google's
10  data overall?
11         MS. STRICK:  Objection: form.
12         THE WITNESS:  A very, very large
13  number of advertisers.
14         BY MS. GOODMAN:
15     Q.   Right.  And so even if it's
16  anonymized, do you think that this disaggregate
17  -- disaggregated anonymized advertiser ID demand
18  that is reflected here in Figure 2 reflects a
19  very, very large number of different advertisers?
20         MS. STRICK:  Objection: form.
21         THE WITNESS:  The dis- -- my
22  understanding is that the anonymized

Page 384

1   advertiser ID is an ID and that one
2   advertiser could have many advertiser
3   IDs --
4          BY MS. GOODMAN:
5      Q.   Right.
6      A.   -- and the purpose of this figure
7   is to show how, by doing this analysis that
8   Professor Chevalier did at the disaggregated
9   anonymized advertiser ID level, she overstates
10  the variation in advertiser ID-specific
11  elasticities.
12     Q.   Okay.  But your Figure 2 shows that
13  there is a difference between demand elasticities
14  among anonymized advertiser IDs, correct?
15         MS. STRICK:  Objection: form.
16         BY MS. GOODMAN:
17     Q.   Whether Cheval- -- Ms. --
18  Professor Chevalier overstated it or not, your
19  own analysis shows there's different demand
20  elasticities among advertiser IDs, right?
21     A.   Individual advertisers may have
22  different elasticities of demand or -- well,

Page 385

1   what's relevant is the aggregate demand
2   elasticity for the product that's being
3   purchased, as I explain in an example in my
4   rebuttal report here earlier on.
5          But in any case, the -- if we were
6   able to observe individual advertisers rather
7   than the anonymized ID, it's true that the
8   elasticity of demand for a product for a specific
9   buyer can differ across buyers.
10     Q.   Okay.
11         MS. STRICK:  Counsel, I believe
12  we're over time.
13         MS. GOODMAN:  What time are we at
14  on the record?
15         THE VIDEOGRAPHER:  You're at
16  six hours -- you're -- you're at seven
17  hours and two minutes.
18         MS. GOODMAN:  Okay.
19         Do you have any redirect?
20         MS. STRICK:  It will be about
21  10 minutes.
22         MS. GOODMAN:  Of redirect?

97 (Pages 382 - 385)

HIGHLY CONFIDENTIAL

Page 386

1          MS. STRICK:  Oh.  Let's take a

2    10 -- let's take a 10-minute break, go off

3    the record --

4          MS. GOODMAN:  Okay.

5          MS. STRICK:  -- when we'll get to

6    come back.

7          THE VIDEOGRAPHER:  We're now off

8    the record at 6:07 p.m.

9              --oOo--

10         (Whereupon, a recess was taken from

11         6:07 p.m. EST to 6:15 p.m. EST.)

12             --oOo--

13         THE VIDEOGRAPHER:  We're now back

14   on the record at 6:15 p.m.

15         You may proceed.

16         MS. STRICK:  I have no redirect.

17         MS. GOODMAN:  Okay.

18         THE VIDEOGRAPHER:  Okay.  This

19   now ends the deposition of

20   Dr. Timothy Simcoe.  We're off the record

21   at 6:15 p.m.

22         (Whereupon, the following

Page 387

1    discussion was held off the video record

2    and on the stenographic record:)

3          CERTIFIED STENOGRAPHER:  I

4    understand you will be getting daily,

5    Counsel.

6          And do you need the job daily as

7    well?

8          MS. CLEMONS:  Yes, we need daily

9    and a rough draft.

10         CERTIFIED STENOGRAPHER:  Sure,

11   not a problem.

12

13         (Witness excused.)

14         (Deposition concluded at 6:15 p.m.

15   EST.)

16

17

18

19

20

21

22

Page 388

1              C E R T I F I C A T E

2          I, Cindy L. Sebo, Nationally Certified Court

3    Reporter herein, do hereby certify that the foregoing

4    deposition of TIMOTHY S. SIMCOE, PH.D. was taken

5    before me pursuant to notice at the time and place

6    indicated; that said witness duly swore to tell the

7    truth, the whole truth, and nothing but the truth

8    under penalties of perjury; that said testimony of

9    witness was correctly recorded to the best of my

10   abilities in machine shorthand, thereafter

11   transcribed under my supervision with computer-aided

12   transcription; that deposition is a true and accurate

13   record of the testimony given by the witness; that I

14   am neither counsel, nor kin to any party in said

15   action, nor interested in the outcome; and that a

16   copy of this transcript obtained from a source other

17   than the court reporting firm, including an adversary

18   or co-counsel in the matter, is uncertified and may

19   not be used at trial.

20         CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR,

     RSA, CA CSR 14409, NJ Certified CR 30XI0024460,

21   NJ Certified RT 30XR00019500, NM CSR 589, NY

     Realtime Court Reporter, NY Association Certified

22   Reporter, OR CSR 230105, TN CSR 998, TX CSR

     12778, WA CSR 23005926, Notary Public

Page 389

1    Amanda Strick, Esq.

2    Amanda.strick@usdoj.gov

3          February 26, 2024

4    RE:   United States, Et Al v. Google, LLC

5    2/23/2024, Timothy  S. Simcoe (#6456894)

6      The above-referenced transcript is available for

7    review.

8      Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12     The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16   Return completed errata within 30 days from

17   receipt of testimony.

18   If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22         Yours,

23         Veritext Legal Solutions

24

25

98 (Pages 386 - 389)