Exhibit B

Page 146



Page 147

13        Q.    When you have conducted
14 preliminary interviews in the past,
15 whether for academic or litigation
16 surveys, did you ever take notes?
17        A.    You know, I don't recall
18 ever conducting such interviews. I might
19 have, but I just don't recall that.
20        As I said, I typically
21 worked with doctoral students on
22 research. And one of their privileges,
23 if you will, is they handle this kind of
24 work. And then we met to discuss. And

Page 148

1 that might have followed by a few
2 additional unstructured interviews.
3        Q.    In general, do you consider
4 it to be a best practice to take notes
5 during preliminary interviews?
6        A.    No.
7        Q.    Why not?
8        A.    Well, you know, each person
9 has his or her rules. And many years
10 ago, I noticed that, while being a
11 student, that I often took the time to
12 take notes. And then thinking back, I
13 said, have I ever used those notes. And
14 the conclusion was no, I just don't use
15 notes. And I developed a rule of let's
16 not waste my time and effort taking
17 notes.
18        Q.    So that's a rule that you
19 follow, not to take notes?
20        A.    You know, it's not written
21 anywhere. Just it's one of those rules
22 that we individuals develop, if you will,
23 over our lifetime.
24        Q.    So is the answer to my

Page 149

1 question yes, that is a rule you've
2 developed for yourself, not to take
3 notes?
4        MS. DEARBORN: Objection to
5        form. Asked and answered.
6        THE WITNESS: As I said,
7        yeah, based on my experience, I
8        do not take notes.
9 BY MS. WOOD:
10        Q.    Part of your academic work
11 has focused on people's propensity to
12 misremember things; is that right?
13        A.    Can you point me to a
14 particular article?
15        I published a number of
16 articles. I don't remember apropos all
17 the articles. Maybe you can point to a
18 particular article where I studied people
19 not remembering.
20        Q.    Do you have any -- as you
21 sit here now, do you recall publishing
22 any academic work in the field of
23 behavioral economics on how people are
24 subject to missed memories -- mistaken



Page 218

```
 6  BY MS. WOOD:
 7        Q.    Do you do that often?  Do
 8  something that you, in other
 9  circumstances, criticize?
10           MS. DEARBORN:  Objection to
11        form.
12           THE WITNESS:  It's -- might
13        have happened, depending on the
14        purpose of what I'm studying.
15           I mean, I don't -- I
16        wouldn't include in my actual
17        surveys flawed questions or
18        things that I criticized.  In
19        fact, I'm making effort for that
20        not to happen.  Most importantly,
21        because I believe in what I said.
22           And if I criticize them for
23        asking those kinds of questions,
24        I believe that the wrong thing to
```

Page 219

```
 1        say, to ask, and I would not
 2        include that in my surveys.
 3  BY MS. WOOD:
 4        Q.    But you have no problem with
 5  asking flawed questions that you've
 6  criticized, as long as you know in
 7  advance that you're not going to keep the
 8  results of those or use the results of
 9  those?
10        A.    Has --
11           MS. DEARBORN:  Please let
12        me get an objection in.
13           Objection to form.
14           THE WITNESS:  It has
15        nothing to do with keeping the
16        results or not keeping the
17        results.  It has absolutely
18        nothing to do with that.
```

Page 220

Page 221



Page 222

Page 224

```
 1    a complete run of the survey with a
 2    sufficiently large sample and you conduct
 3    a survey.  And sometimes people may do
 4    that because they want to -- to know what
 5    the result would be.
 6            A pretest, I think it often
 7    involves a smaller number of respondents,
 8    and it's often designed to test whether
 9    people, for example, say, I don't
10    understand what the survey is about, or
11    some -- something out of the ordinary
12    that tells you that there is something
13    wrong with the survey.
14            Q.    How many pretests do you
15    typically conduct for a survey?
16            A.    You said typically?  None.
17            Q.    And why is that?
18            A.    In the context of
19    litigation?
20            Q.    Yes.
21            A.    In the context of litigation
22    it would be -- you know, sometimes an
23    attorney would say, well -- if you talk
24    about pretest like a pilot sort of --
```

Page 223

```
13            Q.    And have you heard of the
14    term "pilot test" used?
15            A.    Yes.
16            Q.    Is there a difference, in
17    your mind, between a pretest and a pilot?
18            A.    You know, that's a good
19    question.  And I think probably different
20    people may use those terms either
21    interchangeably or as different.
22            Q.    And how do you use those
23    terms?
24            A.    In my mind, a pilot would be
```

Page 225

```
 1    someone would say, well, I'm curious
 2    if -- what you -- can you find
 3    respondents and what the results will be.
 4            So that will involve, you
 5    know -- you know, a significant sample
 6    size.  So that would be more along the
 7    lines of a pilot study.  That happens.
 8            I -- if someone tells me
 9    about that -- let's say someone calls me
10    about a trademark case and say, we -- we
11    want to find out if a survey will show
12    likelihood of confusion.
13            I often say, you know, the
14    threshold for likelihood of confusion is
15    relatively low, let's say 15 percent,
16    which means that there is a -- let's say,
17    in the southern district of New York, I
18    think it's 15 percent.  In some places it
19    might be slightly less.
20            It means you need a fairly
21    sizable sample size to find out -- I
22    mean, obviously, if level of confusion is
23    zero or 50 percent, you know, you don't
24    need a large sample.
```

Page 226

1    But let's say it's in the --
2  close to the threshold.  You need quite a
3  few respondents.  And I tell the
4  attorney, it's pointless.  Let's design a
5  survey as I think it should be designed
6  and let the chips fall as they may.  If
7  the results are what you expect, just --
8  that will be the survey.  I may add even
9  more respondents.
10    If the results are not what
11 you expect, then you will -- you will
12 decide what you want to do, but chances
13 are you will decide to hire another
14 expert.
15    Because if I would sit at a
16 deposition and someone would ask, are you
17 aware of any other survey that was
18 conducted, I would say yes, because I was
19 involved in a pretest, and I would have
20 to -- and that happens often.  That, you
21 know -- usually, if I think beforehand,
22 there's no way the attorney is correct, I
23 just say, let's not waste your client's,
24 you know, time and money.  If it's kind

Page 227

1  of not so clear, then I say, okay, let's
2  give it a try.
3    And sometimes it is what
4  they expect.  Other times it's not what
5  they expect.  If it's not what they
6  expect, I guess they tend to hire another
7  expert.
8    Q.   How many times in litigation
9  have you conducted a survey where you
10 used pretests?
14    Q.   Yes.
15    A.   Very, very few cases.  Very
16 few.  I cannot think -- I think there
17 were -- I did some pretests in the Oracle
18 v. Google case.
19    I might have done
20 pretests -- I'm not even sure about
21 that -- in a case involving the networks
22 against a company that was mostly in
23 New York, called Aereo -- I think it's
24 spelled A-E-R-E-O -- which offered prime

Page 228

1  time TV for, I don't know, $5 a month.
2  And that -- they were pretty successful.
3  I believe this case went all the way to
4  the Supreme Court.
5    But -- and that was sort of
6  an unusual -- that -- that was a
7  different kind of survey.
8    But I normally don't --
9  don't run pretests.  I just design the
10 survey as I think, based on my
11 experience, it should be conducted, and
12 then, as I said, let the chips fall as
13 they may.

Page 229



Page 282

Page 284

Page 283

Page 285

```
11          But, anyway, we can take a
12     break.
13          MS. WOOD:  Let's take a
14     break.
15          THE VIDEOGRAPHER:  Going
16     off the record at 3:17 p.m.
17          (Short break.)
18          THE VIDEOGRAPHER:  We are
19     going back on the record at
20     3:40 p.m.
21  BY MS. WOOD:
```

Page 310

Page 312

1  Obviously, the impact of violating
2  double-blind may vary to some extent
3  across surveys.  But I completely agree
4  that, in general, double-blind is an
5  important principle.
6       Q.    And that principle is there
7  in order to ensure objectivity, correct?
8       A.    In the case -- yeah, in many
9  cases, that's a key reason.  Right.
10      Q.    And, in fact, best practices
11 provide that the survey instrument itself
12 provide no explicit or even implicit
13 clues about the sponsorship, correct?
14      MS. DEARBORN:  Form.
15      THE WITNESS:  I think there
16 are many surveys where someone
17 could infer -- especially in
18 litigation but also in
19 academia -- where someone may
20 infer -- for example, if I show
21 you a toaster and it says Black &
22 Decker and I ask you who made
23 this product, I would assume that
24 many people would say it's

Page 311

Page 313

1  probably done for Black & Decker.
2  Why are they showing me Black &
3  Decker toaster.
4       So it's unavoidable, to
5  some extent, in many surveys.
6       But I completely agree that
7  in general, double-blind is an
8  important principle that I've
9  tried to follow.  Certainly
10 not -- I try not to reveal the
11 sponsor or purpose at the
12 beginning of a survey.
13 BY MS. WOOD:

17 BY MS. WOOD:
18      Q.    Would you agree that
19 double-blind protocols are standard
20 practice that should be employed in
21 surveys whenever possible?
22      A.    Yes.  When you start a
23 survey and while respondents answer the
24 questions, it is important to do that.





Page 318

Page 320

```
10        Q.    And what is focalism?
11        A.    There are many examples.
12              For example, if you ask
13  people to think about the consequences of
14  a particular event, let's say you move
15  from, maybe, D.C.  D.C., the weather is
16  not so bad.  But maybe moving from
17  Minneapolis to Santa Monica or
18  Burlingame, people may overfocus on the
19  weather, not -- recognizing there are
20  very many happy people in Minneapolis,
21  the weather notwithstanding.
22              So in other words, people
23  sometimes focus on something too much
24  and, thereby, overestimate its impact in
```

Page 319

```
1   cases involving patterns.
2               Sometimes survey experts,
3   particularly on behalf of plaintiffs, use
4   a technique called conjoint analysis.
5               And let's say that it's a
6   smartphone, and they present a few
7   features that are important, battery
8   life, brand name, screen size, important
9   attributes like that.  And they also
10  include something that we probably will
11  all agree is much less important.
12              But given that it -- this
13  less important feature is the focus of
14  the study, the conjoint study would tend
15  to overestimate its impact in reality.
16  So focalism could play different roles in
17  different situations.
```

Page 321

Page 374

[redacted]

```
 5        Q.    What did you do to prepare
 6  for this deposition today?
 7             MS. DEARBORN:  As usual,
 8        please set aside the contents of
 9        communications with counsel.
10             THE WITNESS:  So I reviewed
11        the documents that I have,
12        including my report or reports.
13        Various -- and attachments.
14             I met with counsel.
15             I think that's -- that's
16        what comes to mind.
17  BY MS. WOOD:
18        Q.    And how long did you meet
19  with counsel?
20        A.    So I think we had a meeting
21  also with the AG team.  I think it was
22  sort of a Zoom meeting that might have
23  lasted about two hours.  I'm not sure
24  about that.
```

Page 375

```
 1             And I think I met with
 2  counsel.  And there were also people from
 3  AG the past two days.  I think each
 4  meeting lasted, perhaps, maybe four, four
 5  and a half hours.
 6        Q.    Did anyone else, other than
 7  the AG team and counsel, participate in
 8  those meetings?
 9        A.    I don't think so.
10        Q.    And did you review any
11  documents in connection with your
12  preparation for this deposition that were
13  not produced?
14        A.    It's possible.
15        Q.    What documents did you
16  review that were not produced?
17        A.    I saw an e-mail, internal
18  e-mail, I think from 2018.
19             MS. DEARBORN:  Okay.  And I
20        don't think that you're entitled
21        to get the contents of documents
22        that were -- that were reviewed.
23             So please don't describe
24        the documents that you reviewed
```

Page 376

```
 1        in preparation for your
 2        deposition today.
 3             THE WITNESS:  Okay.
 4             MS. DEARBORN:  And --
 5  BY MS. WOOD:
 6        Q.    Were the documents you
 7  reviewed documents that Google's counsel
 8  showed to you?  You can just answer that
 9  yes or no.
10             MS. DEARBORN:  You can
11        answer that yes or no.
12             THE WITNESS:  Yes.
13             MS. DEARBORN:  And,
14        Counsel, I can make a
15        representation that those were
16        not documents that were not
17        produced in this case.
18             MS. WOOD:  Okay.  In other
19        words, every document he saw had
20        been produced in this case?
21             MS. DEARBORN:  Correct.
22  BY MS. WOOD:
```

[redacted]

Page 377

[redacted]



Page 378

Page 380

Page 379

Page 381

```
 1        MS. WOOD:  Why don't we go
 2   off the record.
 3        MS. DEARBORN:  Sure.
 4        THE VIDEOGRAPHER:  Going
 5   off the record at 5:34 p.m.
 6        (Short break.)
 7        THE VIDEOGRAPHER:  We are
 8   going back on the record at
 9   5:47 p.m.
10        MS. WOOD:  I am done with
11   my examination, subject to the
12   reservation of rights that I made
13   at the beginning of the
14   examination.  But I have no
15   further questions at this time.
16        MS. DEARBORN:  And yeah,
17   I'll notice that I think you have
18   45 minutes remaining.  So we'll
19   meet and confer about it and come
20   to a decision on next steps.
21        MS. WOOD:  Okay.  Great.
22        MS. DEARBORN:  I do have a
23   few questions for Dr. Simonson.
24        MS. WOOD:  And I obviously
```

392

1

2             ACKNOWLEDGMENT OF DEPONENT

3

4             I, Itamar Simonson, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 393, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _I-Simonson_____  3/28/2024

16   ITAMAR SIMONSON, Ph.D.          DATE

17

18

19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.

21   My commission expires:_____

22

23   _____
     Notary Public

24

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Errata Sheet for the Transcription of Itamar Simonson, Ph.D.

**Case Name:**   *United States et al v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.)

**Depo. Date:**   February 28, 2024

**Deponent:**   Itamar Simonson, Ph.D.

| Page | Line | Original | Corrected | Reason |
|------|------|----------|-----------|--------|
| 2 | 5 | Suite 8700 | Suite 8622 | Transcription Error or Mistake |
| 2 | 7 | "julia.wood@usdoj.gov" | "julia.tarver.wood@usdoj.gov" | Transcription Error or Mistake |
| 4 | 9 | "OFFICDE" | "OFFICE" | Transcription Error or Mistake |
| 20 | 9 | "That will be the Meta" | "That would be the Meta" | Transcription Error or Mistake |
| 25 | 22 | "usually would be" | "usually it will be" | Transcription Error or Mistake |
| 27 | 1 | "will be the company" | "would be the company" | Transcription Error or Mistake |
| █ | █ | ███████████ | ███████████ | ████████████ |
| █ | █ | ███████████ | ███████████ | ████████████ |
| 34 | 10:11 | "It's one example" | "Yeah, it's one example" | Transcription Error or Mistake |
| 45 | 12 | "context effects and choice" | "context effects in choice" | Transcription Error or Mistake |
| 50 | 24 | "should be reserved" | "should be preserved" | Transcription Error or Mistake |
| █ | █ | █████████ | ██████ | ████████ |
| 89 | 9 | "it does apply" | "it does not apply" | Transcription Error or Mistake |
| 89 | 13 | "programatic" | "programmatic" | Spelling Error |
| 91 | 21 | "programatic" | "programmatic" | Spelling Error |
| 92 | 5 | "programatic" | "programmatic" | Spelling Error |
| 92 | 17 | "programatic" | "programmatic" | Spelling Error |
| 101 | 20 | "programatic" | "programmatic" | Spelling Error |
| 101 | 23 | "Programatic" | "Programmatic" | Spelling Error |
| 102 | 13 | "programatic" | "programmatic" | Spelling Error |
| 102 | 21 | "programatic" | "programmatic" | Spelling Error |
| 104 | 16 | "programatic" | "programmatic" | Spelling Error |

1

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



**HIGHLY CONFIDENTIAL**

**ERRATA SHEET FOR THE TRANSCRIPT OF:**

Case Name:       *United States et al. v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.)

Deposition Date:   02/28/2024

Deponent:       Professor Itamar Simonson

**CORRECTIONS**

| Page | Line | Change | Reason |
|---|---|---|---|
| 13 | 18 | The words "list in hindsight. It" should read "list in hindsight, it" | Transcription error |
| ██ | █ | ████████████████████████████ | ████████████ |
| ██ | | ██████████████████████ | ████████████ |
| 30 | 12 | The word "doctorate" should read "doctoral" | Transcription error |
| 30 | 15 | The word "or" should read "or the" | Transcription error |
| 31 | 10 | The word "receive" should read "received" | Transcription error |
| 31 | 10 | The words "Nobel Prize" should read "the Nobel Prize" | Clarification |
| 34 | 22 | The word "group" should read "groups" | Transcription error |
| 37 | 18 | The word "likely" should read "likelihood of" | Transcription error |
| 43 | 4 | The words "ranked ordered" should read "rank ordered" | Transcription error |
| 44 | 16 | The word "decisionmaking" should read "decision making" | Transcription error |
| 44 | 21 | The word "decisionmaking" should read "decision making" | Transcription error |
| 44 | 24 | The words "much better and rely" should read "much better at relying" | Transcription error |
| 46 | 10 | The word "Are" should read "They're" | Transcription error |
| 47 | 10 | The words "work for" should read "work for a" | Clarification |
| 47 | 10 | The word "firm" should read "firm?" | Transcription error |
| 52 | 21 | The words "there's, like" should read "that's like" | Transcription error |
| 55 | 21 | The words "testify about" should read "testify about it" | Transcription error |

| ██ | ██ | ████████████████ | ████████████ |
|---|---|---|---|
| 57 | 23 | The word "listed" should read "not listed" | Transcription error |
| 57 | 23 | The word "not" should read "no" | Transcription error |
| 58 | 11 | The words "testify. It" should read "testify if it" | Transcription error |
| 58 | 12 | The word "in" should read "on" | Transcription error |
| 65 | 10 | The words "can find" should read "can find it" | Transcription error / clarification |
| ██ | ██ | ███████████████ | ██████████ |
| 85 | 13 | The word "Abarantes" should read "Abrantes" | Transcription error |
| 91 | 21 | The word "programatic" should read "programmatic" | Transcription error |
| 92 | 5 | The word "programatic" should read "programmatic" | Transcription error |
| 92 | 17 | The word "programatic" should read "programmatic" | Transcription error |
| 101 | 20 | The word "programatic" should read "programmatic" | Transcription error |
| 101 | 23 | The word "programatic" should read "programmatic" | Transcription error |
| 102 | 13 | The word "programatic" should read "programmatic" | Transcription error |
| 102 | 21 | The word "programatic" should read "programmatic" | Transcription error |
| 104 | 16 | The word "programatic" should read "programmatic" | Transcription error |
| 109 | 4 | The word "less" should read "less than" | Transcription error |
| ██ | █ | ████████████ | ████████ |
| ██ | █ | ████████████ | ████████ |
| ██ | █ | █████████████ | ████████ |
| ██ | █ | ██████████ | ████████ |
| ██ | █ | ███████████ | ████████ |
| ██ | █ | ██████████████████ | █████████ |
| ██ | █ | ███████████ | ████████ |

| | | | |
|---|---|---|---|
| ██ | █ | ████████████████ | ████████ |
| ██ | █ | ███████████████ | ████████ |
| ██ | █ | ████████████████ | ████████ |
| ██ | █ | ████████████████ | ████████ |
| ██ | █ | ████████████████ | ████████ |
| ██ | █ | ████████████████ | ████████ |
| ██ | █ | ████████████████ | ████████ |
| ██ | ██ | ████████████████ | ████████ |
| ██ | █ | ████████████████ | ████████ |
| ██ | █ | ████████████████ | ████████ |
| ██ | █ | ████████████████ | ████████ |
| ██ | █ | █████████████ | ████████ |
| ██ | █ | ██████████████ | ████████ |
| 148 | 1 | The words "might have followed" should read "might have been followed" | Omission |
| 149 | 16 | The words "apropos all" should read "all" | Transcription error |
| ██ | █ | ███████████████ | ████████ |
| ██ | █ | █████████████ | ████████ |
| ██ | █ | ███████████████ | ████████ |
| ██ | █ | ████████████████ | ████████ |
| ██ | █ | █████████████ | █████████████ |
| ██ | █ | ███████████████ | ████████ |
| ██ | █ | █████████████ | ████████ |
| ██ | █ | █████████████ | ████████ |
| ██ | ██ | ████████████████ | ████████ |
| ██ | █ | ███████████████ | █████ |
| ██ | █ | █████████████ | ████████ |
| ██ | █ | ██████████████ | ████████ |

| | | | |
|---|---|---|---|
| ██ | █ | ████████████ | ██████ |
| ██ | █ | ████████████ | ██████ |
| ██ | █ | ████████ | ██████ |
| ██ | █ | ████████████ | ██████ |
| ██ | █ | █████████ | ██████ |
| 218 | 24 | The word "that" should read "that's" | Transcription error |
| ██ | █ | █████████████ | |
| 224 | 5 | The word "result" should read "results" | Transcription error |
| 225 | 17 | The words "southern district" should read "Southern District" | Transcription error |
| ██ | █ | ████████████ | ██████ |
| ██ | █ | ████████ | ██████ |
| ██ | █ | ████████████ | ██████ |
| ██ | █ | ████████████ | ██████ |
| ██ | █ | ████████████ | ██████ |
| ██ | █ | ████████████ | ████ |
| ██ | █ | ████████████ | ██████ |
| ██ | █ | █████████ | ██████ |
| ██ | █ | ████████████ | ██████ |
| ██ | █ | █████████ | ██████ |
| ██ | █ | ████████████ | ██████ |
| ██ | █ | ████████ | ██████ |
| ██ | █ | ████████████ | ██████ |
| ██ | █ | █████████ | ██████ |

| █ | █ | ███████████████████ | ██████████ |
|---|---|---|---|
| █ | █ | █████████████████████████████████ | |
| █ | █ | ████████████████ | ████████████ |
| █ | █ | ████████████████████ | ████████████ |
| 318 | 20 | The words "very many" should read "many very" | Transcription error |
| 319 | 1 | The word "patterns" should read "patents" | Transcription error |
| █ | █ | ██████████████████████ | ████████████ |
| █ | █ | ██████████████████ | ████████████ |
| █ | █ | ██████████████████ | ████████████ |
| █ | █ | ██████████████ | ████████████ |
| █ | █ | █████████████ | ████████████ |
| █ | █ | ████████████████ | ████████████ |
| █ | █ | ████████████████████ | ████████████ |
| █ | █ | ███████████████ | ████████████ |
| █ | █ | ████████████████ | ████████████ |
| █ | █ | █████████████████ | ████████████ |
| █ | █ | █████████████████ | ████████████ |
| █ | █ | ███████████████ | ████████████ |
| █ | █ | ███████████████ | ████████████ |
| █ | █ | █████████████████ | ████████████ |
| █ | █ | ███████████████ | ████████████ |
| █ | █ | ███████████████ | ████████████ |
| █ | █ | ███████████████ | ████████████ |
| █ | █ | ████████████████ | ████████████ |

| | | | | |
|---|---|---|---|---|
| | | ■ | | |
| ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefor.

Date :  3/28/2024

*I. Simonson*

Itamar Simonson, Ph.D.