**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF**
**ITAMAR SIMONSON AND RELATED OPINIONS OF MARK ISRAEL**

Plaintiffs respectfully move under Rule 702 of the Federal Rules of Evidence to exclude the opinions of Prof. Itamar Simonson, as well as the opinions of Dr. Mark Israel that rely on Prof. Simonson's opinions. Prof. Simonson conducted ████████████████████ ████████████████████████████████████████████. Google's principal economic expert, Dr. Israel, then used Prof. Simonson's survey results to challenge Plaintiffs' market definitions in this case – namely, the markets for publisher ad servers, ad exchanges, and ad networks.

Prof. Simonson's surveys are fundamentally unreliable and fail to adhere to widely accepted standards in the field of survey design. In addition, Prof. Simonson's flawed surveys sought answers to questions that are not relevant and will not assist the jury in deciding this case. Due to these fundamental flaws in the design and implementation of Prof. Simonson's surveys, Google cannot satisfy its burden under Rule 702 to demonstrate that Prof. Simonson's opinions are reliable and will assist the jury. The Court should therefore exercise its gatekeeping function to exclude Prof. Simonson's surveys and opinions, as well as the opinions of Dr. Israel that rely thereon.

## **BACKGROUND**

**A. Prof. Simonson Conducted Three Surveys Targeting** ███████████ ████████

Google retained Prof. Simonson, a retired marketing professor, ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ *See* Exhibit A, January 23, 2024, Expert

Report of Itamar Simonson, Ph.D. ("Simonson Rep.") ¶¶ 1, 13. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████ *See*

*id.* ¶¶ 16, 30. █████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████ *Id.* ¶

42. ████████████████████████████████████████████

█████████████████████████████████ *Id.* ¶ 116. ████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████ *Id.* ¶ 165.

**B. Prof. Simonson Excluded Vital** ██████████ **and** ██████████ **from His Samples**

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ *Id.* ¶ 31. ████████ │ ████████████████

██████████████████████████████████████████████ *Id.* At Prof.

Simonson's direction, ███████████████████████████████████████

████████████████████████████████████████

████████████████ *Id.* (footnote omitted).

████████████ and Prof. Simonson then modified these samples, causing them to

diverge materially from the target population: ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ *Id.* ¶ 34.[1]

Respondents who worked for ████████████████████████████████████

████████████████████████. *Id.* ¶ 34 & App'x I. Even if Google made the decision to

exclude these participants ██████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████. This decision made by ████████████

irreversibly impairs both the reliability and utility of the results.

---

[1] Prof. Simonson ████████████████████████████████████████████

████████████ *See* Exhibit B, Excerpts of February 28, 2024, Deposition of Itamar Simonson
("Simonson Tr.") at 167:18-21.



Exhibit C, February 13, 2024, Expert Rebuttal Report of Wayne D. Hoyer, Ph.D. ("Hoyer Rep.") ¶ 66.[2] Notably, Prof. Simonson excluded the ███████████████████████ *Id.* ¶ 67(b); Exh. A, Simonson Rep. App'x I.  According to an internal Google presentation, ██████████ *See* Exh. C, Hoyer Rep. ¶ 67(b); Exhibit D (GOOG-AT-MDL-008285890, at -899).[3]

The ██████████ also excluded the following ██████████:

- ███████████████████████████
- ██████████ ██████████████████

██████████████████████████

█████████████████████████

█████████████████████████

██████████████████████████

█████████████████████████

███████████████████████████

███████████; and

---

[2] Plaintiffs' rebuttal survey expert, Wayne D. Hoyer, is a Professor of Marketing at the McCombs School of Business at the University of Texas at Austin with more than four decades of experience in the field.

[3] Plaintiffs have only included the relevant excerpt of this document given its length.  Plaintiffs will provide the Court with the full document upon request.  The same is true for Exhibit E.

- ██████████████████████████ that anchor the primary panel Prof.

  Simonson drew from, including ████████████████████████████████

  ████████████████████████ These ████████████████████████████

  ██████████████████████████████.

See Exh. C, Hoyer Rep. ¶¶ 66-67 & n. 111, 112.

Google's own business documents indicate that ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ were excluded from Prof. Simonson's sample. *Id.* ¶ 68; Exhibit E (GOOG-AT-

MDL-011124130, at -141); Exhibit F (GOOG-AT-MDL-011120632, at -641).  Similarly, Prof.

Simonson excluded ██████████████████████████████████████████

██████████████████████████[4] *See* Exh. C, Hoyer Rep. ¶ 68; Exhibit G (GOOG-DOJ-

03047055, at -062);[5] Exh. A, Simonson Rep. App'x I.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████.  Exh. B, Simonson Tr. at 289:13-290:15. ████████████████

████████████████████████████████████████████████████████

---

[4] ████████████████████████████████████████████████████████ despite the decision to exclude these very same entities from their sponsored survey.

[5] Discussing ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████.

████████████████████████████████████████████████

████████████████████████████ Simonson Report ¶ 80.  Respondents

were then asked if they ████████████████████████████████████

██████. *See* Exh. A, Simonson Rep., App'x F.1, at F.1-21; App'x G.1, at G.1-17; App'x

H.1, at H.1-19. ███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████ Exh. A,

Simonson Rep. Exhibit 2; Exhibit 38; Exhibit 69. ███████████████████

████████████████████████████████████

██████████████████████████████. Exh. B, Simonson Tr. at 298:8-

299:16.  As a result, it is impossible to determine whether ██████████████

████████████████████████████████[6]

    **C.  Prof. Simonson Incorrectly** ████████████████████████

████████████████████████████

    After a series of introductory and screening questions, Prof. Simonson's surveys included

questions in four areas: ████████████████████████████████

███████████████████████████████████████████

Exh. C, Hoyer Rep. ¶ 30.  The initial question in the ██████████████ section asked

respondents to ████████████████████████████████

███████████████████████████████████████████

████████████████████████████ *See* Exh. A, Simonson Rep., App'x

_____

[6] Plaintiffs recognize that survey participants were ████████████████████████

████████████████████████████

F.1, at F.1-12; App'x G.1, at G.1-12; App'x H.1, at H.1-11.  Plaintiffs' claims in this case relate

████████████████████████████████████████████████████████████████████

████████████████████████████████████     The surveys then presented respondents with

the following question ("████████████"):



Exh. A, Simonson Rep. ¶ 65 (emphases in original).[7]  Those who respond ████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████     Id. (emphasis in original).  Respondents who did not answer ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████     Id. ¶ 66 (emphasis in original).  The surveys did not define

the key phrases ████████████████████████████████     Exh. C, Hoyer

────────────────────

[7] The ████████████     also incorporated two follow-up questions ████████████

████████████████████████████████████████████████████████████

████████████     Plaintiffs move to exclude all results and reliance on the

████████████     and these follow-up questions.

Rep. ¶¶ 73-74.[8]

Although the ███████████ broadly asked about ███████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████.[9]  *See* Exh. C, Hoyer Rep. ¶ 107.  Nor do any other questions

in Prof. Simonson's surveys.  *Id.*  In fact, Prof. Simonson conceded that it was ████████

████████████████████████████████████████████

████████████████████  Exh, B, Simonson Tr. at 354:4-20.

**D.  Dr. Israel Relies on Prof. Simonson's Flawed Surveys to Opine About ████████**
**█████████**

Prof. Simonson asked his ███████████ in service of Google's economic expert,

Dr. Mark Israel.  Dr. Israel's opinion ███████████████████████

████████████████████████████████████████████

████████.[10]  *See* Exhibit H, January 23, 2024, Expert Report of Mark Israel ("Israel

---

[8] Prof. Simonson ██████████████████████████████  However, the ██████████████ was methodologically flawed in requiring respondents to █████████████████████████.  *See* Simonson Report, Appendix E, at E-2. And Prof. Simonson ████████████████████████████████████  *See* Exh. B, Simonson Tr. at 229:21-230:8.

[9] █████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

[10] Dr. Israel explicitly relies on Prof. Simonson's surveys and report in the following paragraphs of his report: 48, 196-98, 200, 211, 220, 235-38, 240, 247-48, 252, 283, 589, 630, many of which include figures based on Prof. Simonson's surveys.  Plaintiffs move to exclude any portions of Dr. Israel's report rely on the survey results, the ██████████████, and/or any follow-up questions relating to the ████████████.

Rep.") ¶¶ 48; Exhibit I, Excerpts of March 14, 2024, Deposition of Mark Israel ("Israel Tr.") at

411:7-16. Dr. Israel ███████████████████████████████████████████████████████

██████████████████████████████████████████████ Rep. ¶ 48. Because Dr.

Israel considers ████████████████████████████████████████████

████████████████████████████████████, *id.*, ███████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

Prof. Simonson's surveys are a significant part of Dr. Israel's empirical basis for his

████████████████████. *See id.* ¶¶ 235-38. Dr. Israel also leans on Prof. Simonson's surveys

for the ███████████████████████████████████. *Id.* ¶¶ 196, 197, 589, 630.

Critically, however, Dr. Israel admitted that while ███████████████████████████

██████████████████████████████████████████████████████████

██████████████████ Exh. I, Israel Tr. at 412:9-21. Dr. Israel also admitted that he had

██████████████████████████████████████████████ *Id.* 412:22-

413:3, 413:12-13. While Dr. Israel also referenced ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

## **LEGAL STANDARD**

### A. **Standards for Admissibility Under Rule 702 and *Daubert***

Courts applying Federal Rule of Evidence 702 have a gatekeeping responsibility to

"ensur[e] that an expert's testimony both rests on *reliable* foundation and is *relevant* to the task

at hand." *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509

U.S. at 597) (emphasis in original). As revised, Rule 702 places the burden of demonstrating that the expert's testimony will meet these foundational requirements on the party seeking to introduce that testimony. Fed. R. Evid. 702 (effective December 1, 2023) (adding that a properly qualified witness "may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not" that requirements (a) through (d) of the Rule are satisfied).

This gatekeeping duty is heightened in a jury trial because of the difficulty a juror has in evaluating such testimony.  *Id*. at 231; *see also Westberry v. Gislaved Grummi AB*, 178 F.3d 257, 261 (4th Cir. 1999); *Sardis v. Overhead Door Corp.,* 10 F.4th 268, 275 (4th Cir. 2021).  The proponent of expert opinion testimony must establish its admissibility by a preponderance of proof.  *Daubert v. Merrell Dow*, 509 U.S. 579, 592 n.10 (1993); Fed. R. Evid. 702.  A thorough and extensive cross-examination of this testimony "does not ensure reliability of the expert's testimony [and] such testimony must still be assessed before it is presented to the jury."  *Id*. (citing *McClain v. Metabolife Int'l., Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005)).

As with other expert evidence, surveys are subject to Rule 702 and *Daubert* scrutiny. The proponent of an expert survey bears the burden of establishing its admissibility.  *See Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 456 (E.D. Va. 2017) (citing *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)).  Courts recognize that the Federal Judicial Center's *Reference Guide on Survey Research*[11] identifies the "applicable professional standards for survey research," and assists courts in evaluating the admissibility of survey evidence.  *Coryn*

---

[11] Federal Judicial Center, Shari Seidman Diamond, *Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence 359-423 (3d ed. 2011) ("*FJC Reference Guide*"), available at https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf.

*Group II, LLC v. O.C. Seacrets, Inc.*, Civil No. WDQ-08-2764, 2010 WL 1375301, at *7 n.17 (D. Md. Mar. 30, 2010).  *See also Estes Park Taffy Co., LLC. v. Original Taffy Shop, Inc.*, Civil Action No. 15-cv-01697-CBS, 2017 WL 2472149, at *1 n.2 (D. Colo. June 8, 2017). The *FJC Reference Guide* is "intended to assist judges in identifying, narrowing, and addressing issues bearing on the adequacy of surveys either offered as evidence or proposed as a method for developing information."  *FJC Reference Guide* at 362.

### B. An Expert's Survey Must Be Reliable To Be Admissible

An expert's survey and conclusions may be excluded under Rule 702 if the survey "was fundamentally flawed" or suffers from "fatal flaws," as opposed to "mere technical flaws," which instead may go towards the weight of the evidence.  *Valador,* 242 F. Supp. 3d at 448 (citing *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004)).  Fatal flaws are methodological deficiencies that are "so substantial as to render survey conclusions untrustworthy."  *In re Motor Fuel Temperature Sales Practices Litig.*, 2012 WL 13050523, at *6 (D. Kan. Feb. 29, 2012).

"An expert's survey meets *Daubert*'s reliability standards if [among other things] the expert . . . properly defines the 'universe' of respondents" and "selects a representative sample of that universe." *Navarro v. P&G*, 501 F. Supp. 3d 482, 497-498 (S.D. Ohio 2020). "Identification of a survey population must be followed by a selection of a sample that accurately represents that population." *FJC Reference Guide* at 380.  "[A] sample that accurately represents the target population must be selected, and procedures must be taken to reduce the likelihood of a biased sample." *Menasha Corp. v. News America Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003); Manual for Complex Litigation 4th ed. § 11.493 (2004) (considering whether "the sample chosen was representative of that population"), https://www.uscourts.gov/

sites/default/files/mcl4.pdf.  An underinclusive survey may fail to reflect the relevant population accurately, and a survey where the sample is "underinclusive to a significant degree . . . would be unreliable, and thus inadmissible, under *Daubert*."  *Navarro*, 501 F. Supp. 3d at 498.

Surveys are inadmissible under Rule 702 when their underlying samples omit substantial constituencies whose opinions are necessary to understand the issue being assessed by the survey.  *See Hi Ltd. P'ship v. Winghouse of Fla., Inc.*, 2004 U.S. Dist. LEXIS 30687, at *25-26 (M.D. Fla. Oct. 5, 2004) (survey had "patently flawed methodology striking at the heart of the survey's validity" because it failed to include women, who comprised roughly a third of the competing restaurants' clientele); *FTC v. Fleetcor Technologies, Inc.*, 2022 U.S. Dist. LEXIS 143169 (N.D. Ga. Aug. 9, 2022) (holding survey inadmissible under *Daubert* in light of the "deeply unrepresentative sample" that excluded customers for much of the time period in question).  When assessing whether a survey's flaws make it unreliable, courts consider the role counsel played in jeopardizing survey design and sample construction.  *See, e.g.*, *Johnson v. Big Lots Stores, Inc.*, 2008 U.S. Dist. LEXIS 35316, at *52 (E.D. La. 2008) ("[T]he role that Big Lots' former counsel played in directing how the interviews were conducted casts doubt on the reliability of the interviews and gathered data.").

**C.  An Expert's Survey Must Be Relevant To Be Admissible**

Rule 702 requires an expert's testimony to "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The Supreme Court explained that this is primarily a question of relevance and whether the expert testimony is a proper "fit" for the facts of the case.  *Daubert*, 509 U.S. at 591.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 590 U.S. at 591-92.

A survey is inadmissible on relevance (fitness) grounds where it fails to shed light on a fact in issue.  *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 281 (4th Cir. 2002) (reversing district court's admission of survey evidence because the survey "addresses issues that are not relevant to [plaintiff's] false advertising claim").  When a party proposes to admit the opinion of a survey expert, the survey questions themselves must be relevant.  "One indication that a survey offers probative evidence is that it was designed to collect information relevant to the legal controversy."  *FJC Reference Guide* at 373.  "Nonetheless, surveys do not always achieve their stated goals.  Thus, the content and execution of a survey must be scrutinized whether or not the survey was designed to provide relevant data on the issue before the court."  *Id*.

## ARGUMENT

The fundamental flaws in Prof. Simonson's methodology render his opinions inadmissible.  First, Prof. Simonson ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that his samples are not representative of the populations he intended to survey.  These samples became even less representative when many respondents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮.  This affected ▮▮▮▮▮▮, rendering them each unreliable and inadmissible.

Second, the ▮▮▮▮▮▮▮—the primary question in all ▮▮▮▮▮ that asked ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—sheds no light on any question relevant to this case because it relates only to ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Moreover, the question is unreliable because it was written so ambiguously that it requires respondents to speculate on its meaning.  Thus the survey respondents' answers to this flawed and confusing

question cannot provide a reliable basis for Prof. Simonson's or Dr. Israel's opinions and those opinions should therefore be excluded.

## I.     PROF. SIMONSON'S SURVEYS ARE INADMISSIBLE

### A.  The ███████ and ████████████████ Surveys Are Unreliable Because Their Samples Are Unrepresentative of the Target Populations

Prof. Simonson's ████████████ and ████████████████ and his associated opinions are inadmissible because the samples used to conduct those surveys were not representative of the populations they purported to study.  Absent a representative sample, no reliable conclusions can be drawn about the views of the target population.

Prof. Simonson's exclusion of ███████████████████████ ████████████████ precludes Google from demonstrating that Prof. Simonson studied representative samples of the populations he sought to survey.  Prof. Simonson's actions fail to satisfy the proper standards for conducting a survey intended for use in litigation, which stress that "[i]dentification of a survey population must be followed by a selection of a sample that accurately represents that population."  *FJC Reference Guide* at 380.  As a result, Prof. Simonson's surveys are unreliable, and the Court should exclude the opinions Prof. Simonson derives from those surveys and Dr. Israel's opinions that rely on Prof. Simonson's work.

*Winghouse* is on point.  There, women comprised roughly one-third of the relevant consumer clientele, but they were excluded from the sample in Winghouse's expert's survey. 2004 U.S. Dist. LEXIS 30687 at *25.  Hooters argued that the survey was inadmissible because, among other things, the survey "did not use a fair sampling of the full range of potential customers for whom Winghouse and Hooters compete."  *Id.* at *23.  The court agreed because excluding women "reflect[ed] a patently flawed methodology striking at the very heart of the survey's validity."  *Id.* at *25-26.

*Fleetcor* similarly excluded survey evidence where, as here, the sample was unrepresentative of the target population.  In an enforcement action against a payment-card company for false advertising and unfair fee practices, the FTC moved to exclude the company's expert survey, which sought to study whether the company's marketing efforts deceived its card program customers from June 2014 to June 2020.  2022 U.S. Dist. LEXIS 143169 at *9.  The survey expert had excluded customers from nearly the entire relevant time period, only surveying customers who had made a transaction after April 2020.  The court held that such exclusions rendered the sample so "deeply unrepresentative" that the survey expert's opinions should be excluded.  *Id.* at *15 (internal citation omitted).  And the problems created by the unrepresentative sample in *Fleetcor* were "compounded" by the expert asking critical questions in a manner that failed to provide relevant or reliable information, which are flaws that likewise infect Prof. Simonson's survey here.  *Id.* at *16, 24; *see infra* Section II.

As in *Fleetcor* and *Winghouse*, Prof. Simonson's ██████████ and ██████████



██████████ suffer from fundamental flaws because his samples fail to reflect the populations he intended to survey.  ██████████, Prof. Simonson excluded the ██████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. Exh. A, Simonson Rep. ¶¶ 67-68.  The removal of such a large portion of the target population from the pool of potential respondents undermines any notion that the results of the ██████ ██████ and ██████████████████ represent the views of the broader populations they were supposed to study.  In light of these extraordinary exclusions, Google cannot bear its burden to demonstrate that Prof. Simonson's sample is reliable.  These surveys and the conclusions that Prof. Simonson draws from them are inadmissible. And, as a result, the opinions

of Dr. Israel that rely upon them are likewise inadmissible because Dr. Israel █████████
████████████████████████████████████████████████████████████████████████
██████████  ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████

**B.** █████████████████████████████████████████████
**Renders the Surveys Unreliable**

"To ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible:  Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose."  *FJC Reference Guide* at 410-411.  Where the sponsorship of a survey is disclosed, courts should consider "(1) whether the sponsor has views and expectations that are apparent and (2) whether awareness is confined to the interviewers or involves the respondents."  *Id.* at 411.  "For example, if a survey concerning attitudes toward gun control is sponsored by the National Rifle Association, it is clear that responses opposing gun control are likely to be preferred."  *Id.*

Prof. Simonson's █████████████████████████████████████████
████████████████████████████████████████████████████████████  Prof.
Simonson acknowledged that █████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████.  Exh. B, Simonson Tr. 285:22-286:11; 213:10-313:12.  Indeed, Prof.
Simonson could not recall █████████████████████████████████████████
████████████████████████████████████████████████████████████

█████████████████████████████████████████. *See id.* 286:12-287:3; 288:12-288:21.

After having completed Prof. Simonson's surveys, ████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████ Exh. A, Simonson Rep. ¶¶ 79-80.  Like the example in the *FJC Reference Guide*, ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ *See id.* 1, 37, 68.

Prof. Simonson ████████████████████████████████ ████████████████████████████████████████. *See* Exh. B, Simonson Tr. at 298:16-17 ("████████████████████████████████████").  As Prof. Hoyer points out, ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Exh. C, Hoyer Rep. ¶ 14.  Regardless of whether ████████████████████████████████████████████████ ████████████████████████████████████████ *See* Fed. R. Evid. 702.

**C.** ███████████████████████████████████████████████ **Undermines Their Reliability**

Counsel's involvement in survey design and administration compromises a survey's objectivity and reliability when it is linked to methodological flaws. *See Big Lots Stores*, 2008 U.S. Dist. LEXIS 35316, at *53-55. For example, in *Big Lots Stores,* plaintiffs moved to exclude the opinion and report of a survey expert as unreliable under *Daubert*, challenging the unrepresentativeness of the sample and the role defendant's counsel played "in identifying store locations and individuals that [were] interviewed." *Id.* at *57. The court concluded that that the survey sample was deficient, linking counsel's pre-screening activities to the deficient sample. *Id.* at *56-57. "Big Lots' decision not to conduct a larger survey means that it has to live with the legal consequences of the slipshod work done by [the expert] and its own decision to unduly enmesh its lawyer in the survey process." *Id.* at *56.



███████████████████████████████████████████ *See* Exh. A, Simonson Rep. ¶ 34. Contrary to industry practice, ███████████████████████████████████████ See Exh. A, Simonson Tr. at 289:20-290:6;315:13-315:24. ███████████████████ exacerbates the fatal flaws in Prof. Simonson's surveys because it underscores that ███████████ ████████████████████████████ Therefore, the surveys were neither "the product of reliable principles and methods" nor "reflect[ive] [of] a reliable application of [those] principles and methods." Fed. R. Evid. 702.

## II.     THE ████████████████, WHICH IS CRITICAL TO PROF. SIMONSON'S SURVEYS, IS IRRELEVANT AND UNRELIABLE

### A.  The ██████████████████████████████████ ████████████

The results of the ██████████████████████████ are inadmissible, because that question is not relevant to any issue in this case.  The surveys were designed to study

████████████████████████████████████████

████████████████████████████████████████

But Prof. Simonson studied the wrong kind of ████████████████

████████████████████████████████████████

████████████████████████████████████████

A proper question concerning ██████████████████████

████████████████████████████████

Antitrust claims are generally analyzed in the context of a specific "market" for a group of products or services.  That relevant product market may be defined by considering the extent to which buyers of the allegedly monopolized product are likely to substitute to other products in the face of a sustained price increase on the allegedly monopolized product.  The more easily buyers can substitute away from the allegedly monopolized product, the more likely it is that the relevant market is broader than the one allegedly monopolized.  For example, if a plaintiff alleged that a firm monopolized a market for solar panel installation services, the defendant could try to demonstrate that the market is broader (and thus that the firm has less power than plaintiff claims) by marshaling evidence that enough buyers would be likely to switch to other types of installers or means of installation in response to a price increase on the allegedly monopolized installation services, such that the price increase is unprofitable.

Continuing this example, Prof. Simonson's ████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████

The ████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████ *See* Exhibit J, December 22, 2023,

Expert Report of Timonthy Simcoe ¶ 255, Figure 21.  Thus, the ████████████████ improperly

asks respondents about their anticipated reaction to a ████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████ As a result, Google cannot show that Prof.

Simonson's ████████████████ is relevant to any issue in this case.

The Fourth Circuit addressed a similar situation in *Scotts*, where it reversed the trial

court's admission of a survey on relevance grounds because the survey failed to shed light on a

fact in issue.  There, the plaintiff in a false advertising case claimed that defendants' packaging was misleading because it suggested that defendant's product would kill crabgrass that had already sprouted (i.e., "mature" crabgrass).  In support of that claim, the plaintiff submitted a survey, which purported to show that 92.5% of respondents were misled by the defendant's packaging of a crabgrass-control product.  315 F.3d at 278.  The primary survey question asked, "Based on your review of this section of the bag, should this product prevent the growth of crabgrass that looks like the crabgrass pictured?"  *Id.*  The Fourth Circuit concluded that the use of the word "prevent" made the question ambiguous, such that it was unclear if respondents believed the defendant's product would prevent crabgrass from growing in the first instance or kill mature crabgrass.  *Id.*  That flaw was fatal to the relevance of the survey because "the question that [was] key" to the claim was "whether [defendant's] packaging conveys the message that it can kill mature crabgrass," and the survey responses "shed no light on [that] question."  *Id*.

The facts in *Scotts* are complex, but the crux of the Fourth Circuit's holding is simple: whether consumers believed the picture of mature crabgrass on Vigoro packaging advertised crabgrass *prevention* could not help answer the question at issue of whether consumers believed the packaging indicated that Vigoro *killed* crabgrass.  Here, Prof. Simonson's ██████ ██████ suffers from the same fatal flaw.  ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████  In both cases, the primary survey question is irrelevant, making the survey inadmissible.

Prof. Simonson's deposition testimony about the ███████████ confirms that he ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Exh. B, Simonson Tr. 354:4-20.  Rather, he made a conscious choice ███████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████ *Id.* 363:14-364:3.

**B. The ████████████████ is Unreliable Because It is Inherently Vague**

Not only is Prof. Simonson's ███████████████ irrelevant, but it is so vague as to be unreliable.  Courts have found vague or ambiguous survey questions to be inadmissible under Rule 702.  *See, e.g.*, *Citizens Fin. Group*, 383 F.3d 110 at 120-21 (holding that district court properly excluded survey that used vague and imprecise language and surveyed consumers outside of the relevant customer base).  As the *FJC Reference Guide* explains:

> When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question.  If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey.

*Id.* at 388 (citation omitted); *see also* Exh. C, Hoyer Rep. ¶ 71.

On this point, *In re Motor Fuel* is instructive.  There, the court considered a *Daubert* challenge to survey question Q1, which asked, "Do you think each gallon of fuel you buy should contain the same amount of fuel as every other gallon of that same fuel or should each gallon not contain the same amount of fuel."  2012 WL 13050523 at *6.  Although 97 percent of respondents said that each gallon of fuel should contain "the same amount of fuel," the court

determined that Q1 was "very ambiguous" because it was subject to multiple interpretations.  *Id.*
at *6-7.  The plaintiffs' expert interpreted the phrase "amount of fuel" to mean amount of energy,
while defendants' expert interpreted it to refer to volume of fuel.  *Id.* at *7.  The court found the
results of Q1 to be untrustworthy and inadmissible because there was no way to know how the
survey respondents interpreted the phrase, and the ambiguity was central to the plaintiffs'
expert's opinion.



So too here.  Prof. Simonson's ███████████ is ambiguous and unreliable because
███████████████████████.  The ███████████ asked respondents to
explain how they would react if ███████████████████████
███████████████████████████
███ "[12]  Exh. A, Simonson Rep. App'x. F (███████████████), at F.1-13
(emphasis omitted).[13]  Respondents were left to speculate on the meaning of the phrases ███
███████████████ and each respondent likely had their own
subjective interpretation.  *See* Exh. C, Hoyer Rep. ¶ 74.  Social science has shown that
consumers ascribe a range of meanings to phrases like ███████████████
███ "  *Id.*, ¶ 74.  Some may have been considering a ███████████████
███████████████████████████
███████ .  Regardless, as in *Motor Fuel*, there is no way to know how respondents

---

[12] ███████████████████████████████
███████████████████████████████
███████████████████████████████

[13] *See also* Simonson Report, Appendix H (Ad Agency Survey), at H.1-12 (same question); *id.*,
Appendix G (███████████████), at G.1-13 (question revised to ask about the ███
███████████████████████).

interpreted the key phrases in the ███████████, and that ambiguity is central to Prof.

Simonson's opinion about ███████████

The ███████████ fundamental flaws were apparently by design.  Prof. Simonson

contends that the phrasing of ███████████████████████

███████████████████████████████ Exh. A, Simonson Rep. ¶ 17

n.5, ¶ 65.[14] ███████████████████████

███████████████████████████████

███████████████████████████

███████ ███████████████████

███████████████████████████████

███████████████████████████████

███████████████████ underscores the vagueness and, therefore, lack of reliability in

his surveys.

Prof. Simonson could have corrected or mitigated the flaws in his ultimate surveys by

applying his findings ███████████████████████ And,

tellingly, Prof. Simonson later admitted that ███████████████████████

---

[14] Interestingly, when Prof. Simson conducted ███████████████████
███████████████. *See* Exh. A, Simonson
Rep. App'x D at D-9. ███████████████████████
███████████████████████████████
███████████████████████ Exh. B, Simonson Tr. 208:16-18, 209:20-210:5, 210:11-18.

[15] Simonson Rep. App'x D at D-9 ("███████████████████████
███████████████ (emphasis added); *see also* Exh. B, Simonson Tr. at 209:9-211:19.



.” Exh. B, Simonson Tr. 337:11-24.

*Id.* at 338:3-7, 16-20.  In any event, nowhere did Prof. Simonson

.[16] *Id.* at 121:4-20.  In sum, because the ▮▮▮▮▮ is irrelevant and unreliable, Prof. Simonson's opinion about ▮▮▮▮▮, and Dr. Israel's reliance on it for his opinion about market definition, are inadmissible.

## CONCLUSION

For the forgoing reasons, the Motion should be granted.

---

[16] This



*E.g.*, Yvonne C. Schroeder, *Pretesting Survey Questions: The Procedural and Ethical Ramifications*, 11 Am. J. Trial Advoc. 195 (1987) (

Dated: April 26, 2024

Respectfully submitted,

JESSICA D. ABER
United States Attorney

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Aaron M. Sheanin
AARON M. SHEANIN
/s/ Chase E. Pritchett
CHASE E. PRITCHETT
/s/ Julia Tarver Wood
JULIA TARVER WOOD
/s/ Isabel M. Agnew
ISABEL M. AGNEW

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Aaron.Sheanin@usdoj.gov

Attorneys for the United States

JASON S. MIYARES
Attorney General of Virginia

/s/ Tyler T. Henry
STEVEN G. POPPS
Deputy Attorney General
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for the Commonwealth of
Virginia and local counsel for the
States of Arizona, California,
Colorado, Connecticut, Illinois,
Michigan, Minnesota, Nebraska, New
Hampshire, New Jersey, New York,
North Carolina, Rhode Island,
Tennessee, Washington, and West
Virginia