Exhibit 3

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GOOGLE LLC, | ) | Civil Action No. 4:20-cv-00957-SDJ |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## UNITED STATES' STATEMENT OF INTEREST REGARDING THE PARTIES' JOINT MOTION FOR AN ORDER FOR REPRODUCTION OF DISCOVERY

The United States respectfully submits this statement of interest regarding the above-captioned parties' Joint Motion for an Order for Reproduction of Discovery ("Joint Motion") filed in this action on April 23, 2024. *See* Dkt. No. 402. That Joint Motion, which was filed without prior notice to or conferral with the United States, seeks wholesale production in this action of all discovery materials, including all documents and deposition transcripts, produced by all non-parties in the action filed by the United States and seventeen sovereign states that is currently pending in the United States District Court for the Eastern District of Virginia. *See United States, et al. v. Google LLC*, 1:23-cv-00108-LMB-JFA ("Virginia Action"). Included in those discovery materials are a large number of documents that the United States collected from numerous non-parties as part of its pre-complaint investigation of Google's anticompetitive conduct in the advertising technology ("ad tech") industry. The United States respectfully requests that this Court exercise its discretion to direct Google to raise the relief requested by the Joint Motion in the first instance with the U.S. District Court for the Eastern District of Virginia,

where (i) those discovery materials were produced; (ii) the Court issued a Protective Order ("Virginia Protective Order")[1] governing their potential use in other matters, *see* Ex. 1; and (iii) the Court entered a Coordination Order, *see* Ex. 2, outlining the circumstances under which those discovery materials could and could not be used in related litigation.

## DISCUSSION

### A.   It is at best debatable whether the Virginia Protective Order permits Google to seek the relief in the Joint Motion before this Court.

The proposed order attached to the Joint Motion twice states that the relief sought is "[s]ubject to and consistent with Paragraphs 25 through 27 of the Virginia Protective Order in the EDVA Action." Dkt. No. 402-1, at 1-2. Neither the Joint Motion nor the associated proposed order explains how or why the relief sought is consistent with the Virginia Protective Order. Indeed, a pragmatic reading of paragraphs 25 through 27 shows that they exist to protect a party in the Virginia Action that has received a subpoena or other compulsory process from a litigant in another action. In other words, paragraphs 25 through 27 are intended to provide a shield against disclosure to protect the interests of parties and non-parties in the Virginia Action. Google, however, seeks to transform those provisions into a sword, allowing Google to utilize discovery across cases. Two lines of text in paragraph 25 illustrate why this is so:

First, paragraph 25 sets forth the procedure that a party must follow "[i]f [that] Party is served with a lawful subpoena or a court order issued by a court, arbitral, administrative, or legislative body, or with a court order issued in other litigation that compels disclosure of any information or items designated in the Action as Confidential or Highly Confidential." Ex. 1 at

---

[1] The operative protective order in the Virginia Action is entitled "Modified Protective Order" because of a 2023 change in certain provisions from the original protective order issued in the Virginia Action. The modification has no bearing on the issues here.

2

26, ¶ 25. The use of the term "served with" indicates that this section is designed to provide guidance when a litigant in the Virginia Action receives some outside legal demand or order, sought by some entity. Here, Google is effectively claiming to serve itself with legal process to fall within the scope of the provision.

Second, paragraph 25(b) instructs the recipient of the court order to "promptly notify in writing the Person or entity who issued the subpoena or caused the order to issue in the other litigation that some or all of the material covered by the . . . order is subject to [the Virginia Protective Order]." *Id.* at 26, ¶ 25(b). Implicit in that language is that the "Person or entity" who "caused the order to issue in the other litigation" is not the *very same entity* who is receiving the order for production.[2] Here, by contrast, Google is *affirmatively seeking* an order from this Court, directed back at itself, to produce a vast swathe of non-party discovery from the Virginia Action.

The relief sought in the Joint Motion also has significant policy implications for the treatment of non-party materials that the U.S. Department of Justice gathers during its pre-suit antitrust investigations. If Google or any other litigant can affirmatively seek judicial authorization in another court to use investigative materials gathered by the U.S. Department of Justice, particularly where, as here, Google did not even advise the Department of Justice of its intent to do so, the United States may be hampered in its efforts to safeguard and monitor the use of those investigative materials. The less control and visibility the United States has over its investigative materials, the more difficult it is for the United States to credibly assure non-

---

[2] Similarly, to the extent the entity that "caused the order to issue in the other litigation" is this Court and not Google, the same reasoning holds. The entire premise of the Joint Motion is that certain materials are subject to the Virginia Protective Order. A separate notification of this Court to that effect would be superfluous.

parties, many of whom often fear retaliation or exposure of their sensitive information by far larger, more powerful companies, as to the protections that will be afforded the information they provide. In turn, less assurance on this score has the potential for a chilling effect on cooperation by non-parties in future antitrust investigations.[3]

### B.    The Court should direct Google to present its request to the U.S. District Court for the Eastern District of Virginia in the first instance.

Given (i) the potential conflict with the spirit and purpose of the Virginia Protective Order, (ii) the broader policy issues implicated, and (iii) Google's inconsistent position regarding the degree to which discovery in this action should or should not be coordinated with discovery in the Eastern District of Virginia, the United States respectfully requests that Google be directed to present its request to disclose discovery from the Virginia Action to the U.S. District Court for the Eastern District of Virginia in the first instance. *See Mugworld, Inc. v. G.G. Marck & Assocs., Inc.*, 2007 WL 2229568, at *1 (E.D. Tex. June 15, 2007) ("While courts may vacate protective orders issued by another court where the case has been closed or otherwise dismissed, . . . when the other matter is ongoing, courts have held that any request necessitating the modification of the protective order by directed to the issuing court."). Such a weighty determination about the permissible use of materials produced in the Virginia Action is best made in the first instance by—or at least initially presented to—the court that issued the Virginia Protective Order.[4] *See id.* (declining to "disregard the order of another court, especially when

---

[3] The procedural history of the last three days is illustrative: the United States only found out about the Joint Motion on the same day it was filed, and then had to move expeditiously to inform the Court of its concerns. One could envision an alternative scenario where the United States would not learn of an effort to share its investigative materials until after an order permitting such disclosure had already been entered.

[4] The relief sought in the Joint Motion also has significant policy implications for the treatment of agency investigative files in antitrust cases. The U.S. Department of Justice typically provides a defendant in a civil antitrust enforcement action with a copy of its investigative file at or near

[the plaintiff] has not yet sought relief from the issuing court itself"). To date, Google has not sought authorization from the U.S. District Court for the Eastern District of Virginia to use discovery in the Virginia Action in this manner. And, as set forth below, Google has objected to the United States' attempt to seek coordination between this action and the Virginia Action.

> **C.     Google's inconsistent positions concerning the sharing of discovery between this action and the Virginia Action require that both Courts have a complete picture of the positions taken by the parties with respect to coordination.**

The United States has consistently supported the goal of appropriate and efficient sharing of discovery between this action and the Virginia Action. Such coordination is in the best interest of all parties, including non-parties, and the interests of justice. The United States informally made that position known by submitting to the parties a statement that was read into the record at a previous hearing before this Court on the subject of coordination. *See* Ex. 3, Transcript, March 21, 2024 Status Conference, at 38:2-39:1 (E.D. Va.) (quoting email from U.S. Department of Justice trial attorney, stating in part, "The United States believes that the coordination order previously signed by Judge Jordan, Docket 266, should be rendered effective notwithstanding Judge Castel's order in SDNY, declining to order further coordination."). After the United States' position was made known to the Court, counsel for Google stated the following to the Court:

> We've actually had productive discussions over the last two days where Google has made it very clear to plaintiffs *that as regards Virginia, we intend to do everything that we can to sort of continue the effectuation of the existing coordination order that was entered in Virginia and the MDL.* And we have made it very clear to

the time that litigation commences. As the Proposed Order appended to the Joint Motion recognizes, that investigative file tends to include non-party materials produced to the United States in the course of its investigation. *See* Proposed Order to Joint Motion at ¶ 1, Dkt. No. 402-1 (referencing productions "made in connection with . . . the United States['] related pre-suit investigation into Google"). Google should not be permitted to make use of those investigative materials in other litigation whenever it: (1) desires to do so; and (2) can obtain an order from the court presiding over that other case authorizing such use.

> plaintiffs that we are prepared to make Google -- continue to make Google's documents and data available and to otherwise coordinate with respect to that existing coordination order. But the situation we find ourselves in with respect the MDL is somewhat more complicated.

See *id.* at 42:15-42:25 (emphasis added).

However, when the United States and its co-plaintiffs in the Virginia Action sought to amend that very same "existing coordination order that was entered in Virginia and the MDL" to provide for efficient access to depositions and documents between the Virginia Action and this case, Google vigorously opposed that effort. *See* Ex. 4, Google Opp. Br. Mot. Amend Coordination Order (E.D. Va.); Ex. 7, Transcript, April 19, 2024 Mot. Hrg., at 13:24-16:17 (E.D. Va.). The United States sought to amend the coordination order in the Virginia Action so that documents and information collected in the Virginia Action would be available to all parties in this action. At the same time, the United States also sought to obtain permission from both Courts to allow the United States and its co-plaintiffs to have reciprocal access to the transcripts of depositions taken in this action, so Google would not be afforded an asymmetrical information advantage at the upcoming trial in the Virginia Action. The Virginia plaintiffs sought this amendment to prevent a situation where Google (but not the Virginia plaintiffs) had the benefit of relevant deposition transcripts and documents pertaining to potential or actual trial witnesses. *See* Ex. 4, Pls. Br. Mot. Amend Coordination Order, at 7-11(E.D. Va.). Google argued, among other things, that the proposed amendment of the coordination order would give the Virginia plaintiffs a "one-sided advantage of discovery proceedings in another forum after discovery in [the Virginia Action] has closed." Ex. 5, at 5.

The magistrate judge in Virginia ruled from the bench in Google's favor. *See generally* Ex. 7. The deadline for filing objections to the magistrate judge's ruling under Federal Rule of

Civil Procedure 72(a) is May 3, 2024. The United States and the other Virginia plaintiffs—

seventeen other sovereign States with their own Attorneys General—are coordinating and

considering whether to seek additional relief with respect to the magistrate judge's order.

Google should not be able to use its status as a defendant in both matters to take contrary

positions before the two different tribunals. Instead of asking this Court to amend the Virginia

Protective Order in a manner that may have negative ramifications for future antitrust

investigations, Google should be directed to make its arguments to the Court that issued the

Virginia Protective Order, and the Coordination Order, in the first place.

Dated: April 26, 2024 Respectfully submitted,

DOHA G. MEKKI
Principal Deputy Assistant Attorney General
Antitrust Division

/s/ *Julia Tarver Wood*
JULIA TARVER WOOD

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov

**ATTORNEYS FOR THE
UNITED STATES OF AMERICA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 26th day of April, 2024, I caused a true and accurate copy of the foregoing to be filed using the Court's CM/ECF system, which will send an electronic notice of filing to all counsel of record.

<u>/s/ *Julia Tarver Wood*</u>
JULIA TARVER WOOD
Senior Litigation Counsel

# EXHIBIT 1

# Virginia Protective Order

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

UNITED STATES OF AMERICA, *et al.*,    )
                                         )

                             *Plaintiffs,*    )
                                         )

v.                                     )    Civil Action No.: 1:23-CV-00108-LMB-JFA
                                         )

GOOGLE LLC,                       )
                                         )

                             *Defendant.*    )
                                         )

## <u>MODIFIED PROTECTIVE ORDER</u>

In the interests of: (i) ensuring efficient and prompt resolution of this Action;

(ii) facilitating discovery by the Parties litigating this Action; and (iii) protecting certain

information from improper disclosure or use, the Court enters the following Protective Order, as

defined below in Paragraph 1(a). Unless otherwise specified, days will be computed according to

Federal Rule of Civil Procedure 6(a).

The Court, upon good cause shown and pursuant to Fed. R. Civ. P. 26(c)(1), ORDERS as

follows:

### *Definitions*
1. As used herein:

      (a)      "Action" means the action filed in this Court under the caption *United States,*

*et al. v. Google LLC*, 1:23-cv-00108-LMB-JFA, as well as any additional actions

subsequently transferred and/or centralized with this Action, including any related

discovery, pretrial, trial, post-trial, or appellate proceedings. For the avoidance of doubt,

1

"Action" excludes pre-Complaint investigations by one or more Plaintiffs into potential
anticompetitive conduct by the Defendant.

      (b)    "Confidential Information" or "Confidential" means information (regardless of
how it is generated, stored or maintained) or tangible things that constitute a trade secret or
other non-public confidential financial, technical, research, sales, marketing, development, or
commercial information and that have been so designated, or any Document, transcript, or
other material containing such information that has not been published or otherwise made
publicly available.[1] In addition, a Designating Party may designate as Confidential any
information or items made publicly available in violation of a court order to keep such
information confidential, that the Designating Party believes should receive Confidential
treatment. Confidential Information includes (i) information copied or extracted, summarized
or compiled from Confidential Information, and (ii) testimony, conversations, or
presentations by Parties or their Counsel that reveal Confidential Information.

      (c)    "Competitive Decision-Making" means the action or process of making a
business decision or resolving a non-legal question relating to a competitor, potential
competitor, customer, or distribution partner regarding contracts, marketing, pricing,
product, service development or design, product, or service offering, research and
development, mergers and acquisitions, or licensing, acquisition, funding, or enforcement of
intellectual property. It does not include legal advice provided in connection with litigation,
potential litigation, or regulatory matters, nor does it include work performed as part of a
trial team or to keep management advised on the progress or status of litigation, potential

---

[1] For the avoidance of doubt, the Receiving Party's belief that material designated as
Confidential does not meet this standard shall not deprive such material of the protections
afforded to Confidential Information. Any challenge to a designation is subject to Paragraph 13.

litigation, or regulatory matters.

(d)     "Defendant" means Google LLC, as well as its parents, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents (including counsel), and representatives of the foregoing.

(e)     "Designated In-House Counsel" means In-House Counsel designated by Defendant who may be authorized to access Highly Confidential Information pursuant to Paragraph 19 of this Order.

(f)     "Disclosed" means shown, divulged, revealed, produced, described, transmitted or otherwise communicated, in whole or in part.

(g)     "Document" means any document or electronically stored information, as the term is used in Fed. R. Civ. P. 34(a).

(h)     "Highly Confidential Information" or "Highly Confidential," as defined herein, is information that, if disclosed publicly or to a Party, is likely to cause the Producing Party material and significant competitive or commercial harm, and that has been so designated.[2] Subject to the foregoing, Highly Confidential Information may include trade secrets, including algorithms and Source Code; non-public, commercially sensitive customer lists; non-public financial, marketing, or strategic business planning information; current or future non-public information regarding prices, costs, or margins; information relating to research, development testing of, or plans for existing or proposed future products; evaluation of the strengths and vulnerabilities of a Protected Person's product offerings, including non-public pricing and cost information; confidential contractual terms, proposed contractual terms, or

---

[2] For the avoidance of doubt, the Receiving Party's belief that material designated as Highly Confidential does not meet this standard shall not deprive such material of the protections afforded to Highly Confidential Information. Any challenge to a designation is subject to Paragraph 13.

negotiating positions (including internal deliberations about negotiating positions); information relating to pending or abandoned patent applications that have not been made available to the public; personnel files; sensitive personally identifiable information; and communications that disclose any Highly Confidential Information. Highly Confidential Information includes (i) information copied or extracted, summarized or compiled from Highly Confidential Information, and (ii) testimony, conversations, or presentations by Parties or their Counsel that would reveal Highly Confidential Information. A Designating Party may designate as Highly Confidential any information or items made publicly available in violation of a court order to keep such information confidential, that the Designating Party believes should receive Highly Confidential treatment. In addition, if a Protected Person (i) has produced Investigation Materials or (ii) is required by subpoena or court order to produce information that would cause it material and significant competitive or commercial harm, but that information does not specifically fall into one of the categories of information listed in this paragraph, upon a compelling showing, it may seek a court order that such information is Highly Confidential. If a motion is made pursuant to this paragraph and is related to a subpoena or court order, it must be filed no later than the due date to respond to the subpoena or court order. If a Protected Person seeks additional protection pursuant to this paragraph from the Court, the materials for which additional protection has been sought will not be provided to other Persons, aside from outside counsel, until the Court has ruled.

(i)     "In-House Counsel" means any lawyer employed by the Defendant as well as any paralegals, administrative assistants, and clerical and administrative personnel supervised by that lawyer and employed by the Defendant. In-House Counsel, however, does not include: 1) attorneys employed by the Plaintiffs; or 2) Outside Counsel.

4

(j)     "Investigation" means any pre-complaint inquiry by one or more Plaintiffs into potential anticompetitive conduct by the Defendant related to open web display advertising.

(k)     "Investigation Material" means non-privileged documents, testimony or other materials that: (i) any Non-Party provided to any Party, either voluntarily or under compulsory process, relating to the Investigation; (ii) constitute any communication between any Party and any Non-Party in connection with and during the Investigation; (iii) any Party provided to any Non-Party relating to the Investigation; and/or (iv) a Defendant, or affiliated person or entity, provided to a Plaintiff relating to the Investigation. For the avoidance of doubt, the Investigation Materials are governed by the terms of this Order. To the extent that any Investigation Materials are clawed back for any reason, the procedures set forth at Paragraph 12 of this Order shall apply and, as to Plaintiffs, such procedures will supersede any other applicable clawback procedures governing the Investigation Materials. Investigation Materials shall be designated as Highly Confidential by default.

(l)     "Litigation Materials" means non-privileged documents, testimony, or other materials that: (i) any Non-Party provides to any Party, either voluntarily or under compulsory process, in connection with and during the pendency of the Action; (ii) constitute any communication between any Party and any Non-Party in connection with and during the pendency of the Action; (iii) Defendant provides to any Plaintiff in connection with and during the pendency of any of the Action; (iv) any Plaintiff provides to Defendant in connection with and during the pendency of the Action; (v) the Department of Justice provides to any federal governmental agency in connection with and during the pendency of this Action; and/or (vi) any federal governmental agency provides to the Department of

5

Justice in connection with and during the pendency of this Action.

(m) "Non-Party" means any natural person, partnership, corporation, association, or other legal entity not named as a Party in the Action.

(n) "Outside Counsel" means the attorneys employed by outside law firms who are retained to represent or advise a Party, as well as any paralegals, administrative assistants, and clerical and administrative personnel supervised by those lawyers and employed by those Outside Counsel. To the extent any Outside Counsel has not filed an appearance in the Action ("Non-Appearing Law Firm"), a Party shall notify the other Parties of the name of the Non- Appearing Law Firm at least seven days before any attorneys of the Non-Appearing Law Firm obtain access to any Investigation Materials and/or Litigation Materials. Attorneys of the Non- Appearing Law Firm who are given access to Investigation Material and/or Litigation Material, shall first complete and execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto.

(o) "Party" means any Plaintiff or Defendant in the Action, and in the case of each State Plaintiff, means the Attorney General's Office of such State Plaintiff. "Parties" collectively means all Plaintiffs and Defendant in the Action.[3]

(p) "Plaintiffs" means the Plaintiffs in the Action, including all of their employees, agents, and representatives.

(q) "Plaintiffs' Counsel" includes: (i) any employee of the Antitrust Division of the U.S. Department of Justice who is assigned to work on this Action and/or any

---

[3] For purposes of this Protective Order, the term "Party" shall be construed in a manner consistent with the Court's ruling on the Joint Proposed Discovery Plan. Dkt. 94.

employee of the U.S. Department of Justice who is responsible for supervising work related to this Action; and (ii) any employee of a State Plaintiffs' Attorney General's Office (including retained attorneys and contract attorneys). For the avoidance of doubt, "employee" as used in this sub-paragraph includes, but is not limited to, attorneys, paralegals, economists, administrative assistants, IT and support staff, and clerical and administrative personnel;

(r)     "Person" means any natural person, corporate entity, business entity, partnership, association, joint venture, governmental entity, or trust.

(s)     "Producing Party" means a Party who produced or produces Investigation Material, Litigation Material, or Source Code.

(t)     "Protected Person" means any Person (including a Party or a Non-Party) that either voluntarily or under compulsory process, has provided or provides: (i) Investigation Materials, (ii) Litigation Materials; or (iii) Source Code.

(u)     "Receiving Party" means a Party who received Investigation Material, Litigation Material, or Source Code.

(v)     "Source Code" means extremely sensitive information or items representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means. To the extent production of Source Code becomes necessary in this case, a Party who produces Source Code may designate it as "Highly Confidential - Source Code." The protocols for Defendant's production of Source Code, and the review of such Source Code,

7

appear in Appendix B to this Order.

(w) "State Plaintiffs" means the States of California, Colorado, Connecticut, New Jersey, New York, Rhode Island, and Tennessee, and the Commonwealth of Virginia, and any other state that joins the Action, by and through their respective Attorneys General.

(x) "State Plaintiffs' Counsel" means attorneys employed by the State Plaintiffs' Attorney General's Office (including retained attorneys and contract attorneys).

*Designation of Highly Confidential Information and Confidential Information*

2. Within two business days of the Court's entry of this Order, each Party shall send by email, facsimile, or overnight delivery a copy of this Order to any Non-Party Protected Person (or, if represented by counsel, the Non-Party Protected Person's counsel) that provided Investigation Materials to that Party.

3. **Production of Investigation Materials Originating from a Non-Party.** If a non-Party Protected Person determines that this Order does not adequately protect its Confidential Information, it may, within seven days after receipt of a copy of this Order, seek additional protection from the Court for its Confidential information. If a non-Party Protected Person timely seeks additional protection from the Court, the Party's obligation to produce that non-Party Protected Person's documents containing Confidential Information, that is the subject of the motion, is suspended until a decision is rendered by the Court. If the Court orders the production of the non-Party's documents, the Party will have seven days to make the production unless a longer period is ordered by the Court.

4. **Designation of Investigation Materials as Confidential or Highly Confidential by Protected Persons.** To the extent a Protected Person has already designated Investigation

8

Materials as Confidential or Highly Confidential, those materials shall retain those existing

designations, subject to any later challenge by a Party. To the extent that Investigation

Materials are reproduced in the Action, all protections afforded to Litigation Materials

pursuant to this Order shall apply.

5.   The identity of a Non-Party submitting Highly Confidential Information or

Confidential Information shall also be treated as Highly Confidential Information or

Confidential Information for the purposes of this Order where the submitter has requested

such confidential treatment.

6.   Any production of documents or testimony not designated as Confidential or Highly

Confidential Information will not be deemed a waiver of any future claim of confidentiality

concerning such information if it is subsequently designated as Confidential or Highly

Confidential Information. If at any time before trial of this Action, a Protected Person realizes

that it should have designated as Confidential or Highly Confidential Information any

Investigation Materials, Litigation Materials, or Source Code that Person previously produced,

it may so designate such Documents, testimony, or other materials by notifying the Parties in

writing, and, to the extent the new designations relate to Documents, an overlay file with the

new designations shall also be provided in accordance with Paragraph 7(g). The Parties shall

thereafter treat the Investigation Materials, Litigation Materials, or Source Code pursuant to

the Protected Person's new designation under the terms of this Order. However, the disclosure

of any information for which disclosure was proper when made will not be deemed improper

regardless of any such subsequent confidentiality designation.

7.   **Designation of Litigation Materials as Highly Confidential or Confidential by**

**Protected Persons.** The following procedures govern the process for Protected Persons to

9

designate as Highly Confidential or Confidential any information that they disclose in this

Action, including, but not limited to, information in response to requests under Fed. R. Civ.

P. 30, 31, 33, 36, and 45, and Documents disclosed in response to Fed. R. Civ. P. 33(d),

34(b)(2) and (c), or 45:

      (a)     Indiscriminate designations are prohibited.

      (b)     **Testimony.** All transcripts of depositions taken in the Action after entry of this

Order will be treated as Highly Confidential Information in their entirety for 45 days after the

date of the deposition, or until 5 days before trial, whichever date is earlier. Parties will be

responsible for obtaining the deposition transcript for any Party deponents. For Non-Party

deponents, if requested by the Non-Party deponent, the Party who noticed the deposition shall,

within 5 business days of being provided a final transcript (subject to any errata) of the

deposition (or as soon as reasonably possible after the request is made), provide the final

transcript (subject to any errata) to the Non-Party deponent (or the Non-Party deponent's

counsel, if applicable).

      Within 45 days following the date of the deposition, the deponent, whether a

Non-Party or a Party, may designate, subject to the provisions of this Order, Highly

Confidential Information or Confidential Information any portion of the deposition transcript,

by page(s) and line(s), and any deposition exhibits provided by the deponent or the deponent's

employer or its affiliates, or containing the Highly Confidential Information or Confidential

Information of the deponent or the deponent's employer or its affiliates (regardless of who

provided or produced the Document). To be effective, such designations must be provided in

writing to all Parties. All transcripts of depositions taken in this Action after entry of this Order

will be treated as Highly Confidential Information in their entirety until the deadline for the

10

deponent to designate portions of the transcript as Highly Confidential Information has expired. Further, to the extent that a Party's Highly Confidential or Confidential Documents were utilized in the deposition, that Producing Party also has 45 days following the date of the deposition to designate any portion of the deposition testimony as Highly Confidential or Confidential to the extent the deposition testimony discloses or relates to Highly Confidential or Confidential Documents used at the deposition. To be effective, such designations must be provided in writing to all Parties' counsel.

When a Party is entitled under this Order to question a deponent about a Document or information that has been designated by a Non-Party as Highly Confidential or Confidential, and such Non-Party is not in attendance at the deposition, the Party that asked such questions shall designate as Highly Confidential or Confidential the portion of the transcript relating to such Highly Confidential or Confidential Document or information within 45 days following the date of the deposition.

(c) **Documents.** A Protected Person who designates as Highly Confidential Information any Document that it produced in this Action must stamp or otherwise mark each Document containing said information with the designation "HIGHLY CONFIDENTIAL" in a manner that will not interfere with legibility, including page numbering, or audibility unless such Document is produced in native electronic format. A Protected Person who designates as Confidential Information any Document that it produced in this Action must stamp or otherwise mark each Document containing said information with the designation "CONFIDENTIAL" in a manner that will not interfere with legibility, including page numbering, or audibility. Any Document that contains Confidential Information or Highly Confidential Information may be so designated in its entirety. To the extent a Document is

11

produced in native form, such Documents shall be produced in accordance with Paragraph 7(d) below.

(d) **Electronic Documents and Data.** Where a Protected Person produces Confidential or Highly Confidential Information contained in electronic files and Documents in native electronic format, such electronic files and Documents shall be designated by the Protected Person for protection under this Order by appending to the file names or designators' information indicating whether the file contains Highly Confidential Information or Confidential Information, or by any other reasonable method for appropriately designating such information produced in electronic format, including by including a slip sheet associated with the electronic file or by making such designations in reasonably accessible metadata associated with the files. Where Highly Confidential Information or Confidential Information is produced in electronic format on a disk or other medium that contains exclusively confidential information, the "HIGHLY CONFIDENTIAL" or "CONFIDENTIAL" designation may be placed on the disk or other medium. When electronic files or Documents in native form are printed for use at a deposition, in a court proceeding, or for provision in printed form to any person who may receive such files in accordance with this Order, the Party printing the electronic files or Documents shall include the slip sheet identifying the electronic file or Document as "HIGHLY CONFIDENTIAL" or "CONFIDENTIAL" along with the production number or Bates number and designation associated with the native file, or shall affix a legend to the printed Document saying "HIGHLY CONFIDENTIAL" or "CONFIDENTIAL" and include the production number or Bates number and designation associated with the native file.

(e) Upward Designation of Litigation Materials Produced by Other Parties or Non-

Parties. A Protected Person may upward designate (i.e., change any Litigation Materials produced without a designation to a designation of "Confidential" or "Highly Confidential" or designate any Litigation Materials produced as "Confidential" to a designation of "Highly Confidential") any Litigation Materials produced by another Protected Person, provided that said Litigation Materials contains the upward designating Protected Person's own Confidential Information or Highly Confidential Information.

      (f)    Upward designation shall be accomplished by providing written notice to the Parties and the relevant disclosing Protected Person identifying the Litigation Materials to be re- designated within 120 days from the date of the production containing the materials the Protected Person seeks to upwardly designate, or 30 days prior to trial in the Action, whichever is earlier. Such notice must identify (by Bates number, or in the event there is no Bates number, by other individually identifiable information) each Document the Protected Person wishes to upward designate, and include an explanation as to why the Protected Person wishes to upward designate such Documents, and why the existing confidentiality designation is insufficient. The Protected Person shall also provide an overlay file reflecting the new designations in accordance with Paragraph 7(g). Failure to upward designate within 120 days, alone, will not prevent a Protected Person from obtaining the agreement of the disclosing Protected Person to upward designate certain Litigation Materials or from moving the Court for such relief. Any Party may object to the upward designation of Litigation Materials pursuant to the procedures set forth in Paragraph 13 regarding challenging designations.

      (g)    **Overlay Files.** To the extent this Order requires a Protected Person to provide an overlay file in connection with a new or altered confidentiality designation, that Protected Person shall have five business days from the date of the changed designation to produce an

overlay file. In the interim, the Parties shall take care to treat the Documents at issue as if the new designation applies. For the avoidance of doubt, a Party does not violate this provision where it in good faith attempts to comply with the new designation.

8. In the event that a Party is required to produce Documents designated by a Non-Party as Confidential or Highly Confidential Information, then the Party shall:

(a)     promptly notify in writing the Party seeking the Highly Confidential Information or Confidential Information that some or all of the information requested is subject to a protective order;

(b)     promptly notify the Non-Party that its Highly Confidential Information or Confidential Information is being requested and make the information requested available for inspection by the Non-Party or Party; and

(c)     promptly provide the Non-Party with a copy of this Order, the relevant discovery request(s), and a reasonably specific description of the information requested.

The purpose of this provision is to alert a Party to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this Court.

9. If the Non-Party or Party fails to object or seek a protective order from this Court within 14 days of receiving the notice and accompanying information, the Non-Party or Party's Highly Confidential Information or Confidential Information responsive to the discovery request may be produced. If the Non-Party or Party timely seeks a protective order, its Highly Confidential Information or Confidential Information shall not be produced before a determination by the Court. Absent an order to the contrary, the Non-Party or Party shall bear the burden and expense of seeking protection in this Court of its Highly Confidential

Information or Confidential Information. The terms of this Order are applicable to information produced by a Non-Party or Party in the Action and designated as Highly Confidential Information or Confidential Information. Such information produced by Non-Parties or Parties in connection with this Action is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party or Party from seeking additional protections.

10. **Unauthorized disclosure of Confidential Information, Highly Confidential Information, or Highly Confidential - Source Code.** In the event of a disclosure of any Confidential Information, Highly Confidential Information, or Highly Confidential - Source Code to any person(s) not authorized to receive such disclosure under this Order, the Party who discovers such unauthorized disclosure shall: (a) promptly notify the Protected Person whose material has been disclosed and provide to such Protected Person all known relevant information concerning the nature and circumstances of the disclosure. If it is readily discernible which Party is responsible for the disclosure, the disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed material and to ensure that no further unauthorized disclosure and/or use thereof is made; (b) inform the Person(s) to whom unauthorized disclosure was made of all the terms of this Order; and (c) request such Person(s) execute the Agreement Concerning Confidentiality in the form of Appendix A attached hereto. If it is not readily discernible which Party is responsible for the disclosure, the Parties shall work together to: (a) promptly take all reasonable measures to retrieve the improperly disclosed material and to ensure that no further unauthorized disclosure and/or use thereof is made; (b) inform the Person(s) to whom unauthorized disclosure was made of all the terms of this Order, and (c) request such Person(s) execute the

Agreement Concerning Confidentiality in the form of Appendix A attached hereto.

11. Unauthorized or inadvertent disclosure shall not change the confidential status of any disclosed material or waive the Producing Party's right to maintain the disclosed material as containing Confidential Information, Highly Confidential Information, or Highly Confidential - Source Code.

### *Privileged Investigation Materials and Litigation Materials*

12. (a)   The production of privileged or work-product protected Documents, electronically stored information ("ESI"), or information, whether inadvertent or otherwise, is not a waiver of the privilege or protection from discovery in this case or in any other federal or state proceeding. This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d). Federal Rule of Evidence 502(b) shall not apply to any disputes regarding Investigation Material or Litigation Material.

(b)   Nothing contained herein is intended to or shall serve to limit a Party's right to conduct a review of Documents, ESI (including metadata), or information for relevance, responsiveness and/or segregation of privileged and/or protected information before production.

(c)   If the Producing Party becomes aware that it has produced information protected by the attorney-client privilege or any other privilege or immunity, the Producing Party will promptly notify each Receiving Party in writing of the production and the basis of the privilege being asserted. After being notified, a Party must promptly return, sequester,[4] or destroy the specified information and any copies or summaries of the information that it has; must not use or disclose the information until the claim is resolved; must take reasonable steps

---

[4] For the avoidance of doubt, sequestration prohibits the Party in possession from further review of the material once a claim of privilege is made except as otherwise provided in this Paragraph.

to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim in camera. Any challenge to a claim of privilege contemplated by this Paragraph must be made promptly. The Producing Party must preserve the information until the claim is resolved.

(d)     If a Receiving Party becomes aware that it is in receipt of information or material that it knows or reasonably should know is privileged, counsel for the Receiving Party shall immediately take steps to: (i) stop reading such information or material; (ii) notify counsel for the Producing Party of such information or material; (iii) collect all copies of such information and material; and (iv) return to the Producing Party and/or destroy such information or material (and, in the case of destruction, certify that fact to the Producing Party if requested to do so). Any notes or summaries referring or relating to such material shall be destroyed simultaneously therewith.

(e) This Order is without prejudice to any Protected Person's right to assert that any Investigation Materials or Litigation Materials are subject to any applicable claim of privilege or protection, including, but not limited to, the attorney-client privilege and the work-product doctrine, and it is without prejudice to any Party's right to contest such a claim of privilege or protection.

### *Objections to Confidentiality Designations*

13. Any Party who objects to any confidentiality designation, or part thereof, (the "Objecting Party") may, until 30 days before the trial of its Action, provide a written notice to the Protected Person who made such designation (the "Designating Party") and to all Parties stating with particularity the grounds for the objection. All materials objected to shall continue to be treated as Confidential Information, Highly Confidential Information, or Highly

Confidential - Source Code pending resolution of the dispute. Within 10 days of the Objecting

Party's written notice, the Objecting Party and the Designating Party shall attempt to confer to

discuss their respective positions. If the Objecting Party and Designating Party cannot reach an

agreement on the objection within 10 days of the Objecting Party's written notice (or another

deadline agreed to by the Objecting Party and the Designating Party), the Objecting Party may

raise the dispute to this Court by filing a motion in accordance with the applicable Local

Rules. If the Court finds the designation of Confidential Information, Highly Confidential

Information, or Highly Confidential - Source Code to have been inappropriate, the challenged

designation shall be considered rescinded, and the Designating Party shall reproduce the

Documents with the revised designations, along with an overlay file in accordance with

Paragraph 7(g). Notwithstanding anything else contained in this Order, the Parties reserve

their rights under Fed. R. Civ. P. 37.

### *Disclosure of Highly Confidential Information or Confidential Information*

14. Highly Confidential Information may be disclosed only to the following Persons:

(a)      the Court and all Persons assisting the Court in the Action, including law

clerks, court reporters, and stenographic or clerical personnel;

(b)      Outside Counsel for Defendant, except that access by non-attorneys shall

be limited to personnel assigned to work on the Action, whose functions require access

to the information. Such personnel shall not include any employee of a Party;

(c)      Plaintiffs' Counsel, except that access by non-attorneys shall be limited to

personnel assigned to work on the Action, whose functions require access to the

information;

(d)      outside vendors or service providers (such as copy-service providers,

18

outside court reporters retained for depositions, document-management consultants, or lawyers or law firms for document review other than Outside Counsel) and agents or independent contractors retained by a Party to assist that Party in the Action provided that they shall first execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto;

(e) any mediator, arbitrator, or special master that the Parties engage in this Action or that this Court appoints provided that they shall first execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto;

(f) any Person who the Highly Confidential Information itself indicates, or who the Receiving Party has a good-faith basis to believe, was the author, addressee, recipient, custodian, or source of the Document or Highly Confidential Information.

(g) any Person who the Highly Confidential Information itself indicates, or who the Receiving Party has a good-faith basis to believe, had lawful access to the Document or the Highly Confidential Information;

(h) during a deposition, any Person who the Highly Confidential Information itself indicates, or who the Receiving Party has a good-faith basis to believe, had knowledge of the Highly Confidential Information;

(i) during a deposition, any current employee of the Designating Party;

(j) any Person retained by a Party to serve as a testifying or consulting expert in this Action,[5] including any employees of the firm with which the expert or consultant is

---

[5] This provision does not apply to any Person retained by a Party to serve as a testifying or consulting expert, where such person is also an employee of a Party.

associated and independent contractors who assist the expert's work in the Action, provided that they shall first execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto;

(k)     outside trial consultants (including, but not limited to, graphics consultants and mock jurors), provided that they shall first execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto;

(l)     any Person as may be authorized by written agreement of the Designating Party, by verbal agreement of the Designating Party on the record at a deposition or Court hearing, or by order of the Court.

15. Confidential Information may be disclosed only to the following Persons:

(a)     the Court and all Persons assisting the Court in the Action, including law clerks, court reporters, and stenographic or clerical personnel;

(b)     Outside Counsel for Defendant, except that access by non-attorneys shall be limited to personnel assigned to work on the Action, whose functions require access to the information. Such personnel shall not include any employee of a Party;

(c)     Plaintiffs' Counsel, except that access by non-attorneys shall be limited to personnel assigned to work on the Action, whose functions require access to the information;

(d)     the officers, directors, and employees (including In-House Counsel) of Defendant to whom disclosure is reasonably necessary for this litigation and who have signed the Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto;

(e)     outside vendors or service providers (such as copy-service providers, outside

20

court reporters retained for depositions, document-management consultants, or lawyers or law firms for document review other than Outside Counsel) and agents or independent contractors retained by Defendant to assist Defendant in the Action provided that they shall first execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto;

     (f)     any mediator, arbitrator, or special master that the Parties engage in the Action or that this Court appoints provided that they shall first execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto;

     (g)     any Persons who the Confidential Information itself indicates, or who the Receiving Party has a good-faith basis to believe, was the author, addressee, recipient, custodian, or source of the Document or Confidential Information;

     (h)     any Persons who the Confidential Information itself indicates, or who the Receiving Party has a good faith basis to believe had lawful access to the Document or Confidential Information;

     (i)     during a deposition, any Persons who the Confidential Information itself indicates, or who the Receiving Party has a good-faith basis to believe, had knowledge of the Confidential Information;

     (j)     any Person whose statements or communications are quoted, recounted, or summarized in a Party's or Non-Party's Documents or Confidential Information, except that only those portions of the Documents or Confidential Information quoting, recounting, or summarizing a Person's statements or communications may be disclosed to that Person;

     (k)     during a deposition, any current employee of the Designating Party;

(l)     outside trial consultants (including, but not limited to, graphics consultants and mock jurors) provided that they shall first execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto;

(m)     any Person retained by a Party to serve as a testifying or consulting expert in these Action,[6] including any employees of the firm with which the expert or consultant is associated and independent contractors who assist the expert's work in the Action, provided that they shall first execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto;

(n)     any Person as may be authorized by written agreement of the Designating Party, by verbal agreement of the Designating Party on the record at a deposition or Court hearing, or by order of the Court.

16. The Parties shall have the right to seek redress from this Court to enforce the provisions of the Agreement Concerning Confidentiality set forth in Appendix A with respect to any Person bound by this Order.

17. Each Person described in Paragraphs 14 and 15 of this Order to whom information designated as Highly Confidential Information or Confidential Information is disclosed must not disclose that Highly Confidential Information or Confidential Information to any other Person, except as permitted in this Order.

18. Nothing in this Order:

(a)     limits a Protected Person's use or disclosure of its own information designated as Highly Confidential Information or Confidential Information;

---

[6] This provision does not apply to any Person retained by a Party to serve as a testifying or consulting expert, where such Person is also an employee of a Party.

22

(b)      prevents disclosure of Highly Confidential Information or Confidential Information with the consent of the Protected Person that designated the material as Confidential or Highly Confidential;

(c)      prevents disclosure by a Party of Highly Confidential Information or Confidential Information: (i) that is or has become publicly known through no fault of that Party; (ii) lawfully acquired by or known to that Party independent of receipt during the Investigation or in discovery in the Action; (iii) previously produced, disclosed and/or provided to that Party without an obligation of confidentiality and not by inadvertence or mistake; or (iv) pursuant to an order of a court or as may be required by regulation;

(d)      prevents counsel from rendering advice to his or her client with respect to this matter or from generally referring to or relying upon Confidential Information or Highly Confidential Information in rendering such advice so long as counsel does not specifically disclose the substance of the Confidential Information or Highly Confidential Information; or

(e)      prevents Plaintiffs' retention, use, or disclosure of Investigation Materials outside the context of the Action to the extent permitted by applicable law or regulation, for law enforcement purposes, as required by law, court order, or regulation, or for the purpose of securing compliance with a Final Judgment in this Action. Any such disclosures shall be limited to those permitted by applicable law or regulation. Plaintiffs will not disclose any Litigation Materials produced only during the pendency of the Action to any Non-Party, except as ordered by a court or as may be required by law or regulation and subject to Paragraph 28. If Investigation Materials or Litigation Materials are requested for disclosure under a state's public information act or the equivalent, this Order prohibits disclosure to the

23

extent the state's public information act or the equivalent provides an exception for disclosure of information protected by court order.

### Disclosure of Highly Confidential Information to Designated In-House Counsel for Parties Based on Need

19. A Party may at any time before the trial of its Action request disclosure of Highly Confidential Information to Designated In-House Counsel by consent of the Designating Party or motion with the Court. Unless otherwise ordered by the Court or agreed to in writing by the Designating Party, a Party seeking to disclose Highly Confidential Information to Designated In-House Counsel must submit in writing to the other Parties and the Designating Person a written statement that: (1) describes with particularity the Highly Confidential Information the Party seeks to disclose to Designated In-House Counsel; (2) sets forth the full name of each Designated In- House Counsel and the city and state of his or her residence, and (3) describes each Designated In-House Counsel's primary job duties and responsibilities in sufficient detail to determine if each Designated In-House Counsel is involved in Competitive Decision-Making. The Party must meet and confer with the Designating Party to try to resolve the matter by agreement within seven days of the written notice. If no agreement is reached, the Party may file a motion with the Court. The other Parties and/or the Designating Party will have seven days to respond to such motion. The Party will not disclose any Highly Confidential Information to Designated In-House Counsel pending resolution of the dispute. If the Court finds that the Designated In-House Counsel has a particularized need for access to the Highly Confidential Information that outweighs the risk of harm to the Designating Party or the public interest, the Party will be permitted to disclose the Highly Confidential Information to the Designated In-House Counsel.

*Use of Information Designated Highly Confidential or Confidential in this Action*

20. In the event that any Highly Confidential Information or Confidential Information is contained in any pleading, motion, exhibit, or other paper filed or to be filed with the Court, the Court shall be so informed by the Party filing such papers, and such papers shall be filed under seal, in accordance with this Court's Local Rule 5, as modified by the terms of this Order. The Parties agree to act in good faith to limit the need to seal Documents filed in this Court.

21. **Filing Highly Confidential Information or Confidential Information Under Seal.** The filing of documents designated as Confidential or Highly Confidential under seal will be governed by the provisions of Local Civil Rule 5.

22. Parties shall give the other Parties notice (a minimum of two business days) if they reasonably expect a deposition, hearing, or other proceeding to include Highly Confidential Information so that the other Parties can ensure that only authorized individuals are present during the portions of those proceedings where the Highly Confidential Information may be used. The use of a Document as an exhibit at a deposition shall not in any way affect its designation as Highly Confidential Information or Confidential Information.

*Use of Highly Confidential Information or Confidential Information at Trial*

23. Disclosure at trial or at any evidentiary hearing of any Document, testimony, or other material designated as Highly Confidential Information or Confidential Information will be governed pursuant to a separate court order. Unless otherwise directed by the Court, the Parties shall meet and confer and file a motion accompanied by a proposed order outlining those procedures no later than 30 calendar days before the first day of trial or any evidentiary

hearing. Upon the filing of a motion and proposed order governing the disclosure of Highly

Confidential Information or Confidential Information at trial or any evidentiary hearing, the

Parties shall provide notice of such order to Non-Parties whose Highly Confidential

Information or Confidential Information is expected to be used at trial or any evidentiary

hearing.

24. Unless otherwise provided for in this Order, Highly Confidential Information and

Confidential Information produced by a Party or a Non-Party in the Action shall be used

solely for the conduct of the Action and shall not be used by a Party, Non-Party, or any

Person subject to this Order, including counsel for a Party or Non-Party, for any business,

commercial, competitive, personal, or other purpose. Such Highly Confidential and

Confidential Information may only be disclosed under the conditions described in this Order.

### *Investigation Materials or Litigation Materials Subpoenaed or Ordered Produced in Other Litigation*

25. If a Party is served with a lawful subpoena or a court order issued by a court,

arbitral, administrative, or legislative body, or with a court order issued in other litigation

that compels disclosure of any information or items designated in the Action as

Confidential or Highly Confidential that Party must:

(a)      promptly notify in writing the Designating Party (such notification shall

include a copy of the subpoena or court order);

(b)      promptly notify in writing the Person or entity who issued the subpoena or

caused the order to issue in the other litigation, that some or all of the material covered by

the subpoena or order is subject to this Order (such notification shall include a copy of this

Order); and

(c)      cooperate with respect to all reasonable procedures sought to be pursued by

26

the Designating Party whose Highly Confidential or Confidential Information may be affected.[7]

26. If the Designating Party timely[8] seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this Action as Confidential or Highly Confidential before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its Confidential Information or Highly Confidential Information—and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in the Action to disobey a lawful directive from another court.

27. If, under any public records or other relevant law, any Investigation Materials or Litigation Materials are subject to any form of compulsory process in a Plaintiff State or is demanded from any Plaintiff, such Plaintiff shall notify in writing the Designating Party whose Investigation Materials or Litigation Materials may be affected at least 10 business days before producing Investigation Materials or Litigation Materials, unless state or federal statute, or court order or other public adjudicatory body requires that the Plaintiff State produce the Investigation Materials or Litigation Materials in a shorter time frame. A Plaintiff shall not produce the Investigation Materials or Litigation Materials in response to such

---

[7] The purpose of imposing these duties is to alert the interested parties to the existence of this Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court or other tribunal from which the subpoena or order issued.

[8] The Designating Party shall have at least 14 days from the service of the notification pursuant to Paragraph 25(a) to seek a protective order, unless the subpoena or order requires a response within a period shorter than 14 days, or unless a shorter period applies under the rules of the court or other tribunal from which the subpoena or order issued, in which case such rules shall apply.

compulsory process or public records request unless the Plaintiff deems that it is required by law to do so and provides 10 business days' notice of its intent to do so to the Designating Party, unless state or federal statute, or court order or other public adjudicatory body requires that the Plaintiff produce the Investigation Materials or Litigation Materials in a shorter time frame. However, if a Plaintiff denies a public records or similar request and the denial is not successfully challenged or overruled, the Plaintiff does not need to provide notice pursuant to this paragraph. If Investigation Materials or Litigation Materials are requested for disclosure under a state's public information act or the equivalent, this Order prohibits disclosure to the extent the state's public information act or the equivalent provides an exception for disclosure of information protected by court order. Nothing contained herein shall alter or limit the obligations of a Plaintiff State that may be imposed by statute or court order regarding the disclosure of Documents and information supplied to the state.

### *Procedures upon Termination of this Action*

28. The obligations imposed by this Order survive the termination of this Action unless the Court, which shall retain jurisdiction to resolve any disputes arising out of this Order, orders otherwise. Except as otherwise provided by Paragraph 18, within 90 days after the expiration of the time for appeal of an order, judgment, or decree terminating the Action, all Persons, other than Plaintiffs, having received information designated as Confidential Information, Highly Confidential Information) or Highly Confidential - Source Code in such Action must return all copies thereof to the Protected Person (or the Protected Person's counsel if represented by counsel) that produced it or destroy or delete all copies of such Confidential Information, Highly Confidential Information, or Highly Confidential - Source Code. Within 90 days after the expiration of the time for appeal of an order, judgment, or

decree terminating the Action, all Plaintiffs in such Action having received information

designated as Confidential Information, Highly Confidential Information, or Highly

Confidential - Source Code must, to the extent permitted by Plaintiffs' retention schedules,

either make a good-faith effort to return all copies thereof to the Protected Person (or the

Protected Person's counsel if represented by counsel) that produced it or destroy or delete all

copies of such Confidential Information, Highly Confidential Information, or Highly

Confidential - Source Code. Within 90 days after the expiration of the time for appeal of an

order, judgment, or decree terminating this Action, all Persons having received information

designated as Confidential Information must certify compliance with this Paragraph 28 in

writing to the Party or Protected Person that produced the Confidential Information.

29. Counsel for the Parties will be entitled to retain court papers and exhibits, deposition

transcripts and exhibits, hearing transcripts and exhibits, trial transcripts and exhibits,

correspondence (including internal correspondence and email) and work product, provided

that the Parties and their counsel do not disclose the portions of these materials containing

information designated as Highly Confidential Information or Confidential Information to any

Person, except pursuant to court order or agreement with the Protected Person that produced

the Highly Confidential Information or Confidential Information or as otherwise permitted

herein. All Highly Confidential Information and Confidential Information returned to the

Parties or their counsel by the Court likewise must be disposed of in accordance with this

paragraph. Nothing in this paragraph, however, restricts the rights of the Parties under

Paragraphs 14 and 15 of this Order.

### *New Parties to The Action*

30. In the event that additional Persons or entities become parties to the Action,

such new Parties shall not have access to Confidential Information, Highly Confidential Information, or Highly Confidential - Source Code produced by or obtained from any Protected Person until an authorized person executes, on behalf of the new Party, an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto.

### *Non-Parties*

31. Any Party, in conducting discovery from Non-Parties in connection with the Action, shall provide any Non-Party from which it seeks discovery with a copy of this Order so as to inform each such Non-Party of his, her or its rights herein. If a Non-Party provides discovery to any Party in connection with the Action, the provisions of this Order shall apply to such discovery as if such discovery were being provided by a Party. Under such circumstances, if the Non-Party agrees to be bound by the terms of this Order in the form of Appendix A attached hereto, the Non-Party shall have the same rights and obligations under the Order as held by the Parties, except that, other than with leave of court, in no circumstance may a Party's Highly Confidential Information be disclosed to a Non-Party without the consent of that Party. However, a Party's Highly Confidential Information may be shared with a former employee of that Party if the former employee may view the Highly Confidential Information pursuant to Paragraph 14.

### *Reservation of Rights*

32. Nothing contained in this Order or any designation of confidentiality hereunder, or any failure to make such designation, shall be used or characterized by any Party as an admission by a Party or a Party opponent. Nothing in this Order shall be deemed an admission that any particular information designated as Confidential Information, Highly

Confidential Information, or Highly Confidential - Source Code is entitled to protection under the Order, Federal Rule of Civil Procedure 26(c), or any other law. Nothing in this Order shall be construed as granting any Person a right to receive specific Confidential Information, Highly Confidential Information, or Highly Confidential - Source Code where a court has entered an order precluding that Person from obtaining access to that information. The Parties specifically reserve the right to challenge the designation of any particular information as Confidential Information, Highly Confidential Information, or Highly Confidential - Source Code and agree that no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order. Similarly, no Party waives any right to object on any ground to introduction or use as evidence of any of the Investigation Materials or Litigation Materials covered by this Order.

### *Standard of Care*

33. The recipient of any Confidential Information, Highly Confidential Information, or Highly Confidential - Source Code shall maintain such material in a secure and safe area and shall exercise a standard of due and proper care with respect to the storage, custody, use, and/or dissemination sufficient to safeguard against unauthorized or inadvertent disclosure of such material. Confidential Information, Highly Confidential Information, or Highly Confidential - Source Code shall not be copied, reproduced, extracted or abstracted, except for the purpose of the conduct of the Action or as otherwise provided by this Order. All such copies, reproductions, extractions, and abstractions shall be subject to the terms of this Order and be clearly marked to reflect their designation.

### *Right to Seek Modification*

34. Nothing in this Order limits any Person, including members of the public, a Party, or a

31

Protected Person, from seeking: (1) further or additional protections of any of its materials, or (2) modification of this Order upon motion duly made pursuant to the Rules of this Court, including, without limitation, an order that certain material not be produced at all or is not admissible evidence in the Action or any other proceeding.

### *The Privacy Act*

35. Any order of this Court requiring the production of any Document, information, or transcript of testimony constitutes a court order within the meaning of the Privacy Act, 5 U.S.C. § 552a (b) (11).

### *Persons Bound by This Order*

36. This Order shall be binding on the Parties to the Action, their attorneys, and their successors, personal representatives, administrators, assigns, parents, subsidiaries, divisions, affiliates, employees, agents, retained consultants and experts, and any persons or organizations over which they have direct control, and any Non-Party, to the extent such Non-Party has agreed to be bound by this Order.

37. All persons subject to this Order are reminded that this Order may be enforced by the Court's full powers of criminal and civil contempt.

IT IS HEREBY SO ORDERED this _____11TH_____ day of _____MAY_____, 2023.

_____/S/_____ JFA

John F. Anderson
United States Magistrate Judge

32

APPENDIX A (NON-PARTY CONFIDENTIALITY AGREEMENT)

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.<br><br>      Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>      Defendant. | Civil Action No.: 1:23-CV-00108-LMB-JFA |

## AGREEMENT CONCERNING CONFIDENTIALITY

I,_____, am employed by _____

as_____.

I hereby certify that:

1. I have read the Protective Order ("Order") entered in the above-captioned action (this "Action") and understand its terms.

2. I agree to be bound by the terms of the Order entered in this Action.

3. I agree to use the information provided to me only as permitted in the Order.

4. I understand that my failure to abide by the terms of the Order entered in this Action may subject me to civil and criminal penalties for contempt of court.

5. I submit to the jurisdiction of this Court, and specifically the United States District Court for the Eastern District of Virginia, solely for the purpose of enforcing the terms of the Order entered in the above-captioned action and freely and knowingly waive any right I

may otherwise have to object to the jurisdiction of said court.

_____

**Signature**

_____

**Date**

APPENDIX B

UNITED STATES OF AMERICA, et al.

      Plaintiffs,

v.

GOOGLE LLC,

      Defendant.

Civil Action No.: 1:23-CV-00108-LMB-JFA

## PROTECTIVE ORDER: SOURCE CODE PROTOCOL

### *Restrictions on those who may view Source Code*

1. Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated Highly Confidential - Source Code only to:

      a)      the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Agreement Concerning Confidentiality" that is attached to the Protective Order as Appendix A;

      b)      Plaintiffs' Counsel, if one or more Plaintiffs is the Receiving Party, except that access by non-attorneys shall be limited to personnel to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Agreement Concerning Confidentiality" that is attached to the Protective Order as Appendix A;

1

     c)     up to five Experts[9] (for the avoidance of doubt, the Parties can agree to allow such disclosure to more than five Experts of the Receiving Party) of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Agreement Concerning Confidentiality" (Appendix A), and (3) as to whom the procedures set forth in Paragraph 2 below and specifically identified as eligible to access Highly Confidential - Source Code Information or Items, have been followed;

     d)     the Court and its personnel;

     e)     stenographic reporters, videographers and their respective staff who have signed the "Agreement Concerning Confidentiality" (Appendix A) and are transcribing or videotaping a deposition wherein Highly Confidential - Source Code Information or Items are being discussed, provided that such reporters and videographers shall not retain or be given copies of any portions of the source code, which if used during a deposition, will not be attached as an exhibit to the transcript but instead shall be identified only by its production numbers.

     f)     while testifying at deposition or trial in this action only: (i) any current officer, director, or employee of the Producing Party or original source of the information; (ii) any person designated by the Producing Party to provide testimony pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure; and/or (iii) any person who authored, previously received (other than in connection with this litigation), or was directly involved in creating, modifying,

---

[9] "Expert" means any Person retained by a Party to serve as a testifying or consulting expert in this Action, including any employees of the firm with which the expert or consultant is associated and independent contractors who assist the expert's work in the Action, provided that any such testifying expert, consulting expert, employee, or independent contractor shall first execute an Agreement Concerning Confidentiality agreeing to be bound by the terms of this Order in the form of Appendix A attached hereto and comply with all provisions of this Source Code Protocol including by supplying the information needed for compliance with the Process for Requesting To Disclose Source Code set forth below.

or editing the Highly Confidential - Source Code Information or Items, as evident from its face
or reasonably certain in view of other testimony or evidence. Persons authorized to view
Highly Confidential - Source Code Information or Items pursuant to this sub-paragraph shall
not retain or be given copies of the Highly Confidential - Source Code Information or Items
except while so testifying.

### *Process for Requesting to Disclose Source Code*

2.  Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a
Party that seeks to disclose to an Expert (as defined in this Order) any information or item that
has been designated Highly Confidential - Source Code pursuant to paragraphs 1(b) first must
make a written request to the Designating Party that (1) identifies the general categories of
Highly Confidential- Source Code information that the Receiving Party seeks permission to
disclose to the Expert, (2) sets forth the full name of the Expert and the city and state of his or
her primary residence, (3) attaches a copy of the Expert's current resume, (4) identifies the
Expert's current employer(s), (5) identifies each person or entity from whom the Expert has
received compensation or funding for work in his or her areas of expertise or to whom the expert
has provided professional services, including in connection with a litigation, at any time during
the preceding five years, and (6) identifies (by name and number of the case, filing date, and
location of court) any litigation in connection with which the Expert has offered expert
testimony, including through a declaration, report, or testimony at a deposition or trial, during the
preceding five years.

3.  A Party that makes a request and provides the information specified in the preceding
respective paragraphs may disclose the subject Highly Confidential - Source Code to the
identified Expert unless, within 14 days of delivering the request, the Party receives a written

objection from the Designating Party. Any such objection must set forth in detail the grounds on which it is based.

4. A Party that receives a timely written objection must meet and confer with the Designating Party (through direct voice to voice dialogue) to try to resolve the matter by agreement within seven days of the written objection. If no agreement is reached, the Party seeking to make the disclosure to the Expert may file a motion in accordance with Local Rules and Individual Practices seeking permission from the court to do so. Any such motion must describe the circumstances with specificity, set forth in detail the reasons why the disclosure to the Expert is reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any additional means that could be used to reduce that risk. In addition, any such motion must be accompanied by a competent declaration describing the parties' efforts to resolve the matter by agreement (i.e., the extent and the content of the meet and confer discussions) and setting forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

5. In any such proceeding, the Party opposing disclosure to the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Expert.

*Restrictions on those who may see Source Code (Patent and Acquisition Bars)*

6. Absent written consent from the Producing Party, any individual who receives access to information designated Highly Confidential - Source Code by the Producing Party shall not be involved in the prosecution of patents or patent applications relating to the subject matter of this action, including without limitation the patents related to the subject matter of this action and any patent or application claiming priority to the patents related to the subject matter of this action, before any foreign or domestic agency, including the United States Patent and Trademark

4

Office ("the Patent Office"). For purposes of this paragraph, "prosecution" means directly or indirectly drafting, amending, or advising others as to the drafting or amending of patent claims. To avoid any doubt, "prosecution" as used in this paragraph does not include representing a party challenging or defending a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, ex parte reexamination, inter partes reexamination, inter partes review, post grant review or covered business method review). This Prosecution Bar shall begin when access to Source Code information is first received by the affected individual and shall end two (2) years after final termination of this action.

7. Absent written consent from the Producing Party, any individual who receives access to information designated Highly Confidential - Source Code by the Producing Party shall not (i) participate in the acquisition of patents or patent applications relating to the subject matter of this action for the purposes of assertion against Google LLC; or (ii) advise or counsel clients regarding the same. This Acquisition Bar shall not prohibit counsel from advising clients on other legal matters involving patents, including validity and settlement negotiations. This Acquisition Bar shall begin when access to Source Code information is first received by the affected individual and shall end two (2) years after final termination of this action.

### Process for Reviewing Source Code

8. To the extent production of source code becomes necessary in this case, a Producing Party may designate material as Highly Confidential - Source Code if it comprises, includes, or substantially discloses confidential, proprietary or trade secret source code or algorithms. This material may include, among things, technical design documentation that comprises, includes, or substantially discloses source code or algorithms.

9. Protected Material designated as Highly Confidential - Source Code shall be subject to all

of the protections herein including the Prosecution Bar set forth in Paragraph 6 and the

Acquisition Bar set forth in Paragraph 7, and may be disclosed only as set forth in Paragraph 1.

10. Any source code produced in discovery shall only be made available for inspection, not produced except as set forth below, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at (1) an office of the Producing Party or the Producing Party's primary outside counsel of record or (2) another mutually agreed upon location. The source code shall be made available for inspection on a secured computer (the "Source Code Computer") in a secured, locked room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device. The Producing Party will make a good faith effort to provide legitimate review tools to the Source Code Computer as requested by the Receiving Party. The Receiving Party shall provide a license to the requested review tools should the Producing Party not already have one. The secured computer shall have disk encryption and be password protected. Use or possession of any input/output device (e.g., USB memory stick, mobile phone or tablet, camera or any camera-enabled device, CD, floppy disk, portable hard drive, laptop, or any device that can access the Internet or any other network or external system, etc.) is prohibited while accessing the computer containing the source code. All persons entering the locked room containing the source code must agree to submit to reasonable security measures to ensure they are not carrying any prohibited items before they will be given access to the locked room. The computer containing source code will be made available for inspection during regular business hours (9:00 A.M. to 5:00 P.M. local time), upon reasonable notice to the producing party, which shall not be less than 3 business days in advance of the requested inspection. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code

review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code.

11. The Receiving Party may request paper copies of limited portions of source code, but only if and to the extent reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial and except to the extent allowed in Paragraph 16. The Receiving Party shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in Paragraph 10 in the first instance. The Producing Party shall undertake to produce the requested material as soon as possible after it is requested, but in no event more than 5 business days after the request, and the Producing Party will provide the requested material on watermark or colored paper (which shall not prevent the creation of legible copies made only as authorized herein) bearing Bates numbers and the legend Highly Confidential- Source Code unless objected to as discussed below. At the inspecting Party's request or the request of an Expert retained by the inspecting Party to whom disclosure of material designated Highly Confidential - Source Code is permitted, additional sets (or subsets) of printed source code may be requested and provided by the Producing Party within 5 business days of the request. The Producing Party may challenge the amount of source code requested in hard copy form pursuant to the dispute resolution procedure and timeframes set forth in Paragraph 13 of the Protective Order, whereby the Producing Party is the "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute resolution. Contested printouts do not need to be produced to the Receiving Party until the matter is resolved by the Court.

12. The Receiving Party shall maintain a record of any individual who has inspected any portion of the source code in electronic or paper form. The Receiving Party shall maintain all printed portions of the source code in a secured, locked area under the direct control of counsel

7

(or outside experts or consultants who have been approved to access source code) responsible for maintaining the security and confidentiality of the designated materials. Any paper copies designated Highly Confidential - Source Code shall be stored or viewed only at (i) the offices or working locations of outside counsel for the Receiving Party, (ii) the offices or working locations of outside experts or consultants who have been approved to access source code; (iii) the site where any deposition is taken (iv) the Court; or (v) any intermediate location necessary to transport the information to a hearing, trial or deposition. Except as provided in Paragraph 16 of this Appendix, the Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. Any printed pages of source code, and any other documents or things reflecting source code that have been designated by the producing party as Highly Confidential - Source Code may not be copied, digitally imaged or otherwise duplicated, except the Receiving Party may make additional paper copies if such additional copies are necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report) or necessary for deposition, or as provided below in Paragraph 16. Any paper copies used during a deposition shall be retrieved by the Receiving Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.

13. The Receiving Party's outside counsel and/or expert shall be entitled to take notes relating to the source code but may not copy any portion of the source code into the notes. No copies of all or any portion of the source code may leave the room in which the source code is inspected except as otherwise provided herein. Further, no other written or electronic record of the source code is permitted except as otherwise provided herein.

14. A list of names of persons who will view the source code will be provided to the

8

producing party in conjunction with any written (including email) notice requesting inspection. The Producing Party shall maintain a daily log of the names of persons who enter the locked room to view the source code and when they enter and depart. The Receiving Party shall be entitled to a copy of the log.

15. The Receiving Party's outside counsel shall maintain a log of all copies of the source code in its possession or in the possession of its retained consultants. The log shall include the names of the recipients and reviewers of copies and locations where the copies are stored. Upon request by the Producing Party, the Receiving Party shall provide reasonable assurances and/or descriptions of the security measures employed by the Receiving Party and/or person that receives a copy of any portion of the source code. The Producing Party shall be entitled to a copy of the log.

16. Except as provided in this paragraph, the Receiving Party may not create electronic images, or any other images, of the source code from the paper copy for use on a computer (e.g., may not scan the source code to a PDF, or photograph the code). The Receiving Party may create an electronic copy or image of limited excerpts of source code only to the extent necessary in a pleading, exhibit, expert report, discovery document, deposition transcript, other Court document, or any drafts of these documents ("Source Code Documents"). The Receiving Party shall only include such excerpts as are reasonably necessary for the purposes for which such part of the Source Code is used. Images or copies of Source Code shall not be included in correspondence between the parties (references to production numbers shall be used instead) and shall be omitted from pleadings and other papers except to the extent permitted herein. The Receiving Party may create an electronic image of a selected portion of the Source Code only when the electronic file containing such image has been encrypted using commercially

9

reasonable encryption software including password protection. The communication and/or disclosure of electronic files containing any portion of source code shall at all times be limited to individuals who are authorized to see source code under the provisions of this Protective Order. Additionally, all electronic copies must be labeled Highly Confidential - Source Code.

17. To the extent portions of source code are quoted in a Source Code Document, either (1) the entire document will be stamped and treated as Highly Confidential - Source Code or (2) those pages containing quoted Source Code will be separately bound, and stamped and treated as Highly Confidential - Source Code.

**EXHIBIT 2**

**Virginia Coordination Order**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Civil Action No. 1:23-cv-00108-LMB-JFA |

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING<br>ANTITRUST LITIG. | Civil Action No. 1:21-md-03010-PKC |

**[~~PROPOSED~~] ORDER REGARDING COORDINATION OF DISCOVERY**

1.    <u>Definitions</u>.  For purposes of this Order, the following definitions will apply:

  a.    "Confidential Information" means material that qualifies as "Confidential Information" as that term is defined in either paragraph 1(b) of the MDL Confidentiality Order or paragraph 1(b) of the Virginia Protective Order.

  b.    "Coordinated Case" means the MDL or the Virginia Case.  "Coordinated Cases" means the MDL and the Virginia Case.

1

c.      "Coordinated Discovery Period" means the time period after the Deadline for Substantial Completion of Document Production in the Virginia Case and before the Fact Discovery Cutoff in the Virginia Case.

d.      "Counsel" means Outside Counsel, Virginia Plaintiffs' Counsel, and MDL State Plaintiffs' Counsel, provided that "Counsel" shall not include Counsel for any Party that ceases to be part of the MDL (unless and until a further order directs otherwise).

e.      "Cross Notice" means to send a notice of intent to take a deposition of a Party under Federal Rule of Civil Procedure 30(b)(1) or to serve a subpoena for a Non-Party Deposition under Federal Rule of Civil Procedure 45(a)(1), after another Party has Noticed a deposition of the same witness.

f.      "Deadline for Substantial Completion of Document Production in the Virginia Case" means the date ordered by the Court for the substantial completion of document production in the Virginia Case.

g.      "Deposition Limit" means (i) for Parties in the MDL, the fact-deposition limit in the MDL referenced in paragraph 6.5 of Pre-Trial Order Number 5 in the MDL (Dkt. 394), and any changes to that limit that may be made after entry of this Order; and (ii) for Parties in the Virginia Case, the fact-deposition limits in the Virginia Case referenced in paragraph 7 of the Rule 16(b) Scheduling Order in the Virginia Case (Dkt. 94), which references and incorporates paragraph 6(G) of the Joint Discovery Plan in the Virginia Case (Dkt. 87), and any changes to those limits that may be made after entry of this Order.

h.    "Deposition Notice" means a notice of intent to take a deposition of a Party under Federal Rule of Civil Procedure 30(b)(1) or a subpoena for a Non-Party Deposition under Federal Rule of Civil Procedure 45(a)(1).

i.    "District Courts" means the U.S. District Court for the Eastern District of Virginia and the U.S. District Court for the Southern District of New York.

j.    "Expert Discovery" means expert reports in a Coordinated Case, backup materials and other information disclosed in connection with expert reports in a Coordinated Case, and expert testimony (including expert deposition testimony) in a Coordinated Case.

k.    "Fact Discovery Cutoff in the Virginia Case" means the date ordered by the Court for the conclusion of fact discovery in the Virginia Case.

l.    "Google" means Google LLC, as well as its parents, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents (including counsel), and representatives of the foregoing.

m.    "Google Deposition" means any deposition of a current or former employee of Google or of Google's corporate designee under Federal Rule of Civil Procedure 30(b)(6).

n.    "Highly Confidential Information" means material that qualifies as "Highly Confidential Information" as that term is defined in either paragraph 1(h) of the MDL Confidentiality Order or paragraph 1(g) of the Virginia Protective Order.

o.    "MDL" means the multidistrict litigation captioned as *In re Google Digital Advertising Antitrust Litigation* that is currently pending in the U.S. District Court for the Southern District of New York under docket number 21-md-03010-PKC, and all

3

of the cases that are currently part of that multidistrict litigation or that become part of that multidistrict litigation after entry of this Order, but only for such time as a case is part of the multidistrict litigation (unless and until a further order directs otherwise).

     p.    "MDL Confidentiality Order" means the Confidentiality Order entered as docket entry 297 in the MDL.

     q.    "MDL Plaintiff" means a plaintiff in any case made part of the MDL, but only for such time as that plaintiff's case is part of the MDL (unless and until a further order directs otherwise).

     r.    "MDL Plaintiffs' Counsel" means any attorney retained to represent or advise an MDL Plaintiff, as well as any paralegals, administrative assistants, and clerical and administrative personnel supervised by that attorney, but only for such time as that MDL Plaintiff's case is part of the MDL (unless and until a further order directs otherwise).

     s.    "MDL State Plaintiffs" means the States of Texas, Alaska, Arkansas, Idaho, Indiana, Kentucky, Florida, Louisiana, Mississippi, Montana, Missouri, Nevada, North Dakota, South Dakota, South Carolina, Utah, the Commonwealth of Kentucky, Puerto Rico, and any other state that joins the MDL, by and through their respective Attorneys General, but only for such time as that state's case is part of the MDL (unless and until a further order directs otherwise).

     t.    "MDL State Plaintiffs' Counsel" means any attorney retained to represent or advise an MDL State Plaintiff in the MDL, as well as any paralegals, administrative assistants, and clerical and administrative personnel supervised by that attorney, but only

4

for such time as that MDL State Plaintiff's case is part of the MDL (unless and until a further order directs otherwise).

u.     "Meta" means Meta Platforms, Inc. as well as its parents, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents (including counsel), and representatives of the foregoing.

v.     "NBA Stay" means the stay of discovery relating to the Network Bidding Agreement that was entered in paragraph 3 of Pre-Trial Order No. 5 in the MDL (Dkt. 394).

w.     "Non-Noticing Party" means, with respect to a particular deposition, any Party other than the Noticing Party.

x.     "Non-Party Deposition" means a deposition of an individual who is not a Party or a current or former employee of a Party; a deposition of a current or former employee of an entity that is not a Party; and/or a deposition of a corporate designee under Federal Rule of Civil Procedure 30(b)(6) of an entity that is not a Party.

y.     "Notice" means to send a notice of intent to take a deposition of a Party under Federal Rule of Civil Procedure 30(b)(1) or to serve a subpoena for a Non-Party Deposition under Federal Rule of Civil Procedure 45(a)(1).

z.     "Noticing Party" means, with respect to a particular deposition, the Party that sends a Deposition Notice for that deposition.

aa.     "Outside Counsel" means the attorneys employed by outside law firms who are retained to represent or advise a Party in a Coordinated Case, as well as any paralegals, administrative assistants, and clerical and administrative personnel supervised by those attorneys.

5

bb.    "Party" means any individual or entity that asserts a claim, or against which a claim has been asserted, in the MDL or the Virginia Case, including the MDL Plaintiffs, the Virginia Plaintiffs, Meta, and Google, provided that Meta shall not be considered a "Party" while the NBA Stay is in effect or until sixty (60) days after the NBA stay is lifted.  For the avoidance of doubt, unless and until a further order directs otherwise, an individual or entity ceases to be a "Party" if all of the claims that it asserts or that have been asserted against it in the MDL or the Virginia Case have been dismissed or otherwise adjudicated by a District Court or transferred to a court other than one of the District Courts.

cc.    "Protective Orders" means the MDL Confidentiality Order and the Virginia Protective Order.

dd.    "Shared Discovery" means documents and data produced during fact discovery in a Coordinated Case and does not include Expert Discovery.

ee.    "Transcript" means any recording of testimony, including recordings by stenographic means and by video.

ff.    "Virginia Case" means the case captioned as *United States, et al. v. Google, LLC* that is pending in the U.S. District Court for the Eastern District of Virginia under docket number 1:23-cv-00108-LMB-JFA.

gg.    "Virginia Plaintiffs" means the United States (including the "Federal Agency Advertisers" as defined in ¶ 6(A) of the Joint Discovery Plan in the Virginia Case, Dkt. 87), and the States of Arizona, California, Colorado, Connecticut, Illinois, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Washington, and West Virginia and the

6

Commonwealth of Virginia, and any other state that joins the Virginia Case, by and through their respective Attorneys General.

hh. "Virginia Plaintiffs' Counsel" means "Plaintiffs' Counsel" as that term is defined in ¶ 1(p) of the Virginia Protective Order.

ii. "Virginia Protective Order" means the Protective Order entered as docket entry 98 in the Virginia Case.

2. <u>Shared Discovery</u>. Notwithstanding the Protective Orders, Counsel may disclose Shared Discovery to any other Counsel, provided that Shared Discovery may not be disclosed to either (i) any Counsel representing an MDL Plaintiff as to which discovery has been stayed or has not begun; or (ii) Counsel representing Meta while the NBA Stay is in effect.[1]

a. Shared Discovery that was produced and designated as Confidential Information in the Virginia Case may be used in the MDL only to the extent that Confidential Information may be used under the MDL Confidentiality Order.

b. Shared Discovery that was produced and designated as Highly Confidential Information in the Virginia Case may be used in the MDL only to the extent that Highly Confidential Information may be used under the MDL Confidentiality Order.

c. Shared Discovery that was produced and designated as Confidential Information in the MDL may be used in the Virginia Case only to the extent that Confidential Information may be used under the Virginia Protective Order.

d. Shared Discovery that was produced and designated as Highly Confidential Information in the MDL may be used in the Virginia Case only to the extent that Highly Confidential Information may be used under the Virginia Protective Order.

---

[1] Shared Discovery produced by Meta as a Non-Party in the Virginia Case shall not be made available to MDL Plaintiffs until seven (7) days after the NBA Stay is lifted.

e.     Subject to sub-paragraphs 2(a)-(d), Shared Discovery that was produced in a Coordinated Case may be used in any Coordinated Case for any purpose permissible under the Federal Rules of Evidence and the Federal Rules of Civil Procedure (including for purposes of impeachment at trial), as if the Shared Discovery had been produced in both Coordinated Cases.  Notwithstanding the previous sentence, absent an order of the Court in the Virginia Case, Shared Discovery produced in the MDL case after the Fact Discovery Cutoff in the Virginia Case may not be used by any Party in the Virginia Case, unless (1) the Shared Discovery is produced in the Virginia Case within 14 days of its receipt in the MDL, notwithstanding the close of fact discovery in the Virginia Case; and (2) the Shared Discovery is used in the Virginia Case only for impeachment purposes at trial and may not be admitted into evidence or used in any dispositive motion, pleading, or expert report.

3.     <u>Depositions Taken During Coordinated Discovery Period</u>.  During the Coordinated Discovery Period, the following provisions shall apply:

a.     The Parties in the Coordinated Cases shall serve any Deposition Notice on all Parties in the Coordinated Cases.[2]  No Party may Notice a deposition in a Coordinated Case in which it is not a plaintiff or a defendant.  If a deposition has been Noticed in one of the Coordinated Cases, a Party in the other Coordinated Case may Cross Notice the deposition in the other Coordinated Case.

b.     No Party shall send a Deposition Notice for a deposition to be held fewer than twenty-one (21) days after the date on which the Deposition Notice is sent.

---

[2] For purposes of paragraphs 3, 4, and 5, MDL Plaintiffs collectively will be considered a "Noticing Party" or a "Non-Noticing Party," and the Discovery Steering Committee in the MDL shall act on behalf of all MDL Plaintiffs. In addition, Virginia Plaintiffs collectively will be considered a "Noticing Party" or a "Non-Noticing Party," and the United States shall act on behalf of all Virginia Plaintiffs.

     c.     If a Non-Noticing Party wishes to Cross Notice a deposition, it must do so within three (3) business days of receiving the Deposition Notice for that deposition. A Non-Noticing Party may not Cross Notice a deposition if doing so would cause that Non-Noticing Party to exceed a Deposition Limit.

     d.     If a Non-Noticing Party Cross Notices the deposition within three (3) business days of receiving the Deposition Notice, the deposition will count against any Deposition Limit applicable to that Non-Noticing Party (unless the deposition does not take place). The deposition will also count against any Deposition Limit applicable to the Noticing Party (unless the deposition does not take place). For the avoidance of doubt, if a Party withdraws a previously-served Notice or Cross Notice at least forty-eight (48) hours before the deposition takes place, then that deposition will not count against any Deposition Limit applicable to that Party.

     e.     Any witness appearing at a Google Deposition or a Non-Party Deposition taken during the Coordinated Discovery Period cannot be compelled to sit for a second deposition in any Coordinated Case (including a second Rule 30(b)(6) deposition of the same entity on the same or substantially similar topics), absent good cause shown to the Court in the Coordinated Case for which the subsequent deposition of the witness is noticed.

     f.     Notwithstanding the Protective Orders, Counsel may disclose Transcripts and exhibits from depositions taken during the Coordinated Discovery Period to any other Counsel, provided that such Transcripts and exhibits may not be disclosed to either (i) any Counsel representing an MDL Plaintiff as to which discovery has been stayed or has not begun; or (ii) Counsel representing Meta while the NBA Stay is in effect. Subject

to the Protective Orders, Transcripts and exhibits from depositions taken in a Coordinated Case during the Coordinated Discovery Period may be used in any Coordinated Case for any purpose permissible under the Federal Rules of Evidence and the Federal Rules of Civil Procedure (including for purposes of impeachment at trial).

g.        Notwithstanding any other provisions of this Order, while the NBA Stay is in effect, (i) Meta may not Notice or Cross Notice a deposition, and Meta may not question a witness at a Google Deposition or a Non-Party Deposition (except at a Non-Party Deposition of a current or former Meta employee); (ii) MDL Plaintiffs may not Cross Notice a deposition of a current or former Meta employee; and (iii) no Transcripts and exhibits from depositions of current and/or former Meta employees may be disclosed to or used by MDL Plaintiffs.

4.        Time Allocations at Google Depositions Taken During Coordinated Discovery Period. During the Coordinated Discovery Period, the following provisions shall apply:

a.        If any Party Notices a Google Deposition, and no other Party Cross Notices the deposition, then the Noticing Party will have six (6) hours on the record to examine the witness, and any Non-Noticing Party or Parties in the Coordinated Case to which the Deposition Notice applies will collectively have one (1) hour on the record to examine the witness.

b.        If Virginia Plaintiffs and MDL Plaintiffs both Notice or Cross Notice a Google Deposition, and no other Party Notices or Cross Notices the deposition, then the deposition will be held for two (2) consecutive days. Virginia Plaintiffs will have seven (7) hours on the record to examine the witness, MDL Plaintiffs will have six (6) hours on the record to examine the witness, and Meta will have one (1) hour on the record to

10

examine the witness, if Meta is deemed a Party (under paragraph 1(bb)) at the time of the deposition.

      c.     If Virginia Plaintiffs and Meta both Notice or Cross Notice a Google Deposition, and no other Party Cross Notices the deposition, then the deposition will be held for two (2) consecutive days. Virginia Plaintiffs will have seven (7) hours on the record to examine the witness, Meta will have six (6) hours on the record to examine the witness, and MDL Plaintiffs will have one (1) hour on the record to examine the witness.

      d.     If MDL Plaintiffs and Meta both Notice or Cross Notice a Google Deposition, and no other Party Cross Notices the deposition, then MDL Plaintiffs will have three and one-half (3.5) hours on the record to examine the witness, and Meta will have three and one-half (3.5) hours on the record to examine the witness.

      e.     If Virginia Plaintiffs, MDL Plaintiffs, and Meta all Notice or Cross Notice a Google Deposition, then the deposition will be held for two (2) consecutive days. Virginia Plaintiffs will have seven (7) hours on the record to examine the witness, and MDL Plaintiffs and Meta will collectively have seven (7) hours on the record to examine the witness, if Meta is deemed a Party (under paragraph 1(bb)) at the time of the deposition.

5.     <u>Time Allocations at Non-Party Depositions Taken During Coordinated Discovery Period</u>. During the Coordinated Discovery Period, the following provisions shall apply:

      a.     If a Party Notices a Non-Party Deposition, and no other Party Cross Notices the deposition, then the Noticing Party will have six (6) hours on the record to examine the witness, and any Non-Noticing Party or Parties in the Coordinated Case to

which the Deposition Notice applies will collectively have one (1) hour on the record to examine the witness.

      b.     If two Parties (one of which is Google) Notice or Cross Notice a Non-Party Deposition, and no other Party Cross Notices the deposition, then Google will have three (3) hours on the record to examine the witness, the other Party that Noticed or Cross Noticed the deposition will have three (3) hours on the record to examine the witness, and any Non-Noticing Party or Parties in the Coordinated Case(s) to which the Deposition Notice(s) apply will collectively have one (1) hour on the record to examine the witness.

      c.     If two Parties (neither of which is Google) Notice or Cross Notice a Non-Party Deposition, and no other Party Cross Notices the deposition, then each of the Parties that Noticed or Cross Noticed the deposition will have two and one-half (2.5) hours on the record to examine the witness, Google will have one (1) hour on the record to examine the witness, and any Non-Noticing Party in the Coordinated Case(s) to which the Deposition Notice(s) apply will have one (1) hour on the record to examine the witness.

      d.     If three Parties (one of which is Google) Notice or Cross Notice a Non-Party Deposition, and no other Party Cross Notices the deposition, then the deposition will be held for two (2) consecutive days. Each of the Parties that Noticed or Cross Noticed the deposition will have three (3) hours on the record to examine the witness, and any Non-Noticing Party in the Coordinated Case(s) to which the Deposition Notice(s) apply will have one (1) hour on the record to examine the witness.

      e.     If three Parties (none of which is Google) Notice or Cross Notice a Non-Party Deposition, and Google does not Cross Notice the deposition, then the deposition

will be held for two (2) consecutive days. Each of the Parties that Noticed or Cross Noticed the deposition will have four (4) hours on the record to examine the witness, and Google will have one (1) hour on the record to examine the witness.

      f.     If Google, Meta, Virginia Plaintiffs, and MDL Plaintiffs all Notice or Cross Notice a Non-Party Deposition, then the deposition will be held for two (2) consecutive days. Google will have three (3) hours on the record to examine the witness, Meta will have three (3) hours on the record to examine the witness, Virginia Plaintiffs will have three (3) hours on the record to examine the witness, and MDL Plaintiffs will have three (3) hours on the record to examine the witness.

      6.    <u>Depositions Taken Outside Coordinated Discovery Period</u>. Outside the Coordinated Discovery Period, the following provisions shall apply:

      a.     The Parties in the MDL shall serve any Deposition Notice on Virginia Plaintiffs.

      b.     Notwithstanding the Protective Orders, Counsel for any Party may obtain Transcripts and exhibits of Google Depositions and Non-Party Depositions taken in the MDL after the Fact Discovery Cutoff in the Virginia Case directly from the court reporters for those depositions.

      c.     Notwithstanding the Protective Orders, Counsel may disclose Transcripts and exhibits from depositions taken outside the Coordinated Discovery Period to any other Counsel, provided that such Transcripts and exhibits may not be disclosed to either (i) any Counsel representing an MDL Plaintiff as to which discovery has been stayed or has not begun; or (ii) Counsel representing Meta while the NBA Stay is in effect.

d.  Subject to the Protective Orders, absent an order of the Court in the Virginia Case, Transcripts and exhibits from depositions taken outside the Coordinated Discovery Period may not be used in the Virginia Case for any purpose other than impeachment at trial. For the avoidance of doubt, absent an order of the Court in the Virginia Case, such Transcripts and exhibits may not be admitted into evidence at trial in the Virginia Case or otherwise used affirmatively by any Party in any dispositive motion, pleading, or expert report in the Virginia Case.

7.  Expert Discovery.  Expert Discovery shall not be shared between the Coordinated Cases pending further order. At least ninety (90) days before Google's expert reports are due in the MDL, the Parties shall meet and confer over whether there are circumstances in which Expert Discovery may or should be shared between the Coordinated Cases. Google shall notify Virginia Plaintiffs at least twenty-four (24) hours in advance of serving an expert report in the MDL if Google serves such report before the due date in the MDL.

8.  Notice to Non-Parties.  Any Party, in conducting discovery from a non-party in connection with a Coordinated Case, shall provide the non-party from which it seeks discovery with a copy of this Order so as to inform the non-party of his, her, or its rights herein. In addition, within three business days of this Order taking effect, the Parties shall give notice as described in the following sub-paragraphs:

a.  Virginia Plaintiffs shall give notice of this Order to (i) all persons to whom Virginia Plaintiffs provided notice of the Virginia Protective Order under paragraph 2 of that order; and (ii) all recipients of subpoenas that Virginia Plaintiffs have served in the Virginia Case before this Order took effect.

14

     b.    MDL Plaintiffs shall give notice of this Order to (i) all persons to whom MDL Plaintiffs provided notice of the MDL Confidentiality Order under paragraph 2 of that order; and (ii) all recipients of subpoenas that MDL Plaintiffs have served in the MDL before this Order took effect.

     c.    Google shall give notice of this Order to all recipients of subpoenas that Google has served in the Virginia Case and/or the MDL before this Order took effect.

9.    <u>Departure from MDL</u>.  If any case(s) currently part of the MDL are transferred to other venue(s), the Parties in the Coordinated Cases shall meet and confer with the parties to the transferred case(s) regarding whether, and on what conditions, the transferred case(s) should be coordinated with the MDL and the Virginia Case.  If all claims brought by an MDL Plaintiff are dismissed, transferred, or remanded, then that MDL Plaintiff shall be treated as a Non-Party for purposes of this Order after such dismissal, transfer, or remand.  If all claims brought against Meta in the MDL are dismissed, then Meta shall be treated as a Non-Party for purposes of this Order after such dismissal.

10.    <u>Effective Date</u>.  This Order shall not come into effect unless and until it has been entered in both the MDL and the Virginia Case.

IT IS HEREBY SO ORDERED this **5th** day of **June**, 2023.

_____/s/_____
John F. Anderson
United States Magistrate Judge

15

# EXHIBIT 3

# Transcript of Status Conference

# March 21, 2024

# (E.D. Tex.)

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3   THE STATE OF TEXAS, et al,        §
                                       §
 4              Plaintiffs,            §
                                       §
 5       vs.                           §     Case No.:
                                       §     4:20-cv-00957-SDJ
 6   GOOGLE, LLC,                      §
                                       §
 7              Defendant.             §

 8
                         STATUS CONFERENCE
 9        AND PLAINTIFF STATES' MOTION TO LIFT STAY
                   TRANSCRIPT OF PROCEEDINGS
10         BEFORE THE HONORABLE SEAN D. JORDAN
                UNITED STATES DISTRICT JUDGE
11
            Thursday, March 21, 2024; 10:01 a.m.
12                      Plano, Texas

13
     APPEARANCES OF COUNSEL:
14   (Continued on page 2.)

15   FOR THE PLAINTIFF STATES:

16   W. Mark Lanier
     THE LANIER LAW FIRM
17   6810 FM 1960 West
     P. O. Box 691448
18   Houston, Texas 77269-1448

19   Jonathan P. Wilkerson
     THE LANIER LAW FIRM
20   6810 Cypress Creek Parkway
     Houston, Texas 77069

21

22     **********************************************

23             GAYLE WEAR, RPR, CRR
          Federal Official Court Reporter
24              7940 Preston Road
             Plano, Texas 75024
25         gayle_wear@txed.uscourts.gov
```

```
 1    FOR THE PLAINTIFF STATES:
      (Continued from page 1.)
 2
      Zeke DeRose, III
 3    THE LANIER LAW FIRM, PC - Houston
      10940 W. Sam Houston Parkway N.
 4    Suite 100
      Houston, Texas 77064
 5
      Ashley C. Keller
 6    KELLER LENKNER LLC
      150 N. Riverside Plaza, Suite 4270
 7    Chicago, Illinois 60606
 8    Marc Brian Collier
      FULBRIGHT & JAWORSKI
 9    600 Congress, Suite 2400
      Austin, Texas 78701
10
      Geraldine W. Young
11    NORTON ROSE FULBRIGHT US LLP - Houston
      1301 McKinney, Suite 5100
12    Houston, Texas 77010-3095
13    Peter Mifflin Hillegas
      NORTON ROSE FULBRIGHT US LLP - Austin
14    98 San Jacinto Boulevard, Suite 1100
      Austin, Texas 78701-4255
15
      James Lloyd
16    Trevor Young
      STATE OF TEXAS, OFFICE OF THE ATTORNEY GENERAL
17    ANTITRUST DIVISION
      300 W. 15th Street
18    Austin, Texas 78701
19    FOR THE DEFENDANT:
20    R. Paul Yetter
      Mollie Bracewell
21    YETTER COLEMAN, LLP - Houston
      811 Main Street, Suite 4100
22    Houston, Texas 77002
23    Robert John McCallum
      FRESHFIELDS BRUCKHAUS DERINGER US LLP
24    601 Lexington Avenue
      New York, New York 10022
25
```

1   ALSO PRESENT:

2        David T. Moran, Special Master
         JACKSON WALKER LLP - Dallas
3        2323 Ross Avenue, Suite 600
         Dallas, Texas 75201

4
         Roger P. Alford
5        UNIVERSITY OF NOTRE DAME
         3119 Eck Hall of Law
6        Notre Dame, Indiana 46556

7                                *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    March 21, 2024                                 10:01 a.m.

2                          ---o0o---

3                    P R O C E E D I N G S

4                          ---o0o---

5              THE COURT:  Good morning.  Please be seated.

6              So we're back on cause number 4:20-cv-957, the

7    State of Texas, et al versus Google, LLC.  And we can go

8    ahead and start with appearances of counsel and with the

9    Plaintiff States first.

10             MR. LANIER:  Thank you, Your Honor.  Mark Lanier on

11   behalf of the plaintiffs here from the Lanier Law Firm.  We

12   didn't know if a fistfight might break out, so we brought a

13   slew just in case.

14             We have James Lloyd from the AG's office.  We have

15   Marc Collier here from Norton Rose Fulbright; Geraldine Young

16   from Norton Rose Fullbright; Jonathan Wilkerson from our

17   firm; Roger Alford from Notre Dame; Trevor Young from the

18   AG's office as well; Peter Hillegas from Norton Rose

19   Fulbright.  We have back Ashley Keller who has finished

20   his jaunts above.

21             And I'll warn the Court you have hearings set on

22   motions to dismiss coming up April 18th.  With the Court's

23   permission, it looks like I'm in trial in federal court in

24   Helena, Montana, but Mr. Keller will be here to handle those

25   arguments and do all of that.
```

1          And we have James Lloyd from the Lanier law firm as

2    well.  Thank you, Judge.

3          THE COURT:  All right.  Mr. Yetter, you appear to

4    be outnumbered.

5          MR. YETTER:  We are definitely outnumbered, Your

6    Honor.  It's good to be back.

7          On behalf of the defendant, Google, Paul Yetter and

8    my colleague, Mollie Bracewell, and our co-counsel from

9    Freshfields, Rob McCallum.

10          THE COURT:  All right.  And I will remind counsel

11    that we also have -- as we had in our previous hearings, we

12    have the audio feed only line for the public on this hearing.

13          And we are once again joined together for a status

14    conference.  And helpfully the parties have submitted a joint

15    status report in which you laid out topics that the parties

16    believe will be appropriate for a discussion today, and they

17    all make sense to me.  So the agenda I have basically tracks

18    your joint status report which has three topics, the first

19    being the States' motion to lift stay, which is the --

20    basically has been fully briefed at this time.

21          Number two, we have the status of coordination with

22    the MDL, and particularly the proposed coordination order.

23          And then, number three, we have the States'

24    interrogatory responses.

25          So I will just move forward in that order unless

```
1    the parties would prefer some other order.

2              Sound okay to you Mr. Lanier?

3              MR. LANIER:  Yes, sir.

4              THE COURT:  Mr. Yetter?

5              MR. YETTER:  Perfect, Your Honor.

6              THE COURT:  So on the States' motion to lift stay,

7    what the parties suggested is if the Court wishes to hear

8    anything on this issue, the parties are prepared to discuss

9    it.  I think some discussion of this motion may be helpful.

10             I have a couple of questions for both sides, and I

11   might as well start with the States.  And really,

12   Mr. Lanier -- or I don't know if it's going to be you or

13   Mr. Keller -- it might be helpful just to talk a little bit

14   about the types of discovery that you think you're looking

15   for.  Because, you know, and I'll hear this from

16   Mr. Yetter -- it was in their written filing, they make two

17   points about the discovery -- if we leave aside the notion of

18   an order that simply says no discovery is going to be

19   permitted, I see that Google is making two arguments

20   essentially beyond that.

21             The first is all you really need is the Agreement

22   itself, and you have that.  And the second argument that I

23   understand Google is making is, well, even to the extent you

24   might need something beyond that, you already have that

25   information, too, because the discovery that has already
```

1   occurred has provided a lot of information about this.

2          So I would like to get the States' take on those

3   arguments.  I may come back to you on questions about the

4   first question, which is should there be no discovery for

5   reasons having to do with Judge Castel's prior order.

6          MR. LANIER:  All good points, Your Honor, which we

7   are going to ask Mr. Collier to address, if it's okay with

8   the Court.

9          THE COURT:  Right.  And, Mr. Collier, I know you're

10  aware of this, we get probably the best sound from the

11  podium, the big podium there, so if you can make your remarks

12  from there.

13         MR. COLLIER:  Well, and, Your Honor, I was --

14  watched Mr. Lanier's Elmo use in prior hearings -- which as I

15  explain when I teach the associates at my firm, you know,

16  sometimes you've got to use the Elmo, and I get blank

17  stares -- so I thought today, to answer your two questions, I

18  might also use the Elmo.

19         First, I would say, Your Honor, your first question

20  was, Why not just the Agreement itself?  You've got the

21  Agreement; you're done.  And that, Your Honor, gets answered

22  I think by what are our claims.  What are we looking for

23  particularly under the DTPA?  Because that's the easiest.

24  There's no dispute we have a live DTPA claim as to

25  misrepresentations.

```
 1            And just to refresh Your Honor, you know, we pled

 2     the DTPA claim.  Above paragraph 586, for example, we said

 3     what the representations are.  And this is, of course, the

 4     context against which the discovery would occur.  They told

 5     everyone, advertisers, publishers, there will be an equal

 6     playing field; this will be fair and transparent.  And we,

 7     you know, we talk about the Section 2 claims, but under the

 8     DTPA that's just a flat misrepresentation.

 9            And then, Your Honor, I will skip ahead to why

10     isn't the Agreement enough, your first question.  And, you

11     know, I don't like to spend a lot of time with lawyers

12     characterizing with what's pled and what our claims are; I

13     like to go right to it.

14            So, for example, in paragraph 433 of our Fourth

15     Amended Complaint we plead, after talking about the NBA

16     agreement, which we have just the sole Agreement, indeed,

17     since signing the Agreement, Google and Facebook have been

18     working closely in an ongoing manner to help Facebook

19     recognize users in auctions and bid and win more often.

20            And then we go -- and I can walk through as many

21     paragraphs as the Court wants, and I probably will in

22     response to your second question -- we explain what some of

23     the post Agreement conduct is.  And as Mr. Keller argued in

24     the hearing in the previous motion to dismiss, rarely are any

25     sophisticated Fortune 50 companies going to put in the
```

```
 1   agreement the illegal, or anticompetitive, or the

 2   misrepresentation acts.  But we've smoked some of them out.

 3   And what they deal with, Your Honor -- so this, let me -- I

 4   want to answer the questions the way you've asked them.

 5            Why isn't the Agreement enough?  Because both for

 6   our Section 2 claim and for our DTPA misrepresentation claim,

 7   we have to show how that Agreement was implemented that made

 8   this not a fair and equal exchange and made it not

 9   transparent.  And so I can go further on the first, but

10   that's --

11            THE COURT:  No.  I think that's fine for the

12   moment.

13            MR. COLLIER:  All right.  And then back to the

14   complaint, looking at -- oh, you're going to try to make me

15   use the zoom button, but we walk through --

16            (Mr. Lanier stands to assist Mr. Collier.)

17            MR. COLLIER:  Now I get to tell everyone Mark

18   Lanier is my IT help.  There we go.

19            Mr. Lanier, you're not going to be on standby for

20   me?  I mean, he's going to leave me afloat?

21            THE COURT:  He's a man of many talents.

22            MR. COLLIER:  He wants to teach a man to fish, not

23   just give him a plate of fish, clearly.

24            So what sort of things, in response to your second

25   question, Your Honor, do we need in discovery?  What post
```

1    Agreement stuff do we need?  Well, we explained in our

2    complaint in very much detail -- almost like interrogatory

3    answers as opposed to a complaint -- there are some special

4    secret advantages in the auctions that the Agreement and the

5    post Agreement conduct give.

6              Now, we can't tell all of this from the Agreement

7    itself, but we do know that Facebook gets some information

8    and speed advantages.  We've talked about like, for the

9    record, I'm looking at paragraphs 590 to 592 of the Fourth

10   Amended Complaint, and we walk through some of those.  And I

11   can go through as many pages as the Court would like.

12             But, in essence, Facebook gets an advantage, and

13   match rates.  There's nothing transparent or equal playing

14   field about that.  And we need to know what that is, and we

15   need to investigate, was Facebook -- because we've got a good

16   faith to believe it -- given an advantage of match rates --

17   match rates being the advertise, you know, buy and sell

18   side -- helping Facebook recognize users more easily.

19             Facebook was given certain information that other

20   bidders were not given, other sellers were not given.  And

21   then, you know, we go on and on.  But basically that's the

22   sort of pathological detail that's not in a contract, it's in

23   the implementation of the contract that makes it an unequal

24   and nontransparent playing field.

25             THE COURT:  All right.  Mr. Collier, I think that's

1    it for right now.  I think I'll hear from Mr. Yetter first on

2    that topic of I think Google's belief that you all have all

3    the additional information you would need anyway.  And I

4    would like to hear his points on that first, and then I can

5    come back to you if you would like to respond.

6           So Mr. Yetter, let me start out at the outset with

7    you on this issue, and let's go ahead and start with these

8    existing DTPA claims.  We can talk about the Section 2 claim

9    as well.  But obviously Google acknowledges that these DTPA

10   claims are live at the moment.  We have a motion to dismiss

11   pending on them, but at the moment they are live claims and

12   they're claims made that invoke a number of different

13   states', I'm going to call them, consumer protection

14   statutes.

15          So let me get your argument, first of all, on why

16   you think just the Agreement itself should be sufficient with

17   regard to these DTPA claims, if I understood you correctly in

18   your written filing.

19          MR. YETTER:  Yes, Your Honor.  So I think the two

20   questions that you asked are very related, but let me just

21   start with the Agreement itself.  As we put in our papers,

22   Your Honor, this is not the first time this issue of the

23   Network Bidding Agreement has come up with Facebook, it came

24   up in a thoroughly vetted hearing before Judge Castel.  And

25   what the plaintiffs, what the States, told Judge Castel is

Case 4:20-cv-00957-SDJ-BD Document 486-8 Filed 04/26/25 Page 55 of 204 PageID # 20152
Case 1:23-cv-00108-LMB-JFA Document 1381-2 Filed 07/26/24 Page 53 of 204 PageID #
11883
12

1    that the plaintiffs were, quote, "relying mostly on the four

2    corners of the written document," namely the Network Bidding

3    Agreement, as opposed to the wink -- the winks and the nods

4    that we were talking about previously.

5            So what the plaintiffs told Judge Castel, when this

6    issue was live for Judge Castel, to look at their complaint

7    and decide whether there is a Section 1 claim or not, they

8    told Judge Castel that they were relying mostly on the four

9    corners of the written document.  But I believe your two

10   questions are very much related because that hearing wasn't

11   just on the four corners of the document.  As you raised,

12   Your Honor, and we put in our papers, there was lots of

13   discovery.  And I would like to pause just briefly on that.

14           In the investigation that Texas did of Google, or

15   that first two million documents, a substantial number of

16   those documents were Facebook-related Network Bidding

17   Agreement-related documents.  We have looked back at the

18   search terms that we used, search terms like "FB" for

19   Facebook, and "FAN" for Facebook Audience Network, the name

20   "Facebook" -- it wasn't Meta at the time, it was Facebook --

21   "Jedi Blue," which is kind of the project name for the

22   contract, and another search term.  And that generated over

23   500,000 documents that were part of that very initial 2020

24   group of documents.

25           So at this hearing before Judge Castel, Your Honor,

1    not only did the States tell Judge Castel that they're

2    relying mostly on the four corners of the written document,

3    but they had 500,000 documents about the Facebook Agreement

4    on which they had written a complaint, amended the complaint,

5    and I believe amended it again by the time that Judge Castel

6    made that ruling.

7         So our position today is the plaintiffs are coming

8    back to this Court to undo, to essentially reverse, a stay,

9    an order by the MDL judge, Judge Castel.  And they don't have

10   a low burden.  That is -- that is something that you have to

11   provide to this Court very ample cause.  Under Rule 26, this

12   Court -- Rule 26(b)(2)(C) says that a district court must,

13   it's a mandatory, limit discovery when the discovery sought

14   was something that the plaintiffs had ample opportunity to

15   obtain.

16        So in the MDL, Judge Castel was doing exactly what

17   a MDL judge does.  He was streamlining the case.  He was

18   looking at nonviable claims.  And on a multi-amended

19   complaint, on 500,000 documents produced -- not a small

20   amount of discovery, lots of discovery -- he decided that

21   that the Network Bidding Agreement was -- presented no viable

22   basis for a claim.

23        Today, the plaintiffs have to come to this Court

24   and say, We didn't get enough discovery, but they haven't

25   told the Court what exactly it is, in their motion to

1    essentially reverse Judge Castel's motion to stay, what

2    exactly they're looking for.  They've got all the documents.

3    They're not saying, We're missing this group of documents.

4    They're not saying, We need this testimony to understand the

5    documents.  They didn't tell that to Judge Castel when he was

6    there looking at their complaint.  They didn't ask for

7    reconsideration of his ruling because they needed more

8    discovery.

9           And so, Your Honor, kind of in a nutshell, what we

10    see the plaintiffs doing today is very similar to what they

11    did with Judge Castel's order on the ESI order, on the

12    coordination order, and now with the stay on the Network

13    Bidding Agreement, is they're basically trying to undo

14    decisions that the MDL made, which was his job, that they

15    don't like.  But they're not giving this Court the grounds

16    under Rule 26 to find good cause to get -- to reverse the

17    motion.

18           So we believe that not only have they said, the

19    States said, that the Agreement is what they're relying

20    mostly on, but they had lots of discovery, and they're not

21    giving this Court really any idea of the discovery that they

22    say is missing.

23           THE COURT:  All right.  Well, here's how I look at

24    approaching this for both sides.  I think the first question

25    is -- for this Court is should the Court allow any discovery

1   whatsoever with regard to the Network Bidding Agreement.  And

2   the reason I had the States file a motion is because we have

3   a prior order from the MDL.

4           The second question then, to me, is if the States

5   should otherwise have discovery, is the fact that they -- or

6   does the fact that they have the Network Bidding Agreement

7   mean they don't need anything more whatsoever?

8           And then if we're past that, then I think we're

9   into what I consider to be the proportional discovery part of

10  Rule 26(b).  And I don't think that's for me or today or even

11  ruling on this motion.  I think the motion is really about

12  those first two parts, and really about the first part.

13          So I do note that the ruling from Judge Castel has

14  a lot to do with the fact that he was front-loading the

15  consideration of the federal claims, and he really was

16  putting the State claims on hold, which makes total sense.

17  He then had a ruling with regard to the federal claims, and

18  particularly Count Four of the Third Amended Complaint, which

19  had to do with this Agreement in the context of the Section 1

20  claim under the Sherman Act that had been made by the

21  States -- and we can talk about Section 2 in a moment -- but

22  clearly under Section 1.

23          As we sit here today and with the case back here,

24  we have these DTPA claims.  And I think Google acknowledges

25  that there is relevance -- well, that the NBA agreement is

1    relevant to those claims assuming the claims survive.  And so

2    I'm not sure that there is an argument from Google that the

3    Court should nonetheless stop at the fact that there was a

4    stay in place before the MDL court, but now we have the

5    States' claims well in play.  And so it seems to me that

6    there's not that initial breakwater, if you will, of like,

7    well, we shouldn't even consider discovery about this

8    Agreement.

9          But maybe I'm missing something.  I don't think

10   that's Google's argument, but I think the argument maybe goes

11   more to the second point about, well, they already have the

12   NBA agreement; that's the only thing they should have.  But

13   let me know if I'm missing something.

14         MR. YETTER:  Your Honor, I think it's a little bit

15   more than that.  Yes, they already have the NBA agreement.

16   Yes, their complaint says that they -- it characterizes its

17   relevance as the unlawful agreement, which we're going to

18   read from the four corners of the Agreement -- yes, the State

19   represented that to Judge Castel.  But they had more than

20   that, Your Honor.

21         And that's, I believe, that's probably one of the

22   reasons why Judge Castel at that time, once he made that

23   ruling, the DTPA claims of the States existed at that time

24   back in 2022.  It wasn't like they're new to this case now on

25   remand in 2023 and 2024.  And Judge Castel ordered that stay

1    on all discovery of the NBA.  It wasn't just because they had

2    the Agreement itself, but they had $500,000 -- excuse me,

3    500,000 documents of lots of discovery, and some of it is

4    decided in their own complaint.

5            And so the combination of they had the Agreement,

6    which they say it pivotal, which they say is key, but they've

7    had lots of opportunity to take discovery.  And under Rule

8    26(b)(2)(C), they had, quote, ample opportunity to obtain

9    that discovery.  Judge Castel issued that stay.  The

10   Plaintiff States never went back to him and said, We have

11   DTPA claims that we need more discovery on the Network

12   Bidding Agreement.

13           And it's only now, Your Honor, when you first --

14   when this first -- case first came back in November, you told

15   both sides, Tell me what discovery needs to be done because I

16   need to set a schedule for this case.  And in December, both

17   sides gave you their views of what discovery needed to be

18   done.  And Your Honor might recall that the States said

19   nothing about the Network Bidding Agreement; that didn't come

20   up until 2024.  And then you said -- when it did finally come

21   up, you said, Well, you're going to have to file a motion on

22   that.  And it wasn't until earlier this month in March.

23           But, Your Honor, I think that speaks volumes about

24   what these plaintiffs, as we see --

25           THE COURT:  Mr. Yetter, let me just stop you just

1     for a moment.

2           MR. YETTER:  Sure.

3           THE COURT:  But my understanding is Judge Castel

4     didn't, at least in his order, didn't specify this is a

5     26(b)(2)(C) order.

6           MR. YETTER:  No, he didn't.

7           THE COURT:  And so it sounds to me like, like the

8     argument you're making might be something that Google might

9     be raising with this Court of you should do a motion for --

10    some sort of a motion for protection under 26(b)(2)(C).  I

11    don't -- in other words, the first step for me is looking at

12    what Judge Castel did.  I don't see a 26(b)(2)(C) order.

13          What I see is a judge who I think had kept things

14    paused while he considered some substantive issues having to

15    do with a motion to dismiss.  And I hear your point about,

16    well, the States had also gotten all this discovery.  But

17    what I don't have in front of me from Judge Castel is any, if

18    you will, additional analysis or order saying, And, by the

19    way, this should also be stayed under Rule 26(b)(2)(C), which

20    is a different reason --

21          MR. YETTER:  It is, Your Honor.

22          THE COURT:  -- that you might stay discovery.  I

23    don't have that in front of me.  So as far as I'm concerned,

24    the reason that I understand he made the stay is no longer

25    present in this sense.  These, the state law claims, are

```
 1    live, we're working through them.  It is a separate question
 2    to me, then, whether or not there ought to be some protection
 3    or limitation of that discovery.
 4             And I hear the arguments you're making.  You're
 5    making arguments about proportionality.  You're making
 6    arguments about ample time and wasn't completed.  You may
 7    have a number of arguments.  But you understand I'm going to
 8    the antecedent question.  The antecedent question is:  Is
 9    there some order from the MDL or some other reason why this
10    Court should say -- should not even get to those parameters
11    of Rule 26(b)?  I don't see that there is.
12             And so I'll let you continue in a moment, but let
13    me move on to what I think is then the second question, which
14    is:  Well, what about the NBA agreement, the Network Bidding
15    Agreement, itself?  Why would they need -- why would the
16    States need anything more than that?  I've heard from
17    Mr. Collier.  But I will say something that struck me is, I
18    don't know if Google sees these statutes as some sort of
19    strict liability or something like that, but these, at least
20    from my review at this point, these are statutes from the
21    various states that have various scienter requirements.  Even
22    the Texas statute, which generally does not include scienter
23    requirement -- and as you know, there is no pervasive
24    scienter requirements, but there is -- there are scienter
25    requirements baked into certain parts of the Texas DTPA, and
```

1    some of those have been invoked in this case, which I'm sure

2    you're aware of.  So I'm thinking of 17.46(b)(24), amongst

3    other provisions.  (B)(24) strikes me because it's got --

4    it's, you know, failing to disclose information concerning

5    goods or services which was known at the time.  If such

6    failure to disclose was intended to induce a consumer into a

7    transaction the consumer would not have entered had the

8    information been disclosed.  That's one of a few that has

9    sort of a scienter requirement baked in with.  I'm not going

10   to go through it.

11          The other states have -- I'm just using these as

12   examples, by the way.  I mean, we've got other state

13   statutes, for example, that have -- that have been invoked

14   that have particular provisions that would pertain to willful

15   conduct, for example, so -- and I'm looking at like South

16   Carolina; Florida seems to have something like that.

17          What I'm basically saying is these DTPA statutes,

18   in various portions of them, seem to have scienter

19   requirements.  So I could see -- I guess I would see more

20   power in the argument you're making about you don't need

21   anything more than the Agreement itself if this was some sort

22   of strict liability type situation or -- or perhaps the

23   question, under Section 1, is the Agreement in and of itself

24   unlawful.

25          But it seems to me that the DTPA claims and the way

 1    that these statutes work bring in, to some extent and in

 2    certain aspects, some scienter issues.  And I come back to,

 3    in that regard, the fact that under Rule 26(b), the -- you

 4    know, the bar is relatively low generally speaking on

 5    discovery.  I mean, it's not as low as it used to be.  And

 6    this comes to your arguments.

 7            But, you know, the relevant language, as you know,

 8    is that parties can obtain discovery regarding any

 9    non-privileged matter that is relevant to any parties' claim

10    or defense -- and this is where it's changed, right -- and

11    proportional to the needs of the case considering the

12    importance of the issues at stake in the action, the amount

13    in controversy, the parties' relative access to relevant

14    information, the parties' resources, the importance of the

15    discovery in resolving the issues, and whether the burden or

16    expense of the proposed discovery outweighs its likely

17    benefit.

18            So we all know that this rule used to be much more

19    wide open than it is now.  And what I think are some of the

20    arguments Google really wants to press have to do with that

21    latter part of the rule rather than the early part of the

22    rule, which is just saying as a general matter, you get to

23    look into non-privileged things that are relevant.

24            Now, particularly looking at these -- I'm using the

25    scienter as an example, and given that the bar is pretty low,

1    I think if we're just speaking generally, there's going to be

2    some relevant information, it seems to me.  Then I'm

3    getting -- and then I find myself getting to part three here,

4    to me, which is the arguments that I saw in your filings and

5    that you're articulating today that really have to do with

6    getting into the weeds or getting pretty granular on, okay,

7    if they're going to get any discovery, or if there's -- if

8    we're going even look at the States getting anything more,

9    then we need to look at the entirety of Rule 26(b).  And

10   you've mentioned some of the other, you know, protections

11   that are in the rule where discovery is unreasonably

12   cumulative, where a party had ample opportunity to obtain the

13   information.

14          So those are points that we're all familiar with

15   because we see them in motions for protection or we see them

16   in those types of issues.  That to me is a distinct question

17   from again the first question in front of me, which is is the

18   stay lifted as to any discovery on the NBA does not mean

19   you're -- you know, the door is wide open, let's get into

20   reams of discovery on this.

21          So if you see where I'm coming from, Mr. Yetter,

22   it's this motion raises the question whether this Court's

23   going to say King's X, no discovery whatsoever on this, we're

24   done, based on Judge Castel's prior order or for some other

25   reason.

1          And my review of these materials, my review of the

2     parties' pleadings and controlling law, is that even if we're

3     just talking about the DTPA claims, I think there's some

4     opening there.

5          And we can talk about Section 2.  I don't know if

6     you have more you want to say on this, because I do want to

7     ask but the Section 2 argument that you've made as well.

8          MR. YETTER:  All right.  I do have one last point,

9     Your Honor, because I hear where you're going.  But if this

10    were a situation where they, the States, were sending us the

11    Network Bidding Agreement discovery on a clean slate and

12    there was no stay in place, I would -- we would agree with

13    the Court that the only thing you need to look at is the

14    relevance and, you know, and do they already have enough and

15    that sort of thing.  But this is not in that context.

16         What the States are asking the Court to do is

17    essentially to lift an order of the MDL judge.  And that's

18    why we think, Your Honor, that that third step that you've

19    been talking about, which is the cumulative, duplicative,

20    ample opportunity to obtain, under 26 (b)(2)(C), that we

21    believe that's part of the decision for this Court.  And I

22    know that that would get -- the Court has said that would get

23    into the granular of what exactly are they asking for, but

24    that's what we believe the States should have presented to

25    the Court -- this is what we need, this is what we don't

```
 1    have -- and they haven't done that, Your Honor.

 2            So we think their burden is much more than just

 3    normal discovery, is there relevance to this discovery.

 4    Their burden is to convince the Court that to lift a motion

 5    to stay that was put in place by the MDL judge.  And it's

 6    more than just proving relevance.

 7            Their last brief, their reply brief,

 8    hung essentially their whole position on, well, it's clearly

 9    relevant.  And, you know, Your Honor, you're right, it was at

10    one time relevant we believe because we gave them

11    investigative materials and discovery about it early on.

12            At this point, they have to show the Court that --

13    more than that.  It's not just relevance.  It's that we don't

14    have it, and we couldn't have gotten it, and there is a good

15    reason for us to get it.

16            If discovery in this case is a book, the States are

17    acting like we're in the middle of the book.  We think we're

18    in the last couple of chapters.  And that's why that issue of

19    burden and the opportunity -- prior opportunity to obtain it,

20    we think is relevant today to this Court's decision on this

21    motion.

22            THE COURT:  All right, Mr. Yetter.  Well, I may --

23    I don't know that I agree with you on how to read Judge

24    Castel's order and what the Court is looking at here because

25    his order was just a complete stay of discovery and it was
```

1   not, as far as I can tell, a stay that was premised on

2   Because you've gotten everything you need, because there's no

3   more that you would need to get; it was a pause based on

4   other reasons that I think are no longer present.  And

5   precisely because it's not a stay that said, well, you can't

6   get any more of these types of documents or this type of

7   information because of 26(b), because it's not that type of

8   order, it's just a wholesale block.  I think what this Court

9   would be doing is saying, We're not doing a wholesale block.

10  It still leaves the question, if it's raised by the parties,

11  about what exactly type of discovery would be allowable on

12  this.  So I think I see his order a little bit differently.

13          Let me ask you, because we've talked about the DTPA

14  claims, you know, the States' position is, you know, this is

15  also relevant on the Sherman Act Section 2 claim, and the

16  parties have a dispute about this.  And I would like to get

17  your comments on that, because I may be missing this, but

18  I've gone through Judge Castel's September 2022 order very

19  carefully more than once, and it's a very thorough, it's very

20  thoughtful, opinion, and I just don't see that he dismissed

21  the Section 2 claims.  And the States asserted them in the

22  Third Amended Complaint.  We've checked that.  I can give you

23  the paragraphs, but I'm sure you know them by heart.

24          But I will say that Judge Castel was very I think

25  thorough and careful about how he discussed the claims.  So,

1  you know, at page -- I mean, you all know the cite, it is now

2  in the Fed Supp., it's at 627 F.Supp.3d 346.  But like at

3  page 366 of that order he describes the four claims asserted

4  in the Third Amended Complaint.  He carefully distinguishes

5  for claims of violations of Section 1 versus Section 2.  And

6  he describes Count Four, which concerns the Network Bidding

7  Agreement as asserting only Section 1 claims.

8          And I will note that he's careful also to note

9  where the States assert claims that are violations of both

10  Section 1 and Section 2.  So, for example, were they both at

11  play in a particular count?  Count Three is an example of

12  that.  His discussion of Count Three talks about how this is

13  an assertion of violation of both Sections 1 and 2.

14          And I will say that in his entire discussion of

15  Count Four, which is at pages 370 to 377, a very thorough

16  discussion, it's focused, as far as I can tell, entirely on

17  restraint of trade analysis under Section 1.  I just don't

18  see in his order anywhere where he is saying the Section 2

19  claim is gone, also.

20          And so I wanted to get your, you know, thoughts on

21  that, because if I'm missing something, you can let me know,

22  but it seems to me that he did not dismiss that claim.  And

23  so then the question becomes, is there some reason that's

24  otherwise not in front of the Court.  It's back in the Fourth

25  Amended Complaint.

     1          But I've read your written filing on it, and that

     2   prompted me to go back through again Judge Castel's order.

     3   And I'm not seeing it.

     4          MR. YETTER:  Your Honor, we -- I don't think you're

     5   reading this incorrect in terms of Judge Castel's focus.

     6   However, the Section 2 claim, much like the DTPA claims that

     7   the States are making, is based on this concept of an

     8   unlawful agreement.  So what they haven't done for the Court

     9   is explain how -- if that Agreement's not unlawful, how does

    10   it fit within a monopolization -- a Section 2 claim, a

    11   monopolization claim.  And that's what they haven't given the

    12   Court any explanation about.

    13          It's not like you just get to talk about anything.

    14   How does a lawful Agreement, a lawful Network Bidding

    15   Agreement, fit within and have relevance to their

    16   monopolization claim.  And that's what the States have not

    17   explained to the Court.

    18          I will also say that -- and I'm sure the Court

    19   knows this, but Judge Castel had this same issue come before

    20   him with the private plaintiffs in the MDL, and he dismissed

    21   their monopolization claim based on the Network Bidding

    22   Agreement.  And so I think he believed that if that

    23   Agreement -- or he concluded that Agreement was not lawful --

    24   was not unlawful, that it has no place even in their

    25   monopolization claim, the DTPA claims are no longer in the

Case 4:20-cv-00957-SDJ Document 486-8 Filed 04/26/25 Page 99 of 204 PageID #: 11899
Case 1:23-cv-00108-LMB-JFA Document 1231-3 Filed 09/20/24 Page 29 of 59 PageID # 20268

28

1      MDL because the private plaintiffs don't have those.  But the

2      same principle we believe applies here.

3             It's not a Section 2 -- relevant to Section 2

4      because it's not unlawful, it is a valid agreement, according

5      to Judge Castel's prior order, we don't think it's relevant

6      to the DTPA claims as well.  But the plaintiffs don't explain

7      how it is relevant to their Section 2 claim, Your Honor.

8             THE COURT:  All right.  And I'll hear from the

9      plaintiffs on that.  Is there something more you want to say

10     at the moment on this topic?

11            MR. YETTER:  Your Honor, I think you've been very

12     patient and given me time to say plenty.  So if I have

13     something, I will flag you, but I'll wait until after counsel

14     speaks.

15            THE COURT:  All right.  Let me let Mr. Collier

16     respond on those issues.

17            And maybe you can speak to both topics.  You can

18     respond regarding my discussion with Mr. Yetter on the DTPA

19     issue, and I have a feeling you'll have something to say on

20     the Section 2 issue.

21            MR. COLLIER:  Very little to say, Your Honor,

22     because your analysis is correct.  The issue before the Court

23     today is simply, Is the courthouse door fully and forever

24     barred to us taking evidence as to what Google and Facebook

25     did under the NBA agreement?  That's what we did, Your Honor.

1     We moved to lift the stay.  We didn't move to take a certain

2     deposition.  We didn't move to take even the Facebook

3     deposition.  Now, that's coming, of course.  And when it

4     comes, we have a process in place for that, which is --

5     Mr. Moran is sitting right here -- I assure you five minutes

6     after we issue, you know, corporate representative

7     depositions to figure out how this Agreement was implemented,

8     which we don't have.

9            And if you listen carefully, Mr. Yetter never at

10    any point said, They have everything.  What he said was,

11    They've got lots, like just hundreds of thousands of pages,

12    which the Court has addressed before.  You don't just get to

13    point to the haystack and go, Hopefully, it's in there, and

14    tell me it's not.  We don't have anything since 2022 because

15    of the stay.  So we know right now there's things we don't

16    have without even getting into the details.

17            So the issue before the Court is should the stay be

18    lifted.  And we have -- now that we've gone through this

19    hearing, it's clear we have DTPA claims that everyone

20    admits -- and I've walked through covering not just the

21    Agreement, but the post Agreement conduct.  And so we are

22    seeking a lift of the stay for relevant information.

23            And Your Honor is exactly correct.  If they want to

24    make proportionality and burden objections, well, they could

25    have already done so.  We didn't withhold bringing this issue

1   before the Court as has been portrayed.  We served DTPA

2   discovery on November 10th, 2023, as soon as we came back

3   here.  And Google didn't answer it, they said, because it's

4   stayed.

5          And then we come to the Court hearings in December

6   and January and we say, Hey, this is an issue.  And the Court

7   said correctly, Well, you're going to need to file a motion.

8   So we filed a motion immediately.

9          And here we are just simply wanting the courthouse

10  doors open, with 38, 40 days of discovery left.  We've had

11  the clock run out on us for months, and months, and months

12  saying, Okay, this is relevant and material discovery.  Once

13  the discovery -- well, first of all, we've already served

14  some discovery.

15         So if you talk about burdens, why aren't they here

16  saying, Judge, this is what they served on me and here's my

17  evidence as to why it's burdensome.  They don't even

18  acknowledge we've served the written discovery.

19         But once we serve the discovery, I'm sure Mr. Moran

20  will have first shot to:  Does it meet proportionality?

21  Because we've only got a certain amount of time, Judge.  We

22  just want to know what happened.  The Agreement says that

23  various money will flow back and forth.  Of course, it

24  doesn't say how much.  We need information on that.  What

25  money has changed hands?

 1          So I think the Court has it right on what's limited

 2     before the Court is, can we open these doors.  And I could

 3     say a lot about their characterizations of when we're arguing

 4     a section -- well, I'll go ahead and say it -- you've asked

 5     me to comment a little bit about Section 1 versus Section 2.

 6          Mr. Keller, Your Honor, they keep saying when we

 7     were arguing a Section 1 motion to dismiss, said mostly it's

 8     on the Agreement.  Well, that's the nature of a Section 1

 9     claim.  Is there a contractual, you know, kind of almost per

10     se -- you know, I'm a shade tree and I trust lawyers, and I'm

11     really nervous when Professor Alford and others are here to

12     grade my papers.  But essentially, is there something about

13     the four corners of that Agreement that violates Section 1?

14     So, of course, Mr. Keller, Well, mostly we're going to rely

15     on the four corners, Judge.

16          But that's not our Section 2 claim.  That's not our

17     DTPA claim, which takes into account the monopolistic conduct

18     or the conduct that was misrepresented as being equal, or, as

19     Your Honor points out, the conduct that they kept secret.

20          And they kept Project Jedi secret, even when it

21     came out, Your Honor, motion after motion to keep that under

22     seal.  And when it finally broke, it's in 500 papers across

23     the country, this secret deal.  That's the essence of the

24     DTPA claim, of failure to disclose and lying.

25          So --

```
 1              THE COURT:  Mr. Collier, is there something you
 2    want to say about Mr. Yetter's argument that the States have
 3    not explained how the NBA is relevant if it's not, if you
 4    will, unlawful under Section 1?
 5              MR. COLLIER:  Well, if it's -- there is no --
 6    Mr. Alford -- Professor Alford is staring at me, so I'm
 7    feeling a little heat right now.
 8              Otherwise lawful contracts can be a part -- you
 9    know, the only unlawful was, is it per se unlawful under
10    Section 1 on a motion to dismiss?  Not, is it part of the
11    scheme to acquire or maintain a monopoly under Section 2?
12    That can happen all the time.  Otherwise, not per se in the
13    legal contracts between two actors in a marketplace that
14    don't violate Section 1 are part of the relevant conduct in
15    Section 2.
16              THE COURT:  All right, Mr. Collier.  Anything else
17    you wanted to say on this issue?
18              MR. COLLIER:  On this issue, what I will say, Your
19    Honor, is the path forward I believe -- because I don't want
20    to just leave the Court hanging -- we've served discovery in
21    November.  I will pledge to the Court we'll serve our
22    30(b)(6) notice on this of what we want from Google by next
23    Friday.  We'll serve our third-party subpoena to Facebook.
24    Which, by the way -- they say we've got all the stuff --
25    we've never got a Facebook document, not one.  We've never
```

```
 1    heard what Facebook had to say about their part of the deal,
 2    or what Google told them, when it goes to Your Honor's
 3    scienter point.  There's nothing in that stack of 500,000
 4    documents, that haystack, that has anything to do with what
 5    Facebook is going to say Google knew and attempted to
 6    accomplish.
 7            So there's a path forward on this.  We lift the
 8    stay -- or hopefully, Your Honor.  We're going to send out
 9    proportionate discovery.  We don't have lots of time, Your
10    Honor.  If nothing else, if not just our kind of code of
11    ethics and following the rules, we just don't have a lot of
12    time.
13            We're going to send out that discovery.  We've
14    already got some out that they should answer and they should
15    be ordered to answer, so we can start to frame this dispute.
16    We'll serve our two 30(b)(6) notices of deposition, or one to
17    the nonparty, one to them.  And then either Your Honor, if
18    you want it, or Special Master Moran, if there's any
19    proportionality, we'll deal with it in the appropriate course
20    when we have the actual requests.
21            THE COURT:  All right.  Thank you, Mr. Collier.
22            Mr. Yetter, I'll give you another opportunity to
23    speak.  Mr. Collier addressed some of the items we were
24    talking about.
25            MR. YETTER:  Thank you, Your Honor.  Just briefly,
```

```
 1    two points.

 2            I still didn't hear how a lawful agreement fits

 3    within their monopolization Section 2 claim.  I'm not sure

 4    how it does, other than counsel simply saying lots of stuff

 5    does.  Nor do I see how a lawful agreement fits within their

 6    DTPA claim.

 7            But setting that aside, the other point that

 8    counsel made was they sent us discovery in November about the

 9    Network Bidding Agreement.  I don't believe that's accurate.

10    They did send us a ton of discovery, over a hundred requests

11    for production, about their DTPA claims.  I don't believe

12    that the Network Bidding Agreement was part of that.

13            They told -- they told this Court that it's just

14    that DTPA discovery is just going to be a little bit more,

15    we'll need a few more custodians and you'll use the same

16    search terms.  That's not where they are today.  We're having

17    a lot more custodians and we're having new search terms.

18            But fundamentally, Your Honor, we believe that what

19    this Network Bidding Agreement discovery that the States say

20    they will send, is basically starting a whole new phase of

21    the DTPA or Section 2 discovery afresh.  We haven't even seen

22    it yet.

23            So we're talking about, as counsel said, six weeks

24    left before the discovery cutoff, and we still haven't even

25    seen this discovery that -- on the Network Bidding Agreement.
```

```
 1              So those are my only comments, Your Honor.

 2              THE COURT:  All right.  Thank you, Mr. Yetter.

 3              Mr. Collier, if you have something you want to say,

 4      you can.

 5              MR. COLLIER:  Yes.  I will be brief.  I promise,

 6      Your Honor.

 7              Mr. Yetter admits that our November discovery was

 8      on our DTPA claims.  And laptop on an Elmo -- I may need my

 9      technical support guru -- but our discovery was on the AdTech

10      Auction Mechanics, Your Honor.  And we wanted to know

11      everything, but in particular we wanted to know about the

12      open bidding including Jedi, Jedi+ and Jedi++.  We asked for

13      this, Your Honor, and we were just sent away.  And we asked

14      for this in November as soon as we got back to this Court,

15      because the Texas DTPA claims for Texas and, of course, the

16      other states, you know, the analogous, are critical to us.

17              THE COURT:  All right.  Thank you, Mr. Collier.

18              So the second issue I have -- I'm going to move to

19      the second issue unless there is anything else counsel need

20      to say on this.  I see you shaking your heads in the

21      negative, so we'll move to the second topic, which is the

22      coordination order concerning the MDL.

23              So I'm going to just briefly go through our history

24      on this.  As counsel are aware, on February 26, this Court

25      entered an order regarding coordination of discovery.  That
```

1    order was issued after substantial input from the parties, as

2    well as the special master.  But, of course, that order

3    provided that it would not go into effect unless and until it

4    was entered both by this Court and by the MDL Court.  So

5    baked into the order was the notion that this is not going to

6    happen unless we have both Courts signing off on it.

7            On March 14, 2024, this was presented, my

8    understanding, to Judge Castel.  He entered an order on that

9    date, and it confirmed that the coordination order would not

10   be entered in the MDL matter.  The order works through -- I

11   mean, it's not a long order, but I think it expresses what it

12   needs to about the reasons why Judge Castel did not think

13   that would be prudent for the MDL matter.

14           And so I welcome comments from the parties about,

15   you know, moving forward in this case, what you think about

16   opportunities for coordination or what you think about the

17   effect of the coordination order not being in place.

18           I am -- I'm aware -- by the way, I have read the

19   transcript of your comments to the special master about this.

20   So I know at that time you were all digesting this and you've

21   had more time to think about it.

22           So maybe I can start with Mr. Lanier --

23           MR. LANIER:  Yes.

24           THE COURT:  -- and any comments you want to make

25   about what this means going forward in discovery.

1          MR. LANIER:  Thank you, Your Honor.

2          A coordination order exists for the benefit of the

3     Court, obviously, but it mainly exists for the benefit of the

4     parties.  It's just an easier way to cut the diamond.  I look

5     at this, and I would think that even if the judge never

6     entered an order, the parties on their own would figure out a

7     way to coordinate to mutual benefit.

8          So, for example, we have depositions that we set.

9     It seems logical that Google might not wish to produce the

10    same witness twice, in our case and in the MDL.  And so

11    Google would say, Hey, can we coordinate and figure out some

12    way to do this once?

13         By the same token, we want documents and things

14    that are produced in other discovery.  We can go and ape the

15    discovery requests in the other case and just put it down and

16    mimic it, or we can just say, Give us the discovery that was

17    relevant in the other case that's relevant similarly in ours.

18    Either way, it's just adding extra steps to get to an end

19    result that we're entitled to.

20         I view, at this point in my career, discovery not

21    as a game, or but rather means to an end.  And the goal is

22    not to obfuscate, to hide, and to make things arduous and

23    difficult.  The goal is to figure out as expeditiously and

24    efficiently as possible how to get the relevant information

25    to the other side so that we can go about the truth process,

1    which is our American judicial system.

2          I will add to the record, to have an opportunity to

3    use the Elmo, an email that we have received from Michael

4    Wolin, as of March 20th.  And the email was to Z, and Michael

5    Wolin is one of the trial attorneys for the DOJ in the

6    antitrust matter.

7          He writes, for the record, "Zeke, we understand

8    from the March 14th joint status report filed by the

9    Texas-led state plaintiffs and Google that the parties plan

10   to discuss the status of the coordination order in the

11   Eastern District of Texas case during the March 21 conference

12   before Special Master David Moran."

13         Well, actually, it's in front of El Jefe himself.

14         "The United States believes that the coordination

15   order previously signed by Judge Jordan, Docket 266, should

16   be rendered effective notwithstanding Judge Castel's order in

17   SDNY, declining to order further coordination.  Several

18   provisions, in particular paragraphs 3.f., 6.b., and 6.c.,

19   are vital to creating a level playing field between Google,

20   on" the one hand -- or "on one hand," excuse me, "and the

21   Texas and Virginia plaintiffs, on the other hand.  Those

22   provisions as applied to the Virginia plaintiffs, should not

23   be dependent on an action by Judge Castel and are consistent

24   with the provisions already ordered by the Court in the

25   Virginia case in our coordination order.

```
 1            "Regards, Michael Wolin."

 2            You know, the parties are seeking to find some way

 3   to make this efficient and effective.  And part of me just

 4   wants to say, Fine.  If Google doesn't want to enter into a

 5   good coordination order that works with both sides, we don't

 6   need a coordination order, we'll take depositions twice.

 7   We'll just file discovery requests and say, Give us all the

 8   discovery you gave to the other folks.

 9            We can go that route.  We can do that.  The problem

10   might come with our discovery cutoff.  What if there's a

11   third party, say AT&T, that produces discovery to Google in

12   the MDL case three weeks after our discovery cutoff?  If

13   there's no coordination order, we don't have a chance to get

14   that in our case within the discovery cutoff.

15            So absent a discovery -- a coordination order, what

16   are we left with?  Oh, we'll file a motion in front of you

17   and say, We know we're past discovery, but this has been

18   produced in the other case and it's relevant to ours, and we

19   would like it anyway.  And so again it's just more steps that

20   takes away from the judicial economy and the lawyer economy

21   on trying to get to the end.

22            But we think that you had a well-reasoned order.

23   We understand Judge Castel has not entered that order.  And

24   Mr. Keller and I have appeared in front of him on numerous

25   occasions, and he is a strong jurist, and we have no fuss
```

1   with his legal acumen and all.  And I can't presume to say

2   why he has said what he has said for his plaintiffs.

3           But for your court and for your plaintiffs, it

4   still makes sense to us to have the coordination order in

5   place.  But if not, it just means that it's not as efficient,

6   and we'll go after it anyway.

7           THE COURT:  All right.  Thank you, Mr. Lanier.

8           Mr. Yetter?  Oh, okay.  It's going to be

9   Mr. McCallum.

10          MR. MCCALLUM:  Good morning, Your Honor.  Good to

11  see you again.

12          THE COURT:  Good morning.  Good to see you.

13          MR. MCCALLUM:  I think as Your Honor put it, the

14  coordination order was the product of a lot of input from

15  both sides and also with some input from the special master.

16  There was a negotiation.  There was a lot of back and forth.

17  From Google's perspective, there were benefits and

18  responsibilities to both sides as a part and parcel of

19  signing onto a coordination agreement.  And Google was -- in

20  that context of that negotiation, Google was prepared to sign

21  up to a number of responsibilities and to make a number of

22  concessions in exchange for one key benefit.  And the key

23  benefit to Google, in the context of the coordination order,

24  was protection for Google's witnesses in terms of

25  coordination of depositions.  That was the key thing that

1    Google was signing up to, and we were prepared to make some

2    concessions to get that.

3          So now we're in the position that Judge Castel has,

4    of course, we all know, declined to enter the order in the

5    MDL.  And so the effect of that, from a practical

6    perspective, for Google is that we have lost that protection,

7    the one thing that we were bargaining for in the context of

8    the coordination order.

9          So it's our position that sitting here today, we

10   don't think we should be bound by the concessions that we

11   were prepared to make in exchange for that protection because

12   the result of entering a coordination order in its current

13   form without the protection to Google would simply be a

14   one-sided order in favor of plaintiffs, with no protections

15   to Google.

16         And it was precisely for that reason that I think

17   Your Honor alluded to this in your opening remarks, that we

18   insist as part of the terms of the coordination order, that

19   it would not go into effect unless it was entered in both

20   courts, but for that very reason.

21         So Google finds itself in the position where we

22   have to abide by the orders of Judge Castel and, of course,

23   the orders of Your Honor in this Court.  And Google will, of

24   course, abide by both sets of orders.  But that puts us in a

25   situation where Judge Castel has ruled the coordination

Case 4:20-cv-00957-SDJ-DVC Document 480-23 Filed 04/26/2024 Page 55 Page 204 Page 2082
Case 1:23-cv-00108-LMB-JFA Document 480-23 Filed 04/26/2024 Page 55 Page 204 Page 2082
11913

42

1     between this case and the MDL is not appropriate, and so we

2     have to honor that order and we will abide by that order.

3     He's said that discovery is winding down.  And I think you

4     alluded to some of the reasons behind that relatively short

5     order, that he said, in effect, that now is not the time to

6     begin cross-noticing depositions in Texas.

7                So the situation here today is we don't think it's

8     appropriate to enter the coordination order as it was

9     negotiated on the assumption that it would be entered in the

10    MDL.  However, we made it very, very clear to the plaintiffs

11    that we're happy to meet and confer with them in good faith

12    to work through some of the issues that we see arising from

13    that, particularly with respect to the email that was shown

14    to the Court from the Department of Justice.

15               We've actually had productive discussions over the

16    last two days where Google has made it very clear to

17    plaintiffs that as regards Virginia, we intend to do

18    everything that we can to sort of continue the effectuation

19    of the existing coordination order that was entered in

20    Virginia and the MDL.  And we have made it very clear to

21    plaintiffs that we are prepared to make Google -- continue to

22    make Google's documents and data available and to otherwise

23    coordinate with respect to that existing coordination order.

24    But the situation we find ourselves in with respect the MDL

25    is somewhat more complicated.

1          THE COURT:  Right.  Well, certainly as to your

2    point that no one is bound by the coordination order, I

3    agree, and I assume everybody in the room agrees, that the

4    order is very clear, it's not effective -- and that means no

5    one's bound by any provision in it -- unless and until both

6    Courts have entered it.  So as you've noted, both sides are

7    not bound by anything in that order.

8          However, as you've noted and as Mr. Lanier has

9    noted, it certainly and obviously makes sense for the parties

10   to do whatever they can to work together to make the process

11   of depositions, I think particularly as you've noted, but

12   also other discovery, as efficient as possible.

13         And so I don't think there's anything about the

14   fact that the order is not going to be in place here in the

15   MDL that prevents the parties from coordinating on the

16   scheduling of depositions, you know, for this case and the

17   MDL case.  I'm sure the parties can work together to try to

18   do that and make it efficient.

19         And beyond that, Mr. Lanier talked about some

20   things you could do that might allow the parties to

21   coordinate as much possible between these actions.  But the

22   way I see it going forward is it's going to be up to the

23   parties in the first instance to work together and find ways

24   to be as efficient as possible and hopefully, per the email

25   that Mr. Lanier showed, as much as possible under the kinds

1   of agreements you made in the coordination agreement, even

2   though no one's bound by that.  And there may be aspects of

3   that that the parties are, you know, not going to agree on,

4   now that that order is off the table, but the spirit of that

5   order had everything to do with the parties' commitment to

6   save resources and to move forward efficiently.

7           So again, I see this as, in the first instance, the

8   parties trying to work together.  Beyond that, you know, the

9   Court will be ready to intervene as necessary.  We have the

10  special master who can help on discovery issues that arise.

11  But I think that -- I think it's fair to say my hope is the

12  same as yours, that you'll be able to work together as best

13  as possible going forward.

14          MR. MCCALLUM:  And we will do that, Your Honor.

15          And just to be clear, it remains very much in

16  Google's interest, as you can imagine, to coordinate on

17  deposition scheduling, and we will work in good faith to do

18  that.  Our point is simply that the agreement as it was

19  drafted contains concessions that we do not think should

20  necessarily remain in place.

21          THE COURT:  Right.  And the underlying principle

22  that I probably don't need to say, but I will say it, is both

23  sides are going to get the discovery they need in this case.

24  They're going to get it.  And if it means people are deposed

25  twice, then that's what's going to happen.

```
 1            MR. MCCALLUM:  Understood, Your Honor.

 2            THE COURT:  All right.  I think we can move to the

 3     last issue, unless the parties have anything else they want

 4     to talk about on item two.

 5            So I think moving on to the third topic, we have

 6     the States' interrogatory responses.  I don't know if that's

 7     you, Mr. McCallum, or you, Mr. Yetter.  This was when you

 8     filed your status report, a bit of a moving target, I think,

 9     but something that you identified that we would need to

10     discuss.  So Mr. Yetter, you can proceed.

11            MR. YETTER:  Yes.  Thank you, Your Honor.  "Moving

12     target" is the perfect description, and the target is now, as

13     the Court is well aware, the States have gone from

14     representing all of the above consumers, competitors, users,

15     advertisers, and publishers, to dropping -- that was in

16     prior -- that was last Fall, to dropping -- eleven of the

17     States dropping their parens positions, and Texas saying that

18     it has as a policy against proceeding in parens patriae.

19            And then in February, everybody reverting back, all

20     17 States now say they are acting in both in parens and some

21     in sovereign.

22            And now, in March, Your Honor, they've dropped all

23     of their -- they, 16 of the 17 plaintiffs, have dropped all

24     of their damages claims, restitution claims, and disgorgement

25     claims.  Only Puerto Rico has maintained those claims.  That
```

1   is the state, not -- maybe, perhaps, not coincidentally, that

2   has produced no documents to us, no retention policies,

3   almost basically nothing.

4          And we raise it, Your Honor, because we weren't --

5   we are still digesting the impact of that claim.  Now all 17

6   States saying they are still seeking civil penalties, all as

7   in their parens capacity, some in their sovereign capacity,

8   for both DTPA and injunctive -- excuse me, for DTPA claims

9   and injunctive relief for both antitrust and DTPA claims.

10  Puerto Rico is the outlier in terms of seeking damages.

11         But we are still digesting how that affects

12  standing of these claims -- these States who under -- as the

13  Court knows, under some of the DTPA claims, there's no

14  requirement to prove reliance or damages.  And so without

15  injury, under *TransUnion*, there may be an issue of standing.

16  We're still digesting that.  And it certainly does impact

17  discovery.

18         So we wanted to raise it, make sure the Court was

19  aware that even now, just a few weeks before the end of fact

20  discovery, the States have taken what we see as a pretty

21  significant change in position.  And we're obviously going to

22  deal with it and figure out where it goes, but we just wanted

23  to make sure that we brought it up to the Court.

24         THE COURT:  Mr. Yetter, just one quick question.

25         MR. YETTER:  Sure.

1          THE COURT:  Is any of that you think going to be

2    something you're going to raise in regard to the motion to

3    dismiss beyond what's already been raised?

4          MR. YETTER:  That is a very good question, Your

5    Honor.  And we are -- this is a somewhat unusual situation,

6    and the issues are perhaps nuanced on this issue of seeking

7    federal standing for state claims in which you do not have to

8    prove damages or reliance; in other words, injury.  And

9    *TransUnion* says for private plaintiffs, if you don't have

10   injury, you don't have federal standing to seek civil fines.

11         But we're looking at that, Your Honor.  And if we

12   do intend to bring it up, we will raise it promptly with the

13   Court and ask for permission to supplement our briefing.

14         THE COURT:  Understood.  All right.  Thank you,

15   Mr. Yetter.

16         Mr. Lanier?

17         MR. LANIER:  I don't think I have a lot to add to

18   that, Your Honor.  I'm glad we weren't chided for dropping

19   claims.  I think that makes it a little bit easier.  Numerous

20   plaintiffs have been chided for dropping claims.  But we have

21   dropped, as Mr. Yetter reflected.

22         We have the process -- you had asked us in the last

23   hearing to go through a process to make sure that everyone's

24   aware of how the various states are working together to try

25   and address discovery needs.  And we filed that with the

Court.  We gave a copy to Google.  We've never heard anything

back from Google on that.  I think, to some degree, your

instructions to do that have helped us probably clarify some

of this.  And so some of the credit for this actually

probably flows to the Court.

But I can tell you that you've got 17 governmental

entities that are working fast and furious.  While the State

of Texas is in the lead, and the State of Texas has plenty of

people power to move the machine, some of the other states do

not have such dedicated large-budget AG offices, and so it's

still a difficult process fully.  And, yes, a bit of a moving

target for all of us, but one where we are keeping that

target as live and fully up to date as we can as we go along.

We'll continue to do so.

And if Google's got a complaint, we've got a

wonderful process in place right now with Special Master

David Moran.  And I have no doubt, just as he had told us --

we told him on March 7th that we would amend our answers, and

then we did March 15th, within the timeline he gave us.

He -- we've probably made more progress in the last month

working through this stuff with him than we have in the prior

ten months at least, because he's very hands on.  And that's

a process that will be in place for this as well should it

look like our target needs to move some more.  Thank you.

THE COURT:  All right.  Thank you, Mr. Lanier.

```
 1            Mr. Yetter, any followup on this issue?  I mean,
 2   I'll note that it does certainly appear to me that, from my
 3   review of the filings before the Court and the proceedings
 4   before the special master, that a lot of progress has been
 5   made on discovery issues.  That's not to say there aren't
 6   things I can see that you're still working on.  I've read the
 7   most recent status reports, coming in yesterday and today.
 8   So I know there's issues you're working on, but it seems to
 9   me you've made a lot of progress.
10            So Mr. Yetter, you wanted to follow up?
11            MR. YETTER:  Two brief comments, Your Honor.
12   Counsel is right that the Court's direction that the
13   plaintiffs identify a little bit more specifically who
14   represents whom has helped.  It doesn't mean that we're
15   communicating perfectly on all things, but that is the nature
16   of complicated, complex litigation like this.
17            And, secondly, we are appreciative that the Court
18   asked Special Master Moran to give up his entire private law
19   practice so that he could be the special master in this case,
20   because it has -- I don't know how he has kept up any of his
21   law practice, but it is -- and I don't want to break the
22   suspense for our hearing with the special master, but there
23   are a few issues that we need a little bit of guidance from
24   him on.  But, otherwise, we very much appreciate his service
25   and the Court's guidance on all this.
```

```
 1                THE COURT:  All right.  Thank you, Mr. Yetter.

 2                Mr. Lanier, one other thought I had and would like

 3      to get your comment on is whether or not it makes sense at

 4      some point for perhaps the States to file some sort of

 5      advisory on where we are currently with regard to what's

 6      being claimed by each state or what, you know, claims are

 7      being -- are continuing to be pursued and what capacity.

 8                I know you have the answers.  You've been going

 9      through the discovery part of that.  And I will say that the

10      filing you referenced before, that really had to do with

11      making sure there wasn't any confusion about the authority

12      the State and the States' counsel have.  And I know,

13      Mr. Lanier, your firm and Mr. Keller's firm represent more

14      than -- or are involved with more than one state, and the

15      State of Texas has a coordinating role.  But I thought that

16      the filing you made was very thorough.  My sense is, and hope

17      was, that there wouldn't be confusion anymore about that.

18                So I only raise this issue with you because we have

19      had a lot of discussion, and Mr. Yetter's mentioned today and

20      so have you, about, you know, where the states are in terms

21      of claims being pursued and in what capacity -- or I should

22      say damages or remedies.  Let's talk about in terms of

23      remedies being pursued.

24                MR. LANIER:  Judge, what you're asking for is a

25      document of clarity.
```

```
 1                THE COURT:  Yes.

 2                MR. LANIER:  And I think clarity is incredibly

 3       useful to me, too.  I'd love to see that document.  So I'm

 4       going to go out on a limb and tell my team that at your

 5       encouragement, we will produce such a document.  And I don't

 6       know how quickly we can do it.  And recognize that we do

 7       represent a good number of these entities, but, for example

 8       the -- Mr. Yetter had mentioned about Puerto Rico not

 9       producing any document retention policies.  You know,

10       Hausfeld represents Puerto Rico; we do not.  And Hausfeld has

11       told Google, Puerto Rico doesn't have a document retention

12       policy to produce.  And so, you know, we're having to juggle

13       he said/she said within the confines of this.

14                And I think if you were to tell us to put together

15       such a document, that it would enable us to not only do it

16       for ourselves and those we represent, but it would also put a

17       wonderful opportunity on the shoulders of those we do not

18       represent to also help and assist in that regard.  So that

19       would be great.

20                THE COURT:  And, Mr. Lanier, you did talk about

21       time frames.  So if the Court -- because my initial thought

22       was it was something you might all just want to sua sponte

23       file, but I can also -- based on your comments, we can also

24       enter an order.  And in terms of a time frame, you can let me

25       know.  Do you think two weeks?  Do you think longer than that
```

1 would be needed?

2    MR. LANIER:  I think at least -- my people over

3 here are telling me two, but I've got people on the phone and

4 people not here.  If I could have three, and we'll get it

5 done before our next conference.

6    THE COURT:  All right.  So we're looking at more

7 like 21 days, and the Court will plan to get some order out

8 on that.

9    So we've covered, counsel, all the topics that we

10 had for our status conference.  And I know you have another

11 one immediately after this one.

12    Is there any other issue we need to discuss today,

13 Mr. Lanier?

14    MR. LANIER:  Not from plaintiff, Your Honor.

15    MR. YETTER:  No, not for Google, Your Honor.  Thank

16 you.

17    THE COURT:  All right.  And I will add the

18 additional reminder that was brought up at the beginning of

19 the hearing, which is that our next status conference will be

20 a full day for us because we have the conference in the

21 morning, and then at least at the moment we have arguments

22 scheduled for the afternoon on the pending dismissal motions,

23 subject to any -- if there is a need for some sort of

24 supplement or additional briefing, which I'm not suggesting

25 that needs to happen, but it sounds like that's a

1    possibility.  But for the moment, we're ready to go next

2    month on both.

3            And I appreciate your discussion and arguments

4    today.  They are very helpful for the Court.  And we have

5    orders that we'll be planning to get out on the pending stay

6    motion and then on the other issue we discussed

7    regarding remedies sought by the States.

8            All right.  We'll stand in recess.  Thank you,

9    counsel.

10                    (Adjourned at 11:16 a.m.)

11                  *    *    *    *    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4              I, Gayle Wear, Federal Official Court Reporter, in

5    and for the United States District Court for the Eastern

6    District of Texas, do hereby certify that pursuant to Section

7    753, Title 28 United States Code, that the foregoing is a

8    true and correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the regulations

11   of the Judicial Conference of the United States.

12

13              Dated 24th day of March 2024.

14

15

16              /s/ Gayle Wear
                 GAYLE WEAR, RPR, CRR
17               FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25
```

# EXHIBIT 4

# Memorandum and Proposed Order in Support of Motion to Amend Coordination Order

# (E.D. Va.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO AMEND ORDER REGARDING COORDINATION OF DISCOVERY

At the outset of discovery in this case, both the Plaintiffs and Google agreed that coordination with the other lawsuits filed against Google alleging antitrust violations related to Google's ad tech business was in the interest of all parties to the actions, as well as the numerous non-parties whose documents and testimony would be sought in these actions. Plaintiffs and Google sought, and this Court entered, a Coordination Order (ECF No. 251), which at the time covered all the major related cases: this case brought by the United States and its state co-plaintiffs, the case brought by the State of Texas and its state co-plaintiffs, and the cases brought by various private parties and class actions. Because at the time all of those cases except this case were consolidated into a multi-district litigation pending in New York, coordination among all the cases could be effectuated through an order requiring coordination with the multi-district litigation in New York. Since that time, circumstances have changed—the case brought by Texas has been removed from the multi-district litigation and remanded for further proceedings in Texas. This change in circumstances requires an amendment to the Coordination Order to maintain the same level of coordination as previously agreed between the parties and ordered by this Court.

1

When Plaintiffs agreed to coordinate discovery in this action with discovery taking place in the multi-district litigation in New York, Plaintiffs did so with the understanding that after discovery in this action was complete, Plaintiffs would be entitled, pursuant to the terms of the negotiated Coordination Order, to documents and deposition testimony in the other related cases to which Google was a party so that Google would not have, by virtue of its participation in those cases, an informational advantage over Plaintiffs in this action. Plaintiffs negotiated for, and secured, an agreement and order requiring certain documents and testimony obtained in the multi-district litigation to be made available to Plaintiffs—even after the close of fact discovery here (as contained in paragraphs 2.e. and 6.b.-d. of the Coordination Order). Those provisions of the Coordination Order—which applied to the case brought by Texas at the time the Coordination Order was entered—were the fundamental "benefit of the bargain" that Plaintiffs sought in exchange for agreeing to coordinate discovery with the related cases in the first place. Yet now that the Texas case is proceeding with document and deposition discovery, Google seeks to deny Plaintiffs the benefit of that bargain.

For those reasons, Plaintiffs are moving for an order amending the Coordination Order to treat the Texas case identically to the cases still in the multi-district litigation for purposes of the Coordination Order. Plaintiffs have met-and-conferred with counsel for Google and for Texas and its co-plaintiffs regarding this motion. Google opposes the relief requested in this motion. Texas and its co-plaintiffs do not oppose the relief requested.

## BACKGROUND

### A. This Court Ordered Coordination with the Texas Case while Part of the MDL, Including Coordination After the Close of Fact Discovery.

At the start of discovery in this case, the Plaintiffs and Google agreed that coordinating aspects of this case with the pending multi-district litigation against Google, *In re Google Digital*

*Advertising Antitrust Litigation*, No. 1:21-md-03010 (S.D.N.Y.) (the "MDL"), would benefit all parties as well as the numerous third parties whose documents and testimony would be sought in these cases. *See* ECF Nos. 165 & 166 (Google's motion for entry of coordination order); ECF No. 174 (Plaintiffs' brief in support thereof). After resolving certain disputes between the parties as to the extent of the coordination (*see* ECF No. 201), the Court entered an Order Regarding Coordination of Discovery (ECF No. 251) (the "Coordination Order"), which has been in effect ever since. At the time the Coordination Order was entered, the lawsuit filed by Texas and its co-plaintiffs against Google, *State of Texas et al. v. Google LLC*, No. 4:20-cv-957 (E.D. Tex.) (the "Texas Case"), was consolidated with and part of the MDL.

Google obtained significant benefits from the Coordination Order: Google was freely able to use all documents produced in this case in the MDL without serving additional discovery in the MDL (*see* Coordination Order, ¶ 2.e.)—including the millions of documents produced by the United States and the State Plaintiffs from their own files, documents they collected from non-parties during their pre-suit investigations, and documents obtained from non-parties via subpoenas issued in this case. Google further benefitted from the coordination of depositions taken of Google witnesses, who, absent good cause, could only be deposed only once across this case and the MDL. *See* Coordination Order, ¶¶ 3.e., 4.b. Indeed, of the ten party depositions noticed by the Plaintiffs in this case, the MDL Plaintiffs cross-noticed four of them—meaning Google obtained the benefit of scheduling those depositions on two consecutive days, and for the remaining depositions of individual Google witnesses, the MDL Plaintiffs' choice not to cross-notice the depositions meant that those Google witnesses are no longer subject to deposition in the MDL, absent good cause shown.

While discovery is indisputably closed in this case, the Coordination Order expressly permitted limited additional coordination between this case and the MDL after the close of fact discovery. First, this Court ordered that transcripts and exhibits from Google and non-party depositions taken in the MDL could be obtained by counsel for the Plaintiffs and used for impeachment at trial. Coordination Order, ¶ 6.b.-d. Second, this Court ordered that documents obtained by Google in the MDL *after* the close of discovery in this case could be used for impeachment purposes in this case if they were promptly re-produced (within 14 days of receipt) to the Plaintiffs. *Id.*, ¶ 2.e. These provisions were the primary benefit Plaintiffs obtained from agreeing to the Coordination Order and consenting to allowing Google to re-use all materials collected by Plaintiffs in the MDL. And at the time, Google did not dispute that the Coordination Order should allow the use in this case of documents and depositions obtained in the MDL after the close of fact discovery in this case. Indeed, Google argued for a *broader* provision allowing unrestricted use in this case (i.e., not only for impeachment) for documents and depositions it obtained in the MDL after the close of fact discovery, asserting that doing so "advances the truth-seeking function of litigation," would "promote the just resolution of these matters," and lessen "the risk of inconsistent rulings." ECF No. 166, at 6.

### B. After its Remand, Texas Sought an Order from the Texas Court Effectuating Continued Coordination with this Case.

The Coordination Order entered here and in the MDL expressly contemplated the possibility that the Texas Case would become separated from the MDL, and that continued coordination between this case and the Texas Case may be appropriate in that event. *See* Coordination Order, ¶ 9 ("If any case(s) currently part of the MDL are transferred to other venue(s), the Parties in the Coordinated Cases shall meet and confer with the parties to the

4

transferred case(s) regarding whether, and on what conditions, the transferred case(s) should be coordinated with the MDL and the Virginia Case.").

On November 1, 2023, pursuant to orders from the Judicial Panel on Multidistrict Litigation and the United States Court of Appeals for the Second Circuit, the Texas Case was remanded from the MDL for further proceedings before the United States District Court for the Eastern District of Texas, where the case is currently proceeding. *See In re Google Digital Advertising Antitrust Litig.*, MDL No. 3010, ECF No. 250 (J.P.M.L. June 5, 2023); *In re Google LLC*, No. 23-910, ECF No. 101 (2d Cir. Oct. 4, 2023).

Upon remand, Texas and Google sought a coordination order in the Texas Case, and such an order was entered on February 26, 2024. *See* No. 4:20-cv-957, ECF No. 266 (E.D. Tex.). The focus of that order was coordination of fact discovery between the Texas Case and the MDL, as fact discovery is still open in both of those cases, but the order also effectuated some of the limited post-close-of-fact discovery coordination allowed in the Coordination Order. *See id*. ¶ 6.b. ("Counsel for any Party and Virginia Plaintiffs' Counsel may obtain Transcripts and exhibits of Google Depositions, Party Depositions, and Non-Party depositions in the Texas Case or the MDL after the Fact Discovery Cutoffs in the Virginia Case, the Texas Case, or the MDL directly from the court reporters."). That order was signed by the court in the Texas Case but never became effective because it was contingent on obtaining approval in the MDL (*see id*. ¶ 10), which has not occurred to date. But notwithstanding that fact, Google represented to the court in the Texas Case that Google was committed to coordination with this case:

> [Google's Counsel:] We've actually had productive discussions over the last two days where *Google has made it very clear to plaintiffs that as regards Virginia, we intend to do everything that we can to sort of continue the effectuation of the existing coordination order that was entered in Virginia and the MDL*. And we have made it very clear to plaintiffs that we are prepared to make Google --

continue to make Google's documents and data available and to otherwise
coordinate with respect to that existing coordination order.

March 21, 2024 Hearing Transcript, No. 4:20-cv-957, ECF No. 320 (E.D. Tex.) (emphasis

added).[1]

### C.  A Further Order from this Court is Required to Continue the Previously-Ordered Coordination with the Texas Case.

While this Court previously ordered coordination with the Texas Case (when it was part

of the MDL), and the presiding judge in the Texas Case has expressed support for coordination

between the Texas Case and this case, a further order of this Court appears necessary to

implement the coordination. Plaintiffs' proposed order filed herewith does so in the simplest way

possible: amending the Coordination Order to treat the Texas Case as if it were still part of the

MDL for purposes of the Coordination Order. This approach simply applies the current

Coordination Order to the Texas Case without any changes, thereby preserving as much as

possible both the agreements reached by the parties in negotiating the Coordination Order and

the decisions of this Court in ruling on disputes between the parties and in entering the

Coordination Order.

To be clear, Plaintiffs recognize that fact discovery in this case is closed, and therefore

only the provisions of the Coordination Order that apply after fact discovery is closed would

apply moving forward. But, importantly, amending the Coordination Order as Plaintiffs request

would preserve the guidelines for use of fact discovery obtained in the Texas Case after the close

of fact discovery in this case: (1) under paragraph 6.b., Plaintiffs would be able to obtain

transcripts and exhibits from fact depositions taken in the Texas Case directly from the court

---

[1] Upon request, Plaintiffs will provide a copy of the complete transcript of this hearing to the
Court.

reporters; (2) under paragraph 6.d., both Plaintiffs and Google would be permitted to use fact depositions taken in the Texas Case for impeachment at trial in this case; (3) under paragraph 2, Plaintiffs could share fact discovery with Texas and its co-plaintiffs in the Texas Case; and (4) under paragraph 2.e., fact discovery obtained in the Texas Case could be used in this case for impeachment at trial if it was produced to Plaintiffs within 14 days of receipt in the Texas Case—effectively giving Google the option to elect to use new documents obtained in the Texas Case for impeachment at trial in this case if Google promptly re-produces them to the Plaintiffs. As these exact same provisions are already in effect for fact discovery obtained in the MDL, Plaintiffs merely request that they be extended to the Texas Case.

## ARGUMENT

There is ample cause to amend the Coordination Order as Plaintiffs propose. Plaintiffs' amendment updates the Coordination Order to account for the change in circumstances for the Texas Case since the Coordination Order was entered in a way that preserves the Court's decisions and the parties' agreements. Doing so ensures a level playing field between the parties, benefits all of them, and does not prejudice Google.

### A. Extending the Existing Coordination Order to the Texas Case Ensures a Level Playing Field between the Plaintiffs and Google.

The Plaintiffs stand ready to proceed to trial on the record they have developed during discovery in this case, but ongoing discovery in the Texas Case is generating additional material that risks giving Google an asymmetrical informational advantage in this case. Because Google has at least one of the same law firms and several individual lawyers representing it in the Texas Case and in this case, there is a manifest and unavoidable risk that discovery in the Texas Case will inform Google's litigation of this case. Even assuming the best good faith on the part of Google and its counsel, they cannot unknow information they learn from discovery in the Texas

Case and will therefore inevitably rely on that information while litigating this case, even if that reliance is unintentional.[2] As the original Coordination Order implicitly acknowledged, the only practical way to protect against this risk is to make discovery from the Texas Case available to both sides in this case. Maintaining a level playing field among the parties was a key reason the Plaintiffs supported implementing the Coordination Order in the first place. *See* ECF No. 174, at 2 (Plaintiffs' brief in support of coordination order: "The Court should adopt plaintiffs' proposals on these disputed issues because they maintain a level playing field among all parties while still allowing for an appropriate degree of coordination …").

Sections 2 and 6 of the proposed amended Coordination Order would both place limits on the use of discovery obtained in the Texas Case (i.e., use for impeachment only) and ensure the Plaintiffs minimally fair access to the same discovery Google's counsel could access (i.e., allowing Plaintiffs to order deposition transcripts and requiring Google to promptly re-produce documents to Plaintiffs it wishes to use for impeachment at trial). Without those limits and assurances of fair access, an uneven playing field is unavoidable. For example, Google would be able to obtain documents and sworn testimony from non-parties in the Texas Case that would inevitably inform how they craft their examinations of witnesses from those same non-parties if they were called at trial by the Plaintiffs. In addition, if the Plaintiffs lack access to transcripts of the depositions of Google witnesses from the Texas Case, Google witnesses could color their trial testimony on key issues without being vulnerable to fair cross-examination based on their deposition testimony in the Texas case. Remedying this imbalance is an implicit reason the

---

[2] *See PepsiCo., Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (explaining that employee would "inevitably" rely on confidential information learned from prior employer, "whether or not [he] acts consciously or unconsciously" unless he "possessed an uncanny ability to compartmentalize information").

parties agreed to, and the Court entered, the current Coordination Order—and there is no reason to treat depositions and documents from the MDL differently than those from the Texas Case.

Plaintiffs seek a fair trial in which issues are decided on the merits. That cannot occur if Google were allowed to prepare its case with the benefit of multiple months of additional discovery from the Texas Case, but Plaintiffs were not afforded access to the additional information that Google has gathered.

### B. Extending the Existing Coordination Order to the Texas Case Benefits All Parties, Including Google and Non-Parties, and Minimizes the Risk of Inconsistent Judgments.

The existing Coordination Order benefits the parties in the MDL by allowing unrestricted use of all the discovery produced in this case and depositions taken in this case without the need to re-issue discovery requests or non-party subpoenas. This reduces the burden on the plaintiffs in the MDL, Google, and relevant non-parties by removing the need to issue or respond to discovery responses merely seeking the same discovery already assembled in this case. In particular, hundreds of non-parties have responded to document or deposition subpoenas issued by Plaintiffs or Google in this case, producing thousands of documents and sitting for dozens of depositions. The Coordination Order significantly reduces the burden those relevant non-parties would otherwise have to bear if Google or the plaintiffs in the MDL were forced to issue their own subpoenas to obtain those same materials. Google likely recognizes the value of these advantages—as a coordination order was initially jointly proposed by both Google and the Plaintiffs.

Plaintiffs' proposed amendment to the Coordination Order would extend those same benefits to the Texas Case. Both Google and Texas and its co-plaintiffs would reap the benefits of obtaining the discovery assembled in this case, and non-parties may not be burdened with responding to duplicative subpoenas. Google specifically would obtain the right to use all

discovery and depositions from this case in the Texas Case—amounting to millions of documents obtained by the Plaintiffs during their pre-suit investigation, documents obtained from non-parties in this case, and dozens of pre-suit and litigation deposition transcripts. This would be fully consistent with Google's pledge to the court in the Texas Case to "continue the effectuation of the existing coordination order that was entered in Virginia and the MDL." No. 4:20-cv-957, ECF No. 320 (E.D. Tex.).

Plaintiffs further understand that Google is actively seeking to re-use the discovery obtained in this case in the Texas Case—and therefore recognizes the benefit of doing so. Plaintiffs have learned that Google has attempted to serve subpoenas on various non-parties who provided documents to the Plaintiffs during their pre-suit investigations and that those subpoenas have referenced the fact that those non-parties provided documents to the Plaintiffs during their pre-suit investigation. This conduct shows that Google is already relying on discovery it obtained in this case to inform how it is litigating the Texas Case. It is inevitable that discovery in the Texas Case will similarly inform how Google tries this case. Amending the Coordination Order as Plaintiffs propose would allow Google (and Texas and its co-plaintiffs) to re-use discovery from this case in the Texas Case immediately, without pursuing individual subpoenas on hundreds of non-parties.

A further benefit to all parties, including Google, of Plaintiffs' proposal is reducing the risk of inconsistent judgments. Extending the Coordination Order to the Texas case provides at least some pathway for using any highly probative evidence uncovered in the Texas Case at trial in this case. That increases the likelihood that both cases are decided on a consistent set of facts and reach consistent results. As Google itself argued to the Court previously, allowing some use of discovery obtained in the Texas Case at trial in this case would "advance[] the truth-seeking

function of litigation," remove "obstacles to probative evidence being used," "promote the just resolution of these matters," and address "the risk of inconsistent rulings." ECF No. 166, at 6.

### C. Google is not Prejudiced by an Extension of the Existing Coordination Order to the Texas Case.

Amending the Coordination Order as Plaintiffs propose would cause no prejudice or burden on Google. Plaintiffs' amendment would not re-open discovery, force Google to produce additional documents or respond to additional discovery requests, or provide Plaintiffs with any information not already available to Google or its counsel. The provision on deposition transcripts and exhibits specifically states that Plaintiffs would obtain transcripts by ordering them directly from the court reporter (at their own expense), imposing no obligation or burden whatsoever on Google to re-produce any transcripts to the Plaintiffs. And the provision on documents gives Google the ability to decide whether to re-produce documents to the Plaintiffs promptly—giving Google the right to use them at trial in this case for impeachment—or to forego that burden. To the extent Google does argue that Plaintiffs' proposed amendment prejudices Google, that contention is belied by: (1) Google's arguments to this Court in April 2023 seeking broad ability to use information obtained in the MDL in this case, even if the information was obtained after the close of fact discovery (*see* ECF No. 166, at 6-7); (2) Google's agreement to these same provisions with respect to the MDL, and the Texas Case as well while it was part of the MDL, in the current Coordination Order; and (3) Google's recent apparent strategy to issue subpoenas which would allow it to re-use discovery from this case in the Texas Case.

### CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court enter the proposed order amending the Coordination Order. Subsequently, Plaintiffs will work

expeditiously with counsel for Texas and its co-plaintiffs to request that the same order be

entered in the Texas Case.


Dated: April 12, 2024

Respectfully submitted,

JESSICA D. ABER
United States Attorney

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Julia Tarver Wood
JULIA TARVER WOOD
MICHAEL E. WOLIN
AARON M. TEITELBAUM

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov
Attorneys for the United States

JASON S. MIYARES
Attorney General of Virginia

/s/ Tyler T. Henry
STEVEN G. POPPS
Deputy Attorney General
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for the Commonwealth of
Virginia and local counsel for the
States of Arizona, California,
Colorado, Connecticut, Illinois,
Michigan, Minnesota, Nebraska, New
Hampshire, New Jersey, New York,
North Carolina, Rhode Island,
Tennessee, Washington, and West
Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

UNITED STATES, et al.,       )
                         )
        Plaintiffs,     )
       v.                 )     No. 1:23-cv-00108-LMB-JFA
                         )
GOOGLE LLC,           )
                         )
        Defendant.    )

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
**Sherman Division**

THE STATE OF TEXAS, et al.,    )
                         )
        Plaintiffs,     )
       v.                 )     No. 4:20-cv-957-SDJ
                         )
GOOGLE LLC,           )
                         )
        Defendant.    )

## [PROPOSED] ORDER AMENDING PROCEDURES FOR COORDINATION OF DISCOVERY

On June 5, 2023, an order was entered in the United States District Court for the Eastern District of Virginia in the matter of *United States et al. v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (the "Virgnia Case") to effectuate coordination between the Virgnia Case and a related matter pending in the U.S. District Court for the Southern District of New York, *In re Google Digital Advertising Litigation*, No. 21-md-03010-PKS (the "MDL"). Virginia Case ECF Docket No. 251, attached hereto as Exhibit A (the "Coordination Order).

Pursuant to Paragraph 9 of the Coordination Order, the parties in the Virginia Case have met and conferred about coordination between the Virginia Case and a matter that formerly was

part of the MDL but which has since been transferred back to its home district, namely *State of Texas et al. v. Google LLC*, No. 4:20-cv-957-SDJ, currently pending in the U.S. District Court for the Eastern District of Texas (the "Texas Case").

In order to provide for the efficient coordination of discovery and other matters between the Texas Case and the Virginia Case, and in order to preserve the benefits of coordination for which the parties in the Virginia Case negotiated,

IT IS HEREBY ORDERED:

1.     Notwithstanding the Protective Orders entered in the Virginia Case or the Texas Case, the Texas Case shall be treated as if it were the MDL for purposes of the Coordination Order such that the terms of the Coordination Order shall govern the Virginia Case and the Texas Case.

2.     This order shall become effective once entered in both the Virginia Case and the Texas Case.


SO ORDERED THIS _____ DAY OF _____, 2024 IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA.




SO ORDERED THIS _____ DAY OF _____, 2024 IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS.

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Civil Action No. 1:23-cv-00108-LMB-JFA |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIG. | Civil Action No. 1:21-md-03010-PKC |

**[~~PROPOSED~~] ORDER REGARDING COORDINATION OF DISCOVERY**

1.  <u>Definitions</u>.  For purposes of this Order, the following definitions will apply:

    a.  "Confidential Information" means material that qualifies as "Confidential Information" as that term is defined in either paragraph 1(b) of the MDL Confidentiality Order or paragraph 1(b) of the Virginia Protective Order.

    b.  "Coordinated Case" means the MDL or the Virginia Case.  "Coordinated Cases" means the MDL and the Virginia Case.

c.     "Coordinated Discovery Period" means the time period after the Deadline for Substantial Completion of Document Production in the Virginia Case and before the Fact Discovery Cutoff in the Virginia Case.

d.     "Counsel" means Outside Counsel, Virginia Plaintiffs' Counsel, and MDL State Plaintiffs' Counsel, provided that "Counsel" shall not include Counsel for any Party that ceases to be part of the MDL (unless and until a further order directs otherwise).

e.     "Cross Notice" means to send a notice of intent to take a deposition of a Party under Federal Rule of Civil Procedure 30(b)(1) or to serve a subpoena for a Non-Party Deposition under Federal Rule of Civil Procedure 45(a)(1), after another Party has Noticed a deposition of the same witness.

f.     "Deadline for Substantial Completion of Document Production in the Virginia Case" means the date ordered by the Court for the substantial completion of document production in the Virginia Case.

g.     "Deposition Limit" means (i) for Parties in the MDL, the fact-deposition limit in the MDL referenced in paragraph 6.5 of Pre-Trial Order Number 5 in the MDL (Dkt. 394), and any changes to that limit that may be made after entry of this Order; and (ii) for Parties in the Virginia Case, the fact-deposition limits in the Virginia Case referenced in paragraph 7 of the Rule 16(b) Scheduling Order in the Virginia Case (Dkt. 94), which references and incorporates paragraph 6(G) of the Joint Discovery Plan in the Virginia Case (Dkt. 87), and any changes to those limits that may be made after entry of this Order.

2

h.    "Deposition Notice" means a notice of intent to take a deposition of a Party under Federal Rule of Civil Procedure 30(b)(1) or a subpoena for a Non-Party Deposition under Federal Rule of Civil Procedure 45(a)(1).

i.    "District Courts" means the U.S. District Court for the Eastern District of Virginia and the U.S. District Court for the Southern District of New York.

j.    "Expert Discovery" means expert reports in a Coordinated Case, backup materials and other information disclosed in connection with expert reports in a Coordinated Case, and expert testimony (including expert deposition testimony) in a Coordinated Case.

k.    "Fact Discovery Cutoff in the Virginia Case" means the date ordered by the Court for the conclusion of fact discovery in the Virginia Case.

l.    "Google" means Google LLC, as well as its parents, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents (including counsel), and representatives of the foregoing.

m.    "Google Deposition" means any deposition of a current or former employee of Google or of Google's corporate designee under Federal Rule of Civil Procedure 30(b)(6).

n.    "Highly Confidential Information" means material that qualifies as "Highly Confidential Information" as that term is defined in either paragraph 1(h) of the MDL Confidentiality Order or paragraph 1(g) of the Virginia Protective Order.

o.    "MDL" means the multidistrict litigation captioned as *In re Google Digital Advertising Antitrust Litigation* that is currently pending in the U.S. District Court for the Southern District of New York under docket number 21-md-03010-PKC, and all

3

of the cases that are currently part of that multidistrict litigation or that become part of that multidistrict litigation after entry of this Order, but only for such time as a case is part of the multidistrict litigation (unless and until a further order directs otherwise).

      p.    "MDL Confidentiality Order" means the Confidentiality Order entered as docket entry 297 in the MDL.

      q.    "MDL Plaintiff" means a plaintiff in any case made part of the MDL, but only for such time as that plaintiff's case is part of the MDL (unless and until a further order directs otherwise).

      r.    "MDL Plaintiffs' Counsel" means any attorney retained to represent or advise an MDL Plaintiff, as well as any paralegals, administrative assistants, and clerical and administrative personnel supervised by that attorney, but only for such time as that MDL Plaintiff's case is part of the MDL (unless and until a further order directs otherwise).

      s.    "MDL State Plaintiffs" means the States of Texas, Alaska, Arkansas, Idaho, Indiana, Kentucky, Florida, Louisiana, Mississippi, Montana, Missouri, Nevada, North Dakota, South Dakota, South Carolina, Utah, the Commonwealth of Kentucky, Puerto Rico, and any other state that joins the MDL, by and through their respective Attorneys General, but only for such time as that state's case is part of the MDL (unless and until a further order directs otherwise).

      t.    "MDL State Plaintiffs' Counsel" means any attorney retained to represent or advise an MDL State Plaintiff in the MDL, as well as any paralegals, administrative assistants, and clerical and administrative personnel supervised by that attorney, but only

4

for such time as that MDL State Plaintiff's case is part of the MDL (unless and until a further order directs otherwise).

u.     "Meta" means Meta Platforms, Inc. as well as its parents, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents (including counsel), and representatives of the foregoing.

v.     "NBA Stay" means the stay of discovery relating to the Network Bidding Agreement that was entered in paragraph 3 of Pre-Trial Order No. 5 in the MDL (Dkt. 394).

w.     "Non-Noticing Party" means, with respect to a particular deposition, any Party other than the Noticing Party.

x.     "Non-Party Deposition" means a deposition of an individual who is not a Party or a current or former employee of a Party; a deposition of a current or former employee of an entity that is not a Party; and/or a deposition of a corporate designee under Federal Rule of Civil Procedure 30(b)(6) of an entity that is not a Party.

y.     "Notice" means to send a notice of intent to take a deposition of a Party under Federal Rule of Civil Procedure 30(b)(1) or to serve a subpoena for a Non-Party Deposition under Federal Rule of Civil Procedure 45(a)(1).

z.     "Noticing Party" means, with respect to a particular deposition, the Party that sends a Deposition Notice for that deposition.

aa.     "Outside Counsel" means the attorneys employed by outside law firms who are retained to represent or advise a Party in a Coordinated Case, as well as any paralegals, administrative assistants, and clerical and administrative personnel supervised by those attorneys.

5

bb.    "Party" means any individual or entity that asserts a claim, or against

which a claim has been asserted, in the MDL or the Virginia Case, including the MDL

Plaintiffs, the Virginia Plaintiffs, Meta, and Google, provided that Meta shall not be

considered a "Party" while the NBA Stay is in effect or until sixty (60) days after the

NBA stay is lifted.  For the avoidance of doubt, unless and until a further order directs

otherwise, an individual or entity ceases to be a "Party" if all of the claims that it asserts

or that have been asserted against it in the MDL or the Virginia Case have been dismissed

or otherwise adjudicated by a District Court or transferred to a court other than one of the

District Courts.

cc.    "Protective Orders" means the MDL Confidentiality Order and the

Virginia Protective Order.

dd.    "Shared Discovery" means documents and data produced during fact

discovery in a Coordinated Case and does not include Expert Discovery.

ee.    "Transcript" means any recording of testimony, including recordings by

stenographic means and by video.

ff.    "Virginia Case" means the case captioned as *United States, et al. v.*

*Google, LLC* that is pending in the U.S. District Court for the Eastern District of Virginia

under docket number 1:23-cv-00108-LMB-JFA.

gg.    "Virginia Plaintiffs" means the United States (including the "Federal

Agency Advertisers" as defined in ¶ 6(A) of the Joint Discovery Plan in the Virginia

Case, Dkt. 87), and the States of Arizona, California, Colorado, Connecticut, Illinois,

Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, North

Carolina, Rhode Island, Tennessee, Washington, and West Virginia and the

6

Commonwealth of Virginia, and any other state that joins the Virginia Case, by and through their respective Attorneys General.

hh.　"Virginia Plaintiffs' Counsel" means "Plaintiffs' Counsel" as that term is defined in ¶ 1(p) of the Virginia Protective Order.

ii.　"Virginia Protective Order" means the Protective Order entered as docket entry 98 in the Virginia Case.

2.　<u>Shared Discovery</u>.  Notwithstanding the Protective Orders, Counsel may disclose Shared Discovery to any other Counsel, provided that Shared Discovery may not be disclosed to either (i) any Counsel representing an MDL Plaintiff as to which discovery has been stayed or has not begun; or (ii) Counsel representing Meta while the NBA Stay is in effect.[1]

a.　Shared Discovery that was produced and designated as Confidential Information in the Virginia Case may be used in the MDL only to the extent that Confidential Information may be used under the MDL Confidentiality Order.

b.　Shared Discovery that was produced and designated as Highly Confidential Information in the Virginia Case may be used in the MDL only to the extent that Highly Confidential Information may be used under the MDL Confidentiality Order.

c.　Shared Discovery that was produced and designated as Confidential Information in the MDL may be used in the Virginia Case only to the extent that Confidential Information may be used under the Virginia Protective Order.

d.　Shared Discovery that was produced and designated as Highly Confidential Information in the MDL may be used in the Virginia Case only to the extent that Highly Confidential Information may be used under the Virginia Protective Order.

---

[1] Shared Discovery produced by Meta as a Non-Party in the Virginia Case shall not be made available to MDL Plaintiffs until seven (7) days after the NBA Stay is lifted.

e. Subject to sub-paragraphs 2(a)-(d), Shared Discovery that was produced in a Coordinated Case may be used in any Coordinated Case for any purpose permissible under the Federal Rules of Evidence and the Federal Rules of Civil Procedure (including for purposes of impeachment at trial), as if the Shared Discovery had been produced in both Coordinated Cases. Notwithstanding the previous sentence, absent an order of the Court in the Virginia Case, Shared Discovery produced in the MDL case after the Fact Discovery Cutoff in the Virginia Case may not be used by any Party in the Virginia Case, unless (1) the Shared Discovery is produced in the Virginia Case within 14 days of its receipt in the MDL, notwithstanding the close of fact discovery in the Virginia Case; and (2) the Shared Discovery is used in the Virginia Case only for impeachment purposes at trial and may not be admitted into evidence or used in any dispositive motion, pleading, or expert report.

3. <u>Depositions Taken During Coordinated Discovery Period</u>. During the Coordinated Discovery Period, the following provisions shall apply:

a. The Parties in the Coordinated Cases shall serve any Deposition Notice on all Parties in the Coordinated Cases.[2] No Party may Notice a deposition in a Coordinated Case in which it is not a plaintiff or a defendant. If a deposition has been Noticed in one of the Coordinated Cases, a Party in the other Coordinated Case may Cross Notice the deposition in the other Coordinated Case.

b. No Party shall send a Deposition Notice for a deposition to be held fewer than twenty-one (21) days after the date on which the Deposition Notice is sent.

---

[2] For purposes of paragraphs 3, 4, and 5, MDL Plaintiffs collectively will be considered a "Noticing Party" or a "Non-Noticing Party," and the Discovery Steering Committee in the MDL shall act on behalf of all MDL Plaintiffs. In addition, Virginia Plaintiffs collectively will be considered a "Noticing Party" or a "Non-Noticing Party," and the United States shall act on behalf of all Virginia Plaintiffs.

c.       If a Non-Noticing Party wishes to Cross Notice a deposition, it must do so within three (3) business days of receiving the Deposition Notice for that deposition.  A Non-Noticing Party may not Cross Notice a deposition if doing so would cause that Non-Noticing Party to exceed a Deposition Limit.

d.       If a Non-Noticing Party Cross Notices the deposition within three (3) business days of receiving the Deposition Notice, the deposition will count against any Deposition Limit applicable to that Non-Noticing Party (unless the deposition does not take place).  The deposition will also count against any Deposition Limit applicable to the Noticing Party (unless the deposition does not take place).  For the avoidance of doubt, if a Party withdraws a previously-served Notice or Cross Notice at least forty-eight (48) hours before the deposition takes place, then that deposition will not count against any Deposition Limit applicable to that Party.

e.       Any witness appearing at a Google Deposition or a Non-Party Deposition taken during the Coordinated Discovery Period cannot be compelled to sit for a second deposition in any Coordinated Case (including a second Rule 30(b)(6) deposition of the same entity on the same or substantially similar topics), absent good cause shown to the Court in the Coordinated Case for which the subsequent deposition of the witness is noticed.

f.       Notwithstanding the Protective Orders, Counsel may disclose Transcripts and exhibits from depositions taken during the Coordinated Discovery Period to any other Counsel, provided that such Transcripts and exhibits may not be disclosed to either (i) any Counsel representing an MDL Plaintiff as to which discovery has been stayed or has not begun; or (ii) Counsel representing Meta while the NBA Stay is in effect.  Subject

9

to the Protective Orders, Transcripts and exhibits from depositions taken in a Coordinated Case during the Coordinated Discovery Period may be used in any Coordinated Case for any purpose permissible under the Federal Rules of Evidence and the Federal Rules of Civil Procedure (including for purposes of impeachment at trial).

g.    Notwithstanding any other provisions of this Order, while the NBA Stay is in effect, (i) Meta may not Notice or Cross Notice a deposition, and Meta may not question a witness at a Google Deposition or a Non-Party Deposition (except at a Non-Party Deposition of a current or former Meta employee); (ii) MDL Plaintiffs may not Cross Notice a deposition of a current or former Meta employee; and (iii) no Transcripts and exhibits from depositions of current and/or former Meta employees may be disclosed to or used by MDL Plaintiffs.

4.    <u>Time Allocations at Google Depositions Taken During Coordinated Discovery Period</u>. During the Coordinated Discovery Period, the following provisions shall apply:

a.    If any Party Notices a Google Deposition, and no other Party Cross Notices the deposition, then the Noticing Party will have six (6) hours on the record to examine the witness, and any Non-Noticing Party or Parties in the Coordinated Case to which the Deposition Notice applies will collectively have one (1) hour on the record to examine the witness.

b.    If Virginia Plaintiffs and MDL Plaintiffs both Notice or Cross Notice a Google Deposition, and no other Party Notices or Cross Notices the deposition, then the deposition will be held for two (2) consecutive days. Virginia Plaintiffs will have seven (7) hours on the record to examine the witness, MDL Plaintiffs will have six (6) hours on the record to examine the witness, and Meta will have one (1) hour on the record to

10

examine the witness, if Meta is deemed a Party (under paragraph 1(bb)) at the time of the deposition.

      c.     If Virginia Plaintiffs and Meta both Notice or Cross Notice a Google Deposition, and no other Party Cross Notices the deposition, then the deposition will be held for two (2) consecutive days. Virginia Plaintiffs will have seven (7) hours on the record to examine the witness, Meta will have six (6) hours on the record to examine the witness, and MDL Plaintiffs will have one (1) hour on the record to examine the witness.

      d.     If MDL Plaintiffs and Meta both Notice or Cross Notice a Google Deposition, and no other Party Cross Notices the deposition, then MDL Plaintiffs will have three and one-half (3.5) hours on the record to examine the witness, and Meta will have three and one-half (3.5) hours on the record to examine the witness.

      e.     If Virginia Plaintiffs, MDL Plaintiffs, and Meta all Notice or Cross Notice a Google Deposition, then the deposition will be held for two (2) consecutive days. Virginia Plaintiffs will have seven (7) hours on the record to examine the witness, and MDL Plaintiffs and Meta will collectively have seven (7) hours on the record to examine the witness, if Meta is deemed a Party (under paragraph 1(bb)) at the time of the deposition.

5.     <u>Time Allocations at Non-Party Depositions Taken During Coordinated Discovery Period</u>. During the Coordinated Discovery Period, the following provisions shall apply:

      a.     If a Party Notices a Non-Party Deposition, and no other Party Cross Notices the deposition, then the Noticing Party will have six (6) hours on the record to examine the witness, and any Non-Noticing Party or Parties in the Coordinated Case to

which the Deposition Notice applies will collectively have one (1) hour on the record to
examine the witness.

b.     If two Parties (one of which is Google) Notice or Cross Notice a Non-
Party Deposition, and no other Party Cross Notices the deposition, then Google will have
three (3) hours on the record to examine the witness, the other Party that Noticed or Cross
Noticed the deposition will have three (3) hours on the record to examine the witness, and
any Non-Noticing Party or Parties in the Coordinated Case(s) to which the Deposition
Notice(s) apply will collectively have one (1) hour on the record to examine the witness.

c.     If two Parties (neither of which is Google) Notice or Cross Notice a Non-
Party Deposition, and no other Party Cross Notices the deposition, then each of the
Parties that Noticed or Cross Noticed the deposition will have two and one-half (2.5)
hours on the record to examine the witness, Google will have one (1) hour on the record
to examine the witness, and any Non-Noticing Party in the Coordinated Case(s) to which
the Deposition Notice(s) apply will have one (1) hour on the record to examine the
witness.

d.     If three Parties (one of which is Google) Notice or Cross Notice a Non-
Party Deposition, and no other Party Cross Notices the deposition, then the deposition
will be held for two (2) consecutive days.  Each of the Parties that Noticed or Cross
Noticed the deposition will have three (3) hours on the record to examine the witness, and
any Non-Noticing Party in the Coordinated Case(s) to which the Deposition Notice(s)
apply will have one (1) hour on the record to examine the witness.

e.     If three Parties (none of which is Google) Notice or Cross Notice a Non-
Party Deposition, and Google does not Cross Notice the deposition, then the deposition

12

will be held for two (2) consecutive days. Each of the Parties that Noticed or Cross Noticed the deposition will have four (4) hours on the record to examine the witness, and Google will have one (1) hour on the record to examine the witness.

      f.    If Google, Meta, Virginia Plaintiffs, and MDL Plaintiffs all Notice or Cross Notice a Non-Party Deposition, then the deposition will be held for two (2) consecutive days. Google will have three (3) hours on the record to examine the witness, Meta will have three (3) hours on the record to examine the witness, Virginia Plaintiffs will have three (3) hours on the record to examine the witness, and MDL Plaintiffs will have three (3) hours on the record to examine the witness.

    6.    <u>Depositions Taken Outside Coordinated Discovery Period</u>. Outside the Coordinated Discovery Period, the following provisions shall apply:

      a.    The Parties in the MDL shall serve any Deposition Notice on Virginia Plaintiffs.

      b.    Notwithstanding the Protective Orders, Counsel for any Party may obtain Transcripts and exhibits of Google Depositions and Non-Party Depositions taken in the MDL after the Fact Discovery Cutoff in the Virginia Case directly from the court reporters for those depositions.

      c.    Notwithstanding the Protective Orders, Counsel may disclose Transcripts and exhibits from depositions taken outside the Coordinated Discovery Period to any other Counsel, provided that such Transcripts and exhibits may not be disclosed to either (i) any Counsel representing an MDL Plaintiff as to which discovery has been stayed or has not begun; or (ii) Counsel representing Meta while the NBA Stay is in effect.

d.      Subject to the Protective Orders, absent an order of the Court in the Virginia Case, Transcripts and exhibits from depositions taken outside the Coordinated Discovery Period may not be used in the Virginia Case for any purpose other than impeachment at trial.  For the avoidance of doubt, absent an order of the Court in the Virginia Case, such Transcripts and exhibits may not be admitted into evidence at trial in the Virginia Case or otherwise used affirmatively by any Party in any dispositive motion, pleading, or expert report in the Virginia Case.

7.      Expert Discovery.  Expert Discovery shall not be shared between the Coordinated Cases pending further order.  At least ninety (90) days before Google's expert reports are due in the MDL, the Parties shall meet and confer over whether there are circumstances in which Expert Discovery may or should be shared between the Coordinated Cases.  Google shall notify Virginia Plaintiffs at least twenty-four (24) hours in advance of serving an expert report in the MDL if Google serves such report before the due date in the MDL.

8.      Notice to Non-Parties.  Any Party, in conducting discovery from a non-party in connection with a Coordinated Case, shall provide the non-party from which it seeks discovery with a copy of this Order so as to inform the non-party of his, her, or its rights herein.  In addition, within three business days of this Order taking effect, the Parties shall give notice as described in the following sub-paragraphs:

a.      Virginia Plaintiffs shall give notice of this Order to (i) all persons to whom Virginia Plaintiffs provided notice of the Virginia Protective Order under paragraph 2 of that order; and (ii) all recipients of subpoenas that Virginia Plaintiffs have served in the Virginia Case before this Order took effect.

14

b.      MDL Plaintiffs shall give notice of this Order to (i) all persons to whom MDL Plaintiffs provided notice of the MDL Confidentiality Order under paragraph 2 of that order; and (ii) all recipients of subpoenas that MDL Plaintiffs have served in the MDL before this Order took effect.

c.      Google shall give notice of this Order to all recipients of subpoenas that Google has served in the Virginia Case and/or the MDL before this Order took effect.

9.      <u>Departure from MDL</u>. If any case(s) currently part of the MDL are transferred to other venue(s), the Parties in the Coordinated Cases shall meet and confer with the parties to the transferred case(s) regarding whether, and on what conditions, the transferred case(s) should be coordinated with the MDL and the Virginia Case. If all claims brought by an MDL Plaintiff are dismissed, transferred, or remanded, then that MDL Plaintiff shall be treated as a Non-Party for purposes of this Order after such dismissal, transfer, or remand. If all claims brought against Meta in the MDL are dismissed, then Meta shall be treated as a Non-Party for purposes of this Order after such dismissal.

10.     <u>Effective Date</u>. This Order shall not come into effect unless and until it has been entered in both the MDL and the Virginia Case.

IT IS HEREBY SO ORDERED this **5TH** day of __June__, 2023.

_____/s/_____ JFA

John F. Anderson
United States Magistrate Judge

15

# EXHIBIT 5

# Memorandum in Opposition to Motion to Amend Coordination Order

# (E.D. Va.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| **UNITED STATES**, *et al.*, | |
| *Plaintiffs*, | **Civil Action No.** |
| | **1:23-cv-00108-LMB-JFA** |
| **v.** | |
| **GOOGLE LLC**, | |
| *Defendant.* | |

## GOOGLE'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO AMEND ORDER REGARDING COORDINATION OF DISCOVERY

Discovery "indisputably closed in this case" 7 months ago, and as the Court observed in October, "the universe of discovery . . . available to be used in this litigation is now created." Plaintiffs' Brief, ECF No. 551 ("Pl. Br.") at 4 (first quotation); Oct. 13, 2023 Hearing Transcript, ECF No. 484 at 7 (second quotation). Indeed, over the last several years, Plaintiffs have amassed a voluminous discovery record from Google and numerous third-parties. For example, during the Department of Justice's ("DOJ") more than 3-year pre-suit investigation, Google produced nearly 3 million documents and made available more than 30 witnesses for depositions. The DOJ also interviewed numerous third-parties and received nearly 5 million third-party documents. In this action, Plaintiffs have taken 10 Google depositions, 18 third-party depositions, and received over 3 million more documents from Google and third-parties. Now, mere months from trial, and after the MDL Court already declined to continue coordination with the Texas Case, Plaintiffs seek to reopen the record to gather up to 80 additional deposition transcripts and thousands more documents from the remanded Texas proceeding.

Plaintiffs' requested relief would allow them to use the Texas Case as a proxy to reopen discovery in this action, receiving numerous deposition transcripts of Google witnesses from the Texas Case. Plaintiffs insist that this discovery is necessary to maintain a "level playing field." Pl. Br. at 7. But the field is already level: discovery is closed and both sides have the same discovery materials. Moreover, Plaintiffs had nearly endless opportunities to take discovery from Google over the last several years. Rather than cure any information asymmetry, Plaintiffs' request would create one: under their proposal, Google obtains no right to access more discovery of Plaintiffs while Plaintiffs could use the new discovery to inform their trial strategy.

Despite their broad, eleventh hour request to inject voluminous discovery into these proceedings, Plaintiffs declare that they "stand ready to proceed to trial on the record they have developed during discovery in this case." Pl. Br. at 7. They should do so. Plaintiffs have failed to

demonstrate good cause for expanding the scope of discovery in this case by "amending" the existing Coordination Order, and the expansion of discovery Plaintiffs seek would cause Google significant prejudice. For these reasons and as explained below, Google asks this Court to deny Plaintiffs' Motion to Amend the Order Regarding Coordination of Discovery.

## I.    FACTUAL BACKGROUND

On June 5, 2023, the Court entered the Order Regarding Coordination of Discovery (ECF No. 251) (the "Coordination Order") which, among other things, allowed the sharing of discovery between this action and *In re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (S.D.N.Y.) (the "MDL"). When the Coordination Order was entered, *State of Texas et. al. v. Google LLC*, No. 4:20-cv-957 (E.D. Tex.) (the "Texas Case") was consolidated with the MDL, and the scope of discovery available in the MDL (and thus the Texas Case) was similar to the discovery permitted in this case. The MDL Scheduling Order, for example, provided for 15 total fact witness depositions "per side"—*i.e.*, meaning that the Texas plaintiffs and the private plaintiffs in the MDL collectively shared 15 total depositions of Google and third-party witnesses. MDL ECF No. 394 ¶ 6.5.

At the time of the negotiation and entry of the Coordination Order, Texas sought to exit the MDL and be remanded back to the United States District Court for the Eastern District of Texas. The Coordination Order makes clear that this possibility was known to the parties, but there was no agreement as to its consequence and what, if any, coordination should ensue upon that possible event. The Order states: "If any case(s) currently part of the MDL are transferred to other venue(s), the Parties in the Coordinated Cases shall meet and confer . . . regarding whether, and on what conditions, the transferred case(s) should be coordinated with the MDL and the Virginia Case." Coordination Order ¶ 9. In other words, the existing Coordination Order does not

3

provide for automatic continued coordination upon remand or transfer, instead leaving open the possibility that the circumstances of transfer may make continued coordination inappropriate.

Discovery in this case closed on September 8, 2023. On November 1, 2023, the Texas Case was remanded back to the United States District Court for the Eastern District of Texas. After remand, on January 2, 2024, the Court in the Texas Case entered a Scheduling Order setting out the scope of discovery. Texas Case ECF No. 194. Under that Scheduling Order, the Texas Plaintiffs and Google are *each* permitted to take 40 fact witness depositions—meaning the Texas Plaintiffs are now entitled to significantly more depositions than the Texas Plaintiffs had to share with the then-dozens of MDL Plaintiffs under the MDL Scheduling Order. *Id.* at 6.

Not only is discovery in the Texas Case post-remand broader than that permitted in the MDL, it is also focused on different issues than this case. The Texas Plaintiffs have a 71-paragraph "Deceptive Trade Practice Violations" section of their complaint alleging that certain Google conduct is false or misleading under the consumer protection laws of various states. *See* Fourth Am. Compl., MDL ECF No. 541 ¶¶ 526–97.

Recognizing that extended coordination would expand discovery, on March 6, 2024, the Court in the MDL declined to order continued coordination between the MDL and the Texas Case. *See* Pre-Trial Order No. 8, MDL ECF No. 708. Specifically, Judge Castel explained that with "80% of the fact discovery period having passed, discovery in this MDL should be winding down." *Id.* Since then, discovery in the Texas Case and the MDL has proceeded separately.

## II. <u>ARGUMENT</u>

Plaintiffs must show good cause to amend the Coordination Order, as this Court recognized when MDL Plaintiffs previously tried to modify the Coordination Order to expand the scope of their record. *See* Jan. 26, 2024 Hearing Transcript, ECF No. 516 at 18 (explaining that "good cause" is needed to "justify changing the order that was negotiated and entered by our

court and the New York court"); *see also Morris v. Edmonds*, 2009 WL 1065859, at *2 (E.D.N.C. Apr. 17, 2009) ("Plaintiff must show good cause to expand the scope of discovery."). Plaintiffs have not made this showing.

Plaintiffs instead argue that "ample" cause exists because amendment would "ensure[] a level playing field between the parties [and] benefit[] all of them." Pl. Br. at 7. The DOJ had nearly unlimited opportunity for discovery during its over 3-year pre-suit investigation and has received voluminous discovery since. Moreover, contrary to the DOJ's suggestion of a "level" playing field, there would be very real prejudice to Google and this proceeding: Plaintiffs would be allowed additional discovery of Google without Google receiving any corresponding discovery of Plaintiffs, and use of that discovery—imported from a different case—would potentially confuse the issues in this case.

### A. There is No Good Cause to Amend the Coordination Order

Plaintiffs argue that they require (1) deposition testimony from Google witnesses in the Texas Case and (2) documents and deposition testimony from third parties in the Texas Case to use in this action "for impeachment only." Pl. Br. at 8. According to Plaintiffs, this voluminous discovery is necessary to allow "Plaintiffs minimally fair access to the same discovery Google's counsel could access." *Id*. But Plaintiffs and Google already have access to the same discovery record in this case. After filing suit in this forum with full awareness of its expedient scheduling practices, Plaintiffs should not take one-sided advantage of discovery proceedings in another forum after discovery in this matter has closed.[1]

---

[1] In seeking to access this discovery from the Texas Case, Plaintiffs essentially ask this Court to overrule the Protective Order in that case. *See* Plaintiffs' Motion, ECF No. 550 at 4 (Plaintiffs' Proposed Order suggesting shared discovery "[n]otwithstanding the Protective Orders entered in the Virginia Case or the Texas Case"). But courts appropriately decline to order production of discovery that would undermine a protective order in another case. *See, e.g.*, *State Auto. Mut. Ins. Co. v. Davis*, 2007 WL 2670262, at *2 (S.D.W.V. Sept. 7, 2007) (denying motion to compel

Unfettered by deposition limits during its wide-ranging pre-suit investigation, the DOJ chose to depose more than 30 Google witnesses, some more than once. Plaintiffs then took another 10 depositions of Google witnesses in this action, and Plaintiffs have access to over 6 million Google documents. Plaintiffs' purported information asymmetry boils down to a reality present in every case involving corporate litigants: corporate litigants always have more institutional access to and knowledge about their own employees. But that is an out-of-court asymmetry untethered from the evidence each side in this case has in the discovery record.

Granting Plaintiffs' request for Google deposition transcripts from the late-breaking Texas Case will only lead to an "unlevel playing field" for Google, which will be required to share numerous new Google deposition transcripts with Plaintiffs without benefitting from new depositions of Plaintiffs. And there are incremental depositions of Plaintiffs that Google was not able to take: Plaintiffs' Initial Disclosures alone list 35 employees of federal government agencies. Google was not able to depose most of these witnesses given this case's deposition limit. Both parties were, and should remain, bound by the appropriate discovery limitations in this case. Moreover, while discovery from the Texas Case may have limited impeachment value to Plaintiffs, it will be unlikely to have impeachment value for Google because it is unlikely to overlap with the testimony of Plaintiffs' trial witnesses such that impeachment would be possible.

Plaintiffs also do not explain why they need discovery from the third-parties involved in the Texas Case. Many of the third-party subpoenas issued in the Texas Case have been to entities identified by plaintiffs in the Texas Case as likely to have discoverable information related to the

---

production of discovery from a related case, "in the interests of fairness, preserving the reliability of protective orders, and upholding the principle of comity" as that discovery was covered by a protective order in the related case).

Texas Case claims and defenses, including regarding state-law claims not alleged in the instant case. Accordingly, many of the Texas third-parties bear little relevance to Plaintiffs' claims, and Plaintiffs have failed to identify what testimony would be used for impeachment purposes under their proposed amended Coordination Order. Moreover, Plaintiffs' strategic decisions in this action underscore that they already have access to more than enough third-party information. For example, DOJ's pre-suit investigation—which involved numerous interviews with third-parties and access to nearly 5 million third-party documents—was so extensive that Plaintiffs only chose to notice or cross-notice 18 third-party depositions in connection with this action, allowing 2 of their 20 third-party deposition slots to go unused.

None of Plaintiffs' other arguments support their attempt to get more discovery. Plaintiffs argue that extending the Coordination Order to allow "unrestricted use of all the discovery produced in this case" benefits third-parties because "[third]-parties [would] not be burdened with responding to duplicative subpoenas." Pl. Br. at 9. But Google has already addressed this concern. Specifically, Google's document subpoenas of third-parties in the Texas Case for documents produced in connection with this action seek those third-parties' consent to use the documents they produced in this action in the Texas Case. In other words, Google is not burdening third parties with "duplicative subpoenas" requiring two different substantive responses for the same requests.

Plaintiffs' argument that sharing discovery across cases would "reduc[e] the risk of inconsistent judgments," Pl. Br. at 10, also reveals their true motivation: they seek additional evidence from Google to shore up the manifest weakness in their own case. After all, if Plaintiffs believed they would prevail in this case but the plaintiffs in the Texas Case would not, Plaintiffs would have no need for evidence from the Texas Case.

At bottom, it is Plaintiffs who stand to benefit from their own proposal. Plaintiffs seek explicit permission to share discovery from *this case* with Texas, explaining that under the proposed amendment, "Plaintiffs could share fact discovery with Texas and its co-plaintiffs in the Texas case." Pl. Br. at 7. Plaintiffs could suggest specific documents and lines of deposition questioning to the Texas Plaintiffs and then receive the transcripts of the very depositions that they helped to orchestrate to inform their selection of witnesses and lines of cross-examination in this case. Plaintiffs' backdoor attempt to reopen and extend their own discovery through the introduction of further deposition testimony—7 months after the close of fact discovery in this case and less than 5 months away from trial—prejudices Google in this critical pre-trial period, especially with Google obtaining no corresponding right to access more discovery of Plaintiffs.

The MDL Court denied extended coordination between the Texas Case and the MDL—despite the greater overlap between those cases, which both include state law claims—because discovery in the MDL is nearing a close. *See* Pre-Trial Order No. 8, MDL ECF No. 708. Plaintiffs attempt to obscure and avoid the MDL Court's order rejecting further coordination, stating that coordination between the Texas Case and the MDL "was contingent on obtaining approval in the MDL, which has not occurred to date." Pl. Br. at 5. In truth, the MDL Court denied the request for coordination that Plaintiffs seek here, in an even more remote case for which discovery is not just 80%, but 100%, complete and has been for 7 months. The MDL Court's rejection of coordination with the Texas Case is critical: it would be a perverse result if in this case—where fact discovery closed 7 months ago—the Court agreed to extend coordination when the MDL Court has refused. Discovery is over, and the Court should not countenance Plaintiffs' attempt to reopen it solely for their own extended discovery purposes. *Mims v. City of Chicago*, 2021 WL 5006649, at *6 (N.D. Ill. Oct. 28, 2021) (denying motion to

reopen discovery for lack of good cause in a case where "[t]here was enough discovery here to choke a horse" (internal citation and quotations omitted)).

### B. Google Would Be Prejudiced by Amendment of the Coordination Order

Plaintiffs' desired relief would create a feedback loop with the Texas Case in which: 1) Plaintiffs could share discovery from this action with the Texas Plaintiffs to suggest lines of deposition questioning; 2) Texas Plaintiffs could tailor their depositions of Google witnesses based on Plaintiffs' feedback; and 3) the resulting depositions from the Texas Case could be used by Plaintiffs to inform their trial strategy in this action and to arm them with more ammunition for trial. This stands to confuse the issues and cause significant prejudice to Google, which will have no corresponding opportunity to access more discovery of Plaintiffs. *See, e.g.*, *Smith v. City of Greensboro*, 2021 WL 5772309, at *5 (M.D.N.C. Oct. 18, 2021) (denying motion to reopen discovery because, while plaintiff described the proposed additional discovery as "limited," allowing plaintiff to re-depose 7 individuals and take an "unspecified number" of further depositions "would be prejudicial").

In addition to creating an information asymmetry, introduction of discovery from the Texas Case—even if just for impeachment purposes—not only risks confusing the issues for the jury, but would require the Court and parties to parse through the extensive deposition testimony concerning facts and claims that are irrelevant to this proceeding for what is likely to be extremely limited impeachment value.

Finally, Plaintiffs argue that Google cannot claim prejudice because it previously supported coordination under very different circumstances.[2] *See* Pl. Br. at 4, 11 (citing Google's

---

[2] Plaintiffs also argue that Google will suffer no prejudice because extending the Coordination Order will impose no burden on Google. Plaintiffs' burden argument is a red herring: discovery can be prejudicial even if it is not burdensome. *See Wiles v. Black & Boone, P.A.*, 2022 WL 16836204, at *2 (M.D.N.C. Aug. 4, 2022) (finding prejudice without assessing burden).

Brief in Support of Coordination Order, ECF No. 166). While Google argued in favor of and ultimately complied with various levels of coordination, circumstances have materially changed: discovery in this action has closed, the Texas Case has been remanded and opened to significantly broader discovery than contemplated when it was part of the MDL, and the MDL Court declined to order coordination between the Texas Case and the MDL.[3] Given these developments, many of the reasons animating Google's support for coordination have become moot. As counsel for Google has explained: "[T]he key benefit to Google, in the context of the coordination order, was protection for Google's witnesses in terms of coordination of depositions." March 21, 2024 Hearing Transcript, Texas Case ECF No. 320 at 40.[4] Amending the Coordination Order now would provide little-to-no benefit to Google while allowing Plaintiffs to receive the windfall of additional discovery through the Texas Case for use in this action. As made clear from the express language of the original Coordination Order, in the event there was remand to Texas, all bets were off and there is ample reason to hold to that position.

## III.    <u>CONCLUSION</u>

For the reasons stated herein, Google respectfully requests that the Court deny Plaintiffs' Motion to Amend the Order Regarding Coordination of Discovery.

---

[3] Plaintiffs also attempt to emphasize Google's representation to the Texas Court that Google intends to abide by the existing Coordination Order as it relates to this action and the MDL. *See* Pl Br. at 5–6. Google's continued compliance with a court order does not bear on whether coordination should be extended to the Texas Case.

[4] Upon request, Google will provide a copy of the transcript of this hearing to the Court.

Dated: April 17, 2024

Eric Mahr (*pro hac vice*)
Julie S. Elmer (*pro hac vice*)
Andrew J. Ewalt (*pro hac vice*)
Justina Sessions *(pro hac vice)*
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com
julie.elmer@freshfields.com
andrew.ewalt@freshfields.com
justina.sessions@freshfields.com

Daniel S. Bitton (*pro hac vice*)
Bradley Justus (VSB # 80533)
David Pearl (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
dbitton@axinn.com
bjustus@axinn.com
dpearl@axinn.com

Respectfully submitted,

 */s/ Craig C. Reilly*
CRAIG C. REILLY (VSB # 20942)
209 Madison Street
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie Rhee (*pro hac vice*)
William Isaacson (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
kdunn@paulweiss.com
jrhee@paulweiss.com
wisaacson@paulweiss.com
amauser@paulweiss.com

*Counsel for Google LLC*

# EXHIBIT 6

# Reply in Support of Motion to Amend Coordination Order

# (E.D. Va.)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES, et al.,           )
                                 )
                 Plaintiffs,     )
        v.                       )        No. 1:23-cv-00108-LMB-JFA
                                 )
GOOGLE LLC,                      )
                                 )
                 Defendant.      )

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO AMEND ORDER REGARDING COORDINATION OF DISCOVERY

No fair reading of Plaintiffs' motion to amend the Coordination Order can support Google's contention that it is a "broad, eleventh hour request to inject voluminous discovery into these proceedings." Google's Memorandum in Opposition, ECF No. 553 ("Opp.") at 2. The provisions that Plaintiffs request to effectuate limited coordination with the Texas Case are: (a) currently in place for the MDL; (b) applied to the Texas Case as well when it was part of the MDL; and (c) provisions that Google actively sought at the time the Coordination Order was being negotiated and entered. To distract from the limited, reasonable nature of Plaintiffs' request, Google incorrectly asserts that Plaintiffs are seeking to re-open discovery and relies on arguments that are directly contradicted by Google's prior statements to the Court.

Nothing in Plaintiffs' motion would "reopen" discovery in this case. As indicated in Plaintiffs' motion, discovery is "indisputably closed" and Plaintiffs do not seek to change that fact. *See* Plaintiffs' Memorandum in Support of Motion, ECF No. 551 ("Memo.") at 4. Google claims Plaintiffs' proposal would have that effect, but argued the exact opposite to this Court when requesting that the Court allow Google to use *all* discovery collected in the MDL in this case for *any* purpose (not just impeachment, as Plaintiffs propose here):

1

Google's proposal respects the established schedule for this case. That schedule requires fact discovery in that case to be completed by September 8, 2023, and nothing in Google's proposal would change that. The parties would not be able to serve any further document requests or interrogatories in this case after that deadline. Nor would they be able to take additional depositions in this case.

Google's Br. in Support of Coordination Order, ECF No. 166, at 7. Those arguments by Google apply equally to Plaintiffs' motion, which would neither authorize new discovery requests, subpoenas, or depositions in this case, nor allow additional expert discovery or change the factual record available to both sides for summary judgment. Plaintiffs' motion would simply allow them access to certain discovery from the Texas Case for impeachment in the same manner that the Coordination Order already allows access to certain discovery from the MDL. There is no principled reason to treat the MDL differently than the Texas Case—they each include similarly relevant issues and are similarly proceeding on slower timelines than this case.

Further, Google's arguments that Plaintiffs' motion lacks good cause or prejudices Google rely on more assertions that are squarely contradicted by Google's own prior statements. First, Google now argues that discovery in the Texas case is "focused on different issues than this case." Opp. at 4. But Google's counsel stated to Judge Brinkema in support of Google's transfer motion that "this case is exactly substantively identical to the cases that have been pending before Judge Castel for 18 months now," which included the Texas Case at the time. *See* 3/10/2023 Hearing Tr., at 9:2-4. Similarly, Google asserted in its transfer motion that this case "is strikingly similar to the Texas Case" because: "They allege the same facts, relevant markets, and claims, and seek the same relief. They . . . share the same factual nucleus of shared documents. And they will implicate the same or similar documents, data, party witnesses, and third parties as they progress through discovery." Google's Memo. on Mot. to Transfer, ECF No. 44-2, at 11-12.

Second, Google argues that Plaintiffs' discussion of reducing the risk of inconsistent judgments has a "true motivation" of improving Plaintiffs' case. Opp. at 7. But Google

previously made the same arguments to the Court that allowing access to the discovery from the related cases would "advance[] the truth-seeking function of litigation" and denying it would "exacerbate the risk of inconsistent rulings" which would be "compound[ed]" by "insisting that the cases be decided on different evidentiary records." Google's Br. in Support of Coordination Order, ECF No. 166, at 6-7. Google's repudiation of so many of its prior statements demonstrates the inadequacy of Google's opposition to Plaintiffs' motion.

## ARGUMENT

As explained in Plaintiffs' memorandum in support of this motion, amending the Coordination Order to ensure that it continues to apply to the Texas Case (as it did when the Coordination Order was entered) would ensure efficient discovery across the cases, create a level playing field by providing Plaintiffs with similar access to relevant materials being collected by Google's counsel in the Texas Case, minimize burden on third parties and the risk of inconsistent judgments, and create no prejudice to Google. Therefore, good cause exists to amend the Coordination Order as Plaintiffs propose.

### A. Granting Plaintiffs' Motion Would Not "Reopen" Discovery as Google Contends.

Plaintiffs' motion seeks simply to apply the Coordination Order to the Texas Case in the same manner it once applied to the Texas Case and still currently applies to the MDL. Memo. at 2. Google argues repeatedly that this would "reopen" or "extend" discovery. Opp. at 2, 8, 9. That is simply not the case. The Coordination Order already allows Plaintiffs access to the same materials from the MDL, but that fact does not mean that discovery in this case is still "open" or "ongoing." The Court was clear when ruling on the original Coordination Order that while "[a]ll discovery of factual information" was to "be completed by September 8, 2023" it was appropriate to implement Plaintiffs' proposal "on the use of later disclosed information in the MDL proceedings." ECF No. 201 at 3-4. Allowing the parties access to and use for impeachment

purposes of certain materials from related cases was not considered an "extension" of discovery when the Coordination Order was implemented, and it is not an "extension" now.

Indeed, Plaintiffs' motion unquestionably does not allow the Plaintiffs to take any additional discovery. Plaintiffs cannot issue new discovery requests or subpoenas, issue new deposition notices, question any witness under oath, or serve any new or supplemental expert reports. Granting Plaintiffs' motion would not require Google to provide any additional discovery to Plaintiffs—indeed, Google would not be compelled to do any thing at all if Plaintiffs' motion were granted. *See* Memo. at 11. It was the intentional design of the Coordination Order to avoid burdening Google by allowing the Plaintiffs to obtain deposition transcripts directly from the court reporters—instead of requiring Google to re-produce them to Plaintiffs—and Plaintiffs' motion would maintain that provision. *See* Coordination Order, ¶ 6.b.

Google posits the Plaintiffs will somehow use Texas and its co-plaintiffs as "prox[ies]" to take additional discovery by "suggest[ing] specific documents and lines of deposition questioning" or providing "feedback." Opp. at 2, 8, 9. But Texas and its co-plaintiffs are sovereign states, not under the control of the Department of Justice or the State Plaintiffs in this case, and filed their own lawsuit against Google pre-dating this case by several years. Moreover, any coordination of litigation strategy that could occur as a result of Plaintiffs' motion is insignificant in comparison to the advantage Google already enjoys in coordinating its strategy between this case and the Texas Case. Google has some of the same law firms and individual lawyers deciding litigation strategy with the benefit of knowledge of the documents and depositions obtained in both this case and the Texas Case.

**B.  Granting Plaintiffs' Motion Is Necessary to Mitigate the Advantage Google Has of Taking Additional Discovery in the Texas Case Before Trial in This Case.**

Google refers multiple times to the pre-suit investigation undertaken by the Plaintiffs (*see* Opp. at 2, 6, 7) or that both sides were subject to the same discovery limitation in this case (*see* Opp. at 6). Those facts are beside the point. The issue is not what occurred in the past, but what is happening now: Google, using two of the same law firms and many of the same lawyers who have appeared in this case, is taking *forty* additional depositions and obtaining countless additional documents from relevant third parties in the Texas Case. Google can also use these depositions to decide which third party witnesses to call (or not call) in this trial. Furthermore, Google concedes that it is sending "document subpoenas [to] third-parties in the Texas Case for documents produced in connection with this action" (Opp. at 7), meaning that Google is *already* using knowledge learned from this case to guide its discovery strategy in the Texas case.

Google attempts to argue that discovery in the Texas Case is "focused on different issues than this case" because 71 paragraphs of the Texas complaint relate to state law claims. Opp. at 4. But Google neglects to explain that the Texas complaint spans 702 paragraphs, and the large majority of those allegations overlap with the issues in this case. *See* No. 21-md-3010, ECF No. 541. Indeed, in seeking to transfer this case to New York, Google argued at length that this case was simply "DOJ['s] … Own Version of the Texas Case." *See* Google's Memo. on Mot. to Transfer, ECF No. 44-2, at 10-12 ("The DOJ Case filed in this Court is strikingly similar to the Texas Case (and the other S.D.N.Y. Cases). They allege the same facts, relevant markets, and claims, and seek the same relief. They . . . share the same factual nucleus of shared documents. *And they will implicate the same or similar documents, data, party witnesses, and third parties as they progress through discovery*.") (emphasis added). And Google's counsel informed the Court at the transfer motion hearing that "this case is *exactly substantively identical* to the cases

that have been pending before Judge Castel for 18 months now," which included the Texas Case

at the time. *See* 3/10/2023 Hearing Tr., at 9:2-4 (emphasis added).

Google makes no argument that the Google witnesses who will be deposed in the Texas

Case will not provide information relevant to the issues in this case. As explained in Plaintiffs'

opening memorandum, Google witnesses should not be allowed to testify in a related matter on

substantively identical subjects without fear of impeachment in this matter merely because

Google refuses to allow access to those sworn statements. Nothing about that procedure is

consistent with Google's purported aim to "advance[] the truth-seeking function in litigation."

Google's Br. in Support of Coordination Order, ECF No. 166, at 6-7. And for third parties,

Google can assert only that "many"—but, importantly, not all or even the majority of—the third

parties are relevant only to the state law claims in the Texas Case. *See* Opp. at 6-7. If Google did

not anticipate deposing any third parties that are likely to appear as witnesses in this case, surely

it would have said so. Instead, Plaintiffs' understanding is that Google has already noticed

depositions in the Texas Case of third parties that were deposed in this case or appear on the

parties' initial disclosures (and therefore are potential trial witnesses).[1]

For third parties that are potential witnesses in this case, Google provides no explanation

for how its counsel appearing in both cases could ensure they do not: (a) rely on knowledge they

gained in this case (including the detailed knowledge of Plaintiffs' theories and supporting

evidence disclosed in Plaintiffs' expert reports) in deposing these potential witnesses, or (b) rely

on knowledge from these depositions in the Texas Case in crafting trial examinations in this case.

---

[1] Almost none of the arguments in Google's opposition about "asymmetry" or an advantage
gained by the Plaintiffs would be applicable to depositions of third parties taken in the Texas
Case. Opp. at 6. Google states that both sides "should remain[] bound by the appropriate
discovery limitations in this case" (*id.*), but ignores that it enjoys the benefit taking additional
third-party depositions in the Texas Case.

Even if unintentional, that reliance is unavoidable. *See* Memo. at 7-8 & n.2. Denying Plaintiffs'

motion risks the exact result (in reverse) that Google argues would be unjust: "[one side] obtains

no right to access more discovery of [the other side] while [that side] could use the new

discovery to inform their trial strategy." Opp. at 2.

### C.  Because the Use of Depositions and Documents from the Texas Case Would be for Impeachment Only, Google's Prejudice Arguments Are Unfounded.

The Coordination Order provisions that Plaintiffs seek to re-apply to the Texas Case are

limited in scope, only allowing documents or deposition transcripts from the Texas Case to be

used for impeachment at trial and very clearly not allowing them to "be admitted into evidence"

or used affirmatively "in any dispositive motion, pleading, or expert report." Coordination Order,

¶¶ 2.e., 6.d. That fact eliminates the risk of one-sided benefit to the Plaintiffs that Google alleges

as the basis for its prejudice argument. *See* Opp. at 5, 6, 8.

Both parties' theories have been disclosed in their discovery responses and expert reports,

and the upcoming summary judgment briefing will further crystallize the issues and arguments in

the case. Even if Plaintiffs would obtain more transcripts of depositions of Google witnesses

while Google would not receive additional depositions of Plaintiffs' party witnesses (*see* Opp. at

5, 6),[2] Plaintiffs could not alter their previously-disclosed theories and contentions based on

information from those depositions. Any additional information gleaned from documents or

depositions could only be used in the context of impeachment of a witness at trial. Enforcing an

exactly equal number of party depositions is no justification for removing the ability of the

---

[2] In making this argument, Google conveniently ignores that as a party to the MDL and Texas Case, it is already obtaining more depositions than the Plaintiffs in this case. Under the existing Coordination Order, Google can already use those depositions for impeachment in this case, and Google will inevitably apply some knowledge from its depositions in the Texas Case to advantage itself in this case. *See* Memo. at 7-8.

Plaintiffs to discipline a Google or third-party witness with their previous testimony under oath. Removing that possibility could only facilitate the ability of that witness to offer less than truthful testimony to the jury in this case.[3]

The limitation on using documents and depositions from the Texas Case only for impeachment also negates Google's concerns that some of the Texas Case depositions will be irrelevant (Opp. at 6-7) or that there is risk of confusing the issues for the jury (Opp. at 9). When a document or deposition testimony is used for impeachment at trial, a pre-condition to that use is that contrary testimony was already offered for the jury's consideration. Plaintiffs do not plan to offer irrelevant or confusing testimony to the jury, and, if any party does, then the Court would police that conduct at the time. Indeed, because the documents and depositions from the Texas Case could only be used for impeachment, it ensures that irrelevant facts contained therein—for example, those relating to the state law claims—would have no use in this case.

Google claims that the Court would be required to "parse through the extensive deposition testimony concerning facts and claims that are irrelevant to this proceeding for what is likely to be extremely limited impeachment value" (Opp. at 9) but provides no explanation for why the Court would be so burdened. It would be up to the parties, alone, to (a) determine if a document or deposition transcript from the Texas Case contradicts a witness's statement at trial and (b) perform the impeachment. And, in any event, Judge Brinkema is more than capable of determining whether a given prior statement is or is not appropriate impeachment, and policing the boundaries of such impeachment at the trial of this case. No additional work would be

---

[3] For similar reasons, the increased number of depositions that will occur in the Texas Case is beside the point. *Cf.* Opp. at 3, 4. Regardless of the number, the limitation on their use still applies, and it is important that, in both the Texas Case and the MDL, Google is afforded an equal number of depositions as the respective plaintiffs.

required of the Court unless and until a given witness testifies in a manner inconsistent with prior statements or documents. Likewise, there is no burden on Google to do anything unless it chooses to do so. *See* Memo. at 7, 11. Plaintiffs certainly do not object to "pars[ing]" deposition testimony to find the portions with relevant impeachment value, as Google claims would be necessary. Opp. at 9.

### D. Google's Other Arguments Likewise Lack Merit.

To further distract from the good cause that exists for Plaintiffs' motion, Google makes a series of additional factually incorrect arguments.

First, Google asserts that the benefit it sought from the Coordination Order was protection of its witnesses and that amending the Coordination Order would not promote that benefit. Opp. at 10. But Google ignores that for multiple months before the Texas Case was remanded, the Texas Plaintiffs were bound by the Coordination Order and Google obtained benefits during that period, including protections for its witnesses. For example, a former Google executive was deposed for two consecutive days on August 16-17, 2023 pursuant to a notice from the Plaintiffs and cross-notice from the MDL plaintiffs, including the Texas Plaintiffs. Google obtained the benefit of having that witness deposed once, instead of multiple times, across the related cases. Thus, it is the Plaintiffs, not Google, who are currently being denied the benefit they bargained for in the Coordination Order process. *See* Memo. at 2.

Second, Google claims twice that Plaintiffs only used 18 of their allocated 20 third-party depositions in this case. Opp. at 2, 7. That is simply factually wrong. Plaintiffs noticed 11 depositions of third-party witnesses and cross-noticed 9 depositions of third-party witnesses initially noticed by Google. Indeed, it is notable that Google, and Google alone, chose to use less than their allotted portion of third-party witnesses (even though it was Google that initially sought a higher number of third-party depositions than Plaintiffs).

Third, Google argues that this Court should reject limited coordination with the Texas Case because Judge Castel in New York did not order additional coordination between the Texas Case and the MDL. Opp. at 4, 8. Judge Castel rightly has broad discretion to manage the litigation in the MDL as he sees fit, and his rationale for denying coordination (which appears to be that it would complicate the completion of depositions in the MDL—*see* No. 21-md-3010, ECF No. 708) does not apply here. This Court has already ordered coordination with the MDL (and the Texas Case while it was part of the MDL) in the same manner that Plaintiffs seek here. The issue is whether that coordination should be re-applied to the Texas Case, which is not the issue that was before Judge Castel.

Fourth, Google attempts to minimize the inconsistency between its arguments here and its recent statement to the Court in the Texas Case. Opp. at 10 n.3. But Google's counsel's statement that "Google has made it very clear to plaintiffs that as regards Virginia, we intend to do everything that we can to sort of continue the effectuation of the existing coordination order that was entered in Virginia and the MDL" speaks for itself. *See* Memo. at 5-6 (quoting same).

Fifth, Google asserts that Plaintiffs are asking this Court to "overrule" the protective order in the Texas Case. Opp. at 5 n.1. That is not correct. As made clear in Plaintiffs' motion and proposed order, the proposed amendments to the Coordination Order would only become effective when also entered by the court in the Texas Case, which is the same procedure used to implement the existing Coordination Order. *See* Proposed Order, ECF No. 550-1, at 2; Memo. at 11-12; Coordination Order, ¶ 10.

## CONCLUSION

For the reasons stated here and in Plaintiffs' opening memorandum, Plaintiffs respectfully request that the Court grant Plaintiffs' motion to amend the Coordination Order.

10

Dated: April 18, 2024

Respectfully submitted,

JESSICA D. ABER
United States Attorney

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Julia Tarver Wood
JULIA TARVER WOOD
MICHAEL E. WOLIN
AARON M. TEITELBAUM

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov
Attorneys for the United States

JASON S. MIYARES
Attorney General of Virginia

/s/ Tyler T. Henry
STEVEN G. POPPS
Deputy Attorney General
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for the Commonwealth of
Virginia and local counsel for the
States of Arizona, California,
Colorado, Connecticut, Illinois,
Michigan, Minnesota, Nebraska, New
Hampshire, New Jersey, New York,
North Carolina, Rhode Island,
Tennessee, Washington, and West
Virginia

# EXHIBIT 7

# Transcript of Hearing on Motion to Amend Coordination Order

# April 19, 2024

# (E.D. Va.)

```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3     --------------------------x
       UNITED STATES, et al.,      :    Civil Action No.:
 4                                 :    1:23-cv-108
                   Plaintiffs,     :
 5          versus                 :
                                   :    Friday, April 19, 2024
 6     GOOGLE LLC,                 :    Alexandria, Virginia
                                   :    Pages 1-23
 7                  Defendant.     :
       --------------------------x
 8
            The above-entitled motions hearing was heard before
 9     the Honorable John F. Anderson, United States Magistrate
       Judge.
10
                    A P P E A R A N C E S:
11
       FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
12                            OFFICE OF THE UNITED STATES ATTORNEY
                              2100 Jamieson Avenue
13                            Alexandria, Virginia  22314
                              (703) 299-3700
14
                              JULIA TARVER WOOD, ESQUIRE
15                            AARON TEITELBAUM, ESQUIRE
                              MICHAEL WOLIN, ESQUIRE
16                            UNITED STATES DEPARTMENT OF JUSTICE
                              ANTITRUST DIVISION
17                            450 Fifth Street, NW
                              Washington, D.C.  20530
18                            (202) 894-4266

19                            TYLER HENRY, ESQUIRE
                              OFFICE OF THE ATTORNEY GENERAL
20                            OFFICE OF THE SOLICITOR GENERAL
                              202 North Ninth Street
21                            Richmond, Virginia  23219
                              (804) 786-7704
22

23

24

25
                                                              1
```

```
 1                          A P P E A R A N C E S:

 2   FOR THE DEFENDANT:      CRAIG REILLY, ESQUIRE
                             LAW OFFICE OF CRAIG C. REILLY
 3                           209 Madison Street
                             Suite 501
 4                           Alexandria, Virginia  22314
                             (703) 549-5354
 5
                             BRADLEY JUSTUS, ESQUIRE
 6                           KENINA LEE, ESQUIRE
                             CAROLINE BOISVERT, ESQUIRE
 7                           AXINN, VELTROP & HARKRIDER LLP
                             1901 L Street, NW
 8                           Washington, D.C.  20036
                             (202) 699-0950
 9
     TRANSCRIBER:            STEPHANIE M. AUSTIN, RPR, CRR
10                           Transcriber
                             United States District Court
11                           401 Courthouse Square
                             Alexandria, Virginia  22314
12                           (571) 298-1649
                             S.AustinReporting@gmail.com
13
            (TRANSCRIPT PROCEEDINGS RECORDED BY THE FTR SYSTEM)
14

15

16

17

18

19

20

21

22

23

24

25
                                                                    2
```

```
1              P R O C E E D I N G S
2         THE DEPUTY CLERK:  United States, et al. versus
3   Google LLC, Civil Action Number 23-cv-108.
4         MR. MENE:  Good morning, Your Honor.  Gerard Mene
5   with the U.S. Attorney's Office.
6         MS. WOOD:  Good morning, Your Honor.  Julia Wood
7   for the Department of Justice for the plaintiffs.  My
8   colleague, Michael Wolin, will be arguing today.
9         THE COURT:  Okay.
10        MR. WOLIN:  Good morning, Your Honor.
11  Michael Wolin from the Department of Justice.
12        THE COURT:  Thank you.
13        MR. TEITELBAUM:  Good morning, Your Honor.  Aaron
14  Teitelbaum, also from the Department of Justice.
15        THE COURT:  Thank you.
16        MR. HENRY:  Good morning, Your Honor.  Ty Henry
17  from the Virginia Attorney General's Office on behalf of the
18  plaintiff states.
19        THE COURT:  Thank you.
20        MR. JUSTUS:  Good morning, Your Honor.
21  Bradley Justus for Google.  I have my colleagues, Kenina Lee
22  and Caroline Boisvert, and then Craig Reilly, our local
23  counsel.
24        THE COURT:  Okay.  Who's going to argue for?
25        MR. JUSTUS:  I will.
```
                                                                    3

```
 1                THE COURT:  Okay.  Thank you.  Well, I've read the

 2      papers that the parties submitted, so I'll hear any

 3      arguments that you want to make.

 4                Thank you.

 5                MR. WOLIN:  Thank you, Your Honor.

 6                The focus of plaintiffs' motion is one question,

 7      should the Texas case against Google be treated differently

 8      than the MDL case against Google, and we believe the answer

 9      is no, it should be treated the same.

10                THE COURT:  Let me just make sure I understand the

11      facts.  When Texas was part -- well, let me step back.

12                The case that got transferred from Texas to the

13      MDL and then from the MDL back to Texas, was the case that

14      was transferred to the MDL the entire action that was

15      pending in Texas, or were there other parties in the Texas

16      action that continued with a case in Texas and then were

17      rejoined by the attorney general of Texas and the others?

18                MR. WOLIN:  No, Your Honor.  The entire case that

19      Texas's co-plaintiffs filed against Google was transferred

20      to the MDL and then subsequently remanded to Texas.

21                THE COURT:  And when the coordination order was

22      negotiated in the MDL and in this court, at that time, the

23      Texas -- the request to transfer the case back to Texas was

24      pending, so the parties knew that that was something that

25      was on the horizon or could happen; is that right?
```

4

```
 1              MR. WOLIN:  Yes, that's correct, Your Honor.  The
 2    parties anticipated that any case that was in the MDL could
 3    be remanded to its home district, either during discovery or
 4    after discovery was over, which was the reason that the
 5    coordination order allowed for that.  But, in this instance,
 6    it's important.
 7              THE COURT:  Well, it specifically says that if
 8    it's transferred, that the party will be a non-party.  That
 9    once it gets transferred, that party whose case gets
10    transferred is considered to be a non-party.
11              MR. WOLIN:  It says, Your Honor, that if any case
12    gets transferred out of the MDL, the parties will meet and
13    confer and determine at that time, based on where each case
14    is in its timeline, what additional coordination is
15    necessary or proper.  And we believe in this instance,
16    because Texas was transferred while there was still
17    discovery outstanding in Texas, that it was important.
18              THE COURT:  Well, that's -- let's look at the
19    order.  Do you have it in front of you?
20              MR. WOLIN:  Yes.  Of course, Your Honor.
21              THE COURT:  Okay.  Well, it talks about some
22    discussions, but it also says that the transferred case,
23    they will be treated as a non-party; doesn't it?
24              MR. WOLIN:  Yes.  That's correct, Your Honor.
25              THE COURT:  Okay.  So unless and until something
```

5

```
 1    happens, they're a non-party.
 2             MR. WOLIN:  That's correct, Your Honor.  And
 3    that's why we're here today because the coordination order
 4    suggested that the parties meet and confer and determine
 5    what coordination would be appropriate, and we believe that
 6    further coordination is appropriate, given that discovery is
 7    continuing in Texas and depositions are going to be taken,
 8    including depositions of witnesses that are listed on the
 9    parties' initial disclosures in this case.
10             And in that instance, we think that continuing the
11    coordination order is appropriate, specifically because it
12    allowed for the plaintiffs in this case to obtain deposition
13    transcripts for witnesses that were deposed in other cases
14    after discovery closed in this case.  And that was part of
15    the benefit that we bargained for, and we think that it's
16    appropriate to order that given that and all the other
17    reasons that we put forward for why coordination makes
18    sense.
19             THE COURT:  Well, your brief says that the
20    New York court has not -- that the approval of the New York
21    court has not occurred to date.
22             MR. WOLIN:  Yes.  That's correct, Your Honor.
23             THE COURT:  It was denied; right?
24             MR. WOLIN:  It was denied.
25             THE COURT:  Well, help me understand how you can
```

6

1    tell me in your opening brief that it has not occurred to

2    date, when, in fact, it has been requested and denied.

3           MR. WOLIN:  Well, I mean, it hadn't occurred at

4    the time that we filed it.  It's always open to reurging by

5    the parties in the MDL.  The coordination order in the MDL

6    was jointly proposed by Google and the MDL plaintiffs.

7    Judge Castel decided not to implement it; he had his

8    reasons.

9           But, respectfully, that's not the situation that

10   we have in our case.  Discovery is still open in the MDL,

11   and Judge Castel's order was premised on the idea that it

12   might slow down discovery here -- in that case.  But, here,

13   discovery is closed; it's not going to slow anything down.

14   We're just asking to be able to obtain the deposition

15   transcripts and documents that Google obtains in Texas

16   without any burden on Texas itself.

17          We specifically set up the coordination order so

18   there would be no burden.  We can order the deposition

19   transcripts directly from the court reporters.  Google is

20   not involved in that at all.  They don't have to produce any

21   documents to us.  It's their choice.  If they want to

22   produce documents that they obtain in Texas and thereby get

23   the right to use those in our case, it's their option;

24   they're not forced to do it.  And we think this is an

25   important issue particularly because --

                                                              7

```
 1              THE COURT:  Well, if it's an important issue and
 2    the case was transferred to Texas November 1 and you're
 3    bringing this to the Court at the end of April, why do you
 4    wait five months to do that if it's so important an issue
 5    for you?
 6              MR. WOLIN:  Of course, Your Honor.
 7              The process of transferring the case to Texas was
 8    very long and drawn out; it had to go through the JPML, as
 9    well as the Second Circuit.  And then once the case was
10    transferred to Texas, the parties in the Texas litigation
11    began negotiating their own coordination order, which we
12    discussed in our brief, which would have provided us access
13    to deposition transcripts from that case, which was the main
14    objective, the main bargain that we had wanted out of the
15    coordination order.  And when it looked like that wasn't
16    occurring, we realized that really the better path would be
17    to just fully extend the coordination order to the Texas
18    case again as it was when the coordination order was
19    eventually -- or was first implemented.  And we met and
20    conferred with Google, and now we're before Your Honor.
21              We observed in the Texas litigation that the judge
22    there seemed open to coordination with this case.  He had
23    ordered that the deposition transcripts from the Texas case
24    could be shared with us, and then when the coordination
25    order didn't come into effect because of Judge Castel, he
```

8

```
 1  said again from the bench that he would be welcoming
 2  coordination between the cases, and he would be there
 3  willing to help if it was needed by the parties.
 4          THE COURT:  Well, help me understand.  If I was
 5  inclined to grant your request, is that a back door getting
 6  around what Judge Castel has already done?  Since the MDL
 7  parties have access to the discovery in this case, wouldn't
 8  I be somehow or another undoing what he had already decided,
 9  which you say in your brief it hasn't occurred to date when
10  it had actually been decided?
11          And that is -- that is troublesome that you would
12  write a brief and present it to the Court in a matter that
13  has been presented to a district judge in the MDL and
14  decided and tell me that it has not -- that nothing has
15  occurred to date.
16          MR. WOLIN:  We apologize for that, Your Honor.  We
17  thought we were clear.
18          But to get to Your Honor's question, we don't
19  think it's a back door way around Judge Castel's opinion on
20  not allowing further coordination between the MDL and the
21  Texas case.
22          Judge Castel already implemented coordination with
23  this case and the --
24          THE COURT:  But if you get discovery in this case,
25  it's coordinated with the MDL case; right?
```

9

```
 1          MR. WOLIN:  Castel ruled about coordination of
 2   depositions that still were taking place between the MDL and
 3   the Texas case, but that's not the -- we don't have any
 4   ability to share the depositions that we obtained from Texas
 5   if the order is implemented with the MDL.  The coordination
 6   order covers discovery obtained in this case -- the existing
 7   coordination with the MDL covers the discovery that we
 8   obtained in this case; it doesn't necessarily cover the --
 9   anything that we would get for impeachment purposes.
10          THE COURT:  But documents you get in this case you
11   share with the MDL; right?
12          MR. WOLIN:  It would give -- I mean, the
13   coordination order now does give us the ability to share
14   discovery, correct.
15          THE COURT:  Right.  And deposition transcripts are
16   discovery.
17          MR. WOLIN:  Yes, Your Honor.
18          THE COURT:  A product of discovery.
19          So wouldn't -- if, in fact, you know, you were
20   getting deposition transcripts from the 80-or-so depositions
21   that are going on in Texas -- which is much different than
22   when this was negotiated.  There was a set number of
23   depositions that were going to be taken in the MDL and in
24   our case, now Texas apparently has decided you can take up
25   to 80 depositions or something, so it's a much different
```

                                                              10

```
 1   animal now.  But if you get a deposition transcript through
 2   a coordination order in our case, doesn't that give the MDL
 3   proceeding access to that since it's discovery in this case?
 4          MR. WOLIN:  I don't think that's necessarily
 5   correct.  The Texas protective order may prevent that,
 6   but --
 7          THE COURT:  Well, the -- I don't know the Texas
 8   protective order.  I don't know whether it allows you to get
 9   it here; so ...
10          MR. WOLIN:  I mean, the Texas protective order
11   requires that discovery from the Texas case only be used in
12   that case, which is why a coordination order with that case
13   would be required to use some of the discovery here.
14          But Judge Castel didn't seem to be worried about
15   sharing of the -- under the coordination order even if it
16   applied to the Texas case.  He was most concerned with not
17   slowing down the depositions that were occurring in the MDL.
18          THE COURT:  And when are they going to be done,
19   the depositions in the MDL?
20          MR. WOLIN:  June 28th.
21          THE COURT:  And when's the Texas?
22          MR. WOLIN:  May 3rd, Your Honor.
23          THE COURT:  May 3rd?
24          MR. WOLIN:  Yes.
25          THE COURT:  Okay.  And how many depositions are
```

11

```
 1   they allowing in the Texas case?

 2             MR. WOLIN:  In the Texas case, they're allowed 40

 3   per side.

 4             THE COURT:  When you negotiated this order --

 5   coordination order, at that point in time, how many

 6   depositions were the parties allowed to take?

 7             MR. WOLIN:  In this case, the parties were allowed

 8   10 party depositions and 20 third-party depositions.  In the

 9   MDL case, Judge Castel put an initial limit of 15

10   depositions per side, but was open.  As I think he said in

11   his discovery order, he would be open to extending that for

12   a showing of good cause.

13             But, Your Honor, nothing in the coordination order

14   and the negotiations that went into it were premised on the

15   number of depositions.  It doesn't say in the coordination

16   order that it only applies if the number of depositions are

17   roughly equivalent, or it would not apply if Judge Castel

18   ordered more depositions.

19             The number of depositions is really not the most

20   important factor here.  The factor here is the fact that

21   Google is out there taking these depositions.  And Google

22   has an equal number of depositions in Texas as the Texas

23   plaintiffs do, so there's no unfairness there.  But the

24   unfairness to us here is because Google is out there taking

25   these depositions of parties that are listed on our initial
```

12

```
 1    disclosures that may have been deposed in our case, and
 2    there's really an unavoidable risk to Google's counsel, who
 3    are the same counsel in this case.  Two of the same law
 4    firms and several of the same individual lawyers appeared in
 5    both cases.  The harm to us is that they will be out there
 6    taking depositions of these witnesses and then making
 7    decisions about whether to call those witnesses and how they
 8    examine them at trial in our trial here in this courthouse.
 9            And even if they do their best to not share
10    information between the cases -- which wouldn't be
11    allowed -- it's just human nature that it's inevitable that
12    they will unconsciously make decisions based on information.
13    They can't unknow something that they learned in the Texas
14    case from the depositions they're taking there when they're
15    making the decisions about what witnesses to call here and
16    how to cross-examine witnesses that we may call.
17            Thank you, Your Honor.
18            THE COURT:  Okay.
19            MR. WOLIN:  Do you have questions?
20            THE COURT:  No.  Thank you.
21            MR. WOLIN:  Thank you.
22            MR. JUSTUS:  Thank you, Your Honor.
23            THE COURT:  Go ahead.
24            MR. JUSTUS:  Thank you, Your Honor.
25            This circumstance of Texas being remanded to a
```

13

```
1    separate proceeding was considered when the coordination

2    order was entered, and Texas was explicitly carved out of

3    this coordination order in the event of remand for the

4    obvious reason that the circumstances may be very different

5    when and if the case got remanded.  And now we're in those

6    different circumstances.

7            This case has had discovery closed for seven

8    months.  Summary judgment is due next Friday.  We're going

9    to trial later this year, and Texas has -- the Texas case

10   allows a number of depositions in this case that is far in

11   excess of those that have -- the Texas case allows a number

12   of depositions in that case that is far in excess of the

13   number of depositions that were allowed in this case.

14           If this coordination order modification were

15   granted, more depositions would come back into this case

16   than were initially taken in this case.

17           THE COURT:  They would only come back in this case

18   for the purposes of impeachment; is that right?

19           MR. JUSTUS:  Yes, Your Honor.  They would come

20   back in for the purposes of impeachment.

21           But the problem is is what sort of asymmetry does

22   that create?  The DOJ, I think, more or less concedes in

23   their reply brief that if this modification is granted, they

24   will discuss the Virginia discovery materials with Texas.

25           THE COURT:  Well, they had a right to discuss it
```

14

```
 1   with Texas up until the case got transferred.

 2            MR. JUSTUS:  Absolutely.  The problem is is that

 3   they can discuss it with Texas, suggest lines of questioning

 4   for these Texas depositions of Google employees, they will

 5   bring those depos back into this Virginia case for either

 6   impeachment, and also maybe even more importantly, to guide

 7   their trial strategy.  And this is after the government has

 8   had three years of pre-suit investigation, numerous depos

 9   here.  It really works a huge asymmetry.  And, again, this

10   case is buttoned up and getting ready for trial.  This isn't

11   the time to bring back in all this new paper.

12            THE COURT:  How many depositions have been taken

13   in the Texas case?

14            MR. JUSTUS:  So, to date -- it's a small number.

15   I think -- I think it's less than ten; however, over the

16   next three weeks of discovery, and possibly for a limited

17   extension of discovery, there are multiple depos happening

18   every day.

19            THE COURT:  And what --

20            MR. JUSTUS:  Almost every day, I think.

21            THE COURT:  Tell me a little bit more about the

22   issue that was presented to Judge Castel and his decision on

23   that front in the -- I guess the decision not to coordinate

24   between Texas and the MDL proceeding.

25            MR. JUSTUS:  Yeah.  So I think that the parties
```

15

1  presented to Judge Castel the possibility of entering this

2  coordination order between the current MDL and Texas.  And

3  Judge Castel denied it, saying that the MDL case is getting

4  towards the end of discovery, and now is not the time to

5  bring in new deposition coordination into that case,

6  recognizing discovery is almost over.

7          In a lot of ways, Your Honor, I think Judge Castel

8  had more reason to grant this than this Court does, because

9  if Judge Castel had granted this, there was some efficiency

10  in that certain Google deponents wouldn't have had to sit

11  twice, certain third-parties wouldn't have had to sit twice.

12  If this Court granted that relief, even that benefit would

13  not be there, as Your Honor pointed out.

14          There would also be this weird result where

15  there's all this material flowing back into the MDL in

16  contravention of Judge Castel's order through kind of a back

17  door amendment.

18          THE COURT:  All right.  I think I understand your

19  argument.

20          I'll hear anything else from the plaintiffs.

21          MR. WOLIN:  Yes, Your Honor.  I want to start with

22  just a few points, Your Honor.

23          First, counsel from Google talked about the

24  ability of -- or the potential that the United States or the

25  plaintiffs in this case would coordinate directly with

16

1    counsel for Texas to discuss questions or something along

2    those lines. And those were pointed out in our paper.

3    They're their own litigants, they're doing their own

4    strategy.

5         But what's more important, I think, is Google that

6    has the same attorneys who are representing it in both cases

7    and are doing that type of coordination already. They have

8    sent subpoenas to many third parties out of the Texas

9    litigation, including the federal agencies who provided

10   documents in this case, which -- and asking to renotice

11   discovery from this case in the Texas case, which shows that

12   they're already crafting their discovery strategy in the

13   Texas case based on information from this case. So that

14   type of coordination or strategizing was already occurring.

15        And the second thing I want to just go back to is

16   the provision in the coordination order about what would

17   happen if a case was remanded. The -- at the time the

18   parties were negotiating the coordination order, they

19   understood that, at some point, cases from the MDL would be

20   remanded to their home districts for trial or additional

21   proceedings, and the parties negotiated and agreed to the

22   language that they would -- if that occurred, they would

23   continue to meet and confer about whether and how

24   coordination would occur.

25        THE COURT: Well, but -- there is that language,

17

```
 1   but there's also two specific instances in the coordination

 2   order in paragraph bb -- 1bb:  "For the avoidance of doubt,

 3   unless and until a further order directs otherwise, an

 4   individual or entity ceases to be a party" -- that is party

 5   under the terms of this agreement -- "if all claims that it

 6   asserts or have been asserted against it in the MDL of the

 7   Virginia case have been dismissed or otherwise adjudicated

 8   by a district court or transferred to a court other than one

 9   of the district courts."

10          MR. WOLIN:  Yes.

11          THE COURT:  And then it says in paragraph 9:  "If

12   all claims brought by an MDL plaintiff are dismissed,

13   transferred or remanded, then the MDL plaintiff shall be

14   treated as a non-party for the purposes of this order after

15   such dismissal, transfer or remand."

16          MR. WOLIN:  Yes, Your Honor.  And that's why we're

17   before Your Honor today.

18          But what is important is that when we were

19   negotiating it, we contemplated that a remand after

20   discovery had been completed in the MDL and there would be

21   no more discovery in the home district, it would be very

22   different than a remand in this circumstance where Texas was

23   remanded with additional --

24          THE COURT:  Where does it say that in this?  You

25   know, Texas was fighting long and hard to get this case out
```

18

```
 1   of the MDL at the time this was being negotiated, you knew
 2   that.  That isn't what you say here.
 3           MR. WOLIN:  Well, Your Honor, the order says what
 4   it says, and it says that there would be further discussion
 5   about whether and how there would be additional
 6   coordination, which contemplates that there could be an
 7   additional order, which is why we're here today seeking that
 8   additional order, because for all of the reasons that it
 9   made sense to order coordination when Texas was part of the
10   MDL, it still makes sense to order coordination with the
11   Texas case now that it's separate from the MDL.
12           THE COURT:  All right.
13           MR. WOLIN:  Just one final point, Your Honor.
14           At the time the coordination order was entered,
15   remand was with the Second Circuit.  Google was opposing it
16   at that point.  So it was not at all clear that there would
17   actually be a remand of the Texas case to its home
18   jurisdiction.
19           THE COURT:  And again, explain to me why you're
20   bringing this to me in April when the remand became
21   effective in November.
22           MR. WOLIN:  As I explained, Your Honor, the --
23   after the remand became effective, the Texas -- Texas and
24   Google proposed coordination orders to the Court there,
25   which would have provided the Virginia plaintiffs with the
```

19

```
 1    same benefits that they were seeking here.  We thought if
 2    that was sufficient to meet -- to create the level playing
 3    field that we were hoping for at trial that we wouldn't have
 4    to burden the Court, but it seems like that's not happening.
 5    And it's not happening for any reason -- it's happening
 6    because Judge Castel didn't want to coordinate his case with
 7    the Texas case -- with the MDL with the Texas case.  It had
 8    nothing to do with the provision that the Virginia
 9    plaintiffs would be able to obtain deposition transcripts
10    from the Texas case.
11            I mean, Judge Jordan in Texas agreed with that and
12    ordered it.  But to effectuate that, because Judge Castel
13    didn't enter the order, we needed to come here, which is
14    what we're doing and what was contemplated in the
15    coordination order originally, that we would seek additional
16    relief if it was justified when a remand occurred.
17            THE COURT:  All right.  Thank you.
18            MR. WOLIN:  Thank you, Your Honor.
19            THE COURT:  Well, I've reviewed the materials that
20    the parties submitted, I've heard the argument that's been
21    presented here today.  At this point, I don't think that the
22    motion should be granted.
23            First of all, you know, this coordination order
24    was negotiated through a long and difficult process, and the
25    parties agreed to certain provisions at that time.  And at
```

20

1    that time, the case was the MDL case and the Virginia case,

2    and the discovery was set as to what was going to be

3    happening in the MDL case and what was going to be happening

4    in the Virginia case.

5             The parties, you know, made an agreement at that

6    point in time, and the agreement is specific, where it says

7    that if a case gets transferred or remanded -- and this

8    is -- you know, everybody knew it was -- potentially it was

9    going to happen, that that was -- the result of that was

10   that the parties in that remanded case are going to be

11   non-parties.  It's that clear.

12            It does say that, you know, you can come back and

13   and talk about what -- regarding whether and on what

14   conditions the transferred cases should be coordinated with

15   the MDL in Virginia cases, but it doesn't say they will be.

16            Again, I'm not sure why, when this issue came up

17   in November, we're now dealing with it in April on the eve

18   of filing summary judgment motions and motions in limine and

19   four months before the trial in this case.

20            I'm also concerned, to be honest with you -- you

21   know, the Texas case is a much different case now that it's

22   in Texas than it was in the MDL.  Obviously there are

23   issues, and, as Google has pointed out, there are some other

24   claims that weren't being involved in the MDL case, the --

25   that are now part of the Texas case.  A bigger case, a lot

                                                              21

```
 1   more depositions involved, a completely different set of
 2   circumstances.  And I'm concerned that the MDL Court has
 3   denied a similar request.  And we are coordinating with the
 4   MDL Court, and for our Court to take a different position
 5   than the MDL Court, whether it could be used as a back door
 6   for the MDL plaintiffs or not, I think is an open issue.  I
 7   don't think it's as clear as the plaintiffs in this case
 8   indicate, that if you're getting information through a
 9   coordination of discovery -- and it is discovery -- that
10   there may be the opportunity to share that information with
11   the MDL plaintiffs would again be backdooring Judge Castel's
12   denial of a request, not just a he-hasn't-acted-on-it kind
13   of a request.
14           So, for all these reasons, I deny the motion at
15   this time.
16           Anything else from the parties today?
17           MR. JUSTUS:  No, Your Honor.
18           THE COURT:  Okay.  Anything else?
19           MS. WOOD:  Your Honor, I just want to make one
20   clarification for the record.
21           The day the MDL -- the Texas case was remanded, I
22   sent an email personally to counsel for Google to begin the
23   coordination process for the coordination.  I just don't
24   want the Court left with the misimpression that we didn't
25   act promptly.
```

22

```
 1              THE COURT:  And as you know, you can file a motion

 2   on a Friday and get it heard the following Friday.

 3              MS. WOOD:  Understood, Your Honor.  We --

 4              THE COURT:  That's exactly what you did in this

 5   case, and you filed that motion a week ago today.

 6              MS. WOOD:  Yes, Your Honor.  We foolishly thought

 7   that we could negotiate something with Google.

 8              THE COURT:  Okay.  All right.  Okay.  Anything

 9   else?

10              Court will be adjourned.

11                   (Proceedings adjourned.)

12              ---------------------------------

13   I certify that the foregoing is a true and accurate, to the

14   best of my ability, transcription of proceedings recorded by

15   electronic sound recording (FTR system).

16

17                        Stephanie Austin

18                        Stephanie M. Austin, RPR, CRR

19

20

21

22

23

24

25
```

23

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649