# EXHIBIT 3

HIGHLY CONFIDENTIAL

Page 1

```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
                   ALEXANDRIA DIVISION


   _____
                              :
   UNITED STATES OF AMERICA,  :
   et al.,                    :
                              :
          Plaintiffs          :
                              :
          v.                  :  No.  1:23-cv-00108
                              :
   GOOGLE, LLC,               :
                              :
          Defendants.         :
   _____:


                   HIGHLY CONFIDENTIAL

                 Monday, August 21, 2023

          Video Deposition of CHRISTOPHER KOEPKE,
   taken at the Law Offices of Paul, Weiss,
   Rifkind, Wharton & Garrison LLP, 2001 K St NW,
   Washington, DC, beginning at 9:35 a.m. Eastern
   Standard Time, before Ryan K. Black, Registered
   Professional Reporter, Certified Livenote
   Reporter and Notary Public in and for the
   District of Columbia



   Job No. CS6043164
```

HIGHLY CONFIDENTIAL

Page 2

1  A P P E A R A N C E S:
2
3  UNITED STATES DEPARTMENT OF JUSTICE
   ANTITRUST DIVISION
4  BY:  KATHERINE CLEMONS, ESQ.
       VICTOR LIU, ESQ.
5      ALVIN CHU, ESQ.
       MARK SOSNOWSKY, ESQ. - Via Zoom
6  450 5th Street, N.W
   Washington, DC 20530
7  202.514.2414
   katherine.clemons@usdoj.gov
8  victor.liu@usdoj.gov
   alvin.chu@usdoj.gov
9  mark.sosnowsky@usdoj.gov
10 Representing - The United States of America
11
12 PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP,
   BY:  MARTHA L. GOODMAN, ESQ.
13      HEATHER C. MILLIGAN, ESQ.
   2001 K St NW,
14 Washington, DC
   202.223.7341
15 mgoodman@paulweiss.com
   hmilligan@paulweiss.com
16
   Representing - Google LLC
17
18
19
20
21
22
23 ALSO PRESENT:
24 Orson Braithwaite - Legal Videographer
   Kenneth Whitley - Department of Health and Human
25            Services
26

Page 3

1           I N D E X
2  TESTIMONY OF:  CHRISTOPHER KOEPKE        PAGE
3  By Ms. Goodman................................6
4           E X H I B I T S
5  EXHIBIT    DESCRIPTION          PAGE
6  Exhibit 65   a document Bates Numbered
              CMS-ADS-11906 through 11974...117
7
   Exhibit 66   a document Bates Numbered
8             CMS-ADS-23248 through 23337...136
9  Exhibit 67   a document Bates Numbered
              CMS-ADS-59892 through 59893...151
10
   Exhibit 68   a document Bates Numbered
11            CMS-ADS-593107 through 593110..167
12 Exhibit 69   a document Bates Numbered
              CMS-ADS-183807 through 183811..181
13
   Exhibit 70   a document Bates Numbered
14            CMS-ADS-529199 through 529200..190
15 Exhibit 71   a document Bates Numbered
              CMS-ADS-189390.................251
16
   Exhibit 72   a document Bates Numbered
17            CMS-ADS-64968 through 64971....258
18 Exhibit 73   a document Bates Numbered
              CMS-ADS-440295.................265
19
   Exhibit 74   a document Bates Numbered
20            CMS-ADS-531032 through 531072..268
21 Exhibit 75   a document Bates Numbered
              CMS-ADS-569654 through 569667..273
22
23
24
25

Page 4

1        THE VIDEOGRAPHER:  Good morning.  We are
2  going on the record at 9:35 a.m. on August 21st,
3  2023.  Please note that the microphones are
4  sensitive and may pick up whispering and private
5  conversations.  Please mute your phones at this
6  time.  Audio and video recording will continue to
7  take place unless all parties agree to go off the
8  record.
9        This is Media Unit 1 of the
10 video-recorded deposition of Mr. Christopher
11 Koepke in the matter of United States, et al.,
12 versus Google, LLC, filed in the United States
13 District Court Eastern District of Virginia
14 Alexandria Division, Case Number
15 1:23-cv-00108-LMB-JFA.
16       My name is Orson Braithwaite,
17 representing Veritext Legal Solutions, and I'm
18 the videographer.  The court reporter is Ryan
19 Black, from the firm Veritext Legal Solutions.
20       Counsel will now state their appearances
21 and affiliations for the record.
22       MS. GOODMAN:  Martha Goodman, from Paul
23 Weiss, on behalf of Google LLC.
24       MS. MILLIGAN:  Heather Milligan, also on
25 behalf of Paul Weiss, for Google.

Page 5

1        MS. CLEMONS:  Katherine Clemons, with
2  the Department of Justice, on behalf of the
3  United States of America, CMS and the witness.
4        MR. LIU:  Victor Liu, also with the
5  Department of Justice, on behalf of the United
6  States and CMS.
7        MR. CHU:  Alvin Chu, on behalf of United
8  States.
9        MR. WHITLEY:  Kenneth Whitley, Office of
10 General Counsel, Department of Health and Human
11 Services.
12       MS. GOODMAN:  And could the folks
13 attending remotely please state your presence?
14       MR. SOSNOWSKY:  Mark Sosnowsky,
15 Department of Justice, and I will be in and out
16 of this deposition remotely.  So if you lose me,
17 please don't -- you can continue.
18       THE VIDEOGRAPHER:  Thank you.
19       Would the court reporter please swear in
20 the witness?
21         *   *   *
22 Whereupon --
23       CHRISTOPHER KOEPKE,
24 called to testify, having been first duly sworn
25 or affirmed, was examined and testified as

2 (Pages 2 - 5)

Page 218

1  thing. And -- and just describe other products
2  and ask us what our goals are, and what have you,
3  so that they would have a better understanding
4  about how -- about how their products could be
5  used, because, of course, they're trying to sell
6  their products.
7      Q. Did you find those meetings to be
8  valuable?
9         MS. CLEMONS: Objection to form.
10        THE WITNESS: Valuable in what way?
11 BY MS. GOODMAN:
12     Q. Valuable to the work that you do at CMS
13 in advertising.
14        MS. CLEMONS: Objection; form.
15        THE WITNESS: I find them valuable, in
16 part, because it's really interesting to me to
17 see how people do their work. And, yes, some of
18 the data analytics that we've actually requested
19 that they've done for us have been valuable.
20 BY MS. GOODMAN:
21     Q. Despite these meetings also being an
22 opportunity for Google to explain how their
23 products could be used, because, of course,
24 they're trying to sell their products, does CMS
25 still make an independent decision about which

Page 219

1  advertising products or services to use?
2      A. Absolutely, yes.
3      Q. Okay. Anything else, sitting here
4  today, that you can recall about any
5  conversations you have had with any individual
6  from Google --
7         MS. CLEMONS: Objection; form.
8  BY MS. GOODMAN:
9      Q. -- relative to CMS's advertising?
10        MS. CLEMONS: Same objection.
11        THE WITNESS: That's a lot to try to
12 recall. So it -- true specifics? No.
13 Conversations? Yes.
14 BY MS. GOODMAN:
15     Q. Any other types of conversations, other
16 than what we've discussed which you recall having
17 with Google?
18     A. Yes. Thank you.
19     Q. You're welcome.
20     A. In the search ad -- in the search ad
21 arena, Google accepts ads -- or has accepted ads,
22 from people who try to look like the government.
23 And we discover these ads sometimes. And every
24 time I see one, I would send it to Kunal, to
25 Michelle. And -- because most digital companies,

Page 220

1  including Google, have a policy that an ad should
2  not -- what's the word I'm looking for -- mimic
3  -- that's not the word I'm looking for, but it's
4  like that, mimic some other existing
5  organization, or mimic the government when you're
6  not the government, basically.
7         So, you know, an ad that says they're
8  Medicare, and they're not actually Medicare, is
9  misleading to people, and there are a lot of
10 those ads on Google. And so when we find them,
11 we send them and they -- we have conversations
12 about that.
13     Q. And what steps, if any, do you ask
14 Google to take with respect to these ads -- these
15 search ads you're describing?
16     A. Take them down immediately. Asked for
17 some monitoring support. I've asked for it.
18 That is what I've asked for.
19     Q. And what -- what has Google, in return,
20 provided to you with respect to these search ads?
21     A. Google has taken ads down when we find
22 them, and that is Whac-A-Mole because anybody can
23 put up an ad on Google if they've got a credit
24 card. Google has created new policies about
25 taking out ads for health insurance, and have met

Page 221

1  with us about those policies.
2      Q. So is it fair to say that Google is
3  taking steps to address CMS's concerns with
4  respect to search ads that mimic the government?
5         MS. CLEMONS: Objection to form.
6         THE WITNESS: It is fair to say Google
7  has taken steps with regard to search ads.
8  BY MS. GOODMAN:
9      Q. How about with respect to display ads?
10 Are you aware of any conduct on the part of
11 Google with respect to display ads that has
12 negatively impacted CMS's advertising?
13        MS. CLEMONS: Objection to form. And I
14 would caution the witness not to -- to answer the
15 question if your answer would reveal privileged
16 communications with counsel.
17 BY MS. GOODMAN:
18     Q. Are you able to answer that question?
19     A. No.
20     Q. Prior to having any conversation with
21 any lawyer with respect to Google Ads, any lawyer
22 from the government, did you ever have any
23 concerns that Google was engaging in
24 anticompetitive conduct related to display
25 advertising?

Page 222

1  MS. CLEMONS: Objection to form. Calls
2  for a legal conclusion.
3  THE WITNESS: No.
4  BY MS. GOODMAN:
5  Q. And prior to any conversation with any
6  lawyer for the government, did you ever have any
7  concerns that Google was causing CMS to pay more
8  for display advertising than it should have been
9  paying?
10  A. Could you rephrase that, please -- or
11  not rephrase. Just repeat it. That's what I
12  meant. I'm so sorry.
13  Q. That's okay.
14  A. I used the wrong word.
15  Q. Prior to any conversation with any
16  lawyer for the government, did you ever have any
17  concerns that Google was causing CMS to pay more
18  for display advertising than it should have been
19  paying?
20  MS. CLEMONS: Objection; form.
21  THE WITNESS: The tough part here is
22  "should have been paying." That's an -- a really
23  -- that suggests a lot of information.
24  That being said, yes.
25  BY MS. GOODMAN:

Page 223

1  Q. And what -- what concerns did you have
2  with respect to Google causing CMS to pay more
3  for display advertising than it should have been
4  paying prior to any conversation with a lawyer
5  for the government?
6  A. It is possible -- in fact, indeed,
7  probable, that when you are purchasing ads on a
8  cost-per-impression basis, that you're buying
9  things that are not useful to you.
10  Q. And so in what ways has Google, to your
11  knowledge, caused you to buy things that are not
12  useful to you on a cost-per-impression basis?
13  And when I say you, I mean CMS.
14  MS. CLEMONS: Objection to form.
15  THE WITNESS: It has been a concern that
16  we have discussed. Whether it is -- the way you
17  put the question was, like, pure knowledge.
18  Because other ways to potentially buy, which we
19  have not been able to do, would be to buy based
20  on outcomes instead of impressions.
21  BY MS. GOODMAN:
22  Q. And is Google the only provider that you
23  buy ads on an impression basis for, or are there
24  other providers --
25  MS. CLEMONS: Objection to form.

Page 224

1  BY MS. GOODMAN:
2  Q. -- who charge on such a basis, to your
3  knowledge?
4  MS. CLEMONS: Same objection.
5  THE WITNESS: There are other providers.
6  BY MS. GOODMAN:
7  Q. And do you have the same concerns with
8  respect to providers other than Google who charge
9  on a cost-per-impression basis?
10  MS. CLEMONS: Objection to form.
11  THE WITNESS: Yes.
12  BY MS. GOODMAN:
13  Q. Okay. Has anybody at any advertising
14  agency with whom CMS works ever told you that
15  Google was engaging in anticompetitive conduct
16  related to display advertising?
17  A. Not that I recall.
18  Q. Okay. So sitting here today, and prior
19  to any conversation with any lawyer for the
20  government, can you recall any concerns you've
21  ever had with respect to Google's conduct and its
22  affect on CMS's display advertising purchases?
23  MS. CLEMONS: Objection to form.
24  THE WITNESS: Extremely informal
25  conversations between me and my colleagues.

Page 225

1  BY MS. GOODMAN:
2  Q. And what extremely informal
3  conversations between you and your colleagues are
4  you referencing?
5  A. Ones where we notice that all
6  the digital ads that we place go through
7  double-click; that the analytics come through
8  Google analytics. There just seems to be a lot
9  of Google along the ways. And we've had those
10  comments, conversations and we just move on.
11  Because, in the end of the day, we're just doing
12  our jobs.
13  Q. And have you rai -- ever raised those
14  conversations with anybody outside of your
15  colleagues?
16  MS. CLEMONS: Objection to the extent
17  that question calls for privileged communications
18  with counsel. If you're -- if you can answer
19  without referencing or being informed by
20  privileged communications with counsel, you
21  may do so.
22  THE WITNESS: Sorry. I'm just trying to
23  think and remember. It's mental gymnastics at
24  this point. So --
25  BY MS. GOODMAN:

Page 246

1  ads for CMS, the ad agency makes the purchase,
2  the ad agency pays Google for the purchase. CMS
3  does not pay Google directly, but, rather, sends
4  a check to the advertising agency? Am I correct?
5       MS. CLEMONS: Objection to form.
6  Foundation. Calls for a legal conclusion.
7       THE WITNESS: CMS sends an electronic
8  data -- electronic -- not data, EFT. What's it
9  called? Anyway, an electronic funds transfer to
10 our ad agencies for the purposes of ads from
11 Google.
12 BY MS. GOODMAN:
13   Q. And it does not send the EFT -- CMS does
14 not send the EFT to Google, correct?
15       MS. CLEMONS: Objection to form.
16       THE WITNESS: CMS sends the finances for
17 the ads, based on our direction and our strategic
18 planning, to our ad agencies to pay Google.
19 BY MS. GOODMAN:
20   Q. And what happens if the ad agency does
21 not pay Google? Can Google come seek payment
22 from CMS?
23       MS. CLEMONS: Objection to form.
24 Foundation. Calls for a legal conclusion.
25       THE WITNESS: A vendor who has

Page 247

1  worked with a prime contractor for the federal
2  government -- and it's not paid for by the prime
3  contractor -- can reach out to the federal
4  government.
5  BY MS. GOODMAN:
6    Q. Okay. And when they -- when you say
7  "they can reach out to the federal government,"
8  are you referring to any actual ability from
9  -- for them to demand payment from the federal
10 government?
11       MS. CLEMONS: Objection to form.
12 Foundation. Calls for a legal conclusion.
13       THE WITNESS: You are now getting into
14 areas of the FAR, which is what governs federal
15 payment of things, for which my knowledge is,
16 unfortunately, a little vague.
17 BY MS. GOODMAN:
18   Q. Okay. When you say the FAR, what do you
19 mean?
20   A. It is a -- part of the Federal Code that
21 governs the federal government's purchasing of
22 goods and services.
23   Q. Okay. And does the FAR permit CMS to
24 pay Google directly for any digital ads that it
25 buys.

Page 248

1       MS. CLEMONS: Objection to form.
2  Foundation. Calls for a legal conclusion.
3       THE WITNESS: I do not know if the FAR
4  prohibits purchasing of ads from Google.
5  BY MS. GOODMAN:
6    Q. Okay. Do you know if it permits it?
7       MS. CLEMONS: Objection to form,
8  foundation, and calls for a legal conclusion.
9       THE WITNESS: Well, as we do purchase
10 ads from Google, I imagine it does.
11 BY MS. GOODMAN:
12   Q. Okay.
13   A. Because the Contracting Office would
14 probably stop us.
15   Q. And does the FAR permit CMS to pay
16 Google directly, meaning sending the electronic
17 funds from CMS to Google, without using your ad
18 agency as the intermediary? Does the FAR permit
19 CMS to pay Google directly for any digital ads
20 that it buys.
21       MS. CLEMONS: Objection to form and
22 foundation and calls for a legal conclusion.
23       THE WITNESS: I'm not expert enough on
24 the FAR, nor do I think that the FAR directly
25 talks about that topic as you laid it out.

Page 249

1  BY MS. GOODMAN:
2    Q. Okay. In the normal course of your
3  work, do you consider the Department of Justice
4  Antitrust Division to be counsel for the
5  Strategic Marketing Group at CMS?
6       MS. CLEMONS: Objection to form.
7       THE WITNESS: Yes.
8  BY MS. GOODMAN:
9    Q. Why?
10   A. Because they are legal counsel for the
11 federal government, --
12   Q. Okay.
13   A. -- and I'm part of the federal
14 government.
15   Q. When did you first become involved
16 -- strike that.
17       When did you first become aware of an
18 investigation by the Department of Justice into
19 Google?
20       MS. CLEMONS: Objection to form.
21 Foundation.
22       THE WITNESS: Approximately?
23 BY MS. GOODMAN:
24   Q. Yes. Approximately.
25   A. This past winter.

Page 250

1  Q. Was it in 2023 or 2022?
2  A. I believe it was in 2023.
3  Q. And how did you become aware in 2023 of
4  an investigation by the Department of Justice
5  into Google?
6    MS. CLEMONS: Objection; privileged.
7  And I'm going to instruct the witness not to
8  answer to the extent that your answer would be
9  informed by or reveal privileged communications
10 with counsel.
11 BY MS. GOODMAN:
12 Q. Are you able to answer that question,
13 sir?
14 A. No.
15 Q. Okay. So is it fair to say, then, you
16 became aware of an investigation by DOJ through
17 lawyers?
18   MS. CLEMONS: Objection. Calls for
19 privileged information. I'm going to instruct
20 the witness not to answer.
21   MS. GOODMAN: I'm not asking for the
22 communications. I'm asking for how he learned of
23 something. The fact of learning it from lawyers
24 is not privileged, one way or another. I'm not
25 asking for the communications by which he learned

Page 251

1  of it. I'm not asking for the substance of any
2  discussions. I'm asking for how he learned this
3  fact.
4    MS. CLEMONS: You are assuming that he
5  learned something and then asking whether he
6  learned that fact through communications with
7  counsel, which is the topic of the communication
8  with counsel through which someone would learn
9  something.
10   MS. GOODMAN: And it's the same kind of
11 thing that would appear on a privilege log. It
12 doesn't delve into the substance of the
13 communications.
14   MS. CLEMONS: I'm going to instruct the
15 witness not to answer.
16 BY MS. GOODMAN:
17 Q. Okay. Are you going to follow that
18 instruction?
19 A. Yes.
20 Q. Okay.
21   MS. GOODMAN: Can I have Tab 3?
22   (Exhibit No. 71, a document Bates
23 Numbered CMS-ADS-189390, was introduced.)
24 BY MS. GOODMAN:
25 Q. Exhibit 71, CMS-ADS-189390. This is a

Page 252

1  Microsoft Teams invite for a meeting. Subject:
2  DOJ HHS CMS call regarding online advertising
3  purchasing, which you are on in the "To" line,
4  correct?
5  A. I'm trying to get the subject. I will
6  say what is correct is that I am on the "To"
7  line.
8    Ah, there's the subject. Sorry.
9    DOJ HHS CMS call regarding online
10 advertising purchasing, so, yes, correct.
11 Q. And this -- did you recall -- do you
12 recall participating in this call on January 6th,
13 2023?
14 A. Yes.
15 Q. Okay. And to your recollection, did the
16 call last the 30 minutes between 3 and 3:30 p.m.
17 as reflected on this meeting invite?
18 A. I do not recollect.
19 Q. Okay. Do you think it lasted longer or
20 shorter than that amount of time?
21 A. I do not recollect.
22 Q. Okay. Did you understand the purpose of
23 this call to -- for DOJ to understand how CMS
24 buys online ads?
25   MS. CLEMONS: Objection. To the

Page 253

1  extent that question calls for privileged
2  communications with counsel, I'm going to
3  instruct the witness not to answer if your answer
4  would be informed by communications with counsel.
5  BY MS. GOODMAN:
6  Q. Are you able to answer that question?
7  A. I'm going to take counsel's direction.
8  Q. Okay. So the only knowledge you have as
9  to the purpose of this call is from lawyers; is
10 that correct?
11   MS. CLEMONS: You can answer yes or no.
12   THE WITNESS: I don't recall.
13 BY MS. GOODMAN:
14 Q. Okay. Sitting here today, can you think
15 of any other source, other than communications
16 with counsel, that informed your understanding of
17 the purpose of this call in Exhibit 71 on January
18 6th, 2023?
19   MS. CLEMONS: I'm going to object to the
20 extent it calls for communications with other CMS
21 employees that were directed by counsel. So you
22 may answer so long as your answer would not
23 reveal privileged communications with counsel or
24 directed by counsel.
25 BY MS. GOODMAN:

```
                                                Page 290
 1   deposition is over and that Google does not have
 2   grounds to hold the deposition open.
 3         MS. GOODMAN:  Okay.  Thank you for your
 4   time, Mr. Koepke.
 5         THE WITNESS:  It was my pleasure.  This
 6   was fun.
 7         THE VIDEOGRAPHER:  Time is 6:23 p.m.
 8   We're off the record.
 9         (Deposition concluded -- 6:23 p.m.)
```

```
                                                Page 291
 1                C E R T I F I C A T E
 2
 3         I do hereby certify that I am a Notary
 4   Public in good standing, that the aforesaid
 5   testimony was taken before me, pursuant to
 6   notice, at the time and place indicated; that
 7   said deponent was by me duly sworn to tell the
 8   truth, the whole truth, and nothing but the
 9   truth; that the testimony of said deponent was
10   correctly recorded in machine shorthand by me and
11   thereafter transcribed under my supervision with
12   computer-aided transcription; that the deposition
13   is a true and correct record of the testimony
14   given by the witness; and that I am neither of
15   counsel nor kin to any party in said action, nor
16   interested in the outcome thereof.
17
18         WITNESS my hand and official seal this
19   22nd day o
20
21
22                Notary Public
```

```
                                                Page 292
 1   Katherine Clemons Esq
 2   Katherine.clemons@usdoj.gov
 3              August 22nd, 2023
 4   RE:    United States, Et Al v. Google, LLC
 5      8/21/2023, Christopher Koepke (#6043164)
 6       The above-referenced transcript is available for
 7   review.
 8       Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   (erratas-cs@veritext.com).
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19    If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22            Yours,
23            Veritext Legal Solutions
```

```
                                                Page 293
 1   United States, Et Al v. Google, LLC
 2   Christopher Koepke (#6043164)
 3           E R R A T A  S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Christopher Koepke              Date
```