# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

United States of America, )
et al., )
) Case No.
Plaintiffs, ) 1:23-cv-00108-LMB-JFA
)
v. )
) HON. LEONIE H.M. BRINKEMA
Google, LLC, )
)
Defendant. )
______________________________)

* * * * * *

HIGHLY CONFIDENTIAL

* * * * * *

VIDEOTAPED DEPOSITION OF TIMOTHY S. SIMCOE, PH.D.

Friday, February 23, 2024; 9:34 a.m. EST

Reported by: Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460, NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926, Notary Public

Job No. CS 6456894

used in produced documents in this case -- did you ever see the term "open web display advertising" in those documents?

MS. STRICK: Objection: form.

THE WITNESS: I think that the documents that I reviewed -- typically, the people would understand what "open web display advertising" means but didn't have a need to use the term.

BY MS. GOODMAN:

Q. When you say "the people would understand," which people are you referring to?

A. It depends on the documents, but what I had in mind are individuals in the industry.

Q. Are you talking about the authors and recipients on the documents, or are you just saying, anybody who can look at the document that's in the industry would know that it was being -- that what was being discussed was open web display advertising?

MS. STRICK: Objection: form.

THE WITNESS: Among the types of documents I reviewed were documents that were industry press and kind of trade publications related to open web display advertising.

I don't recall whether the term specifically was used in those sites, but based on reading them, my understanding was there's an industry of professionals who work in the open web display advertising space and that they would understand what the term means and that the people who wrote the documents are also within the industry in that sense and would, therefore, understand the term.

BY MS. GOODMAN:

Q. And so is it your testimony you would expect individuals who work in the ad tech industry would understand what the term "open web display advertising" is?

MS. STRICK: Objection: form.

THE WITNESS: I think individuals

might ask for clarification of exactly what you meant but they would understand broadly what that term means.

BY MS. GOODMAN:

Q. Okay. And are you offering any opinion in this case about what the writers or recipients of documents you reviewed understood the term "open web display advertising" to mean?

A. No, those aren't my opinions.

Q. Okay. You mentioned that you looked at documents -- that there are many more documents that you looked at that are not cited in your -- or listed in your report; is that correct?

A. Yes.

Q. Were there any materials you looked at and decided you should not rely upon?

A. I'm not sure if I think of it that way. I looked at many materials, and as I consider what specifically to rely upon, I look more closely at those materials until I reach a point of being comfortable with them. So it's

not as though I look at a document, accept it or reject it immediately. I consider its relevance and then think more about it.

So I reviewed many documents. Not all of them are cited here. Some of them might be things I wouldn't rely upon, but I can't point you to specific things that I didn't rely upon.

Q. Okay. And you rely upon Professor Lee's reports in this case, correct?

A. Yes.

Q. Is -- is -- is Dr. Lee a professor?

A. He is.

Q. Okay. Do you know him, other than from your work on this case?

A. I've met him once or twice.

Q. Okay. How long did you spend reviewing Professor Lee's report?

A. I've reviewed Professor Lee's report -- or sections of his report on various occasions. I recall sitting down with the entirety of Professor Lee's report and spending a day reading it at least once, but then I've gone

back to it many times. So . . .

Q. And did you look at any of the underlying materials cited in Professor Lee's report in connection with your reliance on it?

A. Broadly, yes, to -- I looked at some of the materials cited in Professor Lee's report and considered them in forming my own opinions.

Q. How much time did you spend reviewing materials cited in Professors Lee [sic] report, as opposed to the report itself?

A. It's -- it's not easy to answer that question given that -- I would read the report. I might see something that I thought was relevant in a footnote, review that material, return to reading the report. The two activities were simultaneous.

I could not estimate for you a separate amount of time I spent looking at the documents that I turned my attention to while reading Professor Lee's report.

Q. Did you look at the documents or

materials cited on that day that you were reading the entirety of his report?

A. Yes, and on other days as well.

Q. Okay. Can you approximate how much time you spent reading Professor Lee's report or sections of it over the course of your nine months working on this case?

A. It is very difficult to approximate that. Let's say I spent a full day reading a draft of his opening report. I spent at least half a day reading parts of his other report. I returned back to it many times.

More than two days of work and less than five.

Q. Okay. And that's over the entirety of your work on this matter, correct?

A. Yes. I only reviewed his report while working on this matter.

Q. Sure.

But I mean you're covering the entire nine months that your work -- that you've worked on this matter, whenever first you saw

sections of Professors Lee [sic] report that -- you're talking about the entire nine-month span?

MS. STRICK: Objection: form.

THE WITNESS: I could not have seen his report before I started working on this matter and have only reviewed it since then.

BY MS. GOODMAN:

Q. Okay. Without telling me any substance of your communications, did you ever communicate with Professor Lee about the contents of his report?

MS. STRICK: Again, with the expert -- expert stipulation, you can answer yes or no.

THE WITNESS: No.

BY MS. GOODMAN:

Q. Was there anything in Professors Lee -- in Professor Lee's report that you disagreed with?

A. Not that I can recall, no.

Q. Was there anything that you recall

in his report that you wanted to look at more closely before determining if you agreed or disagreed?

MS. STRICK: Objection: form.

THE WITNESS: As I said, I reviewed his report and, in considering his analysis and opinions, I reviewed the materials that he relied upon. And in that context, I would say I dug in and I tried to evaluate whether he was using sound economic methods.

As far as I can recall, I reached the conclusion that his methods were sound and his conclusions valid. And so I don't -- I would say yes, I -- I tried to evaluate his work. I thought about it, but I don't recall disagreeing with any of it.

BY MS. GOODMAN:

Q. Okay. And it's accurate that you do not offer any independent opinions related to Professor Lee's conclusions?

MS. STRICK: Objection: form.

Page 66

THE WITNESS: I don't opine on the same questions as Professor Lee.
BY MS. GOODMAN:
Q. Okay. And is it accurate that do you not offer any independent opinions related to Professor Lee's conclusions?
MS. STRICK: Objection: form.
THE WITNESS: I believe that's correct.
BY MS. GOODMAN:
Q. Okay. One of the aspects of Professor Lee's report that you rely upon is his definition of the relevant antitrust markets, correct?
MS. STRICK: Objection: form.
THE WITNESS: Yes.
BY MS. GOODMAN:
Q. And you've done no independent work on that topic, correct?
MS. STRICK: Objection: form.
THE WITNESS: I was not asked to define an "antitrust market" in this case.

Page 67

BY MS. GOODMAN:
Q. And so is it accurate that you have not offered an opinion on what a relevant antitrust market in this case is?
A. That's correct.
Q. Okay. And if we turn to Paragraph 59 of your report, starting on Page 27.
CERTIFIED STENOGRAPHER: I think we have to go off the record.
MS. GOODMAN: Okay. We're going off the record.
THE VIDEOGRAPHER: No; we're good.
MS. GOODMAN: Oh.
CERTIFIED STENOGRAPHER: Do you hear that hum?
MS. STRICK: Why don't we take a break anyway and see if we can figure out the hum?
THE WITNESS: Are we off the record?
THE VIDEOGRAPHER: We're now off

Page 68

the record at 10:37 a.m.
--oOo--
(Whereupon, a recess was taken from 10:37 a.m. EST to 10:49 a.m. EST.)
--oOo--
THE VIDEOGRAPHER: We're now back on the record at 10:49 a.m.
You may proceed.
BY MS. GOODMAN:
Q. Professor Simcoe, can you turn to Paragraph 63 of your report on Page 28 -- your opening report, Simcoe 1?
A. Yes.
Q. And you see you write that Lee's report defines a set of relevant antitrust markets for publisher ad servers, ad exchanges and advertiser ad networks.
The remainder of this Section III.A.1 stems largely from your review of Professor Lee's report, correct?
MS. STRICK: Objection: form.
THE WITNESS: Not entirely.

Page 69

BY MS. GOODMAN:
Q. In large part, what you're doing here is summarizing what Professor Lee said?
MS. STRICK: Objection: form.
THE WITNESS: Not completely.
BY MS. GOODMAN:
Q. I didn't ask in completely.
Are you, in large part, summarizing what Professor Lee wrote in his report?
MS. STRICK: Objection: form.
THE WITNESS: I summarized some of what Professor Lee says. I add my own remarks on these markets, and there are some figures that are based on analysis that I did myself.
BY MS. GOODMAN:
[redacted]

THE WITNESS: No.
BY MS. GOODMAN:
Q. Okay. I want to go back a bit to Professor Weintraub.
In Paragraph 36 of your report -- let's go to Paragraph 36.
The last sentence, you write, Ultimately, because the number of buyers and sellers on an exchange determine it's perceived quality, scale is an important dimension of competition among exchanges.
And you cite to Professor Weintraub for that opinion, correct?
A. I do cite to Professor Weintraub here, yes.
Q. Okay. And you cite generally to his report, Section III?
A. Yes.
Q. Okay. Other than Professor Weintraub's opinion, do you have any other basis for your conclusion that the number of buyers and sellers on an exchange determine

its perceived quality and, thus, scale is an important dimension of competition among ad exchanges?
A. Yes.
Q. Okay. What are the other sources of your opinion?
A. This idea is fundamental in the economics of multisided platforms. It's something that I come across all the time in my academic work.
Q. Okay. Are there other factors than the number of buyer and sellers on an exchange that determine its perceived quality?
MS. STRICK: Objection: form.
THE WITNESS: Yes, that's possible.
BY MS. GOODMAN:
Q. Did you consider any of those other factors?
A. Yes.
Q. Was -- is another factor that affects quality an exchange's ability to guard

against spam?
MS. STRICK: Objection: form.
THE WITNESS: I've considered many other features or characteristics of exchanges, but the evidence I've seen makes me think that the most important factor is scale.
And the -- the key thing to keep in mind is that perceived quality has an effect on demand only in terms of relative perceived quality of different products.
BY MS. GOODMAN:
Q. Okay. And you agree that the ad exchange market, as Professor Lee describes it -- or defines it, includes differentiated products?
MS. STRICK: Objection: form.
THE WITNESS: Yes.
BY MS. GOODMAN:
Q. Okay. And that means that ad exchanges provide a distinctive set of features and services from one another?
A. Yes. It means not all ad exchanges

are exactly the same.
Q. And there is -- what -- can you characterize the degree of differentiation among ad exchanges in Professor Lee's ad exchange market?
MS. STRICK: Objection form.
THE WITNESS: As I noted earlier, in my view, scale is the most important aspect of differentiation, and there are enormous differences in scale. So there's quite a bit of differentiation.
BY MS. GOODMAN:
Q. Any other factors that you considered -- strike that.
Are there any other factors that determine quality which you observed a -- a -- a large degree of differentiation among the ad exchanges in Professor Lee's market?
MS. STRICK: Objection: form.
THE WITNESS: I considered -- or saw evidence related to several other characteristics, and I think it's likely

that some exchanges have certain characteristics that others don't have. And in that sense, the relative differentiation on that feature is large.
But the evidence also suggests that on net -- the evidence I've seen didn't make me believe that on net, there were large differences in exchange quality on nonscale features across the exchanges.
BY MS. GOODMAN:
Q. Okay. And did that -- strike that.
MS. GOODMAN: All right. Do you want to take a lunch break now?
MS. STRICK: I'll take lunch.
THE WITNESS: Okay.
THE VIDEOGRAPHER: We're now off the record at 1:02 p.m.
--oOo--
(Whereupon, at 1:02 p.m. EST, a luncheon recess was taken.)
--oOo--

A F T E R N O O N S E S S I O N
(1:38 p.m. EST)
--oOo--
TIMOTHY S. SIMCOE, PH.D.,
was called for continued examination and, after having been previously duly sworn, was examined and testified further as follows:
--oOo--
THE VIDEOGRAPHER: We're now back on the record at 1:38 p.m.
You may proceed.
--oOo--
EXAMINATION (CONTINUED) BY COUNSEL FOR DEFENDANT
--oOo--
BY MS. GOODMAN:
[redacted]

[redacted]

Page 174

Page 176

Page 175

Page 177

BY MS. GOODMAN:

Q. And in your work as an economist, do you typically draw conclusions from a regression that has only seven observations?

MS. STRICK: Objection: form.

THE WITNESS: It depends on the type of conclusions you have in mind.

BY MS. GOODMAN:

Q. What kinds of instances is it appropriate in the generally accepted standards of economics to draw a conclusion from a regression with only seven observations?

A. I'm not sure how to interpret all



of the front end of that question, but I might do something like this in -- depending on what sort of data I have to understand if a line fits a set of points, right.

So seven data points is sufficient to estimate a univariant regression, like I do here, that is, a regression that uses one control variable. And the answer is it depends. You know, sometimes one might draw conclusions from that; other times, one might not.

HIGHLY CONFIDENTIAL

Page 182

47 (Pages 182 - 185)

Veritext Legal Solutions

800-567-8658 973-410-4098

produces a conservative result.

BY MS. GOODMAN:

Q. Okay. And in your report at Paragraph 137 --

A. My opening report?

Q. Yes.

-- you say, The basic idea behind your comparables approach is to find transactions that were not influenced by the relevant conduct and use the price of those transactions as a benchmark to estimate the counterfactual but-for price.

Do you see that?

A. Yes.

Q. And so in this idea, you need to find transactions that were not influenced by the relevant conduct, correct?

A. I explain why the effect that the relevant conduct could have had on the transactions that I use is to increase the take rate of those transactions, which leads to a conservative estimate under my threshold.

Q. How are you confident that it leads to a conservative estimate, when you didn't measure for the increase in price allegedly charged by other exchanges?

MS. STRICK: Objection: form.

THE WITNESS: I explain this in my opening report. It's related to this -- to the economic idea of strategic complementarities, which is to say that in -- under differentiated Bertrand competition, firms respond to price changes by other firms in the same direction, and it's standard in economics to make inferences about direction without trying to measure them.

BY MS. GOODMAN:

Q. Okay. Do you agree that when conducting yardstick damages analysis, you need to control for as many differences between the alleged violator and the groups against whom you're comparing the alleged violator?

MS. STRICK: Objection: form.

THE WITNESS: Control -- do I agree that there are -- could you repeat that?

BY MS. GOODMAN:

Q. Do you agree that it is necessary to control for differences, in this case, between Google and those to whom you're comparing Google?

A. The word "control" can have different meanings; but broadly speaking, one seeks to choose comparable transactions in a manner that makes them similar, except for the alleged conduct.

Q. Okay. Do you also need to -- so what did you do in your comparables approach to compare -- to control for the things that makes Google similar or dissimilar to the other exchanges in your comparables approach?

MS. STRICK: Objection: form.

THE WITNESS: So part of the question's premise is wrong. I didn't select exchanges; I selected transactions. This was something I spent some time on in

the rebuttal report.

BY MS. GOODMAN:

Q. Okay. Let's set that aside for a second because we'll get to that. But I -- I -- I take the -- the point.

But I just want to know, what did you do to control for any differences that don't relate to the alleged misconduct in the selection of your transactions or of your exchanges?

MS. STRICK: Objection: form.

THE WITNESS: I chose transactions from the same relevant antitrust market, from --

BY MS. GOODMAN:

Q. And --

A. -- from -- from exchanges that didn't engage in the conduct.

Q. -- and is there anything else that you did to evaluate the appropriateness of the transactions or exchanges that you chose as comparables?

MS. STRICK: Objection: form.
THE WITNESS: I chose transactions. I chose them on the basis of their being in the same relevant antitrust -- well, using -- transactions that use the tools in the relevant antitrust market, and I considered the broad range of types of transactions conducted on AdX and at the other exchanges in that market.
BY MS. GOODMAN:
Q. And did you control for any differences among the broad ranges of transactions conducted on AdX and on the other exchanges in the market?
MS. STRICK: Objection: form.
THE WITNESS: What types of differences do you have in mind?
BY MS. GOODMAN:
Q. Any of the differences that you have come to learn about in the course of your study of the differentiated products within the

ad exchange market?
MS. STRICK: Objection --
THE WITNESS: The --
MS. STRICK: -- form.
THE WITNESS: -- the ad exchanges are differentiated products; but right now, we're talking about transactions in the open web display impressions market, correct?
BY MS. GOODMAN:
Q. I'm talking about your comparables approach and what you used, which are a set of transactions from a set of ad exchanges in the relevant market, as Professor Lee defined it and what I believe you testified to earlier.
A. Yes.
MS. STRICK: Objection: form.
BY MS. GOODMAN:
Q. Let me try it this way: Do you agree that an ideal yardstick or comparable transaction or firm is one who is as close to the -- to Google as possible?

MS. STRICK: Objection: form.
THE WITNESS: To tell you -- to answer the question about an ideal yardstick, I'd like to know, are we doing a -- a market-level or a -- a firm-level analysis or a transaction-level, the ideal in -- in the context of what -- what type of analysis?
But the -- the premise is right. One wants something that is as close as possible except for the -- the conduct that you are trying to estimate the effect of.
BY MS. GOODMAN:
Q. And so what did you do to make sure that the transactions or the exchanges which you included in your comparables approach were as close as possible except for the conduct that you are trying to estimate the effect of?
MS. STRICK: Objection: form.
THE WITNESS: I chose to include all of the transactions that I could identify in the relevant market to make

them comparable to the broad types of transactions conducted on AdX --
BY MS. GOODMAN:
Q. Well, I --
A. -- and I also did the event study analysis, which I view as complementary and a way to control for some kinds of differences across exchanges.
Q. So you say you chose to include all the transactions that you could identify in the transactional data, correct?
MS. STRICK: Objection: form.
THE WITNESS: What I did is described in the opening report. But Professor Lee defined a relevant antitrust market. That market included a number of exchanges. I used all of the data that was usable that was provided by all of the exchanges in the relevant antitrust market. And as I explain in my report, that provides, after you pool all of them together, a set of transactions on ad

HIGHLY CONFIDENTIAL

exchanges for open web display ads that is the basis for the -- the comparables analysis.

BY MS. GOODMAN:

Q. And my question is, What did you do after compiling that set of transactions to figure out whether they are as close as possible to Google but for the alleged anticompetitive conduct?

MS. STRICK: Objection: form.

THE WITNESS: So far, this conversation, we haven't talked about any material types of differences in those transactions, but --

BY MS. GOODMAN:

MS. STRICK: Oh. Let's take a 10 -- let's take a 10-minute break, go off the record --

MS. GOODMAN: Okay.

MS. STRICK: -- when we'll get to come back.

THE VIDEOGRAPHER: We're now off the record at 6:07 p.m.

--oOo--

(Whereupon, a recess was taken from 6:07 p.m. EST to 6:15 p.m. EST.)

--oOo--

THE VIDEOGRAPHER: We're now back on the record at 6:15 p.m.

You may proceed.

MS. STRICK: I have no redirect.

MS. GOODMAN: Okay.

THE VIDEOGRAPHER: Okay. This now ends the deposition of Dr. Timothy Simcoe. We're off the record at 6:15 p.m.

(Whereupon, the following

discussion was held off the video record and on the stenographic record:)

CERTIFIED STENOGRAPHER: I understand you will be getting daily, Counsel.

And do you need the job daily as well?

MS. CLEMONS: Yes, we need daily and a rough draft.

CERTIFIED STENOGRAPHER: Sure, not a problem.

(Witness excused.)

(Deposition concluded at 6:15 p.m. EST.)

C E R T I F I C A T E

I, Cindy L. Sebo, Nationally Certified Court Reporter herein, do hereby certify that the foregoing deposition of TIMOTHY S. SIMCOE, PH.D. was taken before me pursuant to notice at the time and place indicated; that said witness duly swore to tell the truth, the whole truth, and nothing but the truth under penalties of perjury; that said testimony of witness was correctly recorded to the best of my abilities in machine shorthand, thereafter transcribed under my supervision with computer-aided transcription; that deposition is a true and accurate record of the testimony given by the witness; that I am neither counsel, nor kin to any party in said action, nor interested in the outcome; and that a copy of this transcript obtained from a source other than the court reporting firm, including an adversary or co-counsel in the matter, is uncertified and may not be used at trial.

CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460, NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926, Notary Public

Amanda Strick, Esq.
Amanda.strick@usdoj.gov

February 26, 2024

RE: United States, Et Al v. Google, LLC
2/23/2024, Timothy S. Simcoe (#6456894)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

United States, Et Al v. Google, LLC

Timothy S. Simcoe (#6456894)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE______________________

_______________________________________________

REASON_________________________________________

PAGE_____ LINE_____ CHANGE______________________

_______________________________________________

REASON_________________________________________

PAGE_____ LINE_____ CHANGE______________________

_______________________________________________

REASON_________________________________________

PAGE_____ LINE_____ CHANGE______________________

_______________________________________________

REASON_________________________________________

PAGE_____ LINE_____ CHANGE______________________

_______________________________________________

REASON_________________________________________

PAGE_____ LINE_____ CHANGE______________________

_______________________________________________

REASON_________________________________________

______________________________ ______________

Timothy S. Simcoe Date

United States, Et Al v. Google, LLC

Timothy S. Simcoe (#6456894)

ACKNOWLEDGEMENT OF DEPONENT

I, Timothy S. Simcoe, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

____________________________ _______________

Timothy S. Simcoe Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF _______________, 20___.

_________________________

NOTARY PUBLIC

C E R T I F I C A T E

I, Cindy L. Sebo, Nationally Certified Court Reporter herein, do hereby certify that the foregoing deposition of **TIMOTHY S. SIMCOE, PH.D.** was taken before me pursuant to notice at the time and place indicated; that said witness duly swore to tell the truth, the whole truth, and nothing but the truth under penalties of perjury; that said testimony of witness was correctly recorded to the best of my abilities in machine shorthand, thereafter transcribed under my supervision with computer-aided transcription; that deposition is a true and accurate record of the testimony given by the witness; that I am neither counsel, nor kin to any party in said action, nor interested in the outcome; and that a copy of this transcript obtained from a source other than the court reporting firm, including an adversary or co-counsel in the matter, is uncertified and may not be used at trial.

CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460, NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime Court Reporter, NY Association Certified Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778, WA CSR 23005926, Notary Public

**Errata Sheet for the Transcription of Timothy Simcoe**

**Case Name**: *United States et al v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.)

**Depo. Date**: February 23, 2024

**Deponent**: Timothy Simcoe

| Page | Line | Correction | Reason for Correction |
|---|---|---|---|
| 3 | 7 | Delete "ESQUIRE" after Yin Jia Qiu | Correction |
| 3 | 8 | Delete "MICHAEL WOLIN, ESQUIRE" | Correction |
| 4 | 16 | Delete "ESQUIRE" after Patrick Holder | Correction |
| 14 | 9 | Change "Do you know any" to "Do you know if any" | Clarification |
| 31 | 22 | Change "market power monopolies" to "market power, monopolies" | Transcription Error |
| 34 | 12 | Change "Consensus Governance for Shared" to "Standard Setting Committees: Consensus Governance for Shared" | Transcription Error |
| 35 | 4 | Change "Workshop relate to competition and" to "Workshop related to competition and" | Clarification |
| 41 | 13 | Change "have" to "had" | Transcription Error |
| 43 | 6 | Change "committees" to "commitments" | Transcription Error |
| 45 | 5 | Delete "Okay" | Transcription Error |
| 59 | 7 | Change "sites" to "cites" | Transcription Error |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| 89 | 9 | Change "right?" to "correct?" | Transcription Error |
| 99 | 6 | Change "tied" to "tie" | Transcription Error |
| 99 | 7 | Change "tied" to "tie" | Transcription Error |
| 116 | 7 | Change "ad issue" to "at issue" | Transcription Error |
| 121 | 15 | Change "ad issue" to "at issue" | Transcription Error |
| 124 | 15 | Change "ad issue" to "at issue" | Transcription Error |

| 128 | 4 | Change “a effect” to “an effect” | Transcription Error |
|---|---|---|---|
| 129 | 6 | Change “antitrust damages, anticompetitive” to “antitrust damages, not anticompetitive” | Transcription Error |
| 143 | 22 | Delete “world” | Transcription Error |
| 147 | 12 | Change “to multihoming exchanges” to “to multihome on exchanges” | Transcription Error |
| 147 | 21 | Change “to multihoming exchanges” to “to multihome among exchanges” | Transcription Error |
| 160 | 14 | Change “do. I thought they made sense” to “do, I thought they made sense” | Transcription Error |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| 190 | 18 | Delete “that” | Transcription Error |
| | | | |
| 234 | 7 | Delete “the” | Transcription Error |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| 307 | 10 | Change “parameters, such as CPM type of ad, ad | Transcription Error |

United States, Et Al v. Google, LLC

Timothy S. Simcoe (#6456894)

ACKNOWLEDGEMENT OF DEPONENT

I, Timothy S. Simcoe, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ March 21, 2024

Timothy S. Simcoe Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC