Exhibit F

## Page 330

1  sides of its platform?
2        A.    In general, all else equal, there
3  are network effects here that say advertisers
4  prefer platforms that have more publishers, and
5  publishers prefer -- prefer platforms that have
6  more advertisers, all else equal.
7        Q.    And why, if at all, does scale
8  matter to ad exchanges?
9             ATTORNEY EWALT:  Objection to
10       form and foundation.
11            THE WITNESS:  Yeah, I'm not -- I
12       mean, the -- I'm not sure that it does.
13       I mean, the evidence here is that
14       ad exchanges -- there are lots and
15       lots of ad exchanges competing at various
16       small sizes.  To me, it's the first
17       indicator that this is not an industry in
18       which one has to have scale to compete.
19       BY ATTORNEY NAKAMURA:
20       Q.    Is it your opinion, sitting here
21  today, that scale does not matter to the
22  competitiveness of ad exchanges in digital

## Page 331

1  display advertising?
2             ATTORNEY EWALT:  Objection to
3        form.
4             THE WITNESS:  It's not my opinion
5        that there's no scale effects at all.  I
6        mean, we talked about network effects, so
7        you need some number of publishers and
8        advertisers using your product.  And it's
9        not my opinion that, you know, I could go
10       launch an ad tech product with five
11       impressions.
12            So I think there's some role for
13       scale, but I don't think I've seen any
14       evidence that you have to be particularly
15       large to be able to reach scale.  And I
16       think that's shown by the large number of
17       small competitors that continue to stay
18       in the market and -- and win business.
19       BY ATTORNEY NAKAMURA:
20       Q.    And how do you define, for example,
21  by market share, what a "small competitor" is in
22  the ad exchange business?

## Page 332

1        A.    I don't have a specific cutoff for
2  you.  It's pretty common to see a firm of less
3  than 5 or less than 1 percent.
4             If you look at the data here, there
5  are dozens of ad exchanges competing and staying
6  in the market.  That's not a market structure
7  that, to me, is suggestive that scale is required
8  to compete.
9        Q.    And in your view, as an economist,
10  are the ad exchanges you're describing
11  differentiated?
12       A.    They're not identical, so they're
13  -- I guess they're differentiated.  They're
14  providing the same basic services.  They're
15  taking bids from buy side, and they're bidding on
16  publisher exchanges.  So they're not identical,
17  but they're -- they seem to be successfully
18  competing for advertisers and publishers.
19       Q.    And as an economist, what do you
20  understand the word "differentiated" to mean used
21  in the context of comparing different firms?
22       A.    That they're not -- they're not

## Page 333

1  selling the same thing, that there are
2  differences in their services.
3        Q.    And why, if at all, in your
4  opinion, does scale matter to publisher ad server
5  products?
6             ATTORNEY EWALT:  Objection to
7        form and foundation.
8  ███████████████████████
9  ███████████████████████████████
10 ██████████████████████████████████
11 ██████████████████████████████████
12 ████████████████████████████████
13 ██████████████████████████████
14 ███████████████████████████████████
15 ██████████████████████████████████
16 ███████████████████████████████
17 ███████████████████████████████████
18 █████████████
19 ██████████████████████████████████
20 █████████████████████████████
21 ███████████████████████████████████
22 █████████████████████████████████

Page 334

5      BY ATTORNEY NAKAMURA:
6      Q.    And are there network effects that
7  are relevant to publisher ad servers, in your
8  opinion?
9      A.    Yes.
10     Q.    What are they?
11     A.    Again, that you want -- I mean,
12  it's more about the -- the plat -- the rules of
13  the platform and the extent the ability it has to
14  attract buyers and sellers.  But it's important
15  for an ad server -- to be successful, that it
16  attracts publishers and that that set of
17  publishers and the rules of the ad server attract
18  advertisers.  So it's -- there's network effects
19  in the -- in the sense that attracting both sides
20  of the market matters.
21     Q.    And are there, in your opinion,
22  bidirectional network effects that are of

Page 335

1  relatively the same magnitude moving in both
2  directions for a publisher ad server?
3          ATTORNEY EWALT:  Objection to
4      form.
5          THE WITNESS:  I think they're --
6      in all of these technologies, I think
7      they're relatively of the same magnitude
8      because the whole business is about
9      making matches, so you need people
10     choosing your product on both sides.
11         BY ATTORNEY NAKAMURA:
12     Q.    So is it your opinion that the
13  bidirectional nature of network effects for a
14  publisher ad server are roughly equal to those
15  found in a advertising ad exchange product?
16         ATTORNEY EWALT:  Objection to
17     form.
18         THE WITNESS:  I don't -- it's --
19     I don't know if it's something where you
20     say "roughly equal."  I don't know what
21     the number is.  But I guess conceptually,
22     absolutely, yes.  Because both products

Page 336

1      are part -- and, again, I think of these
2      as part of the -- creating a match, and
3      at every part of that match, you have to
4      get a publisher -- you have to get
5      publishers and advertisers to agree to
6      use your product.
7          So publishers have to agree to
8      use the ad server, and advertisers have
9      to find it worthwhile to buy inventory
10     from a publisher using that ad server.
11     So in -- in each of these matched stages,
12     you need to attract both sides of the
13     market.
14         BY ATTORNEY NAKAMURA:
15     Q.    But how often, as a relative
16  matter, do advertisers buy directly into a
17  publisher's ad server as opposed to, for example,
18  using a DSP or other intermediary service to
19  purchase inventory?
20         ATTORNEY EWALT:  Objection to
21     form.
22         THE WITNESS:  I mean, any --

Page 337

1      anytime that they buy from anybody who's
2      O&O, they're buying directly into an ad
3      server.
4          My point is that if they -- if an
5      ad server -- if Google's ad server didn't
6      work well such that the rules didn't
7      create good matches, advertisers would
8      take their business elsewhere.  And
9      that's a -- that's -- advertisers -- if
10     the rules of the game that were set up by
11     the ad server were unattractive,
12     advertisers are entirely capable of
13     substituting around by purchasing ads in
14     other forms.
15         BY ATTORNEY NAKAMURA:
16     Q.    And other than purchasing from O&O
17  publishers, what examples do you have of an
18  advertiser buying in directly to a publisher ad
19  server?
20     A.    I mean, anytime that they buy
21  direct.
22     Q.    And are there any examples you have

1  of indirect purchasing done directly into a
2  publisher ad server other than through O & O
3  inventory?
4           ATTORNEY EWALT:  Objection to
5  form.
6           THE WITNESS:  I mean, I'm not
7  sure if it's in -- I mean, obviously, the
8  O & O is a big deal.  But I think that --
9  yeah, I think the O & O is where I can
10  see -- the examples I have in mind of
11  where they purchase indirect.  And,
12  obviously, to me, that's an example of
13  substituting around the ad server.
14           There may be examples in the
15  record, but as I sit here, I don't
16  think -- I can't think of a case where
17  there's an indirect purchase straight
18  into an ad server that isn't in an O & O
19  setting.
20  BY ATTORNEY NAKAMURA:
21      Q.    Okay.  Let's turn now to
22  Paragraph 529 of your report, which is on

1  Page 384.
2      A.    Okay.
3  ████████████████████████████████
████████████████████████████████████
███████████████████████████████████████
███████████████████████████████
8      Q.    As an economist, when analyzing
9  competition and markets, do you examine whether
10  output has been reduced relative to a but-for
11  world without the allegedly restrictive conduct?
12      A.    I mean, that's what you would need
13  to do to show harm.  I mean, I think it's an
14  explicit point I make at some length, is that
15  Plaintiffs' experts have not done so.
16      Q.    And you do not look at, however,
17  whether output is simply increasing or decreasing
18  without reference to a but-for world; is that
19  correct?
20      A.    I would certainly look at it.  I
21  look at data -- all data, and when I see output
22  growing dramatically and exceeding projections,

1  it causes me to think it looks like the market is
2  doing well and thus I would need to see some very
3  clear demonstration of a but-for world that would
4  have been even better to conclude there's harm.
5           So I wouldn't stop with the output
6  by itself.  That's my point to Plaintiffs'
7  experts, you need to show a but-for world.  But
8  it certainly tells me that it's going to be a
9  kind of Herculean task to show harm here because
10  this market seems to be doing very well.  But you
11  could do it; you just -- they would have had to
12  show a but-for world to do so.
13      Q.    And how do you identify as a
14  methodological matter, as an economist, when
15  evaluating a competitiveness of a market,
16  candidate but-for worlds that you might compare
17  to the actual world with respect to output?
18           ATTORNEY EWALT:  Objection to
19  form.
20           THE WITNESS:  I mean, I -- I -- I
21  don't know exactly what you're asking,
22  candidate but-for worlds -- it's the

1  Plaintiffs' job, as I see it, to explain
2  what their but-for world is.
3           Candidate but-for worlds would
4  say, in general terms, Here's some
5  conduct I think was harmful, and now I'm
6  going to turn that conduct off and show
7  you the market would have done better.
8           That's the sort of modeling that
9  economists do regularly.  It wasn't done
10  here.  But, certainly, the idea that I'm
11  going to turn off a piece of conduct and
12  show you that the market would perform
13  better without it is -- is the kind of
14  analysis that you would have to do.
15  BY ATTORNEY NAKAMURA:
16      Q.    Is it your opinion that competition
17  can be harmed in a market where output is
18  increasing over time?
19           ATTORNEY EWALT:  Objection to
20  form.
21           THE WITNESS:  Yes.
22

Page 494

17      Q.    And last question:  Can you give me
18  an example, as an economist, of any situation in
19  which a duty to deal would not, in your opinion,
20  be harmful to competition and consumers?
21              ATTORNEY EWALT:  Objection to
22      form.

---

Page 495

1        THE WITNESS:  I think a duty to
2  deal -- an actual requirement to deal is
3  harmful.  I can't think of an example
4  where the duty is not harmful.
5              There might be situations where
6  firms work together in some way that's
7  beneficial, but I think requiring firms
8  to work with their competitors is harmful
9  to the essence of the competitive
10  process.
11        ATTORNEY NAKAMURA:  All right.
12  See, we're at time.
13        Thank you very much, Dr. Israel.
14        And we'll go off the record.
15        ATTORNEY EWALT:  Not quite.  I
16  want to designate the transcript as
17  highly confidential under the protective
18  order in this case.
19        Now we can go off the record.
20        ATTORNEY NAKAMURA:  Thank you.
21        THE VIDEOGRAPHER:  Off the record
22  at 6:36.  And this ends today's

---

Page 496

1        deposition.
2
3              (Witness excused.)
4
5              (Deposition concluded at 6:36 p.m.
6  EDT)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 497

C E R T I F I C A T E
1    I, Cindy L. Sebo, Nationally Certified Court
2  Reporter herein, do hereby certify that the foregoing
3  deposition of MARK A. ISRAEL, PH.D. was taken before
4  me pursuant to notice at the time and place indicated;
5  that said witness duly swore to tell the truth, the
6  whole truth, and nothing but the truth under penalties
7  of perjury; that said testimony of witness was
8  correctly recorded to the best of my abilities in
9  machine shorthand, thereafter transcribed under my
10  supervision with computer-aided transcription; that
11  deposition is a true and accurate record of the
12  testimony given by the witness; that I am neither
13  counsel, nor kin to any party in said action, nor
14  interested in the outcome; and that a copy of this
15  transcript obtained from a source other than the court
16  reporting firm, including an adversary or co-counsel
17  in the matter, is uncertified and may not be used at
18  trial.
19
20  CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR,
    RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
    NJ Certified RT 30XR00019500, NM CSR 589, NY
21  Realtime Court Reporter, NY Association Certified
    Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778,
22  WA CSR 23005926, Notary Public

## Page 498

INSTRUCTIONS TO WITNESS

1          Please read your deposition over

2    carefully and make any necessary corrections.

3    You should state the reason in the appropriate

4    space on the errata sheet for any corrections

5    that are made.

6          After doing so, please sign the

7    errata sheet and date it.

8          You are signing same subject to the

9    changes you have noted on the errata sheet, which

10   will be attached to your deposition.

11         It is imperative that you return

12   the original errata sheet to the deposing

13   attorney within thirty (30) days of receipt of

14   the deposition transcript by you.  If you fail to

15   do so, the deposition transcript may be deemed to

16   be accurate and may be used in court.

17

18

19

20

21

22

## Page 500

CAPTION: United States, et al. vs. Google, LLC

1    MARK A. ISRAEL, PH.D.          NO. 2024-933018

2          E R R A T A   S H E E T

3    PAGE_____ LINE_____ CHANGE _____

4    REASON FOR CHANGE:

     _____

5    PAGE_____ LINE_____ CHANGE _____

6    REASON FOR CHANGE:

7    _____

8    PAGE_____ LINE_____ CHANGE _____

9    REASON FOR CHANGE:

     _____

10   PAGE_____ LINE_____ CHANGE _____

11   REASON FOR CHANGE:

12   _____

13   PAGE_____ LINE_____ CHANGE _____

14   REASON FOR CHANGE:

     _____

15   PAGE_____ LINE_____ CHANGE _____

16   REASON FOR CHANGE:

17   _____

18   PAGE_____ LINE_____ CHANGE _____

19   REASON FOR CHANGE:

     _____

20   PAGE_____ LINE_____ CHANGE _____

21   REASON FOR CHANGE:

22   _____

## Page 499

CAPTION: United States, et al. vs. Google, LLC

1    MARK A. ISRAEL, PH.D.          NO. 2024-933018

2          E R R A T A   S H E E T

3    PAGE_____ LINE_____ CHANGE _____

4    REASON FOR CHANGE:

5    _____

     PAGE_____ LINE_____ CHANGE _____

6    REASON FOR CHANGE:

7    _____

8    PAGE_____ LINE_____ CHANGE _____

9    REASON FOR CHANGE:

10   _____

     PAGE_____ LINE_____ CHANGE _____

11   REASON FOR CHANGE:

12   _____

13   PAGE_____ LINE_____ CHANGE _____

14   REASON FOR CHANGE:

15   _____

     PAGE_____ LINE_____ CHANGE _____

16   REASON FOR CHANGE:

17   _____

18   PAGE_____ LINE_____ CHANGE _____

19   REASON FOR CHANGE:

20   _____

     PAGE_____ LINE_____ CHANGE _____

21

     REASON FOR CHANGE:

22   _____

## Page 501

ACKNOWLEDGMENT OF WITNESS

1

2         I, MARK A. ISRAEL, PH.D., do hereby certify that

3    I have read the foregoing pages herein, and that the

4    same is a correct transcription of the answers given

5    by me of the proceedings taken remotely to the

6    questions therein propounded under penalty of perjury,

7    except for the corrections or changes in form or

8    substance, if any, noted in the attached errata sheet.

9    _____      _____

10    DATE                    SIGNATURE

11

12

13

14

15   Subscribed and sworn to before me

     this _____ day of_____, 20_____.

16

17    My Commission expires:

18

     _____

19

20

21   _____

22        Notary Public

PRIVILEGED & CONFIDENTIAL

| Page | Line | Change | Reason |
|---|---|---|---|
|  |  | quotation) |  |
| ████ | ██ | ██████████████ | Transcription error. |
| ████ | ██ | ██████████████ | Transcription error. |
| 247 | 19 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 248 | 1 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 267 | 9 | "indirect Web, nonvideo display inventory" should be "indirect, web, non-video display inventory" | Transcription error. |
| ████ | ██ | ███████████████ | Transcription error. |
| ████ | ██ | ██████████████ | Transcription error. |
| ████ | █ | ██████████████ | Transcription error. |
| ████ | █ | ███████████████ | Transcription error. |
| 279 | 15 | "answer in" should be "answer on" | Transcription error. |
| 305 | 15 | "can" should be "can-" | Transcription error. |
| ████ | ██ | ██████████ | Transcription error. |
| ████ | ██ | ██████████████ | Transcription error. |
| ████ | █ | ███████████ | Transcription error.. |
| 339 | 14 | "is that" should be "that" | Clarification. |
| 340 | 15 | "a competitiveness" should be "the competitiveness" | Transcription error. |
| ████ | █ | ████████████ | Transcription error. |
| 374 | 10 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 378 | 11 | "test" should be "test-" | Transcription error. |
| ████ | ██ | ████████████ | Transcription error. |
| 385 | 20 | "this auto" should be "this was auto" | Clarification. |
| 389 | 10 | "Demand" should be "demand" | Transcription error. |
| 390 | 9 | "ad" should be "Ads" | Transcription error. |
| 396 | 8 | "and done you" should be "and did you" | Transcription error. |
| ████ | ██ | █████████████ | Transcription error. |
| 402 | 6 | "Demand" should be "demand" | Transcription error. |
| ████ | ██ | ███████████ | Transcription error. |

PRIVILEGED & CONFIDENTIAL

| Page | Line | Change | Reason |
|---|---|---|---|
| 417 | 22 | "make up the" should be "makeup, the" | Transcription error. |
| 418 | 1 | "the respondents looks" should be "the respondents, looks" | Transcription error |
| ███ | █ | ███████████████ | Transcription error. |
| ███ | █ | █████████ | Transcription error. |
| ███ | █ | ████████████████ | Transcription error. |
| ███ | █ | ███████████ | Clarification. |
| ███ | █ | ████████ | Transcription error. |
| ███ | █ | ██████████ | Transcription error. |
| ███ | █ | ██████████ | Transcription error. |
| ███ | █ | ██████████ | Transcription error. |
| ███ | █ | ██████████ | Transcription error. |
| ███ | █ | ██████████████ | Transcription error. |
| ███ | █ | ████████████ | Transcription error. |
| ███ | █ | █████████ | Transcription error. |
| ███ | █ | █████████ | Transcription error. |
| 477 | 12 | "a ad server" should be "an ad server" | Clarification. |
| ███ | █ | ████████████ | Transcription error. |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefor.

Date: ___4/10/2024___   Signature: _Mark a. Sl_____