# Exhibit Q

NBER WORKING PAPER SERIES

FUEL TAX INCIDENCE AND SUPPLY CONDITIONS

Justin Marion
Erich Muehlegger

Working Paper 16863
http://www.nber.org/papers/w16863

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
March 2011

The authors thank Erzo Luttmer, Raj Chetty, Monica Singhal, two anonymous referees and seminar participants at UC Berkeley, Northeastern, UC Santa Cruz, Harvard, Wisconsin, Columbia, Stanford, the Public Choice Society Annual Conference, the National Tax Association Annual Conference, and the NBER Economics of Taxation Summer Institute for helpful comments. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2011 by Justin Marion and Erich Muehlegger. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

# 1  Introduction

Tax incidence plays a central role in current energy policy debates. The extent to which taxes are passed through to retail prices, and on what the pass-through rate depends, determines in part the distributional impact of carbon taxes, the effectiveness of using a tax holiday to ease high fuel prices, and how tax policy can be used to respond to disruptions in the fuel supply chain, such as those caused by natural disasters like hurricane Rita.

While the theory of tax incidence is front and center in the textbook treatment of taxation, the main predictions of the tax incidence model are largely untested. Though it is often assumed that commodity taxes are fully passed through to consumers, this assumption is based on relatively few empirical studies. There is only sparse evidence regarding the extent to which taxes are incorporated into retail prices, as noted by Poterba (1996) and Doyle and Samphantharak (2008), and little work examining the extent to which tax incidence responds to changes in market power or supply elasticity. As a result, the empirical literature on tax incidence is unable to shed much light on the aforementioned policy questions.

In this paper, we examine the pass-through rate of fuel taxes to retail prices by utilizing changes in state gasoline and diesel taxes. Our primary contribution is estimating the dependence of pass-through on factors constraining the gasoline and diesel supply chains. Understanding this dependence provides insight on how tax policy might be conditioned on observed supply conditions. Furthermore, to the extent by which supply chain constraints suggest variation in the elasticity of fuel supply, it provides a test of a fundamental prediction of tax incidence theory.

Consistent with prior literature on gas tax incidence, we find that state gasoline and diesel fuel taxes are on average fully and immediately passed on to consumers. The above result masks important heterogeneity in the rate of pass-through, as we find evidence consistent with the notion that pass-through falls in times of inelastic supply. In particular, the pass-through rate of diesel is low when refinery capacity utilization is at its highest, and when untaxed uses of diesel fuel are less important (which reduces the residual supply elasticity of taxed diesel). We find that the pass-through of gasoline taxes is lower when gasoline content regulations are heterogeneous within a state, which has been found to constrain refiners' ability to adjust production in the short-run. (see for instance Muehlegger, 2006). Moreover, it has been suggested that inventories play a role in constraining the market power of wholesalers – we find that when inventories are constrained from below, the pass-through rate of diesel taxes is greater than one.

Our findings have several implications for current tax policy. First, our work speaks directly

2

to the efficacy of "fuel tax holidays." Like Doyle and Samphantharak (2008), who examine the effects of a gas tax moratorium on prices in Illinois and Indiana, our work suggests that the benefits of a tax holiday will be driven by contemporaneous market conditions. We find that the relationship between capacity utilization and the tax pass-through rate differs between diesel and gasoline. Gasoline taxes are fully passed through to consumers regardless of season or capacity utilization. Consequently, a seasonal state gas tax holiday would apparently provide relief to consumers. In contrast, the pass-through of diesel taxes falls during periods of high capacity utilization. This finding is particularly relevant for fuel tax holidays. Although fuel taxes are passed-through fully under normal circumstances, fuel tax holidays are most attractive to legislators during times of high fuel prices induced by supply chain constraints. We find that at these times, taxes are likely to be shared between consumers and producers - consequently, consumers are unlikely to reap the full benefit of fuel tax moratoria.

Second, our results inform the politics of increasing gasoline taxes. The proposal of the Deficit Reduction Committee recently advocated increasing gasoline prices as part of balancing the federal budget. In addition, several carbon proposal put forth in 2010 implicitly taxed gasoline and diesel by taxing carbon emissions from refinery operations. Our findings inform the distributional consequences of these policies. We find that under most circumstances, gasoline and diesel taxes are fully passed onto consumers. Moreover, since demand for gasoline and diesel fuel are relatively inelastic, our results suggest that refiners, wholesalers and retail station operators likely require little compensation (in the form of tax credits or free carbon permits) to be made whole.

In addition, our work makes several contributions to existing literature on fuel taxes and to the broader literature on tax incidence. To our knowledge ours is the first study to consider the incidence of diesel fuel taxes. Moreover, our work is unique in its examination of how regulations affect tax pass-through. Chouinard and Perloff (2004,2007) and Alm et al (2009) provide evidence regarding the incidence of gasoline taxes on retail prices using state-level variation in taxes and prices. Chouinard and Perloff (2004) tests the response of incidence to residual supply elasticity at the state level, noting that small states should have a greater supply elasticity and therefore a higher rate of consumer incidence. More generally Poterba (1996) examines the incidence of retail sales taxes on clothing prices, Besley and Rosen (1999) consider city-level prices across twelve commodities, and a number of papers including Sung, Hu and Keeler (1994), Barnett et al (1995), Delipalla and O'Donnell (2001), Harding, Lovenheim and Leibtag (2009) and Chiou and Muehlegger (2009) estimate cigarette tax incidence as well as how incidence varies

geographically or demographically.[1]

The paper proceeds as follows. Section 2 presents a theoretical discussion of incidence and supply. Section 3 describes the data and empirical methods we will use. Section 4 presents the empirical results, and Section 5 concludes.

## 2 Model and Industry Background

We consider a quantity tax of $t$ per unit of a good, which is paid by the supplier. A unit mass of firms sell a quantity $q$ of this good to consumers at the tax inclusive price $p$. Consumers have an aggregate demand for the product given by $D(p)$, while competitive supply can be characterized by the function $S(p,t)$. The textbook approach to characterizing incidence starts from the equilibrium condition $D(p) = S(p,t)$ and perturbs this equilibrium by changing the tax:

$$\frac{dp}{dt} = \frac{S_t(p,t)}{D_p(p) - S_p(p,t)} \tag{1}$$

where $S_p$, $S_t$, and $D_p$ represent the derivative of supply with respect to price and tax and the derivative of demand with respect to price, respectively.

Suppose diesel is produced at cost $C(q)$ where $C'(q) > 0$ and $C''(q) > 0$. If firms behave competitively, this yields the profit function

$$\Pi(q) = p(q) - tq - C(q). \tag{2}$$

Firms produce to the point where price is equal to marginal cost, or $q = \phi(p - t)$ where $\phi(p - t) = C'^{-1}(p - t)$. Supply is a function of the price net of tax, so that the supply response to taxes is the same as the response to prices: $S_p = -S_t$. Substituting this into equation (1), multiplying through by $p/q$, and taking the limit as $t \to 0$, the standard representation of incidence is obtained:

$$\frac{dp}{dt} = \frac{\eta}{\eta - \epsilon} \tag{3}$$

where $\eta$ and $\epsilon$ are the elasticities of supply and demand, respectively. The rate of pass-through goes up as supply is more elastic and demand is less elastic.

A long literature in public finance extends this result to non-competitive markets and shows that tax pass-through in oligopolistic markets can exceed one under certain demand conditions.

---

[1] Early empirical work on incidence includes Due (1954), Brownlee and Perry (1967), Woodard and Siegelman (1967), and Sidhu (1971).

Following the derivation in Stead (1985), a firm with market power facing consumers with constant demand elasticity will more than fully pass taxes along to consumers. For firm i setting prices with market power, profit maximizing prices are given by

$$p = \frac{mc + \tau}{1 + \frac{1}{\epsilon_i}}$$

where $\epsilon_i$ is the residual demand curve faced by the firm. Since the profit maximizing firm will set price on the elastic portion of the demand curve, a change in $\tau$ increases tax-inclusive prices by $\frac{1}{1+\frac{1}{\epsilon_i}} > 1$.

## 2.1 Industry Background

The primary contribution of our paper is to estimate how fuel tax pass-through responds to constraints at various points of the supply curve. We briefly describe the US supply chain for petroleum products. We then present a discussion of factors that shift the elasticity of supply $\eta$ and empirically examine how these shifts affect the pass-through of gasoline and diesel taxes.

A four-part supply chain (refining, bulk transport, terminal storage, and retail delivery) delivers petroleum products to US consumers. Crude oil is refinery primarily at domestic refineries, with fifty percent of domestic refining capacity located in Texas, Louisiana and California. From 1983 to 2003, 94 percent of national gasoline consumption was refined domestically.[2] Diesel fuel and gasoline are shipped from refineries in bulk by pipelines or barge to wholesale terminals located near most major US metropolitan areas. Wholesale terminals hold gasoline and diesel inventories to smooth local demand shocks - from the wholesale terminals, tanker trucks transport fuel to industrial and commercial customers and to retail stations for sale to individual drivers.

## 2.2 Refinery Constraints

We examine the effect of four supply chain constraints on fuel tax pass-through. The first constraint we study is when demand for refined products approaches domestic refining capacity. Demand for refined products tends to peak during the summer driving season. On average, domestic refinery capacity is 92 percent utilized during summer months in our study period.

---

[2] Although regulations do not prevent gasoline and diesel fuel from being refined outside the United States and imported into the country, imports face several barriers to being an effective way to mitigate the effects of supply chain constraints. As Borenstein et al (2004) notes, many arbitrage opportunities (due to unanticipated demand shocks or supply constraints) are relatively short in duration. The lag between refining product to meet US fuel requirements and shipping the product to US markets is often great enough to prevent foreign refineries from acting as a competitive source of peak supply.

During several summers of our sample, though, utilization peaks at over 99 percent. During periods of high capacity utilization, academic studies and government investigations have noted that gasoline prices tend to rise dramatically.[3] Moreover, unanticipated refinery closures often lead to large increases in local prices.

Refinery capacity constraints persist for two reasons. First, siting a new refinery is very difficult. Due to environmental regulations, siting challenges and resistance from local communities, no new domestic refineries have been built since 1976 (although a small refinery (163k bbls/day) is currently proposed in Arizona). Second, expansions of capacity at existing refineries is limited in scope - the growth of domestic refining capacity to approximately 1.0 percent per year between 1995 and 2005, the period during which domestic refining capacity was heavily utilized. Over the same decade, consumption of refined products has increased by 1.7 percent per year.

## 2.3   Storage constraints

Firms' abilities to store gasoline and diesel fuel at wholesale terminals introduce important complications when considering tax incidence. Storage places restrictions on the intertemporal evolution of prices. Suppose that a change in the tax rate in time $t+1$ is anticipated at time $t$. Allow firms to store an amount of fuel, $S_t$, from time $t$ to $t+1$ at a marginal storage cost of $k$. A wholesale terminal chooses storage to maximize expected profits:

$$E_t[\Pi_{t+1}] = E_t[p_{t+1} - \tau_{t+1}]S_t/(1+r) - (p_t - \tau_t)S_t - kS_t \qquad (4)$$

The first-order condition of a competitive storage firm is therefore given by

$$(E[p_{t+1}] - \tau_{t+1})/(1+r) = p_t - \tau_t + k. \qquad (5)$$

A simple model of storage predicts that firms will use storage to arbitrage away anticipated differences in prices net of taxes. So long as the no-arbitrage condition holds, prices will rise by the amount of the tax increase and taxes will be fully passed onto consumers. Importantly for our context, the condition (5) should hold even when production is temporarily inelastic, such as when refineries face short-run capacity constraints.

There are several reasons why the simple no-arbitrage condition given by equation (5) may not hold for gasoline or diesel fuel. Borenstein et al (2004) note capacity constraints in the

---

[3] see e.g. Muehlegger (2006) and the FTC Midwest Gasoline Price Investigation

storage market. If capacity constraints in the storage market are binding, the shadow value of the storage constraint would enter into (5). At the low end, storage obviously cannot fall below zero.

In addition, storage plays an important role in mitigating market power in wholesale fuel markets.[4] Inventories help to mitigate market power concerns that may arise due to short-run mismatches between supply and demand – firms are less able to exercise unilateral market power if other firms hold large inventories. When inventories are low, competitors may be less able to offset a reduction in quantity by a competitor. If inventories act as a hedge against market power in wholesale fuel markets, the residual demand elasticity faced by the firm would be negatively correlated with competitors' inventories. When inventories are low, firms able to exercise temporary market power may more than fully pass the taxes onto consumers.

Consequently, the relationship between inventories and tax incidence is complicated. In a market with no constraints and costless storage, we should expect to estimate full pass-through in a first-differenced specification. However, if storage capacity constraints bind, pass-through may either decrease or decrease. Inventories are unable to respond to changes in price, thereby making supply elasticity, however low inventories may increase market power at wholesale terminals, in which case it is conceivable that wholesalers will be able to more than fully pass taxes along to consumers.

## 2.4 Residual Supply Elasticity

For diesel, untaxed supplies provide a source of inventories that supplement wholesale terminal inventories. No. 2 distillate can either be sold as diesel or as heating oil, which suggests that the supply of diesel is the residual of No. 2 distillate supply after subtracting the demand for fuel oil. The residual supply of diesel is therefore given by $S^{diesel}(p) = S(p) - D^{oil}(p)$, where $S(p)$ is the supply of No. 2 distillate.[5] Differentiating with respect to $p$, we obtain the residual supply elasticity of diesel,[6]

$$\eta^{diesel} = \eta/\sigma - \epsilon_{oil}/\sigma^o \tag{6}$$

where $\eta^{diesel}$ is the residual supply elasticity of diesel, $\eta$ is the supply elasticity of No. 2 distillate, $\sigma$ is diesel's share of No. 2 distillate, $\epsilon_{oil}$ is the demand elasticity for fuel oil, and $\sigma^o$ is the supply

---

[4]As Borenstein et al (2004) notes, significant barriers to entry exist in the fuel storage market. Consequently, wholesale storage markets tend to be relatively concentrated.

[5]We consider the residual supply rather than residual demand since demand is likely to be largely independent across fuel oil and diesel markets, while supply is interrelated.

[6]Chouinard and Perloff (2004) perform a similar exercise for gasoline, showing how the residual supply elasticity, and therefore pass-through, in a state is higher as its share of national gasoline demand is lower.

7

of diesel relative to the supply of fuel oil. The supply elasticity is therefore greater when fuel oil demand is high relative to diesel, and a more elastic supply of diesel should increase the pass-through of the diesel tax to consumers. In the empirical section to follow, we utilize variation in weather and households' use of fuel oil as factors that shift $\sigma$ and $\sigma^o$.

## 2.5   Environmental Regulations

Finally, we consider environmental regulations that complicate the bulk transportation, wholesale storage and local distribution of gasoline. In 1990, the Clean Air Act Amendment mandated special requirements for fuel in regions failing to meet EPA limits for ozone and carbon monoxide pollution. The EPA designed reformulated gasoline (RFG) to reduce mobile-source emissions (cars) in areas in serious or severe ozone non-attainment.[7] For regions in carbon monoxide non-attainment, the EPA designed oxygenated gasoline for winter use.[8]

Special blends complicate the petroleum product supply chain – refiners must determine which blends to produce in advance, pipeline operators must manage the transportation of a larger number of incompatible fuels and wholesale terminal operators may have to manage storage for more than one specification of gasoline at once.[9] Consequently, we anticipate that taxes will be less fully passed-through in states where regulatory heterogeneity is greater.[10]

# 3   Data and Methods

## 3.1   Data

We collect a 20-year monthly panel of average state-level prices of gasoline and diesel fuel from the Energy Information Administration (EIA). The EIA reports the monthly average price of

---

[7] Initially, nine cities with 63 million residents fell into this category: Baltimore, Chicago, Hartford, Houston, Los Angeles, Milwaukee, New York City, Philadelphia and San Diego. Subsequently, Sacramento was reclassified as in severe ozone non-attainment area in the summer of 1995. In addition, many other states, counties and cities chose to voluntarily adopt the new, more stringent reformulated gasoline standards. Between 1995 and 2001, areas containing approximately 35 million people have "opted-in" to the federal RFG program.

[8] Oxygenated gasoline is required in winter months where carbon monoxide emissions are greatest. Thirty-nine areas were in non-attainment initially, containing 86 million people. Of these areas, the majority have since come into attainment and stopped using oxygenated gasoline in winter months.

[9] As an example, following Hurricane Rita, the Missouri Department of Natural Resources received an EPA waiver from local RFG requirements. The EPA determined that "an 'extreme and unusual fuel supply circumstance' exists that will prevent the distribution of an adequate supply of RFG to the St. Louis RFG covered area." The waiver allowed St. Louis retail stations to sell conventional gasoline from Sept 27th until October 7th - since the supply of conventional gasoline to the area outside of the RFG covered area was relatively unaffected.

[10] Special blends may also increase concentration if they are sufficiently costly for refineries to produce. For example, the FTC complaint for the Chevron Texaco merger specifically singles out refining, bulk supply and marketing of California Air Resource Board (CARB) gasoline. We do not find evidence that pass-through varies for conventional gasoline and special blends.

No. 2 distillate separately by the type of end user for twenty-three states.[11] To measure the price of No. 2 diesel for on-highway purposes, we use the price to end users through retail outlets. This price is virtually a perfect match of the low-sulfur diesel price, which is almost exclusively for on-highway use. The EIA publishes average retail gasoline prices for all fifty states monthly from 1983 onwards.

We collect information about the federal and state gasoline and on-road diesel tax rates from 1983 to 2003 from the Federal Highway Administration Annual Highway Statistics.[12] Federal on-road diesel excise taxes were four cents per gallon in 1981, rising to the current level of 24.4 cents per gallon in 1993. State on-road diesel excise taxes also rose throughout the period, from a weighted average excise tax rate of 9.2 cents per gallon in 1981 to 19.4 cents per gallon in 2003.[13] Within-state variation also rose throughout the period. In 1981, state on-road diesel taxes varied from a low of 0 cents per gallon in Wyoming to 13.9 cents per gallon in Nebraska. In 2003, Alaska imposes the lowest state diesel taxes, at 8 cents per gallon, while Pennsylvania imposed the highest taxes of 30.8 cents per gallon. As with diesel taxes, state and federal gasoline taxes increased during this time frame. In 1983, the federal gasoline tax was four cents per gallon and average state gasoline taxes were 11.3 cents per gallon. In 1983, tax rates were lowest in Texas at five cents per gallon and highest in Washington and Minnesota at 16 cents per gallon. By 2003, the federal gasoline tax rose to 18.4 cents per gallon and the average state gasoline tax rose to 20.5 cents per gallon, with a low of 7.5 cents per gallon in Georgia and a high of 30 cents per gallon in Rhode Island.

We also collect data capturing market factors that affect the demand and supply of gasoline and diesel. Our demand shifters for diesel fuel are primarily related to temperature and the prevalence of the use of fuel oil as a home heating source. We obtain monthly heating degree days by state from the National Climate Data Center at the National Oceanic and Atmospheric Administration. The number of heating degree days in a month, commonly used to model heating demand, is defined as the sum of the daily number of degrees the temperature is below 65.[14] We also measure state heating oil prevalence using the fraction of households in a state

---

[11] The EIA surveys prices for states using No. 2 distillate as a "significant heating source." (source: EIA Form 782b explanatory notes) Price data exists for Alaska, Idaho, Illinois, Indiana, Michigan, Minnesota, Ohio, Oregon, Virginia, Washington, West Virginia, Wisconsin and all states in New England (PADD1a) and the Central Atlantic subdistricts (PADD1b).

[12] Several states in our sample also levy ad-valorem taxes on gasoline or diesel sales. Since the vast majority of the tax changes in our sample are changes to state and federal quantity-based excise taxes, we focus primarily on the pass-through of these taxes. We do not find that the pass-through of quantity based excise taxes differs significantly for states that additionally levy ad-valorem taxes and states that do not levy ad-valorem taxes.

[13] Oregon does not tax diesel sold for trucking, instead taxing the number of weight-miles driven in the state. For this reason, we exclude Oregon from the subsequent analysis.

[14] For example, if the temperature in a state were 55 degrees for each day in the month of January, the number of

9

reporting in the 1990 census to use fuel oil as the primary energy source for home heating. In addition, we collect state unemployment rates and we calculate the minimum diesel and gasoline tax rates in neighboring states.

To measure capacity constraints at domestic refineries, we obtain national, monthly refinery capacity utilization from the EIA for 1990 to 2003. Capacity utilization is defined as the ratio of total crude oil input to the total available distillation capacity – capacity utilization captures both production constraints arising from both high demand and from unanticipated refinery repairs. In addition, we obtain monthly data on diesel and gasoline inventories at the PADD-level from the EIA for our entire time period. We normalize the inventories by the average daily demand in the prior 12 months in each PADD to measure inventories in terms of number of days of supply.

To measure the effect of environmental regulations, we collect data on within-state variation in gasoline content regulations. For each state, the EIA tracks the proportion of gasoline meeting federal reformulated gasoline requirements, federal oxygenated gasoline requirements and less stringent conventional gasoline requirements.[15] To measure within-state heterogeneity, we sum the squared proportions of RFG, oxygenated and conventional gasoline. A value of one denotes uniform regulation for the entire state; a value of one-third denotes that equal amounts of reformulated, oxygenated and conventional gasoline are sold.

Table 1 reports the summary statistics of our variables. To help interpret the results regarding capacity utilization and incidence, the variable means are also reported separately for months with different rates of US refinery capacity utilization. The average tax inclusive retail price is 120.8 cents per gallon over the course of the series. This price is on average highest when capacity utilization is between 90 and 95 percent, though it is in fact lowest at the highest level of capacity utilization.[16] Over our sample, tax inclusive gasoline prices average 118 cents per gallon. Unlike diesel prices, the average gasoline price rises as refinery capacity utilization increases. The average state diesel tax rate is 18.2 cents per gallon, compared with the average federal tax of 19.8 cents per gallon. Gasoline taxes average 17.1 cents per gallon at the state level and 14.2 cents per gallon at the federal level. The average month has 5.3 heating degree

---

heating degree days for each day would be 10 and the number of heating degree days for the month would be 310.

[15] The EIA does not report quantities when quantities are small enough to potentially infer the actions of any one company. After first-differencing, EIA redaction causes us to omit twenty-seven percent of the base sample. Redaction varies by region - forty seven percent of the observations in PADD 5 are omitted after first-differencing, while only seventeen percent of the observations in PADD 2 are omitted after first differencing. Importantly, we do not find that our base pass-through results differ significantly when we limit ourselves to this subsample.

[16] Since the capacity utilization series is not available for the entire sample, the means separated by capacity utilization may appear inconsistent with the overall mean.

10

days. Since cold months tend to have lower demand for gasoline, the average degree days are at their highest when refinery capacity utilization is at its lowest. For the average state, 28 percent of households use fuel oil (diesel) to heat their homes, yet this varies considerably across states as standard deviation of this variable is 0.20.

The average capacity utilization is 91 percent. Low capacity utilization months disproportionately occur in the winter and spring, while 88 percent of high capacity utilization months are in the second and third quarters of the year. Twelve percent of the gasoline sold during the period met federal reformulated gasoline requirements. Approximately two percent of the gasoline sold met federal oxygenated requirements. Content regulations vary substantially both within and across states. Although the mean of the sum of squared content shares is 0.95, the value is less than 0.75 for approximately ten percent of the sample, and less that 0.6 for approximately five percent of the sample.

Tax increases are most likely to come when capacity utilization is low, as there is a 2.7 percent likelihood a state raises its diesel tax in a month with a capacity utilization of less than 85 percent, compared with 1.6 percent overall. This is primarily due to January being a popular month for tax changes. Yet tax increases in high capacity utilization months are not uncommon. States raise taxes in 1.2 percent of months with a capacity utilization above 95 percent, and tax increases are in fact more likely during these months than when capacity utilization is between 85 and 95 percent.

To further illustrate the variation used in this paper, Figure 1 shows the average diesel tax rate over time for the 22 states we use in the analysis, and the number of states per year changing taxes. The average tax per state increases steadily over time, with the growth rate of taxes perhaps slowing somewhat beginning in the nineties. Fewer states changed diesel tax rates during the nineties, yet we still see that several states change taxes in each year of the data. The only exception is 2000, when tax rates were stable for all states. Figure 2 shows a similar series for gasoline taxes. Gas taxes rise over time, with the rate of growth slowing considerably in recent years. Nonetheless, each year saw at least two states increasing gasoline taxes, with most years witnessing between ten and thirty states changing tax rates.

## 3.2  Methods

The approach taken in this paper is to estimate the effect of federal and state taxes on post-tax (consumer) prices. We assume that the data generating process at the state-month level for

11

prices $p_{it}$ in cents per gallon is given by:

$$p_{it} = \beta_0 + \beta_1 T_{it}^S + \beta_2 T_t^F + BX_{it} + \rho_i + \sigma_t + \epsilon_{it} \qquad (7)$$

where $T_{it}^S$ and $T_t^F$ are the state and federal tax rates in cents per gallon, $X_{it}$ is a vector of time-varying state level covariates, $\rho_i$ is a state-level fixed effect meant to capture time-invariant local cost shifters, and $\sigma_t$ represents time effects. To estimate (7) in the presence of the unobserved state-level heterogeneity described by $\rho_i$, we will estimate the first-differenced equation

$$\Delta p_{it} = \beta_0 + \beta_1 \Delta T_{it}^S + \beta_2 \Delta T_t^F + B\Delta X_{it} + \sigma_t + \epsilon_{it}. \qquad (8)$$

The coefficients $\beta_1$ and $\beta_2$ are therefore estimated from contemporaneous changes in taxes and prices.[17]

Our approach provides a significant advantage over estimating the relationship in levels. In order for our estimates to be biased, the first-differenced omitted variable must be correlated with state-level tax changes. Thus, demographic trends (or other slow moving variables) are unlikely to bias our results, whereas they are more likely to be correlated with prices in a levels regression. In addition, other variables that change discretely such as transportation policy variables must change contemporaneously with the state-level tax changes in order to bias our results. Furthermore, for the majority of our results, $\sigma_t$ consists of month*year fixed effects. Although our effects prevent the estimation of the pass-through of federal taxes ($\beta_2$), the fixed effects subsume all state-invariant shocks that affect gasoline or diesel prices.

## 4   Results

### 4.1   Basic incidence results

The results of estimating equation (8) for diesel are presented in Table 2. The specifications presented in column 1 control for year and month effects, while the specification shown in column 2 also includes state-level covariates. By separately controlling for state and month effects, we allow for the identification of the effects of both state and federal fuel taxes. Our findings indicate that a one cent increase in the state tax rate increases the retail price by 1.22 cents,

---

[17]If tax changes are endogenous to prices then this approach will not be valid, a problem shared with other studies of gasoline tax incidence. For instance, if tax increases are not undertaken when prices are increasing, then our estimate of $\beta_1$ will not be valid. We have found little relationship between tax changes and factors affecting supply conditions. Furthermore, the lag between the passage of a tax rate increase and its implementation implies that tax increases are unlikely to be related to unexpected changes in supply.