# EXHIBIT 100

# REDACTED

Page 1

1                UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF VIRGINIA

2                   ALEXANDRIA DIVISION

3    - - - - - - - - - - - - - x

4       UNITED STATES, et al.,    :

5           Plaintiffs,           :

6         v.                      :   Case No.

7       GOOGLE, LLC,              :   1:23-cv-00108

8           Defendant.            :

9    - - - - - - - - - - - - - x

                              Monday, March 4, 2024

10                                Washington, D.C.

11

     Job No. CS6484199

12   Videotaped Deposition of:

13              WAYNE D. HOYER, Ph.D.,

14   called for oral examination by counsel for the

15   Defendant, pursuant to notice, at the United States

16   Department of Justice, Antitrust Division, 450 Fifth

17   Street, Northwest, Suite 11-248, Washington,

18   D.C. 20001, before Christina S. Hotsko, RPR, CRR, of

19   Veritext Legal Solutions, a Notary Public in and for

20   the District of Columbia, beginning at 8:33 a.m.,

21   when were present on behalf of the respective

22   parties:

Page 2

A P P E A R A N C E S
On behalf of Plaintiffs:
    AARON SHEANIN, ESQUIRE
    U.S. Department of Justice
    Antitrust Division
    450 Golden Gate Avenue, Suite 10-0101
    San Francisco, California
    (415) 229-2930
    aaron.shearnin@usdoj.gov

    CHASE PRITCHETT, ESQUIRE
    United States Department of Justice
    Antitrust Division
    450 Fifth Street, Northwest, Suite 11-248
    Washington, D.C. 20001
    (202) 307-0924
    chase.pritchett@usdoj.gov

On behalf of Defendant:
    MEREDITH R. DEARBORN, ESQUIRE
    Paul Weiss Rifkind Wharton & Garrison, LLP
    535 Mission Street, 24th Floor
    San Francisco, California 94105
    (628) 432-5113
    mdearborn@paulweiss.com
    ANITA Y. LIU, ESQUIRE
    Paul Weiss Rifkind Wharton & Garrison, LLP
    2001 K Street, Northwest
    Washington, DC 20006-1047
    (202) 223-4363
    aliu@paulweiss.com

Also Present:
    Warren Brey, Video Technician
    Suzanne Majewski, Economist, DOJ Antitrust Division
    Elizabeth Aramayo, DOJ Antitrust Division
    Claire Cushman, DOJ Antitrust Division
    Marie Lise Levry, DOJ Antitrust Division

Page 3

## C O N T E N T S

EXAMINATION BY:                              PAGE

  Counsel for Defendant              06

  Counsel for Plaintiffs             457


HOYER DEPOSITION EXHIBITS:                    PAGE

Exhibit 1  Hoyer Expert Report and Errata        04
Exhibit 2  Simonson Expert Report                04
Exhibit 3  Research Article                     198
Exhibit 4  Advertiser Perceptions Website Printout  238
Exhibit 5  Article, Service brand relationship  328
           quality: Hot or cold?

Page 4

## P R O C E E D I N G S

(Hoyer Deposition Exhibits 1 and 2
premarked for identification and attached
to the transcript.)

VIDEO TECHNICIAN:  Good morning.  We're
going on the record at 8:33 a.m. on March 3rd --
I'm sorry, March 4th, 2024.

This is media 1 of the video-recorded
deposition of Professor Wayne Hoyer, taken by
counsel for the plaintiff in the matter of United
States --

MR. SHEANIN:  Counsel for defendant.

VIDEO TECHNICIAN:  I'm sorry.

-- by counsel for defendant in the matter
of United States, et al., versus Google, LLC,
filed in the District Court of the Eastern
District of Virginia, case
number 1:23-CV-00108-LMB-JFA.

The location of the deposition is at the
DOJ Antitrust Division Offices, 450 Fifth Street,
Northwest, Washington, D.C.

My name is Warren Brey representing

Page 5

Veritext Legal Solutions.  I'm the videographer.
The court reporter is Christina Hotsko from the
firm of Veritext Legal Solutions.

Counsel, please introduce yourselves for
the record.

MS. DEARBORN:  Meredith Dearborn,
Paul Weiss, for Google.

MS. LIU:  Anita Liu from Paul Weiss for
Google.  L-i-u.

MR. SHEANIN:  Aaron Sheanin on behalf of
the United States.

MR. PRITCHETT:  Chase Pritchett on behalf
of the United States.

MS. MAJEWSKI:  Suzanne Majewski on behalf
of the United States.

VIDEO TECHNICIAN:  And court reporter,
please swear in the witness.

Whereupon,

WAYNE D. HOYER, Ph.D.,
being first duly sworn or affirmed to testify to
the truth, the whole truth, and nothing but the
truth, was examined and testified as follows:

2 (Pages 2 - 5)

1    Q.  Okay.  So you did not identify any flaws
2  in Dr. Simonson's study that you did not lay out
3  in your report?
4    A.  Yes, that's correct.
5    Q.  Okay.  Is there anything in the way that
6  Dr. Simonson conducted his survey that you agree
7  with?
8    A.  He did some things right, but there are
9  major flaws in the report.
10    Q.  What did he do right?
11    A.  Well, he attempted -- he asked certain
12  questions that were not leading, but some of the
13  key questions in the report were quite flawed.
14    Q.  What questions that he asked -- did he
15  ask that were not leading?
16    A.  I don't have it -- I don't remember
17  the -- I don't have it memorized.  If you want to
18  go to his survey, I could look at that.
19    Q.  It's fair to say that if you didn't
20  identify a critique of a question in your report,
21  you think that the question was phrased
22  appropriately?

1    A.  I would say that.  Yes.
2    Q.  Okay.  Did you take issue with any other
3  aspect of Dr. Simonson's methodology other than
4  the ones that you identified in your report?
5    A.  Not that I can remember.  The main
6  criticisms are in my report.
7    Q.  Okay.  So in your report you do not
8  criticize Dr. Simonson's decision to use $500,000
9  as the cutoff line between the higher and the
10  lower spend surveys, correct?
11    A.  Yes.  I do not criticize that.
12    Q.  You think that was an appropriate line to
13  draw?
14    A.  Well, in retrospect, looking at the
15  distribution of the advertising spend, I think the
16  high end could be higher, but I don't think
17  that -- see that as a major flaw.
18    Q.  Okay.  That dividing line doesn't render
19  Dr. Simonson's report methodologically unreliable
20  in your view?
21    A.  That's correct.
22    Q.  And you do not think in that sample sizes

1  in the surveys, the three surveys that
2  Dr. Simonson conducted, were inappropriate or too
3  small, right?
4    A.  My issue is not with the sample size;
5  it's with the representativeness of the sample.
6    Q.  Great.  And we'll get into a little bit
7  of that later.
8    But you agree that the respondent sample
9  size numbers are large enough to draw robust
10  conclusions in each of Dr. Simonson's reports,
11  right?
12    A.  Well, it's not just about numbers.  It's
13  about -- representativeness is a bigger issue.
14    Q.  Understand.  But just to focus you on my
15  question, you agree that the respondent sample
16  size numbers in each of Dr. Simonson's three
17  surveys were large enough to draw robust
18  conclusions, correct?
19    MR. SHEANIN:  Asked and answered.
20    THE WITNESS:  Again, I stand by my
21  previous answer.
22

1  BY MS. DEARBORN:
2    Q.  I actually need an answer to my question,
3  which is, you agree that the respondent sample
4  size numbers in each of Dr. Simonson's three
5  surveys are large number to draw robust
6  conclusions, correct?
7    MR. SHEANIN:  Counsel --
8  BY MS. DEARBORN:
9    Q.  Setting aside the representativeness
10  issue.
11    MR. SHEANIN:  Asked and answered.
12    THE WITNESS:  What was --
13    MR. SHEANIN:  I said asked and answered.
14  BY MS. DEARBORN:
15    Q.  You can answer the question.
16    A.  The sample size is adequate.
17    Q.  Thank you, Dr. Hoyer.
18    And you don't criticize Dr. Simonson's
19  decision to rely on a third party to assemble a
20  panel of respondents, correct?
21    A.  Correct.  That is done routinely in
22  research.

1    Q.  Okay.  And you didn't find any
2  quantitative errors in the way that Dr. Simonson
3  tabulated his results, right?
4    A.  Not specific tabulation errors, but some
5  in reporting of the results.
6    Q.  Okay.  And focusing on the agency survey
7  for a moment, you don't question Dr. Simonson's
8  instruction to ask agency respondents to focus on
9  the client on which they spend the most time,
10  right?
11    A.  I don't criticize that, no.
12    Q.  Okay.  And I know -- we'll talk a little
13  bit about some questions you have given the length
14  of the surveys, but as a general matter, you don't
15  think 38 or 39 question is too many to ask
16  respondents in a survey, right?
17    MR. SHEANIN:  Objection to form.
18    THE WITNESS:  It depends.  It's not just
19  the number of questions; it's how detailed those
20  questions are.  So -- but it's usually in -- that
21  would be a reasonable size of a survey.
22

1  BY MS. DEARBORN:
2    Q.  Thank you.
3    And we'll talk a little bit about some of
4  your criticisms of Dr. Simonson's exclusion of
5  people who took too long to take the survey, or
6  not long enough.
7    But as a general matter, you agree that
8  it's appropriate to exclude people who took the
9  survey too quickly and those who took too long,
10  right?
11    A.  That is something that's typically done
12  in research, but I don't think he went far enough
13  in this case.
14    Q.  Okay.  Thank you.  And we'll talk a
15  little bit later about your criticisms in that
16  regard.  Thank you, Dr. Hoyer.
17    Now, you'd agree that your typical
18  process for preparing an academic study is to
19  identify a hypothesis you want to test and then to
20  design a study, whether it be a study or
21  experiment, to test that hypothesis, right?
22    A.  Not in all research.  That's the way I do

1  research.  But there are quantitative researchers
2  that start with the data and then develop a
3  hypothesis.
4    Q.  Yeah.  In this case, did you start with a
5  hypothesis?
6    A.  I didn't see a hypothesis.  Not that I
7  can recall.
8    Q.  You didn't start with a hypothesis and
9  then test your results.
10    A.  Normally, when you test a hypothesis,
11  there's a literature review that talks about all
12  the literature and then come up to a formal
13  specific hypothesis.  And I did not see that in
14  the report.
15    Q.  You didn't see that in Dr. Simonson's
16  report?
17    A.  Right.
18    Q.  I'm asking, actually, about your process
19  in coming up with --
20    A.  Oh, in my process, I'm sorry.
21    Q.  Yeah, with your -- in preparing your
22  report in this case, did you start with a

1  hypothesis and then test that conclusion?
2    A.  No, I did not, because that was not my
3  assignment.  I was there to simply review and
4  evaluate Professor Simonson's report, and that's
5  not a research study where I'm collecting data to
6  test that hypothesis.
7    Q.  Okay.  Thank you.
8    You did not conduct a survey in this
9  case, right?
10    A.  Correct.  I did not.
11    Q.  Why not?
12    A.  That was not part of my assignment.  And
13  a survey typically takes four to six weeks at
14  least to conduct, and I had three weeks to produce
15  this report.
16    Q.  So you didn't have enough time to
17  complete a survey of your own?
18    A.  Well, even if I had enough time, I
19  wouldn't have done it.  That was not my
20  assignment.
21    Q.  Okay.  Did anyone tell you not to conduct
22  a survey in this case?

Page 22

1    A. No.
2    Q. All right.
3        MR. SHEANIN: Counsel -- on that last
4  question, I just want to caution you not to get
5  into contents of communication between yourself
6  and counsel or yourself and your staff.
7        MS. DEARBORN: That's completely fine.
8  BY MS. DEARBORN:
9    Q. I want to be clear, in all of my
10 questions here today, I'm not attempting to get
11 into the substance of conversations between
12 yourself and counsel for the Department of
13 Justice.
14   A. Okay.
15   Q. You can set that aside in your answers.
16   A. Okay.
17   Q. I do, however, want to understand the
18 scope of your assignment.  And I think that's an
19 appropriate line of questions to ask, subject to
20 your counsel's objections.
21       So just to be clear, you did not try to
22 conduct a survey or an experiment that corrected

Page 23

1  any of the errors that you identified in
2  Dr. Simonson's report, correct?
3    A. I did not conduct a survey.
4    Q. Okay.  So for example, you didn't conduct
5  a survey that asked whether -- strike that.
6        In preparing your opinions in this case,
7  did you do anything to empirically test how the
8  errors you identified, if corrected, would impact
9  the results that he reached?
10       MR. SHEANIN: Objection to form.
11       THE WITNESS: Could you clarify about
12 what you mean empirically test?
13 BY MS. DEARBORN:
14   Q. Well, what does the word "empirically"
15 mean to you?
16   A. It means collect data.
17   Q. So using that definition, in preparing
18 your opinions in this case, did you do anything to
19 empirically test how the errors that you
20 identified in Dr. Simonson's report, if they were
21 corrected, would impact the results that he
22 reached?

Page 24

1        MR. SHEANIN: Objection to form.
2        THE WITNESS: I did not collect any data,
3  but I re-analyzed some of Simonson's data to
4  support some of my conclusions.
5  BY MS. DEARBORN:
6    Q. And that's -- the data you're identifying
7  is the data that Dr. Simonson provided in the
8  backup to his report?
9    A. Yes.  That's correct.
10   Q. Okay.  Other than what is identified in
11 your report, did you do anything else to
12 empirically test your conclusions about whether
13 the errors in Dr. Simonson's report would impact
14 the results?
15   A. No, I did not.
16   Q. And I think I asked a bad question, so
17 let me ask it again.
18       Other than what is identified in your
19 report, did you do anything to empirically test
20 whether Dr. Simonson's -- the errors that you
21 identified in Dr. Simonson's report would impact
22 his results?

Page 25

1        MR. SHEANIN: Objection to form.
2        THE WITNESS: No, I did not collect any
3  additional data.
4  BY MS. DEARBORN:
5    Q. Okay.  This might be implicit in your
6  prior answers, but let me just ask anyway.
7        In preparing to -- your report in this
8  case, did you talk to any advertisers?
9    A. No, I did not.
10   Q. Did you gather any information from
11 advertisers or advertising agencies?
12   A. No, I did not.
13   Q. Is it fair to say that you restricted
14 your analysis to the data that Dr. Simonson
15 collected?
16   A. I -- well, what he collected, yes.
17   Q. Okay.  Do you have any experience
18 purchasing digital advertising?
19   A. No.  My expertise is in survey
20 methodology and consumer behavior.
21   Q. Okay.  Do you have any experience using
22 ad tech tools?

7 (Pages 22 - 25)

Page 26

1    A. I do not. Again, my expertise is in
2  survey methodology and consumer behavior. And
3  marketing communications.
4    Q. Have you ever conducted a survey of
5  advertisers before?
6    A. Of advertising?
7    Q. Uh-huh. Advertisers.
8    A. Advertisers? As -- do you mean them as
9  the sample?
10    Q. Yes.
11    A. No, I have not.
12    Q. Okay. Would you agree that vendor or
13  advertiser decisionmaking processes might be
14  different from consumer decisionmaking processes?
15      MR. SHEANIN: Objection to form.
16      THE WITNESS: My assignment was not to
17  evaluate the decision process. It was to evaluate
18  questions asked of advertisers. And questions,
19  survey methodology, the -- the basic principles
20  are the same across any target --
21  BY MS. DEARBORN:
22    Q. Okay.

Page 27

1    A. -- audience.
2    Q. How many surveys have you prepared for
3  litigation purposes?
4    A. Three. Actually, I've done a fourth one,
5  but that's currently ongoing, and my report was
6  just submitted and I can't talk about that.
7    Q. Can you describe at a high level what the
8  subject matter of that survey is?
9      MR. SHEANIN: I'm going to caution you
10  that if it's something that's confidential, you
11  should not disclose anything that would violate
12  any kind of confidentiality.
13      THE WITNESS: I can only tell you the
14  topic. It's on understanding -- for credit
15  union -- customers understanding credit union
16  terms for their account.
17  BY MS. DEARBORN:
18    Q. Okay. And how many surveys have you
19  conducted outside of the litigation context?
20    A. Hundreds.
21    Q. Okay. Of all the surveys that you've
22  conducted, what percentage, approximately, would

Page 28

1  be of consumers?
2    A. I would have to -- I don't have my --
3  I've done hundreds of studies. I don't have
4  every -- the large majority.
5    Q. Large majority would be of consumers?
6    A. Yes.
7    Q. Okay. And is it fair to say that, in the
8  litigation context, your surveys are usually in
9  the subject of likelihood of confusion in
10  trademark cases?
11    A. Not always. One of my surveys was on
12  deceptive advertising.
13    Q. Okay. But all of your surveys have
14  been -- have pertained to whether -- strike that.
15      All of your surveys have pertained to --
16  have surveyed the population of consumers, right?
17      MR. SHEANIN: Objection to form.
18      THE WITNESS: That is correct.
19  BY MS. DEARBORN:
20    Q. You're not an expert in advertiser
21  decisionmaking, right?
22    A. Can you define that term?

Page 29

1    Q. Well, you know what the phrase "consumer
2  decisionmaking" means, right?
3    A. Yes.
4    Q. And you would agree that advertisers
5  might use different processes to come to decisions
6  or take different things into consideration when
7  making decisions than consumers, right?
8      MR. SHEANIN: Objection to form.
9      THE WITNESS: I do, in my class, talk
10  about decisions that advertisers need to make in
11  their advertising strategy.
12  BY MS. DEARBORN:
13    Q. Okay. So would you characterize yourself
14  as an expert in advertiser decisionmaking?
15    A. I would classify myself as an expert in
16  advertising and marketing communications.
17    Q. Okay. How -- would you classify yourself
18  as an expert in advertiser decisionmaking?
19      MR. SHEANIN: Asked and answered.
20      THE WITNESS: Again, as I said, I talk
21  about factors that go into advertiser
22  decisionmaking. I've not done research

8 (Pages 26 - 29)

Page 30

1  specifically on how they make decisions.
2  BY MS. DEARBORN:
3      Q.  Okay.  You have not specifically
4  researched how advertisers come to decisions in
5  the course of their business, right?
6      A.  Yes --
7          MR. SHEANIN:  Asked and answered.
8          THE WITNESS:  I have general knowledge
9  about advertising decisionmaking.
10 BY MS. DEARBORN:
11     Q.  But you have not specifically studied how
12 advertisers come to decisions, correct?
13     A.  Right --
14         MR. SHEANIN:  Asked and answered.
15         THE WITNESS:  Sorry.  Yes.
16 BY MS. DEARBORN:
17     Q.  In this case, would it have been possible
18 for you to conduct what you view as a
19 methodologically appropriate survey?
20         MR. SHEANIN:  Objection to form.
21         THE WITNESS:  Again, that was not part of
22 my assignment.

Page 31

1  BY MS. DEARBORN:
2      Q.  Okay.  But would it have been possible
3  for you to do?
4          MR. SHEANIN:  Same objection.
5          THE WITNESS:  Again, that was not part of
6  my assignment.
7  BY MS. DEARBORN:
8      Q.  That's not my question.
9          Would it have been possible for you to
10 conduct a methodologically appropriate survey in
11 this case?
12         MR. SHEANIN:  Objection to form.
13         THE WITNESS:  Theoretically, yes, but
14 actually, operationally, no, in the time
15 constraint.
16 BY MS. DEARBORN:
17     Q.  Okay.  Do you know Dr. Itamar Simonson?
18     A.  I do.
19     Q.  Do you agree that he's an expert in
20 marketing?
21     A.  Yes.  He's a well-known expert in
22 marketing.

Page 32

1      Q.  Do you agree that he's an expert in
2  behavioral economics?
3      A.  I would say he is an expert.  I am not in
4  the area of behavioral economics, but I would
5  assume that he is an expert in behavioral
6  economics.
7      Q.  Okay.  And you agree that Dr. Simonson is
8  qualified to prepare surveys, right?
9      A.  Yes.  He would be.
10     Q.  And he's also qualified to interpret
11 their results?
12     A.  Yes, he is.
13     Q.  So you're not critiquing him for straying
14 beyond the bounds of his expertise, right?
15         MR. SHEANIN:  Objection to form.
16         THE WITNESS:  No, I'm not criticizing him
17 on those grounds.
18 BY MS. DEARBORN:
19     Q.  Okay.  And you agree that he's qualified
20 to prepare the report that he submitted in this
21 case?
22     A.  He's qualified, but he did make flaws.

Page 33

1  There are flaws in his report.
2      Q.  Okay.  You may disagree with his
3  conclusions or the way that he conducted his
4  report --
5      A.  Right.
6      Q.  -- but you don't think he is unqualified
7  to offer these opinions, right?
8      A.  No.
9          MR. SHEANIN:  Objection to form.
10 BY MS. DEARBORN:
11     Q.  All right.  Have you ever worked together
12 with Dr. Simonson?
13     A.  I have not worked on research with him,
14 but we were on a trip together in China.
15     Q.  When was that?
16     A.  2002.
17     Q.  Have you co-authored any papers with
18 Dr. Simonson?
19     A.  No, I have not.
20     Q.  Have you ever evaluated Dr. Simonson's
21 work before?
22         MR. SHEANIN:  Objection to form.

9 (Pages 30 - 33)

Page 34

1    THE WITNESS: I have read his work. But
2 in my extensive reviewing -- well, the review
3 process is blind, so I can't tell you whether I
4 have or not. It's possible, but I don't know.
5 BY MS. DEARBORN:
6    Q. Fair. So to your knowledge, you haven't
7 reviewed Dr. Simonson's work before?
8    MR. SHEANIN: Objection to form.
9    THE WITNESS: Yes. To my knowledge, I
10 have not.
11 BY MS. DEARBORN:
12    Q. Okay. What is your assessment of
13 Dr. Simonson's research record, as a general
14 matter?
15    A. He's a well-respected researcher.
16    Q. How, if at all, do your areas of
17 expertise differ from those of Dr. Simonson?
18    A. The biggest one is I'm a psychologist,
19 and he's a behavioral economist. And I actually
20 have a gripe against behavioral economists.
21 Things they're saying now, we were saying 30 years
22 ago, and they've just discovered it and acting

Page 35

1 like it's a new discovery. And we were saying
2 that -- I've done work in the '80s that people are
3 now doing the same thing and saying, wow, this is
4 new. And that's not true.
5    Q. So your gripe against behavioral
6 economists is not that they are somehow wrong;
7 it's that they're doing something that you have
8 been doing for a long time?
9    A. Yeah. For example, the book by Daniel
10 Kahneman, Think Fast --
11    Q. Thinking, Fast and Slow?
12    A. I was talking about those things in early
13 1980s.
14    Q. Got it. In paragraph 1 of your report,
15 you indicate that your research areas including
16 branding, including brand personality and brand
17 sabotage, advertising information processing, and
18 cause-related marketing, right?
19    A. Yes.
20    Q. What is advertising information
21 processing?
22    A. That is -- again, I'm a consumer

Page 36

1 psychologist, so I'm interested in how people
2 think and process information. So advertising
3 information processing would be when a consumer --
4 and actually, it's broader, any kind of marketing
5 communication, when they see some kind of
6 communication, how do they process it in their
7 mind and does it affect their behavior?
8    Q. You've said a couple of times that you're
9 a consumer psychologist.
10    What does that mean?
11    A. My Ph.D. is in psychology. So I studied
12 under one of the most famous consumer
13 psychologists, Jacob Jacoby. It was at Purdue
14 University, where I worked under him in my Ph.D.
15    But I have a degree, Ph.D., in
16 psychology.
17    Q. Okay. Are you an expert in the ad tech
18 industry?
19    A. No, I'm not.
20    Q. Have you ever conducted a survey
21 involving ad tech in any way before?
22    A. No, I have not.

Page 37

1    Q. And when I -- I should have clarified.
2    Do you understand what the term "ad tech"
3 means?
4    A. I do.
5    Q. What is your understanding of that term?
6    A. Ad tech is the different tools to buy
7 advertising for display -- programmatic display
8 advertising.
9    Q. Okay. And again, you've never conducted
10 a survey of advertisers before, right?
11    MR. SHEANIN: Asked and answered.
12    THE WITNESS: That is correct.
13 BY MS. DEARBORN:
14    Q. Outside of your work on this case, had
15 you ever heard of Advertiser Perceptions before?
16    A. You mean the firm?
17    Q. Yes.
18    A. No.
19    Q. So the first time you heard of Advertiser
20 Perceptions was in connection with this
21 litigation?
22    A. That's correct.

10 (Pages 34 - 37)

Page 38

1    Q. Okay. And I believe earlier, when we
2 spoke about the use of a panel or rely -- or a
3 third-party company to assemble a panel of
4 respondents, you said that that's common in the
5 industry?
6    A. Yes, it is.
7    Q. So have you relied on companies to
8 assemble a panel of respondents for you in surveys
9 that you've conducted in the past?
10    A. Yes, I have.
11    Q. How often have you done that?
12    A. Well, on every survey I did.
13    Q. Very common, then.
14    A. Yes.
15    Q. When you have used a third-party company
16 to assemble a panel of respondents, what, if
17 anything, have you done to verify how they select
18 their panel?
19    A. Well, I ask them about the details, and
20 then I carefully look at what samples have
21 resulted from those.
22    Q. How do you confirm that the panel was

Page 39

1 representative of the population that you're
2 seeking to study?
3    A. Well, typically, for example, in my
4 surveys, one of my surveys -- it was for General
5 Motors, and the panel -- or the respondents had to
6 be owners of a particular set of vehicles during a
7 time frame.
8       And so I carefully cross-checked that
9 data against the -- what the percentage was in the
10 population versus what the percentage was in my
11 panel.
12    Q. And in that example, you're
13 cross-checking the percentage of your panel that
14 were owners of a particular set of vehicles
15 against the general population?
16    A. Well, not the general population. The
17 subject of the survey was owners of those vehicles
18 during a very specific period.
19    Q. Okay.
20    A. And so I had data on how many there were
21 of those of the total population and then how many
22 were in the sample.

Page 40

1    Q. So you compared the percentage of owners
2 of the vehicles to the total population and --
3    A. No. It was in the population of people
4 that bought the GM vehicles. So there were
5 different models. Okay? And in the population,
6 there were X percent that owned one type of
7 vehicle, X percent owned another type of vehicle,
8 and those same percentages were in the panel.
9    Q. Got it. So confirmed that the panel
10 that you had assembled had approximately the same
11 distribution of vehicle ownership --
12    A. Correct.
13    Q. -- as the general population?
14    A. Yes, that's correct.
15    Q. Is there anything else that you did to
16 verify the representativeness of the panel that
17 you used in that example?
18    A. I carefully evaluated the sample, but
19 it's been a while so I don't remember the details.
20    Q. And is that your general practice, to
21 essentially compare the percentage of the --
22 strike that.

Page 41

1       Is that your -- was the example -- was
2 the process that you used in that example your
3 general practice in terms of verifying the
4 representativeness of a panel?
5    A. Yes. So for example, another survey I
6 just did, the sample population were in different
7 states -- 95 percent were in Alabama, 2 percent
8 were in Texas, and some percent in Florida -- and
9 I got a panel and I carefully evaluated that there
10 were the same percentages of respondents in the
11 sample as in those states.
12    Q. Okay. Other than verifying that the
13 population that you are sampling has approximately
14 the same percentage of a key attribute as the
15 general population, is there anything else that
16 you do, typically, to evaluate a panel for a
17 survey that you're conducting?
18    A. Well --
19       MR. SHEANIN: Objection to form.
20       THE WITNESS: My example is to give --
21 usually, it's multiple things; it's not just one
22 thing. So it would be you want the right

11 (Pages 38 - 41)

Page 42

1 proportion of men to women, the right proportion
2 of -- it depends on the survey. But in my one
3 survey I was just talking about, they had to be
4 customers of a credit union. So if they were not
5 customers of a credit union, then they were not
6 included in the sample.
7 So we had to make sure -- we give the
8 panel -- the person who runs the panel and their
9 company specific criteria that they have to meet
10 for the sample.
11 BY MS. DEARBORN:
12 Q. Right. And I'm trying to get at your
13 typical practice for --
14 A. Right. That's the typical practice.
15 Q. Okay. Let me just -- I'll finish my
16 question and you can finish your answer.
17 So is your typical practice to give the
18 company that you're using to assemble a panel
19 criteria that they have to meet for the sample in
20 terms of percentage of distribution of what you're
21 trying to study?
22 MR. SHEANIN: Objection to form.

Page 43

1 THE WITNESS: Yes, except they don't
2 assemble a panel. They have a panel.
3 BY MS. DEARBORN:
4 Q. Okay.
5 A. So they might have 130,000 people in that
6 panel, and you want to systematically select those
7 that meet your target from that panel.
8 Q. Okay. Is there anything else you do to
9 verify the representativeness of a panel that you
10 are assembling for a survey?
11 A. Well, the process is very thorough, to
12 make sure that they match the target population.
13 Q. The process is very thorough for the
14 company that you're relying on to assemble the
15 panel?
16 A. For them and for me.
17 Q. You say for them and for you.
18 What do you mean?
19 A. If I'm doing a litigation survey, one of
20 the most important aspects is to have a
21 representative sample. And so I'm very cautious
22 and very thorough in making sure that my sample is

Page 44

1 representative of the target population to which
2 I'm trying to draw conclusions.
3 Q. And I'm trying to get at your process for
4 determining representativeness.
5 A. Right.
6 Q. So your -- when you attempt to ensure
7 that your survey population is representative and
8 you are relying on a third party, another company,
9 to do that for you, we've talked about checking to
10 ensure that the percentages of the target
11 population that you're sampling are approximately
12 the same on a key attribute that you're attempting
13 to measure.
14 Is there anything else that you do to
15 ensure that the survey population that you have
16 created or that the company has created is
17 representative?
18 MR. SHEANIN: Objection to form.
19 THE WITNESS: The process is simply to
20 make sure, on all the key criteria, to qualify
21 them. And it can be demographics, but it can also
22 be, as I said, user of the product or whatever.

Page 45

1 We're very thorough to make sure we -- "we," I
2 mean the panel company with myself working with
3 them -- to make sure that that sample is
4 representative.
5 BY MS. DEARBORN:
6 Q. Okay. I'd like to turn your attention to
7 paragraph 64 of your report.
8 In this paragraph you use the acronym AP.
9 That stands for Advertiser Perceptions,
10 right?
11 A. Yes.
12 Q. Did you do anything yourself to test the
13 quality of Advertiser Perceptions' panels?
14 A. Could you clarify what you mean by that?
15 Q. Sure. So you understand that
16 Advertiser Perceptions has something calls the
17 AdPROs panel?
18 A. Yes.
19 Q. What do you understand the AdPROs panel
20 to consist of?
21 A. Well, my understanding is it's a
22 specialized company that has advertising

12 (Pages 42 - 45)

Page 46

1 respondents for a situation like this, when you
2 want to survey advertisers.
3    Q.  Okay.  Did you do anything yourself to
4 test the quality of the Advertiser Perceptions
5 AdPROs panel?
6    A.  I didn't have the -- I did not do
7 anything specifically, but there wasn't data in
8 the report for me -- to allow me to do that.
9    Q.  But you didn't talk to anyone in
10 Advertiser Perceptions, for example?
11    A.  No, I did not.
12    Q.  Did you do any research into
13 Advertiser Perceptions apart from what is in
14 Dr. Simonson's report?
15    A.  No, I did not.
16    Q.  Okay.  Did you do any investigation
17 yourself to ascertain the quality of
18 Advertiser Perceptions' methodology for assembling
19 a panel?
20    A.  No, because it wasn't germane to my
21 opinion.  My opinion was more on the result of
22 what they did than what was in the report.

Page 47

1    Q.  Okay.  Do you have any reason to question
2 the quality of Advertiser Perceptions' AdPROs
3 panel?
4    A.  Well, there is a cite in my report.  If
5 you look at 105 footnote on that page.
6    Q.  Yeah.  That's one internal Google
7 document?
8    A.  Yes.
9    Q.  Who gave you that document?  The
10 answer -- question is who?
11    MR. SHEANIN:  That's fine.
12    THE WITNESS:  It was provided to me by
13 Brattle.  And I don't know where they got it.
14 BY MS. DEARBORN:
15    Q.  Did you investigate whether anyone at
16 Google had said positive things about
17 Advertiser Perceptions?
18    A.  I did not.
19    Q.  Did you ask for documents in which Google
20 said positive things about Advertiser Perceptions?
21    A.  My major -- I was not having a major --
22 the point of that what not to make a major

Page 48

1 criticism of Ad Perceptions, and that's not
2 central to my opinions.
3    My opinions are more based on what the
4 sample was, not the process that they went
5 through.
6    Q.  Okay.  So your opinion -- it's not your
7 opinion that Advertiser Perceptions is an
8 unreliable company.
9    A.  No.
10    Q.  And it's not your opinion that
11 Advertiser Perceptions has any methodological
12 problem in assembling the panel of respondents --
13    MR. SHEANIN:  Objection to form.
14 BY MS. DEARBORN:
15    Q.  -- for --
16    A.  That's correct.  I'm not criticizing
17 Ad Perceptions.
18    Q.  Okay.  Are you aware that Google has
19 relied on Advertiser Perceptions for other
20 surveys?
21    A.  In that memo they talk about that they've
22 used them.  Yes.

Page 49

1    Q.  Okay.  And did you see the citation to
2 other Advertiser Perceptions surveys in
3 Dr. Simonson's report?
4    A.  I'm sure I did, but I don't recall.
5    Q.  Okay.  Did you review the other surveys
6 that Advertiser Perceptions has done in
7 preparation of your report?
8    MR. SHEANIN:  Objection to form.
9    THE WITNESS:  No.  As I said, that's not
10 a critical part of my opinion, anything about
11 Ad Perceptions.
12 BY MS. DEARBORN:
13    Q.  Okay.  So you don't think it was
14 inappropriate for Dr. Simonson to rely on
15 Advertiser Perceptions in this case?
16    A.  No, I do not.
17    Q.  Okay.  Let's go to section III.E in your
18 report, please, which begins on page 62.
19    In paragraph 105, you have a sentence --
20 you begin that paragraph with the phrase "I
21 understand."
22    Do you see that?

13 (Pages 46 - 49)

Page 254

1    Q. So that would have been methodologically
2  appropriate but not informing survey respondents
3  and giving them the opportunity to opt out?
4    A. I would ask that question before. It's a
5  different issue. First of all, you want to know
6  are they aware of it. And then you want -- if
7  they are aware who it was, and they get that
8  correct, then you exclude them. Then you ask
9  and -- reveal the sponsor of the survey and see if
10  they have a problem with it. That's -- so it's a
11  different issue.
12    Q. I'm sorry. I just want to understand
13  your testimony.
14       You said, first of all, you want to know
15  if they're aware of it. And then, if they are
16  aware, who it was. And if they get that correct,
17  then you exclude them. Then you ask and reveal
18  the sponsor of the survey and see if they have a
19  problem with it.
20       Are you saying that, at the end of the
21  survey, Dr. Simonson should have first asked
22  respondents to guess the sponsor of the survey and

Page 255

1  then they would be told the sponsor of the survey?
2    A. I'm saying they're separate issues.
3    Q. I see.
4    A. I'm saying standard practice in survey
5  research is to ask the -- what do you think the
6  purpose of the survey was? Or you could ask two
7  questions, who do you -- a lot of times in
8  academic research, there is no sponsor, so you
9  ask, what was the purpose of the survey? But if
10  there is a sponsor, then you ask specifically, who
11  was the sponsor of the survey? And then if they
12  say, it was Google for their antitrust litigation,
13  you eliminate their responses.
14       That's independent of the issue do you
15  reveal -- you could do that and not ever reveal
16  the sponsor.
17    Q. I see. So I think I understand your
18  testimony.
19       In your view, it would have been
20  appropriate for Dr. Simonson to ask respondents
21  who they thought the sponsor of the survey was and
22  its purpose, and if they answered correctly, then

Page 256

1  to exclude their answers, correct?
2    A. Yes. Correct.
3    Q. And what you take issue with is
4  Dr. Simonson's choice to tell respondents the
5  sponsor of the survey and its purpose and then
6  allow themselves to opt out, right?
7    A. I don't take issue with him telling the
8  sponsor of the survey. My concern is that it
9  eliminates a substantial number of people, and its
10  systematic exclusion, and that questions the
11  reliability of the sample.
12    Q. So you think fewer people would opt out
13  if asked to guess about the sponsor of the survey
14  and its purpose than would opt out if told?
15       MR. SHEANIN: Objection. Form.
16       THE WITNESS: Again, they're separate
17  issues. I'm wanting to know on their own if they
18  answered this. And it could happen to anybody in
19  the sample. They could be -- people read the
20  New York Times, they read the news, could be
21  aware, even in the sample as it stands right now.
22  And you just -- I think you need to assess are

Page 257

1  people aware of the issues -- who is sponsoring
2  this survey, and if they are, that could bias
3  their responses, so you would want to exclude
4  them.
5       That's totally separate from the issue
6  of, for whatever reason, tell them who the sponsor
7  is and decide if they want to opt out of having
8  their responses included.
9  BY MS. DEARBORN:
10    Q. You're aware that survey respondents were
11  only told of the survey sponsor and purpose at the
12  very end of the survey, right?
13    A. That's correct.
14    Q. After they had already answered all the
15  questions?
16    A. That's correct.
17    Q. And that the back button on their browser
18  was disabled such that no answers could be changed
19  after the respondents learned the sponsor of the
20  survey and its purpose?
21    A. Yes.
22    Q. How would learning the survey sponsor

65 (Pages 254 - 257)

1 after completing all of the survey responses
2 change the results that respondents gave
3 beforehand?
4    A. I'm not saying that at all.  I don't take
5 issue with them revealing sponsor at the end, and
6 it does not change their responses.  It alters the
7 nature of the sample because a significant number
8 of people opted out.
9        So it has nothing to do with the
10 reliability of their responses prior to that.
11 It's simply what happened as a result of that,
12 that revealing.
13    Q. Would you agree that a survey is blind if
14 survey respondents are unaware of the sponsor
15 while they're answering questions?
16    A. Yes.
17    Q. So in that way, Dr. Simonson's survey was
18 blind, right?
19        MR. SHEANIN: Objection. Form.
20        THE WITNESS: It was blind in design.
21 Yes.
22

1 BY MS. DEARBORN:
2    Q. Do you have any reason to believe that
3 survey respondents were aware of the survey
4 sponsor as they answered questions?
5        MR. SHEANIN: Objection. Form.
6        THE WITNESS: I have no data on that.
7 It's possible, but there's no data -- if he had
8 asked that question at the end, we could know.
9 BY MS. DEARBORN:
10    Q. Are you aware that there is some research
11 that has found that identifying the survey
12 sponsor, even while respondents are answering
13 questions, has no meaningful effect on survey
14 responses?
15    A. That's -- there could be isolated
16 incidences, but based -- you know, particularly
17 Diamond cites this.  There can be an instance
18 where you might reveal it, but the general
19 practice -- the most important practice is to have
20 a double blind survey.
21    Q. Despite the fact that it might be
22 standard practice to have a blind survey, are you

1 aware of research that has found that there is no
2 effect of disclosure of a survey sponsor on the
3 results of a survey?
4        MR. SHEANIN: Objection. Form.
5        THE WITNESS: I can't cite any specific
6 articles, but that's contextual.  It depends how
7 charged the questions are.  There clearly was an
8 issue here because such a substantial -- a large
9 number of people opted out, that they were very
10 concerned that Google was the sponsor or they
11 wouldn't have opted out of the survey.  After
12 going through all that, answering 39 questions and
13 then deciding to have them excluded, there was a
14 clear concern from those respondents.
15 BY MS. DEARBORN:
16    Q. Have you conducted any experiments to
17 determine the effect of disclosure of sponsorship
18 on survey responses?
19    A. I have not.
20    Q. Have you conducted any experiments to
21 determine the effects of disclosure of a survey's
22 purpose on respondents to a survey?

1    A. Generally -- I have not, but that's not a
2 topic I've seen anybody -- that's not something we
3 do.  It's standard practice we do not reveal the
4 sponsor or the purpose of the survey.
5    Q. Do you have any reason to believe that
6 the individuals who opted out of having their
7 survey responses included in the final results
8 would have answered Dr. Simonson's questions
9 differently from the eventual survey respondents?
10        MR. SHEANIN: Objection. Form.
11        THE WITNESS: Well, as I say in my
12 report, it's not systematic -- I mean, it is
13 systematic exclusion if it was random, just people
14 randomly.
15        But specifically, my hypothesis is -- and
16 I don't have data to support, other than the
17 incidence of opting out was 50 percent higher in
18 the high spend advertising survey.  And that
19 indicates that there's some concern about perhaps
20 Google getting their answers or knowing what they
21 answered.  And particularly if they're heavy users
22 of Google ad tools, concerning about some --

66 (Pages 258 - 261)

1 what -- that effect Google -- you know, would
2 Google come after them, whatever.
3     I don't have hard-core evidence, but
4 based on those different percentages, that seems
5 to be consistent with that view.
6 BY MS. DEARBORN:
7   Q. Okay. You don't have hard -- you said
8 you don't have hard-core evidence.
9   A. I don't have actual data on those
10 respondents.
11   Q. Okay. You don't have data that would
12 suggest that people who answered -- strike that.
13     You don't have data that would suggest
14 that people who opted out of having their survey
15 responses included in the final results would have
16 answered differently --
17   A. Yeah.
18   Q. -- from the eventual survey population,
19 right?
20     MR. SHEANIN: Objection. Form.
21     THE WITNESS: Yeah, I do not because
22 Simonson does not provide -- I assume he destroyed

1 that data and does not have that data, because
2 they asked to have it excluded.
3 BY MS. DEARBORN:
4   Q. You say you assume that he destroyed that
5 data.
6     Do you know one way or the other?
7   A. I don't, but he should have.
8   Q. Okay. Once survey respondents opted out
9 of having their survey responses included in the
10 final results, it was appropriate for Dr. Simonson
11 not to look at those responses any further, right?
12   A. Absolutely.
13   Q. And it was appropriate for him not to
14 include them in his final report, right?
15   A. Absolutely.
16   Q. Because doing otherwise would have broken
17 a promise.
18   A. Absolutely.
19   Q. Okay. Now, you said that the number of
20 individuals who opted out in the higher spend
21 survey was higher than in the lower spend survey.
22 Is that the case?

1   A. Yes.
2   Q. Okay. Now, in one of your prior answers,
3 you said that survey respondents might be
4 concerned that Google would come after them for
5 their responses, right?
6   A. I may not have used those exact words,
7 but something to that effect.
8   Q. Okay. You're aware that the survey
9 respondents' identities were kept confidential,
10 right?
11   A. Yes.
12   Q. So what's your basis for thinking that
13 Google could retaliate against survey respondents
14 in the way that you suggest?
15   A. I'm not saying Google would. And you're
16 right, they don't know who -- but why were they
17 concerned? You have a group -- the hard-core
18 evidence is you have a significant percentage of
19 people who, when they found out Google was the
20 sponsor and it related to the antitrust
21 litigation, they wanted out, even after taking the
22 time to fill out the questionnaire.

1     There has to be a reason. It's not
2 random.
3   Q. You say there has to be a reason. But
4 you didn't test it, because you couldn't, right?
5   A. Right. I couldn't.
6   Q. Right.
7   A. There's no data. There's no open-ended
8 responses, why did you opt out?
9   Q. But you didn't, for example, conduct a
10 survey where you did not give survey respondents
11 the ability to opt out and see whether the results
12 would be any different.
13     MR. SHEANIN: Objection. Form.
14     THE WITNESS: No. As I said, I've not
15 done any other surveys.
16 BY MS. DEARBORN:
17   Q. Okay. How would a respondent to these
18 surveys know whether the answers were good for
19 Google or bad for Google?
20   A. I can't speculate, but all I can say is
21 they had some reason to opt out of that survey.
22   Q. Well, you do speculate in your report in

67 (Pages 262 - 265)

Page 266

1 paragraph 83, don't you?
2      MR. SHEANIN: Objection. Form.
3      THE WITNESS: Yeah, we just said this a
4 minute ago.
5 BY MS. DEARBORN:
6   Q. Right. You say, "█████████████
███████████████████████████████████
███████████████████████████
███████████████████████     "
12      That's what you wrote, right?
13   A. Yes.
14   Q. And you're just speculating as to why
15 respondents might have opted out, right?
16      MR. SHEANIN: Objection. Form.
17      THE WITNESS: Yes. Because it's
18 systematic. It's not random -- a random response.
19 They were specifically told something. And for a
20 significant number of people, they decided to
21 behave in a certain way, a consistent manner. So
22 there has to be some reason for it.

Page 267

1      Whether my reason is correct or not is
2 not the issue. The issue is there was a concern
3 that -- when they found out that Google had
4 sponsored the survey.
5 BY MS. DEARBORN:
6   Q. But the reasons for opting out in
7 paragraph 83, that's just your speculation,
8 correct?
9      MR. SHEANIN: Objection. Form.
10      THE WITNESS: Yes.
11 BY MS. DEARBORN:
12   Q. Why would a respondent think that their
13 answers would harm Google in a survey that Google
14 sponsored --
15      MR. SHEANIN: Objection.
16 BY MS. DEARBORN:
17   Q. -- as you suggest here in paragraph 83?
18      MR. SHEANIN: Objection. Form.
19      THE WITNESS: Again, as you said, I'm
20 speculating, but perhaps they are users of Google
21 tools, Google Ads, and that Google might charge
22 them a higher -- I don't know what they were

Page 268

1 thinking. I can only speculate. But there
2 clearly was a reason.
3 BY MS. DEARBORN:
4   Q. But again, you haven't tested what that
5 reason might be?
6      MR. SHEANIN: Objection. Form.
7      THE WITNESS: No, I have not.
8 BY MS. DEARBORN:
9   Q. Okay. We took a little bit of a detour
10 away from the no-contact list, so let's go back to
11 Exhibit [sic] I, please.
12   A. Okay.
13   Q. I'd like you to assume with me for a
14 moment that Dr. Simonson could not conduct a
15 survey that contacted the individuals in
16 appendix I. Just posit that.
17   A. Okay.
18   Q. That he had a valid reason for doing
19 that.
20   A. Okay.
21   Q. Is it your opinion that it is impossible
22 to conduct a reliable survey of advertisers while

Page 269

1 also excluding the entities in appendix I?
2      MR. SHEANIN: Objection. Form.
3      THE WITNESS: Of this magnitude, yes.
4 BY MS. DEARBORN:
5   Q. So you think no survey could have been
6 done in this case that would have been
7 methodologically sound if it was required that the
8 entities in appendix I be excluded?
9      MR. SHEANIN: Objection. Form.
10      THE WITNESS: If -- under that
11 assumption. But as I said before, it would be
12 possible. You take one example, Walt Disney
13 Company. How many thousands of people work for
14 Walt Disney Company? Is every single person in
15 that company aware of these issues?
16      I still think you could -- I think it was
17 a bad decision to exclude all these companies.
18 And -- but what you would do is ask the questions
19 about "do you know who the sponsor of this survey
20 is" at the end. And if they're not, then it's
21 fine to have them in the survey.
22

68 (Pages 266 - 269)

Page 270

1  BY MS. DEARBORN:
2     Q.  Okay.  I think that there's two separate
3  things going on here.  Right?  One is the
4  informed -- the fact that Dr. Simonson informed
5  respondents at the end of the survey as to its
6  sponsor and its purpose?
7     A.  That's a different -- totally different
8  issue.
9     Q.  Right.  So I'm asking a much more narrow
10 question, which is, do you think no survey could
11 have been done in this case --
12    A.  The --
13    Q.  -- if it excluded the entities on
14 appendix I?
15    A.  If you excluded them, yes, you could not
16 get a representative sample.  But I'm saying
17 that -- is it impossible to do a survey?  You
18 could, under the conditions I mentioned.
19    Q.  Okay.  So -- but in your example, you
20 would contact all of these individuals in
21 appendix I.  You would just then ask them to guess
22 about the survey's respondents or --

Page 271

1     A.  Well, I wouldn't contact all of them.  I
2  would have a representative sample that included
3  these, possibly.
4     Q.  I see.  Again, in your view, it was
5  impossible to do a survey in this case if
6  Dr. Simonson couldn't --
7     A.  Yes.
8     Q.  -- contact the individuals in appendix I.
9     A.  Yes.
10    Q.  Okay.  Now, one of the excluded companies
11 in appendix I is Google's parent company,
12 Alphabet, right?
13    A.  Yes.
14    Q.  You point this out in your report.
15    A.  Yes.
16    Q.  Are you saying Google should have
17 surveyed its own parent company?
18    A.  No, I'm not saying that.  But I'm saying
19 eliminating 580 companies is not necessary.
20    Q.  Okay.  Well, he didn't really eliminate
21 580 companies, did he, Dr. Hoyer?
22    A.  That was my understanding, it was 580.

Page 272

1     Q.  All right.  Well, you understand
2  Dr. Simonson was surveying advertisers, right?
3     A.  Yes.
4     Q.  You understand that Dr. Simonson was not
5  conducting a survey of website publishers, right?
6     A.  That's correct.
7     Q.  Does appendix I include website
8  publishers?
9     A.  I don't remember, to be honest.
10        Yes.
11    Q.  And you understand that Dr. Simonson was
12 not conducting a survey of ad tech providers,
13 right?
14    A.  Yes.
15    Q.  Does appendix I include ad tech
16 providers?
17    A.  I don't remember specifically.
18    Q.  If you need to refresh your recollection,
19 you can look at page 1.
20    A.  Page 1 of?
21    Q.  Of appendix I.
22    A.  Okay.  And your question is?

Page 273

1     Q.  Does appendix I, the no-contact list,
2  include ad tech providers?
3     A.  Yes, it does.
4     Q.  Okay.  And it was not erroneous for
5  Dr. Simonson to exclude publishers or ad tech
6  providers from his survey population, right?
7        MR. SHEANIN:  Objection.  Form.
8        THE WITNESS:  No, it was not.
9  BY MS. DEARBORN:
10    Q.  Right.  Because he was surveying
11 advertisers --
12    A.  Right.
13    Q.  -- right?
14        So he didn't exclude 580 companies from
15 his survey population, did he?
16    A.  I would have to go back and see how those
17 numbers were calculated.  But the key issue is not
18 so much the number as the amount of revenue and
19 the amount of advertising that is done on ad tools
20 by the companies that -- by companies that were
21 excluded.
22    Q.  Okay.  How many advertisers did

69 (Pages 270 - 273)

Page 274

1 Dr. Simonson exclude because they're listed in
2 appendix I?
3     A. I believe there was 580. I'd have to go
4 back and check the numbers.
5     Q. Well, 580 includes ad tech providers and
6 publishers, though, right?
7     A. I'm not sure. I don't remember. There
8 are, like, 580 in this table.
9     Q. Where did that number, 580, in your
10 report --
11     A. I asked --
12     Q. -- come from?
13     A. -- Brattle to calculate that for me.
14     Q. And what instructions did you give
15 Brattle to come up with the number 580?
16     A. To find out that -- the number of
17 advertising companies that were excluded.
18     Q. So you think 580 is the number of
19 advertising companies that were excluded from the
20 survey?
21     A. As I said, I'd have to go back and check.
22     Q. Okay. If it's significantly smaller than

Page 275

1 580, would that surprise you?
2     MR. SHEANIN: Objection to form.
3     THE WITNESS: It would surprise me. But
4 again, the key issue is the amount of spending
5 that occurred. It's still a very significant
6 number that were excluded. And the amount of
7 revenue that -- Google's own revenue that comes
8 from those companies is substantial.
9 BY MS. DEARBORN:
10     Q. Okay. If the number 580 includes all of
11 the entities here in Exhibit I -- or, sorry, in
12 appendix I and is not advertisers, do you want to
13 revise your report?
14     A. It doesn't change my opinion.
15     Q. Would you like to revise that number in
16 your report?
17     A. If -- given the opportunity, yes.
18     Q. Okay.
19     A. But still the key conclusion is, for
20 example, 9 of the top 15 whales, which are the
21 largest ad spenders on Google Ads, were excluded.
22 That's significant, independent of 580 or any

Page 276

1 other number.
2     And, you know, if you look at that
3 paragraph where that is quoted, there's a lot
4 of -- you know, it really adds to the
5 unrepresentativeness of the sample.
6     Q. Have you done any analysis as to whether
7 the results of Dr. Simonson's surveys would change
8 if the excluded companies in appendix I were, in
9 fact, included in the survey population?
10     A. I have not done that.
11     Q. Do you have a basis one way or the other
12 to opine as to the direction in which inclusion of
13 those individuals in the survey population would
14 have impacted the results?
15     MR. SHEANIN: Objection. Form.
16 Foundation.
17     THE WITNESS: Showing that your sample is
18 representative is his responsibility, not mine.
19 He should have shown that there were no
20 differences or that that is a valid sample.
21     He has provided, as far as I can see, no
22 evidence that his sample is representative of the

Page 277

1 population.
2 BY MS. DEARBORN:
3     Q. Okay. Now, in previous surveys that you
4 have conducted, you have excluded certain members
5 of populations because you weren't able to contact
6 them for one reason or another, right?
7     A. Yes.
8     Q. Right. So in the credit union case that
9 you just mentioned, you excluded any respondents
10 who were a current member of the credit union,
11 right?
12     A. Yes.
13     MR. SHEANIN: Objection. Form.
14 BY MS. DEARBORN:
15     Q. Did you think the exclusion of members of
16 the credit union created a bias in your survey?
17     A. The population we were representing or
18 trying to generalize to were potential credit
19 union members. And so that's what we had. We had
20 a sample, representative sample, of credit union
21 members.
22     Q. Got it.

70 (Pages 274 - 277)

Page 278

1      MR. SHEANIN:  And can I just say -- I
2  just, again, want to caution you not to go into
3  anything that would revel confidential information
4  in that matter.
5      MS. DEARBORN:  To set Dr. Hoyer's mind at
6  ease, the report is publicly available.
7      MR. SHEANIN:  Okay.
8      MS. DEARBORN:  So I don't think there's
9  confidentiality concern here.
10 BY MS. DEARBORN:
11     Q.  But of course I'm not asking you to
12 violate your -- any confidentiality obligations
13 that you're under, but I'm asking questions to
14 which I believe the answers are public knowledge.
15     A.  Well, there was a reason for that, and
16 the reason was we were testing a language of
17 Vistar's agreement that, when people signed up for
18 an account, they had to read that and understand
19 the terms of that account.  And people who are
20 already members have already seen that account,
21 and that doesn't give an indication of how well
22 new members would understand that language.

Page 279

1      MR. SHEANIN:  Okay.
2      THE WITNESS:  So that's how we...
3      MR. SHEANIN:  I'd remind you to only
4  respond to questions that were actually on the
5  table and posed to you, and I don't believe there
6  was one posed to you at that point.
7      MS. DEARBORN:  And I would request that
8  counsel not coach the witness.
9  BY MS. DEARBORN:
10     Q.  Okay.  You've conducted surveys of
11 purchasers of MP3s.
12     Do you recall that?
13     A.  Yes.
14     Q.  And when you conducted a survey of
15 consumers who purchased MP3s, you excluded from
16 your survey population any individuals under the
17 age of 18, right?
18     A.  Which study are you referring to?  I
19 remember vaguely, but I don't have a detailed
20 memory of that.
21     Q.  It's a 2020 study that you did on MP3
22 purchasing.

Page 280

1      A.  Do you have the reference for it so I
2  can --
3      Q.  I don't, unfortunately.
4      It's a -- well, I have a study that you
5  published in the Journal of the Academy
6  of Marketing Science.
7      A.  Okay.
8      Q.  Does that jog your memory?
9      A.  No.  I have had about 15 articles, or --
10     Q.  Okay.  I'll ask it more generally.
11     When you conduct surveys, as a general
12 matter, it's usually appropriate to exclude
13 minors, right?
14     A.  Yes.
15     Q.  And -- but minors make purchasing
16 decisions, right?
17     A.  Yes.
18     Q.  Does the exclusion of minors from survey
19 populations make the surveys any less reliable?
20     A.  It depends on what type of survey you're
21 talking about.  If it's an academic study, we
22 aren't as concerned about representative [sic] of

Page 281

1  the sample.  If it's a litigation survey where
2  you're trying to draw specific conclusions about a
3  population, and they are a significant buyer, then
4  it is a problem.
5      Q.  Now, Dr. Simonson concludes that, to the
6  extent the companies that he excluded, because
7  they appeared on the no-contact list, are, on
8  average, more sophisticated advertisers, then his
9  results would likely to be conservative on key
10 topics such as multi-homing and substitution.
11     Do you have any reason to doubt that
12 conclusion?
13     A.  Yes.  He provides no evidence of that.
14 Why would they be -- why would it be more
15 conservative?  I don't understand that comment.
16     Q.  Did you review the bases for
17 Dr. Simonson's statement?
18     A.  I did, but I don't remember the
19 specifics.
20     Q.  Did you disagree with him when you
21 reviewed that paragraph in his report?
22     MR. SHEANIN:  Objection.  Form.

71 (Pages 278 - 281)

Page 282

1      THE WITNESS:  To be perfectly honest,
2  that's a phrase that academics use all the time to
3  try to get them out of difficult situations
4  that -- it's not necessarily a valid statement, to
5  be quite honest.
6  BY MS. DEARBORN:
7      Q.  Which phrase, the fact that --
8      A.  Likely to be conservative.
9      Q.  It's not a phrase you've ever used
10  before, Dr. Hoyer?
11      A.  Oh, I've used it.  We all use it.  But
12  that doesn't mean it's right.
13      Q.  But still, you have no basis to disagree
14  with that conclusion in his report, despite the
15  fact that you question the use of the word
16  "conservative," right?
17      MR. SHEANIN:  Objection.  Form.
18      THE WITNESS:  He doesn't provide detailed
19  reasons of why it would be conservative, and I --
20  I would have to be convinced of his reasoning
21  before I would accept that statement.
22

Page 283

1  BY MS. DEARBORN:
2      Q.  Well, part of your assignment was to
3  review and respond to Dr. Simonson's report,
4  right?
5      A.  Yes.
6      Q.  And disagreeing with his statement that
7  exclusion of individuals on the no-contact list is
8  not a criticism -- strike that.
9      His conclusion that exclusion of the
10  companies on the no-contact list was likely to
11  make the results of his survey conservative is not
12  a conclusion that you challenge in your report,
13  correct?
14      A.  I challenge that the sample is
15  unrepresentative, and we don't know how that
16  affected the survey.
17      But the issue -- it's not a valued [sic]
18  support because the purpose of a survey should be
19  to be able to draw valid conclusions on a
20  representative sample.  And anything less than
21  that calls into question the reliability and
22  usefulness of the survey.

Page 284

1      Q.  But you did not specifically disagree
2  with Dr. Simonson's conclusion that exclusion of
3  the companies on the no-contact list may have
4  rendered his survey results conservative, rights?
5      MR. SHEANIN:  Objection.
6  BY MS. DEARBORN:
7      Q.  That's not something that you said in
8  your report?
9      MR. SHEANIN:  Objection to form.
10      THE WITNESS:  I didn't say it in my
11  report.  But since you're asking me, I don't -- I
12  can't accept that comment at face value.
13  BY MS. DEARBORN:
14      Q.  All right.  Let's look at paragraph 69 of
15  your report, please.
16      All right.  And in this paragraph you
17  criticize Dr. Simonson because you say he has no
18  way to ascertain whether two, five, ten, or more
19  respondents in his final sample work for the same
20  company, right?
21      A.  Yes.
22      Q.  That's because, theoretically, people

Page 285

1  from different business units in the same company
2  could answer the survey?
3      MR. SHEANIN:  Objection.  Form.
4      THE WITNESS:  Or from the same business
5  unit even.
6  BY MS. DEARBORN:
7      Q.  Did you look at the data that
8  Dr. Simonson provided to determine how many
9  individuals from the same company answered the
10  survey?
11      MR. SHEANIN:  Objection.  Form.
12  Foundation.
13      THE WITNESS:  I don't recall.  I don't
14  remember seeing that.
15  BY MS. DEARBORN:
16      Q.  Is that something you looked into?
17      MR. SHEANIN:  Objection.  Form.
18  Foundation.
19      THE WITNESS:  I was just basing it on his
20  report that he didn't mention that there was any
21  effort to only have single individuals from each
22  company.  I didn't see his description of that.

72 (Pages 282 - 285)

Page 286

BY MS. DEARBORN:

1  BY MS. DEARBORN:
2      Q.  And you had survey responses in raw data
3  form provided by Dr. Simonson, right?
4      A.  Yes.
5      Q.  Did you look to see how many survey
6  respondents were from the same company?
7          MR. SHEANIN:  Objection.  Form.
8  Foundation.
9          THE WITNESS:  I did not.  This was not a
10  burning issue.  I spent more time on more critical
11  issues.
12  BY MS. DEARBORN:
13      Q.  Okay.  So this isn't, standing alone, a
14  reason why you think Dr. Simonson's report is
15  unreliable?
16          MR. SHEANIN:  Objection.  Form.
17  Foundation.
18          THE WITNESS:  Correct.
19  BY MS. DEARBORN:
20      Q.  Okay.  And you -- we've talked at length
21  about how Dr. Simonson's report or his survey
22  asked respondents in the instructions to answer on

Page 287

1  behalf of their business unit, right?
2      A.  Yes.
3      Q.  And we talked about how Axe and Dove may
4  have different marketing objectives?
5      A.  Yes.
6      Q.  So wouldn't it have been appropriate for
7  Dr. Simonson to survey both a member of the Axe
8  business unit and a member of the Dove business
9  unit?
10          MR. SHEANIN:  Objection.  Form.
11          THE WITNESS:  If they were in separate
12  units, but there's no data to indicate that that
13  occurred, that he -- I mean, he would have had to
14  ask a question of, if it wasn't the same company,
15  was it a different unit?  And I didn't see any
16  data in that regard.
17  BY MS. DEARBORN:
18      Q.  You didn't see data in that regard, but
19  you didn't look, right?  We just talked about
20  that.
21          MR. SHEANIN:  Objection.  Form.
22  Foundation.

Page 288

1          THE WITNESS:  As I said, this is not a
2  key burning issue that leads to my major -- my
3  central conclusions.
4  BY MS. DEARBORN:
5      Q.  Okay.  But you agree that, in your
6  example of Axe and Dove, it would have been
7  appropriate for Dr. Simonson to include two
8  members of the Unilever company, correct?
9      A.  In that specific context, yes.
10          MR. SHEANIN:  We've been going for about
11  an hour.  Would you like a break?
12          THE WITNESS:  We could.  Yeah, I'm fine.
13          MS. DEARBORN:  I'm fine with that.
14          MR. SHEANIN:  Okay.  Let's take a break.
15          VIDEO TECHNICIAN:  We're now off the
16  record at 1:58 p.m.
17      (A recess was taken.)
18          VIDEO TECHNICIAN:  We're now back on the
19  record at 12 -- I'm sorry, 2:12 p.m.
20      You may proceed.
21  Y MS. DEARBORN:
22      Q.  Welcome back, Dr. Hoyer.  I understand

Page 289

1  from your counsel that you'd like to correct or
2  clarify one of your prior answers.
3      A.  Yes.
4      Q.  Please feel free to do that.
5      A.  Yes.  I accidentally misspoke when I
6  mentioned that there was a high -- it's on
7  paragraph 84 of my report.
8          I misspoke.  What -- I meant to say
9  there's a higher percentage -- 50 percent higher
10  percentage of response in the lower end [sic]
11  survey that opted out versus the high end survey.
12  I believe I accidentally reversed that, and -- it
13  was just a mistake.
14      Q.  We're all human.
15      A.  Right.
16      Q.  We misspeak sometimes.  Right?
17      A.  After speaking for hours, it -- right.
18      Q.  Yep.  Thank you for the clarification.
19      A.  Yeah.
20      Q.  And understood.
21      I try not to jump around too much, but I
22  do just have a few clarifying questions about

73 (Pages 286 - 289)

Page 290

1 topics that we addressed prior to the break, so I
2 hope you'll forgive me --
3    A. Sure.
4    Q. -- and if you at any point need to
5 clarify my question, please ask. Okay?
6    A. Okay.
7    Q. Okay. At some point we discussed
8 Dr. Simonson's disclosure at the end of the survey
9 of the survey's sponsor and purpose, right?
10    A. Yes.
11    Q. And you said that it's fairly common to
12 ask respondents to guess at the end of a survey
13 about the survey sponsor and then exclude them if
14 they guess correctly, right?
15    A. Well, could I clar- ---
16    Q. Of course.
17    A. We don't ask them, could you guess? What
18 do you think? Not guess on it. We don't
19 encourage them to come up with any random answer,
20 but rather, what do you think the purpose of this
21 survey was? Or, who was the sponsor of the
22 survey?

Page 291

1    Q. Right. And if they answer correctly to
2 that question at the end of the survey, then you
3 exclude their results --
4    A. Yes.
5    Q. -- right?
6       Do I understand you correctly that the
7 reason you do that is because survey respondents
8 who answer that question correctly would have had
9 in their mind the survey sponsor while they were
10 answering questions?
11    A. Yes. They -- that is the major concern.
12 It's also a major concern in academic studies
13 because it's like a game. A lot of times it's
14 college students or even -- we use panels as well.
15 People are trying to guess what the purpose of the
16 survey is. And it does alter the -- we have
17 demand characteristics if people are concerned
18 about who the sponsor -- you know, what they -- I
19 want to be a good subject, I want to look good,
20 and so I might alter my responses based on that.
21    Q. Okay. So what you're concerned about is
22 the -- what survey respondents have in their mind

Page 292

1 as they're answering the questions, right?
2    A. Yes.
3    Q. You're not concerned about excluding a
4 population of survey respondents at the end of the
5 study simply because they correctly identified the
6 survey sponsor.
7       MR. SHEANIN: Objection. Form.
8       THE WITNESS: Well, you would be -- what
9 we would have to do -- in surveys I've done, if
10 there is -- if there are people -- it's usually
11 not a big problem, but if it is a problem, you've
12 got to make sure the final sample is
13 representative, so you must go back and get
14 respondents to fit that category of what you set
15 out as your sample to reflect the population.
16 BY MS. DEARBORN:
17    Q. Okay. But here, you have no reason to
18 believe that respondents knew, while they were
19 answering questions, that Google sponsored the
20 survey, right?
21       MR. SHEANIN: Objection. Form.
22       THE WITNESS: We don't know, but it's

Page 293

1 possible. But there's no -- he didn't ask that
2 question, so there's no way to determine that.
3 BY MS. DEARBORN:
4    Q. Okay. My question is a little different.
5       You have no reason to believe that
6 respondents knew, while they were answering
7 questions, that Google sponsored the survey,
8 correct?
9       MR. SHEANIN: Objection to form. Asked
10 and answered.
11       THE WITNESS: Yeah, I don't have any data
12 to know whether they did or not.
13 BY MS. DEARBORN:
14    Q. Okay. And nothing about the way that the
15 survey was designed would suggest to survey
16 respondents who sponsored the survey, right?
17       MR. SHEANIN: Objection. Form.
18       THE WITNESS: Not that I could see.
19 BY MS. DEARBORN:
20    Q. That's not one of your criticisms --
21    A. No.
22    Q. -- of Dr. Simonson's study, right?

74 (Pages 290 - 293)

1      MR. SHEANIN: Objection. Form.

2      THE WITNESS: No, it is not one of my

3 criticisms.

4 BY MS. DEARBORN:

5      Q. Okay. All right. We also talked about

6 the excluded list of companies in appendix I, or

7 what I would call the no-contact list, right?

8      A. Yes.

9      Q. And one of your concerns is that the

10 no-contact lists include some very large

11 companies, like members of the Fortune 100, right?

12      A. Yes.

13      Q. It is the case that Dr. Simonson's higher

14 spend advertiser survey also included some very

15 large companies, right?

16      A. They include some. Yes.

17      Q. Right. And he reproduced that in

18 Exhibit 6 to his report?

19      A. I don't recall the specific exhibit.

20      Q. You're welcome to look at it if you need

21 to, but --

22      A. Is that in the report?

1      Q. Yes. Exhibit 6 to his report.

2      A. Okay.

3      Q. And this reproduces the answer to this

4 QS10, the screener question 10, which asks,

5 Approximately how much did your company spend in

6 the last 12 months on all advertising, including

7 all digital types?

8      A. Uh-huh.

9      Q. Right?

10      A. Yes.

11      Q. And this reflects the eventual population

12 of Dr. Simonson's survey?

13      A. I believe that's correct.

14      Q. And there are a number of companies

15 towards the right end of this graph -- that's a

16 terrible question.

17      There's over a hundred companies that

18 spent more than $30 million on advertising in the

19 last 12 months, correct?

20      A. I would assume so, yes.

21      MR. SHEANIN: I -- okay.

22

1 BY MS. DEARBORN:

2      Q. It's actually more than 150 companies

3 that spent more than $30 million in advertising in

4 the last 12 months?

5      A. I believe that's correct.

6      Q. So you'd agree that Dr. Simonson's higher

7 spend advertiser survey included some very large

8 companies, right?

9      MR. SHEANIN: Objection. Form.

10      THE WITNESS: My criticism is not that he

11 included some. If you looked at the distribution

12 of the actual spending of the entire population,

13 my guess, the right end would be significantly

14 higher and it would not look like this bell curve.

15 It would look much -- particularly if you look at

16 amount spent.

17      So I'd say this end of -- the right end

18 of this distribution is underrepresented.

19 BY MS. DEARBORN:

20      Q. So you indicated in your answer that

21 that's your guess, right?

22      A. Well, I know that they've excluded a

1 significant amount of revenue -- companies that

2 account for -- like I said, 9 of the top 15 whales

3 of Google's revenue are excluded.

4      Q. But your view that this distribution is

5 skewed, that's based on a guess, right?

6      MR. SHEANIN: Objection. Form.

7 Misstates testimony.

8      THE WITNESS: I haven't had -- worked out

9 numbers on that.

10 BY MS. DEARBORN:

11      Q. Right. You didn't conduct a study of the

12 overall distribution of advertising spend in U.S.

13 companies, correct?

14      A. Well, I have some data in my report about

15 the amount spent by companies that were excluded.

16 I forget what paragraph it's in, but --

17      Q. Right. We looked at that before. That's

18 the --

19      A. Right.

20      Q. -- companies -- the amount companies

21 spent with Google, right?

22      A. Right.

Page 298

1    Q.  So you haven't done a study that looks at
2  the distribution of advertising spend across all
3  companies in the United States, correct?
4        MR. SHEANIN:  Objection.  Form.
5        THE WITNESS:  Could you restate that
6  question?
7  BY MS. DEARBORN:
8    Q.  I'm not sure I can, but I'll say it
9  again.
10       You haven't done a study that evaluates
11 the distribution of advertising spend across all
12 companies in the United States, right?
13   A.  No, I have not done that study.
14   Q.  Okay.  So you have no basis to say that
15 the distribution in the higher spend advertising
16 study that Dr. Simonson conducted is different
17 from the distribution of advertising spend across
18 companies in the United States, right?
19       MR. SHEANIN:  Objection.  Form.
20       THE WITNESS:  Based on the data in my
21 report, I would be very -- find it very hard to
22 believe that his sample is representative of the

Page 299

1  types of -- the spending companies -- the
2  companies in the population.
3  BY MS. DEARBORN:
4    Q.  You say it's hard to believe, but you
5  haven't done an analysis of that.
6    A.  It's formally hard to believe that --
7  just based on my analysis and these numbers, it
8  would be -- I strongly suspect that the sample is
9  unrepresentative.
10   Q.  Okay.  You said that you strongly
11 suspect.
12       You have not done a study to determine
13 whether or not the sample that Dr. Simonson
14 evaluated in his survey was, in fact,
15 unrepresentative of the United States advertiser
16 population, correct?
17       MR. SHEANIN:  Objection.  Form.
18       THE WITNESS:  Again, I still maintain,
19 based on the numbers I present in my report, that
20 he has excluded very significant advertisers that
21 account for a major portion of Google's business,
22 and that produces an unrepresentative sample.

Page 300

1  BY MS. DEARBORN:
2    Q.  Okay.  I understand you have things that
3  you want to say, and I understand the criticisms
4  in your report.  I really need to ask my questions
5  and get an answer to my question, Dr. Hoyer.  And
6  I know you're not trying to be disrespectful, but
7  I do need an answer to my question.  All right?
8        MR. SHEANIN:  Counsel, he's answering
9  your questions.  You ask him your questions and
10 he's giving you answer.
11       MS. DEARBORN:  That's --
12       MR. SHEANIN:  That's what you're entitled
13 to in a deposition.
14       MS. DEARBORN:  I have asked my question,
15 to which he has given nonresponsive answers, and
16 so I'm going to ask my question again.  And I will
17 get an answer to my question because I think the
18 answer to this one is fairly simple.
19 BY MS. DEARBORN:
20   Q.  Dr. Hoyer, you have not done a study that
21 evaluates the distribution of advertising spend
22 amongst companies in the United States, correct?

Page 301

1        MR. SHEANIN:  Objection.  Form.  Asked
2  and answered.
3        THE WITNESS:  Do I -- I'm not sure --
4        MR. SHEANIN:  You can answer the
5  question.
6        MS. DEARBORN:  Do not coach the witness.
7        MR. SHEANIN:  I --
8  BY MS. DEARBORN:
9    Q.  Please answer the question.
10   A.  I have not done a formal study, but there
11 is strong evidence.
12   Q.  And the strong evidence that you're
13 citing, that's the material in your report that
14 we've discussed previously, looking at the amount
15 of --
16   A.  Yeah.
17   Q.  -- that advertisers spent with Google?
18   A.  Yes.
19   Q.  But you have -- that's spent -- okay.
20 Strike that.
21       All right.  I'd like to turn to another
22 of your criticisms of Dr. Simonson's report and

76 (Pages 298 - 301)

Page 326

1 always games that subjects play. It's -- the key
2 is whether it's systematic demand characteristics.
3 BY MS. DEARBORN:
4    Q. Right. So you would agree that some
5 demand characteristics effect is minor?
6    MR. SHEANIN: Objection. Form.
7    THE WITNESS: The key issue is whether it
8 systematically influences results in a certain
9 way. And particularly, does it influence results
10 towards the hypothesis of the researcher?
11 BY MS. DEARBORN:
12    Q. Have you done any empirical analysis to
13 determine whether demand effects influenced
14 Dr. Simonson's study in a systematic way?
15    MR. SHEANIN: Objection. Form.
16    THE WITNESS: Yeah, I am not -- I did not
17 have time to do a study of that nature. It
18 was not part of my assignment.
19 BY MS. DEARBORN:
20    Q. Would you agree that there's no such
21 thing as a perfect survey?
22    A. I would agree with that. But some

Page 327

1 surveys are much more flawed than others.
2    Q. Have you ever asked survey respondents
3 questions about what they would do in a response
4 to a price increase without specifying the amount
5 of that increase?
6    A. I don't do pricing research, so no, I
7 have not.
8    Q. Have you ever seen that asked?
9    MR. SHEANIN: Objection. Form.
10    THE WITNESS: Most typically -- again,
11 I've seen many studies. Studies that I can recall
12 seeing do specify an amount, like dollar amount or
13 percentage increase.
14 BY MS. DEARBORN:
15    Q. Have you ever seen a survey done that
16 asks respondents what they would do in response to
17 a price increase without specifying the dollar
18 amount or specific amount of the increase?
19    MR. SHEANIN: Objection. Form. Asked
20 and answered.
21    THE WITNESS: Not that I can recall. And
22 if I were a reviewer of a study, I would highly

Page 328

1 question that question as being vague.
2    MS. DEARBORN: Okay. Let's look at --
3 let's do tab 30, please, Anita. Let's mark -- I
4 believe we're up to Exhibit 5.
5    (Hoyer Deposition Exhibit 5 marked for
6    identification and attached to the
7    transcript.)
8 BY MS. DEARBORN:
9    Q. Okay. We've marked as Hoyer Exhibit 5 an
10 article titled, "Service brand relationship
11 quality: Hot or cold?"
12    Do you recognize this document,
13 Dr. Hoyer?
14    A. Yes.
15    Q. What is it?
16    A. Yes.
17    Q. What is it?
18    A. It's an article I wrote with my Swiss
19 colleagues looking at -- it was mainly focused on
20 brand relationship quality.
21    Q. Do you stand by the results of this
22 paper?

Page 329

1    A. Yes.
2    Q. Do you think the methodology you employed
3 was reliable --
4    A. As far as --
5    Q. -- in conducting a survey?
6    A. As far as I can recall, yes.
7    Q. Just because I'm watching the transcript
8 here, please let me finish my question before you
9 start your answer. Our transcript is going to be
10 a mess otherwise.
11    MR. SHEANIN: Yeah, if every one would
12 take a moment so that you could finish the
13 question, I can finish an objection and you can
14 get a good answer --
15    THE WITNESS: Guilty, sorry.
16    MR. SHEANIN: I promise that our court
17 reporter would be appreciative.
18 BY MS. DEARBORN:
19    Q. Okay. So just to ask my question again,
20 you stand by the methodology that you employed in
21 conducting this study, correct?
22    A. Yes.

83 (Pages 326 - 329)

Page 330

1    Q. All right. So this study involved a
2 survey, right?
3    A. Yes.
4    Q. It involved a survey of consumers,
5 correct?
6    A. As far as I remember, yes.
7    Q. And the survey questions are reproduced
8 in appendix A, right?
9    A. Yes.
10    Q. And the only difference between the
11 survey questions reproduced in appendix A and
12 those you actually gave to survey respondents is
13 that you actually substituted a brand in response
14 to the Xs in this table, right?
15    A. I believe so. This was done ten years
16 ago, but yes, I think so.
17    Q. Right. So, here, X was a brand of
18 airline?
19    A. Yes.
20    Q. But otherwise, these were verbatim the
21 questions that you gave to survey respondents,
22 right?

Page 331

1    A. Technically, yes. It's an English
2 translation. It was Swiss -- it was in German.
3    Q. But you think this was accurately
4 translated, correct?
5    A. Yes.
6    Q. Okay. So I'd like to focus your
7 attention midway down the page. There are two
8 questions underneath the header "Willingness to
9 pay a price premium."
10    Do you see that?
11    A. Yes.
12    Q. And one of the questions that you asked
13 consumers in this survey was, "The price of X
14 would have to go up quite a bit before I would
15 switch to another airline brand," right?
16    A. Yes.
17    Q. Did you put a specific value on the
18 phrase "quite a bit" anywhere in this survey?
19    A. This is a standard set of questions.
20 "Willingness to pay" is a common term and is based
21 on a previous scale that's cited there, Netemeyer,
22 et al.

Page 332

1    But no, we did not change that question
2 based on the previous scale.
3    Q. And the previous scale, that's not a
4 dollar figure scale, right? That's, like, a
5 sliding scale from 1 to whatever, indicating the
6 extent to which the respondent agreed with that
7 phrase?
8    MR. SHEANIN: Objection. Form.
9    THE WITNESS: I don't remember if it was
10 a sliding scale.
11 BY MS. DEARBORN:
12    Q. Okay.
13    A. It's been ten years. I --
14    Q. Well, you said the previous scale cited
15 there, so I'm just trying to understand what that
16 previous scale is.
17    A. The Netemeyer, et al., 2004 scale.
18    Q. And what is that? Can you describe
19 it for me?
20    A. Well, it's these two -- it's a scale to
21 measure willingness to pay.
22    Q. But how is -- what are the actual values

Page 333

1 on that scale?
2    A. I don't remember.
3    Q. Is it a specific dollar amount?
4    A. I can't remember, to be honest. It's ten
5 years ago.
6    Q. Just based -- looking at the language of
7 this question --
8    A. I mean, it might be -- I could take time
9 to read the article, to go back and see what all
10 the scales were, but I don't remember off the top
11 of my head.
12    Q. Well, you agree that the question that
13 you asked survey respondents was, "The price of X
14 would have to go up quite a bit before I would
15 switch to another airline brand," right?
16    A. Yes.
17    Q. So the most likely scale that would allow
18 respondents to answer that question is one that
19 indicates their willingness to pay, right?
20 Very -- strongly agree, do not agree, et cetera?
21    MR. SHEANIN: Objection. Form.
22 Foundation.

84 (Pages 330 - 333)

1    THE WITNESS: That's one way you could
2 measure it. You could also ask them -- and some
3 studies do -- how much would it have to go up
4 before I would switch to another brand?
5 BY MS. DEARBORN:
6    Q. That would be a different question,
7 though, right, Dr. Hoyer?
8    A. It would measure willingness to pay.
9    Q. But you would have to ask a different
10 question in order to evaluate how much the price
11 would have to go up in order for them to switch,
12 right?
13    A. Yes.
14    Q. All right. My colleague has helpfully
15 pointed out a portion of this article that might
16 reflesh -- refresh your recollection as to the way
17 that the scale was worded.
18    If you could turn to page 96 of this
19 article, please. Under "Measures," the last
20 sentence of the first paragraph says, "With few
21 exceptions (i.e., consideration of set size, share
22 of wallet, and revenue per customer), all items

1 were measured with a seven-point Likert" --
2 L-i-k-e-r-t --
3    A. Likert.
4    Q. -- "type scale, anchored by 'strongly
5 disagree' and 'strongly agree.'"
6    Do you see that?
7    A. Yes.
8    Q. So the willingness to pay questions are
9 not one of the three exceptions that are listed
10 there, right?
11    A. That's correct.
12    Q. So the willingness to pay questions were
13 measured with a scale anchored by "strongly
14 disagree" and "strongly agree"?
15    MR. SHEANIN: Objection. Form.
16    Go ahead.
17    THE WITNESS: That's correct.
18 BY MS. DEARBORN:
19    Q. Okay. So again, to make sure we have a
20 clean record with that refreshed recollection, in
21 this survey you asked consumers, "The price of X
22 would have to go up quite a bit before I would

1 switch to another airline brand," right?
2    MR. SHEANIN: Asked and answered.
3    THE WITNESS: Yes.
4 BY MS. DEARBORN:
5    Q. And in answering that question,
6 respondents were required to indicate their
7 response on a sliding scale that went from
8 "strongly disagree" to "strongly agree"?
9    A. It's not a sliding scale. It's a
10 seven-point scale, and they circle one of the --
11 or indicate one of the numbers from 1 to 7.
12    Q. I appreciate the clarification.
13    In order to answer the question "The
14 price of X would have to go up quite a bit before
15 I would switch to another airline brand,"
16 respondents answered on a scale that went from
17 "strongly disagree" to "strongly agree"?
18    A. That's correct.
19    Q. And this question did not ask about a
20 specific dollar amount that the price would go up,
21 right?
22    A. It did not.

1    Q. And it didn't ask about a specific
2 percentage that the price would go up before they
3 would answer that question, right?
4    A. Yes.
5    MR. SHEANIN: Object to form.
6    THE WITNESS: Sorry.
7 BY MS. DEARBORN:
8    Q. Okay. And you do not think that asking
9 this question was unreliable in any way, right?
10    MR. SHEANIN: Objection to form.
11    THE WITNESS: I don't think it's the best
12 way we could have asked it. In retrospect, I
13 would have asked it differently, from what I know
14 now. But it's just one item on the whole study.
15 BY MS. DEARBORN:
16    Q. And you did not define the phrase "quite
17 a bit" in that question, right?
18    A. Correct.
19    Q. So you asked respondents, "The price of X
20 would have to go up quite a bit before I would
21 switch to another airline brand," without defining
22 the specific --

85 (Pages 334 - 337)

Page 338

1    A. Yeah.
2    Q. -- price increase, right?
3    A. Yes.
4    Q. The next question under this "Willingness
5  to pay a price premium" section of questions says,
6  "I am willing to pay a higher price for X than for
7  other airline brands."
8       Do you see that?
9    A. Yes.
10   Q. Did you define for survey respondents
11 what a higher price was?
12   A. I guess we did not.
13   Q. Did you attach a specific dollar amount
14 to that phrase?
15   A. I'll be frank. Again, this was --
16   Q. I appreciate it.
17   A. No, we did not.
18   Q. Did you attach a significant numerical
19 value to that phrase? How about that?
20   A. No.
21   Q. Did you attach a specific percentage that
22 the price would go up in connection with this

Page 339

1  question to consumers?
2    A. No, we did not.
3    Q. And again, you think the answers you got
4  to these questions were reliable?
5    A. Well, as I just said, in retrospect, I
6  would have asked these questions differently, but
7  two wrongs don't make a right.
8    Q. Was this paper peer reviewed?
9    A. Yes.
10   Q. And the peer reviewers of this academic
11 paper that you co-authored didn't question the
12 phrasing of that question, correct?
13   A. Correct. Because we used an established
14 scale that had been published elsewhere.
15   Q. But they didn't question your decision
16 not to attach dollar values or percentage
17 increases to that "willingness to pay" set of
18 questions, right?
19      MR. SHEANIN: Objection to form.
20 Foundation.
21      THE WITNESS: Not that I can recall.
22 Again, it's been ten years. But the paper was not

Page 340

1  rejected on those grounds.
2  BY MS. DEARBORN:
3    Q. Thank you, Dr. Hoyer.
4       Okay. Let's stay on paragraph 75 of your
5  report, please.
6       MR. SHEANIN: Are we done with this
7  article?
8       MS. DEARBORN: For the moment.
9       MR. SHEANIN: Okay.
10      MS. DEARBORN: I can't promise we won't
11 return to it.
12 BY MS. DEARBORN:
13   Q. Okay. I'd like to focus your attention
14 on paragraph 75(d).
15      So in the second full sentence of this
16 paragraph, you write, "██████████████████
██████████████████████
██████████████████████████████
███████████████ -- and then you
22 continue.

Page 341

1       Do you see that?
2    A. Yes.
3    Q. I notice that you don't use the
4  word "focalism" in this paragraph.
5       I'm wondering, are you suggesting that
6  Dr. Simonson's survey suffered from focalism bias?
7       MR. SHEANIN: Objection to form.
8       THE WITNESS: How do you define focalism
9  bias?
10 BY MS. DEARBORN:
11   Q. Well, why don't you define it for me?
12   A. I don't -- you mean focalism being
13 focused too much on one topic? I don't remember
14 the specific definition.
15      But I'm not talking about focalism so
16 much as the realistic nature of the scenario that,
17 when advertisers buy display advertising, there
18 are a number of key factors which they consider,
19 the most important one being, does it reach my
20 target?
21      And the reason that's important is
22 because, even if there was a small increase in

86 (Pages 338 - 341)

Page 458

1    Q.  How would you go about determining
2  whether or not different people from the same
3  company or from different business units within
4  the same company took the survey?
5    A.  You would need a question or data on
6  that.  And in his instructions, he -- it is
7  completely anonymous.  And looking back at the
8  backup data, there was no question on what company
9  they were from, so there's no way to evaluate
10  that.
11    MR. SHEANIN:  Thank you.  I have no
12  further questions.
13    MS. DEARBORN:  Nothing further.
14    VIDEO TECHNICIAN:  Okay.  This now ends
15  the deposition of Dr. Wayne Hoyer.  We're off the
16  record at 5:16 p.m.
17    (Whereupon, at 5:16 p.m., the videotaped
18    deposition of WAYNE D. HOYER, Ph.D., was
19    concluded.)
20
21
22

Page 459

1    CERTIFICATE OF NOTARY PUBLIC
2    I, CHRISTINA S. HOTSKO, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing deposition was duly sworn by me; that
6  the testimony of said witness was taken by me in
7  stenotypy and thereafter reduced to typewriting under
8  my direction; that said statement is a true record of
9  the proceedings; that I am neither counsel for,
10  related to, nor employed by any of the parties to the
11  action in which this statement was taken; and,
12  further, that I am not a relative or employee of any
13  counsel or attorney employed by the parties hereto,
14  nor financially or otherwise interested in the
15  outcome of this action.
16  Dated: March 6, 2024
17
18        CHRISTINA S. HOTSKO
19      Notary Public in and for the
20        District of Columbia
21  My commission expires:
22  1 January 2027

116 (Pages 458 - 459)