# EXHIBIT 102

**In the Matter Of:**

*UNITED STATES OF AMERICA v*

*GOOGLE, LLC*

*ITAMAR SIMONSON, PH.D.*

*February 28, 2024*



1

```
 1      IN THE UNITED STATES DISTRICT COURT

 2     FOR THE EASTERN DISTRICT OF VIRGINIA

 3             ALEXANDRIA DIVISION

 4                  - - -

 5
     UNITED STATES OF        :   CASE NO.
 6   AMERICA, et al.,        :   1:23-cv-00108
                             :   -LMB-JFA
 7        Plaintiffs,        :
                             :
 8        v.                 :
                             :
 9   GOOGLE, LLC,            :
                             :
10        Defendant.         :

11         - HIGHLY CONFIDENTIAL -

12                  - - -

13           February 28, 2024

14                  - - -

15

16          Videotaped deposition of
     ITAMAR SIMONSON, Ph.D., taken pursuant to
17   notice, was held at the law offices of
     Paul, Weiss, Rifkind, Wharton & Garrison
18   LLP, 2001 K Street, NW, Washington, D.C.,
     beginning at 9:32 a.m., on the above
19   date, before Michelle L. Gray, a
     Certified Shorthand Reporter, Registered
20   Professional Reporter, Certified Court
     Reporter, Certified Realtime Reporter,
21   and Notary Public.

22
                    - - -
23

24
```

## Page 2

```
 1   APPEARANCES:
 2
     US DEPARTMENT OF JUSTICE,
 3   ANTITRUST DIVISION
     BY:  JULIA TARVER WOOD, ESQ.
 4   BY:  CHASE PRITCHETT, ESQ.
     (In person)
 5   450 Fifth Street, NW
     Suite 8700
 6   Washington, D.C. 20530
     202.307.0924
 7   julia.wood@usdoj.gov
     chase.pritchett@usdoj.gov
 8
         - and -
 9
     US DEPARTMENT OF JUSTICE,
10   ANTITRUST DIVISION
     BY:  AARON M. SHEANIN, ESQ.
11   (In person)
     450 Golden Gate Avenue
12   Suite 10-0101
     San Francisco, California 94102
13   aaron.sheanin@usdoj.gov
     Representing the United States of
14   America
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1   APPEARANCES:  (Cont'd.)
 2
     PAUL, WEISS, RIFKIND, WHARTON &
 3   GARRISON LLP
     BY:  MEREDITH R. DEARBORN, ESQ.
 4   (In person)
     535 Mission Street
 5   24th Floor
     San Francisco, California 94105
 6   628.432.5100
     mdearborn@paulweiss.com
 7
        - and -
 8
     PAUL, WEISS, RIFKIND, WHARTON &
 9   GARRISON LLP
     BY:  CARTER GREENBAUM, ESQ.
10   (Zoom)
     1285 Avenue of the Americas
11   New York, New York 10019
     212.373.3000
12   cgreenbaum@paulweiss.com
13     - and -
14   PAUL, WEISS, RIFKIND, WHARTON &
     GARRISON LLP
15   By:  ANITA Y. LIU, ESQ.
     (In Person)
16   BY:  MARTHA GOODMAN, ESQ.
     (Zoom)
17   2001 K Street, NW
     Washington, D.C. 20006
18   202.223.4363
     aliu@paulweiss.com
19   mgoodman@paulweiss.com
     Representing the Defendant, Google
20   and the Witness
21
22
23
24
```

## Page 4

```
 1   APPEARANCES:  (Cont'd.)
 2
 3   FRESHFIELDS BRUCKHAUS DERINGER LLP
     BY: LAUREN KAPLIN, ESQ.
 4   (Zoom)
     700 13th Street, NW
 5   10th Floor
     Washington, D.C. 20005
 6   202.777.4500
     lauren.kaplin@freshfields.com
 7   Representing the Defendant, Google
     and the Witness
 8
 9   NEW YORK STATE OFFICDE OF THE
     ATTORNEY GENERAL
10   ANTITRUST DIVISION
     BY:  MORGAN JESSEN FEDER, ESQ.
11   8 Liberty Street
     Floor 20
12   New York, New York 10005
     212.416.8288
13   Representing the State of New York
14
     ALSO PRESENT:
15
16   VIDEOTAPE TECHNICIAN:
        Jason Levin - in person
17      (Lexitas)
18
     ZOOM MONITOR:
19      Nathaniel Avila - Zoom
        (Lexitas)
20
     Sue Majewski - Economist
21      (DOJ) - in person
22   Claire Cushman - Paralegal
        (DOJ) - in person
23
24
```

## Page 5

```
 1              - - -
 2            I N D E X
 3              - - -
 4
     Testimony of:
 5
              ITAMAR SIMONSON, Ph.D.
 6
 7     By Ms. Wood               8, 385
 8     By Ms. Dearborn             381
 9
10
                - - -
11
            E X H I B I T S
12
                - - -
13
14   NO.        DESCRIPTION           PAGE
15   Simonson
     Exhibit 1   Expert Report        11
16              Itamar Simonson
                1/23/24
17
     Simonson
18   Exhibit 2   Appendix B           12
                Testimony List
19              Of Simonson
20
21
22
23
24
```

## Page 6

```
                    -  -  -
            DEPOSITION SUPPORT INDEX
                    -  -  -

 Direction to Witness Not to Answer
 PAGE   LINE  PAGE LINE    PAGE LINE
    None.


 Request for Production of Documents
 PAGE   LINE  PAGE LINE    PAGE LINE
    None.


 Stipulations
 PAGE   LINE  PAGE LINE    PAGE LINE
    None.


 Questions Marked
 PAGE   LINE  PAGE LINE    PAGE LINE
    None.
```

## Page 7

  THE VIDEOGRAPHER: We are now on the record.

  My name is Jason Levin. I'm a videographer retained by Lexitas.

  Today's date is February 28, 2024, and the video time is 9:32 a.m. Eastern.

  This deposition is being held at the offices of Paul Weiss in Washington, D.C., in the matter of USA versus Google.

  The deponent is Dr. Itamar Simonson.

  All counsel will be noted on the stenographic record.

  The court reporter is Michelle Gray and will now swear in the witness.

         -  -  -
  ... ITAMAR SIMONSON, Ph.D., having been first duly sworn, was examined and testified as

## Page 8

follows:
         -  -  -
         EXAMINATION
         -  -  -
BY MS. WOOD:

  Q. Good morning, Professor Simonson. We met off the record. My name is Julia Wood. I'm from the United States Department of Justice. I'll be asking you some questions today.

  Can you state your full name for the record.

  A. Itamar Simonson.

  Q. And do you still reside at your address in Burlingame, California?

  A. Partially. I do have that address, but I actually spend more time in Seattle. Now that I'm emeritus professor and no longer teach, I spend most of my time in Seattle, where my kids and grandkids reside.

  Q. And where is that in Seattle?

  A. It's 5416 Kirkwood Place

## Page 9

North, Seattle, 98103.

  Q. All right. And you understand that you're under oath today, correct?

  A. Yes.

  Q. And you are expected to testify to the truth, and anything that you say today can be used by the Department of Justice in civil, criminal, administrative, or regulatory cases or proceedings?

  A. Yes.

  Q. Okay. And is there anything that would prevent you from giving complete and accurate information today?

  A. No.

  Q. As you can see, we have a court reporter here and a videographer here today. It's important for the court reporter to be able to take down everything that is said. So I would ask you to give verbal answers instead of nodding the head, and I'd ask you to speak loudly and clearly and also to wait

**Page 70**

1  not give -- not estimate.
2     Q.  Do you have a range of hours
3  that you would feel comfortable
4  testifying to?
5     A.  Not really.  I mean, I don't
6  think it will be meaningful if I'd say
7  it's between 100 and, I don't know, some
8  higher number.  I'm not sure it will be
9  very meaningful.
10          And as I said, I don't feel
11 comfortable giving you any number, given
12 the fact that I'm -- I'm just really
13 not -- I don't have a good estimate.
14          MS. WOOD:  Whoever is on
15      the phone, if you could please
16      mute your line.  We're hearing
17      feedback from the phone.
18          If that continues to be a
19      problem, we will terminate the
20      remote session.
21 BY MS. WOOD:
22     Q.  You have records of the
23 number of hours that you've worked on the
24 matter?

**Page 71**

1     A.  Yes.
2     Q.  And you're preserving those
3  records, right?
4     A.  Yes.
5     Q.  In your report, you indicate
6  that you also receive compensation based
7  on the professional fees of Analysis
8  Group.  What percentage of Analysis
9  Group's fees do you receive?
10    A.  15 percent.
11    Q.  Have you worked with
12 Analysis Group before?
13    A.  I can think of three other
14 matters.
15    Q.  How many people at Analysis
16 Group are working with on you this
17 matter?
18    A.  I'd say my -- the primary
19 team consists of perhaps five, five
20 people, maybe six people.  But I assume
21 that others, with whom I'm less familiar,
22 have been involved in some limited
23 capacity.
24    Q.  And did those individuals at

**Page 72**

1  Analysis Group work under your direction?
2     A.  Yes.
3     Q.  But they are paid by Google,
4  correct?
5     A.  Yes.
6     Q.  And you receive a percent --
7  15 percent of whatever they are paid by
8  Google?
9     A.  Yes.
10    Q.  Who made the decision to use
11 Advertiser Perceptions in connection with
12 this matter?
13    A.  I did.
14    Q.  And when did you make that
15 decision?
16    A.  I don't recall, exactly.  It
17 would be, I think, the summer of 2023.
18    Q.  2023?
19    A.  Yeah.  Maybe slightly before
20 that.  Maybe.  I don't know if June is
21 part of the summer.  But -- I don't
22 remember exactly, but it was around that
23 time period.
24    Q.  When did Analysis Group

**Page 73**

1  begin working on this matter?
2     A.  In 2021.  Soon after I
3  started working on this case.
4     Q.  And how did you make the
5  decision to use Advertiser Perceptions on
6  this matter?
7     A.  So I think, obviously, that
8  was an important decision, and I wanted
9  to do my due diligence, if you will, on
10 that issue.  So I learned about them,
11 looked at other surveys or survey reports
12 they have done.  I interviewed a couple
13 of people from Advertiser Perceptions.  I
14 think -- and I read about them, whatever
15 I could find on the internet.
16    Q.  Did you consider any other
17 entities to perform that role?
18    A.  I mean, initially, I think
19 there were some other names that came up,
20 but I don't think any of them -- that
21 there was anyone I could find that had
22 the capability to undertake such a
23 survey.
24          I mean, not to -- I guess,

Page 74

```
 1  not to brag, but this is a pretty
 2  complicated survey that required access
 3  to many advertisers and ad agencies, and
 4  I came to the conclusion that AP, or
 5  Advertiser Perceptions, is competent and
 6  has the panel of respondents that would
 7  allow me to conduct this survey, you
 8  know, as it should be.
 9       Q.   Did you first learn about AP
10  from Google?
11       A.   No.
12       Q.   How did you first learn
13  about AP?
14       A.   I think I worked with the
15  team at Analysis Group, and we were
16  looking for companies that could help us
17  conduct such a survey.  And I think there
18  was some names, and I think that the
19  conclusion eventually was that there was
20  really -- as far as we could tell, there
21  was one company that had the capability
22  to conduct such a survey, and that was
23  AP.
24       Q.   What were the other names
```

Page 75

```
 1  that came up?
 2       A.   I don't recall.
 3       Q.   You don't recall any of
 4  them?
 5       A.   Any of them.  As I said, it
 6  was a very short -- someone at AG said,
 7  well, I saw some --
 8            MS. DEARBORN:  You do not
 9       need to disclose any --
10            THE WITNESS:  Okay.
11            MS. DEARBORN:  --
12       communications between yourself
13       and consulting staff at --
14            THE WITNESS:  Okay.
15            MS. DEARBORN:  -- at
16       Analysis Group, under our expert
17       stipulation.
18            THE WITNESS:  Okay.  Sure.
19  BY MS. WOOD:
20       Q.   Who were the people at AP
21  that you interviewed?
22       A.   I remember their first
23  names.  One was Katie, the other one was
24  Andy.
```

Page 76

```
 1       Q.   Did Katie and Andy end up
 2  working on the matter?
 3       A.   I believe so.  Perhaps Katie
 4  even more so.
 5       Q.   Do you remember their
 6  titles?
 7       A.   I -- I do not.
 8       Q.   Do you remember their
 9  functions, even if you don't remember
10  their title?
11       A.   If I'm not wrong, they're
12  executive vice president or vice
13  presidents.  I'm not sure.
14       Q.   Okay.  And you don't
15  remember Katie's last name or Andy's last
16  name?
17       A.   I do not.
18       Q.   And Advertiser Perceptions
19  were retained by whom?
20       A.   Not by me, technically
21  speaking.
22            So I'm not sure exactly who
23  formally retained them.
24       Q.   And did Advertiser
```

Page 77

```
 1  Perceptions work at your direction?
 2       A.   Yes.  I mean, I should note
 3  that Analysis Group also interacted with
 4  them.
 5       Q.   So at times, Advertiser
 6  Perceptions took direction from Analysis
 7  Group?
 8       A.   Yes.
 9       Q.   And you had not worked with
10  Advertiser Perceptions before this
11  matter, correct?
12       A.   That's correct.
13       Q.   At the time that you decided
14  to use Advertiser Perceptions on this
15  matter, were you aware that Google had
16  used them in the past for surveys?
17       A.   Yes.
18       Q.   Do you know how many people
19  from Advertiser Perceptions are working
20  on this matter or have worked on this
21  matter?
22       A.   I'm not aware of -- other
23  than those two, I'm not familiar with
24  that.  I mean, just in general when I
```

Case 1:23-cv-00108-LMB-JFA   Document 646-3   Filed 05/17/24   Page 8 of 16 PageID# 12943
UNITED STATES OF AMERICA v
GOOGLE, LLC
Highly Confidential
Itamar Simonson, Ph.D.
February 28, 2024

Page 106

1 they are the ads often appearing
2 at the top.  Not always.  In the
3 past they were on the right-hand
4 side.
5         Then there are the organic
6 results.
7         So these are all kinds of
8 listings that are -- that appear
9 as a consequence of a particular
10 search.
11 BY MS. WOOD:
12     Q.    And other than the surveys
13 that are described in your report, which
14 has been marked as Simonson Exhibit 1,
15 did you conduct any other surveys in
16 connection with your work on this matter?
17     A.    No.
18     Q.    Did you conduct any other
19 preliminary interviews, other than the
20 preliminary interviews of advertisers
21 that are described in Simonson Exhibit 1?
22     A.    No.
23     Q.    You conducted no interviews
24 with publishers?

Page 107

1     A.    That's correct.
2     Q.    And no interviews with
3 AdTech providers?
4     A.    Right.
5     Q.    At any point in time during
6 your work in this matter, did you
7 consider conducting a survey other than
8 the surveys that were described in
9 Simonson Exhibit 1?
10     A.    No.
11         MS. DEARBORN:  We've been
12 going about an hour and
13 40 minutes.  Are you okay?  Do
14 you need a break?
15         THE WITNESS:  I'm okay, but
16 whatever --
17         MS. WOOD:  We can take a
18 break if you'd like a break.
19         MS. DEARBORN:  Sure.
20         THE VIDEOGRAPHER:  We're
21 going off the record at
22 11:09 a.m.
23         (Short break.)
24         THE VIDEOGRAPHER:  We are

Page 108

1 going back on the record at
2 11:25 a.m.
3 BY MS. WOOD:
4     Q.    Mr. Simonson, in connection
5 with your work on this matter, you
6 arranged for 14 preliminary interviews to
7 be conducted; is that right?
8     A.    Right.
9     Q.    What's the purpose of a
10 preliminary interview?
11     A.    It depends.  I can tell you
12 what it was in this case.
13     Q.    Well, first, I'd like to
14 know in general terms, why are
15 preliminary interviews conducted in
16 connection with surveys?
17     A.    I think it varies.  And I
18 should note that in most surveys in which
19 I've been involved, I did not conduct
20 preliminary interviews.
21     Q.    How often do you conduct
22 preliminary interviews?  What percentage
23 of the surveys in which you're involved
24 do you conduct preliminary interviews?

Page 109

1     A.    I -- very low.  I cannot
2 recall the last time I did.
3     Q.    So less than 10 percent?
4     A.    Well below less 10 percent.
5     Q.    So less than 5 percent?
6     A.    Yes.
7     Q.    And why is that?
8     A.    And we are talking about
9 litigation.
10         In general, I -- I rely on
11 my judgment and my experience conducting
12 thousands of surveys.  Most questions are
13 questions that I've used before in
14 different contexts, so I have no -- no
15 need to have qualitative interviews.
16     Q.    So what was different here?
17     A.    So as I said, in this case,
18 I wanted -- we talked earlier about
19 Advertiser Perceptions.  I was curious to
20 see -- to hear interviews with the kind
21 of people that -- who will later
22 participate in the survey.
23         So I just -- you know, these
24 were advertisers or agencies, and I just

Case 1:23-cv-00108-LMB-JFA   Document 646-3   Filed 05/17/24   Page 9 of 16 PageID# 12954
UNITED STATES OF AMERICA v
GOOGLE, LLC
Highly Confidential
Itamar Simonson, Ph.D.
February 28, 2024

|  |  |
|---|---|
| Page 178 | Page 180 |

**Page 178**

1   Q.   I'd like you to turn to
2 Question 20 of the preliminary interview
3 guide.  It's on Page D-5.
4        Question 20 asked
5 interviewers whether they define display
6 advertising to include ads on social
7 media sites, in-app ads, instream and
8 outstream video ads, and direct ads.
9        Do you see that?
10  A.   Yes.
11  Q.   And did you get answers to
12 that from the 14 preliminary interviews?
13  A.   I believe so, yes.
14  Q.   And what were the answers to
15 that?
16  A.   I do not recall.
17        For the reasons that I just
18 indicated, the content of the answers was
19 not particularly important, given the
20 limited purpose of those preliminary
21 interviews.
22  Q.   And you made a decision not
23 to ask that particular question in the
24 survey that you ultimately launched,

**Page 179**

1 correct?
2   A.   Certainly not.  I defined
3 those terms.
4   Q.   But you didn't ask
5 respondents to the survey whether they
6 would consider display advertising to,
7 for example, include advertising on
8 social media sites, correct?
9        MS. DEARBORN:  Form.
10       THE WITNESS:  I did not
11    ask, nor would it provide any
12    useful information.
13 BY MS. WOOD:
14  Q.   And you took no notes, and
15 you're not aware of anyone else taking
16 notes, about the responses that the
17 14 preliminary interview participants
18 gave on those questions, correct?
19  A.   That's correct.
20       MS. DEARBORN:  Objection to
21    form.  Asked and answered.
22       THE WITNESS:  That's
23    correct.
24 BY MS. WOOD:

**Page 180**

1   Q.   Question 23 of the
2 preliminary interview guide asks the
3 participant what they view as
4 alternatives to certain types of display
5 ads.
6        Do you see that?
7   A.   Yes.
8   Q.   And Question 23 asks whether
9 interviewees viewed social, in-app,
10 video, and direct ads as alternative to
11 display ads.
12       Do you see that?
13       MS. DEARBORN:  Form.
14       THE WITNESS:  I do.
15 BY MS. WOOD:
16  Q.   And did the participants
17 answer that question?
18  A.   I don't recall specifically,
19 but I assume so.
20  Q.   And do you recall what
21 answers they gave about whether they
22 viewed social, in-app, video, and direct
23 ads as alternative to display ads?
24  A.   I do not recall the answers,

**Page 181**

1 for the reasons that I already explained.
2   Q.   And again --
3   A.   It was not important.
4        I just wanted to see -- to
5 hear how they talk about it, but that was
6 not the purpose of those preliminary
7 interviews.
8        And the respondents are not
9 economists.  They are not definers of
10 segments.  And so -- and so I was not
11 going to rely on their answers of -- of
12 these respondents.
13       But I just wanted to hear
14 how they talk about it.
15  Q.   But having heard their
16 answers to these questions, you chose not
17 to ask that question in the online
18 survey, correct?
19       MS. DEARBORN:  Objection to
20    form.
21       THE WITNESS:  Of course
22    not, for the reasons that I just
23    indicated.
24 BY MS. WOOD:

Page 182

1  Q. And did the answers to
2 Questions 20 and 23 influence any
3 decisions you made on how to write the
4 survey?
5  A. No.
6  Q. Why not?
7  A. I designed the survey based
8 on my, I would say, extensive experience
9 and expertise in conducting thousands of
10 surveys and evaluating thousands of
11 surveys. And I tried to ask questions
12 that I think are meaningful and are
13 questions that respondents are capable of
14 providing informative answers to.
15       These would not be among
16 those questions, so that's why I did not
17 include them. They would -- they would
18 be bad questions for the general survey.
19  Q. Why would the Questions 20
20 and 23 be bad questions for the general
21 survey?
22       MS. DEARBORN: Form.
23       Go ahead.
24       THE WITNESS: As I said,

Page 183

1    respondents are not economists.
2    They are not antitrust attorneys.
3    They don't define segments. It's
4    not something they can provide
5    meaningful answers to.
6         And, therefore, while they
7    were asked in these preliminary
8    interviews, it would have been a
9    mistake to ask such questions in
10   the actual questionnaire.
11 BY MS. WOOD:
12  Q. Why would that be a mistake?
13  A. I thought I just answered
14 that.
15  Q. Why would it be a mistake to
16 ask them, even though they are not
17 economists or antitrust specialists?
18       MS. DEARBORN: Object to
19    form. Asked and answered.
20       THE WITNESS: I mean, they
21    are not in a position to provide
22    informative answers to such
23    questions.
24 BY MS. WOOD:

Page 184

1  Q. They could provide answers
2 to those questions as to how they, as
3 participants in the industry, view those
4 advertising questions, correct?
5       MS. DEARBORN: Form.
6       THE WITNESS: I don't know
7    if they can. I mean, you -- as I
8    said, I don't think that they are
9    in the position.
10       That saying, we know from
11   my survey that social is a
12   substitute for display. And I
13   prefer to test it in that way, as
14   opposed to asking them
15   pointblank, assuming they have
16   some insights and they are
17   familiar with definitions and
18   somehow they can say -- define
19   what is meant by alternative.
20       I mean, after all,
21   advertisers want to reach their
22   customers, prospective customers,
23   and get them to like their brand,
24   to buy their product, and so on.

Page 185

1    And I think that's the question.
2         You can reach those people
3    using banner ads. You can use,
4    you know, Facebook, for example.
5    Maybe for some -- some cases you
6    can use Amazon. They have
7    different ways to reach
8    prospective customers and get
9    them to take whatever action or
10   to form judgment that you're
11   interested in.
12        And, therefore, these --
13   these digital advertising
14   categories, I mean, there -- you
15   can say they are alternatives.
16   Obviously, that was -- that is
17   something that was tested in the
18   survey.
19 BY MS. WOOD:
20  Q. But what do you recall about
21 their answers to Questions 20 and 23,
22 about whether they viewed them as
23 alternatives?
24  A. They don't --

## Page 186

1  MS. DEARBORN: Objection to
2  form. Asked and answered.
3  THE WITNESS: Yeah, I
4  already -- as I said, given the
5  limited purpose of those
6  interviews, I didn't think it was
7  important to remember their
8  specific answers.
9  BY MS. WOOD:
10 Q. And you make a rule not to
11 take notes?
12 MS. DEARBORN: Form.
13 THE WITNESS: There was no
14 need to take notes in this case.
15 BY MS. WOOD:
16 Q. And you're not aware of
17 anyone else taking notes or recording the
18 answers in any way?
19 MS. DEARBORN: Objection to
20 form. Asked and answered.
21 THE WITNESS: Right. Yeah,
22 you -- as I said, that's correct.
23 MS. WOOD: Why don't we
24 take a break.

## Page 187

1  MS. DEARBORN: Sure.
2  THE VIDEOGRAPHER: Going
3  off the record at 12:43 p.m.
4  - - -
5  (Whereupon a luncheon
6  recess was taken.)
7  - - -
8  A F T E R N O O N   P R O C E E D I N G S
9  - - -
10 THE VIDEOGRAPHER: We're
11 going back on the record at
12 1:34 p.m.
13 - - -
14 CONTINUED EXAMINATION
15 - - -
16 BY MS. WOOD:
17 Q. So before the break, we were
18 talking about the 14 preliminary
19 interviews, and I just want to make sure
20 I canvass everything you recall about
21 those interviews.
22 With respect to the four to
23 five high-spend advertiser interviews,
24 what, if anything, do you recall about

## Page 188

1  any of those four or five interviews?
2  MS. DEARBORN: Objection to
3  form.
4  THE WITNESS: Not much.
5  As I said, I could tell
6  that these people are familiar
7  with their companies' or business
8  units' advertising decisions,
9  what they use, and so on. That
10 was about it.
11 As I said, it was part of
12 -- part of my assessment of AP
13 and its panel and just wanted to
14 hear them talk about their
15 advertising, what they use.
16 So it served its purpose,
17 but I don't recall specific
18 answers, nor did I expect to use
19 specific answers to -- for any
20 particular purpose, aside from
21 what I said.
22 BY MS. WOOD:
23 Q. Do you think keeping notes
24 of interviews is a basic rule in data

## Page 189

1  preservation and proper research
2  practice?
3  MS. DEARBORN: Objection to
4  form.
5  THE WITNESS: Such a
6  general question.
7  As I indicated, in cases
8  where I used such interviews,
9  primarily, as I was working on
10 research with my doctoral
11 students, they did not take
12 notes.
13 They listened to the people
14 they presented the research to,
15 whatever they are doing. And
16 then we met in person and
17 discussed their impressions.
18 They -- I don't recall
19 anyone taking notes. I trusted
20 their ability to give me the
21 overall impression that they had
22 in that particular -- on that
23 particular study.
24 BY MS. WOOD:

Case 1:23-cv-00108-LMB-JFA   Document 646-3   Filed 05/17/24   Page 12 of 16 PageID# 12947

UNITED STATES OF AMERICA v.
GOOGLE, LLC

Highly Confidential

Itamar Simonson, Ph.D.
February 28, 2024

**Page 322**

```
 1      will remain confidential and no
 2      one will know the respondent's
 3      name, somehow Google will try to
 4      find the name of respondents,
 5      look for those who use only
 6      Google and say, ah, that's a
 7      great opportunity.  We should
 8      take advantage of the situation.
 9          I think it's a very
10      nonsensical, inconceivable
11      scenario.  I think I stand behind
12      the use of the term
13      "hard-pressed."
14  BY MS. WOOD:
15      Q.   Do you know how many of the
16  survey respondents used Google Chrome to
17  complete the survey?
18      A.   I don't recall asking that
19  question.  Google Chrome?  I don't know.
20      Q.   Do you know how many survey
21  respondents have a Gmail address?
22      A.   I don't.
23      Q.   Do you know how many survey
24  respondents use the Gmail address to
```

**Page 323**

```
 1  identify themselves in connection with
 2  the online survey?
 3      A.   What do you mean by that?
 4      Q.   How many respondents were
 5  sent the survey to an address at
 6  Gmail.com?
 7      A.   So AP -- just to -- I think
 8  you know how it works, right?
 9          AP sends an invitation to
10  prospective respondents and says, you
11  know, here is a link to a survey about
12  advertising.  If you'd like to
13  participate, please click on this link.
14      Q.   And how do they send that
15  invitation?  Do they send it to people's
16  e-mail address?
17      A.   Yes.
18      Q.   And do you know how many of
19  those e-mail addresses were Gmail
20  addresses?
21      A.   I don't.
22      Q.   Did you ever talk to
23  customers about concerns about Google
24  retaliating against them?
```

**Page 324**

```
 1          MS. DEARBORN:  Objection to
 2      form.
 3          THE WITNESS:  No.
 4          MS. WOOD:  Let's take a
 5      break.
 6          MS. DEARBORN:  Sure.
 7          THE VIDEOGRAPHER:  Going
 8      off the record at 4:18 p.m.
 9          (Short break.)
10          THE VIDEOGRAPHER:  We are
11      going back on the record at
12      4:38 p.m.
13  BY MS. WOOD:
14      Q.   Now, we've talked throughout
15  the day about the fact that each of your
16  three surveys asked respondents how they
17  would react to a "small but significant"
18  increase in the cost of advertising.
19          Do you recall that,
20  generally?
21      A.   Yes.
22      Q.   Okay.  And you would agree
23  with me that "small but significant" is
24  an inherently subjective term, right?
```

**Page 325**

```
 1          MS. DEARBORN:  Objection to
 2      form.
 3          THE WITNESS:  It's a matter
 4      of how individuals interpret or
 5      understand this term, what it
 6      means to them personally.
 7  BY MS. WOOD:
 8      Q.   And because it's not
 9  defined, there's no way to know what any
10  given respondent thought a "small but
11  significant price increase" actually
12  meant, correct?
13          MS. DEARBORN:  Form.
14          THE WITNESS:  No.  No.
15      That's incorrect.  That's
16      incorrect.
17  BY MS. WOOD:
18      Q.   How do we -- how can we
19  determine what any given survey
20  respondent thought a small but
21  significant price increase meant?
22      A.   Small and significant, they
23  are commonly used terms in the English
24  language.  On the one hand, it's small as
```

Case 1:23-cv-00108-LMB-JFA   Document 646-3   Filed 05/17/24   Page 13 of 16 PageID# 12848

UNITED STATES OF AMERICA v.
GOOGLE, LLC

Highly Confidential

Itamar Simonson, Ph.D.
February 28, 2024

Page 326

1 opposed to large.  And significant, as we
2 said earlier, it's not something that you
3 would ignore.  Doesn't mean it would
4 affect you in any way, but it's something
5 you would consider.
6     So I think it's a very
7 balanced term that I thought was a very
8 good choice for my survey.
9     Q.  Is "small but significant" a
10 term you've used in any other surveys
11 before this one?
12     A.  I don't recall.  I might
13 have.
14     Q.  But you don't recall, as you
15 sit here now, having ever used that term
16 before?
17     A.  I've used other qualitative
18 terms, as opposed to numerical terms,
19 many times.
20     Q.  But I'm asking about the
21 specific term "small but significant."
22     Is that a phrase you've ever
23 used before?
24     A.  For each survey, I use -- I

Page 327

1 may use a different term.
2     Sitting here now, I don't
3 recall.  But it's possible.
4     Q.  And who came up with the
5 phrase "small but significant"?
6     A.  I think it was something
7 that I discussed with Analysis Group, and
8 I found it was a very good term.  And it
9 was also discussed with counsel.
10     Q.  Again, I don't want to know
11 about your conversations with counsel.
12     MS. DEARBORN:  Thank you.
13 BY MS. WOOD:
14     Q.  But was the term "small but
15 significant" a term that you came up with
16 or that someone else came up with?
17     A.  So I don't recall,
18 specifically.  I believe it was something
19 that my team at Analysis Group and I came
20 up with and then discussed with counsel.
21     Q.  Do you know whether it was
22 someone at Analysis Group or you that
23 first came up with the term?
24     A.  I don't recall.

Page 328

1     Q.  Do you think it was you?
2     A.  I do not recall.
3     Q.  And as you sit here now, you
4 can't think of any other time, in your
5 30-plus-year career, that you've used
6 that exact phrase, "small but
7 significant"?
8     A.  I used different qualitative
9 terms, if you will, that have -- that
10 each person can interpret as it applies
11 to him or her.
12     Q.  But that's not my
13 question --
14     A.  But -- so I've used
15 individual terms once and never again, if
16 you will, in various surveys.
17     So it -- I'm not sure if I
18 ever used "small but significant."  But,
19 as I said, I don't recall the details of
20 most of the surveys I've conducted.
21     Q.  How often have you used the
22 phrase "small but significant" before
23 this case?
24     A.  I do not recall.  I cannot

Page 329

1 assess the number of times.
2     Q.  And you would agree with me
3 that one respondent could have
4 interpreted the phrase "small but
5 significant" to indicate 5 percent, for
6 example, but a different respondent might
7 have interpreted that phrase to mean 35
8 or 40 percent, correct?
9         MS. DEARBORN:  Form.
10         THE WITNESS:  Not at all.
11     As I said earlier, based on
12     my understanding of survey
13     takers' behavior and how they
14     answer questions, they will take
15     the term "small but significant"
16     as it -- as it means.
17     They will not go the extra
18     step and say, okay, let's
19     speculate that small but
20     significant is 3 percent,
21     30 percent, 10 percent.  They
22     have no basis for doing that nor,
23     based on my experience, will they
24     do that.

### Page 330

1    That just calls for an
2    extra step. It's like, okay,
3    it's small, but it's something
4    that I would consider. It's
5    significant enough. And they
6    will decide accordingly.
7        They will not go an extra
8    step, convert it to a specific
9    quantity, and then say, okay,
10   based on my speculation, my
11   answer is X. That's not what
12   survey respondents do.
13 BY MS. WOOD:
14   Q.   Okay. I'm now me, Julia
15 Wood, sitting here, and I'm thinking of a
16 number that to me is small but
17 significant.
18   A.   So what -- what's the
19 question?
20   Q.   What's my number?
21       MS. DEARBORN: Objection to
22   form.
23       THE WITNESS: Is that a
24   real --

### Page 331

1 BY MS. WOOD:
2   Q.   No, that's a real question.
3 I'm thinking of a number that's small but
4 significant. What's my number?
5   A.   It reminds me of games I'm
6 playing with my grandkids.
7   Q.   Good. Then you're
8 experienced at it.
9       What's my number?
10      MS. DEARBORN: Okay.
11   Objection to form.
12      THE WITNESS: I'm not sure
13   if you're -- I assume that you're
14   not asking that seriously.
15      But as I said, I will -- I
16   would not think of a number that
17   you're thinking about, nor will I
18   come up with a number. It would
19   be sheer speculation. Therefore,
20   I will not engage in that.
21      You told me it's small but
22   significant, and that's all the
23   information I have, and all the
24   information I will use when

### Page 332

1    answering the question.
2 BY MS. WOOD:
3   Q.   But if I come up with a
4 number that's small but significant to
5 me, that doesn't mean that same number
6 would be small but significant to you,
7 correct?
8   A.   I thought I just answered
9 that.
10      No, you will not come up,
11 if -- I mean, obviously, you're involved
12 in this case, so you're not the typical
13 respondent.
14      But speaking of typical
15 respondents, they would not start
16 speculating about a specific number. So,
17 therefore, it's not like one respondent
18 thinks about Number X and the other one
19 thinks about Number Y. What basis do
20 they have to -- for such speculations?
21   Q.   Regardless of the nature of
22 the speculation, it is possible -- strike
23 that.
24      You say in your report at

### Page 333

1 Footnote 5, on Page 7, "This phrase,"
2 small but significant, "was designed to
3 leave it to the respondents to consider
4 their reaction, if any, if (what they
5 considered to be) 'a small but
6 significant' increase in the cost of
7 programatic display advertising
8 occurred."
9        Right?
10   A.   Right.
11   Q.   And then you say in
12 Footnote 65 of your report, on Page 39,
13 that "The balanced phrasing of 'small but
14 significant' avoids possible demand
15 effects whereby respondents might have
16 assumed that certain answers were
17 expected or preferred."
18      Can you describe how "small
19 but significant" is balanced phrasing, in
20 your view?
21   A.   Okay. Small is usually
22 contrasted with big, and significant is
23 contrasted with insignificant.
24      One goes in one direction,

**Page 358**

1   Q.   Let's say, hypothetically,
2   that AdTech tools are -- represent
3   30 percent of the cost of a display ad.
4   A.   Okay.
5   Q.   And if you tell respondents
6   that the cost of display ads goes up by a
7   small but significant amount, but you
8   don't tell them that the 30 percent cost
9   of the AdTech tool goes up by a small but
10  significant amount, you are necessarily
11  causing the respondent to imagine a
12  higher increase in cost than if you had
13  them focus on the cost of the tool alone.
14       MS. DEARBORN:  Objection to
15   form.
16  BY MS. WOOD:
17       Q.   Do you understand that?
18       A.   I understand the question.
19            Two things.  A, the survey
20  tested what happens if they are told that
21  the cost of display advertising, or
22  programatic display advertising, went up
23  by a small but significant amount.
24  That's what I tested.  It is what it is.

**Page 359**

1            Furthermore, as you know, I
2   asked, later, the question about the
3   magnitudes of diversion to each one, on a
4   0 to 10 scale, and the most common
5   answers were between 7 and 10, which
6   means that respondents are thinking about
7   substantial increases.
8            So in case, let's say, it
9   was -- the actual increase was somewhat
10  lower, maybe the scale numbers would have
11  been somewhat lower than between 7 and
12  10.  But there would still be diversion,
13  which is what my survey tested and
14  showed.
15       Q.   But you agree that if your
16  survey had asked about a fraction of the
17  costs of display advertising increasing
18  and not all of the display advertising
19  cost increasing, you could expect to see
20  a different level of diversion than what
21  you got in your sample?
22            MS. DEARBORN:  Form.
23            THE WITNESS:  As I just
24       said, that's not the case.  We

**Page 360**

1       have the data about the extent of
2       diversion.  And if most
3       respondents say that it's between
4       7 and 10, it means that maybe if
5       it was lower than that, maybe the
6       scale numbers would range
7       between -- I don't want to
8       speculate.
9            Maybe they would have been
10      somewhat lower, but there still
11      would be substitution observed.
12  BY MS. WOOD:
13       Q.   And by focusing on a higher
14  cost than the cost of the AdTech tools
15  alone, that has the potential to create
16  demand effect, does it not?
17       A.   Not at all.  It has nothing
18  to do with demand effect.
19       Q.   If you were retained in a
20  case where the plaintiffs sued Ford for
21  monopolizing the market for truck
22  chassises, would you ask participants
23  about a potential increase in the price
24  of Ford trucks overall, or a potential

**Page 361**

1   increase in the price of the truck
2   chassises?
3            MS. DEARBORN:  Form.
4            THE WITNESS:  Yeah, I take
5       survey design very seriously.
6       And if I were asked to conduct a
7       survey on this topic, I would
8       think about it and figure out
9       what's the right way to do.
10           Sitting here now, I cannot
11      design the right survey and,
12      therefore, cannot answer this
13      question.
14  BY MS. WOOD:
15       Q.   But isn't the relevant
16  question whether the monopolized product
17  price changes, not whether some larger
18  price changes?
19           MS. DEARBORN:  Objection to
20      form.
21           THE WITNESS:  I hate to
22      repeat myself.
23           As I said, the survey
24      looked at the effect on

Case 1:23-cv-00108-LMB-JFA   Document 646-3   Filed 05/17/24   Page 16 of 16 PageID# 12951

UNITED STATES OF AMERICA v.
GOOGLE, LLC

Highly Confidential

Itamar Simonson, Ph.D.
February 28, 2024

Page 386

```
 1      Q.  Did you do anything during
 2  this deposition, including on the last
 3  break, to refresh your recollection about
 4  the number of respondents who put ten
 5  down as nonprofit?
 6          MS. DEARBORN:  And please
 7      set aside communications with
 8      counsel.
 9          THE WITNESS:  So I didn't
10      go back at the data.  The answer
11      was pretty straightforward.  I
12      just went back to my report and
13      thought about it.  I said, well,
14      respondents could have indicated
15      that they were a nonprofit in
16      Question S8.  However they were
17      excluded from the survey later,
18      for example, because they were
19      not using display advertising.
20  BY MS. WOOD:
21      Q.  But you didn't look at data
22  to make that assessment.  You just did
23  that based on inference?
24      A.  Well, as I said, I
```

Page 387

```
 1  personally counted the number of
 2  nonprofit respondents in the data for
 3  both the large -- large segment and small
 4  segment.  So I'm confident about that.
 5          And there were ten
 6  respondents in the large segment who
 7  identified as being in a nonprofit.
 8      Q.  And what about government.
 9  Is the number two for government an
10  accurate number, as far as you know?
11      A.  I didn't look at government.
12      Q.  Okay.  And same for the
13  low-spend, you didn't look at government
14  there either?
15      A.  No.
16          MS. WOOD:  No further
17      questions, subject to the
18      reservation of rights.
19          MS. DEARBORN:  And subject
20      to our prior discussion.
21          THE VIDEOGRAPHER:  And we
22      are going off the record at
23      5:53 p.m.
24          Thank you.
```

Page 388

```
 1              -  -  -
 2          ***********
 3          (Excused.)
 4          (Deposition concluded at
 5  approximately 5:53 p.m.)
```

Page 389

```
 2              CERTIFICATE
 5          I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
 6  deposition is a true record of the
    testimony given by the witness.
 8          It was requested before
    completion of the deposition that the
    witness, ITAMAR SIMONSON, Ph.D., have the
 9  opportunity to read and sign the
    deposition transcript.

            [signature: Michelle L Gray]
12          MICHELLE L. GRAY,
13          A Registered Professional
            Reporter, Certified Shorthand
14          Reporter, Certified Realtime
            Reporter and Notary Public
15          Dated:  February 29, 2024

18          (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
```