# EXHIBIT 114

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

United States of America, et al., ) Plaintiffs, ) vs. ) Google, LLC, ) Defendant. )

Case No. 1:23-cv-00108-LMB-JFA

VIDEO RECORDED DEPOSITION OF WENKE LEE, PhD

Wednesday, March 6, 2024, 9:45 a.m.

US Department of Justice, Antitrust Division
450 5th Street, NW
Washington, DC

Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA
Job Number: CS 6484701

VIDEO RECORDED DEPOSITION OF WENKE LEE, PhD, a witness herein, called by the Defendant for examination, taken pursuant to the Notice, by and before Marjorie Peters, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public in and for the District of Columbia, at US Department of Justice, Antitrust Division, 450 5th Street, NW, Washington, DC, on Wednesday, March 6, 2024, at 9:45 a.m.

A P P E A R A N C E S

For the Plaintiff:

Sean Carman, Esquire
Aaron M. Teitelbaum, Esquire
Senior Litigation Counsel, Antitrust Division
U.S. Department of Justice
450 Fifth Street NW
Washington, DC 20530
Mobile: (202) 894-4266

For the Defendant:

Amy Mauser, Esquire
Katherine Stewart, Esquire
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
amauser@paulweiss.com
202-223-7371

ALSO PRESENT:
David Campbell, Legal Videographer

I N D E X

| EXAMINATION | PAGE |
|---|---|
| WENKE LEE PHD | |
| By Ms. MAUSER | 8 |

I N D E X O F E X H I B I T S

| W. LEE EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Introduction to Information Security | 14 |
| Exhibit 2 | Rate my Professor | 28 |
| Exhibit 3 | Lee Report | 54 |
| Exhibit 4 | "Your Online Interests - Pwned! A Pollution Attack Against Targeted Advertising" | 72 |
| Exhibit 5 | "Financial Lower Bounds of Online Advertising Abuse" | 93 |
| Exhibit 6 | "Understanding Malvertising Through Ad-Injecting Browser Extensions" | 117 |
| Exhibit 7 | ads.txt standard | 181 |

I N D E X O F E X H I B I T S

| W. LEE EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 8 | "Working with the industry towards a fraud-free media supply chain" | 185 |
| Exhibit 9 | IAB Tech Lab, Authorized Sellers for Apps (app-ads.txt), Final specification version 1.0 | 189 |
| Exhibit 10 | Sellers.json | 200 |
| Exhibit 11 | "FAQ for sellers.json and SupplyChain Object" | 200 |
| Exhibit 12 | e-mail 7.9.18, GOOG-AT-MDL-007043716 | 204 |
| Exhibit 13 | "Introduction to Prebid for Header Bidding" is what is on the header of the doc, but in the body it says "Introduction to Prebid" | 227 |

Page 62

with the FBI and Damballa.
MR. CARMAN: Objection. Form. Asked and answered.
A. Like I said, my report, the way I prepared the report is based on the materials I cited.
I did not cite Damballa. I did not FBI -- my engagement with FBI. So those experiences -- I mean, those experiences, you know, they do not directly influence how I wrote my report.
Q. Were they relevant to your report?
MR. CARMAN: Objection. Form.
A. So like I said, I cited materials that I rely on for this report.
I did not cite Damballa. I did not cite my engagement with the FBI.
Q. You mentioned you had a fourth interaction with the FBI.
Can you tell me about that.
A. So I think there were two FBI agents, and then the third one, because the other one got

Page 63

reassigned, they requested to meet with me, let's say, once a month, just checking. They call it engagement, committee engagement.
It was basically try to, you know, ask my opinions of some of the latest threats. You know, what do I -- you know, what's my opinion on some of the threat landscapes and, you know, that kind of thing.
So it's not a specific operation, but every now and then, they would say, oh, do you know about this, do you know about that, kind of thing.
Q. Did you have any interactions with the FBI relating to the digital advertising ecosystem?
A. I don't recall specifically. I would just say some of the questions that they ask, they would point to some, you know, pretty large-scale kind of attack.
But I stopped this kind of engagement more than a year ago because I was like, look, I mean, you can probably talk to some other professor because I'm not busy with other stuff, so

Page 64

we just -- we actually stopped a year ago.
Q. Did your work with Damballa ever involve the digital advertising ecosystem?
MR. CARMAN: Objection. Form.
A. So like I said, the beginning month or the first year, we were selling data to various industry players to use our knowledge of botnet or let's say where are the bots, for them to, you know, block spam, block click frauds.
So that was one example of relevance to digital advertising, from -- specifically --
Q. Sorry.
A. -- with Damballa experience.
Q. Did any participant in the digital advertising ecosystem buy your technology?
MR. CARMAN: Objection. Form.
A. I don't recall. I mean, some of these buyers of our data, some were --
(Clarification requested by the Realtime Stenographer.)
A. Some of the buyers of our -- some of the buyers of our data or technology data, some were

Page 65

sensitive. They -- sometimes they don't tell us what they're doing. That includes actually quite a few US government agencies. Yeah.
So I don't recall the details of who bought what for how long.
Q. Well, at Damballa, did you enter into any contractual arrangements with any participant in the digital advertising ecosystem?
A. Again, I was not involved in the actual business transaction, per say. I was more like a cofounder on the technical side.
I know that we had some very in-depth discussion, maybe even contractual discussions with some of the major players.
Q. Did any of your interactions with the FBI involve Header Bidding?
MR. CARMAN: Objection. Form.
A. No. I don't recall.
Well, like I said, some of the details may escape me, you know, but I don't recall.
Q. Did any of the work you did at Damballa involve Header Bidding?

MR. CARMAN: Objection. Form.
A. I don't recall that.
MS. MAUSER: We have been going over an hour, I don't know if you want to --
MR. CARMAN: Do you want to keep going?
THE WITNESS: No, yeah, I'm fine. I'll be fine. Yeah, thank you.
MR. CARMAN: Okay.
MS. STEWART: Court reporter, are you fine?
COURT REPORTER: Yeah, I'm fine.
MR. TEITELBAUM: Just for my own benefit, actually, if you guys don't mind a short break.
MR. CARMAN: Would you say now.
MR. TEITELBAUM: Doesn't need to be very long.
THE VIDEOGRAPHER: Off the record at 10:46.
(RECESS, 10:46 a.m. - 11:01 a.m.)
THE VIDEOGRAPHER: Back on the

record at 11:01.
BY MS. MAUSER:
Q. Professor Lee, do you have your report in front of you?
A. Yes.
Q. Does this report contain all the opinions that you intend to offer in this case?
A. Yes. So my assignment, like I said, was to analyze Mr. Ferrante's report, so that's my opinions regarding his report.
Q. Does the report contain all the bases for your opinions?
A. Yeah. I would start by saying that I applied this methodology that's very well established in any field, which is for you to offer opinion, you have to first describe, you know, what problem you are addressing, what are the different factors of this -- aspects of this problem that would lead you to believe how effective technology should be.
I then describe, okay, here is the technology that I used to address this problem,

including some of the existing technologies. And then you say, okay, and then you arrive at some meaningful results for people to evaluate the effectiveness of the technology.
And then I say, okay, you know, not only my technology is so effective, I'm better, here is the comparison with others.
So I would say these five-step principles are the basic methodology in any field, and particularly, in scientific discovery and technical advances. I practice this every day. I teach my students, expect them to do the same.
I essentially am, you know, using these five-step principles to analyze every opinion that Mr. Ferrante -- and conclusion that he offered in his report. That's the step I -- the methodology I used.
Q. Okay.
I'd like to turn to some of the presentations and articles that you've written.
In the appendix with your -- to your report with your CV --

A. Okay.
Q. -- you have 15 refereed journal papers; is that right?
A. I'm sorry. How many?
Q. 15, I believe.
A. 15. Oh, wait. You mean the journal papers?
Q. Yes.
A. Yeah. Okay. Yes.
Q. None of them specifically relate to the digital advertising ecosystem, do they?
MR. CARMAN: Objection. Form. Foundation.
A. Oh, let me take a look.
Again, what is your question, again?
Q. Do any of these 15 articles or papers specifically relate to digital advertising?
MR. CARMAN: Same objection.
A. I don't recall from these 15 journal papers, but they do talk about some background technologies.
Q. Okay.

Page 70

I'd like to -- okay, why don't we mark -- I want to -- you have a refereed conference presentation that I want to discuss with you, that we're going to pull up so you can actually see it, that relates to malvertising.

A. Okay.

Q. We may not have it.

If you could turn to the section of your conference presentations, there's number 58.

MR. CARMAN: What page of the report are we on?

MS. MAUSER: It's in his CV. Page 19 of his CV.

THE WITNESS: Yeah.

BY MS. MAUSER:

Q. The presentation is called "Unraveling the Relationship Between Ad-Injecting Browser Extensions and Malvertising."

Do you see that?

A. Yeah. I see that. Yes.

Q. We're just seeing if we have it. We thought we had it. If we don't, maybe we'll get it

Page 71

and we maybe can return to this.

Can you get it and then we'll return to it later.

We'll return to this. I thought we had a copy, but I apologize.

A. Okay. Okay.

Q. Also in your CV, you have a conference presentation that's called "Your Online Interests - Pwned!," and for the court reporter, it's P-W-N-E-D exclamation, "A Pollution Attack Against Targeted Advertising."

Do you see that?

MR. CARMAN: Again, can you tell us what page you're on?

MS. MAUSER: It's under Conference Presentations in the CV, and it is number -- he refers to it throughout his report. It's on page 20.

Dr. Lee also refers to it throughout the text of his report.

MR. CARMAN: Ah. So this is 62. Okay. Thank you.

Page 72

(W. Lee Exhibit 4, "Your Online Interests - Pwned! A Pollution Attack Against Targeted Advertising", was marked for identification.)

COURT REPORTER: Okay. So this is Number 4.

MS. MAUSER: We'll give you a copy of it, so you...

MR. CARMAN: Oh, thanks. Yeah.

BY MS. MAUSER:

Q. When you wrote this article in 2014, were you aware of any actual instances of the pollution attack that you describe in the paper taking place in the digital advertising ecosystem?

MR. CARMAN: Objection. Form.

MS. MAUSER: What's objectionable about the question?

MR. CARMAN: You didn't define what you mean by "digital advertising ecosystem."

BY MS. MAUSER:

Q. Dr. Lee, do you understand what I mean by "digital advertising ecosystem"?

A. I would prefer that you qualify it so

Page 73

that we can put this paper in proper context, I would say.

Q. Do you know what digital advertising is?

A. Yes, I do.

Q. Do you know what -- do you know who the participants in the -- in digital advertising are?

A. Yes, I do.

Q. Who are the participants in digital advertising?

A. So you have the user browsing the web, but you also have the web publishers, you have the advertisers on the other end. In between, you have multiple parties try to -- essentially, how to bring the ads to the publisher so they can appear on the page, so the user can see it.

So that includes servers, server site, DNS platforms --

(Clarification requested by the Realtime Stenographer.)

A. You have the -- so the supply-side platforms, demand-side platforms, ad exchanges. Yeah.

Page 174

contents that deemed inappropriate and harmful.

I'm using that as an example of you basically have to define what do you mean by content that's inappropriate, what do you mean by content that's harmful?

Then you can say, oh, you know, this problem, of course, is very complex, but here are the factors I considered to define this problem. Right. And based on that, here is the technology I used to block them.

You can't just say, I block inappropriate contents and harmful contents. Exactly what do you mean? There's no way for me to actually find that kind of a statement to be meaningful, useful, without giving the proper definition, the scoping of the problem, and accordingly, the technology that you use, and what's the detection rate, you know, false alarm rate and, you know, have you considered all these participants such as, you know, who produced the contents, who -- you know, who distributed them, are there activists group involved, so on and so forth.

Page 175

It's, again, the basic, you know, five-step principles that Mr. Ferrante had failed to follow.

Q. Did you review the policies that -- did you review the Google policies that defined the content falling into the -- to each of the categories addressed in Mr. Ferrante's report?

MR. CARMAN: Objection. Form. Foundation.

A. So again, my task is to look at Mr. Ferrante's report, and analyze how he arrives at those opinions and conclusion. Like I said, I did not find that he cited any of these policies and technologies.

So that's my opinion, is that whatever conclusion and result he presents, because the process did not follow these five-step principles, his opinions and conclusions are not useful and meaningful to me.

Q. Did you review Google's safety and transparency reports?

A. Which one do you refer to?

Page 176

Q. The reports that were discussed in Mr. Ferrante's report.

MR. CARMAN: Objection. Form. Foundation.

A. Let me see. I might have -- let me see.

So are you referring to the annual report that they talk about, some of these numbers?

Q. Yes.

A. Okay.

So I do recall browsing those pages. All I can recall is that there's basically a very short one-page, no more than two pages of summary statement to say, oh, Google, you know, for this kind of -- you know, Google that's -- how to put it? They would say, Google blocked these many of, let's say, bad ads, but never goes into how they defined, let's say, bad ads, what's the policy, what's the process, none of that.

Q. Did you review the policies referenced in those reports?

MR. CARMAN: Objection. That mischaracterizes the reports, and to form and

Page 177

foundation.

A. So, like I said, my job is to -- my assignment was to analyze Mr. Ferrante's report, and look at how he arrived at those, you know, plots and opinions and conclusion. And like I said, I find that he failed to follow these five-step principles.

For example, if they have a policy statement that you could explain, because hey, here's Google policy. Here's how they define it. Here's how they analyze it. He should have put those into the report. That's -- you know, that -- you know.

So again, my job is to analyze his report, and I use this five-step principle to say, well, he failed to follow these five-step principles.

So I just find that his opinions and conclusion are not useful and meaningful to me.

Q. Did you see links in those reports to -- those reports are publicly available; correct?

A. The reference cited by Mr. Ferrante, as I recall it, was publicly available. I clicked on

it, I saw the page. I saw, okay, here's the number that Mr. Ferrante had used to plot. That's the -- and then I looked at the page that I was able to follow and -- click and follow it.

It's like -- like I said, there's pretty much not enough information for me to understand what Google's policy really is, how they define the problem, what technology do they use, you know, what's the detection rate, false alarm rate, and so on, none of that.

Q. Do you recall if those reports contain links to the actual policies describing the applicable policies?

MR. CARMAN: Objection to form. Foundation.

A. So like I said, you know, my job is to analyze Mr. Ferrante's report as it is. I read the references that he relied on to render the opinions and conclusion.

I find that he failed to follow these five-step principles. And that's why I -- you know, my opinion is that his opinions and conclusion

that he offer in the report is basically not useful and not meaningful.

Q. Could you turn to Paragraph 109.

MS. MAUSER: What time -- how long have we been going since...

THE VIDEOGRAPHER: Hour and seven minutes.

MS. MAUSER: I'm about to start another topic, so I don't know if you want to take a break.

MR. CARMAN: This seems like a good time.

THE WITNESS: Yeah, sure, yeah. Okay.

THE VIDEOGRAPHER: Off the record at 1:58.

(RECESS, 1:58 p.m. - 2:14 p.m.)

THE VIDEOGRAPHER: Back on the record at 2:14.

BY MS. MAUSER:

Q. Professor Lee, would you turn to Paragraph 109 of your report.

A. Okay.

Q. The first sentence says, "Publishers and advertisers rely on effective and readily available countermeasures to counteract any potential tendency of Header Bidding to reduce the security of their platforms. These include, for example, widely adopted industry standards such as ads.txt as well as app-ads.txt, sellers.json, and OpenRTB SupplyChain, all of which are useful in preventing fraud by allowing publishers, resellers and advertisers in a bidding transaction to verify and confirm each other's identities."

A. Yeah. I see that.

Q. Is it your opinion, Professor Lee, that the combination of ads.txt, app-ads.txt, sellers.json, and OpenRTB SupplyChain provided publishers and advertisers effective and readily available countermeasures to counteract any potential tendency of Header Bidding to reduce the security of their platforms?

MR. CARMAN: Objection to form.

A. So here, what I said is "all of which

are useful," yep, that's what I said.

Q. The combination of these four standards made Header Bidding safer?

MR. CARMAN: Objection to form.

Q. Did the combination -- did the adoption of these four standards make Header Bidding safer?

MR. CARMAN: Objection to form.

A. Yes. I think so, yes.

Q. Let's start with ads.txt.

Can you mark the ads.txt standard.

(W. Lee Exhibit 7, ads.txt standard, was marked for identification.)

COURT REPORTER: This is Number 7.

THE WITNESS: Okay. Thank you.

BY MS. MAUSER:

Q. Dr. Lee, do you know when the ads.txt standard was issued?

A. When?

Q. Mm-hmm.

A. The document that I read here, version 1.0, that's the official document that I was able to access as well, 1.0.

So it says June 2017.

Q. Do you know who authored the ads.txt standard?

A. If you look at the first page, you talk about authors, and a bunch of significant contributions from, you know, a bunch of participants.

Q. Was George Levitte, project manager of Google, one of the two authors?

A. Yes. That's a -- that's what's listed here as one of the two authors.

Q. Were four Google employees listed as significant contributors to the standard?

MR. CARMAN: Objection. Foundation.

A. Yes, there are a few Google -- a few Google employees, but so are a bunch of other industry participants, including White Ops, such as Dan Kaminsky, and companies such as -- let's see here. I mean, there are a bunch of IAB people, including the author of the document, IAB Tech, which is an industry group, and so on. There are many participants, actually.

Q. Including Google participants?

A. Again, Google, you know, employees is among the group of significant contributors.

Q. Right. One of the two authors was a Google employee?

A. That's correct, and the lead author is an IAB person.

Q. Do you know, Dr. Lee, when the standard was issued in relation to when Google adopted Open Bidding?

MR. CARMAN: I'm sorry.

Q. Do you know if it was before or after Google adopted Open Bidding?

MR. CARMAN: I'm sorry. We're not getting our realtime.

MS. MAUSER: I'm sorry.

MR. CARMAN: No, I hate to --

MS. MAUSER: So we're -- I wonder if you just need to -- because we're getting it.

MR. CARMAN: No, that's what I have done several times.

MR. TEITELBAUM: Yeah, we just tried

to --

MR. CARMAN: I have tried to connect it.

Also, I'm sorry, because I know you've had a hard day, this is like the last thing you need.

MS. MAUSER: Should we go off the record until we get it fixed?

MR. CARMAN: Yeah. Please. Yeah.

THE VIDEOGRAPHER: Off the record at 2:21.

(RECESS, 2:21 p.m. - 2:22 p.m.)

THE VIDEOGRAPHER: Back on the record at 2:22.

BY MS. MAUSER:

Q. Professor Lee, do you know if the ads.txt standard was adopted before or after Google adopted Open Bidding?

A. I don't recall specifically. I think the timeline is pretty close. I don't recall one way or another. No, I don't recall the details of that comparison of time, timestamps.

Q. Did Google push the industry to adopt the ads.txt standard?

MR. CARMAN: Objection. Form.

A. What do you mean by "push"; like specific -- can you, like, be specific with your question?

Q. Sure.

We'll show you a document that may help the questioning.

(W. Lee Exhibit 8, "Working with the industry towards a fraud-free media supply chain", was marked for identification.)

COURT REPORTER: This is Number 8.

THE WITNESS: Thank you.

BY MS. MAUSER:

Q. We just marked a document called Ads.Txt's adoption: IAB's program grows 5.4 times in 2018.

Oh, wait. No, we didn't. I'm looking at the wrong one. You should just have -- I'm sorry. Yeah. Okay. I'm sorry.

I'm sorry, I'll correct the record.

Page 186

We just handed Dr. Lee a document called "Working with the industry towards a fraud-free media supply chain."

A. Okay.

Q. If you turn to page 3 of the document, in the second paragraph, it says, "We believe the ads.txt standard is a significant step forward in the fight against ad fraud, and by the end of October, DoubleClick Bid Manager will only buy a publisher's inventory from sources identified as authorized sellers in its ads.txt file when a file is available."

Do you see that?

A. Yes.

Q. Did that drive the adoption of ads.txt?

MR. CARMAN: Objection to form. And foundation.

Q. Did the requirement by DoubleClick Manager that publishers adopt ads.txt play a factor in driving the adoption of ads.txt?

MR. CARMAN: Objection to form. Foundation.

Page 187

A. So I think this paragraph talks about Google's intention to use ads.txt, right, as a requirement, meaning that the publisher should have ads.txt on the publisher's site, our their account with Google. But that's a common understanding that the intention of ads.txt is, as a publisher, you should have your ads.txt; otherwise, you know, the buyers would -- you know, would find that it's hard to verify your identity and maybe some of the exchanges will not do -- you know, will not kind of support you.

So there's a common understanding, and the fact is, I think, many publishers are starting to use it. So that's the extent I understand ads.txt being adopted by the industry.

Q. Do you know when ads.txt became widely adopted by the industry?

MR. CARMAN: Objection to form. Foundation.

MS. MAUSER: Can you tell me what the problem with the question is.

MR. CARMAN: Yeah.

Page 188

The problem with the question, I think, is instead of asking him what he knows about the adoption, and what he understands terms to mean, you're asking him a vague question that could mean a lot of different things.

MS. MAUSER: What's vague about the question?

MR. CARMAN: The words "widely adopted."

MS. MAUSER: I thought he used similar words.

MR. CARMAN: Well, my objection is that there's --

MS. MAUSER: Okay, hold on. I'll use the words that he used in my question.

MR. CARMAN: Okay.

BY MS. MAUSER:

Q. When did ads.txt become adopted by the industry?

MR. CARMAN: Same objection.

A. I did not specifically track the timeline, per se. I know that, let's say, the first

Page 189

version, 1.0, document was published, let's say, 2017, but I think recall quoting some of the references I cited in the -- in my report to say that there were evidence of adoption of ads.txt that contribute to the reduction of domain spoofing. You know, so that would be after 2017.

I didn't track exactly year by year kind of industry adoption rate. I do not think that I got the same kind of analysis or result from Mr. Ferrante's report, either. I don't know whether Google actually published these kind of numbers, either.

Q. Let's turn to the app-ads.txt file.

(W. Lee Exhibit 9, IAB Tech Lab, Authorized Sellers for Apps (app-ads.txt), Final specification version 1.0, was marked for identification.)

Q. Let me know when you've finished the press release.

A. Okay.

Q. When was the app-ads.txt standard adopted?

MR. CARMAN: Objection. Foundation.

Q. Was the app-ads.txt file adopted?
MR. CARMAN: Same objection.
A. So I noted this document says, final spec version 1.0. It was published in 2019. App-ads.txt.
I did not check -- did not track the years of when it was adopted, by how much, and the annual growth rate. All that, I did not track.
But according to the document, this, you know, 1.0 document was published in March 2019. That's all I know.
Q. So it was adopted sometime after -- it was adopted by industry players sometime after March 2019?
A. Again, I did not track in terms of the -- how widely adopted app-ads.txt really is. I mean, for what I have read and also refreshed my memory by reading, again, the abstract, this really is not in the same domain as what we're talking about in this matter, which is open display app segment.
This is about mobile app developers.

You want to make sure that it's not an impersonation of an app developer. This site is not related to open display web, you know, ad technologies.
And of course, related to, in general, you know, reputation, identity theft, so on and so forth.
That's to the extent I understand app-ads.txt.
Q. Professor Lee, who authored the app-ads.txt standard?
MR. CARMAN: Objection. Foundation. And form.
A. So if I read the -- one of the -- you know, the page there, it talks about authors. There are two co-authors. And then, again, there are a list of significant contributors from a number of companies, including, you know, IAB, you know, and so on.
I would just say that, you know, I don't know how IAB -- this kind of document -- I mean, it's kind of -- to me, it's a little bit odd to say, authors and other contributors.

Normally, in my field, I mean, you have seen some of my academic papers, we list everybody who is involved in the authors list, and for them to say, authors and contributors, significant contributors, kind of strange to me.
But in any case, my point is that it seem to -- seems to acknowledge there are a lot of participants. They obviously contribute to the document.
The also same goes to the ads.txt, the version 1.0. They list the significant contributors.
So obviously, those people who got -- who are listed, they made significant contribution to the document, and maybe they only list the authors that typed the words.
I mean, again, I want to emphasize the fact that there are a lot of industry participants in this kind of effort, and that's what this document actually tries to convey.
Q. But Google's software engineer, Curtis Light, is -- is identified as one of the two

authors; correct?
A. Yes. That's what's being listed as one of the authors. But again, like I said, I want to emphasize the fact that they took the effort -- well, they basically listed all the significant contributors.
From what I'm understanding is that these people must have made significant contribution to this document, the contents of this document; otherwise, they wouldn't have been listed.
Now, the actual writing itself may be, you know, Curtis -- you know, Curtis Light and Curt Larson did a lot of typing and wordsmithing, and so on, but the fact that they list significant contributors means that these people really contribute to the standard. I mean, that's how I understand, yeah.
Q. Do you know if it was that Curtis Light and Curt Larson first brought the standard to IAB, and then IAB, with these other significant contributors, finalized the standard?
MR. CARMAN: Objection. Form.

app-to-developer domain link, participants should view the handling of the domain-to-authorized seller enforcement as nearly identical to that used in ads.txt for web inventory..."

So really, what I'm trying to say here is that app-ads.txt or ads.txt, if you discover one is for ad -- one is for web app -- one is for web advertising, the other one is for app distribution, other than that, the kind of process of verifying is coming from a trusted, verified source. It's basically the same.

So that's why in 109, I say, yeah, by using that, you essentially cut down domain spoofing, regardless the actual application.

And then say, why is it useful to -- let's say, to Header Bidding, it's really in the following sense: In fact, we talked about earlier in -- I think in my Section IV, Subsection -- remind myself when I talk about Subsection 4, we talk about open system, combining multiple data sources.

I would say that from an advertising point of view, for Header Bidding, you can use this

additional information to say, hey, is this domain trustworthy? If this domain has been engaged with falsifying developer ID in the app, distribution side of things, maybe we shouldn't trust this domain to sell ads.

I mean, just like -- just very common sense in cybersecurity is reputation, and sometimes we say the flip side -- well, another way to look at this is guilty by association, meaning that if a different viewpoint says, this domain has been used for bad activities, stay away from it.

So again, like I said, app-ads.txt tries to enforce in the app distribution world, you can verify the developer are coming from the trusted website. So it's completely relevant to ad placement on their website.

So if I'm doing Header Bidding, I would welcome this kind of information, for sure.

Q. Do you know when app-ads.txt was adopted in relation to when Google began offering Open Bidding or Exchange Bidding?

A. I don't recall the exact timeline. Like

I said, you know, by reading this document, this document was published in March 2019, I don't know exactly when Open Bidding or the previous name, however Google called it, was first proposed.

I would -- you know, if I recall it -- again, you know, I don't recall it very clearly, but even by reading something about, around that time, Google had already offered or at least planned something similar to Open Bidding by 2019.

Q. I'm sorry. Okay.

(W. Lee Exhibit 10, Sellers.json, was marked for identification.)

MS. MAUSER: Okay. I'm going to mark another exhibit that you can look at in connection with the one that's put in front of you.

THE WITNESS: Okay.

(W. Lee Exhibit 11, "FAQ for sellers.json and SupplyChain Object", was marked for identification.)

BY MS. MAUSER:

Q. The first document says "Sellers.json" by IAB Lab, and we're going to also mark as the next exhibit "FAQ for sellers.json and SupplyChain

Object."

A. Mm-hmm.

Thank you.

Q. Do you know when IAB -- do you know -- we talked earlier about sellers.json and SupplyChain Object as standards that IAB adopted; correct?

MR. CARMAN: Objection. Foundation. Form.

A. I would say that if you want to find official documents, you go to IAB Labs. I think that applies to ads.txt, app-ads.txt, I think also it applies to sellers.json.

Q. What about SupplyChain Object?

A. I believe so. I mean, that's a source I consistently go to.

Q. Yeah.

A. I mean, I didn't verify there's other sources that talk about this thing as well, but IAB seems to be the place to go with these kind of things.

Q. Do you know if these standards were adopted by IAB in 2019?

Page 202

A. Can you repeat the question again?
Q. Do you know when these two standards were adopted by IAB?
MR. CARMAN: Objection to form.
A. Without -- I mean, I don't know when we cited it, but like I said, you know, normally, you can go to IAB Lab website and look at the list of documents they have, they would tell you it's a 1.0 document. I mean, you could share with me the 1.0 document. You list the date it's being published, right.
So that -- so those are the kind of days I normally refer to as when this becomes a, you know, new core standard or not that IAB want to -- want people to adopt.
Q. Do you know whether sellers.json was -- do you know whether sellers.json was adopted after Google adopted Exchange Bidding, and then Open Bidding?
MR. CARMAN: Objection. Form.
A. So by "Exchange Bidding," are you referring to the former name of Open Bidding, or

Page 203

what do you mean?
Q. Yeah, I'm really using the -- it's the same thing, but change -- the name changed over time.
A. I did not track the timeline, you know, so I did not track the timeline. Like I said, you know, to nail down some of these timelines, I would go to IAB Lab's website and look at the version 1.0 document, and see when was it published. And that, I would -- I would use that as more or less the official "rollout dates."
And for Open Bidding, I would probably do the same thing.
But like I said, I don't recall the exact day that Google started to talk about Exchange Bidding, and then something else, E, sub E, or extreme something.
I think it was probably some time frame of anywhere from 2017 to 2018. I don't know for sure. Okay. So I didn't track the exact timestamps.
Q. Do you know what, if any, role Google

Page 204

had in the adoption of sellers.json?
MR. CARMAN: Objection. Form.
A. I don't recall that specifically. Like I said, you know, when I study these kind of technologies, there's some background information, I go to IAB Lab's website and look at their official documents, and normally, they list, you know, who are the group of significant contributors, and what's the intent of this kind of a, you know, recommendation, and so on, so forth.
I just don't recall seeing, you know, the role of Google.
Q. We're going to mark another document, which is an internal Google document. It's an e-mail exchange. Dated July 9, 2018.
(W. Lee Exhibit 12, e-mail 7.9.18, GOOG-AT-MDL-007043716, was marked for identification.)
THE WITNESS: Thank you.
MR. CARMAN: Can I ask if this document was cited by Mr. Ferrante in his report, do you know?

Page 205

MS. MAUSER: I don't believe so.
MR. CARMAN: Okay.
THE WITNESS: Okay.
BY MS. MAUSER:
Q. On the second page of the e-mail, it says, "Per," P-E-R, which is referring to Per Bjorke --
A. Hold on. I'm sorry. Second page, meaning I have to flip this over?
Q. The very top -- yeah. The back side of the document.
A. Okay. Okay.
Q. "...who has been leading the SupplyChain and sellers.json standards, is unfortunately going on vacation..."
Do you have any reason to disagree or to doubt that Per Bjorke was leading the SupplyChain and sellers.json standards?
MR. CARMAN: Objection. Foundation. And form.
A. So this is one piece of document they provide to me that's from Google. That's where I

read about Per. But I don't recall reading about Google's contribution when I remember reading about sellers.json on IAB Lab website.

So, you know, I would rather look at the -- let's say, the official website and official documents that IAB Lab put out to render my opinion.

Q. Do you know when Header Bidding was first introduced?

MR. CARMAN: Objection. Form. Foundation.

MS. MAUSER: What are the form and foundation issues with that question?

MR. CARMAN: It's the word "introduced." It's -- I think it would be better to start with a -- in other words, we haven't established what Wenke's knowledge is of that question. What he understands "introduced" to mean in this context.

BY MS. MAUSER:

Q. You discuss Header Bidding in your report; correct?

A. I discuss Header Bidding in my report in

the context of analyzing Mr. Ferrante's report.

Q. When -- over what time period do you discuss Header Bidding; what's the time period for Header Bidding in your report?

MR. CARMAN: Objection. Form.

Q. Rephrase it this way:

Are you discussing Header Bidding in any specific moment in time in your report?

MR. CARMAN: Objection. Form.

A. So like I said, you know, my task was analyzing Mr. Ferrante's report.

I don't recall seeing Mr. Ferrante referring Open Bidding or Header Bidding with specific timeline.

So like I said, my task was analyze his report and offer my opinion. So my opinion is not dependent on the specific timestamp you are referring to.

Q. Do you know when -- when did Header Bidding -- when was the first use of Header Bidding?

A. So what do you mean by "first use"?

Q. When did publishers begin to use Header

Bidding?

A. Like I said, I'm not checking the specific timelines. That was not actually relevant to my -- the task of analyzing Mr. Ferrante's report, per se.

But I would say that if I remember right, I think by 2018, you know, Header Bidding was starting to be adopted.

Q. Were you aware of any use of Header Bidding in 2009?

A. Like I said, I did not check specific timelines in terms of who, when, first use. That's very hard to actually measure. And you basically have to know the whole internet. Know every single publisher and ask them, hey, do you use Header Bidding, kind of thing.

So I didn't track the timeline in terms of who and when was first use, and the adoption rate change from year to year, but like I said, my opinion stands with regard to when Header Bidding was introduced, and why it was adopted.

And again, you know, my job is to

analyze Mr. Ferrante's report. I don't think he offered that kind of timelines.

Q. Do you know who the -- who was the founder of Header Bidding?

MR. CARMAN: Objection. Form.

A. I don't recall the -- I don't recall the names, but I do remember reading, you know, names of group people behind this effort, yeah, but I don't recall the specific names.

Q. Do you know who Brian O'Kelley is?

A. Again, without the context to refresh my memory, I cannot -- sorry, I cannot recall the context where or whether I saw his name.

Q. Do you know what AppNexus was?

MR. CARMAN: Objection. Form.

A. Yep. AppNexus is one of the supply-side platforms, I think. Yeah.

Q. Do you know when Google first introduced Open Bidding or Exchange Bidding?

MR. CARMAN: Objection. Form.

Q. As it was known when it was first introduced?

Page 210

A. Sorry. Can you repeat the question again?
Q. Yes.
Do you know when Google first introduced Open Bidding or Exchange Bidding?
A. I remember reading documents to say that Open Bidding or whatever the previous name, Exchange Bidding, was introduced or discussed -- or discussed or introduced within Google in response to Header Bidding.
So obviously, it's after Header Bidding. That's how I can infer.
Q. You said Header Bidding was introduced in 2018?
MR. CARMAN: Objection.
Q. Again --
MR. CARMAN: Form.
A. Yeah. Sorry. I said, I do not remember the exact timestamp. I do not track the timestamp.
But if my memory serves me right, 2018 is the time where, you know, Header Bidding was probably adopted already.

Page 211

Is it before that, after that, I don't know for sure, but the neighborhood of 2018 probably would be, you know, close to what it is.
MR. CARMAN: Objection to form. Again, we haven't defined what we mean by "adopted."
Q. Do you know when the open-source code for Header Bidding was first made available?
MR. CARMAN: Objection. Form.
A. I don't --
Q. Was -- well, let me rephrase it.
Was there open-source code for Header Bidding?
A. Yes. It's called Prebid.
Q. Do you know when that -- when the Prebid code was first made available?
MR. CARMAN: Objection. Form.
A. Again, I didn't track, you know, the specific timelines, but I know that Prebid code open-source effort has been around for a while.
Q. Do you know what the most common form of programmatic bidding was in 2014?
MR. CARMAN: Objection. Form.

Page 212

A. I did not track those kind of volumes, as per bidding technology, per se, for example.
Again, my job is to analyze Mr. Ferrante's report. I don't think he offered that, but I know that around 2014, there are a number of bidding technologies, like Waterfall, Real-Time, and so, yeah.
(Clarification requested by the Realtime Stenographer.)
A. For example, Waterfall, Real-Time, and so on.
MR. TEITELBAUM: Waterfall.
A. Waterfall, yeah.
Q. Do you know what the most common forms of programmatic bidding were in 2015?
MR. CARMAN: Objection. Form.
A. So like I said, I did not track the timeline of these technologies year over year.
You know, my job is to analyze Mr. Ferrante's report. I don't think he ever mentioned that kind of numbers or render any opinions of that. Yeah.

Page 213

Q. Do you know what the most common forms of programmatic bidding were in 2016?
MR. CARMAN: Objection. Form.
A. Again, I did not track the -- I did not track the volume or rate of each form of advertising being used year to year. No, I don't know. I did not track them.
Q. Do you know when the Waterfall method of bidding was used?
A. Was used?
Q. Mm-hmm.
A. I think it was used for quite a while, and then I think when Header Bidding, Open Bidding came around, then I think Water Bidding (sic) just basically became a thing of the past.
MR. CARMAN: I wanted to -- I meant to object to the last question. Sorry. Form.
Q. When did Waterfall become a thing of the past?
MR. CARMAN: Objection. Form.
A. Again, I did not track the exact time, like, meaning that when -- for example, when Open

Bidding, you know, in your term, kept -- was adopted enough that Water Bidding become -- Waterfall became a thing of the past.

But I think around -- you know, if my memory serves me right -- again, first of all, these kind of exact timestamp year is actually irrelevant to my assignment for this case because I'm analyzing Mr. Ferrante's report. He never mentioned or make any sort of relevance -- or make this kind of timestamp relevance.

But in any case, I think by 2018, Waterfall is basically starting to go away. That's how I remember it.

Now, I could remember it wrong.

MR. CARMAN: I'm sorry. There's no good time to do this. Can we go off the record?

THE VIDEOGRAPHER: Off the record at 3:09.

(RECESS, 3:09 p.m. - 3:11 p.m.)

THE VIDEOGRAPHER: Back on the record at 3:11.

BY MS. MAUSER:

Q. Are encrypted communications more secure than unencrypted communications?

MR. CARMAN: Objection. Form.

A. So again, when you compare, let's say, scenarios like that, you want to --

(Clarification requested by the Realtime Stenographer.)

A. When you compare scenarios like we just described, you want to consider multiple factors. And so you cannot say, just because you encrypt, you are more secure. There are other factors you want to consider.

So I would just say that all things equal, encrypted, yeah, would add more security than not encrypted.

Q. In the early days of Header Bidding, user information was not encrypted in the user's browser, was it?

MR. CARMAN: Objection. Form.

A. I don't know for a fact. I do not know of any facts out there that says that has to be the case, in the sense that encrypted connection is a

well-known technology. Anybody can use it. It's available since the '80s, the '90s. Definitely when 2000 comes around, people know how to encrypt traffic, and how to authenticate and encrypt traffic, so yeah.

Q. Do you know if communications in Open Bidding are encrypted?

MR. CARMAN: Objection. Form.

A. So again, my job is to analyze Mr. Ferrante's report. I do not believe he offered that kind of details in terms of what traffic is being protected in Open Bidding versus Header Bidding, and much less talking about whether the traffic is encrypted with Open Bidding versus Header Bidding.

I don't recall seeing that.

Q. Do you know if in Open Bidding, the requests are sent via GAM, and not the user's browser?

MR. CARMAN: Objection to form. Foundation.

Q. By GAM, I mean Google Ad Manager.

MR. CARMAN: Objection to form. Foundation.

A. So the way I understand it is that for Open Bidding, the publisher will invite exchanges to participate in bidding, and that's taking place in GAM, and so on.

But like I said before, Open Bidding actually is implementation of server-side Header Bidding. In server-side Header Bidding, even though you are not using Google, you are essentially doing the same thing on a server that handles this kind of Header Bidding.

Q. Do you know which was adopted first, Open Bidding or server bidding?

MR. CARMAN: Objection to form.

A. Can you repeat the question again?

Q. Yes.

Do you know which came first, Open Bidding or server-side Header Bidding?

MR. CARMAN: Same objection.

A. So again, I did not track the timelines.

My job is to analyze Mr. Ferrante's

Page 218

report. He did not talk about specifically the timeline of, let's say, server-side Header Bidding with Open Bidding. Yeah, I'll leave it at that.

Q. Going back to Open Bidding, do you know whether only approved participants can gain access to receiving bids?

MR. CARMAN: Objection. Form. Foundation.

A. The document I read would say that the -- as a publisher, the way you invite the exchange is that you have a contractual relationship with those exchanges, and GAM does not manage those relationships.

I wouldn't say that in server-side Header Bidding or even client-side Header Bidding, all these security mechanisms, or you call it guardrails, according to Mr. Ferrante, are the well-known security mechanisms that anybody could have or should have adopted.

So really, I do not see anything that Open Bidding is able to do that server-side Header Bidding or even client-side Header Bidding

Page 219

could not do.

Q. Can you explain why client-side communications may not be as secure as server-to-server communications.

MR. CARMAN: Objection. Form.

A. Can you repeat the question again?

Q. Yes.

Can you explain why client-side communications may not be as secure as server-to-server communications.

MR. CARMAN: Same objection.

A. First of all, I do not know where that statement is coming from, and I would just disagree. Like I said, when you say something is not secure, I would say, first of all, how do you define security? What's the context? What are the mechanisms that client-side could not have used?

Okay. After considering all of that, you say, well, I still conclude client-side is less secure. Okay. Let's look at that.

So like I said, I don't think Mr. Ferrante offered any evidence or reasoning to

Page 220

make that kind of statement, and I would not agree to that statement, without the kind of five-step analysis of the problem you are posing.

Q. How can a man-in-the-middle attack intercept data from a user's client's browser?

MR. CARMAN: Objection. Form.

A. So man-in-the-middle, in principle, means that you are -- let's say A talks to B, you are C, you try to insert yourself in the middle, pretend to be B to A, and pretend A to B. That's the basic, you know, classroom teaching I would offer as man in the middle.

But the point is that how to pull it off? Really, again, you have to look at the context to whether man in the middle is possible. In other words, what A and B can do to prevent man in the middle. And there are mechanisms out there, well-known mechanisms out there that you could use.

Q. Do you know if in Open Bidding, because the data is server-to-server, bad actors are prevented from listening in on client communications on the browser, and intercepting the data?

Page 221

MR. CARMAN: Objection. Form.

A. I --

MR. CARMAN: Oh, and foundation as well.

A. So whether you can be more specific with the question. I do not understand what you mean by browser listening in, in an Open Bidding situation. I do not follow.

Q. When data is transmitted to -- from server to server, as it is supposed to through the browser, is it more secure?

MR. CARMAN: Objection. Form. Foundation.

A. So again, it really depends on what security threats you are talking about, and what are the factors and what solutions are out there for you to mitigate some of the security risks. Right.

For example, client-to-server, yeah, that traffic can already be authenticated encrypted, so why is it less secure than server-to-server? There's no basis to render that kind of opinion. You have to basically qualify it and say, hey, here

mechanisms that was useful, and you expect -- I mean, Header Bidding, if you want to compare with Header Bidding, why would we expect Header Bidding not using it. It's a well-known technique and Google yourself proved that it's useful.

Q. You've talked throughout your -- the day on the five steps, and scoping out what the problem is, which I think you said is the first step?

A. Defining the problem, for example --

Q. Defining the problem.

A. -- what is bad app, and then scope it.

Q. Then in the scoping phase, what does the scoping phase entail? What factors do you need to take into account in the scoping phase?

A. So in Section IV, the first subsection talks about different ways that you define the scope of the problem, right. What are the -- you know, how complex is the system. Are there multiple participants. How they interact. Are you talking about some long life cycle attacks. You know, what kind of collaborative technology they can put together.

The problem is without properly scoping, say, I want to fight spam. Okay. In what context, in what scope? Are you trying to eliminate 100 percent of the spam from all the internet, versus you want to basically have a spam filter specifically to an organization.

These kinds of things are super important when you say, oh, I'm going to develop technology. In what sense?

Q. If I were scoping out what the situation were, the security situation relating to Header Bidding in 2016, wouldn't I want to identify what kind of collaborative technology existed in 2016?

MR. CARMAN: Objection. Form. And foundation.

A. So that's exactly my point in Section 2 of Section IV and Section V.

In Section IV, I say, look, Mr. Ferrante, when he says Header Bidding is worse off, he did not -- first of all, did not define the problem, scope the problem, and didn't go through, hey, there are existing technologies that are

well-known, available to this well-known set of attacks and frauds.

Q. Didn't Mr. Ferrante say that when Header Bidding became more widely adopted in 2014-'15, ads.txt had not yet been adopted?

MR. CARMAN: Objection. Form. Foundation.

A. I don't recall where he said that specifically, but regardless, every single time -- every time you have a new or better technology, people adopt it, and then you see improvements of security.

So I -- so that's one example that he -- I think when he talked about noise, he did not talk about ads.txt. We talk about it in our -- in my -- I talk about it in my report to say, first of all, he did not define what noise is. He didn't talk about why Header Bidding would introduce more noise, okay, than otherwise. He didn't talk about what are the existing mechanisms that Header Bidding players or participants could use to reduce the noise.

I mean, I'm assuming because he did not define the scope of the noise, let's say, I assume "noise" means, let's say, ad frauds, right. And then we say -- in my report, say, ads.txt turns out to be very useful available technologies.

And then we -- I think in my report, I cited -- I cited evidence to show that -- let me see.

Yeah. So I think in Paragraph 118, I talk about, you know, ads.txt is an example of security mechanisms that are available to Header Bidding, like to everybody else --

Q. Mm-hmm.

A. -- that they could adopt that would actually help mitigate the issue with noise or ad frauds. In particular, it really -- the adoption of ads.txt was very useful in stamping out domain spoofing.

And ads.txt is just one example of a security mechanism that Header Bidding participants could use. I mean, like I said, they could always use blacklisting, whitelisting, reputation, you

Page 274

know, all kind of mechanisms that you use to detect and block malvertising and software downloads, you name it.

So the point is that I don't care which year. I mean, it's not important which year. I always sort of compare -- you know, if I want to analyze the security issues facing Header Bidding, and what technology -- security technologies that Header Bidding could use, I already offered my opinion the section -- Paragraph 118 as an example. And in my Section IV, in Subsection 5 and 2, I talk about, hey, these are existing technologies that we should consider when we compare this Header Bidding versus otherwise.

Q. When -- before the adoption of ads.txt -- we talked earlier about ads.txt addressing domain spoofing, right, or limiting domain spoofing?

A. Yeah.

Q. With domain spoofing being limited, did that also limit the volume of bidders?

MR. CARMAN: Objection. Form.

Page 275

Foundation.

A. So again, that goes to my principle about applying these five steps. So you really want to scope the problem by considering multiple factors.

So you say security. Okay, does it -- is volume one factor, yes. But that's not the only factor, right.

So you can say, hey, what if I start by really -- you know, if I'm doing Header Bidding, I want to work with partners that I trust, already have a reputation. So I don't have to worry about volume. They're the -- you know, let's say if you compare that with, let's say, Waterfall model. Waterfall model says I rank the ten partners by, historically, how well they pay me. You deal with them one by one, and they all trust it.

Okay. Now, you go to Header Bidding. I'm going to talk to these same ten people that I trusted, so why is that less secure? These same ten trusted partners, right.

Q. But do you agree that with ads.txt, that

Page 276

reduced the number of unvetted bidders?

A. Yes, that's the intent of ads.txt.

But I would caution to say that normally, we don't say that one security mechanism specifically is one silver bullet that kills everything.

Like I said before, ads.txt, they could have used blacklisting, whitelisting, reputation, list device. So, in fact, that's what we said about -- in Paragraph 137, that Google itself talks about -- in this AwBid study, talks about the effectiveness of using blacklisting.

Q. Does --

A. Right.

Q. I'm sorry.

A. So that means blacklisting is a well-known security mechanism that you could use. Yeah.

Q. Doesn't the reduction in the number of unvetted bidders reduce the amount of noise?

MR. CARMAN: Objection. Form. Foundation.

Page 277

A. So again, first of all, I would love Mr. Ferrante -- you know, if he have -- he could have, you know, defined what "noise" means. And also talk about, you know, what effect is affecting noise.

So the point -- I think the analogy that I gave earlier about, you know, dealing with ten trusted partners I think is a good analogy to say, just because there were more partners and more volume doesn't mean that the noise goes up. Depending, really, who they're dealing with.

And as a security matter, you could preselect partners that you trust to deal with. Who said that just because of Header Bidding, you are going to the wild, wild west, and deal with everybody?

MR. CARMAN: So we have been going for more than an hour. Would now be a good time for a break?

MS. MAUSER: Yeah. Yeah.

MR. CARMAN: Okay.

THE VIDEOGRAPHER: Off the record at

4:41.
(RECESS, 4:41 p.m. - 4:56 p.m.)
THE VIDEOGRAPHER: Back on the record at 4:56.
BY MS. MAUSER:
Q. Professor Lee, throughout the day, you have talked about your five-step process for analyzing issues.
Is that five-step process set out in any peer-reviewed article?
A. You mean specifically to these five steps?
Q. Mm-hmm.
A. I don't recall seeing that, but I would say that's a basic principle that everybody in the -- almost every field of research and technology and development will understand.
So let's say in research, the most important thing is so-called repeatable experiment. You say, I discover super connectivity.
Okay. Exactly what are you talking about, exactly what factors, how you set up the

experiments, what with method do you use, what results do you have, then if people cannot repeat the experiment and achieve the same result, that's basically -- you know, depending on the situation, it can be a fraud, it can be a basically meaningless result.
In technology, when they try to sell products, say, oh, I do cybersecurity, and say, I detect intrusions, I block spams, there are well-known ways to evaluate how well you are doing.
For example, everybody I help, you know, people with us say, hey, I'm defining -- I'm detecting spam in the following sense. I'm detecting this kind of spam within this kind of context. Here's my technology.
Then you will probably tell people, hey, I'm reporting not just numbers, I'm reporting the detection rate, and then, how do I compare with other products.
I would tell that you in cybersecurity, there are a lot of labs out there, industry labs, that invite vendors to put in their

system products and then do a bake-off. They basically send a set of, let's say, traffic and see, you know, who's doing what and how well they're doing, let's say, in terms of detection rate and false positive rate.
Even if you don't go through that, before you can sell a product, you actually do the so-called proof of concept, POC. You deploy the product in an enterprise network, let's say, and then after, let's say, a month, you say, hey, here's my score.
You do all that. So, really, what I'm trying to say is that these five steps are basic steps everybody would know and would follow in the work they do, regardless if you're doing research or trying to sell a product or tell people you're doing great things.
Q. If I want to read about the five steps, where would I look to read about these five steps?
A. Like I said, it's a basic thing. Just like one plus one equals two, I don't know where you can look it up.

But like I said, really, I would just say that without doing that, none of our papers would be published. There's a basic 101 in scientific research, is that if your paper, you don't talk about, you don't follow in some sort of form these five steps, your paper will not be published.
For example, in our field, you say, I hear there's a new way of detecting some attacks, you normally would say, here's my detection rate, here's my false alarm rate, this is what I'm using, and by the way, if attacker gave me attempt to evade my system in the following ways, and I should consider that factor as well, so when I develop my methods, I have these kind of ways to make this kind of evasion much harder.
That's essentially a well-practiced -- I wouldn't say skew. It's a requirement. Okay? None of my students would be able to publish any paper without going through these same five steps.
Q. Do you know if these same five steps are

followed by law enforcement?

MR. CARMAN: Objection. Form.

A. So in my interaction with law enforcement, as I said in the morning, I have interacted with, you know, some of the FBI special agents investigating some of these botnets.

Like I said, the first interaction, as an example, they came in and talked about what we do in botnet research.

Then, of course, we walk through what we mean by "botnets," what aspects of botnets we are talking about, what technology we use, why we think we have a good technology, so on so forth.

Essentially, like I said, when you try to present your solution being something useful, you want to go through these steps. This is very well -- this is kind of the expected thing you would do.

I don't know into FBI's exact detailed operations, but we did walk through these kind of steps to understand our technologies.

Q. Do security coders follow these same

five steps?

A. What do you mean by "security coders"?

Q. Do you know if in developing security standards IAB follows these same five steps?

MR. CARMAN: Objection. Form.

A. So I mean, when I read the documents of IAB Lab -- you know, from IAB Lab, let's say -- let's say they talk about, let's say, ads.txt, they did talk about -- start by saying what problem they're attempting to address. Okay. And the scope is, let's say, advertising, and here's the layout of the standard -- of the recommendation that, you know, they would want the publisher to do, and then they say, okay, here's how, then, this information is being used.

That's actually step by step the five steps. It may not be in code, but it's the thought process. So people can follow, yep, that's a good idea. Let's follow it.

That's what you want to accomplish by following these five steps.

Q. Do you have any authority that you could

cite me for these five steps?

MR. CARMAN: Objection. Form.

A. Authority or not, like I said, this is a basic thing. Like I said, the basic hallmark in science is the repeatable experiment; otherwise, how do people believe that we discovered something that they can believe in that's relevant and meaningful.

Like I said, without doing this, I wouldn't say you are a scientist or researcher. I wouldn't even buy product from you if you cannot say, oh, I have a great product.

Like what?

We detect a thousand spams a day.

But with regard to what? What's your detection rate? What is the false alarm rate? These are basic things, and how they define spam, in what context, and so on and so forth.

Why do I need to be the authority of basic things like this? Right.

I would just say that there are various ways that you can look at my record. I published so many papers, get cited so many, you

know, dozens of times, the index (ph), whatever you name it, obviously, I follow these basic standards; otherwise, nobody would probably care to read my papers.

Q. You have a lot of experience in academic settings.

Do you have any authority that the standards that apply in an academic setting apply outside of an academic setting?

MR. CARMAN: Objection. Form.

A. So as I said earlier, right, I know that in cybersecurity, I would think going as far back as late 1990s when I was talking to some of the vendors and industry labs, they do a bake-off every year to evaluate what are the, let's say, good network security products, and the way they do this is that they -- like I said, they invited us to put their system in, and then they let the network run, they'll run traffic, and they know what's called ground truth, meaning they know which packet or which session is bad, which is good.

And then they say, okay, among the

Page 286

bad ones, how many do you detect, how many false alarms are you generating, you know, and so on and so forth.

They actually put out scores like that. So you know, like I said, that's a well-practiced basic, you know, standards and principles that people have been following, even us academia, for a long time, and the reason is, like I said, everybody in the technical field, in the scientific field or even pseudoscience field understand these are basic principles to follow in order for your result to be meaningful, useful.

I mean, that's what you want to accomplish. Right. You don't want to publish a paper that nobody cares to read.

Q. But you can't point me -- if I wanted to learn about these five steps, you can't point me to any published source that I could read setting forth these five steps?

A. So I have not done my own kind of background and say, oh, where do these five steps -- five steps are published and codified?

Page 287

But I would say, you know, if you read about what's science, you will read a lot about repeatable experiments.

In physics, I can tell you in physics.

Let's say I discover, oh, here's a new phenomenon I detected. I discovered super connectivity. There would be quite a few labs trying to repeat the exact same experiments.

Even, you know, when they are able to repeat experiments, they with actually publish a paper. You say, what's the point? They published a paper saying the same thing.

Yes, because that's a very valuable verification point. Without that, there's no science, no progress. Then how do they know, okay, we're making progress in super connectivity. Is it because somebody says so? No. You need people to verify, and you want people verifying it by accepting the repeated experiment. You are accepting the repeated results.

So that's well established. It's so

Page 288

basic, I do not know where we do we have to read the definition of these steps and principles.

Like I said, also in academia, I do not know a cybersecurity company is able to sell their things without going through these five steps, to be honest.

Q. Am I correct that it's your testimony that in defining the problem, the first step, timing does not matter?

MR. CARMAN: Objection. Form.

A. So that's not what I meant. I meant it was in context. Right.

If timing is important, I would consider timing.

Q. In what circumstances is timing important?

A. Again, it has to be in a context, so you give me an example of context.

Q. And in what circumstances is timing important in defining the scope --

MR. CARMAN: Objection. Form.

Q. -- the second step?

Page 289

A. I would say that in defining a scope, you have multiple factors to consider, really depending on what factors are relevant to the problem you are trying to solve.

So in other words, not all problems will always have all the same factors always.

Q. It's your opinion, is it not, that -- strike that.

You didn't specifically reference the five steps in your report, did you?

MR. CARMAN: Objection. Form. Foundation.

A. So I actually did. It's pretty obvious.

In Section 2, I started by saying, hey, you know -- basically, Section IV is a way to say: Here's how you apply the five steps to analyze the problem domain, scope it, and consider possible solutions.

So I started by saying that, you know, we understand, you know, ad fraud is a big problem, and then we talk about, you know, Mr. Ferrante did not follow these five steps, did

Page 290

not describe the problem, scope the problem properly, did not describe exactly the solutions that Google has offered, did not talk about the effectiveness of his approach, and because of that, there's no way for us to evaluate Google's contribution.

Q. Didn't Mr. Ferrante describe the problems associated with Header Bidding in the 2014 and 2015 time frame?

MR. CARMAN: Objection. Form.

A. So can you point me to the exact context in his report that he talks about that?

Q. Well, you're addressing his report, so I'm asking you.

A. So I think in 137, okay, I talk about, you know, he -- you know, Mr. Ferrante says that, you know, Header Bidding was not adopted until 2014, 2015.

First of all, he did not tell us -- you know, I mean, I don't recall that he used any sources to say that. I mean, he -- I mean, if you can, you know, like I said, tell me the context or

Page 291

give me the references, you know, I can go deeper into that.

So in the context of in my report, I say in Paragraph 137 -- you know, we say that Mr. Ferrante, as I analyze his report, cited the Google's AwBid program to study to compare Google's AdX with third-party exchanges, and as we said in these paragraphs from 134 to -- you know, go on to 138, we talk about -- well, actually, 139, all the way, we talk about the fact that the report or reference I cited was actually about what Google did in 2013. It only talks about the effectiveness of blacklisting, basically --

Q. Can you -- I'm sorry.

A. -- and it's actually irrelevant -- irrelevant to his opinion of Header Bidding if Header Bidding was not adopted until this study, so why he is referencing that study to say Header Bidding is not as good.

Q. Can you show me where in your report you have the words "five steps," where you say "five steps," and you say step one is define the problem,

Page 292

step two is define the scope, step three is, you know -- step four is, what step five is, where you actually lay out the methodically what the five steps are, the framework for analysis?

A. Right.

So as I said at the beginning of the -- you know, earlier, I said, these five steps are very basic stuff. It's not like -- it's like, do you go, say, hey, I'm publishing a paper, I'm following these five steps? No, you don't have to say that. Everybody knows that.

Same way when you sell a product. Hey, I'm selling a spam detection product. Let me go through the five steps for you. Step one, step two, step three, step four. No. People expect you to say, okay, I'm detecting spam. Let's make sure we understand what spam is. We're detecting spam in an enterprise. That's my scope. Okay? And then here's my method. Here's my detection rate that's particularly relevant to make my -- to show that my product is effective, and here's how I compare with other products by detection rate.

Page 293

My point is that these are very well-established steps and principles. You don't say, oh, step one, I'm doing this, step two, I'm doing this. No, you don't. It goes without saying. People do it.

So in my report, I would say that in Section IV, I essentially lay out how, you know, these five steps are being used, they should be followed, and how many Mr. Ferrante has failed.

For example, in Section -- so like I said, at the beginning of Section IV, I talk about the purpose of Section IV is to essentially using this methodology to analyze ad frauds, malvertising, and also using these -- follow these five steps to consider technologies and evaluate effectiveness, right.

So in Subsection 1, I talk about there are, you know -- it essentially talks about Mr. Ferrante did not really scope the problem well. For example, the first line there that says that, you know, this system is very complex. That gives you scope, what are you talking about. Ad fraud is

THE WITNESS: Thank you.

THE VIDEOGRAPHER: All right.

MS. MAUSER: Have a safe trip back.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: If that is everything, off the record on March 6, 2024 at 6:28.

(CONCLUDED, 6:28 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, WENKE LEE PhD, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

______________________ ______________________

(DATE) (SIGNATURE)

Job No. CS6484701

CERTIFICATE OF COURT REPORTER

I, Marjorie Peters, Fellow of the Academy of Reporting, Registered Merit Reporter, Certified Realtime Reporter, Realtime Systems Administrator, and Notary Public in the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that the witness was placed under oath according to the law; that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction, and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

I further certify that signature was not waived by the witness.

IN WITNESS WHEREOF, I have hereunto set my [illegible]h, 2023.

Marjorie Peters

Marjorie Peters, FAPR, RMR, CRR, RSA

My commission expires October 31, 2024.

ERRATA SHEET

IN RE:

DEPONENT:

RETURN BY:

= = = = = = = = = = = = = = = = = = = = = = = = =

PAGE/LINE CORRECTION AND REASON

(DATE) (DEPONENT SIGNATURE)

NOTARY PUBLIC:

Job No. CS6484701