# Plaintiffs' Exhibit 11
# (Redacted)

```
                                                              1
 1              UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    ALEXANDRIA DIVISION

 4

 5   UNITED STATES OF AMERICA,   )
     et al,                      )
 6                               )
          Plaintiffs,            )
 7                               ) Case No.
          -vs-                   ) 1:23-cv-00108-LMB-
 8                               ) JFA
     GOOGLE, LLC,                )
 9                               )
          Defendant.             )
10                               )

11

12
              ** HIGHLY CONFIDENTIAL **
13
         _____
14

15        VIDEO RECORDED 30(b)(6) EXAMINATION

16                 OF:   GROUPM

17            BY:   SUSAN SCHIEKOFER

18       _____

19                     TAKEN ON

20
           TUESDAY, SEPTEMBER 26, 2023
21

22
     CERTIFIED STENOGRAPHER:
23     JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
       CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24     CCR-WA (No. 21007264), CSR-CA (No. 14420),
       REALTIME SYSTEMS ADMINISTRATOR
25     JOB NO.:  912924
```

## Page 10

1  hmm.  Does that make sense?
2       A.   Yes.
3       Q.   And then also, this is something
4  that's different from a normal question,
5  but try to let me finish my question before
6  you start giving your answer even if you
7  think you kind of know where I'm going.
8            And similarly, I will try to let
9  you finish your answer before I start
10 asking the next question.  Does that make
11 sense?
12      A.   Yes.
13      Q.   Okay.  And if anything isn't
14 clear at any point, just ask me, and I'll
15 do my best to clear it up.
16      A.   Will do.
17      Q.   Do you understand that the
18 information you provide during this
19 deposition may be used by the Department of
20 Justice in other civil, criminal,
21 administrator or regulatory cases or
22 proceedings?
23      A.   I do.
24      Q.   You work in New York; is that
25 right?

## Page 11

1       A.   I do.
2       Q.   And you live in New York; is that
3  right?
4       A.   I live in New Jersey.
5       Q.   Okay.  Is there an office where
6  you regularly work outside of New York?
7       A.   At home.  I mean, we work three
8  days a week at 3 World Trade Center.
9       Q.   Okay.
10      A.   And then Mondays and Fridays from
11 home.
12      Q.   But outside of New York and
13 New Jersey, there's nowhere else where you
14 regularly work?
15      A.   No.
16      Q.   Okay.  So for all of my
17 questions, I'd like you to answer based on
18 your personal knowledge.
19           Does that make sense?
20      A.   Yes.
21      Q.   So unless I say otherwise, I'm
22 not asking you about information that you
23 learned in preparation for this deposition
24 from other people at GroupM.
25           Does that make sense?

## Page 12

1       A.   Yes.
2       Q.   And if at any point you feel like
3  you have an answer to a question but it's
4  not based on your personal knowledge but
5  instead it's based on something you learned
6  to prepare, will you just let me know and
7  we'll kind of go from there?
8       A.   Yes.
9       Q.   Okay.  Where were you born and
10 raised?
11      A.   I was born in Staten Island,
12 New York, and I was raised in Monmouth
13 County, New Jersey.
14      Q.   Okay.  Can you describe your
15 educational background?
16      A.   Yes.
17           I went undergrad to Montclair
18 University in New Jersey, and master's
19 in -- at NYU in New York.
20      Q.   Okay.  What did you get your
21 master's in?
22      A.   English and American literature.
23      Q.   Okay.  How did you first get into
24 advertising?
25      A.   I had an internship at a company

## Page 13

1  that used to be called Ted Bates when I was
2  19.  And I did that.  And then they offered
3  me a job when I graduated.
4       Q.   And today you work at GroupM; is
5  that right?
6       A.   Yes.
7       Q.   What's your title at GroupM?
8       A.   Chief digital investment officer.
9       Q.   Can you give us a brief
10 description of your responsibilities?
11      A.   I have a small team at the center
12 of GroupM.  And there's agencies at GroupM,
13 and clients sit within agencies.
14           And our team at the center works
15 with the client teams to figure out what
16 are the partners that we want to do
17 business with in terms of things like
18 pricing, first-to-markets, research,
19 basically to provide value for the clients
20 for the money that they're spending across
21 GroupM and the agencies.
22      Q.   Let me ask you a little bit about
23 each of those.
24           So what do you and your team do
25 with respect to pricing?

Page 14

```
 1      A.   We calibrate the market.  We
 2  represent anything that's digital, right?
 3  So there's TV buyers that will buy the
 4  upfront that's been pretty traditional.
 5           I mean, for years and years where
 6  they'll buy, like, prime time on NBC or
 7  sports on NBC.  And as the markets have
 8  evolved with digital, there's always the
 9  digital components to negotiate.
10           So we will negotiate anything
11  that's digital across television, radio,
12  pure-play digital.
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]
23  [redacted]
24  [redacted]
25  [redacted]
```

Page 15

```
 1  [redacted]
 2  [redacted]
 3  [redacted]
 4  [redacted]
 5  [redacted]
 6  [redacted]
 7  [redacted]
 8  [redacted]
 9  [redacted]
10  [redacted]
11  [redacted]
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17      Q.   When did you first start working
18  at GroupM, roughly?
19      A.   In 2010.
20      Q.   Can you give us a brief overview
21  of sort of how your role and
22  responsibilities have changed in GroupM
23  over time?
24      A.   Yes.
25           So I have been part of WPP for a
```

Page 16

```
 1  long time.  Before GroupM I was at Ogilvy.
 2  So I was at Ogilvy for most of my career.
 3  And I started the digital media offering
 4  within Ogilvy.
 5           And then I had my third child and
 6  I went part time for a long time.  And in
 7  -- so that was probably, like, '98 I went
 8  part-time.
 9           And then in 2010, I was ready to
10  come back on a more full-time basis.  There
11  was an opportunity at GroupM to run the
12  AT&T business, which was a large digital
13  advertiser at the time, so I interviewed
14  for that and I got it.
15           And I went over to what was then
16  MEC, which was a GroupM agency, and I ran
17  the AT&T digital business.
18      Q.   And what came next after that?
19      A.   So then I was promoted to
20  president of digital in '14, I think it --
21  no, it could have been -- either '12 or
22  '13 -- no, probably, like, '13.  And I got
23  promoted and did not enjoy the job at all
24  and left.
25           And then the GroupM offered me a
```

Page 17

```
 1  job at the center, right?  So not at the
 2  particular agencies but at the center.  I
 3  worked -- went to work for a gentleman
 4  named Ari Bluman who was -- who had my job,
 5  chief digital officer.
 6           And that was in -- that was
 7  July 2014.  Almost two weeks after I
 8  started working for him, he was diagnosed
 9  with leukemia.  So that was two years.
10           And then he passed away, and I
11  was promoted into his position in '16.  So
12  I've been doing this particular job since
13  '16.
14      Q.   Okay.  Let me ask you one
15  question about GroupM's organization.
16           Does GroupM have different teams
17  that focus on different types of
18  advertising?
19           MR. HUNSBERGER:  Object to form.
20  BY MR. VERNON:
21      Q.   And so, in general, if either
22  your counsel or Google's counsel objects,
23  you can wait for them to object and then
24  answer.  If counsel instructs you not to
25  answer, then that's a different thing --
```

Page 42

```
 1        THE WITNESS:  Yeah, yeah.
 2        I mean, it's a complement to an
 3   overall buy.  Again, like, a client
 4   that spends a lot of money in market
 5   that has a combination of brand and
 6   efficiency goals will use a mix of
 7   media as broad as network television
 8   and, like, all the way through to
 9   search -- right? -- as narrow as
10   search.
11        So it's really -- you know, it's
12   what clients think -- like a
13   combination of it's the creative, it's
14   the media and it's the offer.  So what
15   do those three -- what's the most
16   efficient way.
17        And, again, this is where the
18   planners use syndicated research to
19   find the audiences.  They develop the
20   channels, and then the buyers will go
21   and pick the individual properties
22   within those channels, right?
23        And if it's an only-display
24   campaign, we do those too, but they're
25   just not as prevalent with the types of
```

Page 43

```
 1   advertisers that we have.
 2   BY MR. VERNON:
```

[lines 3-18 redacted]

```
19   BY MR. VERNON:
20        Q.   What differences, if any, are
21   there between display and social?
22             MR. HUNSBERGER:  Object to form.
23             THE WITNESS:  Well, social can
24        have display, right?  So social has a
25        combination of video formats, and then
```

Page 44

```
 1        they could also just have a display ad
 2        that -- that runs in the feed.
 3             It's either called static, it
 4        could be called rich media, but that's
 5        considered display.
 6   BY MR. VERNON:
 7        Q.   Let me ask you:  What differences
 8   are there, if any, between social and
 9   programmatic?
10             MR. HUNSBERGER:  Object to form.
11             MS. KLAUSNER:  Objection to the
12        form.
13             THE WITNESS:  So social -- well,
14        social is also bought programmatically,
15        but it's in platform with the
16        individual social companies.
17   BY MR. VERNON:
18        Q.   Have you ever heard the phrase
19   "open web display"?
20        A.   Yes.
21        Q.   What's your understanding of what
22   open web display means?
23        A.   That means -- and it could be
24   through -- operated through a DSP.  It also
25   could be operated on an IO basis where
```

Page 45

```
 1   you'll having aggregators of content that
 2   will do the job of monetizing those
 3   websites.
```

[lines 4-25 redacted]

Page 46

```
11      Q.   What differences are there, if
12   any, between open web display and social
13   advertising?
14           MR. HUNSBERGER:  Object to form.
15           THE WITNESS:  So open exchange is
16      just a compilation of what basically a
17      reseller has put together.  You know,
18      social is platform specific.
19           And I'm sorry, what was the
20      third?  You said open web and --
21   BY MR. VERNON:
22      Q.   And social.  There wasn't is a
23   third.
24      A.   Okay, okay.
25      Q.   Have you ever heard the term
```

Page 47

```
 1   social jail?
 2           MR. HUNSBERGER:  Object to form.
 3           MS. KLAUSNER:  Objection to the
 4      form.
 5           THE WITNESS:  I mean, I know --
 6      yeah, I mean, if a user is -- you know,
 7      posted something that people reported,
 8      then they go in social jail.
 9   BY MR. VERNON:
10      Q.   I was referring to something
11   different.
12           Have you ever heard the phrase
13   social jail in the context of advertising?
14           MR. HUNSBERGER:  Object to form.
15           THE WITNESS:  No.
16   BY MR. VERNON:
```

Page 48

[redacted]

Page 49

[redacted]





Page 182

1  this deposition today.  We have no
2  further questions, so we just wanted to
3  say thank you, we appreciate it.
4       THE WITNESS:  You're welcome.
5       MS. KLAUSNER:  Great.
6       MR. HUNSBERGER:  Thank you to the
7  witness and counsel.
8       MS. KLAUSNER:  Thank you.
9       THE VIDEOGRAPHER:  The time is
10  3:05 p.m.
11      We're off the record.
12      (Time noted: 3:05 p.m.)

Page 183

1           REPORTER CERTIFICATE
2     I, the undersigned, do hereby certify:
3     That SUSAN SCHIEKOFER was by me duly
4  sworn in the within-entitled cause; that
5  said deposition was taken at the time and
6  place herein named; and that the deposition
7  is a true record of the witness's testimony
8  as reported by me, a disinterested person,
9  and thereafter a total of 186 was
10  transcribed.
11    I further certify that I am not
12  interested in the outcome of the said
13  action, nor connected with, nor related to
14  any of the parties in said action, nor to
15  their respective counsel.
16    IN WITNESS WHEREOF, I have hereunto set
17  my hand this 26th day of September, 2023.
18  Signature: _X_Requested__Waived__Not Requested
19
20       _____
21            JESSICA R. WAACK
              Registered Diplomate Reporter
22           Certified Realtime Reporter
         California Certified Realtime Reporter
23         New York Realtime Court Reporter
           New York Association Court Reporter
24         Notary Public, State of New York
      CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
25    CCR-WA (No. 21007264), CSR-CA (No. 14420)

Page 184

1           INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4  carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8       After doing so, please sign the
9  errata sheet and date it.
10      You are signing same subject to
11  the changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14      It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of
17  receipt of the deposition transcript by
18  you.  If you fail to do so, the deposition
19  transcript may be deemed to be accurate
20  and may be used in court.

Page 185

1  DECLARATION UNDER PENALTY OF PERJURY
2  USA VS. GOOGLE
3  Date of Deposition:  September 26, 2023
4
5
6       I, SUSAN SCHIEKOFER, hereby
7  certify under penalty of perjury under the
8  laws of the State of _____ that
9  the foregoing is true and correct.
10
11    Executed this____ day of     , 2023,
12  at _____.
13
14
15        _____
16             SUSAN SCHIEKOFER
17
18  SUBSCRIBED AND SWORN BEFORE ME
19  THIS __ DAY OF _____, 20
20  _____
              NOTARY PUBLIC
21
22  MY COMMISSION EXPIRES:_____

Case 1:23-cv-00108-LMB-JFA   Document 656-12   Filed 05/17/24   Page 10 of 11 PageID# 13884

UNITED STATES OF AMERICA v.
GOOGLE, LLC
30(b)(6); Highly Confidential

Susan Schiekofer
September 26, 2023

185

```
 1   DECLARATION UNDER PENALTY OF PERJURY
 2   USA VS. GOOGLE
 3   Date of Deposition:   September 26, 2023
 4
 5
 6        I, SUSAN SCHIEKOFER, hereby
 7   certify under penalty of perjury under the
 8   laws of the State of  New York        that
 9   the foregoing is true and correct.
10
11        Executed this 2nd day of Nov, 2023,
12   at  279 Millbun Ave Millbum, NJ 07041
13
14
15              [signature]
16              SUSAN SCHIEKOFER
17
18   SUBSCRIBED AND SWORN BEFORE ME
19   THIS 2nd DAY OF November, 2023
20        [signature]
21          NOTARY PUBLIC
             Frank Bruno Mayer
22   MY COMMISSION EXPIRES: _____
23
24        FRANK A BRUNO-MAYER
          Notary Public - State of New Jersey
25        My Commission Expires Feb 20, 2025
```

```
                                                                    186
1                           ERRATA SHEET

2       USA VS. GOOGLE

3       WITNESS:   SUSAN SCHIEKOFER

4       Date of Deposition:   September 26, 2023

5

6    Reason Codes: 1. Clarify the record
                   2. Conform to the facts
7                  3. Correct transcription errors

8
     Page            Line            Reason
9    From                            To
     Page  40        Line  24        Reason  2
10   From                            To
     Page            Line            Reason
11   From  display                   To  video
     Page  54        Line  9         Reason  2
12   From  OpenX                     To  SpotX
     Page  65        Line  9         Reason  3
13   From  isn't                     To  is an
     Page  78        Line  23        Reason  2
14   From  organic                   To  natural
     Page  85        Line  9         Reason  2
15   From  GroupM at one point       To  GroupM's 24/7 product
     Page  164       Line  21        Reason  2
16   From  That was -- census was Maxus    To  That was -- Census was Wavemaker. Strike: So Maxus -- Maxus became part of Essence. So it's either under Essence or Maxus.
     Page            Line            Reason
17   From                            To
     Page            Line            Reason
18   From                            To
     Page            Line            Reason
19   From                            To
     Page            Line            Reason
20   From                            To
     Page            Line            Reason
21   From                            To
     Page            Line            Reason
22   From                            To
     Page            Line            Reason
23   From                            To

24                          [signature]

25                          SUSAN SCHIEKOFER
```