# Plaintiffs' Exhibit 31 (Redacted)

HIGHLY CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF VIRGINIA
2                  ALEXANDRIA DIVISION
3     --------------------------:
      UNITED STATES, et al.,      :
4                                 :
               Plaintiff,         :
5                                 :
           vs.                    : Case No.:
6                                 : 1:23-CV-00108-LMB-JFA
      GOOGLE, LLC,                :
7                                 :
               Defendant.         :
8     --------------------------:
9
10
11      HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF
12              ABRANTES-METZ, PH.D.
13
14    DATE:          March 7, 2024
15    TIME:          9:12 a.m.
16    LOCATION:      U.S. Department of Justice
                     Antitrust Division
17                   450 Fifth Street, Northwest
                     Washington, D.C. 20530
18
      REPORTED BY:   Shari R. Broussard, RPR, CSR
19                   Reporter, Notary
20    Job No. CS6456952
21
22

HIGHLY CONFIDENTIAL

Page 30

1  Network markets."  And if we can mark as Exhibit 4
2  this document, the report -- opening report of
3  Dr. Robin Lee.
4         (Abrantes-Metz Exhibit Number 4 was
5         marked for identification.)
6  BY MR. ISAACSON:
7     Q   And if we turn to paragraph 12 of that
8  and there's a subparagraph 3 under 12 and you see
9  there he has listed five acts.  And what I'd like
10 to understand is you say you've identified five
11 acts, he's identified five acts here.
12        Are we talking about the same acts?  Are
13 you talking about the same five acts as Dr. Lee?
14        MS. WOOD:  Objection to the form.
15        THE WITNESS:  I actually here condensed
16 five.  There's actually six.  I just called that
17 one of them -- grouped two of them into one.  So
18 literally there are six distinct acts.  Two of
19 them are -- are very, very related.  That's why I
20 called five.
21 BY MR. ISAACSON:
22    Q   And I'll interrupt you.  There you're

Page 31

1  referring to first look and last look?
2     A   So --
3     Q   Those are the two you combined.
4     A   I was referring to that, yes, a
5  combination, but in my summary of opinions I do --
6  I do disentangle them all.  So there's the Google
7  Ads exclusivity, there's exclusive first and last
8  look where also last look is not just for DFP
9  publishers but they are also for third-party
10 publishers.  There's -- there's the AdMeld
11 acquisition, there's unifying pricing rules, and
12 there's the Google restriction AdX to provide
13 realtime feeds exclusively to DFP.
14        So I -- in there I had combined the
15 exclusive first look, exclusive last look together
16 and the exclusive last look was referring to both
17 DFP and third parties.
18    Q   All right.  So looking at what Dr. Lee
19 has summarized, I'm trying to understand whether
20 you were talking about the same acts.
21        He's listed five.  His -- his third one
22 put together into one first look and last look,

Page 32

1  right?
2         So whether you make number three one act
3  or two acts, looking at Dr. Lee's list, are those
4  the same five, or if you divide one of them into
5  two, six acts, that you are describing?
6         MS. WOOD:  Objection to the form.
7         THE WITNESS:  They are similar.  I'm not
8  sure they're all exactly the same, but I'm
9  testifying on my opinions, not his.  So I cannot
10 recall the details of his opinions on these acts.
11 BY MR. ISAACSON:
12    Q   Well --
13    A   I don't rely on them.  I rely on his
14 market definition and market power work and -- and
15 not on his work on conduct.
16    Q   As part of your work in this case, you
17 have been able to study his work on conduct,
18 correct?
19        MS. WOOD:  Objection to the form.
20        THE WITNESS:  I had access to his report
21 to the extent that I wanted to review with a focus
22 on market definition and market power.

Page 33

1         My opinions on -- my opinions are
2  independent of his opinions on the conduct.  He
3  may have found some conduct that may have been
4  problematic for him in terms of anticompetitive
5  effect and I may not or the other way around.
6  BY MR. ISAACSON:
7     Q   All right.  When he identifies as the
8  first act, "Providing unrestricted access to
9  Google Ads' advertiser demand exclusively to its
10 AdX ad exchange, and denying comparable access to
11 rival ad exchange," is that conduct that you also
12 found to be anticompetitive in this case?
13        MS. WOOD:  Objection to the form.
14        THE WITNESS:  I don't know everything
15 that he analyzes within his sub-bullet two.
16 BY MR. ISAACSON:
17    Q   I'm sorry, I'm on sub-bullet one.
18    A   Oh, I'm sorry.
19        Again, I don't know the details of what
20 he is analyzing in each of these sub-bullets.
21        In general, while we may have some
22 differences, in general, yes, I opine that the

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1 exclusivity between Google Ads and AdX is
2 anticompetitive.
3    Q    All right.  With respect to the second
4 item, "Providing access to use of realtime bids
5 from AdX" -- "AdX exclusively to its DFP publisher
6 ad server, and denying comparable access to rival
7 publisher ad service" -- "servers," in general is
8 that also something that you opine is an
9 anticompetitive act?
10       MS. WOOD:  Objection to the form.
11       THE WITNESS:  I don't know the
12 specifics.  I can't recall the specifics of
13 everything he analyzed under that sub-bullet point
14 two.
15       I do opine that AdX having granted this
16 type of information to those accessing AdX through
17 DFP but not to other publishers outside of DFP had
18 anticompetitive effects.
19 BY MR. ISAACSON:
20    Q    All right.  With respect to the third
21 item that he lists there, "Providing access to a
22 feature known as 'Dynamic Allocation' exclusively

Page 35

1 to AdX within DFP, granting AdX valuable
2 'first-look' and 'last-look' advantages over rival
3 ad exchanges," generally is that also something
4 that you have opined is anticompetitive conduct?
5       MS. WOOD:  Objection to the form.
6       THE WITNESS:  So I do not provide an
7 opinion as to whether the access to overall
8 dynamic allocation only in and of itself is
9 anticompetitive.  I focused only on exclusivity of
10 first and last look to AdX.  I also focused on --
11 on the last look that the third-party publishers
12 had to grant to AdX.  I don't believe that
13 last-look aspect is part of his point three.
14 BY MR. ISAACSON:
15    Q    It says "last-look" --
16    A    At least -- yeah, but it says last look
17 within dynamic allocation.  So he talks about
18 accessing dynamic allocation and granting first
19 and last look.  I assume that granting that first
20 and last look is within dynamic allocation.
21       Without reviewing his entire report on
22 this point, I don't know whether he has additional

Page 36

1 concerns about the access to dynamic allocation
2 beyond the ones that I put forward.  I put forward
3 not the access to dynamic allocation and dynamic
4 allocation in and of itself, but the fact that
5 first and last look were exclusively granted to
6 AdX.  And then -- and I don't see -- I -- I seem
7 to see his opinion in point three as potentially,
8 I don't know that for a fact, of potentially being
9 broader than mine in that way.
10       But then I also think that it is
11 possible, and I would have to read his whole
12 section, that at least his summary does not
13 mention the -- the last look granted by
14 third-party publishers, which I focus on.
15       So while point three is similar to the
16 conduct that I analyzed and deemed to be
17 anticompetitive, it doesn't seem to be -- our
18 opinions may not be exactly the same.
19    Q    All right.  I'm going to move to strike
20 the answer because all I asked you was does that
21 paragraph refer to last look.
22       MS. WOOD:  Objection.  Obviously this is

Page 37

1 in the context of multiple questions and that
2 motion is completely unfounded.
3       MR. ISAACSON:  Answering questions based
4 on previous questions I'm not -- I'm not -- I
5 don't think is appropriate.
6 BY MR. ISAACSON:
7    Q    With respect to item four in Dr. Lee's
8 report, "Eliminating publishers' ability to use
9 variable pricing within DFP, impairing their
10 ability to work with rival ad exchanges and exert
11 competitive pressures on AdX," is that -- is that
12 also something that you found generally to be an
13 anticompetitive act?
14       MS. WOOD:  Objection to the form.
15       THE WITNESS:  Without reading his entire
16 section in his report relating to point four, I do
17 not know for a fact how our opinions differ and
18 this applies to all of the points in the summary.
19       That said, to the extent that point four
20 is referring to unified -- UPR, unified pricing
21 rules, I do opine that -- that that conduct was
22 anticompetitive.

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

BY MR. ISAACSON:

1   Q   And I believe you've also said with
2   respect to point five, "Acquiring an emergent
3   competitor, AdMeld, and eliminating as a
4   competitive threat to Google's AdX and DFP
5   products," that's also conduct you found to be
6   anticompetitive?
7       MS. WOOD:  Objection to the form.
8       THE WITNESS:  Yes, I opine there were --
9   there was an anticompetitive effect coming out of
10  this merger that affected directly the relevant
11  markets.
12  BY MR. ISAACSON:
13      Q   All right.  And with respect to those
14  five acts, based on your testimony today am I
15  correct to understand that you don't -- you would
16  not be able to tell me what your reasons are that
17  those are anticompetitive where your reasons would
18  be any different from Dr. Lee's?
19      MS. WOOD:  Objection to the form.
20      THE WITNESS:  I didn't base my opinions
21  on Dr. Lee's.  I don't know his reasons.  I am

Page 39

1   testifying on my reasons.
2       MR. ISAACSON:  All right.  If we can
3   mark as Exhibit 5 the complaint in this case.
4       (Abrantes-Metz Exhibit Number 5 was
5       marked for identification.)
6   BY MR. ISAACSON:
7       Q   And if you look at pages 132 and 133 of
8   the complaint -- and you -- you have reviewed the
9   complaint before, haven't you?
10      A   Yes.  A while back, but I have.
11      Q   And if you look at paragraph 312,
12  there's a list of ten items there.
13      A   Yes.
14      Q   Okay.  That are -- that are alleged to
15  be exclusionary conduct.  The first one refers to
16  Google's acquisition of DoubleClick.
17      Am I correct that is not conduct that
18  you have expressed an opinion about in this case
19  as to whether it's competitive or anticompetitive?
20      A   That is correct.
21      Q   And with respect to item seven, Google's
22  use of Project Bell, am I correct that you are not

Page 40

1   expressing an opinion in this case as to whether
2   Project Bell was competitive or anticompetitive?
3       A   Correct, I have not provided an opinion.
4       Q   And with respect to item eight, Google's
5   deployment of sell-side Dynamic Revenue Share, am
6   I correct that you have not expressed an opinion
7   in this case as to whether that conduct was
8   competitive or anticompetitive?
9       MS. WOOD:  Objection to the form.
10      THE WITNESS:  I do not provide an
11  opinion that -- let's call it DRS -- in and of
12  itself is anticompetitive.
13      The opinion I provide that relates to
14  DRS is that it would have exacerbated the effects
15  of other conduct that I found to be
16  anticompetitive.
17  BY MR. ISAACSON:
18      Q   When you say something exacerbated
19  conduct, does that mean it's anti- -- I'm sorry,
20  let me start the question over.
21      When you say something exacerbated other
22  conduct that you found was anticompetitive, does

Page 41

1   that mean that you're saying that the conduct that
2   you say was exacerbating was itself
3   anticompetitive?
4       MS. WOOD:  Objection to the form.
5       THE WITNESS:  No.  I am saying that
6   there's a conduct that is anticompetitive, it had
7   anticompetitive effects, those effects are larger
8   because of DRS.
9   BY MR. ISAACSON:
10      Q   But DRS you have no opinion standing
11  alone -- let me start over.
12      You have no opinion whether DRS standing
13  alone was competitive or anticompetitive?
14      MS. WOOD:  Objection to the form.
15      THE WITNESS:  As of now, I do not
16  provide an opinion as to whether DRS just in and
17  of itself is or is not anticompetitive.
18  BY MR. ISAACSON:
19      Q   And item nine listed in the complaint
20  refers to Project Poirot.
21      Am I correct that you are not expressing
22  an opinion as to whether Project Poirot was

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1  competitive or anticompetitive?
2        MS. WOOD:  Objection to the form.
3        THE WITNESS:  That is correct.  As of
4  now, given information I have, I -- I am not
5  providing an opinion as to whether Poirot is or is
6  not competitive by itself.
7  BY MR. ISAACSON:
8     Q   And with respect to item four, "Google's
9  limitation of dynamic allocation bidding
10  techniques exclusively to AdX," is that also
11  conduct that you are not expressing an opinion
12  about as to whether it was competitive or
13  anticompetitive?
14        MS. WOOD:  Objection to the form.
15        THE WITNESS:  Well, it depends on -- on
16  what item four has.  I have not really broken it
17  out that way.
18        These relate potentially to whether --
19  whether prices were sent back to publishers only
20  through the context of dynamic allocation, and
21  therefore through DFP, and not to third-party
22  publishers and/or whether third-party publishers

Page 43

1  accessing AdX outside of DFP could have sent
2  dynamic floors to AdX or not and contrasting with
3  the fact that they could within dynamic
4  allocation.  So I have opinions that relate to
5  point four, but I -- I think point four seems to
6  be broad and unspecified on what do bidding
7  techniques mean exclusively to AdX.
8        It...
9  BY MR. ISAACSON:
10    Q   Now, with respect to Google providing
11  unrestricted access to Google Ads' advertiser
12  demand exclusively to its AdX exchange and denying
13  comparable access to rival ad exchanges, your
14  report expresses opinions that that action was
15  taken in an alleged ad exchange market; is that
16  correct?
17        MS. WOOD:  Objection to the form.
18        THE WITNESS:  Could you please repeat
19  the question.
20  BY MR. ISAACSON:
21    Q   Sure.  If it helps you, I'm just using
22  the language in item one of Professor Lee,

Page 44

1  paragraph 12 that we were looking at.
2        MS. WOOD:  What?  Do you want to use
3  the -- her report instead or do you want to ask
4  her about his report?
5        MR. ISAACSON:  No, I -- I'm going to --
6  the -- no, I'm referring to item one in the
7  paragraph 12 little 3.
8        MS. WOOD:  So you want to ask her about
9  her opinion, not Lee's opinions, but you want to
10  use Lee's report to ask her about her opinion?
11        MR. ISAACSON:  Right, I've got -- I've
12  got these on the same page here, so I'm going to
13  do that.
14        MS. WOOD:  I think she's --
15  BY MR. ISAACSON:
16    Q   So item one there, which is, you said,
17  was conduct you had generally discussed as well,
18  does that conduct in your report take place in the
19  ad exchange market?
20        MS. WOOD:  Objection to the form and I
21  am going to object to using Lee's report to ask
22  her about her opinion.  I think if you want to ask

Page 45

1  her about her opinion, you should use her report
2  and the description of the conduct in her report
3  and not ask her about her opinions --
4        MR. ISAACSON:  This is going to be a
5  long speaking objection.  Let's just keep it --
6        MS. WOOD:  Well --
7        MR. ISAACSON:  -- to objection.
8        MS. WOOD:  -- it's -- no.  It's --
9  it's --
10        MR. ISAACSON:  Let's just keep it to
11  objection.
12        MS. WOOD:  -- object not to the -- to
13  the question alone but to the process.  It's an
14  objection to using -- asking her --
15        MR. ISAACSON:  We don't --
16        MS. WOOD:  -- to keep in her mind --
17        MR. ISAACSON:  We don't do speaking
18  objections to process.
19        MS. WOOD:  Well, we do when the process
20  is this unorthodox.  When --
21        MR. ISAACSON:  I don't think --
22        MS. WOOD:  When the report you're asking

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 339

1          CERTIFICATE OF NOTARY PUBLIC

2              I, SHARI R. BROUSSARD, the officer before

3      whom the foregoing deposition was taken, do hereby

4      certify that the witness whose testimony appears

5      in the foregoing deposition was duly sworn by me;

6      that the testimony of said witness was taken by me

7      in stenotype and thereafter reduced to typewriting

8      under my direction; that said deposition is a true

9      record of the testimony given by said witness;

10     that I am neither counsel for, related to, nor

11     employed by any of the parties to the action in

12     which this deposition was taken; and, further,

13     that I am not a relative or employee of any

14     counsel or attorney employed by the parties

15     hereto, nor financially or otherwise interested in

16     the outcome of this action.

17

18                    *Shari R. Broussard*

19                    SHARI R. BROUSSARD

                      Notary Public in and for the

20                    District of Columbia

21

       My commission expires:

22     August 14, 2025

HIGHLY CONFIDENTIAL

Page 340

1                    A C K N O W L E D G E M E N T
2                         O F   D E P O N E N T
3
4
        I, ROSA ABRANTES-METZ, PH.D., do hereby
5
        acknowledge I have read and examined the foregoing
6
        pages of testimony, and the same is a true,
7
        correct and complete transcription of the
8
        testimony given by me, and any changes or
9
        corrections, if any, appear in the attached errata
10
        sheet signed by me.
11
12
13
14
15
16
17
18
19
20
        _____        _____
21      Date                       ROSA ABRANTES-METZ, PH.D.
22      Job No. CS6456952

**HIGHLY CONFIDENTIAL**

**ERRATA SHEET FOR THE TRANSCRIPT OF:**

Case Name:      *United States et al. v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.)

Deposition Date:   03/07/2024

Deponent:      Rosa Abrantes-Metz

**CORRECTIONS**

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 57 | 9 | The word "quantity" should read "quantify" | Transcription error |
| ■ | ■ | ████████████████████ | ████████ |
| 112 | 6-7 | The words "No, of the report.  You're in the opening report." should read "No, of the report you're in.  The opening report." | Clarification |
| 113 | 16 | The word "Googles" should read "Google's" | Transcription error |
| 139 | 10 | The number "100" should read "1000" | Transcription error |
| ■ | ■ | ████████████████████████ | ██████████ |
| ■ | ■ | ██████████████████ | █████████ |
| ■ | ■ | ████████████████ | ██████ |
| ■ | ■ | ██████████████████ | █████████ |

HIGHLY CONFIDENTIAL

Page 340

1              A C K N O W L E D G E M E N T
2                  O F   D E P O N E N T
3

4
      I, ROSA ABRANTES-METZ, PH.D., do hereby
5
      acknowledge I have read and examined the foregoing
6
      pages of testimony, and the same is a true,
7
      correct and complete transcription of the
8
      testimony given by me, and any changes or
9
      corrections, if any, appear in the attached errata
10
      sheet signed by me.
11
12
13
14
15
16
17
18
19
20
      _____        _____
21    Date                        ROSA ABRANTES-METZ, PH.D.
22    Job No. CS6456952

**Attorney Errata Sheet for the Transcription of Rosa Abrantes-Metz**

**Case Name**:  *United States et al v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.)

**Depo. Date**:  March 7, 2024

**Deponent**:  Dr. Rosa Abrantes-Metz

| Page | Line | Correction | Reason for Correction |
|------|------|------------|-----------------------|
| 2 | 21 | Change "Jeff Brennan" to "Jeff Vernon" | Transcription error |
| 17 | 12 | Replace "ran" with "run" | Clarification |
| 26 | 11 – 12 | Change "Is that discussion of open web advertising…" to "Is that discussion of open web display advertising…" | Transcription error |
| 27 | 1 | Change "of open web advertising consistent…" to "of open web display advertising consistent…" | Transcription error |
| 44 | 2 | Replace "What? Do you want" with "Well, do you want" | Transcription error |
| 44 | 9 | Replace "Lee's opinions" with "Lee's opinion" | Transcription error |
| 45 | 12 | Replace "object not to the" with "objection not to the" | Transcription error |
| 46 | 5 | Replace "Okay." with "Alright." | Transcription error |
| 46 | 16 | Replace "Object" with "Objection" | Transcription error |
| 47 | 2 | Replace "whether" with "where" | Clarification |
| ██ | ██ | ██████████ | ██████ |
| ██ | ██ | ████████ | ██████ |
| ██ | ██ | ████████████████ | ██████ |
| ██ | ██ | ████████████ | ██████ |
| ██ | ██ | ██████████ | ██████ |
| ██ | ██ | █████████ | ██████ |
| 64 | 5 | Capitalize "Google Ads" | Transcription error |
| 66 | 2 | Delete "as" after "broad" | Clarification |
| ██ | ██ | ██████████ | ██████ |
| 76 | 15 – 16 | Replace "the separate products" with "as separate products" | Transcription error |

| | | | |
|---|---|---|---|
| 79 | 1 | Replace "physical" with "feasible" | Transcription error |
| 79 | 2 | Replace "feeds" with "bids" | Transcription error |
| 114 | 9 | Replace "from" with "for" | Clarification |
| 145 | 3 | Change "a monopolist" to "a hypothetical monopolist" | Transcription error |
| ▮ | ▮ | ▮ | ▮ |
| 177 | 8 – 9 | Replace "20 is less than" with "20 is less than double" | Clarification |
| 192 | 9 | Replace "approve" with "a prove" | Transcription error |
| 196 | 6 – 7 | Replace "or quality was lower than it actually was or innovation was lower than it actually was" with "or quality was lower than it should have been or innovation was lower than it should have been" | Clarification |
| 202 | 6 – 7 | Delete "from" after "required" | Clarification |
| 202 | 8 | Replace "clients, for example," with "clients. For example," | Punctuation for clarity |
| 227 | 20 – 21 | Delete "do" before "neither" ; Replace "or" with "nor" | Clarification |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| 269 | 20 | Change "dynamic allocations" to "dynamic allocation" | Transcription error |
| 276 | 20 | Replace "lied" with "lay" | Clarification |
| 279 | 7 | Change "publisher" to "publishers" | Transcription error |
| 290 | 4 – 5 | Replace "this intermediation" with "disintermediation" | Transcription error |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ |

| | | | |
|---|---|---|---|
| ███ | ███ | ████████████████ | ████ |
| ███ | ██ | ██████████ | ████ |
| ███ | ██ | █████████████ | ██████ |
| ███ | ███ | ██████████████ | ████ |
| ███ | ██ | ████████████ | ████ |
| ███ | ██ | ███████████ | ████ |
| ███ | ██ | ████████ | ████ |
| ███ | ██ | █████████ | ████ |
| ███ | ██ | █████████ | █████ |
| ███ | ███ | ████████████ | ████ |
| ███ | ██ | █████████ | ████ |
| ███ | ██ | █████████████ | ████ |
| ███ | █ | ██████████ | ████ |
| ███ | █ | ████████ | ████ |
| ███ | █ | █████████ | ████ |
| 314 | 20 | Replace "entire competitive" with "anticompetitive" | Transcription error |
| 314 | 21 | Replace "entire competitive" with "anticompetitive" | Transcription error |
| ███ | █ | █████████ | █████ |
| ███ | █ | ████████████ | █████ |
| 329 | 5 | Insert open quotations before "a rationale" | Punctuation – this is a quote from the report and is ended with closed quotations |
| ███ | ███ | █████████ | ████ |
| 337 | 17 | Replace "agree" with "disagree" | Transcription error |