# Plaintiffs' Exhibit 69

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

| | |
|---|---|
| UNITED STATES, et al., | ) Case No.<br>) 1:23-cv-00108-LMB-JFA |
| Plaintiffs, | ) |
| vs. | ) |
| GOOGLE LLC, | ) |
| Defendant. | ) |

_____

- HIGHLY CONFIDENTIAL -

VIDEOTAPED 30(b)(6) DEPOSITION OF
UNITED STATES ARMY
through the testimony of
COLONEL JOHN HORNING
September 29, 2023
1:06 p.m.

Reported by: Bonnie L. Russo
Job No. 6105371

HIGHLY CONFIDENTIAL

Page 14

1  been on or about May of 2021 through on or
2  about late April of 2023.
3     BY MS. GOODMAN:
4     Q.  And it's the army's testimony that
5  Lieutenant Colonel Morris was the COR for the
6  national media talent and furnishing task order
7  over the period May 2021 to April 2023?
8     MS. CLEMONS:  Objection to form.
9     THE WITNESS:  No.  He was in the
10 position then -- I believe he passed the
11 contracting officer's representative duties to
12 Major Lee-Ann Craig in the fall of 2022.  He
13 was her supervisor, but I think the actual
14 designation as a COR once she came into the
15 office was moved to her and she took that over,
16 as best I recall in September or October of
17 2022, same task order and she took
18 responsibility from him as she reported to him
19 but as a part of her assignment, she took that
20 responsibility over.
21    BY MS. GOODMAN:
22    Q.  So am I understanding the army's

Page 15

1  testimony correctly that Lieutenant Colonel
2  Morris was the COR on the national media talent
3  and furnishings task order from May 2021
4  through September or October of 2022?
5     A.  Without the specific documentation
6  in front of me, I believe that that represents
7  an accurate timeline.
8     Q.  And Major Lee-Ann Craig, for what
9  period of time was she the COR on the paid
10 media task order?
11    A.  As best as I can recall without
12 having her appointment documentation in front
13 of me for a specific date, she began the role
14 in September of 2022 and is still currently the
15 contracting officer's representative on the
16 national media talent and furnishings task
17 order.
18    Q.  You understand when I am saying
19 "COR," I am also referring -- I'm referring to
20 the contracting officer representative.  Yes?
21    A.  I understand or I believe that to be
22 your -- but I did notice in the last deposition

Page 16

1  transcription, there was some ambiguity because
2  we also talked about one of the task orders
3  that was COR ops, and that was C-O-R-E, and it
4  came back in the transcript as C-O-R, the same
5  as contracting officer's representative so I am
6  just trying to be -- just to be clear in the
7  event that there is any confusion.
8     Q.  Okay.  Appreciate that.
9        Did you speak with Major Craig to
10 prepare for your deposition today?
11    A.  Yes, I did.
12    Q.  How long did you speak with Major
13 Craig?
14    A.  I spoke with her over the course of
15 several days, probably a total of two hours, if
16 I summed it up.
17    Q.  What did you speak with Major Craig
18 about?
19    MS. CLEMONS:  Objection.  Form.
20    THE WITNESS:  We spoke predominantly
21 about the deliverables associated with our
22 media plan, the strategy element of it first

Page 17

1  and the tactical plan.  We talked a little bit
2  about some of the deliverables that highlight
3  the specifics of the plan and then we also went
4  through some of her example billing and
5  invoices and how she -- how she reviews them
6  before they get accepted in the -- in the
7  billing system.
8     Q.  Is it Major Craig's duties to review
9  bills before they are accepted for payment?
10    MS. CLEMONS:  Objection.  Form.
11    THE WITNESS:  That is one of the
12 responsibilities of the contracting officer's
13 representative to review the invoices prior, to
14 check them against everything from the dates of
15 the task order to ensure that it's appropriate
16 and then also to match it against the elements
17 of the plan, to make sure that was something
18 that was approved ahead of time, and then so
19 that's the responsibility of any COR and then
20 as such for her, that was her responsibility in
21 that particular task order.
22    BY MS. GOODMAN:

Page 18

1  Q. Was there -- strike that.
2     With Lieutenant Colonel Morris, what
3  did you speak about with him with regards to
4  DV360?
5     MS. CLEMONS: Objection to form.
6     THE WITNESS: What I spoke about
7  with him was -- in order to gain a little bit
8  more understanding of how we had purchased
9  DV360, a little bit better understanding of the
10 product with respect to how it may be
11 differentiated from other ad products online
12 that we have used and a little bit of
13 information on how we had come to use that
14 particular product.
15    BY MS. GOODMAN:
16 Q. How did the army come to use the
17 particular product, DV360?
18    MS. CLEMONS: Objection. Form.
19    THE WITNESS: So the army develops a
20 media plan every year in line with the
21 strategic objectives that we are attempting to
22 meet, to reach with respect to the various ways

Page 19

1  to serve and in an accessions environment,
2  essentially getting people to join.
3     When then Major Morris, now
4  Lieutenant Colonel Morris took over the
5  national media talent and furnishings on or
6  around April of 2021, it's my understanding
7  from speaking with him that we were using more
8  than one product for display advertising, and
9  as he explained it to me, we had observed
10 performance and costs associated with both, and
11 then he had made recommendations in the fall of
12 2021 that we consider not using the two
13 products and instead use just one product.
14    And then as I recall, early in
15 calendar year 2022, perhaps January, I can't be
16 certain, but the recommendation was made and
17 AMO leadership approved that we consolidate and
18 just use one product and that was DV360.
19    BY MS. GOODMAN:
20 Q. What was the other display
21 advertising product that the army was using
22 prior to 2022?

Page 20

1  A. We were using both Verizon DSP and
2  DV360.
3  Q. And what differences between the
4  Verizon DSP and DV360 did the army observe?
5     MS. CLEMONS: Objection to form.
6     THE WITNESS: So before we made any
7  determination, late in calendar year 2021, we
8  looked at performance of both products and
9  found them to be equivalent, at least in our
10 purposes in terms of performance delivery.
11    The media team though recommended
12 that the army could have some efficiency gained
13 if we were to reduce one product and the
14 recommendation was to cease using Verizon DSP
15 and use Google's DV360.
16    BY MS. GOODMAN:
17 Q. Why was the recommendation to cease
18 using Verizon's DSP?
19    MS. CLEMONS: Objection to form.
20    THE WITNESS: Based on both products
21 appearing to deliver equivalent results within
22 -- within the audience, so from a purely -- how

Page 21

1  the audience perceives, judges, interacts,
2  creative, there was an efficiency possible as
3  recommended by Colonel Morris that said we
4  could -- we could potentially save money,
5  resources, by consolidating and his
6  recommendation was that the product we
7  consolidate to was Google DV360.
8     BY MS. GOODMAN:
9  Q. What efficiencies were possible by
10 consolidating to DV360?
11    MS. CLEMONS: Objection to form.
12    THE WITNESS: As I understand it,
13 there was just an overall cost savings that the
14 army could realize by not using two separate
15 platforms. I don't have the figures of any
16 specific amount.
17    BY MS. GOODMAN:
18 Q. And did the army, in fact, achieve
19 the overall cost savings by not using two
20 separate platforms?
21    MS. CLEMONS: Objection. Form.
22 Foundation.

Page 38

1  accounting service so they actually handle the
2  cash, if you will, even if it is electronic for
3  the defense department, the defense finance and
4  accounting service, and GFEBS is more like the
5  software that is used for accounting purposes.
6      Q.   And what is wide area work flow?
7      A.   Wide area work flow is a system that
8  -- perhaps among other things, primarily, as I
9  am familiar with and how we use it, is used for
10 contracting purposes and our primary use of it
11 is in receiving our invoices, ensuring that
12 they match the task order number and
13 appropriate CLINs that are associated with the
14 task order and actually review the invoices
15 that a contractor provides against our plans,
16 make sure it's, you know, in scope, right
17 dates, right amounts, was what we actually
18 worked on, what was actually delivered, and
19 then the COR within the wide area work flow
20 will accept that invoice and then being that
21 that is a software system, in and of itself,
22 it's linked to GFEBS for basically being able

Page 39

1  to debit or credit the appropriate accounts,
2  and then which are also linked to DFAS to then
3  actually effect the payment to whomever it is.
4      So wide area work flow is a system
5  in which we are managing the invoicing and --
6  and elements of the contract by task order and
7  CLIN.
8      Q.   What did you speak with Major Dan
9  Duplessis about?
10     A.   Major Dan Duplessis is the current
11 branch chief for paid media.  He is Major
12 Lee-Ann Craig's supervisor and he took over for
13 Lieutenant Colonel Morris.  He did not take
14 over the COR role though.  That was -- as we
15 discussed earlier, that was passed from Colonel
16 Morris to Major Craig.
17     So my discussion with him was a
18 little bit more about the media plan and some
19 of the deliverables from the strategy to the
20 strategic plan down to the tactical plan and a
21 couple of deliverables that we used to ensure
22 elements of the plan.  The -- our --

Page 40

1  essentially, our flowchart and the firm flex,
2  two deliverables per the task order that lay
3  out the elements of the plan, what we have
4  approved and then capture that.
5      Both those documents are used by the
6  team to check if we are getting what we paid
7  for and to also ensure it is sort of documented
8  and memorialized the plan that we have agreed
9  to, and then again, the COR uses them to check
10 invoices and to see that they match what we
11 have, the plan that -- that we approved is what
12 we are getting billed for.
13     Q.   So you mentioned three kinds of
14 documents there in your answer.
15     Can you explain to me what the
16 strategic plan is as compared to the tactical
17 plan as compared to the firm flex plan?
18     A.   Sure.
19         MS. CLEMONS:  Objection to form.
20         BY MS. GOODMAN:
21     Q.   Or document.
22     A.   So the media plan starts from

Page 41

1  identifying the objectives that we have for
2  accessions.  The first deliverable after we
3  define for the agency strategic objectives, we
4  define the audience, we also begin to define at
5  that point, as we will understand what our
6  likely budget will be, given that it's
7  government budget and so there are the
8  intricacies of government budgeting systems and
9  things, in terms of president's budget is
10 signed or not, and what we will have, and so
11 with a -- with a reasonable guesstimate of what
12 we think the budget will be based on previous
13 requests, we give the agency essentially some
14 broad guidance on this is what we would like to
15 achieve.  This is a specific deliverable, the
16 strategic plan for them to come back with
17 several courses of action of how we might reach
18 those objectives using, in this case, the
19 national media -- national media talent and
20 furnishings task orders so in this area, how
21 media can best help.
22     They will develop that plan in

11 (Pages 38 - 41)

Page 42

1  consultation with the branch chief and the
2  national media manager, so that would be in
3  this case, Major Duplessis and Major Craig,
4  will work with their agency partners to develop
5  this plan and then they will come back and
6  brief the strategy plan, which essentially is a
7  couple of courses of action that address sort
8  of -- in big rocks, the audience that we are
9  trying to achieve and how we might apportion
10 the investment by product for AEMO concurrence.
11       When they get direction from AEMO
12 leaders then on which of the courses of action
13 that we may select or -- or guidance,
14 additional guidance to go back and rework or
15 however it may be, they go to work on the
16 national tactical plan.
17       The tactical plan will include much
18 more detail into specific partners and channel
19 mix.  As the name tactical differentiated from
20 strategic implies, it will have a lot more
21 detail, a lot more granular information about
22 what the plan is going to be.

Page 43

1       That plan brief will come back as
2  well for brief and approval, usually it will go
3  through several discussions between AEMO
4  leaders and the media team before we settle on
5  an approved plan.  Once we have settled on an
6  approved plan, one of the next deliverables
7  will be the flowchart which will show by month
8  and by channel mix, and to the extent we are
9  able to by product, I talk about enlisted or
10 officer or different ways -- different ways to
11 serve, but by channel mix, there by month, how
12 much, what our actual dollar plan investment
13 across all the months of the plan are going to
14 be.  Excuse me.
15       The next document from that that I
16 mentioned was the firm flex.  That essentially
17 gives us a little bit more information so with
18 regard to how much flexibility we have to make
19 adjustments in out times, in out months, weeks,
20 whatever it may be, given that -- like with any
21 vendor, we know, we may make a commitment to
22 purchase whatever contract, whatever good or

Page 44

1  service.
2       In this case, we are talking about
3  media inventory and they will have depending on
4  the network or channel or whatever, have terms
5  associated with and lock in a month, lock in
6  two months, whatever it may be per vendor.  But
7  understanding that at certain times, if we want
8  to make a change, we may be in a position where
9  we could lose money, and so that's kind of the
10 firm part, and then it's almost like drawing a
11 line between those things that are already
12 committed and if you were to change it now,
13 you'd risk losing your investment, your money,
14 because we have made an agreement with the
15 vendor already, and those things that are still
16 sort of outside that lock-in window, which if
17 you wanted to change, we could still change.
18       So the strategic plan, the tactical
19 plan, the flowchart and the firm flex are the
20 primary.  There is lots of other documentation
21 and reports after the fact and how it's going
22 and -- but those are the primary sort of

Page 45

1  planning deliverables and products though each
2  may have some other supporting efforts as well.
3       Q.   Is it the contracting officer
4  representative's responsibility to determine
5  that these deliverables that you have
6  mentioned, the strategic plan, national
7  tactical plan, flowcharts and firm flex
8  documentation are satisfactory to the army?
9            MS. CLEMONS:  Objection.  Form.
10           THE WITNESS:  Yes.  Within the
11 construct of the deliverables outlined by the
12 performance work statement, that is part of the
13 contracting officer's responsibility is to make
14 a determine -- surveil the quality of
15 deliverable and ensure that we are getting the
16 items that we are supposed to per the terms and
17 that they represent a quality product as well.
18           BY MS. GOODMAN:
19      Q.   And what you just described, is that
20 the contracting officer or the COR's
21 responsibility?
22      A.   It's the COR's responsibility.

12 (Pages 42 - 45)

Page 46

1  MS. CLEMONS: Objection to form.
2  BY MS. GOODMAN:
3      Q. Okay. Can somebody other than a COR
4  tell the ad agency, DDB, that, for example, the
5  strategic plan is acceptable to the army?
6      MS. CLEMONS: Objection to form.
7      THE WITNESS: We have quite a bit of
8  meetings and interaction at multiple levels
9  from our leader, at the highest, our AEMO's
10 leader, to the deputy to director level, my
11 level to branch chief to contracting officer's
12 representative, probably representing at the
13 lowest level, where we will discuss any
14 particular topic related to, you know, in this
15 case, we are talking about national media plan,
16 or we may discuss elements of the strategic
17 plan, what we like, what we don't like, what
18 our thoughts are.
19     We will have discussions on an
20 approval brief. All of those discussions are
21 professional in nature in order to best get the
22 sense of what the army wants and/or what the

Page 47

1  agency is presenting, but when any decision is
2  made by army leadership, it is always the
3  responsibility and requirement that the
4  contracting officer's representative capture
5  and then deliver that message officially, so
6  while we may talk in a meeting like this across
7  the room, ultimately, and has always been the
8  case as long as I have been in any discussion,
9  whichever senior leader, it could be more
10 senior than me perhaps me, will always say,
11 hey, but you will get that direction from the
12 COR after the conclusion of this, and the COR
13 generally compiles the notes, make sure they
14 got the leadership's intent right, and then
15 they are responsible to deliver the actual --
16 this is the direction from the army to you.
17     BY MS. GOODMAN:
18     Q. And that answer you just provided,
19 it applies to the other deliverables we talked
20 about, correct?
21     MS. CLEMONS: Objection to form.
22     THE WITNESS: That's correct.

Page 48

1  BY MS. GOODMAN:
2      Q. Okay. I am handing you what I am
3  marking as Exhibit 99. It was previously
4  marked in a deposition as 99 so that's why it
5  has this number.
6      And my question to you, Colonel
7  Horning, is whether you recognize this as the
8  base IDIQ contract between the army and DDB.
9      A. Yes, in the pages I am looking at so
10 far, I recognize it as our base IDIQ.
11     Q. And IDIQ stands for indefinite
12 delivery, indefinite quantity, correct?
13     A. That is correct.
14     Q. And is it accurate that the army
15 uses IDIQ contracts because it cannot determine
16 above a specified minimum, the precise
17 quantities of supplies or services that the
18 army will require during the contract period?
19     MS. CLEMONS: Objection to form.
20     THE WITNESS: That sounds correct.
21 I'm not sure what you are reading from, if that
22 was from an official government publication,

Page 49

1  but as I understand the IDIQ, it is a contract
2  vehicle option that the government has, in this
3  case, that the army has, in order to pursue
4  goods and service where we may not know the
5  exact quantity or the exact due date or the
6  exact delivery circumstance because, for
7  example, in our case, we are operating in the
8  market and there are things that may happen
9  where we would want to either take advantage of
10 or may change something that we had intended to
11 deliver and we stopped, and so an indefinite
12 delivery, indefinite quantity provides a
13 measure of flexibility to say we want this good
14 or service, but we may need to tell you later
15 how much and when to actually deliver them, and
16 that's just a different sort of vehicle which
17 does allow for some flexibility that may not be
18 appropriate in all other contracting scenarios,
19 but in one like ours, where we are bidding in
20 -- or we are working in an open market, you
21 know, outside of just acquiring tanks.
22     We are acquiring ads which lots of

13 (Pages 46 - 49)

Page 86

1  not the deciding authority on how we might
2  resolve an error.
3      BY MS. GOODMAN:
4      Q.   And when you say that's your
5  mistake, you eat the cost, that's something
6  that the army could tell one of its contractors
7  when it spends outside of what it is authorized
8  to spend; is that correct?
9      MS. CLEMONS:  Objection to form.
10     THE WITNESS:  Ultimately the
11 contractor is responsible for the terms of the
12 performance work statement.  And the
13 contracting officer's representative, in
14 surveilling and overseeing the delivery of the
15 elements of the performance work statement,
16 could make a determination that something was
17 or was not met or was or was not delivered
18 appropriately or accordingly.
19     Ultimately it would be the KO's
20 determination, but I believe it to be accurate
21 to say that in instances in which a delivery or
22 a deliverable or the manner in which something

Page 87

1  was done, if it did not meet the army's
2  requirements per the PWS, that the army, the
3  government could refuse payment for something
4  that didn't meet -- didn't meet standards.
5      BY MS. GOODMAN:
6      Q.   And when the army -- in such a
7  circumstance that the army refuses payment, is
8  it the contractor's responsibility to still pay
9  the cost to the vendor?
10     MS. CLEMONS:  Objection.  Form.
11 Foundation.
12     THE WITNESS:  It's my
13 understanding -- although I think that probably
14 gets into some other contract piece that I may
15 not be expert, but in my understanding, yes.
16     Ultimately DDB made a commitment
17 here to their subcontractor who made a
18 commitment to a vendor and funds were already
19 committed, spent.  I'm not sure that they use
20 the same sort of budget terms that we use.  And
21 that in this case, DDB itself could be told
22 that they will have to absorb that cost out of

Page 88

1  their own operating budget, expenses, profits.
2      BY MS. GOODMAN:
3      Q.   Does the army have a contract with
4  Google relative to digital advertising?
5      MS. CLEMONS:  Objection to form.
6  Foundation.
7      THE WITNESS:  I'm not aware of a
8  contract between the army and Google.  I
9  understand Google is one of the media vendors
10 that the army purchases inventory from with the
11 facilitation of our media buying agency.
12     BY MS. GOODMAN:
13     Q.   And the facilitation of your media
14 buying agency, that includes DDB and its
15 subcontractor OMD; is that correct?
16     MS. CLEMONS:  Objection to form.
17     THE WITNESS:  The army has a
18 contract with DDB.  OMD, an affiliate who is a
19 subcontractor to DDB does the labor associated
20 with the purchase and using whatever it is,
21 their media buying service, back to our earlier
22 discussion about why they, you know, were

Page 89

1  awarded the contract by their abilities and
2  capabilities system they have to purchase the
3  media, to physically conduct the transactions
4  and then also to load and traffic and send the
5  creative assets to the vendors who are giving
6  us the space or whoever, the display area,
7  wherever, TV, radio, anything, Internet as
8  well, the same.
9      And then ultimately though, the
10 costs for all of those things are still sent
11 back to the army so when we talk about the
12 invoice review, the media COR gets the invoice
13 from Google or whichever vendor and then
14 ultimately has to match that back up to the
15 media plan and pays that.
16     BY MS. GOODMAN:
17     Q.   And in the course of your review of
18 invoices in order to prepare for the deposition
19 today, you saw that invoices are issued from a
20 vendor to OMD, correct?
21     MS. CLEMONS:  Objection to form.
22 Foundation.

23 (Pages 86 - 89)

Page 90

1  THE WITNESS: So actually, as I
2  recall, looking at several invoices, the
3  invoice still had army as its To. It was
4  provided physically or e-mailed physically
5  first to OMD, who would collect all of the
6  various invoices, bundle them, provide them to
7  DDB who reviews, who then would be the
8  responsible party for entering that bundled --
9  and it could be by a couple weeks, a month,
10 whatever the time period may be. Provides that
11 bundled set of invoices after their review and
12 certification that these do represent to the
13 best of their knowledge, true and accurate,
14 into the wide area work flow system whereby
15 then the COR can see them and then review them
16 against the army's approved media plan.
17     BY MS. GOODMAN:
18  Q. And so in -- basically, there are a
19 few steps, vendor issues invoice to OMD, OMD
20 bundled invoices to DDB and then DDB issues
21 invoices to the army, correct?
22     MS. CLEMONS: Objection to form.

Page 91

1  THE WITNESS: So for cost CLIN items
2  or in other direct expense, where it is not a
3  labor cost and it's not other type of contract
4  line item, for a cost CLIN like this. Yeah,
5  the vendor issues the invoice, although issues
6  to -- it is still to army, but provides the
7  physical invoice for routing first through OMD
8  and media.
9       First through OMD. OMD as the
10 affiliate subcontractor then bundles and sends
11 to DDB and then DDB personnel are responsible
12 for loading them into the wide area work flow.
13     BY MS. GOODMAN:
14  Q. Okay. Does the army play any direct
15 role in negotiating the purchase of any digital
16 media?
17     MS. CLEMONS: Objection to form.
18     THE WITNESS: The army plays a role
19 in that we are the decision authority of what
20 gets placed when and where and the amount in
21 which we are spending on it. How much we are
22 dedicating to, and then of course, in the

Page 92

1  context of an approved plan, the discussion is
2  and then there is an expectation of what we are
3  getting for it as well.
4       We don't approve a plan just based
5  on dividing up the money. It's also with what
6  do we believe we are getting for each of those
7  divisions of money on the various products or
8  the various inventories, creative deliveries
9  that, you know, we may be purchasing in the
10 media plan.
11     BY MS. GOODMAN:
12  Q. Does the army negotiate the price of
13 digital media with any vendor?
14     MS. CLEMONS: Objection to form.
15 Foundation.
16     THE WITNESS: It depends. There are
17 negotiations that occur in the context of
18 building out the plan, specifically when we are
19 talking -- we're at the level of the tactical
20 plan. And there are -- there is more than one
21 vendor out there and as we are developing a
22 tactical plan, we may receive proposals from

Page 93

1  vendors and in that proposal, hey, this is what
2  we can do, here's an example of how we will,
3  you know, support you, what we can provide, we
4  may or may not like all of the items or they
5  may be fantastic but maybe it's too much or
6  maybe it's not interesting to us.
7       So there is some negotiation from
8  the vendor and us as a team between the army,
9  the DDB mission task lead and the media for
10 this case and the OMD team to review what is
11 proposed by a vendor and maybe counter-propose
12 or accept or deny altogether until ultimately
13 we get to something that we are all comfortable
14 that this represents something we are
15 interested in and we believe it's at a fair
16 price for what is being offered, and then we
17 will move towards the actual sort of -- we'll
18 book that or we'll approve those items as a
19 part of the plan.
20     BY MS. GOODMAN:
21  Q. Did the army purchase any display
22 advertising directly from Google?

Page 102

1  Morris?
2      A.  I think as I said earlier in my
3  testimony, I believed it to be early in
4  calendar year '22, whether it was 10 March or
5  not, or whether we had made the decision and
6  these were older slides or we were in the
7  process of making that change right then, it
8  could be.
9      Q.  And if you look at your e-mail on
10 the first page, 70535, five bullets -- five
11 slashes down where you write: "Lennox and
12 Nicole."
13         Do you see where I am?
14     A.  Yes.
15     Q.  You write: "Lennox and Nicole,
16 additionally, I need some feedback from you
17 two, since you initially offered, on what you
18 see as additional workload requirements
19 associated with taking on COR duties."
20        So does this refresh your
21 recollection that as of the date of this
22 e-mail, March 1, Colonel Morris was not the

Page 103

1  COR?
2      A.  Yes. I guess that would be accurate
3  then. We were making that decision at the time
4  of these e-mails.
5      Q.  Okay. And then just my last
6  question to you, sir, your last slash here,
7  sitting here today, do you still believe that
8  it's important for your team to keep their work
9  within the 9 to 5 hours as much as possible?
10         MS. CLEMONS: Objection to form.
11 Foundation.
12         THE WITNESS: So as much as
13 possible, yes. Frankly, that's not always --
14 that's not always possible and soldiers are in
15 the army 24/7. However, we are also cognizant
16 of wanting people to be able to have their time
17 at home, be their time away from work,
18 considering, you know, much of this is borne
19 out of -- most all of us have been to war and
20 have been away for a year at a time, and so
21 we're much more attuned to when we're home,
22 have some time to be home too.

Page 104

1         MS. GOODMAN: Thank you, sir, I have
2  no further questions.
3         MS. CLEMONS: We can go off the
4  record.
5         THE VIDEOGRAPHER: The time is
6  p.m. We are off the record.
7         (A short recess was taken.)
8         THE VIDEOGRAPHER: The time is
9  p.m. We are on the record.
10    EXAMINATION BY COUNSEL FOR PLAINTIFF
11        BY MS. CLEMONS:
12     Q.  Colonel Horning, I just have a few
13 questions for you.
14        When OMD is executing purchases of
15 digital display advertising on army's behalf,
16 can they use any vendor that they decide they
17 would like to use for those purchase
18 executions?
19        MS. GOODMAN: Object to form.
20        THE WITNESS: So when we are
21 developing the plan and we get to the stage
22 where it's the tactical, which would be the

Page 105

1  first time we would talk about vendors in
2  general, the earlier stages of the plan
3  development of strategy, don't mention any
4  vendors, but once we are into the tactical
5  development, OMD may recommend anyone and may
6  recommend as a part of the plan any vendor.
7         I think based on their experience
8  working with us, we have probably coalesced
9  around certain vendors in general, certain
10 things that they wouldn't recommend as being
11 incorrect for the audience or not brand safe or
12 whatever. We don't have any concerns about
13 brand safety with our current lineup, but they
14 can recommend anything within that.
15        However, ultimately, the ones that
16 we then choose are based on the army's approval
17 of the plan. Once the plan is approved, then
18 each of the various vendors, whether it be CBS
19 or whether it be Google DV360, or whether it be
20 Condé Nast if we were going to put something in
21 magazines, once that's an approved part of the
22 plan which is a task order deliverable of the

27 (Pages 102 - 105)

Page 106

1  plan, then that has to be stuck to, unless, you
2  know, they may recommend -- maybe something
3  changes in the market and they recommend we
4  change something and then they'll bring that
5  back to the army for approval again, but they
6  can't change from what is the approved plan on
7  their own.
8      BY MS. CLEMONS:
9      Q.  And I believe you -- you testified
10 earlier regarding whether the army is able to
11 control or direct how -- the method by which
12 the contractor or subcontractor carries out the
13 contract requirement.
14     Do you recall that testimony?
15     A.  I do.
16     Q.  Were you -- strike that.
17     How does, what you just testified
18 to, with respect to whether OMD can -- can
19 decide on its own what vendors to use in
20 executing display advertising purchases, square
21 with your testimony about whether the army can
22 control the method under the contract.

Page 107

1      MS. GOODMAN:  Object to the form.
2      THE WITNESS:  So I think there is a
3  fundamental difference in those two pieces of
4  the contract that get to that point, and the
5  first part of the -- from the line of the base
6  IDIQ and the government not directing is
7  largely intended for the government not to tell
8  the contractor how to run their business
9  internally.
10     But the difference with respect to
11 the purchase of media is, these are also -- as
12 part of the task order, specific deliverables
13 that have to be approved by the army, so in
14 this case, the elements of the media plan and
15 the tactical plan and what is in it is already
16 laid out as a deliverable that must be approved
17 by the army as opposed to, you know, the thing
18 that I mentioned in the sense of how they run
19 their operation internally with number of
20 employees or -- or types of computer systems
21 they may use.  That is at their discretion, but
22 the deliverables are not at their discretion,

Page 108

1  because that's what they agreed to within --
2  having an agreed performance work statement in
3  the contract.
4      MS. CLEMONS:  Thank you, Colonel
5  Horning.  That is all I have.
6      MS. GOODMAN:  Okay.  Nothing
7  further.
8      THE VIDEOGRAPHER:  The time is 3:31
9  p.m.  We are off the record.
10     (Whereupon, the proceeding was
11 concluded at 3:31 p.m.)

Page 109

1      CERTIFICATE OF NOTARY PUBLIC
2      I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10 record of the testimony given by said witness;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this deposition was taken; and further,
14 that I am not a relative or employee of any
15 attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.

19     _____
20     Notary Public in and for
21     the District of Columbia
22 My Commission expires:  August 14, 2025

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2     I, COLONEL JOHN HORNING, do hereby certify
 3   that I have read the foregoing transcript of my
 4   testimony taken on 9/29/23, and further certify
 5   that it is a true and accurate record of my
 6   testimony (with the exception of the
 7   corrections listed below):
 8   Page   Line      Correction
 9   ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18          _____
            COLONEL JOHN HORNING
19
     SUBSCRIBED AND SWORN TO BEFORE ME
20   THIS ____ DAY OF _____, 2023.
21
     _____  _____
22   (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
     Job No. CS6105371
```

Page 111

```
 1   Katherine Clemons, Esq.
 2   Katherine.clemons@usdoj.gov
 3            October 2, 2023
 4   RE:   United States, Et Al v. Google, LLC
 5      9/29/2023, John  Horning , Army 30(b)(6) (#6105371)
 6      The above-referenced transcript is available for
 7   review.
 8      Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   erratas-cs@veritext.com
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19    If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25
```

29 (Pages 110 - 111)

HIGHLY CONFIDENTIAL

Page 110

1      ACKNOWLEDGMENT OF DEPONENT

2         I, COLONEL JOHN HORNING, do hereby certify

3      that I have read the foregoing transcript of my

4      testimony taken on 9/29/23, and further certify

5      that it is a true and accurate record of my

6      testimony (with the exception of the

7      corrections listed below):

8      Page      Line           Correction

9      ____      ____      _____

10     ____      ____      _____

11     ____      ____      _____

12     ____      ____      _____

13     ____      ____      _____

14     ____      ____      _____

15     ____      ____      _____

16     ____      ____      _____

17     ____      ____      _____

18                         HORNING.JOHN.PAUL.1127754272
                           Digitally signed by HORNING.JOHN.PAUL.1127754272
                           Date: 2023.11.03 15:31:39 -05'00'

                           COLONEL JOHN HORNING

19

       SUBSCRIBED AND SWORN TO BEFORE ME

20     THIS _____DAY OF _____, 2023.

21

       _____   _____

22     (NOTARY PUBLIC)        MY COMMISSION EXPIRES:

       Job No. CS6105371