# Plaintiffs' Exhibit 71

```
                                                                Page 1

 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                   ALEXANDRIA DIVISION
 3
       _____
 4                                  :
       UNITED STATES OF AMERICA,    :
 5     et al.,                      :
                                    :
 6          Plaintiffs              :
                                    :
 7         v.                       :  No.  1:23-cv-00108
                                    :
 8     GOOGLE, LLC,                 :
                                    :
 9          Defendants.             :
       _____:
10
11              Tuesday, August 15, 2023
12
                Video Deposition of ALLEN OWENS,
13
       taken at the Law Offices of Paul, Weiss, Rifkind,
14
       Wharton & Garrison LLP, 2001 K St NW, Washington,
15
       DC, beginning at 9:37 a.m. Eastern Standard Time,
16
       before Ryan K. Black, Registered Professional
17
       Reporter, Certified Livenote Reporter and Notary
18
       Public in and for the District of Columbia
19
20
21
22
23
24
25     Job No. CS6037511
```

Page 58

1  -- admirals to whom you've reported while you've
2  been the director of marketing?
3     A.  Yes.
4     Q.  Who are those admirals?
5     A.  Admiral Velez.  Yeah.
6     Q.  Beyond the Admirable -- Admiral --
7  strike that.
8        Is the Admiral -- does the Admiral sit
9  at the top of the Navy Recruiting Command?
10    A.  Yes.
11    Q.  Okay.  Who is the Admiral's boss?
12    A.  That would be referred to as NETC,
13 N-E-T-C, which is the commander Naval Education
14 and Training Command.
15    Q.  I've read some documents that you've
16 produced entitled -- meaning the Navy has
17 produced -- entitled the Commander's Report.
18 Who's the commander referred to in those
19 documents?
20       MR. MCBIRNEY:  Objection; foundation.
21       THE WITNESS:  Yeah.  I -- I would need
22 to see the documents just to make sure that I'm
23 -- that I give you an accurate answer.
24 BY MS. GOODMAN:
25    Q.  Okay.  What are your job

Page 59

1  responsibilities as the director of marketing for
2  the Navy Recruiting Command?
3     A.  Sure.  My overall responsibilities as
4  director of marketing is to set the strategy for
5  our marketing and to ensure that -- that the
6  marketing is effective at producing leads and
7  increasing Navy awareness.
8     Q.  When you say "producing leads," what do
9  you mean?
10    A.  Producing actionable lists of people
11 with their contact information who are both
12 qualified and interested to join the Navy.
13    Q.  What responsibilities, if any, do you
14 have as director of marketing with respect to
15 purchasing media?
16    A.  Sure.  So setting the strategy and
17 approving the tactics employed to purchase media.
18    Q.  When you say "tactics employed," what do
19 you mean?
20    A.  I mean to approve recommended media
21 plans for execution.
22    Q.  Are you the COR on the VMLYR [sic]
23 contract in your role as director of marketing?
24    A.  Yes.
25    Q.  Okay.  So is it accurate that the entire

Page 60

1  time you have been the deputy director or the
2  director that you served as the COR on the VMLYR
3  [sic] contract?
4        MR. MCBIRNEY:  Object to form.
5        THE WITNESS:  Yes.
6  BY MS. GOODMAN:
7     Q.  Okay.  Prior to March of 2020, who was
8  the COR, to you -- if you know, on the VMLYR
9  [sic] contract?
10    A.  Prior to 2020, it would have been the
11 outgoing deputy, Mr. John Byrd.
12    Q.  And did Mr. Byrd leave Navy Recruiting
13 Command in March of 2020?
14    A.  No.
15    Q.  Where did he go?
16    A.  He -- he retired.
17    Q.  So did he leave the Navy Recruiting
18 Command in March of 2020 when he retired?
19    A.  I don't believe so.  I believe it was
20 earlier than that.
21    Q.  I see.
22       Do you use your personal email for work
23 purposes?
24    A.  No.
25    Q.  Have you ever used your personal email

Page 61

1  for work purposes?
2     A.  The only time I can recollect using
3  any personal email was if there are videos that
4  wouldn't play on the NMCI, so, for review, I may
5  have sent them to my personal email so that I
6  could view them because of connectivity issues.
7     Q.  What is the "NMCI"?
8     A.  I'm sorry, the Navy Marine Corps
9  Internet system.
10    Q.  Is that, like, a special intranet within
11 the Navy?
12    A.  Yes.
13    Q.  Okay.  And is that the only internet
14 system that you can use at -- in your job at the
15 Navy?
16    A.  Yes.
17    Q.  And using your personal email so that
18 you could view videos because of connectivity
19 issues, do you have any other recollection of
20 using your personal email for work purposes?
21    A.  Not that I recall.
22    Q.  Okay.
23       MR. MCBIRNEY:  Martha, if we're going to
24 start going into documents, is now a good time
25 for a break?

Page 114

1  those items, correct?
2       MR. MCBIRNEY: Same objections.
3       THE WITNESS: It provides a -- a
4  breakdown of the cost for each of those under
5  Branded Display, Paid Social and CPL Job Sites as
6  well as Paid Search Keywords.
7  BY MS. GOODMAN:
8     Q. That's an estimate, correct?
9       MR. MCBIRNEY: Same objections.
10      THE WITNESS: I would say it would be
11 fair to characterize it as a -- as an estimate.
12 BY MS. GOODMAN:
13    Q. Okay. And that's because your agency,
14 Young & Rubicam as reflected in the second bullet
15 under Item 3, is to negotiate and purchase
16 digital media and, thus, you can't set the price
17 at this time, correct?
18      MR. MCBIRNEY: Same objections.
19      THE WITNESS: Yeah. So it's my
20 understanding that the specific price can't be
21 set from the ad co, which is why it does say
22 negotiate.
23 BY MS. GOODMAN:
24    Q. Are you aware of any task order entered
25 into under the contract with -- I'll call it the

Page 115

1  master contract that we've talked about at the
2  last session, are you aware of any task order
3  issued under that contract that sets a price for
4  specific digital media buy purchases?
5     A. Can you please be more specific so I
6  -- I can give you a precise answer?
7     Q. I just want to know, sitting here today,
8  your best recollection of whether you are aware
9  of any task order that sets a price for digital
10 media purchases?
11    A. Sitting here today, to my best
12 recollection, I'm not aware of that.
13    Q. Okay. Okay. What is the Naval Supply
14 Systems Command?
15    A. Naval Supply Systems Command, NAVSUP, is
16 the -- otherwise known as NAVSUP, is the command
17 that oversees our fleet logistics center, the
18 ones who do the contracting.
19    Q. And so under what circumstances does the
20 Naval Supply Systems Command issue task orders
21 under the Young & Rubicam master contract?
22      MR. MCBIRNEY: Objection; foundation.
23      THE WITNESS: So the Fleet Logistics
24 Center would issue -- issues this contract.
25 And it's my understanding they also issue the

Page 116

1  contracts or any task orders -- I believe it's
2  over a dollar threshold of 5 million -- but I'm
3  -- I'm -- it's a dollar threshold. Sitting here
4  today I can't recollect exactly if it's 5
5  million, but I think that's the threshold.
6  BY MS. GOODMAN:
7     Q. And so regardless of what the threshold
8  is, understanding you're not current in your
9  recollection of what it is, if it's under that
10 threshold, is it therefore issued by the Navy
11 Recruiting Command?
12    A. Yes.
13      MR. MCBIRNEY: Objection; foundation.
14 BY MS. GOODMAN:
15    Q. To your knowledge, why is it the
16 case that a certain dollar threshold causes a
17 different organization within the DoD to issue
18 the task order?
19      MR. MCBIRNEY: Objection. Calls for
20 speculation.
21      THE WITNESS: Yeah. I -- I don't know.
22 BY MS. GOODMAN:
23    Q. Okay. So after a task order is issued
24 relative to placing media buys, what does VMLY&R
25 do in order to perform under that task order?

Page 117

1     A. So once a task order has been issued,
2  VMLY&R will produce a recommended plan which
3  includes specific tactics to accomplish the
4  strategy that is being employed with that plan.
5     Q. And when you say, "specific tactics,"
6  can you give some examples of what you're
7  referring to?
8     A. Sure. They may recommend that we spend
9  a certain dollar amount with Hulu or YouTube TV,
10 or you name the business.
11    Q. And then what do you do after receiving
12 a recommended plan that VMLY&R produces under a
13 task order?
14    A. So I review the recommended plan, look
15 at the estimated costs and estimated impressions
16 that they will give to get an idea of the CPMs,
17 and then make a determination to either approve
18 the plan or have them make edits.
19    Q. Okay. What kind of edits do you
20 routinely ask VMLY&R to make?
21      MR. MCBIRNEY: Object to the form of the
22 question.
23      THE WITNESS: I wouldn't say there
24 are -- there's any specific type of edit that is
25 routine, but edits could be anything from not

Page 118

1  placing ads with using -- utilizing a specific
2  partner or considering alternate -- alternate
3  spends.  But there's nothing -- there's nothing
4  routine or specific.
5  BY MS. GOODMAN:
6     Q.  Okay.  Is it often the case that you
7  approve their recommended plan without edit?
8        MR. MCBIRNEY:  Objection; vague.
9        THE WITNESS:  Yeah.  I can't recall
10 the -- the number of edits that I would issue to
11 them.
12 BY MS. GOODMAN:
13    Q.  Do you -- have you ever approved a
14 recommended plan without making an edit?
15    A.  Sitting here today, I -- I don't recall.
16    Q.  One way or another?
17    A.  Right.
18    Q.  How does VMLY&R go about purchasing ads?
19       MR. MCBIRNEY:  Objection; foundation.
20 And vague.
21       THE WITNESS:  Yeah.  So we have the
22 contract with VMLY&R.  And we set the strategy
23 and have them come to us with those recommended
24 tactics.  But we don't tell them how to go and
25 purchase it, so ...

Page 119

1  BY MS. GOODMAN:
2     Q.  So sitting here today, do you know how
3  VMLY&R goes about purchasing ads?
4        MR. MCBIRNEY:  Objection; vague.
5        THE WITNESS:  Sitting here today, I
6  don't know their exact process of purchasing the
7  ads on our behalf.
8  BY MS. GOODMAN:
9     Q.  Okay.  How about at a more general
10 level?  Rather than their exact process, do you
11 know generally how they go about purchasing ads?
12    A.  Sitting here today, it's my testimony
13 that I am not aware of their process to go and
14 purchase the ads.
15    Q.  Okay.  What does Wavemaker do?
16    A.  It's my understanding that Wavemaker is
17 the arm of VMLY&R which purchases the ads.
18    Q.  Okay.  So do you have an understanding
19 with respect to Wavemaker and VMLY&R with respect
20 to purchasing of ads?
21       MR. MCBIRNEY:  Object to the form of the
22 question.
23       THE WITNESS:  So our contract is with
24 VMLY&R, and I'm not privy to their exact business
25 relationships with -- with their companies.

Page 120

1  BY MS. GOODMAN:
2     Q.  Okay.  So you don't know anything about
3  any contractual relationships between VMLY&R and
4  Wavemaker.  Is that accurate?
5     A.  I don't know the exact legal business
6  relationship between the two.
7     Q.  Do you have any understanding about the
8  contractual relationship between the two?
9        MR. MCBIRNEY:  Objection.  Assumes
10 facts.
11       THE WITNESS:  Yeah.  As stated, I do
12 not know the specific legal business definition
13 or arrangement between the two.
14 BY MS. GOODMAN:
15    Q.  Okay.  Do you have any understanding
16 about any relationship between VMLY&R and
17 Wavemaker with respect to digital ad purchases
18 on behalf of the Navy?
19    A.  Yeah.  Sitting here today, I -- I don't
20 know that -- that specific legal business
21 arrangement.
22    Q.  Okay.  Do you know if any contract
23 exists between VMLY&R and Wavemaker?
24    A.  Sitting here today, I don't have the
25 specific business contractual relationship

Page 121

1  between the two.
2     Q.  So you don't know if any contract
3  exists; is that correct?
4        MR. MCBIRNEY:  Objection.  Asked and
5  answered.
6        THE WITNESS:  Sitting here today, I am
7  unaware of the specific, exact legal business
8  arrangement between those two entities.
9  BY MS. GOODMAN:
10    Q.  Okay.  I understand you don't know
11 the exact legal business arrangement between
12 Wavemaker and VMLY&R.
13    A.  Mm-hmm.
14    Q.  I want to know whether you have any
15 knowledge or awareness of any contract between
16 the two?
17       MR. MCBIRNEY:  Objection.  Asked and
18 answered.
19       THE WITNESS:  I'm aware of our contract
20 with VMLY&R, and I'm unaware of the specific
21 arrangement between them and Wavemaker.
22 BY MS. GOODMAN:
23    Q.  Have you ever seen a contract between
24 VMLY&R and Wavemaker?
25       MR. MCBIRNEY:  Objection.  Asked and

Page 142

1   THE WITNESS:  To the best of my
2  knowledge, the only programmatic partner that the
3  Navy purchases marketing and advertising through
4  via our contract with VMLY&R is the Trade Desk.
5  BY MS. GOODMAN:
6   Q.  Okay.  So, to be clear, has VMYL&R, to
7  your knowledge, ever used Google's product DV360
8  to facilitate the placement of programmatic
9  display ads on behalf of the Navy?
10   MR. MCBIRNEY:  Objection; foundation.
11   THE WITNESS:  So I recall that
12  Google term, the SV or DV360; however, it's my
13  understanding that the only programmatic buying
14  that has been done on our behalf -- on the Navy's
15  behalf is with the Trade Desk.
16  BY MS. GOODMAN:
17   Q.  Okay.  And when you say "programmatic
18  buying," I want to drill down a little bit more
19  specifically to programmatic display advertising.
20  So not programmatic connected TV, not
21  programmatic online video, but programmatic
22  display ads, okay?  And so is the Trade Desk the
23  only provider that has been used by VMLY&R to
24  purchase programmatic display ads on behalf of
25  the Navy?

Page 143

1   MR. MCBIRNEY:  Objection.  Object to the
2  form.
3   THE WITNESS:  To the best of my
4  knowledge, the only programmatic buying that has
5  been done on behalf of the Navy has been with
6  -- I'm drawing a blank now on the -- the Trade
7  Desk.  Sorry.
8  BY MS. GOODMAN:
9   Q.  And within your answer, are you
10  including programmatic display advertising
11  buying?
12   A.  I am stating programmatic buying
13  overall.
14   Q.  Okay.  So are you aware of any provider,
15  other than the Trade Desk, that has been used by
16  VMLY&R to purchase programmatic display ads on
17  behalf of the Navy?
18   MR. MCBIRNEY:  Object to the form.
19   THE WITNESS:  My understanding is that
20  any programmatic buying that has been done on
21  behalf of the Navy has been with the Trade Desk.
22  BY MS. GOODMAN:
23   Q.  And only in the Trade Desk, to your
24  knowledge, correct?
25   A.  My understanding is that the Trade Desk

Page 144

1  is the only programmatic buyer that the Navy has
2  utilized for programmatic marketing and
3  advertising.
4   Q.  Okay.
5   A.  That's my understanding.
6   Q.  Are you aware of any Google products
7  or services that VMLY&R could use to place
8  programmatic ads on the internet on behalf of the
9  Navy?
10   A.  Can you repeat the question?
11   Q.  Are you aware of any Google product
12  or service that could be used by VMLY&R to
13  purchase digital media on behalf of the Navy
14  -- programmatic digital media on behalf of the
15  Navy?
16   A.  The Navy utilizes VMLY&R to execute
17  purchases on our behalf, but we do not direct
18  them how to do so.
19   Q.  And so you don't direct them any
20  particular vendor to use.  Is that accurate?
21   MR. MCBIRNEY:  Object to form.
22   THE WITNESS:  We -- the Navy does not
23  direct VMLY&R to use any particular ad-buying
24  method.  We review their recommended plan and
25  then approve it, or -- or suggest edits, for

Page 145

1  purchasing our -- our media on our behalf.
2  BY MS. GOODMAN:
3   Q.  So in the course of your work as the
4  director of marketing for the Navy Recruiting
5  Command, are you aware of any Google product or
6  service that VMLY&R could use in order to place
7  programmatic display ads on behalf of the Navy?
8   MR. MCBIRNEY:  Object.  Asked and
9  answered, and same to form.
10   THE WITNESS:  Not that I can recall.
11  BY MS. GOODMAN:
12   Q.  Okay.  So do you know what DV360 is?
13   A.  Sitting here today, I do not.
14   Q.  Okay.  Have you ever come across the
15  term DV360 in the course of your work as the
16  COR supervising the VMLY&R contract?
17   A.  As stated earlier, that phrase -- I
18  recollect that phrase, but I don't recollect in
19  what context.
20   Q.  And have you had any conversations with
21  anybody at VMLY&R about whether to use DV360?
22   MR. MCBIRNEY:  Object to form, and asked
23  and answered.
24   THE WITNESS:  Not to my recollection.
25   MS. GOODMAN:  Mm-hmm.

Page 146

1  Can I have this one, please?
2  (Exhibit No. 57, a document Bates
3  Numbered NAVY-ADS19114 through NAVY-ADS19182, was
4  introduced.)
5  BY MS. GOODMAN:
6  Q.  I'm handing you Exhibit 57,
7  NAVY-ADS19114 through 19182.
8  And this is, again, a somewhat lengthy
9  deck, so we'll start at the cover page, which is
10 an email from Petergarlinghouse@wmglobal.com to
11 yourself and others on May 24th, 2021, correct?
12 A.  That what this would appear to be
13 Q.  Okay.  And it's attaching a Navy
14 Tactical Reco June-July Final presented 5-21 --
15 5-24-21, correct?
16 A.  That's what this email seems to
17 indicate, yes.
18 Q.  Okay.  Who's Peter Garlinghouse?
19 A.  Peter Garlinghouse works for Wavemaker.
20 I believe he works under the direction of Sandra
21 Mouio.
22 Q.  Under the direction of who?  I'm sorry.
23 I didn't catch that.
24 A.  Sandra Mouio.
25 Q.  Mouio.  Okay.

Page 147

1  And what is a tact -- what is a tactical
2  reco document, like the kind attached here?
3  What's its purpose?
4  A.  Sure.  So as mentioned earlier, the
5  Navy issues a task order, and in concert with the
6  overall strategy that's to be employed for that
7  year, the tactical reco is a response to that
8  where they propose what buys to execute for that
9  task order for Navy's approval.
10 Q.  Okay.  And so this -- are there multiple
11 tactical reco's issued with respect to a single
12 task order?
13 A.  Typically, there would only be one, but
14 there could be an instance where there might be
15 more than one, depending on what the spend was
16 and what the recommendations were.
17 Q.  Okay.  And so earlier we were talking
18 about how you review the recommendations and
19 maybe make edits to it or otherwise improve it.
20 Do you recall that testimony?
21 A.  Yes.
22 Q.  Okay.  And so is this the kind of
23 document and recommendation that you would review
24 and provide input on consistent with what we
25 test -- talked about earlier?

Page 148

1  A.  Let me just take a quick look at the
2  document --
3  Q.  Sure.
4  A.  -- just to make sure.
5  (Witness reviews document.)
6  Okay.  Yes, this is the type of document
7  that I was referencing earlier.
8  Q.  Meaning a recommendation that you would
9  review and approve or review and propose edits,
10 correct?
11 A.  Yes.  That's correct.
12 Q.  Okay.  So let's turn to Page 122, ending
13 in 122.
14 A.  You're testing out my eyes today.
15 Q.  Yeah.  It's hard to see on this one.
16 It's Page 8 of the deck.
17 A.  Okay.
18 Q.  Under Display Video, are these the
19 entities used by VMLY&R at this time with respect
20 to display and video ads?
21 MR. MCBIRNEY:  Objection; vague.
22 THE WITNESS:  Let me review that
23 section.
24 (Reviews document.)
25 It would appear on 9122 that those logos

Page 149

1  at the bottom are a summary of the display video
2  listed out in the rest of the document.
3  BY MS. GOODMAN:
4  Q.  Okay.  And under the -- on Page 19122
5  under Display Video, where the logos are listed,
6  the only one to your knowledge that is a Google
7  product or service is YouTube.  Is that accurate?
8  A.  Of all the logos shown at the left-hand
9  side of Page 9122, YouTube is the only one, to my
10 knowledge, that is a Google product.
11 Q.  Okay.  And let's go to Page 19129.
12 Under Partner Overview, can you read the first
13 sentence?
14 A.  Just read it verbatim to you?
15 Q.  Yes, please.
16 A.  On Page 9129 the first sentence under
17 Partner Overview states, "The Trade Desk is our
18 preferred programmatic partner, with dynamic
19 targeting capabilities and massive reach."
20 Q.  To your knowledge, is that an accurate
21 statement?
22 A.  Sitting here today, I have no reason to
23 believe that is that it's not.
24 Q.  Okay.  From your point of view, was the
25 Trade Desk the Navy's preferred programmatic

38 (Pages 146 - 149)

Page 186

1  MR. MCBIRNEY: Object to the form.
2  THE WITNESS: You're asking me a
3  question, though, that would have been outside
4  of my wheelhouse or purview during that time.
5  So the only one I can say with any certainty
6  would have been based on the email that you're
7  showing me here that in 2017 the Trade Desk was
8  at least being used.
9  BY MS. GOODMAN:
10  Q. Okay. Setting aside from this document,
11  just back to the Trade Desk generally, do you
12  know what ad exchanges, if any, they used to
13  place programmatic advertising on behalf of the
14  Navy?
15  MR. MCBIRNEY: Object to form.
16  THE WITNESS: So we contract with VMLY&R
17  to do those buys on our behalf, so I don't have
18  any specific knowledge of what tools they would
19  have used to do that.
20  BY MS. GOODMAN:
21  Q. And it's accurate that you don't know
22  what ad exchanges they used; is that correct?
23  A. Sitting here today, I don't know what ad
24  exchanges they would have used.
25  MS. GOODMAN: Can I have 14?

Page 187

1  (Exhibit No. 60, a document Bates
2  Numbered NAVY-ADS28530 through NAVY-ADS28531, was
3  introduced.)
4  BY MS. GOODMAN:
5  Q. I'm handing you Exhibit 60,
6  NAVY-ADS28530 through 28531.
7  This is a two-page email exchange on
8  which you are copied from December of 2022. Is
9  that accurate?
10  A. That is what this appears to be.
11  Q. Okay. The subject is "ADV ROI Project
12  Questions." What does that mean?
13  A. My understanding would be that this is
14  referencing Advertising Return on Investment
15  Project.
16  Q. Do you recall what Advertising Return on
17  Investment Project was being worked on in the
18  December 2022 time period?
19  A. Yeah. If you would give me a moment to
20  just review this and see if it refreshes.
21  (Reviews document.)
22  Okay. I'm sorry. Can you repeat the
23  question?
24  Q. What return on advertising -- Return on
25  Investment Advertising Project was being worked

Page 188

1  on in the December 2022 time period?
2  A. Sure. My recollection is the
3  Optimization Group Project referenced here was a
4  project where we had an outside company take our
5  data and then make projections on the amount of
6  funding that would be needed in market to have
7  the desired impact. It's, basically, an outside
8  analysis of our data.
9  Q. What outside company was used?
10  A. I believe their name was Optimization
11  Group.
12  Q. Did you ever work with anybody at
13  Optimization Group on that project?
14  A. Only in providing them the information
15  for them to conduct their analysis.
16  Q. So other than this email that we're
17  looking at, can you recall any other information
18  that you provided them to conduct their analysis?
19  A. I can't recall all the information that
20  was shared with them, but we shared with them our
21  data to provide the analysis.
22  Q. And when you say your data, what data
23  are you referring to?
24  A. It would have been data from the sources
25  indicated on this email, so things like the Data

Page 189

1  Czar Bible, analytics assessments. I don't have
2  a total encompassing list.
3  Q. Are you say "analytics assessments,"
4  what do you mean?
5  A. Those end-of-month reports.
6  Q. So other than the end-of-month reports
7  and the Data Czar Bible, can you think of any
8  other data you provided to the Optimization
9  Group?
10  A. Sitting here today, I cannot.
11  Q. Okay. Do you know who at the
12  Optimization Group conducted this project?
13  A. I don't recall the name sitting here
14  today.
15  Q. Okay. Who is Scott Milliet?
16  A. So Scott Milliet was operations officer
17  who took over, after I retired, as operations
18  officer.
19  Q. Does he report to you?
20  A. He did report to me prior to retiring.
21  He's retired.
22  Q. I see. When did he retire?
23  A. It's this summer. I don't remember the
24  exact date.
25  Q. At the bottom of -- on the back of the

Page 190

1  page it says, Mr. and -- in Mr. Milliet's email
2  he says, "this is not a Washington tasker."  Do
3  you see that?
4     A.  Yes.
5     Q.  What does that mean?
6     A.  So often we may get a very quick turn
7  request from Washington for data, et cetera,
8  necessitating a quick turn.  So I think this is
9  just indicating that that's not one of those.
10    Q.  Okay.  So then we see Ms. Fisch respond
11 to Mr. Milliet's email two days later -- and
12 please remind me what does Ms. Fisch do with
13 respect to the Navy and the VMLY&R contract?
14    A.  Sure.  As her signature line indicates,
15 she's group director for client engagement.  So
16 she engages with us on a near day-to-day basis
17 for any ongoing work.
18    Q.  Okay.  And so three questions down
19 she's answering the question, "How are recruiting
20 results actually tracked," dot dot dot.  Do you
21 see that?
22    A.  Yes.
23    Q.  Okay.  And she writes that, "Yet, due
24 to the nature of digital marketing channels,
25 optimizations and other advertising strategy

Page 191

1  adjustments are made in realtime and are
2  optimized based on key KPIs, such as cost per
3  lead, RFI form completions and Q&I lead trends."
4  What do you understand that to mean?
5      MR. MCBIRNEY:  Objection; foundation.
6      THE WITNESS:  Yeah.  I wouldn't feel
7  comfortable in characterizing her comments from
8  -- from last year.  I'm not sure exactly what she
9  was getting at with that statement.
10 BY MS. GOODMAN:
11    Q.  Have you ever heard -- strike that.
12      I'm not asking you to tell me what she
13 meant.  I'm asking you what do you understand
14 this sentence to mean?
15     MR. MCBIRNEY:  Same objection.
16     THE WITNESS:  Sure.  My understanding
17 would be that, due to the nature of digital
18 advertising, that changes could be made quickly
19 if we see something's not working.
20 BY MS. GOODMAN:
21    Q.  And is that understanding based on your
22 work as the director of marketing for the Navy
23 Recruiting Command?
24    A.  My understanding is, yeah, based on my
25 experience in this role, yes.

Page 192

1     Q.  Okay.  And can change -- based on
2  your experience in this role as the director of
3  marketing, can changes to advertising strategy be
4  made by shifting money from video display -- from
5  video ads on YouTube to display ads on the Trade
6  Desk, for example?
7      MR. MCBIRNEY:  Objection; foundation.
8  Calls for speculation.
9      THE WITNESS:  I would consider that a
10 change in tactics, not strategy.  But -- but my
11 understanding is that, yes, changes could be made
12 if we found that a channel was no longer
13 delivering.
14 BY MS. GOODMAN:
15    Q.  And the channels -- when you say
16 "channels," are you consider YouTube -- video ads
17 on YouTube and display ads via the Trade Desk to
18 be two different channels?
19    A.  I'm applying that statement to any
20 digital marketing and advertising data.
21    Q.  Okay.  And do you recall ever switching
22 money or moving money from one channel to another
23 based on realtime performance?
24    A.  Sitting here today, I don't recall that.
25    Q.  Mm-hmm.  And is that because you leave

Page 193

1  that optimization to VMLY&R to -- to perform?
2     A.  No.  It's based on the question you
3  asked me.
4     Q.  Okay.  Is it up to VMLY&R to make
5  any optimization adjustments as described in
6  Ms. Fisch's email here?
7       MR. MCBIRNEY:  Objection; vague.
8       THE WITNESS:  Again, I'm not certain
9  of the characterization of what she was talking
10 about here.  My -- I would assume she might have
11 been talking about programmatic.  But, again, I
12 can't -- I can't assign my thoughts of what she
13 was thinking at that time, so I can't answer that
14 question.
15 BY MS. GOODMAN:
16    Q.  Okay.  Setting aside what she's written
17 in this document, is it up to VMLY&R, as a
18 general matter as the ad agency for the Navy, to
19 direct any adjustments to campaign-spend across
20 digital media channels based on realtime
21 performance, or is that something that you do?
22     MR. MCBIRNEY:  Object to form.
23     THE WITNESS:  If VMLY&R were going to
24 make changes that deviated from the approved
25 plan, they would need to seek my approval.

49 (Pages 190 - 193)

Page 194

1  BY MS. GOODMAN:
2      Q.  Okay.  And what constitutes a change
3  that deviates from the approved plan?  Is it
4  -- in other words, is it okay for VMLY&R to take
5  $1 from YouTube and put it to the Trade Desk, if
6  that dollar was allocated differently in the
7  approved plan?
8      MR. MCBIRNEY:  Object to form.
9      THE WITNESS:  It's my testimony that if
10 they are to deviate from the approved flow in the
11 plan that they would need to seek my approval.
12 BY MS. GOODMAN:
13     Q.  Okay.  And have you ever not provided
14 such approval?
15     A.  Yes.
16     Q.  Under what circumstances?
17     A.  There was a recommendation to come off
18 of Twitter during some contentious times, and I
19 disapproved that recommendation.
20     Q.  Why did you disapprove of the
21 recommendation to come off of Twitter?
22     A.  I was concerned about brand safety and
23 that it would be potentially viewed as a protest,
24 political or otherwise.
25     Q.  Do you recall ever having discussions

Page 195

1  with VMLY&R about allocating money between video
2  via YouTube and the Trade Desk?
3      A.  I'm sorry.  Can you -- can you ask that
4  again?
5      Q.  Do you ever recall having any
6  discussions with VMLY&R about how to allocate
7  money between video via YouTube and programmatic
8  ads via the Trade Desk?
9      A.  Sitting here today, I don't recall any
10 such conversations.
11     Q.  Okay.  To your knowledge, how are
12 advertising strategy adjustments made in realtime
13 based on Key Performance Indicators?
14     A.  I don't have that level of detailed
15 knowledge.
16     Q.  Is it important for to you understand
17 how those strategy adjustments are made in
18 realtime as director of marketing for the Navy
19 Recruiting Command?
20     A.  As the director of Navy Recruiting
21 Command, it's more important that I understand
22 that those adjustments can be made, rather than
23 how they're made.
24     Q.  Okay.  Is it fair to say, then, sir,
25 that, as a general matter, you leave it up to

Page 196

1  your media agency, VMLY&R, to make such
2  adjustments?
3      MR. MCBIRNEY:  Objection.  Asked and
4  answered.
5      THE WITNESS:  It's my testimony that if
6  the agency is going to make deviations from the
7  approved plan that they should seek my approval.
8  BY MS. GOODMAN:
9      Q.  And what about if the realtime
10 adjustment they want to make does not deviate
11 from the approved plan, in such a circumstance
12 you leave it up to your media agency, VMLY&R, to
13 make such an adjustment that does not deviate
14 from the approved plan?
15     MR. MCBIRNEY:  Object to form.
16     THE WITNESS:  So can you give me an
17 example of -- I'm trying to wrap my head around
18 that question.  Can you give me an example of the
19 what-if scenario you're proposing?
20 BY MS. GOODMAN:
21     Q.  If VMLY&R recommends spending up to
22 $50,000 on YouTube and up to $50,000 on the Trade
23 Desk and they determine that instead they should
24 spend $30,000 on YouTube and take any of those
25 additional funds and spend them on the Trade Desk

Page 197

1  based on realtime campaign performance, are you
2  required to approve that?
3      MR. MCBIRNEY:  Objection.  Calls for
4  speculation.
5      MS. GOODMAN:  He asked for a
6  hypothetical, sir.
7      MR. MCBIRNEY:  He did ask for one.
8      THE WITNESS:  In the hypothetical you
9  just suggested, that would be a deviation from
10 the plan since the plan includes dollar amounts
11 to spend with each vendor.  So they would need to
12 seek my approval in that scenario.
13 BY MS. GOODMAN:
14     Q.  Can you think of any circumstance where
15 VMLY&R makes an adjustment in realtime based on
16 key KPIs that does not require your approval?
17     A.  Sitting here today, I can think of no
18 situation like that.
19     Q.  Okay.  So can they make an adjustment in
20 realtime on all the ad spend on the Trade Desk
21 between Online Video and Connected TV, for
22 example?
23     A.  If the approved plan has a breakdown
24 between those two, they would need to stay to
25 the approved plan.  And if they're going to

50 (Pages 194 - 197)

Page 278

1  Q. Other than yourself, was there
2  any person who is not a lawyer who provided
3  information that assisted in responding to the
4  interrogatories that you verified?
5      MR. MCBIRNEY: Objection to foundation.
6      THE WITNESS: Yeah. As I -- as I
7  testified earlier, I did have members of my
8  team assist me in providing my response to the
9  interrogatories.
10 BY MS. GOODMAN:
11  Q. Okay. Anybody outside of members of
12 your team assist in providing information to help
13 in res -- responding to the interrogatories?
14      MR. MCBIRNEY: Same objection.
15      THE WITNESS: Not that I recall.
16 BY MS. GOODMAN:
17  Q. Anybody at Wavemaker provide information
18 that assisted in responding to these
19 interrogatories?
20  A. Not that I recall.
21  Q. Same question as to VMLY&R.
22  A. Not that I recall.
23  Q. Did Mr. Edmondson provide any
24 information that was -- that assisted in
25 responding to the interrogatories that you

Page 279

1  verified?
2   A. I would consider him to be covered under
3  the question of VMLY&R, so not that I recall.
4   Q. Same question as to Sandra Mouio?
5   A. And same response. I would consider her
6  to be part of the Wavemaker entity, so not that I
7  recall.
8       MR. MCBIRNEY: Can I get a check on the
9  time?
10      THE VIDEOGRAPHER: 7:02.
11      MR. MCBIRNEY: I guess that's time.
12      MS. GOODMAN: Thank you for your time,
13 Mr. Owens.
14      THE VIDEOGRAPHER: Off the record,
15 Counsel?
16      MS. GOODMAN: Yes.
17      MR. MCBIRNEY: Off the record.
18      THE VIDEOGRAPHER: The time is 7:03 p.m.
19 We're off the record.
20      (Deposition concluded -- 7:02 p.m.)

Page 280

CERTIFICATE

I do hereby certify that I am a Notary Public in good standing, that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 17th day of

Notary Public

Page 281

1  Jimmy McBirney, Esq.
2  jimmy.mcbirney@usdoj.gov
3       August 17, 2023
4  RE:   United States, Et Al v. Google, LLC
5       8/15/2023, Allen Owens (#6037511)
6       The above-referenced transcript is available for
7  review.
8       Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions

```
1    United States, Et Al v. Google, LLC
2    Allen Owens (#6037511)
3                    E R R A T A   S H E E T
4    PAGE  51  LINE  8   CHANGE  "I WAS EMPLOYED AS A
5    CONTRACTOR FOR APPROXIMATELY SIX MONTHS IN ANALYTICS DEPARTMEN
6    REASON  OMISSION
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   [signature]                          15 SEP 2023
24   Allen Owens                          Date
25
```

```
                                                     Page 282

1    United States, Et Al v. Google, LLC

2    Allen Owens (#6037511)

3               E R R A T A   S H E E T

4    PAGE 107 LINE 9,10 CHANGE "our applied win" to

5    "are applied when"

6    REASON ERROR

7    PAGE 114 LINE 21 CHANGE "ad co" to "get go"

8    

9    REASON ERROR

10   PAGE 243 LINE 18 CHANGE "WAW" to "WAWF"

11   

12   REASON ERROR

13   PAGE____ LINE____ CHANGE_____

14   

15   REASON_____

16   PAGE____ LINE____ CHANGE_____

17   

18   REASON_____

19   PAGE____ LINE____ CHANGE_____

20   

21   REASON_____

22   

23   [signature]                    15 SEP 2023

24   Allen Owens                    Date

25
```

Page 283

```
1    United States, Et Al v. Google, LLC
2    Allen Owens (#6037511)
3                ACKNOWLEDGEMENT OF DEPONENT
4       I, Allen Owens, do hereby declare that I
5    have read the foregoing transcript, I have made any
6    corrections, additions, or changes I deemed necessary as
7    noted above to be appended hereto, and that the same is
8    a true, correct and complete transcript of the testimony
9    given by me.
10
11   _____         15 SEP 2023
12   Allen Owens                             Date
13   *If notary is required
14                   SUBSCRIBED AND SWORN TO BEFORE ME THIS
15           _____ DAY OF _____, 20___.
16
17
18                           _____
19                           NOTARY PUBLIC
20
21
22
23
24
25
```

Page 282
1  United States, Et Al v. Google, LLC
2  Allen Owens (#6037511)
3          E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Allen Owens                     Date
25

Page 283
1  United States, Et Al v. Google, LLC
2  Allen Owens (#6037511)
3          ACKNOWLEDGEMENT OF DEPONENT
4    I, Allen Owens, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Allen Owens                     Date
13 *If notary is required
14         SUBSCRIBED AND SWORN TO BEFORE ME THIS
15         _____ DAY OF _____, 20___.
16
17
18         _____
19         NOTARY PUBLIC
20
21
22
23
24
25