# Plaintiffs' Exhibit 73

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

UNITED STATES, et al.,      ) 1:23-cv-00108-LMB-JFA
                            )
    Plaintiffs,             )
                            )
vs.                         )
                            )
GOOGLE LLC,                 )
                            )
    Defendants.             )
_____)


VIDEOTAPED DEPOSITION OF

KENDALL OLIPHANT

August 9, 2023

9:32 a.m.



Reported by: Bonnie L. Russo
Job No. 6031956

Page 30

1  BY MS. GOODMAN:
2  Q.  And --
3  A.  -- that would relate to paid media.
4  Q.  So am I understanding your testimony
5  correctly that Deb made a comment to you that
6  sometimes it's not good -- it's good not to be
7  aware of things or be an expert in things and
8  that that related to paid media; is that right?
9  MS. ZWOLINSKI:  Objection.  Form.
10  Foundation.
11  THE WITNESS:  It was an
12  acknowledgement of the suit in that I was
13  involved, and that's it.  I am characterizing
14  based on a vague menu -- I mean memory, just
15  being honest.
16  BY MS. GOODMAN:
17  Q.  Do you recall when this comment was
18  made?
19  A.  I honestly don't.
20  Q.  And do you recall the context or the
21  conversation in which it came up?
22  MS. ZWOLINSKI:  Objection.  Form.

Page 31

1  THE WITNESS:  I honestly don't.  It
2  was appropriate, but I can't recall what else
3  was discussed.
4  BY MS. GOODMAN:
5  Q.  And did you understand her comment
6  to mean that it's good for you not to
7  necessarily be an expert in paid media or for
8  who not be an expert in paid media?
9  MS. ZWOLINSKI:  Objection.  Form.
10  THE WITNESS:  I would -- I can't
11  assume what she thought.  My interpretation was
12  that she was not, so that -- I don't know.  No
13  one wants to be here.
14  BY MS. GOODMAN:
15  Q.  Did you understand that in any way
16  as to your expertise in paid media or...?
17  MS. ZWOLINSKI:  Objection.  Form.
18  THE WITNESS:  Yes.
19  BY MS. GOODMAN:
20  Q.  And what did you understand her to
21  mean with respect to your expertise in paid
22  media?

Page 32

1  MS. ZWOLINSKI:  Objection.  Form.
2  THE WITNESS:  That I manage that
3  order.  I was the one that had the -- the most
4  knowledge of it.
5  BY MS. GOODMAN:
6  Q.  I see.  Based on what you can recall
7  sitting here today, is it correct or incorrect
8  to say that the side comment that we're
9  discussing came up in the context of a
10  conversation with respect to who from the
11  census bureau would be tasked with
12  participating in this lawsuit?
13  MS. ZWOLINSKI:  Objection.  Form.
14  THE WITNESS:  Can you repeat that,
15  please.
16  BY MS. GOODMAN:
17  Q.  Did the side comment that we're
18  discussing -- and I am using "side comment" as
19  a shorthand -- did that come up in the context
20  of a conversation about who from the census
21  bureau would participate in this lawsuit?
22  A.  I don't believe so.  That's not -- I

Page 33

1  don't -- that's not correct.
2  Q.  Okay.  And just for the record, best
3  recollection sitting here today, any more
4  details about the context in which the side
5  comment came up?
6  A.  Not that I can recall.
7  Q.  Okay.  What is your title?
8  A.  Chief of the contract management --
9  contract program office in the communications
10  directorate of the census bureau.
11  Q.  And for how long have you held that
12  position?
13  A.  Since October of 2021.
14  Q.  And prior to October 2021, what
15  position did you hold at the census bureau?
16  A.  I was chief of the integrated
17  communications, contract program management
18  office.
19  Q.  And what time period did you hold
20  the position of chief of the integrated
21  communications, contract program management
22  office?

Page 34

1  A. It began in 2016. I don't know the
2  exact date or month, but it was through
3  September of 2021.
4  Q. With respect to your current role as
5  chief of the contract management -- sorry. The
6  contract program office and the communications
7  directorate of the census bureau, do you
8  understand the United States lawsuit to be
9  based on any work you do in that role?
10     MS. ZWOLINSKI: Objection. Form.
11     THE WITNESS: I understand it to be
12 based on work that was conducted in my previous
13 role, not in my current role.
14     BY MS. GOODMAN:
15  Q. And so we'll focus our time here
16 today on your time as the chief of the ICC
17 contract program management office.
18  A. ICC PMO.
19  Q. ICC PMO?
20  A. Yes.
21  Q. All right. We'll use that
22 shorthand. Thank you.

Page 35

1     To whom did you report when you were
2  chief of the ICC PMO?
3  A. Originally I directly reported to
4  Stephen Buckner. He was the assistant director
5  for communications.
6     And then I reported to Burton Reist,
7  who was the other assistant director for
8  communications. We had two.
9  Q. And in your role as chief, who
10 reported to you?
11  A. I had a staff of approximately 15,
12 16 people at any given time.
13  Q. What -- describe your job
14 responsibilities as chief of the ICC PMO.
15  A. I oversaw all things related to -- I
16 oversaw the communications contract not as the
17 contracting officer's representative but as the
18 program officer as well as anything related to
19 it. That included program management reports,
20 stakeholder engagement, budget, et cetera.
21  Q. And did your role as chief of the
22 ICC PMO include responsibilities for all of the

Page 36

1  task orders under the main contract?
2     MS. ZWOLINSKI: Objection. Form.
3     THE WITNESS: For context only -- I
4  am trying to figure out how best to explain.
5     In terms of government contracts,
6  management of a contract is actually done --
7  you have a contracting officer who is
8  ultimately responsible for the contract, and
9  they can make decisions that impact scope.
10    But then you have a contracting
11 officer representative, or COR, who
12 administrates the contract.
13    The communications contract was so
14 large, you had a COR that administered the
15 master contract and was ultimately responsible
16 for all the -- all the orders, but each order
17 had a separate COR.
18    BY MS. GOODMAN:
19  Q. I am following you.
20  A. Okay.
21  Q. In your role, however, in terms of
22 program management of the master contract, did

Page 37

1  you have responsibility for managing all of the
2  orders issued under that master contract?
3     MS. ZWOLINSKI: Objection. Form.
4     THE WITNESS: I had the
5  responsibility of understanding and providing
6  guidance and reporting up and down and out, but
7  I did not have responsibility for managing the
8  orders. Only the COR on the contract can
9  manage the orders.
10    BY MS. GOODMAN:
11  Q. Okay. Sitting here today, what --
12 what's your understanding of which task orders
13 are relevant to the lawsuit brought by the
14 United States?
15    MS. ZWOLINSKI: Objection. Form.
16 Foundation.
17    THE WITNESS: Order 8, which was
18 recruitment advertising, and Order 15, which
19 was media planning and buying.
20    BY MS. GOODMAN:
21  Q. And what were your responsibilities
22 with respect to Order 8?

Page 74

1  Q.  Prime contractor?
2  A.  Just prime contractor. That's easy.
3  Q.  Okay. And we'll refer to Young &
4  Rubicam which is also known as VMLY&R as the
5  prime contractor?
6  A.  Prime or Y&R, whichever works for
7  you.
8  Q.  Y&R?
9  A.  Yeah.
10 Q.  And various task orders were issued
11 under the master contract, correct?
12 A.  Yes.
13 Q.  And Order 15 which relates to paid
14 media, that was also issued to Y&R, correct?
15 A.  Yes.
16 Q.  And Order 8 under the master
17 contract, which relates to recruiting of census
18 workers, that was also issued to Y&R, correct?
19 A.  Yes.
20 Q.  Okay. Order 15, describe for me at
21 a high level what Order 15 covers.
22 A.  Order 15 covered the development of

Page 75

1  the media strategy, plans, purchasing -- I am
2  looking forward, strategy, plan, purchasing and
3  evaluation. By evaluation, that is comparing
4  planned versus actual.
5  Q.  When you say "planned versus
6  actual," are you referring to planned media
7  spend as compared to actual media spend?
8  A.  Yes.
9  Q.  Okay. And did Order 15 contemplate
10 Y&R entering into subcontracting relationships?
11      MS. ZWOLINSKI:  Objection. Form.
12      THE WITNESS:  For context. When the
13 communications contract was competed, Y&R --
14 when they were awarded the contract, the
15 contract -- they came with their entire team in
16 place.
17      The RFP for the contract
18 specifically requested the ability to create
19 messaging to reach numerous languages in their
20 native tongue.
21      The previous census -- well -- so
22 Y&R came to the table with their contractors

Page 76

1  already as part of their team with the
2  understanding that each contractor had a role.
3  You had a number of contractors that were
4  audience-specific and they were required --
5  their role was to create communications to
6  reach their audience because that was their
7  specialty, and in some cases, they also bought
8  media.
9       Most of the media they purchased was
10 local and hyper local. Y&R, the agency itself,
11 did not buy media. They brought subcontractors
12 on to plan and purchase the media.
13      BY MS. GOODMAN:
14 Q.  And that was permitted under Order
15 15, correct?
16 A.  Yes, it was.
17 Q.  And as a result, the census bureau
18 did not contract directly with any of the
19 subcontractors or entities who were purchasing
20 the media; is that correct?
21      MS. ZWOLINSKI:  Objection. Form.
22      THE WITNESS:  The census bureau

Page 77

1  contracted with Y&R and to -- to perform all
2  the requirements under the communications
3  contract, which included planning and
4  purchasing media. As such, Y&R contracted --
5  subcontracted with other agencies to assist
6  them. They were purchasing media on behalf of
7  the census bureau.
8       BY MS. GOODMAN:
9  Q.  And so those other agencies who were
10 purchasing media on behalf of the census
11 bureau, with respect to those agencies, there
12 is no contract between the census bureau and
13 those agencies who were purchasing media on
14 behalf of the census bureau, correct?
15      MS. ZWOLINSKI:  Objection. Form.
16      THE WITNESS:  No direct contracts,
17 yes, correct.
18      BY MS. GOODMAN:
19 Q.  And so after the master contract was
20 awarded, the communications contract, I think
21 you also referred to it, then Order 15 was
22 agreed to; is that correct?

20 (Pages 74 - 77)

Page 78

1   MS. ZWOLINSKI: Objection. Form.
2   THE WITNESS: Yes. It was awarded.
3   BY MS. GOODMAN:
4   Q.   And that was also as awarded to
5   Young & Rubicam?
6   A.   For context. The prime contract was
7   awarded to Young & Rubicam, and thus, all
8   orders under the prime contract are
9   automatically awarded to Young & Rubicam.
10  Q.   And Order 15 pertains to media
11  planning and buying, correct?
12  A.   Correct.
13  Q.   And so by virtue of Order 15,
14  pertaining to media planning and buying being
15  awarded to Young & Rubicam, there was no
16  separate order between the census bureau and
17  any other agency on whose -- who was making
18  paid media purchases, correct?
19       MS. ZWOLINSKI: Objection. Form.
20       THE WITNESS: Correct.
21       BY MS. GOODMAN:
22  Q.   And as part of agreeing to Order 15

Page 79

1   with Y&R, they had to complete a technical
2   proposal; is that correct?
3        MS. ZWOLINSKI: Objection. Form.
4        THE WITNESS: That is correct.
5        BY MS. GOODMAN:
6   Q.   And what does the technical proposal
7   entail?
8   A.   The government, the census bureau in
9   this case, defines the requirements. The
10  requirements are shared with Y&R and they
11  provide a proposal in response to those
12  requirements.
13       The census bureau or the government
14  reviews their proposal to make sure it's in
15  line with the requirements. If negotiations
16  are required, they are done between the
17  contractor, the contracting officer -- Y&R, the
18  contracting officer and the CORs before a final
19  proposal is accepted.
20       (Deposition Exhibit 14 was marked
21  for identification.)
22       BY MS. GOODMAN:

Page 80

1   Q.   So I am going to hand you what I
2   have marked as Exhibit 14,
3   CENSUS-ADS-0000387420 through 387490.
4        And take a look at it, and just --
5   can you confirm for me that this is the
6   technical proposal that Y&R submitted for Order
7   15?
8        Ms. Oliphant, you see the first page
9   says: "Integrated communication contract,
10  revised technical proposal, Version 2, October
11  5, 2018"?
12  A.   Yes, I do.
13  Q.   Okay. Any reason to doubt that this
14  is the technical proposal submitted by Y&R?
15  A.   I have no doubt this is the
16  technical proposal submitted from Y&R. For
17  context, every -- multiple technical proposals
18  were received as additional work was added. I
19  am verifying this was for the first initial
20  technical proposal.
21  Q.   Okay.
22  A.   That's --

Page 81

1   Q.   And sitting here today, do you
2   recall technical proposals issued with respect
3   to Order 15 after October 5, 2018?
4   A.   Yes. They would -- ideally, they
5   would be considered modifications, so it would
6   be -- if we wanted to do additional work for
7   some reason that was in scope of the order but
8   was in addition to what had already been
9   planned, approved and funded, Y&R would -- we
10  would have to provide the requirements to Y&R.
11       They would still have to provide a
12  technical and a price proposal. We would still
13  go through the same process. It should be
14  adequately or appropriately marked. I am just
15  making sure.
16  Q.   Okay. I want to direct your
17  attention to Page 6 of this document,
18  Bates-labeled 25 at the end.
19  A.   Uh-huh.
20  Q.   And in the first full paragraph
21  beginning: "Supplementing these workshops."
22       Do you see where I am?

Page 82

1  A. Yes.
2  Q. Sort of in the middle of the
3  paragraph, it says: "Team Y&R, small business
4  media buying agencies and WaveMaker also
5  determined there was a need to align around a
6  single planning platform to consolidate
7  efforts, eliminate redundancies and achieve
8  optimal performance."
9       Do you know what the single planning
10 platform around which Team Y&R proposed
11 aligning?
12 A. In the very next paragraph, it
13 states that: "They decided to align around
14 WaveMakers, establish three phase, ten stage,
15 37 step media planning, buying and activation
16 process, that reflects industry best practices
17 for campaigns of this size and complexity."
18 Q. Okay. So are -- do you understand
19 in the previous paragraph, the single planning
20 platform to be a reference to that three phase,
21 ten stage, 37 step media planning, buying and
22 activation process?

Page 83

1  A. Yes.
2  Q. Okay. On page -- let's turn to Page
3  10, Bates ending in 29.
4       You see the reference to the Media
5  101 workshop?
6  A. Yes.
7  Q. What was the Media 101 workshop?
8  A. For context. The census bureau does
9  not purchase media. Everyone involved in
10 anything related to media under this contract,
11 not everyone had experience or understood the
12 process.
13      The workshop provided that
14 information so that everybody was -- most of us
15 were on a level playing field in terms of basic
16 understanding of what it took to -- what goes
17 into planning and purchasing media.
18 Q. And did you attend the Media 101
19 workshop?
20 A. Yes.
21 Q. Did you view it as informative?
22      MS. ZWOLINSKI: Objection. Form.

Page 84

1       THE WITNESS: Extremely.
2       BY MS. GOODMAN:
3  Q. And why did you view it as extremely
4  informative?
5  A. Because other than myself, no one in
6  the room had any experience with purchasing
7  paid media under a communications contract.
8  Q. And prior -- strike that.
9       Did you, yourself, at this time have
10 any knowledge or awareness with respect to how
11 the paid media industry buying -- strike that.
12      Did you -- at this time in October
13 of 2018, did you know how paid media purchasing
14 worked?
15      MS. ZWOLINSKI: Objection. Form.
16      THE WITNESS: I have a -- I had a
17 good working knowledge.
18      BY MS. GOODMAN:
19 Q. Okay. And was that from the 2010
20 census?
21 A. Yes.
22 Q. Okay. So you see the first bullet

Page 85

1  point under Media 101 workshop?
2  A. Yes.
3  Q. And it says: "The workshop is
4  designed to provide the most up-to-date
5  information on industry offerings, practices
6  and metrics."
7       Do you see that?
8  A. Yes.
9  Q. And in your view, did the Media 101
10 workshop in fact provide the most up-to-date
11 information on industry offerings, practices
12 and metrics?
13 A. As of that date, yes.
14 Q. Okay. And then the last paragraph
15 under Media 101 where it says: "The workshop
16 will include."
17      You see that it says: "The workshop
18 will include presentations on" -- and I am
19 skipping to the second sentence, "digital media
20 channels, the media planning and buying
21 process, media forms and templates and media
22 stewardship."

Page 86

1    A.   Yes.
2         MS. ZWOLINSKI:  Objection.  Form.
3         BY MS. GOODMAN:
4    Q.   Did -- what is your understanding of
5    the term "digital media channels" here?
6    A.   In this workshop, they explained the
7    different types of media, the reach, any
8    limitations to the reach, how they worked
9    together to provide a holistic approach to
10   encouraging response.
11        So in terms of digital media
12   channels, they -- without going into a lot of
13   detail, discussed site direct and what that
14   meant, programmatic, social, and paid search.
15   And explained that -- that's pretty much it.
16   Q.   And let's turn to Page 14, Bates
17   ending in 33.
18        At the bottom where it begins:
19   "Digital advertising," do you see that?
20   A.   Yes.
21   Q.   Okay.  The first sentence says:
22   "Team Y&R partner Reingold will assess factors

Page 87

1    for digital media options identifying metrics
2    such as cost of serving, reach, and expected
3    engagement for cross team Y&R review."
4         Do you see that?
5    A.   Yes.
6    Q.   Okay.  Why were the metrics of cost
7    of serving, reach, and expected engagement
8    factors that Reingold would need to assess as
9    it is making purchases under Order 15?
10        MS. ZWOLINSKI:  Objection.  Form.
11        THE WITNESS:  It was Reingold's job,
12   as was Y&R and all subcontractors, to make sure
13   that everything they did and every purchase
14   they made was as efficient and effective as
15   possible.  So every data point they could use
16   to ensure that, they did.
17        BY MS. GOODMAN:
18   Q.   And those were the factors listed
19   here that were assessed for all types of
20   digital media; is that correct?
21        MS. ZWOLINSKI:  Objection.  Form.
22        THE WITNESS:  There may have been

Page 88

1    more.  That's what they discussed in this
2    document.
3         BY MS. GOODMAN:
4    Q.   And do you see the paragraph:  "Team
5    Y&R will centralize as much of its national
6    programmatic display video and search campaigns
7    within" -- "within one advertising tech stack."
8         Do you see that?
9    A.   Yes.
10   Q.   Do you know whether this occurred?
11   A.   As far -- as far as I'm aware, it
12   was.
13   Q.   And do you know what ad tech stack
14   was utilized?
15        MS. ZWOLINSKI:  Objection.  Form.
16        THE WITNESS:  I do not recall.
17        MS. GOODMAN:
18   Q.   And do you know if it was --
19   involved any Google products or services?
20   A.   I don't recall.
21   Q.   Is that something that would have
22   been important to you in your role as the

Page 89

1    contracting officer representative on Order 15?
2         MS. ZWOLINSKI:  Objection.  Form.
3         THE WITNESS:  That level of detail,
4    no.
5         BY MS. GOODMAN:
6    Q.   Okay.  And if you turn to Page 30
7    ending in Bates 49, I want to direct your
8    attention to this little flow chart in the
9    middle of the page.
10        Do you see that?
11   A.   Yes.
12   Q.   Was that process -- strike that.
13        It is titled:  "Census Bureau 2010
14   Media Billing Process."
15        Do you see that?
16   A.   Yes.
17   Q.   Is this the same process that was
18   filed -- followed for the 2020 census media
19   billing process?
20   A.   For the most part, yes.
21   Q.   When you say "for the most part,"
22   what was different about billing processes in

Page 94

1  and how they're classified.
2      Q.  Would it also be accurate to refer
3  to these different channels as different kind
4  of types of products?
5          MS. ZWOLINSKI:  Objection.  Form.
6          THE WITNESS:  I don't know that I
7  would consider them products.
8          BY MS. GOODMAN:
9      Q.  Why not?
10     A.  Because within each there is so
11 much.  Print is a category.  Out of home is a
12 category.  Paid social is a category.  They are
13 not products themselves.
14     Q.  But -- okay.  Within paid social
15 what are the options that you're referring to?
16     A.  Well, there are examples given here
17 on the page:  Social sharing platforms, chat
18 apps, those are options.  Those are other --
19 you know, different options within paid social,
20 and those are just a couple of options.  Every
21 day options increase --
22     Q.  Okay.

Page 95

1      A.  -- in all of these categories.
2      Q.  And how about with respect to
3  programmatic?  What are the options that you
4  understand to be available within that
5  category?
6          MS. ZWOLINSKI:  Objection.  Form.
7          THE WITNESS:  Within programmatic on
8  this particular page, it really just gives you
9  an idea of what programmatic is.  It doesn't
10 get into any of the options so when you're
11 talking to somebody and you say programmatic
12 versus paid search, you understand what the
13 difference is between the two.
14         BY MS. GOODMAN:
15     Q.  And what are the differences between
16 the two?
17     A.  My understanding is with paid search
18 you are actually choosing search terms that you
19 are paying for -- so when I am searching for
20 something, no matter what platform I am on,
21 what comes to the top of my search, the
22 responses to my query, the very top entries are

Page 96

1  those that have been paid for.  They are paid
2  to move up to the top.
3          So -- or you want to make sure -- so
4  when we want it -- we wanted everything we did,
5  anything that had census -- a question about
6  census, we wanted the census bureau to pop up.
7  So it could be a million and one different
8  terms, but those terms triggered -- I don't
9  know what you call it -- in the list that the
10 census site is the first site that you go to.
11     Q.  Okay.  So what -- I want to re-ask a
12 question I think I already asked, but see if I
13 can get a different answer, which is:  What are
14 the kinds of different options by name, by
15 type, by provider within the programmatic
16 category?
17         MS. ZWOLINSKI:  Objection.  Form.
18         THE WITNESS:  I don't know.
19         BY MS. GOODMAN:
20     Q.  Did you have occasion to learn those
21 throughout -- learn the various options within
22 that category during your time as COR for Order

Page 97

1  15?
2          MS. ZWOLINSKI:  Objection.  Form.
3          THE WITNESS:  No.  What we learned
4  is the different -- that there is a difference
5  between these, and working together, they help
6  extend our message.  All of these are
7  components of what were required for us to
8  reach -- our goal was to reach almost
9  everybody.  We had a very short time frame, and
10 we didn't -- we had to use every possible tool
11 there was.
12         So programmatic did not replace --
13 replace paid search, did not replace digital,
14 did not replace paid social, did not replace
15 any of these.  They all worked together like a
16 team.
17         BY MS. GOODMAN:
18     Q.  And how did they -- how did you --
19 how did the census bureau, from your point of
20 view, execute on making sure that they worked
21 together to reach all Americans to participate
22 in the census?

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1  MS. ZWOLINSKI: Objection. Form.
2  THE WITNESS: Well, we start with a
3  media plan. The ad agency provides a
4  recommended media plan based upon the agreed
5  upon strategies that we've all come to agree
6  upon.
7  All the agencies purchasing media
8  present the media plan to the census bureau.
9  We evaluate it. We ask questions. We provide
10 comments. Revisions are made based upon those.
11 A final media plan is approved, and we -- while
12 it is just a plan, it is an iterative plan that
13 forms the base of what we do, and as needed, we
14 will add to it.
15 Every -- if you are blasting the
16 message, all of these work. But as you move
17 further into the actual event, there may be
18 segments of the population or segments of the
19 country that are not responding at the rate
20 that you anticipated. So you go back into your
21 tool chest to determine what is the best tool
22 to use to help encourage, and that tool may not

Page 99

1  be paid media. It may be boots on the ground,
2  which is not included in this because it's not
3  paid media.
4  But we had a lot of tools in our
5  chest. So we would determine if there were --
6  you know, paid -- use site directory, you go
7  directly to a site. What is the -- what is
8  the -- so we created -- we segmented the
9  audience. We had an audience segmentation. We
10 did a lot of research around messaging, and we
11 took all that research, and we had an ongoing
12 survey.
13 We took all of that information. We
14 talked to the people on the ground, and we
15 determined if we needed to change anything and
16 how -- what that change included.
17 BY MS. GOODMAN:
18 Q. And so with respect to -- let's try
19 to focus only on paid media --
20 A. Uh-huh.
21 Q. -- understanding there are many
22 other tools.

Page 100

1  But with respect to paid media,
2  would you -- sorry.
3  During the course of the execution
4  of the campaign, did you make adjustments from
5  moving money spent from one category to another
6  category in order to reach your goal of
7  targeting whichever particular audience you
8  were not seeing the response rate from?
9  MS. ZWOLINSKI: Objection. Form.
10 THE WITNESS: In terms of moving
11 from one category to another, can you be more
12 specific.
13 BY MS. GOODMAN:
14 Q. So if programmatic advertising was
15 not delivering the result that you were hoping
16 to see in terms of reach, would you shift some
17 of the money spent on programmatic advertising
18 to another category such as paid search,
19 digital, or paid social?
20 MS. ZWOLINSKI: Objection. Form.
21 Foundation.
22 THE WITNESS: So when we approve

Page 101

1  spending -- and I'm sure you have looked at the
2  media authorization forms because we had an
3  example previously -- it is by audience, and
4  there are funds allocated to the different
5  media -- media channel options.
6  In terms of digital, it is broken
7  out by paid search -- paid social, site direct,
8  paid search, and programmatic. We approve the
9  total amount on that form for digital, and as
10 we are evaluating effectiveness if there is --
11 if we find that a particular audience is more
12 predisposed to one type versus another, we do
13 have that ability to move money.
14 I can't necessarily say how often
15 that happened because we normally within the
16 bureau and within the presentations for the
17 most part, we talk about digital as a whole.
18 We don't talk about the differences between the
19 categories. We want our ad agencies to use the
20 options in the digital tool chest as
21 appropriately as possible to help us reach our
22 goal.

Veritext Legal Solutions
800-567-8658                                                                973-410-4098

HIGHLY CONFIDENTIAL

Page 102

1  BY MS. GOODMAN:
2     Q.   Now, you said within the bureau you
3  talk about digital as a whole.  Why is that?
4           MS. ZWOLINSKI:  Objection.  Form.
5           THE WITNESS:  Because most people
6  don't care about the difference.  We -- we are
7  not media buyers.  We are looking at
8  categories.
9           So the vast people -- unless you are
10 right up in this, and even if people who were
11 right close to it, we didn't evaluate each
12 individual piece of digital, right.  We're like
13 would digital work.
14          We might ask whether or not we need
15 to adjust our search terms.  You might -- that
16 might be a conversation, but -- or do we need
17 to put more in social but in terms of site
18 direct and programmatic, that fell within the
19 digital moniker.
20          BY MS. GOODMAN:
21     Q.   And so from your point of view, were
22 site direct and programmatic sort of -- not

Page 103

1  that they were the same thing, but you thought
2  about them in the same way?
3           MS. ZWOLINSKI:  Objection.  Form.
4           THE WITNESS:  We did not think about
5  them.  We trusted our ad agencies to -- once we
6  had approved the plan, to reach our audience
7  the best way they could within that plan,
8  within the -- within the integrity of the plan
9  or the spirit of the plan.
10          BY MS. GOODMAN:
11    Q.   If you turn to Page 13 of the deck,
12 Bates ending 44.  Is it fair to say that this
13 slide shows that what matters to the census
14 bureau is reaching a consumer wherever they may
15 be found?
16          MS. ZWOLINSKI:  Objection.  Form.
17          THE WITNESS:  That is safe to say.
18          BY MS. GOODMAN:
19    Q.   And so just as you might reach a
20 consumer through a display banner in the first
21 bullet, you also need to consider whether you
22 can reach them by Googling a product to learn

Page 104

1  more, correct?
2           MS. ZWOLINSKI:  Objection.  Form.
3           THE WITNESS:  For context most
4  people have no idea where they get their
5  messages.  So you cannot rely on one form of
6  media for the message to seed.  You've got to
7  surround them with the messaging so that the
8  first few times it may not really click.
9           You've watched a commercial.  It may
10 be four -- the fourth time you heard that
11 commercial before something in it makes you
12 really look up and pay attention, or you might
13 like something in the commercial but still not
14 know what that commercial is advertising
15 because you're only focused on one piece.
16          In order to effectively reach the
17 number of people that we needed to reach and --
18 and -- and -- and -- and -- and -- and -- and
19 encourage response for a complete census, we
20 needed a holistic -- we needed a holistic
21 approach.  We needed to hit them -- serve
22 messaging from every possible angle.

Page 105

1           And so you get up in the morning.
2  It might be on the morning news, or it might be
3  a commercial -- it might be a story on the
4  morning news, right.  That's earned media.  For
5  paid media it may be on TV.  It might be -- you
6  might be -- if -- it all depends on how you
7  take your media, how you receive your media.
8  That's where it hits you the most.  But I can't
9  count on that being the only source of you
10 accepting the message.
11          BY MS. GOODMAN:
12    Q.   And turning to Page 17 ending in 48,
13 how -- how is the optical -- strike that.
14          I am reading in the second bullet
15 where it begins: "Paid media."  My question
16 is: How is the optimal mix for efficient and
17 effective performance for paid media determined
18 for the -- you know, as census was executing on
19 the 2020 campaign?
20          MS. ZWOLINSKI:  Objection.  Form.
21          THE WITNESS:  So as the sentence
22 reads, we have many research tools and

27 (Pages 102 - 105)

Page 334

1  provided you legal advice?
2      MS. ZWOLINSKI: Objection. Form.
3      THE WITNESS: No.
4      BY MS. GOODMAN:
5   Q. Okay. And is your answer the same
6  in January of 2023?
7      MS. ZWOLINSKI: Objection. Form.
8      THE WITNESS: Yes.
9      BY MS. GOODMAN:
10  Q. Okay. And in the course of your
11 participation in this lawsuit if you've had
12 questions about your participation in this
13 lawsuit, have you turned to the attorneys at
14 the antitrust division with your questions?
15     MS. ZWOLINSKI: Objection. Form.
16     THE WITNESS: No.
17     BY MS. GOODMAN:
18  Q. To whom have you turned, if anyone?
19  A. Commerce.
20  Q. And is that Mr. Cannon?
21  A. That's Mr. Cannon, yes.
22  Q. Do you consider the lawyers for the

Page 335

1  antitrust division to be lawyers for the census
2  bureau?
3      MS. ZWOLINSKI: Objection. Form.
4  Foundation.
5      THE WITNESS: I do not.
6      BY MS. GOODMAN:
7   Q. Why not?
8      MS. ZWOLINSKI: Objection. Form.
9  Foundation.
10     THE WITNESS: Since census has their
11 own lawyers and we have commerce lawyers, and I
12 believe the commerce lawyers would be more --
13 more sort of categorized in that way versus
14 DOJ.
15     BY MS. GOODMAN:
16  Q. Okay. And is your answer the same
17 with respect to your participation in this
18 lawsuit as a representative of the census
19 bureau?
20     MS. ZWOLINSKI: Objection. Form.
21 Foundation.
22     THE WITNESS: Yes.

Page 336

1      MS. GOODMAN: I have no further
2  questions. I'll pass the witness.
3      MS. ZWOLINSKI: We have no
4  questions.
5      MS. GOODMAN: Okay. Thank you so
6  much for your time, Ms. Oliphant. I very much
7  appreciate it.
8      THE WITNESS: You're welcome. Thank
9  you.
10     THE VIDEOGRAPHER: Off the record.
11     MS. GOODMAN: Yes.
12     THE VIDEOGRAPHER: This marks the
13 end of the deposition of Kendall Oliphant. We
14 are going off the record at 18:24.
15     (Whereupon, the proceeding was
16 concluded at 6:24 p.m.)

Page 337

1      CERTIFICATE OF NOTARY PUBLIC
2      I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10 record of the testimony given by said witness;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this deposition was taken; and further,
14 that I am not a relative or employee of any
15 attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.
18
19          *Bonnie L Russo*
20          Notary Public in and for
21          the District of Columbia
22 My Commission expires: August 14, 2025

HIGHLY CONFIDENTIAL

Page 338

1  ACKNOWLEDGMENT OF DEPONENT
2  I, KENDALL OLIPHANT, do hereby certify that
3  I have read the foregoing transcript of my
4  testimony taken on 8/9/23, and further certify
5  that it is a true and accurate record of my
6  testimony (with the exception of the
7  corrections listed below):
8  Page   Line        Correction
9  ____   ____   _____
10 ____   ____   _____
11 ____   ____   _____
12 ____   ____   _____
13 ____   ____   _____
14 ____   ____   _____
15 ____   ____   _____
16 ____   ____   _____
17 ____   ____   _____
18         _____
           KENDALL OLIPHANT
19
   SUBSCRIBED AND SWORN TO BEFORE ME
20 THIS _____DAY OF _____, 2023.
21
   _____  _____
22 (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
   Job No. CS6031956

Page 339

1  Rachel Zwolinski, Esq.
2  rachel.zwolinski@usdoj.gov
3             August 10, 2023
4  RE:   United States, Et Al v. Google, LLC
5    8/9/2023, Kendall Oliphant (#6031956)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Veritext Legal Solutions
800-567-8658                                             973-410-4098

Page 338

1  ACKNOWLEDGMENT OF DEPONENT

2  I, KENDALL OLIPHANT, do hereby certify that

3  I have read the foregoing transcript of my

4  testimony taken on 8/9/23, and further certify

5  that it is a true and accurate record of my

6  testimony (with the exception of the

7  corrections listed below):

8  | Page | Line | Correction |
|---|---|---|
| 33 | 7 | communications contract, program |
| 34 | 6 | "and" should be "within" instead |
| 99 | 6 | "directory" should be "direct" |
| 118 | 9 | "do-not" should be "do-not-buy" |
| 126 | 16 | "invoice" should be "invoiced" |
| 157 | 16 | "BETT" should be "BET" |
| 285 | 19 | paid media, earned media, and partnership |

_____
KENDALL OLIPHANT

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 2023.


_____      _____
(NOTARY PUBLIC)          MY COMMISSION EXPIRES:

Job No. CS6031956

HIGHLY CONFIDENTIAL

Page 339

1  Rachel Zwolinski, Esq.
2  rachel.zwolinski@usdoj.gov
3                              August 10, 2023
4  RE:    United States, Et Al v. Google, LLC
5     8/9/2023, Kendall Oliphant (#6031956)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22              Yours,
23              Veritext Legal Solutions
24
25