# Plaintiffs' Exhibit 77

HIGHLY CONFIDENTIAL

Page 1

1

2           IN THE UNITED STATES DISTRICT COURT

            FOR THE EASTERN DISTRICT OF VIRGINIA

3                  ALEXANDRIA DIVISION

4      _____

5      UNITED STATES,        )1:23-cv-00108-LMB-JFA

       et al.,               )

6                            )

7         Plaintiffs,        )

                             )

       vs.                   )

8                            )

       GOOGLE LLC,           )

9                            )

          Defendants.        )

10     _____)

11

12

                     - HIGHLY CONFIDENTIAL -

13

14              VIDEOTAPED DEPOSITION OF

15                CHRISTOPHER KARPENKO

16                  August 10, 2023

17                    9:35 a.m.

18

19

20

21

22      Reported by:  Bonnie L. Russo

        Job No. 6031969

HIGHLY CONFIDENTIAL

Page 10

1  the outcome.
2       If there are any objections to
3  proceeding, please state them at the time of
4  your appearance.
5       Counsel and all present, including
6  remotely, will now state their appearances and
7  affiliations for the record beginning with the
8  noticing attorney.
9       MS. GOODMAN:  Martha Goodman from
10  Paul Weiss on behalf of Google LLC, and I am
11  joined by my colleague Annelise Corriveau.
12       MR. RYAN:  Good morning.  James Ryan
13  on behalf of the United States and the witness.
14       MR. GROSSMAN:  David Grossman on
15  behalf of the United States.
16       MR. CHU:  Alvin Chu on behalf of the
17  United States.
18       MR. WEAVER:  Michael Weaver for the
19  United States Postal Service.
20       MR. KARPENKO:  Chris Karpenko with
21  the United States Postal Service.
22       MS. GOODMAN:  Is anybody on Zoom who

Page 11

1  needs to state their appearance, please?
2       MS. WOOD:  I don't need to state an
3  appearance, but I'll be in and out throughout
4  the day.  Julia Wood from the Department of
5  Justice.
6       MS. CLEMENS:  Same for -- this is
7  Katherine Clemens with the Department of
8  Justice.
9       MR. CARMAN:  And Sean Carman from
10  the Department of Justice.
11       MS. GOODMAN:  We did not hear the
12  last person who spoke.  Can you repeat
13  yourself, please.
14       MR. CARMAN:  Yeah.  Sean Carman for
15  the Department of Justice, S-E-A-N C-A-R-M-A-N.
16       MS. GOODMAN:  Okay.
17
18       CHRISTOPHER KARPENKO,
19  being first duly sworn, to tell the truth, the
20       whole truth and nothing but the truth,
21       testified as follows:
22  EXAMINATION BY COUNSEL FOR DEFENDANT

Page 12

1  BY MS. GOODMAN:
2   Q.  Good morning, Mr. Karpenko.
3   A.  Good morning.
4   Q.  Have you been deposed before?
5   A.  I have.
6   Q.  How recently?
7   A.  Possibly within the last two years.
8   Q.  And was that in connection with your
9  work at the U.S. Postal Service?
10   A.  It was.
11   Q.  And what was it regarding?
12   A.  Specifically it was in regards to
13  contested environment for picture permit
14  stamps.
15   Q.  Okay.  For -- for purposes of this
16  deposition, I want to make sure that you take a
17  pause before I finish my question so that I can
18  complete my question, allow your counsel to
19  object, and then you can answer the question.
20  Okay?
21   A.  Okay.
22   Q.  And can you also speak up a little

Page 13

1  bit.  Sometimes it's a bit hard to hear you,
2  and we want to make sure the court reporter is
3  getting everything down.  Okay?
4   A.  Sure.
5   Q.  Okay.  And if you don't understand
6  my question, please let me know.  Okay?
7   A.  Okay.
8   Q.  Otherwise, I will assume you
9  understand my question.  Sound good?
10   A.  Yes.
11   Q.  And the court reporter cannot really
12  transcribe uh-huh or huh, uh-uhs because they
13  are hard to understand what you mean, so can
14  you please answer a question with a yes or no
15  or another verbal manner.  Okay?
16   A.  Yes.
17   Q.  And is there any reason you cannot
18  provide truthful and accurate testimony today?
19   A.  No.
20   Q.  And what is your current title at
21  the United States Postal Service?
22   A.  As of today, it's senior director

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1  customer marketing.
2      Q.   And for how long have you held the
3  role of senior director for customer marketing?
4      A.   Maybe three months.
5      Q.   And what do you do as the senior
6  director for customer marketing?
7      A.   I'm responsible with my team to
8  represent the postal service to perform
9  marketing initiatives, messaging, and create a
10  positive brand for the United States Postal
11  Service.
12      Q.   And prior to taking on the role of
13  senior director for customer marketing, what
14  was your role at the postal service?
15      A.   Executive director of brand
16  marketing.
17      Q.   And what is the difference between
18  your role of senior director of customer
19  marketing and executive director of brand
20  marketing?
21          MR. RYAN:  I'll object to
22  foundation, but it's fine.

Page 15

1          THE WITNESS:  There are several
2  nuances of reporting structure where some of my
3  directs have been moved.  We've elevated those
4  groups as we have grown them to make them more
5  of a larger autonomous group.
6          BY MS. GOODMAN:
7      Q.   How about with respect to your job
8  responsibilities?  Have those changed in the
9  course of moving from the executive director to
10  the senior director position?
11      A.   I don't have specific
12  responsibilities tied to licensing and
13  intellectual property.  The other move -- moved
14  to what we would call our digital group under
15  Kim Workinger.  That encompasses all our -- our
16  own USPS.com site.
17      Q.   So the digital group under Kim
18  Workinger encompasses the USPS.com site.  Am I
19  understanding you correctly?
20      A.   Yes.
21      Q.   And when you were executive director
22  for brand marketing, you had responsibilities

Page 16

1  tied to licensing and intellectual property.
2  Am I understanding that correctly?
3      A.   Yes.
4      Q.   How about with respect to
5  advertising?  How, if at all, have your
6  responsibilities changed from being executive
7  director to senior director?
8          MR. RYAN:  Objection.  Form.
9          THE WITNESS:  I still have the
10  responsibilities to develop campaigns and
11  execute them.  We have a marketing operations
12  team that answers under our insights group.
13  That's probably the only other difference that
14  I can think of at the moment --
15          BY MS. GOODMAN:
16      Q.   And --
17      A.   -- other than what you were stating
18  before.
19      Q.   So in your capacity -- in your prior
20  capacity as executive director and in your
21  current capacity as senior director, please
22  describe what your responsibilities are with

Page 17

1  respect to advertising.
2          MR. RYAN:  Objection.  Vague.
3          THE WITNESS:  Could you clarify for
4  me.
5          BY MS. GOODMAN:
6      Q.   What do you understand the term
7  "advertising" to mean?
8      A.   Advertising for me is to be able to
9  position messaging in whatever format that
10  might be to our potential customers, whether
11  they be consumer or businesses, and the postal
12  service -- and my role in the postal service is
13  to help place proper messaging for our various
14  campaigns that we are going to be executing for
15  the year.
16      Q.   Okay.  And so with respect to the
17  understanding of advertising that you have just
18  stated for the record, can you please describe
19  what your responsibilities are with respect to
20  advertising.
21      A.   My role is to determine what
22  campaigns to run for the year, take the

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1    insights that are provided to us, take the
2    target audience that we're trying to reach, and
3    make creative and place that creative or
4    content in the appropriate way for our desired
5    outcome.
6        Q.   And when you say "place that
7    creative or content in the appropriate way for
8    our desired outcome," what do you mean?
9        A.   Proper messaging can be placed or
10   positioned in a variety of ways.  We use media,
11   variety of different media types.  We also use
12   materials that we provide to our salespeople.
13       Q.   When you say that you -- you use
14   media in a variety of different media types,
15   can you elaborate on that, please.
16       A.   Can you clarify what you mean by --
17   what you're looking for.
18       Q.   Well, when you say media, that you
19   use a variety of different media types, what do
20   you mean?
21       A.   So we have a variety of different
22   media channels that we use.  Those media

Page 19

1    channels are fairly broad, so not all
2    inclusive.  Top of mind you would see the
3    traditional TV, radio, print, direct mail,
4    digital, which would have subsets within that
5    that might fall under social media, banner
6    advertising, e-mail marketing, and then we, of
7    course, have our own messaging that we use
8    within our own postal infrastructure.
9        Q.   And so your role includes then
10   determining the kind of media to use when
11   seeking to get your message out to your target
12   audience; is that correct?
13       MR. RYAN:  Objection.  Foundation.
14       THE WITNESS:  Myself and my group
15   have responsibility for rolling out campaigns
16   that would include a variety of different media
17   types, and we assess what those media types
18   may -- may work in combination with each other
19   to optimize our results.
20       BY MS. GOODMAN:
21       Q.   Okay.  And you have -- do you have a
22   direct role in selecting the variety of

Page 20

1    different media types that are used for a
2    particular campaign?
3        A.   Yes.
4        Q.   How long have you been at the United
5    States Postal Service?
6        A.   Over 35 years.
7        Q.   And what -- prior to -- well, strike
8    that.
9            How long -- for what time period
10   were you executive director of brand marketing
11   for the USPS?
12       A.   I was in that role eight-plus years,
13   I believe.
14       Q.   How did you come to be the executive
15   director of brand marketing?
16       A.   I was selected by the chief
17   marketing officer.
18       Q.   Do you report to the chief marketing
19   officer?
20       A.   I report to the VP of marketing
21   today.
22       Q.   And who is the VP of marketing?

Page 21

1        A.   Sheila Holman, H-O-L-M-A-N.
2        Q.   When you were executive director,
3    did you also report to Ms. Holman?
4        A.   For a short period of time, yes.
5        Q.   What period of time did you report
6    to Ms. Holman?
7        A.   I believe she was hired while we
8    were in COVID, so 2021, I believe.
9        Q.   And prior to Ms. Holman being hired,
10   to whom did you report while you were executive
11   director of brand marketing?
12       A.   The name was Steve Monteith.
13       Q.   Is that M-O-N-T-E-I-T-H --
14       A.   T-E-I-T-H, yes.  With a V, I
15   believe.  Steve Monteith.
16       Q.   And what -- was Mr. Monteith the VP
17   of marketing?
18       A.   He was.
19       MR. RYAN:  Objection.  Form.
20       THE WITNESS:  Sorry.
21       MS. GOODMAN:  What is the form
22   objection?

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 210

1  buys?
2      MR. RYAN:  Objection to form.
3  Foundation.
4      THE WITNESS:  UM leverages their
5  buying power for all of their clients and
6  passes it through appropriately, I believe.
7      BY MS. GOODMAN:
8   Q.   And -- and -- and that includes
9  passing it through to the postal service?
10     MR. RYAN:  Objection to form.
11     THE WITNESS:  We believe that there
12 is an opportunity for the postal service to get
13 some value out of their ability to buy the way
14 they buy.
15     MS. GOODMAN:  Okay.  Shall we take a
16 break?
17     MR. RYAN:  Sure.
18     THE VIDEOGRAPHER:  Going off record.
19 The time is 15:41.
20     (A short recess was taken.)
21     THE VIDEOGRAPHER:  Going back on the
22 record.  The time is 1600 hours.

Page 211

1      MS. GOODMAN:  Mr. Karpenko, I'm
2  going to hand you Exhibit 41, USPS-ADS-661829
3  through 661869.
4      (Deposition Exhibit 41 was marked
5  for identification.)
6      BY MS. GOODMAN:
7   Q.   And this is an e-mail attaching an
8  avoid surcharge media recommendation
9  presentation, correct?
10     MR. RYAN:  Objection to form and
11 foundation.
12     THE WITNESS:  Yes.
13     BY MS. GOODMAN:
14  Q.   Okay.  And is the purpose of a
15 presentation like this for the postal service
16 team under your direction and yourself to walk
17 through media buy strategy with Universal
18 McCann for a particular advertising campaign?
19     MR. RYAN:  Objection to form and
20 foundation.
21     THE WITNESS:  This is a particular
22 lead gen campaign that we were looking to run.

Page 212

1      BY MS. GOODMAN:
2   Q.   Right.  And so you -- in the course
3  of your work with Universal McCann, are these
4  the kinds of presentations you routinely
5  receive from them with respect to media buying
6  recommendations for particular campaigns?
7   A.   Yes, we do receive presentations
8  like this.
9   Q.   And so what is your process upon
10 receiving a presentation like this with
11 Universal McCann with respect to formulating a
12 media-buying strategy for a particular campaign
13 and then executing on it?
14     MR. RYAN:  Objection to form and
15 foundation.
16     THE WITNESS:  This part -- this
17 campaign, like others, are examples of the
18 postal service deciding that we want to run a
19 particular campaign tied to a particular
20 message.
21     In this case it was about the --
22 avoiding surcharge.  This is a campaign tied to

Page 213

1  shippers, people that ship, businesses that
2  ship.
3      The -- throughout the presentation
4  you will see there is validation from UM to --
5  there is some validation from UM into some of
6  the tasks and parameters that we wanted to put
7  forward.  You will see that on Page 4, let's
8  say.
9      BY MS. GOODMAN:
10  Q.   Okay.  Can I ask you a question
11 about Page 4.
12  A.   Sure.
13  Q.   So the campaign parameters that are
14 reflected here on Page 4, did those inform the
15 kind of media that you will decide to purchase
16 for purposes of this campaign?
17     MR. RYAN:  Objection to form and
18 foundation.
19     Counsel, can you ask if he has
20 actually seen this document before.
21     MS. GOODMAN:  I will ask my
22 questions.

54 (Pages 210 - 213)

1    THE WITNESS: I'm sorry. Could you
2 repeat the question.
3    BY MS. GOODMAN:
4    Q.   Yeah.  The campaign parameters that
5 are reflected here on Page 4, did these
6 parameters inform the kind of media that you in
7 working with Universal McCann decided to
8 purchase for purposes of this campaign?
9    MR. RYAN: Objection to form and
10 foundation.
11    THE WITNESS: This would be part of
12 the process for us.  Prior to this
13 presentation, we would be working with -- in
14 this case we would -- this would have come out
15 of my brand shipping team.  They would have
16 been working with our creative agency of record
17 as well as our media agency of record.  And
18 within that there are other agencies also that
19 may indeed play in this.
20    This is UM's part of it after they
21 have been briefed as to what we are trying to
22 do.  We are trying to run a -- avoiding

1 ship surcharges.  We had a rough budget and how
2 long we wanted to run that program and what we
3 were trying to accomplish, who that target
4 audience was.
5    UM provided a recommendation for the
6 campaign.  This is part of -- this is part of
7 the overall campaign.  This is the media part
8 of the campaign that UM would be responsible
9 for.  There are other entities that would also
10 play a role with this campaign.
11    BY MS. GOODMAN:
12    Q.   And so when the postal service is
13 working on determining the correct -- the
14 optimal media strategy for a particular
15 campaign, do you first need to determine what
16 the campaign parameters are?  An example being
17 exhibited on Slide 4 of this deck.
18    MR. RYAN: Objection to foundation.
19    THE WITNESS: This is Slide 4
20 campaign parameters?
21    BY MS. GOODMAN:
22    Q.   Right.

1    A.   Would be a helpful basis for UM to
2 provide recommendation for us on what they feel
3 they could do to help this campaign be
4 successful.
5    Q.   And is -- in shorthand is setting
6 the campaign parameters sort of Step 1 in the
7 process of determining what is the appropriate
8 mix of media to buy for this particular
9 campaign?
10    MR. RYAN: Objection to form and
11 foundation.
12    THE WITNESS: This campaign
13 parameter is given to Universal McCann for the
14 media component.  There are other parameters
15 that we need to put in place that are similar
16 to the objective that tie to other agencies
17 that we work with.
18    So in this particular case, we might
19 involve McCann, which is McCann/MRM, so -- and
20 it's McCann M-C-C-A-N-N-/-M-R-M -- to do our
21 creative for us.  That creative may take on
22 direct mail creative, digital banner creative,

1 potentially something tied to social media as a
2 potential option as creative goes with our
3 other agency, Weber Shandwick/Powell Tate, as
4 well as anything we might do internally with
5 our own group under our brand digital team on
6 the dot-com site if we were potentially using
7 something there.  So it's a broader, larger --
8    BY MS. GOODMAN:
9    Q.   Sure.
10    A.   -- effort.
11    Q.   But more specifically in my
12 questions today -- or at least certainly in
13 this line of questioning -- are focused on the
14 determination with respect to what kind of paid
15 media to purchase --
16    A.   Uh-huh.
17    Q.   -- for purposes of a particular
18 campaign that the postal service is running.
19    And so with respect to making such
20 that -- such a determination of what is the
21 appropriate mix of paid media to purchase, is
22 it important at the outset to establish what

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

1   the campaign parameters for that campaign are?
2        MR. RYAN: Objection. Form.
3        THE WITNESS: Yes. My team works
4   with UM on defining what those campaign
5   parameters are. UM may come back and say you
6   may have a budget of 500,000. We recommend
7   600,000, and then we can go back and forth as
8   to whether or not we agree.
9        In this particular case, their
10  recommended budget was 500,000 with an
11  evergreen search of 750,000.
12       BY MS. GOODMAN:
13  Q.   What is evergreen search?
14  A.   Evergreen search for us is being
15  always on, so we run -- we have -- there's --
16  there's organic search and paid search. We run
17  multiple millions of dollars of paid search
18  that we add words in to -- for searching for
19  for customers.
20       And we were adding in particular --
21  a number of phrases or words into our paid
22  search program so that if someone happened to

Page 219

1   type in a particular word that was key to this,
2   it would -- it would pop up in the paid
3   environment. We hoped to already have it
4   showing up in organically as well. When you
5   have them showing up in both on the front page,
6   you are more apt to have someone click through.
7        So we add paid into that to help us
8   potentially bring more reinforcement for
9   someone to have confidence to click through and
10  have a higher probability of clicking through
11  for going to our site or content.
12  Q.   And is paid search a form of digital
13  advertising?
14       MR. RYAN: Objection to foundation.
15       THE WITNESS: I would consider paid
16  search a form of digital advertising.
17       BY MS. GOODMAN:
18  Q.   Okay. And if you go to Slide 11
19  ending in 41 Bates, is this slide depicting the
20  recommended allocation for this particular
21  campaign of the moneys budgeted for the
22  campaign across display, social, and search?

Page 220

1   A.   You asked me to look for Slide 11.
2   Was there another page as well?
3   Q.   On Bates 841. I think you're on the
4   right page. Oh.
5   A.   This one.
6   Q.   Yeah.
7   A.   Okay. Just one pay.
8   Q.   So this slide depicts a proposed
9   allocation of money across three different
10  channels, correct?
11       MR. RYAN: Objection to form.
12       THE WITNESS: This shows a
13  recommendation from UM to utilize display,
14  social, and search for the media purchase of
15  this campaign. It is not limited to other
16  media channels like the direct mail piece that
17  went with this.
18       BY MS. GOODMAN:
19  Q.   Okay. And you see under
20  "display" --
21  A.   Yes.
22  Q.   -- it references Cadreon.

Page 221

1        Do you see that?
2   A.   I do.
3   Q.   What is Cadreon?
4   A.   Cadreon is an entity that --
5        MR. RYAN: Objection. Foundation.
6        THE WITNESS: Oh, sorry.
7        Cadreon is an entity that UM has
8   used to help place advertising for us.
9        BY MS. GOODMAN:
10  Q.   And postal service does not have a
11  contract directly with Cadreon; is that
12  correct?
13       MR. RYAN: Objection to foundation.
14       THE WITNESS: I'm unaware of any
15  contract with Cadreon.
16       BY MS. GOODMAN:
17  Q.   And is Cadreon now called Matterkind
18  to your knowledge?
19       MR. RYAN: Objection to foundation.
20       THE WITNESS: I believe that Cadreon
21  evolved to the name Matterkind.
22       BY MS. GOODMAN:

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 318

1  witness based on what we view as improper
2  assertions of privilege.
3       So I'll hold the deposition open for
4  the record and I will pass the witness.
5       MR. RYAN:  Any questions?  I would
6  like to just note at this point, we would like
7  -- it might be automatic, but just for the
8  record, I just want to note that we want to
9  designate the entire transcript -- treat it --
10  have it treated as highly confidential for the
11  time allotted in the protective order, to allow
12  portions of the transcript to be -- the proper
13  portions to be designated and any exhibits that
14  are highly confidential.
15       MS. GOODMAN:  Okay.
16       MR. RYAN:  No questions for the
17  witness.
18       MS. GOODMAN:  Thank you,
19  Mr. Karpenko.
20       THE WITNESS:  Thank you.
21       THE VIDEOGRAPHER:  This marks the
22  end of the deposition of Mr. Karpenko.  Going

Page 319

1  off the record at 19:05.
2       (Whereupon, the proceeding was
3  concluded at 7:05 p.m.)

Page 320

1       CERTIFICATE OF NOTARY PUBLIC
2       I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.
18
19
20       Notary Public in and for
21       the District of Columbia
22  My Commission expires:  August 14, 2025

Page 321

1  Sean Carman
2  sean.carman@usdoj.gov
3       August 11, 2023
4  RE:   United States, Et Al v. Google, LLC
5  8/10/2023, Christopher Karpenko (#6031969)
6  The above-referenced transcript is available for
7  review.
8  Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12  The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
          Yours,
22       Veritext Legal Solutions

81 (Pages 318 - 321)

HIGHLY CONFIDENTIAL

Page 322

1  United States, Et Al v. Google, LLC

2  Christopher Karpenko (#6031969)

3        E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19

20

21  _____  _____

22  Christopher Karpenko            Date

Page 323

1  United States, Et Al v. Google, LLC

2  Christopher Karpenko (#6031969)

3        ACKNOWLEDGEMENT OF DEPONENT

4    I, Christopher Karpenko, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____  _____

12  Christopher Karpenko            Date

13  *If notary is required

14        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  _____ DAY OF _____, 20___.

16

17

18        _____

19        NOTARY PUBLIC

20

21

22

82 (Pages 322 - 323)

HIGHLY CONFIDENTIAL

Page 323

1    United States, Et Al v. Google, LLC

2    Christopher Karpenko (#6031969)

3              ACKNOWLEDGEMENT OF DEPONENT

4       I, Christopher Karpenko, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____          09-21-2023

12   Christopher Karpenko                      Date

13   *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      21 DAY OF September , 2023.

16

17

18   _____

19              NOTARY PUBLIC

20

21                      TERRY-ANN MONIQUE SCOTT
                        NOTARY PUBLIC DISTRICT OF COLUMBIA
22                      My Commission Expires January 1, 2028