# Plaintiffs' Exhibit 79

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

UNITED STATES, et al.,                 ) 1:23-cv-00108-LMB-JFA
)
)
    Plaintiffs,                        )
)
vs.                                    )
)
GOOGLE LLC,                            )
)
    Defendants.                        )
_____)

- HIGHLY CONFIDENTIAL -

VIDEOTAPED DEPOSITION OF
KOBY SOUTH
August 31, 2023
9:06 a.m.

Reported by:  Bonnie L. Russo
     Job No. CS6074125

Page 34

1  A.  Still a civil servant so...
2  Q.  So in the first four years, you were
3  at the Office of Mental Health and Suicide
4  Prevention, you were on a nonpermanent -- you
5  were in a nonpermanent role; is that right?
6  A.  I don't know that I would
7  characterize it -- it was the detail. I was
8  still a full-time civil servant on a detail.
9  Q.  I am just trying to understand. You
10 said you were permanently reassigned to the
11 Office of Mental Health and Suicide Prevention,
12 what's the distinction that you are drawing
13 there? How is that different than what you
14 were doing for the first four years?
15 A.  With the federal government, you
16 have what they call billets or FTEs, full-time
17 equivalents. And each office has, like, oh,
18 you have 50 people, you can't have more than 50
19 people. We really want to hire you but we can
20 only have 50 people. Well, then a
21 reorganization happened and they got some more
22 billets, and they were, like, we love you, we

Page 35

1  have room now so...
2  Q.  Okay. What's your -- what was your
3  title after you were permanently assigned to
4  the Office of Mental Health and Suicide
5  Prevention?
6  A.  Management and program analyst.
7  Q.  And what are your responsibilities
8  in that role?
9  A.  Large, national campaign management
10 and external education and communication to
11 VA's primary stakeholders, veterans.
12 Q.  What does large, national campaign
13 management entail?
14 A.  Many things.
15 Q.  Can you just give me a summary?
16 A.  Outreach with other organizations.
17 They can be, you know, nonprofits or
18 corporations or other government agencies,
19 websites, communication product development,
20 all of this is focused on mental health, and
21 mental health services, mental health
22 resources, encouraging veterans to access

Page 36

1  resources to get mental health treatment, so
2  communication products that fulfill that
3  mission.
4      You know, everything from websites
5  to print and electronic materials, development,
6  video production and paid media.
7  Q.  And then in your -- your other role,
8  external education and communication to VA's
9  primary stakeholders and veterans, what do you
10 -- what does that entail?
11 A.  That is part of the national
12 campaign, yeah. That's what we do is, you
13 know, external communication is part of the
14 national campaigns.
15 Q.  What are the campaigns that you
16 oversee right now?
17     MR. CARMAN:  Objection. Foundation.
18     BY MS. MORGAN:
19 Q.  Do you oversee campaigns right now?
20 A.  Yes.
21 Q.  Which campaigns are you overseeing
22 right now?

Page 37

1  A.  Make the Connection and general
2  mental health. I would just call it general
3  mental health. It doesn't have a specific
4  title. The stuff we create for general mental
5  health drives people to mentalhealth.VA.gov.
6  Q.  Are there individual ad campaigns
7  within the general mental health category?
8  A.  Yes.
9  Q.  What are some of those?
10 A.  Can you clarify that?
11 Q.  Yeah. I guess I am trying to
12 understand if general mental health has
13 initiatives within it or specific campaigns
14 within it where there is, like, different
15 creative that is constructed or where there is
16 a different media plan for how the media is
17 going to be distributed.
18     Are there different campaigns with
19 that understanding?
20     MR. CARMAN:  Objection to form.
21     THE WITNESS:  Yes.
22     BY MS. MORGAN:

10 (Pages 34 - 37)

Page 154

1   A.  It is.
2   Q.  Is that a specific ad campaign that
3   is -- is Suicide Prevention Month a specific ad
4   campaign that falls under the umbrella of
5   mental health initiatives in the Office of
6   Mental Health and Suicide Prevention?
7       MR. CARMAN:  Objection.  Form.
8       THE WITNESS:  We sort of define
9   loosely, you know, semantics, but this is an
10  observance that has paid media as part of an
11  overall campaign.
12      BY MS. MORGAN:
13  Q.  What is the strategy of the overall
14  campaign it's a part of?
15  A.  Awareness.
16  Q.  What is the specific strategy
17  associated with -- is there a specific strategy
18  associated with Suicide Prevention Month?
19  A.  Building awareness of resources.
20  Q.  What resources?
21  A.  In this instance the reach-out
22  campaign.

Page 155

1   Q.  And what's the reach-out campaign?
2   A.  It's a Suicide Prevention Month
3   slogan to promote veterans to reach out if they
4   become, you know -- are in moments of crisis
5   basically.
6   Q.  In the -- in the first line of this
7   e-mail underneath the greeting, it says:
8   "Thanks for the time today as we walked through
9   the specific channels and tactics recommended
10  for SPM.  The plan is attached."
11      Do you see that?
12  A.  I do.
13  Q.  Do you understand what Ms. Stoltz
14  meant by specific channel and tactics?
15  A.  I assume I knew what she meant at
16  the conclusion of that meeting.  Currently I
17  would have to refresh myself, but I am pretty
18  sure they are also included in this attachment.
19  Q.  Do you have any understanding of if
20  there is a difference between a channel and
21  tactic?
22      MR. CARMAN:  Objection.  Form.

Page 156

1   Foundation.
2       THE WITNESS:  No.
3       BY MS. MORGAN:
4   Q.  The next sentence says:  "We will
5   mark this as approved."
6       Do you see that?
7   A.  I do.
8   Q.  Does the Office of Mental Health and
9   Suicide Prevention always approve the media
10  plans that are created by its contractors?
11      MR. CARMAN:  Objection.  Form.
12  Foundation.
13      THE WITNESS:  Yes.
14      BY MS. MORGAN:
15  Q.  You have never seen a media -- like
16  a contractor move forward with a media plan
17  without seeking approval from the Office of
18  Mental Health and Suicide Prevention?
19  A.  In my experience in my role,
20  absolutely not.
21  Q.  Would you expect that that could
22  ever happen?

Page 157

1       MR. CARMAN:  Objection.  Form.
2   Foundation.
3       BY MS. MORGAN:
4   Q.  Just based on your experience, do
5   you have any understanding of whether that
6   could happen?
7   A.  I don't work with any people in the
8   government that I have ever been around in my
9   23 years of federal service who would do
10  something that was morally questionable or
11  unethical like that.
12  Q.  Would you consider not approving a
13  media plan to be morally questionable?
14  A.  Maybe not morally question.  It
15  would be unethical, and it would be a violation
16  of the contract, and it would jeopardize the
17  relationship and could lead to more severe
18  consequences for a contractor because it's
19  pretty clearly stated what is -- should and
20  should not happen in regards to paid media
21  plans.
22  Q.  When you say "it's clearly stated,"

Page 158

1  do you mean the contractor has to seek
2  approval?
3      A.  It says the contractor needs -- the
4  paid media plan has to be approved and that
5  anything that's paid or placed has to be
6  preapproved.
7      Q.  So when you're talking about
8  something being unethical, you're talking about
9  the contractor being unethical for moving
10 forward without getting approval for a media
11 plan, not the VA or some other government
12 agency being unethical because a contractor
13 didn't?
14     A.  Yes.
15        MR. CARMAN:  Objection.
16        BY MS. MORGAN:
17     Q.  Okay.
18     A.  Sorry.
19     Q.  Are you authorized to approve a
20 media plan for the Office of Mental Health and
21 Suicide Prevention?
22     A.  Yes.

Page 159

1      Q.  Were you authorized to approve the
2  Suicide Prevention Month media plan?
3      A.  I think this requires a little
4  clarification.  It depends on the program and
5  how each of those programs in the office are --
6  what their leadership requires.
7         And in our current -- under this
8  specific evidence that you've provided, we
9  volunteered to assist the suicide prevention
10 program for a limited time period.  Their
11 communication program in general was faltering.
12 And so as part of our volunteer work, we came
13 in and fixed certain elements that were -- that
14 were broken.
15        However, they have a much more
16 direct leadership style, and so many of these
17 media plans require at least the leadership of
18 suicide prevention or deputy approval.  If I
19 recall correctly, something like this would
20 have either been approved -- you know, we would
21 have briefed Dr. Lisa Kearney or Dr. Matt
22 Miller on this, and they would have at least

Page 160

1  concurred.  And, you know, that's generally how
2  things happen there.
3         Under mental health and Make the
4  Connection, we -- we brief our chief of staff,
5  but we are the ultimate approvers on the paid
6  media plan.
7      Q.  Okay.  I think I understand the
8  point of clarification here, but let me make
9  sure.
10        So you told me earlier that you work
11 in the mental health side of the -- mental
12 health communication side of the Office of
13 Mental Health and Suicide Prevention; is that
14 right?
15        MR. CARMAN:  Objection.  Form.
16        THE WITNESS:  That sounds accurate.
17        BY MS. MORGAN:
18     Q.  Okay.  And there are ad campaigns
19 that fall on the mental health side or
20 initiatives that fall on the mental health
21 side, including Make the Connection, and mental
22 health generally, which has a lot of topics

Page 161

1  under it; is that right?
2      A.  That's correct.
3      Q.  Okay.  There are also ad campaigns
4  and topics that fall on the suicide side of the
5  office; is that correct?
6      A.  Correct.
7         MR. CARMEN:  Objection.  Form.
8         BY MS. MORGAN:
9      Q.  Okay.  Is -- Suicide Prevention
10 Month is on the suicide -- Suicide Prevention
11 Month is on -- not in the mental health side of
12 the Office of Mental Health and Suicide
13 Prevention; is that right?
14        MR. CARMAN:  Objection.  Form.
15        THE WITNESS:  Yes.
16        BY MS. MORGAN:
17     Q.  Okay.  So this campaign, Suicide
18 Prevention Month, falls under the suicide side
19 of the Office of Mental Health and Suicide
20 Prevention; is that right?
21     A.  Yes.
22     Q.  And you were working on this

HIGHLY CONFIDENTIAL

Page 218

1  Q. Are those transactions that Reingold
2  did with Google to the best of your knowledge?
3      MR. CARMAN: Objection to form.
4  Foundation.
5      THE WITNESS: To the best of my
6  understanding, those are ads that Reingold
7  purchased on behalf of the United States
8  Government.
9      BY MS. MORGAN:
10  Q. And were those ads purchased through
11  Google?
12      MR. CARMAN: Objection. Form.
13  Foundation.
14      THE WITNESS: I think that's asking
15  me to speculate.
16      BY MS. MORGAN:
17  Q. Does it say Google in this line
18  item?
19  A. Yes.
20  Q. Do you have an understanding -- you
21  testified that the lines above this related to
22  Facebook were about transactions with Facebook.

Page 219

1  Do you have a reason to think that
2  the lines that say Google right below that
3  would not be about transactions with Google?
4      MR. CARMAN: Objection. Form.
5  Foundation.
6      THE WITNESS: I feel like you
7  switched your words between Facebook and Google
8  a little bit, but I would say that based on
9  this spreadsheet this appears to be ads that
10  were purchased on Facebook. I cannot verify
11  whether these were purchased through Google or
12  through Facebook, but it appears to be the
13  case.
14      BY MS. MORGAN:
15  Q. Okay. What about below there?
16  There is a line that says: "Microsoft Bing."
17  Do you see that?
18  A. I do.
19  Q. Do you have an understanding of what
20  that is referring to?
21      MR. CARMAN: Objection. Form.
22      THE WITNESS: It appears to be

Page 220

1  similar to the above information, that those
2  are ads purchased on the Bing search engine.
3      BY MS. MORGAN:
4  Q. Do you know what kind of ads those
5  might be?
6  A. I don't recall in this instance, no,
7  I do not. Likely some sort of search ad
8  related to Bing search results, but that is a
9  speculation.
10  Q. Below Microsoft Bing there is one
11  line that says: "Yahoo."
12      Do you see that?
13  A. I do.
14  Q. Do you know what that's referring
15  to?
16  A. No. Likely Yahoo search engine
17  stuff too.
18  Q. Do you know if the Office of Mental
19  Health and Suicide Prevention -- well, scratch
20  that.
21      Do you know if Reingold purchases
22  ads for the suicide prevention campaign or any

Page 221

1  other campaign for the Office of Mental Health
2  and Suicide Prevention using Yahoo programmatic
3  buying and selling technology?
4      MR. CARMAN: Objection. Form.
5  Foundation.
6      THE WITNESS: I do not know.
7      BY MS. MORGAN:
8  Q. Do you know what a DSP is?
9  A. I did. Now I forgot. Digital
10  service provider.
11  Q. Do you know what a DSP is used for?
12  A. It is used in some way on
13  programmatic ad stuff.
14  Q. Do you know if there are DSPs that
15  Reingold has used to buy ads for campaigns
16  through the -- for campaigns for the Office of
17  Mental Health and Suicide Prevention?
18      MR. CARMAN: Objection to form.
19      THE WITNESS: I know that Reingold
20  has used DV360 to purchase ads for the Office
21  of Mental Health and Suicide Prevention.
22      BY MS. MORGAN:

56 (Pages 218 - 221)

Veritext Legal Solutions
800-567-8658                                          973-410-4098

Page 222

1  Q. Do you -- is it your understanding
2  that DV360 is a DSP?
3  A. I think so. I'm not positive.
4  Q. Do you know if Reingold has used a
5  DSP owned by Yahoo?
6  A. I am not aware of that.
7  Q. Do you know if Reingold has used a
8  DSP from The Trade Desk?
9      MR. CARMAN: Objection to form.
10     THE WITNESS: I definitely have
11 never seen that. I don't know, no.
12     BY MS. MORGAN:
13  Q. Have you ever evaluated which DSPs
14 are used to buy ad space for campaigns of the
15 Office of Mental Health and Suicide Prevention?
16     MR. CARMAN: Objection. Form.
17     THE WITNESS: No.
18     BY MS. MORGAN:
19  Q. Have you ever evaluated any other ad
20 tech tools used for programmatic buying in --
21 for campaigns of the Office of Mental Health
22 and Suicide Prevention?

Page 223

1      MR. CARMAN: Objection. Form.
2      THE WITNESS: No.
3      BY MS. MORGAN:
4   Q. Do you know what The Trade Desk is?
5   A. No.
6   Q. In the document we were just looking
7  at, Reingold is asking for payment from the
8  Office of Veterans Affairs; is that right?
9      MR. CARMAN: Object to form and
10 foundation.
11     THE WITNESS: Reingold is invoicing
12 to be reimbursed for what appears to be
13 exclusively paid media that they purchased
14 under the direction of the government.
15     BY MS. MORGAN:
16  Q. To your knowledge, does the Office
17 of Mental Health and Suicide Prevention
18 contract directly with Google for the purchase
19 of ad space?
20     MR. CARMAN: Objection to form.
21     THE WITNESS: To my knowledge, the
22 Office of Mental Health and Suicide Prevention

Page 224

1  has never contracted directly with Google.
2      BY MS. MORGAN:
3   Q. What about any other ad tech
4  providers? To your knowledge, has the Office
5  of Mental Health and Suicide Prevention
6  contracted with any ad tech providers?
7      MR. CARMAN: Objection. Form.
8      THE WITNESS: No.
9      BY MS. MORGAN:
10  Q. To your knowledge, has the Office of
11 Veteran Affairs generally -- I am just talking
12 about within your knowledge. Has the Office of
13 Veteran Affairs generally contracted directly
14 with Google --
15     MR. CARMAN: Objection to form and
16 foundation.
17     BY MS. MORGAN:
18  Q. -- for --
19     MR. CARMAN: Sorry. I didn't mean
20 to cut you off.
21     BY MS. MORGAN:
22  Q. Has the Office of Veteran Affairs

Page 225

1  generally contracted directly with Google for
2  programmatic sale or purchase of ad space?
3      MR. CARMAN: Objection. Form.
4  Foundation.
5      THE WITNESS: From my direct
6  knowledge, I am not aware of the Department of
7  Veterans Affairs ever contracting directly with
8  Google.
9      BY MS. MORGAN:
10  Q. From your experience has the Office
11 of Veteran Affairs ever contracted directly
12 with any ad tech provider for the programmatic
13 buying or selling of ad space?
14     MR. CARMAN: Objection to form.
15 Foundation.
16     THE WITNESS: To my knowledge, the
17 Department of Veterans Affairs doesn't have
18 personnel with the experience, not even the --
19 the series number to be performing those types
20 of duties. Thus, why all of this type of ad
21 purchasing is done through specialized,
22 performance work statement contracts.

Page 290

1  THE WITNESS: Yeah, I am
2  generalizing that I think most record retention
3  policies are somewhere in the neighborhood of
4  seven years. That would include most records.
5  I highly doubt that they are deleting patient
6  records every seven years though, but most
7  business operational documents I think are
8  seven years.
9      BY MS. MORGAN:
10    Q. Do you use any kind of chat platform
11  to communicate at work?
12    A. We use Teams, yes.
13    Q. And you use the chat function inside
14  Teams?
15    A. Yes.
16      MS. MORGAN: Okay. I think we can
17  go off the record. I think I am done on the
18  30(b)(1), but I want to just talk to my team.
19      Does anyone object to taking a
20  break?
21      MR. CARMAN: No.
22      THE VIDEOGRAPHER: The time is

Page 291

1  p.m. This ends Unit 5. Off the record.
2      (A short recess was taken.)
3      THE VIDEOGRAPHER: The time is
4  -- 4:08 p.m. We are on the record.
5      MS. MORGAN: Mr. South, I am not
6  going to have further questions for you as a
7  fact witness.
8      And before we go off the record in
9  this deposition, I do want to just reserve
10  rights -- my understanding is that last night
11  the Department of Justice informed Google that
12  there were some -- like several thousand
13  documents of Mr. South's that had not been
14  produced yet. We proceeded with the deposition
15  anyways. It was scheduled. I'll just reserve
16  the right to reopen the deposition should that
17  become necessary when we look at the documents.
18      And I have no further questions on
19  this -- in this deposition.
20      MR. CARMAN: We have no questions.
21      THE VIDEOGRAPHER: The time is
22  p.m. We are off the record.

Page 292

1      (Whereupon, the proceeding was
2  concluded at 4:08 p.m.)

Page 293

1      CERTIFICATE OF NOTARY PUBLIC
2      I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.

*Bonnie L. Russo*

19  _____
20      Notary Public in and for
21      the District of Columbia
22  My Commission expires: August 14, 2025.

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL

Page 293

1       CERTIFICATE OF NOTARY PUBLIC

2           I, Bonnie L. Russo, the officer before
3       whom the foregoing deposition was taken, do
4       hereby certify that the witness whose testimony
5       appears in the foregoing deposition was duly
6       sworn by me; that the testimony of said witness
7       was taken by me in shorthand and thereafter
8       reduced to computerized transcription under my
9       direction; that said deposition is a true
10      record of the testimony given by said witness;
11      that I am neither counsel for, related to, nor
12      employed by any of the parties to the action in
13      which this deposition was taken; and further,
14      that I am not a relative or employee of any
15      attorney or counsel employed by the parties
16      hereto, nor financially or otherwise interested
17      in the outcome of the action.

18                  *Bonnie L Russo*

19                  _____
20                  Notary Public in and for
21                  the District of Columbia
22      My Commission expires:  August 14, 2025.

HIGHLY CONFIDENTIAL

Page 294

1  ACKNOWLEDGMENT OF DEPONENT
2  I, KOBY SOUTH, do hereby certify that I have
3  read the foregoing transcript of my testimony
4  taken on 8/31/23, and further certify that it
5  is a true and accurate record of my testimony
6  (with the exception of the corrections listed
7  below):
8  Page   Line       Correction
9  ____   ____    _____
10 ____   ____    _____
11 ____   ____    _____
12 ____   ____    _____
13 ____   ____    _____
14 ____   ____    _____
15 ____   ____    _____
16 ____   ____    _____
17 ____   ____    _____
18       _____
           KOBY SOUTH
19
   SUBSCRIBED AND SWORN TO BEFORE ME
20 THIS _____ DAY OF _____, 2023.
21
   _____  _____
22 (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
   Job No. CS6074125

Page 295

1  SEAN CARMAN, ESQUIRE
2  sean.carman@usdoj.gov
3          September 1, 2023
4  RE: United States, Et Al v. Google, LLC
5   8/31/2023, Koby South (#6074125)
6   The above-referenced transcript is available for
7  review.
8   Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to
15 Erratas-CS@veritext.com.
16
17   Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25    Job No. CS6074125

75 (Pages 294 - 295)

HIGHLY CONFIDENTIAL

Page 294

ACKNOWLEDGMENT OF DEPONENT

I, KOBY SOUTH, do hereby certify that I have read the foregoing transcript of my testimony taken on 8/31/23, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

| Page | Line | Correction |
|------|------|------------|
| 195  | 11   | cue        |
| 197  | 1    | cue        |
| 201  | 9    | cue        |
| 201  | 15   | cue        |
| 106  | 6    | ad         |
| 45   | 5    | help       |
| 45   | 5    | help       |
| 111  | 16   | MTC        |
| 115  | 1 & 5 | MTC       |

_[signature]_

KOBY SOUTH

SUBSCRIBED AND SWORN TO BEFORE ME THIS 29 DAY OF September, 2023.

_____   _____
(NOTARY PUBLIC)           MY COMMISSION EXPIRES:

Job No. CS6074125