# Exhibit I

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

- - - - - - - - - - - - - - -+

UNITED STATES OF AMERICA, et al,

       Plaintiffs,    | Case Number:

  vs.    | 1:23-cv-00108-LMB-JFA

GOOGLE, LLC,

       Defendant.

- - - - - - - - - - - - - - -+

Video Deposition of
ROBIN E. LEE, Ph.D.
Friday, March 15, 2024
9:39 a.m.

Veritext Job 6456904

Reported by: Laurie Donovan, RPR, CRR, CLR

Page 26

1    institutional details, learning as much as I
2    can before applying these economic
3    frameworks.
4  BY MR. ISAACSON:
5    Q    Before the fall of 2019, did you
6  consider yourself an expert in digital
7  advertising?
8         MR. NAKAMURA: Objection to form.
9         THE WITNESS: Again, I'm here testifying
10   as an economic expert with training in
11   industrial organization.
12 BY MR. ISAACSON:
13   Q    So before the fall of 2019, before
14 you're hired to testify in this case, did you
15 consider yourself an expert in digital
16 advertising?
17        MR. NAKAMURA: Objection to form.
18        THE WITNESS: Probably depends on what
19   you referred to as "expert," but I knew a
20   little bit of it, about digital advertising,
21   based on my prior experience, but I have not
22   published any work on digital advertising

Page 27

1    specifically, although some of my work,
2    including that on cable television markets,
3    touched upon advertising, and in my teaching,
4    I do, as an industrial organization
5    economist, cover advertising as an economic
6    concept.
7  BY MR. ISAACSON:
8    Q    So based on that work you had done as
9  you -- that touched on digital advertising, before
10 the fall of 2019, did you consider yourself to be
11 an expert in digital advertising?
12        MR. NAKAMURA: Objection to form.
13        THE WITNESS: I don't think I ever
14   called myself an expert --
15 BY MR. ISAACSON:
16   Q    And I understand --
17   A    -- in digital advertising.
18   Q    Thank you. I didn't mean to interrupt
19 you.
20        And I understand that based on your
21 background in economics, you are applying your
22 expertise to digital advertising in this case.

Page 28

1  You've told me that several times, but as of
2  today, would you call yourself an expert in
3  digital advertising?
4         MR. NAKAMURA: Objection to form.
5         THE WITNESS: So here I'm testifying as
6    an economic expert and as somebody who has
7    studied digital advertising, in particular,
8    web display advertising, at some length for
9    the past several years.
10 BY MR. ISAACSON:
11   Q    So would you -- as of today, would you
12 call yourself an expert in digital advertising?
13        MR. NAKAMURA: Objection to form.
14        THE WITNESS: I don't have -- I'm not
15   applying a label to myself of that form.
16 BY MR. ISAACSON:
17   Q    You're aware that the United States is
18 seeking damages in this case on behalf of federal
19 agency advertisers; is that right?
20   A    I'm aware.
21   Q    And you are not expressing opinions in
22 this case about whether those federal agencies

Page 29

1  have suffered any antitrust injury, correct?
2         MR. NAKAMURA: Objection to form.
3         THE WITNESS: So I'm expressing the
4    opinion that certain actions taken by Google
5    with respect to its ad tech products have
6    harmed customers of its products which
7    include advertisers.
8  BY MR. ISAACSON:
9    Q    And are you expressing any opinion in
10 this case about whether the federal agency
11 advertisers have suffered any damages?
12        MR. NAKAMURA: Objection to form.
13        THE WITNESS: So again, my opinion is
14   that certain actions taken by Google has
15   harmed advertisers and publishers that use ad
16   tech products to transact open-web display
17   advertising.
18 BY MR. ISAACSON:
19   Q    Are you expressing any opinions in this
20 case about the amount of any damages of any
21 federal agency advertiser?
22        MR. NAKAMURA: Objection to form.

Page 30

1    THE WITNESS: I'm not providing a
2    precise number of damages for these
3    particular advertising customers.
4  BY MR. ISAACSON:
5    Q   And based on your background in
6  economics and industrial organization, as I
7  understand it, you are not offering expert
8  opinions on the meaning of any individual
9  documents in this case?
10   MR. NAKAMURA: Objection to form.
11   THE WITNESS: Can you restate your
12   question or rephrase it?
13 BY MR. ISAACSON:
14   Q   Are you offering expert opinions on the
15 meaning of any individual documents in this case?
16   MR. NAKAMURA: Objection to form.
17   THE REPORTER: Meaning?
18   MR. ISAACSON: Meaning, yes.
19   THE WITNESS: I'm not.
20   MR. NAKAMURA: Same objection.
21 BY MR. ISAACSON:
22   Q   And you are not expressing an opinion in

Page 31

1  this case on the accounting profits of any Google
2  product area; is that correct?
3    MR. NAKAMURA: Objection to form.
4    THE WITNESS: Can you restate your
5    question, please.
6  BY MR. ISAACSON:
7    Q   Sure. You are not expressing an opinion
8  in this case on the accounting profits of any
9  Google product area in this case; am I correct?
10   MR. NAKAMURA: Objection to form.
11   THE WITNESS: So in my reports I do
12   discuss accounting profits and their
13   differences from economic profits, but I'm
14   not expressing opinions as to the level of
15   accounting profits for Google, Google's ad
16   tech products.
17 BY MR. ISAACSON:
18   Q   Are you expressing an opinion in this
19 case as to the level of economic product --
20 economic profits for Google's ad tech products?
21   MR. NAKAMURA: Objection to form.
22   THE WITNESS: So I'm expressing an

Page 32

1    opinion that certain Google products, in
2    particular -- I'm sure we'll discuss them --
3    Google Ads, AdX, and DFP, possess substantial
4    and sustained market power protected by
5    significant barriers to entry, which are
6    associated with economic profits.
7  BY MR. ISAACSON:
8    Q   Are you expressing an opinion in this
9  case as to the amount of economic profits for
10 Google ad tech products?
11   MR. NAKAMURA: Objection to form.
12   THE WITNESS: As I stated before, I'm
13   expressing an opinion regarding the extent of
14   market power for these products which would
15   be associated with a positive economic
16   profit.
17 BY MR. ISAACSON:
18   Q   All right. My question went to the
19 amount of economic profits.
20   Are you expressing an opinion in this
21 case as to the amount of economic profits for
22 Google ad tech products?

Page 33

1    MR. NAKAMURA: Objection to form.
2    THE WITNESS: My opinion is that Google
3    Ads, AdX and DFP are earning economic profits
4    consistent with their possession of
5    substantial and sustained market power.
6  BY MR. ISAACSON:
7    Q   And have you expressed an opinion as to
8  the amount of those profits, those economic
9  profits that you just referred to?
10   A   I believe that is saying something about
11 the amount, what I just said.
12   Q   Is saying -- are you able to express an
13 opinion as to the amount of economic profits from
14 Google ad tech products in a dollar amount?
15   MR. NAKAMURA: Objection to form.
16   THE WITNESS: So I'm not providing a
17   specific dollar number for that measure.
18 BY MR. ISAACSON:
19   Q   Before you were retained in this case,
20 had you heard the term "open-web display
21 advertising"?
22   A   So before I was retained by this case, I

Page 34

1  recall hearing the term "open-web" in contrast
2  with "walled garden," and I recall being familiar
3  with display advertising. I think I noted my
4  experience 15 years prior, looking into this
5  space.
6      Q   And before this case, had you heard the
7  term "open-web display advertising" as one term
8  with all four words?
9      A   I do not recall having come across those
10 four words together.
11         (Exhibit 1 was marked for
12         identification.)
13         (Exhibit 2 was marked for
14         identification.)
15         (Exhibit 3 was marked for
16         identification.)
17 BY MR. ISAACSON:
18     Q   We've marked as Exhibit 1 your opening
19 expert report, we've marked as Exhibit 2 your
20 rebuttal report, and Exhibit 3 is your
21 supplemental report.
22         You have them all in front of you for

Page 35

1  ease of access at any point.
2          If I can ask you to look at paragraph 7
3  of your opening report. That's Exhibit 1. In
4  paragraph 7 you say, "I have been asked by counsel
5  at the Department of Justice," and then you list a
6  number of things.
7          In the first bullet point, you say --
8  again, with reference to "I have been asked by
9  counsel at the Department of Justice to --
10 Determine whether publisher ad servers, ad
11 exchanges, and advertiser ad networks are open-web
12 display advertising, both worldwide . . . and in
13 the United States, are relevant antitrust
14 markets."
15         I skipped a parenthetical about how
16 worldwide is developed.
17         The -- were you asked to consider any
18 other market definition that would be at issue in
19 this case other than what is said there, whether
20 publisher ad servers, ad exchanges and advertiser
21 ad networks for open-web display advertising are
22 relevant antitrust markets?

Page 36

1          MR. NAKAMURA: Objection to form.
2          THE WITNESS: I'm sorry. Can you repeat
3      your question, please.
4  BY MR. ISAACSON:
5      Q   Sure.
6          So in that bullet point, it lists
7  markets, potential markets for publisher ad
8  servers, ad exchanges, and advertiser ad networks,
9  all for open-web display advertising. You were
10 asked to determine whether those are relevant
11 antitrust markets.
12         My question is: Were you asked to
13 consider any other market definition than those
14 potential market definitions?
15     A   So I recall looking into whether there
16 is a relevant market for demand-side platforms, a
17 relevant antitrust product market for demand-side
18 platforms.
19     Q   All right. Other than looking into a
20 relevant market for demand-side platforms, were
21 you asked to consider any other potential relevant
22 markets other than those which are listed in

Page 37

1  paragraph 7?
2          MR. NAKAMURA: I'll instruct Professor
3      Lee to answer to the extent to which he
4      considered the other markets that counsel
5      asked about, not any communications from
6      counsel to him.
7          THE WITNESS: So I also considered a
8      relevant antitrust product market for a
9      broader set of bidding tools, which includes
10     advertiser ad networks and demand-side
11     platforms, but as I note in my reports,
12     concluded that the smaller subset of
13     advertiser ad networks comprises a relevant
14     antitrust product market.
15 BY MR. ISAACSON:
16     Q   So other than markets for publisher ad
17 servers, ad exchanges, advertiser ad networks, all
18 for open-web display advertising, or a relevant
19 market for demand-side platforms or for ad
20 networks and demand-side platforms, did you
21 consider any other potential market definitions in
22 this case?

| | |
|---|---|
| Page 38 | Page 40 |
| 1  MR. NAKAMURA: Objection to form. | 1  display advertising or the underlying digital |
| 2  THE WITNESS: So in this case, as I note | 2  advertisements themselves? |
| 3  in my rebuttal report, I considered | 3  BY MR. ISAACSON: |
| 4  alternative markets that were proposed by | 4  Q  I'm going to ask you if you've seen |
| 5  Dr. Israel and potentially Doctor or | 5  industry sources reporting market shares for any |
| 6  Professor Ghose, but those alternative market | 6  products that would include the term "open-web |
| 7  definitions proposed by Google's experts or | 7  display advertising." |
| 8  others that I examined and opined are not | 8  A  So can I ask you to rephrase the |
| 9  appropriate for evaluating Google's market | 9  question?  You're asking if I've seen market |
| 10  power over its ad tech products that I | 10  shares of products that sell open-web display |
| 11  examined for evaluating the competitive | 11  advertising? |
| 12  effects of its conduct that I examined. | 12  Q  Any type of products.  Does it -- like |
| 13  BY MR. ISAACSON: | 13  it can be any market, any market share where the |
| 14  Q  The -- do you know if the term "open-web | 14  terms "open-web display advertising" is used. |
| 15  display advertising" existed before counsel for | 15  MR. NAKAMURA: Objection to form. |
| 16  the Department of Justice asked you to consider | 16  THE WITNESS: So in my -- maybe I'm not |
| 17  that term for your market definition? | 17  understanding your question correctly, but in |
| 18  MR. NAKAMURA: Objection to form. | 18  my report, for example, I've seen a Google |
| 19  THE WITNESS: So as an economist, I'm | 19  document talking about -- discussing DFP's |
| 20  interpreting "open-web display advertising" | 20  share across various measures of what they |
| 21  as referring to a set of transactions with | 21  refer to as "addressable inventory" or "not |
| 22  certain characteristics used to be precise | 22  walled garden," and the addressable inventory |
| Page 39 | Page 41 |
| 1  about the products that I'm examining. | 1  overlaps with open-web publishers, publishers |
| 2  I have seen materials -- I don't recall | 2  that don't -- that aren't using integrated ad |
| 3  the precise dates for those documents -- | 3  tech tools to sell their inventory. |
| 4  where both the term "open-web," the term | 4  BY MR. ISAACSON: |
| 5  "display advertising," as well as I've seen | 5  Q  We can talk about addressable inventory |
| 6  documents from firms where "open-web display | 6  later, but whether it's advertising, technology, |
| 7  advertising," those four words, have been | 7  whatever product you want to name, have you seen |
| 8  used. | 8  any industry sources that report market shares for |
| 9  BY MR. ISAACSON: | 9  a market using the words "open-web display |
| 10  Q  Do you believe you've seen documents | 10  advertising"? |
| 11  where all four words, "open-web display | 11  MR. NAKAMURA: Objection to form. |
| 12  advertising," were used together? | 12  THE WITNESS: So those documents I |
| 13  A  I recall seeing documents produced by | 13  referenced earlier, I don't recall if they |
| 14  Adobe and Facebook, although one of them may be an | 14  report any market share figures.  I don't |
| 15  industry source that used open-web display. | 15  recall, sitting here today. |
| 16  Q  The -- have you seen any industry | 16  BY MR. ISAACSON: |
| 17  sources that report market shares for open-web | 17  Q  And let me see if I can -- so there are |
| 18  display advertising? | 18  public industry sources that report on -- report |
| 19  MR. NAKAMURA: Objection to form. | 19  data for digital advertising, correct? |
| 20  THE WITNESS: So if I may ask you to be | 20  MR. NAKAMURA: Objection to form. |
| 21  more specific.  Are you referring to ad tech | 21  THE WITNESS: Yes, I believe there are |
| 22  products that facilitate the sale of open-web | 22  public sources, including e-Marketer, that |

Page 42

1  looks at digital advertising.
2  BY MR. ISAACSON:
3      Q   Have you seen any industry sources that
4  report public data that would reflect shares of
5  any market that uses the term "open-web display
6  advertising"?
7          MR. NAKAMURA: Objection to form.
8          THE WITNESS: I think, as I mentioned
9      before, sitting here today, I don't recall if
10     any of the documents that I remember using
11     the terms "open-web display" report market
12     share figures or rely upon public data.
13 BY MR. ISAACSON:
14     Q   And is it also the case that, sitting
15 here today, you don't recall any documents from
16 Google that report market shares using the term
17 "open-web display advertising"?
18     A   Sitting here today, I do not recall any
19 Google documents using the term "open-web display
20 advertising" that report market shares for ad tech
21 products.
22     Q   And sitting here today, from the

Page 43

1  third-party documents that have been made
2  available to you from this case, am I correct you
3  do not recall any third-party documents that use
4  the term "open-web display advertising" to report
5  market shares for any products?
6      A   So as I noted earlier, I recall
7  third-party documents using the term "open-web
8  display." I do not recall if they reported market
9  shares for specific ad tech products.
10     Q   To your knowledge, is this case the
11 first time anyone has tried to assemble market
12 share data using the term "open-web display
13 advertising"?
14     A   I'm not quite sure what you mean by
15 assemble data using a term. I understand what it
16 means to assemble data restricted to a set of
17 products with certain features.
18     Q   So let me explain.
19         You have, in your reports, estimated
20 market shares for markets where you're using the
21 term "open-web display advertising," correct?
22     A   So as an economist, in my reports I'm

Page 44

1  using the term "open-web" to refer to publisher
2  inventory or publisher web inventory that is not
3  sold through integrated ad tech products, and it's
4  a description of what that set of inventory is.
5          I use "display advertising" to refer to
6  a particular form of digital advertising, and so
7  when I use those terms, it's meant to clarify the
8  sets of products and transactions over which
9  certain calculations are made.
10     Q   I'm not asking you how you're using the
11 term or why you're using the term.
12         You, in your reports, do estimates of
13 market shares where -- different markets where you
14 use the term "open-web display advertising,"
15 correct?
16     A   So the relevant product markets that I
17 evaluate are those involving advertiser ad
18 networks, ad exchanges, and publisher ad servers,
19 so those are the markets.
20     Q   So you estimate market shares in your
21 report for a market of publisher ad servers for
22 open-web display advertising, correct?

Page 45

1      A   These are publisher ad servers which are
2  used to transact open-web display advertising.
3      Q   Is that a yes?
4      A   I'm sorry. What is your question?
5      Q   In your report, you estimate market
6  shares for publisher ad servers for open-web
7  display advertising, correct?
8      A   I do provide market shares for publisher
9  ad servers that facilitate the transaction of
10 open-web display advertising.
11     Q   And in your reports, you report market
12 shares for ad exchanges for open-web display
13 advertising, correct?
14     A   I do report market shares for ad
15 exchanges that facilitate the sale of open-web
16 display advertising.
17     Q   And in your, in your report, you report
18 market shares for advertiser ad networks for
19 open-web display advertising, correct?
20     A   In my report I do report market shares
21 for --
22         THE REPORTER: Hold on just a moment.

12 (Pages 42 - 45)

Page 66

1  you know, my opinions regarding market
2  definition are based on the totality of
3  evidence that I present.
4      I think a strong set of evidence that I
5  discuss which supports the validity of the
6  relevant product markets is Google's exercise
7  of market power over its AdX, Google Ads and
8  DFP product, right?
9      So I'm looking at not just a single
10 piece of evidence, but the totality of
11 evidence to form my opinions regarding market
12 definition.
13 BY MR. ISAACSON:
14     Q  If products have incremental value of a
15 certain magnitude, you would consider that
16 evidence that they are not close substitutes; is
17 that correct?
18     MR. NAKAMURA:  Objection to form.
19     THE WITNESS:  I think that it is an
20 important consideration whether or not a set
21 of, here, digital advertisements provide
22 distinct value over other forms of digital

Page 67

1  advertising.  I think that's important to
2  understand, but when I get to market
3  definition, I'll be focusing on the tools
4  used to transact those digital
5  advertisements, and there I will also
6  consider the extent to which the underlying
7  tools can be replaced with other
8  alternatives.
9  BY MR. ISAACSON:
10     Q  And as an economist, how would you look
11 at -- how would you decide whether, what magnitude
12 is necessary for -- I'll start that question over.
13     In order for incremental differences to
14 be evidence that two products are not close
15 substitutes, how would you define the magnitude
16 that's necessary of that difference?
17     MR. NAKAMURA:  Objection to form.
18     THE WITNESS:  So the preamble to your
19 question is not something that I stated or
20 necessarily agree with.
21 BY MR. ISAACSON:
22     Q  You don't agree that incremental

Page 68

1  differences between products can be evidence that
2  two products are -- I'm doing a double negative
3  now, so let me just ask you:  In order for -- do
4  you agree that incremental differences of a
5  certain magnitude can be evidence that two
6  products are not close substitutes?
7      MR. NAKAMURA:  Objection to form.
8      THE WITNESS:  I guess the question is
9  imprecise.  What do you, what do you mean
10 by -- I think what I said before is examining
11 whether, in this case, open-web display
12 advertising has distinct incremental value
13 over other forms of digital advertising is an
14 important consideration in my analysis of
15 whether the relevant product markets I
16 evaluate are valid and pass the hypothetical
17 monopolist test.
18 BY MR. ISAACSON:
19     Q  And how do you determine whether
20 something has -- two products have -- one product
21 has distinct incremental value?
22     A  I think a large part of my report talks

Page 69

1  about reasons why open-web display advertising is
2  an important form of monetization for -- let's
3  focus on publishers.
4      So for publishers, open-web display
5  advertising is significant evidence that speaks to
6  the value it has for helping them monetize their
7  web inventory.
8      Q  How do I, how do I determine whether
9  something, in your view, would have distinct
10 incremental value?  For example, does Coke have
11 distinct incremental value over Pepsi?
12     A  Well, I'm not valuating soft drinks in
13 this matter.  What I'm doing is showing here, for
14 the purpose of looking at ad tech products,
15 publishers derive significant value, additional
16 monetization from being able to sell their web
17 inventory through display ads.
18     And if they did not have access to those
19 tools that allow them to sell display ads, they
20 would be foregoing a significant amount of
21 advertising revenue, which would likely lead to a
22 reduction of content and investment.

18 (Pages 66 - 69)

Page 70

1    And in my report, I discuss why other
2    forms of digital advertising are unlikely to be
3    effective replacements for display advertising.
4    Q   And in your view, can two products that
5    have distinct incremental value from one another
6    be close substitutes?
7       MR. NAKAMURA:  Objection to form.
8       THE WITNESS:  I think, I think this is
9    why one needs to look at the totality of the
10   evidence and to look at other things to
11   inform whether, in this case, ad tech
12   products like ad exchanges, if controlled by
13   a hypothetical monopolist, could exercise
14   market power over competitive levels.
15   BY MR. ISAACSON:
16   Q   Let me repeat the question, because
17   you're saying "I think this is why," and I don't
18   know what you're talking about.
19       In your view, can two products that have
20   distinct incremental value from one another be
21   close substitutes?
22       MR. NAKAMURA:  Objection to form.

Page 71

1       THE WITNESS:  I think I answered this
2    question before, that it will depend on other
3    things, including magnitude.  If there's de
4    minimus incremental value, then it may not be
5    the case.
6    BY MR. ISAACSON:
7    Q   I'm using your term, "distinct
8    incremental value," right?  In your view, can two
9    products that have distinct incremental value from
10   one another be close substitutes?
11   A   So when I'm using "distinct incremental
12   value" here for the purposes of open-web display
13   advertising, I'm describing why it provides
14   significant incremental value to the customers who
15   rely upon it.
16   Q   So can two products that have
17   significant incremental value from one another be
18   close substitutes?
19   A   So if we're talking about digital
20   advertising, I'm not evaluating, for the present
21   market definition, substitution among digital
22   advertising.  The focus of my inquiry is whether

Page 72

1    or not ad tech products, ad exchanges, ad
2    networks, advertiser ad networks, and publisher ad
3    servers --
4    Q   I don't know what that has to do with my
5    question.  Let me repeat my question.
6       Can two products that have significant
7    incremental value differences from one another be
8    close substitutes?
9    A   It's difficult to provide a general
10   statement.  This is why I'm looking at the
11   totality of evidence to inform my opinions
12   regarding market definition.
13   Q   The -- and you are using the term "close
14   substitutes" for your analysis in this case,
15   because you find the term "reasonable substitute"
16   to be too vague; is that correct?
17   A   Well, the "reasonable substitute"
18   language you used in your question without
19   appropriate context, I wanted to clarify.
20       So in my report, when I use "close
21   substitute," what I'm talking about is
22   substitution that's sufficient to constrain the

Page 73

1    exercise of market power, and it depends on the
2    context we're using it, right?
3       So for market definition, I am applying
4    an economic framework known as the hypothetical
5    monopolist test, and for that test, it's important
6    to consider the extent to which a hypothetical
7    monopolist, over a set of products, would be
8    constrained by alternatives, outside of the
9    products it controls, from exercising significant
10   market power over competitive levels.
11   Q   So you've tried to, you've tried to
12   clarify the context of the question.
13       I'm asking you:  You're using the term
14   "close substitute" for your analysis in this case
15   rather than "reasonable substitutes," because you
16   think the language "reasonable substitutes" is too
17   vague; is that correct?
18   A   That statement I made earlier was in the
19   context of the question you asked.  I don't know
20   if I used term "reasonable" elsewhere in my
21   reports, which might have been a different
22   context, but I was saying for today, when I use

Page 74

1  the term close substitutes and when you use close
2  substitutes in my reports, the description I
3  provided earlier is what I mean by that.
4      Q   Today you prefer the term "close
5  substitutes" because you think the term
6  "reasonable substitutes" is vague; is that
7  correct?
8      A   At present, without having provided a
9  definition for that, I would say that it is not
10 clear.  I want to be precise.
11     Q   The -- you agree that a variety of ad
12 tech products work in conjunction with one another
13 to facilitate display advertising transactions,
14 correct?
15         MR. NAKAMURA:  Objection to form.
16         THE WITNESS:  So particular ad tech
17     products, the ones I discuss, advertiser ad
18     networks, ad exchanges, publisher ad servers,
19     are often used in conjunction with one
20     another by advertisers and publishers to
21     transact open-web display advertising.
22

Page 75

1  BY MR. ISAACSON:
2      Q   And you would refer to ad tech products
3  working in conjunction with one another as an "ad
4  tech stack"; is that right?
5          MR. NAKAMURA:  Objection to form.
6          THE WITNESS:  I think I and other
7      industry participants have used the term "ad
8      test stack" to refer to the set of products,
9      not necessarily them working in conjunction
10     with one another.  It's a set of products
11     that, you know, facilitate the sale of
12     open-web display advertising.
13         MR. NAKAMURA:  Counsel, we've been going
14     for about an hour and 15.
15         MR. ISAACSON:  Let me just -- I'll be
16     done with this in a minute.
17 BY MR. ISAACSON:
18     Q   Paragraph 53 of your opening report,
19 which is page 26, in paragraph 53 you write, "A
20 variety of ad tech products work in conjunction
21 with one another to facilitate display advertising
22 transactions between publishers and advertisers.

Page 76

1  These products form what is known as the 'ad tech
2  stack.'"
3          That's what you've written there,
4  correct?
5      A   That is what I wrote there.
6      Q   And you would consider Google to have an
7  ad tech stack; is that right?
8      A   So the way that I'm using the term here
9  is to refer to the set of all the products that
10 are used to facilitate display advertising, so
11 publisher ad servers, ad exchanges and advertiser
12 bidding tools, which include DSPs and advertiser
13 ad networks.  Those products overall are what I,
14 what I am referring to as an, as the ad tech
15 stack.
16     Q   So that wasn't my question.
17         My question was:  Do you consider Google
18 to have an ad tech stack?
19     A   So I consider Google to be a firm that
20 offers products within what is known as the ad
21 tech stack.
22     Q   You consider Google to offer something

Page 77

1  that's within the ad tech stack but not to offer
2  itself an ad tech stack; is that correct?
3      A   Again, I'm using the ad tech stack to
4  refer to these three -- I say, called them
5  "layers" of ad tech products, and Google offers
6  products in each of those layers.
7      Q   Do you consider Google to offer an ad
8  tech stack with those three layers?
9      A   I can't answer your question.  I don't
10 consider Google to offer the stack.  The stack
11 refers to the set of all the products that are in
12 these layers, and Google offers products contained
13 within these layers.  In particular, the ones I
14 focus on are Google Ads, AdX and DFP.
15     Q   Paragraph 53 you say, "At a high level,
16 the ad tech stack can be described as comprising
17 three layers," and then you define the three
18 layers as "publisher ad servers, ad exchanges and
19 advertiser bidding tools."
20         Does Google offer ad tech with publisher
21 ad servers, ad exchanges, and advertiser bidding
22 tools?

Page 78

1  A   So Google offers a publisher ad server,
2  an ad exchange, an advertiser ad network, and a
3  demand-side platform.
4  Q   And at a high level, do you believe
5  Google is offering a, is offering an ad tech
6  stack?
7       MR. NAKAMURA:  Objection to form.
8       THE WITNESS:  So at a high level, I'm
9  referring to the ad tech stack, which
10 represents -- I think I said this before --
11 all the products that are in these different
12 layers, and again, Google offers products
13 which are contained within this broader ad
14 tech stack which describes these different
15 layers.
16 BY MR. ISAACSON:
17 Q   Do you deny that Google is offering, at
18 a high level, an ad tech stack consisting of three
19 layers that include publisher ad servers, ad
20 exchanges, and advertiser bidding tools?
21      MR. NAKAMURA:  Objection to form.
22      THE WITNESS:  So how I and other -- I

Page 79

1  believe other industry participants have used
2  the term "ad tech stack" is to refer to this
3  entire -- I'm going to use loosely the word
4  "industry," but essentially the set of
5  products falling into these different layers.
6       So no single firm offers the entire ad
7  tech stack, because the ad tech stack has
8  different participants, although Google does
9  have a very large share of each of these
10 layers, but is not the only provider of
11 products.
12 BY MR. ISAACSON:
13 Q   So Google does not offer an ad tech
14 stack, in your view?
15      MR. NAKAMURA:  Objection to form.
16      THE WITNESS:  The way I am using the
17 term, and I put it in quotes, "ad tech stack"
18 refers to, I think I said in the last answer,
19 the entirety of these layers, all of the
20 products that are in each of these layers.
21      MR. ISAACSON:  Let's take a break.
22      MR. NAKAMURA:  Okay.

Page 80

1       THE VIDEOGRAPHER:  Going off the record
2  at 11:02 a.m.
3       (Whereupon, a short recess was
4       taken.)
5       THE VIDEOGRAPHER:  Going back on the
6  record at 11:19 p.m.  You may proceed.
7       (Exhibit 4 was marked for
8       identification.)
9  BY MR. ISAACSON:
10 Q   Marked as Lee Exhibit 4 is a document
11 dated November 2020, Bates-stamped
12 GOOG-DOJ-AT-OO855803 to 813.
13      If you look at page 807 at the bottom --
14 take a look at 807 at the bottom.
15      You referred earlier in the deposition
16 to a document that referred to -- it had a market
17 share and used the term "addressable inventory"?
18 A   I did refer to a document.  This is not
19 the one I had in mind.
20 Q   Okay.  You cited it.  We took a shot at
21 it, because it says "addressable inventory," and
22 you cite it at footnote 252 of your report.

Page 81

1       MR. NAKAMURA:  That's at page 81.
2       THE WITNESS:  So footnote 252?
3  BY MR. ISAACSON:
4  Q   Yes.
5  A   I'm citing to page 808.
6  Q   That might be an error, because 807 says
7  "addressable inventory" and 808 does not.
8  A   But footnote 252 is attached to a
9  sentence that states "a 2020 Google" --
10      THE REPORTER:  Could you slow down?  Is
11 attached to a statement --
12      THE WITNESS:  To a statement that is not
13 referring to addressable inventory.
14 BY MR. ISAACSON:
15 Q   But -- so but page 807 is not the
16 document you were referring to that -- referring
17 to addressable inventory and having a market
18 share?
19      It will help you to look at 807 to
20 answer this question.
21 A   So 807 I see later in my report, in
22 Figure 41, it does show this.  I was thinking in

21 (Pages 78 - 81)

**Errata Sheet for the Deposition Transcript of Professor Robin S. Lee**

**Case Name**: *United States et al v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.)

**Depo. Date**: March 15, 2024

**Deponent**: Robin Lee

| Page | Line | Correction | Reason for Correction |
|---|---|---|---|
| 10 | 10 | Change "White?" to "pretty wide?" | Transcription error |
| 17 | 6 | Change "9:48 pm" to "9:49 am" | Transcription error |
| 23 | 11 | Change "Dr. Weintrop" to "Dr. Weintraub" | Transcription error |
| 33 | 19 | Change "in" to "for" | Transcription error |
| 38 | 2 | Change "I note" to "noted" | Transcription error |
| 38 | 7 | Change "or" to "are" | Transcription error |
| 38 | 11 | Change "for" to "or" | Transcription error |
| 44 | 13 | Change "different" to "for" | Transcription error – glitch in audio |
| 58 | 20 | Add "display advertising" after "open-web" | Transcription error |
| 59 | 3 | Change "customer" to "customers" | Transcription error |
| 59 | 4 | Add "product" before "markets" | Transcription error |
| 65 | 13 | Change "advertise bits" to "advertisements" | Transcription error |
| 69 | 4 – 5 | Change "So for publishers, open-web display advertising is significant evidence" to "So for publishers, open-web display advertising -- there is significant evidence" | Transcription error |
| 69 | 12 | Change "valuating" to "evaluating" | Transcription error |
| 73 | 20 | Add "the" before "term" | Transcription error |
| 74 | 1 | Change "you use" to "I use" | Transcription error |
| 80 | 6 | Change "p.m." to "a.m." | Transcription error |
| 80 | 12 | Change "GOOG-DOJ-AT-OO855803 to" to "GOOG-DOJ-AT-00855803 through" | Transcription error and spelling for clarity |
| 94 | 13 | Change "(indecipherable) -- elsewhere" to "as I noted earlier elsewhere --" | Transcription error |
| 107 | 9 | Change "ad networks I provided data" to "ad networks that provided data" | Transcription error |
| 108 | 1 | Change "curtailed, as you noted," to "; Criteo, as you noted;" | Transcription error |
| 109 | 8 | Change "them are of these" to "them -- or of these --" | Transcription error |

| | | | |
|---|---|---|---|
| 112 | 4 | Change "this application" to "its applications" | Transcription error |
| 112 | 5 | Change "those were present" to "it was present" | Transcription error |
| 115 | 16 | Change "the web and ad property" to "a web and an app property" | Transcription error |
| 117 | 14 | Change "display, with regards" to "display. With regards" | Transcription error |
| 126 | 8 – 9 | Change "this app component" to "there was an app component" | Transcription error |
| 127 | 14 | Change "Google display network" to "Google Display Network" | Capitalization for clarity |
| 128 | 1 | Change "DFPs" to "DFP" | Transcription error |
| 129 | 5 | Change "DC360" to "DV360" | Transcription error |
| 129 | 13 | Add double quotation mark after "rivals." | Transcription error |
| 129 | 21 | Change "methods to monopolization" to "methods of monopolization" | Transcription error |
| 130 | 2 | Change "to rivals" to "of rivals" | Transcription error |
| 132 | 7 | Change "firm" to "firm's" | Transcription error |
| ■ | ■ | ■■■■■■■■■■■■■■■■■■■■ | ■■■■■■■■■ |
| 143 | 16 | Change "In paragraphs 12 and 3" to "In paragraph 12 on page 3" | Transcription error |
| 146 | 14 | Change "advertisers side" to "advertiser side" | Transcription error |
| 162 | 8 | Change "open bidding" to "Open Bidding" | Capitalization for clarity |
| 174 | 16 | Change "accommodation" to "competition" | Transcription error |
| 180 | 2 – 3 | Change "experience in" to "experiments and" | Transcription error |
| 180 | 21 | Change "AdX's" to "Ads-AdX" | Transcription error |
| 181 | 20 | Change "Ads, AdX's" to "Ads-AdX" | Transcription error |
| 184 | 8 | Remove extra space before "de minimus" | Formatting for clarity |
| 189 | 15 | Change "anyone can have last-look over" to "any one to have last-look over" | Transcription error |
| 196 | 8 | Change "shares" to "share" | Transcription error |
| ■ | ■ | ■■■■■■■■■■■■■■■■■■■■■■■■■■■■ | ■■■■■■■■■■■■■ |
| 199 | 9 | Change "Exhibit 7" to "Lee Exhibit 7" | Transcription error |
| 200 | 9 – 10 | Change "whether – the value of whether" to "whether he's evaluated" | Transcription error |
| 200 | 11 | Change "antirust" to "antitrust" | Transcription error |
| 201 | 11 | Change "the" to "this" | Transcription error |

| 202 | 3 | Change "it as" to "as a" | Transcription error |
|---|---|---|---|
| 203 | 1 | Change "advertiser ad network --" to "advertiser ad network product --" | Transcription error |
| 206 | 7 | Change "average than a disproportionate" to "average, and a disproportionate" | Transcription error |
| ███ | █ | ███████████████████████████████ | ████████████ |
| 207 | 18 | Change "zero zero" to "zero-zero" | Punctuation for clarity |
| 208 | 6 | Change "zero zero" to "zero-zero" | Punctuation for clarity |
| 208 | 16 – 17 | Change "Could I inspect that real briefly before I hand it back to you?" to "And, Professor Lee, could I just inspect that briefly before you take a look and I'll hand it back to you?" | Transcription error |
| 208 | 18 | Change "Okay" to "Here you go" | Transcription error |
| 208 | 20 | Change "I've given you Figure 1 [sic] and drawn" to "In Figure -- I've given you Figure 1 [sic] and drawn -- and drawn" | Transcription error |
| 209 | 17 | Remove "then" before "an increase" | Transcription error |
| 211 | 1 – 2 | Change "are we referring to Figure 16 instead of Figure 1?" to "I'd like to note that we're referring to Figure 16 and I think you said Figure 1, so I just want to make that clear." | Transcription error |
| 212 | 9 | Change "Like none of my reports -- " to "So, as I said in my reports," | Transcription error |
| ███ | █ | ███████████████████████ | ████████████ |
| ███ | █ | ███████████████████████████ | ████████████ |
| ███ | █ | █████████████████████████████ | ████████████ |
| ███ | █ | ██████████████████████ | ████████████ |
| ███ | █ | █████████████████ | ████████████ |
| ███ | █ | ████████████████ | ████████████ |
| 227 | 19 | Insert "Which paragraph" after "Counsel?" | Transcription error |
| 227 | 22 | Change "Actually, the heading." to "Actually, the heading—won't even go to the paragraph." | Transcription error |
| 229 | 7 | Change "Let me pause there" to "The -- let me pause there" | Transcription error |
| 234 | 7 | Change "analysis" to "analyses" | Transcription error |
| 236 | 2 | Change "AdX's" to "Ads-AdX" | Transcription error |
| 236 | 22 | Insert "to" before "DFP" | Transcription error |

| | | | |
|---|---|---|---|
| 239 | 2 | Change "controlling" to "after controlling" | Transcription error |
| 242 | 1 – 2 | Change "could stop for a break" to "could stop soon, that'd be great." | Transcription error |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| 244 | 1 | Insert quotations around "quality-adjusted." | Punctuation for clarity |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ |
| 263 | 2 | Change "they" to "I" | Transcription error |
| 264 | 11 | Change "E10" to "B-10" | Transcription error |
| ■ | ■ | ■ | ■ |
| 267 | 2 | Change "is" to "has" | Transcription error |
| 288 | 20 | Change "yield" to "yield," | Transcription error |
| 292 | 2 | Change "AdX was allowed" to "AdX -- was -- allowed" | Transcription error |
| 292 | 8 | Change "in the" to "into" | Transcription error |
| 296 | 5 | Change "Abrontes" to "Abrantes" | Transcription error |
| 296 | 6 | Change "Abrontes" to "Abrantes" | Transcription error |
| 296 | 11 | Change "to" to "through" | Transcription error |
| 298 | 13 | Change ", which is really only a decade" to "-- which was really only at the start of the decade" | Transcription error |
| 299 | 6 | Change "RTV" to "RTB" | Transcription error |
| 299 | 21 | Change "Abrontes" to "Abrantes" | Transcription error |
| 303 | 1 | Change "it is cited? I mean this" to "is it cited? I mean is this" | Transcription error |
| 305 | 13 | Replace "?" with "." | Transcription error |
| 307 | 5 | Change "I don't recall." to "Sitting here today, I don't recall." | Transcription error |

| 307 | 8 – 9 | Change "which is discussing unified pricing," to "which is discussing unified pricing rules," | Transcription error |
| --- | --- | --- | --- |
| 307 | 15 | Add a single quotation mark in front of "raises" | Lee Report quotes Jonathan Bellack starting at "raises" |
| 307 | 16 | Change "publics, referring pubs are" to "pubs', referring to publishers, 'are" | Transcription error |
| 307 | 17 | Add a single quotation mark after "harder." | End of Jonathan Bellack quote |
| 309 | 11 | Change "buyer-specifically" to "buyer-specific" | Transcription error |
| 309 | 22 | Change "Abrontes" to "Abrantes" | Transcription error |
| 313 | 12 | Add "It's not isolated." After answer. | Transcription error – missed in crosstalk |
| 319 | 7 | Change "unfeasible" to "infeasible" | Transcription error |
| 323 | 22 | Change "which you discuss" to "which -- you -- discuss" | Transcription error |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefor.

Date: 4/22/24   Signature: _____