Exhibit Q

LEXITAS™

89

1  A. I don't recall the specific questions.
2  Q. Were the questions you were asked earlier
3  today on the same topics you were asked about in
4  the meeting, the prior meeting?
5  A. Generally, yes. Specifics -- today was
6  much more specific than the types of questions I
7  was asked.
8  Q. Do you know, Mr. Soroca, are you expected
9  to testify at trial in this matter?
10  A. I don't know.
11     MR. KRESSIN: Objection.
12     I'm instructing you to answer only to the
13  extent can you do so without revealing
14  attorney-client privileged information.
15  A. I don't know specifically. I know that
16  I've been subpoenaed for today.
17  Q. You live in Massachusetts. Correct?
18  A. I do.
19  Q. Do you plan to travel to Virginia if
20  called to testify?
21  A. I have no plans to travel to Virginia.
22  Q. Are you aware you're listed as a potential

90

1  DOJ witness for trial in the filings the DOJ has
2  made in this case?
3  A. I am now.
4  Q. So you were not previously aware that you
5  were listed in those filings?
6  A. No. I was aware that I was potentially
7  going to be called as a witness.
8  Q. Did you consent to being included on the
9  DOJ's witness list?
10     MR. KRESSIN: Objection.
11  A. No. I was subpoenaed.
12  Q. But you understand you could be called to
13  testify -- called by DOJ to testify at trial?
14  A. Yes.
15     MR. PEARL: Can we go off the record for a
16  second?
17     THE VIDEOGRAPHER: The time is 11:31 a.m.,
18  and we are going off the record.
19     (Off the record, 11:31 a.m. to 11:33 a.m.)
20     THE VIDEOGRAPHER: The time is 11:33 a.m.,
21  and we are back on the record.
22  BY MR. PEARL:

91

1  Q. Mr. Soroca, do you know who Jonathan
2  Kanter is?
3  A. I'm aware of -- I believe he's on the DOJ.
4  Q. Have you met him before?
5  A. No, not that I'm aware.
6  Q. Are you aware that Jonathan Kanter was
7  once Magnite's lawyer?
8     MR. GUDZOWSKI: Objection, relevance.
9  A. No.
10  Q. You're not aware?
11  A. No.
12  Q. Did Jonathan Kanter's law firm represent
13  Magnite earlier in DOJ's investigation?
14     MR. KRESSIN: Objection.
15     MR. GUDZOWSKI: Objection, relevance.
16  A. I don't know.
17  Q. Mr. Soroca, you understand that you're
18  here today testifying as the corporate
19  representative of Magnite?
20  A. I do.
21  Q. And your testimony is that you do not know
22  whether Jonathan Kanter's law firm represented

92

1  Magnite?
2     MR. KRESSIN: Objection, it's outside of
3  the scope of the topics identified in the 30(b)(6)
4  motion.
5     MR. GUDZOWSKI: Objection, relevance.
6     MR. KRESSIN: You can answer from your own
7  personal knowledge.
8  A. I do not know.
9  Q. I'm going to be handing you an exhibit
10  I'll mark . . .
11     MR. PEARL: This is going to be
12  Exhibit Magnite 1. It's marked with Bates
13  DOJ-ADS-B-0000025100.
14     (Magnite Exhibit 1 marked for
15  identification)
16  Q. Have you had a chance to review that?
17  A. Okay. I've read it.
18  Q. Have you seen this document before?
19  A. No.
20  Q. Is this document something that would have
21  been helpful for you to review in your preparation
22  for the deposition today?

93

1    MR. GUDZOWSKI: Objection, form.
2 Objection, relevance.
3    Q. You can answer.
4    **A. The question is whether this would be**
5 **helpful?**
6    Q. To prepare for your deposition. Correct.
7    **A. I don't know.**
8    Q. What is this document?
9    MR. GUDZOWSKI: Objection, relevance.
10   **A. This document is a letter from the Kanter**
11 **law firm to John Hogan.**
12   Q. Do you recognize this exhibit as a true
13 and accurate copy of the letter?
14   **A. I have no --**
15   MR. KRESSIN: Objection.
16   MR. GUDZOWSKI: Objection.
17   **A. I have no way of knowing that.**
18   Q. Do you see the letterhead at the top of
19 the letter?
20   **A. I do.**
21   Q. What does it say?
22   **A. Kanter Law Group.**

94

1    Q. Do you know who the "Kanter" in Kanter Law
2 Group refers to?
3    MR. GUDZOWSKI: Objection.
4    **A. I don't.**
5    Q. So you don't know whether it's Jonathan
6 Kanter?
7    MR. GUDZOWSKI: Objection.
8    **A. That would be an assumption.**
9    Q. And your testimony is you don't know if
10 that is Jonathan Kanter?
11   **A. I'm not familiar with Jon or the Kanter**
12 **Law Group personally.**
13   Q. And again, I think you said you have never
14 met him before?
15   MR. GUDZOWSKI: Objection.
16   **A. No.**
17   Q. And you don't know if the Kanter Law Group
18 represented Magnite in this investigation?
19   MR. GUDZOWSKI: Objection, relevance.
20   **A. No.**
21   Q. Does this document do anything to help you
22 know if the Kanter Law Group represented Magnite?

95

1    MR. GUDZOWSKI: Objection.
2    **A. Yes.**
3    Q. Does it refresh your recollection about
4 whether the Kanter Law Group represented Magnite
5 in this investigation?
6    MR. GUDZOWSKI: Objection.
7    **A. I have no memory of this. I was not**
8 **involved with this at this time. It was outside**
9 **the scope of my role.**
10   Q. Do you, sitting here today, have any
11 reason to believe that this document does not
12 demonstrate that the Kanter Law Group represented
13 Magnite in this investigation?
14   MR. GUDZOWSKI: Objection.
15   MR. KRESSIN: I'm going to object and
16 instruct you to answer only to the extent can you
17 do so without revealing attorney-client privileged
18 communications.
19   **A. Could you repeat the question?**
20   Q. Based on this document, do you understand
21 that the Kanter Law Group represented Magnite in
22 this investigation?

96

1    MR. GUDZOWSKI: Objection.
2    **A. I don't know what extent that**
3 **representation was, but it would appear that**
4 **there's a letter. That's the extent -- this is**
5 **the extent of my understanding of the**
6 **representation.**
7    Q. Do you see the first sentence of the
8 letter where it says, "On behalf of our client,
9 Magnite, Inc., we are submitting to you a digital
10 file," et cetera?
11   **A. I see it.**
12   Q. Did I read that correctly?
13   **A. Yes.**
14   Q. Does that refresh your recollection as to
15 whether the Kanter Law Group represented Magnite
16 in this investigation?
17   MR. GUDZOWSKI: Objection, relevance.
18   **A. There's no recollection to refresh. All I**
19 **have is this document on this matter.**
20   Q. Do you have any reason to believe that
21 what's written in this document is not true?
22   **A. No.**

97

1  Q. Okay. You can put that to the side.
2  Okay.
3      Mr. Soroca, does Magnite offer a product
4  that competes with Google's ad exchange AdX?
5  A. Yes.
6  Q. What is that product?
7  A. That is our DV+ exchange.
8  Q. Does Magnite offer a product that competes
9  with Google's ad server DSP or Google Ad Manager?
10 A. No.
11 Q. Does it offer an ad server that would like
12 to win business from Google's DSP or Google's Ad
13 Manager?
14 A. In the display business, no.
15 Q. Does Magnite offer an ad server?
16 A. Yes.
17 Q. What is that?
18 A. It's a product we called SpringServe.
19 Q. And SpringServe can be used to serve ads.
20 Is that correct?
21     MR. GUDZOWSKI: Objection, form.
22 Q. What does SpringServe do?

98

1  A. SpringServe is an ad server for the OTT
2  and CTV market.
3  Q. What's the OTT and CTV market?
4  A. Over the top and connected television.
5  Q. Could the -- so what formats -- what ad
6  formats can the SpringServe ad server serve?
7  A. Are you asking what formats it serves
8  today?
9  Q. To start, yeah.
10 A. Connected television, over the top, which
11 are short form for long -- shorthand for long-form
12 video. And some online video.
13 Q. Do you have plans for it to be able to
14 serve additional ad formats in the future?
15 A. Only in the OTT and connected television
16 space.
17 Q. Is it technologically possible for
18 SpringServe to serve other formats of ads?
19     MR. GUDZOWSKI: Objection, form.
20 A. Technologically, anything is possible with
21 built-in software.
22 Q. Could the SpringServe ad server today

99

1  serve ad formats other than those you mentioned
2  already?
3  A. Today it is not capable of doing that. We
4  would have to build software.
5  Q. Would anything prohibit Magnite from
6  making those technological updates to enable
7  SpringServe to serve other formats of ads?
8      MR. GUDZOWSKI: Objection, form.
9  A. What would prohibit us from doing it would
10 be we would build software and we would -- we
11 believe that we would not be able to enter a
12 market -- enter the display market.
13 Q. Does Magnite offer DSP?
14 A. No.
15 Q. Would Magnite like for it to be easier to
16 compete against Google in the products where you
17 compete against Google?
18     MR. GUDZOWSKI: Objection, form.
19 A. Yes.
20 Q. Would Magnite like it to be easier to win
21 business from Google in the products where you
22 compete?

100

1      MR. GUDZOWSKI: Objection, form.
2  A. Yes.
3  Q. Did you want the Department of Justice to
4  sue Google to make it easier for Magnite to
5  compete?
6      MR. GUDZOWSKI: Objection, form.
7      MR. KRESSIN: Objection.
8      I'm going to instruct you to answer only
9  to the extent can you do so without revealing
10 attorney-client privileged information.
11     Also objecting as scope. It's outside
12 the topics identified in the subpoena.
13     You can answer from your own personal
14 knowledge.
15 A. From my personal knowledge? Can you ask
16 the question again, please?
17 Q. Did you want the Department of Justice to
18 sue Google to make it easier for Magnite to
19 compete?
20     MR. GUDZOWSKI: Objection.
21 A. I had never thought about that answer. I
22 guess no, because I never thought about the

101

1  answer.
2     Q. When you became aware that the Department
3  of Justice was investigating Google's ad tech
4  business, did you want that to result in a lawsuit
5  against Google?
6        MR. GUDZOWSKI:  Objection.
7        MR. KRESSIN:  And objection again as to
8  scope.
9        You can answer from your own personal
10 knowledge.
11    **A. So repeat the question, please.**
12    Q. When you learned that the Department of
13 Justice was investigating Google's ad tech
14 business, did you want that investigation to lead
15 to a lawsuit against Google?
16    **A. Yes.**
17       MR. GUDZOWSKI:  Objection.
18       Sorry.
19    Q. Sorry.  I missed the answer.  Could you
20 answer that again.
21    **A. Yes.**
22    Q. Thank you.  Did Magnite welcome the

102

1  lawsuit against Google?
2        MR. GUDZOWSKI:  Objection.
3        MR. KRESSIN:  Same scope objection.
4        Again, only to the degree you can answer
5  without revealing attorney-client information.
6     **A. I don't know what "welcome" means.  What**
7  **do you mean by "welcome"?**
8     Q. Were you happy when you learned of the
9  lawsuit against Google?
10       MR. GUDZOWSKI:  Objection.
11       MR. KRESSIN:  Same objections.
12    **A. Happy, no.**
13    Q. Did you believe it would be good for
14 Magnite's business when you learned of the lawsuit
15 against Google?
16       MR. KRESSIN:  Same objections.
17       MR. GUDZOWSKI:  Objection.
18    **A. I believe it would be good for the**
19 **industry.**
20    Q. What do you mean when you say "good for
21 the industry"?
22    **A. That leveling the playing field and**

103

1  eliminating the believed unfair practices would be
2  better for competition amongst Magnite and our
3  peers.
4     Q. So would that be better for Magnite's
5  bottom line?
6     **A. It would be speculating.  Potentially.**
7     Q. Did you believe that -- do you believe
8  that Magnite would be more financially successful
9  as a result of this lawsuit?
10       MR. GUDZOWSKI:  Objection.
11       MR. KRESSIN:  Objection regarding the
12 scope.
13       You can answer from your personal
14 knowledge.
15    **A. Yes.**
16    Q. Okay.  Mr. Soroca, what is your view of
17 the market share of Google's AdX product?
18    **A. This is an answer from Magnite's point of**
19 **view?**
20    Q. Correct.
21    **A. Somewhere in the 70 percent range.**
22    Q. Would your view on the dominance of AdX

104

1  change if you learned that AdX's share was
2  actually lower than, I think you said, 70 percent?
3        MR. GUDZOWSKI:  Objection, form.
4     **A. No.**
5     Q. Why not?
6     **A. Because the view that we get from our**
7  **publishers and our marketers indicates that**
8  **there's Google and there's everyone else.**
9     Q. So your views on AdX's dominance are from
10 what you hear from publishers?
11       MR. KRESSIN:  Objection, form.
12    **A. Publishers and marketers.**
13    Q. Have you done any studies of the
14 features -- of AdX's features?
15    **A. No.**
16    Q. Have you done any studies on DFP's
17 features?
18    **A. No.**
19    Q. Have you done any studies of DV360's
20 features?
21    **A. No.**
22    Q. Do you have any personal basis for your

177

1  A. Because the industry had moved to
2  first-price auctions, and not all the bidders had
3  bid-shading algorithms that were prepared for that
4  move.
5  Q. And bid-shading algorithms are important
6  for first-price auctions?
7      MR. GUDZOWSKI: Objection, form.
8  A. I don't know that they're important, but
9  they're a part of the -- a part of that type of an
10 auction.
11 Q. But it was a common problem for bidders
12 that they needed to adjust to the first-price
13 auction?
14     MR. GUDZOWSKI: Objection, form.
15 A. It was common enough for us to build a
16 feature.
17 Q. And there's a reference to a feature there
18 called "EMR." What is EMR?
19 A. "EMR" stands for estimated market rate.
20 Q. And what does EMR do?
21 A. EMR reduces a bid that we receive in a
22 first-price auction and estimates the amount

178

1  that's necessary to clear the downstream auction.
2  Q. And is that a bid-shading technique?
3  A. It is a bid-shading technique.
4  Q. Does that help buyers?
5  A. It does help buyers.
6  Q. How so?
7  A. It protects them from overpaying.
8  Q. Does it help publishers?
9  A. It does help publishers.
10 Q. And how is that?
11 A. What it does is ensures that the buyers
12 are paying a market rate as opposed to an inflated
13 rate. And if they were paying pure first price,
14 the publishers end up with spiky revenue. It
15 might spike up and down as the buyers pulled back.
16 We designed this feature to be good for buyers and
17 sellers.
18 Q. Has Magnite disclosed EMR to its
19 customers?
20 A. Yes.
21 Q. You can put that one aside.
22     I want to turn to your testimony from

179

1  earlier where I believe you characterized Google
2  as dominant in the ad tech space. Is that
3  accurate?
4  A. Yes.
5  Q. What do you base that assessment on?
6  A. The market share that we -- that we're
7  given and the buyers and sellers -- there's AdX
8  and then there's everyone else.
9  Q. So your assessment is based on what
10 customers have told you?
11 A. Yes.
12 Q. Is it based on anything else?
13 A. No.
14 Q. Okay. So we discussed previously that
15 Magnite has a take rate. Correct?
16 A. Yes.
17 Q. Who pays that take rate?
18 A. The take rate is a publisher fee.
19 Q. Is that the only fee that Magnite charges
20 publishers for using its SSP?
21 A. Yes.
22 Q. Is that fee disclosed to your customers?

180

1  A. Yes.
2  Q. Has Magnite ever charged any other fees
3  for its SSP services?
4  A. Magnite did.
5  Q. What fees were those?
6  A. Those were buy-side fees.
7  Q. And how did the buy-side fee work?
8  A. The actual mechanics were before my time
9  at the company. But there was a -- there were two
10 bid reductions that happened along the way.
11 Q. Can you explain what that means?
12 A. So when the bid comes in, a fee is taken
13 off, and then it clears, a fee is taken off, the
14 first being the buy-side fee, the second being the
15 take rate.
16 Q. Thanks. And that first fee, that was --
17 that's essentially charged to advertisers. Is
18 that right?
19 A. Yes.
20 Q. Was that first fee disclosed to
21 advertisers?
22 A. The company's position is that the actual

181

1  fee wasn't but the right to take the fee was.
2     Q. What is the distinction there?
3     A. The number was not disclosed.
4     Q. When the buy-side fee and the take rate
5  that we discussed earlier were both taken into
6  account, what was the total take rate that Magnite
7  would take on a transaction?
8     A. I don't recall the actual number. When
9  those were in full force, I was not at the
10 company.
11    Q. Do you know if it was greater than
12 20 percent?
13    A. I don't know for certain.
14    Q. Is it a common practice for SSPs to charge
15 buy-side fees?
16    A. Not any longer.
17    Q. Are you aware of any of Magnite's
18 competitors having charged buy-side fees?
19    A. In the past, yes.
20    Q. Who were they?
21    A. We believe that our direct peer-side
22 competitors, such as OpenX Programmatic and Xandr,

182

1  all did.
2     Q. And again, those fees were typically not
3  disclosed to advertisers?
4       MR. KRESSIN: Objection.
5     Q. The precise numbers of those fees were not
6  disclosed to advertisers?
7     A. I can't speak to what happened in the
8  other exchanges.
9     Q. Are you aware whether Google has ever
10 charged buy-side fees on AdX?
11    A. I don't know.
12    Q. We've talked a little bit earlier about
13 Prebid. What is Prebid?
14    A. Prebid is an organization that built open
15 source software as a header wrapper.
16    Q. And Magnite, when it was Rubicon, was a
17 cofounder of Prebid. Correct?
18    A. Yes, we were.
19    Q. Is Prebid still in existence today?
20    A. Yes, Prebid is still in existence.
21    Q. Would you characterize it as a success?
22    A. Yes.

183

1     Q. Why is that?
2     A. Because it gave access to the industry
3  that was previously not made available.
4     Q. Do you have any sense of how many
5  publishers make use of Prebid?
6     A. I don't know the precise number. Over a
7  thousand.
8     Q. Are you familiar with Google's Open
9  Bidding product?
10    A. I am.
11    Q. Are you aware of whether publishers
12 stopped using Prebid after Google introduced Open
13 Bidding?
14    A. In general, I would say no. I can't speak
15 to any specifics that a publisher turned off
16 Prebid in favor of OB.
17    Q. As far as you know, publishers continue to
18 use Prebid today?
19    A. Yes.
20    Q. And we've talked also about header
21 bidding. Do you mean that synonymously with
22 Prebid or is that something different?

184

1     A. Header bidding is a concept. Prebid is
2  a -- is one way to access the header.
3     Q. Okay. Has Prebid, to your knowledge,
4  introduced a server-side header bidding tool?
5     A. Yes.
6     Q. We also talked about Magnite's Demand
7  Manager. So that's your -- can you tell me again
8  what that product is?
9     A. Yes. Demand Manager is our software that
10 allows publishers to configure and manage and get
11 analytics based on running a Prebid wrapper.
12    Q. Do you have any sense of how many
13 publishers make use of Demand Manager?
14    A. About ▮▮▮▮▮▮▮▮
15    Q. Does Magnite consider Demand Manager
16 successful?
17       MR. KRESSIN: Objection.
18       MR. GUDZOWSKI: Objection.
19    A. Modest.
20    Q. Can publishers sell their inventory
21 through both Demand Manager and through Google's
22 Open Bidding?

**Page 185**

1  A. Yes.
2  MR. PEARL: Okay. Maybe we could take a
3  quick recess.
4  THE VIDEOGRAPHER: The time is 2:28 p.m.,
5  and we are going off the record.
6  (Recess, 2:28 p.m. to 2:41 p.m.)
7  THE VIDEOGRAPHER: The time is 2:41 p.m.,
8  and we are back on the record.
9  MR. PEARL: Thank you, Mr. Soroca. We
10  have no further questions. I'll reserve the rest
11  of our time.
12  MR. GUDZOWSKI: Thank you.
13  FURTHER EXAMINATION BY COUNSEL FOR
14  UNITED STATES OF AMERICA
15  BY MR. GUDZOWSKI:
16  Q. Mr. Soroca, we don't have too many more
17  questions, but we do have a few. So if you can
18  just indulge us.
19  So earlier in the day I used a phrase
20  "Google demand network."
21  Does Google have a product called the
22  "Google Display Network"?

**Page 186**

1  A. I believe those to be the same.
2  Q. Okay. So when I was referring to the
3  Google demand network, you understood that to mean
4  the product that's also known as Google Display
5  Network?
6  A. Also known -- or previously known as
7  AdWords.
8  Q. And is there other names?
9  A. Those are the names I'm aware of.
10  Q. What is SpringServe, again?
11  A. SpringServe is our ad server for the
12  connected television and over-the-top market,
13  primarily for long-form video.
14  Q. And is it an ad server for display
15  advertising?
16  A. No, it is not.
17  MR. PEARL: Objection, form.
18  Q. How, if at all, is -- how, if at all, is
19  it different than a display ad server?
20  MR. PEARL: Objection, form.
21  A. It serves a totally different market. It
22  has similar features, but it serves a different

**Page 187**

1  market and a different media format.
2  Q. And why do you say "a different market"?
3  A. Because we view the connected television
4  market as completely different from the display
5  market.
6  Q. And how is it different?
7  A. Different sellers of inventory, different
8  budgets. It's primarily a private marketplace or
9  a programmatic guaranteed space as opposed to open
10  auction.
11  Q. And who are the different sellers?
12  A. These would be device manufacturers like
13  LG, Visio, Samsung; OEMs like Roku; broadcasters
14  like NBC.
15  Those are very different than -- just a
16  different seller market than what's on the display
17  desktop role.
18  Q. And the display desktop role, who are
19  typically the publishers?
20  MR. PEARL: Objection to form.
21  A. There are tens of thousands of publishers
22  in that industry.

**Page 188**

1  Q. Fair to say they're not Roku or Samsung or
2  any companies like that?
3  MR. PEARL: Objection to form.
4  A. No.
5  Q. If you can go to Exhibit 3.
6  MR. GUDZOWSKI: To make sure we're on the
7  same page, everyone, it's the edited transcript
8  for Magnite earnings call May 10, 2023.
9  MR. JUSTUS: Which Exhibit 3 are you
10  referring to?
11  MR. GUDZOWSKI: Sorry. Did I get the
12  wrong one?
13  MR. JUSTUS: I just don't know if you're
14  talking about a different number.
15  Q. MR. GUDZOWSKI: I'm looking for the one
16  that's dated May 10th, 2023. And that's the same
17  edited transcript.
18  A. I have it as 8.
19  Q. All right. And this is a May 10th one.
20  Right?
21  A. That's what I have.
22  Q. The May 10th one. And that's Exhibit 8.

189

1  Sorry.
2      All right. If you'd go to page 3 and look
3  at the paragraph under Michael Barrett. And if
4  you look at the fourth paragraph there, the second
5  sentence.
6      I believe earlier, talking with counsel
7  for Google, we were discussing the sentence that
8  begins, "This has resulted in market share gains
9  for Magnite."
10     I believe you had said earlier that that
11 resulted in market share gains relative to your
12 peers.
13     Could you elaborate on that? You
14 identified one, PubMatic, I believe. Could you
15 just explain a little bit what you meant by that?
16     MR. PEARL: Objection, form.
17 **A. I believe what he was comparing here was**
18 **the earnings that PubMatic reported during the**
19 **same period where they reported a negative share**
20 **or share loss where we reported share growth.**
21     Q. And just to be clear, when you said market
22 share gains for Magnite, you're not referring --

190

1  you're not comparing that to the market share of
2  AdX?
3      MR. PEARL: Objection, form.
4  **A. No.**
5      Q. You can set that aside.
6      I know earlier you talked about AdX's take
7  rate, in our questioning and in Google's
8  questioning. And earlier counsel for Google asked
9  you about the difference between ▮ and
10 20 percent. Is that right?
11     MR. PEARL: Objection, form.
12 **A. They did.**
13     Q. And you said that ▮ percent was Magnite's
14 take rate for open auction. Right? Is that
15 right?
16     MR. PEARL: Objection to form.
17 **A. That's right. That is correct.**
18     Q. And do you believe ▮ percent is a
19 competitive take rate for open auction?
20     MR. PEARL: Objection to form.
21 **A. That's the take rate that we are able to**
22 **maintain and market.**

191

1      Q. And if Magnite were to increase its take
2  rate from ▮ percent, that would be an
3  increase of ▮ percent. Is that right?
4      MR. PEARL: Objection to form.
5  **A. Yes.**
6      Q. So Google's published take rate, and one
7  you kind of described as you had read about on the
8  blog, is over ▮ percent higher than -- ▮ percent
9  higher than Magnite's take rate. Is that right?
10     MR. PEARL: Objection, form.
11 **A. The comparison between our take rate and**
12 **their blog. That is correct.**
13     Q. All right. If we can go to Exhibit 4. I
14 believe I got this one right. Exhibit 4, and
15 specifically page number Bates MAGNITE-00002637.
16     I think earlier counsel for Google was
17 asking you about these charts. Is that right?
18 **A. They did.**
19     Q. Okay. So earlier you were looking at
20 these charts and counsel was walking you through
21 the charts and comparing certain metrics.
22     In that comparison, this comparison here,

192

1  is this comparing figures before and after Magnite
2  built out auction capacity?
3      MR. PEARL: Objection, form.
4  **A. Yes. That is what it is designed to show.**
5      Q. Okay. Can you tell us more about this
6  building out of auction capacity?
7      MR. PEARL: Objection, form.
8  **A. So the way the system is designed is we**
9  **try to bring as many ad requests into the front**
10 **door, and then we'll filter those down to the**
11 **highest-monetizing ones that we then put out to**
12 **auction.**
13     **The number of opportunities that we put**
14 **out to auction is directly correlated with the**
15 **auction capacity. So the more auction capacity we**
16 **can bring, the more auctions that we can conduct**
17 **that actually go out to DSPs, come back and end up**
18 **with bids in the ad server.**
19     Q. How much of that build-out cost --
20     MR. PEARL: Objection to form.
21 **A. I don't have the figures. I would say**
22 **it's a combination of hardware and software.**

193
1  Q. Is it fair to say it's a meaningful cost,
2  building auction capacity?
3      MR. PEARL: Objection, form.
4      A. It's meaningful. Our CapEx numbers are
5  disclosed in our statements.
6      Q. And if I'm reading this chart right, is it
7  the case that before the build-out your average
8  daily take rate was ▮▮▮ percent?
9      MR. PEARL: Objection, form.
10     A. Yes.

194
1      Q. And your net revenue per 1 million
2  auctions also dropped. Is that right?
3      MR. PEARL: Object to form.
4      A. Correct.
5      Q. So after investing in the capacity
6  build-out, your take rate -- sorry -- your take
7  rate, win rate, and net revenue per 1 million
8  auction all fell?
9      MR. PEARL: Objection, form.
10     A. Yes.

20     Q. I think early on you had talked about how
21  revenues increased in Magnite. Is that right?
22     MR. PEARL: Objection to form.

195
1      A. Yes.
2      Q. In the display ad tech space, which
3  company has the most revenue?
4      MR. PEARL: Objection, form.
5      A. Presumably Google.
6      Q. And why do you say that?
7      MR. PEARL: Objection, form.
8      A. Because they are the largest in the
9  category.
10     Q. And what categories are they the largest
11  in?
12     MR. PEARL: Objection, form.
13     A. What categories are you looking for?
14     Q. Specifically within display ad tech, which
15  categories of that technology would you say
16  they're the dominant -- the largest in?
17     MR. PEARL: Objection, form.
18     A. They're the largest DSP, they're the
19  largest SSP, and they're the largest ad server.
20     MR. GUDZOWSKI: All right. Thank you. I
21  think we're okay on our end.
22     I'll pass it off to you.

196
1      MR. PEARL: Can we take a quick recess?
2      THE VIDEOGRAPHER: The time is 2:53 p.m.,
3  and we are going off the record.
4      (Recess, 2:53 p.m. to 2:59 p.m.)
5      THE VIDEOGRAPHER: The time is 2:59 p.m.
6  We are going on the record.
7      MR. PEARL: We have no further questions.
8  Thank you, Mr. Soroca.
9      MR. GUDZOWSKI: Thank you, Mr. Soroca.
10     MR. KRESSIN: Again, I'd like to designate
11  the transcript as highly confidential.
12     THE VIDEOGRAPHER: This concludes today's
13  deposition. The time is 3:00 p.m., and we are
14  going off the record.
15     (Off the record at 3:00 p.m.)



```
                                                               198
 1                 E R R A T A   S H E E T

 2      I, ADAM SOROCA, do hereby certify that I have

 3    read the foregoing transcript of my testimony, and

 4    further certify that said transcript is a true and

 5    accurate record of my testimony (with the

 6    exception of the following corrections listed

 7    below):

 8    Page        Line                    Correction
         See Errata Sheet Attached
 9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

12    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

14    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

16    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

17    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

18    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19    Signed under the pains and penalties of perjury

20    this   13th     day of    October        , 2023.
                                      DocuSigned by:
21                                    Adam L. Soroca
                                      D7A53756A26E478...
22                              ADAM SOROCA
```