# Plaintiffs' Exhibit 81

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION
------------------------X
UNITED STATES, ET AL.,   :
                         :
        Plaintiff,       :
                         :  Case No.
     v.                  :  1:23-cv-00108-LMB-JFA
                         :
GOOGLE LLC,              :
                         :
        Defendant.       :
------------------------X

VIDEOTAPED DEPOSITION OF SUSAN A. MCMEEN
Thursday, September 7, 2023; 9:45 a.m. EDT

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR, CLR, RSA, NYRCR, NYACR, CA CSR 14409, NJ CCR 30XI00244600, NJ CRT 30XR00019500, Washington State CSR 23005926, Oregon CSR 230105, TN CSR 998, NW CSR 589, Remote Counsel Reporter, LiveLitigation Authorized Reporter, Notary Public
Job No. 6067835

|  | Page 22 |  | Page 24 |
|---|---|---|---|
| 1 | been finished. | 1 | the subject matter of the deposition? |
| 2 | MR. SOSNOWSKY: And I would also | 2 | A. They are just aware of the |
| 3 | ask that you just give a pause so that I | 3 | information that we've had to collect for it, but |
| 4 | can -- | 4 | nothing in particular about it. |
| 5 | THE WITNESS: Sure. | 5 | Q. So what did you tell your staff in |
| 6 | MR. SOSNOWSKY: -- interject an | 6 | particular about the subject matter of the |
| 7 | objection, if appropriate. | 7 | deposition? |
| 8 | BY MR. GREENBAUM: | 8 | A. They just know I'm being deposed, |
| 9 | Q. So approximately how many calls did | 9 | but it's -- that's about -- that's it. |
| 10 | you have with this group of individuals to | 10 | Q. And did you discuss your |
| 11 | prepare for your deposition today? | 11 | participation in this lawsuit with anyone besides |
| 12 | A. It was a couple calls. | 12 | those with whom you prepared for this deposition? |
| 13 | I don't remember exactly the | 13 | A. No. |
| 14 | lengths of those calls, but they weren't that | 14 | Q. Anyone from Stratacomm? |
| 15 | long. | 15 | A. No. |
| 16 | Q. More than 30 minutes? | 16 | Q. Anyone from Ad Council? |
| 17 | MR. SOSNOWSKY: Objection: form. | 17 | A. No. |
| 18 | THE WITNESS: I'd say, you know, | 18 | Q. Friends? |
| 19 | maybe an hour or so. Maybe a couple -- | 19 | A. No. |
| 20 | maybe one or two went a little bit | 20 | Q. Anyone else at NHTSA? |
| 21 | longer. I just don't remember. | 21 | A. Just my attorneys at NHTSA. |
| 22 |  | 22 | Q. Did you discuss your participation |

|  | Page 23 |  | Page 25 |
|---|---|---|---|
| 1 | BY MR. GREENBAUM: | 1 | in this lawsuit with Elizabeth Nilsson? |
| 2 | Q. Okay. Did you discuss your | 2 | A. No. |
| 3 | deposition with anyone besides the people with | 3 | Q. With Julie Vallese? Am I -- |
| 4 | whom you've prepared? | 4 | A. No. Vallese. |
| 5 | A. No. | 5 | Q. Vallese? |
| 6 | Q. Did you discuss this deposition | 6 | A. Yes. |
| 7 | with anyone from Stratacomm? | 7 | Q. Okay. And -- |
| 8 | A. No. | 8 | A. No -- |
| 9 | Q. Did you discuss this deposition | 9 | Q. -- you did not? |
| 10 | with anyone from Ad Council? | 10 | A. -- except for she knows that I'm |
| 11 | A. No. | 11 | being deposed -- |
| 12 | Q. Did you discuss this deposition | 12 | Q. Okay. |
| 13 | with any friends? | 13 | A. -- and being at the meeting. |
| 14 | A. No. | 14 | Again, Elizabeth is on my staff, so |
| 15 | Q. Any family? | 15 | I obviously had to tell my staff why I would not |
| 16 | A. No. | 16 | be available. |
| 17 | Q. Did you tell anyone that you were | 17 | Q. Okay. What is your current title? |
| 18 | going to be deposed today? | 18 | A. The director of consumer |
| 19 | A. I spoke to my staff and told them | 19 | information. |
| 20 | that I would not be available because of this | 20 | Q. And how long have you held that |
| 21 | going on. | 21 | title? |
| 22 | Q. And did you tell any -- your staff | 22 | A. A little over 15 years. |

7 (Pages 22 - 25)

Page 26

1    Q.    Prior to that, what position did
2   you hold?
3    A.    I was at a different organization.
4    Q.    What organization?
5    A.    That was the Office of Personnel
6   Management.
7    Q.    And from what years did you -- how
8   long did you hold a position at the Office of
9   Personnel Management?
10    A.    It was a little over two years.
11   I'd have to back out the years.
12         Do you want me to do that?
13    Q.    No.
14    A.    Thank you.
15    Q.    But what was your title there?
16    A.    I was -- I believe it was the
17   director of business development.
18    Q.    And what was your role in that
19   position?
20    A.    So I handled the communications and
21   the business development for two parts, or
22   organizations, within the -- I'll just call it

Page 27

1   "OPM," for short.
2    Q.    What two parts of the organization?
3    A.    Oh, gosh.  I remember their
4   acronyms.
5         The CLCS, which is -- there was a
6   consulting service there that provided consulting
7   services for the rest of the Government.  And
8   then there was a leadership development
9   organization where I provided marketing
10   assistance and oversight for them.
11    Q.    And prior to your position at OPM,
12   what -- did you hold any other positions in
13   marketing or communications?
14         MR. SOSNOWSKY:  Objection --
15         THE WITNESS:  Not --
16         MR. SOSNOWSKY:  -- form.
17         Go ahead.
18         THE WITNESS:  I worked at the
19   Postal Service --
20         BY MR. GREENBAUM:
21    Q.    And --
22    A.    -- prior to that.

Page 28

1    Q.    -- what was your role at the Postal
2   Service?
3    A.    I had several roles there.  One of
4   them -- I was a product manager for the
5   self-service area, and then I was the manager of
6   the call center there and then a first-class
7   manager managing the first-class product and
8   other products there.
9    Q.    And do you have any marketing or
10   communications experience that predates your
11   position at the U.S. Postal Service?
12    A.    Yes.  I worked for the Department
13   of Energy within the Energy Efficiency and
14   Renewable Energy.
15    Q.    Any other positions?
16    A.    Yes.
17         Prior to that, I worked for the
18   Energy Information Administration.
19    Q.    In total, how many years of
20   experience do you have in the field of marketing
21   and communications?
22    A.    Over 25 years.

Page 29

1    Q.    Okay.  Can you describe your role
2   as a director of consumer information for the --
3   for NHTSA?
4    A.    So I manage a wide variety of
5   issues, ranging from mark -- consumer market
6   research to creative development to partner
7   strategies to media buying, managing staff,
8   managing the budgets and addressing other
9   concerns that come up with regards to
10   communications.
11    Q.    And who do you report to at NHTSA?
12    A.    My boss is Julie Vallese.
13    Q.    And what's her title?
14    A.    Associate administrator of consumer
15   information and communications.
16    Q.    And who reports to you?
17    A.    I have six people on my staff.
18    Q.    Okay.  And what are their
19   responsibilities?
20    A.    They --
21         MR. SOSNOWSKY:  Objection: form.
22         Go ahead.

8 (Pages 26 - 29)

Page 34

1  So some -- my staff have -- managed
2  campaigns that are on multiple different
3  contracts, but I have appointed people who are
4  over all the main core, the contract officer
5  representative for the contract.
6      Q.  So does Ms. Nilsson work on -- is
7  Ms. Nilsson responsible for -- does Ms. Nil- --
8  strike that.
9      Does Ms. Nilsson work on campaigns
10 that other individuals are responsible for and
11 she provides support?
12     A.  No; she manages her own campaigns,
13 too.  She has the child passenger safety
14 campaigns, the heat-stroke campaign, and is
15 overseeing one of the campaigns as we call
16 "speed."
17     Q.  Okay.  And who's the fifth person
18 that reports to you?
19     A.  That would be Thomas Bayhi.
20     Q.  And what are Mr. Bayhi's
21 responsibilities?
22     A.  So, right now, because he's with --

Page 35

1  has only been with us a little over a year, he's
2  more working with my other campaign managers.
3      So he is supporting the speed
4  campaign, the motorcycle, bikes, move over, to
5  the best of my knowledge.
6      And then, also, we're going to be
7  putting on a communications forum in a month, and
8  he is working on that.
9      Q.  And the last person that reports to
10 you -- what's their name?
11     A.  Her name is Gabriela Gordon.  And
12 she just started working for me about a month and
13 a half or two months ago, somewhere around that
14 time frame.
15     Q.  And what are her responsibilities?
16     A.  Right now, her sole responsibility
17 is to assist in the development and execution of
18 the communications forum.
19     Q.  Are there any campaigns that NHTSA
20 runs that you did not mention in the context of
21 the responsibilities of your team?
22     A.  Yes.  I just -- it's hard to

Page 36

1  remember them all.
2      We do have the vehicle -- we have a
3  theft-prevention campaign, to the best of my
4  knowledge -- I'm trying to remember these.
5      Q.  Let me try it this way --
6      A.  Thank you.
7      Q.  -- does your role as director of
8  consumer information include responsibilities for
9  all advertising campaigns that are relevant to
10 this lawsuit?
11     MR. SOSNOWSKY:  Objection: vague.
12     THE WITNESS:  So it's hard for me
13 to know exactly all the details because I
14 really don't.  I've tried to keep myself
15 pretty distant from this.  So -- just to
16 really provide whatever information is
17 asked of me.
18     So I really have not gone and
19 compared all the list.  I've only been
20 asked to provide information, and that is
21 what I've done.
22     So I can't really tell you,

Page 37

1  without seeing the list, what exactly is
2  in the list and what I work on.
3      BY MR. GREENBAUM:
4      Q.  What do you mean -- what do you
5  mean when you say you've tried to keep yourself
6  pretty distant from this?
7      A.  I have answered questions that my
8  attorneys at NHTSA -- I'll just call it "NHTSA."
9  It's the National Highway Traffic Safety
10 Administration.  Sorry -- whatever information
11 has been asked of us, I have provided or I've
12 asked my staff to provide, and really just to
13 answer questions that people have asked of me
14 to -- you know, that they've asked.
15     Q.  So does your role of director of
16 consumer information include responsibilities for
17 all advertising campaigns that NHTSA runs?
18     A.  Yes.
19     Q.  And there's a subset of those
20 campaigns that are relevant to this lawsuit; is
21 that right?
22     MR. SOSNOWSKY:  Objection:

Page 70

```
1    A.    Okay.
2          And it's what number?
3    Q.    One hundred is -- are the last
4    three digits.
5          Yep.  You should see big text that
6    says, Media Planning.
7    A.    I do.
8    Q.    So it says, Media Planning.
9          What is media planning?
10   A.    They plan our media -- it's just
11   the process of planning to put together the media
12   by plan.
13   Q.    Great.
14         And what would be the purpose of --
15   and you can look through the slide deck -- what
16   would be the purpose of this slide deck?
17         MR. SOSNOWSKY:  Objection: form.
18         (Whereupon, the witness reviews
19          the material provided.)
20         THE WITNESS:  Hold on.  I just . .
21   .
22         I'm sorry.  Can you repeat your
```

Page 71

```
1    question now?
2          BY MR. GREENBAUM:
3    Q.    What is the purpose of this slide
4    deck?
5          MR. SOSNOWSKY:  Objection:
6    foundation.
7          THE WITNESS:  You know, it's been
8    four or five years since this was put
9    together.  I can only kind of -- I can't
10   really recall why we put it together back
11   then.
12         BY MR. GREENBAUM:
13   Q.    Does it generally describe the
14   media planning process that NHSTA's ad agencies
15   use to purchase advertising?
16   A.    No.  Actually, it -- it -- it talks
17   about media buy planning, but the -- when you use
18   the word "process," I guess I need to understand
19   more what you mean by that.
20   Q.    Well, let's walk through a couple
21   of pages, and you can tell me what represents
22   your process --
```

Page 72

```
1    A.    Sure.
2    Q.    -- and what might be different
3    today than it was in 2019.
4          Okay?
5          Let's take a look at Slide 2.
6    A.    Okay.
7    Q.    This is the Bates ending in 101.
8    It says Media Deliverables at the top.
9          What does this slide depict about
10   the process that NHTSA or its ad agencies use to
11   engage in media planning?
12         MR. SOSNOWSKY:  Objection:
13   foundation.
14         THE WITNESS:  So this is just a
15   very high overview of just kind of points
16   in time, but there's things that happen
17   during these times.
18         So it's just a very 50,000-foot
19   level.
20         BY MR. GREENBAUM:
21   Q.    Let me try it this way.  I'm trying
22   to get a basic understanding --
```

Page 73

```
1    A.    Sure.
2    Q.    -- of the process that your ad
3    agencies employ to purchase advertising --
4    A.    Um-hum.
5    Q.    -- and I see on this page that
6    there are three deliverables that the -- that are
7    depicted.
8          There's a Media Work Plan, a Media
9    Buy Recommendation and a Media Buy Summary.
10         Do you see that?
11   A.    Yes.
12   Q.    Are those three deliverables that
13   your ad agencies provide in order to assist NHTSA
14   with planning its media purchases?
15         MR. SOSNOWSKY:  Objection: form.
16         THE WITNESS:  So if you want to
17   reference 2019 --
18         BY MR. GREENBAUM:
19   Q.    Yeah.
20   A.    -- I don't really recall exactly
21   the process which we used then.  It has evolved
22   over time.
```

Page 74

1  So that's why it's -- I'm trying to
2  understand your question, but I need more
3  specifics of what you're looking for.
4      Q.  Does your ad agency send you a
5  media work plan before they engage in a campaign
6  to purchase advertising?
7      MR. SOSNOWSKY: Objection: form.
8      THE WITNESS: They provide us a
9  media work plan that they -- the agency
10 will provide to us. And then we will
11 meet with them and discuss the media buy
12 plan.
13     There a lot of times are revisions
14 and things that need to be changed before
15 we feel comfortable with the plan. Once
16 we're comfortable with the plan, then we
17 approve the plan.
18     BY MR. GREENBAUM:
19     Q.  Okay. Do you -- so the -- the
20 first step is they provide a work plan?
21     A.  Yes.
22     Q.  You review the work plan?

Page 75

1      A.  My campaign manager of a specific
2  campaign will review the plan, sometimes with me,
3  sometimes without me. And then we will
4  collectively, most times, but not always, then
5  meet with the ad agency to discuss the media buy
6  plan.
7      Q.  And then I see a second deliverable
8  called "media buy recommendations."
9      What's the role of the media buy
10 recommendation deliverable --
11     MR. SOSNOWSKY: Objection:
12 foundation.
13     BY MR. GREENBAUM:
14     Q.  -- in this process?
15     MR. SOSNOWSKY: Same objection.
16     THE WITNESS: So, as I said
17 earlier, things have evolved, and we do
18 things a little bit differently now. So
19 there isn't, like, these three distinct
20 processes; it's more fluid now.
21     So once the plan is approved,
22 they're able to go back and then put

Page 76

1  together what we call now -- a more like
2  Excel spreadsheets with all the detail of
3  what they're planning on purchasing
4  associated with the media buy summary of
5  all the different things associated with
6  it.
7      BY MR. GREENBAUM:
8      Q.  In 2019, did your media agencies
9  provide a media buy recommendation deliverable
10 like that depicted in this slide?
11     MR. SOSNOWSKY: Objection: form.
12     THE WITNESS: So the media buy
13 recommendation is actually something that
14 they recommended. I do not believe -- I
15 am not certain and I cannot recall if we
16 actually instituted that. I just know,
17 really, the way we operate today.
18     BY MR. GREENBAUM:
19     Q.  Can you go to slide ending in
20 Bates 105?
21     If you look on the right side of
22 the page, it says, As much as possible,

Page 77

1  recommendations are bundled by channel/medium and
2  sent for review.
3      In 2019, did your ad agencies
4  bundle their recommendations by channel/medium
5  for your review?
6      MR. SOSNOWSKY: Objection: form.
7      THE WITNESS: So they have -- I
8  don't like -- I would like to use the
9  word, instead of bundled, "categories" or
10 "buckets."
11     If we're referring to 2019, I
12 can't really recall exactly how it was
13 done. Again, this is really -- from my
14 understanding, this document here and the
15 e-mail -- it was a recommendation that
16 they're trying to provide to us to the
17 process.
18     We do work continually with our ad
19 agencies to better refine and develop a
20 better media work plan that is digestible
21 and then used for our states and local
22 communities to use.

Page 78

1    So, really, that is one of the
2    main purposes for that document and also
3    for us to use. But mostly, when we
4    develop it, we're doing it in such a way
5    so that the states and local communities
6    can pick it up and understand then what
7    has -- what is NHTSA planning on
8    purchasing so they can develop their own
9    plans.
10       BY MR. GREENBAUM:
11    Q.   And setting aside the, you know,
12   media buy recommendation or the deliverable that
13   you are -- your ad agency provides, do they
14   typically bundle media purchases by channel or
15   medium?
16       MR. SOSNOWSKY: Objection: form.
17       THE WITNESS: So I wouldn't want
18    to say that all of these are always
19    included. Some may, some not. They've
20    changed over time, too. So I really need
21    to know exactly when you're asking this
22    or if -- what your question -- how -- you

Page 79

1    know, specifically what you're asking.
2       BY MR. GREENBAUM:
3    Q.   Are media purchases recommendations
4   typically bundled according to the channel and
5   medium, in your experience?
6    A.   So --
7       MR. SOSNOWSKY: Objection: form.
8       THE WITNESS: -- so, as I had
9    mentioned earlier, we don't really bundle
10    things; we put them in buckets and
11    categories. So, you know, that's what --
12    how the agency will present it to us.
13       The titles may change because
14    media is changing.
15       BY MR. GREENBAUM:
16    Q.   What's in the category that's
17   listed as Custom here below?
18       MR. SOSNOWSKY: Objection:
19    foundation.
20       THE WITNESS: I don't know, given
21    just seeing this, what the intent was
22    because it could be interpreted

Page 80

1    differently depending upon a campaign.
2       Can we take a break in just a
3    few minutes?
4       MR. GREENBAUM: Now's a good time.
5       THE WITNESS: Okay. Great.
6       THE VIDEOGRAPHER: The time is
7    10:47 a.m. This ends Unit 1. We're off
8    the record.
9           --oOo--
10     (Whereupon, a recess was taken from
11       10:47 a.m. EDT to 11:02 a.m. EDT.)
12          --oOo--
13       THE VIDEOGRAPHER: The time is
14    11:02 a.m. This begins Unit Number 2.
15    We're on the record.
16       MR. SOSNOWSKY: Okay. Counsel,
17    actually, something that -- you both kind
18    of trail off in your question and your
19    answer. So if you could just both be
20    careful that one is finished before you
21    respond and that you finish your answer
22    before you ask, I'd appreciate it,

Page 81

1    because I get lost sometimes.
2       BY MR. GREENBAUM:
3    Q.   You can put the document aside for
4   a second.
5    A.   Okay.
6    Q.   Speaking generally about the
7   process NHTSA uses to purchase advertising, what
8   input does -- does your team have on which
9   channels are used to advertise on behalf of
10   NHTSA?
11    A.   Are you referring to a particular
12   time period or --
13    Q.   Let's start with today.
14    A.   Okay. So we look -- NHTSA looks to
15   the ad agency to bring forth the appropriate
16   channels to use in our paid media campaigns.
17    Q.   Does your team have any input on
18   that channel mix?
19    A.   We look to our ad agency to provide
20   us the expertise of media buying to give us the
21   best approach in how to reach our target
22   audience.

|   | Page 262 |   | Page 264 |
|---|---|---|---|
| 1 | Trade Desk, Sling TV; is that right? | 1 | Q.  Okay. |
| 2 | A.  That's what they're listing, but I | 2 | So I just want to ask a couple of |
| 3 | do not know if that's all-inclusive. | 3 | questions on Page 4 of 29, Bates ending in 7074, |
| 4 | Q.  Okay.  And there could be others? | 4 | the paragraph that begins, The primary media |
| 5 | A.  There could be. | 5 | strategy. |
| 6 | Q.  I want to go back to Tab 41, which | 6 | Do you see that? |
| 7 | is Exhibit 100, something we previously looked | 7 | A.  Yes, right under Media Strategy. |
| 8 | at. | 8 | Um-hum. |
| 9 | And this is the e-mail from | 9 | Q.  It says, The primary media strategy |
| 10 | Glaceria Mason to you, attaching a Labor Day -- | 10 | will be to build frequency in order to convey |
| 11 | Labor Day media work plan. | 11 | NHTSA's impaired-driving message.  In order to |
| 12 | Okay? | 12 | affect behavioral change, the message must be |
| 13 | A.  I don't believe I recall us going | 13 | seen many times within the campaign period. |
| 14 | through this. | 14 | Why is it -- what -- what does it |
| 15 | Q.  Do you recall me asking you who ST1 | 15 | mean when it says, The primary media strategy |
| 16 | refers to, the first page, first e-mail? | 16 | will be to build frequency in order to convey |
| 17 | A.  Yes. | 17 | NHTSA's impaired-driving message? |
| 18 | Q.  Okay. | 18 | What does that mean? |
| 19 | Okay.  So I'd like to go to Page 3, | 19 | A.  So one of the issues here that I |
| 20 | Bates ending in 73, of the presentation that she | 20 | have is that this is not the final document, and |
| 21 | attaches.  You can read the presentation, which | 21 | I don't have the questions -- they -- they |
| 22 | we've previously reviewed, I think.  It's called | 22 | apologize in the e-mail.  They say they |

|   | Page 263 |   | Page 265 |
|---|---|---|---|
| 1 | the Impaired-Driving 2019 HVE Campaigns, Labor | 1 | apologized and asked if you would list the |
| 2 | Day and December Holiday, Media Work Plan. | 2 | questions, and they'd be happy to have them |
| 3 | A.  Yeah, we -- the plan, we have not | 3 | addressed.  So I must have had questions about |
| 4 | reviewed. | 4 | this.  So this is not the final.  So I don't know |
| 5 | Q.  Okay.  Take a second to familiarize | 5 | if my questions referred to making change -- what |
| 6 | yourself. | 6 | changes in the document. |
| 7 | A.  Okay. | 7 | Q.  So do you disagree with the |
| 8 | (Whereupon, the witness reviews | 8 | statement that the primary media strategy that |
| 9 | the material provided.) | 9 | NHTSA employees would be to build frequency in |
| 10 | BY MR. GREENBAUM: | 10 | order to convey NHTSA's impaired-driving message? |
| 11 | Q.  Ms. McMeen, it's been six minutes. | 11 | A.  Our goals at NHTSA is to build |
| 12 | Can we try the same approach we used last time, | 12 | reach and frequency.  So I'm not sure, depending |
| 13 | where if I ask a question that requires anything | 13 | upon what the final document ended up saying, |
| 14 | more than where you have read to so far, you can | 14 | given that I had questions and it appears that |
| 15 | then ask to read any remainder of the document | 15 | they had -- they are asking in this e-mail for me |
| 16 | you haven't already finished? | 16 | to provide it to them to address them, and I just |
| 17 | Is that fair? | 17 | don't know what those questions were, because |
| 18 | A.  I guess it depends on the question | 18 | this was four years ago. |
| 19 | and where it is to -- | 19 | Q.  Yeah.  So let me try asking very |
| 20 | Q.  Okay. | 20 | generally here about what -- what -- |
| 21 | A.  -- help me answer that. | 21 | A.  Sure. |
| 22 |   | 22 | Q.  -- you interpret this language to |

Page 266

1  mean, because the last sentence says, Digital and
2  paid social will be built -- will build off the
3  base created by the traditional portions of the
4  media plan.
5      What does that mean, that digital
6  and paid social will build off the base?
7      MR. SOSNOWSKY: Objection:
8  foundation.
9      THE WITNESS: I'm not really sure
10 either --
11     BY MR. GREENBAUM:
12  Q.  Okay.
13  A.  -- because they're being vague, and
14 the problem is this is not the final document,
15 and I don't know what the questions that I had
16 for them were.
17  Q.  Generally, do you think that paid
18 -- that digital and paid social can build off of
19 a base of traditional portions of a media plan?
20     MR. SOSNOWSKY: Objection: form.
21     THE WITNESS: So I would like to
22 refer to today in the way we work things.

Page 267

1  We look at, holistically, all of the
2  channels that we have to build -- to
3  create our media buy plan and media buy
4  summary to then have the -- the buy
5  executed incorporating all the various
6  channels to maximize our reach and
7  frequency with our target audience.
8      BY MR. GREENBAUM:
9   Q.  Next page, 707 -- two pages later,
10 7076, the section says Media Selection and
11 Rationale.  It says, A multi-platform approach is
12 imperative in today's fragmented media
13 environment.
14     Do you believe that today's media
15 environment is fragmented?
16     MR. SOSNOWSKY: Objection: form.
17     THE WITNESS: I think -- I -- I
18 guess I hate to speculate or provide an
19 opinion.
20     BY MR. GREENBAUM:
21  Q.  You don't want to speculate on
22 today's media environment?

Page 268

1   A.  I can say what I see.
2   Q.  Certainly.
3      Do you believe, in your experience,
4  that today's media environment is fragmented?
5      MR. SOSNOWSKY: Objection: form.
6      THE WITNESS: I would say that
7  there's many more opportunities to reach
8  a target audience.
9      BY MR. GREENBAUM:
10  Q.  Okay.  I want to shift to
11 discussing Google's and NHTSA's use of Google
12 products and services.
13     What Google Products does NHTSA or
14 its media agencies utilize to purchase
15 advertising?
16     MR. SOSNOWSKY: Objection: form.
17     THE WITNESS: Again, it depends
18 upon the campaign and when.
19     BY MR. GREENBAUM:
20  Q.  Does NHTSA or its media agencies
21 utilize DV360 to purchase advertising?
22     MR. SOSNOWSKY: Objection: form.

Page 269

1      THE WITNESS: It depends upon
2  which campaign and which contractor we're
3  referring to.
4      BY MR. GREENBAUM:
5   Q.  Has NHTSA used DV360 between
6  the years 2019 and 2023 to purchase advertising?
7      MR. SOSNOWSKY: Objection: form.
8      THE WITNESS: It depends upon
9  which campaign.
10     BY MR. GREENBAUM:
11  Q.  So I understand it depends on the
12 campaign.  I just want to understand, has NHTSA
13 ever -- strike that.
14     Has NHTSA used, at least once,
15 DV360 in a campaign to purchase advertising
16 between 2019-2023?
17  A.  I do believe so.
18  Q.  Which campaigns?
19  A.  It is on our vehicle side, but I
20 can't remember exactly, is my recall.  And I
21 don't remember from the behavioral side or for
22 Ad Council.

## Page 426

```
 1              C E R T I F I C A T E
 2       I, Cindy L. Sebo, Nationally Certified Court
 3  Reporter herein do hereby certify that the foregoing
 4  deposition of SUSAN A. MCMEEN was taken before me
 5  pursuant to notice; that said witness was duly sworn
 6  remotely by a certified stenographer to tell the truth,
 7  the whole truth, and nothing but the truth under penalty
 8  of perjury; that the testimony of said witness was
 9  correctly recorded to the best of my ability in machine
10  shorthand and thereafter transcribed under my
11  supervision with computer-aided transcription; that the
12  deposition is a true and accurate record of the
13  testimony given by the witness; and that I am neither of
14  counsel nor kin to any party in said action, nor
15  interested in the outcome thereof.
16
17       [signature]
18       Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR, CLR,
         RSA, NYRCR, NYACR, CA CSR #14409, NJ CCR
19       30XI00244600, NJ CRT 30XR00019500,
         Washington CSR 23005926, Oregon State 230105,
20       TN CSR 998, NM CSR 589, Remote Counsel
         Reporter, LiveLitigation Authorized Reporter,
21       Notary Public
22
```

## Page 427

```
 1              E R R A T A
 2  WITNESS:  SUSAN A. MCMEEN
 3  DATE:     September 7, 2023
 4  CAPTION:  United States, et al. versus Google LLC
 5  PAGE  LINE  REASON FOR CHANGE:
 6  ___   ___   _____
 7  ___   ___   _____
 8  ___   ___   _____
 9  ___   ___   _____
10  ___   ___   _____
11  ___   ___   _____
12  ___   ___   _____
13  ___   ___   _____
14  ___   ___   _____
15  ___   ___   _____
16  ___   ___   _____
17  ___   ___   _____
18  ___   ___   _____
19  ___   ___   _____
20  ___   ___   _____
21  ___   ___   _____
22  ___   ___   _____
```

## Page 428

```
 1              E R R A T A
 2  WITNESS:  SUSAN A. MCMEEN
 3  DATE:     September 7, 2023
 4  CAPTION:  United States, et al. versus Google LLC
 5  PAGE  LINE  REASON FOR CHANGE:
 6  ___   ___   _____
 7  ___   ___   _____
 8  ___   ___   _____
 9  ___   ___   _____
10  ___   ___   _____
11  ___   ___   _____
12  ___   ___   _____
13  ___   ___   _____
14  ___   ___   _____
15  ___   ___   _____
16  ___   ___   _____
17  ___   ___   _____
18  ___   ___   _____
19  ___   ___   _____
20
21  _____   _____
22  DATE      SUSAN A. MCMEEN
```

## Page 429

```
 1        ACKNOWLEDGMENT OF WITNESS
 2
 3       I, SUSAN A. MCMEEN, do hereby certify that I
 4  have read the foregoing pages herein, and that the same
 5  is a correct transcription of the answers given by me of
 6  the proceedings taken remotely to the questions therein
 7  propounded under penalty of perjury, except for the
 8  corrections or changes in form  or substance, if any,
 9  noted in the attached errata sheet.
10
11
12  _____      _____
13  DATE                  SIGNATURE
14
15  Subscribed and sworn to before me
16  this _____ day of_____, 20_____.
17
18       My Commission expires:
19       _____
20
21       _____
22       Notary Public
```

Page 427

1       E R R A T A

2   WITNESS:   SUSAN A. MCMEEN

3   DATE:      September 7, 2023

4   CAPTION:   United States, et al. versus Google LLC

5   PAGE   LINE   Change:

6   29     5      Change "Mark" to "Marketing"

7   29     14     Change "Consumer information and communications" to "Office of Communication and Consumer Information"

8   33     2      Change "Camp" to "Campaigns"

9   48     17     Change "Tom Brus" to "Tombras"

10  48     20     Change "Tom Brus" to "Tombras"

11  143    8      Delete "perch-"

12  165    3      Change "Sierra" to "Glaelis Sierra"

13  165    4      Change "Sierra Giaelis" to "Glaelis Sierra"

14  165    5      Change "Sierra Giaelis" to "Glaelis Sierra"

Page 429

ACKNOWLEDGMENT OF WITNESS

I, SUSAN A. MCMEEN, do hereby certify that I have read the foregoing pages herein, and that the same is a correct transcription of the answers given by me of the proceedings taken remotely to the questions therein propounded under penalty of perjury, except for the corrections or changes in form or substance, if any, noted in the attached errata sheet.

10/5/23                    Susan McMeen
DATE                                  SIGNATURE

Subscribed and sworn to before me
this _____ day of_____, 20_____.


My Commission expires:

_____

_____

          Notary Public