# Plaintiffs' Exhibit 87 (Redacted)

HIGHLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____
                            :
UNITED STATES OF AMERICA,   :
et al.,                     :
                            :
       Plaintiffs           :
                            :
       v.                   : No.  1:23-cv-00108
                            :
GOOGLE, LLC,                :
                            :
       Defendants.          :
_____ :

HIGHLY CONFIDENTIAL

Monday, August 21, 2023

Video Deposition of CHRISTOPHER KOEPKE, taken at the Law Offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 2001 K St NW, Washington, DC, beginning at 9:35 a.m. Eastern Standard Time, before Ryan K. Black, Registered Professional Reporter, Certified Livenote Reporter and Notary Public in and for the District of Columbia

Job No. CS6043164

Page 6

1  follows:
2           *   *   *
3              EXAMINATION
4  BY MS. GOODMAN:
5     Q.  Good morning, Mr. Koepke.
6     A.  Good morning.
7     Q.  Have you been deposed before?
8     A.  I think once.  I'm not exactly sure it
9  was a formal deposition, --
10    Q.  Okay.
11    A.  -- but yes.
12    Q.  Was there a court reporter taking down
13 everything you were saying?
14    A.  No, there was not.
15    Q.  Okay.  So in this deposition,
16 it's important that you allow me to finish my
17 question before you answer, because our court
18 reporter, Mr. Black, is taking down everything
19 we're saying --
20    A.  All right.
21    Q.  -- and he can't take two people talking
22 at the same time.  Okay?
23    A.  All right.
24    Q.  So please let me finish my question
25 before you begin your answer.  Okay?

Page 7

1     A.  Okay.
2     Q.  Okay.  And the court reporter also
3  cannot record nonverbal answers or half verbal
4  answers, like uh-huh or huh-uh, so please make
5  sure to speak in a -- answer the questions
6  verbally.  Okay?
7     A.  Okay.
8     Q.  Okay.  And I will assume that you
9  understand my questions unless you ask me for a
10 clarification.  Okay?
11    A.  Okay.
12    Q.  And is there any reason you're unable to
13 provide your truthful and accurate testimony here
14 today?
15    A.  No.
16    Q.  Okay.  What is your current title?
17    A.  Director of the Strategic Marketing
18 Group in the Office of Communications at the
19 Centers for Medicare and Medicaid Services.
20    Q.  And what are your responsibilities as
21 the director of the Strategic Marketing Group at
22 the Office of Communications at the Centers for
23 Medicare and Medicaid Services?
24    A.  When -- this federal agency is
25 responsible for Medicare, Medicaid and other

Page 8

1  healthcare programs.  When we need people,
2  citizens of America to take an action, it is my
3  job to do outreach to help them know what actions
4  they need to take.  I could probably go on for
5  the rest of the day with details on that.
6     Q.  I'm sure we'll get to it.  How long have
7  you been the director -- is the strategic
8  marketing -- strike that.
9         Is the Strategic Marketing Group
10 abbreviated SMG?
11    A.  Yes, it is.
12    Q.  Okay.  How long have you been director
13 of SMG?
14    A.  Approximately nine to ten years.
15    Q.  And prior to serving as director of SMG,
16 what -- what job did you have, if any?
17    A.  I was the deputy director of the
18 Creative Services Group in the Office of
19 Communications at the Centers for Medicare and
20 Medicaid Services.
21    Q.  And how long were you the deputy
22 director of the Creative Services Group?
23    A.  I would say three to four years.
24    Q.  In your role as director of SMG, who do
25 you report to?

Page 9

1     A.  I report to the deputy director of the
2  Office of Communications.
3     Q.  And what is that individual's name?
4     A.  Mary Wallace.
5     Q.  How long has Mary Wallace been the
6  person to whom you've -- who you report?
7     A.  Nine to ten years.
8     Q.  And to whom does Ms. Wallace report?
9         MS. CLEMONS:  Objection; foundation.
10        THE WITNESS:  Many people, but the
11 administrator of CMS.
12 BY MS. GOODMAN:
13    Q.  And who is the current administrator of
14 CMS?
15    A.  Chiquita Brooks-LaSure.
16    Q.  And how long has Ms. LaSure been the
17 administrator at CMS?
18        MS. CLEMONS:  Objection; foundation.
19        THE WITNESS:  I don't know when she was
20 confirmed.
21 BY MS. GOODMAN:
22    Q.  Okay.  How many administrators of CMS
23 have you worked under over the course of your
24 time as director of SMG?
25    A.  I could give you an approximate number.

Page 70

1  keep going.
2      MS. CLEMONS: Okay.
3      BY MS. GOODMAN:
4      Q. Thank you. I appreciate it. And then
5  we can take a break.
6      GumGum. Have you heard of GumGum?
7      A. Yes.
8      Q. Is that a programmatic provider CMS has
9  used.
10     MS. CLEMONS: Objection to form.
11     THE WITNESS: We usually use GumGum,
12 yes.
13 BY MS. GOODMAN:
14     Q. And how do you -- why does CMS use
15 GumGum relative to any other programmatic
16 provider?
17     MS. CLEMONS: Objection; form.
18     THE WITNESS: We invest in multiple
19 programmatic providers so we can track their ROI,
20 their return on investment, to be as efficient as
21 possible.
22 BY MS. GOODMAN:
23     Q. And what about Adsmovil? Have you heard
24 of Adsmovil?
25     A. Yes.

Page 71

1      Q. Is that a programmatic provider that CMS
2  has used.
3      MS. CLEMONS: Objection; form.
4      THE WITNESS: Yes.
5  BY MS. GOODMAN:
6      Q. Why do you use Adsmovil relative to any
7  other programmatic provider?
8      MS. CLEMONS: Objection; form.
9      THE WITNESS: We use multiple
10 programmatic providers to track the return on
11 investment on a particular campaign to be most
12 efficient to achieve our goals for the American
13 taxpayer.
14 BY MS. GOODMAN:
15     Q. And last one. Have you heard of
16 QuantiCast?
17     A. Yes.
18     Q. Is that a programmatic provider that CMS
19 has used?
20     MS. CLEMONS: Objection; form.
21     THE WITNESS: I am not sure.
22 BY MS. GOODMAN:
23     Q. Okay. Have you heard of MNI?
24     A. Yes.
25     Q. Is that a programmatic provider CMS has

Page 72

1  used?
2      MS. CLEMONS: Objection to form.
3      THE WITNESS: Yes.
4  BY MS. GOODMAN:
5      Q. And why has CMS used MNI relative to any
6  other programmatic provider?
7      MS. CLEMONS: Objection; form.
8      THE WITNESS: We invest in multiple
9  programmatic providers so we can track their
10 return on investment so we can see what is most
11 efficient at achieving our goals.
12 BY MS. GOODMAN:
13     Q. Okay. And then can you think of any
14 Google programmatic services that CMS has used?
15     MS. CLEMONS: Objection; form.
16     THE WITNESS: Yes.
17 BY MS. GOODMAN:
18     Q. Which ones?
19     A. Google Display Network and DV360.
20 [REDACTED]
21 [REDACTED]
22 [REDACTED]
23     MS. CLEMONS: Objection; form.
24 [REDACTED]
25 [REDACTED]

Page 73

1  [REDACTED]
2  [REDACTED]
3  [REDACTED]
4  [REDACTED]
5  [REDACTED]
6      MS. GOODMAN: Okay. We can take a
7  break.
8      THE VIDEOGRAPHER: The time is 11:03
9  a.m. This ends unit 1. We're off the record.
10     (Recess taken.)
11     THE VIDEOGRAPHER: The time is 11:20
12 a.m. This begins Unit Number 2. We're on the
13 record.
14 BY MS. GOODMAN:
15     Q. Mr. Koepke, have you -- can you think of
16 any other places CMS has placed ads that would be
17 in the bucket of ads within a logged-in
18 experience?
19     MS. CLEMONS: Objection to form.
20     THE WITNESS: Not off the top of my
21 head.
22 BY MS. GOODMAN:
23     Q. And another kind of digital ad we've
24 discussed was OTT ads. Do you recall that?
25     A. Yes.

Page 74

1  Q.  What -- what places has CMS placed OTT
2  ads?
3      MS. CLEMONS:  Objection to form.
4      THE WITNESS:  Hulu.  I'm pulling a blank
5  on a couple of the others.  Competitors to Hulu.
6  BY MS. GOODMAN:
7  Q.  And do you know what mechanism CMS uses
8  to place ads on Hulu or other competitors to
9  Hulu?
10     MS. CLEMONS:  Objection to form.
11     THE WITNESS:  We provide direction to
12 our contractors to place ads on OTT to reach
13 audiences of interest for our programs.
14 BY MS. GOODMAN:
15 Q.  And do you provide any direction in what
16 particular way to place OTT ads in order to reach
17 audiences of interest?
18     MS. CLEMONS:  Objection to form.
19     THE WITNESS:  We provide direction as to
20 the tactics and the channels that will reach the
21 audiences of our interest.
22 BY MS. GOODMAN:
23 Q.  Do you -- do you direct them to use any
24 particular ad-buying tool in order to place ads
25 on OTT?

Page 75

1      MS. CLEMONS:  Objection to form.
2  Foundation.
3      THE WITNESS:  We do.
4  BY MS. GOODMAN:
5  Q.  And what ad-buying tools do you direct
6  the ad agencies to use in order to place ads on
7  OTT?
8      MS. CLEMONS:  Objection; form.
9      THE WITNESS:  I'm not sure.
10 BY MS. GOODMAN:
11 Q.  Okay.  So how do you know that you
12 direct them to use particular ad-buying tools?
13 A.  In our media plans, we approve the
14 entire media plan, which included ad-buying
15 tools.
16 Q.  And do all of the ad-buying tools used
17 by ad agencies for CMS need to go through the
18 privacy analysis that we talked about earlier?
19     MS. CLEMONS:  Objection; form.
20 Foundation.
21     THE WITNESS:  To the degree that there
22 is a data exchange with our website.  That's the
23 key.
24 BY MS. GOODMAN:
25 Q.  Are you aware of any digital ad provider

Page 76

1  who did not make it through the privacy analysis
2  and was not approved for use?
3      MS. CLEMONS:  Objection; form.
4  Foundation.
5      THE WITNESS:  I am not.
6  BY MS. GOODMAN:
7  Q.  So we've talked about a variety of types
8  of digital ads, YouTube, programmatic mobile,
9  programmatic video, programmatic display, ads
10 with publishers, website takeovers, ads within a
11 logged-in experience, including Google Discovery,
12 Facebook, Instagram, Twitter and LinkedIn,
13 Search, including Google and Bing and
14 over-the-top ads, including Hulu and competitors
15 of Hulu.  How does CMS decide which of those
16 digital categories to use when making decisions
17 about advertising?
18     MS. CLEMONS:  Objection; form.
19 Foundation.
20     THE WITNESS:  We consider the audience
21 that we try to reach, the behavior we want them
22 to do, and the size of the budget that we have at
23 our disposal.
24 BY MS. GOODMAN:
25 Q.  Anything else that you consider in

Page 77

1  making a decision on which advertising -- digital
2  advertising category to use?
3      MS. CLEMONS:  Objection; form.
4      THE WITNESS:  That might vary by
5  campaign, but off the top of my head I can't say.
6  What I said was the most important.
7  BY MS. GOODMAN:
8  Q.  Does CMS try to create an appropriate
9  mix of advertising across all of the categories
10 that we've discussed?
11     MS. CLEMONS:  Objection; form.
12     THE WITNESS:  What would be your
13 definition of appropriate mix?
14 BY MS. GOODMAN:
15 Q.  For whatever is -- CMS deems to be
16 appropriate for a given campaign.  So do you
17 decide to use multiple different channels, and,
18 if so, how do you make those decisions?
19     MS. CLEMONS:  Objection; form.
20     THE WITNESS:  We assess the goal of
21 the campaign, the audience that we're trying to
22 reach, how we can best reach them, and the amount
23 of resources we have.
24 BY MS. GOODMAN:
25 Q.  And in the course of those

Page 114

1 Q. Okay. How about the -- have you
2 observed any changes in the availability of
3 advertising providers that you could use to reach
4 your audience over the 2019 to 2023 time period?
5     MS. CLEMONS: Objection to form.
6     THE WITNESS: I don't recall.
7 BY MS. GOODMAN:
8 Q. So earlier we talked about a lot of the
9 different programmatic providers that CMS has
10 used.
11 A. Mm-hmm.
12 Q. Do you recall that testimony?
13 A. Yes, I do.
14 Q. Okay. With respect to those providers,
15 were they all available to CMS in the 2019 year
16 as compared to the 2023 year?
17     MS. CLEMONS: Objection; form.
18     THE WITNESS: I don't recall.
19 BY MS. GOODMAN:
20 Q. Are you aware of any advertising
21 providers who were not available to CMS in
22 2019 but who are available to CMS in 2023?
23     MS. CLEMONS: Objection to form.
24     THE WITNESS: I am not.
25 BY MS. GOODMAN:

Page 115

1 Q. Okay. So one of the subtle changes
2 that you said you observed was that display has
3 become more impactful, correct? And when you say
4 "display," can you be more detailed about what
5 kind of display advertising you mean that has
6 become more impactful as in having a higher
7 return on investment?
8     MS. CLEMONS: Objection to form.
9     THE WITNESS: So kind of display really
10 covers a lot of categories, because there's
11 creative, there's delivery systems, there's
12 targeted. Do you have anything particularly in
13 mind?
14 BY MS. GOODMAN:
15 Q. No. I want to understand what you mean
16 by "display being more impactful."
17 A. All right.
18     MS. CLEMONS: Objection to form.
19     THE WITNESS: So to the best of my
20 recollection, display ads that -- what we would
21 call -- I don't know. Let me see. I've gotta
22 think of the term here -- prospecting. So those
23 are the ads that go out and find people who could
24 benefit from the program, who may or may not have
25 ever interacted with the program before. To the

Page 116

1 best of my recollection, that type of display
2 ad has increased in its value to us.
3 BY MS. GOODMAN:
4 Q. And how does CMS go about -- what
5 methods does CMS use to place these kinds of
6 prospecting display ads?
7     MS. CLEMONS: Objection to form.
8     THE WITNESS: We direct our contractors
9 to do it on our behalf.
10 BY MS. GOODMAN:
11 Q. And do you direct them to use any
12 particular provider?
13     MS. CLEMONS: Objection to form.
14 Foundation.
15     THE WITNESS: We will direct them to use
16 particular providers.
17 BY MS. GOODMAN:
18 Q. Okay. So with respect to the increasing
19 effectiveness of prospecting display ads, what
20 providers have you used?
21     MS. CLEMONS: Objection to form.
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

Page 117

1 [redacted]
2 [redacted]
3 [redacted]
4 [redacted]
5     MS. GOODMAN: Shall we take a break for
6 lunch?
7     MS. CLEMONS: Yeah.
8     THE WITNESS: I'm good with whatever.
9     THE VIDEOGRAPHER: The time is 12:22
10 p.m. This ends Unit 2. We're off the record.
11     (Lunch recess taken.)
12     (Exhibit No. 65, a document Bates
13 Numbered CMS-ADS-11906 through 11974, was
14 introduced.)
15     THE VIDEOGRAPHER: The time is 1:14 p.m.
16 This begins Unit Number 3. We're on the record.
17 BY MS. GOODMAN:
18 Q. Mr. Koepke, I'm going to hand you a
19 document marked Exhibit 65, CMS-ADS-11906 through
20 11974.
21 And this is a technical proposal from
22 Weber Shandwick for Healthcare.gov 2010 Open
23 Enrollment campaign, correct?
24 A. I'm not sure. It's going to take me a
25 minute to look at it.

Page 118

1  Q. Sure.
2  A. It appears as such.
3  Q. Okay. And what is the purpose of a
4  technical proposal, to your knowledge?
5      MS. CLEMONS: Objection; form.
6      THE WITNESS: A technical proposal is
7  part of a contracting process. So the offerers,
8  which are the different ad agencies who might be
9  interested in contracting with the federal
10 government, would write a technical proposal to
11 show their abilities to meet the standards that
12 the federal government has set forward.
13 BY MS. GOODMAN:
14  Q. And did multiple different contractors
15 compete each year for the Open Enrollment
16 campaign, or was it only Webber Shandwick?
17     MS. CLEMONS: Objection to form.
18     THE WITNESS: Each year?
19 BY MS. GOODMAN:
20  Q. Each year.
21  A. Okay. It was not always only Weber
22 Shandwick, to the best of my knowledge. I'm
23 actually not a hundred percent sure, but -- so I
24 don't know.
25  Q. Okay. As the director of the Strategic

Page 119

1  man -- Marketing Group, did you review technical
2  proposals?
3   A. No, I did not.
4      MS. CLEMONS: Objection to form.
5      THE WITNESS: I'm so sorry.
6  BY MS. GOODMAN:
7   Q. Have you ever had occasion to read
8  them?
9      MS. CLEMONS: Objection to form.
10     THE WITNESS: Have I ever had the
11 occasion to read a technical proposal of any
12 sort?
13 BY MS. GOODMAN:
14  Q. Of -- related to any advertising
15 campaign handled by the Strategic Marketing Group
16 at CMS.
17  A. You had a lot of very specific details
18 in that question that would lead me to say no.
19  Q. What are the specific details in my
20 question that would lead you to say no?
21  A. One of them was the "Strategic Marketing
22 Group."
23  Q. Did I state that incorrectly?
24     MS. CLEMONS: Objection to form.
25     THE WITNESS: You did not say "Strategic

Page 120

1  Marketing Group" incorrectly. It sounded correct
2  to me.
3  BY MS. GOODMAN:
4   Q. Okay. I don't understand what the
5  detail with respect to the Strategic Marketing
6  Group led you to say no to my question.
7      MS. CLEMONS: Objection to form.
8  BY MS. GOODMAN:
9   Q. Can you explain that to me?
10  A. Your question had three parts: Have I
11 ever read a technical proposal. Is it about
12 advertising. And is it for the Strategic
13 Marketing Group at CMS. I guess that's four
14 parts.
15     The Strategic Marketing Group did not
16 exist when I read the technical proposals.
17  Q. When did you read the technical
18 proposals?
19     MS. CLEMONS: Objection to form.
20     THE WITNESS: The early 2000s.
21 BY MS. GOODMAN:
22  Q. So since the early 2000s, is it accurate
23 that you have not read the strat -- the technical
24 proposals submitted by ad agencies?
25     MS. CLEMONS: Objection to form.

Page 121

1      THE WITNESS: The technical proposals
2  are written by -- are read and judged by trained
3  staff who work for me.
4  BY MS. GOODMAN:
5   Q. Okay. And so your trained staff read
6  and review them, but you do not; is that correct?
7   A. That is correct.
8   Q. Okay. Do you discuss the technical
9  proposals with your staff?
10  A. I do not.
11  Q. Why not?
12  A. Because it is inappropriate for people
13 judging a technical proposal to talk with other
14 people about it in the process of an acquisition.
15  Q. Why is that improper or inappropriate?
16  A. I would only be doing conjecture, but
17 it's -- the government has a goal to be fair to
18 all businesses. And so, therefore, the people
19 who read the proposals and judge them are doing
20 so in a non-biased sense. And discussing with
21 anyone else could -- could increase or add bias
22 to a process.
23  Q. And which of your staff reviewed
24 technical proposals for the Healthcare.gov Open
25 Enrollment campaigns in the '19 to '23 time

Page 226

1  Q. So you can't answer -- you are unable
2  to answer that question without relying on
3  privileged communications; is that correct?
4  A. That is correct.
5  Q. So you've never raised those concerns
6  with anybody at your advertising agencies, for
7  example. Is that accurate?
8  A. As part of the informal conversations
9  with colleagues, I can't recall.
10  Q. Okay. You referenced DoubleClick. What
11  is DoubleClick?
12  A. DoubleClick is a tool that allows us to
13  track ad performance and our websites together.
14  Q. So it's a -- -- it's an -- a data
15  monitoring tool. Is that accurate?
16  A. From my understanding, that's partially
17  accurate. It's also a data-creating tool.
18  Q. And Google Analytics, has CMS decided
19  not to use Google Analytics anymore --
20  MS. CLEMONS: Objection; form.
21  BY MS. GOODMAN:
22  Q. -- within the Strategic Marketing Group,
23  at least?
24  A. The Strategic Marketing Group did not
25  decide not to use Google Analytics.

Page 227

1  Q. Did somebody else decide not to use
2  Google Analytics?
3  MS. CLEMONS: Objection; form.
4  Foundation.
5  THE WITNESS: By "somebody else,"
6  would -- could you give me a little more on that?
7  BY MS. GOODMAN:
8  Q. Is the Strategic Marketing Group -- has
9  the Strategic Marketing Group transitioned from
10  using Google Analytics to an Adobe product?
11  A. The Strategic Marketing Group is in the
12  process of that right now.
13  Q. Okay. Why are you in that process now?
14  A. The people who manage the websites,
15  which is different from the Strategic Marketing
16  Group, made a decision to go from Google
17  Analytics to the Adobe product.
18  Q. Okay. So under the agency -- the
19  CMS's contracts with advertising agencies, is it
20  accurate that the advertising agency negotiates
21  the prices to be paid for advertising?
22  MS. CLEMONS: Objection to form.
23  Foundation.
24  THE WITNESS: In an ad agency, there
25  are buyers who get on the phones, like, with TV

Page 228

1  networks and talk about the price of what's
2  available.
3  BY MS. GOODMAN:
4  Q. And do you participate in discussions
5  between advertising agencies and any vendors over
6  price for ad buys on behalf of CMS?
7  MS. CLEMONS: Objection to form.
8  THE WITNESS: We participate in
9  conversations with the ad agencies over price and
10  what they've done to negotiate, and we provide
11  direction when we think there's other
12  negotiations that should be done.
13  BY MS. GOODMAN:
14  Q. Okay. But you -- but does any
15  individual from CMS actually participate in the
16  negotiations over price?
17  MS. CLEMONS: Objection to form.
18  Foundation.
19  THE WITNESS: To the extent that we
20  direct our ad agencies on negotiating a price, we
21  do participate.
22  BY MS. GOODMAN:
23  Q. Okay. Beyond -- aside from the
24  extent to which you direct your ad agencies on
25  negotiating a price, is there any other way in

Page 229

1  which you participate in such negotiations? And
2  when I say "you," I mean CMS individuals.
3  MS. CLEMONS: Objection to form.
4  Foundation.
5  THE WITNESS: Our participation is
6  through the direction of those who work for us.
7  BY MS. GOODMAN:
8  Q. Okay. The advertising purchases which
9  your ad agency makes on behalf of CMS are part of
10  a bundle of services that the ad agency provides,
11  correct?
12  MS. CLEMONS: Objection; form.
13  Foundation.
14  THE WITNESS: I'm not sure what you mean
15  by "bundle."
16  BY MS. GOODMAN:
17  Q. A group of services that the ad agency
18  provides includes buying ads, as well as other
19  services, correct?
20  MS. CLEMONS: Objection to form.
21  Foundation.
22  THE WITNESS: I would say that we
23  contract with the ad agencies to help us
24  implement our ad campaigns.
25  BY MS. GOODMAN:

Page 230

1  Q.  And that includes both buying ads as
2  well as other services, correct?
3      MS. CLEMONS:  Objection to form.
4  Foundation.
5      THE WITNESS:  There are other activities
6  involved.
7  BY MS. GOODMAN:
8  Q.  And -- okay.
9      The ad agencies with whom CMS works, are
10  they independent of CMS?
11     MS. CLEMONS:  Objection; form.
12     THE WITNESS:  What is your definition of
13  "independent of CMS"?
14  BY MS. GOODMAN:
15  Q.  They're a separate entity.
16     MS. CLEMONS:  Objection to form.  Calls
17  for a legal conclusion.
18     THE WITNESS:  They are contracted
19  entity.
20  BY MS. GOODMAN:
21  Q.  Okay.  Separate from CMS, correct?
22     MS. CLEMONS:  Objection to form.
23     THE WITNESS:  Bound by a contract.
24  BY MS. GOODMAN:
25  Q.  And does CMS control the ad agency's

Page 231

1  activities?
2      MS. CLEMONS:  Objection to form.  Calls
3  for a legal conclusion.  Foundation.
4      THE WITNESS:  All their activities?
5  BY MS. GOODMAN:
6  Q.  Does CMS control the ad agency's
7  activities relative to the advertising services
8  that the ad agency provides to CMS?
9      MS. CLEMONS:  Objection to form.  Calls
10  for a legal conclusion.  Foundation.
11     THE WITNESS:  Control is not a term I've
12  used before.  Direct.  But I can see how they are
13  related, so we direct those activities.
14  BY MS. GOODMAN:
15  Q.  But you would not say that CMS controls
16  their activities.  Is that accurate?
17     MS. CLEMONS:  Objection; form.  Calls
18  for a legal conclusion.  Foundation.
19     THE WITNESS:  Well, I would say that we
20  control their activities.
21  BY MS. GOODMAN:
22  Q.  Why is that?
23  A.  Well, in part, I never thought about it
24  like that until you just -- you just started
25  using the word.

Page 232

1  Direct and control are very similar.
2  Q.  Okay.  When the -- when a advertising
3  budget is set for a particular channel of
4  advertising, does the ad agency have discretion
5  on how to spend that budget within the channel?
6      MS. CLEMONS:  Objection to form.
7      THE WITNESS:  No.
8  BY MS. GOODMAN:
9  Q.  No?  Why not?
10 A.  Because we do.
11 Q.  What do you mean by that?
12 A.  Well, as we've discussed earlier today,
13 even optimizations go through ATBs.  Those ATBs
14 are a form of the direction that we give the
15 advertiser on how to spend the budget.
16 Q.  Okay.  So if an ATB authorizes $10,000
17 in purchases for social media, does the ad agency
18 have discretion on how to spend that $10,000
19 within the social media category?
20     MS. CLEMONS:  Objection to form.
21     THE WITNESS:  No.  There are -- no.
22 BY MS. GOODMAN:
23 Q.  And why not?
24 A.  Because in the end, CMS is responsible
25 for how we're spending taxpayer dollars and

Page 233

1  responsible for the impact of our campaigns.
2  Q.  And so is it accurate that CMS directs
3  the ad agency to spend $10 on Facebook, $10 on
4  Instagram, $10 on LinkedIn, or is that specific
5  allocation within the discretion of the
6  advertising agency, so long as it is within
7  the authorization to buy?
8      MS. CLEMONS:  Objection to form.
9      THE WITNESS:  If there was any
10 discretion, that would be discretion given by
11 CMS.
12 BY MS. GOODMAN:
13 Q.  Okay.
14 A.  But I am not aware of any such
15 discretion.
16 Q.  Can you go back to Exhibit 69?
17     And if you turn to Page 810, this is an
18 authorization to buy, correct?
19 A.  It's gonna take me a minute to ascertain
20 that.
21     (Reviews document.)
22     Yes.  Correct.
23 Q.  Okay.  And you see that this particular
24 example states, just under the chart, that
25 "Centers for Medicare and Medicaid services

59 (Pages 230 - 233)

Page 234

1  client signature authorizes Weber Shandwick
2  Agency to purchase media totaling 8. --
3  $8,219,893, plus or minus 5 percent, correct?
4      A.  Correct.
5      Q.  So that "plus or minus 5 percent," is
6  that committed to the discretion of the ad agency
7  for the -- for buying purposes?
8          MS. CLEMONS:  Objection to form.
9          THE WITNESS:  No.
10 BY MS. GOODMAN:
11     Q.  Why not?
12     A.  There are many factors that go into the
13 availability of -- of media at any given time,
14 the availability of a purchase.  And some of
15 these tactics, channels, such as search,
16 the amount of spend there is what we call
17 demand-driven, which isn't just that you've made
18 a decision "I'm going to spend a hundred thousand
19 dollars on search," but it depends on how many
20 people actually search the terms that you're
21 bidding on to put those ads.  Therefore, there is
22 a natural fluctuation in ad availability and ad
23 cost that neither CMS nor Weber Shandwick can be
24 a hundred percent held accountable.  So we give
25 ourselves a 5 percent plus or minus within these

Page 235

1  numbers based on that.
2      Q.  Okay.  And the sentence here that says,
3  "With client's consent, shifts in allocation of
4  the spend across channels may be made without the
5  need for a new ATB so long as the total spend
6  does not exceed the amount authorized in this
7  document," what does that mean?
8      A.  That means that we can direct the
9  media buy and not have an ATB every single time
10 -- optimizations of not having an ATB every
11 single time.
12     Q.  And when your advertising agency is
13 making ad purchases for CMS, are you aware of
14 each and every time they are making a purchase on
15 Google or through the Trade Desk or through AARP
16 and the exact price that is negotiated for such
17 purchases are agreed?
18         MS. CLEMONS:  Objection to form.
19         THE WITNESS:  Well, as -- my
20 understanding is in the time period of this,
21 there's 44 campaigns, something like that, me
22 personally, not necessarily everything, but my
23 staff is.
24         We are aware of the allocation of
25 the budget and the timelines for when they are

Page 236

1  supposed to be spent as in -- as directed in the
2  flowcharts of what we looked at before for these
3  campaigns.
4  BY MS. GOODMAN:
5      Q.  Okay.  And each and every time a
6  purchase is, in fact, made according to the
7  flowcharts, are you made aware of that, or of the
8  price that is paid at that particular time?
9      A.  We --
10         MS. CLEMONS:  Objection to form.
11         THE WITNESS:  We monitor on a very close
12 basis how that money is spent over time and in
13 what channels.
14 BY MS. GOODMAN:
15     Q.  Okay.  Does the ad agency obtain
16 anybody's approval at CMS prior to making any
17 particular advertising buy so long as it is
18 within the authorization to buy?
19         MS. CLEMONS:  Objection to form.
20         THE WITNESS:  The authorization to buy
21 provides the government a lot of control and
22 provides a lot of direction to how the ad agency
23 then carries out the minutia of the budget.
24 BY MS. GOODMAN:
25     Q.  Okay.  And so is anybody at CMS aware

Page 237

1  -- made aware of each and every time that the ad
2  agency is carrying out the minutia of the budget?
3          MS. CLEMONS:  Objection to form.
4          THE WITNESS:  Not to my knowledge.
5  BY MS. GOODMAN:
6      Q.  Okay.  And is carrying out the minutia
7  of the budget committed to the discretion of the
8  ad agency?
9          MS. CLEMONS:  Objection to form.
10         THE WITNESS:  What is your definition of
11 "minutia of the budget"?
12 BY MS. GOODMAN:
13     Q.  I'm using it as you used the term, so
14 you tell me how you're using it.
15     A.  So the exact hour that somebody gets
16 on the phone call and -- and told -- talks to
17 somebody about the placement of an ad, actually,
18 we've actually reviewed all of those too, on some
19 campaigns, the exact placement of every single
20 ad.  That is what I would call the minutia.
21         What I would call the important control
22 and the important direction is the, "these are
23 the channels we're going to use; this is the
24 audience we're gonna reach; this is the delivery
25 we expect for that," and on a weekly basis how

HIGHLY CONFIDENTIAL

Page 290
1  deposition is over and that Google does not have
2  grounds to hold the deposition open.
3      MS. GOODMAN:  Okay.  Thank you for your
4  time, Mr. Koepke.
5      THE WITNESS:  It was my pleasure.  This
6  was fun.
7      THE VIDEOGRAPHER:  Time is 6:23 p.m.
8  We're off the record.
9      (Deposition concluded -- 6:23 p.m.)

Page 291
1           C E R T I F I C A T E
2
3      I do hereby certify that I am a Notary
4  Public in good standing, that the aforesaid
5  testimony was taken before me, pursuant to
6  notice, at the time and place indicated; that
7  said deponent was by me duly sworn to tell the
8  truth, the whole truth, and nothing but the
9  truth; that the testimony of said deponent was
10 correctly recorded in machine shorthand by me and
11 thereafter transcribed under my supervision with
12 computer-aided transcription; that the deposition
13 is a true and correct record of the testimony
14 given by the witness; and that I am neither of
15 counsel nor kin to any party in said action, nor
16 interested in the outcome thereof.
17
18      WITNESS my hand and official seal this
19 22nd day o
20
21           _____
22           Notary Public

Page 292
1  Katherine Clemons Esq
2  Katherine.clemons@usdoj.gov
3           August 22nd, 2023
4  RE:   United States, Et Al v. Google, LLC
5  8/21/2023, Christopher Koepke (#6043164)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 (erratas-cs@veritext.com).
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions

Page 293
1  United States, Et Al v. Google, LLC
2  Christopher Koepke (#6043164)
3         E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Christopher Koepke            Date

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL

Page 294

```
 1  United States, Et Al v. Google, LLC
 2  Christopher Koepke (#6043164)
 3          ACKNOWLEDGEMENT OF DEPONENT
 4     I, Christopher Koepke, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____   _____
12  Christopher Koepke               Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
```

75 (Page 294)

```
                                                              Page 117
 1    United States, Et Al v. Google, LLC
 2    Christopher Koepke (#6075382)
 3                     E R R A T A  S H E E T
 4    PAGE   11    LINE   4    CHANGE
 5    "neck" should read "NEC"
 6    REASON
 7    PAGE   66    LINE   16   CHANGE
 8    "organization" should read "authorization"
 9    REASON
10    PAGE   89    LINE   21   CHANGE
11    "Aaron Blazer" should read "Erin Blazar"
12    REASON
13    PAGE   90    LINE   2    CHANGE
14    "Aaron Blazer" should read "Erin Blazar"
15    REASON
16    PAGE   90    LINE   6    CHANGE
17    "Aaron" should read "Erin"
18    REASON
19    PAGE   91    LINE   14   CHANGE
20    "Aaron Blazer" should read "Erin Blazar"
21    REASON
22    Page: 102    Line: 6    Change: "DO" should read "DOJ"
23    Christopher P. Koepke -S    Digitally signed by Christopher P. Koepke -S    9/29/23
                                  Date: 2023.09.29 11:18:12 -04'00'
24    Christopher Koepke                                    Date
25
```

1  United States, Et Al v. Google, LLC

2  Christopher Koepke (#6075382)

3  ACKNOWLEDGEMENT OF DEPONENT

4  I, Christopher Koepke, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.

10  *Christopher P. Koepke -S*  
    Digitally signed by Christopher P. Koepke -S  
    Date: 2023.09.29 11:56:51 -04'00'    9/29/23

11  _____    _____

12  Christopher Koepke                            Date

13  *If notary is required

14  SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  _____ DAY OF _____, 20___.

16

17

18  _____

19  NOTARY PUBLIC

20

21

22

23

24

25