# Plaintiffs' Exhibit 89

HIGHLY CONFIDENTIAL

Page 1

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                      ALEXANDRIA DIVISION
     _____
     UNITED STATES,         )1:23-cv-00108-LMB-JFA
     et al.,                )
                            )
         Plaintiffs,        )
                            )
     vs.                    )
                            )
     GOOGLE LLC,            )
                            )
         Defendants.        )
     _____)


                     VIDEOTAPED DEPOSITION OF

                         KENDALL OLIPHANT

                         August 9, 2023

                            9:32 a.m.







         Reported by:  Bonnie L. Russo
         Job No. 6031956
```

Page 30

1  BY MS. GOODMAN:
2      Q.  And --
3      A.  -- that would relate to paid media.
4      Q.  So am I understanding your testimony
5  correctly that Deb made a comment to you that
6  sometimes it's not good -- it's good not to be
7  aware of things or be an expert in things and
8  that that related to paid media; is that right?
9          MS. ZWOLINSKI:  Objection.  Form.
10 Foundation.
11         THE WITNESS:  It was an
12 acknowledgement of the suit in that I was
13 involved, and that's it.  I am characterizing
14 based on a vague menu -- I mean memory, just
15 being honest.
16     BY MS. GOODMAN:
17     Q.  Do you recall when this comment was
18 made?
19     A.  I honestly don't.
20     Q.  And do you recall the context or the
21 conversation in which it came up?
22         MS. ZWOLINSKI:  Objection.  Form.

Page 31

1          THE WITNESS:  I honestly don't.  It
2  was appropriate, but I can't recall what else
3  was discussed.
4      BY MS. GOODMAN:
5      Q.  And did you understand her comment
6  to mean that it's good for you not to
7  necessarily be an expert in paid media or for
8  who not be an expert in paid media?
9          MS. ZWOLINSKI:  Objection.  Form.
10         THE WITNESS:  I would -- I can't
11 assume what she thought.  My interpretation was
12 that she was not, so that -- I don't know.  No
13 one wants to be here.
14     BY MS. GOODMAN:
15     Q.  Did you understand that in any way
16 as to your expertise in paid media or...?
17         MS. ZWOLINSKI:  Objection.  Form.
18         THE WITNESS:  Yes.
19     BY MS. GOODMAN:
20     Q.  And what did you understand her to
21 mean with respect to your expertise in paid
22 media?

Page 32

1          MS. ZWOLINSKI:  Objection.  Form.
2          THE WITNESS:  That I manage that
3  order.  I was the one that had the -- the most
4  knowledge of it.
5      BY MS. GOODMAN:
6      Q.  I see.  Based on what you can recall
7  sitting here today, is it correct or incorrect
8  to say that the side comment that we're
9  discussing came up in the context of a
10 conversation with respect to who from the
11 census bureau would be tasked with
12 participating in this lawsuit?
13         MS. ZWOLINSKI:  Objection.  Form.
14         THE WITNESS:  Can you repeat that,
15 please.
16     BY MS. GOODMAN:
17     Q.  Did the side comment that we're
18 discussing -- and I am using "side comment" as
19 a shorthand -- did that come up in the context
20 of a conversation about who from the census
21 bureau would participate in this lawsuit?
22     A.  I don't believe so.  That's not -- I

Page 33

1  don't -- that's not correct.
2      Q.  Okay.  And just for the record, best
3  recollection sitting here today, any more
4  details about the context in which the side
5  comment came up?
6      A.  Not that I can recall.
7      Q.  Okay.  What is your title?
8      A.  Chief of the contract management --
9  contract program office in the communications
10 directorate of the census bureau.
11     Q.  And for how long have you held that
12 position?
13     A.  Since October of 2021.
14     Q.  And prior to October 2021, what
15 position did you hold at the census bureau?
16     A.  I was chief of the integrated
17 communications, contract program management
18 office.
19     Q.  And what time period did you hold
20 the position of chief of the integrated
21 communications, contract program management
22 office?

9 (Pages 30 - 33)

Page 34

1   A.  It began in 2016. I don't know the
2   exact date or month, but it was through
3   September of 2021.
4   Q.  With respect to your current role as
5   chief of the contract management -- sorry. The
6   contract program office and the communications
7   directorate of the census bureau, do you
8   understand the United States lawsuit to be
9   based on any work you do in that role?
10      MS. ZWOLINSKI: Objection. Form.
11      THE WITNESS: I understand it to be
12  based on work that was conducted in my previous
13  role, not in my current role.
14      BY MS. GOODMAN:
15  Q.  And so we'll focus our time here
16  today on your time as the chief of the ICC
17  contract program management office.
18  A.  ICC PMO.
19  Q.  ICC PMO?
20  A.  Yes.
21  Q.  All right. We'll use that
22  shorthand. Thank you.

Page 35

1       To whom did you report when you were
2   chief of the ICC PMO?
3   A.  Originally I directly reported to
4   Stephen Buckner. He was the assistant director
5   for communications.
6       And then I reported to Burton Reist,
7   who was the other assistant director for
8   communications. We had two.
9   Q.  And in your role as chief, who
10  reported to you?
11  A.  I had a staff of approximately 15,
12  16 people at any given time.
13  Q.  What -- describe your job
14  responsibilities as chief of the ICC PMO.
15  A.  I oversaw all things related to -- I
16  oversaw the communications contract not as the
17  contracting officer's representative but as the
18  program officer as well as anything related to
19  it. That included program management reports,
20  stakeholder engagement, budget, et cetera.
21  Q.  And did your role as chief of the
22  ICC PMO include responsibilities for all of the

Page 36

1   task orders under the main contract?
2       MS. ZWOLINSKI: Objection. Form.
3       THE WITNESS: For context only -- I
4   am trying to figure out how best to explain.
5       In terms of government contracts,
6   management of a contract is actually done --
7   you have a contracting officer who is
8   ultimately responsible for the contract, and
9   they can make decisions that impact scope.
10      But then you have a contracting
11  officer representative, or COR, who
12  administrates the contract.
13      The communications contract was so
14  large, you had a COR that administered the
15  master contract and was ultimately responsible
16  for all the -- all the orders, but each order
17  had a separate COR.
18      BY MS. GOODMAN:
19  Q.  I am following you.
20  A.  Okay.
21  Q.  In your role, however, in terms of
22  program management of the master contract, did

Page 37

1   you have responsibility for managing all of the
2   orders issued under that master contract?
3       MS. ZWOLINSKI: Objection. Form.
4       THE WITNESS: I had the
5   responsibility of understanding and providing
6   guidance and reporting up and down and out, but
7   I did not have responsibility for managing the
8   orders. Only the COR on the contract can
9   manage the orders.
10      BY MS. GOODMAN:
11  Q.  Okay. Sitting here today, what --
12  what's your understanding of which task orders
13  are relevant to the lawsuit brought by the
14  United States?
15      MS. ZWOLINSKI: Objection. Form.
16  Foundation.
17      THE WITNESS: Order 8, which was
18  recruitment advertising, and Order 15, which
19  was media planning and buying.
20      BY MS. GOODMAN:
21  Q.  And what were your responsibilities
22  with respect to Order 8?

Page 86

1   A.   Yes.
2        MS. ZWOLINSKI:  Objection.  Form.
3        BY MS. GOODMAN:
4   Q.   Did -- what is your understanding of
5   the term "digital media channels" here?
6   A.   In this workshop, they explained the
7   different types of media, the reach, any
8   limitations to the reach, how they worked
9   together to provide a holistic approach to
10  encouraging response.
11       So in terms of digital media
12  channels, they -- without going into a lot of
13  detail, discussed site direct and what that
14  meant, programmatic, social, and paid search.
15  And explained that -- that's pretty much it.
16  Q.   And let's turn to Page 14, Bates
17  ending in 33.
18       At the bottom where it begins:
19  "Digital advertising," do you see that?
20  A.   Yes.
21  Q.   Okay.  The first sentence says:
22  "Team Y&R partner Reingold will assess factors

Page 87

1   for digital media options identifying metrics
2   such as cost of serving, reach, and expected
3   engagement for cross team Y&R review."
4        Do you see that?
5   A.   Yes.
6   Q.   Okay.  Why were the metrics of cost
7   of serving, reach, and expected engagement
8   factors that Reingold would need to assess as
9   it is making purchases under Order 15?
10       MS. ZWOLINSKI:  Objection.  Form.
11       THE WITNESS:  It was Reingold's job,
12  as was Y&R and all subcontractors, to make sure
13  that everything they did and every purchase
14  they made was as efficient and effective as
15  possible.  So every data point they could use
16  to ensure that, they did.
17       BY MS. GOODMAN:
18  Q.   And those were the factors listed
19  here that were assessed for all types of
20  digital media; is that correct?
21       MS. ZWOLINSKI:  Objection.  Form.
22       THE WITNESS:  There may have been

Page 88

1   more.  That's what they discussed in this
2   document.
3        BY MS. GOODMAN:
4   Q.   And do you see the paragraph:  "Team
5   Y&R will centralize as much of its national
6   programmatic display video and search campaigns
7   within" -- "within one advertising tech stack."
8        Do you see that?
9   A.   Yes.
10  Q.   Do you know whether this occurred?
11  A.   As far -- as far as I'm aware, it
12  was.
13  Q.   And do you know what ad tech stack
14  was utilized?
15       MS. ZWOLINSKI:  Objection.  Form.
16       THE WITNESS:  I do not recall.
17       MS. GOODMAN:
18  Q.   And do you know if it was --
19  involved any Google products or services?
20  A.   I don't recall.
21  Q.   Is that something that would have
22  been important to you in your role as the

Page 89

1   contracting officer representative on Order 15?
2        MS. ZWOLINSKI:  Objection.  Form.
3        THE WITNESS:  That level of detail,
4   no.
5        BY MS. GOODMAN:
6   Q.   Okay.  And if you turn to Page 30
7   ending in Bates 49, I want to direct your
8   attention to this little flow chart in the
9   middle of the page.
10       Do you see that?
11  A.   Yes.
12  Q.   Was that process -- strike that.
13       It is titled:  "Census Bureau 2010
14  Media Billing Process."
15       Do you see that?
16  A.   Yes.
17  Q.   Is this the same process that was
18  filed -- followed for the 2020 census media
19  billing process?
20  A.   For the most part, yes.
21  Q.   When you say "for the most part,"
22  what was different about billing processes in

23 (Pages 86 - 89)

Page 90

1  2020 as compared to what is depicted on the
2  2010 chart here?
3      A.   I honestly -- I do not recall what
4  EDI means or DDS, so I'm not sure if those were
5  systems that may have changed between 2010 and
6  2020.  But the gist of this is -- yes.
7          MS. GOODMAN:  Okay.  All right.  You
8  can put that document to the side, and I would
9  like to hand you another document which is
10  marked Exhibit 15, Census Ads0000248031 through
11  248185.
12         (Deposition Exhibit 15 was marked
13  for identification.)
14         BY MS. GOODMAN:
15     Q.   And this is an e-mail from yourself
16  to Kia Anderson dated September 14, 2022.
17         Do you see that?
18     A.   Yes.
19     Q.   Okay.  And the subject is:  "Census
20  Media 101 Deck," right?
21     A.   Yes.
22     Q.   Okay.  And you're sending the paid

Page 91

1  Media 101 training that Y&R provided to the
2  census bureau to Ms. Anderson, correct?
3      A.   Yes.
4      Q.   And why were you sending this deck
5  to Ms. Anderson?
6      A.   She wanted -- she wanted to know
7  more about -- for context.  Kia Anderson was
8  detailed to HHS working on the public education
9  campaign.  She wanted to have a better
10 understanding of media buying.
11         Every agency buys media differently,
12 but there are still some basic -- there is
13 still some basic information that is just the
14 same -- that's the same.
15         She had no experience with media
16 buying, and in order to have a better
17 understanding of the conversations that were
18 taking place in the room, she asked if I had
19 anything that could provide, you know, just a
20 basic understanding.
21         And this is what I sent.  It
22 explained all the different types of media,

Page 92

1  what they are used for, how things have changed
2  or at least as of the time of this document
3  so...
4      Q.   And so you thought that this was a
5  really good educational tool for Ms. Anderson,
6  correct?
7          MS. ZWOLINSKI:  Objection.  Form.
8          THE WITNESS:  I thought -- it was
9  what I had that I could send that would at
10 least get her started.
11         BY MS. GOODMAN:
12     Q.   And you endeavored to send her what
13 you thought would be the most appropriate and
14 informative material, correct?
15         MS. ZWOLINSKI:  Objection.  Form.
16         THE WITNESS:  That was my goal.
17 This is what I got to first.
18         BY MS. GOODMAN:
19     Q.   Okay.  So let's go through this deck
20 a little bit.  And you recall this was
21 presented at the Media 101 training by Y&R,
22 correct?

Page 93

1      A.   Yes.
2      Q.   And you attended?
3      A.   Yes.
4      Q.   Let's turn to Page 11,
5  CENSUS-ADS-248042.
6          What is this slide depicting?
7      A.   This slide depicts rudimentary
8  visuals of various media channel options that
9  are out there for use.
10     Q.   And how do you understand -- what's
11 your -- strike that.
12         What do you mean by "media channel
13 options"?
14     A.   Television is a channel.  Radio is a
15 channel.  Out of home, which includes
16 billboards, bus -- sides of buses, sides of
17 buildings, anything out of the -- out of the
18 home, print, all of those.
19         And then bottom row is the different
20 -- a few of the different options within
21 digital.  So these are options or -- you know,
22 of different media channels that can be used

24 (Pages 90 - 93)

Page 334

1  provided you legal advice?
2      MS. ZWOLINSKI: Objection. Form.
3      THE WITNESS: No.
4      BY MS. GOODMAN:
5      Q. Okay. And is your answer the same
6  in January of 2023?
7      MS. ZWOLINSKI: Objection. Form.
8      THE WITNESS: Yes.
9      BY MS. GOODMAN:
10     Q. Okay. And in the course of your
11 participation in this lawsuit if you've had
12 questions about your participation in this
13 lawsuit, have you turned to the attorneys at
14 the antitrust division with your questions?
15     MS. ZWOLINSKI: Objection. Form.
16     THE WITNESS: No.
17     BY MS. GOODMAN:
18     Q. To whom have you turned, if anyone?
19     A. Commerce.
20     Q. And is that Mr. Cannon?
21     A. That's Mr. Cannon, yes.
22     Q. Do you consider the lawyers for the

Page 335

1  antitrust division to be lawyers for the census
2  bureau?
3      MS. ZWOLINSKI: Objection. Form.
4  Foundation.
5      THE WITNESS: I do not.
6      BY MS. GOODMAN:
7      Q. Why not?
8      MS. ZWOLINSKI: Objection. Form.
9  Foundation.
10     THE WITNESS: Since census has their
11 own lawyers and we have commerce lawyers, and I
12 believe the commerce lawyers would be more --
13 more sort of categorized in that way versus
14 DOJ.
15     BY MS. GOODMAN:
16     Q. Okay. And is your answer the same
17 with respect to your participation in this
18 lawsuit as a representative of the census
19 bureau?
20     MS. ZWOLINSKI: Objection. Form.
21 Foundation.
22     THE WITNESS: Yes.

Page 336

1      MS. GOODMAN: I have no further
2  questions. I'll pass the witness.
3      MS. ZWOLINSKI: We have no
4  questions.
5      MS. GOODMAN: Okay. Thank you so
6  much for your time, Ms. Oliphant. I very much
7  appreciate it.
8      THE WITNESS: You're welcome. Thank
9  you.
10     THE VIDEOGRAPHER: Off the record.
11     MS. GOODMAN: Yes.
12     THE VIDEOGRAPHER: This marks the
13 end of the deposition of Kendall Oliphant. We
14 are going off the record at 18:24.
15     (Whereupon, the proceeding was
16 concluded at 6:24 p.m.)

Page 337

1      CERTIFICATE OF NOTARY PUBLIC
2      I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10 record of the testimony given by said witness;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this deposition was taken; and further,
14 that I am not a relative or employee of any
15 attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.
18
19     *Bonnie L. Russo*
20     Notary Public in and for
21     the District of Columbia
22 My Commission expires: August 14, 2025

85 (Pages 334 - 337)

HIGHLY CONFIDENTIAL

Page 338

1  ACKNOWLEDGMENT OF DEPONENT
2      I, KENDALL OLIPHANT, do hereby certify that
3  I have read the foregoing transcript of my
4  testimony taken on 8/9/23, and further certify
5  that it is a true and accurate record of my
6  testimony (with the exception of the
7  corrections listed below):
8  Page    Line       Correction
9   ____   ____    _____
10  ____   ____    _____
11  ____   ____    _____
12  ____   ____    _____
13  ____   ____    _____
14  ____   ____    _____
15  ____   ____    _____
16  ____   ____    _____
17  ____   ____    _____
18        _____
          KENDALL OLIPHANT
19
    SUBSCRIBED AND SWORN TO BEFORE ME
20  THIS ____ DAY OF _____, 2023.
21
    _____  _____
22  (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
    Job No. CS6031956

Page 339

1  Rachel Zwolinski, Esq.
2  rachel.zwolinski@usdoj.gov
3           August 10, 2023
4  RE:   United States, Et Al v. Google, LLC
5    8/9/2023, Kendall Oliphant (#6031956)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

HIGHLY CONFIDENTIAL

Page 339

1  Rachel Zwolinski, Esq.
2  rachel.zwolinski@usdoj.gov
3            August 10, 2023
4  RE:   United States, Et Al v. Google, LLC
5     8/9/2023, Kendall Oliphant (#6031956)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22           Yours,
23           Veritext Legal Solutions
24
25

HIGHLY CONFIDENTIAL

Page 338

1        ACKNOWLEDGMENT OF DEPONENT

2        I, KENDALL OLIPHANT, do hereby certify that

3   I have read the foregoing transcript of my

4   testimony taken on 8/9/23, and further certify

5   that it is a true and accurate record of my

6   testimony (with the exception of the

7   corrections listed below):

8   Page      Line        Correction

9   33        7           communications contract, program

10  34        6           "and" should be "within" instead

11  99        6           "directory" should be "direct"

12  118       9           "do-not" should be "do-not-buy"

13  126       16          "invoice" should be "invoiced"

14  157       16          "BETT" should be "BET"

15  285       19          paid media, earned media, and partnership

16  ___       ___         _____

17  ___       ___         _____

18                        _____
                          KENDALL OLIPHANT

19

    SUBSCRIBED AND SWORN TO BEFORE ME

20  THIS _____ DAY OF _____, 2023.

21

22  (NOTARY PUBLIC)       MY COMMISSION EXPIRES:

    Job No. CS6031956