# Plaintiffs' Exhibit 114
# (Redacted)

```
                              VOLUME 1
                              PAGES:  1-198
                              EXHIBITS:  See Index

               UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
                      ALEXANDRIA DIVISION
    _____
                                  )
    UNITED STATES OF AMERICA,     )
    et al.,                       )
                                  )
            Plaintiffs,            ) Case No.
                                  ) 1:23-cv-00108-LMB-JFA
        v.                        )
                                  )
    GOOGLE, LLC,                  )
                                  )
            Defendant.            )
                                  )
    _____)

                ** HIGHLY CONFIDENTIAL **

          VIDEOTAPED DEPOSITION of ADAM SOROCA
                 Thursday, August 31, 2023
                        8:58 a.m.
                        AC Hotel
                    225 Albany Street
                  Boston, Massachusetts

            Michelle Keegan, RMR, CRR, CSR
                         Lexitas
          508-478-9795 ~ 508-478-0595 (Fax)
                   www.LexitasLegal.com
```

```
 1  A P P E A R A N C E S:
 2
 3  US DEPARTMENT OF JUSTICE, ANTITRUST DIVISION
    By:  Milosz Gudzowski, Esq.
 4  By:  Michael Wolin, Esq.
    450 56th Street NW
 5  Washington, D.C. 20530
    Phone:  (646) 541-7333
 6  Email:  milosz.gudzowski@usdoj.gov
    Email:  michael.wolin@usdoj.gov
 7  Counsel for Plaintiff
 8
    AXINN, VELTROP & HARKRIDER LLP
 9  By:  David R. Pearl, Esq.
    By:  Bradley Justus, Esq.
10  By:  Luke T. Martin, Esq.
    1901 L Street, NW
11  Washington, D.C. 20036
    Phone:  (202) 912-4700
12  Email:  dpearl@axinn.com
    Email:  bjustus@axinn.com
13  Email:  lmartin@axinn.com
    Counsel for Defendant Google LLC
14
15  KRESSIN MEADOR LLC
    By:  Brandon Kressin, Esq.
16  By:  Catherine Larsen, Esq.
    5609 Golden Bear Drive
17  Overland Park, Kansas 66223
    Phone:  (913) 374-0750
18  Email:  brandon@kressinmeador.com
    Email:  catherine@kressinmeador.com
19  Counsel for Magnite
```

```
 1  APPEARANCES (continued):
 2
 3  Also Present:
 4    Jake Before, Videographer
 5    Brian Smith, Lexitas                      (Zoom)
 6    Aaron Saltz, Magnite General Counsel
 7    Linnaea Petterson, USDOJ Paralegal        (Zoom)
```

```
 1                      I N D E X
 2
    Videotaped Deposition of:                      Page
 3
    ADAM SOROCA
 4
      By Mr. Gudzowski                             7, 185
 5   By Mr. Pearl                                  84
 6
                        E X H I B I T S
 7
    Soroca Nos.                                    Page
 8
    Exhibit 1    Email, Bates-numbered              44
 9               RUBICON-00001139 through -1141
10
    Magnite Nos.                                   Page
11
    Exhibit 1    Letter dated October 9, 2020,      92
12               Bates-numbered
                 DOJ-ADS-B-0000025100
13               through -5101
14  Exhibit 2    Document, "Magnite Reports        121
                 Record Fourth Quarter and
15               Full-Year 2022 Results"
16  Exhibit 3    Document, "Edited Transcript,     129
                 Event Date/Time: August 09,
17               2023/8:30 PM GMT"
18  Exhibit 4    Document, "Board of Directors     134
                 Meeting, April 20, 2023,"
19               Bates-numbered MAGNITE-00002598
                 through -2671
20
    Exhibit 5    Document, "All Hands Meeting      141
21               December 2019," Bates-numbered
                 MAGNITE-00004628 through -4692
```

9

1  before?
2  **A. No.**
3  Q. I'd like to start with some ground rules
4  to help the deposition go smoothly.
5     First, it's very important for us not to
6  talk over each other so the court reporter can get
7  an accurate transcription of the deposition.
8     If at any time you don't understand a
9  question I ask, please let me know and I'll
10 clarify; otherwise, we'll assume that you
11 understood the question.
12    Does that make sense?
13 **A. Yes.**
14 Q. A transcript doesn't record nods,
15 headshakes, hand gestures, so please make sure all
16 your answers are verbal and audible.
17    Does that make sense?
18 **A. Yes.**
19 Q. While we're on the record, you cannot
20 communicate with others or consult any notes.
21    Does that make sense?
22 **A. Yes.**

10

1  Q. Do you have any notes in front of you?
2  **A. No.**
3  Q. Do you understand that you're sworn here
4  to answer all questions in this deposition
5  truthfully?
6  **A. I do.**
7  Q. Do you understand that the information you
8  provide during this deposition may be used by the
9  Department of Justice in other civil, criminal,
10 administrative, or regulatory cases or
11 proceedings?
12 **A. I do.**
13 Q. Is there any reason you can't answer
14 truthfully?
15 **A. There is not.**
16 Q. Are you taking any medications that might
17 interfere with your ability to answer questions
18 today?
19 **A. No.**
20 Q. Mr. Soroca, unless I say otherwise, for
21 all my questions I would like you to answer based
22 on your personal knowledge only.

11

1     Does that make sense?
2  **A. Yes.**
3  Q. So unless I say otherwise, I'm not asking
4  about information that you learned during
5  preparation for this deposition that comes from
6  someone else at Magnite and that you did not have
7  any personal knowledge about.
8     Does that make sense?
9  **A. Yes.**
10 Q. If at any point you feel like you have
11 information that is within the knowledge of
12 Magnite but not within your personal knowledge,
13 please specifically state that you're basing your
14 answer on something that is not within your
15 personal knowledge, and then we'll take it from
16 there.
17 **A. I understand.**
18 Q. Thank you. Now I'm going to go through
19 some background.
20    Mr. Soroca, what is your position at
21 Magnite?
22 **A. I'm the chief product officer.**

12

1  Q. And could you briefly describe your
2  responsibilities as chief product officer?
3  **A. As chief product officer, I'm responsible**
4  **for developing the company's product vision, road**
5  **maps, and go-to-market strategies.**
6  Q. And how long have you worked at Magnite?
7  **A. Six years. A little over six years.**
8  Q. And could you just briefly describe your
9  roles and responsibilities at Magnite prior to
10 becoming chief product officer?
11 **A. I joined Magnite in July of 2017, and I**
12 **was hired to -- I came over through acquisition,**
13 **and the first role was to be the head of the**
14 **global buyer team. Sorry. Head of the global DSP**
15 **team.**
16    **About six months later, I was asked to**
17 **take on and be the head of the full global buyer**
18 **team.**
19 Q. And would you tell us about that position.
20 What were your responsibilities?
21 **A. My responsibilities were to call on and**
22 **understand the market dynamics for our brand, our**

13
1  agency, and our DSP customers, developing
2  go-to-market strategies and building those
3  relationships.
4      Q. And how is that different from what you do
5  now?
6      A. Now my responsibilities are to build the
7  road maps that end up delivering software to
8  service all of our clients on both the buy and the
9  sell side.
10     Q. And could you just briefly describe what
11 you mean by "road maps."
12     A. Road maps would be a list of projects or
13 software that we are going to build.
14     Q. And who are your clients, generally
15 speaking?
16     A. Magnite's clients would be DSPs, brands
17 and agencies on the buy side, and sellers of
18 inventory or publishers on the sell side.
19     Q. And where were you before Magnite?
20     A. I had started a company called nToggle.
21     Q. And how long were you there for?
22     A. Approximately two and a half to three

14
1  years.
2      Q. And did you say earlier that that company
3  was brought over to Magnite?
4      A. Correct.
5      Q. And could you just describe the
6  circumstances of that.
7      A. nToggle was acquired by Rubicon Project at
8  the time.
9      Q. And what did nToggle do?
10     A. nToggle provided machine-learning-based
11 traffic shaping that took the stream of traffic
12 from exchanges and shaped it for the DSPs.
13     Q. And before nToggle, where were you at?
14     A. I was at a company called Millennial
15 Media.
16     Q. And what did you do there?
17     A. I was the chief product officer.
18     Q. And what is Millennial Media?
19     A. Millennial Media was an ad network --
20 mobile ad network and programmatic ad stack.
21     Q. And is that company still around?
22     A. It is not.

15
1      Q. What happened to it?
2      A. It was acquired by Yahoo.
3      Q. And is that when you left?
4      A. No.  I may not be right.  It was either
5  acquired by Verizon or Yahoo -- I forget the
6  sequencing -- or AOL.
7      Q. And why did you leave Millennial Media?
8      A. To go start nToggle and a discussion with
9  the CEO that it was time for me to move on.
10     Q. Before Millennial Media, what did you do?
11     A. I worked for a company called Jumptap.
12     Q. And could you tell us a little bit about
13 Jumptap.
14     A. Jumptap was another mobile ad network and
15 programmatic stack.
16     Q. And what do you mean by that?  What's a
17 mobile ad network?
18     A. An ad network, we took insertion orders
19 from buyers and delivered the campaigns across
20 mobile app providers.
21     Q. And is Jumptap still around?
22     A. It is not.

16
1      Q. What happened?
2      A. It was acquired by Millennial Media.
3      Q. And before Jumptap, what did you do?
4      A. I was at Lycos.
5      Q. What did you do there?
6      A. I was the general manager of the search
7  services.
8      Q. And what year was that?
9      A. Could you repeat the question?
10     Q. What years were you there?
11     A. 2002 to 2005.
12     Q. And I think I forgot to ask, what years
13 were you at Jumptap?
14     A. 2005 until -- through the acquisition and
15 end of Millennial Media, 2014.
16     Q. And before Lycos, what did you do?
17     A. I was at a company called
18 MotherNature.com.
19     Q. And what was your role there?
20     A. I was director of business development.
21     Q. And before that?
22     A. I was at a company called Cybersmith.

57

1  distribute but not specific knowledge.
2    Q. And what's the industry chatter about
3  that?
4    A. We get a share -- one of our peers,
5  PubMatic, gets a share. I couldn't say any more
6  than that.
7    Q. Do you know if AdX gets a share of that
8  GDN spend?
9    A. I don't know how GDN gets distributed
10 through GAM, whether it's specifically through the
11 AdX channel or it's through GAM itself. I believe
12 the latter, but can't be certain.
13   Q. And does Magnite have as much access to
14 GDN as GAM?
15      MR. PEARL: Objection, form.
16   A. There's no way for us to know that.
17   Q. Let's move on to a different topic,
18 slightly different.
19      How successful or unsuccessful has
20 Google's AdX been in display?
21      MR. PEARL: Objection, form.
22   A. I believe them to be highly successful.

58

1    Q. And is that success based on having the
2  best product?
3       MR. PEARL: Objection, form.
4    A. I would say that our products are
5  comparable on the exchange side.
6    Q. And is Google's success based on its
7  innovation?
8       MR. PEARL: Objection, form.
9    A. I'm not aware of big innovations on the
10 exchange side that would equate to the level of
11 success.
12   Q. So how come Google's AdX has been as
13 successful as you say without innovation?
14      MR. PEARL: Objection, form.
15   A. That is a question that is asked across
16 the industry for a long time. I do not have a
17 clear answer to that.
18   Q. What do people say in the industry?
19      MR. PEARL: Objection, form.
20   A. They wonder why the share is so large.
21   Q. What's your understanding of Google's open
22 auction display take rate for AdX?

59

1       MR. PEARL: Objection, form.
2    A. The only thing that I can point to on
3  their display take rate is what they wrote in a
4  blog a few years ago where they don't disclose
5  their take rate precisely, but they indicate they
6  are generally in the 20 percent take rate range.
7    Q. And is "open auction" a kind of common
8  term in the industry?
9    A. Yes.
10   Q. And what does it mean?
11   A. Open auction is unreserved inventory. It
12 is not prenegotiated price inventory between a
13 buyer or seller. It's an impression that is --
14 it's basically the lower end of priority that gets
15 put out for bid.
16   Q. And what's a take rate?
17   A. What's the take rate for who?
18   Q. What is a take rate?
19   A. Oh, take rate, what is a take rate? A
20 take rate is how much a technology provider earns
21 out of a transaction.
22   Q. And kind of looping back kind of all

60

1  together, so when you say -- I believe you said it
2  was 20 percent, Google's take rate?
3       MR. PEARL: Objection, form.
4    A. That's what Google posted on a blog.
5    Q. What does it actually mean in this
6  context?
7       MR. PEARL: Objection, form.
8    A. That means out of a dollar, Google would
9  earn 20 cents for the transaction that occurs
10 through the AdX platform.
11   Q. And how does Magnite's open auction
12 display take rate compare to that?
13   A. Our take rate is lower.
14   Q. Approximately how much lower?
15   A. Our take rate for open auction is
    ███████████ ██ ███████
17   Q. And do you have a view on why Google's
18 take rate for its AdX product is higher than
19 yours, how are they able to kind of bear that in
20 the market?
21      MR. PEARL: Objection to form.
22   A. My view of that would be that they get --

61

1  they can command whatever take rate they so chose.
2     Q. And can you elaborate on that? Why do you
3  think that?
4     A. They are not held to the same transparency
5  standards that we are on the buy side of the
6  business. And they have the ability to win
7  inventory or they had the ability to win inventory
8  at whatever take rate they put out there.
9     Q. Could you elaborate on why transparency
10 has something to do with take rate?
11        MR. PEARL: Objection, form.
12    A. So buyers, particularly the largest
13 agencies and the largest marketers, went through a
14 wave of requiring companies like Magnite to
15 declare and report against our take rate.
16    Q. And is that not the same for AdX?
17        MR. PEARL: Objection to form.
18    A. AdX -- my understanding is that AdX would
19 not engage in those conversations and didn't have
20 to negotiate those rates.
21    Q. And do you think that actually has --
22 gives Google's AdX the ability to have a higher

62

1  take rate?
2        MR. PEARL: Objection, form.
3     A. I do.
4     Q. Is there anything else that gives Google
5  the ability to have a higher take rate?
6        MR. PEARL: Objection, form.
7     A. Given what we've discussed today, their
8  ability to win at a higher rate than others means
9  that they can take more of the transaction and
10 still compete and win the auction.
11    Q. And why do you think they're able to win a
12 higher rate than others?
13    A. Because of things like last look.
14    Q. Any other things?
15        MR. PEARL: Objection, form.
16    A. Other information they may be privy to in
17 their view of market based on their ad server
18 position.
19    Q. And just to be clear, that information is
20 not information that they would give to Magnite?
21        MR. PEARL: Objection, form.
22    A. No.

63

1     Q. What effects, if any, does size have in
2  the exchange market?
3        MR. PEARL: Objection to form.
4     A. Can you define what you mean by "size"?
5     Q. Does the word "scale" make it more
6  meaningful to you?
7        MR. PEARL: Objection to form.
8     A. The larger -- the more inventory an
9  exchange has access to, the more robust the
10 business is going to be.
11    Q. And do you not -- does Magnite have as
12 much access to inventory as Google to AdX?
13        MR. PEARL: Objection to form.
14    A. I don't believe we do.
15    Q. Why not?
16    A. There is a part of the market,
17 particularly in the long tail of publishers, the
18 smaller publishers, that are ad server customers
19 of GAM that we do not work with. And so that
20 would be inventory that is unique to Google.
21    Q. And if Magnite had access to those
22 publishers, what specifically would that do to

64

1  your business?
2        MR. PEARL: Objection, form.
3     A. We would have more supply that passes
4  through our system, and we would retrieve more
5  bids from the DSPs and ultimately deliver more
6  revenue.
7     Q. And would it help Magnite compete more
8  effectively?
9        MR. PEARL: Objection to form.
10    A. We would -- we would grow our revenue.
11 And so yes, we would be more competitive.
12    Q. In terms of having more of the inventory,
13 would it have an effect on being able to optimize
14 your floors better?
15        MR. PEARL: Objection, form.
16    A. Floors are typically optimized on a
17 per-publisher basis. So I don't think that more
18 breadth would change our authorization within the
19 vertical nature of a publisher.
20    Q. I'm going to ask this question a little
21 differently.
22        Are there ways which size matters in the

197

1  COMMONWEALTH OF MASSACHUSETTS
2  SUFFOLK, SS.
3
4     I, Michelle Keegan, Registered Merit Reporter
5  and Notary Public in and for the Commonwealth of
6  Massachusetts, do hereby certify that ADAM SOROCA,
7  the witness whose deposition is hereinbefore set
8  forth, was duly sworn by me and that such
9  deposition is a true record, to the best of my
10 ability, of the testimony given by the witness.
11    I further certify that I am neither related to
12 or employed by any of the parties in or counsel to
13 this action, nor am I financially interested in
14 the outcome of this action.
15    In witness whereof, I have hereunto set my hand
16 and seal this 1st day of September, 2023.
17
18
19                  [signature]
20                  Notary Public
21                  My commission expires:
22                  May 15, 2026

198

1           E R R A T A   S H E E T
2     I, ADAM SOROCA, do hereby certify that I have
3  read the foregoing transcript of my testimony, and
4  further certify that said transcript is a true and
5  accurate record of my testimony (with the
6  exception of the following corrections listed
7  below):
8  Page      Line              Correction
9     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
10    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
11    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
12    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
13    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
14    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
15    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
16    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
17    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
18    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
19 Signed under the pains and penalties of perjury
20 this        day of              , 2023.
21
22                       ADAM SOROCA

**ERRATA SHEET**
**DEPOSITION TRANSCRIPT OF**
**ADAM SOROCA**
Deposition Date:  August 31, 2023

| Page(s) | Line(s) | Transcript Text | Correction | Reason |
|---|---|---|---|---|
| 8 | 21 | "MR. PEARL" | "MR. KRESSIN" | Mr. Pearl does not represent the witness; Mr. Kressin represents the witness. |
| Throughout | Throughout | "Google demand network" | "Google Demand Network" | Proper noun; capitalization |
| 29<br><br>30<br><br>31 | 17<br><br>9 – 11<br><br>5 | "Publisher" | "publisher" | Not a proper noun; capitalization |
| 41 | 1 | "Rubicon Project index" | "Rubicon Project, Index" | Transcription error; Mr. Soroca is listing two exchanges. |
| 119<br><br>174 | 22<br><br>17 | "prebid" | "Prebid" | Proper noun; capitalization |
| 123 | 3 | "2022" | "2021" | Transcription error |
| 133 | 18 | "Mr. Barry" | "Mr. Barrett" | Transcription error |
| 142 | 16, 18, 20 | "the Trade Desk" | "The Trade Desk" | Proper noun; capitalization |
| 154 | 19 | "Sovereign" | "Sovrn" | Transcription error |
| 159 | 11 | "own" | "open" | Transcription error |

| 171 | 22 | "Rev" | "REVV" | Transcription error |
|---|---|---|---|---|
| 172 | 5, 13, 15 | | | |