**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES, *et al.*,<br><br>     *Plaintiffs*,<br><br>  vs.<br><br>GOOGLE LLC,<br><br>     *Defendant*. | No. 1:23-cv-00108-LMB-JFA |

**GOOGLE LLC'S REPLY IN SUPPORT OF ITS MOTION FOR**
**<u>SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................. 1

II.    REPLY TO PLAINTIFFS' RESPONSE TO GOOGLE'S STATEMENT OF
       UNDISPUTED FACTS ("Reply to RSUF") ...................................... 2

III.   RESPONSES TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL
       FACTS ("RSAMF") ........................................................................... 3

IV.    ARGUMENT ...................................................................................... 6

       A.     For All Their Claims, Plaintiffs Are Asking This Court to Overturn *Trinko*
              and *linkLine* .......................................................................... 6

              1.     Plaintiffs' Claims Are Barred by Established Supreme Court
                     Precedent Holding that a Firm Generally Has No Duty to Deal with
                     Its Rivals. ...................................................................... 7

              2.     The Cases Plaintiffs Rely On Only Confirm This Is a Lawful Refusal
                     to Deal. ........................................................................... 10

       B.     Plaintiffs' Monopolization and Tying Claims Also Fail for Other Reasons. ....... 14

              1.     Plaintiffs' Claims Regarding Real-Time Bidding, Dynamic
                     Allocation, and Unified Pricing Rules Also Fail Because They Are
                     Lawful Product Improvements. ........................................... 14

              2.     Plaintiffs' Assertion of AdX-DFP Tying and Monopolization Claims
                     Based on Restriction of Google Ads Demand to AdX Fail to Define
                     the Required Market in Google Ads Advertiser Demand..................... 15

              3.     Plaintiffs' New Google Ads-AdX Tying Theory Is Both Too Late and
                     Insufficient. ................................................................... 17

       C.     Plaintiffs Have Not Provided Any Evidence that the DoubleClick
              Acquisition, Project Poirot, Sell-Side Dynamic Revenue Sharing, or Project
              Bell Harmed Competition. .................................................... 18

       D.     Plaintiffs Cannot Demonstrate Anticompetitive Conduct by Arguing that
              Lawful Refusals to Deal and Product Improvements Form an
              "Anticompetitive Enterprise." ................................................ 19

       E.     All Claims Must Be Dismissed Because Plaintiffs Have Failed to Define
              Relevant Markets That Can Support Their Claims. .................... 20

       F.     Even If "Ad Exchanges for Open-Web Display Advertising" Were a
              Relevant Market, By Plaintiffs' Own Terms, Google Would Not Have
              Monopoly Power in That Market.............................................. 21

       G.     Plaintiffs Are Asking This Court to Overturn *Illinois Brick*................. 22

CONCLUSION....................................................................................... 25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1-800 Contacts, Inc.* v. *FTC*,
  1 F.4th 102 (2d Cir. 2021) ...................................................................18

*Abcor Corp.* v. *AM Int'l, Inc.*,
  916 F.2d 924 (4th Cir. 1990) ...............................................................20

*Advanced Health-Care Servs., Inc.* v. *Radford Cmty. Hosp.*,
  910 F.2d 139 (4th Cir. 1990) ...............................................................18

*Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) ........................................................10, 13

*Alivecor, Inc.* v. *Apple, Inc.*,
  2024 WL 591864 (N.D. Cal. 2024) .......................................................14

*Allied Orthopedic Appliances Inc.* v. *Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) ...............................................................14

*Apple* v. *Pepper*,
  139 S. Ct. 1514 (2019).............................................................22, 23, 24

*Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)....................................................................... *passim*

*Atl. Richfield Co.* v. *USA Petroleum Co.*,
  495 U.S. 328 (1990)..............................................................................18

*Barclay White Skanska* v. *Battelle Mem'l Inst.*,
  262 F. App'x 556 (4th Cir. 2008) .........................................................17

*Berkey Photo, Inc.* v. *Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)..................................................................14

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)..............................................................................18

*Chase Mfg., Inc.* v. *Johns Manville Corp.*,
  84 F.4th 1157 (10th Cir. 2023) ........................................................10, 12

*Cloaninger ex rel. Estate of Cloaninger* v. *McDevitt*,
  555 F.3d 324 (4th Cir. 2009) ...............................................................17

*United States* v. *Colgate & Co.*,
  250 F.3d 300 (1919) ................................................................................................7

*Coronavirus Rep.* v. *Apple, Inc.*,
  85 F.4th 948, 957 (9th Cir. 2023) ...........................................................................16

*Covad Commc'ns Co.* v. *Bell Atl. Corp.*,
  398 F.3d 666 (D.C. Cir. 2005) ..................................................................................9

*Del. Valley Surgical Supply Inc.* v. *Johnson & Johnson*,
  523 F.3d 1116 (9th Cir. 2008) .................................................................................23

*Dickson* v. *Microsoft*,
  309 F.3d 193 (4th Cir. 2002) .............................................................................16, 19

*Duane* v. *GEICO*,
  37 F.3d 1036 (4th Cir. 1994) ...................................................................................10

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) ..................................................................................19

*FTC* v. *Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2021) ..........................................................................9, 10

*New York* v. *Facebook, Inc.*,
  549 F. Supp. 3d 6 (D.D.C. 2021),
  *aff'd sub nom. New York* v. *Meta Platforms, Inc.*,
  66 F.4th 288 (D.C. Cir. 2023) .............................................................11, 13, 19, 20

*United States* v. *Google LLC*,
  687 F. Supp. 3d 48 (D.D.C. 2023) ..........................................................................19

*Illinois Brick* v. *Illinois*,
  431 U.S. 720 (1977) ..................................................................................2, 22, 23, 25

*Imaging Ctr., Inc.* v. *W. Md. Health Sys., Inc.*,
  158 F. App'x 413 (4th Cir. 2005) ............................................................................19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  2024 WL 1014159 (E.D.N.Y. 2024) ........................................................................24

*It's My Party, Inc.* v. *Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016) ...................................................................................16

*Kloth* v. *Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006) ..............................................................................23, 24

*Kolon Indus. Inc.* v. *E.I. DuPont de Nemours & Co.*,
748 F.3d 160 (4th Cir. 2014) .........................................................................21

*In re Local TV Advert. Antitrust Litig.*,
2023 WL 1863046 (N.D. Ill. 2023) ................................................................24

*Lorain Journal Co.* v. *United States*,
342 U.S. 143 (1951)........................................................................................10

*Loren Data Corp.* v. *GSX, Inc.*,
501 F. App'x 275 (4th Cir. 2012) ....................................................................8

*New York* v. *Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023)..............................................................7, 8, 10, 11

*United States* v. *Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) (en banc) .........................................................12

*Military Servs Realty, Inc. v. Realty Consultants of Va., Ltd.*,
823 F.2d 829 (4th Cir. 1987) ..........................................................................18

*Novell, Inc.* v. *Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ............................................................ *passim*

*Olympia Equip. Leasing Co.* v. *W. Union Tel. Co.*,
797 F.2d 370, 375 (7th Cir. 1986) ..................................................................15

*Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)...............................................................................1, 9, 19

*FTC* v. *Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ..........................................................................10

*Retractable Techs., Inc.* v. *Beckton Dickinson & Co.*,
842 F.3d 883 (5th Cir. 2016) ..........................................................................19

*New York ex. rel. Schneiderman* v. *Actavis PLC*,
787 F.3d 638 (2d Cir. 2015)............................................................................14

*Soskel* v. *Texaco Inc.*,
514 F. Supp. 578 (S.D.N.Y. 1981)..................................................................24

*Twin City Sportservice, Inc.* v. *Charles O. Finley & Co.*,
512 F.2d 1264 (9th Cir. 1975) ........................................................................21

*US Airways, Inc.* v. *Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019)..............................................................................15

*Kansas* v. *UtiliCorp United, Inc.*,
  497 U.S. 199 (1990) ........................................................................................................23

*Va. Vermiculite, Ltd.* v. *W.R. Grace & Co.-Conn.*,
  108 F. Supp. 2d 549 (W.D. Va. 2000) .............................................................................15

*Verizon Commc'ns Inc.* v. *L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).................................................................................................. *passim*

*Viamedia, Inc.* v. *Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) .....................................................................................10, 12

*Warren Gen. Hosp.* v. *Amgen Inc.*,
  643 F.3d 77 (3d Cir. 2011).............................................................................................23

**Statutes**

15 U.S.C. § 4 ...............................................................................................................................25

15 U.S.C. § 15a ...........................................................................................................................25

**Other Authorities**

Google Ad Manager Help, *Google Ad Manager Partner Guidelines*,
  tinyurl.com/GAMGuidelines .............................................................................................4

Google Ad Manager Help, *Purchase Traffic to Your Site*,
  tinyurl.com/GAMPurchaseTraffic .....................................................................................4

Display & Video 360 Help, *Supported Display Exchanges*,
  tinyurl.com/DV360Exchanges ...........................................................................................4

## I.    INTRODUCTION

Plaintiffs' Opposition is an overt attempt to rewrite the law.  The Supreme Court has held that "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *see also Verizon Commc'ns Inc.* v. *L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004).  Notwithstanding this controlling precedent, Plaintiffs' basis for *all* their claims is that it is exclusionary for Google not to provide rivals with "comparable" access to its technology and customers—that is, access comparable to Google's own.  Plaintiffs wave away the Supreme Court's long established and generally applicable right to refuse to deal with rivals as applicable only in "two unique contexts" not at issue in this case.  And Plaintiffs even argue that conduct the Supreme Court has declared to be legal can be invalidated by this Court, if it is described as part of a broader unlawful enterprise.

As they have done in public speeches and other fora, Plaintiffs seek to render *Trinko* and *linkLine* dead letter, offering up a series of novel approaches designed to gut controlling Supreme Court precedent: They say that *Trinko* only concerned an "outright" refusal to deal (a phrase that fails to describe *Trinko* and appears nowhere in the law); the right to refuse to deal is inapplicable to a case about "conditions" on customers (an argument floated in DOJ speeches but rejected by courts because *any* refusal to deal with rivals could be described that way); and this is actually a case about "tying" (belied by Plaintiffs' admission that they are demanding "comparable" access for rivals to technological features of AdX and not challenging the integration of AdX and DFP).

In inviting this Court to accept these arguments, Plaintiffs ask this Court to flout its duty to apply controlling precedent.  It is telling that Plaintiffs can cite no court which has done so, including in cases like this one focused on software, technological interoperability, and digital platforms, while Google has cited many courts that have faithfully applied precedent to dismiss

claims just like the ones in this case.

Plaintiffs' claims all also fail because of their made-up market definitions: the previously unheard of and non-existent tools for "open-web display advertising." Plaintiffs still cannot point to a single market participant or credible piece of evidence that supports their "delineated for this case" markets. Even if this Court accepts Plaintiffs' narrowly defined market for ad exchanges and market share calculation, Google's share is well short of the Fourth Circuit's 70% threshold. And Plaintiffs do not dispute that Google's share is declining or that the number of new exchanges has grown tenfold in the last decade, from 10 in 2010 to over 100 today. Hardly signs of "durable" market power, as required to have a triable case under Fourth Circuit precedent.

Finally, the United States' damages claim fails for the independent reason that, as Plaintiffs concede, no federal agency advertiser ("FAA") bought directly from Google, as required by *Illinois Brick* v. *Illinois*, 431 U.S. 720 (1977). Again, here, the United States' argument is that a long-established, clear Supreme Court rule that has been applied to many other parties for years should not apply to it.

## II.   REPLY TO PLAINTIFFS' RESPONSE TO GOOGLE'S STATEMENT OF UNDISPUTED FACTS ("Reply to RSUF")

Plaintiffs' Responses to Google's Statement of Undisputed Facts raise factual disputes not material to the issues on summary judgment, do not cite admissible evidence that supports their assertions, and demonstrate a lack of understanding of ad tech products. For example:

4. Not all digital publishers use publisher ad servers together with ad exchanges to sell inventory. Some use ad networks like Google's AdSense, Ex. 127, ¶¶ 126-128[1]; or engage in

---

[1] All references to Ex. 1 through 146 refer to the Declaration of Bryon Becker in Support of Google LLC's Motion for Summary Judgment and Motions to Exclude, ECF No. 581, Declaration of Bryon Becker in Support of Google LLC's Oppositions to Plaintiffs' Motions to Exclude, ECF No. 646, and Declaration of Bryon Becker in Support of Google LLC's Replies in Support of Google LLC's Motion for Summary Judgment and Motions to Exclude. All references

direct deals with advertisers, *id.* ¶ 69.  Those channels enable a publisher to reach advertisers that use Google Ads, Ex. 127, ¶¶ 126-128, 342, but neither is included in Plaintiffs' defined markets. Ex. 8 at 92:21-93:2.

7, 12, 15. Plaintiffs' small number of cited documents do not demonstrate that "the industry" recognizes "open-web display advertising" as "a distinct form of digital advertising" narrowly defined in the way that Plaintiffs' expert defines it—including only traditional banner ads appearing on websites that use third-party ad tech, *see* Ex. 1, ¶¶ 49(1), 49(3), 49(4)(C), 55.[2]

45, 46, 47. The integration of AdX and DFP benefits publishers, Ex. 129 at -94; SUF 46, 47, and advertisers because, among other things, Google can disable fraudulent, spammy, or inappropriate publishers to ensure quality, Ex 120 at -436-37; Ex. 130 at -496, -512.

## III. RESPONSES TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS ("RSAMF")

For purposes of this motion, Google does not dispute the facts contained in SAMF 1, 4,

---

to "PX" refer to Plaintiffs' exhibits attached to the Declaration of Aaron Teitelbaum In Support of Plaintiffs' Response to Google's Motion for Summary Judgment, ECF No. 656-1.  With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability.  All emphasis is added unless otherwise indicated.

[2] *See* PX 3 at -647 (referring, without explanation, to a "highly fragmented open web display advertising market" in connection with an assessment of the threat of Apple developing an ads business that includes "traditional formats" like "display, video, native," and "search ads"); ███████ ███████████████████████████████████████████████████████████████ PX 5 (using the words "Display Web" without distinguishing "open web" from "closed web" or defining any terms); ██████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ █████████████████████████████ *compare* ███████████████████████████████████ ████████████ *and* ████████████████████████████████████ *with* Ex. 1, ¶¶ 49(1), 49(4)(C) (Prof. Lee's definition of display ads excludes native advertising, which he defines as including social media ads).

8, 9, 13, 16, and 20.[3]   Google disputes that any of Plaintiffs' SAMF are material to resolving Google's motion for summary judgment.   Google disputes the accuracy of the following SAMF:

2. Publishers are not "captive" to DFP.   Google does not prohibit publishers who use AdX or DFP from dealing with competitor publisher ad servers or building their own.[4]

3. Google Ads does not purchase exclusively on AdX; advertisers using Google Ads bid on third-party exchanges through AwBid.   SUF 41.   The use of AwBid has increased since it first launched in 2013.   Ex. 131, ¶ 634 & Fig. 91.   Nor does Google restrict advertisers that use Google Ads from using other tools to bid into third-party exchanges.   Advertisers, including the ones that use Google Ads and especially larger ones that account for the bulk of spend on Google Ads, can and do use other ad buying tools.   Ex. 1, ¶ 371, Fig. 36, 37, 38; Ex. 127, ¶ 188; Ex. 131, ¶ 199. For example, ███████████████████████████████████████████████████ ██████████████████████████████████████   including Google's DV360—which bids into at least 80 non-Google exchanges,[5] Ex. 1, ¶¶ 130-131; SUF 23—and a third-party tool, The Trade Desk.   Ex. 62, App. E, Fig. 16.

5. AdX does not "extract high fees on each transaction."   RSAMF 7.

6. AdX's competitors and customers recognize that users have alternatives to AdX, and those alternatives compete with one another and with AdX.   ███████████████████████

---

[3] Google disputes any characterizations in Plaintiffs' SAMF that are argumentative or assert legal conclusions.   *See, e.g.*, SAMF 1 ("secured monopolies"), 4 ("killed"), 6 ("dominant ad exchange"), 7 ("supracompetitive"), 8 ("competition Google foreclosed"), 9 ("leveraged DFP's dominance," "exploiting its last look advantage"), 12 ("competitive pressure," "Google foreclosed this competition," "anti-steering clause").

[4] Google Ad Manager Help, *Purchase Traffic to Your Site*, tinyurl.com/GAMPurchaseTraffic; Google Ad Manager Help, *Google Ad Manager Partner Guidelines*, tinyurl.com/GAMGuidelines (no restrictions on publishers who use Google Ad Manager from using other publisher ad servers).

[5] Display & Video 360 Help, *Supported Display Exchanges*, tinyurl.com/DV360Exchanges.



7. When AdX's revenue share is compared to the prices charged by other exchanges, other exchanges have charged ████████████████.[6] Ex. 1, Fig. 110. ████████████ ████████████████████████ *Id.* Fig. 54. Viewed across integrated products, Google's revenue shares are ████████████ ████████████████ ████████████████████████████ ████████████

10, 11. Plaintiffs' expert agrees that Project Poirot was ████████████ ████████████████████████ Ex. 32 at 211:12-25, 212:2-10; *see also id.* at 210:5-211:2 (agreeing Poirot increased advertiser surplus).

12. UPR dictates the floor prices publishers set within Google's own product, not the floor prices set outside Google Ad Manager for non-Google exchanges. Ex. 1, ¶ 708.

14. In working with the FAAs' advertising agencies, Google sometimes prepares "non-binding, broad" joint business plans that describe how Google might "work <u>with an advertising agency</u> on behalf of the ultimate advertiser." PX 98 at 115:8-21; *see also* PX 153.

15. The FAAs are the "ultimate decisionmakers" only in the sense that they approve high-level media plans that their advertising agencies propose. In some plans, the <u>ad agencies</u> can propose ad formats or ad tech tools, but even those plans do not direct the ad agencies to make specific ad purchases transaction-by-transaction.[7] The ad agencies retain significant discretion to select ad formats and ad tech tools, and the FAAs rely on their ad agencies to make real-time

---

[6] Plaintiffs' cited exhibit does not show Google employees attributed AdX's pricing only to the integration of Google Ads and AdX. PX 117 at -259-61 (Google personnel noting other factors supporting AdX's pricing, such as "proprietary targeting/data" and no "hidden buy-side fees").

[7] *See* PX 74 at -011; PX 72 at -204; PX 70 at -391, -395; Ex. 75 at -425, -432-33; Ex. 70 at -075-76, -105; PX 78 at -876, -909; PX 76 at -990; PX 80 at -737, -739-47.

optimizations, moving ad dollars of authorized amounts that are up to tens of thousands of dollars within and among different spend categories.[8]  SUF 90, 96.

17. As Plaintiffs do not dispute, and their expert conceded, Google sends invoices to the advertising agencies—not to the FAAs—and the advertising agencies fulfill those invoices by making payments to Google.  SUF 92, 93; Ex. 68 at 85:15-87:1, 92:21-93:9.

18, 19. Ad agencies use buying tools to place bids on AdX, Ex. 62, App. E, ¶ 44, Fig. 8-10, so the AdX revenue share is deducted from the ad agency's bid.  After an ad agency makes an advertising purchase, it bills the FAA for the costs of advertising, typically on a monthly basis, in an aggregated sum, not for individual transactions.[9]  Ad agencies do not necessarily charge the FAAs for all costs that the ad agencies are invoiced by ad tech vendors; for example, the ad agencies may give the FAAs a discount from the amount charged in a vendor's invoice.[10]

## IV.    ARGUMENT

### A.    For All Their Claims, Plaintiffs Are Asking This Court to Overturn *Trinko* and *linkLine*.

As Plaintiffs' expert, Professor Robin Lee, explains at the outset of his report, Plaintiffs' claims rest on five anticompetitive acts, with all but one facially dependent on the allegation that Google is denying its rivals "███████████" to its technology and customers. Ex. 1, ¶ 12(3); SUF § II.E.3-8, 42, 49.  This includes Plaintiffs' "tying" claim, which is identified as Prof. Lee's second enumerated act.  With respect to the fifth act, Google's AdMeld acquisition, discovery has shown that Plaintiffs' experts do not take issue with the acquisition, but complain that after the acquisition Google did not integrate certain AdMeld real-time bidding technology that

---

[8] *See, e.g.*, *supra* note 7; Ex. 12 at 100:14-101:22; Ex. 138 at 107:2-108:4; Ex. 77 at -559.

[9] *See, e.g.*, Ex. 139 at -005, -017; Ex. 140 at -378-80; Ex. 141 at -511-514; Ex. 142 at -681; Ex. 143 at -131; Ex. 144 at -171-72.

[10] Ex. 79 at 83:21-88:1; Ex. 99 at -979; Ex. 65 at 78:9-79:4.

Plaintiffs say would have granted rivals comparable access to AdX.  SUF 75.  Plaintiffs have not presented any evidence showing that the acquisition itself was anticompetitive.[11]

Plaintiffs also do not dispute that to provide this comparable access Google would have to redesign its systems to accommodate its rivals, saying only that to do anything in the tech industry, "some degree of 'technical work' is necessary" and that the extent of necessary technical work "does not inform whether conduct violates the antitrust laws."  Opp. at 23.  In short, Plaintiffs and their economists do not contest that they are advancing a requirement of undefined amounts of technical work to accommodate rivals, and consider that irrelevant.

1. Plaintiffs' Claims Are Barred by Established Supreme Court Precedent Holding that a Firm Generally Has No Duty to Deal with Its Rivals.

"As a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Trinko*, 540 U.S. at 408 (quoting *United States* v. *Colgate & Co.*, 250 U.S. 300, 307 (1919)).  Refusal to deal claims allege that a defendant "witheld valuable access from rivals leaving them weakened and less competitive."  *New York* v. *Meta Platforms, Inc.*, 66 F.4th 288, 306 (D.C. Cir. 2023) (quoting DOJ's amicus brief and rejecting its argument).  That is precisely what Plaintiffs allege here.

Plaintiffs attempt to avoid this conclusion by contending that the Supreme Court decisions holding that firms have, as "a general matter," a "long recognized right" to refuse to deal with other businesses somehow only apply in "two unique contexts"—where the defendant "outright refused" to deal with a rival, or where the rival itself "challenged an ongoing deal in search of

---

[11] Plaintiffs suggest the AdMeld acquisition was "primarily" anticompetitive because it "shut down a nascent competitor."  Opp. at 21-22 n.6.  None of Plaintiffs' experts have meaningfully advanced this theory, SUF 75, and Plaintiffs cite no admissible supporting evidence.

better terms." Opp. at 20. Plaintiffs argue that, other than these situations, courts are free to restrict a firm's right not to deal with its rivals. *E.g.*, Opp. at 21 (arguing Google wanted "publisher and advertiser customers to choose Google over its rivals"); Ex. 137, ¶ 532

███████████████████████████████████████████████████████

███████████████████████████ No court has ever so held. Specifically with respect to *Trinko*, the Fourth Circuit stated: "The [United States Supreme] Court observed that exceptions to the right to refuse to deal should be recognized with caution due to the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Loren Data Corp.* v. *GSX, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012).

Accepting Plaintiffs' arguments would require this Court to ignore its duty to follow Supreme Court precedent. In *Trinko*, for example, a customer of Verizon's rival sought to compel greater "access" to Verizon's telecommunications network. 540 U.S. at 404-05. The complaint asserted that Verizon sometimes refused to fill rivals' interconnection orders "at all," or filled them *only after* filling the orders of "its own local phone service." *Id*. These refusals, the plaintiff claimed, were part of an "anticompetitive scheme to discourage customers from becoming or remaining customers of [competitors]," thus impeding rivals' market entry. *Id.* at 405. These allegations were held to be lawful refusals to deal. *Id.* at 410; *see Meta*, 66 F.4th at 306 ("The Supreme Court treated all of the company's actions, and inactions, as refusals to deal.").

Plaintiffs likewise ignore (and ask this Court to ignore) the Supreme Court's discussion of its prior decisions explaining its expansive protection of the "long recognized right" of a business to refuse to deal. *Trinko*, 540 U.S. at 408. The Supreme Court in *Trinko* discussed its prior decision in *Aspen Skiing*, which permitted an antitrust claim where a firm terminated a

preexisting and presumably profitable course of dealing with a competitor. *Id.* at 409-10.[12]  No such claim is made in this case.[13]  The Supreme Court explained that "*Aspen Skiing* is at or near the boundary of § 2 liability," and it declined to expand liability beyond the factors in *Aspen Skiing*.  *Id.* at 408.  The reason is that compelled sharing comes at a substantial cost.  It risks undermining the "purpose of antitrust law" by reducing incentives to invest in resources generating a competitive advantage, *id.* at 407-08, and it "requires antitrust courts to act as central planners, identifying the proper . . . terms of dealing—a role for which they are ill suited," *id.* at 408.  The latter danger is particularly at odds with Plaintiffs' suggestion that the extent of technical work that would be required by Google to accommodate rivals "does not inform whether conduct violates the antitrust laws."  Opp. at 23.

Subsequently, in *linkLine*, the Court unanimously held that Pacific Bell did not violate the Sherman Act when it charged other Internet providers a high fee to buy space on its phone lines to deliver an Internet connection.  555 U.S. at 450-51.  Plaintiffs there argued that higher fees created a price squeeze for competitors.  Although the lower courts "did not regard *Trinko* as controlling because the case did not directly address price-squeeze claims," the Supreme Court rejected that approach because the reasoning of *Trinko* still applied "with equal force."  *Id.* at 450-

---

[12] The court identified these factors from *Aspen Skiing*: (1) "unilateral termination of a voluntary" and "presumably profitable course of dealing" with its competitor; (2) termination must reflect "a willingness to forsake short-term profits to achieve an anticompetitive end"; and (3) defendant must "already [be] in the business" of providing the products or services at issue.  *Id.* at 409-10.

[13] Plaintiffs contend that the challenged conduct, rather than terminating a pre-existing relationship, began with "█████████████," Ex. 1, ¶ 604, and do not challenge any dealing that predates that launch.  Just as "the absence of this preexisting relationship . . . doomed the plaintiffs in *Trinko*," it should do the same here.  *FTC* v. *Facebook, Inc.*, 560 F. Supp. 3d 1, 24 (D.D.C. 2021); *see also Covad Commc'ns Co.* v. *Bell Atl. Corp.*, 398 F.3d 666, 672-73 (D.C. Cir. 2005) (same).  Plaintiffs also maintain that Google's limitations on dealing with rivals has been profitable for Google.  Ex. 2, ¶¶ 383-384, 398; PX 27, ¶ 334; Ex. 145, ¶ 314.

51; *see Duane* v. *GEICO*, 37 F.3d 1036, 1043 (4th Cir. 1994) (lower courts "are not free to strip content from principle by confining the Supreme Court's holdings to the precise facts before us").

The Courts of Appeal likewise have made clear that *Trinko* applies well beyond Plaintiffs' cramped reading.  *E.g.*, *Meta*, 66 F.4th at 305 (prohibiting apps on its platform that replicated Facebook's core functions was a lawful refusal to deal); *Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183-84 (9th Cir. 2016) (same for withholding parts and pricing policies that affected Honeywell's competitors for repair services); *Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d 1064, 1074-78 (10th Cir. 2013) (same for withdrawing pre-release software development tools from rival developers); *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 993-95 (9th Cir. 2020) (same for refusing to sell chips to customers who did not agree to license Qualcomm's cellular technology patents).

    2.   The Cases Plaintiffs Rely On Only Confirm This Is a Lawful Refusal to Deal.

Unable to escape the right to refuse to deal, Plaintiffs seek refuge in *Lorain Journal*, *Chase Manufacturing*, and *Viamedia.*  Opp. at 21.  But as Plaintiffs recognize, Opp. at 21, every one of these cases involved a firm that would only provide a product or service to customers if they agreed not to do business with the firm's rivals.[14]  For example in *Lorain Journal*, a local newspaper would not accept ads from customers if they advertised with other local media.  Google places no such restriction on advertisers or publishers nor prohibits them from doing business with its rivals.  Plaintiffs cannot claim that Google told its customers they may not deal with rivals

---

[14] *Lorain Journal Co.* v. *United States*, 342 U.S. 143, 152 (1951) ("refus[ing] to accept" ads from customer who also advertised with publisher's rival); *Chase Mfg., Inc.* v. *Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) (threatening "to cut off" customers who bought rival's product); *Viamedia, Inc.* v. *Comcast Corp.*, 951 F.3d 429, 444, 448-49 (7th Cir. 2020) (denying access to those who dealt with rival); *see also FTC* v. *Facebook*, 560 F. Supp. 3d at 29 (noting *Lorain Journal* involved "a very special form of exclusive dealing . . . a refusal to sell to end-user customers who purchase[d] from the monopolist's competitor").

(as in *Lorain Journal*). They instead claim that when Google did not provide rivals with comparable access to its technology and customers, this amounted to the same thing.

This distinction is critical. To fall within the *Lorain Journal* line, the defendant must have "conditioned access" to its product on a customer "agreeing not to deal with" the defendant's competitors. *New York* v. *Facebook, Inc.*, 549 F. Supp. 3d 6, 32-34 (D.D.C. 2021), *aff'd sub nom. New York* v. *Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) (rejecting the same argument made here). Plaintiffs make no such allegation. Instead, the restriction they assert is that DFP is the only way to access "real-time bids from AdX," which in turn is "the only way to gain access to Google Ads demand." Opp. at 21-22, 26; Ex. 1, ¶ 574 ███████████████████████ ████████████████████████████████████████████████████████████

Even assuming that were the case (it is not), allegations that Google restricted how its own products interoperate with rivals do not run afoul of *Lorain Journal* because customers may deal with those rivals outside of Google's systems. *See Meta*, 66 F.4th at 304 (declining to apply *Lorain Journal* where Facebook's "competitor integration policy limited only how canvas apps on Facebook operate, and [left] app developers entirely free to develop applications for Facebook's competitors"); *Novell*, 731 F.3d at 1072, 1074 (differentiating interference with "the abilities of third parties to deal with rivals (exclusive dealing)" from a firm's unilateral decision to "keep [technology] to itself"). To the contrary, the law permits Google to design well-integrated products that render it "uniquely suited to serve" its customers. *Trinko*, 540 U.S. at 407. Plaintiffs' argument would extend *Lorain Journal* to require, contrary to *Trinko,* the Lorain newspaper to run advertisements placed by media rivals because that would be the only way to reach the newspaper's "unique" or "valuable" subscribers.

*United States* v. *Microsoft Corp.*, which Plaintiffs invoke, is instructive. One issue there

was that Microsoft had developed software to operate Java programs faster on Microsoft's system than on its competitors' systems, and these programs were incompatible with rivals' versions. 253 F.3d 34, 74-75 (D.C. Cir. 2001) (en banc).  Rejecting the view that promoting this software was "exclusionary conduct," the D.C. Circuit held that "a monopolist does not violate the antitrust laws simply by developing a product that is incompatible with those of its rivals." *Id.* at 75.  The argument Plaintiffs advance here could just as readily have been applied to Microsoft: "Google's [Microsoft's] conduct forced publishers [customers] to choose between forgoing the benefits of AdX's real-time bids [faster Java operation] or using DFP [Microsoft's software]."  Opp. at 22. But there, as here, it is no basis for "imposition of liability."  *Microsoft*, 253 F.3d at 75.

*Chase Manufacturing* and *Viamedia* also confirm that Plaintiffs' claims must be treated as refusal to deal claims.  *Chase Manufacturing* explains that, unlike exclusivity conditions, refusals to deal are the appropriate framework for analyzing a demand for "monopolists sharing their technology with rivals." 84 F.4th at 1173.  And in *Viamedia*, the court addressed allegations that the defendant denied rivals access to its service and "discouraged customers from doing business" with competitors as a refusal to deal.  951 F.3d at 459.[15]  Plaintiffs' arguments that Google forced "publisher and advertiser customers to choose Google over its rivals" by denying rivals comparable access to Google's technology and customers, Opp. at 21, align precisely with arguments that courts have treated as refusal to deal claims.

Plaintiffs also invite the Court to be the first, for a monopolization claim, to conduct a generalized inquiry into whether the challenged acts "were undertaken with anticompetitive

---

[15] In *Viamedia*, the Seventh Circuit also concluded that Viamedia's claim "closely tracks *Aspen Skiing* and contains the key elements that were missing in *Trinko*: a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers," 951 F.3d at 463, none of which is present here.

intent." Opp. at 20. That inquiry disregards *Trinko*, which noted that the monopolist "denied interconnection services to rivals in order to limit entry," yet analyzed the case through the *Aspen Skiing* factors. 540 U.S. at 407-08. Courts have rejected time and again Plaintiffs' "anticompetitive intent" test. *E.g.*, *Aerotec*, 836 F.3d at 1184 (rejecting argument that refusal to deal is unlawful because it was motivated by "intent to foreclose competition"); *Novell*, 731 F.3d at 1078 (same); *Facebook*, 549 F. Supp. 3d at 26 (plaintiffs cannot establish a duty-to-deal violation by pointing to a mere "intent to harm—or, the flip side of the same coin, to avoid helping—a rival or rivals").

Finally, what Plaintiffs label a "tying" claim is also precluded by the refusal to deal doctrine because it rests entirely on demanding Google provide rivals with comparable access to its technology and customers. Count IV of the Complaint alleges a tying claim based on Google's integration of its software product Google Ad Exchange (AdX) (the tying product) and publisher ad server (DFP) (the tied product). First Am. Complaint, ECF No. 120 ("FAC") ¶¶ 336-339. Plaintiffs' expert explained this is exclusionary conduct because, expressly invoking a duty to deal, Google provides access to "███████████████████████████████████ ██████████████████████████████████████" Ex. 1, ¶ 12(3)(2); SUF 42. And Plaintiffs admit that enjoining the alleged tie, as they conceive it, would mean "Google's customers can do business with whomever they choose, including Google's competitors," through technical work on Google systems to permit that outcome. Opp. at 23. Plaintiffs give up the game in their Opposition by conceding they "do not challenge the integration of AdX and DFP itself" but, rather, the decision to deny rival ad servers access to the technological innovation of real-time bidding on Google's product. *Id.* That decision, made by Google about access to its own systems, is squarely protected under the law and there is no precedent to suggest forced

13

sharing of technology and customers can be compelled.

**B.    Plaintiffs' Monopolization and Tying Claims Also Fail for Other Reasons.**

1.    Plaintiffs' Claims Regarding Real-Time Bidding, Dynamic Allocation, and Unified Pricing Rules Also Fail Because They Are Lawful Product Improvements.

Plaintiffs do not rebut that Google "has the right to implement a product change that is detrimental for some purposes so long as it is an improvement for consumers in some other way." *Alivecor, Inc.* v. *Apple, Inc.*, 2024 WL 591864, at *14 (N.D. Cal. 2024) (discussing *Allied Orthopedic Appliances Inc.* v. *Tyco Health Care Grp. LP*, 592 F.3d 991, 1000-02 (9th Cir. 2010)). Plaintiffs contend, however, that Google somehow attracted customers by "making its products worse." Opp. at 21. Courts "are properly very skeptical" about claims like Plaintiffs' "that competition has been harmed by a dominant firm's product design changes." *Microsoft*, 253 F.3d at 54; *see also Allied Orthopedic*, 592 F.3d at 1000 (noting "the undesirability of having courts oversee product design, and any dampening of technological innovation would be at cross-purposes with antitrust law"). In line with that admonition, even the cases Plaintiffs cite recognize the need to identify specific "associated conduct" that is anticompetitive beyond the mere product introduction. *Allied Orthopedic*, 592 F.3d at 999-1000; *see also Berkey Photo, Inc.* v. *Eastman Kodak Co.*, 603 F.2d 263, 286 n.30 (2d Cir. 1979) ("the product introduction itself" cannot supply the violation); *New York ex. rel. Schneiderman* v. *Actavis PLC,* 787 F.3d 638, 653-54 (2d Cir. 2015) ("Neither product withdrawal nor product improvement alone is anticompetitive.").

Here, Plaintiffs identify no such conduct other than the "conditioning of access to AdX real-time bids on the use of DFP," which is a function of the technical design of Google's products. Opp. at 23. In addition to restating Plaintiffs' refusal to deal claim, this argument fails because it is undisputed that restricting AdX real-time bidding to DFP, according to Plaintiffs' experts, improved Google's products for publishers. Br. at 24; *see also* Reply to RSUF 45, 46,

47 (noting improved publisher quality for advertisers). The same is true for Dynamic Allocation, which was a product improvement for publishers consisting of optional features that generated additional revenue, SUF 57 (acknowledging benefits derived from DA). It is also undisputed UPR improved the advertiser experience, *see* RSUF 83 (acknowledging benefits for "bidders" (i.e., advertisers)).[16] Perhaps rivals would have preferred these innovations not be integrated into Google's products but, as now-Justice Gorsuch explained in *Novell*, the "Supreme Court and this [Court], however, have long and emphatically rejected this approach . . . . Forcing monopolists to 'hold an umbrella over inefficient competitors' might make rivals happy but it usually leaves consumers paying more for less." *Novell*, 731 F.3d at 1072 (quoting *Olympia Equip. Leasing Co.* v. *W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986)).

> **2.** <u>Plaintiffs' Assertion of AdX-DFP Tying and Monopolization Claims Based on Restriction of Google Ads Demand to AdX Fail to Define the Required Market in Google Ads Advertiser Demand.</u>

In its Opening Brief, Google explained that Plaintiffs' tying claim and two of its challenged acts of anticompetitive conduct depend on an assertion that "███████████ ████████████████████████████████████████████████████████████ ██████" Ex 1, ¶ 37; *see* Br. at 27. Plaintiffs say that the source of Google's market power in the first market is Google Ads demand. FAC ¶ 172 ("Google's market power stemming from its unique and substantial advertiser demand").

This argument, predicated on the power of Google Ads demand, is what courts have considered a two-market claim. *See, e.g.*, *Va. Vermiculite, Ltd.* v. *W.R. Grace & Co.-Conn.*, 108

---

[16] Plaintiffs' comparison of UPR to an anti-steering provision is wrong as a matter of law. UPR does not limit the floor prices publishers set outside of Google's publisher ad server. It only limits what publishers do within DFP. Plaintiffs' cited authority involves more sweeping restrictions. *See US Airways, Inc.* v. *Sabre Holdings Corp.*, 938 F.3d 43, 51 (2d Cir. 2019) (provisions barred offering fares or discounts outside defendant's platform or encouraging off-platform business).

F. Supp. 2d 549, 580 (W.D. Va. 2000); *Dickson* v. *Microsoft*, 309 F.3d 193, 206 (4th Cir. 2002). But here Plaintiffs have failed to define the first market for advertisers who place ads, including through Google Ads.  Plaintiffs do not define—and they do not contend that they define—the market in which Google Ads demand gives Google market power.  This failure to define a market is fatal to any attempt to maintain an antitrust claim based on the alleged power in Google Ads demand (i.e., advertisers using Google Ads).  Br. at 27-28; *see Coronavirus Rep.* v. *Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023) ("Without a defined relevant market in terms of product or service, one cannot sensibly or seriously assess market power.").

In Plaintiffs' view, it suffices to define markets for ad exchanges and ad networks and then assert that Google has power in those markets because advertisers using those products provide "unique demand unavailable [to publishers] elsewhere."  Opp. at 27.  But Plaintiffs have done no work—and defined no market—to assess that Google advertisers are not also available elsewhere.  Put another way, this "elsewhere" is the market Plaintiffs say supports their claim of "market" power, and it is the market Plaintiffs have failed to define.  FAC ¶ 172; *see* Opp. at 27 ("Google Ads' advertiser demand . . . is a reason why Google has monopoly power in the ad network and ad exchange markets.").[17]  Plaintiffs offer no authority in antitrust law for a claim of market power that does not define the market from which that power is derived.  Having failed to define the relevant market in which Plaintiffs claim Google's advertiser demand has market power,  Plaintiffs offer the court no way of assessing whether Google's customers actually are a "unique" demand source that creates market power for purposes of an antitrust claim.  *E.g., It's*

---

[17] *See also* Ex. 1. ¶¶ 421-22, 432 ██████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████; *id.* ¶¶ 37-38 ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████; Ex. 127, ¶ 429.

*My Party, Inc.* v. *Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016) ("In the absence of a plausible market definition, courts are hard pressed to discern the nature or extent of any anticompetitive injury that plaintiff and other similarly situated parties may be suffering.").

     3.   <u>Plaintiffs' New Google Ads-AdX Tying Theory Is Both Too Late and Insufficient.</u>

In their Opposition, Plaintiffs scramble to put together a new antitrust claim that they have failed to allege and also to prove. In their Complaint, Plaintiffs allege a tie between AdX (as the tying product) and DFP (as the tied product). *See* FAC ¶¶ 337, 339 (alleging that "AdX and DFP are separate and distinct products" and that a "tying arrangement affects a substantial volume of commerce in the publisher ad server market"). Now, Plaintiffs attempt to tack on a new "tie" that Google Ads customers—advertisers—are "forc[ed] to use AdX." Opp. at 24.

This alleged tie between Google Ads (as the tying product) and AdX (as the tied product) is a new theory, which Plaintiffs cannot add at summary judgment. *E.g., Barclay White Skanska* v. *Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) ("Plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *Cloaninger ex rel. Estate of Cloaninger* v. *McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) ("A plaintiff may not raise new claims after discovery . . . without amending his complaint.").

But, even if Plaintiffs could, this new tying claim fails for the same reasons that Plaintiffs' refusal to deal claims fail. Google Ads bids into non-AdX exchanges. SUF 41. And Google in no way limits whether advertisers use other buying tools to purchase into other exchanges. RSAMF 3. Advertisers that use Google Ads—especially the larger advertisers that account for the bulk of spend on Google Ads—can and do use other buying tools, including DV360. RSAMF 3. For example, ███████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████   RSAMF 3.  Plaintiffs' new claim, at bottom, is that advertisers cannot use Google's own product, Google Ads, to bid into non-Google exchanges on "comparable" terms as bidding into Google's ad exchange—which is a lawful refusal to deal with rivals.  *See* RSUF 23.

### C.   Plaintiffs Have Not Provided Any Evidence that the DoubleClick Acquisition, Project Poirot, Sell-Side Dynamic Revenue Sharing, or Project Bell Harmed Competition.

For their monopolization and attempted monopolization claims, Plaintiffs bear the burden to prove that Google willfully acquired or maintained monopoly power "in an exclusionary manner."  *Advanced Health-Care Servs., Inc.* v. *Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990).  To establish conduct was anticompetitive, Plaintiffs must provide actual evidence of harm to competition, such as expert testimony, made up of more than "general economic theory," *Military Servs Realty, Inc.* v. *Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987), or "theoretical and anecdotal" evidence, *1-800 Contacts, Inc.* v. *FTC*, 1 F.4th 102, 118 (2d Cir. 2021).  Yet Plaintiffs do not dispute that none of their experts have offered an opinion, based on the factual evidence in this case, that the DoubleClick acquisition, Project Poirot, sell-side DRS, or Project Bell[18] were anticompetitive—even "minimally."  Opp. at 27.  It is also not enough to identify evidence that the alleged conduct harmed rivals.  Much lawful competition harms rivals, but conduct is only actionably anticompetitive if it "exclude[s] rivals on some basis other than efficiency," so that it "either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 & n.32 (1985); *see also Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 337 (1990).  "The antitrust laws were enacted for the protection of competition, not competitors."  *Brunswick*

---

[18] Plaintiffs concede the version of Project Bell upon which their claim is based was never fully implemented commercially so could not have had anticompetitive effect.  Opp. at 26 n.11.

*Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).  In their Opposition, Plaintiffs still do not identify any triable evidence that the four acts harmed not just *rivals*, but *competition*.

Despite lacking this evidence, Plaintiffs argue that the acts were anticompetitive because they were "a necessary first step to Google's exclusionary course of conduct" or "exacerbated the effects of other anticompetitive conduct."  RSUF 33, 35; Opp. at 26-27.  This is rhetoric that can be used against any successful business with popular products.  Plaintiffs have come forward with no evidence that each act was "separately" anticompetitive, so there is insufficient evidence from which a factfinder could find monopolization or attempted monopolization based on any of these four acts.  *See Imaging Ctr., Inc.* v. *W. Md. Health Sys., Inc.*, 158 F. App'x 413, 419-20 (4th Cir. 2005) (affirming summary judgment because no evidence of harm to competition).

### D.   Plaintiffs Cannot Demonstrate Anticompetitive Conduct by Arguing that Lawful Refusals to Deal and Product Improvements Form an "Anticompetitive Enterprise."

Unable to establish that any of the conduct they identify was anticompetitive, Plaintiffs suggest that all they need to show is a "broader anticompetitive enterprise."  Opp. at 25.  This well-worn argument has been repeatedly rejected by the Supreme Court, appellate courts, and district courts.  *United States* v. *Google LLC*, 687 F. Supp. 3d 48, 70 (D.D.C. 2023) (explaining "the court must disaggregate the exclusionary conduct into its component parts").[19]  As these courts have explained, each underlying act must itself be actionable exclusionary conduct under the antitrust laws.  Cases that aggregate anticompetitive harm only do so for acts that are

---

[19] *See also linkLine*, 555 U.S. at 452 (rejecting "amalgamation" of two "meritless" claims of anticompetitive conduct); *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) ("courts disaggregate the exclusionary conduct into its component parts before applying the relevant law."); *Retractable Techs., Inc.* v. *Beckton Dickinson & Co.*, 842 F.3d 883, 891-93 (5th Cir. 2016); *Dickson*, 309 F.3d at 211 (each agreement, "when considered separately," must be anticompetitive); *Facebook, Inc.*, 549 F. Supp. 3d at 47-48 (same).

*individually actionable* on their own.  *See, e.g.*, *Abcor Corp.* v. *AM Int'l, Inc.*, 916 F.2d 924, 931 (4th Cir. 1990) (individual acts that are no "more than aggressive competition . . . do not amount to an antitrust violation").  And conduct that is lawful per se—like lawful refusals to deal and product improvements—cannot be aggregated to establish a "broader anticompetitive enterprise." *Facebook*, 549 F. Supp.3d at 47 (lawful refusals to deal are "not the sort of lawful conduct that the monopoly-broth theory is designed to account for and, to the extent that theory is viable, should be excluded from its reach").

### E. All Claims Must Be Dismissed Because Plaintiffs Have Failed to Define Relevant Markets That Can Support Their Claims.

As Google argued in its Opening Brief, "Plaintiffs' market definition depends on their chief economist," so summary judgment as to all claims is warranted because Prof. Lee does not provide competent evidence to support his markets based  on "open-web display advertising." Br. at 29.  In their Opposition, Plaintiffs defend Prof. Lee's analysis, *see* Opp. at 28 & n.14, and cite a handful of documents, but those documents do not support Plaintiffs' definition of "open-web display advertising."  Reply to RSUF 7, 12, 15.

Plaintiffs' expert defines "open-web display ads" as traditional banner ads that appear on websites and are placed using third-party ad tech tools.  But the specific examples Plaintiffs identify further demonstrate that their expert's market definition does not make sense.  ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ Moreover, ████████

████████████████████████████████████████

████████████████  demonstrating by Plaintiffs' own example that their failure to include proprietary ad servers in their market disregards how competition in digital advertising works in

practice.  *See Twin City Sportservice, Inc.* v. *Charles O. Finley & Co.*, 512 F.2d 1264, 1272 n.1

(9th Cir. 1975) (plaintiff's "failure to include as participants in [the market for baseball concession

services] baseball clubs which supply their own concessions very likely would compel reversal").

And even focusing as Plaintiffs do on an "open-web" publisher's website, the *Washington Post*

can use the exact same tools it uses to sell "open-web display ads" in order to sell ad formats,

such as instream video or native ads, on its website that Plaintiffs exclude from their definition of

"open-web display ads," *see* SUF 9.  No competent expert evidence exists to support any of these

exclusions from the proposed market definitions.  *See* Lee Reply § I.  These examples therefore

do not create a triable issue of fact on market definition.

> **F.      Even If "Ad Exchanges for Open-Web Display Advertising" Were a
> Relevant Market, By Plaintiffs' Own Terms, Google Would Not Have
> Monopoly Power in That Market.**

As the Fourth Circuit has explained, "the Supreme Court has never found a party with less

than 75% market share to have monopoly power."  *Kolon Indus. Inc.* v. *E.I. DuPont de Nemours

& Co.*, 748 F.3d 160, 174 (4th Cir. 2014).  Applying that guidance, the Fourth Circuit decided a

case with analogous facts, affirming summary judgment for the defendant because the "line" at

"the bottom of the range for a finding of monopoly power" is "70% market share," so a defendant

with a market share of at most 59% that had "decreased to 55%" over three years could not be a

monopolist.  *Id.*  Because, even by Plaintiffs' own calculations, AdX's highest U.S. market share

from 2018-2022 was ███ and has ██████████████ in 2022, no more is needed to resolve

Plaintiffs' claim.  SUF 24.  Plaintiffs' arguments otherwise rely on non-controlling Fourth Circuit

dicta.  Opp. at 30.

Even if it were possible in the Fourth Circuit for a company with less than 70% market

share to be a monopolist, that company is only a monopolist if it has "durable" power in that

market.  *Kolon*, 748 F.3d at 175.  Here, the undisputed facts show no "durable" power: AdX's

market share has been falling since 2020, and the number of exchanges has grown from less than 10 in 2010 to over 100 exchanges active today.  *See* Br. at 31; SUF 24-25, 27-28.

Plaintiffs also did not establish that Google charged supracompetitive prices.  Opp. at 29-30.  Plaintiffs do not dispute, and their expert Prof. Lee agrees, Ex. 1, ¶ 248 & n.335; *id.* §§ IV.C.3, IV.D.3, IV.E.3, that price comparisons must account for quality differences.  SAMF 7; Br. at 31-32.  Any comparison of price must account for the benefits of using AdX, *see* Reply to RSUF 45, 46, 47.  Nor does AdX charge higher prices than its competitors.  From 2018 through 2020, ███████████████████████████████.  And in 2021 and 2022, Plaintiffs focus only on the one "tiny" exchange that charged more than 20%, Opp. at 30, ignoring that ████████████████████████████████████.  Ex. 1 Fig. 110.  For example, in 2022 ██████████████████████████████████.  *Id.*  In 2021 and 2022 ███████████████████████████████████ ████████.  Ex. 1, Fig. 54, 88, 89.

### G.    Plaintiffs Are Asking This Court to Overturn *Illinois Brick*.

Under *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977) and *Apple* v. *Pepper*, 139 S. Ct. 1514 (2019), the United States lacks standing to seek damages.  *Illinois Brick* lays down a bright-line rule: direct purchasers who pay the alleged antitrust violator have standing to recover for alleged overcharges; indirect purchasers do not.  431 U.S. at 746.  Applying that rule in *Apple*, mobile app purchasers were direct purchasers because it was undisputed that they "bought the apps directly from Apple."  139 S. Ct. at 1520.  "The absence of an intermediary [was] dispositive."  *Id.* at 1521.

Here, Plaintiffs offer no evidence showing any direct transaction or purchase between an FAA and Google.  Plaintiffs also do not dispute that, for every transaction underlying the FAAs' damages claims, no contract between Google and an FAA existed, Google never invoiced the

FAAs, and no FAA directly paid Google.  SUF 93, 94.  Google takes its AdX revenue share from payments made by the ad agencies, and the ad agencies invoice the FAAs an aggregated sum— not in individual real-time transactions as Plaintiffs suggest, *see* Opp. at 32 n.16—that may not reflect the full amount Google invoiced the ad agency.  RSAMF 18, 19; Ex. 68 at 90:19-91:11. Moreover, as Plaintiffs' expert acknowledges, even the amount the FAAs were invoiced by their ad agencies may not be the amount the FAAs actually paid.  Ex. 68 at 20:16-21:3, 177:3-19, 237:4-20.  It is thus undisputed that the ad agencies are the "immediate buyers" from Google[20] and are intermediaries between the FAAs and Google—making the FAAs "indirect purchasers who are two or more steps removed from the violator" and "may not sue."  *Apple*, 139 S. Ct. at 1520-21.  The FAAs therefore are not direct purchasers, and their damages claims run afoul of the *Illinois Brick* rule.  *See Kansas* v. *UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990).[21]

Plaintiffs advance the novel argument that *Illinois Brick* is limited to a "traditional resale supply chain framework" and should not apply because the ad agencies and The Trade Desk "act as facilitators, not resellers."  Opp. at 32.  They have cited no applicable precedent or legal standard that would permit them to circumvent *Illinois Brick*.  Plaintiffs do not even explain how a court would decide whether an "intermediary" in a transaction should be considered a "facilitator."  Nor is there an exception that "immediate beneficiaries" may sue for damages.  Opp.

---

[20] It is immaterial that some of the FAAs' ad agencies had contracts with Google that, in certain circumstances, relieve the agency from paying Google until the FAA has paid the agency.  SAMF 17.  What matters for *Illinois Brick* is not "the reimbursement structure," but whether "plaintiffs paid [Google]."  *Kloth* v. *Microsoft Corp.*, 444 F.3d 312, 321 (4th Cir. 2006).  As Plaintiffs do not dispute, no payment flowed directly from any FAA to Google.  SUF 93.

[21] *See also Del. Valley Surgical Supply Inc.* v. *Johnson & Johnson*, 523 F.3d 1116, 1125 (9th Cir. 2008) (plaintiff that "was invoiced by, and sent payments directly to" party other than defendant was not a direct purchaser); *Warren Gen. Hosp.* v. *Amgen Inc.*, 643 F.3d 77, 88-89 (3d Cir. 2011) (hospital was not a direct purchaser where "the only direct financial transaction" with the hospital was "after the purchases had concluded").

at 32.  In *Apple*, the Court stated in no uncertain terms: "Our precedent in *Illinois Brick* established a *bright-line rule* where direct purchasers . . . may sue antitrust violators from whom they purchased a good or service," and only when "there is *no intermediary* between the purchaser and the antitrust violator" may the purchaser sue.  139 S. Ct. at 1522.

Plaintiffs' reference to irrelevant facts, Opp. at 32, also does not change the bright-line test.  It is both unremarkable and immaterial that Google treats the FAAs as advertisers who benefit from Google's services.  An alleged violator may intend for its products or services to reach—or benefit—indirect purchasers, but that does not change their indirect purchasers status.

Plaintiffs argue in the alternative that the so-called "control exception" to the direct-purchaser rule should apply because the ad agencies are "purchasing agents."  Opp. at 33-34.  But they do not dispute the absence of any Fourth Circuit precedent extending the "control exception" to principal-agent relationships.[22]  *Id*.  And Plaintiffs fail to contend with the only case to address the "control exception" in the context of advertising agencies purchasing advertising for an advertiser client.  That court concluded, on the basis of the very same appellate court decisions that the Fourth Circuit has cited, *see Kloth*, 444 F.3d at 321, that the "control exception" does not extend to the advertiser-agency relationship.  *In re Local TV Advert. Antitrust Litig.*, 2023 WL 1863046, at *2-3 (N.D. Ill. 2023).

Any "control exception" would be "limited to relationships involving such functional

---

[22] Plaintiffs cite two cases, Opp. at 32-33 & n.16, extending an exception to the direct-purchaser rule to principal-agent relationships, which the Fourth Circuit has never done.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 1014159, at *16 (E.D.N.Y. 2024); *Soskel* v. *Texaco Inc.*, 514 F. Supp. 578, 580 (S.D.N.Y. 1981).  Even if they were correctly decided, both cases considered inapposite facts.  In *Interchange*, the intermediary lacked discretion; it was merely a conduit to remit money to the plaintiffs.  *Interchange*, 2024 WL 1014159, at *16-17.  In *Soskel*, the intermediary was the defendant's franchisee, and the defendant *directly* collected some of the credit charges consumers incurred.  514 F. Supp. at 579-81.

economic or other unity that there effectively has been only one sale." *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 713 (D. Md. 2001), *aff'd sub nom. Kloth*, 444 F.3d 312. That is a high bar.  Here, no facts show "functional economic or other unity."  Opp. at 33-34.  Ad agencies retain significant discretion to recommend and purchase ad formats and ad tech tools, and they make real-time optimizations, moving authorized ad dollars up to tens of thousands of dollars within and among different spend categories.  RSAMF 14, 15, 18, 19; SUF 90, 96.  The FAAs do not direct their ad agencies at the transaction level to purchase "open-web display advertising" using Google's tools.  SUF 90, 95, 96.  To recognize an exception to the direct-purchaser rule here would be to gut Supreme Court precedent.

Finally, Plaintiffs argue that Section 4A of the Clayton Act exempts them from *Illinois Brick* because Section 4A claims are brought "in a law enforcement capacity."  Opp. at 34. Section 4A does no such thing.  It enables the United States to seek damages when it has been "injured in its business or property," but makes no mention of seeking damages in a law enforcement capacity.  15 U.S.C. § 15a.  *Other* parts of the antitrust statutes empower the United States to seek *equitable* antitrust relief in a law enforcement capacity, but those are not invoked for the damages claim.  *E.g.*, 15 U.S.C. § 4.  Because the United States brings its damages claim not in a law enforcement capacity but as an (indirect) purchaser, it also is not "positioned to avoid the risk of multiple liability for defendants," Opp. at 34, from, for example, ad agencies or TTD claiming to be purchasers.  The United States' argument that *Illinois Brick* should not apply to it is not only unsupported by legal precedent, but also contradictory to *Illinois Brick*, where the indirect purchasers who lacked standing included the State of Illinois, 431 U.S. at 726.  Plaintiffs again ask the Court to ignore controlling Supreme Court precedent for purposes of this case.

## CONCLUSION

For the foregoing reasons, Google's motion for summary judgment should be granted.

Dated: May 31, 2024

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Julie Elmer (*pro hac vice*)
Lauren Kaplin (*pro hac vice*)
Scott A. Eisman (*pro hac vice*)
Jeanette Bayoumi (*pro hac vice*)
Claire Leonard (*pro hac vice*)
Sara Salem (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

*Counsel for Defendant Google LLC*

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
 CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Bryon P. Becker (VSB #93384)
Erica Spevack (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile (202) 223-7420
kdunn@paulweiss.com

Meredith Dearborn (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (202) 330-5908
mdearborn@paulweiss.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com