# EXHIBIT 131

# REDACTED

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA, ET AL.,

      Plaintiffs,

      v.

GOOGLE LLC,

       Defendant.

Case No. 1:23-cv-00108 (LMB/JFA)

EXPERT REPORT OF MARK A. ISRAEL

January 23, 2024

HIGHLY CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

display advertising,"[88] "ad exchanges for indirect open web display advertising,"[89] and

"advertiser ad networks for open web display advertising."[90]

147.    Prof. Lee is Plaintiffs' market definition expert.[91] He concludes that the product markets delineated in the Complaint are relevant antitrust markets.[92] He also opines that both the world (excluding certain countries and regions) and the United States are relevant geographic markets for each product market.[93] As I explain further below, Prof. Lee reaches his conclusions about the relevant product and geographic markets primarily on the basis of qualitative analysis of differences between products. He does not present any empirical estimates of substitution patterns or implement a hypothetical monopolist test.[94]

148.    By focusing on narrow component-specific product markets, Plaintiffs' market definition approach delineates boundaries that exclude important substitutes (described further below) in

---

[88]    *DOJ Complaint*, § VI.B.1.  See also *DOJ Complaint*, n. 4 ("The process described herein governs the sale of display ads on the '**open web**,' meaning websites whose inventory is sold through ad tech intermediaries that offer inventory from multiple websites. Some websites, especially social media companies like Facebook and Snapchat, operate under a different 'closed web' (or 'walled garden') model in which inventory is sold directly to individual advertisers using a proprietary tool employed by that website. Other types of advertising distinct from open web display advertising include search ads (e.g., sponsored results in a search engine), video ads (e.g., commercials that play before, during, or after a streaming video), and mobile app ads (e.g., ads shown within a game or other non-browser app downloaded from an app store to a user's mobile device)." (emphasis in the original)).

[89]    *DOJ Complaint*, § VI.B.2.

[90]    *DOJ Complaint*, § VI.B.3.

[91]    *Lee Report*, § IV.

[92]    *Lee Report*, ¶ 244.

[93]    *Lee Report*, ¶ 244.

[94]    Prof. Lee asserts that observed substitution patterns "███████████████████ ███████████████████████████" (*Lee Report*, ¶ 251).  However, as I explain further below, advertisers seek to reach their target audience wherever that audience can be found.  There is no reason to think that this basic feature of digital advertising holds only at "high" prices for open web display.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

199.    Large advertisers account for a majority of ad spend on both "advertiser ad networks" and DSPs, and thus competition for large advertisers provides strong competitive discipline that benefits all advertisers.[208]  Specifically, Table 2 below shows that the majority of Google Ads display spending is accounted for by advertisers who spend a significant amount of money on advertising.  For example, ▓ percent of Google Ads display spending in 2022 was accounted for by advertisers who spent more than $100,000 (in addition to any additional spending via other tools), and ▓ percent was accounted for by advertisers who spent more than $1 million. Although many small advertisers use Google Ads (more than ▓▓▓▓▓ advertiser accounts spent less than ▓▓▓ in 2022), the spending on Google Ads is predominantly driven by large advertisers (those advertisers spending less than $10,000 in 2022 collectively accounted for more than ▓ percent of the advertisers, but less than ▓▓▓▓ of total spend on Google Ads).

---

[208]    That is, pricing on "advertiser ad networks" reflects competition for marginal dollars, and if larger, sophisticated buyers—who make up the vast majority of spending on ad networks—find DSPs to be a credible option, then the easy ability for those buyers to substitute creates competition with DSPs for those marginal dollars, meaning DSPs should be in the market.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

374.    Although the United States is the appropriate geographic market to examine in this case, as explained above, my conclusions that Google lacks monopoly power and that its challenged conduct has not harmed competition do not depend on whether the relevant geographic market is the United States or worldwide.  The empirical analysis in the main body of this report primarily focuses on U.S. data, both because that is the appropriate geographic market and because the available U.S. data are generally more comprehensive than the available worldwide data (and are therefore better suited for analyzing the competitive environment).  My backup materials contain key empirical results demonstrating that all my conclusions hold in a worldwide geographic market (e.g., that measures of Google's share do not support a finding of monopoly power, that indicators of market performance demonstrate a well-functioning market with rising output and flat or falling prices, etc.).

## V.    GOOGLE DOES NOT HAVE MONOPOLY POWER

375.    Plaintiffs allege that Google possesses monopoly power in each of their alleged relevant markets described in the prior section.[470]  Obviously, to the extent those market definitions are invalid—as I have shown above—claims of monopoly power in the alleged markets likewise fail.  Plaintiffs' expert Prof. Lee does not directly conclude that Google has monopoly power, but rather states that he "███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████"[471]  When I refer to Google not having "monopoly power" in the subsequent discussion,

---

[470]    *DOJ Complaint*, ¶ 287 (alleging that "Google has exploited its monopoly power over DFP" in the alleged market for publisher ad servers), ¶ 296 (alleging that Google has monopoly power in the alleged market for ad exchanges), and ¶ 301 (alleging that Google has monopoly power in the alleged market for "advertiser ad networks").

[471]    *Lee Report*, ¶ 408.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

party exchanges]" and AwBid targeting had been "expanded to include contextual keywords, ICM, Custom-In-Market, etc."[918]

634.    According to Google Ads data produced in this case, among the U.S. spending on Google Ads via AdX and third-party exchanges, the percentage going to third-party exchanges increased from approximately ▮ percent in 2015 to ▮ percent in 2022 (and has been above ▮ percent since 2017); in 2022, nearly ▮▮▮▮▮ of Google Ads' U.S. spending was via third-party exchanges (see Figure 91).  Therefore, although it is true that Google Ads predominantly buys on AdX, Plaintiffs' characterization that Google restricts "Google Ads' advertiser demand *exclusively* to AdX"[919] (emphasis added) is simply incorrect (or the conduct at issue ceased with the launch of AwBid).



---

[918]    GOOG-DOJ-AT-02307442 at -443.  See also GOOG-DOJ-10924864 and GOOG-DOJ-13615208.

[919]    *DOJ Complaint*, ¶ 263.