**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

UNITED STATES, et al.,          )
                                 )
            Plaintiffs,     )
     v.                     )     No. 1:23-cv-00108-LMB-JFA
                                 )
GOOGLE LLC,               )
                                 )
            Defendant.    )

**<u>PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE OPINIONS
OF ITAMAR SIMONSON AND RELATED OPINIONS OF MARK ISRAEL</u>**

## INTRODUCTION

Professor Simonson's opinions about the three advertiser surveys he conducted are unreliable and inadmissible because he asked an unrepresentative sample of advertisers and advertising agencies about switching between the wrong products. Dr. Israel's opinions leveraging these fundamentally flawed surveys are likewise inadmissible. At the direction of Google's counsel, Prof. Simonson excluded ████████████ as well as all ████████ ████ from his survey samples. This unusual decision created an unrepresentative sample of the very purchasers Prof. Simonson sought to survey, ostensibly to understand the magnitude and nature of shifts in advertising spend by these advertisers. Thus, although Prof. Simonson attempted to study the correct *universe* (advertisers and ad agencies), his *sample* was fatally flawed. Google confuses these two concepts (universe and sample) and tries to defend the reliability of Prof Simonson's samples by incorrectly focusing on its numerical size rather than their representativeness of the universe he tried to study. Regardless of how many participants were in the studies, Prof. Simonson's failure to ensure those participants were *representative* of the intended universe renders his survey results unreliable and inadmissible under Rule 702(b).

Google contends that Prof. Simonson had no choice but to exclude large swaths of the surveys' intended population due to ethical rules that restrict Google's lawyers, but any such limitation cannot excuse Prof. Simonson's flawed and unreliable sampling methodology or rescue his survey results from exclusion under Rule 702. If Google's lawyers' ethical obligations precluded Prof. Simonson from using reliable methods to conduct an appropriately representative survey, Google could have sought relief from the Court, or Prof. Simonson could have decided not to conduct a survey at all. What Google cannot do is use attorney ethics rules as a basis to skew the survey sample (and thus the survey results) in ways that make them unreliable.

The flaws in Prof. Simonson's survey design did not end there. At counsel's direction,

Prof. Simonson ███████████████████████████████████████ ████████████████████████████████, which resulted in as many as one-quarter of respondents opting-out of submitting answers they had already entered. This disclosure and opt-out procedure—implemented here for the first time ever in Prof. Simonson's decades-long career—similarly biased the sample and survey results, insofar as it, among other things, signaled a preference for pro-Google responses among the respondents. The opt-out procedure biased the survey sample even further, rendering the survey results unreliable under Rule 702(c).

Finally, rather than asking advertisers about the ad tech tools they used to buy and sell advertising—the actual products at issue in this case—Prof. Simonson asked advertisers about their preferences for different advertising *formats*. This decision to ask respondents about switching between advertising formats, not switching between ad tech tools, makes Prof. Simonson's critical Diversion Question[1] irrelevant. Even Google concedes that Prof. Simonson's survey was not asking about customer switching for "the particular products at issue," *i.e.*, ad tech tools used to buy and sell open-web display advertising. Google admission is dispositive. Surveys that do not actually address the facts at issue here should be excluded under Rule 702(a).

## ARGUMENT

### A. Prof. Simonson's Opinions Are Unreliable Because His Samples Are Biased

Prof. Simonson's advertiser survey samples are fatally flawed under Rule 702(b) because (1) they excluded companies that account for a significant portion of the target population and (2) respondents could opt-out upon learning that Google sponsored the surveys for use in defending against a monopolization lawsuit. The compounding impact of these decisions renders

---

[1] The Diversion Question asked survey respondents whether they would "divert some of [their] advertising spending for the coming year to other types of digital advertising" if "the cost of programmatic display advertising has recently increased by a small but significant amount, and will remain elevated for the foreseeable future." Opening Br. at 7, ECF No. 613.

Prof. Simonson's samples so incomplete as to be uninformative of the universe of advertisers he sought to survey. Rule 702(b) prohibits scientific methods based on insufficient facts or data.

Google suggests—without evidence—that those exclusions would not affect the outcome of the surveys, yet Prof. Simonson's surveys provide no support for this sweeping conclusion. Google argues that Plaintiffs bear the burden of explaining why these excluded participants would have responded differently, but that is precisely backwards. As the proponent of the expert, Google must demonstrate why Prof. Simonson's methods and results are reliable. Plaintiffs do not need to conduct their own survey to demonstrate bias under Rule 702.

1. **Google's Exclusion of High Spend Advertisers and Ad Agencies Resulted in Biased and Unrepresentative Survey Samples**

Google conflates the question of an appropriate survey "universe" with a reliable "sample" of that universe. Plaintiffs challenge the latter, not the former, with respect to Prof. Simonson's surveys. "A universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123 (4th Cir. 2011) (cleaned up); Shari Seidman Diamond, *Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence 359, 376 (Fed. Jud. Ctr. 3d ed. 2011) ("*FJC Reference Guide*"). "Identification of a survey population [universe] must be followed by selection of a sample that accurately represents that population." *FJC Reference Guide* at 380; *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) ("[A] sample that accurately represents the target population must be selected, and procedures must be taken to reduce the likelihood of a biased sample.") *aff'd*, 354 F.3d 661 (7th Cir. 2004).

Google's case law regarding the selection of the "wrong universe," *see* Opp. at 12-13, ECF No. 641, is non-responsive to Plaintiffs' challenge. *See, e.g., PBM Prods.*, 639 F.3d at 124 (holding that an expert "survey[ing] the wrong universe bears directly on the weight accorded to

the survey, not to its admissibility"); *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544–45 (10th Cir. 1996) ("Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility.") (cleaned up)).[2] And even those cases acknowledge Plaintiffs' point that the survey sample must be "a sufficiently close approximation of the recipient pool to be admissible," *PBM Prods.*, 639 F.3d at 124, and that, "[t]he district court should exclude the survey when the sample is clearly not representative of the universe it is intended to reflect," *Harolds Stores*, 82 F.3d at 1544; *see also Valador*, 242 F. Supp. at 461 (survey inadmissible as "under-inclusive" because it "did not cover the prime market for defendants' product").[3]

Prof. Simonson's exclusion of individuals who work for companies on the No Contact List[4] also rendered his samples unrepresentative of his defined universe. Google does not dispute the extent of Prof. Simonson's exclusions, including the ███████████████████████████ ███████████████████████████████████████. *See* Opening Br. at 4-5.

---

[2] This is not to suggest a black-and-white distinction between universe and sample issues or that a faulty universe cannot separately serve as a basis for exclusion. For example, in *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th Cir. 2017), which relies on *PBM, supra*, the court excluded the opinion of an expert who failed to survey even a "sufficiently close approximation" of the correct universe when he focused on customers irrelevant to the trademark confusion claim and excluded many of the subject product's average purchasers. *Valador*, 242 F. Supp. 3d at 460–61 (quoting *PBM Prods*, 639 F.3d at 123).

[3] Google also cites *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146 (4th Cir. 2012), but that case is distinguishable. There, the Fourth Circuit held that the defendant's "laundry list of alleged technical deficiencies" with the plaintiff's survey expert including the "exclusion of relevant consumers," were appropriately addressed by the trier of fact. *Id.* at 163. Nothing in the Fourth Circuit's opinion suggests that those customers constituted a distinct group (like the large, more sophisticated advertisers who are potential witnesses against the defendant here), such that their exclusion would have rendered the sample unrepresentative of the survey universe.

[4] The No Contact List included ████████████████████████████████████ ███████████████████████████████████████████████████. *See* Exhibit A, Expert Report of Itamar Simonson, Ph.D. ("Simonson Rep.") ¶ 34, ECF No. 609-2.

Not all advertisers are created equal, especially here where a critical question in the case is the extent to which total spend on ad tech tools would shift in response to an increase in price or decrease in quality. Yet, Prof. Simonson ignored the views of ███████████████████ ████████████████████████████████████████████████████. Prof. Simonson pre-screened out of the survey samples respondents who worked for companies that are likely ████████████████████████████ Ex. A, Simonson Rep. ¶ 34, and ████ ██████████████████████████████ Google's own documents show ███ █████████████████████████████████████████████████████████ ██████████████████████████████████ Exhibit G (GOOG-DOJ-03047055 at -062), ECF No. 609; Exhibit L, Crain Communications Inc., "Ad Age Leading National Advertisers 2023: 200 biggest advertisers," June 26, 2023 (cited in Exhibit C, Expert Rebuttal Report of Wayne D. Hoyer, Ph.D. ("Hoyer Rep.") ¶ 67 n.116, 117, ECF No. 609-4) (exclusions highlighted) ("Ad Age Top 200"). Google recognizes that these companies are different another reason too: they are potential witnesses against Google in this and related cases.

Google misdirects away from this problem by focusing instead on the raw number of companies excluded, approximately 150, relative to the raw number of potential individual respondents invited to take the surveys, 11,162.[5] But this comparison misses the point by obfuscating the economic significance of the omitted companies. Having excluded such a material portion of the ████████████████, Prof. Simonson's survey failed to provide reliable insight into whether an advertising technology monopolist could profitably increase

---

[5] Google's claim that there were "millions of potential advertisers or ad agencies," Opp. at 13-14, is without basis. Prof. Simonson testified that he thought the panel had only thousands of members. Exhibit M, Deposition of Itamar Simonson ("Simonson Tr."), Feb. 28, 2024, at 134:19-135:3. Prof. Simonson also has no idea how many potential *individuals* working for these 150 companies were excluded. Ex. M, Simonson Tr. at 136:9-17.

prices or reduce quality without losing enough revenue from customers switching to another ad

tech tool, an analysis informed by total advertising spend not total number of customers.

Google's assurance that Prof. Simonson "confirmed that his Higher-Spend Advertiser

Survey included advertisers at the very high spend level (more than $15 million)," Opp. at 13,

falls flat for the same reason, ████████████████████████████████████████████

████████████████████████████████████████████. *See* Ex. L, Ad Age Top 200.

By declining to recognize the economic significance of the 150 companies on the No Contact

List, Google ignores with what makes Prof. Simonson's samples unrepresentative and unreliable.

Google cannot salvage the samples by relying on Prof. Simonson's speculation that

excluding large, more sophisticated advertisers, likely would have rendered the results of his

surveys more conservative. Opp. at 13-14. Prof. Simonson failed to examine whether No Contact

List advertisers would have responded differently, and he has no data to analyze to ground such

an assertion. *See* Exhibit N, Deposition of Wayne D. Hoyer ("Hoyer Tr."), March 4, 2024. at

281:5-15. The excluded companies were █████████████████████████████████████████████

█████████████████████████████—that Prof. Simonson could not reliably conduct his

surveys without them. His approach is akin to a mortgage lender conducting a nationwide survey

about housing costs, excluding everyone from California, Texas, Florida, and Pennsylvania—

four of the five most populous states—without assessing whether residents from the excluded

states would have responded differently than those of the surveyed states, and then touting how it

"only" missed residents from *four* states and sent the survey to millions of people in 46 states.

Prof. Simonson's methodology is unreliable, and Google fails to satisfy its burden to

show otherwise by a preponderance of evidence. *See* Fed. R. Evid. 702; *see also Merisant Co. v.*

*McNeil Nutritionals, LLC*, 242 F.R.D. 315, 319–20 (E.D. Pa. 2007) ("[T]he proponent of a

consumer survey has the burden of establishing that it was conducted in accordance with

accepted principles of survey research," including that "[a] proper universe must be examined

and a *representative* sample must be chosen[.]") (quoting *Pittsburgh Press Club v. United States*,

579 F.2d 751, 758 (3d Cir. 1978)).[6]

Google's attempts to shift its the burden to Plaintiffs are legally unfounded, which is

revealed by their citations of authority. This case is not remotely akin to the circumstances in

*Jackson v. E-Z-GO Division of Textron, Inc.*, 326 F. Supp. 3d 375 (W.D. Ky. 2018), or *In re

Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d

116 (D.N.J. 2020), where experts accounted for the effect of their exclusions, and the party

challenging the survey did not put forth a reason why the expert's methodology was unreliable.

*Cf. City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1048 (9th Cir. 2014) (district court

erred "given that Dr. Sturchio refuted [defendant's] assertion that the Guidance Manual protocols

were not followed"). There is no analogy here where Prof. Simonson offers only speculation that

his exclusions did not bias his results, and Plaintiffs' survey rebuttal expert, Prof. Wayne Hoyer,

███████████████████████████████████████

*See* Exhibit O, Expert Rebuttal Report of Wayne D. Hoyer, Ph.D. ("Hoyer Rep.") ¶¶ 65-70.

Google's improper burden-shifting is most evident in its analysis of *Hi Ltd. Partnership

v. Winghouse of Florida., Inc.*, 2004 U.S. Dist. LEXIS 30687 (M.D. Fla. Oct. 5, 2004), and *FTC

v. Fleetcor Technologies, Inc.*, 2022 WL 3350066 (N.D. Ga. Aug. 9, 2022). In *Winghouse*,

whether men and women would have responded to the survey differently was unknowable and

beside the point. What was clear is that the absence of women made the sample so incomplete as

---

[6] Google finds no support in *Precision Fabrics Grp., Inc. v. Tietex Int'l, Ltd.*, 367 F. Supp. 3d
487, 506-07 (D.S.C. 2019) (declining, after jury trial, to exclude testimony of expert on flame
retardants whose opinion bore on a disputed issue of fact rather than a question of reliability).

to be uninformative of the universe of the company's customers because women "comprise nearly a third" of that universe. *Winghouse*, 2022 WL 3350066, at *25–26. Prof. Simonson made a similar error here by excluding advertisers and ad agencies that comprise about a third (or more) of the universe he was trying to study, and which Prof. Simonson acknowledges are more sophisticated than the parts of the universe he did study. *See* Ex. C, Hoyer Rep. ¶¶ 66-67.

The same dynamic exists in *FleetCor*, 2022 WL 3350066, at *5–6, where the defendant's expert omitted a large swath of customers who may have left FleetCor out of dissatisfaction with its practices. Opp. at 15-16. Again, why or how the excluded customers would have responded differently than those surveyed was unknowable, and the FTC did not need to demonstrate bias to exclude the survey. Rather, the survey omitted too much of the target population, making the sample "patently not representative of the population he stated he was surveying." *FleetCor*, 2022 WL 3350066, at *6 (cleaned up). Prof. Simonson's failure is the same, resulting in "a deeply unrepresentative sample [that] is so fundamental as to be fatal to his results." *Id*.

## 2.   Prof. Simonson's Post-Survey Disclosures and Opt-Out Option Rendered the Survey Results Unreliable

Google fails to show why Prof. Simonson's disclosures and opt-out option reflect reliable survey practices and rendered trustworthy results. As an initial matter, it is important to note that the survey respondents all work in an industry where Google, the dominant monopolist, wields vast power and influence over the companies that employ respondents. Against that backdrop, the choice to engage in post-survey disclosures and opt-out options requires explanation because one-quarter of respondents, for reasons not recorded, opted to have their data excluded from the survey results out after being told that Google was sponsoring the survey to aid its defense of an antitrust lawsuit. Prof. Simonson speculates that this practice had no impact on his survey results, but he failed to provide any evidence whatsoever to support this supposition. And Google

provides no explanation why these disclosures were even necessary, given that they deviate from standard industry practice. Thus, Google fails to satisfy its burden.

### a. Prof. Simonson Failed to Follow Standard Practices for a Litigation Survey

Google's disclosure and opt-out option did not "follow[] the cautionary procedure in the *FJC Reference Guide*"[7] as Google claims. Opp. at 17. First, as he concedes, Prof. Simonson did not "follow" the *FJC Reference Guide* here; he followed the direction of Google's lawyers. Ex. A, Simonson Rep. ¶ 34; Ex. B, Simonson Tr. at 289:13-290:6.

Second, the "cautionary procedure" referenced by Google only considers narrow disclosure of the identity of the sponsor, not the survey's purpose, including its use in litigation. *Reference Guide* at 411. The *FJC Reference Guide* is clear that the standard practice in litigation surveys is to keep the respondent blind to its sponsor *and* purpose whenever possible to ensure objectivity. *Id.* at 410-11; *see Pittsburgh Press*, 579 F.2d at 756–57, 759 (survey respondents should not be aware of the purpose of the survey or precise nature of the litigation). Conveying survey sponsorship and purpose increases the likelihood of biased results. *FJC Reference Guide* at 374 & n. 71. Therefore, the *FJC Reference Guide* instructs survey experts to conduct "an evaluation of the likely biases introduced by . . . awareness of the survey's sponsorship" including "whether the sponsor has views and expectations that are apparent." *Id.* at 411. Disclosure can bias results not only through the content of responses but also by skewing the sample through an opt-out option following disclosure. *Cf. id.* at 411. Yet Prof. Simonson did not evaluate the likely biases from disclosing the sponsor and purpose, despite ███████████ ████████████████████████████ Ex. M, Simonson Tr. at 160:76-7, 161:4-16.

---

[7]The *FJC Reference Guide* is "intended to assist judges in identifying . . . issues bearing on the adequacy of surveys [] offered as evidence[.]" *FJC Reference Guide* at 362.

As evident from the materially high opt-out rate, Prof. Simonson's disclosures impacted respondents' decisions whether to submit their survey responses. That fact alone is inconsistent with reliable survey methodologies. *See, e.g.*, *United States v. S. Ind. Gas & Elec. Co.*, 258 F. Supp. 2d 884, 891, 894 & n.5 (S.D. Ind. 2003) (excluding survey in part because pre-survey cover letter's disclosure of sponsor and litigation purpose left "little doubt" that it influenced those "[who] chose not to respond"); *Pittsburgh Press,* 579 F.2d at 759 (similar). The timing of the disclosures—post-survey as opposed to pre-survey—does not remedy the problem. ████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████ It is natural to question whether these respondents opted out because they were concerned that their answers were not favorable to Google's litigating position, and a mere assurance of anonymity may not have assuaged those concerns. *See* Ex. C, Hoyer Rep. ¶ 83; Ex. M, Simonson Tr. at 157:7-158:1 (███████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████).

Third, Prof. Simonson could not determine whether the disclosure and opt-out procedure affected his results. █████████████████████████████████████████████████

████████████████████████████████████████████████. *See* Ex. B, Simonson Tr. at 298:8-299:16, 305:4-13. Prof. Simonson's commitment ███████████████

████████████████████████████████████████████████. The skewing of the sample is foundational, and the █████████████████████████████

Fourth, Prof. Simonson's claim that "██████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ Ex. A, Simonson Rep. ¶ 81, is mere *ipse dixit*.

The Rule 702 inquiry focuses not on the expert's conclusions but rather on "the soundness and

care with which the expert arrived at [his] opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d

426, 431 (7th Cir. 2013); *see also Sardis v. Overhead Door Corp.,* 10 F.4th 268, 290 (4th Cir.

2021) (quoting Fed. R. Evid. 702 advisory comm. Notes (2000)) ("The trial court's gatekeeping

function requires more than simply 'taking the expert's word for it.'"). Prof. Simonson ███████

███████████████████████, Ex. B, Simonson Tr. at 285:22-293:16, ████████████████

█████████████████████████████, Ex. B, Simonson Tr. at 289:13-19, and

therefore he has no basis to conclude that the opt-out procedure had no effect.[8] And Prof. Hoyer

posits that ████████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. O, Hoyer Rep. ¶

85. ███████████████████████████████████ *See* Ex. N, Hoyer Tr. at 255:4-13.

**b. Google Cannot Rely on the FTC's Practice of Adhering to the Privacy Act When Conducting a Survey of Consumers**

Google compares apples to oranges when it claims that disclosing the sponsor and

---

[8] Prof. Simonson cites two articles in his report as support for his opinion that ████████████████

███████████████ Ex. A, Simonson Rep. ¶ 81 & n. 86, ███████████████████

██████████████████████ *See* Exhibit P, Charles Crabtree, Holger L. Kern, and
Matthew T. Pietryka (2022), "Sponsorship Effects in Online Surveys," *Political Behavior*, Vol.
44, pp. 265-266 ("Our experiments were designed to explore the possibility of bias induced by
the logos of universities that vary in terms of religiosity, ideology, and prestige on our survey
items measuring social conservatism, group affect, and political knowledge. … Scholars must
also consider whether our results generalize to other subject pools."); Exhibit Q, Del Hawkins
(1979), "The Impact of Sponsor Identification and Direct Disclosure of Respondent Rights on
the Quantity and Quality of Mail Survey Data," *Journal of Business*, Vol. 52, No. 4, pp. 587
("The conclusions suggested by this study are limited to mail surveys, to well-known department
store sponsors, to particular ways of identifying both sponsors and respondent rights, and to other
conditions as well.").

purpose of a litigation survey is proper because it is consistent with the FTC's practice in the *Intuit* enforcement matter. Opp. at 7, 18. The survey in that case was conducted pursuant to the Privacy Act, 5 U.S.C. § 552a(e)(3), which legally requires surveyors to explain the survey's purpose and to provide respondents an option to opt-out. Private parties like Google have no similar legal obligations, and the disclosures in Prof. Simonson's surveys raised concerns that the FTC's disclosure did not. Namely, the relationship between Google as a monopolist and its customers is very different from the relationship between the FTC and private citizens, as

███████████████████████████████████████████████████████

███████████████████. *See* Ex. N, Hoyer Tr. at 264:17-265:2. By contrast, the FTC was surveying consumers that it had a mission and incentive to protect from harm.

### 3. Google's Counsel Introduced Fatal Flaws into Prof. Simonson's Surveys

While some attorney involvement in survey design may be necessary to ensure questions are relevant, *FJC Reference Guide* at 374, undue attorney involvement can undermine a survey's reliability. *See Yapp v. Union Pac. R.R. Co.*, 301 F. Supp. 2d 1030, 1037 (E.D. Mo. 2004) (condemning counsel's involvement in survey design as "indicat[ing] a lack of independence and thus a lack of scientific validity"). This is particularly true when, as here, attorney involvement is the source of significant flaws in the survey. *See, e.g.*, *Johnson v. Big Lots Stores, Inc.* 2008 WL 1930681, at *16 (E.D. La. Apr. 29, 2008) (counsel chose unrepresentative sample); *S. Ind. Gas & Elec.*, 258 F. Supp. 2d at 894 (counsel created bias); *Pittsburgh Press,* 579 F.2d at 759 (same).

Contrary to Google's contention, *Johnson v. Big Lots Stores* is instructive. There, directions from counsel artificially constrained the sample in a way that made it unrepresentative, 2008 WL 1930681, at *17-20, and the expert "played no role in the selection of [] interview locations" or many of the interviewees. *Id*. at *13. The same occurred here when Google's counsel instructed Prof. Simonson to exclude from his samples ███████████████

██████████████████████████████████████████████. Google does not dispute that, like in *Big Lots*, Prof. Simonson did not use independent judgment when selecting his samples, but it tries to distinguish *Big Lots* by pointing out that counsel there "hand-picked" a "miniscule subset" of survey respondents. Opp. at 19. That is no distinction, however, because the basic flaw is the same: an inappropriately narrow sample caused by undue influence from counsel.

Google also tries to justify Prof. Simonson's flawed samples based on attorney ethical obligations about communications with represented persons. Opp. at 1, 5, 19 (citing Rule 4.2, Va. R. Prof'l Conduct). But this is not a basis to allow Prof. Simonson to testify at trial about his unreliable survey results. Insofar as counsel's ethical obligations required Prof. Simonson to have unrepresentative samples, the surveys are unreliable (and thus inadmissible) regardless.█

██████████████████████████████████████████████████

██████████████████████████████ *See* Ex. N, Hoyer Tr. 268:21-269:3.

Rule 4.2 of the Virginia Rules of Professional Conduct does not disempower Google from taking steps to ensure the reliability of its expert's survey. For example, Google could have sought consent of counsel to have the represented parties contacted by its survey company, or it could have requested relief from the Court. *See* Rule 4.2, Va. R. Prof'l Conduct. Alternatively, Prof. Simonson could have directed the survey company to avoid outreach to individuals who are members of the control group at firms on the No Contact List.[9] Instead, Google chose to do nothing and now expects the Court to accept a fundamentally flawed proffer of expert testimony.

---

[9] The Commentary to Rule 4.2 explains, "In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs, or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability." *See* Rule 4.2, Va. R. Prof'l Conduct, Comment 7.

Google also cannot redeem these deficiencies by pointing to Prof. Simonson's testimony that he would have refused to conduct his surveys, if he had believed that the exclusions from the No Contact List and opt-out procedure would undermine the reliability of his methods or results.[10] Opp. at 19. Employing these procedures was counsel's decision, not Prof. Simonson's. *See* Ex. A, Simonson Rep. ¶ 34; Ex. B, Simonson Tr. at 289:13-290:15. He has no data from the excluded individuals to analyze the impact of their exclusion on his methodology. And because Prof. Simonson ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

### B. Prof. Simonson's Diversion Question Is Neither Relevant Nor Reliable

#### 1. Prof. Simonson's Diversion Question Does Not Relate to the Tools Used to Purchase Open Web Display Advertising.

As Prof Simonson admitted, "████████████████████████████████████████
██████████████████████████████████████████████ Ex. B, Simonson Tr. 354:4-20, the central market definition question in this case. Google also concedes that Prof. Simonson's Diversion Question[11] asks about the wrong product, Opp. at 24 (admitting Prof. Simonson did not test cross-elasticity of demand for "the particular product at issue"), or that one of "[t]he key fact[s] for Plaintiffs' market definition is whether an advertiser would change the tool used." *Id*. at 21. By failing to ask about the very products at issue, Prof. Simonson's analysis is unrelated to a "fact in issue" and should be excluded under Rule 702(a).

Google defends the relevance of Prof. Simonson's Diversion Question by arguing that it

---

[10] Google cites "obligations" as its reason for including the sponsor and purpose disclosures with the opt-out option, Opp. at 19, but provides no further explanation. Nothing in Rule 4.2 suggests that these procedures are required.

[11] Plaintiffs provide the full text of the Diversion Question and directly related questions in their opening brief. Opening Br. 7.

"go[es] to the question of substitution." *Id.* at 20. However, it asks about the wrong type of substitution. Google makes a category error by asking survey participants about a significant price increase for one product (advertising) to then attempt to draw the contours of markets for different products (ad tech tools). A price increase on open-web display advertising generally is divorced from open-web display tools because such an increase would be larger than a price increase on the tools, which are a portion of the cost of open-web display advertising. *See* Opening Br. at 20. Google leaves unaddressed and unrebutted the fact that the Diversion Question is, by analogy, asking about the cost of solar panel production when the matter at issue is actually solar panel installation. *See id.* at 19-20.

When survey evidence "shed[s] no light on" the "question that is key to" the claims at issue, it is not relevant, and it is error to allow a factfinder to rely on such evidence. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 279-81 (4th Cir. 2002). Just as the "critical issue" in *Scotts* was whether consumers thought a product's packaging conveyed that it could kill mature crabgrass (when it could not), *id*, the critical issue for market definition here is how customers would respond to a price increase on the ad tech tools at issue in Plaintiffs' markets. In *Scotts*, the key issue was "whether [the defendant's crabgrass-control product] packaging conveys the message that [it] *kills* mature crabgrass, a message that would be false." *Id.* at 279. The Fourth Circuit found, however, that the survey "simply did not address that question" because the wording of the survey question made it impossible to reliably understand whether the consumers had evaluated the correct message. *Id.* at 278-81. There, the survey question at issue was: "Based on your review of this section of the bag, should this product prevent the growth of crabgrass that looks like the crabgrass pictured?" *Id.* at 279. The *Scotts* court found that the ambiguity of the word "prevent" made it impossible to tell "from this question whether the respondents who

answered yes believed that [the product] could prevent mature crabgrass by stopping it before it started [the true statement], or whether they believed that Vigoro could kill if applied to established, mature crabgrass [the false statement]." *Id.*

The same ambiguity taints Prof. Simonson's Diversion Question. It is impossible to tell whether respondents answered "yes" because they were responding to the "critical issue" (the price of ad tech tools) rather than some other, irrelevant issue (the overall increase in price of open web advertising with no differentiation between tool and non-tool related costs). Google contends the Diversion Question was close enough because it was related to open-web display advertising, and the tools are used to buy and sell such advertising, but *Scotts* teaches that a survey question either addresses the "critical issue" or it doesn't; there is no "close enough."[12]

Google cites *H&R Block*, which supports Plaintiffs' position, not Google's. The diversion question in *H&R Block* asked about substitutes for the products at issue, unlike Prof Simonson's survey, which asked about substitution for products not at issue. In *H&R Block* the parties disputed whether the product market was do-it-yourself ("DIY") tax preparation products or all tax preparation products or services. *United States v. H&R Block, Inc.*, 831 F. Supp. 2d 27, 33 (D.D.C. 2011). The court admitted a survey asking about consumers' use of "options [that] encompassed both competing Digital DIY tax preparation products as well as alternative services" because it "provides at least some indication of the products and services that compete

---

[12] Plaintiffs are not arguing that Prof. Simonson was required to conduct a hypothetical monopolist test ("HMT") or a SSNIP test, as Google claims. Opp. at 22-23. The Diversion Question is irrelevant because, according to Google, Prof. Simonson was trying to study "reasonable interchangeability of product and services," including "cross-elasticity of demand," Opp. at 23, but the Diversion Question did not study either issue for the "products and services" at issue in the case.

with" the defendant's product at issue.[13] *Id.* Google also cites to *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 106 (2d Cir. 2002) ("*PepsiCo II*"), but that case involves a pre-litigation ordinary course business consumer survey,[14] *not* an expert survey. *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 252 (S.D.N.Y. 2000) ("*PepsiCo I*"); *PepsiCo II*, 315 F.3d at 106. No party challenged the relevance, whether based on Rule 702 (which was inapplicable) or otherwise, of the ordinary course evidence. In any event, the survey question at issue specifically included the option of "independent food service delivery," the method of distribution actually at issue, *PepsiCo I*, 114 F. Supp. 2d at 252, *PepsiCo II*, 315 F.3d at 106, not an overboard question about all methods of distribution or the all-in costs of distribution that considered, for example, the quality and cost of rubber hoses used to make soda in addition to independent distribution.

### 2. Professor Simonson's Diversion Question Produces Unreliable Results.

Google proposes a novel standard for evaluating the reliability of a survey question, claiming that "any dispute about question wording goes to the weight, not admissibility, of the survey results." Opp. at 25. Google is wrong. Not only is *Scotts* a prominent example in the Fourth Circuit of a dispute about survey wording going to admissibility, but none of Google's cited cases stand for the proposition that *any* dispute as to survey wording goes purely to weight. *E.&J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292-93 (9th Cir. 1992) (asks about correct product); *Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 707, 711 (W.D. Va. 2004)

---

[13] In this context, Prof. Simonson's Diversion Question would be analogous to asking about a "small but significant" increase in the overall cost of tax preparation, including accessing or purchasing the computer on which the software was installed, copying, mailing, other administrative costs, and any additional costs in addition to the cost of the TaxACT software. The survey question at issue asked specifically and exclusively about the "price, functionality or quality" of the TaxAct product and listed specific alternative products. *Id.* at 31.

[14] *PepsiCo II*, Br. Of Appellee the Coca-Cola Co., 2001 WL 34113687 at *10, *13 (survey conducted in 1996); *PepsiCo I*, Complaint, 1998 WL 34311463 (S.D.N.Y. May 7, 1998).

(declining to adopt magistrate's admission of survey expert testimony where the survey questions were worded "in a [biased] manner" and produced skewed results which could not be remedied on cross-examination); *vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 458 (D.S.C. 2019) (finding challenge to purportedly leading questions can go to weight, but not addressing questions so ambiguous as to be unreliable); *Geiger v. Creative Impact Inc.*, 2020 WL 3268675, at *3 (D. Ariz. June 17, 2020) (denying challenge to "yes" or "no" response options, not the actual language of the questions); *Bluetooth SIG, Inc. v. FCA US LLC*, 468 F. Supp. 3d 1342, 1346-47 (W.D. Wash. 2020) (asking about the correct mark, "BLUETOOTH," at issue).

Given Dr. Israel's reliance, *see* Opening Br. at 8-9, the Diversion Question is crucial and ambiguous by design. Prof. Simonson, who could not recall ever previously asking a question using the term "small but significant," *see* Ex. M, Simonson Tr. at 326:9-13, 328:3-329:1, and provides no evidence as to how respondents actually understood the question, *see* Ex. C, Hoyer Rep. ¶ 74(b) & n.137, nevertheless considers the term to be "balanced." But as Prof. Hoyer demonstrated, this cursory, methodology-free approach elides serious flaws with the question's wording. Respondents may have interpreted "small but significant" much in the same way that a patient would react to being told they needed to undergo a "routine, but serious" medical procedure. Rather than consider the diagnosis to be balanced, the patient may focus on the potential serious consequences of the procedure even if their doctor performs it routinely. *Id.* ¶ 74(b). Critically, Google does not dispute that respondents were left to speculate on the meanings of "small but significant" and for the "foreseeable future" in the Diversion Question, and that social science establishes that terms like this mean different things to different people. Opening Br. at 23 (citing Hoyer Rep. ¶ 74). Since Prof. Simonson failed to provide any evidence—through a pretest or the survey itself—that survey respondents understood the "small

but significant" term in the Diversion Question, his mere say-so cannot be credited.[15]

Google grasps at straws in arguing that the Diversion Question is somehow reliable because Prof. Hoyer once asked a question from a dated academic survey (with no litigation purpose) that contained the term "quite a bit." Opp. at 26. Prof. Hoyer also testified that the "quite a bit" question was pulled from a "standard set of questions" for measuring "willingness to pay," a common dependent variable, in a study on airline brand loyalty; he did not suggest the question would have been "standard practice" more broadly, or in the more nuanced context here where Prof. Simonson attempts to measure responses to price sensitivities.[16] Ex. N, Hoyer Tr. at 331:12-332:21. More fundamentally, the survey was for academic purposes and was not subject to the rigors of Rule 702, which must be met for admission here.

Google's conclusory treatment of *In re Motor Fuel Temperature Sales Practices Litigation* affirms the similarity between Prof. Simonson's Diversion Question and the "very ambiguous" question that was excluded there. 2012 WL 13050523 at *7 (D. Kan. Feb. 29, 2012). The *Motor Fuel* survey asked whether each gallon of fuel should contain "the same amount of fuel as every other gallon of that same fuel." *Id.* at *3. The court found the results inadmissible because there was no way to know whether respondents read "amount of fuel" to mean energy or volume, and that "ambiguity goes to the heart of [the expert's] conclusions." *Id.* at *7. The same is true here. The results of the Diversion Question are inadmissible.

---

[15] ███████████████████████████████████████████████████████████ Ex. M, Simonson Tr. at 121:8-122:3, 246:3-9, is also inconsistent with standard survey practices. *See FJC Reference Guide* at 394.

[16] *Hambrick ex rel. Hambrick v. Ken-Bar Mfg. Co.*, does not support Google. 422 F. Supp. 2d 627, 638 (W.D. Va. 2002) (rejecting *Daubert* challenge to the plaintiff's survey expert who testified that her negligible contact with the polling firm that conducted the survey was "standard practice in survey research"). Unlike in *Hambrick*, neither Prof. Hoyer nor anything else in the record here suggests that Prof. Simonson's Diversion Question is "standard practice."

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs'

motion.

Dated: May 31, 2024

Respectfully submitted,

| | |
|---|---|
| JESSICA D. ABER | JASON S. MIYARES |
| United States Attorney | Attorney General of Virginia |
| | |
| /s/ Gerard Mene | /s/ Tyler T. Henry |
| GERARD MENE | STEVEN G. POPPS |
| Assistant U.S. Attorney | Deputy Attorney General |
| 2100 Jamieson Avenue | TYLER T. HENRY |
| Alexandria, VA 22314 | Assistant Attorney General |
| Telephone: (703) 299-3777 | |
| Facsimile: (703) 299-3983 | Office of the Attorney General of Virginia |
| Email: Gerard.Mene@usdoj.gov | 202 North Ninth Street |
| | Richmond, VA 23219 |
| /s/ Aaron M. Sheanin | Telephone: (804) 692-0485 |
| AARON SHEANIN | Facsimile: (804) 786-0122 |
| /s/ Chase E. Pritchett | Email: thenry@oag.state.va.us |
| CHASE E. PRITCHETT | |
| /s/ Isabel M. Agnew | Office of the Attorney General of Virginia |
| ISABEL M. AGNEW | 202 North Ninth Street |
| /s/ Brent K. Nakamura | Richmond, VA 23219 |
| BRENT K. NAKAMURA | Telephone: (804) 692-0485 |
| /s/ Julia Tarver Wood | Facsimile: (804) 786-0122 |
| JULIA TARVER WOOD | Email: thenry@oag.state.va.us |
| | |
| United States Department of Justice | Attorneys for the Commonwealth of Virginia and |
| Antitrust Division | local counsel for the States of Arizona, California, |
| 450 Fifth Street NW, Suite 7100 | Colorado, Connecticut, Illinois, Michigan, |
| Washington, DC 20530 | Minnesota, Nebraska, New Hampshire, New |
| Telephone: (202) 307-0077 | Jersey, New York, North Carolina, Rhode Island, |
| Fax: (202) 616-8544 | Tennessee, Washington, and West Virginia |
| Email: Julia.Tarver.Wood@usdoj.gov | |
| | |
| Attorneys for the United States | |