```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3     --------------------------x
       UNITED STATES, et al.,      :     Civil Action No.:
 4                                 :     1:23-cv-108
                   Plaintiffs,     :
 5          versus                 :     Friday, June 7, 2024
                                   :     Alexandria, Virginia
 6     GOOGLE LLC,                 :
                                   :     Pages 1-40
 7                   Defendant.    :
       --------------------------x
 8

 9          The above-entitled motions hearing was heard before
       the Honorable Leonie M. Brinkema, United States District
10     Judge.  This proceeding commenced at 10:06 a.m.

11                       A P P E A R A N C E S:

12     FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                              OFFICE OF THE UNITED STATES ATTORNEY
13                            2100 Jamieson Avenue
                              Alexandria, Virginia  22314
14                            (703) 299-3700

15                            JULIA TARVER WOOD, ESQUIRE
                              MATTHEW HUPPERT, ESQUIRE
16                            KATHERINE CLEMONS, ESQUIRE
                              AARON TEITELBAUM, ESQUIRE
17                            UNITED STATES DEPARTMENT OF JUSTICE
                              ANTITRUST DIVISION
18                            450 Fifth Street, NW
                              Washington, D.C.  20530
19                            (202) 894-4266

20                            JONATHAN HARRISON, ESQUIRE
                              OFFICE OF THE ATTORNEY GENERAL
21                            OFFICE OF THE SOLICITOR GENERAL
                              202 North Ninth Street
22                            Richmond, Virginia  23219
                              (804) 786-7704

23

24

25
                                                                1
```

```
 1                    A P P E A R A N C E S:

 2   FOR THE DEFENDANT:      CRAIG REILLY, ESQUIRE
                             LAW OFFICE OF CRAIG C. REILLY
 3                           209 Madison Street
                             Suite 501
 4                           Alexandria, Virginia  22314
                             (703) 549-5354
 5
                             KAREN DUNN, ESQUIRE
 6                           AMY MAUSER, ESQUIRE
                             JEANNIE RHEE, ESQUIRE
 7                           WILLIAM ISAACSON, ESQUIRE
                             PAUL, WEISS, RIFKIND,
 8                           WHARTON & GARRISON LLP
                             2001 K Street, NW
 9                           Washington, D.C.  20006
                             (202) 223-7300
10
     COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
11                           Official Court Reporter
                             United States District Court
12                           401 Courthouse Square
                             Alexandria, Virginia  22314
13                           (571) 298-1649
                             S.AustinReporting@gmail.com
14
             COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
15

16

17

18

19

20

21

22

23

24

25
                                                                  2
```

```
 1                    P R O C E E D I N G S

 2            THE DEPUTY CLERK:  Civil Action Number

 3    1:23-cv-108, United States of America, et al. versus Google

 4    LLC.

 5            Will counsel please note their appearance for the

 6    record, first for the plaintiff.

 7            MR. MENE:  Good morning, Your Honor.  Gerard Mene

 8    with the U.S. Attorney's Office.

 9            THE COURT:  Good morning.

10            MS. WOOD:  Good morning, Your Honor.  Julia Wood

11    from the Department of Justice for the plaintiffs.

12            THE COURT:  Good morning, Ms. Wood.

13            MS. WOOD:  I'll introduce my colleagues as well.

14    Matthew Huppert, Katherine Clemons and Aaron Teitelbaum are

15    here as well, all for the Department of Justice.

16            MR. HARRISON:  Good morning, Your Honor.  Jonathan

17    Harrison from the Virginia Attorney Generals Office.

18            THE COURT:  We always forget you, but you're not

19    forgotten.  Okay.

20            MR. HARRISON:  I'm here on behalf of the state

21    plaintiffs.

22            MS. DUNN:  Good morning, Your Honor.  Karen Dunn

23    from Paul, Weiss on behalf of Google.  With me here is Amy

24    Mauser, also from Paul, Weiss; Jeannie Rhee, Bill Isaacson,

25    and I understand that Mr. Reilly is with Judge Hilton.
```

3

```
 1              THE COURT:  That's all right.  I knew about it.
 2   That's not a problem.
 3              Who's going to be arguing on behalf of Google?
 4              MS. DUNN:  I will, Your Honor.
 5              THE COURT:  All right.  Well, as you know, we sort
 6   of had a preview of this issue last week.  Since then,
 7   there's been a chance to further consider it and brief it.
 8              But what is before the Court today is the
 9   defendant's motion to strike Count 5, which is the only
10   count that -- oh, Mr. Reilly is here.  Judge Hilton is so
11   fast, I knew you wouldn't be late.
12              MR. REILLY:  Yes.  Thank you, Your Honor.
13              THE COURT:  Is to strike Count 5, because the
14   damages that could possibly be obtained at trial have been
15   tendered to the government, and, therefore, the issue in
16   Count 5 is now moot.  And with Count 5 out of the case,
17   there is no longer a basis upon which there should be a jury
18   trial, and that's essentially the issue we have before us
19   today.
20              It's my understanding -- and I guess, Ms. Wood,
21   you're going to be speaking for the plaintiff?
22              MS. WOOD:  Yes, Your Honor.
23              THE COURT:  All right.  It's my understanding that
24   if you come to an agreement or if we resolve the issue as to
25   the amount of damages that would possibly be obtainable
```

4

```
 1    under Count 5, if that amount has, in fact, been given or

 2    tendered to you, that that would satisfy the damage issue

 3    for Count 5.

 4          MS. WOOD:  Your Honor, I would just clarify that

 5    we do not view this to be, in any way, shape or form, a

 6    settlement agreement.  We do believe under the case law,

 7    that if that amount is satisfied to the extent that a jury

 8    could potentially award up to that amount, then that

 9    situation would be moot, and the damages claim would be

10    dismissed.  We just have certain Tunney Act obligations when

11    we are engaged in settlement.  We would just want to clarify

12    for the record, this is not a settlement posture we find

13    ourselves in.

14          THE COURT:  I think that's quite clear.  You're

15    fighting it tooth and nail.  But it's not a settlement.

16          MS. WOOD:  Yes, Your Honor.

17          THE COURT:  But you would also agree that if there

18    is no longer a claim for damages in the litigation, that

19    there is no longer a basis for a jury, because all the other

20    relief that you can possibly get under Counts 1 through 4 is

21    injunctive relief, which goes to the equitable power of the

22    Court.

23          MS. WOOD:  Yes, Your Honor.  Absolutely.

24          THE COURT:  All right.  So we're clear about the

25    parameters.
```

```
 1            So the only real issue that we need to talk about
 2   today then is this issue as to whether or not the check, the
 3   cashier's check -- which I think is significant if you look
 4   at the case law.  It's not an offer; it's an absolute here's
 5   the money.  If they could have given you a wheelbarrow of
 6   cash, it would be the same thing.  You've got the money in
 7   hand, and so the only real question is, is that dollar
 8   amount, does that represent what could possibly have been
 9   obtained if the case had gone to trial.
10            And on this one, I think the government has a very
11   difficult job, given the record, as we said last time.  And
12   I do want to commend Ms. Rhee in particular, because you
13   were not prepared to argue the issue and you came in and did
14   a fine job.  And, Ms. Wood, you also were not prepared.  I
15   mean, that wasn't on the docket, and you did an excellent
16   job as well.
17            But I've spent time going over your expert
18   reports, and I had even my clerk do a -- you know, with the
19   computer now you can do a word check.  I don't see
20   anything -- in either Dr. Simcoe's report or any of the
21   other two experts who address damages, I don't see any
22   actual discussion of the 5 percent take rate.
23            It's included in Simcoe's charts, and that's all
24   it is.  It's there.  And he has two charts.  He has the one
25   we talked about last time, which is the chart that shows
```

the -- there are ten ad tech entities on that chart, Google

and nine others.  And Google and eight of those nine, as I

said last time -- and I looked at the chart again, and it's

consistent with that -- their take rates are all within a

relatively close range.

        And then there's one outlier who is way below

that.  Not way below, it comes in at about 8.2, 8.3.  It's

hard to read on the chart because it's not that clearly

delineated.  And there was one year over that, I think it's

a ten-year time span, in which the take rate went below

5 percent.  So I called that entity last time an outlier,

and I still do.

        But then we looked further at the Simcoe report,

and if you look at that, there's a second chart where he

draws sort of that line.  And he, again, talks about what

those numbers essentially mean, and he also says that the --

says nothing about the 5 percent.  There's no 5 percent

discussion in his report.  So that's the first concern I

have.

        And the second -- well, I have several.

        The second problem I think you have is that if you

look at Ms. Lim's report, she doesn't use the 5 percent; her

range is between the 10 percent and the 16.9 as the take

rate.  And the original damages expert who, by the way, left

the case.  Was there a reason why he left the case?

7

1              MS. WOOD:  For purely personal reasons, Your

2    Honor.

3              THE COURT:  Purely personal reasons.  All right.

4    But she fully adopted his report.

5              Now, I've read his report, and in his report, you

6    know, he says that he based his calculations -- and his

7    chart goes from the 16.2 percent up.  I think that was the

8    lowest number he had.  I'm sorry, 10 percent, 16.2, 16.9.

9    And he said that that chart, which is what he used to do the

10   damage calculation, was based in part on Simcoe.  He does

11   not discuss the 5 percent at all.

12             So you've got your -- all your damage experts have

13   gone with the range of numbers starting from the 10 percent

14   up to the 16.9.  The 10 percent is the highest number, that

15   represents the biggest damage amount for the plaintiff.  And

16   the cashier's check, which Google has delivered to you all,

17   is for the most generous number in that respect.

18             So I don't see any evidence at all, other than

19   these three, you know, little emails that float around that

20   are interesting to read, but they're just talking about

21   possible.  Yeah.  It's possible.  Maybe we should consider

22   going down to a certain lower percent take rate, but that's

23   not the kind of evidence that supports an actual damage

24   claim.

25             And then the last problem you've got -- and we

                                                              8

 1   talked about this last week -- is that in your opposition to

 2   the motion for summary judgment -- and I think this is very

 3   interesting -- is that the defendant's motion for summary

 4   judgment was filed, I think it was in April, one day -- and

 5   in that, they listed I think 70 or 80 -- or quite a few

 6   statements of uncontested facts, which is standard practice

 7   in civil cases.  Every summary judgment motion should have a

 8   separate section that lists those facts that the party

 9   believes are uncontested.  And then the way the law works is

10   if the opposing side does not object to a proposed, you

11   know, uncontested fact, that fact is deemed admitted.  And

12   we talked about this a bit last week as well.

13          And so the problem here is, although you all

14   objected to over 60 of those uncontested facts -- so

15   clearly, you know, the government and the plaintiffs were

16   paying careful attention to the uncontested facts, and the

17   majority of them -- or a significant number of them you

18   actually were contesting or adding some modification to

19   them, you fully accepted the one that addresses the damages

20   range.

21          And so on that kind of a record, it's extremely

22   problematic that you could come in and argue -- that you can

23   come in and argue that somehow you're entitled to something

24   more than the 10 percent.

25          So I'm looking at you because, Ms. Wood, you've

                                                            9

1     got the heavy lift on this one.

2               MS. WOOD:  Thank you, Your Honor.

3               Let me respond.  I think the fundamental issue

4     that we would like to point out is what Google has done here

5     is an extraordinary step.  What Google seeks to do is,

6     unilaterally, without consent, and frankly without

7     forewarning, moot a damages claim and take away the United

8     States' right to have its day in court to put on damages.

9               THE COURT:  Well --

10              MS. WOOD:  And the reason --

11              THE COURT:  You're getting your day in court.  And

12    the real issue -- look, let's be honest about it.  The real

13    issue, and the real issue the government has in this case,

14    is not recovering damages.  Because even if a different take

15    rate were used, the amount of actual monetary injury to the

16    government agencies is, by federal standards, somewhat de

17    minimis.  Your attorney's fees are dwarfing the amount.

18              So the real issue in this case is the injunctive

19    relief that you're seeking, it's to stop what you maintain

20    is the anti-competitive behavior.  That's really what this

21    case is about.

22              MS. WOOD:  Your Honor, I don't disagree at all

23    that the injunctive relief is the most important, that

24    vindicating the rights of the United States, but that is

25    equally important.

                                                              10

1          The only reason I raise the unusual posture is

2     there is a different legal standard that applies in the

3     context of unilateral mootness.  And so we believe that a

4     jury could find -- without expert assistance, a jury need

5     not rely on damages numbers offered by experts to reach

6     their own conclusion about an appropriate but-for take rate.

7          THE COURT:  Well, that may be the case, but it's

8     your obligation as an attorney to have clearly articulated

9     so that both -- so that the other side knows what the damage

10    range is that they're facing.  And the problem here is -- I

11    want to just ask another question because it's not clear

12    from the record.

13         Judge Anderson had to order you to respond to

14    Google's request for a damage calculation.  Remember they

15    asked that?  And he ordered that you file an interrogatory

16    answer.  And that answer was filed, as I recall, before the

17    expert reports were produced.

18         MS. WOOD:  Yes, Your Honor.

19         THE COURT:  Did you ever amend that answer?

20         MS. WOOD:  The answer, once we filed the expert

21    reports, I don't believe we amended it further after that.

22    But I do believe, as the record makes clear, that in that

23    damages calculation, we included a but-for take rate as low

24    as 2 percent.  We made clear that if you're talking about

25    the full breadth of damages that could potentially result in

11

1  a jury verdict, that a but-for take rate as low as 2 percent

2  could apply.

3          Furthermore, both Ms. Lim and Professor Simcoe

4  make very clear in their expert reports that they are not

5  opining on what the jury should conclude is the appropriate

6  but-for take rate.  They're both very clear in that regard.

7  Professor Simcoe makes the point over and over that his

8  estimations of a but-for take rate are highly conservative

9  for the reasons we discussed last week.  Because to look at

10  a market that has been dominated by a monopolist for over a

11  decade and look at what existing take rates are in that

12  market is highly conservative to the point that it may even

13  not be that probative.

14          What we think is probative and what a jury could

15  conclude is probative is defendant's own employees talking

16  about if there was not the Google ads demand tied to AdX,

17  they would not be able to charge higher than a 5 percent

18  but-for take rate.

19          We believe that even assuming defendant --

20  plaintiffs' experts, Simcoe and Lim, offered 10 percent,

21  16 percent and other figures, a jury has the prerogative to

22  conclude that 5 percent is the take rate that would have

23  applied in the absence of Google's anticompetitive conduct.

24  The fact that Professor Simcoe attempted to perform

25  empirical analysis that bakes into it the monopoly that's

```
 1    been existing in the market for over a decade just shows the

 2    range.

 3              And, again, with respect to Statement of

 4    Undisputed Fact 85, that statement was not relevant to the

 5    summary judgment motion that was filed.  It is not deemed

 6    admitted for all purposes without this Court, in its

 7    discretion, pursuant to Rule 56(g), making that

 8    determination.

 9              We think the Court should decline to make that

10    determination because, in that very same brief, we made very

11    clear that the range of but-for take rates was between 5 and

12    15 percent.  Yes, there's evidence of 2, but we think the

13    range of 5 to 15 percent is a reasonable range, and we made

14    that argument in the very same brief.

15              THE COURT:  Well, how could you say that choosing

16    5 as the bottom number is reasonable when you've pointed to

17    evidence of 1 or 2 percent?  I mean, it's inconsistent.

18              MS. WOOD:  Well, Your Honor, I think we are

19    attempting to walk a difficult line here.  We've been put in

20    a position where we have unconsensually having our damages

21    claim removed.  In that unique posture -- this is not a

22    settlement agreement, this is not what anybody in the

23    courtroom thinks is likely that the jury will ultimately

24    conclude.  The question before the Court is what could a

25    jury, based on this evidence, potentially conclude.  We
```

1  don't think there's any debate that, based on this evidence,

2  a jury could potentially conclude that 5 percent is an

3  appropriate but-for take rate.  We think the evidence is

4  clear about that.

5       Whether we could have additionally argued in our

6  discretion to say that a jury could conclude 2 percent,

7  we're not -- we have the discretion to say what we think the

8  case law would support.  We believe the case law would

9  support a but-for take rate at 5 percent given the evidence

10 that we've put forward.

11      And I want to just emphasize, Your Honor, yes, the

12 brief does cite a few emails.  That's the nature of the

13 summary judgment brief, because it's only designed not to

14 marshal every piece of evidence one has on a point; it's

15 designed to set forth a disputed issue of fact.

16      We think, read in context, our summary judgment

17 brief makes clear that we are disputing the but-for take

18 rate, and that we are disputing Google's assessment that

19 20 percent was an appropriate take rate, and we are saying

20 that we believe the appropriate take rate is between 5 and

21 15 percent.  They read that in the brief, they saw that in

22 the brief, and so I don't think it's fair -- and they knew

23 that during discovery we were arguing potentially a

24 2 percent.

25      So it's not as if they're -- you know, we're not

14

```
 1    on notice of this potential argument.  We fundamentally

 2    believe the jury, without expert assistance, can conclude an

 3    appropriate but-for take rate based on the testimony of fact

 4    witnesses, not just experts.  And there's no question we

 5    would have fact witnesses and documents both that support

 6    the 5 percent take rate, and because of that, we believe

 7    that is a potential damage that could be recovered.  We're

 8    not saying it's likely, we're not even saying that's what we

 9    necessarily would have asked.

10            Could a jury possibly determine a 5 percent

11    but-for take rate?  We believe the evidence shows that they

12    could, and given the unusual nature of Google trying to take

13    away the United States' right to put on a damages case on

14    behalf of these FAAs, that they should have to meet that

15    higher burden.

16            Also, with respect to the trivialization of the

17    amount, I assure you, this amount is not trivial to the

18    agencies involved.  It may be trivial relative to Google's

19    wealth, but these agencies work hard every day on behalf of

20    the American people, and the difference between $2 million

21    and $3 million or more is material to these agencies and

22    their work.  So I don't want to leave the Court with the

23    impression that this amount is immaterial to the agencies.

24            THE COURT:  All right.  Let me ask you this:

25    These experts, were they deposed?
```

15

```
1              MS. WOOD:  Yes, they were.

2              THE COURT:  So Simcoe was deposed?

3              MS. WOOD:  Yes.

4              THE COURT:  And Lim or was her predecessor

5    deposed?

6              MS. WOOD:  Lim was deposed.  And I would add that

7    when they were deposed, they indicated that they were not

8    saying what the appropriate but-for take rate should be.

9    They did not say that.  In fact, they were asked -- I know

10   at least Lim was asked that question directly.  And they

11   were not asked that.  It was clear that we were leaving room

12   to argue at trial what the appropriate but-for take rate was

13   based on a multitude of factors, expert testimony, fact

14   testimony and documents.

15             THE COURT:  Then why didn't you object to

16   Uncontested Fact 85?

17             MS. WOOD:  Because Uncontested Fact 85 was phrased

18   as what calculations the experts had done.

19             Again, the fact that Google, the night before, had

20   done this very unusual thing and served us at 7 p.m. with a

21   process server with a check and a motion to dismiss the

22   damages claim, we were not thinking of the motion to dismiss

23   the damages claim when we were rebutting facts in the

24   summary judgment brief.  In fact, there's a footnote in our

25   summary judgment brief opposition that says:  We note that
```

1   Google has filed this motion to dismiss.  We are not

2   addressing that here, and we are continuing, you know, to

3   file the summary judgment brief that we've been working on

4   for the last two weeks.  We didn't rewrite the whole brief

5   to take into account of the last-minute filing they had

6   served hours before.

7            THE COURT:  But, you know, you could have tried,

8   at least -- I don't know if I would have accepted it or not.

9   You could have filed a motion to amend your position on the

10  uncontested facts.

11           Again, 85 says:  "Plaintiffs claim less than

12  $1 million in damages -- by their calculations, as little as

13  164,189, or, at most, 745,152 (before trebling and

14  pre-judgment interest) -- on behalf of eight federal

15  advertising agencies who allegedly suffered injury between

16  January 2019 and January of 2023 when advertising agencies

17  purchased 'open-web display ads' on the FAA's behalf."

18  That's what was given to you all as an uncontested fact.

19           MS. WOOD:  And, Your Honor, we did dispute that

20  partially.  I hope Your Honor is aware of that.  We made

21  clear -- if you look at the summary judgment brief, we made

22  clear that we were disputing the phrase "at most."  We

23  absolutely did dispute that phrase.  And so if you remove

24  that phrase, what's left is:  "Plaintiffs claim as little as

25  $1 million in damages."  Their check didn't pay us

                                                          17

```
 1    $1 million in damages.  Their check was based on $745,000 of
 2    damages.
 3           So even if Your Honor were to accept that SUF 85
 4    prevents us from arguing a 5 percent but-for take rate, the
 5    check they have already tendered is not for the amount of
 6    SUF 85.  It is not for $1 million plus pre-judgment interest
 7    and trebling; it is for an amount less than that.  So, at
 8    the very least, they should be required to tender a check of
 9    $999,999, Your Honor.
10           THE COURT:  All right.  Thank you, Ms. Wood.
11           MS. WOOD:  Thank you.
12           THE COURT:  Ms. Dunn.
13           MS. DUNN:  Thank you, Your Honor.
14           THE COURT:  Do you want to start with the first
15    issue -- the last issue first, that is the uncontested
16    facts?
17           MS. DUNN:  Yes.
18           THE COURT:  All right.
19           MS. DUNN:  I would be glad to, Your Honor.
20           So, the first thing is, we believe it's really
21    important to do this right, in the right way.  It's
22    obviously not something that happens every day, so we're
23    trying to do this really by the rules and by the book.
24           So starting with SUF 85.  As Your Honor said, the
25    day after we filed our mootness motion, the government
```

18

1  confirmed that they did not dispute SUF 85.  And this does

2  not say what my friend on the other side just said; it says

3  what the Court said, which is what plaintiffs claim less

4  than a million dollars in damages, by their calculations --

5  which, by the way, we'll get to the legal standard, but

6  that's what is important.  By their calculations, as little

7  as 164,189, or, at most, 745,152 before trebling and

8  pre-judgment interest.  So as the Court is aware, the check

9  that we tendered -- the certified check that we tendered, is

10  for 745,152 trebled with pre-judgment interest.

11       So, the first thing I'll say is that in our last

12  hearing, the Court said the government will be held to its

13  position.  And what the legal standard is, where counsel

14  started, is to say that the legal standard is whatever

15  plaintiffs could potentially recover, including a number

16  that -- admittedly, the 5 percent that they plucked out.  So

17  that's not the standard in the Fourth Circuit.

18       *Simmons v. United Mortgage* says:  "Mootness is

19  measured by what relief the plaintiff sought to obtain

20  through the claim."  And that makes sense because the issue

21  is mootness.  Is there a claim?  Is there a jurisdictional

22  basis for the Court?  And so that's why the courts don't

23  look at what could a jury possibly do, because a jury could

24  possibly, as we all know, do anything at all; it is looked

25  at as what the plaintiffs claim, because the question is, is

19

1    there a case in controversy.

2          Now, I will -- starting with SUF 85, can walk

3    through why this is the plaintiffs' claim.

4          Now, as the Court I think alluded to in the last

5    hearing, this is a binding judicial admission.  There is no

6    legal authority to say that this admission is just for the

7    purpose of a summary judgment brief.

8          And as to this idea that somehow this was actually

9    disputed because the plaintiffs didn't like the language "as

10   little as" or "at most," that's Footnote 1 in their

11   opposition to the summary judgment motion.  And what they

12   say is they dispute the vague subjective and self-serving

13   terminology included in many of the statement of undisputed

14   fact, and they include in that list things like innovation,

15   and popular, because they don't like how we phrased it

16   because it seems self-serving to them.  So when we say "as

17   little as," that's saying this number is little.  Or when we

18   say "at most" this other number, we're saying that number

19   still isn't so high, and the Court has called it de minimis.

20         And so even if they're objecting to the

21   self-servingness there, they are not objecting to the

22   amounts, and they're not objecting to the idea that

23   plaintiffs claim less than a million dollars.

24         And I think at this point, it's important to

25   emphasize for the Court that the number that the government

                                                          20

```
 1    is urging the Court to accept is a computation not disclosed
 2    in discovery; disclosed to us on the night of June 1st, a
 3    few days ago, Saturday, Saturday night.  They sent us, for
 4    the first time, the computation that goes along with this
 5    5 percent idea.  And that's -- that is truly extraordinary.
 6    It would be extraordinary on its own, but it is especially
 7    extraordinary in light of the fact that Rule 26 says:
 8    During discovery, your computation -- uses the word
 9    computation -- has to be disclosed, and nine months ago,
10    Judge Anderson said to the government that they had to do
11    that.  And so Judge Anderson also said they can't wait even
12    for the expert report to disclose that, much less wait until
13    nine months later when we're in the middle of summary
14    judgment briefings.
15            THE COURT:  Of course what they did disclose when
16    they finally sent you the answer was a number range which is
17    much higher than what we're talking about now.
18            MS. DUNN:  Yes, Your Honor.  Exactly.
19            THE COURT:  That's why I asked the question
20    whether there had been any revision of their answer.  And,
21    quite frankly, that's another basic problem in this case.
22            All civil cases -- I mean, Google's a big case,
23    but it's no different than any other civil case.  Plaintiffs
24    are required to amend their discovery responses when new
25    evidence is developed.  And that's why I was rather
```

21

1  surprised.  Again, you don't necessarily file your discovery

2  responses with the Court unless there's a dispute, but

3  that's why I asked the question whether the government's

4  response on the damage numbers was ever amended, and

5  apparently, according to Ms. Wood, it was not.  So that

6  should have been done.

7          MS. DUNN:  We agree, Your Honor.

8          Also surprising to us was that on May 31st after

9  the Court hearing that I apologize for not being present

10  for, but my colleague, ably, was able to handle.  On

11  May 31st, they said they couldn't even give us the

12  computation then because the key person was unavailable.

13          So this computation that should have been amended,

14  that Judge Anderson said nine months ago needed to be turned

15  over that wasn't in the expert reports, was not even

16  available or accessible or replicable by DOJ on May 31st,

17  and we had to wait until the next day.

18          Now, that -- so, so far, we've talked about

19  holding them to their admission in the summary judgment

20  opposition, a binding judicial admission, and we've talked

21  about holding them to their disclosure obligations under

22  Rule 26 and to Judge Anderson's admonitions.

23          The third problem is that there is -- as the Court

24  has already alluded to, there is no support for this new

25  number, the 5 percent, in anything, including the documents,

22

1    but I would like to start, if it pleases Your Honor, with

2    the expert reports.

3           Now, the first thing I'll say is that DOJ has

4    insisted, many, many times, including before Judge Anderson

5    and in their own briefs, that expert computation is

6    necessary to come up with the total.  Their own words before

7    Judge Anderson last year were that complex expert

8    calculations are needed in order to come up with a total,

9    and the only way to calculate how much those were, how much

10   those prices were overcharged, is through economic modeling.

11   In their opposition to the mooting motion on page 4 they say

12   it's required.  So that's pretty recent.

13          If it pleases the Court, Your Honor, I would like

14   to show the Court the actual figures from the expert

15   reports, because you have to go from figure this to footnote

16   that --

17          THE COURT:  We've looked at that.

18          MS. DUNN:  -- is that okay?

19          THE COURT:  I've got them pretty much in mind.

20          By the way, you raise an issue that we had kicked

21   around in chambers, and that is, all right, so we let this

22   case go to the jury on the government's theory of 2 percent,

23   and as you're pointing out, there's no evidence as to what

24   that 2 percent would result in.  And we were joking about,

25   do we give a calculator to the jury, and do they have to sit

                                                              23

1     there and do the mathematics themselves?

2                 MS. DUNN:  Well --

3                 THE COURT:  So are you saying that within the --

4     as I recall, there's nothing in any of the expert

5     disclosures that calculates what would a 2 percent take rate

6     be.

7                 MS. DUNN:  Your Honor, I do think the slides would

8     help, but I can try to start without them.

9                 THE COURT:  All right.

10                MS. DUNN:  Figure 19 in the Lim report, it's

11    entitled Summary of Damages to FAAs.

12                THE COURT:  Right.

13                MS. DUNN:  You're familiar with that undoubtedly.

14                The 16.6 comes from Simcoe.  The 16.2 comes from

15    Simcoe.  Those are the but-for take rates that he analyzed.

16    The 10 percent was an instruction from the DOJ.  Okay.  So

17    the 10 percent is not in Simcoe.  And actually in

18    deposition, Simcoe says -- he disavows that he's advancing

19    the 10 percent.  Okay.  But, nonetheless, Lim has instructed

20    use 10 percent, 16.2 and 16.6.  She does that.

21                In her Summary of Damages chart, she has AdX

22    overcharge from the exchange, and then she has a platform

23    fee overcharge.  She adds these two together, and that's

24    where she and we and the government, at a certain point, got

25    164,189 to 745,152.  Okay.  Then the government says, no,

24

1    that summary of damages from Lim, don't look at that; look

2    at Figure 38 in Appendix D in Lim instead.

3            Now, Figure 38 in Appendix D is a sensitivity

4    analysis; it is not a but-for take rate analysis.  And what

5    a sensitivity analysis does, as the Court, I'm sure, is

6    aware, it's designed to change a variable so that you see

7    how sensitive the economic model is so that if it's going

8    crazy, that's a bad model.  I'll put aside the fact that

9    this model seems too sensitive, but that's a different

10   problem.

11           Lim, in Figure 38, then puts red boxes.  The red

12   boxes she puts around the percentages that she's drawn from

13   Simcoe, and around the 10 percent that the government has

14   instructed.  So everything in the Simcoe Figure 22 is

15   red-boxed in Lim 38.  5 percent, no red box.  Okay.  Then

16   the only place in Lim where she mentions Figure 38, that the

17   government now wants to hang its hat on vicariously, is

18   Footnote 53.

19           Now, Footnote 53, she expressly says that she got

20   these numbers from Simcoe 22 in Appendix D.  Okay.  So that

21   requires us to go to, first, Simcoe 22, which has, as you'll

22   see if you go back and look at it, the 16.6, the 16.2.

23   Those are the ones he advances.  And then some that start

24   with 15.7, 15.6, where he's segmenting out just large

25   exchanges.  He doesn't, in the end, advance that, but he did

25

1   those calculations, and all those have the red boxes.

2   Again, no 5 percent anywhere to be found.

3            Now, Figure 38 also doesn't include, notably, and

4   another -- yet another reason it can't be a damages

5   analysis, it doesn't include the platform fee, which is part

6   of the computation that Lim explains in Figure 19 when she

7   adds the AdX overcharge, plus the platform fee, to get her

8   100,000 to -- 100 to 700 range.  So the platform fee is a

9   big deal because it's one component of her damages analysis.

10  Nowhere in Figure 38; nowhere in Simcoe.

11           Also nowhere in Appendix D.  Appendix D shows how

12  Lim calculated these things.  She has Figure 37, which is

13  dedicated to platform fee overcharge; it does not include

14  the 5 percent.  So the platform fee overcharge -- which is

15  part of the damages calculations that Lim does -- there's

16  nowhere in Lim's report where she's doing a 5 percent

17  calculation.  She does only the 16.6, the 16.2 and the

18  10 percent that the government instructed.  So that's a

19  problem.

20           Then, resorting as it must to paragraph 77 of the

21  Lim report, the government says, no, you can get the

22  platform fee overcharge, and, actually, this whole

23  calculation, you can get it from paragraph 77 in the Lim

24  report.

25           I could read to the Court paragraph 77 in the Lim

26

report.  It gives instructions; it does not give any kind of formula.  And, actually, if you followed the instructions in the Lim report at paragraph 77 to try to calculate the damages and the platform fee overcharge, you wouldn't come up with the number that we were given on Saturday night, June 1st.  Okay.

So the government has said, oh, you should be able to calculate this number using Lim 77, and they also say in their brief at page 2, the surreply brief, that the jury could calculate it just looking at Lim 77.

Well, calculator or not, this number that you calculate with Lim 77 doesn't match what the DOJ calculated and gave to us as their computation that they're saying is the 5 percent.  So they can't do it.  We couldn't do it.  We needed expert help to even figure out 77.  And the jury is assuredly not going to be able to do that.  So that's the expert report.  That brings us to the documents.

I want to first say that never in the history of antitrust cases has a but-for world been defined by a small collection of documents that don't purport to define a but-for world.  It may never have been just documents anyway.  Areeda and Hovenkamp say you need experts; the DOJ, this whole way along, said you need experts; there are various Courts of Appeal in the United States that have said you always need an expert.  The Third Circuit has found

1    that; other appellate courts have alluded to that.

2            But, here, you can't -- you don't even have to get

3    to this question, because not a single one of these

4    documents say they're calculating a 5 percent but-for rev

5    share.  They don't -- at one point in one of these documents

6    that the government points to, somebody says, if we did

7    5 percent, how could we be competitive?

8            So these documents don't support a 5 percent, they

9    don't support a 10 percent, they certainly don't do any of

10   these calculations that we were required to receive during

11   discovery and through the experts.  And so what is going on

12   here is -- I mean, the whole thing is extremely strange,

13   I'll be honest.  I don't really understand it.  And the idea

14   that the expert report somehow baked in this calculation

15   that actually their main damages expert disclaimed twice

16   that, they say he baked in 5 percent.  Well, no, he

17   disclaimed even 10 percent.  So that doesn't make sense.

18   Reliance on the documents is legally wrong but also

19   factually wrong.

20           And I want in particular, Your Honor -- and I

21   appreciate the Court's indulgence of the time -- is to

22   say -- I think it's really important that I respond to this

23   attack that the damages number might not be a lot of money.

24           So this damages number is less money than the

25   government has spent on expert fees alone, and that includes

                                                              28

 1   the expert fees that they probably spent last week getting

 2   their experts to run new calculations to urge this Court and

 3   us to accept.

 4          And so nobody is saying this is such a trivial

 5   amount of money in certain contexts.  What we're saying is,

 6   if what is really the concern is the taxpayer dollar, then

 7   paying experts many millions of dollars more than you're

 8   claiming in damages, and fighting tooth and nail to protect

 9   that, spending even more money, and even more money to

10   litigate it of the taxpayer dollars, it's not a consistent

11   argument.

12          So I appreciate the Court allowing us to make this

13   argument, and I'm happy to answer any question.

14          THE COURT:  All right.  Ms. Wood, I want you to

15   respond to something.  I'm intrigued.

16          It is correct that it was the Department of

17   Justice that proposed to Ms. Lim that she use a 10 percent

18   take rate?

19          MS. WOOD:  Your Honor, yes.  And let me explain,

20   because I think that goes to the fundamental heart of the

21   issue here.

22          The government has always maintained that the

23   expert analysis that was done by Professor Simcoe, the

24   empirical analysis, was so conservative that it likely

25   grossly understated the harm to the market.  And for that

                                                              29

1    reason, and because Google's own documents and Google's own

2    employees talk about what they could charge in a truly

3    competitive market, and that they would be lucky to get

4    5 percent in that competitive market, the government has

5    always maintained the flexibility to argue at trial a

6    but-for take rate lower than that.

7            THE COURT:  Let me stop you.

8            So then why not say to Ms. Lim, give us a

9    10 percent take rate, and give us a calculation on a

10   5 percent take rate, and give us a calculation on a

11   2 percent.

12           MS. WOOD:  So, Your Honor, Figure 38, that is

13   exactly what Figure 38 does.  And Figure 38 has the number,

14   doesn't require a calculator, literally -- the jury just

15   needs to look at this one page.

16           And, again, we're operating in a bit of fiction

17   here.  We have some agency in this.  We, in closing

18   arguments, can tie together documents, tie together various

19   figures, and show the jury step by step how they get to the

20   numbers.  We have the ability to put on the exhibit list the

21   backup materials that show what the take rate would be at

22   5 percent, 1 percent, 15 percent or whatever.

23           We were maintaining optionality as to what the

24   ultimate evidence would show, and that is totally

25   appropriate.  As long as we give them disclosure of the

                                                          30

 1   lower and upper bounds -- which we unequivocally did -- and

 2   as long as we made clear that there was not one specific

 3   but-for take rate that the government was arguing.  The

 4   government was prepared to put on evidence about take rates

 5   lower than what Professor Simcoe arrived at in his report,

 6   because, again, the take rates he arrived at in his report

 7   are necessarily baking in the decades worth of monopoly

 8   behavior.  And so they're simply so conservative that they

 9   may not even be all that probative of what the true harm is.

10   That's why Exhibit 38 exists.  That's why it's in there.

11          Yes, are these red boxes checked?  Yes.  But

12   5 percent is right there.  I know Your Honor can't see it,

13   but 5 percent is right there.  All they have to do is say

14   5 percent, and the advertisers' portion of that is 19.3, and

15   you get to 1079.

16          Is the calculation to arrive at the platform

17   overcharge fee more complicated?  Yes.  They can't get it

18   from one chart, I can see that, that's $100,000.  We could

19   make the choice at trial to not even bother with that and

20   just tell the jury if you think 5 percent is the right

21   number, look at this chart, here's where it is in the chart,

22   let me tell you exactly how to find it, it's right here

23   under 5, right across here at 19.3, and this is the number

24   you should award.  We have that flexibility in putting on

25   the evidence and arguing to the jury.  So what they're

                                                          31

1    trying to do is front-load all of that and bind us to things

2    that were not properly before the Court at the summary

3    judgment phase.

4             And frankly, you know, the expert fees that have

5    been expended in this case are enormous, and that is because

6    the conduct of this defendant has been widespread and

7    egregious.  But those expert fees will serve the Court in a

8    bench trial as well, because the same fundamental harm that

9    has been suffered by the entire industry, not just these

10   FAAs, is going to relate to that same expert analysis.

11            We can talk, and we talked a little bit last week

12   about what of the damages experts would still remain even if

13   this case proceeds with a bench trial, and that's because

14   those expert analyses are still relevant.  Not with respect

15   to the FAA damages, but with respect to looking at things

16   like but-for take rates and defendant's profitability and

17   the like.

18            So I would just end, Your Honor, I understand Your

19   Honor's skepticism.  I would just offer that we don't

20   believe that we need expert testimony to argue to the jury

21   facts that are in evidence that support a different but-for

22   take rate.  We believe that given the unique circumstances

23   where they are unilaterally and unconsensually taking away

24   our right to put on evidence about the FAA's harm, that they

25   should have to pay the full extent that we would be prepared

                                                              32

1     to argue at the jury trial.

2              If Your Honor concludes that, for whatever reason,

3     we are precluded from arguing 5 percent at a jury trial, I

4     think that's a different issue, but I don't believe the

5     response that we gave to SUF 85 would preclude us from

6     arguing a but-for take rate lower than that at trial.

7              THE COURT:  All right.  Thank you.

8              I'm going to give you an oral ruling now to put

9     you at rest, and then you'll get a more detailed explanation

10    in the not-too-distant future.

11             I am going to grant the defendant's motion,

12    because, again, I think a fair reading of the expert reports

13    does not support the argument that there is a 5 percent take

14    rate at issue in this case.  And to ask a jury to

15    basically -- it would completely undermine the fact that a

16    jury is supposed to have, you know, sufficient, appropriate

17    evidence upon which to make a decision.  They're not

18    supposed to speculate or render a decision based on

19    speculation.  Without the assistance of expert evidence in

20    this area, that's exactly what the government is asking a

21    jury to do, and that would not be appropriate.

22             There are multiple reasons -- some of which I

23    preliminarily outlined for you today -- why I'm satisfied,

24    in this case, that the cashier's check that was tendered to

25    the government fully satisfies any damage claim that they

                                                          33

1   could possibly have obtained in this litigation based upon

2   what the expert reports revealed, as well as the

3   government's admission, which I still think is essentially

4   an admission as to 85, the statement of uncontested facts.

5           So, as a result of that, I am striking the request

6   for jury, and that does change, I think significantly, some

7   of the tenor in the *Daubert* motions.

8           So here is what I'm planning to do.  I'm going to

9   leave some *Daubert* -- I'm going to leave the *Daubert* motions

10  on for next Friday.  I'm going to continue the summary

11  judgment argument to the following Friday, which you already

12  had on your calendars, because we had that date as a Google

13  date anyway.  And I want some time, number one, to be able

14  to get this opinion out, to digest the *Daubert* motions.

15          I will say right now, because it's going to be a

16  bench trial, much of the argument that comes out in the

17  *Daubert* motions is, well, you know, we don't want to confuse

18  the jury, blah-blah-blah.  Well, you don't have to worry;

19  you can confuse me, but not the jury.  All right.

20          So, in other words, a lot of the argument about

21  *Daubert* may become almost moot at this point.  I'm going to

22  be the trier of fact.  I'm able to get through and parse

23  expert reports.

24          There's no dispute -- with one exception,

25  Mr. Ferrante.  There's no dispute, in my view, as to the

34

```
 1    expert qualifications of any of the experts at issue;
 2    correct?  Nobody's disputing their qualifications?
 3               MS. WOOD:  That's correct, Your Honor.
 4               MS. DUNN:  Yes, Your Honor.
 5               THE COURT:  All right.  So the only one over which
 6    there is potentially a legitimate argument is Ferrante, in
 7    my view.  I'm not convinced that he would be a genuinely
 8    qualified expert given the fact that he hasn't worked for
 9    the FBI since 2011.  It's also a strange area.  But I have
10    an open mind.  I'm going to spend some time looking at him.
11               As to the other four, it might make sense to think
12    about pulling back significantly.  But at least your oral
13    arguments will be much less because you don't have to worry
14    about the jury and those aspects of those reports that might
15    be confusing.
16               I've always had some qualms about Daubert because
17    I'm an old-time trial lawyer and trial judge, and that's
18    what trials are about.  You put a witness on the stand, and
19    you see whether the witness's testimony is credible or not
20    credible.  And with experts they either have -- you know,
21    they've used an appropriate methodology, they've got the
22    right data upon which they base their conclusion and the
23    conclusion makes sense.  I mean, that's what judges do.  And
24    so I -- you know, and having done some preliminary look at
25    these Daubert motions, I'm not convinced there's really much
```

                                                          35

1    left to be argued except for the Ferrante motion.  But I'll

2    leave all five on the docket for next Friday.  All right.

3    That's what we will be arguing.

4            And then summary judgment we'll argue the

5    following week, because that also gives you a little bit of

6    a chance to re-evaluate how you want to spend your oral time

7    on those motions because things may have changed from both

8    this week and from next week.  All right.

9            MS. WOOD:  Your Honor, may I ask one question?

10           THE COURT:  Yes, Ms. Wood.  Yeah.

11           MS. WOOD:  Under the current schedule, our

12   deadline to file exhibit lists, witness lists and depo

13   designations is June 28th, which was two weeks after the

14   oral argument on summary judgment.

15           I would just request that there be a commensurate

16   adjustment to that so that we're not filing all of those

17   within seven days of the oral argument on summary judgment,

18   Your Honor.

19           THE COURT:  All discovery is over in this case;

20   right?  That has closed?

21           MS. WOOD:  Yes, Your Honor.

22           THE COURT:  So all we're doing between now and

23   September is streamlining the issues for trial.  I see no

24   reason why you all -- sit down together, work out a proposed

25   revised schedule for those filings; all right?

                                                          36

```
 1            MS. WOOD:  I appreciate that, Your Honor.
 2            THE COURT:  All right.  In terms of motions, I
 3   would think after we get through this bunch in June, do you
 4   anticipate much motions practice in July?  I mean, motions
 5   in limine, I assume there will be some motions in limine,
 6   hopefully not too many.  But other than that, what is
 7   anticipated before the trial?
 8            MS. WOOD:  Your Honor, I don't believe that
 9   necessarily there would be any motion practice in July other
10   than confidentiality issues with respect to certain Google
11   documents and third parties.
12            THE COURT:  With respect to certain parties.
13            MS. WOOD:  The only other question I would have
14   for the Court is, to the extent that we are now proceeding
15   with a bench trial, whether, for the Court's convenience,
16   whether the Court would want some sort of pretrial briefing,
17   but that not necessarily need be in July.
18            THE COURT:  All right.  Well, we're going to talk
19   about that.
20            The other thing is, I would expect, given the
21   interest of at least litigators and other litigation in this
22   case -- and we've had this issue come up before -- there
23   will probably be some pressure, also from the media, to get
24   access to evidence in this case.  So I'm giving both sides a
25   heads-up.  The Court does not have the resources to be
```

```
 1   publishing all of the exhibits as they come in, and there

 2   may be redaction issues as well.

 3           So I want both sides -- and I'm sure your

 4   technology support systems are fantastic.  But you need to

 5   be prepared.  The rule we will have in this case is that

 6   once an exhibit is admitted into evidence, it's the

 7   obligation of the party who moved the exhibit in to make it

 8   available on a website that you've set up so that the public

 9   can get pretty quick access to it.

10           We did this in the Moussaoui case; it satisfied

11   the media interest.  And I think the rule that we had, and

12   it sort of came from the Fourth Circuit, is it had to be

13   posted by early the next morning.  So obviously while the

14   case is going on, you know, you're here, but you go back to

15   the office that night and some of your paralegals or

16   whatever will upload so that it's out there so we don't get

17   an issue about access.  All right.

18           In terms of redactions, I am somewhat concerned

19   about that.  Now, my understanding is you've agreed to

20   unredact the dollar amounts that we've been talking about.

21           MS. DUNN:  Yes, Your Honor.

22           THE COURT:  I think out of an abundance of

23   caution, when you get our opinion, I'm going to give it to

24   you under seal, and we'll give you a short time period to

25   indicate if there's anything within our opinion that still
```

38

1   bumps into something that is deemed highly confidential.

2   Simply confidential is not going to be enough.  All right.

3   But because so much of the material that we've got in this

4   record, and especially the third-party material has

5   sensitivities to it, we're going to need to be careful.  So

6   a lot of what we do we'll have to follow that kind of

7   pattern.  All right.

8          And then one of the things to consider in the

9   motions in limine is if there are portions of the trial that

10  are going to have to be held sealed because we're discussing

11  stuff that is under seal.  I need those heads-up, because it

12  changes how we, you know, handle the logistics within the

13  courtroom.  All right.  And there may be protests from the

14  media, which they have a right to raise.  So I want to avoid

15  those types of bumps as the case goes along.

16         I will want -- because this is a complex case, I

17  can tell you right now, I definitely will want proposed

18  findings of fact and conclusions of law before the trial

19  starts, backing it up I would think at least three weeks

20  before the trial.  All right.

21         But, anyway, the reason I asked you about -- the

22  last half of July, I won't be available.  So if you're

23  planning, get any hearings done before July 21st or in

24  August, there's a blackout period there.  All right.

25         Again, I want to commend counsel.  Your arguments

39

```
 1   are great.  I'm looking forward to this trial because the

 2   quality of the lawyering has been excellent.  Just don't

 3   start, you know, taking shots at each other.  Let's keep

 4   this as a good straightforward -- it may be a bit dry, but I

 5   would rather it dry than unnecessarily emotional.  All

 6   right.

 7             We'll recess court for the day.

 8             MS. DUNN:  Thank you, Your Honor.

 9               (Proceedings adjourned at 10:58 a.m.)

10             ----------------------------------

11   I certify that the foregoing is a true and accurate

12   transcription of my stenographic notes.

13

14                         _Stephanie Austin_

15                         Stephanie M. Austin, RPR, CRR

16

17

18

19

20

21

22

23

24

25
                                                              40
```