```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
 2                 ALEXANDRIA DIVISION

 3  --------------------------x
    UNITED STATES, et al.,     :    Civil Action No.:
 4                             :    1:23-CV-108
             Plaintiffs,       :
 5      versus                 :    Friday, June 14, 2024
                               :    Alexandria, Virginia
 6  GOOGLE LLC,                :
                               :    Pages 1-25
 7           Defendant.        :
    --------------------------x
 8

 9       The above-entitled motions hearing was heard before
    the Honorable Leonie M. Brinkema, United States District
10  Judge.  This proceeding commenced at 10:29 a.m.

11              A P P E A R A N C E S:

12  FOR THE PLAINTIFFS:   GERARD MENE, ESQUIRE
                          OFFICE OF THE UNITED STATES ATTORNEY
13                        2100 Jamieson Avenue
                          Alexandria, Virginia  22314
14                        (703) 299-3700

15                        JULIA TARVER WOOD, ESQUIRE
                          CRAIG BRISKIN, ESQUIRE
16                        UNITED STATES DEPARTMENT OF JUSTICE
                          ANTITRUST DIVISION
17                        450 Fifth Street, NW
                          Washington, D.C.  20530
18                        (202) 894-4266

19                        BRENT NAKAMURA, ESQUIRE
                          UNITED STATES DEPARTMENT OF JUSTICE
20                        Antitrust Division
                          450 Golden Gate Avenue
21                        Room 10-0101
                          San Francisco, California  94102
22                        (415) 205-3248

23                        MICHAEL FREEMAN, ESQUIRE
                          UNITED STATES DEPARTMENT OF JUSTICE
24                        801 West Superior Avenue
                          Suite 400
25                        Cleveland, Ohio  44113
                          (216) 622-3611
```

                                                        1

```
 1                    A P P E A R A N C E S:

 2   FOR THE PLAINTIFFS:    TYLER HENRY, ESQUIRE
                            OFFICE OF THE ATTORNEY GENERAL
 3                          OFFICE OF THE SOLICITOR GENERAL
                            202 North Ninth Street
 4                          Richmond, Virginia  23219
                            (804) 786-7704
 5
     FOR THE DEFENDANT:     CRAIG REILLY, ESQUIRE
 6                          LAW OFFICE OF CRAIG C. REILLY
                            209 Madison Street
 7                          Suite 501
                            Alexandria, Virginia  22314
 8                          (703) 549-5354

 9                          KAREN DUNN, ESQUIRE
                            WILLIAM ISAACSON, ESQUIRE
10                          AMY MAUSER, ESQUIRE
                            ERICA SPEVACK, ESQUIRE
11                          JEANNIE RHEE, ESQUIRE
                            PAUL, WEISS, RIFKIND,
12                          WHARTON & GARRISON LLP
                            2001 K Street, NW
13                          Washington, D.C.  20006
                            (202) 223-7300
14
     COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
15                          Official Court Reporter
                            United States District Court
16                          401 Courthouse Square
                            Alexandria, Virginia  22314
17                          (571) 298-1649
                            S.AustinReporting@gmail.com
18
             COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
19

20

21

22

23

24

25
                                                              2
```

1                    P R O C E E D I N G S

2              THE DEPUTY CLERK:  Civil Action Number

3    1:23-cv-108, United States of America, et al. versus Google

4    LLC.

5              Will counsel please note their appearance for the

6    record, first for the plaintiffs.

7              THE COURT:  You know, you don't need all that

8    paper.

9              MS. WOOD:  I have a lot of paper, Your Honor.

10             THE COURT:  This is as much as I've got.

11             MR. MENE:  Good morning, Your Honor.  Gerard Mene

12   with the U.S. Attorney's Office.

13             THE COURT:  Good morning.

14             MS. WOOD:  Better prepared, Your Honor.

15             Julia Tarver Wood from the Department of Justice

16   on behalf of the plaintiffs.  I've brought with me my

17   colleagues, Brent Nakamura, Michael Freeman and Craig

18   Reilly.

19             THE COURT:  Good morning.

20             MS. WOOD:  I'm sorry.  Craig Briskin.  We'll share

21   him.

22             MR. HENRY:  Good morning, Your Honor.  Ty Henry

23   from the Virginia Attorney General's Office on behalf of the

24   plaintiff states.

25             THE COURT:  Good morning.

                                                            3

```
 1            All right.  And for the defense.
 2            MS. DUNN:  Good morning, Your Honor.  Karen Dunn
 3   on behalf of Google.  With me today, Mr. Bill Isaacson, who
 4   will be doing the argument, Amy Mauser, Erica Spevack,
 5   Jeannie Rhee, and we are the proud colleagues of Mr. Craig
 6   Reilly.
 7            THE COURT:  Mr. Reilly, you're very popular this
 8   morning.
 9            MR. REILLY:  I can't explain it.
10            THE COURT:  Before we get to the motions that's on
11   the docket today, I did want to address this issue about
12   redactions.  And I want to repeat what I said last week, is
13   that this case must be tried as transparently as possible
14   because of the significant public interest in the case.
15            The memorandum opinion we issued last -- earlier
16   this week, Google has no objections to anything that's in
17   the opinion, and, therefore, did not request any redactions.
18   And then, Ms. Wood, we heard from you all that you were
19   concerned that there might be third parties who might be
20   concerned about the one chart.
21            I have to tell you, I can't imagine any -- we
22   redacted the names, so all we've got is a chart with some,
23   you know, little lines going up and down, and we've already
24   talked about the percentages, and that's out in the open.
25   So unless you have gotten any rumblings from anybody that
```

4

 1    they're concerned about that, I am going to open up the

 2    whole thing.

 3            MS. WOOD:  Your Honor, there's always rumblings,

 4    but we have nothing specific to that chart, Your Honor.

 5            THE COURT:  All right.  Then I'm going to go ahead

 6    today and order that the memorandum opinion, unredacted, be

 7    filed.  All right.  So we'll take care of that.

 8            Okay.  So what we have then before us today are

 9    multiple motions under *Daubert*, for the Court to consider

10    whether any or all of various expert reports should be

11    stricken in total or in part.  And I've looked at the

12    motions very, very carefully.  I've looked at the arguments.

13    I'm not going to hear much argument today, all right,

14    because, again, this case is going to be a bench trial, so I

15    ultimately will be the person deciding, you know, what

16    evidence I find is credible, what I find is incredible, and

17    I think it is premature for the Court to be doing that.

18            There's no dispute -- with the exception of the

19    testimony of Mr. Ferrante, there is no dispute between the

20    parties as to the expert qualifications of the various

21    experts at issue in these motions.  And I would agree that

22    all of the other experts have excellent credentials.

23    They're specialists in their fields, and they've got all of

24    the academic and experiential credits that are appropriate.

25            So then the real dispute is, in some respects, the

                                                              5

```
 1   assumptions, the methodologies, the particular market that's

 2   being looked at, and those are the types of factual -- I

 3   think those are factual disputes that have to be resolved at

 4   trial.  I've read a couple of transcripts in some of the

 5   depositions, and, again, I need to see and hear those

 6   witnesses in person.  Reading a cold record is, in my view,

 7   not sufficient.

 8            Some of the concerns you all expressed in your

 9   motions were written when we thought this might be a jury

10   trial, and so some of the issues about, oh, this could tend

11   to confuse a jury, well, I can get confused also, but I

12   think perhaps I confuse a little less so than a jury.  In

13   any case, that issue is no longer of concern.

14            So I am going to deny all the motions in limine.

15   The one I want to hear a little bit of argument about is the

16   one involving Mr. Ferrante.  And so I'm going to ask Google

17   to respond to the plaintiffs' argument that -- both in terms

18   of -- I'm not so sure he's not qualified to talk at least

19   about cybersecurity and whether or not the features that are

20   of concern would be elements that would enhance

21   cybersecurity.  I'm not sure that he's not qualified.  It's

22   just that in looking at what he says, in other words, his

23   conclusions that you're a leader in that area, I don't think

24   that's an appropriate conclusion for a person of that type

25   of expertise.
```

6

1           And I'm curious whether or not -- I am assuming

2    Google's going to have actual witnesses who are going to

3    talk about the features of the system and those features

4    that make it more secure than previous or other features.

5           MR. ISAACSON:  Yes, Your Honor.  Google witnesses

6    will testify that they intended certain features in order to

7    protect security; we'll describe those.  They are not

8    experts to describe the extent of risk in the outside world

9    that they're fighting against.

10          So Mr. Ferrante, who does have 25 years of

11   experience in cybersecurity, including at the FBI and the

12   White House going back -- Your Honor may have mentioned to

13   having been at the FBI a while ago, this complaint goes back

14   to 2008 and talks about conduct at least from 2011 forward.

15   And during that period, the security issues come into play

16   based on his experience to describe -- and this is the first

17   opinion in his report -- the dangers of malvertising in

18   digital advertising.  So that comes up in a couple ways as

19   being directly relevant in the case.

20          Fundamental to the government's case is they are

21   saying that going back to 2008, that Google's

22   anticompetitive conduct causes their success, that it

23   enhances their market power and alleged monopoly power.

24          Google, on the other hand, will say that we have

25   been succeeding through product quality, including security,

                                                              7

1   that that is essential to the choices that are being made.

2   It goes to the heart of whether -- how competition is

3   working in this case.

4          In addition, okay, under Fourth Circuit law, they

5   have the obligation to show we had no business justification

6   for our conduct.  And, in addition, security is a

7   well-recognized pro-competitive justification for conduct.

8   That's what happened in the *Epic v. Apple* case.

9          THE COURT:  But aren't you going to have designers

10  or people who've developed the system who are going to come

11  in and say, you know, we have this particular feature

12  because we have found that it is capable of detecting

13  malware?  I mean, I don't know how you're planning to put

14  your case on, but Ferrante can't testify to that; he doesn't

15  know.

16         MR. ISAACSON:  So he can testify -- yeah.  There

17  are things he can't testify to and won't testify to and

18  aren't in his report.

19         What he can testify to is that what -- that

20  concern that they are addressing is really a great big deal

21  and should not be minimized or ignored, which is

22  fundamentally what the government wants to do.

23         All right.  What's on the top of mind -- on

24  people's minds who are customers and consumers is security

25  and their private information.  And everything that they are

                                                                8

1  asking Google to do exposes that information to third-party

2  competitors.  Each of the individual anticompetitive acts

3  that are described in this case would require us to hook up

4  and connect and expose that private information, going back

5  to 2011 in many cases, to third-party exchanges, for

6  example.  Just looking at the exchanges.  Those are the

7  exchanges of where the auctions take place.

8         In each one of those times we do that, we expose

9  that private information to unknown actors, which goes into,

10  well, how big a risk is that?  What's going on out there in

11  the world?

12         THE COURT:  I understand that.  But he can't

13  testify to that.  You're going to have, again, I assume,

14  computer scientists, technical people, engineers at Google

15  who will be explaining, we have this feature because it

16  provides this degree of speed or this degree of efficiency

17  or this degree of security.  Don't you have that evidence?

18         MR. ISAACSON:  Yes, Your Honor.  But when you're

19  addressing that, you also look at what are you addressing

20  and how big a problem is this.

21         THE COURT:  But then -- I'm sorry.  Again, I've

22  read his deposition, and he was asked multiple times, you

23  know, what actual experience he has with the ad tech

24  industry, per se.  He doesn't really have a whole lot.

25  There's no question he knows about cybersecurity.

9

```
 1              I just tried a case, a business intrusion case.
 2    Spent, you know, four days hearing about, you know, how
 3    malware gets put in and all the very clever things that
 4    people are doing.  I could almost take judicial notice of
 5    this fact.
 6              I don't see why I need an expert to tell me that
 7    the concerns about malvertising and the concerns about, you
 8    know, fraudsters, et cetera, invading these systems, why do
 9    I need an expert for that when I'm having your people tell
10    me, you know, how the system operates, concerns about, you
11    know, intrusions and what you did to fix it?
12              MR. ISAACSON:  So we're making a record here, Your
13    Honor, and while our people can say things like we are
14    concerned about digital advertising fraud, we are concerned
15    about organized crime, that organized -- they can't say,
16    this is such a large problem that billions of dollars are
17    being lost, that organized crime is -- the number two area
18    of organized crime to drugs is digital advertising fraud.
19    Right.  This is -- we need to make a record; it doesn't have
20    to be prolonged or extensive.
21              You can grasp this quickly, and we don't have to
22    do it like we would have to do it for a jury, but it is
23    perfectly valid to put this into a record because he has
24    experience with malvertising, he's got lots of that at the
25    FBI and the White House and in private consulting, he can
```

10

1    describe this problem, the case law says that cybersecurity

2    experts can describe these problems.  And then when Google

3    says we have concerns about this and address these things

4    going back to 2011 and 2008, that you are linking up the

5    extent of the problem and what Google is doing.

6         In addition, his opinions say that, based on his

7    background, he thinks Google has made significant efforts

8    towards security.  He doesn't have to say they're the best,

9    that they're number one, but that they're a leader in the

10   industry shows that we are investing in security.

11        And, again, going back to the issue of what is

12   happening here.  Is it a -- they are listing five

13   anticompetitive pieces of conduct that go back to 2011, four

14   of which would require us to hook up to third parties,

15   either exchanges or ad servers, that are strangers with

16   private data, and that -- the issue is whether that conduct

17   is anticompetitive and that's what's been driving this

18   industry; or, has it been our success and quality.  And part

19   of that success and quality is security.  And it's --

20        THE COURT:  What statistics are you going to have

21   in this record that is able to show that you actually have a

22   system that is more secure than your competitors?

23        MR. ISAACSON:  We will show -- we don't have an

24   obligation to show that we are more secure than every

25   competitor.  What we will show is that we are competing by

11

1    providing quality security.  And so there are other

2    companies that will have quality security.  Their experts

3    haven't looked at them, they don't know who they are, right,

4    and they haven't looked at the security issue; they ignore

5    it.  Right.

6              But we get to say, under the case law, we are

7    competing with high quality and high security.  We don't

8    have to show we are the most high quality ad tech out there,

9    but we get to show that we have high quality and high

10   security.  And Mr. Ferrante's report supports that.

11             And that then raises the issue of when you are

12   learning about these specific instances of conduct, is that

13   what's driving this industry, or is it all of the Google

14   innovations, many of which are about security.

15             THE COURT:  All right.  Ms. Wood, who's going to

16   respond to that?

17             MR. FREEMAN:  Mr. Freeman, Your Honor, who took

18   Mr. Ferrante's deposition.

19             THE COURT:  All right.

20             MR. FREEMAN:  Good morning, Your Honor.

21             THE COURT:  Good morning.

22             MR. FREEMAN:  As the Court has already

23   highlighted, there's two problems with Mr. Ferrante's

24   proposed testimony, that being the lack of method and

25   explanation about how his experience led to his opinions,

12

1    and then what the Court is also inquiring about, the

2    relevancy of the particular testimony.

3            There's no debate, with the exception of the field

4    test that we set aside, that Mr. Ferrante's relying on his

5    experience alone.  And even the most qualified expert in

6    experience still must show their work, which is listed in

7    the advisory notes of 702 and adopted by the Fourth Circuit,

8    *United States v. Wilson*.  That experience-based experts must

9    show three things, one, how their experience led to their

10   opinions; two, why their experience is a sufficient basis

11   for those opinions; and third, how he reliably applied his

12   experience to the facts of this case.  And in this

13   particular case, we have no -- we have nothing that connects

14   those two dots or explains the two things.

15           We have no connection of why his FBI experience

16   from 2005 to 2017 gives him a factual basis or personal

17   basis to opine about the current threat to the digital

18   advertising.

19           THE COURT:  Well, wait.  You said current threat.

20   But Mr. Isaacson's been pointing out that the time frame

21   you're talking about here goes back quite a few years before

22   right now.

23           MR. FREEMAN:  The complaint does, but not

24   Mr. Ferrante's opinions.  If you look at his first opinion

25   about the threat to the digital advertising ecosystem, he

13

1    makes a claim about the threat being current, the maltreat

2    to the digital advertising ecosystem, and then only cites

3    the quantity or amount spent from 2018 to 2023.

4         So his opinion about malvertising and ad fraud

5    does not go back to 2011 or any time in which he was with

6    the FBI; it actually starts the year after he left the FBI

7    in 2018.  So while that may be part of the allegations in

8    the amended complaint, his opinion in his report and in his

9    deposition is not about the current -- that threat for the

10   whole duration of the alleged time frame, Your Honor.

11        And so we still are left with an analytical gap

12   between his experience and the opinions that he has.  In

13   particular, even his opinion about being a leader in

14   cybersecurity Google.  He was asked repeatedly how that

15   compared to other people in the industry, and he said he

16   didn't know such comparative analysis.

17        The two things that he highlights that demonstrate

18   that Google is a leader actually undercut his point.  The

19   first is he highlights the prosecution investigation of 3ve.

20   Mr. Ferrante had no personal experience with that

21   investigation.  He relied exclusively on public reports,

22   press releases and a paper cowritten by Google.  The second

23   was the ad tech's invention for cybersecurity, but openly

24   admits that that was a collaborative effort by industry

25   experts.  So even the two things whether he states were --

                                                          14

1  demonstrate that Google is an early industry leader actually

2  undercut his point about that.

3          In 3ve, as the Court has already indicated,

4  Mr. Ferrante openly admitted that Google's platforms were

5  equally vulnerable to that attack than anyone else, which

6  undercuts the point that they are a leader in cybersecurity

7  when they were just as vulnerable as the entire ecosystem.

8          And so when you look at this in an additional

9  Eastern District of Virginia case, *Copeland v. Bieber*, there

10  there was an expert that had some related expertise or

11  experience in the field.  And that particular case was a

12  copyright infringement case about a song.

13          There, there was a proposed expert of a 30-year

14  audio engineer who produced 40 million records who opined

15  about similarities of two songs, and the Court in the

16  Eastern District of Virginia excluded that testimony because

17  he didn't show his work.  He didn't know how he got from his

18  experience to his opinion, and that's exactly what we have

19  here.

20          We have Mr. Ferrante, who did cybersecurity with

21  the FBI and partly with the White House and some consulting,

22  but there still is no explanation anywhere in the record, in

23  the reports or in his deposition testimony, that explains

24  how he can make those particular opinions.  Particularly, he

25  openly admits he had no exposure to header bidding or open

15

1    bidding prior to being retained in this particular case.

2              Which, one of the things that Google counsel

3    mentioned, that he has extensive experience in malvertising.

4    The record is totally contradictory to that.  When pinned in

5    the deposition about his experience with the digital

6    advertising ecosystem, he highlighted a single case in 2011,

7    and then even peeled back the onion a little bit further

8    about what he did, he said he was there to support his

9    colleagues.  One case from 2011 was the only case that he

10   could determine was his actual experience at the FBI with

11   malvertising and ad fraud.

12             Then going on to the relevancy, which is really at

13   the heart of the Court's questioning of Google counsel, and

14   the problem is it's untethered to any of the anticompetitive

15   conduct.  As the Court has indicated, Google can and has now

16   been assured that it will call witnesses to explain explicit

17   decisions.  Header bidding and open bidding is not

18   inherently alleged to be anticompetitive, and those are the

19   only two products that he talks about in his particular

20   report.

21             THE COURT:  All right.  Let me hear from

22   Mr. Isaacson.

23             MR. FREEMAN:  Yes.

24             THE COURT:  Go ahead.

25             MR. ISAACSON:  A couple things, Your Honor.

                                                              16

1          So, first of all, it's incorrect that Mr. Ferrante

2    only is directed at current threats.  For example, we talked

3    about header bidding.  Header bidding, which is open code

4    which is placed on a publisher's website.  We don't know --

5    it's open source, so you don't know what security

6    protections there are going to be, and it has all of our

7    personal information on it.  And over 40 pages of this

8    complaint are dedicated to Google trying to thwart header

9    bidding.  Right.  Which is just open-source sharing of our

10   information.  This happens back in 2014 and 2015 is when

11   that conduct begins.

12          The way this works, works the same way that

13   cybersecurity exposure to malware works across the board.

14   And Mr. Ferrante's experience is that malvertising was the

15   number two experience that -- number two threat to malware

16   that they were experiencing while at the FBI.

17          When they talk about, well, what case was he on,

18   he explains in his depositions he's supervising many cases

19   as opposed to being the case agent, and emphasizes over and

20   over that he understands how this works, has experience with

21   how this works, and the cybersecurity mechanisms for how

22   this work overlap with digital advertising.

23          Counsel is also not correctly describing how the

24   law works, particularly with cybersecurity experts.

25   Cybersecurity experts and in the cases that we have cited

                                                              17

1    testify to and are permitted to testify to based on their

2    experience exactly the sorts of things that we are talking

3    about here.

4            For example, in the *Quality Plus* case in this

5    district, the cybersecurity expert there was a Mr. Anderson.

6    And that Court, in considering his testimony, says:

7    Anderson did not perform tests to arrive at his opinions.

8    Instead, relying on his expertise and several publications

9    discussed in his report.  Anderson discussed the background

10   principles of cybersecurity and different types of

11   cyberattacks at length.  For example -- and it cites the

12   types of documents that he cited, just as Mr. Ferrante cites

13   documents.

14           He also states that the most common form of

15   identity theft involves the fraudulent use of a victim's

16   personal information for financial gain.  He draws on

17   similar sources to discuss different types of criminal

18   organizations that engage in cybercrime.  Specifically, he

19   cites a report that states:  Security researchers have

20   detected a rise of attacks from Nigerian cybercriminals, and

21   he goes on about that -- the Court decision goes on about

22   that.  Although *Quality Plus* challenges the principles and

23   methods that Anderson relies on in making his opinions, this

24   goes to the weight afforded to Anderson's testimony, not to

25   admissibility.

                                                            18

1          That becomes clear in counsel's argument when he

2     begins to do things that you do in cross-examination.  When

3     he says, well, the things he points to that say Google is a

4     leader in the field don't actually show that he was a leader

5     in the field.

6          There are many things that Mr. Ferrante cites,

7     including ad.txt, which happens at the same time as the rise

8     of header bidding that are in the report.  But the extent to

9     which this is a factual -- a matter of gist for

10    cross-examination as opposed to an actual attack on his

11    qualifications I think is made clear from that.

12         Mr. Ferrante's experience ties directly to the

13    issues in this case.  He can testify based on his experience

14    that the ad tech field in the ad tech area, security is a

15    major issue and describe the scope of that.  He can testify

16    that both it exists and its importance, and also that Google

17    has done significant work in competing to attempt to address

18    those threats.  All of that is relevant record evidence for

19    the case, and we want to put it in the record for your

20    benefit.  We have to take into account how efficiently we do

21    that, given your understanding of this case relative to a

22    jury, but it's going to be important to put that into the

23    record.

24         THE COURT:  All right.  Well, I've heard the

25    argument, but it has not convinced me that this witness is

19

```
 1    either necessary, relevant or that his conclusions are

 2    adequately supported by the analysis that he has provided,

 3    so I am going to grant that motion.

 4           The only other one that I was somewhat concerned

 5    about was the survey.  I gave very careful consideration to

 6    that, and I've decided, although I think there are many

 7    features of the survey that are problematic, it goes to the

 8    weight rather than the admissibility.  So I'm going to deny

 9    the government's motion to strike the survey.  So we're

10    going to go forward then with the experts except for

11    Mr. Ferrante.

12           Now, because of the interrelationship between the

13    expert testimony and the summary judgment motions, I'm going

14    to save you all some time and money, and I'm going to tell

15    you right now that I've looked carefully already at the

16    summary judgment motions.  There are clearly way too many

17    material facts in dispute.  I mean, there's a huge fact --

18    because we're leaving the dueling experts in the case, you

19    know, the market definition is right there.  That's one of

20    the biggest ones we have to resolve.  That's a factual

21    issue, and both experts -- you know, we have dueling experts

22    on that.  So I'm going to deny without prejudice the summary

23    judgment motions.

24           In addition, it's now a bench trial.  You know,

25    the same person who's resolving summary judgment is going to
```

1    be trying the case.  For appellate purposes, it's a much

2    better record to have a resolution of the case done on a

3    trial record rather than a summary judgment record.  It

4    gives both sides the opportunity to fully flesh out the

5    evidence, for the testimony to come in, for credibility of

6    the witnesses to be evaluated, and so we're going to let

7    this case go to trial.  So I'm saving you the trouble.  I'm

8    denying all the motions for summary judgment.

9            Now, what I want to do, though, do not assume I'm

10   an expert on this case.  All right.  I want to make sure

11   that you adequately, you know, define your terms and make

12   sure.  So, to that extent, I was concerned, Mr. Isaacson,

13   about your comment.  I appreciate the fact that you think I

14   might be a better trier of fact than the jury; don't assume

15   that necessarily.

16           So I do expect that you will absolutely walk me

17   through the technology.  And I'll have a new law clerk on

18   the case, and he needs to be educated as well.  So keep that

19   in mind as you prepare for trial.  All right.

20           So the last thing --

21           MS. WOOD:  Your Honor, may I ask one question in

22   that regard?

23           THE COURT:  Yes.

24           MS. WOOD:  We had talked before about the

25   possibility of exploring a tutorial for the jury.  I don't

                                                              21

```
 1    know if that's necessary for the Court, or we can do it in
 2    the normal course through witnesses.  We, as the plaintiff,
 3    are certainly prepared to do that in the normal course
 4    through witnesses.  But I know that it is the practice in
 5    other complex cases, patent cases, for example, to have a
 6    day of a tutorial.  If the Court is interested in something
 7    like that, we would be more than amenable.  We're also
 8    prepared to proceed with witnesses.
 9              THE COURT:  I think it will save time and money,
10    because there can be disputes about the tutorial.  You can
11    present it to me as the witnesses testify.  And as you
12    probably know, I'm never shy.  If I don't understand
13    something, I will stop you in the middle of your examination
14    and start questioning the witness myself.
15              MS. WOOD:  Understood, Your Honor.  We appreciate
16    that.
17              THE COURT:  Okay.  That's one of the reasons I
18    prefer, in some respects, bench trials to jury trials,
19    because I feel less inhibition about doing that.  With a
20    jury, you have to be obviously careful not to overquestion
21    witnesses.  All right.
22              The last thing I would ask you to do now, since
23    we're getting closer to the trial and obviously the trial
24    has shifted dramatically with Count 5 being out and with the
25    jury being out, and now that you know almost all the experts
```

22

```
 1    are staying in, I'm giving you leave to work together if
 2    there is a new schedule that you want to issue in terms of,
 3    you know, in limine motions, et cetera, so that we get
 4    everything resolved before the trial gets started.  All
 5    right.
 6              MS. WOOD:  Yes.  And we've worked very
 7    collaboratively on that.  We think we'll have something to
 8    propose to the Court in short order.
 9              THE COURT:  All right.  Ms. Rhee, did you have
10    something for the Court?
11              MS. RHEE:  Actually, we were just going to say,
12    Your Honor, I think the parties are very close with the
13    exception of only one or two items with respect to
14    scheduling.
15              THE COURT:  All right.  Now, the only other thing
16    that I can see may be an issue -- and I don't know if we
17    have any counsel out there now representing third parties,
18    but how much litigation am I going to be expecting from the
19    third parties and issues about protective orders?
20              MS. WOOD:  Your Honor, we may know some of that
21    today.  I know today is the deadline for third parties to
22    register objections to the summary judgment and *Daubert*
23    exhibits.  We obviously won't know the full extent of it,
24    but we should get some indication today.
25              THE COURT:  All right.  And I'm not sure whether
```

23

```
 1   I'm going to handle those or see if I can get Judge Anderson

 2   to help me with that.  It will depend in part on how many we

 3   get.

 4            But, as I've said before, I'm going to err on the

 5   side of transparency.  And so the fact that information

 6   might be "embarrassing" or we would rather it not is not the

 7   issue.  It has to be a genuine, you know, trade secret that

 8   would absolutely put a party at a significant competitive

 9   disadvantage.  But if there's any indication that the same

10   information basically is out there in the ether or it's been

11   discussed, then it's absolutely going to come -- you know,

12   not be hidden from public view.  Because it will make the

13   case difficult to try if we have portions of testimony that

14   all of a sudden have to be, you know, blanked out, having

15   people come and go from the courtroom and that sort of

16   thing.  So I want to try to keep that to a minimum.

17            MS. WOOD:  And, Your Honor, that is part of why

18   the plaintiffs have tried to structure the pretrial schedule

19   in such a fashion that all of that should be resolved before

20   opening statements.

21            Parties and non-parties are required, under the

22   schedule we've been discussing and the Court has already

23   imposed, to a certain extent, to register confidentiality

24   objections pretrial, and those will be resolved pretrial.

25   And we hope that will make for a much more efficient trial,
```

24

 1   because we'll all know in advance what the Court has already

 2   ruled is in or out.  We won't be making those kinds of

 3   judgment calls on a daily basis and interrupting the trial

 4   to do that.

 5            THE COURT:  All right.  Was there anything further

 6   from Google?

 7            MR. ISAACSON:  No, Your Honor.

 8            THE COURT:  No.  All right.  Very good.  Then

 9   we'll recess court for the day.

10            (Proceedings adjourned at 10:59 a.m.)

11            ----------------------------------

12   I certify that the foregoing is a true and accurate

13   transcription of my stenographic notes.

14

15                        *Stephanie Austin*

16                        Stephanie M. Austin, RPR, CRR

17

18

19

20

21

22

23

24

25

                                                              25