# Lim Ex. N
# (Google's Proposed Redactions)

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **UNITED STATES OF AMERICA, ET AL.,**<br>　　　　**Plaintiffs,**<br><br>　　v.<br><br>**GOOGLE LLC,**<br>　　　　**Defendant.** | Case No. 1:23-cv-00108 (LMB/JFA) |

**EXPERT REPORT OF MARK A. ISRAEL**

**January 23, 2024**

HIGHLY CONFIDENTIAL

SUBJECT TO PROTECTIVE ORDER

impression is small, but the cost of building and maintaining the relevant engineering infrastructure is many orders of magnitude larger.[588] In such a setting, with high fixed costs and low marginal costs, gross margins say little about market power, let alone monopoly power.[589]

429. Third, as I explained in Section V.A, the finding that a firm has monopoly power requires that the firm has the ability to restrict market-wide output, without that output being replaced by other firms. Therefore, if a firm has high margins driven by ongoing investments that expand output, then interpreting the margins generated by that investment as evidence of monopoly power is misleading. If a high margin is the consequence of output-expanding investments made in response to competition, inferring monopoly power from that margin confuses the ability to suppress output with the success of procompetitive investments (with the practical effect of discouraging output-expanding investments). That is, a firm may make profitable investments that generate a good return—in the form of sales with high margins—but if that firm were to back off on the investments, others would surpass it. In such a case, the firm is profitable due to ongoing procompetitive investments but cannot be said to possess monopoly power. To the contrary, the firm is consistently expanding output, not restricting it.

430. Plaintiffs' expert Prof. Lee appears to agree with me that there are issues in interpreting measures of accounting profits as evidence of market power.[590] However, it is worth noting that Plaintiffs' own expert Dr. Respess concluded that "the most relevant [Google] P&L is the overall

---



588 ▮

589 ▮

590    *Lee Report*, ¶¶ 415-419.

DVAA P&L with AdMob excluded," ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[591] Because economic profits are generally smaller than accounting profits (because of the consideration of opportunity costs in calculating economic profits),[592] the most natural interpretation of this finding is that Google's ad tech business also experienced economic losses during that period, which clearly points *against* Google possessing substantial and sustained market power.

431.    In short, although Prof. Lee and I appear to agree that there are significant limitations in inferring market or monopoly power from accounting measures, if anything, the evidence from those measures is much more consistent with my conclusion that Google faces vibrant and ongoing competition than Prof. Lee's conclusion that Google possesses substantial and sustained market power.

### G.    SUMMARY

432.    The bottom line conclusion from the evidence described above—regarding estimates of Google's market share (Section V.B), advertiser and publisher multi-homing (Section V.C), case studies of ongoing competition (Section V.D), Google's investments in response to competition (Section V.E), and accounting margins (Section V.F)—is that Google does not possess monopoly power in any relevant market, nor does it have a "dangerous probability" of obtaining it. Instead, the evidence demonstrates that Google faces ongoing intense competitive pressure from numerous sources. I address certain other evidence that Plaintiffs' expert Prof. Lee presents as supposed evidence of Google's alleged substantial and sustained market power in

---

[591]    *Respess Report*, ¶ 98 and Figure 28. See also GOOG-DOJ-28502334 at -334 ("▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓").

[592]    See, e.g., *Besanko et al. (2013)*, p. 20 (describing that economic profits are equal to accounting profits minus opportunity costs).

840.    Second, even if, counterfactually, Google's conduct did lead to higher advertising prices, advertising costs do not generally translate into higher prices for the advertised products. For example, in standard price-setting models, the cost of advertising does not appear in the firm's first-order conditions because it does not vary with output.[1321] In this scenario, an increase in the cost of advertising may cause the firm to reduce its use of advertising, but would not change the price of the product(s) it is selling. Prof. Lee's caution in stating only that retail prices *can* be higher (even under the mistaken premise that advertising costs are higher) is thus warranted.[1322] Prof. Lee presents no economic model or empirical analysis to demonstrate that higher advertising costs, *even if they were to occur*, would be passed on to consumers or to what degree.

_____
Mark A. Israel
January 23, 2024

---

[1321]    Hal Varian (2022), "Advertising Costs and Product Prices," *Journal of Law and Economics*, 65(6): S419-S431. See also *Lee Report*, ¶ 842 ("The extent to which they do so depends on the nature of competition and the characteristics of costs and demand for the product." (citing Jeremy I. Bulow and Paul Pfleiderer (1983), "A Note on the Effect of Cost Changes on Prices," *Journal of Political Economy*, 91(1): 182-185; and E. Glen Weyl and Michal Fabinger (2013), "Pass-Through as an Economic Tool: Principles of Incidence under Imperfect Competition," *Journal of Political Economy*, 121(3): 528-583)).

[1322]    *Lee Report*, § VIII.B.2 ("Higher fees charged for open-web display advertising *can* lead to higher retail prices." (emphasis added)).