**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE
<u>UNITED STATES' DAMAGES CLAIM AND TO STRIKE THE JURY DEMAND</u>**

## <u>INTRODUCTION</u>

After the litigants and the Court spent the last 16 months preparing this case to be tried to a jury, Google apparently had a last-minute change of heart. On May 16, without notice or conferral, Google took the extraordinary step of sending a process server to the offices of the Antitrust Division to deliver a multimillion-dollar cashier's check, with the objective to "moot" the United States' damages claim and thereby spare Google judgment by a jury. Simultaneously, Google filed a motion, again without notice or conferral, *see* Loc. Civ. R. 7(E), to strike Plaintiffs' jury trial demand. That motion failed even to mention Google's own jury demand made more than a year earlier, a demand that has shaped how the Court and the parties have organized and prepared this case. Instead, Google set forth a legal argument, contrary to decades of precedent, that invites this Court to declare for the first time that the United States is somehow categorically barred from demanding that its civil damages claims be tried to a jury. These efforts are contrary to the relevant law and facts at issue here.

That said, if Google takes certain steps, identified below, to unconditionally satisfy the full extent of the United States' damages here (steps it has not yet taken), the Court would not need to address Google's novel constitutional argument. Plaintiffs filed this case to hold Google accountable for engaging in a systematic effort, spanning more than a decade, to acquire and maintain monopoly power in digital advertising technology markets that affect nearly every internet user and the many publishers and advertisers whose businesses, content creation, and free expression rely on the ad-supported internet. Plaintiffs are confident they will receive a fair adjudication of these important claims, whether by jury or bench trial. What Plaintiffs value above all else is that Google's efforts to avoid judgment by jury do not upset the schedule already set by the Court for resolution of these claims.

On the merits, however, Google's motion fails for the following reasons.

*First*, Google has not "mooted" the United States' damages claim because (1) the check it delivered did not actually compensate the United States for the full extent of its claimed damages; and (2) the unilateral offer of payment was improperly premised on Google's insistence that such payment "not be construed" as an admission of damages. If Google wants to satisfy the United States' damages claim unilaterally, it must meet certain requirements. Under the law, Google must pay the United States the maximum amount it could possibly recover at trial, which Google has not done. And Google cannot condition acceptance of that payment on its assertion that the United States was not harmed in the first place. In doing so, Google attempts to seize the strategic *upside* of satisfying the United States' damages claim (potentially allowing it to avoid judgment by a jury) while at the same time avoiding the strategic *downside* of the United States being free to argue the common-sense inference that Google's payment, is, at minimum, an acknowledgment of the harm done to federal agency advertisers who used Google's ad tech tools.

*Second*, the Seventh Amendment has always been interpreted to allow the United States, as here, to try treble damages claims to a jury, and Google's argument controverts centuries of jurisprudence and history. For more than a century, the Supreme Court has held that treble-damages claims under the antitrust laws are "[s]uits at common law," triable to a jury as of right. Nothing in the text, history, or purpose of the Seventh Amendment, or the English common law rights that it preserved, suggests that a sovereign plaintiff, like the United States, can be deprived of a jury in circumstances where private litigants are afforded one. Nor is there any precedent for depriving a plaintiff of a jury trial merely because a case presents some level of "complexity."

Ultimately, Google may be willing and able to cure the flaws in its attempt to satisfy the United States' damages claim. It may also be that the Court allows Google to withdraw its

consent to a jury trial. But today, neither circumstance has occurred, and so, at present, there is no valid legal basis to grant Google's motion to strike Plaintiffs' jury demand. And if the Court is inclined to proceed with a bench trial, it should do so based on Google (eventually) satisfying the United States' damages claim, not based on Google's flawed constitutional argument.

## BACKGROUND

### The United States' Damages Claim

The Antitrust Division of the U.S. Department of Justice has authority under 28 CFR § 0.40 to seek recovery on behalf of the United States for damage to its business or property under 15 U.S.C. § 15a. Under that authority, the Division has discretion about whether, and on whose behalf, to bring such claims for damages. Nothing about this authority dictates how or when the Antitrust Division must gather information about such damages. Far from being an "afterthought," as alleged by Google, the United States diligently gathered information about federal agencies' purchases of open web display advertising to determine whether, and to what extent, they had been harmed by Google's anticompetitive conduct.

The Complaint alleged that the United States purchased "in excess of $100 million in open web display advertising," and as authorized by statute, it sought to recover treble damages for Google's overcharges on those purchases. ECF No. 120 ¶ 278.[1] To streamline the issues and meet the rapid pace of discovery in this case, the United States, like many litigants, focused its damages claim. Specifically, it confined its damages claims to relevant purchases by only eight federal agencies ("federal agency advertisers" or "FAAs") that purchased open web display

---

[1] That allegation was borne out by Plaintiffs' expert analysis, which showed that the U.S. Government purchased over $70 million in open web display advertising exclusively using Google tools (Google's ad-buying tools, Google Ads and DV360, and its ad exchange, AdX), not including the open web display advertising purchased using third-party buying tools or third-party exchanges.

advertising from Google. There is nothing remarkable about a litigant making decisions to streamline and focus its case. While seeking damages on behalf of only these eight federal agencies shrank the universe of potential damages, it allowed the United States to serve its primary obligation: to bring this matter to trial expeditiously in order to end Google's illegal conduct and restore competition to these critical markets as quickly as possible.

Calculating the amount of Google's overcharge required fulsome discovery from Google, and analysis from Plaintiffs' experts, on topics including (a) what fees Google would have been able to charge in a "but for" world in which it had not engaged in anticompetitive conduct; and (b) how that overcharge was borne by Google's advertiser versus publisher customers.[2] In December 2023, Plaintiffs' damages expert served an expert report calculating the amount by which the eight FAAs were overcharged, given various potential "but for" take rates to be determined by the trier of fact. Assuming a but-for take rate of 5%, rather than the 20% take rate Google charged in the real world, the damages arising from the eight FAAs' relevant purchases of open web display advertising amounted to $1,188,711, before trebling or pre-judgment interest, both of which apply here. ECF No. 647-2 (Lim Report) ¶¶ 68-71 & fig. 38. While Google's motion seeks to belittle the demonstrable economic harm inflicted on these eight FAAs, these amounts are meaningful to each of these FAAs who face strapped budgets and use digital advertising to serve consequential public policy goals like recruiting Americans to serve

---

[2] Google suggests that the amount of damages at issue in this case is insignificant relative to the $100 million in open web display digital advertising purchased by the United States. However, Google is comparing apples to oranges. There is no apt comparison between: (a) the cost of open web digital advertising purchased by the United States ($100 million) versus (b) the recoverable damages to the United States arising from Google's conduct, which necessarily reflect not only a narrowed universe of federal agencies but also the fact that Google's supracompetitive ad tech fees, as high as they are, are nonetheless only a percentage of the overall cost of open web display advertising.

the military, reducing rates of teen suicide, keeping our highways safe, and more. These overcharges might seem small to Google, but they reflect concrete economic harm to the federal agencies working on behalf of the American people. Moreover, these numbers are a small fraction of the much broader harm that Google has inflicted on the market writ large, which as Plaintiffs' experts have calculated, runs in the billions of dollars. *Id*. fig. 15.

### *Preparations by the Parties and the Court for a Jury Trial*

Plaintiffs demanded a jury trial in their initial complaint filed on January 24, 2023, which contained a claim for treble damages, a classic form of legal relief. ECF No. 1 at 1, 140; *see also* ECF No. 120 at 1, 140. In May 2023, Google likewise demanded a jury trial "on all issues so triable." ECF No. 208 at 55-56. Accordingly, for well over a year, the parties have spent significant time and resources preparing to try a damages claim (in addition to other claims) to a jury. Those preparations have been significant. The United States and relevant third parties that facilitated the FAAs' purchases of open web display advertising were involved in an extensive discovery campaign led by Google. Plaintiffs retained and disclosed reports for two damages-specific experts; the parties briefed several damages-specific motions (to compel, to exclude testimony, and for summary judgment); and Plaintiffs expended significant effort preparing for a jury trial, including development of the evidentiary record for a trial presentation tailored to a jury. Importantly, the Court delayed the trial date in this matter in part to accommodate a jury, observing that Plaintiffs' requested trial date in July 2024 "will pose difficulty in selecting a jury that can sit for a significant trial during the summer months." ECF No. 525 at 1. That later trial setting gave Google weeks of extra time to prepare its summary judgment and *Daubert* motions "because the trial ha[d] been pushed." ECF No. 544, Feb. 23, 2024 Hr'g Tr. 16:5-6.

Throughout those 15 months of preparations by the Court and the parties, Google remained silent about Plaintiffs' jury demand as well as its request for a jury trial. That silence abruptly ended after the close of business on May 16, 2024, the night before Plaintiffs were due to file several briefs dedicated in whole or part to damages issues. Only then did Google file the present motion to strike Plaintiffs' jury demand, which occurred only hours after Google sent a process server to the Antitrust Division's offices to deliver a cashier's check that Google intended to extinguish the United States' damages claim as well as the prior 15 months of work dedicated to trying that claim to a jury. In a letter, Google's counsel stated that it was "voluntarily tendering" a cashier's check that it purported was "for the full amount of damages alleged by the United States." ECF No. 632-5 at 1. The letter also stated that the check "should not be construed either as an admission that Google is liable in this action, or that the United States has suffered any damages." *Id*. That check remains uncashed.

## ARGUMENT

### I. The United States' Damages Claim Has Not Been Satisfied

Try as it might, Google has failed to satisfy the United States' damages claim in a manner that would avoid a jury trial.[3]  The cashier's check that Google delivered did not reflect the maximum amount that the United States could recover at trial, nor did Google present that check without conditions. For these reasons, Google's actions to date do not preclude the United States from continuing to pursue damages on the FAAs' behalf.

---

[3] Google's attempt to pay the United States for harm caused by Google does not implicate the Court's subject-matter jurisdiction, given the pendency of other claims that Google does not dispute supply the constitutional requirement of a case or controversy. ECF No. 632 at 2 n.2, 6. Thus the proper mechanism to seek dismissal of Plaintiffs' damages claim would be a motion for partial summary judgment, not a motion to dismiss. In that regard, Google could and should have raised these arguments more than a month ago, at the time it filed its motion for summary judgment. Doing so then would have streamlined the issues for the parties and the Court.

Had Google properly conferred with Plaintiffs prior to filing the Motion, the parties could have discussed these matters, which could have obviated the need for the present motion. Prior to filing this response, Plaintiffs contacted Google to make it aware of the deficiencies in its attempts so that it can have the opportunity to cure those deficiencies if it chooses. At the time of this writing, Google has not so cured. Should there be any additional updates prior to the hearing on this motion, Plaintiffs will advise the Court.

### A. Google's Attempted Payment Did Not Satisfy the United States' Damages Claim

Because Google does not dispute that the Court has subject-matter jurisdiction arising from Plaintiffs' claims for injunctive relief, Am. Compl. ¶¶ 310-39, 342, the relevant question here is whether Google has satisfied the United States' damages claim (*i.e.*, "mooted" it in a non-jurisdictional sense). Google's attempt to do so fails because (1) Google did not actually compensate the United States for the full extent of its claimed damages, and (2) the attempted payment was made on the premise that it not be construed as an admission of liability or damages.

"[A]n unaccepted settlement offer has no force," *Gomez*, 577 U.S. at 156, and "does not moot a plaintiff's case," *id*. at 165. When, unlike here, a damages claim is the only relief a plaintiff seeks, satisfaction of that single claim moots the case. The Supreme Court has cautioned that the claim is not satisfied (and thus the case is not moot) unless, at a minimum, "a defendant deposits the full amount of the plaintiff's individual claim in an account payable to the plaintiff, and the court then enters judgment for the plaintiff in that amount." *Id*. at 166. That circumstance was only "hypothetical" in *Gomez*, *id.*, but several lower courts presented with similar arguments have followed the Court's lead. *See, e.g.*, *Fulton Dental, LLC v. Bisco, Inc.*, 860 F.3d 541, 545 (7th Cir. 2017) (claim not moot because payment not made to "a bank account in the plaintiff's name"); *Chen v. Allstate Ins. Co.*, 819 F.3d 1136, 1138 (9th Cir. 2016) (claim not moot unless

"the district court entered judgment affording [plaintiff] complete relief"); *Fisher v. Aetna Life Ins. Co.*, 478 F. Supp. 3d 489, 496 (S.D.N.Y. 2020) (holding "the *Gomez* exception does not apply . . . because the Court hasn't yet entered judgment for [plaintiff]"); *Gray v. Kern*, 143 F. Supp. 3d 363, 367 (D. Md. 2016) (damages claim moot if defendant "deposits the full amount recoverable with the Clerk of the Court, and the Court then enters judgment in that amount"), *vacated in part*, 702 F. App'x 132 (4th Cir. 2017).

    ***Not proper payment***. The most obvious defect in Google's attempted payment is that it is not for "the full amount" that the United States could possibly recover at trial on its damages claim. *Gomez*, 577 U.S. at 166. A payment cannot satisfy a damages claim unless a plaintiff "could not possibly recover more" than the tendered amount "if her case proceeded to a jury trial." *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 372 (4th Cir. 2012); *see also Hanover Ins. Co. v. Engineered Sys. All., LLC*, 2019 WL 1409723, at *6 (D. Md. Mar. 28, 2019) (no mootness where amount of check defendant mailed plaintiff was less than what "could be" recovered); *Carter v. Stewart Title & Guar. Co.*, 2013 WL 436517, at *4 (D. Md. Feb. 4, 2013) (no mootness where offer was not for "the full amount [plaintiff] could conceivably obtain if the case proceeded to trial").[4] Here, Google did not, as it contends, deliver "the maximum amount of damages the United States claims in this case." ECF No. 632 at 15. Rather, Google's check reflected what *Google* may estimate as the likely outcome for damages, but that fails to satisfy the legal standard, which focuses on what recovery is "possibl[e]" at trial. *Warren*, 676 F.3d at 372.

---

[4] *Gomez* abrogated *Warren* only insofar as the latter concluded that an unaccepted offer of relief can moot a case. *See Warren*, 676 F.3d at 371. *Warren* ultimately held that the claim at issue was not moot, either because the offer was not for the full amount of the plaintiff's claim or because the offer was conditional, *see id*. at 371-73, and *Gomez* did not disturb those holdings.

Plaintiffs' damages expert, Adoria Lim, calculated pre-treble damages for the FAAs much higher than the $745,152 Google cites in its motion, and record evidence would support a damages award to the FAAs at trial, before trebling or prejudgment interest, of $1,188,711. The FAAs' damages are measured by the amount Google overcharged them for using its AdX ad exchange and other ad tech tools. Therefore, the amount of damages depends primarily on (1) what Google's AdX fee (or "take rate") would have been absent Google's anticompetitive conduct, and (2) how the take rate would be apportioned among advertisers like the FAAs and publishers using AdX. One of the Plaintiffs' experts, Prof. Timothy Simcoe, calculated that advertisers like the FAAs bear 19.3% of the cost of the AdX take rate, and Google's own documents support the reasonable inference that Google's take rate in a more competitive market could be 5%. *See, e.g.*, ECF No. 640-1 (Simcoe Report) ¶¶ 12, 236 & n.253; ECF No. 673-17 (GOOG-TEX-00106259) at 260–61; ECF No. 652-11 (GOOG-DOJ-32034896) at 896; ECF No. 673-18 (GOOG-DOJ-09470144) at 145. If the jury were to agree with that evidence, as it reasonably could, then the United States' damages would be as much as $1,188,711, before trebling or pre-judgment interest, and $3,652,824 after trebling and prejudgment interest. *See* ECF No. 647-2 figs. 37-38.[5]

The fact that the evidence supports a jury award greater than Google has thus far delivered is underscored by the "relaxed" standard for calculating damages in an antitrust action

---

[5] Google has not attempted to demonstrate that a jury could not award Plaintiffs more than the amount Google has attempted to pay, nor is a motion to strike a jury demand or a motion to dismiss on mootness grounds the appropriate procedure for doing so. *See, e.g.*, *Bais Yaakov of Spring Valley v. ACT, Inc.*, 798 F.3d 46, 53 (1st Cir. 2015) (courts should resolve "a disagreement about the measure of damages" through a motion for summary judgment or judgment on the pleadings, not "under the guise of determining whether cases are moot"); *see also Warren*, 676 F.3d at 373 (offer to moot damages claim "deprives [plaintiff] of her right to have a jury determine disputes of fact regarding actual damages").

like this one. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981). In such

actions, damages "are rarely susceptible of the kind of concrete, detailed proof of injury which is

available in other contexts," *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123

(1969), and so they need "not be measured with the exactness which might otherwise have been

possible," but instead may be " a just and reasonable estimate based on relevant data," *Bigelow v.*

*RKO Radio Pictures*, 327 U.S. 251, 264 (1946). Reliable expert testimony and Google's own

analysis reflecting the fees it would likely be forced by competition to charge in a market

unburdened by Google's monopolization conduct satisfy this lenient standard.

　　Additionally, several courts across the country, including a panel of the Fourth Circuit,

have held that merely delivering a check payable to the plaintiff, as Google has, is insufficient to

constitute actual payment to the plaintiff for the purpose of unilaterally satisfying a damages

claim. *See Gomez*, 577 U.S. at 166 (suggesting that actual payment requires the maximum

damages amount to be "deposit[ed] . . . in an account payable to the plaintiff"); *Bennett v. Off. of*

*Fed. Emp.'s Grp. Life Ins.*, 683 F. App'x 186, 188 (4th Cir. 2017) ("tendering a check" does not

moot a claim); *Fulton Dental*, 860 F.3d at 545; *Naranjo v. Nick's Mgmt., Inc.*, 652 F. Supp. 3d

737, 746-47 (N.D. Tex. 2023) (no mootness where plaintiff "rejected [defendant's] check");

*Cline v. Sunoco, Inc. (R&M)*, 2019 WL 7759052, at *4 (E.D. Okla. Oct. 3, 2019) ("[R]eturning a

check for the full settlement amount transforms the payment into an unaccepted settlement

offer."), *appeal docketed*, No. 23-7090 (10th Cir. Dec. 15, 2023); *Ung v. Universal Acceptance*

*Corp.*, 190 F. Supp. 3d 855, 860-61 (D. Minn. 2016) (no mootness where plaintiff rejected

tender).

　　Some courts have differentiated between a check drawn from the defendant's account and

a cashier's check, holding that delivery of the latter can unilaterally satisfy a claim for monetary

10

relief because it is "guaranteed." *See*, *e.g.*, *Kuntze v. Josh Enters., Inc.*, 365 F. Supp. 3d 630, 641-42 (E.D. Va. 2019); *Grimes v. Brunson Grp., Inc.*, 2021 WL 328239, at *2 (E.D.N.C. Feb. 1, 2021). But other courts have reached the opposite conclusion. *See*, *e.g.*, *Krumm v. Kittrich Corp.*, 2019 WL 6876059, at *3 (E.D. Mo. Dec. 17, 2019) (no mootness where plaintiff "rejected tender" of cashier's check); *Pankwoski v. Bluenrgy Grp. Ltd.*, 2016 WL 7179122, at *3 (S.D. Tex. Dec. 9, 2016) (similar); *Fam. Med. Pharmacy, LLC v. Perfumania Holdings, Inc.*, 2016 WL 3676601, at *5-8 (S.D. Ala. July 5, 2016) (similar).

Google focuses on the fact that it delivered a cashier's check as a proxy for satisfaction of the claim. ECF No. 632 at 2, 14 n.8. That is incorrect. As the Fourth Circuit in *Bennett* held, refusal of a tendered check forestalls mootness, 683 F. App'x at 188, and it did not distinguish between different types of instruments. Because a plaintiff may refuse to accept a cashier's check for reasons including insufficiency of the amount tendered, just the same as it can for other negotiable instruments, the fact that Google tendered a cashier's check rather than a check drawn from a bank account does not itself render the claim satisfied. That result is also consistent with *Gomez*, insofar as payment in any form that can be rejected (including a cashier's check for an insufficient amount) is, once rejected, merely an "unaccepted offer" that cannot moot a claim. 577 U.S. at 162; *see also Ung*, 190 F. Supp. 3d at 860-61 ("there is no principled difference between a plaintiff rejecting a *tender* of payment and an *offer* of payment" (collecting authorities)). Moreover, for understandable and prudential reasons, the form and process for payment to a government entity can differ from private commercial transactions, and those different rules can affect how any form of payment—cashier's check or otherwise—can be made and accepted, all issues that could have been resolved through conferral.

*Payment is not unconditional*. Google's check was also insufficient to satisfy the United States' damages claim because it was premised on the payment "not be[ing] construed either as an admission that Google is liable in this action, or that the United States has suffered any damages." ECF No. 632-5 at 1. Although such terms could be negotiated in a bilateral settlement agreement, when a party acts unilaterally to satisfy a claim, it cannot insist on such caveats, which are akin to "condition[s]" being placed on the payment. *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 766 (4th Cir. 2011); *accord Warren*, 676 F.3d at 372 (offer to satisfy damages claim had "inherent flaw" that it was "not unequivocal but 'conditional'"). Google need not confess liability, but it also cannot purport to unilaterally preclude Plaintiffs from arguing at trial that Google's payment is evidence of both damages and liability. While not required, such an inference is permissible because, at common law, "a tender of the amount due was deemed 'an admission of liability' on the cause of action to which the tender related, so any would-be defendant who tried to deny liability could not effectuate a tender." *Gomez*, 577 U.S. at 170 (Thomas, J., concurring); *accord id*. at 156 (majority opinion) (defendant not entitled to moot a claim with an offer in part because of its "continuing denial of liability").

Google's primary authority, *Jarrett v. United States*, 79 F.4th 675 (6th Cir. 2023) is inapplicable for multiple reasons. *First*, unlike this case, *Jarrett* involved "full and unconditional payment" of the amount the plaintiff had overpaid to the government in taxes. *Id*. at 682; *see id*. at 678 (defendant "must hand over the full sum without stipulation or condition" to satisfy a damages claim). Google's payment here was neither "full" nor "unconditional." *Second*, unlike here, the IRS in *Jarrett* "conceded [the plaintiff's] overpayment," acknowledging that he had been damaged and was entitled to a refund. *Id*. at 681-82. Google made no such concession here. *Third*, the mailing of a check in *Jarrett* constituted actual payment by operation of law because

"[b]y law, the IRS pays the refund when it mails the original check." *Id*. at 680. Google cannot

take advantage of any similar legal fiction here.

### B.  Google Consented to a Jury Trial

Google also consented to a jury trial in this matter, which would permit a jury trial

regardless of whether Google satisfied the United States' damages claim. *See* Fed. R. Civ. P.

39(c)(2). Not only did Google itself demand a jury trial, *see* ECF No. 208 at 55-56, but Plaintiffs

likewise "demand[ed] a jury," Google did "not object," and the Court has already "order[ed] trial

to a jury," and so Google's conduct could be "regarded as a trial by consent." *Bereda v.*

*Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 52 (3d Cir. 1989); *accord Broadnax v. City of*

*New Haven*, 415 F.3d 265, 272 (2d Cir. 2005); *Pals v. Schepel Buick & GMC Truck, Inc.*, 220

F.3d 495, 501 (7th Cir. 2000); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 795-96 &

n.101 (5th Cir. 1999); *see* ECF No. 547 at 1 ("the jury trial will begin . . . with the selection of

ten (10) jurors").

A party may move to revoke its consent "at any time before trial," *Israelitt v. Enter.*

*Servs. LLC*, 2022 WL 80486, at *1 (D. Md. Jan. 7, 2022), which Google may impliedly be

seeking but has not yet explicitly articulated. The Court also retains discretion to deny such a

request. *Martin v. Bimbo Foods Bakeries Dist., Inc.*, 2016 WL 6459609, at *1-2 (E.D.N.C. Oct.

31, 2016) (denying request due to delay); *see also Lumbermen's Mut. Cas. Co. v. Holiday*

*Vehicle Leasing Inc.*, 2003 WL 1797888, at *2 (S.D.N.Y. Apr. 4, 2003) (court "retain[s] the

discretion to order a jury trial even in the absence of a constitutional or statutory right").[6]

Although the Court retains discretion to proceed to a jury trial in the absence of a

damages claim, whether the Court should exercise that discretion is not yet ripe because Google

---

[6] The Court similarly retains discretion *sua sponte* to "try any issue with an advisory jury." Fed.
R. Civ. P. 39(c)(1).

has not satisfied the United States' damages claim. Should Google, in fact, cure the deficiencies in its attempt to satisfy that claim such that Plaintiffs no longer possess a claim triable to jury by right, Plaintiffs defer to the Court as to whether to proceed to a jury or bench trial, as Plaintiffs will unquestionably receive a fair trial in this Court regardless of the identity of the factfinder.

## II.    The United States Has a Seventh Amendment Right to Have Clayton Act Damages Claims Decided by a Jury

Google's preference to avoid public scrutiny goes well beyond this case and the specific damages that the FAAs seek. Google has fought hard to keep its anticompetitive conduct shielded from public view by using a variety of tools, including trying to strike jury demands, to keep litigation proceedings out of public view, and to destroy evidence before it can be preserved and potentially publicly aired. *See Epic Games, Inc. v. Google LLC*, 3:20-cv-05671-JD, ECF No. 501 (N.D. Cal. Nov. 3, 2023) (order denying Google's request to "withdraw" its consent to a jury on the eve of trial in an antitrust case); *id.*, ECF No. 591, Trial Tr. Vol. 16, at 3228 (Dec. 1, 2023) (conducting an evidentiary hearing and ultimately instructing the jury that it may presume that Google's deleted chats contained unfavorable evidence); *United States v. Google LLC*, 1:20-cv-03010-APM, ECF Nos. 551-554 (D.D.C. Mar. 13, 2023) (filing notices for 147 out of 148 Google-produced exhibits cited in Plaintiffs' summary judgment opposition brief fully under seal given Google's confidentiality designations).

Google now takes those efforts one step further by contending that the Seventh Amendment's guarantee of trial by jury does not extend to the United States, even when, as here, the United States brings a treble-damages action that is indisputably legal, not equitable. That argument is wrong. It casts aside more than a century's worth of jurisprudence recognizing that the right to a jury trial is preserved for treble-damages actions in antitrust cases. Instead, Google rests its arguments on flawed historical analogues and a fundamental misunderstanding of the

14

purpose and function of the Seventh Amendment. Should the Court reach this question,[7]

Google's arguments should be rejected.

### A. The Seventh Amendment Preserves the Right to Try Clayton Act Damages Actions to a Jury

"The right of trial by jury is of ancient origin," and the jury's maintenance "as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 485-86 (1935). The text of the Seventh Amendment speaks of "Suits," not parties, U.S. Const. amend. VII, and therefore it "require[s] a jury trial on the merits in those *actions* that are analogous to 'Suits at common law.'" *Tull v. United States*, 481 U.S. 412, 417 (1987) (emphasis added); *see Colgrove v. Battin*, 413 U.S. 149, 152 (1973) (Seventh Amendment "defines the kind of cases for which jury trial is preserved"); *see also*, *e.g.*, *United States v. Sprague*, 282 U.S. 716, 731 (1931) (Constitution's "words and phrases were used in their normal and ordinary as distinguished from technical meaning").

To determine which "actions . . . are analogous," courts (1) "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity," and (2) "examine the remedy sought and determine whether it is legal or equitable in nature." *Tull*, 481 U.S. at 417-18. In this regard, the "more important[]" question is whether "the remedy available . . . is legal or equitable in nature." *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 829 (4th Cir. 1994); *accord Tull*, 481 U.S. at 421 ("characterizing the relief sought is

---

[7] The Court need not reach the constitutional question raised by Google's motion if it grants Google's motion to strike based on satisfaction of the United States' damages claim, *see supra* Part I, or if it exercises its discretion to deny Google's request to withdraw its consent to a jury trial, should Google make such a request, s*ee supra* Part I.B. In the interest of completeness, Plaintiffs nevertheless address Google's Seventh Amendment argument here should the Court reach it.

more important than finding a precisely analogous common-law cause of action" (cleaned up)). Precedent, informed by this two-part analysis, demonstrates that actions for treble damages under the Clayton Act, 15 U.S.C. §§ 15, 15a,[8] are "Suits at common law" for which the Seventh Amendment preserves the right to a jury trial.

Federal courts have long held, in no uncertain terms, that "the right to trial by jury applies to treble damage suits under the antitrust laws." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959). Indeed, trying treble-damages claims to a jury is "an essential part of the congressional plan for making competition rather than monopoly the rule of trade." *Id*. Beginning with Justice Holmes more than a century ago, there is an unbroken line of precedent affirming that "when a penalty of triple damages is sought to be inflicted, the [Sherman Act] should not be read as attempting to authorize liability to be enforced otherwise than through the verdict of a jury in a court of common law."[9] *Fleitmann v. Welsbach Street Lighting Co. of Am.*, 240 U.S. 27, 29 (1916) (the law "plainly provides" right to jury trial for such actions).

The two-part *Tull* framework confirms that actions seeking treble damages for violation of the antitrust laws must be afforded a jury trial. As to the nature of the action, actions seeking damages for violation of the antitrust laws are "similar in form to suits for damages in tort." *In re Japanese Elec. Prods. Antitrust Litig.*, 631 F.2d 1069, 1081 (3d Cir. 1980). This is because "[f]rom the earliest days of the Sherman Act, courts have treated antitrust violations as akin to torts." *Burlington Indus. v. Milliken & Co.*, 690 F.2d 380, 391 (4th Cir. 1982). And under

---

[8] Here, the Clayton Act provides the procedural right of action for treble damages, 15 U.S.C. § 15a, while the Sherman Act, *id*. §§ 1, 2, contains the substantive prohibitions that give rise to the action.

[9] The Sherman Act originally contained a private right of action for treble-damages, *see* Pub. L. No. 51-647, § 7, 26 Stat. 209, 210 (1890), that was substantially the same as the treble-damages actions now provided by the Clayton Act, 15 U.S.C. §§ 15, 15a.

"settled law," statutory claims that "can be said to sound basically in tort and seek legal relief" are "Suits at common law" for which the Seventh Amendment guarantees a jury trial. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999) (cleaned up); *accord Curtis v. Loether*, 415 U.S. 189, 195-96 (1974).

As to the "more important" question of the "relief sought," *Tull*, 481 U.S. at 421, it has long been understood that "[r]emedies intended to punish culpable individuals . . . were issued by courts of law, not courts of equity," *id.* at 422 (collecting cases); *id.* at 422 n.7 (remedy that "exacts punishment" is "a kind of remedy available only in courts of law"). To support this proposition in *Tull*, a government civil-penalty suit, the Supreme Court analogized to a private treble-damages action. This analogy starts from the premise that, for Seventh Amendment purposes, there is no relevant difference between a private and a government action for treble damages. *Id.* at 422 (citing private suit, *Ross v. Bernhard*, 396 U.S. 531, 536 (1970)).

Moreover, treble damages are a quintessentially legal, not equitable, form of relief. In antitrust cases, treble damages are provided "in part for punitive purposes." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 n.10 (1977); *see also Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 575 (1982) ("antitrust treble damages were designed in part to punish past violations" and "deter future antitrust violations"); *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct . . ."). Therefore, it "is easy" to conclude that "[a]ntitrust suits for treble damages are clearly legal actions" because "punitive damage awards such as the treble damages available under the antitrust laws were historically available only at common law." *Standard Oil Co. of Cal. v. Arizona*, 738 F.2d 1021, 1027 (9th Cir. 1984); *accord Ross*, 396 U.S. at 536 n.6 (observing that "[t]he treble damages action" is "a legal proceeding");

*Japanese Elec. Prods.*, 631 F.2d at 1079 (treble damages actions "are plainly legal in nature" because "[t]hey seek relief in a form traditionally associated with courts of law"). No other reasonable conclusion is possible because an action for treble damages "could not be maintained in equity." *Meyer v. Kan. City S. Ry. Co.*, 84 F.2d 411, 413 (2d Cir. 1936).

### B. The United States Has the Same Right to a Jury Trial in Clayton Act Damages Actions as Private Parties Do

Rather than dispute any of the foregoing principles establishing that treble damages actions under the Clayton Act are "Suits at common law" under the Seventh Amendment, Google seeks to interject an atextual exception into the Amendment's plain text and categorically sweep away the right to a jury trial only when the United States seeks to vindicate the Clayton Act. ECF No. 632 at 7-10. That contention betrays a basic misunderstanding of the Seventh Amendment and the history that informs its meaning.

#### 1. The Seventh Amendment Applies to Government Actions as It Does to Private Actions

The Seventh Amendment "defines the kind of cases for which jury trial is preserved," *Colgrove*, 413 U.S. at 152, not the classes of plaintiffs to which the guarantee extends. *See N.C. Env't Just. Network v. Taylor*, 2014 WL 7384970, at *4 (E.D.N.C. Dec. 29, 2014) (jury right does not "depend[] on the identity of the plaintiff"). Thus, "the right to jury trial exists in actions by the United States where it would in a similar action between private parties." *Damsky v. Zavatt*, 289 F.2d 46, 51 (2d Cir. 1961) (Friendly, J.); *accord Austin v. Shalala*, 994 F.2d 1170, 1175 (5th Cir. 1993) ("[W]here the United States brings [an] action, the right to trial by jury is determined in the same manner as if the suit were between private parties."); 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2314 (4th ed. 2023) ("Actions brought by or on behalf of the United States . . . carry the same jury trial right as any other civil action."). Google does not cite any authority to the contrary, and for good reason: when the

nature of the action and the relief sought are the same, *see Tull*, 481 U.S. at 417-18, the

established framework for interpreting the Seventh Amendment does not reach a different result

depending on the identity of the plaintiff. Here, the United States is no more or less entitled to a

jury when it seeks treble damages (a legal remedy) to vindicate a violation of the antitrust laws

than a private plaintiff would be when bringing the same claim.

Of course, as Google observes, ECF No. 632 at 9, when a plaintiff sues a sovereign, no

jury trial is guaranteed, but that is because of a separate doctrine governing sovereign immunity,

not because of the operation of the Seventh Amendment. As a sovereign, the United States "is

immune from suit save as it consents to be sued, and the terms of its consent to be sued in any

court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S.

535, 538 (1980). Thus, "if Congress waives the Government's immunity from suit, . . . the

plaintiff has a right to a trial by jury only where that right is one of the terms of the

Government's consent to be sued." *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981) (cleaned up).

And "[w]hen Congress has waived the sovereign immunity of the United States, it has almost

always conditioned that waiver upon a plaintiff's relinquishing any claim to a jury trial." *Id*. at

161. This principle is not "problematic," as Google contends, ECF No. 632 at 9, but rather is

woven into the fabric of American law, just as it was for centuries before that in England. *See*,

*e.g.*, *Alden v. Maine*, 527 U.S. 706, 715-16 (1999) ("The generation that designed and adopted

our federal system considered immunity from private suits central to sovereign dignity.");

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984) (sovereign immunity plays

a "vital role . . . in our federal system"); *Standard Oil*, 738 F.2d at 1027 n.9 ("Just because

individuals may not be entitled to jury trials against the government, it does not follow that the

government is not entitled to jury trials against individuals.").

Fundamentally, the fact that the separate doctrine of sovereign immunity exists to govern suits against a sovereign operates in tandem with the Seventh Amendment, but it does not alter the contours and protections of the Seventh Amendment analysis, which focuses on the type of claim being brought, not the plaintiff bringing the claim.

## 2. Sovereign Plaintiffs Have Historically Been Entitled to Trial by Jury

To the extent that "the application of the Seventh Amendment is determined by reference to history," *Standard Oil*, 738 F.2d at 1026, history shows that sovereigns like the United States may avail themselves of the Amendment's jury-trial right.

Google's arguments have already been rejected by the Ninth Circuit in *Standard Oil*, in which defendants in a Sherman Act suit argued that State plaintiffs did not have a Seventh Amendment right to a jury trial. The court analogized the sovereign States to the English monarchy in 1791, finding that "the crown was entitled to jury trial on demand under the common law that existed in 1791 in England." *Id*. at 1028. "There are many cases, both before and after 1791, where the crown brought suit before a jury," and, "[i]n fact, trial by jury was originally a royal, as opposed to popular right." *Id*. (collecting cases). As the Ninth Circuit emphasized, "[a]t common law, the jury was developed not merely as a protection for the individual, but also by the monarchs for their use." *Id*. (quoting *EEOC v. Corry Jamestown Corp*., 719 F.2d 1219, 1224 (3d Cir. 1983)); *accord SEC v. Kopsky*, 537 F. Supp. 2d 1023, 1026 n.1 (E.D. Mo. 2008) ("[W]ithout question, the crown was entitled to bring suit in courts of law, where jury trials occurred in 1791."); *see also*, *e.g.*, *Bishop of Landaff v. King* (1731) 94 Eng. Rep. 364, 2 Barn. K.B. 72 (common-law action by King George II wherein "the jury found a verdict for the King"). Congress recognized the same right of sovereigns to jury trials in its very first session, providing in the inaugural Judiciary Act that federal courts would have jurisdiction over "all suits at common law where the United States sue," and "the trial of issues in fact . . .

shall be by jury." 1 Cong. Ch. 20 § 9, 1 Stat. 73, 76-77 (1789). Therefore, the jury right as it existed in 1791, and thus how it was "preserved" in the Seventh Amendment, included a right for sovereign plaintiffs in "Suits at common law" to have their claims tried by a jury.[10]

### 3. The Hudson Declaration Is Improper and Unavailing

Google's presentation of a declaration from a scholar of "English legal history" (the "Hudson Declaration") to buttress its legally unsupported position is both improper and unavailing. Google purports to offer this declaration "pursuant to Federal Rule of Civil Procedure 44.1," ECF No. 632 at 8, but that is not a proper basis for disclosing untimely expert opinions because the interpretation of the Seventh Amendment does not require the Court to "determin[e] foreign law." Fed. R. Civ. P. 44.1. Google does not "claim[] foreign law applies" here, *Baker v. Booz Allen Hamilton, Inc.*, 358 F. App'x 476, 481 (4th Cir. 2009) (per curiam), nor could it. Accordingly, the submission of Prof. Hudson's declaration is improper, and the Court should decline to consider it.

In any event, the Hudson Declaration is of little use to the Court because it conducts a results-driven inquiry into English common law. At the outset, the Hudson Declaration is contrary to the analysis of the Ninth Circuit in *Standard Oil* and the Third Circuit in *Corry Jamestown*. This is perhaps no surprise because it conducts an extraordinarily narrow "investigation" of English legal history, focusing almost entirely on an analogy to an "information on behalf of the crown." Hudson Decl. ¶ 12. Such an "abstruse historical search for

---

[10] As Google observes, "[c]ivil antitrust cases brought by the United States have historically been tried to the bench," ECF No. 632 at 1, but, contrary to Google's implication, that is not because the Seventh Amendment is inapplicable to such cases. It is because many of those cases seek only injunctive relief and because damages claims under 15 U.S.C. § 15a have often been obtained by consent decree, *see, e.g.*, *United States v. SG Ints. I, Ltd.*, 2012 WL 6196131, at *1 (D. Colo. Dec. 12, 2012) (recovering $550,000 in antitrust overcharges to the United States through consent judgment); *United States v. Frito-Lay, Inc.*, 1974 WL 925, at *4 (C.D. Cal. Oct. 21, 1974) (similar).

the nearest 18th-century analog" not only is a disfavored mode of Seventh Amendment analysis, *Tull*, 481 U.S. at 421, but also does not attempt to locate an analog to the treble-damages action and ignores the "more important" question of whether the remedy sought is legal or equitable, *id.* at 422 n.7.

Even if the kind of narrow analysis it performs were useful, the Hudson Declaration's analysis is flawed. An 18th-century action for "information on behalf of the crown" dealt with "trespass committed on the lands of the crown," enforcement of "contract[s] for monies due to the king," and recovery of royal property or revenues. 4 William Blackstone, *Commentaries* *261-62. In other words, it was an action to vindicate a purely "personal wrong" against the king, *id.* at *261, but that is not at all like the action here, which vindicates public wrongs. An action like the present one "fosters competition and furthers the interests of the public by imposing a severe penalty (treble damages) for violation of the antitrust laws." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 300 (3d Cir. 2012); *accord Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 502 (1969) (treble damages actions "vindicate the important public interest in free competition"). The Hudson Declaration's four-paragraph "investigation" into the "information" action also leads to a lackluster conclusion: a single volume of reported cases from a single English court "offer[s] no indication that cases brought by the Crown against a private individual for damages would customarily have gone to a jury." Hudson Decl. ¶ 14. Proof-by-absence from an incomplete survey of English common law is hardly a basis on which to deprive the United States of its right to a jury trial.

Although perhaps no 18th-century action is "precisely analogous," *Tull*, 481 U.S. at 421, to the present treble damages action, common-law actions at least as analogous as the one identified by the Hudson Declaration are the offenses of forestalling, regrating, and engrossing.

As described by Blackstone, these were all "offence[s] at common law" that involved the manipulation of free trade to raise prices by consolidating economic power into "one or two rich men," and they were punishable by "discretionary fine and imprisonment," 5 William Blackstone, *Commentaries* *160, as well as "treble damages," Spencer Weber Waller, *The Incoherence of Punishment in Antitrust*, 78 Chi.-Kent L. Rev. 207, 215 (2003). As common-law actions, they were tried to juries. *E.g.*, *Rex v. Rusby* (1800) 170 Eng. Rep. 241, Peake Add. Cas. 189; *Penn's Case* (1633) 79 Eng. Rep. 874, Cro. Car. 314.

Like the modern-day antitrust action, common-law actions against forestalling, regrating, and engrossing "were the provisions above all others which protected fair competition in trade in old times in England." Edward A. Adler, *Monopolizing at Common Law and Under Section Two of the Sherman Act*, 31 Harv. L. Rev. 246, 251 (1917). Indeed, the modern concept of "monopolization" in the Sherman Act is "synonymous with . . . the old offenses of engrossing, forestalling, and regrating," *id.* at 260-61, and the 18th-century English statutory offense of "monopoly," which was punishable by "forfeiture of treble damages" was "much the same offence" as engrossing, 5 William Blackstone, *Commentaries* *160. The Hudson Declaration does not consider this analogy or any of the historical evidence discussed *supra* pp. 20-21, showing that the English sovereign historically tried common-law actions to juries.

Because the Court needs no expert assistance to interpret the Seventh Amendment, and because the assistance Google has offered is procedurally infirm and lacking in both rigor and substance, the Court should decline Google's invitation to consider the Hudson Declaration.

## C. This Case's Complexity Is No Bar to a Jury Trial

The "complexity" of this case is no bar to a jury trial because complexity is not an exception to a party's right to demand a jury under the Seventh Amendment. Every day across America, juries—in both criminal and civil cases—parse evidence related to complex industries,

sophisticated actors, and even highly-technical subject matters (*e.g.*, patent litigation, complex securities fraud, litigation involving sophisticated financial instruments, and more). Google's suggestion that a jury would somehow be unable to faithfully review the evidence at issue here to render a judgment is contrary to fundamental tenets of the American judicial system.

Indeed, nearly all Circuits to have encountered this issue have either rejected or declined to apply a complexity exception to the Seventh Amendment.[11] *See Soderbeck v. Burnett Cnty.*, 752 F.2d 285, 289 (7th Cir. 1985); *Pinemont Bank v. Belk*, 722 F.2d 232, 238 (5th Cir. 1984) (declining to decide "whether the Seventh Amendment right to jury trial comprehends a 'complexity' exception"); *City of N.Y. v. Pullman Inc.*, 662 F.2d 910, 919 (2d Cir. 1981) (declining to apply "complexity exception," "[a]ssuming arguendo that [it] is ever appropriate"); *In re U.S. Fin. Sec. Litig.*, 609 F.2d 411, 432 (9th Cir. 1979) ("We hold that there is no complexity exception to the Seventh Amendment right to jury trial in civil cases."); *see also SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1130 (Fed. Cir. 1985) (Markey, C.J., additional views) ("We discern no authority and no compelling need to apply in patent infringement suits for damages a 'complexity' exception denying litigants their constitutional right under the Seventh Amendment.").[12] The Third Circuit is closest to being an outlier, *see Japanese Elec. Prods.*, 631 F.2d at 1084-88, but the extraordinary circumstances animating

---

[11] The Fourth Circuit has never encountered this constitutional question. The two cases Google cites, *Malbon v. Pa. Millers Mut. Ins. Co.*, 636 F.2d 936 (4th Cir. 1980), and *Gen. Tire & Rubber Co. v. Watkins*, 331 F.2d 192 (4th Cir. 1964), both dealt with different questions regarding a court's discretionary determination whether to order a jury trial under Federal Rule of Civil Procedure 39(b) (proceeding with a jury trial when "a jury trial is not properly demanded"). Neither case suggested, let alone held, that "complexity" could nullify a plaintiffs' jury demand in a damages action.

[12] The Supreme Court has suggested that "the practical abilities and limitations of juries" is one of several factors relevant to determining whether a kind of action is legal or equitable under the Seventh Amendment. *Ross*, 396 U.S. at 528 n.10. But Google does not contend that the "complexity" of this treble damages action renders it an action in equity.

*Japanese Electrical Products* are not at issue here. Such an exception would only theoretically apply "when a jury will not be able to perform its task of rational decisionmaking with a reasonable understanding of the evidence and the relevant legal standards," in violation of the Due Process Clause. *Id*. at 1086. Google does not and cannot contend that its due process rights would be infringed by trying this case to a jury.

"Rightly or wrongly, our system commits the decision of complex as well as simple facts . . . to the jury in cases in which a right to a jury trial is given." *Soderbeck*, 752 F.2d at 289. Planning for and executing discovery in this case, including expert work on both sides, has not been simple, but that does not change the fact that in courthouses across the country, including this one, juries have decided consequential questions involving patents, environmental claims, and other matters involving technical subjects. This case is also no more complex than the 13-count antitrust case against Google that was tried to a jury over the course of four weeks in the fall of 2023. *See Epic Games, Inc. v. Google LLC*, 20-cv-5671 (N.D. Cal.). At bottom, the scheme at the heart of this case and the facts are not so complex as to turn a jury of Virginians into "tool[s] of arbitrary and erratic judicial power." *Japanese Elec. Prods.*, 631 F.2d at 1085. While Google complains about the "sprawling" nature of the "course of conduct" at issue, ECF No. 632 at 11, it would be perverse to permit a monopolist to escape a jury by devising a scheme of market exclusion that happens to be complicated.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that Court deny Google's motion to strike Plaintiffs' jury demand.

Dated: May 30, 2024

Respectfully submitted,

JESSICA D. ABER
United States Attorney

JASON S. MIYARES
Attorney General of Virginia

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Tyler T. Henry
STEVEN G. POPPS
Deputy Attorney General
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

/s/ Julia Tarver Wood
JULIA TARVER WOOD
/s/ Matthew R. Huppert
MATTHEW R. HUPPERT
/s/ Katherine Clemons
KATHERINE E. CLEMONS
AARON M. TEITELBAUM

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov

Attorneys for the Commonwealth of Virginia and local counsel for the States of Arizona, California, Colorado, Connecticut, Illinois, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Washington, and West Virginia

Attorneys for the United States