**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 1:23-cv-00108-LMB-JFA |
| GOOGLE LLC, | |
| *Defendant*. | |

**MEMORANDUM OF LAW IN SUPPORT OF GOOGLE LLC'S MOTION TO**
**EXCLUDE THE TESTIMONY OF DR. TIMOTHY SIMCOE**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND AND SUMMARY OF SIMCOE'S OPINIONS.................................................. 3

LEGAL STANDARD...................................................................................................................... 8

ARGUMENT ................................................................................................................................. 10

I.      Simcoe Should Be Precluded From Offering Testimony About A "Predicted" 10
        Percent But-For Revenue Share............................................................................................ 10

        A.      Having Disclaimed Any Opinion Based On It, Simcoe's "Predicted" 10
                Percent But-For Revenue Share Is Not Helpful to the Jury.................................. 10

        B.      The "Predicted" 10 Percent But-For Revenue Share Is Not Supported By
                A Reliable Methodology........................................................................................ 12

II.     Simcoe's Comparables Approach Should Be Excluded Because It Is Not The Product
        of A Reliable Methodology. ................................................................................................. 14

        A.      The Comparables Approach Selects Comparator Firms In An Arbitrary
                and Unsupported Manner....................................................................................... 15

        B.      The Comparables Approach Fails to Control For Differences That Could
                Explain Differences In Prices Charged By AdX and Third-Party
                Exchanges. ............................................................................................................ 17

III.    Simcoe's Event Study Should Be Excluded Because It Does Not Reliably Control
        For The Procompetitive Effects of AdX's Transition to Unified First Price
        Auctions. .............................................................................................................................. 22

IV.     Simcoe's Apportionment Analysis Must Be Excluded Because it is Premised on the
        Fundamentally Flawed Assumption that FAAs are "Representative Advertisers." ......... 24

V.      Simcoe's Opinions Must Be Excluded In Whole If Any Conduct He Removed From
        His But-For World Is Held To Be Lawful. .......................................................................... 27

VI.     Simcoe's Opinions Must Be Excluded In Whole If The Court Grants Google's
        Motion to Exclude the Testimony of Dr. Robin Lee. ......................................................... 28

CONCLUSION.............................................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATA Airlines, Inc.* v. *Fed. Ex. Corp.*,
   665 F.3d 882 (7th Cir. 2011) ................................................................12

*Blue Cross & Blue Shield United of Wisconsin* v. *Marshfield Clinic*,
   152 F.3d 588 (7th Cir. 1998) .........................................................19, 28

*Bouygues Telecom, S.A.* v. *Tekelec*,
   2007 WL 4699237 (E.D.N.C. Feb. 5, 2007)........................................12

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2017 WL 10434367 (N.D. Cal. Jan. 23, 2017).....................................28

*CDW LLC* v. *NETech Corp.*,
   906 F. Supp. 2d 815 (S.D. Ind. 2012) ..................................................21

*Cede & Co.* v. *Technicolor, Inc.*,
   2003 WL 23700218 (Del. Ch. Dec. 31, 2003), *aff'd in part, rev'd in part on
   other grounds*, 884 A.2d 26 (Del. 2005)..............................................12

*City of Rockford* v. *Mallinckrodt ARD, Inc.*,
   2024 WL 1363544 (N.D. Ill. Mar. 29, 2024).......................14, 16, 19, 28

*Columbia Gas Transmission, LLC* v. *171.54 Acres of Land*,
   2023 WL 9272553 (S.D. Ohio Nov. 9, 2023)........................................12

*Comcast Corp.* v. *Behrend*,
   569 U.S. 27 (2013)................................................................................28

*Daubert* v. *Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)..............................................................................10

*Devito* v. *Smithkline Beecham Corp.*,
   2004 WL 3691343 (N.D.N.Y. Nov. 29, 2004) ......................................11

*Doctor's Data, Inc.* v. *Barrett*,
   2017 WL 11885711 (N.D. Ill. Mar. 31, 2017).......................................19

*El Aguila Food Prods., Inc.* v. *Gruma Corp.*,
   131 F. App'x 450 (5th Cir. 2005) .........................................................16

*El Aguila Food Prods., Inc.* v. *Gruma Corp., Inc.*,
   301 F. Supp. 2d 612 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005) ...................27

**Page(s)**

*Eleven Line, Inc.* v. *N. Tex. State Soccer Ass'n, Inc.*,
    213 F.3d 198 (5th Cir. 2000) ...................................................................14, 16, 21

*ePlus, Inc.* v. *Lawson Software, Inc.*,
    764 F. Supp. 2d 807 (E.D. Va. 2011) ...................................................................10

*Gen. Elec. Co.* v. *Joiner*,
    522 U.S. 136 (1997) ...................................................................11

*Harris Wayside Furniture Co.* v. *Idearc Media Corp.*,
    2008 WL 7109357 (D.N.H. Dec. 22, 2008) ...................................................15, 21

*Hempstead* v. *Pfizer, Inc. (In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.)*,
    150 F. Supp. 3d 644 (D.S.C. 2015) ...................................................................9

*In re IBM Peripheral EDP Devices Antitrust Litig.*,
    481 F. Supp. 965 (N.D. Cal. 1979) ...................................................................23

*It's My Party, Inc.* v. *Live Nation, Inc.*,
    88 F. Supp. 3d 475 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th Cir. 2016) ...............................24

*Kentucky Speedway, LLC* v. *Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ...................................................................28

*Lake* v. *Adams*,
    2020 WL 1016352 (W.D. Va. Mar. 2, 2020) ...................................................................10

*LeClercq* v. *The Lockformer Co.*,
    2005 WL 1162979 (N.D. Ill. Apr. 28, 2005) ...................................................24, 26

*In re Lipitor (Atorvastatin Calcium) Mktg.* v. *Pfizer, Inc.*,
    892 F.3d 624 (4th Cir. 2018) ...................................................................8, 13

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ...................................................................18

*Loeffel Steel Prods., Inc.* v. *Delta Brands, Inc.*,
    387 F.Supp.2d 794 (N.D. Ill. 2005) ...................................................................16

*Menasha Corp.* v. *News Am. Mktg. In-Store, Inc.*,
    354 F.3d 661 (7th Cir. 2004) ...................................................................23

*Mitchell* v. *Geo Grp. Inc.*,
    2022 WL 874287 (D. Ariz. Mar. 24, 2022) ...................................................................10

*Multimatic, Inc.* v. *Faurecia Interior Sys. USA, Inc.*,
    358 F. App'x 643 (6th Cir. 2009) ...................................................................21

iii

**Page(s)**

*Nease* v. *Ford Motor Co.*,
  848 F.3d 219 (4th Cir. 2017) .................................................................9

*Prince George's Cnty.* v. *Wells Fargo & Co.*,
  520 F. Supp. 3d 747 (D. Md. 2021) ......................................................12

*S. Pac. Commc'ns Co.* v. *Am. Tel. & Tel. Co.*,
  556 F. Supp. 825 (D.D.C. 1982) ...........................................................23

*Silicon Knights, Inc.* v. *Epic Games, Inc.*,
  2011 WL 6748518 (E.D.N.C. Dec. 22, 2011) ........................................9

*Sims* v. *Kia Motors of America, Inc.*,
  839 F.3d 393 (5th Cir. 2016) ...............................................................28

*Tyger Constr. Co.* v. *Pensacola Constr. Co.*,
  29 F.3d 137 (4th Cir. 1994) .................................................................11

*Werdebaugh* v. *Blue Diamond Growers*,
  2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ......................................23

*Whitfield* v. *John Bourne Co.*,
  16 F. App'x 116 (4th Cir. 2001) ...........................................................19

*In re Wholesale Grocery Prod. Antitrust Litig.*,
  946 F.3d 995 (8th Cir. 2019) ...............................................................19

**Statutes & Rules**

15 U.S.C. § 15a ..............................................................................................1

Fed. R. Evid. 702 ...............................................................................8, 9, 10

Fed. R. Evid. 702(b) .......................................................................................9

Fed. R. Evid. 702(d) .......................................................................................9

**Other Authorities**

Daniel L. Rubinfeld, *Reference Manual on Scientific Evidence* (3d ed. 2011) .............................12

Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* (5th ed. 2013) ...............................................................................................12

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2023) ..................................14

Report of the Advisory Committee on Evidence Rules 5-6 (May 15, 2022), tinyurl.com/AdvisoryCommitteeRpt .......................................................9

# INTRODUCTION

The opinions of Plaintiff's damages expert, Dr. Timothy Simcoe, should be excluded because they are not based on a reliable application of a recognized methodology, fail to account for the effects of lawful behavior, and fail to reflect the economic and factual realities of the record. In its fifth claim, Plaintiff United States seeks damages under 15 U.S.C. § 15a on behalf of eight federal agency advertisers ("FAAs"). According to its complaint, Google's alleged anticompetitive conduct caused Plaintiff United States to pay more for Google's ad tech services that facilitate purchases of "open-web display advertising." Simcoe opines that Google charged a supracompetitive revenue share for Google's ad exchange tool called AdX, which facilitates sales of "open-web display" impressions. Simcoe purports to calculate (a) what percent revenue share Google would have charged publishers absent certain of its alleged anticompetitive conduct, and (b) what percentage of that overcharge would have been borne by advertisers.

Simcoe's but-for revenue share opinions are premised on two flawed and economically unsound models (the "Comparables Approach" and the "Event Study") which he claims show that but for alleged anticompetitive conduct, Google would have charged a worldwide average AdX revenue share of between 16.2 and 16.6 percent, rather than the average 19.8 percent it charges worldwide. He also offers, in the background of his report, an additional "predicted" but-for AdX revenue share of 10 percent, based on a regression so unreliable that he subsequently rejected the calculation, testifying he is "not offering an opinion that the but-for take rate is 10 percent." Ex. 91 at 180:5-12.[1] Simcoe then attempts to "apportion" his purported overcharges between Google's

---

[1] All references to "Ex." refer to the Declaration of Bryon Becker in Support of Google's Motion for Summary Judgment and Motions to Exclude. With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability. All emphasis is added unless otherwise indicated.

advertiser and publisher customers, and opines that advertisers paid 19.3 percent of any AdX overcharge. But his apportionment is premised on the economically erroneous and factually unsupported assumption that each of the FAAs is equivalent to a "representative advertiser." Accordingly, Simcoe's opinions should be excluded for the following reasons.

*First*, with respect to his "predicted" 10 percent but-for AdX revenue share, Simcoe disclaimed offering any opinion that the but-for revenue share is 10 percent, and the crude regression purporting to calculate that revenue share does not comply with accepted methodology and is therefore unreliable.

*Second*, Simcoe's Comparables Approach estimating a but-for AdX revenue share fails to comply with a recognized and reliable methodology. And in implementing the Comparables Approach, Simcoe fails to evaluate the comparability of the firms he uses to build his model, and fails to control for lawful factors that affect his results.

*Third*, Simcoe's Event Study estimating a but-for AdX revenue share fails to account for the effects of an undisputedly lawful and procompetitive product feature that Google implemented at the same time it implemented the allegedly unlawful rule change Simcoe purports to measure. His model is therefore unable to distinguish between impressions gained from lawful, procompetitive behavior and the challenged conduct.

*Fourth*, Simcoe's Apportionment Analysis, purporting to measure the percentage of the alleged AdX overcharge borne by the FAAs, fails to account for facts in the record showing that FAAs cannot be likened to "representative"—i.e., average—advertisers. Simcoe acknowledges that the FAAs are not the average advertiser; they have "their own objectives." Ex. 91 at 379:11-21. Simcoe's application of a market-wide, worldwide apportionment figure to the FAAs does not "fit" the facts of this case, as *Daubert* requires, and is also unreliable.

## BACKGROUND AND SUMMARY OF SIMCOE'S OPINIONS

**I.      Background**

Plaintiff United States asked Simcoe "to estimate the percent overcharge paid by advertisers who purchase display advertisements on the open web." Ex. 5, ¶ 6.[2]

Simcoe did no "independent analysis" of relevant product markets, market power, or alleged anticompetitive conduct to complete his assignment.  Ex. 91 at 161:4-162:3; Ex. 5, ¶ 7. Rather, Simcoe reviewed the report of Plaintiffs' expert Robin Lee, and adopted Lee's relevant antitrust markets, Ex. 5, ¶¶ 7, 59; Ex. 91 at 70:14-21, his conclusions that Google "has substantial and sustained market power" in each of the alleged relevant markets; and his opinion that "Google's conduct was exclusionary."  Ex. 5, ¶¶ 63, 88.

Simcoe summarizes parts of Lee's report about features of so-called "open-web ad impressions," and focuses on the average prices of such impressions sold on different ad exchanges.  Ex. 5, ¶¶ 79-87.  Simcoe opines that the differences in prices charged by those exchanges "reflects differences in the nature and quality of publisher inventory sold through each exchange, as well as differences in demand, costs and other features of the auction process across the exchanges."  Ex. 5, ¶ 85.

In a background section of his report, Simcoe also sets out a simple diagram that "plots the average take rate of each exchange" against the average cost-per-thousand-impressions ("CPM") "of impressions sold through that exchange." Ex. 5, ¶ 86.  He performs a simple linear regression over those seven observations in order to measure "the relationship between average CPM and

---

[2] All cites to Simcoe's initial expert report hereinafter incorporate the later-filed errata, where applicable.  *See* Ex. 92.

average take rate for all exchanges other than AdX," for the January 2019 to March 2023 time period. *Id.*

He then writes, "extrapolating from the linear regression model, AdX's predicted take rate" would be "10 percent." *Id.* ¶ 87. While Simcoe makes vague statements about the linear regression "informing" his analysis, he expressly disavowed that regression when he testified at deposition: "I'm not offering an opinion that the but-for take rate is 10 percent." Ex. 91 at 180:5-12; *see also id.* at 179:4-12 (testifying that the regression "informs my analysis, but it's not, on its own, the basis for any conclusion about the take rates in the but-for world").

## II.     Summary of Opinions

***But-For World.***  Simcoe next constructs a but-for world to estimate the AdX revenue share that Google would have charged absent certain alleged anticompetitive conduct. Ex. 5, ¶ 103. Simcoe defines his but-for world as one in which three—out of the Complaint's alleged ten—acts of alleged anticompetitive conduct did not occur:  where 1) there "is no tie between Google Ads and AdX"; 2) there "is no tie between AdX and DFP"; and 3) Google did not introduce Unified Pricing Rules ("UPR"). *Id.* Simcoe states that he focuses on these three allegedly anticompetitive acts because they "were in place during the damages period" and "continue today." *Id.* ¶ 105. As for the challenged conduct that occurred before the damages period, Simcoe claims that it is "relevant," but testified that he did "not contemplate removing that other conduct in characterizing the but-for world." Ex. 91 at 78:3-79:3.

As to the first act he removes in the but-for world, Simcoe claims that without a "tie" between Google's ad buying tool Google Ads and AdX, "advertisers on Google Ads would be able to use a single buying tool to multihome among exchanges by submitting bids through multiple paths, including other exchanges with take rates lower than the 20 percent currently charged by

AdX." Ex. 5, ¶ 103.a.  As to the second, Simcoe claims that without a "tie" between AdX and Google's publisher ad tool DFP, "AdX advertisers would be able to submit real-time bids into third-party publisher ad servers, making alternatives to DFP more attractive to publishers." *Id.* ¶ 103.b.  And as to the third, Simcoe claims that if publishers could "vary the floors for different exchanges within DFP," they would exert "pressure on specific exchanges to reduce their take rates in order to win more auctions." *Id.* ¶ 103.c.

Simcoe then constructs and applies two different models to estimate the AdX revenue share in his but-for world that excludes these three conducts: the "Comparables Approach" and the "Event Study." *Id.* ¶ 136.

***Comparables Approach.***  For the Comparables Approach, Simcoe calculates a benchmark revenue share against which to compare Google's actual AdX revenue share.  The benchmark is a weighted average monthly revenue share for "open-web display" transactions conducted through seven third-party exchanges[3]—out of more than *fifty ad exchanges* competing with AdX in the real world for "open-web display" impressions—during the January 2019 to March 2023 time period.  *Id.* ¶¶ 216-17, 223-24, Fig. 15; Ex. 2, ¶ 220.  Simcoe claims that his Comparables Approach is a yardstick approach commonly used in measuring overcharge damages.  Ex. 93, ¶ 52.

Based on his Comparables Approach, Simcoe opines that in his but-for world Google would have charged a 16.2 percent AdX revenue share.  Ex. 91 at 258:20-259:6.  Simcoe does not explain why the seven exchanges he selected are appropriate or reliable benchmarks against which to compare Google's AdX, based on factors an economist must consider when selecting proper benchmarks.  Simcoe also does not explain why other exchanges are left out.  For example, he

---

[3] These are PubMatic, Magnite/Rubicon, Index Exchange, OpenX, Xandr, Sovrn, and Yieldmo. Ex. 5, Fig. 15, notes.

excludes ad exchanges that produced data for U.S. impressions only, even though the Plaintiff United States is seeking to recover on behalf of FAAs that advertise almost exclusively in the United States.  Ex. 5, ¶ 276; Ex. 38, ¶ 139 n.319 ("collectively, during the damages period, more than 99.6% of FAA spending through DV360 was targeted at U.S. users").

For the seven exchanges he includes, Simcoe did not calculate the average revenue share charged by each of the seven, but Google's expert Professor Judith Chevalier did so using Simcoe's data.  Ex. 38, Fig. 10.  Calculated on a per-exchange basis, six of the seven exchanges included in Simcoe's Comparables Approach charge *higher* than the model's total weighted average but-for revenue share of 16.2 percent—i.e., higher than the price Simcoe claims AdX would have charged but for the alleged anticompetitive conduct—with one of those exchanges charging significantly more than the current AdX revenue share of 19.8 percent.  *Id.*[4]  Simcoe did not challenge Chevalier's calculations, and Simcoe could not explain what factors would permit some ad exchanges to charge what appears to be a supracompetitive price because it is higher than the weighted average, or why Google could not therefore charge the same higher-than-average price for the same reasons.  Ex. 91 at 289:18-290:10; 303:15-304:15.

***Event Study.***  Simcoe also calculates what he calls his "Event Study" to estimate a but-for AdX revenue share.  Ex. 5, ¶ 226.  The Event Study is based on Google's introduction of UPR.  UPR benefitted advertisers by simplifying bidding, minimizing bidder errors, and improving decision-making.  Mem. of Law ISO Mot. for S.J. ¶¶ 82-83.  After UPR was introduced (starting gradually in May 2019, and fully launched in September 2019), publishers using Google's DFP

---

[4] Simcoe's Comparables Analysis results in a worldwide weighted average revenue share estimate of 16.2 percent.   The following ███████████████████████████████████████████████

publisher tool could no longer require an advertiser bid from AdX to beat a higher floor price than a bid coming from a different ad exchange for the very same ad impression. *Id.* ¶¶ 80-83.

Plaintiffs challenge UPR as anticompetitive, claiming that UPR allowed Google's advertiser tools to win more auctions through AdX "to the detriment of rival exchanges." Ex. 5, ¶¶ 119-123. Thus, through the Event Study, Simcoe calculates what he calls the "UPR equivalent take rate,"[5] and asserts that the difference between Google's "as-is" revenue share and the "UPR equivalent take rate" estimates the effects of Google's unlawful imposition of UPR. *Id.* ¶¶ 149-150.

The fatal flaw in the Event Study is that it does not account or control for the effect of AdX's transition from a second price auction to a unified first price auction ("UFPA"), which allows all possible sources of demand—including direct deals, header bidding bids, competitor exchanges, and AdX—to compete against each other in real time in a first price auction. Ex. 1, ¶ 165; *see also* Mem. of Law ISO Mot. for S.J. ¶ 81. Plaintiffs do not challenge UFPA as anticompetitive and their experts agree it is procompetitive; it increases "competition among exchanges." Ex. 28, ¶ 195; Ex. 5, ¶ 116. The full implementation of UPR occurred at the exact same time that AdX implemented UFPA. Simcoe's failure to take UFPA into account in his Event Study means that there is no way to separate the effect of increased lawful competition through UFPA from any effect of the alleged unlawful implementation of UPR.

---

[5] To calculate this rate, Simcoe purports to estimate "two key parameters" using a regression model. With the first parameter, he claims to measure "the increase in market share that Google achieved by implementing UPR." Ex. 5, ¶ 226. Simcoe claims that because "Google could not implement UPR in the but-for world, this parameter provides an indication of the benefits that Google derives from its exclusionary conduct, and the corresponding harm to publishers and advertisers." *Id.* With the second parameter, Simcoe purports to measure "the sensitivity of ad exchange demand to changes in the take rate." *Id.* The ratio of the first parameter (incremental impressions won by AdX) to the second (revenue share sensitivity) results in "the 'take-rate equivalent' impact of UPR." *Id.*

*Apportionment Analysis.*  Last, Simcoe constructs and applies a methodology to apportion the purported but-for AdX revenue share between publishers, on one side, and advertisers, on the other side.  Simcoe opines that the percentage share AdX charges publishers for selling their inventory is an "*ad valorem* fee" that "functions similarly to a tax."  Ex. 5, ¶ 159.  Simcoe states that "the *incidence* (i.e., the share of harm) of a 'tax' on a transaction" depends "on the relative price elasticities of publisher supply and advertiser demands."  *Id.*  Accordingly, the percent of the alleged AdX overcharge purportedly borne by advertisers and publishers, respectively, depends on the relative price elasticities of advertiser demand and publisher supply.  *Id.* ¶¶ 159, 173-175. After estimating these elasticities, Simcoe uses them to calculate the portion of the alleged overcharge that the FAAs supposedly bore.  In doing so, Simcoe assumes that the FAAs are "representative advertisers."  *Id.* ¶ 127; Ex. 91 at 369:2-370:4.  In making this assumption, Simcoe simply means that FAAs can be stand-ins for "supply and demand elasticities for the entire market" simply because they are "large buyers that buy a variety of ads in the open web display impression market."  Ex. 91 at 369:2-370:4.[6]  But in treating the FAAs as, essentially, the market-wide average, Simcoe ignores his own admissions that the FAAs are not uniform in terms of the demand curves they generate, as well as the extensive fact record showing that the FAAs are decidedly *not* market-wide average advertisers.

## LEGAL STANDARD

Federal Rule of Evidence 702 permits testimony where the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" so long as the expert's opinion is "based on sufficient facts or data," "is the product

---

[6] Despite testifying here to an "open web display impression market," Simcoe claims to be calculating overcharges in the alleged ad exchange market.

of reliable principles and methods," and the expert has reliably applied "the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also In re Lipitor (Atorvastatin Calcium) Mktg.* v. *Pfizer, Inc.*, 892 F.3d 624, 631 (4th Cir. 2018). A district court has a "gatekeeping responsibility" to make sure that expert testimony "both rests on a *reliable* foundation and is *relevant* to the task at hand." *Nease* v. *Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (emphasis in original). As of December 2023, Federal Rule 702 was amended to require courts to take a more active role in analyzing experts' conclusions and ensure they are the result of "reliable application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's notes to 2023 amendment. The changes respond to the fact that many courts have declared the requirements set forth in Rule 702(b) and (d) "are questions of weight and not admissibility, and more broadly that expert testimony is presumed to be admissible," and "the language of the amendment more clearly empowers the court to pass judgment on the conclusion that the expert has drawn from the methodology." Report of the Advisory Committee on Evidence Rules 5-6 (May 15, 2022), tinyurl.com/AdvisoryCommitteeRpt.

The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of evidence. *Silicon Knights, Inc.* v. *Epic Games, Inc.*, 2011 WL 6748518, at *5 (E.D.N.C. Dec. 22, 2011).

***Reliability***: Rule 702 requires not only that experts use reliable principles and methods, they must also reliably apply "the principles and methods to the facts of the case." Fed. R. Evid. 702; *Hempstead* v. *Pfizer, Inc. (In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.)*, 150 F. Supp. 3d 644, 660-61 (D.S.C. 2015) ("courts have made clear that regardless of what the methodology may be called, it must meet the standards of Rule 702— an expert must use a valid methodology, the methodology must be reliably applied, and her

9

opinions must be supported by sufficient facts and data"). "Any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.

   ***Relevance***: Expert testimony must also be "sufficiently tied to the facts of the case" and "aid the jury in resolving a factual dispute." *ePlus, Inc.* v. *Lawson Software, Inc.*, 764 F. Supp. 2d 807, 812 (E.D. Va. 2011). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). Helpfulness to the trier of fact is "the touchstone" under Rule 702. *Lake* v. *Adams*, 2020 WL 1016352, at *1 (W.D. Va. Mar. 2, 2020).

## ARGUMENT

**I.     Simcoe Should Be Precluded From Offering Testimony About A "Predicted" 10 Percent But-For Revenue Share.**

   The Court should preclude Simcoe from testifying about any "predicted" 10 percent but-for revenue share because Simcoe expressly disclaimed offering this "prediction" as an opinion. Moreover, this "prediction" is unreliable because it is based on a linear regression model that falls well short of satisfying recognized standards in the field, the economic literature, or the case law.

### A.     Having Disclaimed Any Opinion Based On It, Simcoe's "Predicted" 10 Percent But-For Revenue Share Is Not Helpful to the Jury.

   Simcoe admitted at his deposition that he is "not offering an opinion that the but-for take rate is 10 percent," Ex. 91 at 180:5-12, and disavowed it as a proper "basis for any conclusion about the take rates in the but-for world," *id.* at 179:4-12. Where, as here, an expert "disavows an opinion expressed in the expert's report," he should be "precluded from offering that opinion at trial." *Mitchell* v. *Geo Grp. Inc.*, 2022 WL 874287, at *5-6 (D. Ariz. Mar. 24, 2022) (expert disavowed opinion when asked, "point-blank to verify that he wasn't offering" said opinion "and

he responded by confirming that he wasn't doing so"); *Devito* v. *Smithkline Beecham Corp.*, 2004 WL 3691343, at *4 (N.D.N.Y. Nov. 29, 2004) (when an expert "expressly" disavows holding an opinion at his deposition, "necessarily he has no foundation, scientific or otherwise" for it).

Plaintiff may point to Simcoe's conclusory assertion that the 10 percent prediction "informs" his analysis, but a prediction that he disavows and fails to explain how it informs the analysis is improper.  Allowing Simcoe to testify about this "predicted" revenue share will only invite the jury to consider it as a potential input to measuring damages when Simcoe has explicitly disavowed that it should be used as such, particularly where, as here, antitrust damages are "an area where a jury's common sense is less available than usual to protect it." *Tyger Constr. Co.* v. *Pensacola Constr. Co.*, 29 F.3d 137, 145 (4th Cir. 1994); Ex. 91 at 179:4-12 (testifying that the regression "informs my analysis, but it's not, on its own, the basis for any conclusion about the take rates in the but-for world").  Simcoe's claim that his prediction "can form part of a reliable analysis" if it is "used along with all of the other information that I use in doing my own analysis" provides the jury with no understanding of how this predicted revenue share "should be used." *Id.* at 182:11-21.  "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997).

Plaintiff may also attempt to use the 10 percent prediction to support the calculations of its other damages expert, Adoria Lim, who separately calculates Plaintiff's alleged damages using, among other inputs, a 10 percent but-for revenue share solely at the "request" of Plaintiff United States.  Mem. of Law ISO Mot. to Exclude Lim at 7.  Lim did not rely on Simcoe's "prediction" in calculating damages based on a 10 percent but-for AdX revenue share. *Id.* at 19.  Lim does not know the basis for Plaintiff United States' request and is not aware of any facts that support a 10

percent but-for revenue share.  *Id*.  With Simcoe having disclaimed offering any opinion that a "predicted" 10 percent revenue share is a proper but-for estimate, Plaintiff United States cannot claim Simcoe's analysis supports Lim's use of a 10 percent revenue share input.

**B.**     **The "Predicted" 10 Percent But-For Revenue Share Is Not Supported By A Reliable Methodology.**

The 10 percent prediction is not the product of reliable analysis and should be excluded.

***First***, Simcoe's regression supporting the "prediction" includes just seven observations— a number that the economic literature and courts agree is woefully insufficient to produce a reliable estimate.  Daniel L. Rubinfeld, *Reference Manual on Scientific Evidence* at 342 (3d ed. 2011) ("thirty or more data points will be sufficient for regressions with a small number of explanatory variables");[7] Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach* at 176 (5th ed. 2013) (minimum of thirty observations is "satisfactory").

Courts have excluded economic models as unreliable when they are based on too few observations.  For example, the Seventh Circuit lambasted an expert for using "a tiny sample—10 observations," because "small samples are less representative" and a regression based on ten observations "would yield a less precise prediction."  *ATA Airlines, Inc.* v. *Fed. Ex. Corp.*, 665 F.3d 882, 895-96 (7th Cir. 2011); *see also Columbia Gas Transmission, LLC* v. *171.54 Acres of Land*, 2023 WL 9272553, at *7 (S.D. Ohio Nov. 9, 2023) (finding expert model using twenty-two observations as unreliable; crediting opposing expert who pointed to "various manuals" showing twenty-two observations was insufficient); *Cede & Co.* v. *Technicolor, Inc.*, 2003 WL 23700218,

---

[7] Courts frequently rely on Rubinfeld's reference guide.  *E.g., Bouygues Telecom, S.A.* v. *Tekelec*, 2007 WL 4699237, at *5 n.4 (E.D.N.C. Feb. 5, 2007); *Prince George's Cnty.* v. *Wells Fargo & Co.*, 520 F. Supp. 3d 747, 755 n.6 (D. Md. 2021).

at *9 (Del. Ch. Dec. 31, 2003) (similar), *aff'd in part*, *rev'd in part on other grounds*, 884 A.2d 26 (Del. 2005).

      ***Second***, and not surprisingly given the tiny number of observations used in the model, the 10 percent predicted but-for revenue share is not reliable because its p-value—a measure of statistical significance—is far too high.  *In re Lipitor*, 892 F.3d at 634 ("The p-value represents the likelihood that an apparent association observed in a data set is the product of random chance rather than a true relationship"); *see also* Ex. 38, ¶ 66.  For an association like Simcoe's 10 percent prediction to be "considered statistically significant," consistent with the academic literature, courts have looked for p-values of less than "0.05."  *In re Lipitor*, 892 F.3d at 634; Rubinfeld, *supra*, at 320 ("Although the 5% criterion is typical, reporting of more stringent 1% significance tests or less stringent 10% tests can also provide useful information.").  A p-value of less than 0.05 means "there is a less than 5% chance that a discovered association is a false positive result."  *In re Lipitor*, 892 F.3d at 634; *see also* Rubinfeld, *supra*, at 320.

      The p-value for this regression is 0.375, meaning there is a nearly 40 percent chance that the 10 percent prediction is a "false positive result"; the upshot is that there is very little confidence that the 10 percent prediction is what would occur in a but-for world.  *In re Lipitor*, 892 F.3d at 634.  Simcoe agrees that this p-value is far too high.  Ex. 91 at 187:19-188:14 (testifying that the 0.375 p-value is "higher than the standard threshold of, say, 10 percent or 5 percent").  As Google's expert Chevalier explains, this model "cannot be interpreted as demonstrating a positive relationship" between CPM and an exchange's revenue share in light of the .375 p-value.  Ex. 38, ¶ 66.  Simcoe never defended his regression as reliable in the face of Chevalier's criticism.  Ex. 91 at 188:20-189:3.

*Last*, the predicted revenue share is unreliable for common-sense reasons. This crude regression showing a positive correlative relationship between two metrics—CPM and average revenue share—does not and cannot explain the myriad reasons why revenue shares are different across ad exchanges, and does not control in any way for these myriad reasons. As Simcoe acknowledges, variation in prices across exchanges "reflects differences in the nature and quality of publisher inventory sold through each exchange, as well as differences in demand, costs and other features of the auction process across the exchanges." Ex. 5, ¶ 85.

## II. Simcoe's Comparables Approach Should Be Excluded Because It Is Not The Product of A Reliable Methodology.

Simcoe's Comparables Approach to estimate a but-for AdX revenue share is not a reliable or valid application of well-accepted methods of estimating overcharge damages. There are two common, well-accepted methods of measuring overcharge damages: the "benchmark" method (also referred to as a "yardstick" method) and the "before-and-after" method. *Eleven Line, Inc.* v. *N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 207 (5th Cir. 2000); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 399b (5th ed. 2023). Simcoe claims that his Comparables Approach is a proper application of the benchmark/yardstick method of estimating overcharge damages. Ex. 93, ¶ 52. The "yardstick method of estimating but-for prices" is a one by which "prices in a similar market, unaffected by the anticompetitive conduct present in the market at issue, are assumed to be a reasonable stand-in for the but-for prices that would have prevailed in the market at issue absent the anticompetitive conduct." *City of Rockford* v. *Mallinckrodt ARD, Inc.*, 2024 WL 1363544, at *6 (N.D. Ill. Mar. 29, 2024).

There are two methodological errors with Simcoe's Comparables Approach that render it inadmissible. *First*, Simcoe conducts no comparability analysis in selecting the seven ad

exchanges whose data he relies on to estimate a purported but-for AdX revenue share.  **Second**, Simcoe fails to control for differences between the ad exchanges he chooses as his benchmark and AdX, a necessary step in applying this methodology.

### A. The Comparables Approach Selects Comparator Firms In An Arbitrary and Unsupported Manner.

Simcoe does <u>no analysis whatsoever</u> to determine whether any of the comparator firms he uses in the Comparables Approach are sufficiently similar to Google's AdX but for the alleged conduct, as is required in order for a yardstick analysis to yield reliable results.  *Harris Wayside Furniture Co.* v. *Idearc Media Corp.*, 2008 WL 7109357, at *3 (D.N.H. Dec. 22, 2008) ("The yardstick methodology requires similarity of enough business characteristics to make the comparison reasonable and the predictions based thereon trustworthy.").  Rather, he testified that the "appropriateness" of the ad exchanges he selected "is a function of the fact that they sell access to tools, exchanges specifically, that are used to facilitate open web advertising transactions." Ex. 91 at 242:13-243:2.  But the fact that the ad exchanges provide a similar service as Google's AdX does not alone make it a proper comparable for a reliable yardstick analysis; that is because a proper analysis requires looking at more than the provision of a specific service (facilitation of "open-web display ads" worldwide), but identifying comparables based on multiple factors, including the differentiation among products and services offered.  At the same time, the fact that these seven exchanges provide a similar service does not explain why Simcoe excluded the fifty-plus other additional firms that provide a service similar both to Google's AdX <u>and</u> the seven benchmark firms he selected.  Ex. 2, ¶ 220.

Moreover, Simcoe <u>concedes</u> that ad exchanges are differentiated products and used to facilitate more than just "open-web display" impressions.  Ex. 5, ¶ 146.  Simcoe's failure to even consider, let alone account for, the fact that an ad exchange like AdX and so many others facilitate

placement of all sorts of ads, to be placed in all sorts of places, renders his analysis supported only by his say-so. *See* Mem. of Law ISO Mot. to Exclude Lee at 14-17, 29-31.

Simcoe's failure to consider and evaluate comparability factors is fatal to his Comparables Approach. For example, in *Eleven Line*, the Fifth Circuit determined that the plaintiff, an indoor soccer arena, had not demonstrated "reasonable similarity" of the chosen benchmark where "the only evidence of comparability" was the fact that the plaintiff owned the indoor soccer arenas used as comparables; there was no comparability analysis for factors such as "geographical location, size or attractiveness of those facilities, the size and type of the soccer player market that they served," among others, rendering the damages estimate based on those comparables inadmissible. 213 F.3d at 208-09.

Other courts have similarly emphasized that in order for a benchmark method to be reliable, the expert must analyze other "critical factors as what services the companies provided, their customer base, the products they sold, the geographic markets in which they operated, their prices and other critical aspects of the business" to determine whether the selected comparable firms are methodologically proper comparators. *Loeffel Steel Prods., Inc.* v. *Delta Brands, Inc.*, 387 F.Supp.2d 794, 813, 815 (N.D. Ill. 2005) (rejecting testimony on proposed yardstick where expert "admitted he knew nothing about the respective geographic or product markets or customer bases of the eight companies or of the quality of service or any other relevant factor that would bear upon the question of comparability"); *El Aguila Food Prods., Inc.* v. *Gruma Corp.*, 131 F. App'x 450, 453 (5th Cir. 2005) (affirming exclusion where expert "made no effort to demonstrate the reasonable similarity of the plaintiffs' firms and the businesses whose earnings data he relied on as a benchmark"); *City of Rockford*, 2024 WL 1363544, at *7 (rejecting as "fundamentally unreasoned" the selection of the "pharmaceutical market as a whole" as a yardstick market for a

specific type of drug where the only reasoning was a "conclusory assertion that it is appropriate because it reflects 'typical pharmaceutical industry market conditions'").

Simcoe claims, in his rebuttal, that he did not select comparable ad exchanges, but rather comparable transactions. Ex. 93, ¶¶ 48-49. This is a linguistic contortion that contradicts the actual analysis he conducted. Simcoe repeatedly characterized his Comparables Approach as comparing "exchange-level" data. Ex. 5, ¶¶ 73, 141, 142, 148, 216, 217, Figs. 4, 14, 15; Ex. 93, ¶¶ 33, 36, 48 n.71, 54 & n.81, Fig. 3. He also explains how he chose which exchanges to include in his analysis. Ex. 5, ¶ 276 ("I exclude exchanges who only produced data associated with US impressions"). And by his own admission, the data he relies on is aggregated to the exchange level. Id. ¶ 141. Therefore, Simcoe's original position, set forth in his opening report, that he "must compare the average take rates across different ad exchanges, as opposed to comparing take rates charged for comparable impressions" accurately reflects his analysis, notwithstanding any backtracking efforts to the contrary. Id. Moreover, Simcoe's claimed focus on solely "open-web display" impression transactions only furthers Plaintiff expert Lee's unreliable and improper market definition opinions which define a market for ad tech tools based on one capability ("open-web display") even though they are capable of facilitating many additional types and placements of ads. See Mem. of Law ISO Mot. to Exclude Lee at 14-17, 29-31.

### B. The Comparables Approach Fails to Control For Differences That Could Explain Differences In Prices Charged By AdX and Third-Party Exchanges.

Simcoe's Comparables Approach is unreliable for the additional reason that the crude methodology underlying this approach fails to control for the differences among the seven selected ad exchanges and the products or services they offer, any of which might explain why the weighted average prices charged by each ad exchange are different.

Simcoe opines that the but-for AdX revenue share is equal to the weighted average revenue shares charged by the seven benchmark firms used in the analysis. This weighted average calculation yields a 16.2 percent AdX but-for revenue share. As Google's expert Chevalier showed, and Simcoe did not dispute, six out of seven ad exchanges used in the analysis charge more than a 16.2 percent revenue share, and one charges higher than Google's actual revenue share.[8] Ex. 91 at 303:5-13 (agreeing that his but-for weighted average take is lower than the average take rates of six out of his seven comparable exchanges). This weighted average calculation does not attempt to control for any differences which might explain the price variation among the seven benchmark ad exchanges as well as Google's AdX, which is necessary for this analysis to be reliable. Simcoe admits that his Comparables Approach does not do what the law requires, even though he agrees that ad exchanges are differentiated products and as such "relative quality is almost definitionally something that can affect prices." Ex. 91 at 254:12-18. But he did not control for any "factors that may be correlated with differences in average take rates" between or among Google and the seven ad exchanges; nor did he attempt to "tease out various causes" that would explain the difference in prices charged by ad exchanges.[9]

Multiple courts have excluded expert analyses that do not control for differences that might explain the different prices charged by the benchmark firms and the alleged antitrust violator. For

---

[8] *See* Ex. 38, Fig. 10, which shows ███████████████████████████████████
████.

[9] Ex. 91 at 255:22-256:12 (admitting he has not "done a specific analysis to try and isolate the causes that produce the particular variation" between benchmark firm Yieldmo's [32.6%] take rate and others); *id.* at 290:2-10 (admitting "I haven't done a systematic investigation to try and tease out various causes as to what explains pairwise differences in the take rates charged by different - - among the exchanges whose transactions I use in the comparable analysis"); *id.* at 261:2-262:1 (admitting his Comparables Approach measures alleged price differences without controlling for any "factors that may be correlated with differences in average take rates").

example, in *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 976 (C.D. Cal. 2012), the court excluded the expert's yardstick analysis which attempted to measure overcharge damages by comparing the average ticket price for rock concerts promoted by the defendants to the average ticket price for rock concerts promoted by other firms. This comparison assumed that the difference in average ticket prices was due "entirely to defendants' allegedly anticompetitive conduct," and failed to account for other probable reasons. *Id.* at 975. The failure to account "for *any* other possible explanation(s)" for the difference in average prices charged, such as "artist quality/popularity" rendered the analysis "so incomplete as to be inadmissible." *Id.* at 976 (emphasis in original).

Similarly, in *Blue Cross & Blue Shield United of Wisconsin* v. *Marshfield Clinic*, 152 F.3d 588, 592 (7th Cir. 1998), plaintiff (Blue Cross of Wisconsin) alleged it had been overcharged for medical services because the defendant (Marshfield) entered into illegal market-allocation agreements with competitors. Plaintiff's expert offered a benchmark that compared Marshfield's prices to prices charged by other medical providers in Wisconsin. But because the expert did not control for the quality of Marshfield's service relative to other providers, or for their market share in part of the state, the district court rejected the benchmark. *Id.* at 593. The Seventh Circuit affirmed. Because the expert attributed "the entire difference between the prices of the Marshfield Clinic and the prices of other Wisconsin providers of medical services to the division of markets, with no correction for any other factor except differences in the treatment mix," the study could "not provide a rational basis for a judgment." *Id.*; *see also Doctor's Data, Inc.* v. *Barrett*, 2017 WL 11885711, at *6 (N.D. Ill. Mar. 31, 2017) (excluding expert opinion where expert purported to use a yardstick method and "simply assumed" the economic impact was due to the at-issue conduct); *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1003 (8th Cir. 2019)

(affirming district court's exclusion of expert testimony where simply "stating that a benchmark controls for all factors does not make it so, without more"); *Whitfield* v. *John Bourne Co.,* 16 F. App'x 116, 123 (4th Cir. 2001) (affirming district court's grant of summary judgment where plaintiff had "not considered and accounted for the differences inherent in the markets in his" yardstick comparison and explaining that "the disparity in sales numbers could be explained by many reasons other than any unfair practices by appellees"); *City of Rockford*, 2024 WL 1363544, at *9 (rejecting yardstick model where expert failed to distinguish "the effect of the unlawful conduct taken as a whole against any other factors that may have affected the price").

On rebuttal, Simcoe attempts to save his Comparables Approach from exclusion by pointing out that because it is a weighted "average" of millions of "transactions" within the seven firms, it is somehow a "conservative" and therefore valid estimate. Ex. 93, ¶ 49. Chevalier revealed Simcoe's sleight of hand when she calculated average revenue shares by exchange for each of the seven benchmarks. As noted above, this exercise showed six of the seven exchanges charge higher than Simcoe's weighted average of 16.2 percent, and one exchange charges significantly more than the current AdX revenue share. Ex. 91 at 303:5-13; Ex. 38, Fig. 10. By averaging all of the exchanges' revenue shares, Simcoe attempts to mask this underlying set of facts and his failure to explain why or how six out of the seven exchanges from which he calculates a but-for revenue share can charge what would appear to be supracompetitive—*i.e.*, above 16.2 percent—prices. Alternatively, insofar as these exchanges can charge a higher-than-average price because their products or services are different or more valuable, Simcoe has no explanation as to why AdX could not charge a comparably higher-than-average price for competitive reasons.

Further, Simcoe admits that he is taking an average of averages covering "a variety of different kinds of transactions to come up with an average take rate for all sorts of different

transactions on different exchanges."  Ex. 91 at 257:19-258:18.  But averaging inputs that are flawed is not akin to controlling for product differences.  Averaging tries to hide that fundamental flaw; it does not fix it.[10]  Simcoe acknowledged that in averaging the averages, any differences in quality among the ad exchanges' offerings are "averaged out when I pool together all of the transactions through the non-AdX exchanges in calculating a weighted average."  *Id.* at 270:3-14.

A but-for revenue share predicated on an average of prices, which have not been adjusted to account for reasons to explain why some exchanges can charge more than the but-for revenue share or why Google could not as well, is not reliable under *Daubert*.  In *Eleven Line*, the expert used averages of the selected benchmarks to compare plaintiff's financial performance to "the blended performance" of "more- and less-profitable facilities."  213 F.3d at 208.  The Fifth Circuit rejected this rationale, explaining that the "analytical problem and failure of this proof lies in the fact that an average of unknowns is also an unknown," and likened it to opining that because "McDonald's franchises earn a certain average rate of return, a particular franchise will perform to the average."  *Id.*; *see also Harris Wayside*, 2008 WL 7109357, at *2 (excluding expert testimony which "simply compared plaintiffs to the median profitability" of other companies in the industry); *CDW LLC* v. *NETech Corp.*, 906 F. Supp. 2d 815, 824-25 (S.D. Ind. 2012) (damages calculations "based on 'average' yardstick methodology" was inadmissible).[11]

---

[10] Even if Simcoe's focus on "transactions" was consistent with reality, which it is not, Simcoe nowhere explains why it is reliable to exclude "transactions" from ad exchanges, such as DCN and Sharethrough, that produced only U.S. data, even though the "worldwide transactions" comprising the Comparables Approach include U.S. data.  Ex. 5, Fig. 15, notes; Ex. 91 at 192:12-193:1.

[11] When asked what would allow competitor ad exchanges—none of which are accused of anticompetitive conduct—to charge higher than the average revenue shares, Simcoe's response was only that "It's a mathematical property of an average that some will be above and some will be below."  Ex. 91 at 252:12-21.  As the cases cited above show, the average does not make his opinion reliable.

The fact that ad exchanges Simcoe used in the Comparables Approach are the ones which produced data in this case does not render the selection of those firms reliable.  Simcoe was retained by the United States in May 2023.  If Simcoe needed different or additional data to make his analysis reliable, his client had every opportunity to get it for him.  *See Multimatic, Inc.* v. *Faurecia Interior Sys. USA, Inc.*, 358 F. App'x 643, 655 (6th Cir. 2009) (no abuse of discretion when excluding "expert testimony whose flaws stem in part from the expert's efforts to do the best job he could with the limited data his client would provide").[12]

Last, the Event Study does not save the Comparables Approach from exclusion.  Simcoe testified that controlling for unobserved factors in the Comparables Approach was unnecessary because he attempted to do so in the Event Study, which was "complementary" to his Comparables Approach.  Ex. 91 at 261:2-262:1.  The Event Study is unreliable, as discussed below.  But even if it were not, the fact that Simcoe attempted to control for differences in the Event Study shows precisely why he needed to do so if the Comparables Approach were to be methodologically sound.

## III.   Simcoe's Event Study Should Be Excluded Because It Does Not Reliably Control For The Procompetitive Effects of AdX's Transition to Unified First Price Auctions.

The Event Study is premised upon an unreliable and improper assumption that an increase in AdX impressions after the full launch of UPR is a measure of alleged anticompetitive conduct, and is not due to other lawful factors.  Simcoe does not dispute that UPR launched simultaneously with unified first price auction (UFPA), and Simcoe does not dispute that UFPA increased competition.  Because the Event Study does not address or control for the increase in AdX impressions observed being caused by conduct that Plaintiff acknowledges is procompetitive, the Event Study is unreliable.

---

[12] As noted below, firms operating outside of Lee's relevant market did produce data and Simcoe failed to consider whether those firms could be used as comparables.

Beginning in September 2019, at the same time it fully launched UPR, Google also transitioned AdX from second price auction to a unified first price auction—a practice that Plaintiff does not challenge as anticompetitive and whose experts opine increases competition.  Ex. 28, ¶ 195.  UFPA allows all possible sources of demand—including direct deals, header bidding bids, competitor exchanges, and AdX—to compete against each other in real time in a first price auction.  Ex. 1, ¶ 165; *see also* Mem. of Law ISO Mot. for S.J. ¶ 81.  Notwithstanding the undisputed fact that AdX's move to UFPA increased competition, Simcoe conducted no analysis to isolate or account for the effect UFPA had on the increase in AdX impressions after UFPA was implemented, Ex. 91 at 341:20-342:5, and did not include a variable in his Event Study to control for any increase in impressions due to UFPA.  *Id.* at 342:18-343:3.  Because there is no showing that "other causes" of an alleged overcharge "have been filtered out of the damage claim," the Event Study must be excluded.  *S. Pac. Commc'ns Co.* v. *Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 1090 (D.D.C. 1982); *see also In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1013 (N.D. Cal. 1979) ("If injury is shown to be attributable to factors for which the defendant cannot be held liable, then a damage case that ignores those factors must fail."); *Werdebaugh* v. *Blue Diamond Growers*, 2014 WL 7148923, at *10 (N.D. Cal. Dec. 15, 2014) (finding fatal methodological error where the expert's damages model "omitted," and thus failed to "control for," a real-world variable whose effect was highly correlated with that of the at-issue conduct because such a model was "incapable of isolating the damages attributable to Defendant's alleged wrongdoing").

Simcoe opined that the effect of the simultaneous transition to UFPA "would be neutral" on his Event Study because a handful of documents vaguely characterize the benefits of the September 2019 rule changes as being attributable to the removal of "last look" and lower price floors "that a first-price auction enables."  Ex. 91 at 341:4-343:3; Ex. 5 ¶ 157 & n.213.  These

cherry-picked documents are not a proper basis to opine that he did not have to control for UFPA. One of the documents is an email <u>written a year before</u> UFPA was even introduced. "Instead of econometric analysis," Simcoe's reliance on these internal company documents is impermissible "armchair economics." *Menasha Corp.* v. *News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 664 (7th Cir. 2004); Ex. 91 at 342:7-343:3 (admitting that his event study model "does not" include "a variable that somehow captures the effect of UFPA in the regression"). Further, the fact that Simcoe chooses to rely on some record evidence but ignores contrary evidence is impermissible cherry-picking. *LeClercq* v. *The Lockformer Co.*, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (excluding expert whose "failure to discuss the import of, or even mention," material facts was "cherry-picking the facts he considered to render his opinion"). As just one example, Simcoe cites as support for his opinion one page from a Google presentation, but ignores other evidence in the same deck showing that UFPA resulted in 43 percent higher impressions on AdX. Ex. 61 at -361.

**IV.    Simcoe's Apportionment Analysis Must Be Excluded Because it is Premised on the Fundamentally Flawed Assumption that FAAs are "Representative Advertisers."**

Simcoe's Apportionment Analysis is unreliable because it is based on an assumption contradicted by overwhelming evidence that the FAAs are "representative"—i.e., an average— worldwide advertiser. Simcoe's flawed assumption that the FAAs are "representative advertisers" results in an apportionment figure that does not take into account the demand elasticities of the eight FAAs. Because Simcoe did not analyze or otherwise account for differences in the factors which affect the FAAs' demand for "open-web display" impressions as compared to the average worldwide advertiser, his Apportionment Analysis will not provide the jury with a reliable basis, which also fits the facts of this case, to estimate the portion any alleged AdX overcharge that is borne by any individual FAA. As a result, any damages award would be based on an improper

24

expert opinion.  Even if expert testimony is "based on sound methodology," it "should be excluded if it is based on unsound or incorrect assumptions."  *It's My Party, Inc.* v. *Live Nation, Inc.*, 88 F. Supp. 3d 475, 483 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th Cir. 2016).

The Apportionment Analysis seeks to allocate to the publisher side and advertiser side of an AdX transaction their respective shares of the alleged AdX overcharge and does so in part by looking at demand elasticities, or demand curves, faced by advertisers.  Identifying demand curves faced by different advertisers is a necessary step of such an analysis because different demand elasticities can lead to different shares (Simcoe's "incidence") of the alleged AdX overcharge borne by specific advertisers.  *See* Ex. 38, ¶¶ 18, 158-159; *cf.* Ex. 93, ¶ 30 (acknowledging that when economists estimate aggregate supply and demand elasticities to measure the incidence of a tax on a group of buyers or sellers they are measuring the <u>average</u> incidence for a group, as opposed to buyer or seller-specific incidence (share)).  By treating the FAAs as representative advertisers, Simcoe wrongly treats the FAAs as having the same demand curves as one another as well as the same demand curve as the "marketwide" worldwide average advertiser.  Ex. 91 at 369:2-370:4.  Yet Simcoe acknowledged that the FAAs do not face the same demand curves as one another or as the demand curve he generates for all worldwide advertisers, in part because FAAs have "their own objectives in purchasing ads, they purchase different kinds of ads as well as different quantities of ads."  *Id.* at 382:11-14; 379:11-21; *cf.* Ex 38, Fig. 24 (showing significantly different average CPMs by FAA).  Simcoe's own rebuttal analysis demonstrates this phenomenon.  His Figure 2 shows that demand elasticities vary <u>significantly</u> across advertisers, but he does not then account for how that variation would change the portion of the alleged AdX overcharge the FAAs would bear in light of those significant variations.

There are multiple reasons in the record showing why it is possibly the case the FAAs are therefore not representative, none of which Simcoe controlled for in the Apportionment Analysis:

- The FAAs go through a regulated government contracting process in order to contract with ad agencies, who in turn buy ads on their behalf.[13]

- The FAAs face federal appropriations and other budgeting issues,[14] and may not have the money allocated to them to actually spend when needed.[15]

- The FAAs have rules dictating the channels and platforms they are permitted to advertise on for security reasons.[16]

- Some FAAs advertise primarily during very discrete time periods.  For example, the Census Bureau's largest advertising efforts surround the census, which occurs every ten years.[17]

- Each FAA targets different audiences, and those audiences are specific to the federal agency's mandate.  For example, the VA wants to reach people who have served in the

---

[13] *E.g.*, Ex. 18 at 193:1-194:5 (explaining RFP process for USPS ad agency contracting); Ex. 20 at 90:23-93:24 (describing the Navy's selection of VMLY&R as its ad agency and the corresponding contract award process undertaken).

[14] Ex. 22 at 63:3-64:12 (explaining that the Office of Mental Health and Suicide Prevention at the VA does not have a specific paid media budget but rather receives funding for paid media via "lag funding," i.e. funding not used by other programs in the office, "kind of like leftovers").

[15] Ex. 65 at 42:18-44:7 (explaining the many layers through which funding must travel before being approved for any given task order and the irregularity in the timing in which funds are received); Ex. 23 at 91:18-92:6; 109:11-110:13 (indicating that Congress appropriates funds to NHTSA for specific campaigns); Ex. 95 at -313.

[16] Ex. 18 at 284:13-285:15 ("I would note something like a Snapchat we wouldn't use.  We're required to memorialize our advertising, and Snapchat is designed to put something up and make it go away.  It doesn't work for us under the federal umbrella."); Ex. 23 at 45:19-46:9 ("because I'm a Government agency, I'm not able to advertise in all those," referring to a list of digital advertising channels); Ex. 16 at 56:17-21 ("TikTok is a social media platform but it's not one that we are allowed to be on.").

[17] Ex. 95 at -313 (noting "legislation requires a census every 10 years").

military, and specifically does *not* want to reach those who have not.[18]   The armed

forces want to target young individuals who have not served in the military.[19]

Simcoe's failure to consider or account at all for evidence like the above, demonstrating that FAAs

are differentiated in many ways, results in an opinion and analysis that fails to account for

important facts of this case.  *See LeClercq*, 2005 WL 1162979, at *4 (excluding expert whose

"failure to discuss the import of, or even mention," material facts amounted to "cherry-picking the

facts he considered to render his opinion," and did not satisfy *Daubert*); *El Aguila Food Prods.,*

*Inc.* v. *Gruma Corp., Inc.*, 301 F. Supp. 2d 612, 620-24 (S.D. Tex. 2003) (excluding expert

testimony "based on wholly insufficient data" while failing to take into account "the facts of the

case"), *aff'd*, 131 F. App'x 450 (5th Cir. 2005).

## V.     Simcoe's Opinions Must Be Excluded In Whole If Any Conduct He Removed From His But-For World Is Held To Be Lawful.

Simcoe opines that his Comparables Approach and Event Study measure the revenue share

Google would charge for AdX transactions in "a but-for world where a) there is no tie between

Google Ads and AdX"[20]; b) "there is no tie between AdX and DFP"; and c) "publishers can vary

the floors for different exchanges within DFP."  Ex. 5, ¶ 103.  As explained in Google's motion

for summary judgment, these purported anticompetitive conducts are lawful because 1) Plaintiffs

---

[18] Ex. 22 at 234:14-236:13 (explaining the VA wants to do its "best" to get ads "in front of relevant veteran callers").

[19] *E.g.*, Ex. 20 at 125:14-127:17.

[20] Simcoe's opinion notwithstanding, Plaintiffs do not allege that Google unlawfully tied Google Ads and AdX.  *See* First Am. Complaint, ECF No. 120 ("FAC") ¶¶ 336-339.  Instead, as their economic experts opining on anticompetitive conduct explain, Plaintiffs allege that Google should have given rival exchanges "comparable access" to Google's own Google Ads customers.  Ex. 1, ¶ 12(3)(1); Ex. 6 at 33:7-34:2, 46:8-47:11.  Those arguments challenge a refusal to deal, not any tying arrangement.  Google has therefore sought summary judgment as to any claim based on the restriction of Google Ads demand to AdX on the ground, among others, that Plaintiffs challenge a lawful refusal to deal with competitors.  *See* Mem. of Law ISO Mot. for S.J. at 22-27.

have failed to define a market in which advertisers purchasing ads, including through Google Ads, participate; 2) there is no tie between AdX and DFP in the real world and Plaintiffs' tying claim is a duty-to-deal claim in disguise; and 3) all three conducts are lawful refusals to deal and product improvements.  *See* Mem. of Law ISO Mot. for S.J. at 23-28, 28-30.  But the Court need not agree with Google as to all three alleged forms of conduct being lawful in order for Simcoe's opinions to be rendered irrelevant.  Even if just one of alleged forms of conduct is lawful, Simcoe's estimates of the but-for AdX revenue share must be excluded in full because those estimates are predicated upon a but-for world that removes lawful conduct.

Where a "plaintiff's expert's damages study cannot segregate lawful from unlawful practices, then no damages may be awarded on the basis of that study."  Areeda & Hovenkamp, *supra*, ¶ 657b.  This requirement, known as "disaggregation" of damages, *id.*, follows from the "unremarkable premise" that a model purporting to serve as evidence of antitrust damages must measure only those damages attributable to unlawful practices.  *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 35-38 (2013) (rejecting expert "methodology that identifies damages that are not the result of the wrong"); *Marshfield Clinic*, 152 F.3d at 593 ("Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment."); *City of Rockford*, 2024 WL 1363544, at *6-9 (same).

## VI.  Simcoe's Opinions Must Be Excluded In Whole If The Court Grants Google's Motion to Exclude the Testimony of Dr. Robin Lee.

Simcoe relies on Lee's conclusions in forming the opinions on which his but-for world is predicated.  *See supra* p. 3.  An expert whose proffered testimony relies on another expert's theories that have been or may be excluded as unreliable should also be excluded.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL 10434367, at *2 (N.D. Cal. Jan. 23, 2017)

(excluding damages expert opinion because it relied upon another expert's unreliable overcharge estimates to calculate total damages); *Kentucky Speedway, LLC* v. *Nat'l Ass'n of Stock Car Auto Racing, Inc*., 588 F.3d 908, 919 (6th Cir. 2009) (excluding plaintiff's expert's opinion regarding defendant's alleged anticompetitive conduct because it was based on second expert's market analysis which the court had found to be unreliable); *Sims* v. *Kia Motors of America, Inc*., 839 F.3d 393, 404-06 (5th Cir. 2016) (same).

Google has concurrently moved to exclude Lee's opinions on market definition and market power that Simcoe incorporates as inputs into his own opinion and upon which Simcoe's but-for world is predicated.  *See* Mem. of Law ISO Mot. to Exclude Lee at 14-30.  To the extent that the Court excludes those opinions, the Court must also exclude all of Simcoe's opinions, as his but-for world relies upon Lee's opinions regarding the relevant antitrust markets and Google's alleged market power in those markets.

## CONCLUSION

For the above reasons, all of the opinions of Dr. Timothy Simcoe should be excluded.

Dated: April 26, 2024

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Julie Elmer (*pro hac vice*)
Lauren Kaplin (*pro hac vice*)
Scott A. Eisman (*pro hac vice*)
Jeanette Bayoumi (*pro hac vice*)
Claire Leonard (*pro hac vice*)
Sara Salem (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com




*Counsel for Defendant Google LLC*

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Joseph Bial (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Bryon P. Becker (VSB #93384)
Erica Spevack (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile (202) 223-7420
kdunn@paulweiss.com

Meredith Dearborn (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (202) 330-5908
mdearborn@paulweiss.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com