Exhibit A

HIGHLY CONFIDENTIAL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

United States of America, *et al.*,

**Plaintiffs,**

**v**

Google LLC,

**Defendant.**

**Case No. 1:23-cv-00108**

**HON. LEONIE H. M. BRINKEMA**

EXPERT REPORT OF
## TIMOTHY SIMCOE, PH.D.

**DECEMBER 22, 2023**

HIGHLY CONFIDENTIAL

exclusionary conduct. Finally, I briefly summarize the purchases that federal agency advertisers ("FAAs") make through AdX.

15. In Section IV, I provide the analytical framework for my damages calculations. The calculation proceeds in two steps. First, I estimate the total overcharge due to Google's conduct. Second, I use the tax incidence model to estimate the proportion of the total overcharge incurred by advertisers as opposed to publishers. I describe the quantitative inputs that are required at each step, as well as the data and methods that I use to estimate each input.

16. In Section V, I present my estimates of each input to the damages model, and then combine those inputs to estimate the advertiser overcharges resulting from Google's conduct. Along the way, I also describe additional analyses that I have performed as "checks" or "robustness tests" on my analysis.

17. In Section VI, I describe additional damages to FAAs that stem from Google's conduct, but that are not the result of overcharges on AdX specifically. Though I do not quantify these damages, I explain why they are likely to be significant.


## II. Open Web Display Ad Tech

18. This section provides background information on the firms, technologies, products and services that comprise open web display advertising ("display advertising"), which is one type of online advertising. I describe buyers (advertisers) and sellers (publishers) of display advertising opportunities, and the ways that these parties transact. I also describe a group of technological products the "ad tech stack" that buyers and sellers of open web display advertising use to automate the purchase and delivery of open web display advertisements.[4]

19. Professor Lee's Report provides additional information about many topics discussed in this section of my report.[5] Although this section of my report provides sufficient background to

---

[4]   Figure 30 in Appendix F summarizes a number of key display advertising terms and acronyms that are used throughout my Expert Report.

[5]   *See* Expert Report of Robin S. Lee, PhD, *United States of America, et al., v. Google, LLC*, Case No. 1:23-cv-00108, December 22, 2023 ("Lee Report"), Section II.

understand my analysis of the harm to FAAs caused by Google's conduct, a reader seeking more information about specific display advertising technologies or business practices should refer to Section II of Professor Lee's Report.

## II.A. Display Advertising Basics

20. Display advertising refers to various types of advertisements that may be served to users who browse websites or use mobile apps.[6] The business model adopted by many internet publishers involves bundling display advertisements together with content that users of an app or web site wish to consume.[7] If, when an internet user loads a web page, it contains an advertisement, that instance of a particular ad being shown to a particular user is called an impression.[8] The total number of impressions that a website could potentially serve (i.e., display to users) is referred to as a publisher's inventory.[9]

21. Display ads may consist of images, text, interactive elements, audio, or some combination of these.[10] Some of the most common examples of display ads include banner ads, which function

---

[6]  *See* Lee Report, Section II.A.

[7]  Some publishers may both charge for their content, and advertise to their users. Publishers may also monetize their content in other ways, such as soliciting donations from users.

[8]  *See* Lee Report, Section II.A.1.; *see also,* "What is an Ad Impression? All You Need to Know," AdPushUp, May 29, 2023, https://www.adpushup.com/blog/what-is-an-ad-impression/ ("An ad impression is a fundamental metric in online advertising. It occurs when an advertisement is successfully displayed to a user on a website, mobile app, or any digital platform. It signifies that an ad has been visually presented, regardless of whether the user interacts with it or not.").

[9]  A publisher's inventory is not the total quantity of ads that were actually sold and displayed, but rather, the maximum amount that the publisher could have sold given the number of user visits and the tool configuration of each page. *See* GOOG-DOJ-AT-02199478, at -485 (05/26/2021) ("Inventory is the sum of requests to which ads can be delivered.").

[10]  *See* Lee Report, Section II.A.; *see also,* GOOG-DOJ-AT-00221276, at -284 (12/01/2017) ("When it comes to ad creatives there are several that you can run on the Google Display Network: Text Ads[,] Responsive ads[,] Native ads[,] Image ads[,] Dynamic ads[,] Lightbox ads[,] Video ads[,] Gmail ads"); *see also,* Michelle Ofiwe, "What Are Display Ads? Display Advertising Explained," Semrush Blog, July 9, 2021, https://www.semrush.com/blog/display-ads/ ("Display ads are graphic adverts that appear online on websites, mobile apps, and social media. They usually include text, images, video, and sometimes audio.").

Although some video advertisements may have an audio component, ads that are audio only are excluded from my analysis.

HIGHLY CONFIDENTIAL

**FIGURE 2: COMPONENTS OF THE AD TECH "STACK"**

| | Publisher Ad Server | Ad Exchange / Sell-Side Platform | Buyer Tools | |
| --- | --- | --- | --- | --- |
| | | | DSP | Ad Network |
| **Functionality** | Ad serving logic Publisher controls Monitoring and reporting | RTB auction management Inventory to bid matching | Bidding strategy User targeting Campaign mgmt | Simplified bid tools CPM-to-CPC pricing Reporting |
| **Google Product** | Ad Manager (GAM/DFP) | AdX | DV360 | Google Ads |
| **Typical Pricing** | Volume tier fee per direct impression served. Waived if exchange fee is charged. Low tier at GAM is $0.085 CPM. | "Take rate" or ad-valorem transaction tax on advertiser payments. Google averages 20% take rate on AdX. | Revenue share (similar to take rate) with volume discounts. | "Margin" based on difference between CPC fees and CPM costs. |
| **Other Providers** | Equativ Xandr | Equativ, Magnite (Rubicon), OpenX, Index Exchange, Xandr, Yahoo | Adobe, Amazon, TradeDesk, Verizon, Xandr | Criteo |

Source: Lee Report, Section II.B.1, Section II.D, Section IV.C, Section IV.D, and Section II.B.2.a.

## II.B.1. Publisher Ad Servers

30.  Publisher ad servers allow publishers to connect with the ad tech ecosystem and automate the management of their ad inventory. These pieces of software allow publishers to set parameters that determine which advertisements will be allocated to each impression in their inventory—including impressions allocated through both direct and indirect sales channels.[24] To conduct an RTB auction, publisher ad servers must first integrate or connect with ad exchanges. If an ad server and an ad exchange are integrated, then the server can send "bid requests" for a particular impression to the exchange, and in turn, receive offers to purchase that impression from advertisers who also connect to the exchange.

31.  As the layer in the stack that makes the final decision regarding what advertisement is matched to each impression opportunity, a publisher ad server is responsible for routing specific advertisements to individual web browsers.[25] Publisher ad servers may also have other features

---

[24]  *See* Lee Report, Section II.B.1.; *see also*, "The Main Technology Platforms and Intermediaries in the Digital Advertising Ecosystem," The AdTech Book by Clearcode, accessed December 19, 2023, https://adtechbook.clearcode.cc/adtech-platforms-and-intermediaries ("All of the popular advertising agencies have their own agency trading desk which runs the programmatic media-buying activities for the agency's clients." and "First-Party Ad Server…This technological platform allows publishers to manage the ad slots on their website and display ads that have been sold directly to advertisers (i.e. direct campaigns).").

[25]  *See* Lee Report, Section II.B.1.

that help publishers monitor sales, bill customers, and make inventory management decisions by tracking metrics such as click-through rates.[26]

32. Google's publisher ad server is GAM. Google originally acquired this product through its 2008 acquisition of DoubleClick. In many Google documents, the GAM publisher ad server is referred to by its legacy name of DoubleClick for Publishers ("DFP").[27]

33. Publisher ad servers generally charge a fixed fee for each direct impression served, with tiered volume discounts and possibly other negotiated discounts for individual publishers.[28] For example, Google's publisher ad server charges $0.085 per 1,000 direct impressions served up to 50 million impressions.[29] Many publisher ad servers waive their fees if the transaction uses an ad exchange owned by the same firm. For example, Google does not charge ad serving fees for indirect impressions if those impressions are purchased by an advertiser using Google's AdX ad exchange.[30]  The share of total US and worldwide impressions served is around 90 percent for Google's publisher ad server.[31]

### II.B.2. Ad Exchanges

34. Ad exchanges are the software tool that conducts the RTB auctions that are the defining feature of the programmatic indirect channel. Ad exchanges are also referred to as supply-side platforms

---

[26]   *See* Lee Report, Section II.B.1.

[27]   David Lawsky, "Google Closes DoubleClick Merger After EU Approval," Reuters, March 11, 2008, https://www.reuters.com/article/us-google-doubleclick-eu/google-closes-doubleclick-merger-after-eu-approval-idUSBFA00058020080311 ("Google Inc closed its $3.1 billion acquisition of online ad delivery company DoubleClick Inc on Tuesday, just hours after the deal won unconditional approval from the European Commission."); *see also*, GOOG-DOJ-AT-01510462, at -466 (06/23/2020) ("2008[:] DoubleClick acquisition (ad server, exchange)").

[28]   *See* Lee Report, Section II.D.

[29]   *See* Lee Report, Section II.D.

[30]   *See* Lee Report, Section II.D.

[31]   *See* Lee Report, Section V.B.2.a.

in which buyers attract sellers to an exchange, and vice versa. Ultimately, because the number of buyers and sellers on an exchange determine its perceived quality, scale is an important dimension of competition among ad exchanges.[36]

37.   Google's ad exchange is called AdX.[37]  This product was originally acquired as part of Google's 2008 acquisition of DoubleClick.[38] AdX is currently the largest ad exchange. Estimates based on either revenue or the number of open web RTB transactions conducted through AdX place its share of the ad exchange market between 45 and 60 percent.[39] Several other firms either currently operate or have previously operated ad exchanges, including Yahoo, Index Exchange, Pubmatic, Magnite, and Xandr.[40]

38.   Ad exchanges typically charge a fee based on a percentage of the amount bid by an advertiser to purchase an impression. This percentage is called the take rate. The average take rate charged by AdX is 20 percent.[41] So, for example, if an advertiser submits a $10 bid to AdX, and that is the highest bid among all AdX demand sources, then AdX will submit an $8 bid to the publisher ad server on behalf of that advertiser, and keep $2 for AdX. If the publisher ad server accepts the bid, AdX would collect $10 in gross revenue (the amount paid by the advertiser), and $2 in net revenue (the amount remaining after paying $8 to the publisher).[42]

39.   Certain exchanges vary their take rate from one auction to the next, and advertisers do not always know what take rate they are being charged.[43] Likewise, publishers generally know only

---

[36]   *See* The Report of Professor Gabriel Weintraub, PhD, *United States of America, et al., v. Google, LLC*, Case No. 1:23-cv-00108, December 22, 2023 ("Weintraub Report")*,* Section III.

[37]   *See* Lee Report, Section II.C.2.
        AdX and DFP were combined to form GAM in June 2018. *See* Lee Report, Section II.C.

[38]   Complaint ¶ 16, ECF No. 208.

[39]   *See* Lee Report, Section. V.C.2.a., Figure 46.

[40]   Summaries of these ad exchanges are provided in Figure 32 in Appendix F; *see also*, Lee Report, Section IV.D.; *see also*, "The Main Technology Platforms and Intermediaries in the Digital Advertising Ecosystem," The AdTech Book by Clearcode, accessed December 19, 2023, https://adtechbook.clearcode.cc/adtech-platforms-and-intermediaries.

[41]   *See* Lee Report, Section II.D. and V.C.3.

[42]   This simplified example excludes various other fees that might be charged by the ad server or the buying tools to keep the exposition simple.

[43]   *See, e.g.*, Lee Report, Section IV.F.2.

impression available to a private auction.[66] They set parameters governing how often a given advertisement can be shown to a specific user.[67] For impressions that may be sold through an RTB auction, the configuration of the publisher ad server determines which advertiser ad networks and exchanges receive "bid requests" and whether there is a "floor" (or "reserve price") below which the impression will not be sold. Publishers generally adjust the tool configuration of their publisher ad server over time based on internal objectives, which may include "yield" (or "revenue") and ad quality, and changes in the market environment.[68]

54. At the other end of the stack, buyers select a tool for purchasing impressions. When choosing a DSP or advertiser ad network, advertisers consider the amount of inventory that is addressable through the tool, as well as the other features of the product.[69] In contrast to publisher ad servers, however, many advertisers "multihome" (i.e., use more than one advertiser ad network or DSP) in order to access a larger quantity and variety of publisher inventory.[70]

---

moderate an advertiser's demands on behalf of the publishers. You know, our ability to do reporting, help them have insights. All of these things are attributes that the entire, you know, that each individual business competes on and is evaluated on. Buyers also look to make sure that the traffic is of high quality, doesn't have significant amounts of spam or invalid traffic, which is fun with robots, which is part of what Ads.txt tried to help stop."); *see also,* Deposition of Chris LaSala (Google), August 17, 2023, 630:10–630:19 ("Q. Okay. Is brand protections for publishers another value that Google Ad Exchange offered? A. Yeah, that's fair. I kind of put that in the bucket of, like, fraud and spam protection, but you're right, that's a little bit different. It's making sure - brand protection is making sure that a questionable ad doesn't show up against brand content. That's another one.") *see also,* Deposition of Scott Sheffer (Google), July 20, 2020, 266:19–268:17 ("My question is, why couldn't publishers get identical marketing demand and yield on other exchanges as they did on AdX? A….So the second one is - so inventory quality is another one. So, again, like, as we do on the advertiser-facing side, on the publisher-facing side, we have a pretty rigorous process to stop bad publishers from coming into the network or bad inventory from surfacing. So we tend to remove that as well, and so that's another way in which other exchanges might - might differ in terms of the remarketing demand, quality of inventory and the yield, that would end up surfacing from the advertiser through to the partners.").

66   *See* Lee Report, Section IV.C.; *see generally* Deposition of Johnathan Bellack, October 10, 2020, 58:1–60:25.

67   *See* Lee Report, Section II.B.

68   *See* Lee Report, Section II.B.1. and Section VII.D.2.

69   *See generally* Lee Report, Section II.B.2.; *see also,* Tiffany Caldwell, "Programmatic Advertising: Choosing the Right DSP for Your Business," Portent, December 15, 2020, https://www.portent.com/blog/programmatic/programmatic-advertising-choosing-the-right-dsp-for-your-business.htm ("Evaluating the inventory, technology, brand-safe functionality, reporting and analytics, cost, and the partnership are all crucial to choosing the right DSP for your business. Evaluating a DSP may seem daunting, but it's an essential step in setting your business up for success when launching programmatic advertising.").

70   *See* Lee Report, Section III.C.

### III.A.1. Markets for Ad Tech Tools

63. Professor Lee's Report defines a set of relevant antitrust markets for publisher ad servers, ad exchanges, and advertiser ad networks.[89] I have reviewed his analysis and adopt his conclusion that these are relevant antitrust markets for the purpose of assessing Google's alleged anticompetitive conduct. I also adopt Professor Lee's conclusion that Google has substantial and sustained market power in the market for each of these ad tech tools.[90]

64. There are a number of factors that contribute to Google's market power across the entire ad tech stack, and not all of those factors are specific to the market for individual ad tech tools. Some of the assets that differentiate Google from its competitors across the ad tech stack are: (i) Google's unique owned and operated ("O&O") inventory generated by Search and YouTube; (ii) its Google Ads advertisers, many of whom purchase Google's O&O inventory through its proprietary tools; (iii) the data that Google amasses on users across all of its businesses; and (iv) Google's publisher clients on DFP.[91] As one Google executive noted in a 2017 email, "the value of Google's ad tech stack is less in each individual product, but in the connections across all of them."[92] In communications with regulators, industry participants have also expressed their belief that Google has "dominance across the ad tech stack," which benefits Google "to the detriment" of its competitors.[93]

65. In this report, I estimate the prices that Google would have charged for its publisher ad server and ad exchange products but-for its exclusionary conduct. The remainder of this sub-section

---

[89]   *See* Lee Report, Sections IV.C.–IV.E.

[90]   *See* Lee Report, Section V.

[91]   *See* Lee Report, Section V.A.1.

[92]   GOOG-DOJ-04830048, at -048 (09/05/2017) ("The value of Google's ad tech stack is less in each individual product, but in **the connections across all of them.**") (emphasis in original).

[93]   TTD_DOJ-GOOG23-0001957, at -966–67 (02/03/2022) ("Google's integration of its publisher ad server and SSP/ad exchange into Google Ad Manager ("GAM") has benefitted Google to the detriment of competitor DSPs like TTD. We understand that GAM has unrivalled visibility in terms of bids submitted and actual clearing prices. Further, because of its dominance across the ad tech stack, Google is uniquely positioned to amass data points on the buy- and sell-side to combine with its own first party data from Google products, properties, and services to further bolster its competitive advantage, including its understanding of a user or ad impression. We believe that these advantages, certain of which are summarized below, have driven customers to not just GAM, but also Google's DSP, DV360.").

HIGHLY CONFIDENTIAL

provides an overview of those two markets and evidence that Google has market power within each of them.

66. Professor Lee's Report provides an extensive discussion of the evidence that publisher ad servers constitute a relevant antitrust market, and that Google possesses substantial and sustained market power within that market.[94] Here, I briefly summarize several key points from his analysis.

67. Publishers that sell open web display impressions have three basic alternatives to purchasing a publisher ad server: (i) selling their inventory exclusively through the indirect channel via advertiser ad networks, (ii) selling their inventory exclusively through the direct channel, or (iii) building their own publisher ad server. Evidence shows that none of these options is an effective substitute, and so industry participants recognize publisher ad servers as an important and distinct tool within the ad tech stack.

   a. Large publishers that seek to optimize their sales across the direct channel (where prices are higher) and the indirect channel (where it is possible to efficiently reach a larger volume of advertisers) cannot rely only on advertiser ad networks.

   b. Direct sales are very costly compared to using a publisher ad server, making them a poor substitute. Given the current price disparities between direct and indirect sales, publishers would substitute to direct sales if they could easily do so.

   c. Developing a proprietary publisher ad server is a costly and risky investment. It is beyond the financial reach of many small publishers, and even for larger publishers would bring few benefits unless they can convince demand-side partners (such as AdX) to integrate.

   d. Finally, Google's internal documents recognize different competitors for DFP than for other products within its ad tech stack.[95]

68. Several types of evidence indicate that Google has substantial and sustained power in the publisher ad server market.

---

[94]   *See* Lee Report, Sections IV.C. and V.B.
[95]   *See* Lee Report, Section II.B., Figure 19.

HIGHLY CONFIDENTIAL

a.   Google's DFP ad server possesses a very high share of the market. Google's internal documents suggest that it holds between and 85 and 90 percent market share as of 2018.[96] Facebook estimated DFP's market share to be between 70 and 80 percent in 2018.[97] Professor Lee's analysis of Google data suggests that DFP serves 91 percent of total worldwide open web display impressions.[98]

b.   Industry participants have noted that publishers' choice of a publisher ad server is a very "sticky" decision. Publishers rarely change publisher ad servers because large investments are required to integrate the publisher ad server with a website. DoubleClick's former CEO observed of publisher ad servers that, "[n]othing has such high switching costs…[t]akes an act of God to do it."[99]

c.   Google has taken several product design actions that degrade the quality of its publisher ad server. In particular, Google's use of "first look" to preference bids submitted through AdX reduces competition to purchase impressions. Google's adoption of Unified Pricing Rules ("UPR") placed restrictions on publishers' ability to set different price floors for each exchange, thus removing control and constraining publisher choice. The fact that Google maintained its very high market share in the publisher ad server market despite these practices indicates that it has substantial market power.[100]

69.   As with publisher ad servers, Professor Lee's Report provides an extensive discussion of the evidence that ad exchanges constitute a relevant antitrust market, and that Google possesses

---

[96]   *See, e.g.*, GOOG-DOJ-03070314, at -314 (05/08/2018) ("For the past couple of decades, DFP has been the ad server of choice for pretty much all publishers for display. 90% market share"); *see also*, GOOG-DOJ-03227244, at -252–272 (06/24/2019) ("Non-Weighted Breadth of top 2/3 of the addressable market…Global XC…Web Platform Penetration[:] 85%…Weighted average penetration [is] ~91%") and -272 ("Web DFP Penetration [is] # domains with DFP tag or adsense hardcoded or Yavin implementation…# domains addr. running ads (non weighted Breadth)").

[97]   *See* FBDOJGOOG_00028978, at -992–993 (02/2018) (slide deck shows "Google market share" for 2017 and the forecast for 2022 for Web, with Google's share at 72% in 2017 and forecast at 80% in 2022.).

[98]   *See* Lee Report, Section V.B.2.

[99]   GOOG-DOJ-01439665, at -669 (02/11/2009) ("Nothing has such high switching costs. If there's a better network or exchange, you can just switch to it. Switching platforms is a nightmare. Takes an act of God to do it.").

[100]   *See generally* Lee Report, Section VIII.A.

HIGHLY CONFIDENTIAL

**FIGURE 4: EFFECTIVE TAKE RATE FOR WORLDWIDE OPEN WEB DISPLAY + VIDEO OUTSTREAM IMPRESSIONS**



Source: Brattle Analysis of monthly AdX and third-party exchange data. See Exchange Figures workpaper.

Notes: I calculate the take rate for each exchange as the fees collected by any given exchange divided by total advertising spending through that exchange on a monthly basis. I exclude from this figure exchanges whose produced data was insufficient to calculate either total advertiser spending or total fees collected by the exchange. See Appendix C.2.

74. AdX's average take rate has remained very close to 20 percent for the entire period from January 2014 to March 2023.[111] The take rates of third-party exchanges have generally trended

---

[111] This does not imply that Google charges 20 percent for the publisher ad server and exchange on every transaction, or to every publisher. Google has signed some revenue sharing "deals" with a handful of large publishers that effectively set AdX's take rate for those select publishers somewhat below 20 percent. *See, e.g.*, GOOG-AT-MDL-007366628, at -655 (04/2020) ("Summary of Current CBS Deal: Key Terms…OA Rev Share Tier[:] Year 1[:] 80% up to $2M / month[,] 82% from $2M - $4M / month[,] 85% above $4M / month…"). However, the aggregate data show that overall impact of those deals is relatively small.

HIGHLY CONFIDENTIAL

**FIGURE 5: WORLDWIDE OPEN WEB DISPLAY IMPRESSIONS**



Source: Brattle Analysis of monthly AdX and third-party exchange data. See Exchange Figures workpaper.

Notes: I smooth the monthly impressions data in this figure using a 4-month rolling average.

See Appendix C.2.

77. The patterns illustrated in Figure 4 and Figure 5 are consistent with Professor Lee's conclusion that Google has substantial and sustained market power in the ad exchange market.[113] For exchanges like ███, I observe the expected relationship between take rates and quantities, where a decline in price is accompanied by an increase in volume. For AdX, however, a constant price (that is increasing in relative terms) is accompanied by steady growth in the total volume of impressions served through this set of exchanges.

---

[113] *See* Lee Report, Section V.C.

HIGHLY CONFIDENTIAL

delivered to a user; sponsored listings that appear on e-commerce platforms; and in-app advertisements that appear within a specific application on a mobile device.[120]

80. Open web display advertisements are display ads delivered along with a web page within a user's browser on a personal computer or mobile device. This format is referred to as "open web" because procurement and delivery is managed through the ad tech stack rather than through proprietary tools associated with a particular publisher like Meta or Amazon or a particular function (*e.g.*, search), and because it is delivered within a web browser as opposed to a mobile app. Within the digital advertising ecosystem, open web display advertising is recognized as a distinct and important advertisement format.[121]

81. From a publisher perspective, open web display advertising is distinctive because it does not require a website to have specific functionality.[122] Publishers of web sites that do not have particular content and features, such as general search and shopping, would find it difficult to substitute alternative digital ad formats for open web display advertisements. From an advertiser perspective, display advertising is distinctive because it reaches a large and diverse group of users in an environment where the use of standardized tools and formats leads to increased competition among publishers.

82. Many publishers sell open web display ad impressions through the programmatic indirect channel, and even the largest publishers are very small relative to the total quantity of open web display advertising.[123] In general, individual publishers can influence the price of impressions displayed on their own sites by adjusting content, improving targeting, or making other changes that improve a site's quality as perceived by advertisers. But publishers' price-setting power in the open web display market is ultimately limited by competition. Any publisher that seeks to

---

[120] *See* Lee Report, Section II.A.

[121] *See* Lee Report, Section IV.B.

[122] For example, Google Search sells advertisements that are related to the users' search terms, offering a unique means of advertising that is not available to all website publishers. Likewise, video hosting sites such as YouTube benefit from the ability to display video ads prior to the video that the user wishes to view. Shopping websites, social media websites, and application developers may also have unique advertising opportunities that do not generalize to all web-based publishers. *See* Lee Report, Section IV.B.1.a.

[123] For example, in 2022, the ten largest publishers accounted for 11.5 percent of the total impressions on AdX. *See* AdX Publisher Impression Shares workpaper.

HIGHLY CONFIDENTIAL



**FIGURE 7: AVERAGE SPEND PER 1,000 WORLDWIDE IMPRESSIONS, 2018-2021**

Source: Brattle Analysis of monthly AdX and third-party exchange data. See Exchange Figures workpaper.

Notes: Advertiser spend per impression calculated by exchange as total advertising spending through a given exchange, divided by the total number of impressions associated with that spending. Values are average monthly CPM by exchange over the exchange-months in 2018 to 2021. See Appendix C.2.

85. The price dispersion in Figure 7 reflects differences in the nature and quality of publisher inventory sold through each exchange, as well as differences in demand, costs and other features of the auction process across the exchanges.[125] Notably, AdX is the only exchange in Figure 7

---

[125]    19:2–17

In this context, "impression quality" can have different facets, including: the reputation of the publisher, whether the impression is likely to reach a unique or desirable group of end-users, whether there is information that allows the advertiser to specifically target a particular user who values the impression highly, or the size and ad type.

with an average CPM below $1.00. Indeed, comparing Figure 6 to Figure 7 suggests that AdX's large scale and low average CPM have a strong influence on the worldwide average CPM.

86. Figure 8 plots the average take rate of each exchange (as illustrated in Figure 4) against the average CPM of impressions sold through that exchange. Each circle corresponds to an exchange, and the size of the circle is proportional to the impressions of the corresponding exchange. The gray line is based on a linear regression that measures the relationship between average CPM and average take rate for all exchanges other than AdX.[126]

**FIGURE 8: AVERAGE CPM VERSUS AVERAGE TAKE RATE, BY EXCHANGE**



Source: Brattle analysis of monthly AdX and third-party exchange data. See Comparables workpaper.

Notes: I calculate each exchange's take rate as the sum of their net revenue between January 2019 and March 2023 divided by the sum of their gross revenue during that same period. The best fit line for non-AdX exchanges is estimated via a linear regression of take rate on CPM, weighted by each exchange's total in-market impressions between January 2019 and 2023. I exclude from these calculations exchanges who did not provide data on any of impressions, net revenue, or gross revenue, or exchanges whose data is exclusive to US rather than worldwide impressions. See Appendix C.2.

---

[126] The regression specification is $TakeRate = \alpha + \beta \cdot CPM$. Each exchange is weighted by its total impressions from January 2019 through March 2023 (though weighting by revenue produces similar results).

87. The gray line in Figure 8 shows that, among all non-AdX exchanges, there is a positive correlation between average CPM and average take rate. That is, exchanges with a higher take rate have a higher average CPM.[127] Indeed, extrapolating from the linear regression model, AdX's predicted take rate, based on its average CPM, would be 10 percent, or about half of its actual 19.8 percent take rate. To understand the factors that allow AdX to maintain its unusual competitive position (as illustrated in Figure 8), the next sub-section of my report considers Google's business practices in the relevant antitrust markets.

## III.C. Google's Exclusionary Conduct

88. Google has been accused of several types of exclusionary conduct that would lead to reduced competition and higher prices. I have reviewed Professor Lee's Report and agree with his conclusion that Google's conduct was exclusionary and resulted in materially higher fees paid by advertisers in the ad exchange market above the competitive rates that would have been paid but-for Google's conduct.[128] The following figure summarizes several types of exclusionary conduct

---

[127] This makes sense, because high average CPM is desirable to publishers, so exchanges with higher average CPMs will be less likely to have to negotiate and decrease their take rates to win publishers. And evidence shows these negotiations are a reason exchanges lower their take rates. *See, e.g.*, Deposition of



[128] *See* Lee Report, Section VIII.A.1.

competitive pressure on bids from a particular source, either because doing so maximizes revenue in a specific auction or as part of a broader strategy to promote competition among ad tech intermediaries as well as advertisers.[147]

101. In September 2019, Google adopted its UPR policy along with removal of its "last look" advantage from Dynamic Allocation, and a switch to a first-price auction format on AdX.[148] UPR eliminated publishers' ability to set publisher-specific price floors within DFP. Google understood that UPR would reduce the quality of its publisher ad server from the publisher perspective, and internal documents show that is why the change was bundled together with other changes that publishers were likely to view favorably.[149]

102. The UPR policy acts like a "Most Favored Nation" clause that requires publishers to adopt a common pricing rule for all exchanges, and thereby prevent publishers from steering impressions to a particular demand source. This prevents publishers from placing competitive pressure on a particular buyer, such as AdX, by subjecting them to a higher floor. Internal documents show

---

[147]   *See* Lee Report Section VII.D.2.; *see also*, GOOG-AT-MDL-008064626, at -626 (04/12/2019) (An April 2019 E-mail explains that publishers might set a lower floor for HB "to limit their reliance on us [Google] for demand and make sure as much of their demand as possible gets filled through 3P sources. This could be policy related or because they have a lower revshare with those partners.").

[148]   *See generally*, Ravi Report, Section III.E.1.; *see also*, GOOG-DOJ-03226088, at -089 (06/25/2019) ("And on April 18th, we announced Unified Pricing Rules (UPR) in Open Beta…100% of Ad Manager traffic will move to First Price in late July. Unified Pricing Rules will apply to all non-guaranteed inventory."); *see also*, Jason Bigler, "Rolling out first price auctions to Google Ad Manager partners," Google Ad Manager, September 5, 2019, https://www.blog.google/products/admanager/rolling-out-first-price-auctions-google-ad-manager-partners/; *see also*, GOOG-DOJ-AT-01139367, at -367 (02/13/2019) (Google internal documents refers to these "rules" as "unified pricing controls.").

[149]   *See* GOOG-DOJ-02857290, at -291 (05/09/2019) (In a May 2019 email, Google's Ali Nasri Amini explained that "[w]e could keep all the current floor-pricing options and move to first-price auction and this would have achieved most of what we desperately need to fix our ecosystem. However, Adx team wanted to use this migration as an opportunity to significantly limit the ability of publishers to set floor-prices per buyers (which is a good goal to have)."); *see also*, GOOG-DOJ-AT-01680360, at -362–363 (01/04/2019) (In a January 2019 email, Google's Nitish Korula noted the benefits of combining the changes: "With the current plan (common floors, or removing per-buyer pricing), we would be taking away some functionality that publishers have today. We could likely sell it to them as part of this broader change…but if we offer it in a first-price world, I think it would be very hard for us to take it away later: It would be viewed as a pure loss of functionality that we're doing for our (perceived 'nefarious / self-serving' reasons), rather than (if we do it together) removing (or never building in the first place) functionality that doesn't make as much sense in a first-price world.").

that Google understood that publishers were setting a higher floor for AdX, and thus expected that AdX would be the primary beneficiary of the UPR policy.[150]

## III.D. The But-For World

103.   A basic principle of antitrust damages is that harm to a plaintiff is assessed relative to a counterfactual "but-for" world where the challenged conduct did not occur. I consider a but-for world where:

a.   There is no tie between Google Ads and AdX. Thus, advertisers on Google Ads would be able to use a single buying tool to multihome among exchanges by submitting bids through multiple paths, including other exchanges with take rates lower than the 20 percent currently charged by AdX.

b.   There is no tie between AdX and DFP. Thus, AdX advertisers would be able to submit real-time bids into third-party publisher ad servers, making alternatives to DFP more attractive to publishers.

c.   Publishers can vary the floors for different exchanges within DFP, thereby exerting pressure on specific exchanges to reduce their take rates in order to win more auctions.

104.   Both economic theory and the evidence presented in this case show how these changes would also produce greater competition in the relevant ad tech tool markets. It is my opinion that removing the two ties and ending Google's practice of prohibiting variable price floors on DFP would lead Google to compete by lowering its take rate.

---

[150]   *See* GOOG-TEX-00096393, at -395 (06/19/2018) (In a June 2018 email, Google's Nirmal Jayaram wrote: "If we figure out how to equalize floors (i.e., get the Adx floors down), as a buyer, we will start seeing benefits in terms of buying more through Adx and decreasing incrementality on 3PE [third party exchanges]."); *see also,* GOOG-DOJ-AT-00571933, at -933 (08/13/2019) (In an August 2019 email Google employees discussed results from an internal experiment indicating that UPR would cause DV360 to win approximately 31.8 percent more impressions on AdX-web and would lead to a 6.4 percent increase in AdX-web revenue.). Academic research has noted that these restrictions like UPR, referred to as *platform most-favored-nation clauses* "typically raise platform fees and retail prices and curtail entry or skew positioning decisions by potential entrants pursuing low-end business models." Researchers have called for greater antitrust enforcement actions against these sorts of restrictions; *see also,* Andre Boik and Kenneth S. Corts, "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry" *Journal of Law and Economics* 59, no. 1 (2016): 105–134; *see also,* Jonathan B. Baker and Fiona Scott Morton, "Antitrust Enforcement Against Platform MFNs," *The Yale Law Journal* (2018): 2176–2202.

HIGHLY CONFIDENTIAL

win rate fell from 29-30 percent to 23-24 percent and that Rubicon reported a $100,000 per day loss due to the implementation of UPR. [179]

d.  A slide from a September 2019 Google presentation reports that "[f]or AdWords, the avg. publisher floor reduces from $3.31 under legacy floors to $1.01 under UPR" and refers to a "[n]egative effect on [non-Google] SSP spend, since [header bidding/open bidding] demand previously had no floors applied on Ad Manager." [180]

120.  Because publishers used variable floors to steer inventory to exchanges other than AdX before Google imposed UPR rules, it is reasonable to conclude those same economic incentives would lead them to do so again in a but-for world without UPR. As I explained above, publishers' reasons for steering demand reflect both idiosyncratic benefits of working with other exchanges and also a desire to place greater pressure on AdX to compete harder by reducing its take rate. [181]

121.  When more impressions are sold through rival exchanges, and publishers have more flexibility to seek out low-cost supply pathways, economic theory suggests that Google would have incentives to reduce its take rate. This is the publisher-side version of the advertiser-side incentive that I described above in relation to the tie between AdX and Google Ads. These competitive incentives would be amplified by indirect network effects at the exchange level.

122.  Thus, both economic theory and the available evidence of real-world market behavior show that, but for UPR, Google would face pressure to reduce its take rate in order to win more auctions.

123.  Finally, although I have described the impacts of each type of but-for conduct independently, I note that market participants' rational incentives suggest that the types of conduct would reinforce one another in practice, leading to even stronger pressures for Google to reduce its stack-wide take rate. For example, but for the series of ties between Google Ads, AdX, and DFP, publishers using alternative publisher ad servers and RTB tools would be able to access demand

---

[179]  GOOG-DOJ-15044036, at -038–040 (08/15/2019) ("We went from a consistent 29/30% render rate to one now closer to 23/24%. Render Rate maps closely to what Google defines as win rate. We believe this is about ~$100k/day opp loss due to this change.").

[180]  GOOG-DOJ-AT-02204351, at -381 (09/03/2019) ("For AdWords, the av[era]g[e] publisher floors reduces from $3.31 under legacy floors to $1.01 under UPR…**Negative effect on 3P SSP spend, since HB/OB demand previously had no floors applied on AdManager**.") (emphasis in original).

[181]  *See* Section III.D.1.

The two formulas are mathematically equivalent.[185] In practice, however, it can be easier to calculate total expenditures and the average percentage overcharge than to identify a specific but-for price paid for every transaction.

130. Overcharge damages represent a transfer from the buyer to the seller. They do not measure the total harm caused by the exclusionary conduct. There is often additional harm in the form of surplus from sales that would have occurred in the but-for world, but do not occur in practice. Nevertheless, the overcharge does compensate the buyer for the difference between actual and competitive prices on all units actually purchased.

131. I have been asked to calculate the percentage overcharge that FAA advertisers incurred due to Google's conduct in the relevant antitrust markets for ad tech tools. I understand that Dr. Respess will calculate the FAA's total expenditures and use my estimate of the percentage overcharge to calculate monetary damages incurred by the FAAs.

132. My analysis focuses on the overcharge associated with the AdX ad exchange and the DFP publisher ad server. Because the as-is price for AdX and DFP is expressed as a take rate, the but-for price that I estimate below is also expressed as an *ad valorem* fee applied to the purchase price of each impression.[186]

133. In Section II.B.2, I explained how the cost of an *ad valorem* tax is shared between buyers and sellers of a product or service, because the buyers pay more and the sellers receive less than they would without the tax. Economic models of tax incidence provide simple formulas for the buyers' and sellers' share of the total tax. Those formulas depend on the slope of the supply and demand curves for the underlying product.[187] This section of my report describes an economic model of tax incidence that can be applied to the AdX take rate to apportion the overcharge

---

[185] This is because the percentage overcharge equals the average overcharge, divided by the average as-is price, and total expenditure is quantity purchased, multiplied by the average as-is price.

[186] As I explained in Section II.B.1, DFP charges other fees for serving direct impressions, and to the extent those prices also reflect the market power associated with Google's exclusionary conduct, my overcharge estimates are conservative. My estimate includes only open web display advertising transactions conducted on AdX, for which DFP fees are "waived," given the 20 percent AdX take rate.

[187] As explained below, the true economic cost of the tax to each party depends on the elasticities of each party, rather than the party on whom the tax is actually levied.

between advertisers and publishers. The model requires estimates of the slope of the supply and demand curves for open web impressions sold on AdX as inputs.[188]

134. The steps in my advertiser overcharge calculation are summarized in the following figure.

FIGURE 10: OUTLINE OF OVERCHARGE ESTIMATION

| 1 | **Estimate total overcharge.** |
| 2 | **Estimate the proportion of the total overcharge paid by advertisers.** |
| 2a | Estimate the price elasticity of AdX advertiser demand for AdX impressions. |
| 2b | Estimate the price elasticity of supply for impressions sold to AdX advertisers. |
| 2c | Combine estimates from steps 2a and 2b using the model of tax incidence to calculate the share of the total overcharge incurred by advertisers. |
| 3 | **Combine the total overcharge from step 1 and the advertiser share from step 2c to calculate total percentage overcharge paid by FAAs.** |

135. The remainder of this section explains each of these steps in more detail. First, in Section IV.A, I explain two approaches that I use to estimate the but-for take rate. Then, in Section IV.B, I explain the tax incidence framework used for apportioning the total overcharge, and the methods that I use to estimate the inputs to that model.

## IV.A. Methods for Estimating But-For Take Rate

136. I consider two different methods to estimate the but-for take rate: comparables and an event-study regression.

### IV.A.1. Comparables Approach

137. The comparables method is a commonly used approach to estimate damages in a variety of contexts.[189] The basic idea behind this methodology is to find transactions that were not

---

[188] In this section, I present the framework for my overcharge model by reviewing the economic theory of *ad valorem* taxes. I do this because the economic theory used to analyze other *ad valorem* fees is frequently applied to analyzing the effect of taxes, and because consumers commonly experience *ad valorem* fees through paying taxes. However, AdX's fee is not, strictly speaking, a tax.

[189] *See, e.g.*, National Research Council of the National Academies, "Reference Manual on Scientific Evidence: Third Edition," *National Academies Press*, accessed December 17, 2023,

influenced by the relevant conduct and use the price of those transactions as a benchmark to estimate the counterfactual but-for price that would have been paid in transactions that were influenced by the relevant conduct.[190] The comparables approach is sometimes referred to as the "market approach" because it relies on the market price of arms-length transactions as its primary form of evidence.

138. The comparables method proceeds in five steps:

   1. Identify characteristics of a transaction useful for assessing comparability,

   2. Based on relevant characteristics, choose a set of comparable transactions,

   3. Select weights or multiples so that each comparable is appropriately scaled,

   4. Calculate a weighted average price for the comparable transactions, and

   5. Compare the as-is price to the but-for price calculated in the previous step.

139. For the first step in the comparables approach, I use the characteristics of open web display advertising transactions, as described in Section III.A.1 above. I focus on impressions displayed to worldwide users, though I also perform my analysis on impressions displayed to US users as a robustness test. I exclude impressions that are not in the relevant market, including impressions sold via the direct channel, as well as a variety of advertising formats such as search advertising, social media, instream video, in-app, and ads served within the "walled gardens" owned and operated by large publishers such as Amazon or Facebook.[191]

140. For the second step in the comparables approach, I select all transactions where an advertiser pays an ad exchange other than AdX for serving an open web display impression. Although these transactions are selected based on characteristics of advertising impressions, the relevant price is the take rate charged by the ad exchange for facilitating the transaction between a publisher and advertiser.

---

https://nap.nationalacademies.org/read/13163/chapter/10; *see also*, Rosa M. Abrantes-Metz and Alberto D. Metz, "How to Approach the Calculation of Overcharge by Multisided Platforms," *Competition Policy International*, January 2023, https://www.brattle.com/wp-content/uploads/2023/02/How-to-Approach-the-Calculation-of-Overcharge-by-Multisided-Platforms.pdf.

[190]  The comparables approach is analogous to econometric estimation of "treatment effects" by comparing a treated group of transactions influenced by certain conduct to a control group that was not affected by the conduct.

[191]  *See* Appendix C.

HIGHLY CONFIDENTIAL

141. For the third step, the choice of weights will typically depend on the data that is available. In this case, I have access to data produced by Google and several other ad exchanges. For each non-Google (or "third-party") exchange I observe the monthly gross and net revenues, as well as the total number of impressions sold each month. This allows me to calculate the average take rate (which equals net revenue divided by gross revenue) for each month. The third-party exchange data I rely on do not provide information about prices or take rates at the level of the individual impression.[192] Thus, I must compare the average take rates across different ad exchanges, as opposed to comparing take rates charged for comparable impressions.

142. Given the data available to me, I use gross revenue weights to calculate the weighted average take rate for third-party exchanges. An exchange's gross revenue weight corresponds to its share of the total gross revenue collected from advertisers by all comparable exchanges between January 2019 and March 2023.[193]

143. Gross revenue weights are one appropriate choice for two reasons. First, the weights ensure that "more important" exchanges (which sell more impressions or have higher average CPMs) exert more influence on the but-for price. Without weights, a relatively small exchange would have the same impact on the average take rate as a much larger one.[194] Second, gross revenue weights ensure that the weighted average take rate calculated in the final step of the comparables analysis is equal to the market-wide average take rate for all comparable transactions.[195] Because AdX serves a substantial share of the entire open web display market, its transactions will necessarily include a wide range of publishers, advertisers, and internet users. Using gross revenue weights

---

[192] I understand that some third-party exchanges have produced impression- or bid-level data, but that these data do not cover as many exchanges, and they cover shorter time periods than the aggregate data that I use as inputs to my analysis.

[193] I chose this time period because it overlaps the damages period and is the longest span of time for which it is possible to construct a "balanced panel" consisting of eight exchanges, including AdX, given the data produced.

[194] For example, consider a case in which several general-purpose exchanges collectively account for 90 percent of gross exchange revenue and have a 14 percent take rate, while an equal number of smaller, specialty exchanges account for only 10 percent of gross exchange revenue and have an 18 percent take rate. Weighting the average take rate by gross revenue would result in an overall average take rate of 14.4 percent, while the unweighted average take rate would be 16 percent.

[195] In mathematical terms, $\sum \tau_i \cdot w_i = \frac{\text{Total Net revenue}}{\text{Total Gross revene}}$, because $\tau_i = \frac{Net\ Revenue_i}{Gross\ Revenue_i}$ and $w_i = \frac{Gross\ Revenue_i}{Total\ Gross\ Revenue}$

that produce a market-wide average across all other exchanges ensures that the but-for take rate is based on a comparably diverse set of transactions.[196]

144.   I believe that the comparables approach is likely to produce conservative estimates of the but-for take rate compared to a model of equilibrium price setting that accounts for the differentiating features of Google's ad tech products within the but-for world. This view is based on a concept that economists call strategic complementarity.

145.   Economic models of markets where firms sell differentiated products or services, and compete by setting prices (rather than choosing quantities of a good to produce), are referred to as models of *differentiated Bertrand competition*.[197] In this type of competition, a change in price by one firm generally causes other firms in the same market to adjust their prices in the *same direction*.[198] Intuitively, an initial price cut would lead some customers to switch to the firm that reduces its price. Because its rivals now sell to fewer customers, they would have incentives to reduce their own price. This would create incentives for the first firm to reduce its price further, and so on. When prices in a competitive market move together in this fashion, economists say that they are strategic complements.[199]

---

[196]   I also note that the fact that other exchanges are operating at a much smaller scale and still charge these rates indicates Google would be able to cover its costs at these prices, and there is no concern that it would exit the market in the but-for world.

[197]   Jean Tirole, "Chapter 7: Product Differentiation: Price Competition and Non-Price Competition," *The Theory of Industrial Organization* (1988), 277–302.

[198]   Jan Potters and Sigrid Suetens, "Cooperation in Experimental Games of Strategic Complements and Substitutes," *The Review of Economic Studies* 76, no. 3 (2009): 1125–1147, at 1126 ("A straightforward but important implication of strategic complementarity is that a change in one player's choice gives the other player an incentive to move in the *same* direction"); *see also,* Nirvikar Singh and Xavier Vives, "Price and Quantity Competition in a Differentiated Duopoly," *The RAND Journal of Economics* 15, no. 4, (1984): 546–554; *see also,* Jeremy I. Bulow, John D. Geanakoplos, and Paul D. Klemperer, "Multimarket Oligopoly: Strategic Substitutes and Complements," *Journal of Political Economy* 93, no. 3 (1985): 488–511; *see also,* Xavier Vives, "Nash Equilibrium with Strategic Complementarities," *Journal of Mathematical Economics,* 19, no. 3 (1990): 305–321.

[199]   Jan Potters and Sigrid Suetens, "Cooperation in Experimental Games of Strategic Complements and Substitutes," *The Review of Economic Studies* 76, no. 3 (2009): 1125–1147, at 1127 ("For example, in the typical case of oligopolistic price competition with substitute goods (strategic complements), if a firm that aims at colluding sets a price above the Nash equilibrium level, then the best response for the competitor is to set a price above the Nash equilibrium level as well.").

HIGHLY CONFIDENTIAL

146. Ad exchanges and publisher ad servers are differentiated products. Professor Lee's report describes a number of features that differ across rival ad exchange and publisher ad server implementations,[200] though the core features of an ad exchange such as running real-time auctions between demand sources are present in all modern ad exchanges. Google documents also indicate that they understand their ad tech tools to be differentiated products.[201] Moreover, it is clear that ad tech tool suppliers compete by setting take rates, rather than choosing the number of impressions they will serve. This establishes that the ad exchange and publisher ad server markets are examples of differentiated Bertrand competition. I therefore expect that prices – that is, take rates – in those markets are strategic complements.

147. The notion that AdX's take rate and the take rates for other exchanges are strategic complements is further supported by Google's internal analysis. Google documents indicating concerns about fierce competition and "commoditization" of the ad exchange market support the idea that a reduction in Google's take rate would lead other exchanges to follow suit.[202] When considering the threat posed by header bidding, for example, Google employees discussed the "other value that [AdX] provides,"[203] and noted that the commoditization of the "traditional" ad exchange would drastically reduce take rates among ad exchanges, potentially driving take rates as low as five percent.[204]

---

[200]  *See* discussion in Section II and Appendix F; s*ee also generally* Lee Report, Section II.B.

[201]  For instance, *see* GOOG-DOJ-14826585, at -596 ("Approximately 13 features represent the current delta between AdX and competitors").

[202]  GOOG-TEX-00106259, at -260–61 (11/04/2017) (Payam Shodjai proposing a 5% AdX rev share for Authorized Buyer demand and undifferentiated DV360 demand, or DV360 demand without proprietary Google data and targeting); GOOG-DOJ-32034896, at -896 (06/20/2018) (Aparna Pappu proposing that for Google's AdX product "[f]or all programmatic i.e. transactions including AdX and EB – sellside charges for taking on risk of being a clearing house so whatever 2% to 10% whatever we think the market can bear but ideally closer to 2%.").

[203]  GOOG-DOJ-10634461, at -466–468 (09/02/2016) ("There is some other value that ADX (and Jedi) provides beyond protections, etc - unified reporting and clearing are other examples. Because of all that those benefits, I still think that ADX would have value even in a world where there was a neutral bare-bones uber-exchange. I think the best outcome is that we own the 'uber-exchange' and can charge for it, but some partners may just never trust us no matter how fair or open we are. I agree with your conclusion that client-side or server-side doesn't matter much to buyers from a technology perspective - it is more about what they get with each option - eg, client side they get more independence from Google, reduced fees, get around EDA.").

[204]  GOOG-DOJ-10634461, at -465–466 (09/06/2016) ("My conclusion is that there are three threats to our open auction/remnant business from essentially commoditization of the traditional SSP. [A]) We lose advantageous access to the inventory [B]) We (dbm+gdn) are left with no/disadvantaged access [C]) Our AdX buyers move away[.] I am of the opinion that (A) already happened . . . only question is whether we want to slow it down

---

148. Strategic complementarity implies that Google's *current* supracompetitive take rate encourages other exchanges to raise their own take rates above the level that would prevail in a competitive equilibrium. Therefore, any market-wide competitive take rate estimated from existing as-is take rates of non-AdX exchanges is likely an overestimate (i.e., conservative) relative to the market-wide competitive take rate that I would estimate but-for Google's conduct. Moreover, because strategic complementarity implies that third-party exchanges would reduce their own prices in the but-for world, Google could still benefit from product differentiation that is not linked to its exclusionary conduct. Put differently, I do not have access to the ideal data for a comparables analysis – because Google's conduct affects the take rates of other exchanges in the real world – and this leads to conservative estimates of the but-for take rate. Moreover, because strategic complementarity implies that third-party exchanges would reduce their own prices in the but-for world, Google could still benefit from product differentiation that is not linked to its exclusionary conduct.

### IV.A.2. Event Study Approach

149. In September 2019, Google's adoption of UPR imposed restrictions on publishers' ability to submit auctions with price floors that varied by demand source. Google's own analysis suggested that, although UPR upset its publisher customers, it also led to AdX winning many more impressions (without reducing its 20 percent take rate).[205] Section III.A.1 describes how Google's ability to impose UPR on publishers who had already revealed a preference for setting variable price floors is an indication of the degree of market power created by the ties between

---

further . . . As such let's really focus our attention on (B), which would help with (C) but sadly the latter might not be sustainable either….Now going back to Chris' points around policy, and buyer level enforcement. I don't think Publishers would allow a massive proliferation of participants in the HB (AKA client side Auction) ecosystem. The end game would be a mix of SSPs, few niche buyers ("networks") like CRTO, FAN, Amazon and *maybe* some hybrid DSPs. All of them would essentially offer the same value to the publisher but might have different policies, which are primarily designed to protect their buyers. As such I think these pieces gets commoditized, so we probably can charge 5%-8% for all these services Chris and Jim cite. [let's call them X]… Now you enter Ali's idea to do transparent 1st price auction, this is a solution to a different problem (let's call it Z), i.e. how AdX should be competing with other SSPs to have more of the independent small DSPs incentivized to buy through AdX. It's also a way to protect DBM/GDN from buying the same inventory through other SSPs.") and at -464 (09/04/2016) ("I agree with the analogy, indeed an exchange shouldn't be an immensely profitable business, it's like a public good used to facilitate buyers and sellers. As we discussed many times, if we started all over again I would conclude that sell side margins are higher than a natural equilibrium and buy side margins are too low. Moreover the real value in sellside margins come from X+Y+reservation functionality. ").

205  *See* Appendix H.1.

Google Ads, AdX, and DFP. In the but-for world, Google would not possess this market power, and its take rate elasticity of demand would be closer to what other exchanges face in the as-is world.

150. The preceding discussion suggests a thought experiment: If Google's customers were just as price sensitive as the customers of other exchanges, because Google lacked the market power that stems from certain of its prior conduct, how much would Google have needed to reduce its take rate to have attained the same increase in transactions as it gained through UPR? Subtracting the "UPR equivalent take rate" from Google's as-is 20 percent take rate would provide an alternative data point for the possible take rate that Google would charge in the but-for world. Ultimately, this analysis provides a (partial) measure of the effect of the conduct in which Google engaged in the as-is world, but not in the but-for world.

151. It is possible to estimate the UPR-equivalent take rate using an "event study" regression model combined with the data produced by Google and third-party exchanges. The event study regression takes the following form[206]:

$$\ln(Q_{it}) = \delta_i + \gamma_t + \rho \times isGoogle_i \times UPRImpl_t + \alpha \times isGoogle_i \times LRUPR_t - \beta\tau_{i,t} + \varepsilon_{i,t}$$

where,

$i$: identifies the exchange and $t$ identifies the month.

$Q_{i,t}$: is the number of impressions sold on exchange $i$ in month $t$,

---

[206] This regression can be derived from the widely applied discrete choice demand model of Berry (1994). In particular, suppose advertiser $i$ seeks to buy an impression with expected price $p$, and is selecting among several exchanges (indexed by $j$). The net benefits of buying through exchange $j$ are represented as $u_{ij} = X_i\theta + \xi_i - \beta p(1 + \tau_i) + \varepsilon_{ij}$, where $X_i$ and $\xi_i$ are observed and unobserved exchange characteristics respectively; $p(1 + \tau_i)$ is the bid required to purchase the impression through exchange $j$; and the term $\varepsilon_{ij}$ reflects idiosyncratic benefits that advertiser $i$ derives on exchange $j$. Assuming the advertiser chooses the exchange with the highest net benefits, Berry (1994) shows how to move from the choice model to my regression. The outcome variable in his paper is expressed as the log-ratio of market shares, $\ln(S_{it}/S_{0t})$ of the exchanges. In my regression, the share of the outside good, $S_{0t}$, is absorbed by the month effects and the unobserved exchange characteristics, $\xi_i$, are captured by the exchange fixed effects.
*See* Steven T. Berry, "Estimating Discrete-Choice Models of Product Differentiation," *The RAND Journal of Economics* (1994): 242-262.

HIGHLY CONFIDENTIAL

assumption (a) in the second interpretation, then my estimate is likely conservative due to strategic complementarities.

157.   Finally, I note that the introduction of UPR in September 2019 was accompanied by the move to a first-price auction and the removal of the "last look" benefit provided by Dynamic Allocation. Because the removal of "last look" led to a lower win rate for AdX, however, the event study estimates should underestimate the benefits of UPR, and are therefore conservative.[211] Google's internal analysis shows that the switch to first-price auction had little impact on market outcomes.[212] In particular, a September 2019 email from Google's Nitish Korula indicates that the combined changes would produce a substantial increase in revenue for Google, and explains that "the primary benefit here is from lowered unified floors that a first-price auction enables, not 'first price' in itself."[213]

# IV.B. Method for Apportioning Total Overcharge

158.   This section explains the method I use to apportion the total overcharge between publishers and advertisers.

159.   In economics, fees that are equal to a percent of a total sales amount are referred to as *ad valorem* fees. AdX's *ad valorem* fee functions similarly to a tax, creating a "wedge" between the price paid by advertisers and the price received by website publishers. The economic theory analyzing *ad valorem* fees frequently studies taxes, since this is the context in which consumers often have experience with *ad valorem* fees.[214] Many common taxes, such as sales taxes, are

---

[211]   *See* GOOG-DOJ-AT02204351, at -359 (09/03/2019) ("Removing Last Look* has significant negative impact" slide shows -9.41% impact on Impressions for total AdX only web.").

[212]   Economic theory suggests that, holding all else equal, the switch from a second-price to a first-price auction format will have no impact on the expected revenue of the seller or the expected payment from the buyer. This famous result is known as the Revenue Equivalence Theorem. (*see, e.g.,* P. Milgrom, *Putting Auction Theory to Work*, Cambridge University Press, Cambridge, 2004.)

[213]   GOOG-DOJ-AT-00588455, at -455 (09/08/2018) ("The main thing to remember is that the primary benefit here is from lowered unified floors that a first-price auction enables, not 'first price' in itself.").

[214]   Hal R. Varian, *Intermediate Microeconomics: A Modern Approach*, ed. 2 (New York: W. W. Norton & Company, 1990), 283–284 ("There are several different kinds of taxes that one might impose. Two examples we will consider here are **quantity taxes** and **value** taxes (also called **ad valorem** taxes)…A value tax is a tax expressed in percentage units. State sales taxes are the most common example of value taxes. If your state has a

equal to a fixed percent of a transaction amount; AdX's fee structure is similar, since AdX also typically charges a fixed percentage of the transaction amount when an impression is sold through its exchange. Both the sales tax and AdX fee are therefore *ad valorem* fees. Under this framework, the *incidence* (i.e., the share of harm) of a "tax" on a transaction does not depend on whether it is the buyer or the seller who nominally pays the tax. Rather, the tax burden depends on the relative price elasticities of publisher supply and advertiser demands.[215]

160.   Section II.B.2 explained how an *ad valorem* fee such as AdX's take rate resembles a tax. The take rate (or take rate increase) creates a "wedge" between the price paid by advertisers and the price received by website publishers in an open web display advertising transaction. In other words, advertisers pay more and publishers receive less than they would but for AdX's take rate, with the difference going to Google.

161.   In this section, I explain the standard framework that economists use to measure the incidence from a tax or *ad valorem* fee. In this tax incidence model, a buyer or seller's share of the total cost of the tax depends on the elasticity (or slope) of the supply and demand curves for the item that is purchased. Section IV.B.1 explains the standard tax incidence model, which can be found in many textbooks, and Section IV.B.2 explains how I adapt that framework to the fees charged in the ad tech stack.

### IV.B.1. Tax Incidence Framework

162.   The price elasticity of demand captures the change in the quantity demanded when the price of a good changes from some baseline price.[216] Demand is said to be *elastic* when the percent change in quantity purchased exceeds the percent change in price. Demand is considered *inelastic* when

---

5 percent sales tax, then when you pay $1.05 for something (including the tax), the supplier gets $1.00.") (emphasis in original).

[215]   Hal R. Varian, *Intermediate Microeconomics: A Modern Approach*, ed. 2 (New York: W. W. Norton & Company, 1990), 288 ("[A] tax really shouldn't be regarded as a tax on firms or on consumers. Rather, taxes are on transactions *between* firms and consumers. In general, a tax will both raise the price paid by consumers and lower the price received by firms. How much of a tax gets passed along will therefore depend on the characteristics of demand and supply.").

[216]   *See* Edgar K. Browning and Jacquelene M. Browning, *Microeconomic Theory and Applications*, 4th ed. (New York: Harper Collins, 1992), 94 ("The price elasticity of demand is a measure of how sensitive quantity demanded is to a change in the price of a product. It can be defined as *the percentage change in quantity demanded divided by the percentage change in price*.").

HIGHLY CONFIDENTIAL

197. I do not use the instrumental variables method to estimate the elasticity of supply or demand for open web display impressions (although the Google experiments that I describe below can be viewed as an application of the IV method). I do, however, rely on the key insight of the IV methodology: shifts in supply will estimate the slope of the demand curve, and vice versa.

### IV.B.3.b. Estimating Elasticities with Simulated Auctions

198. In the auction context, the supply curve corresponds to the probability that a bidder will win the item being auctioned if they bid a certain price. Like all supply curves, this probability increases as the bid increases (that is, it slopes upward). Similarly, the demand curve is the probability that a seller will find a willing buyer as a function of given reserve price. Like all demand curves, this function slopes down.

199. In the present matter, Google has produced data on all bids submitted in a sample of auctions conducted in every minute of the month of June 2023 .[234] See Appendix C.3 for a more detailed discussion of the data. Building on the IV estimation ideas described above, I use these auction-level data to estimate the elasticity of supply for open web display advertisements sold on AdX by simulating the impact of an increase in demand while holding supply constant (and vice versa).

200. Before describing how the simulations work, I note that the demand and supply for open web display impressions on AdX is slightly different from the supply or demand for a generic auction. As described in Section IV.B.2, it is the residual supply curve (i.e., net of purchases by advertisers on non-AdX exchanges) that is used in my tax incidence framework. The relevant supply function in this context corresponds to the probability that the highest AdX bid exceeds the larger of either the highest non-AdX bid ("HOB") or the reserve price. Similarly, the relevant demand curve represents that probability that there is an AdX bidder willing to pay more than the greater of the HOB or the reserve price.

201. For each auction in the data produced by Google, I extract the highest bid submitted through AdX, the HOB, and the reserve price (or floor) associated with the highest AdX bid. To estimate

---

[234]   Letter from David Pearl to Michael Freeman, August 22, 2023.

207. Once again, the "bunching" of AdX bids at the reserve price creates a potential bias. In particular, a small increase in the reservation price can lead to a large drop in the simulated AdX win rate, leading to a large estimated elasticity. This produces a bias because my simulation does not account for the fact that many AdX bidders that bid just above the floor would likely increase their bids to the new reservation price when faced with a slightly higher floor, instead of dropping out of the auction. Appendix H.3 shows how I correct this bias by choosing $\delta$ appropriately.

### IV.B.3.c. Google Experiments

208. As a check on the estimates produced by the auction simulation methods described above, I use several experiments conducted by Google in the ordinary course of business to calculate an implied elasticity of either supply or demand. These experiments were identified through a systematic review of documents produced by Google, as described in Appendix G.

209. In general, Google's experiments and simulations varied different aspects of their business model, such as the Google Ads take rate, in order to study how key outcomes, including average prices and quantities, changed in response. For an experiment to be useful for demand or supply estimation, it must satisfy the IV assumptions described above. That is, an experiment can be used to estimate the elasticity of demand if it shifts only the supply of impressions available to AdX. And conversely, an experiment can be used to estimate the elasticity of supply if it shifts only the demand for impressions on AdX.[237]

210. For estimating the elasticity of demand, I use experiments related to the introduction of UPR. This is because UPR led to more impressions being available on AdX (a shift in supply) without shifting advertisers' willingness to pay.

211. For estimating supply, I consider experiments that change Google's take rate, leading to a higher net bid (equivalent to an increase in demand) without shifting the supply of impressions. I also consider simulations in which Google removed particular sources of demand (e.g., Google Ads) from the AdX platform.

---

[237] To understand the importance of this feature, see the discussion of instrumental variables in Section IV.A.2.

HIGHLY CONFIDENTIAL

| 1 | **Estimate total overcharge.** |
|---|---|
| 2 | **Estimate the proportion of the total overcharge paid by advertisers.** |
| 2a | Estimate the price elasticity of AdX advertiser demand for AdX impressions. |
| 2b | Estimate the price elasticity of supply for impressions sold to AdX advertisers. |
| 2c | Combine estimates from steps 2a and 2b using the model of tax incidence to calculate the share of the total overcharge incurred by advertisers. |
| 3 | **Combine the total overcharge from step 1 and the advertiser share from step 2c to calculate total percentage overcharge paid by FAAs.** |

## V.A.1. Comparables Approach

216. Section IV.A.1 explained how the comparables approach is a widely used method for estimating damages that, if applied correctly, will yield a reliable estimate of AdX's but-for take rate. The assumptions and steps for carrying out this analysis were described in Section IV.A.1. This section presents several estimates of the weighted average take rate charged by other exchanges in the as-is world (hereafter referred to as the "market-wide competitive take rate").

217. In order to calculate the market-wide competitive take rate, I rely on the same monthly exchange data for AdX and third-party exchanges summarized in Figure 4 and Figure 5 above.[239] These data are based on worldwide open web display advertising impressions sold between January 2019 (the start of the damages period) and March 2023 (the last month in which data necessary to calculate take rates is available for the majority of exchanges).[240] The eight ad exchanges included in this dataset are AdX, ███████████████████████████████████████████ ███████████.[241]

218. The data produced by third-party exchanges do not clearly indicate whether their gross or net revenues include the 5 percent fees charged by Google for using AdX Open Bidding. My baseline estimates are based on the conservative assumption that third-party take rates do not include AdX Open Bidding fees.

---

[239] Appendix C.2 describes this dataset in greater detail.

[240] *See* sheet "take_rate" of Exchange Figures workpaper.

[241] I exclude from these calculations exchanges who did not provide data on any of impressions, net revenue, or gross revenue, or exchanges whose data is exclusive to US rather than worldwide impressions. Moreover, I exclude data from Fyber, ironSource, Unity, and Vungle as I understand that they primarily operate auctions for in-app impressions.

HIGHLY CONFIDENTIAL

Notes: I calculate the market-wide average comparable take rate as the sum of net revenue associated with the third-party exchanges divided by the sum of their gross revenue. See Appendix C.2.

221. In Figure 14, the estimated market-wide competitive take rate fluctuates over time for two reasons. First, the take rate of each third-party exchanges changes from month to month.[242] Second, the revenue weights associated with each exchange can fluctuate over time depending on their revenue shares among the non-AdX exchanges.

222. In practice, Google maintains a stable AdX take rate, and I assume that Google would continue to set a stable take rate in the but-for world. To calculate a single market-wide competitive take rate, I aggregate the monthly net and gross revenue values associated for all non-AdX exchanges across all available months. I subsequently calculate a single market-wide comparable take rate by dividing the aggregated non-AdX net revenue into aggregated non-AdX gross revenue.

223. Figure 15 shows the results of this calculation. Between January 2019 and March 2023, the worldwide average take rate for open web display impressions sold through AdX was 19.8 percent. Over the same period, the weighted average take rate for worldwide impressions sold through third-party ad exchanges was 16.2 percent. This implies a total overcharge of 18.2 percent.[243]

**FIGURE 15: BUT-FOR COMPARABLE TAKE RATES, WORLDWIDE IMPRESSIONS**

| Exchange | | Take-Rate |
|---|---|---|
| AdX | [1] | 19.8% |
| All Third Parties | [2] | 16.2% |
| Large Third Parties | [3] | 15.6% |

Source: Brattle analysis of monthly exchange-level panel. See Comparables workpaper.

---

[242] Many short-run fluctuations in third-party exchange take rates reflect idiosyncratic factors that are not material to understanding the overall difference between Google's as-is and but-for take rates. For example, an exchange may negotiate discounts with specific publishers, leading to fluctuations in the average take rate that are driven by that number of impressions served for that advertiser in a particular month.

[243] $18.2\% = (19.8\% - 16.2\%) / 19.8\%$

Notes: Large third parties are those whose total gross revenue constitutes at least 10 percent of total gross revenue among the included third-party exchanges between January 2019 and March 2023. The take rate for each group is calculated as the total net revenue between January 2019 and March 2023 for that group divided by is total gross revenue over the same period. I exclude DCN and Sharethrough from my calculations as their data pertains to US impressions only. I exclude Yahoo and Equativ as their data does not contain values for net revenue.

[1]: Excludes Open Bidding transactions.

[2]: Includes Index Exchange, Magnite/Rubicon, OpenX, Pubmatic, Sovrn, Xandr, and YieldMo.

[3]: Includes Index Exchange, Magnite/Rubicon, OpenX, Pubmatic, and Xandr.

224. In Figure 15, I also show how the results of the comparables approach would change if I exclude two "small" ad exchanges (██████ and ██████████) that each account for less than 10 percent of the total revenue on non-AdX exchanges . For the remaining "large" exchanges (████████████████ ████████████████████████████, and ██████) the weighted average take rate based on worldwide impressions is 15.6 percent. In Appendix D, I report additional robustness checks, including a set of weighted averages based on impressions served to a US internet users.

225. In Section IV.A.2, I explained how both economic theory and Google's own internal analysis suggest that the comparables approach yields a conservative estimate of the take rate that Google would charge in the but-for world. Thus, in my view, the estimates reported in Figure 15 provide an upper-bound estimate of the but-for take rate that provides a reliable basis for calculating the damages incurred by the FAAs.

### V.A.2. Event Study Approach

226. Section IV.A.2 describes the event study methodology that I use to obtain a second estimate of the AdX take rate that Google would charge but for its exclusionary conduct. This method uses a regression to estimate two key parameters. The first parameter, $\alpha$, measures the increase in market share that Google achieved by implementing UPR. Because Google could not implement UPR in the but-for world, this parameter provides an indication of the benefits that Google derives from its exclusionary conduct, and the corresponding harm to publishers and

Notes:  The figure provides average CPM paid by the FAAs and by other advertisers on AdX impressions purchased through DV360 between January 2019 and January 2021, in addition to Google's fees and some statistics that characterize the variability in prices for those impressions. The first panel shows revenue per impression (the amount paid by advertisers), the second panel shows net revenue per impression (the amount retained by Google), and the third panel shows the traffic acquisition cost ("TAC") per impression (the amount paid to publishers). As a matter of accounting, the revenue per impression is equal to the sum of the net revenue per impression and the traffic acquisition cost per impression. Revenue includes media costs, platform fees, and other fees. The dataset reports revenues and costs at the advertisement level, rather than the individual impression level, so standard deviations are calculated only based on across-advertisement variation (weighted by impression), rather than within-advertisement variation. See "Filters" tab in FAA non-FAA Comparison workpaper for filters applied to the data.

The "full stack" take rate for FAA impressions is 24.6% = $0.42 / $1.71.

## F.2      Glossary of Key Terms

### FIGURE 30: GLOSSARY OF KEY TERMS

| Ad exchange | Ad exchanges are the software tool that conducts the RTB auctions that are the defining feature of the programmatic indirect channel. Ad exchanges are also referred to as supply-side platforms ("SSPs").[278] |
| --- | --- |
| Advertiser ad networks | Advertiser ad networks typically exist in the same "layer" of the stack as DSPs because they provide a tool that advertisers can use to purchase impressions. Unlike DSPs, which allow advertisers to bid for inventory directly, advertiser ad networks typically buy ad inventory from multiple publishers, bundle it into impression categories, and then resell that inventory to advertisers.[279] |

---

[278] *See* Lee Report, Section II.B.3.; *see also*, Ryan Joe, "Defining SSPs, Ad Exchanges And Rubicon Project," AdExchanger, February 7, 2014, https://www.adexchanger.com/yield-management-tools/defining-ssps-ad-exchanges-and-rubicon-project/ ("The distinction between an ad exchange and a supply-side platform (SSP) has become muddled as the once disparate but complementary technologies have merged.").

[279] "What is AdTech? Basic of The Ad Tech Ecosystem Explained," AdButler, May 5, 2021, https://www.adbutler.com/blog/article/what-is-ad-tech-the-ad-tech-ecosystem-explained ("Ad networks amalgamate and sell publishers' ad inventory within the ad tech space. They operate by establishing deals with publishers, bundling their available ad inventory into categories, and offering to sell that categorized inventory to interested advertisers.").

HIGHLY CONFIDENTIAL

| | |
|---|---|
| **Ad Tech stack** | The set of technologies used to sell and publish an open web display impression are referred to as the "ad tech stack."[280] This term could refer to the entire suite of technologies available to display advertisers and publishers, or to the specific combination of ad tech products and platforms used by an individual firm.[281] |
| **Google Ads (*Adwords*)** | The advertiser-facing side of Google's advertiser ad network is called Google Ads[282] This service is used by advertisers to purchase third-party impressions via RTB auctions, and also to buy search and video ads on Google's own web sites (i.e., Google Search and YouTube).[283] |
| **AdX** | Google's ad exchange is called AdX, which facilitates transactions through primarily open and private auctions.[284] |
| **CPM** | Prices for display advertisements are typically quoted in terms of cost per mile ("CPM"), which is the amount an advertiser pays to purchase one thousand impressions.[285] |
| **DBM** | DoubleClick Bid Manager ("DBM"), now DV360, is Google's DSP[286] |

---

[280] *See* Lee Report, Section II.A.1.

[281] "What is AdTech? Basics of The Ad Tech Ecosystem Explained," AdButler, May 5, 2021, https://www.adbutler.com/blog/article/what-is-ad-tech-the-ad-tech-ecosystem-explained ("The assembly of an 'ad tech stack' refers to the selection of various ad platform and tool components that will be used to accomplish objectives within the advertising ecosystem. For publishers, an ad tech stack involves selecting tools that optimize ad revenue – while for advertisers, it means finding platforms that offer the most cost effective way to distribute ads.").

[282] *See* Lee Report, Section II.C.3.a.

[283] *See* Lee Report, Section II.C.3.a.

[284] *See* Lee Report, Section II.C.2.

[285] Some advertisers pay on a cost per click ("CPC") basis that depends on the number of internet users who click on an advertisement, as opposed to merely viewing it. In the open web channel, prices quoted to an advertiser on a CPC basis are generally converted to CPM basis by an intermediary before the auction takes place. *See* Lee Report, Section II.B.2.

[286] *See* Lee Report, Section II.C.4.

HIGHLY CONFIDENTIAL

| | |
|---|---|
| **DFP** | DoubleClick for Publishers ("DFP"), now GAM, is Google's publisher ad server[287] |
| **Display ads** | Display ads may consist of images, text, interactive elements, audio, or some combination of these.[288] Some of the most common examples of display ads include banner ads, which function as digital billboards on websites, interactive ads that users can engage with, and interstitial ads that popup and cover a user's entire screen, forcing the user to engage with them.[289] |
| **DSP** | DSPs allow advertisers to connect into the ad tech ecosystem and automate the process of purchasing internet ads.[290] DSPs help advertisers manage their advertising campaigns by allowing them to define their budgets, set bidding strategies, and target a specific audience.[291] |

---

[287] David Lawsky, "Google closes DoubleClick merger after EU approval," Reuters, March 11, 2008, https://www.reuters.com/article/us-google-doubleclick-eu/google-closes-doubleclick-merger-after-eu-approval-idUSBFA00058020080311 ("Google Inc closed its $3.1 billion acquisition of online ad delivery company DoubleClick Inc on Tuesday, just hours after the deal won unconditional approval from the European Commission."); *see also*, GOOG-DOJ-AT-01510462, at -466 (06/23/2020) ("2008[:] DoubleClick acquisition (ad server, exchange)").

[288] *See* Lee Report, Section II.A.; *see also*, Michelle Ofiwe, "What Are Display Ads? Display Advertising Explained," Semrush Blog, July 9, 2021, https://www.semrush.com/blog/display-ads/ ("Display ads are graphic adverts that appear online on websites, mobile apps, and social media. They usually include text, images, video, and sometimes audio.").

Although some video advertisements may have an audio component, ads that are audio only are excluded from my analysis.

[289] Michelle Ofiwe, "What Are Display Ads? Display Advertising Explained," Semrush Blog, July 9, 2021, https://www.semrush.com/blog/display-ads/ ("Banner ads are a bit like digital billboards. They're located in high-traffic spots, usually at the front, bottom, or side of the webpage, and are also known as one of the best ways to drive traffic online…Rich media ads (or interactive ads) come under the HTML category…With a rich media ad, you can even simultaneously play a video and invite the user to engage with a poll or survey... Interstitial Ads These are image or HTML ads that pop up when you open an app or website. They cover the screen so that the user has to engage with them (even if only to click them away) to access the site.").

[290] "What is AdTech? Basics of The Ad Tech Ecosystem Explained," AdButler, May 5, 2021, https://www.adbutler.com/blog/article/what-is-ad-tech-the-ad-tech-ecosystem-explained. ("DSPs are the advertiser counterpart to SSPs. They allow advertisers to connect to the programmatic ecosystem, allowing them to configure an automated ad buying process.").

[291] *See* Lee Report, Section II.B.2.a. A major advantage of web advertising over traditional advertising channels is the ability of advertisers to target the specific users that the advertisers are most interested in reaching. Advertisers and their agencies rely on ad tech platforms to provide information contained in "cookies" and other user-level data to identify the consumers who best achieve the goals of an advertising campaign. A key benefit of cookies is that they allow advertisers to target users who have already visited their website or visited related sites, searched for context related to an advertiser's product, or who match advertisers' target demographic characteristics.

HIGHLY CONFIDENTIAL

| | |
|---|---|
| **DV360** | Google's DSP is called Display and Video 360 (DV360).[292] |
| **Exchange Bidding** | Former name for "Open bidding" |
| **GAM** | Google's publisher ad server is GAM. Google originally acquired this product through its 2008 acquisition of DoubleClick. In many Google documents, the GAM publisher ad server is referred to by its legacy name of DoubleClick for Publishers ("DFP").[293] |
| **Header bidding** | Header bidding was originally developed as a means for ad exchanges to submit real-time bids into Google's publisher ad server at a point in time when Google provided that advantage exclusively to AdX.[294] |
| **Impression** | If, when an internet user loads a web page, it contains an advertisement, that instance of a particular ad being shown to the user is called an impression.[295] |
| **Open bidding** | In 2018, Google introduced "Open Bidding" (previously referred to as "Exchange Bidding") to the AdX platform in response to the increasing popularity of header bidding.[296] Instead of a pre-bidding process followed by a subsequent auction (or series of auctions) run by the publisher ad server—as occurs in header bidding—Google's Open Bidding conducts a single auction |

---

[292] *See* Lee Report, Section II.C.4.

[293] David Lawsky, "Google closes DoubleClick merger after EU approval," Reuters, March 11, 2008, https://www.reuters.com/article/us-google-doubleclick-eu/google-closes-doubleclick-merger-after-eu-approval-idUSBFA00058020080311 ("Google Inc closed its $3.1 billion acquisition of online ad delivery company DoubleClick Inc on Tuesday, just hours after the deal won unconditional approval from the European Commission."); *see also*, GOOG-DOJ-AT-01510462, at -466 (06/23/2020) ("2008[:] DoubleClick acquisition (ad server, exchange)").

[294] *See* Lee Report, Section II.E.3.

[295] *See* Lee Report, Section II.A.1.

[296] *See* Lee Report, Section II.E.4.; *see also*, GOOG-DOJ-15277215, at -230−31 (05/05/2016) ("Rollout Plan[:] V0 / POC: Through End of Q1[.] - 2-3 exchanges, 5-10 publishers…V0.9 / Alpha: Through End of Q2[.] - expand to 4-5 exchanges (including Rubicon)…V1 / Beta: Post Q2…V2+ : TBD/2017?"); *see also*, GOOG-DOJ-15277215, at -217−218 (05/05/2016) ("Exchange Bidding in Dynamic Allocation allows non-AdX exchanges to access and purchase DFP publisher inventory via AdX piping…Why We Are Doing This?…It turns out that getting per-query bids from exchanges dramatically increases yield, so pubs are clamouring for this functionality. 'Header bidding' is a DFP hack that makes this possible and has gained rapid adoption") (emphasis in original)

| | where bids from non-AdX exchanges are allowed to compete with bids from AdX and other sources of advertising demand.[297] |
|---|---|
| **Publisher Ad Server** | Publisher ad servers allow publishers to connect with the ad tech ecosystem and automate the management of their ad inventory. These pieces of software allow publishers to set parameters that determine which advertisements will be allocated to each impression in their inventory—including impressions allocated through both direct and indirect sales channels.[298] |
| **SSP** | Ad exchanges are also referred to as supply-side platforms ("SSPs").[299] |
| **UPR** | Unified Pricing Rules ("UPR") placed restrictions on publishers' ability to set different price floors for each exchange. |
| **Walled Garden** | A closed ecosystem where the service provider has total control over all the operations in the ecosystem.[300] |

---

[297] *See* Lee Report, Section II.E.4.; *see also*, "Introduction to Open Bidding," Google Ad Manager Help, accessed December 19, 2023, https://support.google.com/admanager/answer/7128453?hl=en ("Open Bidding allows you to invite third-party demand partners to compete for your inventory in a single auction with real-time, server-to-server bidding…Open Bidding in Ad Manager also reduces the latency historically associated with header bidding. Ad Manager communicates directly with third-party demand partners in a server-to-server connection…Open Bidding…is handled by the Ad Manager ad server, which calls all yield partners at once so they can compete in real time during the dynamic allocation process.").

[298] *See* Lee Report, Section II.B.1.; *see also*, "The Main Technology Platforms and Intermediaries in the Digital Advertising Ecosystem," The AdTech Book by Clearcode, accessed December 19, 2023, https://adtechbook.clearcode.cc/adtech-platforms-and-intermediaries ("All of the popular advertising agencies have their own agency trading desk which runs the programmatic media-buying activities for the agency's clients." and "First-Party Ad Server…This technological platform allows publishers to manage the ad slots on their website and display ads that have been sold directly to advertisers (i.e. direct campaigns).").

[299] *See* Lee Report, Section II.B.3.; *see also*, Ryan Joe, "Defining SSPs, Ad Exchanges And Rubicon Project," AdExchanger, February 7, 2014, https://www.adexchanger.com/yield-management-tools/defining-ssps-ad-exchanges-and-rubicon-project/ ("The distinction between an ad exchange and a supply-side platform (SSP) has become muddled as the once disparate but complementary technologies have merged.").

[300] *See* Ravi Report, Appendix C.6.c.

HIGHLY CONFIDENTIAL

**FIGURE 31: EXAMPLES OF PUBLISHER AD SERVERS**

| | |
|---|---|
| **Zedo** | Established in 1999, Zedo historically provided publishers with ad tech products and services—including ad serving—but was acquired in 2021 and no longer competes in the publisher ad server market.[301] |
| **Broadstreet** | Broadstreet offers an ad management platform that includes a publisher ad server catering primarily to local business and B2B publishers.[302] |
| **AdButler** | AdButler provides an array of online advertising solutions including display publisher ad servers.[303] |
| **Epom** | Epom provides publisher ad server-related services to customers of varying sizes, offering pricing plans that depend, in part, on the volume of expected ad impressions and traffic amount.[304] Epom also provides services to advertisers through its DSP.[305] |
| **Kevel** | Kevel offers publisher ad server-related services and provides its customers with the capability to design their own custom ad platforms.[306] In addition to its |

---

[301] "ZEDO," Crunchbase, accessed December 19, 2023, https://www.crunchbase.com/organization/zedo ("ZEDO provides online advertising products and services to internet publishers, advertisers and agencies.", "Acquisition[:] Dec 8, 2021 **Warner Bros. Discovery** acquired **ZEDO** for an **undisclosed amount**") and ("Founded Date[:] Nov 1, 1999") (emphasis in original); *see also*, Our Bureau, "Discovery, Inc. acquires assets of ad-tech co ZEDO," The Hindu BusinessLine, updated December 8, 2021, https://www.thehindubusinessline.com/info-tech/discovery-inc-acquires-assets-of-ad-tech-co-zedo/article37895120.ece ("Discovery, Inc on Wednesday announced that it had acquired the assets, technology and intellectual property off ZEDO, an Inda and United States-based advertising technology company. 'The acquisition will bring ZEDO's technology in-house and enable faster innovation across Discovery's ad solutions,' the company said in an official release.").

[302] *See* "Our Story," Broadstreet, accessed December 19, 2023, https://broadstreetads.com/our-story/.

[303] *See* "Digital Advertising Technology for the Planet's Best Businesses," AdButler, accessed December 19, 2023, https://www.adbutler.com/#Display ("We bring together everything you need to manage, serve and track any type of ad on any screen. AdButler's products power ad serving for web sites, apps, marketplaces, retailers, email newsletters, connected TV, digital out of home, and everything in between.").

[304] Ad Server Pricing, Epom, accessed December 20, 2023, https://epom.com/pricing/ad-server.

[305] "DSP Server Pricing," Epom, accessed December 19, 2023, https://epom.com/pricing/dsp.

[306] "Our Mission," Kevel, accessed December 18, 2023, https://www.kevel.com/about ("Kevel offers the infrastructure APIs needed to quickly build custom ad platforms for sponsored listings, internal promotions, native ads, and more.").

| | |
|---|---|
| | publisher ad server, Kevel offers its customers the ability to build their own custom ad platforms. |
| **Smart** | Smart AdServer was relaunched as Equativ in 2022; it continues to operate globally and now, in addition to its publisher ad server, Smart also offers an exchange, buyer tools, and media services.[307] |
| **Uprival** | Uprival provides publisher ad server-related services to both publishers and advertisers.[308] |

### FIGURE 32: EXAMPLES OF AD EXCHANGES

| | |
|---|---|
| **Yahoo** | Yahoo used to operate an ad exchange alongside its DSP but earlier this year in February announced that it was shutting down its ad exchange.[309] Yahoo continues to operate an ad exchange and DSP under Yahoo Advertising.[310] |
| **Index Exchange** | Index Exchange is a global firm that provides programmatic advertising solutions through its platform, which includes an ad exchange partnered with over 150 DSPs.[311] |

---

[307] Marisa Nelson, "Smart AdServer Rebrands as Equativ," Equativ, June 8, 2022, https://equativ.com/blog/press-release/smart-adserver-rebrands-as-equativ/ ("Global adtech company, Smart AdServer has re-launched its global presence in 14 countries under the new name, Equativ." and "Equativ offers the market its own independent ad server, SSP, buyer tools, and media services to fulfill the promise of advertising technology.").

[308] UpRival, accessed December 19, 2023, https://uprival.com/ ("UpRival at the core is an Ad Server built specifically for Media Buyers and Ad Networks").

[309] Anthony Vargas, "Yahoo Shuttering Its SSP Is Evidence That Ad Exchanges Are Becoming Interchangeable," AdExchanger, February 15, 2023, https://www.adexchanger.com/platforms/yahoo-shuttering-its-ssp-is-evidence-that-ad-exchanges-are-becoming-interchangeable/ ("The end of Yahoo's SSP represents an unexpected shift in the digital advertising landscape. The move, which Yahoo announced last week, demonstrates how difficult it's become for supply-side platforms to prove their value in a commoditized marketplace.").

[310] "Yahoo Exchange," yahoo! Advertising, accessed December 20, 2023, https://www.advertising.yahooinc.com/our-dsp/exchange.

[311] Index Exchange, accessed December 19, 2023, https://www.indexexchange.com/ ("Our ad exchange enables media owners to grow revenue and marketers to reach consumers on any screen, through an ad format."); "Exchange Access and Transactions," Index Exchange, accessed December 19, 2023, https://www.indexexchange.com/product/exchange-access-transactions/ ("We partner with over 150 demand-side platforms, making it easy to access our exchange through your existing workflows and preferred DSPs.").

HIGHLY CONFIDENTIAL

| Pubmatic | Founded in 2006, Pubmatic is a global firm that operates an ad exchange and offers solutions for buyers and publishers.[312] Pubmatic also offers a header bidding solution under the name OpenWrap.[313] |
| --- | --- |
| Amazon Publisher Services | Amazon Publisher Services, as the name suggests, offers solutions targeted for publishers (large and mid-size) through its cloud-based marketplace.[314] |
| Magnite | Established in 2020, Magnite advertises itself as the largest independent sell-side advertising company.[315] Along side its ad exchange, Magnite also offers publisher header biddings solutions through its Prebid.org solution.[316] |
| Xandr | Xandr, a subsidiary of Microsoft, offers a full suite of ad tech solutions, including an ad exchange and DSP.[317] Similar to Magnite and Pubmatic, alongside its own ad exchange, Xandr also offers header bidding solutions.[318] |

[312] "PubMatic is First Sell-Side Technology Provider to Offer Powerful Experian Commerce Data in Both the US and UK," PubMatic, November 6, 2023,  https://pubmatic.com/news/pubmatic-is-first-sell-side-technology-provider-to-offer-powerful-experian-commerce-data-in-both-the-us-and-uk/ ("PubMatic's sell-side platform empowers the world's leading digital content creators across the open internet to control access to their inventory and increase monetization by enabling marketers to drive return on investment and reach addressable audiences across ad formats and devices.").

[313] "Meet OpenWrap: Revenue and Control in One Unified Header Bidding Solution," PubMatic, accessed December 19, 2023, https://pubmatic.com/products/openwrap/ ("Our unified header biding solution, OpenWrap, features specialized infrastructure that gives publishers innovative custom management tools and performance optimization insights to unlock new revenue opportunities across all channels, formats, devices, and screens.").

[314] Amazon Publisher Services, accessed December 19, 2023, https://aps.amazon.com/aps/index.html ("Amazon Publisher Services is a suite of cloud services that brings you solutions built by Amazon.").

[315] Magnite, accessed December 19, 2023, https://www.magnite.com/ ("Magnite is the world's largest independent sell-side advertising company.").

[316] "Magnite for Sellers," Magnite, accessed December 19, 2023, https://www.magnite.com/sellers/ ("We know Prebid because we co-founded Prebid.org. That's why the world's top publishers rely on Demand Manager for turnkey wrapper management and yield optimization…Prebid is the foundation for ad tech's next decade: community-driven, future-proof, and transparent…Configure and optimize every aspect of your header with intuitive UIs and real-time analytics.").

[317] "Publisher Platforms," Microsoft Advertising, accessed December 19, 2023, https://about.ads.microsoft.com/en-us/solutions/xandr/publisher-platforms-scaled-buying-selling-solutions ("Unlock the full value of your inventory and improve the experience for your consumers with Monetize SSP, Monetize Ad Server, and Yield Analytics. Xandr is uniquely positioned to offer you scaled, streamlined buying and selling platforms that are helping to shape the future of media monetization.").

[318] "Publisher Platforms," Microsoft Advertising, accessed December 19, 2023, https://about.ads.microsoft.com/en-us/solutions/xandr/publisher-platforms-scaled-buying-selling-solutions ("With Prebid-powered header bidding technology, deals capabilities, and curated premium demand, Xandr's

**FIGURE 33: EXAMPLES OF DSPS**

| | |
|---|---|
| **Zeta** | Zeta advertises a cloud based, AI powered marketing platform for advertisers, which includes a DSP.[319] |
| **Yahoo** | Yahoo DSP Advertising Solutions offers identity solutions, measurement tools and access to Yahoo "premium inventory" and native marketplaces.[320] |
| **Amazon Ads** | Amazon DSP, offered under Amazon Ads, enables advertisers to promote their products and services to third-party websites and across various Amazon properties, including Twitch and Freevee, as well as on Amazon devices like Fire TV and Echo Show.[321] |
| **MediaMath** | MediaMath, was a popular DSP that filed for bankruptcy earlier this year June.[322] |
| **The Trade Desk** | The Trade Desk operates a DSP that boasts access to a marketplace of 350+ partners.[323] |

---

supply-side platform (SSP) powers monetization through advanced tools to manage demand for all channels and formats—from display to Connected TV (CTV) to native.").

[319] Zeta Global, accessed December 20, 2023, https://zetaglobal.com ("We are Zeta: the AI-Powered Marketing Cloud[.] We unify identity, intelligence, and activation to create better experiences for consumers and better results for brands."); "Activation," Zeta Global, accessed December 20, 2023, https://zetaglobal.com/platform/activation/.

[320] "Yahoo DSP Advertising Solutions", yahoo! Advertising, accessed December 20, 2023, https://www.advertising.yahooinc.com/our-dsp ("Exclusive access to Yahoo premium inventory and one of the largest premium native marketplaces.").

[321] "Amazon DSP," Amazon Ads, accessed December 19, 2023, https://advertising.amazon.com/solutions/products/amazon-dsp ("Amazon DSP is a demand-side platform that allows you to programmatically buy ads to reach new and existing audiences on and off Amazon."); *see also*, "Display ads," Amazon Ads, accessed on December 19, 2023, https://advertising.amazon.com/products/display-ads?ref_=a20m_us_p_all_da ("Display ads help your brand connect with customers across Amazon properties like Twitch and Freevee and devices like Fire TV and Echo Show, as well as premium third-party content.").

[322] Kendra Barnett, "MediaMath's Dramatic and Drawn-out Downfall: 'Leadership Really Messed This Up'," *The Drum*, July 3, 2023, https://www.thedrum.com/news/2023/07/03/behind-mediamath-s-dramatic-and-drawn-out-downfall-leadership-really-messed-up ("Popular demand-side platform (DSP) MediaMath, which at one point was valued at over $1bn, filed for Chapter 11 bankruptcy on Friday evening.").

[323] "Demand Side Platform," The Trade Desk, accessed December 19, 2023, https://www.thetradedesk.com/us/our-platform/dsp-demand-side-platform ("With our demand-side platform,

HIGHLY CONFIDENTIAL

#### FIGURE 34: EXAMPLES OF ADVERTISER AD NETWORKS

| | |
|---|---|
| **Adsterra** | Adsterra was founded in 2013 and operates an advertiser ad network that serves over 400 publishers.[324] |
| **Amazon Publisher Services** | In addition to Amazon's ad exchange, discussed above, Amazon Publisher Services also operates an advertiser ad network.[325] |
| **Meta** | Meta operated an advertiser ad network called Audience Network serving open web display ad impressions. However, it recently changed the type of ads it would fill through its advertiser ad network, choosing to focus on only mobile app ad impressions instead.[326] |

## Appendix G: Derivation of Advertiser Overcharge

288.  In this Appendix, I provide the mathematical details of how I derive the formula for advertisers' share of total overcharge in Section IV.B.2. As explained therein, I assume that the total publisher supply of impressions equals the total advertiser demand of impressions. Mathematically, this assumption can be represented by the following market clearing condition:

$$S\big((1-\tau) \cdot P\big) = D^A(P) + D^O(P^O)$$

---

you can use data to reach more people wherever they are. Plus, get total transparency into performance, so you can optimize toward the goals that are most important to your business." and "Access a marketplace of 350+ partners").

[324]  "Advanced Advertising Network With a unique Partner Care Approach," Adsterra, accessed December 19, 2023, https://adsterra.com; *see also*, Shubham Grover, "Adsterra Review: Factsheet, Overview, Payment, Pros, and Cons," AdPushUp, May 15, 2021, https://www.adpushup.com/blog/adsterra-review-factsheet-overview-payment-pros-and-cons/ ("Adsterra is a popular ad network in the ad tech industry." and "**Founded in:** 2013…**Live publishers:** 438 (as per SimilarTech)") (emphasis in original).

[325]  Shubham Grover, "22 Best Ad Networks for Publishers in 2023," May 4, 2023, https://www.adpushup.com/blog/the-best-ad-networks-for-publishers/ ("Whether you are a mid-sized publisher, small publisher, or a large publisher, Amazon Publisher services has solutions for everyone. It is one of the best ad networks."); *see also*, Amazon Publisher Services, accessed December 20, 2023, https://aps.amazon.com/aps/index.html.

[326]  "Changes to Web and In-Stream Placements," Meta, accessed December 19, 2023, https://www.facebook.com/business/help/645132129564436 ("As of Apr 11 2020, Audience Netowrk no longer fills any ad requests to web and in-stream placements. We've made this decision based on where we see growing demand from our partners, which is in other formats across mobile apps."); *see also*, "Meta Audience Network," accessed December 20, 2023, https://www.facebook.com/audiencenetwork/.

HIGHLY CONFIDENTIAL

Timothy Simcoe, Ph.D.

December 22, 2023

**Expert Report of T. Simcoe (December 22, 2023)--Errata**

| Page | Paragraph | Footnote | Original | Corrected | Reason |
|---|---|---|---|---|---|
| 7 | 10 | 1 | "Rounding our the top five…" | "Rounding out the top five…" | Typo |
| 7 | 11 | | "…for use of its AdX platform would be at least 16.2 percent or below." | "…for use of its AdX platform would be at most 16.2 percent or below." | Typo |
| 8 | 11 | | "…17.9 percent lower than the fees that Google actually charged." | "…18.2 percent lower than the fees that Google actually charged." | Typo |
| 8 | 12 | | "…the total harm increases and advertisers would incur 24.6 percent of that larger amount." | "…the total harm increases and advertisers would incur 25.6 percent of that larger amount." | Typo |
| 9 | 15 | | "…framework for my damages calculations." | "…framework for my advertiser overcharge calculations." | Clarification |
| 9 | 18 | | "…a group of technology products the 'ad tech stack' that buyers…" | "…a group of technology products (the 'ad tech stack') that buyers…" | Typo |
| 10 | 20 | 9 | GOOG-DOJ-AT-02199478, at -485 (05/26/2021) | GOOG-DOJ-AT-02199478, at -485 (06/2019) | Typo |
| 11 | 21 | 11 | "Interstitial Ads These" | "Interstitial Ads[:] These" | Typo |
| 11 | 23 | 12 | "*See* Lee Report, Section IV.B.4., Figure 32 and Section IV.B.4." | "*See* Lee Report, Section IV.B.4, Figure 32." | Typo |
| 12 | 24 | 15 | Lee Report, Section II.B.2. | Lee Report, Section II.B.1. | Typo |
| 15 | 33 | | "Google's publisher ad server charges $0.085 per 1,000 direct impressions served up to 50 million impressions " | "Google's publisher ad server charges $0.085 per 1,000 direct impressions served up to 50 million impressions in a month" | Clarification |
| 15 | 33 | | "For example, Google does not charge ad serving fees…" | "For example, Google does not charge GAM ad serving fees…" | Clarification |
| 15 | 33 | | "…around 90 percent  for Google's publisher ad server." | "…around 90 percent  for Google's publisher ad server in 2022." | Clarification |
| 17 | 37 | 38 | "Complaint ¶ 16, ECF No. 208." | "Defendant Google LLC's Answer to Plaintiffs' Complaint ¶ 16, ECF No. 208." | Clarification |
| 17 | 37 | 39 | "Lee Report, Section. V.C.2.a., Figure 46." | "Lee Report, Section. V.C.2.a., Figures 47 and 48." | Clarification |
| 17 | 39 | 43 | "Lee Report, Section IV.F.2." | Lee Report, Section IV.E. | Typo |
| 20 | 49 | 59 | "Lee Report, Section V.D.2., Figure 59 and Section V.C.2., Figure 49." | "Lee Report, Section V.D.2., Figure 57 and Section V.C.2., Figure 47." | Typo |
| 23 | 53 | 66 | "Deposition of Johnathan Bellack, October 10, 2020," | "Deposition of Jonathan Bellack, October 2, 2020," | Typo |
| 24 | 55 | 72 | "with a broad swatch of plans" | "with a broad swath of plans" | Typo |
| 24 | 55 | 73 | "your app… See" | "your app…Learn" | Typo |
| 24 | 55 | 75 | "This means that on some days we might not reach your average daily budget, and on others we might exceed it." | "This means that on some days you might not reach your average daily budget, and on others you might exceed it." | Typo |
| 27 | 58 | 88 | "And from our experience" | "And from your experience" | Typo |
| 36 | 78 | | "Because Google Ads submits bid almost exclusively through AdX…" | "Because Google Ads submits bids almost exclusively through AdX…" | Typo |

| | | | | | |
|---|---|---|---|---|---|
| 36 | 78 | . | "...AdX's exclusive access to Google Ads' advertisers." | "...AdX's near-exclusive access to Google Ads' advertisers." | Clarification |
| 38 | 83 | . | "Figure 7 illustrates the average price..." | "Figure 6 illustrates the average price..." | Typo |
| 38 | 83 | . | "the average advertiser spend per US open web display impression has fluctuated between" | "the average advertiser spend per 1,000 US open web display impressions has fluctuated between" | Clarification |
| 39 | 84 | . | "the average price per worldwide open web display impression" | "the average price per 1,000 worldwide open web display impression" | Clarification |
| 41 | 86 | 126 | $TakeRate = \alpha + \beta \cdot CPM$ | $TakeRate = \alpha + \beta \cdot CPM + \varepsilon$ | Typo |
| 43 | 88 | Figure 9 | "Lee Expert Report, Section I.A.2., Figure 2." | "Lee Expert Report, Section I.E.2., Figure 2." | Typo |
| 43 | 90 | 131 | "Ravi's Expert Report contains the following appendices to be cross-referenced:" | "See the appendix discussions in The Expert Report of R Ravi appendices on the following topics:..." | Clarification |
| 43 | 90 | 132 | "Weintraub's Expert Report explains..." | "Professor Weintraub's Expert Report explains..." | Typo |
| 43 | Figure 9 | . | Right-hand dark blue oval labeled "Publishers" | Label as "Advertisers" instead | Typo |
| 45 | 93 | 137 | "that exchange functionality is not" | "that 'exchange functionality' is not" | Typo |
| 45 | 94 | . | "AdX's exclusive access to Google Ads' advertisers" | "AdX's nearly exclusive access to Google Ads' advertisers" | Clarification |
| 45 | 94 | . | "AdX's exclusive access to Google Ads' advertisers forces publisher ad servers to integrate with AdX" | "AdX's exclusive access to Google Ads' advertisers strongly incentivizes publisher ad servers to integrate with AdX" | Clarification |
| 46 | 97 | 143 | "*See* Deposition of Michael Shaughnessy (Kargo), August 9, 2023, 21:21–23..." | "*See* Deposition of Michael Shaughnessy (Kargo), August 9, 2023, 21:19–23..." | Typo |
| 46 | 97 | 143 | "A. Because we" | "THE WITNESS: Because we" | Typo |
| 47 | 99 | . | "If no advertiser bids above the floor, then the publisher may re-allocate the impression by re-auctioning the impression, or filling the space with a default or house advertisement." | "If no advertiser bids above the floor, then the publisher may fill the space with a default or house advertisement." | Clarification |
| 52 | 111 | 157 | "I think the 20% would cater" | "I think the 20% would crater" | Typo |
| 53 | 111 | 160 | "why we can't" | "why we can" | Typo |
| 54 | 115 | 167 | "versus most SSP's that" | "versus most SSPs that" | Typo |
| 54 | 115 | 168 | "versus most SSP's that" | "versus most SSPs is that" | Typo |
| 56 | 119 | . | "An August 201 email..." | "In an August 2019 email..." | Typo |
| 67 | 151 | . | "$... - \beta \tau_{i,t} + \varepsilon_{i,t}$" | "$... - \beta \tau_{i,t} + \xi_{i,t}$" | Typo |
| 67 | 151 | . | "$\varepsilon_{i,t}$: is an econometric error term" | "$\xi_{i,t}$: is an econometric error term" | Typo |
| 70 | 157 | 213 | "GOOG-DOJ-AT-00588455, at -455 (09/08/2018)..." | "GOOG-DOJ-AT-00588455, at -455 (09/06/2018)..." | Typo |
| 76 | 171 | 222 | "...as illustrated in Figure 12 and Figure 13. For completeness, a graphical analysis of that case is provided in Appendix D." | "...as illustrated in Figure 12 and Figure 13." | Clarification |
| 79 | 181 | . | "This process is analogous to the price changes depicted in and Figure 13..." | "This process is analogous to the price changes depicted in Figure 13..." | Typo |
| 80 | 184 | . | "Expressing the market clearing condition in terms of AdX's residual supply curve Figure 12 shows that..." | "Expressing the market clearing condition in terms of AdX's residual supply curve shows that..." | Typo |
| 80 | 185 | . | "This is analogous to the graphical analysis of a shift in the supply curves due a tax..." | "This is analogous to the graphical analysis of a shift in the supply curves due to a tax..." | Typo |

| | | | | | |
|---|---|---|---|---|---|
| 86 | 208 | | "...systematic review of documents produced by Google, as described in Appendix G." | "...systematic review of documents produced by Google, as described in Appendix H." | Typo |
| 90 | 222 | | "...gross revenue values associated for all non-AdX exchanges..." | "...gross revenue values associated with all non-AdX exchanges..." | Typo |
| 90 | 222 | | "...dividing the aggregated non-AdX net revenue into aggregated non-AdX gross revenue." | "...dividing the aggregated non-AdX net revenue by aggregated non-AdX gross revenue." | Typo |
| 91 | 224 | | "In Appendix D, I report additional robustness checks..." | "In Appendix E, I report additional robustness checks..." | Typo |
| 92 | 227 | 245 | "*See* Section V.A.1 and Appendix C.1 for a discussion of the data." | "*See* Section V.A.1 and Appendix C.2 for a discussion of the data." | Typo |
| 92 | 229 | | "...instruments in many other studyes.246 The potential endogeneity of prices of a well-known econometric concern..." | "...instruments in many other studies,246 to address the potential endogeneity of prices, a well-known econometric concern..." | Clarification |
| 94 | 231 | | "...AdX's share of worldwide open web display impressions increased by 20.8 percent." | "...AdX's share of worldwide open web display impressions increased by 21.2 percent." | Typo |
| 95 | 233 | | "The rightmost columns in Figure 17 presents..." | "The rightmost columns in Figure 16 presents..." | Typo |
| 95 | 234 | | "The results in Figure 17..." | "The results in Figure 16..." | Typo |
| 95 | 234 | | "Figure 27 in Appendix E shows estimates for the same IV and OLS models..." | "Figure 28 in Appendix E shows estimates for the same IV models..." | Typo |
| 95 | 235 | | "In Figure 26 in Appendix E I report estimates of the same models in Figure 17..." | "In Figure 26 in Appendix E I report estimates of the same models in Figure 16..." | Typo |
| 97 | 240 | 254 | "...*See* Appendix C.3 for futher discussion." | "...See Appendix C.3 for futher discussion. *See also* GAM Elasticity Workpapers." | Clarification |
| 98 | 244 | | "Appendix G provides a more detailed discussion..." | "Appendix H provides a more detailed discussion..." | Typo |
| 99 | Figure 18 | | "Notes: See Appendix G for more details..." | "Notes: *See* Appendix H.1 for more details..." | Typo |
| 100 | 249 | | "This means that a 1 percent increase in the price of ads on AdX produces a 0.5 percent increase in the number of impressions available to AdX Advertisers." | "This means that a 1 percent increase in the price of ads on AdX produces a 0.47 percent increase in the number of impressions available to AdX Advertisers." | Clarification |
| 101 | 250 | | "I discuss how I calculate AdX's supply elasticity based on each of these Google documents in more detail in Appendix G." | "I discuss how I calculate AdX's supply elasticity based on each of these Google documents in more detail in Appendix H.2." | Typo |
| 101 | 252 | | "...fall near the bottom of this range, my estimates based on auction simulations fall near the bottom of this range." | "...fall near the bottom of this range." | Typo |
| 101 | 252 | | "...will be conservative relative to calculations performed using four out of five of the elasticity estiamtes based on Google's internal analyses." | "...will be conservative relative to calculations performed using three out of five of the elasticity estiamtes based on Google's internal analyses." | Typo |
| 101 | Figure 20 | | "See Appendix G for more details..." | "*See* Appendix H.2 for more details..." | Typo |
| 105 | 259 | | "Appendix D includes a recreation of Figure 22 for only US impressions." | [Delete] | Typo |
| 107 | 266 | 265 | "and at page 233" | "and at page 232" | Typo |

| | | | | | |
|---|---|---|---|---|---|
| 124 | Figure 29 | | "...AND NON-FAA IMPRESSIONS, JANUARY 2019 - JANUARY 2021" | "...AND NON-FAA IMPRESSIONS, JANUARY 2019 - JANUARY 2023" | Typo |
| 130 | Figure 31 | 304 | "Ad Server Pricing, Epom..." | "'Ad Server Pricing,' Epom..." | Typo |
| 133 | Figure 33 | 321 | "...('Amazon DSP is a demand-side platform that allows you to programmatically buy ads to reach new and existing audiences on and off Amazon.')..." | "...('Amazon DSP is a demand-side platform that allows you to programmatically buy ads to reach new and existing audiences anywhere they spend their time.')..." | Typo |
| 134 | Figure 34 | 325 | "Shubham Grover, '22 Best Ad Networks for Publishers in 2023,' May 4, 2023,..." | "Shubham Grover, '22 Best Ad Networks for Publishers in 2023,' AdPushUp, May 4, 2023,..." | Typo |
| 134 | Figure 34 | 326 | "...('As of Apr 11 2020, Audience Netowrk no longer'..." | "...('As of Apr 11 2020, Audience Network no longer'..." | Typo |
| 134 | Figure 34 | 326 | "...'Meta Audience Network,' accessed December 20, 2023,..." | "...'Meta Audience Network,' Meta, accessed December 20, 2023,..." | Typo |
| 135 | 289 | | $\frac{\partial D^O}{\partial P^O} \cdot \frac{dP}{d\tau}$ | $\frac{\partial D^O}{\partial P^O} \cdot \frac{dP^O}{d\tau}$ | Typo |
| 138 | Section H | Figure 35 Source | "GOOG-DOJ-AT-02204351." | GOOG-DOJ-AT-02204351, at -360 (09/03/2019). | Typo |
| 141 | 306 | | "...buy-side take rate without changing the its take rate..." | "...buy-side take rate without changing the take rate..." | Typo |
| 141 | Figure 36 | | "Source: Brattle analysis of GOOG-DOJ-15140608." | "Source: Brattle analysis of GOOG-DOJ-15140608, at -609 (01/10/2014)." | Typo |
| 147 | 320 | | "where the key variable x represents the amount of an AdX bid expressed as a percentage of its reserve price:" $$C(x) = \alpha + \beta_1 x + \beta_2 x^2 + \sum_{k=0}^{U} \gamma_k \cdot 1[x = k] + \varepsilon$$ | "where the key variable b(x) is the bin corresponding to x, which is the amount of an AdX bid expressed as a percentage of its reserve price:" $$C(x) = \alpha + \beta_1 \boldsymbol{b(x)} + \beta_2 (\boldsymbol{b(x)})^2 + \sum_{k=0}^{U} \gamma_k \cdot 1[\boldsymbol{b(x)} = k] + \varepsilon$$ | Clarification |
| 147 | 320 | | The expression $\alpha + \beta_1 x + \beta_2 x^2$ is a quadratic function of the AdX bid size. | The expression $\alpha + \beta_1 \boldsymbol{b(x)} + \beta_2 (\boldsymbol{b(x)})^2$ is a quadratic function of the AdX bid bin number. | Clarification |
| 149 | 322 | | "...the publisher may re-auction the impression, re-allocate the impression to a direct campaign, or fill it with a default or house advertisement." | "...the publisher may re-allocate the impression to a direct campaign or fill it with a default or house advertisement." | Typo |

January 13, 2024