# Exhibit B

HIGHLY CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                   ALEXANDRIA DIVISION
 3
      United States of America, )
 4    et al.,                   )
                                ) Case No.
 5              Plaintiffs,     ) 1:23-cv-00108-LMB-JFA
                                )
 6    v.                        )
                                ) HON. LEONIE H.M. BRINKEMA
 7    Google, LLC,              )
                                )
 8              Defendant.      )
      _____)
 9
10                     * * * * *
11              HIGHLY CONFIDENTIAL
12                     * * * * *
13
14    VIDEOTAPED DEPOSITION OF TIMOTHY S. SIMCOE, PH.D.
15         Friday, February 23, 2024; 9:34 a.m. EST
16
17
18
      Reported by:  Cindy L. Sebo, RMR, CRR, CLR, RPR, CCR,
19    CSR, RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
      NJ Certified RT 30XR00019500, NM CSR 589, NY Realtime
20    Court Reporter, NY Association Certified Reporter, OR
      CSR 230105, TN CSR 998, TX CSR 12778, WA CSR
21    23005926, Notary Public
22    Job No. CS 6456894
```

Page 58

1  used in produced documents in this case -- did
2  you ever see the term "open web display
3  advertising" in those documents?
4         MS. STRICK: Objection: form.
5         THE WITNESS: I think that the
6     documents that I reviewed -- typically, the
7     people would understand what "open web
8     display advertising" means but didn't have
9     a need to use the term.
10        BY MS. GOODMAN:
11     Q.   When you say "the people would
12  understand," which people are you referring to?
13     A.   It depends on the documents, but
14  what I had in mind are individuals in the
15  industry.
16     Q.   Are you talking about the authors
17  and recipients on the documents, or are you just
18  saying, anybody who can look at the document
19  that's in the industry would know that it was
20  being -- that what was being discussed was open
21  web display advertising?
22        MS. STRICK: Objection: form.

Page 59

1         THE WITNESS: Among the types of
2     documents I reviewed were documents that
3     were industry press and kind of trade
4     publications related to open web display
5     advertising.
6         I don't recall whether the term
7     specifically was used in those sites, but
8     based on reading them, my understanding was
9     there's an industry of professionals who
10    work in the open web display advertising
11    space and that they would understand what
12    the term means and that the people who
13    wrote the documents are also within the
14    industry in that sense and would,
15    therefore, understand the term.
16        BY MS. GOODMAN:
17     Q.   And so is it your testimony you
18  would expect individuals who work in the ad tech
19  industry would understand what the term "open web
20  display advertising" is?
21        MS. STRICK: Objection: form.
22        THE WITNESS: I think individuals

Page 60

1     might ask for clarification of exactly what
2     you meant but they would understand broadly
3     what that term means.
4         BY MS. GOODMAN:
5      Q.   Okay. And are you offering any
6   opinion in this case about what the writers or
7   recipients of documents you reviewed understood
8   the term "open web display advertising" to mean?
9      A.   No, those aren't my opinions.
10     Q.   Okay. You mentioned that you
11  looked at documents -- that there are many more
12  documents that you looked at that are not cited
13  in your -- or listed in your report; is that
14  correct?
15     A.   Yes.
16     Q.   Were there any materials you looked
17  at and decided you should not rely upon?
18     A.   I'm not sure if I think of it that
19  way. I looked at many materials, and as I
20  consider what specifically to rely upon, I look
21  more closely at those materials until I reach a
22  point of being comfortable with them. So it's

Page 61

1   not as though I look at a document, accept it or
2   reject it immediately. I consider its relevance
3   and then think more about it.
4         So I reviewed many documents. Not
5   all of them are cited here. Some of them might
6   be things I wouldn't rely upon, but I can't point
7   you to specific things that I didn't rely upon.
8      Q.   Okay. And you rely upon
9   Professor Lee's reports in this case, correct?
10     A.   Yes.
11     Q.   Is -- is -- is Dr. Lee a professor?
12     A.   He is.
13     Q.   Okay. Do you know him, other than
14  from your work on this case?
15     A.   I've met him once or twice.
16     Q.   Okay. How long did you spend
17  reviewing Professor Lee's report?
18     A.   I've reviewed Professor Lee's
19  report -- or sections of his report on various
20  occasions. I recall sitting down with the
21  entirety of Professor Lee's report and spending a
22  day reading it at least once, but then I've gone

16 (Pages 58 - 61)

Page 62

1  back to it many times.  So . . .
2      Q.    And did you look at any of the
3  underlying materials cited in Professor Lee's
4  report in connection with your reliance on it?
5      A.    Broadly, yes, to -- I looked at
6  some of the materials cited in Professor Lee's
7  report and considered them in forming my own
8  opinions.
9      Q.    How much time did you spend
10 reviewing materials cited in Professors Lee [sic]
11 report, as opposed to the report itself?
12     A.    It's -- it's not easy to answer
13 that question given that -- I would read the
14 report.  I might see something that I thought was
15 relevant in a footnote, review that material,
16 return to reading the report.  The two activities
17 were simultaneous.
18          I could not estimate for you a
19 separate amount of time I spent looking at the
20 documents that I turned my attention to while
21 reading Professor Lee's report.
22     Q.    Did you look at the documents or

Page 63

1  materials cited on that day that you were reading
2  the entirety of his report?
3      A.    Yes, and on other days as well.
4      Q.    Okay.  Can you approximate how much
5  time you spent reading Professor Lee's report or
6  sections of it over the course of your
7  nine months working on this case?
8      A.    It is very difficult to approximate
9  that.  Let's say I spent a full day reading a
10 draft of his opening report.  I spent at least
11 half a day reading parts of his other report.  I
12 returned back to it many times.
13         More than two days of work and less
14 than five.
15     Q.    Okay.  And that's over the entirety
16 of your work on this matter, correct?
17     A.    Yes.  I only reviewed his report
18 while working on this matter.
19     Q.    Sure.
20         But I mean you're covering the
21 entire nine months that your work -- that you've
22 worked on this matter, whenever first you saw

Page 64

1  sections of Professors Lee [sic] report that --
2  you're talking about the entire nine-month span?
3          MS. STRICK:  Objection: form.
4          THE WITNESS:  I could not have
5  seen his report before I started working on
6  this matter and have only reviewed it since
7  then.
8          BY MS. GOODMAN:
9      Q.    Okay.  Without telling me any
10 substance of your communications, did you ever
11 communicate with Professor Lee about the contents
12 of his report?
13         MS. STRICK:  Again, with the
14 expert -- expert stipulation, you can
15 answer yes or no.
16         THE WITNESS:  No.
17         BY MS. GOODMAN:
18     Q.    Was there anything in
19 Professors Lee -- in Professor Lee's report that
20 you disagreed with?
21     A.    Not that I can recall, no.
22     Q.    Was there anything that you recall

Page 65

1  in his report that you wanted to look at more
2  closely before determining if you agreed or
3  disagreed?
4          MS. STRICK:  Objection: form.
5          THE WITNESS:  As I said, I
6  reviewed his report and, in considering his
7  analysis and opinions, I reviewed the
8  materials that he relied upon.  And in that
9  context, I would say I dug in and I tried
10 to evaluate whether he was using sound
11 economic methods.
12         As far as I can recall, I reached
13 the conclusion that his methods were sound
14 and his conclusions valid.  And so I don't
15 -- I would say yes, I -- I tried to
16 evaluate his work.  I thought about it, but
17 I don't recall disagreeing with any of it.
18         BY MS. GOODMAN:
19     Q.    Okay.  And it's accurate that you
20 do not offer any independent opinions related to
21 Professor Lee's conclusions?
22         MS. STRICK:  Objection: form.

Page 66

1  THE WITNESS: I don't opine on
2  the same questions as Professor Lee.
3  BY MS. GOODMAN:
4  Q. Okay. And is it accurate that do
5  you not offer any independent opinions related to
6  Professor Lee's conclusions?
7  MS. STRICK: Objection: form.
8  THE WITNESS: I believe that's
9  correct.
10  BY MS. GOODMAN:
11  Q. Okay. One of the aspects of
12  Professor Lee's report that you rely upon is his
13  definition of the relevant antitrust markets,
14  correct?
15  MS. STRICK: Objection: form.
16  THE WITNESS: Yes.
17  BY MS. GOODMAN:
18  Q. And you've done no independent work
19  on that topic, correct?
20  MS. STRICK: Objection: form.
21  THE WITNESS: I was not asked to
22  define an "antitrust market" in this case.

Page 67

1  BY MS. GOODMAN:
2  Q. And so is it accurate that you have
3  not offered an opinion on what a relevant
4  antitrust market in this case is?
5  A. That's correct.
6  Q. Okay. And if we turn to
7  Paragraph 59 of your report, starting on Page 27.
8  CERTIFIED STENOGRAPHER: I think
9  we have to go off the record.
10  MS. GOODMAN: Okay. We're going
11  off the record.
12  THE VIDEOGRAPHER: No; we're
13  good.
14  MS. GOODMAN: Oh.
15  CERTIFIED STENOGRAPHER: Do you
16  hear that hum?
17  MS. STRICK: Why don't we take a
18  break anyway and see if we can figure out
19  the hum?
20  THE WITNESS: Are we off the
21  record?
22  THE VIDEOGRAPHER: We're now off

Page 68

1  the record at 10:37 a.m.
2  --oOo--
3  (Whereupon, a recess was taken from
4  10:37 a.m. EST to 10:49 a.m. EST.)
5  --oOo--
6  THE VIDEOGRAPHER: We're now back
7  on the record at 10:49 a.m.
8  You may proceed.
9  BY MS. GOODMAN:
10  Q. Professor Simcoe, can you turn to
11  Paragraph 63 of your report on Page 28 -- your
12  opening report, Simcoe 1?
13  A. Yes.
14  Q. And you see you write that Lee's
15  report defines a set of relevant antitrust
16  markets for publisher ad servers, ad exchanges
17  and advertiser ad networks.
18  The remainder of this
19  Section III.A.1 stems largely from your review of
20  Professor Lee's report, correct?
21  MS. STRICK: Objection: form.
22  THE WITNESS: Not entirely.

Page 69

1  BY MS. GOODMAN:
2  Q. In large part, what you're doing
3  here is summarizing what Professor Lee said?
4  MS. STRICK: Objection: form.
5  THE WITNESS: Not completely.
6  BY MS. GOODMAN:
7  Q. I didn't ask in completely.
8  Are you, in large part,
9  summarizing what Professor Lee wrote in his
10  report?
11  MS. STRICK: Objection: form.
12  THE WITNESS: I summarized some
13  of what Professor Lee says. I add my own
14  remarks on these markets, and there are
15  some figures that are based on analysis
16  that I did myself.
17  BY MS. GOODMAN:
18  Q. And setting aside your figures, you
19  say you did your -- is it accurate you're saying
20  you did some of your own analysis -- strike that.
21  You said you make your own
22  remarks on some of these markets.

18 (Pages 66 - 69)

Page 166

1  THE WITNESS: No.
2  BY MS. GOODMAN:
3     Q.   Okay. I want to go back a bit to
4  Professor Weintraub.
5         In Paragraph 36 of your
6  report -- let's go to Paragraph 36.
7         The last sentence, you write,
8  Ultimately, because the number of buyers and
9  sellers on an exchange determine it's perceived
10 quality, scale is an important dimension of
11 competition among exchanges.
12        And you cite to
13 Professor Weintraub for that opinion, correct?
14    A.   I do cite to Professor Weintraub
15 here, yes.
16    Q.   Okay. And you cite generally to
17 his report, Section III?
18    A.   Yes.
19    Q.   Okay. Other than
20 Professor Weintraub's opinion, do you have any
21 other basis for your conclusion that the number
22 of buyers and sellers on an exchange determine

Page 167

1  its perceived quality and, thus, scale is an
2  important dimension of competition among ad
3  exchanges?
4     A.   Yes.
5     Q.   Okay. What are the other sources
6  of your opinion?
7     A.   This idea is fundamental in the
8  economics of multisided platforms. It's
9  something that I come across all the time in my
10 academic work.
11    Q.   Okay. Are there other factors than
12 the number of buyer and sellers on an exchange
13 that determine its perceived quality?
14        MS. STRICK: Objection: form.
15        THE WITNESS: Yes, that's
16   possible.
17        BY MS. GOODMAN:
18    Q.   Did you consider any of those other
19 factors?
20    A.   Yes.
21    Q.   Was -- is another factor that
22 affects quality an exchange's ability to guard

Page 168

1  against spam?
2        MS. STRICK: Objection: form.
3        THE WITNESS: I've considered
4  many other features or characteristics of
5  exchanges, but the evidence I've seen makes
6  me think that the most important factor is
7  scale.
8        And the -- the key thing to keep
9  in mind is that perceived quality has an
10 effect on demand only in terms of relative
11 perceived quality of different products.
12        BY MS. GOODMAN:
13    Q.   Okay. And you agree that the ad
14 exchange market, as Professor Lee describes it --
15 or defines it, includes differentiated products?
16        MS. STRICK: Objection: form.
17        THE WITNESS: Yes.
18        BY MS. GOODMAN:
19    Q.   Okay. And that means that ad
20 exchanges provide a distinctive set of features
21 and services from one another?
22    A.   Yes. It means not all ad exchanges

Page 169

1  are exactly the same.
2     Q.   And there is -- what -- can you
3  characterize the degree of differentiation among
4  ad exchanges in Professor Lee's ad exchange
5  market?
6        MS. STRICK: Objection form.
7        THE WITNESS: As I noted earlier,
8  in my view, scale is the most important
9  aspect of differentiation, and there are
10 enormous differences in scale. So there's
11 quite a bit of differentiation.
12        BY MS. GOODMAN:
13    Q.   Any other factors that you
14 considered -- strike that.
15        Are there any other factors
16 that determine quality which you observed a --
17 a -- a large degree of differentiation among the
18 ad exchanges in Professor Lee's market?
19        MS. STRICK: Objection: form.
20        THE WITNESS: I considered -- or
21 saw evidence related to several other
22 characteristics, and I think it's likely

Page 170

1 that some exchanges have certain
2 characteristics that others don't have.
3 And in that sense, the relative
4 differentiation on that feature is large.
5         But the evidence also suggests
6 that on net -- the evidence I've seen
7 didn't make me believe that on net, there
8 were large differences in exchange quality
9 on nonscale features across the exchanges.
10        BY MS. GOODMAN:
11    Q.   Okay.  And did that -- strike that.
12        MS. GOODMAN:  All right.  Do you
13 want to take a lunch break now?
14        MS. STRICK:  I'll take lunch.
15        THE WITNESS:  Okay.
16        THE VIDEOGRAPHER:  We're now off
17 the record at 1:02 p.m.
18             --oOo--
19        (Whereupon, at 1:02 p.m. EST, a
20         luncheon recess was taken.)
21             --oOo--
22

Page 171

1        A F T E R N O O N    S E S S I O N
2             (1:38 p.m. EST)
3             --oOo--
4        TIMOTHY S. SIMCOE, PH.D.,
5 was called for continued examination and, after
6 having been previously duly sworn, was examined
7 and testified further as follows:
8             --oOo--
9        THE VIDEOGRAPHER:  We're now back
10 on the record at 1:38 p.m.
11        You may proceed.
12             --oOo--
13 EXAMINATION (CONTINUED) BY COUNSEL FOR DEFENDANT
14             --oOo--
15        BY MS. GOODMAN:
16    Q.   Professor Simcoe, let's turn in
17 your report to Paragraph 87.
18        And Paragraph 87 discusses your
19 Figure 8, which is a linear -- linear regression
20 model plotting average CPM against average take
21 rate by exchange, correct?
22        MS. STRICK:  Objection: form.

Page 172

1        THE WITNESS:  Yes, it's a
2 regression model of the average take rate
3 regressed on average -- every CPM.  It also
4 illustrates some other things, but yes.
5        BY MS. GOODMAN:
6    Q.   And in Paragraph 87, you write,
7 Extrapolating from the linear regression model,
8 AdX's predicted take rate based on its average
9 CPM would be 10 percent.
10        Correct?
11   A.   Yes.
12   Q.   And the predicted take rate that
13 you predict from Figure 8 -- that never bore out
14 in any of your analyses, correct?
15        MS. STRICK:  Objection: form.
16        THE WITNESS:  What do you mean by
17 bore out in any of my analyses?
18        BY MS. GOODMAN:
19   Q.   The actual analyses that you
20 conducted to figure out AdX's but-for take rate
21 never yielded a 10 percent but-for take rate,
22 correct?

Page 173

1        MS. STRICK:  Objection: form.
2        THE WITNESS:  I think that there
3 are some other regressions that have -- in
4 the histogram of results and the appendix
5 to the rebuttal report that might go as low
6 as that in the robustness analyses I did.
7        BY MS. GOODMAN:
8    Q.   But the -- but the but-for take
9 rate that you offer in this case as a reliable
10 estimate of a but-for take rate is not
11 10 percent, correct?
12        MS. STRICK:  Objection: form.
13        THE WITNESS:  The main figures at
14 the back of my report, where I report my
15 conclusions as to a -- I want to get this
16 right -- is upper bound on the reliable
17 but-for take rate do not report a
18 10 percent number in them.
19        BY MS. GOODMAN:
20   Q.   And which figure are you looking
21 at?
22   A.   I believe it's Figure 22.

Page 174

1  Q. Okay. And so these are the but-for
2 take rates that you put forward should -- would
3 exist in the but-for world?
4         MS. STRICK: Objection: form.
5         THE WITNESS: I do a large number
6  of analyses, including some of the
7  robustness ones that I mentioned earlier,
8  but Figure 2 summarizes the baseline
9  results of my analysis.
10        BY MS. GOODMAN:
11 Q. Okay. And you -- you mean
12 Figure 22?
13 A. Yes. What -- sorry. Figure 22.
14 Q. Okay. And in Figure 8, you're
15 using seven data points -- seven observations in
16 your analysis, correct?
17        MS. STRICK: Objection: form.
18        THE WITNESS: Where was that?
19        Here it is.
20        Yes. I use impression weights, I
21 believe, in this regression, but the
22 regression line is fitted to the

Page 175

1  weight -- you know, it's a weighted
2 regression that's fitted to the average
3  take rate and the average CPM of the seven
4 exchanges, excluding AdX, that are shown in
5 the figure.
6         BY MS. GOODMAN:
7  Q. And it's from that regression that
8 uses seven observations from which you say there
9 could be a predicted take rate of 10 percent?
10        MS. STRICK: Objection: form.
11        THE WITNESS: I said if you
12 extrapolate from that specific regression
13 model, which just means if you read off the
14 gray line, conditioning only on CPM, the --
15 the predicted value of that regression
16 would be around 10 percent if a exchange
17 had the same average CPM as AdX.
18        BY MS. GOODMAN:
19 Q. And in Paragraph -- well -- you
20 agree that CPM is influenced by differences in
21 the nature and quality of publisher inventory?
22        MS. STRICK: Objection: form.

Page 176

1         THE WITNESS: Yes. I think I say
2  that somewhere.
3         BY MS. GOODMAN:
4  Q. In Paragraph 85, right?
5  A. Yeah. I'll take -- I'll take your
6  word for it, yes.
7  Q. Okay. And also that -- you agree
8 that CPM -- average CPM differs across exchanges
9 based on the differences in demand, cost and
10 other features of the auction process across the
11 exchanges?
12 A. Could you repeat that one?
13 Different -- or point me to where I wrote it.
14 Q. Paragraph 85, the first sentence.
15 A. Yes.
16 Q. And so your Figure 8 does not
17 consider the differences in other features of the
18 auction process across the exchanges, correct?
19        MS. STRICK: Objection: form.
20        THE WITNESS: That regression
21 does not control explicitly. It simply
22 takes an average CPM -- my recollection is

Page 177

1  it's the average CPM over the same period
2  that is used to construct -- I guess the
3  earlier -- there's some earlier figures
4  that show CPMs by exchange or -- it's the
5 same as Figure 7 and Figure -- in any case,
6 my point is that it's -- it's a average
7  over many months of data that I used to
8  construct the -- the mean CPM that's then
9  used in the regression.
10        BY MS. GOODMAN:
11 Q. And in your work as an economist,
12 do you typically draw conclusions from a
13 regression that has only seven observations?
14        MS. STRICK: Objection: form.
15        THE WITNESS: It depends on the
16 type of conclusions you have in mind.
17        BY MS. GOODMAN:
18 Q. What kinds of instances is it
19 appropriate in the generally accepted standards
20 of economics to draw a conclusion from a
21 regression with only seven observations?
22 A. I'm not sure how to interpret all

HIGHLY CONFIDENTIAL

Page 178

1  of the front end of that question, but I might do
2  something like this in -- depending on what sort
3  of data I have to understand if a line fits a set
4  of points, right.
5         So seven data points is sufficient
6  to estimate a univariant regression, like I do
7  here, that is, a regression that uses one control
8  variable. And the answer is it depends. You
9  know, sometimes one might draw conclusions from
10 that; other times, one might not.
11     Q.   And do you draw a conclusion from
12 this regression in Figure 8 as to what the
13 but-for world should look like or would look
14 like?
15         MS. STRICK: Objection: form.
16         THE WITNESS: A conclusion as to
17 what the but-for world . . .
18         Figure 8 is used to illustrate
19 the unique, say, competitive position of
20 AdX. I think it can inform the analysis
21 that I do, but Figure 8 is not a direct
22 input into the numbers that I report in

Page 179

1  Figure 22, or whatever it was that we
2  discussed earlier.
3         BY MS. GOODMAN:
4     Q.   And do you draw a conclusion from
5  the regression in Figure 8 that in a
6  but-for world, AdX's predicted but-for take rate
7  would be 10 percent?
8         MS. STRICK: Objection: form.
9         THE WITNESS: As I said, Figure 8
10 informs my analysis, but it's not, on its
11 own, the basis for any conclusion about the
12 take rates in the but-for world.
13         BY MS. GOODMAN:
14     Q.   So is it fair to say you are not
15 offering an opinion in this case that the but-for
16 take rate is 10 percent?
17         MS. STRICK: Objection: form.
18         THE WITNESS: The opinion that I
19 discussed earlier -- I -- I mentioned that
20 I view the numbers in Figure 22 as an upper
21 bound for the take rate in the
22 but-for world.

Page 180

1         I haven't been asked to analyze
2  what's the lowest possible take rate. I'm
3  not offering an opinion as to that.
4         BY MS. GOODMAN:
5     Q.   Are you offering an opinion that in
6  the but-for world you construct, the but-for take
7  rate is 10 percent?
8         MS. STRICK: Objection: form.
9         THE WITNESS: I have no analysis
10 -- how to say it.
11        No, I'm not offering an opinion
12 that the but-for take rate is 10 percent.
13        BY MS. GOODMAN:
14    Q.    Okay. Would it be reliable, in
15 your view as an economist, to calculate damages
16 based on a but-for take rate of 10 percent based
17 on the work you did in this regression in
18 Figure 8?
19        MS. STRICK: Objection: form.
20        THE WITNESS: As I said, Figure 8
21 informs my analysis, and so Figure 8 is
22 part of what I've done here. And in that

Page 181

1  sense, it's relied upon.
2         I do not rely on Figure 8
3  standing on its own -- the regression in
4  Figure 8 standing on its own.
5         BY MS. GOODMAN:
6     Q.   And would it be, therefore,
7  inappropriate for a fact-finder to rely on a
8  10 percent but-for take rate to calculate
9  damages?
10        MS. STRICK: Objection: form.
11        THE WITNESS: It depends.
12        BY MS. GOODMAN:
13    Q.    What does it depend on?
14    A.    Well, your question was whether it
15 would be appropriate for them to --
16    Q.    That's fair --
17    A.    -- use 10 percent.
18    Q.    -- let me rephrase my question.
19        Would it be reliable as a
20 matter of economics for a fact-finder to rely on
21 a 10 percent but-for take rate to calculate
22 damages in this case when that 10 percent take

Veritext Legal Solutions
800-567-8658                                                          973-410-4098

Page 182

1  rate is derived solely from your regression in
2  Figure 8?
3         MS. STRICK: Objection: form.
4         THE WITNESS: I would, as a
5  matter of economics, look to see more than
6  Figure 8 standing on its own, though I
7  think a fact-finder can reasonably rely on
8  Figure 8 in forming a determination of the
9  but-for take rate, as I do in this report.
10        BY MS. GOODMAN:
11    Q.  And would it be reliable as a
12 matter of economics for a fact-finder to look at
13 Figure 8 standing on its own in calculating
14 damages?
15        MS. STRICK: Objection: form.
16        THE WITNESS: I think Figure 8
17 can form part of a reliable analysis, as it
18 does here. So it could be used, but it
19 should be used along with all the other
20 information that I use in doing my own
21 analysis.
22

Page 183

1         BY MS. GOODMAN:
2     Q.  Okay. And it -- thus, you agree it
3  would not be appropriate as a matter of economics
4  to use 10 percent as a but-for take rate standing
5  alone?
6         MS. STRICK: Objection: form.
7         THE WITNESS: It depends.
8         BY MS. GOODMAN:
9     Q.  But you don't do that in your
10 report, do you?
11    A.  I do not use Figure 8 as the
12 stand-alone basis for opinions in my report.
13    Q.  And you read Professor Chevalier's
14 report, correct?
15    A.  Yes.
16    Q.  And she calculated a p-value of
17 that -- of your regression in Figure 8, right?
18    A.  She did some -- I don't -- I don't
19 recall specifically what she did, but I think she
20 did something of that nature, yes.
21    Q.  And the p-value she calculated was
22 .375?

Page 184

1     A.  Do you know what it is a p-value
2  of?
3     Q.  The regression.
4     A.  I'm sorry --
5         MS. STRICK: Objection: form.
6         BY MS. GOODMAN:
7     Q.  The p-value that she calculated for
8  the regression is .375.
9         You read that in her report?
10        MS. STRICK: Objection:
11 foundation.
12        THE WITNESS: I read her report.
13 As I said, I don't recall the specifics and
14 I know that she did some analysis that
15 could have produced a p-value.
16        BY MS. GOODMAN:
17    Q.  Okay. And a p-value of .375 is too
18 high to be considered con- -- statistically
19 significant.
20        Do you agree with that as a
21 matter of economics --
22        MS. STRICK: Objection:

Page 185

1  foundation --
2         BY MS. GOODMAN:
3     Q.  -- and statistics?
4         MS. STRICK: -- objection:
5  foundation and form.
6         THE WITNESS: The standard
7  practice -- so a p-value is -- it gives a
8  likelihood of observing the data that we
9  see under a null hypothesis. I don't know
10 specifically what type of p-value you're
11 referring to here, so I'm speculating a
12 little. But a standard threshold for
13 p-values is either 10 or 5 or 1 percent.
14        BY MS. GOODMAN:
15    Q.  And a p-value of .375 exceeds the
16 standard thresholds, correct?
17        MS. STRICK: Objection:
18 foundation.
19        THE WITNESS: Yes.
20        BY MS. GOODMAN:
21    Q.  And when a p-value exceeds a
22 standard threshold, does that make the analysis

HIGHLY CONFIDENTIAL

Page 190

1   produces a conservative result.
2       BY MS. GOODMAN:
3       Q.   Okay.  And in your report at
4   Paragraph 137 --
5       A.   My opening report?
6       Q.   Yes.
7            -- you say, The basic idea
8   behind your comparables approach is to find
9   transactions that were not influenced by the
10  relevant conduct and use the price of those
11  transactions as a benchmark to estimate the
12  counterfactual but-for price.
13           Do you see that?
14      A.   Yes.
15      Q.   And so in this idea, you need to
16  find transactions that were not influenced by the
17  relevant conduct, correct?
18      A.   I explain why the effect that the
19  relevant conduct could have had on the
20  transactions that I use is to increase the take
21  rate of those transactions, which leads to a
22  conservative estimate under my threshold.

Page 191

1       Q.   How are you confident that it leads
2   to a conservative estimate, when you didn't
3   measure for the increase in price allegedly
4   charged by other exchanges?
5            MS. STRICK:  Objection: form.
6            THE WITNESS:  I explain this in
7       my opening report.  It's related to this --
8       to the economic idea of strategic
9       complementarities, which is to say that in
10      -- under differentiated Bertrand
11      competition, firms respond to price changes
12      by other firms in the same direction, and
13      it's standard in economics to make
14      inferences about direction without trying
15      to measure them.
16           BY MS. GOODMAN:
17      Q.   Okay.  Do you agree that when
18  conducting yardstick damages analysis, you need
19  to control for as many differences between the
20  alleged violator and the groups against whom
21  you're comparing the alleged violator?
22           MS. STRICK:  Objection: form.

Page 192

1            THE WITNESS:  Control -- do I
2       agree that there are -- could you repeat
3       that?
4            BY MS. GOODMAN:
5       Q.   Do you agree that it is necessary
6   to control for differences, in this case, between
7   Google and those to whom you're comparing Google?
8       A.   The word "control" can have
9   different meanings; but broadly speaking, one
10  seeks to choose comparable transactions in a
11  manner that makes them similar, except for the
12  alleged conduct.
13      Q.   Okay.  Do you also need to -- so
14  what did you do in your comparables approach to
15  compare -- to control for the things that makes
16  Google similar or dissimilar to the other
17  exchanges in your comparables approach?
18           MS. STRICK:  Objection: form.
19           THE WITNESS:  So part of the
20      question's premise is wrong.  I didn't
21      select exchanges; I selected transactions.
22      This was something I spent some time on in

Page 193

1       the rebuttal report.
2            BY MS. GOODMAN:
3       Q.   Okay.  Let's set that aside for a
4   second because we'll get to that.  But I -- I --
5   I take the -- the point.
6            But I just want to know, what
7   did you do to control for any differences that
8   don't relate to the alleged misconduct in the
9   selection of your transactions or of your
10  exchanges?
11           MS. STRICK:  Objection: form.
12           THE WITNESS:  I chose
13      transactions from the same relevant
14      antitrust market, from --
15           BY MS. GOODMAN:
16      Q.   And --
17      A.   -- from -- from exchanges that
18  didn't engage in the conduct.
19      Q.   -- and is there anything else that
20  you did to evaluate the appropriateness of the
21  transactions or exchanges that you chose as
22  comparables?

Page 194

1    MS. STRICK: Objection: form.
2    THE WITNESS: I chose
3 transactions. I chose them on the basis of
4 their being in the same relevant
5 antitrust -- well, using -- transactions
6 that use the tools in the relevant
7 antitrust market, and I considered the
8 broad range of types of transactions
9 conducted on AdX and at the other exchanges
10 in that market.
11    BY MS. GOODMAN:
12    Q.   And did you control for any
13 differences among the broad ranges of
14 transactions conducted on AdX and on the other
15 exchanges in the market?
16    MS. STRICK: Objection: form.
17    THE WITNESS: What types of
18 differences do you have in mind?
19    BY MS. GOODMAN:
20    Q.   Any of the differences that you
21 have come to learn about in the course of your
22 study of the differentiated products within the

Page 195

1 ad exchange market?
2    MS. STRICK: Objection --
3    THE WITNESS: The --
4    MS. STRICK: -- form.
5    THE WITNESS: -- the ad exchanges
6 are differentiated products; but right now,
7 we're talking about transactions in the
8 open web display impressions market,
9 correct?
10    BY MS. GOODMAN:
11    Q.   I'm talking about your comparables
12 approach and what you used, which are a set of
13 transactions from a set of ad exchanges in the
14 relevant market, as Professor Lee defined it and
15 what I believe you testified to earlier.
16    A.   Yes.
17    MS. STRICK: Objection: form.
18    BY MS. GOODMAN:
19    Q.   Let me try it this way: Do you
20 agree that an ideal yardstick or comparable
21 transaction or firm is one who is as close to the
22 -- to Google as possible?

Page 196

1    MS. STRICK: Objection: form.
2    THE WITNESS: To tell you -- to
3 answer the question about an ideal
4 yardstick, I'd like to know, are we doing
5 a -- a market-level or a -- a firm-level
6 analysis or a transaction-level, the ideal
7 in -- in the context of what -- what type
8 of analysis?
9    But the -- the premise is right.
10 One wants something that is as close as
11 possible except for the -- the conduct that
12 you are trying to estimate the effect of.
13    BY MS. GOODMAN:
14    Q.   And so what did you do to make sure
15 that the transactions or the exchanges which you
16 included in your comparables approach were as
17 close as possible except for the conduct that you
18 are trying to estimate the effect of?
19    MS. STRICK: Objection: form.
20    THE WITNESS: I chose to include
21 all of the transactions that I could
22 identify in the relevant market to make

Page 197

1 them comparable to the broad types of
2 transactions conducted on AdX --
3    BY MS. GOODMAN:
4    Q.   Well, I --
5    A.   -- and I also did the event study
6 analysis, which I view as complementary and a way
7 to control for some kinds of differences across
8 exchanges.
9    Q.   So you say you chose to include all
10 the transactions that you could identify in the
11 transactional data, correct?
12    MS. STRICK: Objection: form.
13    THE WITNESS: What I did is
14 described in the opening report. But
15 Professor Lee defined a relevant antitrust
16 market. That market included a number of
17 exchanges. I used all of the data that was
18 usable that was provided by all of the
19 exchanges in the relevant antitrust market.
20 And as I explain in my report, that
21 provides, after you pool all of them
22 together, a set of transactions on ad

HIGHLY CONFIDENTIAL

Page 198

1 exchanges for open web display ads that is
2 the basis for the -- the comparables
3 analysis.
4     BY MS. GOODMAN:
5     Q.   And my question is, What did you do
6 after compiling that set of transactions to
7 figure out whether they are as close as possible
8 to Google but for the alleged anticompetitive
9 conduct?
10           MS. STRICK:  Objection: form.
11           THE WITNESS:  So far, this
12 conversation, we haven't talked about any
13 material types of differences in those
14 transactions, but --
15     BY MS. GOODMAN:
16     Q.   Did you look for any material types
17 of differences in those transactions in order to
18 determine if they are appropriate comparables?
19     A.   I think I did at least one.
20          So one thing that you can observe
21 is CPM.  And there's a -- a figure somewhere in
22 my opening report where I discuss the overlap in

Page 199

1 the distribution of impression prices between
2 impressions sold on AdX and impressions sold on
3 the other exchanges in the market.
4     Q.   And so how does that tell you that
5 the transactions you selected are appropriate or
6 are as comparable to Google as possible?
7           MS. STRICK:  Objection: form.
8           THE WITNESS:  CPM is one of the
9 characteristics that I can observe of the
10 transactions, or on an aggregate basis in
11 any case, and so I looked to see whether
12 the range of impression prices for
13 impressions sold on AdX exhibited
14 substantial overlap with the range of
15 impression prices sold on the other
16 exchanges in the market.  That overlap is
17 an indicator of comparability.
18     BY MS. GOODMAN:
19     Q.   Other than the overlap, did you do
20 anything to consider -- to figure out whether the
21 transactions you selected are comparable to
22 Google's transactions?

Page 200

1           MS. STRICK:  Objection: form.
2 THE WITNESS:  As I sit here, what     I can
3 recall doing on a quantitative --      well, what I
4 can recall doing is choosing       to include all
5 of the transactions that I        could identify in
6 the relevant markets and        checking for
7 overlap in the price       distribution.
8
9     BY MS. GOODMAN:
10     Q.   And that's all you can recall doing
11 in order to determine that the transactions you
12 included were, in fact, good comparables to the
13 Google AdX transactions, correct?
14           MS. STRICK:  Objection: form.
15           THE WITNESS:  As I said, this
16 analysis is complemented by the event study
17 analysis, which controls for differences
18 across exchanges in other ways.  And I
19 reviewed -- I view the two of them as
20 supporting one another.
21     BY MS. GOODMAN:
22     Q.   But you didn't rely on the event

Page 201

1 study in order to select the comparable
2 transactions, correct?
3     A.   Correct.
4     Q.   Okay.  You just think that that
5 supports your conclusion in the selection of your
6 comparable transactions --
7           MS. STRICK:  Objection: form.
8     BY MS. GOODMAN:
9     Q.   -- or supports -- strike that.
10          Go ahead.  You can answer.
11     A.   I can't, because I didn't
12 understand.
13     Q.   The event study, in your view,
14 simply supports which transactions you selected
15 for your comparables approach --
16           MS. STRICK:  Objection: form.
17           BY MS. GOODMAN:
18     Q.   -- but you didn't conduct the event
19 study in order to find the right comparables,
20 right?
21     A.   There were two questions there, and
22 I think the answer is no with respect to the

51 (Pages 198 - 201)

```
 1                    C E R T I F I C A T E
 2           I, Cindy L. Sebo, Nationally Certified Court
 3      Reporter herein, do hereby certify that the foregoing
 4      deposition of TIMOTHY S. SIMCOE, PH.D. was taken
 5      before me pursuant to notice at the time and place
 6      indicated; that said witness duly swore to tell the
 7      truth, the whole truth, and nothing but the truth
 8      under penalties of perjury; that said testimony of
 9      witness was correctly recorded to the best of my
10      abilities in machine shorthand, thereafter
11      transcribed under my supervision with computer-aided
12      transcription; that deposition is a true and accurate
13      record of the testimony given by the witness; that I
14      am neither counsel, nor kin to any party in said
15      action, nor interested in the outcome; and that a
16      copy of this transcript obtained from a source other
17      than the court reporting firm, including an adversary
18      or co-counsel in the matter, is uncertified and may
19      not be used at trial.
20      CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR,
        RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
21      NJ Certified RT 30XR00019500, NM CSR 589, NY
        Realtime Court Reporter, NY Association Certified
22      Reporter, OR CSR 230105, TN CSR 998, TX CSR
        12778, WA CSR 23005926, Notary Public
```

HIGHLY CONFIDENTIAL

Page 390

1  United States, Et Al v. Google, LLC
2  Timothy S. Simcoe (#6456894)
3         E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 Timothy S. Simcoe                 Date
25

Page 391

1  United States, Et Al v. Google, LLC
2  Timothy S. Simcoe (#6456894)
3         ACKNOWLEDGEMENT OF DEPONENT
4     I, Timothy S. Simcoe, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____   _____
12 Timothy S. Simcoe                 Date
13 *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25

99 (Pages 390 - 391)

Veritext Legal Solutions
800-567-8658                                              973-410-4098

**Errata Sheet for the Transcription of Timothy Simcoe**

**Case Name**: *United States et al v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.)

**Depo. Date**: February 23, 2024

**Deponent**: Timothy Simcoe

| Page | Line | Correction | Reason for Correction |
|---|---|---|---|
| 3 | 7 | Delete "ESQUIRE" after Yin Jia Qiu | Correction |
| 3 | 8 | Delete "MICHAEL WOLIN, ESQUIRE" | Correction |
| 4 | 16 | Delete "ESQUIRE" after Patrick Holder | Correction |
| 14 | 9 | Change "Do you know any" to "Do you know if any" | Clarification |
| 31 | 22 | Change "market power monopolies" to "market power, monopolies" | Transcription Error |
| 34 | 12 | Change "Consensus Governance for Shared" to "Standard Setting Committees: Consensus Governance for Shared" | Transcription Error |
| 35 | 4 | Change "Workshop relate to competition and" to "Workshop related to competition and" | Clarification |
| 41 | 13 | Change "have" to "had" | Transcription Error |
| 43 | 6 | Change "committees" to "commitments" | Transcription Error |
| 45 | 5 | Delete "Okay" | Transcription Error |
| 59 | 7 | Change "sites" to "cites" | Transcription Error |
| 84 | 5 | Change "first/last loose" to "first/last look" | Clarification |
| 84 | 7 | Change "restriction" to "restrictions" | Transcription Error |
| 89 | 9 | Change "right?" to "correct?" | Transcription Error |
| 99 | 6 | Change "tied" to "tie" | Transcription Error |
| 99 | 7 | Change "tied" to "tie" | Transcription Error |
| 116 | 7 | Change "ad issue" to "at issue" | Transcription Error |
| 121 | 15 | Change "ad issue" to "at issue" | Transcription Error |
| 124 | 15 | Change "ad issue" to "at issue" | Transcription Error |

| 128 | 4 | Change "a effect" to "an effect" | Transcription Error |
|---|---|---|---|
| 129 | 6 | Change "antitrust damages, anticompetitive" to "antitrust damages, not anticompetitive" | Transcription Error |
| 143 | 22 | Delete "world" | Transcription Error |
| 147 | 12 | Change "to multihoming exchanges" to "to multihome on exchanges" | Transcription Error |
| 147 | 21 | Change "to multihoming exchanges" to "to multihome among exchanges" | Transcription Error |
| 160 | 14 | Change "do. I thought they made sense" to "do, I thought they made sense" | Transcription Error |
| 172 | 3 | Change "every CPM" to "average CPM" | Transcription Error |
| 173 | 4 | Change "and the appendix" to "in the appendix" | Clarification |
| 173 | 15 | Change "is upper bound" to "is an upper bound" | Transcription Error |
| 177 | 6 | Change "a average" to "an average" | Transcription Error |
| 188 | 16 | Change "Open web" to "opined" | Transcription Error |
| 190 | 18 | Delete "that" | Transcription Error |
| 225 | 5 | Change "comparable approach" to "comparables approach" | Misstatement |
| 234 | 7 | Delete "the" | Transcription Error |
| 254 | 6 | Change "Index's average take rate" to "Index Exchange's average take rate" | Clarification |
| 262 | 20 | Change "simplifying" to "simply" | Transcription Error |
| 263 | 14 | Change "complementary" to "complementarity" | Transcription Error |
| 266 | 21 | Change "between exchanges and" to "between exchanges in" | Transcription Error |
| 269 | 12 | Change from "well in dimensions" to "well in some dimensions" | Transcription Error |
| 282 | 19 | Change "contemplates but-for world" to "contemplates a but-for world" | Transcription Error |
| 285 | 18 | Change "aggravation" to "aggregation" | Transcription Error |
| 291 | 20 | Change" relative" to "relevant" | Transcription Error |
| 304 | 21 | Change "opinion" to "testimony" | Transcription Error |
| 307 | 10 | Change "parameters, such as CPM type of ad, ad | Transcription Error |

|   |   |   |   |
|---|---|---|---|
|   |   | size," to "parameters, such as CPM, type of ad, ad size" |   |
| 319 | 3 | Change "suspect" to "suspects" | Transcription Error |
| 328 | 21 | Change "coefficient UPR" to "UPR coefficient" | Clarification |
| 347 | 10 | Change "primary threat, that" to "primary threat to" | Transcription Error |
| 349 | 21 | Change "pretrends test" to ""pre-trends test"" (insert quotations) | Transcription Error |
| 350 | 17 | Change "pretrends" to "pre-trends" | Transcription Error |
| 351 | 3 | Change "pretrends" to "pre-trends" | Transcription Error |
| 351 | 18 | Change "pretrends" to "pre-trends" | Transcription Error |
| 351 | 22 | Change "pretrends" to "pre-trends" | Transcription Error |
| 352 | 5 | Change "pretrends" to "pre-trends" | Transcription Error |
| 354 | 22 | Change "pretrends" to "pre-trends" | Transcription Error |
| 354 | 22 | Change "The" to "the" | Transcription Error |
| 354 | 22 – 355:1 | Insert quotations around "the pre-trend test that you're referring to is not relevant to my analysis." | Transcription Error |
| 355 | 12 | Change "pretrends" to "pre-trends" | Transcription Error |
| 356 | 12 | Change "UFPA" to "UPR" | Transcription Error |
| 357 | 9 | Change "event window" to "pre-event window" | Transcription Error |
| 360 | 3 | Change "out or outside the" to "at or outside of the" | Transcription Error |
| 364 | 1 | Change 'discontinuance" to "discontinuous" | Transcription Error |
| 365 | 5 | Change "short-un" to "short-run" | Transcription Error |
| 367 | 7 | Change "non-AdX's" to "non-AdX" | Transcription Error |
| 380 | 7 | Change "was" to "is" | Transcription Error |
| 380 | 19 | Change "use" to "used" | Transcription Error |

HIGHLY CONFIDENTIAL

Page 391

1  United States, Et Al v. Google, LLC

2  Timothy  S. Simcoe (#6456894)

3              ACKNOWLEDGEMENT OF DEPONENT

4     I, Timothy  S. Simcoe, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____[signature]_____    __March 21, 2024_____

12  Timothy  S. Simcoe                              Date

13  *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20___.

16

17

18                       _____

19                       NOTARY PUBLIC