# Exhibit C

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| United States of America, *et al.*, **Plaintiffs,** v Google LLC, **Defendant.** | **Case No. 1:23-cv-00108** <br> **HON. LEONIE H. M. BRINKEMA** |

EXPERT REBUTTAL REPORT OF
**TIMOTHY SIMCOE, PH.D.**

**FEBRUARY 13, 2024**

supply and demand of ad impressions.[31] This section explains why Prof. Chevalier's representativeness criticism is incorrect.

## V.A. The Elasticities of Supply and Demand for Open Web Display Impressions Do Not Depend on Advertiser Similarity

27. In my Initial Report, I use data from a large sample of auctions conducted in June 2023 to estimate the elasticity of demand and the elasticity of supply for open web display impressions sold using AdX.[32] Prof. Chevalier opines that my exchange-level estimates of the elasticity of demand and supply are unreliable because FAAs differ from other advertisers.[33] She then estimates a set of "advertiser specific" elasticities and suggests that many of these estimates are different from my exchange-level elasticity estimates.[34]

28. Prof. Chevalier's approach ignores the typical practice of conducting a tax incidence analysis. In order to analyze how a change in a tax affects economic agents, economists estimate the demand and supply elasticities of the products that are taxed.[35] In this case, I analyze how a change in AdX's take rate would affect open web display advertisers. Hence, I estimate demand and supply elasticities of open web display ad impressions sold through AdX.

29. It is the elasticity of demand for the product, and not the price sensitivity of individual customers, that determines the incidence of a tax or an overcharge. To understand this point, consider the gasoline marketplace. Some customers are less sensitive to the price of gasoline and

---

[31] *See* Chevalier Report, Section V.B.1., ¶ 137 ("In fact, when Prof. Simcoe's method of estimating demand elasticities is modified to conduct the analysis on a more disaggregate basis, it shows that there is substantial heterogeneity in the degree in which advertisers respond to prices for the set of impressions they purchase.").

[32] *See* Simcoe Initial Report, Section IV.B.1. and IV.B.2.

[33] *See* Chevalier Report, Section V.B.1., ¶ 136 ("A fundamental flaw in Prof. Simcoe's overcharge apportionment is that his analysis 'treats the FAAs as a "representative advertiser."' In other words, Prof. Simcoe's overcharge apportionment analysis assumes that each of the FAAs faces the same demand and supply curves for the types of impressions that it purchased as the average advertiser purchasing open web display inventory via AdX. But contrary to Prof. Simcoe's assumption, the portion of any overcharge borne by advertisers can, and likely does, vary by advertiser.").

[34] *See* Chevalier Report, Section V.B.1., Figure 28 and Figure 29.

[35] *See, e.g.*, Timothy J. Besley and Harvey S. Rosen, "Sales Taxes and Prices: An Empirical Analysis," *National Tax Journal* 52, no. 2 (1999): 157–178; *see also*, Sophia Delipalla and Owen O'Donnell, "Estimating tax incidence, market power and market conduct: The European cigarette industry," *International Journal of Industrial Organization* 19, no. 6 (2001): 885–908.

others are more price sensitive (e.g., because they can commute by bicycle rather than car). If a gas tax is introduced, and the retail price rises from $1.00 per gallon to $1.10 per gallon, while the gas station's revenue falls to $0.90 per gallon, then 50 percent of the tax incidence falls on sellers and 50 percent on buyers, regardless of whether an individual buyer is more or less price sensitive.[36] Ultimately, the price sensitivity of each gasoline buyer will contribute to determine the gasoline price after a tax is introduced, but the price that each of those individuals faces is the same market price for all gasoline buyers.

30. As for the question of whether and how to group individual advertisers for the purpose of estimating the demand elasticity, it is not uncommon for economists to estimate a demand curve for a group of products that are reasonable substitutes. Economists regularly estimate supply and demand curves from heterogeneous groups of buyers and sellers, and standard economics textbooks explain how this is done.[37] Thus, while it is possible to study heterogeneity in tax incidence—between gas stations for example—that does not prevent economists from estimating aggregate supply and demand elasticities and using those estimates to measure the average incidence of a tax.[38]

31. Prof. Lee shows that ad exchanges used to transact open web display ad impressions are substitutes, and that open web display advertising is distinct from other types of display advertising.[39] Although Google's experts claim other types of digital advertising are interchangeable with open web display advertising, none of them claim or suggest open web display ad impressions should be further segmented based on the types of advertisers who purchase them.[40] Therefore, the key question in this case is not whether the FAAs resemble other advertisers, but rather whether the FAAs purchase similar impressions to other advertisers.

---

[36] As explained in my Initial Report, an overcharge analysis holds quantities fixed at the as-is level. *See* Simcoe Initial Report, Section IV., ¶ 128.

[37] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th ed. (Pearson: Essex, 2015), 85–88; *see also*, Judith Chevalier and Austan Goolsbee, "Are Durable Goods Consumers Forward-Looking? Evidence From College Textbooks," *The Quarterly Journal of Economics* 124, no. 4 (2009): 1853–1884.

[38] Justin Marion and Erich Muehlegger, "Fuel tax incidence and supply conditions," *Journal of Public Economics* 95, no. 9–10 (2011): 1202–1212.

[39] *See* Lee Initial Report, Section II.B.3.; *see also*, Lee Initial Report, Section IV.B.

[40] *See* Israel Report, Sections IV.C.2 and IV.C.3.

advertising on U.S. internet users."[45] However, for many advertisers, US and non-US impressions are reasonable substitutes. For example, an FAA might view the end user location as the most salient characteristic of an impression, but another bidder might care far more about the end user's browsing history. FAAs bid against other advertisers who purchase impressions worldwide, and if US and non-US impressions are substitutable in those advertisers' view, it will be reflected in the elasticity of demand, and therefore the price of the impression.[46]

34. Figures 24, 25, and 26 in Prof. Chevalier's Expert Report compare the average cost per thousand impressions (CPM), click-through rate (CTR), and cost-per-click (CPC) of impressions purchased by FAAs to an average for all advertisers.[47] Two of these metrics are not actually characteristics of an impression that can be compared across FAAs and other advertisers to assess whether they purchase different types of impressions. In particular, both CTR and CPC measure the end user's response to the media and the advertiser. Thus, even if the distribution of impressions purchased by FAA and non-FAA advertisers were identical, these two metrics could differ because users are more likely to click on advertisements displayed by non-FAA advertisers than by FAA advertisers.

35. With respect to CPMs, Prof. Chevalier's Figure 24 indicates that there is a 27.1 percent difference between the average CPM for impressions purchased by the FAAs (excluding the Navy) and all US Advertisers.[48] Although she asserts elsewhere in her report that it is necessary to compare these differences to some measure of variability, Prof. Chevalier does not provide any indication of the degree of variability of the average CPM within each group.[49] I have performed my own calculations that show the difference in average CPM between FAA and all

---

[45]   See Chevalier Report, Section V.A.1., ¶ 67 ("Given that Plaintiffs seek damages on behalf of the FAAs, which largely focuses their advertising on U.S. internet users, the choice to focus on worldwide data exclusively is puzzling.").
[46]   For example, if the price of non-US impressions decreased, this would cause non-FAA advertisers to win these impressions at lower prices, putting downward pressure on the prices of US impressions.
[47]   For each of these statistics, Prof. Chevalier purports to calculate the averages across these metrics between January 2019 and January 2023 for seven FAAs individually; for FAAs collectively, excluding the Navy; and for all advertisers. See Chevalier Report, Section V.B.1.a.
[48]   $27.1\% = (\$2.14 - \$1.63) \div ((\$2.14 + \$1.63) \div 2)$.
[49]   See Figure 14 in Appendix D.2. See also, Chevalier Report, Section V.A.2.c.

advertiser purchases is only 0.09 of the standard deviation in CPMs for all advertisers.[50] This difference is "small" by Prof. Chevalier's standard, and indicates that there is substantial overlap in the distribution of impression prices between FAAs and all other advertisers.[51]

36. Because advertiser similarity does not influence the elasticity of demand or supply for open web display impressions, Figures 22 and 23 in Prof. Chevalier's Expert Report are irrelevant to the question of whether an exchange-level model is appropriate for estimating AdX's overcharge. Figures 22 and 23 in Prof. Chevalier's Expert Report are also biased because she does not have data that would allow her to aggregate all of the anonymized advertiser IDs that correspond to the same advertiser.

### V.C. Prof. Chevalier Overstates the Variance in Advertiser-Specific Elasticity

37. Figures 28 and 29 in Prof. Chevalier's Expert Report purport to show that the demand elasticities she estimates for certain anonymized advertiser IDs differ from the exchange-level demand elasticity estimates contained in my Initial Report.[52] She relies on this analysis to opine that my exchange-level analysis is incorrect, and that "markets" should be defined narrowly based on a very small number of auctions.[53] In addition to my conceptual disagreements with Prof. Chevalier's decision to estimate advertiser-specific elasticities, I also conclude that flaws in her analysis caused those estimates to be incorrect.

---

[50]   $0.09 = (\$2.10 - \$1.91) \div \$2.14$.

   My calculation is conservative because it is based on an underestimate of the true standard deviation of the impression price. Because I do not have impression-level data, I calculated the standard deviation using data that was aggregated to the level of the advertisement, as Prof. Chevalier has done. This aggregation reduces the estimated standard deviation. See George Casella and Roger L. Berger, *Statistical Inference*, 2nd ed. (Cengage Learning, 2002) Section 11.2.6 Partitioning Sums of Squares. See also, Figure 14.

[51]   See Figure 14 in Appendix E.2. The figure reports Prof. Chevalier's calculation of the mean and standard deviation of CPM, CPC, and CTR for all advertisers included in the figure. I then adjusted Prof. Chevalier's code to calculate the same values across FAAs. See Chevalier Report Backup, xbridge_output_2.xlsx and 3. XBridge Analysis.py.

[52]   See Chevalier Report, Section V.B.1.b.

[53]   This conclusion also disagrees with Prof. Israel, who finds that impressions are substitutable not only across advertisers purchasing open web display advertisements through ad tech tools, but also ad impressions on social media platforms, in-stream video ads, mobile ads, and search ads. See Israel Report, Section III.C.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

47. In this section, I explain in turn why each of these claims is inappropriate. First, however, it is useful to reiterate the conceptual basis for my Comparables Approach, as explained in my Initial Report.[70]

48. The Comparables Approach selects an appropriate set of *transactions* and uses the average price of those transactions as a benchmark. The comparables used in my Initial Report are all open web display advertising transactions on non-AdX ad exchanges. Because I do not have access to impression-level data, I compute the *market-wide average* take rate as a revenue-weighted average of the take rates for transactions on all non-AdX ad exchanges that produced usable data.[71]

49. Many of Prof. Chevalier's critiques of my Comparables Approach appear to be based on the mistaken view that I have selected a set of comparable *exchanges*, rather than comparable transactions. That is incorrect. I did not include transactions in my analysis on the basis of comparing exchanges. Nor do I assume that all non-AdX exchanges are identical. The key assumption of the Comparables Approach is that *after pooling* all of the transactions sold by non-AdX exchanges (which were not accused of any exclusionary conduct) the market-wide average take rate is a conservative estimate of the but-for AdX take rate.[72]

**VI.A.1. Prof. Chevalier's Opinions Do Not Undermine the Validity of my Comparables Approach**

50. This section explains how my Comparables Approach is based upon well-accepted economic methods and principles. I first explain why my approach produces a reliable, albeit conservative, estimate of the but-for take rate. I then demonstrate that my comparable but-for take rate is robust to small changes in assumptions.

---

[70] *See* Simcoe Initial Report, Section IV.A.1.
[71] My Initial Report explained how it is possible to calculate the weighted average using aggregated exchange-level data, even if the impression level data are not available. *See* Simcoe Initial Report, Section IV.A.1., FN 195.
[72] *See* Simcoe Initial Report, Section IV.A.1., ¶¶ 143–148.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

because Google's conduct could influence the prices charged by other firms in the same market. As I explained in my Initial Report and in Section III above, if anything, Google's supracompetitive fees would cause the comparable firms I analyze to charge higher take rates relative to the but-for world with greater competition—a point with which Prof. Chevalier does not appear to disagree.[76] Intuitively, when a firm with significant market power charges a supracompetitive price, other fringe firms also have incentives to set their prices above a competitive level in response. In summary, my Comparables Analysis is a "yardstick" approach that produces conservative estimates of the but-for take rate.

53. The article cited to by Prof. Chevalier describes the other type of comparable, benchmarks, as follows: "[b]enchmarks are comparisons against the same market, either before or after the violation occurred[.]"[77] Given the long period of time during which Google's exclusionary conduct took place, and the fact that its conduct is ongoing, I do not have access to data that would allow me to implement the benchmark approach. However, my Event Study Approach is similar to the "difference in differences" approach described in the cited article in that it compares Google to other firms, before and after the implementation of UPR.[78] The Event Study approach has the added benefit of using exchange "fixed effects" to control for any unmeasured quality differences that may exist between exchanges.[79] Notably, my Comparables Approach and Event Study Approach yield very similar estimates of the but-for take rate.[80]

54. In performing my Comparables Analysis, I relied on the data produced in this case to form my conclusions. In particular, I calculated the but-for take rate using data from every exchange that produced data sufficient to calculate a take rate for worldwide impressions within the relevant antitrust market defined by Prof. Lee, of which 8 provided the information necessary to compute

---

[76] See Section III.
[77] See Chevalier Report, Section V.A.2.a., FN 156.
[78] Unlike the difference-in-differences methodology, my Event Study Approach does not assume that non-AdX exchanges provide an unbiased estimate of the counterfactual change in impression shares for AdX, given that shares of all exchanges in the relevant market are simultaneously determined.
[79] See Simcoe Initial Report, Section V.A.2., ¶ 229.
[80] See Simcoe Initial Report, Figure 22. Likewise, my Event Study analysis is conservative, since it analyzes only one piece of Google's at-issue conduct, UPR. See Simcoe Initial Report, Section IV.A.2.

a take rate for impressions associated with the relevant market.[81] The exchange data included in my Comparables Analysis collectively constitute 81 percent of impressions transacted through ad exchanges. In other words, my Comparables Analysis is based on data covering the large majority of transactions associated with the ad exchange market.[82]

55. To be clear, the fact that my Comparables Analysis produces a take rate that is lower than AdX's as-is take rate is an *outcome* of my approach and not a pre-condition for selecting the set of transactions to include in my calculations.[83] As I explained in my Initial Report, and in Section VI.A above, I first identified the following characteristics of transactions in the data useful for estimating a relevant but-for take rate: open web display advertising transactions displayed to worldwide users.[84] I subsequently selected transactions where an advertiser pays an ad exchange other than AdX for an impression matching these characteristics.[85] Only after selecting the comparable transactions (and associated take rates) did I calculate the but-for take rate.[86]

56. Nevertheless, to illustrate that the results of my Comparables Analysis are robust to excluding impressions associated with any particular exchange, I have re-estimated AdX's but-for take rate by separately excluding impressions associated with each exchange included in my dataset one at a time.[87] The results are shown in Figure 3 below. In Figure 3, Column [A] identifies the exchange data excluded from each calculation. Columns [B] and [C] show my estimated but-for take rate when including all remaining third-party exchange impressions or only the remaining large third-party exchange impressions, respectively. Xandr and Yieldmo are the only exchange

---

[81] I excluded AdSense from my aggregate exchange-level panel because its transactions likely do not serve as reasonable comparables given that it is a Google product in the same antitrust market defined by Prof. Lee as AdX. *See* Simcoe Initial Report, Appendix C.2., ¶ 275; *see also*, Lee Initial Report, Section IV; *see also*, MSFT-LIT-0000002971 (11/19/2019); *see also*, EQUATIV-000000091 (6/24/2023).

[82] *See* Lee Initial Report, Figure 47.

[83] *See* Simcoe Initial Report, Sections IV.A.1. and V.A.1. All of the exchanges whose transactions I included in my analysis of large third parties have also been identified by both third parties and Google itself as competitors to AdX. *See* GOOG-DOJ-03901903, at -918 (11/29/2018); *see also*, GOOG-DOJ-09183195, at -206 (02/10/2020).

[84] *See* Simcoe Initial Report, Section IV.A.1.a., ¶ 139.

[85] *See* Simcoe Initial Report, Section IV.A.1.a., ¶ 140.

[86] *See* Simcoe Initial Report, Section IV.A.1.a., ¶¶ 141–143.

[87] *See* Chevalier Report, Section V.A.2.f. This analysis demonstrates that, despite Prof. Chevalier's claims, my Comparables Analysis does not result in "[s]ubstantially [l]ower or [z]ero [d]amages" under "[r]easonable [a]djustments."

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### VI.A.3. Prof. Chevalier's Quality-Related Critiques Are Unpersuasive

72. This section responds to Prof. Chevalier's hypothesis that differences in quality between exchanges could be driving the difference between AdX's and other exchanges' take rates. In this context, quality refers to various factors—unrelated to the exclusionary conduct—that might explain differences in the take rates charged by different exchanges.[108] Prof. Chevalier relies on this hypothesis at several points in her Expert Report, and further opines that there are many reasons unrelated to exclusionary conduct that different exchanges can charge a range of take rates.[109] She also claims that I do not address whether differentiated exchange features explain differences in take rates.[110]

73. As an initial matter, my Comparables Approach does not assume that all exchanges are equal, or that advertisers or publishers perceive all non-AdX exchanges to have the same level of quality. For the reasons explained in my Initial Report and in Section VI.A above, pairwise comparisons between exchanges meant to establish the existence of quality differences are not relevant. Prof.

---

[108] *See* Chevalier Report, Section V.A.2.a., ¶ 73 ("Yet Prof. Simcoe does not explore whether any such factor could explain the differences behind the revenue shares charged by AdX and competing exchanges, instead simply assuming that any difference is attributable to the challenged conduct.").

[109] *See* Chevalier Report, Section V.A.2.a.

[110] *See* Chevalier Report, Section V.A.2.a., ¶ 73 ("Prof. Simcoe himself recognizes that there are substantial differences among ad exchanges, describing them as 'differentiated products,' with a 'number of features that differ across rival ad exchange…implementations. Yet Prof. Simcoe does not explore whether any such factor could explain the differences behind the revenue shares charged by AdX and competing exchanges, instead simply assuming that any difference is attributable to the challenged conduct.").

Economists use the term *differentiated products* to describe products that consumers perceive to differ from one another. When products are differentiated, at the same price, consumers might prefer one product to another. For example, Coca-Cola and Pepsi are similar products that would reasonably be considered to compete with one another in the same economic market, though consumers often express a (sometimes strong) preference for one brand of cola versus the other. Markets with differentiated products are a common area of study in Industrial Organization. For example, economists have modeled competition between differentiated products such as automobiles and cereal.

A popular economics textbook describes modeling competition between restaurants using a representative consumer model with monopolistic competition—the same type of economic model I use in my overcharge model. As the textbook explains, "[t]his model might be used to study the restaurant market, in which firms produce differentiated products (such as different ethnic cuisines), but all compete for the same customers." Though consumers may perceive restaurants to offer differentiated services, like ad exchanges, they compete for the same set of customers and are thus appropriate to model as competing in the same economic market.

*See* Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th ed. (Pearson: Essex, 2015), 225–226; *see also*, Aviv Nevo, "Measuring Market Power in the Ready-To-Eat Cereal Industry," *Econometrica* 69, no. 2 (2001): 307–342; *see also*, Steven Berry, James Levinsohn, and Ariel Pakes, "Automobile Prices in Market Equilibrium," *Econometrica* 63, no. 4 (1995): 841–890.

Chevalier's critique is only relevant if she asserts that AdX has a perceived quality advantage relative to the non-AdX exchanges taken as a group, and where that quality advantage is not a result of Google's exclusionary conduct.

74. One potential measure of exchange quality could be the average CPM because, for publishers, it could reflect the competition among buyers that elevates price, and, for buyers, it could reflect the desirability of inventory. The average CPM of an exchange is an imperfect measure of quality, in part because it can be influenced by Google's conduct.[111] Nevertheless, Figure 8 in my Initial Report shows that, if I were to assume that CPM is a valid proxy for exchange quality, AdX's as-is take rate is above the quality-adjusted market-wide average take rate. In other words, controlling for quality based on CPM leads to a lower but-for take rate than my Comparables Approach.

75. To support her assertion that AdX is higher quality than other exchanges, Prof. Chevalier relies on a single set of surveys that purports to show differences in sell-side platform ("SSP") quality.[112] These surveys are not persuasive for several reasons. First, as a general matter, it is likely difficult for survey respondents to disentangle their perceptions of quality from the effects of Google's exclusionary conduct. Second, Google has identified issues with the reliability of the survey. Third, the set of survey questions changed over time, making the results more difficult to interpret. Finally, Prof. Chevalier's interpretation of the survey conflicts with other evidence on the perceived quality of exchanges. I expand of these four points below.

76. First, my Initial Report explains that a key dimension of "quality" for ad exchanges, given that they are two-sided, is the installed base of buyers and sellers to which they connect.[113] This dimension of quality cannot easily be disentangled from Google's exclusionary conduct, given that an important effect of that conduct is to prevent rival exchanges from reaching a comparable scale. Put differently, but-for the near exclusivity of Google Ads demand to AdX, and the

---

[111] For example, the tax incidence model in my initial report implies that AdX's conduct will lead to a higher CPM for impressions sold through AdX.
[112] *See* Chevalier Report, Exhibit 16.
[113] *See* Simcoe Initial Report, Section III.A.1., ¶ 70 ("The indirect network effects created by amassing a large pool of buyers and sellers are an important source of differentiation among ad exchanges.").

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Timothy Simcoe, Ph.D.

_____

**Expert Rebuttal Report of T. Simcoe February 13, 2024)--Errata**

| Page | Paragraph | Footnote | Original | Corrected | Reason |
|---|---|---|---|---|---|
| 6 | 17 | 15 | "*See* Simcoe Initial Report, Section IV.B.2., ¶ 190" | "*See* Simcoe Initial Report, Section IV.B.2., ¶¶ 190–**191**." | Clarification |
| 9 | 23 | 25 | "Section **IV.D.1.**" | "Section **V.C.3.**" | Clarification |
| 9 | 24 | 26 | "*See* Lee Initial Report, **Section IV.A.1, ¶ 254**" | [[Remove]] | Clarification |
| 13 | 34 | - | "Even within one advertiser, the target audience, budget, and **objectives of an advertising campaign can be diverse,** and…" | "Even within one advertiser, the target audience, budget, and **objectives of advertising campaigns can be diverse,** and…" | Clarification |
| 14 | 33 | 45 | "which largely focus**es** their advertising" | "which largely focus their advertising" | Typo |
| 24 | 55 | 83 | "*See* GOOG-DOJ-03901903, at -9**18**" | "*See* GOOG-DOJ-03901903, at -9**20**" | Clarification |
| 24 | 55 | 84 | "*See* Simcoe Initial Report, Section IV.A.1.**a.**, ¶ 139." | "See Simcoe Initial Report, Section IV.A.1., ¶ 139." | Clarification |
| 24 | 55 | 85 | "*See* Simcoe Initial Report, Section IV.A.1.**a.**, ¶ 140." | "See Simcoe Initial Report, Section IV.A.1., ¶ 140." | Clarification |
| 24 | 55 | 86 | "*See* Simcoe Initial Report, Section IV.A.1.**a.**, ¶¶ 141–143." | "*See* Simcoe Initial Report, Section IV.A.1., ¶¶ 141–143." | Clarification |
| 35 | 85 | 126 | "Some publishers **have** benefited…" | "Some publishers benefited…" | Clarification |
| 36 | 85 | 130 | "Q. **And** how, if at all…" | "Q. How, if at all…" | Clarification |
| 36 | 86 | 133 | "Google's conflict of interest…" | "Google's conflict of interest**s**…" | Clarification |
| 39 | 94 | 145 | "…may instead be the reason **the** publishers…" | "…may instead be the reason **that** publishers…" | Clarification |
| 46 | 109 | 170 | "NBER Technical Working Paper Series (1998)…" | "NBER Technical Working Paper Series**, no. 221** (1998)…" | Clarification |
| 47 | 112 | 175 |  | "*See* Chevalier Report, Figures 19 and 20." | Clarification |
| 48 | 116 | 180 | "Chevalier Report, Section V.A.3.e., ¶ 127." | "Chevalier Report, Section V.A.3.e., ¶¶ 127-**128**." | Clarification |
| 49 | 117 | 184 |  | "Simcoe Initial Report, Figure 28." | Clarification |
| 62 | 127 | 196 | "in her input **data**Chevalier databricks_code…" | "in her input **data.** *See* **Chevalier** databricks_code…" | Typo |
| 63 | 130 |  | "130.It…" | "130. It…" | Typo |
| 63 | 130 | 200 | "Chevalier Report, Full-Stack Revenue Shares Workpaper, at tabs "full_stack_exhibit"" | "Chevalier Report, Full-Stack Revenue Shares Workpaper, at tab "full_stack_exhibit"." | Typo |
| 63 | 132 | 201 | "Steven T. Berry, "Estimating Discrete-Choice Models of Product Differentiation," The RAND Journal of Economics (1994): 242-262." | "Steven T. Berry, "Estimating Discrete-Choice Models of Product Differentiation," The RAND Journal of Economics **25, no. 2** (1994): 242-262." | Typo |
| 68 | Figure 14 | - | "Prof. Chevalier backup, "xbridge_output_2.csv"." | "Brattle analysis of Chevalier Report, XBridge Workpaper." | Clarification |

_____

February 20, 2024