# Exhibit F

**In the Matter Of:**

*United States vs*

*Google*

# MARK ISRAEL, PH.D.

*March 14, 2024*



Page 330

1  sides of its platform?
2        A.      In general, all else equal, there
3  are network effects here that say advertisers
4  prefer platforms that have more publishers, and
5  publishers prefer -- prefer platforms that have
6  more advertisers, all else equal.
7        Q.      And why, if at all, does scale
8  matter to ad exchanges?
9              ATTORNEY EWALT:  Objection to
10       form and foundation.
11             THE WITNESS:  Yeah, I'm not -- I
12       mean, the -- I'm not sure that it does.
13       I mean, the evidence here is that
14       ad exchanges are -- there are lots and
15       lots of ad exchanges competing at various
16       small sizes.  To me, it's the first
17       indicator that this is not an industry in
18       which one has to have scale to compete.
19             BY ATTORNEY NAKAMURA:
20       Q.      Is it your opinion, sitting here
21  today, that scale does not matter to the
22  competitiveness of ad exchanges in digital

Page 331

1  display advertising?
2              ATTORNEY EWALT:  Objection to
3       form.
4              THE WITNESS:  It's not my opinion
5       that there's no scale effects at all.  I
6       mean, we talked about network effects, so
7       you need some number of publishers and
8       advertisers using your product.  And it's
9       not my opinion that, you know, I could go
10       launch an ad tech product with five
11       impressions.
12             So I think there's some role for
13       scale, but I don't think I've seen any
14       evidence that you have to be particularly
15       large to be able to reach scale.  And I
16       think that's shown by the large number of
17       small competitors that continue to stay
18       in the market and -- and win business.
19             BY ATTORNEY NAKAMURA:
20       Q.      And how do you define, for example,
21  by market share, what a "small competitor" is in
22  the ad exchange business?

Page 332

1        A.      I don't have a specific cutoff for
2  you.  It's pretty common to see a firm of less
3  than 5 or less than 1 percent.
4              If you look at the data here, there
5  are dozens of ad exchanges competing and staying
6  in the market.  That's not a market structure
7  that, to me, is suggestive that scale is required
8  to compete.
9        Q.      And in your view, as an economist,
10  are the ad exchanges you're describing
11  differentiated?
12       A.      They're not identical, so they're
13  -- I guess they're differentiated.  They're
14  providing the same basic services.  They're
15  taking bids from buy side, and they're bidding on
16  publisher exchanges.  So they're not identical,
17  but they're -- they seem to be successfully
18  competing for advertisers and publishers.
19       Q.      And as an economist, what do you
20  understand the word "differentiated" to mean used
21  in the context of comparing different firms?
22       A.      That they're not -- they're not

Page 333

1  selling the same thing, that there are
2  differences in their services.
3        Q.      And why, if at all, in your
4  opinion, does scale matter to publisher ad server
5  products?
6              ATTORNEY EWALT:  Objection to
7       form and foundation.
8              THE WITNESS:  Again, it's not
9       obvious, to me, that scale -- SV
10       large-scale is required, but we talked
11       some about there being technology costs
12       to developing an ad server.  I talked
13       about that in the report.  So you
14       probably need enough scale to be able to
15       spread those costs out over enough
16       business to make it cost-effective.
17             That's the main one I can think
18       of.
19             I mean, generally, you're going
20       to -- network effects still apply.
21       You're going to want a ad server with a
22       set of matching rules, and so on, that

Page 334

1   are able to attract advertisers and
2   publishers.  But that's less about
3   needing scale upfront and more about, you
4   know, competing to attract business.
5           BY ATTORNEY NAKAMURA:
6       Q.    And are there network effects that
7   are relevant to publisher ad servers, in your
8   opinion?
9       A.    Yes.
10      Q.    What are they?
11      A.    Again, that you want -- I mean,
12  it's more about the -- the plat -- the rules of
13  the platform and the extent the ability it has to
14  attract buyers and sellers.  But it's important
15  for an ad server -- to be successful, that it
16  attracts publishers and that that set of
17  publishers and the rules of the ad server attract
18  advertisers.  So it's -- there's network effects
19  in the -- in the sense that attracting both sides
20  of the market matters.
21      Q.    And are there, in your opinion,
22  bidirectional network effects that are of

Page 335

1   relatively the same magnitude moving in both
2   directions for a publisher ad server?
3           ATTORNEY EWALT:  Objection to
4       form.
5           THE WITNESS:  I think they're --
6       in all of these technologies, I think
7       they're relatively of the same magnitude
8       because the whole business is about
9       making matches, so you need people
10      choosing your product on both sides.
11          BY ATTORNEY NAKAMURA:
12      Q.    So is it your opinion that the
13  bidirectional nature of network effects for a
14  publisher ad server are roughly equal to those
15  found in a advertising ad exchange product?
16          ATTORNEY EWALT:  Objection to
17      form.
18          THE WITNESS:  I don't -- it's --
19      I don't know if it's something where you
20      say "roughly equal."  I don't know what
21      the number is.  But I guess conceptually,
22      absolutely, yes.  Because both products

Page 336

1   are part -- and, again, I think of these
2   as part of the -- creating a match, and
3   at every part of that match, you have to
4   get a publisher -- you have to get
5   publishers and advertisers to agree to
6   use your product.
7           So publishers have to agree to
8   use the ad server, and advertisers have
9   to find it worthwhile to buy inventory
10  from a publisher using that ad server.
11  So in -- in each of these matched stages,
12  you need to attract both sides of the
13  market.
14          BY ATTORNEY NAKAMURA:
15      Q.    But how often, as a relative
16  matter, do advertisers buy directly into a
17  publisher's ad server as opposed to, for example,
18  using a DSP or other intermediary service to
19  purchase inventory?
20          ATTORNEY EWALT:  Objection to
21      form.
22          THE WITNESS:  I mean, any --

Page 337

1   anytime that they buy from anybody who's
2   O&O, they're buying directly into an ad
3   server.
4           My point is that if they -- if an
5   ad server -- if Google's ad server didn't
6   work well such that the rules didn't
7   create good matches, advertisers would
8   take their business elsewhere.  And
9   that's a -- that's -- advertisers -- if
10  the rules of the game that were set up by
11  the ad server were unattractive,
12  advertisers are entirely capable of
13  substituting around by purchasing ads in
14  other forms.
15          BY ATTORNEY NAKAMURA:
16      Q.    And other than purchasing from O&O
17  publishers, what examples do you have of an
18  advertiser buying in directly to a publisher ad
19  server?
20      A.    I mean, anytime that they buy
21  direct.
22      Q.    And are there any examples you have

## Page 338

1 of indirect purchasing done directly into a
2 publisher ad server other than through O & O
3 inventory?
4          ATTORNEY EWALT:  Objection to
5     form.
6          THE WITNESS:  I mean, I'm not
7     sure if it's in -- I mean, obviously, the
8     O & O is a big deal.  But I think that --
9     yeah, I think the O & O is where I can
10    see -- the examples I have in mind of
11    where they purchase indirect.  And,
12    obviously, to me, that's an example of
13    substituting around the ad server.
14          There may be examples in the
15    record, but as I sit here, I don't
16    think -- I can't think of a case where
17    there's an indirect purchase straight
18    into an ad server that isn't in an O & O
19    setting.
20          BY ATTORNEY NAKAMURA:
21    Q.    Okay.  Let's turn now to
22 Paragraph 529 of your report, which is on

## Page 339

1 Page 384.
2    A.    Okay.
3    Q.    All right.  Paragraph 529, you
4 describe various indicators of market performance
5 that are consistent with the well-functioning of
6 the marketplace; is that correct?
7    A.    Yes.
8    Q.    As an economist, when analyzing
9 competition and markets, do you examine whether
10 output has been reduced relative to a but-for
11 world without the allegedly restrictive conduct?
12    A.    I mean, that's what you would need
13 to do to show harm.  I mean, I think it's an
14 explicit point I make at some length, is that
15 Plaintiffs' experts have not done so.
16    Q.    And you do not look at, however,
17 whether output is simply increasing or decreasing
18 without reference to a but-for world; is that
19 correct?
20    A.    I would certainly look at it.  I
21 look at data -- all data, and when I see output
22 growing dramatically and exceeding projections,

## Page 340

1 it causes me to think it looks like the market is
2 doing well and thus I would need to see some very
3 clear demonstration of a but-for world that would
4 have been even better to conclude there's harm.
5          So I wouldn't stop with the output
6 by itself.  That's my point to Plaintiffs'
7 experts, you need to show a but-for world.  But
8 it certainly tells me that it's going to be a
9 kind of Herculean task to show harm here because
10 this market seems to be doing very well.  But you
11 could do it; you just -- they would have had to
12 show a but-for world to do so.
13    Q.    And how do you identify as a
14 methodological matter, as an economist, when
15 evaluating a competitiveness of a market,
16 candidate but-for worlds that you might compare
17 to the actual world with respect to output?
18          ATTORNEY EWALT:  Objection to
19     form.
20          THE WITNESS:  I mean, I -- I -- I
21     don't know exactly what you're asking,
22     candidate but-for worlds -- it's the

## Page 341

1     Plaintiffs' job, as I see it, to explain
2     what their but-for world is.
3          Candidate but-for worlds would
4     say, in general terms, Here's some
5     conduct I think was harmful, and now I'm
6     going to turn that conduct off and show
7     you the market would have done better.
8          That's the sort of modeling that
9     economists do regularly.  It wasn't done
10    here.  But, certainly, the idea that I'm
11    going to turn off a piece of conduct and
12    show you that the market would perform
13    better without it is -- is the kind of
14    analysis that you would have to do.
15          BY ATTORNEY NAKAMURA:
16    Q.    Is it your opinion that competition
17 can be harmed in a market where output is
18 increasing over time?
19          ATTORNEY EWALT:  Objection to
20     form.
21          THE WITNESS:  Yes.
22

Page 494

1  academic textbooks, journals, well-accepted
2  concepts in the field.
3              So I just want to make sure
4  that you have the opportunity to tell me if there
5  are any citations you can provide at all
6  regarding the economic understanding of a duty to
7  deal.
8      A.    There's lots of citations in this
9  report in other sections, and there are more
10 beyond that.  This is an introduction that has
11 literally no footnotes because it's introducing
12 the rest of the report.
13             If you want to look in the rest of
14 the report, there's whole sections on the harms
15 that come -- that would come from behavior like
16 this.
17     Q.    And last question:  Can you give me
18 an example, as an economist, of any situation in
19 which a duty to deal would not, in your opinion,
20 be harmful to competition and consumers?
21             ATTORNEY EWALT:  Objection to
22     form.

Page 495

1      THE WITNESS:  I think a duty to
2  deal -- an actual requirement to deal is
3  harmful.  I can't think of an example
4  where the duty is not harmful.
5             There might be situations where
6  firms work together in some way that's
7  beneficial, but I think requiring firms
8  to work with their competitors is harmful
9  to the essence of the competitive
10 process.
11     ATTORNEY NAKAMURA:  All right.
12 See, we're at time.
13     Thank you very much, Dr. Israel.
14     And we'll go off the record.
15     ATTORNEY EWALT:  Not quite.  I
16 want to designate the transcript as
17 highly confidential under the protective
18 order in this case.
19     Now we can go off the record.
20     ATTORNEY NAKAMURA:  Thank you.
21     THE VIDEOGRAPHER:  Off the record
22 at 6:36.  And this ends today's

Page 496

1      deposition.
2
3             (Witness excused.)
4
5             (Deposition concluded at 6:36 p.m.
6  EDT)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 497

C E R T I F I C A T E

1      I, Cindy L. Sebo, Nationally Certified Court
2  Reporter herein, do hereby certify that the foregoing
3  deposition of MARK A. ISRAEL, PH.D. was taken before
4  me pursuant to notice at the time and place indicated;
5  that said witness duly swore to tell the truth, the
6  whole truth, and nothing but the truth under penalties
7  of perjury; that said testimony of witness was
8  correctly recorded to the best of my abilities in
9  machine shorthand, thereafter transcribed under my
10 supervision with computer-aided transcription; that
11 deposition is a true and accurate record of the
12 testimony given by the witness; that I am neither
13 counsel, nor kin to any party in said action, nor
14 interested in the outcome; and that a copy of this
15 transcript obtained from a source other than the court
16 reporting firm, including an adversary or co-counsel
17 in the matter, is uncertified and may not be used at
18 trial.
19 _____
     CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR,
20   RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
     NJ Certified RT 30XR00019500, NM CSR 589, NY
21   Realtime Court Reporter, NY Association Certified
     Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778,
22   WA CSR 23005926, Notary Public

## Page 498

INSTRUCTIONS TO WITNESS

1        Please read your deposition over

2   carefully and make any necessary corrections.

3   You should state the reason in the appropriate

4   space on the errata sheet for any corrections

5   that are made.

6        After doing so, please sign the

7   errata sheet and date it.

8        You are signing same subject to the

9   changes you have noted on the errata sheet, which

10  will be attached to your deposition.

11        It is imperative that you return

12  the original errata sheet to the deposing

13  attorney within thirty (30) days of receipt of

14  the deposition transcript by you.  If you fail to

15  do so, the deposition transcript may be deemed to

16  be accurate and may be used in court.

17

18

19

20

21

22

## Page 499

CAPTION: United States, et al. vs. Google, LLC

1   MARK A. ISRAEL, PH.D.            NO. 2024-933018
2             E R R A T A   S H E E T
3   PAGE_____ LINE_____ CHANGE _____
4   REASON FOR CHANGE:
    _____
5
    PAGE_____ LINE_____ CHANGE _____
6
    REASON FOR CHANGE:
7   _____
8   PAGE_____ LINE_____ CHANGE _____
9   REASON FOR CHANGE:
    _____
10
    PAGE_____ LINE_____ CHANGE _____
11
    REASON FOR CHANGE:
12  _____
13  PAGE_____ LINE_____ CHANGE _____
14  REASON FOR CHANGE:
    _____
15
    PAGE_____ LINE_____ CHANGE _____
16
    REASON FOR CHANGE:
17  _____
18  PAGE_____ LINE_____ CHANGE _____
19  REASON FOR CHANGE:
    _____
20
    PAGE_____ LINE_____ CHANGE _____
21
    REASON FOR CHANGE:
22  _____

## Page 500

CAPTION: United States, et al. vs. Google, LLC

1   MARK A. ISRAEL, PH.D.            NO. 2024-933018
2             E R R A T A   S H E E T
3   PAGE_____ LINE_____ CHANGE _____
4   REASON FOR CHANGE:
    _____
5
    PAGE_____ LINE_____ CHANGE _____
6
    REASON FOR CHANGE:
7   _____
8   PAGE_____ LINE_____ CHANGE _____
9   REASON FOR CHANGE:
    _____
10
    PAGE_____ LINE_____ CHANGE _____
11
    REASON FOR CHANGE:
12  _____
13  PAGE_____ LINE_____ CHANGE _____
14  REASON FOR CHANGE:
    _____
15
    PAGE_____ LINE_____ CHANGE _____
16
    REASON FOR CHANGE:
17  _____
18  PAGE_____ LINE_____ CHANGE _____
19  REASON FOR CHANGE:
    _____
20
    PAGE_____ LINE_____ CHANGE _____
21
    REASON FOR CHANGE:
22  _____

## Page 501

ACKNOWLEDGMENT OF WITNESS

1

2      I, MARK A. ISRAEL, PH.D., do hereby certify that

3   I have read the foregoing pages herein, and that the

4   same is a correct transcription of the answers given

5   by me of the proceedings taken remotely to the

6   questions therein propounded under penalty of perjury,

7   except for the corrections or changes in form or

8   substance, if any, noted in the attached errata sheet.

9   _____      _____

10    DATE                    SIGNATURE

11

12

13

14

15  Subscribed and sworn to before me

    this _____ day of_____, 20_____.

16

17    My Commission expires:

18

    _____

19

20

21  _____

22      Notary Public

PRIVILEGED & CONFIDENTIAL

| Page | Line | Change | Reason |
|------|------|--------|--------|
| | | quotation) | |
| 244 | 10 | "obtaining it." should be "obtaining it."" (missing close quotation) | Transcription error. |
| 245 | 16 | "county" should be "accounting" | Transcription error. |
| 247 | 19 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 248 | 1 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 267 | 9 | "indirect Web, nonvideo display inventory" should be "indirect, web, non-video display inventory" | Transcription error. |
| 267 | 10 | "alleged open Web display" should be "alleged "open web display" (missing open quotation) | Transcription error. |
| 267 | 11 | "advertising market)" should be "advertising" market)" (missing close quotation) | Transcription error. |
| 269 | 2 | "publisher ad servers" should be "publisher ad servers—" | Transcription error. |
| 269 | 4 | "Google's measured share   using" should be "Google's measured share—using" | Transcription error. |
| 279 | 15 | "answer in" should be "answer on" | Transcription error. |
| 305 | 15 | "can" should be "can-" | Transcription error. |
| 309 | 13 | "it is" should be "it is:" | Transcription error. |
| 309 | 16 | ", with citations" should be "; with citation" | Transcription error. |
| 333 | 9 | "scale -- SV" should be "scale --" | Transcription error.. |
| 339 | 14 | "is that" should be "that" | Clarification. |
| 340 | 15 | "a competitiveness" should be "the competitiveness" | Transcription error. |
| 366 | 1 | "master" should be "matter" | Transcription error. |
| 374 | 10 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 378 | 11 | "test" should be "test-" | Transcription error. |
| 382 | 17 | "reports" should be "report" | Transcription error. |
| 385 | 20 | "this auto" should be "this was auto" | Clarification. |
| 389 | 10 | "Demand" should be "demand" | Transcription error. |
| 390 | 9 | "ad" should be "Ads" | Transcription error. |
| 396 | 8 | "and done you" should be "and did you" | Transcription error. |
| 400 | 17 | "Demand" should be "demand" | Transcription error. |
| 402 | 6 | "Demand" should be "demand" | Transcription error. |
| 408 | 18 | "camp" should be "camp-" | Transcription error. |

PRIVILEGED & CONFIDENTIAL

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 417 | 22 | "make up the" should be "makeup, the" | Transcription error. |
| 418 | 1 | "the respondents looks" should be "the respondents, looks" | Transcription error |
| 420 | 8 | "Demand" should be "demand" | Transcription error. |
| 446 | 13 | "features   including" should be "features—including" | Transcription error. |
| 446 | 14 | "auctions   into" should be "auctions—into" | Transcription error. |
| 453 | 4 | "DFP -- DSPs" should be "DSPs" | Clarification. |
| 453 | 9 | "mil" should be "mille" | Transcription error. |
| 453 | 11 | "rate.  So" should be "rate, so" | Transcription error. |
| 456 | 7 | "DF360" should be "DV360" | Transcription error. |
| 456 | 18 | "DFP360" should be "DV360" | Transcription error. |
| 456 | 21 | "advertising Google Ads" should be "advertising, Google Ads" | Transcription error. |
| 468 | 17 | "ads clients (e.g., agency" should be "Ads clients (e.g., Agency" | Transcription error. |
| 468 | 18 | "direct advertiser" should be "Direct Advertiser" | Transcription error. |
| 469 | 1 | "ads" should be "Ads" | Transcription error. |
| 470 | 22 | "ads" should be "Ads" | Transcription error. |
| 477 | 12 | "a ad server" should be "an ad server" | Clarification. |
| 482 | 13 | "Demand" should be "demand" | Transcription error. |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefor.

Date: _____4/10/2024_____     Signature: _____