**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

UNITED STATES, *et al.*,

                *Plaintiffs*,

     v.

GOOGLE LLC,

                *Defendant*.

No. 1:23-cv-00108-LMB-JFA

**GOOGLE LLC'S REPLY IN SUPPORT OF ITS**
**MOTION TO EXCLUDE THE TESTIMONY OF DR. TIMOTHY SIMCOE**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.     Plaintiff's Argument That the Jury Should Consider Simcoe's "Predicted" 10
       Percent But-For Revenue Share "For What It Is Worth" Asks the Court to Place
       Inadmissible Expert Testimony before the Jury. ................................................... 2

       A.     Plaintiff Ignores Legal Authority Holding That an Expert Who Disavows
              an Opinion Is Precluded from Offering That Opinion at Trial. ............................ 2

       B.     Simcoe's "Predicted" 10 Percent But-For Revenue Share Is Not Supported
              by a Reliable Methodology. .................................................................................. 4

II.    Plaintiff's Opposition Fails to Overcome the Methodological Errors in Simcoe's
       Comparables Approach. ......................................................................................... 8

       A.     Simcoe Conducted No Analysis to Select Proper Comparators, a
              Necessary Step of This Methodology. .................................................................. 8

       B.     Simcoe Failed to Control for Any Differences between the Comparators
              and AdX, Rendering the Comparables Approach Unreliable. ............................. 10

       C.     Claiming the Comparables Approach Is "Conservative" Does Not Save It
              from Exclusion. ................................................................................................... 14

III.   The Event Study Is Unreliable because Simcoe Failed to Control for Lawful
       Conduct, a Fact Plaintiff Concedes in Opposition. .............................................. 14

IV.    Simcoe's Apportionment Analysis Does Not Provide the Jury With A Non-
       Speculative Basis on Which to Estimate FAA Damages. ...................................... 17

V.     Plaintiff, Who Must Show That the Purported Overcharge Measures Only
       Anticompetitive Effects, Agrees That Simcoe's Opinions Must Be Excluded If
       Any Conduct He Removed in the But-For World Is Held to Be Lawful or If Lee's
       Opinions Are Excluded. ....................................................................................... 20

CONCLUSION .................................................................................................................. 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allegheny Pepsi-Cola Bottling Co.* v. *Mid-Atlantic Coca-Cola Bottling Co.*,
    690 F.2d 411 (4th Cir. 1982) ....................................................................................20

*ATA Airlines, Inc.* v. *Fed. Exp. Corp.*,
    665 F.3d 882 (7th Cir. 2011) .......................................................................................7

*Bazemore* v. *Friday*,
    478 U.S. 385 (1986)....................................................................................................11

*City of Rockford* v. *Mallinckrodt ARD, Inc.*,
    2024 WL 1363544 (N.D. Ill. Mar. 29, 2024)............................................................10

*Concord Boat Corp.* v. *Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ...................................................................................15

*Crawford* v. *Newport News Indus. Corp.*,
    2017 WL 3222547 (E.D. Va. July 28, 2017)............................................................11

*Deiter* v. *Microsoft Corp.*,
    436 F.3d 461 (4th Cir. 2006) .....................................................................................20

*Devito* v. *Smithkline Beecham Corp.*,
    2004 WL 3691343 (N.D.N.Y. Nov. 29, 2004) ...........................................................3

*Eleven Line, Inc.* v. *N. Texas State Soccer Ass'n, Inc.*,
    213 F.3d 198 (5th Cir. 2000) .....................................................................................13

*Home Placement Serv., Inc.* v. *Providence Journal Co.*, 819 F.2d 1199,
    819 F.2d 1199, 1206 (1st Cir. 1987)............................................................................8

*In re IBM Peripheral EDP Devices Antitrust Litig.*,
    481 F. Supp. 965 (N.D. Cal. 1979) ...........................................................................16

*It's My Party, Inc.* v. *Live Nation, Inc.*,
    88 F. Supp. 3d 475 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th Cir. 2016) .................18

*LeClercq* v. *The Lockformer Co.*,
    2005 WL 1162979 (N.D. Ill. Apr. 28, 2005) ......................................................17, 19

*Lehrman* v. *Gulf Oil Corp.*,
    500 F.2d 659 (5th Cir. 1974) .....................................................................................14

*In re Lipitor (Atorvastatin Calcium) Mktg.* v. *Pfizer, Inc.*,
892 F.3d 624 (4th Cir. 2018) ...................................................................5, 6

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) .......................................................11

*Metrix Warehouse, Inc.* v. *Daimler-Benz Aktiengesellschaft*,
828 F.2d 1033, 1004 n.21 (4th Cir. 1987) ...............................................8, 9

*Mitchell* v. *Geo Grp. Inc.*,
2022 WL 874287 (D. Ariz. Mar. 24, 2022) ................................................3

*Nease* v. *Ford Motor Co.*,
848 F.3d 219 (4th Cir. 2017) .....................................................................4

*Price* v. *L'Oréal USA, Inc.*,
2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) ...........................................14

*R.F.M.A.S., Inc.* v. *So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010) .......................................................14

*Smith* v. *Virginia Commonwealth Univ.*,
84 F.3d 672 (4th Cir. 1996) .....................................................................11

*Southern Pacific Communications Co.* v. *American Tel. and Tel. Co.*,
556 F. Supp. 825 (D.D.C. 1982) ..............................................................15

*Tyger Constr. Co.* v. *Pensacola Constr. Co.*,
29 F.3d 137 (4th Cir. 1994) .......................................................................4

*In re Urethane Antitrust Litigation*,
166 F. Supp. 3d 501 (D.N.J. 2016) .............................................................6

*US Airways, Inc.* v. *Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019) .......................................................................15

*Virnetx, Inc.* v. *Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ................................................................16

*Werdebaugh* v. *Blue Diamond Growers*,
2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ...........................................15

*Whitfield* v. *John Bourne Co.*,
16 F. App'x 116 (4th Cir. 2001) ...............................................................10

*In re Wholesale Grocery Prod. Antitrust Litig.*,
946 F.3d 995 (8th Cir. 2019) ...................................................................12

**Statutes & Rules**

Federal Rule of Evidence 702...............................................................................1, 3, 11, 14

**Other Authorities**

Paul R. Milgrom, *Putting Auction Theory To Work* 90 (2004) ...................................................16

Daniel L. Rubinfeld, *Reference Manual on Scientific Evidence* (3d ed. 2011) ..........................5, 6

## INTRODUCTION

Google's opening motion explained that the opinions of Plaintiff's[1,2] damages expert Dr. Timothy Simcoe are not based on a reliable application of a recognized methodology, fail to account for the effects of lawful behavior, and fail to reflect the economic and factual realities of the record and this case.  Nothing in Plaintiff's opposition changes these conclusions.

*First*, Google explained that Simcoe should not be permitted to testify to a predicted 10 percent but-for revenue share because he disclaimed reliance on that revenue share and the regression to support it was unreliable.  Plaintiff contends that the jury should be allowed to consider the predicted 10 percent figure "for what it is worth," but that is what *Daubert* and Federal Rule of Evidence 702 prohibit: an expert may not testify to estimates based on unreliable methodologies, much less estimates which they will not even defend.  In any event, "what it is worth" is <u>nothing</u> because the regression is unreliable.  Plaintiff does not demonstrate otherwise.

*Second*, two methodological errors baked into Simcoe's Comparables Approach are independent bases to exclude it, and Plaintiff fails to refute Google's arguments showing why this is so.  Plaintiff's alternative points are a mix of straw-man and red-herring arguments that do nothing to redeem the Comparables Approach.

*Third*, Simcoe's Event Study, where at least two simultaneous events of consequence took

---

[1] All references to Ex. 1 through 162 refer to the Declaration of Bryon Becker in Support of Google LLC's Motion for Summary Judgment and Motions to Exclude, ECF No. 581, Declaration of Bryon Becker in Support of Google LLC's Oppositions to Plaintiffs' Motions to Exclude, ECF No. 646, and Declaration of Bryon Becker in Support of Google LLC's Replies in Support of Google LLC's Motion for Summary Judgment and Motions to Exclude.  With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability.  All emphasis is added unless otherwise indicated.

[2] The opposition brief to which this brief replies was signed by Plaintiff United States as well as Plaintiff States.  But Plaintiff States did not retain Simcoe, Ex. 91 at 25:15-17, and he is not providing expert testimony on the States' behalf as no State seeks damages.

place, is unreliable because he considers only one of those events.  Simcoe fails to account for lawful, procompetitive effects of Google's transition to a unified first-price auction ("UFPA"), which occurred <u>at the same time</u> as the implementation of unified pricing rules ("UPR")—the challenged conduct whose effect the Event Study purports to measure.  Simcoe's failure to separate the effects of simultaneous lawful conduct that would be correlated with an increase in AdX impressions from the alleged unlawful conduct affords the Court no way to conclude that the price Google charges for AdX is due to allegedly unlawful conduct.

*Fourth*, none of the arguments Plaintiff makes in opposition correct for the flawed assumption, that FAAs are "representative" advertisers, underlying Simcoe's Apportionment Analysis.

*Finally*, Plaintiff's assertion that its burden of calculating damages is lighter in an antitrust case does not alter the standards for admissibility of expert evidence or Plaintiff's burden to prove the element of antitrust injury—that is, that alleged damages flow from an anticompetitive effect of the defendant's behavior—as well as its burden to prove that the losses it claims were caused only by Google's alleged unlawful conduct.  Simcoe's models fail these standards and burdens.

## <u>ARGUMENT</u>

I.    **Plaintiff's Argument That the Jury Should Consider Simcoe's "Predicted" 10 Percent But-For Revenue Share "For What It Is Worth" Asks the Court to Place Inadmissible Expert Testimony before the Jury.**

    A.    **Plaintiff Ignores Legal Authority Holding That an Expert Who Disavows an Opinion Is Precluded from Offering That Opinion at Trial.**

In his report, Simcoe performed a regression with seven observations comparing two things: the average take rate of selected ad exchanges and the average cost of impressions sold through each exchange.  He then stated "extrapolating from the linear regression model, AdX's predicated take rate" would be "10 percent."  Br. at 3-4.  At deposition, Simcoe disavowed any

opinion that Google would charge a 10 percent revenue share in the but-for world.  Ex. 91 at 180:5-12.  Plaintiff's opposition confirms that his analysis leading to a "predicted" 10 percent but-for revenue share "did not, and was not meant to, calculate what AdX's take rate would be in a but-for world."  Opp. at 22.

Plaintiff does not address <u>at all</u> Google's argument that the law compels exclusion of an opinion the expert disavows.  Br. at 10-12.  When an expert "disavows an opinion expressed in the expert's report," he should be "precluded from offering that opinion at trial." *Mitchell* v. *Geo Grp. Inc.*, 2022 WL 874287, at *5-6 (D. Ariz. Mar. 24, 2022) (expert disavowed opinion when asked, "point-blank, to verify that he wasn't offering" said opinion "and he responded by confirming that he wasn't doing so"); *Devito* v. *Smithkline Beecham Corp.*, 2004 WL 3691343, at *4 (N.D.N.Y. Nov. 29, 2004) (when an expert "expressly" disavows holding an opinion, "necessarily he has no foundation, scientific or otherwise" for it).  Simcoe did exactly that when he testified that he is "not offering an opinion that the but-for take rate is 10 percent," Ex. 91 at 180:5-12, and disavowed it as a "basis for any conclusion about the take rates in the but-for world," *id.* at 179:4-12—notwithstanding the fact that Plaintiff retained Simcoe to provide exactly such a conclusion.[3]

Faced with its own expert's disavowal, Plaintiff had to concede that Simcoe's regression does not support a 10 percent but-for revenue share.  Opp. at 22 (admitting that the model does not "calculate what AdX's take rate would be in a but-for world").  Plaintiff nevertheless asks the Court to allow the jury to consider this model "for what it is worth."  *Id.*  *Daubert* and Federal Rule of Evidence 702 prohibit this approach to expert evidence.  "The main purpose of *Daubert*

---

[3] Opp. at 1 ("Dr. Simcoe is a well-regarded econometric expert who engaged in traditional, well-accepted empirical analyses to arrive at a conservative estimate of how much Google overcharged its ad exchange customers"); Ex. 5, ¶ 6 ("I have been asked by Plaintiffs to estimate the percent overcharge paid by advertisers who purchase display advertisements on the open web due to exclusionary conduct by Google").

exclusion is to protect juries from being swayed by dubious" expert testimony. *Nease* v. *Ford Motor Co*., 848 F.3d 219, 231 (4th Cir. 2017). This gatekeeping duty is all the more important when it comes to damages—"an area where a jury's common sense is less available than usual to protect it." *Tyger Constr. Co.* v. *Pensacola Constr. Co.*, 29 F.3d 137, 145 (4th Cir. 1994). Plaintiff's purpose here—to inflate its damages or confuse the jury as to the evidence supporting such damages—is improper. Plaintiff's other damages expert, Adoria Lim, calculates damages using a 10 percent but-for revenue share merely at the instruction of the United States. That is also improper for the reasons explained in Google's motion and reply brief to exclude those calculations. Lim Br. at 17-18, Lim Reply at 7-10. Allowing the jury to consider Simcoe's "predicted" 10 percent but-for revenue share analysis when Plaintiff and its expert disclaim it as a calculation of "what AdX's take rate would be in a but-for world," Opp. at 22, will only, and wrongly, invite the jury to consider it as a potential input to measuring damages.

Last, Plaintiff's argument that the unreliable regression generating the 10 percent prediction "is only one data point among many to suggest that AdX currently charges a supracompetitive take rate," Opp. at 22, has no citation to any support in the record and, in any event, is the same thing as saying this result "informs" Simcoe's analysis. Br. at 11. Unreliable "data points" are the same as inadmissible data points and do not become admissible because they are part of a group of points. Simcoe stating that this unreliable regression "informs" his analysis, or Plaintiff arguing that it is "one data point among many," would wrongly allow the jury to use that "predicted" revenue share in calculating damages and provides no explanation to the jury of any other use for the regression. *Id.*

**B.      Simcoe's "Predicted" 10 Percent But-For Revenue Share Is Not Supported by a Reliable Methodology.**

Plaintiff's arguments attempting to show that Simcoe's "predicted" 10 percent but-for

revenue share analysis is reliable must be rejected.

**First**, Plaintiff provides no explanation as to why comparing only two pieces of information—the revenue share and the average cost of impressions on an exchange—is informative of or supports any issue in this case, including damages. Nor does Plaintiff explain why a regression comparing those two things is a reliable methodology to determine injury or damages, let alone any other issue. Plaintiff also provides no explanation as to why a regression on the issue of injury or damages can ignore many other factors that affect prices. Br. at 18-21 (citing cases).

**Second**, Plaintiff ignores the econometrics literature and case law showing that a regression that includes just seven observations woefully fails to produce a reliable outcome—even if the relationship being analyzed is between just two variables. The *Reference Manual on Scientific Evidence*, which provides guidance to judges in these circumstances, Br. at 12 n.7 (citing cases), states that "thirty or more data points will be sufficient for regressions with a small number of explanatory variables." Daniel L. Rubinfeld, *Reference Manual on Scientific Evidence* at 342 (3d ed. 2011). Plaintiff does not address this authority.

The only authority Plaintiff cites to support its argument that Simcoe's use of just seven observations was "sufficiently large to serve its limited purpose" is Simcoe's own *ipse dixit* at deposition and *In re Lipitor (Atorvastatin Calcium) Mktg.* v. *Pfizer, Inc.*, 892 F.3d 624, 633-34 (4th Cir. 2018)—in which the Fourth Circuit affirmed the district court's decision to exclude an expert's testimony. Opp. at 22. The part of *In re Lipitor* that Plaintiff quotes selectively has nothing to do with the sample size used in a regression.[4] Instead, the Fourth Circuit was referring

---

[4] The full quote is: "Also casting a specter of unreliability over Dr. Jewell's report was the manner in which he applied otherwise reliable statistical tests to the data. Statisticians rely on a range of mathematical tests to extrapolate meaning from data. Choosing the test to apply is a matter of

to how the expert applied and reported the outcomes of statistical tests, improperly, and in a "results-driven" manner. *In re Lipitor*, 892 F.3d at 634-35 ("Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion"). The expert omitted the results of a test that returned a p-value above acceptable range in order to focus on the results of a test that returned a p-value within the acceptable range. *Id*. The Fourth Circuit affirmed the exclusion of the expert's opinion, and that ruling supports Google, not Plaintiff. *Id.* at 635.

Plaintiff's other cited case, *In re Urethane Antitrust Litigation*, 166 F. Supp. 3d 501, 508-09 (D.N.J. 2016), also supports Google. The defendant there argued that statistical insignificance was a reason alone for excluding the expert's testimony and models. *Id.* Here, Simcoe's 10 percent prediction should be excluded for multiple reasons as explained in Google's Motion[5]—not just that it produces a p-value demonstrating its unreliability. A model with seven observations, like here, is not reliable, particularly when it produces a p-value of 0.375 (i.e., 37.5 percent). *In re Lipitor*, 892 F.3d at 634 ("an association is considered statistically significant if its p-value is less than 0.05"); Rubinfeld, *supra*, at 320 ("Although the 5% criterion is typical, reporting of more stringent 1% significance tests or less stringent 10% tests can also provide useful information").[6] And then Simcoe disclaimed reliance on this model. Ex. 91 at 180:14-181:4.

---

selecting the appropriate tool for the task, and involves consideration of a variety of factors including type of data and sample size." *In re Lipitor*, 892 F.3d at 633-34.

[5] Br. at 12-14 (explaining that the regression is unreliable because it includes too few observations, generates a p-value that is too high, and fails to take into account or control for common-sense reasons why exchanges may charge different prices).

[6] Simcoe agrees that this p-value is far higher than the standard threshold for statistical significance. Ex. 91 at 187:19-188:14. Further, while Simcoe does not report a p-value for his predicted 10 percent model, he does reports p-value information for other regressions in his report. *See* Ex. 5, Fig. 16 (denoting where p-values are less than 0.01, 0.05, and 0.10).

***Third***, Plaintiff defends Simcoe's regression by pointing to Chevalier's use of seven observations in a standard deviation calculation that she performed to demonstrate the unreliability of the Comparables Approach, not the 10 percent but-for prediction. This comparison draws a false equivalency between two fundamentally different statistics and reasons for using them. Chevalier was not doing what Simcoe purported to do—predicting a but-for world; she was assessing the data Simcoe relies on for his Comparables Approach using a descriptive statistical analysis to illustrate the wide variation in revenue shares across exchanges otherwise masked by Simcoe's use of averages, *infra* pp. 12-13.[7]

***Finally***, Plaintiff argues that the difference in price demonstrated by this unreliable regression is nonetheless reliable because "ad exchanges are at most differentiated in limited ways." Opp. at 23. This ignores that Simcoe <u>concedes</u> that ad exchanges are differentiated products and are used to facilitate more than just "open-web display" impressions. Br. at 15 (citing Ex. 5, ¶ 146); *see also* Opp. Ex. B at 169:2-11 (testifying there is "quite a bit of differentiation," among exchanges such that it is "likely that some exchanges have certain characteristics that others don't have," *id.* at 169:13-170:9); Ex. 91 at 254:12-18 (agreeing that ad exchanges are differentiated and "relative quality is almost definitionally something that can affect prices"). This argument also flies in the face of Simcoe's assertion that variation in prices across exchanges "reflects differences in the nature and quality of publisher inventory sold through each exchange, as well as differences in demand, costs and other features of the auction process across the exchanges." Ex. 5, ¶ 85. Google explained why this model's failure to control for the quality

---

[7] A "descriptive statistic" is used to describe the characteristics of a sample. While a small number of observations can be sufficient to generate a reliable <u>descriptive</u> statistic of a sample, the same is not true about the number of observations required to generate a reliable <u>predictive</u> statistic. *See ATA Airlines, Inc.* v. *Fed. Exp. Corp.*, 665 F.3d 882, 895-96 (7th Cir. 2011) (a "tiny sample—10 observations" "are less representative" and "yield a less precise prediction").

differences that Simcoe acknowledges renders it unreliable.  Br. at 14.  Plaintiff is flat wrong in stating that Google "fails to identify" factors that Simcoe ignored in this analysis.  Opp. at 23.[8]

## II. Plaintiff's Opposition Fails to Overcome the Methodological Errors in Simcoe's Comparables Approach.

### A. Simcoe Conducted No Analysis to Select Proper Comparators, a Necessary Step of This Methodology.

Simcoe conducts no comparability analysis in selecting the seven ad exchanges as comparators for his Comparables Approach.  The law is clear that a proper yardstick analysis must include at least some assessment of the comparability between the firm at issue and the selected comparators but for the alleged anticompetitive conduct.  Br. at 16.  Plaintiff agrees, stating that "multiple factors should be considered to confirm that there is reasonable comparability, including 'product, firm, and market comparability.'"  Opp. at 12 (citing *Home Placement Serv., Inc.* v. *Providence Journal Co.*, 819 F.2d 1199, 1206 (1st Cir. 1987)).  But Plaintiff fails to establish that any such factors were actually evaluated by its expert.

Plaintiff argues that Simcoe "evaluated the only available index" by using transaction data from some exchanges which produced that data in this case.  Opp. at 12 (quoting *Metrix Warehouse, Inc.* v. *Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033, 1004 n.21 (4th Cir. 1987)).  This is not a reliable methodology for selecting comparator firms, and *Metrix Warehouse* does not hold otherwise.  In *Metrix*, the Fourth Circuit declined to hold that the expert's use of the yardstick method was "flawed to the point of irrelevancy" where it appeared that the selected comparable

---

[8] Footnote 723 to Lee's rebuttal report, which Plaintiff cites, has nothing to do with Plaintiff's claim that "ad exchanges are at most differentiated in limited ways," nor does it have any bearing on whether observable differences "support" the correlation that Simcoe found.  The footnote focuses on only one ad exchange, ███████████ █ ████████████████████████████ because according to Plaintiff's own experts, ███████████████████████████████████████ .
Opp. Ex. G, ¶ 459 n.723; Ex. 91 at 253:2-19.

"market was the only available index by which unfettered economic behavior could be measured." *Id.* at 1044 n.21.  Here, when asked whether he tried "to identify a different market to serve as a comparable," Simcoe responded, "I did not give a lot of consideration to that."  Ex. 91 at 231:15-232:1.  When asked whether he "set out" in his "report anywhere the steps" he undertook "to attempt to identify a comparable market," he responded, "No."  *Id.* at 233:9-12.  Simcoe admitted that he did next to nothing to determine that his selected comparables were "the only available index" for AdX, an especially egregious flaw here given that a huge number of potential comparators offering mobile, in-app, social, native, connected TV, or video ads, sit outside the antitrust markets Plaintiff has manufactured for this case.  *See, e.g.*, Lee Reply at 2-7.

Next, Plaintiff argues Simcoe selected appropriate comparators because he relied on Dr. Robin Lee's opinion that "open-web display advertising is a distinct and valuable form of advertising."  Opp. at 13.  Even though the comparators transacted in "open-web display advertising," that provides no information to compare their performance and quality in doing so. Lee also provides no information on the comparators: he admitted that ad exchanges can be used to transact many formats, including "open web," in-app, native, social, retail, and video ads, but he does not know what publishers and advertisers take into account in making decisions among those exchanges.  Ex. 8 at 53:7-54:4, 89:11-90:2, 122:8-123:21.  Lee also has not analyzed quality differences among exchanges, *id.* at 239:14-19, although he, like Simcoe, admits those differences exist, *id.* at 231:12-232:13, 243:14-245:9.

Plaintiff next argues that the seven benchmark exchanges' transactions that Simcoe selected were appropriate, and that "transactions," rather than "exchanges," are the appropriate unit of analysis.  Opp. at 14-15.  This about-face beggars belief.  Br. at 17; Ex. 93, ¶¶ 48-49. Regardless, it is Simcoe's failure to conduct any analysis whatsoever to determine whether the

firms he uses in the Comparables Approach are sufficiently similar to AdX that renders his Comparables Approach unreliable.  Br. at 15-17.  Further, Plaintiff makes no argument in opposition that attempts to justify why Simcoe arbitrarily excluded transactions from exchanges that produced U.S.-only data—even though such transactions are undoubtedly "the same product type," "from the same geographic market," and "transacted using the same type of tool" and should therefore fit the criteria Simcoe allegedly used when selecting "transactions," not ad exchanges, as comparators.  Opp. at 12; Br. at 21 n.10.

Last, Plaintiff argues that Simcoe did not cherry-pick or rely on too small a "slice" of data.  Opp. at 17.  But ad exchanges operating outside of Lee's relevant market did produce data that Simcoe failed to evaluate or consider at all; the fact that ad exchanges Simcoe used in the Comparables Approach are some of those that produced "open-web display advertising" data in this case does not render the selection of those firms reliable without Simcoe having first determined that they are proper comparables.  Br. at 22.

## B.   Simcoe Failed to Control for Any Differences between the Comparators and AdX, Rendering the Comparables Approach Unreliable.

Simcoe fails to control for any differences between the ad exchanges he chose as benchmarks and AdX.  The law is clear that a yardstick model that fails to consider and account for factors or reasons having nothing to do with the alleged wrongdoing that "may have affected the price" is inadmissible.  *City of Rockford* v. *Mallinckrodt ARD*, *Inc.*, 2024 WL 1363544, at *9 (N.D. Ill. Mar. 29, 2024); Br. at 18-21 (citing numerous cases including *Whitfield* v. *John Bourne Co.*, 16 F. App'x 116, 123 (4th Cir. 2001) (affirming district court's grant of summary judgment where plaintiff had "not considered and accounted for the differences inherent in the markets in his" yardstick comparison).  Simcoe admitted that his Comparables Approach measures price differences without controlling for any "factors that may be correlated with differences in average

take rates."  Ex. 91 at 261:7-262:1.  Plaintiff offers no argument or case law that excuses this failure.

Plaintiff argues that Google raises "the specter of differences" to "quibble" with Simcoe's methodology and that "Rule 702 does not require Dr. Simcoe to test every possible variable that might explain price difference."  Opp. at 15.  Likewise, Plaintiff cites *Bazemore* v. *Friday*, 478 U.S. 385, 400 (1986), which stands for the proposition that "a regression analysis that includes less than all measurable variables may serve to prove a plaintiff's case" so long as it accounts for "major factors."  The proposition that a methodology which includes "less than <u>all</u> measurable variables" (or "every possible variable") does not support a methodology like the Comparables Approach which fails to control for <u>any</u> differences.  E.g., *Smith* v. *Virginia Commonwealth Univ.*, 84 F.3d 672, 676 (4th Cir. 1996) ("*Bazemore* and common sense require that any multiple regression analysis used to determine pay disparity must include all the *major* factors on which pay is determined") (emphasis in original); *Crawford* v. *Newport News Indus. Corp.*, 2017 WL 3222547, at *5 (E.D. Va. July 28, 2017) (rejecting regression model that failed to account "for a major factor" because "as the *Bazemore* Court noted, while an admissible regression analysis need not account for all variables," "it must at least account for the major factors").

This response from Plaintiff also sets up a straw man.  Google does not argue that a proper yardstick approach must control for "every possible variable."  Opp. at 15.  Rather, a yardstick analysis needs to control for "major factors" that might explain the price differences observed through the yardstick approach.  *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 976 (C.D. Cal. 2012) (quoting *Bazemore*) (excluding yardstick analysis that failed to account for a "major factor in determining" "prices").  While Plaintiff says Simcoe "adhered to those principles," Opp. at 15, that is just lawyer say-so that not even Simcoe defends.  *Cf. In re Wholesale Grocery Prod.*

11

*Antitrust Litig.*, 946 F.3d 995, 1003 (8th Cir. 2019) (affirming district court's exclusion of expert testimony where simply "stating that a benchmark controls for all factors does not make it so, without more").  The Comparables Approach does not control for any factor whatsoever.  Lee stated repeatedly that price comparisons for purposes of establishing an antitrust claim should be adjusted for quality, *see, e.g.*, Ex. 1, ¶ 248 & n.335, and product quality is at least one "major factor" that the Comparables Approach does not control for.[9]  Google's AdX provides important comparative advantages in security and privacy; the Comparables Approach does not control for these advantages either.  Ex. 101, ¶¶ 76-78; *see also* Ex. 159, ¶ 70 ("Ad exchanges provide a distinctive set of features and services," such as "tools for detecting and filtering spam, malware and fraud; tools for data collection and privacy management; and a billing and payments infrastructure.").  Functionality is another, as Lee has acknowledged; ad exchanges can be used to transact many formats, including "open web," in-app, native, social, retail and video ads.  *Supra* p. 9.  The Comparables Approach does not control for functionality.  Plaintiffs allege as part of their claims that AdX has superior scale and valuable customers compared to competitor exchanges, other factors that should be, but that are not, controlled for.  *See, e.g.*, First. Am. Compl. ECF No. 120 ¶¶ 73, 108; RSUF ¶¶ 22, 29.

The failure to control for differences is not a mere hypothetical flaw.  As Google showed, when the data Simcoe uses to calculate a weighted but-for revenue share is examined on an exchange-by-exchange basis, six of the seven exchanges charge revenue shares that are higher

---

[9] Plaintiff claims that when Simcoe testified that there is "quite a bit of differentiation," Opp. Ex. B at 169:2-11, among exchanges such that it is "likely that some exchanges have certain characteristics that others don't have," *id.* at 169:13-170:9, what he <u>actually</u> meant "as an economist" was that ad exchanges "are either not differentiated at all or are differentiated in limited ways."  Opp. at 14 & n.10.  Plaintiff cannot distance itself from its own expert's testimony through lawyer argument.

than the but-for revenue share Simcoe would present to the jury.  Br. at 18, 20.  This means that, in Simcoe's but-for world, 86 percent of his comparables (who are not alleged antitrust violators) could and would charge revenue shares higher than the competitive price his model predicts.  Put differently, something <u>other</u> than alleged anticompetitive conduct would permit Simcoe's comparables to charge above-competitive prices, whether that be quality, functionality, customer base, or scale, and Simcoe does not and cannot account for why those reasons do not also allow Google to charge the price it does, Ex. 91 at 289:18-290:10, even though Plaintiff agrees differentiated products may properly charge higher prices.  *See* SAMF ¶ 7.

Plaintiff's claim that Simcoe's Event Study saves his Comparables Approach from having to control for differences affecting price is unavailing because it simply shows it is necessary to control for differences, Br. at 22, and ignores that Simcoe offers two unreliable but-for revenue share opinions, each independent from the other and inadmissible for independent reasons.

Last, Plaintiff halfheartedly argues that Simcoe controlled for differences because he used weighted averages.  Opp. at 17.  This is a red-herring.  Unreliable methods do not become reliable by the use of averages.  To the contrary, Simcoe's weighted average revenue shares allow six out of seven exchanges to charge what appear to be supracompetitive prices.[10]  *Eleven Line, Inc.* v. *N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 208-209 (5th Cir. 2000), which Plaintiff does not address, illustrates the fatal flaw in relying on averages.  The court explained that the "analytical problem and failure of this proof lies in the fact that an average of unknowns is also an unknown," and compared it to saying that because "McDonald's franchises earn a certain average rate of return, a particular franchise will perform to the average."  *Id.*; *see also* Br. at 21 (citing cases).

---

[10] *See* Ex. 38, Fig. 10, which shows █████████████████████████████████████████████
████████████████████████████████████████████████████████████

**C.** **Claiming the Comparables Approach Is "Conservative" Does Not Save It from Exclusion.**

Plaintiff tries to save the Comparables Approach from exclusion by claiming it results in a "conservative" but-for revenue share.  Opp. at 12-13, 17-18.  But a methodology must still be reliable, even when that methodology is asserted to produce allegedly conservative results.  *See R.F.M.A.S., Inc.* v. *So*, 748 F. Supp. 2d 244, 275-76 (S.D.N.Y. 2010) (where an expert repeatedly described his opinion as "conservative," holding that the reliability and admissibility of the testimony was not "saved" by "the fact that their estimate of damages may actually understate the true extent of damage"); *Price* v. *L'Oréal USA, Inc.*, 2020 WL 4937464, at *7 (S.D.N.Y. Aug. 24, 2020) (expert's justification that choices in model design were "conservative" was not a "sufficient explanation to show a reliable foundation for the" choices).  Plaintiff cites only one case, from 1974 and before the Supreme Court's *Daubert* decision and the most recent amendments to Federal Rule of Evidence 702, where the Fifth Circuit noted in dicta that an expert's design choice "may well" have benefited the opposing party.  *Lehrman* v. *Gulf Oil Corp.*, 500 F.2d 659, 670 (5th Cir. 1974).  This case does not endorse admitting expert testimony concerning <u>unreliable</u> models as long as the expert says they are "conservative."  And even if the differences which Simcoe does not control for could be excused because that failure "may well" benefit the opposing party, neither Simcoe nor Plaintiff show how those differences "may well" benefit Google.

**III.** **The Event Study Is Unreliable because Simcoe Failed to Control for Lawful Conduct, a Fact Plaintiff Concedes in Opposition.**

The Event Study attempts to draw conclusions from the introduction of UPR,[11] which took place at the same time that Google moved to UFPA—conduct Plaintiff does not challenge.  The

---

[11] Plaintiff's comparison of UPR to an anti-steering provision is wrong.  Opp. at 7 & n.6.  UPR does not limit the floor prices publishers set outside of Google's publisher ad server.  It only limits what publishers do within DFP.  S.J. Reply at 14 n.14.

Event Study estimates an increase in impressions won by AdX customers from only one of those simultaneous events, UPR, and ignores UFPA's role in increasing impressions won.[12]  The Event Study must therefore be excluded because it does "not separate lawful from unlawful conduct." *Concord Boat Corp.* v. *Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000); Br. at 22-23.

Plaintiff argues it was not necessary to control for lawful conduct in the Event Study because UFPA was "unlikely to have a material effect on transaction volume." Opp. at 19.  This ignores the many cases Google cites for the proposition that the Event Study is unreliable because it does not address or control for the increase in AdX impressions being caused by simultaneous conduct that Plaintiffs' experts opine increases competition.  Br. at 22.  Plaintiff attempts to dismiss these cases in a footnote as standing for the "proposition that a regression should be excluded only where it blatantly fails."  Opp. at 20 n.13.  That is not what Google's cited cases stand for.

In *Southern Pacific Communications Co.* v. *American Tel. and Tel. Co.*, 556 F. Supp. 825, 1090 (D.D.C. 1982), the court outlined problematic assumptions of the model at issue and then concluded that "even if" the plaintiff's assumptions were valid, a "single aggregated but for damage model was fatally deficient" because it "gave the Court no means of assuring itself that injuries attributable to other causes—such as lawful competition or [plaintiff's] own inefficiencies—have been excluded from the damage claim." *Id.*  In *Werdebaugh* v. *Blue Diamond Growers*, 2014 WL 7148923, at *10 (N.D. Cal. Dec. 15, 2014), as here, the expert failed to "isolate the harm (e.g., the price premium) attributable only to the [unlawful conduct], rather than to the joint effect of both the [unlawful conduct] and the value of" defendant's brand. *Id.*  The court concluded "this methodological failure alone is sufficient for the Court to conclude that Plaintiff

---

[12] UFPA benefitted advertisers and publishers and was expected to increase impressions transacted on AdX.  Ex. 61 at -361 (showing that UFPA resulted in 43 percent higher impressions on AdX).

has failed to put forth damages limited to Defendant's liability in this case." *Id.* at *11. Plaintiff does not address *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1013 (N.D. Cal. 1979), in which the court stated that "if injury is shown to be attributable to factors for which the defendant cannot be held liable, then a damage case that ignores those factors must fail."

Plaintiff relies on two things for the assumption that UFPA was unlikely to have a material effect, neither of which passes muster. The first is an economic theory called the Revenue Equivalence Theorem, which featured in a lone footnote in Simcoe's opening report, where he wrote that this theory "suggests that, holding all else equal," there would be no effect "on the expected revenue of the seller or the expected payment from the buyer." Opp. Ex. A, ¶ 157 n.212. But the Event Study is not measuring expected revenue or payment; it measures impression volume. *Id*. ¶ 150 (Event Study predicts "how much would Google have needed to reduce its take rate to have attained the same increase in transactions as it gained through UPR" in the but-for world). So, Simcoe's cited theory is a mismatch and, in any event, absent any analysis, a theory alone is not an excuse for failing to control for lawful conduct in a model that is intended to predict a but-for world. *Virnetx, Inc.* v. *Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014) (agreeing with courts that had "rejected invocations of" an economic "theorem without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand"). Simcoe does not establish that the premises of the Revenue Equivalence Theorem are satisfied in the Event Study. When those premises do not hold, it is possible for sellers to be better off in a first-price auction than in a second-price auction, as demonstrated in the textbook cited by Plaintiff. Paul R. Milgrom, *Putting Auction Theory To Work* 90 (2004). Moreover, the Theorem is not applicable here because "all else" was not "held equal"; UFPA was not one simple change from second-price auction to first-price auction; instead, the pre-UFPA auction environment involved

multiple different auction formats that could be run underlined sequentially, which UFPA did away with. Ex. 132, ¶¶ 428, 459.  These differences show why it was necessary for Simcoe to control for UFPA rather than resort to a footnote "suggesting" a theory supports his decision not to do so.

The second thing Plaintiff points to as a reliable basis for not controlling for UFPA are two internal Google documents.  These documents undermine, not support, the Event Study, and cannot justify not controlling for a major simultaneous event like UFPA.  Br. at 24.  One of those documents shows a 43 percent underlined increase in impressions due to UFPA (which is the exact same effect—an increase in impressions—that Simcoe attributes in whole to UPR).  Simcoe's "failure to discuss the import of, or even mention" this piece of the document amounts to "cherry-picking the facts he considered to render his opinion."  *LeClercq* v. *The Lockformer Co.*, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005).  And Plaintiff has no response to the fact that the other document Simcoe relied on was written a year before UFPA was introduced.  Br. at 24.

Last, Plaintiff urges that Simcoe's choices in the design of the Event Study led to "conservative results."  Opp. at 21.  But as explained above, a methodology must still be reliable, even when that methodology is asserted to produce conservative results.

## IV.    Simcoe's Apportionment Analysis Does Not Provide the Jury With A Non-Speculative Basis on Which to Estimate FAA Damages.

The Apportionment Analysis uses a "tax incidence framework" that treats the AdX revenue share as an "*ad valorem* fee" that "functions similarly to a tax."  Opp. Ex. A, ¶¶ 159, 162.  Simcoe uses this framework to apportion the AdX fee between publishers and advertisers, stating that "the *incidence* (i.e., the share of harm) of a 'tax' on a transaction" depends "on the relative price elasticities of publisher supply and advertiser demands."  *Id.*  After estimating these elasticities, Simcoe uses them to estimate the portion of the alleged overcharge that the FAAs supposedly bore.

The major flaw in Simcoe's Apportionment Analysis is the assumption that the FAAs are

"representative" advertisers.  Plaintiff asserts, without citation to anything, that Simcoe did not make this assumption.  Plaintiff is wrong: Simcoe wrote in his report, "I treat the FAAs as a 'representative advertiser' in my analysis," Ex. 5, ¶ 127, and he testified at deposition that sentence meant that he was "estimating marketwide supply and demand elasticities" and applying those to the FAAs—without any analysis or consideration of whether it is appropriate to treat the FAAs as "representative," that is, as a proxy for "marketwide supply and demand elasticities."  Ex. 91 at 370:19-371:8.  The problem with assuming that the percentage of the alleged overcharge borne by eight FAAs is <u>identical</u> to the percentage borne by a marketwide, average advertiser is that, as a matter of economics and a matter of fact, the assumption is incorrect in this case.  *See It's My Party, Inc.* v. *Live Nation, Inc.*, 88 F. Supp. 3d 475, 483 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th Cir. 2016) (finding that even if expert testimony is "based on sound methodology," it "should be excluded if it is based on unsound or incorrect assumptions").

Plaintiff overreaches when arguing that Simcoe did not have to consider the demand elasticities faced by FAAs because "a tax incidence model considers the elasticity of demand and supply for a product," and "not the elasticity of individual buyers and sellers."  Opp. at 24-25. Simcoe acknowledges that individual demand elasticities "contribute" to determining market-level outcomes.  Opp. Ex. C, ¶ 29 ("the price sensitivity of each gasoline buyer will contribute to determine the gasoline price after a tax is introduced").  Plaintiff's opposition also concedes this truism, stating that the "forces" "that set the market-clearing price for a product" are "composed of all individual buyers' and sellers' elasticities."  Opp. at 25.  Moreover, Simcoe acknowledges in his rebuttal report that "it is possible to study heterogeneity in tax incidence."  Opp. Ex. C, ¶ 30. And the article Plaintiff cites, Opp. at 24 n.15, recognizes that tax incidence "varies geographically

or demographically"; it is not necessarily uniform "marketwide." Opp. Ex. Q at 3-4.[13]

Plaintiff next argues that "even if individualized inquiry were required," whether FAAs' portion of the alleged overcharge "deviated significantly" from other advertisers depends on whether FAAs purchased "impressions that were economically similar to those purchased by other advertisers" and that Simcoe evaluated this question and concluded the difference in price FAAs paid for impressions compared to the worldwide advertiser "is minimal." Opp. at 26. Looking at price alone to determine economic similarity is highly flawed in this case, even if doing so would make sense as a theoretical matter. Simcoe acknowledged at deposition that FAAs did "purchase different kinds of ads as well as different quantities of ads," factors other than price which also affect whether FAA impressions are "reasonably similar." Ex. 91 at 379:11-21; *see also id.* at 382:11-14 (testifying the FAAs generate different demand curves). For example, the value of an impression for an advertiser depends on the user seeing the ad; certain advertisers therefore compete for impressions that are not valuable for other advertisers, depending on the targeted audience. *See* Br. at 26-27 (citing Exs. 20, 22). The U.S. Army recruiting campaigns, for instance, do not necessarily compete for the same impressions that the U.S. Postal Service would want to purchase, given each agency's target audience. *See, e.g.*, Ex. 161, ¶ 150.

Last, as a factual matter, Plaintiff ignores that Simcoe's own analysis, Figure 2 of his rebuttal report, shows that demand elasticities vary significantly across advertisers. Br. at 25. Given the variation in advertiser elasticities that his own analysis shows, Simcoe's refusal to consider, let alone account for, how that variation affects the portion of the alleged AdX overcharge the FAAs actually bear results in an opinion and analysis that fails to account for important facts of this case. *See LeClercq*, 2005 WL 1162979, at *4 (excluding expert whose

---

[13] Opp. Ex. P, also cited by Plaintiff, does not mention tax incidence.

"failure to discuss the import of, or even mention," material facts amounted to "cherry-picking the facts he considered to render his opinion," and did not satisfy *Daubert*).

**V.     Plaintiff, Who Must Show That the Purported Overcharge Measures Only Anticompetitive Effects, Agrees That Simcoe's Opinions Must Be Excluded If Any Conduct He Removed in the But-For World Is Held to Be Lawful or If Lee's Opinions Are Excluded.**

Throughout its opposition, Plaintiff argues that its burden of proving damages is lighter in an antitrust case. Opp. at 2, 10-11. This principle does not alter the standards for admissibility of expert evidence or change Plaintiff's burden to prove the element of antitrust injury—that is, that alleged damages flow from an anticompetitive effect of the defendant's behavior. *Deiter* v. *Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006) (antitrust injury is an element of an antitrust plaintiff's prima facie case). Simcoe's models do not do this. Further, Simcoe's models do not show that the losses Plaintiff claims are caused only by Google's alleged unlawful conduct. *Allegheny Pepsi-Cola Bottling Co.* v. *Mid-Atlantic Coca-Cola Bottling Co.*, 690 F.2d 411, 415 (4th Cir. 1982) ("an antitrust plaintiff is entitled to recover only for that portion" of its losses "caused by the defendants' unlawful conduct").

Given these principles, Plaintiff does not contest that where an expert's damages analysis cannot segregate the effects of lawful practices from unlawful practices, then no damages may be awarded on the basis of that analysis. Br. at 28 (citing authority). Nor does Plaintiff disagree that, if Lee is excluded, so too must Simcoe. Br. at 28-29. Accordingly, when ruling on Google's summary judgment motion, should the Court hold that any one of the alleged anticompetitive conducts that Simcoe removes in his but-for world is lawful, or, alternatively, should the Court exclude Lee, the Court must exclude Simcoe.

## CONCLUSION

Google respectfully requests that the Court grant its motion and exclude Simcoe's opinions.

Dated: May 31, 2024

Respectfully submitted,

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Julie Elmer (*pro hac vice*)
Lauren Kaplin (*pro hac vice*)
Scott A. Eisman (*pro hac vice*)
Jeanette Bayoumi (*pro hac vice*)
Claire Leonard (*pro hac vice*)
Sara Salem (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
 CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Bryon P. Becker (VSB #93384)
Erica Spevack (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
kdunn@paulweiss.com

Meredith Dearborn (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101
mdearborn@paulweiss.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com

*Counsel for Defendant Google LLC*