**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

UNITED STATES, *et al.*,

                    *Plaintiffs*,

          v.

GOOGLE LLC,

                    *Defendant*.

No. 1:23-cv-00108-LMB-JFA

**MEMORANDUM OF LAW IN SUPPORT OF GOOGLE LLC'S**
**MOTION TO EXCLUDE THE TESTIMONY OF ADORIA LIM**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND AND SUMMARY OF LIM'S OPINIONS ..................................... 2

    I.    Theory of Damages ................................................................................... 2

    II.    FAA Damages Opinions .......................................................................... 3

    III.    Non-Party Overcharge Opinions ............................................................. 7

    IV.    Accounting Profitability Opinions ........................................................... 9

LEGAL STANDARD .............................................................................................. 11

ARGUMENT ........................................................................................................... 12

    I.    Lim's FAA Damages Opinions Should Be Excluded................................ 12

        A.    The Damages Opinions Must Be Excluded Because They Are Based on the Legally Invalid Theory That the FAAs May Recover Damages as Indirect Purchasers. .............................................. 12

        B.    The Damages Opinions for CMS and NHTSA Must Be Excluded as Unreliable Because There Is "Insufficient" Record Evidence Supporting Them. ......................................................... 14

        C.    The Damages Opinion Based on a 10 Percent But-For Revenue Share Should Be Excluded Because No Facts Support It as a Revenue Share That Would Be Charged in a But-For World.......................... 17

        D.    The Damages Opinions Must Be Excluded in Their Entirety if the Court Grants Google's *Daubert* Motion as to Simcoe................... 19

    II.    Lim's Non-Party Overcharge Opinions Should Be Excluded as Irrelevant and Unhelpful to the Trier of Fact. .......................................................... 20

    III.    Lim's Accounting Profitability Opinions Should Be Excluded as Irrelevant, Unreliable, and Unhelpful to the Trier Of Fact............................................ 22

        A.    Lim's Accounting Profitability Opinions Should Be Excluded as Irrelevant and Unhelpful; Even Lim Disclaims Their Usefulness. ...................... 22

        B.    Lim's Accounting Profitability Analysis Regarding Google's Operating Margins on a "Net Revenue Basis" Is Unreliable Because It Deviates from Standard Accounting Practices and Cannot Support Her Conclusions. .............. 23

CONCLUSION ........................................................................................................ 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Brasko* v. *First Nat'l Bank of Penn*.,
    2023 WL 7191120 (D. Md. Nov. 1, 2023) ...........................................................................17

*Brittney Gobble Photography, LLC* v. *Sinclair Broadcast Grp., Inc.*,
    2021 WL 5359671 (D. Md. Nov. 17, 2021) ......................................................................18

*Bunting Graphics, Inc.* v. *Whiting-Turner Contracting C*o.,
    2022 WL 14664724 (D. Md. Oct. 25, 2022) .....................................................................25

*Burlington Indus.* v. *Milliken & Co*.,
    690 F.2d 380 (4th Cir. 1982) ............................................................................................14

*In re Cathode Ray Tube (CRT) Antitrust Litig*.,
    2017 WL 10434367 (N.D. Cal. Jan. 23, 2017)..................................................................19

*Children's Broad. Corp.* v. *The Walt Disney Co*.,
    245 F.3d 1008 (8th Cir. 2011) ..........................................................................................21

*Cooper* v. *Smith & Nephew, Inc.*,
    259 F.3d 194 (4th Cir. 2001) ............................................................................................25

*Daubert* v. *Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).....................................................................................................12, 20

*Equal Rights Ctr.* v. *Equity Residential*,
    2016 WL 1258418 (D. Md. Mar. 31, 2016).......................................................................23

*In re Flash Memory Antitrust Litig.*,
    2010 WL 2332081 (N.D. Cal. June 9, 2010) .....................................................................15

*Garlinger* v. *Hardee's Food Sys., Inc.*,
    16 F. App'x 232 (4th Cir. 2001) ..................................................................................20, 23

*Grande Vista, LLC* v. *United States*,
    2023 WL 4296571 (D. Md. June 30, 2023).......................................................................17

*Illinois Brick Co.* v. *Illinois*,
    431 U.S. 720 (1977)...........................................................................................................12

*It's My Party, Inc.* v. *Live Nation, Inc. (It's My Party I)*,
    88 F. Supp. 3d 475 (D. Md. 2015) ....................................................................................11

*Kentucky Speedway, LLC* v. *Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ...........................................................................19

*Koenig* v. *Beekmans*,
    2017 WL 6033404 (W.D. Tex. Dec. 5, 2017) ...............................................16

*Kumho Tire Co., Ltd.* v. *Carmichael*,
    526 U.S. 137 (1999)........................................................................................23

*Lake* v. *Adams*,
    2020 WL 1016352 (W.D. Va. Mar. 2, 2020)............................................12, 22

*Limelight Networks, Inc.* v. *XO Comms, LLC*,
    2018 WL 678245 (E.D. Va. Feb. 2, 2018).......................................................21

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. and Prods. Liab. Litig.*,
    892 F.3d 624 (4th Cir. 2018) ..........................................................................23

*Moke Am. LLC* v. *Am. Custom Golf Cars, Inc.*,
    2022 WL 17477062 (E.D. Va. Dec. 6, 2022) ..................................................13

*Moore* v. *Equitrans, L.P.*,
    27 F.4th 211 (4th Cir. 2022) ...........................................................................12

*Nease* v. *Ford Motor Co.*,
    848 F.3d 219 (4th Cir. 2017) .....................................................................11, 12

*Newman* v. *Hy-Way Heat Sys., Inc.*,
    789 F.2d 269 (4th Cir. 1986) .....................................................................16, 18

*Petri* v. *Va Bd. of Med.*,
    2014 WL 5421238 (E.D. Va. Oct. 23, 2014)...................................................22

*Polyzen, Inc.* v. *Radiadyne, LLC*,
    2016 WL 5360576 (E.D.N.C. Sept. 23, 2016).................................................13

*Sardis* v. *Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) ......................................................................12, 25

*Silicon Knights, Inc.* v. *Epic Games, Inc.*,
    2011 WL 6748518 (E.D.N.C. Dec. 22, 2011) .............................................13, 17

*Simmons* v. *USI Ins. Servs., LLC*,
    2024 WL 946311 (M.D. Fla. Mar. 5, 2024) ....................................................13

*Sims* v. *Kia Motors of America, Inc.*,
    839 F.3d 393 (5th Cir. 2016) ..........................................................................19

iii

*Snoeyenbos* v. *Curtis*,
  60 F.4th 723 (4th Cir. 2023) ........................................................................22

*T.H.E. Ins. Co.* v. *Davis*,
  54 F.4th 805 (4th Cir. 2022) ........................................................................17

*Trigon Ins. Co.* v. *United States*,
  204 F.R.D. 277 (E.D. Va. 2001) ..................................................................18

*Tyger Const. Co.* v. *Pensacola Const. Co.*,
  29 F.3d 137 (4th Cir. 1994) ..........................................................11, 16, 18

*Uniloc USA, Inc.* v. *Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ...................................................................21

## Statutes & Rules

15 U.S.C. § 15a ...............................................................................................1, 20

Fed. R. Evid. 702 ........................................................................................ *passim*

## Other Authorities

Barry Kanczuker, *Remarks before the 2017 AICPA Conference on Current SEC
  and PCAOB Developments* (December 4, 2017) .......................................24

FASB, *ASC 606 – Revenue from Contracts with Customers*.................................24, 25

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
  Principles and Their Application* (5th ed. 2023) .......................................15

Wesley R. Bricker, *Remarks before the Annual Life Sciences Accounting &
  Reporting Congress: "Advancing Effective Internal Control and Credible
  Financial Reporting"* (March 21, 2017).....................................................24

## INTRODUCTION

In support of its claim for damages under 15 U.S.C. § 15a, Plaintiff proffers Lim as an expert to calculate damages to the eight Federal Agency Advertisers ("FAAs") on whose behalf Plaintiff pursues damages. Lim's analysis is rife with irrelevant opinions and unsupported assumptions, and would not help the factfinder, but rather would distract and confuse from the relatively small sum that the FAAs seek in damages.

Lim's damages opinions should be excluded for the following reasons:

*First*, Lim's FAA damages opinion is premised upon a legally incorrect theory—that the FAAs, all indirect purchasers, may recover damages under federal antitrust law. Under the Supreme Court's rule in *Illinois Brick*, the FAAs are barred from doing so, and Lim's damages opinion is contrary to controlling law and therefore irrelevant.

*Second,* Lim effectively admits that there is insufficient data to support her damages estimation as to the Centers for Medicare & Medicaid Services ("CMS") and National Highway Traffic Safety Administration ("NHTSA"), and therefore her opinion of damages incurred by those two FAAs is unreliable.

*Third*, Lim's damages opinion based on a hypothetical 10 percent but-for revenue share has no factual or analytic support—she was simply instructed by Plaintiff to assume it—and is therefore too unreliable, speculative, and unhelpful to present to the trier of fact. In other words, her denominator is simply made up.

*Fourth*, all of Lim's overcharge calculations are based upon the unreliable estimates of Plaintiff's other damages expert, Dr. Timothy Simcoe, who is also the subject of a *Daubert* motion.

*Fifth*, Lim's opinions as to overcharges borne by advertisers <u>who are not party to the case</u> and on whose behalf Plaintiff cannot seek damages are irrelevant and unhelpful to the trier of fact

in assessing the FAAs' damages.  Permitting this testimony at trial before a jury risks irreparably prejudicing Google and tainting the jury's damages award with a bloated damages sum entirely unconnected to the much smaller amount that Plaintiff claims.

*Finally*, and separately, Plaintiff proffers Lim to analyze profitability of aspects of Google's display advertising business.  On this topic, Lim's opinions should be excluded as unhelpful to the trier of fact under *Daubert*.  They are premised upon profit and loss statements ("P&Ls") never used within Google and never serving any real-world use.  No other expert relies on Lim's profitability conclusions, and Lim herself disavows relying on her P&Ls to draw any conclusions that might at all be relevant to any issue in this case.  Moreover, Lim's analysis regarding Google's internal accounting treatment of its operating margins is unhelpful to the trier of fact and unreliable because it deviates from standard accounting practices.  She appears to have manufactured this analysis in an attempt to bolster Google's profit margins beyond the figures presented in Google's own statements prepared in the ordinary course of business.

For these reasons, the Court should exclude Lim's testimony in its entirety.

## BACKGROUND AND SUMMARY OF LIM'S OPINIONS

### I.    Theory of Damages

Plaintiff claims that eight FAAs incurred monetary damages as a result of Google's alleged anticompetitive conduct.  The eight FAAs are the U.S. Army, U.S. Navy, U.S. Air Force, U.S. Postal Service ("USPS"), Census Bureau, Department of Veterans Affairs, NHTSA, and CMS.  Plaintiff's alleged damages are premised on the theory that the FAAs were overcharged on certain "open-web display advertising" transactions that flowed through Google's ad exchange tool called

AdX.  Ex. 5 ¶ 6;[1,2]  Ex. 62, App. E ¶¶ 14, 23.  For each of these transactions, the FAAs used third-party advertising agencies to purchase ads on their behalf.  Ex. 62, App. E ¶ 44.

Plaintiff retained Dr. Timothy Simcoe to estimate a counterfactual AdX revenue share based on a hypothetical "but-for" world which excludes some of Google's alleged anticompetitive conduct.  Ex. 5, ¶¶ 89-90, 103. Simcoe estimates a range of but-for AdX revenue shares instead of the 19.8 percent that Google charged during the damages period, including 16.2 and 16.6 percent.  Ex. 5, ¶¶ 11, 223, 231-233, Figs. 15, 16, 22.  Simcoe also attempts to apportion the alleged AdX overcharge between advertisers and publishers, and concludes that advertisers bear 19.3 percent of the claimed overcharge.  Ex. 5, ¶¶ 12, 256, Fig. 21; *see also* Mem. of Law ISO Mot. to Exclude Simcoe at 24-27.

## II.    FAA Damages Opinions

Plaintiff retained Lim[3] to quantify overcharges and damages for the eight FAAs from January 25, 2019 through January 24, 2023, relying on Simcoe's overcharge and apportionment figures to do so.  Ex. 62,  App. E ¶¶ 15, 17.

---

[1] All references to "Ex." refer to the Declaration of Bryon Becker in Support of Google's Motion for Summary Judgment and Motions to Exclude.  With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability.  All emphasis is added unless otherwise indicated.

[2] All cites to Simcoe's initial expert report hereinafter incorporate the later-filed errata, where applicable.  *See* Ex. 92 (Simcoe errata).

[3] The United States originally retained Dr. Thomas S. Respess III to perform these analyses.  On February 13, 2023, a day before Respess's rebuttal report was due, Plaintiff informed Google that Respess was withdrawing from the above referenced matter and that Lim would be serving in his place and offering a rebuttal opinion.  Ex. 96.  In her rebuttal report, Lim adopts Respess's initial report in full, including "the opinions, analysis, and abbreviations noted therein."  Ex. 62, ¶ 5.  Lim attaches Dr. Respess's initial report, corrected for errata, as Appendix E to her rebuttal report.  Accordingly, this memorandum frequently cites to Lim's Appendix E to reference Respess's initial report.

**1.**      First, Lim identifies the purchases for which Plaintiff seeks damages.  Lim starts with monthly transactional data produced by Google and The Trade Desk ("TTD") related to digital advertising purchases for advertisers worldwide.  She applies data filters in order to narrow the dataset, so that it covers only transactions for which Plaintiff is seeking damages—i.e., only purchases: (a) executed by an identified third-party ad agency or in some instances a sub-contracting ad agency; (b) on behalf of an FAA; (c) of "open web display advertising," and (d) flowing through Google's AdX via one of three platforms: Google's DV360, Google Ads, or TTD's demand-side platform.  Ex. 62, App. E ¶¶ 39-42.

Lim dubs each "unique combination of FAA, prime ad agency, and (as applicable) sub ad agency" through which an FAA purchased "open web display advertising" via either Google Ads, DV360, or TTD and flowing through AdX as an "FAA Purchase Pathway." Ex. 62, App. E ¶¶ 44-48, Figs. 8, 9, 10.  Each pathway shows that every FAA purchased display ads using one, sometimes two, ad agency intermediaries. Ex. 62, App. E Figs. 8, 9, 10.  She assigns each pathway a reference name.  For example, the FAA Purchase Pathway dubbed "Navy.1" is Navy open web display advertising purchases made with its ad agency Y&R, and sub-ad agency Wavemaker, through Google Ads.  Navy "open-web display advertising" purchases made with its ad agency Group M, and through TTD, are assigned a reference name of "Navy.2."  Ex. 62, App. E Fig. 8.

In filtering the data to isolate the transactions for which Plaintiff is seeking damages, Lim identifies nine unique "Unknown Ad Agency Purchase Pathways" where the data she is using "do not indicate the ad agencies that FAAs used for certain purchases."  Ex. 62, App. E  ¶ 50; Ex. 97.[4] She excludes these pathways from her damages analysis.  *Id.*  As a result of applying filters and

---

[4] In addition, Lim excludes 131 unique purchase pathways from her damages analysis "at the instruction of the United States."  These pathways include all USPS pathways from 2019 and 2020. Ex. 62, App. E  ¶ 50 & n.33;  Ex. 97.

excluding certain pathways, Lim identifies, in total, 15 unique FAA Purchase Pathways undergirding her damages analysis, and calculates the total spending on advertising in those pathways at $46.4 million.  Ex. 62, Figs. 8-11.

**2**.      Second, for every included FAA Purchase Pathway *except* for all of the CMS and NHTSA FAA Purchase Pathways (4 out of 15 total), Lim purports to confirm that the FAA paid for these purchases through her review and "walk-through" of selected invoicing documents and invoicing data that Google produced.  Ex. 62, App. E ¶ 56; Ex. 68 at 89:16-22.  Lim performed these reviews to confirm "that the FAA paid for those transactions" in each pathway.  Ex. 62, App. E. ¶ 56.  For example, for the Census.1 Purchase Pathway, Lim purports to track $3,124,625 from Google invoice data to Reingold, a subcontractor, through to the Census Bureau's primary ad agency, Y&R, and eventually back to the Census Bureau using Census Bureau payment documentation.  Ex. 62, App. E ¶ 56, n.36, & p. 146.

As noted, Lim did not perform a "walk-through" for any CMS or NHTSA FAA Purchase Pathway and was not able to confirm that CMS and NHTSA actually paid for the services for which they are claiming damages.  Lim admitted in deposition that she was not able to perform a walk-through for these 4 pathways because "there was insufficient data/documents in the record to do so."  Ex. 68 at 233:1-16, 242:8-244:11, 248:12-249:1.  In other words, she lacked any scientific or analytic basis for including them.  Nevertheless, she includes these 4 FAA Purchase Pathways in her damages analysis "based on instruction from the United States."  Ex. 62, App. E ¶ 56.

Google also looked for any documents produced in discovery by Plaintiff that would show NHTSA or CMS paying for any purchases of "open-web display advertising."  Google did not locate any such records anywhere in Plaintiff's document production.  Thus, there is no record

evidence of CMS or NHTSA actually paying their ad agencies for any purchases of open web display advertising that are part of Lim's damages calculations.  The claimed damages associated with CMS's and NHTSA's alleged purchases of "open-web display advertising" constitute almost a quarter of the total damages Plaintiff seeks.  *See infra* pp. 14-17.

    **3.**    Third, Lim calculates, through a series of simple mathematical computations, the dollar amount of the alleged AdX overcharge included within the $46.4 million in the FAAs' total "open-web display advertising purchases."  Ex. 62, App. E ¶ 58.  She starts by calculating the "AdX Actual Take" as equal to the monies flowing from the FAAs to AdX, less the monies that AdX paid to publishers.  Ex. 62, App. E ¶¶ 58, 64-67.  Lim determines that for the 15 included FAA Purchase Pathways, the AdX Actual Take equals approximately $7.7 million.  Ex. 62, App. E Fig. 16.[5]  Then, she calculates the "AdX But-For Take" as equal to actual AdX revenues multiplied by three different but-for take rates: 16.2, 16.6, and 10 percent.  Ex. 62, App. E ¶ 73, Fig. 17.  The first two, 16.2 and 16.6 percent, are but-for take rates estimated by Simcoe.  Ex. 62, App. E ¶¶ 60, 68 & n.53.  Lim uses the 10 percent but-for take rate "as requested by the United States."  Ex. 62, App. E ¶¶ 60, 68.  Lim then subtracts the AdX But-For Take from the AdX Actual Take to arrive at an AdX Overcharge.  Ex. 62, App. E ¶ 72.  Last, Lim applies the results of Simcoe's apportionment analysis (that advertisers bore 19.3 percent of the alleged overcharge) to calculate how much of the alleged AdX Overcharge was born by the FAAs.[6]  Ex. 62,  App. E ¶ 61.  These calculations result in damages of between $149,789 (using the highest, 16.6 percent, but-

---

[5] Thus, the actual AdX revenue share charged to the FAAs for the purchases underlying Plaintiff's damages claim is 18.5 percent, not 19.8 percent, as estimated by Simcoe.  Ex. 62, App. E Fig. 17 (derived by dividing the "AdX Actual Take" by the "AdX Revenues").

[6] Lim also applies a "one percent haircut" to her calculation of the AdX Overcharge to account for the "less than one percent" share of "invalid traffic."  Ex. 62, App. E ¶ 59.

for take rate) and $676,779 (using the lowest, 10 percent, but-for take rate).  Ex. 62, App. E Fig. 17.

    **4.**    Fourth, Lim calculates a "platform fee overcharge" from the FAAs' use of DV360 and Google Ads (but not TTD), because these tools "charged platform fees based on a percentage of the amounts of AdX Revenues."  Ex. 62, App. E ¶ 76.  These platform fee overcharges are estimated between $14,401 and $68,373.  Ex. 62, App. E ¶¶ 63, 76-77, Fig. 18.  Adding the platform fee overcharges to her AdX Overcharge calculations results in damages between $164,189 and $745,152.  Ex. 62, App. E ¶ 78, Fig. 19.  Figure 19 of Lim's report, reproduced below, summarizes these results.

| But-For Take Rate | AdX Overcharge to FAAs [A] | Platform Fees Overcharge to FAAs [B] | Total Damages to FAAs [C] = [A] + [B] |
|---|---|---|---|
| 10.0% | $676,779 | $68,373 | $745,152 |
| 16.2% | 181,728 | 17,672 | 199,399 |
| 16.6% | 149,789 | 14,401 | 164,189 |

**Figure 19: Summary of Damages to FAAs January 25, 2019 – January 24, 2023**

Sources: [A]: **Figure 17**, row [5]. [B]: **Figure 18**, row [4]. *Note*: USPS pathways only include amounts from January 2021 onward.

## III.    Non-Party Overcharge Opinions

    Without any explanation of the connection or relevance to the damages claims at issue in this case, Lim also purports to calculate AdX overcharges born by <u>all</u> publishers and advertisers worldwide, <u>all</u> advertisers and publishers "based in the United States," and <u>all</u> "U.S. government agencies and their publishers."  Ex. 62, App. E ¶¶ 22, 68-71, Figs. 13, 14, 15.  Lim uses the same

inputs and methodology she used for the FAAs[7] to opine that "Google overcharged worldwide advertisers <u>and publishers</u>" between $483.8 million and $1.7 billion between January 2019 and 2023; U.S.-based advertisers and publishers between $208.7 and $765.3 million; and U.S. government agencies (inclusive of the eight FAAs) and their publishers between $1.5 million and $6.1 million.  Ex. 62, App. E ¶¶ 22, 70-71, Fig. 15.[8]  Lim calculates the purported AdX "But-For Take" with simple arithmetic— multiplying actual AdX revenues found in Google's produced data by the same "but-for" revenue shares she used for the FAAs (16.6 and 16.2 percent, derived from Simcoe, and 10 percent based on instruction from the United States).  Ex. 62, App. E Fig. 15.  Lim makes no adjustments nor attempts to control for any other variables in Simcoe's analyses or outside of them that could reflect differences within the hypothetical "but-for world" for all worldwide advertisers and publishers before doing this arithmetic exercise requiring no expert analysis or expertise.

Lim's calculations—of alleged overcharges to non-party advertisers and publishers—are entirely independent from her FAA-specific damages opinion.  No other expert relies on Lim's non-party overcharge estimates in their own analyses.

---

[7] Lim derives her non-party figures from the monthly transactional data produced by Google, applying the same product market filters and estimated "but for" revenue shares, and the same simple mathematical calculations to determine "AdX Actual Take" and "AdX But-For Take" as she did with the FAAs.  Ex. 62, App. E. ¶¶ 58-59, 69.  Lim does not include transactions flowing through TTD in these non-party overcharge calculations because "TTD and other 3P DSPs did not produce non-FAA buying information regarding their worldwide, United States, and other U.S. government agency transactions."  Ex. 62, App. E ¶ 67.

[8] Lim's estimates for "all" U.S. government agencies and their publishers includes non-FAA agencies such as the Marines, Coast Guard, Central Intelligence Agency, National Park Service, and Internal Revenue Service.  Ex. 62, App. E ¶ 67.

IV.     **Accounting Profitability Opinions**

Separate from Lim's damages calculations, Plaintiff also asked her to "analyze the profitability of aspects of Google's display advertising product area," presumably because, as she notes, another of Plaintiff's experts, Dr. Robin Lee, "may rely on my profitability analyses in forming his opinions." Ex. 62, App. E ¶ 18. That expert did not, in fact, rely on any of Lim's profitability opinions. Ex. 1, ¶ 419 (given "the challenges with mapping Google's profits to the products contained in the relevant markets at issue in this matter, I do not rely on measures of accounting profit"). In her rebuttal report, Lim opined that she would "not use" her accounting profitability opinions "to reach any conclusion about the profitability of products in the Relevant Product Markets." Ex. 62, ¶ 17. She reiterated this at deposition. Ex. 68 at 281:7-283:3.

Nevertheless, Lim still offers two opinions regarding accounting profitability. To arrive at both of these opinions, Lim manipulates a series of Google's internal P&L statements for what Google calls Display, Video, Apps, and Analytics ("DVAA"), a division of its business which includes, among many products and services, Google's ad tech stack.[9] The DVAA P&Ls—as well as the product-level P&Ls within DVAA that Google creates—are therefore not limited to "open-web display advertising," and instead reflect revenues and costs associated with numerous ad formats outside the scope of Plaintiffs' alleged product markets. Ex. 1, ¶ 419; Ex. 62, ¶ 17.

First, Lim opines that, for the DVAA business, its profits and operating profit margins increased "steadily" from 2016 to 2019, and from 2020 to 2022, profits increased "significantly." Ex. 62, App. E ¶¶ 25, 100. Importantly, however, Lim reaches these opinions after excluding a Google product from her analysis called AdMob. She excludes AdMob "because AdMob deals

---

[9] DVAA was a product area from approximately 2015 to October 2019. Following that date, the products in DVAA were divided into two successor product areas: Apps, Video & Display and Buying, Analytics & Measurement. Ex. 98 at 3. Google's P&Ls, however, still refer to DVAA.

exclusively with ads which appear in apps," a format outside of Plaintiff's alleged relevant product market.  Ex. 62, App. E ¶ 98.  Yet even after excluding AdMob, Lim's observations appear inconsistent with Plaintiff's desired narrative.  After excluding AdMob, Lim observes that almost half of the revenues reflected in the P&Ls (41 percent) "are related to transactions not in the Relevant Product Markets" as defined by Plaintiffs' expert, Lee.  Ex. 62, ¶¶ 17, 56.  And after excluding AdMob, Lim observes that Google had operating losses for DVAA for three years from 2015-2017.  Ex. 62, App. E Fig. 28.  Lim also observes that Google's operating profit margins for DVAA remained in the single digits throughout the time period analyzed, with a peak of just 8 percent in 2021 before declining to 6 percent in 2022.  Ex. 62, App. E Fig. 28.

Accordingly, and perhaps unsatisfied with the operating profit margins she observed, Lim then provides an "alternative" measure of gross margins and operating margins for DVAA excluding AdMob.  To do this, Lim treats DVAA revenues as "net" revenues rather than as "booked" revenues.  To support this accounting treatment on a net versus booked basis, according to Lim, Google "could be" considered an agent rather than a principal under the relevant accounting principles,[10] and thus "could" have portrayed its internal P&Ls this way.  Ex. 62, App. E ¶¶ 103, 110-111.  Importantly, Lim does not opine that Google's decision to treat itself as a principal rather than an agent under the accounting guidance is wrong.  Ex. 62, App. E  ¶¶ 104-109.  After deciding that Google "could" treat itself as an agent rather than principal, Lim then opines that, using her "alternative" P&L, "in 2021 and 2022, DVAA excluding AdMob earned double-digit operating margins on a net revenue basis."  Ex. 62, App. E  ¶¶ 108-111.

---

[10] These principles are set forth in Accounting Standards Codification ("ASC") *606 Revenue from Contracts with Customers*.  ASC is "the codification of accounting standards into a single source of authoritative Generally Accepted Accounting Principles (GAAP)."  Ex. 62, App. E  ¶ 102 n.93.

**LEGAL STANDARD**

Federal Rule of Evidence 702 permits a qualified expert to testify if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," if those opinions are based on "sufficient facts or data," and if those opinions are derived from "reliable principles and methods" that the expert reliably applied "to the facts of the case." Fed. R. Evid. 702. "Implicit" in Rule 702 is the "district court's gatekeeping responsibility to ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Nease* v. *Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (emphasis in original).

"With respect to reliability, the district court must ensure that the proffered expert opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Id.* Even if expert testimony is "based on sound methodology," it "should be excluded if it is based on unsound or incorrect assumptions." *It's My Party, Inc.* v. *Live Nation, Inc. (It's My Party I)*, 88 F. Supp. 3d 475, 483 (D. Md. 2015) (citing *Tyger Const. Co.* v. *Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994)), *aff'd*, 811 F.3d 676 (4th Cir. 2016). As of December 2023, Federal Rule 702 was amended to require courts to take a more active role in analyzing experts' conclusions and ensure they are the result of "reliable application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note to 2023 amendments. The changes "respond to the fact that many courts have declared the requirements set forth in Rule 702(b) and (d) . . . are questions of weight and not admissibility, and more broadly that expert testimony is presumed to be admissible," and "the language of the amendment more clearly empowers the court to pass judgment on the

conclusion that the expert has drawn from the methodology."  Report of the Advisory Committee

on Evidence Rules, at 6-7 (May 15, 2022), tinyurl.com/AdvisoryCommitteeRpt.

For an expert opinion to be relevant, it must "help the trier of fact to understand the

evidence or to determine a fact in issue."  *Nease*, 848 F.3d at 229 (quoting *Daubert* v. *Merrell Dow*

*Pharms., Inc.*, 509 U.S. 579, 591 (1993)).  "Expert testimony which does not relate to any issue in

the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591.  Helpfulness to the trier

of fact is "the touchstone" under Rule 702.  *Lake* v. *Adams*, 2020 WL 1016352, at *1 (W.D. Va.

Mar. 2, 2020).

The party offering the expert bears the burden of establishing that Rule 702 is satisfied.

Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592 & n.10.

## **ARGUMENT**

### I.     **Lim's FAA Damages Opinions Should Be Excluded.**

### A.     **The Damages Opinions Must Be Excluded Because They Are Based on the Legally Invalid Theory That the FAAs May Recover Damages as Indirect Purchasers.**

Expert testimony predicated on a theory that is contrary to controlling law is irrelevant,

unhelpful, and must be excluded.  *Moore* v. *Equitrans, L.P.*, 27 F.4th 211, 223 (4th Cir. 2022)

(affirming exclusion of damages expert's opinions as "irrelevant and unlikely to assist the jury"

because the damages estimate was "contrary to controlling law"); *see also Sardis* v. *Overhead*

*Door Corp.*, 10 F.4th 268, 294-95 (4th Cir. 2021) (expert's testimony that was "incompatible with

Virginia law" should have been excluded as irrelevant).

The FAAs are not direct purchasers under *Illinois Brick* v. *Illinois*, 431 U.S. 720 (1977),

and they do not satisfy any exception to the rule that only those who purchase directly from an

alleged violator of the Sherman Act may recover overcharge damages, as explained in Google's

concurrently filed motion for summary judgment.  *See* Mem. of Law ISO Mot. for S.J. at 32-35.

Lim agrees that for all 15 of the "FAA Purchase Pathways" for which Plaintiff seeks damages, the FAAs "used ad agencies to make their purchases." Ex. 68 at 75:15-76:7. In some instances, the FAAs used more than one ad agency. *See* Ex. 62, App. E ¶ 44, Figs. 8, 9, 10 & 16) (summarizing the FAA purchase pathways for which the U.S. is seeking damages).[11] Lim also agrees that in all purchases underlying her damages estimates, the FAAs never paid Google directly, but instead paid their ad agencies, who in turn paid Google. Ex. 68 at 92:21-93:9; 96:20-97:3 ("Google invoiced the ad agencies, the ad agencies invoiced the FAAs, the FAAs cut checks to the ad agencies, and the ad agencies cut checks to Google.").

Accordingly, Lim's FAA damages opinion, which is premised entirely on indirect purchases, is contrary to controlling law and legally irrelevant, and must be excluded. *Polyzen, Inc.* v. *Radiadyne, LLC*, 2016 WL 5360576, at *12 (E.D.N.C. Sept. 23, 2016) (excluding plaintiff's damages expert testimony which was reliant on the success of claims "no longer viable" based on the district court's summary judgment ruling); *Silicon Knights, Inc.* v. *Epic Games, Inc.*, 2011 WL 6748518 , at *12 (E.D.N.C. Dec. 22, 2011) (excluding expert opinion regarding costs incurred for developing video game engine as irrelevant because under applicable law, plaintiff could not recover for those damages); *Simmons* v. *USI Ins. Servs., LLC*, 2024 WL 946311, at *7 (M.D. Fla. Mar. 5, 2024) ("As this measure of damages is legally unavailable, expert testimony on this issue, however reliable in theory, is not legally relevant."); *cf. Moke Am. LLC* v. *Am. Custom Golf Cars, Inc.*, 2022 WL 17477062, at *8-10 (E.D. Va. Dec. 6, 2022) (excluding expert testimony on

---

[11] When asked at her deposition if she saw any evidence of an FAA purchasing directly from Google, Lim claimed not to understand the meaning of the term "directly." Ex. 68 at 73:17-74:8 ("Q. Okay. So did you see any evidence that an FAA buys ad inventory directly from Google? A. As I stated earlier, the -- the FAAs purchased advertising from -- they purchased services from Google. Q. Yes. A. I'm not – I'm not -- again, I'm not sure what you mean by 'directly.' I think I've -- I think I've stated my understanding of both the -- of who's doing the purchasing and who's doing the paying in terms of the payment flow process.").

affirmative defense of "unlawful use doctrine" as irrelevant after finding the doctrine did not apply to the case).

At a minimum, the Court should exclude Lim's damages calculations in which TTD is part of the "Purchase Pathway."  Lim's damages calculations include "Purchase Pathways" for the Navy and USPS involving the use of a third-party buying tool from TTD submitting bids via Google's AdX.  Ex. 62, App. E Fig. 10.  The TTD-related pathways amount to $901,405 in Navy and USPS spending and result in up to $8,817 in alleged damages.  Ex. 62, App. E Figs. 1, 11, 16-18.  These are indirect purchases for which Plaintiff legally cannot seek damages, and Lim's opinions related to these purchases should be excluded.  *See* Mem. of Law ISO Mot. for S.J. at 35.

### B. The Damages Opinions For CMS and NHTSA Must Be Excluded as Unreliable Because There Is "Insufficient" Record Evidence Supporting Them.

Because there is no proof in the record that CMS and NHTSA actually paid for any of the open web display advertising purchases included in Lim's damages calculations, those claimed damages must be excluded.  NHTSA's claimed damages are between $5,284 and $27,705, and CMS's claimed damages are between $20,434 and $143,439.[12]  These claimed damages amount to almost 24 percent of the total AdX spend upon which Lim bases her damages calculations, and almost a quarter of all of the damages that Plaintiff seeks.

In antitrust cases, alleged overcharge damages must be calculated as "the difference between the prices actually paid and the prices that would have been paid" but for the unlawful conduct.  *Burlington Indus.* v. *Milliken & Co.*, 690 F.2d 380, 385 (4th Cir. 1982); *see also* ABA

---

[12] These figures are derived from Appendix Exhibit 11 of Dr. Judith Chevalier's report, which in turn is derived from Lim's backup materials. Ex. 38, App. Ex. 11. Specifically, one can calculate the CMS and NHTSA-specific damages figures for each alleged "but-for" revenue share by calculating the sum of rows 6 & 7, 9 & 10, and 12 & 13 in columns B and D of Dr. Chevalier's Appendix Exhibit 11.

Model Jury Instructions in Civil Antitrust Cases (2016), at B-5 (noting the "proper way to calculate damages is to determine the difference between the prices plaintiff <u>actually paid</u> for [*product X*] and the prices plaintiff would have paid"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 395 (5th ed. 2023) (describing overcharge damages calculations as "the difference between the price <u>actually paid</u> and the price that would have been paid but for the unlawful conduct multiplied by the quantity purchased"). As this leading treatise explains, to calculate damages, "the relevant figures are the prices actually paid in the most literal sense."  Areeda & Hovenkamp, *supra*, ¶ 395b n.11.

Lim included damages "as requested by the United States" for CMS and for NHTSA even though, as she testified, there was "insufficient data/documents in the record" to verify that either CMS or NHTSA actually paid their ad agencies for the purchases underlying these damages, or that the ad agencies paid Google.   Ex. 62, App. E ¶ 56; Ex. 68 at 233:1-16; 242:8-244:11.  Lim cannot reliably opine that CMS and NHTSA suffered an overcharge when there is no documentary evidence in the record showing that CMS and NHTSA "actually paid" for the purchases underlying these claims.  Areeda & Hovenkamp, *supra*, ¶ 395b n.11.[13]

The need to demonstrate the price actually paid is especially apparent where, as here, the payment process involves various intermediaries between the alleged antitrust violator and Plaintiff in a "complex" purchasing chain.  Ex. 68 at 237:4-20; *cf. In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *11 (N.D. Cal. June 9, 2010) (determining "pass-through" damages

---

[13] Plaintiff cannot rely on invoices alone because invoices do not reflect the prices actually paid by the FAAs, as Lim acknowledges. Ex. 68 at 20:16-21:3; 177:3-19.  The amount invoiced may be subject to "discounts, rebates, and allowances not reflected on the invoice." Areeda & Hovenkamp, *supra*, ¶ 396e.  These concerns are not merely hypothetical—the record reflects instances of FAAs disputing ad agency invoices, and instances of ad agencies providing discounts from the amounts reflected in a vendor invoice. Ex. 79 at 83:16-88:1; Ex. 99 at -979; Ex. 65 at 78:9-79:4.

"requires the identification of the particular channel applicable," and "tracing the overcharge through the various intermediaries that lie between" the plaintiff and defendant). The FAAs were never invoiced directly for Google's services. Instead, Google invoiced the FAAs' ad agencies, who in turn submitted those invoices to the FAAs. Ex. 68 at 90:19-91:11.

Lim acknowledges that it is important to show the FAAs actually paid for these purchases; her "walk-throughs" sought to confirm "that the FAA paid for those transactions" (although the "walk-throughs" were only performed for a subset of FAA purchases). Ex. 62, App. E ¶ 56; Ex. 68 at 243:10-19. Moreover, Lim expressly chose to exclude the "Unknown Ad Agency Pathways" from her damages opinion because she could not confirm that the FAA paid for those purchases, another indication she understands the importance of demonstrating actual FAA payment. Ex. 62, App. E ¶ 50; Ex. 68 at 137:9-14 (answering "correct" to the question, "The reason you excluded the unknown ad agency purchase pathways is because you could not confirm that the FAA paid amounts that Google charged for ad tech services, correct?").

Lim's opinion must be excluded because she improperly assumes, without support, that CMS and NHTSA actually paid for the transactions for which they seek damages and, by extension, actually paid any alleged overcharge. "Expert opinion evidence based on assumptions not supported by the record should be excluded." *Tyger*, 29 F.3d at 143; *see also Newman* v. *Hy-Way Heat Sys., Inc*., 789 F.2d 269, 270 (4th Cir. 1986) (noting experts must base their opinions on facts "established by independent evidence properly introduced"); Fed. R. Evid. 702 advisory committee's note to 2000 amendments. Courts exclude expert opinions where, as here, they rely on unsupported assumptions—here that CMS and NHTSA transmitted funds which in turn were transmitted to Google for the ad purchases included in Lim's calculations—however simplistic or straightforward those assumptions may be. *E.g.*, *Koenig* v. *Beekmans*, 2017 WL 6033404, at *4-

5 (W.D. Tex. Dec. 5, 2017) (in personal injury suit arising from a head-on car collision, excluding expert opinion which assumed, without support, that the two cars involved in the collision were driving the posted speed limit before the accident); *Brasko* v. *First Nat'l Bank of Penn.*, 2023 WL 7191120, at *4-5 (D. Md. Nov. 1, 2023) (excluding expert opinion regarding alleged overcharges on title insurance because expert assumed, "based on his view that owner's policies are purchased 99% of the time" that the plaintiffs "met the criteria for a" discounted "reissue rate"—including by previously owning a policy—but did not receive it); *Grande Vista, LLC* v. *United States*, 2023 WL 4296571, at *7-8 (D. Md. June 30, 2023) (excluding expert opinion where expert relied on "common knowledge" to opine that the chemical compound toluene is highly toxic and was "unable to identify a reliable source for his conclusions").

Without <u>any</u> evidence, documents, or data indicating that CMS and NHTSA actually paid for any purchase at issue, Lim's damages opinion for these agencies rests on an unsupported assumption and must be excluded.

**C.    The Damages Opinion Based on a 10 Percent But-For Revenue Share Should Be Excluded Because No Facts Support It as a Revenue Share That Would Be Charged in a But-For World.**

Lim applies, without explanation or support, a 10 percent "but-for" revenue share in her damages calculations at the request of the United States.  Ex. 62, App. E ¶ 60.  Any damages opinions based on this 10 percent but-for revenue share must be excluded because there is no independent factual support or evidence that a 10 percent but-for revenue share would apply in the but-for world.  *E.g., T.H.E. Ins. Co.* v. *Davis*, 54 F.4th 805, 822-23 (4th Cir. 2022) (affirming district court's exclusion of expert testimony in case arising from hot air balloon accident because there was no factual support for the expert's assumption that plaintiffs were not in the "balloon's basket at the time of their injuries"); *Silicon Knights*, 2011 WL 6748518, at *16-17 (excluding

expert opinion where expert assumed that plaintiff could have renegotiated its licensing agreement to include more favorable terms with defendant without support for that assumption).

Experts "must verify the assumptions they are given" by counsel where such assumptions have a "monumental impact" on a damages calculation; they cannot just take counsel's word for it. *Brittney Gobble Photography, LLC* v. *Sinclair Broadcast Grp., Inc.*, 2021 WL 5359671, at *7 (D. Md. Nov. 17, 2021); *see also Trigon Ins. Co.* v. *United States*, 204 F.R.D. 277, 294 (E.D. Va. 2001) (explaining that "if opinions expressed in an expert report are not the opinions of the expert, the expert will not be able to satisfy the requirements of Fed. R. Evid. 702 and *Daubert* that the report be based on the expert's own valid reasoning and methodology"). Lim concedes that she included damages based on a 10 percent but-for revenue share based solely on the instruction of Plaintiff. Ex. 62, App. E ¶¶ 60 & n.42, 68. Lim does not know the basis or foundation for Plaintiff's request and is not "personally aware of any facts that would support the application" of a 10 percent but-for revenue share in a hypothetical but-for world. She has not performed "an independent analysis" of the 10 percent but-for revenue share, either. Ex. 68 at 231:3-232:11. Nor does Lim base this calculation off of Simcoe's opinions. And Simcoe conceded he is "not offering an opinion that the but-for take rate is 10 percent," Ex. 91 at 180:5-12, and disclaimed it as a proper "basis for any conclusion about the take rates in the but-for world," Ex. 91 at 179:4-12.

The jury should not be permitted to hear an unsubstantiated damages estimate based on a but-for revenue share that is entirely unsupported and speculative, particularly where, as here, antitrust damages are "an area where a jury's common sense is less available than usual to protect it." *Tyger*, 29 F.3d at 145. Because Lim's damages calculations are premised upon a hypothetical 10 percent but-for revenue share that is "unsupported by" the evidence, "indeed in contradiction of, the uncontroverted evidence," it is unhelpful and must be excluded. *Newman*, 789 F.2d at 270.

**D.      The Damages Opinions Must Be Excluded in Their Entirety if the Court Grants Google's *Daubert* Motion as to Simcoe.**

Lim relies on Simcoe's AdX but-for revenue share estimates of 16.2 and 16.6 percent to calculate the FAAs' alleged damages.  Ex. 62 App. E ¶¶ 17, 60.  Lim also uses Simcoe's apportionment estimate of 19.3 percent.  Ex. 62 App. E ¶ 61.  Lim did not independently assess Simcoe's analyses or calculations.  Ex. 62 App. E ¶ 17 ("While I have reviewed Dr. Simcoe's analysis, I do not purport to independently evaluate that analysis, but rather use it as an input to calculate overcharges and advertiser damages."); Ex. 68 at 46:5-48:1.

An expert whose proffered testimony relies on another expert's theories that are excluded should also be excluded.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL 10434367, at *2 (N.D. Cal. Jan. 23, 2017) (excluding damages expert opinion because it relied upon another expert's unreliable overcharge estimates to calculate total damages); *Kentucky Speedway, LLC* v. *Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009) (affirming district court's decision to exclude plaintiff's expert's opinion regarding defendant's alleged anticompetitive conduct because it was based on second expert's market analysis which the court had found to be unreliable); *Sims* v. *Kia Motors of America, Inc.*, 839 F.3d 393, 404-06 (5th Cir. 2016) (excluding engineer's theory about fuel tank straps because engineer relied on another expert's inadmissible downward displacement theory).

Google has concurrently moved to exclude Simcoe's opinions, including the but-for revenue shares and apportionment estimates that Lim incorporates as inputs into her own calculations.  *See* Mem. of Law ISO Mot. to Exclude Simcoe.  If that motion is granted, Lim's damages opinions must also be excluded.

## II.      Lim's Non-Party Overcharge Opinions Should Be Excluded as Irrelevant and Unhelpful to the Trier of Fact.

Lim purports to calculate AdX overcharges born by numerous non-parties with no immediate connection or relevance to this case, including: all publishers and advertisers worldwide, all U.S.-based advertisers and publishers, and all U.S. government agencies and their publishers.  Ex. 62, App. E ¶¶ 22-23, 68-71, Figs. 13, 14, 15.  Calculations which purport to assess overcharges for advertisers and publishers who are not party to this case and for whom Plaintiff is not and cannot pursue a damages claim stray far beyond the facts and legal claims at issue and serve no helpful purpose for the trier of fact assessing Plaintiff's alleged damages.   These calculations should be excluded.  *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful"); *Garlinger* v. *Hardee's Food Sys., Inc.*, 16 F. App'x 232, 235 (4th Cir. 2001) (requiring a valid "connection between the expert's testimony and the pertinent inquiry before the court as a precondition to admissibility").

With respect to the worldwide overcharges figure, and as noted in Google's concurrently filed *Daubert* motion to exclude Lee, Plaintiff is suing Google for alleged conduct <u>in the United States</u>.  There is no evidence that the FAAs purchased ad inventory outside the United States, where competitive conditions vary greatly from those in the United States.  Further, Plaintiff United States has no standing to represent private entities in a claim for damages under the Sherman Act, foreign or domestic.  *See* 15 U.S.C. § 15a.

Additionally, as the Court made clear,  Plaintiff United States may not pursue damages on behalf of any U.S. government agency outside of the eight FAAs it identified.  3/31/2023 Hearing Tr., ECF No. 95 at 8:14-9:21 (instructing that "this is not going to be a revolving door," and requiring Plaintiff to stick with the eight FAAs "that you have set out here today"; and that if "one or two of them fall by wayside, they fall by the wayside, and you go with the remaining ones").

Lim's overcharge calculations for all advertisers and publishers, beyond the eight FAAs for which Plaintiff seeks damages, serve no useful purpose for the trier of fact, and Lim does not purport to provide a purpose. No other experts rely on these calculations in reaching their conclusions. Nor do these calculations relate to any legal element or factual issue pertaining to any of Plaintiff's claims.

Instead, the sole purpose of Lim's non-party calculations appears to be an attempt to bolster or lend legitimacy to the much smaller damages figure that Plaintiff seeks. Allowing Lim to proffer non-party overcharge calculations would be highly prejudicial to Google and risks confusing the jury. *See Limelight Networks, Inc.* v. *XO Comms, LLC*, 2018 WL 678245, *1 (E.D. Va. Feb. 2, 2018) ("trial courts exercise more control over experts than lay witnesses when weighing the probative value of an expert's opinion against its potential prejudice"). For example, in *Uniloc USA, Inc.* v. *Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011), the Federal Circuit affirmed the district court's award of a new trial on damages after the court concluded that the plaintiff's damages expert had erroneously testified about the entire market value of certain Microsoft products ($19 billion) when there was no relevance of that figure to any damages caused by the patent infringement at issue. The panel explained that evidence of billions in revenue "from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." *Id.* A similar circumstance arose in *Children's Broad. Corp.* v. *The Walt Disney Co.*, 245 F.3d 1008, 1017-19 (8th Cir. 2011), where the Eighth Circuit affirmed the district court's grant of a new trial on the grounds that the plaintiff's expert's testimony–of $177 million in alleged damages–"tainted the trial." *Id.* at 1018-19. As the panel explained, the jury's $20 million award "for breach of a contract that was terminable at will with ninety days notice" suggests that the expert's testimony "gave the jury an unrealistic idea of

the appropriate measure of damages." *Id.* at 1019; *see also Snoeyenbos* v. *Curtis*, 60 F.4th 723,

733-34 (4th Cir. 2023) (no abuse of discretion in excluding and limiting expert testimony on

plaintiff's state of mind because allowing multiple witnesses, in addition to defendant, to testify

about her state of mind would have risked confusing the jury into thinking the inquiry was

subjective rather than objective in nature).

### III.   Lim's Accounting Profitability Opinions Should Be Excluded as Irrelevant, Unreliable, and Unhelpful to the Trier Of Fact.

#### A.   Lim's Accounting Profitability Opinions Should Be Excluded as Irrelevant and Unhelpful; Even Lim Disclaims Their Usefulness.

Lim's profitability opinions have no connection to this case: none of Plaintiffs' experts rely

on Lim's profitability opinions and Lim herself disavows the relevancy of her accounting

profitability analysis.  Lim's profitability opinions are wholly unrelated to any element of

Plaintiffs' claims, and they should be excluded because they fail to satisfy the "touchstone" of

Rule 702—helpfulness to the trier of fact.  *Lake*, 2020 WL 1016352, at *1.

Lim stated in her report that Plaintiff's expert Lee may rely on her profitability analysis to

assess market power.  Ex. 62, App. E ¶ 18.   Yet Lee explicitly declines to do so, concluding the

analysis involves too many products outside of Plaintiff's alleged relevant markets.  Ex. 1, ¶ 419.

None of Plaintiffs' other experts mention, let alone rely on, Lim's profitability analyses.  Ex. 68 at

282:22-283:3 ("Q. And are you aware of any expert for the plaintiffs who rely on your profitability

analyses in their reports? A. I am not.").  In her rebuttal report, Lim opined that she would "not

use the DVAA P&L excluding AdMob to reach any conclusion about the profitability of products

in the Relevant Product Markets."  Ex. 62 ¶ 17; Ex. 68 at 281:7-283:3.  Because all of the

accounting profitability opinions do "not relate to any issue in the case," they are "therefore not

relevant" and  should be excluded.  *Petri* v. *Va Bd. of Med.*, 2014 WL 5421238, at *5 (E.D. Va.

Oct. 23, 2014) (in Sherman Act case, excluding testimony that "would not assist the trier of fact

in determining the reasonableness of the restraint, the only relevant inquiry"); *Garlinger*, 16 F. App'x at 235-36 (affirming exclusion of expert testimony in products liability case arising from injuries sustained from hot coffee spill at Hardee's where testimony did "not aid the trier of fact in determining" the "key question" at issue in the case, "whether it was unreasonably dangerous of Hardee's to serve coffee at the higher temperature"); *Equal Rights Ctr.* v. *Equity Residential*, 2016 WL 1258418, at *16 (D. Md. Mar. 31, 2016) (excluding experts' opinions as irrelevant where experts failed to opine on defendant's adherence to objective building standards, and therefore could not help trier of fact understand the "central issue of liability for design and construction violations").

**B.     Lim's Accounting Profitability Analysis Regarding Google's Operating Margins on a "Net Revenue Basis" Is Unreliable Because It Deviates from Standard Accounting Practices and Cannot Support Her Conclusions.**

Lim's accounting profitability opinion that Google "could be" considered an agent rather than a principal under the relevant accounting guidelines rests on a perfunctory analysis, without any basis or precedent in real-world accounting practices.  *See Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 152 (1999) (experts must apply "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. and Prods. Liab. Litig.*, 892 F.3d 624, 642 (4th Cir. 2018) (noting courts must "look beyond the confines of the courtroom and ask what experts do in the real world").  As a result, Lim's opinions about what "alternative" P&Ls which she created show, and which treat Google as an agent under the applicable accounting guidelines, must also be excluded.

Apparently unsatisfied with Google's own operating profit margins as reported in its P&Ls, even after excluding AdMob, Lim devises an "alternative" method of analyzing Google's P&Ls based on her opinion that Google "could" have treated itself as a principal rather than agent for purposes of its internal accounting treatment of DVAA revenues.  Lim's "alternative" analysis

allows her to opine that Google's operating profit margins reach "double-digits" for two years. Ex. 62, App. E  ¶¶ 110-111.

Lim takes extreme care <u>not</u> to opine that Google was <u>incorrect</u> in treating itself as a principal in its internal accounting P&Ls.  Ex. 62, ¶ 21 & App. E ¶¶ 104-109.    Documents upon which Lim relied show the rigor in Google's own ordinary-course analysis in reaching its determination that it is a principal according to the relevant accounting rules.  *See, e.g.*, Ex. 62, App. E ¶ 104 & nn.98, 99.  Knowing that she therefore could not possibly opine that Google's analysis was incorrect, Lim presents her analysis as an "alternative."

But even that "alternative" opinion—that Google "could" have made a different decision in its accounting treatment—is at odds with the ASC 606 standard, which does not permit "optionality."  Barry Kanczuker, *Remarks before the 2017 AICPA Conference on Current SEC and PCAOB Developments* (December 4, 2017), tinyurl.com/kanczukerspeech.  In other words, there are right and wrong answers when it comes to the principal-agent determination.

In any event, the methodology by which Lim supports her "alternative" view of Google's profit margins is far too perfunctory and surface level to be considered reliable.  Lim devotes all of six paragraphs, Ex. 62, App. ¶¶ 104-109, to an accounting analysis that requires a factual examination of "the specified goods or services" to be provided to the customer as well as whether Google "controls" that good or service before it is transferred to its customer.  FASB,  *ASC 606 – Revenue from Contracts with Customers*, https://tinyurl.com/ASC606Rev.  According to the SEC, this analysis must be based on the "facts and circumstances" of the particular company at issue, and should be performed at the contract level.  Wesley R. Bricker, *Remarks before the Annual Life Sciences Accounting & Reporting Congress: "Advancing Effective Internal Control and Credible Financial Reporting"* (March 21, 2017), tinyurl.com/brickerspeech; *ASC 606*, *supra* ("An entity

recognizes revenue in accordance with that core principle by applying the following steps: Step 1: Identify the contract(s) with a customer" and  "Step 2: Identify the performance obligations in the contract.").

Beginning with the first step, Lim devotes one paragraph to her conclusion that for all of Google's DVAA business, "it would be reasonable" for Google to consider the specified good or service it provides to advertisers to be "publishers' ad inventory," rather than "enhanced ad inventory," as Google concluded after extensive analysis. Ex. 62, App. E ¶ 104.  Lim cites nothing in support of this statement, and she did not reference a single contract to examine what good or service is in fact provided.  On the second step—control—Lim looks to what companies other than Google report in their SEC annual filings to conclude "it would be reasonable" for Google to consider itself an agent in the at-issue transactions. Ex. 62, App. E ¶ 108.  Her conclusions are based on a perfunctory comparison to the accounting determinations reported in SEC filings of five other cherry-picked companies and are not reliable. *Bunting Graphics, Inc.* v. *Whiting-Turner Contracting Co.*, 2022 WL 14664724, at *9-10 (D. Md. Oct. 25, 2022) (excluding expert opinion as unreliable where report was "devoid of any explanation regarding methodology, analysis, or expert knowledge" and failed to connect record evidence to expert's conclusions); *see also Sardis*, 10 F.4th at 295 (excluding expert opinion as unreliable where expert "presented a hypothesis only" but "failed to validate it with testing or any other objective comparison"); *Cooper* v. *Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (excluding expert opinion as unreliable where opinions "amounted to a wholly conclusory finding").

## CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court grant its motion and exclude the testimony of Adoria Lim.

Dated: April 26, 2024

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Julie Elmer (*pro hac vice*)
Lauren Kaplin (*pro hac vice*)
Scott A. Eisman (*pro hac vice*)
Jeanette Bayoumi (*pro hac vice*)
Claire Leonard (*pro hac vice*)
Sara Salem (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
 CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Joseph Bial (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Bryon P. Becker (VSB #93384)
Erica Spevack (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile (202) 223-7420
kdunn@paulweiss.com

Meredith Dearborn (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101
mdearborn@paulweiss.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com

*Counsel for Defendant Google LLC*