**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

UNITED STATES, *et al.,*

          *Plaintiffs,*

   v.

GOOGLE LLC,

          *Defendant.*

No. 1:23-cv-00108-LMB-JFA

---

**NON-PARTY INDEX EXCHANGE INC.'S OBJECTIONS AND MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTIONS TO THE PUBLIC USE OF CONFIDENTIAL INFORMATION**

      Pursuant to Local Rules 5(c) and 5(h), non-party Index Exchange Inc. ("Index"), through its undersigned counsel, respectfully submits its Objections and this Memorandum of Law in Support of Index's Objections to the Public Use of Confidential Information at Trial ("Index's Objections") in response to: (i) Defendant Google LLC's ("Google's") Deposition Testimony Designations (ECF No. 893), (ii) Plaintiffs' Notice of Intent to Present Deposition Testimony (ECF No. 895), (iii) Google's Trial Exhibit List (ECF No. 894), (iv) Plaintiffs' Trial Exhibit List (ECF No. 892), and (v) Plaintiffs' Objections and Counter-Designations to Defendant's Deposition Designations (ECF No. 917); and pursuant to the Court's June 24, 2024 Order providing that any party or non-party who objects to the public use of confidential documents or testimony must file a specific objection with a proposed acceptable redaction of the information (ECF No. 871).

      Index, a non-party, respectfully requests that the Court maintain the confidentiality of a limited set of highly sensitive proprietary data points about Index's business contained within the voluminous exhibits and deposition designations proposed by Google and Plaintiffs (the

"Parties") for use in the trial of this action.  These data points include specific facts and numbers regarding Index's customer pricing, financial results, transactional data, and technical capabilities.  As set forth in the accompanying declaration of Index's Chief Executive Officer, Andrew Casale, Index submits that the public disclosure of this highly sensitive proprietary information would cause significant, irreparable harm to Index and put it at a disadvantage against its competitors, including by equipping Index's competitors to undercut or acquire Index.

Index is not seeking to maintain under seal the majority of the confidential information contained in the thousands of pages of documents and data that Index has produced in response to third-party subpoenas issued by the Parties in this action.  Nor is Index seeking to maintain under seal the vast majority of the transcript of the deposition of its CEO, Mr. Casale.  Moreover, Index is not seeking to seal any exhibits in their entirety, except two.  Index does not believe that the balance of the references to Index's confidential information need to remain sealed and consents to disclosure of information that is not highly sensitive or proprietary.  Instead, Index respectfully requests that the Court maintain the confidentiality of a limited set of highly sensitive proprietary data points through narrow, targeted redactions.

In particular, Index seeks to maintain under seal – through narrow, targeted redactions – references to (1) Index's "take rates" (the fees that Index has negotiated with its publisher customers); (2) the number of integrations Index has achieved with demand-side platforms; (3) breakdowns of Index's transactional data, including the number or percentage of transactions that fall within certain categories; (4) Index's revenues, including gross revenues, net revenues, and revenue share; (5) Index's shares of ad exchange fees, spending, and impressions among ad exchanges; and (6) Index's spending per impression.  Index takes great care to maintain the confidentiality of this highly sensitive proprietary information, including through the use of

confidentiality agreements.  The information Index seeks to maintain under seal is limited.

However, because of the nature of this case, that limited information is repeated extensively in

various forms throughout the Parties' proposed trial exhibits and deposition designations.

As a non-party to this action, Index has cooperated with extensive requests for its

documents and data, including producing its CEO for a deposition.  The Parties have also

identified Index's CEO as a witness at trial.  Disclosing Index's proprietary non-public

information as a consequence of that cooperation will have a profound adverse impact on Index.

Indeed, the disclosure of this information, including Index's non-public fees and the volume of

its transactions in certain markets, could cause more harm to Index than the alleged anti-

competitive behavior that is the focus of this lawsuit.

For the reasons stated below, Index respectfully requests that the Court sustain Index's

Objections, and order the redaction of references to Index's highly sensitive proprietary

information contained in the Parties' trial exhibits and deposition designations, as specified in

further detail in Section I below.

## BACKGROUND

In March 2023, Plaintiffs and Google issued separate subpoenas to Index in this matter

pursuant to Federal Rule of Civil Procedure 45.  In response to those subpoenas, Index has

produced thousands of pages of documents and terabytes of data.  Index designated certain

material in its productions as "confidential" or "highly confidential" pursuant to the Modified

Protective Order (ECF No. 203).  The Parties served Index with deposition subpoenas in August

2023, resulting in Index's Chief Executive Officer, Andrew Casale, providing extensive

testimony on behalf of Index ("Casale Testimony").  Index designated portions of the transcript

of Mr. Casale's deposition as confidential or highly confidential pursuant to the Modified

Protective Order.  The Parties have also identified Mr. Casale as a witness at trial.

On May 23, 2024, Plaintiffs' counsel notified counsel for Index that Google's motion for summary judgment and accompanying exhibits, filed on April 26, 2024, contained material that Index had produced and designated as confidential or highly confidential.  In the following weeks, counsel for the Parties notified Index's counsel that the Parties had included material that Index had produced and designated as confidential or highly confidential within the briefing and exhibits filed in connection with Plaintiffs' opposition and Google's reply in support of Google's motion for summary judgment, Google's motions to exclude the testimony of Plaintiffs' expert witnesses and Plaintiffs' opposition thereto, and Plaintiffs' sur-reply to Google's motion to dismiss.  The Parties filed all of these materials conditionally under seal or with redactions in accordance with the Modified Protective Order, together with motions to seal and notices of the materials filed under seal.

Pursuant to the Court's order dated June 4, 2024 providing a process for third parties to respond to the various motions to seal, on June 14, 2024, Index filed a response to the Parties' Motions to seal that requested that the Court maintain the confidentiality of limited set of highly sensitive proprietary data points about Index's business contained within the Parties' filings. ECF Nos. 837, 855.  On July 10, 2024, Magistrate Judge Anderson granted Index's request to maintain under seal two footnotes in Google's memorandum of law in support of its motion to exclude Plaintiffs' expert Dr. Timothy Simcoe.  ECF No. 902.  In reaching this result, Magistrate Judge Anderson held that "allowing *specific* information relating to *individual* take rates or revenue shares by non-parties should remain under seal and is appropriate under the compelling governmental interest standard."  *Id.* at 3 (emphasis in original).  On July 11, 2024, Magistrate Judge Anderson granted in part Index's request to seal certain exhibits to the DOJ's opposition to

Google's motion to exclude Dr. Simcoe.  ECF No. 903.  Magistrate Judge Anderson ordered that the names of non-parties contained within certain exhibits should be redacted, with the figures themselves filed in the public record.  *Id.* at 2-5.[1]

On July 5, 2024, the Parties filed deposition testimony designations for trial that included excerpts from the Casale Testimony (ECF Nos. 893 and 895) and trial exhibit lists (ECF Nos. 892 and 894).  On July 19, 2024, Plaintiffs filed counter-designations in response to defendants' deposition designations that included excerpts from the Casale Testimony (ECF No. 917).  The Court's Order dated June 24, 2024 provides that any party or non-party who objects to the public use of confidential documents or testimony must file a specific objection with a proposed acceptable redaction of the information.  ECF No. 871.

As a non-party to this action, Index is not privy to the Parties' under seal filings or the unredacted versions of documents filed with redactions.  The Parties' exhibit lists do not attach any of the proposed exhibits.  However, they contain brief descriptions of the documents, including Bates Numbers for documents produced in the litigation.  Google's trial exhibit list included two documents produced by Index, identified by Bates Number.  *See* ECF No. 894. The descriptions on both exhibit lists indicate that they include figures from expert reports that were previously filed under seal or with redactions, and that were the subject of Index's prior motion to seal briefing.  *See* ECF Nos. 892, 894.  Following their filings on July 5, Plaintiffs and Google each provided Index with a list of the specific exhibits that contained references to any of Index's information.  Google also provided Index with heavily redacted versions of the exhibits.

---

[1] At the conclusion of the Order, Magistrate Judge Anderson noted that ultimately the trial judge would rule on these issues should the exhibits be introduced at trial, but as discussed at length herein, Index contends that the confidentiality of Index's highly proprietary information should be maintained at trial.

The Parties did not provide Index with any unredacted versions of the exhibits containing references to Index's confidential or highly confidential information because the exhibits contain highly confidential and sensitive data of other third parties.  Instead, counsel for the Parties went through a process of identifying each exhibit that contained any references to Index's confidential or highly confidential information, and prepared summaries of those exhibits.

Counsel for Index and Index's CEO, Andrew Casale, carefully reviewed the summaries prepared by the Parties to determine whether public disclosure of Index's confidential information contained in the exhibits would cause Index competitive harm.  *See* Declaration of Andrew Casale in Support of Index's Objections to the Public Use of Confidential Information at Trial ("Casale Decl.") ¶ 5.  Based on the Parties' summaries, some of the references to Index contained in the exhibits reflect Index's confidential, highly sensitive proprietary information, including confidential financial information.  *Id.*  Further, some of the excerpts of the Casale Testimony contained in the deposition designations also contain Index's highly sensitive proprietary information.  As the disclosure of this information would damage Index's competitive standing, Index now submits these Objections respectfully requesting that the Court maintain the confidentiality of a limited set of data points contained in the Parties' trial exhibits and deposition testimony designations through targeted, narrow redactions.

## **LEGAL STANDARD**

"When presented with a request to seal judicial records or documents, a district court must comply with certain substantive and procedural requirements."  *Va. Dep't. of State Police v. Washington Post*, 386 F.3d 567, 576 (4th Cir. 2004).  "As to the substance, the district court first 'must determine the source of the right of access with respect to each document,' because 'only then can it accurately weigh the competing interests at stake.'"  *Id.* (quoting *Stone v. Univ. of Md.*

6

*Med. Sys. Corp.*, 855 F.2d 178, 181 (4th Cir. 1988)). "The right of public access to documents or materials filed in a district court derives from two independent sources: the common law and the First Amendment." *Id.* at 575. "In contrast to the common law, 'the First Amendment guarantee of access has been extended only to particular judicial records and documents.'" *Id.* (quoting *Stone*, 855 F.2d at 180).

"The Fourth Circuit has 'recognized that the First Amendment right of access extends to civil trials[.]'" *RegScan, Inc. v. Bureau of Nat'l Affs., Inc.*, 2011 WL 5239221, at *2 (E.D. Va. Nov. 1, 2011) (quoting *ACLU v. Holder*, 2011 WL 1108252 (4th Cir. Mar. 28, 2011)); *see also Craddock v. LeClairRyan*, 2019 WL 2437460, at *8 (E.D. Va. June 11, 2019) (noting "trial transcripts and documents in evidence at a public jury trial" are among the that the "judicial records" that are subject to the First Amendment right of access). Although courts frequently consider the First Amendment right of access in connection with summary judgment motions, the "same analysis [] appl[ies] to materials presented at trial." *Benedict v. Hankook Tire Co.*, 323 F. Supp. 3d 747, 756 (E.D. Va. 2018); *see also Pittston Co. v. United States*, 2002 WL 32158052, at *2 (E.D. Va. Oct. 2, 2002), *aff'd*, 368 F.3d 385, 406 (4th Cir. 2004) (for purposes of the First Amendment right of access, "materials filed in conjunction with a summary judgement motion are [analytically] no different than materials actually mentioned in court or entered into evidence."). The First Amendment's right of access applies to materials even where they are not essential to the disposition of issues presented at trial or summary judgment. *See United States ex rel. Oberg v. Nelnet, Inc.*, 105 F.4th 161, 172-73 (4th Cir. 2024).

The First Amendment right of access is "not unlimited," *RegScan*, 2011 WL 5239221, at *2 (citing *Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (1978)), and "must be balanced against other compelling interests." *In re Knight Publ'g Co.*, 743 F.2d 231, 234 (4th Cir. 1984). The

First Amendment's "presumption of openness[,]" can be "overcome [] by an overriding interest based on findings that closure is essential to preserve higher values[.]"  *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510 (1984).  Courts have found "private interests [to] be [sufficiently] compelling for [these] purposes."  *Benedict*, 323 F. Supp. 3d at 755 (internal marks and citations omitted).  In sum, as the Fourth Circuit recently observed in *Nelnet*, although "the First Amendment poses a high bar for anyone wishing to seal documents or proceedings, it is not insurmountable," and certain interests, including "a corporation's confidentiality interest in proprietary and trade-secret information," can justify sealing under the First Amendment standard.  *Nelnet*, 105 F.4th at 171 n.8.

"A corporation may possess a strong interest in preserving the confidentiality of its proprietary and trade-secret information, which in turn may justify partial sealing of court records [under the First Amendment]."  *Doe v. Public Citizen*, 749 F.3d 246, 269 (4th Cir. 2014); *see also Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 2024 WL 1464744, at *2 (M.D.N.C. Apr. 4, 2024) ("'[t]he interest in preserving the confidentiality of sensitive business information' can override the public's First Amendment right of access") (quoting *Warner v. Midland Funding, LLC*, 2021 WL 3432556, at *7 (M.D.N.C. Aug. 5, 2021));  *Centripetal Networks, Inc., v. Cisco Systems, Inc.*, No. 2:18-cv-00094-HCM-LRL, ECF No. 595 (E.D. Va. Sept. 22, 2020) (sealing portions of trial transcript and exhibits containing "confidential licensing and technical information"); *Pittston Co.*, 368 F.3d at 406 (affirming decision to seal certain "confidential, proprietary, commercial, or financial data"); *LifeNet Health v. LifeCell Corp.*, 2015 WL 12517430, at *4 (E.D. Va. Feb. 12, 2015) (granting motion to seal portions of trial transcripts containing trade secrets).  Relatedly, the potential for competitive harm may suffice as an overriding interest to overcome the First Amendment's presumption of access.  For example, in

*Lord Corp. v. S & B Tech. Prods., Inc.*—a decision cited approvingly by this Court in *LifeCell Corp.*, 2015 WL 12517430, at *4—the Court granted a motion to seal a document containing "confidential and proprietary commercial information," observing that while the information at issue was "of [the] utmost importance to" the parties and non-parties it belonged to given the risk of "competitive harm" associated with disclosure, the information was neither "generally available to the public" nor "bearing importance [on] any public matters."  2012 WL 4056755, at *1 (E.D.N.C. Sept. 14, 2012).  *See also Nixon*, 435 U.S. at 598 (recognizing that where records contain "sources of business information that might harm a litigant's competitive standing," limiting public access to those records may be appropriate); *Markel Am. Ins. Co. v. McRae*, 2024 WL 68346, at *5 (M.D.N.C. Jan. 5, 2024), *adopted by* 2024 WL 730303 (M.D.N.C. Feb. 22, 2024) (same).

Courts in the Fourth Circuit also consider privacy interests, and routinely grant motions to seal judicial records containing the confidential information of third parties.  *See P&L Dev. LLC v. Bionpharma Inc.*, 2019 WL 2079830, at *2 (M.D.N.C. May 10, 2019) (Noting that "[the] privacy interests of non-parties" is among the interests courts have found sufficient to override the presumption of access); *see, e.g.*, *LifeCell Corp.*, 2015 WL 12517430, at *4 (granting motion to seal portions of trial transcripts containing third party confidential information); *Accordius Health LLC v. Marshall*, 2020 WL 7774401, at *11 (M.D.N.C. Dec. 30, 2020) (granting motion to seal document containing confidential information pertaining to businesses not party to the present litigation); *Robinson v. Bowser*, 2013 WL 3791770, at *4 (M.D.N.C. July 19, 2013) (granting motion to seal documents containing third-party information because "the interest in keeping such information (and other sensitive personal material regarding third parties) private outweighs the First Amendment right of access"); *Tustin v. Motorists Mut. Ins. Co.*, 668 F. Supp.

2d 755, 761, 762 (N.D. W. Va. 2009) (granting motion to seal document that had "the potential to prejudice other third parties if disclosed").

To "determine whether the interests in sealing the records outweigh First Amendment considerations," courts in the Fourth Circuit "must engage in a three-part procedure[,] wherein: "(1) the court must provide public notice of the request to seal and allow interested parties a reasonable opportunity to object; (2) the court must consider less drastic alternatives to sealing the documents; and (3) the court must articulate specific reasons and factual findings supporting its decision to seal." *Adams v. Object Innovation, Inc.*, 2011 WL 7042224, at *4 (E.D. Va. Dec. 5, 2011) (citing *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir.2000)).  As to the second step, this District has found that "[a] proposal to redact only the proprietary and confidential information, rather than seal the entirety of [the given material], constitutes the least drastic method of shielding the information at issue." *Adams*, 2011 WL 7042224, at *4.

Pursuant to Local Civil Rule 5(C), a motion to file under seal must be accompanied by a non-confidential supporting memorandum, which shall include:

> (1) A non-confidential description of what material has been filed under seal;
>
> (2) A statement why sealing is necessary, and why another procedure will not suffice, as well as appropriate evidentiary support for the sealing request;
>
> (3) References to the governing case law, an analysis of the appropriate standard to be applied for that specific filing, and a description of how that standard has been satisfied;
>
> (4) Unless permanent sealing is sought, a statement as to the period of time the party seeks to have the matter maintained under seal and how the matter is to be handled upon unsealing.

E.D. Va. Local Civ. R. 5(C).

When a party moves to file material under seal because another party has designated that

material as confidential, Local Civil Rule 5(C) requires that the party designating the material as confidential file a response to the motion complying with requirements (2), (3), and (4) above, along with a proposed order. *See id.* Local Civil Rule 5(H) further provides that "[t]rial exhibits, including documents previously filed under seal, and trial transcripts will not be filed under seal except upon a showing of necessity demonstrated to the trial judge." E.D. Va. Local Civ. R. 5(H).

## ARGUMENT

Index respectfully requests that the Court maintain under seal very narrow, limited portions of the Parties' trial exhibits and deposition testimony designations that reference confidential, highly sensitive, proprietary data points about Index's customer pricing, financial results, transactional data, and technical capabilities. The disclosure of this information would cause significant, irreparable harm to Index's competitive standing. Given the harm to Index that would result if these data points became public, Index seeks to have these data points maintained under seal permanently, and respectfully requests that the Court order narrow, targeted redactions to the trial exhibits and deposition testimony designations.[2]

## I.   INDEX HAS PROVIDED A NON-CONFIDENTIAL DESCRIPTION OF THE MATERIAL INDEX SEEKS TO MAINTAIN UNDER SEAL

Index seeks to seal discrete portions of the Parties' trial exhibits and deposition designation through narrow, targeted redactions. As a non-party, Index is not privy to unredacted versions of the trial exhibits, except the two exhibits that Index produced. Accordingly, with respect to the trial exhibits, Index bases its sealing request and its descriptions

---

[2] With respect to the deposition testimony designations, Index has proposed acceptable redactions of the information. Regarding the trial exhibits, the Parties have not provided Index with unredacted copies of the exhibits, and Index is therefore unable to propose specific acceptable redactions. However, below, Index has provided descriptions of the information that Index requests is redacted within the trial exhibits.

of the materials at issue on summaries prepared by the Parties and provided to Index's counsel.

Index submits the following non-confidential descriptions of the portions of the materials that

Index requests remain under seal:

1.      The Parties' deposition designations and counter-designations from the deposition of

Andrew Casale (ECF Nos. 893, 895, and 917):

        a.      Page 32, line 23 (revenue information);

        b.      Page 33, lines 15 and 22-24 (transaction and customer information);

        c.      Page 34, lines 3 and 15 (customer information);

        d.      Page 36, lines 2 and 8 (transaction and integration information);

        e.      Page 81, lines 16-17 (expenditure information);

        f.      Page 121, lines 17-18 and 24-25 (take rate information);

        g.      Page 122, lines 3-4 (take rate information);

        h.      Page 136, line 15 (take rate information);

        i.      Page 189, lines 10-11 and 20-21 (revenue information);

        j.      Page 250, line 11 (take rate information);

        k.      Page 251, lines 8-10 and 24 (take rate information); and

        l.      Page 252, lines 2-3, 8-9, and 13-14 (take rate information).

2.      Exhibits contained on Google's Trial Exhibit List, ECF No. 894:

        a.      DTX 1551 (IX_00000001, Index Exchange - Data Requests) (Detailed

                spreadsheet produced by Index that contains information regarding Index's take

                rates and other detailed, highly sensitive proprietary financial data);

        b.      DTX 1651 (Israel Report Snippet of Figure 75 [DTX 1892]);

        c.      DTX 1892 (Figure 75, Israel Expert Report, Ad Exchange Average Fees, 2020-

2022);

d.  DTX 1893 (Figure 76, Israel Expert Report, Combined Advertiser Buying Tool and Exchange Fees, 2020-2022);

e.  DTX 1949 (Figure 136, Israel Expert Report, Shares Among Ad Exchanges for All U.S. Display Advertising, 2022);

f.  DTX 1956 (Figure 143, Israel Expert Report, Selected Non-Google Ad Exchanges U.S. Indirect Open Web Display (Non-Video) Spending, 2019-2022);

g.  DTX 1989 (Table 22, Israel Expert Report, U.S. Indirect Open Web Display (Non-Video) Exchange Spending Shares, 2019-2022);

h.  DTX 1991 (Table 24, Israel Expert Report, Shares Among Advertiser Buying Tools, Ad Exchanges, and Publisher Ad Servers for All U.S. Display Advertising, 2022);

i.  DTX 2220 (IX-INV-00000002, REG_US DOJ_CID_Index Exchange Inc._Additional Response_FINAL_01Jun2021) (Detailed spreadsheet produced by Index that contains information regarding Index's take rates and other detailed, highly sensitive proprietary financial data);

j.  DTX 2043 (Exhibit 3, Chevalier Expert Report Appendix, Monthly Gross Revenue by AdX and Competing Exchanges Based on the Simcoe Report | U.S. Transactions October 2018 - September 2021);

k.  DTX 2044 (Exhibit 4, Chevalier Expert Report Appendix, Monthly Net Revenue By AdX And Competing Exchanges Based On The Simcoe Report I U.S. Transactions October 2018 - September 2021);

l.  DTX 2047 (Exhibit 7, Chevalier Expert Report Appendix, Summary Statistics Of

Average Monthly Impressions, Gross Revenue, And Net Revenue By AdX And Competing Exchanges (Excluding Openx) Based On The Simcoe Report | Worldwide & U.S. Transactions);

m.    DTX 2049 (Exhibit 9, Chevalier Expert Report Appendix, Ad Buying Toolexchange Combinations Average Full-Stack Revenue Share AdX Sell-Side, Xbridge Buy-Side & Third-Party Data |Worldwide Transactions January 2019 - March 2023);

n.    DTX 2051 (Exhibit 3, Chevalier Expert Report, Illustrative Adjustment To Simcoe Figure 8 Average Revenue Share And Cpm | U.S. Transactions January 2019 - March 2023);

o.    DTX 2053 (Exhibit 10, Chevalier Expert Report, AdX And Competing Exchanges Annual Average Revenue Share Compared To All Competing Exchanges Weighted Average Revenue Share Based On The Simcoe Report | AdX Data & Third-Party Data | Worldwide Transactions);

p.    DTX 2054 (Exhibit 13, Chevalier Expert Report, AdX And Competing Exchanges Annual Average Revenue Share Compared To All Competing Exchanges Weighted Average Revenue Share Based On The Simcoe Report | AdX Data & Third-Party Data | U.S. Transactions);

q.    DTX 2056 (Exhibit 20, Chevalier Expert Report, Upr Event Study Regressions Dependent Variables: Log(Gross Revenue) And Log(Net Revenue) Based On The Simcoe Report | Worldwide Transactions October 2018 – September 2021);

r.    DTX 2057 (Exhibit 21, Chevalier Expert Report, Summary Statistics Of Average Monthly Impressions, Gross Revenue, And Net Revenue By AdX And

Competing Exchanges Based On The Simcoe Report | Worldwide & U. S. Transactions);

s.    DTX 2058 (Exhibit 22, Chevalier Expert Report, Regression Analysis Of Post-Upr Changes AdX Vs Aggregate Competing Exchanges Based On The Simcoe Report | Worldwide Transactions October 2018 – September 2021);

t.    DTX 2064 (Figure 8, Chevalier Expert Report, U.S. Average Full-Stack Revenue Share by Ad Buying Tool – Exchange Combinations (Jan. 2019 – Mar. 2023));

u.    DTX 2065 (Figure 9, Chevalier Expert Report, U.S. Average Revenue Share and CPM by Exchange (Jan. 2019 – Mar. 2023));

v.    DTX 2066 (Figure 10, Chevalier Expert Report, Worldwide Average Revenue Shares of Competing Exchanges Considered by Prof. Simcoe (Jan. 2019 – Mar. 2023));

w.    DTX 2067 (Figure 11, Chevalier Expert Report, Worldwide Monthly Average Revenue Shares by Exchange (Jan. 2016 – Mar. 2023));

x.    DTX 2068 (Figure 12, Chevalier Expert Report, Worldwide Comparison of AdX Revenue Share to Competing Exchanges Weighted Average Revenue Share (Jan. 2016 – Mar. 2023));

y.    DTX 2069 (Figure 13, Chevalier Expert Report, U.S. Monthly Average Revenue Shares by Exchange (Jan. 2016 – Mar. 2023));

z.    DTX 2070 (Figure 14, Chevalier Expert Report, U.S. Comparison of AdX Revenue Share to Competing Exchanges Weighted Average Revenue Share (Jan. 2016 – Mar. 2023));

aa.    DTX 2071 (Figure 15, Chevalier Expert Report, U.S. Comparison of Google Full-

Stack Revenue Shares to Competitors Full-Stack Revenue Shares (Jan. 2019 –
Mar. 2023));

bb.  DTX 2072 (Figure 17, Chevalier Expert Report, Worldwide AdX and Competing
Exchanges Gross Revenue (Oct. 2018 – Sep. 2021));

cc.  DTX 2073 (Figure 18, Chevalier Expert Report, Worldwide AdX and Competing
Exchanges Net Revenue (Oct. 2018 – Sep. 2021)); and

dd.  DTX 2076 (Figure 21, Chevalier Expert Report, Worldwide Change in AdX and
Competing Exchanges Impressions Post-UPR (Oct. 2018 – Sep. 2021)).

3.  Exhibits contained on Plaintiffs' Trial Exhibit List, ECF No. 892:

a.  PTX 1199 (Figure 4, Initial Expert Report of Timothy Simcoe, Effective Take
Rate for Worldwide Open Web Display + Video Outstream Impressions);

b.  PTX 1200 (Figure 5, Initial Expert Report of Timothy Simcoe, Worldwide Open
Web Display Impressions);

c.  PTX 1203 (Figure 8, Initial Expert Report of Timothy Simcoe, Average CPM
Versus Average Take Rate, By Exchange);

d.  PTX 1205 (Figure 15, Initial Expert Report of Timothy Simcoe, But-for
Comparable Take Rates, Worldwide Impressions);

e.  PTX 1213 (Figure 25, Initial Expert Report of Timothy Simcoe, But-for
Comparable Take Rates, US Impressions);

f.  PTX 1233 (Figure 51, Initial Expert Report of Robin S. Lee, AdX and third-party
ad exchanges' shares of ad exchange fees from worldwide indirect open-web
display transactions (2022));

g.  PTX 1238 (Figure 48, Initial Expert Report of Robin S. Lee, AdX and third-party

16

ad exchanges' shares of worldwide indirect open-web display impressions among ad exchange (2022));

h.  PTX 1241 (Figure 54, Initial Expert Report of Robin S. Lee, Worldwide open-web indirect display take rates for ad exchanges, and AdX's worldwide indirect open-web display market share (2018-2022));

i.  PTX 1254 (Figure 84, Initial Expert Report of Robin S. Lee, Exchange impressions and spend by user and publisher location (2022));

j.  PTX 1256 (Figure 86, Initial Expert Report of Robin S. Lee, Relative shares of indirect open-web display impressions by user and publisher location);

k.  PTX 1257 (Figure 87, Initial Expert Report of Robin S. Lee, Relative shares of indirect open-web display fees by user and publisher location);

l.  PTX 1260 (Figure 90, Initial Expert Report of Robin S. Lee, AdX maintains a substantial share of US indirect open-web display impressions transacted through ad exchanges (2018-2022));

m.  PTX 1261 (Figure 91, Initial Expert Report of Robin S. Lee, AdX and third-party exchanges' shares of US indirect open-web display impressions among ad exchanges (2022));

n.  PTX 1262 (Figure 92, Initial Expert Report of Robin S. Lee, AdX earns consistently high net revenues from the sale of US indirect open-web display impressions (2018-2022));

o.  PTX 1263 (Figure 93, Initial Expert Report of Robin S. Lee, AdX maintains a substantial share of ad exchange fees from US indirect open- web display impressions (2018-2022));

p.      PTX 1264 (Figure 94, Initial Expert Report of Robin S. Lee, AdX and third-party

      exchanges' shares of ad exchange fees from US indirect open-web display

      transactions (2022));

q.      PTX 1265 (Figure 95, Initial Expert Report of Robin S. Lee, AdX maintains a

      substantial share of worldwide indirect open-web display spend transacted

      through ad exchanges (2018-2022));

r.      PTX 1266 (Figure 96, Initial Expert Report of Robin S. Lee, AdX maintains a

      significant share of US indirect open-web display spend);

s.      PTX 1280 (Figure 110, Initial Expert Report of Robin S. Lee, Summary of

      worldwide open-web indirect display take rates among ad exchanges);

t.      PTX 1292 (Figure 122, Initial Expert Report of Robin S. Lee, AdX maintains a

      substantial share of worldwide indirect open-web display impressions transacted

      through ad exchanges (2018-2022));

u.      PTX 1293 (Figure 123, Initial Expert Report of Robin S. Lee, AdX maintains a

      significant share of ad exchange fees from worldwide indirect open-web display

      transactions (2018-2022));

v.      PTX 1294 (Figure 124, Initial Expert Report of Robin S. Lee, AdX maintains a

      substantial share of US indirect open-web display impressions transacted through

      ad exchanges (2018-2022));

w.      PTX 1295 (Figure 125, Initial Expert Report of Robin S. Lee, AdX earns

      consistently high net revenues from the sale of US indirect open-web display

      impressions (2018-2022));

x.      PTX 1306 (Figure 137, Initial Expert Report of Robin S. Lee, Monthly coverage

of exchanges that produced data (impressions));

y.     PTX 1307 (Figure 138, Initial Expert Report of Robin S. Lee, Monthly coverage of exchanges that produced data (spend));

z.     PTX 1310 (Figure 30, Initial Expert Report of Rosa Abrantes-Metz, Ad Exchange Take Rates);

aa.    PTX 1311 (Figure 31, Initial Expert Report of Rosa Abrantes-Metz, Ad Exchange Take Rate Coeffcients of Variation);

bb.    PTX 1312 (Figure 4, Initial Expert Report of Gabriel Weintraub, Monthly Number of Publisher with at Least One Impression Transacted on AdX and Rival Exchanges);

cc.    PTX 1313 (Figure 5, Initial Expert Report of Gabriel Weintraub, Monthly Number of Demand Sources that Served at Least One Impression Through AdX and Rival Exchanges);

dd.    PTX 1314 (Figure 6, Initial Expert Report of Gabriel Weintraub, Monthly Volume of Impressions Won for AdX and Rival Exchanges);

ee.    PTX 1315 (Figure 7, Initial Expert Report of Gabriel Weintraub, Share of Impressions Won Among Bids Submitted (Win Rate) for AdX and Rival Exchanges);

ff.    PTX 1316 (Figure 8, Initial Expert Report of Gabriel Weintraub, Number of Queries Where the Exchange Submitted at Least One Bid);

gg.    PTX 1317 (Figure 9, Initial Expert Report of Gabriel Weintraub, Monthly Advertiser Spend for AdX and Rival Exchanges);

hh.    PTX 1318 (Figure 10, Initial Expert Report of Gabriel Weintraub, Monthly Net

Revenue for AdX and Rival Exchanges);

ii.  PTX 1324 (Figure 16, Initial Expert Report of Gabriel Weintraub, Rival Exchanges Would Need to Dedicate a Substantial Share of their Queries to Experimentation in Order to Run as Many Web Display Experiments as Google in 2018);

jj.  PTX 1364 (Figure 3, Rebuttal Expert Report of Timothy Simcoe, Comparables But-For Take Rate Estimates Excluding One Third- Party Exchange, Worldwide Impressions);

kk.  PTX 1365 (Figure 4, Rebuttal Expert Report of Timothy Simcoe, Event Study But-For Take Rate Estimates Controlling For Adx And Third-Party Exchange Trends, Worldwide Impressions);

ll.  PTX 1366 (Figure 5, Rebuttal Expert Report of Timothy Simcoe, Event Study But-For Take Rate Estimates Controlling For Exchange-Specific Trends, Worldwide Impressions);

mm.   PTX 1367 (Figure 6, Rebuttal Expert Report of Timothy Simcoe, Event Study But-For Take Rate Estimates With Alternative Windows);

nn.  PTX 1368 (Figure 7, Rebuttal Expert Report of Timothy Simcoe, Event Study First Stage Results Using Alternative Ivs);

oo.  PTX 1369 (Figure 8, Rebuttal Expert Report of Timothy Simcoe, Histogram Of But-For Take Rate Estimates From 216 Combinations Of Event Study Specification Alterations);

pp.  PTX 1390 (Figure 22, Rebuttal Expert Report of Robin Lee, Ad exchanges with the highest DV360 spend, by user location (2022));

qq.   PTX 1393 (Figure 26, Rebuttal Expert Report of Robin Lee, Number of worldwide auctions won by the top 10 exchanges in GAM, with and without competition, June 28, 2023);

rr.   PTX 1394 (Figure 27, Rebuttal Expert Report of Robin Lee, Share of worldwide auctions won by the top 10 exchanges in GAM, with and without competition);

ss.   PTX 1395 (Figure 28, Rebuttal Expert Report of Robin Lee, Percent decrease in worldwide publisher payout if exchange was removed);

tt.   PTX 1396 (Figure 29, Rebuttal Expert Report of Robin Lee, Dr. Israel's estimate of US ad exchange fees for indirect web non-video advertising (2020–2022));

uu.   PTX 1397 (Figure 30, Rebuttal Expert Report of Robin Lee, AdX and third-party exchange US indirect web non-video take rates relative to AdX take rate (2020–2022));

vv.   PTX 1408 (Figure 42, Rebuttal Expert Report of Robin Lee, Scale of AdX in comparison to that of non-Google exchanges participating in open bidding, measured by spending on GAM (2022), extension of Israel Report, Table 16, right panel);

ww.   PTX 1409 (Figure 43, Rebuttal Expert Report of Robin Lee, Scale of AdX in comparison to that of non-Google exchanges participating in open bidding, measured by impressions purchased on GAM (2022), extension of Israel Report, Table 16, right panel);

xx.   PTX 1417 (Figure 53, Rebuttal Expert Report of Robin Lee, Average US publisher RPM on AdX as compared to rival exchanges (2017–2022));

yy.   PTX 1436 (Figure 73, Rebuttal Expert Report of Robin Lee, Number of auctions

won by the top 10 exchanges in GAM, with and without competition, after attributing Reservation bids to exchanges using targeted_custom_criteria1384);

zz.   PTX 1437 (Figure 74, Rebuttal Expert Report of Robin Lee, Share of auctions won with and without competition by the top 10 exchanges in GAM, after attributing Reservation bids to exchanges using targeted_custom_criteria);

aaa.   PTX 1438 (Figure 75, Rebuttal Expert Report of Robin Lee, Percent decrease in publisher payout if exchange was removed, after attributing Reservation bids to exchanges using targeted_custom_criteria);

bbb.   PTX 1440 (Figure 77, Rebuttal Expert Report of Robin Lee, Percent decrease in publisher payout if exchange was removed, US users (June 28, 2023));

ccc.   PTX 1444 (Figure 82, Rebuttal Expert Report of Robin Lee, Percent drop in publisher payout from removing bidding tool, worldwide (June 28, 2023));

ddd.   PTX 1445 (Figure 83, Rebuttal Expert Report of Robin Lee, Percent drop in publisher payout from removing bidding tool, US users (June 28, 2023));

eee.   PTX 1448 (Figure 86, Rebuttal Expert Report of Robin Lee, Extension of Israel Report, Table 16, for AdX and exchanges participating in open bidding on GAM, US (2022));

fff.   PTX 1450 (Figure 88, Rebuttal Expert Report of Robin Lee, Extension of Israel Report, Table 16, for AdX and exchanges participating in open bidding on GAM, worldwide (2022));

ggg.   PTX 1453 (Figure 91, Rebuttal Expert Report of Robin Lee, Scale of AdX in comparison to that of non-Google exchanges participating in open bidding, measured by spending on GAM, worldwide (2022), extension of Israel Report,

Table 16, right panel);

hhh.   PTX 1454 (Figure 92, Rebuttal Expert Report of Robin Lee, Scale of AdX in comparison to that of non-Google exchanges participating in open bidding, measured by impressions purchased on GAM, worldwide (2022), extension of Israel Report, Table 16, right panel);

iii.   PTX 1455 (Figure 93, Rebuttal Expert Report of Robin Lee, Average worldwide publisher RPM on AdX as compared to rival exchanges (2017-2022));

jjj.   PTX 1464 (Figure 1, Rebuttal Expert Report of Gabriel Weintraub, Google Ads And DV360 Win More Impressions Than Non-Google Bidders In GAM (June 2023 Bid- Level Data));

kkk.   PTX 1468 (Table 1, Rebuttal Expert Report of Gabriel Weintraub, DR. Israel's Table 16 Omits That Google's Products Are Multiples Larger Than "Small" And "Large" Firms That "Successfully Compete");

lll.   PTX 1470 (Table 3, Rebuttal Expert Report of Gabriel Weintraub, The Percent Change Across Exchanges Decreases From 12.5 Percent To 2.4 Percent After Separating Out Google From Non- Google Exchanges In Dr. Israel's Table 18); and

mmm.  PTX 1471 (Table 4, Rebuttal Expert Report of Gabriel Weintraub, Non-Google Exchanges Saw A Decrease In Ad Spend On DV360 By 20 Percent Following The Implementation Of Poirot V2 In September 2018.

## II.   REDACTION OF INDEX'S HIGHLY SENSITIVE PROPRIETARY INFORMATION IS NECESSARY AND ALTERNATIVES WILL NOT SUFFICE

The information that Index seeks to keep confidential includes highly sensitive strategic and proprietary information about Index's customer pricing, financial results, transactional data,

and technical capabilities.  *See* Casale Decl. ¶ 5.  In particular, according to the summaries

provided by the Parties, these references include highly sensitive proprietary information

regarding: (1) Index's "take rates" (the fees that Index has negotiated with its publisher

customers); (2) the number of integrations Index has achieved with demand-side platforms;

(3) breakdowns of Index's transactional data, including the number or percentage of transactions

within certain categories; (4) Index's revenues, including gross revenues, net revenues, and

revenue share; (5) Index's shares of ad exchange fees and impressions among ad exchanges; and

(6) Index's spending per impression.  *Id.* ¶ 7.  As set forth in the accompanying declaration of

Index's CEO, Andrew Casale, the public disclosure of these highly sensitive detailed, specific,

proprietary data points about Index's business – none of which are public – would cause

significant, irreparable harm to Index's competitive standing, including reducing Index's ability

to succeed against its competitors and making Index vulnerable to acquisition.  *Id.*  Accordingly,

maintaining the confidentiality of this highly sensitive proprietary information is necessary.

     Index is a privately held company and does not publicly release proprietary financial and

business information concerning its customer pricing, financial results, transactional data, or

technical capabilities.  *See id.* ¶ 6.  Index takes great care to maintain the confidentiality of this

highly sensitive proprietary information, including through the use of confidentiality agreements.

*Id.*  Disclosure of this highly sensitive information would cause significant injury to Index and

put it at a disadvantage against competitors, who would be armed with non-public knowledge of

Index's business and financial status.  *Id.*  Further, the public disclosure of Index's take rates

would also injure Index's critical and long-fostered relationships with publishers.  *Id.* ¶ 9.  If

Index's take rates became public as a result of this lawsuit, every publisher with a negotiated

take rate higher than Index's disclosed average take rate would ask to renegotiate its current take

rate with Index, essentially seeking a discount. *Id.* This result would directly harm Index's business and competitive standing. *Id.*

As a non-party, Index has cooperated with extensive requests for its documents and data. *Id.* ¶ 8. Disclosing Index's proprietary non-public information as a consequence of that cooperation would profoundly adversely impact Index. *Id.* If the purpose of this lawsuit is to preserve (or even increase) competition in the advertising technology market, disclosing Index's proprietary information, equipping competitors to either undercut or acquire Index, would have the opposite effect. *Id.* Indeed, the disclosure of this information, including Index's non-public take rates and the volume of its transactions in certain markets, could cause more harm to Index than the alleged anti-competitive behavior that is the focus of this lawsuit. *Id.*

With respect to alternatives to sealing, *see* Local Civil Rule 5(C), Index does not seek to seal the vast majority of the referenced documents or exhibits in their entirety. Instead, as an alternative to the sealing of entire documents and exhibits, Index proposes narrow, targeted redactions of the limited information specified in Section I, *supra*. With respect to the transcript of Mr. Casale's deposition, Index seeks to redact individual lines of the transcript of Mr. Casale's deposition, as specified in Section I, *supra*. With respect to the trial exhibits, Index is not privy to the underlying unredacted exhibits, with the exception of DTX 1551 and DTX 2220, two spreadsheets produced by Index. DTX 1551 and DTX 2220 are detailed spreadsheets that Index's counsel prepared in response to the DOJ's subpoena that consist entirely of Index's highly sensitive proprietary information, including take rates and other very sensitive financial information. Index submits that DTX 1551 and DTX 2220 should be maintained under seal in their entirety. However, with respect to all of the rest of the Parties' trial exhibits, Index proposes that the limited, specific data points described in the foregoing paragraphs are redacted

where they appear in the exhibits.  Any alternative other than Index's proposed limited redactions (and the sealing of DTX 1551 and DTX 2220 in their entirety) would not preserve the confidentiality of Index's highly sensitive proprietary information.

Finally, redaction of this information is entirely consistent with Magistrate Judge Anderson's orders to date regarding the prior set of sealing motions.  *See* ECF Nos. 902, 903. Magistrate Judge Anderson's July 10, 2024 order held that "allowing *specific* information relating to *individual* take rates or revenue shares by non-parties should remain under seal and is appropriate under the compelling governmental interest standard."  ECF No. 902 at 3 (emphasis in original).  Magistrate Judge Anderson's July 11, 2024 order (the "July 11 Order") granted third parties' motions to seal, in part, certain exhibits to Plaintiffs' opposition to Google's motion to exclude the testimony of one of Plaintiffs' expert witnesses, by ordering that the names of non-parties contained within certain exhibits should be redacted.  ECF No. 903.  The July 11 Order held that several of the same figures that Index now seeks to maintain under seal contain specific confidential information of Index and other third parties that should remain under seal.[3] *See id.*

## III.   GOVERNING CASE LAW SUPPORTS INDEX'S REQUEST TO MAINTAIN ITS HIGHLY SENSITIVE PROPRIETARY INFORMATION UNDER SEAL

The Fourth Circuit has recognized that a corporation's "strong interest in preserving the confidentiality of its proprietary and trade-secret information . . . may justify partial sealing of court records."  *Public Citizen*, 749 F.3d at 269.  In particular, courts in the Fourth Circuit will grant motions to seal commercially-sensitive documents when "[t]he public's interest in accessing this information is outweighed by a party's interest in 'preserving confidentiality' of

---

[3] In particular, the July 11 Order found that figures that appear in trial exhibits PTX1199, PTX1200, PTX1203, PTX1237, PTX1280, PTX1396, and DTX2067, should be redacted to protect the confidential information of third parties.

commercially sensitive information that is 'normally unavailable to the public.'" *Glob. Tel*Link Corp. v. JACS Sols., Inc.*, 2023 WL 9197897, at *2 (E.D. Va. Oct. 4, 2023) (quoting *Flexible Benefits Council v. Feltman*, 2008 WL 4924711, at *1 (E.D. Va. Nov. 13, 2008)) (granting motion to seal).

This is true where, for example, "there is no legitimate public interest in disclosing the proprietary and confidential information of [the defendant] . . . and disclosure to the public could result in significant damage to the company." *Adams*, 2011 WL 7042224, at *4 (granting motion to seal); *see also Centripetal Networks*, ECF No. 595 (sealing portions of trial transcript and exhibits after finding "a compelling interest in the protection of [] confidential licensing and technical information which outweigh[ed] the public right of access to trial materials pursuant to the First Amendment[.]"); *Silicon Knights, Inc. v. Epic Games, Inc.*, 2011 WL 901958, at *2 (E.D.N.C. Mar. 15, 2011) (granting motion to seal documents containing "confidential and proprietary commercial information, including . . . highly sensitive financial and business information belonging to the parties as well as third-parties"); *Syngenta Crop Prot., LLC v. Willowood, LLC*, 2017 WL 6001818, at *1-6 (M.D.N.C. Dec. 4, 2017) (sealing "certain trial exhibits" containing a party's "confidential business information[,]" including information "used [by the party] . . . to make decisions about how much product to make, pricing points, and other competitive matters[,]" noting that disclosure would "harm [that party's] competitive standing."); *Markel Am. Ins.*, 2024 WL 68346, at *6 (concluding "the public's right of access" to a deposition transcript was "outweighed by the confidential, business nature of the transcript" and thereby ordering that "the Court permanently seal" the transcript).

Here, revealing specific numbers and figures about Index's business and commercial arrangements with its customers, including the fees Index charges its customers, Index's

revenues, and Index's market share, could cause significant, irreparable harm to Index. *See* Casale Decl. ¶¶ 5-9. With this information, any of Index's competitors could undercut Index, and Index could become vulnerable to acquisition. *Id.* ¶ 7. Further, although some of the information Index seeks to maintain under seal appears in papers submitted in connection with a dispositive motion, the information itself has little bearing on matters of significant public importance, given that Index is not seeking to seal any of the *aggregated* references to ad exchange data across the market. Instead, Index is seeking to maintain under seal only the relatively small percentage of footnotes, figures, and other references within the Parties' deposition designations and trial exhibits that specifically reveal Index's individual data points. *See* Section I, *supra*.

This is precisely the type of information that courts in this District routinely maintain under seal, particularly where the information belongs to a third party. *See, e.g.*, *LifeCell Corp.*, 2015 WL 12517430, at *4 (sealing portions of trial transcripts containing third party confidential information); *Glob. Tel\*Link*, 2023 WL 9197897, at *2 (granting motion to seal "commercially sensitive information that is 'normally unavailable to the public'"); *Adams*, 2011 WL 7042224, at *4 (granting motion to seal where "there [wa]s no legitimate public interest in disclosing the proprietary and confidential information . . . and disclosure to the public could result in significant damage to the company"); *Biedermann Techs. GmbH & Co. v. K2M, Inc.*, 2021 WL 8445264, at *2 (E.D. Va. Sept. 1, 2021) (granting motion to seal documents where they disclose "highly confidential information and should remain sealed because they are not generally known and are of competitive value"); *Vir2us, Inc. v. Sophos Inc.*, 2019 WL 13398985, at *1 (E.D. Va. Aug. 9, 2019) (granting motion to seal where information "is not generally known, has economic value, and the disclosure of it would cause competitive harm if made widely public"); *Intelligent*

*Verification Sys., LLC v. Microsoft Corp.*, 2015 WL 13036877, at *1 (E.D. Va. Feb. 6, 2015) (granting motion to seal "sensitive business information" where the parties' "competitive positions might be impaired if this information is disclosed to the public at large").

In addition to the general considerations relating to Index's proprietary business and financial data, the information regarding Index's "take rates" is particularly sensitive.  *See* Casale Decl. ¶¶ 8-9.  Knowledge of Index's take rates could allow Index's competitors to undercut Index's fees, and public disclosure of this data would injure Index's critical and long-fostered relationships with publishers, encouraging Index's publisher customers to seek discounts from their current rates.  *Id.* ¶ 9.  Courts in this District have granted motions to seal documents containing the terms of agreements between businesses where such terms are "highly confidential and could be used for competitive purposes by other businesses in the industry if they are not protected from public disclosure."  *See, e.g.*, *Globus Med. Inc. v. Jamison*, 2023 WL 4937386, at *2-3 (E.D. Va. Jan. 12, 2023) (granting motion to seal).  In *Globus Medical*, the court granted a motion to seal the proposed terms of a distributorship agreement between two third parties to the litigation, one of the plaintiff's competitors and a distributor.  *Id.*  The court explained that sealing was appropriate because the document contained "confidential information that could potentially be used by competitors to the detriments of these non-parties."  *Id.* at *2. The same is true of Index's take rates, which represent negotiations between Index and its individual customers.

## CONCLUSION

For the reasons set forth above, Index respectively requests that the Court sustain Index's objections and order narrow, targeted redactions of the Parties' trial exhibits and deposition designations from the deposition of Andrew Casale.  A proposed order is attached.

Dated:   July 26, 2024                Respectfully submitted,


                                          /s/ Mary C. Zinsner
                                      Mary C. Zinsner (VSB No. 31397)
                                      TROUTMAN PEPPER HAMILTON
                                      SANDERS LLP
                                      401 9th Street, NW, Suite 1000
                                      Washington, DC 20004
                                      Tel.: (202) 274-1932
                                      Fax: (202) 274-2994
                                      mary.zinsner@troutman.com

                                      Laura Anne Kuykendall (VSB No. 82318)
                                      TROUTMAN PEPPER HAMILTON
                                      SANDERS LLP
                                      1001 Haxall Point
                                      Richmond, VA 23219
                                      Tel.: (804) 697-1200
                                      Fax: (804) 697-1339
                                      la.kuykendall@troutman.com

                                      *Attorneys for Non-Party*
                                      *Index Exchange Inc.*