**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) No. 1:23-cv-00108-LMB-JFA |
| | ) |
| GOOGLE LLC, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT GOOGLE LLC'S MOTION TO EXCLUDE THE TESTIMONY OF ADORIA LIM**

# INTRODUCTION[1]

Adoria Lim is a forensic accountant who is prepared to offer expert testimony concerning the amount of damages that eight federal agency advertisers (the "FAAs") sustained as a result of Google's anticompetitive behavior in the markets for ad tech tools used to sell digital ads on the open web. In addition, Ms. Lim is prepared to testify regarding the quantum of monetary harm that Google's conduct has imposed on the marketplace beyond the FAAs' damages—as much as $1.69 billion worldwide—as well as the profitability of the market segment in which Google's ad tech business operates.

Google's motion to exclude entirely the testimony of Ms. Lim takes a scattershot approach, offering six baseless arguments why the jury should not be allowed to hear her opinions. Two of Google's arguments are merely derivative of arguments Google makes elsewhere: (1) the FAAs lack standing as a matter of law to recover damages because they are indirect purchasers; and (2) Dr. Timothy Simcoe's estimates of the AdX "take rate" Google would have charged but for its anticompetitive behavior, which Ms. Lim relies on for some of her damages calculations, are inadmissible. The first argument is a legal challenge to Plaintiffs' damages claim, not a proper *Daubert* challenge. The second is a criticism of Dr. Simcoe, not Ms. Lim. In any event, both arguments are wrong: the FAAs are direct purchasers, and Dr. Simcoe's but-for take rates are admissible. The reasons why they are wrong are addressed more fully in the

---

[1] With no notice or conferral, at approximately 6:00pm ET yesterday, May 16, 2024, Google filed a Motion to Strike Jury Demand and to Dismiss, ECF No. 628, and delivered a check to the Department of Justice with the goal of fully compensating the FAAs for the damages they suffered and which the United States claims on their behalf. This motion may, according to Google, have a collateral impact on the arguments briefed herein. Plaintiffs address Google's arguments as raised in its motion to exclude the testimony of Ms. Lim as planned and intend to respond in due course to Google's recent filing.

appropriate places: Plaintiffs' oppositions to (1) Google's motion for summary judgment; and (2) Google's motion to exclude the testimony of Dr. Simcoe, both of which were filed today.

Google's four remaining arguments attack the factual basis and relevance of some of Ms. Lim's opinions. Ms. Lim's models are well-grounded in the factual record, including from Google's own ordinary course documents showing that in a more competitive ad tech market, a lower take rate is plausible. Ms. Lim's opinions about the impact of Google's overcharges on the broader marketplace are both relevant and important to help the jury appreciate the harm that Google's conduct has caused, in concrete monetary terms. Separately, Ms. Lim's opinions about Google's profitability are independently relevant as evidence of monopoly power and are also relevant should Google seek to introduce evidence about its profitability as a defense to Plaintiffs' claims. Ms. Lim formulated her profitability opinions using well-accepted accounting principles, and her testimony will aid the trier of fact.

Thus, Google's motion to exclude the testimony of Ms. Lim should be denied.

## BACKGROUND AND SUMMARY OF MS. LIM'S OPINIONS

**I.    Ms. Lim's Qualifications**

Ms. Lim is a Principal with The Brattle Group, Inc., an international firm that offers consultancy services regarding accounting, finance, economics, and damages in a wide range of industries. She is a Certified Public Accountant, a Certified Fraud Examiner, and is Certified in Financial Forensics (CFF) and Accredited in Business Valuation (ABV) by the American Institute of Certified Public Accountants. Ms. Lim has over two decades of professional experience in accounting, including as internal auditor and financial analyst at a Fortune 500 corporation, and as an auditor at Ernst & Young. She also has extensive experience directing

research and providing expert testimony on a wide range of matters before government agencies and in litigation. Exh. A, Lim Reb. ¶¶ 1-4 & Appendix A (curriculum vitae).[2]

## II. Ms. Lim's Opinions

Pursuant to 15 U.S.C. § 15a, the United States seeks damages for the amount by which eight FAAs who purchased open web display advertisements using Google's ad tech tools were overcharged by Google. The fees that Google charged the FAAs for the use of AdX, Google's ad exchange product, are higher than they would have been but for Google's anticompetitive conduct across the ad tech stack. Ms. Lim ascertained the amounts of open web display advertisements the FAAs purchased using Google's AdX tool at its actual take rate and then, consistent with reliable and accepted methodologies, applied a variety of but-for take rates to the FAA's purchases to estimate how much Google overcharged each FAA for the four-year period from January 25, 2019, through January 24, 2023 (the "damages period"). Exh. B, Respess Rep. ¶ 15.[3] The take rates that Ms. Lim used to estimate damages included certain rates modelled by Dr. Simcoe, but-for take rates referenced in Google's ordinary course business documents, and other potential but-for take rates a jury might find to be appropriate, based on the evidence ultimately presented at trial. *See* Exh. B, Respess Rep. Appendix D, Fig. 38.

---

[2] This exhibit, along with several other exhibits, have been excerpted for length. The full relevant documents are available at the Court's request.

[3] Dr. Thomas Respess submitted the initial report that is the subject of Google's motion ("Respess Rep."). On February 12, 2024, Dr. Respess withdrew, and Ms. Lim, who has worked on this matter in a consulting capacity to Dr. Respess since February 2023, substituted for him as an expert, adopting his report, "including the opinions, analysis, and abbreviations noted therein." *See* Exh. A, Lim Reb. ¶ 5. Consistent with her adoption, Plaintiffs refer to Dr. Respess's initial report as if originally submitted by Ms. Lim.

3

Because the United States brought the present case not only to seek damages on behalf of the FAAs but also to enforce the antitrust laws more broadly, including by obtaining injunctive relief to remedy Google's anticompetitive conduct on behalf of the public writ large, the United States asked Ms. Lim to use her damages methodology to estimate the monetary harm that Google's conduct has caused to publishers and advertiser customers as a whole. Finally, the United States asked Ms. Lim to analyze the profitability of Google's display advertising business. *Id.* ¶ 18.

***Damages Methodology.*** Ms. Lim has set forth a methodology for reviewing transaction and invoice data to isolate the FAAs' payments to Google for the placement of open-web display ads, which serve as a basis for her damages analysis.

First, Ms. Lim reviewed transaction and invoice data produced by Google and The Trade Desk ("TTD"). *Id.* ¶¶ 39-51.[4] These data came from three places: (1) five datasets produced by Google reflecting purchases of display advertising through Google's buy-side and sell-side products by advertising customers (including the FAAs and others), which Ms. Lim refers to as "RFP60 Data";[5] (2) similar data produced by TTD for FAA advertising purchases on AdX and elsewhere that utilized TTD's buying tool ("TTD Data"); and (3) invoicing data produced by Google that corresponds to the FAA transactions in the RFP60 data, which Ms. Lim refers to as "RFP76 Data." *Id.* ¶¶ 39, 54-55.

---

[4] The United States is seeking damages both for the overcharges the FAAs paid to Google's AdX product using Google ad-buying tools, and for the charges the FAAs ultimately paid to AdX using the ad-buying tool of TTD, a Google competitor. Respess Rep. ¶ 23.

[5] Google itself represented that the RFP60 data was reflective of FAA purchases. In response to Plaintiffs Request for Production No. 60 (attached as Exhibit C), which asked for "all advertising **purchased** or won by any Federal Agency Advertiser since January 1, 2019," Google agreed to produce data reflecting information reflecting the "impressions **purchased**." *Id.* at 10, 12 (emphasis added).

Ms. Lim isolated in-scope transactions using filters that are available in the datasets. *Id.* ¶¶ 40-41 & Fig. 5 & 6. She then identified 15 unique combinations (or "pathways") that the FAAs used to make purchases, for which she calculated damages ("FAA Purchase Pathways"). *Id.* ¶¶ 44-49, 51 & Fig. 8-11. For some transactions, Ms. Lim could not confirm the ad agency involved due to deficiencies in Google's data, so she excluded those transactions from her damages calculations, resulting in a conservative estimate of damages. *Id.* ¶ 50.

Next, Ms. Lim determined the overcharge, by calculating the amount in fees that Google actually charged the FAAs in the identified pathways ("actual take"), and then subtracting the amount that the FAAs would have paid but for Google's anticompetitive behavior ("but-for take"). *Id.* ¶¶ 58, 64-67. To determine the but-for take, Ms. Lim applied several "but-for take rates," including two provided by Dr. Simcoe, and one provided by the United States, based on evidence in the record. *Id.* ¶¶ 68. Applying those but-for take rates, Ms. Lim calculated damages to worldwide, United States, and United States government agency advertisers and publishers, as well as specifically to the 8 FAAs. *Id.* ¶ 69 & Fig. 15. She arrived at the AdX overcharge to the FAAs by applying a 19.3% advertiser (as opposed to publisher) share of the AdX overcharges, based on an estimate from Dr. Simcoe. *Id.* ¶¶ 60-61, 74. Next, she calculated an additional overcharge related to platform fees, which is a separate fee that the FAAs paid to DV360 and Google Ads, two advertiser buying tools. These fees were higher than they should have been because they were based on Google's inflated AdX charges. *Id.* ¶ 63, 76-77 & Fig. 18.

Ms. Lim arrived at total damages amounts by trebling overcharges and adding prejudgment interest. *Id.* ¶¶ 79-81 & Fig. 20. Those amounts, using the three but-for take rates she highlighted in the body of her report, range from $506,478 to $2,297,242. *Id.* ¶ 81 & Fig. 20.

5

***Profitability Analysis.*** Ms. Lim reviewed Google's internal accounting documents to arrive at an estimate of the profitability of portions of Google's ad tech stack. *Id.* ¶ 82. She focused on Google's profit and loss statements in the Display, Video, Apps, and Analytics ("DVAA") product area, which includes Google's ad tech products. *Id.* ¶ 85. Ms. Lim opines that in order to analyze Google's profitability, "the most relevant P[rofit]&L[oss] is the overall DVAA P&L with AdMob excluded because AdMob deals with ads which appear in apps, which are an excluded ad type." *Id.* ¶ 98.

Ms. Lim provides two views of Google's gross and operating profits, one that treats Google as an agent in ad tech transactions, and one that treats Google as a principal. Her analysis shows that if one regards Google as an agent, the operating profit margin for Google's DVAA Product Area, excluding AdMob, on a net revenue basis, increased from 6 percent in 2020 to 18 percent in 2022, and the DVAA Product Area, excluding AdMob, earned $1.5 billion in 2021 and $1.2 billion in 2022. *Id.* ¶ 100 & Fig. 28. If one regards Google as a principal, the operating profit margin for DVAA, excluding AdMob, increased from 2% to 6% during that period. Exh. B, Respess Rep. ¶ 99 & Fig. 28.

Ms. Lim further explains these two views of Google's gross profits and operating profits, which adjust for how Google accounts for "traffic acquisition costs" ("TAC"). These "costs" are what advertisers—not Google—ultimately pay to publishers for ads sold via Google's ad tech tools. *Id.* ¶ 101; Exh. D, Google Suppl. Resp. to Pls.' Interrogatory No. 3, Aug. 16, 2023, at 5 ("Cost of Sales include TAC" which "represents revenue share payments to publishers"). In Google's accounting reports, Google books all of the funds it receives from advertisers as revenue, even though most of those funds are consistently remitted (as "costs" to Google) to the publishers whose advertising inventory is being sold. Google increases both its booked revenue

6

and costs by the amount of TAC for DVAA based on its assessment that Google is a "principal" that effectively controls digital ads in the process of selling them, rather than an "agent" who facilitates their sale. This choice has the impact of significantly increasing Google's revenues, and by extension, decreasing Google's profits as a percentage of revenues. Ms. Lim provides both views, which may be helpful to the jury in assessing Google's profitability.

## **LEGAL STANDARD**

Expert testimony is admissible under Rule 702 "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)). Federal Rule of Evidence 702 permits an expert to offer opinion testimony where the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," so long as the expert's opinion is "based on sufficient facts or data," "is the product of reliable principles and methods," and the expert "has reliably applied the principles and methods to the facts of the case." *In re Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting Fed. R. Evid. 702).

A motion to exclude under Rule 702 and *Daubert* that does not challenge the relevance or reliability of an expert's methodology, but instead only makes legal arguments that should be raised in a motion for summary judgment, should be denied. *See Conn. Yankee Atomic Power Co. v. United States*, 169 Fed. Cl. 450, 452-53 (2024); *Crown Packaging Tech., Inc. v. Belvac Prod. Mach., Inc.,* 2022 U.S. Dist. LEXIS 48061, at *13 (W.D. Va. Mar. 17, 2022). The court's decision regarding admissibility also does not require an evaluation of the strength or weight of the testimony so long as the expert has reliably applied her principles and methods to the facts of

the case. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999); *see also E.E.O.C. v. Freeman,* 778 F.3d 463, 466 (4th Cir. 2015) ("The scope of the court's gatekeeping inquiry will depend upon the particular expert testimony and facts of the case.").

## ARGUMENT

Google's motion to exclude entirely the testimony of Ms. Lim does not challenge: (1) Ms. Lim's qualifications as an expert (Exh. A, Lim Reb. ¶¶ 1-4 & Appendix A); (2) her methodology for filtering relevant data—primarily produced by Google—to identify multiple FAA purchase pathways (Exh. B, Respess Rep. ¶¶ 38-51); (3) her damages model for calculating AdX and platform fee overcharges, and the mathematical application of the but-for take rate to calculate damages for multiple FAA purchase pathways (Exh. B, Respess Rep. ¶¶ 52-78); (4) her methodology for calculating prejudgment interest and treble damages (Exh. B, Respess Rep. ¶¶ 79-81 & Fig. 20), or (5) the methodology of her profitability analysis that regards Google as a principal in ad tech transactions (Exh. B, Respess Rep. ¶¶ 82-100).

The only bases that Google gives for excluding Ms. Lim's damages-related opinions in total are collateral legal challenges or not specifically directed at the actual analysis Ms. Lim performed: (1) whether the FAAs are direct purchasers who can recover damages under the Sherman Act; and (2) whether Ms. Lim's testimony on damages should be excluded if Dr. Simcoe's testimony is excluded. Mot. at 1. The rest of Google's challenges are unfounded, and in any event, should not prevent Ms. Lim from testifying regarding the other topics in her report.

### I. The FAAs Have Standing to Recover Damages, and Ms. Lim Properly Does Not Opine on That Issue.

The FAAs are entitled to recover damages for the overcharges Google imposed on them because, pursuant to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and its progeny, the FAAs were "direct purchasers" from Google during the damages period. Ms. Lim is an

8

accountant and does not opine on that legal issue, nor would it be proper for her to do so. Experts are generally not permitted to offer opinions that "state[] a legal standard or draw[] a legal conclusion by applying law to the facts."[6] *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006).

Google disagrees with Plaintiffs on the underlying direct-purchaser issue, and it has moved for summary judgment on Plaintiffs' damages claim on that basis. ECF No. 571 at 32-34. Google repeats those same arguments in moving to exclude Ms. Lim, ECF No. 577 at 12-14, but those arguments have nothing to do with Ms. Lim's qualifications, the reliability of her methodology, or the sufficiency of her factual support under Rule 702 and *Daubert*. Rather, those arguments are properly addressed in the context of summary judgment, not here.

## II.  Ms. Lim Uses a Reliable Methodology for Calculating Damages to All of the FAAs, Including CMS and NHTSA.

Google argues that unless Ms. Lim can personally verify that the Centers for Medicare & Medicaid Services ("CMS") and the National Highway Traffic Safety Administration ("NHTSA") paid Google for digital ads, her testimony as to those agencies should be excluded. This argument has no merit.

First, this is a summary judgment motion improperly recast as a Rule 702 motion. Google does not challenge Ms. Lim's methodology, but instead challenges the sufficiency of Plaintiffs' evidence for damages. There is no question about the sufficiency of the evidence of CMS and

---

[6] At Ms. Lim's deposition, Google repeatedly tried to get her to agree that the FAAs did not purchase ads "directly" from Google, and she repeatedly refused to offer any opinion on that issue. *See* Exh. E, Lim Dep. at 67:10 – 97:19.

9

NHTSA's purchases and payments, both in Google's own transaction and invoicing data, as well as in payment records that CMS and NHTSA produced to Google during discovery.[7]

Even if this proof of payment did not exist, it is not necessary to recover under the antitrust laws. *See In re Western Liquid Asphalt Cases,* 487 F.2d 191, 200 (9th Cir. 1973) (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946)) ("Direct proof of payment is not required, of course, because to require it could prevent enforcement of the antitrust laws."); *see also Burlington Industries v. Milliken & Co.*, 690 F.2d 380, 386 (4th Cir. 1982) (instructing trial court to evaluate antitrust damages as difference between the price plaintiffs "*were required to pay*" and the price "they would have paid in an untainted market") (emphasis added). Here, there is no dispute about the amounts in Google's own transaction data that the FAAs "were required to pay" under the relevant contracts and invoices, and there is no basis in fact or law to distinguish between that amount and the amount the FAAs "actually paid." *Id*. at 385. Indeed, the contracts that govern these purchases require that the amounts Google charged the advertising agencies for the FAAs' advertising exactly match the amounts the ad agencies charged the FAAs for that same advertising.[8]

Second, Ms. Lim's assignment was not to verify payments; it was to describe and apply a reliable methodology for calculating damages. This methodology is the same for all of the FAAs, including CMS and NHTSA. Nevertheless, Google takes issue with Ms. Lim's "walk through" analysis. Her analysis is an extra "spot-check" merely to confirm, by examining the consistency

---

[7] *See* Exh. F, CMS-ADS-0001096610 (CMS payment data); Exh. G, NHTSA-ADS-0000284491 (NHTSA payment data).

[8] *See, e.g.,* Exh. H, CMS-ADS-0001139301] (CMS "agrees that it will be solely liable to pay of any media advertising authorized by this document"); Ex. I, NHTSA-ADS-0000718102 (NHTSA agrees to fully reimburse agent for labor and materials necessary to execute the contract).

of numbers through the billing process, the mechanics of how the FAAs paid for their purchases. The FAAs cut checks to the ad agencies, and the ad agencies cut checks to Google for the FAAs' purchases. Through her "walk through" analysis, Ms. Lim observed that payments from the FAAs to their ad agencies *always* matched amounts that Google charged in all of the transactions she sampled. *See* Exh. B, Respess Rep. ¶ 56. In fact, Google fails to identify any instance where an FAA did not pay for ad tech services -- which is notable given that it was the recipient of these payments -- and it has not endorsed an expert to rebut Ms. Lim's methodology.

**III.   Google's Own Documents Support a 10% But-For Take Rate.**

Ms. Lim's report includes a damages calculation premised on a 10% but-for take rate that is supported by Google's own ordinary course documents that it produced in this case and that will be evidence at trial. *See*, *e.g.*, Exh. J, GOOG-TEX-00106259, at -260–61 (Google employee proposing 5 percent AdX take rate in 2017); Exh. K, GOOG-DOJ-32034896, at -896 (Google employee proposing AdX take rates in 2018 ranging from "2% to 10% whatever we think the market can bear but ideally closer to 2%"). Such documents constitute "sufficient facts or data" to support Ms. Lim's application of a 10% but-for take rate as one of the damages scenarios to be assessed by the finder of fact. Fed. R. Evid. 702.[9]

Ms. Lim's opinions concern the methodology for computing damages, and those opinions will assist the jury by giving them the tools they need and the options they may use to calculate the FAAs' damages using different but-for take rates ranging from 1% to 16.6%. *See* Exh. B, Respess Rep. at Fig. 38. The two highest of those but-for rates (16.2% and 16.6%), are the result

---

[9] Given these documents and others, it is unclear what basis Google has to argue that Ms. Lim's opinions based on a 10% take rate are not only "unsupported" but "in contradiction of, the uncontroverted evidence." Mot. at 18. Google does not cite any evidence, let alone "uncontroverted evidence," in support of this argument.

11

of expert analysis performed by Dr. Simcoe. They represent an "upper bound" or "conservative" measure of the FAAs' damages. Exh. L, Simcoe Rep. ¶¶ 225, 235. The other but-for rates are ultimately based on other parts of the factual record in this case, including Google's ordinary course documents.

The "correct" but-for take rate for calculating the FAAs' damages is ultimately a question for the finder of fact. "[T]he fact of injury and the amount of damages are questions for the jury to decide." *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 431 (4th Cir. 1986). The Advisory Committee Notes state that Rule 702 allows reliance "on hypothetical facts that are supported by the evidence." Rule 702 does not "authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." As the court observed in *In re Zetia Ezetimibe Antitrust Litig.*, MDL No. 18-md-2836, 2022 U.S. Dist. LEXIS 145836 (E.D. Va. Aug 3, 2022), "if the evidence could support the disputed fact, the testimony is admissible." *Id.* at *30 (citing *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 143 (4th Cir. 1994)). That is because Rule 702 "is not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. Rather, it is common and reasonable for experts to rely on the plaintiff's version of the contested facts, which can be tested at trial.[10] Ms. Lim's opinions and analytical work simply provide the jury a means to convert the but-for take rate they find into an appropriate estimate of Plaintiffs' damages.

---

[10] *See also Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) (affirming admission of expert testimony "based on [plaintiff's] version of the contested facts"); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) (similar); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis" is a "factual matter[] to be determined by the trier of fact, or, where appropriate, on summary judgment").

12

**IV.     Google's Overcharges Have Caused Marketwide Harm.**

Ms. Lim calculates the amount of harm from Google's anticompetitive conduct in the form of overcharges to worldwide, U.S. and government publishers and advertisers—as much as $1.69 billion worldwide. This analysis is relevant to Plaintiffs' claims, because in assessing whether a defendant's conduct is unlawful under the antitrust laws, "it is appropriate to examine the economic effects of the challenged conduct on consumers, competitors, and the alleged violator itself." *Advanced Health-Care Svcs. v. Radford Comm. Hosp.*, 910 F.2d 139, 148 (4th Cir. 1990); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (to determine whether conduct is exclusionary under Section 2, "it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way"). Given that relevance is "a low bar to admissibility" of expert testimony, *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003), the Court should not exclude this testimony.

The United States seeks damages, but it does not seek *only* damages. Plaintiffs also seek injunctive relief to remedy Google's anticompetitive conduct on behalf of the public, as evidenced by the fact that the Amended Complaint is brought on behalf of the people of the United States as well as by the Attorneys General of 17 States on behalf of their own citizens. ECF No. 120, Am. Compl. ¶ 342(6)-(9). The fact that not every person in America or across the world who has been harmed by Google's conduct are not specifically enumerated as parties here is legally irrelevant. Unlike the private litigants in the cases cited by Google, the United States is "primarily charged by Congress with the duty of protecting the public interest under" the antitrust laws, and it "seeks its injunctive remedies on behalf of the general public." *United States v. Borden Co.*, 347 U.S. 514, 518 (1954); *see also* 15 U.S.C. § 4 (empowering the Attorney General to sue to prevent and restrain violations of the federal antitrust laws).

Plaintiffs do not seek to recover the amount of these larger overcharges as monetary damages, but Ms. Lim's calculations are nevertheless relevant to show the magnitude of harm that Google's conduct has caused to ad tech market customers writ large. It is thus appropriate for Ms. Lim to use her accounting expertise to calculate the larger impact of Google's anticompetitive conduct, understanding that these overcharges reflect only one way in which Google's conduct has harmed the relevant markets. A firm's ability to impose sustained overcharges is relevant evidence of market power or monopoly power, an element of Plaintiffs' monopolization and tying claims.[11] The court should not exclude this portion of Ms. Lim's testimony under Rule 702.

## V. Ms. Lim's Profitability Opinions Are Relevant to Plaintiffs' Claims.

### A. Ms. Lim's Profitability Analysis Is A Direct Response to Google's Claim of Low Margins.

Ms. Lim's opinions about Google's profitability are proper because profitability can be relevant to market power and anticompetitive effects. *See*, *e.g.*, *United States v. Microsoft Corp.,* 253 F.3d at 51 (ability to profitably raise prices above competitive levels is indicative of monopoly power); *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015) (rising profits supportive of monopoly power); *Great W. Directories v. Sw. Bell Tel. Co.,* 63 F.3d 1378, 1384 (5th Cir. 1995) ("profit levels" are among "[s]everal factors [that] are determinative of a finding of monopoly power"); *Borden v. FTC*, 674 F.2d 498, 512 (6th Cir. 1982), *vacated on other*

---

[11] *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) ("a firm is a monopolist if it can profitably raise prices substantially above the competitive level," so "[w]here evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear."); *Geneva Pharms. Tech. Corp. v. Barr Labs Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (monopoly power "can be proven directly through evidence of control over prices or the exclusion of competition"); *see also* Exh. M, Lee Rep. ¶ 534 (opining that Google Ads' ability to charge supracompetitive fees is direct evidence of Google's substantial and sustained market power in the advertiser ad network market).

*grounds,* 103 S. Ct. 2115 (1983) (high profits evidence of monopoly power).[12] This testimony easily clears the low bar of admissibility for expert testimony. *See United States v. Leftenant*, 341 F.3d at 346.

Moreover, to the extent that Google intends to contend at trial that its low profit margins suggest that it lacks monopoly power in the relevant markets, Plaintiffs are entitled to rebut that evidence with expert testimony. For example, Google's principal economic expert, Dr. Mark Israel, cited Ms. Lim's profitability analysis, concluding that Google's accounting profit margins "clearly point[] *against* Google possessing substantial and sustained market power." *See* Exh. N, Israel Rep. § V.F., ¶ 430 (emphasis in original). The fact that Google's own expert relies on Ms. Lim's analysis to draw conclusions about market power independently demonstrates its relevance and shows why Ms. Lim should be permitted to respond to any of Google's claims regarding its profitability and margins at trial.

### B.  Ms. Lim Properly Considers Two Views of Google's DVAA Profits.

Google takes issue with Ms. Lim providing an alternative view of Google's profits that does not include "traffic acquisition costs" ("TAC"), the amounts that advertisers pay to publishers using Google's tools, as revenues. Google asserts that this opinion "rests on a perfunctory analysis, without any basis or precedent in real-world accounting practices." Mot. at 23. This is false. In addition to being helpful to the jury, Ms. Lim's opinions are admissible

---

[12] On the other hand, the absence of high prices or profits does not mean that a firm is not a monopolist. *See, e.g.*, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272-73 (2d Cir. 1979) ("It is not a defense to liability under s 2 that monopoly power has not been used to charge more than a competitive price or extract greater than a reasonable profit."). The reason is that possession of monopoly power sometimes "deadens initiative, discourages thrift and depresses energy." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 427 (2d Cir. 1945) (Hand, J.).

because they reflect commercial realities and are the product of well-accepted principles and methods accountants can use to provide alternative views of profitability.

Ms. Lim's opinions on this topic are narrow and sensible, and not "perfunctory," as Google contends. ECF No. 577 at 24. She concluded that deducting TAC from revenues, rather than treating it as part of the cost of sales, is "another valid way of accounting for TAC," Exh. B, Respess Rep. ¶ 101. To arrive at these conclusions, which "require[] considerable judgment," Exh. B, Respess Rep. ¶ 104, Ms. Lim applied a well-recognized accounting standard—Accounting Standards Codification ("ASC") Topic 606—regularly used by accountants to evaluate whether a company is a principal or agent in the context of its business, *i.e.*, whether it is providing a good or service or arranging for another party to do so. *See id.* ¶¶ 101-109. Ms. Lim's professional judgment is that, in light of how Google does business and deals with its customers, it "would be reasonable" for Google to consider itself an agent, rather than a principal, and therefore to evaluate its profitability on a net basis. *Id.* ¶ 108. Her opinion is the product of a well-recognized, multi-step process and based on a reasonable assessment of the nature of Google's ad tech business and is informed by Ms. Lim's accounting experience as well as her extensive review and analysis of documents and data reflecting how Google operates its business.

Google's two quibbles with Ms. Lim's approach are that (1) she does not perform a contract-by-contract evaluation to identify "performance obligations," and (2) she refers to the accounting determinations of five other ad tech firms that each consider themselves agents, unlike Google. ECF No. 577 at 25. Neither criticism renders her analysis unreliable or inadmissible, and at best, these criticisms go to the weight, not the admissibility, of Ms. Lim's testimony.

Google ignores Ms. Lim's detailed explanation that under GAAP, a contract-by-contract review is not required to come to a reliable judgment, especially when a firm's arrangement with its customers is similar across portfolios of contracts. Exh. A, Lim Reb. ¶¶ 12, 31 and Exh. O, ASC 606-10-10-4. Google itself has not analyzed the principal/agent issue at an individual contract level. Exh. A, Lim Reb. ¶ 34 (also noting that such a review is not feasible, because the contracts at issue number in the hundreds of thousands). Ms. Lim's opinion is based on a thorough application of GAAP, in which she considered Google's "control" of publishers' ad inventory. For example, she applied three "indicators" of control from GAAP to Google's business, two of which suggested that Google acts as an agent. Exh. B, Respess Rep. ¶ 108. Ms. Lim also considered the statements of Google's own employees who have evaluated Google's profitability as an agent.[13] Third, in addition to considering other ad tech companies' accounting treatment of this issue, Ms. Lim demonstrated the validity of her approach by analogy to the auction house Sotheby's, which like Google offers its customers an auction service and considers itself an agent for accounting purposes. Exh. B, Respess Rep. ¶¶ 106-07.

Ms. Lim's review and analysis of how other ad tech companies categorize themselves is not a basis to exclude her opinions. Ms. Lim did not "cherry-pick" the other ad tech companies she referenced, as Google claims. Mot. at 25. Neither Google nor its experts cite an example of any ad tech company Ms. Lim excluded from her analysis. The fact that several other ad tech providers consider themselves agents is simply additional real-world corroboration that Ms. Lim's opinions about Google's business are reasonable and grounded in commercial realities. Indeed, "one of Google's own experts, Dr. Mark Israel, cites an ad tech industry report that

---

[13] *See* Exh. B, Respess Rep. ¶ 109 (quoting GOOG-DOJ-09729045 at -046) (Google employee stating, "Another way to look at the P&L is: operating profits relative to net revenue, similar to how most agency businesses report their financials").

reports revenues excluding TAC." Exh. A, Lim Reb. ¶ 23 (citing Israel Rep. § IV.G.2., ¶ 359 n.451).

Last, Ms. Lim explains, "Companies often create both GAAP and non-GAAP financial reports to serve different purposes; one is not inherently more useful or meaningful for all purposes." Exh. A, Lim Reb. ¶ 22. The question here is not the proper method to account for TAC for purposes of external financial reporting, but rather the use of acceptable methods to account for TAC that could be useful to a trier of fact in assessing Google's profitability.

## CONCLUSION

For the foregoing reasons, the Court should deny Google's motion to exclude the testimony of Adoria Lim.

Dated: May 17, 2024

Respectfully submitted,

| | |
|---|---|
| JESSICA D. ABER<br>United States Attorney | JASON S. MIYARES<br>Attorney General of Virginia |
| /s/ Gerard Mene<br>GERARD MENE<br>Assistant U.S. Attorney<br>2100 Jamieson Avenue<br>Alexandria, VA 22314<br>Telephone: (703) 299-3777<br>Facsimile: (703) 299-3983<br>Email: Gerard.Mene@usdoj.gov | /s/ Tyler T. Henry<br>STEVEN G. POPPS<br>Deputy Attorney General<br>TYLER T. HENRY<br>Assistant Attorney General<br><br>Office of the Attorney General of Virginia<br>202 North Ninth Street<br>Richmond, VA 23219<br>Telephone: (804) 692-0485<br>Facsimile: (804) 786-0122<br>Email: thenry@oag.state.va.us |
| /s/ Julia Tarver Wood<br>JULIA TARVER WOOD<br>CRAIG L. BRISKIN<br>KATHERINE E. CLEMONS<br><br>United States Department of Justice<br>Antitrust Division<br>450 Fifth Street NW, Suite 7100<br>Washington, DC 20530<br>Telephone: (202) 307-0077 | Attorneys for the Commonwealth of Virginia and local counsel for the States of Arizona, California, Colorado, Connecticut, Illinois, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, |

Fax: (202) 616-8544  
Email: Julia.Tarver.Wood@usdoj.gov  

Attorneys for the United States

North Carolina, Rhode Island, Tennessee, Washington, and West Virginia