# Exhibit A
# (previously filed as Dkt. 647-1)

HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:23-cv-108 (LMB/JFA) |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**EXPERT REBUTTAL REPORT OF ADORIA LIM**

_____

ADORIA LIM

February 13, 2024

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# I.    Qualifications

1.      I am a Principal at The Brattle Group, Inc. ("Brattle"). Brattle is an international consulting firm that provides consulting services in, among other things, accounting, finance, and economics covering a wide range of industries. Brattle has offices throughout North America, Europe, and in Australia. I am the head of Brattle's Accounting Practice and the head of Brattle's San Francisco office. I am a Certified Public Accountant (CPA) with two decades of experience in various roles at a Big Four accounting firm, a Fortune 500 publicly traded company, and as a consultant. I am a Certified Fraud Examiner (CFE). I am also Certified in Financial Forensics (CFF) and Accredited in Business Valuation (ABV) by the American Institute of Certified Public Accountants (AICPA). My work focuses on matters that involve accounting, finance, valuation, and damages issues.

2.      Before coming to Brattle, I was a Principal with Corporate Diligence Specialists, LLC, a consulting firm that specializes in performing accounting and financial diligence in mergers and acquisitions (M&A). Prior to Corporate Diligence Specialists, LLC, I was a Principal at Cornerstone Research, an economic consulting firm. Prior to Cornerstone Research, I was an internal auditor and financial analyst at The Clorox Company. Prior to The Clorox Company, I was an auditor at Ernst & Young LLP, where I conducted audits for public and private clients of varying sizes in a diverse range of industries.

3.      Throughout my career, I have examined a wide range of financial reporting, management reporting, and other accounting issues. My experience also includes various damages and profitability analyses. I have reconstructed financial records, traced transactions through accounting systems, and reviewed payment and cash flow information.

4.      I earned a BA in Economics from the University of California, Los Angeles (UCLA) and an MBA from Stanford University. My curriculum vitae, which includes a list of my publications and my prior testimony, is included as **Appendix A: Curriculum Vitae**.

# II.   Assignment

5.      Dr. Thomas S. Respess III submitted a report in this matter on December 22, 2023 ("Respess Initial Report")[1] on behalf of the United States. This rebuttal report incorporates my

---

[1]    Expert Report of Thomas S. Respess III, December 22, 2023 ("Respess Initial Report").

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

adoption of the Respess Initial Report, including the opinions, analysis, and abbreviations noted therein. Given this adoption, in this report, I will refer to the Respess Initial Report as my own. **Appendix C: Updated P&L Figures** contains updated Figures 23, 24, 28, 30, and 31 from the Respess Initial Report. **Appendix D: Glossary of Terms and Abbreviations** is a glossary of terms and abbreviations used in the Respess Initial Report and this report. **Appendix E: Respess Initial Report (Corrected for Errata)** is a copy of the Respess Initial Report, corrected for errata.

6.  On January 23, 2024, several experts submitted reports in this matter on behalf of Google. The report of Dr. Douglas Skinner ("Skinner Report")[2] and certain aspects of the report of Dr. Judith Chevalier ("Chevalier Report")[3] criticized the analyses and opinions presented in the Respess Initial Report. In addition, the report of Dr. Mark Israel ("Israel Report")[4] makes statements regarding the conclusions that one can reach about Google's market power in the Relevant Product Markets based on my profitability analysis in this case. The United States has asked me to respond to those matters in this rebuttal report.

7.  Staff at Brattle have assisted me by performing work at my direction. All of the opinions and conclusions stated in this report are my own. Brattle is being compensated for my work at a rate of $800 per hour. Neither Brattle's compensation nor my compensation is contingent upon my opinions, my testimony, or the outcome of this matter.

8.  My opinions and conclusions are based on the evidence that has been provided to me to date, as well as my knowledge and expertise gained during my professional career. In forming my opinions in this report, in addition to the sources I relied upon in preparing the Respess Initial Report, I have relied upon the additional documents listed in **Appendix B: Additional Documents Relied Upon**. I reserve the right to modify or supplement my conclusions as additional information is made available to me, or as I perform further analysis.

---

[2]  Expert Report of Douglas Skinner, January 23, 2024 ("Skinner Report").

[3]  Expert Report of Judith A. Chevalier, January 23, 2024 ("Chevalier Report").

[4]  Expert Report of Mark A. Israel, January 23, 2024 ("Israel Report").

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

profession, including public statements by EY itself. The principal/agent assessment under GAAP requires "significant judgment," in the words of U.S. Securities and Exchange Commission staff, and it is therefore quite subjective, particularly in the ad tech space, which Google itself has acknowledged in its own accounting policy memos. As a result, reasonable accountants can reach different but appropriate conclusions.

12.     Dr. Skinner contends that I should have performed my principal/agent analysis "at a contract level."[8] However, GAAP does not require a principal/agent analysis to be performed at an individual contract level, nor would it be feasible, given that Google's ad tech business involves thousands of contracts. Neither Google, Google's auditors, the SEC, nor Dr. Skinner himself has analyzed (or required Google to analyze) the principal/agent issue at an individual contract level.

13.     Dr. Skinner claims that my profitability analysis is flawed because I do not allocate additional indirect "costs incurred at the corporate (or 'headquarters') level"[9] to the DVAA P&L.[10] The core premise—and flaw—of Dr. Skinner's argument is his belief that I should have analyzed DVAA's profitability "on a standalone basis" in order to "compare its profitability to that of other standalone entities, including public companies."[11] Dr. Skinner fails to explain the need for this "standalone" analysis. I did not in fact compare DVAA's profitability to that of any standalone entities, including public companies; my analysis simply shows DVAA's profitability over the past several years. Moreover, Dr. Skinner does not identify any specific additional costs that I should have added to my analysis of DVAA's operating profits.

14.     In the Respess Initial Report, I concluded based on my profitability analysis that Google's operating profit margins for its DVAA Product Area had improved over time. Dr. Skinner, referring to Projects Turbo and Sushi, states that I fail "to acknowledge and account for differences across the internal DVAA P&Ls [I rely] upon, with the result that [I am] unable to properly or reliably compare the internal DVAA P&Ls over time (Section VIII.B.1)."[12] In fact, the improving trend of profitability that I presented for the DVAA Product Area in the Respess Initial Report is conservative because, as Dr. Skinner points out, each change in allocation methodology loaded additional costs onto the DVAA P&L in the year of the change and in

---

[8]     Skinner Report, Section III., ¶ 12.b.

[9]     *Id*., Section VIII.B.2., ¶ 80.

[10]    *Id.*, Section VIII., ¶ 55.

[11]    *Id.*, Section VIII.B.2., ¶ 81.

[12]    *Id.*, Section VIII., ¶ 55.

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

20.     **Dr. Skinner Mischaracterizes My Opinion.**  Dr. Skinner claims that I "fai[l] to show or explain why considering Google to be an agent in all (or most) of the relevant transactions is **more appropriate** than Google's determination to consider itself a principal in these transactions."[21]

21.     First, Dr. Skinner's statement (and subsequent discussion in his report) is a fundamental mischaracterization of my opinion. Dr. Skinner incorrectly *assumes* that I am opining on whether Google's internal DVAA product-area reporting was in accordance with GAAP, and that I disagree with Google's treatment of itself as a principal in its publicly filed financial statements reported under GAAP.[22] I do not take those positions. Rather, I state that treating Google as an agent and deducting TAC from revenues is "**another valid way** of accounting for TAC in the DVAA P&Ls[.]"[23]

22.     Companies often create both GAAP and non-GAAP financial reports to serve different purposes; one is not inherently more useful or meaningful for all purposes.[24] In the ordinary course of business, Google created "management view" financial reports for internal reporting purposes, which Google acknowledges are non-GAAP (because the management view reports classify certain costs differently from GAAP-based "external view" reports).[25] Internal

---

[21]   Skinner Report, Section III., ¶ 12.a. (emphasis added).

[22]   *Id.*

[23]   Respess Initial Report, ¶ 101 (emphasis added).

[24]   Ray H. Garrison, Eric Noreen, and Peter Brewer, *Managerial Accounting,* 17th ed., (McGraw Hill, 2020) ("Garrison"), 3 ("[M]anagerial accounting helps managers perform three vital activities—planning, controlling, and decision making. Planning involves establishing goals and specifying how to achieve them. Controlling involves gathering feedback to ensure that the plan is being property executed or modified as circumstances change. Decision making involves selecting a course of action from competing alternatives."). *See also*, Financial Accounting Standards Board, Statement of Financial Accounting Concepts No. 8: Conceptual Framework for Financial Reporting ("CON8"), Chapter 1, ¶ OB2 ("The objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity."). *See also*, Srikant M. Datar and Madhav V. Rajan, *Horngren's Cost Accounting: A Managerial Emphasis*, 16th ed. (Hoboken, NJ: Pearson, 2018) ("Horngren's Cost Accounting"), 3 ("Internal measures and reports do not have to follow GAAP but are based on cost-benefit analyses. [External f]inancial statements must be prepared in accordance with GAAP and be certified by external, independent auditors.").

[25]   Rule 30(b)(6) Deposition of Jessica Mok (Google), November 10, 2023, ("Mok Deposition"), 21:10–19 ("THE WITNESS: There are two standard P&L views. BY MS.

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

management reports are not legally required, but may be useful for a company's internal management decision-making.[26]

23.      I started my profitability analysis with Google's non-GAAP "management view" internal financial reports.[27] While I then used the GAAP framework of principal versus agent considerations to make adjustments to them, I did not purport to convert non-GAAP reports into GAAP reports.[28] Dr. Skinner fails to address my fundamental point that looking at financial performance metrics on a net revenue basis (revenues net of TAC or "ex-TAC"), rather than a gross basis (revenues including TAC), could be informative regarding a company's financial performance. For example, a recent Yahoo Finance article identified "[r]evenue, excluding traffic acquisitions costs" as one of "Alphabet's most significant metrics" when evaluating

---

STRICK: Q. What are those? A. One which we call the external view, and then one which we call the management view. Q. How are these different? A. The external view treats -- the management view has a bucket of costs that we internally consider OpEx. The external view treats this pool of cost as cost of sales.") and 157:22–25 ("The ads P&L has the two views we talked about, one which aligns to external reporting and one which aligns to management reporting. So the DVAA P&Ls we looked at today only have the management view."). *See also,* Skinner Report, Section VI., ¶ 32 ("I understand that 'external view' P&Ls largely align with external reporting accounting policies, while 'management view' P&Ls are largely for decision-making by business managers.").

[26]   Mok Deposition, November 10, 2023, 136:20 – 137:5 ("THE WITNESS: The goal of internal management P&Ls is to drive insight into business economics grounded in a view that business owners can take action, and my understanding is that the cost reclassification process from OpEx to cost of sales abstracts some of the information on where those costs come from, and so if we presented a view that was aligned to the external reporting, you – you'd have more costs in a bucket without actionable details of where that cost came from; so it would be harder to have a conversation on who owns these costs and what can we do about them.").

[27]   Respess Initial Report, Section IX.A.1., ¶ 87 and Figure 23. Based on my review of P&L files in this matter, Google appears to clearly label its "external view" reports as such. See, for example, GOOG-DOJ-32223434. I used DVAA P&Ls that were not labeled "external view." See also, Skinner Report, Section VI, ¶ 46 ("Google made changes to various aspects of its internal DVAA P&Ls on an ongoing basis."); and *id.,* Section VII., ¶ 48 ("I understand that Dr. Respess performs these calculations on the basis of numbers he extracts from various documents that contain internal DVAA P&Ls.").

[28]   Respess Initial Report, Section IX.B.3.a. – IX.B.3.b., ¶¶ 104–110 and Figure 30.

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

company results to Wall Street expectations.[29] Moreover, one of Google's own experts, Dr. Mark Israel, cites an ad tech industry report that reports revenues excluding TAC.[30]

24.     Second, Dr. Skinner mischaracterizes my opinion regarding principal versus agent considerations in public reporting under GAAP as well. As I discuss in the next section of this report, under GAAP, there may be no single "correct" method to account for certain types of transactions, particularly in areas that require significant judgment. In these circumstances, a company may report transactions using one of multiple "acceptable alternatives."[31] While Google's auditors and the SEC did not take exception to Google's treatment of itself as a principal, there is no indication that they would have taken exception to Google treating itself as an agent. That is, either determination could be a valid assessment under GAAP. As I state in the Respess Initial Report, "Google **could** be considered an agent in the display ad transactions."[32] Thus, Dr. Skinner is simply wrong to assert that I stated that it was "more appropriate" to regard Google as an agent in ad tech transactions.

25.     Below, I discuss mischaracterizations that Dr. Skinner makes regarding GAAP, specifically that (1) the principal versus agent determination in ad tech transactions has a low degree of subjectivity; and (2) a contract-by-contract assessment of principal versus agent issues is required under GAAP.

---

[29]   Hamza Shaban, "Alphabet Stock Tumbles After Company Misses Expectations on Google Ad Revenue," January 31, 2024, Yahoo! Finance, https://finance.yahoo.com/news/alphabet-misses-expectations-on-google-ad-revenue-sending-stock-lower-213120143.html.

[30]   Israel Report, Section IV.G.2., ¶ 359, n. 451.

[31]   ASC 235-10-50-3 ("Disclosure of accounting policies shall identify and describe the accounting principles followed by the entity and the methods of applying those principles that materially affect the determination of financial position, cash flows, or results of operations. In general, the disclosure shall encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it shall encompass those accounting principles and methods that involve any of the following: a. A selection from existing acceptable alternatives.").

[32]   Respess Initial Report, Section IX.B.3.a., ¶ 103 (emphasis added).

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

30.    In fact, as I discuss in my opening report, several of Google's competitors account for the majority of their ad tech transactions as agents.[47] Dr. Skinner speculates that their circumstances could be different, [48] but he fails to provide any evidence to substantiate this opinion, nor does he acknowledge that two companies with the same fact pattern could reach different conclusions. Moreover, Dr. Skinner ignores my discussion of Sotheby's, who, like Google, runs auctions to pair buyers and sellers, but, unlike Google, considers itself an agent in accounting for its auction activities.[49]

> **b.    Google Did Not Perform, and Neither Its Auditors nor the SEC Required Google to Perform, a Principal/Agent Assessment at the Individual Contract Level**

31.    Dr. Skinner also contends that I should have performed my analysis "at a contract level."[50] However, GAAP does not require a principal/agent analysis to be performed at an

---

[47]    Respess Initial Report, Section IX.B.3.a., ¶ 109 ("Indeed, other ad tech service providers, including Magnite Inc. and PubMatic, consider themselves to be *agents*… [o]ther companies that provide ad tech services also record revenue as agents."). *See also*, Magnite, Inc. 2020 10-K, p. 47 ("For substantially all transactions executed through our platform, we act as an agent on behalf of the publisher that is monetizing its inventory, and revenue is recognized net of any advertising inventory costs that we remit to sellers."). *See also*, PubMatic 2022 10-K, p. 5 ("We are an independent technology company seeking to maximize customer value by delivering digital advertising's supply chain of the future.") and p. 73 ("The Company has determined that it does not act as the principal in the purchase and sale of digital advertising inventory because it does not control the advertising inventory and it does not set the price which is the result of an auction within the marketplace. Based on these and other factors, the Company reports revenue on a net basis."). *See also*, Tremor International Ltd 2022 Annual Report, p. 47 ("[T]he Company positions itself as a stronger digital advertising platform in the marketplace with an integrated, end-to-end platform connecting the DSP and SSP sides of the business in a unified platform… the Company reports its Programmatic business, tech stack, features, business models and activity as an agent and therefore presented revenue from Programmatic on a net basis.").

[48]    Skinner Report, Section VIII.A., ¶ 71 ("Dr. Respess points to the fact that certain other entities that operate in various parts of the ad tech ecosystem—i.e., Magnite, PubMatic, Criteo, and Tremor—consider themselves to be agents for accounting purposes… [d]ifferences among companies and their circumstances (including the nature of their products, their arrangements with customers, and how their businesses are managed and operated) may properly explain differences in accounting treatment under U.S. GAAP.").

[49]    Respess Initial Report, Section IX.B.3.a., ¶¶ 106–107.

[50]    Skinner Report, Section III., ¶ 12.b. ("Dr. Respess' opinions with respect to the determinations of whether Google acts as an agent or principal in its DVAA business are flawed because he:…2) fails to acknowledge that the relevant U.S. GAAP accounting

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

individual contract level, nor would it be feasible, given that Google's ad tech business involves thousands of contracts. Neither Google, Google's auditors, the SEC, nor Dr. Skinner himself have analyzed (or required Google to analyze) the principal/agent issue at an individual contract level.

32.    **Figure 1** below shows the number of ad agency IDs within Google's DV360 and Google Ads transactional databases, as well as the number of publisher IDs from Google's Finance Team, specifically the sellside XPP Monthly database, from January 2019 to January 2023.[51] Assuming each ID corresponds to a unique contract between Google and either an ad agency or a publisher, I estimate that there are over 75,000 contracts between Google and ad agencies and over 160,000 contracts between Google and publishers.[52] Given their volume, it would not be feasible to individually analyze the appropriate principal/agent accounting treatment for each and every contract Google has with ad agencies and publishers.

---

analysis should be performed at a contract level and, instead, reaches a conclusion based on his view of DVAA's business as a whole.").

[51]    XPP Monthly Current Stats GOOG-AT-MDL-DATA-000561031–000561262. I perform this analysis using the most senior level of Google's customer hierarchy. For Google Ads, I use the "parent" level rather than one of the subsidiary layers (the "company" or "division" level); for DV360, I use DV360_partner_id. On the publisher side, Google Ads and DV360 transactions share the same set of identifiers, and I use the most senior level of the publisher hierarchy, publisher_parent_id.

[52]    For some DV360 transactions, there is both a DV360_partner_id and a third_party_parent_id; if the same third_party_parent_id also appears in Google Ads transactions, then I consider these to be the under the same agency contract to conservatively avoid the potential of double-counting ad agency contracts. On the publisher side, I conservatively assume that a single publisher_parent_id corresponds to a single contract between Google and a given publisher, even if that identifier is associated with multiple Google sellside platforms.

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

34.     I have not seen any evidence that Google has ever made a principal/agent assessment on a contract-by-contract basis, nor does Dr. Skinner cite any such evidence. I analyze Google's contracts on a portfolio basis in accordance with GAAP.

35.     Dr. Skinner also asserts that I "fail[ed] to perform the requisite analysis to determine whether the necessary U.S. GAAP-based considerations differ for different products and transactions."[55]  I did consider the different products and transactions for which Google determined it was the principal and concluded the factors affecting my conclusion were similar in each circumstance.[56]  For each of the different products and transactions for which Google determined it was the principal, Google determined that the "specific good or service" was a combination of the advertising inventory plus Google's "value add"[57] and that Google controlled the "optimized" or "enhanced" inventory because it determined how and when to fulfill its performance obligations based a set of factors it identified in its overarching accounting policy memo.[58] However, in my opinion, for each product, it would be reasonable to conclude that the

---

[55]   Skinner Report, Section VIII.A., ¶ 67.

[56]   The different products (or combinations of products) for which Google prepared analyses are: Authorized Buyers and Open Bidding transactions through Google publisher inventory; Google Ads via AdSense, Ad Mob, and Ad Manager; DV360 via AdSense, Ad Mob, and Ad Manager; and purchases on 3rd Party Exchanges via Google buying doors.

[57]   GOOG-AT-MDL-008930806, at -811 (09/2021) ("Ads Revenue Recognition (Gross vs. Net)") ("[O]ur promise to a customer to provide enhanced or optimized ad inventory, for Authorized Buyer RTB or DV360 respectively, is a combination of: (1) the advertising inventory, and (2) our value added targeting to meet the customer's campaign objectives."). *See also*, GOOG-AT-MDL-008930629, at -634 (07/30/2021) ("Principal vs. Agent – Authorized Buyers and Open Bidding") ("The optimized ad inventory is a combination of: (1) the advertising inventory, and (2) Google's 'value add.'"). *See also*, GOOG-AT-MDL-008930642, at -645 (02/07/2020) ("Principal vs. Agent – Advertising through 3rd Party Exchanges") ("The optimized ad inventory is a combination of: (1) the advertising inventory, and (2) Google's 'value add.'"). *See also*, GOOG-AT-MDL-008930621, at -624 (08/05/2019) ("Principal vs. Agent – Google Ads (AdSense / Ad Mob/ Ad Manager)") ("The enhanced ad inventory is a combination of the following items: (1) the ad inventory, and (2) Google's 'value add.'"). *See also*, GOOG-AT-MDL-008930754, at -757 (03/09/2017) ("ASC 606 Adoption: DBM Principal vs. Agent Summary") ("Optimized advertising is a combination of the following items: (1) the ad inventory, and (2) Google's 'value add.'").

[58]   GOOG-AT-MDL-008930806, at -815 (09/2021) ("Ads Revenue Recognition (Gross vs. Net)") ("[O]ur assessment of the factors above would indicate that we control the enhanced ad inventory for the following reasons…"). *See also*, GOOG-AT-MDL-008930629, at -636 (07/30/2021) ("Principal vs. Agent – Authorized Buyers and Open Bidding") ("We control the optimized ad inventory before it is transferred to our customers for the following reasons…"). *See also*, GOOG-AT-MDL-008930642, at -646 (02/07/2020) ("Principal vs.

17

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## VII. Appendix A: Curriculum Vitae

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## ADORIA LIM
Global Practice Leader, Accounting Practice
Managing Director, San Francisco Office

San Francisco, CA                  +1.415.217.1064                  Adoria.Lim@brattle.com

**Ms. Adoria Lim** is the head of Brattle's Accounting Practice and its San Francisco office. She is a Certified Public Accountant (CPA) with two decades of experience in accounting and finance at a Big 4 accounting firm, a Fortune 500 publicly-traded company, and as a consultant.  Ms. Lim is also a Certified Fraud Examiner (CFE), Certified in Financial Forensics (CFF), and Accredited in Business Valuation (ABV). She focuses on matters that involve accounting, auditing, finance, damages, and fraud.

Ms. Lim has directed research involving the evaluation of accounting and disclosures with regard to Generally Accepted Accounting Principles (GAAP), the evaluation of audit and review procedures with regard to Generally Accepted Auditing Standards (GAAS), the evaluation of the adequacy of internal controls over financial reporting (ICFR), and the appropriateness of cost accounting allocations.

Ms. Lim's expertise includes forensic accounting analysis; the preparation of pro forma and carve-out financial statements; profitability analysis, including estimates of "but for" revenues, costs, and profits; valuation; and loss causation and damages analyses.  She has reconstructed financial records, traced transactions through accounting systems, reviewed payment and cash flow information, and determined liquidity and equity positions.

Ms. Lim has directed research in SEC, DOJ, and PCAOB investigations and enforcement actions; tax disputes with the IRS; auditor malpractice suits; securities class actions; breach of contract matters; purchase price disputes; and intellectual property disputes.  Her clients have included the SEC, the DOJ, Cisco, Halliburton, LG Philips, Vivendi, and Big 4 accounting firms.

Prior to joining The Brattle Group, Ms. Lim was a Principal at Corporate Diligence Specialists LLC (CDS), where she directed financial and accounting diligence related to mergers and acquisitions for private equity funds, investors, and lenders.  Prior to CDS, Ms. Lim was a Principal at Cornerstone Research, where she directed research on behalf of clients in complex litigation.

30

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## EDUCATION

- M.B.A., Stanford University
- B.A., Economics, University of California, Los Angeles (UCLA)

## ACADEMIC HONORS

University of California, Los Angeles
- Regents Scholar
- Summa Cum Laude
- Phi Beta Kappa
- Golden Key Honor Society

## CERTIFICATIONS

- Certified Public Accountant (CPA)
- Certified Fraud Examiner (CFE)
- Certified in Financial Forensics (CFF)
- Accredited in Business Valuation (ABV)

## AREAS OF EXPERTISE

- Financial Accounting and Reporting
- Internal Controls over Financial Reporting
- Auditing
- Forensic Accounting
- Fraud
- Mergers & Acquisitions
- Valuation
- Managerial and Cost Accounting
- Profitability Analysis
- Tax Controversy
- General Damages

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## PUBLICATIONS

"Coronavirus (COVID-19) May Bring Litigation Fever," with Jack Turner, published by *Wolters Kluwer*, 2020.

"The Do's and (Mostly) Don'ts of Non-GAAP Measures," with Chi Cheng, published by *Law360*, 2017.

"Due Diligence is the Mother of Good Luck," published by *Financier Worldwide*, 2016.

"How Principles-Based Accounting Standards Impact Litigation," with Chi Cheng, published by *Law360*, 2016.

"Non-GAAP Measures: The SEC Awakens," published by the Securities Litigation Section of the American Bar Association, *Practice Points*, 2015.

"The Unaccounted Cost of Accounting-Sounding Terms in Purchase Agreements," with Yvette Austin Smith, published by *Financier Worldwide*, 2015.

"What Makes Securities Class Actions with Accounting Allegations Different," with Elaine Harwood and Laura Simmons, published by American Bar Association, 2011.

## LECTURES

Panelist, "Preparing for SEC's Financial Fraud Probes: What Companies Need to Know LIVE Webcast," presented by The Knowledge Group, 2019.

Panelist, "Accounting Fraud & SEC Investigations: What Lies Ahead in 2017 & Beyond LIVE Webcast," presented by The Knowledge Group, 2017.

Panelist, "SEC Revised Compliance and Disclosure Interpretations (C&DIs): Time to Rethink Your Firm's Current Non-GAAP Measures LIVE Webcast," presented by The Knowledge Group, 2016.

Panelist, "Class Action Settlements: Trends, Lessons Learned, and Creative New Approaches," 3rd Annual Western Regional CLE Program on Class Actions and Mass Torts, presented by the ABA Section of Litigation CADS Committee and The Bar Association of San Francisco, 2016.

Guest lectures: Princeton University (2016, 2017); University of Southern California (USC), Leventhal School of Accounting (2016, 2017); University of California at San Diego (UCSD), Rady School of Management (2015); New York University (NYU), Stern School of Business (2010, 2011).

32

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## SELECTED LITIGATION EXPERIENCE

### Financial Accounting and Reporting, Internal Controls, and Auditing

- Directed research, as a testifying expert, in a dispute between a power plant and one of its power purchasers.  Analyzed accounting for a litigation settlement between the power plant and one of its vendors.  Attorneys: Sutherland Asbill & Brennan.

- Directed research for the SEC in an investigation of a public company's purchase price allocation related to an acquisition and subsequent accounting for goodwill.

- Directed research for Ernst & Young LLP which was accused of failing to meet audit standards in its audit of Lehman Brothers.  Analyzed accounting and auditing issues. Analyzed investment banking practices, including financing and liquidity arrangements such as repurchase agreements.  Attorneys: Latham & Watkins.

- Directed research for executives of Qwest (now CenturyLink) who were charged by the SEC for accounting fraud.  Analyzed lease accounting, revenue recognition, and internal controls over financial reporting in the context of swaps, exchanges, and multi-element arrangements.  Attorneys: Clifford Chance; Steese, Evans & Frankel.

- Directed research for Alstom which was accused of accounting fraud. Analyzed percentage-of-completion accounting, consolidation of special purpose entities, and accounting and disclosure of loan guarantees. Attorneys: Hughes Hubbard & Reed.

- Directed research for Scientific Atlanta (now part of Cisco) which was accused of accounting fraud.  Analyzed disclosure of material adverse trends, revenue recognition, and internal controls with regard to collectability and delivery obligations.  Attorneys: Winston & Strawn.

- Directed research for Cisco which was accused of accounting fraud. Analyzed reserves for inventory, loans, and product returns; revenue recognition in the context of vendor financing; and accounting for loan guarantees. Attorneys: Winston & Strawn.

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## SELECTED LITIGATION EXPERIENCE (continued)

### Forensic Accounting, Fraud

- Directed research, as a testifying expert, for the DOJ with regard to an alleged false invoicing scheme perpetrated by taxpayers to reduce taxes. Analyzed thousands of source documents, including invoices, purchase orders, and bank statements, to reconstruct supply chain paper trail and cash flows.

- Directed research, as a testifying expert, for plaintiffs in a class action alleging price fixing amongst manufacturers of canned tuna (Bumble Bee, StarKist, and Chicken of the Sea). Analyzed relationships between parent companies and their subsidiaries, including control; transfers of economic benefits from subsidiaries to parent companies; and the impact of dividends, a stock repurchase, and leverage on companies' assets, earnings, and financial health. Attorneys: Wolf Haldenstein.

- Directed research, as a testifying expert, for a real estate developer accused of claiming excess local governmental subsidies.  Analyzed developer's expenses and claims. Attorneys: Morrison & Foerster.

- Directed research for investor in an alleged Ponzi scheme. Reviewed bank statements and accounting records to analyze roundtrip transactions conducted by related parties used to mask Ponzi scheme. Attorneys: Schindler Cohen & Hochman.

- Directed research for Vivendi related to the company's sudden credit default. Analyzed the company's treasury management practices, liquidity, and cash transfers among subsidiaries and the parent company.  Attorneys: Cravath, Swaine & Moore.

- Directed research for AOL Time Warner which was accused of improper revenue recognition. Reviewed thousands of pages of documents, including emails, voicemails, purchase orders, invoices, contracts, and audit workpapers, as well as reconstructed accounting and payment records, for approximately one hundred sales transactions related to the company's simultaneous other transactions with the same customers, including equity investments and purchases from customers.  Attorneys: Cravath, Swaine & Moore.

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## SELECTED LITIGATION EXPERIENCE (continued)

### Mergers & Acquisitions, Valuation

- Directed research, as a testifying expert, for the acquirer in an M&A transaction. Analyzed the valuation framework, the use of multiples, the meaning of EBITDA, and customary adjustments to EBITDA. Attorneys: King & Spalding.

- Directed research, as a testifying expert, for a private equity firm accused of selling a company whose financial statements violated accounting standards. Analyzed the acquired company's accounting for fixed assets, internal controls over same, EBITDA calculations, and damages to the acquirer. Attorneys: Paul Weiss Rifkind Wharton & Garrison.

- Directed research for the DOJ in its investigation of the potential merger between Aetna and CVS. Analyzed potential cost synergies.

- Directed research for a venture capital firm who accused the seller of an acquired company of accounting fraud.  Analyzed the acquired company's internal controls and revenue recognition.  Computed alternative purchase price had the acquired company used cash accounting instead of accrual accounting.  Attorneys: Wilson Sonsini Goodrich & Rosati.

- Directed research for an international corporation that had acquired another company. Analyzed whether the acquired company's foreign transaction gains and losses should be included in the computation of an earn-out provision in accordance with the securities purchase agreement.  Attorneys: Sidley Austin.

- Directed research for a national video rental chain as to whether recent changes in industry and market conditions on the company's future revenues, margins, profits, and potential debt ratings resulted in a material adverse change (MAC) with regard to a leveraged buy-out of the company.  Attorneys: Gibson, Dunn & Crutcher.

- Directed research for Cisco which was accused of improperly acquiring a start-up. Analyzed the start-up's likelihood of obtaining investment or acquisition from third parties, and the start-up's valuation. Attorneys: Winston & Strawn.

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## SELECTED LITIGATION EXPERIENCE (continued)

### Pro Forma/Carve-Out Analysis, Profitability Analyses, Cost Accounting

- Directed research, as the testifying expert, for the Government of India. Analyzed the application of cost allocation principles to common costs incurred for multiple development areas in an Oil & Gas production sharing contract. Attorneys: RS Prabhu.

- Directed research for the shareholders of a bankrupt savings bank who accused the U.S. government of wrongly shutting it down. Constructed carve-out pro forma financial statements to determine the profits of a bank division.  Attorneys: Winston & Strawn.

- Directed research for Amazon.com which was accused by the IRS of allocating insufficient costs from its domestic operations to its foreign operations in the context of an intangible property cost sharing agreement. Analyzed the company's cost accounting, common costs, and the company's allocation of intangible property development costs.  Attorneys: Skadden, Arps, Slate, Meagher & Flom; and Bingham McCutchen.

- Directed research for a real estate marketing agency accused of violating antitrust regulations regarding horizontal integration.  Analyzed the stand-alone revenues, and allocated costs and profits of the agency's business segments to determine if any such segments were viable as stand-alone businesses.

- Directed research for Halliburton which was under investigation by the DOJ for bribes paid to foreign officials to obtain construction contracts in Nigeria, a violation of the Foreign Corrupt Practices Act.  Analyzed revenues, allocated costs (including cost of capital), profits, and cash flows from ill-gotten gains.  Attorneys: Baker Botts.

### Tax Controversy

- Directed research for sellers of an investment management company in dispute with the IRS as to the amount of sales proceeds that should be treated as a capital gain or as ordinary income. Analyzed consolidation and control. Attorneys: McDermott Will & Emery.

- Directed research for an international publisher and distributor of video games.  Analyzed the valuation of intangible property transferred from domestic to foreign operations.

36

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- Directed research for banking institutions accused by the IRS of engaging in certain financing transactions solely for the purpose for of reducing U.S. federal tax obligations. Analyzed profits generated by the transactions in question and contemporaneous financing alternatives and their costs/benefits.  Attorneys: Bingham McCutchen.

## General Damages

- Directed research, as a testifying expert, for the majority shareholder in the valuation of a minority interest, shareholder damages due to delays in shareholder distributions, and prejudgment interest. Attorneys: Paul, Weiss, Rifkind, Wharton & Garrison LLP.

- Directed research, as a testifying expert, for SoundExchange on the quantum of copyright royalties owed by a provider of digital sound recordings.  Attorneys: Jenner & Block.

- Directed research, as a testifying expert, for plaintiffs in a class action against Blue Shield of California which was accused of inappropriately failing to reimburse qualifying claims. Analyzed insurer's avoided costs. Attorneys: Grant & Eisenhofer; and Zuckerman Spaeder.

- Directed research for Diageo, an international beverage producer and distributor, related to allegations of trademark confusion. Examined issues of causation and disgorgement under the Lanham Act. Attorneys: Proskauer Rose.

- Directed research for a Big 4 accounting firm accused of failing to meet audit standards in its audit of a failed credit card bank. Analyzed the company's losses caused by the alleged audit failure and how, if any, changes in the audit firm's behavior could have reduced that loss.  Attorneys: Latham & Watkins.

- Directed research for a manufacturer of solar panels accused by a supplier of purchasing insufficient quantities in violation of a supply contract.  Analyzed damages to the supplier, including lost revenues, costs, and contribution margin, and changes to those measures resulting from reduced economies of scale.  Attorneys: Sidley Austin.

## EXPERT REPORTS AND PRIOR TESTIMONY

- *Proposed Debarment of Mr. Wallace Haislip and Mr. Julian Eidson.* Report, 2009, on behalf of defendants. Accounting for marketing support agreements. Attorneys: Gibson Dunn.

37

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- *Benchmark Institute Fiscal Monitoring.* Report, 2012, on behalf of monitoring entity. Maintenance of accounting records and internal controls. Attorneys: Winston & Strawn.

- *South Mississippi Electric Power Association v. Plum Point Energy Associates, LLC.* Report, deposition, and arbitration hearing, 2016, on behalf of plaintiff. Accounting treatment and audit of a litigation settlement (GAAP and GAAS).  Attorneys: Sutherland Asbill & Brennan.

- *Crestview DSW Investors, L.P. v. Cott Corporation.* Reports, 2017, on behalf of defendant. Accounting for business combinations and fixed assets, asset write-downs, valuation of a privately-held company, adjusted EBITDA, internal controls, and damages. Attorneys: Paul, Weiss, Rifkind, Wharton & Garrison LLP.

- *Charles Des Roches, et al. v. California Physicians' Service d/b/a Blue Shield of California, et al.* Report and deposition, 2017, on behalf of plaintiffs. Calculation of costs avoided by health insurer by denying claims. Attorneys: Grant & Eisenhofer; and Zuckerman Spaeder.

- *SoundExchange, Inc.* v. *Muzak LLC.* Report and deposition, 2019, on behalf of plaintiff. Calculation of underpayment of copyright royalties.  Attorneys: Jenner & Block.

- *In Re: Packaged Seafood Products Antitrust Litigation.* Reports and depositions, 2019, 2022, and 2023, on behalf of plaintiffs. Relationships between parent companies and their subsidiaries, including control; transfers of economic benefits from subsidiaries to their parent companies; the impact of dividends and a stock repurchase on a company's assets and earnings; and the impact of a leveraged buyout on a company's leverage, earnings, and financial health.  Attorneys: Wolf Haldenstein.

- *Oliver Luck v. Vincent K. McMahon and Alpha Entertainment LLC.* Report and deposition, 2021, on behalf of plaintiff. Quantum of lost compensation and the materiality of a business decision.  Attorneys: Shipman & Goodwin; and Dubrowski, Larkin & Stafford.

- *Agro Merchants LATAM Holdings S.à r.l. v. Agrofundo Brasil II Fundo de Investimento em Participações, AGF Latin America LP, Leiden PE LP, and Mid-Market LAIF LP.* Reports, 2021 and 2022, on behalf of plaintiff. Principles of valuation, the use of multiples, the meaning of EBITDA, and customary adjustments to EBITDA in an M&A transaction. Attorneys: King & Spalding.

HIGHY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

- *Nancy Lazar v. Edward S. Hyman and ISI Holding, Inc.*, Reports and deposition, 2021, on behalf of defendants. Valuation of a minority interest, shareholder damages due to delays in shareholder distributions, and calculation of prejudgment interest. Attorneys: Paul, Weiss, Rifkind, Wharton & Garrison LLP.

- *Vedanta Limited and Cairn Energy Hydrocarbons Limited v. The Government of India*. Reports and arbitration hearing, 2022, on behalf of defendant. Application of cost allocation principles to common costs incurred for multiple development areas in an Oil & Gas production sharing contract.

- *United States of America v. Francis Burga and Francis Burga as the Administrator of the Estate of Margelus Burga*. Report and deposition, 2023, on behalf of plaintiff (DOJ). Analysis of supply chain activities and cash flows related to an alleged false invoicing scheme perpetrated by taxpayers to reduce taxes.

- *City of Atlanta Policy Officers' Pension Plan, et al. v. Celsius Holdings, Inc. et al.* Report, 2023, on behalf of plaintiffs. Accounting for a company's modifications of shared-based compensation.

HIGHLY CONFIDENTIAL

107.    Similar to Sotheby's, once a publisher puts ad inventory available on one of Google's sell-side platforms, Google has an exclusive agreement with the publisher to perform activities that culminate in the matching of a publisher to an advertiser. Such an exclusive arrangement does not mean that Google has "control" or that Google is the principal in its auction activities.

108.    GAAP also provides three indicators that an entity controls the good or service: (a) the entity has primary responsibility for fulfilling the promise to provide the good or service, (b) the entity has inventory risk, and (c) the entity has discretion in establishing the price.[110] While Google arguably does have primary responsibility for the promise to match ad inventory with advertisers, it does not meet the other two indicators. As Google states in its accounting policies, it "does not have substantive inventory risk as [it] do[es] not purchase ad inventory from the publishers in advance of sale to [its] customers."[111] With respect to the third indicator, the pricing is primarily driven by floors provided by the publishers and bid limits set by advertisers. Thus one could conclude that Google does not have primary discretion in establishing the price. Consistent with Sotheby's accounting treatment, it would be reasonable to conclude that Google was an agent in the at-issue transactions.

109.    Indeed, other ad tech service providers, including Magnite Inc. and PubMatic, consider themselves to be *agents*, whereby they arrange for one party (the publisher) to provide a specified good or service to another party (the advertiser), *i.e.,* their role in display ad transactions is akin to that of a broker helping two parties make a deal.[112] Other companies that provide ad tech services

---

[110]  ASC 606-10-55-39.

[111]  GOOG-AT-MDL-008930621, at -627 (07/26/2021).

[112]  ASC 606-10-55-36 ("When another party is involved in providing goods or services to a customer, the entity should determine whether the nature of its promise is a performance obligation to provide the specified goods or services itself (that is, the entity is a principal) or to arrange for those goods or services to be provided by the other party (that is, the entity is an agent)." Magnite, Inc. 2020 10-K, p. 47 ("We generate revenue from the purchase and sale of digital advertising inventory through our platform. We also generate revenue from the fee we charge clients for use of our Demand Manager product, which generally is a percentage of the client's advertising spending on any advertising marketplace. We recognize revenue upon the fulfillment of our contractual obligations in connection with a completed transaction, subject to satisfying all other revenue recognition criteria. For substantially all transactions executed through our platform, we act as an agent on behalf of the publisher that is monetizing its inventory, and revenue is recognized net of any advertising inventory costs that we remit to sellers."). Pubmatic discloses that it records revenue as an agent. *See* Pubmatic 2022 10-K, at p. 73 ("The Company has determined that it does not act as the principal in the purchase and sale of digital advertising inventory because it does not control

HIGHLY CONFIDENTIAL

also record revenue as agents.[113] Moreover, some employees at Google have constructed DVAA P&Ls showing "operating profits relative to net revenue,"[114] whereby TAC is netted against revenue, as though Google were an agent, not a principal. In one email exchange between two Google finance employees, one stated, "[G]iven the way the P&L is constructed, with all principal (O&O) businesses stripped out, and only "agent" (intermediary) businesses included in the P&L, the economics are never going to look great. Another way to look at the P&L is: operating profits relative to net revenue, **similar to how most agency businesses report their financials**. On that basis, operating profit percent goes from ███████████████████ in 2022. I shared this

---

the advertising inventory and it does not set the price which is the result of an auction within the marketplace. Based on these and other factors, the Company reports revenue on a net basis.").

[113]   Criteo records revenue for its Criteo Marketing Solutions and certain revenue from the Criteo Retail Media segment as a principal while it records other revenue from the Criteo Retail Media segment and that from Iponweb as an agent. *See* Criteo S.A. 2022 10-K, at p. F-17 ("We act as principal in our Criteo Marketing Solutions arrangements because (i) we control the advertising inventory before it is transferred to our clients; (ii) we bear sole responsibility in fulfillment of the advertising promise and bear inventory risks and (iii) we have full discretion in establishing prices…We act either as principal or as agent in our Criteo Retail Media segment. For the arrangements related to transactions using our legacy Retail Media solutions, we consider that we act as principal, as we exercise significant control over the client's advertising campaign. For arrangements related to transactions using our Platform, a self-service solution providing transparency, measurement and control to our brand, agency and retailer customers, we act as agent, because we (i) do not control the advertising inventory before it is transferred to our clients, (ii) do not have inventory risks because we do not purchase the inventory upfront and (iii) have limited discretion in establishing prices as we charge a platform fee based on a percentage of the digital advertising inventory purchased through the use of the platform…We act as agent in Iponweb provided solutions as we (i) do not control the advertising inventory before it is transferred to our clients, (ii) do not have inventory risks because we do not purchase the inventory upfront and (iii) have limited discretion in establishing prices as we charge a fee based on a percentage of the digital advertising inventory traded through our solutions.").

Tremor, which purchased Amobee in September 2022, discloses that it records transactions as an agent. *See* "Tremor International Ltd 2022 Annual Report," p. 47 ("The Company concluded that its Programmatic activity (i) does not have manual control over the process, (ii) the Company is not primarily responsible for fulfillment, (iii) the Company has no inventory risk and (iv) the Company obtains only momentary a title to the advertising space offered via the end-to-end platform. As a result, the Company reports its Programmatic business, tech stack, features, business models and activity as an agent and therefore presented revenue from Programmatic on a net basis.").

[114]   GOOG-DOJ-09729045 at -046 (11/28/2017) ("DVAA").

HIGHLY CONFIDENTIAL

alternative way to look at the P&L with Kristin before, she seemed receptive to it." (emphasis added)[115] I assume Google management would be interested in looking at the profitability in this way because they measure their performance against the revenues they actually retain—not revenues that include amounts shared with their publisher partners. The revenues that are shared with the publishers are fixed and beyond the control of the managers; to the extent management could improve profitability, it would be through controlling costs other than TAC.

### b.   *Alternative DVAA P&L Excluding AdMob (Net Revenue Basis)*

110.    **Figure 30** below depicts a DVAA Excluding AdMob P&L if, in the alternative, Google could be considered an agent in display ad transactions. As discussed earlier, Google refers to Booked Revenues minus TAC as Net Revenues. Treating Net Revenues as the top line in the DVAA Alternative P&L does not change the dollar amounts of gross or operating profit. However, it does have the effect of amplifying the margins on a percentage basis because revenues (denominator) decrease but dollar profits (numerator) remain the same, making negative profit margins more negative and positive profit margins more positive. For example, comparing **Figure 28** (booked revenue basis) to **Figure 30** (net revenue basis), the 2022 operating profit margin is 6 percent on a booked revenue basis but 18 percent on a net revenue basis. **Figure 31** is a summary of the profit margins from both **Figure 28** (booked revenue basis) and **Figure 30** (net revenue basis).



---

115  *Id.*