# Exhibit E
# (previously filed as Dkt. 647-5)

CONFIDENTIAL

Page 1

```
IN THE UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF VIRGINIA
          ALEXANDRIA DIVISION
---------------------------:
UNITED STATES, et al.,     :
                           :
          Plaintiff,       :
                           :
     vs.                   : Case No.:
                           : 1:23-CV-00108-LMB-JFA
GOOGLE, LLC,               :
                           :
          Defendant.       :
---------------------------:
```

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ADORIA LIM

DATE:        February 29, 2024
TIME:        9:37 a.m.
LOCATION:    U.S. Department of Justice
             Antitrust Division
             450 Fifth Street, Northwest
             Washington, D.C. 20530

REPORTED BY: Shari R. Broussard, RPR, CSR
             Reporter, Notary
Job No. CS6485261

Page 62

1  between DV360, 3P DSPs, and Google Ads on the left
2  side and FAAs in the blue bubble on the right
3  side?
4       MR. BRISKIN:  Objection to form.
5       THE WITNESS:  I guess I'm just not
6  following your question.  The -- I hadn't thought
7  about it that way.  The way I think about it is
8  that the FAAs purchase the services from Google
9  and -- and that's what -- that's what is conveyed
10 in Figure 3.
11 BY MS. GOODMAN:
12     Q    So you don't have an opinion one way or
13 another whether it would be accurate to put the ad
14 agencies in between the DV360, 3P DSPs, and Google
15 Ads on the left side and the FAA bubble on the
16 right side?
17      MR. BRISKIN:  Objection to form.
18      THE WITNESS:  I think if you're asking
19 if I were to do a diagram of the purchase pathways
20 with regard to the payment flows, then -- I mean,
21 could one draw -- draw a diagram in such a way
22 that you could insert -- or you could put circles

Page 63

1  in between -- if you had a string of circles -- I
2  mean, you could choose to draw the diagram however
3  you want.  You could -- you could put the circles
4  there, you could -- I'm not sure I understand your
5  question.
6  BY MS. GOODMAN:
7       Q    Does diagram -- or does Figure 3 leave
8  out a step in the purchasing pathway for the FAAs?
9       MR. BRISKIN:  Objection to form.
10      THE WITNESS:  Diagram 3 shows that the
11 FAAs purchased services from Google.
12 BY MS. GOODMAN:
13     Q    Does it leave out a step --
14      MR. BRISKIN:  Objection to form.
15 BY MS. GOODMAN:
16     Q    -- of your purchasing pathways?
17      MR. BRISKIN:  Sorry.  Objection to form.
18      THE WITNESS:  I'm -- I'm not sure what
19 you mean by the question.  I don't think it
20 leaves -- I don't think Figure 3 leaves out any
21 steps.
22 BY MS. GOODMAN:

Page 64

1       Q    Okay.
2       A    It shows the FAAs purchasing services
3  from Google.
4       Q    Is there a difference in your report
5  between what you call a purchasing avenue and a
6  purchase pathway?
7       A    The purchase pathway is a very defined
8  term in my report.  I don't think the purchase
9  avenues -- I think I use that rather loosely.
10     Q    Okay.  So if we were to retitle Figure 3
11 "Illustration of FAAs' Purchasing Pathways," you
12 would need to include the advertising agencies in
13 this diagram, correct?
14      MR. BRISKIN:  Objection to form.
15      THE WITNESS:  I -- honestly I hadn't
16 thought about it, so I mean I --
17 BY MS. GOODMAN:
18     Q    I'm asking you to think about it here.
19     A    I haven't thought about it.  I don't --
20 I don't know how I would draw that.
21     Q    Okay.  Let's look at Figure 4.  The
22 purchasing is -- this Figure 4 is titled "Purchase

Page 65

1  Avenues Included in Damages Analysis."
2       Do you see that?
3       A    I do.
4       Q    And the purchase avenues included in the
5  damages analysis are the 15 defined purchase
6  pathways, correct?
7       MR. BRISKIN:  Objection to form.
8       THE WITNESS:  One more time, please.
9  BY MS. GOODMAN:
10     Q    The purchase avenues included in your
11 damages analysis are the 15 defined purchasing
12 pathways set out in Figures 8, 9, and 10, correct?
13     A    That's not the way I would --
14      MR. BRISKIN:  Objection.
15      THE WITNESS:  -- phrase it.
16 BY MS. GOODMAN:
17     Q    Okay.  Your damages analysis includes 15
18 defined purchase pathways, correct?
19     A    That's correct.
20     Q    And what is the difference between those
21 15 defined purchase pathways and what you describe
22 in Figure 4 as the "FAA Purchase Avenues Included

Page 66

1  in Damages Analysis"?
2  A   The -- the avenues are the red lines
3  or -- or, sorry, the FAA purchase avenues are the
4  red arrows shown in Figure 4 and the FAA purchase
5  pathways are a subset of the red avenues.
6  Q   Okay.  Did you see any evidence --
7  withdrawn.
8      And so would it be accurate to put in
9  between the left-hand side of DV360, TTD, other
10 DSPs, and Google Ads and the right-hand side blue
11 bubble FAAs the advertising agencies through which
12 FAAs purchase ads?
13     MR. BRISKIN:  Objection to form.
14     THE WITNESS:  I think this question was
15 similar to the previous question you asked me
16 before.  Figure 3 just is different from -- I'm
17 sorry, Figure 4 is different from Figure 3 in that
18 it breaks out more binders and it shows the red
19 arrows, which are the FAA purchase pathways, of
20 which the -- sorry, it shows the red arrows, which
21 are the FAA purchase avenues, of which the FAA
22 purchase pathways are a -- are a subset.  So that

Page 67

1  I -- I -- I -- I think you're asking a very
2  similar question with regard to Figure 3 and
3  Figure 4.  I don't -- I would have the same
4  answer.
5  BY MS. GOODMAN:
6  Q   Okay.  And it's accurate that the FAAs
7  purchased display ads from Google using various ad
8  agencies, correct?
9  A   Yes.
10 Q   Did you see any evidence that FAAs
11 purchased display ads directly from Google?
12     MR. BRISKIN:  Objection to form.
13     THE WITNESS:  Could you clarify what you
14 mean by "directly"?
15 BY MS. GOODMAN:
16 Q   With no other entity sitting in between
17 the FAA and Google.
18     MR. BRISKIN:  Objection to form.
19     THE WITNESS:  What -- what do you -- can
20 you clarify what you mean by "sitting in between"?
21 BY MS. GOODMAN:
22 Q   Well, Mr. Briskin is sitting in between

Page 68

1  yourself and Mr. Chu.  That's what I mean.
2  Imagine yourself to be an FAA and Mr. Chu being
3  Google.
4      Is there any other entity between the
5  FAA and Google in the course of purchasing ads
6  that you saw?
7      MR. BRISKIN:  Objection to form.
8      THE WITNESS:  So I'm not -- sorry, I'm
9  not -- I'm not sure the -- the seating -- the
10 hypothetical -- or it's not hypothetical, but the
11 seating diagram really helps me understand your
12 question.
13     Again, the FAAs and -- the FAAs
14 purchased display advertising from Google and, as
15 I testified earlier, that the FAAs used ad
16 agencies to do so.
17 BY MS. GOODMAN:
18 Q   Okay.  And by using the ad agencies to
19 do so, is it accurate that the ad agencies sit
20 between the FAAs and Google?
21     MR. BRISKIN:  Objection to form.
22     THE WITNESS:  Again, I'm not sure what

Page 69

1  you mean by "sit between."
2  BY MS. GOODMAN:
3  Q   So you can't answer the question?
4  A   I think you'd have to clarify it for me.
5  Q   Okay.  What's your understanding of the
6  word "directly"?
7      MR. BRISKIN:  Objection to form.
8      THE WITNESS:  I -- I -- it depends on
9  the context.
10 BY MS. GOODMAN:
11 Q   Can you give me a dictionary definition
12 of the word "directly"?
13 A   Probably not without the dictionary.
14 Q   Okay.
15 A   I'm sorry, just -- I -- I wasn't
16 prepared on dictionary definitions today.
17 Q   Okay.  Did you see any evidence that the
18 FAAs paid money directly to Google?
19     MR. BRISKIN:  Objection to form.
20     THE WITNESS:  Again, can you clarify
21 what you mean by "directly"?
22 BY MS. GOODMAN:

18 (Pages 66 - 69)

Page 70

1  Q   Dollars went from an FAA directly to
2  Google.
3      MR. BRISKIN:  Objection to form.
4      THE WITNESS:  So let me -- let me -- let
5  me state it this way:  So what I saw in the
6  payment process was that Google invoiced the --
7  Google invoiced the ad agencies and the ad
8  agencies invoiced the FAAs and the FAAs paid
9  100 percent of the charges invoiced by Google.
10     VIDEO TECHNICIAN:  Sorry, ma'am, it
11 picks up when you're touching the microphone.
12     THE WITNESS:  Oh, sorry.  I've probably
13 just got a nervous habit there.  Apologies.  Do I
14 need to say that again?
15     VIDEO TECHNICIAN:  No, you're fine.
16     THE WITNESS:  Okay.
17 BY MS. GOODMAN:
18  Q   And so in what you saw, if I'm
19 understanding you correctly, Google invoiced the
20 ad agencies and the ad agencies invoiced the FAAs,
21 correct?
22  A   Yes.

Page 71

1  Q   Okay.  And so in what you saw, can we
2  have the common understanding that the ad
3  agencies, therefore, sit between Google and the
4  FAAs?
5      MR. BRISKIN:  Objection to form.
6  BY MS. GOODMAN:
7  Q   That's what I mean by "sit between."
8  Okay?
9  A   Are you referring to the payment process
10 specifically when you refer to -- to "sit
11 between"?
12  Q   I'm referring to both the payment and
13 purchasing process.
14     MR. BRISKIN:  Objection to form.
15     THE WITNESS:  I reviewed the -- I
16 reviewed the payment process.
17 BY MS. GOODMAN:
18  Q   Did you review the purchasing process?
19  A   What do you mean by "purchasing
20 process"?
21  Q   What's your understanding of the
22 difference between payment and purchase?

Page 72

1  A   I'm -- I'm -- I'm trying to actually
2  understand what you mean by the difference between
3  payment and purchase because you -- you asked a
4  question about purchase, you asked a question
5  about -- and I clarified with regard to payment.
6  And -- and so if you could clarify what you mean
7  by "purchase."
8  Q   I want to use --
9  A   I don't want to have a
10 misunderstanding --
11  Q   I agree.
12  A   -- between the two of us.
13  Q   I agree.
14     You used the word "purchase" throughout
15 your report, so I want to use your understanding
16 of purchase and I want to use your understanding
17 of payment, which is also in your report.
18     So please tell me what you understand to
19 mean the difference between those two words as
20 used in your report and we will have that common
21 understanding.
22  A   So as I testified earlier, my

Page 73

1  understanding is that based on what I saw, the
2  FAAs purchased an advertising from Google.  With
3  regard to the payment flow process specifically,
4  Google invoiced the ad agencies and the ad
5  agencies invoiced the FAAs and the payments
6  reflect the invoiced parties.
7      MS. GOODMAN:  Move to strike as not
8  responsive.
9  BY MS. GOODMAN:
10  Q   My question to you is simply what do you
11 understand the difference in meaning of the words
12 "payment" and "purchase" to be in your report?
13  A   Purchase in my mind is who is -- it's
14 who is -- it's -- it's the advertiser buying the
15 ad inventory.  Payment refers, in -- in my mind,
16 to the physical flow of funds.
17  Q   Okay.  So did you see any evidence that
18 an FAA buys ad inventory directly from Google?
19     MR. BRISKIN:  Objection to form.
20     THE WITNESS:  As I stated earlier,
21 the -- the FAAs purchased advertising from -- they
22 purchased services from Google.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

BY MS. GOODMAN:

Q  Yes.

A  I'm not -- I'm not -- again, I'm not sure what you mean by "directly."  I think I've -- I think I've stated my understanding of both the -- of who's doing the purchasing and who's doing the paying in terms of the payment flow process.

Q  It is accurate that some of the ad agencies used by FAAs engaged other ad agencies to execute the FAAs' ad purchases, correct?

A  Yes.

MR. BRISKIN:  Can we take a break in the next five minutes, whenever it's a good breaking point?

MS. GOODMAN:  Yeah.

BY MS. GOODMAN:

Q  Ms. Lim, did you see any evidence of an FAA buying ad inventory without the use of an advertising agency?

A  It's possible that that happened.  I was asked to focus my damages analysis -- or

Page 75

Dr. Respess was asked to focus his damages analysis on the specific F- -- FAA purchase pathways in the -- in the Respess report.

In -- in those pathways the FAAs used ad agencies to make their purchases of Google services, but it's -- it's -- it's possible that I -- I -- so, for example, what I'm -- let me just -- what I'm thinking about is, as I mentioned in my report, there are a number of blank agency IDs and I don't know in those circumstances where -- whether an ad agency was involved or not and I -- I can't recall -- no, no.  Sorry.  Strike that.  I do recall that there are FAAs associated with those blank agency IDs.

Q  Okay.  So for each of the 15 purchase pathways included in your damages analysis, did you see any evidence of any of the FAAs within those purchase pathways buying ad inventory without the use of an advertising agency?

A  By definition, those purchase pathways are as I've described them in Figures 8 through 10 of the opening report and each of those -- in each

Page 76

of those pathways the FAAs use ad agencies to make their purchases.

Q  And so it's accurate that, for purposes of the damages which you calculate in this case, there is no instance of an FAA buying ad inventory without the use of an advertising agency?

A  Yes.

MS. GOODMAN:  We can take a break.

MR. BRISKIN:  Thanks.

VIDEO TECHNICIAN:  Off the record at 11:38.

(Brief recess.)

VIDEO TECHNICIAN:  Back on the record at 11:53.

BY MS. GOODMAN:

Q  Ms. Lim, if you could turn to Exhibit 1, Appendix E, paragraph 44.

A  On page 17?

Q  Yes.

A  I'm there.

Q  The first sentence reads, "The FAAs purchased display ads from Google using various ad

Page 77

agencies."

Do you see that?

A  Yes.

Q  For purposes of your damages computation, did you see any evidence that any FAA directed the advertising agency to purchase ads using Google products or services?

MR. BRISKIN:  Objection to form.

THE WITNESS:  I'm not sure what you mean by "directed."

BY MS. GOODMAN:

Q  Did you see any evidence that any FAA told their advertising agency please purchase ads using Google products or services?

MR. BRISKIN:  Objection to form.

THE WITNESS:  I wasn't -- I was focused on the payment flow process, so I -- and I -- let me -- let me start over.

So in the course of my work -- work, as I mentioned before, I reviewed probably thousands -- probably thousands of -- of documents in this matter and I don't recall the contents of

CONFIDENTIAL

Page 78

1  each and every one of those.  What I -- what I
2  focused on was the payment flow process.
3       So with regard to your question, I
4  think -- I think my answer is I don't know.  I
5  don't -- I don't remember.
6  BY MS. GOODMAN:
7    Q   Okay.  So with regard to my question,
8  you don't remember whether you saw any evidence
9  that any FAA directed their advertising agency to
10 use Google products or services to purchase ads;
11 is that accurate?
12   A   I think --
13      MR. BRISKIN:  Objection to form.
14      THE WITNESS:  I think you modified your
15 question to say -- when you clarified, you said
16 did I see any evidence that an FAA had told an ad
17 agency.  And if -- if -- if that's how you're --
18 what you mean by "directed," I don't recall one
19 way or the other.
20 BY MS. GOODMAN:
21   Q   Okay.  That is what I mean by
22 "directed."

Page 79

1       So with regard to my question, you don't
2  remember whether you saw any evidence that any FAA
3  directed their advertising agency to use Google
4  products or services to purchase -- to purchase
5  ads; is that correct?
6       MR. BRISKIN:  Objection to form.
7       THE WITNESS:  If -- if in that question
8  you -- you mean to replace "directed" with "told,"
9  then I don't recall one way or the other.
10 BY MS. GOODMAN:
11   Q   I said that is what I mean by
12 "directed," so I would like to get a clear answer
13 to my question.
14   A   Sorry, I thought I was being -- being
15 clear.
16   Q   There's no question pending.
17   A   Apologies.
18   Q   Did you see any evidence in this case
19 that any FAA instructed their advertising agency
20 to use Google products or services to purchase
21 ads?
22      MR. BRISKIN:  Objection to form.

Page 80

1       THE WITNESS:  What do you mean by
2  "instructed"?  Do you mean told again?
3  BY MS. GOODMAN:
4    Q   What do you understand the word
5  "instructed" to mean?
6    A   It depends on the context.
7    Q   In the context of my sentence, how do
8  you interpret it?
9    A   I think that's what I'm asking you,
10 if -- if you're -- if you mean told.
11   Q   I just want to understand how you
12 under- -- how you interpret the word "instructed"
13 in my question.
14      What do you think I mean?
15      Let me withdraw that.
16      What do you understand the word
17 "instructed" to mean in my question?
18   A   Told.
19   Q   Okay.  Did you see any evidence in this
20 case that any FAA instructed their advertising
21 agency to use Google products or services to
22 purchase ads?

Page 81

1       MR. BRISKIN:  Objection to form.
2       THE WITNESS:  Could you -- one -- one
3  more time.  Sorry.
4  BY MS. GOODMAN:
5    Q   Did you see any evidence in this case
6  that any FAA instructed their advertising agency
7  to use Google products or services to purchase
8  ads?
9       MR. BRISKIN:  Objection to form.
10      THE WITNESS:  Sorry, I -- I just want to
11 be clear.  Again, it's -- it's the -- it's the FAA
12 is purchasing ads and -- and so -- so I think my
13 answer is the -- again, I'm not sure how that
14 question is different from your previous question,
15 which -- which I understand you to mean did I see
16 any evidence in this matter where the -- where an
17 FAA told an ad agency to use Google with regard to
18 the FAAs' purchase -- purchases of Google's
19 services.
20      And my -- so my answer would be that,
21 again, I've reviewed thousands of documents in
22 this matter and I don't recall the -- the content

21 (Pages 78 - 81)

Page 82

1  of each and every one of them, so I may have seen
2  something, I -- I may not. I -- I don't recall
3  one way or the other. It was not something I
4  focused on.
5      MS. GOODMAN: Move to strike.
6  BY MS. GOODMAN:
7     Q   It's accurate that the FAAs purchased
8  display ads from Google using various ad agencies,
9  correct?
10     MR. BRISKIN: Objection to form.
11     Oh, sorry.
12     THE WITNESS: Yes.
13  BY MS. GOODMAN:
14     Q   Okay. The FAAs used the various ad
15  agencies how to purchase ads from Google?
16     MR. BRISKIN: Objection to form.
17     THE WITNESS: I'm not sure what you mean
18  by "how."
19  BY MS. GOODMAN:
20     Q   How did the various ad agencies
21  participate in the process of purchasing display
22  ads from Google for the FAAs?

Page 83

1     A   So my work focused on the payment flow
2  process. I wasn't focused on the -- I wasn't
3  focused on exactly what the ad agencies did in
4  facilitating the FAAs' purchases of Google
5  services.
6     Q   Okay. Paragraph 44 of Appendix E, page
7  17, the sentence I just read is from that and it
8  cites to two documents in Exhibit 26 -- footnote
9  26.
10     Did you review those two documents cited
11  in footnote 26?
12     A   Yes.
13     Q   Did you come away with an understanding
14  of how the ad agencies participate in the process
15  of purchasing display ads from Google?
16     A   So a couple of clarifications. The -- I
17  know there are two Bates stamps in footnote 26. I
18  think it's actually the same document.
19     The -- the -- the document, as it's
20  noted in the footnote, is a contract between the
21  Air Force and GSD&M.
22     I was focused on -- my review of this

Page 84

1  particular contract was to provide overall context
2  to, for example, an FAA purchase pathway. It
3  wasn't -- I wasn't focused on the -- I wasn't
4  focused on what particular activities the -- the
5  ad agencies did.
6     Q   Okay. So sitting here today, do you
7  have any understanding of how the ad agencies
8  participate in the process of purchasing display
9  ads from Google for the FAAs?
10     And I'm not asking for what your
11  understanding is. I'm simply asking whether you
12  have an understanding of how they participate.
13     A   The -- the ad agencies facilitate the
14  FAAs' purchases.
15     Q   Okay. Do you know how the FAAs
16  facilitate the ad agencies -- the FAAs' purchases?
17     A   Again, I didn't focus on exactly what
18  activities they did.
19     Q   Okay. So do you have an understanding
20  of how the ad agencies facilitate the FAAs'
21  purchases?
22     A   I don't have a detailed understanding.

Page 85

1     Q   Do you have an understanding?
2     A   Yes.
3     Q   What is your understanding of how the
4  FA- -- how the ad agencies facilitate the FAAs'
5  purchases?
6     A   The -- the FAAs facilitate the FAAs'
7  purchases -- for example, I believe that --
8  that -- that they're the ones that log in, so to
9  speak, to Google Ads or DV360.
10     Q   And what is your understanding based on
11  that the ad agencies are the ones who log in, so
12  to speak, to Google Ads or DV360?
13     A   I -- I can't remember where I gained
14  that understanding.
15     Q   Okay. And it is your understanding
16  sitting here today that Google sends invoices to
17  ad agencies, correct?
18     A   Yes.
19     Q   And it is your understanding sitting
20  here today that Google -- that within your damages
21  calculations Google only sends invoices to ad
22  agencies, not directly to the FAA, correct?

CONFIDENTIAL

Page 86

1    MR. BRISKIN:  Objection to form.
2    THE WITNESS:  One more time, please.
3  BY MS. GOODMAN:
4    Q   Within your damages calculations, the
5  transactions within your damages calculations, is
6  it accurate that for all of those purchases Google
7  sent invoices to an ad agency, not to the FAA?
8    MR. BRISKIN:  Objection to form.
9    THE WITNESS:  Yes.
10  BY MS. GOODMAN:
11    Q   And for all of the transactions within
12  your damages calculations, did you see any
13  evidence that an FAA transmitted money directly to
14  Google?
15    MR. BRISKIN:  Objection to form.
16    THE WITNESS:  With regard to the payment
17  flow process, what I saw is that the FAAs cut
18  checks to the ad agencies and the ad agencies cut
19  checks to Google such that --
20  BY MS. GOODMAN:
21    Q   What evidence --
22    A   -- such that in the end the FAAs paid

Page 87

1  100 percent of the charges -- of Google's charges.
2    Q   What evidence did you see that ad
3  agencies cut checks to Google?
4    A   That would be in my Appendix E to the
5  opening report.
6    Q   What kinds of documents did you believe
7  were sufficient evidence to form the belief that
8  the ad agencies cut checks to Google?
9    MR. BRISKIN:  Objection to form.
10    THE WITNESS:  That's -- that's my
11  understanding from the payment flow process.
12  BY MS. GOODMAN:
13    Q   And I'm asking what kinds of documents
14  is your understanding based on.  I'm not asking
15  for a specific document, but what kinds of things
16  did you see that lead you to believe the -- or
17  leads you to the opinion that the ad agency cut a
18  check to Google?
19    A   Is -- it would be, for example, the
20  payment data and invoices that are listed in
21  Appendix E.
22    Q   What payment data did you see from an --

Page 88

1  from an advertising agency, not from the FAA, but
2  evidence of an advertising agency paying money to
3  Google?  What payment data are you referring to?
4    A   Perhaps it would be helpful to -- let me
5  just point that -- let me go to my Appendix E and
6  I -- I will -- well, I will go there.
7       So, for example --
8    Q   Can you -- I'm sorry to interrupt, but
9  can you just identify what page you're looking at?
10    A   I'm in -- I'm on pages 158 and 159.
11    Q   Thank you.
12       Go ahead.
13    A   So, for example, in the IPG MediaOcean
14  data I saw evidence of cuts being check -- or
15  checks being cut from an ad agency to Google.
16    Q   Okay.  And is it accurate that for no
17  other of the payment purchase pathways reflected
18  in your Appendix E do you include any evidence
19  that an ad agency cut a check to Google?
20    A   I'd -- I'd have to go through each and
21  every one.  I don't -- I don't recall specifically
22  the -- there were many invoices and much payment

Page 89

1  data that I looked at.  I just don't recall
2  specifically --
3    Q   Okay.
4    A   -- in terms of -- I -- I recall on --
5  for USPS we got a quite fulsome dataset, but I
6  just -- I just don't recall specifically with
7  regard to other pathways.
8    Q   If you saw payment data showing payments
9  from an advertising agency to Google, would that
10  be reflected in your Appendix E?
11    MR. BRISKIN:  Objection to form.
12    THE WITNESS:  It would be reflected in
13  my Documents Relied Upon list, the documents that
14  I relied upon.
15  BY MS. GOODMAN:
16    Q   But it wouldn't be in Appendix E?
17    A   Appendix E is a -- are examples of
18  walk-throughs that I performed with regard to the
19  payment process.  Appendix E includes documents
20  related to those walk-throughs.  But it's possible
21  that I saw additional payment data outside of
22  Appendix E.

Veritext Legal Solutions
800-567-8658                                                                                                973-410-4098

Page 90

1  Q  And just for the record, when you say
2  "Appendix E," you're talking about Appendix E to
3  the initial Respess report, correct?
4  A  Yes.
5  Q  And Appendix E to your rebuttal report
6  is, in fact, the initial Respess report, correct?
7  A  Corrected for errata.
8  Q  Yes.
9  A  Yes.  It's rather confusing.
10  Q  Okay.  So could we talk about Appendix E
11  to the Respess report in this deposition as
12  Appendix E/E so we know what we're talking about?
13  A  Wait, wait, wait, wait.  What do you
14  want to call it?  Wait.  Sorry?
15  Q  Withdrawn.
16     MR. BRISKIN:  Was that a joke?  Appendix
17  2.
18  BY MS. GOODMAN:
19  Q  Did you see any evidence in this case
20  for purposes of your damages calculation that any
21  FAA paid Google directly for the use of DV360?
22     MR. BRISKIN:  Objection to form.

Page 91

1     THE WITNESS:  Sorry, are we talking
2  about the FAA purchase pathways included in my
3  damages analysis?
4  BY MS. GOODMAN:
5  Q  Yes, ma'am.
6     MR. BRISKIN:  Same objection.
7     THE WITNESS:  What I saw was that --
8  again, what I saw was that Google invoiced ad
9  agency, ad agency invoiced FAA, FAA cut a check to
10  the ad -- ad agency, and ad agency cut a check to
11  Google.
12  BY MS. GOODMAN:
13  Q  Okay.  And so is it your testimony that
14  you did not see any evidence of Google paying
15  money -- strike that.  Withdrawn.
16     Is it accurate that you did not see any
17  evidence that any FAA paid money to Google
18  directly for the use of DV360?
19     MR. BRISKIN:  Objection to form.
20     THE WITNESS:  Sorry, sorry, I'm not --
21  I'm not sure what you mean by "directly," but we
22  just discussed in --

Page 92

1  BY MS. GOODMAN:
2  Q  May I --
3  A  -- US- --
4  Q  May I provide an understanding of -- let
5  me tell you my understanding of "directly" and
6  then maybe that will help you answer the question.
7  A  Okay.
8  Q  By "directly" I mean without the
9  intervention of somebody -- of a medium or an
10  agent.
11     So did you see any evidence that any FAA
12  paid Google directly for the use of DV360 for the
13  transactions included in your damages
14  calculations?
15     MR. BRISKIN:  Objection to form.
16     THE WITNESS:  Let me -- I'm not sure how
17  that question is different from the questions you
18  asked before in which I referred you to the IPG
19  data for USPS.
20  BY MS. GOODMAN:
21  Q  Okay.  Let me try again.
22     Did you see any evidence that any FAA

Page 93

1  paid Google without the intervention of a medium
2  or an agent for the use of DV360 for the
3  transactions included in your damages calculation?
4     MR. BRISKIN:  Objection to form.
5     THE WITNESS:  So, again, my
6  understanding is that Google invoiced the ad
7  agencies, the ad agencies invoiced the FAAs, the
8  FAAs cut checks to the ad agencies, and the ad
9  agencies cut checks to Google.
10  BY MS. GOODMAN:
11  Q  So based on what you saw, is it accurate
12  that the FAAs used a medium or an agent in order
13  to pay Google?
14  A  I'm not sure what you mean by "medium"
15  or "agent."
16     The -- the payment process by which the
17  FAAs paid for their Google purchases -- the
18  payment process involves ad agencies.
19  Q  And the ad agencies are in between -- in
20  that payment process they are in between Google
21  and the FAA, correct?
22     MR. BRISKIN:  Objection to form.

CONFIDENTIAL

Page 94

1  THE WITNESS: Again, I'm not sure what
2  you mean by "in between," but as I testified,
3  Google invoices the ad agencies, ad agencies
4  invoice the FAAs, FAA -- FAAs cut checks to the ad
5  agencies, ad agencies cut checks to Google.
6  BY MS. GOODMAN:
7  Q  Okay. I'm going to ask one more time
8  just to see if you can answer the question as I've
9  posed it. And if you can't, that's fine and I'll
10 move to strike your answer and I'll call the
11 court -- I'll bring this to the judge.
12     But I'm asking a question to which
13 you're not providing an answer and that is are the
14 ad agencies in between the payment -- in the
15 payment -- withdrawn.
16     In the payment process which you have
17 described, do the ad agencies sit in between
18 Google and the FAA in order for Google to receive
19 money from the FAA?
20     MR. BRISKIN: Objection to form.
21     THE WITNESS: Again, I -- I think I've
22 explained my understanding of the process. I'm

Page 95

1  not sure what you mean by "sit in between," but I
2  think I've been very clear that the -- Google
3  invoices the ad agencies, ad agencies invoice the
4  FAA, FAAs cut the checks to the ad agencies, ad
5  agencies cut the checks to Google.
6  BY MS. GOODMAN:
7  Q  And in the process which you have
8  described --
9  A  I mean, I -- I -- that's the way that I
10 would describe the process.
11 Q  Okay.
12 A  So -- sorry.
13 Q  In the process which you have described
14 it is correct that the ad agencies are in between
15 Google and the FAAs, correct?
16     MR. BRISKIN: Objection to form.
17     THE WITNESS: You seem really -- you
18 seem really interested in "in between" and, again,
19 I'm not sure what "in between" means with regard
20 to your -- your question.
21     The way the invoicing process works
22 is -- is as I've explained it and that's the way I

Page 96

1  would phrase it. I -- again, Google invoiced the
2  ad agencies, ad agencies invoiced the FAAs, FAAs
3  cut the checks to the ad agencies, ad agencies
4  cut -- cut the checks to Google.
5     MS. GOODMAN: Okay. I'll move to strike
6  as nonresponsive.
7     MR. BRISKIN: Can we take a quick break?
8     MS. GOODMAN: Sure.
9     VIDEO TECHNICIAN: Off the record at
10 12:21.
11     (Brief recess.)
12     VIDEO TECHNICIAN: Back on the record at
13 12:36.
14 BY MS. GOODMAN:
15 Q  Ms. Lim, for every transaction that you
16 include in the purchase pathways underlying your
17 damages calculation, did you see any evidence that
18 Google paid for the ads without the use of an ad
19 agency? Withdrawn.
20     For every transaction that you include
21 in your purchase pathways underlying your damages
22 calculations, did you see any evidence that the

Page 97

1  FAA paid for the ads without the use of an ad
2  agency?
3  A  No.
4  Q  You relied on data produced by Google
5  which you refer to as RFP60 data, correct?
6  A  Yes.
7  Q  Did you understand that the RFP60 data
8  includes advertiser names which are input by
9  customers?
10     MR. BRISKIN: Objection to form.
11     THE WITNESS: May I review my report to
12 refresh my memory with regard to that?
13 BY MS. GOODMAN:
14 Q  Sure. Which page of the report are you
15 thinking of?
16 A  It's in the area of Figures 8 through
17 10.
18     So what I observed in the RFP60 data was
19 there was some nonstandardization in terms of the
20 information that was input into various fields
21 that -- I'm not sure why there's
22 nonstandardization -- non- -- nonstandardization.

25 (Pages 94 - 97)

Page 98

1    One reason could be because the -- the
2    advertisers or the ad agencies assisting the
3    advertisers could be putting in information into
4    those fields in a nonstandard way.
5    Q   Did you have an understanding of the
6    RFP60 data that the -- the information listed in
7    the advertiser fields is not verified, curated, or
8    cleaned by Google?
9        MR. BRISKIN:  Objection to form.
10       THE WITNESS:  I do not have an
11   understanding of the process by which Google vets
12   or doesn't vet the information that may be input
13   either by Google or by others into its databases.
14   BY MS. GOODMAN:
15   Q   Okay.  Would it be important to you for
16   purposes of your analysis to know whether the
17   information for the advertiser identities within
18   the RFP60 data is not verified, curated, or
19   cleaned by Google?
20       MR. BRISKIN:  Objection to the form.
21       THE WITNESS:  Which field in particular
22   are you talking about?

Page 99

1    BY MS. GOODMAN:
2    Q   The fields listing the name of the
3    advertiser customer.
4        MR. BRISKIN:  Objection to form.
5        THE WITNESS:  So the -- can you ask the
6    question one more time?  Sorry.
7    BY MS. GOODMAN:
8    Q   Would it be important for you to know
9    that the -- the fields including names of the
10   advertising customer in RFP60 data is not
11   verified, curated, or cleaned by Google?
12       MR. BRISKIN:  Objection to the form.
13       THE WITNESS:  The -- the -- no.
14   BY MS. GOODMAN:
15   Q   Why not?
16       MR. BRISKIN:  Same objection.
17       THE WITNESS:  I didn't need to focus on
18   the process of Google vetting information in the
19   advertiser field.
20   BY MS. GOODMAN:
21   Q   In paragraph 45 of Appendix E on page 17
22   of the Respess initial report --

Page 100

1    A   Page 17?  Sorry.
2    Q   Yes.
3        Do you see paragraph 45?
4    A   I do.
5    Q   Okay.  You write, "I identified FAAs in
6    the RFP60 data and the TTD data and then
7    identified specific combinations of FAAs and ad
8    agencies."
9        My question is what did you do to
10   identify the FAAs in the RFP60 data?
11   A   So that's described in the rest of the
12   paragraph.
13   Q   So you see a bunch of fields in the
14   RFP60 data, and you referred to them as advertiser
15   identifier variables, and then you used those
16   variables to identify the FAAs.
17       My question is how do you use the
18   variables to identify the FAAs?
19       MR. BRISKIN:  Objection to form.
20       THE WITNESS:  So my process was that, as
21   I described in my report, I first arrived at a --
22   a bucket of advertisers with FAA-sounding words in

Page 101

1    the advertiser identifier variables, and -- and
2    this is described in my footnote 28, and I then
3    limited my damages analysis to advertiser
4    identi- -- identifier variables and, in fact, FAA
5    purchase pathways, which I understand the United
6    States is seeking damages for.
7    BY MS. GOODMAN:
8    Q   Okay.  So are the advertiser identifier
9    variables, which are within your purchase pathways
10   and which are thus within your damages
11   calculation, those were all identified by the
12   United States; is that right?
13       MR. BRISKIN:  Objection to form.
14       THE WITNESS:  I'm not -- I'm not sure I
15   would quite phrase it that way.  Let me -- let me
16   try again.
17       So I reviewed the RFP60 database and I
18   saw FAA-sounding words in the advertiser
19   identifier variables and -- and then -- so that's
20   like a bigger bucket -- and then the United States
21   instructed me to limit my damages analysis to a
22   smaller bucket of FAA purchase pathways.

Page 318

1  Q  When you worked at Ernst & Young -- what
2  time period did you work at Ernst & Young?
3  A  '95 through '98.
4  Q  Other than in this case, have you looked
5  at Ernst & Young audit reports since -- over the
6  time -- over the time period of 2015 to the
7  present let's say?  In the course of your work
8  have you had occasion to look at EY audit reports?
9  A  For any company?
10  Q  Yes.
11  A  Audit opinions, yes.
12  Q  Okay.  And in the course of your work on
13  this case you do not disagree with anything that
14  EY concluded as to the principal/agent
15  determination that Google made, correct?
16      MR. BRISKIN:  Objection to form.
17      THE WITNESS:  I -- I don't agree or
18  disagree with EY not taking exception to Google's
19  treatment of itself as a principal in most of its
20  transactions.
21  BY MS. GOODMAN:
22  Q  Okay.

Page 319

1      MR. BRISKIN:  Counsel, we're at five
2  minutes over seven hours.
3      MS. GOODMAN:  I have one more question
4  if I may.
5      MR. BRISKIN:  Okay.
6      MS. GOODMAN:  Thanks.
7  BY MS. GOODMAN:
8  Q  You do not recall reviewing or seeing
9  testimony from representatives of the Navy in
10  which they testified the only ad network or DSP
11  that they ever used to buy open web display ads
12  was The Trade Desk, correct?
13      MR. BRISKIN:  Objection to form.
14      THE WITNESS:  I -- I reviewed thousands
15  of documents in this case.  I -- I don't recall
16  that one way or the other.
17      MS. GOODMAN:  Okay.  I pass the witness.
18      MR. BRISKIN:  We have no questions.
19      VIDEO TECHNICIAN:  All right.  If that's
20  everything, off the record on February 29th, 2024
21  at 7:28 p.m.
22      (Discussion off the record.)

Page 320

1      MS. GOODMAN:  We just went back on the
2  record and I just want to note for the record that
3  I am reserving my rights to bring Ms. Lim back for
4  additional questioning based on the filibustering,
5  evasive answers, and nonresponsiveness to my
6  questions.  So I just wanted to state that for the
7  record.
8      MR. BRISKIN:  Well, we dispute that.  We
9  don't agree with your characterizations.
10      MS. GOODMAN:  Okay.  Thank you.
11      (Whereupon, at 7:28 p.m., the
12       deposition of ADORIA LIM
13       was concluded.)
14      * * * * *

Page 321

1      CERTIFICATE OF NOTARY PUBLIC
2      I, SHARI R. BROUSSARD, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing deposition was duly sworn by me;
6  that the testimony of said witness was taken by me
7  in stenotype and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness;
10  that I am neither counsel for, related to, nor
11  employed by any of the parties to the action in
12  which this deposition was taken; and, further,
13  that I am not a relative or employee of any
14  counsel or attorney employed by the parties
15  hereto, nor financially or otherwise interested in
16  the outcome of this action.

19      SHARI R. BROUSSARD
    Notary Public in and for the
20       District of Columbia

    My commission expires:
22  August 14, 2025

81 (Pages 318 - 321)

Veritext Legal Solutions
800-567-8658                                                973-410-4098

CONFIDENTIAL

Page 322

1  A C K N O W L E D G E M E N T
2       O F  D E P O N E N T
3
4
   I, ADORIA LIM, do hereby acknowledge
5
   I have read and examined the foregoing pages of
6
   testimony, and the same is a true, correct and
7
   complete transcription of the testimony given by
8
   me, and any changes or corrections, if any, appear
9
   in the attached errata sheet signed by me.
10
11
12
13
14
15
16
17
18
19
   _____    _____
20  Date            ADORIA LIM
21
22  Job No. CS6485261

Page 323

1  Craig Briskin, Esq.
2  Craig.Briskin@usdoj.gov
3           March 4, 2024
4  RE:   United States, Et Al v. Google, LLC
5     2/29/2024, Adoria Lim (#6485261)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16  Return completed errata within 30 days from
17 receipt of testimony.
18   If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 324

1  United States, Et Al v. Google, LLC
2  Adoria Lim (#6485261)
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23  _____  _____
24 Adoria Lim                     Date
25

82 (Pages 322 - 324)

Veritext Legal Solutions
800-567-8658                                        973-410-4098

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

ERRATA SHEET FOR THE TRANSCRIPT OF:

Deponent: Adoria Lim

Case Name: *United States et al v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.)

Deposition Date: February 29, 2024

CORRECTIONS:

| Page | Line | Change or Correction | Reason |
|---|---|---|---|
| 4 | 15 | "Counsel will please identify yourselves" should read "Counsel will **you** please identify yourselves" | *Transcription Error* |
| 5 | 10 | "MR. GRIFFIN: John Griffin, financial" should read "MR. GRIFFIN: John Griffin, **I'm a** financial" | *Transcription Error* |
| 11 | 15 | "of that list and that would be Zoi Fairlie. Last" should read "of that list and that would be **Zoe** Fairlie. Last" | *Typo* |
| 17 | 1 | "matter, meaning from the spring of 2023 to the" should read "matter, meaning from the spring of 2023 to" | *Transcription Error* |
| 17 | 11-12 | "contents of the bills, I'm asking if she reviewed bills." should read "contents of the bills, I'm asking if she **reviews them**." | *Transcription Error* |
| 20 | 7 | "so it's not something I'm focused on" should read "so it's not something **I** focused on" | *Transcription Error* |
| 22 | 15 | "report, you know, in which he quantified damages" should read "report, in which he quantified damages." | *Transcription Error* |
| 23 | 22 | " Q When you were -- withdrawn." should read "Q When you were -- **never mind** -- withdrawn." | *Transcription Error* |
| 30 | 16 | "noted -- but a stand-alone digital advertising" should read "**loaded** -- but a stand-alone digital advertising" | *Transcription Error* |
| 66 | 18 | " it breaks out more binders and it shows the red" should read "it breaks out more **buying doors** and it shows the red" | *Transcription Error* |
| 81 | 11-12 | "be clear. Again, it's -- it's the -- it's the FAA is purchasing ads and -- and so -- so I think my" should read "be clear. Again, it's -- it's the -- it's the **FAAs** purchasing ads and -- and so -- so I think my" | *Transcription Error* |
| 91 | 8 | "again, what I saw was that Google invoiced ad" should read "again, what I saw was that Google invoiced **the** ad" | *Transcription Error* |
| 92 | 21 | "Q Okay. Let me try again." should read "Q Okay. **I'll** try again." | *Transcription Error* |
| 95 | 4 | "FAA, FAAs cut the checks to the ad agencies, ad" should read "**FAAs**, FAAs cut the checks to the ad agencies, ad" | *Transcription Error* |
| 100 | 7 | "Q Well, let's grab the question." should read "Q **I'll withdraw** the question." | *Transcription Error* |
| 123 | 16 | "now." should read "**1:15** now." | *Transcription Error* |

| 134 | 16 | "will answer the question." should read "will answer **your** question." | *Transcription Error* |
| 146 | 14 | "**Kasolay (ph)?**" should read "**Casale**?" | *Typo* |
| 276 | 22 | "Q Okay. You conducted a profitability" should read "Q Okay. You **also** conducted a profitability | *Transcription Error* |
| 278 | 14 | "Which page?" should read "**What** page?" | *Transcription Error* |

Date: _____3/29/2024_____   Signature: _____