**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

UNITED STATES, et al.,       )
                         )
         Plaintiffs,    )
   v.                    )     No. 1:23-cv-00108-LMB-JFA
                         )
GOOGLE LLC,           )
                         )
         Defendant.    )

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF
ITAMAR SIMONSON AND RELATED OPINIONS OF MARK ISRAEL**

Plaintiffs respectfully move under Rule 702 of the Federal Rules of Evidence to exclude the opinions of Prof. Itamar Simonson, as well as the opinions of Dr. Mark Israel that rely on Prof. Simonson's opinions. Prof. Simonson conducted three surveys of advertisers to gather information concerning their views and behaviors about digital advertising. Google's principal economic expert, Dr. Israel, then used Prof. Simonson's survey results to challenge Plaintiffs' market definitions in this case – namely, the markets for publisher ad servers, ad exchanges, and ad networks.

Prof. Simonson's surveys are fundamentally unreliable and fail to adhere to widely accepted standards in the field of survey design. In addition, Prof. Simonson's flawed surveys sought answers to questions that are not relevant and will not assist the jury in deciding this case. Due to these fundamental flaws in the design and implementation of Prof. Simonson's surveys, Google cannot satisfy its burden under Rule 702 to demonstrate that Prof. Simonson's opinions are reliable and will assist the jury. The Court should therefore exercise its gatekeeping function to exclude Prof. Simonson's surveys and opinions, as well as the opinions of Dr. Israel that rely thereon.

## BACKGROUND

### A.  Prof. Simonson Conducted Three Surveys Targeting Advertiser and Ad Agency Populations

Google retained Prof. Simonson, a retired marketing professor, "to conduct surveys designed to examine how advertisers at companies and advertisers at ad agencies (collectively, 'advertisers') approach, manage, and evaluate digital advertising and, in particular, display advertising and programmatic display advertising."  *See* Exhibit A, January 23, 2024, Expert Report of Itamar Simonson, Ph.D. ("Simonson Rep.") ¶¶ 1, 13.  Market research firm Advertiser Perceptions, overseen by Prof. Simonson, facilitated three surveys: the "Higher-Spend Advertiser Survey," the "Lower-Spend Advertiser Survey," and the "Ad Agency Survey."  *See id.* ¶¶ 16, 30.  The Higher-Spend Advertiser Survey targeted a universe of "advertisers and marketers based in the U.S. who work for companies that sell and advertise products or services (as opposed to ad agencies) and have spent over $500,000 on advertising in the past year."  *Id.* ¶ 42.  The Lower-Spend Advertiser Survey targeted a similar universe of U.S.-based advertisers but who spent less than $500,000 on advertising in the past year. *Id.* ¶ 116.  The Ad Agency Survey targeted "individuals based in the U.S. who work for ad agencies and assist their clients with media strategy . . . who have used programmatic display advertising in the past year for their primary client and who were personally involved in assisting their primary client with decisions regarding their use of display advertising."  *Id.* ¶ 165.

### B.  Prof. Simonson Excluded Vital Advertisers and Ad Agencies from His Samples

Market research firm Advertiser Perceptions selected samples of respondents for the three surveys from panels of potential respondents from U.S.-based "brand marketers, agency executives, media specialists, digital publishers and IT leaders directly involved in media and ad tech purchase decisions."  *Id.* ¶ 31.  Advertiser Perceptions' panels covered "the world's top

brands and agencies—including 100% of the Ad Age Top 200 Advertisers." *Id.* At Prof. Simonson's direction, Advertiser Perceptions employed its "standard practices" to select a "sample that was representative of the U.S. advertiser population accounting for the vast majority of spending." *Id.* (footnote omitted).

Google's counsel and Prof. Simonson then modified these samples, causing them to diverge materially from the target population: "At the direction of counsel, I asked AP [Advertiser Perceptions] to pre-screen respondents to ensure that they did not work for any companies that are parties to, were identified on the initial disclosures in, or have received subpoenas in connection with *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.) or the cases consolidated in *In re Google Digital Advertising Antitrust Litigation*, No. 1:21-md-03010 (S.D.N.Y.), including *Texas v. Google LLC*, No. 4:20-cv-00957 (E.D. Tex.)." *Id.* ¶ 34.[1] Respondents who worked for the hundreds of companies on the resulting "No Contact List" did not participate in any of the surveys. *Id.* ¶ 34 & App'x I. Even if Google made the decision to exclude these participants based upon a concern about contact with them given the pendency of this litigation, that problem could have been cured in another manner (including notification and a request for permission to the Court or Plaintiffs). This decision made by Google's counsel irreversibly impairs both the reliability and utility of the results.

---

[1] Prof. Simonson testified in his deposition that the decision to exclude these entities and individuals "was an instruction from counsel, so I didn't ask them, why are you telling me not to include them." *See* Exhibit B, Excerpts of February 28, 2024, Deposition of Itamar Simonson ("Simonson Tr.") at 167:18-21.

The No Contact List that was used to exclude potential survey participants contains a significant portion of the world's top advertisers and ad agencies, including "numerous companies that are top advertising spenders and revenue generators for Google." Exhibit C, February 13, 2024, Expert Rebuttal Report of Wayne D. Hoyer, Ph.D. ("Hoyer Rep.") ¶ 66.[2] Notably, Prof. Simonson excluded the six largest global ad agencies—WPP, Publicis Groupe, Omnicom, Interpublic, Dentsu, and Havas—collectively known as the "Big 6." *Id.* ¶ 67(b); Exh. A, Simonson Rep. App'x I. According to an internal Google presentation, in the first quarter of 2023, five of the Big 6 accounted for two-thirds of Google's ad agency revenue. *See* Exh. C, Hoyer Rep. ¶ 67(b); Exhibit D (GOOG-AT-MDL-008285890, at -899).[3]

The No Contact List also excluded the following advertisers:

- 30 of the Fortune 100 largest companies by revenue, including 5 of the top 10;

- Top digital advertisers in the United States across retail, finance, home and décor, employment services, traditional media, SaaS (Software as a Service), and streaming services, including Amazon, Target, Walmart, eBay, Lowe's, Kohl's, State Farm, American Express, Motley Fool, Wayfair, Instacart, Monster Government Solutions, LinkedIn, Fox Corp., The Washington Post, Warner Bros. Discovery (Brands include CNN and Max), Buzzfeed, Bloomberg L.P., The New York Times Company, Match Group, Adobe, Paramount Global, The Walt Disney Company, AT&T, Netflix, Comcast, and Hilton Worldwide Holdings; and

---

[2] Plaintiffs' rebuttal survey expert, Wayne D. Hoyer, is a Professor of Marketing at the McCombs School of Business at the University of Texas at Austin with more than four decades of experience in the field.

[3] Plaintiffs have only included the relevant excerpt of this document given its length. Plaintiffs will provide the Court with the full document upon request. The same is true for Exhibit E.

- 29 percent of the Ad Age Top 200 Advertisers that anchor the primary panel Prof. Simonson drew from, including 9 of the top 10 advertisers; 29 of the top 50 advertisers; and 58 of the top 200 advertisers.  These 58 companies accounted for half of the total advertising dollars of the 200 largest advertisers in 2022.

*See* Exh. C, Hoyer Rep. ¶¶ 66-67 & n. 111, 112.

Google's own business documents indicate that companies on the No Contact List that were excluded from the survey population represent an outsized portion of the companies that use Google's ad tech tools.  Nine of 15 advertisers Google identified as "Top Whales" in a 2023 presentation were excluded from Prof. Simonson's sample.  *Id.* ¶ 68; Exhibit E (GOOG-AT-MDL-011124130, at -141); Exhibit F (GOOG-AT-MDL-011120632, at -641).  Similarly, Prof. Simonson excluded Walmart, Target, and CVS—advertisers that Google identified in a 2019 presentation as 3 of its "Top 6 Whales."[4]  *See* Exh. C, Hoyer Rep. ¶ 68; Exhibit G (GOOG-DOJ-03047055, at -062);[5] Exh. A, Simonson Rep. App'x I.

In addition to these broad exclusions, Google's counsel directed Prof. Simonson to reveal the sponsor and purpose of the survey to respondents after they completed their surveys for all three surveys.  Exh. B, Simonson Tr. at 289:13-290:15.  At the conclusion of the surveys, respondents were informed that the surveys were conducted "on behalf of Google" and "in

---

[4] Having subpoenaed Walmart and other major advertisers for documents, Google presumably thought the views of these companies were relevant to this case, despite the decision to exclude these very same entities from their sponsored survey.

[5] Discussing "whales" in the context of retailers, one example Google document discussing large advertisers defines "whales" as companies that have the most power and money.  *See* Exh. G at -062 ("Segment 1 – Top 6 Whales (i.e. Walmart, Target): The Top 6 retailers have the most power and this is where the money is[.]  Understand that the majority of opportunity lies within these 6, but it's also key to understand that it's necessary to respect these longstanding merchant/manufacturer relationships").

connection with pending antitrust lawsuits in which the plaintiffs allege that Google engaged in anticompetitive conduct related to digital advertising."  Simonson Report ¶ 80.  Respondents were then asked if they wanted to "participate in this survey" and have their responses included or excluded.  *See* Exh. A, Simonson Rep., App'x F.1, at F.1-21; App'x G.1, at G.1-17; App'x H.1, at H.1-19.  16 percent of respondents in the Higher-Spend Advertiser Survey, 24 percent of respondents in the Lower-Spend Advertiser Survey, and 15 percent of respondents in the Ad Agency Survey chose to exclude their completed responses based on this disclosure.  Exh. A, Simonson Rep. Exhibit 2; Exhibit 38; Exhibit 69.  None of the survey data for these respondents were retained as part of the study, and thus Prof. Simonson has no way to evaluate whether the exclusion of these respondents skewed the results of his survey.  Exh. B, Simonson Tr. at 298:8-299:16.  As a result, it is impossible to determine whether the disclosure of the sponsor and purpose of the surveys biased the outcome of the surveys for all three samples.[6]

### C.  Prof. Simonson Incorrectly Asked Diversion Questions About Display Advertising Rather Than the Ad Tech Tools at Issue

After a series of introductory and screening questions, Prof. Simonson's surveys included questions in four areas: "Use of Ad Agencies"; "Budget Allocation and Substitution"; "Use of Ad Buying Tools for Programmatic Display (Multi-homing)"; and "Measuring Performance." Exh. C, Hoyer Rep. ¶ 30.  The initial question in the "Budget and Allocation" section asked respondents to estimate their business unit/team's budget allocation across ten types of digital advertising: Search, Programmatic Display, Direct Deals Display, Email, Digital Audio, Social, App/In-app, Digital Video, Connected TV, or eCommerce.  *See* Exh. A, Simonson Rep., App'x

---

[6] Plaintiffs recognize that survey participants were unaware of Google's sponsorship while completing the survey.  However, as the opt-outs that compromised the sample were borne out of the disclosure, the violation of double-blind protocols at the survey's conclusion nevertheless impacts the survey's validity.

F.1, at F.1-12; App'x G.1, at G.1-12; App'x H.1, at H.1-11.  Plaintiffs' claims in this case relate

only to technology tools used to buy and sell programmatic (i.e., automated) display advertising

sold on the open web.  Am. Compl. ¶¶ 282-303.  The surveys then presented respondents with

the following question ("Diversion Question"):

> Now suppose that, based on your analysis, the cost of **programmatic display**
> **advertising** has **recently increased by a small but significant amount, and will**
> **remain elevated for the foreseeable future**.  Assume further that, based on similar
> analyses for other digital advertising types, the costs of other digital advertising
> types have not changed and are not expected to change.
>
> So if the cost of programmatic display advertising increases (while the cost of other
> advertising types remains the same), <u>will you or won't you divert some of your</u>
> <u>advertising spending for the coming year to other types of digital advertising</u>?

Exh. A, Simonson Rep. ¶ 65 (emphases in original).[7]  Those who respond "Yes, I will divert

some of my advertising spending for the coming year to other types of digital advertising" were

then asked to which of the ten types of advertising they would "divert [their] advertising

spending for the coming year as a result of the **increase in the cost of programmatic display**

**advertising**[.]"  *Id.* (emphasis in original).  Respondents who did not answer "None of the

above" or "Don't know / Unsure" were prompted to use a sliding scale to indicate the extent they

"would divert (that is, increase) advertising spending for the coming year to **each type of digital**

**advertising** [they] just indicated."  *Id.* ¶ 66 (emphasis in original).  The surveys did not define

the key phrases "small but significant amount" or "for the foreseeable future."  Exh. C, Hoyer

---

[7] The Diversion Question also incorporated two follow-up questions concerning whether
advertisers would shift their spend and the extent of those hypothetical shifts. *See* Simonson
Report, Appendix F.1, at F.1-13-14 (Higher-Spend Advertiser Survey, Q6 and Q7); Appendix
G.1, at G.1-13-14 (Lower-Spend Advertiser Survey, Q10 and Q11); Appendix H.1, at H.1-12-13
(Ad Agency Survey, Q5 and Q6).  Plaintiffs move to exclude all results and reliance on the
Diversion Question and these follow-up questions.

Rep. ¶¶ 73-74.[8]

Although the Diversion Question broadly asked about advertisers' response to a hypothetical increase in the cost of programmatic display advertising, it did not ask about the component of the specific cost at issue in this case:  technology tools used to buy and sell programmatic display advertising.[9]  *See* Exh. C, Hoyer Rep. ¶ 107.  Nor do any other questions in Prof. Simonson's surveys.  *Id.*  In fact, Prof. Simonson conceded that it was not "an objective of the survey to look at components of cost and so on," because he thought that doing so would have made the survey too confusing. Exh, B, Simonson Tr. at 354:4-20.

### D.  Dr. Israel Relies on Prof. Simonson's Flawed Surveys to Opine About Advertiser Substitution

Prof. Simonson asked his Diversion Question in service of Google's economic expert, Dr. Mark Israel.  Dr. Israel's opinion criticizing Plaintiffs' market definition—publisher ad servers, advertising exchanges, and advertiser ad networks—relies heavily on Prof. Simonson's surveys and report.[10]  *See* Exhibit H, January 23, 2024, Expert Report of Mark Israel ("Israel

---

[8] Prof. Simonson pretested the survey, which is supposed to identify problems with the survey before it is conducted. However, the pretest protocol was methodologically flawed in requiring respondents to take a 39-question survey with many detailed subparts before they were asked about whether they considered any questions unclear.  *See* Simonson Report, Appendix E, at E-2. And Prof. Simonson did not retain the results of the pretest, making it impossible to know whether pretest respondents were in fact confused by the Diversion Question. *See* Exh. B, Simonson Tr. at 229:21-230:8.

[9] As explained further below, the relevant question to determine the appropriate scope of an antitrust market is how respondents would react to the increase in the price of the ad tech tools themselves (but one component of the cost of digital advertising), not how they would react to an increase in the price of digital advertising overall (which is much larger).

[10] Dr. Israel explicitly relies on Prof. Simonson's surveys and report in the following paragraphs of his report: 48, 196-98, 200, 211, 220, 235-38, 240, 247-48, 252, 283, 589, 630, many of which include figures based on Prof. Simonson's surveys.  Plaintiffs move to exclude any portions of Dr. Israel's report rely on the survey results, the Diversion Question, and/or any follow-up questions relating to the Diversion Question.

Rep.") ¶¶ 48; Exhibit I, Excerpts of March 14, 2024, Deposition of Mark Israel ("Israel Tr.") at 411:7-16. Dr. Israel rejects these three markets in favor of an undifferentiated, amalgamated, and problematic "two-sided transaction market for display advertising." Israel Rep. ¶ 48. Because Dr. Israel considers anything that may reduce any open web display advertising transactions a competitive constraint on Google's specific open-web display advertising tools, *id.*, he seeks to show that advertisers would switch to different forms of digital advertising, such as social media and in-app advertising, in response to a potential price increase for programmatic display advertising.

Prof. Simonson's surveys are a significant part of Dr. Israel's empirical basis for his market definition opinions. *See id.* ¶¶ 235-38. Dr. Israel also leans on Prof. Simonson's surveys for the proposition that advertisers use multiple ad buying tools. *Id.* ¶¶ 196, 197, 589, 630. Critically, however, Dr. Israel admitted that while he looked at the underlying data he "did not do any independent analysis of the backup data" and "reli[ed] on [Prof. Simonson] for the methods and the analysis." Exh. I, Israel Tr. at 412:9-21. Dr. Israel also admitted that he had never conducted a survey and "wouldn't hold [himself] out as a survey expert." *Id.* 412:22-413:3, 413:12-13. While Dr. Israel also referenced "other empirical evidence," such as Google's own documents and third-party materials, which purport to supplement the survey results, the surveys themselves are a significant part of Dr. Israel's opinions about advertiser substitution.

## LEGAL STANDARD

### A. Standards for Admissibility Under Rule 702 and *Daubert*

Courts applying Federal Rule of Evidence 702 have a gatekeeping responsibility to "ensur[e] that an expert's testimony both rests on *reliable* foundation and is *relevant* to the task at hand." *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509

U.S. at 597) (emphasis in original). As revised, Rule 702 places the burden of demonstrating that the expert's testimony will meet these foundational requirements on the party seeking to introduce that testimony. Fed. R. Evid. 702 (effective December 1, 2023) (adding that a properly qualified witness "may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not" that requirements (a) through (d) of the Rule are satisfied).

This gatekeeping duty is heightened in a jury trial because of the difficulty a juror has in evaluating such testimony. *Id.* at 231; *see also Westberry v. Gislaved Grummi AB*, 178 F.3d 257, 261 (4th Cir. 1999); *Sardis v. Overhead Door Corp.,* 10 F.4th 268, 275 (4th Cir. 2021). The proponent of expert opinion testimony must establish its admissibility by a preponderance of proof. *Daubert v. Merrell Dow*, 509 U.S. 579, 592 n.10 (1993); Fed. R. Evid. 702. A thorough and extensive cross-examination of this testimony "does not ensure reliability of the expert's testimony [and] such testimony must still be assessed before it is presented to the jury." *Id.* (citing *McClain v. Metabolife Int'l., Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005)).

As with other expert evidence, surveys are subject to Rule 702 and *Daubert* scrutiny. The proponent of an expert survey bears the burden of establishing its admissibility. *See Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 456 (E.D. Va. 2017) (citing *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)). Courts recognize that the Federal Judicial Center's *Reference Guide on Survey Research*[11] identifies the "applicable professional standards for survey research," and assists courts in evaluating the admissibility of survey evidence. *Coryn*

---

[11] Federal Judicial Center, Shari Seidman Diamond, *Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence 359-423 (3d ed. 2011) ("*FJC Reference Guide*"), available at https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf.

*Group II, LLC v. O.C. Seacrets, Inc.*, Civil No. WDQ-08-2764, 2010 WL 1375301, at *7 n.17 (D. Md. Mar. 30, 2010). *See also Estes Park Taffy Co., LLC. v. Original Taffy Shop, Inc.*, Civil Action No. 15-cv-01697-CBS, 2017 WL 2472149, at *1 n.2 (D. Colo. June 8, 2017). The *FJC Reference Guide* is "intended to assist judges in identifying, narrowing, and addressing issues bearing on the adequacy of surveys either offered as evidence or proposed as a method for developing information." *FJC Reference Guide* at 362.

### B.  An Expert's Survey Must Be Reliable To Be Admissible

An expert's survey and conclusions may be excluded under Rule 702 if the survey "was fundamentally flawed" or suffers from "fatal flaws," as opposed to "mere technical flaws," which instead may go towards the weight of the evidence. *Valador,* 242 F. Supp. 3d at 448 (citing *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004)).  Fatal flaws are methodological deficiencies that are "so substantial as to render survey conclusions untrustworthy." *In re Motor Fuel Temperature Sales Practices Litig.*, 2012 WL 13050523, at *6 (D. Kan. Feb. 29, 2012).

"An expert's survey meets *Daubert*'s reliability standards if [among other things] the expert . . . properly defines the 'universe' of respondents" and "selects a representative sample of that universe." *Navarro v. P&G*, 501 F. Supp. 3d 482, 497-498 (S.D. Ohio 2020). "Identification of a survey population must be followed by a selection of a sample that accurately represents that population." *FJC Reference Guide* at 380.  "[A] sample that accurately represents the target population must be selected, and procedures must be taken to reduce the likelihood of a biased sample." *Menasha Corp. v. News America Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003); Manual for Complex Litigation 4th ed. § 11.493 (2004) (considering whether "the sample chosen was representative of that population"), https://www.uscourts.gov/

sites/default/files/mcl4.pdf.  An underinclusive survey may fail to reflect the relevant population accurately, and a survey where the sample is "underinclusive to a significant degree . . . would be unreliable, and thus inadmissible, under *Daubert*."  *Navarro*, 501 F. Supp. 3d at 498.

Surveys are inadmissible under Rule 702 when their underlying samples omit substantial constituencies whose opinions are necessary to understand the issue being assessed by the survey.  *See Hi Ltd. P'ship v. Winghouse of Fla., Inc.*, 2004 U.S. Dist. LEXIS 30687, at *25-26 (M.D. Fla. Oct. 5, 2004) (survey had "patently flawed methodology striking at the heart of the survey's validity" because it failed to include women, who comprised roughly a third of the competing restaurants' clientele); *FTC v. Fleetcor Technologies, Inc.*, 2022 U.S. Dist. LEXIS 143169 (N.D. Ga. Aug. 9, 2022) (holding survey inadmissible under *Daubert* in light of the "deeply unrepresentative sample" that excluded customers for much of the time period in question).  When assessing whether a survey's flaws make it unreliable, courts consider the role counsel played in jeopardizing survey design and sample construction.  *See, e.g.*, *Johnson v. Big Lots Stores, Inc.*, 2008 U.S. Dist. LEXIS 35316, at *52 (E.D. La. 2008) ("[T]he role that Big Lots' former counsel played in directing how the interviews were conducted casts doubt on the reliability of the interviews and gathered data.").

### C.  An Expert's Survey Must Be Relevant To Be Admissible

Rule 702 requires an expert's testimony to "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The Supreme Court explained that this is primarily a question of relevance and whether the expert testimony is a proper "fit" for the facts of the case.  *Daubert*, 509 U.S. at 591.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 590 U.S. at 591-92.

A survey is inadmissible on relevance (fitness) grounds where it fails to shed light on a fact in issue. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 281 (4th Cir. 2002) (reversing district court's admission of survey evidence because the survey "addresses issues that are not relevant to [plaintiff's] false advertising claim"). When a party proposes to admit the opinion of a survey expert, the survey questions themselves must be relevant. "One indication that a survey offers probative evidence is that it was designed to collect information relevant to the legal controversy." *FJC Reference Guide* at 373. "Nonetheless, surveys do not always achieve their stated goals. Thus, the content and execution of a survey must be scrutinized whether or not the survey was designed to provide relevant data on the issue before the court." *Id*.

## <u>ARGUMENT</u>

The fundamental flaws in Prof. Simonson's methodology render his opinions inadmissible. First, Prof. Simonson excluded such a significant portion of the population for his Ad Agency Survey and Higher-Spend Advertiser Survey that his samples are not representative of the populations he intended to survey. These samples became even less representative when many respondents withheld their responses upon learning that Google sponsored the survey in connection with antitrust litigation. This affected all three surveys, rendering them each unreliable and inadmissible.

Second, the Diversion Question—the primary question in all three surveys that asked advertisers about their willingness to substitute to other types of digital advertising—sheds no light on any question relevant to this case because it relates only to the cost of programmatic display advertising as a whole, rather than the cost of display advertising tools. Moreover, the question is unreliable because it was written so ambiguously that it requires respondents to speculate on its meaning. Thus the survey respondents' answers to this flawed and confusing

question cannot provide a reliable basis for Prof. Simonson's or Dr. Israel's opinions and those

opinions should therefore be excluded.

## I.     PROF. SIMONSON'S SURVEYS ARE INADMISSIBLE

### A.  The Ad Agency and Higher-Spending Advertiser Surveys Are Unreliable Because Their Samples Are Unrepresentative of the Target Populations

Prof. Simonson's Ad Agency Survey and Higher-Spend Advertiser Survey and his

associated opinions are inadmissible because the samples used to conduct those surveys were not

representative of the populations they purported to study.  Absent a representative sample, no

reliable conclusions can be drawn about the views of the target population.

Prof. Simonson's exclusion of large swaths of top ad agencies and advertisers, at the

direction of Google's counsel, precludes Google from demonstrating that Prof. Simonson studied

representative samples of the populations he sought to survey.  Prof. Simonson's actions fail to

satisfy the proper standards for conducting a survey intended for use in litigation, which stress

that "[i]dentification of a survey population must be followed by a selection of a sample that

accurately represents that population."  *FJC Reference Guide* at 380.  As a result, Prof.

Simonson's surveys are unreliable, and the Court should exclude the opinions Prof. Simonson

derives from those surveys and Dr. Israel's opinions that rely on Prof. Simonson's work.

*Winghouse* is on point.  There, women comprised roughly one-third of the relevant

consumer clientele, but they were excluded from the sample in Winghouse's expert's survey.

2004 U.S. Dist. LEXIS 30687 at *25.  Hooters argued that the survey was inadmissible because,

among other things, the survey "did not use a fair sampling of the full range of potential

customers for whom Winghouse and Hooters compete."  *Id.* at *23.  The court agreed because

excluding women "reflect[ed] a patently flawed methodology striking at the very heart of the

survey's validity."  *Id.* at *25-26.

*Fleetcor* similarly excluded survey evidence where, as here, the sample was unrepresentative of the target population.  In an enforcement action against a payment-card company for false advertising and unfair fee practices, the FTC moved to exclude the company's expert survey, which sought to study whether the company's marketing efforts deceived its card program customers from June 2014 to June 2020.  2022 U.S. Dist. LEXIS 143169 at *9.  The survey expert had excluded customers from nearly the entire relevant time period, only surveying customers who had made a transaction after April 2020.  The court held that such exclusions rendered the sample so "deeply unrepresentative" that the survey expert's opinions should be excluded.  *Id.* at *15 (internal citation omitted).  And the problems created by the unrepresentative sample in *Fleetcor* were "compounded" by the expert asking critical questions in a manner that failed to provide relevant or reliable information, which are flaws that likewise infect Prof. Simonson's survey here.  *Id*. at *16, 24; *see infra* Section II.

As in *Fleetcor* and *Winghouse*, Prof. Simonson's Ad Agency Survey and Higher-Spend Advertiser Survey suffer from fundamental flaws because his samples fail to reflect the populations he intended to survey.  At counsel's direction, Prof. Simonson excluded the Big 6 ad agencies, critical digital ad spenders, Google's own "Top Whale" advertisers, and a substantial portion of the Ad Age Top 200 that anchors the AdPROS panel lauded by Prof. Simonson. Exh. A, Simonson Rep. ¶ ¶ 67-68.  The removal of such a large portion of the target population from the pool of potential respondents undermines any notion that the results of the Ad Agency Survey and Higher Spend Advertiser Survey represent the views of the broader populations they were supposed to study.  In light of these extraordinary exclusions, Google cannot bear its burden to demonstrate that Prof. Simonson's sample is reliable.  These surveys and the conclusions that Prof. Simonson draws from them are inadmissible. And, as a result, the opinions

of Dr. Israel that rely upon them are likewise inadmissible because Dr. Israel is not a survey expert and did not independently verify or analyze Prof. Simonson's data, analyses, or conclusions. Therefore, Dr. Israel lacks any basis—much less a reliable one—to rely on analyses, opinions, and conclusions of Prof. Simonson that are themselves unreliable and inadmissible.

### B. Disclosing the Surveys' Sponsor and Purpose, and Allowing Respondents to Exclude Their Completed Responses, Renders the Surveys Unreliable

"To ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible: Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose." *FJC Reference Guide* at 410-411. Where the sponsorship of a survey is disclosed, courts should consider "(1) whether the sponsor has views and expectations that are apparent and (2) whether awareness is confined to the interviewers or involves the respondents." *Id.* at 411. "For example, if a survey concerning attitudes toward gun control is sponsored by the National Rifle Association, it is clear that responses opposing gun control are likely to be preferred." *Id.*

Prof. Simonson's disclosure of the surveys' sponsor and purpose at its conclusion and allowing respondents to opt-out after learning that information is at odds with the principle of double blindness, thus further undermining the reliability of Prof Simonson's surveys. Prof. Simonson acknowledged that using a double-blind survey is "an important principle that [he tries] to follow," and that the disclosures he made to respondents in this case are "uncommon" in litigation surveys. Exh. B, Simonson Tr. 285:22-286:11; 213:10-313:12. Indeed, Prof. Simonson could not recall a single other instance—among the thousands of surveys he has conducted—when he revealed a survey's sponsor and purpose at a survey's conclusion and

allowed respondents to then exclude themselves, as he did here.  *See id*. 286:12-287:3; 288:12-288:21.

After having completed Prof. Simonson's surveys, respondents were informed that the surveys were conducted "on behalf of Google" and "in connection with pending antitrust lawsuits in which the plaintiffs allege that Google engaged in anticompetitive conduct related to digital advertising." Exh. A, Simonson Rep. ¶¶ 79-80.  Like the example in the *FJC Reference Guide*, these disclosures indicated to respondents that answers supportive of Google's litigating positions "are likely to be preferred."  This in turn provided a reason for respondents to opt out if their answers were not supportive of Google's positions.  Between fifteen percent and nearly a quarter (24%) of survey respondents availed themselves of this opportunity to exclude their responses from the survey immediately after reading this disclosure.  *See id.* 1, 37, 68.

Prof. Simonson has no data from the respondents who opted out and therefore has no way to know whether and to what degree these disclosures biased his survey results.  *See* Exh. B, Simonson Tr. at 298:16-17 ("Obviously, those that were excluded, I don't have their data.").  As Prof. Hoyer points out, "where respondents took the time to complete the surveys but then choose to be excluded once they learned that the survey was sponsored by Google in the context of a litigation suggests that these respondents must have differed systematically from those who chose to include their responses in the survey." Exh. C, Hoyer Rep. ¶ 14.  Regardless of whether the opt-outs actually biased the survey results, Google cannot meet its burden to show that the three surveys were reliable without data from the individuals who excluded themselves. *See* Fed. R. Evid. 702.

**C.  The Interference of Google's Counsel in the Design of the Surveys Undermines Their Reliability**

Counsel's involvement in survey design and administration compromises a survey's objectivity and reliability when it is linked to methodological flaws.  *See Big Lots Stores*, 2008 U.S. Dist. LEXIS 35316, at *53-55.  For example, in *Big Lots Stores,* plaintiffs moved to exclude the opinion and report of a survey expert as unreliable under *Daubert*, challenging the unrepresentativeness of the sample and the role defendant's counsel played "in identifying store locations and individuals that [were] interviewed."  *Id.* at *57.  The court concluded that that the survey sample was deficient, linking counsel's pre-screening activities to the deficient sample.  *Id.* at *56-57.  "Big Lots' decision not to conduct a larger survey means that it has to live with the legal consequences of the slipshod work done by [the expert] and its own decision to unduly enmesh its lawyer in the survey process."  *Id.* at *56.

Google, like the defendant in *Big Lots Stores*, interfered with its expert's surveys in fundamental ways.  Google's counsel directed Prof. Simonson to exclude the companies on the No Contact List, making the samples in the Higher-Spend Advertiser Survey and the Ad Agency Survey unrepresentative of the survey population.  *See* Exh. A, Simonson Rep. ¶ 34.  Contrary to industry practice, Google's counsel also dictated that each of the surveys reveal their sponsor and purpose and provide respondents with the choice to opt-out based on that information.  See Exh. A, Simonson Tr. at 289:20-290:6;315:13-315:24. Google's counsel's interference exacerbates the fatal flaws in Prof. Simonson's surveys because it underscores that the survey-design choices that caused the flaws were made by advocates, rather than experts.  Therefore, the surveys were neither "the product of reliable principles and methods" nor "reflect[ive] [of] a reliable application of [those] principles and methods."  Fed. R. Evid. 702.

## II.   THE DIVERSION QUESTION, WHICH IS CRITICAL TO PROF. SIMONSON'S SURVEYS, IS IRRELEVANT AND UNRELIABLE

### A.  The Diversion Question Is Not Relevant Because It Does Not Ask About the Product Markets at Issue

The results of the Diversion Question from all three surveys are inadmissible, because that question is not relevant to any issue in this case.  The surveys were designed to study advertiser substitution behavior to determine whether the product markets Plaintiffs allege— three kinds of tools used to buy and sell programmatic display advertising—are properly defined. But Prof. Simonson studied the wrong kind of advertiser substitution by asking the wrong Diversion Question:  How advertisers would respond to a change in the price for programmatic display advertising *overall*, rather than a change in the price of the ad tech tools that are at issue.

A proper question concerning advertiser responses to a hypothetical increase in the cost of the ad transaction tools at issue here may be relevant to the issue of market definition. Antitrust claims are generally analyzed in the context of a specific "market" for a group of products or services.  That relevant product market may be defined by considering the extent to which buyers of the allegedly monopolized product are likely to substitute to other products in the face of a sustained price increase on the allegedly monopolized product.  The more easily buyers can substitute away from the allegedly monopolized product, the more likely it is that the relevant market is broader than the one allegedly monopolized.  For example, if a plaintiff alleged that a firm monopolized a market for solar panel installation services, the defendant could try to demonstrate that the market is broader (and thus that the firm has less power than plaintiff claims) by marshaling evidence that enough buyers would be likely to switch to other types of installers or means of installation in response to a price increase on the allegedly monopolized installation services, such that the price increase is unprofitable.

Continuing this example, Prof. Simonson's Diversion Question is analogous to asking consumers who demand both solar panels and solar panel installation what they would do in response to an increase in the price of solar panels themselves rather than an increase in the price of installation services, much of which could be driven by the other inputs to the overall cost of an installed solar panel, such as raw materials, tariffs, or research and development, none of which bear on the price of solar panel installation.

The Diversion Question asks about the total cost of programmatic display advertising, but only one component of those total costs—advertising technology tools—are relevant to this case. An increase in the cost of programmatic display advertising would include the cost not only of the ad tech tools to facilitate the transaction, but also significantly larger costs of the creative work needed to produce the ad as well as the cost of placement of the ad on publisher websites. In other words, an increase in the cost of ad tech tools would be a fraction of the cost of programmatic display advertising.  Moreover, advertisers bear only about 20 percent of any increase in the cost of ad tech tools; publishers pay the rest.  *See* Exhibit J, December 22, 2023, Expert Report of Timothy Simcoe ¶ 255, Figure 21.  Thus, the Diversion Question improperly asks respondents about their anticipated reaction to a hypothetical "small but significant" change in the price of what advertisers would pay for programmatic display advertising, rather than the considerably smaller change that is relevant to defining a market for display ad tools.  The question thus provides no relevant insight into how advertisers would respond to a small but significant change in the cost of any ad tech tool.  As a result, Google cannot show that Prof. Simonson's Diversion Question is relevant to any issue in this case.

The Fourth Circuit addressed a similar situation in *Scotts*, where it reversed the trial court's admission of a survey on relevance grounds because the survey failed to shed light on a

fact in issue.  There, the plaintiff in a false advertising case claimed that defendants' packaging was misleading because it suggested that defendant's product would kill crabgrass that had already sprouted (i.e., "mature" crabgrass).  In support of that claim, the plaintiff submitted a survey, which purported to show that 92.5% of respondents were misled by the defendant's packaging of a crabgrass-control product.  315 F.3d at 278.  The primary survey question asked, "Based on your review of this section of the bag, should this product prevent the growth of crabgrass that looks like the crabgrass pictured?"  *Id.*  The Fourth Circuit concluded that the use of the word "prevent" made the question ambiguous, such that it was unclear if respondents believed the defendant's product would prevent crabgrass from growing in the first instance or kill mature crabgrass.  *Id.*  That flaw was fatal to the relevance of the survey because "the question that [was] key" to the claim was "whether [defendant's] packaging conveys the message that it can kill mature crabgrass," and the survey responses "shed no light on [that] question."  *Id.*

The facts in *Scotts* are complex, but the crux of the Fourth Circuit's holding is simple: whether consumers believed the picture of mature crabgrass on Vigoro packaging advertised crabgrass *prevention* could not help answer the question at issue of whether consumers believed the packaging indicated that Vigoro *killed* crabgrass.  Here, Prof. Simonson's Diversion Question suffers from the same fatal flaw.  Asking about crabgrass prevention says nothing about killing crabgrass in the same way that asking about an "increase in the cost of display advertising" says nothing about the effect of an increase in the cost of an advertising technology transaction tool.  In both cases, the primary survey question is irrelevant, making the survey inadmissible.

Prof. Simonson's deposition testimony about the Diversion Question confirms that he avoided asking the question that would have been relevant to the claims and defenses in this case.  Prof. Simonson conceded that "it was not an objective of the survey" to evaluate how advertisers would respond to an increase in the cost of the ad tech tools at issue in this case.  Exh. B, Simonson Tr. 354:4-20.  Rather, he made a conscious choice not to ask "whether [survey participants] would divert, based on a small but significant change in the cost of ad tech tools." He maintained that would have been a "bad question" because he "was just not sure that respondents would understand what [he] was referring to."  *Id.* 363:14-364:3.

## B.  The Diversion Question is Unreliable Because It is Inherently Vague

Not only is Prof. Simonson's Diversion Question irrelevant, but it is so vague as to be unreliable.  Courts have found vague or ambiguous survey questions to be inadmissible under Rule 702.  *See, e.g.*, *Citizens Fin. Group*, 383 F.3d 110 at 120-21 (holding that district court properly excluded survey that used vague and imprecise language and surveyed consumers outside of the relevant customer base).  As the *FJC Reference Guide* explains:

> When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question.  If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey.

*Id.* at 388 (citation omitted); *see also* Exh. C, Hoyer Rep. ¶ 71.

On this point, *In re Motor Fuel* is instructive.  There, the court considered a *Daubert* challenge to survey question Q1, which asked, "Do you think each gallon of fuel you buy should contain the same amount of fuel as every other gallon of that same fuel or should each gallon not contain the same amount of fuel."  2012 WL 13050523 at *6.  Although 97 percent of respondents said that each gallon of fuel should contain "the same amount of fuel," the court

determined that Q1 was "very ambiguous" because it was subject to multiple interpretations. *Id.* at *6-7. The plaintiffs' expert interpreted the phrase "amount of fuel" to mean amount of energy, while defendants' expert interpreted it to refer to volume of fuel. *Id.* at *7. The court found the results of Q1 to be untrustworthy and inadmissible because there was no way to know how the survey respondents interpreted the phrase, and the ambiguity was central to the plaintiffs' expert's opinion.

So too here. Prof. Simonson's Diversion Question is ambiguous and unreliable because it does not define key terms that are ambiguous. The Diversion Question asked respondents to explain how they would react if "the cost of programmatic display advertising has recently increased by a small but significant amount and will remain elevated for the foreseeable future."[12] Exh. A, Simonson Rep. App'x. F (Higher Spend Advertiser Survey), at F.1-13 (emphasis omitted).[13] Respondents were left to speculate on the meaning of the phrases "small but significant amount" and "foreseeable future," and each respondent likely had their own subjective interpretation. *See* Exh. C, Hoyer Rep. ¶ 74. Social science has shown that consumers ascribe a range of meanings to phrases like "small but significant" and "foreseeable future." *Id.*, ¶ 74. Some may have been considering a 2% price increase over the course of the next month, whereas others may have been considering a 20% price increase over the course of the next decade. Regardless, as in *Motor Fuel*, there is no way to know how respondents

---

[12] Whether a hypothetical monopolist can significantly and profitably increase the price of an allegedly monopolized product or service is a classic question that economic experts evaluate in an antitrust case. But lay survey respondents cannot be expected to know the complex tools economists use to answer such a question.

[13] *See also* Simonson Report, Appendix H (Ad Agency Survey), at H.1-12 (same question); *id.*, Appendix G (Lower Spend Advertiser Survey), at G.1-13 (question revised to ask about the "cost of display advertising" rather than the "cost of programmatic display advertising").

interpreted the key phrases in the Diversion Question, and that ambiguity is central to Prof. Simonson's opinion about advertiser diversion.

The Diversion Question's fundamental flaws were apparently by design.  Prof. Simonson contends that the phrasing of *small but significant* amount "was designed to leave it to the respondent to consider their reaction, if . . . (what they consider to be) a "small but significant" increase in the cost of programmatic display advertising occurred."  Exh. A, Simonson Rep. ¶ 17 n.5, ¶ 65.[14]  However, in his preliminary interviews, which were a precursor to the final surveys, Prof. Simonson tested how respondents considered only two potential numerical increases (5%, and, later 10%) in advertising quality, measured as return on investment (ROI) but no other values,[15] revealing his ability to have tested for and included questions that included more precise values.  That his ultimate surveys included no values at all, whether specific numerical price changes, quality changes, or even a range—whether wide or narrow—of price or quality changes in the Diversion Question underscores the vagueness and, therefore, lack of reliability in his surveys.

Prof. Simonson could have corrected or mitigated the flaws in his ultimate surveys by applying his findings from his pretest and preliminary interviews, yet failed to do so.  And, tellingly, Prof. Simonson later admitted that no one involved with the survey bothered to ask *any*

---

[14] Interestingly, when Prof. Simson conducted preliminary interviews he specifically included a discrete, numerical amount by which the product at issue had changed. *See* Exh. A, Simonson Rep. App'x D at D-9. While explaining his avoidance of precise numerical price increase, he said he included the 5% value merely in order to hear how respondents "think about" the question of a change in price and further admitted that he "could have asked a different question" including "ask[ing] about X percent, whatever it is, 5 percent, 10 percent" and that he "could have asked it in other ways." Exh. B, Simonson Tr. 208:16-18, 209:20-210:5, 210:11-18.

[15] Simonson Rep. App'x D at D-9 ("45. Let's talk about a hypothetical situation.  Please imagine a situation in which you notice that the ROI of your programmatic display ads goes down **by 5 percentage points** . . .") (emphasis added); *see also* Exh. B, Simonson Tr. at 209:9-211:19.

preliminary interview respondents whether they would consider 5 or 10 percent a "small but significant price increase." Exh. B, Simonson Tr. 337:11-24. Nor did anyone involved with the survey try to further explain or quantify the meanings of "foreseeable future" or "remain elevated." *Id.* at 338:3-7, 16-20. In any event, nowhere did Prof. Simonson retain any information about how any preliminary interview participants answered those considerably less vague questions.[16] *Id.* at 121:4-20. In sum, because the Diversion Question is irrelevant and unreliable, Prof. Simonson's opinion about advertiser diversion, and Dr. Israel's reliance on it for his opinion about market definition, are inadmissible.

## **CONCLUSION**

For the forgoing reasons, the Motion should be granted.

---

[16] This failure to retain responses is another flaw in Prof. Simonson's survey. *See FJC Reference Guide* at 394 (in explaining the dangers of failing to record interviews with respondents "[f]ailure to record every part of the exchange in the order in which it occurs raises questions about the reliability of the survey, because neither the court nor the opposing party can evaluate whether the probe affected the views expressed by the respondent."). Notably, it is important to remain wary of how pretest and preliminary interview results are used as respondents' answers may be used to design the ultimate survey in a way that is—improperly—more favorable to one party. *E.g.*, Yvonne C. Schroeder, *Pretesting Survey Questions: The Procedural and Ethical Ramifications*, 11 Am. J. Trial Advoc. 195 (1987) ("During litigation, certain statistical results obtained from a survey may be more favorable to one party than to the other. Thus, pretesting may theoretically be used to obtain a desired result.").

Dated: April 26, 2024

Respectfully submitted,

JESSICA D. ABER
United States Attorney

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Aaron M. Sheanin
AARON M. SHEANIN
/s/ Chase E. Pritchett
CHASE E. PRITCHETT
/s/ Julia Tarver Wood
JULIA TARVER WOOD
/s/ Isabel M. Agnew
ISABEL M. AGNEW

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Aaron.Sheanin@usdoj.gov

Attorneys for the United States

JASON S. MIYARES
Attorney General of Virginia

/s/ Tyler T. Henry
STEVEN G. POPPS
Deputy Attorney General
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for the Commonwealth of
Virginia and local counsel for the
States of Arizona, California,
Colorado, Connecticut, Illinois,
Michigan, Minnesota, Nebraska, New
Hampshire, New Jersey, New York,
North Carolina, Rhode Island,
Tennessee, Washington, and West
Virginia