# Exhibit B

*Previously Filed as Dkt. 609-3)*

**In the Matter Of:**

*UNITED STATES OF AMERICA v*

*GOOGLE, LLC*

---

*ITAMAR SIMONSON, PH.D.*

*February 28, 2024*

---



Case 3:23-cv-03417-VC Document 1096-2   Filed 08/01/24   Page 3 of 44   Page 3086 (Ph.D.)

UNITED STATES OF AMERICA v.
GOOGLE, LLC

Ramez Shmeisch, Ph.D.
February 28, 2024

Highly Confidential

Page 118

1  interviews conducted; is that right?
2       A.   Yes.
3       Q.   And were those conducted
4  individually?
5       A.   Yes.
6       Q.   And how were those
7  interviews conducted?
8       A.   Well, an appointment was --
9  how do you say -- was set.  And when the
10 time came, I was on the line, and one of
11 the team members at Analysis Group
12 contacted -- I believe contacted or went
13 to the site.  It was a phone interview,
14 but I forget exactly how it came about.
15      But at some point I do
16 recall the interviewer saying, is the
17 respondent on the line, or something like
18 that.  So it must have been some -- one
19 of those services.  And at some point the
20 respondent said, yeah, I'm on the line.
21 And I said, thank you for being here.
22 And the questions started.
23      Q.   And so all 14 of the
24 interviews were conducted over the

Page 119

1  telephone?
2       A.   As far as I recall, yes.
3       Q.   And there was no video
4  participation?
5       A.   I believe that's correct.
6       Q.   And other than you, who else
7  listened to the 14 interviews at the time
8  they were conducted?
9       A.   I'm not sure.  There might
10 have been other people or one person at
11 Analysis Group -- I'm not sure, exactly.
12      Obviously, the person who
13 was the interviewer was there, but it's
14 quite possible that one or two other
15 people from AG were listening as well.
16      Q.   And AG refers to Analysis
17 Group?
18      A.   Yes.
19      Q.   Who was the interview?  Was
20 it the same interview for each of the
21 14 interviews?
22      A.   There were two interviewers.
23 I don't know if -- you want their names?
24      Q.   Yes.

Page 120

1       A.   So one of them is Kate
2  Schofield.  The other person's name is
3  Greg Weiss.
4       Q.   W-E-I-S-S?
5       A.   Yes.
6       Q.   And who -- for whom does
7  Kate Schofield work?
8       A.   They are both at Analysis
9  Group.
10      Q.   Did they each conduct seven,
11 or how did they divide them up?
12      A.   I don't remember exactly.
13 Each conducted several interviews.  I
14 don't remember the exact distribution.
15      Q.   And those two individuals
16 were responsible, together, for
17 conducting all 14?
18      A.   Yes.
19      Q.   And you listened to all 14?
20      A.   Yes.
21      Q.   And you listened to all 14
22 as they were occurring?
23      A.   Yes.
24      Q.   Were the preliminary

Page 121

1  interview respondents given any questions
2  in writing?
3       A.   I don't -- I don't think so.
4       Q.   And did the preliminary
5  interview respondents provide any written
6  answers?
7       A.   I don't think so, no.
8       Q.   And were the answers that
9  were given by the preliminary interview
10 subjects recorded in any way?
11      A.   No, at least not to my
12 knowledge.
13      Q.   Why not?
14      A.   As I said, I -- I listened
15 to them, and the -- the interviewer
16 listened to them, so I saw no need to
17 record them.
18      Q.   Did you take any notes at
19 all?
20      A.   I did not.
21      Q.   Did the interviewer take any
22 notes at all?
23      A.   Not to my knowledge.
24      Q.   Did the -- anyone else at

Page 138

1     A.    I'm not aware of that.
2     Q.    You don't think there's any
3   recording anywhere of what ad agencies
4   were participants in your 14 preliminary
5   interviews?
6     A.    I don't recall receiving it.
7     I don't want to speculate
8   about their names being -- being
9   available somewhere.
10    Q.    Well, did you ask either
11  Analysis Group or AP to maintain a record
12  of who was, in fact, interviewed as part
13  of this process?
14    A.    No.
15    Q.    Why not?
16    A.    It was not important at all.
17    As I explained, the purpose
18  of those qualitative interviews were --
19  was very limited, and it would have made
20  no difference if the agency is X or Y.
21    Q.    Didn't you ask that the
22  respondents who participated in the
23  preliminary interview not be invited to
24  participate in the subsequent surveys?

Page 139

1     A.    Yes.
2     Q.    So how could you ensure that
3   they were eliminated from subsequent
4   surveys if there was no record kept of
5   who they were?
6     A.    AP, I assume, knew who was
7   interviewed.
8     Q.    Okay.  So AP had a record of
9   who was interviewed.
10    A.    Oh, yeah.  Yes.  Okay.
11    I assume that AP did -- I
12  mean, AP gave the names, and they knew
13  who was interviewed, and they could make
14  sure that the same people would not be
15  invited later.
16    Q.    Okay.  So AP has a list of
17  who -- who the 14 interview participants
18  were?
19          MS. DEARBORN:  Objection to
20      form.
21          THE WITNESS:  I believe so,
22      yes.
23  BY MS. WOOD:
24    Q.    And to your knowledge, were

Page 140

1   the individuals who participated in the
2   preliminary interviews excluded from the
3   survey?
4     A.    To my knowledge, yes.
5     Q.    And to your knowledge,
6   were -- for the individuals who
7   participated in the preliminary
8   interviews, were their respective
9   companies excluded from the survey or
10  only the individual?
11    A.    I mean, right now, sitting
12  here now, I don't remember the answer.
13    It may be another business
14  unit from the same company might have
15  been interviewed.  But, actually, I
16  should not speculate about it.  I'm not
17  sure.
18    Q.    What were your instructions?
19    A.    I don't recall giving
20  specific instructions on that issue.
21    Q.    Do you recall the company
22  names of any of the individuals who were
23  interviewed as part of the 14 preliminary
24  interviews?

Page 141

1     A.    No.
2     Q.    You don't recall a single
3   company name?
4          MS. DEARBORN:  Objection.
5          THE WITNESS:  I don't -- if
6      I'm not wrong, I never knew their
7      names in the first place.
8   BY MS. WOOD:
9     Q.    What were the gender of the
10  participants in the interview?
11    A.    I think there are two
12  primary genders.  So I'm -- what do you
13  mean by what were the genders?
14    Q.    What was the gender
15  distribution of the interview
16  participants?
17    A.    Didn't kept track of that.
18  It made no difference whatsoever.  They
19  were whatever they were.
20    Q.    Did you speak to any women?
21    A.    I did not speak to anyone.
22    Q.    Did you hear a conversation
23  involving a woman interview participant?
24    A.    I'm pretty sure that the

Page 142

1  answer is yes.
2       Q.   You believe you did?
3       A.   I believe I did.
4       Q.   What's your level of
5  certainty about that?
6       A.   I'm not good at certainty.
7  I'd say approximately 90 percent.
8       Q.   Okay.  And how many women
9  interview participants were there?
10      A.   Did not recall.
11      Q.   You don't know whether they
12 were half?
13      A.   I do not recall.
14      Q.   Okay.  What were the age of
15 the participants who were interviewed?
16      A.   I don't think I knew that.
17      Q.   Did you ask that?
18      A.   No.
19      Q.   Do you know whether
20 Advertiser Perceptions had that
21 information?
22      A.   I don't recall right now if
23 there was a question about that.  I sort
24 of doubt it.  They probably did not.

Page 143

1       Q.   Do you know the state of
2  resident of the participants who
3  participated in the preliminary
4  interviews?
5       A.   No.
6       Q.   Do you know the job title of
7  the participants who participated in the
8  preliminary interviews?
9       A.   You know, I probably should
10 look at the -- at the questionnaire and
11 see if that was one of the preliminary
12 questions.  Right now, I don't remember.
13      Q.   So you don't remember any of
14 the names of the companies who were
15 interviewed, you don't remember the job
16 title of any of the people that were
17 interviewed; is that correct?
18      MS. DEARBORN:  Objection to
19      form.
20      THE WITNESS:  I certainly
21      do not remember.  I didn't
22      memorize those interviews.
23      If it -- if there was a
24      question about the age and gender

Page 144

1       or the position, then I heard it
2  while listening to the interview.
3  BY MS. WOOD:
4       Q.   But you don't recall that
5  now?
6       A.   Exactly.
7       Q.   But you wouldn't have to
8  memorize that information if you'd taken
9  notes of that information, right?
10      A.   It was completely
11 unimportant for me.
12      Q.   Okay.  Over what period of
13 time were the preliminary interviews
14 conducted?
15      A.   I think -- I forget.
16 Maybe -- I forget.  Maybe August,
17 September.
18      Q.   So over multiple weeks?
19      A.   Yes.  I think -- I forget
20 exactly.  I think that the large-spend
21 advertisers were conducted first, if I'm
22 not wrong.  Then the agencies.  Then the
23 low-spend advertisers.
24      Q.   And why were they done in

Page 145

1  that order?
2       A.   I'm not sure.  Just received
3  names of large advertisers first, and --
4  and then wanted to do some agencies.
5       Q.   So were all the
6  large-spend-advertiser preliminary
7  interviews conducted before the first
8  agency interview was conducted?
9       A.   You know, I -- I don't
10 recall.  I -- I don't know.  I'm not sure
11 that's the case, but I just don't
12 remember.
13      Again, it was completely --
14 it was not important at all.
15      Q.   But you did ask Advertiser
16 Perceptions to schedule the large-spend
17 advertiser interviews before the agency
18 and low-spend advertiser agencies?
19      A.   I'm not sure if it was an
20 explicit request, but I think that's the
21 way it happened, that we first received
22 names of large advertisers and then said,
23 okay, let's talk to some agencies.  And
24 then there were the smaller advertisers.

Page 146

1    Q.    And you don't remember the
2  single company name of any of those
3  agencies or advertisers?
4         MS. DEARBORN:  Objection to
5         form.
6         THE WITNESS:  Again, as I
7         said, as far as I recall, I never
8         heard those names.  And that
9         might explain why I don't
10        remember any name.
11 BY MS. WOOD:
12        Q.    Well, did you ever ask the
13 names?
14        A.    No.  I couldn't care less
15 about the specific name.
16        Q.    Okay.
17        A.    It was not important.
18              As I explained, the purpose
19 of the survey was quite limited, the
20 preliminary interviews.
21        Q.    How long --
22        A.    And for that -- for that
23 purpose, there was no need to know the
24 names and all those other things you were

Page 147

1  asking about.
2         Q.    How long was each interview?
3         A.    I think close to an hour.
4  In some cases an hour.
5         Q.    What was the variability in
6  the length of the interviews?
7         A.    I don't recall exactly.
8  Probably between 45 minutes and
9  65 minutes.
10        Q.    And were the interviewees
11 given breaks during the interview?
12        A.    No.
13        Q.    When you have conducted
14 preliminary interviews in the past,
15 whether for academic or litigation
16 surveys, did you ever take notes?
17        A.    You know, I don't recall
18 ever conducting such interviews.  I might
19 have, but I just don't recall that.
20              As I said, I typically
21 worked with doctoral students on
22 research.  And one of their privileges,
23 if you will, is they handle this kind of
24 work.  And then we met to discuss.  And

Page 148

1  that might have followed by a few
2  additional unstructured interviews.
3         Q.    In general, do you consider
4  it to be a best practice to take notes
5  during preliminary interviews?
6         A.    No.
7         Q.    Why not?
8         A.    Well, you know, each person
9  has his or her rules.  And many years
10 ago, I noticed that, while being a
11 student, that I often took the time to
12 take notes.  And then thinking back, I
13 said, have I ever used those notes.  And
14 the conclusion was no, I just don't use
15 notes.  And I developed a rule of let's
16 not waste my time and effort taking
17 notes.
18        Q.    So that's a rule that you
19 follow, not to take notes?
20        A.    You know, it's not written
21 anywhere.  Just it's one of those rules
22 that we individuals develop, if you will,
23 over our lifetime.
24        Q.    So is the answer to my

Page 149

1  question yes, that is a rule you've
2  developed for yourself, not to take
3  notes?
4         MS. DEARBORN:  Objection to
5         form.  Asked and answered.
6         THE WITNESS:  As I said,
7         yeah, based on my experience, I
8         do not take notes.
9  BY MS. WOOD:
10        Q.    Part of your academic work
11 has focused on people's propensity to
12 misremember things; is that right?
13        A.    Can you point me to a
14 particular article?
15              I published a number of
16 articles.  I don't remember apropos all
17 the articles.  Maybe you can point to a
18 particular article where I studied people
19 not remembering.
20        Q.    Do you have any -- as you
21 sit here now, do you recall publishing
22 any academic work in the field of
23 behavioral economics on how people are
24 subject to missed memories -- mistaken

Page 162

1  Q.    At the beginning of the
2  preliminary interview guide, it asks if
3  the participant has any questions before
4  the interviewer is to continue.
5          Do you recall whether any of
6  the interview participants asked any
7  questions at that point?
8      A.    I don't recall that they
9  did, but it's not inconceivable.  I just
10 don't recall any questions.
11     Q.    Do you recall whether any of
12 the interview participants asked
13 questions about Google's sponsorship
14 and/or the litigation involving Google?
15     A.    I do not recall, no.
16     Q.    You don't recall that one
17 way or the other?
18     A.    I just don't recall any
19 question being asked.
20     Q.    But you don't deny there
21 might have been questions asked?
22         MS. DEARBORN:  Objection to
23     form.
24         THE WITNESS:  You cannot

Page 163

1      deny something that you're not
2      aware of.
3          I was there.  I listened to
4      the interviews.  I don't remember
5      any questions.
6  BY MS. WOOD:
7      Q.    But it's possible that you
8  forgot?
9      A.    We -- yeah.  We are all
10 human, and we are capable of forgetting.
11     Q.    In the introduction to the
12 preliminary interview guide, it states,
13 "Based on our research, we understand
14 that your company is not a participant in
15 those lawsuits."
16         What did you mean by "a
17 participant in those lawsuits"?
18     A.    Well, that was a way of
19 saying -- I mean, I didn't want to kind
20 of get into, well, you should know that
21 those who got, say, a subpoena or -- et
22 cetera.  It was determined that they
23 should not participate in the survey.
24         So that was a succinct way

Page 164

1  of telling them, your company is not
2  involved, so that respondents don't feel
3  like maybe they are inadvertently saying
4  something that may come to -- or that may
5  be used against their own company.
6      Q.    What was your basis for
7  suggesting that the participant's company
8  was not involved?
9      A.    There was a list of
10 companies that we talked about, and
11 they -- those who were included in the
12 preliminary interviews were not on that
13 list.
14     Q.    And that list is Appendix I
15 of your -- to your report, correct?
16     A.    Yes, I believe so.
17     Q.    And Appendix I is dated as
18 of August 15, 2023.
19         Do you see that?
20     A.    Let's see.  Let me find
21 that.
22         MS. DEARBORN:  Counsel, if
23     you'd like me to help the
24     witness -- he found it.

Page 165

1          THE WITNESS:  I found the
2      appendix.  Yeah.
3          Let's see.  Okay.
4  BY MS. WOOD:
5      Q.    Were -- were there other
6  iterations of the no-contact list other
7  than this one that is as of August 15,
8  2023?
9      A.    I'm not aware of any other
10 list.
11     Q.    Were any interviews of any
12 kind conducted prior to August 15, 2023?
13     A.    I don't think so.
14     Q.    You indicated in your
15 report, at Paragraph 34, that these
16 people that appear on -- in Appendix I,
17 the no-contact list, were excluded at the
18 direction of counsel.
19     A.    Right.
20     Q.    Is that correct?
21     A.    Yes.
22     Q.    Was the intent, to your
23 understanding, to exclude individuals or
24 entities that might have a stake in

Page 166

1   litigation against Google?
2         MS. DEARBORN:  Please
3   exclude from your -- from your
4   answer any information you
5   received only from counsel in
6   that regard.
7         THE WITNESS:  So I don't
8   want to speculate about that.
9         I mean, I could -- I could
10  come up with my own reasoning,
11  but I'd -- I'd rather not
12  speculate.  Because no one said
13  that's the reason why people who
14  are directly involved in this
15  litigation should not be
16  interviewed.
17        I am familiar from other
18  contexts.  Let's say if there are
19  class actions in a particular
20  category, and a class has already
21  been certified, then I know that
22  if you conduct a survey after the
23  class was certified, you should
24  not contact class members.

Page 167

1         Now, that's a different
2   thing.  Here we are not talking
3   about a class.  But, you know, it
4   seems to have the same sort of
5   flavor.
6   BY MS. WOOD:
7         Q.   I guess my question is to
8   you as the designer of the survey.
9         Was it your intent to
10  exclude entities that would have a
11  financial stake in the outcome of
12  litigation against Google?
13        MS. DEARBORN:  Same
14  caution, but you can answer the
15  question.
16        THE WITNESS:  As I said,
17  I -- I don't -- I did not have
18  the intention.  It was an
19  instruction from counsel, so I
20  didn't ask them, why are you
21  telling me not to include them.
22  BY MS. WOOD:
23        Q.   And who prepared the
24  no-contact list that appears at

Page 168

1   Appendix I?
2         A.   I don't recall.  Certainly
3   not me.
4         Q.   Do you know the criteria
5   that was used to include individuals or
6   companies on the no-contact list?
7         MS. DEARBORN:  Same
8   caution.
9         THE WITNESS:  I do not
10  know.
11  BY MS. WOOD:
12        Q.   Do you know why, if the
13  intent was to survey advertisers, why
14  this list contains non-advertisers, such
15  as publishers?
16        MS. DEARBORN:  Same
17  caution.
18        THE WITNESS:  I just do not
19  know.
20  BY MS. WOOD:
21        Q.   Do you know why the entities
22  on the no-contact list are classified in
23  the right-hand column under the type of
24  entity?

Page 169

1         MS. DEARBORN:  Same
2   caution.
3         THE WITNESS:  Again, I
4   didn't prepare it, so I don't
5   know why.
6   BY MS. WOOD:
7         Q.   And was every entity on the
8   no-contact list excluded regardless of
9   the classification in the column, type of
10  entity?
11        A.   Yes.
12        Q.   And was every individual who
13  was in any way associated as an employee
14  or otherwise with each of those companies
15  also excluded?
16        A.   So if any individuals who
17  were associated with whatever it is,
18  reading the first one, 33 across, were
19  not interviewed.
20        Q.   So, for example, where it
21  says Alaska Department of Labor, no one
22  from the Alaska Department of Labor would
23  be contacted or interviewed, even though
24  Alaska Department of Labor is referenced

Case 1:23-cv-01228-UNA   Document 1096-2   Filed 08/01/24   Page 9 of 44 PageID #: 88877

UNITED STATES OF AMERICA v.
GOOGLE, LLC

Highly Confidential

James Simonson, Ph.D.
February 28, 2024

---

Page 206

1  hypothetical question about return on
2  investment, ROI, on programatic display
3  going down by 5 percentage points and
4  whether that would prompt the respondent
5  to change spending on programatic
6  display.
7          Do you see that?
8      A.   I do.
9      Q.   Who developed the idea for
10 that question?
11     A.   It was probably me.  It was
12 probably me.  And I thought, even though
13 I believed that that is an improper
14 question for the actual survey -- and
15 I've written about it, and I've done
16 studies about that, and I've criticized
17 other people who ask people, let's say
18 the price goes up by X percent.  No,
19 let's say the price goes up by Y percent,
20 and so on.
21         Those questions are flawed
22 in all kinds of ways.  And it was clear
23 to me that the only option, if we're
24 thinking now about the diversion

Page 207

1  question, is to have a meaningful term
2  that is not an absolute number, not a
3  specific quantity.
4          And if you're interested,
5  I'm happy to share with you some of the
6  research I've done on this topic.  I
7  already mentioned earlier, the pillow
8  paper, which summarizes many of those
9  studies.  But if you read the articles
10 that I have published over the years,
11 you'll see the same thing over and over
12 again.
13         So, here, I wanted to see in
14 the context of the preliminary
15 interviews, on which I was not going to
16 rely for any purpose other than the
17 things that I already said.  I didn't
18 think that asking them what would you do,
19 would you change X if the cost went up by
20 5 percent.  That's a bad question.  I
21 criticize other people for doing that.
22         So I think -- yeah, so that
23 question was asked.  Not a question I
24 would include in an actual survey.

Page 208

1      Q.   Why did you ask a bad
2  question in the preliminary interview?
3      A.   Well, it's a bad question in
4  the sense that I don't believe that these
5  respondents can give a meaningful,
6  informative answer.
7          But given that I was not
8  going to rely on those initial
9  interviews, I said, okay, let's hear what
10 they say in response to such a question.
11     Q.   Why would you want to ask a
12 question that didn't give meaningful,
13 informative answers?
14         MS. DEARBORN:  Objection to
15 form.  Misstates testimony.
16         THE WITNESS:  As I said, I
17 asked a question because I wanted
18 to hear how they think about it.
19         I was not going to rely on
20 their answers.  And, as you know,
21 I did not rely on the -- on the
22 answers to the qualitative
23 interviews, with the exception of
24 things that I'd talked about

Page 209

1  earlier.
2          But the 5 percent would
3          have been a bad question, a
4          question that I personally
5          criticized others for using, and
6          I published articles making that
7          point.
8  BY MS. WOOD:
9      Q.   But my question to you is
10 not why you didn't use the 5 percent
11 question in your ultimate survey.  You've
12 given extensive answers about that.  What
13 I'd like to know is why you did use it in
14 the preliminary interview.
15         What information did it give
16 you that you couldn't have gotten through
17 other means?
18         MS. DEARBORN:  Form.
19         Go ahead.
20         THE WITNESS:  Maybe I could
21         have asked a different question.
22         I just said, let's -- let's ask
23         about X percent, whatever it is,
24         5 percent, 10 percent,

Page 210

```
 1        20 percent.  For whatever reason,
 2    I ask here about 5 percent.
 3            And then there's a question
 4    there in B about -- goes down by
 5    10 percentage point.
 6            So I asked those questions
 7    knowing there are severe
 8    limitations.
 9    BY MS. WOOD:
10        Q.    But why?
11        A.    Why.  Because I just wanted
12    to hear how respondents think about that
13    issue.
14        Q.    Why was that important to
15    you?
16        A.    Just to inform me in this
17    exploratory phase and to see how they
18    think about those kind of issues.
19        Q.    And why phrase it in a way
20    that you believe to be problematic?  Why
21    couldn't you phrase it in a way that you
22    thought was less problematic and still
23    hear that -- how they think about those
24    issues?
```

Page 211

```
 1        A.    I mean --
 2            MS. DEARBORN:  Objection to
 3        form.
 4            THE WITNESS:  I could have
 5        asked it in other ways.  That's
 6        probably true.
 7            I, for whatever reason -- I
 8        don't remember, exactly, my
 9        thinking process at the time.
10        But I just happened to ask about
11        the 5 percent and then the
12        10 percent.
13    BY MS. WOOD:
14        Q.    And your recollection is the
15    5 percent and the 10 percent were
16    concepts that you came up with, not
17    concepts that were suggested to you by
18    anyone else?
19        A.    Absolutely.
20        Q.    And you refer to
21    Question 45, and similar -- well, related
22    questions in the survey as the diversion
23    questions.
24            Do you remember that?
```

Page 212

```
 1        A.    I remember that.  I mean,
 2    I --
 3            MS. DEARBORN:  Yeah, sorry.
 4            I object to form.
 5    BY MS. WOOD:
 6        Q.    My question is just who came
 7    up with the idea of a diversion question
 8    at all -- regardless of how it's
 9    phrased --
10        A.    I see.
11        Q.    -- who came up -- was that
12    part of your assignment or was that
13    something you came up with?
14        A.    So I think an issue that I
15    wanted to get at was whether display,
16    programatic display advertising, or in
17    the case of the smaller advertisers,
18    display advertising, has substitutes.
19            In other words, if the cost
20    of display -- display advertising goes
21    up, whether respondents would say, in
22    that case we're not changing; or they
23    say, yes, we will change.
24            Again, making sure I'm not
```

Page 213

```
 1    asking about absolute or a specific
 2    number.  And when I ask them about the
 3    extent of diversion to each type, I,
 4    again, use a relative scale, going from,
 5    keep to same, to increase substantially.
 6        Q.    Again, my question was, was
 7    that diversion topic -- generally, not
 8    how it was worded -- part of your
 9    assignment or an idea that you came up
10    with?
11        A.    No.  As I said -- I'm sorry.
12    Maybe I didn't give you a direct answer.
13            Yeah, I was asked, among
14    other issues -- and you see the list of
15    objectives -- to design a survey that
16    will examine the degree of substitution,
17    if any, from between display advertising
18    and other types of digital advertising.
19        Q.    And with that assignment in
20    mind, you came up with Question 45 in the
21    preliminary interview guide?
22            MS. DEARBORN:  Form.
23            THE WITNESS:  Absolutely
24        not.
```

| Page 214 | Page 216 |
|---|---|

**Page 214**

BY MS. WOOD:

2  Q.   Okay.  How, if at all, did
3  Question 45 in the preliminary interview
4  guide inform the survey questions on that
5  same subject of diversion?
6  A.   It did not.  As I said, if
7  you look at the question, it's entirely
8  different.
9        Question 45 has the flaws
10  that I pointed to in earlier work.  Was
11  not intended to be the diversion question
12  in an actual survey.
13       Q.   In other work, have you ever
14  used flawed questions like Number 45?
15  A.   Yes.
16       Q.   And if you believe 45 --
17  A.   And I should say other
18  surveys -- if we talk about unstructured
19  qualitative interviews that are
20  exploratory in nature, where my focus was
21  on other issues, in which case the actual
22  wording of the questions was not an
23  important consideration, or maybe I
24  wanted to explore, for whatever reason,

**Page 215**

1  something else.
2        Q.   But even in an
3  unstructured -- unstructured qualitative
4  interview, why wouldn't you want your
5  questions to be as good as possible?
6        MS. DEARBORN:  Form.
7        THE WITNESS:  I thought
8    that this set of questions would
9    inform me about the thinking of
10   those few respondents.
11       I was not interested, and
12   as I said, as you know, I did not
13   bother to remember this content
14   of specific answers.  I just
15   wanted something that has to do
16   with cost increase.
17  BY MS. WOOD:
18       Q.   And why couldn't you have
19  just asked the survey participants, what
20  would you do if there was a cost
21  increase?
22       MS. DEARBORN:  Form.
23       THE WITNESS:  Yeah, I
24   haven't thought about that.  I'm

**Page 216**

1  sure there are all kinds of
2  options.
3        The specific phrasing of
4    the question was not an important
5    consideration, so that just came
6    to mind, and that's what I used
7    in those -- in those preliminary
8    interviews.
9  BY MS. WOOD:
10       Q.   But in those preliminary
11  interviews, you drafted -- and regardless
12  of whether you drafted, you certainly
13  approved Question 45, correct?
14       A.   Right.
15       Q.   Why did you focus
16  Question 45 on return on investment going
17  down as opposed to costs going up, for
18  example?
19       A.   Well, you know, I cannot sit
20  here, six, seven months later and
21  recreate my thinking back then.  I mean,
22  any question you ask, there are probably
23  other ways of asking it.
24       I don't -- I don't recall

**Page 217**

1  considering what you just said.  But
2  there are other ways -- and especially
3  when you conduct those kind of
4  interviews, where the content of the
5  answers is not important and the actual
6  survey will be entirely different than
7  these qualitative interviews, having the
8  perfect question was not my intention or
9  criterion that I considered for those
10  limited interviews.
11       Q.   I can understand why you
12  wouldn't be concerned with coming up with
13  the perfect question.
14       My question is why you would
15  use a question with known flaws?
16       MS. DEARBORN:  Objection to
17    form.  Asked and answered.
18       THE WITNESS:  As I said --
19    as I said, I -- it did not
20    affect.  It just came to mind,
21    5 percent.  I saw other people,
22    whom I had criticized, use those
23    kind of questions in a couple of
24    cases, and I said, okay, someone

| Page 218 | Page 220 |
|---|---|

**Page 218**

1       else used something like that.
2       Maybe -- which I criticized.
3       Maybe I -- I'll just use
4       something like that, even though
5       I previously criticized that.
6  BY MS. WOOD:
7       Q.  Do you do that often?  Do
8  something that you, in other
9  circumstances, criticize?
10      MS. DEARBORN:  Objection to
11     form.
12      THE WITNESS:  It's -- might
13     have happened, depending on the
14     purpose of what I'm studying.
15      I mean, I don't -- I
16     wouldn't include in my actual
17     surveys flawed questions or
18     things that I criticized.  In
19     fact, I'm making effort for that
20     not to happen.  Most importantly,
21     because I believe in what I said.
22      And if I criticize them for
23     asking those kinds of questions,
24     I believe that the wrong thing to

**Page 220**

1       have made no difference to me.
2       It's not something I looked at.
3       That was not the intention of
4       that question.
5       And that's another way of
6       saying the format of the
7       question, in the context of those
8       very few interviews, really
9       played no significant role in my
10      thought process.
11  BY MS. WOOD:
12      Q.  What was the purpose of the
13  question?  If you didn't care about the
14  5 percent, you didn't care about the
15  10 percent, you didn't care about the
16  ROI, what did you care about?
17      MS. DEARBORN:  Objection to
18     form.
19      THE WITNESS:  I think I
20     already answered that a few
21     times.
22      As I said, I wanted to see
23     if there is -- if something jumps
24     out here in the survey,

| Page 219 | Page 221 |
|---|---|

**Page 219**

1       say, to ask, and I would not
2       include that in my surveys.
3  BY MS. WOOD:
4      Q.  But you have no problem with
5  asking flawed questions that you've
6  criticized, as long as you know in
7  advance that you're not going to keep the
8  results of those or use the results of
9  those?
10      A.  Has --
11      MS. DEARBORN:  Please let
12     me get an objection in.
13     Objection to form.
14     THE WITNESS:  It has
15     nothing to do with keeping the
16     results or not keeping the
17     results.  It has absolutely
18     nothing to do with that.
19      As I said, let's say I
20     ask -- ask about 5 percent, and
21     they say, okay, that will cause
22     us to decrease use of display
23     advertising by 57 percent or by
24     10 percent or not at all.  Would

**Page 221**

1       something, like, I use a term.
2       You asked me about that.
3       100 percent of the respondents
4       say, DSP, never heard about this
5       thing.  Or advertising tool.  I
6       mean, that might give me a pause
7       at least.  They may be
8       unrepresentative, given with all
9       but such a small sample, but that
10      may give me pause.
11      In addition, I want to see,
12      am I interviewing people who are
13      knowledgeable.  We discussed
14      earlier my selection of AP.
15      So regardless of the
16      question format and the answers,
17      that's not what I used those few
18      preliminary interviews for.
19  BY MS. WOOD:
20      Q.  Do you recall any answers at
21  all that you got in response to
22  Question 45?
23      MS. DEARBORN:  Form.
24      THE WITNESS:  I do not.

Page 222

1  BY MS. WOOD:
2      Q.    Have you now told me
3  everything that you recall about the
4  14 preliminary interviews?
5          MS. DEARBORN:  Form.
6          THE WITNESS:  I hesitate
7          to -- I believe so.  Nothing
8          comes to mind that I didn't tell
9          you.  But, obviously, it's a
10         function of the question you ask.
11         But I cannot think of anything I
12         have not told you.  I think the
13         past four hours addressed the --
14 BY MS. WOOD:
15     Q.    Is there --
16     A.    -- qualitative interviews
17 quite thoroughly.
18     Q.    Is there anything you could
19 do to further refresh your recollection
20 about the answers that you heard during
21 the 14 preliminary interviews, other than
22 what you've already done?
23     A.    No.
24     Q.    Did any of the interview

Page 223

1  participants ask any questions at all
2  about Google or the lawsuit?
3          MS. DEARBORN:  Form.
4          THE WITNESS:  I think we
5          talked about that already, and I
6          do not recall anyone asking such
7          a question.
8  BY MS. WOOD:
9      Q.    Now, you also conducted
10 pretests in connection with your work in
11 this matter; is that right?
12     A.    Right.
13     Q.    And have you heard of the
14 term "pilot test" used?
15     A.    Yes.
16     Q.    Is there a difference, in
17 your mind, between a pretest and a pilot?
18     A.    You know, that's a good
19 question.  And I think probably different
20 people may use those terms either
21 interchangeably or as different.
22     Q.    And how do you use those
23 terms?
24     A.    In my mind, a pilot would be

Page 224

1  a complete run of the survey with a
2  sufficiently large sample and you conduct
3  a survey.  And sometimes people may do
4  that because they want to -- to know what
5  the result would be.
6          A pretest, I think it often
7  involves a smaller number of respondents,
8  and it's often designed to test whether
9  people, for example, say, I don't
10 understand what the survey is about, or
11 some -- something out of the ordinary
12 that tells you that there is something
13 wrong with the survey.
14     Q.    How many pretests do you
15 typically conduct for a survey?
16     A.    You said typically?  None.
17     Q.    And why is that?
18     A.    In the context of
19 litigation?
20     Q.    Yes.
21     A.    In the context of litigation
22 it would be -- you know, sometimes an
23 attorney would say, well -- if you talk
24 about pretest like a pilot sort of --

Page 225

1  someone would say, well, I'm curious
2  if -- what you -- can you find
3  respondents and what the results will be.
4          So that will involve, you
5  know -- you know, a significant sample
6  size.  So that would be more along the
7  lines of a pilot study.  That happens.
8          I -- if someone tells me
9  about that -- let's say someone calls me
10 about a trademark case and say, we -- we
11 want to find out if a survey will show
12 likelihood of confusion.
13         I often say, you know, the
14 threshold for likelihood of confusion is
15 relatively low, let's say 15 percent,
16 which means that there is a -- let's say,
17 in the southern district of New York, I
18 think it's 15 percent.  In some places it
19 might be slightly less.
20         It means you need a fairly
21 sizable sample size to find out -- I
22 mean, obviously, if level of confusion is
23 zero or 50 percent, you know, you don't
24 need a large sample.

| Page 226 | Page 228 |
|---|---|

Page 226

1    But let's say it's in the --
2 close to the threshold.  You need quite a
3 few respondents.  And I tell the
4 attorney, it's pointless.  Let's design a
5 survey as I think it should be designed
6 and let the chips fall as they may.  If
7 the results are what you expect, just --
8 that will be the survey.  I may add even
9 more respondents.
10    If the results are not what
11 you expect, then you will -- you will
12 decide what you want to do, but chances
13 are you will decide to hire another
14 expert.
15    Because if I would sit at a
16 deposition and someone would ask, are you
17 aware of any other survey that was
18 conducted, I would say yes, because I was
19 involved in a pretest, and I would have
20 to -- and that happens often.  That, you
21 know -- usually, if I think beforehand,
22 there's no way the attorney is correct, I
23 just say, let's not waste your client's,
24 you know, time and money.  If it's kind

Page 228

1 time TV for, I don't know, $5 a month.
2 And that -- they were pretty successful.
3 I believe this case went all the way to
4 the Supreme Court.
5    But -- and that was sort of
6 an unusual -- that -- that was a
7 different kind of survey.
8    But I normally don't --
9 don't run pretests.  I just design the
10 survey as I think, based on my
11 experience, it should be conducted, and
12 then, as I said, let the chips fall as
13 they may.
14    Q.    So what circumstances led
15 you to do a pretest here?
16    A.    I just wanted to -- I didn't
17 expect anything surprising.  And,
18 obviously, with such a small number of
19 pretest interviews, that wouldn't tell
20 you about -- anything about results.
21    Just wanted to see if
22 anything jumps out in the sense that, you
23 know, when we ask respondents at the very
24 end, do you have any questions, was

Page 227

1 of not so clear, then I say, okay, let's
2 give it a try.
3    And sometimes it is what
4 they expect.  Other times it's not what
5 they expect.  If it's not what they
6 expect, I guess they tend to hire another
7 expert.
8    Q.    How many times in litigation
9 have you conducted a survey where you
10 used pretests?
11    A.    Very -- you mean like --
12 like what I did here with relatively few
13 interviews?
14    Q.    Yes.
15    A.    Very, very few cases.  Very
16 few.  I cannot think -- I think there
17 were -- I did some pretests in the Oracle
18 v. Google case.
19    I might have done
20 pretests -- I'm not even sure about
21 that -- in a case involving the networks
22 against a company that was mostly in
23 New York, called Aereo -- I think it's
24 spelled A-E-R-E-O -- which offered prime

Page 229

1 any -- was any question unclear, if I
2 find that many of the pretest respondents
3 say, you know, X was not clear, you know,
4 that definitely would have caused me to
5 reconsider how I phrased that question.
6    Q.    Is it important that the
7 pretest be done by participants who are
8 generally representative of the larger
9 survey population?
10    A.    If -- again, if the number
11 of pretest respondents is small, then I'm
12 not concerned about representativeness.
13    Q.    And here you conducted
14 12 pretests; is that correct?
15    A.    Yes.
16    Q.    Five in the higher-spend
17 category, three in the lower-spend
18 category, and four in the ad agency
19 category; is that correct?
20    A.    Yes.
21    Q.    Did you keep records of
22 those pretest results?
23    MS. DEARBORN:  Form.
24    THE WITNESS:  You know,

Case 3:16-cv-01806-LMB-GPA  Document 1096-2  Filed 08/01/24  Page 15 of 44 PageID#
UNITED STATES OF AMERICA v.
GOOGLE, LLC
Highly Confidential
Itamar Simonson, Ph.D.
February 28, 2024

Page 230

```
 1        frankly, I don't recall if we
 2        did.
 3              I mean, that was actual
 4        questionnaires that were -- I
 5        don't -- I don't -- I'm not aware
 6        of records being kept.  But
 7        sitting here now, I'm not
 8        100 percent.
 9   BY MS. WOOD:
10        Q.    Did you ask that the records
11   be kept?
12              MS. DEARBORN:  Form.
13              THE WITNESS:  I -- I do
14        recall that -- being informed
15        that the respondents said
16        everything pretty much -- maybe
17        there were a couple of
18        exceptions -- everything was
19        clear and they did not identify
20        any problems.
21   BY MS. WOOD:
22        Q.    What were the couple of
23   exceptions?
24        A.    I -- I do not recall.
```

Page 231

```
 1        Q.    You don't recall anything
 2   about the exceptions to everything being
 3   clear?
 4              MS. DEARBORN:  Form.
 5              THE WITNESS:  I -- that's
 6        correct.
 7   BY MS. WOOD:
 8        Q.    Did you personally
 9   participate in the pretest?
10        A.    No.
11        Q.    Who did?
12        A.    I mean -- I mean, these were
13   actual -- they were similar -- aside from
14   the questions that appear at the end,
15   these were just like normal interviews.
16        Q.    If you look at Appendix E to
17   your report, it has the pretest moderator
18   instructions?
19        A.    Right.  But the moderator
20   didn't ask the questions and did not
21   interfere in the -- at the beginning,
22   except for, you know, those
23   introductions.
24              And -- let's see.  What --
```

Page 232

```
 1   what page are you looking at?
 2        Q.    Your report, Appendix E.
 3        A.    So as I said, just a brief
 4   introduction, then they go to the survey.
 5   They complete it, and then they -- they
 6   are asked a few brief questions.
 7              But for all practical
 8   purposes, these people did the survey on
 9   their own, like actual respondents did
10   subsequently.
11        Q.    Who was the moderator for
12   the 12 pretests?
13        A.    If I recall correctly, they
14   were the same people that did the
15   qualitative interviews, but I'm not
16   certain about that.  I don't -- I don't
17   recall.
18        Q.    And you didn't listen to any
19   of the pretests?
20        A.    No.  There was nothing to
21   listen to, aside from, I guess, the last
22   few questions.
23        Q.    Right.  There was the -- the
24   script that you provide in Appendix E is
```

Page 233

```
 1   what you could have listened to, right?
 2        A.    Right.
 3        Q.    And you did not?
 4        A.    I did not listen to those.
 5   Yes.
 6        Q.    Okay.  And -- and so you
 7   have no firsthand knowledge of any of the
 8   answers to any of the questions that were
 9   asked as part of the pretest?
10        A.    I had the reports of those
11   who did that.
12        Q.    And were those written
13   reports?
14        A.    I do not recall if that was
15   just information shared with me when we
16   met for our, you know, weekly meeting --
17   you know, one of our weekly meetings.
18              Yeah, and by the way, there
19   was no reason for me to participate
20   because most of the time is taken by the
21   respondent working on his or her own,
22   completing the survey.
23        Q.    Right.  But you could have
24   listened to the other portions, correct?
```

Page 282

1   difference?
2       A.   Yes.
3       Q.   Okay.  Let's turn to
4   Exhibit 37 to your report, which is the
5   same response statistics for the
6   lower-spend advertiser survey.
7            MS. DEARBORN:  Counsel, we
8            can go whenever, but at an
9            appropriate time to take a break,
10           I'm going to need a bio break.
11           MS. WOOD:  Sure.  I mean,
12           if you need one now --
13           MS. DEARBORN:  No, it's
14           okay.
15           MS. WOOD:  Let's just
16           finish this page.
17           MS. DEARBORN:  That's fine.
18           THE WITNESS:  So where --
19  BY MS. WOOD:
20      Q.   It's Exhibit 37.
21      A.   Okay.
22      Q.   Now, this summarizes the
23  response statistics that were included
24  for the lower-spend advertiser survey,

Page 283

1   correct?
2       A.   Right.
3       Q.   And here you see the number
4   we discussed before, that 17 percent of
5   the lower-spend advertiser survey
6   participants were excluded because of the
7   answer that they gave to QS7, correct?
8       A.   Right.
9       Q.   And that was, for this
10  survey, 178 people, correct?
11      A.   Right.
12      Q.   And do you know, of those
13  individuals, how many of those had
14  indicated "other"?
15      A.   Fewer.
16      Q.   How many of -- if you turn
17  to Exhibit 40.
18      A.   Okay.
19      Q.   Exhibit 40 shows, in
20  response to QS8 -- so everyone whose data
21  is recorded in Exhibit 40, by definition,
22  made it through QS7, right?
23      A.   Right.
24      Q.   And do you see that

Page 284

1   zero percent of the respondents answered
2   that they were in government?
3       A.   Yes, I do see that.
4       Q.   And zero percent answered
5   that they were employed by a nonprofit?
6       A.   That's right.
7       Q.   Okay.
8            MS. WOOD:  We can take a
9            break.
10           THE WITNESS:  So -- and
11           these are the lower-spend
12           advertisers.
13           MS. WOOD:  There's no
14           question pending.
15           THE WITNESS:  Okay.  I'm
16           just completing my answer.
17           I'm saying, this is an
18           exhibit that relates to lower
19           spend, where people who get --
20           got to this question were neither
21           nonprofit nor government.
22  BY MS. WOOD:
23      Q.   The people who survived QS7
24  did not indicate that they were nonprofit

Page 285

1   or government, correct?
2            MS. DEARBORN:  Objection to
3            form.
4            THE WITNESS:  Exactly.
5            Even though, presumably, the QS7
6            for the low spend was somehow
7            better and presumably helped
8            increase the number of nonprofit
9            and government, that does not
10           appear to be the case.
11           But, anyway, we can take a
12           break.
13           MS. WOOD:  Let's take a
14           break.
15           THE VIDEOGRAPHER:  Going
16           off the record at 3:17 p.m.
17           (Short break.)
18           THE VIDEOGRAPHER:  We are
19           going back on the record at
20           3:40 p.m.
21  BY MS. WOOD:
22      Q.   Mr. Simonson, how many times
23  in your prior surveys have you told the
24  survey participants about the survey

Case 1:23-cv-00108-LMB-WEF   Document 1096-2   Filed 08/01/24   Page 17 of 44 PageID# 37657

Page 286

1  sponsor at the conclusion of the survey?
2      A.    In litigation -- in academic
3  research it's done frequently.  It's
4  referred to as debriefing.  Not -- not so
5  much about -- I mean, they know who the
6  sponsor is, presumably the university, but
7  but the purpose of the study is described
8  during the debriefing process.  So that's
9  very common in academic research.
10          In litigation, based on my
11 experience, it's -- it's uncommon.
12     Q.    Have you ever done it before
13 this case?
14     A.    I do not recall.
15     Q.    You don't recall ever doing
16 it before this case?
17     A.    I do not.
18     Q.    And how many times in your
19 prior surveys have you told participants
20 at the end that the purpose of the survey
21 was in connection with the litigation?
22     A.    Not in the same manner, I've
23 not.  There are a number of cases where I
24 wanted to find out at the conclusion of

Page 287

1  the survey whether they're aware of any
2  litigation in a related matter.
3          For -- just to give you an
4  example.  I was involved in a case in
5  which the maker of sugar accused the
6  maker of Splenda that -- that Splenda
7  actually has zero sugar in it, which it
8  does.  I mean, it's completely
9  artificial, and it was very much on the
10 news.  And I wanted to know, given it was
11 on, you know, national TV, I was curious
12 to find out if respondents heard about
13 it.
14          Same thing.  I was involved
15 in a case pertaining to the Volkswagon
16 diesel matter, also has received
17 attention.  So I was asking, have you
18 heard about any litigation in the general
19 area.
20          So I've done that, but
21 that's, obviously, different than -- than
22 what was done here.
23     Q.    How many times have you done
24 what was done here, disclosed to the

Page 288

1  participants that the sponsor of the
2  survey is involved in litigation and
3  described the nature of that litigation
4  to the survey participants at the
5  conclusion?
6      A.    I don't recall doing that,
7  even though I would not have had any
8  concern, in other cases, doing it,
9  because I know the questions have already
10 been answered and cannot be changed.  So
11 it couldn't make any difference.
12     Q.    And how many times in prior
13 surveys you've conducted have you offered
14 the respondent an option to opt out of
15 the survey results once they were
16 informed about the survey sponsor and
17 purpose?
18     A.    I don't recall.
19     Q.    You don't recall ever doing
20 that?
21     A.    I don't recall doing that.
22 I'm trying to think.  It might have
23 happened, something somewhat similar.
24 But, you know, nothing comes to mind

Page 289

1  right now.
2      Q.    What are you thinking of
3  that might have been similar?
4      A.    I'm trying to think whether
5  it came up, let's say, in academic
6  studies, where I would say, well, this
7  study is about X.  You know, if you wish,
8  you -- you don't have to be included.
9  Even though all the data are
10 confidential, but -- so it might have
11 happened.  No specific study comes to
12 mind right now.
13     Q.    So you can't think of any
14 instance here, other than in this case,
15 where, at the conclusion of the survey,
16 you offered the respondents an option to
17 opt out once the respondent knows the
18 survey-sponsored purpose?
19     A.    Right.
20     Q.    Why did you do that here?
21     MS. DEARBORN:  Please
22 exclude from your answer any
23 discussions with counsel.
24     THE WITNESS:  So I was -- I

Case 1:23-cv-00108-LMB-WBP    Document 1096-2    Filed 08/01/24    Page 18 of 44 PageID#

UNITED STATES OF AMERICA v.
GOOGLE, LLC

Highly Confidential

Itamar Simonson, Ph.D.
February 28, 2024

1    can say that I was -- I was
2    advised by counsel.
3             MS. DEARBORN:  Right.
4    BY MS. WOOD:
5        Q.    So it was not your decision?
6        A.    It was not my decision.  But
7    had I thought that that could change --
8    change the results or impact the
9    conclusions in any way, I would say no.
10   I wouldn't do it.
11            For example, had I been told
12   that you have to say -- to provide this
13   information upfront, I may very well have
14   said, in the context of this survey, that
15   I think that's problematic.
16       Q.    And why would that be
17   problematic?
18       A.    You know, I should say, in
19   general, it could be problematic.
20   Especially in surveys in which the
21   subject involves evaluations pertaining
22   to the sponsor of the survey.
23            So, for example, if I'm
24   doing a customer satisfaction survey, and

1    I'm telling that this survey is being
2    conducted on behalf of Company X, and
3    then I'm asking them to evaluate
4    Company X, that could be a problem.
5             So in this survey, I don't
6    think -- I don't think that it would have
7    been a problem, because the questions do
8    not involve evaluations of the company
9    and the subjects are not focused on
10   Google, the sponsor of the -- of the
11   survey.  And given the nature of this
12   question, I don't think it would have
13   been a problem.
14            But just in general, I
15   prefer not to provide that information
16   upfront.
17       Q.    You indicated that counsel
18   advised you to make the disclosure.  Did
19   counsel also advise you to exclude the --
20   to offer the respondents the option to
21   exclude their answers from the survey --
22            MS. DEARBORN:  You can
23        answer --
24   BY MS. WOOD:

1        Q.    -- or is that a decision you
2    made?
3             MS. DEARBORN:  I apologize.
4             You can answer that
5        question yes or no.
6             THE WITNESS:  What?
7             MS. DEARBORN:  You can
8        answer the question yes or no.
9             THE WITNESS:  Let's read
10       the question again.
11   BY MS. WOOD:
12       Q.    Sure.
13            You indicated that counsel
14   advised you to make the disclosure.  My
15   question is a little bit different.
16            Did counsel also advise you
17   to offer the respondents an option to
18   exclude their answers from the survey or
19   was that a decision you made?
20       A.    A little harder -- it's
21   possible -- I don't recall.  It's
22   possible that counsel suggested that.
23            I also think that, given
24   that I just told them the purpose of the

1    survey and its sponsor, it would be fair
2    to offer them that option.
3             So whether or not counsel
4    said that they thought that we should
5    offer that option, I think I would have
6    made the same decision.
7        Q.    The decision being to, once
8    you've already told them about the
9    sponsor and the purpose, to at least give
10   them the option to exclude their data?
11       A.    Exactly.  Exactly.  Because
12   if they said, you know -- give them the
13   option, if they don't want to be
14   included, notwithstanding the fact that
15   the survey never asked them what they
16   think about Google and so on.
17       Q.    Now, here, a significant
18   percentage of the survey respondents were
19   excluded -- strike that.
20            Here, a significant
21   percentage of the survey responses --
22   strike that again.
23            Here, a significant
24   percentage of the survey respondents

Page 294

1   asked that their data be excluded, once
2   they learned that the survey was being
3   conducted on Google's behalf for
4   litigation, correct?
5           MS. DEARBORN:  Objection to
6       form.
7           THE WITNESS:  I mean, I
8       think it's -- I forget the
9       number.  Between like 16 and 24.
10      Something in that range.
11  BY MS. WOOD:
12      Q.   And is that a significant
13  percentage?
14          MS. DEARBORN:  Form.
15          THE WITNESS:  I mean, I --
16      in this case, when, as a factual
17      matter, we know that it's between
18      16 percent and 24 percent, I see
19      no need to translate that to any
20      descriptive word.  Because we do
21      know, as a matter of fact, that
22      it is between 16 percent and
23      24 percent.
24  BY MS. WOOD:

Page 295

1       Q.   And so you can't answer
2   whether 16 percent is significant or not?
3           MS. DEARBORN:  Form.
4           THE WITNESS:  As I said,
5       I -- I don't.  And I don't think
6       other people that hear the word
7       "significant," to translate that
8       to a particular percentage.  They
9       just don't do that.  I've
10      conducted thousands of studies,
11      and they just wouldn't speculate
12      about a specific percentage.
13          Unlike that, in this
14      particular case we have effect.
15      We know that between -- about
16      16 percent and 24 percent chose
17      to be excluded.  So there's no
18      need to say, okay, you know, in
19      reality it was between 16 and 24.
20      Now, is that significant?
21          I don't think it's -- it's
22      certainly -- there is no reason
23      whatsoever why it would impact
24      the survey conclusions or

Page 296

1       results.  So I think that the
2       findings are unaffected by that.
3           Now, if someone wants to
4       call 16 to 24 percent significant
5       or not, that's -- you know, I
6       don't see the point of that.
7   BY MS. WOOD:
8       Q.   My question to you was can
9   you answer the question whether
10  16 percent is significant or not?
11          MS. DEARBORN:  Form.
12          THE WITNESS:  In my mind,
13      in this particular case, it's not
14      significant, and I see no reason
15      whatsoever why 16 percent or
16      24 percent in this context
17      affected the results and the key
18      conclusions.
19  BY MS. WOOD:
20      Q.   What analysis did you do to
21  determine whether these voluntary
22  exclusions impacted the results of the
23  surveys?
24      A.   As I said, I looked at the

Page 297

1   remaining sample.  I saw that it includes
2   a very large number of the respondents in
3   the three groups.  I looked at
4   differences.  Let's say you can compare
5   those that spend between half a million
6   and $15 million, compare that to 15 to
7   more than 15.
8           Does that make a difference?
9   It does not make a difference.
10          You're doing the same thing
11  to subgroups in the low-spend
12  advertisers.  You don't find differences.
13          In other words, regardless
14  of -- of the composition of those who
15  said that they do not want to be
16  included, that would not have affected
17  the main conclusions of this survey.
18      Q.   Did you do any mathematical
19  analysis to assess whether the excluded
20  population of voluntary exclusions
21  differed from the population that was
22  included in the results?
23          MS. DEARBORN:  Form.
24          THE WITNESS:  I'm not sure

Case 2:23-cv-00108-LMB-WEF Document 1096-2 Filed 08/01/24 Page 20 of 44 PageID# 16608

UNITED STATES OF AMERICA v.
GOOGLE, LLC

Highly Confidential

Itamar Simonson, Ph.D.
February 28, 2024

|  | Page 298 |
|---|---|

1    what you mean by mathematical --
2    what did you call it?
3    BY MS. WOOD:
4        Q.    Analysis.
5        A.    Analysis.
6             What do you have in mind?
7    I'm not understanding your questions.
8        Q.    Did you look at the data
9    that was collected from the voluntarily
10   excluded participants and compare how
11   that data looked against the data from
12   the survey participants whose data
13   remained?
14       A.    Okay.  Can you rephrase?  I
15   don't think the question is meaningful.
16            Obviously, those that were
17   excluded, I don't have their data.
18            But I'm looking at the data
19   that I have.  I see it's representative.
20   There are no differences.  I notice that
21   the experts who prepare the rebuttal
22   report, the only thing that he could say
23   is, well, it was a little higher in the
24   low-spend group than in the higher-spend

|  | Page 299 |
|---|---|

1    group.  That's it.
2             I didn't hear, nor can I
3    think of, any scenario whereby the
4    excluded would have affected the
5    conclusions of the survey.
6             Again, as I said earlier,
7    this was not a survey about, you know,
8    how much do you like Google.  That was
9    not the survey.
10            Had it been about how much
11   do you like Google or anything along
12   those line, then I may have concerns
13   about that, because it's possible that
14   people who said they don't like Google
15   may be more inclined to say, I want to be
16   excluded.
17       Q.    Were the survey results from
18   the participants who voluntarily excluded
19   themselves retained?
20       A.    Nope.  At least I'm not
21   sure.  I'm not aware -- I've never seen
22   it, of course.  AG, as far as I know, and
23   we talked about it, they don't have that.
24            So I'm -- as far as I know,

|  | Page 300 |
|---|---|

1    it doesn't exist, so I don't know more
2    than that.
3        Q.    Well, it certainly existed
4    at one time, correct?
5             MS. DEARBORN:  Form.
6             THE WITNESS:  I assume so.
7    BY MS. WOOD:
8        Q.    And so what happened to it?
9             MS. DEARBORN:  Form.
10            THE WITNESS:  Well, as I
11            said, AP might have had it.  I
12            don't know if they did.  I assume
13            that it was on their server
14            somewhere.
15   BY MS. WOOD:
16       Q.    Did you instruct them to
17   preserve it?
18            MS. DEARBORN:  Objection to
19            form.
20            THE WITNESS:  As I said,
21            they were not going to be used or
22            looked at.  They were assured of
23            confidentiality, and they were
24            given the option to be excluded.

|  | Page 301 |
|---|---|

1             I think it's important, if
2             you tell them that, not to break
3             your -- violate your promise and
4             start looking at the data,
5             just -- even though you told them
6             you would not do that.  I think
7             that would be unethical.
8    BY MS. WOOD:
9        Q.    My question was did you
10   instruct AP to preserve the data?
11            MS. DEARBORN:  Objection to
12            form.
13            THE WITNESS:  I did not.
14   BY MS. WOOD:
15       Q.    Are you aware of whether
16   anyone on behalf of Google instructed AP
17   to preserve the data?
18            MS. DEARBORN:  Objection to
19            form.
20            THE WITNESS:  I greatly
21            doubt it, but certainly not
22            aware.  And I don't think that
23            Google was involved in that.
24            Certainly, I can't imagine that

Page 302

1      Google would be telling AP what
2      to do with data.
3  BY MS. WOOD:
4      Q.    Did Google instruct AP to
5  delete the data?
6          MS. DEARBORN:  Objection to
7      form.
8          THE WITNESS:  As I said, I
9      don't believe that -- I'm not
10     aware of Google communicating
11     with AP concerning this survey.
12 BY MS. WOOD:
13     Q.    Did you instruct AP to
14 delete the data?
15         MS. DEARBORN:  Object to
16     form.
17         THE WITNESS:  I did not.
18 BY MS. WOOD:
19     Q.    And you didn't -- you didn't
20 instruct them to preserve it, either?
21         MS. DEARBORN:  Form.
22         THE WITNESS:  I did not
23     communicate with AP about those
24     who were excluded.

Page 303

1          I mean, obviously, I feel
2      confident that including them
3      would have made no difference.
4      Maybe the numbers would be tiny
5      difference -- tiny bit different
6      in this direction or that
7      direction, just based on random
8      chance.
9          I see no conceivable
10     reason -- and I noticed that your
11     expert couldn't come up with any
12     scenario whereby those who chose
13     to be excluded would change any
14     of the conclusions.
15 BY MS. WOOD:
16     Q.    If we had the data, we could
17 actually determine mathematically if the
18 data had an impact on the overall
19 results, correct?
20         MS. DEARBORN:  Form.
21         THE WITNESS:  As I said, if
22     you look at those, at the number
23     who were -- chose to be excluded,
24     you can tell that it's extremely

Page 304

1      inconceivable, unlikely, that
2      something like that would happen.
3          As I said, that would be
4      unethical, if I tell them, you're
5      excluded, then your -- no one
6      looks at your data and your wish
7      will be respected, and then I
8      said, okay, forget it.  Actually,
9      I'm going to look at that.
10         That would be completely
11     improper, and that's something
12     that I would not allow.
13 BY MS. WOOD:
14     Q.    And do you think it would be
15 completely improper to destroy the data
16 once it had been collected?
17         MS. DEARBORN:  Object to
18     form.
19         THE WITNESS:  Yeah.  No one
20     raised a question, and -- I don't
21     know.  That's a different issue.
22     That's not in -- in my domain.
23         As I said, they were told
24     that their data would not be

Page 305

1      used, and that's what we should
2      have done.
3  BY MS. WOOD:
4      Q.    Now -- but you have no
5  reason to believe that Advertiser
6  Perceptions destroyed the data, correct?
7      A.    I know nothing about what AP
8  did with the data.
9      Q.    And you never asked that?
10     A.    That's correct.
11     Q.    Do you know whether Analysis
12 Group has the data?
13     A.    They don't.
14     Q.    That you know?
15     A.    We talked about it.  They
16 don't.
17     Q.    And, originally, the data
18 was communicated in the form of an Excel
19 spreadsheet, correct?
20         MS. DEARBORN:  Form.
21         What -- what data are you
22     referring to, Counsel?
23         MS. WOOD:  The survey data.
24         THE WITNESS:  I believe so.

| Page 306 | Page 308 |
|---|---|

BY MS. WOOD:

Q.   And there was an Excel spreadsheet containing survey data for each of the three surveys, correct?

A.   I believe so.  Whether there might have been some other more basic or primitive data that was collected that was not in Excel, I'm not sure.

But the datasets that I saw were all in -- in Excel.

Q.   And if there was a difference in the results between the included and the excluded respondents, an analysis of the excluded responses would show whether the survey was reliable, correct?

MS. DEARBORN:  Form.

THE WITNESS:  Could you read that question again.

BY MS. WOOD:

Q.   Yeah.

If there was a difference between the results -- the survey results generated from the survey respondents and

correct?

A.   Could you rephrase.

Q.   Do you recall looking at the data for the excluded fast readers and slowpokes and determining whether that data was or was not inconsistent with the data for the overall survey participants?

A.   Some of it I did, yes.

Q.   And do you recall looking at data concerning respondents who had selected decoy options and comparing whether that data was consistent or not?

A.   Right.

Q.   But you didn't do that with respect to the percentages of excluded -- voluntarily excluded data, correct?

MS. DEARBORN:  Form.

THE WITNESS:  I'm not -- I have trouble making the connection between the two.

Let's say that people who spend less time or too much time on the questionnaire -- and let's say that we ignore them and then

| Page 307 | Page 309 |
|---|---|

the survey results generated from the excluded respondents, that information would assist the finder in fact in determining whether the survey produced reliable results, correct?

MS. DEARBORN:  Objection to form.

THE WITNESS:  Absolutely not.  This imaginary scenario.

I guess you're saying those who chose to be excluded, actually none of them would have diverted, none of them multi-home, none of them runs experiment, none of them uses agency.

I think that's such a nonsensical scenario that I assume you didn't ask it seriously.

BY MS. WOOD:

Q.   For other populations that were excluded, you did look at their data and compared it to the final results,

we look at the results, I think that makes sense.

What that has to do with separating those who chose to be excluded, about whom I have no information, and those who the great majority were included, that's completely different.

BY MS. WOOD:

Q.   Did you consider the possibility that the respondents who chose to have their data excluded might vary from the other population because they are the respondents who worry about possible recriminations?

MS. DEARBORN:  Form.

THE WITNESS:  I thought about that and exclude -- and rejected that.  Because, again -- and I think I already said that.

You have to look at the type of survey that you're doing.  If you're asking people, do you -- do you use an ad agency,

| Page 310 |
|---|

1    do you run experiments.  If the
2    cost of something went up, would
3    you switch to something else, and
4    so on.
5         There's nothing in these
6    questions that someone could say,
7    okay, well, this survey is
8    sponsored by Google, and Google
9    probably wants me to say that I
10   use an ad agency; and, therefore,
11   I'm not going to share
12   information because I already
13   said that I use an ad agency.
14        I mean, this story makes
15   absolutely no sense.  And I have
16   yet to hear any explanation why
17   such behavior would be observed.
18   It just makes no sense.
19 BY MS. WOOD:
20        Q.    Would you agree with the
21 principle that a survey should avoid
22 revealing the sponsor of the survey and
23 its purpose?
24        A.    At the beginning of the

| Page 311 |
|---|

1    survey, I agree.  At the end it makes no
2    difference.
3         Q.    But at the end it makes a
4    difference if that data -- if the survey
5    respondents are then given the
6    opportunity to remove the data, correct?
7              MS. DEARBORN:  Form.
8              THE WITNESS:  In many cases
9         it would not.
10             In this case, for example,
11        as I just explained, it did not,
12        for the obvious reasons.  And if
13        someone has a new theory as to
14        why it could have affected the
15        results, I will be happy to -- to
16        look into that idea.
17 BY MS. WOOD:
18        Q.    Would you agree that
19 double-blind protocols are standard
20 practice that should be employed in
21 surveys whenever possible?
22        A.    Yes.  When you start a
23 survey and while respondents answer the
24 questions, it is important to do that.

| Page 312 |
|---|

1    Obviously, the impact of violating
2    double-blind may vary to some extent
3    across surveys.  But I completely agree
4    that, in general, double-blind is an
5    important principle.
6         Q.    And that principle is there
7    in order to ensure objectivity, correct?
8         A.    In the case -- yeah, in many
9    cases, that's a key reason.  Right.
10        Q.    And, in fact, best practices
11   provide that the survey instrument itself
12   provide no explicit or even implicit
13   clues about the sponsorship, correct?
14             MS. DEARBORN:  Form.
15             THE WITNESS:  I think there
16        are many surveys where someone
17        could infer -- especially in
18        litigation but also in
19        academia -- where someone may
20        infer -- for example, if I show
21        you a toaster and it says Black &
22        Decker and I ask you who made
23        this product, I would assume that
24        many people would say it's

| Page 313 |
|---|

1         probably done for Black & Decker.
2         Why are they showing me Black &
3         Decker toaster.
4              So it's unavoidable, to
5         some extent, in many surveys.
6              But I completely agree that
7         in general, double-blind is an
8         important principle that I've
9         tried to follow.  Certainly
10        not -- I try not to reveal the
11        sponsor or purpose at the
12        beginning of a survey.
13 BY MS. WOOD:
14        Q.    And was there some reason
15 why a double-blind protocol could not be
16 used for these three surveys, through the
17 end of the survey?
18        A.    I thought we already talked
19 about that.
20        Q.    From your perspective, what
21 was the reason why a double-blind
22 protocol could not be used for these
23 three surveys?
24             MS. DEARBORN:  Objection to

| Page 314 | Page 316 |
|---|---|

**Page 314**

    form.
2       THE WITNESS:  Double --
3   double-blind protocol was used.
4   I'm not sure where you got the
5   idea that it's not.
6       I said at the very end.
7   You said through the end.
8       What matters is what
9   respondents know while they
10  answer the survey questions,
11  based on which conclusions are
12  reached.
13      Whether at the very end,
14  last screen, someone said well,
15  this survey is done on behalf of
16  X, that makes no difference.
17 BY MS. WOOD:
18      Q.  Well, it made an actual
19 literal difference, because 16 to
20 24 percent of the respondents' answers
21 were excluded based on that difference,
22 correct?
23      MS. DEARBORN:  Form.
24      THE WITNESS:  But that's --

**Page 315**

1       that's a whole different issue.
2   And we already talked about that
3   as well.
4       But in any case, what's
5   important is what respondents
6   know while they answer the survey
7   questions.
8       In this case, none of the
9   respondents knew the sponsor or
10  purpose of the survey while
11  answering the questions.
12 BY MS. WOOD:
13      Q.  What circumstances in this
14 case required, from your perspective,
15 disclosure of the survey sponsor to
16 survey participants?
17      MS. DEARBORN:  Objection to
18      form.
19      And please exclude from
20      your answer conversations with
21      counsel.
22      THE WITNESS:  As I said,
23      that was largely at the advice of
24      counsel.

**Page 316**

1 BY MS. WOOD:
2       Q.  But I'm asking from your
3   perspective, putting aside what you were
4   told by counsel, from your perspective,
5   the circumstances of this case require
6   disclosure.
7       MS. DEARBORN:  Form.
8       THE WITNESS:  Again, that
9       was primarily based on whatever
10      counsel considered and the basis
11      for reaching that conclusion.
12 BY MS. WOOD:
13      Q.  And you have testified in
14 other matters that knowing the identity
15 of the survey sponsor can change the
16 answers, correct?
17      MS. DEARBORN:  Form.
18      THE WITNESS:  I don't
19      recall specific.  But it sounds
20      like something I would say.  That
21      definitely I try to keep --
22      maintain a double-blind standard
23      while respondents answer the
24      survey questions.

**Page 317**

1 BY MS. WOOD:
2       Q.  In fact, do you recall
3   testifying in other matters that "the
4   principle that a survey should avoid
5   revealing the sponsor of the survey and
6   its purpose is not in dispute among
7   professional survey takers"?
8       MS. DEARBORN:  Objection to
9       form.
10      THE WITNESS:  That --
11      survey takers.  Okay.
12      Yeah, it's -- again, I
13      don't recall saying it, but it
14      sounds like something I would
15      say.
16 BY MS. WOOD:
17      Q.  And, in fact, in your
18 report, you write that information about
19 the survey purpose and the sponsor "was
20 included at the end of the survey to
21 avoid introducing any potential bias in
22 the survey responses due to demand
23 effects whereby respondents might have
24 assumed that certain answers were

Page 318

1 expected or preferred."
2        Is that right?
3        A.    That's what I wrote.  Yeah,
4 that sounds like what I just said here.
5        Q.    And you also referred in
6 your report to focalism.
7        Do you recall that?
8        A.    It sounds like something I
9 would say, depending on each case.
10       Q.    And what is focalism?
11       A.    There are many examples.
12       For example, if you ask
13 people to think about the consequences of
14 a particular event, let's say you move
15 from, maybe, D.C.  D.C., the weather is
16 not so bad.  But maybe moving from
17 Minneapolis to Santa Monica or
18 Burlingame, people may overfocus on the
19 weather, not -- recognizing there are
20 very many happy people in Minneapolis,
21 the weather notwithstanding.
22       So in other words, people
23 sometimes focus on something too much
24 and, thereby, overestimate its impact in

Page 319

1 cases involving patterns.
2        Sometimes survey experts,
3 particularly on behalf of plaintiffs, use
4 a technique called conjoint analysis.
5        And let's say that it's a
6 smartphone, and they present a few
7 features that are important, battery
8 life, brand name, screen size, important
9 attributes like that.  And they also
10 include something that we probably will
11 all agree is much less important.
12       But given that it -- this
13 less important feature is the focus of
14 the study, the conjoint study would tend
15 to overestimate its impact in reality.
16 So focalism could play different roles in
17 different situations.
18       Q.    What were you referring to
19 when you said that certain answers could
20 be expected or preferred if the survey
21 respondents were told of the purpose and
22 sponsor at the beginning?
23       A.    Well, it's kind of a general
24 principle, as I said, that, you know, it

Page 320

1 varies -- the significance of that varies
2 across studies.
3        But in some surveys, I give
4 the example of a customer satisfaction
5 survey.  It could have a significant
6 impact because respondents may wish to
7 please the sponsor of the survey.
8        Q.    In your report, you write,
9 "One would be hard-pressed to come up
10 with a scenario whereby those respondents
11 who used fewer advertising buying tools
12 would be systematically more likely to
13 indicate that they prefer not to be
14 included in the sample."
15       Do you recall that?
16       A.    Yeah.  That sounds like
17 something I would say.
18       Q.    Okay.  Did you consider the
19 scenario in which a customer of Google
20 uses only one ad buying tool, which is
21 Google's ad buying tool, and that in that
22 scenario, that customer might be
23 reluctant to say something that might
24 upset Google?

Page 321

1        MS. DEARBORN:  Form.
2        THE WITNESS:  So what's the
3        question?  What do I think about
4        it?
5 BY MS. WOOD:
6        Q.    Did you consider the
7 scenario -- you had said in your report
8 that you would be hard-pressed to come up
9 with a scenario.  I'm offering you a
10 scenario.
11       What about the scenario in
12 which a customer of Google uses only one
13 ad buying tool, which is Google, and that
14 customer might be reluctant to say
15 something that might upset Google,
16 particularly when that something was in
17 connection with a serious antitrust
18 litigation concerning Google?
19       MS. DEARBORN:  Objection to
20       form.
21       THE WITNESS:  Okay.  So I
22       guess the scenario you are
23       raising is that, notwithstanding
24       the assurance that everything

Highly Confidential

---

Page 330

1    That just calls for an
2    extra step.  It's like, okay,
3    it's small, but it's something
4    that I would consider.  It's
5    significant enough.  And they
6    will decide accordingly.
7         They will not go an extra
8    step, convert it to a specific
9    quantity, and then say, okay,
10   based on my speculation, my
11   answer is X.  That's not what
12   survey respondents do.
13   BY MS. WOOD:
14        Q.   Okay.  I'm now me, Julia
15   Wood, sitting here, and I'm thinking of a
16   number that to me is small but
17   significant.
18        A.   So what -- what's the
19   question?
20        Q.   What's my number?
21        MS. DEARBORN:  Objection to
22   form.
23        THE WITNESS:  Is that a
24   real --

Page 331

1    BY MS. WOOD:
2         Q.   No, that's a real question.
3    I'm thinking of a number that's small but
4    significant.  What's my number?
5         A.   It reminds me of games I'm
6    playing with my grandkids.
7         Q.   Good.  Then you're
8    experienced at it.
9         What's my number?
10        MS. DEARBORN:  Okay.
11   Objection to form.
12        THE WITNESS:  I'm not sure
13   if you're -- I assume that you're
14   not asking that seriously.
15        But as I said, I will -- I
16   would not think of a number that
17   you're thinking about, nor will I
18   come up with a number.  It would
19   be sheer speculation.  Therefore,
20   I will not engage in that.
21        You told me it's small but
22   significant, and that's all the
23   information I have, and all the
24   information I will use when

Page 332

1    answering the question.
2    BY MS. WOOD:
3         Q.   But if I come up with a
4    number that's small but significant to
5    me, that doesn't mean that same number
6    would be small but significant to you,
7    correct?
8         A.   I thought I just answered
9    that.
10        No, you will not come up,
11   if -- I mean, obviously, you're involved
12   in this case, so you're not the typical
13   respondent.
14        But speaking of typical
15   respondents, they would not start
16   speculating about a specific number.  So,
17   therefore, it's not like one respondent
18   thinks about Number X and the other one
19   thinks about Number Y.  What basis do
20   they have to -- for such speculations?
21        Q.   Regardless of the nature of
22   the speculation, it is possible -- strike
23   that.
24        You say in your report at

Page 333

1    Footnote 5, on Page 7, "This phrase,"
2    small but significant, "was designed to
3    leave it to the respondents to consider
4    their reaction, if any, if (what they
5    considered to be) 'a small but
6    significant' increase in the cost of
7    programatic display advertising
8    occurred."
9         Right?
10        A.   Right.
11        Q.   And then you say in
12   Footnote 65 of your report, on Page 39,
13   that "The balanced phrasing of 'small but
14   significant' avoids possible demand
15   effects whereby respondents might have
16   assumed that certain answers were
17   expected or preferred."
18        Can you describe how "small
19   but significant" is balanced phrasing, in
20   your view?
21        A.   Okay.  Small is usually
22   contrasted with big, and significant is
23   contrasted with insignificant.
24        One goes in one direction,

Page 334

1  small, and the other one goes in the
2  other direction.  I think it's a balanced
3  term that begins with "small" and then
4  goes to "significant."
5          And then respondents have
6  that term and they can answer the
7  question.
8      Q.    And when hearing that
9  phrase, is it your position that no
10 respondent will ever attempt to quantify
11 a number associated with "small but
12 significant"?
13     A.    I don't know what you mean
14 by "no respondent."  I don't -- I tend
15 not to talk in such terms.
16         I don't know, maybe one in a
17 million would.  I'm not going to
18 speculate about that.
19         I'm saying, you have to rely
20 on your survey practice, having conducted
21 thousands of surveys.  And there is a
22 literature on the manner in which
23 respondents answer questions.
24         And in this case, it's

Page 335

1  important to keep in mind "small but
2  significant."  No respondents has any
3  basis for speculating that it means
4  Number X.  There is no basis for such
5  speculation, and they would not do that.
6          They were asked about small
7  but significant.  That's how they think
8  about it.
9      Q.    And during the pretests,
10 that was the first time that the phrase
11 was used, correct?  The phrase was not
12 used in the preliminary interviews,
13 right?
14     A.    That's right.
15     Q.    And you don't have any
16 records indicating how pretest
17 participants viewed or interpreted the
18 phrase "small but significant," correct?
19         MS. DEARBORN:  Form.
20         THE WITNESS:  I didn't ask
21     them about the meaning of this
22     term or that term.
23 BY MS. WOOD:
24     Q.    Okay.  You said that you

Page 336

1  considered small but significant to be
2  balanced because small tends in one
3  direction, and significant, in your view,
4  tends in a different direction.
5          What about when you couple
6  those two terms with the phrase "for the
7  foreseeable future"?
8      A.    What -- what is that --
9          MS. DEARBORN:  Form.
10         THE WITNESS:  I'm not sure
11     I follow the question.
12 BY MS. WOOD:
13     Q.    Which direction does --
14 which direction does "for the foreseeable
15 future" take the otherwise balanced
16 phrase "small but significant"?
17         MS. DEARBORN:  Form.
18         THE WITNESS:  I see no
19     basis for believing that "for the
20     foreseeable future" has any
21     impact whatsoever.
22 BY MS. WOOD:
23     Q.    "For the foreseeable future"
24 is a subjective term, correct?

Page 337

1          MS. DEARBORN:  Form.
2          THE WITNESS:  Actually, I
3      don't -- I don't know if it's
4      subjective.  I haven't thought
5      about it as subjective or
6      objective.
7          I think that the meaning is
8      that in the future that you can
9      see.
10 BY MS. WOOD:
11     Q.    In any of the either
12 preliminary interviews or pretests, did
13 anyone ask the preliminary interview
14 respondents or the pretest respondents
15 whether they considered 5 percent to be
16 small but significant?
17     A.    No.
18     Q.    Did anyone ask any of the
19 preliminary interview respondents or
20 pretest respondents whether 10 percent is
21 small but significant?
22     A.    No.
23     Q.    Would you agree that
24 different respondents might ascribe

---

Page 338

1  different meanings to "for the
2  foreseeable future"?
3          A.   I don't see why that would
4  be.  "For the foreseeable future," that
5  seems like a commonly used English term.
6  It's the future that you can see.  Let's
7  say it's the next year or whatever it is.
8          Q.   Well, what is it?  Is it the
9  next year or is it the next 50 years?
10         A.   No, I don't think -- I
11  wouldn't attach it to a particular
12  period.  Probably not 50 years.
13              But in the future that you
14  can make projections, that you can
15  predict.
16         Q.   And what about "remain
17  elevated," that is also a subjective
18  term, right?  "Elevated"?
19         A.   No.  "Remain elevated"?  In
20  what way is it subjective?
21         Q.   What does elevation mean?
22         A.   Remain elevated.  Increase
23  by 5 percent and it stays there.
24         Q.   Okay.  And if it's remaining

---

Page 339

1  elevated for the foreseeable future, does
2  that mean that it's remaining elevated
3  for one year or 50 years?
4              MS. DEARBORN:  Form.
5              THE WITNESS:  I said,
6          again, respondents would not
7          attach the number of days to this
8          term.  It's a term commonly used
9          in English, I believe.  The
10         future that you can see.
11  BY MS. WOOD:
12         Q.   A lot of the terms are
13  commonly used in English on which the
14  speakers and the hearers of those terms
15  don't agree, correct?
16         A.   What are you talking about,
17  specifically?
18         Q.   Just in general, there are
19  plenty of subjective terminology that's
20  used in the English language about which
21  a speaker and a hearer might have
22  different interpretations, correct?
23              MS. DEARBORN:  Objection to
24          form.

---

Page 340

1              THE WITNESS:  As a generic
2          question, can it happen?  Yeah.
3              It could happen in some cases.
4  BY MS. WOOD:
5          Q.   So the foreseeable future to
6  me might mean 50 years.  The foreseeable
7  to you might mean a year, right?
8          A.   As I said, neither one of us
9  will try to translate that to number of
10  days, a number of months or number of
11  years.
12         Q.   Why do you think neither one
13  of us will try -- how do you know how I'm
14  going to interpret foreseeable future and
15  whether I would translate that into a
16  specific time period or not?
17         A.   I think the only thing it
18  tells you is it is not going to go -- in
19  the foreseeable future, it's -- it's
20  staying elevated by 5 percent.  That's
21  all it says.
22              In other words --
23         Q.   But I don't know how long
24  foreseeable future is.

---

Page 341

1              MS. DEARBORN:  Objection to
2          form.
3              THE WITNESS:  Now, but I'm
4          asking you now, will you make a
5          decision.  And if you say, okay,
6          it's not something that will
7          disappear in the next few days.
8              In the foreseeable future it will
9          remain at that elevated level.
10  BY MS. WOOD:
11         Q.   But my view of what
12  constitutes the foreseeable future might
13  change my answer to that question.
14              Maybe I do contracts every
15  six months.  Maybe I do contracts every
16  five years.  Maybe, for me, foreseeable
17  future is two weeks.  Maybe for my
18  colleague, foreseeable future is a
19  ten-year contract.
20              You have no way of
21  determining for any given respondent what
22  frame of reference they had in mind when
23  they answered the question for the
24  foreseeable future, correct?

Case 1:23-cv-00108-LMB-JFA    Document 1096-2    Filed 08/01/24    Page 29 of 44 PageID# 30922

UNITED STATES OF AMERICA v.
GOOGLE, LLC

Highly Confidential

Itamar Simonson, Ph.D.
February 28, 2024

---

Page 350

1  whether you think that you're very likely
2  to watch the movie Oppenheimer.
3          In other words, there is
4  logical order to questions, and it would
5  make no sense to use any other order.
6      Q.   That doesn't take away from
7  the fact that the question order effect
8  will impact answers to subsequent
9  questions, given how they've answered
10  previous questions, correct?
11      A.   That's incorrect.  That's
12  incorrect.  I'm happy to explain why, but
13  it's completely incorrect in this case.
14      Q.   If you've already indicated
15  that you would divert in response to an
16  increase in cost, it would be
17  inconsistent for a respondent to then be
18  inclined to answer that they would keep
19  the same amount of display spend if
20  they've already indicated they would
21  change their display spend.
22          Do you agree with that?
23          MS. DEARBORN:  Form.
24          THE WITNESS:  Are you --

Page 351

1          I'm not sure I follow the
2          question.
3              So when you say would you
4          divert to other types of digital
5          advertising?
6  BY MS. WOOD:
7      Q.   Correct.
8      A.   So from display to something
9  else?
10      Q.   Correct.
11      A.   Okay.  I thought you asked
12  it would make no sense for you to
13  increase display.
14          But in any case, of course.
15  You just told me that you, as a result of
16  the price increase, you would divert.  So
17  now I'm asking you, what would you divert
18  to.
19          You just -- there was no
20  order effect in this case.  You just told
21  me that you would -- you will divert.
22      Q.   And for those respondents
23  who already said they will divert, to
24  later ask them whether they will not

Page 352

1  change but keep the same, their level of
2  display spend, would be inconsistent,
3  correct?
4          MS. DEARBORN:  Form.
5          THE WITNESS:  I mean,
6          obviously, there are a number of
7          advertising options.
8              So they could very well
9          say, I'm going to increase X and
10          keep the same, something else.
11          Quite possible.
12  BY MS. WOOD:
13      Q.   Now, in your Question 5 to
14  the higher-spend advertisers and
15  Question 4 to the agency participants,
16  you asked about the cost of programatic
17  display advertising; is that right?
18      A.   You mean in this question
19  about diversion?
20      Q.   Yes.
21      A.   Yes.
22      Q.   And for the lower-spend
23  advertisers, you changed, instead of cost
24  of programatic display advertising, you

Page 353

1  changed it to cost of display
2  advertising, right?
3      A.   That's correct.
4      Q.   Okay.  Now, you understand
5  that the cost of display advertising
6  includes, as one component, the cost
7  associated with the AdTech tools used to
8  purchase display ads, right?
9      A.   That's my understanding.  I
10  mean, it was not -- yeah, it was not
11  something that I was trying to explore in
12  the survey.  I just wanted to find out
13  whether an increase in the cost of, let's
14  say, programatic display advertising will
15  cause respondents to divert to other
16  forms of digital advertising, but --
17      Q.   But you --
18      A.   Yes.  Go ahead.
19      Q.   Well, no.  Are you done with
20  your answer?
21      A.   I think so.
22      Q.   But you chose not to ask the
23  survey participants how they would react
24  to a small but significant increase in

Page 354

1  the cost associated with AdTech tools as
2  opposed to AdTech ads over -- as
3  opposed -- let me try that again.
4          You chose not to ask the
5  survey participants how they would react
6  to a small but significant increase in
7  the cost of AdTech tools for programatic
8  display advertising, correct?
9      A.    I was trying not to make the
10 survey confusing.  I -- the survey asked
11 the questions that it asked.  I think the
12 right questions, properly phrased.
13         I asked if the cost of,
14 let's say, programatic display goes up by
15 5 percent, as a general category,
16 programatic -- cost of programatic
17 display goes up by 5 percent.  That's it.
18         I was not -- did not intend,
19 nor was it an objective of the survey, to
20 look at components of cost and so on.
21     Q.    But you didn't ask
22 whether -- in the survey, whether
23 programatic display costs would go up by
24 5 percent, correct?

Page 355

1      A.    I did not or I did?
2      Q.    You did not.
3      A.    Let's read the questions.
4          "Now suppose that, based on
5  your analysis, the cost of programatic
6  display advertising has recently
7  increased by a small but significant
8  amount," et cetera.
9          So maybe I'm miss --
10 misunderstanding your question.
11         I did ask that, right?
12     Q.    You asked that, but you
13 didn't ask whether the cost of
14 programatic display would go up by
15 5 percent, correct?
16     A.    Right.  Oh, yeah, that's
17 right.
18     Q.    Okay.  And --
19     A.    Yeah.  Correction.  Yeah, I
20 just -- I asked -- I guess we talked so
21 much about small but significant that I
22 was trying to --
23     Q.    You were trying to put a
24 number to small but significant?

Page 356

1          MS. DEARBORN:  Objection to
2      form.
3          THE WITNESS:  No.  No.  No.
4      I'm trying to -- I like
5      variety -- no.  I'm just kidding.
6          I meant to say "small but
7      significant."
8  BY MS. WOOD:
9      Q.    Okay.  And to you, does
10 small and significant -- but significant
11 mean 5 percent?
12         MS. DEARBORN:  Form.
13         THE WITNESS:  No.
14 BY MS. WOOD:
15     Q.    You just thought of that
16 number randomly?
17         MS. DEARBORN:  Form.
18         THE WITNESS:  I said
19     5 percent.  I'm sure we all
20     sometimes use the wrong words.
21     I -- in fact, I just read it,
22     small but significant, yeah.
23 BY MS. WOOD:
24     Q.    Okay.  Why is there a link

Page 357

1  in your mind between 5 percent and small
2  but significant?
3          MS. DEARBORN:  Objection to
4      form.  Argumentative.  Assumes
5      facts.
6          THE WITNESS:  The reason I
7      make in my mind, I used the wrong
8      word.
9  BY MS. WOOD:
10     Q.    Now, you understand that if
11 the cost of the AdTech tools is just one
12 component of the cost of display ads,
13 generally, then asking about a small but
14 significant increase in the cost of
15 display advertising overall, as opposed
16 to a small but significant increase in
17 the cost of certain AdTech tools, you are
18 actually increasing the cost that the
19 survey respondents are reacting to,
20 right?
21         MS. DEARBORN:  Form.
22         THE WITNESS:  I'm not sure
23     I follow your question.
24 BY MS. WOOD:

Page 358

1    Q.    Let's say, hypothetically,
2  that AdTech tools are -- represent
3  30 percent of the cost of a display ad.
4    A.    Okay.
5    Q.    And if you tell respondents
6  that the cost of display ads goes up by a
7  small but significant amount, but you
8  don't tell them that the 30 percent cost
9  of the AdTech tool goes up by a small but
10 significant amount, you are necessarily
11 causing the respondent to imagine a
12 higher increase in cost than if you had
13 them focus on the cost of the tool alone.
14       MS. DEARBORN:  Objection to
15    form.
16 BY MS. WOOD:
17    Q.    Do you understand that?
18    A.    I understand the question.
19       Two things.  A, the survey
20 tested what happens if they are told that
21 the cost of display advertising, or
22 programatic display advertising, went up
23 by a small but significant amount.
24 That's what I tested.  It is what it is.

Page 359

1        Furthermore, as you know, I
2  asked, later, the question about the
3  magnitudes of diversion to each one, on a
4  0 to 10 scale, and the most common
5  answers were between 7 and 10, which
6  means that respondents are thinking about
7  substantial increases.
8        So in case, let's say, it
9  was -- the actual increase was somewhat
10 lower, maybe the scale numbers would have
11 been somewhat lower than between 7 and
12 10.  But there would still be diversion,
13 which is what my survey tested and
14 showed.
15    Q.    But you agree that if your
16 survey had asked about a fraction of the
17 costs of display advertising increasing
18 and not all of the display advertising
19 cost increasing, you could expect to see
20 a different level of diversion than what
21 you got in your sample?
22       MS. DEARBORN:  Form.
23       THE WITNESS:  As I just
24    said, that's not the case.  We

Page 360

1        have the data about the extent of
2        diversion.  And if most
3        respondents say that it's between
4        7 and 10, it means that maybe if
5        it was lower than that, maybe the
6        scale numbers would range
7        between -- I don't want to
8        speculate.
9        Maybe they would have been
10       somewhat lower, but there still
11       would be substitution observed.
12 BY MS. WOOD:
13    Q.    And by focusing on a higher
14 cost than the cost of the AdTech tools
15 alone, that has the potential to create
16 demand effect, does it not?
17    A.    Not at all.  It has nothing
18 to do with demand effect.
19    Q.    If you were retained in a
20 case where the plaintiffs sued Ford for
21 monopolizing the market for truck
22 chassises, would you ask participants
23 about a potential increase in the price
24 of Ford trucks overall, or a potential

Page 361

1  increase in the price of the truck
2  chassises?
3        MS. DEARBORN:  Form.
4        THE WITNESS:  Yeah, I take
5        survey design very seriously.
6        And if I were asked to conduct a
7        survey on this topic, I would
8        think about it and figure out
9        what's the right way to do.
10       Sitting here now, I cannot
11       design the right survey and,
12       therefore, cannot answer this
13       question.
14 BY MS. WOOD:
15    Q.    But isn't the relevant
16 question whether the monopolized product
17 price changes, not whether some larger
18 price changes?
19       MS. DEARBORN:  Objection to
20       form.
21       THE WITNESS:  I hate to
22       repeat myself.
23       As I said, the survey
24       looked at the effect on

Page 362

1    substitution, if any, of
2    increasing the cost of display or
3    programatic display by a small
4    but significant amount.
5         And I also asked about the
6    extent of diversion or
7    substitution.
8         As a result, we can
9    conclude that even if I were
10   asking about a portion of the --
11   of a particular component of
12   display advertising, there would
13   still be substantial
14   substitution.
15   BY MS. WOOD:
16        Q.   Well, but you don't know
17   that, because you've already testified
18   that you don't know what the extent of
19   the diversion would be if respondents
20   were asked about the cost of AdTech tools
21   changing, not AdTech -- not
22   advertisements overall changing?
23        MS. DEARBORN:  Objection to
24        form.  Misstates prior testimony.

Page 363

1         THE WITNESS:  As I said, we
2    have the data, but the degree to
3    which they would divert, based on
4    that, we know that even if it
5    were lower than that, there would
6    still be substitution,
7    substantial substitutions.
8         Maybe it will be somewhat
9    different.  But we know, based on
10   the data that are available, that
11   there would still be substantial
12   substitution.
13   BY MS. WOOD:
14        Q.   You could have chosen to
15   use -- to ask survey participants whether
16   they would divert, based on a small but
17   significant change in the cost of AdTech
18   tools, right?  Nothing prevented you from
19   asking that question?
20        A.   That would be a bad
21   question.
22        Q.   Why would that be a bad
23   question?
24        A.   I'm just not sure that

Page 364

1    respondents would understand what I was
2    referring to.  Again, I tried, as much as
3    possible, to simplify.
4         Q.   Well, but your -- your
5    simplification, in this instance, asked a
6    question that is not relevant to the
7    lawsuit.  It asked a question about
8    whether the cost of programatic
9    advertising would go up, not whether the
10   cost of tools used to purchase
11   programatic advertising would go up.
12        Do you understand that?
13        MS. DEARBORN:  Objection to
14        form.  Argumentative.  Calls for a
15        legal conclusion.
16        THE WITNESS:  I said I
17        already answered that previously.
18        I'm happy to repeat.
19        As I said, we can look at
20        the actual data.  And we know,
21        based on the degree of diversion,
22        that even if it were a component,
23        and let's say there was a way to
24        make the question crystal clear,

Page 365

1         there would still be substantial
2         substitutions -- substitution.
3    BY MS. WOOD:
4         Q.   But you can't say what that
5    diversion would be, because you don't
6    have the data, correct?
7         A.   I asked the questions that I
8    asked.
9         Q.   You asked in Question 7
10   which of the following ad buying tools,
11   if any, respondents used in the past
12   year.
13        Do you recall that,
14   generally?
15        A.   Yes.
16        Q.   And you agreed that a
17   respondent could answer that question
18   with two or more ad buying tools, but
19   that wouldn't necessarily mean that that
20   respondent was using those two ad buying
21   tools at the same time, correct?
22        MS. DEARBORN:  Form.
23        THE WITNESS:  It's within
24        the period of time that -- it's

Page 374

1      A.    No.
2      Q.    And you didn't interview any
3  AdTech providers?
4      A.    Correct.
5      Q.    What did you do to prepare
6  for this deposition today?
7            MS. DEARBORN:  As usual,
8       please set aside the contents of
9       communications with counsel.
10           THE WITNESS:  So I reviewed
11      the documents that I have,
12      including my report or reports.
13      Various -- and attachments.
14           I met with counsel.
15           I think that's -- that's
16      what comes to mind.
17  BY MS. WOOD:
18     Q.    And how long did you meet
19  with counsel?
20     A.    So I think we had a meeting
21  also with the AG team.  I think it was
22  sort of a Zoom meeting that might have
23  lasted about two hours.  I'm not sure
24  about that.

Page 375

1            And I think I met with
2  counsel.  And there were also people from
3  AG the past two days.  I think each
4  meeting lasted, perhaps, maybe four, four
5  and a half hours.
6      Q.    Did anyone else, other than
7  the AG team and counsel, participate in
8  those meetings?
9      A.    I don't think so.
10     Q.    And did you review any
11  documents in connection with your
12  preparation for this deposition that were
13  not produced?
14     A.    It's possible.
15     Q.    What documents did you
16  review that were not produced?
17     A.    I saw an e-mail, internal
18  e-mail, I think from 2018.
19           MS. DEARBORN:  Okay.  And I
20      don't think that you're entitled
21      to get the contents of documents
22      that were -- that were reviewed.
23           So please don't describe
24      the documents that you reviewed

Page 376

1       in preparation for your
2       deposition today.
3            THE WITNESS:  Okay.
4            MS. DEARBORN:  And --
5  BY MS. WOOD:
6      Q.    Were the documents you
7  reviewed documents that Google's counsel
8  showed to you?  You can just answer that
9  yes or no.
10           MS. DEARBORN:  You can
11      answer that yes or no.
12           THE WITNESS:  Yes.
13           MS. DEARBORN:  And,
14      Counsel, I can make a
15      representation that those were
16      not documents that were not
17      produced in this case.
18           MS. WOOD:  Okay.  In other
19      words, every document he saw had
20      been produced in this case?
21           MS. DEARBORN:  Correct.
22  BY MS. WOOD:
23     Q.    Okay.  Do you recall, based
24  on reviewing those documents, that people

Page 377

1  at Google had some pretty negative things
2  to say about Advertiser Perceptions at
3  times?
4      A.    I can't --
5            MS. DEARBORN:  Objection to
6      form.
7            And I also don't think that
8       you get to get at the contents of
9       the -- of the information that we
10      reviewed.
11           So if you'd like to put a
12      document in front of me -- in
13      front of him, you can ask him
14      about that.
15           But I'm going to instruct
16      the witness not to answer as to
17      the contents of documents that he
18      reviewed with counsel.
19           MS. WOOD:  I'm not asking
20      him that.  I'm asking whether he
21      recalls ever reviewing documents
22      in which Google internal
23      employees criticized Advertiser
24      Perceptions.

1          MS. DEARBORN:  You can
2      answer that question.  It's a
3      different question.
4          THE WITNESS:  Yes.
5  BY MS. WOOD:
6      Q.    Do you recall reviewing
7  documents in which Google employees
8  stated they didn't have a very high
9  degree of confidence in the fidelity of
10 Advertiser Perceptions' research and
11 methodologies?
12         MS. DEARBORN:  Objection to
13     form.
14         THE WITNESS:  If I recall
15     correctly, there was a particular
16     individual who wrote that in an
17     e-mail, about this fidelity
18     language that you used.
19 BY MS. WOOD:
20     Q.    Do you recall whether there
21 are other individuals at Google who
22 called Advertiser Perceptions "a junky
23 company with ridiculous results"?
24         MS. DEARBORN:  Object to

1      form.
2          THE WITNESS:  I think there
3      was one other person in 2018 who
4      wrote it in an e-mail.
5  BY MS. WOOD:
6      Q.    You write in your report
7  that Advertiser Perceptions has a
8  standard process they put in place to
9  generate survey samples that are
10 representative of the advertiser
11 population they are intended to reach.
12         Do you recall that?
13     A.    Yes.
14     Q.    What did you do to evaluate
15 that process that AP used to generate
16 representative survey samples?
17     A.    So as I do in other surveys
18 in which I rely on internet panels,
19 happens quite often, I have a general
20 understanding that they have a list of
21 members and they randomly select from
22 that list.
23         I -- I can't remember any
24 case in which I examined specifically how

1  they do that.
2      Q.    So you did nothing to verify
3  that independently?
4          MS. DEARBORN:  Form.
5          THE WITNESS:  Just as I
6      don't verify it independently, in
7      all the numerous other surveys
8      that I conduct.
9          You have to work with firms
10     or panels that you trust.
11 BY MS. WOOD:
12     Q.    Why did you run the surveys
13 consecutively rather than at the same
14 time?
15     A.    No particular reason.
16     Q.    Did you get preliminary
17 results from the higher-spend advertiser
18 surveys before the lower-spend advertiser
19 survey or agency survey was launched?
20     A.    I don't recall,
21 specifically.  It's possible that I had
22 at least partial results for some of the
23 questions for one survey before starting
24 the next.

1          MS. WOOD:  Why don't we go
2  off the record.
3          MS. DEARBORN:  Sure.
4          THE VIDEOGRAPHER:  Going
5  off the record at 5:34 p.m.
6          (Short break.)
7          THE VIDEOGRAPHER:  We are
8  going back on the record at
9  5:47 p.m.
10         MS. WOOD:  I am done with
11 my examination, subject to the
12 reservation of rights that I made
13 at the beginning of the
14 examination.  But I have no
15 further questions at this time.
16         MS. DEARBORN:  And yeah,
17 I'll notice that I think you have
18 45 minutes remaining.  So we'll
19 meet and confer about it and come
20 to a decision on next steps.
21         MS. WOOD:  Okay.  Great.
22         MS. DEARBORN:  I do have a
23 few questions for Dr. Simonson.
24         MS. WOOD:  And I obviously

392

1

2                    ACKNOWLEDGMENT OF DEPONENT

3

4              I, <u>Itamar Simonson</u>, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 393, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _I. Simonson_____  3/28/2024

16   ITAMAR SIMONSON, Ph.D.          DATE

17

18

19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.

21   My commission expires:_____

22

23   _____
     Notary Public

24

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Errata Sheet for the Transcription of Itamar Simonson, Ph.D.**

**Case Name:**   *United States et al v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.)

**Depo. Date:**   February 28, 2024

**Deponent:**   Itamar Simonson, Ph.D.

| Page | Line | Original | Corrected | Reason |
|------|------|----------|-----------|--------|
| 2 | 5 | Suite 8700 | Suite 8622 | Transcription Error or Mistake |
| 2 | 7 | "julia.wood@usdoj.gov" | "julia.tarver.wood@usdoj.gov" | Transcription Error or Mistake |
| 4 | 9 | "OFFICDE" | "OFFICE" | Transcription Error or Mistake |
| 20 | 9 | "That will be the Meta" | "That would be the Meta" | Transcription Error or Mistake |
| 25 | 22 | "usually would be" | "usually it will be" | Transcription Error or Mistake |
| 27 | 1 | "will be the company" | "would be the company" | Transcription Error or Mistake |
| 29 | 11 | "order in that case" | "order entered in that case" | Transcription Error or Mistake |
| 29 | 20 | "anything. But one of my concerns" | "anything that one of my concerns" | Clarification / Transcription Error or Mistake |
| 34 | 10:11 | "It's one example" | "Yeah, it's one example" | Transcription Error or Mistake |
| 45 | 12 | "context effects and choice" | "context effects in choice" | Transcription Error or Mistake |
| 50 | 24 | "should be reserved" | "should be preserved" | Transcription Error or Mistake |
| 62 | 5 | "You know, I" | "Yeah, I" | Transcription Error or Mistake |
| 89 | 9 | "it does apply" | "it does not apply" | Transcription Error or Mistake |
| 89 | 13 | "programatic" | "programmatic" | Spelling Error |
| 91 | 21 | "programatic" | "programmatic" | Spelling Error |
| 92 | 5 | "programatic" | "programmatic" | Spelling Error |
| 92 | 17 | "programatic" | "programmatic" | Spelling Error |
| 101 | 20 | "programatic" | "programmatic" | Spelling Error |
| 101 | 23 | "Programatic" | "Programmatic" | Spelling Error |
| 102 | 13 | "programatic" | "programmatic" | Spelling Error |
| 102 | 21 | "programatic" | "programmatic" | Spelling Error |
| 104 | 16 | "programatic" | "programmatic" | Spelling Error |

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| 111 | 2 | "So it was sort of just a get" | "So it was sort of just to get" | Transcription Error or Mistake |
|---|---|---|---|---|
| 112 | 19 | "programatic" | "programmatic" | Spelling Error |
| 126 | 1 | "up 14" | "up being 14" | Transcription Error |
| 126 | 17:18 | "there was no given number. They were not" | "there was no -- given the number, they were not" | Transcription Error/Clarification |
| 132 | 14 | "ad pros" | "AdPros" | Spelling Error |
| 133 | 3 | "ad pros" | "AdPros" | Spelling Error |
| 133 | 17 | "ad pros" | "AdPros" | Spelling Error |
| 133 | 21 | "ad pros" | "AdPros" | Spelling Error |
| 134 | 7 | "ad pros" | "AdPros" | Spelling Error |
| 134 | 14 | "ad pros" | "AdPros" | Spelling Error |
| 134 | 19:20 | "ad pros" | "AdPros" | Spelling Error |
| 135 | 16 | "add pros" | "AdPros" | Spelling Error |
| 135 | 17 | "ad pros" | "AdPros | Spelling Error |
| 135 | 18 | "ad pros" | "AdPros" | Spelling Error |
| 144 | 7 | "But you wouldn't have to" | "But you wouldn't have had to" | Transcription Error or Mistake |
| 185 | 6:7 | "They have different ways" | "There are different ways" | Transcription Error or Mistake |
| 194 | 22 | "programatic" | "programmatic" | Spelling Error |
| 199 | 17 | "you are not going to derive" | "you cannot derive" | Transcription Error or Mistake |
| 200 | 9:10 | "you also serve as searcher. You cannot look at that" | "you also as a researcher, you cannot look at that" | Transcription Error/Clarification |
| 206 | 2 | "programatic" | "programmatic" | Spelling Error |
| 206 | 5 | "programatic" | "programmatic" | Spelling Error |
| 212 | 16 | "programatic" | "programmatic" | Spelling Error |
| 221 | 8:9 | "given with all but such a small sample" | "given we talk about such a small sample" | Transcription Error/Clarification |
| 222 | 6:8 | "I hesitate to -- I believe so. Nothing comes to mind" | "I hesitate to -- I believe so, yes. I don't -- nothing comes to mind" | Transcription Error/Clarification |
| 236 | 9:10 | "this think-aloud product called methodology" | "this think-aloud protocol methodology" | Transcription Error/Clarification |
| 239 | 7 | "or some cost effect" | "or the sunk cost effect" | Transcription Error or Mistake |
| 255 | 14 | "And they speculated" | "And he speculated" | Transcription Error or Mistake |
| 262 | 13 | "As I said, you are looking" | "As I said, you -- looking" | Transcription Error/Clarification |
| 274 | 5 | "programatic actions" | "programmatic auctions" | Spelling Error |

2

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| 289 | 18 | "survey-sponsored purpose" | "survey sponsor and purpose" | Transcription Error/Clarification |
|---|---|---|---|---|
| 333 | 7 | "programatic" | "programmatic" | Transcription Error or Mistake |
| 340 | 6:7 | "the foreseeable to you" | "the foreseeable future to you" | Transcription Error or Mistake |
| 348 | 14 | "programatic" | "programmatic" | Transcription Error or Mistake |
| 348 | 15 | "whether it will" | "whether they will" | Transcription Error or Mistake |
| 352 | 16 | "programatic" | "programmatic" | Spelling Error |
| 352 | 24 | "programatic" | "programmatic" | Spelling Error |
| 353 | 14 | "programatic" | "programmatic" | Spelling Error |
| 354 | 7 | "programatic" | "programmatic" | Spelling Error |
| 354 | 14 | "programatic" | "programmatic" | Spelling Error |
| 354 | 16 | "programatic -- cost of programatic" | "programmatic -- cost of programmatic" | Spelling Error |
| 354 | 23 | "programatic" | "programmatic" | Spelling Error |
| 355 | 5 | "programatic" | "programmatic" | Spelling Error |
| 355 | 14 | "programatic" | "programmatic" | Spelling Error |
| 357 | 6:7 | "The reason I make in my mind" | "There is no link in my mind" | Transcription Error/Clarification |
| 358 | 22 | "programatic" | "programmatic" | Spelling Error |
| 362 | 3 | "programatic" | "programmatic" | Spelling Error |
| 363 | 2 | "have the data, but the degree" | "have the data about the degree" | Transcription Error/Clarification |
| 364 | 8 | "programatic" | "programmatic" | Spelling Error |
| 364 | 11 | "programatic" | "programmatic" | Spelling Error |
| 365 | 16 | "And you agreed" | "And you agree" | Transcription Error or Mistake |
| 370 | 2 | "programatic" | "programmatic" | Spelling Error |
| 371 | 2 | "programatic" | "programmatic" | Spelling Error |

**HIGHLY CONFIDENTIAL**

**ERRATA SHEET FOR THE TRANSCRIPT OF:**

Case Name:    *United States et al. v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.)

Deposition Date:  02/28/2024

Deponent:    Professor Itamar Simonson

**CORRECTIONS**

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 13 | 18 | The words "list in hindsight. It" should read "list in hindsight, it" | Transcription error |
| 18 | 4 | The word "There" should read "They" | Transcription error |
| 18 | 5 | The words "headed a position" should read "had a deposition" | Transcription error |
| 30 | 12 | The word "doctorate" should read "doctoral" | Transcription error |
| 30 | 15 | The word "or" should read "or the" | Transcription error |
| 31 | 10 | The word "receive" should read "received" | Transcription error |
| 31 | 10 | The words "Nobel Prize" should read "the Nobel Prize" | Clarification |
| 34 | 22 | The word "group" should read "groups" | Transcription error |
| 37 | 18 | The word "likely" should read "likelihood of" | Transcription error |
| 43 | 4 | The words "ranked ordered" should read "rank ordered" | Transcription error |
| 44 | 16 | The word "decisionmaking" should read "decision making" | Transcription error |
| 44 | 21 | The word "decisionmaking" should read "decision making" | Transcription error |
| 44 | 24 | The words "much better and rely" should read "much better at relying" | Transcription error |
| 46 | 10 | The word "Are" should read "They're" | Transcription error |
| 47 | 10 | The words "work for" should read "work for a" | Clarification |
| 47 | 10 | The word "firm" should read "firm?" | Transcription error |
| 52 | 21 | The words "there's, like" should read "that's like" | Transcription error |
| 55 | 21 | The words "testify about" should read "testify about it" | Transcription error |

| 57 | 10 | The word "Archer-Daniels" should read "Archer Daniels" | Transcription error |
|---|---|---|---|
| 57 | 23 | The word "listed" should read "not listed" | Transcription error |
| 57 | 23 | The word "not" should read "no" | Transcription error |
| 58 | 11 | The words "testify. It" should read "testify if it" | Transcription error |
| 58 | 12 | The word "in" should read "on" | Transcription error |
| 65 | 10 | The words "can find" should read "can find it" | Transcription error / clarification |
| 74 | 18 | The word "was" should read "were" | Transcription error |
| 85 | 13 | The word "Abarantes" should read "Abrantes" | Transcription error |
| 91 | 21 | The word "programatic" should read "programmatic" | Transcription error |
| 92 | 5 | The word "programatic" should read "programmatic" | Transcription error |
| 92 | 17 | The word "programatic" should read "programmatic" | Transcription error |
| 101 | 20 | The word "programatic" should read "programmatic" | Transcription error |
| 101 | 23 | The word "programatic" should read "programmatic" | Transcription error |
| 102 | 13 | The word "programatic" should read "programmatic" | Transcription error |
| 102 | 21 | The word "programatic" should read "programmatic" | Transcription error |
| 104 | 16 | The word "programatic" should read "programmatic" | Transcription error |
| 109 | 4 | The word "less" should read "less than" | Transcription error |
| 110 | 7 | The words "there was" should read "it was about" | Transcription error |
| 111 | 2 | The words "just a get" should read "just to get" | Transcription error |
| 111 | 15 | The words "there are" should read "these were" | Transcription error |
| 112 | 19 | The word "programatic" should read "programmatic" | Transcription error |
| 116 | 8 | The word "recognize" should read "recognized" | Transcription error |
| 116 | 16 | The word "agency" should read "and agency" | Transcription error |
| 125 | 11 | The word "one" should read "an" | Transcription error |

| 128 | 6 | The word "pick" should read "picked" | Transcription error |
|-----|---|---|---|
| 130 | 2 | The words "report list" should read "report lists" | Transcription error |
| 132 | 14 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 133 | 3 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 133 | 17 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 133 | 21 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 134 | 7 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 134 | 14 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 134 | 19-20 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 135 | 16 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 135 | 18 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 136 | 15 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 141 | 17 | The word "kept" should read "keep" | Transcription error |
| 143 | 2 | The word "resident" should read "residence" | Transcription error |
| 148 | 1 | The words "might have followed" should read "might have been followed" | Omission |
| 149 | 16 | The words "apropos all" should read "all" | Transcription error |
| 155 | 4 | The word "attorney" should read "attorneys" | Transcription error |
| 156 | 23 | The word "interview" should read "interviewer" | Transcription error |
| 157 | 23 | The word "your" should read "the" | Transcription error |
| 158 | 23 | The word "received" should read "received the" | Transcription error |
| 177 | 6 | The word "did" should read "do" | Transcription error / clarification |
| 184 | 10 | The words "That saying" should read "That said" | Transcription error |
| 194 | 22 | The word "programatic" should read "programmatic" | Transcription error |
| 200 | 1 | The word "alternative" should read "alternatively" | Transcription error |
| 200 | 9-10 | The words "you also serve as searcher. You" should read "you also as a researcher, you" | Transcription error |
| 202 | 21 | The words "than about those" should read "than on those" | Clarification |
| 206 | 2 | The word "programatic" should read "programmatic" | Transcription error |
| 206 | 5 | The word "programatic" should read | Transcription error |

| | | "programmatic" | |
|---|---|---|---|
| 206 | 18 | The word "No" should read "Now" | Transcription error |
| 210 | 5 | The word "point" should read "points" | Transcription error |
| 212 | 16 | The word "programatic" should read "programmatic" | Transcription error |
| 213 | 5 | The word "to" should read "the" | Transcription error |
| 213 | 17 | The words "from between" should read "between" | Transcription error |
| 218 | 24 | The word "that" should read "that's" | Transcription error |
| 221 | 8-9 | The words "with all but" should read "we talk about" | Transcription error |
| 224 | 5 | The word "result" should read "results" | Transcription error |
| 225 | 17 | The words "southern district" should read "Southern District" | Transcription error |
| 236 | 3 | The words "the hypothesis" should read "hypotheses" | Transcription error |
| 236 | 9 | The words "product called" should read "protocol" | Transcription error |
| 239 | 7 | The word "some" should read "sunk" | Transcription error |
| 241 | 10 | The word "clear" should read "clear?" | Transcription error |
| 242 | 9 | The word "is" should read "were" | Transcription error |
| 244 | 16 | The word "right" should read "the right" | Transcription error |
| 249 | 8 | The word "term" should read "terms" | Clarification |
| 255 | 14 | The word "they" should read "he" | Transcription error |
| 257 | 12 | The words "just Dr. Hoyer" should read "Dr. Hoyer just" | Transcription error |
| 272 | 7 | The word "marketings" should read "marketing" | Transcription error |
| 272 | 10 | The word "criteria" should read "criterion" | Transcription error |
| 274 | 5 | The word "programatic" should read "programmatic" | Transcription error |
| 279 | 21 | The words "you see if" should read "if you see" | Transcription error |
| 287 | 15 | The word "Volkswagon" should read "Volkswagen" | Transcription error |
| 295 | 14 | The word "effect" should read "a fact" | Transcription error |
| 295 | 15 | The words "between – about" should read "between about" | Transcription error |

| 298 | 7 | The word "questions" should read "question" | Transcription error |
| 298 | 21 | The words "experts who prepare" should read "expert who prepared" | Transcription error / clarification |
| 299 | 12 | The word "line" should read "lines" | Transcription error |
| 309 | 7 | The word "were" should read "who were" | Transcription error |
| 318 | 20 | The words "very many" should read "many very" | Transcription error |
| 319 | 1 | The word "patterns" should read "patents" | Transcription error |
| 335 | 2 | The words "No respondents" should read "No respondent" | Transcription error |
| 342 | 13 | The word "never" should read "they never" | Transcription error |
| 343 | 11 | The words "attribute. That's" should read "attribute that's" | Transcription error |
| 345 | 7 | The word "seller" should read "sellers" | Transcription error |
| 346 | 7 | The word "at" should read "to" | Transcription error |
| 348 | 14 | The word "programatic" should read "programmatic" | Transcription error |
| 349 | 11 | The words "this question" should read "these questions" | Transcription error |
| 351 | 12 | The word "it" should read "if it" | Transcription error |
| 352 | 16 | The word "programatic" should read "programmatic" | Transcription error |
| 352 | 24 | The word "programatic" should read "programmatic" | Transcription error |
| 353 | 14 | The word "programatic" should read "programmatic" | Transcription error |
| 354 | 7 | The word "programatic" should read "programmatic" | Transcription error |
| 354 | 14 | The word "programatic" should read "programmatic" | Transcription error |
| 354 | 16 | The word "programatic" should read "programmatic" | Transcription error |
| 354 | 23 | The word "programatic" should read "programmatic" | Transcription error |
| 355 | 5 | The word "programatic" should read "programmatic" | Transcription error |
| 355 | 14 | The word "programatic" should read "programmatic" | Transcription error |
| 358 | 22 | The word "programatic" should read | Transcription error |

| | | "programmatic" | |
|---|---|---|---|
| 361 | 9 | The word "do" should read "do it" | Clarification |
| 362 | 3 | The word "programatic" should read "programmatic" | Transcription error |
| 363 | 7 | The word "substitutions" should read "substitution" | Transcription error |
| 364 | 8 | The word "programatic" should read "programmatic" | Transcription error |
| 364 | 11 | The word "programatic" should read "programmatic" | Transcription error |
| 366 | 22 | The words "they ask" should read "they were asked" | Transcription error |
| 370 | 2 | The word "programatic" should read "programmatic" | Transcription error |
| 371 | 2 | The word "programatic" should read "programmatic" | Transcription error |
| 383 | 6 | The words "to the" should read "to" | Transcription error |
| 383 | 15 | The word "Number" should read "number" | Transcription error |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefor.

Date : 3/28/2024

Itamar Simonson, Ph.D.