# Exhibit I
# (previously filed as Dkt. 609-10)

**In the Matter Of:**

*United States vs*

*Google*

MARK ISRAEL, PH.D.

March 14, 2024



Case 1:23-cv-00108-LMB-JFA   Document 1096-9   Filed 08/01/24   Page 3 of 18 PageID# 81261

United States vs.                                                                        Mark Israel, Ph.D.
Google                              Highly Confidential                                  March 14, 2024

### Page 402

1  BY ATTORNEY NAKAMURA:
2  Q.   And if an exchange did not have
3  access to Google Ads, is it your opinion that the
4  exchange's payout to publishers would not be
5  affected relative to a world in which they did
6  have access to Google Ads Demand?
7  A.   I mean, that one depends on the
8  specific auction.  It's not my opinion that
9  there's no auction -- that the -- the mixture of
10 where various sources of demand goes have no
11 effect on what different exchanges offer, just my
12 opinion that they're still able to compete for
13 demand and that there's no harm to the market or
14 to competition.
15      But advertisers sort themselves out
16 among different exchanges, then for any given
17 bid, different exchanges might end up bidding
18 different amounts.  That's possible, but that
19 doesn't harm their ability to compete or harm
20 advertisers or publishers.
21 Q.   Have you identified any other
22 sources of demand that are similar to that from

### Page 403

1  Google Ads?
2      ATTORNEY EWALT:  Objection to
3      form.
4      THE WITNESS:  I'm not entirely
5      sure what you mean by "sources of
6      demand."  The sources of demand are the
7      advertisers --
8  BY ATTORNEY NAKAMURA:
9  Q.   Yep.
10 A.   -- and those advertisers can and
11 do, and can, as they need to, bid through other
12 buying tools and other exchanges.
13 Q.   And what are examples of those
14 buying tools and exchanges that would have a
15 similar group or class of advertisers as those
16 who advertise through Google Ads?
17 A.   I'm -- I'm not saying that they
18 have a similar group today, although many of them
19 have access to the same large advertisers that we
20 talk about who are the most important part of the
21 demand.
22      So Point 1 is that the Trade Desk

### Page 404

1  and Xandr and Criteo and others -- many of them
2  have the same large advertisers, right.  But
3  Point 2 is that if somebody -- if trying to act
4  as a bottleneck, the source of demand is not the
5  tool; the source of demand is the advertisers,
6  and the advertisers have all sorts of options to
7  prevent that bottleneck from limiting their
8  ability to win bids.
9  Q.   So why, in your opinion, are the
10 large advertisers the most important source of
11 demand within Google Ads, as opposed to the small
12 advertisers?
13 A.   Because they -- they account for
14 the vast majority of their revenue.
15 Q.   And so it is amount of revenue
16 alone, in your opinion, that is important in
17 determining whether or not a class of advertisers
18 is important to Google Ads; is that correct?
19      ATTORNEY EWALT:  Objection to
20      form.
21      THE WITNESS:  I mean, again,
22      "important" is -- is a -- it depends how

### Page 405

1      you define "important."  But, certainly,
2      I think that when we're thinking about
3      demand sources, which is what we're
4      talking about, and the amount of demand,
5      we measure the amount of demand by the
6      amount of revenue, the amount of
7      spending.
8      That's the measure of demand.
9  BY ATTORNEY NAKAMURA:
10 Q.   And are there any other factors
11 besides the amount of demand, as measured in
12 dollars or revenue, that would be important -- an
13 important consideration in determining the value
14 of advertisers to Google Ads?
15 A.   I mean, I'm not sure I understand
16 where you're going.  I -- I mean, I -- it's --
17 the -- their value as an advertiser is the amount
18 of money they can bring.
19      I mean, I guess you can secondarily
20 ask are they actually unique to Google Ads in the
21 sense that they can't be found anywhere else,
22 right.  So the opinion I express in the report

Case 1:23-cv-00108-LMB-JFA   Document 1096-9   Filed 08/01/24   Page 4 of 18 PageID# 81262

United States vs. Google — Highly Confidential — Mark Israel, Ph.D. — March 14, 2024

**Page 406**

1  is, putting those two things together, the
2  advertisers who account for the overwhelming
3  majority of the revenue are not in any way
4  captive to Google Ads.
5      Q.   Is it your opinion that whether
6  they are unique to Google Ads as an advertiser is
7  something that should be considered in analyzing
8  the competitive significance of Google Ads?
9      A.   I wouldn't say unique because that
10 implies just what they're deciding now.
11          I think -- I think I would say
12 whether they are captive to Google Ads would be a
13 fact- -- a factor.  But my opinion is that they
14 are not captive to Google Ads.
15          If Google Ads -- if Google tried to
16 exert market power in some way, those advertisers
17 have options.
18     Q.   Can a small advertiser who is using
19 a Google Ads interface for a single ad campaign
20 also use another advertiser network-buying tool,
21 such as the Facebook audience network, can they
22 do that -- split their budget for a single

**Page 407**

1  advertising campaign across both tools?
2      A.   Sure.
3      Q.   And what examples in your report do
4  you have of that, to split a single campaign
5  across more than one tool for a network product?
6      A.   I mean, you went to Facebook.  I
7  don't know.  We'd have to see in the report if
8  there are examples, but it's not remotely
9  uncommon for small advertisers to run
10 campaigns -- I mean, these I've worked on
11 directly, frankly -- to run campaigns where they
12 split budget across Google Ads and Facebook.
13 That's common.
14     Q.   And that's -- I want to make sure
15 that we're talking about the same thing.
16          So when you say "budget," in
17 advertising, budget is separate, as I understand
18 it, from a campaign, because a single campaign,
19 as I understand display advertising, is, for
20 example, campaign to sell Nike shoes, which may
21 be separate or the same than a budget.
22          Is that also your

**Page 408**

1  understanding?
2          ATTORNEY EWALT:  Objection to
3      form.
4          THE WITNESS:  I mean, I'm happy
5      to talk about a campaign.  I mean,
6      ultimately, what matters is they're
7      moving spending, right.  We don't -- I
8      wouldn't analyze competition campaign by
9      campaign because it's -- these guys
10     compete for advertising spending, so the
11     competition could be to win the next
12     campaign.
13         But the ans- -- the answer to my
14     last question was very much specific to a
15     campaign.  There -- there certainly are
16     small advertisers and large advertisers
17     who run campaigns where, within that
18     campaign, they're camp -- they're
19     advertising across display, social,
20     search, e-mail, and they're using
21     whatever tools they need inside that
22     campaign.

**Page 409**

1  BY ATTORNEY NAKAMURA:
2      Q.   And what is your understanding of
3  the degree to which smaller advertisers
4  multihome, as compared to large advertisers?
5      A.   I think the report says that they
6  multihome somewhat less.
7           That said, the -- I mean, there's
8  -- there's -- the survey evidence certainly also
9  shows them multihoming.  And my own experience is
10 the example you just gave, small -- and we see it
11 in the data, too -- small advertisers are very
12 big users of Facebook.  And so the notion that a
13 small advertiser would advertise both on
14 Google Ads and on Facebook is, I mean, not
15 remotely rare; it's probably the norm.
16     Q.   And when you talk about survey
17 evidence, are you discussing evidence obtained
18 from the report of Professor Simonsen, who
19 submitted a report in this case?
20     A.   Yeah, that would certainly be one
21 source.  There's also other surveys by advertiser
22 perceptions cited in my report.  I'm talking

Case 1:23-cv-00108-LMB-JFA   Document 1096-9   Filed 08/01/24   Page 5 of 18 PageID# 81953

United States vs. Google — Highly Confidential — Mark Israel, Ph.D. — March 14, 2024

### Page 410

1  about what's cited in my report, which certainly
2  includes Professor Simonsen's survey.
3      Q.   And does Professor Simonsen's
4  survey access the degree of -- to which
5  advertisers multihome?
6      A.   I don't know what you mean by "the
7  degree."
8           He asked, Do you use multiple
9  tools?  For --
10     Q.   As a -- I'm sorry.
11     A.   -- for me, multihoming is a yes/no
12 question.
13     Q.   Yes.
14          And that is the way he asked it
15 in the survey; isn't it correct?  A yes/no
16 question?
17     A.   I would define "multihoming" as
18 using multiple tools, so you do or you don't.
19     Q.   And if 99.5 percent of advertisers
20 -- I'm sorry -- if 99.5 percent of an
21 advertiser's budget went to one tool and
22 .5 percent went to another tool, would you, in

### Page 411

1  your opinion, consider that to be multihoming?
2      A.   Yes, because the advertiser is
3  using both tools, which means if the relative
4  conditions of the two change, the advertiser,
5  without new setup costs, can switch those
6  proportions.
7      Q.   And with respect to
8  Professor Simonsen's report, you rely on portions
9  of his report in reaching the opinions in your
10 report; is that correct?
11          ATTORNEY EWALT:  Objection to
12     form.
13          THE WITNESS:  I mean, I -- yeah,
14     it certainly is cited to in my report.
15     So that would be materials that I relied
16     upon.
17          BY ATTORNEY NAKAMURA:
18     Q.   And did you review any of the
19 backup materials that were produced to Plaintiffs
20 along with Professor Simonsen's report?
21     A.   I've seen the underlying data.
22 I've looked at the underlying data.  I mean, I

### Page 412

1  rely on him for the conclusions and the
2  processing, but I have seen the raw data.
3      Q.   Did you do any analysis on the raw
4  data yourself?
5      A.   No.  I rely on him for the
6  conclusions and the analysis, but I have -- you
7  asked if I reviewed any of the backup materials.
8  I have looked at the raw data.
9      Q.   Did you do any independent analysis
10 to verify that Professor Simonsen used a reliable
11 method for administering the survey discussed in
12 his report?
13     A.   I rely on him for that.
14     Q.   So is the answer to my question no,
15 you did not do any independent analysis on the
16 material in Professor Simonsen's report -- the
17 backup data, I mean?  I apologize.
18     A.   That's a different question.
19          The backup -- yeah, I did not do
20 any independent analysis of the backup data.  I
21 rely on him for the methods and the analysis.
22     Q.   Have you ever conducted a survey

### Page 413

1  yourself as part of work as an expert witness or
2  consultant?
3      A.   Conducted?  No.
4      Q.   Do you have any experience in your
5  career at all in administering a consumer survey?
6      A.   I mean, yes, in the sense that I've
7  been close to them; I've given input into good
8  questions; I've, you know, seen multiple rounds
9  of them and the kind of answers you get.
10          So I've been a closely involved
11 observer and a sort of qualified user of the
12 data, but I'm -- I wouldn't hold myself out as a
13 survey expert.
14     Q.   And when were you giving close
15 input to a survey?  When was that?
16     A.   I mean, the case that I was
17 thinking of was -- I think I can say this --
18 consulting work on the merger of AT&T and DIRECTV
19 some years ago, where there was a survey done to
20 measure people's choices of video providers.
21          And I was -- I was the economist
22 who was going to do the modeling with the

Case 1:23-cv-00108-LMB-JFA   Document 1096-9   Filed 08/01/24   Page 6 of 18 PageID# 81954

United States vs. Google — Highly Confidential — Mark Israel, Ph.D. — March 14, 2024

**Page 414**

1  results, so I was, in that case, closely involved
2  in what questions should be asked, what data
3  should be collected, what we were seeing.
4      Q.   But there was a -- I'm sorry.
5           But there was a separate expert
6  in that case who actually administered the
7  survey; is that correct?
8      A.   That's correct.
9      Q.   And so in this case, did you
10 provide any input to Professor Simonsen regarding
11 the design of the survey?
12          ATTORNEY EWALT:  I'm going to
13     object and instruct you not to answer
14     about any communications with
15     Professor Simonsen.
16          BY ATTORNEY NAKAMURA:
17     Q.   Did you speak to Professor Simonsen
18 at -- at any time after your retention -- after
19 his retention for this matter?
20     A.   Yes.
21     Q.   How many times did you speak to
22 him?

**Page 415**

1      A.   Two or three.
2      Q.   What are the approximate dates of
3  the times when you spoke to him?
4      A.   I don't know.
5      Q.   Was it after October of 2023?
6      A.   I don't think so.
7      Q.   Was it after August of 2023?
8      A.   I think it was longer ago than
9  that.
10     Q.   Was it before July of 2023?
11     A.   I think so.
12     Q.   All right.  Thank you.
13          So did you know that -- do you
14 know the percentage of Fortune 50 companies that
15 were excluded as respondents from -- from
16 Professor Simonsen's survey?
17     A.   No, as I sit here, I don't.
18          That information may be in my
19 report.  I'm sure it's in his.  But I don't know.
20     Q.   Is there any level or percentage of
21 exclusion of Fortune 500 companies from
22 Professor Simonsen's survey that would concern

**Page 416**

1  you as to the applicability of his survey for
2  your report?
3      A.   No.  Again, I -- I rely on him, as
4  a well-qualified survey expert, to take the right
5  steps to have a representative sample.
6      Q.   Do you agree that the sample for
7  any survey on which you would rely in an
8  antitrust case should have a statistically
9  representative sample?
10     A.   Not necessarily.  I mean, you
11 should understand the sample and appropriately
12 process it and account for it.  But sample --
13 samples have all sorts of forms, and, again, I
14 rely on him to appropriately adjust.
15          But underlying samples themselves
16 are not always representative.
17     Q.   And in your opinion, then, even if
18 they sam- -- if the underlying sample is not
19 representative, it is proper, in your view, to
20 rely on that unrep- -- statistically
21 unrepresentative sample to reach conclusions as
22 an economist expert studying competition; is that

**Page 417**

1  right?
2          ATTORNEY EWALT:  Objection to
3     form.
4          THE WITNESS:  I mean, it depends
5     what conclusions you're reaching and how
6     you're using them.
7          But, again, my point, which is as
8     a general matter of the question you
9     asked, was not all samples are
10    representative random samples, and people
11    use them and account for that in
12    appropriate ways.
13         BY ATTORNEY NAKAMURA:
14     Q.   So how would you describe a
15 statistically representative sample?  What does
16 that mean to you?
17     A.   I mean, just as a mat -- a pure
18 matter of sampling, it would mean that the --
19 and, again, I -- I leave more of this to survey
20 design experts, but what it means to me is that
21 the sample has -- is -- if it was representative
22 on relevant dimensions, it's sort of make up the

Case 1:23-cv-00108-LMB-JFA   Document 1096-9   Filed 08/01/24   Page 7 of 18 PageID# 81265

United States vs. Google — Highly Confidential — Mark Israel, Ph.D. — March 14, 2024

**Page 418**

1  mix of the respondents looks like some broader
2  population.
3      Q.    And by "broader population," do you
4  mean broader population of interest to the
5  evaluation you would be performing as part of an
6  analysis of competition?
7      A.    I don't know.
8            ATTORNEY EWALT:  Objection to
9      form.
10           THE WITNESS:  Yeah.  Just -- you
11     just said -- I mean, as a general matter,
12     is it representative or not?  I would say
13     it matches some population that you're
14     trying to match to.
15           And, again, if -- if it does or
16     doesn't, there's all sorts of ways to
17     adjust for that.  But the definition of
18     "representative," I would say, means it
19     broadly matches some broader population.
20           BY ATTORNEY NAKAMURA:
21     Q.    Do you know the earliest date on
22  which it was technically feasible for Google Ads

**Page 419**

1  or GDN to bid cross exchange?
2      A.    Like, did they have the ability to
3  do it?
4      Q.    Yeah.
5      A.    I don't know the first date.
6      Q.    What is your understanding of the
7  current restrictions into what types of inventory
8  Google Ads will bid on on third-party exchanges
9  today?
10           ATTORNEY EWALT:  Objection to
11     form.
12           THE WITNESS:  I mean, today, I
13     guess I -- my understanding is they bid
14     on a variety of inventory.  I don't think
15     it's -- or at least I don't know that
16     it's limited to just specific types of
17     inventory.  I -- I think there has to be
18     a deal of some sort with the exchange
19     such that they can get the information
20     they need, you know, match cookies and
21     have some certainty about the quality of
22     the exchange, and so on on -- on a number

**Page 420**

1      of dimensions.
2            But I don't -- at least I don't
3      understand it or don't know that it's
4      defined by only certain types of
5      inventory now.
6            BY ATTORNEY NAKAMURA:
7      Q.    Do you know what approximate
8  percentage of Google Ads Demand is bidding into
9  third-party exchanges as a proportion of the
10 overall demand, as measured by revenue, that
11 Google Ads has from its advertisers?
12     A.    I have a number in the report, I
13 think, which is that among exchanges, it's
14 something like 16 percent.
15     Q.    But as a percentage of Google Ads
16 total revenue, do you have that figure?
17     A.    Only what I just said, which I
18 think is that of total Google Ads spending across
19 exchanges, 16 percent of it is on third-party
20 exchanges.
21     Q.    In your opinion, was the
22 introduction of the AWBid product beneficial for

**Page 421**

1  publishers in the digital advertising market?
2      A.    I mean, I haven't studied that.  I
3  don't really offer an opinion.
4            I mean, all else equal, I think
5  adding another buying tool has at least some
6  benefit to publishers.  But how significant it is
7  given that those same buyers have lots of other
8  ways to -- other buying tools they could use,
9  I -- it's not something I've studied.
10     Q.    And in your opinion, was the
11 introduction of the AWBid product good for
12 advertisers -- I'm sorry -- beneficial to
13 advertisers?
14           ATTORNEY EWALT:  Sorry to
15     interrupt, but just for your information,
16     it's typically pronounced AWBid.  It's a
17     little bit confusing.
18           ATTORNEY NAKAMURA:  That's fine.
19           THE WITNESS:  So I think AWBid
20     was a step towards, you know, Google
21     adding additional service through
22     Google Ads.  So Google is competing, and

Case 1:23-cv-00108-LMB-JFA   Document 1096-9   Filed 08/01/24   Page 8 of 18 PageID# 81256

United States vs. Google | Highly Confidential | Mark Israel, Ph.D. — March 14, 2024

Page 494

1 academic textbooks, journals, well-accepted
2 concepts in the field.
3     So I just want to make sure
4 that you have the opportunity to tell me if there
5 are any citations you can provide at all
6 regarding the economic understanding of a duty to
7 deal.
8     A.   There's lots of citations in this
9 report in other sections, and there are more
10 beyond that.  This is an introduction that has
11 literally no footnotes because it's introducing
12 the rest of the report.
13     If you want to look in the rest of
14 the report, there's whole sections on the harms
15 that come -- that would come from behavior like
16 this.
17     Q.   And last question:  Can you give me
18 an example, as an economist, of any situation in
19 which a duty to deal would not, in your opinion,
20 be harmful to competition and consumers?
21     ATTORNEY EWALT:  Objection to
22   form.

Page 495

1     THE WITNESS:  I think a duty to
2 deal -- an actual requirement to deal is
3 harmful.  I can't think of an example
4 where the duty is not harmful.
5     There might be situations where
6 firms work together in some way that's
7 beneficial, but I think requiring firms
8 to work with their competitors is harmful
9 to the essence of the competitive
10 process.
11     ATTORNEY NAKAMURA:  All right.
12 See, we're at time.
13     Thank you very much, Dr. Israel.
14     And we'll go off the record.
15     ATTORNEY EWALT:  Not quite.  I
16 want to designate the transcript as
17 highly confidential under the protective
18 order in this case.
19     Now we can go off the record.
20     ATTORNEY NAKAMURA:  Thank you.
21     THE VIDEOGRAPHER:  Off the record
22 at 6:36.  And this ends today's

Page 496

1 deposition.
2
3     (Witness excused.)
4
5     (Deposition concluded at 6:36 p.m.
6 EDT)

Page 497

C E R T I F I C A T E

1     I, Cindy L. Sebo, Nationally Certified Court
2 Reporter herein, do hereby certify that the foregoing
3 deposition of MARK A. ISRAEL, PH.D. was taken before
4 me pursuant to notice at the time and place indicated;
5 that said witness duly swore to tell the truth, the
6 whole truth, and nothing but the truth under penalties
7 of perjury; that said testimony of witness was
8 correctly recorded to the best of my abilities in
9 machine shorthand, thereafter transcribed under my
10 supervision with computer-aided transcription; that
11 deposition is a true and accurate record of the
12 testimony given by the witness; that I am neither
13 counsel, nor kin to any party in said action, nor
14 interested in the outcome; and that a copy of this
15 transcript obtained from a source other than the court
16 reporting firm, including an adversary or co-counsel
17 in the matter, is uncertified and may not be used at
18 trial.
19 _____
    CINDY L. SEBO, RMR, CRR, CLR, RPR, CCR, CSR,
20  RSA, CA CSR 14409, NJ Certified CR 30XI0024460,
    NJ Certified RT 30XR00019500, NM CSR 589, NY
21  Realtime Court Reporter, NY Association Certified
    Reporter, OR CSR 230105, TN CSR 998, TX CSR 12778,
22  WA CSR 23005926, Notary Public

Case 1:23-cv-00108-LMB-JFA   Document 1096-9   Filed 08/01/24   Page 9 of 18 PageID# 81267

United States vs. Google — Highly Confidential — Mark Israel, Ph.D. — March 14, 2024

## Page 498

INSTRUCTIONS TO WITNESS

1    Please read your deposition over
2 carefully and make any necessary corrections.
3 You should state the reason in the appropriate
4 space on the errata sheet for any corrections
5 that are made.
6    After doing so, please sign the
7 errata sheet and date it.
8    You are signing same subject to the
9 changes you have noted on the errata sheet, which
10 will be attached to your deposition.
11    It is imperative that you return
12 the original errata sheet to the deposing
13 attorney within thirty (30) days of receipt of
14 the deposition transcript by you. If you fail to
15 do so, the deposition transcript may be deemed to
16 be accurate and may be used in court.

## Page 499

CAPTION: United States, et al. vs. Google, LLC
1  MARK A. ISRAEL, PH.D.        NO. 2024-933018
2           E R R A T A   S H E E T
3  PAGE_____ LINE_____ CHANGE _____
4  REASON FOR CHANGE:
   _____
5
   PAGE_____ LINE_____ CHANGE _____
6
   REASON FOR CHANGE:
7  _____
8  PAGE_____ LINE_____ CHANGE _____
9  REASON FOR CHANGE:
   _____
10
   PAGE_____ LINE_____ CHANGE _____
11
   REASON FOR CHANGE:
12 _____
13 PAGE_____ LINE_____ CHANGE _____
14 REASON FOR CHANGE:
   _____
15
   PAGE_____ LINE_____ CHANGE _____
16
   REASON FOR CHANGE:
17 _____
18 PAGE_____ LINE_____ CHANGE _____
19 REASON FOR CHANGE:
   _____
20
   PAGE_____ LINE_____ CHANGE _____
21
   REASON FOR CHANGE:
22 _____

## Page 500

CAPTION: United States, et al. vs. Google, LLC
1  MARK A. ISRAEL, PH.D.        NO. 2024-933018
2           E R R A T A   S H E E T
3  PAGE_____ LINE_____ CHANGE _____
4  REASON FOR CHANGE:
   _____
5
   PAGE_____ LINE_____ CHANGE _____
6
   REASON FOR CHANGE:
7  _____
8  PAGE_____ LINE_____ CHANGE _____
9  REASON FOR CHANGE:
   _____
10
   PAGE_____ LINE_____ CHANGE _____
11
   REASON FOR CHANGE:
12 _____
13 PAGE_____ LINE_____ CHANGE _____
14 REASON FOR CHANGE:
   _____
15
   PAGE_____ LINE_____ CHANGE _____
16
   REASON FOR CHANGE:
17 _____
18 PAGE_____ LINE_____ CHANGE _____
19 REASON FOR CHANGE:
   _____
20
   PAGE_____ LINE_____ CHANGE _____
21
   REASON FOR CHANGE:
22 _____

## Page 501

ACKNOWLEDGMENT OF WITNESS

1
2     I, MARK A. ISRAEL, PH.D., do hereby certify that
3  I have read the foregoing pages herein, and that the
4  same is a correct transcription of the answers given
5  by me of the proceedings taken remotely to the
6  questions therein propounded under penalty of perjury,
7  except for the corrections or changes in form or
8  substance, if any, noted in the attached errata sheet.
9  _____        _____
10    DATE                 SIGNATURE
11
12
13
14
15 Subscribed and sworn to before me
   this _____ day of_____, 20____.
16
17    My Commission expires:
18
   _____
19
20
21 _____
22    Notary Public

**Attorney Errata Sheet for the Transcription of Mark A. Israel**

**Case Name**:  *United States et al v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.)

**Depo. Date**:  March 14, 2024

**Deponent**:  Dr. Mark Israel

| Page | Line | Correction | Reason for Correction |
|---|---|---|---|
| 23 | 4 | Change "look at a number of firms" to "look at the number of firms" | Transcription error |
| 23 | 18 – 19 | Change "Number of firms, as I said, can be" to "Number of firms can be, as I said" | Transcription error |
| 46 | 10 | Delete "ability" | Transcription error |
| 59 | 3 | Insert "and" after "substantial" | Transcription error |
| 59 | 9 | Change "applying" to "playing" | Transcription error |
| 60 | 12 | Replace the comma after "substantial" with "and" | Transcription error |
| 61 | 6 | Replace the comma after "substantial" with "and" | Transcription error |
| 62 | 4 | Insert "in" after "example," | Transcription error |
| 62 | 10 | Delete "actually" | Transcription error |
| 73 | 11 | Change "didn't" to "doesn't" | Transcription error |
| 91 | 14 | Change "Paragraph 344, with that. Is" to "paragraph 344. With that, is" | Transcription error |
| 95 | 12 | Replace "Hypothetical" with "A hypothetical" | Transcription error |
| 122 | 16 | Delete "and" | Transcription error |
| 126 | 8 – 9 | Insert a comma after "says" ; insert quotations around "I love the Ford Mustang, and you should all buy it." | Punctuation – clarity |
| 130 | 12 | Replace the period after "went" with a comma | Punctuation – clarity |
| 134 | 11 | Delete "And" | Transcription error |
| 135 | 5 – 6 | Insert quotations around "all digital advertising" | Punctuation – clarity |
| 145 | 9 | Delete "services" (at 1:53:34) | Transcription error |
| 152 | 2 – 4 | Insert a comma after "said" ; insert quotations around "wherever they have inventory, they want to | Punctuation – clarity |

| | | | |
|---|---|---|---|
| | | sell their advertisements." | |
| 159 | 20 | Replace "include" with "conclude" | Transcription error |
| 162 | 9 | Replace "Flash" with "particular" | Transcription error |
| 165 | 4 | Insert "it" after "running" | Transcription error |
| 166 | 6 – 8 | Delete "And by 'its own,' I meant as opposed to server side" from the question and insert it as the first sentence in the answer. | Transcription error; recorded part of the question as part of the answer |
| 169 | 8 | Insert quotations around "For example" | Transcription error |
| 169 | 9 | Insert a comma after "states" | Transcription error |
| 169 | 9 – 14 | Insert quotations around the quote beginning with "Kevel" and ending with "scratch." | Transcription error |
| 176 | 11 – 12 | Insert quotations around "Why abandon the full stack approach?" | Transcription error |
| 176 | 19 | Replace "would be" with "was" | Transcription error |
| 178 | 5 | Insert quotations around "Supply Side (publisher-facing)." | Transcription error |
| 178 | 7 – 11 | Insert quotations around the quote beginning with "Owning" and ending with "start." | Transcription error |
| 182 | 2 | Replace "vie" with "vi—" | Transcription error |
| 182 | 12 | Replace "DSL –" with "DS—" | Transcription error |
| 182 | 21 | Insert quotations around "Supply Side (publisher-facing)." | Punctuation – clarity |
| 183 | 1 – 2 | Insert quotations around "However, it is a zero-sum game, and Google has a significant head start." | Punctuation – clarity |
| 185 | 2 | Insert "with" before "your" | Transcription error |
| 188 | 14 | Insert "and" after "substantial" | Transcription error |
| 189 | 22 – 190:7 | Insert quotations around the quote beginning with "To" and ending with "behind." | Punctuation – clarity |
| 190 | 11 | Insert quotations around "Other Factors" | Punctuation – clarity |
| 206 | 11 – 12 | Insert quotations around "Impressions that, when you advertise on them, generate more revenue." | Punctuation |
| 206 | 22 | Insert "revenue" after "really" | Transcription error |
| 219 | 2 | Delete "go –" | Transcription error |

2

| 219 | 8 – 10 | Insert quotations around "I explain that considering a market for ad tech products as a whole—" | Transcription error |
|---|---|---|---|
| 223 | 6 | Replace "ad," with "ad—" | Transcription error |
| 224 | 9 | Replace "professional" with "provision" | Transcription error |
| 227 | 12 | Replace "On" with "Well" | Transcription error |
| 232 | 8 | Insert "that" after "opinion" | Transcription error |
| 244 | 2 – 10 | Insert quotations around the quote beginning with "The" and ending with "it." | Transcription error |
| 249 | 2 | Insert quotations around "Section H, The Relevant Geographic Market." | Transcription error |
| 249 | 16 – 18 | Insert quotations around the title starting with "Hence" and ending with "States." | Transcription error |
| 261 | 9 – 11 | Insert quotations around the title starting with "Google" and ending with "2022." | Transcription error |
| 263 | 8 | Replace "exchange that" with "each data set" | Transcription error |
| 263 | 21 – 22 | Insert quotations around the title starting with "U.S." and ending with "Spending" | Transcription error |
| 265 | 10 – 13 | Insert quotations around the title starting with "Google" and ending with "2022." | Transcription error |
| 266 | 4 – 6 | Insert quotations around the title starting with "AdX" and ending with "2022" | Transcription error |
| 267 | 7 – 11 | Insert quotations around the quote starting with "For" and ending with "market)." | Transcription error |
| 267 | 10 – 11 | Insert single quotations around "open Web display advertising" in parentheses | Transcription error |
| 269 | 1 – 6 | Insert quotations around the quote beginning with "I" and ending with "servers." | Transcription error |
| 270 | 21 | Insert quotations around "U.S. inventory" | Transcription error |
| 277 | 9 – 14 | Insert quotations around the quote beginning with "A" and ending with "DE)." | Transcription error |
| 278 | 8 – 9 | Insert quotations around the title "Pandemic and privacy pose challenges, especially for Web publishers" | Transcription error |
| 283 | 10 | Replace "correct" with "your opinion" | Transcription error |
| 283 | 19 | Replace "alleges" with "alleged is" | Transcription error |
| 287 | 11 | Delete "And" | Transcription error |

3

| 289 | 7 | Change "market prices" to "marketplaces" | Transcription Error |
|---|---|---|---|
| 323 | 7 | Change "supercompetitive" to "supracompetitive" | Transcription Error |
| 325 | 4 | Change "substantial, sustained" to "substantial and sustained" | Transcription Error |
| 342 | 17 | Add quotation marks around "doing well" | To denote emphasis in speech |
| 343 | 10 | Add quotation marks around "doing well" | To denote emphasis in speech |
| 409 | 18 | Change "Simonsen" to "Simonson" | Transcription Error |
| 410 | 2 | Change "Simonsen" to "Simonson" | Transcription Error |
| 410 | 3 | Change "Simonsen" to "Simonson" | Transcription Error |
| 411 | 8 | Change "Simonsen" to "Simonson" | Transcription Error |
| 411 | 20 | Change "Simonsen" to "Simonson" | Transcription Error |
| 412 | 10 | Change "Simonsen" to "Simonson" | Transcription Error |
| 412 | 16 | Change "Simonsen" to "Simonson" | Transcription Error |
| 414 | 10 | Change "Simonsen" to "Simonson" | Transcription Error |
| 414 | 15 | Change "Simonsen" to "Simonson" | Transcription Error |
| 414 | 17 | Change "Simonsen" to "Simonson" | Transcription Error |
| 415 | 16 | Change "Simonsen" to "Simonson" | Transcription Error |
| 415 | 22 | Change "Simonsen" to "Simonson" | Transcription Error |
| 456 | 7 | Change "DF360" to "DV360" | Transcription Error |
| 456 | 18 | Change "DFP360" to "DV360" | Transcription Error |

Date: April 10, 2014           By: */s/ Brent K. Nakamura*

**HIGHLY CONFIDENTIAL**

**ERRATA SHEET FOR THE TRANSCRIPT OF:**

Case Name: *United States et al. v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.)

Deposition Date: March 14, 2024

Deponent: Mark Israel

**CORRECTIONS**

| Page | Line | Change | Reason |
|---|---|---|---|
| 15 | 11 | "organization   which" should be "organization—which" | Transcription error. |
| 16 | 5 | "As what is" should be "And what is" | Transcription error. |
| 16 | 14 | "characteristic of a" should be "characteristic of an" | Clarification. |
| 16 | 16 | "the price, in the textbook definition" should be "the price in the textbook definition" | Transcription error. |
| 18 | 10 | "Competition more, generally is" should be "Competition more generally is" | Transcription error. |
| 19 | 4 | "competition?" should be "competition""? (missing close quotation) | Transcription error. |
| 23 | 18 | "to the number of firms that suggests." should be "to the number of firms that suggests a healthy market." | Clarification. |
| 26 | 16 | "; some settings" should be "; in some settings" | Clarification. |
| 29 | 13 | "that generals," should be "that a general," | Clarification. |
| 39 | 8 | "For well" should be "For wel-" | Transcription error. |
| 45 | 9 | "by other firm" should be ""by other firm" (missing open quotation) | Transcription error. |
| 46 | 1 | "situation which a firm" should be "situation in which a firm" | Clarification. |
| 46 | 20 | "I mean, each" should be "I mean, for each" | Clarification. |
| 46 | 21 | "industry you want to look at and think" should be "industry you would want to look at, you want to think" | Clarification. |
| 46 | 22 | "and who" should be "and what" | Clarification. |
| 61 | 8 | "there -- there" should be "there, there" | Transcription error. |

| Page | Line | Change | Reason |
|---|---|---|---|
| 61 | 10 | "market, right." should be "market, right?" | Transcription error. |
| 61 | 12 | "can do it" should be "can do that" | Clarification. |
| 67 | 10 | "substantial sustained" should be "substantial, sustained" | Transcription error. |
| 83 | 14 | "behavior" should be "behave" | Transcription error. |
| 87 | 1 | "which I've considered" should be "I've considered" | Clarification. |
| 100 | 14 | "The report comments" should be "I don't think the report comments" | Transcription error. |
| 107 | 2 | "said they" should be "said -- they" | Transcription error. |
| 107 | 3 | "they're a" should be "there's" | Transcription error. |
| 108 | 4 | "in the body. I" should be "in the body I" (deleting the period) | Transcription error. |
| 111 | 14 | "that are allowed" should be "that allowed" | Clarification. |
| 113 | 6 | "colliloquy [sic]" should be "colloquy" | Clarification. |
| 133 | 20 | "there" should be "they" | Transcription error. |
| 135 | 12 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 136 | 1 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 136 | 5 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 136 | 10 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 137 | 16 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 137 | 22 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 138 | 17 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 138 | 22 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 144 | 15 | "publicists" should be "Publicis" | Transcription error. |
| 148 | 22 | "compete" should be "compute" | Transcription error. |
| 158 | 6 | "header biddings take away" should be "header bidding takes away" | Clarification. |
| 158 | 7 | "header biddings do" should be "header bidding does" | Clarification. |
| 159 | 20 | "include" should be "conclude" | Transcription error. |
| 162 | 9 | "Flash" should be "particular" | Transcription error. |
| 163 | 17 | "a way" should be "away" | Transcription error. |
| 166 | 10 | "prebid" should be "Prebid" | Transcription error. |
| 169 | 5 | "apologize, 241" should be "apologize, Page 241" | Clarification. |

PRIVILEGED & CONFIDENTIAL

| Page | Line | Change | Reason |
|---|---|---|---|
| 169 | 8 | "begins, For example," should be "begins with "for example,"" | Clarification. |
| 175 | 3 | "focusing them" should be "focused" | Clarification. |
| 176 | 11 | "the slide title Why" should be "the slide title "Why" (missing open quotation) | Transcription error. |
| 176 | 12 | "abandon the full stack approach?" should be "abandon the full stack approach?"" (missing close quotation) | Transcription error. |
| 178 | 5 | "Supply Side (publisher facing)" should be ""Supply Side (publisher facing)"" (missing open and close quotations) | Transcription error. |
| 182 | 2 | "vie" should be "be" | Transcription error. |
| 182 | 12 | "DSL -- like" should be "DS- -- so like" | Transcription error. |
| 182 | 21 | "Supply Side (publisher facing)" should be ""Supply Side (publisher facing)"" (missing open and close quotations) | Transcription error. |
| 188 | 14 | "substantial sustained" should be "substantial, sustained" | Transcription error. |
| 190 | 11 | "Other Factors" to ""Other Factors"" (missing open and close quotations) | Transcription error. |
| 215 | 2 | "know case" should be "know cases" | Transcription error. |
| 223 | 6 | "ad," should be "ad-" | Transcription error. |
| 224 | 1 | "Well, If people" should be "Well, if people" | Transcription error. |
| 233 | 4 | "substitution very important across" should be "substitution, very important, across" | Transcription error. |
| 234 | 18 | "that are" should be "that are," | Transcription error. |
| 244 | 3 | "you write, The bottom-line conclusion" should be "you write: "The bottom line" (missing open quotation) | Transcription error. |
| 244 | 4 | "above  regarding" should be "above—regarding" | Transcription error. |
| 244 | 6 | "multihoming," should be "multi-homing" | Transcription error. |
| 244 | 7 | "Section V.C, and others  is that Google does not" should be "(Section V.C)" and others "is that Google does not" (with additional close and open quotations) | Transcription error. |
| 244 | 8 | "markets" should be "market" | Transcription error. |
| 244 | 9 | "dangerous probability" should be ""dangerous probability"" (missing open and close | Transcription error. |

PRIVILEGED & CONFIDENTIAL

| Page | Line | Change | Reason |
|---|---|---|---|
| | | quotation) | |
| 244 | 10 | "obtaining it." should be "obtaining it."" (missing close quotation) | Transcription error. |
| 245 | 16 | "county" should be "accounting" | Transcription error. |
| 247 | 19 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 248 | 1 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 267 | 9 | "indirect Web, nonvideo display inventory" should be "indirect, web, non-video display inventory" | Transcription error. |
| 267 | 10 | "alleged open Web display" should be "alleged "open web display" (missing open quotation) | Transcription error. |
| 267 | 11 | "advertising market)" should be "advertising market)" (missing close quotation) | Transcription error. |
| 269 | 2 | "publisher ad servers" should be "publisher ad servers—" | Transcription error. |
| 269 | 4 | "Google's measured share   using" should be "Google's measured share—using" | Transcription error. |
| 279 | 15 | "answer in" should be "answer on" | Transcription error. |
| 305 | 15 | "can" should be "can-" | Transcription error. |
| 309 | 13 | "it is" should be "it is:" | Transcription error. |
| 309 | 16 | ", with citations" should be "; with citation" | Transcription error. |
| 333 | 9 | "scale -- SV" should be "scale --" | Transcription error.. |
| 339 | 14 | "is that" should be "that" | Clarification. |
| 340 | 15 | "a competitiveness" should be "the competitiveness" | Transcription error. |
| 366 | 1 | "master" should be "matter" | Transcription error. |
| 374 | 10 | "EMARKETER" should be "eMarketer" | Transcription error. |
| 378 | 11 | "test" should be "test-" | Transcription error. |
| 382 | 17 | "reports" should be "report" | Transcription error. |
| 385 | 20 | "this auto" should be "this was auto" | Clarification. |
| 389 | 10 | "Demand" should be "demand" | Transcription error. |
| 390 | 9 | "ad" should be "Ads" | Transcription error. |
| 396 | 8 | "and done you" should be "and did you" | Transcription error. |
| 400 | 17 | "Demand" should be "demand" | Transcription error. |
| 402 | 6 | "Demand" should be "demand" | Transcription error. |
| 408 | 18 | "camp" should be "camp-" | Transcription error. |

PRIVILEGED & CONFIDENTIAL

| Page | Line | Change | Reason |
| --- | --- | --- | --- |
| 417 | 22 | "make up the" should be "makeup, the" | Transcription error. |
| 418 | 1 | "the respondents looks" should be "the respondents, looks" | Transcription error |
| 420 | 8 | "Demand" should be "demand" | Transcription error. |
| 446 | 13 | "features   including" should be "features—including" | Transcription error. |
| 446 | 14 | "auctions   into" should be "auctions—into" | Transcription error. |
| 453 | 4 | "DFP -- DSPs" should be "DSPs" | Clarification. |
| 453 | 9 | "mil" should be "mille" | Transcription error. |
| 453 | 11 | "rate.  So" should be "rate, so" | Transcription error. |
| 456 | 7 | "DF360" should be "DV360" | Transcription error. |
| 456 | 18 | "DFP360" should be "DV360" | Transcription error. |
| 456 | 21 | "advertising Google Ads" should be "advertising, Google Ads" | Transcription error. |
| 468 | 17 | "ads clients (e.g., agency" should be "Ads clients (e.g., Agency" | Transcription error. |
| 468 | 18 | "direct advertiser" should be "Direct Advertiser" | Transcription error. |
| 469 | 1 | "ads" should be "Ads" | Transcription error. |
| 470 | 22 | "ads" should be "Ads" | Transcription error. |
| 477 | 12 | "a ad server" should be "an ad server" | Clarification. |
| 482 | 13 | "Demand" should be "demand" | Transcription error. |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefor.

Date: 4/10/2024                              Signature: Mark a. Ll