# Exhibit M

*Previously filed as Dkt. 718-2)*

## In the Matter Of:

*UNITED STATES OF AMERICA v*

*GOOGLE, LLC*

---

*ITAMAR SIMONSON, PH.D.*

*February 28, 2024*

---



| | Page 114 |
|---|---|

1    Q.    That's all you can think of
2  right now?
3    A.    Yes.
4    Q.    In the prior instances,
5  understanding they've been limited, in
6  which you have conducted preliminary
7  interviews, how many preliminary
8  interviews do you typically conduct?
9    A.    As I said, I can't think of
10 the last time I did that.  And I assume
11 we are talking about litigation,
12 litigation surveys.  Or are you including
13 academic?
14   Q.    Including academic surveys
15 as well.
16   A.    So in the case of academic,
17 let's say I usually worked with doctoral
18 students.  And I would say, why don't you
19 talk to some of your friends, fellow
20 doctoral students, and run the
21 questionnaire by -- by them and try to
22 get their, you know, feedback.
23         So that would be an example
24 that happened, I would say, quite a few

| | Page 115 |
|---|---|

1  times.
2    Q.    And is it important that the
3  participants in the preliminary interview
4  process be representative in any way of
5  the larger sample?
6    A.    No.
7    Q.    Why not?
8    A.    They just -- I mean, we talk
9  about a really small sample.  So you
10 could not draw any statistical
11 conclusions based on those few
12 qualitative initial interviews.
13   Q.    Now, you indicated in your
14 report that you used the feedback and the
15 responses of the interview participants
16 to inform the development of the survey
17 questions, correct?
18   A.    Yeah.  Combined with my
19 judgment.
20   Q.    Okay.  When were these
21 preliminary interviews conducted?
22   A.    Well, I forget.  Perhaps
23 August of 2023.
24   Q.    And before the preliminary

| | Page 116 |
|---|---|

1  interviews were conducted, had you
2  planned to conduct three separate
3  surveys: high-spend, low-spend, and ad
4  agencies?
5    A.    I don't recall exactly the
6  timing of that decision.
7          As I said, I did have some
8  concerns, because I recognize it would
9  be, as much as possible, important to --
10 to tailor the survey to the respondent
11 and respondent's knowledge.  And, yeah,
12 in that regard, that was, yeah, something
13 that was on my mind.
14         And the size of the
15 advertiser, obviously, we have a
16 distinction between advertiser agency.  I
17 thought agencies may have somewhat
18 different perspective.  It turns out the
19 differences were generally small.
20         But these were just thoughts
21 that I had.  I said that I wanted to make
22 sure that I don't limit the survey to,
23 let's say, very large advertisers.
24   Q.    Did you have a preliminary

| | Page 117 |
|---|---|

1  survey draft before the preliminary
2  interviews were conducted?
3    A.    I don't -- I don't think so.
4          I mean, there might have
5  been.  Again, I don't recall exactly.
6  There might have been.  I had very
7  initial draft -- but I think I did not.
8  But I'm not sure.
9    Q.    And who drafted the
10 preliminary interview guide?
11   A.    I think it was a
12 collaborative effort between me and the
13 support team at Analysis Group.
14   Q.    Did anyone from AP -- I'm
15 going to refer to Advertiser Perceptions
16 as AP in this deposition; is that okay?
17   A.    Sure.
18   Q.    Did anyone from AP provide
19 any input on the substance of the
20 preliminary interview guide?
21   A.    As far as I recall, the
22 answer is no.
23   Q.    Now, you indicate in your
24 report that there were 14 preliminary

Case 1:23-cv-00108-LMB-JFA   Document 1097-1   Filed 08/01/24   Page 4 of 26 PageID# 83105
UNITED STATES OF AMERICA v.
GOOGLE, LLC
Highly Confidential
James Brock, Ph.D.
February 28, 2024

**Page 118**

1  interviews conducted; is that right?
2       A.    Yes.
3       Q.    And were those conducted
4  individually?
5       A.    Yes.
6       Q.    And how were those
7  interviews conducted?
8       A.    Well, an appointment was --
9  how do you say -- was set.  And when the
10 time came, I was on the line, and one of
11 the team members at Analysis Group
12 contacted -- I believe contacted or went
13 to the site.  It was a phone interview,
14 but I forget exactly how it came about.
15       But at some point I do
16 recall the interviewer saying, is the
17 respondent on the line, or something like
18 that.  So it must have been some -- one
19 of those services.  And at some point the
20 respondent said, yeah, I'm on the line.
21 And I said, thank you for being here.
22 And the questions started.
23       Q.    And so all 14 of the
24 interviews were conducted over the

**Page 119**

1  telephone?
2       A.    As far as I recall, yes.
3       Q.    And there was no video
4  participation?
5       A.    I believe that's correct.
6       Q.    And other than you, who else
7  listened to the 14 interviews at the time
8  they were conducted?
9       A.    I'm not sure.  There might
10 have been other people or one person at
11 Analysis Group -- I'm not sure, exactly.
12       Obviously, the person who
13 was the interviewer was there, but it's
14 quite possible that one or two other
15 people from AG were listening as well.
16       Q.    And AG refers to Analysis
17 Group?
18       A.    Yes.
19       Q.    Who was the interview?  Was
20 it the same interview for each of the
21 14 interviews?
22       A.    There were two interviewers.
23 I don't know if -- you want their names?
24       Q.    Yes.

**Page 120**

1       A.    So one of them is Kate
2  Schofield.  The other person's name is
3  Greg Weiss.
4       Q.    W-E-I-S-S?
5       A.    Yes.
6       Q.    And who -- for whom does
7  Kate Schofield work?
8       A.    They are both at Analysis
9  Group.
10       Q.    Did they each conduct seven,
11 or how did they divide them up?
12       A.    I don't remember exactly.
13 Each conducted several interviews.  I
14 don't remember the exact distribution.
15       Q.    And those two individuals
16 were responsible, together, for
17 conducting all 14?
18       A.    Yes.
19       Q.    And you listened to all 14?
20       A.    Yes.
21       Q.    And you listened to all 14
22 as they were occurring?
23       A.    Yes.
24       Q.    Were the preliminary

**Page 121**

1  interview respondents given any questions
2  in writing?
3       A.    I don't -- I don't think so.
4       Q.    And did the preliminary
5  interview respondents provide any written
6  answers?
7       A.    I don't think so, no.
8       Q.    And were the answers that
9  were given by the preliminary interview
10 subjects recorded in any way?
11       A.    No, at least not to my
12 knowledge.
13       Q.    Why not?
14       A.    As I said, I -- I listened
15 to them, and the -- the interviewer
16 listened to them, so I saw no need to
17 record them.
18       Q.    Did you take any notes at
19 all?
20       A.    I did not.
21       Q.    Did the interviewer take any
22 notes at all?
23       A.    Not to my knowledge.
24       Q.    Did the -- anyone else at

Page 122

1   Analysis Group take any notes in any way
2   of the calls?
3       A.    Not that I'm aware.
4       Q.    Were the subjects told that
5   you were listening in?
6       A.    I don't recall.
7       Q.    Did you introduce yourself?
8       A.    I did not.
9       Q.    And were the interviews
10  recorded in any way?
11      A.    You just asked me that, and
12  I think I said --
13      Q.    I mean by, like, an audio
14  device.
15      A.    As far as I know, the answer
16  is no.
17      Q.    Do you know whether any
18  attorneys for Google were present during
19  the interviews?
20      A.    Not that -- I don't think
21  so.  I'm certainly not aware of that.
22      Q.    Do you know whether any
23  Google employees were present during any
24  of the interviews?

Page 123

1       A.    Same answer.  I don't think
2   so.
3       Q.    Were any employees of
4   Advertiser Perceptions present during the
5   interviews?
6       A.    I don't think so.
7       Q.    Did Ms. Schofield or
8   Ms. Weiss know any of the respondents who
9   participated in the preliminary
10  interviews, to your knowledge?
11      A.    No.
12      Q.    And were the interviewees
13  told that other people were listening to
14  the conversation?
15      A.    As I said, I don't recall.
16      Q.    Did you produce any writing
17  after the interviews took place,
18  summarizing your thoughts and ideas about
19  the interviews?
20      A.    No.
21      Q.    Are you aware of anyone else
22  doing so?
23      A.    Not that I recall.  I mean,
24  it's possible.  I mean, we -- I did have

Page 124

1   or still do have -- or maybe I shouldn't
2   go into my working with Analysis Group.
3           But I do talk to them quite
4   often, such as once a week.  And it's
5   quite possible that we discussed those
6   interviews.
7           MS. DEARBORN:  And --
8   BY MS. WOOD:
9       Q.    You don't have to disclose
10  anything about your communications with
11  Analysis Group.
12          MS. DEARBORN:  Thank you.
13  BY MS. WOOD:
14      Q.    My question really relates
15  to written summaries of those interviews.
16  Did those exist, to your knowledge?
17      A.    No.  At least, yeah, to my
18  knowledge, no.
19      Q.    And how was it determined
20  that 14 interviews would be conducted?
21      A.    I don't think that we
22  started by saying, let's have 14.
23          I think I just wanted to get
24  a feel, as I explained, for the kind of

Page 125

1   respondent that we will get.  Just listen
2   to the way they talk about their work and
3   advertising.  That was about it.
4           So, you know, I'm not sure
5   that I set out to have 14 interviews
6   exactly.  I just -- they -- as I said,
7   those qualitative interviews had a very
8   limited role, did not provide the
9   basis -- I mean, with those couple of
10  exceptions where they provided --
11  provided one input.
12          But they did not have any
13  specific purpose with respect to -- to
14  building the questionnaire.  It was a
15  very limited part of this survey, the
16  ultimate survey, I should say.
17      Q.    You said you didn't have the
18  objective to interview 14.  What was your
19  objective in terms of the number of
20  preliminary interviews you wanted to
21  have?
22      A.    I -- I don't recall having a
23  specific number in mind.  A few.
24      Q.    Well, how did the number end

Page 126

1   up 14?
2        A.   Things happen.  I don't
3   know.  I think I felt that no additional
4   information would be gained by conducting
5   more such interviews.
6        Q.   So you didn't set out in
7   advance to interview a set number of
8   participants?
9        A.   Not -- not a specific
10  number, right.
11       Q.   And how were the interview
12  respondents chosen?
13       A.   I assume randomly.  I mean,
14  they were just names that appear --
15       Q.   You say you assume randomly.
16  Do you know how they were chosen?
17       A.   No, there was no -- there
18  was no given number.  They were not
19  supposed to be -- it wasn't important
20  whether they are random or not random.  I
21  wanted to have advertisers, some large,
22  some small, and some agencies.  That's
23  about it.  And Advertiser Perceptions has
24  a large panel, and those names happened

Page 127

1   to be selected from that panel.
2        Q.   How did they happen to be
3   selected?
4        A.   These are just names that
5   were provided by AP to Analysis Group,
6   and they were interviewed.
7        Q.   Do you know how AP selected
8   the names?
9        A.   In that case, I don't.  Nor
10  was it important for me.  Because, again,
11  I did not rely on those interviews for
12  any statistical conclusions or otherwise.
13       Q.   Did you ask AP how they
14  selected them?
15       A.   I don't think so, no.  As I
16  said, it was just not important for that
17  limited purpose of those qualitative
18  interviews.
19       Q.   And so to you, it didn't
20  matter whether AP selected the
21  respondents randomly or by design to meet
22  some certain predetermined criteria that
23  AP had in mind?
24            MS. DEARBORN:  Objection to

Page 128

1        form.
2            THE WITNESS:  As far as the
3   qualitative interviews are
4   concerned, I'd say that that is
5   -- I don't see what -- what else
6   is there.  They just pick a few
7   names.
8            But it did not make any
9   difference because of the limited
10  purpose of those qualitative
11  interviews.
12           And I don't know exactly --
13  yeah.  So let me stop there.
14           It's just people to talk
15  to.  Some are large advertisers.
16  Some are small.  Some are
17  agencies.
18  BY MS. WOOD:
19       Q.   What were the range of
20  spending levels of the interview
21  participants?
22       A.   I don't recall, as I said.
23  Some were over half a million.  Some were
24  under half a million.  And some were

Page 129

1   agencies.
2        Q.   And how many were over half
3   a million?
4        A.   It was maybe five.  I just
5   don't remember.
6        Q.   Was it five, or you don't
7   recall?
8        A.   I don't know if it was five
9   or four.
10       Q.   Okay.  It was either four or
11  five?
12       A.   Right.
13       Q.   And how many were under
14  $500,000 in spend?
15       A.   Same answer.
16       Q.   You don't recall, but it was
17  either four or five?
18       A.   Right.
19       Q.   And how many were agency
20  interview participants?
21       A.   Either four or five.
22       Q.   And you don't recall?
23       A.   Right.  I mean, we can --
24  perhaps it was listed.

Page 130

1    I think the -- I mean, I do
2  know that the report list, it said that X
3  interviews, qualitative interviews, were
4  conducted.
5        Q.    It says 14 were conducted.
6  It doesn't indicate what the --
7        A.    It doesn't indicate.  Okay.
8  So maybe I misremembered.
9        Q.    -- it doesn't break it down,
10  correct?
11        A.    It was -- I do know that
12  of -- out of the three groups, two had
13  five respondents and one had four.
14        Q.    And you don't know which
15  respondent group had less than the other
16  two?
17        A.    That's correct.
18        Q.    Okay.  Did you intend to
19  have the same number of interview
20  participants from each category?
21        A.    Approximately.
22        Q.    And why was -- why were you
23  unable to do that?
24            MS. DEARBORN:  Objection to

Page 131

1      form.
2            THE WITNESS:  I didn't -- I
3      didn't -- as I've explained now a
4      couple of times, given the
5      limited role of the qualitative
6      interviews, it made no
7      difference.
8            And at some point I felt
9      like, okay, everything that I
10      could conceivably get from those
11      qualitative interviews, I did.
12      There was no need to conduct
13      more.
14  BY MS. WOOD:
15        Q.    And you didn't intend that
16  the preliminary interviews be conducted
17  from a representative sample?
18        A.    That's correct.
19        Q.    And did you intend for the
20  preliminary interviews to include a
21  representative sample of job titles or
22  responsibilities?
23        A.    No.
24        Q.    Were interview participants

Page 132

1  excluded based on the no-contact list
2  that you've provided in Appendix I to
3  your report?
4        A.    You're talking about
5  qualitative interviews?
6        Q.    For the preliminary
7  interviews we've been talking about, the
8  14 preliminary interviews, did that
9  exclude companies and individuals listed
10  in the no-contact list, which is in
11  Appendix I to your report?
12        A.    Correct.
13        Q.    And do you know what
14  percentage of the ad pros panel was
15  excluded due to the participant being on
16  the no-contact list?
17        A.    I think the number, if I
18  recall correctly, might have been
19  something in the neighborhood of 400.
20            I mean, the total list is
21  580, but it includes publishers and some
22  other non-advertiser categories.  So I
23  think it ended up being somewhere in the
24  neighborhood of 400.

Page 133

1        Q.    But for the preliminary
2  interview participants, they were all
3  taken from Ad Perceptions ad pros panel,
4  correct?
5        A.    Again, but those that were
6  excluded were -- were excluded for --
7  also for the qualitative interviews.
8        Q.    Understood.
9            Let me just -- let me
10  focus -- if you could just focus on my
11  question, I promise I'm going to get to
12  that point.
13            I just want to know, in the
14  beginning, isn't it true for the
15  14 preliminary interviews that were
16  conducted, they were all taken from
17  Advertiser Perceptions ad pros panel; is
18  that right?
19        A.    Yes.
20        Q.    Okay.  And do you know, of
21  the members of Ad Perceptions ad pros
22  panel, how -- what percentage were
23  excluded due to the no-contact list?
24        A.    So I just gave you the

**Page 134**

1  number.
2        I forget the total number of
3  members they have on that panel, but I
4  said it's somewhere in the neighborhood
5  of 400.
6        Q.   The number of -- of members
7  of ad pros panel is 400?
8        A.   No.  The number that were
9  excluded because of the -- what did you
10 refer to it -- no-call list is
11 approximately 400.
12       Q.   And were all 400 of the
13 individuals on the no-contact list
14 already prior members of the ad pros
15 panel?
16       A.   I think so.  You know, I'm
17 not sure about every single one.  I would
18 assume that most of them are.
19       Q.   How many members of the ad
20 pros panel are there?
21       A.   I -- right now, I don't
22 recall the total number.  It's probably
23 changing daily.  But I don't remember the
24 exact number.

**Page 135**

1        Q.   Are we talking about
2  hundreds, thousands?
3        A.   I think thousands.
4        Q.   Okay.  And of the thousands
5  that are on that list, approximately 400
6  were excluded because they were on the
7  no-contact list; is that right?
8        A.   Right.
9        Q.   And the 400 on the
10 no-contact list, that includes company
11 names, correct?
12       A.   As opposed to what?
13       Q.   Individual names.
14       A.   Yeah.  Company names, yes.
15       Q.   So do you know whether the
16 add pros list, when you said that you
17 thought the ad pros list was somewhere in
18 the thousands, is the ad pros list a list
19 of individuals or company names?
20       A.   You know, I forget.  But I
21 think there are thousands of companies.
22       Q.   Companies?
23       A.   Companies.
24       Q.   And of those thousands of

**Page 136**

1  companies, 400 companies or individuals
2  were excluded; is that right?
3             MS. DEARBORN:  Objection to
4        form.
5             THE WITNESS:  Yeah.
6        Something like that.  I mean,
7        approximately, yes.
8  BY MS. WOOD:
9        Q.   And am I right that if a
10 company name was on the no-contact list,
11 no individual from that company was
12 allowed to participate, correct?
13       A.   That's correct.
14       Q.   But you don't know the
15 percentage of the ad pro panel that was
16 excluded due to the no-contact list?
17       A.   I don't remember.
18       Q.   Do you have that information
19 anywhere, preserved?
20       A.   I don't think so.
21       Q.   When you say you don't think
22 so, is it possible you have it preserved
23 somewhere?
24       A.   No.

**Page 137**

1        I mean, I don't know.  I
2  hesitate to say no.  I'm sure it's
3  something that could be easily
4  determined, but sitting here now, I don't
5  recall seeing such a number.
6        Q.   How would you go about
7  determining it?
8        A.   Well, I visited AP website a
9  number of times, and I don't recall right
10 now if they state the exact number of
11 members they have.  I'm sure that could
12 help.
13       Q.   Do you remember the names of
14 the ad agencies that were -- participated
15 in the preliminary interview?
16       A.   I do not.
17       Q.   You don't remember any of
18 their names?
19       A.   I do not.  I'm trying to
20 think if I ever knew.  I don't know.  I'm
21 not sure.  I don't recall knowing their
22 names.
23       Q.   Were there names recorded
24 somewhere?

1      A.    I'm not aware of that.
2      Q.    You don't think there's any
3  recording anywhere of what ad agencies
4  were participants in your 14 preliminary
5  interviews?
6      A.    I don't recall receiving it.
7      I don't want to speculate
8  about their names being -- being
9  available somewhere.
10     Q.    Well, did you ask either
11 Analysis Group or AP to maintain a record
12 of who was, in fact, interviewed as part
13 of this process?
14     A.    No.
15     Q.    Why not?
16     A.    It was not important at all.
17     As I explained, the purpose
18 of those qualitative interviews were --
19 was very limited, and it would have made
20 no difference if the agency is X or Y.
21     Q.    Didn't you ask that the
22 respondents who participated in the
23 preliminary interview not be invited to
24 participate in the subsequent surveys?

1      A.    Yes.
2      Q.    So how could you ensure that
3  they were eliminated from subsequent
4  surveys if there was no record kept of
5  who they were?
6      A.    AP, I assume, knew who was
7  interviewed.
8      Q.    Okay.  So AP had a record of
9  who was interviewed.
10     A.    Oh, yeah.  Yes.  Okay.
11     I assume that AP did -- I
12 mean, AP gave the names, and they knew
13 who was interviewed, and they could make
14 sure that the same people would not be
15 invited later.
16     Q.    Okay.  So AP has a list of
17 who -- who the 14 interview participants
18 were?
19     MS. DEARBORN:  Objection to
20     form.
21     THE WITNESS:  I believe so,
22     yes.
23 BY MS. WOOD:
24     Q.    And to your knowledge, were

1  the individuals who participated in the
2  preliminary interviews excluded from the
3  survey?
4      A.    To my knowledge, yes.
5      Q.    And to your knowledge,
6  were -- for the individuals who
7  participated in the preliminary
8  interviews, were their respective
9  companies excluded from the survey or
10 only the individual?
11     A.    I mean, right now, sitting
12 here now, I don't remember the answer.
13     It may be another business
14 unit from the same company might have
15 been interviewed.  But, actually, I
16 should not speculate about it.  I'm not
17 sure.
18     Q.    What were your instructions?
19     A.    I don't recall giving
20 specific instructions on that issue.
21     Q.    Do you recall the company
22 names of any of the individuals who were
23 interviewed as part of the 14 preliminary
24 interviews?

1      A.    No.
2      Q.    You don't recall a single
3  company name?
4      MS. DEARBORN:  Objection.
5      THE WITNESS:  I don't -- if
6      I'm not wrong, I never knew their
7      names in the first place.
8  BY MS. WOOD:
9      Q.    What were the gender of the
10 participants in the interview?
11     A.    I think there are two
12 primary genders.  So I'm -- what do you
13 mean by what were the genders?
14     Q.    What was the gender
15 distribution of the interview
16 participants?
17     A.    Didn't kept track of that.
18 It made no difference whatsoever.  They
19 were whatever they were.
20     Q.    Did you speak to any women?
21     A.    I did not speak to anyone.
22     Q.    Did you hear a conversation
23 involving a woman interview participant?
24     A.    I'm pretty sure that the

Page 150

1  memories?
2        A.    As I said, nothing comes to
3  mind, but it's quite possible I did.
4        Q.    Okay.  Do you think it's
5  important for a preliminary interview to
6  be capable of evaluation?
7        A.    Could you repeat that.
8        Q.    Do you think it's important
9  for a preliminary interview to be capable
10 of evaluation?
11             MS. DEARBORN:  Form.
12             THE WITNESS:  As I said, I
13        typically don't -- don't conduct
14        preliminary interviews.
15             You know, sometimes, I
16        think it may be good for the
17        doctoral student to conduct them,
18        and maybe that would give that
19        student an idea.
20             But -- so -- so I don't
21        have such rules about the impact
22        or the use of preliminary
23        interviews for evaluation,
24        whatever you mean by evaluation.

Page 151

1  BY MS. WOOD:
2        Q.    When preliminary interviews
3  are used to shape a survey, do you think
4  it's important for the preliminary
5  interviews to be capable of evaluation?
6             MS. DEARBORN:  Form.
7             THE WITNESS:  What do you
8        mean by -- can you define
9        evaluation?
10 BY MS. WOOD:
11       Q.    Evaluation by others.
12             MS. DEARBORN:  Same
13        objection.
14             THE WITNESS:  Evaluation --
15        absolutely not.  I mean, it
16        depends.  Again, it's such a
17        generic question --
18 BY MS. WOOD:
19       Q.    Well, is your answer
20 "absolutely not" or "it depends"?
21             MS. DEARBORN:  Counsel,
22        please let the witness finish his
23        answer.  This is the third time
24        you've interrupted him.  Please

Page 152

1        let him finish his answers.
2             THE WITNESS:  It's such a
3        generic question.  Maybe there
4        are conceivable situations.
5             Let's say my students
6        conduct, as part of their class
7        assignment, they conduct such
8        interviews, and they think it's
9        important with me to share -- to
10       share with me, I should say, then
11       maybe they should present it in a
12       way that I can evaluate whatever
13       they are studying.
14             So it really depends.  But,
15       I mean, the term "evaluation" is
16       so generic.  It could mean all
17       kinds of things.
18             So I'm not sure how to --
19       how you want to -- how you want
20       me to interpret it.
21 BY MS. WOOD:
22       Q.    Was the preliminary
23 interview guide which appears at
24 Appendix D to your report intended to be

Page 153

1  read verbatim to the participants?
2             MS. DEARBORN:  Objection to
3        form.
4             Go ahead.
5             THE WITNESS:  As I said, it
6        was unstructured.
7             As I also said, not all of
8        the listed questions were asked.
9        And some other questions were
10       asked, depending on how the
11       interview evolved.
12 BY MS. WOOD:
13       Q.    My question was your intent.
14             Was the preliminary
15 interview guide intended to be read
16 verbatim to the participants?
17       A.    No.
18             MS. DEARBORN:  Objection.
19             Give me a minute to get an
20        objection in.
21             THE WITNESS:  I apologize.
22             MS. DEARBORN:  Objection to
23        form.  Asked and answered.
24 BY MS. WOOD:

| Page 154 | Page 156 |
|---|---|

**Page 154**

1   Q.   And who made the decision to
2   tell the participants at the outset of
3   the preliminary interview that the
4   interview was being conducted on Google's
5   behalf?
6   A.   I think that -- that --
7   something that the AG people and I
8   decided to do.
9        It's possible, I don't have
10  a specific recollection, that it also
11  involved a discussion with an attorney.
12       MS. DEARBORN:  And as
13       usual, please exclude from all of
14       your answers, discussions with
15       attorneys.
16       Thank you.
17  BY MS. WOOD:
18  Q.   I'm not asking about any of
19  the discussions you had with your counsel
20  or counsel for Google.
21       I do want to know, yes or
22  no, whether you made the decision as
23  opposed to someone else making the
24  decision.

**Page 155**

1   A.   No, I -- I did not make the
2   decision on my own.  It was, I'd say, in
3   consultation with AG and one or more
4   attorney, I think.
5   Q.   Attorneys from where?
6   A.   Who represent Google.
7   Q.   Attorneys from what --
8   from -- attorney -- inhouse counsel at
9   Google or outside counsel to Google?
10  A.   No.  I'm just talking about
11  outside counsel.
12  Q.   Outside counsel from what
13  firm?
14  A.   I do not -- do not recall.
15  Q.   So outside counsel for
16  Google were involved in discussions about
17  whether to disclose to interview
18  participants at the outset of the
19  interview that the interview was being
20  conducted on Google's behalf; is that
21  correct?
22       MS. DEARBORN:  You can --
23       you can answer that yes or no.
24       But please do not reveal the

**Page 156**

1        substance of any communications
2        with counsel.
3        THE WITNESS:  I don't have
4        a specific recollection.  But if
5        you ask me to try to answer as to
6        the best of my ability, I think,
7        yeah, that -- that did happen
8        before those preliminary
9        interviews were conducted.
10  BY MS. WOOD:
11  Q.   And what was the purpose of
12  telling interview participants at the
13  outset that the interview was being
14  conducted on Google's behalf?
15  A.   So -- so, again, I don't
16  want to reveal discussions with
17  attorneys.  But -- and you know that in
18  the actual surveys, such information was
19  provided at the very end.
20       Now, the qualitative
21  interviews, as I said, lasted about an
22  hour.  And it's kind of conversational,
23  with -- you know, you say the interview
24  is saying something -- the interviewee is

**Page 157**

1   saying something, and then the
2   interviewer follows up with that.  Say,
3   oh, you just said X.
4        Even though the follow-up is
5   not among the questions in this
6   questionnaire, but they would follow up.
7        And it seemed, in that
8   context, when you have an hour discussion
9   with someone, to say, oh, thank you for
10  your time.  By the way, this -- this
11  survey is -- was done on behalf of Google
12  and in connection with antitrust
13  litigation.
14       That seemed sort of unfair,
15  in my judgment, unfair to the respondent,
16  because they just, you know, spent a lot
17  of time.  And I'm not sure how I would
18  feel if I were the respondent.
19       And for whatever reason,
20  that's -- even though I'm assured of
21  confidentiality, if someone said, well,
22  you know, you just spent an hour, you
23  should know what your surveys are used
24  for, or -- in what context they are -- I

Page 158

1  felt that made me uncomfortable.
2          And for those interviews,
3  given their very limited purpose, I felt
4  it was fine.
5          And especially -- and I
6  should emphasize, if you look at the
7  questions, they never asked -- it's not a
8  user satisfaction survey.  There was
9  no -- there were no questions about how
10 much do you like Google as opposed to
11 someone else.  So, therefore, I couldn't
12 think of any bias that could have been
13 created.
14         But in any case, given the
15 nature of those preliminary interviews, I
16 thought it would be fair to tell them
17 upfront.  If they were not interested,
18 that would be fine.
19      Q.    Were each of the
20 14 interview participants instructed that
21 the interview was being conducted on
22 Google's behalf?
23      A.      They received information
24 that appeared at the introduction to the

Page 159

1  survey that you see in the exhibit.
2      Q.      So that part was read
3  verbatim?
4      A.      Yes.
5      Q.      To each of the
6  14 participants?
7      A.      Correct.
8      Q.      And based on that disclosure
9  at the outset of the preliminary
10 interview, did any of the interview
11 participants decline to participant?
12     A.      Not that I recall.  I don't
13 think so.
14     Q.      Is that something you would
15 recall?
16     A.      I think I would, but one
17 never knows.  But I think I would.
18     Q.      What was the purpose of
19 telling interview participants at the
20 outset, not only that the interview was
21 on Google's behalf, but also that it was
22 in connection with pending antitrust
23 lawsuits in which the plaintiffs allege
24 that Google engaged in anti-competitive

Page 160

1  conduct related to digital advertising?
2          MS. DEARBORN:  Form.
3          THE WITNESS:  Just -- I
4      don't know if you call it full
5      disclosure.  It's probably not
6      full.  But it's a pretty
7      extensive disclosure.
8          And the decision was made
9      that that's information that
10     should be shared with those
11     respondents.
12 BY MS. WOOD:
13     Q.    Did you do any analysis of
14 how that disclosure might impact the
15 results of the preliminary interviews?
16     A.    Yes.
17     Q.    And what was your analysis?
18     A.    As I just said, I concluded
19 that there was no reason that this
20 disclosure would affect any of the
21 answers.
22         Again, this was not one of
23 those surveys where you are opining on
24 this company or that company, which may

Page 161

1  create some sort of bias, or impression
2  management, as it's sometimes referred
3  to.
4      Q.    But you did no A/B testing
5  to determine whether the results were
6  different in groups who didn't have that
7  disclosure versus results in groups that
8  did have that disclosure, correct?
9      A.    That's correct.  Obviously,
10 there were 14 respondents.  It would not
11 be meaningful to do A/B testing.
12         And, again, there was a
13 limited purpose to those interviews, as I
14 already explained a few times.  And,
15 consequently, it really didn't matter
16 much.
17     Q.    Were any of the preliminary
18 interviews terminated prior to
19 completion?
20     A.    I don't think so.
21     Q.    Did you or Analysis Group
22 attempt any interviews other than the 14
23 that were ultimately conducted?
24     A.    Not that I'm aware.

| Page 162 | Page 164 |
|---|---|

**Page 162**

1     Q.   At the beginning of the
2 preliminary interview guide, it asks if
3 the participant has any questions before
4 the interviewer is to continue.
5       Do you recall whether any of
6 the interview participants asked any
7 questions at that point?
8     A.   I don't recall that they
9 did, but it's not inconceivable. I just
10 don't recall any questions.
11     Q.   Do you recall whether any of
12 the interview participants asked
13 questions about Google's sponsorship
14 and/or the litigation involving Google?
15     A.   I do not recall, no.
16     Q.   You don't recall that one
17 way or the other?
18     A.   I just don't recall any
19 question being asked.
20     Q.   But you don't deny there
21 might have been questions asked?
22       MS. DEARBORN: Objection to
23     form.
24       THE WITNESS: You cannot

**Page 163**

1 deny something that you're not
2 aware of.
3     I was there. I listened to
4 the interviews. I don't remember
5 any questions.
6 BY MS. WOOD:
7     Q.   But it's possible that you
8 forgot?
9     A.   We -- yeah. We are all
10 human, and we are capable of forgetting.
11     Q.   In the introduction to the
12 preliminary interview guide, it states,
13 "Based on our research, we understand
14 that your company is not a participant in
15 those lawsuits."
16     What did you mean by "a
17 participant in those lawsuits"?
18     A.   Well, that was a way of
19 saying -- I mean, I didn't want to kind
20 of get into, well, you should know that
21 those who got, say, a subpoena or -- et
22 cetera. It was determined that they
23 should not participate in the survey.
24     So that was a succinct way

**Page 164**

1 of telling them, your company is not
2 involved, so that respondents don't feel
3 like maybe they are inadvertently saying
4 something that may come to -- or that may
5 be used against their own company.
6     Q.   What was your basis for
7 suggesting that the participant's company
8 was not involved?
9     A.   There was a list of
10 companies that we talked about, and
11 they -- those who were included in the
12 preliminary interviews were not on that
13 list.
14     Q.   And that list is Appendix I
15 of your -- to your report, correct?
16     A.   Yes, I believe so.
17     Q.   And Appendix I is dated as
18 of August 15, 2023.
19     Do you see that?
20     A.   Let's see. Let me find
21 that.
22     MS. DEARBORN: Counsel, if
23     you'd like me to help the
24     witness -- he found it.

**Page 165**

1     THE WITNESS: I found the
2     appendix. Yeah.
3     Let's see. Okay.
4 BY MS. WOOD:
5     Q.   Were -- were there other
6 iterations of the no-contact list other
7 than this one that is as of August 15,
8 2023?
9     A.   I'm not aware of any other
10 list.
11     Q.   Were any interviews of any
12 kind conducted prior to August 15, 2023?
13     A.   I don't think so.
14     Q.   You indicated in your
15 report, at Paragraph 34, that these
16 people that appear on -- in Appendix I,
17 the no-contact list, were excluded at the
18 direction of counsel.
19     A.   Right.
20     Q.   Is that correct?
21     A.   Yes.
22     Q.   Was the intent, to your
23 understanding, to exclude individuals or
24 entities that might have a stake in

Page 242

1    unclear.
2               You didn't provide that
3    instruction, though, right?
4         A.    Again, that would have been
5    a mistake.
6               I actually did -- did
7    research on exactly that sort of issue,
8    where, for example, in one study, there
9    is some respondents -- some participants
10   who entered a supermarket.  And I told
11   them, when you -- after you shop at a
12   supermarket, I'm going to interview you
13   when you walk out of the supermarket and
14   ask you about your experience.
15              Other shoppers entered the
16   store and were not told that,
17   subsequently, they would be asked to
18   evaluate their experience.
19              And what we found, very
20   robust result, is that people who knew in
21   advance that they would be interviewed
22   about their experience were significantly
23   more negative in their evaluations,
24   because they figured out that they need

Page 243

1    to say something constructive.  And while
2    they are shopping, they're just
3    collecting evidence so that they'll have
4    something to say when they walk out of
5    the supermarket.
6               And I think there is
7    something like that here.  If you keep
8    asking, was there anything unclear in
9    what I just asked you.  Okay, nothing.
10   Then you know the next -- for the next
11   question you will be asked something
12   similar.  And now they are looking for
13   something to say.
14        Q.    Well, here, you told the
15   pretest recipients that you would be
16   asking them questions at the end,
17   correct?
18        A.    Yes.
19        Q.    How many of the pretest
20   participants agreed to have their data
21   used once they learned the purpose of the
22   survey?
23        A.    I don't -- I don't recall.
24        Q.    Did any of them?

Page 244

1         A.    Did any of them what?
2         Q.    Elect to have their data
3    excluded.
4         A.    I don't recall that.
5         Q.    Did you ask that question?
6         A.    Just sitting here now, I do
7    not recall.
8         Q.    Question 5 of the pretest
9    follow-up questions asked, "What do you
10   think might be the purpose for conducting
11   this survey?"
12              What answers were received
13   in response to that question?
14        A.    The only thing I generally
15   recall is that no one came up with,
16   quote-unquote, right answer.
17        Q.    What was the right answer?
18        A.    Right answer?  It's -- I'm
19   trying to think what would be the right
20   answer here.  That I was asked -- I mean,
21   I don't know.  I don't want to construct
22   a right answer.
23              But I don't think this --
24   the answers to this question provided

Page 245

1    useful information.  But that's what I
2    vaguely recall.
3         Q.    Were the answers to the
4    pretest follow-up questions recorded in
5    any way?
6         A.    Not that I'm aware.
7         Q.    Based on the pretest, the
8    survey respondents understood the meaning
9    of display advertising; is that correct?
10              MS. DEARBORN:  Form.
11              THE WITNESS:  Where are you
12        reading from?
13   BY MS. WOOD:
14        Q.    I'm asking the question.
15              Based on the pretesting that
16   was done, is it your belief that the
17   survey respondents understood the meaning
18   of the term "display advertising"?
19              MS. DEARBORN:  Form.
20              THE WITNESS:  I believe so.
21              As you know, in the actual
22        survey, the term "display
23        advertising" was defined very
24        clearly in the screener of the

**Page 246**

1    questionnaire.
2  BY MS. WOOD:
3       Q.   And based on the pretest,
4  you believe that understanding was clear
5  to the survey respondents?
6       A.   Yes.
7       Q.   But you didn't record those
8  responses anywhere?
9       A.   Right.
10      Q.   Were the pretest respondents
11 asked whether any questions made them
12 feel like they should answer in a certain
13 way?
14      A.   Not that I recall.  It would
15 surprise me if they did, but I don't
16 recall anyone saying that.
17      Q.   For each of the pretests,
18 how long did it take them to complete the
19 survey?
20      A.   I do not recall.
21      Q.   Were you given any data or
22 statistics about that?
23      A.   I don't believe so.
24      Q.   Do you know whether the

**Page 247**

1  amount of time it took the pretest
2  participants to take the survey varied
3  from the amount of time it took the final
4  survey participants to take the survey?
5       A.   I do not recall.
6       Q.   If it took participants as
7  long as 30 or 45 minutes, would you
8  expect them to be able to remember
9  questions that had been unclear from 30
10 or 45 minutes before?
11      A.   If something stood out for
12 them, they might.  But I don't think -- I
13 think 30 to 45 minutes is way longer than
14 what the survey actually took, on
15 average.
16      Q.   How long did the survey take
17 on average?
18      A.   I think it was something
19 such as an average, perhaps, ten minutes
20 or so.
21      Q.   Even after ten minutes,
22 would you expect someone to be able to
23 remember every question that they were
24 asked in ten minutes and remember whether

**Page 248**

1  any one particular question or any part
2  of one question was unclear?
3       MS. DEARBORN:  Objection.
4       Compound.
5       THE WITNESS:  As I said, I
6       wanted to see if something jumps
7       out as so -- how do you say it --
8       egregious, so unclear, that they
9       would talk about it at the
10      conclusion of the survey.
11          If there was something
12      minor, maybe they would or they
13      would not.
14 BY MS. WOOD:
15      Q.   Is it fair to say that for
16 each of your three surveys, a significant
17 number of completed surveys were excluded
18 from your analysis?
19      MS. DEARBORN:  Form.
20      THE WITNESS:  What do you
21      mean by "significant"?  What are
22      you referring to and what do you
23      mean by significant?
24 BY MS. WOOD:

**Page 249**

1       Q.   What does the word
2  "significant" mean to you?
3       MS. DEARBORN:  Form.
4       THE WITNESS:  Funny you
5       should ask.
6          Significant means
7       significant.  It's a -- let's
8       think about the term "small" and
9       "significant."
10         Small is small.  And
11      significant means it's not
12      something that you would
13      completely ignore.  So it's
14      something that you would
15      consider.
16 BY MS. WOOD:
17      Q.   So using that definition, is
18 it fair to say that a significant number
19 of the respondents who completed your
20 surveys were excluded from your final
21 analysis?
22      MS. DEARBORN:  Form.
23      THE WITNESS:  What are you
24      referring to?

| Page 250 | Page 252 |
|---|---|

**Page 250**

BY MS. WOOD:

2  Q.  Is it fair to say that a
3  significant number of the respondents who
4  completed your surveys were excluded from
5  the final analysis?
6      MS. DEARBORN:  Form.
7      THE WITNESS:  I'd say
8      probably not.
9  BY MS. WOOD:
10  Q.  Why not?
11  A.  I mean, what are you
12  referring to now in excluding?  Are you
13  talking about those who were excluded
14  because they took less than, say,
15  100 seconds?
16  Q.  If you look at the total
17  number of excluded surveys, regardless of
18  the reason for the exclusion, would you
19  agree that a significant number of
20  completed surveys were excluded from your
21  analysis?
22      MS. DEARBORN:  Form.
23      THE WITNESS:  So you're
24      referring to people who passed

**Page 251**

1      the screener and were found to be
2      qualified respondents.  Is that
3      what you're asking about?
4  BY MS. WOOD:
5  Q.  I'm referring to any
6  participant who completed the entire
7  survey but whose data was, nonetheless,
8  excluded.
9  A.  I don't know what you're
10  referring to.  But I don't think there
11  was a significant number that were --
12  significant number of respondents who
13  were excluded.
14  Q.  Okay.  So you don't think a
15  significant number were excluded?
16      MS. DEARBORN:  Form.
17      THE WITNESS:  Right.
18  BY MS. WOOD:
19  Q.  Your survey results for the
20  higher-spend and lower-spend advertiser
21  surveys only included respondents who
22  said they work for a company that
23  "sells products or services and
24  advertises/markets its products or

**Page 252**

1  services"; is that correct?
2      A.  Can you repeat that, please.
3      Q.  Your survey results for the
4  higher-spend and lower-spend surveys only
5  included respondents who said they work
6  for a company that "sells products or
7  services and advertises/markets its
8  products or services"; is that correct?
9      A.  Yes.
10      Q.  And that resulted in a
11  significant number of survey participants
12  being excluded, correct?
13      MS. DEARBORN:  Form.
14      THE WITNESS:  Right.
15  BY MS. WOOD:
16      Q.  It did?
17      A.  There were quite a few that
18  were excluded.  That's right.
19      I mean, obviously, they
20  didn't complete the survey, so I guess
21  they -- that's not what you -- not what
22  you referred to in your earlier question.
23      Q.  Correct.  This is a
24  different question.

**Page 253**

1      A.  Okay.  Yeah.  Quite a few
2  were excluded in that question.
3      Q.  Okay.  And, in fact, in the
4  high-spend advertiser survey, that
5  resulted in 29 percent of the survey
6  participants being excluded, correct?
7      A.  I would have to look at the
8  sample disposition, but that could very
9  well be correct.
10      Q.  And then the lower-spend
11  advertiser survey, that resulted in
12  17 percent of survey participants being
13  excluded, correct?
14      A.  Okay.  Again, I didn't
15  memorize those numbers, but if -- I'll
16  take your representation.
17      Q.  Now, at the time the surveys
18  were being conducted, did you know that
19  there were governmental entities who did
20  not sell products or services, who were
21  significant purchasers of display
22  advertising?
23      MS. DEARBORN:  Objection to
24      form.

## Page 322

1    will remain confidential and no
2    one will know the respondent's
3    name, somehow Google will try to
4    find the name of respondents,
5    look for those who use only
6    Google and say, ah, that's a
7    great opportunity.  We should
8    take advantage of the situation.
9        I think it's a very
10   nonsensical, inconceivable
11   scenario.  I think I stand behind
12   the use of the term
13   "hard-pressed."
14 BY MS. WOOD:
15       Q.    Do you know how many of the
16 survey respondents used Google Chrome to
17 complete the survey?
18       A.    I don't recall asking that
19 question.  Google Chrome?  I don't know.
20       Q.    Do you know how many survey
21 respondents have a Gmail address?
22       A.    I don't.
23       Q.    Do you know how many survey
24 respondents use the Gmail address to

## Page 323

1    identify themselves in connection with
2    the online survey?
3        A.    What do you mean by that?
4        Q.    How many respondents were
5    sent the survey to an address at
6    Gmail.com?
7        A.    So AP -- just to -- I think
8    you know how it works, right?
9        AP sends an invitation to
10   prospective respondents and says, you
11   know, here is a link to a survey about
12   advertising.  If you'd like to
13   participate, please click on this link.
14       Q.    And how do they send that
15 invitation?  Do they send it to people's
16 e-mail address?
17       A.    Yes.
18       Q.    And do you know how many of
19 those e-mail addresses were Gmail
20 addresses?
21       A.    I don't.
22       Q.    Did you ever talk to
23 customers about concerns about Google
24 retaliating against them?

## Page 324

1        MS. DEARBORN:  Objection to
2    form.
3        THE WITNESS:  No.
4        MS. WOOD:  Let's take a
5    break.
6        MS. DEARBORN:  Sure.
7        THE VIDEOGRAPHER:  Going
8    off the record at 4:18 p.m.
9        (Short break.)
10       THE VIDEOGRAPHER:  We are
11   going back on the record at
12   4:38 p.m.
13 BY MS. WOOD:
14       Q.    Now, we've talked throughout
15 the day about the fact that each of your
16 three surveys asked respondents how they
17 would react to a "small but significant"
18 increase in the cost of advertising.
19       Do you recall that,
20 generally?
21       A.    Yes.
22       Q.    Okay.  And you would agree
23 with me that "small but significant" is
24 an inherently subjective term, right?

## Page 325

1        MS. DEARBORN:  Objection to
2    form.
3        THE WITNESS:  It's a matter
4    of how individuals interpret or
5    understand this term, what it
6    means to them personally.
7 BY MS. WOOD:
8        Q.    And because it's not
9 defined, there's no way to know what any
10 given respondent thought a "small but
11 significant price increase" actually
12 meant, correct?
13       MS. DEARBORN:  Form.
14       THE WITNESS:  No.  No.
15   That's incorrect.  That's
16   incorrect.
17 BY MS. WOOD:
18       Q.    How do we -- how can we
19 determine what any given survey
20 respondent thought a small but
21 significant price increase meant?
22       A.    Small and significant, they
23 are commonly used terms in the English
24 language.  On the one hand, it's small as

Page 326

1  opposed to large.  And significant, as we
2  said earlier, it's not something that you
3  would ignore.  Doesn't mean it would
4  affect you in any way, but it's something
5  you would consider.
6        So I think it's a very
7  balanced term that I thought was a very
8  good choice for my survey.
9        Q.    Is "small but significant" a
10 term you've used in any other surveys
11 before this one?
12       A.    I don't recall.  I might
13 have.
14       Q.    But you don't recall, as you
15 sit here now, having ever used that term
16 before?
17       A.    I've used other qualitative
18 terms, as opposed to numerical terms,
19 many times.
20       Q.    But I'm asking about the
21 specific term "small but significant."
22             Is that a phrase you've ever
23 used before?
24       A.    For each survey, I use -- I

Page 327

1  may use a different term.
2             Sitting here now, I don't
3  recall.  But it's possible.
4        Q.    And who came up with the
5  phrase "small but significant"?
6        A.    I think it was something
7  that I discussed with Analysis Group, and
8  I found it was a very good term.  And it
9  was also discussed with counsel.
10       Q.    Again, I don't want to know
11 about your conversations with counsel.
12             MS. DEARBORN:  Thank you.
13 BY MS. WOOD:
14       Q.    But was the term "small but
15 significant" a term that you came up with
16 or that someone else came up with?
17       A.    So I don't recall,
18 specifically.  I believe it was something
19 that my team at Analysis Group and I came
20 up with and then discussed with counsel.
21       Q.    Do you know whether it was
22 someone at Analysis Group or you that
23 first came up with the term?
24       A.    I don't recall.

Page 328

1        Q.    Do you think it was you?
2        A.    I do not recall.
3        Q.    And as you sit here now, you
4  can't think of any other time, in your
5  30-plus-year career, that you've used
6  that exact phrase, "small but
7  significant"?
8        A.    I used different qualitative
9  terms, if you will, that have -- that
10 each person can interpret as it applies
11 to him or her.
12       Q.    But that's not my
13 question --
14       A.    But -- so I've used
15 individual terms once and never again, if
16 you will, in various surveys.
17             So it -- I'm not sure if I
18 ever used "small but significant."  But,
19 as I said, I don't recall the details of
20 most of the surveys I've conducted.
21       Q.    How often have you used the
22 phrase "small but significant" before
23 this case?
24       A.    I do not recall.  I cannot

Page 329

1  assess the number of times.
2        Q.    And you would agree with me
3  that one respondent could have
4  interpreted the phrase "small but
5  significant" to indicate 5 percent, for
6  example, but a different respondent might
7  have interpreted that phrase to mean 35
8  or 40 percent, correct?
9             MS. DEARBORN:  Form.
10             THE WITNESS:  Not at all.
11             As I said earlier, based on
12       my understanding of survey
13       takers' behavior and how they
14       answer questions, they will take
15       the term "small but significant"
16       as it -- as it means.
17             They will not go the extra
18       step and say, okay, let's
19       speculate that small but
20       significant is 3 percent,
21       30 percent, 10 percent.  They
22       have no basis for doing that nor,
23       based on my experience, will they
24       do that.

| Page 330 |
| --- |

1    That just calls for an
2    extra step.  It's like, okay,
3    it's small, but it's something
4    that I would consider.  It's
5    significant enough.  And they
6    will decide accordingly.
7         They will not go an extra
8    step, convert it to a specific
9    quantity, and then say, okay,
10   based on my speculation, my
11   answer is X.  That's not what
12   survey respondents do.
13   BY MS. WOOD:
14   Q.    Okay.  I'm now me, Julia
15   Wood, sitting here, and I'm thinking of a
16   number that to me is small but
17   significant.
18   A.    So what -- what's the
19   question?
20   Q.    What's my number?
21        MS. DEARBORN:  Objection to
22   form.
23        THE WITNESS:  Is that a
24   real --

| Page 331 |
| --- |

1    BY MS. WOOD:
2    Q.    No, that's a real question.
3    I'm thinking of a number that's small but
4    significant.  What's my number?
5    A.    It reminds me of games I'm
6    playing with my grandkids.
7    Q.    Good.  Then you're
8    experienced at it.
9         What's my number?
10        MS. DEARBORN:  Okay.
11   Objection to form.
12        THE WITNESS:  I'm not sure
13   if you're -- I assume that you're
14   not asking that seriously.
15        But as I said, I will -- I
16   would not think of a number that
17   you're thinking about, nor will I
18   come up with a number.  It would
19   be sheer speculation.  Therefore,
20   I will not engage in that.
21        You told me it's small but
22   significant, and that's all the
23   information I have, and all the
24   information I will use when

| Page 332 |
| --- |

1    answering the question.
2    BY MS. WOOD:
3    Q.    But if I come up with a
4    number that's small but significant to
5    me, that doesn't mean that same number
6    would be small but significant to you,
7    correct?
8    A.    I thought I just answered
9    that.
10        No, you will not come up,
11   if -- I mean, obviously, you're involved
12   in this case, so you're not the typical
13   respondent.
14        But speaking of typical
15   respondents, they would not start
16   speculating about a specific number.  So,
17   therefore, it's not like one respondent
18   thinks about Number X and the other one
19   thinks about Number Y.  What basis do
20   they have to -- for such speculations?
21   Q.    Regardless of the nature of
22   the speculation, it is possible -- strike
23   that.
24        You say in your report at

| Page 333 |
| --- |

1    Footnote 5, on Page 7, "This phrase,"
2    small but significant, "was designed to
3    leave it to the respondents to consider
4    their reaction, if any, if (what they
5    considered to be) 'a small but
6    significant' increase in the cost of
7    programatic display advertising
8    occurred."
9         Right?
10   A.    Right.
11   Q.    And then you say in
12   Footnote 65 of your report, on Page 39,
13   that "The balanced phrasing of 'small but
14   significant' avoids possible demand
15   effects whereby respondents might have
16   assumed that certain answers were
17   expected or preferred."
18        Can you describe how "small
19   but significant" is balanced phrasing, in
20   your view?
21   A.    Okay.  Small is usually
22   contrasted with big, and significant is
23   contrasted with insignificant.
24        One goes in one direction,

| Page 386 | Page 388 |
|---|---|

**Page 386**

1    Q.    Did you do anything during
2  this deposition, including on the last
3  break, to refresh your recollection about
4  the number of respondents who put ten
5  down as nonprofit?
6         MS. DEARBORN:  And please
7    set aside communications with
8    counsel.
9         THE WITNESS:  So I didn't
10    go back at the data.  The answer
11    was pretty straightforward.  I
12    just went back to my report and
13    thought about it.  I said, well,
14    respondents could have indicated
15    that they were a nonprofit in
16    Question S8.  However they were
17    excluded from the survey later,
18    for example, because they were
19    not using display advertising.
20  BY MS. WOOD:
21    Q.    But you didn't look at data
22  to make that assessment.  You just did
23  that based on inference?
24    A.    Well, as I said, I

**Page 387**

1  personally counted the number of
2  nonprofit respondents in the data for
3  both the large -- large segment and small
4  segment.  So I'm confident about that.
5         And there were ten
6  respondents in the large segment who
7  identified as being in a nonprofit.
8    Q.    And what about government.
9  Is the number two for government an
10  accurate number, as far as you know?
11    A.    I didn't look at government.
12    Q.    Okay.  And same for the
13  low-spend, you didn't look at government
14  there either?
15    A.    No.
16         MS. WOOD:  No further
17    questions, subject to the
18    reservation of rights.
19         MS. DEARBORN:  And subject
20    to our prior discussion.
21         THE VIDEOGRAPHER:  And we
22    are going off the record at
23    5:53 p.m.
24         Thank you.

**Page 388**

1       -  -  -
2    ***********
3    (Excused.)
4    (Deposition concluded at
5  approximately 5:53 p.m.)

**Page 389**

1
2              CERTIFICATE
3
4
5       I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
        It was requested before
8  completion of the deposition that the
   witness, ITAMAR SIMONSON, Ph.D., have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12  _____
   MICHELLE L. GRAY,
13  A Registered Professional
   Reporter, Certified Shorthand
14  Reporter, Certified Realtime
   Reporter and Notary Public
15  Dated:  February 29, 2024
16
17
18       (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

## Page 390

```
 1           INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition

 4  over carefully and make any necessary

 5  corrections.  You should state the reason

 6  in the appropriate space on the errata

 7  sheet for any corrections that are made.

 8           After doing so, please sign

 9  the errata sheet and date it.

10           You are signing same subject

11  to the changes you have noted on the

12  errata sheet, which will be attached to

13  your deposition.

14           It is imperative that you

15  return the original errata sheet to the

16  deposing attorney within thirty (30) days

17  of receipt of the deposition transcript

18  by you.  If you fail to do so, the

19  deposition transcript may be deemed to be

20  accurate and may be used in court.

21

22

23

24
```

## Page 391

```
 1              -  -  -  -  -

                E R R A T A

 2              -  -  -  -  -

 3

 4  PAGE  LINE  CHANGE

 5  ____  ____  _____

 6     REASON:  _____

 7  ____  ____  _____

 8     REASON:  _____

 9  ____  ____  _____

10     REASON:  _____

11  ____  ____  _____

12     REASON:  _____

13  ____  ____  _____

14     REASON:  _____

15  ____  ____  _____

16     REASON:  _____

17  ____  ____  _____

18     REASON:  _____

19  ____  ____  _____

20     REASON:  _____

21  ____  ____  _____

22     REASON:  _____

23  ____  ____  _____

24     REASON:  _____
```

## Page 392

```
 1

 2       ACKNOWLEDGMENT OF DEPONENT

 3

 4       I,_____, do

 5  hereby certify that I have read the

 6  foregoing pages, 1 - 393, and that the

 7  same is a correct transcription of the

 8  answers given by me to the questions

 9  therein propounded, except for the

10  corrections or changes in form or

11  substance, if any, noted in the attached

12  Errata Sheet.

13

14

15  _____

16  ITAMAR SIMONSON, Ph.D.        DATE

17

18

19  Subscribed and sworn

    to before me this

20  _____ day of _____, 20____.

21  My commission expires:_____

22

23  _____

23  Notary Public

24
```

## Page 393

```
 1           LAWYER'S NOTES

 2  PAGE  LINE

 3  ____  ____  _____

 4  ____  ____  _____

 5  ____  ____  _____

 6  ____  ____  _____

 7  ____  ____  _____

 8  ____  ____  _____

 9  ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22  ____  ____  _____

23  ____  ____  _____

24  ____  ____  _____
```

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| 111 | 2 | "So it was sort of just a get" | "So it was sort of just to get" | Transcription Error or Mistake |
| 112 | 19 | "programatic" | "programmatic" | Spelling Error |
| 126 | 1 | "up 14" | "up being 14" | Transcription Error |
| 126 | 17:18 | "there was no given number. They were not" | "there was no -- given the number, they were not" | Transcription Error/Clarification |
| 132 | 14 | "ad pros" | "AdPros" | Spelling Error |
| 133 | 3 | "ad pros" | "AdPros" | Spelling Error |
| 133 | 17 | "ad pros" | "AdPros" | Spelling Error |
| 133 | 21 | "ad pros" | "AdPros" | Spelling Error |
| 134 | 7 | "ad pros" | "AdPros" | Spelling Error |
| 134 | 14 | "ad pros" | "AdPros" | Spelling Error |
| 134 | 19:20 | "ad pros" | "AdPros" | Spelling Error |
| 135 | 16 | "add pros" | "AdPros" | Spelling Error |
| 135 | 17 | "ad pros" | "AdPros | Spelling Error |
| 135 | 18 | "ad pros" | "AdPros" | Spelling Error |
| 144 | 7 | "But you wouldn't have to" | "But you wouldn't have had to" | Transcription Error or Mistake |
| 185 | 6:7 | "They have different ways" | "There are different ways" | Transcription Error or Mistake |
| 194 | 22 | "programatic" | "programmatic" | Spelling Error |
| 199 | 17 | "you are not going to derive" | "you cannot derive" | Transcription Error or Mistake |
| 200 | 9:10 | "you also serve as searcher. You cannot look at that" | "you also as a researcher, you cannot look at that" | Transcription Error/Clarification |
| 206 | 2 | "programatic" | "programmatic" | Spelling Error |
| 206 | 5 | "programatic" | "programmatic" | Spelling Error |
| 212 | 16 | "programatic" | "programmatic" | Spelling Error |
| 221 | 8:9 | "given with all but such a small sample" | "given we talk about such a small sample" | Transcription Error/Clarification |
| 222 | 6:8 | "I hesitate to -- I believe so. Nothing comes to mind" | "I hesitate to -- I believe so, yes. I don't -- nothing comes to mind" | Transcription Error/Clarification |
| 236 | 9:10 | "this think-aloud product called methodology" | "this think-aloud protocol methodology" | Transcription Error/Clarification |
| 239 | 7 | "or some cost effect" | "or the sunk cost effect" | Transcription Error or Mistake |
| 255 | 14 | "And they speculated" | "And he speculated" | Transcription Error or Mistake |
| 262 | 13 | "As I said, you are looking" | "As I said, you -- looking" | Transcription Error/Clarification |
| 274 | 5 | "programatic actions" | "programmatic auctions" | Spelling Error |

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| 289 | 18 | "survey-sponsored purpose" | "survey sponsor and purpose" | Transcription Error/Clarification |
|---|---|---|---|---|
| 333 | 7 | "programatic" | "programmatic" | Transcription Error or Mistake |
| 340 | 6:7 | "the foreseeable to you" | "the foreseeable future to you" | Transcription Error or Mistake |
| 348 | 14 | "programatic" | "programmatic" | Transcription Error or Mistake |
| 348 | 15 | "whether it will" | "whether they will" | Transcription Error or Mistake |
| 352 | 16 | "programatic" | "programmatic" | Spelling Error |
| 352 | 24 | "programatic" | "programmatic" | Spelling Error |
| 353 | 14 | "programatic" | "programmatic" | Spelling Error |
| 354 | 7 | "programatic" | "programmatic" | Spelling Error |
| 354 | 14 | "programatic" | "programmatic" | Spelling Error |
| 354 | 16 | "programatic -- cost of programatic" | "programmatic -- cost of programmatic" | Spelling Error |
| 354 | 23 | "programatic" | "programmatic" | Spelling Error |
| 355 | 5 | "programatic" | "programmatic" | Spelling Error |
| 355 | 14 | "programatic" | "programmatic" | Spelling Error |
| 357 | 6:7 | "The reason I make in my mind" | "There is no link in my mind" | Transcription Error/Clarification |
| 358 | 22 | "programatic" | "programmatic" | Spelling Error |
| 362 | 3 | "programatic" | "programmatic" | Spelling Error |
| 363 | 2 | "have the data, but the degree" | "have the data about the degree" | Transcription Error/Clarification |
| 364 | 8 | "programatic" | "programmatic" | Spelling Error |
| 364 | 11 | "programatic" | "programmatic" | Spelling Error |
| 365 | 16 | "And you agreed" | "And you agree" | Transcription Error or Mistake |
| 370 | 2 | "programatic" | "programmatic" | Spelling Error |
| 371 | 2 | "programatic" | "programmatic" | Spelling Error |

| 128 | 6 | The word "pick" should read "picked" | Transcription error |
|---|---|---|---|
| 130 | 2 | The words "report list" should read "report lists" | Transcription error |
| 132 | 14 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 133 | 3 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 133 | 17 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 133 | 21 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 134 | 7 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 134 | 14 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 134 | 19-20 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 135 | 16 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 135 | 18 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 136 | 15 | The words "ad pros" should read "Ad Pros" | Transcription error |
| 141 | 17 | The word "kept" should read "keep" | Transcription error |
| 143 | 2 | The word "resident" should read "residence" | Transcription error |
| 148 | 1 | The words "might have followed" should read "might have been followed" | Omission |
| 149 | 16 | The words "apropos all" should read "all" | Transcription error |
| 155 | 4 | The word "attorney" should read "attorneys" | Transcription error |
| 156 | 23 | The word "interview" should read "interviewer" | Transcription error |
| 157 | 23 | The word "your" should read "the" | Transcription error |
| 158 | 23 | The word "received" should read "received the" | Transcription error |
| 177 | 6 | The word "did" should read "do" | Transcription error / clarification |
| 184 | 10 | The words "That saying" should read "That said" | Transcription error |
| 194 | 22 | The word "programatic" should read "programmatic" | Transcription error |
| 200 | 1 | The word "alternative" should read "alternatively" | Transcription error |
| 200 | 9-10 | The words "you also serve as searcher. You" should read "you also as a researcher, you" | Transcription error |
| 202 | 21 | The words "than about those" should read "than on those" | Clarification |
| 206 | 2 | The word "programatic" should read "programmatic" | Transcription error |
| 206 | 5 | The word "programatic" should read | Transcription error |

| | | "programmatic" | |
|---|---|---|---|
| 361 | 9 | The word "do" should read "do it" | Clarification |
| 362 | 3 | The word "programatic" should read "programmatic" | Transcription error |
| 363 | 7 | The word "substitutions" should read "substitution" | Transcription error |
| 364 | 8 | The word "programatic" should read "programmatic" | Transcription error |
| 364 | 11 | The word "programatic" should read "programmatic" | Transcription error |
| 366 | 22 | The words "they ask" should read "they were asked" | Transcription error |
| 370 | 2 | The word "programatic" should read "programmatic" | Transcription error |
| 371 | 2 | The word "programatic" should read "programmatic" | Transcription error |
| 383 | 6 | The words "to the" should read "to" | Transcription error |
| 383 | 15 | The word "Number" should read "number" | Transcription error |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefor.

Date :  3/28/2024

Itamar Simonson, Ph.D.

UNITED STATES OF AMERICA V
GOOGLE, LLC

Highly Confidential

Itamar Simonson, Ph.D.
February 28, 2024

392

```
1
2              ACKNOWLEDGMENT OF DEPONENT
3
4          I, Itamar Simonson, do
5    hereby certify that I have read the
6    foregoing pages, 1 - 393, and that the
7    same is a correct transcription of the
8    answers given by me to the questions
9    therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____    3/28/2024
16   ITAMAR SIMONSON, Ph.D.         DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
23   _____
     Notary Public
24
```