# Exhibit N
# (previously filed as Dkt. 718-3)

Page 1

1        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF VIRGINIA
2             ALEXANDRIA DIVISION
3    - - - - - - - - - - - - - - - x
4       UNITED STATES, et al.,      :
5            Plaintiffs,            :
6         v.                        :  Case No.
7       GOOGLE, LLC,                :  1:23-cv-00108
8            Defendant.             :
9    - - - - - - - - - - - - - - - x
                              Monday, March 4, 2024
10                                   Washington, D.C.
11
      Job No. CS6484199
12   Videotaped Deposition of:
13              WAYNE D. HOYER, Ph.D.,
14   called for oral examination by counsel for the
15   Defendant, pursuant to notice, at the United States
16   Department of Justice, Antitrust Division, 450 Fifth
17   Street, Northwest, Suite 11-248, Washington,
18   D.C. 20001, before Christina S. Hotsko, RPR, CRR, of
19   Veritext Legal Solutions, a Notary Public in and for
20   the District of Columbia, beginning at 8:33 a.m.,
21   when were present on behalf of the respective
22   parties:

Page 250

1  Q. I'm asking about Advertiser Perceptions'
2 surveys, not the surveys that Dr. Simonson
3 conducted.
4       Are we on the same page?
5  A. Okay. Same criticism of that. They just
6 ask frequent -- they don't ask frequency. They
7 just ask how many tools used.
8  Q. You think Advertiser Perceptions' surveys
9 were flawed because they don't ask about frequency
10 of use?
11      MR. SHEANIN: Objection. Form.
12 Foundation.
13      THE WITNESS: As I said before, I haven't
14 seen their surveys.
15 BY MS. DEARBORN:
16  Q. Right. You haven't reviewed any of
17 Advertiser Perceptions' other surveys, correct?
18  A. That's correct.
19  Q. So you have no basis to say whether
20 they're asking about frequency of use.
21  A. Well, other than what's said in the
22 footnote of the Simonson report.

Page 251

1  Q. Okay. So your entire opinion is based on
2 the footnote -- on this score is based on the
3 footnote in Dr. Simonson's report?
4      MR. SHEANIN: Objection. Form.
5 Misstates testimony. Foundation.
6      THE WITNESS: As I've said, I'm not
7 criticizing Ad Perceptions. I criticize
8 Simonson's report and the fact that there's no
9 information on frequency of use.
10 BY MS. DEARBORN:
11  Q. Okay. Well, you do question
12 Dr. Simonson -- the results of Dr. Simonson's
13 survey, don't you?
14  A. Yes.
15  Q. And you have no basis to opine one way or
16 the other as to whether the results in the survey
17 are similar or different to those that
18 Advertiser Perceptions has reached in other
19 surveys that it's conducted, right?
20      MR. SHEANIN: Objection. Form.
21 Foundation.
22      THE WITNESS: That's correct.

Page 252

1 BY MS. DEARBORN:
2  Q. All right. I'd like to ask you about
3 another criticism that you have of Dr. Simonson's
4 report, which is its exclusion of companies in his
5 appendix I, which is the no-contact list.
6      So let's start with paragraph 65 of your
7 report. But it's fine to turn to appendix I --
8  A. Uh-huh.
9  Q. -- while we ask these questions.
10      Do you know why Professor Simonson
11 excluded the companies in appendix I from his
12 survey respondent pool?
13  A. I don't have a detailed understanding,
14 but my basic understanding is that these were
15 companies involved in litigation about Google.
16  Q. Do you think it would have been
17 appropriate for Professor Simonson to contact
18 someone who's involved in this litigation?
19      MR. SHEANIN: Objection. Calls for a
20 legal conclusion.
21      THE WITNESS: I think it's possible. I
22 think -- a lot of these companies are large. And

Page 253

1 just because the company is involved in litigation
2 doesn't mean that every single member of that
3 company is going to know about that litigation,
4 nor does it mean even people not -- that are
5 contacted aren't aware of that litigation.
6      And one way you would deal with this is,
7 at the end of a survey, to always ask a question,
8 who do you think sponsored this survey or who --
9 or what is the purpose of this survey?
10      And if you get people in that question,
11 then they are excluded from the sample. But you
12 could still survey those individuals.
13 BY MS. DEARBORN:
14  Q. Are you saying it would have been
15 appropriate to include a question at the end of
16 the survey that asked who do you think sponsored
17 the survey?
18  A. Absolutely. We do that all the time. I
19 do that in every survey I do.
20  Q. And if respondents answered the question
21 correctly, they would be excluded?
22  A. Yes.

```
                                                      Page 254                                                            Page 256
 1     Q.  So that would have been methodologically        1  to exclude their answers, correct?
 2  appropriate but not informing survey respondents       2     A.  Yes.  Correct.
 3  and giving them the opportunity to opt out?            3     Q.  And what you take issue with is
 4     A.  I would ask that question before.  It's a      4  Dr. Simonson's choice to tell respondents the
 5  different issue.  First of all, you want to know      5  sponsor of the survey and its purpose and then
 6  are they aware of it.  And then you want -- if        6  allow themselves to opt out, right?
 7  they are aware who it was, and they get that          7     A.  I don't take issue with him telling the
 8  correct, then you exclude them.  Then you ask         8  sponsor of the survey.  My concern is that it
 9  and -- reveal the sponsor of the survey and see if    9  eliminates a substantial number of people, and its
10  they have a problem with it.  That's -- so it's a   10  systematic exclusion, and that questions the
11  different issue.                                    11  reliability of the sample.
12     Q.  I'm sorry.  I just want to understand       12     Q.  So you think fewer people would opt out
13  your testimony.                                    13  if asked to guess about the sponsor of the survey
14         You said, first of all, you want to know   14  and its purpose than would opt out if told?
15  if they're aware of it.  And then, if they are     15         MR. SHEANIN:  Objection.  Form.
16  aware, who it was.  And if they get that correct, 16         THE WITNESS:  Again, they're separate
17  then you exclude them.  Then you ask and reveal   17  issues.  I'm wanting to know on their own if they
18  the sponsor of the survey and see if they have a  18  answered this.  And it could happen to anybody in
19  problem with it.                                  19  the sample.  They could be -- people read the
20         Are you saying that, at the end of the    20  New York Times, they read the news, could be
21  survey, Dr. Simonson should have first asked     21  aware, even in the sample as it stands right now.
22  respondents to guess the sponsor of the survey and 22 And you just -- I think you need to assess are

                                                      Page 255                                                            Page 257
 1  then they would be told the sponsor of the survey?    1  people aware of the issues -- who is sponsoring
 2     A.  I'm saying they're separate issues.            2  this survey, and if they are, that could bias
 3     Q.  I see.                                         3  their responses, so you would want to exclude
 4     A.  I'm saying standard practice in survey         4  them.
 5  research is to ask the -- what do you think the       5         That's totally separate from the issue
 6  purpose of the survey was?  Or you could ask two      6  of, for whatever reason, tell them who the sponsor
 7  questions, who do you -- a lot of times in            7  is and decide if they want to opt out of having
 8  academic research, there is no sponsor, so you        8  their responses included.
 9  ask, what was the purpose of the survey?  But if      9  BY MS. DEARBORN:
10  there is a sponsor, then you ask specifically, who  10     Q.  You're aware that survey respondents were
11  was the sponsor of the survey?  And then if they    11  only told of the survey sponsor and purpose at the
12  say, it was Google for their antitrust litigation,  12  very end of the survey, right?
13  you eliminate their responses.                      13     A.  That's correct.
14         That's independent of the issue do you      14     Q.  After they had already answered all the
15  reveal -- you could do that and not ever reveal    15  questions?
16  the sponsor.                                       16     A.  That's correct.
17     Q.  I see.  So I think I understand your       17     Q.  And that the back button on their browser
18  testimony.                                         18  was disabled such that no answers could be changed
19         In your view, it would have been           19  after the respondents learned the sponsor of the
20  appropriate for Dr. Simonson to ask respondents   20  survey and its purpose?
21  who they thought the sponsor of the survey was and 21     A.  Yes.
22  its purpose, and if they answered correctly, then 22     Q.  How would learning the survey sponsor
```

Page 258

```
 1  after completing all of the survey responses
 2  change the results that respondents gave
 3  beforehand?
 4      A.  I'm not saying that at all.  I don't take
 5  issue with them revealing sponsor at the end, and
 6  it does not change their responses.  It alters the
 7  nature of the sample because a significant number
 8  of people opted out.
 9          So it has nothing to do with the
10  reliability of their responses prior to that.
11  It's simply what happened as a result of that,
12  that revealing.
13      Q.  Would you agree that a survey is blind if
14  survey respondents are unaware of the sponsor
15  while they're answering questions?
16      A.  Yes.
17      Q.  So in that way, Dr. Simonson's survey was
18  blind, right?
19          MR. SHEANIN:  Objection.  Form.
20          THE WITNESS:  It was blind in design.
21  Yes.
22
```

Page 259

```
 1  BY MS. DEARBORN:
 2      Q.  Do you have any reason to believe that
 3  survey respondents were aware of the survey
 4  sponsor as they answered questions?
 5          MR. SHEANIN:  Objection.  Form.
 6          THE WITNESS:  I have no data on that.
 7  It's possible, but there's no data -- if he had
 8  asked that question at the end, we could know.
 9  BY MS. DEARBORN:
10      Q.  Are you aware that there is some research
11  that has found that identifying the survey
12  sponsor, even while respondents are answering
13  questions, has no meaningful effect on survey
14  responses?
15      A.  That's -- there could be isolated
16  incidences, but based -- you know, particularly
17  Diamond cites this.  There can be an instance
18  where you might reveal it, but the general
19  practice -- the most important practice is to have
20  a double blind survey.
21      Q.  Despite the fact that it might be
22  standard practice to have a blind survey, are you
```

Page 260

```
 1  aware of research that has found that there is no
 2  effect of disclosure of a survey sponsor on the
 3  results of a survey?
 4          MR. SHEANIN:  Objection.  Form.
 5          THE WITNESS:  I can't cite any specific
 6  articles, but that's contextual.  It depends how
 7  charged the questions are.  There clearly was an
 8  issue here because such a substantial -- a large
 9  number of people opted out, that they were very
10  concerned that Google was the sponsor or they
11  wouldn't have opted out of the survey.  After
12  going through all that, answering 39 questions and
13  then deciding to have them excluded, there was a
14  clear concern from those respondents.
15  BY MS. DEARBORN:
16      Q.  Have you conducted any experiments to
17  determine the effect of disclosure of sponsorship
18  on survey responses?
19      A.  I have not.
20      Q.  Have you conducted any experiments to
21  determine the effects of disclosure of a survey's
22  purpose on respondents to a survey?
```

Page 261

```
 1      A.  Generally -- I have not, but that's not a
 2  topic I've seen anybody -- that's not something we
 3  do.  It's standard practice we do not reveal the
 4  sponsor or the purpose of the survey.
 5      Q.  Do you have any reason to believe that
 6  the individuals who opted out of having their
 7  survey responses included in the final results
 8  would have answered Dr. Simonson's questions
 9  differently from the eventual survey respondents?
10          MR. SHEANIN:  Objection.  Form.
11          THE WITNESS:  Well, as I say in my
12  report, it's not systematic -- I mean, it is
13  systematic exclusion if it was random, just people
14  randomly.
15          But specifically, my hypothesis is -- and
16  I don't have data to support, other than the
17  incidence of opting out was 50 percent higher in
18  the high spend advertising survey.  And that
19  indicates that there's some concern about perhaps
20  Google getting their answers or knowing what they
21  answered.  And particularly if they're heavy users
22  of Google ad tools, concerning about some --
```

66 (Pages 258 - 261)

Page 262

1  what -- that effect Google -- you know, would
2  Google come after them, whatever.
3      I don't have hard-core evidence, but
4  based on those different percentages, that seems
5  to be consistent with that view.
6  BY MS. DEARBORN:
7    Q. Okay. You don't have hard -- you said
8  you don't have hard-core evidence.
9    A. I don't have actual data on those
10 respondents.
11   Q. Okay. You don't have data that would
12 suggest that people who answered -- strike that.
13     You don't have data that would suggest
14 that people who opted out of having their survey
15 responses included in the final results would have
16 answered differently --
17   A. Yeah.
18   Q. -- from the eventual survey population,
19 right?
20     MR. SHEANIN: Objection. Form.
21     THE WITNESS: Yeah, I do not because
22 Simonson does not provide -- I assume he destroyed

Page 263

1  that data and does not have that data, because
2  they asked to have it excluded.
3  BY MS. DEARBORN:
4    Q. You say you assume that he destroyed that
5  data.
6      Do you know one way or the other?
7    A. I don't, but he should have.
8    Q. Okay. Once survey respondents opted out
9  of having their survey responses included in the
10 final results, it was appropriate for Dr. Simonson
11 not to look at those responses any further, right?
12   A. Absolutely.
13   Q. And it was appropriate for him not to
14 include them in his final report, right?
15   A. Absolutely.
16   Q. Because doing otherwise would have broken
17 a promise.
18   A. Absolutely.
19   Q. Okay. Now, you said that the number of
20 individuals who opted out in the higher spend
21 survey was higher than in the lower spend survey.
22 Is that the case?

Page 264

1    A. Yes.
2    Q. Okay. Now, in one of your prior answers,
3  you said that survey respondents might be
4  concerned that Google would come after them for
5  their responses, right?
6    A. I may not have used those exact words,
7  but something to that effect.
8    Q. Okay. You're aware that the survey
9  respondents' identities were kept confidential,
10 right?
11   A. Yes.
12   Q. So what's your basis for thinking that
13 Google could retaliate against survey respondents
14 in the way that you suggest?
15   A. I'm not saying Google would. And you're
16 right, they don't know who -- but why were they
17 concerned? You have a group -- the hard-core
18 evidence is you have a significant percentage of
19 people who, when they found out Google was the
20 sponsor and it related to the antitrust
21 litigation, they wanted out, even after taking the
22 time to fill out the questionnaire.

Page 265

1      There has to be a reason. It's not
2  random.
3    Q. You say there has to be a reason. But
4  you didn't test it, because you couldn't, right?
5    A. Right. I couldn't.
6    Q. Right.
7    A. There's no data. There's no open-ended
8  responses, why did you opt out?
9    Q. But you didn't, for example, conduct a
10 survey where you did not give survey respondents
11 the ability to opt out and see whether the results
12 would be any different.
13     MR. SHEANIN: Objection. Form.
14     THE WITNESS: No. As I said, I've not
15 done any other surveys.
16 BY MS. DEARBORN:
17   Q. Okay. How would a respondent to these
18 surveys know whether the answers were good for
19 Google or bad for Google?
20   A. I can't speculate, but all I can say is
21 they had some reason to opt out of that survey.
22   Q. Well, you do speculate in your report in

67 (Pages 262 - 265)

Page 266

1 paragraph 83, don't you?
2     MR. SHEANIN: Objection. Form.
3     THE WITNESS: Yeah, we just said this a
4 minute ago.
5 BY MS. DEARBORN:
6   Q. Right. You say, "It is entirely possible
7 that respondents who chose to have their responses
8 excluded did not want Google to have access to
9 their responses despite being told at the
10 beginning that their responses would be
11 anonymous."
12     That's what you wrote, right?
13   A. Yes.
14   Q. And you're just speculating as to why
15 respondents might have opted out, right?
16     MR. SHEANIN: Objection. Form.
17     THE WITNESS: Yes. Because it's
18 systematic. It's not random -- a random response.
19 They were specifically told something. And for a
20 significant number of people, they decided to
21 behave in a certain way, a consistent manner. So
22 there has to be some reason for it.

Page 267

1     Whether my reason is correct or not is
2 not the issue. The issue is there was a concern
3 that -- when they found out that Google had
4 sponsored the survey.
5 BY MS. DEARBORN:
6   Q. But the reasons for opting out in
7 paragraph 83, that's just your speculation,
8 correct?
9     MR. SHEANIN: Objection. Form.
10     THE WITNESS: Yes.
11 BY MS. DEARBORN:
12   Q. Why would a respondent think that their
13 answers would harm Google in a survey that Google
14 sponsored --
15     MR. SHEANIN: Objection.
16 BY MS. DEARBORN:
17   Q. -- as you suggest here in paragraph 83?
18     MR. SHEANIN: Objection. Form.
19     THE WITNESS: Again, as you said, I'm
20 speculating, but perhaps they are users of Google
21 tools, Google Ads, and that Google might charge
22 them a higher -- I don't know what they were

Page 268

1 thinking. I can only speculate. But there
2 clearly was a reason.
3 BY MS. DEARBORN:
4   Q. But again, you haven't tested what that
5 reason might be?
6     MR. SHEANIN: Objection. Form.
7     THE WITNESS: No, I have not.
8 BY MS. DEARBORN:
9   Q. Okay. We took a little bit of a detour
10 away from the no-contact list, so let's go back to
11 Exhibit [sic] I, please.
12   A. Okay.
13   Q. I'd like you to assume with me for a
14 moment that Dr. Simonson could not conduct a
15 survey that contacted the individuals in
16 appendix I. Just posit that.
17   A. Okay.
18   Q. That he had a valid reason for doing
19 that.
20   A. Okay.
21   Q. Is it your opinion that it is impossible
22 to conduct a reliable survey of advertisers while

Page 269

1 also excluding the entities in appendix I?
2     MR. SHEANIN: Objection. Form.
3     THE WITNESS: Of this magnitude, yes.
4 BY MS. DEARBORN:
5   Q. So you think no survey could have been
6 done in this case that would have been
7 methodologically sound if it was required that the
8 entities in appendix I be excluded?
9     MR. SHEANIN: Objection. Form.
10     THE WITNESS: If -- under that
11 assumption. But as I said before, it would be
12 possible. You take one example, Walt Disney
13 Company. How many thousands of people work for
14 Walt Disney Company? Is every single person in
15 that company aware of these issues?
16     I still think you could -- I think it was
17 a bad decision to exclude all these companies.
18 And -- but what you would do is ask the questions
19 about "do you know who the sponsor of this survey
20 is" at the end. And if they're not, then it's
21 fine to have them in the survey.
22

Page 270

1  BY MS. DEARBORN:
2     Q. Okay. I think that there's two separate
3  things going on here. Right? One is the
4  informed -- the fact that Dr. Simonson informed
5  respondents at the end of the survey as to its
6  sponsor and its purpose?
7     A. That's a different -- totally different
8  issue.
9     Q. Right. So I'm asking a much more narrow
10 question, which is, do you think no survey could
11 have been done in this case --
12    A. The --
13    Q. -- if it excluded the entities on
14 appendix I?
15    A. If you excluded them, yes, you could not
16 get a representative sample. But I'm saying
17 that -- is it impossible to do a survey? You
18 could, under the conditions I mentioned.
19    Q. Okay. So -- but in your example, you
20 would contact all of these individuals in
21 appendix I. You would just then ask them to guess
22 about the survey's respondents or --

Page 271

1     A. Well, I wouldn't contact all of them. I
2  would have a representative sample that included
3  these, possibly.
4     Q. I see. Again, in your view, it was
5  impossible to do a survey in this case if
6  Dr. Simonson couldn't --
7     A. Yes.
8     Q. -- contact the individuals in appendix I.
9     A. Yes.
10    Q. Okay. Now, one of the excluded companies
11 in appendix I is Google's parent company,
12 Alphabet, right?
13    A. Yes.
14    Q. You point this out in your report.
15    A. Yes.
16    Q. Are you saying Google should have
17 surveyed its own parent company?
18    A. No, I'm not saying that. But I'm saying
19 eliminating 580 companies is not necessary.
20    Q. Okay. Well, he didn't really eliminate
21 580 companies, did he, Dr. Hoyer?
22    A. That was my understanding, it was 580.

Page 272

1     Q. All right. Well, you understand
2  Dr. Simonson was surveying advertisers, right?
3     A. Yes.
4     Q. You understand that Dr. Simonson was not
5  conducting a survey of website publishers, right?
6     A. That's correct.
7     Q. Does appendix I include website
8  publishers?
9     A. I don't remember, to be honest.
10       Yes.
11    Q. And you understand that Dr. Simonson was
12 not conducting a survey of ad tech providers,
13 right?
14    A. Yes.
15    Q. Does appendix I include ad tech
16 providers?
17    A. I don't remember specifically.
18    Q. If you need to refresh your recollection,
19 you can look at page 1.
20    A. Page 1 of?
21    Q. Of appendix I.
22    A. Okay. And your question is?

Page 273

1     Q. Does appendix I, the no-contact list,
2  include ad tech providers?
3     A. Yes, it does.
4     Q. Okay. And it was not erroneous for
5  Dr. Simonson to exclude publishers or ad tech
6  providers from his survey population, right?
7        MR. SHEANIN: Objection. Form.
8        THE WITNESS: No, it was not.
9  BY MS. DEARBORN:
10    Q. Right. Because he was surveying
11 advertisers --
12    A. Right.
13    Q. -- right?
14       So he didn't exclude 580 companies from
15 his survey population, did he?
16    A. I would have to go back and see how those
17 numbers were calculated. But the key issue is not
18 so much the number as the amount of revenue and
19 the amount of advertising that is done on ad tools
20 by the companies that -- by companies that were
21 excluded.
22    Q. Okay. How many advertisers did

Page 274

1  Dr. Simonson exclude because they're listed in
2  appendix I?
3      A.  I believe there was 580.  I'd have to go
4  back and check the numbers.
5      Q.  Well, 580 includes ad tech providers and
6  publishers, though, right?
7      A.  I'm not sure.  I don't remember.  There
8  are, like, 580 in this table.
9      Q.  Where did that number, 580, in your
10 report --
11     A.  I asked --
12     Q.  -- come from?
13     A.  -- Brattle to calculate that for me.
14     Q.  And what instructions did you give
15 Brattle to come up with the number 580?
16     A.  To find out that -- the number of
17 advertising companies that were excluded.
18     Q.  So you think 580 is the number of
19 advertising companies that were excluded from the
20 survey?
21     A.  As I said, I'd have to go back and check.
22     Q.  Okay.  If it's significantly smaller than

Page 275

1  580, would that surprise you?
2         MR. SHEANIN:  Objection to form.
3         THE WITNESS:  It would surprise me.  But
4  again, the key issue is the amount of spending
5  that occurred.  It's still a very significant
6  number that were excluded.  And the amount of
7  revenue that -- Google's own revenue that comes
8  from those companies is substantial.
9  BY MS. DEARBORN:
10     Q.  Okay.  If the number 580 includes all of
11 the entities here in Exhibit I -- or, sorry, in
12 appendix I and is not advertisers, do you want to
13 revise your report?
14     A.  It doesn't change my opinion.
15     Q.  Would you like to revise that number in
16 your report?
17     A.  If -- given the opportunity, yes.
18     Q.  Okay.
19     A.  But still the key conclusion is, for
20 example, 9 of the top 15 whales, which are the
21 largest ad spenders on Google Ads, were excluded.
22 That's significant, independent of 580 or any

Page 276

1  other number.
2         And, you know, if you look at that
3  paragraph where that is quoted, there's a lot
4  of -- you know, it really adds to the
5  unrepresentativeness of the sample.
6      Q.  Have you done any analysis as to whether
7  the results of Dr. Simonson's surveys would change
8  if the excluded companies in appendix I were, in
9  fact, included in the survey population?
10     A.  I have not done that.
11     Q.  Do you have a basis one way or the other
12 to opine as to the direction in which inclusion of
13 those individuals in the survey population would
14 have impacted the results?
15        MR. SHEANIN:  Objection.  Form.
16 Foundation.
17        THE WITNESS:  Showing that your sample is
18 representative is his responsibility, not mine.
19 He should have shown that there were no
20 differences or that that is a valid sample.
21        He has provided, as far as I can see, no
22 evidence that his sample is representative of the

Page 277

1  population.
2  BY MS. DEARBORN:
3      Q.  Okay.  Now, in previous surveys that you
4  have conducted, you have excluded certain members
5  of populations because you weren't able to contact
6  them for one reason or another, right?
7      A.  Yes.
8      Q.  Right.  So in the credit union case that
9  you just mentioned, you excluded any respondents
10 who were a current member of the credit union,
11 right?
12     A.  Yes.
13        MR. SHEANIN:  Objection.  Form.
14 BY MS. DEARBORN:
15     Q.  Did you think the exclusion of members of
16 the credit union created a bias in your survey?
17     A.  The population we were representing or
18 trying to generalize to were potential credit
19 union members.  And so that's what we had.  We had
20 a sample, representative sample, of credit union
21 members.
22     Q.  Got it.

Page 278

1  MR. SHEANIN: And can I just say -- I
2 just, again, want to caution you not to go into
3 anything that would revel confidential information
4 in that matter.
5  MS. DEARBORN: To set Dr. Hoyer's mind at
6 ease, the report is publicly available.
7  MR. SHEANIN: Okay.
8  MS. DEARBORN: So I don't think there's
9 confidentiality concern here.
10 BY MS. DEARBORN:
11  Q. But of course I'm not asking you to
12 violate your -- any confidentiality obligations
13 that you're under, but I'm asking questions to
14 which I believe the answers are public knowledge.
15  A. Well, there was a reason for that, and
16 the reason was we were testing a language of
17 Vistar's agreement that, when people signed up for
18 an account, they had to read that and understand
19 the terms of that account. And people who are
20 already members have already seen that account,
21 and that doesn't give an indication of how well
22 new members would understand that language.

Page 279

1  MR. SHEANIN: Okay.
2  THE WITNESS: So that's how we...
3  MR. SHEANIN: I'd remind you to only
4 respond to questions that were actually on the
5 table and posed to you, and I don't believe there
6 was one posed to you at that point.
7  MS. DEARBORN: And I would request that
8 counsel not coach the witness.
9 BY MS. DEARBORN:
10  Q. Okay. You've conducted surveys of
11 purchasers of MP3s.
12  Do you recall that?
13  A. Yes.
14  Q. And when you conducted a survey of
15 consumers who purchased MP3s, you excluded from
16 your survey population any individuals under the
17 age of 18, right?
18  A. Which study are you referring to? I
19 remember vaguely, but I don't have a detailed
20 memory of that.
21  Q. It's a 2020 study that you did on MP3
22 purchasing.

Page 280

1  A. Do you have the reference for it so I
2 can --
3  Q. I don't, unfortunately.
4  It's a -- well, I have a study that you
5 published in the Journal of the Academy
6 of Marketing Science.
7  A. Okay.
8  Q. Does that jog your memory?
9  A. No. I have had about 15 articles, or --
10  Q. Okay. I'll ask it more generally.
11  When you conduct surveys, as a general
12 matter, it's usually appropriate to exclude
13 minors, right?
14  A. Yes.
15  Q. And -- but minors make purchasing
16 decisions, right?
17  A. Yes.
18  Q. Does the exclusion of minors from survey
19 populations make the surveys any less reliable?
20  A. It depends on what type of survey you're
21 talking about. If it's an academic study, we
22 aren't as concerned about representative [sic] of

Page 281

1 the sample. If it's a litigation survey where
2 you're trying to draw specific conclusions about a
3 population, and they are a significant buyer, then
4 it is a problem.
5  Q. Now, Dr. Simonson concludes that, to the
6 extent the companies that he excluded, because
7 they appeared on the no-contact list, are, on
8 average, more sophisticated advertisers, then his
9 results would likely to be conservative on key
10 topics such as multi-homing and substitution.
11  Do you have any reason to doubt that
12 conclusion?
13  A. Yes. He provides no evidence of that.
14 Why would they be -- why would it be more
15 conservative? I don't understand that comment.
16  Q. Did you review the bases for
17 Dr. Simonson's statement?
18  A. I did, but I don't remember the
19 specifics.
20  Q. Did you disagree with him when you
21 reviewed that paragraph in his report?
22  MR. SHEANIN: Objection. Form.

71 (Pages 278 - 281)

Page 282

1    THE WITNESS: To be perfectly honest,
2 that's a phrase that academics use all the time to
3 try to get them out of difficult situations
4 that -- it's not necessarily a valid statement, to
5 be quite honest.
6 BY MS. DEARBORN:
7    Q. Which phrase, the fact that --
8    A. Likely to be conservative.
9    Q. It's not a phrase you've ever used
10 before, Dr. Hoyer?
11   A. Oh, I've used it. We all use it. But
12 that doesn't mean it's right.
13   Q. But still, you have no basis to disagree
14 with that conclusion in his report, despite the
15 fact that you question the use of the word
16 "conservative," right?
17       MR. SHEANIN: Objection. Form.
18       THE WITNESS: He doesn't provide detailed
19 reasons of why it would be conservative, and I --
20 I would have to be convinced of his reasoning
21 before I would accept that statement.
22

Page 283

1 BY MS. DEARBORN:
2    Q. Well, part of your assignment was to
3 review and respond to Dr. Simonson's report,
4 right?
5    A. Yes.
6    Q. And disagreeing with his statement that
7 exclusion of individuals on the no-contact list is
8 not a criticism -- strike that.
9       His conclusion that exclusion of the
10 companies on the no-contact list was likely to
11 make the results of his survey conservative is not
12 a conclusion that you challenge in your report,
13 correct?
14   A. I challenge that the sample is
15 unrepresentative, and we don't know how that
16 affected the survey.
17      But the issue -- it's not a valued [sic]
18 support because the purpose of a survey should be
19 to be able to draw valid conclusions on a
20 representative sample. And anything less than
21 that calls into question the reliability and
22 usefulness of the survey.

Page 284

1    Q. But you did not specifically disagree
2 with Dr. Simonson's conclusion that exclusion of
3 the companies on the no-contact list may have
4 rendered his survey results conservative, rights?
5       MR. SHEANIN: Objection.
6 BY MS. DEARBORN:
7    Q. That's not something that you said in
8 your report?
9       MR. SHEANIN: Objection to form.
10      THE WITNESS: I didn't say it in my
11 report. But since you're asking me, I don't -- I
12 can't accept that comment at face value.
13 BY MS. DEARBORN:
14   Q. All right. Let's look at paragraph 69 of
15 your report, please.
16      All right. And in this paragraph you
17 criticize Dr. Simonson because you say he has no
18 way to ascertain whether two, five, ten, or more
19 respondents in his final sample work for the same
20 company, right?
21   A. Yes.
22   Q. That's because, theoretically, people

Page 285

1 from different business units in the same company
2 could answer the survey?
3       MR. SHEANIN: Objection. Form.
4       THE WITNESS: Or from the same business
5 unit even.
6 BY MS. DEARBORN:
7    Q. Did you look at the data that
8 Dr. Simonson provided to determine how many
9 individuals from the same company answered the
10 survey?
11      MR. SHEANIN: Objection. Form.
12 Foundation.
13      THE WITNESS: I don't recall. I don't
14 remember seeing that.
15 BY MS. DEARBORN:
16   Q. Is that something you looked into?
17      MR. SHEANIN: Objection. Form.
18 Foundation.
19      THE WITNESS: I was just basing it on his
20 report that he didn't mention that there was any
21 effort to only have single individuals from each
22 company. I didn't see his description of that.

72 (Pages 282 - 285)

Page 326

1  always games that subjects play. It's -- the key
2  is whether it's systematic demand characteristics.
3  BY MS. DEARBORN:
4     Q. Right. So you would agree that some
5  demand characteristics effect is minor?
6       MR. SHEANIN: Objection. Form.
7       THE WITNESS: The key issue is whether it
8  systematically influences results in a certain
9  way. And particularly, does it influence results
10 towards the hypothesis of the researcher?
11 BY MS. DEARBORN:
12    Q. Have you done any empirical analysis to
13 determine whether demand effects influenced
14 Dr. Simonson's study in a systematic way?
15      MR. SHEANIN: Objection. Form.
16      THE WITNESS: Yeah, I am not -- I did not
17 have the time to do a study of that nature. It
18 was not part of my assignment.
19 BY MS. DEARBORN:
20    Q. Would you agree that there's no such
21 thing as a perfect survey?
22    A. I would agree with that. But some

Page 327

1  surveys are much more flawed than others.
2     Q. Have you ever asked survey respondents
3  questions about what they would do in a response
4  to a price increase without specifying the amount
5  of that increase?
6     A. I don't do pricing research, so no, I
7  have not.
8     Q. Have you ever seen that asked?
9       MR. SHEANIN: Objection. Form.
10      THE WITNESS: Most typically -- again,
11 I've seen many studies. Studies that I can recall
12 seeing do specify an amount, like dollar amount or
13 percentage increase.
14 BY MS. DEARBORN:
15    Q. Have you ever seen a survey done that
16 asks respondents what they would do in response to
17 a price increase without specifying the dollar
18 amount or specific amount of the increase?
19      MR. SHEANIN: Objection. Form. Asked
20 and answered.
21      THE WITNESS: Not that I can recall. And
22 if I were a reviewer of a study, I would highly

Page 328

1  question that question as being vague.
2       MS. DEARBORN: Okay. Let's look at --
3  let's do tab 30, please, Anita. Let's mark -- I
4  believe we're up to Exhibit 5.
5       (Hoyer Deposition Exhibit 5 marked for
6       identification and attached to the
7       transcript.)
8  BY MS. DEARBORN:
9     Q. Okay. We've marked as Hoyer Exhibit 5 an
10 article titled, "Service brand relationship
11 quality: Hot or cold?"
12     Do you recognize this document,
13 Dr. Hoyer?
14    A. Yes.
15    Q. What is it?
16    A. Yes.
17    Q. What is it?
18    A. It's an article I wrote with my Swiss
19 colleagues looking at -- it was mainly focused on
20 brand relationship quality.
21    Q. Do you stand by the results of this
22 paper?

Page 329

1     A. Yes.
2     Q. Do you think the methodology you employed
3  was reliable --
4     A. As far as --
5     Q. -- in conducting a survey?
6     A. As far as I can recall, yes.
7     Q. Just because I'm watching the transcript
8  here, please let me finish my question before you
9  start your answer. Our transcript is going to be
10 a mess otherwise.
11      MR. SHEANIN: Yeah, if every one would
12 take a moment so that you could finish the
13 question, I can finish an objection and you can
14 get a good answer --
15      THE WITNESS: Guilty, sorry.
16      MR. SHEANIN: I promise that our court
17 reporter would be appreciative.
18 BY MS. DEARBORN:
19    Q. Okay. So just to ask my question again,
20 you stand by the methodology that you employed in
21 conducting this study, correct?
22    A. Yes.

83 (Pages 326 - 329)

Page 330

1  Q. All right. So this study involved a
2  survey, right?
3  A. Yes.
4  Q. It involved a survey of consumers,
5  correct?
6  A. As far as I remember, yes.
7  Q. And the survey questions are reproduced
8  in appendix A, right?
9  A. Yes.
10  Q. And the only difference between the
11  survey questions reproduced in appendix A and
12  those you actually gave to survey respondents is
13  that you actually substituted a brand in response
14  to the Xs in this table, right?
15  A. I believe so. This was done ten years
16  ago, but yes, I think so.
17  Q. Right. So, here, X was a brand of
18  airline?
19  A. Yes.
20  Q. But otherwise, these were verbatim the
21  questions that you gave to survey respondents,
22  right?

Page 331

1  A. Technically, yes. It's an English
2  translation. It was Swiss -- it was in German.
3  Q. But you think this was accurately
4  translated, correct?
5  A. Yes.
6  Q. Okay. So I'd like to focus your
7  attention midway down the page. There are two
8  questions underneath the header "Willingness to
9  pay a price premium."
10    Do you see that?
11  A. Yes.
12  Q. And one of the questions that you asked
13  consumers in this survey was, "The price of X
14  would have to go up quite a bit before I would
15  switch to another airline brand," right?
16  A. Yes.
17  Q. Did you put a specific value on the
18  phrase "quite a bit" anywhere in this survey?
19  A. This is a standard set of questions.
20  "Willingness to pay" is a common term and is based
21  on a previous scale that's cited there, Netemeyer,
22  et al.

Page 332

1  But no, we did not change that question
2  based on the previous scale.
3  Q. And the previous scale, that's not a
4  dollar figure scale, right? That's, like, a
5  sliding scale from 1 to whatever, indicating the
6  extent to which the respondent agreed with that
7  phrase?
8    MR. SHEANIN: Objection. Form.
9    THE WITNESS: I don't remember if it was
10  a sliding scale.
11  BY MS. DEARBORN:
12  Q. Okay.
13  A. It's been ten years. I --
14  Q. Well, you said the previous scale cited
15  there, so I'm just trying to understand what that
16  previous scale is.
17  A. The Netemeyer, et al., 2004 scale.
18  Q. And what is that scale? Can you describe
19  it for me?
20  A. Well, it's these two -- it's a scale to
21  measure willingness to pay.
22  Q. But how is -- what are the actual values

Page 333

1  on that scale?
2  A. I don't remember.
3  Q. Is it a specific dollar amount?
4  A. I can't remember, to be honest. It's ten
5  years ago.
6  Q. Just based -- looking at the language of
7  this question --
8  A. I mean, it might be -- I could take time
9  to read the article, to go back and see what all
10  the scales were, but I don't remember off the top
11  of my head.
12  Q. Well, you agree that the question that
13  you asked survey respondents was, "The price of X
14  would have to go up quite a bit before I would
15  switch to another airline brand," right?
16  A. Yes.
17  Q. So the most likely scale that would allow
18  respondents to answer that question is one that
19  indicates their willingness to pay, right?
20  Very -- strongly agree, do not agree, et cetera?
21    MR. SHEANIN: Objection. Form.
22  Foundation.

84 (Pages 330 - 333)

Page 334

1   THE WITNESS: That's one way you could
2 measure it. You could also ask them -- and some
3 studies do -- how much would it have to go up
4 before I would switch to another brand?
5 BY MS. DEARBORN:
6   Q. That would be a different question,
7 though, right, Dr. Hoyer?
8   A. It would measure willingness to pay.
9   Q. But you would have to ask a different
10 question in order to evaluate how much the price
11 would have to go up in order for them to switch,
12 right?
13   A. Yes.
14   Q. All right. My colleague has helpfully
15 pointed out a portion of this article that might
16 reflesh -- refresh your recollection as to the way
17 that the scale was worded.
18   If you could turn to page 96 of this
19 article, please. Under "Measures," the last
20 sentence of the first paragraph says, "With few
21 exceptions (i.e., consideration of set size, share
22 of wallet, and revenue per customer), all items

Page 335

1 were measured with a seven-point Likert" --
2 L-i-k-e-r-t --
3   A. Likert.
4   Q. -- "type scale, anchored by 'strongly
5 disagree' and 'strongly agree.'"
6   Do you see that?
7   A. Yes.
8   Q. So the willingness to pay questions are
9 not one of the three exceptions that are listed
10 there, right?
11   A. That's correct.
12   Q. So the willingness to pay questions were
13 measured with a scale anchored by "strongly
14 disagree" and "strongly agree"?
15   MR. SHEANIN: Objection. Form.
16   Go ahead.
17   THE WITNESS: That's correct.
18 BY MS. DEARBORN:
19   Q. Okay. So again, to make sure we have a
20 clean record with that refreshed recollection, in
21 this survey you asked consumers, "The price of X
22 would have to go up quite a bit before I would

Page 336

1 switch to another airline brand," right?
2   MR. SHEANIN: Asked and answered.
3   THE WITNESS: Yes.
4 BY MS. DEARBORN:
5   Q. And in answering that question,
6 respondents were required to indicate their
7 response on a sliding scale that went from
8 "strongly disagree" to "strongly agree"?
9   A. It's not a sliding scale. It's a
10 seven-point scale, and they circle one of the --
11 or indicate one of the numbers from 1 to 7.
12   Q. I appreciate the clarification.
13   In order to answer the question "The
14 price of X would have to go up quite a bit before
15 I would switch to another airline brand,"
16 respondents answered on a scale that went from
17 "strongly disagree" to "strongly agree"?
18   A. That's correct.
19   Q. And this question did not ask about a
20 specific dollar amount that the price would go up,
21 right?
22   A. It did not.

Page 337

1   Q. And it didn't ask about a specific
2 percentage that the price would go up before they
3 would answer that question, right?
4   A. Yes.
5   MR. SHEANIN: Object to form.
6   THE WITNESS: Sorry.
7 BY MS. DEARBORN:
8   Q. Okay. And you do not think that asking
9 this question was unreliable in any way, right?
10   MR. SHEANIN: Objection to form.
11   THE WITNESS: I don't think it's the best
12 way we could have asked it. In retrospect, I
13 would have asked it differently, from what I know
14 now. But it's just one item on the whole study.
15 BY MS. DEARBORN:
16   Q. And you did not define the phrase "quite
17 a bit" in that question, right?
18   A. Correct.
19   Q. So you asked respondents, "The price of X
20 would have to go up quite a bit before I would
21 switch to another airline brand," without defining
22 the specific --

85 (Pages 334 - 337)

Page 458

1  Q. How would you go about determining
2 whether or not different people from the same
3 company or from different business units within
4 the same company took the survey?
5  A. You would need a question or data on
6 that. And in his instructions, he -- it is
7 completely anonymous. And looking back at the
8 backup data, there was no question on what company
9 they were from, so there's no way to evaluate
10 that.
11     MR. SHEANIN: Thank you. I have no
12 further questions.
13     MS. DEARBORN: Nothing further.
14     VIDEO TECHNICIAN: Okay. This now ends
15 the deposition of Dr. Wayne Hoyer. We're off the
16 record at 5:16 p.m.
17     (Whereupon, at 5:16 p.m., the videotaped
18     deposition of WAYNE D. HOYER, Ph.D., was
19     concluded.)
20
21
22

Page 459

1     CERTIFICATE OF NOTARY PUBLIC
2     I, CHRISTINA S. HOTSKO, the officer before
3 whom the foregoing deposition was taken, do hereby
4 certify that the witness whose testimony appears in
5 the foregoing deposition was duly sworn by me; that
6 the testimony of said witness was taken by me in
7 stenotypy and thereafter reduced to typewriting under
8 my direction; that said statement is a true record of
9 the proceedings; that I am neither counsel for,
10 related to, nor employed by any of the parties to the
11 action in which this statement was taken; and,
12 further, that I am not a relative or employee of any
13 counsel or attorney employed by the parties hereto,
14 nor financially or otherwise interested in the
15 outcome of this action.
16 Dated: March 6, 2024
17
18     CHRISTINA S. HOTSKO
19     Notary Public in and for the
20     District of Columbia
21 My commission expires:
22 1 January 2027

116 (Pages 458 - 459)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | | | | |
|---|---|---|---|---|
| | | is they were asked to focus on their biggest client." | is they were asked to focus on the client **they spent the most time on**." | |
| 169 | 1-5 | "My decades of experience doing questionnaires, people don't --they remember individual questions, but they can forget instructions, particularly if they're violated." | "**Based on my** decades of experience doing questionnaires, people remember individual questions, but they can forget instructions, **frequently** they're violated." | Clarification |
| 173 | 12 | "communications, that is what I preach in my class,…" | "communications, that is what I **teach** in my class,…" | Correction |
| 199 | 1 | "colleagues from the University of Bern in Wharton" | "colleagues from the University of Bern **and** Wharton" | Clarification |
| 203 | 8-10 | "To ensure that our sample contains a sufficient number of companies with both **hot** -- low and high degrees of.." | "To ensure that our sample contains a sufficient number of companies with both -- low and high degrees of.." | Typo |
| 220 | 2-4 | "and I was explaining why I was not concerned in this study and I was concerned in mine." | "and I was explaining why I was not concerned in this study and I was concerned in **Prof. Simonson's survey**." | Clarification |
| 241 | 6-7 | "It's not – there are not multiple quotes" | "**There** are multiple quotes" | Typo; Clarification |
| 252-253 | 21-5 | "I think it's possible. I think -- a lot of these companies are large. And just because the company is involved in litigation doesn't mean that every single member of that company is going to know about that litigation, nor does it mean even people not -- that are contacted aren't aware of that litigation." | "I think it's possible. I think -- a lot of these companies are large. And just because the company is involved in litigation doesn't mean that every single member of that company is going to know about that litigation, nor does it mean ~~even~~ people ~~not~~ that are contacted aren't aware of that litigation." | Transcription Error; Clarification |
| 253 | 10-11 | "And if you get people in that question, then they are excluded from the sample." | "And if you get people **answering** that question, then they are excluded from the sample." | Clarification |
| 278 | 17 | "Vistar's agreement that" | "**Vystar's** agreement that" | Typo |
| 299 | 6-9 | "It's formally hard to believe that -- just based on my analysis and these numbers, it would be -- I strongly suspect that the sample is unrepresentative." | "It's hard to believe that -- just based on my analysis and these numbers, it would be -- I strongly suspect that the sample is unrepresentative." | Clarification |

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | | | | |
|---|---|---|---|---|
| 314-315 | 21-2 | "Because in Simon's [sic] report, people are opting to change and spending more and switching, diverting, in his question." | "Because in **Simonson's** report, people are opting to change and spending more and switching, diverting, in his question." | Typo |
| 353 | 13-14 | "But that is, to me, a bias question, and it's not reflective of how" | "But that is, to me, a **biased** question, and it's not reflective of how" | Typo |
| 356 | 21-22 | "There are consumers cost is the only thing, and that's why..." | "There are consumers **for whom** cost is the only thing, and that's why..." | Clarification |
| 386 | 4-5 | "The prospective issue is about, is it my unit, is it me, is it my company?" | "The **perspective** issue is about, is it my unit, is it me, is it my company?" | Typo |
| 392 | 11 | "you get no actual precision." | "you get no **additional** precision." | Clarification |
| 397 | 9-10 | "No, I don't see how that's irrelevant [sic]." | "No, I don't see how that's **relevant**." | Typo |
| 412 | 6-7 | "That's not the center [sic] to my criticism." | "That's not **central** to my criticism." | Clarification |
| 429 | 2-5 | "But they could still not be [sic] close attention to the survey and not straightline that answer, but it's still not an indication that they were paying close attention to the survey." | "But they could still not be **paying** close attention to the survey and not straightline that answer, but it's still not an indication that they were paying close attention to the survey." | Clarification |
| 430 | 2-3 | "That seemed like a question that could be responsible [sic], straight …" | "That seemed like a question that could be **susceptible to straight-lining** …" | Clarification |

_[signature]_