**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

UNITED STATES, *et al.*,

                    *Plaintiffs*,

        vs.

GOOGLE LLC,

                    *Defendant*.

No. 1:23-cv-00108-LMB-JFA

**GOOGLE LLC'S MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF ITAMAR SIMONSON AND**
**<u>RELATED OPINIONS OF MARK ISRAEL</u>**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................................. 1

II.   BACKGROUND ............................................................................................... 2

    A.    Professor Simonson Is Qualified to Conduct Surveys. .......................................... 2

    B.    Professor Simonson's Three Surveys Queried Statistically Robust Panels of Higher-Spend Advertisers, Lower-Spend Advertisers, and Ad Agencies. ............. 4

    C.    Professor Simonson's Surveys Asked Advertisers and Ad Agencies Questions About the Extent of Multi-Homing and the Extent to Which They Would Divert Spending from Display Advertising. ................................ 8

    D.    Dr. Israel's Opinion Reasonably Relied on Professor Simonson's Surveys as Evidence in Support of Market Definition .............................................. 10

III.  LEGAL STANDARD ...................................................................................... 11

IV.   ARGUMENT .................................................................................................. 12

    A.    Professor Simonson Surveyed the Proper Universe of Advertisers ..................... 12

        1.    Professor Simonson's Exclusion of Approximately 150 Advertisers and Ad Agencies Does Not Render the Higher-Spend Advertiser Survey or Ad Agency Survey Unreliable. ................................. 12

        2.    Disclosing the Survey's Sponsor Is Not Unusual And Does Not Provide a Basis for Exclusion ...................................... 16

        3.    Professor Simonson Conducted His Surveys Independently and Without "Interference" from Google. ...................................... 19

    B.    Professor Simonson's Diversion Question Is Relevant, and the Results from that Question Are Reliable. ...................................................... 20

        1.    Professor Simonson's Diversion Question Is Relevant to Market Definition. .................................................... 20

        2.    The Results of Professor Simonson's Diversion Question Are Reliable. .................................................... 25

CONCLUSION .......................................................................................................... 27

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AHP Subsidiary Holdings Co.* v. *Stuart Hale Co.*,
  1 F.3d 611 (7th Cir. 1993) ..................................................................................................11

*Apple* v. *Epic*,
  67 F.4th 946 (9th Cir. 2023) ...............................................................................................23

*Belk, Inc.* v. *Meyer Corp, U.S.*
  679 F.3d 146 (4th Cir. 2012) .........................................................................................11, 13

*Blue Cross & Blue Shield United of Wisc.* v. *Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995),
  *as amended on denial of reh'g* (Oct. 13, 1995) ...................................................................20

*Bluetooth SIG, Inc.* v. *FCA US LLC*,
  468 F. Supp. 3d 1342 (W.D. Wash. 2020).........................................................................27

*Brown Shoe Co.* v. *United States*,
  370 U.S. 294 (1962)............................................................................................................24

*Chi. Mercantile Exch. Inc.* v. *ICE Clear US, Inc.*,
  2020 WL 1905760 (N.D. Ill. Apr. 17, 2020) .....................................................................13

*City of Pomona* v. *SQM N. Am. Co.*,
  750 F.3d 1036 (9th Cir. 2014) .......................................................................................14, 18

*Consul, Ltd.* v. *Transco Energy Co.*,
  805 F.2d 490 (4th Cir. 1986) ..............................................................................................20

*E.&J. Gallo Winery* v. *Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir. 1992) ............................................................................................27

*FTC* v. *FleetCor Tech. Inc.*,
  2022 WL 3350066 (N.D. Ga. Aug. 9, 2022) .................................................................15, 16

*Geiger* v. *Creative Impact Inc.*,
  2020 WL 3268675 (D. Ariz. June 17, 2020) ......................................................................27

*Gucci Am., Inc.* v. *Guess?, Inc.*,
  831 F. Supp. 2d 723 (S.D.N.Y. 2011)..................................................................................4

*Gutierrez* v. *Wells Fargo Bank, N.A.*,
  730 F. Supp. 2d 1080 (N.D. Cal. 2010),
  *rev'd in part on other grounds*, 704 F.3d 712 (9th Cir. 2012).................................................4

*United States* v. *H&R Block, Inc.*,
    831 F. Supp. 2d 27 (D.D.C. 2011) ..................................................................24, 27

*Hambrick ex rel. Hambrick* v. *Ken-Bar Mfg. Co.*,
    422 F. Supp. 2d 627 (W.D. Va. 2002) ...................................................................26

*Harolds Stores, Inc.* v. *Dillard Dep't Stores, Inc.*,
    82 F.3d 1533 (10th Cir. 1996) .............................................................................13

*HI Ltd. P'ship* v. *Winghouse of Fla., Inc.*,
    2004 WL 5486964 (M.D. Fla. Oct. 5, 2004) .........................................................15

*HI Ltd. Partnership* v. *Winghouse of Florida, Inc.*,
    347 F. Supp. 2d 1256 (M.D. Fla. 2004) ................................................................15

*It's My Party, Inc.* v. *Live Nation, Inc. (It's My Party II)*,
    811 F.3d 676 (4th Cir. 2016) .........................................................................20, 22

*Jackson* v. *E-Z-GO Div. of Textron, Inc.*,
    326 F. Supp. 3d 375 (W.D. Ky. 2018) ..................................................................14

*Jellibeans, Inc.* v. *Skating Clubs of Ga., Inc.*,
    716 F.2d 833 (11th Cir. 1983) .............................................................................27

*In re: Johnson & Johnson Talcum Powder Prods. Mktg.,
    Sales Pracs. & Prods. Litig.*,
    509 F. Supp. 3d 116 (D.N.J. 2020) ......................................................................15

*Johnson* v. *Air & Liquid Sys., Corp.*,
    2020 WL 11563846 (E.D. Va. Nov. 6, 2020) ........................................................11

*Johnson v. Big Lots Stores, Inc.*,
    2008 WL 1930681 (E.D. La. Apr. 29, 2008) .........................................................19

*Kargo Glob., Inc.* v. *Advance Magazine Publishers, Inc.*,
    2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)............................................................4

*Ky. Speedway, LLC* v. *Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908, 918 (6th Cir. 2009) .......................................................................24

*Little* v. *Wash. Metro. Area Transit Auth.*,
    249 F. Supp. 3d 394 (D.D.C. 2017) ......................................................................11

*Maldonado* v. *Apple, Inc.*,
    2021 WL 1947512 (N.D. Cal. May 14, 2021) ........................................................27

*Malletier* v. *Dooney & Bourke, In*c.,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)......................................................................3

*Mitchell* v. *Gencorp Inc.*,
  165 F.3d 778 (10th Cir. 1999) ........................................................................11

*In re Motor Fuel Temperature Sales Practices Litig.*,
  2012 WL 13050523 (D. Kan. Feb. 29, 2012) ..................................................27

*PBM Prods., LLC* v. *Mead Johnson & Co.*,
  639 F.3d 111 (4th Cir. 2011) ...........................................................2, 11, 12, 13

*PepsiCo, Inc.* v. *Coca-Cola Co.*,
  114 F. Supp. 2d 243 (S.D.N.Y. 2000)..............................................................25

*PepsiCo, Inc.* v. *Coca-Cola Co.*,
  315 F.3d 101 (2d. Cir. 2002)............................................................................25

*Precision Fabrics Grp., Inc.* v. *Tietex Int'l, Ltd.*,
  367 F. Supp. 3d 487 (D.S.C. 2019)..............................................................14, 18

*Saint Alphonsus Med. Ctr.-Nampa Inc.* v. *St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ...........................................................................23

*Satellite Television & Associated Res., Inc.* v. *Continental Cablevision of Va.*,
  714 F.2d 351 (4th Cir. 1983) ...........................................................................23

*Sazerac Co.* v. *Fetzer Vineyards, Inc.*,
  265 F. Supp. 3d 1013 (N.D. Cal. 2017) .............................................................4

*Schechner* v. *Whirlpool Corp.*,
  2018 WL 6843305 (E.D. Mich. Oct. 30, 2018) ..................................................3

*Scotts* v. *United Industries Corp.*,
  315 F.3d 264 (4th Cir. 2002) ...........................................................................25

*Simon Prop. Grp. L.P.* v. *mySimon, Inc.*,
  104 F. Supp. 2d 1033 (S.D. Ind. 2000) ..............................................................4

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
  2018 WL 563144 (D. Mass. Jan. 25, 2018)......................................................24

*TCL Commc'n Tech. Holdings, Ltd.* v. *Telefonaktiebolaget LM Ericsson*,
  2018 WL 4488286 (C.D. Cal. Sept. 14, 2018),
  *rev'd in part, vacated in part on other grounds*,
  943 F.3d 1360 (Fed. Cir. 2019)..........................................................................4

*THOIP* v. *Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010)................................................................4

*Tunnell* v. *Ford Motor Co.*,
    330 F. Supp. 2d 707 (W.D. Va. 2004) ...................................................................27

*In re University of S. Calif. Tuition & Fees COVID-19 Refund Litig.*,
    2023 WL 6453814 (C.D. Cal. Sept. 29, 2023) ......................................................27

*U.S. Healthcare, Inc.* v. *Healthsource, Inc.*,
    986 F.2d 589 (1st Cir. 1993) ...............................................................................23

*US Wind, Inc.* v. *InterMoore, Inc.*,
    640 F. Supp. 3d 390 (D. Md. 2022) .......................................................................21

*Va. Vermiculite, Ltd.* v. *W.R. Grace & Co. Conn.*,
    108 F. Supp. 2d 549 (W.D. Va. 2000) ............................................................22, 23

*VIP Prods., Inc.* v. *Jack Daniel's Props., Inc.*,
    291 F. Supp. 3d 891 (D. Ariz. 2018),
    *rev'd in part, vacated in part on other grounds*,
    953 F.3d 1170 (9th Cir. 2020) ................................................................................4

*vonRosenberg* v. *Lawrence*,
    413 F. Supp. 3d 437 (D.S.C. 2019) ......................................................................27

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    2021 WL 6690337 (E.D. Va. Aug. 16, 2021) ........................................................11

**Other Authorities**

2010 Merger Guidelines ......................................................................................................2

Advertiser Perceptions, "What Advertisers Think" (2016),
    tinyurl.com/AdPerceptionsBrochure ..................................................................5

Commission Opinion, Intuit, Inc., FTC Docket No. 9408 (Jan. 22, 2024)....................18

Fed. R. Evid. 702 ..............................................................................................................11

Federal Judicial Center, Shari Seidman Diamond, *Reference Guide on Survey*
    *Research*, in Reference Manual on Scientific Evidence (3d ed. 2011) .............17, 27

Federal Rule of Disciplinary Enforcement IV.B ...............................................................5

5 McCarthy on Trademarks and Unfair Competition § 32:170 (5th ed.) .......................11

Novemsky Report, Intuiti Inc., FTC Docket No. 9408 (filed Feb. 10, 2023)..................7

Virginia Rules of Prof. Conduct 4.2 ..................................................................................5

# I.     INTRODUCTION

Professor Itamar Simonson, one of the world's leading experts in survey design, conducted reliable and relevant surveys that empirically prove what the fact witnesses in this case have also said:  Advertisers and ad agencies commonly use multiple ad buying tools, and allocate their spending between different ad formats—including social media, display, video, and more—easily and quickly in response to minor changes in cost.  Prof. Simonson's surveys invalidate Plaintiffs' gerrymandered market definition, which imagines "open-web display advertising," and Google's tools for buying such advertising, as a fictional island that advertisers can never leave.  Plaintiffs have the burden of proof, yet despite retaining *nine* experts, they commissioned no survey at all.

Plaintiffs first argue that Prof. Simonson's surveys are unreliable because he excluded a handful of potential witnesses from the survey universe.  Google instructed Prof. Simonson not to survey these entities in order to comply with counsel's ethical obligations not to contact represented parties: standard fare in litigation.  At most, the No Contact List included around *150* advertisers and ad agencies.  Prof. Simonson's team eventually reached out to 11,162 potential respondents.  Plaintiffs' motion says exactly nothing about why the small number of excluded respondents might have answered the surveys' questions any differently than those who were invited to participate, and there is no reason to think that they would.

Next, as is the federal government's own practice, Prof. Simonson disclosed at the very end of the surveys that Google sponsored it for litigation purposes, and offered respondents the ability to exclude their answers from consideration.  Because survey respondents had no idea that Google sponsored the survey *when they were answering questions*, this end-of-survey disclosure did not violate typical practice to ensure that surveys are "blind."  Prof. Simonson carefully considered whether opt-out exclusion would impact the surveys' results, and explained why he believed that it would not.  Again, Plaintiffs offer no reason why this decision might have biased

1

the results.

At bottom, these are not criticisms warranting exclusion. The Fourth Circuit has held that a critique that a survey asked questions of "the wrong universe bears directly on the weight accorded to the survey, not to its admissibility." *See, e.g.*, *PBM Prods., LLC* v. *Mead Johnson & Co.*, 639 F.3d 111, 124 (4th Cir. 2011). The Court should reach the same result here.

Plaintiffs next critique Prof. Simonson's surveys for asking advertisers how they would react to a small but significant increase in the cost of display advertising. This is merely a complaint that Prof. Simonson did not ask a different question—one Plaintiffs failed to ask anyone. To be clear: Plaintiffs have the burden to prove their relevant market. Their own experts could have, but did not, perform what is called the "hypothetical monopolist test," which involves an analysis of whether a hypothetical monopolist could profitably "impose a small but significant non-transitory increase in price ('SSNIP')" without "customers substituting away from the products." 2010 Merger Guidelines § 4.1.1 at 9, § 4.1.3 at 11. It was not Google's burden to perform such a test, and Prof. Simonson is not attempting to do so here. Instead, Prof. Simonson's surveys provide useful evidence that Plaintiffs' market definition is impermissibly gerrymandered. Survey evidence of industry participant understanding and behavior is unquestionably relevant for this purpose. And Plaintiffs' halfhearted critique that this question is vague is easily dispensed with for a number of reasons, not least because Plaintiffs' own expert asked nearly identical questions in his own peer-reviewed, published prior survey from 2015.

In sum, Plaintiffs' criticisms are grounds for cross-examination, not exclusion. Google respectfully requests that the Court deny Plaintiffs' motion.

## II. BACKGROUND

### A. Professor Simonson Is Qualified to Conduct Surveys.

Professor Itamar Simonson is the Sebastian S. Kresge Emeritus Professor of Marketing at

Stanford University's Graduate School of Business, where he taught for more than 25 years.  *See* Ex. A, ECF No. 615-1, January 23, 2024, Expert Report of Itamar Simonson, Ph.D ("Simonson Rep.") ¶ 1.[1]  Google retained Prof. Simonson to conduct "surveys designed to examine how advertisers at companies and advertisers at ad agencies . . . approach, manage, and evaluate digital advertising and, in particular, display advertising and programmatic display advertising," which were defined consistent with Plaintiffs' complaint.  *Id.* ¶ 13 & n.4.

Plaintiffs rightly do not challenge Prof. Simonson's qualifications.  As Plaintiffs' own rebuttal survey expert, Dr. Wayne Hoyer, agrees, Prof. Simonson is a well-respected expert in behavioral economics and marketing.  *See* Ex. 100 at 31:17-34:15; *see also* Simonson Rep. ¶¶ 3-6.  He has published countless articles, Simonson Rep. ¶ 4, won numerous awards for his scholarship, *id.* ¶ 5, taught doctoral courses for 33 years in proper (and improper) ways to conduct surveys and evaluate managerial decision-making, *id.* ¶ 7, and has been repeatedly qualified as an expert on survey design and implementation by federal courts, *see, e.g.*, *Malletier* v. *Dooney & Bourke, In*c., 525 F. Supp. 2d 558, 626 n.210 (S.D.N.Y. 2007) ( "Simonson is eminently qualified to analyze survey techniques"); *Schechner* v. *Whirlpool Corp.,* 2018 WL 6843305, at *9 (E.D. Mich. Oct. 30, 2018) ("Simonson's credentials are impressive, and his qualifications related to consumer research cannot be reasonably challenged.").[2]

---

[1] All references to Ex. A through J refer to exhibits to Plaintiffs' Motion to Exclude Opinions of Itamar Simonson and Related Opinions of Mark Israel, ECF No. 613 ("Pls.' Br.").  All references to Ex. 1 through 126 refer to the Declaration of Bryon Becker in Support of Google LLC's Motion for Summary Judgment and Motions to Exclude, ECF No. 581, and Declaration of Bryon Becker in Support of Google LLC's Oppositions to Plaintiffs' Motions to Exclude.  With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability.  All emphasis is added unless otherwise indicated.

[2] *See also TCL Commc'n Tech. Holdings, Ltd.* v. *Telefonaktiebolaget LM Ericsson*, 2018 WL 4488286, at *29 (C.D. Cal. Sept. 14, 2018) (finding Prof. "Simonson's testimony credible" and

**B.      Professor Simonson's Three Surveys Queried Statistically Robust Panels of Higher-Spend Advertisers, Lower-Spend Advertisers, and Ad Agencies.**

Prof. Simonson was asked to address factors that advertisers and ad agencies consider when allocating their spending, the ways they may react to "changing display advertising costs," their use of ad buying tools, the ways they assess performance, and other issues.  Simonson Rep. ¶ 13. The first thing that Prof. Simonson did was to define the relevant "universe" for his surveys.  *Id.* ¶ 21.  After identifying the level of spend as a factor that may impact advertisers' responses, *id.* ¶¶ 21, 25, Prof. Simonson crafted three surveys: one targeted at higher-spend advertisers (those who spent more than $500,000 per year), one at lower-spend advertisers (those who spent less than $500,000 per year), and one at advertising agencies.  *Id.* ¶¶ 18, 42, 116, 165.  Plaintiffs do not challenge Prof. Simonson's decision to define the universe of potential respondents by level of spend.  They also do not challenge the decision to place the dividing line at $500,000 per year. *See, e.g.*, Ex. 100 at 15:7-21.

As is routinely done in academic research, *id.* at 17:18-22, 38:1-14, Prof. Simonson relied on a "leading" third-party market research firm, here Advertiser Perceptions, to recruit a panel of

---

that he is "exceptionally well credentialed in survey work"), *rev'd in part, vacated in part on other grounds*, 943 F.3d 1360 (Fed. Cir. 2019); *VIP Prods., Inc.* v. *Jack Daniel's Props., Inc.*, 291 F. Supp. 3d 891, 902 (D. Ariz. 2018) ("Dr. Simonson has served as an expert witness on numerous occasions, providing testimony on issues related to marketing, consumer behavior, trademark-related matters, false advertising, and branding."), *rev'd in part, vacated in part on other grounds*, 953 F.3d 1170 (9th Cir. 2020); *Gucci Am., Inc.* v. *Guess?, Inc.*, 831 F. Supp. 2d 723, 745 (S.D.N.Y. 2011) (agreeing with Dr. Simonson's survey analysis); *THOIP* v. *Walt Disney Co.*, 690 F. Supp. 2d 218, 232-42 (S.D.N.Y. 2010) (relying on Dr. Simonson's opinions to exclude opposing expert's survey); *Simon Prop. Grp. L.P.* v. *mySimon, Inc.*, 104 F. Supp. 2d 1033, 1043-44, 1048, 1050 (S.D. Ind. 2000) (repeatedly citing Prof. Simonson's expert report as support for excluding opposing expert's survey); *Kargo Glob., Inc.* v. *Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *9-*10, *15-*16 (S.D.N.Y. Aug. 6, 2007) (embracing Prof. Simonson's report as stating "unassailable commonsense" and denying motion to exclude his testimony); *Gutierrez* v. *Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1114 (N.D. Cal. 2010) ("This remarkably candid opinion was echoed throughout Expert Simonson's direct testimony."), *rev'd in part on other grounds*, 704 F.3d 712 (9th Cir. 2012).

representative advertisers and agencies.  Simonson Rep. ¶ 30.  Prof. Simonson did "due diligence" to ensure that Advertiser Perceptions used a reliable process to recruit respondents.  *See id.* ¶ 33 & n.35; Ex. 102 at 73:4-15; *see also* Ex. 111 at -666-67 (describing the composition of Advertiser Perceptions' panel).[3]  Plaintiffs do not criticize Prof. Simonson's reliance on Advertiser Perceptions to assemble a panel.  *See* Ex. 100 at 48:-6-49:16.

In crafting the universe of respondents, Prof. Simonson, at Google's direction, instructed Advertiser Perceptions not to invite companies, federal agencies, or state agencies that are parties to, are identified in initial disclosures in, or have received subpoenas in connection with this litigation or related litigation—the "No Contact List."  Simonson Rep. ¶ 34, App. I.  Those exclusions reflected Google's desire to comply with ethical prohibitions against contacting represented parties.  *See* Virginia Rules of Prof. Conduct 4.2; Federal Rule of Disciplinary Enforcement IV.B.  In total, the No Contact List included only around ***150*** advertisers or agencies.[4] Simonson Rep. App. I.  Even after complying with the no-contact directive, Advertiser Perceptions was able to invite 4,978 individuals at qualified higher-spend advertisers, 2,268 at lower-spend advertisers, and 3,916 at ad agencies—a total of ***11,162*** potential participants—to complete the surveys.  *Id.* Ex. 1 at 37, 68.

During the surveys, "respondents were 'blind' to the purpose of the survey and the identity of its sponsor."  *Id.* ¶¶ 27; *see also id.* ¶ 79; Ex. 100 at 258:13-21 (agreeing that a survey is "blind"

---

[3]  *See also* Advertiser Perceptions, "What Advertisers Think" (2016), tinyurl.com/ AdPerceptionsBrochure at 18 (the "proprietary database and panels of media decision makers are large and responsive" and the "advertiser survey and questionnaire development process that [Advertiser Perceptions] employs is proven and ensures optimal response").

[4]  The No Contact List listed all parties, potential witnesses, and subpoena recipients, which included publishers and ad tech companies—who would not have been qualified to respond to Prof. Simonson's survey regardless of their status as parties or witnesses.  Simonson Rep. App. I.

if survey respondents are unaware of the sponsor when answering questions).  Even so, in order to avoid bias, Prof. Simonson took care not to single out Google or any other company in the questions.  Simonson Rep. ¶¶ 27, 81.  At the very end, respondents were presented with a disclosure that Google sponsored the survey and were given the option to exclude their results from consideration.  *Id.* ¶¶ 79-81.  There was no way for survey respondents to change their responses after learning this information, because the surveys disabled the "back" button in respondents' browsers.  *Id.* ¶ 27 n.22, ¶ 59 n.55.

Prof. Simonson carefully considered whether the ability to opt out would bias his results, and concluded it did not, because "there is no reason to expect" those who opted out

> to be different from the other respondents.  Considering that respondents were asked to describe their advertising practices and considerations, and they were not asked to evaluate any particular company, there is no reason to expect those who chose to not be included in the sample to be different in any systematic way or in any way that pertains to the surveys' conclusions from other respondents.

*Id.* ¶ 81.  Prof. Simonson also cited academic research that identifying the survey sponsor may not affect survey responses.  *Id.* ¶ 81 n.86.  In keeping with survey best practices, Prof. Simonson did not further examine the survey answers of any respondents who opted out.  *See* Ex. 100 at 263:8-18 (agreeing it would have been improper to examine those responses).  A total of 94 respondents from higher-spend advertisers, 95 from lower-spend advertisers, and 71 from ad agencies asked for their responses to be excluded.  Simonson Rep. Ex. 1, 37, 68.

Disclosing the sponsor and purpose of a survey used for litigation purposes is consistent with the federal government's own practice.  Below is an example of a final question from a survey sponsored by the United States Federal Trade Commission ("FTC") in a report dated December 9, 2022, that, as Prof. Simonson did, disclosed the sponsor and litigation purpose of the surveys at the end of the questions, promised confidentiality, and gave participants the opportunity to have

their submission excluded from consideration:

---

**Main Questionnaire   OPT OUT**

You finished the survey!  Thank you for your participation.

This survey is being conducted on behalf of the United States Federal Trade Commission (FTC), the nation's consumer protection agency, in order to collect information about the reactions and experiences of potential customers to advertisements  by Intuit, the maker of TurboTax.

The FTC investigates unfair and deceptive conduct by companies.  The information you provide could help us further our mission under the FTC Act to protect consumers.

The FTC will treat your responses as confidential and will handle your information as outlined in the FTC's privacy policy, which you can read at http://www.ftc.gov/ftc/privacy.shtm.

The information collected in this survey may be made available to our law enforcement partners or in the course of litigation, as required by a court.

Your participation in this survey is strictly voluntary.  If you wish to opt out, please let us know and we will honor this request and delete your submission from our records.


TAT400. Do you wish to opt-out?

**[PROGRAMMER:  RANDOMIZE]**

**[DELETE RESPONDENT DATA IF 1 ("Yes")]**

   1.  Yes, I want to opt-out, please delete my submission
   2.  No, I do not want to opt-out, please keep my submission

---

*See* Novemsky Report, App. D, at 9, Intuit Inc., FTC Docket No. 9408 (filed Feb. 10, 2023); *compare* Simonson Rep. App. F.2-39, App. G.2-32, App. H.2-41.

Even excluding companies on the No Contact List, and even excluding individuals who opted out, as well as those who were disqualified for other reasons (such as not having the right level of spend, or taking the surveys too fast or too slow), Prof. Simonson's surveys generated robust and representative samples at each level of spend.   The final Higher-Spend Advertiser Survey included responses from 502 advertisers; the Lower-Spend Advertiser Survey from 302 advertisers; and the Ad Agency Survey from 381 ad agencies.  Simonson Rep. ¶ 37.  The final samples were "large compared to many other surveys" Prof. Simonson had previously conducted

and allowed him to draw reliable conclusions with appropriately narrow confidence intervals. *Id.* ¶ 37 n.43. The final samples included very large advertisers, including a substantial proportion who spend more than $15 million per year. *Id.* ¶ 33 n.36 (Advertiser Perceptions "generated a sample with equal proportion of respondents within the $500,000 to $15,000,000 annual ad spend range and the $15,000,000+ annual ad spend range."). As Dr. Hoyer, agrees, the size of Prof. Simonson's survey samples are "adequate" to draw robust conclusions. Ex. 100 at 17:2-16.

Plaintiffs did not conduct their own survey. And neither Dr. Hoyer nor Plaintiffs conducted any empirical analysis as to whether the entities who were excluded from participation based on their presence on the No Contact List or as one of the opt-outs would have answered, or did answer, the survey questions any differently from those whose responses were included. *Id.* 22:21-23:3 ("Q. So just to be clear, you did not try to conduct a survey or an experiment that corrected any of the errors that you identified in Dr. Simonson's report, correct? A. I did not conduct a survey."), 276:6-10 ("Q. Have you done any analysis as to whether the results of Dr. Simonson's surveys would change if the excluded companies in appendix I were, in fact, included in the survey population? A. I have not done that."). Nor is Plaintiffs' criticism based on logic. As discussed below, neither Plaintiffs' expert nor Plaintiffs' motion to exclude offers a single credible reason why the excluded respondents may have biased Prof. Simonson's survey results.

### C. Professor Simonson's Surveys Asked Advertisers and Ad Agencies Questions About the Extent of Multi-Homing and the Extent to Which They Would Divert Spending from Display Advertising.

Prof. Simonson asked advertisers and ad agencies across each of his three surveys questions about their use of various digital advertising types, reliance on ad agencies, reactions to an increase in the cost of programmatic display advertising, use of different ad buying tools, and metrics they use to assess performance. Simonson Rep. ¶ 39. In their motion, Plaintiffs do not

challenge most of these questions or answers, including questions about the types and number of ad buying tools that advertisers utilize to purchase display advertising, as well as the extent to which they have utilized new ad buying tools in the past year (hereinafter "Multi-Homing Questions").  *Id.* ¶¶ 18, 68-72.

In the lone question whose wording Plaintiffs do challenge, Prof. Simonson measured the extent to which respondents would divert any of their advertising spending to other ad formats in response to an increase in the cost of programmatic display advertising.  *See id.* ¶¶ 63-67 (hereinafter the "Diversion Question").  The Diversion Question instructed users to "suppose that . . . the cost of programmatic display advertising has recently increased by a small but significant amount, and will remain elevated for the foreseeable future," but that the cost of other digital advertising types, like social and search, remained the same.  *Id.* ¶ 65.  It then asked whether respondents would divert spending to other formats, and to which types of advertising respondents would divert their spend.  *Id*.  As Prof. Simonson explained in his report, that question is similar to other questions concerning "status quo bias."  *See id*. ¶ 63 (citing academic articles).  Plaintiffs' own survey expert, Dr. Hoyer, previously used a similar question in a survey published in a peer-reviewed journal in 2015, asking survey respondents how strongly they agreed that "The price of X would have to go up quite a bit before I would switch to another" brand.  Ex. 103 at 101, Table A1; Ex. 100 at 335:19-340:1.

The results of Dr. Simonson's surveys confirm that advertisers and ad agency employees regularly adjust their spending across various forms of advertising, and between 54% and 61% of respondents would divert spending from "programmatic display advertising" to another format—such as social, search, digital video, direct deals, and Connected TV—in response to a small but significant price increase.  Simonson Rep. ¶ 18 & Fig. 2, Ex. 58, 59, 81, 82.  These responses

provide empirical data that supports the qualitative testimony in this case:  Advertisers make purchasing decisions based on return on investment (ROI), so they shift spend across advertising types in response to changes in ROI.  Ex. 104 at 33:14-24  ("Q. In Meta's experience, do its advertiser customers move their ad dollars between ads on apps and ads on websites?  A. Yes.  We see advertisers move their investments based on the performance metrics that they care about across all forms of advertising."); Ex. 105 at 139:25-140:12 (if display became more expensive, Comcast "would move our money out of display into other digital areas . . . like social or online audio"); Ex. 106 at 165:25-166:24 ("in my experience, marketers will want to make sure they are getting their return on investment and they'll recalibrate their campaigns and their tactics" to do so, including by "shifting ad spend from one inventory to another"), Ex. 107 at 116:5-15 (if "a channel is costing a lot of money and not returning enough of a benefit [Omnicom] might switch to something that is more efficient");  Ex. 108 at 182:1-11 (the Army optimizes spend by "reallocating" dollars "to more efficient channels," including by moving "display dollars to paid social"); Ex. 109 at 79:10-80:5 (NHTSA shifted spend from display advertising to social in response to a decrease in click through rates); Ex. 110 at 146:19-147:19 (CMS could shift spend from display advertising to social media channels to optimize performance).

### D.   Dr. Israel's Opinion Reasonably Relied on Professor Simonson's Surveys as Evidence in Support of Market Definition.

Dr. Mark Israel is Google's rebuttal economics expert, who responds to Plaintiffs' economist, Prof. Robin Lee.  Dr. Israel opines, among other things, that Prof. Lee's proposed market definitions—consisting only of ad tech for "open-web display advertising," and excluding transactions in other ad formats, like social and video, even when the tools themselves can facilitate transactions in a variety of formats—are implausible and inconsistent with the record evidence. While Dr. Israel's opinions rest on other evidence, *see* Pls.' Br. at 9 (citing Dr. Israel's report), he

cites Prof. Simonson's surveys as showing that advertisers shift spend easily and quickly between formats, including by using the very same tools that they use to transact in "open-web display advertising" to purchase other types of ads.  Ex. H, ECF No. 614-4 at 27.  Dr. Israel's report also relies on the results of Prof. Simonson's questions related to multihoming and other questions that Plaintiffs do not attack.

## III.   LEGAL STANDARD

Under Federal Rule of Evidence Rule 702 and *Daubert*, expert testimony is admissible if it is relevant and reliable.  *PBM*, 639 F.3d at 123.  While the burden is on the proponent of the testimony to make a "threshold showing" that the expert's testimony meets *Daubert*'s relevance and reliability standards, *Little* v. *Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 408 (D.D.C. 2017), the proponent need not "prove that the expert is undisputably correct," *Mitchell* v. *Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999); *see also In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL 6690337, at *3 (E.D. Va. Aug. 16, 2021); *Johnson* v. *Air & Liquid Sys., Corp.*, 2020 WL 11563846, at *3-4 (E.D. Va. Nov. 6, 2020) (the proponent "does not need to prove anything").

Courts commonly admit expert survey evidence under *Daubert*.  The Fourth Circuit has explained that most challenges to survey evidence do not impact a survey's admissibility: "While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare."  *PBM*, 639 F.3d at 123 (quoting *AHP Subsidiary Holding Co.* v. *Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993)).  The survey taker need only rely on methods "of the type considered reliable by experts in [his] field." *Id.* at 124.  The "majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence."  5 McCarthy on Trademarks and Unfair Competition § 32:170 (5th ed.) (cited approvingly in *Belk, Inc.* v. *Meyer Corp, U.S.* 679 F.3d 146, 163 (4th Cir. 2012)).

## IV.    ARGUMENT

Plaintiffs make two arguments for exclusion.  *First*, they challenge Prof. Simonson's "universe" as being unrepresentative of the populations he purported to study, because he excluded the (a) approximately 150 advertisers and ad agencies on the No Contact List and (b) respondents who opted out at the end of the surveys.  Pls.' Br. §§ I.A, I.B.  Plaintiffs also complain that Google's counsel directed both decisions.  *Id*. § I.C.  *Second*, Plaintiffs challenge the relevance and reliability of the Diversion Question.  *Id*. §§ II.A, II.B.  Neither challenge has merit.

### A.    Professor Simonson Surveyed the Proper Universe of Advertisers.

1.    <u>Professor Simonson's Exclusion of Approximately 150 Advertisers and Ad Agencies Does Not Render the Higher-Spend Advertiser Survey or Ad Agency Survey Unreliable.</u>[5]

Plaintiffs' challenge to the "universe" of Prof. Simonson's survey respondents as excluding potential witnesses is not a reason to exclude Prof. Simonson's opinions.  In *PBM*, the Fourth Circuit rejected a *Daubert* challenge to a survey based on the argument that the survey evaluated the "wrong universe" of respondents.  639 F.3d at 123.  While the company's infant formula products were targeted at parents of children aged 2 to 3 months, the challenged survey included parents of children up to two years of age.  *Id.* at 118; Response Brief of Appellees, 2010 WL4097509, at *36, *PBM Prods., LLC* v. *Mead Johnson & Co.*, 639 F.3d 111 (4th Cir. 2011). The Fourth Circuit held that, even though "the survey sample may not exactly match the audience that reached the advertisement, it is a sufficiently close approximation of the recipient pool to be admissible."  *PBM*, 639 F.3d at 123.  Thus, the argument that the expert "surveyed the wrong universe bears directly on the weight accorded to the survey, not to its admissibility."  *Id.* at 124. The Fourth Circuit reached a similar conclusion in *Belk*, dismissing challenges to, among other

---

[5] Plaintiffs do not challenge the Lower-Spend Advertiser Survey on this ground.  Pls.' Br. at 14.

things, the "exclusion of relevant consumers" and "geographic representativeness" of a survey sample as part of a "laundry list of alleged technical deficiencies" that "can reduce a survey's weight," but not its admissibility.  679 F.3d at 163; *see also Harolds Stores, Inc.* v. *Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1545-46 (10th Cir. 1996) ("technical or methodological deficiencies," including that Plaintiff's survey expert excluded relevant respondents, "bear on the weight—not the admissibility—of the survey"); *Chi. Mercantile Exch. Inc.* v. *ICE Clear US, Inc.*, 2020 WL 1905760, at *13 (N.D. Ill. Apr. 17, 2020) (same).  The Court should reach the same result here.

Prof. Simonson's universe of respondents easily clears the *Daubert* threshold for reliability. Plaintiffs do not challenge the actual composition of Prof. Simonson's universe.  Prof. Simonson verified that his samples included a statistically relevant number of advertisers above and below the $500,000 spend mark.  Simonson Rep. ¶ 37 & n.43.  While Plaintiffs complain that Prof. Simonson excluded large companies and agencies, Prof. Simonson confirmed that his Higher-Spend Advertiser Survey included advertisers at the very high spend level (more than $15 million), and Plaintiffs concede that the No Contact List did not exclude the majority of the Fortune 100 or the Ad Age Top 200 advertisers.  Pls.' Br. at 4-5; Simonson Rep. ¶ 33 n.36.

Prof. Simonson considered and explained why excluding potential witnesses from the Higher-Spend Advertiser and Ad Agency survey pools who were on the No Contact List did not render his survey results unreliable.  He wrote in his report:

> To the extent those [excluded] companies are, on average, more sophisticated advertisers, then my results would likely be conservative on key topics such as multi-homing (*i.e.*, the use of multiple ad buying tools and/or advertising types) and substitution across advertising types in response to cost increases, which likely requires greater experience and expertise.

Simonson Rep. ¶ 34.

Plaintiffs do not explain why the approximately 150 excluded potential respondents, out of

millions of potential advertisers or ad agencies,[6] would provide materially different answers from those included—or, in other words, why their exclusion would systematically bias the survey results.[7]   *See Precision Fabrics Grp., Inc.* v. *Tietex Int'l, Ltd.*, 367 F. Supp. 3d 487, 507 (D.S.C. 2019) (admitting expert's opinion when there was "no showing" as to how the criticism identified would have rendered the expert's opinions unreliable).   Plaintiffs only allege that the excluded entities are large companies.  Pls.' Br. at 4-5, 15.  That is not a reasoned argument.  Plaintiffs do not explain ***why*** the excluded companies would have answered questions differently than those qualified to respond to the surveys.  Plaintiffs also do not dispute in any reasoned way Prof. Simonson's explanation as to why excluding the potential respondents would, if anything, make his results more conservative.  Simonson Rep. ¶ 34.

In short, Google has carried its burden to demonstrate that Prof. Simonson's survey universe was a representative cross-section of advertisers at varying levels of spend.  Plaintiffs cannot win their exclusionary motion through rhetoric alone.  *Cf. City of Pomona* v. *SQM N. Am. Co.*, 750 F.3d 1036, 1048 (9th Cir. 2014) ("The district court did not provide an explanation as to why Dr. Sturchio's alleged failures to adhere to the protocols in the Guidance Manual were significant enough to render his entire analysis unreliable."); *Jackson* v. *E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 406 (W.D. Ky. 2018) ("Defendant has not, and nor have its experts, explained to the Court how these differences render Seluga's principles and methods unreliable."); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp.

---

[6] Plaintiffs allege that Google Ads alone is used by "more than two million" advertisers.  First Am. Compl., ECF No. 120 ("FAC") ¶ 93.

[7] At his deposition, Dr. Hoyer volunteered a "guess" that the exclusion of advertisers on the No Contact List might have made the final survey population different in distribution of spending than the distribution of all advertisers in the United States, but he confessed that he had not "worked out numbers" on this or conducted any study to evaluate the distribution of advertising spend across all U.S. advertisers.  Ex. 100 at 294:5-298:13.

3d 116, 144 (D.N.J. 2020) (without rebuttal expert testimony as to why plaintiffs' expert's methodology was flawed, "the Court has no basis to find that those methods were unreliable").

The two out-of-Circuit, unpublished cases that Plaintiffs cite are inapposite.  In both cases, the facts demonstrated that there was a ***reason*** that the exclusion of particular populations may have biased the survey's results.  No such reason exists here.

In *HI Ltd. Partnership* v. *Winghouse of Florida, Inc*., the plaintiff, the restaurant chain "Hooters," sued a competitor, Winghouse of Florida ("Winghouse"), alleging that Winghouse used "trade dress in the operation of their sports bar and grills that is confusingly similar to Plaintiffs' trade dress."  347 F. Supp. 2d 1256, 1257 (M.D. Fla. 2004).  The  "overwhelmingly predominant feature" of the trade dress was the "iconic Hooters Girl."  *Id.* at 1257-58.  The Middle District of Florida excluded Hooters' survey because it "fail[ed] to include a single female in the survey, when women comprise nearly a third of Hooters' customer base and perhaps even more of Winghouse's clientele."  *HI Ltd. P'ship* v. *Winghouse of Fla., Inc*., 2004 WL 5486964, at *8 (M.D. Fla. Oct. 5, 2004) (order on motions in limine).  The court did not find it necessary to  articulate why this exclusion of such a large portion of the customer base would bias the results, but the reasoning is clear: female and male customers of Hooters may respond differently to questions about the recognizability of the "iconic Hooters girl," rendering the exclusion of an entire gender material.

Similarly, in *FTC* v. *FleetCor Technologies, Inc.,* the FTC brought an enforcement action against a technology company for actions that "stretch back to 2014."  2022 WL 3350066, at *6 (N.D. Ga. Aug. 9, 2022).  The defendant engaged a survey expert who surveyed only current customers as of April 2020, omitting "all customers who may have signed up for a FleetCor card from June 2014 through April 2020 but who left, potentially ***because of*** dissatisfaction with one

of the FleetCor practices at issue in this litigation." *Id.* at *5 (emphasis in original).  The court found that the "importance of including respondents from the full time period" was "crucial" in light of the facts of the case, because "FleetCor's own company materials and surveys themselves demonstrate that customers left—in droves—because of dissatisfaction with fees that were too high or because they were not receiving promised discounts." *Id.*

Here, by contrast, there is no reason to believe that the exclusion of potential respondents from around 150 potential advertisers or ad agencies—when more than ten thousand respondents received the survey—biased the survey results.

> 2.  <u>Disclosing the Survey's Sponsor Is Not Unusual And Does Not Provide a Basis for Exclusion</u>

Without citing a single case, Plaintiffs next argue that Prof. Simonson's surveys should be excluded for disclosing Google's sponsorship of the surveys at the very end—after the respondents had finished answering questions.  Pls.' Br. 16-17.  This argument is meritless as well.

Plaintiffs are wrong that disclosure of the surveys' sponsor and purpose at the end of the surveys violated the principle of "double-blindness."  Pls.' Br. 16.  As their own expert conceded, a survey is "blind" if survey respondents are unaware of the sponsor when answering questions.[8] Ex. 100 at 258:13-21.  Here, the survey respondents were unaware, while they were answering questions, that Google sponsored the surveys, and the survey questions were phrased generically so as not to suggest Google's (or any company's) involvement.  Simonson Rep. ¶¶ 27, 79-81. There was no way for survey respondents to change their responses after learning that Google sponsored the surveys.  *Id.* ¶ 27 n.22, ¶ 59 n.55.  Thus, the surveys were blind.

---

[8] Double-blindness refers to lack of knowledge of sponsorship for both the respondents and the interviewers.  Here, the survey was administered online, so there were no interviewers.

Prof. Simonson followed the cautionary procedure in the *FJC Reference Guide*,[9] on which Plaintiffs rely.  Pls.' Br. at 10.  That guide acknowledges that "in some surveys (e.g., some government surveys), disclosure of the survey's sponsor to respondents (and thus to interviewers) is required." *FJC Reference Guide* at 411.  "Such surveys call for an evaluation of the likely biases introduced by interviewer or respondent awareness of the survey's sponsorship." *Id.* Prof. Simonson properly evaluated whether end-of-survey disclosure of Google's sponsorship would bias his results, and concluded it would not.  He noted that respondents were not aware when they were answering questions who the sponsor was, and could not change their answers once they knew.  Simonson Rep. ¶ 27 n.22, ¶ 59 n.55, ¶ 79.  He also observed that the questions did not ask about any particular company, so there is no reason to believe that those who opted out would have favored or disfavored Google in a systematic way. *Id.* ¶¶ 79, 81; Ex. B, ECF No. 614-1 at 298:8-299:16, 309:10-310:18.  As he explained in his report, based on the facts of his surveys, there is "no reason to expect the respondents" who opted out "to be different from the other respondents." Simonson Rep. ¶ 81.

Further, Plaintiffs make no attempt to explain how the responses of those who opted out would more likely favor or disfavor Google—and even imply there may have been no systematic difference, *see* Pls.' Br. at 17.  They do not explain how Google's views and expectations were apparent while respondents were taking the surveys. *Cf. FJC Reference Guide* at 411 (whether disclosure of sponsorship affected objectivity depends on "whether the sponsor has views and expectations that are apparent").  Nor do they explain how a survey respondent would know what answers Google might "prefer." *Cf. id.* at 410 (disclosure can affect objectivity if it communicates

<hr/>

[9] Federal Judicial Center, Shari Seidman Diamond, *Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence (3d ed. 2011) ("*FJC Reference Guide*"), available at https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf.

to respondents "what they believe are the preferred responses of the survey's sponsor").  Plaintiffs'

rebuttal expert, Dr. Hoyer, posited only that respondents would think that Google might "come

after" the respondents whose answers it did not like, Ex. 100 at 261:5-262:5, a "hypothesis" for

which there is absolutely no evidence at all and that makes no sense for a number of reasons, not

least because Prof. Simonson's surveys promised respondents that their responses would remain

anonymous.  Ex. 100 at 266:6-13.[10]  Plaintiffs cannot move to exclude Prof. Simonson's surveys

as unreliable solely on the basis of speculation.  *See Precision Fabrics*, 367 F. Supp. 3d at 507;

*City of Pomona*, 750 F.3d at 1048.

     The federal government follows the opt-out procedure that Prof. Simonson employed.  *See*

s*upra* p. 7.  Moreover, the FTC has rejected the exact argument that Plaintiffs make here.  The

respondent in an agency enforcement matter, Intuit, argued that allowing survey respondents to

opt out meant that survey participants were "unrepresentative and biased," as Plaintiffs argue in

this case.  Commission Opinion at 69, Intuit, Inc., FTC Docket No. 9408 (Jan. 22, 2024).  The

FTC easily rejected this:

> The notification regarding the opt-out option and purpose of the survey, which is
> required by the Privacy Act, 5 U.S.C. § 552a(e)(3), was included at the end of the
> survey, rather than earlier on, thereby avoiding bias in the responses. . . .  Moreover,
> Respondent has identified no reason to think that those who opted out differed from
> those who continued to participate in any way that would have affected the survey
> results. There is certainly no basis for Respondent's suggestion those who opted
> out were sympathetic to Intuit.  It is equally plausible that consumers with positive
> views of TurboTax were more likely to stay in the survey because they wanted to
> ensure their answers would help Intuit.

*Id.*  The same rationale supports the reliability of Prof. Simonson's surveys.

---

[10] Plaintiffs criticize Prof. Simonson for not analyzing the responses of the opt-outs. Pls.' Br. at
17.  However, as Dr. Hoyer testified, it would have been improper for Prof. Simonson to do so.
Ex. 100 at 263:8-18 ("Q. Once survey respondents opted out of having their survey responses
included in the final results, it was appropriate for Dr. Simonson not to look at those responses any
further, right?  A. Absolutely.").

3.      Professor Simonson Conducted His Surveys Independently and Without "Interference" from Google.

There was no undue involvement from counsel in Prof. Simonson's surveys.  Pls.' Br. 18-19.  Prof. Simonson designed his surveys based on his "extensive experience and expertise in conducting thousands of surveys."  Ex. 102 at 182:1-18; *see also id.* at 109:10-15, 361:4-9; Simonson Rep. ¶¶ 10, 19-29 (describing process for designing surveys).  It is true that the instructions not to contact certain witnesses and to allow participants to opt out came from counsel in order to comply with ethical obligations.  *See* Simonson Rep. ¶ 34; Ex. B, ECF 614-1 at 289:20-290:2.  However, Prof. Simonson testified that, had he believed those parameters would have undermined the methodological soundness of his results, he would have refused to conduct his surveys with them in place.  *E.g.*, Ex. B, ECF 614-1 at 290:6-15 ("Had I thought that [allowing opt outs] that could change—change the results or impact the conclusions in any way, I would say no.  I wouldn't do it.").  As explained above, Prof. Simonson believed that there is no reason to expect that either instruction from counsel impacted the results or prevented the surveys from achieving large and representative samples.  *E.g.*, Simonson Rep. ¶¶ 33 n.36, 37 n.43, 81.

The single out-of-Circuit case Plaintiffs cite is inapposite.  In that case, counsel selected the survey respondents.  *Johnson v. Big Lots Stores, Inc*., 2008 WL 1930681, at *15 (E.D. La. Apr. 29, 2008) (counsel "identified individual employees" and "interviewed those individuals before [the expert's team] questioned them").  The court explained that "interviewing a hand-picked, pre-screened, miniscule subset of a relatively large population of employees hardly constitutes a reliable method for gathering representative data."  *Id.* at *16.  This case is nothing like *Big Lots*.  Prof. Simonson independently determined the appropriate survey universe, designed appropriate questions, and surveyed respondents without interference or involvement from Google.  That Google's counsel directed Prof. Simonson to comply with ethical obligations and allow opt-outs

19

is not undue "interference."

**B.    Professor Simonson's Diversion Question Is Relevant, and the Results from that Question Are Reliable.**

The Diversion Question in all three surveys asked advertisers whether they would divert advertising spending to other types of advertising if the cost of "programmatic display advertising" increased "by a small but significant amount, and will remain elevated for the foreseeable future." Simonson Rep. ¶ 65.  The responses showed that the majority of high-spend advertisers, low-spend advertisers, and ad agencies would divert spending to other digital advertising types in response to an increase in the cost of programmatic display advertising.  *Id.* Fig. 2.  Plaintiffs challenge the relevance and reliability of the Diversion Question.[11]  Pls.' Br. at 19-25.  These arguments, too, should be rejected.

1.    <u>Professor Simonson's Diversion Question Is Relevant to Market Definition.</u>

Prof. Simonson's and Dr. Israel's expert opinions based on responses to the Diversion Question go directly to an issue key to all the claims in this case—market definition.  *See Consul, Ltd.* v. *Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986) ("proof of a relevant market is the threshold" for monopolization claim); *It's My Party, Inc.* v. *Live Nation, Inc. (It's My Party II)*, 811 F.3d 676, 681 (4th Cir. 2016) (same for tying).  Plaintiffs have the burden to prove a relevant market, which requires the Court to evaluate "substitution both by buyers and sellers."  *Blue Cross & Blue Shield United of Wisc.* v. *Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995); *see also It's My Party II*, 811 F.3d at 683.  Prof. Simonson's surveys go to the question of substitution, which is relevant rebuttal evidence on an

---

[11] Plaintiffs do not challenge the relevance of the Multi-Homing Question, or of any other question other than the Diversion Question.  Any attempt to preclude Dr. Israel from relying on the responses to the Multi-Homing Question (or other questions) should be denied.

issue for which Plaintiffs have the burden of proof.  *See US Wind, Inc.* v. *InterMoore, Inc.*, 640 F. Supp. 3d 390, 406-07 (D. Md. 2022) (expert opinion is relevant if it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute").

Plaintiffs assert three relevant markets in this case, all defined as tools that can enable transactions in so-called "open-web display advertising."  FAC ¶¶ 282, 290, 297, 310-339.  This overly narrow market definition ignores that advertisers can and do easily shift spending between advertisements on the so-called "open web" and those in other digital formats, like social media, connected TV, and more.

The degree to which advertisers shift their spending between ad formats is not a question divorced from their use of ad tech tools, as Plaintiffs suggest.  Pls.' Br. 19.  When an advertiser purchases an ad format, it necessarily uses an ad tech tool that can enable transactions in that format.   Moreover, as Google explained in its motion to exclude the opinions of Plaintiffs' economist, Prof. Robin Lee, many of the ad tech tools at issue can enable the advertisers who use them to transact in a variety of different ad formats.  Mem. of Law ISO Mot. to Exclude Lee ("Lee *Daubert*"), ECF No. 574 at 25-26; *see* Ex. 8, ECF No. 597-7 at 53:7-54:4, 89:11-90:2, 104:17-105:7.  According to Prof. Lee, if the same tool has the ability to transact advertising on both the "open web" and apps, for example, when the tool is used to facilitate a transaction for an ad appearing on the "open web," that transaction is included in his market share calculations.  Ex. 3, ECF No. 597-3 ¶ 140.  But when the very same tool is used to facilitate a transaction for the very same ad appearing in an app, that transaction is ***not*** included in his market share calculations.  *Id*. The key fact for Plaintiffs' market definition is thus not only whether an advertiser would change the tool used, but also whether that advertiser would purchase a different format of ad, with that same tool or otherwise.  Prof. Lee even admits that no existing ad tech tools exclusively serve

"open-web display advertising," Ex. 8, ECF No. 597-7 at 89:11-90:2; *e.g., id.* at 94:15-95:1, 99:12-20, 101:17-102:1, 124:2-125:3, and he is unaware of ad exchanges that facilitate advertising only for "open-web display ads," *id*. at 104:17-105:7.

The extent to which customers can and do switch between ad formats—including by using the very same tools that Prof. Lee argues are in his defined market—accordingly goes directly to the question of whether Plaintiffs' proposed markets are implausibly narrow. *See, e.g.*, *It's My Party II*, 811 F.3d at 683; *Va. Vermiculite, Ltd.* v. *W.R. Grace & Co. Conn.*, 108 F. Supp. 2d 549, 586-87 (W.D. Va. 2000).

Dr. Israel explains just that: the qualitative evidence that Prof. Simonson's surveys produced shows that Plaintiffs' proposed market definitions are nonsensical. As Dr. Israel opined, the surveys demonstrate that Prof. Lee's "advertiser ad network" market definition is "too narrow" because advertisers might use different tools, or use tools for different advertising purchases, that Prof. Lee implausibly excludes. Ex. H, ECF No. 614-4 at 27 ("If an advertiser is not successfully reaching its target audience when it utilizes Google Ads, it may shift ad spend to Meta Ads Manager . . . . Given the wide range of options to which advertisers can and do switch (as demonstrated by Prof. Simonson's survey and other empirical evidence)—and the associated ad tech that facilitates those transactions—Plaintiffs' market definition is untenable.").

There can therefore be no question that advertisers' general willingness to switch between ad formats bears on advertisers' willingness to switch between tools that transact in those formats. Instead, Plaintiffs essentially complain that Prof. Simonson did not ask a different and more specific question—the hypothetical monopolist test ("HMT"), or how advertisers would respond to "a sustained price increase on the allegedly monopolized product," the "ad tech transaction tools

at issue." Pls.' Br. at 19.[12]  To be clear:  It was not Google's burden to conduct an HMT.  It is not Google's burden to prove any relevant market at all.  *Satellite Television & Associated Res., Inc.* v. *Cont'l Cablevision of Va.*, 714 F.2d 351, 355 (4th Cir. 1983) (plaintiff's burden to prove market definition); *see also Va. Vermiculite*, 108 F. Supp. 2d at 579 (same); Lee *Daubert* at 19-20 (Plaintiffs failed to conduct an HMT).  Prof. Simonson has never claimed to be conducting an HMT, nor did Dr. Israel use the answers to the Diversion Question that way, *see* Ex. H, ECF No. 614-4 ¶¶ 220, 235-238, 252.

Instead, Prof. Simonson's surveys provide the kind of qualitative evidence that courts routinely rely on in evaluating whether a plaintiff's proposed market is too narrow.  Specifically, in determining whether a product market properly accounts for the reasonable interchangeability of products and services, "[u]sage patterns, ***customer surveys***, actual profit levels, comparison of features, ease of entry, and many other facts are pertinent."  *U.S. Healthcare, Inc.* v. *Healthsource, Inc.*, 986 F.2d 589, 599 (1st Cir. 1993).  Customer survey data is one form of empirical evidence that can be relevant to cross-elasticity of demand.  *See Apple* v. *Epic*, 67 F.4th 946, 975 (9th Cir. 2023).  Moreover, the results of the Diversion Question are also relevant because they demonstrate that advertisers do not view tools for "open-web display advertising" as a "separate" entity, or the use of ad tech tools for "open-web display advertising" as a "peculiar" use.  *See Brown Shoe Co.* v. *United States*, 370 U.S. 294, 325 (1962) (identifying "practical indicia" that may help identify the outer boundaries of a product market, including "distinct customers, distinct prices, sensitivity to price changes, and specialized vendors").

---

[12] This is sometimes called a SSNIP test, asking whether "enough consumers would respond" to a small but significant nontransitory increase in price ("SSNIP") by "purchasing the product from outside the proposed . . . market, making the SSNIP unprofitable."  *Saint Alphonsus Med. Ctr.-Nampa Inc*. v. *St. Luke's Health Sys., Ltd*., 778 F.3d 775, 784 (9th Cir. 2015).

Courts have repeatedly admitted as relevant customer surveys and expert opinions about customer preferences, like Prof. Simonson's, that are submitted by antitrust defendants to rebut plaintiffs' implausible market definitions.  Such evidence is relevant even if it does not explicitly test cross-elasticity of demand for the particular product at issue.  Moreover, while Plaintiffs argue that Prof. Simonson's surveys were required to test for cross-elasticity of demand, none of Plaintiffs' experts have provided any quantitative or survey evidence of it.[13]

In *United States* v. *H&R Block, Inc.*, 831 F. Supp. 2d 27 (D.D.C. 2011), for example, the court admitted an expert survey that provided indirect evidence of diversion even though the survey did not "actually ask about a change in price" or directly measure "overall switching between products," *id.* at 31, 33.  The court observed:

> While the wording of the survey question may limit its relevance on specific issues, because the survey provides at least some indication of the products and services that compete with [the defendant's product], the Court cannot say that it does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401 (defining relevant evidence).

*Id.* at 33; *see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at *9 (D. Mass. Jan. 25, 2018) (denying plaintiffs' motion for summary judgment based in part on econometric analysis conducted by defendant's expert that was "not a quantitative cross-price elasticity of demand study" but still "bear[s] upon a showing of cross-elasticity of demand").

---

[13] Google has moved to exclude the opinions of Plaintiffs' lead economist, Prof. Lee, because he relied **solely** on *Brown Shoe*'s "practical indicia" to define his market, and did not conduct **any** quantitative analysis of the relevant market, as it was Plaintiffs' burden to do.  Lee *Daubert* at 18-19.  As Google wrote, the practical indicia come into play "only after" a proper analysis of the outer boundaries of the market, which Prof. Lee failed to conduct.  *Id.* (citing, *inter alia*, *Ky. Speedway, LLC* v. *Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009)).  While practical indicia are relevant to market definition, and here demonstrate the implausibility of Plaintiffs' market definition, Plaintiffs cannot rely on them alone to discharge their burden of proof.

24

In *PepsiCo, Inc.* v. *Coca-Cola Co.*, 315 F.3d 101, 107 (2d. Cir. 2002), the Second Circuit affirmed a grant of summary judgment in favor of the defendant that was based partly on a customer survey.  The plaintiff, PepsiCo, sought to define the relevant market as "fountain syrup delivered by independent foodservice distributors." *PepsiCo, Inc.* v. *Coca-Cola Co.*, 114 F. Supp. 2d 243, 248 (S.D.N.Y. 2000).  The defendant, Coca-Cola, responded that the market should not be limited by method of distribution because other methods of distribution, such as "bottler-delivered Pepsi," were acceptable substitutes.  *Id.* As evidence, Coca-Cola produced a PepsiCo customer survey that did not conduct an HMT, but merely showed that customers did not consider the method of distribution an important criterion for selecting a fountain syrup supplier.  *Id.* at 252. The court still considered the survey to be relevant evidence that the relevant market could not be restricted by type of distribution. *Id.*; 315 F.3d at 107.  The same is true here: the Diversion Question tests the importance to advertisers of ad format, so the results are relevant to whether Plaintiffs' markets should be limited to transactions in only one ad format: "open-web display."[14]

2.      The Results of Professor Simonson's Diversion Question Are Reliable.

Plaintiffs also challenge the Diversion Question as "unreliable because it is inherently vague." Pls.' Br. at 22.  Specifically, they challenge the use of the phrases "small but significant" and "foreseeable future." *Id.* at 23.  Any dispute about question wording goes to the weight, not admissibility, of the survey results.

Prof. Simonson explained, relying on his expert knowledge and experience, that the phrase

---

[14] The single case Plaintiffs cite, *Scotts* v. *United Industries Corp.*, 315 F.3d 264 (4th Cir. 2002), offers no support for Plaintiffs' position.  The Fourth Circuit assumed that that the survey was admissible, but concluded that it was not probative of "the relevant question," consumer confusion, because it tested only whether the packaging conveyed a message that the product "prevented" the growth of crabgrass, not whether it "killed" crabgrass.  *Id.* at 278-79.  Only the latter statement was actually alleged to be false.  Because the survey did not ask about the only untrue implication being tested in the case, it did not bear on the case at all.

"small but significant" is a balanced term that avoids predisposing the respondent to a particular answer. Simonson Rep. ¶ 65 n.65; Ex. 102 at 325:18-326:8; Ex. B, ECF No. 614-1 at 332:24-334:7; *see also id.* at 336:13-21 (same for "the foreseeable future"). He concluded, based on his experience, that the respondents generally would ***not*** assign a numerical value to the phrase "small but significant" and instead answer the question qualitatively, as written. Ex. 102 at 329:10-330:12. That conclusion was based on his "understanding of survey takers' behavior and how they answer questions"; his "survey practice, having conducted thousands of surveys"; and "literature on the manner in which respondents answer questions." *Id.* at 329:10-330:12, 326:14-19 ("I've used other qualitative terms, as opposed to numerical terms, many times."); Ex. B, ECF No. 614-1 at 334:8-335:8.

Plaintiffs' own survey expert, Dr. Wayne Hoyer, asked remarkably similar questions in a peer-reviewed, published paper. Dr. Hoyer and his co-authors asked two questions about price. The first asked respondents how they would react if an airline's fees went "up quite a bit," while the second asked whether respondents were willing "to pay a higher price" for one airline as compared to another. Ex. 103 at 101, Table A1. In neither question did Dr. Hoyer or his co-authors assign a numerical value to these phrases, instead leaving it up to respondents to answer based on their definition of what the phrases meant to them. *See* Ex. 100 at 331:12-332:2, 336:19-337:14, 337:16-18, 338:4-340:1. As Dr. Hoyer acknowledged, the wording of those questions came from a "standard set of questions," *id.* at 331:17-322:2, and Dr. Hoyer stands by the "methodology that [he] employed in conducting this study," *id.* at 329:19-22. Plaintiffs' own survey expert thus agrees that these questions were "standard practice," rendering Prof. Simonson's surveys "sufficiently reliable." *Hambrick ex rel. Hambrick* v. *Ken-Bar Mfg. Co.*, 422 F. Supp. 2d 627, 638 (W.D. Va. 2002).

It is well-established that quibbles about the phrasing of questions go to the weight and not the admissibility of a survey.[15] *See, e.g.*, *E.&J. Gallo Winery* v. *Gallo Cattle Co.*, 967 F.2d 1280, 1292-93 (9th Cir. 1992) ("slanted" questions "go to weight, not admissibility"); *Jellibeans, Inc.* v. *Skating Clubs of Ga., Inc.*, 716 F.2d 833, 844-45 (11th Cir. 1983) ("poorly designed questions . . . affect the survey's weight . . . and not its admissibility").  Courts consistently reject challenges to the "phrasing" of survey questions as "slanted," "leading," "ambiguous," or "poorly worded" because such critiques do not bear on admissibility.  *See, e.g.*, *Tunnell* v. *Ford Motor Co.*, 330 F. Supp. 2d 707, 722 (W.D. Va. 2004); *vonRosenberg* v. *Lawrence*, 413 F. Supp. 3d 437, 457 (D.S.C. 2019); *H&R Block*, 831 F. Supp. 2d at 32-33, 35-36; *Geiger* v. *Creative Impact Inc.*, 2020 WL 3268675, at *3 (D. Ariz. June 17, 2020); *Bluetooth SIG, Inc.* v. *FCA US LLC*, 468 F. Supp. 3d 1342, 1346-47 (W.D. Wash. 2020).  Plaintiffs' arguments do not render the Diversion Question irrelevant or unreliable.[16]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to exclude opinions of Professor Simonson and related opinions of Dr. Israel should be denied.

---

[15] Unlike in *In re Motor Fuel Temperature Sales Practices Litig.*, 2012 WL 13050523, at *6-7 (D. Kan. Feb. 29, 2012), the case cited by Plaintiffs, *see* Pls.' Br. at 22-23, none of Plaintiffs' complaints about the Diversion Question—even if they had any validity—render the question so ambiguous that respondents could have misunderstood the central question.

[16] Plaintiffs make much of the fact that Prof. Simonson asked a different version of the Diversion Question in preliminary interviews, and did not retain responses to the preliminary interviews and pretests.  Pls.' Br. at 24-25 & n.16.  Prof. Simonson testified that each of those decisions was appropriate based on his expert knowledge and experience.  *See* Ex. 102 at 186:10-22; Ex. B, ECF No. 614-1 at 148:3-149:8, 206:9-207:24, 210:14-18, 220:12-221:18.

In any event, this challenge is not grounds for exclusion.  Surveys are not excluded even for complete failure to conduct a formal pretest.  *See Maldonado* v. *Apple, Inc.*, 2021 WL 1947512, at *23 (N.D. Cal. May 14, 2021) (citing *FJC Reference Guide*); *In re University of S. Calif. Tuition & Fees COVID-19 Refund Litig.*, 2023 WL 6453814, at *12 (C.D. Cal. Sept. 29, 2023).

Dated: May 17, 2024

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
 CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Julie Elmer (*pro hac vice*)
Lauren Kaplin (*pro hac vice*)
Scott A. Eisman (*pro hac vice*)
Jeanette Bayoumi (*pro hac vice*)
Claire Leonard (*pro hac vice*)
Sara Salem (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Joseph Bial (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Bryon P. Becker (VSB #93384)
Erica Spevack (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile (202) 223-7420
kdunn@paulweiss.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Meredith Dearborn (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (202) 330-5908
mdearborn@paulweiss.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com

*Counsel for Defendant Google LLC*