**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION**</u>
<u>**FOR SUMMARY JUDGMENT**</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

I.    RESPONSE TO GOOGLE'S "STATEMENT OF UNDISPUTED FACTS"....................... 2

II.    STATEMENT OF ADDITIONAL MATERIAL FACTS .................................................. 13

LEGAL STANDARD ........................................................................................................ 18

ARGUMENT ..................................................................................................................... 19

I.    Google's Course of Conduct Was Unlawful Because It Distorted the Competitive Process and Constrained Its Customers' Choices.................................................................. 19

    A.   Google's Actions Are Neither Unilateral Refusals to Deal with Rivals nor Product Improvements. ........................................................................................................ 20

        1.  Google Compels Its Publisher Customers to Use DFP if They Want Access to Real-Time Bids from AdX .......................................................................................... 21

        2.  Google Restricts its Advertiser Customers' Ability to Use Rival Ad Exchanges. .... 23

        3.  Google Unlawfully Grants Itself Both a "First Look" and a "Last Look," Free of Competitive Pressure ................................................................................................ 24

        4.  Google Flexed Its Dominance by Degrading a Valuable Product Feature That Allowed Its Publisher Customers to Choose Rival Demand Sources. ..................... 25

    B.   In All Events, Google's Conduct Is Unlawful Because It Was Part of a Broader Anticompetitive Enterprise ..................................................................................... 25

II.   Plaintiffs Have Not "Abandoned" Reliance on the DoubleClick Acquisition, Project Poirot, Sell-Side Dynamic Revenue Share, or Project Bell. ............................................................ 26

III.  Plaintiffs Were Not Required to Define a Market for Google Ads Advertiser Demand, and the Markets Plaintiffs Have Defined Are Sound. ................................................................ 27

IV.  Google Has Monopoly Power in the Ad Exchange Market. .................................................. 29

V.   The United States Has Standing to Sue Google for Damages............................................... 31

    A.   The United States Is a Direct Purchaser of AdX Services. ................................................. 31

    B.   The FAAs Have Standing Because They Controlled the Relevant Transactions. ............ 33

    C.   The Court Should Decline to Extend *Illinois Brick* to the Section 4A Claim.................... 34

## INTRODUCTION

The United States and Seventeen Sovereign States filed this lawsuit to challenge Google's illegal scheme to monopolize certain digital advertising technologies ("ad tech") that, as a practical matter, fund the news media, content creation, and free expression of ideas that underpin the open internet as we know it. Discovery in this case has confirmed that Google willfully acquired monopoly power and subverted the competitive process to maintain and entrench that power.

Today, Google intermediates most open web display advertising transactions, and its customers are deprived of meaningful competition. When publishers tried to engage in self-help to reduce their dependence on Google's dominant ad tech, Google thwarted those efforts by exerting even more control over the terms by which its customers could use its ad tech tools. That is not competition on the merits. Google's exclusionary conduct allowed it to attain an immense scale in the relevant markets while depriving its competitors of equivalent scale necessary to compete. This imbalance has become self-reinforcing, as the masses of data that Google accumulates through its ad tech business provide it with a scale advantage that competitors cannot match.

Google's anticompetitive and exclusionary conduct is unlawful in its own right and mutually reinforcing on the whole. *See City of Mishawka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980); *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 381 (S.D.N.Y. 2022) (noting "there is nothing remarkable" in advancing a theory that "Google's purportedly unlawful schemes were more powerful because of their combined effect"). This conduct violates Sections 1 and 2 of the Sherman Act, and Plaintiffs are empowered to seek equitable relief on behalf of the public. Separately, the United States has standing to seek damages from Google as a direct purchaser of Google's ad tech services. *See* 15 U.S.C. § 15a.

Google seeks to dispose of this lawsuit based on an incorrect recitation of the law and a myopic retelling of the facts. Google argues that it lacks monopoly power along every dimension except the one that matters most under the law: whether it has the power to control price or output (it does). As detailed below, Google's motion for summary judgment should be denied because the factual disputes are both genuine and material, and none of Google's arguments justify judgment as a matter of law. Plaintiffs respectfully ask that the Court deny Google's motion in its entirety and allow this case to proceed to trial.

## **BACKGROUND**

## I.    **RESPONSE TO GOOGLE'S "STATEMENT OF UNDISPUTED FACTS"**

Plaintiffs do not dispute the following Statements of Undisputed Fact ("SUFs"): 1, 3, 5-6, 8, 14, 18-21, 29, 31-32, 38, 40, 50, 52-53, 58, 61, 64, 67-68, 70, 80, 82, 85, 88, 92, 93, and 94.[1] Plaintiffs dispute the remaining SUFs for the following reasons:

2. Digital advertising encompasses a broad range of forms of advertising, and is sold using a variety of methods. It is not a single "two-sided marketplace." "Best match possible"

---

[1] Plaintiffs do, however, dispute Google's characterizations in the argumentative subheadings contained in the SUF. *E.g.*, MSJ 4 ("Plaintiffs' Made-Up Markets"). Plaintiffs also dispute the vague, subjective, and self-serving terminology included in many SUFs, including the following: the use of the term "two-sided market place," which is a legal and economic term of art, in SUF 2; the phrase "integrated ad tech stack" in SUF 16; the reference to the growth of transactions as an "explosion" in SUF 21; the characterization of products as "innovations" or "innovative" in SUFs 51 and 55; the use of the passive voice ("was not designed to") to describe Google's refusal to allow other exchanges to utilize DA in SUF 58; the terms "short-lived," "obsolete," and "popular" in SUF 69; the phrase "key . . . features" in SUF 71; the phrase "Google should have" in reference to expert opinions about the effects of Google's conduct in SUF 42, 49, 60, 65, and 84; the phrases "as little as" or "at most" in SUF 85; and the phrase "control" in SUF 87. Finally, while Google's statements in SUF 30 and 70 are also literally true, they omit the full substance of the FTC's and DOJ's public statements. In all events, these statements are inadmissible and legally irrelevant to this case, which challenge Google's past and ongoing exclusionary conduct. *See* 15 U.S.C. § 18a(i)(1) ("[A]ny failure of the [FTC or DOJ] to take any action under this section shall not bar any proceeding or any action with respect to such acquisition at any time under any other section of this Act or any other provision of law."); *Steves & Sons, Inc.* v. *JELD-WEN, Inc.*, 988 F.3d 690, 713-14 (4th Cir. 2021).

means different things to publishers and advertisers. For example, publishers seek high prices while advertisers seek low prices, all else equal.

4. Google's assertions are significantly more vague and general than the cited evidence, and conflate a number of concepts. Some, but not all, digital publishers use publisher ad servers; some, but not all, publishers use one or more ad exchanges to sell impressions in real-time auctions; and some, but not all, publishers sell their inventory through ad networks. *E.g.*, Pls.' Ex. Opp. Summ. J. ("PX") 1, at -350 (indicating publishers like Facebook and Amazon were "Unaddressable" by Google's open web display ad tech products); PX 2, at 322:6-323:2 ("all of the buying [for Facebook] happens in Facebook" using "its own proprietary ad tech tools").

7. "Open web display advertising" is a distinct form of digital advertising recognized in the industry and Google's own documents. *See, e.g.,* PX 3, at -647 (discussing the "open web display advertising market"); PX 4, at -402 (referencing "open web display impressions"); PX 5, at -251; PX 6, at 82:15-25; PX 7, at 185:2-22.

9. Many items "can appear on websites" that are not reasonable substitutes for open web display advertising, including instream video and native ads. *See, e.g.*, PX 8, ¶¶ 272-74; 276-78. Additionally, no ads of any type are included or excluded from Plaintiffs' market definitions, which are for ad tech products, not the ads themselves. SUF 6.

10. Open web publishers cannot sell inventory on Amazon, Facebook, or other closed-web sites. PX 1, at -350; *see also* Plaintiffs' Response to SUF ("RSUF") 9.

11. App-only developers generally use tools different from the relevant products used to sell open web display advertising. PX 9, at -124 (describing AdMob customers as "'Pure Play' App developers first (not an existing company that launched an app). Contrasted with companies like NYT or Domino's."); PX 10, at -477 (customers of Google's mobile app ad tech product

Admob are "Mobile app developers who only develop mobile apps" because "it's built specifically for mobile apps"), -478 (comparing "AdMob vs Ad Manager"); *see also* RSUF 9.

12. Plaintiffs did not "coin" the term "open-web display ads." RSUF 7.

13. Plaintiffs' relevant markets include transactions for outstream video advertising but not instream video advertising. ECF No. 581, Becker Decl. Ex. ("DX") 1, ¶ 49(3). To the extent practicable, Plaintiffs' market share calculations include outstream video transactions but not instream video transactions. *Id.* Fig. 45; *see also* PX 8, App. H, ¶ 8 & n.1310.

15. Advertisers knew about open web display advertising before this case. *See, e.g.*, PX 7, at 185:2-22; PX 6, at 82:15-25; PX 11, at 44:18-46:10; PX 12, at 156:14-157:4)

16. The integration between and among Google's ad tech tools is not comparable to that of Microsoft, Criteo, and Amazon. PX 13, at 236:10-237:3; 256:15-22; 309:24-310:11; 310:22-312:10; PX 14, at 193:6-9; 204:7-208:2;  PX 15, at -348;  PX 16, at 84:3-86:10; 136:7-136:12.

17. Google Ad Manager ("GAM") does not always "maximize publisher revenue." PX 17, at -660; PX 18, at -255-57; PX 19, at -315

22. Due to Google's anticompetitive conduct, non-Google exchanges face significant competitive disadvantages and selling via non-Google exchanges is not comparable to selling via AdX. PX 20, at -219; PX 21, at -396; PX 22, at -335; PX 23, at -326; PX 24, at 21:14-22:2, 25:13-23; PX 25, at -939-40.

23. Google Ads does not bid for impressions via non-Google exchanges in a comparable manner to the way it bids on AdX. RSUF 41.

24-27. *See* Statement of Additional Material Facts ("SAMF") 5-9; DX 1, Figs. 88-89; DX 3, Fig. 13.

28. The cited evidence says nothing about "output." Only DX 1, Fig. 92 addresses the U.S. market, in the context of net revenues from the sale of U.S. indirect open web display impressions. The other figures relate to worldwide net and gross revenues.

30. Plaintiffs' experts express views on the anticompetitive effects of this conduct. *See* RSUF 33, 34, 35, and 36 for responses specific to each alleged act.

33. Plaintiffs' experts opine that the DoubleClick acquisition was a necessary first step to Google's exclusionary course of conduct. PX 26, at 173:19-21; PX 8, ¶¶ 424, 573, § VII.A; PX 27, ¶ 250; PX 28, at 269:8-18.

34. Plaintiffs' expert analysis supports the conclusion that Project Bell, though not fully commercially launched, was anticompetitive in intent. PX 8, App. L, ¶¶ 80-84; PX 29, ¶ 123.[2]

35. Plaintiffs' expert analysis supports the conclusion that Project Poirot exacerbated the effects of other anticompetitive conduct, and also is probative of market power, scale, and anticompetitive intent. PX 30, ¶¶ 285, 287; PX 29, ¶ 198; PX 8, App. L, ¶ 67; PX 32, ¶ 225; PX 27, ¶ 287-91.

36. Plaintiffs' expert analysis supports the conclusion that sell-side dynamic revenue sharing ("SSDRS") exacerbated the effects of other anticompetitive conduct, and also is probative of market power, scale, and anticompetitive intent. PX 31, at 40:4-16; PX 30, ¶ 285; PX 27, ¶ 479; PX 26, at 174:18-175:3; PX 8, ¶¶ 514, 686; PX 29, ¶ 139; PX 32, at p. 139, § VI.B.2.

---

[2] In 2014 and 2015, Google contemplated implementing Project Bell, which would lower Google Ads' bids to publishers that did not provide AdX with the "first call" opportunity to purchase their inventory. PX 135, at -394; PX 136, at -701; PX 137, at -550. Google warned publishers they would get lower yield if they did not place AdX first. PX 136, at -704. Google never fully commercialized Project Bell because it was unable to develop a mechanism to detect whether a publisher was in fact calling rival demand sources first. PX 138, at -326.

37. Prior to the DoubleClick acquisition, ad exchanges, including AdX, were not commercially available. For instance, in merger filings, Google represented that AdX prior to the acquisition had "generated only about US$8,200 in [total US] revenue from *beta* testing." PX 33, at -229.

39. AdX's advantage stems from Google preventing other exchanges from accessing the majority of Google Ads demand, not from "integration." PX 34, at -445-447; PX 35, at -083; PX 36, at -517; PX 37, at -216.

41. Initially, AwBid did not "allow[]" Google Ads customers to bid into non-Google ad exchanges, except for a narrow category of advertising called "remarketing." PX 38, at -331; PX 2, at 224:20-225:15. More recently, Google Ads customers are still limited to bidding for a small subset of advertising on non-Google ad exchanges. PX 39, at -218. As of July 2018, AwBid represented "3.5% of GDN gross revenue." PX 40, at -580. In 2022, "non-Google inventory" accounted for less than 6% of Google Ads' impressions. PX 8, ¶ 629.

42. Dr. Abrantes-Metz opined that an "alternative to restricting Google Ads to AdX" was to allow "Google Ads [to] interoperate with ad exchanges."  DX 44, ¶ 66. Ad exchanges are not rivals to Google Ads. PX 41, at -505.

43. Dr. Abrantes-Metz states, "Whatever work had to be done, Google had done it with respect to DV360." DX 6, at 60:10-11. Prof. Ravi states that Google had already done the same work with AwBid. DX 32, at 101:6-14. Dr. Abrantes-Metz also states that the evidence "belies any suggestion that such interoperability was unduly expensive or was otherwise technically infeasible." DX 44, ¶ 66. Google documents indicate that the "trade-off between work involved [in expanding AwBid] & returns seems good." PX 42, at -924.

44. Google had already accounted for this risk with AwBid. DX 47, at -731-32. Google had found that the "Inventory Quality" of rival exchanges met "AdX policy ratings and compares to [its own] Adsense Longtail," and that "Click Spam is at acceptable levels in most exchanges." PX 43, at -240-41.

45. The nature of the connection between AdX and DoubleClick for Publishers ("DFP") is not a positive attribute. It is part of Google's anticompetitive conduct in this case. *See, e.g.*, SAMF 2, 5, 9; DX 1, ¶ 631.

46. Google tied its publisher-side products together not because of quality concerns, but because it wanted to foreclose competition. *See* PX 44, at -462-63 (Google wants AdX to "serve as a tool to pull publishers onto [D]FP."); PX 45, at -236. Rivals repeatedly asked Google for access to AdX's real-time bids but were denied, despite getting such access to non-Google ad exchanges. *See, e.g.*, PX 46, at 39:5-41:20.

47. Google's statement conflates the exclusive access to AdX's real-time bids granted to DFP, described by Plaintiffs' expert and quoted in the first half of Google's statement, DX 4, ¶ 162, with the unification of DFP and AdX to form GAM described in the second half of the statement, DX 50, at -375.

48. AdX Direct tags do not provide non-DFP publishers access to AdX's real-time bids. PX 47, at -439; PX 8, ¶¶ 646-48.

49. The cited evidence does not support Google's statement. Dr. Abrantes-Metz offered potential alternatives to Google's conduct, none of which "involve the sharing of any competitive innovation with a rival company." DX 44, ¶ 68.

51. The cited evidence reflects that Dynamic Allocation ("DA") was an "existing feature," not an innovation. DX 28, ¶ 268.

54. "First look" did not use "the highest predicted bid from the waterfall," but rather "the highest price of any of the publisher's eligible booked, static remnant line items[.]" PX 21, at -396; PX 18, at -255; PX 48, at -157-158. While Google's statement does not identify the market in which DA purportedly increased competition, DA did not increase competition in any relevant market alleged by Plaintiffs. SAMF 5, 9.

55. As employed by Google, DA was a feature that publishers using GAM could not deactivate, and which hindered competition. *See* RSUF 51, 56; SAMF 5, 9.

56. "It is not possible for publishers using [GAM] to deactivate Enhanced Dynamic Allocation within the [GAM] interface." PX 49, at -796; PX 50, at -866; PX 51, at -105. A Google witness could not recall a publisher ever turning off DA. DX 54, at 145:20-146:9; *see also* RSUF 62.

57. The cited evidence does not support Google's statement. Prof. Lee explained that the benefits derived from DA come from AdX's introduction and provision of real-time bids to DFP. DX 1, ¶ 638. Prof. Weintraub, also explained that "overall advertiser surplus does not change very much" as a result of "first look," but that "AdX's advertiser[s] capture[] a disproportionately larger portion" of transactions, resulting in "suboptimal matches" and therefore DA "does not yield efficient allocations." DX 4, ¶ 191; DX 28, ¶ 82.

59. Open Bidding (later renamed "Exchange Bidding") did not make available "an integration like DA" because Google charges a 5-10% fee and because exchanges cannot use it "to bid in with demand from their own DSPs." DX 1, ¶ 161; PX 25, at -939-40; PX 21, at -401; PX 52, at -579; PX 53, at -913; PX 54, at 109:20-114:24; PX 55, at 153:8-155:12.

60. Plaintiffs' experts opine on how conduct relating to DA harmed competition in the ad exchange market and is direct evidence of Google's monopoly power in the publisher ad server

market, including after the introduction of Exchange Bidding, and before the introduction of the

Unified First Price Auction ("UFPA"). PX 8, ¶ 12(3)(3); *id*. ¶ 463; PX 27, ¶ 433.

62. Giving AdX bidders a "last look" was not, as a practical matter, "option[al]" for

publishers using DFP. PX 50, at -866; PX 49, at -796. Google's own documents show that last

look "only benefits us [(Google)]" and that publishers complained about last look. PX 200,

at -349; PX 17, at -660. These are not indicia of an "optional" feature.

63. Payouts to publishers under Last Look were "substantially the same." PX 56, at -201.

Prof. Ravi's statement concerns the "preferential position that DFP placed AdX in its waterfall,"

not "last look" in general. DX 32, at 125:24-126:8.

65. Dr. Abrantes-Metz opined that "DFP as a publisher ad server should have worked on

the – serving the best interest of its own publishers[,]" and that Google did not act in those

interests. DX 6, at 273:6-13. This testimony occurred in the context of illustrating why Google's

conduct harmed competition. *See id*. She also explained that her suggested alternatives to

Google's conduct did not involve "sharing anything with any rival" to DFP. DX 44, ¶ 67.

66. The cited evidence supports only that "some product changes would be necessary in

DFP," DX 32, at 131:1-13, and that Google doing something other than "harm its own

customers" may involve a different "choice," DX 6, at 281:16-282:11.

69. Google's own website currently advertises "Yield Management" prominently as a

capability of GAM, indicating that yield management is not "obsolete." PX 57.

71. Real-time bidding was a key AdMeld feature not integrated into AdX. *See* SUF 72.

72. Removing the real-time bidding feature that AdMeld had previously provided harmed

competition. PX 58, at -412-16; PX 26, at 292:18-293-1. Real-time bidding was used by

significant AdMeld publishers. *E.g.*, PX 59, at -375-76; PX 58, at -413 (a network of websites

including LinkedIn, MySpace, Weather.com, and eBay). As Google's own expert noted, "Admeld's RTB revenue surpassed its traditional yield management revenue in September 2011." DX 33, ¶ 740 & n.1128 (citing PX 60, at -372-73).

73. Two other yield managers, PubMatic and Rubicon, continued to offer real-time bidding, but it was not integrated with AdX. PX 26, at 298:18-22; PX 61, at -802-04. Google recognized at the time that these two companies were "far behind" AdMeld. PX 59, at -377. Their market shares are approximately ███████, respectively. PX 8, at Fig. 47.

74. The cited evidence does not support that "yield managers offered real-time bids only from the relevant yield manager." AdX's real-time bids were never available via AdMeld because it was against AdX's policy. PX 58, at -411-12.

75. Google's acquisition of AdMeld also eliminated a nascent "direct competitor" to DFP and AdX. PX 61, at -783, -789-90.

76. The cited evidence indicates that "[i]ntegration with **pub-owned servers** are still possible," DX 49, at -663, but that Google thought that "going slow makes sense" for "strategic" reasons, *id.* at -664. *See also* RSUF 46.

77. The cited evidence states, "The only acceptable interface is one where the ad server passes a minCPM to AdX, and if AdX can beat this minCPM, then the query must serve." DX 48, at -004.

78. The cited evidence states, "Account managers and the spam team will have a new type of spam to manage[,]" but not whether these would differ per publisher. DX 48, at -004.

79. The cited evidence does not support Google's statement that publishers "had to" separately set price floors. At a minimum, publishers were permitted, but not obligated, to separately set price floors for each exchange they were using. *E.g.*, PX 62, at -802.

81. Google's transition to a UFPA involved two separate and unrelated changes; Google's statement conflates these two changes. First, Google eliminated publishers' ability to set different floors per exchange within DFP. This change was in no way consistent with industry practice. PX 63, at -120. Second, Google transitioned AdX to "first-price" auction rules after a majority of ad exchanges had already done so to participate in header bidding. PX 124, at -532.

83. Plaintiffs' expert does not say that UPR benefited advertisers, and the cited passages do not concern the harms of UPR to advertisers. For example, UPR shifted more transactions to AdX, at the expense of advertisers who had to pay Google's supracompetitive fees. PX 8, ¶ 697. Plaintiffs' expert merely agreed that UPR might minimize bidder errors or eliminate ambiguity "broadly speaking." PX 64, at 245:19-20; 246:1-2.

84. The cited evidence does not support Google's statement. Rather, the cited evidence refers to Prof. Lee's testimony that prior to 2019, publishers could use variable price floors, and the "less exclusionary conduct would be not removing that functionality." PX 26, at 168:11-16.

86. The Federal Agency Advertisers' ("FAAs") purchases of ad exchange services originate with the FAAs, which develop and approve media plans in coordination with their ad agencies and authorize their ad agencies to execute ad purchases on the FAAs' behalf in accordance with those plans pursuant to procurement contracts, and task orders issued thereunder. PX 190, ¶ 5; PX 196, ¶ 5; PX 189, ¶ 5; PX 188, ¶ 5; PX 197, ¶ 5; PX 198, ¶ 5; PX 191, ¶ 6; PX 199, ¶ 3; PX 66, at 122:8-123:16; PX 12, at 167:16-169:10; DX 75; PX 67, at 66:14-72:15; PX 68; PX 65; PX 69, at 18:16-19:18, 39:8-45:2, 104:14-108:3; PX 70; PX 71, at 116:22-118:04, 147:1-148:11; PX 72; PX 73, at 77:19-79:19, 97:18-101:22; PX 74, at -001-12; PX 75; PX 76; PX 77, at 211:1-218:1; PX 78; PX 79, at 156:8-158:14; PX 80; PX 81, at 74:4-76:6; DX 70; PX 78.

87. Google controls The Trade Desk's ("TTD") access to AdX via contract terms that prohibit reselling and require a direct relationship with an advertiser or its agent. PX 82; PX 83.

89. Legally and factually, the FAAs were the purchasers for each transaction for which the United States claims damages. *See* SAMF 13-20; RSUF 86, 90, 95-97.

90. FAAs direct and approve their ad agencies' use of ad buying tools on their behalf, including Google DV360. PX 84, at 5-7; PX 85, at 16:25-18:7; PX 12, at 198:7-16; PX 86, at 49:5-13; PX 87, at 116:4-117:4; PX 69, at 18:16-19:18; PX 71, at 116:22-118:04; PX 88, at 204:18-205:3; PX 89, at 87:12-88:14; PX 79, at 221:14-21; PX 90, at 20:14-21:12.

91. *See* RSUF 89.

95. The ad agencies provide the FAAs marketing services beyond ad placement, but these services are not bundled together with media and are compensated separately from ad purchases, for which FAAs either pay ad agencies in advance or are contractually obligated to reimburse all payments made by ad agencies on their behalf. PX 190, ¶¶ 3-4; PX 196, ¶¶ 3-4; PX 189, ¶¶ 3-4; PX 188, ¶¶ 3-4; PX 197, ¶¶ 3-4; PX 198, ¶¶ 3-4; PX 191, ¶¶ 4-5; PX 199, ¶¶ 5-6; DX 73, at -935-40; PX 91, at -834-002; PX 92, at -462-013; DX 78, at -450-56; PX 93, at -868-76; PX 94, at -359-67; PX 95, at -553-58; PX 96, at -103-05; DX 71, at -354; PX 12, at 170:25-179:4.

96. The discretion FAAs afford to their ad agencies is limited to that approved in detailed media plans and authorizations. PX 190, ¶ 6; PX 196, ¶ 6; PX 189, ¶ 6; PX 188, ¶ 6; PX 197, ¶ 6; PX 198, ¶ 6; PX 191, ¶ 7; PX 199, ¶ 4; PX 85, at 17:13-22:8; 25:13-26:09; PX 66, at 83:13-22, 179:10-180:5; PX 81, at 266:17-267:7; PX 87, at 75:11-15, 232:2-233:11; PX 69, at 39:8-45:17, 91:14-92:10; PX 6, at 241:01-242:24; PX 71, at 193:16-194:24; PX 73, at 79:6-19, 81:1-15; PX 77, at 211:1-213:8; PX 79, at 156:8-20; RSUF 86.

97. In Google's transactional data, "Account IDs" for FAA purchases are specific to the FAAs, and some of the relevant ad agency contracts and accounts with Google reference the FAA or were created specifically for FAA purchases. PX 84, 1-13; PX 97, ¶¶ 45-49; PX 98, at 109:17-110:7, 111:20-113:4; PX 99; PX 100; PX 101; PX 102; PX 103.

## II.    STATEMENT OF ADDITIONAL MATERIAL FACTS ("SAMF")

1. DFP was the dominant publisher ad server for open web display advertising when Google acquired it in 2008.[3] As part of the same deal, Google also acquired AdX, then a nascent ad exchange. SUF 31. This acquisition set the stage for Google securing monopolies in the relevant markets alleged here, as Google recognized that acquiring the largest publisher ad server was foundational to achieving "the biggest and most liquid exchange." PX 106, at -670.

2. Because of the "huge switching cost" of publisher ad servers, PX 106, at -668, the acquisition of DFP secured for Google a pool of captive publisher inventory. Google knew then that "more pubs from DFP mean[t] more attractive to advertisers" and "more advertisers mean[t] more desire for pubs to get on DFP," which was a "virtuous circle" that Google could exploit. PX 107, at -014-15.

3. To further cement its dominance in the publisher ad server market and further increase the switching costs of DFP, in 2009 Google decided to restrict advertisers using its advertiser ad network, Google Ads, to purchasing exclusively on AdX. PX 35, at -083; SUF 38; RSUF 39, 41. Google also restricted DFP publishers' ability to compare AdX's real-time bids against other demand sources. PX 44, at -462-63; PX 45, at -236; PX 108, at -967-68; RSUF 46. Google Ads' advertiser customers were "overcharg[ed]" as a result. PX 109, at -181.

---

[3] PX 104, at -701 (DoubleClick had "9 of Top 10 US, 8 of Top 10 European sites" and "35 of Top 50 web publishers"); PX 105, at -891 (DoubleClick had "60% share" of publishers).

4. In 2011, Google acquired the yield manager Admeld, which presented a threat to DFP and AdX as one of three "Direct Competitors" that threatened to "disintermediate" both,[4] and subsequently killed it after rebuilding some, but not all, of its functionality into AdX and DFP. PX 110, at -421; PX 111, at -299; DX 58, at -445; RSUF 72.

5. With publishers increasingly captive to DFP, Google began to use that power to funnel transactions to AdX, where it extracted high fees on each transaction. PX 106, at -668; SAMF 7. Google, through DFP, granted itself through AdX a right of first refusal (or "first look") to purchase their inventory—even when advertisers using rival ad exchanges had a higher real-time bid that would generate more revenue for the publisher. PX 19, at -315; PX 112, at -048. This allowed AdX to cherry-pick the "highest paying impressions," which left non-Google exchanges with less valuable impressions (only those that AdX had passed over). PX 113, at -064; PX 8, ¶¶ 666-72; PX 27, ¶ 338. Over time, this decreased the historical average CPM for rival exchanges, further disadvantaging them in the waterfall. PX 8, ¶¶ 671-72.

6. By 2022, AdX's worldwide market share had grown to 57%, making it roughly 9 times the size of its nearest rival. PX 8, ¶ 485, Fig. 47. No rival to AdX had more than 6% share of impressions in 2022, and only six exchanges that produced data had more than a 1% share. PX 8, at Fig. 47. Similarly, in the United States, AdX's market share in 2022 was five times as large as the next largest ad exchange competitor. PX 8, ¶ 490. AdX's more significant competitors and customers viewed AdX as the dominant ad exchange. PX 114, at 60:17-61:8 (AdX has "the ability to win inventory at whatever take rate they put out there"); *see also* PX 24, at 12:8-13:18 (describing "limited leverage" due to lack of "reasonable alternatives").

---

[4] PX 61, at -783, -789-90.

7. Google's dominance in the ad exchange market allowed it to command a supracompetitive take rate of 20%. SUF 26. The only ad exchange with a higher take rate for the years 2021 or 2022, among those that produced data, was ██████, which had a 1% share worldwide and is differentiated from other ad exchanges, in contrast to AdX's 57% share. PX 8, at Fig. 110; PX 115, at -325 (██████ is a "specialist native network[]"); PX 116, ¶ 459 n.723. Google employees recognized that AdX's 20% take rate was high and likely facilitated only by the tie between Google Ads and AdX. PX 117, at -260. They suggested that the AdX take rate should be between 5% and 15% to reflect the market. PX 118, at -145; PX 117, at -260. Google considered reducing the AdX take rate but concluded that it would not be economically beneficial to Google. PX 119, at -227; PX 120, at -758.

8. Publishers and third-party ad exchanges worked together to develop header bidding to restore the competition Google foreclosed and replicate a subpar kind of access to DFP provided solely to AdX. PX 121, at -218 ("per-query bids from exchanges ***dramatically increases yield***, so pubs [publishers] are clamouring for this functionality" (triple emphasis in the original)); PX 122, at -601; PX 123, at -825. Header bidding allowed other ad exchanges to submit bids into DFP on a per-impression, real-time basis. PX 121, at -218; PX 122, at -601.

9. But even with header bidding, Google leveraged DFP's dominance to give AdX a right of last refusal or "last look" to win transactions involving DFP publishers. PX 121, at -221; PX 125, at -709. Google used sell-side Dynamic Revenue Share ("SSDRS") "to exploit [that] last look advantage." PX 23, at -326. SSDRS varied the AdX take rate—after seeing the highest competing bid from header bidding exchanges—so that it could "pay high and win" for competitive transactions and "pay low," i.e., charge a higher take rate for, less competitive transactions. PX 23, at -326. By exploiting its last look advantage, Google could maintain its

average 20% take rate without losing business. PX 126, at -356. Rival exchanges could not

achieve the same result because they did not have AdX's last look advantage. PX 23, at -326.

10. Google also implemented Project Poirot ("Poirot") "to combat the effects of header

bidding." PX 123, at -825; PX 127, at -512. To participate in header bidding, ad exchanges had

to change their auction mechanics from second-price auctions to first-price auctions. PX 124, at -

532; PX 127, at -512. Poirot systematically lowered bids submitted by DV360, Google's other

buy-side product, to these rival exchanges that had moved to "first price auctions . . . to compete

in the header bidding auction." PX 124, at -532 (showing that "Fair second-price auction[s]" had

dropped from 75.1% in December 2017 to 32.8% in March 2018 and that "First-price auction[s]"

had correspondingly increased from 5.8% to 43.3%); PX 127, at -512; PX 123, at -825.

11. Poirot was an effective strategy Google employed to combat header bidding, as it

shifted DV360 spend toward AdX and away from rival exchanges participating in header

bidding. PX 127, at -512; PX 128, at -310; PX 129, at -347; PX 123, at -825. Poirot had a

"devastating impact" on header bidding exchanges like ███████ "resulting in severe financial

consequences" and a "large layoff." PX 54, at 21:15-22; PX 130, at -482, -484.

12. Despite Google's efforts to combat header bidding, some publishers used their ability

to set higher floors on AdX relative to rival exchanges to shift transactions to lower-cost rivals

and reduce their dependence on AdX. PX 134, at -955-56; PX 62, at -802. This allowed

publishers to put competitive pressure on AdX and maximize the overall value of their inventory.

*Id*. Yet in 2019, Google foreclosed this competition too by imposing so-called Uniform Pricing

Rules ("UPR"). These rules, imposed by fiat, acted as an uncompensated anti-steering clause on

all of Google's DFP customers. *Cf.* PX 194, at -648; PX 195, at -708, -710. UPR "required

publishers using DFP to set a single price floor for all exchanges." SUF 82; RSUF 81. As Google

intended, UPR increased spending on AdX at the expense of rival ad exchanges and prevented publishers from preferencing rival advertiser ad networks. PX 131, at -933; DX 60, at -318; PX 133, at -038-39; PX 134, at -955-956.

13. Advertisers, including FAAs, do not buy ad inventory *from* ad agencies or DSPs, such as TTD, but *through* them. Although Google sometimes uses "resellers," the FAAs' ad agencies and TTD are not authorized resellers and can only access Google's platforms if they are authorized to act on an advertiser client's behalf or, for TTD, "have a direct relationship" with an advertiser or their agent. PX 139, ¶ 2(b); PX 140, at -706; PX 141, ¶ 2(b); PX 142, ¶ 2(b); PX 143, ¶ 6; PX 144, ¶ 6; PX 145, at -382-83; PX 146, at -052-53, -056; PX 147; PX 148, at 13:5-15:21; PX 83.

14. Google's sales teams consider the FAAs to be their clients, develop "joint business plans" for Google and each FAA, track and analyze advertising revenues from each FAA, create FAA-specific contracts and technology solutions, and organize their business by FAA rather than ad agency. PX 192; PX 149; PX 150, at -324; PX 151; PX 152; PX 153; PX 154, at -674; PX 98, at 61:20-66:1, 81:13-82:12; PX 155; PX 156; PX 157; PX 158; PX 159; PX 160, at -521; PX 103; PX 171.

15. Advertising agencies and TTD act *on behalf of* FAAs, and FAAs are the ultimate advertising decisionmakers, even when working with an ad agency. PX 161; PX 162; PX 163; PX 154; PX 164; PX 165; PX 166; PX 167, at -446, -450; PX 168; PX 75; PX 78, at -934; PX 146, at -052, -056; *see* RSUF 86, 90, 96.

16. Multiple ad agencies can be involved in facilitating FAA purchases on AdX, but none operate an ad exchange, many are affiliates of the prime agency specializing in media buying, and all work closely with the prime agency and FAA. PX 190, ¶ 3; PX 196, ¶ 3; PX 189, ¶ 3; PX

198, ¶ 5; PX 6, at 67:3-24, 216:7-15; PX 169, at 49:15-50:11, 88:18-89:12; PX 73, at 81:22-83:1; PX 170; PX 140; PX 171; PX 172, at 849; PX 173; PX 103.

17. Many FAA transactions were facilitated by ad agencies whose contracts with Google relieve the ad agency from any obligation to pay Google unless and until the FAA has paid the ad agency. PX 174; PX 175; PX 176; PX 139, at -565; PX 140; PX 141, at -875; PX 142, at -254; PX 143, at 331; PX 178, at -371; PX 144, at -388; PX 179; PX 180; DX 71, at -354.

18. AdX only sells exchange buying services to an FAA when the FAA's bid successfully results in a transaction with a publisher, and Google's AdX fee is charged not at the level of the ad agency or DSP, but rather is a transaction-specific fee assessed on FAA purchases and associated in Google transactional data with each FAA. PX 83; PX 181; SUF 5; PX 84, at 11-13, 15-16; PX 97,, ¶¶ 45-49; PX 21.

19. When the FAA wins an AdX auction, the FAA's ad is instantly served to the publisher's website; Google then deducts its AdX fee from the FAA's winning bid amount and credits the remainder to the publisher. PX 182, at 256:10-261:19; PX 11, at 170:18-172:10; PX 8,, ¶ 105 (citing PX 183, at 488, 500-01); PX 21.

20. Pricing for Google's AdX services is set exclusively by Google on a per-transaction basis and is often not known to ad agencies. PX 6, at 250:2-251:18; PX 21.

## **LEGAL STANDARD**

"The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). A genuine issue of material fact exists if "the evidence offered is such that a reasonable jury might return a verdict for the non-movant," and a court must "view the evidence in the light most favorable to the nonmoving party." *Id*. (citation omitted).

## ARGUMENT

I.   **Google's Course of Conduct Was Unlawful Because It Distorted the Competitive Process and Constrained Its Customers' Choices.**

The offense of monopolization under Section 2 of the Sherman Act has two elements: (1) "possession of monopoly power in the relevant market" and (2) "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc) (per curiam) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). The overarching question is whether the monopolist's conduct "harm[ed] the competitive *process* and thereby harms consumers." *Microsoft*, 253 F.3d at 58. In answering this question, "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992); *In re Suboxone Antitrust Litig.*, 622 F. Supp. 3d 22, 59-62 (E.D. Pa. 2022).

The conduct described in in this Section and in Section II below harmed the competitive process by (1) restricting publishers' and advertisers' choice of ad tech providers; and (2) manipulating the mechanics of ad tech auctions to favor its own products, thereby shielding Google from having to compete on the merits with other ad tech providers. *See* SAMF 1-5, 9-12. The result is that Google has stymied competition in open web display ad tech markets for over a decade, harming advertisers and publishers, and depriving competitors of the scale they would need to challenge Google's dominance. *Id.*[5] The Court should reject Google's invitation to

---

[5] Similarly, Google's conduct meets the elements of a tying claim, *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992), because Google used AdX's market power in the ad exchange market to coerce publishers into using DFP instead of a competing publisher ad server. SAMF 3; RSUF 46.

ignore the totality of its exclusionary conduct and instead zero in on individual aspects of that conduct. *See City of Anaheim*, 955 F.2d at 1376; *In re Suboxone*, 622 F. Supp. 3d at 62. Though Google's conduct is unlawful when analyzed piece by piece, none was conceived or implemented in isolation. SAMF 1-5, 9-12.

### A. Google's Actions Are Neither Unilateral Refusals to Deal with Rivals nor Product Improvements.

Google contends that four aspects of its challenged conduct were *per se* lawful, either as "refusals to deal" or "product improvements." Def.'s Mem. Supp. Summ. J. ("MSJ") 19-26. These arguments fail because they are contrary to law and economic reality.

Only two narrow situations are properly recognized as unilateral refusals to deal with rivals: (i) where the defendant outright refused to provide a rival a requested product or service, *see Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-09 (2004); or (ii) where a rival challenged an ongoing deal in search of better terms, *see Pac. Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438, 442, 451 (2009). The recognition of these two unique contexts emanates from the basic principle that, "[i]n the absence of any purpose to create or maintain a monopoly, the [Sherman Act] does not restrict the long recognized right of [businesses] . . . to exercise . . . discretion as to parties with whom [they] will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). The doctrine "targets only a discrete category of section 2 cases" and "doesn't seek to displace doctrines that address a monopolist's more direct interference with rivals." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013). Moreover, even when challenged conduct involves a refusal to deal with a rival on a rival's preferred terms, Section 2 liability will still apply when the acts are undertaken with anticompetitive intent. *See Trinko*, 540 U.S. at 409; *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601-05 (1985) (right to choose with whom to deal applies "*[i]n the absence*

20

*of any purpose to create or maintain a monopoly*" (citation omitted)); *Lorain Journal Co. v. United States*, 342 U.S. 143, 148-49, 155 (1951) (same).

Google misapplies this doctrine, purporting to immunize monopolists like Google from *conditionally* withholding products or services to coerce its own *customers*. *E.g.*, *Lorain Journal*, 342 U.S. at 155; *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468-69, 472 (7th Cir. 2020). Here, Google uses its monopoly power to coerce its publisher and advertiser customers to choose Google over its rivals by subverting competition and making its products worse. *See Novell*, 731 F.3d at 1076. This case is not about forcing Google to help its *competitors* or requiring Google to grant its competitors access to its ad tech products; it is about the constraints that Google has placed on its own customers. Thus, Google's reliance on *Trinko* and similar cases, MSJ 19-21, is misplaced. *See Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) (holding that district court erred by "borrowing a standard from refusal-to-deal-with-rivals caselaw" in evaluating defendant's refusal to sell to companies that did business with its rivals). Additionally, while genuine product improvement may be competition on the merits, "product redesign is anticompetitive when it coerces consumers and impedes competition." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015).

Application of these principles to the four aspects of Google's conduct that it argues are immune—(1) restriction of real-time bids from AdX to DFP, (2) restriction of Google Ads demand to AdX, (3) first look/last look, and (4) UPR—shows that all of this conduct is exclusionary, not unilateral refusals to deal or product improvements.

      1.    Google Compels Its Publisher Customers to Use DFP if They Want Access to Real-Time Bids from AdX[6]

---

[6] Google asserts that "Plaintiffs' claim with respect to AdMeld is . . . a derivation of their claim that it was anticompetitive for Google" to limit real-time bidding from AdX to DFP. MSJ 24.

Google admits that it conditions publishers' access to "real-time bids from AdX" on their use of DFP. SUF 49-50; RSUF 46. This conduct is a tie, not a refusal to deal with rivals, because it serves to constrain customer choice—the "crux" of an unlawful tie. *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016). For publishers who wanted access to AdX's real-time bids, Google took away publishers' freedom to select the publisher ad server of their choice. Google's conduct forced publishers to choose between forgoing the benefits of AdX's real-time bids or using DFP, even if publishers "might have preferred to" get their ad server "elsewhere." *Id*. (citation omitted).[7] Google's contention that the AdX-DFP tie is merely a refusal to deal ignores the economic realities of these markets. Other publisher ad servers are not merely Google's rivals. They are also intermediary tools that publishers use to sell advertising, and "a tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." *Viamedia*, 951 F.3d at 472.[8]

By Google's lights, any tie could be recast as a refusal to deal, *i.e.*, refusing access to A for anyone who does not also buy B. But that is not the law. *See*, *e.g.*, *Kodak*, 504 U.S. at 463 &

---

That is incorrect. The AdMeld acquisition was anticompetitive primarily because Google sought to shut down a nascent competitor to AdX and DFP. SAMF 4; *Grinnell*, 384 U.S. at 576 (acquisitions that "perfected . . . monopoly power" violate Section 2).

[7] Google's cited cases are inapposite. In *Service & Training, Inc. v. Data General Corp.*, the plaintiff could not establish conditioning, 963 F.2d 680, 686-87 (4th Cir. 1992), and in *It's My Party*, the plaintiff could not establish forcing, 811 F.3d at 684. But Google effectively concedes conditioning, and ample evidence supports coercion. SUF 49-50; RSUF 46; SAMF 3. In any event, neither court rejected the claim as a "disguise[d] duty to deal claim[]." MSJ 25.

[8] In *Viamedia*, a firm that represented cable companies sought to sell the companies' advertising inventory to an advertising cooperative controlled by the representative's monopolist rival. 951 F.3d at 434-35. The monopolist refused to deal with the representative, insisting that the cable companies needed to hire the monopolist as their representative if they wanted access to the cooperative. *Id.* The court held that this condition of sale was an unlawful tie because "once [the monopolist] refused to deal through [the companies'] chosen intermediary, they had no practical choice but to obtain ad rep services from [the monopolist]." *Id*. at 471 n.17. The same is true here: Google prevented AdX advertiser bids from competing in real time with rival exchange bids unless publishers were using DFP (the intermediary). SUF 49-50; RSUF 46.

n.8 (Kodak's "alleged sale of parts to third parties on condition that they buy service from Kodak is not [a unilateral refusal to deal]"). The crucial distinction is that ties also coerce *customers*, *id*., while refusals to deal do not.

For similar reasons, the Court should also reject Google's challenge to Plaintiffs' tying claim. Am. Compl. ¶¶ 336-39; MSJ 24-25. Plaintiffs are not seeking to impose a "duty to deal" on Google, but instead hold it accountable for its exclusionary conduct. Contrary to Google's suggestion, *id.*, the injunctive relief and divestiture sought in the complaint is consistent with Plaintiffs' efforts to "enjoin the tie," Am. Compl. ¶ 342(6)-(7), so that Google's customers can do business with whomever they choose, including Google's competitors. *Cf. Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017). Google's repeated references to unidentified "technical work" that would be required to correct its exclusionary conduct, *see, e.g.*, SUF 43, 50, are a distraction. For anything to occur in the tech industry, some degree of "technical work" is necessary. Whether and to what extent a particular change would require "technical work" does not inform whether conduct violates the antitrust laws.

Google's conduct is likewise not "ipso facto immune from scrutiny" merely because it could be self-servingly characterized as a "new product introduction." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 n.30 (2d Cir. 1979). Plaintiffs do not challenge the integration of AdX and DFP "itself"; rather, Plaintiffs challenge the *conditioning* of access to AdX real-time bids on the use of DFP, which is the "associated conduct" that "supplies the violation." *Id*. And "product redesign" that "coerces consumers and impedes competition," as nearly every tie does, is still unlawful. *Actavis*, 787 F.3d at 652.

       2.    <u>Google Restricts its Advertiser Customers' Ability to Use Rival Ad Exchanges.</u>

Google's conditioning of ad network services (through Google Ads) on the use of AdX, SAMF 3, is a tie and not a refusal to deal or product improvement for many of the same reasons. The tie constrained advertisers' freedom to buy ads on their preferred exchange, thereby interfering with Google Ads customers' ability to do business with AdX's competitors. *See Lorain Journal*, 342 U.S. at 155.[9] If Google's ad exchange is superior, it should be able to win Google Ads customers through competition on the merits, not by forcing them to use AdX. This conduct is also not immune as a product improvement for the same reasons as the AdX-DFP tie.

3.   Google Unlawfully Grants Itself Both an Exclusive "First Look" and a "Last Look," Free of Competitive Pressure.

Through its first look/last look policies, Google used its dominance in the publisher ad server market through DFP to "gain a competitive advantage" in the ad exchange market by suppressing competitive bidding from rival ad exchanges. *Kodak*, 504 U.S. at 482; SAMF 5, 9. The uncompensated and unnegotiated right of refusal that DFP afforded AdX, but not its rivals, gave AdX an undeniable competitive edge in all transactions, especially the most lucrative ones. *Id.* It denied rival exchanges the ability to compete—even if they could have submitted a bid that was higher than AdX's bid. SAMF 5; *see MISO Transmission Owners v. FERC*, 819 F.3d 329, 333 (7th Cir. 2016) (Posner, J.) ("A firm blessed with a right of first refusal can by exercising its option exclude competition with it[.]"). This is not about "shar[ing]" Google's "technology" with rival exchanges, MSJ 25, or better serving customers, SAMF 5, 8; for those reasons, refusal-to-deal and product-improvement doctrines are again inapposite.

---

[9] *See also Microsoft*, 253 F.3d at 64-67 (commingling browser and operating system code and removing Internet Explorer from the Add/Remove function violated Section 2); *In re Deere & Co. Repair Serv. Antitrust Litig.*, 2023 WL 8190256, at *2, *34 (N.D. Ill. Nov. 27, 2023) (defendant plausibly violated section 2 by selling tractors with integrated software and using the software to block customers from "perform[ing] their own repairs or hav[ing] a local repair shop perform the repairs").

4.   Google Flexed Its Dominance by Degrading a Valuable Product Feature
     That Allowed Its Publisher Customers to Choose Rival Demand Sources.

It is undisputed that Google previously allowed DFP publishers to set different price

floors for different demand sources and ad exchanges. RSUF 79. It is also undisputed that that

UPR took away that choice and instead "required publishers using DFP to set a single price floor

for all exchanges." SUF 82. Publishers previously used differential pricing to solicit impressions

from exchanges with lower take rates, putting competitive pressure on AdX. SAMF 12. By

restricting the terms on which a customer can transact with rival ad exchanges, Google is not

refusing to deal, it is restraining the competitive process.[10] *See, e.g.*, *Chase Mfg.*, 84 F.4th at

1173; *Actavis*, 787 F.3d at 655 (defendant's withdrawal of product was anticompetitive because

defendant "deprived customers of [] choice"); *In re Google Digital Advert. Antitrust Litig.*, 627

F. Supp. 3d at 401 (explaining that "restrict[ing] publishers' pricing decisions does not appear to

have a legitimate business purpose other than to restrict competition in the ad exchange

market").

**B. In All Events, Google's Conduct Is Unlawful Because It Was Part of a Broader
   Anticompetitive Enterprise.**

Even if any of Google's conduct is analyzed as a refusal to deal, genuine issues of

material fact remain as to whether it "was part of a larger anticompetitive enterprise . . . to

deprive a rival from the market or discipline it for daring to compete on price." *Viamedia*, 951

F.3d at 462; *Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006).

---

[10] UPR is analogous to an anti-steering provision, in that it prevents publishers from steering
business away from Google's ad tech products and toward those of Google's rivals. *See, e.g.*, *US
Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 51, 60-63 (2d Cir. 2019) (holding that
reasonable jury could have found that anti-steering provision of contract was exclusionary).

The record here reflects such a larger enterprise. *See* SAMF 1, 3-5, 8-12. Google intentionally withheld Google Ads bidding activity from rival ad exchanges to "prevent [them] from eroding its monopolistic position." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 378 (1973). Google recognized that increased bidding into third-party exchanges would benefit advertisers but would permit publishers to switch to Google's rivals without losing access to Google Ads demand. PX 184, at -586, 592; RSUF 41, 46; SAMF 3. Google nonetheless maintained this restriction knowing that it would harm Google Ads customers. *Id.*; PX 185, at -202; PX 186, at -676.

Google likewise restricted real-time bidding on DFP inventory to AdX as part of the same strategy to ensure that AdX and DFP remained the only way to gain access to Google Ads demand. SAMF 3. As a Google employee explained in 2013, "[o]ur goal should be all or nothing – use AdX as your SSP or don't get access to our demand. It's a key feature and we need to use it while its still proprietary to AdX." PX 37, at -216. UPR and First Look/Last Look were part of that same strategy to exclude rivals by preventing competition on the merits against rival exchanges. *See* RSUF 79-83, SAMF 8-9, 12.

## II.   Plaintiffs Have Not "Abandoned" Reliance on the DoubleClick Acquisition, Project Poirot, Sell-Side Dynamic Revenue Share, or Project Bell.

Google claims that since "Plaintiffs' experts do not allege that" the DoubleClick acquisition, Poirot, or SSDRS "harmed competition," Plaintiffs have "abandoned the claim that [those] formerly pleaded acts are anticompetitive" and "have not met their burden to establish that those acts could support Section 2 liability." MSJ 26-27. Google is incorrect.[11] Expert

---

[11] Although discovery revealed that Project Bell, Am. Compl. ¶ 162, was not fully implemented commercially, RSUF 34 & n.2, evidence about Project Bell is nevertheless probative of Google's overall business strategy and anticompetitive intent. *See, e.g.*, *Kolon Indus.*, 637 F.3d at 441 (attempted monopolization claim requires evidence of "specific intent to monopolize").

testimony is not required to prove that conduct is anticompetitive.[12] Moreover, as outlined above, RSUF 33-36; SAMF 1-2, 9-11, Plaintiffs have plenty of evidence, including expert opinion evidence, concerning the role that the DoubleClick acquisition, Poirot, and SSDRS played in Google's "willful acquisition or maintenance of monopoly power." *Kodak*, 504 U.S. at 483. Even if each of these practices must be "minimally" anticompetitive for their effects to be aggregated, *United States v. Google LLC*, No. 20-CV-3010, 2023 WL 4999901, at *12 (D.D.C. Aug. 4, 2023), there is sufficient evidence concerning that they at least minimally harmed competition, such that there exist genuine issues of material fact as to each one.

### III.   Plaintiffs Were Not Required to Define a Market for Google Ads Advertiser Demand, and the Markets Plaintiffs Have Defined Are Sound.

Google's contention that Plaintiffs should have defined a market for "Google Ads' advertiser demand" is incorrect. MSJ 27-28. Google Ads' advertiser demand is not a separate relevant market that must be defined here; it is a reason why Google has monopoly power in the ad network and ad exchange markets. Publishers need access to AdX in part because it is the only realistic source of Google Ads demand.[13] SAMF 3. Google possesses monopoly power in the ad network market in part because it has unique demand unavailable elsewhere. PX 8, ¶¶ 422, 523; PX 187, at -797-99. Plaintiffs have defined markets for advertiser ad networks and

---

[12] While "[e]xpert testimony is useful as a guide to interpreting market facts, . . . it is not a substitute for them." *Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). "[C]ommon sense . . . suggest[s] that expertise in antitrust economics [is] not required to determine that certain actions by a competitor have detrimental effects on its competition." *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, No. 04-CV-4213, 2011 WL 167259, at *6 (D. Minn. Jan. 14, 2011). To support its argument, Google cites only one case, *Military Services Realty, Inc.* v. *Realty Consultants of Virginia, Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987). But Google's selective quoting elides the fact that the plaintiff's experts' depositions were only one item in a list of deficiencies found by the court, and that lack of expert testimony by itself was not dispositive. *Id.*

[13] Google's reliance on *Ohio v. American Express Co.*, 585 U.S. 529 (2018) is misplaced. There, consumer demand for credit cards figured heavily in the analysis, but nowhere did the Court require plaintiffs to define credit card users as a separate market from the credit card market.

for ad exchanges. From the publishers' perspective, the advertisers that bid through Google Ads and AdX are features of those ad tech products, not a separate market that Plaintiffs must define. *See Geneva Pharms. Tech. Corp. v. Barr Labs Inc.,* 386 F.3d 485, 500-01 (2d Cir. 2004) (explaining that court looks at elasticity of consumer demand in a product market to determine whether a company has monopoly power).

The Court should also reject Google's false equivalency between mobile app and open web ads, as well as its comparison of open web display advertising to "walled garden" setups. MSJ 29-30. First, Google's argument ignores that, from the publisher's perspective, the results of Google's Washington Post example are not "absurd[]" at all. *See id*. If the Washington Post runs a website and wants to monetize that website by selling display ad inventory programmatically, it will need to use open web ad tech tools to do so. Of course, the Washington Post can sell ad space in other places as well, such as in its print editions, on a billboard, or in its mobile app, but those alternatives do not reduce the Washington Post's need for a publisher ad server or ad exchanges to facilitate the sales of open web display ads on its website.

Ad space on the Facebook (Meta) or Amazon websites is likewise distinct because that ad space is not sold through the same ad tech tools at issue here. Rather, Meta and Amazon operate as "walled gardens," which use their own in-house tools to sell ad space only on their own websites, rather than across the open web. *See* RSUF 4; PX 8, ¶¶ 79, 439, n.31 & App'x M; PX 116, ¶ 70 & n.115. Thus, the ad tech tools used internally by Facebook or Amazon do not help the Washington Post sell ad inventory on its website.[14]

---

[14] To the extent Google is otherwise seeking to cross-reference its arguments from its Motion to Exclude the Testimony of Prof. Lee, MSJ 29-30, Plaintiffs have addressed those arguments in the response to that motion.

IV.     **Google Has Monopoly Power in the Ad Exchange Market.**

Repeating a failed argument from its motion to dismiss, Google once again argues that it lacks monopoly power in the ad exchange market based on: (1) a bare weighing of market shares; and (2) an ad exchange counting exercise that ignores the actual competitive landscape. The record shows that Google has monopoly power—or in the alternative, that there is a dangerous probability that it will secure monopoly power—in the ad exchange market based on its ability to maintain fees above the competitive level for over a decade, its market share, or a combination of both. SAMF 6-7.

"[M]onopoly power" is "the power to control prices or exclude competition." *Grinnell*, 384 U.S. at 571 (citation omitted). Specifically, it is the power "to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supercompetitive price untenable." *Am. Acad. Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1319 (7th Cir. 1991). Monopoly power can "also be inferred from the structure and composition of the relevant market," such as through market shares. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007). But when "there is direct evidence that the defendant has actually set prices or excluded competition," an antitrust plaintiff "is not required to rely on indirect evidence of a defendant's monopoly power, such as high market share." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir. 1999).

While direct evidence of monopoly power is "rarely available," this is one of those rare cases because Google has flexed its power to "control prices" for over a decade. *Microsoft*, 253 F.3d at 51. Google does not dispute that it maintained a 20% take rate for over a decade, a take rate 33% to 300% above what its employees discussed was appropriate for the market. SUF 26; SAMF 7. Competitors and customers of AdX have similarly observed that negotiating with Google over AdX take rates is essentially a fool's errand because of AdX's dominance. SAMF 6.

Google claims that its prices are not supracompetitive because they are not the highest charged by any exchange. MSJ 31-32. This argument misses the mark. First, a supracompetitive price is merely a "price higher than the competitive price." *Beckley-Cardy*, 922 F.2d at 1319. Indeed, Google's own employees concur that a 20% take rate is higher than competitive. SAMF 7. Second, the only exchange charging more than 20% in 2021 or 2022 has a tiny market share, and occupies a niche that likely explains its high take rate. *Id.* In addition to Google's ability to control prices, the record shows that Google has the power to "exclude competition," *Grinnell*, 384 U.S. at 571, by taking actions that harmed other ad exchanges' ability to compete with AdX, *E.g.*, RSUF 41, 62; SAMF 3, 5, 9-12.

Finally, even if proof of market share were a necessary component of a monopolization claim (it is not), there is no 70% market-share threshold for monopoly power in this Circuit. MSJ 30. "[M]arket share of less than 60% . . . does not necessarily foreclose a finding of monopoly power, [although] it does weigh heavily against such a finding." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014). The Fourth Circuit also favorably quoted *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984), for the observation that "absent special circumstances, a defendant must have a market share of at least *50 percent* before he can be guilty of monopolization." *E.I. du Pont de Nemours & Co.* v. *Kolon Indus, Inc.*, 637 F.3d 435, 450-51 (4th Cir. 2011) (emphasis added); *see also Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984) ("[A] party may have monopoly power in a particular market, even though its market share is less than 50%."); *US Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 112595, at *9 (S.D.N.Y. Apr. 15, 2022) (market share between 49% and 52% percent sufficient for monopoly power).

An excessive focus on market shares would be particularly inappropriate here where AdX's size dwarfs the competition. Far from "exploding," MSJ 31, in 2022 only about six other ad exchanges had a market share above one percent, and AdX's share is more than *nine times* larger than its next biggest rival and twice as large as the next nine largest rivals *combined*. SAMF 6 (citing PX 8, at Fig. 47). Nonparties' testimony confirms AdX's dominance. *Id.* In *Kolon Industries*, only *two companies*, accounted for "99%" of the market, with defendant DuPont accounting for about 55% market share. 748 F.3d at 163. That pales in comparison to Google's dominance here. In any event, Google's ability to control prices and exclude competition, plus its intentional, exclusionary conduct, reflects a "dangerous probability" that Google will succeed in monopolizing the ad exchange market. *Kolon Indus.*, 637 F.3d at 441.

## V.   The United States Has Standing to Sue Google for Damages.[15]

The United States seeks damages under 15 U.S.C. § 15a ("Section 4A") for eight FAAs who purchased open web display ads on AdX. Contrary to Google's arguments, *Illinois Brick Co. v. Illinois*, 41 U.S. 720 (1977), does not bar the United States' damages claim because the FAAs are direct purchasers of AdX services and have standing to recover the overcharge imposed by Google. Even if the FAAs were indirect purchasers, the "control" exception would apply, and *Illinois Brick* should not extend to the Section 4A claim in this case.

### A.  The United States Is a Direct Purchaser of AdX Services.

The United States directly purchased the Google AdX exchange services for which it

---

[15] With no notice or conferral, at approximately 6:00pm ET yesterday, May 16, 2024, Google filed a Motion to Strike Jury Demand and to Dismiss, ECF No. 628, and delivered a check to the Department of Justice with the goal of fully compensating the FAAs for the damages they suffered and which the United States claims on their behalf. This motion may, according to Google, have a collateral impact on the arguments briefed herein. Plaintiffs address Google's arguments as raised in the present motion as planned and intend to respond in due course to Google's recent filing.

seeks damages. When advertising agents and the ad-buying tool TTD, acting on behalf of the FAAs, executed FAA-approved purchases on AdX, the FAAs were the immediate beneficiaries of, and incurred the costs for, the AdX exchange services purchased.[16] Neither the ad agencies nor TTD were resellers or intermediaries in the supply chain for AdX services. Therefore, *Illinois Brick*'s traditional resale supply chain framework does not apply to these purchases.

Google's documents show that the FAAs are Google's "clients." SAMF 13, 14; *see also* SUF 5. Google organizes its sales business, revenue tracking, services, and account representatives around the FAAs, not their ad agencies or TTD. SAMF 14. Google actively participates in FAA media strategy (*id.*); conditions ad agency and TTD access to its platforms on their representation of advertiser clients such as the FAAs (SAMF 13; RSUF 87); creates FAA-specific agreements, incentives, and technology solutions (SAMF 14; RSUF 97); and includes sequential liability clauses freeing many of the FAAs' ad agencies from responsibility to pay Google invoices unless and until the FAA has paid (SAMF 17).[17]

Even if the FAAs' ad agencies and TTD could be considered "intermediaries," they are not links in the supply chain within the meaning of *Illinois Brick* because they act as facilitators, not resellers. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* ("*Interchange*"), 2024 WL 1014159, at *11 (E.D.N.Y. Mar. 8, 2024); *see also Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019); SAMF 13, 1820; RSUF 86, 87, 90, 96, 97; SUF 5, 85.

---

[16] The instantaneous and transaction-specific nature of AdX services further undermines Google's contention that AdX services pass down a distribution chain akin to bricks. An entire open web display ad transaction on AdX, including payment to Google of the AdX fee pulled from the FAA's winning bid, occurs in an instant. SAMF 19. There is no opportunity for resale of AdX services. *See Soskel v. Texaco Inc.*, 514 F. Supp. 578, 580 (S.D.N.Y. 1981).

[17] Google advocates for a direct payor standard, focusing on which entity directly paid Google. But no such rule exists, and implementing a "'who pays' rule 'would require [the Court] to rewrite the rationale of *Illinois Brick* and to gut the longstanding bright-line rule.'" *Interchange*, 2024 WL 1014159, at *12 (quoting *Pepper*, 139 S. Ct. at 1522).

Google cannot credibly argue that the ad agencies or TTD resold to the FAAs ad exchange buying services purchased from Google because Google's transactional systems reflect that these were FAA purchases and no authorized resellers were involved in any of the transactions at issue. *Soskel*, 514 F. Supp. at 580; SAMF 13, 18; RSUF 97. Further, the FAAs' ad agencies are entitled to full reimbursement (or upfront payment) for FAA ad purchases, including 100% of AdX fees extracted from FAAs' winning bids. Thus, the ad agencies, like credit card issuing banks, are insulated from antitrust injury and "would have little incentive to sue on behalf of [FAAs]." *See Interchange*, 2024 WL 1014159, at *12; SAMF 17, 19, 20; RSUF 95.[18] As such, *Illinois Brick*'s concern with duplicative recovery is not at issue here. *See id.*

### B.   The FAAs Have Standing Because They Controlled the Relevant Transactions.

The FAAs can recover in any event because there was "functional economic or other unity" between the FAAs and ad agencies, such that "there effectively *has been only one sale.*" *See In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 713 (D. Md. 2001), *aff'd sub nom. Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006). As discussed above, there are no successive sales of AdX services. There is only one instantaneous transaction, upon which the FAAs exert control and during which the FAA immediately receives the benefit of the services and becomes obligated to pay for those services. SAMF 19; RSUF 96, 86, 90.[19]

---

[18] Google's arguments that the FAAs cannot be direct purchasers (or qualify for any *Illinois Brick* exception) because the FAAs did not sign platform access agreements are unavailing because the damages arise from monopolistic overcharges on transaction fees assessed on the FAAs' purchases, not a contractual entitlement. *See Interchange*, 2024 WL 1014159, at *12; *see also Blue Shield of Va. v. McCready*, 457 U.S. 465, 475 (1982); SAMF 18-20. And Google's contracts with the FAAs' agents require the agents to be representing advertisers. SAMF 13.

[19] Google's cited cases are inapposite. *See McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 853-54, 856 (3d Cir. 1996) (plaintiffs not direct purchasers of photocopies where lawyers, not purchasing agents, had "exclusive control of the manner of performing" their legal work); *In re Local TV Advert. Antitrust Litig.*, 2023 WL 1863046, at *2 (N.D. Ill. Feb. 9, 2023) (interpreting

Google's narrow interpretation of the control exception would convert the "functional economic or other unity" standard in this Circuit to a formalistic "legal ownership" standard. The approach fails to account for industries and circumstances where a buyer, such as the FAAs, uses a purchasing agent who, for all functional purposes is acting as a representative of the buyer-client to execute purchases with discretion to make decisions only to benefit the buyer and comply with the buyer's purchasing directives and goals. *See NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 505 (S.D.N.Y. 1996). The Court need not determine that FAAs control their agencies for all purposes in order to find that the FAAs exerted sufficient control here.

**C.  The Court Should Decline to Extend *Illinois Brick* to the Section 4A Claim.**

Whether *Illinois Brick* even applies to claims for damages to the United States under Section 4A is an issue of first impression. The United States as a claimant also suing in a law enforcement capacity materially differs from the circumstances of *Illinois Brick*. None of the reasons the Supreme Court articulated for the indirect purchaser rule apply with equal force to the United States, which is: (1) empowered not only to recover damages to federal agencies but also to seek injunctive and declaratory relief for harm to all market participants; (2) uniquely positioned to avoid the risk of multiple liability for defendants; and (3) able to assess when the value of protecting the public outweighs the burdens of tracing harm through multiple levels of the supply chain.

The Court need not reach the applicability of *Illinois Brick* to 4A claims because the United States is a direct purchaser and the control exception would apply even if it were not. But

---

control exception under strict and inapplicable precedent in Seventh Circuit essentially limiting exception to common ownership); *cf. In re Deere & Co. Repair Serv. Antitrust Litig.*, 2023 WL 8190256, at *16-23 (N.D. Ill. Nov. 27, 2023) (*Illinois Brick* inapplicable).

to the extent the Court finds *Illinois Brick* would otherwise bar suit for any of the FAAs' AdX

purchases, the Court should decline to extend *Illinois Brick* to the 4A claim in this case.

Dated: May 17, 2024

Respectfully submitted,

JESSICA D. ABER
United States Attorney

/s/ Gerard Mene
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Julia Tarver Wood
JULIA TARVER WOOD
CRAIG L. BRISKIN
ALVIN H. CHU
KATHERINE E. CLEMONS
ANDREW L. KLINE
VICTOR K. LIU
CHASE E. PRITCHETT
AARON M. TEITELBAUM

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov

Attorneys for the United States

JASON S. MIYARES
Attorney General of Virginia

/s/ Tyler T. Henry
STEVEN G. POPPS
Deputy Attorney General
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for the Commonwealth of
Virginia and local counsel for the
States of Arizona, California,
Colorado, Connecticut, Illinois,
Michigan, Minnesota, Nebraska, New
Hampshire, New Jersey, New York,
North Carolina, Rhode Island,
Tennessee, Washington, and West
Virginia