**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

UNITED STATES, *et al.*,

                 *Plaintiffs*,

    vs.

GOOGLE LLC,

                *Defendant*.

No. 1:23-cv-00108-LMB-JFA

**GOOGLE LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR**
**<u>SUMMARY JUDGMENT</u>**

## **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................. 1

II.    STATEMENT OF UNDISPUTED FACTS ("SUF").......................... 3

    A.    The Ad Tech Marketplace ................................................. 3

    B.    Plaintiffs' Made-Up Markets ............................................. 4

    C.    Google's Ad Tech Products ............................................... 6

    D.    Plaintiffs' Expert's Estimates Show No Monopoly Power in the "Ad Exchange Market" .......................................................... 7

    E.    The Challenged Conduct and No Longer Challenged Conduct............ 8

        1.    Abandonment of DoubleClick Acquisition as an Anticompetitive Act...... 8

        2.    Abandonment of Project Bell, Project Poirot, and Sell-Side Dynamic Revenue Sharing as Anticompetitive Acts ............................. 9

        3.    "Providing unrestricted access to Google Ads' advertiser demand exclusively to its AdX ad exchange, and denying comparable access to rival ad exchanges" .......................................... 9

        4.    "Providing access to and use of real-time bids from AdX exclusively to its DFP publisher ad server, and denying comparable access to rival publisher ad servers" ....................................... 10

        5.    Limitation of Dynamic Allocation to AdX ............................ 11

        6.    "Last look" ........................................................ 13

        7.    Acquisition of AdMeld ............................................. 14

        8.    Unified Pricing Rules ("UPR")...................................... 15

    F.    Plaintiffs' Damages Claim ............................................ 16

III.    LEGAL STANDARD...................................................... 18

IV.    ARGUMENT ............................................................. 19

    A.    The Court Should Grant Summary Judgment on All Claims Because the Challenged Acts Were Lawful Refusals to Deal with Rivals and Product Improvements. ....................................................... 19

        1.    Lawful refusals to deal with rivals are immune from antitrust scrutiny... 19

        2.    Legitimate product improvements are immune from antitrust scrutiny. .. 21

        3.    Plaintiffs challenge only lawful refusals to deal and product improvements..................................................... 22

        4.    Plaintiffs' experts do not allege that any other acts had anticompetitive effects. ........................................... 26

B.      Plaintiffs' Claims of Anticompetitive Conduct Based on Google Ads'
        Advertiser Demand Fail as a Matter of Law......................................................... 27

C.      All Claims Must Be Dismissed Because Plaintiffs Cannot Support Their
        Alleged Markets............................................................................................................. 29

        1.      There is no competent evidence supporting Plaintiffs' proposed
                markets................................................................................................................... 29

        2.      Even if "Ad Exchanges for Open Web Display Advertising" were a
                proper relevant market, Google does not have monopoly power in that
                market...................................................................................................................... 30

D.      Under *Illinois Brick*, the Court Should Grant Summary Judgment on the
        Plaintiffs' Claim for Damages (Count V)................................................................. 32

        1.      It is undisputed that no FAA purchased any advertising directly from
                Google...................................................................................................................... 32

        2.      No exception to the bright-line rule against indirect purchaser claims
                applies...................................................................................................................... 33

        3.      Indirect purchases via The Trade Desk are barred by *Illinois Brick*......... 34

CONCLUSION................................................................................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Health-Care Servs., Inc.* v. *Radford Cmty. Hosp.*,
　910 F.2d 139 (4th Cir. 1990) .................................................................18

*Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*,
　836 F.3d 1171 (9th Cir. 2016) ....................................................20, 25, 26

*Alivecor, Inc.* v. *Apple, Inc.*,
　2024 WL 591864 (N.D. Cal. 2024) ......................................................21

*Allied Orthopedic Appliances Inc.* v. *Tyco Health Care Grp. LP*,
　592 F.3d 991 (9th Cir. 2010) ...........................................................21, 22

*Anderson* v. *Liberty Lobby, Inc.*,
　477 U.S. 242 (1986)................................................................................18

*Apple Inc.* v. *Pepper*,
　139 S. Ct. 1514 (2019)............................................................................33

*Authenticom, Inc.* v. *CDK Glob., LLC*,
　874 F.3d 1019 (7th Cir. 2017) ...............................................................25

*Belmora, LLC* v. *Bayer Consumer Care AG*,
　338 F. Supp. 3d 477 (E.D. Va. 2018), *rev'd in part on other grounds*,
　987 F.3d 284 (4th Cir. 2021) ...........................................................29, 30

*Berkey Photo, Inc.* v. *Eastman Kodak Co.*,
　603 F.2d 263 (2d Cir. 1979)..........................................................21, 22, 23

*Berlyn, Inc.* v. *Gazette Newspapers, Inc.*,
　223 F. Supp. 2d 718 (D. Md. 2002), *aff'd*, 73 F. App'x 576 (4th Cir. 2003) ...................29, 30

*Blue Cross & Blue Shield United* v. *Marshfield Clinic*,
　65 F.3d 1406 (7th Cir. 1995) ..................................................................32

*Cavalier Tel., LLC.* v. *Verizon Va., Inc.*,
　330 F.3d 176 (4th Cir. 2003) ..................................................................20

*Church & Dwight Co., Inc.* v. *Mayer Lab'ys, Inc.*,
　868 F. Supp. 2d 876 (N.D. Cal. 2012), *vacated in part on other grounds*,
　2012 WL 1745592 (N.D. Cal. 2012) ......................................................31

*Cogan* v. *Harford Mem'l Hosp.*,
　843 F. Supp. 1013 (D. Md. 1994).....................................................29, 31

*Colsa Corp.* v. *Martin Marietta Servs., Inc.*,
    133 F.3d 853 (11th Cir. 1998) .............................................................................30

*Consul, Ltd.* v. *Transco Energy Co.*,
    805 F.2d 490 (4th Cir. 1986) ...............................................................................29

*Dickson* v. *Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ...............................................................................18

*Drs. Steuer & Latham, Pa.* v. *Nat'l Med. Enters., Inc.*,
    672 F. Supp. 1489 (D.S.C. 1987), *aff'd mem.*, 846 F.2d 70 (4th Cir. 1988) .........30

*FTC* v. *Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ...............................................................................28

*Epps* v. *Scaffolding Sols., LLC*,
    2019 WL 3363790 (E.D. Va. 2019).......................................................................22

*Goldwasser* v. *Ameritech Corp.*,
    222 F.3d 390 (7th Cir. 2000) ...........................................................................21, 26

*Ill. Tool Works Inc.* v. *Indep. Ink, Inc.*,
    547 U.S. 28 (2006)................................................................................................28

*Illinois Brick* v. *Illinois*,
    431 U.S. 720 (1977)..............................................................................................33

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ..............................................................................18

*In re Local TV Advert. Antitrust Litig.*,
    2023 WL 1863046 (N.D. Ill. 2023) ..................................................................33, 34

*In re Microsoft Corp. Antitrust Litig.*,
    127 F. Supp. 2d 702 (D. Md. 2001),
    *aff'd sub nom. Kloth* v. *Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006)...........33, 34

*It's My Party, Inc.* v. *Live Nation, Inc.*,
    88 F. Supp. 3d 475 (D. Md. 2015), *aff'd*, 811 F.3d 676 (4th Cir. 2016) ................25

*It's My Party, Inc.* v. *Live Nation, Inc. (It's My Party II)*,
    811 F.3d 676 (4th Cir. 2016) .................................................................8, 24, 28, 29

*Jersey Dental Lab'ys* v. *Dentsply Int'l, Inc.*,
    2002 WL 2007916 (D. Del. 2002),
    *rev'd on other grounds*, 424 F.3d 363 (3d Cir. 2005)............................................33

*Kloth* v. *Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) ...........................................................................33

*Kolon Indus. Inc.* v. *E.I. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) .....................................................................31, 32

*Ky. Speedway, LLC* v. *Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ...........................................................................30

*Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*,
    551 U.S. 877 (2007)...........................................................................................21

*Loren Data Corp.* v. *GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) .....................................................................20

*M&M Medical Supplies & Serv., Inc.* v. *Pleasant Valley Hosp., Inc.*,
    981 F.2d 160 (4th Cir. 1992) ...........................................................................18

*McCarthy* v. *Recordex Serv., Inc.*,
    80 F.3d 842 (3d Cir. 1996)................................................................................33

*Mil. Servs. Realty, Inc.* v. *Realty Consultants of Va., Ltd.*,
    823 F.2d 829 (4th Cir. 1987) ...........................................................................27

*New York* v. *Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021),
    *aff'd sub nom. New York* v. *Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023).....................................................................18, 21

*Novell, Inc.* v. *Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) .......................................................................20

*Ohio* v. *Am. Express Co.*,
    585 U.S. 529 (2018)..........................................................................................28

*Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)....................................................................................20, 22

*R.J. Reynolds Tobacco Co.* v. *Philip Morris, Inc.*,
    199 F. Supp. 2d 362 (M.D.N.C. 2002), *aff'd* 67 F. App'x 810 (4th Cir. 2003).......................31

*Rebel Oil Co., Inc.* v. *Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...........................................................................30

*Service & Training, Inc.* v. *Data General Corp.*,
    963 F.2d 680 (4th Cir. 1992) ...........................................................................25

*Stearns* v. *Genrad, Inc.*,
    752 F.2d 942 (4th Cir. 1984) ...........................................................................32

*United States* v. *Google LLC*,
  2023 WL 4999901 (D.D.C. 2023) .......................................................................18

*United States* v. *Microsoft Corp.*,
  147 F.3d 935 (D.C. Cir. 1998) ...........................................................................21

*United States* v. *Nat'l Lead Co.*,
  332 U.S. 319 (1947)............................................................................................21

*Va. Vermiculite, Ltd.* v. *W.R. Grace & Co.-Conn.*,
  108 F. Supp. 2d 549 (W.D. Va. 2000) ...............................................................30

*Verizon Commc'ns Inc.* v. *Law Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)..................................................................................... *passim*

**Statutes & Rules**

Clayton Act § 15 ..................................................................................................19

Fed. R. Civ. P. 56(a) ......................................................................................18, 22

Sherman Act § 2.......................................................................................... *passim*

**Other Authorities**

Fed. Trade Comm'n, *Federal Trade Commission Closes Google/DoubleClick
  Investigation* (Dec. 20, 2007), tinyurl.com/DoubleClickAcquisition........................8

Google, *Ad Manager Certified External Vendors*, tinyurl.com/AdXVendors ...............7

Google, *Introduction to Open Bidding*, tinyurl.com/OpenBidding ................................7

N.Y. City Bar Ass'n, *The 2022 Milton Handler Lecture – Jonathan Kanter*,
  YouTube (May 25, 2022), tinyurl.com/MiltonHandlerLecture..............................22

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
  Principles and Their Application* (5th ed. 2023) ......................................................4

U.S. Dep't of Just., *Antitrust Division Policy Director David Lawrence Delivers
  Keynote at Hal White Antitrust Conference* (June 24, 2022),
  tinyurl.com/HalWhiteKeynote..............................................................................22

U.S. Dep't of Just., *Assistant Attorney General Jonathan Kanter of the Antitrust
  Division Delivers Keynote at Fordham Competition Law Institute's 49th
  Annual Conference on International Antitrust Law and Policy*
  (Sept. 16, 2022), tinyurl.com/FordhamKeynote ....................................................22

U.S. Dep't of Just., *Statement of the Department of Justice's Antitrust Division*
  (Dec. 2, 2011), tinyurl.com/AdMeldAcquisition...................................................14

## I.    INTRODUCTION

Plaintiffs have made no secret of their mission to litigate cases beyond the boundaries of U.S. antitrust law.  But the law, as enacted by Congress and interpreted by the Supreme Court, does not prohibit any of the conduct at issue here.  It's simply not an antitrust violation to develop a product that is particularly (or even uniquely) suited to serving customers' needs.  And U.S. antitrust law does not force companies to share with their competitors.  The law also requires Plaintiffs to prove a real market, and when seeking monetary compensation, as Plaintiffs are here, to have directly bought the goods or services from the defendant.  No competent evidence supports Plaintiffs' fabricated markets, and no Plaintiff ever bought advertising space directly from Google.  Measured against the actual law, Plaintiffs' case comes up short, and summary judgment is appropriate.

The antitrust claims in this case involve "ad tech," the software that connects publishers wanting to sell digital ad space with advertisers wanting to buy it, and real-time bidding, an innovation that Google and its competitors first introduced in around 2009 to make it possible for publishers and advertisers to match and transact within a fraction of a second, showing an ad to a user in real time.  As a result of this breakthrough—in which Google and its competitors invest billions of dollars each year to continue improving—publishers and advertisers have realized economic growth and users have enjoyed digital content for free.  Industry competitiveness has only grown during this time.  The number of ad exchanges alone grew from fewer than 10 ad exchanges in 2010 to more than 100 today.  And Google, for all of its technological innovation in this space, has never had more than 15% of digital display advertising spend (with that share falling) and has never raised prices.

This case, more likely born of Plaintiffs' zeal to change the law, is based on just ten cherry-picked actions in a sixteen-year period.  With respect to nearly half of those, even Plaintiffs'

experts do not say they are anticompetitive.  In any event, Plaintiffs' entire case is doomed because all of these acts are lawful choices about whom to do business with and product improvements that benefited Google's customers.  Plaintiffs' central premise, underlying all of their claims, is that Google is required to give its rivals "the same" or "comparable" access to its innovations and customers that it provides to its own products.  This theory has long been foreclosed by the Supreme Court's unanimous decision, as articulated in *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), and its progeny.  That should end the case.

Next, as explained in Google's motion to exclude the testimony of their chief economist, Professor Robin Lee, Plaintiffs made up markets specifically for this case, focused on three particular ad tech tools that can transact "open-web display advertising."  These made-up markets exclude leading competitors and ignore most of the actual functionality of these ad tech tools, as Prof. Lee admits.  That too should end the case because, under controlling law, a party must have competent expert support to move past summary judgment.  And in the year 2024, and many years before that, there can be no serious claim that ad placement on mobile apps and social media should be excluded in market share calculations, which is precisely what Prof. Lee concedes he does.

Perhaps this is why not a single federal agency advertising executive (hand-picked to participate in this litigation) had ever heard of Plaintiffs' alleged markets.  Federal agencies were added to the Complaint at the last minute.  But their damages claim—for less than one million dollars (before trebling)—must be dismissed pursuant to *Illinois Brick* because the agencies did not directly purchase advertising from Google.

Plaintiffs' claims ask this Court to overrule well-established Supreme Court precedent starting with *Trinko* and create a new standard; to compel interoperability; and to intervene in product design.  But none of that is permissible based on decades of binding precedent.  For good

reason: because as the Supreme Court has recognized time over time, that would undermine the incentive to innovate and disregard the intense competition driving that innovation, which here has significantly contributed to a safe, secure, and growing digital economy.

Google respectfully submits that summary judgment should be granted in its favor.

## II.    STATEMENT OF UNDISPUTED FACTS ("SUF")

### A.    The Ad Tech Marketplace

1.    Ad tech is software that makes it possible for digital content providers (publishers) to sell online advertising space to advertisers and for digital advertisers to buy ad space.  Ex. 1, ¶¶ 51–53.[1]  It can facilitate an instant auction, match, and delivery of an ad from an advertiser within a fraction of a second when a user opens, to name just a few examples, a website, mobile app, gaming console, or streaming television service.  *See* Ex. 1, ¶ 73; Ex. 2, ¶ 51; Ex. 3, ¶ 103.

2.    Digital advertising is a two-sided marketplace, with the interests of both sides— publishers (selling advertising space) and advertisers (buying advertising space)—intersecting. Ex. 1, ¶¶ 52, 170.  It is important to advertisers and publishers to find for each impression "the best match possible."  Ex. 4, ¶ 71; *see also* Ex. 1, ¶ 104.

3.    Publishers of digital content designate space for digital ads, called inventory.  Each time a user visits the publisher's content, an impression is created, and a matched advertiser places its ad there.  Ex. 1, ¶¶ 52, 54.

4.    Digital publishers employ a wide variety of software tools to manage and monetize advertising space.  Ex. 1, ¶¶ 79-83; Ex. 4, ¶ 38.  Publishers use publisher ad servers to decide

---

[1] All references to "Ex." refer to the Declaration of Bryon Becker in Support of Google's Motion for Summary Judgment and Motions to Exclude.  With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability.  All emphasis is added unless otherwise indicated.

which ad to serve and where the ad should be displayed, and use multiple ad exchanges to sell impressions in real-time auctions.  Ex. 1, ¶¶ 85-86, 103-107.  Publishers can also sell their inventory through ad networks.  Ex. 2, ¶ 49.

5.     Advertisers use software tools to target their ads and get the best return on their advertising.  Ex. 1, ¶ 283; Ex. 5, ¶ 55.  Advertisers may work with advertising agencies that set ad campaign goals, develop campaign budgets, select buyer tools, manage advertising purchases, and bid on the advertiser's behalf.  Ex. 1, ¶ 92; Ex. 2, ¶ 33; Ex. 5, ¶ 55.

**B.     Plaintiffs' Made-Up Markets**

6.     Plaintiffs allege that, over the course of sixteen years, Google has monopolized three different markets: (1) "publisher ad servers for open web display advertising"; (2) "ad exchanges for indirect open web display advertising"; and (3) "advertiser ad networks for open web display advertising."  First Am. Compl., ECF No. 120 ("FAC") ¶¶ 16-41, 282, 290, 297, 310-335.

7.     Plaintiffs' expert,  Prof. Lee, delineated these markets based on "open-web display advertising."[2]  As another of Plaintiffs' experts explained: "the term is simply a name—a name that was given to the relevant antitrust market delineated for this case."  Ex. 6 at 26:22-27:8; *see also* Ex. 1, ¶ 244; Ex. 7 at 107:11-110:3.

8.      Plaintiffs' alleged market definitions exclusively focus on ad tech that has the ability to transact <u>display ads</u> viewed on <u>websites</u> operated by what Plaintiffs call "<u>open-web publishers</u>" who rely on "third-party ad tech products (i.e., products that these publishers do not themselves own) to sell their display ad inventory."  Ex. 1, ¶¶ 50, 55, 56.

---

[2] Prof. Robin Lee is Plaintiffs' expert economist.  Plaintiffs also proffered the opinions of Dr. Rosa Abrantes-Metz, Dr. Wayne Hoyer, Dr. Wenke Lee ("W. Lee"), Adoria Lim, Prof. Ramamoorthi Ravi, Prof. Timothy Simcoe, and Prof. Kenneth Wilbur.

9.      Like display ads, instream video and native ads can appear on websites, but are excluded from Prof. Lee's market definition.  Ex. 1, ¶ 49.

10.     Amazon, Facebook, and others operate websites where display ads appear, but ads on their websites and on other social media and retail websites are excluded from Plaintiffs' markets.  Ex. 1, ¶ 55.

11.     Even though the same tools Plaintiffs use to define their markets are used to sell display ads in apps, Plaintiffs exclude all in-app ads from their markets.  Ex. 1, ¶ 55.

12.     In delineating the alleged markets, Plaintiffs focus on only one functionality of ad tech—the ability to serve what they have coined "open-web display ads," Ex. 8 at 92:17-94:1, 94:3-14, even though each tool serves multiple forms of digital advertising, such as ads on mobile apps and connected TV.[3]

13.     Prof. Lee limits his market share calculations to "open-web display transactions" excluding other transactions by the same tool, including native, in-app, and video ads.  Ex. 3, ¶ 140; Ex. 8 at 92:3-16.

14.     No advertiser who testified in this case—including the federal agency advertiser plaintiffs—stated that they only use the ad tech tools at issue for "open-web display advertising." Ex. 12 at 100:14-101:22, 103:19-105:10; Ex. 13 at 28:24-29:24; Ex. 14 at -737; Ex. 15 at 382:6-12.

15.     No advertiser who testified in this case had heard of "open-web display advertising" before this case.[4]

---

[3] Ex. 8 at 89:19-90:2, 94:20-95:1, 99:3-20, 127:4-11; Ex. 9 at 290:12-292:4, 294:16-295:16, 296:13-18; Ex. 10 at 18:12-21:25; Ex. 11 at 126:13-25.

[4] Ex. 12 at 193:18-194:5; Ex. 16 at 259:19-261:2; Ex. 17 at 208:3-208:13; Ex. 18 at 269:8-270:3; Ex. 19 at 220:5-8; Ex. 20 at 206:24-207:20; Ex. 21 at 70:9-71:18; Ex. 22 at 278:12-20; Ex. 23 at 47:8-22.

### C.    Google's Ad Tech Products

16.    Like other industry participants, including for example Microsoft, Criteo, and Amazon, Google offers an integrated stack of ad tech tools.  *E.g.*, Ex. 1, ¶ 81 & Fig. 19; Ex. 9 at 282:19-284:21, 292:21-296:18; Ex. 24; Ex. 25 at 29:23-31:22, 60:20-24; Ex. 26 at 6; Ex. 27 at -784, -792.

17.    Google Ad Manager ("GAM") includes a publisher ad server and an ad exchange, Ex. 28, ¶¶ 30-31, and analytics, security, and yield management tools to maximize publisher revenue, Ex. 29 at -242; Ex. 30 at -236-39.

18.    The publisher ad server, formerly called "DoubleClick for Publishers" ("DFP"), enables publishers to manage and sell their inventory of impressions.  Ex. 1, ¶¶ 110-111.

19.    GAM allows publishers to sell inventory not only on websites, but in other digital formats such as in apps and on connected TV.   Ex. 8 at 86:10-87:18, 94:20-95:1.

20.    GAM also offers publishers access to an ad exchange, called AdX, which provides real-time auction matching between advertisers and publishers in exchange for a commission, also called a revenue share.  Ex. 1, ¶ 120 & n.140.

21.    In around 2009, Google—along with other companies—introduced real-time bidding ("RTB"), which  facilitated an explosion in the number of transactions.  Ex. 31 at -094-97; Ex. 32 at 143:10-144:7.

22.    Google's publisher ad server (DFP) allows publishers to sell impressions not only on Google's own exchange (AdX) but on competitor exchanges.  Google, *Ad Manager Certified External Vendors*, tinyurl.com/AdXVendors; Google, *Introduction to Open Bidding*, tinyurl.com/OpenBidding.

23.    Google also provides software tools that help advertisers manage their ad campaigns and buy inventory from publishers.  An example is Google Ads, which enables

advertisers to (among other things) bid for ad space via AdX and competitor exchanges, Ex. 1, ¶ 604, and to place ads on the Google Display Network—a collection of digital properties consisting of over 2 million websites, videos, and apps, Ex. 1, ¶¶ 122, 123 n.144.  Google Ads is also the buying door for Google owned and operated properties, including Search and YouTube, which are outside Plaintiffs' markets.  Ex. 1, ¶ 123 n.144.  Google also offers Display & Video 360 ("DV360"), another ad tech software tool that enables advertisers to manage ad campaigns and buy inventory from publishers, including inventory offered via ad exchanges and on certain Google owned and operated properties like YouTube.  Ex. 1, ¶¶ 130, 132.

**D.    Plaintiffs' Expert's Estimates Show No Monopoly Power in the "Ad Exchange Market"**

24.    According to Prof. Lee's United States market share estimates, AdX has never had greater than 56% share of the alleged "ad exchange" market by any metric, and AdX's market share has been decreasing at least since 2020.  Ex. 3, Rpt. Fig. 13.  From 2020 to 2022, AdX's share of impressions has fallen from 56% to 47%, of fees from 45% to 37%, and of spend from 43% to 34%.  *Id.*; *see also* Ex. 1, Figs. 88-89.

25.    Using Prof. Lee's worldwide market share estimates, AdX has never had greater than 66% market share by any metric, and its share of the alleged "ad exchange" market worldwide has been decreasing since at least 2020.  Ex. 3, Fig. 13.

26.    AdX's fee has remained 20% since its launch in 2009, and has never been the highest of the exchanges in the alleged "ad exchange market" between 2015 and 2022.  Ex. 1, Fig. 110; Ex. 2, ¶ 468; Ex. 33, Tbl. 8; Ex. 34 at -199; Ex. 35 at -046; Ex. 36.

27.    The number of ad exchanges has grown from less than 10 in 2010 to over 80 in 2019—including five years before Plaintiffs' experts opine that Google acquired monopoly power in <u>any</u> market, Ex. 1, ¶ 12(2).  Ex. 2, ¶ 235 (citing Ex. 37 at -042); Ex. 8 at 103:22-104:5.  The

number has continued to grow, with over 100 exchanges active today.  Ex. 25 at 40:4-10.

28.    From 2018 to 2022, output among ad exchanges in the U.S. doubled from less than $50 million to over $100 million.  Ex. 1, Figs. 49, 92; Ex. 38, Fig. 17.

**E.    The Challenged Conduct and No Longer Challenged Conduct**

29.    Out of thousands of new ad tech software features launched over a sixteen-year period, the Complaint identified ten forms of conduct—two of which are acquisitions that took place over a decade ago—as alleged anticompetitive acts.  FAC ¶¶ 312, 319, 326; Ex. 33, ¶ 478, Fig. 66.

30.    None of Plaintiffs' experts opine that four of the ten alleged acts are anticompetitive:  (1) Google's DoubleClick acquisition; (2) Project Bell; (3) sell-side Dynamic Revenue Sharing; and (4) Project Poirot.  Ex. 1, ¶ 12(3); Ex. 6 at 29:17-31:17.

1.    <u>Abandonment of DoubleClick Acquisition as an Anticompetitive Act</u>

31.    In April 2007, Google announced its acquisition of DoubleClick, which included both an early version of the publisher ad server DoubleClick for Publishers ("DFP") and a nascent ad exchange (AdX).  Ex. 1, App. L ¶¶ 17, 24.

32.    The Federal Trade Commission concluded, "after carefully reviewing the evidence," that the acquisition was "unlikely to substantially lessen competition."  Fed. Trade Comm'n, *Federal Trade Commission Closes Google/DoubleClick Investigation* (Dec. 20, 2007), tinyurl.com/DoubleClickAcquisition.

33.    Plaintiffs' experts do not opine that Google's acquisition of DoubleClick was anticompetitive or exclusionary.  Ex. 6 at 39:14-20; Ex. 8 at 173:19-21; Ex. 28, ¶ 30; Ex. 39 at 269:4-18.

2.    <u>Abandonment of Project Bell, Project Poirot, and Sell-Side Dynamic Revenue Sharing as Anticompetitive Acts</u>

34.    Plaintiffs' experts do not opine that Project Bell, a product design that prevented multi-calling—a practice by publishers of repeatedly calling for bids for the same impression in hopes of receiving a higher bid—was anticompetitive. Ex. 6 at 39:21-40:2; Ex. 8 at 174:6-10; Ex. 28, ¶¶ 130-131; Ex. 32 at 166:7-13, 166:24-168:7, 169:20-24, 170:24-171:19; Ex. 39 at 271:11-18.

35.    Plaintiffs' experts do not opine that Project Poirot, a product design that benefited advertisers by helping them win the same impressions at lower prices, was anticompetitive. Ex. 2, ¶ 281; Ex. 6 at 41:19-42:6; Ex. 8 at 175:10-15; Ex. 32 at 210:20-211:25; Ex. 40 at -637, -644; Ex. 41 at -116.

36.    Plaintiffs' experts do not opine that sell-side dynamic revenue sharing ("DRS"), a product design that increased publishers' revenue and allowed advertisers to win more impressions, was anticompetitive. Ex. 6 at 40:4-12; Ex. 8 at 174:18-175:3; Ex. 32 at 184:22-185:16, 187:12-188:3, 190:18-191:8; Ex. 42 at -484; Ex. 43 at -101-02; Ex. 44, ¶ 285.

3.    <u>"Providing unrestricted access to Google Ads' advertiser demand exclusively to its AdX ad exchange, and denying comparable access to rival ad exchanges"[5]</u>

37.    Prior to the DoubleClick acquisition, Google Ads did not bid into any exchanges, including AdX. FAC ¶ 78.

38.    When Google re-launched AdX on its own infrastructure in 2009, Google Ads bid only into AdX. Ex. 1, ¶ 604; Ex. 6 at 240:6-17.

39.    Integration between Google Ads and AdX "makes AdX more attractive to sellers,"

---

[5]    Ex. 1, ¶ 12(3)(1).

Ex. 1, ¶ 544, because they can better monetize their inventory through a large "number of advertisers" with ad diversity.  Ex. 39 at 194:10-194:19.

40. Prior to 2013, Google had not designed an integration to enable Google Ads to bid into competitors' ad exchanges.  Ex. 1, ¶ 604; Ex. 32 at 100:11-102:16.

41. In 2013, Google first implemented AwBid, which allows Google Ads advertisers to bid into ad exchanges other than AdX.  Ex. 6 at 240:6-17; Ex. 45 at -655; Ex. 46 at -443.

42. Plaintiffs' experts opine that Google should provide rival exchanges with access to Google Ads demand that is "comparable" to the access AdX has, Ex. 1, ¶ 12(3); Ex. 6 at 33:7-34:2, 46:8-47:11; Ex. 44, ¶ 66, which would require Google Ads to bid into rival exchanges, Ex. 8 at 147:1-148:18.

43. Expanding the existing degree of interoperability between Google Ads and third-party exchanges would require Google to undertake technical work.  Ex. 6 at 60:6-61:4; Ex. 32 at 100:11-102:16; Ex. 44, ¶ 66.

44. Expanding the existing degree of interoperability between Google Ads and third-party exchanges would also expose Google Ads' advertiser customers to increased invalid traffic and brand safety risks due to lower quality control on inventory on third-party exchanges.  Ex. 47 at -731-32.

    4. <u>"Providing access to and use of real-time bids from AdX exclusively to its DFP publisher ad server, and denying comparable access to rival publisher ad servers"</u> [6]

45. AdX has historically integrated best with Google's publisher ad server, DoubleClick for Publishers, or DFP.  Ex. 1, ¶ 631.

46. Google decided to build its publisher-side products in this integrated way because,

---

[6]   Ex. 1, ¶ 12(3)(2).

among other reasons, previous integrations with third-party tools had been "plagued with ongoing issues"; Google had "engineering concerns associated with spam detection and inventory quality controls"; and rivals were not willing to aid in the integration efforts without being paid.  Ex. 48 at -003-04; Ex. 49 at -662, -665.

47.     The "link between AdX and DFP" increases the value of Google's products, Ex. 4, ¶¶ 162, 164 & n.384, by providing publishers better quality control and a streamlined user interface.  Ex. 50 at -375; Ex. 51 at 146:5-24.

48.     Since Google re-launched AdX on its own infrastructure in 2009, any publisher—even those who do not use DFP—has been able to access the advertiser demand that bids into AdX by using "AdX Direct" tags, which are pieces of code that publishers can place on their websites.  Ex. 1, ¶ 643; Ex. 33, ¶¶ 653-654.

49.     Plaintiffs' experts opine that Google should make it easier for rival publisher ad servers to access AdX demand (including demand from Google Ads advertisers) by providing them access to AdX that is "comparable" to the access Google's publisher ad server has, including access to real-time bids from AdX.  Ex. 1, ¶ 12(3)(2); Ex. 3, ¶¶ 238, 593-594; Ex. 6 at 34:3-18; Ex. 8 at 153:15-20; Ex. 44, ¶ 68.

50.     Going beyond AdX Direct, and providing additional access to and use of real-time bids from AdX to third-party ad servers, would require Google to undertake additional technical work.  Ex. 8 at 155:12-156:3; Ex. 33, ¶ 518.

### 5.     Limitation of Dynamic Allocation to AdX

51.     Dynamic Allocation ("DA") was a product innovation that DoubleClick created before Google acquired the company in 2008.   Ex. 28, ¶ 268.

52.     Before DA, publishers sold ad impressions via a "waterfall" process, which offered each impression in sequence to various places where advertisers were buying.  Ex. 1, ¶ 145; Ex.

52 at 889.

53.     The "waterfall" process was inefficient because it sometimes resulted in an advertiser winning an impression when another advertiser later in the waterfall was willing to pay a higher price.  Ex. 1, ¶ 147; Ex. 28, ¶ 78.

54.     DA increased competition by enabling multiple AdX advertisers to bid in an auction, using the highest predicted bid from the waterfall as the auction floor price the AdX bidders had to beat.  Ex. 1, ¶¶ 149-150; Ex. 4, ¶¶ 118, 179-180.  "First look" is a term used to refer to how DA works: if an AdX advertiser's bid beat the highest predicted bid from the waterfall, that advertiser would win the impression before the impression was offered to other buyers in the waterfall.  Ex. 1, ¶ 666.

55.     Google continued DoubleClick's innovative DA feature, and made it available to all its customers.  Ex. 53 at -843.

56.     DA was optional.  Publishers could still use the waterfall process instead.  Ex. 54 at 145:20-145:24.

57.     Plaintiffs' experts acknowledge that publishers benefited from DA because they earned increased revenues as a result, Ex. 1, ¶¶ 147, 638; Ex. 4, ¶ 118, and advertisers buying on AdX benefited from improved access to inventory, Ex. 4, ¶ 191; Ex. 28, ¶ 82; Ex. 55 at -419.

58.     From Google's acquisition of DoubleClick until 2016, DFP was not designed to enable other exchanges to use DA.  Ex. 1, ¶ 152 & n.202, App. L ¶ 48; Ex. 2, ¶ 322.

59.     With the launch of Exchange Bidding in 2016, DFP made available an integration like DA for third-party exchanges, enabling them to compete with AdX in real time.  Ex. 1, ¶ 160.

60.     Plaintiffs' experts limit their opinions of anticompetitive conduct relating to DA to opining that Google should have modified the ways in which rival exchanges accessed DFP

before Exchange Bidding.  Ex. 1, ¶ 12(3)(3); Ex. 6 at 272:15-273:18.

       6.    "Last look"

61.    "Last look" was "a term used by some in the industry to refer to the way Dynamic Allocation works" after the rise of header bidding; header bidding is code on a publisher's website that allows ad exchanges and other demand sources to compete in real-time for an impression before the publisher's ad server is called to sell it.  Ex. 1, ¶¶ 154, 156, 675, Fig. 68; Ex. 2, ¶ 346.

62.    Publishers using DFP had the option of giving AdX bidders a "last look"— a chance to beat the winning bid from a header bidding auction—by allowing them to bid on impressions after a header bidding auction, using the highest header bidding bid as a floor price for the AdX auction.  An AdX buyer would win the auction only if it bid higher than all of the header bidding auction bids.  Ex. 1, ¶ 673; Ex. 28, ¶¶ 274-275.

63.    Plaintiffs' experts acknowledge publishers who gave AdX a "last look" benefited from increased revenue.  Ex. 3, ¶ 622; Ex. 28, ¶¶ 274-275.  Plaintiffs' expert Prof. Ravi agreed that the "last look" mechanism "made Google's ad exchange more attractive to the buyers in exchanges."  Ex. 32 at 125:24-126:14.

64.    "Last look" has not existed since 2019, when Google transitioned to a first-price auction.  Ex. 1, ¶ 679; *infra* SUF ¶ 81 (describing transition to first-price auction).

65.    Plaintiffs' experts opine that Google should have redesigned DFP to allow publishers to give rival exchanges a "last look," Ex. 6 at 272:15-273:18, 280:6-281:4; Ex. 44, ¶ 67, or permitted rival exchanges to submit real-time bids alongside AdX in an attempt to beat the winning bid from the header bidding auction, Ex. 8 at 156:4-20, 165:3-11.

66.    Building DA for rival exchanges so that publishers could give them a "last look" would have required technical and engineering work.  Ex. 32 at 131:1-13; *see also* Ex. 6 at 278:9-282:11; Ex. 33, ¶ 518.

7.     Acquisition of AdMeld

67.     In 2011, Google acquired AdMeld, which included "yield management" technology that permitted publishers to compare offers from multiple buy-side sources at the same time, as well as ad exchange functionality.  Ex. 1, ¶¶ 718, 723, 730.

68.     At that time, yield management was in demand among publishers.  Ex. 56 at -883; Ex. 57 at -485-86.  AdMeld was one of several yield managers on the market.  Ex. 1, ¶ 723; Ex. 56 at -892.

69.     Yield management was a short-lived technology that became obsolete as real-time bidding became popular.  Ex. 33, ¶ 740.

70.     In December 2011, the DOJ, "after a thorough review of the evidence," concluded that Google's AdMeld acquisition "is not likely to substantially lessen competition in the sale of display advertising." U.S. Dep't of Just., *Statement of the Department of Justice's Antitrust Division* (Dec. 2, 2011), tinyurl.com/AdMeldAcquisition.

71.     Google integrated key AdMeld features into AdX.  Ex. 1, ¶ 730; Ex. 8 at 287:19-288:4, 291:9-19; Ex. 58 at -442.

72.     Google did not integrate a feature that a "small handful of AdMeld sellers" used called server-side integration, which enabled AdMeld's ad exchange to provide real-time bids to third-party ad servers.  Ex. 1, ¶ 731; Ex. 2, ¶ 116; Ex. 58 at -448.

73.     Other yield managers on the market continued to offer real-time bidding through server-side integration.  Ex. 8 at 297:19-298:22.

74.     The server-side integration technology used by AdMeld and other yield managers offered real-time bids only from the relevant yield manager; it would not have made real-time bids from AdX available to third-party ad servers.  Ex. 1, ¶ 728; Ex. 59 at -596.  Both before and after the AdMeld acquisition, the integration technology did not make real-time bids from AdX

available to third-party ad servers.  Ex. 1, ¶¶ 631, 640.

75.     Plaintiffs' complaint concerning AdMeld is the same as their complaint concerning restricting to DFP "effective real-time access to AdX," Ex. 3, ¶ 686; Ex. 6 at 286:5-17, 288:7-12, 295:4-296:1; Ex. 8 at 290:4-14; Ex. 44, ¶ 69; they do not otherwise challenge the acquisition, Ex. 2, ¶¶ 116, 382; Ex. 8 at 292:5-293:1.

76.     As explained above, integration of the server-side integration feature raised "engineering concerns associated with spam detection and inventory quality controls," and would have required "significant work in engineering."  Ex. 48 at -003-04; Ex. 49 at -662, -665; *see also* Ex. 2, ¶¶ 382 & n.593, 384 & n.596.

77.     Additionally, the integration would only work if the publisher ad server met interface, formatting, and coding requirements.  Ex. 48 at -004.

78.     Server-side integration would also require ongoing support from multiple teams because it would bring "a new type of spam to manage," which would differ "per pub[lisher]" using the service.  Ex. 48 at -004.

8.     Unified Pricing Rules ("UPR")

79.     Prior to 2019, publishers had to separately set price floors for each of the exchanges they were using to sell their inventory.  Ex. 1, ¶ 707.

80.     This means an advertiser bidding on an impression through one exchange could face a different minimum price to beat than if the same advertiser was bidding on the same impression through a different exchange.   Ex. 1, ¶ 707.

81.     In 2019, Google transitioned to a Unified First Price Auction ("UFPA") to bring Google's auction practices in line with how "most ad exchanges" operate today.  FAC ¶ 56; Ex. 1, ¶¶ 164-165.

82.     UPR required publishers using DFP to set a single price floor for all exchanges

15

participating in a unified auction.  Ex. 1, ¶ 708.

83.     According to Plaintiffs' own expert, UPR benefited advertisers by simplifying bidding, minimizing bidder errors, improving decision-making, Ex. 32 at 245:15-246:2, and lowering effective price floors, FAC ¶ 246; Ex. 2, ¶ 406; Ex. 60 at -318; Ex. 61 at -354, which increased impressions won by advertisers bidding through AdX, Ex. 2, ¶¶ 398 & n.627, 406 & n.645; Ex. 61 at -381.

84.     Plaintiffs' experts opine that Google should have designed the UFPA to provide publishers with the ability to discriminate against Google by setting a higher floor price for AdX than other exchanges.  Ex. 8 at 168:5-16.

### F.     Plaintiffs' Damages Claim

85.     Plaintiffs claim less than a million dollars in damages—by their calculations as little as $164,189 or at most $745,152 (before trebling and pre-judgment interest)—on behalf of eight federal advertising agencies ("FAAs") who allegedly suffered injury between January 2019 and January 2023 when advertising agencies purchased "open-web display ads" on the FAAs' behalf. FAC ¶ 342; Ex. 5, ¶ 11; Ex. 62, App. E, Fig. 19.

86.     Plaintiffs claim that the FAAs were overcharged on transactions that originated with their ad agencies; went through one of three advertiser tools (DV360, Google Ads, or the third-party advertiser tool offered by The Trade Desk ("TTD")); and then to AdX.  Ex. 5, ¶ 6; Ex. 62, App. E, ¶¶ 14, 23.

87.     TTD is a public company and major Google competitor; Google has no control over TTD. Ex. 10 at 313:18-21.

88.     The FAAs' damages are calculated based on the difference between the revenue share the FAAs actually paid for AdX's tech services that facilitate purchases of "open-web display advertising" and what Plaintiffs say it should have been "but-for" Google's conduct (10%,

16.2%, or 16.6%).  Ex. 5, ¶ 132 & n.186; Ex. 62, ¶ 68.

89.     For each transaction for which Plaintiffs claim damages, third-party advertising agencies were the purchasers.  Ex. 62, App. E, ¶ 44, Figs. 8-10 & 16.

90.     The FAAs did not direct the ad agencies to use Google products or services.[7]

91.     No FAA purchased ad tech services directly from Google.[8]

92.     No FAA directly invoiced Google.  Ex. 68 at 85:15-87:1, 92:21-93:9.

93.     No payments flowed directly from any FAA to Google.  Ex. 68 at 85:15-87:1.

94.     There are no contracts between Google and any of the FAAs related to their purchase of advertising.

95.     In addition to purchasing advertising, ad agencies provide the FAAs marketing services, including marketing plans and performance tracking.[9]

96.     The FAAs afford significant discretion to their ad agencies, including what kinds of ads to purchase (and shift spend among) and what tools to use.[10]

97.     The ad agencies have their own contracts with Google, and those contracts are generally not specific to the ad agencies' relationship with the FAAs.  Ex. 81 at 108:12-110:19; *see also, e.g.*, Ex. 82.

---

[7] Ex. 18 at 144:13-145:2; Ex. 21 at 29:22-30:21; Ex. 23 at 85:2-19; Ex. 63 at 62:8-21; Ex. 64 at 69:22-70:9; Ex. 65 at 49:3-13; Ex. 66 at 88:19-91:11; Ex. 67 at -3744.

[8] Ex. 62, App. E, ¶ 44, Figs. 8-10 & 16; *see also, e.g.*, Ex. 12 at 304:2-9; Ex. 18 at 307:18-309:20; Ex. 21 at 63:7-17; Ex. 23 at 56:16-21, 88:2-8; Ex. 68 at 75:15-76:7.

[9] Ex. 64 at 111:20-112:10; Ex. 69 at -428, -459-60; Ex. 70 at -074, -076, -107; Ex. 71 at -357-61; Ex. 72 at -266; Ex. 73 at -939; Ex. 74 at -760-61; Ex. 75 at -424, -431-34, -459-60.

[10] Ex. 12 at 132:5-133:17, 152:8-154:9; Ex. 18 at 144:13-145:2, 241:14-242:5; Ex. 21 at 29:22-30:21; Ex. 23 at 82:1-5, 142:8-17, 275:11-21, 296:20-297:12; Ex. 65 at 71:1-72:2; Ex. 67 at -744; Ex. 72 at -266; Ex. 74 at -760-61; Ex. 76 at -713, 719-20; Ex. 77 at -559; Ex. 78 at 458-59; Ex. 79 at 57:19-59:13; Ex. 80 at 49:15-52:11.

III.    **LEGAL STANDARD**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[11]   Google seeks summary judgment on each of Plaintiffs' five claims.  The first three are for monopolization or attempted monopolization under Section 2 of the Sherman Act.  FAC ¶¶ 310-335.  All monopolization and attempted monopolization claims require proof of a relevant market, proof of monopoly power or a dangerous probability of monopoly power in that market, and proof of anticompetitive conduct.  *Verizon Commc'ns Inc.* v. *Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Advanced Health-Care Servs., Inc.* v. *Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990).

When evaluating anticompetitive conduct, courts must "disaggregate the [alleged] exclusionary conduct into its component parts," and each component part must itself be anticompetitive.  *United States* v. *Google LLC*, 2023 WL 4999901, at *12 (D.D.C. 2023); *see also Dickson* v. *Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) (each agreement, "when considered separately," must be anticompetitive); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022).  Conduct that is immune from antitrust scrutiny—such as lawful refusals to deal—cannot be part of an overall anticompetitive "course of conduct."  *New York* v. *Facebook, Inc.*, 549 F. Supp. 3d 6, 47-48 (D.D.C. 2021), *aff'd sub nom. New York* v. *Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023).

Plaintiffs' fourth claim is for tying, FAC ¶¶ 336-339, which is "an agreement by a party to

---

[11] A fact is material if it "might affect the outcome of the suit."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *M&M Medical Supplies & Serv., Inc.* v. *Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir. 1992).

sell one product but only on the condition that the buyer also purchases a different (or tied) product." *It's My Party, Inc.* v. *Live Nation, Inc. (It's My Party II)*, 811 F.3d 676, 684 (4th Cir. 2016). That claim requires market power in the tying product and coercion to purchase a tied product. *Id.* The fifth claim seeks damages under § 15 of the Clayton Act for alleged AdX overcharges allegedly incurred by eight federal agencies. FAC ¶¶ 340–341.

## IV. ARGUMENT

### A. The Court Should Grant Summary Judgment on All Claims Because the Challenged Acts Were Lawful Refusals to Deal with Rivals and Product Improvements.

#### 1. <u>Lawful refusals to deal with rivals are immune from antitrust scrutiny.</u>

Plaintiffs' claims are barred by the Supreme Court's refusal to deal doctrine. It is well-settled that the Sherman Act "does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 408.

This principle applies even where an alleged monopolist "denies interconnection services to rivals in order to limit entry." *Id.* at 407-08. In *Trinko*, the Supreme Court considered an allegation that Verizon—which was under a statutory obligation to share its network—had discriminated against its competitors by failing adequately to service its competitors' customers, thus discouraging them from doing business with its rivals. *Id.* at 404-05. The Supreme Court found that this did not give rise to an antitrust claim:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited.

*Id.* at 407-08. Verizon was under no obligation to design or implement "new systems. . . simply

19

to make [rivals'] access possible." *Id.* at 410; *cf. Cavalier Tel., LLC.* v. *Verizon Va., Inc.*, 330 F.3d 176, 188, 190 (4th Cir. 2003) (similar allegations stated no antitrust claim).

The Supreme Court has since emphasized that "a firm with no duty to deal in the wholesale market has no obligation to deal under terms and conditions favorable to its competitors." *Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*, 555 U.S. 438, 450-51 (2009); *see also Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016); *Loren Data Corp.* v. *GXS, Inc.*, 501 F. App'x 275, 283 (4th Cir. 2012) (no Section 2 violation where competitors were "not satisfied" with terms of access).

As *Trinko* and its progeny make clear, these principles forbid claims that are premised on "enforced sharing." *Trinko*, 540 U.S. at 408.  As a consequence, courts have consistently refused to require technology companies to make their products interoperable with their rivals.

In *Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013), for example, now-Justice Gorsuch, writing for a unanimous Tenth Circuit panel, held that Microsoft's refusal to grant access to its Windows operating system to independent software developers was a lawful refusal to deal, *id*. at 1079.  Microsoft made a design choice in 1994 not to extend the interoperability of certain software interfaces, in part to give Microsoft Office a "real advantage" over rival software developers.  *Id.* at 1069.  This design choice made it more difficult for independent software vendors to write software that worked well with the operating system.  *Id.*  The Tenth Circuit held that this was a lawful refusal to deal:  "Forcing firms to help one another would also risk reducing the incentive both sides have to innovate, invest, and expand—again results inconsistent with the goals of antitrust."  *Id.* at 1073.  In addition:

> If forced sharing were the order of the day, courts would have to pick and choose the applicable terms and conditions.  That would not only risk judicial complicity in collusion and dampened price competition.  It would also require us to become "central planners," a role for which we judges lack many comparative advantages

20

and a role in which we haven't always excelled in the past.

*Id.*; *see also Alivecor, Inc.* v. *Apple, Inc.*, 2024 WL 591864, at *14-15 (N.D. Cal. 2024) (summary judgment because defendant was "under no antitrust obligation to make its improvements . . . compatible with [rival's] app"); *Facebook, Inc.*, 560 F. Supp. 3d at 5 (there is "nothing unlawful" about a policy of refusing interoperability with competing apps).

> 2.   Legitimate product improvements are immune from antitrust scrutiny.

Relatedly, to avoid chilling innovation and thereby competition, an alleged monopolist's "design change that improves a product by providing a new benefit to consumers does not violate Section 2 absent some associated anticompetitive conduct," even if the change "harms competitors as a result." *Allied Orthopedic Appliances Inc.* v. *Tyco Health Care Grp. LP*, 592 F.3d 991, 998-1000 (9th Cir. 2010); *see also Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 896-97 (2007) (antitrust laws permit a manufacturer to "strive to improve its product quality"); *United States* v. *Nat'l Lead Co.*, 332 U.S. 319, 359 (1947) (antitrust law should not "reduce the competitive value of the independent research of the parties"); *Goldwasser* v. *Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000) ("even a monopolist is entitled" to improve the "quality of its products"). This principle reflects "the undesirability of having courts oversee product design" because "any dampening of technological innovation would be at cross-purposes with antitrust law." *United States* v. *Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998). "The attempt to develop superior products is . . . an essential element of lawful competition." *Berkey Photo, Inc.* v. *Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979). "Any firm, even a monopolist, may generally bring its products to market whenever and however it chooses." *Id.*

Product improvements do not violate the antitrust laws <u>even if</u> they have a negative impact on rivals. Courts may not balance "the benefits or worth of a product improvement against its anticompetitive effects" because that would be "unwise" and "unadministrable." *Allied*

*Orthopedic*, 592 F.3d at 1000; *see also Berkey Photo*, 603 F.2d at 286-87.  Courts are not product designers, and do not assess whether an improvement was the "right amount of innovation," as even an improvement that is "seemingly minor"—or "less valuable" than "initially believed"—"can be adequately judged only by the market itself."  *Allied Orthopedic*, 592 F.3d at 1000.

3.  <u>Plaintiffs challenge only lawful refusals to deal and product improvements.</u>

Plaintiffs have been overt about their desire to overturn the *Trinko* line of cases.[12]  The only six acts that Plaintiffs and their experts continue to challenge are all lawful refusals to deal and product improvements.[13]  SUF ¶¶ 29-30; *see linkLine*, 555 U.S. at 450-51.  Their overall theory is that "Google established a Google-only pipeline through the heart of the ad tech stack, denying non-Google rivals <u>the same access</u>."  Ex. 1, ¶ 574; *see also id.* ¶¶ 12, 577, 604, 606, 612, 614, 631, 632, 640, 642, 657, 664, 666, 671, 673, 694; Ex. 2, ¶¶ 292-293; SUF ¶¶ 37-84.  As explained below, these alleged refusals to deal all also involved lawful product improvements.  Specifically:

a.  **Restriction of Google Ads' advertiser demand to AdX**

Plaintiffs' experts challenge Google's choice to provide "unrestricted access to Google

---

[12] In multiple public speeches, DOJ officials have expressed the desire to overturn the *Trinko* line of cases.  *E.g.*, U.S. Dep't of Just., *Antitrust Division Policy Director David Lawrence Delivers Keynote at Hal White Antitrust Conference* (June 24, 2022), tinyurl.com/HalWhiteKeynote (*Trinko* makes "problematic assumptions" and should be "reassessed");  U.S. Dep't of Just., *Assistant Attorney General Jonathan Kanter of the Antitrust Division Delivers Keynote at Fordham Competition Law Institute's 49th Annual Conference on International Antitrust Law and Policy* (Sept. 16, 2022), tinyurl.com/FordhamKeynote (referring to *Trinko* as "judicial error," including because it was about "expensive infrastructure like telephone poles and wires"); N.Y. City Bar Ass'n, *The 2022 Milton Handler Lecture – Jonathan Kanter*, YouTube at 1:07:06-1:09:19 (May 25, 2022), tinyurl.com/MiltonHandlerLecture (describing *Trinko* as a "case precedent" that is "no longer as relevant" and suggesting that courts have "an opportunity" to "overturn precedents").

[13] To the extent the Court finds that only some of these acts are lawful, it should grant partial summary judgment as to those acts in order to "narrow" the issues for trial.  *Epps* v. *Scaffolding Sols., LLC*, 2019 WL 3363790, at *12 (E.D. Va. 2019); Fed. R. Civ. P. 56(a) (as amended in 2010, clarifying summary judgment is allowed on a "part" of a claim).

Ads' advertiser demand exclusively to its AdX ad exchange, and deny comparable access to rival ad exchanges." Ex. 1, ¶ 12(3)(1); SUF ¶ 42.

Plaintiffs challenge a lawful refusal to deal because Plaintiffs' claim is that Google should have allowed rival ad exchanges "access" to Google's <u>own customers</u>, which it attracted to its advertiser-side product, Google Ads, through interoperability "comparable" to the access of Google's ad exchange. Ex. 1, ¶ 12(3)(1); SUF ¶ 42; *see Trinko*, 540 U.S. at 409-10.

The restriction of Google Ads' advertiser demand to AdX was also a product design that Plaintiffs' experts acknowledge "makes AdX more attractive to sellers," Ex. 1, ¶ 544, by enabling publishers to better monetize their inventory through a large "number of advertisers" with ad diversity, Ex. 39 at 194:10-194:19. It is an "essential element of lawful competition" that Google may bring these products to market "however it chooses." *Berkey Photo*, 603 F.2d at 286.

> **b.**    **Restriction to DFP of "effective real-time access to AdX" and failure to give rival ad servers access to "real-time bids" from AdMeld post-acquisition**

Plaintiffs' experts criticize Google's choice to provide "access to . . . real-time bids from AdX exclusively to its DFP publisher ad server, and deny comparable access to rival publisher ad servers." Ex. 1, ¶ 12(3)(2); SUF ¶ 49. That theory lies at the heart of Plaintiffs' legal challenges (1) under Section 2 for the alleged refusal to provide effective real-time bids to rival ad servers; (2) under Section 2 for allegedly not incorporating an AdMeld feature into AdX; and (3) to an alleged tie between AdX as the tying product and DFP as the tied product (Count IV).

Google is under no legal obligation to share with rival publisher ad servers access to its Google Ads customers and its infrastructure—the "source of its advantage." *Trinko*, 540 U.S. at 407-08, 409-10. Further, the combination of DFP and AdX provided customers a common user interface for Google's exchange and publisher ad server. SUF ¶ 47. Plaintiffs' experts

acknowledge that the "link between AdX and DFP" improved Google's products for publishers. Ex. 4, ¶¶ 162, 164 & n.384.  Google's design choice in developing an integration of DFP and AdX that provided benefits to its customers is not subject to antitrust review.

Plaintiffs' experts similarly challenge Google's post-AdMeld acquisition decision not to incorporate into AdX a server-side integration that provided third-party publisher ad servers access to real-time bids from AdMeld.  SUF ¶¶ 72, 75.  Plaintiffs' claim with respect to AdMeld is therefore a derivation of their claim that it was anticompetitive for Google not to "provide access to and use of real-time bids from AdX exclusively to its DFP publisher ad server, and deny comparable access to rival publisher ad servers," Ex. 1, ¶ 12(3)(2).

Finally, a tying claim is where customers are forced to purchase a second unwanted product in order to obtain a desired one.  *It's My Party II*, 811 F.3d at 684.  But that is not the type of claim Plaintiffs bring.  Plaintiffs claim that Google compels publishers to use DFP (rather than rival publisher ad servers) because DFP is the only publisher ad server with full access (through AdX) to real-time bids from Google Ads advertisers.  FAC ¶¶ 337-338.  Prof. Lee makes this clear in defining the tying claim as including "denying comparable access to rival publisher ad servers." Ex. 1, ¶ 12(3)(2).  This claim must be rejected for the same reason that Plaintiffs' monopolization claim must be rejected.

The "tying" claim fails as a matter of law.  "A challenged arrangement is not a tie-in unless the alleged foreclosure can be eliminated by instructing the defendant to disaggregate what it sells to its customers," "rather than by an order to sell something . . . to would-be rivals."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1700j1 (5th ed. 2023).  In other words, "the proper remedy" is "to enjoin the tie, not to create a duty to deal."  *Authenticom, Inc.* v. *CDK Glob., LLC*, 874 F.3d 1019, 1026 (7th Cir.

2017).  In this case, Plaintiffs' claim is <u>not</u> to disaggregate AdX and DFP.  It is to "relax the AdX terms of service," Ex. 44, ¶ 68, or provide "rival publisher ad servers" access to "AdX's real-time bids," Ex. 3, § VII.B.4; *accord* Ex. 5, ¶¶ 103(b), 104.   *See* SUF ¶¶ 42, 49.  In other words, Plaintiffs' tying claim is nothing more than a veiled duty to deal claim.

Courts have routinely dismissed on summary judgment similar attempts to disguise duty to deal claims as tying claims.  In *Service & Training, Inc.* v. *Data General Corp.*, 963 F.2d 680 (4th Cir. 1992), the Fourth Circuit rejected a plaintiff's tying claim where the evidence "showed nothing more than" the defendant's "unilateral decision" to selectively license its products, *id*. at 686; *see also It's My Party, Inc.* v. *Live Nation, Inc.*, 88 F. Supp. 3d 475, 501 (D. Md. 2015) (construing tying claim that defendant "forced artists to use its promotion services at its venues" as non-actionable refusal-to-deal claim), *aff'd*, 811 F.3d 676 (4th Cir. 2016); *Aerotec*, 836 F.3d at 1180 (rejecting that "a refusal to deal with competitors may form the basis of a tying claim").

### c.    Dynamic Allocation's "first look" & "last look"

 "First look" and "last look" are simply descriptions of how Dynamic Allocation worked; they are not separate product features.  SUF ¶¶ 54, 61.  Dynamic Allocation was an innovative— and optional—functionality that Google developed for AdX that benefited Google's publisher customers by providing them with higher returns if they turned the feature on.  SUF ¶¶ 55-57.  Plaintiffs' allegation with respect to Dynamic Allocation's "first look" and "last look" is that "rival ad exchanges" were denied "the ability to bid alongside AdX in realtime and obtain access to the advantages associated with dynamic allocation."  Ex. 8 at 156:4-20.  This is an allegation that Google should have shared the Dynamic Allocation technology it innovated with its rivals.  *See Trinko*, 540 U.S. at 409-10; SUF ¶ 60.

### d.    Unified Pricing Rules

Prior to 2019, an advertiser bidding on the exact same impression offered through different exchanges would receive differing prices for the exact same ad space. SUF ¶ 80. In 2019, Google required publishers to create a single price floor for all exchanges. SUF ¶ 82. Plaintiffs and their experts acknowledge that UPR benefited advertisers by lowering price floors on AdX and simplifying the bidding process. SUF ¶ 83.

Plaintiffs' experts challenge Google's choice to "eliminate publishers' ability to use variable price floors within DFP," which allegedly "impaired their ability to work with rival ad exchanges." Ex. 1, ¶ 12(3)(4). This is an allegation that when Google developed and launched the Unified First Price Auction, it should have incorporated a feature for publishers that would have made it easier for Google's ad exchange rivals to compete with AdX. In other words, Plaintiffs complain that Google did not build into Unified First Price Auction a feature that would allow publishers to disadvantage Google's ad exchange. SUF ¶ 84.

Plaintiffs claim that offering Google's technological features to its rivals would not be "unduly expensive or . . . technically infeasible." Ex. 44, ¶ 66; *see also* Ex. 6 at 60:6-61:4, 62:11-63:6, 88:9-90:4; Ex. 8 at 302:2-303:12; Ex. 32 at 101:6-102:16. Google had no obligation to undertake any effort <u>at all</u> to assist its competitors, regardless of how minimal Plaintiffs' experts might believe that effort might be. *See Goldwasser*, 222 F.3d at 398, 400-01 ("the antitrust laws do not impose that kind of affirmative duty, even on monopolists"). Requiring otherwise—demanding that Google aid its competitors and particularly for pricing—"would require the courts to play precisely the kind of central planning role that courts are ill suited to play." *Aerotec*, 836 F.3d at 1184.

   4. <u>Plaintiffs' experts do not allege that any other acts had anticompetitive effects.</u>

Plaintiffs have—rightly—abandoned the claim that a number of formerly pleaded acts are

anticompetitive.  SUF ¶¶ 33 (DoubleClick Acquisition), 34 (Bell), 35 (Poirot), 36 (sell-side DRS).

Because Plaintiffs have not presented competent evidence that those acts harmed competition, they

have not met their burden to establish that those acts could support Section 2 liability.  *E.g.*, *Mil.*

*Servs. Realty, Inc.* v. *Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) (affirming

summary judgment for defendant where plaintiff's "experts were simply unable, when deposed,

to provide any facts concerning injury to competition").

The rest of the pleaded acts supporting Counts I, II, III, and IV are lawful refusals to deal

and product improvements, as discussed above.  Because none of the underlying acts support a

monopolization, attempted monopolization, or tying claim, Google requests summary judgment

on all counts of the Complaint.

### B.     Plaintiffs' Claims of Anticompetitive Conduct Based on Google Ads' Advertiser Demand Fail as a Matter of Law.

Two of the six acts Plaintiffs rely on to satisfy the anticompetitive conduct element of their

monopolization and attempted monopolizations claims,[14] as well as their tying claim, depend on

exclusive access to Google Ads' advertiser demand. Ex. 1, ¶ 12(3)(1), (2).  Plaintiffs' claim of

anticompetitive conduct is that "Google has used its market power <u>in one market</u> to foreclose and

diminish the competitiveness of rivals' products <u>in another</u>." *Id*. ¶ 37; *see also id.* ¶¶ 571, 573.  To

support this two-market claim, Prof. Lee says that Google is exercising market power in a market

that includes, for example, Google Ads' advertiser demand to place ads on Google owned and

operated properties in order to foreclose and diminish rivals' competitiveness in the other markets

for ad exchanges and publisher ad servers.  Ex. 1, ¶¶ 12(3), 606-611; *see also id.* ¶¶ 377 (Google

---

[14] These two acts, discussed in Section IV.A.3, are:  "Restriction of Google Ads' advertiser demand to AdX"; and "Restriction to DFP of effective real-time access to AdX."

Ads demand is "advertising demand"), 422-423, 432, 470, 519, 523 (market power from Google Ads demand).

The problem with Plaintiffs' claim is that any two-market claim must define both markets. Plaintiffs fail to define a market for advertisers who place ads, including through Google Ads. Rather, the markets Plaintiffs allege are technology markets. Ex. 8 at 271:20-272:14. That failure to define the first market from which Google has allegedly used its market power is fatal to Plaintiffs' monopolization and attempted monopolization claims to the extent they depend on "restriction of Google Ads' advertiser demand to AdX" and "restriction to DFP of effective real-time access to AdX." *Ohio* v. *Am. Express Co.*, 585 U.S. 529, 543 (2018) ("Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition."). Plaintiffs may argue that documents refer to Google advertisers as unique and valuable, but arguments about Google's power in an undefined market do not prove anticompetitive conduct. *See FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("harms, even if real, are not anticompetitive" if they are not "exclusionary conduct in 'the area of effective competition'" (quoting *Am. Express*, 585 U.S. at 543-44)). To allow a claim based on alleged power exercised from an undefined market[15] would be to permit a de facto tying claim that avoids the requirement that a tying claim define the market of the tying product, *see, e.g.*, *Ill. Tool Works Inc.* v. *Indep. Ink, Inc.*, 547 U.S. 28, 35-36, 46 (2006); *It's My Party II*, 811 F.3d at 681, 684 (tying claim faces "the initial challenge of identifying exactly what market defendant is accused of monopolizing").

---

[15] Plaintiffs' damages expert concedes that Plaintiffs' claim depends on an undefined market when he characterizes Plaintiffs' claim of AdX exclusivity as a "tie between Google Ads and AdX." Ex. 5, ¶ 103(a).

**C.    All Claims Must Be Dismissed Because Plaintiffs Cannot Support Their Alleged Markets.**

1.    <u>There is no competent evidence supporting Plaintiffs' proposed markets.</u>

"Proof of a relevant market is the threshold requirement" for Plaintiffs' claims. *Consul, Ltd.* v. *Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986) (monopolization); *It's My Party II*, 811 F.3d at 681 (tying). Courts in this Circuit consistently grant summary judgment where there is no competent evidence <u>provided by an expert</u> to support the relevant market. *E.g.*, *Belmora, LLC* v. *Bayer Consumer Care AG*, 338 F. Supp. 3d 477, 487 (E.D. Va. 2018), *rev'd in part on other grounds*, 987 F.3d 284 (4th Cir. 2021); *Berlyn, Inc.* v. *Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 727 (D. Md. 2002), *aff'd*, 73 F. App'x 576 (4th Cir. 2003); *Cogan* v. *Harford Mem'l Hosp.*, 843 F. Supp. 1013, 1020 (D. Md. 1994). Because Plaintiffs' market definition depends on their chief economist who fails to provide competent evidence to support the markets that Plaintiffs created for this litigation, *see* Mem. of Law ISO Mot. to Exclude Lee, summary judgment as to all claims is warranted. *E.g.*, *It's My Party II*, 811 F.3d at 683 (affirming summary judgment for defendant where there was no competent evidence on market definition: "No party can expect to gerrymander its way to an antitrust victory without due regard for market realities").

The putative markets make no sense, as explained in detail in Google's motion to exclude Prof. Lee's testimony ("Lee *Daubert* Motion"). While Prof. Lee claims that his three markets are defined by three specific ad tech tools, he excludes the same type of ad tech tools created by publishers that operate their own websites, like Amazon and Meta, even though those publishers are some of the world's largest display advertising platforms, and despite testimony of Plaintiffs' own marketing expert that "Meta competes with sellers of open web display advertising." SUF ¶¶ 8, 10; Ex. 7 at 249:19-20. Prof. Lee also defines "display ads" to exclude ad formats that are facilitated by the same ad tech tools he uses to define his markets and that appear on the same

"open" websites as display ads, SUF ¶ 9, and ads appearing on mobile apps or connected TV, SUF ¶¶ 11, 12.  One example to illustrate the absurdity: Plaintiffs' market definitions would include ad tech serving an ad placed on a front-page article on washingtonpost.com, but exclude the <u>very same ad</u> from the <u>very same advertiser</u> placed on the <u>very same article</u> by the <u>very same tool</u> when viewed by the <u>very same user</u> in the Washington Post mobile app.

Because Plaintiffs have presented no competent evidence, grounded in commercial realities, to support their alleged markets, Google is entitled to summary judgment on all of Plaintiffs' claims.  *Rebel Oil Co., Inc.* v. *Atl. Richfield Co.*, 51 F.3d 1421, 1435-37 (9th Cir. 1995) (expert opinion that is "economically unreasonable" is "insufficient to support a jury verdict"); *Belmora*, 338 F. Supp. 3d at 487 ("The Fourth Circuit has recognized that the proponent of an antitrust claim must present expert testimony to establish its proposed market definition."); *Berlyn*, 223 F. Supp. 2d at 727; *Cogan*, 843 F. Supp. at 1020.[16]

### 2.   Even if "Ad Exchanges for Open Web Display Advertising" were a proper relevant market, Google does not have monopoly power in that market.

Plaintiffs cannot demonstrate that Google has monopoly power in the so-called market for "ad exchanges for open web display advertising," which defeats Count II (monopolization of the "ad exchange" market).  Because Plaintiffs' only claimed damages are an overcharge on Google's ad exchange, summary judgment is also appropriate as to Count V (damages).

The Fourth Circuit has "drawn the line" at 70% market share as "the bottom of the range for a finding of monopoly power."  *Kolon Indus. Inc.* v. *E.I. DuPont de Nemours & Co.*, 748 F.3d

---

[16] *See also Colsa Corp.* v. *Martin Marietta Servs., Inc.*, 133 F.3d 853, 855 n.4 (11th Cir. 1998); *Ky. Speedway, LLC* v. *Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009); *Drs. Steuer & Latham, Pa.* v. *Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1512 n.25 (D.S.C. 1987), *aff'd mem.*, 846 F.2d 70 (4th Cir. 1988); *Va. Vermiculite, Ltd.* v. *W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 576 n.16 (W.D. Va. 2000).

160, 174 (4th Cir. 2014).  Even accepting Plaintiffs' fictional market definition, the highest U.S. market share from 2018-2022 that Prof. Lee calculated is 56% in 2020.[17]  SUF ¶ 24.  AdX's U.S. market share was otherwise 51% or lower and has been falling since 2020.  SUF ¶ 24; Ex. 3, Rpt. Fig. 13.  These shares fall "far below" this Circuit's line.  *R.J. Reynolds Tobacco Co.* v. *Philip Morris, Inc.*, 199 F. Supp. 2d 362, 394 (M.D.N.C. 2002), *aff'd* 67 F. App'x 810 (4th Cir. 2003) (51.3% market share "far below" the "generally-accepted 70% to 75% minimum share necessary" for monopoly power).

In addition, the market for ad exchanges, even as Plaintiffs define it, is not just expanding, but exploding.  According to Plaintiffs' experts, the number of ad exchanges has grown from less than 10 in 2010 to over 80 in 2019 and has continued to grow to over 100 today.  SUF ¶ 27.  Net revenues among exchanges have doubled from $50 million in January 2018 to over $100 million by the end of 2022.  SUF ¶ 28.  And Prof. Lee shows rival exchanges <u>taking</u> nearly 10 percentage points of share from AdX between 2020 and 2022.  SUF ¶ 24.

Nor is there any competent evidence that AdX charges supracompetitive prices.  It is undisputed that between 2015 and 2022 AdX never charged the highest ad exchange fee in the market.  SUF ¶ 26.  Plaintiffs' experts merely opine that AdX's prices were higher than those of <u>some</u> competitors for <u>some</u> periods of time. Ex. 8 at 222:11-17.  But "high prices are not equivalent to supra-competitive prices."  *Church & Dwight Co., Inc.* v. *Mayer Lab'ys, Inc.*, 868 F. Supp. 2d 876, 897 (N.D. Cal. 2012), *vacated in part on other grounds*, 2012 WL 1745592 (N.D. Cal. 2012); *see also R.J. Reynolds Tobacco*, 199 F. Supp. 2d at 382.  Prof. Lee also provides no analysis of ad

---

[17] For the reasons reflected in the Lee *Daubert* motion, the Court should exclude Prof. Lee's opinions as to worldwide market shares.  But even the highest worldwide market share he calculated for AdX, a 66% share based on impressions in 2020, SUF ¶ 25, still does not meet the threshold.

exchange quality-adjusted prices, *see* Ex. 8 at 239:14-19, despite acknowledging that ad exchanges differentiate on quality, Ex. 1, ¶¶ 248 n.355, 348; Ex. 8 at 231:12-232:13, 244:21-245:15; *see Blue Cross & Blue Shield United* v. *Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995) (inappropriate to infer monopoly power from prices in market with differential quality).

Plaintiffs' alternative theory under Count II that Google attempted monopolization of their ad exchange market fails for similar reasons.  FAC ¶¶ 324-329; Ex. 1, ¶ 570.  A failure to obtain monopoly power over 15 years of conduct cannot demonstrate a "dangerous probability of successful monopolization," as required to show attempt.  *Kolon*, 748 F.3d at 178 (affirming summary judgment where defendant's "market share had been in steady decline"); *Stearns* v. *Genrad, Inc.*, 752 F.2d 942, 947 (4th Cir. 1984) (affirming summary judgment where market share increased from 38% to 49% because there was "no dangerous probability of monopolization").

### D.     Under *Illinois Brick*, the Court Should Grant Summary Judgment on the Plaintiffs' Claim for Damages (Count V).

Because the FAAs did not directly purchase any so-called "open-web display advertising," their damages claim should be dismissed.  During the hearing on Google's motion to dismiss, the Court noted that Plaintiffs might have a "problem" if "you all had used a real middleman." 4/28/2023 Tr., ECF No. 164 at 21:15-23.  The undisputed facts now show that the FAAs did use "real middleman" ad agencies, who paid for the use of Google's tools.

#### 1.     It is undisputed that no FAA purchased any advertising directly from Google.

Each and every transaction underlying the eight FAAs' claims for damages involved the use of at least one, and sometimes two, middleman ad agencies who purchased impressions (and as such, ad tech services to facilitate those purchases) on the FAAs' behalf.  Ex. 62, App. E, ¶ 44, Figs. 8-10; SUF ¶ 89.  Further, every FAA testified, and Plaintiffs' expert Adoria Lim agreed, that there are no direct purchases by any FAA from Google.  SUF ¶ 91.  There is no evidence of any

invoices issued directly to an FAA, of any payments flowing directly from an FAA to Google, or of any contracts between Google and any of the FAAs.  SUF ¶¶ 92-94.

These undisputed facts show that the United States' damages claim is barred by the Supreme Court's bright-line rule, set forth in *Illinois Brick* v. *Illinois*, 431 U.S. 720, 745-46 (1977): "Those who purchase indirectly or through intermediaries are barred from recovering for antitrust injuries." *Kloth* v. *Microsoft Corp.*, 444 F.3d 312, 319-20 (4th Cir. 2006); *see also Apple Inc.* v. *Pepper*, 139 S. Ct. 1514, 1521 (2019) (indirect purchasers may not seek passed-on overcharges).

> 2.   No exception to the bright-line rule against indirect purchaser claims applies.

*Illinois Brick* recognizes narrow exceptions where there is a preexisting, cost-plus contract or "where the direct purchaser is owned or controlled by its customer."  431 U.S. at 736 & n.16. In opposing Google's motion to dismiss, Plaintiffs argued that the latter exception applies because of a purported principal-agent relationship between the FAAs and ad agencies.

The Fourth Circuit has never applied the "control" exception to principal-agent relationships.  *See In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 713 (D. Md. 2001), *aff'd sub nom. Kloth*, 444 F.3d 312.  The "control" exception is construed narrowly, and should be "limited to relationships involving such functional economic or other unity that there effectively has been only one sale."  *Id.* at 713.  Courts have declined to extend the "control" exception to principal-agent relationships.  *E.g.*, *McCarthy* v. *Recordex Serv., Inc.*, 80 F.3d 842, 853-54, 856 (3d Cir. 1996) (affirming summary judgment even though a principal-agent relationship existed because the agent, plaintiffs' attorneys, retained "exclusive control of the manner of performing their legal work"); *Jersey Dental Lab'ys* v. *Dentsply Int'l, Inc.*, 2002 WL 2007916, at *2 (D. Del. 2002), *rev'd on other grounds*, 424 F.3d 363 (3d Cir. 2005) (declining to "extend the scope of the [control] exception beyond parent-subsidiary relationships"); *In re Local TV Advert. Antitrust*

*Litig.*, 2023 WL 1863046, at \*2 (N.D. Ill. 2023) (control exception only applies if "the indirect purchaser is essentially the same entity as the direct purchaser").

Here, the control exception cannot apply because there is no evidence showing any functional or economic unity between the FAAs and their ad agencies such that they should be treated as the same entities.  SUF ¶¶ 90-97.  The FAAs and their ad agencies are separate and independent entities, each capable of making their own decisions.  There is no evidence showing that the FAAs control the ad agencies' purchasing decisions.  The contracts between the FAAs and ad agencies give the ad agency discretion in making purchases.  SUF ¶¶ 90, 95-96.  The ad agencies have their own contracts with Google, and those contracts cover any purchases the ad agencies make.  SUF ¶ 97.  Finally, no FAA testified that it directed its ad agency to use Google products or services.  SUF ¶ 90.  This undisputed evidence shows no control or even principal-agent relationship.  *See Local TV*, 2023 WL 1863046, at \*2 (on discovery motion, relationship between ad agencies and advertisers did not satisfy control exception); *In re Microsoft*, 127 F. Supp. 2d at 713 (end customers who purchased Microsoft software from sellers of Microsoft software did not satisfy control exception because Microsoft and sellers "are clearly separate and independent entities capable of making their own decisions").

### 3.  Indirect purchases via The Trade Desk are barred by *Illinois Brick*.

For the Navy and USPS, Plaintiffs seek damages for alleged AdX overcharges paid on over $900,000 in spending placed through third-party The Trade Desk ("TTD")—a competitor to Google.  SUF ¶ 86; Ex. 62, App. E, Fig. 10, 11.  Google does not control TTD (a public company), SUF ¶ 87; these are indirect purchases for which the United States cannot seek damages.

## CONCLUSION

For the foregoing reasons, Google's motion for summary judgment should be granted.

Dated: April 26, 2024

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Julie Elmer (*pro hac vice*)
Lauren Kaplin (*pro hac vice*)
Scott A. Eisman (*pro hac vice*)
Jeanette Bayoumi (*pro hac vice*)
Claire Leonard (*pro hac vice*)
Sara Salem (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

*Counsel for Defendant Google LLC*

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
 CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie S. Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Joseph Bial (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Bryon P. Becker (VSB #93384)
Erica Spevack (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile (202) 223-7420
kdunn@paulweiss.com

Meredith Dearborn (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (202) 330-5908
mdearborn@paulweiss.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com