# Exhibit I
# (previously filed as Dkt. 660-9)

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                     Alexandria Division

4      - - - - - - - - - - - - - - -+
                                     |
5      UNITED STATES OF AMERICA,     |
       et al,                        |
6                                    |
                Plaintiffs,          |   Case Number:
7                                    |
        vs.                          |   1:23-cv-00108-
8                                    |   LMB-JFA
                                     |
9      GOOGLE, LLC,                  |
                                     |
10              Defendant.           |
                                     |
11     - - - - - - - - - - - - - - -+

12

13                   Video Deposition of

14                  ROBIN E. LEE, Ph.D.

15                 Friday, March 15, 2024

16                      9:39 a.m.

17

18

19

20     Veritext Job 6456904

21     Reported by:  Laurie Donovan, RPR, CRR, CLR

22

Page 26

1    institutional details, learning as much as I
2    can before applying these economic
3    frameworks.
4  BY MR. ISAACSON:
5    Q   Before the fall of 2019, did you
6  consider yourself an expert in digital
7  advertising?
8        MR. NAKAMURA:  Objection to form.
9        THE WITNESS:  Again, I'm here testifying
10   as an economic expert with training in
11   industrial organization.
12 BY MR. ISAACSON:
13   Q   So before the fall of 2019, before
14 you're hired to testify in this case, did you
15 consider yourself an expert in digital
16 advertising?
17       MR. NAKAMURA:  Objection to form.
18       THE WITNESS:  Probably depends on what
19   you referred to as "expert," but I knew a
20   little bit of it, about digital advertising,
21   based on my prior experience, but I have not
22   published any work on digital advertising

Page 27

1    specifically, although some of my work,
2    including that on cable television markets,
3    touched upon advertising, and in my teaching,
4    I do, as an industrial organization
5    economist, cover advertising as an economic
6    concept.
7  BY MR. ISAACSON:
8    Q   So based on that work you had done as
9  you -- that touched on digital advertising, before
10 the fall of 2019, did you consider yourself to be
11 an expert in digital advertising?
12       MR. NAKAMURA:  Objection to form.
13       THE WITNESS:  I don't think I ever
14   called myself an expert --
15 BY MR. ISAACSON:
16   Q   And I understand --
17   A   -- in digital advertising.
18   Q   Thank you.  I didn't mean to interrupt
19 you.
20       And I understand that based on your
21 background in economics, you are applying your
22 expertise to digital advertising in this case.

Page 28

1  You've told me that several times, but as of
2  today, would you call yourself an expert in
3  digital advertising?
4        MR. NAKAMURA:  Objection to form.
5        THE WITNESS:  So here I'm testifying as
6    an economic expert and as somebody who has
7    studied digital advertising, in particular,
8    web display advertising, at some length for
9    the past several years.
10 BY MR. ISAACSON:
11   Q   So would you -- as of today, would you
12 call yourself an expert in digital advertising?
13       MR. NAKAMURA:  Objection to form.
14       THE WITNESS:  I don't have -- I'm not
15   applying a label to myself of that form.
16 BY MR. ISAACSON:
17   Q   You're aware that the United States is
18 seeking damages in this case on behalf of federal
19 agency advertisers; is that right?
20   A   I'm aware.
21   Q   And you are not expressing opinions in
22 this case about whether those federal agencies

Page 29

1  have suffered any antitrust injury, correct?
2        MR. NAKAMURA:  Objection to form.
3        THE WITNESS:  So I'm expressing the
4    opinion that certain actions taken by Google
5    with respect to its ad tech products have
6    harmed customers of its products which
7    include advertisers.
8  BY MR. ISAACSON:
9    Q   And are you expressing any opinion in
10 this case about whether the federal agency
11 advertisers have suffered any damages?
12       MR. NAKAMURA:  Objection to form.
13       THE WITNESS:  So again, my opinion is
14   that certain actions taken by Google has
15   harmed advertisers and publishers that use ad
16   tech products to transact open-web display
17   advertising.
18 BY MR. ISAACSON:
19   Q   Are you expressing any opinions in this
20 case about the amount of any damages of any
21 federal agency advertiser?
22       MR. NAKAMURA:  Objection to form.

8 (Pages 26 - 29)

Page 30

1      THE WITNESS:  I'm not providing a
2    precise number of damages for these
3    particular advertising customers.
4  BY MR. ISAACSON:
5      Q    And based on your background in
6  economics and industrial organization, as I
7  understand it, you are not offering expert
8  opinions on the meaning of any individual
9  documents in this case?
10     MR. NAKAMURA:  Objection to form.
11     THE WITNESS:  Can you restate your
12    question or rephrase it?
13  BY MR. ISAACSON:
14     Q    Are you offering expert opinions on the
15  meaning of any individual documents in this case?
16     MR. NAKAMURA:  Objection to form.
17     THE REPORTER:  Meaning?
18     MR. ISAACSON:  Meaning, yes.
19     THE WITNESS:  I'm not.
20     MR. NAKAMURA:  Same objection.
21  BY MR. ISAACSON:
22     Q    And you are not expressing an opinion in

Page 31

1  this case on the accounting profits of any Google
2  product area; is that correct?
3      MR. NAKAMURA:  Objection to form.
4      THE WITNESS:  Can you restate your
5    question, please.
6  BY MR. ISAACSON:
7      Q    Sure.  You are not expressing an opinion
8  in this case on the accounting profits of any
9  Google product area in this case; am I correct?
10     MR. NAKAMURA:  Objection to form.
11     THE WITNESS:  So in my reports I do
12    discuss accounting profits and their
13    differences from economic profits, but I'm
14    not expressing opinions as to the level of
15    accounting profits for Google, Google's ad
16    tech products.
17  BY MR. ISAACSON:
18     Q    Are you expressing an opinion in this
19  case as to the level of economic product --
20  economic profits for Google's ad tech products?
21     MR. NAKAMURA:  Objection to form.
22     THE WITNESS:  So I'm expressing an

Page 32

1  opinion that certain Google products, in
2  particular -- I'm sure we'll discuss them --
3  Google Ads, AdX, and DFP, possess substantial
4  and sustained market power protected by
5  significant barriers to entry, which are
6  associated with economic profits.
7  BY MR. ISAACSON:
8      Q    Are you expressing an opinion in this
9  case as to the amount of economic profits for
10  Google ad tech products?
11     MR. NAKAMURA:  Objection to form.
12     THE WITNESS:  As I stated before, I'm
13    expressing an opinion regarding the extent of
14    market power for these products which would
15    be associated with a positive economic
16    profit.
17  BY MR. ISAACSON:
18     Q    All right.  My question went to the
19  amount of economic profits.
20     Are you expressing an opinion in this
21  case as to the amount of economic profits for
22  Google ad tech products?

Page 33

1      MR. NAKAMURA:  Objection to form.
2      THE WITNESS:  My opinion is that Google
3    Ads, AdX and DFP are earning economic profits
4    consistent with their possession of
5    substantial and sustained market power.
6  BY MR. ISAACSON:
7      Q    And have you expressed an opinion as to
8  the amount of those profits, those economic
9  profits that you just referred to?
10     A    I believe that is saying something about
11  the amount, what I just said.
12     Q    Is saying -- are you able to express an
13  opinion as to the amount of economic profits from
14  Google ad tech products in a dollar amount?
15     MR. NAKAMURA:  Objection to form.
16     THE WITNESS:  So I'm not providing a
17    specific dollar number for that measure.
18  BY MR. ISAACSON:
19     Q    Before you were retained in this case,
20  had you heard the term "open-web display
21  advertising"?
22     A    So before I was retained by this case, I

9 (Pages 30 - 33)

Page 34

1  recall hearing the term "open-web" in contrast
2  with "walled garden," and I recall being familiar
3  with display advertising.  I think I noted my
4  experience 15 years prior, looking into this
5  space.
6      Q    And before this case, had you heard the
7  term "open-web display advertising" as one term
8  with all four words?
9      A    I do not recall having come across those
10  four words together.
11         (Exhibit 1 was marked for
12         identification.)
13         (Exhibit 2 was marked for
14         identification.)
15         (Exhibit 3 was marked for
16         identification.)
17  BY MR. ISAACSON:
18      Q    We've marked as Exhibit 1 your opening
19  expert report, we've marked as Exhibit 2 your
20  rebuttal report, and Exhibit 3 is your
21  supplemental report.
22         You have them all in front of you for

Page 35

1  ease of access at any point.
2         If I can ask you to look at paragraph 7
3  of your opening report.  That's Exhibit 1.  In
4  paragraph 7 you say, "I have been asked by counsel
5  at the Department of Justice," and then you list a
6  number of things.
7         In the first bullet point, you say --
8  again, with reference to "I have been asked by
9  counsel at the Department of Justice to --
10  Determine whether publisher ad servers, ad
11  exchanges, and advertiser ad networks are open-web
12  display advertising, both worldwide . . . and in
13  the United States, are relevant antitrust
14  markets."
15         I skipped a parenthetical about how
16  worldwide is developed.
17         The -- were you asked to consider any
18  other market definition that would be at issue in
19  this case other than what is said there, whether
20  publisher ad servers, ad exchanges and advertiser
21  ad networks for open-web display advertising are
22  relevant antitrust markets?

Page 36

1      MR. NAKAMURA:  Objection to form.
2      THE WITNESS:  I'm sorry.  Can you repeat
3      your question, please.
4  BY MR. ISAACSON:
5      Q    Sure.
6         So in that bullet point, it lists
7  markets, potential markets for publisher ad
8  servers, ad exchanges, and advertiser ad networks,
9  all for open-web display advertising.  You were
10  asked to determine whether those are relevant
11  antitrust markets.
12         My question is:  Were you asked to
13  consider any other market definition than those
14  potential market definitions?
15      A    So I recall looking into whether there
16  is a relevant market for demand-side platforms, a
17  relevant antitrust product market for demand-side
18  platforms.
19      Q    All right.  Other than looking into a
20  relevant market for demand-side platforms, were
21  you asked to consider any other potential relevant
22  markets other than those which are listed in

Page 37

1  paragraph 7?
2      MR. NAKAMURA:  I'll instruct Professor
3      Lee to answer to the extent to which he
4      considered the other markets that counsel
5      asked about, not any communications from
6      counsel to him.
7      THE WITNESS:  So I also considered a
8      relevant antitrust product market for a
9      broader set of bidding tools, which includes
10      advertiser ad networks and demand-side
11      platforms, but as I note in my reports,
12      concluded that the smaller subset of
13      advertiser ad networks comprises a relevant
14      antitrust product market.
15  BY MR. ISAACSON:
16      Q    So other than markets for publisher ad
17  servers, ad exchanges, advertiser ad networks, all
18  for open-web display advertising, or a relevant
19  market for demand-side platforms or for ad
20  networks and demand-side platforms, did you
21  consider any other potential market definitions in
22  this case?

10 (Pages 34 - 37)

Page 38

1       MR. NAKAMURA:  Objection to form.
2       THE WITNESS:  So in this case, as I note
3   in my rebuttal report, I considered
4   alternative markets that were proposed by
5   Dr. Israel and potentially Doctor or
6   Professor Ghose, but those alternative market
7   definitions proposed by Google's experts or
8   others that I examined and opined are not
9   appropriate for evaluating Google's market
10  power over its ad tech products that I
11  examined for evaluating the competitive
12  effects of its conduct that I examined.
13  BY MR. ISAACSON:
14      Q   The -- do you know if the term "open-web
15  display advertising" existed before counsel for
16  the Department of Justice asked you to consider
17  that term for your market definition?
18      MR. NAKAMURA:  Objection to form.
19      THE WITNESS:  So as an economist, I'm
20  interpreting "open-web display advertising"
21  as referring to a set of transactions with
22  certain characteristics used to be precise

Page 39

1   about the products that I'm examining.
2       I have seen materials -- I don't recall
3   the precise dates for those documents --
4   where both the term "open-web," the term
5   "display advertising," as well as I've seen
6   documents from firms where "open-web display
7   advertising," those four words, have been
8   used.
9   BY MR. ISAACSON:
10      Q   Do you believe you've seen documents
11  where all four words, "open-web display
12  advertising," were used together?
13      A   I recall seeing documents produced by
14  Adobe and Facebook, although one of them may be an
15  industry source that used open-web display.
16      Q   The -- have you seen any industry
17  sources that report market shares for open-web
18  display advertising?
19      MR. NAKAMURA:  Objection to form.
20      THE WITNESS:  So if I may ask you to be
21  more specific.  Are you referring to ad tech
22  products that facilitate the sale of open-web

Page 40

1   display advertising or the underlying digital
2   advertisements themselves?
3   BY MR. ISAACSON:
4       Q   I'm going to ask you if you've seen
5   industry sources reporting market shares for any
6   products that would include the term "open-web
7   display advertising."
8       A   So can I ask you to rephrase the
9   question?  You're asking if I've seen market
10  shares of products that sell open-web display
11  advertising?
12      Q   Any type of products.  Does it -- like
13  it can be any market, any market share where the
14  terms "open-web display advertising" is used.
15      MR. NAKAMURA:  Objection to form.
16      THE WITNESS:  So in my -- maybe I'm not
17  understanding your question correctly, but in
18  my report, for example, I've seen a Google
19  document talking about -- discussing DFP's
20  share across various measures of what they
21  refer to as "addressable inventory" or "not
22  walled garden," and the addressable inventory

Page 41

1   overlaps with open-web publishers, publishers
2   that don't -- that aren't using integrated ad
3   tech tools to sell their inventory.
4   BY MR. ISAACSON:
5       Q   We can talk about addressable inventory
6   later, but whether it's advertising, technology,
7   whatever product you want to name, have you seen
8   any industry sources that report market shares for
9   a market using the words "open-web display
10  advertising"?
11      MR. NAKAMURA:  Objection to form.
12      THE WITNESS:  So those documents I
13  referenced earlier, I don't recall if they
14  report any market share figures.  I don't
15  recall, sitting here today.
16  BY MR. ISAACSON:
17      Q   And let me see if I can -- so there are
18  public industry sources that report on -- report
19  data for digital advertising, correct?
20      MR. NAKAMURA:  Objection to form.
21      THE WITNESS:  Yes, I believe there are
22  public sources, including e-Marketer, that

11 (Pages 38 - 41)

Page 42

1    looks at digital advertising.
2    BY MR. ISAACSON:
3        Q    Have you seen any industry sources that
4    report public data that would reflect shares of
5    any market that uses the term "open-web display
6    advertising"?
7        MR. NAKAMURA:  Objection to form.
8        THE WITNESS:  I think, as I mentioned
9    before, sitting here today, I don't recall if
10   any of the documents that I remember using
11   the terms "open-web display" report market
12   share figures or rely upon public data.
13   BY MR. ISAACSON:
14       Q    And is it also the case that, sitting
15   here today, you don't recall any documents from
16   Google that report market shares using the term
17   "open-web display advertising"?
18       A    Sitting here today, I do not recall any
19   Google documents using the term "open-web display
20   advertising" that report market shares for ad tech
21   products.
22       Q    And sitting here today, from the

Page 43

1    third-party documents that have been made
2    available to you from this case, am I correct you
3    do not recall any third-party documents that use
4    the term "open-web display advertising" to report
5    market shares for any products?
6        A    So as I noted earlier, I recall
7    third-party documents using the term "open-web
8    display."  I do not recall if they reported market
9    shares for specific ad tech products.
10       Q    To your knowledge, is this case the
11   first time anyone has tried to assemble market
12   share data using the term "open-web display
13   advertising"?
14       A    I'm not quite sure what you mean by
15   assemble data using a term.  I understand what it
16   means to assemble data restricted to a set of
17   products with certain features.
18       Q    So let me explain.
19       You have, in your reports, estimated
20   market shares for markets where you're using the
21   term "open-web display advertising," correct?
22       A    So as an economist, in my reports I'm

Page 44

1    using the term "open-web" to refer to publisher
2    inventory or publisher web inventory that is not
3    sold through integrated ad tech products, and it's
4    a description of what that set of inventory is.
5        I use "display advertising" to refer to
6    a particular form of digital advertising, and so
7    when I use those terms, it's meant to clarify the
8    sets of products and transactions over which
9    certain calculations are made.
10       Q    I'm not asking you how you're using the
11   term or why you're using the term.
12       You, in your reports, do estimates of
13   market shares where -- different markets where you
14   use the term "open-web display advertising,"
15   correct?
16       A    So the relevant product markets that I
17   evaluate are those involving advertiser ad
18   networks, ad exchanges, and publisher ad servers,
19   so those are the markets.
20       Q    So you estimate market shares in your
21   report for a market of publisher ad servers for
22   open-web display advertising, correct?

Page 45

1        A    These are publisher ad servers which are
2    used to transact open-web display advertising.
3        Q    Is that a yes?
4        A    I'm sorry.  What is your question?
5        Q    In your report, you estimate market
6    shares for publisher ad servers for open-web
7    display advertising, correct?
8        A    I do provide market shares for publisher
9    ad servers that facilitate the transaction of
10   open-web display advertising.
11       Q    And in your reports, you report market
12   shares for ad exchanges for open-web display
13   advertising, correct?
14       A    I do report market shares for ad
15   exchanges that facilitate the sale of open-web
16   display advertising.
17       Q    And in your, in your report, you report
18   market shares for advertiser ad networks for
19   open-web display advertising, correct?
20       A    In my report I do report market shares
21   for --
22       THE REPORTER:  Hold on just a moment.

12 (Pages 42 - 45)

Page 66

1    you know, my opinions regarding market
2    definition are based on the totality of
3    evidence that I present.
4        I think a strong set of evidence that I
5    discuss which supports the validity of the
6    relevant product markets is Google's exercise
7    of market power over its AdX, Google Ads and
8    DFP product, right?
9        So I'm looking at not just a single
10   piece of evidence, but the totality of
11   evidence to form my opinions regarding market
12   definition.
13   BY MR. ISAACSON:
14       Q    If products have incremental value of a
15   certain magnitude, you would consider that
16   evidence that they are not close substitutes; is
17   that correct?
18       MR. NAKAMURA:  Objection to form.
19       THE WITNESS:  I think that it is an
20   important consideration whether or not a set
21   of, here, digital advertisements provide
22   distinct value over other forms of digital

Page 67

1    advertising.  I think that's important to
2    understand, but when I get to market
3    definition, I'll be focusing on the tools
4    used to transact those digital
5    advertisements, and there I will also
6    consider the extent to which the underlying
7    tools can be replaced with other
8    alternatives.
9    BY MR. ISAACSON:
10       Q    And as an economist, how would you look
11   at -- how would you decide whether, what magnitude
12   is necessary for -- I'll start that question over.
13       In order for incremental differences to
14   be evidence that two products are not close
15   substitutes, how would you define the magnitude
16   that's necessary of that difference?
17       MR. NAKAMURA:  Objection to form.
18       THE WITNESS:  So the preamble to your
19   question is not something that I stated or
20   necessarily agree with.
21   BY MR. ISAACSON:
22       Q    You don't agree that incremental

Page 68

1    differences between products can be evidence that
2    two products are -- I'm doing a double negative
3    now, so let me just ask you:  In order for -- do
4    you agree that incremental differences of a
5    certain magnitude can be evidence that two
6    products are not close substitutes?
7        MR. NAKAMURA:  Objection to form.
8        THE WITNESS:  I guess the question is
9    imprecise.  What do you, what do you mean
10   by -- I think what I said before is examining
11   whether, in this case, open-web display
12   advertising has distinct incremental value
13   over other forms of digital advertising is an
14   important consideration in my analysis of
15   whether the relevant product markets I
16   evaluate are valid and pass the hypothetical
17   monopolist test.
18   BY MR. ISAACSON:
19       Q    And how do you determine whether
20   something has -- two products have -- one product
21   has distinct incremental value?
22       A    I think a large part of my report talks

Page 69

1    about reasons why open-web display advertising is
2    an important form of monetization for -- let's
3    focus on publishers.
4        So for publishers, open-web display
5    advertising is significant evidence that speaks to
6    the value it has for helping them monetize their
7    web inventory.
8        Q    How do I, how do I determine whether
9    something, in your view, would have distinct
10   incremental value?  For example, does Coke have
11   distinct incremental value over Pepsi?
12       A    Well, I'm not valuating soft drinks in
13   this matter.  What I'm doing is showing here, for
14   the purpose of looking at ad tech products,
15   publishers derive significant value, additional
16   monetization from being able to sell their web
17   inventory through display ads.
18       And if they did not have access to those
19   tools that allow them to sell display ads, they
20   would be foregoing a significant amount of
21   advertising revenue, which would likely lead to a
22   reduction of content and investment.

18 (Pages 66 - 69)

Page 70

1     And in my report, I discuss why other
2 forms of digital advertising are unlikely to be
3 effective replacements for display advertising.
4     Q    And in your view, can two products that
5 have distinct incremental value from one another
6 be close substitutes?
7         MR. NAKAMURA:  Objection to form.
8         THE WITNESS:  I think, I think this is
9     why one needs to look at the totality of the
10    evidence and to look at other things to
11    inform whether, in this case, ad tech
12    products like ad exchanges, if controlled by
13    a hypothetical monopolist, could exercise
14    market power over competitive levels.
15 BY MR. ISAACSON:
16    Q    Let me repeat the question, because
17 you're saying "I think this is why," and I don't
18 know what you're talking about.
19        In your view, can two products that have
20 distinct incremental value from one another be
21 close substitutes?
22        MR. NAKAMURA:  Objection to form.

Page 71

1         THE WITNESS:  I think I answered this
2     question before, that it will depend on other
3     things, including magnitude.  If there's de
4     minimus incremental value, then it may not be
5     the case.
6 BY MR. ISAACSON:
7     Q    I'm using your term, "distinct
8 incremental value," right?  In your view, can two
9 products that have distinct incremental value from
10 one another be close substitutes?
11    A    So when I'm using "distinct incremental
12 value" here for the purposes of open-web display
13 advertising, I'm describing why it provides
14 significant incremental value to the customers who
15 rely upon it.
16    Q    So can two products that have
17 significant incremental value from one another be
18 close substitutes?
19    A    So if we're talking about digital
20 advertising, I'm not evaluating, for the present
21 market definition, substitution among digital
22 advertising.  The focus of my inquiry is whether

Page 72

1 or not ad tech products, ad exchanges, ad
2 networks, advertiser ad networks, and publisher ad
3 servers --
4     Q    I don't know what that has to do with my
5 question.  Let me repeat my question.
6         Can two products that have significant
7 incremental value differences from one another be
8 close substitutes?
9     A    It's difficult to provide a general
10 statement.  This is why I'm looking at the
11 totality of evidence to inform my opinions
12 regarding market definition.
13    Q    The -- and you are using the term "close
14 substitutes" for your analysis in this case,
15 because you find the term "reasonable substitute"
16 to be too vague; is that correct?
17    A    Well, the "reasonable substitute"
18 language you used in your question without
19 appropriate context, I wanted to clarify.
20        So in my report, when I use "close
21 substitute," what I'm talking about is
22 substitution that's sufficient to constrain the

Page 73

1 exercise of market power, and it depends on the
2 context we're using it, right?
3         So for market definition, I am applying
4 an economic framework known as the hypothetical
5 monopolist test, and for that test, it's important
6 to consider the extent to which a hypothetical
7 monopolist, over a set of products, would be
8 constrained by alternatives, outside of the
9 products it controls, from exercising significant
10 market power over competitive levels.
11    Q    So you've tried to, you've tried to
12 clarify the context of the question.
13        I'm asking you:  You're using the term
14 "close substitute" for your analysis in this case
15 rather than "reasonable substitutes," because you
16 think the language "reasonable substitutes" is too
17 vague; is that correct?
18    A    That statement I made earlier was in the
19 context of the question you asked.  I don't know
20 if I used term "reasonable" elsewhere in my
21 reports, which might have been a different
22 context, but I was saying for today, when I use

19 (Pages 70 - 73)

Page 74

1 the term close substitutes and when you use close
2 substitutes in my reports, the description I
3 provided earlier is what I mean by that.
4     Q    Today you prefer the term "close
5 substitutes" because you think the term
6 "reasonable substitutes" is vague; is that
7 correct?
8     A    At present, without having provided a
9 definition for that, I would say that it is not
10 clear.  I want to be precise.
11     Q    The -- you agree that a variety of ad
12 tech products work in conjunction with one another
13 to facilitate display advertising transactions,
14 correct?
15         MR. NAKAMURA:  Objection to form.
16         THE WITNESS:  So particular ad tech
17     products, the ones I discuss, advertiser ad
18     networks, ad exchanges, publisher ad servers,
19     are often used in conjunction with one
20     another by advertisers and publishers to
21     transact open-web display advertising.
22

Page 75

1 BY MR. ISAACSON:
2     Q    And you would refer to ad tech products
3 working in conjunction with one another as an "ad
4 tech stack"; is that right?
5         MR. NAKAMURA:  Objection to form.
6         THE WITNESS:  I think I and other
7     industry participants have used the term "ad
8     test stack" to refer to the set of products,
9     not necessarily them working in conjunction
10     with one another.  It's a set of products
11     that, you know, facilitate the sale of
12     open-web display advertising.
13         MR. NAKAMURA:  Counsel, we've been going
14     for about an hour and 15.
15         MR. ISAACSON:  Let me just -- I'll be
16     done with this in a minute.
17 BY MR. ISAACSON:
18     Q    Paragraph 53 of your opening report,
19 which is page 26, in paragraph 53 you write, "A
20 variety of ad tech products work in conjunction
21 with one another to facilitate display advertising
22 transactions between publishers and advertisers.

Page 76

1 These products form what is known as the 'ad tech
2 stack.'"
3         That's what you've written there,
4 correct?
5     A    That is what I wrote there.
6     Q    And you would consider Google to have an
7 ad tech stack; is that right?
8     A    So the way that I'm using the term here
9 is to refer to the set of all the products that
10 are used to facilitate display advertising, so
11 publisher ad servers, ad exchanges and advertiser
12 bidding tools, which include DSPs and advertiser
13 ad networks.  Those products overall are what I,
14 what I am referring to as an, as the ad tech
15 stack.
16     Q    So that wasn't my question.
17         My question was:  Do you consider Google
18 to have an ad tech stack?
19     A    So I consider Google to be a firm that
20 offers products within what is known as the ad
21 tech stack.
22     Q    You consider Google to offer something

Page 77

1 that's within the ad tech stack but not to offer
2 itself an ad tech stack; is that correct?
3     A    Again, I'm using the ad tech stack to
4 refer to these three -- I say, called them
5 "layers" of ad tech products, and Google offers
6 products in each of those layers.
7     Q    Do you consider Google to offer an ad
8 tech stack with those three layers?
9     A    I can't answer your question.  I don't
10 consider Google to offer the stack.  The stack
11 refers to the set of all the products that are in
12 these layers, and Google offers products contained
13 within these layers.  In particular, the ones I
14 focus on are Google Ads, AdX and DFP.
15     Q    Paragraph 53 you say, "At a high level,
16 the ad tech stack can be described as comprising
17 three layers," and then you define the three
18 layers as "publisher ad servers, ad exchanges and
19 advertiser bidding tools."
20         Does Google offer ad tech with publisher
21 ad servers, ad exchanges, and advertiser bidding
22 tools?

20 (Pages 74 - 77)

Page 78

1    A   So Google offers a publisher ad server,
2  an ad exchange, an advertiser ad network, and a
3  demand-side platform.
4    Q   And at a high level, do you believe
5  Google is offering a, is offering an ad tech
6  stack?
7       MR. NAKAMURA:  Objection to form.
8       THE WITNESS:  So at a high level, I'm
9    referring to the ad tech stack, which
10   represents -- I think I said this before --
11   all the products that are in these different
12   layers, and again, Google offers products
13   which are contained within this broader ad
14   tech stack which describes these different
15   layers.
16 BY MR. ISAACSON:
17   Q   Do you deny that Google is offering, at
18 a high level, an ad tech stack consisting of three
19 layers that include publisher ad servers, ad
20 exchanges, and advertiser bidding tools?
21      MR. NAKAMURA:  Objection to form.
22      THE WITNESS:  So how I and other -- I

Page 79

1    believe other industry participants have used
2    the term "ad tech stack" is to refer to this
3    entire -- I'm going to use loosely the word
4    "industry," but essentially the set of
5    products falling into these different layers.
6       So no single firm offers the entire ad
7    tech stack, because the ad tech stack has
8    different participants, although Google does
9    have a very large share of each of these
10   layers, but is not the only provider of
11   products.
12 BY MR. ISAACSON:
13   Q   So Google does not offer an ad tech
14 stack, in your view?
15      MR. NAKAMURA:  Objection to form.
16      THE WITNESS:  The way I am using the
17   term, and I put it in quotes, "ad tech stack"
18   refers to, I think I said in the last answer,
19   the entirety of these layers, all of the
20   products that are in each of these layers.
21      MR. ISAACSON:  Let's take a break.
22      MR. NAKAMURA:  Okay.

Page 80

1       THE VIDEOGRAPHER:  Going off the record
2    at 11:02 a.m.
3       (Whereupon, a short recess was
4       taken.)
5       THE VIDEOGRAPHER:  Going back on the
6    record at 11:19 p.m.  You may proceed.
7       (Exhibit 4 was marked for
8       identification.)
9  BY MR. ISAACSON:
10   Q   Marked as Lee Exhibit 4 is a document
11 dated November 2020, Bates-stamped
12 GOOG-DOJ-AT-OO855803 to 813.
13      If you look at page 807 at the bottom --
14 take a look at 807 at the bottom.
15      You referred earlier in the deposition
16 to a document that referred to -- it had a market
17 share and used the term "addressable inventory"?
18   A   I did refer to a document.  This is not
19 the one I had in mind.
20   Q   Okay.  You cited it.  We took a shot at
21 it, because it says "addressable inventory," and
22 you cite it at footnote 252 of your report.

Page 81

1       MR. NAKAMURA:  That's at page 81.
2       THE WITNESS:  So footnote 252?
3  BY MR. ISAACSON:
4    Q   Yes.
5    A   I'm citing to page 808.
6    Q   That might be an error, because 807 says
7  "addressable inventory" and 808 does not.
8    A   But footnote 252 is attached to a
9  sentence that states "a 2020 Google" --
10      THE REPORTER:  Could you slow down?  Is
11   attached to a statement --
12      THE WITNESS:  To a statement that is not
13   referring to addressable inventory.
14 BY MR. ISAACSON:
15   Q   But -- so but page 807 is not the
16 document you were referring to that -- referring
17 to addressable inventory and having a market
18 share?
19      It will help you to look at 807 to
20 answer this question.
21   A   So 807 I see later in my report, in
22 Figure 41, it does show this.  I was thinking in

21 (Pages 78 - 81)

**Errata Sheet for the Deposition Transcript of Professor Robin S. Lee**

**Case Name**:    *United States et al v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.)

**Depo. Date**:    March 15, 2024

**Deponent**:      Robin Lee

| Page | Line | Correction | Reason for Correction |
|------|------|-----------|----------------------|
| 10 | 10 | Change "White?" to "pretty wide?" | Transcription error |
| 17 | 6 | Change "9:48 pm" to "9:49 am" | Transcription error |
| 23 | 11 | Change "Dr. Weintrop" to "Dr. Weintraub" | Transcription error |
| 33 | 19 | Change "in" to "for" | Transcription error |
| 38 | 2 | Change "I note" to "noted" | Transcription error |
| 38 | 7 | Change "or" to "are" | Transcription error |
| 38 | 11 | Change "for" to "or" | Transcription error |
| 44 | 13 | Change "different" to "for" | Transcription error – glitch in audio |
| 58 | 20 | Add "display advertising" after "open-web" | Transcription error |
| 59 | 3 | Change "customer" to "customers" | Transcription error |
| 59 | 4 | Add "product" before "markets" | Transcription error |
| 65 | 13 | Change "advertise bits" to "advertisements" | Transcription error |
| 69 | 4 – 5 | Change "So for publishers, open-web display advertising is significant evidence" to "So for publishers, open-web display advertising -- there is significant evidence" | Transcription error |
| 69 | 12 | Change "valuating" to "evaluating" | Transcription error |
| 73 | 20 | Add "the" before "term" | Transcription error |
| 74 | 1 | Change "you use" to "I use" | Transcription error |
| 80 | 6 | Change "p.m." to "a.m." | Transcription error |
| 80 | 12 | Change "GOOG-DOJ-AT-OO855803 to" to "GOOG-DOJ-AT-00855803 through" | Transcription error and spelling for clarity |
| 94 | 13 | Change "(indecipherable) -- elsewhere" to "as I noted earlier elsewhere --" | Transcription error |
| 107 | 9 | Change "ad networks I provided data" to "ad networks that provided data" | Transcription error |
| 108 | 1 | Change "curtailed, as you noted," to "; Criteo, as you noted;" | Transcription error |
| 109 | 8 | Change "them are of these" to "them -- or of these --" | Transcription error |

| | | | |
|---|---|---|---|
| 112 | 4 | Change "this application" to "its applications" | Transcription error |
| 112 | 5 | Change "those were present" to "it was present" | Transcription error |
| 115 | 16 | Change "the web and ad property" to "a web and an app property" | Transcription error |
| 117 | 14 | Change "display, with regards" to "display. With regards" | Transcription error |
| 126 | 8 – 9 | Change "this app component" to "there was an app component" | Transcription error |
| 127 | 14 | Change "Google display network" to "Google Display Network" | Capitalization for clarity |
| 128 | 1 | Change "DFPs" to "DFP" | Transcription error |
| 129 | 5 | Change "DC360" to "DV360" | Transcription error |
| 129 | 13 | Add double quotation mark after "rivals." | Transcription error |
| 129 | 21 | Change "methods to monopolization" to "methods of monopolization" | Transcription error |
| 130 | 2 | Change "to rivals" to "of rivals" | Transcription error |
| 132 | 7 | Change "firm" to "firm's" | Transcription error |
| 143 | 1 | Add "of this figure" after "unaddressable part." | Transcription error |
| 143 | 16 | Change "In paragraphs 12 and 3" to "In paragraph 12 on page 3" | Transcription error |
| 146 | 14 | Change "advertisers side" to "advertiser side" | Transcription error |
| 162 | 8 | Change "open bidding" to "Open Bidding" | Capitalization for clarity |
| 174 | 16 | Change "accommodation" to "competition" | Transcription error |
| 180 | 2 – 3 | Change "experience in" to "experiments and" | Transcription error |
| 180 | 21 | Change "AdX's" to "Ads-AdX" | Transcription error |
| 181 | 20 | Change "Ads, AdX's" to "Ads-AdX" | Transcription error |
| 184 | 8 | Remove extra space before "de minimus" | Formatting for clarity |
| 189 | 15 | Change "anyone can have last-look over" to "any one to have last-look over" | Transcription error |
| 196 | 8 | Change "shares" to "share" | Transcription error |
| 196 | 21 – 22 | Change "computed for –" to "computed for – users"; delete "By Mr. Isaacson: Q Users?" | Lee added "users," not Isaacson; Isaacson wasn't questioning |
| 199 | 9 | Change "Exhibit 7" to "Lee Exhibit 7" | Transcription error |
| 200 | 9 – 10 | Change "whether – the value of whether" to "whether he's evaluated" | Transcription error |
| 200 | 11 | Change "antirust" to "antitrust" | Transcription error |
| 201 | 11 | Change "the" to "this" | Transcription error |

| 202 | 3 | Change "it as" to "as a" | Transcription error |
|---|---|---|---|
| 203 | 1 | Change "advertiser ad network --" to "advertiser ad network product --" | Transcription error |
| 206 | 7 | Change "average than a disproportionate" to "average, and a disproportionate" | Transcription error |
| 207 | 3 | Change "advertisers, the highest" to "advertisers with the highest" | Transcription error |
| 207 | 18 | Change "zero zero" to "zero-zero" | Punctuation for clarity |
| 208 | 6 | Change "zero zero" to "zero-zero" | Punctuation for clarity |
| 208 | 16 – 17 | Change "Could I inspect that real briefly before I hand it back to you?" to "And, Professor Lee, could I just inspect that briefly before you take a look and I'll hand it back to you?" | Transcription error |
| 208 | 18 | Change "Okay" to "Here you go" | Transcription error |
| 208 | 20 | Change "I've given you Figure 1 [sic] and drawn" to "In Figure -- I've given you Figure 1 [sic] and drawn -- and drawn" | Transcription error |
| 209 | 17 | Remove "then" before "an increase" | Transcription error |
| 211 | 1 – 2 | Change "are we referring to Figure 16 instead of Figure 1?" to "I'd like to note that we're referring to Figure 16 and I think you said Figure 1, so I just want to make that clear." | Transcription error |
| 212 | 9 | Change "Like none of my reports -- " to "So, as I said in my reports," | Transcription error |
| 213 | 12 | Insert "in" before "the main text" | Transcription error |
| 214 | 16 | Change "declines to" to "declines from" | Transcription error |
| 215 | 17 | Change "between 15 and 20, maybe halfway" to "between 15—maybe halfway" | Transcription error |
| 216 | 9 | Change "is the end" to "is either the end" | Transcription error |
| 219 | 7 | Change "It's" to "If it's" | Transcription error |
| 220 | 14 | Insert "for" after "difficult" | Transcription error |
| 227 | 19 | Insert "Which paragraph" after "Counsel?" | Transcription error |
| 227 | 22 | Change "Actually, the heading." to "Actually, the heading—won't even go to the paragraph." | Transcription error |
| 229 | 7 | Change "Let me pause there" to "The -- let me pause there" | Transcription error |
| 234 | 7 | Change "analysis" to "analyses" | Transcription error |
| 236 | 2 | Change "AdX's" to "Ads-AdX" | Transcription error |
| 236 | 22 | Insert "to" before "DFP" | Transcription error |

| 239 | 2 | Change "controlling" to "after controlling" | Transcription error |
|---|---|---|---|
| 242 | 1 – 2 | Change "could stop for a break" to "could stop soon, that'd be great." | Transcription error |
| 242 | 6 | Change "Make it quick" to "I mean, if it's quick that would be fine." | Transcription error |
| 242 | 18 | Insert "at" after "transacted" | Transcription error |
| 243 | 8 | Change "had not opined" to "am not opining" | Transcription error |
| 244 | 1 | Insert quotations around "quality-adjusted." | Punctuation for clarity |
| 247 | 3 | Change "Bernicky" to "Bernanke" | Transcription error |
| 247 | 3 – 4 | Change "CPC, CPM" to "CPC-CPM" | Transcription error |
| 252 | 8 | Change "AW bidding program" to "AWBid program" | Transcription error |
| 255 | 19 | Change "all bid" to "AWBid" | Transcription error |
| 256 | 10 | Change "AdSense in third-party exchanges" to "AdSense, in third-party exchanges," | Transcription error |
| 261 | 17 | Change "AW bid" to "AWBid" | Transcription error |
| 263 | 2 | Change "they" to "I" | Transcription error |
| 264 | 11 | Change "E10" to "B-10" | Transcription error |
| 264 | 19 – 20 | Change "relevant product market among advertiser ad networks" to "relevant product market. Among advertiser ad networks" | Transcription error |
| 267 | 2 | Change "is" to "has" | Transcription error |
| 288 | 20 | Change "yield" to "yield," | Transcription error |
| 292 | 2 | Change "AdX was allowed" to "AdX -- was -- allowed" | Transcription error |
| 292 | 8 | Change "in the" to "into" | Transcription error |
| 296 | 5 | Change "Abrontes" to "Abrantes" | Transcription error |
| 296 | 6 | Change "Abrontes" to "Abrantes" | Transcription error |
| 296 | 11 | Change "to" to "through" | Transcription error |
| 298 | 13 | Change ", which is really only a decade" to "-- which was really only at the start of the decade" | Transcription error |
| 299 | 6 | Change "RTV" to "RTB" | Transcription error |
| 299 | 21 | Change "Abrontes" to "Abrantes" | Transcription error |
| 303 | 1 | Change "it is cited? I mean this" to "is it cited? I mean is this" | Transcription error |
| 305 | 13 | Replace "?" with "." | Transcription error |
| 307 | 5 | Change "I don't recall." to "Sitting here today, I don't recall." | Transcription error |

| 307 | 8 – 9 | Change "which is discussing unified pricing," to "which is discussing unified pricing rules," | Transcription error |
|---|---|---|---|
| 307 | 15 | Add a single quotation mark in front of "raises" | Lee Report quotes Jonathan Bellack starting at "raises" |
| 307 | 16 | Change "publics, referring pubs are" to "pubs', referring to publishers, 'are" | Transcription error |
| 307 | 17 | Add a single quotation mark after "harder." | End of Jonathan Bellack quote |
| 309 | 11 | Change "buyer-specifically" to "buyer-specific" | Transcription error |
| 309 | 22 | Change "Abrontes" to "Abrantes" | Transcription error |
| 311 | 3 | Change "a changes" to "changes" | Transcription error |
| 313 | 12 | Add "It's not isolated." After answer. | Transcription error – missed in crosstalk |
| 319 | 7 | Change "unfeasible" to "infeasible" | Transcription error |
| 320 | 2 | Change "exchanges" to "changes" | Transcription error |
| 323 | 22 | Change "which you discuss" to "which -- you -- discuss" | Transcription error |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefor.

Date: 4/22/24   Signature: _____