# Exhibit 1
# (Excerpt)

Dena C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

Tina Wolfson (State Bar No. 174806)
Theodore W. Maya (State Bar No. 223242)
Rachel Johnson (State Bar No. 331351)
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
rjohnson@ahdootwolfson.com

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | Case No. 5:20-cv-03556-BLF<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. Beth Labson Freeman |

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

54. When an internet user clicks to visit a web page, in the milliseconds that it takes for that page to load, real-time auctions are occurring in the background to determine which ads will display on the web page *that particular user* will see. These auctions are run by supply-side platforms (SSPs), exchanges, and demand-side platforms (DSPs) in the ad tech stack.

55. On the supply side of the exchange, suppliers—online publishers—of display advertising employ publisher ad servers (PAS) to accept, store, and manage ads; choose where and when ads appear; and track the effectiveness of ad campaigns. Each specific ad placement is determined based on bids from advertisers and/or preexisting arrangements between publishers and advertisers. Publishers rely on supply-side platforms (SSPs) to run auctions, interface directly with their demand-side equivalents, and optimize available inventory.

56. The demand side is comprised of advertisers and media agencies running advertising campaigns for businesses. Advertisers and media agencies rely on advertiser ad servers (AAS) to store ads, deliver them to publishers, and record transactions. Advertisers and media agencies also employ demand-side platforms (DSPs) to purchase digital advertising by bidding in auctions and to manage their bids.

57. The DSP connects to an ad exchange, which combines inventory from ad networks and SSPs with third-party data from a data management platform or data broker. When an ad space on a publisher's site becomes available, the ad exchange holds an auction in which the DSP bids on the impression submitted by the ad network or SSP.

58. Together, the publisher ad servers (PAS), supply-side platforms (SSP), advertiser ad servers (AAS), and demand-side platforms (DSP) comprise what is known as the "ad tech stack." By connecting publishers and advertisers, an ad tech provider functions as an intermediary broker. The U.K.'s Competition and Markets Authority (CMA) depicted this market as follows:

by invoking data privacy laws, the CMA observed that "Google itself" has proposed technologies "to allow targeted advertising without user profiling," and that Google has an obvious incentive to interpret data protection laws in a self-serving way to "entrench[] its own competitive advantage, including by denying third parties access to data that is necessary for targeting, attribution, verification and fee or price assessment" while preserving its own right to use that data within its "walled garden."

## V.  INTERSTATE TRADE AND COMMERCE

180. Google's conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

181. At all material times, Google participated in the marketing, promotion, distribution, and sale of publication and advertising services for display advertisements in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

182. Google's conduct also had substantial intrastate effects in that, among other things, Google's publication and advertising services for display advertisements were sold in each state, including California. At least thousands of individuals in each state, including California, were impacted by Google's anticompetitive conduct. As alleged below, absent Google's unlawful conduct, Plaintiffs and class members within each state would have paid less or received more money for digital advertising services.

## VI.  RELEVANT MARKET

183. Google's anticompetitive conduct has restrained competition in the market for online display advertising services, encompassing the overall system or process that connects online display advertisers and publishers (including Google). This market, colloquially known as the "ad tech stack" or "ad stack," comprises various segments and is the relevant market that Google monopolized for purposes of this action.

184. The relevant geographic market is the United States. Market participants recognize this in the ordinary course of business. For example, Google offers display advertisers the ability to target and deliver ads based on the location of publishers or consumers in the United States. Google also separately tracks display advertising revenue for the United States.

185. Google is the dominant provider of online search and search advertising in the United States—over 90% of internet searches are performed on Google's search engine—and used its dominant position in those markets to restrain trade in the separate market for display advertising services.

186. The display advertising services market comprises advertising services and platforms, and publishing services and platforms. Google has monopolized each of the relevant submarkets of the overall market for display advertising services, including the subsidiary markets for publisher ad servers, supply-side platforms, demand-side platforms, and advertiser ad servers. Google's conduct had the intent and effect of suppressing competition in the display advertising services market as well as in each of its component submarkets, and converting those submarkets into a single intermediation market under its control.

187. Google controls well over 90% of the PAS submarket and more than half of the SSP and associated ad exchange submarket. Likewise, on the demand side, Google controls 80-90% of the AAS submarket and at least 60% of the DSP submarket.

188. Google has wielded its market power to integrate each submarket of the ad stack into a single set of bundled services, with the intent and effect of preventing and discouraging competitors (other display advertising services providers), publishers, and advertisers from relying on advertising service providers on a product-by-product basis. Google's anticompetitive conduct has foreclosed competition, eliminating the ability of each segment of the display advertising services process, and the process as a whole, to function as a free and independent market. As a result of Google's conduct detailed in this complaint, Google has succeeded in combining the various subcomponents of the intermediation market for display advertising into one market—and a large and continually increasing majority of advertisers and publishers recognize and submit to this economic reality by paying only Google for display advertising brokering services.

189. Digital display advertising on the open web is a "market" under antitrust law even though advertisers may engage in other forms of digital advertising as well. Online display advertising is at base a matching problem. On one side are publishers who produce content, and earn