# Exhibit 2

2021 WL 7083558 (N.D.Cal.) (Trial Motion, Memorandum and Affidavit)
United States District Court, N.D. California,
San Jose Division.

In Re GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION.

No. 5:20-cv-03556-BLF.
January 15, 2021.

**Defendants' Notice of Motion And Motion to Dismiss First Amended Consolidated Class Action Complaint: Memorandum of Points and Authorities in Support Thereof**

John E. Schmidtlein (Ca State Bar No. 163520), Benjamin M. Greenblum (pro hac vice), Williams & Connolly LLP, 725 Twelfth Street, N.w., Washington, DC 20005, Telephone: (202) 434-5000, Facsimile: (202) 434-5029, Email: jschmidtlein@wc.com, bgreenblum@wc.com, for defendants Google LLC and Alphabet Inc.
Judge: Hon. Beth Labson Freeman.

Hearing Date: April 8, 2021

Time: 9:00am

Place: Courtroom 3

## NOTICE OF MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 8, 2021, at 9:00 a.m., or as soon thereafter as this matter may be heard, either in Courtroom 3 of this Court, located at 280 South 1st Street, San Jose, California, or by videoconference or teleconference, Defendants Google LLC and Alphabet Inc. will hereby move the Court for an order dismissing Plaintiffs' First Amended Consolidated Class Action Complaint with prejudice.

This Motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiffs fail to plausibly plead a facially sustainable relevant market, any anticompetitive conduct by Defendants, or any antitrust injury, each of which is fatal to Plaintiffs' Sherman Act and Unfair Competition Law claims. Two of the Plaintiffs also are bound to arbitrate all of the claims asserted in this action.

The Motion is based upon this Notice; the accompanying Memorandum of Points and Authorities; the previously submitted Declaration of Michael Kreins; any reply memorandum; the pleadings and files in this action; and such other matters as may be presented at or before the hearing.

DATED: January 15, 2021

**WILLIAMS & CONNOLLY LLP**

By: /s/ John E. Schmidtlein

John E. Schmidtlein (CA State Bar No. 163520)

Benjamin M. Greenblum (*pro hac vice*)

WILLIAMS & CONNOLLY LLP

725 Twelfth Street, N.W.

Washington, DC 20005

Telephone: (202) 434-5000

Facsimile: (202) 434-5029

Email: jschmidtlein@wc.com

bgreenblum@wc.com

*Attorneys for Defendants Google LLC and Alphabet Inc.*

### TABLE OF CONTENTS

| | |
|---|---|
| TABLE OF AUTHORITIES | III |
| MEMORANDUM OF POINTS AND AUTHORITIES | 1 |
| INTRODUCTION | 1 |
| BACKGROUND | 1 |
| LEGAL STANDARD | 4 |
| ARGUMENT | 4 |
| I. PLAINTIFFS FAIL TO ADEQUATELY PLEAD A SHERMAN ACT CLAIM | 4 |
| A. Plaintiffs Fail to Allege a Plausible "Relevant Market." | 4 |
| 1. Plaintiffs Have Not Adequately Alleged Facts to Support a Relevant Market Comprising a Collection of Products and Services Used by Different Custom ers for Different Purposes | 5 |
| 2. The "Online Display Advertising Services" Market Is Facially Unsustainable for Excluding Economic Substitutes | 6 |
| B. Plaintiffs Fail to Plead Actionable Anticompetitive Conduct | 9 |
| 1. Plaintiffs Fail to Plead A Claim for "Monopoly Leveraging." | 9 |
| 2. Plaintiffs Fail To Plead a Tying Claim | 11 |
| 3. Plaintiffs Fail to Plead a Denial of Interoperability Claim | 13 |
| 4. Plaintiffs Fail to Plead a Claim Based on the Alleged Failure to Disclose Various Data and Information to Competitors | 14 |
| 5. Plaintiffs Fail to Plead Claims Based on Google's Acquisitions | 15 |
| 6. The FAC's Pleading Deficiencies Are Not Remedied by Allegations as to Government Investigations | 18 |
| C. Plaintiffs Fail to Plead Antitrust Standing | 19 |
| II. PLAINTIFFS FAIL TO PLAUSIBLY PLEAD VIOLATIONS OF THE UCL | 20 |
| III. SUREFREIGHT GLOBAL LLC AND MR. LINDO ARE BOUND TO ARBITRATE | 20 |
| CONCLUSION | 24 |

# TABLE OF AUTHORITIES
## CASES

| Case | Page |
|---|---|
| *Adtrader, Inc. v. GoogleLLC,* 2018 WL 1876950 (N.D. Cal. Apr. 19, 2018) | 21 |
| *Ajzenman v. Office of Comm'r ofBaseball,* 2020 WL 6037140 (C.D. Cal. Sept. 14, 2020) | 23 |
| *AlaskaAirlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536 (9th Cir. 1991) | 10 |
| *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.,* 592 F.3d 991 (9th Cir. 2010) | 14 |
| *Am. Online, Inc. v. GreatDeals.Net,* 49 F. Supp. 2d 851 (E.D. Va. 1999) | 8 |
| *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333 (2011) | 21 |
| *Aya Healthcare Servs. v. AMN Healthcare, Inc.,* 2017 WL 6059145 (S.D. Cal. Dec. 6, 2017) | 20 |
| *Blair v. Rent-A-Center, Inc.,* 928 F.3d 819 (9th Cir. 2019) | 22, 23 |
| *Brantley v. NBC Universal, Inc.,* 675 F.3d 1192 (9th Cir. 20 12) | 11 |
| *Carefusion Corp. v. Medtronic, Inc.,* 2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) | 17 |
| *Chavez v. Whirlpool Corp.,* 93 Cal. App. 4th 363 (2001) | 20 |
| *City of San Jose v. Comm'r ofBaseball,* 776 F.3d 686 (9th Cir. 2015) | 20 |
| *Complete Entm't Res. v. Live Nation Entm't, Inc.,* 2016 WL 3457177 (C.D. Cal May 11, 2016) | 17 |
| *Eastman v. Quest Diagnostics Inc.,* 724 F. App'x 556 (9th Cir. 2018) | 16, 17 |
| *Facebook, Inc. v. Power Ventures, Inc.,* 2010 WL 3291750 (N.D. Cal. July 20, 2010) | 13 |
| *Feitelson v. Google Inc.,* 80 F. Supp. 3d 1019 (N.D. Cal. 2015) | 12, 13, 20 |
| *FTC v. Qualcomm Inc.,* 969 F.3d 974 (9th Cir. 2020) | 13 |
| *Garcia v. Comcast Cable Commc 'ns Mgmt. LLC,* 2017 WL 1210044 (N.D. Cal. Mar. 31, 2017) | 22 |
| *Garrison v. Oracle Corp.,* 159 F. Supp. 3d 1044 (N.D. Cal. 2016) | 17, 18 |
| *Golden Gate Pharm. Servs. v. Pfizer, Inc.,* 433 F. App'x 598 (9th Cir. 2011) | 4 |
| *Hicks v. PGA Tour, Inc.,* 897 F.3d 1109 (9th Cir. 2018) | 4, 6, 8, 20 |
| *hiQ Labs, Inc. v. LinkedIn Corp.,* 2020 WL 5408210 (N.D. Cal. Sept. 9, 2020) | 9 |
| *Hirsh v. Martindale-Hubbell, Inc.,* 674 F.2d 1343 (9th Cir. 1982) | 6 |
| *Huron Valley Publ'g Co. v. Booth Newspapers, Inc.,* 336 F. Supp. 659 (E.D. Mich. 1972) | 8 |
| *In re Flash Memory Antitrust Litig.,* 643 F. Supp. 2d 1133 (N.D. Cal. 2009) | 18 |
| *In re Graphics Processing Units Antitrust Litig.,* 527 F. Supp. 2d 1011 (N.D. Cal. 2007) | 18 |
| *In re Nat'l Football League's Sunday TicketAntitrust Litig.,* 933 F. 3d 1136 (9th Cir. 2019) | 4 |
| *Johnmohammadi v. Bloomingdale's, Inc.,* 755 F.3d 1072 (9th Cir. 2014) | 21 |
| *Johnson v. JP Morgan Chase Bank, N.A.,* 2018 WL 4726042 (C.D. Cal. Sept. 18, 2018) | 24 |
| *Kilgore v. KeyBank, Nat Ass 'n,* 718 F.3d 1052 (9th Cir. 2013) | 21 |
| *Kramer v. Enter. Holdings, Inc.,* 829 F. App'x 259 (9th Cir. 2020) | 23 |
| *LiveUniverse, Inc. v. MySpace, Inc.,* 2007 WL 6865852 (C.D. Cal. June 4, 2007) | 13, 15, 20 |
| *McGill v. Citibank N.A.,* 2 Cal. 5th 945 (2017) | 24 |
| *MetroNet Servs. Corp. v. Qwest Corp.,* 5 383 F.3d 1124 (9th Cir. 2004) | 15 |
| *Mohamed v. Uber Techs., Inc.,* 848 F.3d 1201 (9th Cir. 2016) | 21 |
| *Novation Ventures, LLC v. J.G. Wentworth Co.,* 711 F. App'x 402 (9th Cir. 2017) | 20 |
| *O'Connor v. Wells Fargo, N.A.,* 2014 WL 4802994 (N.D. Cal. Sept. 26, 2014) | 23 |

| | |
|---|---|
| *Packaging Sys. v. PRC-Desoto Int'l,* 268 F. Supp. 3d 1071 (C.D. Cal. 2017) | 11 |
| *Paladin Assocs. v. Mont. Power Co.,* 328 F.3d 1145 (9th Cir. 2003) | 4, 11 |
| *Parreno v. Berryessa Union Sch. Dist.,* 2010 WL 532376 (N.D. Cal. Feb. 8, 2010) | 23 |
| *PNY Techs. v. SanDisk Corp.,* 2012 WL 1380271 (N.D. Cal. Apr. 20, 2012) | 9 |
| *Reveal ChatHoldco, LLC v. Facebook, Inc.,* 471 F. Supp. 3d 981 (N.D. Cal. 2020) | passim |
| *Rogers v. Lyft, Inc.,* 452 F. Supp. 3d 904 (N.D. Cal. 2020) | 23, 24 |
| *Ryan v. Microsoft Corp.,* 147 F. Supp. 3d 868 (N.D. Cal. 2015) | 17, 18 |
| *Safeway Inc. v. AbbottLabs.,* 761 F. Supp. 2d 874 (N.D. Cal. 2011) | 10 |
| *Sahagian v. Genera Corp.,* 2009 WL 9504039 (C.D. Cal. July 6, 2009) | 20 |
| *Samsung Elecs. Co. v. Panasonic Corp.,* 747 F.3d 1199 (9th Cir. 2014) | 18 |
| *Shierkatz Rllp v. Square, Inc.,* 2015 WL 9258082 (N.D. Cal. Dec. 17, 2015) | 22 |
| *Sidibe v. Sutter Health,* 4 F. Supp. 3d 1160 (N.D. Cal. 2013) | 11, 20 |
| *Snyder v. Nationstar Mortg. LLC,* 2015 WL 7075622 (N.D. Cal. Nov. 13, 2015) | 23 |
| *Sponheim v. Citibank, N.A.,* 2019 WL 2498938 (C.D. Cal. June 10, 2019) | 24 |
| *Trudeau v. Google LLC,* 349 F. Supp. 3d 869 (N.D. Cal. 2018), *aff'd,* 816 F. App'x 68 (9th Cir. 2020) | 21, 22 |
| *Unigestion Holdings, SA. v. UPM Tech., Inc.,* 412 F. Supp. 3d 1273 (D. Or. 2019) | 10 |
| *Verizon Commc 'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398 (2004) | 10, 13 |
| *Wright v. Sirius XM Radio Inc.,* 2017 WL 4676580 (C.D. Cal. June 1, 2017) | 24 |
| *Z Techs. Corp. v. Lubrizol Corp.,* 753 F.3d 594 (6th Cir. 2014) | 17 |
| **STATUTORY PROVISIONS** | |
| 15 U.S.C. § 15b | 16, 17 |

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Defendants' initial motion to dismiss raised several deficiencies going to the heart of Plaintiffs' last complaint. Plaintiffs' First Amended Complaint ("FAC") does little to cure these deficiencies: rather than adding detail and definition to the existing allegations, Plaintiffs simply added breadth. Each of the grounds for dismissal thus remain.

*First,* Plaintiffs still fail to allege a properly defined relevant product market; their amendment doubles down on distinctions between multiple services they define as part of one antitrust market, and confirms the absurdity of excluding digital advertising on all "social media" or on Amazon from the relevant product market. *Infra* Part I.A. *Second,* Plaintiffs continue to fail to plead anticompetitive conduct; behind the labels of "leveraging," "tying," and "dominance," their FAC does not identify any actionable conduct. *Infra* Part I.B. *Third,* Plaintiffs still do not plead which services in the alleged market they themselves bought. *Infra* Part I.C.

Plaintiffs' California Unfair Competition Law ("UCL") claim still relies on the same allegations, and so fails on the same grounds. *Infra* Part II. *Finally,* and in the alternative, the claims of two named Plaintiffs who are bound to arbitrate (Surefreight Global and Mr. Lindo) should be dismissed. *Infra* Part III.

### BACKGROUND

Plaintiffs filed their FAC on December 4, 2020 in response to Defendants' motion to dismiss the Consolidated Class Action Complaint ("CAC"). Plaintiffs are advertisers who allegedly "paid Google directly to broker the placement of [their] display advertisements on third-party websites," FAC ¶¶ 8-23, and seek to represent a putative class of both advertisers and publishers who used Google's "display advertising services" to place or sell online display advertisements, *id.* ¶ 225.

Plaintiffs do not allege that Google has monopolized a market for "display advertising"; rather, they allege a relevant product market of "online display advertising *services,* encompassing the overall system or process that connects online display advertisers and publishers (including Google)." *Id.* ¶ 183.[1] That alleged market "comprises advertising services and platforms, and publishing services and platforms," *id.* ¶ 186--the former constituted of advertiser ad servers ("AAS") and demand-side platforms ("DSP") used by advertisers to "store ads, deliver them to publishers, and record transactions" and to "purchase digital advertising by bidding in auctions and to manage their bids" respectively, *id.* ¶ 56; the latter of publisher ad servers ("PAS") and supply-side platforms ("SSP") used by publishers to "accept, store, and manage ads; choose where and when ads appear, and track the effectiveness of ad campaigns" and to "run auctions, interface directly with their demand side equivalents, and optimize available inventory" respectively, *id.* ¶ 55.

---

[1]  In this memorandum, all emphases are supplied, and citations omit internal case references.

Plaintiffs are advertisers who claim to have "paid Google directly to broker the placement of [their] display advertisements on third-party websites." *Id.* ¶¶ 8, 14, 19. Plaintiffs describe the purchased services as "intermediation services," *id.* ¶¶ 9, 15, 20, but do not categorize them as any one of the specific "services and platforms" identified in the body of the FAC. The only service that Plaintiffs specifically claim to have purchased is the use of Google's "AdWords," but as Plaintiffs concede, that was for *search* advertising, *id.* ¶¶ 11, 16, 21; it is therefore outside the scope of the class definition and alleged relevant product market, which are limited to *display* advertising. *Id.* ¶¶ 197, 225. As to display advertising, Plaintiffs do not specify any of Google's advertiser-facing services they purchased--such as Google Ads, a tool the FAC describes as typically used by "[s]maller advertisers," *id.* ¶ 53, or Display & Video 360, allegedly "Google's main DSP," *id.* ¶ 62.

Additionally, none of the named Plaintiffs is alleged to be an online *publisher* that sells online ad inventory space and so would use the publisher-facing services described in the FAC. Publishers nevertheless remain within the scope of the defined putative class. *Id.* ¶ 225.

Recognizing that much online display advertising itself only one form of internet advertising, *id.* ¶ 30--is sold through parties that do not employ Google's advertising services, Plaintiffs have no choice but to seek to improperly narrow the relevant market further to only "[p]rogrammatic ... ads" sold "on the open web" apparently to be distinguished from "social media ... ads" and "close-ended advertising services." *Id.* ¶¶ 189, 206. Plaintiffs thus try to exclude competing display advertising services sold by "companies like Facebook, Twitter, and Snapchat[, which] primarily host social media content," and also all display advertising services sold by Amazon, which "primarily operates an online market for goods." *Id.* ¶ 204. Plaintiffs try to justify the exclusion of all of these competing alternatives on the alleged basis that Google's advertising services "access a *range* of publication options," whereas these other platforms sell only "their own ad inventory"--hence Plaintiffs' description that they are "close-ended" platforms and so allegedly "do not compete for the same business." *Id.* ¶¶ 203-04, 206. But Plaintiffs nowhere explain why display ads on Facebook the single most popular website hosting display advertising or Amazon--another extraordinarily popular website with advertisers do not compete with display ads on other websites that use Google's advertising services.

Plaintiffs also seek to carve out of the relevant product market the option available to advertisers to bypass Google altogether and "connect directly ... to negotiate the placement of advertisements onto the publisher's supply of advertising space." *Id.* ¶ 190. They say this is "impractical and very rare," but concede it is a viable alternative for "large advertisers (*e.g.,* Nike,

Barclays)," and for "publishers with premium, expensive inventory, such as major media sites like *Forbes,* the *Wall Street Journal,* or the *New York Times.*" *Id.* ¶¶ 190, 192. The FAC's market definition fails to account for this alternative, nor explain why it should not reduce any estimated market shares pled. Plaintiffs thus apparently are limiting the relevant product market to display advertising services purchased from Google by "small- and medium-sized advertisers," *id.* ¶ 193, even though the putative class is not limited to such advertisers.

The categories of antitrust conduct alleged in the FAC are substantively similar to those in the CAC: "leveraging [Google's] monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage." *Id.* ¶ 238. Plaintiffs offer no material new allegations to bolster their claim that such conduct is cognizable under federal antitrust or state unfair competition law.

Two of three remaining Plaintiffs agreed to Google's Terms of Service providing for arbitration of disputes that "arise out of or relate in any way to" Google's advertising programs and services. Kreins Decl. ¶¶ 5, 10, 13, 15; Exs. A & D, § 13(A). Despite amending the complaint in the wake of the the prior motion to dismiss, Plaintiffs do not allege in the FAC that the arbitration clause is unenforceable in any respect.

## LEGAL STANDARD

"A claim is facially plausible when it allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Reveal Chat Holdco, LLC v. Facebook, Inc.,* 471 F. Supp. 3d 981, 989 (N.D. Cal. 2020). On a Rule 12(b)(6) motion, "the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff," but need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id.*

## ARGUMENT

### I. PLAINTIFFS FAIL TO ADEQUATELY PLEAD A SHERMAN ACT CLAIM.

"To plausibly plead a monopolization claim, plaintiffs must allege: (a) the possession of monopoly power in the relevant markets; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *In re Nat'l FootballLeague's Sunday Ticket Antitrust Litig.,* 933 F. 3d 1136, 1159 (9th Cir. 2019). The FAC fails to plausibly allege any of the three required elements.

#### A. Plaintiffs Fail to Allege a Plausible "Relevant Market."

"For antitrust purposes, a market is composed of products that have reasonable interchangeability for the purposes for which they are produced price, use and qualities considered." *Paladin Assocs. v. Mont. Power Co.,* 328 F.3d 1145, 1163 (9th Cir. 2003). A relevant market definition may not encompass products that are not "reasonably interchangeable by *consumers for the same purposes.*" *Golden Gate Pharm. Servs. v. Pfizer, Inc.,* 433 F. App'x 598, 598 99 (9th Cir. 2011) (emphasis in original). Nor can it rest on a definition that is too narrow, failing to encompass "the product at issue as well as all economic substitutes

for the product." *Hicks v. PGA Tour, Inc.,* 897 F.3d 1109, 1120 (9th Cir. 2018). The FAC's proposed relevant market runs afoul of both principles.

### 1. Plaintiffs Have Not Adequately Alleged Facts to Support a Relevant Market Comprising a Collection of Products and Services Used by Different Customers for Different Purposes.

Plaintiffs purport to describe a single market that, according to the FAC, is comprised of four different services and/or products: "publisher ad servers, supply-side platforms, demand-side platforms, and advertiser ad servers," which they abbreviate as PAS, SSP, DSP, and AAS. FAC ¶¶ 183, 186. According to Plaintiffs, two of the services (DSP and AAS) are used only by advertisers, whereas two of them are used only by publishers (PAS and SSP). *Id.* ¶¶ 55-56. Indeed, with respect to each of these pairings, Plaintiffs allege that the services are "distinct" from one another. *Id.* ¶ 76 (alleging distinctions between "ad server and exchange" for publishers, and "distinct" AAS and DSP services for advertisers). In light of these allegations, Plaintiffs fail to adequately plead a single relevant product market because their purported market includes products and services that Plaintiffs and other advertisers admittedly do not purchase or use.[2]

[2]   Although business practices impacting the products and services offered to *publishers* surely could have important consequences for *advertisers,* that is not sufficient, absent other allegations not made here, to support the broad overarching services market pled by Plaintiffs here.

The FAC seeks to evade these distinctions, insisting that Google "convert[ed]" such services into "a single intermediation market under its control." *Id.* ¶¶ 186, 188. The theory appears to refer to Google's alleged "bundl[ing] two distinct products together and rebrand[ing] the integrated entity as a single product." *Id.* ¶ 76. This does not save Plaintiffs' market definition, for at least three reasons. *First,* the FAC alleges only the bundling of services for advertisers *with other services for advertisers,* and the same with respect to services for publishers; Plaintiffs' "single intermediation market" descriptor does nothing to address the differences that the FAC alleges between services for advertisers and publishers. *Second,* the FAC describes various services for advertisers (or publishers) as essentially complementary of one another from the perspective of advertisers and publishers, respectively--rather than as substitutes. *See id.* ¶¶ 55-56. *Third,* precisely because Plaintiffs continue to allege "unlawful tying" by Google between the respective pairs of services, FAC ¶¶ 67, 122, Plaintiffs have no choice but to characterize the services as "distinct." *See Hirsh v. Martindale-Hubbell, Inc.,* 674 F.2d 1343, 1350 (9th Cir. 1982) ("The existence of separate markets ... is crucial to a finding of an unlawful tying arrangement.").

### 2. The "Online Display Advertising Services" Market Is Facially Unsustainable for Excluding Economic Substitutes.

The relevant market must include "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Hicks,* 897 F.3d at 1120. Here, the alleged market for "online display advertising services" on the "open web" improperly excludes other ways for advertisers to reach publishers without using Google's services, and also improperly excludes the many alternatives to online display advertising.

#### a. The Proposed Relevant Market Excludes Alternative Means of Accessing Online Display Advertising.

***Plaintiffs exclude "major media sites" and "close-ended" websites.*** Plaintiffs concede that alternative services are used to access the display advertising inventory on the world's most popular websites: Facebook, Twitter, Snapchat, Amazon, *Forbes,*

the *Wall Street Journal,* the *New York Times,* and other unspecified "major media sites." FAC ¶¶ 192, 204. But Plaintiffs fail to plausibly allege why users of the foregoing websites are "distinct for advertising purposes" from users of the "open web." *Hicks,* 897 F.3d at 1122. To exclude "close-ended" websites with "in-house display advertising systems" from the relevant market simply because "advertisements that appear on th[em] ... only reach visitors to *those* websites," FAC ¶ 204, only begs the relevant question. Nowhere does the FAC explain why advertisers would not consider these websites (and the consumers who view ads on them) interchangeable with those websites accessible through Google's services including Google's own "close-ended" YouTube website which Plaintiffs elsewhere admit is another popular place where advertisers seek to place display advertising. *See id.* ¶¶ 114, 116.

***Plaintiffs exclude direct negotiation between advertisers and publishers.*** The FAC concedes that advertisers and publishers can "connect directly ... to negotiate the placement of advertisements," *id.* ¶ 190, but insist that it allegedly accounts for "a very low percentage of the display advertising market," and that it is not an option for "small- and medium-sized advertisers" and non-premium publishers. *Id.* ¶¶ 192-93. The former is no reason to exclude direct negotiation altogether from the relevant market, particularly in the absence of any articulation of how the allegedly "low percentage" was determined; and, as to the latter, nowhere do Plaintiffs purport to define a market (or a class definition) that includes only small- and medium-sized advertisers and non-premium publishers. *See id.* ¶ 183 (defining a market that "connects online display advertisers and publishers"). And Plaintiffs' class definition purports to include all publishers and advertisers who "used Google's display advertising services," without any regard to their size. *See id.* ¶ 225.

***Plaintiffs exclude "social-media display advertising."*** The FAC pushes aside all such advertising without even defining the term, much less explaining why advertisers would not consider it interchangeable with the *"range* of publication options" accessible through Google's services. *Id.* ¶ 203. If there is some reason why "social-media display advertising" lacks what the FAC describes as the distinguishing feature of "online display advertising" the ability to "target[] based on individual user data and profiles," *id.* ¶ 195--the FAC does not say what that reason is.

***Plaintiffs exclude all advertising on "online market[s] for goods."*** The FAC declares Amazon outside the relevant market because it is an "online market for goods." *Id.* ¶ 204. But the FAC describes the alleged "online display advertising services market" as one that helps advertisers "market[] goods," *id.* ¶ 190, so that descriptor cannot by its terms preclude the interchangeability of Amazon with the display advertising services that Plaintiffs claim constitute a market unto themselves. Plaintiffs have failed to plausibly allege the exclusion of such websites from the relevant market.

The reason for all these exclusions is that Plaintiffs otherwise have no hope of pleading that Google has monopoly power in "online display advertising services." But that is no reason to lower the pleading standard. Without a cognizable relevant market, the FAC states no antitrust claim.

### b. The Proposed Market Excludes Alternative Forms of Advertising.

As Plaintiffs acknowledge, advertisers are not limited to the internet; they can also promote their products through "print, television, radio, or billboard advertisements." *Id.* ¶ 195. Plaintiffs' restriction of the relevant market exclusively to "display advertising on the open web" is contrary to this reality, and to the Ninth Circuit's decision in *Hicks.*

*Hicks* rejected a proposed relevant market of advertising between commercial breaks during professional golf tournaments, because it excluded numerous "economic substitutes," including both digital advertising ("advertising through a search engine or social media platform that provides advertisers insights on users' online history"), as well as non-digital advertising ("airing commercials during golf-related television programs, radio broadcasts, or podcasts," or "put[ting] its logo on a magazine ad,

or on a wall in golf course clubhouses, or any number of other places"). 897 F.3d at 1121. *Hicks* cited with approval the "many courts [that] have rejected antitrust claims reliant on proposed advertising markets limited to a single form of advertising." *Id.* at 1123 (citing *Am. Online, Inc. v. GreatDeals.Net,* 49 F. Supp. 2d 851, 858 (E.D. Va. 1999) (rejecting a relevant market of "email advertising" for excluding substitutes, including "the World Wide Web, direct mail, billboards, television, newspapers, radio, and leaflet, to name a few"); *Huron Valley Publ'g Co. v. Booth Newspapers, Inc.,* 336 F. Supp. 659, 662 (E.D. Mich. 1972) (rejecting a relevant market of "newspaper advertising" for excluding other "modes of retail advertising")); *see also Reveal Chat,* 471 F. Supp. 3d at 1000 (expressing "real concerns" over a "Social Advertising Market").

Plaintiffs' only effort to distinguish "online display advertising" from what they call "traditional forms of advertising" is that the former allegedly "reaches targeted consumers individually and ... can be continuously updated and improved based on data showing how consumers are responding." FAC ¶ 196. But Plaintiffs also allege that such targeting comes at a higher cost: without it, "the prices for ad space trading ... drop by half or more." *Id.* ¶ 195. Where the price of a form of advertising "would reflect any increased effectiveness compared to other forms of advertising[,] [t]his increased effectiveness would not place the advertising format in a distinct market because ... companies can reach [potential] customers through other formats." *Hicks,* 897 F.3d at 1122. Standing alone, alleged increased effectiveness is insufficient to segregate one particular form of advertising from the others.

### B. Plaintiffs Fail to Plead Actionable Anticompetitive Conduct.

To plead "the willful acquisition or maintenance of monopoly power," Plaintiffs must plead facts sufficient to show that Google engaged in anticompetitive acts; "mere possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *PNY Techs. v. SanDisk Corp.,* 2012 WL 1380271, at * 10 (N.D. Cal. Apr. 20, 2012).

Plaintiffs fail to meet this burden. The FAC loosely refers to various alleged conduct stretching across different business units, over a period of many years, including conduct wholly unrelated to any product that Plaintiffs conceivably could have used. Attempting to plead their single count of Sherman Act monopolization, Plaintiffs refer to monopoly leveraging, tying, denial of interoperability, the acquisition of rivals, and restricting competitors' access to information. FAC ¶ 238. None of these allegations adequately pleads a Section 2 claim.

### 1. Plaintiffs Fail to Plead A Claim for "Monopoly Leveraging."

Plaintiffs allege that Google has leveraged monopolies in the search and search advertising markets to gain a monopoly in a separate display advertising market.[3] According to Plaintiffs, those purported search monopolies, along with "the data they generate about individual users[,] give Google an enormous advantage over online advertisers and publishers owing to the sheer volume of information Google acquires about consumers through its integrated panoply of products and services." *Id.* ¶ 88.

---

[3] Without a properly pled relevant market, *supra* Part I.A, Plaintiffs of course have not adequately pled monopoly power.

The claim fails as a matter of law: "an antitrust violation requires that there be anticompetitive conduct and leveraging by itself is not inherently anticompetitive in nature." *hiQ Labs, Inc. v. LinkedIn Corp.,* 2020 WL 5408210, at * 12 (N.D. Cal. Sept. 9, 2020). "Monopoly leveraging is just one of a number of ways that a monopolist can permissibly benefit from its position ... This does not mean, however, that such conduct is anticompetitive ... The Supreme Court has consistently held that there must

be 'predatory' conduct to attain or perpetuate a monopoly for a monopolist to be liable under Section 2." *Alaska Airlines, Inc. v. UnitedAirlines, Inc.,* 948 F.2d 536, 548--49 (9th Cir. 1991). The Sherman Act therefore does not apply "when a monopolist has a lawful monopoly in one market and uses its power to gain a competitive advantage in the second market." *Id.* at 548; *see also Unigestion Holdings, SA. v. UPM Tech., Inc.,* 412 F. Supp. 3d 1273, 1286 (D. Or. 2019) ("A mere unfair advantage combined with the use of upstream monopoly power is not sufficient to state a claim for a monopoly or attempted monopoly of the second market under a leveraging theory."). Instead, "leveraging presupposes anticompetitive conduct." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 415 n.4 (2004). Because Plaintiffs have not sufficiently alleged anticompetitive conduct in *either* the alleged leveraging markets or, as explained more fully below, in the alleged leveraged market, their leveraging claim fails. *See also SafewayInc. v. AbbottLabs.,* 761 F. Supp. 2d 874, 895 (N.D. Cal. 2011) ("Monopoly leveraging, on its own, is not proscribed under Section 2.").

In amending their complaint, Plaintiffs still do not sufficiently plead any anticompetitive conduct in the alleged search and search advertising markets. Plaintiffs merely assert, with no factual support, that "Google used exclusionary agreements, tying arrangements, and payoffs to barricade its general search monopoly such that competitors are denied vital distribution, scale and product recognition[.]" FAC ¶ 83. What these "arrangements," "payoffs" and "barricades" were with respect to search, who the "competitors" were, and what "products" were denied distribution, scale, and recognition, the FAC does not say; nor do Plaintiffs explain how that conduct impacted display advertising. The FAC elsewhere refers to the Department of Justice's suit against Google related to search, *id.* ¶ 162, but Plaintiffs have previously distinguished that suit from theirs, making plain that they "do not seek relief based on Google's monopolization of search." Ex. E [Plaintiffs' JPML Opp.] at 7. Because the FAC does not allege any anticompetitive conduct in the alleged leveraging search markets, there is no independent leveraging claim for the FAC to state. Accordingly, Plaintiffs' leveraging claim rises or falls with its remaining claims of Google's anticompetitive behavior.

### 2. Plaintiffs Fail To Plead a Tying Claim.

To sustain a tying claim in the Ninth Circuit, *first* a plaintiff must plead "that there exist two distinct products or services in different markets whose sales are tied together." *Paladin Assocs.,* 328 F.3d at 1159. To satisfy this first prong, a plaintiff "must define the relevant market for both the tying product and the tied product." *Packaging Sys. v. PRC-Desoto Int'l,* 268 F. Supp. 3d 1071, 1083 (C.D. Cal. 2017); *see also Sidibe v. Sutter Health,* 4 F. Supp. 3d 1160, 1174-75 (N.D. Cal. 2013) (dismissing tying claims for lack of plausible market definitions). *Second,* a plaintiff must show "that the seller possesses appreciable economic power in the tying product market sufficient to *coerce* acceptance of the tied product." *Paladin Assocs.,* 328 F.3d at 1159. It is "[e]ssential to th[is] second element of a tying claim ... that the seller *coerced* a buyer to purchase the tied product. A plaintiff must present evidence that the defendant *went beyondpersuasion* and coerced or forced its customers to buy the tied product in order to obtain the tying product." *Id. Third,* a plaintiff must show "that the tying arrangement affects a not insubstantial volume of commerce in the tied market." *Id.* This requires a plaintiff to "plead facts showing [a] negative impact on competition in the tied markets." *Sidibe,* 4 F. Supp. 3d at 1178; *see also Brantley v. NBC Universal, Inc.,* 675 F.3d 1192, 1200 (9th Cir. 2012) ("actual adverse effect on competition" necessary to plead tying claim).

Plaintiffs allege that Google uses tying to compel the purchase of display advertising. *First,* Plaintiffs allege that advertisers use Google's display advertising services in order to access Google's search data. FAC ¶¶ 104-05. *Second,* Plaintiffs allege that "[w]hen a Google Ads account is established for use in placing search advertisements, Google Ads is set up as the default account for placing both search *and* display advertisements." *Id.* ¶ 102 (emphasis in original). *Third,* Plaintiffs allege that advertisers can only purchase YouTube ad inventory by using Google's tools. *Id.* ¶ 116. *Finally,* Plaintiffs allege that Google has tied products together by "combin[ing]" formerly separate products. *Id.* ¶ 122. None of these allegations states a tying claim.

As an initial matter, for each of Plaintiffs' four tying theories, Plaintiffs have still failed to plead a relevant market for the allegedly tied product. *Supra* Section I.A. In addition to that flaw, Plaintiffs' tying allegations suffer from myriad additional flaws.

Plaintiffs' claim that advertisers use Google's display advertising services in order to access Google's search data is no more than a rehashing of their failed leveraging claim. That Google's display advertising services may help advertisers "to craft [a] more effective advertising campaign[]," FAC ¶ 104, merely confirms that advertisers choose Google because it offers a superior product, not that Google improperly coerces advertisers to use particular Google services that advertisers do not want.

Similarly, with respect to the allegation as to default settings for Google Ads accounts there is no allegation in the FAC that advertisers are somehow precluded from changing the default setting and using Google services for only search or display advertising. Instead, the FAC posits in passing, without any factual support, that "[a]dvertisers that open a Google Ads account are required to buy Google search advertising." *Id.* ¶ 106. This allegation is conclusory in the extreme; the "require[ment]" is nowhere identified in the FAC.

With respect to Plaintiffs' YouTube-related allegations, Plaintiffs still fail to plead a relevant market for the alleged tying product; they continue to reference a "video-ad publishing market," *id.* ¶ 113, but do not plead facts to support such a market. According to Plaintiffs, "about half of all video ads *not appearing on Facebook and Amazon* appear on YouTube." *Id.* ¶ 114. The FAC remains devoid of any allegations regarding the makeup of the so-called video-ad publishing market as a whole, or any explanation of why video display ads on Facebook and Amazon are excluded from such a market. Those omissions make it impossible to evaluate whether Google (through YouTube) has enough economic power in the "video-ad publishing market" to force advertisers to buy Google advertising services in order to advertise on YouTube. *See, e.g., Feitelson v. Google Inc., 80 F. Supp. 3d 1019, 1031-32 (N.D. Cal. 2015)* (denying tying claim when plaintiff alleged only that Android OS occupied a 51.7% share of the U.S. *smartphone* market, which excluded other handheld devices such as phones and tablets).

Finally, Plaintiffs' allegation that Google has "combined ad tech stack products that were once technically separate," FAC ¶ 122, does not state a tying claim. Specifically, Plaintiffs allege that "Google in 2018 merged DoubleClick for Publishers and AdX into a single product called Google Ad Manager." *Id.* Standing alone, offering two products for sale together, or "rebranding" two products as one, *id.* ¶ 76, does not state a tying claim without allegations that each product cannot be purchased or used separately. Plaintiffs do not allege that Google actually *coerces* usage of the combined products together: they do not plead that either product is unavailable for purchase without the other. *See Apple iPod iTunes Antitrust Litig., 2009 WL 10678940, at *5 (N.D. Cal. Oct. 30, 2009)* ("[I]n cases involving only a technological interrelationship, courts have adhered to the proposition that if the buyer is free to take either product by itself, there is no tying.").

### 3. Plaintiffs Fail to Plead a Denial of Interoperability Claim.

Plaintiffs allege that Google has failed to make its technologies sufficiently interoperable with those offered by its competitors. FAC ¶¶ 134-45. Chiefly, Plaintiffs allege that (1) Google's SSP "is designed to operate more efficiently with Google's own advertising service," *id.* ¶¶ 122, 135-39; (2) a user of Google's DoubleClick ad server has "a much harder time using ... non-Google buying tool[s]" compared to using Google's buying tools, *id.* ¶¶ 140-41; and that (3) Google's "systems" do not work with the header bidding mechanism "designed by Google's competitors," *id.* ¶¶ 142-45. Even were these allegations moored in any way to whatever advertising or advertising services Plaintiffs themselves purchased, the allegations state no claim.

The Sherman Act imposes "no duty to aid competitors." *Trinko,* 540 U.S. at 411; *see also FTC v. Qualcomm Inc.,* 969 F.3d 974, 993 (9th Cir. 2020) ("Competitors are not required to engage in a lovefest."). Antitrust law therefore does not require Google to make its services interoperable--much less "efficiently" so--with its competitors' services. "[M]erely introducing a product that is not technologically interoperable with competing products is not violative of Section 2." *Facebook, Inc. v. Power Ventures, Inc.,* 2010 WL 3291750, at * 13 (N.D. Cal. July 20, 2010). Thus, in *LiveUniverse v. MySpace, Inc.,* the Ninth Circuit held that MySpace's redesign of its platform to prevent users from linking to another website stated no claim because MySpace has the right "freely to exercise [its] own independent discretion as to parties with whom [it] will deal." 304 F. App'x 554, 556-57 (9th Cir. 2008); *see also Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.,* 592 F.3d 991, 1002 (9th Cir. 2010) ("Plaintiffs' argument that Tyco could have made its monitors compatible with the old sensors also fails ... [A] monopolist has no duty to help its competitors survive or expand when introducing an improved product design."). Google is under no duty to aid its competitors by ensuring that its products are interoperable with, much less work as efficiently or as easily with, its competitors' products. *See Apple iPod iTunes Antitrust Litig.,* 2009 WL 10678940, at *5 ("While Defendant did develop two products that worked optimally with one another, consumers remained free at all times to purchase one or the other without purchasing both.").

The lack of such a duty is for a good reason. "Antitrust scholars have long recognized the undesirability of having courts oversee product design, and any dampening of technological innovation would be at cross-purposes with antitrust laws." *Allied Orthopedic,* 592 F.3d at 1000. Such undesirability is evident on the face of the FAC. For example, Plaintiffs allege that Google's Accelerated Mobile Pages ("AMP") technology is incompatible with header bidding, which publishers can enable by placing on their websites certain javascript code. FAC ¶¶ 142,

144. But Plaintiffs concede that "[b]y limiting the type of programming codes that can be used on a page, AMP pages load faster than they otherwise would," *id.* ¶ 155--a critical feature of successful digital advertising. Similarly, Plaintiffs also concede that the design of Google's SSP is such that it "operate[s] *more efficiently* with Google's own advertising services." *Id.* ¶ 137. Such an effort at "product improvement by itself does not violate Section 2." *Allied Orthopedic,* 592 F.3d at 999.

**4. Plaintiffs Fail to Plead a Claim Based on the Alleged Failure to Disclose Various Data and Information to Competitors.**

Plaintiffs complain that Google has "maintain[ed] a culture of secrecy around its advertising services." FAC ¶ 146. Specifically, Plaintiffs take issue with Google's failure to publish certain metrics from its advertising services, including its "take rate," costs and fees, "time-stamp information on bids," and data concerning the effectiveness of digital ads. *Id.* ¶¶ 148, 150. Moreover, Plaintiffs challenge alleged actions that "prevent competitors from obtaining" customer data, including, for example, "the fees [Google] charges for each transaction." *Id.* ¶¶ 147, 154. Setting aside the lack of detail and vagueness in these allegations-- which again are unmoored to any particular antitrust injury suffered by Plaintiffs such allegations fail to identify any conduct deemed anticompetitive under the antitrust laws.

In order to allege anticompetitive conduct based on the withholding of information, Plaintiffs must allege that Google had some *duty* to provide it. *See Reveal Chat,* 471 F. Supp. 3d at 1000-01. Generally, there is "no duty to aid competitor[s]." *Id; see supra* Part I.B.3. Because Plaintiffs have made no allegations to circumvent that general rule here, any allegations concerning Google's failure to provide information to its competitors must be dismissed. *See Reveal Chat,* 471 F. Supp. 3d at 1001 (dismissing claims challenging Facebook's refusal to provide consumer data to its competitors because Facebook had no duty to deal). Plaintiffs' "transparency" allegations thus do not describe a circumstance in which "[t]he court can simply order the defendant to deal with its competitors on the same terms that it already deals with others in the existing retail market, without setting the terms of dealing." *MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1133 (9th Cir. 2004). Courts are particularly hesitant

to force competitors to share information with one another where, as here, the information is not "ma[d]e ... available to the public"--for "an antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations." *Id.*

Finally, to the extent that Plaintiffs claim that Google was under a duty to share the challenged information with its customers, rather than with competitors, *see* FAC ¶ 146, the allegations fail for the independent reason that they fail to plead harm to competition. See *LiveUniverse, Inc. v. MySpace, Inc.,* 2007 WL 6865852, at * 13 (C.D. Cal. June 4, 2007) (dismissing refusal to deal claims because the "course of dealing" defendant was alleged to have unlawfully terminated was with its own "users," rather than with competitors). Whatever "failures of transparency" allegedly "prevent advertisers from knowing if they are wasting some of their spend," FAC ¶ 150, that is not a harm that the antitrust laws exist to prevent. *LiveUniverse,* 2007 WL 6865852, at* 13.

### 5. Plaintiffs Fail to Plead Claims Based on Google's Acquisitions.

Plaintiffs allege that "[s]ince 2007, Google has made numerous key acquisitions in the interest of taking control of the entire ad tech stack." FAC ¶ 61. Plaintiffs list five acquisitions, the latest of which occurred in 2014. *Id.* ¶ 62. Plaintiffs have not pled sufficient factual support for the claim that the acquisitions violated Section 2. In any event, none of the acquisitions took place within the four-year statute of limitations. 15 U.S.C. § 15b.

### a. The Acquisition Claims Do Not Describe Anticompetitive Conduct.

The FAC makes specific allegations regarding only two vertical acquisitions: the 2007 acquisition of DoubleClick and the 2010 acquisition of AdMob. FAC ¶¶ 68-69. Plaintiffs acknowledge that the FTC reviewed both acquisitions and took no action against them. *Id.*

As to DoubleClick, Plaintiffs allege that, contrary to a "representation" Google allegedly made to the FTC at the time of the acquisition, in 2016 it "began merging DoubleClick web-browsing data with personal information collected through other Google services." *Id.* ¶ 68. What this has to do with Plaintiffs' antitrust claims, and in particular with the alleged monopolization of a market for display advertising services, the FAC does not say. Indeed, Plaintiffs appear to acknowledge that Google's data policies did ***not*** help Google either acquire or maintain a monopoly, as they allege that Google's already ***existing*** "monopolies enabled Google to" adopt its "data policy without risk of losing business to rivals more protective of consumer privacy." *Id.*

Regarding the AdMob acquisition, Plaintiffs complain that the FTC's "assumption that Apple would continue to build its presence in the mobile ad market," proved incorrect when Apple "abandoned its attempt to develop a competing mobile ad network" in 2016. *Id.* ¶ 69. That Apple, one of the world's largest companies, allegedly abandoned its effort to compete--untethered to any particular anticompetitive conduct by Google, and in a market ("mobile ad market") that is undefined in the FAC--clearly does not make the AdMob acquisition an antitrust violation a decade after it occurred.

Despite their amendments, then, Plaintiffs fail to sufficiently "demonstrate how" any of "the acquisitions unreasonably restricted competition." *Eastman v. QuestDiagnostics Inc.,* 724 F. App'x 556, 559 (9th Cir. 2018). Plaintiffs do not allege by how much each acquisition increased Google's share of any relevant market; nor do they make any "allegations related to the remaining competitors in the relevant market[s]." *Id.* Plaintiffs' allegations are therefore "insufficient to establish that the merger[s] led to a greater power to exclude competitors." *Carefusion Corp. v. Medtronic, Inc.,* 2010 WL 4509821, at *8 (N.D. Cal. Nov. 1, 2010).

#### b. The Acquisition Claims Are Time-Barred.

Even had Plaintiffs articulated a claim as to any of the five identified acquisitions, the latest acquisition occurred in 2014, and so Plaintiffs are far out of time. *See* 15 U.S.C. § 15b ("Any action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred under commenced within four years after the cause of action accrued."). Plaintiffs try to plead a purported "continuing course of unlawful conduct" and "fraudulent concealment," FAC ¶¶ 217, 219-24, but come nowhere near the pleading standard for either.

To begin with, the "continuing violation doctrine does not make sense in the context of anticompetitive mergers," and does not apply here. *Reveal Chat,* 471 F. Supp. 3d at 994; see also *Z Techs. Corp. v. Lubrizol Corp.,* 753 F.3d 594, 599 (6th Cir. 2014) ("We have not discovered a case ... in which the continuing violations doctrine has been applied to price increases following a merger or acquisition. Taken together, it is clear from the complete absence of supporting case law that the continuing violations does not apply to such claims."); *Complete Entm't Res. v. Live Nation Entm't, Inc.,* 2016 WL 3457177, at * 1 (C.D. Cal May 11, 2016) ("find[ing] this reasoning [from Z. *Techs.]* persuasive" and dismissing antitrust claim).

If the doctrine did apply, Plaintiffs would need to allege that Google "completed an overt act during the limitations period that" was "a new and independent act" inflicting "new and accumulating injury on" Plaintiffs. *Reveal Chat,* 471 F. Supp. 3d at 994. "Merely carrying out during the limitations period a final, binding decision made prior to the limitations period does not qualify as a new overt act." *Garrison v. Oracle Corp.,* 159 F. Supp. 3d 1044, 1071-72 (N.D. Cal. 2016); *see also Complete Entm't Res.,* 2016 WL 3457177, at *1. The FAC pleads no such act.

Likewise, Plaintiffs have failed to plead fraudulent concealment. To do so, Plaintiffs would have had to plead under Rule 9(b), *Ryan v. Microsoft Corp.,* 147 F. Supp. 3d 868, 886 (N.D. Cal. 2015), that "(1) [Google] took affirmative acts to mislead [Plaintiffs]; (2) [Plaintiffs] did not have actual or constructive knowledge of the facts giving rise to [their] claim; and (3) [Plaintiffs] acted diligently in trying to uncover the facts giving rise to [their] claim," *Garrison,* 159 F. Supp. 3d at 1073. Plaintiffs do not (because they cannot) deny that the acquisitions at issue were all publicly disclosed and reviewed by antitrust regulators years ago. Plaintiffs do not plead a single affirmative act to mislead, much less one specific to the acquisitions they challenge. See *Ryan,* 147 F. Supp. 3d at 886 ("Plaintiffs fail to sufficiently allege misleading conversations [with defendant]," or to "sufficiently allege affirmative acts of concealment during [legal] proceedings").

Finally, to the extent that Plaintiffs purport to seek injunctive relief, any such claim is barred by laches. *See Samsung Elecs. Co. v. Panasonic Corp.,* 747 F.3d 1199, 1205 (9th Cir. 2014) ("[T]he four-year statute of limitations ... furnishes a guideline for computation of the laches period.").

### 6. The FAC's Pleading Deficiencies Are Not Remedied by Allegations as to Government Investigations.

In the absence of any plausible allegation as to anticompetitive conduct, the FAC leans heavily on government investigations into various aspects of Google's businesses. *See* FAC ¶¶ 161--79. These allegations "carr[y] no weight in pleading an antitrust ... claim." *In re Graphics Processing UnitsAntitrust Litig.,* 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007); *see also In reFlash MemoryAntitrustLitig.,* 643 F. Supp. 2d 1133, 1149 n.11 (N.D. Cal. 2009). The FAC also repeatedly quotes a report of the House Judiciary Committee, *see* FAC ¶¶ 158, 171, 172, 201, 205, but that report was focused on why existing antitrust law does ***not*** prohibit much of the challenged conduct.[4]

4    See https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf at p. 397 (urging "overriding judicial decisions that have treated unfavorably ... refusal to deal-based theories of harm"); p. 397 ("recommend[ing] that Congress consider whether making a design change that ... undermines competition should be a violation of Section 2, regardless of whether the design change can be justified as an improvement for consumers"); p. 403 (recommending the "[e]liminati[on] [of] court-created standards for 'antitrust injury' and 'antitrust standing'").

### C. Plaintiffs Fail to Plead Antitrust Standing.

Even had Plaintiffs pled unlawful conduct, their FAC plainly fails to plausibly allege antitrust injury. Antitrust injury requires "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, ... (4) that is of the type the antitrust laws were intended to prevent, and (5) the injured party [is] a participant in the same market as the alleged malefactors." *Reveal Chat,* 471 F. Supp. 3d at 997. "Naked assertions" of antitrust injury that are "devoid of further factual enhancement" are insufficient. *Id.* Plaintiffs' allegations fall far short of meeting this standard.

*First,* Plaintiffs still do not identify what particular "intermediation services" they purchased from Google, and thus fail to trace a link between the unlawful conduct and any injury to them. The FAC alleges in broad brush that Plaintiffs paid Google to "broker the placement" of "display advertisements on third-party websites." FAC ¶¶ 8-23. Plaintiffs however do not identify the particular advertiser service(s) on which they are claiming overcharges. This matters. For example, while the FAC alleges all manner of conduct related to Google's Display & Video 360 "Google's main DSP," *id.* ¶¶ 62, 76, 119, 140--that advertising service product was *notused* by any of the Plaintiffs, who do not describe themselves as the "enterprise advertising customers" for which the FAC says that product is "reserved." *Id.* ¶ 194. Moreover, as advertisers, Plaintiffs could not have purchased services that the FAC pleads are relevant only to publishers, i.e., the PAS and SSP "segments" of the purported relevant market, *id.* ¶ 55. *See, e.g., Reveal Chat,* 471 F. Supp. 3d at 998 (dismissing for lack of allegations that Plaintiffs were "consumers" in the purported relevant market).

*Second,* the only form of advertiser injury alleged by the FAC is that "advertisers have paid more than they otherwise would have paid." FAC ¶ 211. But this is divorced from any particular allegedly anticompetitive practice, because again, Plaintiffs do not plead any facts to suggest that they overpaid for particular display advertising services as a result of Google's alleged monopolization of any relevant market. *See Reveal Chat,* 471 F. Supp. 3d at 997 (plaintiffs must allege an injury "flow[ing] from that which makes the conduct unlawful"). Where a plaintiff does not plead "specific facts detailing their alleged purchases, it is impossible to tell whether the Complaint plausibly alleges that they are market participants," which itself compels dismissal. *Sahagian v. Genera Corp.,* 2009 WL 9504039, at *5 (C.D. Cal. July 6, 2009); *see also Aya Healthcare Servs. v. AMN Healthcare, Inc.,* 2017 WL 6059145, at *5 (S.D. Cal. Dec. 6, 2017) ("Plaintiffs repeatedly claim Defendants' alleged conduct resulted in higher prices and reduced output. However, Plaintiffs do not allege facts or anecdotal evidence supporting this contention.").

For these reasons, Plaintiffs have failed to plausibly allege antitrust standing.

### II. PLAINTIFFS FAIL TO PLAUSIBLY PLEAD VIOLATIONS OF THE UCL.

Plaintiffs' UCL claim should be dismissed for the same reasons as their Sherman Act claim. *See Feitelson,* 80 F. Supp. 3d at 1034 (citing *City of San Jose v. Comm'r of Baseball,* 776 F.3d 686, 691-92 (9th Cir. 2015)); *see also Hicks,* 897 F.3d at 1124; *Novation Ventures, LLC v. J.G. Wentworth Co.,* 711 F. App'x 402, 405 (9th Cir. 2017) ("[A]ny claimed unlawfulness [or] unfairness ... was based entirely on the alleged federal antitrust ... wrongdoing."); *LiveUniverse, Inc.,* 304 F. App'x at 557

("Where ... the same conduct is alleged to support both a plaintiff's federal antitrust claims and state-law unfair competition claim, a finding that the conduct is not an antitrust violation precludes a finding of unfair competition."); *Sidibe,* 4 F. Supp. 3d at 1181.

That Plaintiffs allege that Google acted not only unlawfully but also unfairly does not change the result. "If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason ... the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' towards consumers." *Chavez v. Whirlpool Corp.,* 93 Cal. App. 4th 363, 375 (2001). That fits the FAC to atee. *Compare* FAC ¶ 238 (Sherman Act claim) *with id.* ¶ 247 (predicating unfairness claim on the exact same alleged conduct). Therefore, a determination that the FAC fails to allege a Sherman Act claim "necessarily implies that the conduct is not 'unfair' towards consumers." *Chavez,* 93 Cal. App. 4th at 375.

### III. SUREFREIGHT GLOBAL LLC AND MR. LINDO ARE BOUND TO ARBITRATE.

Even were Plaintiffs to have stated a claim, two Plaintiffs--Surefreight Global LLC and Mr. Lindo are bound to arbitrate such claims, and their claims therefore should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

These Plaintiffs agreed to Google's Advertising Program Terms of Service ("TOS") between 2017 and 2018, and so "agree[d] to arbitrate all disputes and claims ... that arise out of or relate in any way to" Google's advertising programs. Kreins Decl. ¶¶ 13, 15; Exs. A & D, § 13(A). Defendants request that the Court take judicial notice of the TOS and related documents, as specified in, and authenticated by, the attached Declaration of Michael Kreins, submitted in support of Defendants' previous Motion to Dismiss. *See Trudeau v. Google LLC,* 349 F. Supp. 3d 869, 876 (N.D. Cal. 2018) (takingjudicial notice of the "TOS, the opt-out website, and the website at which advertisers accepted or declined the TOS," because, *inter alia,* "they are not the subject of reasonable dispute and their authenticity is not in question" (citing Fed. R. Evid. 201)), *aff'd,* 816 F. App'x 68 (9th Cir. 2020). These Plaintiffs' consent to the TOS means that the Court should dismiss their claims. *See Johnmohammadi v. Bloomingdale's, Inc.,* 755 F.3d 1072, 1074 (9th Cir. 2014) ("[A] district court may either stay the action or dismiss it outright when ... the court determines that all of the claims raised in the action are subject to arbitration.").

"The FAA reflects a strong policy in favor of arbitration." *Trudeau,* 349 F. Supp. 3d at 874 (*citing AT&TMobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011)). A court's role "under the FAA is to determine (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank, Nat. Ass 'n,* 718 F.3d 1052, 1058 (9th Cir. 2013). Here, the answer to both questions is yes.

*First,* the arbitration agreement is neither procedurally nor substantively unconscionable. The "threshold inquiry in California's unconscionability analysis is whether the arbitration agreement is adhesive." *Mohamed v. Uber Techs., Inc.,* 848 F.3d 1201, 1211 (9th Cir. 2016). An "arbitration agreement is not adhesive if there is an opportunity to opt out of it." *Id.* This Court has previously observed that Google's TOS "make[s] it clear that advertisers can freely opt out of the Dispute Resolution Agreement provision." *Adtrader, Inc. v. GoogleLLC,* 2018 WL 1876950, at *4 (N.D. Cal. Apr. 19, 2018); *see also Trudeau,* 349 F. Supp. 3d at 877 ("[T]he ... TOS provided a meaningful opportunity to opt out of the arbitration provision."). Because the agreement contains a voluntary opt out procedure, "the arbitration provision is not procedurally unconscionable and thus not unconscionable." *Trudeau,* 349 F. Supp. 3d at 877.

Because the arbitration agreement is not procedurally unconscionable, the Court need not reach the issue whether the agreement is substantively unconscionable. *Id.* In any event, it is not "so one-sided as to shockthe conscience." *ShierkatzRllp v. Square, Inc.,* 2015 WL 9258082, at *10 (N.D. Cal. Dec. 17, 2015). First, it is bilateral. *See Garcia v. Comcast Cable Commc'nsMgmt.*

*LLC,* 2017 WL 1210044, at *3 (N.D. Cal. Mar. 31, 2017) (requiring "only a modicum of bilaterality"). Moreover, the TOS provides for arbitration hearings "in the county (or parish) ... of Advertiser's principal place of business." Kreins Decl. Exs. A & D, § 13(C). Finally, the TOS requires Google to pay the arbitration fees in many instances. *See* Kreins Decl. Exs. A & D, § 13(D).

*Second,* the arbitration agreement plainly encompasses Plaintiffs' claims, insofar as it applies to "all disputes and claims ... that arise out of or relate in any way" to Google's advertising programs. And the TOS extends to claims based on events that occurred before 2017: subsection 13(A)(2) expressly covers "claims that arose before Customer or Advertiser first accepted any version of these Terms containing an arbitration provision." Kreins Decl. Exs. A & D, § 13(A)(2); *Trudeau,* 349 F. Supp. 3d at 878. "On its face then, the arbitration provision applies to claims arising before the 2017 TOS." *Id.* In view of these authorities, and the filing of the initial motion to dismiss, the arbitration issue is no surprise to Plaintiffs yet their FAC continues to stay silent on the issue, and fails to challenge the enforceability of the arbitration clause.

Plaintiffs have instead alleged, in an apparent attempt to circumvent arbitration, that they view themselves as seeking a public injunction under the UCL: "The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly." FAC ¶¶ 243, 251. In view of their reference to an injunction that would "benefit the public," Plaintiffs presumably intend to seek application of the Ninth Circuit's recent holding that the California law "prohibit[ion of] the waiver of the right to pursue public injunctive relief in any forum" is not preempted by the Federal Arbitration Act. *Blair v. Rent-A-Center, Inc.,* 928 F.3d 819, 827 (9th Cir. 2019). Defendants will respond if and when Plaintiffs make such an argument (and preserve their rights to contend that *Blair* was wrongly decided)--the FAC itself does not do so. But it would make no difference here *if Blair* was correctly decided and applied.

As an initial matter, Plaintiffs have no right to a "public injunction" under the Sherman Act, and thus that claim at least should be dismissed in favor of arbitration. *See Rogers v. Lyft, Inc.,* 452 F. Supp. 3d 904, 919 (N.D. Cal. 2020) ("The public injunction is a creature of California law ...").

Even with respect to Plaintiffs' UCL claim, the FAC's mere recitation that Plaintiffs seek an unspecified injunction that will "primar[ily] ... benefit the public" does not stave off arbitration. "Courts do not take relief styled as a 'public injunction' at face value." *Ajzenman v. Office of Comm'r of Baseball,* 2020 WL 6037140, at *6 (C.D. Cal. Sept. 14, 2020).

*First,* Plaintiffs have not even pled what they are seeking to enjoin; the FAC says simply that Plaintiffs seek "injunctive relief to restore competition in the relevant market and its constituent submarkets." FAC p.51. What exactly Plaintiffs are asking the Court to use its equitable powers to order Defendants to do is identified nowhere in the FAC, which simply describes the "form and content of injunctive relief" as a "question" common to the putative class. *Id.* ¶ 231(d). This alone warrants dismissal of any claim for a public injunction. *See, e.g., Snyder v. Nationstar Mortg. LLC,* 2015 WL 7075622, at * 11 (N.D. Cal. Nov. 13, 2015) (dismissing UCL claim because "Plaintiff fail[ed] to state what particular unfair business practices she seeks to enjoin," and thus "request for injunctive relief [was] not sufficiently stated") (citing *O'Connor v. Wells Fargo, N.A.,* 2014 WL 4802994, at *8 (N.D. Cal. Sept. 26, 2014) ("Plaintiff's request for injunctive relief is insufficiently stated; Plaintiff does not specify what the 'threatened conduct' he seeks to enjoin is ...")); *Parreno v. Berryessa Union Sch. Dist.,* 2010 WL 532376, at * 1 (N.D. Cal. Feb. 8, 2010) ("Parreno's claim for injunctive relief is inadequately pleaded because it fails to specify the relief she seeks[.]"). Without any actual pleading of a request for a particular form of injunction, there is no right to a public injunction that could preclude application of the arbitration clause. *See, e.g., Kramer v. Enter. Holdings, Inc.,* 829 F. App'x 259, 260 (9th Cir. 2020) (enforcing arbitration clause where "[t]he complaint is specific in requesting damages for him and his proposed class, but it only asks in general terms 'for any and all injunctive relief the Court deems appropriate'").

*Second,* whatever injunction Plaintiffs intend to pursue, the FAC seeks to benefit only the class of advertisers and publishers that they seek to represent, *i. e.,* "the class of people who stand to benefit from any injunctive relief are necessarily limited only to those individuals who have entered into contractual agreements with [Google], not the public at large." *Johnson v. JP Morgan Chase Bank, N.A.,* 2018 WL 4726042, at *7 (C.D. Cal. Sept. 18, 2018). *See also, e.g., McGill v. Citibank, N.A.,* 2 Cal. 5th 945, 955 (2017) ("Relief that has the primary purpose or effect of redressing or preventing injury to an individual plaintiff--or to a group of individuals similarly situated to the plaintiff--does not constitute public injunctive relief."); *Rogers,* 452 F. Supp. 3d at 920-21 ("[T]he plaintiffs' decision to label their claim as one for a 'public injunction' seems dubious because the proposed remedy runs directly to the plaintiffs and similarly situated [private parties], with the public benefiting only collaterally."); *Sponheim v. Citibank, N.A.,* 2019 WL 2498938, at *5 (C.D. Cal. June 10, 2019) (rejecting claim of public injunction where plaintiffs sought relief on behalf of only those who "held Citibank checking accounts"); *Wright v. Sirius XM Radio Inc.,* 2017 WL 4676580, at *9 (C.D. Cal. June 1, 2017) (no public injunction because relief extended only to lifetime Sirius XM subscribers who had subscriptions canceled).

## CONCLUSION

The FAC should be dismissed. As this is the third attempt by Plaintiffs to plead cognizable claims, *see* ECF 1 & 35, the dismissal should be with prejudice.

DATED: January 15, 2021

**WILLIAMS & CONNOLLY LLP**

By: /s/ John E. Schmidtlein

John E. Schmidtlein (CA State Bar No. 163520)

Benjamin M. Greenblum (*pro hac vice*)

WILLIAMS & CONNOLLY LLP

725 Twelfth Street, N.W.

Washington, DC 20005

Telephone: (202) 434-5000

Facsimile: (202) 434-5029

Email: jschmidtlein@wc.com

bgreenblum@wc.com

*Attorneys for Defendants Google LLC and Alphabet Inc.*

**In Re GOOGLE DIGITAL ADVERTISING ANTITRUST..., 2021 WL 7083558...**

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.