# Exhibit 6

# In the matter of Google/DoubleClick
## F.T.C. File No. 071-0170

## DISSENTING STATEMENT OF
## COMMISSIONER PAMELA JONES HARBOUR

The majority is to be commended for issuing a detailed and thoughtful statement of its reasons for closing the investigation.[1]  In particular, the majority has endeavored to explain the complex mechanics of online advertising.  This may help consumers make more informed choices about their online activities, because they will better understand the products and services affected by this transaction.

But Section 7 is inherently forward-looking.  It requires the Commission to apply a dynamic analytical approach, based on predictions about how markets will evolve.  This is especially true of the online advertising market, which continues to expand at lightning speed.

I dissent because I make alternate predictions about where this market is heading, and the transformative role the combined Google/DoubleClick will play if the proposed acquisition is consummated.  If the Commission closes its investigation at this time, without imposing any conditions on the merger, neither the competition nor the privacy interests of consumers will have been adequately addressed.

I. **HORIZONTAL OVERLAPS BASED ON MAJORITY'S MARKET DELINEATIONS**

Based on the majority's characterization of the relevant product markets, I see at least three areas where the parties currently compete, or likely would compete in the near future.  As a result of these competitive overlaps, I have reason to believe that the proposed acquisition may substantially lessen competition.

  A. **Google and DoubleClick are Potential Competitors in Third Party Ad Serving Tools**

But for Google's acquisition of DoubleClick, the parties likely would have competed head-to-head in the market for third party ad serving tools.  Prior to the announcement of the deal, Google was developing and beta-testing its own third party ad serving solution, Google for Publishers and Google for Advertisers, which would have competed against DoubleClick's DART for Publishers

---

[1] Google/DoubleClick, F.T.C. File No. 071-0170, Statement of Federal Trade Commission (Dec. 20, 2007), *available at* http://www.ftc.gov/os/caselist/0710170/071220statement.pdf [hereinafter Majority Statement].

and DART for Advertisers. Development efforts ceased once the proposed acquisition of DoubleClick was announced.

It is difficult to believe that Google – with a market capitalization of nearly $207 billion, a top-notch engineering team, and a wealth of connections among publishers and advertisers – would have been unable to refine its beta product and release a highly competitive third party ad serving solution of its own. Third party ad serving customers likely would have benefitted from both price and innovation competition as a result of Google's entry efforts. In addition, Google's vertical integration via internal development would have created its own synergies, which calls into question the merger specificity of any synergies that may result from Google's acquisition of DoubleClick.

### B. DoubleClick's Recent Entry into the Intermediation Market

Through AdSense for Content, and acting as an intermediator, Google places millions[2] of contextual ads on publishers' web pages, typically in "remnant" space that has not been directly purchased by advertisers. These ads may be text-based, or they may conform to a variety of graphical display formats.[3]

DoubleClick recently entered the intermediation market with its own "DoubleClick Advertising Exchange,"[4] which places display advertisements in the same type of remnant space on publishers' web pages. This constitutes current horizontal competition between Google and DoubleClick, which will be eliminated as a result of their merger.

The majority claims that the intermediation market is highly fragmented, and that no evidence suggests DoubleClick was uniquely positioned to become a major player in this space.[5] But DoubleClick's marketing materials for its new advertising exchange suggest otherwise:

---

[2]"The Google content network reaches 75% of unique internet users in over 100 countries and 20 languages on millions of sites across the web." Google AdWords, Content Network, Partner Sites, *at* https://adwords.google.com/select/afc/partners.html. Google explains its AdSense for Content business at https://www.google.com/adsense/static/en_US/AfcOverview.html?gsessionid=ClEgEz3MwAU.

[3]*See* https://www.google.com/adsense/static/en_US/AdFormats.html?sourceid=aso&subid=ww-ww-et-asui&medium=link#image (available formats for Google AdSense contextual ads include a variety of graphical/display formats in addition to text formats).

[4]*See* http://www.doubleclick.com/products/advertisingexchange/index.aspx ("The DoubleClick Advertising Exchange service makes buying and selling digital advertising faster, easier and more profitable. Through an impression-by-impression auction marketplace, the service connects industry-leading online publishers with top-tier advertisers, agencies and networks.").

[5]Majority Statement at n.7.

2

> Both buyers and sellers streamline ad operations and eliminate counting discrepancies through integration with DART for Publishers, DART Enterprise and DART for Advertisers. DoubleClick Advertising Exchange provides a single billing and payment point for all transactions, greatly reducing complexity and financial risk for participants.[6]

I find DoubleClick's marketing position highly credible, especially when viewed in light of the dominance of the company's ad serving tools.[7] The parties argue that their merger makes sense because customers increasingly demand integrated online advertising solutions. It is plausible that DoubleClick, even without Google, would be able to meet at least some of that demand.

### C.  Google's Entry into Site-Specific Text and Image Ads

Google's business now includes a "placement targeting" component, whereby advertising customers select specific websites on which to display their text or image-based advertisements.

> Placement targeting (formerly called site targeting) lets AdWords[8] advertisers choose individual spots in the Google content network where they'd like their ads to appear. A placement might be an entire website or a subset of a site, such as only the sports pages of a news site. You handpick your audience, big or small. . . . As with all AdWords advertising, you'll compete for space with other advertisers. If you choose very prominent and popular sites, you'll need a higher price to win the ad position. Placement-targeted campaigns can take either cost-per-click (CPC) or cost-per-thousand impressions (CPM) pricing.[9]

---

[6]*See* http://www.doubleclick.com/products/advertisingexchange/index.aspx.

[7]*See infra* page 5 *et seq*. for a discussion of network effects.

[8]Google explains its AdWords business at http://www.google.com/adwords/learningcenter/text/18911.html.

[9]https://adwords.google.com/support/bin/answer.py?answer=18265&topic=7072; *see also* Google AdWords, AdWords Help Center, *What is a placement?*, *at* http://adwords.google.com/support/bin/answer.py?answer=77872&topic=7072:

> A placement is any selected website, or subset of pages or ad units on a site, where you'd like to see your ad appear. You choose placements for your ads when you create a placement-targeted AdWords campaign. A placement can be an entire website, but it can also be a collection of pages on that site or a particular ad unit on one or more pages. For instance, a placement could put your

3

A site-specific targeted placement through Google – especially an image-based advertisement with CPM pricing – would seem to compete directly against a display advertisement managed through DoubleClick's ad serving tools. An advertiser might choose to use Google's placement targeting program to place the advertisement, instead of using a DoubleClick-based solution.

## II.  BROADER APPROACH TO COMPETITIVE ANALYSIS

These existing horizontal overlaps are troubling enough, and might have provided a predicate for the Commission to impose conditions on the merger. But even more troubling is that the combination of Google and DoubleClick likely will affect the evolution of the entire online advertising market – especially in light of existing network effects, and the tremendous additional network effects the transaction will generate. The majority's analysis skims too quickly over these points. Network effects deserve greater attention.

In many ways, the acquisition of DoubleClick by Google is a case of first impression for the Commission. The transaction will combine not only the two firms' products and services, but also their vast troves of data about consumer behavior on the Internet. Thus, the transaction reflects an interplay between traditional competition and consumer protection issues. The Commission is uniquely situated to evaluate the implications of this kind of data merger, from a competition as well as a consumer protection perspective. The Commission should maximize its opportunity to do so, especially where the merged firm will be capable of dominating the "Database of Intentions."[10]

---

> ads on just the football section of a news website, on the showtimes pages of a movie ticketing site, or on a specific ad unit that is always in one position on a particular political blog or web page.

[10]  The "Database of Intentions" was first described by John Battelle as "the aggregate results of every search ever entered, every result list ever tendered, and every path taken as a result." JOHN BATTELLE, THE SEARCH: HOW GOOGLE AND ITS RIVALS REWROTE THE RULES OF BUSINESS AND TRANSFORMED OUR CULTURE 6 (2005); *see also* John Battelle's Searchblog, *The Database of Intentions* (Nov. 13, 2003), at http://battellemedia.com/archives/000063.php:

> [The Database of Intentions] lives in many places, but three or four places in particular hold a massive amount of this data (ie MSN, Google, and Yahoo). This information represents, in aggregate form, a place holder for the intentions of humankind – a massive database of desires, needs, wants, and likes that can be discovered, supoenaed, archived, tracked, and exploited to all sorts of ends. Such a beast has never before existed in the history of culture, but is almost guaranteed to grow exponentially from this day forward. This artifact can tell us extraordinary things about who we are and what we want as a culture. And it has the potential to be abused in equally extraordinary fashion.

A.  **Network Effects in Online Advertising**

A network effect arises when a good or service increases in value as more people use it. Feedback fosters acceptance and enhances popularity, which generates even more feedback, in a continually self-reinforcing loop.[11]

The online advertising market already is characterized by several different types of network effects. By purchasing DoubleClick, Google will acquire data that will contribute to, and exacerbate, network effects. As a result, the Google/DoubleClick combination is likely to "tip" both the search and display markets in Google's favor, and make it more difficult for any other company to challenge the combined firm.

The majority characterizes search and display advertising as complements rather than substitutes.[12] But these two methods of advertising already are closely related in several ways. They are the two primary routes for online advertising, and they compete for advertising dollars. More importantly, both search and display advertising are susceptible to network effects. The second generation of the Internet – sometimes referred to as "Web 2.0" – is characterized by greater interaction and connectedness among Web users.[13] One defining aspect of Web 2.0 is that the most successful companies "have embraced the power of the web to harness collective intelligence."[14] As explained by one of the individuals who coined the Web 2.0 moniker, "Network effects from user contributions are the key to market dominance in the Web 2.0 era."[15] In the online advertising

---

[11]An oft-cited example is the fax machine. One fax machine would have been worthless; but once a critical mass of machines was deployed and users could exchange documents with many other people, the technology became immensely popular. Stock exchanges (such as NASDAQ), computer operating systems (such as Windows), and auction systems (such as eBay) are other classic examples of markets that demonstrate strong network effects.

[12]Majority Statement at 3 ("the advertising space sold by search engines is not a substitute for space sold directly or indirectly by publishers or vice versa."), 7 ("Advertisers purchase different types of ad inventory for different purposes, and one type does not significantly constrain the pricing of another. For instance, advertisers primarily purchase search advertising space to implement direct response ad campaigns, while directly sold ad inventory is generally purchased for brand advertising campaigns.").

[13]For a detailed explanation of the Web 2.0 concept, penned by one of the originators of the term, see Tim O'Reilly, *What is Web 2.0: Design Patterns and Business Models for the Next Generation of Software* (Sept. 30, 2005), *at* http://www.oreilly.com/pub/a/oreilly/tim/news/2005/09/30/what-is-web-20.html.

[14]*Id.*

[15]*Id.*

5

market, the relevant "user contributions" are the data mined from Internet searching and browsing habits.

On the search side, Google is able to charge a premium for search advertising[16] because Google has the highest volume of searches.[17] More searches translate to more incoming data, which enables Google to enhance the quality of the underlying algorithms used to process searches and match them to relevant advertisements. Google's search methodology and advertisement targeting become even better as consumers use Google's search engine more.[18] Improved searches drive still more traffic to the site, which further increases the value of search advertising on Google.[19]

On the display advertising side, DoubleClick has amassed its own storehouse of information about how consumers behave on the Internet, which enables DoubleClick and its customers to make better predictions about where to place advertisements.[20] DoubleClick's customer base comprises

---

[16] According to a July 2007 study of search advertising, during the prior 18 months Google had received 76% of search revenue collected by the top three search engines, against 60% of total ad impressions displayed. In contrast, Yahoo received 18.3% of media spend on search advertising, against 34% of searches. Business Wire, *Google Leads in Search Monetization as Yahoo's Market Share Stabilizes* (July 17, 2007), *at* http://www.businesswire.com/portal/site/google/index.jsp?ndmViewId=news_view&newsId=20070717005817&newsLang=en.

[17] Google is estimated to account for nearly 60% of all Internet search queries in the United States – over six billion each month – more than double the next-largest search property. comScore Press Release, *comScore Releases October U.S. Search Engine Rankings* (Nov. 21, 2007), *available at* http://www.comscore.com/press/release.asp?press=1908 ("Among core search engines in October 2007, Google Sites remained the top search property with more than 6.1 billion core searches conducted, representing a 58.5 percent share of the search market."). In contrast, Yahoo had a 22.9% share during the same time period. *Id.*

[18] One example is Google's ability to detect misspellings and suggest alternatives, based on analyses of common spelling errors among millions of searches.

[19] According to one recent report, of the total market of over 500,000 online advertisers who run search campaigns, approximately 90% do so through the Google search engine, compared to 30% through Yahoo! and 10% through Microsoft's search engine. William Blair & Company, News Report, *William Blair & Company Partners With AdGooroo for Study of Search Engine Advertising Industry* (Aug. 21, 2007), *at* http://www.williamblair.com/Pages/news_story_dept.asp?uid=1248&depID=4.

[20] The parties have represented that under their current contracts, DoubleClick does not own the proprietary business data it collects on behalf of its individual clients. But DoubleClick appears to have access to a wealth of *aggregated* data about user preferences and Internet behavior, based on its cookie-enabled tracking of users as they travel among websites, and would seem to have a strong incentive to use it. Moreover, to the extent DoubleClick's customer contracts allow DoubleClick to use a customer's proprietary data to target ads on that customer's

6

publishers, advertisers, and intermediators who create value for, and extract value from, the DoubleClick tools by engaging in activities that generate data about consumers' preferences and Internet behavior.[21]

### 1. Convergence of Search and Display

The combined Google/DoubleClick will be able to exploit network effects and accelerate a convergence between search and display. Various scenarios for data sharing have been hypothesized,[22] but they all rely on the same conclusion: search information gathered by Google, combined with browsing information gathered by DoubleClick, will create a far richer source of data to enable highly targeted advertising. Type the search term "apple" into the Google search engine, and Google will "know" whether the user is focusing on food (apple recipes) or technology products (Apple computers), depending on which websites the user recently visited (Cooking Light versus MacWorld) as well as what searches she recently conducted (Golden Delicious versus iPod). Subsequent search *and* display advertisements will be targeted to match these revealed preferences.

### 2. Convergence of Premium vs. Remnant Space, and of Direct vs. Intermediated Sales

Network effects resulting from the aggregation of Google and DoubleClick's data, in an environment characterized by sophisticated behavioral targeting, also may blur the distinction

---

behalf, DoubleClick would not necessarily be prevented from using the data for commercial purposes, if it will benefit the customer.

[21]DoubleClick Inc. website, *About Us*, at http://www.doubleclick.com/about/about_us.aspx (DoubleClick "delivers billions of digital communications every day").

[22]Several concerned third parties described the following scenario. Today, DoubleClick places a cookie on a user's computer, which enables DoubleClick to track the user's visits to any website that displays ads served by DoubleClick. Similarly, Google places a cookie on a user's computer to track searches and clicks resulting from searches. Both of these cookies are linked to a computer's Internet Protocol, or IP, address. Some computers with "always on" Internet access keep the same IP address for long periods of time. Other computers change IP addresses periodically.

Post-merger, a user would visit one or more sites displaying DoubleClick ads, and also conduct one or more Google searches, during a time period when the IP address remained the same (a highly likely confluence of events, given each party's reach on the Internet). The merged firm would be able to use the common IP address to link the Google and DoubleClick cookies on that machine, and thereby cross-index that user among both databases – without relying on any proprietary customer data. And once the cookies themselves were linked in the merged firm's dataset, it would not matter if the user's IP address changed in the future.

between "premium" and "remnant" advertising space, and narrow the gap between the value of direct and intermediated sales.

Today, ads sold by publishers directly to advertisers are served in premium space and command the highest prices. Presumably, this is because advertisers place the greatest value on their own strategic assessments regarding the types of consumers who will view an advertisement in a specific location on a specific website, and the value this display opportunity will generate. In contrast, remnant space is perceived as having a lower value because no advertisers have claimed it. This space tends to be filled via third-party intermediation and/or contextual advertising, at much lower prices.

Post-merger, the combined Google/DoubleClick will become a "super-intermediator" with access to unparalleled data sources. In this role, Google/DoubleClick may be able to match up buyers and sellers in ways that more fully maximize the value of all advertising space. As the merged firm's dataset grows, data-driven algorithms may perform at least as well as direct sales – *if not better* – in choosing which advertisements to display to generate the greatest return on investment. If this were to occur, the value of intermediated "remnant" space might approach (or surpass) the value of directly-sold "premium" advertisements, in terms of the ability to place the right message in front of the right Internet users at the right moment.

### 3. Unanswered Questions Regarding Impact of Network Effects

I acknowledge that behavioral targeting may create economic efficiencies that would – in the short run – be attractive to the parties' advertiser and publishing customers (putting aside for a moment the potential impact on consumers on the privacy front). Still, marrying the two datasets raises long-term competition questions that beg further inquiry.

- In a post-merger online advertising market driven by the value of behavioral targeting, will Google/DoubleClick face meaningful competition?

- Will any other firm be able to amass a dataset of the same scope and size?

- Will any other company be able to overcome network effects and offer an equally focused level of behavioral targeting?

- If advertisers and publishers have to channel their online advertising through Google/DoubleClick in order to access the best dataset that supports targeted advertising, will any other firms have the ability or incentive to compete meaningfully in this market?

These questions would be difficult to answer, even with complete information about the parties' intentions. But here, the difficulty is compounded because the parties have made no binding commitments regarding their plans for merging their datasets.

8

### B.     <u>Future Approach to Data Mergers</u>

Throughout the Commission's antitrust investigation of this transaction, I was concerned that the data issues would be relegated to the consumer protection side of the agency, and would not receive adequate attention by antitrust staff. I remain concerned that the Commission's antitrust investigation relied on the parties' representations about what they intend to do with their combined data troves, even though their choices about data integration are as relevant to the antitrust analysis as they are to the consumer protection review. After all, why would Google pay billions of dollars for DoubleClick, in an effort to keep DoubleClick out of the hands of competitors, if Google does not intend to combine the two firms' valuable datasets?

In the future, the Commission likely will issue Second Requests in other merger investigations that implicate combinations of data as well as potentially overlapping products and services. When those deals arise, the Commission should ensure that the combinations of data are included squarely within the scope of Second Requests. In this case, for example, it might have been possible to define a putative relevant product market comprising data that may be useful to advertisers and publishers who wish to engage in behavioral targeting.

The Commission could have continued its investigation of Google's proposed acquisition of DoubleClick, used compulsory process, and conducted a fuller analysis of the parties' post-merger data intentions – especially while the merger remains "on hold" during the review in the European Union. Alternatively, the Commission could have asked the parties to make binding commitments regarding their handling of data, and to memorialize those representations in a consent agreement.[23]

### III.     <u>PRIVACY CONCERNS</u>

Privacy concerns represent the "other side of the coin" of the exact same merger of datasets. The combination of Google and DoubleClick undeniably raises numerous privacy questions – and these questions, too, beg answers.

The parties claim to place a high value on protecting consumer privacy. In various fora, both public and private, senior corporate officials have offered assurances that the combined firm will not use consumer data inappropriately. But charged as I am with protecting the interests of consumers, I am uncomfortable accepting the merging parties' nonbinding representations at face

---

[23] For example, the Commission might have mandated a firewall between the Google and DoubleClick data for some period of time, consistent with the parties' representations that they do not intend to merge the datasets. Such a firewall would need to be carefully crafted to avoid gamesmanship, permit auditing, and the like.

9

value. The truth is, we really do not know what Google/DoubleClick can or will do with its trove of information about consumers' Internet habits. The merger creates a firm with vast knowledge of consumer preferences,[24] subject to very little accountability.

Traditional competition analysis of Google's acquisition of DoubleClick fails to capture the interests of all the relevant parties. Google and DoubleClick's customers are web-based publishers and advertisers who will profit from better-targeted advertising. From the perspective of these customers, the more data the combined firm is able to gather and mine, the better (assuming, as the majority presumably does, that the financial benefits of highly-targeted advertising outweigh any harm caused by reduced competition). But this analysis does not reflect the values of the consumers whose data will be gathered and analyzed. Under the majority's application of Section 7, there is no adequate proxy for the consumers whose privacy is at stake, because consumers have no business relationship with Google or DoubleClick.

I have paid particularly close attention to the privacy debate surrounding this transaction. In addition, I have considered (and continue to consider) various theories that might make privacy "cognizable" under the antitrust laws, and thus would have enabled the Commission to reach the privacy issues as part of its antitrust analysis of the transaction.[25]

But having said that, I agree with the majority that a more comprehensive approach to privacy is preferable. While this transaction sparked great interest in privacy issues and created momentum for a meaningful discussion, it would be short-sighted to focus on the behavior of a single company (in a merger context) when the issue is relevant to so many other firms as well.

---

[24]The privacy discourse is about more than just Personally Identifiable Information, or PII. It also should encompass a wide range of data about consumer behavior on the Internet, including all of the different kinds of data Google collects through its various products and services (such as Google Mail, Google Checkout, and Google Talk). I note, however, that Google may indeed have access to PII, and may be able to use it to derive additional details that could be used for behavioral targeting purposes. To cite just one example (and there may be others): through the popular GoogleMaps application, Google may be able to deduce a user's home address (based either on a user's saved locations, or the frequency of searches for directions from one location). Once an address is identified, it is easy enough to "reverse search" public directories to obtain a name, phone number, property value information, and other pieces of data – all of which could then be tied to specific Google (and, post-merger, DoubleClick) user cookies to enable more refined behavioral targeting.

[25]One could argue, for example, that if network effects lead to a reduction in the number of search competitors, consumers will suffer from a diversity of choice among search engines, which will reduce the incentives of search firms to compete based on privacy protections or related non-price dimensions. *See, e.g.,* Testimony of Peter J. Swire, Submission to the Federal Trade Commission, Town Hall on "Ehavioral Advertising: Tracking, Targeting, and Technology" (Oct. 18, 2007), *available at*
http://www.ftc.gov/os/comments/behavioraladvertising/071018peterswire.pdf.

10

The proposed behavioral advertising principles released by Commission staff are an excellent first step, and I have concurred in the Commission's decision to authorize staff to publish them.[26] In addition, Commissioner Leibowitz's concurring statement[27] nicely frames the privacy issues, and I agree with everything he has so cogently articulated. I write separately to express a few additional thoughts.

### A.   Privacy Matters to Consumers

Some commentators have argued that consumers do not really value privacy, as evidenced by their conduct on the Internet and elsewhere. True, a minority of consumers will share their most intimate details with anyone – on the Internet, on the radio, or on national television. In addition, consumers often receive benefits by sharing their personal information, including free services and access to more desirable information.

But privacy principles should protect the majority of consumers who do care about their privacy, and who would prefer greater transparency about the use of their personal information. It would be disingenuous to claim that consumer privacy is passively slipping away. Rather, it is actively reduced by the choices we make (or do not make) as a society, as we go about "constructing the information economy through the law."[28]

### B.   Privacy Is About More Than Behavioral Advertising

I expect that the proposed behavioral advertising principles will generate a great deal of useful commentary and discussion. Commenters are especially urged to consider the role of behavioral advertising principles within the larger privacy context. For example, the Commission should learn more about the extent to which these principles are consistent with privacy regulations and principles adopted elsewhere in the world. Any final set of principles that emerges must respect the privacy regimes established in other jurisdictions, in order to foster international trust and facilitate global commerce.

Commenters also may wish to discuss the relative merits and drawbacks of a self-regulatory approach, as opposed to a legislative solution. I know that many companies have devoted substantial resources to developing privacy protection and compliance programs. Congress ultimately will need to decide whether a market-oriented solution is workable, given the disconnect

---

[26]FTC News Release, *FTC Staff Proposes Online Behavioral Advertising Privacy Principles* (Dec. 20, 2007), *available at* http://www.ftc.gov/opa/2007/12/principles.shtm.

[27]Google/DoubleClick, F.T.C. File No. 071-0170, Concurring Statement of Commissioner Jon Leibowitz (Dec. 20, 2007), *available at* http://www.ftc.gov/os/caselist/0710170/071220leib.pdf.

[28]Daniel J. Solove, *Identity Theft, Privacy, and the Architecture of Vulnerability*, 54 HASTINGS L.J. 1227, 1241 (2003).

11

between the financial incentives of advertisers and publishers (i.e., to exploit data) and the privacy incentives of some consumers (i.e., to protect data).  Congress also must determine whether comprehensive privacy legislation (including, but not limited to, behavioral advertising) is needed, or whether the existing framework of privacy laws is adequate.

### C.     Privacy Enforcement

In the meantime, the Commission will continue to rely on its traditional Section 5 authority to protect consumer privacy.  Companies are required to uphold their privacy promises, or else they may face charges of deception.[29]

Assuming that Google and DoubleClick are allowed to merge, the combined firm is urged to state clearly and unambiguously what kind of information it intends to gather, how it will collect and use that information, and what choices consumers will be able to exercise.  Consumers deserve a clear explanation from Google/DoubleClick, so they can shape their Internet behavior and determine how much information they are willing to reveal.  Clearly explaining the firm's information practices and the choices available to consumers will demonstrate Google/DoubleClick's good intentions, as well as the company's willingness to be held accountable for its commitments.

## IV.    CONCLUSION

I am convinced that the combination of Google and DoubleClick has the potential to profoundly alter the 21st century Internet-based economy – in ways we can imagine, and in ways we cannot.

I do not doubt that this merger has the potential to create some efficiencies, especially from the perspective of advertisers and publishers.  But it has greater potential to harm competition, and it also threatens privacy.  By closing its investigation without imposing any conditions or other safeguards, the Commission is asking consumers to bear too much of the risk of both types of harm.

The unique confluence of competition and consumer protection issues should have been a call to action for this agency – "the only federal agency with both consumer protection and

---

[29] *See, e.g.*, FTC News Release, *ChoicePoint Settles Data Security Breach Charges; to Pay $10 Million in Civil Penalties, $5 Million for Consumer Redress* (Jan. 26, 2006), *available at* http://www.ftc.gov/opa/2006/01/choicepoint.htm (enforcement case based on failure to abide by stated privacy policies).; FTC News Release, *Guidance Software Inc. Settles FTC Charges; Company Failed to Use Reasonable Security Measures to Protect Consumers' Data* (Nov. 16, 2006), *available at* http://www.ftc.gov/opa/2006/11/guidance.shtm (same).

competition jurisdiction in broad sectors of the economy."[30]  Section 5 of the FTC Act is the cornerstone of the Commission's authority to review a wide range of business practices.  The agency

> embraces its dual, but complementary, missions.  While the FTC's competition and consumer protection missions focus on different types of conduct, they share the same overall goal: that consumers obtain truthful information about products and services that they can then use to make purchase decisions in a competitive marketplace in which their personal information is safeguarded. This purpose has assumed even greater importance in this dynamic, digital, and global marketplace.[31]

With this mission statement as our guidepost, the Commission could have utilized the full scope of its statutory powers to ensure competition was not harmed, while also addressing the privacy issues.

---

[30] FEDERAL TRADE COMM'N, THE FTC IN 2007: A CHAMPION FOR CONSUMERS AND COMPETITION (Apr. 2007), at 1, *available at* http://www.ftc.gov/os/2007/04/ChairmansReport2007.pdf.

[31] *Id.*

13