**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| UNITED STATES, *et al.*,<br><br>　　　　　　　　*Plaintiffs*,<br><br>　　vs.<br><br>GOOGLE LLC,<br><br>　　　　　　　　*Defendant*. | No. 1:23-cv-00108-LMB-JFA |

**GOOGLE LLC'S MOTION *IN LIMINE***
**TO EXCLUDE NON-PARTY LAY OPINIONS REGARDING GOOGLE'S ALLEGED**
**MONOPOLY OR ANTICOMPETITIVE CONDUCT**

REDACTED VERSION

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   BACKGROUND ..................................................................................................... 3

III.  LEGAL STANDARD ........................................................................................... 14

IV.   ARGUMENT ......................................................................................................... 14

      A.    The Court should exclude lay testimony concerning market definition, market power, and competitive effects because it is improper expert opinion testimony offered by lay witnesses. ........................................................ 14

      B.    The Court should exclude lay witness opinion testimony because it is speculative and lacking in foundation................................................... 18

      C.    The Court should exclude improper lay opinion testimony to the extent it relies on hearsay................................................................................. 19

CONCLUSION.................................................................................................................... 20

REDACTED VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Turbine Tech., Inc. v. Atlas Copco AB*,
410 F.3d 701 (Fed. Cir. 2005)...............................................................16

*Bank of China, New York Branch v. NBM LLC*,
359 F.3d 171, 181-82 (2d Cir. 2004) ...............................................16, 17

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977).................................................................................1

*Certain Underwriters at Lloyd's, London* v. *Sinkovich*,
232 F.3d 200 (4th Cir. 2000) ...............................................2, 14, 15, 19

*United States v. Conn*,
297 F.3d 548 (7th Cir. 2002) ................................................................17

*Daedalus Blue, LLC* v. *Microstrategy Inc.*,
2023 WL 5337826 (E.D. Va. Aug. 18, 2023)........................................18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)..............................................................................14

*Fed. Trade Comm'n* v. *Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) ......................................................1, 16

*Flatiron-Lane* v. *Case Atl. Co.*,
121 F. Supp. 3d 515 (M.D.N.C. 2015) ..................................................19

*Floyd v. City of Spartanburg S.C.*,
2023 WL 7385716 (D.S.C. Aug. 29, 2023) ...........................................14

*Kauffman v. Park Place Hosp. Grp.*,
468 F. App'x 220 (4th Cir. 2012) .........................................................13

*King v. Rumsfeld*,
328 F.3d 145 (4th Cir. 2003) ................................................................14

*Moke Am. LLC v. Am. Custom Golf Cars, Inc.*,
2023 WL 3686963 (E.D. Va. Jan. 11, 2023) .........................................13

*Nat'l R.R. Passenger Corp. v. Ry. Express, LLC*,
268 F.R.D. 211 (D. Md. 2010)...............................................................15

REDACTED VERSION

*United States. v. Perkins*,
  470 F.3d 150 (4th Cir. 2006) ......................................................15, 16

*Prieto v. Malgor*,
  361 F.3d 1313 (11th Cir. 2004) ...........................................................14

*United States v. Turner*,
  781 F.3d 374 (8th Cir. 2015) ...............................................................17

**Other Authorities**

Fed. R. Civ. P. 26 .............................................................................14

Fed. R. Evid. 701(a), (c) ...................................................................14

Fed. R. Evid. 702(b)-(c) ...................................................................14

Federal Rule of Evidence 602 ............................................................1

Federal Rule of Evidence 701 .....................................................*passim*

Federal Rule of Evidence 703 ..........................................................19

Federal Rule of Evidence 801 ............................................................2

Federal Rule of Evidence 802 ......................................................2, 19

Federal Rules of Civil Procedure Rule 26(a)(3) .................................3

Local Civil Rule 30 ...........................................................................3

Rule 602 .....................................................................................2, 18

Rule 702 .........................................................................2, 14, 15, 19

Rules 602, 701, and 702.....................................................................2

Rules 701 and 702............................................................................15

iii

## I.      INTRODUCTION

The antitrust laws "were enacted for the protection of competition, not competitors." *Brunswick Corp*. v. *Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 488 (1977).[1]  Yet Plaintiffs have built this case in large part from the perspective of Google's competitors, eliciting improper and unsupported opinion testimony for use at trial.

From depositions of lay witnesses of Google's ad tech competitors, Plaintiffs have designated testimony that Google was "dominant."  Ex. M, Adam Soroca 30(b)(6) (Magnite) Dep Tr. (opining on Google's dominance more than a dozen times).  Plaintiffs have also designated lay opinions about Google's market share from witnesses who had done no economic analysis or established any qualifications for doing so, and whether Google was a "monopolist"–a "term of art under federal law with a precise economic meaning." *Fed. Trade Comm'n* v. *Facebook, Inc*., 560 F. Supp. 3d 1, 20 (D.D.C. 2021).  Plaintiffs will have ample opportunity to present arguments about Google's market share and whether it has monopoly power, but it must do so through valid expert testimony.

Plaintiffs should be prohibited from eliciting this lay witness testimony at trial—either through live witnesses or deposition designations—because none of these third-party competitor witnesses has the proper foundation of knowledge, expert qualifications, or done the required economic analysis to opine as to whether Google is a monopolist whose conduct harmed competition.  Such  testimony constitutes (i) improper lay opinion testimony under Federal Rule of Evidence 701 that is properly the province of experts; (ii) testimony about which the witness lacks personal knowledge under Federal Rule of Evidence 602, and (iii) hearsay testimony that

---

[1] With respect to quoted material, unless otherwise indicated, all brackets, ellipses, footnote call numbers, internal quotations, and citations have been omitted for readability.  All emphasis is added unless otherwise indicated.

REDACTED VERSION

cannot be offered by a lay witness under Federal Rule of Evidence 801.

*First*, this testimony is inadmissible under Rule 701 because lay witnesses may testify only about opinions that are "rationally based on the witness's perception," and "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. Courts exclude lay witness testimony that is not rationally based on firsthand knowledge or observation, but is ill-disguised expert opinion. *E.g.*, *Certain Underwriters at Lloyd's, London* v. *Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000). The experience of third parties in the industry does not render them competent to testify as to conclusions such as whether a firm is dominant, a monopoly, anticompetitive or causing anticompetitive effects. Because the proffered lay opinion testimony is properly the province of expert testimony and not lay testimony, Plaintiffs should not be permitted to evade the expert requirements of Rule 702 by offering expert testimony through lay witnesses.

*Second*, the improper lay opinions should be excluded as speculative and lacking in proper foundation under Rule 602. Plaintiffs have elicited and designated testimony that asks lay witnesses to engage in speculation or respond to hypotheticals about which they lack personal knowledge, sometimes offering their "best guess" or what the witness "would presume."

*Third*, even if this testimony were not prohibited by Rules 602, 701, and 702, the Court should still exclude it because these opinions are derived from out-of-court statements and are being proffered for the truth of the matter disclosed. Pursuant to Federal Rule of Evidence 802, lay witnesses may not rely on hearsay. *See* Fed. R. Evid. 802; *see also* Fed. R. Evid. 801.

Defendant brings this motion understanding that the trial here will be before the Court, which can give no weight to loose references to terms like monopolist or dominance. Google brings this motion because Plaintiffs' trial plan includes calling a large number of witnesses to

REDACTED VERSION

provide inadmissible testimony, wasting the time of the Court and the parties that should be spent on the issues and proper evidence in the case.

Google also recognizes that the Court cannot make across-the-board rulings concerning testimony it has not heard.  The motion therefore sets forth exemplars of the objected-to testimony and a proposed order asking the Court to rule on the examples, so that the parties may be guided by that ruling with respect to third-party testimony.

## II.    BACKGROUND

Plaintiffs have designated improper lay opinion testimony from at least 12 third parties about whether Google is a monopolist, what Google's share is of a given market (and the precise contours of that market), and whether Google's conduct is anticompetitive.[2]  A sampling of this improper testimony—all of which Plaintiffs designated—follows.[3]

**AppNexus (O'Kelley)**.  Plaintiffs designated testimony from Brian O'Kelley, the founder of AppNexus, a company that provided "the cloud computing layer that would facilitate realtime bidding" for ad auctions, including tools for ad sellers (publishers), ad buyers (advertisers), and an exchange.  Ex. J, Brian O'Kelley 30(b)(1) (AppNexus) Dep. Tr. at 40:3-11, 68:11-69:9; *see id.* at 207:7-20, 209:8-10 (discussing AT&T's acquisition of AppNexus and later acquisition by Microsoft under the name "Xandr").

---

[2] Pursuant to the Court's Order Modifying the Pretrial Schedule entered on June 24, 2024, ECF No. 871, Rule 26(a)(3) of the Federal Rules of Civil Procedure, and Local Civil Rule 30, Google has filed a full set of objections to improper lay opinion testimony as part of its pre-trial filings using the objection codes 602, 701, 702, and 802. *See* ECF Nos. 919, 967, 1088.  This motion in limine identifies a subset of that objectionable testimony to illustrate the issue and guide the court's resolution of the objections.  It should not be construed as a waiver of the full set of improper lay opinion objections lodged in those filings.

[3] A summary of all the designations described in this brief, together with the bases for exclusion, are set forth in Appendix A to this brief.

REDACTED VERSION

O'Kelley opined that the "practices of DFP" including "last look" "dramatically increased" AdX's market share, yet also acknowledged, "I don't know exactly how it impacted market share because I don't have all the numbers. But in terms of their ability to out-price competitors, it had a huge impact . . . ." *Id.* at 114:3-11; 125:13-126:19.

On other occasions, O'Kelley was asked whether certain conduct "increase[d] the dominance of the DFP ad server?" *Id*. at 74:17-19 (discussing the DoubleClick acquisition). To this, O'Kelley responded with generally improper opinion testimony that his "perspective was—is that DFP was already pretty dominant . . . It wasn't just the best technology—it wasn't the best ad server. But every other ad server company either went out of business or was sold for scrap. They just destroyed all competition for that ad server." *Id.* at 74:17-75:21. Elsewhere, O'Kelley opined that Google had "unique demand" that "was tied to the Google search business" and "there were no other way to get those ad dollars, except from Google." *Id.* at 94:05-96:14.  O'Kelley provided no basis for this testimony, such as firsthand knowledge of his own unsuccessful attempts to reach these advertisers or some personal investigation into whether all the advertisers who advertised on Google Search did not use any other non-Google buying tools.

**Equativ (Creput)**.  Plaintiffs designated testimony from Arnaud Creput, Equativ's CEO.  Equativ is a competitor "ad tech company," operating both "an ad server and an SSP." Ex. D, Arnaud Creput 30(b)(1) (Equativ) Dep. Tr. at 8:16-9:2.  In several instances, Plaintiffs ask Creput to opine on Google's market share.  For example, Plaintiffs asked Creput about his "understanding of the market share of Google's DFP as a publisher ad server among media publishers." *Id.* at 23:22-24:3.  Creput opines that "Google's share is estimated at 90 percent" without any indication of the basis for his estimate.  *Id.*  Similarly, Plaintiffs asked Creput to

REDACTED VERSION

"characterize Google DFP's position in the publisher ad server business." *Id.* at 24:4-9. Creput

opines that Google's position is "dominating and actually monopolistic." *Id.* In another

instance, Plaintiffs asked Creput to opine whether Google's manner of competition is "fair." *Id.*

at 115:7-13. Specifically, Plaintiffs asked, "do you think Google competes in a fair and

transparent manner in the display advertising technology business today?" *Id.* Creput opines,

"I think everything I said so far shows that I don't believe that at all." *Id.*

**Index Exchange (Casale).** Plaintiffs designated testimony from Andrew Casale, the

President and CEO of Index Exchange, which is an ad exchange whose customers are

publishers. Ex. C, Andrew Casale 30(b)(6) (Index Exchange) Dep. Tr. at 12:10-12; 14:9-23.

Like other third parties, Casale testified as to "the size of Google display network's market

share" without any particular data but instead opined, "I would assume significant, but there's

also no normal tracking of this, so I can't comment." *Id.* at 115:18-116:5. Likewise, he opined

that "the market share of folks like Magnite, PubMatic, and Index" are "combined . . . still quite

a bit smaller" again without data or a precise market definition. *Id.* at 147:5-15.

Elsewhere, Plaintiffs designated testimony from Casale engaging in speculation about

Google's motives, *id.* at 197:8-18 (Q: "What is your understanding of why Google created the

Open Bidding product?" A: "We assumed it was an attempt at creating a header bidding

killer."); testimony that relies on hearsay, *id.* at 158:16-24 (Q: "Have you ever spoken to

publishers who expressed any concern about Google's dominance across the ad tech stack?" A:

"That's a pretty common position that a lot of publishers have."); and testimony about how

certain ad space buyers operate without any foundation as to personal knowledge, *id.* at 132:17-

133:8 (Q: "In your opinion, does GDN represent a unique source of demand in the market?" A:

REDACTED VERSION

"Yes. . . . As far as I know, GDN is comprised of either of hundreds of thousands or millions of SMBs [small and medium-sized businesses], which is a very, very unique source of demand.").

**Kargo (Shaugnessy)**.  Plaintiffs designated testimony from Michael Shaugnessy, Chief Operating Officer at Kargo, a company that helps publishers sell digital ad space primarily through direct deals between buyers and sellers, as well as through its "supply-side platform" (SSP)  or "exchange" offering.  Ex. L, Michael Shaugnessy 30(b)(1) (Kargo) Dep. Tr. 8:15-24, 11:18-25, 12:25-13:3.  Plaintiffs asked Shaugnessy to opine that Google has the "dominant publisher ad server on the market," *id.* at 35:16-19, and the "largest SSP for Open Auction display advertising transaction," *id.* at 14:23-15:2, without having him offer any explanation about how he defines the precise boundaries of the market or what substitutes might be available.  Shaugnessy also opines on how particular product designs might affect competition based on his general assumptions about the market or how he believes other publishers might operate. *E.g.*, *id.* at 70:19-71:1-4 (Q: "So how, if at all, does the link between GDN, AdX, and DFP affect competition between publisher ad servers?" A: "It inhibits meaningful competition . . . .  From my understanding, the systems operate best together."); *id.* at 50:9-25 ("Publishers use Google Ad Manager and would not switch, as far as I know, unless there was an opportunity to access this type of demand [from AdX].").

**Kevel (Avery)**.  Plaintiffs designate testimony from James Avery, the founder and CEO of Kevel, a company which sells application programming interfaces to ad space sellers so they can build their own ad platforms.  Ex. A, James Avery 30(b)(1) (Kevel) Dep Tr. at 10:21-25.

Plaintiffs asked Avery to opine on his views about competition in the market generally, asking "what *opinion*, if any" he had on "the effects on competition or other publisher ad servers that result from the links between [Google's] DFP, AdX and AdWords." *Id.* at 96:17-

97:6 (emphasis added). Avery responded, "I think it makes it almost impossible for publisher ad servers to compete against GAM in the market." *Id.* Similarly, Plaintiffs invited Avery to opine several times on Google's market share. *E.g., id.* at 28: 11-13, 43:13-20, 50:25-51:13. For instance, Avery opined that Google's position in the publisher ad server business is "dominant." *Id.* at 28: 11-13. Elsewhere, Plaintiffs asked Avery about his views that Google's publisher ad server is a "monopoly in the publisher ad server market." *Id.* 43:13-20. Avery responded by stating that "over 90 percent or more of publishers are using" Google's publisher ad server. *Id.* Plaintiffs also asked Avery how Google's ad exchange AdX compares "to other ad exchanges – like Index, Pubmatic, or AppNexus – for programmatic display advertising," "[i]n terms of size," to which Avery responded, "I believe it is the largest." *Id.* at 50:25-51:13. When asked for the basis for this assertion, Avery admitted it was "[b]ased on the publishers that we talked to." *Id.*

**Magnite (Soroca)**. Plaintiffs designate testimony from Adam Soroca, the Chief Product Officer for Magnite, which operates a "sell-side advertising platform." Ex. M, Adam Soroca 30(b)(6) (Magnite) Dep. Tr. at 11:20-12:5; 121:17-122-13.

Throughout Soroca's deposition, Plaintiffs repeatedly elicited opinion testimony about what he believed Google's market share was in various alleged product markets or how he would characterize Google's position in the market. *E.g.*, *id.* at 18:9-12 (Q: "Mr. Soroca, which company has the largest display publisher ad server?" A: "I believe that to be Google."); *id.* at 19:1-6 ("position in the display publisher ad server business" is "dominant"); *id.* at 20:7-11 (same as to "ad exchange business"); *id.* 21:5-9 (similar); *id.* at 23:14-18 (same as to "sell side in the display advertising market"); *id.* at 25:18-21 (same as to "Google demand network's position"); *id.* at 195:14-19 (similar, opining across markets).

REDACTED VERSION

When asked what basis he had for these opinions, Soroca offered (without detail) his own market share calculations, *id.* at 19:9-12 ("I believe them to have market share in the 95 to 97 percent range"); hearsay, *id.* 20:12-16 ("As we talk with our publishers and our advertisers, they signal that this is the case."), *id.* at 25:22-26:4 (reporting what "publishers tell" him); and general industry chatter, *id.* at 27:8-12 (DV360 is "known in the industry to be the largest").

**Microsoft (John)**.  Plaintiffs designate testimony from Benneaser John, VP of Engineering at Microsoft.  Ex. H, Ben John 30(b)(6) (Microsoft) Dep. Tr. at 7:21-8:16.  John joined Microsoft as part of its acquisition of Xandr (formerly known as "AppNexus"), having served as Chief Technology Office at both predecessor companies.  *Id.*  As noted above, *see supra* at 3, AppNexus provides a set of ad tech tools that operate across the full technology stack for ad buyers and sellers.

As with other rivals, Plaintiffs elicit improper opinion testimony from John about how he perceives Google's position in the market without any foundation for how John would have personal knowledge about Google's user base or what the limits of any particular market is in John's view.  *Id.* at 183:24-184:5 (Google is "the leading market player" in the "publisher ad server business"); *id.* at 194:25-195:7 (stating that the Google Display Network, "Because of the user volume and access and the market penetration with Google's—properties and the large scale . . . it's pretty big.").

Plaintiffs also elicited opinion testimony about why John believes Google is able to outcompete rivals.  John asserted Google was "able to maintain its position as the largest display SSP" because "the customers that Google ad server and AdX had access . . . [to] are sticky."  *Id.* at 238:13-239:3.  John also opines that Google has remained larger than Microsoft, even though "Xandr is doing all that it can to compete with Google," because of "AdX

REDACTED VERSION

demand." *Id.* at 243:3-19; *see id.* ("that publishers can monetize in place of Google is the reason consistently the publishers are leveraging Google's product").  Both opinions make assumptions about customer behavior—that publishers stay with Google solely for access to AdX demand (are "sticky") and that they would not move elsewhere for a better product offering—for which John lacks personal knowledge and Plaintiffs lay no foundation.

John also provides more general opinions on how certain product design might affect competition in the marketplace.  *E.g.*, *id.* at 184:17-185:4 (opining the impact "on competition from the fact that Google demand is not fully available to publishers, unless the publishers use DFP" is that "there will not be any other ad server other than Google"); *id.* 204:3-14 (opining that "Google's acquisition of DoubleClick" means "that publishers are not able to migrate and other players are not able to migrate publishers to other ad servers, there is no level field on playing competition").  As with other rivals, Plaintiffs laid no foundation for these broad conjectures about competition, basing some on hearsay.  *Id.* at 186:3-13 (Q: "Is Google's publisher ad server's success due to Google competing fairly on the merits and having the best product?"  A: "*Based on what I hear* and see the documentation, Google doesn't have the best product. . . . But as I said, product is not the only reason customers or publishers stay with or work with Google ad server.  It's the demand and stickiness.").

**OpenX (Gentry)**.  Plaintiffs designated testimony from John Gentry, CEO of OpenX, a "global ad exchange."  Ex. F, John Gentry 30(b)(6) (OpenX) Dep. Tr. at 11:6-12.  Plaintiffs asked Gentry to opine on "AdX's position in the display exchange business," which Gentry described as "dominant."  *Id.* at 40:13-16.  Similarly, Plaintiffs asked Gentry to "characterize Google's position in the display publisher ad server business."  *Id.* at 17:16-21.  Again, Gentry opined that Google's position is "dominant" with a "90 percent-plus share."  *Id.*  Separately,

REDACTED VERSION

Plaintiffs asked Gentry to opine about the experiences of a publisher, often eliciting a response premised on hearsay.  *E.g.*, *id.* at 18:8-19; 30:15-23.  For instance, Plaintiffs asked Gentry "why would a publisher want to manage their price floors to have less revenue from Google and more revenue from other exchanges?"  *Id.* at 30:15-23.  Gentry opines, "most publishers would express to me that they were concerned about the reliance on Google revenue and the significant amount of Google – significant percentage of revenue that Google represented of their total."  *Id.*

**The Trade Desk (Dederick)**.  Plaintiffs elicited inadmissible lay opinion testimony from The Trade Desk's 30(b)(6) representative, John Dederick.  The Trade Desk is an "ad buying platform" that enables digital ad space buyers to execute "digital advertising campaigns."  Ex. E, John Dederick 30(b)(6) (The Trade Desk) Dep. Tr. at 13:5-21.  Dederick served as "Chief Client Officer and EVP," *id.* at 8:2-5, and testified that although his "███████ ████████████████████████," *id.* at 73:15-24, he is "not responsible for most of our individual client conversations," because that "wouldn't have been [his] role," *id.* at 94:16-95:12.  He contrasted The Trade Desk, which he referred to as "a buy-side only representative," *id.* at 90:13-17, and a "buy-side only platform," *id.* at 90:20-91:9, with the "sell-side of our industry," which he stated includes "companies like SSPs[4] and publisher ad servers."  *Id.* at 91:10-17.  Dederick testified The Trade Desk's "most intense competition has been and continues to be with Google's demand side platform," which is not in any market defined by Plaintiffs.  *Id.* at 24:18-25:5.

---

[4] "An ad exchange" is "sometimes called a supply-side platform or SSP."  Am. Compl. ¶ 46, ECF No. 18.

REDACTED VERSION

Although Dederick's own experiences were exclusively in supporting ad space buyers—not ad space sellers—DOJ solicited extensive opinion testimony about general marketplace dynamics across the ad tech industry, including about the ad space seller side of the business. Dederick opined, for instance, that Google's publisher ad server "is far and away the dominant publisher ad server." *Id.* at 153:23-154:2. When asked why he said that, Dederick did not indicate any data source or basis for personal knowledge but instead opined on his general understanding of the evolution of Google's advertising business. *Id.* at 154:3-155:14. Dederick similarly opined that this history enabled Google "to set the rules for all of the auctions." *Id.* at 205:15-206:24. Plaintiffs also invited Dederick to opine on whether "Google's position in the publisher ad server business for Display" was "good for advertisers, bad for advertisers or how do you see it?" *Id.* at 206:25-207:4. Dederick responded that "having one party dominate all of publisher ad serving is really terrible for advertisers" because "it limits their ability to get competitive yield optimization from the publishers, it limits their ability to have a fair chance at buying the most cost effective or efficient, it eliminates the possibility for a more cost efficient supply chain . . ." *Id.* at 207:7-24. Confirming this answer was not based on personal knowledge but instead specialized knowledge and hearsay, Dederick explained: "I base that answer on my knowledge of how publisher ad servers interact with ad exchanges and DSPs and, you know, 11 years of representing buyers who have spoken about the consequences of what that means for advertisers.'" *Id.* at 207:25-208:8.

Even on the ad buyer side of the business, Dederick's testimony veered into improper opinion. For example, when Plaintiffs asked Dederick why he "describe[d] AdX, Google's AdX as dominant," Dederick responded that it was because AdX has "the largest pool of inventory that we look at programmatically, so any DSP has to buy AdX in order to be competitive." *Id.*

at 162:7-22.  Dederick's answer was premised on assumptions about how advertisers operate without any indication of personal knowledge or even data substantiating his view of Google's inventory compared to other large publishers (for instance the numerous popular social media sites, including Facebook).  Likewise, Dederick was invited to opine on the effect that Google's "acquisition of Admeld [had] on Google's position in the ad exchange market," to which he offered a lengthy account of how he understood Google's product offerings evolved.  *Id.* at 215:15-217:1.  None of this was based on direct knowledge but instead amounted to general opinion testimony, which is reserved for experts based on their skill and training.

**NewsCorp (Minkin)**.  As with rivals, Plaintiffs also elicited lay opinion testimony from several large publishers.  This includes testimony from David Minkin, who oversees the sale of digital advertising at News Corp, a company that includes publications such as *The Wall Street Journal*, *Market Watch*, and *Barrons*.  Ex. I, David Minkin 30(b)(6) (NewsCorp) Dep. Tr. at 13:8-10, 13:14-18, 14:4-10.  Here, too, Plaintiffs elicited testimony that "the position of AdX as compared to other ad exchanges" was "[d]ominant," *id.* at 199:10-20, and that "Google's publisher ad server's position" was also "dominant," *id.* at 189:19-190:4.  Despite making a marketwide statement, Minkin's based his testimony on his "own understanding of the industry," "common knowledge", and News Corp's "own reports on programmatic revenue." *Id.* at 198:23-199:2; 199:15-20.

**New York Times (Glogovsky)**.  Plaintiffs also designated improper opinion testimony from James Glogovsky, Vice President of Revenue and Operations at *The New York Times*, another large publisher.  Ex. G, James Glogovsky 30(b)(1) & 30(b)(6) (*The New York Times*) Dep Tr. at 14:8-14.  For instance, Plaintiffs ask Glogovsky to opine if "it could be better for competition if AdX were available separately from DFP," to which Glogovsky responded,

REDACTED VERSION

"assuming that there were available competitors of potential—or of the necessary size to compete and fill the vacant inventory, it would be potentially beneficial in this hypothetical scenario." *Id.* at 283:16-284:2.

**Vox (Pauley)**.  Plaintiffs designated testimony from Ryan Pauley, President of Revenue and Growth at Vox Media. Vox 30(b)(1) & 30(b)(6) (Pauley) Dep Tr. at 7:4-6.  Vox is a publisher and ad tech competitor.  The company sells ad inventory on its digital properties, and sells its own proprietary ad tech tools, including an ad network and an SSP, under the brand name "Concert." *Id.* at 71:23-72:17; 79:19-80:7; 127:20-128:18.

Plaintiffs asked Pauley to opine on the state of competition in the industry.  For instance, Plaintiffs asked, "do you feel there is or is not a sufficient level of competition for Google Ad Manager as a publisher ad server today?" to which Pauley opines, "In my assessment, there is not a significant amount of competition in that market." *Id.* at 41:25-42:9.  Plaintiffs also asked Pauley to "characterize the level of competition" AdX "faces in the exchange business." *Id.* at 15:20-22.  Pauley opined, "I don't view there to be much competition at the scale that AdX is operating at for our business." *Id.* at 15:25-16:3.  Similarly, Plaintiffs ask Pauley "what impact, if any," do Google's Unified Pricing Rules "have on the potential for there to be more competition for AdX?" *Id.* at 29:13-19.  In response, Pauley opined, "[i]t seemed to limit competition for AdX." *Id.*  Elsewhere, Plaintiffs elicited testimony from Pauley on various hypotheticals, including, "if competition for AdX were to increase, what impact, if any, could that have on AdX's take rates." *Id.* at 54:9-11.  Pauley responded, "I think, presumably and speculatively, it could lower the take rates of AdX and increase the revenue to a publisher like Vox Media." *Id.* at 54:14-17.

REDACTED VERSION

III.   **LEGAL STANDARD**

Courts have broad discretion to resolve evidentiary issues raised in motions *in limine*. *Kauffman v. Park Place Hosp. Grp.*, 468 F. App'x 220, 222 (4th Cir. 2012).  In jury trials and bench trials alike, courts grant motions *in limine* to exclude irrelevant evidence and eliminate unnecessary argument or delay to streamline a trial.  *See, e.g.*, *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, 2023 WL 3686963, at *1, 5 (E.D. Va. Jan. 11, 2023); *Floyd v. City of Spartanburg S.C.*, 2023 WL 7385716, at *11 (D.S.C. Aug. 29, 2023).

IV.   **ARGUMENT**

A.   **The Court should exclude lay testimony concerning market definition, market power, and competitive effects because it is improper expert opinion testimony offered by lay witnesses.**

Federal Rule of Evidence 701 requires that lay witness opinion testimony be  "limited to one that is" both "rationally based on the witness's perception" and "not based on scientific, technical, or other specialized knowledge."  Fed. R. Evid. 701(a), (c).  Rule 701 therefore "generally does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000). Instead, a lay witness may only "offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived." *King v. Rumsfeld*, 328 F.3d 145, 157 (4th Cir. 2003) (Gregory, J., concurring in part and dissenting in part) (citations omitted).

Federal Rule of Evidence 702, in turn, sets forth the requirements for admissible expert opinion testimony:  a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that," among other things, "it is more likely than not that . . . the testimony is based on sufficient facts or data," and "is the product of reliable principles or

14

REDACTED VERSION

methods." Fed. R. Evid. 702(b)-(c); *see* Fed. R. Civ. P. 26 (requiring disclosure of a written report containing "a complete statement of all opinions to be expressed and the basis and reasons for them").  These disclosure requirements enable the court to "ensure that" expert opinion testimony "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *see also Prieto v. Malgor*, 361 F.3d 1313, 1318-19 (11th Cir. 2004) (holding that a police officer should have produced an expert report before testifying on the appropriateness of level of force used by officers); *Nat'l R.R. Passenger Corp. v. Ry. Express, LLC*, 268 F.R.D. 211, 217 (D. Md. 2010) (requiring production of expert reports for railroad's employees who would testify about how real estate and train movements would be affected by potential resolution of case).

The Fourth Circuit, and federal courts around the country, apply Rules 701 and 702 to prohibit lay witnesses from offering testimony that is the proper province of an expert. In *Sinkovich*, for example, the Fourth Circuit held that the district court erred in admitting lay testimony at a bench trial under Rule 701 when the testimony was based on the witness's investigation and analysis of the accident at issue (expert opinion under Rule 702) rather than on "first-hand knowledge of the accident . . . based on his perceptions." 232 F.3d at 204; *see also, e.g.*, *United States. v. Perkins*, 470 F.3d 150, 155-56 (4th Cir. 2006) (affirming exclusion of officer testimony about "reasonableness" of use of force where officers did not witness the use because "lay opinion testimony *must* be based on personal knowledge") (emphasis in original).

Non-parties' lay opinion testimony about Google's alleged "dominant" position, whether it is a "monopoly," its market share, conclusory views of the relevant antitrust markets constructed for this litigation, and speculative opinions about harm to competition all trespass the Federal Rules' careful separation between lay and expert witness testimony.

15

REDACTED VERSION

Each of these topics requires evidence based on "scientific, technical, or other specialized knowledge," which must be supported by a properly qualified expert under Rule 702, not a lay witness's opinion. Fed. R. Evid. 701; *see also* Fed. R. Evid. 701 advisory committee's note to 2000 amendment ("the distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." (internal quotation marks and citation omitted)).   For example, whether Google has monopoly power is a technical question that depends significantly on the boundaries of the relevant market, whether there are viable substitutes for Google's offerings, and precise calculations based on verifiable data. *See Facebook,* 560 F. Supp. 3d at 20 (noting "monopoly power" is a "term of art" and noting the FTC could not satisfy its pleading burden by "merely alleg[ing] that a defendant firm has somewhere over 60% share of an unusual, nonintuitive product market — the confines of which are only somewhat fleshed out and the players within which remain almost entirely unspecified").

The fact that a witness may have some relevant industry background about the topic at hand does not permit Plaintiffs to admit "expert testimony dressed in lay witness clothing." *Perkins*, 470 F.3d at 156.   For example, in *Air Turbine Tech., Inc. v. Atlas Copco AB*, 410 F.3d 701, 714 (Fed. Cir. 2005), the court affirmed exclusion of the testimony of a lay witness—the co-inventor of a patent—about his observations regarding the mechanical functions of another product that may have infringed that patent.   Likewise, in *Bank of China, New York Branch v. NBM LLC*, the court reversed the district court's admission of lay witness testimony from a bank employee "regarding typical international banking transactions or definitions of banking terms, and any conclusions that he made" to the extent it "reflected specialized knowledge he has

16

REDACTED VERSION

because of his extensive experience in international banking" rather than "based on his perceptions." 359 F.3d 171, 181-82 (2d Cir. 2004).

The testimony Plaintiffs seek to offer from non-parties is just like that which was held improper in these and other cases. For example, Plaintiffs designate testimony from NewsCorp's corporate representative opining that Google's ad server and ad exchange had a "dominant" position in the market based on NewsCorp's own revenue reports (which would not reveal Google's position in the market for all publishers) and the representative's "own understanding of the industry and the fact that I've been in it for 24 years." Ex. I at 199:15-20; *see id.* at 188:19-190:4. Likewise, Plaintiffs designate testimony from The Trade Desk, a rival of Google's for ad buying tools, opining that "having one party dominate all of publisher ad serving is really terrible for advertisers," Ex. E at 207:7-24, not on the basis of personal knowledge but rather a general understanding grounded in claimed expertise from years of working in the industry and otherwise inadmissible hearsay, *id*. at 207:25-208:8. ("I base that answer on my knowledge of how publisher ad servers interact with ad exchanges and DSPs and, you know, 11 years of representing buyers who have spoken about the consequences of what that means for advertisers.").

It makes no difference that third parties may profess to couch their opinions in many years or extensive experience in the industry. "[L]ay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *United States v. Turner*, 781 F.3d 374, 388 (8th Cir. 2015) (internal quotation marks and citation omitted). Where a witness's testimony is "not based only on his observations," but also on "accumulated expertise obtained through experience and training," it does not meet the requirements of Rule 701. *United States v. Conn*, 297 F.3d 548, 554 (7th Cir.

2002); *id.* at 554-55 (concluding that the testimony offered by an AFT agent regarding the defendant's firearms collection should have been excluded under Rule 701 because the agent was "assisting the jury by applying his years of ATF experience to give the jurors a better understanding of the nature of Mr. Conn's firearms stash"); *see also Bank of China*, 359 F.3d at 181-82 (Where a lay witness has "specialized knowledge" acquired through "extensive experience" in a particular field, and relies on that knowledge rather than his immediate observations of the case, "admission pursuant to Rule 701 [is] error.").

### B. The Court should exclude lay witness opinion testimony because it is speculative and lacking in foundation.

Federal Rule of Evidence 602 provides "a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602; *see Daedalus Blue, LLC* v. *Microstrategy Inc.*, 2023 WL 5337826, at *5-6 (E.D. Va. Aug. 18, 2023) (excluding lay testimony from an employee at defendant's firm offering opinion about how technical code compares in a patent infringement suit where employee did not work on the code at issue because he lacked the personal knowledge required by Rule 602).

In several instances, Plaintiffs directly invited lay witnesses to speculate outside their personal knowledge. *E.g.*, Ex. G at 174:15-24. (Q: "*What's your best estimate*, based on your experience, for whether Google's DSP either does or does not provide unique demand for open auction specifically for The New York Times?" A: "*My best guess* is that Google's DSP has unique demand and transacts on The New York Times." (emphasis added)); Ex. B, Gopal Bhatia 30(b)(1) (NBC Universal + Comcast) Dep. Tr. at 90:23-91:3 (Q: "Was there a need for more competition in the display advertising marketplace?" A: "*I believe most players believed so*, yes." (emphasis added)).  More broadly, Plaintiffs asked rivals on numerous occasions to opine about

REDACTED VERSION

how ad buyers and sellers make decisions even though they had no personal knowledge about those decisions.  For example, Plaintiffs designated testimony from Microsoft opining that Google's publisher customers are "sticky" and remain with Google solely because of "AdX demand," despite having no personal knowledge of how those customers actually evaluate which ad tech tool to use. Ex. H at 238:13-239:3, 243:3-19.

Elsewhere, Plaintiffs elicited improper opinion not based on personal knowledge by posing hypotheticals that asked Google's competitors to speculate about how altering certain market dynamics would affect competition.  *E.g.*, Ex. K at 120:6-14 (Q: "Would more competition in – or what impact, if any, would more competition in the publisher ad server business and the scaled SSP business have on innovation?" A: "Speculatively, it would improve the innovation in those markets, I would presume."); Ex. F at 32:19-22 (Q: "Shifting transactions from AdX to other exchanges could potentially make the exchange market more competitive. Is that fair?" A: "Yes.").  All of this testimony should be excluded because lay witness cannot "answer hypothetical questions." *Sinkovich*, 232 F.3d at 203; *see Flatiron-Lane* v. *Case Atl. Co.*, 121 F. Supp. 3d 515, 543 (M.D.N.C. 2015) ("Moreover, when a witness gives his testimony in response to a hypothetical question, this indicates that he is giving an expert opinion within Rule 702.").

Because none of this testimony is within the witnesses' personal knowledge, it should be excluded as lacking foundation and speculative.

**C.    The Court should exclude improper lay opinion testimony to the extent it relies on hearsay.**

Federal Rule of Evidence 802 provides that hearsay is generally inadmissible. *See* Fed. R. Evid. 802.  Federal Rule of Evidence 703 creates a limited exception to that general rule, allowing a testifying "expert" to rely on "otherwise . . . inadmissible" materials—including hearsay—in

REDACTED VERSION

forming their opinion.  *See* Fed. R. Evid. 703.  The rules do not extend this same courtesy to lay witnesses.  Yet Plaintiffs' lay witnesses' opinions regarding Google's alleged anticompetitive conduct are predicated on inadmissible hearsay, for example, statements made to witnesses by their customers.  *E.g.*, Ex. A at 51:11-13 (opinion was "Based on the publishers that we talked to"); Ex. I 189:19-190:4 (opinion based on "common knowledge throughout the industry"); Ex. F 30:15-23 (opining that "Most publishers would express to [him] that they were concerned about the reliance on Google revenue").  The rules' prohibition of lay witness testimony based on hearsay is a third, independent reason to strike the Plaintiffs' lay witnesses' opinion testimony regarding Google's alleged monopoly status.

## CONCLUSION

For the foregoing reasons, the Court should exclude all improper lay witness opinion testimony.

REDACTED VERSION

Dated: August 16, 2024                    Respectfully submitted,


Eric Mahr (*pro hac vice*)              */s/ Craig C. Reilly*
Andrew Ewalt (*pro hac vice*)           Craig C. Reilly (VSB # 20942)
Tyler Garrett (VSB # 94759)             THE LAW OFFICE OF
FRESHFIELDS BRUCKHAUS                    CRAIG C. REILLY, ESQ:
DERINGER US LLP                         209 Madison Street, Suite 501
700 13th Street, NW, 10th Floor         Alexandria, VA 22314
Washington, DC 20005                    Telephone: (703) 549-5354
Telephone: (202) 777-4500               Facsimile: (703) 549-5355
Facsimile: (202) 777-4555               craig.reilly@ccreillylaw.com
eric.mahr@freshfields.com

Justina K. Sessions (*pro hac vice*)    Karen L. Dunn (*pro hac vice*)
FRESHFIELDS BRUCKHAUS                    Jeannie S. Rhee (*pro hac vice*)
DERINGER US LLP                         William A. Isaacson (*pro hac vice*)
855 Main Street                         Amy J. Mauser (*pro hac vice*)
Redwood City, CA 94063                  Martha L. Goodman (*pro hac vice*)
Telephone: (650) 618-9250               Bryon P. Becker (VSB #93384)
Fax: (650) 461-8276                     Erica Spevack (*pro hac vice*)
justina.sessions@freshfields.com        PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP
Daniel Bitton (*pro hac vice*)          2001 K Street, NW
AXINN, VELTROP & HARKRIDER              Washington, DC 20006-1047
LLP                                     Telephone: (202) 223-7300
55 2nd Street                           Facsimile (202) 223-7420
San Francisco, CA 94105                 kdunn@paulweiss.com
Telephone: (415) 490-2000
Facsimile: (415) 490-2001               Erin J. Morgan (*pro hac vice*)
dbitton@axinn.com                       PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP
Bradley Justus (VSB # 80533)            1285 Avenue of the Americas
AXINN, VELTROP & HARKRIDER              New York, NY 10019-6064
LLP                                     Telephone:  (212) 373-3387
1901 L Street, NW                       Facsimile:  (212) 492-0387
Washington, DC 20036                    ejmorgan@paulweiss.com
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com


*Counsel for Defendant Google LLC*


21
REDACTED VERSION