# EXHIBIT E

# REDACTED

1

2          UNITED STATES DISTRICT COURT

3                   FOR THE

4          EASTERN DISTRICT OF VIRGINIA

5   -------------------------------------X
    United States et al.,
6

7                    Plaintiff,

8                    v.

9   GOOGLE LLC,

10

                     Defendant.
11  -------------------------------------X

12  Civil Action No. 1:23-CV-00108

13

14            HIGHLY CONFIDENTIAL

15          VIDEOTAPED DEPOSITION

16                    OF

17             JOHN DEDERICK

18          FRIDAY, JULY 28, 2023

19

20

21

22

23

24  Reported by:
    CANDIDA BORRIELLO
25  JOB NO. 6418591-001-001

Page 6

1
2      THE VIDEOGRAPHER:  We are now on
3   the record.  The time is 9:37 a.m. ET
4   on Friday, July 28, 2023.
5      Audio and video recording will
6   continue to take place unless all
7   parties agree to go off the record.
8      This is the video recorded
9   proceeding of John Dederick being
10  taken by counsel here in the matter of
11  United States, et al., versus Google,
12  LLC.
13      My name is Joe Raguso, I am the
14  videographer on behalf of US Legal
15  Support located at 16825 Northchase
16  Drive, Houston, Texas.  I am not
17  related to any party in this action,
18  nor am I financially interested in the
19  outcome.
20      The court reporter is Candida
21  Borriello on behalf of US Legal
22  Support.
23      Appearances have been noted on the
24  stenographic record and the court
25  reporter will now swear in the

Page 7

1      J. Dederick - Highly Confidential
2   witness.
3   J O H N   D E D E R I C K,
4   called as a witness, having been
5   duly sworn by a Notary Public,
6   was examined and testified as
7   follows:
8   EXAMINATION BY
9   MS. RHEE:
10     Q.   Good morning, Mr. Dederick.
11     A.   Good morning.
12     Q.   I'm gonna need you to speak into
13  the microphone so that the court reporter can
14  hear you, okay?
15     A.   Got it, yep.
16     MS. PREWITT:  You need to pull
17  it --
18     Do you need him to pull it forward
19  a little bit?
20     THE WITNESS:  I can pull it up a
21  little if that's helpful.
22     Q.   Thank you very much.
23     A.   Sure.
24     Q.   Where do you live?
25     A.   Brooklyn, New York.

Page 8

1      J. Dederick - Highly Confidential
2      Q.   Thank you.
3      Q.   What is your current position at
4   The Trade Desk?
5      A.   Chief client officer and EVP.
6      Q.   When did you start at The Trade
7   Desk?
8      A.   February of 2012.
9      Q.   Have you been there continuously
10  since 2012?
11     A.   Yes.
12     Q.   Are you prepared to testify today
13  as The Trade Desk's corporate representative
14  on certain topics that have been specified in
15  the deposition, notice and subpoena?
16     A.   Yes.
17     Q.   I'm now going to show you what
18  we're gonna mark as Dederick deposition
19  exhibit -- oh, Trade Desk Deposition
20  Exhibit 1.
21     (TTD Exhibit 1, The Trade Desk's
22     Annual Filings with the Securities and
23     Exchange Commission, was marked for
24     identification.)
25  BY MS. RHEE:

Page 9

1      J. Dederick - Highly Confidential
2      Q.   Are you familiar with The Trade
3   Desk Annual Filings with the Securities and
4   Exchange Commission?
5      A.   I'm just gonna take a minute to
6   review this document, take a look at what's
7   in here.
8      Q.   Well, as the designated corporate
9   representative, are you familiar with The
10  Trade Desk's annual 10-K reporting
11  obligations?
12     A.   Yes, I am familiar with that.
13     Q.   And do you have in front of you the
14  Annual 10-K Report that was filed by The
15  Trade Desk?
16     MS. PREWITT:  Objection.  If you
17  could just let him have a moment to
18  look at the document then I think he
19  can respond to your questions more
20  fully.
21     MR. VERNON:  We seemed to skim
22  appearances, so while he's reviewing
23  it, I'll just do that quickly myself.
24     My name is Jeff Vernon, appearing
25  on behalf of the United States.  With

Page 10

1    J. Dederick - Highly Confidential
2    me is Amanda Strick.
3         MS. PREWITT:  I'll just note my
4    appearance as well.  Elizabeth
5    Prewitt, from Latham & Watkins, on
6    behalf The Trade Desk.  Also with us
7    is Adam Chiu and Becky McMahon.  As
8    well as counsel for The Trade Desk
9    Julie Kleeman.
10        MS. RHEE:  I believe the court
11   reporter has the appearances for the
12   record for Google.
13   BY MS. RHEE:
14   Q.    Mr. Dederick, I'm now going to
15   actually direct your attention to the
16   relevant passage of The Trade Desk's annual
17   10-K, okay?
18   A.    Okay.
19   Q.    Now, you understand that this
20   filing by The Trade Desk's submitted yearly
21   to the US Securities and Exchange Commission
22   is a signed statement by the company's chief
23   financial officer pursuant to the
24   requirements of the Securities and Exchange
25   Act, correct?

Page 11

1    J. Dederick - Highly Confidential
2    A.    I am familiar that this document is
3    intended to notify and advise shareholders
4    and prospective shareholders, yes.
5    Q.    And what happens to companies that
6    make misstatements in these annual 10-K
7    reports?
8         MS. PREWITT:  Objection.  Outside
9    the scope of the notice topics, as
10   well there's no foundation --
11   Q.    You're to answer the question.
12        MS. PREWITT:  Let me finish my
13   objection, I was continuing with an
14   objection, which is, first it's
15   outside the scope.  Second of all, you
16   don't have a factual basis and no
17   foundation to assume that this witness
18   would be knowledgeable on this topic.
19   He's a representative of The Trade
20   Desk on noticed topics that you
21   outlined in your notice.
22        MS. RHEE:  Let's go off the
23   record.
24        THE VIDEOGRAPHER:  All parties
25   agree to go off the record?

Page 12

1    J. Dederick - Highly Confidential
2         MR. VERNON:  Yes.
3         THE VIDEOGRAPHER:  We are going
4    off the record.  The time is 9:43 a.m.
5         (Whereupon, a brief recess was
6    taken.)
7         THE VIDEOGRAPHER:  We are back on
8    the record.  The time is 9:48 a.m.
9    BY MS. RHEE:
10   Q.    Mr. Prewitt [sic], as The Trade
11   Desk corporate representative, you stand by
12   the company's annual 10-K report's, correct?
13        MS. PREWITT:  Counselor --
14        MR. VERNON:  Objection.  Vague.
15   A.    I'm sorry, you're referring to me?
16   Q.    Yes.
17        MS. PREWITT:  Counsel, for the
18   record, you called him Ms. Prewitt, I
19   think that was the hesitation there.
20   A.    Yeah.
21        Will you repeat the question,
22   please?
23   Q.    I'm sorry.
24        Mr. Dederick, as the company's
25   corporate representative, you stand by the

Page 13

1    J. Dederick - Highly Confidential
2    company's annual 10-K report, correct?
3         MR. VERNON:  Same objection.
4    A.    Yes.
5    Q.    So, let's actually turn to page 5
6    and to make this go easier, I've highlighted
7    the relevant passage that I want to direct
8    your attention to, okay?
9         So, on the top of the page under
10   the heading Overview, you see where it says:
11        The Trade Desk offers a
12   self-service cloud-based ad buying platform
13   that empowers our clients to plan, manage,
14   optimize and measure more expressive data
15   driven digital advertising campaigns.
16        Do you see that?
17   A.    Yes.
18   Q.    Is that an accurate description of
19   The Trade Desk's business?
20   A.    Yes, The Trade Desk is a DSP and
21   that's an accurate description of a DSP.
22   Q.    Now, the next sentence says:
23        Our platform allows clients to
24   execute integrated campaigns across ad
25   formats and channels, including video, which

1      J. Dederick - Highly Confidential
2  includes Connected TV, CTV, Display, audio,
3  digital out of home, native and social on a
4  multitude of devices, such as computers,
5  mobile devices, televisions and streaming
6  devices.
7      Do you see that?
8      A.  Yes.
9      Q.  Is that an accurate description of
10 The Trade Desk's business?
11     A.  Yes.  And I would add that when we
12 refer to clients, we refer to media buyers
13 who are leveraging a DSP.
14     Q.  So, continuing on, the next
15 paragraph actually talks about The Trade
16 Desk's clients.
17     Do you see that?
18     A.  Uh-huh.
19     Q.  It says:
20     Our clients are advertising
21 agencies, brands and other service providers
22 for advertisers with whom we entered into
23 ongoing master services agreements.
24     Do you see that?
25     A.  Yes.

1      J. Dederick - Highly Confidential
2      Q.  Is that an accurate description of
3  The Trade Desk's clients?
4      A.  Yes, and all of those are buyers.
5  And for clarity, the brands really means
6  advertisers in that context.
7      Q.  Now, the next two sentences go on
8  to state:
9      We generate revenue by charging our
10 clients a platform fee based on a percentage
11 of a client's total spend on advertising.  We
12 also generate revenue from providing data and
13 other value added services and platforms
14 features.
15     Is that an accurate description of
16 the way in which The Trade Desk generates
17 revenue?
18     A.  Yes, The Trade Desk generates
19 revenue based on the media buying activity of
20 those clients on our platform and that's an
21 accurate representation of how.
22     Q.  Now, when was The Trade Desk
23 established?
24     A.  The Trade Desk was established in
25 2009.

1      J. Dederick - Highly Confidential
2      Q.  When did The Trade Desk go public?
3      A.  If memory serves, The Trade Desk
4  went public in 2016.
5      Q.  Now, I want to direct your
6  attention to page 3 of this 2022 annual
7  report.
8      Now, under the Summary of Risk
9  Factors, do you see in the fourth bulleted
10 item the following:
11     The market in which we participate
12 is intensely competitive and we may not be
13 able to compete successfully with our current
14 and future competitors.
15     Do you see that?
16     A.  I don't believe that's the fourth
17 bullet, for clarity.
18     Q.  I'm sorry, the fourth bullet from
19 the bottom.
20     A.  Okay.
21     Q.  Do you see that?
22     A.  I see that sentence.
23     Q.  Do you stand by that statement in
24 The Trade Desk's annual report as the
25 company's corporate representative?

1      J. Dederick - Highly Confidential
2      MR. VERNON:  Objection.  Vague.
3      A.  I think it's important to note the
4  context of risk factors offered in a document
5  like this, the context will be to provide
6  prospective shareholders and our shareholders
7  a summary of our business to help insulate
8  from lawsuits or SEC violations.  And so, the
9  idea that we as a DSP compete with DSPs like
10 DV360 and that is a very intense competition
11 is accurate.
12     I would also note under these risk
13 factors --
14     Q.  I'm sorry.
15     A.  I would note that there's a
16 section --
17     Q.  Hold on a second.
18     MR. VERNON:  I think you have to
19 let him -- objection.  Please let him
20 finish his answer.
21     Q.  Let me -- let me ask you the next
22 question, okay?  You've answered my question.
23     MR. VERNON:  Please let him finish
24 his --
25     A.  So, I would also note that there's

```
1        J. Dederick - Highly Confidential
2              I would add I don't know that --
3    Q.    There's no pending question.  Thank
4    you.
5    A.    I don't know that the reason to
6    have --
7    Q.    Mr. Dederick --
8    A.    There's an equivalency you're
9    assuming in the word "market" --
10             (Cross-talk.)
11   Q.    There's no pending question, so let
12   me keep going.
13             MS. PREWITT:  Counsel, I just
14   don't --
15             MS. RHEE:  There are no -- there
16   are no speaking objections either, so
17   let's just keep going.
18             MS. PREWITT:  I don't think it's
19   necessary to try to prevent the
20   witness from speaking.
21             MS. RHEE:  DOJ can take its time.
22             MS. PREWITT:  Okay, so let's just
23   keep going.
24             MR. VERNON:  I also object to
25   cutting the witness off.
```

```
1        J. Dederick - Highly Confidential
2              MS. RHEE:  Let's just keep going.
3    BY MS. RHEE:
4    Q.    Let's direct your attention now to
5    page 11.
6              Mr. Dederick, do you see in The
7    Trade Desk's annual report a section called
8    Our Competition?
9    A.    Yes.
10   Q.    Now, you see the choice of word
11   similarly selected by The Trade Desk here,
12   Our INDUSTRY?
13   A.    I see that word.
14   Q.    Okay.  So, I'm gonna read it.  The
15   10-K says:
16             Under our competition:
17             Our industry is highly competitive
18   and fragmented.
19             Do you see that?
20   A.    I do see that sentence.
21             MS. PREWITT:  Apologies,
22   Counselor.  I just -- my fault, I just
23   actually missed where we were.  I'm
24   sorry, what page?
25             MS. RHEE:  Page 11.
```

```
1        J. Dederick - Highly Confidential
2              MS. PREWITT:  Okay.  Thank you.
3    Sorry.
4    Q.    It goes on to say:
5              We compete with other demand side
6    platform providers, some of which are
7    smaller, privately held companies and others
8    are divisions of large well-established
9    companies such as Google and Adobe.
10             Do you see that?
11   A.    I do see that sentence.
12   Q.    We believe that we compete
13   primarily based on our performance,
14   capabilities and transparency of our platform
15   as well as our focus on the buy-side.
16             Do you see that?
17   A.    I see that sentence.
18   Q.    As The Trade Desk's corporate
19   representative, do you stand by that
20   statement about your competition?
21   A.    I would offer further context.  Our
22   largest around most intense competition has
23   been and continues to be with Google's demand
24   side platform and we do compete, our clients
25   appreciate our transparency and the trust
```

```
1        J. Dederick - Highly Confidential
2    that we're able to establish by being a
3    buy-side only platform.  Most of our
4    competition, in terms of the DSP category, is
5    coming from DV360.
6    Q.    That was not the question.  So, let
7    me try this again.
8              Mr. Dederick, as The Trade Desk's
9    corporate representative, do you stand by the
10   statement just read about your competition?
11   A.    I stand by our 10-K.
12   Q.    So, do you stand by the 10-K
13   statement that your industry is highly
14   competitive and fragmented?
15   A.    Yes.  And the important context is
16   the industry is the advertising industry.
17   There's a broad advertising industry in which
18   we compete with one small part, which is
19   demand side platforms.  It's not -- it's a
20   false equivalency, it's a claim that because
21   the first sentence says our industry means
22   that the demand side platforms are in some
23   way the equivalent of the word industry.  Our
24   industry refers to the advertising industry,
25   which is highly competitive.
```

Page 26

1        J. Dederick - Highly Confidential
2        Q.   Okay.  Well, so then let's go to
3   the next sentence.
4             Do you stand by the 10-K statement
5   that The Trade Desk competes with other
6   demand side platform providers, some of which
7   are smaller privately held companies and
8   others are divisions of large
9   well-established companies such as Google and
10  Adobe.
11            Do you stand by that statement?
12       A.   Well, Adobe has since -- I think
13  after this document was created, has
14  essentially sunsetted their DSP business, so
15  they are no longer a significant competitor
16  in this category for the Trade Desk.
17            I do stand by the sentence that we
18  compete with other DSPs and I offered
19  additional context that DV360 is the
20  principal competitor.
21       Q.   Well, since this statement, do you
22  also compete with Xandr?
23       A.   Xandr, since this statement, was
24  acquired by Microsoft.
25       Q.   So, do you compete with Xandr?

Page 27

1        J. Dederick - Highly Confidential
2        A.   Very minimally.
3        Q.   So, do you compete with Xandr?
4        A.   Yes, with the further context that
5   the competition is minimal.
6        Q.   Do you compete with Criteo?
7        A.   I do not believe Criteo would
8   consider themselves a DSP.
9        Q.   Do you compete with Criteo?
10       A.   Not in the DSP category.
11       Q.   Do you compete with Criteo?
12       A.   Not in the DSP category.
13       Q.   That's not my question.
14       A.   I've already stated my answer.
15            MS. PREWITT:  Objection,
16  Counselor.  Asked and answered.
17            Actually --
18            MR. VERNON:  Objection.  Leading.
19       Q.   Let me ask the question again.
20            Do you compete with Criteo?
21       A.   We do not compete with Criteo in
22  the DSP category.
23       Q.   But that's not my question.
24       A.   You would need to understand the
25  broader context of the advertising ecosystem

Page 28

1        J. Dederick - Highly Confidential
2   whereby obviously there's an overall amount
3   of ad spend, right?  There is a total TAM of
4   advertising.  There are many different kinds
5   of companies who are attempting to
6   participate in the overall pie of
7   advertising.  Criteo is one kind of company.
8   The Trade Desk and DV360 are a different kind
9   of company.
10            To the extent that all parties are
11  attempting to capture share, sure, we compete
12  with Criteo.
13       Q.   Do you compete with Oath?
14       A.   Oath, there is no company called
15  Oath at this point.
16       Q.   Do you compete with Adform?
17       A.   We do compete with Adform in the
18  DSP category.  The competition is not
19  significant.
20       Q.   So, when you made this statement in
21  your 10-K, who other than Google did you
22  reference or mean to reference when you said,
23  some of which are smaller, privately held
24  companies and others are divisions of well
25  larger established companies?

Page 29

1        J. Dederick - Highly Confidential
2            MS. PREWITT:  Objection.
3        A.   This sentence outlines who all of
4   our competitors might be.  There are smaller
5   and have been smaller DSPs, Adform is one.
6   And I wouldn't claim to know who all of the
7   small entrants category are.
8        Q.   What about Yahoo?
9        A.   Yahoo does participate in the DSP
10  category.  And again, the competition is
11  not -- not significant.
12       Q.   To what extent does The Trade Desk
13  compete with advertising agencies?
14       A.   The Trade Desk --
15            MS. PREWITT:  Objection.
16       A.   The Trade Desk does not compete
17  with advertising agencies.
18            MR. VERNON:  Could we go off the
19  record for one second?
20            MS. RHEE:  Yes.
21            THE VIDEOGRAPHER:  Off the record.
22  The time is 10:08 a.m.
23            (Whereupon, a brief recess was
24  taken.)
25            THE VIDEOGRAPHER:  We are back on

Page 70

```
 1        J. Dederick - Highly Confidential
 2   understand where all of the -- what all of
 3   their media spend goes between an advertiser
 4   buying an add and a publisher showing an ad.
 5             And so, for a small subset of
 6   publishers who have the sophistication and
 7   capability to leverage multiple different
 8   implementation of demands, OpenPath has been
 9   helpful at giving buyers more efficiency in
10   some cases to those publishers.
11   Understanding it is quite small, I believe
12   the number of OpenPath implementations we
13   have is 20, and that they typically plug
14   directly into DFP, which will be the
15   publisher at server.
16        Q.   We gotta break this down so that
17   people can understand your answer.
18        A.   Okay.
19        Q.   So, let's take it in smaller steps,
20   okay, Mr. Dederick?
21        A.   Okay.
22        Q.   Let's start with, is OpenPath an
23   offering intended to give clients a
24   simplified direct connection to publishers?
25        A.   No.
```

Page 72

```
 1        J. Dederick - Highly Confidential
 2   sentence.  That is what we're after, is a
 3   more direct connection and efficiency on
 4   behalf of buyers.
 5        Q.   So, the answer is yes, the offering
 6   is intended to give clients a simplified
 7   direct connection to publishers?
 8        MS. PREWITT:  Objection.
 9        MR. VERNON:  Objection, mistakes.
10   Objection, leading.
11        A.   I have offered my explanation.
12   It's important to -- it's important to not
13   isolate a couple of sentences in a paragraph
14   intended to describe OpenPath.  So, it's
15   really important to understand the additional
16   context I provided in my previous answer.
```

Page 71

```
 1        J. Dederick - Highly Confidential
 2        Q.   Well, when The Trade Desk said in
 3   the 10-K "OpenPath is our supply path
 4   optimization offering," is that a true
 5   statement?
 6        A.   No, we have a much broader supply
 7   path optimization offering.  OpenPath is one
 8   part that contributes to our overall supply
 9   path optimization efforts.
10        Q.   Okay.  Is OpenPath one a part of
11   The Trade Desk's supply path optimization
12   offering?
13        A.   Yes, OpenPath contributes to our
14   supply path optimization efforts.
15        Q.   Okay.  And are those efforts
16   intended to give clients a simplified direct
17   connection to publishers?
18        A.   The words in this document, just to
19   break them down, what they mean is, we --
20   with OpenPath, a -- a advertiser will have
21   access to a publisher without usually without
22   the SSP layer.  It is not direct in that it
23   always connects into DFP, the publisher ad
24   server.  And so, it's important to understand
25   the real meaning for the context of this
```

Page 73

```
 1        J. Dederick - Highly Confidential
...
25        Q.   Okay.  As the corporate
```

representative here today, is it your understanding that those documents are contracts?
A. I believe that they are contracts.
Q. So, I'm now going to turn to tab or what it is the number now, The Trade Desk Exhibit 7?
(TTD Exhibit 7, OpenPath Publisher Terms and Conditions, Bates TTD_DOJ-GOOG23-0001039 through TTD_DOJ-GOOG23-0001052, was marked for identification.)
BY MS. RHEE:
Q. Mr. Dederick, do you see in front of you a document that was produced as part of this litigation Bates stamp ending in 039?
A. I do see that.
Q. Okay. And it's the OpenPath Publisher Terms and Conditions?
A. I see those words. And I'm really not familiar with this document, so I would really want to look at this, as I said, 'cause I really -- if you give me one of the contracts we do with advertisers, I'll know

it cold, I won't know this document well.
Q. Okay. Why don't we go off the record and you can take the time to look at this, okay?
MR. VERNON: I object to that. I think if you want him to look at it, that's part of your time.
MS. RHEE: This was noticed as a topic, so let's -- let's just go off the record.
MR. VERNON: Object.
MS. PREWITT: Look, I just, you know, 22 notice topics.
THE WITNESS: Why don't we give me two minutes as if it were a different one and I'll give it a scan, okay?
MS. RHEE: Okay, that's fine. Okay, terrific.
THE WITNESS: So, two minutes. Thank you so match.
MR. VERNON: Also, I mean, if you have particular parts, I'm happy to have you direct him to those.
BY MS. RHEE:

Q. So, Mr. Dederick, if you actually --
MS. PREWITT: Objection.
MR. VERNON: You were gonna give him two minutes.
MS. PREWITT: Just two minutes. I mean maybe --
Q. While you're looking, I actually just want to focus in particular on the page that is titled, OpenPath Publisher Inventory Supply Agreement.
A. And what page is that?
Q. If you look on the second page.
A. Okay.
Q. Okay. So, take a look, okay.
A. Okay.
(Document review.)
MS. PREWITT: Is there a particular part of that he should be focusing on first?
THE WITNESS: That page.
MS. PREWITT: Other than that, like, within this. A lot of legalese, so...

BY MS. RHEE:
Q. Particularly want to direct your attention to Paragraph 2.
MS. PREWITT: Thank you.
A. (Document review.)
Okay.
Q. Okay?
A. Okay.
Q. Now, you see under the title OpenPath Publisher Inventory Supplier Agreement a subsection of that agreement is a paragraph that is then titled OpenPath Support Cost?
A. I do see that as one of the described terms.
Q. Okay. Under the term that is OpenPath Support Cost it reads:
Company agrees to offset TD, and TD is referenced as The Trade Desk, offset TD's cost associated with the integration pursuant to this agreement.
And then there's a paren that says that is the support cost.
Do you see that?

1      J. Dederick - Highly Confidential
2   Desk and available on the company website?
3      A.   I have no reason to doubt that.
4           MR. VERNON:  Just ask that you
5      give him a small amount of time to
6      read the document.
7      A.   (Document review.)
8      Q.   I'm only going to focus your
9   attention on the first three paragraphs,
10  okay?
11     A.   Okay.
12     Q.   Now, you see in May of 2022, The
13  Trade Desk announced more publishers have
14  joined OpenPath their proprietary product
15  designed to provide advertisers with direct
16  access to premium digital advertising
17  inventory.  Publishers included BuzzFeed, the
18  Los Angeles Times, Forbes Media, Vine and Red
19  Ventures whose publishing brands include
20  Healthline Media and CNET have now joined at
21  the initiative.
22     A.   I see those words.
23     Q.   Okay.  And you don't have any
24  reason to doubt that accuracy of this
25  announcement by The Trade Desk, do you?

1      J. Dederick - Highly Confidential
2      A.   I don't.  This is a press release,
3   so this will be an attempt to the
4   marketplace, to our clients, to our partners,
5   to investors in the industry to represent the
6   momentum and, you know, really help us sell a
7   feature from The Trade Desk.
8      Q.   But it's important to be accurate
9   in these kinds of announcements, right?
10     A.   These announcements are intended to
11  help represent the momentum and work we've
12  done for the purposes of gaining awareness
13  and gaining favorability from partners, from
14  clients, from investors, so that's why we
15  would create that.
16     Q.   Well, but they're not false, are
17  they?
18          MS. PREWITT:  Objection.
19     A.   I would have no reason to expect
20  that The Trade Desk would be -- would be
21  false.
22     Q.   So, when The Trade Desk issued this
23  announcement, you don't have any reason to
24  doubt that these publishers in fact signed up
25  with OpenPath?

1      J. Dederick - Highly Confidential
2      A.   To the best of my knowledge, we
3   have about 20 publishers signed up with
4   OpenPath.
5      Q.   Now the next paragraph says:
6           Since OpenPath launched in
7   February 2022, more than 100 premium
8   publishers globally have registered interest
9   in the product as they look to maximize
10  revenue from advertising impressions.
11          Do you see that?
12     A.   Yeah, and that's where I think -- I
13  think in this document, I think it's on the
14  next page where we say, we can't help
15  publishers with yield management purposes,
16  which means we are not helping a publisher
17  raise CPMs or segment their inventory in the
18  interest of raising costs.
19          And so, that's why it's, you know,
20  there's probably a big difference between
21  publishers who are interested and the
22  integrations we've done.  OpenPath is really
23  applicable to publishers who have the
24  capacity for in-house yield management
25  because, you know, The Trade Desk is

1      J. Dederick - Highly Confidential
2   remaining an advocate of the buyers who, you
3   know, obviously want to buy for a lower cost.
4   And that's why this is, as we've talked about
5   before, a real initiative toward supply chain
6   efficiencies for buyers.
7      Q.   Okay.  The following paragraph
8   says:
9           Initial OpenPath publisher partners
10  include Reuters, the Washington Post,
11  Gannett, USA Today Network, Condé Nast,
12  McClatchy, Advance Local, Media News Group,
13  Tribune Publishing, Nexstar Digital and
14  CafeMedia among others.
15          Do you see that?
16     A.   I do see those words.
17     Q.   Okay.  Do you have any reason to
18  doubt that in fact those are OpenPath
19  publishing partners?
20     A.   To the best of my knowledge, we
21  have about 20 OpenPath publishers, it's -- I
22  work on the buy-side, so I do not have a lot
23  of familiarity with which publishers they
24  are.
25     Q.   Okay.  But you don't have any

John Dederick - Highly Confidential 8/9/228, 2023

Page 90

1      J. Dederick - Highly Confidential
2  reason to doubt that among those 20 OpenPath
3  publishers they include Reuters, The
4  Washington Post, Gannett, USA Today, Condé
5  Nast, McClatchy, Advance, Media News, Tribune
6  Publishing, Nexstar Digital and CafeMedia,
7  correct?
8      A.   I don't have a reason to doubt
9  the -- I would assume those are OpenPath
10 implementations where The Trade Desk OpenPath
11 plugs into DDP, which would be the ad server
12 for all those publishers.
13     Q.   Now, you just answered that you are
14 on the buy-side at The Trade Desk; is that
15 right?
16     A.   The Trade Desk as a whole is a
17 buy-side, only representative.
18     Q.   Well, I just want to read back to
19 you your answer:
20          To the best of my knowledge, we
21 have about 20 OpenPath publishers.  I work on
22 the buy-side, so I do not have a lot of
23 familiarity with which publishers they are.
24          That was your answer on the record,
25 correct?

Page 91

1      J. Dederick - Highly Confidential
2      A.   Yes.  And what I mean by that is,
3  my job is to work with buyers.  We do have an
4  inventory partnerships team whose job it is
5  to plug into suppliers.  The -- all of that
6  work is done in the interest of being a
7  buy-side only platform, we must have supply
8  partnerships in order to have anything to
9  buy.
10     Q.   When you say you have a inventory
11 partnerships team whose job it is to plug
12 into suppliers, that is sell-side, right?
13     A.   No.  The sell-side of our industry
14 are companies like SSPs and publisher ad
15 servers.  The buy-side of our industry are
16 companies like demand side platforms.  The
17 Trade Desk is a demand side platform.
18     Q.   Okay.  At The Trade Desk, who works
19 on the inventory partnerships team whose job
20 it is to plug into suppliers, in other words,
21 publishers?
22     A.   It is not publishers.  Principally
23 it is SSPs that we plug into.
24     Q.   Whose job is it at The Trade Desk
25 to work with inventory partnerships?

Page 92

1      J. Dederick - Highly Confidential
2      A.   We have an inventory partnerships
3  team.  And again, every demand side platform
4  must have inventory partnerships so that they
5  will have inventory to buy.
6      Q.   And does that same team have
7  responsibility for OpenPath?
8      A.   OpenPath is part of our inventory
9  partnerships.
10     Q.   Who leads that team?
11     A.   It's part of the organization of
12 Tim Simms, our chief revenue officer.
13     Q.   And is that team responsible for
14 the publisher Inventory Supplier Agreements?
15     A.   Within that team, there would be
16 people who would -- who would negotiate or
17 work with suppliers to sign those agreements.
18     Q.   With respect to the fees that are
19 reflected in those publisher Inventory
20 Supplier Agreements, are those fees disclosed
21 to your advertising clients?
22     A.   We are transparent with advertising
23 clients about support costs.
24     Q.   So, is the answer yes?
25     A.   The answer is we are transparent

Page 93

1      J. Dederick - Highly Confidential
2  with advertisers and buyers about support
3  costs.
4      Q.   So, are the terms and conditions of
5  the Inventory Supplier Agreements disclosed
6  to your advertising clients?
7      A.   Well, the document that you shared
8  with me earlier is a confidential document
9  because it's a contract, so we -- we would
10 never share one partner or client's contract
11 with other partners or clients.
12     Q.   Have you ever personally disclosed
13 to your advertising clients that The Trade
14 Desk charges 4 and a half percent in support
15 costs?
16     A.   I have -- when we rolled out
17 OpenPath, we spoke to our clients about
18 support costs.
19     Q.   And did you disclose that the
20 amount that The Trade Desk was charging was
21 4 and a half percent?
22     A.   When we rolled out OpenPath, we
23 were open with clients about support costs.
24     Q.   So, is the answer yes, you disclose
25 that Trade Desk?

John Dederick - Highly Confidential
June 28, 2023

Page 94

1    J. Dederick - Highly Confidential
2        MS. PREWITT: Objection. He's
3    answered that question probably four
4    times at this rate.
5        A.   Yeah, my answer is that we were
6    transparent with clients about support costs.
7        Q.   Did you disclose the amount?
8        MS. PREWITT: Objection. He's
9    answered the question about now six
10   times.
11       A.   I wasn't a party to all these
12   conversations, so I can't speak to individual
13   contents. But as a best practice, we were
14   transparent with buy-side partners about
15   support costs.
16       Q.   When you had personal conversations
17   with your clients, did you disclose the
18   4 and a half percent?
19       MS. PREWITT: Objection. He's
20   answered these questions multiple
21   times.
22       MR. VERNON: He's already answered
23   the question.
24       THE COURT REPORTER: I'm sorry, I
25   didn't hear you, Mr. Vernon.

Page 95

1    J. Dederick - Highly Confidential
2        A.   I'm the chief client officer, I'm
3    not responsible for most of our individual
4    client conversations were really -- that
5    wouldn't have been my -- my role.
6        Q.   So, you personally never disclosed
7    the 4 and a half percent?
8        A.   My role isn't to roll out new
9    products and initiatives to our clients.
10       Q.   So, the answer is no?
11       A.   My role is not to have those
12   conversations.
13       Q.   I want to go to a document that
14   we're gonna mark as Trade Desk Exhibit 9.
15       MR. VERNON: Would now be a good
16   time for a five-minute break?
17       MS. RHEE: Sure.
18       THE VIDEOGRAPHER: We're off the
19   record. The time is 11:59 a.m.
20       (Whereupon, a brief recess was
21   taken.)
22       THE VIDEOGRAPHER: We're back on
23   the record. The time is 12:18 p.m.
24   BY MS. RHEE:
25       Q.   Okay. I want to now direct your

Page 96

1    J. Dederick - Highly Confidential
2    attention to a different topic and that is
3    The Trade Desk's historic take rate. So, I
4    want to show you a document that we're gonna
5    actually go back to an exhibit that we
6    already marked as The Trade Desk Exhibit 2
7    and that is the earnings call transcript from
8    February of 2023.
9        MS. PREWITT: This one here,
10   right?
11       MS. RHEE: Yes.
12       Q.   Now, this time I want to direct
13   your attention to the bottom of page 19. And
14   in response to a question from one of the
15   analysts about The Trade Desk's take rate,
16   you see you are chief financial officer,
17   Mr. Grayson answering:
18       We've had really consistent take
19   rate trends.
20       Do you see that?
21       A.   I see those words, yes.
22       Q.   Okay. He goes on to say:
23       If you look at our take rate data
24   from 2014 to 2022 over that eight-year
25   period, I think we went up four years and

Page 97

1    J. Dederick - Highly Confidential
2    then went down four years, so it's been very
3    consistently right around that 20 percent
4    figure, some years it goes up a little bit,
5    some years it goes down a little bit.
6        Do you see that?
7        A.   I see those words. I'm just
8    reading the rest of his answer.
9        Q.   Yeah. He goes on, the next page
10   is:
11       But the real important thing to
12   note about the take rate is that while it's
13   been really steady, I said this I think on
14   the -- in the prepared remarks, we've made
15   massive improvements for our platform, right?
16   We're shipping new products, we're adding new
17   features, we're innovating for customers and
18   we're effectively passing that surplus to
19   them so they can create value and then grow
20   spend with us and then spin our flywheel.
21   And I don't think there's any reason why that
22   historical range changes for the near future.
23       You see that?
24       A.   I see those words, yes.
25       Q.   Okay. And you stand by those

1    J. Dederick - Highly Confidential
2        So, for my questions, unless I say
3    otherwise, I'm only asking you to answer
4    based on your personal knowledge only.
5        Does that make sense?
6    A.   Yes.
7    Q.   If at any point you feel like you
8    have information that is within the knowledge
9    of The Trade Desk, but not within your own
10   personal knowledge, can you just state so,
11   state that and then we'll deal with it from
12   there.
13       Does that make sense?
14   A.   Yes.
15   Q.   Okay.  Let me ask you really
16   briefly just about your background.
17       Where were you born and raised?
18   A.   I was born and raised -- I was born
19   in a New York Hospital, but raised in a New
20   Jersey suburb called Westfield, New Jersey.
21   Q.   Did you attend college?
22   A.   Yes.
23   Q.   Where did you go to college?
24   A.   Connecticut College.
25   Q.   What did you major in?

1    J. Dederick - Highly Confidential
2    A.   Music.
3    Q.   Do you serve on any professional
4    boards?
5    A.   I serve on, you know, industry
6    board of Advertiser Perceptions and I've
7    participated in some mobile marketing
8    association boards in the past, really more
9    industry body than corporate boards.
10   Q.   And when you say industry body
11   boards, what -- what industry are you
12   referring to?
13   A.   Advertising industry.
14   Q.   When did you join The Trade Desk?
15   A.   February of 2012.
16   Q.   And what is your position today?
17   A.   Chief client officer and EVP.
18   Q.   And so briefly, what are your
19   responsibilities as chief client officer of
20   The Trade Desk?
21   A.   I oversee really our large client
22   organization, so our relationships across
23   agency holding companies, our large
24   advertiser relationships.  I also oversee our
25   global sales enablement, go to market like

1    J. Dederick - Highly Confidential
2    the people that help the sales team in market
3    tell their stories, that group is also with
4    me.
5    Q.   And can you just very briefly
6    describe the other positions that you've held
7    at The Trade Desk in your role and
8    responsibilities for those positions?
9    A.   Okay.  I came on, you know, 17
10   employees at The Trade Desk, not yet
11   profitable, you know, really just starting
12   the sales organization as the first person
13   fully dedicated to selling and getting new
14   clients.  We built up our relationships
15   across the industry and I started managing a
16   pod of sellers in our east coast business and
17   then I managed our east coast sales
18   organization.  I moved on to manage our North
19   American sales organization.  And after that,
20   moved over to launch this large client
21   organization, which is really the team that
22   I've built now, who, you know, I oversee in
23   my current responsibilities as chief client
24   officer.
25   Q.   I think you worked at WebMD from

1    J. Dederick - Highly Confidential
2    2008 to 2011; is that right?
3    A.   That sounds right.
4    Q.   And just briefly, what were your
5    responsibilities in that position?
6    A.   At WebMD, I started as a sales
7    planner really like an assistant to
8    salespeople.  I moved on to manage sales
9    planners and then transitioned into sales was
10   the last role I had at WebMD.
11   Q.   And you worked at the Wall Street
12   Journal from 2007 to 2008; is that right?
13   A.   Yes.
14   Q.   And what were your responsibilities
15   there?
16   A.   More of the sales planner
17   responsibilities, I was the assistant to the
18   sales planner.
19   Q.   Let me ask you a little bit about
20   Google's position in display ad tech, is that
21   all right?
22   A.   Okay.
23   Q.   Which company has the largest
24   publisher ad server?
25   A.   Google's DFP is far and away the

Page 154

1         J. Dederick - Highly Confidential
2  dominant publisher ad server.
3      Q.   Why do you say that "Google's DFP
4  is far and away the dominant publisher ad
5  server"?
6      A.   I'd love to talk about why I say
7  that and why that happened if it gives some
8  context.  The context would be, you know, the
9  early days of the internet, obviously the
10  front door was the browser.  When Google
11  search came about, they successfully moved
12  the front door of the internet from the
13  browser to the search engine.  And we all now
14  often for years have started with Search and
15  Google Search has been incredibly successful.
16  And the monetization of Google Search is
17  advertising, so Google was able to amass
18  millions of advertisers on a search basis
19  with a dominant search platform.
20      And what they did next was
21  basically turn the presence they had in
22  search into a Display Ad Network, which is
23  what Google AdWords is.  And what that looked
24  like was going to publishers and saying, if
25  you implement my ad serving technology, you

Page 155

1         J. Dederick - Highly Confidential
2  can get all of the dollars and all of the
3  demand from the millions of search
4  advertisers we have too.  So, if you -- if,
5  and only if, you implement our ad server and
6  the publisher ad server, you can get all the
7  money from all the search advertisers we
8  have.  And so, in so doing, and then, you
9  know, with the acquisition of DoubleClick,
10  which is dominant, I think, major majority
11  share publisher ad server, you know, they
12  created real dominance in publisher ad
13  serving.  And so -- yeah, let me leave it
14  there.
15      Q.   Let me ask you first:  Can you just
16  briefly describe what a publisher ad server
17  is?
18      A.   A publisher ad server is the tool
19  that an online publisher, and whether that's,
20  you know, New York Times or Netflix will use
21  to determine who buys their ads, who has
22  access, what those will be priced at and in
23  what sort of order or rank of priority.  So,
24  really the publisher ad server is where, you
25  know, you think of how ads appear on the

Page 156

1         J. Dederick - Highly Confidential
2  internet, that is where the main decision is
3  made, which is essentially the publisher's
4  saying, okay, you can have the ad and this
5  will be the price that we agree to.  That
6  really happens, you know, within the
7  publisher ad server.
8      Q.   And I think you also mentioned
9  something called an ad network.
10      In the context of Display
11  advertising, can you describe what an ad
12  network is briefly?
13      A.   So, ad networks evolved after
14  publishers -- excuse me, sorry.
15      Ad networks evolved after, you
16  know, direct publisher buying is you're
17  buying from one individual publisher.  An ad
18  network just means there's a group of
19  publishers, there's more supply and liquidity
20  you buy from.  Often an ad network means
21  there will be some level of non-transparency
22  if you're a buyer and, you know, what you get
23  if you're a buyer with an ad network is more
24  supply, bigger supply.  And if you're the
25  sellers who participate, what you get is more

Page 157

1         J. Dederick - Highly Confidential
2  of an opportunity to optimize yield which
3  really means, like, use all of the different
4  supply you have access to to drive up costs
5  and to sell through as much of your inventory
6  as possible.
7      So, an ad network was the first
8  extension from direct publisher buying into
9  like a larger marketplace.
10      Q.   In the context of Display, who has
11  the largest ad network?
12      A.   Google AdWords.
13      Q.   And when I asked you why DFP is the
14  dominant publisher ad server, you mentioned
15  Google AdWords, what's the connection there?
16      MS. RHEE:  Objection to form.
17      A.   So, it's very linear and so I
18  apologize if I repeat myself from -- but it
19  is the same exact story.  Google Search
20  became the front door to the internet.
21  Google transitioned Search from monetizing
22  search results, right, as in selling search
23  placements on google.com, right, that's --
24  that was the initial monetization of Google
25  Search property into selling ads for other

Page 158

1    J. Dederick - Highly Confidential
2    publishers as well as google.com.
3            The path to selling ads for other
4    publishers that weren't google.com was going
5    to those publishers and saying, if you want
6    my millions of search advertisers, you have
7    to implement my publisher ad server.  At the
8    time that, you know, ad network was the only
9    bigger thing than direct publisher sales.
10   So, what they were doing was building an ad
11   network.
12           So, basically AdWords was --
13   started as a direct evolution of Google
14   Search business to take all of the
15   advertisers who were buying and leveraged
16   them with publisher, say, if you want this
17   demand that we already have, implement this
18   ad server.  And then back to advertisers,
19   look at the ad network we have in addition to
20   the search business, so we can spend more of
21   your money and monetize more of, you know,
22   the internet via not just google.com, but
23   this ad network which is lots and lots of
24   other properties that have implemented our ad
25   server.

Page 159

1    J. Dederick - Highly Confidential
2    Q.   Which company has the largest ad
3    exchange for Display?
4    A.   Google AdX.
5    Q.   How would you characterize Google
6    AdX's position in the Display ad exchange
7    business?
8    A.   Google AdX is the largest ad
9    exchange.  And once again, I mean, it really
10   is an evolution of what I talked about with
11   the publisher ad server being, like, the key
12   to how we as an industry decide who gets what
13   ad and what cost.  The most important part is
14   the publisher ad server.  And so, after, you
15   know, Google had expanded into AdWords and
16   GDN really, you know, can be used
17   synonymously with AdWords, there became a
18   more competitive field for what's called
19   programmatic advertising or auction based
20   advertising or real-time bidding.  And if
21   Google needed to continue to maintain the
22   dominant presence in publisher ad serving,
23   because again that's really where the buck
24   stops, they needed to build a dominant ad
25   exchange.  And so, the evolution which is

Page 160

1    J. Dederick - Highly Confidential
2    characterized by, you know, first the
3    DoubleClick acquisition and then the
4    acquisition of Admeld is basically how AdX
5    became the dominant exchange or in SSP.  But
6    it also, really importantly, is how they
7    protect their position as the dominant
8    publisher ad server.
9    Q.   All right.  So, one of the things
10   that you said, I think was that AdX is how
11   Google protects its dominant position as a
12   publisher ad server.
13           What did you mean by that?
14           MS. RHEE:  Objection to form.
15           MR. CHIU:  Same objection.
16   A.   So, again, publisher ad server is
17   where the buck stops.  The most important
18   decision, the be all end all for whether an
19   ad gets shown on a publisher is within the ad
20   server.  When -- when Google initially came
21   to the publishers with all of the search
22   demand to say, look at all of these
23   advertisers, look at all of this money, if
24   you want this ad revenue, you need to
25   implement our publisher ad server.  That was

Page 161

1    J. Dederick - Highly Confidential
2    how they achieved dominance followed by the
3    acquisition of Admeld.  You know, initially
4    much of their presence was in the long tail
5    of publishers, Admeld gave them the head or
6    the big publishers.  Admeld was -- Admeld was
7    the dominant SSP for big publishers.
8            So, when they completed that, what
9    was happening was there was starting to be a
10   more competitive marketplace where other
11   companies like Microsoft at the time and, you
12   know, the acquisition of aQuantive, that era
13   was when pro- -- the concepts of programmatic
14   marketing and real-time bidding were coming
15   in to play, and so if Google was going to
16   compete, they couldn't just keep an ad
17   network because somebody else had a better
18   idea.  And so, in order to retain their
19   position as the dominant publisher ad server,
20   they had to create the dominant ad exchange
21   also.
22           And it was the same pitch, the same
23   pitch as when they went to publishers to say,
24   if you want my search demand, implement my ad
25   server, it's if you want my dominant AdX

John Dederick - Highly Confidential - June 28, 2023

Page 162

1      J. Dederick - Highly Confidential
2   demand, you must implement my ad server.
3   It's the same theory. And it continues to
4   rely on dominance starting with Search, into
5   publisher ad serving, into ad network, into
6   SSP and exchange.
7      Q.   Why do you describe AdX, Google's
8   AdX as dominant?
9      MS. RHEE:  Objection to form.
10     A.   I would describe Google's AdX as
11  dominant because it is the largest pool of
12  inventory that we look at programmatically,
13  so any DSP has to buy AdX in order to be
14  competitive. Any advertiser who's buying
15  programmatically has to buy AdX in order to
16  be competitive. And any publisher who wants
17  to monetize and be competitive with other
18  publishers monetizing must implement AdX.
19        And I -- there is not one DSP or
20  advertiser that I can think of that doesn't
21  buy AdX and there is not one publisher that I
22  can think of that doesn't monetize with AdX.
23     Q.   And why is that?
24     A.   They would -- it would render
25  uncompetitive, they would be unable to keep

Page 163

1      J. Dederick - Highly Confidential
2   up. It is such a large -- it is such a large
3   surplus of supply and it is enriched with
4   access to that enormous publisher
5   marketplace. So, you know, if you're a
6   publisher trying to monetize and, again, get
7   the highest cost for inventory and sell the
8   most of it, you have to have access to the
9   biggest amount of demand and that is only
10  available if you implement AdX.
11     Q.   How do The Trade Desk's negotiation
12  with Google AdX compare to The Trade Desk's
13  negotiation with other exchanges?
14     MR. CHIU:  Objection to form.
15     MS. RHEE:  Objection to form.
16     A.   Well, I sit on -- I sit on the
17  buy-side. Excuse me. I'm -- I interact with
18  our advertisers, the whole company is the
19  buy-side. So, I -- in order to answer this
20  question, I need to lean on some of the
21  knowledge that I have from talking to people
22  on our executive team who oversee our
23  inventory partnerships and our partnerships
24  team. Is that okay?
25     Q.   Sure, go ahead.

Page 164

1      J. Dederick - Highly Confidential
2      A.   Okay. From what I understand, you
3   know, essentially it is a sort of a take it
4   or leave it relationship where the sort of
5   underlying theme is, you know, like, where
6   else are you gonna go? So, our way or the
7   highway. So, I mean, suffice to say, we have
8   very little leverage when negotiating with
9   AdX and when we go and try to implement, you
10  know, I mentioned we are buy-side platform,
11  so we are going to the supply-side to try to
12  get them to sign up for terms that will make
13  inventory cleaner that will make pricing
14  better for advertisers, that will make, you
15  know, premium content as effective as user
16  generated content or at least measurable.
17        And so, those are the conversations
18  that we are bringing to the SSPs and we have
19  initiatives like the gold standard, which are
20  SSPs who are willing to, you know, do these
21  things to assure quality, to assure
22  fair pricing, fair auction dynamics and
23  enough transparency. And as you might
24  imagine, I mean, we had the worst
25  conversations from what I understood and

Page 165

1      J. Dederick - Highly Confidential
2   continue to be with AdX because of their
3   dominant position and their ability to say,
4   where else you gonna go?
5      Q.   So, how does that compare with the
6   The Trade Desk's negotiations with other
7   exchanges?
8      A.   Our negotiations with other
9   exchange are much more reasonable. They
10  are -- I think there's a fairer balance of
11  power and, you know, we've had a lot of
12  adoption of our inventory partnership
13  criteria like the gold standard or like our
14  invalid traffic requirements, or the signals
15  that we require from the sell-side to try to
16  create a more fair auction where buyers have
17  more data symmetry with sellers.
18        You know, we've been able to make a
19  lot of progress with the other exchanges, but
20  again they're all smaller than AdX.
21     Q.   So, for the next -- for the rest of
22  my questions, let's again go back to basing
23  your answers based on your personal
24  knowledge, but if you think that you are
25  aware of something based on your preparation

1    J. Dederick - Highly Confidential
2  and the ad exchange market and, you know,
3  until there's a fairer auction, then we
4  haven't found the right way to try to
5  compete.
6    Q.   I think we discussed earlier it's
7  fair to say that The Trade Desk has in
8  general grown significantly over the past,
9  call it, five years?
10   A.   I think that would depend on your
11 definition of significant.
12   Q.   I'm gonna try to maybe simplify a
13 little bit.
14        The Trade Desk has grown in the
15 past five years its DSP; is that correct?
16   A.   We are a DSP and, yes, we have --
17 we have grown in the past five years and, you
18 know, that's been largely from leaning into
19 places like Connected Television.
20   Q.   So, yeah, that's what I was gonna
21 ask you.
22        How much of The Trade Desk's growth
23 over the past, say, five years has come from
24 Display versus other types of ads?
25   A.   Unfortunately, we have really

1    J. Dederick - Highly Confidential
2  struggled to grow Display advertising.  And
3  so, our largest and fastest growing channel
4  is Connected Television.  When you look at
5  the growth trends across channels, that's
6  where the growth is really coming from and
7  we've really had a hard time in growing
8  Display.
9    Q.   A second ago you mentioned a fair
10 auction, do you remember that?
11   A.   Yes.
12   Q.   Does Google run a fair auction?
13        MS. RHEE:  Objection to form.
14   A.   No.
15   Q.   Why do you say that?
16   A.   You know, usually in a fair
17 auction, you would have some level of
18 transparency into what's happening and maybe
19 you'd have -- maybe every participant in the
20 auction wouldn't be owned by the same
21 company.  In the auctions that are held in
22 AdX, remember we're talking about the
23 publisher ad server, the ad exchange, the
24 demand-side platform and the advertiser ad
25 server most of the time all being owned by

1    J. Dederick - Highly Confidential
2  the same company.  So, if those are the key
3  participants in an auction and no one outside
4  of Google has transparency into what's
5  happening, I don't know how you could imagine
6  that that would be a fair auction.
7    Q.   Other than what we've already
8  talked about, what other examples are you
9  aware of Google doing things that you view
10 as not being a fair auction?
11   A.   I would say any forms of bid
12 manipulation where, again, we just don't have
13 transparency into.  If you don't work at
14 Google, you don't know whether -- how this is
15 happening, when it's happening, if it's
16 happening, but it's widely reported on and
17 the speculation among publishers, advertisers
18 and agencies that manipulating bids for -- or
19 win rates is happening constantly.  And not
20 surprisingly manipulating bids is at the
21 heart of every -- every, you know, potential
22 uncovered practice, whether that's Project
23 Poirot, Project Bernake, Project Bell,
24 dynamical allocation, dynamic revenue
25 sharing, unified auction.  What all of those

1    J. Dederick - Highly Confidential
2  things have in common is they are exerting a
3  level of unilateral control over the auction.
4  Many of those things represent falsely
5  altering advertiser bids without the
6  advertiser's awareness as in increasing or
7  decreasing advertiser bids without the
8  advertiser ever knowing that that's
9  happening.  Many of those things represent
10 fixing or changing aspects of the auction to
11 give Google bidding preferential treatment.
12        So -- what all of those things have
13 in common is, you know, their attempts at an
14 unfair auction and they're successful.
15   Q.   What is your understanding -- what
16 gives Google the ability to set the rules of
17 an auction for Display?
18        MS. RHEE:  Objection.  Lacks
19 foundation.
20        MR. CHIU:  Same objection.
21   A.   The reason that Google is able to
22 set the rules for all of the auctions is
23 complete dominance in the publisher ad server
24 marketplace, which again, that came from
25 dominance in Search, where Google's

John Dederick - Highly Confidential
June 28, 2023

Page 206

1        J. Dederick - Highly Confidential
2    successfully becoming the front door to the
3    internet and incredibly successful
4    monetization of their Search platform went
5    directly into, walking into every publisher
6    and saying, hey, if you want my millions of
7    Search advertisers and all of the money that
8    they represent, implement my publisher ad
9    server.
10       And that is really, you know, what
11   they have protected successfully for years
12   since that happened and moving into creating
13   the most successful and largest ad exchange
14   is really another means of protecting their
15   dominance in publisher ad serving.  Because
16   again, you know, the idea in exchange in RTB
17   grew and Google then created and acquired
18   their way into the dominant ad exchange.
19       So, it is because the ad exchange
20   hosts the auction where Google has dominance
21   and the publisher uses the bids that come out
22   of an auction to decide which ads go where at
23   what cost, that's why Google has the ability
24   to run the auction.
25       Q.   So, is Google's position in the

Page 207

1        J. Dederick - Highly Confidential
2    publisher ad server business for Display good
3    for advertisers, bad for advertisers or how
4    do you see it?
5        MS. RHEE:  Objection.  Lacks
6        foundation.
7        A.   So, having one party dominate all
8    of publisher ad serving is really terrible
9    for advertisers.  And the reason is it limits
10   their ability to get competitive yield
11   optimization from the publishers, it limits
12   their ability to have a fair chance at buying
13   the most cost effective or efficient, it
14   eliminates the possibility for a more cost
15   efficient supply chain because of course
16   there are no par- -- there are no
17   competitors, meaningful competitors, in
18   publisher ad serving.  So, whatever fees they
19   choose to charge for that, which make their
20   way into cost of media for an advertiser,
21   blank check.
22       So, there are numerous ways that
23   Google's control over the publisher ad
24   serving market harms advertisers.
25       Q.   What did you base the answer that

Page 208

1        J. Dederick - Highly Confidential
2    you just gave on?
3        A.   I base that answer on my knowledge
4    of how publisher ad servers interact with ad
5    exchanges and DSPs and, you know, 11 years of
6    representing buyers who have spoken about the
7    consequences of what that means for
8    advertisers.
9        Q.   How did your 11 years of working
10   with advertisers inform the answer that you
11   gave?
12       MS. RHEE:  Objection to form.
13       A.   As I talked to the world's largest
14   and most sophisticated advertisers, the
15   world's largest and most sophisticated
16   agencies, the reason that the largest and
17   most sophisticated have chosen to work with
18   us is because they trust that we won't bias,
19   or self-preference, and they have seen huge
20   issues with the conflicts of interest within
21   Google.  And so, to the extent possible,
22   they've often wanted to multi-home or use
23   multiple platforms as in The Trade Desk and
24   Google.  And, you know, they frequently talk
25   to us about what they're seeing in Google

Page 209

1        J. Dederick - Highly Confidential
2    activity and what they wish they could get
3    away from, but sometimes can't.
4        Q.   Let me switch topics and ask you
5    about header bidding.
6        Is that okay?
7        A.   Yep.
8        Q.   Overall was header bidding good or
9    bad for advertisers?
10       MS. RHEE:  Objection.
11       A.   Overall the impact of header
12   bidding is very good for advertisers.
13       Q.   Why is that?
14       A.   Prior to header bidding, Google's
15   dominance in publisher ad serving meant every
16   advertiser was subject to the decisions of
17   Google's ad server about what ads they got
18   access to and at what cost.  What header
19   bidding represented was alternatives to
20   Google, as in competing ad exchanges, having
21   the opportunity to skip the line, get ahead
22   of Google's visibility for the first time and
23   host a fairer auction that certainly can
24   include Google, but puts all visibility on a
25   level playing field.  So, what header really

1          J. Dederick - Highly Confidential
2    AdX before?
3          A.   Well, this is the linear story --
4          MS. RHEE:  Objection to form.
5          A.   This is the --
6          MS. RHEE:  Lacks foundation.
7          A.   So, this is the linear example of
8    Google dominance in Search which they
9    monetize successfully on their Search owned
10   and operated, turned that into an ad network
11   by going to publishers and offering them a
12   publisher ad server that would give them
13   access to all of their Search advertisers and
14   all of that money, which every publisher, you
15   know, is very attractive to them.  And so,
16   that led to GDN and AdWords, the ad network.
17   And then what that gave them was a dominant
18   share in publisher ad serving as well as
19   dominance in Search.  What grew organically
20   in the industry was a movement toward more
21   auction based buying, more real-time bidding,
22   and Google saw that happening.  And so, in
23   sort of mid 2000s there was sort of the race,
24   the arm's race to create the dominant ad
25   exchange.  When ad networks, you know, you

1          J. Dederick - Highly Confidential
2    name it, the old ad networks like BlueLithium
3    or these companies that just aren't around
4    anymore, what sort of ate the ad networks was
5    programmatic and auction based buying and so,
6    that became the next natural evolution.  And
7    as that happened, Google needed to operate
8    the dominant ad exchange if they wanted to
9    retain the dominant publisher ad server.
10         And so, that was why Google's
11   worked very hard to build their dominance in
12   publisher ad serving into an ad exchange and
13   then acquired their way into more market
14   share through the acquisition of Admeld.
15         Q.   You mentioned Admeld a couple
16   times.
17         What effect, if any, did the
18   acquisition of Admeld have on Google's
19   position in the ad exchange market today?
20         MR. CHIU:  Objection.  Lacks
21   foundation.
22         A.   So, it's important to look back at
23   that moment in time and understand that
24   Google had already acquired DoubleClick.
25   DoubleClick was a dominant publisher ad

1          J. Dederick - Highly Confidential
2    server and the movement of real-time bid and
3    auction based buying had really begun and,
4    you know, Google in part because of the way
5    that the search business naturally led them
6    to work with a lot of the smaller publishers
7    that linked directly from google.com and that
8    long tail of smaller publishers were a lot of
9    the initial implementations of DoubleClick
10   and DFP.  Google had a lot of share among the
11   smaller publishers, but an independent ad
12   exchange who specialized in strong yield
13   optimization unsurprisingly was the favor of
14   the larger publishers.  So, Google had a
15   pretty good sense of the tail, Admeld had the
16   head in terms of the publisher ad exchange
17   implementations.  And so, by acquiring Admeld
18   they sort of completed their market share
19   dominance and position in the ad exchange
20   market by filling out the big publisher side.
21   So, prior they didn't have the big publishers
22   when they acquired Admeld and shut that down
23   and built it all into DoubleClick, they then
24   bought their way into full market share in
25   the ad exchange business.

1          J. Dederick - Highly Confidential
2          Q.   Let me go back to header bidding a
3    little bit.
4          I think one of the things you said
5    was header bidding created new competition
6    for both DFP and also for AdX.
7          Did I get that right?
8          A.   Yes.
9          MS. RHEE:  Objection.
10         Q.   Do you still view it that way
11   today?
12         A.   No.
13         Q.   Why?
14         A.   Google understood that header
15   bidding posed an exceptional threat because
16   of what I described header bidding created
17   competition around the most important
18   dominant positions that they have, which are
19   the ad exchange, which protects the publisher
20   ad server.  When header bidding happened, it
21   created an opportunity for publishers to see
22   that they can get better yield from working
23   outside of Google's unified stack and many
24   publishers did and that's why publishers
25   raced to a very difficult implementation of

Page 218

1    J. Dederick - Highly Confidential
2  header bidding.  Header bidding is not easy
3  for a publisher to implement.  They only did
4  that at scale because they were getting
5  better yield unsurprisingly from a more
6  competitive market.  And Google recognized
7  that threat and what it could mean to them
8  losing their dominant position in publisher
9  ad serving.
10       And so, what they did really
11 successfully was introduce open bidding,
12 which took all of the control that header
13 bidding had democratized and brought it right
14 back into Google successfully.
15       So, unfortunately the competitive
16 marketplace that header bidding really
17 successfully started to create the momentum
18 and the thought that there might be a
19 competitive market really has gone away and
20 that's been the result of the success of
21 their open bidding program.
22      Q.   Going to switch topics again and
23 ask you a little bit about OpenPath.
24       I think my first question, to what
25 extent does OpenPath compete with exchanges

Page 219

1    J. Dederick - Highly Confidential
2  like AdX?
3      A.   OpenPath is really not competitive
4  to exchanges like AdX.
5      Q.   Why do you say that?
6      A.   OpenPath isn't competitive to
7  exchanges because OpenPath is a buy-side tool
8  for accessing publisher inventory more
9  efficiently on behalf of buyers.  OpenPath
10 explicitly does not offer yield optimization
11 capabilities and it doesn't promise, you
12 know, to, you know, improve pricing and fill
13 or it's not built to improve pricing and fill
14 for publishers.  It's built to create a more
15 efficient path to buying inventory for
16 advertisers.
17       So, one, because it's not built to
18 serve publisher interest and, two, because
19 it's very small.  OpenPath is 20 publishers
20 today.  OpenPath is gonna be dependent on
21 larger publishers who again can multi-home or
22 use multiple instances.  Every OpenPath
23 publisher plugs directly into DFP, so we are
24 not bypassing DFP through OpenPath.
25       And so, you know, no buyer would

Page 220

1    J. Dederick - Highly Confidential
2  consider OpenPath a viable alternative to
3  AdX, for example.  And I don't think AdX
4  views OpenPath as competitive.
5      Q.   To what extent does OpenPath
6  compete with publisher ad servers like DFP?
7      A.   It doesn't.
8      Q.   Why do you say that?
9      A.   Because in almost every OpenPath
10 implementation, it just plugs right into DFP.
11      Q.   Let me change topics slightly.  And
12 I'll start by just asking you kind of simply,
13 as a DSP, who are The Trade Desk's main
14 competitors?
15      A.   DV360, to a lesser extent now
16 Amazon, and those are the main competitors.
17      Q.   To what extent does The Trade Desk
18 compete with ad networks like the Google
19 Display Network?
20      A.   So, the DSP category does not
21 include those ad networks.  However, you
22 know, of course, there's a broader picture at
23 play where an advertiser has however much
24 budget and many different channels and
25 platforms will compete for the overall ad

Page 221

1    J. Dederick - Highly Confidential
2  budget of an advertiser.
3       And so, to the extent that The
4  Trade Desk wants to compete for performance
5  display dollars, unfortunately performance
6  display dollars are almost entirely dominated
7  by AdWords and DV360.
8      Q.   How close of a competitor for The
9  Trade Desk is Google Display Network a close
10 competitor or not a close competitor?
11      MS. RHEE:  Objection to form.
12      A.   The Google Display Network a/k/a
13 AdWords is really an ad network, it is not a
14 DSP.  It does buy via DV3670, so it has
15 access to a DSP and it's plugged into the
16 broader ecosystem of Google, but really
17 AdWords and GDN has locked up the performance
18 display network and we're not really able to
19 compete for that, so we'd like to,
20 absolutely.
21      Q.   When you were mentioning The Trade
22 Desk's main competitors, why did you not
23 include the Google Display Network?
24      A.   I think of --
25      MS. RHEE:  Objection to form and

Page 322

```
1          J. Dederick - Highly Confidential
2    ------------------I N D E X------------------
3    WITNESS:    JOHN DEDERICK
4    EXAMINATION BY:                          PAGE
5    MS. RHEE                                   7
6    MR. VERNON                               147
7    MS. RHEE                                 291
8    MR. VERNON                               317
9
10
     ----------------E X H I B I T S--------------
11
     TTD EXHIBITS
12
     NUMBER          DESCRIPTION           PAGE
13
14   Exhibit 1   The Trade Desk's Annual     8
15               Filings with the
                 Securities and Exchange
16               Commission
17   Exhibit 2   The Trade Desk, Inc.,      32
                 Nasdaq Earnings Call
18               Transcripts
19   Exhibit 3   E-mail chain, Bates        41
                 TTD_DOJ-GOOG23-0022648
20               through
                 TTD_DOJ-GOOG23-0022649
21   Exhibit 4   The Trade Desk Reports     52
                 First Quarter Financial
22               Results
23   Exhibit 5   The Trade Desk Q1 2023     55
                 Investor Presentation
24
25          (Exhibits continued on next page.)
```

Page 323

```
1          J. Dederick - Highly Confidential
2               (Exhibits continued.)
3    Exhibit 6   The Trade Desk's Document    62
4                titled Programmatic
                 Private Marketplace
5                Training, Bates
                 TTD_DOJ-GOOG23-0000472
6                through
                 TTD_DOJ-GOOG23-0000487
7    Exhibit 7   OpenPath Publisher Terms     74
8                and Conditions, Bates
                 TTD_DOJ-GOOG23-0001039
9                through
                 TTD_DOJ-GOOG23-0001052
10   Exhibit 8   May 5, 2002 Press Release    85
11               issued by The Trade Desk
12   Exhibit 9   E-mail with attachment,     120
                 Bates
13               TTD_DOJ-GOOG23-0021505
                 through
14               TTD_DOJ-GOOG23-0021616
15   Exhibit 10  E-mail chain with           267
                 attachment, Bates
16               TTD_DOJ-GOOG23-0009846
                 through
17               TTD_DOJ-GOOG23-0009892
18   Exhibit 11  The Trade Desk vs. Google   280
                 document, Bates
19               TTD_DOJ-GOOG23-0001954
                 through
20               TTD_DOJ-GOOG23-0001956
21   Exhibit 12  Document, Bates             307
                 TTD_DOJ-GOOG23-0001901
22               through
                 TTD_DOJ-GOOG23-0001908
23
24
25
```

Page 324

```
1          J. Dederick - Highly Confidential
2              C E R T I F I C A T E
3

     STATE OF NEW YORK    )
4                         :  SS.:
     COUNTY OF RICHMOND   )
5
6        I, CANDIDA BORRIELLO, a Notary
7    Public for and within the State of New York,
8    do hereby certify:
9        That the witness, JOHN DEDERICK,
10   whose examination is hereinbefore set forth
11   was duly sworn and that such examination is a
12   true record of the testimony given by that
13   witness.
14       I further certify that I am not
15   related to any of the parties to this action
16   by blood or by marriage and that I am in no
17   way interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto
19   set my hand this 4th day of August, 2023.
20
21               Candida Borriello
                 CANDIDA BORRIELLO
22
23
24
25
```

Page 325

```
1          J. Dederick - Highly Confidential
2    ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name:    US et al. Versus GOOGLE LLC
     Dep. Date:    JULY 28, 2023
4    Deponent:     JOHN DEDERICK
5    Pg. Ln.  Now Reads      Should Read     Reason
6    ___ ___  _____     _____     _____
7    ___ ___  _____     _____     _____
8    ___ ___  _____     _____     _____
9    ___ ___  _____     _____     _____
10   ___ ___  _____     _____     _____
11   ___ ___  _____     _____     _____
12   ___ ___  _____     _____     _____
13   ___ ___  _____     _____     _____
14   ___ ___  _____     _____     _____
15   ___ ___  _____     _____     _____
16   ___ ___  _____     _____     _____
17   ___ ___  _____     _____     _____
18   ___ ___  _____     _____     _____
19   ___ ___  _____     _____     _____
20               _____
                 JOHN DEDERICK
21
     SUBSCRIBED AND SWORN BEFORE ME,
22
     This___ day of_____, 20__.
23
     _____
24          Notary Public
25   My Commission Expires:_____
```