# EXHIBIT F

# REDACTED

LEXITAS™

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

vs.

GOOGLE, LLC,

Defendant.

Case No. 1:23-cv-00108-LMB-JFA

HIGHLY CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF

JOHN GENTRY

THURSDAY, OCTOBER 26, 2023

Reported in Stenotype by:
Cody R. Knacke, RPR, CSR No. 13691
Job No.: 916483

I - N - D - E - X
(Continued)

E - X - H - I - B - I - T - S

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 18 | Presentation "Budget Meeting Follow Ups January 2019," Bates Nos. OPENX-00001645 to 1676 | 226 |
| Exhibit 19 | Presentation "The Operating Playbook," Bates Nos. OPENX-0000682 to 719 | 229 |
| Exhibit 20 | E-mail correspondence dated 12/6/2013, Bates Nos. OPENX-00013598 to 13600 | 232 |
| Exhibit 21 | Presentation "Company Meeting January 2017," Bates Nos. OPENX-00000611 to 630 | 240 |
| Exhibit 22 | Presentation "Neil-OpenX Discussion," Bates Nos. OPENX-00001018 to 1049 | 266 |

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 134 | 13 |

INFORMATION REQUESTED
None.

THURSDAY, OCTOBER 26, 2023
8:59 A.M.

THE VIDEOGRAPHER: Okay. Good morning, everyone. We are now on the record.

My name is Gabriela Alvarez. I am the videographer representing Lexitas.

This video deposition is for the United States District Court for the Eastern District of Virginia.

Today's date is October 26, 2023, and the time is 8:59 a.m. Pacific time.

This deposition is being held remotely in the matter of the United States of America, et al., versus Google LLC, Case Number 1:23-cv-00108.

The deponent today is Mr. John Gentry.

All counsel will be noted in the stenographic record.

And the court reporter today is Cody Knacke. He will now swear in the witness.

JOHN GENTRY,
called as a witness, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. VERNON:

Q. Good morning, Mr. Gentry, and everybody.

First question, Mr. Gentry: Can you say and spell your name for the record.

A. Sure. John David Gentry. J-O-H-N D-A-V-I-D G-E-N-T-R-Y.

Q. Okay. Let me really quickly go over a few guidelines for the deposition.

The first guideline: Since there's a court reporter here transcribing what we say, please do your best to answer audibly as opposed to with gestures, which I am doing right now, or, you know, "uh-huh" or "um" or that kind of thing. That'll make the record clear.

Does that make sense?

A. Yes.

Q. Second, please do your best to let me finish my question before you start your answer, even if you know where I'm going.

And on my end, I'll do my best to let you finish your answer before I start another question.

Does that make sense?

A. Yes.

Q. And then the last guideline: In terms of breaks, we'll probably plan to take a break about once an hour. But if you need a break at a different time, just let me know, and we can

accommodate that.

Does that make sense?

A. Yes.

Q. A few more things. For all of my questions, unless I say otherwise, I'd like you to answer based on your personal knowledge only.

Does that make sense?

A. Yes.

Q. So for my questions, unless I say otherwise, I'm not asking you about information you learned during your preparation for the deposition that relates to something that someone else at OpenX knows but that you do not have personal knowledge of.

Does that make sense?

A. Yes.

Q. If at any point you feel like you have information that is within the knowledge of OpenX but not your personal knowledge that's responsive to one of the questions that I asked, please say that, and we'll take it from there.

Does that make sense?

A. Mostly.

Do you have an example of just what that would be?

Q. Yeah, just if I ask you a question and you realize that you learned something in preparation for your deposition that really isn't based on your own personal experience but instead it's based on someone else at OpenX's knowledge and you feel that it's responsive to my question, then just say -- you know, describe what I've just said. Say it's within someone else's knowledge.
A. Okay.
Q. And we'll kind of take it from there.
Does that make sense?
A. Yeah.
Q. Do you understand that the information you provide during this deposition may be used by the Department of Justice in other civil, criminal, administrative, or regulatory cases or proceedings?
A. Yes.
Q. Let me ask you about your background.
Where were you born and raised?
A. I was born in Los Angeles, California, and I grew up in Palos Verdes, California, Palos Verdes Estates.
Q. Can you describe your educational background?
A. Sure. High school here in the local

community, Palos Verdes Estates. I went to college for two years at UC Santa Barbara, two years at UCLA. Graduated from UCLA. And then I got my master's in business from the Kellogg School at Northwestern.
Q. And you are the CEO of OpenX; is that right?
A. Yes.
Q. Can you briefly describe, at a high level, what OpenX is.
A. OpenX is a global ad exchange, would be the simple description of it.
Q. And what is an ad exchange, just at a high level?
A. Okay. So what we do is we support publishers and their ability to sell their inventory. We do that by aggregating publisher demand from across thousands of publishers. They will send ad requests to us when a given page on their website or app opened, also potentially in a CTV app as well.
At that point, we will then take those ad requests and submit those through and federate those out to a lot of what we call DSPs, demand-side partners, who also have technology and algorithms

that allow them to bid on behalf of advertisers to place an advertisement in that space.
Q. Okay. As CEO of OpenX, what are your main responsibilities?
A. My main responsibilities are for everything at the company. You know, the classic CEO responsibilities would be strategy, funding, people, culture.
Q. And can you describe sort of your background at OpenX, meaning the other positions you held prior to becoming CEO?
A. Sure. I joined OpenX originally as a consultant in early 2012. I believe it was either February or March. I became full-time in September 1st of 2013 as president of the company. I had responsibility for everything other than finance, legal, HR, comms.
And then I became the CEO of the company in February of 2020.
Q. I'd like to ask you some questions about the publisher ad service business.
Is that okay?
A. Sure.
Q. What was OpenX's first product?
A. First product was an ad server.

Originally, it was an open source ad server when the company was founded before I was there, and then they took that with the intention of turning it into a for-pay ad server and run a, you know, for-pay ad server into the marketplace. Again, before I was there.
Q. Does OpenX still operate a publisher ad server today?
A. No, we don't.
Q. And just roughly, when did OpenX stop operating a publisher ad server?
A. I think we started winding it down and recognizing the essential challenges as early as 2015. I believe we wound it down in 2018, 2019. There was kind of a piece-by-piece process to that.
Q. When OpenX competed in the publisher ad server business, which company had the largest publisher ad server?
A. Google.
Q. And what was Google's publisher ad server known as?
A. DFP, DoubleClick for Publishers.
Q. If a publisher used a publisher ad server other than Google's DFP, how much access did they have to AdX?

Page 14

MS. LEE: Objection. Form.
THE WITNESS: Sorry.
BY MR. VERNON:
Q. Can you just repeat your answer?
A. Zero. We did not have access to AdX.
Q. And I think I should back up.
What is AdX?
A. AdX is the SSP, or supply-side platform -- which is what we are -- that Google owns, is connected to what today is called GAM, which is the Google ad server product, which was formerly DFP.
Q. How, if at all, did the fact that the publishers have zero access to AdX if they did not use DFP as their publisher ad server affect OpenX's ability to compete with DFP in the publisher ad server business?
MS. LEE: Objection to form.
BY MR. VERNON:
Q. Go ahead.
A. Sorry. If I can speak. I don't know -- am I allowed to --
Q. Oh, yeah. Okay.
So if a lawyer objects, just pause for a second, let them make their objection, and then you can go ahead and answer.

Page 15

The only difference is if a lawyer instructs you not to answer, which probably would be your lawyer if it happens, that's a different thing, and we will deal with that if that happens.
Does that make sense?
A. Yeah, no problem.
Q. Let me just -- to make it clear, I'll repeat my question.
A. That'd be great.
Q. How, if at all, did the fact that publishers had zero access to AdX if they did not use Google's DFP as their publisher ad server affect OpenX's ability to compete with DFP in the publisher ad server business?
MS. LEE: Object to form.
THE WITNESS: It prevented our ability to compete in the publisher ad server business over time.
BY MR. VERNON:
Q. What do you mean by that?
A. Fundamentally, the inability for OpenX to offer an ad server that could access the largest source of advertiser demand in the Internet, which was represented by AdX, imagine if a publisher went with the OpenX ad server, they were going to have a

Page 16

much lower amount of potential revenue that they could acquire and, as a result, much less monetization. So it was economically an unwise choice for them to choose to go with someone that did not have access to the largest pool of demand.
Q. How successful, if at all, was OpenX at convincing publishers to switch from DFP as their publisher ad server to OpenX as their publisher ad server?
A. Personal knowledge --
MS. LEE: Objection to form.
THE WITNESS: My personal knowledge is that I don't think we ever managed to switch somebody over. We often -- we often switched from other ad servers but not from DFP.
BY MR. VERNON:
Q. So what's your understanding of why OpenX was, to your knowledge, unable to convince publishers to switch from Google's DFP to OpenX's ad server?
MS. LEE: Objection to form.
THE WITNESS: Because we did not have the access to AdX that we could offer a somewhat competitive similar offering to DFP.
///

Page 17

BY MR. VERNON:
Q. What was the main reason that OpenX exited the publisher ad server business?
A. The main reason was because we could not get access. As an asset, we could not get access to AdX demand.
Q. What impact, if any, is there on competition in the publisher ad server business from the fact that publishers cannot access AdX demand unless they use DFP as their publisher ad server?
MS. LEE: Objection to form.
THE WITNESS: You cannot compete as an ad server if you do not have the ability to access a similar amount of demand as your competition.
BY MR. VERNON:
Q. How would you characterize Google's position in the display publisher ad server business?
MS. LEE: Objection to form.
THE WITNESS: Dominant, I think at this point, 90 percent-plus share.
BY MR. VERNON:
Q. And what's the main reason why Google has a dominant position in the publisher ad server business for display?

MS. LEE: Objection to form.
THE WITNESS: Because of the fact that they've got access, sole access to the massive amounts of demand represented by AdX which is a combination of the Google Ads ad network -- Google Ads network, and also the DV360 demand.
BY MR. VERNON:
Q. Why, if at all, is accessing AdX demand important to publishers?
MS. LEE: Objection to form.
THE WITNESS: Publishers, you know, prioritize -- their goal with an ad server and with their ad business is to drive as much revenue as possible to be able to fund investments in their properties, so they have to drive the most revenue they can.
When one ad server represents far and away the best opportunity for monetization or revenue, they are going to choose that ad server.
BY MR. VERNON:
Q. In your experience, are publishers realistically able to switch away from Google's DFP for publisher ad serving?
MS. LEE: Objection to form.
THE WITNESS: I'm not aware of any

publisher, and certainly that I can think of in my personal knowledge, that has switched away from DFP or what is now known as GAM.
BY MR. VERNON:
Q. Okay. Let me ask you some questions about a different topic, OpenX's exchange and spending from DV360.
Is that okay?
A. Yes.
Q. First question: What is OpenX's main business today?
A. Our main business is our -- what we call our exchange business, also called at times the supply-side platform.
Q. And how does OpenX's exchange compare with other exchanges just in terms of size?
A. Depends on the exchanges you're comparing us to. If you're comparing us to public market competitors, PubMatic's about -- in terms of revenue, PubMatic's about two and a half times as large as us, Magnite's about six times as large as us following several acquisitions, and then AdX is far larger than us, but I don't know their numbers.
Q. Sort of ballpark, where does OpenX's exchange fall in terms of is it the first largest or

the fifth largest or tenth largest exchange for display?
MS. LEE: Object to form.
THE WITNESS: Somewhere in the fourth to possibly sixth, I would guess that's -- you know, without knowing competitor information and some of the independents, I guess we're in that zone.
BY MR. VERNON:
Q. Okay. In the 2016 to 2017 time frame -- well actually, let me back up.
What is a DSP?
A. A DSP is a demand-side platform. It is a company designed to enable advertisers to bid across a variety of inventory sources or supply sources. All typically digital.
Q. And is it fair to say that DSPs bid on OpenX's exchange?
A. Yes.
Q. In the 2016 to 2017 time frame, which DSP was the largest buyer on OpenX's exchange?
A. DV360, Google.
Q. And what is DV360?
A. DV360 is Google's demand-side platform.
Q. How, if at all, did Google's DV360's spending on the OpenX's exchange change over time?

MS. LEE: Objection to form. Foundation.
THE WITNESS: Is there a specific time period that you're...
BY MR. VERNON:
Q. Sure.
So in approximately 2018 or 2019, how, if at all, did Google's DV360 spending on OpenX's exchange change over time?
MS. LEE: Objection to form.
THE WITNESS: Google had been a strong partner of ours since the early days of the company. In 2018, really the second half of the year, we saw a massive drop in DV360 spend on OpenX.
BY MR. VERNON:
Q. How, if at all, did the decrease in spending by DV360 on OpenX affect OpenX?
MS. LEE: Objection to form.
[redacted]

the drop began, we asked them many, many times as to why the drop had occurred. You know, this was -- this was a normal course of business to ask them about what was going on with spend, as we do with all of our DSP partners.

We were told that everything looked normal, there was no problem on their end, their systems were all normal, which made us, at the time, assume that we had something wrong, but we had no idea what was going on.

BY MR. VERNON:

Q. Do you feel that Google gave OpenX an honest answer as to why DV360's spending on OpenX went down?

MS. LEE: Objection to form.

THE WITNESS: No.

BY MR. VERNON:

Q. Why do you say that?

A. Well, just from the complaint, reading the complaint and learning there was a project named Poirot that appeared designed to target specific exchanges and lower the spend on those exchanges. That was a new piece of information to us.

Q. In the display exchange business, what display exchange is the largest?

MS. LEE: Objection to form.

THE WITNESS: The largest exchange in the display business is AdX.

BY MR. VERNON:

Q. And AdX is Google's exchange; is that fair?

A. That is true, yes.

Q. So Google has both the largest display exchange and one of the largest DSPs; is that fair?

A. Yes, that's fair.

MS. LEE: Objection to form.

BY MR. VERNON:

Q. How easy or difficult is it for OpenX to compete against Google's AdX given that Google is also one of the largest buyers on OpenX's exchange?

MS. LEE: Objection to form.

THE WITNESS: Honestly, when we look at our competitive set, we would like to be able to compete with Google, but Google's really in a class of its own, given its end-to-end control from the DSP side with DV360 to AdX to control of the ad server.

So -- well, technically, as an SSP to compete with AdX, I cannot think of a time when we successfully changed things with AdX that much, other than the introduction of header bidding.

But in general, we look at our competitive

set -- the people we're trying to take share from day in and day out are often the PubMatics or Magnites of the world.

BY MR. VERNON:

Q. At one point you referred to Google having end-to-end control of DV360 from AdX to the ad server.

What did you mean by that?

MS. LEE: Objection to form.

THE WITNESS: They'll take an advertiser's dollar from DV360 -- and that could be a dollar that's from DV360 acting as a DSP or from the Google ad network running through DV360 -- they will funnel those dollars through AdX. And then because they own the ad server, they have the ability to deeply understand exactly what is happening, which bids are winning, and what the rules are of a publisher ad server that determines how the revenue flows into a publisher's ad server.

BY MR. VERNON:

Q. Understood.

Let me ask you some questions about price floors and Google's unified pricing rules. Is that okay?

A. Sure.

Q. In the context of display advertising, what is a price floor?

A. A price floor is a floor set typically set by a publisher that gets passed along through an SSP or ad exchange to a DSP that's establishing the minimum price their publisher's asking -- expecting to be paid for that unit of inventory that they are offering.

Q. Prior to Google's unified pricing rules, to what extent did publishers set different price floors for different exchanges?

MS. LEE: Objection to form.

THE WITNESS: It varies by publisher, but it was common practice for publishers to set a different floor for Google than they would set for perhaps the independent exchanges.

BY MR. VERNON:

Q. And prior to Google's uniform pricing rules, why did publishers set a different price floor for Google than for the other exchanges?

MS. LEE: Objection to form.

THE WITNESS: There was a couple different reasons. I think that the two biggest ones that I'm aware of: One, publishers that were aware that with the amount of demand that Google had being so much

larger than the various independent exchanges, that Google had a higher probability that they could pay more for a given piece of inventory than one of the independent exchanges.

So, as a result, they wanted to send Google a higher floor with the knowledge that Google could likely pay that and had the demand to pay that.

The second reason publishers expressed to me when talking about this was they liked the idea of trying to diversify their revenue. And if Google did not pay the higher floor, then they, you know, had less revenue coming in from Google and more coming in from independent exchanges.

BY MR. VERNON:

Q. And why would a publisher want to manage their price floors to have less revenue from Google and more revenue from other exchanges?

MS. LEE: Objection to form.

THE WITNESS: Most publishers would express to me that they were concerned about the reliance on Google revenue and the significant amount of Google -- significant percentage of revenue that Google represented of their total.

BY MR. VERNON:

Q. How, if at all, did Google's unified

pricing rules affect publishers' ability to set a higher price floor for AdX than for other exchanges?

MS. LEE: Objection to form.

THE WITNESS: My understanding of unified pricing rules is that what Google did was basically establish that a publisher could not set differential floors across their inventory.

BY MR. VERNON:

Q. Was Google taking away publishers' ability to set different floors for different exchanges, good or bad, for publishers?

MS. LEE: Objection to form.

THE WITNESS: That was a negative to publishers. Publishers were unhappy about that and felt it lowered their degree of control over how they ran their -- their advertising business.

BY MR. VERNON:

Q. Why is Google able to control how publishers run this part of their business?

MS. LEE: Objection to form.

THE WITNESS: Two reasons: One is that they own and control the ad server. So they decide the product roadmap for the ad server.

The second is, is that they have such a dominant position that no publisher, at this point,

has any realistic opportunity or would think necessarily about switching off of Google's ad server.

So with that being the case, they could make, really, whatever changes they want to make despite the fact that, you know, a publisher might not like it.

BY MR. VERNON:

Q. Fair to say that prior to Google's uniform price rules, publishers could try to give AdX a higher floor to shift transactions from AdX to other exchanges? Is that fair?

MS. LEE: Objection to form.

THE WITNESS: Yes. And --

BY MR. VERNON:

Q. And shift -- sorry. Go ahead.

A. No, that's fine. That's fine.

The answer's "Yes."

Q. Shifting transactions from AdX to other exchanges could potentially make the exchange market more competitive. Is that fair?

A. Yes.

MS. LEE: Objection to form.

BY MR. VERNON:

Q. So what effect, if any, does Google's

taking away publishers' ability to set higher price floors for AdX have on the level of competition in the exchange business?

MS. LEE: Objection to form.

THE WITNESS: It reduces the level of competition in the exchange business by reducing the opportunity for non-Google SSPs to capture publisher -- capture delivery demand of publishers.

BY MR. VERNON:

Q. Let me shift topics again and ask you about last look. Is that okay?

A. Yes.

Q. In the context of display advertising, what does "last look" mean?

A. Last look was the ability of the -- of Google to see the bids that are brought into the ad server and, with last look, decide whether they wanted to place another bid of their own after seeing the bids of the competition.

Q. How, if at all, did Google's last look affect OpenX's ability to compete in the display exchange business?

MS. LEE: Objection to form.

THE WITNESS: It was -- it was not an even playing field. Because we could place a bid, and

that any of us had a higher bid.

BY MR. VERNON:

Q. And first look -- AdX's first look would also mean that the advertiser that values the impression the most might not acquire the impression; is that fair?

MS. LEE: Objection to form.

THE WITNESS: Yes, that's fair.

BY MR. VERNON:

Q. So is AdX's first look good or bad for publishers?

MS. LEE: Objection to form.

THE WITNESS: Bad, in my opinion.

BY MR. VERNON:

Q. And why, in your opinion, is AdX's first look bad for publishers?

MS. LEE: Objection to form.

THE WITNESS: Because it does not enable realtime competition from a variety of sources allowing a publisher to get the highest bid -- possible bid for their inventory.

BY MR. VERNON:

Q. Apologies if this is a little repetitive.

What impact, if any, did AdX's first look have on publishers' ability to get the highest

amount of revenue for their impressions?

MS. LEE: Objection to form.

THE WITNESS: Because AdX could transact in what is a noncompetitive dynamic, that resulted in a publisher not receiving the highest possible bid for their inventory.

BY MR. VERNON:

Q. In your opinion was AdX's first look good or bad for advertisers?

MS. LEE: Objection to form.

THE WITNESS: I think it was bad for advertisers.

BY MR. VERNON:

Q. And why do you think that AdX's first look was bad for advertisers?

MS. LEE: Objection to form.

THE WITNESS: Because it created a single channel by which an advertiser could access a publisher's inventory. And you could have an advertiser that wanted to work with a different exchange that did not have the ability to compete with their bid on an equal basis with the AdX bid.

BY MR. VERNON:

Q. What impact, if any, did AdX's first look have on the extent to which the advertisers with the

highest valuation of an impression actually won that impression?

MS. LEE: Objection to form.

THE WITNESS: It would limit advertisers that existed outside of the -- that were not bidding through AdX that could have had the highest value bid from winning those impressions.

BY MR. VERNON:

Q. Okay. Let me ask you a few questions about AdX's position in the display exchange business.

Is that okay?

A. Yes.

Q. How would you characterize AdX's position in the display exchange business?

MS. LEE: Objection to form.

THE WITNESS: Dominant.

BY MR. VERNON:

Q. And why do you say that AdX is dominant in the display exchange business?

A. Because it is the delivery point for the largest source of demand in the display business.

Q. Have you ever seen any publishers stop using AdX?

MS. LEE: Objection to form.

THE WITNESS: No.

BY MR. VERNON:

Q. Why, as far as you have seen, do publishers not stop using AdX?

A. Because --

MS. LEE: Objection to form.

THE WITNESS: Because it is the delivery point for the largest source of demand for display advertising.

BY MR. VERNON:

Q. What competitive advantages, if any, does AdX have when competing against OpenX?

MS. LEE: Objection to form.

THE WITNESS: One would be the enormous amount of demand that it gets from being owned by Google. So it's getting proprietary access to Google demand.

The other would be the knowledge that it gets from Google's ownership of the ad server and the ability for Google to use their knowledge of the ad server, their knowledge of bid prices, their knowledge of winning bid prices to inform AdX bidding strategy.

BY MR. VERNON:

Q. Can you explain -- one of the things you said was Google's ownership of the ad server gives

DECLARATION UNDER PENALTY OF PERJURY

I hereby declare under penalty of perjury that the foregoing is my deposition under oath; that I have read same; and that I have made the corrections, additions, or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this        day of             , 2023.

_________________________

JOHN GENTRY

DEPONENT'S CHANGES OR CORRECTIONS

Note: If adding to your testimony, print the words you want to add. If deleting from your testimony, print the words you want to delete. Specify with "Add" or "Delete" and sign this form.

DEPOSITION OF: JOHN GENTRY
DATE OF DEPOSITION: OCTOBER 26, 2023

| PAGE | LINE | CHANGE/ADD/DELETE |
| --- | --- | --- |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |

Deponent's Signature _______________ Date _______

COUNTY OF LOS ANGELES, )
                       )
STATE OF CALIFORNIA,   )

I, Cody R. Knacke, Registered Professional Reporter, Certified Shorthand Reporter in and for the State of California, License No. 13691, hereby certify that the deponent was by me first duly sworn and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceedings and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificate null and void.

In witness whereof, I have hereunto set my hand this day: October 27, 2023.

_________________________

CODY R. KNACKE, RPR, CSR No. 13691