# EXHIBIT G

# REDACTED

```
                                                        Page 1
 1
 2       H I G H L Y    C O N F I D E N T I A L
 3       IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
 4       ALEXANDRIA DIVISION
         -------------------------------x
 5       UNITED STATES, et al.,
 6                 Plaintiffs,
 7              vs.                      Case No.
                                         1:23-cv-000108
 8       GOOGLE LLC,
 9                 Defendant.
         -------------------------------x
10
11
12                HIGHLY CONFIDENTIAL
13         REMOTE/ORAL/WEB VIDEOCONFERENCE
14      VIDEOTAPED DEPOSITION OF JAMES GLOGOVSKY
15             Friday, August 25, 2023
16                    9:11 a.m.
17
18
19
20
21
22
23      Reported by:
        Jennifer Ocampo-Guzman, CRR, CLR
24
25      Job No. CS6072653
```

Page 2

 8    August 25, 2023
 9    9:11 a.m.

12        HIGHLY CONFIDENTIAL
13    Remote/Oral/Web Videoconference
14    Videotaped Deposition of JAMES
15    GLOGOVSKY, held via Zoom Web
16    Videoconference, pursuant to subpoena,
17    before Jennifer Ocampo-Guzman, a
18    Certified Realtime Shorthand Reporter
19    and Notary Public of the State of New
20    Jersey.

Page 3

 2  A P P E A R A N C E S:

 4    UNITED STATES DEPARTMENT OF JUSTICE
 5    Attorneys for Plaintiff United States
 6        325 7th Street, Suite 300
 7        Washington, DC 20004
 8    BY:  JEFFREY VERNON, ESQ.
 9        DIANA HENRY, ESQ.
10        RACHEL HANSEN, ESQ.
11        LEVI MARKS, ESQ.

13    NEW YORK STATE OFFICE OF THE ATTORNEY
14    GENERAL
15    Attorney for Plaintiff State of New York
16        28 Liberty Street
17        New York, New York 10005
18    BY:  MORGAN FEDER, ESQ.

Page 4

 2  APPEARANCES (Continued):

 4    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 5    Attorneys for Defendant Google LLC
 6        1285 Avenue of the Americas
 7        New York, New York 10019
 8    BY:  ERIN J. MORGAN, ESQ.
 9        ELIZABETH NORFORD, ESQ.

12    THE NEW YORK TIMES
13    Attorney for The New York Times and the
14    Deponent
15        620 Eighth Avenue
16        New York, New York 10018
17    BY:  DEMETRI BLAISDELL, ESQ.

20    ALSO PRESENT:
21        MARC FRIEDMAN, Videographer

Page 5

 1        HIGHLY CONFIDENTIAL
 2        THE VIDEOGRAPHER:  Good morning.
 3    We are going on the record at 9:11 a.m.
 4    on Friday, August 25, 2023.  Please note
 5    this deposition is being conducted
 6    virtually.  Quality of recording depends
 7    on the quality of the camera and
 8    internet connection of all participants.
 9    What is heard from the witness and seen
10    on screen is what will be recorded.
11    Audio and video recording will continue
12    to take place unless all parties agree
13    to go off the record.  This is media
14    unit number 1 of the video-recorded
15    deposition of James Glogovsky in the
16    matter of United States, et al., versus
17    Google LLC.  This case is filed in the
18    United States District Court, Eastern
19    District of Virginia, Alexandria
20    division, case number 1:23-CV-00108.
21        My name is Marc Friedman.  I'm the
22    certified video legal specialist and
23    your court reporter today is Jennifer
24    Guzman and we are both from the firm of
25    Veritext Legal Solutions.  I'm not

2 (Pages 2 - 5)

Page 10

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2       A.  I studied at Southern Illinois
3  University in Carbondale, Illinois.
4       Q.  What did you study?
5       A.  Finance.
6       Q.  And what did you do after college?
7       A.  I began working at the Weather
8  Channel, in media.
9       Q.  And I'm sorry.  I didn't hear --
10  oh, in media, okay.
11           How long were at the Weather
12  Channel?
13       A.  A little over five years.
14       Q.  And then where did you go after
15  that?
16       A.  I went to a startup.
17       Q.  What kind of start up?
18       A.  It was an agency startup, for
19  media.
20       Q.  Like an ad agency?
21       A.  Yes.
22       Q.  What was that agency called?
23       A.  Anthro Agency.
24       Q.  And what did you do there?
25       A.  I was director of strategy and

Page 11

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2  operations.
3       Q.  What kind of strategy were you
4  directing?
5           MR. BLAISDELL:  Object to the form
6       of the question.
7       A.  Largely media strategy work.
8       Q.  When you say media, what are you
9  referring to?
10       A.  Display and social media, across a
11  handful of platforms.
12       Q.  What kind of platforms?
13       A.  Ad buying platforms.
14           (Discussion off the record.)
15           MS. MORGAN:  Maybe you could just
16       try to speak up.  Okay.
17       Q.  What ad buying platforms?
18       A.  There were a number of them.
19  Mostly, the predominant ones in social and
20  display media --
21              (Discussion off the
22       record.)
23           MS. MORGAN:  Can we go off the
24       record again and try to troubleshoot
25       this.  I don't want to use time on the

Page 12

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2  record to work on the audio.
3           THE VIDEOGRAPHER:  Standby, the
4  time is 9:21 a.m.  We're going off the
5  record.
6       (A brief recess was taken.)
7           THE VIDEOGRAPHER:  The time is
8  9:26 a.m. and we are back on the record.
9       Q.  Okay.  After another audio break, I
10  think we're ready to continue.  Right before
11  the break, you were saying, I think that at
12  your previous job, at an ad agency, you
13  directed strategy related to ad buying in
14  social media and display media; is that
15  right?
16       A.  Yes.
17       Q.  Okay.  What type of, can you give
18  me just like a couple of examples of the
19  platforms you were buying on?
20       A.  We were primarily buying on DB,
21  Google's buying platform.
22       Q.  Okay.  When did you come to The New
23  York Times?
24       A.  I joined The New York Times in
25  2017, I believe in August.

Page 13

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2       Q.  Was there anything between the ad
3  agency and New York Times?
4       A.  I worked at Vice Media.
5       Q.  What did you do at Vice?
6       A.  I was director of revenue
7  operations.
8       Q.  And what did that entail?
9       A.  It included the responsibilities of
10  managing our monetization efforts around
11  programmatic, also the pricing and inventory
12  responsibilities for our direct business and
13  then also managing a lot of our data
14  operations to ensure that we had accurate
15  forecasting.
16       Q.  It's a lot of things.
17           Okay.  So you came to The New York
18  Times in 2017.  What was your role when you
19  came to the Times?
20       A.  I started at The New York Times as
21  director of yield.
22       Q.  What did that role entail?
23       A.  Primary responsibilities was the
24  pricing and inventory for our direct
25  business.

4 (Pages 10 - 13)

Page 14

GLOGOVSKY - HIGHLY CONFIDENTIAL

Q. How has your role changed over time, just briefly?

A. My role has evolved and changed periodically. I went from director of yield to now vice president of revenue operations and analytics, which has a broader remit.

Q. What is that broader remit, what's your -- what do you do now?

A. I still oversee digital direct pricing and inventory, with the additions of our print business, also custom pricing, sales planning or media planning, ad operations and solutions and programmatic.

Q. I think you said this, but you do that across digital and print?

A. That is correct.

Q. Okay. I am going to come back to that.

But I want to start by asking whether you're aware that between the fall of 2019 through 2021 the Department of Justice conducted an investigation into Google's ad tech business. Are you aware of that?

A. I am aware.

Page 15

GLOGOVSKY - HIGHLY CONFIDENTIAL

Q. Did you meet with the Department of Justice at any point between 2019 and 2021?

MR. BLAISDELL: Object to the form of the question.

A. I do not recall.

Q. You don't recall whether you met with the Department of Justice in that two-year period or you don't recall if you've met with the Department of Justice ever?

MR. BLAISDELL: Object to the form of the question.

A. I do not recall meeting with the Department of Justice about that specific topic or investigation.

Q. Did you meet with the Department of Justice to talk about ad tech at any point?

MR. BLAISDELL: Object to the form of the question.

A. I do not recall.

Q. How many times have you met with the Department of Justice?

MR. BLAISDELL: Object to form of the question.

MR. VERNON: I just want to object

Page 16

GLOGOVSKY - HIGHLY CONFIDENTIAL

on relevancy grounds, if we are getting outside of this case I don't know if there are or there are not, but if there were meetings about other investigations, I would to object that.

Go ahead.

Q. How many times have you met with the Department of Justice?

A. I do not know the specific number off the top of my head.

Q. Is it more than once?

MR. BLAISDELL: Object to the form of the question.

A. Possibly.

Q. You can't remember if it was more than one time?

MR. BLAISDELL: Object to the form of the question.

A. No.

Q. And the one time you met with the Department of Justice that you can remember, what did you talk about?

MR. BLAISDELL: Object to the form of the question.

Page 17

GLOGOVSKY - HIGHLY CONFIDENTIAL

MR. VERNON: Objection on relevance. If we are going you outside of the scope of this case, but go ahead.

A. It was an unrelated case around domain spoofing.

Q. Have you ever talked to the Department of Justice about Google?

MR. BLAISDELL: Object to the form of the question.

A. Not that I'm aware of.

Q. Have you ever talked to the Department of Justice about ad tech tools?

MR. BLAISDELL: Object to the form of the question.

A. During the conversation, ad tech tools would have come up based on the topic.

Q. How did ad tech tools come up in a discussion about spoofing?

MR. BLAISDELL: Object to the form of the question.

A. Ad tech tools would have come up based on the publishers' knowledge, The New York Times' knowledge about how ad spoofing takes place.

Page 170

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2  Google's DSP?
3      MR. BLAISDELL: Object to form.
4      A. We have a limited understanding of
5  the uniqueness from the DSP side. We also
6  understand that many advertisers and agencies
7  use a multitude of different DSPs
8  interchangeably for different KPIs, different
9  campaigns, on many different brands within
10 the advertiser, so it is hard to say how
11 unique that demand from the DSP specifically
12 that Google operates would be incremental
13 revenue to us.
14     Q. Do you know one way or the other
15 whether the demand from Google's DSP is
16 unique?
17     MR. BLAISDELL: Object to form.
18     A. Sorry. Can you please clarify?
19     Q. Sure.
20     Do you know whether -- how about
21 this: What is your best, best estimate,
22 using your experience in the industry, as to
23 whether the demand that comes from Google's
24 DSP is either unique or not unique?
25     MS. MORGAN: Objection to form.

Page 171

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2      MR. BLAISDELL: Object to form.
3      A. May I ask a question? I have to
4  clarify.
5      Q. Yeah, go ahead.
6      A. Are you looking for a figure?
7      Q. No, no, no. Just qualitative. So.
8  Let me just -- I'll ask the question again,
9  just so the record is clear.
10     What is your best understanding,
11 based on your years of experience in the
12 industry, as to whether the Google's DSP
13 either does or does not bring unique demand
14 to The New York Times?
15     MS. MORGAN: Objection to form.
16     MR. BLAISDELL: Object to form.
17     A. Based on my understanding of your
18 question, for The New York Times
19 specifically, I believe that the best guess
20 for unique demand coming through Google's DSP
21 would be less on the open auction side for
22 the DSP and more on the programmatic
23 guaranteed side, as Google was a pioneer in
24 programmatic guarantee at an earlier stage in
25 programmatic guaranteed lifespan.

Page 172

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2      Q. Focusing on open auction
3  specifically, what is your best estimate for
4  whether Google's DSP either does or does not
5  provide unique demand for The New York Times?
6      MR. BLAISDELL: Object to form.
7      A. I'm going to ask you to clarify
8  again. I'm trying to understand what you're
9  looking for as the best guess.
10     Q. Just qualitatively whether your
11 best estimate, based on your experience in
12 the industry, is either that Google's DSP
13 does provide unique revenue for The New York
14 Times or it does not?
15     A. As a percentage, unique revenue, I
16 unfortunately do not have a best guess on
17 how, what percentage of our revenue coming
18 from Google auction, Google AdX open auction
19 is unique. I think that is a very difficult
20 question to answer for The New York Times and
21 any publisher as we do not have that
22 visibility.
23     Q. So stepping aside from the question
24 of a specific percentage, what's your best
25 estimate for, based on your experience in the

Page 173

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2  industry, whether the Google DSP either does
3  or does not provide unique demand to The New
4  York Times for open auction specifically?
5      MS. MORGAN: Object to form.
6      A. For -- I'm sorry. I'm still
7  struggling with the question. I am going to
8  have to ask you again.
9      Q. Sure.
10     So I don't want to ask about a
11 specific percentage.
12     A. Okay.
13     Q. What I do want to ask about is just
14 your best estimate, again based on your
15 experience, for whether Google's DSP either
16 does provide unique revenue to New York Times
17 for open auction specifically or it does not?
18     MS. MORGAN: Objection to form.
19     MR. BLAISDELL: Object to form.
20     A. From my personal capacity and my
21 experience that you called out, I do believe
22 that Google AdX does provide unique demand.
23     Q. Let me ask a slightly different
24 question. I think you answered about AdX.
25 Do you remember that?

Page 174
GLOGOVSKY - HIGHLY CONFIDENTIAL

1
2     Focusing on Google's DSP, what's
3  your best sense for whether Google's DSP
4  either does or does not provide unique demand
5  to The New York Times for open auction
6  specifically?
7     MS. MORGAN: Objection to form.
8     A.  My best guess for The New York
9  Times specifically that AdX does provide
10 unique demand for open auction.
11    Q.  But I think you referred to AdX
12 again and I'm just trying to ask about the
13 DSP.  Does that make sense?
14    A.  All right, yes.
15    Q.  Let me just ask my question, so
16 it's clearer.
17    What's your best estimate, based on
18 your experience, for whether Google's DSP
19 either does or does not provide unique demand
20 for open auction specifically for The New
21 York Times?
22    A.  My best guess is that Google's DSP
23 has unique demand and transacts on The New
24 York Times.
25    Q.  Sorry.  It took me a while to get

Page 175
GLOGOVSKY - HIGHLY CONFIDENTIAL

1
2  there.
3     What is your best estimate based on
4  your experience for whether Google's display
5  network provides unique demand for open
6  auction displays, specifically for The New
7  York Times?
8     MS. MORGAN: Objection to form.
9     MR. BLAISDELL: Object to form.
10    A.  My best guess is that Google's
11 display network does provide unique demand to
12 The New York Times.
13    Q.  And why?
14    MR. BLAISDELL: Object to form.
15    A.  From my understanding, the demand
16 from Google's ad network -- sorry, I'm
17 forgetting the appropriate, exact name --
18 provides unique demand that is not available
19 to either SSPs from our understanding and is
20 only accessible through AdX.
21    Q.  Can you explain, at whatever level
22 of generality you're comfortable with, how
23 important the unique demand that comes from
24 Google's display network is for The New York
25 Times?

Page 176
GLOGOVSKY - HIGHLY CONFIDENTIAL

1
2     MS. MORGAN: Objection to form.
3     MR. BLAISDELL: Object to form.
4     A.  In general we are actively seeking
5  out unique demand across all of our
6  programmatic providers or SSP providers, and
7  that uniqueness in each of those providers is
8  very important, and the primary, one of the
9  reasons, one of the primary reasons of many
10 reasons why we would work with them.  And
11 specifically to your point, Google would be
12 one of those providers that we would, we
13 would consider that.
14    Q.  Is it fair to say that the Google
15 display network has the largest source of
16 unique demand for programmatic display for
17 The New York Times specifically?
18    MS. MORGAN: Objection to form,
19 lacks foundation.
20    MR. BLAISDELL: Object to form.
21    A.  Can you clarify the question?
22    Q.  Sure.
23    What's your understanding of what
24 the largest source of unique demand is for
25 programmatic display revenue specifically?

Page 177
GLOGOVSKY - HIGHLY CONFIDENTIAL

1
2     MR. BLAISDELL: Object to form.
3     [REDACTED]
4     [REDACTED]
5     [REDACTED]
6     [REDACTED]
7     [REDACTED]
8     [REDACTED]
9     [REDACTED].
10    Q.  In your last answer, did you mean
11 to say that Google has the largest share of
12 unique demand for programmatic display for
13 The New York Times?
14    MS. MORGAN: Objection to form.
15    [REDACTED]
16    [REDACTED]
17    [REDACTED]
18    [REDACTED]
19    [REDACTED]
20    [REDACTED]
21    [REDACTED]
22    Q.  Understood.
23    Let me switch topics politely.
24    What is AdX' -- Google AdX' take
25 rate for open auction display for The New

| Page 282 | Page 284 |
|---|---|
| GLOGOVSKY - HIGHLY CONFIDENTIAL | GLOGOVSKY - HIGHLY CONFIDENTIAL |

Page 282

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2  because of the connections between DFP and
3  AdX?
4      MS. MORGAN: Objection to form,
5  lacks foundation.
6      MR. BLAISDELL: Object to form.
7      A. I believe it's difficult to answer,
8  because there are unique propositions by most
9  ad tech companies whether it be SSPs or ad
10 servers that are competing with one another,
11 and my spec -- my opinion would be purely
12 speculation, whether it was hard or not.
13     Q. Can you identify a strong
14 competitor for Google as a publisher ad
15 server today?
16     MS. MORGAN: Objection to form.
17     A. For The New York Times we have not
18 recently RFI'd solutions for ad serving and
19 we have not taken the actions to identify a
20 potential replacement to Google Ad Manager.
21     Q. Do you know whether there is a lot
22 of competition for Google as a publisher ad
23 server today for display?
24     MR. BLAISDELL: Object to form.
25     MS. MORGAN: Objection to form.

Page 283

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2      A. It depends on what Google perceives
3  as competition for both ad serving and
4  monetization, and I would not be in the
5  position to say whether or not there is high
6  level of competition that Google perceives or
7  not.
8      Q. Could you at least understand why
9  it might be hard to compete with Google in
10 the publisher ad server business because of
11 the connections between DFP and AdX?
12     MS. MORGAN: Objection to form.
13     MR. BLAISDELL: Object to form.
14     A. I can reasonably understand that as
15 a reason that others may point to.
16     Q. Is it fair to say that it could be
17 better for competition if AdX were available
18 separately from DFP?
19     MS. MORGAN: Objection to form.
20     MR. BLAISDELL: Object to the form.
21     A. In this hypothetical scenario,
22 assuming that there were available
23 competitors of potential -- or of the
24 necessary size to compete and fill the vacant
25 inventory, it would be potentially beneficial

Page 284

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2  in this hypothetical scenario.
3      Q. So it's fair to say that it could
4  be potentially beneficial for publishers to
5  have the option to use DFP without using AdX;
6  is that correct?
7      MS. MORGAN: Objection to form.
8      MR. BLAISDELL: Object to form.
9      A. If it was exclusively focused on
10 programmatic open auction revenue that would
11 be potentially a benefit in this hypothetical
12 scenario. However, there are other
13 considerations publishers would need to
14 consider and ensure that they have taken on
15 the understanding of the operational burden
16 and tax that it would require the
17 infrastructure, the capital intensivity in
18 both in costs and in also how it would impact
19 their other lines of business.
20     So it's not purely just an open
21 auction answer.
22     Q. Is it fair to say that it could be
23 good for competition in the publisher ad
24 server business if AdX were available
25 separately from DFP?

Page 285

1  GLOGOVSKY - HIGHLY CONFIDENTIAL
2      MS. MORGAN: Objection to form.
3      A. In this hypothetical scenario, with
4  the appropriate competitors, of the size, to
5  fill this space that is being left behind in
6  this decision, it could be potentially
7  beneficial. However, there are other factors
8  that publishers would need to consider in
9  that switch or change in their strategy.
10     Q. Why do you say that it could
11 potentially be beneficial for competition for
12 AdX to be available separately from DFP?
13     A. It's not a certainty that
14 competition will meet the current level of
15 competition, and because of that, I cannot
16 unequivocally confirm that it would be a
17 benefit or not.
18     Q. Setting aside whether it's a
19 certainty, why do you say that it could be
20 better for competition if AdX were separately
21 available from DFP?
22     A. Theoretically there could be more
23 players in the space, which could potentially
24 drive up CPMs and benefit publishers
25 ultimately to make more revenue.

Page 298

```
 1   GLOGOVSKY - HIGHLY CONFIDENTIAL
 2   will reserve the rest of my time to use
 3   then.
 4       MR. VERNON:  Thank you
 5   Mr. Glogovsky, to Demetri and the court
 6   reporter, Google's counsel and
 7   everybody.  Definitely appreciate it.
 8   It's been a long day and we thank you
 9   for your time.
10       MS. MORGAN:  I second that.  Thank
11   you.  I know it's painful to sit for a
12   deposition, especially on a summer
13   Friday, and we really appreciate the
14   time.
15       MR. BLAISDELL:  Sorry.  Just before
16   we go off the record, I will also note
17   that The Times also objects to
18   Ms. Morgan's attempt to reserve time for
19   some subsequent deposition.  We've made
20   the witness available now for the time
21   that the parties were permitted to
22   examine him, and it's our position that
23   there will be no further deposition for
24   no further questioning by either party
25   to this case.
```

Page 299

```
 1   GLOGOVSKY - HIGHLY CONFIDENTIAL
 2       THE VIDEOGRAPHER:  Okay to close
 3   the record?
 4       MS. MORGAN:  Yes, we can close it.
 5       THE VIDEOGRAPHER:  Standby.  This
 6   concludes today's deposition given by
 7   James Glogovsky.  The number of media
 8   units used is six and will be retained
 9   by Veritext Legal Solutions.  We are
10   going off the record at 5:26 p.m.,
11   Eastern Daylight Time.  Thank you,
12   everybody.  Have a great weekend.  Nice
13   working with you.
14       (Time noted:  5:26 p.m.)
```

Page 300

```
 1
 2   STATE OF _____ )
 3                         ) :ss
 4   COUNTY OF _____ )
 5
 6
 7       I, JAMES GLOGOVSKY, the witness
 8   herein, having read the foregoing
 9   testimony of the pages of this
10   deposition, do hereby certify it to be a
11   true and correct transcript, subject to
12   the corrections, if any, shown on the
13   attached page.
14
15        _____
16             JAMES GLOGOVSKY
17
18   Sworn and subscribed to before
19   me, this      day of
20       , 2023.
21   _____
22   Notary Public
23
24
25   Job No. CS6072653
```

Page 301

```
 1
 2            C E R T I F I C A T E
 3   STATE OF NEW JERSEY )
 4                       : ss.
 5   COUNTY OF MIDDLESEX )
 6       I, Jennifer Ocampo-Guzman, a
 7   Certified Realtime Shorthand Reporter and
 8   Notary Public within and for the State of New
 9   Jersey, do hereby certify:
10       That JAMES GLOGOVSKY, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn, via remote/oral/web
13   videoconference, and that such deposition is
14   a true record of the testimony given by the
15   witness.
16       I further certify that I am not
17   related to any of the parties to this action
18   by blood or marriage, and that I am in no
19   way interested in the outcome of this
20   matter.
21       IN WITNESS WHEREOF, I have
22   hereunto set my hand this 27th day of August
23   2023.
24
                  J. Ocampo-Guzman
25   JENNIFER OCAMPO-GUZMAN, CRR, CLR
```

Veritext Legal Solutions
800-567-8658                                      973-410-4098