# EXHIBIT H

# REDACTED

H I G H L Y   C O N F I D E N T I A L

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

-----------------------------x

UNITED STATES, et al.,

Plaintiffs,

vs.                                    Case No.
                                       1:23-cv-000108

GOOGLE LLC,

Defendant.

-----------------------------x

HIGHLY CONFIDENTIAL
VIDEOTAPED DEPOSITION OF BENNEASER JOHN
New York, New York
Friday, September 8, 2023
9:17 a.m.

Reported by:
Jennifer Ocampo-Guzman, CRR, CLR
JOB NO. 6082515

September 8, 2023
9:17 a.m.

HIGHLY CONFIDENTIAL
Videotaped Deposition of
BENNEASER JOHN, held at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, pursuant to subpoena, before Jennifer Ocampo-Guzman, a Certified Realtime Shorthand Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

UNITED STATES DEPARTMENT OF JUSTICE
Attorneys for Plaintiff United States
325 7th Street, Suite 300
Washington, DC 20004
BY: JEFFREY VERNON, ESQ.
KAITLYN BARRY, ESQ.
JEFF QUI, ESQ., (via Zoom)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Attorneys for Defendant Google LLC
1285 Avenue of the Americas
New York, New York 10019
BY: KAREN DUNN, ESQ.
ERICA SPEVACK, ESQ.
WILLIAM ISAACSON, ESQ. (p.m. session)
JULIA WOOD, ESQ., (via Zoom)

AXINN, VELTROP & HARKRIDER LLP
Attorneys for Defendant Google LLC
55 Second Street
San Francisco, California 94105
BY: ISABELLA SOLORZANO, ESQ.

APPEARANCES (Continued):

ORRICK HERRINGTON & SUTCLIFFE LLP
Attorneys for nonparty Microsoft and the Deponent
1152 15th Street, N.W.
Washington, D.C. 20005-1706
BY: EILEEN COLE, ESQ.
ALLEN DAVIS, ESQ., (via Zoom)

ALSO PRESENT:
CARLOS RIVERA, Videographer

HIGHLY CONFIDENTIAL

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:17 a.m. on September 8, 2023. Please note that the microphones are sensitive and may pick up whispering and minor conversations; and please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit number 1 of the video-recorded deposition of Benneaser John taken by counsel for defendant, in the matter of the United States of America versus Google LLC, filed in the United States District Court, for the Eastern District of Virginia, case number 1:23-cv-000108-LMB-JFA. The location of this deposition is 1285 Avenue of the Americas, New York, New York. My name is Carlos Rivera representing Veritext and I'm the videographer. The court reporter is Jennifer Ocampo-Guzman also representing

HIGHLY CONFIDENTIAL

Veritext.

I'm not authorized to administer an oath, I'm not related to any party in this action. I'm not financially interested in the outcome.

If there are any objections to the proceedings, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearance and affiliation for the record, beginning with the noticing attorney.

MS. DUNN: Karen Dunn from Paul Weiss, on behalf of Google.

MS. SPEVACK. Erica Spevack, Paul Weiss, on behalf of Google.

MS. SOLORZANO: Isabella Solorzano, Axinn, Veltrop & Harkrider, on behalf of Google.

MR. VERNON: Jeff Vernon, on behalf of the United States.

MS. BARRY: Kaitlyn Barry, on behalf of the United States.

JOHN - HIGHLY CONFIDENTIAL

MS. COLE: Eileen Cole, Orrick, on behalf of the witness and Microsoft.

THE VIDEOGRAPHER: Can the court reporter please swear in or affirm the witness.

B E N N E A S E R J O H N, called as a witness, having been duly sworn, was examined and testified as follows:

EXAMINATION BY

MS. DUNN:

Q. Can you state your name for the record, please?

A. Benneaser John, and I go by Ben John.

Q. And where do you live?

A. Princeton, New Jersey.

Q. What is your current position at Microsoft?

A. VP of engineering.

Q. And when did you start working at Microsoft?

A. June 6, 2022.

Q. And prior to Microsoft, where did you work?

JOHN - HIGHLY CONFIDENTIAL

A. At Xandr.

Q. And when did you start working at Xandr?

A. I started at AppNexus late 2012, and AppNexus evolved to Xandr, part of the AT&T acquisition.

Q. And what was your position at Xandr?

A. CTO.

Q. And you said prior to Xandr you worked at AppNexus?

A. Yes.

Q. And when did you start working at AppNexus?

A. January 2013, to be exact.

Q. And what was your position at AppNexus?

A. I played multiple roles. I started as head of engineering for web services, then SVP of engineering for buyer side systems, and then I took the CTO role.

Q. And you're prepared to testify today as the corporate representative of Microsoft, including as to topics relating to

JOHN - HIGHLY CONFIDENTIAL

Xandr, which was acquired by Microsoft in 2022, and also AppNexus, which was acquired by AT&T in 2018, when it was integrated into AT&T's new tech offering, which was branded Xandr, correct?

A. That is correct.

MS. COLE: I just want to state for the record, to the extent that we have the records and materials from the transition.

MS. DUNN: Understood.

Q. And just for the record, Microsoft acquired your former company Xandr, was that in 2022?

A. Uh-huh.

(Discussion off the record.)

A. Oh, sorry, yes.

Q. And Xandr, just for the record, is an advertising technology company with buy and sell side capabilities?

A. That's correct, yes.

Q. If you -- we'll show you Tab 2.

MS. COLE: Before we go on I want to mark this so I don't forget later, I

feature perspective, we meet or beat some of those features.

Q. So from a product feature perspective, Xandr can meet or beat Google's features, why has Xandr been unsuccessful in the past in convincing US publishers to switch from Google to Xandr for publisher ad serving for display?

MS. DUNN: Objection to form.

A. There are three reasons: One, migration costs. The second one is Google AdX demand; and there is a third one about guarantee, which Xandr does not offer guarantee.

I don't have any specific details of which customers Google offers guarantees, but we don't offer guarantees; because customers ask for guarantees, but we usually don't offer.

Q. By "guarantee," what do you mean?

A. Guarantee payment, even if they don't monetize, you will have to cut a check and give them a payment.

Q. Does Xandr offer those types of

guarantees?

A. We don't do it.

Q. Do you know whether Google does?

A. I don't have, but customers claim that they would like to have guarantees.

Q. So it sounds like you're saying you don't know specifically whether Google offers guarantees, revenue guarantees for publisher ad serving; is that correct?

A. That is correct.

MS. DUNN: Objection to form.

Q. In the last ten years, how easy or difficult has it been for Xandr, as a publisher ad server, to compete with Google's Publisher ad server for display in the US?

A. It's very difficult. We're not able to penetrate or migrate any large publishers in the US; even though, you know, we are headquartered here, we have teams and engineers and sales force here. It's not all headquarters, but we have our teams. It's very hard.

Q. How would you characterize Google's position in the publisher ad server business

in the US?

A. They're the leading market player, and almost all publishers use Google ad server.

Q. What impact, if any, is there on competition from the fact that Google's demand is not fully available to publishers unless the publisher uses DFP as their publisher ad server?

MS. DUNN: Objection to form. Calls for a legal conclusion, an expert opinion, and there's no foundation.

MS. COLE: Objection to form.

A. Could you repeat the first part of the question?

Q. Sure. What impact, if any, is there on competition from the fact that Google demand is not fully available to publishers, unless the publishers use DFP, Google DFP, as their publisher ad server?

MS. DUNN: Same objection.

A. So the impact will be there will not be any other ad server other than Google. And Google will have the say in how much or

how publishers can monetize or get the better yield; and that is -- and that will be the impact.

Q. If the display publisher ad server business were more competitive, would that be bad or good?

MS. DUNN: Objection, leading.

A. It's absolutely good for publishers.

Q. Why would it be absolutely good for publishers, if the display publisher ad server business were to be more competitive?

MS. DUNN: Same objection.

A. They have an opportunity -- they run the RFPs. Every time they have an opportunity to migrate, and it's better monetization; not during the lockdown, and ability to try other features, so that's -- yeah, those are the things that publishers would miss.

Q. Fair to say that Google's publisher ad server has been successful in the display publisher ad server business?

A. Based on the market leading and

JOHN - HIGHLY CONFIDENTIAL
based on the market presentation, yes.
Q. Is Google's publisher ad server's success due to Google competing fairly on the merits and having the best product?
MS. DUNN: Objection to form.
A. Based on what I hear and see the documentation, Google don't have the best product. They missed it a lot in the product. But as I said, product is not the only reason customers or publishers stay with or work with Google ad server. It's the demand and stickiness.
MS. DUNN: Objection. Move to strike as inappropriate, improper opinion testimony.
[redacted]
server business in Europe than in the US; is that right?
A. That's correct.
Q. Why has Xandr had less success as a display publisher ad server in the US as compared with Europe?
A. Based on the conversations, I know

JOHN - HIGHLY CONFIDENTIAL
revenue is important for publishers, but also in EMEA the customers are vocal about not having to lock down and be part of, you know, one of the dominant ad server. So like they were very vocal, even if they are willing to take a risk and willing to take a revenue cut.
And customers like Axel Springer are very vocal about it publicly, why they want to support AppNexus and Xandr and now Microsoft.
And --
MS. DUNN: I just want to object to this entire dialogue. He prefaced that answer saying, based on the conversations, so that calls for hearsay.
We don't know, he's here as a Microsoft 30(b)(6), not as somebody to speak for either publishers and customers, which he has been constantly asked to speak for. So we would move to strike all of that preexisting testimony.

JOHN - HIGHLY CONFIDENTIAL
MR. VERNON: Why don't you finish your answer first.
A. (Continuing) And so we have case studies published and in US the primary brand focus is on revenue and not willingness to try and take a risk.
Q. When you just gave your answer about why Xandr had had less success as a publisher ad server in the US, compared to Europe, what are you basing it on?
A. Based on the RFPs that we received, based on the meetings that I was personally joined and discussed with them.
Q. What meetings were those that you were personally involved?
A. With FOX, with Insider.
Q. And what conclusions did you draw from those meetings relevant to why Xandr had less success in the public ad server in the US compared to Europe?
A. It's not just the technology of the product, it's about the demand and the migration.
Q. A minute ago you referred to --

JOHN - HIGHLY CONFIDENTIAL
MS. DUNN: Objection. And move to strike, for the same basis stated earlier.
Q. A minute ago you referred to a dominant ad server. Which it company were you referring to?
A. Google.
Q. Why did you describe Google as having a dominant ad server?
A. Based on the market penetration and how many customers are using.
Q. Have any of the European publishers that switched from DSP, Google's publisher ad server, to Xandr for display publisher ad serving later switched back to Google?
A. I would say three.
Q. Which three was it?
A. One in Australia, I believe Sky; and the second one was, Switzerland. The third I don't recall.
Q. What's your understanding of why those publishers switched from Xandr to DFP for publisher ad server?
MS. DUNN: Objection, form.

A. They were losing the local AdX demand.
Q. Is the --
MS. DUNN: Objection. There is no foundation to this testimony.
Q. When you just talked about the publishers that switched back from Xandr to Google, what are you basing that on?
A. Based on the e-mails that we have received directly from the customers.
Q. Focusing on Europe specifically, is the potential problem that a publisher uses AdX revenue if they do not use Google as their publisher ad server in Europe? Is that completely not a problem, is it still a problem somewhat or has it been --
MS. DUNN: Objection to form.
MS. COLE: Object to scope. You asked -- it's outside the scope.
MS. DUNN: Well, if that's true, most of these conversations have been about Europe.
MR. VERNON: You can answer.
A. So there are -- it's kind of like a

two types of publishers. Sophisticated publishers like Axel Springer. They were able to migrate and gain 17 percentage of incremental revenue right after the migration. It's a public case study document to produce. And the reason is, they're using mediation, they were sophisticated, they were able to predict and build an auction price and continuously gain. And they still love working with Microsoft.
On a small scale publishers, like the ones, those who left us, they don't have technologies to invest and compare the bid price and then -- and still get the AdX demand and continuously gain the revenue. They're the ones that are losing. So if the publishers are willing to go extra mile and work with us and put some skill, technology, they can leverage Xandr ad server and get the AdX demand, through our Mediation.
(Discussion off the record.)
Q. Let me switch topics slightly and ask you about Google's uniform price rules; is that okay?

A. Sure.
Q. When Xandr is the publisher ad server for a publisher, does Xandr prevent the publisher from using different price floors for different exchanges?
A. No, we did not.
Q. Why not?
A. We give the controls to the publisher, how they want to set the price, and that's the price we use for the bidding auction.
Q. Why did Xandr allow publishers to set different price floors for different exchanges?
A. Depending upon the placements and the type of inventory, they'll be able to manage the floor prices; and it is a feature that we give them full control, how they manage it.
Q. What benefits, if any, result to publishers from Xandr allowing publishers to set different price floors for different exchanges?
A. So there are -- they can -- they

know the inventory better, they know their audience better, based on how they predict their page views and the seasonality and the type of audience and timing, they can have different flows. It's all about powering the publishers so they can monetize their content better.
Q. When Google is the publisher ad server, to what extent can publishers set different floors for different exchanges?
MS. COLE: Objection, scope. He is here on behalf of Microsoft.
Go ahead.
A. I do not recall the Google specific product feature that you are talking about.
Q. Have you heard of Google's uniform price rules?
A. So price rules or pricing auction?
Q. The former. Not the unified auction, but UPR, uniform price rules.
A. I haven't looked at the product and used them.
Q. Do you know whether Google's uniform price rules prevents publishers from

using different floors for different exchanges?

MS. DUNN: Objection, foundation.

MS. COLE: Scope.

A. I do not have any direct knowledge on that.

Q. If Google's UPR prevented publishers from setting different price floors for different exchanges, would that be good or bad for publishers?

MS. DUNN: Objection, leading.

A. Multiple tools is good for the customers and publishers.

Q. If the Google's UPR --

MR. VERNON: I'll move on.

Q. How does Google's AdX compare in size to the other display exchanges?

A. Very large, given the market. All of the small- and large-scale publishers' supplies are available on Google exchange.

Q. Are you familiar with the GDN, the Google Display Network?

A. Yes.

Q. How does GDN compare in size to the

other display owners?

A. Because of the user volume and access and the market penetration with Google's -- properties and the large scale, small to medium to large scale, it's pretty big.

MS. DUNN: Objection. Move to strike as improper opinion testimony.

Q. How much access does Xandr's SSP have to GDN?

A. It's been going up and down, so there are two types of demand that we get from Google. One is from GDN and one is from DV360. And GDN is only for display with no retargeting. The other one is for all formats, which is DV360. I would say combining both, it would be 10 to 20 percentage; but GDN is very, very small out of that, probably less than five percent.

Q. Just focusing on GDN specifically, how much of GDN's demand does Xandr's SSP have access to?

A. I do not know what percentage of the total GDN demand that we get, but out of

the full demand that we get, GDN is probably roughly five percent.

Q. And a moment ago you mentioned retargeting; do you remember that?

A. Uh-huh.

Q. What is retargeting?

A. Like the use or access of paid to the property, then the use of services other places you would be able to target that user based on the previous browsing experience.

Q. Does -- how much access does Xandr's SSP have to GDN demand that is not retargeting?

A. GDN, without retargeting, we don't have access.

Q. What impact, if any, is there on competition in the SSP business from the fact that Xandr's SSP does not have access to non-retargeting demand from GDN?

MS. DUNN: Objection to form and calls for improper opinion testimony.

A. Since I'm not sure about the blog, the person who does the -- the demand that's not available, I'm not sure.

MR. VERNON: You guys want to go off the record and take a break? It's been an hour.

MS. COLE: How much time is on the record, and how much time do you want for your break?

MR. VERNON: Like ten minutes.

(Discussion off the record.)

THE VIDEOGRAPHER: The time is 2:36, and this marks the end of media number 3, and we're off the record.

(A brief recess was taken.)

THE VIDEOGRAPHER: The time is 2:54 p.m. and this begins media unit number 4.

Q. Welcome back. So let me ask you to turn back to Exhibit 1. There was a project chart for a presentation that Google counsel showed you earlier today.

It's not that one. It looks like this.

A. Yes, yes.

Q. Thank you. Let me ask you to turn to page 5 -- page 551 at the bottom, and it's

right of that numbered 1, 2 and 3; do you see that?

A. Yes, I do.

Q. And the second one underneath the boxes says a likelihood at 75 percent; do you see that? It's like smaller text.

A. Yeah, yeah.

Q. In the box it says, "Google as clear winner. Weak second place player." Do you see that?

A. Number 2?

Q. Right.

A. Yeah.

Q. What does this diagram convey about what might happen if Google acquired Dart?

MS. DUNN: Objection, form. Same objections as before.

A. So these are the scenarios when Google acquires, and they execute really well, what would be the -- Google's second position growth on market share will be.

Q. What would it mean for Google to be the clear winner and there to be a weak second place player?

A. The gap between the player 1 and player 2 will be large.

Q. And would that have been good for competition or bad for competition?

MS. DUNN: Objection, calls for improper opinion testimony, and objection to form.

A. The market leans towards the leading player, so it is bad for the competition.

Q. Today, what is Microsoft's understanding of the competitive effects of Google's acquisition of DoubleClick?

MS. DUNN: Objection to form and calls for improper opinion testimony.

A. And your question is, just to clarify, today's Microsoft's position?

Q. Right.

A. It's exactly how we thought back in the days when Google had this search: Large share and get access to the largest publisher market and the leading product and execute slow would have a leading position in this market. And that's exactly what's happening,

and that's our position today, too.

Q. So today, do you view Google's acquisition of DoubleClick as good for competition or bad for competition?

MS. DUNN: Same objections: Objection to form and calls for improper opinion testimony.

A. You know, the fact that publishers are not able to migrate and other players are not able to migrate publishers to other ad servers, there is no level field on playing competition as compared to products to convert customers.

Q. So I think part of what you said was today there is not a level playing field.

What relation, if any, does that have to Google's acquisition of DoubleClick?

MS. DUNN: Objection to form.

A. Google did not have publisher access or access of product before the acquisition; so this gave Google access to the publishers and access to the product.

And the advertisers, those who are looking -- those who are looking to reach the

search audience, but also looking to reach the same audience that Google could not offer to them, so now Google is able to go and say, look, I can help you reach the audience, but they're not able to reach the search audience and also reach through the access that I have through publishers. So they're able to keep advertising dollars and demand dollars sticky to Google as well as keep the publishers sticky on the sell side as well.

Q. In your opinion overall, was Google's acquisition of DoubleClick good or bad for competition?

MS. DUNN: Objection to form and calls for improper opinion testimony.

A. Could you clarify the first part of the question? Sorry.

Q. Sure. In your opinion overall, and just based on your experience, was Google's acquisition of DoubleClick good or bad for competition?

MS. DUNN: Same objections.

A. In my opinion, I believe in best of breed and provide accessibility; and

targeting parameters for social media versus nonsocial media.

Q. When you say that social media and nonsocial media have different targeting --

MS. DUNN: I'm sorry. Before you get to the question, object to the last answer based on improper opinion testimony and also he's testifying, quote, from an advertiser perspective.

Q. When you said there are different targeting parameters for social compared to display, what did you mean by that?

A. So that the format of the ad and how you measure an ad and how you expect a user to interact with those ads, attribution, all of those, because social media is more like a closed net. That data is not available, and advertisers need to run different metrics to match how their advertising dollar is spent between social versus nonsocial.

Q. So focusing on the US, you view social advertising and display advertising as substitutes, or no?

MS. DUNN: Objection. Calls for improper opinion testimony.

A. They're not substitutes. Also based on the auto fees that they've seen and how agencies, advertisers are organized, there's a separate group or team that they buy social media advertising; there's a separate team that buys non. So one won't be able to replace or substitute the other.

MR. VERNON: You can set that document aside.

MS. COLE: You think it's a good time to take a break?

MR. VERNON: We can take the break. We can go off.

THE VIDEOGRAPHER: The time is 3:44 p.m., and this marks the end of media unit number 4.

(A brief recess was taken.)

THE VIDEOGRAPHER: The time is 4:04 p.m. This begins media unit number 5.

Q. Welcome back.

A. Thank you.

Q. So earlier we were talking about who Xandr's main competitors were for SSPs.

Do you remember that?

A. Yes, I do.

Q. And I think the two that we discussed were Magnite and Google's AdX; is that correct?

A. That's fair.

Q. Why did you not list Amazon as one of the main or two main competitors for Xandr's SSP?

A. I think I added Amazon after you reminded me Amazon is also an SSP; but I also have -- we also integrate with them using their header bidding technology called TAM; and so they also bring in a demand; so they are also competitor in the SSP.

Q. Do you view TAM, Amazon's TAM as a header bidding effort?

A. Correct, it's a header bidding effort.

Q. Is Amazon's -- what are other header bidding efforts pier does Xandr connect to?

A. So the preview open source and our DSP and TAM.

Q. Between AdX and Amazon, which company is larger, which SSP is larger in the SSP business for display?

A. Based on what we see in all marketplace, Google is the largest.

Q. And what, approximately, is the difference in size between AdX and Amazon SSP?

MS. DUNN: Objection to form.

A. I don't recall the numbers of what percentage that we transact between Amazon and Google.

Q. How big is Google's AdX in the display SSP business compared to Xandr?

MS. DUNN: Objection to form.

A. We see Google supply and most of the supply is on their ad server supply; but it's hard for me from outside to separate whether it's an SSP supply or an ad server supply. But it's on the exchange, right, if it's sitting on the exchange. That's why I'm mixing the words SSP and AdX change if it's

on their exchange. And I believe it's all ad server supply, yeah, that's the --

Q. Do you know what the second largest display SSP is after AdX?

A. I believe it's AppNexus as an independent programmatic supply, as an independent, not having a one-piece supply on our platform next to Google, but --

Q. Sorry.

A. -- but I don't see the numbers between the other SSPs.

Q. Was Google's AdX the largest display exchange five years ago?

MS. DUNN: Objection to form.

A. Yes, yes, it still is.

Q. Why is Google able to maintain its position as the largest display SSP, at least for the last five years?

MS. DUNN: Objection to form.

MS. COLE: Object to scope as to -- he's testifying on behalf of Microsoft.

A. You know, the customers that Google ad server and AdX had access that I mentioned before, they are sticky; and I believe that's

one of the reasons the supply is consistently staying there.

Q. When you say the customers are sticky, what do you mean by that?

A. Like the publishers, those are leveraging Google ad server and makes the supply available on AdX. Also, it's my belief that the 1-P also plays also part of the exchange, Google's.

Q. How, if at all, does Google's publisher customers being sticky on its ad server affect Google being the largest SSP for display?

MS. DUNN: Objection to form, foundation, calls for opinion testimony.

A. Can you repeat the first part, how does the --

Q. Yeah. One of the things you mentioned is that Google's publisher customers are sticky, with respect to Google's publisher ad server.

A. That's correct.

Q. How does that stickiness affect, if at all, Google AdX's ability to remain the

largest SSP for display for over at least the last five years?

MS. DUNN: Objection to form, same objections.

MS. COLE: I object in terms of scope he's testifying on behalf of Microsoft, so if you're asking him what Google is doing -- you can ask him what the effect of Microsoft is, you can ask him what Microsoft's experience is, but object on scope for, for the prior reasons.

MR. VERNON: Why don't you answer, and we will kind of take it from there.

A. To clarify, you're asking why customers are sticky and staying with Microsoft, Google's ad server?

Q. Slightly different.

How, if at all, does the stickiness of Google's publisher ad server customers affect Google's ability to remain, AdX's ability to remain the largest display SSP for at least the last five years?

MS. DUNN: Same objection. At this

point I think it's very clear he has no foundation for this.

A. The question I'm not clear on. How does it affect means is the publisher, the customers are staying with the Google ad server, number one. The uses are consistently using digital technologies more and more, so the supply volume is increasing, the user engagement is increasing consistently; but that's one reason I can think of.

Q. Okay. Is it fair to say Xandr's SSP competes with Google's SSP?

A. That is correct.

Q. Is it fair to say Xandr's, then, doing as much as it can to compete with AdX in the SSP business?

A. That is correct.

Q. Why is it that at least over the course of the last five years, AdX has remained as the largest display SSP, even though Xandr is doing everything that it can to compete with AdX?

MS. DUNN: Objection to form.

JOHN - HIGHLY CONFIDENTIAL

A. So from my understanding and where Xandr did not have the first-party properties, Google does; and that the volume and the scale of the supply comes from -- that stays with the Google ad exchange. Xandr was mostly an independent technology company where we had to get the publisher supply to on-board and activate.

Q. By 1-P, are you referring mostly to you or something else?

A. Many Google properties.

Q. I asked you, which Google properties are you referring to?

A. The properties like Google News, Google Search, Google Maps, any properties that the consumers can access.

Q. If you were to set Goggle's first-party properties aside, would Google still be the largest SSP for display in the US?

MS. DUNN: Objection to form.

A. That is correct, because most of the small- to large-scale publishers use Google as an ad server and that supplies on

JOHN - HIGHLY CONFIDENTIAL

the exchange.

Q. So if you set aside the fact that Google has first-party properties, what other reasons, if any, are there why Google has been able to remain the largest display SSP, despite the fact that Xandr is doing all that it can to compete with Google?

A. Number one is the demand, AdX demand.

Q. What do you mean by that?

A. Like the access of, availability of the demand that publishers can monetize in place of Google is the reason consistently the publishers are leveraging Google's product.

Q. And which demand are you referring to?

A. AdX demand.

Q. Where does that demand come from on the buy side?

A. On the buy side, it goes from AdWords and DV360.

Q. In your experience is AdWords demand available fully to Google's SSP and to

JOHN - HIGHLY CONFIDENTIAL

other SSPs?

A. Based on what we see, you know, when customers leverage Google ad server as part, directly part of the exchange versus when they degrade to SSP, customers who are directly on the Google Ad Exchange and AdX has a large access for the demand.

Q. Is DV360 equally available to Google's AdX on the one hand and third-party SSPs on the other hand?

A. Not necessarily, because AdX customers, the publisher customers get those demand significantly higher, and we still get the demand through open ad TV, but that is very, very low.

Q. Do you know how AdX's access to DV360 demand has changed in the last four years?

A. Yes, it was, it was higher before Google introduced the spreads auction, then it slowed down. Excuse me, and trend is generally, excuse me, trend is generally going down. And we still get the demand, but prior to the first price auction it was

JOHN - HIGHLY CONFIDENTIAL

higher.

Q. Do you know why AppNexus has been getting less demand from the DV360 now, compared to previously?

A. We've been working with Google, and the reasons --

MS. COLE: Objection. Did you say AppNexus or did you -- just to clarify.

MR. VERNON: Let me reask it again, in case I did ask it.

Q. Did you know why AppNexus SSP is getting less demand from DV360 now, compared to previously?

A. The reasons that we are getting from Google is, number one, the demand for displays is weakening. Number two, the pricing that after Google introduced first price auction, they optimized the pricing of the algorithm that we're not winning much. The third thing is more demand dollars are going towards video and other competitors like YouTube.

These are the reasons that we received from Google.

JOHN - HIGHLY CONFIDENTIAL

evolves, multiple players started picking compared to the display advertising.

Q. Okay.

MR. VERNON: Could we go off the record. Just give me two minutes. I just want to make sure I asked all the questions.

THE VIDEOGRAPHER: The time is 6:19 p.m. and we're off the record.

(A brief recess was taken.)

THE VIDEOGRAPHER: The time is 6:21 p.m. and we're back on the record.

Q. Do you have that document in front of you that we were just looking at?

A. Yes, I do.

Q. And the one that refers to the "marketplace lock-in in Display." Do you see that?

A. Yes, I do.

Q. Earlier counsel asked you some questions about meetings between the DOJ and Microsoft with Xandr. Do you remember that?

A. Yes, I do.

Q. Did Microsoft or Xandr create this

JOHN - HIGHLY CONFIDENTIAL

document that talks about marketplace lock-in for display for purposes of showing it to the DOJ?

A. Absolutely not.

MR. VERNON: Okay. With that, and unless counsel for Google has further questions, I'm done with my questions, and I thank you and the court reporter and the videographer and to everyone for taking the time to sit here on a Friday.

THE WITNESS: Thank you, all.

MS. DUNN: Thank you very much. We appreciate you very, very much.

THE VIDEOGRAPHER: We're going off the record at 6:22 p.m., and this concludes today's testimony given by Ben John. The total number of media units was five, and they will be retained by Veritext.

(Time noted: 6:22 p.m.)

STATE OF ______________)
) :ss
COUNTY OF _____________)

I, BENNEASER JOHN, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

_____________________
BENNEASER JOHN

Sworn and subscribed to before me, this day of , 2023.

______________________________
Notary Public

CERTIFICATE

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, Jennifer Ocampo-Guzman, a Certified Realtime Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That BENNEASER JOHN, the witness whose deposition is hereinbefore set forth, was duly sworn, and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of September 2023.

J. Ocampo-Guzman
JENNIFER OCAMPO-GUZMAN, CRR, CLR