# EXHIBIT I

HIGHLY CONFIDENTIAL

Page 1

1          HIGHLY CONFIDENTIAL
2      IN THE UNITED STATES DISTRICT COURT
3      FOR THE EASTERN DISTRICT OF VIRGINIA
4              Alexandria Division
5   ---------------------------------*
6   UNITED STATES OF AMERICA, et al.,
7              Plaintiffs,      Case No.:
8         vs.                   1:23-CV-00108
9   GOOGLE LLC,
10             Defendant.
11  ---------------------------------*
12        STENOGRAPHIC AND VIDEO-RECORDED
13            30(b)(6) DEPOSITION OF
14               DAVID A. MINKIN
15          Friday, September 22, 2023
16                 9:08 a.m.
17
18
19
20  Stenographically recorded by:
21  Josephine H. Fassett, RPR, CCR
    Job No. CS6080194
22
23
24
25

HIGHLY CONFIDENTIAL

Page 6

```
 1            HIGHLY CONFIDENTIAL
 2    ---------------------EXHIBITS---------------------
 3    EXHIBIT    DESCRIPTION                    PAGE
 4    Exhibit 6   Document titled May 2019 Review    123
 5        of News Corp's Programmatic
 6        Advertising Opportunities, Bates
 7        NEWSCORP-DOJCID-00035550 to
 8        NEWSCORP-DOJCID-00035605
 9    Exhibit 7   Document titled YinYang Product    124
10        Roadmap March 2019, Bates
11        NEWSCORP-DOJCID-00035151 to
12        NEWSCORP-DOJCID-00035263
13    Exhibit 8   Article titled Deprioritising      125
14        Google Ad Exchange, Bates
15        NEWSCORP-DOJCID-00003014 to
16        NEWSCORP-DOJCID-00003017
17    Exhibit 9   Document titled Summary of Item    133
18        and Relevance to the Business:
19        To Prioritize Programmatic Deals
20        in the News Corp Ad Tech Stack,
21        Bates NEWSCORP-DOJCID-00020462 to
22        NEWSCORP-DOJCID-00020463
23
24
25
```

Page 7

```
 1            HIGHLY CONFIDENTIAL
 2    ---------------------EXHIBITS---------------------
 3    EXHIBIT    DESCRIPTION                    PAGE
 4    Exhibit 10  Document titled Dow Jones AdTech:  137
 5        FY24 Investment Overview, Bates
 6        NEWSCORP_GOOG_0000158 to
 7        NEWSCORP_GOOG_0000165
 8    Exhibit 11  Document titled May 2019 Review    144
 9        of News Corp's Programmatic
10        Advertising Opportunities (native
11        version)
12    Exhibit 12  Email Exchange, Bates              159
13        NEWSCORP-DOJCID-00031851
14    Exhibit 13  Email Exchange, Bates              165
15        NEWSCORP-DOJCID-00032156 to
16        NEWSCORP-DOJCID-00032158
17    Exhibit 14  Slide Deck titled Dow Jones        165
18        Programmatic Training November
19        2016, Bates
20        NEWSCORP-DOJCID-00032159 to
21        NEWSCORP-DOJCID-00032185
22    Exhibit 15  Email Exchange, Bates              171
23        NEWSCORP-DOJCID-00000858 to
24        NEWSCORP-DOJCID-00000860
25
```

Page 8

```
 1            HIGHLY CONFIDENTIAL
 2    ---------------------EXHIBITS---------------------
 3    EXHIBIT    DESCRIPTION                    PAGE
 4    Exhibit 16  Document titled DFP Flow Chart     174
 5        December 2016, Bates
 6        NEWSCORP-DOJCID-00000865 to
 7        NEWSCORP-DOJCID-00000879
 8    Exhibit 17  Memo titled "How to not run AdX    203
 9        in AdManager360," Bates
10        NEWSCORP-DOJCID-00024369 to
11        NEWSCORP-DOJCID-00024372
12    Exhibit 18  Email Exchange, Bates              213
13        NEWSCORP_GOOG_0000045 to
14        NEWSCORP_GOOG_0000047
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
 1        HIGHLY CONFIDENTIAL - MINKIN
 2        (On the stenographic and video record
 3    9:08 a.m.)
 4        THE VIDEOGRAPHER:  Good morning.  We
 5    are going on the record at 9:08 a.m. on
 6    September 22, 2023.
 7        Please note that the microphones are
 8    sensitive and may pick up whispering and
 9    private conversations.  Please mute your
10    phones at this time.
11        Audio and video recording will
12    continue to take place unless all parties
13    agree to go off the record.
14        This is Media Unit 1 of the
15    video-recorded deposition of David Minkin
16    in the matter of the United States of
17    America, et al. versus Google LLC filed in
18    the United States District Court for the
19    Eastern District of Virginia, Case
20    number 1:23-CV-00108-LMB-JFA.
21        The location of the deposition is
22    Freshfields Bruckhaus & Deringer LLP.
23        My name is John DeFillipo representing
24    Veritext and I'm the videographer.  The
25    court reporter is Josephine Fassett from
```

Page 10

1  HIGHLY CONFIDENTIAL - MINKIN
2  the firm Veritext.
3      I'm not authorized to administer an
4  oath, I'm not related to any party in this
5  action nor am I financially interested in
6  the outcome.
7      If there are any objections to the
8  proceeding, please state them at the time
9  of your appearance.
10     Counsel and all present, including
11 remotely, will now state their appearances
12 and affiliations for the record, beginning
13 with the noticing attorney.
14     MS. SESSIONS:  Good morning.  Justina
15 Sessions of Freshfields Bruckhaus Deringer
16 on behalf of Google.  I'm joined today in
17 the room by my colleagues, Tyler Garrett
18 and Scott Eisman.
19     MR. THORNE:  John Thorne representing
20 News Corp and Mr. Minkin.  I'm with the
21 firm Kellogg Hansen Todd Figel & Frederick.
22 And I'm joined by my partner, Dan Bird; my
23 colleague, Trip Henningson; and in-house
24 counsel for News Corp, Genie Gavenchak,
25 Martin d'Halluin, and Elizabeth Taras.

Page 11

1  HIGHLY CONFIDENTIAL - MINKIN
2      MR. WOLIN:  Michael Wolin.  I'm an
3  attorney in the Department of Justice
4  Antitrust Division on behalf of the United
5  States.  I'm joined here by another
6  attorney on behalf of the United States,
7  Vanessa Molina.  And joining remotely we
8  have another attorney for the United States
9  Julie Myers Wood.
10     And, Mr. Minkin, because we're from
11 the Department of Justice, I have one
12 preliminary question, which is:  Do you
13 understand that the information you provide
14 during this deposition may be used by the
15 Department of Justice in other civil,
16 criminal, administrative or regulatory
17 cases or proceedings?
18     MR. MINKIN:  Yes, I understand.
19     MR. WOLIN:  Thank you.
20     THE VIDEOGRAPHER:  Will the court
21 reporter please swear in the witness and
22 then counsel may proceed.
23
24
25

Page 12

1  HIGHLY CONFIDENTIAL - MINKIN
2      DAVID A. MINKIN
3  the witness, having been duly sworn, was examined
4  and testified under oath as follows:
5      EXAMINATION
6  BY MS. SESSIONS:
7  Q.  Good morning, Mr. Minkin.
8  A.  Good morning.
9  Q.  My name is Tina Sessions.  I am an
10 attorney for Google in this matter.
11     Could you please state your full name
12 for the record.
13 A.  David Adam Minkin.
14 Q.  Do you understand that you've sworn to
15 tell the truth today?
16 A.  Yes, I understand.
17 Q.  Is there anything that would prevent you
18 from giving true and complete answers to my
19 questions today?
20 A.  No, there is nothing that would prevent
21 me from doing that.
22 Q.  Over the course of this deposition, I'm
23 going to ask you a number of questions.  Sometimes
24 my questions may not be entirely clear.  Will you
25 agree that if you don't understand a question that

Page 13

1  HIGHLY CONFIDENTIAL - MINKIN
2  I ask you that you'll ask me for clarification?
3  A.  Yes, I agree.
4  Q.  What city and state do you live in?
5  A.  I live in Garrison, New York.
6  Q.  Do you work at News Corp?
7  A.  Yes, I work at News Corp.
8  Q.  What is your job title at News Corp?
9  A.  I am the senior vice president of
10 digital operations and client success.
11 Q.  And do you work for a particular
12 division or unit within News Corp?
13 A.  Yes, specifically for Dow Jones.
14 Q.  And what publications fall under
15 Dow Jones?
16 A.  Dow Jones would include The Wall Street
17 Journal, MarketWatch, Barron's, and a number of
18 other smaller publications.
19 Q.  How long have you held the title Senior
20 Vice President of Digital Operations and Client
21 Success?
22 A.  It's only been a few months.
23 Q.  At a high level, what are your job
24 responsibilities?
25 A.  My team is responsible for many of the

Page 14

```
 1        HIGHLY CONFIDENTIAL - MINKIN
 2   pre- and post-advertising sales operations related
 3   to all things at Dow Jones.
 4       Q.  Do your job responsibilities include the
 5   sale of digital advertising on Dow Jones
 6   properties?
 7       A.  I am -- I do oversee the sale, the
 8   programmatic sale of inventory for Dow Jones
 9   properties and work closely with our direct
10   sellers as well.
11       Q.  Who do you report to?
12       A.  I report to Josh Stinchcomb, the chief
13   revenue officer for Dow Jones.
14       Q.  And how many people report directly to
15   you?
16       A.  Roughly 100 to 120 people report in to
17   me.
18       Q.  Prior to becoming senior vice president
19   of digital operations and client success, what was
20   your job title?
21       A.  I have had numerous job titles in recent
22   years over at Dow Jones.  I was previously the
23   senior vice president of products digital strategy
24   and -- no.  Digital and product strategy, I
25   believe, but my title's changed quite a number of
```

Page 15

```
 1        HIGHLY CONFIDENTIAL - MINKIN
 2   times over the past few years.  Every few months
 3   it changes.
 4       Q.  Okay.  And I don't mean to make this a
 5   memory test --
 6       A.  Yes.
 7       Q.  -- about your job titles.
 8           MS. SESSIONS:  So if I could have the
 9       first document here.  Thank you.
10           I'm going to ask the court reporter to
11       mark this first document as Exhibit No. 1.
12           (LinkedIn Profile of David Minkin
13       marked as Exhibit 1, as of this date.)
14   BY MS. SESSIONS:
15       Q.  Mr. Minkin, the court reporter has
16   handed you a document that's been marked as
17   Exhibit 1, which is a printout of what we
18   understand to be your LinkedIn profile.
19           Can you take a look at it and let me
20   know if it looks like an accurate copy of your
21   LinkedIn profile?
22       A.  Yes, this looks like an accurate copy of
23   my LinkedIn profile.
24       Q.  And Exhibit 1 states that you are
25   currently the SVP, Digital Operations & Client
```

Page 16

```
 1        HIGHLY CONFIDENTIAL - MINKIN
 2   Success at Dow Jones; is that right?
 3       A.  Yes.  It says customer success here, but
 4   yes.
 5       Q.  Okay.  And then turning to page 2 of
 6   Exhibit 1, prior to your current job title, this
 7   states that your job title was SVP, Commercial
 8   Product Strategy and Digital Operations.
 9       A.  That's correct.
10       Q.  Is that correct?
11       A.  Yes, that is correct.
12       Q.  Okay.  And that was your job title from
13   approximately August 2022 to March 2023?
14       A.  Yes, that is correct.
15       Q.  Okay.  And then is it correct that prior
16   to becoming SVP, Commerical Product Strategy and
17   Digital Operations, you were GM of The Exchange?
18       A.  That is correct.
19       Q.  What is The Exchange?
20       A.  The Exchange was sort of an abstract way
21   that we grouped some of our ad products.  So, in
22   essence, we at Dow Jones see our product suite
23   bifurcating between sort of high-touch very
24   customized products and more low-touch highly
25   scalable products.  High-touch includes things
```

Page 17

```
 1        HIGHLY CONFIDENTIAL - MINKIN
 2   like custom content and stuff like that.  That we
 3   have called The Trust, which is our custom studio.
 4   And then for everything else that fell into that
 5   sort of realm of low touch and highly scalable,
 6   that is what we classified as The Exchange.  So
 7   really it's a suite of products.
 8       Q.  Can you give me an example of a lower
 9   touch product that would fall under The Exchange?
10       A.  Any of our programmatic offerings would
11   fall into The Exchange.
12       Q.  And you've used that term I think twice
13   now already, so it's a reasonably good time for me
14   to ask you:  When you say programmatic offerings,
15   what do you mean?
16       A.  So basically there are two means by
17   which ad space can be sold digitally.  It can be
18   sold the more traditional way, which is from one
19   human to another via an insertion order.  That
20   would be what I call direct.  Or it could be sold
21   more like machine to machine through a
22   programmatic infrastructure, and that is what I
23   would call programmatic.
24       Q.  So you consider programmatic ad sales to
25   be ad sales that are made machine to machine?
```

## Page 186

HIGHLY CONFIDENTIAL - MINKIN

EXAMINATION

BY MR. WOLIN:

Q. Thank you, Mr. Minkin. We met earlier today. Again, I'm an attorney representing the United States. I'm going to ask you a couple questions. Is that all right?

A. Yes.

Q. And my time is limited, so I apologize if we move quickly from topic to topic.

A. Okay.

Q. You talked today about ad servers; is that right?

A. Yes.

Q. And you're familiar with the term publisher ad server?

A. Yes.

Q. What publisher ad server does News Corp use today?

A. We use Google Ad Manager.

Q. And what company offers the largest publisher ad server for web display advertising?

MS. SESSIONS: Object to the form.

A. Largest meaning most used?

Q. Which company today offers the largest

## Page 187

HIGHLY CONFIDENTIAL - MINKIN

publisher ad server for web display advertising in terms of most used?

MS. SESSIONS: Object to the form.

A. That would be Google Ad Manager.

Q. And what's your basis for saying so?

A. One, sort of common knowledge within our industry. Two, outside our evaluation in 2017 there's been no real other ad server to even investigate.

Q. And we touched on this before, but I just want to go back to it.

What other options does News Corp have besides Google Ad Manager for use as a publisher ad server for web display advertising?

A. In theory, options could have been at the time what was the AppNexus ad server, which we determined was not viable for revenue reasons. Beyond that, the only other solution I can potentially imagine is building an ad server, but we don't have the engineering jobs or resources to do such a thing.

Q. I believe you stated earlier during the questioning by Google's counsel that you believed there was no viable alternative to using Google Ad

## Page 188

HIGHLY CONFIDENTIAL - MINKIN

Manager. Do you recall that?

A. Yes.

Q. Why is there no other viable alternative besides Google Ad Manager?

A. Because in that 2017 analysis -- and continues to be the issue today -- by moving to AppNexus, for instance, now Xandr, you would lose all the unique AdWords demand that comes with Google Ad Manager and only through Google Ad Manager.

Q. Could News Corp use technology provided by Facebook for its publisher ad server?

A. Not that I'm aware of.

Q. Could News Corp use technology provided by Amazon as its publisher ad server?

MS. SESSIONS: Object to the form.

A. No, not that I'm aware of.

Q. Could News Corp develop its own in-house publisher ad server?

A. Again, in theory, that might be possible, but we don't have the resources or the expertise to do such a thing and we would run up to the same issue we had when we did the AppNexus evaluation, we would lose the unique demand tied

## Page 189

HIGHLY CONFIDENTIAL - MINKIN

to Google Ad Manager.

Q. How would you characterize the position of Google's GAM publisher ad server as compared to any other publisher ad servers in the market?

MS. SESSIONS: Object to the form.

A. Sorry, could you repeat that question one more time.

Q. How would you characterize the position of Google's GAM publisher ad server as compared to any other publisher ad servers in the market?

MS. SESSIONS: Same objection.

A. When you say position, can you define that, please.

Q. I think in your previous testimony today you referred to Google as having a dominant position. Do you recall that?

A. Yes.

Q. How would you describe Google's publisher ad server's position as compared to any other publisher ad server?

A. They are the dominant ad server.

Q. What's your basis for saying that Google has the dominant publisher ad server?

A. Again, just, one, common knowledge

Page 190

1  HIGHLY CONFIDENTIAL - MINKIN
2  throughout the industry.  And two, based on, you
3  know, our evaluations previously there is no real
4  viable alternative.
5      Q.  You mentioned the consideration of
6  switching to AppNexus, correct?
7      A.  Yes.
8      Q.  We spoke about that or you talked about
9  that at length in response to Google's counsel's
10 questioning, right?
11     A.  Yes.
12     Q.  What were the reasons that Google
13 decided not to switch to app -- let me strike
14 that.
15         What were the reasons that News Corp
16 decided not to switch to AppNexus and instead
17 remain with GAM?
18     A.  It was primarily because of the unique
19 programmatic demand that is only accessible via
20 GAM.
21     Q.  How much revenue did News Corp believe
22 it might lose by switching away from GAM?
23     A.  I don't recall the exact dollar figure
24 but it was in the millions of dollars.
25     Q.  Why did News Corp not believe that it

Page 191

1  HIGHLY CONFIDENTIAL - MINKIN
2  could make that revenue up from other sources?
3      A.  Because the volume of programmatic
4  demand coming through Google Ad Manager that is
5  unique to Google Ad Manager is, frankly, just
6  extremely significant and it's hard to imagine how
7  we would make that up otherwise.
8      Q.  When you say it's extremely significant,
9  what do you mean by that?
10     A.  It's as a percent of volume of
11 programmatic transactions.  I don't know the exact
12 percent.  But, you know, it -- there's no --
13 there's no programmatic player who would have more
14 volume than Google.  They are the biggest.
15     Q.  Let's -- could you pull up Exhibit 3
16 from your pile there, which is the Project
17 Cinderella analysis in 2017.  Let me know when you
18 have that in front of you.
19     A.  Yes.
20     Q.  At the bottom of the first page there's
21 a portion of the chart that refers to revenue
22 risk.  Do you see that?
23     A.  Yes.
24     Q.  It says in that portion of the chart,
25 "Disconnecting AppNexus and DFP would potentially

Page 192

1  HIGHLY CONFIDENTIAL - MINKIN
2  have an eight-figure impact on programmatic
3  revenue."  Do you see that?
4      A.  Yes.
5      Q.  Is that the analysis that News Corp came
6  to at the time?
7      A.  Yes.
8      Q.  An eight-figure impact means tens of
9  millions of dollars, correct?
10     A.  That is correct.
11     Q.  And that's consistent with what you just
12 told me that News Corp stayed with Google Ad
13 Manager primarily because of its unique demand,
14 correct?
15     A.  That is correct.
16     Q.  Could you flip forward in that document
17 to the page, it's slide number 4 with Bates number
18 ending in 6137.  Let me know when you have that in
19 front of you.
20     A.  Yes, I do.
21     Q.  And do you recall you were questioned
22 about this chart by Google's counsel?
23     A.  Yes.
24     Q.  And in particular you were questioned
25 about the bullet point in the column on the right

Page 193

1  HIGHLY CONFIDENTIAL - MINKIN
2  side of the chart that states, "Impressions sold
3  programmatically only have rev share."
4      A.  Yes.
5      Q.  And that refers to Google not charging
6  an ad serving fee for impressions sold
7  programmatically, correct?
8      A.  That is correct.  Yes.
9      Q.  And would that apply only to impressions
10 that are monetized programmatically through
11 Google's AdX ad exchange?
12     A.  That is my understanding, yes.
13     Q.  So if an impression was sold or
14 monetized through another ad exchange competing
15 with AdX, Google would still charge the ad serving
16 fee, correct?
17     A.  That is my understanding.
18     Q.  So let's turn forward to slide 11, which
19 is the Bates number ending in 6144.  Do you have
20 that in front of you?
21     A.  Yes, I do.
22     Q.  And there's a heading there Revenue
23 Risk, right?
24     A.  Yes.
25     Q.  And the second bullet point there refers

HIGHLY CONFIDENTIAL

Page 198

1    HIGHLY CONFIDENTIAL - MINKIN
2  based on whatever calculation, Google then makes a
3  determination whether AdX has beat that value that
4  they derived, again, mysteriously.  And if they
5  do, they will show an impression from AdX.  But,
6  again, that does not exist or isn't available for
7  other exchanges.
8      Q.  I do want to move on in the interest of
9  time.
10     We have used the term today ad exchange,
11 correct?
12     A.  Yes.
13     Q.  So you're familiar with that term?
14     A.  Yes.
15     Q.  And also familiar with the term open
16 auction?
17     A.  Yes.
18     Q.  What company offers the largest ad
19 exchange for open auction display advertising
20 transactions?
21         MS. SESSIONS:  Object to the form.
22     A.  Google.
23     Q.  What's your basis for saying so?
24     A.  One, common knowledge.  And two, we
25 could see it in our own reports on programmatic

Page 199

1    HIGHLY CONFIDENTIAL - MINKIN
2  revenue and where the revenue's coming from.
3      Q.  When you say you can see it in your own
4  programmatic reports, can you elaborate on what
5  you're seeing?
6      A.  Sure.  So we can pull a report looking
7  at which, which exchanges are driving, how much
8  revenue each exchange is driving, and you can see
9  that Google is driving the most.
10     Q.  So based on the reports that you viewed,
11 how would you characterize the position of AdX as
12 compared to the other ad exchanges?
13        MS. SESSIONS:  Object to the form.
14     A.  Dominant.
15     Q.  What's your basis for saying that?
16     A.  Again, just based on my own
17 understanding of the industry and the fact that
18 I've been in it for 24 years, I have a pretty good
19 understanding of the ecosystem and the players in
20 it.
21     Q.  If you recall, in Exhibit 3 Google's
22 counsel questioned you about the take rate for
23 open auction that's listed on slide 4 of the
24 exhibit.  Do you recall that?
25     A.  Yes.

Page 200

1    HIGHLY CONFIDENTIAL - MINKIN
2      Q.  Does -- so News Corp pays a take rate to
3  Google for open auction transactions that occur
4  through AdX; is that correct?
5      A.  That is correct.
6      Q.  And do you recall the take rate that
7  News Corp pays today?
8      A.  I don't recall the specific percent, no.
9      Q.  It's a 3-tiered rate, though, correct?
10     A.  I believe so, but I'm not a hundred
11 percent sure on that.
12     Q.  Do you recall that the lowest tier the
13 take rate is 20 percent that goes to Google?
14     A.  Certainly in this proposal that's what
15 it was, I don't remember if that was where it
16 ended up in the final contract.
17     Q.  Is 20 percent the standard take rate
18 that Google charges for open auction on AdX?
19        MS. SESSIONS:  Object to the form.
20     A.  I do not know what their standard take
21 rate is.
22     Q.  Is the rate that News Corp pays to
23 Google for open auction transactions on AdX higher
24 or lower than the take rate that it pays to other
25 exchanges for open auction transactions?

Page 201

1    HIGHLY CONFIDENTIAL - MINKIN
2        MS. SESSIONS:  Object to the form.
3      A.  I believe it's going to vary.  But,
4  again, Google will manipulate the take rate, so
5  it's difficult to say explicitly.
6      Q.  At least as shown on slide 4 of
7  Exhibit 3, for some transactions the open auction
8  take rate would be less than 20 percent; is that
9  right?
10     A.  Yes.  In this proposal, yes.
11     Q.  Are you aware of any other publishers
12 that have obtained a take rate of lower than
13 20 percent for open auction transactions on AdX?
14     A.  No, I'm not aware of the financials for
15 other publishers.
16     Q.  You spoke a minute ago about the unique
17 demand that's available through Google, right?
18     A.  Uh-hum.  Yes.
19     Q.  What, if any, alternatives does News
20 Corp have for the demand available on Google's
21 AdX?
22     A.  There are no alternatives in the sense
23 of, if we want that demand, we need to work with
24 Google.
25     Q.  What is unique about the demand that's

Veritext Legal Solutions
800-567-8658                                                              973-410-4098

HIGHLY CONFIDENTIAL

Page 230

```
 1        HIGHLY CONFIDENTIAL
 2          C E R T I F I C A T E
 3
 4     I, JOSEPHINE H. FASSETT, a Registered
 5  Professional Reporter, Certified Court Reporter, and
 6  Notary Public of the states of New York and New
 7  Jersey, do hereby certify that the witness, whose
 8  stenographically recorded deposition is hereinbefore
 9  set forth, was first duly sworn by me on the date
10  indicated, and that the foregoing stenographically
11  recorded deposition is a true and accurate record of
12  the testimony given by such witness.
13     I FURTHER CERTIFY that I am not employed by nor
14  related to any of the parties to this action by
15  blood or marriage, and that I am in no way
16  interested in the outcome of this matter.
17     IN WITNESS WHEREOF, I have subscribed my hand
18  this 26th day of September 2023.
19
20
21         _____
           JOSEPHINE H. FASSETT, RPR, CCR
22         NCRA License No. 32148
           CCR License No. 30XI00098400
23         New York Notary Public
           New Jersey Notary Public
24
25
```

Page 231

```
 1        HIGHLY CONFIDENTIAL
 2       CERTIFICATION OF WITNESS
 3
 4     I, DAVID A. MINKIN, hereby certify that I have
 5  read the transcript of my testimony taken under oath
 6  in my stenographically recorded deposition on
 7  September 22, 2023, and that the transcript is a
 8  true, complete and accurate record of my testimony,
 9  and that the answers on the record as given by me
10  are true and correct, subject to the changes and/or
11  corrections, if any, shown on the attached page.
12
13
            _____
14               DAVID A. MINKIN
15
16  Subscribed and sworn to before me this_____ day
17  of_____, 2023.
18
19          _____
            Notary Public State of
20
21
22
23
24
25
```

Page 232

```
 1  John Thorne, Esq.
 2  jthorne@kellogghansen.com
 3            September 26th 2023
 4  RE:   United States, Et Al v. Google, LLC
 5    9/22/2023, David A. Minkin , News Corp (#6080194)
 6     The above-referenced transcript is available for
 7  review.
 8     Within the applicable timeframe, the witness should
 9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  (erratas-cs@veritext.com)
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22           Yours,
23           Veritext Legal Solutions
24
25
```

Page 233

```
 1  United States, Et Al v. Google, LLC
 2  David A. Minkin , News Corp (#6080194)
 3         E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  David A. Minkin , News Corp        Date
25
```

59 (Pages 230 - 233)