# EXHIBIT M

# REDACTED

LEXITAS™

```
 1                        VOLUME 1
                      PAGES:  1-198
 2                    EXHIBITS:  See Index
 3
            UNITED STATES DISTRICT COURT
 4       FOR THE EASTERN DISTRICT OF VIRGINIA
                 ALEXANDRIA DIVISION
 5
    _____
 6                          )
    UNITED STATES OF AMERICA, )
 7  et al.,                  )
                             )
 8       Plaintiffs,         ) Case No.
                             ) 1:23-cv-00108-LMB-JFA
 9    v.                     )
                             )
10  GOOGLE, LLC,             )
                             )
11       Defendant.          )
                             )
12  _____)
13
              ** HIGHLY CONFIDENTIAL **
14
15      VIDEOTAPED DEPOSITION of ADAM SOROCA
             Thursday, August 31, 2023
16                  8:58 a.m.
17                  AC Hotel
                225 Albany Street
18             Boston, Massachusetts
19
20      Michelle Keegan, RMR, CRR, CSR
                    Lexitas
21      508-478-9795 ~ 508-478-0595 (Fax)
              www.LexitasLegal.com
22
```

```
 1  A P P E A R A N C E S:
 2
 3  US DEPARTMENT OF JUSTICE, ANTITRUST DIVISION
    By:  Milosz Gudzowski, Esq.
 4  By:  Michael Wolin, Esq.
    450 56th Street NW
 5  Washington, D.C. 20530
    Phone:  (646) 541-7333
 6  Email:  milosz.gudzowski@usdoj.gov
    Email:  michael.wolin@usdoj.gov
 7  Counsel for Plaintiff
 8
    AXINN, VELTROP & HARKRIDER LLP
 9  By:  David R. Pearl, Esq.
    By:  Bradley Justus, Esq.
10  By:  Luke T. Martin, Esq.
    1901 L Street, NW
11  Washington, D.C. 20036
    Phone:  (202) 912-4700
12  Email:  dpearl@axinn.com
    Email:  bjustus@axinn.com
13  Email:  lmartin@axinn.com
    Counsel for Defendant Google LLC
14
15  KRESSIN MEADOR LLC
    By:  Brandon Kressin, Esq.
16  By:  Catherine Larsen, Esq.
    5609 Golden Bear Drive
17  Overland Park, Kansas 66223
    Phone:  (913) 374-0750
18  Email:  brandon@kressinmeador.com
    Email:  catherine@kressinmeador.com
19  Counsel for Magnite
20
21
22
```

```
 1  APPEARANCES (continued):
 2
 3  Also Present:
 4    Jake Before, Videographer
 5    Brian Smith, Lexitas                  (Zoom)
 6    Aaron Saltz, Magnite General Counsel
 7    Linnaea Petterson, USDOJ Paralegal    (Zoom)
```

```
 1                  I N D E X
 2
    Videotaped Deposition of:              Page
 3
    ADAM SOROCA
 4
      By Mr. Gudzowski                     7, 185
 5   By Mr. Pearl                          84
 6
                    E X H I B I T S
 7
    Soroca Nos.                            Page
 8
    Exhibit 1    Email, Bates-numbered     44
 9               RUBICON-00001139 through -1141
10
    Magnite Nos.                           Page
11
    Exhibit 1    Letter dated October 9, 2020,    92
12               Bates-numbered
                 DOJ-ADS-B-0000025100
13               through -5101
14  Exhibit 2    Document, "Magnite Reports       121
                 Record Fourth Quarter and
15               Full-Year 2022 Results"
16  Exhibit 3    Document, "Edited Transcript,    129
                 Event Date/Time: August 09,
17               2023/8:30 PM GMT"
18  Exhibit 4    Document, "Board of Directors    134
                 Meeting, April 20, 2023,"
19               Bates-numbered MAGNITE-00002598
                 through -2671
20
    Exhibit 5    Document, "All Hands Meeting     141
21               December 2019," Bates-numbered
                 MAGNITE-00004628 through -4692
22
```

**Page 5**

```
 1              EXHIBITS (continued)
 2
    Exhibit 6    United States Securities and        146
 3               Exchange Commission,
                 Washington, D.C. 20549,
 4               Form 10-K
 5  Exhibit 7    Document, "August All Hands,        152
                 Thursday, August 12, 2021,"
 6               Bates-numbered MAGNITE-00005773
                 through -5831
 7
    Exhibit 8    Document, "Edited Transcript,       155
 8               Event Date/Time: May 10,
                 2023/8:30 PM GMT"
 9
    Exhibit 9    Document, "Edited Transcript,       168
10               Q2 2021 Magnite Inc Earnings
                 Call, Event Date/Time: August
11               05, 2021/8:30 M GMT"
12  Exhibit 10   Document, "Product Data Sheet,      171
                 Updated Sep 2, 2011,"
13               Bates-numbered MAGNITE-00015312
                 through -5320
14
    Exhibit 11   Document, "Competition &            175
15               Markets Authority - Online
                 platforms and digital
16               advertising market study:
                 Notice under section 174 of the
17               Enterprise Act 2022, Response
                 of The Rubicon Project,"
18               Bates-numbered RUBICON-00000102
                 through -0155
19
20
       * Original exhibits retained by court reporter *
21
         ** Documents quoted on the record are
22                transcribed as read **
```

**Page 6**

1           P R O C E E D I N G S
2       THE VIDEOGRAPHER: We are now on the
3   record. My name is Jake Before. I am the
4   videographer retained by Lexitas.
5       This is a video deposition for the United
6   States District Court for the Eastern District of
7   Virginia.
8       Today's date is August 31st, 2023, and the
9   video time is 8:58 a.m. This deposition is being
10  held at the AC Hotel by Marriott, 225 Albany
11  Street, Boston, Massachusetts, in the matter of
12  United States of America, et al., versus Google,
13  LLC. The deponent is Adam Soroca.
14      Would all counsel please voice-identify
15  themselves for the record.
16      MR. GUDZOWSKI: Milosz Gudzowski for the
17  United States. I'm joined here with my colleague
18  Michael Wolin, also for the United States.
19      MR. PEARL: David Pearl for Google. I
20  have with me my colleagues Bradley Justus and Luke
21  Martin.
22      MR. KRESSIN: Brandon Kressin for Magnite.

**Page 7**

1   I have my colleagues Catherine Larsen and Aaron
2   Saltz from Magnite.
3       THE VIDEOGRAPHER: All right. Will the
4   court reporter please swear in the witness and we
5   can proceed.
6               ADAM SOROCA,
7   having been satisfactorily identified and duly
8   sworn by the Notary Public, was examined and
9   testified as follows:
10          EXAMINATION BY COUNSEL FOR
11           UNITED STATES OF AMERICA
12  BY MR. GUDZOWSKI:
13      Q. Good morning, Mr. Soroca. My name is
14  Milosz Gudzowski. I'll be doing the questioning
15  today. With me is Michael Wolin, who just
16  introduced himself.
17      MR. GUDZOWSKI: Are there any people
18  online who want to identify themselves? Is there
19  anyone online yet?
20      Not yet.
21      Q. Mr. Soroca, could you please state your
22  full name for the record.

**Page 8**

1       **A. Adam Lee Soroca.**
2       Q. What city and state do you live in?
3       **A. I live in Cambridge, Massachusetts.**
4       Q. What city and state do you work in?
5       **A. I work in Boston, Massachusetts.**
6       Q. Are there any other cities that you have a
7   home?
8       **A. I have a second home in Sheffield,**
9   **Massachusetts.**
10      Q. Any other cities that you regularly work
11  in?
12      **A. No. Other than visiting offices.**
13      Q. Okay. Mr. Soroca, are you represented by
14  counsel today?
15      **A. Yes.**
16      Q. Could you please identify your counsel.
17      **A. Brandon.**
18      MR. GUDZOWSKI: Counsel, could you clarify
19  for the record, are you representing both the
20  party Magnite and the individual witness?
21      MR. PEARL: That's correct.
22      Q. Mr. Soroca, have you ever been deposed

9

1 before?
2 **A. No.**
3 Q. I'd like to start with some ground rules
4 to help the deposition go smoothly.
5     First, it's very important for us not to
6 talk over each other so the court reporter can get
7 an accurate transcription of the deposition.
8     If at any time you don't understand a
9 question I ask, please let me know and I'll
10 clarify; otherwise, we'll assume that you
11 understood the question.
12    Does that make sense?
13 **A. Yes.**
14 Q. A transcript doesn't record nods,
15 headshakes, hand gestures, so please make sure all
16 your answers are verbal and audible.
17    Does that make sense?
18 **A. Yes.**
19 Q. While we're on the record, you cannot
20 communicate with others or consult any notes.
21    Does that make sense?
22 **A. Yes.**

10

1 Q. Do you have any notes in front of you?
2 **A. No.**
3 Q. Do you understand that you're sworn here
4 to answer all questions in this deposition
5 truthfully?
6 **A. I do.**
7 Q. Do you understand that the information you
8 provide during this deposition may be used by the
9 Department of Justice in other civil, criminal,
10 administrative, or regulatory cases or
11 proceedings?
12 **A. I do.**
13 Q. Is there any reason you can't answer
14 truthfully?
15 **A. There is not.**
16 Q. Are you taking any medications that might
17 interfere with your ability to answer questions
18 today?
19 **A. No.**
20 Q. Mr. Soroca, unless I say otherwise, for
21 all my questions I would like you to answer based
22 on your personal knowledge only.

11

1    Does that make sense?
2 **A. Yes.**
3 Q. So unless I say otherwise, I'm not asking
4 about information that you learned during
5 preparation for this deposition that comes from
6 someone else at Magnite and that you did not have
7 any personal knowledge about.
8    Does that make sense?
9 **A. Yes.**
10 Q. If at any point you feel like you have
11 information that is within the knowledge of
12 Magnite but not within your personal knowledge,
13 please specifically state that you're basing your
14 answer on something that is not within your
15 personal knowledge, and then we'll take it from
16 there.
17 **A. I understand.**
18 Q. Thank you.  Now I'm going to go through
19 some background.
20    Mr. Soroca, what is your position at
21 Magnite?
22 **A. I'm the chief product officer.**

12

1 Q. And could you briefly describe your
2 responsibilities as chief product officer?
3 **A. As chief product officer, I'm responsible**
4 **for developing the company's product vision, road**
5 **maps, and go-to-market strategies.**
6 Q. And how long have you worked at Magnite?
7 **A. Six years.  A little over six years.**
8 Q. And could you just briefly describe your
9 roles and responsibilities at Magnite prior to
10 becoming chief product officer?
11 **A. I joined Magnite in July of 2017, and I**
12 **was hired to -- I came over through acquisition,**
13 **and the first role was to be the head of the**
14 **global buyer team.  Sorry.  Head of the global DSP**
15 **team.**
16    **About six months later, I was asked to**
17 **take on and be the head of the full global buyer**
18 **team.**
19 Q. And would you tell us about that position.
20 What were your responsibilities?
21 **A. My responsibilities were to call on and**
22 **understand the market dynamics for our brand, our**

                                                                                                13

1  agency, and our DSP customers, developing
2  go-to-market strategies and building those
3  relationships.
4     Q. And how is that different from what you do
5  now?
6     A. Now my responsibilities are to build the
7  road maps that end up delivering software to
8  service all of our clients on both the buy and the
9  sell side.
10    Q. And could you just briefly describe what
11 you mean by "road maps."
12    A. Road maps would be a list of projects or
13 software that we are going to build.
14    Q. And who are your clients, generally
15 speaking?
16    A. Magnite's clients would be DSPs, brands
17 and agencies on the buy side, and sellers of
18 inventory or publishers on the sell side.
19    Q. And where were you before Magnite?
20    A. I had started a company called nToggle.
21    Q. And how long were you there for?
22    A. Approximately two and a half to three

                                                                                                14

1  years.
2     Q. And did you say earlier that that company
3  was brought over to Magnite?
4     A. Correct.
5     Q. And could you just describe the
6  circumstances of that.
7     A. nToggle was acquired by Rubicon Project at
8  the time.
9     Q. And what did nToggle do?
10    A. nToggle provided machine-learning-based
11 traffic shaping that took the stream of traffic
12 from exchanges and shaped it for the DSPs.
13    Q. And before nToggle, where were you at?
14    A. I was at a company called Millennial
15 Media.
16    Q. And what did you do there?
17    A. I was the chief product officer.
18    Q. And what is Millennial Media?
19    A. Millennial Media was an ad network --
20 mobile ad network and programmatic ad stack.
21    Q. And is that company still around?
22    A. It is not.

                                                                                                15

1     Q. What happened to it?
2     A. It was acquired by Yahoo.
3     Q. And is that when you left?
4     A. No.  I may not be right.  It was either
5  acquired by Verizon or Yahoo -- I forget the
6  sequencing -- or AOL.
7     Q. And why did you leave Millennial Media?
8     A. To go start nToggle and a discussion with
9  the CEO that it was time for me to move on.
10    Q. Before Millennial Media, what did you do?
11    A. I worked for a company called Jumptap.
12    Q. And could you tell us a little bit about
13 Jumptap.
14    A. Jumptap was another mobile ad network and
15 programmatic stack.
16    Q. And what do you mean by that?  What's a
17 mobile ad network?
18    A. An ad network, we took insertion orders
19 from buyers and delivered the campaigns across
20 mobile app providers.
21    Q. And is Jumptap still around?
22    A. It is not.

                                                                                                16

1     Q. What happened?
2     A. It was acquired by Millennial Media.
3     Q. And before Jumptap, what did you do?
4     A. I was at Lycos.
5     Q. What did you do there?
6     A. I was the general manager of the search
7  services.
8     Q. And what year was that?
9     A. Could you repeat the question?
10    Q. What years were you there?
11    A. 2002 to 2005.
12    Q. And I think I forgot to ask, what years
13 were you at Jumptap?
14    A. 2005 until -- through the acquisition and
15 end of Millennial Media, 2014.
16    Q. And before Lycos, what did you do?
17    A. I was at a company called
18 MotherNature.com.
19    Q. And what was your role there?
20    A. I was director of business development.
21    Q. And before that?
22    A. I was at a company called Cybersmith.

**17**

1   Q. And what did you do there?
2   **A. I was a director of business development.**
3   Q. When did you graduate college?
4   **A. 1994.**
5   Q. Okay. And so between 1994 and -- did you
6   have a position before Cybersmith?
7   **A. I did.**
8   Q. What did you do?
9   **A. I was a ski tour operator.**
10  Q. Did that have any role in digital
11  advertising?
12  **A. It did not.**
13  Q. So I'm going to move on. I'm going to ask
14  you a little bit about Google's position in the
15  display ad tech space.
16      My first question is, Mr. Soroca, what is
17  a publisher ad server for display advertising?
18  **A. A publisher ad server is a piece of**
19  **software that is used to control and schedule and**
20  **decision the ads that get served on a publisher's**
21  **inventory.**
22  Q. And in the display advertising space,

**18**

1   could you explain a little bit what display
2   advertising is?
3       MR. PEARL: Objection, form.
4   **A. Display advertising is a form of**
5   **advertising where a digital ad unit is served on a**
6   **web page or other form of media that is fairly**
7   **static in nature and delivered and input in front**
8   **of a consumer.**
9   Q. Mr. Soroca, which company has the largest
10  display publisher ad server?
11      MR. PEARL: Objection, form.
12  **A. I believe that to be Google.**
13  Q. And what's their product called?
14  **A. Google Ad Manager.**
15  Q. Has it had other names before?
16  **A. Yes.**
17  Q. What were those names?
18  **A. DoubleClick for Publishers.**
19  Q. Any other names, do you believe?
20  **A. Not that I recall.**
21  Q. How would you characterize --
22  **A. Sorry. Just DoubleClick.**

**19**

1   Q. And how would you characterize Google's
2   position in the display publisher ad server
3   business?
4       MR. PEARL: Objection, form.
5   Q. You can answer.
6   **A. Dominant.**
7   Q. And can you say that again? Sorry.
8   **A. Dominant.**
9   Q. And why do you view Google as the dominant
10  publisher ad server for display?
11  **A. I believe them to have market share in the**
12  **95 to 97 percent range.**
13  Q. Mr. Soroca, what is an ad exchange for
14  display advertising?
15  **A. An ad exchange is a piece of software that**
16  **in real time auctions off in display inventory or**
17  **any other form of inventory.**
18  Q. And which company has the largest ad
19  exchange for display?
20      MR. PEARL: Objection, form.
21  **A. I believe that to be Google.**
22  Q. And what's their product called?

**20**

1   **A. It is now a part of GAM.**
2   Q. And what was it called before it was a
3   part of GAM?
4   **A. AdX.**
5   Q. Does it still go by AdX?
6   **A. Colloquially.**
7   Q. And, Mr. Soroca, how would you
8   characterize Google AdX's position in the display
9   ad exchange business?
10      MR. PEARL: Objection, form.
11  **A. The dominant player in the market.**
12  Q. And why do you view Google's AdX as the
13  dominant display ad exchange?
14      MR. PEARL: Objection, form.
15  **A. As we talk with our publishers and our**
16  **advertisers, they signal that that is the case.**
17  Q. So are you saying publishers have told you
18  this?
19  **A. Yes.**
20  Q. And any other participants in the
21  advertising market, have they told you this as
22  well?

21

1  A. The marketers as well, including
2  advertising agencies.
3  Q. Any others?
4  A. No.
5  Q. And with respect to Google AdX's dominant
6  position in the marketplace, has that changed in
7  the last five years?
8     MR. PEARL: Objection, form.
9  A. Not to my knowledge.
10  Q. And so you view that they're still
11  dominant over the last five years?
12    MR. PEARL: Objection.
13  A. Yes.
14    MR. PEARL: Form.
15  Q. For display advertising, among the various
16  different exchanges, which exchange does Magnite
17  compete with most closely?
18    MR. PEARL: Objection, form.
19  A. We view our direct competitors as
20  companies including PubMatic; Index Exchange;
21  OpenX; now inside of Microsoft, Xandr.
22  Q. And why didn't you say AdX in that list of

22

1  companies?
2  A. Because they're in a different category in
3  terms of their size and our ability to compete and
4  take share.
5  Q. And why do you say they're in their own
6  category?
7  A. They have such a significant share
8  differential between us and our peers that there
9  seems to be a ceiling on which we can gain ground.
10  And so we typically just try to take share
11  primarily from the list that I gave you.
12  Q. And to make sure I had the list right,
13  what were the companies on the list that you
14  consider as your peers?
15    MR. PEARL: Objection to form.
16  A. PubMatic, Index Exchange, OpenX, Xandr
17  inside of Microsoft.
18  Q. And what is the ceiling?
19    MR. PEARL: Objection, form.
20  A. It's unclear to us, but there seems to be
21  a part of the budgets that we cannot bring onto
22  our exchange.

23

1  Q. And you say that that's share from AdX
2  that you're saying that you can't bring onto your
3  exchange?
4     MR. PEARL: Objection to form.
5  A. Correct.
6  Q. In the industry, is the term "sell side" a
7  phrase that's used in the industry, as you can
8  recall?
9  A. Yes.
10  Q. And what's that phrase mean?
11  A. The sell side will typically refer to the
12  software that is running on publisher inventory
13  and help to monetize it.
14  Q. And how would you characterize Google's
15  position on the sell side in the display
16  advertising market?
17    MR. PEARL: Objection, form.
18  A. Dominant.
19  Q. And why would you view Google as having a
20  dominant position on the sell side of the display
21  advertising market?
22    MR. PEARL: Objection, form.

24

1  A. Because of the feedback that we've
2  received from our buyers and sellers.
3  Q. And who are your buyers and sellers?
4  A. Sellers would be all of the publishers
5  that are on our platform. Those are digital
6  websites or mobile app companies.
7     The buy side, we would hear that through
8  the advertising agencies or the direct marketers,
9  marketers directly themselves.
10  Q. And has that changed in the last five
11  years?
12  A. No, not to my knowledge.
13  Q. I'm going to shift gears a little bit.
14    Which company has the largest display
15  advertiser ad network?
16    MR. PEARL: Objection, form.
17  A. I don't know the answer to that.
18  Q. Is "advertiser ad network" a phrase that's
19  used in the industry or is that not a common
20  phrase?
21    MR. PEARL: Objection, form.
22  A. It's a phrase I'm familiar with.

25
1  Q. Okay. And what does it mean to you?
2  **A. An ad network would typically be a company**
3  **that provides -- they get insertion orders from**
4  **marketers, and they deliver those campaigns on to**
5  **publishers or the marketers log into a system to**
6  **deliver the inventory on to publishers.**
7  Q. And have you heard of Google demand
8  network? Is that something that -- a company
9  you're familiar with --
10    MR. PEARL: Objection.
11  Q. -- or something you're familiar with?
12    MR. PEARL: Objection.
13  **A. Could you repeat the name?**
14  Q. Google demand network.
15  **A. Yes.**
16  Q. What are they?
17  **A. An ad network.**
18  Q. Okay. And how would you characterize
19 Google demand network's position in this market?
20    MR. PEARL: Objection, form.
21  **A. Very strong.**
22  Q. And why do you view Google demand network

26
1  as having a very strong position in this market?
2    MR. PEARL: Objection, form.
3  **A. Publishers tell us how much they rely on**
4  **the money flow that comes from that source.**
5  Q. And is "demand-side platform" a phrase
6  you're familiar with?
7  **A. Yes.**
8  Q. And what is a display demand-side
9 platform?
10    MR. PEARL: Objection, form.
11  **A. Demand-side platform is a system that bids**
12  **on inventory from supply-side platforms or**
13  **exchanges in real time.**
14    THE VIDEOGRAPHER: I think we just lost
15 power.
16    MR. GUDZOWSKI: Let's go off the record.
17    (Off the record, 9:18 a.m. to 9:19 a.m.)
18    THE VIDEOGRAPHER: The time is 9:19 a.m.,
19 and we are back on the record.
20 BY MR. GUDZOWSKI:
21  Q. Mr. Soroca, does Google have a demand-side
22 platform?

27
1  **A. It does.**
2  Q. And what is it called?
3  **A. DV360.**
4  Q. And how would you characterize DV360's
5 position in the demand-side platform market?
6    MR. PEARL: Objection, form.
7  **A. Dominant.**
8  Q. And why do you view DV360 as having a
9 dominant position?
10    MR. PEARL: Objection, form.
11  **A. They're known in the industry to be the**
12  **largest.**
13  Q. And could you elaborate who in the
14 industry has given you that information?
15    MR. PEARL: Objection to form.
16  **A. We see it on our platform and we hear it**
17  **from our publishers and others in the industry.**
18  Q. And broadly speaking, how would you
19 characterize Google's position in display
20 advertising technology?
21    MR. PEARL: Objection, form.
22  **A. Dominant.**

28
1  Q. And why would you say Google is dominant
2 in the display advertising technology?
3    MR. PEARL: Objection, form.
4  **A. From end to end, from the buy side through**
5  **the sell side, they're by far the largest player.**
6  Q. And so what problems, if any, does
7 Google's dominance across the display advertising
8 technology create for exchanges?
9    MR. PEARL: Objection, form.
10  **A. That's the ceiling. We feel that it**
11  **limits our ability to grow at a rate that we**
12  **could.**
13  Q. Does it limit your ability to compete?
14    MR. PEARL: Objection, form.
15  **A. To gain share from them, yes.**
16  Q. And can you give us a little bit more
17 description of how their dominance actually does
18 that?
19    MR. PEARL: Objection, form.
20  **A. For example, when we approach agencies to**
21  **engage in broader relationships or supply-path**
22  **optimization deals, the size of those deals or the**

29

1  growth that we could expect from executing a deal
2  like that is typically limited because we couldn't
3  take as much because the buyers know that they're
4  going to end up spending a substantial amount
5  through a pipe that they don't have control over.
6      Q. And I'll come back to this topic later on.
7      But are there any kind of examples of --
8  that you can give where Google's dominance is
9  inhibiting Magnite's ability to compete?
10     MR. PEARL:  Objection, form.
11     A. There are cases where we've spoken with
12 agencies about doing larger deals, and they said
13 yes, we're going to do something with you.  But
14 there's a limit to how big it can be because of
15 our inability to control where our money goes
16 through the DV360 path.
17     Q. Does Google's Publisher ad server run
18 auctions?
19     MR. PEARL:  Objection, form.
20     A. Yes.
21     Q. And how -- what's the product that's
22 running auctions, again?

30

1      MR. PEARL:  Objection, form.
2      A. There are two layers of auctions, as I
3  understand it.  There's a first auction that
4  happens in the programmatic space, and that would
5  be AdX.
6      And then there is an auction that happens
7  in the ad server, and that would be GAM.
8      Q. And the ad server you're referring to is
9  the Publisher ad server?
10     A. The Publisher ad server.
11     Q. And when GAM runs its Publisher ad server
12 auctions, how would you characterize those
13 auctions in terms of fairness?
14     MR. PEARL:  Objection, form.
15     A. I have no context to see what's inside the
16 ad server.
17     Q. Do you have any view, just based on
18 industry or just your experience with interacting
19 with GAM or just a conversation you've had with
20 others?
21     MR. PEARL:  Objection, form.
22     A. Their last look was believed to have been

31

1  a technique that was used to circumvent or
2  thumb-on-scale the auction, and other techniques
3  were believed to have been used.  And that would
4  have come through our publisher partners' talking
5  to us.
6      But without seeing inside the ad server
7  and knowing the mechanics, I don't have specific
8  knowledge other than the belief in the industry.
9      Q. And with the last look, could you describe
10 what that is?
11     MR. PEARL:  Objection, form.
12     A. Last look is a feature inside the ad
13 server that after the primary set of demand was
14 considered Google had a chance to beat it with one
15 last look at it and pay one cent higher than
16 everybody else.  And Google was the only one that
17 had access to that pricing information.
18     Q. And would you consider that fair?
19     MR. PEARL:  Objection, form.
20     A. I don't consider it fair.
21     Q. And what risks, if any, did Google's last
22 look create for Magnite?

32

1      MR. PEARL:  Objection, form.
2      A. It meant that we could not deliver
3  campaigns at the full rate for our buyers at which
4  they could.  It also meant that perhaps our
5  publishers were not seeing the full monetization
6  that they could because the real price curve was
7  obfuscated.
8      Q. And what gives them the ability to do last
9  look?
10     MR. PEARL:  Objection, form.
11     A. They were the ad server -- or they are the
12 ad server.
13     Q. Does this have an impact on advertisers?
14     MR. PEARL:  Objection, form.
15     A. Yes.
16     Q. And what impact would that be?
17     MR. PEARL:  Objection, form.
18     A. Advertisers don't necessarily have their
19 demand flow through the pipes that they have
20 established deals with or prefer.
21     Q. And I asked about Magnite, but what
22 impact, if any, does this have on competition in

### Page 41

1   So the Rubicon Project index would all sit
2   somewhere in the waterfall. It would call down
3   linearly or serially.
4       When header bidding came, it gave the
5   exchanges the ability to all get a bid in at the
6   same time for all of the ad impressions.
7       Q. And what did that do for competition?
8       MR. PEARL: Objection, form.
9       A. I believe it helped.
10      Q. I think earlier you said you don't believe
11  Google's AdX market share changed appreciably in
12  the last five years or its dominance hasn't
13  changed.
14      Why do you say that, notwithstanding the
15  header bidding?
16      MR. PEARL: Objection, form.
17      A. So I will give the answer based on
18  conversations that I've had with our publisher
19  team in preparation for today.
20      Q. Okay.
21      A. Through their conversations in the market,
22  publishers will tell us at the high end that the

### Page 42

1   share of wallet that AdX has is about -- it can be
2   70 percent, unless the publisher wants to
3   deliberately mitigate the amount of spend that
4   goes through AdX through a bunch of configurations
5   and can get the share of wallet down to 40
6   percent.
7       Q. But is it your view, notwithstanding
8   header bidding, that AdX's dominance hasn't
9   changed in the past five years?
10      MR. PEARL: Objection, form.
11      A. I agree with that statement.
12      Q. And why do you say that?
13      A. From the conversations that our company
14  has had with publishers throughout that period of
15  time.
16      Q. What percentage of Magnite's display
17  revenue comes from DV360, approximately?
18      MR. PEARL: Objection, form.
19      A. Today, approximately 37 percent.
20      Q. And if let's say DV360's bidding
21  algorithms were kind of constructed in a way to
22  push more spending to AdX and less spending to

### Page 43

1   other exchanges, what impact, if any, would that
2   have on Magnite?
3       MR. PEARL: Objection to form.
4       A. Could you repeat the question?
5       Q. Sure. If DV360's bidding, the way it
6   bids, was altered in a way to kind of push more
7   spending to AdX versus other exchanges, versus
8   Magnite, what impact would that have on Magnite?
9       MR. PEARL: Objection, form.
10      A. It limits our ability to grow.
11      Q. And why is that?
12      A. Because there are advertiser budgets that
13  would be steered away from our exchange in favor
14  of AdX.
15      Q. And what effect, if any, would that have
16  on competition in the exchange market?
17      MR. PEARL: Objection to form.
18      A. It limits who the real -- the group of
19  competitors who compete amongst Magnite and the
20  peers that I mentioned versus the ability to
21  really compete against AdX.
22      Q. All right. I think I'm going to show you

### Page 44

1   a document.
2       MR. GUDZOWSKI: I'm going to mark it
3   Soroca Exhibit 1.
4       (Soroca Exhibit 1 marked for
5   identification)
6       Q. I'll hand that to you. Mr. Soroca, if you
7   don't mind taking a read. And let me know when
8   you've finished reading it.
9       MR. GUDZOWSKI: Just for the record, this
10  is Bates Number RUBICON-00001139.
11      Q. Mr. Soroca, is this an email from Todd
12  Smith to you?
13      A. The email is from Todd Smith to a group,
14  and I'm included on that group.
15      Q. Just briefly, who are the people on the
16  group?
17      A. The group includes Mark Balabanian, Jen
18  Fagnini, Joe Prusz, Ryan Mulcahy, and Tom Kershaw.
19      Q. And who is Todd Smith?
20      A. Todd Smith was a member of the Rubicon
21  Project team on our business development group,
22  and he, amongst other things, managed the Google

101

1  answer.
2    Q. When you became aware that the Department
3  of Justice was investigating Google's ad tech
4  business, did you want that to result in a lawsuit
5  against Google?
6       MR. GUDZOWSKI: Objection.
7       MR. KRESSIN: And objection again as to
8  scope.
9       You can answer from your own personal
10 knowledge.
11    A. So repeat the question, please.
12    Q. When you learned that the Department of
13 Justice was investigating Google's ad tech
14 business, did you want that investigation to lead
15 to a lawsuit against Google?
16    A. Yes.
17       MR. GUDZOWSKI: Objection.
18       Sorry.
19    Q. Sorry. I missed the answer. Could you
20 answer that again.
21    A. Yes.
22    Q. Thank you. Did Magnite welcome the

102

1  lawsuit against Google?
2       MR. GUDZOWSKI: Objection.
3       MR. KRESSIN: Same scope objection.
4       Again, only to the degree you can answer
5  without revealing attorney-client information.
6    A. I don't know what "welcome" means. What
7  do you mean by "welcome"?
8    Q. Were you happy when you learned of the
9  lawsuit against Google?
10      MR. GUDZOWSKI: Objection.
11      MR. KRESSIN: Same objections.
12   A. Happy, no.
13   Q. Did you believe it would be good for
14 Magnite's business when you learned of the lawsuit
15 against Google?
16      MR. KRESSIN: Same objections.
17      MR. GUDZOWSKI: Objection.
18   A. I believe it would be good for the
19 industry.
20   Q. What do you mean when you say "good for
21 the industry"?
22   A. That leveling the playing field and

103

1  eliminating the believed unfair practices would be
2  better for competition amongst Magnite and our
3  peers.
4    Q. So would that be better for Magnite's
5  bottom line?
6    A. It would be speculating. Potentially.
7    Q. Did you believe that -- do you believe
8  that Magnite would be more financially successful
9  as a result of this lawsuit?
10      MR. GUDZOWSKI: Objection.
11      MR. KRESSIN: Objection regarding the
12 scope.
13      You can answer from your personal
14 knowledge.
15   A. Yes.
16   Q. Okay. Mr. Soroca, what is your view of
17 the market share of Google's AdX product?
18   A. This is an answer from Magnite's point of
19 view?
20   Q. Correct.
21   A. Somewhere in the 70 percent range.
22   Q. Would your view on the dominance of AdX

104

1  change if you learned that AdX's share was
2  actually lower than, I think you said, 70 percent?
3       MR. GUDZOWSKI: Objection, form.
4    A. No.
5    Q. Why not?
6    A. Because the view that we get from our
7  publishers and our marketers indicates that
8  there's Google and there's everyone else.
9    Q. So your views on AdX's dominance are from
10 what you hear from publishers?
11      MR. KRESSIN: Objection, form.
12   A. Publishers and marketers.
13   Q. Have you done any studies of the
14 features -- of AdX's features?
15   A. No.
16   Q. Have you done any studies on DFP's
17 features?
18   A. No.
19   Q. Have you done any studies of DV360's
20 features?
21   A. No.
22   Q. Do you have any personal basis for your

105

1 view that AdX is dominant?
2   A. Are you asking about the market share or
3 are you asking about for the rationale?
4   Q. I'm asking whether you have any personal
5 experience regarding AdX's market share.
6   A. Only of that from working with our
7 publisher team.
8   Q. So only from what you've heard from
9 others?
10   A. From our publisher team. Yes.
11   Q. Can you rule out that Google's success is
12 due to its offering superior products?
13   MR. GUDZOWSKI: Objection, form.
14   MR. KRESSIN: Objection.
15   A. The mechanics of the ad ecosystem related
16 to the way money gets funded really have very
17 little to do with features. It has to do with how
18 much demand at what price is put into the auction.
19   Q. Can you explain what you mean?
20   A. As traffic moves from a page loading and
21 ad opportunity, that ad opportunity is basically a
22 jump ball.

106

1     And it just -- what really matters is what
2 price comes back to determine the winner. And so
3 it has very little to do with features. It's a
4 matter of what price gets returned and what price
5 makes it down to the final auction and what the
6 final auction will clear the transaction at.
7   Q. Can the features of an exchange influence
8 whether a price is higher or lower for a marketer?
9   A. They can.
10   Q. But I think -- let me withdraw that.
11     Your view is that the quality of -- is
12 your view that the quality of an ad exchange has
13 no bearing on whether it's successful or not?
14   MR. GUDZOWSKI: Objection, form.
15   A. Once you reach to a certain level of
16 capability, there's very little that additional
17 features would do to create such separation in the
18 market.
19   Q. And what's your basis for reaching that
20 conclusion?
21   A. Years of experience of understanding how
22 the money flows in the industry.

107

1   Q. But that's only -- that's the only thing
2 you're basing it on?
3   MR. KRESSIN: Objection.
4   MR. GUDZOWSKI: Objection.
5   A. I would base it on that and the publishers
6 that we have aren't asking us for certain features
7 that we are deficient in or certain features that
8 we are missing other than those that are blocked
9 from us from GAM.
10   Q. Have you done any studies on the technical
11 features of the Google product that you've
12 referred to as last look?
13   A. No.
14   Q. Have you done any study of the impacts on
15 the market of the product you referred to as last
16 look?
17   MR. GUDZOWSKI: Objection, form.
18   A. No.
19   Q. Is your view of the feature that you're
20 calling last look based entirely on what other
21 people have told you about it?
22   MR. GUDZOWSKI: Objection, form.

108

1   A. Yes.
2   Q. Do you have any examples of the feature
3 you're referring to as last look actually winning
4 an auction for one penny more than the next
5 highest bid?
6   MR. GUDZOWSKI: Objection, form.
7   A. I have no transactions or no data to
8 produce.
9   Q. Are you aware if the feature known as
10 "last look" only allowed Google to win auctions
11 when it was delivering the highest bid from an
12 advertiser?
13   MR. GUDZOWSKI: Objection, form.
14   A. That was last look by definition, that it
15 got a second look at the impression to deliver at
16 a higher rate.
17   Q. And does that mean that the bid that AdX
18 was bringing was the highest bid compared to all
19 the other bids?
20   A. The second bid that AdX brought was the
21 highest bid.
22   Q. So again, there was not a situation as a

117

1  he's answering for himself or from the company.
2      MR. JUSTUS: We object to you asking
3  questions during Mr. Pearl's questioning.
4      THE VIDEOGRAPHER: Would you like to go
5  off the record?
6      The time is 12:02 p.m., and we are going
7  off the record.
8      (Lunch recess, 12:02 p.m. to 12:49)

118

1      A F T E R N O O N   S E S S I O N
2      THE VIDEOGRAPHER: The time is 12:49 p.m.,
3  and we are back on the record.
4  BY MR. PEARL:
5      Q. Hello again, Mr. Soroca. I wanted to
6  start with some basics.
7      Can you tell me what ad tech products
8  Magnite offers today.
9      A. Sure. We have a number of ad tech
10 products. I'll talk about them distinctly on our
11 CTV business and our DV+ business.
12     On CTV, those are our products and
13 services, the over the top and connected
14 television space. We have products that range
15 from an ad server to an exchange.
16     On the DV+ side of the business, that's
17 our display online video side of the business. We
18 have a wrapper management software that we call
19 "Demand Manager." And we have an ad exchange that
20 we call "DV+."
21     And those are tied together between some
22 user interfaces and audience identity tools.

119

1      Q. And so you have two exchanges. Is that
2  correct?
3      A. We do.
4      Q. And if I use "exchange" and "SSP"
5  synonymously today, will you understand me to be
6  talking about the same thing?
7      A. Yes.
8      Q. So you referenced a CTV exchange. What's
9  that called?
10     A. That product is called "Streaming."
11     Q. Just Streaming. And another exchange that
12 does, I think you said, display and video?
13     A. Display, online video. So we would
14 characterize that as short-form video. Audio and
15 digital out of home.
16     Q. And what's that one called?
17     A. That one is called "DV+."
18     Q. Okay. I think you mentioned a header
19 bidding wrapper. What's the name of that product?
20     A. We don't have a heading bidder wrapper.
21 We have wrapper management software. So that is
22 software that configures the prebid wrapper on

120

1  behalf of publishers. That product is called
2  "Demand Manager."
3      Q. Okay. And the ad server we talked about
4  earlier, that's SpringServe?
5      A. Correct.
6      Q. Do you offer a product called "ClearLine?"
7      A. We do offer a product called "ClearLine."
8      Q. What is that?
9      A. ClearLine is a product that's tied to the
10 SpringServe ad server. It is for direct buying of
11 particularly OTT and CTV inventory, inventory
12 where the buyer and seller have prenegotiated
13 their rates. So they've prenegotiated PMP,
14 private marketplace, or PG, programmatic
15 guaranteed deal.
16     And so the fixed-price buying is something
17 that buyers came to us and said we'd rather not
18 use a DSP. We'd rather just buy it directly.
19     Q. Got it. Thank you.
20     MR. PEARL: Can you grab Tab 3, please.
21     Q. I'm going to be showing you an exhibit
22 that we'll mark as Magnite Exhibit 2.

121

1      (Magnite Exhibit 2 marked for
2   identification)
3      Q. Let me know when you're ready.
4      **A. Okay.**
5      Q. Have you seen this document before?
6      **A. In this form, no.**
7      Q. Have you seen it in a different form?
8      **A. Parts of it are -- yeah.  Yes, I have.**
9      Q. What is it?
10     **A. These are our fourth-quarter 2022 and**
11  **full-year '22 results.**
12     Q. Do you recognize Exhibit 2 as a true and
13  accurate copy of those fourth-quarter and
14  full-year 2022 results?
15     **A. I can't compare it to the actual, but I**
16  **have no reason to believe it's not.**
17     Q. Okay.  Was Exhibit 2 prepared in the
18  normal course of Magnite's business at the time it
19  was created, the document that is depicted here?
20     **A. I believe that to be true.**
21     Q. If you look at the very first line of the
22  document, it says, "Magnite is the world's largest

122

1   independent sell-side advertising platform."
2      Do you see where I'm talking about?
3      **A. I do.**
4      Q. Did I read that correctly?
5      **A. Yes.**
6      Q. Okay.  What does that mean?
7      **A. I didn't author the document, but I would**
8   **interpret it to mean, as we characterize our**
9   **business, that we are the leader amongst the**
10  **independent category of SSPs, meaning the peer set**
11  **that we referenced earlier.**
12     **We're not a part of Microsoft.  We're not**
13  **a part of Google.  We're not a part of Comcast.**
14     Q. If you go down to the chart that starts at
15  the very bottom of the first page and then carries
16  on to the next page, can you tell me what
17  Magnite's revenue for year-end -- for the year
18  ending December 31st, 2022 was?
19     **A. The full year?**
20     Q. Correct.
21     **A. Listed here, December 31st, 2022.  2022 is**
22  **listed at $577.1 million.**

123

1      Q. If you flip over to the next page, can you
2   tell me what Magnite's gross profits were for the
3   year ending December 31st, 2022?
4      **A. The gross profits listed here would be**
5   **$269.9 million.**
6      Q. And then I'm going to flip us back.  Can
7   you tell me what percentage growth Magnite
8   experienced in revenue between 2021 and 2022,
9   there at the bottom?
10     **A. For the full year or the three months**
11  **ending?  I missed the question.**
12     Q. The full year.
13     **A. 23 percent favorable.**
14     Q. Is 23 percent a significant amount of
15  growth?
16        MR. KRESSIN:  Objection, form.
17     **A. I don't know what to compare that to.**
18     Q. Does Magnite view 23 percent as a
19  significant amount of growth for its business?
20        MR. GUDZOWSKI:  Objection, form.
21     **A. We feel that we executed well in the**
22  **industry, given the constraints that we have.**

124

1      Q. Okay.  You can put that aside.
2      I want to go -- I want to ask a little bit
3   about your DV+ product that we were just talking
4   about.
5      First, does DV+ stand for something?
6      **A. Yes.**
7      Q. What is it?
8      **A. Display video and everything else other**
9   **than CTV and OTT.**
10     Q. And what would you say the key
11  functionalities of DV+ are?
12     **A. DV+ has all of the core components of an**
13  **ad exchange.  We onboard traffic.  We traffic**
14  **shape with advanced algorithms.  We make that**
15  **traffic available to buyers through advanced**
16  **traffic-shaping algorithms.  We have pricing**
17  **algorithms and yield optimization.  We have**
18  **curation tools to allow buyers to group their**
19  **inventory and target their inventory.**
20     **And we have a robust set of deal tools**
21  **that allow sellers and buyers to connect to**
22  **traffic PMPs, private marketplaces, and PG deals.**

193

1  Q. Is it fair to say it's a meaningful cost,
2  building auction capacity?
3      MR. PEARL: Objection, form.
4  **A. It's meaningful. Our CapEx numbers are**
5  **disclosed in our statements.**
6  [redacted]
7  [redacted]
8  [redacted]
9      MR. PEARL: Objection, form.
10  **A. Yes.**
11  [redacted]
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17  [redacted]
18  [redacted]
19  [redacted]
20  [redacted]
21  [redacted]
22  [redacted]

194

1  Q. And your net revenue per 1 million
2  auctions also dropped. Is that right?
3      MR. PEARL: Object to form.
4  **A. Correct.**
5  Q. So after investing in the capacity
6  build-out, your take rate -- sorry -- your take
7  rate, win rate, and net revenue per 1 million
8  auction all fell?
9      MR. PEARL: Objection, form.
10  **A. Yes.**
11  Q. And would you describe that as hitting a
12  ceiling, perhaps?
13      MR. PEARL: Objection, form.
14  **A. I would characterize this as approaching a**
15  **ceiling. I would not say that this has hit a**
16  **ceiling.**
17  Q. And why is that?
18  **A. Because the net for 1 million auctions**
19  **would drop much greater than that.**
20  Q. I think early on you had talked about how
21  revenues increased in Magnite. Is that right?
22      MR. PEARL: Objection to form.

195

1  **A. Yes.**
2  Q. In the display ad tech space, which
3  company has the most revenue?
4      MR. PEARL: Objection, form.
5  **A. Presumably Google.**
6  Q. And why do you say that?
7      MR. PEARL: Objection, form.
8  **A. Because they are the largest in the**
9  **category.**
10  Q. And what categories are they the largest
11  in?
12      MR. PEARL: Objection, form.
13  **A. What categories are you looking for?**
14  Q. Specifically within display ad tech, which
15  categories of that technology would you say
16  they're the dominant -- the largest in?
17      MR. PEARL: Objection, form.
18  **A. They're the largest DSP, they're the**
19  **largest SSP, and they're the largest ad server.**
20      MR. GUDZOWSKI: All right. Thank you. I
21  think we're okay on our end.
22      I'll pass it off to you.

196

1      MR. PEARL: Can we take a quick recess?
2      THE VIDEOGRAPHER: The time is 2:53 p.m.,
3  and we are going off the record.
4      (Recess, 2:53 p.m. to 2:59 p.m.)
5      THE VIDEOGRAPHER: The time is 2:59 p.m.
6  We are going on the record.
7      MR. PEARL: We have no further questions.
8  Thank you, Mr. Soroca.
9      MR. GUDZOWSKI: Thank you, Mr. Soroca.
10      MR. KRESSIN: Again, I'd like to designate
11  the transcript as highly confidential.
12      THE VIDEOGRAPHER: This concludes today's
13  deposition. The time is 3:00 p.m., and we are
14  going off the record.
15      (Off the record at 3:00 p.m.)

197

1  COMMONWEALTH OF MASSACHUSETTS

2  SUFFOLK, SS.

3

4     I, Michelle Keegan, Registered Merit Reporter

5  and Notary Public in and for the Commonwealth of

6  Massachusetts, do hereby certify that ADAM SOROCA,

7  the witness whose deposition is hereinbefore set

8  forth, was duly sworn by me and that such

9  deposition is a true record, to the best of my

10 ability, of the testimony given by the witness.

11    I further certify that I am neither related to

12 or employed by any of the parties in or counsel to

13 this action, nor am I financially interested in

14 the outcome of this action.

15    In witness whereof, I have hereunto set my hand

16 and seal this 1st day of September, 2023.

17

18

19

20                  Notary Public

21                  My commission expires:

22                  May 15, 2026


198

1           E R R A T A  S H E E T

2     I, ADAM SOROCA, do hereby certify that I have

3  read the foregoing transcript of my testimony, and

4  further certify that said transcript is a true and

5  accurate record of my testimony (with the

6  exception of the following corrections listed

7  below):

8  Page      Line               Correction

9  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

12 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

14 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

16 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

17 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

18 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19 Signed under the pains and penalties of perjury

20 this       day of            , 2023.

21

22                  ADAM SOROCA