# EXHIBIT 8

# REDACTED

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                     Alexandria Division

4      - - - - - - - - - - - - - -+
                                   |
5      UNITED STATES OF AMERICA,   |
       et al,                      |
6                                  |
               Plaintiffs,         |    Case Number:
7                                  |
          vs.                      |    1:23-cv-00108-
8                                  |    LMB-JFA
                                   |
9      GOOGLE, LLC,                |
                                   |
10                Defendant.       |
                                   |
11     - - - - - - - - - - - - - -+

12

13                    Video Deposition of

14                   ROBIN E. LEE, Ph.D.

15                  Friday, March 15, 2024

16                       9:39 a.m.

17

18

19

20     Veritext Job 6456904

21     Reported by:  Laurie Donovan, RPR, CRR, CLR

22

Page 2

```
 1
 2
 3
 4
 5
 6                March 15, 2024
 7                9:38 a.m.
 8
 9        Video Deposition of ROBIN S. LEE, Ph.D.,
10  held in person in Washington, D.C., with the
11  witness and all parties participating in person (
12  a few remotely), pursuant to the Rules of the
13  United States District Court for the Eastern
14  District of Virginia, Alexandria Division, subject
15  to such stipulations as may be recited herein or
16  attached hereto, before Laurie Donovan, a
17  Registered Professional Reporter and notary public
18  of the District of Columbia, who officiated in
19  administering the oath to the witness.
20
21
22
```

Page 4

```
 1   (Appearances continued)
 2   ALSO PRESENT:
 3        Warren Brey, videographer
 4        Bryon Becker
 5        Chris Erickson, Axinn Veltrop Harkrider
 6        Justin Wood
 7        Victor Liu
 8        Sophia Casten
 9        Colleen Dugan
10        Suzanne Majewski
11        Dave Barth (Bates White)
12
13
14
15
16
17
18
19
20
21
22
```

Page 3

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3        U.S. Department of Justice
 4        Antitrust Division
 5        450 Golden Gate Avenue
 6        Room 10-0101
 7        San Francisco, California 94102
 8        (415)934-5300
 9        By:  Brent Nakamura, Esq.
10        brent.nakamura@usdoj.gov
11   ON BEHALF OF THE DEFENDANT:
12        Paul Weiss Rifkind Wharton Garrison LLP
13        2001 K Street, NW
14        Washington, D.C. 20006
15        (202)223-7300
16        By:  William Isaacson, Esq.
17        wisaacson@paulweiss.com
18        Erica Spevack, Esq.
19        espevack@paulweiss.com
20
21
22
```

Page 5

```
 1           EXAMINATION INDEX
 2                    PAGE
 3   EXAMINATION BY MR. ISAACSON . . . . . . . . .   9
 4
 5
 6
 7
 8
 9           E X H I B I T S
10   EXHIBIT   DESCRIPTION              PAGE
11   Exhibit 1  Expert Report of Robin S. Lee,
12        Ph.D., December 22, 2023 . . . . .  34
13   Exhibit 2  Expert Rebuttal Report of Robin
14        S. Lee, Ph.D., February 13, 2024 .  34
15   Exhibit 3  Expert Supplemental Report of
16        Robin S. Lee, Ph.D., March 4,
17        2024 . . . . . . . . . . . . . . .  34
18   Exhibit 4  "Avid Display Business Overview,"
19        November 2020, by Sissie Hsiao,
20        PowerPoint presentation,
21        Bates GOOG-DOJ-AT-00855803 . . . .  80
22
```

2 (Pages 2 - 5)

1    THE WITNESS: I'm not providing a
2    precise number of damages for these
3    particular advertising customers.
4    BY MR. ISAACSON:
5    Q   And based on your background in
6    economics and industrial organization, as I
7    understand it, you are not offering expert
8    opinions on the meaning of any individual
9    documents in this case?
10       MR. NAKAMURA: Objection to form.
11       THE WITNESS: Can you restate your
12    question or rephrase it?
13    BY MR. ISAACSON:
14    Q   Are you offering expert opinions on the
15    meaning of any individual documents in this case?
16       MR. NAKAMURA: Objection to form.
17       THE REPORTER: Meaning?
18       MR. ISAACSON: Meaning, yes.
19       THE WITNESS: I'm not.
20       MR. NAKAMURA: Same objection.
21    BY MR. ISAACSON:
22    Q   And you are not expressing an opinion in

1    this case on the accounting profits of any Google
2    product area; is that correct?
3       MR. NAKAMURA: Objection to form.
4       THE WITNESS: Can you restate your
5    question, please.
6    BY MR. ISAACSON:
7    Q   Sure. You are not expressing an opinion
8    in this case on the accounting profits of any
9    Google product area in this case; am I correct?
10       MR. NAKAMURA: Objection to form.
11       THE WITNESS: So in my reports I do
12    discuss accounting profits and their
13    differences from economic profits, but I'm
14    not expressing opinions as to the level of
15    accounting profits for Google, Google's ad
16    tech products.
17    BY MR. ISAACSON:
18    Q   Are you expressing an opinion in this
19    case as to the level of economic product --
20    economic profits for Google's ad tech products?
21       MR. NAKAMURA: Objection to form.
22       THE WITNESS: So I'm expressing an

1    opinion that certain Google products, in
2    particular -- I'm sure we'll discuss them --
3    Google Ads, AdX, and DFP, possess substantial
4    and sustained market power protected by
5    significant barriers to entry, which are
6    associated with economic profits.
7    BY MR. ISAACSON:
8    Q   Are you expressing an opinion in this
9    case as to the amount of economic profits for
10    Google ad tech products?
11       MR. NAKAMURA: Objection to form.
12       THE WITNESS: As I stated before, I'm
13    expressing an opinion regarding the extent of
14    market power for these products which would
15    be associated with a positive economic
16    profit.
17    BY MR. ISAACSON:
18    Q   All right. My question went to the
19    amount of economic profits.
20       Are you expressing an opinion in this
21    case as to the amount of economic profits for
22    Google ad tech products?

1       MR. NAKAMURA: Objection to form.
2       THE WITNESS: My opinion is that Google
3    Ads, AdX and DFP are earning economic profits
4    consistent with their possession of
5    substantial and sustained market power.
6    BY MR. ISAACSON:
7    Q   And have you expressed an opinion as to
8    the amount of those profits, those economic
9    profits that you just referred to?
10    A   I believe that is saying something about
11    the amount, what I just said.
12    Q   Is saying -- are you able to express an
13    opinion as to the amount of economic profits from
14    Google ad tech products in a dollar amount?
15       MR. NAKAMURA: Objection to form.
16       THE WITNESS: So I'm not providing a
17    specific dollar number for that measure.
18    BY MR. ISAACSON:
19    Q   Before you were retained in this case,
20    had you heard the term "open-web display
21    advertising"?
22    A   So before I was retained by this case, I

Page 34

1 recall hearing the term "open-web" in contrast
2 with "walled garden," and I recall being familiar
3 with display advertising. I think I noted my
4 experience 15 years prior, looking into this
5 space.
6     Q    And before this case, had you heard the
7 term "open-web display advertising" as one term
8 with all four words?
9     A    I do not recall having come across those
10 four words together.
11          (Exhibit 1 was marked for
12          identification.)
13          (Exhibit 2 was marked for
14          identification.)
15          (Exhibit 3 was marked for
16          identification.)
17 BY MR. ISAACSON:
18     Q    We've marked as Exhibit 1 your opening
19 expert report, we've marked as Exhibit 2 your
20 rebuttal report, and Exhibit 3 is your
21 supplemental report.
22          You have them all in front of you for

Page 35

1 ease of access at any point.
2          If I can ask you to look at paragraph 7
3 of your opening report. That's Exhibit 1. In
4 paragraph 7 you say, "I have been asked by counsel
5 at the Department of Justice," and then you list a
6 number of things.
7          In the first bullet point, you say --
8 again, with reference to "I have been asked by
9 counsel at the Department of Justice to --
10 Determine whether publisher ad servers, ad
11 exchanges, and advertiser ad networks are open-web
12 display advertising, both worldwide . . . and in
13 the United States, are relevant antitrust
14 markets."
15          I skipped a parenthetical about how
16 worldwide is developed.
17          The -- were you asked to consider any
18 other market definition that would be at issue in
19 this case other than what is said there, whether
20 publisher ad servers, ad exchanges and advertiser
21 ad networks for open-web display advertising are
22 relevant antitrust markets?

Page 36

1          MR. NAKAMURA: Objection to form.
2          THE WITNESS: I'm sorry. Can you repeat
3 your question, please.
4 BY MR. ISAACSON:
5     Q    Sure.
6          So in that bullet point, it lists
7 markets, potential markets for publisher ad
8 servers, ad exchanges, and advertiser ad networks,
9 all for open-web display advertising. You were
10 asked to determine whether those are relevant
11 antitrust markets.
12          My question is: Were you asked to
13 consider any other market definition than those
14 potential market definitions?
15     A    So I recall looking into whether there
16 is a relevant market for demand-side platforms, a
17 relevant antitrust product market for demand-side
18 platforms.
19     Q    All right. Other than looking into a
20 relevant market for demand-side platforms, were
21 you asked to consider any other potential relevant
22 markets other than those which are listed in

Page 37

1 paragraph 7?
2          MR. NAKAMURA: I'll instruct Professor
3 Lee to answer to the extent to which he
4 considered the other markets that counsel
5 asked about, not any communications from
6 counsel to him.
7          THE WITNESS: So I also considered a
8 relevant antitrust product market for a
9 broader set of bidding tools, which includes
10 advertiser ad networks and demand-side
11 platforms, but as I note in my reports,
12 concluded that the smaller subset of
13 advertiser ad networks comprises a relevant
14 antitrust product market.
15 BY MR. ISAACSON:
16     Q    So other than markets for publisher ad
17 servers, ad exchanges, advertiser ad networks, all
18 for open-web display advertising, or a relevant
19 market for demand-side platforms or for ad
20 networks and demand-side platforms, did you
21 consider any other potential market definitions in
22 this case?

10 (Pages 34 - 37)

1      MR. NAKAMURA: Objection to form.
2      THE WITNESS: So in this case, as I note
3  in my rebuttal report, I considered
4  alternative markets that were proposed by
5  Dr. Israel and potentially Doctor or
6  Professor Ghose, but those alternative market
7  definitions proposed by Google's experts or
8  others that I examined and opined are not
9  appropriate for evaluating Google's market
10  power over its ad tech products that I
11  examined for evaluating the competitive
12  effects of its conduct that I examined.
13  BY MR. ISAACSON:
14      Q   The -- do you know if the term "open-web
15  display advertising" existed before counsel for
16  the Department of Justice asked you to consider
17  that term for your market definition?
18      MR. NAKAMURA: Objection to form.
19      THE WITNESS: So as an economist, I'm
20  interpreting "open-web display advertising"
21  as referring to a set of transactions with
22  certain characteristics used to be precise

1  about the products that I'm examining.
2      I have seen materials -- I don't recall
3  the precise dates for those documents --
4  where both the term "open-web," the term
5  "display advertising," as well as I've seen
6  documents from firms where "open-web display
7  advertising," those four words, have been
8  used.
9  BY MR. ISAACSON:
10      Q   Do you believe you've seen documents
11  where all four words, "open-web display
12  advertising," were used together?
13      A   I recall seeing documents produced by
14  Adobe and Facebook, although one of them may be an
15  industry source that used open-web display.
16      Q   The -- have you seen any industry
17  sources that report market shares for open-web
18  display advertising?
19      MR. NAKAMURA: Objection to form.
20      THE WITNESS: So if I may ask you to be
21  more specific. Are you referring to ad tech
22  products that facilitate the sale of open-web

1  display advertising or the underlying digital
2  advertisements themselves?
3  BY MR. ISAACSON:
4      Q   I'm going to ask you if you've seen
5  industry sources reporting market shares for any
6  products that would include the term "open-web
7  display advertising."
8      A   So can I ask you to rephrase the
9  question? You're asking if I've seen market
10  shares of products that sell open-web display
11  advertising?
12      Q   Any type of products. Does it -- like
13  it can be any market, any market share where the
14  terms "open-web display advertising" is used.
15      MR. NAKAMURA: Objection to form.
16      THE WITNESS: So in my -- maybe I'm not
17  understanding your question correctly, but in
18  my report, for example, I've seen a Google
19  document talking about -- discussing DFP's
20  share across various measures of what they
21  refer to as "addressable inventory" or "not
22  walled garden," and the addressable inventory

1  overlaps with open-web publishers, publishers
2  that don't -- that aren't using integrated ad
3  tech tools to sell their inventory.
4  BY MR. ISAACSON:
5      Q   We can talk about addressable inventory
6  later, but whether it's advertising, technology,
7  whatever product you want to name, have you seen
8  any industry sources that report market shares for
9  a market using the words "open-web display
10  advertising"?
11      MR. NAKAMURA: Objection to form.
12      THE WITNESS: So those documents I
13  referenced earlier, I don't recall if they
14  report any market share figures. I don't
15  recall, sitting here today.
16  BY MR. ISAACSON:
17      Q   And let me see if I can -- so there are
18  public industry sources that report on -- report
19  data for digital advertising, correct?
20      MR. NAKAMURA: Objection to form.
21      THE WITNESS: Yes, I believe there are
22  public sources, including e-Marketer, that

11 (Pages 38 - 41)

Page 42

1    looks at digital advertising.
2    BY MR. ISAACSON:
3    Q   Have you seen any industry sources that
4    report public data that would reflect shares of
5    any market that uses the term "open-web display
6    advertising"?
7         MR. NAKAMURA:  Objection to form.
8         THE WITNESS:  I think, as I mentioned
9    before, sitting here today, I don't recall if
10    any of the documents that I remember using
11    the terms "open-web display" report market
12    share figures or rely upon public data.
13    BY MR. ISAACSON:
14    Q   And is it also the case that, sitting
15    here today, you don't recall any documents from
16    Google that report market shares using the term
17    "open-web display advertising"?
18    A   Sitting here today, I do not recall any
19    Google documents using the term "open-web display
20    advertising" that report market shares for ad tech
21    products.
22    Q   And sitting here today, from the

Page 43

1    third-party documents that have been made
2    available to you from this case, am I correct you
3    do not recall any third-party documents that use
4    the term "open-web display advertising" to report
5    market shares for any products?
6    A   So as I noted earlier, I recall
7    third-party documents using the term "open-web
8    display."  I do not recall if they reported market
9    shares for specific ad tech products.
10    Q   To your knowledge, is this case the
11    first time anyone has tried to assemble market
12    share data using the term "open-web display
13    advertising"?
14    A   I'm not quite sure what you mean by
15    assemble data using a term.  I understand what it
16    means to assemble data restricted to a set of
17    products with certain features.
18    Q   So let me explain.
19         You have, in your reports, estimated
20    market shares for markets where you're using the
21    term "open-web display advertising," correct?
22    A   So as an economist, in my reports I'm

Page 44

1    using the term "open-web" to refer to publisher
2    inventory or publisher web inventory that is not
3    sold through integrated ad tech products, and it's
4    a description of what that set of inventory is.
5         I use "display advertising" to refer to
6    a particular form of digital advertising, and so
7    when I use those terms, it's meant to clarify the
8    sets of products and transactions over which
9    certain calculations are made.
10    Q   I'm not asking you how you're using the
11    term or why you're using the term.
12         You, in your reports, do estimates of
13    market shares where -- different markets where you
14    use the term "open-web display advertising,"
15    correct?
16    A   So the relevant product markets that I
17    evaluate are those involving advertiser ad
18    networks, ad exchanges, and publisher ad servers,
19    so those are the markets.
20    Q   So you estimate market shares in your
21    report for a market of publisher ad servers for
22    open-web display advertising, correct?

Page 45

1    A   These are publisher ad servers which are
2    used to transact open-web display advertising.
3    Q   Is that a yes?
4    A   I'm sorry.  What is your question?
5    Q   In your report, you estimate market
6    shares for publisher ad servers for open-web
7    display advertising, correct?
8    A   I do provide market shares for publisher
9    ad servers that facilitate the transaction of
10    open-web display advertising.
11    Q   And in your reports, you report market
12    shares for ad exchanges for open-web display
13    advertising, correct?
14    A   I do report market shares for ad
15    exchanges that facilitate the sale of open-web
16    display advertising.
17    Q   And in your, in your report, you report
18    market shares for advertiser ad networks for
19    open-web display advertising, correct?
20    A   In my report I do report market shares
21    for --
22         THE REPORTER:  Hold on just a moment.

12 (Pages 42 - 45)

Page 46

1    (Technical difficulties.)
2    THE WITNESS: So in my report --
3    BY MR. ISAACSON:
4    Q   I'll repeat the question.
5    In your report, you report market shares
6    for advertiser ad networks for open-web display
7    advertising, correct?
8    A   I do compute market shares for
9    advertiser ad networks that facilitate the sale of
10   open-web display advertising.
11   Q   And to your knowledge, is this case the
12   first time anyone has tried to compute market
13   shares for markets referring to open-web display
14   advertising?
15   MR. NAKAMURA: Objection to form.
16   THE WITNESS: So that's perhaps where
17   I'm not understanding your question
18   completely.
19   I have seen market shares computed let's
20   say by Google towards ad tech products
21   looking at I think what they call
22   "addressable inventory," but inventory from

Page 47

1    publishers on the web that don't use
2    integrated ad tech tools. So those are
3    shares computed by Google for open-web
4    display advertising.
5    BY MR. ISAACSON:
6    Q   So you believe you have seen -- so you
7    say "addressable," but let me ask you -- I want to
8    repeat the question, using the terms I'm using.
9    Is this the -- is this case the first
10   time anyone has tried to compute market shares for
11   markets that use the term open-web display
12   advertising?
13   MR. NAKAMURA: Objection to form.
14   THE WITNESS: I can't speak to what
15   anyone has ever done.
16   BY MR. ISAACSON:
17   Q   To your knowledge, is that true?
18   MR. NAKAMURA: Objection to form.
19   THE WITNESS: Again, I do not recall
20   those third-party documents that use the term
21   open-web display advertising, whether they
22   had within them calculations of market

Page 48

1    shares.
2    BY MR. ISAACSON:
3    Q   So it is correct that you don't recall,
4    anytime before this case, that anyone has tried to
5    compute market shares for markets using the term
6    open-web display advertising?
7    MR. NAKAMURA: Objection to form.
8    THE WITNESS: Again, I'm not quite
9    sure -- I've seen shares computed for tools
10   that transact open-web display advertising.
11   BY MR. ISAACSON:
12   Q   Have you seen, anytime before this case,
13   where someone has tried to compute market shares
14   for markets where they use the term open-web
15   display advertising?
16   MR. NAKAMURA: Objection to form.
17   THE WITNESS: Used -- again, if you're
18   referring to a document which has the term
19   open-web display advertising in which market
20   shares are computed, as I noted before, I do
21   not recall seeing a document that has market
22   shares and those terms together, but I have

Page 49

1    seen documents in which market share is
2    computed for particular ad tech products that
3    transact open-web display advertising.
4    BY MR. ISAACSON:
5    Q   And those market share documents you
6    see -- that you say you've seen that computed
7    market shares for ad tech products that transact
8    open-web display advertising, do those products
9    also transact products -- I messed that up. I
10   have to start over.
11   You say you have seen documents in which
12   market shares are computed for ad tech products
13   that transact open-web display advertising.
14   Have you seen market shares for ad tech
15   products that transacted only open-web display
16   advertising?
17   MR. NAKAMURA: Objection to form.
18   THE WITNESS: Well, the market shares I
19   compute also contain products that are able
20   to transact display advertising for owned and
21   operated properties. For example, many of
22   Google's products can be used to access its

13 (Pages 46 - 49)

1    owned and operated inventory.
2        I think I, I discuss this in my reports,
3    how some products can be used to transact
4    open-web inventory, while at the same time
5    those products can be used to transact owned
6    and operated or walled garden inventory.
7  BY MR. ISAACSON:
8    Q   Have you seen market shares for ad tech
9  products reported in this case where the
10  transactions were limited to impressions or
11  revenues for open-web display ads?
12       MR. NAKAMURA:  Objection to form.
13       THE WITNESS:  So in my report, again,
14    there are -- I've seen Google documents that
15    look at measures of share for DFP restricting
16    attention to web display inventory that's not
17    coming from walled garden publishers, and so
18    that set of inventory overlaps with open-web.
19  BY MR. ISAACSON:
20    Q   Your definition of open-web display
21  would exclude what you call walled gardens,
22  correct?

1    A   So open-web, as I use the term in my
2  report, refers to web publisher inventory that is
3  not transacted through -- integrated or where the
4  publisher owns these ad tech tools.  I've seen
5  various definitions of walled gardens, but I have
6  seen one where it also refers to the presence of
7  integrated ad tech tools as a characteristic.
8    Q   Have you seen market shares for ad tech
9  products reported in this case for -- I'll start
10  over.
11       Have you seen market shares for ad tech
12  products reported in this case where the
13  transactions were limited to impressions or
14  revenues for open-web display advertising as you
15  have defined open-web display advertising?
16       MR. NAKAMURA:  Objection to form.
17       THE WITNESS:  So, for example, I believe
18    I've seen documents describing shares of
19    products like ad exchanges that are used to
20    access open-web display inventory, and these
21    ad exchanges are not -- where we're
22    restricting transactions that aren't --

1    sorry -- where we're restricting attention to
2    transactions that aren't from walled gardens.
3        So ad exchanges, demand-side platforms,
4    other ad tech products offered by third
5    parties aren't generally used to transact
6    walled garden inventory, and so --
7        THE REPORTER:  You said "aren't"?
8        THE WITNESS:  Aren't used to transact
9    walled garden inventory, so shares reported
10    let's say by third parties for those products
11    that do not transact walled garden inventory
12    would be measured over inventory from
13    open-web publishers, so that's where I'm
14    having difficulty understanding your
15    question.
16  BY MR. ISAACSON:
17    Q   Ad exchanges, for example, do they
18  engage in transactions limited to open-web display
19  advertising as you have defined it?
20    A   So some ad exchanges, like AdX, can
21  facilitate the sale of transactions from Google's
22  owned and operated properties.

1        THE REPORTER:  Can you slow down?  "Like
2    AdX, can facilitate the" --
3        THE WITNESS:  Sale of display
4    advertising from Google's owned and operated
5    properties.
6  BY MR. ISAACSON:
7    Q   Does AdX also facilitate transactions on
8  apps?
9    A   It's my understanding AdX does, so when
10  I'm restricting attention to web inventory, AdX
11  transacts open-web publisher inventory as well as
12  Google owned and operated web inventory.
13    Q   So you would not consider AdX, for
14  example, to be limited to transactions for
15  open-web display advertising as you have defined
16  it?
17       MR. NAKAMURA:  Objection to form.
18       THE WITNESS:  So in my market, the
19    markets I evaluate, the relevant criteria is
20    whether the publisher ad server, the ad
21    exchange or the advertiser ad network is able
22    to facilitate the sale of open-web display

14 (Pages 50 - 53)

Page 54

1   advertising.
2        So AdX, it can do other things, but
3   what's important is that it can sell open-web
4   displays.
5   BY MR. ISAACSON:
6        Q    That's not necessarily important to my
7   question, all right?
8        So I just wanted to know if AdX was
9   limited to open-web display, and I believe you
10  agree that it can do other things, so I want to go
11  back to my question here.
12       Have you seen any market shares for ad
13  tech products that are limited to just open-web
14  display advertising and don't include other
15  things, other types of transactions that are also
16  being done?
17       MR. NAKAMURA:  Objection to form.
18       THE WITNESS:  So this is what I was
19       discussing earlier.
20       I recall seeing testimony and documents
21       where they talk about shares for certain
22       products like exchanges, and they -- I don't

Page 55

1   recall -- may be restricting attention to
2   transactions from open-web publishers, so
3   they're not counting transactions let's say
4   through AdX that are coming from Google's
5   owned and operated properties.
6   BY MR. ISAACSON:
7        Q    Am I correct then that you don't recall
8   any market shares reported for ad tech products
9   that you have seen where the transactions were
10  limited to open-web display advertising and did
11  not include other types of transactions?
12       MR. NAKAMURA:  Objection to form.
13       THE WITNESS:  I think I've answered that
14       question, and sitting here, I don't recall
15       whether those calculations I was referring to
16       earlier excluded owned and operated
17       integrated transactions through products that
18       could facilitate both.
19  BY MR. ISAACSON:
20       Q    If you could look at paragraph 262 of
21  your opening report.
22       MR. NAKAMURA:  Counsel, is that page

Page 56

1   107?
2        MR. ISAACSON:  Yes.
3   BY MR. ISAACSON:
4        Q    There's a section on this page titled
5   "Open-web display advertising is a distinct and
6   important form of advertising for publishers and
7   advertisers."
8        The -- in paragraph 261, you say, "In
9   this section, I discuss why open-web display
10  advertising is a distinct and valuable form of
11  advertising for open-web publishers and
12  advertisers."
13       You go on to say in the second sentence
14  of paragraph 262, "open-web display advertising is
15  distinct and valuable for open-web publishers and
16  advertisers" -- and actually, more broadly, you
17  say, "If open-web display advertising is distinct
18  and valuable for open-web publishers and
19  advertisers, then these customers would have
20  limited ability to substitute away from products
21  used to transact such advertising, if those
22  products were priced higher than competitive

Page 57

1   levels."
2        When you refer to "distinct and
3   valuable," open-web display advertising being
4   "distinct and valuable," is that the test you use
5   to determine whether open-web display advertising
6   was a substitute for other types of digital
7   advertising?
8        MR. NAKAMURA:  Objection to form.
9        THE WITNESS:  So in the preamble, I'm
10       not sure you read 262 correctly.  You may
11       have said a clause without the "if" prior to
12       it.  I just wanted to --
13  BY MR. ISAACSON:
14       Q    I did go back and read the "if," but
15  yes, I agree it says "if."
16       A    You missed, you missed also the clause
17  before it, which provides context for why we're
18  talking about "if."
19       The whole point here of this paragraph
20  is to discuss differences between open-web display
21  advertising and other forms of digital
22  advertising, which then inform why tools such as

15 (Pages 54 - 57)

Page 58

1 ad exchanges, advertiser ad networks, and
2 publisher ad servers which transact this kind of
3 advertising are valuable to customers and why they
4 are relevant product markets.
5      As I note throughout my reports, the
6 relevant product markets do not include the
7 underlying display advertisements themselves.
8   Q   All right.  So you used these product
9 differences to inform your analysis as to why
10 open-web display advertising would be part of a
11 relevant market; is that correct?
12   A   I didn't follow your --
13      MR. NAKAMURA:  Objection to form.
14      THE WITNESS:  I didn't follow your
15   question.
16 BY MR. ISAACSON:
17   Q   When you use the term "differences."
18 The whole point of this paragraph is to discuss --
19 you say "the whole point here of this paragraph is
20 to discuss differences between open-web and other
21 forms of digital advertising."  You say that
22 "which then informs why tools such as ad

Page 59

1 exchanges, advertiser ad networks, and publisher
2 ad services which transact this kind of
3 advertising are valuable to customer and why they
4 are relevant markets."
5      Am I correct that you are using product
6 differences to inform your analysis as to why
7 open-web display advertising would be part of a
8 relevant ad tech market?
9   A   No, I --
10      MR. NAKAMURA:  Objection to form.
11      THE WITNESS:  I didn't follow that.  I
12   don't think that's what I said.  I'm not
13   using -- so let me take a step back.
14 BY MR. ISAACSON:
15   Q   Well, let me ask a different question.
16   A   Sure.
17   Q   Have you done an analysis of differences
18 between open-web display advertising and other
19 forms of digital advertising to inform your
20 relevant market analysis?
21      MR. NAKAMURA:  Objection to form.
22      THE WITNESS:  So if you read the

Page 60

1 entirety of paragraph 262, I explain --
2 BY MR. ISAACSON:
3   Q   Let's focus on my question.
4   A   -- what I am doing in this subsection of
5 IV.B.
6   Q   What I would like to know is:  Have you
7 done an analysis of differences between open-web
8 display advertising and other forms of digital
9 advertising to help inform your relevant market
10 analysis?
11      MR. NAKAMURA:  Objection to form.
12      THE WITNESS:  So I discuss in this
13   subsection why open-web display advertising
14   is a distinct and valuable form of
15   advertising for open-web publishers and
16   advertisers.
17      The reason why that is useful is because
18   it informs the extent to which customers,
19   open-web publishers and advertisers, would be
20   able to substitute away from products used to
21   transact such advertising if those products
22   were priced higher than competitive levels.

Page 61

1 BY MR. ISAACSON:
2   Q   So have you done an analysis of
3 whether -- of how open-web, open-web display
4 advertising is distinct and valuable to inform
5 your analysis of substitutes in this case?
6   A   I think your term "analysis of
7 substitutes" is vague.
8      I have analyzed open-web display
9 advertising, which is important to analyze; I have
10 discussed why it is distinct and valuable compared
11 to other forms of digital advertising; and I've
12 also discussed why tools used to transact that
13 kind of advertising are valuable for its
14 customers.
15      Hence, my opinion is that the relevant
16 product markets I evaluate satisfy the
17 hypothetical monopolist test and are valid.
18   Q   And so would you -- so am I correct that
19 two products that are reasonable substitutes for
20 one another can both be valuable?
21      MR. NAKAMURA:  Objection to form.
22      THE WITNESS:  I'm not quite sure I

16 (Pages 58 - 61)

1    follow your question.
2  BY MR. ISAACSON:
3    Q   I'll repeat it.  Can two products that
4  are reasonable substitutes for one another both be
5  valid?
6       MR. NAKAMURA:  Objection to form.
7       THE WITNESS:  What do you mean by
8  "reasonable substitutes"?
9  BY MR. ISAACSON:
10    Q   Reasonable substitutes within a market,
11  within a market definition analysis.
12       MR. NAKAMURA:  Objection to form.
13       THE WITNESS:  So because of the
14  imprecision of terms like "reasonable," I
15  used the phrase "close substitutes," and by
16  close substitutes, I mean are sufficiently
17  close substitute alternatives to constrain
18  the exercise of market power by a
19  hypothetical monopolist.
20       And what I'm -- my opinion is that
21  publisher ad servers or advertiser ad
22  networks or ad exchanges that facilitate the

1  sale of open-web display advertising, a
2  hypothetical monopolist in each of those
3  product markets would not be constrained by
4  close enough substitutes outside of those
5  relevant product markets.
6  BY MR. ISAACSON:
7    Q   The -- can two products that are not
8  close substitutes both be valuable?
9       MR. NAKAMURA:  Objection to form.
10       THE WITNESS:  I can derive value from a
11  cup of water, and I can derive value from a
12  car.
13  BY MR. ISAACSON:
14    Q   The -- does assess -- how does looking
15  at whether a product is valuable show whether or
16  not it is a close substitute?
17    A   So here I'm describing why customers
18  value display advertising or open-web display
19  advertising in addition to or over other
20  alternative products.
21       So as an economist, we would say these
22  types of advertising, this type of advertising

1  delivers incremental value, delivers additional
2  value, delivers distinct value, and hence,
3  publisher customers that -- or advertiser
4  customers that don't have access to ad tech tools
5  which facilitate the sale of open-web display
6  inventory would be giving up that incremental
7  value.
8       And this is why products that can
9  facilitate the sale of open-web display
10  advertising can possess -- if controlled by a
11  single firm, a hypothetical monopolist, can
12  possess significant market power, and so this is
13  true for publisher ad servers, separately for ad
14  exchanges, and separately for advertiser ad
15  networks.
16    Q   So am I correct that if one product
17  offers incremental value over another product, in
18  your view, they won't be close substitutes?
19    A   I think it's important to consider
20  magnitudes, consider the extent to which that
21  incremental value is something that is not
22  available from some other alternative.  One would

1  also want to consider -- let me, let me I think
2  pull back.
3       You use the term "products" a lot, and I
4  want to make sure that I'm distinguishing between
5  the ad tech products -- DFP, AdX, Google Ads or
6  advertiser ad exchanges, ad networks, advertiser
7  ad networks and publisher ad servers --
8  differently from digital advertising.
9       So I'm not using products to refer to
10  digital advertising or open-web display
11  advertising.  Just to be precise, I'm not going to
12  use "products" when I'm referring to the
13  underlying digital advertise bits.  I'm going to
14  keep "products" as something to refer to the ad
15  tech tools at issue in this matter.
16    Q   All right, but in a market definition
17  analysis, how do I -- if products have incremental
18  value of a certain magnitude, you would say that
19  they are not close substitutes; is that correct?
20       MR. NAKAMURA:  Objection to form.
21       THE WITNESS:  I wouldn't necessarily
22  conclude solely from one piece of evidence --

17 (Pages 62 - 65)

Page 66

1  you know, my opinions regarding market
2  definition are based on the totality of
3  evidence that I present.
4      I think a strong set of evidence that I
5  discuss which supports the validity of the
6  relevant product markets is Google's exercise
7  of market power over its AdX, Google Ads and
8  DFP product, right?
9      So I'm looking at not just a single
10  piece of evidence, but the totality of
11  evidence to form my opinions regarding market
12  definition.
13  BY MR. ISAACSON:
14   Q   If products have incremental value of a
15  certain magnitude, you would consider that
16  evidence that they are not close substitutes; is
17  that correct?
18      MR. NAKAMURA: Objection to form.
19      THE WITNESS: I think that it is an
20  important consideration whether or not a set
21  of, here, digital advertisements provide
22  distinct value over other forms of digital

Page 67

1  advertising. I think that's important to
2  understand, but when I get to market
3  definition, I'll be focusing on the tools
4  used to transact those digital
5  advertisements, and there I will also
6  consider the extent to which the underlying
7  tools can be replaced with other
8  alternatives.
9  BY MR. ISAACSON:
10   Q   And as an economist, how would you look
11  at -- how would you decide whether, what magnitude
12  is necessary for -- I'll start that question over.
13      In order for incremental differences to
14  be evidence that two products are not close
15  substitutes, how would you define the magnitude
16  that's necessary of that difference?
17      MR. NAKAMURA: Objection to form.
18      THE WITNESS: So the preamble to your
19  question is not something that I stated or
20  necessarily agree with.
21  BY MR. ISAACSON:
22   Q   You don't agree that incremental

Page 68

1  differences between products can be evidence that
2  two products are -- I'm doing a double negative
3  now, so let me just ask you: In order for -- do
4  you agree that incremental differences of a
5  certain magnitude can be evidence that two
6  products are not close substitutes?
7      MR. NAKAMURA: Objection to form.
8      THE WITNESS: I guess the question is
9  imprecise. What do you, what do you mean
10  by -- I think what I said before is examining
11  whether, in this case, open-web display
12  advertising has distinct incremental value
13  over other forms of digital advertising is an
14  important consideration in my analysis of
15  whether the relevant product markets I
16  evaluate are valid and pass the hypothetical
17  monopolist test.
18  BY MR. ISAACSON:
19   Q   And how do you determine whether
20  something has -- two products have -- one product
21  has distinct incremental value?
22   A   I think a large part of my report talks

Page 69

1  about reasons why open-web display advertising is
2  an important form of monetization for -- let's
3  focus on publishers.
4      So for publishers, open-web display
5  advertising is significant evidence that speaks to
6  the value it has for helping them monetize their
7  web inventory.
8   Q   How do I, how do I determine whether
9  something, in your view, would have distinct
10  incremental value? For example, does Coke have
11  distinct incremental value over Pepsi?
12   A   Well, I'm not valuing soft drinks in
13  this matter. What I'm doing is showing here, for
14  the purpose of looking at ad tech products,
15  publishers derive significant value, additional
16  monetization from being able to sell their web
17  inventory through display ads.
18      And if they did not have access to those
19  tools that allow them to sell display ads, they
20  would be foregoing a significant amount of
21  advertising revenue, which would likely lead to a
22  reduction of content and investment.

18 (Pages 66 - 69)

1 my head, Figure 42 and Figure 43, which are from
2 another document that also uses the term
3 "addressable," but these are two documents, the
4 ones from Figures 42 and 43 of my initial report,
5 and this one you're showing me, that use
6 "addressable."
7     Q So when Exhibit 4 refers to "display web
8 addressable inventory" in doing a market share
9 calculation, this would be for the publisher ad
10 server DoubleClick for Publishers, correct?
11     A So this is referring to -- this 807
12 figure is referring to Ad Manager.
13     Q So I am correct?
14        MR. NAKAMURA: Objection.
15 BY MR. ISAACSON:
16     Q Am I correct in my question?
17     A So in my report I note that Google Ad
18 Manager, GAM, is a term that Google uses to refer
19 to DFP and AdX.
20     Q So do you believe this is a market share
21 for exchanges and publisher ad servers combined?
22     A I am not saying it is a -- I think this

1 is a measure of share over some metric, where it
2 says "85 percent of display web addressable
3 inventory flowing through" Ad Manager.
4     Q So do you know what share is being
5 discussed here?
6        MR. NAKAMURA: Objection to form.
7        MR. ISAACSON: What's the objection?
8        MR. NAKAMURA: The objection is what
9    share of what? Vague.
10        MR. ISAACSON: The question is "so do
11    you know what share is being discussed here."
12        MR. NAKAMURA: Yes. Share of what?
13    Vague, anyway.
14 BY MR. ISAACSON:
15     Q Do you know what market share is being
16 discussed in this document?
17     A So I'm -- when I reference this document
18 in my report, or this page, I note that it states
19 85 percent of display web addressable inventory
20 flows through Ad Manager.
21     Q Do you consider that to be a market
22 share calculation?

1     A I consider it to be a share of some
2 metric of addressable inventory, display web
3 addressable inventory.
4     Q So you don't consider this to be a
5 market share calculation; is that correct?
6     A So in my report I show that -- or I
7 state that "multiple Google documents since 2018
8 estimate DFP's market share" --
9     Q I'm asking you, sir --
10     A -- "across various measures."
11     Q -- this document. This document. Just
12 this document. We can talk about other documents
13 later. Do you consider this document on this
14 page, 803, to be a market share calculation?
15     A As I was saying, when I reference "this
16 document," I note that Google documents, including
17 this one, estimate DFP's market share across
18 various measures, so this is a share of a
19 particular measure.
20     Q Do you consider it to be -- this
21 document, page 807, to be a market share measure?
22     A It is a share of a measure that DFP or

1 in GAM represents, so it is a -- GAM, G-A-M.
2     Q I've asked -- I'm asking you multiple
3 times if you consider this to be a market share
4 measure, and you're responding you consider it to
5 be a measure, so I don't know if you're answering
6 my question yes or no.
7     A I, I say this is a document that reports
8 DFP's market -- or presents a measure of DFP's
9 market share.
10     Q Okay. So you do consider this page a
11 measure of DFP's market share, and what market is
12 being -- what market is being discussed here?
13     A It's discussing, as I'm interpreting it,
14 discussing 85 of addressable display web inventory
15 flowing through --
16        THE REPORTER: Discussing what? I'm
17    sorry.
18        THE WITNESS: 85 percent of display web
19    addressable inventory flowing through GAM,
20    which includes DFP.
21 BY MR. ISAACSON:
22     Q Is this document on this page addressing

22 (Pages 82 - 85)

Page 86

1 a market share for publisher ad servers?
2    A   So in the rest of my -- elsewhere in my
3 report, I note that display web -- sorry --
4 open-web publishers tend to use one publisher ad
5 server for their display advertising needs, and if
6 GAM and DFP represents 85 percent of display web
7 addressable inventory, that is its share of
8 display web addressable inventory that goes
9 through publisher ad servers.
10    Q   I'm going to ask my question again to
11 see if I can get you to answer.
12       Is this document on this page discussing
13 a market share for publisher ad servers?
14    A   I'm presenting it as something that
15 represents one measure of a market share of DFP
16 within publisher ad servers.
17    Q   And the market share calculation that's
18 being done here includes revenue for apps,
19 correct?
20       MR. NAKAMURA:  Objection to form.
21 Foundation.
22       THE WITNESS:  Can you repeat your

Page 87

1 question?
2 BY MR. ISAACSON:
3    Q   Sure.
4       Do you see -- look at the, look at the
5 diagram there.  Do you see it's measuring market
6 share based on "$24 Billion Revenue Under
7 Management"?
8    A   I don't know if that's the basis on the
9 market share that's in the sentence above it.
10    Q   Well, look at the notes below.  Do you
11 see it begins with "$24 Billion"?
12    A   I do see a "$24 Billion Revenue Under
13 Management" sentence.
14    Q   And do you see on the chart the
15 reference to "apps" in the upper right-hand
16 corner?
17    A   I do see that there are apps in the
18 figure.
19    Q   And do you see it also includes search?
20    A   I see the figure reports -- has the word
21 "search."
22    Q   Do you know if the calculations here are

Page 88

1 limited to open-web display advertising?
2       MR. NAKAMURA:  Objection to form.
3       THE WITNESS:  In my report I am noting
4 that this slide says 85 percent of display
5 web addressable inventory flows through GAM,
6 and this is one of many other documents that
7 I --
8 BY MR. ISAACSON:
9    Q   I'm not asking you about --
10    A   -- discuss Google's reports, and I also
11 calculate, using data.
12    Q   I move to strike the discussion about
13 documents.  We're just -- I'm just trying to get
14 through this page with you, sir, okay, and your
15 understanding of it.
16       The revenue flowing through GAM that's
17 addressed in this document includes revenue
18 related to apps, correct?
19       MR. NAKAMURA:  Objection to form.
20       THE WITNESS:  This page here does not
21 provide enough information to determine
22 whether the 85 percent of display web

Page 89

1 addressable inventory includes apps.
2 BY MR. ISAACSON:
3    Q   And the app, revenue from apps would not
4 be included in your market definition of publisher
5 ad servers, correct?
6    A   Can you repeat your question?
7    Q   Revenue from apps would not be included
8 in your market definition of publisher ad servers,
9 correct?
10    A   So I don't understand the question.
11    Q   When you define open-web display for
12 your market definition, you exclude apps, correct?
13    A   So I think it's important to understand
14 what my relevant product markets are.  They are
15 publisher -- so for publisher ad servers, they are
16 products that are publisher ad servers which can
17 facilitate the sale of open-web display
18 advertising.
19       Some of those products, including, as
20 you noted, DFP, can transact other forms of
21 digital advertising.  Those products are not
22 excluded just because they can transact other

23 (Pages 86 - 89)

Page 90

1  forms of digital advertising.  So that's what I
2  mean by I don't follow your question.
3      Q   So when you define a market for
4  publisher ad servers for open-web display
5  advertising, that would include transactions on
6  those publisher ad servers for -- that are not
7  open-web display advertising; am I correct?
8      A   I think your question is imprecise.
9  Again, the relevant product market --
10     Q   It's my question, sir, so you're going
11  to have to deal with it here.
12         The -- when you define a market for
13  publisher ad servers for open-web display
14  advertising, you are not limiting that market to
15  transactions for open-web display advertising; is
16  that correct?
17         MR. NAKAMURA:  Objection to form.
18         THE WITNESS:  So the relevant product
19     markets that I evaluate in this case are not
20     comprised of transactions.
21  BY MR. ISAACSON:
22     Q   I'm just asking you about publisher ad

Page 91

1  servers at this point.  We're starting with one
2  market, all right?  The -- when you define a
3  market for publisher ad servers for open-web
4  display advertising, you are not limiting that
5  market to transactions on those publisher ad
6  servers for open-web display advertising; is that
7  correct?
8      A   So again, I don't --
9         MR. NAKAMURA:  Objection to form.
10        THE WITNESS:  -- follow the --
11        THE REPORTER:  I'm sorry.  Was there an
12     objection?
13        MR. NAKAMURA:  Objection to form.
14        THE REPORTER:  Okay.  So what?
15        THE WITNESS:  Again, I don't follow the
16     question, because, as I noted, the relevant
17     product markets contain, in this case,
18     publisher ad servers, right, which were these
19     ad tech tools.  The relevant product markets
20     are not comprised of transactions, so when
21     you say transactions are in or out of a
22     relevant product market, I don't follow what

Page 92

1  you mean by that.
2  BY MR. ISAACSON:
3      Q   When you measure market share for the
4  market for publisher ad servers with -- for
5  open-web display advertising, when you measure
6  those shares, do you limit yourself to
7  transactions involving open-web display
8  advertising?
9      A   So I provide different measures of
10  market shares, using the data produced in this
11  case.  In some of those calculations, I compute
12  market shares for publisher ad servers over
13  open-web display transactions, as that informs the
14  extent to which DFP or a hypothetical monopolist
15  of publisher ad servers would be able to exercise
16  market power.
17     Q   You expressed an opinion in this case
18  that publisher ad servers for all transactions
19  being on those ad servers are a relevant market?
20        MR. NAKAMURA:  Objection to form.
21        THE WITNESS:  So my opinion is that
22     publisher ad servers that can be used to

Page 93

1     facilitate the sale of open-web display
2     advertising is a relevant product market.
3  BY MR. ISAACSON:
4      Q   Is it your opinion -- are you expressing
5  an opinion in this case that publisher ad servers
6  that can facilitate the sale of open-web display
7  advertising, as well as other transactions, are a
8  relevant market?
9         MR. NAKAMURA:  Objection to form.
10        THE WITNESS:  I think it overlaps the --
11     the relevant criteria for whether a product
12     is included in the publisher ad server
13     product market that I evaluate is whether it
14     is able to facilitate the sale of open-web
15     display transactions.
16        Those publisher ad servers within this
17     market may also be able to transact other
18     forms of digital advertising.  DFP is an
19     example of a publisher ad server that is in
20     the relevant product market comprising
21     publisher ad servers, and it can facilitate
22     the sale of other types of digital

Page 94

1 advertising.
2 BY MR. ISAACSON:
3    Q   So for your publisher ad server market,
4 the product in that market are publisher ad
5 servers that can facilitate open-web display
6 advertising even if they can, even if they can
7 facilitate other transactions; is that right?
8    A   So the ability to transact other types
9 of transactions is not disqualifying for a product
10 to be contained within the publisher ad server
11 market.  The necessary criteria is whether it is
12 able to facilitate the sale of both --
13 (indecipherable) -- elsewhere, indirect and direct
14 transactions for open-web display advertising.
15    Q   Do -- and so the products in the, in
16 your publisher ad server market, for example,
17 would include publisher ad servers that facilitate
18 open-web display transactions as well as
19 advertising transactions on apps; is that correct?
20    A   So DFP, for example, can serve both web
21 display and app display, to my understanding, and
22 DFP is a product contained in the publisher ad

Page 95

1 server market.
2    Q   And would you agree with me that DFP
3 competes with other publisher ad servers that
4 facilitate advertising, advertising transactions
5 on apps?
6       MR. NAKAMURA:  Objection to form.
7       THE WITNESS:  So I think there is, for
8    example, like DFP and AdMob, which is a
9    Google product -- AdMob, A-D-M-O-B -- are
10    Google products, and I believe that there is
11    publisher substitution between the two.
12       For the purpose of market definition,
13    the relevant question is the extent to which
14    publisher ad servers that can only facilitate
15    the sale of app display and not web display
16    constrain a hypothetical monopolist of
17    publisher ad servers that are able to
18    transact open-web display advertising.
19 BY MR. ISAACSON:
20    Q   I didn't ask you about the purpose of
21 market definition, so I'll move to strike the
22 answer from that point afterwards.

Page 96

1       So am I correct that DFP competes with
2 publisher ad servers that facilitate advertising
3 on apps?
4       THE REPORTER:  On apps, you said?
5       MR. NAKAMURA:  Objection to form.
6 BY MR. ISAACSON:
7    Q   Like an app.
8    A   Is there an example of a publisher ad
9 server you have in mind that cannot facilitate --
10    Q   I just want you to answer the question,
11 sir.
12       Am I correct the DFP would compete with
13 a publisher ad server that facilitates advertising
14 on apps?
15       MR. NAKAMURA:  Objection to form.
16       THE WITNESS:  I think in your
17    hypothetical, I'm trying to understand more
18    about the details to, to answer the question.
19    So one is:  Is there an example of one that
20    you can think of so I can ground my answer in
21    specifics?
22

Page 97

1 BY MR. ISAACSON:
2    Q   Are you able to answer the question
3 whether DFP would compete with a publisher ad
4 server that facilitates advertising on apps?
5       MR. NAKAMURA:  Objection to form.
6       THE WITNESS:  So there is some degree --
7    I think I answered before -- of publisher
8    substitution between let's say AdMob and DFP,
9    but it's my opinion that such substitution
10    between app-only publisher ad servers and
11    those that can facilitate the sale of
12    open-web display is insufficient to constrain
13    the exercise of market power by a
14    hypothetical monopolist of publisher ad
15    servers.
16 BY MR. ISAACSON:
17    Q   And you've answered the question by
18 referring to substitution, and not everybody is
19 going to understand what you're talking about when
20 I say "do they compete."  So for those who
21 don't -- who aren't in your field, are you able --
22 can you answer the question whether DoubleClick

25 (Pages 94 - 97)

Page 98

1  for Publishers would compete with an ad -- with a
2  publisher ad server that facilitates advertising
3  on an app?
4      MR. NAKAMURA:  Objection to form.
5      THE WITNESS:  So as an economist, when
6  you say "compete," I, I'm answering
7  interpreting that as the extent to which
8  there is substitution by some set of
9  customers so that a firm, by adjusting its
10  actions, can earn more business perhaps from
11  that, that rival.
12      Under that definition, there is some
13  substitution.  Potentially, you know, you
14  have an app-only server like potentially
15  AdMob, but substitution, it's my opinion,
16  would not be sufficient to invalidate a
17  publisher ad server product market.
18  BY MR. ISAACSON:
19      Q   The -- for the, for the ad exchange
20  market that you have defined, are the products in
21  the ad exchange market that you have defined, do
22  those include exchanges that facilitate open-web

Page 99

1  display advertising as well as advertising that's
2  not open-web display advertising?
3      A   So some of the participants within the
4  ad exchange product market that I evaluate can
5  transact other forms of digital advertising than
6  open-web display.  For example, AdX, as we
7  discussed earlier, can transact display inventory
8  from Google's owned and operated properties.
9      Q   AdX can also facilitate transactions,
10  advertising transactions on apps, correct?
11      A   That is my understanding.
12      Q   The -- and so the products in your ad
13  exchange market, for example, would be -- would
14  include exchanges that facilitate advertising
15  transactions both on open-web display advertising
16  and on advertising on apps, correct?
17      A   So I think we established that AdX is
18  within the ad exchange product market, and AdX, to
19  my understanding, can transact both open-web
20  display as well as app display advertising.
21      Q   And a customer of an exchange would
22  evaluate an exchange on the total amount of

Page 100

1  advertising it can facilitate; would you agree
2  with that?
3      A   I think it very much depends on the
4  customer.  A publisher that does not have, for
5  example, an app, it only has web and doesn't own
6  its own integrated ad tech tools, would likely
7  weigh more heavily or primarily consider an
8  exchange's ability to transact web display, as
9  that is what is relevant for that publisher
10  customer.
11      Q   Do you agree a publisher customer of an
12  exchange that has both an app and a website would
13  evaluate the exchange based on its ability to
14  facilitate both types of transactions, open-web
15  display and apps?
16      A   Sorry.  I didn't follow, I didn't follow
17  your question.  You said an exchange that has a
18  website and an app?
19      Q   Yeah, I misspoke.
20      Do you agree, do you agree that
21  publishers, in evaluating exchanges that have
22  both -- that facilitate both transactions on

Page 101

1  open-web display and on apps would evaluate the
2  exchange based on their ability to facilitate both
3  types of transactions?
4      A   It is my recollection that -- and I
5  think I discuss this in my report, that publishers
6  are able to split up different forms of digital
7  inventory across different products, for
8  example -- I provided an example of Disney that
9  has a separate integrated publisher ad server for
10  its in-stream video advertisements and uses DFP
11  for its web display advertising.
12      So in that case, I believe Disney
13  evaluated an ad tech product based on its ability
14  to transact display, even though that same
15  publisher had other types of digital inventory to
16  monetize.
17      Q   Going to your point that ad exchanges
18  also facilitate advertising on connected TV,
19  correct?
20      MR. NAKAMURA:  Objection to form.
21      THE WITNESS:  I believe there exist ad
22  exchanges that can serve connected TV digital

26 (Pages 98 - 101)

Page 102

1    advertising.
2    BY MR. ISAACSON:
3        Q    And there are ad exchanges, like AdX,
4    that facilitate advertising transactions on -- for
5    display ads, for ads on apps, and for connected
6    TV, correct?
7            MR. NAKAMURA:  Objection to form.
8            THE WITNESS:  I don't know.  I, just
9        sitting here today, don't recall AdX's
10       connective TV functionalities.  I noted
11       before that publishers often use multiple ad
12       exchanges, and there's, as I noted, evidence
13       that publishers can split various digital
14       inventory they have across different ad tech
15       products.
16   BY MR. ISAACSON:
17       Q    Am I correct that you -- well, you've
18   been studying the ad exchanges since what; since
19   fall of 2019?  Is that right?
20       A    I started working on this matter in the
21   fall of 2019.
22       Q    And today do you have an understanding

Page 103

1    of approximately how many ad exchanges there are?
2        A    So, by far, the largest ad exchange for
3    open-web display inventory is AdX.  There are --
4    let me go to my report.  There are approximately
5    four or five others with shares greater than one
6    or two percent that I --
7        Q    Listen to my question.
8        A    -- reported.
9        Q    My question was:  How many ad exchanges
10   are there?  I didn't ask about shares or size.  Do
11   you know how many ad exchanges there are?
12       A    I was trying to answer the question.
13       Q    Why don't you get to the answer.  I'm
14   sorry for interrupting you, but my question is
15   simple.  Do you know how many ad exchanges there
16   are, approximately?
17       A    I know there are approximately five that
18   produce data with a market share in '22 above one,
19   one percent, and there may be some others with
20   less than that.  I don't have a precise number of
21   the number of exchanges with very low shares.
22       Q    Do you know if there are more than 100

Page 104

1    ad exchanges?
2        A    So I know that in my rebuttal report, I
3    present a slide from a 2019 presentation from
4    Google to the DOJ, indicating that their DSP
5    supports over 80 exchanges at the time.
6        Q    The -- and when you say you've been
7    talking -- your just, you know, previous answers
8    were referring to ad exchanges with low market
9    share.  Those are low market shares -- are those
10   low market shares for a market for open-web
11   display advertising?
12       A    So again, I don't have a market for
13   transactions that I evaluate.  That share that I
14   reported earlier represents the share of indirect,
15   in that case, I believe worldwide open-web display
16   transactions that go through ad exchanges.
17       Q    The -- do you know how many exchanges or
18   what proportion of exchanges will facilitate
19   transactions for open-web display advertising and
20   advertising on apps?
21       A    So I don't have the -- sitting here
22   today, I do not recall the precise number.

Page 105

1        Q    Do you know if there's any ad exchange
2    that facilitates advertising only for open-web
3    display advertising?
4        A    Sitting here today, I can't name a
5    specific one that I know definitively does not
6    transact other forms of digital advertising than
7    open-web display.
8        Q    And when you defined market shares for
9    the, for the exchange market in this case, whether
10   on impressions or on a revenue basis, you have
11   done that looking at transactions for open-web
12   display ads, correct?
13       A    I don't know what you mean by "defined
14   market shares."
15       Q    When you estimated the market shares.
16       A    And so can you repeat your question,
17   please.
18       Q    Would you have estimated market shares
19   for the exchange market in this case, you have
20   done that based on impressions or revenues for
21   transactions for open-web display advertising,
22   correct?

27 (Pages 102 - 105)

Page 106

1     A    I computed market shares for ad
2  exchanges over indirect open-web display
3  impressions to inform my analysis of market power
4  in the ad exchange market.
5     Q    So you're -- to be clear -- and let's,
6  let's look at paragraph 7 of your report?
7     A    Which report?
8     Q    Your opening report, what we looked at
9  before.
10        In here we were looking at before, you
11  were going to "determine whether publisher ad
12  servers, ad exchanges, and advertiser ad networks
13  for open-web display advertising" were relevant
14  markets.
15        When it says "for open-web display
16  advertising," to be more precise, what you mean is
17  that they can facilitate open-web display
18  advertising, correct?
19        MR. NAKAMURA:  Objection to form.
20        THE WITNESS:  So the modifier "for
21    open-web display advertising," when applied
22    to these three products, refers to the

Page 107

1     ability to transact open-web display
2     advertising.
3  BY MR. ISAACSON:
4     Q    And, and then for advertiser ad
5  networks, there's only three advertiser ad
6  networks in your relevant market there, right?
7        MR. NAKAMURA:  Objection to form.
8        THE WITNESS:  There are three advertiser
9    ad networks I provided data for the use of
10    computing market shares, and they are the
11    three that I analyze in this relevant product
12    market.
13  BY MR. ISAACSON:
14     Q    That would be essentially referred to as
15  FAN, Criteo, and Google, correct?
16        MR. NAKAMURA:  Objection to form.
17        THE WITNESS:  So FAN was a product in
18    the advertiser ad network product market for
19    open-web display advertising until
20    approximately 2020, at which point it exited
21    or no longer -- still present elsewhere, but
22    it no longer transacts open-web display

Page 108

1     advertising curtailed, as you noted, and
2     Google Ads, which is -- when I use Google
3     Ads, I'm referring to the advertiser-facing
4     component of the Google Display Network.
5  BY MR. ISAACSON:
6     Q    So are there other advertiser networks
7  in your market that you didn't use for market
8  shares because they didn't provide data?
9        MR. NAKAMURA:  Objection to form.
10        THE WITNESS:  So I am not aware of
11    another bidding tool that's specifically an
12    advertiser ad network.  However, to be
13    conservative in my initial report, I
14    computed -- I computed market shares for
15    advertiser networks that included the
16    possibility that other bidding tools that did
17    not produce data were advertiser ad networks.
18  BY MR. ISAACSON:
19     Q    I'm not asking you how you're
20  conservative.  I'm just talking about your
21  definition of advertiser ad networks.
22        Did you investigate whether there were

Page 109

1  other advertiser ad networks other than the three
2  for which you had data?
3     A    I did look into that.
4     Q    Did you determine there were no other
5  advertiser ad networks?
6     A    So I did -- just sitting here today,
7  there are other advertiser ad networks, but many
8  of them are of these transacted owned and operated
9  inventory, so the extent to which they transacted
10  open-web display inventory, did not have data on
11  that, which is why I performed additional
12  robustness tests to allow for the possibility that
13  other bidding tools would be included in the
14  advertiser ad network market.
15     Q    When I'm asking you these questions,
16  sir, I'm not asking you about other things you
17  did.  This goes faster if we just answer the
18  question.
19        The -- who are the other advertiser ad
20  networks you identified but did not have data on
21  open-web display inventory?
22     A    Sitting here today, I don't recall the

28 (Pages 106 - 109)

Page 110

1  specific one I -- oh, wait. Hold on one second.
2      So I looked at Microsoft Audience
3  Network as well as Yahoo. Here, I noted that they
4  appear to focus primarily on native ads as well as
5  owned and operated. So there are other networks
6  that I was discussing before that I examined and
7  looked into.
8      Q   And they did not provide you data on
9  open-web display, so you didn't include them in
10  the market share, correct?
11      MR. NAKAMURA: Objection to form.
12      THE WITNESS: So sitting here today, I
13    don't recall -- some of these networks may
14    have provided data, but none of the
15    transactions were identified as display, and
16    so then in those instances they would not
17    have been included in market share
18    transactions restricted to open-web display.
19  BY MR. ISAACSON:
20      Q   Had you heard the term "advertiser ad
21  network" before your work on this case?
22      A   I don't, I don't remember. I do

Page 111

1  remember hearing "ad networks" before. I can't
2  give you, you know, a certain answer whether or
3  I'd not or had heard "advertiser ad networks"
4  before.
5      Q   Right. You said that FAN stopped
6  facilitating open-web display advertising, and
7  then -- but was still operating. That's generally
8  right?
9      A   So I believe -- so there is a product
10  known as Meta Ads, previously Facebook Ads, which
11  advertisers can use to purchase owned and operated
12  Facebook inventory.
13      Q   And can they -- is there also -- can
14  they also purchase on apps?
15      A   It's my understanding that the Facebook
16  product allows advertisers to purchase on the
17  Facebook apps like Instagram and Facebook.
18      Q   And during the time that FAN was
19  included in your market share calculations, was
20  FAN facilitating advertising both on open-web
21  display and on apps?
22      A   I can't speak for certainty on the

Page 112

1  internal name that Facebook used for its ad tech
2  product that sold on apps, but Facebook offered ad
3  tech tools that advertisers could use to advertise
4  on this application, as well as for the period of
5  time when those were present open-web, on
6  open-web.
7      Q   And when Facebook moved to just
8  facilitating through an ad network transactions to
9  advertising on apps, including -- well, let me,
10  let me be specific. I'll back up here.
11      During that -- when Facebook was
12  facilitating advertising transactions on apps,
13  that included third-party apps, correct?
14      MR. NAKAMURA: Objection to form.
15      THE WITNESS: I can't recall. I don't
16    recall.
17  BY MR. ISAACSON:
18      Q   So you don't know today whether the
19  Facebook advertiser ad network, as you call it, in
20  your market share facilitated both open-web
21  display advertising, advertising on Facebook as
22  well as advertising on third-party apps?

Page 113

1      A   During --
2      MR. NAKAMURA: Objection to form.
3      THE WITNESS: During what period of
4    time?
5  BY MR. ISAACSON:
6      Q   During the period of time when you were
7  including them in your market share selections.
8      MR. NAKAMURA: Same objection.
9      THE WITNESS: So as I noted, like so
10    prior to 2020, I do not know for certain the
11    ability of Facebook's ad tech tools to
12    transact on third-party applications.
13  BY MR. ISAACSON:
14      Q   Do you know for the time period after
15  you removed Facebook from your market share
16  calculations, whether Facebook was still
17  facilitating advertising transactions on
18  third-party apps?
19      MR. NAKAMURA: Objection to form.
20      THE WITNESS: So I don't think I removed
21    Facebook necessarily. It's using the data
22    from Facebook, and if there's a zero, for

29 (Pages 110 - 113)

Page 114

1    example, then it would be there, but it
2    wouldn't show up.
3         (Reporter clarification.)
4         THE WITNESS:  So if there's a zero, the
5    data would be used but would not show up as a
6    positive share.
7         Setting that aside, I apologize.  I
8    forgot your question.  If you can repeat it,
9    please.
10   BY MR. ISAACSON:
11   Q    Do you know for the time period after
12   Facebook was no longer part of your estimating,
13   estimation of market share calculations for
14   advertiser ad networks, whether Facebook was still
15   facilitating advertising transactions on
16   third-party apps?
17        MR. NAKAMURA:  Objection to form.
18        THE WITNESS:  So I'm not certain on
19   Facebook's ability to transact display
20   inventory on third-party apps.
21   BY MR. ISAACSON:
22   Q    When you estimate market shares for

Page 115

1    advertiser ad networks, you are only looking at
2    transactions for open-web display ads, correct?
3    A    So I believe the market share
4    calculations that I performed related to
5    advertiser ad networks are with respect to
6    open-web display impressions.
7    Q    And that's also for ad exchanges --
8    maybe I asked this before, but I'll ask you,
9    because I don't remember if I asked.  For ad
10   exchanges, when you estimate market shares, you
11   estimate -- you only look at transactions for
12   open-web display advertising; is that correct?
13   A    I believe I report in my rebuttal report
14   a share of publisher, some measure of publisher
15   transactions or revenue for those that owned both
16   the web and ad property, and I, sitting here
17   today -- I can spend some time to look for it, but
18   it may involve exchanges or publisher ad servers,
19   and so that's why I'm pausing before I answer your
20   question.
21   Q    The -- with respect to -- with respect
22   to competition in the exchange market for

Page 116

1    products -- let me start over.
2         I'm trying to understand, now that
3    you're talking about facilitating transactions, so
4    for the exchange market that facilitates open-web
5    display advertising, you have not looked at how
6    those exchanges compete with respect to
7    transactions that would include apps, connected
8    TV, or otherwise non-open-web display advertising,
9    correct?
10        MR. NAKAMURA:  Objection to form.
11        THE WITNESS:  So I have -- I believe I
12   have looked at dimensions of competition for
13   non-open-web display inventory across
14   exchanges in my analysis.  I think I've noted
15   the, for example, the ability of ad tech
16   products to charge different fees across app,
17   in-stream video, and open-web display, which
18   speaks to potentially competitive differences
19   across those forms of digital advertising.
20        That's one example I can look through my
21   report if you would like me to.
22

Page 117

1    BY MR. ISAACSON:
2    Q    The -- when you consider the exchanges
3    in your ad exchange market, for exchanges that can
4    facilitate open-web display advertising as well as
5    other types of advertising, have you done any
6    analysis of the quality of those exchanges, taking
7    into account all of the transactions that
8    facilitate?
9         MR. NAKAMURA:  Objection to form.
10        THE WITNESS:  So I, I think I said
11   earlier, performed some analysis, some
12   analyses regarding ad exchange's ability to
13   facilitate other forms of digital advertising
14   than open-web display, with regards to
15   quality, as I discuss in my report, there are
16   various measures of quality, but industry
17   participants often point to an exchange's
18   ability to monetize inventory as perhaps the
19   most important measure of quality.
20        And so on the dimension of monetization,
21   I've analyzed that in many ways, and indeed
22   it's one of the ways in which Google's

30 (Pages 114 - 117)

1    conduct that I analyzed affected the
2    competitiveness of rivals.
3    BY MR. ISAACSON:
4        Q   So have you analyzed the ability of
5    exchanges to monetize all of the inventory that
6    they deal with, not limited to open-web display
7    advertising?
8        A   So the primary focus of my analysis was
9    indeed on an ad exchange's ability to monetize
10   open-web display inventory, and, to match
11   advertisers to open-web display inventory.
12           Sitting here today, I don't recall all
13   the analyses that I might have performed related
14   to an ad exchange's ability to monetize other
15   forms of inventory.  I believe I provide -- no,
16   let me, let me stop there.
17           I don't recall all of the analyses that
18   I performed, sitting here today, but I can go to
19   them if you would like me to look for some.
20       Q   The -- have you done any analysis that
21   you recall as to how publishers view the exchanges
22   in your market compared to one another, taking

1    into account all the transactions that they
2    facilitate, and not limited to open-web display
3    advertising?
4            MR. NAKAMURA:  Objection to form.
5            THE WITNESS:  I think earlier I noted --
6        discuss in my reports regarding publishers
7        ability to multi-home or use multiple
8        exchanges, and use multiple ad tech products
9        for different forms of digital advertising.
10   BY MR. ISAACSON:
11       Q   Have you done any analysis, including
12   looking at multi-homing, that would tell you how
13   publishers view exchanges in your market compared
14   to one another, once you take into account all of
15   the advertising transactions they facilitate and
16   not limit it to open-web display advertising?
17           MR. NAKAMURA:  Objection to form.
18           THE WITNESS:  So my analysis overall
19       supports my opinion that publishers choosing
20       ad exchanges for open-web display
21       transactions value those ad exchanges'
22       ability to transact open-web display

1    advertising.  I do not -- let me, let me stop
2    there.
3    BY MR. ISAACSON:
4        Q   All right.  Which publisher specifically
5    values an exchange in this case because of
6    open-web display transactions and not take into
7    account all of the advertising the exchange
8    facilitates?
9            MR. NAKAMURA:  Objection to form.
10           THE WITNESS:  So it's hard for me to
11       definitively state a negative, whether
12       publishers --
13   BY MR. ISAACSON:
14       Q   Can you identify by name any publisher
15   who values an exchange in this case because of
16   open-web display transactions and doesn't take
17   into account all of the advertising the exchange
18   facilitates?
19       A   So I noted in my report that there exist
20   publishers who do not have apps, who do not have
21   in-stream video players, who do not run social
22   sites for which these other alternative digital

1    advertising formats other than web display, those
2    would not be viable alternatives, and it's for
3    those publishers who likely would primarily value
4    an ad exchange's ability to transact open-web
5    display and not advertising the publisher can't
6    employ.
7        Q   Can you identify any publisher by name
8    that has both a website and an app that values an
9    exchange in this case because of the open-web
10   display transactions and doesn't take into account
11   all of the advertising the exchange facilitates?
12           MR. NAKAMURA:  Objection to form.
13           THE WITNESS:  I think I noted earlier
14       that publishers could use different platforms
15       for displaying an app.  It's my recollection
16       some publishers may use let's say AdMob, and
17       they could use -- AdMob for app, DFP for --
18           THE REPORTER:  I'm sorry.  What?
19           THE WITNESS:  Some publishers can use
20       AdMob for app, can use DFP or GAM for
21       display, and for those types of publishers,
22       it's likely they would evaluate the

31 (Pages 118 - 121)

Page 122

1    performance of those different products based
2    on the transactions that they use them for.
3  BY MR. ISAACSON:
4      Q   My question was about exchange products.
5  Do you understand that? I'm asking about
6  exchanges.
7      A   I noted --
8      Q   So let me repeat the question.
9          Can you identify any publisher by name
10 that has both a website and an app that values an
11 exchange in this case because of the open-web
12 display transactions and doesn't take into account
13 all of the transactions the exchange facilitates?
14         MR. NAKAMURA:  Objection to form.
15         THE WITNESS:  So I noted earlier it's
16    difficult for me to tell you definitively
17    what a publisher does or does not take into
18    account.  I'm not a publisher.
19 BY MR. ISAACSON:
20     Q   Can you identify any advertiser by name
21 that values an exchange in this case because of
22 the open-web display transactions and doesn't take

Page 123

1  into account all the transactions the exchange
2  facilitates?
3          MR. NAKAMURA:  Objection to form.
4          THE WITNESS:  I think I answered a
5     similar answer to you before.  I can't speak
6     for sure what an advertiser would or would
7     not consider, and the extent to which there
8     are advertisers who split up different
9     advertising or digital advertising needs
10    across different tools, for those
11    advertisers, they may likely primarily value
12    an ad exchange's ability to transact open-web
13    display.
14 BY MR. ISAACSON:
15     Q   You say they may, but you don't know, do
16 you?
17         MR. NAKAMURA:  Objection to form.
18         THE WITNESS:  I said earlier it's
19    difficult -- I mean I cannot definitively
20    state what an advertiser does or does not
21    consider at all when making their decisions.
22

Page 124

1  BY MR. ISAACSON:
2      Q   The -- and the same is true for an
3  advertiser ad network, isn't it, that you would be
4  unable to name any advertisers who evaluate an ad
5  network based on open-web display transactions as
6  opposed to all the transactions the ad network can
7  facilitate?
8          MR. NAKAMURA:  Objection to form.
9          THE WITNESS:  I think my report
10    expressed the opinion that a source of Google
11    Ads' market power and display comes from
12    smaller advertisers who may rely on Google
13    Ads for, for search ads as well, so there is
14    some degree to which the choice of Google Ads
15    could be influenced by smaller advertisers'
16    desire to also obtain search advertising, and
17    that is a source of Google Ads' substantial
18    market power.
19 BY MR. ISAACSON:
20     Q   And small advertisers could also
21 consider the apps that are available by going
22 through Google -- going through Google Ads,

Page 125

1  correct?
2      A   Insofar they could do many things.  They
3  could consider that as well.
4      Q   When advertisers -- when advertisers
5  work with Google Ads, is it your understanding
6  that they say I want to do apps or open-web?  Do
7  they make some decision on that at the beginning?
8          MR. NAKAMURA:  Objection to form.
9          THE WITNESS:  What I've seen in the
10    course of my, my work on this matter from
11    Google documents and sworn testimony is that
12    many advertisers, when they, when they choose
13    Google Ads, do put weight on access to
14    Google's display network, and the, including
15    AdSense and the display inventory through
16    AdX.
17         I can't definitively say that none of
18    those advertisers do not care about other
19    types of digital advertising through Google
20    Ads.
21 BY MR. ISAACSON:
22     Q   So when an advertiser actually gets onto

32 (Pages 122 - 125)

Page 126

1 Google Ads, do you have an -- do you understand
2 that they input information about how much they
3 want to spend and their goals, but they don't
4 choose what type of ad it's going to be, an app
5 versus open-web?
6     MR. NAKAMURA: Objection to form.
7     THE WITNESS: It's my understanding that
8     when AdSense launched in 2003, before this
9     app component, Google Ads' advertisers, I
10    thought, could -- may express some control,
11    whether they were only purchasing search ads
12    or through the Google Display Network.
13        I think one of the advantages of Google
14    Ads versus let's say a DSP is the simplified
15    UI that allows an advertiser to submit a
16    budget, but that's also why the small
17    advertisers or advertisers with less complex
18    needs wouldn't be able to use a DSP.
19 BY MR. ISAACSON:
20    Q   With the simplified user interface of
21 Google Ads, do you understand that the advertiser
22 inputs information, and then that the technology

Page 127

1 decides whether the ad will be on an app or on the
2 web, for example?
3     MR. NAKAMURA: Objection to form.
4     THE WITNESS: So I can't speak for
5     certainty to the extent to which Google Ads
6     allows advertisers to express preferences
7     over app versus web inventory. I believe
8     that other forms of digital differences --
9     other digital advertising preferences could
10    be conveyed, including whether to advertise
11    on YouTube for in-stream video.
12 BY MR. ISAACSON:
13    Q   And if an advertiser purchased ads on
14 the Google display network, they can buy app
15 inventory from AdMob or DFP, correct?
16    MR. NAKAMURA: Objection to form.
17    THE WITNESS: So as I use it, Google Ads
18    is referring to the, the advertising facing
19    component of Google Display Network, but that
20    Google Ads, as a larger product, can be used
21    by advertisers to access other forms of
22    Google's digital inventory -- ad inventory,

Page 128

1     which includes DFPs, AdMob, YouTube, Search.
2 BY MR. ISAACSON:
3     Q   If I can ask you to look at paragraph 14
4 of your opening report.
5         By the way, you didn't like the term "ad
6 stack" for putting the Google publisher ad server,
7 exchange, and advertiser ad network together. Do
8 you have a term for -- if a, if a -- for, if I put
9 those all together, what I should call those?
10    A   So I didn't quite follow your question.
11 I don't think I said I liked or didn't like it.
12    Q   I'm not -- it was, it was enough, so I'm
13 not going to call it a "tech stack" unless you're
14 comfortable with it.
15        So if I refer to that as their tech --
16 their ad tech technology, and that would refer to
17 all three things, is that, is that -- are you
18 comfortable with that?
19    A   So what are we referring to with Google
20 Ads, AdX and DFP, so those three products?
21    Q   Yes.
22    A   I think we can call them the relevant ad

Page 129

1 tech products offered by Google, "relevant"
2 referring to --
3    Q   I'll call them Google ad tech products
4 just to be a little shorter, if that's okay.
5    A   Would you include DC360 under that
6 umbrella?
7    Q   We don't have to include that.
8    A   I will clarify if it is unclear going
9 forward.
10    Q   All right. So in paragraph 14 in the
11 second sentence, you say, "Most common methods of
12 monopolization undermine the ability of customers
13 to transact freely with rivals.
14        So if Google doesn't allow its
15 competitors to transact freely on its ad tech
16 products, do you consider that to be one of the
17 methods of monopolization you're referring to
18 here?
19    MR. NAKAMURA: Objection to form.
20    THE WITNESS: So the full sentence says
21    "the most common methods to monopolization
22    undermine the ability to customers to

33 (Pages 126 - 129)

Page 138

1    (Whereupon, the lunch recess was
2    taken.)
3    THE VIDEOGRAPHER:  We're back on the
4    record at 1:26 p.m.  You may proceed.
5    (Exhibit 5 was marked for
6    identification.)
7    BY MR. ISAACSON:
8    Q   We've marked as Lee Exhibit 5 a document
9    dated first quarter 2018, Bates-stamped
10   GOOG-DOJ-04442323 through 2372, and if you look at
11   2350, hopefully you see a page you recognize.
12   A   This is a long document, but I will just
13   jump to --
14   Q   Yes, yes, because you referred --
15   A   -- 2350.
16   Q   -- you referred me to Figure 42 and 43
17   of your report earlier, and a document you had
18   looked at referring to addressable -- using the
19   term "addressable."
20   A   So I see this slide.
21   Q   Right.  The, the slide on page 2350 that
22   I referred to you is Figure 42 of your report,

Page 139

1    correct?
2    A   Figure 42 is this slide from this
3    presentation.
4    Q   And you have not put any of the notes in
5    your report that are at the bottom of this slide,
6    correct?
7    A   Footnote 626 has some of those notes
8    from this slide.
9    Q   Okay, yes.  Thank you.
10   The, the "unaddressable" here
11   includes -- so there's addressable ads and
12   unaddressable ads, correct?
13   A   I believe "unaddressable" and
14   "addressable" refers to the pages or the
15   inventory, not the ads.
16   Q   Yes.  You're correct.  There's
17   addressable and unaddressable pages or page views
18   that could be used to run ads; is that correct?
19   A   Yes, I believe addressable and
20   unaddressable refers to the page views coming from
21   these pages.
22   Q   And you don't understand the

Page 140

1    calculations here to be market shares, do you?
2    A   So I am, in my report, describing these
3    slides partly to, to note that Google considers
4    the set of pages or page views that are
5    addressable by its ad tech products as different
6    from those offered by its owned and operated
7    properties, as well as Amazon and Facebook.
8    Q   So I'll move to strike your answer.  I'm
9    going to ask you the question again.
10   You don't understand the calculations in
11   this slide to be market share estimates, do you?
12   A   So in 42, Figure 42 in my report, I do
13   not believe I am citing to the percentages here as
14   a value for market shares.
15   Q   Right, and when this slide divides pages
16   that are available for ads between addressable and
17   unaddressable, the unaddressable includes
18   competitors, correct?
19   MR. NAKAMURA:  Objection to form.
20   BY MR. ISAACSON:
21   Q   Do you see that in the notes?
22   A   So it includes "Adult, Goog," which I'm

Page 141

1    referring -- interpreting to be Google's owned and
2    operated as depicted in the the, the Figure "YT,"
3    which I understand to be YouTube; "FB," Facebook;
4    "Amzn," Amazon, "are not addressable."
5    Q   And the notes to the slide refers to
6    unaddressable including other competitors,
7    correct?
8    MR. NAKAMURA:  Objection to form.
9    THE WITNESS:  I see that word, yes.
10   BY MR. ISAACSON:
11   Q   And the other competitors in the chart
12   up above, as you said, include Facebook and
13   Amazon, correct?
14   A   Google has many different products, many
15   different businesses, so they may consider
16   Facebook and Amazon competitors.  I think I
17   acknowledge Google documents viewing Amazon and
18   Facebook as potential competitors to some of its
19   products, in some of the -- in the relevant
20   product -- in some of the relevant product
21   markets.
22   Q   So I just asked you what the slide says,

36 (Pages 138 - 141)

Page 142

1 so let's focus on that.
2      The competitors who are in the category
3 of "unaddressable" in this slide include Facebook
4 and Amazon, correct?
5      A   So the slide says "other unaddressable
6 inventory" -- sorry.  The slide says "Other
7 unaddressable, including blacklisted sites, other
8 competitors," and in "unaddressable" also is
9 Google, YouTube, Facebook, Amazon.
10      Q   And you don't think that Google,
11 Facebook -- you don't think Facebook and Amazon
12 are in the category of blacklisted sites; you
13 understand that they are being -- that the term
14 "competitors" in this document is referring to
15 them, correct?
16      A   I'm not -- I understand include -- when
17 something includes something, it may not be
18 comprehensive.
19      Q   The two competitors that are listed in
20 this category include Facebook and Amazon,
21 correct?
22      A   There is Facebook and Amazon within the

Page 143

1 unaddressable part.
2      THE REPORTER:  Was there an objection?
3 If there was, I couldn't hear.
4 BY MR. ISAACSON:
5      Q   The -- if we can look at paragraph 35 of
6 your report, opening report, where you discuss
7 foreclosure and impeding customers from working
8 with rivals.
9      A   Should I put this aside?
10      Q   Yes.
11      A   Okay.  Thank you.
12      I see that paragraph.
13      Q   All right, and if you can hold that
14 paragraph with your finger and look at paragraph
15 12 on page 3 at the same time.
16      In paragraphs 12 and 3, you list five
17 categories of conduct.
18      You're familiar with this part of your
19 report, correct?
20      A   I am familiar with paragraph 12.
21      Q   So paragraph -- there's, there's five --
22 there's descriptions of five categories of conduct

Page 144

1 there.  The first three fall under the category of
2 foreclosure.
3      Do I have that right?
4      MR. NAKAMURA:  Objection to form.
5      THE WITNESS:  So I do characterize the
6 first three items here as involving
7 foreclosure.
8 BY MR. ISAACSON:
9      Q   And "foreclosure" is defined as
10 "limiting access to an important input or
11 resource"; is that right?
12      A   That's not the full statement that is
13 written on, on page 9.
14      Q   All right.  Do you agree that that's a
15 fair shorthand description of it?
16      A   I think it's useful to state that the
17 way it's described here is that foreclosure refers
18 to withholding, degrading, or limiting access.
19      Q   Okay.  We'll use all those words.
20      So "foreclosure" is defined as
21 "withholding, degrading," or "limiting access to
22 an important input or resource," correct?

Page 145

1      A   That's how I'm using the term in my
2 report.
3      Q   Right.  So the input or resource --
4 well, let's look at the first category of conduct.
5 "Providing unrestricted access to Google Ads'
6 advertiser demand exclusively to its AdX ad
7 exchange, and denying comparable access to rival
8 ad exchanges."
9      Is the input or resource that is being
10 denied to rivals from that first item of conduct,
11 access to Google's advertising customers?
12      MR. NAKAMURA:  Objection to form.
13      THE WITNESS:  So the input or resource
14 I'm referring to is Google Ads and the demand
15 that flows through Google Ads.
16 BY MR. ISAACSON:
17      Q   And the demand that goes through Google
18 Ads are advertisers who are customers of Google,
19 correct?
20      MR. NAKAMURA:  Objection to form.
21      THE WITNESS:  So Google Ads serves both
22 advertisers, potentially intermediated

37 (Pages 142 - 145)

Page 146

1  through agencies; and Google Ads also
2  facilitates transactions for publishers, and
3  Google Ads serve those types of customers.
4  So the input or resource, again, is Google
5  Ads' access to -- from the exchange market,
6  access to demand from Google Ads.
7  BY MR. ISAACSON:
8    Q    And that demand from Google Ads is
9  demand from Google -- is from advertisers or
10  advertising agencies?
11       MR. NAKAMURA:  Objection to form.
12       THE WITNESS:  So the demand that flows
13    through an ad tech product from the
14    advertisers side represents what advertisers
15    or their agencies are, are bidding for.
16  BY MR. ISAACSON:
17    Q    And those advertisers and those agencies
18  are Google customers, correct, Google Ads
19  customers?
20    A    So Google ads serves different
21  customers, but among the -- it serves advertisers
22  and, in some cases, their agencies.

Page 147

1    Q    And providing access to those customers,
2  to rival ad exchanges, would require access to
3  Google technology to make those customers
4  available, correct?
5       MR. NAKAMURA:  Objection to form.
6       THE WITNESS:  So it's not necessarily
7    direct access to the advertisers or agencies.
8    It's whether or not Google Ads bids into
9    rival ad exchanges that is referenced in this
10    item 1.
11  BY MR. ISAACSON:
12    Q    So in item 1, you're referring -- when
13  you say "unrestricted access to Google Ads
14  advertiser demand," you're saying that Google Ads
15  would have to be able to bid into rival ad
16  exchanges?
17       MR. NAKAMURA:  Objection to form.
18       THE WITNESS:  I didn't quite follow
19    your, your question.
20  BY MR. ISAACSON:
21    Q    I'm trying to understand your last
22  answer.

Page 148

1    The -- you, you said, "It's not
2  necessarily direct access to the advertisers or
3  agencies.  It's whether or not Google Ads bids
4  into rival ad exchanges that is referenced in this
5  item 1."
6    So the -- when you're referring to
7  restrictions on access to Google Ads advertisers
8  demands, you're referring to the fact that Google
9  Ads does not bid into rival ad exchanges for those
10  advertisers?
11       MR. NAKAMURA:  Objection to form.
12       THE WITNESS:  It's not, quote, "for
13    those advertisers" as you state in the
14    question.  It's Google Ads does not bid into
15    rival ad exchanges or subsets of, of
16    impressions, and forecloses those ad
17    exchanges from accessing its advertiser
18    demand.
19  BY MR. ISAACSON:
20    Q    You're saying that Google Ads should bid
21  into rival exchanges for impressions but not on
22  behalf of advertisers?

Page 149

1       MR. NAKAMURA:  Objection to form.
2       THE WITNESS:  I'm not saying what Google
3    Ads should or should not do.  I'm not giving
4    an opinion.
5  BY MR. ISAACSON:
6    Q    Google -- when Google Ads bids into,
7  bids into an exchange, it's bidding for an
8  advertiser customer, correct?
9       MR. NAKAMURA:  Objection to form.
10       THE WITNESS:  Google Ads, as a bidding
11    tool, submits bids on behalf of its
12    advertiser or advertising agency customers.
13  BY MR. ISAACSON:
14    Q    And when you're referring to the
15  exclusivity here, you're saying that Google Ads is
16  not bidding for advertisers -- using its -- let me
17  start over.
18    When you're referring to the exclusivity
19  in item 1 here, you are referring to that Google
20  Ads is not using -- let me start over.
21    When you -- in item 1, what you are
22  referring to there is that Google Ads, as a

38 (Pages 146 - 149)

Page 150

1    bidding tool, is not submitting bids on behalf of
2    its advertisers or advertising agency customers
3    into rival ad exchanges?
4        MR. NAKAMURA:  Objection to form.
5        THE WITNESS:  So the action that is
6    referenced in here in item 1 refers to
7    foreclosing rival ad exchanges from
8    unrestricted access to Google Ads.  As I
9    described in my report, Google has restricted
10    the demand provided by Google Ads into rival
11    ad exchanges.
12    BY MR. ISAACSON:
13    Q    And when you're referring to that
14    restriction, what you mean -- what you're
15    referring to is, is that Google Ads will not bid
16    for its advertisers using its tools into -- I'm
17    going to start that over.
18        When you're referring to that
19    restriction, what you are referring to here is
20    that Google Ads, as a bidding tool, is not
21    submitting bids on behalf of advertisers or
22    advertising agency customers into rival ad

Page 151

1    exchanges?
2        MR. NAKAMURA:  Objection to form.
3        THE WITNESS:  I don't think that's a
4    complete summary of what I said.  I think
5    what's relevant is that the -- well, what
6    some Google employees are referring to as
7    "exclusivity" references the foreclosure of
8    access to some amount of Google Ads
9    advertising demand.
10        In my report, I talk that there is a
11    limited exception, so it's not the case that
12    Google Ads does not interact at all with
13    rival ad exchanges, but that this access is
14    limited.
15    BY MR. ISAACSON:
16    Q    So when you're referring to that limited
17    access, what you're referring to is that Google
18    Ads, as a bidding tool, is not submitting bids on
19    behalf of advertisers or advertising agency
20    customers into rival ad exchanges in some
21    circumstances?
22    A    That is the aspect of foreclosure that I

Page 152

1    am focusing on in item (1_, sub-element 3 of
2    paragraph 12 -- element (1) of point 3 of
3    paragraph 12.
4    Q    Let's move to the second element.
5        "Providing access to and use of realtime
6    bids from AdX exclusively to its DFP publisher ad
7    server, and denying comparable access to rival
8    publisher ad servers."
9        Is the asset -- is the input or resource
10    that is being denied to rivals from item (2)
11    access to realtime bidding on Google's AdX
12    exchange?
13        MR. NAKAMURA:  Objection to form.
14        THE WITNESS:  I would not characterize
15    it that way.
16    BY MR. ISAACSON:
17    Q    What is the input or resource that is
18    being denied to rivals in the second piece of
19    conduct here?
20    A    It refers to the access to and use of
21    AdX realtime bids, also referred to as "per query
22    pricing" --

Page 153

1    Q    So --
2    A    -- to rival publishers ad servers.
3    Q    So is the input or resource that is
4    being denied to Google rivals in your second
5    category of conduct access to AdX realtime
6    bidding?
7        MR. NAKAMURA:  Objection to form.
8        THE WITNESS:  I'm not using the term
9    "realtime bidding."  That's not an accurate
10    characterization of, of my report or what I
11    said.  What I said is the realtime bids or
12    per query pricing.
13    BY MR. ISAACSON:
14    Q    Okay.  I will modify it to bids.
15        So the asset denied to rivals from the
16    second conduct you described is access to AdX
17    realtime bids; is that correct?
18        MR. NAKAMURA:  Objection to form.
19        THE WITNESS:  That is what the second
20    element refers to.
21    BY MR. ISAACSON:
22    Q    And in order to have access to realtime

39 (Pages 150 - 153)

Page 154

1  bids on AdX, rivals would have to have some sort
2  of technical connection to Google in order to, to
3  have that access, right?
4     A   So it would be similar to a connection
5  that other exchanges other than AdX provide to
6  non-Google publishers ad servers.
7     Q   Google would have to affirmatively
8  implement technology to give rivals access to
9  realtime AdX bids, correct?
10        MR. NAKAMURA:  Objection to form.
11        THE WITNESS:  It was not evident to me
12     the extent to which Google had that ability
13     in the past, as I noted elsewhere in my
14     report.  Admeld was a company that Google
15     acquired and had the technology to provide
16     realtime bids into other publisher ad
17     servers.
18  BY MR. ISAACSON:
19     Q   My question was about implementing
20  technology, right?
21        If Google doesn't do the technical
22  work -- let me put it this way.

Page 155

1        Google would have to do technical work
2  to give rivals access to realtime AdX bids,
3  correct?
4        MR. NAKAMURA:  Objection to form.
5        THE WITNESS:  And so my response is
6     noting that I'm not certain as to the extent
7     to which such technology may have existed and
8     was instead removed or withheld, which is
9     different from implementing something that
10     did not exist before.
11  BY MR. ISAACSON:
12     Q   Right.  Are you aware -- are -- can
13  Google's rivals right now go onto AdX and get, and
14  get technical access to AdX realtime bids?
15        MR. NAKAMURA:  Objection to form.
16        THE WITNESS:  It is my understanding at
17     present, Google does not provide realtime
18     bids, per query pricing, from AdX to rival
19     publisher ad servers.
20  BY MR. ISAACSON:
21     Q   And you would have to do something to
22  the technology to provide access to realtime bids

Page 156

1  if you wanted to change that?
2     A   It's my understanding that something
3  would need to change.
4     Q   The third item here is "Providing access
5  to a feature known as Dynamic Allocation
6  exclusively to AdX within DoubleClick For
7  Publishers (DFP) granting AdX valuable first-look
8  and last-look advantages over rival ad exchanges."
9        Is the input or resource that is being
10  described in this third category, is that access
11  to either a first-look or a last-look at bids on
12  AdX?
13        MR. NAKAMURA:  Objection to form.
14        THE WITNESS:  So the, the input or, or
15     resource that is being denied or had been
16     denied to rival ad exchanges was the ability
17     to bid alongside AdX in realtime and obtain
18     access to the advantages associated with
19     dynamic and enhanced dynamic allocation
20     within DFP.
21  BY MR. ISAACSON:
22     Q   Okay.  The input -- and in order to

Page 157

1  reverse that and to have provided the ability to
2  bid alongside AdX in realtime, that would -- that
3  also would require at least some technical work,
4  correct?
5        MR. NAKAMURA:  Objection to form.
6        THE WITNESS:  So the industry provided a
7     tool that enabled such functionality called
8     "header bidding" for other servers, and
9     Google, in 2018, fully launched a version of
10     what's called "Open Bidding," which allowed
11     other exchanges, with some limitations, to
12     bid alongside AdX in realtime within DFP.
13  BY MR. ISAACSON:
14     Q   And do you know how much technical work
15  was involved in creating Open Bidding?
16        MR. NAKAMURA:  Objection to form.
17        THE WITNESS:  I don't have a specific
18     number.
19  BY MR. ISAACSON:
20     Q   You would agree it took a least some
21  technical work to implement Open Bidding?
22     A   I agree that improvements to products

40 (Pages 154 - 157)

Page 158

1   require some level of investment.
2       Q   And what you're saying is that in order
3   to, to provide access to bids alongside of, of
4   Google's AdX, Google would have had to have done
5   something like Open Bidding much earlier?
6       MR. NAKAMURA: Objection to form.
7       THE WITNESS: I'm not opining what
8   Google should or needed to do.  My opinion is
9   that this particular act harmed competition.
10      I will note that other entities created
11  such a technical product known as "Header
12  Bidding," and it's something that Google
13  could have, for example, removed the
14  last-look earlier than it did, and that did
15  not require creating Open Bidding.
16  BY MR. ISAACSON:
17      Q   All right.  I'll move to strike after "I
18  will note."  I just want to ask questions and not
19  get all your notes here, all right?
20      The -- what you're saying, in order to
21  provide access to bids alongside of Google's AdX,
22  Google would have had to implement some technical

Page 159

1   changes, whether it's Open Bidding or something
2   else, much earlier than it did Open Bidding?
3       A   So that's what I was getting to.  Header
4   Bidding allowed publishers to receive realtime
5   bids from other ad exchanges within DFP.  It
6   started emerging around 2013 or 2014, although AdX
7   retained what has been referred to as a "last-look
8   advantage" over those exchanges participating in
9   Header Bidding.
10      Q   So in order to avoid this competitive
11  effect, Google could have implemented something
12  like Header Bidding; is that what you're saying?
13      MR. NAKAMURA: Objection to form.
14      THE WITNESS: I'm not expressing an
15  opinion what Google could have done.  I'm
16  noting that the withholding of these
17  particular advantages from rival exchanges
18  within DFP that were associated with dynamic
19  allocation harmed competition.
20  BY MR. ISAACSON:
21      Q   In order to have provided bidding
22  alongside of AdX, do you have an opinion about

Page 160

1   what Google could have done to have avoided that?
2       MR. NAKAMURA: Objection to form.
3       THE WITNESS: Well, I noted one thing --
4   BY MR. ISAACSON:
5       Q   And I said the question wrong, so I'm
6   going to rephrase.  I apologize.
7       In order to provide bidding alongside of
8   AdX, do you have an opinion what, what Google
9   could have done to have achieved that?
10      A   So today, with a Unified First Price
11  Auction, Google's AdX does not retain a last-look
12  advantage over rival ad exchanges, and rival ad
13  exchanges could -- can submit realtime bids
14  alongside AdX into DFP.
15      So even though -- let me strike that.
16      So at present, those exclusive
17  advantages to AdX have been opened up to rivals,
18  but that's not to say the impact of the conduct is
19  not still ongoing.
20      Q   So in order to have bidding alongside of
21  AdX, Google could have implemented Unified Price,
22  First Price Auction.  It could have implemented

Page 161

1   Open Bidding.
2       Is there anything else that Google, to
3   your knowledge, Google could have done to have
4   achieved that result?
5       MR. NAKAMURA: Objection to form.
6       THE WITNESS: I'm not sure what you mean
7   by "that result."
8   BY MR. ISAACSON:
9       Q   Having the -- having bidding alongside
10  of AdX, the subject we're talking about.
11      MR. NAKAMURA: Objection to form.
12      THE WITNESS: So what I have described
13  with, for example, Open Bidding represents
14  less exclusionary alternatives to the
15  withholding of these advantages to rival ad
16  exchanges.
17      Another less exclusionary act would
18  include not providing AdX with information
19  from the winning Header Bidding auction,
20  thereby granting AdX last-look over Header
21  Bidding exchanges, and Header Bidding was a
22  tool, again, that allowed rival ad exchanges

41 (Pages 158 - 161)

Page 162

1    to submit realtime bids into DFP.
2    BY MR. ISAACSON:
3        Q   Well, when Header Bidding was submitted
4    to AdX, the -- are there other less, what you
5    described as less exclusionary alternatives to
6    denying rivals access to bidding alongside of
7    access other than what you've, other that what
8    you've named?  You've named open bidding, you've
9    named Unified Price Auctions, and you've named not
10   providing Header Bidding bid information.
11       MR. NAKAMURA:  Objection to form.
12       THE WITNESS:  So I didn't follow the
13   first part of your question, and I don't
14   think that's completely accurate, what I had
15   said before.  For the second part --
16   BY MR. ISAACSON:
17       Q   Let me, let me put it this way.
18       You have been listing less exclusionary
19   alternatives to the conduct described in item 3,
20   and you've named Open Bidding, you've named
21   Unified First Price Auctions, and you've, you've
22   named not sharing Header Bidding bids.

Page 163

1        Is there anything else that you would
2    identify as less exclusionary conduct to, to
3    number 3?
4        MR. NAKAMURA:  Objection to form.
5        THE WITNESS:  So the first part of your
6    statement when you summarized what I had said
7    previously is imprecise, so I'm not agreeing
8    with that characterization.
9        The conduct that is referenced in item 3
10   refers to exclusively providing these
11   advantages I discuss in my report to AdX
12   within DFP that are associated with dynamic
13   allocation, and limiting or withholding
14   access to those advantages to rival ad
15   exchanges, and so less exclusionary
16   alternatives involves relaxing those
17   restrictions.
18   BY MR. ISAACSON:
19       Q   What would relax -- what does -- how do
20   you implement relaxing those restrictions other
21   than things you've named so far?
22       A   So the primary way to relax an exclusive

Page 164

1    condition is to no longer make that condition
2    exclusive, so --
3        Q   So how is that technically implemented
4    for item 3?
5        A   I provided earlier examples.
6        Q   Other than examples that you have
7    listed, are there any other ways that, for item 3,
8    that you, that you can, that you can name for
9    me --
10       A   So --
11       Q   -- that would relax the restriction, the
12   restriction -- what you call a restriction there?
13       A   So those are three -- I think I listed
14   three particular specific alternatives, but I can
15   generally categorize things that are less
16   exclusionary as those that allow rival ad
17   exchanges to submit realtime bids alongside AdX so
18   that AdX does not have a first-look over those ad
19   exchanges, and that does not provide information
20   about the winning bids from other ad exchanges to
21   be used as a floor for AdX, thereby providing in
22   AdX a last-look over those ad exchanges, and there

Page 165

1    may be other actions that achieve those goals,
2    which could be then less exclusionary.
3        Q   So in general, to be less exclusionary,
4    Google would have to allow rival ad exchanges to
5    submit realtime bids alongside AdX; is that right?
6        MR. NAKAMURA:  Objection to form.
7        THE WITNESS:  So allowing ad exchanges,
8    rival ad exchanges to submit realtime bids
9    into DFP to evaluate it alongside AdX
10   represents a form of less exclusionary
11   conduct.
12   BY MR. ISAACSON:
13       Q   Now, the next items, 4 and 5, I believe
14   you put in the category of impeding customers from
15   working with rivals; is that correct?
16       A   I do note that those items (4) and (5)
17   in paragraph 12, sub-bullet 3, have elements of
18   impeding customers from working with rivals.
19       Q   The -- and with item (4) where you're
20   talking about variable pricing floors, you're,
21   you're talking about price floors that are
22   submitted by rival ad exchanges -- I'm sorry.

42 (Pages 162 - 165)

1	In item 4, you're talking about pricing
2	floors that are submitted by DoubleClick for
3	Publishers into AdX, correct?
4	MR. NAKAMURA:  Objection to form.
5	THE WITNESS:  That's not accurate.
6	BY MR. ISAACSON:
7	Q	Okay.  Why don't you describe it?
8	A	So paragraph 12, bullet 3, item (4)
9	refers to the elimination of variable price floors
10	within DFP, which represents different reserve
11	prices a publisher using DFP could use for the
12	different ad exchanges that are used to sell
13	impressions.
14	Q	And the price floors you are referring
15	to are submitted into AdX, correct?
16	MR. NAKAMURA:  Objection to form.
17	THE WITNESS:  So within DFP, AdX
18	receives a floor, but the variable pricing
19	floor restriction refers to whether or not a
20	publisher could use a different price floor
21	with a different exchange.
22

1	BY MR. ISAACSON:
2	Q	All right.  The price floors submitted
3	by publishers are submitted into DFP for any ad
4	exchange, correct?
5	A	Prior to the removal of the ability to
6	set variable floors, a publisher could specify a
7	different price floor into DFP --
8	Q	I'm not -- I'm just talking about at any
9	time, just a price floor, whether they're variable
10	or uniform.
11	The price floor is submitted by
12	publishers into DFP for any ad exchange, correct?
13	A	I guess it's the modifier "for any ad
14	exchange" that I'm, I'm confused by.
15	Q	For any ad exchange that DFP is going to
16	submit a price floor --
17	THE REPORTER:  I'm sorry.  Say it again.
18	BY MR. ISAACSON:
19	Q	Do you know, when DFP gets a price floor
20	from a publisher, who does it submit that price
21	floor to?
22	MR. NAKAMURA:  Objection to form.

1	THE WITNESS:  So exchanges being called
2	within DFP can receive a floor when they're
3	called from DFP.
4	BY MR. ISAACSON:
5	Q	The -- all right, and in order to be
6	less exclusionary, Google would have to permit
7	publishers to submit variable price floors that
8	could be submitted to Google's rivals; is that
9	right?
10	MR. NAKAMURA:  Objection to form.
11	THE WITNESS:  So prior to 2019,
12	publishers could submit or use variable price
13	floors within DFP across exchanges.  Post
14	2019, that ability was removed.  An example
15	of less exclusionary conduct would be not
16	removing that functionality.
17	BY MR. ISAACSON:
18	Q	And that means that Google would have to
19	permit publishers to submit variable price floors
20	to Google's rivals, correct?
21	MR. NAKAMURA:  Objection to form.
22	THE WITNESS:  So less exclusionary

1	conduct would have been Google continuing to
2	allow publishers to use variable price
3	floors, as is my understanding, they continue
4	to do in certain subsets in, in France, for
5	example.
6	BY MR. ISAACSON:
7	Q	And so what you're talking about,
8	though, is when you're saying "using variable
9	price floors," that means Google submits a price,
10	a variable price chosen by a publisher to one of
11	its rivals, correct?
12	MR. NAKAMURA:  Objection to form.
13	THE WITNESS:  So DFP, as a publisher ad
14	server, is a software product that publishers
15	can use to do many things, but one of which
16	is to facilitate the sale of indirect
17	open-web display transactions.
18	Publishers using DFP can specify, prior
19	to 2019, different floors for different ad
20	exchanges.  So then when the publisher used
21	DFP, those floors the publisher could provide
22	would then be provided to the different

43 (Pages 166 - 169)

Page 170

1    exchanges.
2    BY MR. ISAACSON:
3        Q   DFP is -- you and I know this, but the
4    whole world doesn't know it.  "DFP" is DoubleClick
5    for Publishers, a Google product, correct?
6        THE REPORTER:  DoubleClick for what?
7    BY MR. ISAACSON:
8        Q   Publishers.  It's a Google product,
9    correct?
10       A   Google owns DFP, yeah.
11       Q   And so what you're saying is that prior
12   to 2019, DoubleClick for Publishers could submit
13   different price floors to different ad -- to, to,
14   to rival ad exchanges of Google's AdX, correct?
15       MR. NAKAMURA:  Objection to form.
16       THE WITNESS:  I think I answered that
17       customers using -- publishers using DFP prior
18       to 2019 were able to specify variable price
19       floors for different exchanges.
20   BY MR. ISAACSON:
21       Q   And if you were to return to that, what
22   that would mean is that Google's DFP product would

Page 171

1    be submitting variable price floors to rivals,
2    rival exchanges of Google?
3        MR. NAKAMURA:  Objection to form.
4        THE WITNESS:  So are you, are you
5        characterizing what --
6    BY MR. ISAACSON:
7        Q   I'm just trying to understand --
8        A   -- happened prior to 2019?
9        Q   No, I'm saying -- I'm just trying to
10   understand what, what needs to be implemented
11   here.
12       So at a high level, in order to be not
13   exclusionary, Google's DFP product would have to,
14   have to be able to submit variable price floors to
15   rival exchanges of Google?
16       MR. NAKAMURA:  Objection to form.
17       THE WITNESS:  I'm not expressing an
18       opinion on what it would have to do in order
19       for some conduct to not be exclusionary.  My
20       opinion is that this removal of a feature
21       functionality that publishers were able to
22       use within DFP harmed competition.

Page 172

1    BY MR. ISAACSON:
2        Q   And in order to eliminate that harm to
3    competition from removal of the feature
4    functionality, would you have to reinstate that
5    feature functionality and, and have Google's DFP
6    product submit, be able to submit variable price
7    floors to rival exchanges at Google?
8        MR. NAKAMURA:  Objection to form.
9        THE WITNESS:  So again, I'm not opining
10       on what must be done or what has to be done.
11       My opinion is that this action, removing this
12       ability to set variable pricing floors within
13       DFP, harmed competition.
14       MR. ISAACSON:  All right.  You can mark
15       this as Exhibit 6.
16       (Exhibit 6 was marked for
17           identification.)
18   BY MR. ISAACSON:
19       Q   Exhibit 6 is the Complaint that was
20   filed in this action.
21       I assume you've had the chance to review
22   this before?

Page 173

1        A   I have read that Complaint.
2        Q   If you could look at page 132, there's a
3    list of ten items of conduct that begin at the
4    bottom of page 132 and continue onto page 133.
5        Do you see that?  There's a list of ten.
6    They're numbered, too.
7        A   I see paragraph 312 which lists ten
8    actions.
9        Q   So item 1 there is "Google's acquisition
10   of DoubleClick to obtain not only a dominant
11   publisher ad server, DFP, but also a nascent ad
12   exchange, AdX, in order to pursue its goal of
13   dominance across the entire ad tech stack."
14       Have you, have you expressed an opinion
15   about whether the conduct in item 1 relating to
16   Google's acquisition of DoubleClick was
17   anticompetitive?
18       MR. NAKAMURA:  Objection to form.
19       THE WITNESS:  I'm not expressing an
20       opinion that Google's acquisition of
21       DoubleClick alone harmed competition.
22

44 (Pages 170 - 173)

Page 174

1  BY MR. ISAACSON:
2      Q   Looking at item 7, which refers to
3  Project Bell, are you expressing an opinion about
4  whether Google's Project Bell was anticompetitive?
5          MR. NAKAMURA:  Objection to form.
6          THE WITNESS:  So with respect to Bell, I
7      express the opinion that it demonstrates
8      Google Ads' substantial market power, but I
9      do not express the opinion that Project Bell
10     did or did not harm competition.
11 BY MR. ISAACSON:
12     Q   Item 8 refers to "sell-side Dynamic
13 Revenue Share."
14         Have you expressed an opinion in this
15 case as to whether sell-side dynamic revenue share
16 harmed accommodation?
17         MR. NAKAMURA:  Objection to form.
18         THE WITNESS:  So with respect to
19     sell-side dynamic revenue share, I express
20     the opinions that it represents an example of
21     AdX's market power, that it is a way in which
22     AdX was able to take advantage of the

Page 175

1      last-look within DFP, but I do not express an
2      opinion whether sell-side dynamic revenue
3      share alone did or did not harm competition.
4  BY MR. ISAACSON:
5      Q   And with respect to item 9, Project
6  Poirot, have you, have you expressed an opinion in
7  this case as to whether Project Poirot was
8  anti-competitive?
9          MR. NAKAMURA:  Objection to form.
10         THE WITNESS:  So I opine that Project
11     Poirot demonstrates Google's ability to
12     affect competition among ad exchanges through
13     behavior of its bidding tools, but I do not
14     opine that Project Poirot alone did or did
15     not harm competition.
16 BY MR. ISAACSON:
17     Q   The -- we're done with the Complaint.
18         If you can look go back to your
19 paragraph 12(3) on page 3 of your opening report.
20     A   Paragraph 12(3).
21     Q   With regards to item (1), "Providing
22 unrestricted access to Google Ads' advertiser

Page 176

1  demand exclusively to its Google -- exclusively to
2  its AdX ad exchange, and denying comparable access
3  to rival ad exchanges," you have given the opinion
4  in this case about effects on an ad exchange
5  market.
6          Am I correct you have not given any
7  opinions in this case about any effect of this
8  conduct on an ad server -- on a publisher ad
9  server market?
10         MR. NAKAMURA:  Objection to form.
11         THE WITNESS:  That is not correct.
12 BY MR. ISAACSON:
13     Q   The -- have you given opinions that item
14 1 had a competitive effect on the advertiser ad
15 network market?
16         MR. NAKAMURA:  Objection to form.
17         THE WITNESS:  So I opine that Google's
18     conduct that harmed the competitiveness of
19     rival ad exchanges harmed the competitiveness
20     of rivals in the publisher ad server market
21     and the advertiser ad network market, because
22     products in those latter two markets rely

Page 177

1      upon ad exchanges to transact open-web
2      display advertising.
3  BY MR. ISAACSON:
4      Q   The -- can you identify in the work that
5  you have done -- I'll start that over.
6          Can you identify where in your reports
7      you have quantified any anticompetitive effects on
8      publishers from the conduct in your item number 1,
9      the unrestricted access to Google -- referring to
10     "unrestricted access to Google Ads' advertisers"?
11         MR. NAKAMURA:  Objection to form.
12         THE WITNESS:  So the harm to
13     customers -- in this case, publishers -- from
14     the conduct that I examine in my reports
15     comes from Google's conduct harming the
16     competitiveness of its rivals in the relevant
17     product markets, in doing so, that sustain
18     and enhance Google's market power over the
19     products in the relevant product markets, and
20     that, in turn, harms publishers through three
21     different channels.
22

45 (Pages 174 - 177)

1  BY MR. ISAACSON:
2      Q   Sir, can I just ask you to readdress
3  yourself to the question, what I have asked you?
4          Have you quantified that harm to
5  publishers?
6          MR. NAKAMURA:  Objection to form.
7          THE WITNESS:  I provided various pieces
8      of analysis that support my opinion that the
9      harm to publishers is material.
10         With regards to publisher harm, I
11     provide quantitative evidence that an
12     increase in ad tech fees reduces publisher
13     payouts, and I provide quantitative analysis
14     that indicates that item 1, which refers to
15     AdX's exclusivity, materially contributes to
16     higher fees for ad tech products.
17 BY MR. ISAACSON:
18     Q   The, the quantitative evidence about an
19 increase in ad tech fees that you're referring to;
20 is that a quantitative analysis of the AdX fees?
21     A   So I present results from simulations
22 from Google that varied the AdX take rate, and

1  showing that --
2      Q   I'm just, I'm just trying to understand
3  which fees you're referring to.
4          So are you referring to AdX -- when you
5  say that you provided "quantitative evidence that
6  an increase in ad tech fees reduces publisher
7  payouts," are you referring to AdX fees?
8      A   So one simulation I refer to looks at
9  AdX take rates and shows that as those increase,
10 publishers' payouts strictly fall.
11     Q   Right, and have you attempted to
12 quantify, right, the amount of effect on
13 publishers from Google's limitation of Google Ads
14 demand?
15     A   So what I just described and other
16 evidence supports my opinion that the harm to
17 publishers from this action led to material harm.
18     Q   Have you attempted to quantify what
19 "material harm" means in this case?
20         MR. NAKAMURA:  Objection to form.
21         THE WITNESS:  I provided evidence
22     that -- or the analysis I conducted, using

1  everything I've seen, including data,
2      documents, and these experience in
3      simulations, I use to support my opinion that
4      the harm to publishers from this conduct was
5      material.
6  BY MR. ISAACSON:
7      Q   Yeah, you just said that.  Have you
8  attempted to quantify what "material" means?
9      A   It's --
10     Q   Is it one percent?  Ten dollars?  Is
11 there any, any expression of what "material"
12 means?
13     A   What I mean by "material" is something
14 that's --
15     Q   I'm not asking you what you mean by
16 "material."  I'm asking you whether there's any
17 quantification of what you call "material" in your
18 reports.
19         MR. NAKAMURA:  Objection to form.
20         THE WITNESS:  The evidence I provide or
21     the analysis I provide regarding AdX's
22     exclusivity supports my opinion that the

1      impact in fees for AdX relative to less
2      exclusionary conduct is not de minimus.  It's
3      material.
4  BY MR. ISAACSON:
5      Q   All right.  Material -- you're using not
6  "de minimus, material."
7          Have you attempted to quantify by any
8  metric, whether it's dollars or percentages, what
9  de minimus means in your analysis?
10         MR. NAKAMURA:  Objection to form.
11         THE WITNESS:  So I think the challenge
12     with -- you're asking for like a specific
13     number?
14 BY MR. ISAACSON:
15     Q   Yes.
16     A   As I note in my report, I'm comparing
17 outcomes between the observed world and
18 alternatives that involve less restrictive --
19 sorry -- less exclusionary conduct.
20         With respect to Google Ads, AdX's
21 exclusivity, that conduct has been ongoing for
22 quite some time, so both any specific alternative

Page 190

1  publishers benefited.
2      Q   But am I correct that, that in your
3  view, providing bidding alongside AdX to other
4  exchanges rather than the last-look to AdX, that
5  -- I need to say it the other way around.
6          By providing the last-look to AdX, that
7  rather than providing bidding alongside AdX to
8  other exchanges, that made AdX more attractive to
9  publisher customers?
10         MR. NAKAMURA:  Objection to form.
11         THE WITNESS:  I'm not quite sure I
12      follow.  I guess my, my opinion -- when I say
13      "bidding alongside AdX," I mean those rival
14      exchanges submit realtime bids, not in the
15      waterfall, and they would not be subject to
16      last-look, and if that were the case, it's my
17      opinion that publishers would be better off
18      from that than only allowing AdX to submit
19      realtime bids at the head of the waterfall.
20  BY MR. ISAACSON:
21      Q   Did providing a last-look to AdX make
22  AdX more attractive to publishers than rival

Page 191

1  exchanges?
2          MR. NAKAMURA:  Objection; form.
3          THE WITNESS:  It's my opinion that this
4      exclusive -- these exclusive advantages
5      provided by AdX harmed competition, and so
6      that harmed competition could make
7      publishers -- well, my opinion is that
8      competition harmed publisher customers.
9  BY MR. ISAACSON:
10      Q   Maybe you didn't hear my question.
11         Did providing a last-look to AdX make
12  AdX more attractive to publishers compared to
13  rival exchanges?
14         MR. NAKAMURA:  Objection to form.
15         THE WITNESS:  And what's important for
16      me to understand is what is the relevant
17      comparison.  It's -- you're, you're saying
18      providing AdX with last-look versus --
19  BY MR. ISAACSON:
20      Q   Not providing it.
21      A   But then if you don't provide AdX with
22  last-look, does it still have first-look over the

Page 192

1  waterfall?  So this hypothetical is not fully
2  formed for, for me to answer your question.
3      Q   Do you have an opinion on the
4  anticompetitive effects of last-look independent
5  of first-look?
6          MR. NAKAMURA:  Objection to form.
7          THE WITNESS:  So I provide evidence that
8      giving up last-look, holding everything else
9      fixed, reduced impressions and spend on AdX.
10     There are Google experiments in 2019 that
11     isolated -- it's my recollection -- the
12     impact of removing last-look, so that would
13     be consistent with Google's last-look
14     providing it with an advantage.
15  BY MR. ISAACSON:
16      Q   So just looking at the provision of
17  last-look on AdX, and that alone, holding
18  everything else constant, did the last-look make
19  AdX more attractive to Google customers?
20         MR. NAKAMURA:  Objection to form.
21  BY MR. ISAACSON:
22      Q   Specifically publishers?

Page 193

1          MR. NAKAMURA:  Same objection.
2          THE WITNESS:  So I'm trying to think
3      about whether a publisher, as you're asking
4      me, would view AdX as more attractive versus
5      AdX --
6  BY MR. ISAACSON:
7      Q   If you --
8      A   -- winning more auctions.
9      Q   If you don't know, feel free to tell me
10  if you don't know how a publisher felt like that.
11  I just want to know if you have an opinion about
12  whether's Google first -- last-look made AdX more
13  attractive to publishers.
14         MR. NAKAMURA:  Objection to form.
15         THE WITNESS:  So last-look versus not
16      having last-look may have made AdX relatively
17      more attractive to rival ad exchanges.
18  BY MR. ISAACSON:
19      Q   Can we look at your rebuttal report,
20  page 85, Figure 13?
21      A   Is it possible to take a break soon?
22  Now is fine?

49 (Pages 190 - 193)

1     MR. ISAACSON:  Yes.  It's not about
2  torture.
3     THE VIDEOGRAPHER:  We're off the record
4  at 2:40 p.m.
5        (Whereupon, a short recess was
6        taken.)
7     THE VIDEOGRAPHER:  We're back on the
8  record at 2:53.  Please proceed.
9  BY MR. ISAACSON:
10    Q   I tried to say this before.  Turn to
11 page 85 of your rebuttal report, Figure 13.
12       All right.  There's a chart here, Figure
13 13, "Lee and Israel estimates of AdX market shares
14 among ad exchanges using Google and third-party
15 data."
16       And this is a chart that you prepared
17 based on your analysis of the data and then the
18 backup materials from Dr. Israel's report; is that
19 correct?
20    A   That's correct.
21    Q   All right, and this is referring to AdX
22 market share, so we're talking about the exchange

1  market, correct?
2     A   This is looking at market shares for ad
3  exchanges.
4     Q   And this is ad exchanges that facilitate
5  open-web display advertising?
6        MR. NAKAMURA:  Objection to form.
7        THE WITNESS:  The products in these AdX
8     market shares that I present here are those
9     ad exchanges that can facilitate the sale of
10    open-web display.
11 BY MR. ISAACSON:
12    Q   There is -- for all of the share
13 calculations from 2019 to 2022, worldwide and in
14 the United States, there's no year where you find
15 that Google AdX's market share is 70 percent or
16 above.
17    A   So the numbers here for these measures
18 and years are below 70 percent.
19    Q   And in the United States, all of the
20 shares are 56 percent or below, correct?
21    A   For these United States measures that I
22 compute, all the numbers in this table are

1  56 percent or below.
2     Q   And for the United States in 2022, if
3  you look at the dollar figures, whether they're
4  fees or spend, the market share numbers, whether
5  it's you or Dr. Israel, are from 34 to 38 percent,
6  correct?
7        MR. NAKAMURA:  Objection to form.
8        THE WITNESS:  So the spend shares for ad
9     exchanges that I compute in the United States
10    is 34 percent.  The fee share is 37 percent.
11    There's a number from Dr. Israel that is
12    38 percent.
13 BY MR. ISAACSON:
14    Q   And in the United States market, the AdX
15 market share measured by impressions has decreased
16 from 56 percent in 2020 to 47 percent in 2022.
17       Am I reading that correctly?
18       MR. NAKAMURA:  Objection to form.
19       THE WITNESS:  I want to be precise.  I
20    believe these are impressions computed for --
21 BY MR. ISAACSON:
22    Q   Users?

1     A   U.S. users, and in 2020, among ad
2  exchanges, that number is 56 percent, and then it
3  goes to 47 percent in 2022.
4     Q   And looking at the United States market
5  based on spend, you calculate a 43 percent share
6  in 2019, declining to 34 percent in 2022, correct?
7     A   43 percent in 2020 for spend among
8  U.S -- open-web impressions from U.S. users, and
9  then in 2022, that number is 34 percent for that
10 measure.
11    Q   If you look at paragraph 12 of your
12 opening report again, but now sub 2 instead of sub
13 3.
14    A   I see that paragraph.
15    Q   Right.  At the end of that paragraph,
16 you say Google has "possessed that market power in
17 each of the relevant markets in recent years, and
18 likely since at least 2015."
19       Have you expressed any opinions in this
20 case that Google possessed market power in any
21 market prior to 2015?
22    A   I just wanted to say that's not what

50 (Pages 194 - 197)

Page 198

1 this paragraph says.
2    Q  I'm -- that's why I'm asking you the
3 question. I'm not telling you what the paragraph
4 says.
5    A  I see. So what, what is your question
6 again?
7    Q  Do you have an opinion in this case
8 whether Google possessed market power in any
9 market prior to 2015?
10    A  So my opinion here, just to be clear, is
11 that it possesses substantial market power in the
12 three relevant product markets, across both
13 geographic markets. It has possessed that
14 substantial and sustained market power -- or
15 substantial market power in each of the relevant
16 markets in recent years, and likely since at least
17 2015.
18       I'm not providing an opinion for whether
19 it possessed or did not possess substantial market
20 power in the relevant markets before 2015.
21    Q  Are you giving an opinion as to which
22 year Google did acquire substantial market power

Page 199

1 in the relevant -- in the three relevant markets?
2       MR. NAKAMURA: Objection to form.
3       THE WITNESS: I am not providing a
4    precise date.
5       MR. ISAACSON: This would be Exhibit 7.
6       (Exhibit 7 was marked for
7          identification.)
8 BY MR. ISAACSON:
9    Q  Exhibit 7, which has also previously
10 been marked as Ravi Exhibit 3, is an article by
11 Dr. Ravi titled "First-Price Auctions in Online
12 Display Advertising," and the -- you cite this in
13 Footnote 316 of your report, so I'm assuming
14 you've read this article before.
15    A  I have looked at this article.
16    Q  On the first page, there's a section in
17 bold titled "Evolution of the Display Advertising
18 Market."
19    A  I see that.
20    Q  And Dr. Ravi writes, "Display
21 advertising, with an estimated market share of
22 54 percent in the United States, has grown to be a

Page 200

1 significant proportion of the digital advertising
2 market."
3       Do you understand that when Dr. Ravi
4 talks about the display advertising market, he's
5 referring to a market that would include websites,
6 social media networks and, and/or mobile apps?
7       MR. NAKAMURA: Objection to form.
8       THE WITNESS: I don't know the
9    calculations here, nor do I know whether --
10    the value of whether what he's calling a
11    market is a relevant antitrust market.
12       (Reporter clarification.)
13       THE WITNESS: Whether, whether he has
14    examined whether what he is calling a market
15    is a relevant antitrust market.
16 BY MR. ISAACSON:
17    Q  Do you have an opinion in this case as
18 to whether there is a display advertising market
19 in the United States?
20       MR. NAKAMURA: Objection to form.
21       THE WITNESS: Could you describe what
22    you mean by that term?

Page 201

1 BY MR. ISAACSON:
2    Q  I'm just going to give you the term and
3 ask you if you have an opinion based on your
4 knowledge of those terms.
5       Do you have an opinion as to whether
6 there is a display advertising market in the
7 United States?
8       MR. NAKAMURA: Objection to form.
9       THE WITNESS: So I'm not expressing an
10    opinion whether there's a relevant antitrust
11    market that comprises the general term of
12    "display advertising."
13 BY MR. ISAACSON:
14    Q  Now, in your report you discuss -- I'm
15 done with this article.
16       Your report discusses that "larger and
17 more sophisticated advertisers often use DSPs, but
18 often also use advertiser networks."
19       Do you generally remember that?
20    A  Can I revise my previous answer to your
21 question? I misspoke.
22       So in my rebuttal report, I do express

51 (Pages 198 - 201)

Page 222

1  BY MR. ISAACSON:
2  Q  Yes, it is.  We're talking about this
3  chart.
4  A  Yeah.
5  Q  So did I, did I read the chart
6  correctly?
7  A  AdX had a 20 percent take rate over the
8  period of 2020 --
9  THE REPORTER:  Say that again.  I'm
10  sorry.
11  THE WITNESS:  AdX had approximately a
12  20 percent take rate from 2020 to the end of
13  '22.  The average third-party exchange take
14  rate was less than that, and as we discussed
15  before, the AdX share sometime in 2020
16  touched 60 percent; at the end of '22, ended
17  around 45 percent.
18  BY MR. ISAACSON:
19  Q  All right.  You talked about, before
20  about doing an analysis of a hypothetical
21  monopolist.
22  The -- when you're looking at prices

Page 223

1  charged by a hypothetical monopolist to decide
2  whether they're above competitive levels, you
3  would look at quality-adjusted prices; is that
4  correct?
5  A  The exercise that I think you are
6  referring to is examining a hypothetical
7  monopolist for the purpose of market definition.
8  In that analysis, one examines whether a
9  hypothetical monopolist of a set of products can
10  exercise significant market power, which includes
11  being able to price products above competitive
12  levels or degrade quality below competitive
13  levels.
14  Q  The -- and in analyzing market power and
15  whether that exists, when looking at prices, you
16  would also look at whether -- you would also look
17  at quality-adjusted prices, correct?
18  MR. NAKAMURA:  Objection to form.
19  THE WITNESS:  When examining market
20  power, it's important to consider the quality
21  of a product.  We discussed a measure of
22  quality earlier today, which is the ability

Page 224

1  of an ad tech product to monetize inventory,
2  and you would look at the price the product
3  would charge.
4  BY MR. ISAACSON:
5  Q  And in looking at whether prices are
6  above competitive levels in comparing products,
7  you would also compare them -- let me start over.
8  In looking at whether prices are above
9  competitive levels, you would also look at
10  quality-adjusted prices, correct?
11  A  You would consider the extent to which a
12  product has quality or prices that would deviate
13  from competitive levels.
14  Q  You just said "quality or prices."  That
15  wasn't my question.
16  In looking at whether prices are above
17  competitive levels, an economist looks at
18  quality-adjusted prices, correct?
19  MR. NAKAMURA:  Objection to form.
20  THE WITNESS:  That is one thing one
21  would factor in.  For example, if two
22  products have different features or qualities

Page 225

1  that they offer customers, they may be
2  offered at different prices, but that doesn't
3  necessarily mean those prices are not at
4  competitive levels.
5  What's relevant is the extent to which,
6  for example, other products that enter with
7  similar features or cost structures, would
8  that result in price levels falling or
9  quality levels increasing, and if so, that is
10  evidence that prevailing price levels or
11  quality levels are not at competitive levels.
12  BY MR. ISAACSON:
13  Q  All right, and when you say "what's
14  relevant is the extent to which, for example,
15  other products that enter with similar features or
16  cost structures," by "similar features," that's --
17  you're referring to quality, correct?
18  MR. NAKAMURA:  Objection to form.
19  THE WITNESS:  So a quality advantage for
20  a product is --
21  BY MR. ISAACSON:
22  Q  Try to listen to my question.

57 (Pages 222 - 225)

Page 230

1 price comparisons for ad exchanges?
2    A   So in my analysis, when opining on
3 market definition and market power, I am
4 accounting for quality differences in my analysis.
5    Q   So do you consider yourself to have done
6 a price comparison that was quality adjusted for
7 ad exchanges?
8       MR. NAKAMURA: Objection to form.
9       THE WITNESS: What I've done in terms of
10      directly comparing fees is comparing their
11      take rates. In my subsequent analysis, to
12      support opinions regarding market definition
13      and market power, I account for these
14      monetization differences and indeed note that
15      they're a source of AdX's market power.
16 BY MR. ISAACSON:
17    Q   I don't know why this is difficult to
18 answer yes or no.
19       Do you consider yourself to have done a
20 quality-adjusted price comparison for the prices
21 of exchanges?
22       MR. NAKAMURA: Objection to form.

Page 231

1       THE WITNESS: So I compared the take
2       rates across different exchanges, as we
3       discussed, and in the rest of my analysis, I
4       examined the extent to which those price
5       differences are attributable to things like
6       quality.
7 BY MR. ISAACSON:
8    Q   Do you believe you've answered my
9 question with a yes or a no?
10      MR. NAKAMURA: Objection to form.
11 BY MR. ISAACSON:
12    Q   My question is: Do you believe you have
13 done quality-adjusted price comparisons for ad
14 exchanges?
15      MR. NAKAMURA: Same objection.
16      THE WITNESS: It's my same answer. I
17      provided price comparisons of take rates for
18      ad exchanges with analyses of quality
19      differences.
20 BY MR. ISAACSON:
21    Q   And do you believe that's a quality-
22 adjusted price comparison?

Page 232

1       MR. NAKAMURA: Same objection.
2       THE WITNESS: I note in Footnote 723 of
3       my rebuttal report, talking about different
4       CPMs and payouts that ad exchanges provide,
5       and noting that these differences can result
6       from different types of impressions they tend
7       to transact.
8          So there are price comparisons across
9       exchanges that account for the breadth of
10      impressions that exchanges can transact, and
11      that is a measure of quality, so there are
12      price comparisons that account for those
13      quality differences.
14 BY MR. ISAACSON:
15    Q   So do you think you've done a
16 price-adjusted quality comparison for ad exchanges
17 in this case; yes or no?
18      MR. NAKAMURA: Objection to form.
19      THE WITNESS: I performed analyses of
20      fees and prices that, that support my
21      opinions regarding market power. Those
22      opinions account for quality differences.

Page 233

1 BY MR. ISAACSON:
2    Q   So is that "yes"?
3       MR. NAKAMURA: Objection to form.
4       THE WITNESS: I mean I think I provided
5       my answer.
6 BY MR. ISAACSON:
7    Q   And do you have any explanation as to
8 why you can't answer that question yes or no?
9       MR. NAKAMURA: Objection to form.
10      THE WITNESS: I think it's the term
11      you're using is vague.
12 BY MR. ISAACSON:
13    Q   The term I'm using is "quality-adjusted
14 prices," which is a term used throughout your
15 report.
16    A   That is a term that I use in my report.
17    Q   And you consider that term vague?
18    A   I consider your term, "quality-adjusted
19 price comparison," to be vague.
20    Q   The -- you said there's a monetization
21 difference between AdX and other exchanges, right?
22    A   AdX has -- AdX monetizes differently

59 (Pages 230 - 233)

Page 238

1    A  So there --
2    Q  Are you comparing quality-adjusted
3  prices?
4    A  So this analysis here I point to is just
5  comparing their ad serving fees.
6    Q  And do you know anything about the
7  quality of the Equativ publisher ad server?
8    A  I know things about the features, but I
9  believe publishers, by and large, use DFP, and
10  part of that is due to its exclusive access to
11  realtime bids from AdX.
12    Q  And you've done an analysis in this case
13  that, without looking at quality-adjusted prices,
14  just looking at prices, that controlling for
15  changes in the composition of publishers over
16  time -- controlling for changes in the composition
17  of publishers over time, the fees for DoubleClick
18  for Publishers have remained relatively flat
19  between 2014 and 2023?
20      MR. NAKAMURA:  Objection to form.
21      THE WITNESS:  So I have performed an
22    analysis using DFP ad serving fees that I

Page 239

1    have noted that those fees remain relatively
2    flat, controlling for changes in the
3    composition of publishers over time.
4  BY MR. ISAACSON:
5    Q  And you also agree that the take rate
6  for AdX has remained largely constant over time?
7      MR. NAKAMURA:  Objection to form.
8      THE WITNESS:  It's my understanding that
9    the AdX take rate, on average, for open-web
10    display inventory has been approximately
11    20 percent since the early 2010s, 2012, and
12    perhaps earlier as well.
13  BY MR. ISAACSON:
14    Q  And do you know if AdX's take rate has
15  remained constant on a quality-adjusted basis?
16      MR. NAKAMURA:  Objection to form.
17      THE WITNESS:  I don't recall performing
18    that analysis.  It wasn't necessary for my
19    opinions.
20  BY MR. ISAACSON:
21    Q  And the DoubleClick for Publishers fees
22  that you say remain constant, have you done a --

Page 240

1  do you know whether those fees remain constant on
2  a quality-adjusted basis?
3      MR. NAKAMURA:  Objection to form.
4      THE WITNESS:  I haven't performed that
5    analysis.  It wasn't necessary for my
6    opinions.
7  BY MR. ISAACSON:
8    Q  If we can go back to your E pages of
9  your first report, so page E-2.
10    So looking at your Figure 110, am I
11  correct that ██████ ████ ████ and ████
12  four out of the six exchanges reported in that
13  year, all charged higher take rates than AdX?
14      MR. NAKAMURA:  Objection to form.
15      THE WITNESS:  What year are you looking
16    at?
17  BY MR. ISAACSON:
18    Q  2018.
19    A  Oh, in 2018.
20      MR. NAKAMURA:  Same objection.
21      THE WITNESS:  So you mentioned ████
22    and the others are --

Page 241

1  BY MR. ISAACSON:
2    Q  Charging higher take rates than Google
3  AdX.
4    A  So in 2018, ████ ████ ████ and
5  ████ --
6      THE REPORTER:  Say that again.
7      THE WITNESS:  ██████ ████ ████
8    and ██ -- scratch ████ but ████ ████
9    and ██████ have calculated open-web
10    indirect display take rates that are above
11    20 percent.
12  BY MR. ISAACSON:
13    Q  And so actually, I think you mentioned
14  before this table is an annual basis.  So when it
15  says January 2018, is this a number for the whole
16  year?
17    A  This is not the table I referenced
18  earlier.
19    Q  Is this -- so is this a number for
20  January or is it for the whole year?
21    A  This one is the January of each year.
22      MR. NAKAMURA:  Counsel, we've been going

61 (Pages 238 - 241)

Page 242

1  for over an hour, so if we could stop for a
2  break.
3      MR. ISAACSON:  Sure.  Well, it's a
4  matter of whether you want me to keep going
5  to finish this table here.
6      MR. NAKAMURA:  Make it quick.
7  BY MR. ISAACSON:
8      Q   The -- so in January 2018, were
9  ███████    and ███████ charging prices above
10 competitive levels?
11     MR. NAKAMURA:  Objection to form.
12     THE WITNESS:  So I'm not opining on what
13 the competitive levels precisely are.  I
14 don't know the extent to which ███████
15 ███████ or ███████ were able to profitably
16 price at these levels, nor, sitting here, do
17 I know precisely the volume that they
18 transacted these higher rates.
19 BY MR. ISAACSON:
20     Q   So for example, just the fact that
21 ███████ is charging a 26 percent take rate and
22 Google AdX is -- well, let me say this

Page 243

1  differently.
2      The fact that three out of the six
3  companies reported for January 2018 are charging
4  higher take rates than Google AdX at that time
5  does not mean that those companies are charging
6  prices above competitive levels; is that correct?
7      A   Oh, no.  My statement earlier was that I
8  had not opined the exact number of
9  supracompetitive prices, but those are likely
10 higher.  I was noting that it's not clear the
11 extent to which they are profitably charging those
12 prices, and with ███████ you see that those take
13 rates fall in the subsequent years.
14     Q   The -- and so do you have an opinion
15 then that in that year, that the prices above
16 20 percent are supracompetitive?
17     MR. NAKAMURA:  Objection to form.
18 BY MR. ISAACSON:
19     Q   In January 2018?
20     MR. NAKAMURA:  Objection to form.
21     THE WITNESS:  Well, I think this comes
22 back to your point regarding

Page 244

1  quality-adjusted.  I think, for example,
2  ███████ in my rebuttal report, I describe
3  why the product it offers is differentiated,
4  and one needs to account for those
5  differences when evaluating whether a given
6  product's take rate in nominal terms is
7  supracompetitive.
8      It's my opinion that Google AdX, its
9  20 percent fee is supracompetitive.
10 BY MR. ISAACSON:
11     Q   So in January 2018, it's your opinion
12 that Google AdX's 20 percent take rate is
13 supracompetitive or above competitive levels,
14 and -- but you don't have that opinion about
15 ███████ who is charging 37 percent, because they
16 are offering a differentiated product, and you
17 need to account for those differences?
18     A   I'm expressing an opinion of Google
19 AdX's take rate of 20 percent being
20 supracompetitive.
21     Q   Yes, but you've also said that in
22 order -- in order to determine whether ███████

Page 245

1  37 percent take rate is above competitive levels
2  or supracompetitive, you would need to account for
3  the differences of ███████ compared to the other
4  exchanges, correct?
5      MR. NAKAMURA:  Objection to form.
6      THE WITNESS:  I think there are features
7  that I would want to analyze before
8  expressing an opinion.  Even within a
9  relevant antitrust product market, products
10 may be differentiated.  With ███████ I just
11 point to Footnote 723 of my rebuttal report
12 that discusses that particular exchange.
13 BY MR. ISAACSON:
14     Q   And with respect to the, to the
15 exchanges in your Figure 110 where you are
16 displaying take rates across several years, you
17 did not do any comparisons of the features of
18 those exchanges or their quality as compared to
19 AdX; is that correct?
20     MR. NAKAMURA:  Objection to form.
21     THE WITNESS:  So, for example, the
22 footnote I referenced just before talks about

62 (Pages 242 - 245)

Page 266

1  this case that Google Ads could be considered a
2  tying product?
3      MR. NAKAMURA: Objection to form.
4      THE WITNESS: So as an economist, I'm
5   noting that tying can be defined as
6   conditioning access to an important product
7   the firm controls on the purchase of another
8   product that the firm also controls.
9  BY MR. ISAACSON:
10     Q   So I want to focus you on where you're
11  referring to market A, the tying product.
12     Do you see that?
13     A   So this paragraph --
14     Q   Let me ask the question.
15     Do you see "market A tying product"?
16     A   So tying product refers to the product
17  that customers desire in market A.
18     Q   Yes.
19     A   That is the tying product.
20     Q   You have not alleged that Google Ads is
21  a tying product in this case?
22     MR. NAKAMURA: Objection to form.

Page 267

1      THE WITNESS: My opinion is that Google
2   is foreclosed access to Google Ads,
3   unrestricted access to Google Ads to rival ad
4   exchanges, and as a matter of economics, the
5   unrestricted access to Google Ads is
6   conditioned on the use of Google's AdX
7   product in the exchange market, or
8   potentially through AdSense.
9  BY MR. ISAACSON:
10     Q   So that wasn't my question, sir. I
11  think you know what my question was.
12     Look at "tying product."
13     Do you see that in your report?
14     A   I see --
15     Q   Do you see the words "tying product"
16  right after market A? Do you see that?
17     A   I do see that.
18     Q   Okay. Have you given an opinion in this
19  case that Google Ads is a tying product?
20     MR. NAKAMURA: Objection to form.
21     THE WITNESS: So I'm not offering a
22   legal opinion on --

Page 268

1  BY MR. ISAACSON:
2      Q   I'm not asking you for any --
3      A   -- tying product.
4      Q   -- legal opinions. Let me, let me just
5   be clear. I'm asking you for an opinion as an
6   economist, okay?
7      Have you given an opinion in this case
8   that Google Ads is a tying product in a market?
9      MR. NAKAMURA: Objection to form.
10     THE WITNESS: I have given the opinion
11  that unrestricted access to Google Ads is
12  conditioned on the use of Google's other ad
13  tech products, including AdX. As an
14  economist, that satisfies this definition I'm
15  providing in this paragraph.
16  BY MR. ISAACSON:
17     Q   So how -- in this case, have you -- are
18  you giving the opinion that Google Ads is a tying
19  product in a relevant market?
20     MR. NAKAMURA: Objection to form.
21     THE WITNESS: My opinion is, again, that
22  Google Ads -- scratch that.

Page 269

1      My opinion is that unrestricted access
2   to Google Ads is conditioned on the user
3   access to AdX and AdSense.
4  BY MR. ISAACSON:
5      Q   So I'm getting the sense --
6      A   As an economist --
7      Q   -- you don't want to answer this
8   question, because you keep saying -- telling me
9   about unconditional access. That's fine. You
10  have that opinion. You said it several times.
11     But I want to know specifically, not a
12  legal opinion, as an economist using the terms of
13  your report, are you giving the opinion that
14  Google Ads is a tying product in a relevant
15  market?
16     MR. NAKAMURA: Objection to form.
17     THE WITNESS: So as I write in this
18  paragraph, one method through which firms can
19  foreclose rivals from access to an important
20  input or resource is by tying. I note that
21  tying is conditioning access to a resource or
22  input to the purchase or use of another

68 (Pages 266 - 269)

Page 270

1    product the firm also controls.
2        In this case, those conditions can be
3    used to describe the relationship between
4    unrestricted access to Google Ads and the use
5    of Google's other ad tech products, including
6    AdX and AdSense.
7    BY MR. ISAACSON:
8      Q   So I'm going to be blunt with you, sir.
9    We're going to make the statement to the court
10   that you have not defined Google Ads as a tying
11   product in a relevant market, all right?
12       Are you going to say that that's true or
13   false?
14       MR. NAKAMURA:  Objection to form.
15       THE WITNESS:  As an economist, one way
16    of describing the relationship between Google
17    Ads and AdX is that Google has conditions on
18    tied access to Google Ads demand on the use
19    of its AdX exchange product.
20   BY MR. ISAACSON:
21     Q   So are you going to tell the court that,
22   yes, as an economist, you have described Google

Page 271

1    Ads as a tying product in a relevant market?
2        MR. NAKAMURA:  Objection to form.
3        THE WITNESS:  As an economist, I would
4     not use that language.  I would use the
5     language that I provided, that unrestricted
6     access to Google Ads is conditioned on use or
7     tied to the use of AdX and AdSense.
8    BY MR. ISAACSON:
9      Q   Right, and you have not defined any
10   market in this case where the products would
11   include advertising through Google Ads, correct?
12     A   I have --
13       MR. NAKAMURA:  Objection to form.
14       THE WITNESS:  I have defined a market.
15    Let me scratch that.
16    I have evaluated a relevant product
17    market, advertiser ad networks, that contains
18    Google Ads.
19   BY MR. ISAACSON:
20     Q   Right.  You, you, you've defined markets
21   in this case with ad technology, correct?  You
22   have not defined a market where the products are

Page 272

1    actual advertising, correct?
2        MR. NAKAMURA:  Objection to form.
3        THE WITNESS:  I define -- I evaluated
4     relevant product markets, as you noted, which
5     contain ad tech products.
6    BY MR. ISAACSON:
7      Q   And you have not evaluated relevant
8    product markets where advertising, including
9    advertising through Google Ads, is a relevant
10   product market?
11       MR. NAKAMURA:  Objection to form.
12       THE WITNESS:  I'm not expressing the
13    opinion in the relevance of a product market
14    comprising advertising.  Is that --
15   BY MR. ISAACSON:
16     Q   I think you've, I think you've answered
17   the question.  Thank you.
18       The -- now, with respect to the
19   geographic scope of the market, you expressed an
20   opinion that there's a relevant geographic market
21   that's worldwide for all three of your product
22   markets, correct?

Page 273

1      A   So I evaluate a worldwide geographic
2    market, excluding certain regions, for the three
3    relevant product markets.
4      Q   So for shorthand, I'm going to use the
5    term "worldwide market."  I understand that you
6    exclude certain regions.  I just don't want to
7    have to say that every time.
8        The -- in addition to a worldwide
9    geographic market, you also agree that the United
10   States is a relevant geographic market for the
11   three markets you've defined in this case,
12   correct?
13     A   I also opine that the United States is a
14   relevant geographic market for the three product
15   markets.
16     Q   In general, drawing a broad market
17   violates principles articulated by the Department
18   of Justice and Federal Trade Commission that
19   relevant markets should be narrowly defined,
20   correct?
21       MR. NAKAMURA:  Objection to form.
22       THE WITNESS:  I don't agree with that

69 (Pages 270 - 273)

Page 274

1    characterization.
2    BY MR. ISAACSON:
3        Q   Why don't you look at paragraph 326 of
4    your rebuttal report, and Footnote 510.
5            In Footnote 510, did you write, "Drawing
6    such a broad market also violates the principle
7    that has been articulated by the Department of
8    Justice and Federal Trade Commission that relevant
9    markets, when used for computing market shares,
10   should be narrowly defined."
11       A   "When used for computing market shares
12   should be narrowly defined," there is a
13   parenthetical in that quote.
14       Q   I'm going to ask you that. I'm going to
15   ask you that next.
16           So then did you also quote the merger
17   guidelines, saying, "Defining a market broadly to
18   include relatively distant product or geographic
19   substitutes can lead to misleading market shares."
20       A   I see that.
21       Q   And did you also quote it, saying,
22   "Market shares of different products that narrowly

Page 275

1    define markets are more likely to capture the
2    relative competitive significance of these
3    products, and often more accurately reflect
4    competition between close substitutes."
5            Did you also quote that?
6        A   I did quote that.
7        Q   And did you also quote the guidelines
8    saying, "Because the relative competitive
9    significance of more distant substitutes is apt to
10   be overstated by their share of sales, when the
11   agencies rely on market shares and concentration,
12   they usually do so in the smallest relevant
13   market, satisfying the hypothetical monopolist
14   test."
15       A   I see that.
16       Q   Okay. In this case, you've given the
17   opinion that both the broad worldwide market and
18   the United -- and the narrower United States
19   geographic market are appropriate relevant markets
20   in this case; is that right?
21       A   I do, and I describe at length why I do
22   so in my reports.

Page 276

1        Q   Have you evaluated information --
2    reviewed information in this case that says that
3    the -- that shows that the value of advertising
4    impressions varies greatly across countries in the
5    world?
6            MR. NAKAMURA: Objection to form.
7            THE WITNESS: I believe I have seen that
8        evidence as well as advertisers transacting
9        across country boundaries.
10   BY MR. ISAACSON:
11       Q   The -- you've seen evidence that, for
12   example, advertising impressions in the United
13   States and in Europe are much higher than the rest
14   of the world?
15           MR. NAKAMURA: Objection to form.
16           THE WITNESS: Can you repeat your
17       question, please.
18   BY MR. ISAACSON:
19       Q   Sure.
20           Have you seen evidence that the cost of
21   advertising impressions in the United States and
22   in some parts of Europe are much higher than the

Page 277

1    rest of the world?
2            MR. NAKAMURA: Objection to form.
3            THE WITNESS: I have seen information
4        indicating that digital advertising prices
5        can vary across countries.
6    BY MR. ISAACSON:
7        Q   And that --
8        A   Probably it's based on user location. I
9    don't remember the precise metric of which those
10   calculations are measured.
11       Q   And those price differences between
12   countries are a relevant consideration in, in
13   defining a geographic market, correct?
14       A   So I don't recall your statement
15   corresponding to the prices of the ad tech
16   products, which are the components of the relevant
17   product markets.
18       Q   Okay. Are you -- have you looked at the
19   price differences between ad tech products across
20   the worldwide markets, across your worldwide
21   market?
22           MR. NAKAMURA: Objection to form.

70 (Pages 274 - 277)

1    THE WITNESS: So, for example, AdX -- I,
2    I report take rates across the worldwide and
3    U.S. geographic markets, noting that, for
4    example, AdX has 20 percent.
5    BY MR. ISAACSON:
6    Q   Right. So that's a take rate.
7       So when you say 20 percent of the cost
8    of an impression, if the costs of the impressions
9    vary widely across the world, then the amount of
10   money you take in will vary widely across the
11   world; isn't that mathematically right?
12      MR. NAKAMURA: Objection to form.
13      THE WITNESS: In this -- in the ad tech
14      industry for many products, prices are quoted
15      as take rates or margins. We spent much of
16      today talking about prices as measured as
17      such.
18   BY MR. ISAACSON:
19   Q   Right. When we've been talking about
20   prices today, we're talking about a percentage
21   take rate, the equivalent of a commission, a
22   20 percent commission, for example. We have not

1    been actually talking about the money that's
2    actually taken in from an advertisement or from an
3    ad tech, from an ad tech transaction?
4       I won't bother you with that question.
5       The, the -- do you agree there are
6    differences in regulatory frameworks across the
7    United States that are applicable to ad tech?
8       MR. NAKAMURA: Objection to form.
9       THE WITNESS: I'm aware that, for
10      example, the French competition authority,
11      for example, has some different regulations
12      on the operation --
13   BY MR. ISAACSON:
14   Q   Have you done any --
15   A   -- of the --
16   Q   Have you done any analysis of, of
17   regulatory comparisons, other than France, for
18   advertising technology across the globe?
19      MR. NAKAMURA: Objection to form.
20      THE WITNESS: I believe I have. I just
21      can't, sitting here today, recall all
22      references and analyses that I, I did.

1    BY MR. ISAACSON:
2    Q   Do you think that the fact that
3    advertisements are in different languages in
4    different countries is pertinent to deciding
5    whether there is a worldwide or a U.S., United
6    States market?
7       MR. NAKAMURA: Objection to form.
8       THE WITNESS: Well, stepping back, my
9       opinion is that both the worldwide, with the
10      caveats, and the United States are relevant
11      geographic markets.
12      With respect to the worldwide geographic
13      market, I describe the reasons why it is
14      appropriate, in particular the fact that
15      customers of all three product markets
16      transact across country and region
17      boundaries, U.S. publishers do not only
18      receive advertising dollars from U.S.
19      advertisers.
20      Secondly, supply-side competition among
21      these ad tech products is global. When we
22      think about scale, impressions are not

1    necessarily restricted to country boundaries.
2       And third, Google's conduct that I
3       examined is not specific to a single country.
4    BY MR. ISAACSON:
5    Q   So I'll move to strike the answer.
6       I asked you whether language differences
7    were pertinent.
8       So are language differences relevant to
9    deciding whether there's a worldwide market?
10   A   What is relevant, among other factors,
11   is the extent to which the geographic region
12   defined is useful and informative for
13   understanding the competitive effects of Google's
14   conduct.
15   Q   I'm just asking whether language
16   differences are relevant in the worldwide -- in
17   determining whether there's a worldwide market.
18   A   Insofar as differences that you
19   mentioned undermine the importance of the other
20   reasons why the worldwide market is appropriate,
21   they would be considerations.
22      MR. ISAACSON: The -- this will be

71 (Pages 278 - 281)

Page 282

1    Exhibit 9.
2        (Exhibit 9 was marked for
3        identification.)
4    BY MR. ISAACSON:
5        Q    All right.  Exhibit 9 is Bates-stamped
6    ATT-GCID-00111234 through 288.
7        All right.  This is a document produced
8    by Xandr in this case, and if you look at 241 at
9    the bottom, it says at the top of that page,
10   "█ percent of Xandr's current sale-side revenue
11   comes from the EMEA."
12       You understand that's Europe/Middle
13   East/Africa, right?
14   A    I do understand EMEA stands for what you
15   said.
16   Q    So it says, "█ percent of Xandr's
17   current sell-side revenue comes from EMEA, where
18   competitive dynamics and customer needs differ
19   meaningfully from the United States."
20       Have you seen evidence in this case that
21   different -- for different regions of the world,
22   competitive dynamics and customer needs differ

Page 283

1    meaningfully for ad tech?
2        MR. NAKAMURA:  Objection to form.
3        THE WITNESS:  I recall seeing
4        differences in sales or, or shares of, of
5        different products across different regions.
6        I think -- I cite to other Google documents
7        that talk about some differences across EMEA
8        versus other geographic regions, like the
9        Americas and APAC.
10   BY MR. ISAACSON:
11   Q    Okay.  This document says
12   "Competitive" -- this Xandr document says,
13   "Competitive dynamics differ meaningfully from the
14   United States."
15       For any of the ad technology you've been
16   discussing in this case, have you seen documents
17   saying the competitive dynamics for ad tech do not
18   differ meaningfully from the United States?
19       MR. NAKAMURA:  Objection to form.
20       THE WITNESS:  It's hard to affirm to
21       the -- confirm a negative, but sitting here
22       today, I don't recall.

Page 284

1    BY MR. ISAACSON:
2        Q    Have you seen any business documents in
3    this case that say the competitive dynamics for ad
4    tech in the United States are comparable to the
5    rest of the world?
6        MR. NAKAMURA:  Objection to form.
7        THE WITNESS:  I don't, sitting here
8        today, recall any such documents.
9    BY MR. ISAACSON:
10       Q    And we discussed before that the United
11   States is seeking damages on behalf of federal
12   agency advertisers.
13       Have you seen any data suggesting
14   federal agency advertisers purchase ad inventory
15   outside the United States?
16       MR. NAKAMURA:  Objection to form.
17       THE WITNESS:  Sitting here today, I, I
18   don't recall seeing that information.
19       MR. ISAACSON:  The -- this will be the
20   next exhibit, Exhibit 10.
21       (Exhibit 10 was marked for
22       identification.)

Page 285

1    BY MR. ISAACSON:
2        Q    All right.  This is another
3    Microsoft/Xandr document.  It is Bates-stamped
4    MSFT-LIT-0000000137.  It's a native document, so
5    it's 115 pages.
6        The -- looking at page 17, this document
7    from Xandr, which is owned by Microsoft, it says,
8    "In the United States, Xandr's core market is
9    limited in scale and highly competitive."
10       The -- and you see that Xandr's core
11   segment there includes "Display, Digital Video,
12   Advance TV, Traditional TV."
13   A    So I haven't had a chance to review this
14   whole slide deck.  I'm only looking at page 17.
15   Q    Well, then let me ask you to look at
16   page 15.  That will be easier.
17       It says, "Global ad spending is
18   increasing" -- oh, I'm sorry.  Page 16.
19       "Global ad spending is increasing, with
20   international growth outpacing the United States."
21       Do you see that at the top?
22   A    I see that.

72 (Pages 282 - 285)

Page 286

1    Q    And then there's ad spend by regions of
2 the world, and Xandr's conducting a separate
3 analysis for the United States, Europe, Middle
4 East, Africa, Latin America, and APAC.
5         Have you, have you seen other business
6 documents breaking up the world into different
7 regions from ad tech companies?
8    A    So as I noted before, and I do cite to
9 Google documents which look at Americas, APAC,
10 EMA, and one of those documents talks about the
11 overlap between the buy-side and sell-side
12 interacting across two regions.
13   Q    And do the Google documents also discuss
14 that there are competitive differences for
15 different -- for their, for their, for their
16 products in different parts of the world?
17        MR. NAKAMURA:  Objection to form.
18        THE WITNESS:  There may.  I don't recall
19        the Google documents explicitly off the top
20        of my mind that make any such explicit
21        call-outs, but they may exist.
22

Page 287

1        MR. ISAACSON:  All right.  Why don't we
2 take a break.  I have to decide what I'm
3 going to do with my remaining time.  Off the
4 record.
5        THE VIDEOGRAPHER:  Going off the record
6 at 5:14 p.m.
7        (Whereupon, a short recess was
8        taken.)
9        THE VIDEOGRAPHER:  We're now back on the
10 record at 5:30 p.m.
11       You may proceed.
12 BY MR. ISAACSON:
13   Q    All right.  Turning to the subject of
14 Admeld, following the acquisition of Admeld by
15 Google, Google merged Admeld in AdX -- into AdX,
16 correct?
17       MR. NAKAMURA:  Objection to form.
18 BY MR. ISAACSON:
19   Q    Let me -- following the acquisition,
20 Google merged the Admeld products and AdX products
21 together, correct?
22       MR. NAKAMURA:  Objection to form.

Page 288

1        THE WITNESS:  So after the acquisition
2 of Admeld, it's my understanding Google began
3 replicating some of Admeld's features into
4 AdX and DFP.
5 BY MR. ISAACSON:
6    Q    And do you know what Admeld
7 functionality was put into AdX?
8    A    My understanding is that there was some
9 functionalities related to yield management, in
10 particular managing static networks that were
11 built post the acquisition within AdX and DFP, but
12 certain features that Admeld offered were not
13 integrated or were eliminated.
14   Q    When you refer to "yield management," is
15 that also called "yield optimization"?
16   A    So yield management can refer to many
17 things in this, in this industry.  What I'm
18 referring to is what so-called yield managers
19 around 2010 help publishers do.  So many things
20 help publishers manage or optimize yield
21 monetization.
22       What I discuss in my report with respect

Page 289

1 to yield management is the ability to deal with
2 so-called "managed networks," and again, help a
3 publisher rank in their waterfall different ad
4 networks, and that might have been called yield
5 optimization as well.
6    Q    Okay.  That yield management
7 functionality that you were just describing was
8 incorporated into AdX, correct?
9    A    So some additional versions of yield
10 management capabilities after the Admeld
11 acquisition were built into Google's ad tech
12 products.  I don't know precisely whether they
13 were into DFP or into AdX.
14   Q    All right.  So, but the -- to your
15 knowledge, the Admeld yield management
16 functionality was incorporated into Google
17 products, whether it was DoubleClick for
18 Publishers or AdX?
19   A    So it's my understanding that functions
20 that Admeld used to offer, some of them were
21 later, some of them rebuilt into the AdX or DFP
22 platform, and some features, notably, realtime

73 (Pages 286 - 289)

Page 290

1  bidding into third-party publishers ad servers,
2  were not brought over or incorporated with
3  Google's products.
4      Q   Were there any functions of Admeld that
5  you're aware of that were not brought over into
6  Google's products other than realtime bidding into
7  third-party publisher ad servers?
8      A   There may also have been restrictions
9  imposed on customers' ability to use what
10  previously was Admeld with other exchanges or
11  yield managers.  I discuss this here in my report,
12  but the main feature that I describe that was not
13  incorporated was this provision of realtime bids
14  into rival publisher ad servers.
15     Q   So I just want make sure we're -- I
16  understand what you're talking about is your main
17  point.  I'm going to come to that.  I just want to
18  make sure there's no other points here.
19         The -- are you saying that, to your
20  knowledge, Google failed to incorporate Admeld
21  yield management functionality in any respect?
22     A   Can you repeat your question, please.

Page 291

1      Q   Sure.
2          Are you saying that, to your knowledge,
3  Google failed to incorporate any, any part of
4  Admeld's yield management functionality?
5          MR. NAKAMURA:  Objection to form.
6          THE WITNESS:  That is not what I am
7      saying.
8  BY MR. ISAACSON:
9      Q   Is the only Admeld technology that you
10  are aware of that wasn't incorporated into Google
11  products was, was the provision of realtime bids
12  into rival publisher ad servers?
13     A   So one other thing that I describe in my
14  reports is an exchange-like product that Admeld
15  had offered post-acquisition.  My understanding,
16  Admeld's product was shut down, but AdX remained.
17  So insofar as there was a separate ad exchange
18  operated by Admeld, that was not something that
19  continued to be in operation --
20     Q   Right, but referring to functionality,
21  exchange functionality was fully incorporated into
22  AdX following the Admeld acquisition?

Page 292

1          MR. NAKAMURA:  Objection to form.
2          THE WITNESS:  So AdX was allowed for
3      realtime auctions.
4  BY MR. ISAACSON:
5      Q   The only functionality from Admeld that
6  you would -- that you could identify that was not
7  incorporated into a Google product was the
8  provision of realtime bids in the rival publisher
9  ad servers; is that correct?
10     A   So sitting here today, that's the, the
11  primary one I can recall.
12     Q   Right, and so would you have an -- do
13  you have an opinion as to whether the acquisition
14  of Admeld was anticompetitive, separate from the
15  fact that Google did not incorporate realtime bids
16  into rival publisher ad servers?
17         MR. NAKAMURA:  Objection to form.
18         THE WITNESS:  So my opinion regarding
19     the harm to competition arising from the
20     Admeld acquisition includes the actions that
21     Google took subsequent to that acquisition,
22     including the removal of the realtime bidding

Page 293

1  feature.
2  BY MR. ISAACSON:
3      Q   Have you identified in your reports any
4  harm to competition from the Admeld acquisition
5  separate from Google not incorporating the
6  provision of realtime bids into rival publisher ad
7  servers?
8          MR. NAKAMURA:  Objection to form.
9          THE WITNESS:  So one, one of the other
10     sources through which competition was
11     impacted was the elimination of this other ad
12     exchange product that Admeld offered.  It
13     also eliminated an option that customers had
14     to receive realtime bids from a different
15     yield manager.
16         So it's that elimination of a competitor
17     that also harmed competition.
18  BY MR. ISAACSON:
19     Q   Do you -- you've used, I believe, a
20  four-part test to analyze whether there's
21  exclusionary conduct that affects competition
22  adversely in this case?

74 (Pages 290 - 293)

Page 294

1    A   So I, I articulate a four-step
2    framework --
3    Q   Right.
4    A   -- for evaluating the competitive
5    effects --
6    Q   Applying that four --
7    A   -- of Google's conduct.
8    Q   Applying your four-step framework, if
9    the Admeld acquisition went forward and Google had
10   incorporated realtime bidding into third-party
11   exchanges, would you have an opinion whether the
12   acquisition was anticompetitive?
13          MR. NAKAMURA:  Objection to form.
14          THE WITNESS:  So my evaluation of that,
15       the conduct related to Admeld, evaluates the
16       complete, the total -- the totality of
17       acquisition and behavior surrounding it,
18       including the, the removal of, of that
19       feature.  I did not conduct a separate
20       analysis.
21   BY MR. ISAACSON:
22   Q   You did not conduct a separate analysis

Page 295

1    of the acquisition of Admeld apart from Google's
2    failure to incorporate realtime bids into rival
3    publisher ad servers; is that correct?
4          MR. NAKAMURA:  Objection to form.
5          THE WITNESS:  So my analysis
6       incorporated the removal of the realtime bids
7       into rival publisher ad servers as part of,
8       of my analysis.
9    BY MR. ISAACSON:
10   Q   And so returning to my question, if the
11   Admeld acquisition went forward and Google had
12   incorporated realtime bidding into third-party
13   exchanges, am I correct you would not have an
14   opinion whether the acquisition was
15   anticompetitive?
16          MR. NAKAMURA:  Objection to form.
17          THE WITNESS:  I did not conduct that
18       analysis, and I'm not expressing an opinion
19       whether it would be or would not harm
20       competition.
21          MR. ISAACSON:  If we can mark this as
22       Exhibit 11.

Page 296

1          (Exhibit 11 was marked for
2          identification.)
3    BY MR. ISAACSON:
4    Q   Exhibit 11 has previously been marked as
5    Abrontes-Metz Exhibit 17.
6          Did you review the Abrontes-Metz
7    deposition?
8    A   I did not.
9    Q   The -- and you cite this document at
10   note -- Footnote 1069 of your report.  It's
11   Bates-stamped GOOG-DOJ-03606441 to 451.
12          And in your report, you say in paragraph
13   731, you say, "For example, a 2012 client
14   migration document following the acquisition noted
15   that Google did not plan to integrate Admeld's API
16   features that, if allowed, would 'pass realtime
17   AdX pricing into a non-DFP ad server,'" and then
18   do you see you cite this document for that?
19   A   I see that.
20   Q   And in that footnote, you accurately
21   quote that "Admeld can be called via API to serve
22   an ad.  There are a small handful of Admeld

Page 297

1    sellers that currently have API integrations in
2    place at the ad server level."
3          At the time of the acquisition, there
4    was only a small handful, and I'm not sure what
5    that is, two fingers, only a small handful of ad
6    sellers that were using these API integrations to
7    talk to third-party -- to connect to third-party
8    advertisers, correct?
9          MR. NAKAMURA:  Objection to form.
10          THE WITNESS:  That is what this
11       document, as quoted here, states.  Not the
12       two fingers part but the, the small handful
13       part.
14   BY MR. ISAACSON:
15   Q   Right.  The -- and then at 442 of the
16   document, 442, the transition document says in
17   section 2.1 in the first bullet, "Almost all the
18   great Admeld functionality is moving into AdX."
19          That was -- was it your understanding
20   that the Admeld functionality following the
21   acquisition was moving into AdX, with the
22   exception of these APIs that were being used by a

75 (Pages 294 - 297)

1  small handful of Admeld sellers?

2      A   So it's my understanding that the Admeld

3  integration did not include these APIs which would

4  allow for realtime bids to be provided to

5  third-party ad servers.

6      Q   And did -- was it your understanding

7  that that was only being -- that technology that

8  was not being integrated was only being used by a

9  small handful of sellers?

10     MR. NAKAMURA:  Objection to form.

11     THE WITNESS:  So that's consistent with,

12  at the time, realtime bidding emerging, which

13  is really only a decade.  Notably, the other

14  two yield managers identified by Google as

15  potential merging partners, PubMatic and

16  Rubicon started to integrate realtime

17  bidding, and so usage was smaller early on

18  but grew, and it's telling that PubMatic and

19  Rubicon are two of the largest but still very

20  distant ad exchange competitors to AdX today.

21  This API is used by exchanges to provide

22  realtime bids.

1  BY MR. ISAACSON:

2      Q   And in what years do you think PubMatic,

3  Rubicon, and Google launched realtime bidding?

4      A   So I know at the -- in paragraph 727 of

5  my initial report, I note that a 2011 Google slide

6  deck noted that PubMatic has less RTV and that

7  Rubicon may not at the time, but since then,

8  Rubicon is an ad exchange and has incorporated

9  realtime bidding.

10     Q   Right.  Do you know which ad exchanges

11  launched realtime bidding and when?

12     A   Sitting here today, I can't give you the

13  start dates for every exchange.  I don't recall

14  right now off the top of my head.

15     MR. ISAACSON:  All right.  This will be

16  marked as Exhibit 12.

17     (Exhibit 12 was marked for

18     identification.)

19  BY MR. ISAACSON:

20     Q   The, the -- Exhibit 12 has also been

21  previously marked as Abrontes-Metz Exhibit 19,

22  Bates stamp GOOG-DOJ-03610002 through 4.

1      In the overview, you will see it's

2  discussing "an outstanding request from publishers

3  has been to support server-side integration, such

4  that a publisher's first- or third-party ad server

5  would invoke AdX," and then there's a business

6  analysis that follows.

7      A   I don't see a date for this document.

8      Q   The date of the document is February 5,

9  2014.  That may come from the metadata.

10     A   Do you have the metadata for this

11  document?

12     Q   I didn't bring it with me, no.  I have

13  recorded that it's February, February 5, 2014.

14     The -- and you see there's a business

15  analysis of the APIs that would connect to

16  third-party exchanges?

17     A   I see the words "Business Analysis" on

18  page 003.

19     Q   And on 003 under "Costs/Risks," the

20  first thing it says is, "The development for this

21  feature is not easy, and this was proved by

22  Admeld.  From Brian Adams: 'We did several

1  server-side integrations at Admeld (including with

2  Criteo), and they were plagued with ongoing

3  issues.'"

4      Did you do any investigation of

5  technical problems with the functionality that

6  Admeld had for connecting to third-party

7  exchanges?

8      MR. NAKAMURA:  Objection to form.

9  BY MR. ISAACSON:

10     Q   Third-party ad servers.

11     MR. NAKAMURA:  Same objection.

12     THE WITNESS:  So you're saying this is a

13  2014 document?

14  BY MR. ISAACSON:

15     Q   Yes.

16     A   This is around the time, my

17  understanding, that Header Bidding was emerging,

18  which allowed exchanges to provide realtime bids

19  into publisher ad servers, so I noted that it

20  appeared as though this technology was becoming

21  adopted by ad exchanges.

22     Q   So I'll move to strike that.  That's not

1 even an answer. Just a note you're telling me.
2       The question is: Did you do any
3 investigation of technical problems with the
4 functionality of the Admeld technology that would
5 connect to third-party ad servers?
6       MR. NAKAMURA: Objection to form.
7       THE WITNESS: This is what I was
8    attempting to answer in my previous
9    statement.
10       I'm not opining here as a technical
11    expert, but as an economist, I looked at the
12    provision of features by other products that
13    are available in the market in the same time
14    period, that informs the feasibility of those
15    features being introduced at all.
16 BY MR. ISAACSON:
17   Q   So does it affect your analysis at all
18 when you read a document that says the technology
19 that was not incorporated was "plagued" with
20 problems?
21       MR. NAKAMURA: Objection to form.
22       THE WITNESS: So sitting here today --

1 it is cited? I mean this -- cited in my
2 reports?
3 BY MR. ISAACSON:
4   Q   No, I don't believe this is.
5   A   So for the reasons I described before, I
6 would -- I understand that adding features, as we
7 discussed at the beginning, require costs, but the
8 extent to which this is in 2014, the ability for
9 exchanges to submit realtime bids into publisher
10 ad servers, at least via Header Bidding, indicates
11 to me that technical considerations were not
12 insurmountable.
13   Q   When you read that the document says
14 that the Admeld technology that we are discussing
15 "was plagued with ongoing issues," does that give
16 you any pause in reaching an opinion that it was
17 anticompetitive for Google not to incorporate that
18 technology into AdX?
19       MR. NAKAMURA: Objection to form.
20       THE WITNESS: I would say that the rest
21    of that sentence says, dot, dot, dot, "At
22    this point, I'm more of the mindset of

1 getting folks to flip to DFP than get them
2 DA."
3       The next paragraph says, "Therefore, we
4    should enter into this project only if it's
5    truly economically viable. If we can have
6    customers use DFP SB instead for DA, this may
7    be a much better solution."
8       So as I read this, sitting here today,
9    the author of this document is describing
10    costs and benefits, and one of those benefits
11    is denying something to rival servers so that
12    more customers would join DFP.
13 BY MR. ISAACSON:
14   Q   The author is discussing alternatives to
15 the Admeld technology, correct?
16       MR. NAKAMURA: Objection to form.
17 BY MR. ISAACSON:
18   Q   What you were just reading?
19   A   What I was reading is the cost and risks
20 from what this document is describing; third-party
21 ad server dynamic allocation, so that paragraph
22 or the --

1   Q   That's not talking about incorporating
2 the Admeld technology with APIs, right?
3   A   My understanding of this document is the
4 first page says, "Some publishers have requested
5 integration to directly call AdX from their ad
6 server, specifically without a client-side
7 redirect. This feature was available through
8 Admeld."
9       So that's the feature I understand this
10 document to be discussing.
11   Q   Right. That's the one we saw was being
12 used by a small handful of sellers, correct?
13       MR. NAKAMURA: Objection to form?
14       THE WITNESS: And so the costs/risks on
15    page 2 are talking about, it's my
16    understanding, the cost risks of that
17    feature, and the quote in the first paragraph
18    Costs/Risks is talking about, my
19    understanding, providing a feature like that
20    to a third-party ad server.
21 BY MR. ISAACSON:
22   Q   Exactly. You are talking about -- not

77 (Pages 302 - 305)

Page 306

1  about the fact that they didn't incorporate this
2  technology.  You are talking about why didn't --
3  that they didn't, in your words, "provide a
4  feature like that to third-party ad servers."
5       MR. NAKAMURA:  Objection to form.
6       THE WITNESS:  So previously, Admeld
7    provided its own realtime bids to rival
8    servers.  When the Admeld acquisition
9    happened, Google here is talking about how
10   they're not offering the feature that was
11   available through Admeld is my understanding
12   of this document.
13 BY MR. ISAACSON:
14   Q   Yes, and what you were just saying is
15 that they then were discussing whether they should
16 developed that feature themselves?
17   A   I think I was quoting the document that
18 said "the development for this feature."  That's
19 what I was reading from.
20   Q   The -- do you know who Brian Adams is?
21 And to assist you, it's not the singer.
22   A   I don't -- sitting here today, I don't

Page 307

1  recall.
2    Q   You don't know that he's the founder of
3  Admeld?
4       MR. NAKAMURA:  Objection to form.
5       THE WITNESS:  I don't recall.
6  BY MR. ISAACSON:
7    Q   All right.  If you look at your report
8  at paragraph 707, which is discussing unified
9  pricing, the opening report, and at page --
10 actually, paragraph 711.  Well, no.  Actually, I'm
11 going to ask you about paragraph 707.  I
12 apologize.
13       You quote Jonathan Bellack in paragraph
14 707.  "Jonathan Bellack wrote that another
15 employee raises an interesting point that some
16 publics, referring pubs are raising AdX floors on
17 purpose to make us work harder."
18       If AdX was subject to a higher price
19 floor, then Google advertiser customers bidding on
20 AdX had to pay more in order to win those
21 impressions, correct?
22       MR. NAKAMURA:  Objection to form.

Page 308

1       THE WITNESS:  Sorry.  I missed that.
2    Will you continue to read the quote?
3  BY MR. ISAACSON:
4    Q   No.  I was asking the question, so --
5    A   Oh.
6    Q   Okay.  So I'm sorry if I blurred that
7  for you.
8    A   Yeah.
9    Q   So the quote is:  "Some publishers are
10 raising AdX floors on purpose to make us work
11 harder."
12       Do you see that?
13   A   I see that part of the quote.
14   Q   So my question is:  If AdX was subject
15 to a higher price floor, then Google's advertiser
16 customers bidding on AdX had to pay more in order
17 to win those impressions; is that correct?
18       MR. NAKAMURA:  Objection to form.
19       THE WITNESS:  Not necessarily, and that
20   is evidenced by AdX's sell-side DRS program,
21   which adjusted margins so that publishers
22   could earn more without affecting advertiser

Page 309

1    prices, if AdX reduced its take rate, and
2    that is what competition tends to do is put
3    pressure on the fees.
4  BY MR. ISAACSON:
5    Q   And then if you look at paragraph 711 of
6  your report, you say at the end, "A slide from a
7  May 2019 presentation reports negative press upon
8  subsequent announcement around our intent to unify
9  pricing across all demand sources (including
10 Header Bidding) and disallow the ability to set
11 buyer-specifically floors."
12       Do you see that?
13   A   I see that.
14       Could I have a moment to read the
15 paragraph?
16   Q   Sure.  I'll get a document ready for
17 you.
18       (Exhibit 13 was marked for
19       identification.)
20 BY MR. ISAACSON:
21   Q   I've handed you Exhibit 13, which has
22 also been previously marked as a Abrontes-Metz

78 (Pages 306 - 309)

Page 330

1  BY MR. ISAACSON:
2      Q   In that section have you quantified a
3  reduction in quality or quantity of online
4  content?
5      A   In this section, I do not provide a
6  specific number for that measure.
7          MR. ISAACSON:  I'd love to have more
8  time, but . . .
9          THE VIDEOGRAPHER:  This is the end of
10  the deposition.  We're off the record at
11  6:31 p.m.
12          (Signature having not been
13          waived, the video deposition of
14          ROBIN S. LEE, Ph.D. was concluded
15          at 6:31 p.m.)
16
17
18
19
20
21
22

Page 331

1
2
3
4
5
6      ACKNOWLEDGEMENT OF WITNESS
7      I, Robin S. Lee, Ph.D., do hereby
8  acknowledge that I have read and examined the
9  foregoing testimony, and the same is a true,
10  correct and complete transcription of the
11  testimony given by me, and any corrections
12  appear on the attached Errata sheet signed by
13  me.
14
15
16  _____
17  (DATE)        (SIGNATURE)
18
19
20
21
22  Job No. CS6456904

Page 332

1      E R R A T A  S H E E T
2  IN RE:  United States vs. Google, Inc.
3  RETURN BY:
4  PAGE   LINE        CORRECTION AND REASON
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____
22  (DATE)      (SIGNATURE)
    Job No. CS6456904

Page 333

1
2
3
4
5  CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
6      I, Laurie Donovan, Registered
    Professional Reporter, Certified Realtime
7   Reporter, and notary public for the District
    of Columbia, the officer before whom the
8   foregoing deposition was taken, do hereby
    certify that the foregoing transcript is a
9   true and correct record of the testimony
    given; that said testimony was taken by me
10  stenographically and thereafter reduced to
    typewriting under my supervision; and that I
11  am neither counsel for, related to, nor
    employed by any of the parties to this case
12  and have no interest, financial or otherwise,
    in its outcome.
13
        IN WITNESS WHEREOF, I have hereunto set
14  my hand and affixed my notarial seal this
    23rdh day of March 2024.
15
16  My commission expires:  July 14, 2027
17
18
19  _____
20  LAURIE DONOVAN
    NOTARY PUBLIC IN AND FOR
21  THE DISTRICT OF COLUMBIA
22

84 (Pages 330 - 333)