# EXHIBIT 10

# REDACTED

Page 1

UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF VIRGINIA

-------------------------------------------X
United States et al.,

                        Plaintiff,

                        v.

GOOGLE LLC,

                        Defendant.
-------------------------------------------X

Civil Action No. 1:23-CV-00108


                HIGHLY CONFIDENTIAL

            VIDEOTAPED DEPOSITION

                      OF

                JOHN DEDERICK

            FRIDAY, JULY 28, 2023








Reported by:
CANDIDA BORRIELLO
JOB NO. 6418591-001-001

## Page 2

```
1
2               DATE:  JULY 28, 2023
3               TIME:  9:37 a.m. (Eastern Time)
4
5
6      Deposition of JOHN DEDERICK, held at the
7   offices of PAUL, WEISS, RIFKIND, WHARTON &
8   GARRISON LLP, 1285 6th AVENUE, NEW YORK, NEW
9   YORK 10019, before Candida Borriello, Court
10  Reporter and Notary Public of the State of
11  New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1
2   A P P E A R A N C E S:  (Continued)
3
4   Appearing on Behalf of The Trade Desk and
    the Witness:
5
    LATHAM & WATKINS LLP
6           1271 Avenue of the Americas
            New York, NY 10020
7           (212) 906-1354
    BY:     ELIZABETH PREWITT, ESQ.
8   E-MAIL: Elizabeth.prewitt@lw.com
9            - and -
10  LATHAM & WATKINS LLP
            505 Montgomery Street
11          Suite 2000
            San Francisco, California 94111
12          (415) 395-8259
    BY:     REBECCA SUZANNE MCMAHON, ESQ.
13          AARON T. CHIU, ESQ.
    E-MAIL: becky.mcmahon@lw.com
14          aaron.chiu@lw.com
15
16  ALSO PRESENT:
17          JOE RAGUSO, Videographer
18          JULIE KLEEMAN,
            The Trade Desk
19          In-house Counsel
20          ISABEL M. AGNEW, ESQ.,
            Department of Justice
21          (Via Remote Videoconference)
22          ZACHARY MOZENTER, Economist
            Department of Justice
23          (Via Remote Videoconference)
24
        (Appearances continued on next page.)
25
```

## Page 3

```
1
2   A P P E A R A N C E S:
3
    Appearing on Behalf of the Plaintiff, United
4   States, et al.:
5   U.S. DEPARTMENT OF JUSTICE
    OFFICE OF THE UNITED STATES
6           Liberty Square Building
            450 5th Street NW
7           Washington, DC 20001
    BY:     JEFFREY VERNON, ESQ.
8           AMANDA STRICK, ESQ.
    E-MAIL: jeffrey.vernon@usdoj.gov
9           amanda.strick@usdoj.gov
10
11
    Appearing on Behalf of the Defendant,
12  Google LLC:
13  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
            2001 K Street, NW
14          Washington, DC 20006-1047
            (202) 223-7466
15  BY:     JEANNIE RHEE, ESQ.
            ERICA SPEVACK, ESQ.
16  E-MAIL: jrhee@paulweiss.com
            espevack@paulweiss.com
17
             - and -
18
    AXINN, VELTROP & HARKRIDER LLP
19          114 West 47th Street
            New York, New York 10036
20          (212) 728-2200
    BY:     ANDREW FREEBORN, ESQ.
21  E-MAIL  afreeborn@axinn.com
22
23  (Appearances continued on next page.)
24
25
```

## Page 5

```
1
2   A P P E A R A N C E S:  (Continued)
3
4           IAN EISNER
            The Trade Desk
5           In-house Counsel
            (Via Remote Videoconference)
6
7       For Plaintiffs:
            (Via Remote Videoconference)
8
            JONATHAN HARRISON, ESQ.
9           LAUREN POMEROY, ESQ.
            JULIA TARVER WOOD, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    J. Dederick - Highly Confidential
2    me is Amanda Strick.
3         MS. PREWITT:  I'll just note my
4    appearance as well.  Elizabeth
5    Prewitt, from Latham & Watkins, on
6    behalf The Trade Desk.  Also with us
7    is Adam Chiu and Becky McMahon.  As
8    well as counsel for The Trade Desk
9    Julie Kleeman.
10        MS. RHEE:  I believe the court
11   reporter has the appearances for the
12   record for Google.
13   BY MS. RHEE:
14        Q.   Mr. Dederick, I'm now going to
15   actually direct your attention to the
16   relevant passage of The Trade Desk's annual
17   10-K, okay?
18        A.   Okay.
19        Q.   Now, you understand that this
20   filing by The Trade Desk's submitted yearly
21   to the US Securities and Exchange Commission
22   is a signed statement by the company's chief
23   financial officer pursuant to the
24   requirements of the Securities and Exchange
25   Act, correct?

1    J. Dederick - Highly Confidential
2        A.   I am familiar that this document is
3    intended to notify and advise shareholders
4    and prospective shareholders, yes.
5        Q.   And what happens to companies that
6    make misstatements in these annual 10-K
7    reports?
8        MS. PREWITT:  Objection.  Outside
9    the scope of the notice topics, as
10   well there's no foundation --
11       Q.   You're to answer the question.
12       MS. PREWITT:  Let me finish my
13   objection, I was continuing with an
14   objection, which is, first it's
15   outside the scope.  Second of all, you
16   don't have a factual basis and no
17   foundation to assume that this witness
18   would be knowledgeable on this topic.
19   He's a representative of The Trade
20   Desk on noticed topics that you
21   outlined in your notice.
22       MS. RHEE:  Let's go off the
23   record.
24       THE VIDEOGRAPHER:  All parties
25   agree to go off the record?

1    J. Dederick - Highly Confidential
2        MR. VERNON:  Yes.
3        THE VIDEOGRAPHER:  We are going
4    off the record.  The time is 9:43 a.m.
5        (Whereupon, a brief recess was
6    taken.)
7        THE VIDEOGRAPHER:  We are back on
8    the record.  The time is 9:48 a.m.
9    BY MS. RHEE:
10       Q.   Mr. Prewitt [sic], as The Trade
11   Desk corporate representative, you stand by
12   the company's annual 10-K report's, correct?
13       MS. PREWITT:  Counselor --
14       MR. VERNON:  Objection.  Vague.
15       A.   I'm sorry, you're referring to me?
16       Q.   Yes.
17       MS. PREWITT:  Counsel, for the
18   record, you called him Ms. Prewitt, I
19   think that was the hesitation there.
20       A.   Yeah.
21       Will you repeat the question,
22   please?
23       Q.   I'm sorry.
24       Mr. Dederick, as the company's
25   corporate representative, you stand by the

1    J. Dederick - Highly Confidential
2    company's annual 10-K report, correct?
3        MR. VERNON:  Same objection.
4        A.   Yes.
5        Q.   So, let's actually turn to page 5
6    and to make this go easier, I've highlighted
7    the relevant passage that I want to direct
8    your attention to, okay?
9        So, on the top of the page under
10   the heading Overview, you see where it says:
11       The Trade Desk offers a
12   self-service cloud-based ad buying platform
13   that empowers our clients to plan, manage,
14   optimize and measure more expressive data
15   driven digital advertising campaigns.
16       Do you see that?
17       A.   Yes.
18       Q.   Is that an accurate description of
19   The Trade Desk's business?
20       A.   Yes, The Trade Desk is a DSP and
21   that's an accurate description of a DSP.
22       Q.   Now, the next sentence says:
23       Our platform allows clients to
24   execute integrated campaigns across ad
25   formats and channels, including video, which

Page 14

```
 1        J. Dederick - Highly Confidential
 2   includes Connected TV, CTV, Display, audio,
 3   digital out of home, native and social on a
 4   multitude of devices, such as computers,
 5   mobile devices, televisions and streaming
 6   devices.
 7        Do you see that?
 8   A.   Yes.
 9   Q.   Is that an accurate description of
10   The Trade Desk's business?
11   A.   Yes.  And I would add that when we
12   refer to clients, we refer to media buyers
13   who are leveraging a DSP.
14   Q.   So, continuing on, the next
15   paragraph actually talks about The Trade
16   Desk's clients.
17        Do you see that?
18   A.   Uh-huh.
19   Q.   It says:
20        Our clients are advertising
21   agencies, brands and other service providers
22   for advertisers with whom we entered into
23   ongoing master services agreements.
24        Do you see that?
25   A.   Yes.
```

Page 15

```
 1        J. Dederick - Highly Confidential
 2   Q.   Is that an accurate description of
 3   The Trade Desk's clients?
 4   A.   Yes, and all of those are buyers.
 5   And for clarity, the brands really means
 6   advertisers in that context.
 7   Q.   Now, the next two sentences go on
 8   to state:
 9        We generate revenue by charging our
10   clients a platform fee based on a percentage
11   of a client's total spend on advertising.  We
12   also generate revenue from providing data and
13   other value added services and platforms
14   features.
15        Is that an accurate description of
16   the way in which The Trade Desk generates
17   revenue?
18   A.   Yes, The Trade Desk generates
19   revenue based on the media buying activity of
20   those clients on our platform and that's an
21   accurate representation of how.
22   Q.   Now, when was The Trade Desk
23   established?
24   A.   The Trade Desk was established in
25   2009.
```

Page 16

```
 1        J. Dederick - Highly Confidential
 2   Q.   When did The Trade Desk go public?
 3   A.   If memory serves, The Trade Desk
 4   went public in 2016.
 5   Q.   Now, I want to direct your
 6   attention to page 3 of this 2022 annual
 7   report.
 8        Now, under the Summary of Risk
 9   Factors, do you see in the fourth bulleted
10   item the following:
11        The market in which we participate
12   is intensely competitive and we may not be
13   able to compete successfully with our current
14   and future competitors.
15        Do you see that?
16   A.   I don't believe that's the fourth
17   bullet, for clarity.
18   Q.   I'm sorry, the fourth bullet from
19   the bottom.
20   A.   Okay.
21   Q.   Do you see that?
22   A.   I see that sentence.
23   Q.   Do you stand by that statement in
24   The Trade Desk's annual report as the
25   company's corporate representative?
```

Page 17

```
 1        J. Dederick - Highly Confidential
 2        MR. VERNON:  Objection.  Vague.
 3   A.   I think it's important to note the
 4   context of risk factors offered in a document
 5   like this, the context will be to provide
 6   prospective shareholders and our shareholders
 7   a summary of our business to help insulate
 8   from lawsuits or SEC violations.  And so, the
 9   idea that we as a DSP compete with DSPs like
10   DV360 and that is a very intense competition
11   is accurate.
12        I would also note under these risk
13   factors --
14   Q.   I'm sorry.
15   A.   I would note that there's a
16   section --
17   Q.   Hold on a second.
18        MR. VERNON:  I think you have to
19   let him -- objection.  Please let him
20   finish his answer.
21   Q.   Let me -- let me ask you the next
22   question, okay?  You've answered my question.
23        MR. VERNON:  Please let him finish
24   his --
25   A.   So, I would also note that there's
```

Page 18

1        J. Dederick - Highly Confidential
2   a --
3        Q.   Excuse me, Mr. Dederick.  The DOJ
4   attorney is gonna be able to ask you
5   questions, but the way that this goes is I
6   get to ask my questions, you've answered the
7   question, so let me ask you the next
8   question, okay?
9            MR. VERNON:  I think --
10           THE COURT REPORTER:  (Admonition.)
11  BY MS. RHEE:
12       Q.   So, Mr. Dederick, the next question
13  in connection with this bulleted item under
14  the Summary of Risk Factors is, what market
15  is The Trade Desk referring to when it states
16  "The market in which we participate is
17  intensely competitive"?
18       A.   My belief would be that the market
19  we're referring to is the DSP marketplace, so
20  direct competition from DSPs like DV360.
21       Q.   Well, let me direct your attention
22  to page 5.
23           Do you see there's a section in the
24  annual report that states:
25           Our Industry.

Page 19

1        J. Dederick - Highly Confidential
2        A.   Yes.
3        Q.   Okay.  And under that section the
4   first bulleted or the first bolded item is a
5   statement that says:
6            Media is increasingly digital.
7            Do you see that?
8        A.   Yes.
9        Q.   It goes on to say:
10           Media is increasingly digital as a
11  result of advances in technology and changes
12  in consumer behavior.
13           Did I read that correctly?
14       A.   I think so.
15       Q.   Yes or no.
16       A.   Please read it again.
17       Q.   Media is increasingly digital as a
18  result of advances and technology and changes
19  in consumer behavior.  The shift has enabled
20  unprecedented options for advertisers to
21  target and measure their advertising
22  campaigns across nearly every media channel
23  and device.
24       A.   Yes, that is what that says.
25       Q.   Okay.  It then goes on to say:

Page 20

1        J. Dederick - Highly Confidential
2            The digital advertising market is a
3   significant and growing part of the total
4   advertising market.
5            Do you see that?
6        A.   I do see that sentence.
7        Q.   What is the digital advertising
8   market that is being referenced there?
9        A.   It looks to me like this paragraph
10  is attempting to contextualize the larger
11  advertising marketplace.  A portion of the
12  overall advertising marketplace is often
13  referred to as digital.  Digital would be
14  typically internet connected formats, media.
15  And so, it appears that this paragraph is
16  attempting to contextualize a portion of the
17  overall advertising market as digital.
18       Q.   Well, why is it then referring to
19  this market as "our industry"?
20       A.   The Trade Desk as it --
21           MR. VERNON:  Objection.
22  Misstates.  Sorry.  Misstates the --
23  what it says.
24       A.   I believe that this paragraph is
25  considered an industry trend.  You'll see

Page 21

1        J. Dederick - Highly Confidential
2   right before that -- that paragraph:  Some of
3   the key industry trends are:
4        Q.   That is under a topic heading
5   called Our Industry, correct?
6        A.   I believe this portion, again, is
7   to advise investors, prospective investors on
8   what is happening in the overall advertising
9   industry.
10       Q.   Is it under a topic heading called
11  Our Industry?  Am I reading that correctly?
12       A.   I believe the importance of this
13  section and the reasons we are outlining
14  what's happening in the overall advertising
15  industry is to illustrate trends in the
16  advertising industry, that would potentially
17  impact prospective and current shareholders.
18       Q.   Mr. Dederick, my question is, is
19  this under a topic heading in The Trade
20  Desk's Annual 10-K called Our Industry?
21       A.   Those words do appear on this page,
22  sure, yes.
23       Q.   And those words were the ones
24  selected by The Trade Desk, correct?
25       A.   That would've been the case, yes.

Page 22

```
1           J. Dederick - Highly Confidential
2               I would add I don't know that --
3       Q.   There's no pending question.  Thank
4    you.
5       A.   I don't know that the reason to
6    have --
7       Q.   Mr. Dederick --
8       A.   There's an equivalency you're
9    assuming in the word "market" --
10              (Cross-talk.)
11      Q.   There's no pending question, so let
12   me keep going.
13              MS. PREWITT:  Counsel, I just
14      don't --
15              MS. RHEE:  There are no -- there
16      are no speaking objections either, so
17      let's just keep going.
18              MS. PREWITT:  I don't think it's
19      necessary to try to prevent the
20      witness from speaking.
21              MS. RHEE:  DOJ can take its time.
22              MS. PREWITT:  Okay, so let's just
23      keep going.
24              MR. VERNON:  I also object to
25      cutting the witness off.
```

Page 23

```
1           J. Dederick - Highly Confidential
2               MS. RHEE:  Let's just keep going.
3    BY MS. RHEE:
4       Q.   Let's direct your attention now to
5    page 11.
6               Mr. Dederick, do you see in The
7    Trade Desk's annual report a section called
8    Our Competition?
9       A.   Yes.
10      Q.   Now, you see the choice of word
11   similarly selected by The Trade Desk here,
12   Our INDUSTRY?
13      A.   I see that word.
14      Q.   Okay.  So, I'm gonna read it.  The
15   10-K says:
16              Under our competition:
17              Our industry is highly competitive
18   and fragmented.
19              Do you see that?
20      A.   I do see that sentence.
21              MS. PREWITT:  Apologies,
22      Counselor.  I just -- my fault, I just
23      actually missed where we were.  I'm
24      sorry, what page?
25              MS. RHEE:  Page 11.
```

Page 24

```
1           J. Dederick - Highly Confidential
2               MS. PREWITT:  Okay.  Thank you.
3    Sorry.
4       Q.   It goes on to say:
5               We compete with other demand side
6    platform providers, some of which are
7    smaller, privately held companies and others
8    are divisions of large well-established
9    companies such as Google and Adobe.
10              Do you see that?
11      A.   I do see that sentence.
12      Q.   We believe that we compete
13   primarily based on our performance,
14   capabilities and transparency of our platform
15   as well as our focus on the buy-side.
16              Do you see that?
17      A.   I see that sentence.
18      Q.   As The Trade Desk's corporate
19   representative, do you stand by that
20   statement about your competition?
21      A.   I would offer further context.  Our
22   largest around most intense competition has
23   been and continues to be with Google's demand
24   side platform and we do compete, our clients
25   appreciate our transparency and the trust
```

Page 25

```
1           J. Dederick - Highly Confidential
2    that we're able to establish by being a
3    buy-side only platform.  Most of our
4    competition, in terms of the DSP category, is
5    coming from DV360.
6       Q.   That was not the question.  So, let
7    me try this again.
8               Mr. Dederick, as The Trade Desk's
9    corporate representative, do you stand by the
10   statement just read about your competition?
11      A.   I stand by our 10-K.
12      Q.   So, do you stand by the 10-K
13   statement that your industry is highly
14   competitive and fragmented?
15      A.   Yes.  And the important context is
16   the industry is the advertising industry.
17   There's a broad advertising industry in which
18   we compete with one small part, which is
19   demand side platforms.  It's not -- it's a
20   false equivalency, it's a claim that because
21   the first sentence says our industry means
22   that the demand side platforms are in some
23   way the equivalent of the word industry.  Our
24   industry refers to the advertising industry,
25   which is highly competitive.
```

Page 26

1    J. Dederick - Highly Confidential
2    Q.   Okay.  Well, so then let's go to
3  the next sentence.
4        Do you stand by the 10-K statement
5  that The Trade Desk competes with other
6  demand side platform providers, some of which
7  are smaller privately held companies and
8  others are divisions of large
9  well-established companies such as Google and
10 Adobe.
11       Do you stand by that statement?
12   A.   Well, Adobe has since -- I think
13 after this document was created, has
14 essentially sunsetted their DSP business, so
15 they are no longer a significant competitor
16 in this category for the Trade Desk.
17       I do stand by the sentence that we
18 compete with other DSPs and I offered
19 additional context that DV360 is the
20 principal competitor.
21   Q.   Well, since this statement, do you
22 also compete with Xandr?
23   A.   Xandr, since this statement, was
24 acquired by Microsoft.
25   Q.   So, do you compete with Xandr?

Page 27

1    J. Dederick - Highly Confidential
2    A.   Very minimally.
3    Q.   So, do you compete with Xandr?
4    A.   Yes, with the further context that
5  the competition is minimal.
6    Q.   Do you compete with Criteo?
7    A.   I do not believe Criteo would
8  consider themselves a DSP.
9    Q.   Do you compete with Criteo?
10   A.   Not in the DSP category.
11   Q.   Do you compete with Criteo?
12   A.   Not in the DSP category.
13   Q.   That's not my question.
14   A.   I've already stated my answer.
15       MS. PREWITT:  Objection,
16 Counselor.  Asked and answered.
17       Actually --
18       MR. VERNON:  Objection.  Leading.
19   Q.   Let me ask the question again.
20       Do you compete with Criteo?
21   A.   We do not compete with Criteo in
22 the DSP category.
23   Q.   But that's not my question.
24   A.   You would need to understand the
25 broader context of the advertising ecosystem

Page 28

1    J. Dederick - Highly Confidential
2  whereby obviously there's an overall amount
3  of ad spend, right?  There is a total TAM of
4  advertising.  There are many different kinds
5  of companies who are attempting to
6  participate in the overall pie of
7  advertising.  Criteo is one kind of company.
8  The Trade Desk and DV360 are a different kind
9  of company.
10       To the extent that all parties are
11 attempting to capture share, sure, we compete
12 with Criteo.
13   Q.   Do you compete with Oath?
14   A.   Oath, there is no company called
15 Oath at this point.
16   Q.   Do you compete with Adform?
17   A.   We do compete with Adform in the
18 DSP category.  The competition is not
19 significant.
20   Q.   So, when you made this statement in
21 your 10-K, who other than Google did you
22 reference or mean to reference when you said,
23 some of which are smaller, privately held
24 companies and others are divisions of well
25 larger established companies?

Page 29

1    J. Dederick - Highly Confidential
2        MS. PREWITT:  Objection.
3    A.   This sentence outlines who all of
4  our competitors might be.  There are smaller
5  and have been smaller DSPs, Adform is one.
6  And I wouldn't claim to know who all of the
7  small entrants category are.
8    Q.   What about Yahoo?
9    A.   Yahoo does participate in the DSP
10 category.  And again, the competition is
11 not -- not significant.
12   Q.   To what extent does The Trade Desk
13 compete with advertising agencies?
14   A.   The Trade Desk --
15       MS. PREWITT:  Objection.
16   A.   The Trade Desk does not compete
17 with advertising agencies.
18       MR. VERNON:  Could we go off the
19 record for one second?
20       MS. RHEE:  Yes.
21       THE VIDEOGRAPHER:  Off the record.
22 The time is 10:08 a.m.
23       (Whereupon, a brief recess was
24 taken.)
25       THE VIDEOGRAPHER:  We are back on

Page 302

1    J. Dederick - Highly Confidential
2    Q.  -- from 2020 to the present?
3         MS. PREWITT:  I'm gonna ask to go
4    off the record here.
5         MS. RHEE:  There's a pending
6    question.
7    Q.  Can you answer that?
8    A.  No, I don't remem- -- I didn't --
9    I'm sorry, you guys were all talking so I
10   didn't really hear the question.
11   Q.  So, the pending question is:  Have
12   you been asked to refresh any documents from
13   2020 to the present?
14        MS. PREWITT:  Objection.  I've
15   asked to go -- I've asked to go off
16   the record so we can have a discussion
17   on this.
18   A.  I don't remember.
19        MS. RHEE:  Okay.  We can take a
20   break.
21        THE VIDEOGRAPHER:  Off the record.
22   The time is 6:43 p.m.
23        (Off-the-record discussion was
24   held.)
25        THE VIDEOGRAPHER:  Back on the

Page 303

1    J. Dederick - Highly Confidential
2    record.  The time is 6:45 p.m.
3    BY MS. RHEE:
4    Q.  Okay.  Mr. Dederick, one of the
5    questions that you were asked about from
6    Mr. Vernon was about last look.
7         Do you remember that?
8    A.  Yes.
9    Q.  And your testimony, if I recall
10   from the transcript, and this is I believe
11   193/21 to 194/3 was:
12        Communication between an ad
13   exchange and a publisher ad server.  This is
14   the ad exchange getting the opportunity to,
15   you know, have access to the publisher ad
16   server in a way others can't, other ad
17   exchanges can't.
18        Do you recall that testimony you
19   gave?
20        MR. VERNON:  Can you give us a
21   chance to check what you're quoting
22   from.  It's 193?
23        MS. RHEE:  Yes.
24   Q.  Do you recall that testimony?
25   A.  I remember the line of discussion.

Page 304

1    J. Dederick - Highly Confidential
2    Q.  Okay.  Is it your understanding
3    that last look is something that continues?
4    A.  I want to say that last look was
5    deprecated at some point.
6    Q.  In fact, it was deprecated, wasn't
7    it?
8         MR. VERNON:  Objection, leading.
9    A.  So, from what I've known and from
10   what I've understood, there were a host of
11   practices that DFP and AdX realized that in
12   order to compel SSPs to participate in open
13   bidding to effectively destroy the access
14   created by header bidding, they needed to
15   capitulate on a few points.  By that time,
16   both had amassed dominant market share in the
17   SSP category and in the publisher ad serving
18   category.
19        So, to the extent they ended the
20   practices that created that dominant market
21   share in order to compel SSPs into an arena
22   where they would effectively sacrifice the
23   benefits gained by header bidding, you know,
24   that's the context that I understand some of
25   these practices ending under.

Page 305

1    J. Dederick - Highly Confidential
2    Q.  Well, let me ask the question
3    again.
4         Did last look get deprecated or
5    didn't it?
6    A.  I believe that when Google chose to
7    deprecate the last look process, it was in
8    the interest of compelling other SSPs who had
9    begun to threaten the dominant position that
10   Google created and publisher ad serving and
11   the ad exchange to participate in open
12   bidding, which was effectively their response
13   to header bidding, which was the first time
14   Google's dominance had ever been questioned
15   in publisher ad serving and in the ad
16   exchange market.
17        And so, to the extent Google
18   pacified those SSPs by starting to send them
19   checks.  How often is it you get checks from
20   your biggest competitor, through open bidding
21   as a platform and process and they needed to
22   end certain practices in order to do that.
23   That is the context that I understand the end
24   of last look coming.
25   Q.  So, is that a long answer to saying

Page 306

1        J. Dederick - Highly Confidential
2   it ended?
3        MR. VERNON:  Objection.
4        A.   I provided my answer.
5        Q.   I just want to understand, did last
6   look end?
7        A.   I provided my answer.
8        Q.   When did it end?
9        A.   I can't recall the dates.
10       Q.   Was it sometime ago?
11       A.   I can't recall the dates.
12       Q.   When it ended, from your answer you
13  talked about it in the context of header --
14  I'm sorry, open bidding; is that right?
15       A.   I talked about Google's move to
16  really stifle the growth of header bidding by
17  bringing all of the exchanges into their
18  decisioning engine of open bidding.
19       Q.   Now, open bidding accepts header
20  bidding bids, doesn't it?
21       A.   You would really have to ask
22  someone who's intimately familiar with SSP
23  technology.  I don't know the answer to that.
24       Q.   So, sitting here today, you don't
25  know whether open bidding accepts header

Page 307

1        J. Dederick - Highly Confidential
2   bidding bids?
3        A.   Open bidding is effectively an
4   alternative to header bidding that Google
5   created, whether that alternative to header
6   bidding interacts with -- with other header
7   bidding implementations, I don't know.  I
8   know that open bidding is a direct response
9   to header bidding innovation from other SSPs
10  and -- but I, you know, you're starting to
11  get into the very inner workings of SSP
12  technology and The Trade Desk is a buy-side
13  company, just has limited visibility and
14  that's not technology that obviously we
15  build, so, you know, you might have to speak
16  to the supply-side for those answers.
17       Q.   So, you don't know?
18       A.   I provided my answer.
19       Q.   Now, you talked at length with
20  Mr. Vernon about Unified ID, so I want to
21  follow up on some questions about that.
22       MS. RHEE:  I want to introduce
23       Exhibit 12.
24       MS. SPEVACK:  TTD 12.
25       (TTD Exhibit 12, Document, Bates

Page 308

1        J. Dederick - Highly Confidential
2   TTD_DOJ-GOOG23-0001901 through
3   TTD_DOJ-GOOG23-0001908, was marked for
4   identification.)
5   BY MS. RHEE:
6        Q.   This was a document that's
7   produced, got Bates number ending in 1901
8   [sic] and I know you're gonna want to take a
9   minute to take a read through.
10       MS. PREWITT:  Is there some part
11       he can focus on because it's very
12       dense?
13       Q.   Yeah.  I want to direct you in
14  particular to -- towards the bottom of the
15  first page that starts with "And at Google,
16  they're not interested in doing evil."
17       MR. VERNON:  Do you have a date on
18       this document, Counsel?
19       MS. RHEE:  I don't.  I was gonna
20       ask about that, it was produced in the
21       form that it was produced.
22       Q.   And the paragraph begins about
23  wanting to go a bit deeper into the cookie
24  issue?
25       A.   Okay, yeah.  I'm just reading this.

Page 309

1        J. Dederick - Highly Confidential
2   Jeff's talk track on this first page and then
3   I'll be right with you.
4        (Document review.)
5        Okay.
6        Q.   Okay.  So, you see this is a note
7   and it looks to be an internal note from
8   Mr. Green, your founder and CEO?
9        A.   So, this document is the recap of
10  an all hands from the employees who were
11  present, many of them aren't here anymore.  I
12  know this document is years old.  And this
13  would be the recap of an all hands call that
14  we do weekly where members of our leadership
15  team are speaking to the company.
16       Q.   Okay.  So, you don't have any
17  reason to doubt the authenticity of this
18  document from being within The Trade Desk?
19       A.   No.
20       Q.   Okay.  Okay.  And that it is an
21  accurate summary of all hands statements from
22  Mr. Green, your founder and CEO?
23       A.   From a number of years ago, this
24  looks -- yeah, I have no reason to doubt that
25  this is an accurate depiction of something he

Page 310

1    J. Dederick - Highly Confidential
2  said years ago.
3    Q.   Right.  In the same way that
4  Mr. Vernon walked you through sales pitch
5  decks from 2015, which is many, many years
6  ago, right?
7    MS. PREWITT:  Objection.
8    A.   Seven.
9    Q.   Okay.  So, it couldn't be that long
10 ago because this is a conversation with
11 cookie deprecation, right?
12    MS. PREWITT:  Objection.
13    A.   Well, that conversation's been
14 going on for a long time.
15    Q.   Okay.  So, I want to direct your
16 attention to the portion that begins with:
17    And at Google, they're not
18 interested in doing evil.  Despite the fact
19 that they do like to be big.  They do like to
20 win.  They're not trying to destroy the
21 internet.  And what they did with the policy
22 that they came out with I think threaded the
23 needle perfectly between those two things.
24 And I've been public about giving them lots
25 of credit for that.  Lou's response to that

Page 311

1    J. Dederick - Highly Confidential
2  was, what if they feel pressured to do what
3  Apple did?  I said, I believe Apple's been
4  the most hypocritical company on this issue
5  in the world.
6    Now, I want to actually then turn
7  your attention to the second page and this is
8  the page ending in 1902.
9    MS. PREWITT:  Objection.  Was
10    there a question there?
11    MS. RHEE:  I just want to complete
12    the passage here about Google.
13    Q.   So, do you see the page ending in
14 1902?
15    A.   I see that page.
16    Q.   The sentence that refers to Google
17 is the second full paragraph and it reads:
18    They're not thinking about the fact
19 that Google is trying to navigate something
20 that is very sensitive and they're in the
21 cross-hairs on both the rock and a hard place
22 to mix metaphors and it's really important
23 that we not overreact.  With all that being
24 said, even if cookies went away, we would get
25 another identifier.  Targeted advertising is

Page 312

1    J. Dederick - Highly Confidential
2  not going anywhere because the entire
3  internet is dependent on it.  It's the quid
4  of pro quo of the internet, you see relevant
5  ads in exchange for free services.
6    Do you see that?
7    A.   I see those words.
8    Q.   Okay.  Is that what Mr. Green, the
9  founder and CEO of The Trade Desk, said to
10 all of its employees?
11    MS. PREWITT:  Objection.
12    A.   So, this is years ago.  And what's
13 helpful to note, more recently Jeff wrote an
14 op-ed that's publically available which
15 states that Google has moved on from do no
16 evil to win at all costs.  So, unfortunately,
17 the policies that Jeff is referring to years
18 ago were not what Google implemented and
19 Jeff's hope and speculation about the
20 approach that Google Chrome and the Google
21 team would take did not pan out.  And that
22 was not the message or the policies that
23 Google has been threatening the industry with
24 since this point.
25    So, you know, you see a more

Page 313

1    J. Dederick - Highly Confidential
2  optimistic tone from us at this point and
3  then more recently, you know, the policies
4  and the actions of Google as they've talked
5  about Chrome's actions to deprecate
6  third-party cookies, they've changed
7  dramatically from the messages that Google
8  was giving the market at this time years ago.
9    Q.   Okay.  Google was The Trade Desk's
10 biggest competitor, right?
11    A.   Well, DV360 specifically is The
12 Trade Desk's biggest DSP competitor.
13    Q.   And as you testified repeatedly,
14 The Trade Desk's entire business is DSP; is
15 that right?
16    MS. PREWITT:  Objection.
17    A.   Yes, The Trade Desk is a DSP.
18    Q.   So, is Google The Trade Desk's
19 biggest competitor?
20    A.   Google's DV360 is The Trade Desk's
21 biggest competitor.
22    Q.   Okay.  So, now, since you said
23 Mr. Green has done an about-face, I
24 actually -- more recently, I want to direct
25 your attention back to Exhibit 2, which is in



Page 314

1   J. Dederick - Highly Confidential
2   your pile in front of you.
3       MS. PREWITT:  Just gonna object to
4   that commentary.
5   Q.   So, let's go to Exhibit 2.
6       MS. SPEVACK:  The earnings call
7   from February 2023.
8   A.   Okay.
9   Q.   Okay, great.
10      So, Exhibit 2 is the February 15,
11  2023 earnings call in the transcript,
12  correct?
13  A.   It appears to be.
14  Q.   Okay.  So, I want to direct your
15  attention to page 5 of that earnings call and
16  these are the remarks from Mr. Green.
17      So, directing your attention to the
18  second to last full paragraph on that page he
19  says:
20      If you had told me at this time
21  last year how much progress the industry
22  would have made on UID2 in 2022, I don't
23  think I would have believed you.  At the
24  beginning of our fourth quarter last year,
25  around 15 percent of the third-party data

Page 315

1   J. Dederick - Highly Confidential
2   ecosystem was estimating on UID2.  This is
3   essentially a very large sample of the entire
4   data ecosystem of the entire internet.  By
5   the first half of this year, we expect we
6   will be in the 75 percent range.  Levels
7   of activation that high mean we will
8   effectively -- we will have effectively
9   solved the identity matching challenge of the
10  entire open internet on a scale well beyond
11  anything cookies have ever accomplished and
12  all while providing consumers with much
13  greater control over their privacy.
14      Do you see that?
15  A.   I see those words.
16  Q.   Okay.  And you don't have any
17  reason to doubt the accuracy of that
18  transcript?
19  A.   You know, Jeff is speaking on an
20  earnings call and one of the great -- one of
21  Jeff's real strengths is vision.
22

Page 316

1   J. Dederick - Highly Confidential
2

Page 317

1   J. Dederick - Highly Confidential
2

16      MS. PREWITT:  Can we do a time
17  check?
18      THE VIDEOGRAPHER:  Three hours and
19  32 minutes.
20      MS. RHEE:  Thank you,
21  Mr. Dederick.
22      MR. VERNON:  I'll go fast.
23  EXAMINATION BY
24  MR. VERNON:
25  Q.   Do you know we were talking earlier

Page 318

1    J. Dederick - Highly Confidential
2  about last look, do you remember that?
3    A.   Yes.
4    Q.   Do you know whether Google has
5  tried to do anything similar to last look
6  after, quote/unquote, deprecating it?
7    A.   My understanding from speaking to,
8  you know, I'm gonna -- we hadn't talked about
9  which hat I'm wearing.  I'm gonna talk about
10 knowledge I've gained from talking to our
11 inventory partnerships team who regularly
12 interface with SSPs and publishers.
13    My understanding was that the
14 deprecation of the last look, which was
15 essentially an unfair advantage over
16 competing SSPs and prospective competing ad
17 servers was a part of an effort to bring the
18 SSPs into their open bidding program and open
19 bidding was Google's competitive response to
20 header bidding.
21    And again, header bidding was the
22 first -- first real threat Google's dominance
23 in publisher ad serving in the SSP business
24 had ever experienced.  And so, Google saw the
25 other SSPs starting to threaten their

Page 319

1    J. Dederick - Highly Confidential
2  business and thought, how can we bring all of
3  that control back into the Google ecosystem,
4  how can we regain control of a market that
5  appears to be getting a little bit outside of
6  your sphere of control.
7    And so, open bidding was the
8  program where they brought all of the control
9  back from the SSPs and literally started
10 sending checks to their competing SSP
11 partners and those checks are too big for the
12 SSP not to say no to.  So, open bidding
13 essentially pacified those SSPs from
14 continuing to threaten their dominance.
15    Q.   Does Google, quote/unquote,
16 deprecating last look completely allay your
17 concerns with Google's position in the
18 Display ad tech's deck?
19    MS. RHEE:  Objection to form.
20    A.   No.
21    Q.   And just briefly, why is that?
22    A.   They have 90 percent share in
23 publisher ad serving, they have the dominant
24 SSP, they have the dominant DSP, they have
25 the dominant advertising ad server.  They

Page 320

1    J. Dederick - Highly Confidential
2  control the auction and ad selection process
3  top to bottom.  One of the tiny features of
4  one of those products going away, so?
5    MR. VERNON:  So, I will give back
6  to the universe however much time I
7  have left and thank everybody,
8  including, Mr. Dederick, the court
9  reporter and videographer for sticking
10 with us through a long day.
11    THE VIDEOGRAPHER:  It's okay with
12 counsel to close out the video record?
13    MR. VERNON:  Yep.
14    MS. PREWITT:  Yep.
15    THE VIDEOGRAPHER:  We're off the
16 record at 7:08 p.m. and this concludes
17 today's deposition.
18    Thank you, everyone, and have a
19 great evening.
20    (Time noted:  7:08 p.m. Eastern Time)
21
22
23
24
25

Page 321

1    J. Dederick - Highly Confidential
2
3         J U R A T
4
5
6    I, JOHN DEDERICK, do hereby
7  certify under penalty of perjury that
8  I have read the foregoing transcript
9  of my deposition taken on JULY 28,
10 2023; that I have made such
11 corrections as appear noted herein in
12 ink, initialed by me; that my
13 testimony as contained herein, as
14 corrected, is true and correct.
15
16
17 _____
         JOHN DEDERICK
18
19
   Subscribed and sworn to before me
20
   This _____ day of _____, 20___.
21
22 _____
         NOTARY PUBLIC
23
24
25

John Dederick - Highly Confidential
July 28, 2023

---

## Page 322

```
 1        J. Dederick - Highly Confidential
 2   ------------------I N D E X------------------
 3   WITNESS:   JOHN DEDERICK
 4   EXAMINATION BY:                        PAGE
 5   MS. RHEE                                 7
 6   MR. VERNON                             147
 7   MS. RHEE                               291
 8   MR. VERNON                             317
 9
10
           ----------------E X H I B I T S--------------
11
     TTD EXHIBITS
12
     NUMBER          DESCRIPTION          PAGE
13
14   Exhibit 1   The Trade Desk's Annual     8
                 Filings with the
15               Securities and Exchange
                 Commission
16
17   Exhibit 2   The Trade Desk, Inc.,      32
                 Nasdaq Earnings Call
17               Transcripts
18
     Exhibit 3   E-mail chain, Bates        41
19               TTD-DOJ-GOOG23-0022648
                 through
20               TTD-DOJ-GOOG23-0022649
21   Exhibit 4   The Trade Desk Reports     52
                 First Quarter Financial
22               Results
23   Exhibit 5   The Trade Desk Q1 2023     55
                 Investor Presentation
24
25           (Exhibits continued on next page.)
```

## Page 323

```
 1        J. Dederick - Highly Confidential
 2            (Exhibits continued.)
 3   Exhibit 6   The Trade Desk's Document   62
                 titled Programmatic
 4               Private Marketplace
                 Training, Bates
 5               TTD-DOJ-GOOG23-0000472
                 through
 6               TTD-DOJ-GOOG23-0000487
 7   Exhibit 7   OpenPath Publisher Terms    74
                 and Conditions, Bates
 8               TTD-DOJ-GOOG23-0001039
                 through
 9               TTD-DOJ-GOOG23-0001052
10   Exhibit 8   May 5, 2002 Press Release   85
                 issued by The Trade Desk
11
     Exhibit 9   E-mail with attachment,    120
12               Bates
                 TTD-DOJ-GOOG23-0021505
13               through
                 TTD-DOJ-GOOG23-0021616
14
15   Exhibit 10  E-mail chain with          267
                 attachment, Bates
16               TTD-DOJ-GOOG23-0009846
                 through
17               TTD-DOJ-GOOG23-0009892
18   Exhibit 11  The Trade Desk vs. Google  280
                 document, Bates
19               TTD-DOJ-GOOG23-0001954
                 through
20               TTD-DOJ-GOOG23-0001956
21   Exhibit 12  Document, Bates            307
                 TTD-DOJ-GOOG23-0001901
22               through
                 TTD-DOJ-GOOG23-0001908
23
24
25
```

## Page 324

```
 1        J. Dederick - Highly Confidential
 2          C E R T I F I C A T E
 3
     STATE OF NEW YORK    )
 4                        : SS.:
     COUNTY OF RICHMOND   )
 5
 6        I, CANDIDA BORRIELLO, a Notary
 7   Public for and within the State of New York,
 8   do hereby certify:
 9        That the witness, JOHN DEDERICK,
10   whose examination is hereinbefore set forth
11   was duly sworn and that such examination is a
12   true record of the testimony given by that
13   witness.
14        I further certify that I am not
15   related to any of the parties to this action
16   by blood or by marriage and that I am in no
17   way interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto
19   set my hand this 4th day of August, 2023.
20
21            Candida Borriello
               CANDIDA BORRIELLO
22
23
24
25
```

## Page 325

```
 1        J. Dederick - Highly Confidential
 2   ERRATA SHEET FOR THE TRANSCRIPT OF:
 3   Case Name:    US et al. Versus GOOGLE LLC
     Dep. Date:    JULY 28, 2023
 4   Deponent:     JOHN DEDERICK
 5   Pg. Ln. Now Reads      Should Read   Reason
 6   ___ ___ _____  _____  _____
 7   ___ ___ _____  _____  _____
 8   ___ ___ _____  _____  _____
 9   ___ ___ _____  _____  _____
10   ___ ___ _____  _____  _____
11   ___ ___ _____  _____  _____
12   ___ ___ _____  _____  _____
13   ___ ___ _____  _____  _____
14   ___ ___ _____  _____  _____
15   ___ ___ _____  _____  _____
16   ___ ___ _____  _____  _____
17   ___ ___ _____  _____  _____
18   ___ ___ _____  _____  _____
19   ___ ___ _____  _____  _____
20   ___ ___ _____  _____  _____
                    _____
                         JOHN DEDERICK
21
     SUBSCRIBED AND SWORN BEFORE ME,
22
     This___ day of_____, 20__.
23
     _____
24           Notary Public
25   My Commission Expires:_____
```