# EXHIBIT 44

# PUBLIC

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| United States of America, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Google LLC, <br><br> Defendant. | Case No. 1:23-cv-00108-LMB-JFA <br><br> Hon. Leonie H. M. Brinkema |

# EXPERT REBUTTAL REPORT OF ROSA M. ABRANTES-METZ, PH.D.

**February 13, 2024**

HIGHLY CONFIDENTIAL - Privileged & Confidential

Expert Rebuttal Report of Rosa M. Abrantes-Metz, Ph.D.

65. This directly mischaracterizes both the challenged conduct and its implied remedies. As I explain in more detail in Section IV, much of the conduct at issue are choices Google has made to create exclusivities. Relaxing those exclusivities does not require Google to deal with competitors. Other conduct involves the deprecation of *existing functionality*.

### i. The But-For World I Describe in My Initial Report is Reasonable

66. The alternative to restricting Google Ads to AdX is not that Google Ads must somehow interoperate with other advertiser ad networks or DSPs and share "competitive innovations," but simply that Google Ads interoperate with ad exchanges. As I explain below, the record evidence belies any suggestion that such interoperability was unduly expensive or was otherwise technically infeasible.

67. Similarly, one alternative to exclusively placing AdX at the top of DFP's remnant waterfall (which creates First Look and Last Look effects) would be to allow publishers in DFP to select other exchanges or demand sources to place at the top of that waterfall – exchanges and demand sources that DFP *already interoperated with* – as well as modifying the AdX terms of service for third parties. Neither step involves sharing anything with any rival. In the case of Last Look, of course, another alternative would be to simply end the practice itself which, again, does not require interoperating with any rival.

68. The exclusive link between AdX and DFP could be remedied, for example, by first, relaxing the AdX terms of service, and second, by conveying to third parties the actual bid information on an impression-by-impression basis. This, again, does not involve the sharing of any competitive innovation with a rival company. While it may have required some modification to AdX Direct protocols, the record evidence is clear that Google was actively considering such changes. I would also note that the transmission of bid information is not uncommon in this industry (Header Bidding and Open Bidding simply being two examples). Asking AdX to conform with industry practices and tell its customers the price it is paying for impressions cannot be construed as excessively burdensome.

Expert Rebuttal Report of Rosa M. Abrantes-Metz, Ph.D.

69. The conducts at issue with UPR and the AdMeld acquisition involve the deprecation of existing functionalities. One alternative would have been to not deprecate that functionality.

70. The claims by Dr. Israel that the but-for world I consider is excessively burdensome to Google, or that it would, in any way, require Google to share competitive innovations with rivalS, are simply false. I respond to these arguments in the context of the specific challenged conduct in Section IV below. Dr. Israel has not produced any evidence of any costs of supposed interoperability required by a plausible but-for world. Neither has Dr. Israel produced any evidence of any delay in introducing interoperable products or features that would occur in a reasonable but-for world. He presents only his supposition of these costs and delays.

### ii. Dr. Israel Presents no Reliable Evidence that Innovation in Ad Tech Would be Lower But For Google's Challenged Conduct

71. Regarding innovation, Dr. Israel contends that Google can only maximize the return on its innovation in one ad tech market if it is able to exclude *customers* in other ad tech markets:

> Because of the complementarity between different ad tech components, some of the benefits of that investment will accrue to other components, such as the publisher ad servers that help sell publishers' ad inventory through that exchange and thus benefit from increased advertiser demand. To maximize the exchange's incentives to make the investment in the first place, it is beneficial if the benefits to other components can be kept in-house, so that the benefits of the investment accrue to the firm making it.[74]

72. The circumstance Dr. Israel describes is one in which Google should be allowed to extend market power from one market to another market by restricting which customers can access

---

[74] Israel Initial Report, at ¶ 494.

Expert Rebuttal Report of Rosa M. Abrantes-Metz, Ph.D.

of the market and the conditions under which it was implemented. Therefore, my conclusion that the imposition of UPR "foreclosed competition from rivals in the Advertiser Ad Network market and the Ad Exchange market" stands.[420]

## G. Other Conduct by Google Exacerbated the Anticompetitive Effects of the Conduct at Issue

285. Dr. Israel and Professor Milgrom address other Google conduct which was discussed in my Initial Report including Project Bernanke, Project Poirot, and Sell-Side Dynamic Revenue Sharing ("DRS").[421] As Dr. Israel acknowledges, I do not explicitly allege that these programs were anticompetitive standing alone based on the information available to me,[422] but understanding these programs is critical to understanding the context of Google's other anticompetitive conduct. My discussion of these programs is to show that they exacerbate the anticompetitive effects of the Google conduct at issue by directing more transactions toward AdX and denying those transactions and operating scale to third-party exchanges.

286. Specifically, Project Poirot "lowered the bids DV360 submitted to AdX's rivals, but not to AdX," and "shifted spending toward AdX."[423] While "Last Look, coupled with Google's bid manipulation schemes, DRS and Bernanke" enabled AdX to win transactions that it could not "at its usual take rate" and allowed "AdX to capture impressions it otherwise would not win, denying transactions (and scale) to third-party exchanges."[424] This exacerbated the impact of AdX's exclusive First and Last Look. "Google's programs such as Bernanke and DRS allow AdX advertisers with lower willingness to pay to sometimes win impressions over non-AdX

---

[420] Abrantes-Mez Initial Report, at ¶ 460.

[421] Israel Initial Report, at ¶¶ 687 – 706, 750 – 761 and 766; Milgrom Initial Report, at ¶¶ 141 – 176, 192 – 251 and 365 – 413; and Abrantes-Metz Initial Report, at ¶¶ 258 – 291.

[422] Israel Initial Report, at ¶¶ 687, 751, and 766.

[423] Abrantes-Metz Initial Report, at ¶¶ 286 – 289.

[424] Abrantes-Metz Initial Report, at ¶¶ 358 – 362.