# EXHIBIT 68

# PUBLIC

CONFIDENTIAL

1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION
3     --------------------------:
      UNITED STATES, et al.,      :
4                                 :
              Plaintiff,          :
5                                 :
          vs.                     : Case No.:
6                                 : 1:23-CV-00108-LMB-JFA
      GOOGLE, LLC,                :
7                                 :
              Defendant.          :
8     --------------------------:
9
10
11    CONFIDENTIAL VIDEOTAPED DEPOSITION OF ADORIA LIM
12
13    DATE:            February 29, 2024
14    TIME:            9:37 a.m.
15    LOCATION:        U.S. Department of Justice
                       Antitrust Division
16                     450 Fifth Street, Northwest
                       Washington, D.C. 20530
17
      REPORTED BY:     Shari R. Broussard, RPR, CSR
18                     Reporter, Notary
19    Job No. CS6485261
20
21
22

CONFIDENTIAL

Page 2

```
1            A P P E A R A N C E S
2  On behalf of Plaintiff:
3     CRAIG BRISKIN, ESQUIRE
       KATHERINE CLEMONS, ESQUIRE
4     ALVIN CHU, ESQUIRE
       U.S. Department of Justice
5     450 Fifth Street, Northwest
       Washington, D.C. 20530
6
   On behalf of Defendant:
7
       MARTHA L. GOODMAN, ESQUIRE
8      ANNELISE CORRIVEAU, ESQUIRE
       BYRON BECKER, ESQUIRE
9      HEATHER MILLIGAN, ESQUIRE     (Via Zoom)
       Paul, Weiss, Rifkind,
10       Wharton & Garrison, LLP
       2001 K Street, Northwest
11     Washington, D.C. 20006-1047
       (202) 223-7341
12     mgoodman@paulweiss.com
       accoriveau@paulweiss.com
13     bpbecker@paulweiss.com
14  ALSO PRESENT:
15     David Campbell, Video Technician
       John Griffin, DoJ
16     Oliva Choi, DoJ
       Margaret Lynn, DoJ
17     Dulce Nunez, DoJ
       David Pearl, Esquire        (Via Zoom)
18     Alison Forman, The Brattle Group  (Via Zoom)
       Jack Turner, The Brattle Group   (Via Zoom)
19     Julie Suh, The Brattle Group     (Via Zoom)
       Xiaoxi Tu, Esquire           (Via Zoom)
20
21
22
```

Page 3

```
1          C O N T E N T S
2  EXAMINATION BY:                    PAGE
3     Counsel for Defendant          5
4
5  LIM DEPOSITION EXHIBITS:  *        PAGE
6   1 Lim Expert Rebuttal Report, 2/13/24,
      Respess Expert Report, 12/22/23   44
7
    2 Letter from Pearl to Garcia, 9/23/23  109
8
    3 Blog, "How our display buying platforms
9     share revenue with publishers"   119
10  4 Digital Media Bills, Bates NAVY-ADS-249484
      to 522                      153
11
    5 Declaration of Devon P. Mahoney   268
12
13
14
15
16
17
18
19
20
21
22  (* Exhibits attached to transcript.)
```

Page 4

```
1           P R O C E E D I N G S
2       VIDEO TECHNICIAN:  Good morning.  We are
3  going on the record on February 29th, 2024, and
4  the time on the video monitor is 9:37 a.m.
5       This is Media Unit Number 1 of the
6  video-recorded deposition of Adoria Lim in the
7  matter of United States of America, et al., versus
8  Google, LLC.  The location of this deposition is
9  450 Fifth Street, Northwest, Washington, D.C.
10  20530.
11       My name is David Campbell, representing
12  Veritext, and I'm the videographer.  The court
13  reporter today is Shari Broussard also with
14  Veritext.
15       Counsel will please identify yourselves
16  for the record after which the court reporter will
17  please swear in the witness and we can proceed.
18       MS. GOODMAN:  Martha Goodman on behalf
19  of plaintiff Google -- I'm sorry, defendant
20  Google, joined by Annelise Corriveau and Byron
21  Becker of Paul Weiss and Ricardo -- I forgot his
22  last name --
```

Page 5

```
1       MR. MARCHINGIGILO:  Marchingigilo.
2       MS. GOODMAN:  -- from Analysis Group.
3       MR. BRISKIN:  Craig Briskin from the
4  Department of Justice for plaintiffs.
5       MR. CHU:  Alvin Chu, Department of
6  Justice, for plaintiffs.
7       MS. CLEMONS:  Katherine Clemons --
8  Katherine Clemons, Department of Justice, for
9  plaintiffs.
10       MR. GRIFFIN:  John Griffin, financial
11  analyst with the Department of Justice.
12       THE REPORTER:  Are you ready for me to
13  swear the witness?
14       MS. GOODMAN:  I guess so.
15  WHEREUPON,
16           ADORIA LIM
17  called as a witness, and having been sworn by the
18  notary public, was examined and testified as
19  follows:
20       EXAMINATION BY COUNSEL FOR DEFENDANT
21  BY MS. GOODMAN:
22     Q   Good morning, Ms. Lim.
```

2 (Pages 2 - 5)

Veritext Legal Solutions

CONFIDENTIAL

1   with Brent.

2     Q   And to the best of your memory, when did

3   you first speak with Brent?

4     A   I don't have a more specific memory

5   other than the spring of 2023.

6     Q   And have you worked -- what's your best

7   estimate of the number of hours you have billed on

8   this matter since you began work on it sometime in

9   the spring or late spring of 2023?

10     A   Over 600 hours.

11     Q   And those are billed at -- all 600 of

12   those hours were billed at the rate of $800 an

13   hour?

14     A   Yes.

15     Q   How many other individuals at The

16   Brattle Group besides yourself have billed to this

17   matter?

18     A   More than 30, less than 50.

19     Q   And how many individuals at -- at The

20   Brattle Group have worked on the quantification of

21   damages in this matter?

22     A   Are you -- I need you to clarify -- or

1   let me ask you to clarify with regard to in

2   support of Dr. Simcoe, in support of Dr. Respess

3   and/or myself or are you asking about -- are you

4   asking for the collective -- those collective --

5   all those people under that umbrella, or are you

6   asking about a specific -- under a specific -- in

7   support of a specific expert?

8     Q   Sure.  So for Dr. Respess and yourself,

9   how many individuals at The Brattle Group have

10   worked on what I'll call the quantification of

11   damages that is reflected in your report and

12   Dr. Respess' report?

13     A   More than five, less than ten.

14     Q   The individuals who you met with at The

15   Brattle Group to prepare for your deposition which

16   you named earlier, are those the individuals who

17   worked on the quantification of damages at The

18   Brattle Group?

19     A   Those are a -- those individuals that I

20   named earlier are a subset.

21     Q   So you named seven individuals earlier.

22   Are there any other individuals you're remembering

1   who worked on the quantification of damages at The

2   Brattle Group for this matter?

3     A   Again, in reference to -- in -- in

4   support of either Dr. Respess or myself?

5     Q   Yes.

6     A   Also Gage Hornung, H-O-R-N-U-N-G.

7     Q   Anybody else?

8     A   There are some individuals in our IT

9   group whose names I don't remember right now.

10     Q   Okay.  Did you review bills on this

11   matter?

12     When I say "this matter," I'm referring

13   specifically to the quantification of damages done

14   by Dr. Respess and yourself.

15     A   I don't review the invoices themselves.

16   I review the time entries for those individuals

17   who are working -- who work to support Dr. Respess

18   and who are working to support myself.

19     Q   Okay.  And have you reviewed the time

20   entries for the individuals who are working to

21   support Dr. Respess and yourself throughout the

22   entirety of Brattle Group's engagement on this

1   matter, meaning from the spring of 2023 to the

2   present?

3     MR. BRISKIN:  Let me just state that

4   Section 515 of the expert stip protects budgets,

5   invoices, bills, receipts, or time records

6   concerning testifying experts, or consultants,

7   their staff, assistants, colleagues, or associates

8   of other companies or organizations from

9   disclosure.

10     MS. GOODMAN:  I am not asking about the

11   contents of the bills, I'm asking if she reviewed

12   bills.

13     MR. BRISKIN:  Right.  I'm instructing

14   the witness not to testify with regard to any

15   contents of budgets, invoices, bills, receipts, or

16   time records.

17   BY MS. GOODMAN:

18     Q   So my question again is do you review

19   the time entries for the individuals who you named

20   who worked to support Dr. Respess and yourself

21   from the beginning of this -- the engagement on

22   this matter to the present?

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1     A   Yes.
2     Q   Okay.  Did the time entries also
3  indicate the hourly rate at which somebody bills?
4         MR. BRISKIN:  I'll instruct the witness
5  not to answer.
6  BY MS. GOODMAN:
7     Q   How do you know the hourly rate of
8  individuals who bill out at The Brattle Group on
9  this matter?
10    A   I'm involved in the budgeting process.
11    Q   Okay.  Can you approximate how many
12 hours the eight individuals you named who have
13 worked at The Brattle Group in support of
14 Dr. Respess and your analyses in this matter, how
15 many hours have those individuals billed over the
16 life of that work?
17    A   I couldn't tell you that.  I -- I don't
18 know.
19    Q   Can you approximate it?
20    A   I have not focused on that and I have
21 not kept count.
22    Q   Are you aware of any individual, other

Page 19

1  than yourself, at The Brattle Group billing more
2  than 600 hours --
3     A   I --
4     Q   -- on the quantification of damages?
5     A   I haven't focused on that, so I -- I --
6  I don't know.
7     Q   Do you expect your staff to work more or
8  fewer hours than yourself?
9         MR. BRISKIN:  Objection to the form.
10        THE WITNESS:  Can you clarify what you
11 mean by that question?  Are you referring in a --
12 in a given year, just generally or --
13 BY MS. GOODMAN:
14    Q   On -- on this matter do you expect your
15 staff to work more or fewer hours than yourself?
16        MR. BRISKIN:  Objection to the form.
17        THE WITNESS:  I don't have an
18 expectation in that regard.
19 BY MS. GOODMAN:
20    Q   Okay.  Do you know how much The Brattle
21 Group has been paid in connection with the work it
22 has done with respect to Dr. Respess' work --

Page 20

1  report and your report on this matter?
2     A   I don't know.
3     Q   Can you give an approximation?
4     A   I'm -- as I said earlier, I'm -- I don't
5  see the invoices when they go out and I -- I'm not
6  in charge of collections on those invoices either,
7  so it's not something I'm focused on.
8     Q   Do you make a distinction between
9  invoices and collections in your answer?
10    A   So they're -- they're connected because
11 you don't get collections unless you invoice.  So
12 you could invoice and not collect.  But in either
13 case -- in any case, as I said, I haven't -- I'm
14 not in charge of the invoicing process or
15 collection process in this matter.
16    Q   Okay.  Is it possible to -- is it
17 possible for The Brattle Group to invoice an
18 amount and collect less than that amount?
19        MR. BRISKIN:  Objection to the form.
20        THE WITNESS:  Unfortunately, yes.
21 BY MS. GOODMAN:
22    Q   And it's the case that just because an

Page 21

1  amount is invoiced doesn't mean that's the amount
2  that's ultimately paid, correct?
3     A   Unfortunately, correct.
4     Q   Okay.  And so you've worked you said
5  about --
6     A   But generally speaking again, I've
7  almost never seen a --
8     Q   I don't think there's a question
9  pending.
10    A   Sorry, I didn't finish my answer, so I
11 was just completing my answer.
12        Again, I don't think I've seen an
13 instance in which you can collect or we've
14 collected without invoicing.
15    Q   Okay.  Are you done?
16        MR. BRISKIN:  Objection to form.
17        THE WITNESS:  I'm done with that last
18 answer.
19 BY MS. GOODMAN:
20    Q   Okay.  You've billed you said over 600
21 hours on this matter, correct?
22    A   Correct.

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1    Q   Are all 600 of those hours in connection
2  with the quantification of damages work done in
3  the Respess/Lim report -- reports?
4    A   Well, the -- since the time I filed my
5  rebuttal report, I've billed additional hours in
6  preparing for this deposition.  So the 600 hours
7  would be an approximation of hours billed to date.
8    Q   Okay.  So of the 600 hours that you have
9  billed to date, how many of those hours relate to
10  the work to quantify damages in this case?
11    A   I'm not sure what you mean by my -- by
12  that question, but I've spent about 400 hours --
13  I've spent about 400 hours in support of -- in
14  support of Dr. Respess in the preparation of his
15  report, you know, in which he quantified damages.
16    Q   Okay.  I'm just trying to understand of
17  the 600 hours you spent in connection with the
18  Respess/Lim reports, including the preparation for
19  your deposition about which we're here to --
20  you're here to testify -- preparation of your
21  reports about which you're here to testify today,
22  how many of those 600 hours go to the work related

Page 23

1  to the profitability opinions versus the damages
2  opinions?
3    A   I would not be able to tell you that.  I
4  have not kept count.
5    VIDEO TECHNICIAN:  I'm sorry.  Can we go
6  off the record one second?
7    MS. GOODMAN:  Sure.
8    MR. BRISKIN:  Sure.
9    VIDEO TECHNICIAN:  Off the record at
10  10:03.
11    (Brief recess.)
12    VIDEO TECHNICIAN:  Back on the record at
13  10:08.
14  BY MS. GOODMAN:
15    Q   Ms. Lim, of the 600 hours that you have
16  spent working on the topics reflected in the
17  Respess and Lim reports, including preparing for
18  your deposition, can you give an approximation of
19  how many of those hours relate to the calculation
20  of damages?
21    A   I'm sorry, I didn't keep count.
22    Q   When you were -- withdrawn.

Page 24

1    I'm not asking if you kept count, I'm
2  asking if you can give an approximation of how
3  many hours of the 600 were spent in connection
4  with work on the quantification of damages?
5    MR. BRISKIN:  Objection to form.
6    THE WITNESS:  I haven't focused on
7  keeping track of my hours in the manner in which
8  you described.  I wouldn't be able to give you any
9  approximation.
10  BY MS. GOODMAN:
11    Q   So you can't say if you spent one hour
12  working on the quantification of damages and 599
13  hours working on the accounting opinions you
14  offer?
15    MR. BRISKIN:  Objection to form.
16    THE WITNESS:  I'm sorry, I just haven't
17  kept track in the manner in which you're asking.
18  I -- I -- I just can't give an approximation.
19  BY MS. GOODMAN:
20    Q   Okay.  So it's possible you've spent one
21  hour of the 600 hours on the quantification of
22  damages?

Page 25

1    MR. BRISKIN:  Objection to form.
2    THE WITNESS:  I'm sure that I spent more
3  than one hour.
4  BY MS. GOODMAN:
5    Q   Okay.  Have you spent more than ten
6  hours on the approximation of damages?
7    A   I've spent more than ten hours.
8    Q   Have you spent more than a hundred hours
9  on the calculation of damages?
10    A   I'm not sure.  I haven't kept count.
11  It's quite possible.
12    Q   Is it quite possible or probable or more
13  likely than not?  Can you say more than possible?
14    A   It's quite possible.
15    Q   Dr. Respess billed 348.5 hours on this
16  matter.
17    Does that figure help you approximate
18  how many hours you spent on the topic of
19  calculating damages in this matter?
20    A   No.
21    Q   Is it quite possible that you billed
22  more than 200 hours to the calculation of damages

7 (Pages 22 - 25)

CONFIDENTIAL

Page 42

1  withdrawal prior to reading his declaration
2  yesterday.
3      BY MS. GOODMAN:
4      Q   When did you learn that Dr. Respess
5  could no longer work on the matter?
6      MR. BRISKIN:  You can answer with a date
7  if you know.
8      THE WITNESS:  February 12th.
9      BY MS. GOODMAN:
10     Q   Who wrote your rebuttal report?
11     A   I wrote my rebuttal report as it is
12 filed.
13     Q   Did you work on your rebuttal report
14 prior to February 12th?
15     MR. BRISKIN:  I'd just instruct the
16 witness not to answer with regard to the contents
17 of the report.
18     THE WITNESS:  Prior to Dr. Respess'
19 withdrawal, I worked with Dr. Respess on the
20 preparation of what was at -- what was at that
21 time going to be his rebuttal report.
22     BY MS. GOODMAN:

Page 43

1      Q   Did you write any portions of the
2  rebuttal report as filed prior to February 12th,
3  2024?
4      MR. BRISKIN:  You can answer yes or no.
5      THE WITNESS:  No.
6      BY MS. GOODMAN:
7      Q   Did you -- are there any portions of the
8  rebuttal report, which you filed on February 13th,
9  2024, which were written by Dr. Respess?
10     MR. BRISKIN:  I'd just instruct the
11 witness not to respond with regard to the
12 contents, but you can respond yes or no.
13     THE WITNESS:  I wrote my rebuttal report
14 as filed.
15     BY MS. GOODMAN:
16     Q   You wrote the entirety of your rebuttal
17 report as filed; is that your testimony?
18     MR. BRISKIN:  Objection to form.
19     THE WITNESS:  Yes, it is my words.
20     BY MS. GOODMAN:
21     Q   Did you write them out yourself?
22     A   I'm not sure what you mean by "write

Page 44

1  them out."  Could you clarify, please.
2      Q   Did you type every word in your rebuttal
3  report yourself?
4      MR. BRISKIN:  Objection to form.
5      THE WITNESS:  If you're asking me
6  whether I keystroked every single letter in my
7  rebuttal report, no.
8      MR. BRISKIN:  Aren't we getting close to
9  an hour?  Is this a good time to take a break?
10     MS. GOODMAN:  Sure.
11     MR. BRISKIN:  Okay.
12     VIDEO TECHNICIAN:  Off the record at
13 10:37 a.m.
14     (Brief recess.)
15     (Lim Exhibit Number 1 was
16         marked for identification.)
17     VIDEO TECHNICIAN:  Back on the record at
18 10:53.
19     BY MS. GOODMAN:
20     Q   Ms. Lim, you've been handed your
21 rebuttal report marked as Lim Exhibit 1.
22     Do you have that in front of you?

Page 45

1      A   I do.
2      Before we continue, I realized that I
3  need to clarify.  I left one individual off of the
4  list of names that I had given you with regard to
5  other Brattle staff that assisted Dr. Respess in
6  the preparation of his report and assisted me in
7  the preparation of my report and that is Alison
8  Forman.
9      Q   Okay.  So you have Exhibit 1 in front of
10 you?
11     A   I do.
12     Q   And the -- the opinions you offer in
13 this case are based on the assumption that Google
14 has violated the antitrust laws as alleged in the
15 amended complaint; is that accurate?
16     A   Are you referring to a particular
17 portion of my report?
18     Q   I'm just asking if your opinions are
19 based on the assumption that Google has violated
20 the antitrust laws as alleged in the amended
21 complaint.  Is that accurate?
22     A   Yes.

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1    Q   Okay.  And you have not been asked to
2   independently evaluate the legal claims in this
3   matter; is that accurate?
4    A   Yes.
5    Q   And is it your testimony that you did
6   not independently evaluate Dr. Simcoe's analyses
7   in this case?
8    A   That is correct.
9    Q   And the only thing you do with
10  Dr. Simcoe's analyses is use them as inputs to
11  calculate overcharges and advertiser damages?
12   A   That is correct.
13   Q   Did you read Dr. Simcoe's report?
14   A   I have.
15   Q   Did you evaluate or study his models to
16  understand how he arrived at the but-for take rate
17  that he offers in his report?
18      MR. BRISKIN:  Objection to form.
19      THE WITNESS:  Can you ask the question
20  again?
21  BY MS. GOODMAN:
22   Q   Did you study his models to understand

Page 47

1   how he arrived at the but-for take rates that he
2   offers in his report?
3    A   I -- I read his report.  I wouldn't use
4   the word "study" to describe what I did.  I read
5   his report at a high level and did not attempt to
6   evaluate his analyses.
7    Q   And because you did not attempt to
8   evaluate his analyses, you have no opinion about
9   the strength or weakness of his analyses; is that
10  accurate?
11      MR. BRISKIN:  Objection to form.
12      THE WITNESS:  I did not independently
13  evaluate Dr. Simcoe's analyses.
14  BY MS. GOODMAN:
15   Q   And is it accurate then that you have no
16  opinion about the strength or weakness of his
17  analyses?
18   A   I have no opinions about that.
19   Q   And so you have no opinion whether
20  Dr. Simcoe's analyses are correct or incorrect,
21  correct?
22      MR. BRISKIN:  Objection to form.

Page 48

1      THE WITNESS:  Correct.
2   BY MS. GOODMAN:
3    Q   And you're not offering an opinion in
4   this case as to whether the overcharge you
5   calculate was caused by anticompetitive conduct;
6   is that correct?
7    A   One more time.
8    Q   You are not offering an opinion in this
9   case as to whether the overcharge you calculate
10  was caused by anticompetitive conduct; is that
11  correct?
12   A   That is correct.
13   Q   You are not opining in this case that
14  Google is not in compliance with generally
15  accepted accounting principles by treating itself
16  as a principal, correct?
17   A   I do not have an opinion that Google's
18  financial statements in which Google considers
19  itself a principal, that those financial
20  statements are materially misstated.
21   Q   You -- you do not offer an opinion in
22  this case as to whether Google's internal DVAA

Page 49

1   product area reporting was in accordance with
2   GAAP, correct?
3      MR. BRISKIN:  Objection to form.
4   BY MS. GOODMAN:
5    Q   Let me withdraw the question.
6      Your opinion in this case -- withdrawn.
7      You do not opine that Google's internal
8   DVAA product area reporting was not in accordance
9   with GAAP, correct?
10      MR. BRISKIN:  Objection to form.
11      THE WITNESS:  So I -- I don't -- I don't
12  have an opinion about whether Google's internal
13  DVAA product area reporting was in accordance with
14  GAAP.
15  BY MS. GOODMAN:
16   Q   And --
17      MR. BRISKIN:  Did you finish your
18  answer?
19      THE WITNESS:  I did.  Thank you.
20  BY MS. GOODMAN:
21   Q   And it is accurate that you do not have
22  an opinion about whether Google's internal DVAA

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1    product area reporting was not in accordance with
2    GAAP, correct?
3           MR. BRISKIN:  Objection to form.
4           THE WITNESS:  I think -- I think Google
5    has stated that its DVAA internal management view
6    reporting is not in accordance with GAAP.
7    BY MS. GOODMAN:
8        Q   I'm asking for your opinion in this
9    case.  Can you please answer the question as I
10   posed it.
11          You do not have an opinion about whether
12   Google's internal DVAA product area reporting was
13   not in accordance with GAAP, correct?
14          MR. BRISKIN:  Objection to form.
15          THE WITNESS:  So as I just said, Google
16   has said that its management view internal
17   reporting is not in accordance with GAAP and I see
18   no reason to -- I've not seen anything to indicate
19   that Google is wrong in that respect.
20   BY MS. GOODMAN:
21       Q   I'm just asking whether you offer an
22   opinion one way or another in this case as to

Page 51

1    whether Google's internal DVAA management
2    reporting is not in accordance with GAAP and it
3    sounds like the answer is no.  Am I correct in
4    understanding your testimony?
5           MR. BRISKIN:  Objection to form.
6           THE WITNESS:  I -- I just think it's a
7    little more nuanced than that.
8    BY MS. GOODMAN:
9        Q   Okay.  You do not opine that Google is
10   not in accordance with GAAP by treating itself as
11   a principal, correct?
12          MR. BRISKIN:  Objection to form.
13          THE WITNESS:  Sorry, one more -- one
14   more time.
15   BY MS. GOODMAN:
16       Q   You do not offer an opinion that Google
17   is not in accordance with GAAP by treating itself
18   as a principal, correct?
19          MR. BRISKIN:  Objection to form.
20          THE WITNESS:  I'm not sure how that
21   question is different from the other question you
22   asked before.

Page 52

1           I do not have an opinion about whether
2    Google's financial statements -- publicly-reported
3    financial statements in which Google treats itself
4    as a principal for most transactions is materially
5    misstated relative to GAAP.
6    BY MS. GOODMAN:
7        Q   It is accurate that you do not disagree
8    with Google's treatment of itself as a principal
9    in its publicly-filed financial statements
10   reported under GAAP, correct?
11          MR. BRISKIN:  Objection to form.
12          THE WITNESS:  Sorry, I'm getting a
13   little -- little confused about the double
14   negatives.  One more time.
15   BY MS. GOODMAN:
16       Q   It is accurate that you do not disagree
17   with Google's treatment of itself as a principal
18   in its publicly-filed financial statements
19   reported under GAAP?
20          MR. BRISKIN:  Objection to form.
21          THE WITNESS:  I don't agree or disagree.
22   I don't have an opinion about that.

Page 53

1    BY MS. GOODMAN:
2        Q   Okay.  And you do not offer an opinion
3    in this matter that Google misapplied ASC 606 by
4    treating itself as a principal, correct?
5           MR. BRISKIN:  Objection to form.
6           THE WITNESS:  Again, are you -- are you
7    referring to Google's publicly-reported financial
8    statements?
9    BY MS. GOODMAN:
10       Q   Yes.
11       A   I don't have an opinion one way or the
12   other.  I don't agree or disagree with regard to
13   Google's treatment of itself as a principal for
14   most transactions in those financial statements.
15       Q   And in this line of questioning you were
16   looking at Exhibit 1, which is your rebuttal
17   report.  Which parts of Exhibit 1 were you
18   reading -- reading?
19          MR. BRISKIN:  Objection to form.
20          THE WITNESS:  You asked me some
21   questions about whether I had performed an
22   independent evaluation of Dr. Simcoe's work and I

14 (Pages 50 - 53)

Page 66

1   in Damages Analysis"?
2       A   The -- the avenues are the red lines
3   or -- or, sorry, the FAA purchase avenues are the
4   red arrows shown in Figure 4 and the FAA purchase
5   pathways are a subset of the red avenues.
6       Q   Okay.  Did you see any evidence --
7   withdrawn.
8           And so would it be accurate to put in
9   between the left-hand side of DV360, TTD, other
10  DSPs, and Google Ads and the right-hand side blue
11  bubble FAAs the advertising agencies through which
12  FAAs purchase ads?
13          MR. BRISKIN:  Objection to form.
14          THE WITNESS:  I think this question was
15  similar to the previous question you asked me
16  before.  Figure 3 just is different from -- I'm
17  sorry, Figure 4 is different from Figure 3 in that
18  it breaks out more binders and it shows the red
19  arrows, which are the FAA purchase pathways, of
20  which the -- sorry, it shows the red arrows, which
21  are the FAA purchase avenues, of which the FAA
22  purchase pathways are a -- are a subset.  So that

Page 67

1   I -- I -- I -- I think you're asking a very
2   similar question with regard to Figure 3 and
3   Figure 4.  I don't -- I would have the same
4   answer.
5   BY MS. GOODMAN:
6       Q   Okay.  And it's accurate that the FAAs
7   purchased display ads from Google using various ad
8   agencies, correct?
9       A   Yes.
10      Q   Did you see any evidence that FAAs
11  purchased display ads directly from Google?
12          MR. BRISKIN:  Objection to form.
13          THE WITNESS:  Could you clarify what you
14  mean by "directly"?
15  BY MS. GOODMAN:
16      Q   With no other entity sitting in between
17  the FAA and Google.
18          MR. BRISKIN:  Objection to form.
19          THE WITNESS:  What -- what do you -- can
20  you clarify what you mean by "sitting in between"?
21  BY MS. GOODMAN:
22      Q   Well, Mr. Briskin is sitting in between

Page 68

1   yourself and Mr. Chu.  That's what I mean.
2   Imagine yourself to be an FAA and Mr. Chu being
3   Google.
4           Is there any other entity between the
5   FAA and Google in the course of purchasing ads
6   that you saw?
7           MR. BRISKIN:  Objection to form.
8           THE WITNESS:  So I'm not -- sorry, I'm
9   not -- I'm not sure the -- the seating -- the
10  hypothetical -- or it's not hypothetical, but the
11  seating diagram really helps me understand your
12  question.
13          Again, the FAAs and -- the FAAs
14  purchased display advertising from Google and, as
15  I testified earlier, that the FAAs used ad
16  agencies to do so.
17  BY MS. GOODMAN:
18      Q   Okay.  And by using the ad agencies to
19  do so, is it accurate that the ad agencies sit
20  between the FAAs and Google?
21          MR. BRISKIN:  Objection to form.
22          THE WITNESS:  Again, I'm not sure what

Page 69

1   you mean by "sit between."
2   BY MS. GOODMAN:
3       Q   So you can't answer the question?
4       A   I think you'd have to clarify it for me.
5       Q   Okay.  What's your understanding of the
6   word "directly"?
7           MR. BRISKIN:  Objection to form.
8           THE WITNESS:  I -- I -- it depends on
9   the context.
10  BY MS. GOODMAN:
11      Q   Can you give me a dictionary definition
12  of the word "directly"?
13      A   Probably not without the dictionary.
14      Q   Okay.
15      A   I'm sorry, just -- I -- I wasn't
16  prepared on dictionary definitions today.
17      Q   Okay.  Did you see any evidence that the
18  FAAs paid money directly to Google?
19          MR. BRISKIN:  Objection to form.
20          THE WITNESS:  Again, can you clarify
21  what you mean by "directly"?
22  BY MS. GOODMAN:

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1    Q    Dollars went from an FAA directly to
2  Google.
3          MR. BRISKIN:  Objection to form.
4          THE WITNESS:  So let me -- let me -- let
5  me state it this way:  So what I saw in the
6  payment process was that Google invoiced the --
7  Google invoiced the ad agencies and the ad
8  agencies invoiced the FAAs and the FAAs paid
9  100 percent of the charges invoiced by Google.
10         VIDEO TECHNICIAN:  Sorry, ma'am, it
11 picks up when you're touching the microphone.
12         THE WITNESS:  Oh, sorry.  I've probably
13 just got a nervous habit there.  Apologies.  Do I
14 need to say that again?
15         VIDEO TECHNICIAN:  No, you're fine.
16         THE WITNESS:  Okay.
17 BY MS. GOODMAN:
18    Q    And so in what you saw, if I'm
19 understanding you correctly, Google invoiced the
20 ad agencies and the ad agencies invoiced the FAAs,
21 correct?
22    A    Yes.

Page 71

1    Q    Okay.  And so in what you saw, can we
2  have the common understanding that the ad
3  agencies, therefore, sit between Google and the
4  FAAs?
5          MR. BRISKIN:  Objection to form.
6  BY MS. GOODMAN:
7    Q    That's what I mean by "sit between."
8  Okay?
9    A    Are you referring to the payment process
10 specifically when you refer to -- to "sit
11 between"?
12    Q    I'm referring to both the payment and
13 purchasing process.
14         MR. BRISKIN:  Objection to form.
15         THE WITNESS:  I reviewed the -- I
16 reviewed the payment process.
17 BY MS. GOODMAN:
18    Q    Did you review the purchasing process?
19    A    What do you mean by "purchasing
20 process"?
21    Q    What's your understanding of the
22 difference between payment and purchase?

Page 72

1    A    I'm -- I'm -- I'm trying to actually
2  understand what you mean by the difference between
3  payment and purchase because you -- you asked a
4  question about purchase, you asked a question
5  about -- and I clarified with regard to payment.
6  And -- and so if you could clarify what you mean
7  by "purchase."
8    Q    I want to use --
9    A    I don't want to have a
10 misunderstanding --
11    Q    I agree.
12    A    -- between the two of us.
13    Q    I agree.
14         You used the word "purchase" throughout
15 your report, so I want to use your understanding
16 of purchase and I want to use your understanding
17 of payment, which is also in your report.
18         So please tell me what you understand to
19 mean the difference between those two words as
20 used in your report and we will have that common
21 understanding.
22    A    So as I testified earlier, my

Page 73

1  understanding is that based on what I saw, the
2  FAAs purchased an advertising from Google.  With
3  regard to the payment flow process specifically,
4  Google invoiced the ad agencies and the ad
5  agencies invoiced the FAAs and the payments
6  reflect the invoiced parties.
7          MS. GOODMAN:  Move to strike as not
8  responsive.
9  BY MS. GOODMAN:
10    Q    My question to you is simply what do you
11 understand the difference in meaning of the words
12 "payment" and "purchase" to be in your report?
13    A    Purchase in my mind is who is -- it's
14 who is -- it's -- it's the advertiser buying the
15 ad inventory.  Payment refers, in -- in my mind,
16 to the physical flow of funds.
17    Q    Okay.  So did you see any evidence that
18 an FAA buys ad inventory directly from Google?
19         MR. BRISKIN:  Objection to form.
20         THE WITNESS:  As I stated earlier,
21 the -- the FAAs purchased advertising from -- they
22 purchased services from Google.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1 BY MS. GOODMAN:
2     Q   Yes.
3     A   I'm not -- I'm not -- again, I'm not
4 sure what you mean by "directly."  I think I've --
5 I think I've stated my understanding of both
6 the -- of who's doing the purchasing and who's
7 doing the paying in terms of the payment flow
8 process.
9     Q   It is accurate that some of the ad
10 agencies used by FAAs engaged other ad agencies to
11 execute the FAAs' ad purchases, correct?
12     A   Yes.
13         MR. BRISKIN:  Can we take a break in the
14 next five minutes, whenever it's a good breaking
15 point?
16         MS. GOODMAN:  Yeah.
17 BY MS. GOODMAN:
18     Q   Ms. Lim, did you see any evidence of an
19 FAA buying ad inventory without the use of an
20 advertising agency?
21     A   It's possible that that happened.  I was
22 asked to focus my damages analysis -- or

Page 75

1 Dr. Respess was asked to focus his damages
2 analysis on the specific F- -- FAA purchase
3 pathways in the -- in the Respess report.
4         In -- in those pathways the FAAs used ad
5 agencies to make their purchases of Google
6 services, but it's -- it's -- it's possible that
7 I -- I -- so, for example, what I'm -- let me
8 just -- what I'm thinking about is, as I mentioned
9 in my report, there are a number of blank agency
10 IDs and I don't know in those circumstances
11 where -- whether an ad agency was involved or not
12 and I -- I can't recall -- no, no.  Sorry.  Strike
13 that.  I do recall that there are FAAs associated
14 with those blank agency IDs.
15     Q   Okay.  So for each of the 15 purchase
16 pathways included in your damages analysis, did
17 you see any evidence of any of the FAAs within
18 those purchase pathways buying ad inventory
19 without the use of an advertising agency?
20     A   By definition, those purchase pathways
21 are as I've described them in Figures 8 through 10
22 of the opening report and each of those -- in each

Page 76

1 of those pathways the FAAs use ad agencies to make
2 their purchases.
3     Q   And so it's accurate that, for purposes
4 of the damages which you calculate in this case,
5 there is no instance of an FAA buying ad inventory
6 without the use of an advertising agency?
7     A   Yes.
8         MS. GOODMAN:  We can take a break.
9         MR. BRISKIN:  Thanks.
10         VIDEO TECHNICIAN:  Off the record at
11 11:38.
12         (Brief recess.)
13         VIDEO TECHNICIAN:  Back on the record at
14 11:53.
15 BY MS. GOODMAN:
16     Q   Ms. Lim, if you could turn to Exhibit 1,
17 Appendix E, paragraph 44.
18     A   On page 17?
19     Q   Yes.
20     A   I'm there.
21     Q   The first sentence reads, "The FAAs
22 purchased display ads from Google using various ad

Page 77

1 agencies."
2         Do you see that?
3     A   Yes.
4     Q   For purposes of your damages
5 computation, did you see any evidence that any FAA
6 directed the advertising agency to purchase ads
7 using Google products or services?
8         MR. BRISKIN:  Objection to form.
9         THE WITNESS:  I'm not sure what you mean
10 by "directed."
11 BY MS. GOODMAN:
12     Q   Did you see any evidence that any FAA
13 told their advertising agency please purchase ads
14 using Google products or services?
15         MR. BRISKIN:  Objection to form.
16         THE WITNESS:  I wasn't -- I was focused
17 on the payment flow process, so I -- and I -- let
18 me -- let me start over.
19         So in the course of my work -- work, as
20 I mentioned before, I reviewed probably
21 thousands -- probably thousands of -- of documents
22 in this matter and I don't recall the contents of

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1 each and every one of those.  What I -- what I
2 focused on was the payment flow process.
3        So with regard to your question, I
4 think -- I think my answer is I don't know.  I
5 don't -- I don't remember.
6 BY MS. GOODMAN:
7    Q   Okay.  So with regard to my question,
8 you don't remember whether you saw any evidence
9 that any FAA directed their advertising agency to
10 use Google products or services to purchase ads;
11 is that accurate?
12    A   I think --
13        MR. BRISKIN:  Objection to form.
14        THE WITNESS:  I think you modified your
15 question to say -- when you clarified, you said
16 did I see any evidence that an FAA had told an ad
17 agency.  And if -- if -- if that's how you're --
18 what you mean by "directed," I don't recall one
19 way or the other.
20 BY MS. GOODMAN:
21    Q   Okay.  That is what I mean by
22 "directed."

Page 79

1        So with regard to my question, you don't
2 remember whether you saw any evidence that any FAA
3 directed their advertising agency to use Google
4 products or services to purchase -- to purchase
5 ads; is that correct?
6        MR. BRISKIN:  Objection to form.
7        THE WITNESS:  If -- if in that question
8 you -- you mean to replace "directed" with "told,"
9 then I don't recall one way or the other.
10 BY MS. GOODMAN:
11    Q   I said that is what I mean by
12 "directed," so I would like to get a clear answer
13 to my question.
14    A   Sorry, I thought I was being -- being
15 clear.
16    Q   There's no question pending.
17    A   Apologies.
18    Q   Did you see any evidence in this case
19 that any FAA instructed their advertising agency
20 to use Google products or services to purchase
21 ads?
22        MR. BRISKIN:  Objection to form.

Page 80

1        THE WITNESS:  What do you mean by
2 "instructed"?  Do you mean told again?
3 BY MS. GOODMAN:
4    Q   What do you understand the word
5 "instructed" to mean?
6    A   It depends on the context.
7    Q   In the context of my sentence, how do
8 you interpret it?
9    A   I think that's what I'm asking you,
10 if -- if you're -- if you mean told.
11    Q   I just want to understand how you
12 under- -- how you interpret the word "instructed"
13 in my question.
14        What do you think I mean?
15        Let me withdraw that.
16        What do you understand the word
17 "instructed" to mean in my question?
18    A   Told.
19    Q   Okay.  Did you see any evidence in this
20 case that any FAA instructed their advertising
21 agency to use Google products or services to
22 purchase ads?

Page 81

1        MR. BRISKIN:  Objection to form.
2        THE WITNESS:  Could you -- one -- one
3 more time.  Sorry.
4 BY MS. GOODMAN:
5    Q   Did you see any evidence in this case
6 that any FAA instructed their advertising agency
7 to use Google products or services to purchase
8 ads?
9        MR. BRISKIN:  Objection to form.
10        THE WITNESS:  Sorry, I -- I just want to
11 be clear.  Again, it's -- it's the -- it's the FAA
12 is purchasing ads and -- and so -- so I think my
13 answer is the -- again, I'm not sure how that
14 question is different from your previous question,
15 which -- which I understand you to mean did I see
16 any evidence in this matter where the -- where an
17 FAA told an ad agency to use Google with regard to
18 the FAAs' purchase -- purchases of Google's
19 services.
20        And my -- so my answer would be that,
21 again, I've reviewed thousands of documents in
22 this matter and I don't recall the -- the content

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1  of each and every one of them, so I may have seen
2  something, I -- I may not.  I -- I don't recall
3  one way or the other.  It was not something I
4  focused on.
5       MS. GOODMAN:  Move to strike.
6  BY MS. GOODMAN:
7    Q   It's accurate that the FAAs purchased
8  display ads from Google using various ad agencies,
9  correct?
10      MR. BRISKIN:  Objection to form.
11      Oh, sorry.
12      THE WITNESS:  Yes.
13  BY MS. GOODMAN:
14   Q   Okay.  The FAAs used the various ad
15  agencies how to purchase ads from Google?
16      MR. BRISKIN:  Objection to form.
17      THE WITNESS:  I'm not sure what you mean
18  by "how."
19  BY MS. GOODMAN:
20   Q   How did the various ad agencies
21  participate in the process of purchasing display
22  ads from Google for the FAAs?

Page 83

1    A   So my work focused on the payment flow
2  process.  I wasn't focused on the -- I wasn't
3  focused on exactly what the ad agencies did in
4  facilitating the FAAs' purchases of Google
5  services.
6    Q   Okay.  Paragraph 44 of Appendix E, page
7  17, the sentence I just read is from that and it
8  cites to two documents in Exhibit 26 -- footnote
9  26.
10      Did you review those two documents cited
11  in footnote 26?
12   A   Yes.
13   Q   Did you come away with an understanding
14  of how the ad agencies participate in the process
15  of purchasing display ads from Google?
16   A   So a couple of clarifications.  The -- I
17  know there are two Bates stamps in footnote 26.  I
18  think it's actually the same document.
19      The -- the -- the document, as it's
20  noted in the footnote, is a contract between the
21  Air Force and GSD&M.
22      I was focused on -- my review of this

Page 84

1  particular contract was to provide overall context
2  to, for example, an FAA purchase pathway.  It
3  wasn't -- I wasn't focused on the -- I wasn't
4  focused on what particular activities the -- the
5  ad agencies did.
6    Q   Okay.  So sitting here today, do you
7  have any understanding of how the ad agencies
8  participate in the process of purchasing display
9  ads from Google for the FAAs?
10      And I'm not asking for what your
11  understanding is.  I'm simply asking whether you
12  have an understanding of how they participate.
13   A   The -- the ad agencies facilitate the
14  FAAs' purchases.
15   Q   Okay.  Do you know how the FAAs
16  facilitate the ad agencies -- the FAAs' purchases?
17   A   Again, I didn't focus on exactly what
18  activities they did.
19   Q   Okay.  So do you have an understanding
20  of how the ad agencies facilitate the FAAs'
21  purchases?
22   A   I don't have a detailed understanding.

Page 85

1    Q   Do you have an understanding?
2    A   Yes.
3    Q   What is your understanding of how the
4  FA- -- how the ad agencies facilitate the FAAs'
5  purchases?
6    A   The -- the FAAs facilitate the FAAs'
7  purchases -- for example, I believe that --
8  that -- that they're the ones that log in, so to
9  speak, to Google Ads or DV360.
10   Q   And what is your understanding based on
11  that the ad agencies are the ones who log in, so
12  to speak, to Google Ads or DV360?
13   A   I -- I can't remember where I gained
14  that understanding.
15   Q   Okay.  And it is your understanding
16  sitting here today that Google sends invoices to
17  ad agencies, correct?
18   A   Yes.
19   Q   And it is your understanding sitting
20  here today that Google -- that within your damages
21  calculations Google only sends invoices to ad
22  agencies, not directly to the FAA, correct?

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1      MR. BRISKIN:  Objection to form.
2      THE WITNESS:  One more time, please.
3   BY MS. GOODMAN:
4      Q    Within your damages calculations, the
5   transactions within your damages calculations, is
6   it accurate that for all of those purchases Google
7   sent invoices to an ad agency, not to the FAA?
8      MR. BRISKIN:  Objection to form.
9      THE WITNESS:  Yes.
10  BY MS. GOODMAN:
11     Q    And for all of the transactions within
12  your damages calculations, did you see any
13  evidence that an FAA transmitted money directly to
14  Google?
15     MR. BRISKIN:  Objection to form.
16     THE WITNESS:  With regard to the payment
17  flow process, what I saw is that the FAAs cut
18  checks to the ad agencies and the ad agencies cut
19  checks to Google such that --
20  BY MS. GOODMAN:
21     Q    What evidence --
22     A    -- such that in the end the FAAs paid

Page 87

1   100 percent of the charges -- of Google's charges.
2      Q    What evidence did you see that ad
3   agencies cut checks to Google?
4      A    That would be in my Appendix E to the
5   opening report.
6      Q    What kinds of documents did you believe
7   were sufficient evidence to form the belief that
8   the ad agencies cut checks to Google?
9      MR. BRISKIN:  Objection to form.
10     THE WITNESS:  That's -- that's my
11  understanding from the payment flow process.
12  BY MS. GOODMAN:
13     Q    And I'm asking what kinds of documents
14  is your understanding based on.  I'm not asking
15  for a specific document, but what kinds of things
16  did you see that lead you to believe the -- or
17  leads you to the opinion that the ad agency cut a
18  check to Google?
19     A    Is -- it would be, for example, the
20  payment data and invoices that are listed in
21  Appendix E.
22     Q    What payment data did you see from an --

Page 88

1   from an advertising agency, not from the FAA, but
2   evidence of an advertising agency paying money to
3   Google?  What payment data are you referring to?
4      A    Perhaps it would be helpful to -- let me
5   just point that -- let me go to my Appendix E and
6   I -- I will -- well, I will go there.
7      So, for example --
8      Q    Can you -- I'm sorry to interrupt, but
9   can you just identify what page you're looking at?
10     A    I'm in -- I'm on pages 158 and 159.
11     Q    Thank you.
12     A    Go ahead.
13     A    So, for example, in the IPG MediaOcean
14  data I saw evidence of cuts being check -- or
15  checks being cut from an ad agency to Google.
16     Q    Okay.  And is it accurate that for no
17  other of the payment purchase pathways reflected
18  in your Appendix E do you include any evidence
19  that an ad agency cut a check to Google?
20     A    I'd -- I'd have to go through each and
21  every one.  I don't -- I don't recall specifically
22  the -- there were many invoices and much payment

Page 89

1   data that I looked at.  I just don't recall
2   specifically --
3      Q    Okay.
4      A    -- in terms of -- I -- I recall on --
5   for USPS we got a quite fulsome dataset, but I
6   just -- I just don't recall specifically with
7   regard to other pathways.
8      Q    If you saw payment data showing payments
9   from an advertising agency to Google, would that
10  be reflected in your Appendix E?
11     MR. BRISKIN:  Objection to form.
12     THE WITNESS:  It would be reflected in
13  my Documents Relied Upon list, the documents that
14  I relied upon.
15  BY MS. GOODMAN:
16     Q    But it wouldn't be in Appendix E?
17     A    Appendix E is a -- are examples of
18  walk-throughs that I performed with regard to the
19  payment process.  Appendix E includes documents
20  related to those walk-throughs.  But it's possible
21  that I saw additional payment data outside of
22  Appendix E.

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1    Q    And just for the record, when you say
2    "Appendix E," you're talking about Appendix E to
3    the initial Respess report, correct?
4        A    Yes.
5        Q    And Appendix E to your rebuttal report
6    is, in fact, the initial Respess report, correct?
7        A    Corrected for errata.
8        Q    Yes.
9        A    Yes.  It's rather confusing.
10       Q    Okay.  So could we talk about Appendix E
11   to the Respess report in this deposition as
12   Appendix E/E so we know what we're talking about?
13       A    Wait, wait, wait, wait.  What do you
14   want to call it?  Wait.  Sorry?
15       Q    Withdrawn.
16           MR. BRISKIN:  Was that a joke?  Appendix
17   2.
18   BY MS. GOODMAN:
19       Q    Did you see any evidence in this case
20   for purposes of your damages calculation that any
21   FAA paid Google directly for the use of DV360?
22           MR. BRISKIN:  Objection to form.

Page 91

1            THE WITNESS:  Sorry, are we talking
2    about the FAA purchase pathways included in my
3    damages analysis?
4    BY MS. GOODMAN:
5        Q    Yes, ma'am.
6            MR. BRISKIN:  Same objection.
7            THE WITNESS:  What I saw was that --
8    again, what I saw was that Google invoiced ad
9    agency, ad agency invoiced FAA, FAA cut a check to
10   the ad -- ad agency, and ad agency cut a check to
11   Google.
12   BY MS. GOODMAN:
13       Q    Okay.  And so is it your testimony that
14   you did not see any evidence of Google paying
15   money -- strike that.  Withdrawn.
16           Is it accurate that you did not see any
17   evidence that any FAA paid money to Google
18   directly for the use of DV360?
19           MR. BRISKIN:  Objection to form.
20           THE WITNESS:  Sorry, sorry, I'm not --
21   I'm not sure what you mean by "directly," but we
22   just discussed in --

Page 92

1    BY MS. GOODMAN:
2        Q    May I --
3        A    -- US- --
4        Q    May I provide an understanding of -- let
5    me tell you my understanding of "directly" and
6    then maybe that will help you answer the question.
7        A    Okay.
8        Q    By "directly" I mean without the
9    intervention of somebody -- of a medium or an
10   agent.
11           So did you see any evidence that any FAA
12   paid Google directly for the use of DV360 for the
13   transactions included in your damages
14   calculations?
15           MR. BRISKIN:  Objection to form.
16           THE WITNESS:  Let me -- I'm not sure how
17   that question is different from the questions you
18   asked before in which I referred you to the IPG
19   data for USPS.
20   BY MS. GOODMAN:
21       Q    Okay.  Let me try again.
22           Did you see any evidence that any FAA

Page 93

1    paid Google without the intervention of a medium
2    or an agent for the use of DV360 for the
3    transactions included in your damages calculation?
4            MR. BRISKIN:  Objection to form.
5            THE WITNESS:  So, again, my
6    understanding is that Google invoiced the ad
7    agencies, the ad agencies invoiced the FAAs, the
8    FAAs cut checks to the ad agencies, and the ad
9    agencies cut checks to Google.
10   BY MS. GOODMAN:
11       Q    So based on what you saw, is it accurate
12   that the FAAs used a medium or an agent in order
13   to pay Google?
14       A    I'm not sure what you mean by "medium"
15   or "agent."
16           The -- the payment process by which the
17   FAAs paid for their Google purchases -- the
18   payment process involves ad agencies.
19       Q    And the ad agencies are in between -- in
20   that payment process they are in between Google
21   and the FAA, correct?
22           MR. BRISKIN:  Objection to form.

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1          THE WITNESS:  Again, I'm not sure what
2    you mean by "in between," but as I testified,
3    Google invoices the ad agencies, ad agencies
4    invoice the FAAs, FAA -- FAAs cut checks to the ad
5    agencies, ad agencies cut checks to Google.
6    BY MS. GOODMAN:
7       Q   Okay.  I'm going to ask one more time
8    just to see if you can answer the question as I've
9    posed it.  And if you can't, that's fine and I'll
10   move to strike your answer and I'll call the
11   court -- I'll bring this to the judge.
12          But I'm asking a question to which
13   you're not providing an answer and that is are the
14   ad agencies in between the payment -- in the
15   payment -- withdrawn.
16          In the payment process which you have
17   described, do the ad agencies sit in between
18   Google and the FAA in order for Google to receive
19   money from the FAA?
20          MR. BRISKIN:  Objection to form.
21          THE WITNESS:  Again, I -- I think I've
22   explained my understanding of the process.  I'm

Page 95

1    not sure what you mean by "sit in between," but I
2    think I've been very clear that the -- Google
3    invoices the ad agencies, ad agencies invoice the
4    FAA, FAAs cut the checks to the ad agencies, ad
5    agencies cut the checks to Google.
6    BY MS. GOODMAN:
7       Q   And in the process which you have
8    described --
9       A   I mean, I -- I -- that's the way that I
10   would describe the process.
11      Q   Okay.
12      A   So -- sorry.
13      Q   In the process which you have described
14   it is correct that the ad agencies are in between
15   Google and the FAAs, correct?
16          MR. BRISKIN:  Objection to form.
17          THE WITNESS:  You seem really -- you
18   seem really interested in "in between" and, again,
19   I'm not sure what "in between" means with regard
20   to your -- your question.
21          The way the invoicing process works
22   is -- is as I've explained it and that's the way I

Page 96

1    would phrase it.  I -- again, Google invoiced the
2    ad agencies, ad agencies invoiced the FAAs, FAAs
3    cut the checks to the ad agencies, ad agencies
4    cut -- cut the checks to Google.
5          MS. GOODMAN:  Okay.  I'll move to strike
6    as nonresponsive.
7          MR. BRISKIN:  Can we take a quick break?
8          MS. GOODMAN:  Sure.
9          VIDEO TECHNICIAN:  Off the record at
10   12:21.
11          (Brief recess.)
12          VIDEO TECHNICIAN:  Back on the record at
13   12:36.
14   BY MS. GOODMAN:
15      Q   Ms. Lim, for every transaction that you
16   include in the purchase pathways underlying your
17   damages calculation, did you see any evidence that
18   Google paid for the ads without the use of an ad
19   agency?  Withdrawn.
20          For every transaction that you include
21   in your purchase pathways underlying your damages
22   calculations, did you see any evidence that the

Page 97

1    FAA paid for the ads without the use of an ad
2    agency?
3       A   No.
4       Q   You relied on data produced by Google
5    which you refer to as RFP60 data, correct?
6       A   Yes.
7       Q   Did you understand that the RFP60 data
8    includes advertiser names which are input by
9    customers?
10          MR. BRISKIN:  Objection to form.
11          THE WITNESS:  May I review my report to
12   refresh my memory with regard to that?
13   BY MS. GOODMAN:
14      Q   Sure.  Which page of the report are you
15   thinking of?
16      A   It's in the area of Figures 8 through
17   10.
18          So what I observed in the RFP60 data was
19   there was some nonstandardization in terms of the
20   information that was input into various fields
21   that -- I'm not sure why there's
22   nonstandardization -- non- -- nonstandardization.

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1    One reason could be because the -- the
2    advertisers or the ad agencies assisting the
3    advertisers could be putting in information into
4    those fields in a nonstandard way.
5        Q    Did you have an understanding of the
6    RFP60 data that the -- the information listed in
7    the advertiser fields is not verified, curated, or
8    cleaned by Google?
9        MR. BRISKIN:  Objection to form.
10       THE WITNESS:  I do not have an
11   understanding of the process by which Google vets
12   or doesn't vet the information that may be input
13   either by Google or by others into its databases.
14   BY MS. GOODMAN:
15       Q    Okay.  Would it be important to you for
16   purposes of your analysis to know whether the
17   information for the advertiser identities within
18   the RFP60 data is not verified, curated, or
19   cleaned by Google?
20       MR. BRISKIN:  Objection to the form.
21       THE WITNESS:  Which field in particular
22   are you talking about?

Page 99

1    BY MS. GOODMAN:
2        Q    The fields listing the name of the
3    advertiser customer.
4        MR. BRISKIN:  Objection to form.
5        THE WITNESS:  So the -- can you ask the
6    question one more time?  Sorry.
7    BY MS. GOODMAN:
8        Q    Would it be important for you to know
9    that the -- the fields including names of the
10   advertising customer in RFP60 data is not
11   verified, curated, or cleaned by Google?
12       MR. BRISKIN:  Objection to the form.
13       THE WITNESS:  The -- the -- no.
14   BY MS. GOODMAN:
15       Q    Why not?
16       MR. BRISKIN:  Same objection.
17       THE WITNESS:  I didn't need to focus on
18   the process of Google vetting information in the
19   advertiser field.
20   BY MS. GOODMAN:
21       Q    In paragraph 45 of Appendix E on page 17
22   of the Respess initial report --

Page 100

1        A    Page 17?  Sorry.
2        Q    Yes.
3            Do you see paragraph 45?
4        A    I do.
5        Q    Okay.  You write, "I identified FAAs in
6    the RFP60 data and the TTD data and then
7    identified specific combinations of FAAs and ad
8    agencies."
9            My question is what did you do to
10   identify the FAAs in the RFP60 data?
11       A    So that's described in the rest of the
12   paragraph.
13       Q    So you see a bunch of fields in the
14   RFP60 data, and you referred to them as advertiser
15   identifier variables, and then you used those
16   variables to identify the FAAs.
17           My question is how do you use the
18   variables to identify the FAAs?
19       MR. BRISKIN:  Objection to form.
20       THE WITNESS:  So my process was that, as
21   I described in my report, I first arrived at a --
22   a bucket of advertisers with FAA-sounding words in

Page 101

1    the advertiser identifier variables, and -- and
2    this is described in my footnote 28, and I then
3    limited my damages analysis to advertiser
4    identi- -- identifier variables and, in fact, FAA
5    purchase pathways, which I understand the United
6    States is seeking damages for.
7    BY MS. GOODMAN:
8        Q    Okay.  So are the advertiser identifier
9    variables, which are within your purchase pathways
10   and which are thus within your damages
11   calculation, those were all identified by the
12   United States; is that right?
13       MR. BRISKIN:  Objection to form.
14       THE WITNESS:  I'm not -- I'm not sure I
15   would quite phrase it that way.  Let me -- let me
16   try again.
17           So I reviewed the RFP60 database and I
18   saw FAA-sounding words in the advertiser
19   identifier variables and -- and then -- so that's
20   like a bigger bucket -- and then the United States
21   instructed me to limit my damages analysis to a
22   smaller bucket of FAA purchase pathways.

26 (Pages 98 - 101)

CONFIDENTIAL

Page 130

1  report which identifies 155 pathways for potential
2  inclusion in your damages calculations.
3      A  I'll take your representation that
4  that's the number.
5      Q  Okay.  And of those 155 pathways in your
6  backup to Figure 11, it's accurate you exclude 131
7  pathways at the United States' request, correct?
8      A  I -- I'll take your representation on
9  the -- on the math.  There are pathways that I
10 excluded.
11      There are pathways that I included
12 because the United States is seeking damages on
13 those pathways and there are pathways that I
14 excluded because I understand the United States is
15 not seeking damages on those pathways.
16      Q  Well, there are pathways that you --
17 that the United States --
18      A  So --
19      Q  -- asked you to -- excuse me, my
20 question --
21      A  Sorry.
22      Q  -- was not complete.

Page 131

1      A  Sorry.
2      Q  I'll restart the question.
3      There are pathways -- there are certain
4  FAA purchase pathways that the United States asked
5  you to exclude, correct?
6      A  Yes.
7      Q  Okay.  And there are 131 pathways -- FAA
8  purchase pathways that the United States asked you
9  to exclude, correct?
10      A  I'm happy to take your representation on
11 the -- the number.
12      Q  Okay.  Did the United States tell you
13 any facts as to why they wanted those pathways
14 excluded?
15      MR. BRISKIN:  Objection.  I'm going to
16 instruct the witness not to answer pursuant to the
17 expert stipulation.
18      MS. GOODMAN:  Can we go off the record?
19      MR. BRISKIN:  Sure.
20      VIDEO TECHNICIAN:  We're going off the
21 record at 2:05.
22      (Brief recess.)

Page 132

1      VIDEO TECHNICIAN:  Back on the record at
2  2:07.
3      BY MS. GOODMAN:
4      Q  Ms. Lim, did the United States give you
5  any facts upon which you relied in support of your
6  exclusion of certain purchase pathways from your
7  report?
8      A  No.
9      Q  Okay.  Did the United States tell you to
10 assume anything for purposes of your report upon
11 which you relied in excluding the certain purchase
12 pathways that the United States asked you to
13 exclude?
14      A  That was a long one.  Could you do that
15 one again?  Sorry.
16      Q  Did you rely on any assumptions provided
17 by the United States as to why certain purchase
18 pathways were excluded?
19      A  No.
20      Q  Did you do any analysis to confirm
21 whether it was proper to exclude certain FAA
22 purchase pathways from your damages calculation?

Page 133

1      MR. BRISKIN:  Objection to form.
2      THE WITNESS:  I'm not sure what you mean
3  by "proper," but it would be -- my damages
4  calculations include the FAA purchase pathways for
5  which the United States is seeking damages and it
6  seems reasonable to me that therefore I wouldn't
7  be calculating damages on pathways that the United
8  States is not seeking damages for.
9      BY MS. GOODMAN:
10      Q  Okay.  Did you do any analysis to figure
11 out whether the United States could seek damages
12 for the certain FAA purchase pathways that they
13 told you to exclude from your calculations?
14      MR. BRISKIN:  Objection to form.
15      THE WITNESS:  What do you mean by they
16 could seek damages for?
17      BY MS. GOODMAN:
18      Q  Did you do any analysis to figure out
19 whether the United States -- withdrawn.
20      Did you do any analysis to figure out
21 whether the pathways that the United States asked
22 you to exclude otherwise met the criteria for

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1  purchases for which the United States is seeking
2  damages?
3        MR. BRISKIN:  Objection to form.
4        THE WITNESS:  The -- the -- the criteria
5  for inclusion is that the United States is seeking
6  damages on included pathways in my damages
7  calculation.
8  BY MS. GOODMAN:
9     Q   So is it your testimony that the
10 pathways for which the United States -- States is
11 seeking damages is a result of the United States'
12 instruction to you to include only those pathways?
13       MR. BRISKIN:  Objection to form.
14       THE WITNESS:  Maybe it would help if I
15 explain my -- the process because I think that
16 will answer the question.
17       So in the course of my work I looked at
18 the RFP60 data, I identified unique combinations
19 of FAAs and ad agencies when there was information
20 about an ad agency.  And then with regard to those
21 unique combinations, the United States asked me to
22 limit my damages analysis to those pathways for

Page 135

1  which they were seeking damages and, conversely,
2  the United States asked me to exclude those
3  pathways for which the United States is not
4  seeking damages.
5  BY MS. GOODMAN:
6     Q   And the United States instructed you to
7  remove amounts available for services in 2019 and
8  2020 from damages for the USPS Universal McCann,
9  Matterkind, TTD pathway, correct?
10    A   Yes.
11    Q   And that's the USPS.2 pathway?
12    A   Hang tight.  Sorry.
13    Q   Let me withdraw the question.
14       For both USPS pathways, USPS.1 and 2,
15 the United States instructed you to remove amounts
16 billed for services in 2019 and 2020, correct?
17    A   Yes.
18    Q   Did you rely on any facts provided to
19 you by the United States for why you excluded
20 those pathways?
21    A   No.
22    Q   Did they -- did you rely on the

Page 136

1  assumptions the United States told you to make for
2  why those pathways are excluded?
3     A   No.
4     Q   I'm sorry, for why those amounts billed
5  in '19 and '20 were excluded.
6     A   No.
7     Q   And you excluded unknown ad agency
8  purchase pathways from your damages analysis,
9  correct?
10    A   Yes.
11    Q   And you excluded nine unknown purchase
12 pathways, correct?
13    A   I don't recall the -- the number.
14    Q   And you excluded the --
15    A   When you -- when you say "nine," are you
16 referring to a part of my report?
17    Q   I'm referring again to your Figure 11
18 backup.
19       Have you reviewed that backup?
20    A   Yes.
21    Q   When did you last review the backup to
22 Figure 11?

Page 137

1     A   I don't recall specifically.
2     Q   Okay.  And the reason you excluded the
3  unknown ad agency purchase pathways is because you
4  could not confirm that the FAA paid the amounts
5  that Google charged for ad tech services, correct?
6        MR. BRISKIN:  Objection to form.
7        THE WITNESS:  One more time.
8  BY MS. GOODMAN:
9     Q   The reason you excluded the unknown ad
10 agency purchase pathways is because you could not
11 confirm that the FAA paid amounts that Google
12 charged for ad tech services, correct?
13       MR. BRISKIN:  Objection to form.
14       THE WITNESS:  Correct.
15 BY MS. GOODMAN:
16    Q   Other than the United States telling you
17 to exclude a pathway, is there any other reason
18 you excluded a purchase pathway from your damages
19 calculation?
20    A   Well, as we just discussed, there are
21 some unknown ad agency FAA purchase pathways which
22 I excluded.

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1    Q    Okay. Other than the United States
2  telling you to exclude a pathway and your
3  excluding a pathway due to the ad agency being
4  unknown, is there any other reason you excluded a
5  purchase pathway from your damages calculation?
6    A    I -- I just want to be really clear
7  here. So in coming up with the list of unique FAA
8  purchase pathways, I'm referring to display
9  advertising or open web display advertising. It's
10 possible that there are other FAA purchase
11 pathways not included in my damages analysis that
12 relate to out-of-scope spending.
13   Q    Okay. In paragraph 47 you write, "I
14 refer to each unique combination of FAA, prime ad
15 agency, and (as applicable) sub ad agency as an
16 'FAA Purchase Pathway.'"  So my question is in
17 reference to "FAA Purchase Pathway" as you use it
18 here in your report in paragraph 47.
19        And my question is, other than the
20 United States telling you to exclude an FAA
21 purchase pathway and your excluding an FAA
22 purchase pathway due to the ad agency being

Page 139

1  unknown, is there any other reason you excluded
2  an -- an FAA purchase pathway from your damages
3  calculation?
4        MR. BRISKIN: Objection to form.
5        THE WITNESS: No.
6  BY MS. GOODMAN:
7    Q    Okay. Some of the FAA purchase pathways
8  for which you calculate damages include The Trade
9  Desk, correct?
10   A    Yes.
11   Q    And The Trade Desk is a DSP, correct?
12   A    Yes.
13   Q    For what reason did you not include any
14 other DSP that is not Google in your damages
15 analysis?
16       MR. BRISKIN: Objection to form.
17       THE WITNESS: I don't believe I had the
18 data to do that.
19 BY MS. GOODMAN:
20   Q    Is it your understanding that no other
21 third-party DSP produced data from which you could
22 estimate damages?

Page 140

1        MR. BRISKIN: Objection to form.
2        THE WITNESS: Yes.
3  BY MS. GOODMAN:
4    Q    Did you ask for data produced by other
5  third-party DSPs in the course of your work from
6  --
7        MR. BRISKIN: Objection to form.
8  BY MS. GOODMAN:
9    Q    -- your -- from the United States?
10       MR. BRISKIN: Objection to form.
11       THE WITNESS: I -- I asked for a lot of
12 data. I don't recall specifically the answer to
13 this question.
14 BY MS. GOODMAN:
15   Q    Okay. Can we turn to Figure 6 of your
16 report.
17       It's accurate that Figure 6 reflects the
18 variables in Trade Desk data that filters -- the
19 available filters on those variables and the
20 filters that you chose to apply for purposes of
21 your damages calculation, correct?
22   A    Yes.

Page 141

1        MR. BRISKIN: Objection to form.
2  BY MS. GOODMAN:
3    Q    Okay. And under "SupplyVendor" you have
4  "google" and then an asterisk, correct?
5    A    Yes.
6    Q    And the asterisk denotes many other
7  supply vendors, right?
8    A    Yes.
9    Q    Do you know how many other supply
10 vendors were reflected in The Trade Desk data?
11   A    I don't recall.
12   Q    Does it sound accurate to you that there
13 were over 100 different vendors -- supply vendors
14 reflected in The Trade Desk data?
15       MR. BRISKIN: Objection to form.
16       THE WITNESS: I don't recall one way or
17 the other.
18 BY MS. GOODMAN:
19   Q    No reason to doubt my statement that
20 there were over a hundred different vendors
21 reflected in The Trade Desk data?
22       MR. BRISKIN: Objection to form.

36 (Pages 138 - 141)

CONFIDENTIAL

Page 170

1  fractions are similar?
2      MR. BRISKIN:  Objection.  I think that
3  really goes to a communication and I'll instruct
4  the witness not to answer.
5      You can rephrase.
6      MS. GOODMAN:  I object to that.  It's
7  exactly what she just said.  I just used her exact
8  language.
9      MR. BRISKIN:  And you asked for a
10  communication and I instructed her not to answer.
11  BY MS. GOODMAN:
12      Q   You don't recall seeing anything
13  provided to you that is consistent with the notion
14  that the fractions are similar between TTD and
15  AdX -- I'm sorry, TTD and DV360, correct?
16      MR. BRISKIN:  Objection.  Form.
17      THE WITNESS:  I'm -- I'm not sure how
18  this question is different from your previous
19  questions, but let me -- let me try again just so
20  I can be clearer.
21      MS. GOODMAN:  Move to strike everything
22  before she begins answering the question.

Page 171

1      MR. BRISKIN:  We'll take exception to
2  that and all your other motions to strike which we
3  think are not well founded.
4      Is there a question pending?
5  BY MS. GOODMAN:
6      Q   Are you going to answer the question?
7      A   Sorry, was there a question pending?
8      Q   Yes.
9      A   Sorry, I did not --
10      Q   You don't recall seeing anything
11  provided to you that is consistent with the notion
12  that the fraction of AdX take is similar between
13  TTD and DV360, correct?
14      MR. BRISKIN:  Objection to form.
15      THE WITNESS:  I don't recall one way or
16  the other.
17  BY MS. GOODMAN:
18      Q   So therefore you don't recall seeing
19  anything that is consistent or inconsistent with
20  the notion that the fraction of AdX take is
21  similar between TTD and DV360, correct?
22      MR. BRISKIN:  Objection to form.

Page 172

1      THE WITNESS:  I certainly didn't see
2  anything inconsistent.  I may have seen
3  something -- documents that were consistent and
4  may not have cited that here.
5  BY MS. GOODMAN:
6      Q   But you don't recall, do you?
7      MR. BRISKIN:  Objection to form.
8      THE WITNESS:  Sorry, I think I answered
9  this question.  Let me -- let me try again because
10  perhaps I wasn't clear.
11      MS. GOODMAN:  Move to strike.
12      The question is withdrawn.
13      MR. BRISKIN:  Can I take a quick break
14  in the next five minutes, please.
15      MS. GOODMAN:  Let's take a break.
16      MR. BRISKIN:  Off the record at 3:03.
17      (Brief recess.)
18      VIDEO TECHNICIAN:  Back on the record at
19  3:24.
20  BY MS. GOODMAN:
21      Q   Ms. Lim, would you turn to paragraph 59
22  of the Respess initial report, which is on page

Page 173

1  23.
2      A   I'm there.
3      Q   Okay.  The last full sentence in that
4  paragraph on this page says, "Amounts that Google
5  refunds to its advertisers should not be included
6  in the damages calculations and I therefore remove
7  them."
8      Did I read that right?
9      A   Yes.
10      Q   Why is it your opinion that amounts that
11  Google refunds to its advertisers should not be
12  included in the damages calculations?
13      A   If an advertiser -- for -- for example,
14  if instead of paying a hundred dollars to purchase
15  ads an advertiser pays $99 to purchase ads, then I
16  would want the $99 to be the input into my damages
17  calculation.
18      Q   And why is that?
19      A   Because the advertiser paid $99 instead
20  of a hundred dollars.
21      Q   Okay.  Is it important for purposes of
22  calculating damages to account only for what was

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1  actually paid by the person claiming damages?
2          MR. BRISKIN:  Objection to form.
3          THE WITNESS:  It depends on the facts
4  and circumstances.
5  BY MS. GOODMAN:
6      Q   Do you agree that overcharge damages are
7  a measure of the difference between the price the
8  plaintiff actually paid and the price that they
9  would have paid in the but-for world?
10         MR. BRISKIN:  Objection to form.
11         THE WITNESS:  Yes.
12  BY MS. GOODMAN:
13     Q   And do you agree the proper way to
14  calculate damages in an antitrust case is to
15  determine the difference between the prices
16  plaintiff actually paid and the prices the
17  plaintiff would have paid in the but-for world?
18         MR. BRISKIN:  Objection to form.
19         THE WITNESS:  I think it would depend on
20  the facts and circumstances in the particular
21  antitrust case.
22  BY MS. GOODMAN:

Page 175

1      Q   Okay.  How about in this antitrust case?
2  Do you agree that in this antitrust case the
3  proper way to calculate damages is to determine
4  the difference between the prices the plaintiff,
5  here the United States, actually paid and the
6  prices the United States would have paid in the
7  but-for world?
8          MR. BRISKIN:  Objection to form.
9          THE WITNESS:  So my damages calculation
10  takes the difference between the AdX take rate --
11  sorry, the AdX take and the but-for take in this
12  circumstance.
13         MS. GOODMAN:  Okay.  Move to strike as
14  nonresponsive.
15  BY MS. GOODMAN:
16     Q   Do you agree that in this case the way
17  to actually calculate damages is to determine the
18  difference between the prices the United States
19  actually paid and the prices the -- the plaintiff
20  would have paid in the but-for world?
21         MR. BRISKIN:  Objection to form.
22         THE WITNESS:  In -- in this case the way

Page 176

1  I have calculated damages is the difference
2  between the AdX take and the but-for take.
3          MS. GOODMAN:  Move to strike as
4  nonresponsive.
5  BY MS. GOODMAN:
6      Q   Do you agree that the typical measure of
7  damages is the difference between the actual price
8  paid and the presumed competitive price in the
9  but-for world?
10         MR. BRISKIN:  Objection to form.
11         THE WITNESS:  I'm sorry, what was your
12  question?
13  BY MS. GOODMAN:
14     Q   Do you agree that the typical measure of
15  damages is the difference between the actual price
16  paid and the presumed competitive price in the
17  but-for world?
18         MR. BRISKIN:  Objection to form.
19         THE WITNESS:  It depends on -- it --
20  it -- the facts and circumstances.
21  BY MS. GOODMAN:
22     Q   Are you measuring overcharge damages in

Page 177

1  this case?
2      A   Yes.
3      Q   Okay.  And you agree that there's a
4  difference between -- strike -- withdrawn.
5          You agree that there can be a difference
6  between an amount that is invoiced and an amount
7  that is in fact paid, correct?
8      A   As a general matter, yes.
9      Q   Okay.  And as a general matter, there
10  can be differences between the amount invoiced and
11  the amount paid for a variety of reasons, correct?
12     A   As a general matter.
13     Q   You agree as a general matter?
14     A   I do.
15     Q   Is one of the reasons that an invoice
16  could be different from the amount paid because
17  the person paying the invoice disputes the
18  invoiced amount?
19     A   That could be one reason.
20     Q   Did you see any evidence in this case
21  suggesting or showing that the invoice amount was
22  not the amount paid?

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1   A  No.

2   Q  Did you review any testimony of any

3  federal agency advertiser in this case?

4   A  Yes.

5   Q  Where is that listed in your report?

6   A  My Documents Relied Upon list is a list

7  of documents that I relied upon in forming the

8  opinions in my report.

9      In addition to the list of documents in

10  the Documents Relied Upon list, there are many

11  other documents that I considered in forming my

12  conclusions and the FAA depositions would have

13  been amongst the documents I considered.

14   Q  Okay. But you did not rely upon any FAA

15  deposition testimony; is that accurate?

16   A  I think that's right.

17   Q  Did you review the deposition testimony

18  of the United States Army?

19   A  Myself or my staff would have reviewed

20  that.

21   Q  Did you review it?

22   A  So the way I think about my staff is

Page 179

1  that they are my arms and legs, so to speak, and

2  if -- if I've directed them to review it and

3  they've reviewed it, I mean, in my mind I've

4  reviewed it. So I'm -- my -- I didn't personally

5  review it if that -- if that's what you're asking

6  me, my staff would have reviewed it.

7   Q  Okay. So you didn't personally review

8  the Army testimony, correct?

9   A  I don't believe so.

10   Q  Are you familiar with the phrase

11  equitable -- "request for equitable adjustment"?

12   A  It doesn't ring a bell.

13   Q  So you aren't aware of the fact that in

14  this case the United States Army testified --

15  testified about how its ad agency exceeded its

16  authorized spending limit on advertising? You

17  aren't aware of that, correct?

18     MR. BRISKIN: Objection to form.

19     THE WITNESS: Sorry, could you ask the

20  question one more time?

21  BY MS. GOODMAN:

22   Q  Are you aware of any evidence in this

Page 180

1  case that the United States Army received a

2  request for equitable adjustment from its ad

3  agency because the ad agency exceeded its

4  authorized spending limit on advertising?

5     MR. BRISKIN: Objection to form.

6     THE WITNESS: Again, the phrase -- what

7  was it -- equitable adjustment doesn't ring a

8  bell.

9  BY MS. GOODMAN:

10   Q  Okay. Are you aware of any evidence in

11  this case that the United States Army's

12  advertising agency exceeded its authorized

13  spending limit on advertising?

14     MR. BRISKIN: Objection to form.

15     THE WITNESS: That's not something I

16  focused on in my analysis.

17  BY MS. GOODMAN:

18   Q  Okay. Are you aware of any evidence

19  whether, as I've described, whether or not you

20  focused on it?

21     MR. BRISKIN: Objection to form.

22     THE WITNESS: Not sitting here today.

Page 181

1  BY MS. GOODMAN:

2   Q  And are you aware of any evidence that

3  in the case where the United States Army's ad

4  agency exceeded its authorized spending limit, it

5  was the advertising agency who had to pay the

6  digital ad vendors, not the Army?

7     MR. BRISKIN: Objection to form.

8     THE WITNESS: What I saw in my work in

9  the performance of my walk-throughs of each FAA

10  purchase pathway was that all amounts charged by

11  Google were paid by the FAAs.

12     MS. GOODMAN: I move to strike as

13  nonresponsive.

14  BY MS. GOODMAN:

15   Q  Are you aware of any evidence in this

16  case that the U.S. Army's ad agency exceeded its

17  authorized spending limit and thus the ad agency

18  had to pay digital ad vendors, not the Army?

19     MR. BRISKIN: Objection to form.

20     THE WITNESS: I guess what I'm getting a

21  little hung up on is you say in your question that

22  the ad agencies paid the vendor, such as Google,

46 (Pages 178 - 181)

CONFIDENTIAL

Page 226

1    BY MS. GOODMAN:
2      Q   It was a better fit for what you were
3    doing?
4          MR. BRISKIN:  Objection to form.
5          THE WITNESS:  Yes.
6    BY MS. GOODMAN:
7      Q   You calculated damages that would be
8    owed to the United States by Google for a range of
9    AdX but-for take rate percentages, correct?
10     A   One more time.
11     Q   You calculated damages that would be
12   owed to the United States by Google for a range of
13   AdX but-for take rate percentages, correct?
14         MR. BRISKIN:  Objection to form.
15         THE WITNESS:  Are you referring to
16   something specific in my report?
17   BY MS. GOODMAN:
18     Q   Not that I can immediately recall.  I'm
19   just asking if you calculated damages that would
20   be owed to the United States by Google for a range
21   of AdX but-for take rate percentages, correct?
22         MR. BRISKIN:  Objection to form.

Page 227

1          THE WITNESS:  Yes.
2    BY MS. GOODMAN:
3      Q   Okay.  And one of those was 10 percent,
4    right?
5      A   Yes.
6      Q   And one of those was 16.2 percent?
7      A   Yes.
8      Q   And one of those was 16.6 percent?
9      A   Yes.
10     Q   And you understood that Dr. Simcoe
11   calculated a but-for take rate of 16.2 percent,
12   correct?
13     A   Yes.
14     Q   And you understand he calculated a
15   but-for take rate of 16.6 percent, correct?
16     A   Yes.
17     Q   And you understand Professor Simcoe did
18   not calculate a but-for take rate of 10 percent,
19   correct?
20     A   Yes.
21     Q   Did you read Dr. Simcoe's deposition
22   testimony?

Page 228

1      A   No.
2      Q   Without telling me what you discussed,
3    did you discuss Dr. Simcoe's deposition testimony
4    with anybody?
5          MR. BRISKIN:  Objection to form.
6          THE WITNESS:  I'm not sure if that gets
7    into conferences -- substance of conversations
8    with counsel or my staff.
9    BY MS. GOODMAN:
10     Q   I'm not asking for the substance.  I'm
11   asking you a yes or no question.
12         Did you discuss Dr. Simcoe's deposition
13   testimony with anybody?
14         MR. BRISKIN:  Objection to form.
15         THE WITNESS:  Yes.
16   BY MS. GOODMAN:
17     Q   Okay.  And you are aware that Dr. Simcoe
18   does not opine that a 10 percent but-for take rate
19   is appropriate on a stand-alone basis, correct?
20         MR. BRISKIN:  Objection to form.
21         THE WITNESS:  I'm -- I didn't read his
22   deposition, so if you're referring to something he

Page 229

1    said in his deposition, then I'm -- I wouldn't
2    be -- I wouldn't be familiar with that.
3    BY MS. GOODMAN:
4      Q   I'm not referring to what he said in his
5    deposition.  I'm asking are you aware that
6    Dr. Simcoe does not opine that a 10 percent
7    but-for take rate is an appropriate measure of a
8    but-for take rate?
9          MR. BRISKIN:  Objection to form.
10         THE WITNESS:  Okay.  So if -- I think if
11   you're asking me about what's in Dr. Simcoe's
12   reports, my understanding is that he did not -- he
13   estimated various but-for take rates and 10
14   percent is not one of those take rates -- but- --
15   but-for take rates.
16   BY MS. GOODMAN:
17     Q   Okay.  Are you aware that Professor
18   Simcoe testified in deposition that a 10 percent
19   but-for take rate -- take rate is not a conclusion
20   he reaches about the take rate in the but-for
21   world?
22         MR. BRISKIN:  Objection to form.

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

1    THE WITNESS:  As I just testified, I --
2  I didn't read his deposition, so I don't know what
3  he said in it.
4  BY MS. GOODMAN:
5    Q    Okay.  But you had conversations about
6  his deposition with individuals, so I'm just
7  asking if you have an awareness about what
8  Professor Simcoe testified in deposition, that he
9  is not offering an opinion that the but-for take
10  rate is 10 percent?
11    MR. BRISKIN:  Objection to form.
12  BY MS. GOODMAN:
13    Q    Are you aware of that?
14    A    I -- I don't have that awareness.
15    Q    Okay.  You have no opinion as to the
16  appropriateness of any of the but-for take rates
17  you apply in your damages calculation, correct?
18    A    I did not do an independent evaluation
19  of the but-for take rate.
20    Q    Okay.  And you have no opinion as to the
21  appropriateness of any but-for take rate, correct?
22    MR. BRISKIN:  Objection to form.

Page 231

1    THE WITNESS:  I do not.
2  BY MS. GOODMAN:
3    Q    And so the United States instructed you
4  to use an alternative AdX but-for take rate of
5  10 percent, correct?
6    A    Yes.
7    Q    Are you aware of any facts that support
8  application of a 10 percent but-for take rate?
9    MR. BRISKIN:  I'll just instruct the
10  witness not to answer with regard to
11  communications with counsel, but you can answer.
12    THE WITNESS:  My understanding is that
13  the United States intends on presenting evidence
14  with regard to the 10 percent but-for take rate at
15  trial, but I haven't performed an independent
16  analysis of that 10 percent.  I haven't, for
17  example, searched in databases looking for
18  10 percent.
19  BY MS. GOODMAN:
20    Q    So you aren't personally aware of any
21  facts that would support application of that
22  but-for take rate?

Page 232

1    A    Not sitting here today.  It's not
2  something I focused on.
3    Q    Okay.  Did the United States -- did you
4  rely on any facts communicated to you by the
5  United States in applying a 10 percent but-for
6  take rate in your calculations?
7    A    One more time.
8    Q    Did you rely on any facts communicated
9  to you by the United States in applying a
10  10 percent but-for take rate in your calculations?
11    A    No.
12    Q    Okay.  Let's turn to paragraph 56 of the
13  Respess initial report.
14    A    Yes, I'm there.
15    Q    And you write in the first sentence,
16  "For each FAA Purchase Pathway except CMS.1,
17  CMS.2, NHTSA.1, and NHTSA.2, I selected a number
18  of transactions of open web display advertising
19  and confirmed that the FAA paid for those
20  transactions."
21    Did I read that correctly?
22    A    Yes.

Page 233

1    Q    You did not select transactions for the
2  CMS and NHTSA pathways to review in order to
3  confirm that the FAA paid for those transactions,
4  correct?
5    MR. BRISKIN:  Objection to form.
6    THE WITNESS:  I did not perform
7  walk-throughs of those FAA purchase pathways
8  because there was insufficient data/documents in
9  the record to do so.
10  BY MS. GOODMAN:
11    Q    And so is it accurate that you were not
12  able to confirm that the FAAs paid for the
13  transactions reflected in the two CMS and two
14  NHTSA pathways?
15    MR. BRISKIN:  Objection to form.
16    THE WITNESS:  I was not able to do so.
17  BY MS. GOODMAN:
18    Q    Did you attempt to verify that CMS or
19  NHTSA paid for the transactions reflected in those
20  four purchase pathways?
21    MR. BRISKIN:  Objection to form.
22    THE WITNESS:  The documents produced in

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

1  the record did not -- were insufficient to perform
2  a walk-through as I did for the other purchase
3  pathways.
4  BY MS. GOODMAN:
5      Q   And so you didn't see any documents or
6  data in the record to show actual transmission of
7  payments from those FAAs to anybody; is that
8  accurate?
9          MR. BRISKIN:  Objection to form.
10         THE WITNESS:  No.  No, that's not
11 accurate.
12 BY MS. GOODMAN:
13     Q   Okay.  What documents did you see in the
14 record that showed that payments were made from
15 those FAAs to an ad agency?
16         MR. BRISKIN:  Objection to form.
17         THE WITNESS:  I don't recall the exact
18 documents.
19 BY MS. GOODMAN:
20     Q   Okay.  But it's your testimony you saw
21 evidence in the record of payments going from CMS
22 to an ad agency?

Page 235

1      A   That is my recollection.
2      Q   Okay.  And it's your testimony you saw
3  evidence in the record of payments going from
4  NHTSA to an ad agency?
5      A   Same answer.  That's my recollection.
6      Q   So what was insufficient about what you
7  saw in the record in order to confirm that those
8  two FAAs paid for the transactions reflected in
9  the four purchase pathways we're discussing?
10     A   I don't -- I don't recall exactly what
11 was insufficient.  The -- the process of each
12 walk-through requires at -- at least ad agency
13 invoices and FAA payments.
14         My recollection is that there were --
15 there was missing data in -- in one of those.  I
16 don't recall exactly.  I just recall that there
17 was insufficient data.
18     Q   When did you last look at the data
19 available to you in order to confirm whether CMS
20 or NHTSA paid for the transactions reflected in
21 the four purchase pathways we're discussing?
22         MR. BRISKIN:  Objection to form.

Page 236

1          THE WITNESS:  It would have been during
2  the time that I was assisting Dr. Respess in
3  preparing his report.
4  BY MS. GOODMAN:
5      Q   Okay.  And after you learned that you
6  would be testifying as an expert in this case, you
7  didn't do anything to check your recollection --
8  to check the work that had been done prior to your
9  coming in as the testifying expert to figure out
10 what was insufficient about the data that we're
11 discussing?
12         MR. BRISKIN:  Objection to form.
13         THE WITNESS:  I wouldn't characterize it
14 that way.  I was very involved with Dr. Respess
15 and Brattle staff during the preparation of his
16 report and there was lots of -- lots of checking
17 with regard to Dr. Respess' analyses and
18 conclusions and statements in his report.
19         I felt -- I -- I felt comfortable with
20 adopting those analyses and conclusions given my
21 awareness of -- given my work with Dr. Respess and
22 awareness of the entire process, not just

Page 237

1  awareness but familiarity and -- and being part of
2  that process, including the checking process.
3  BY MS. GOODMAN:
4      Q   Would Dr. Respess be able to tell me
5  what was insufficient about the data that -- such
6  that he could not confirm that the FAAs paid for
7  the transactions reflected in the four purchase
8  pathways we're discussing?
9          MR. BRISKIN:  Objection to form.
10         THE WITNESS:  I don't believe he would
11 be able to recall any better than I would.  There
12 were hundreds, maybe thousands of invoices that we
13 reviewed and many different purchase pathways,
14 some of which are quite complex to do the
15 walk-throughs on.
16         I recall that, again, there was missing
17 information in these pathways, but I don't recall
18 exactly -- the exact invoices, for example, that
19 were missing or the exact payment data on -- that
20 were missing.
21 BY MS. GOODMAN:
22     Q   And it's accurate that for none of these

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

1   purchase pathways does your report anywhere
2   identify payment data showing that the FAAs paid
3   for the transactions reflected in -- or included
4   within the CMS and NHTSA purchase pathways,
5   correct?
6           MR. BRISKIN: Objection to form.
7           THE WITNESS: One more time.
8           Sorry, I just hadn't thought of my
9   report that way. Go ahead.
10  BY MS. GOODMAN:
11      Q   There is no statement in your report
12  identifying payment data which shows CMS or NHTSA
13  paid for the transactions included within the CMS
14  and NHTSA purchase pathways, correct?
15          MR. BRISKIN: Objection to form.
16          THE WITNESS: I can't think of such a
17  statement or something in my report that lists
18  that sitting here today.
19  BY MS. GOODMAN:
20      Q   Okay. In your --
21      A   It's not something that -- it's not
22  something that I relied upon.

Page 239

1       Q   Okay. Appendix E --
2       A   I mean, that -- go ahead.
3       Q   -- to Dr. Respess' initial report
4   includes walk-throughs for various FAA purchase
5   pathways. None of which are for CMS or NHTSA,
6   correct?
7       A   That -- that is correct.
8           Just to be clear, so as I testified
9   before, I recall seeing some agency invoices
10  and -- some Google invoices, some agency invoices,
11  some FAA payment information. I didn't see
12  anything that was inconsistent with the idea that
13  the FAAs paid for their purchases. But I was not
14  able to complete walk-throughs and that's why
15  there are no walk-throughs for these transactions
16  included in Appendix E.
17          MS. GOODMAN: Okay. I'm going to move
18  to strike everything after "That is correct."
19  BY MS. GOODMAN:
20      Q   Let's turn to Append- -- Figure 16 of
21  Dr. Respess' initial report.
22      A   Sorry, what page are you on?

Page 240

1       Q   Thirty-three of Figure 16.
2       A   I'm there.
3       Q   Okay. And for CMS your damages
4   calculations include $8.4 million in AdX revenue,
5   correct?
6       A   You're looking at the 8478727?
7       Q   Yes.
8       A   I used the -- that amount in deriving my
9   damages amount.
10      Q   Right. And you used the amount of
11  $1.5 million approximately for NHTSA in deriving
12  your damages, correct?
13      A   Yes.
14      Q   Okay. And if you add 8.4 million to
15  1.5 million, it's approximately $10 million,
16  correct?
17      A   If you're asking me a math- --
18  arithmetic question, that sounds about right.
19      Q   Okay. If you add the 8.478727 and the
20  1.588607, it's approximately $10 million.
21      A   What's 607? Wait.
22      Q   15- --

Page 241

1       A   Where -- where -- maybe I'm just not
2   looking at the right thing.
3       Q   All right. Withdrawn.
4       A   I'm looking at --
5       Q   Withdrawn.
6           MR. BRISKIN: You went to a different
7   number.
8           THE WITNESS: Oh.
9   BY MS. GOODMAN:
10      Q   The total CMS of 8,478,727 added to the
11  total of NHTSA of 1,588,607 equals 10,067,334,
12  correct?
13          MR. BRISKIN: Objection to form.
14          THE WITNESS: Again, if you're asking me
15  an arithmetic question, I'm -- I'm -- I'm happy to
16  take your representation about that.
17  BY MS. GOODMAN:
18      Q   Okay. And 10 million --
19          VIDEO TECHNICIAN: Careful not to touch
20  the mic, ma'am.
21          THE WITNESS: Oh, sorry, sorry.
22  BY MS. GOODMAN:

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

1    Q   10,067,334 divided by the total AdX
2    revenue in your damages calculation of 41,789,429
3    is 24.1 percent, correct?
4        MR. BRISKIN:  Objection to form.
5        THE WITNESS:  I will take your
6    representation on the arithmetic.
7    BY MS. GOODMAN:
8        Q   Okay.  And so for 24.1 percent of the
9    input of AdX revenues in your damages calculations
10   in this case you were not able to show -- you were
11   -- you did not write anywhere in your report that
12   CMS and NHTSA paid for those transactions,
13   correct?
14       MR. BRISKIN:  Objection to form.
15       THE WITNESS:  I did not perform
16   walk-throughs of the CMS and -- and NHTSA
17   pathways -- purchase -- FAA purchase pathways.
18       Can we take a break in about five --
19   just a bio break in about five minutes?
20   BY MS. GOODMAN:
21       Q   And so you did not -- you were not able
22   to confirm that NHTSA and CMS paid the combined

Page 243

1    $10 million shown in Figure 16, correct?
2        MR. BRISKIN:  Objection to form.
3        THE WITNESS:  The $10 million would be a
4    subset of what they paid.  Yeah, so, again, I was
5    unable to perform walk-throughs of the CMS and
6    NHTSA FAA purchase -- purchase pathways whereby
7    I -- I could gain an understanding of the payment
8    process.
9    BY MS. GOODMAN:
10       Q   The purpose of the walk-through that you
11   do is as you describe in paragraph 56 of the
12   Dr. Respess initial report, which was to confirm
13   that the FAA paid for those transactions, correct?
14       A   I would see those -- I see those words
15   on the page.  The -- I think of it as I performed
16   the walk-throughs to -- to gain an understanding
17   of the payment flow process and in that process I
18   confirmed that the FAAs paid for amounts invoiced
19   by Google.
20       Q   And because you didn't do that
21   walk-through for CMS or NHTSA, you had not
22   confirmed that those FAAs paid the $10 million

Page 244

1    reflected in Figure 16, correct?
2        MR. BRISKIN:  Objection to form.
3        THE WITNESS:  Yes.
4    BY MS. GOODMAN:
5        Q   Okay.  And the $10 million reflected in
6    Figure 16 is approximately 24.1 percent of the
7    total AdX revenue going into your damages
8    calculation, correct?
9        MR. BRISKIN:  Objection to form.
10       THE WITNESS:  I haven't done that math,
11   but I'm happy to take your representation on it.
12       MS. GOODMAN:  Okay.  We can take your
13   break now.
14       THE WITNESS:  Great.  Thank you.
15       VIDEO TECHNICIAN:  Off the record at
16   5:29.
17       (Brief recess.)
18       VIDEO TECHNICIAN:  Back on the record at
19   5:35.
20   BY MS. GOODMAN:
21       Q   Okay.  So continuing on your -- at
22   your -- looking at your Figure 16 on page 33, of

Page 245

1    the remaining approximately 31 million in AdX
2    revenue reflected in Figure 16, how much of that
3    31 million were you able to trace back to proof of
4    payment in the record?
5        MR. BRISKIN:  Objection to form.
6        THE WITNESS:  So Appendix E indicates
7    the --
8        VIDEO TECHNICIAN:  Ma'am, please don't
9    touch it.
10       THE WITNESS:  Oh, sorry.
11       Appendix E shows the FAA purchase
12   pathways for which I performed walk-throughs.
13   BY MS. GOODMAN:
14       Q   Okay.  And how much in spending were you
15   able to walk through and thus confirm purchases --
16   I'm sorry -- payments for?
17       MR. BRISKIN:  Objection to form.
18       THE WITNESS:  In the -- in the
19   walk-throughs I performed I confirmed that the
20   FAAs paid for 100 percent of Google's invoices.
21   BY MS. GOODMAN:
22       Q   Well, you say in paragraph 56 that you

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

1  selected a number of transactions of open web
2  display advertising and confirmed that the FAA
3  paid for those transactions.
4        Is the number every single transaction
5  which is included in your damages analysis?
6        MR. BRISKIN:  Objection to form.
7        THE WITNESS:  So there -- within each
8  FAA purchase pathway there are -- there are many
9  invoices and many purchases.  I performed
10  walk-throughs for a subset of the invoices -- of
11  the Google invoices in each FAA purchase pathway.
12  BY MS. GOODMAN:
13     Q   Okay.  Let's turn to Appendix E,
14  "Pathway Examples and Associated Documents" in
15  Dr. Respess' initial report.  It's page 141.
16     A   I am there.
17     Q   If I add up in each pathway example the
18  numbers included in your Column A under "RFP76
19  Data," is it your testimony that number will equal
20  all of the transactions which you included in your
21  damages analysis except for those for CMS and
22  NHTSA?

Page 247

1        MR. BRISKIN:  Objection to form.
2        THE WITNESS:  No.
3  BY MS. GOODMAN:
4     Q   No.  If I --
5     A   That's not my testimony.
6     Q   Okay.  If I add up each RFP76 data
7  number reflected in Appendix E, that's
8  approximately $7.5 million.  Any reason to doubt
9  that?
10       MR. BRISKIN:  Objection to form.
11       THE WITNESS:  I'm happy to take your
12  representation on that.
13  BY MS. GOODMAN:
14     Q   Okay.  And the RFP76 data shows total ad
15  spending, right?  It's not just AdX revenue?
16       MR. BRISKIN:  Objection to form.
17       THE WITNESS:  The RFP76 data shows the
18  amounts invoiced by Google.
19  BY MS. GOODMAN:
20     Q   Right, which is not only AdX revenue,
21  correct?
22     A   Correct.

Page 248

1     Q   Okay.  And let's turn to Figure 11 in
2  your -- in Respess' report.
3     A   Okay.  We're -- we're leaving page 141.
4  Can you tell me what page to go to?
5     Q   Twenty-one.
6        And there's 46.4 million in Column A,
7  which is included as in scope in your damages
8  analysis, correct?
9        MR. BRISKIN:  Objection to form.
10       THE WITNESS:  Yes.
11  BY MS. GOODMAN:
12     Q   Okay.  So -- and you were not able to
13  confirm for NHTSA or CMS the 1.4 or -- million or
14  808,000 reflected in Figure 11, correct?
15       MR. BRISKIN:  Objection to form.
16       THE WITNESS:  You're referring to the
17  amounts in Column A?
18  BY MS. GOODMAN:
19     Q   Yes.
20     A   Yeah.
21     Q   You were not able to confirm that those
22  amounts for CMS and NHTSA were in fact paid for?

Page 249

1     A   Correct.
2     Q   Okay.  And so if we take those amounts
3  out from the 46.4 million, we're still at a number
4  that's more than $7.5 million, correct?
5        MR. BRISKIN:  Objection to form.
6        THE WITNESS:  If you're asking me about
7  the arithmetic, I'll take your representation on
8  that.
9  BY MS. GOODMAN:
10     Q   Okay.  And so of the $46.4 million
11  included in your damages analysis as reflected in
12  Figure 11, you were able to confirm purchases for
13  7.5 million as reflected in your Appendix E
14  walk-through; is that accurate?
15       MR. BRISKIN:  Objection to form.
16       THE WITNESS:  I was able to confirm
17  payment for more than the sum of the RFP76 amounts
18  shown in Appendix E.
19  BY MS. GOODMAN:
20     Q   Okay.  But you nowhere set out the work
21  you did to confirm that payment for all of those
22  amounts, right?  You only set out the work you did

63 (Pages 246 - 249)

CONFIDENTIAL

1 to confirm payment for $7.5 million in RFP76
2 spending numbers?
3     MR. BRISKIN:  Objection to form.
4     THE WITNESS:  I -- I disagree with that
5 characterization.  Appendix E shows examples of
6 the walk-throughs that I performed for each of the
7 FAA purchase pathways excluding the CMS and -- and
8 NHTSA pathways.  Appendix E includes all of the
9 documents that I used in performing my
10 walk-throughs.  Although there's a -- a table at
11 the beginning of each FAA purchase pathway in
12 Appendix E, that table represents one example of
13 the multiple walk-throughs that I performed and
14 the -- the process is the same.  The pattern is
15 the same within each FAA purchase pathway for the
16 process that I did of -- of walking through the --
17 the payment process, so I -- I'll stop there.
18 BY MS. GOODMAN:
19     Q   Okay.  And so you did not give an
20 example -- or you did not -- your pathway figures
21 in Appendix E do not show me all of the work that
22 you claim to have done, correct, in order to trace

1 the payments?
2     MR. BRISKIN:  Objection to form.
3     THE WITNESS:  I disagree with that.
4 BY MS. GOODMAN:
5     Q   Okay.  Let me try again.
6     How am I supposed -- let's take -- let's
7 take Navy.  Turn to page 152.
8     A   I am there.
9     Q   Okay.  And so your asterisks on the
10 pathway documents, Figure 55, mean that those are
11 the documents I should look at in order to check
12 your work reflected in Figure 54, correct?
13     MR. BRISKIN:  Objection to form.
14     THE WITNESS:  Oh, one -- one could check
15 my work, so to speak, by reviewing the asterisked
16 documents.
17 BY MS. GOODMAN:
18     Q   Okay.  So how is it that I am able --
19 how is it that you would suggest I look at every
20 other document you cite in Figure 55 in order for
21 me to check your work and confirm your testimony
22 that you saw a hundred percent payment for all of

1 the Navy purchases upon which your damages
2 calculations are based?
3     MR. BRISKIN:  Objection to form.
4     THE WITNESS:  So I provided the example
5 in Figures 54 -- in Figure 54 of the walk-through
6 that I performed for that particular invoice and
7 it's the exact same process that I did and that
8 one could do for the other Google invoices that
9 would be included in the Bates stamped documents
10 in Figure 55.  So I didn't feel it was necessary
11 to have a very repetitive -- and it would be
12 probably over a thousand pages -- I didn't feel it
13 was necessary to repeat -- to show every single
14 Google invoice -- show a table -- show a table
15 like I did in 50- -- Figure 50- -- sorry,
16 Figure 54 for every single walk-through that I did
17 for Navy because the -- the pattern, the process
18 is the same.
19     One -- one could check my work, so to
20 speak, by reviewing the documents that are listed
21 in Figure 55.
22 BY MS. GOODMAN:

1     Q   But you've told me that the tracing
2 process that you've done is complex, right?
3     A   It -- it can be.
4     Q   Yes.  And there are many, many, many
5 documents cited in Figure 55, right?
6     A   I don't know what you mean by "many,
7 many."  I could count those for you if you'd like.
8     Q   All right.  I'm not asking you do that.
9     A   Just -- so to -- to clarify --
10     Q   There's no pending question.  Let me ask
11 my question.  Thank you.
12     A   Apologies.
13     Q   You have not set out in your report
14 anywhere the pathway work you did to confirm
15 payment for every invoice other than NHTSA and CMS
16 that is included in your damages calculation,
17 correct?
18     MR. BRISKIN:  Objection to form.
19     THE WITNESS:  I disagree with that.
20 BY MS. GOODMAN:
21     Q   Your pathway figures that I can read in
22 order to check your work and turn to the

CONFIDENTIAL

Page 274

1    MR. BRISKIN: Objection to form.
2    THE WITNESS: Are you talking about
3    exchanges in general or are you talking about AdX?
4    BY MS. GOODMAN:
5    Q   Did you see any evidence one way or
6    another for any platform, any advertiser, ad
7    network, or DSP that they may vary their platform
8    fees based on bids into exchanges?
9    MR. BRISKIN: Objection to form.
10    THE WITNESS: I'm not really sure what
11    you mean by "based on bids into exchanges." They
12    may --
13    BY MS. GOODMAN:
14    Q   Okay. Let me try again.
15    Do you cite anything in paragraph 77, in
16    terms of documentary evidence, that supports your
17    assumption that the actual percentage of platform
18    fees as a fraction of AdX revenue would have
19    remained constant absent the AdX overcharge?
20    MR. BRISKIN: Objection to form.
21    THE WITNESS: I -- I think I just
22    explained to you that I have no data available to

Page 275

1    me which indicates that the actual percentage
2    would have changed, so I make the assumption that
3    it would have remained the same. And so with
4    regard to that, you can't cite something that's
5    not there.
6    BY MS. GOODMAN:
7    Q   Did you ask for information that would
8    support or refute your assumption that the actual
9    percentage of platform fees as a fraction of AdX
10    revenues would have remained constant absent the
11    AdX overcharge?
12    MR. BRISKIN: Objection to form.
13    THE WITNESS: I -- I directed my staff
14    to research this issue and to look for data and,
15    as -- as I testified, no data was available.
16    BY MS. GOODMAN:
17    Q   When you say "data," are you talking
18    about like a spreadsheet transaction or, you know,
19    aggregated data or are you talking about documents
20    like e-mails and memos and things?
21    A   Both.
22    Q   Okay. And so your staff didn't give

Page 276

1    you, for example, any documents showing that
2    Criteo sometimes charges a negative platform fee?
3    MR. BRISKIN: Objection to form.
4    THE WITNESS: Well, I was interested in
5    the platform fees that Google charges.
6    BY MS. GOODMAN:
7    Q   Okay. So you didn't see the document
8    that I just explained?
9    MR. BRISKIN: Objection to form.
10    THE WITNESS: I'm not sure which
11    document that is. Did you want to show that to me
12    so I can refresh my memory?
13    BY MS. GOODMAN:
14    Q   No. But do you recall sitting here
15    today seeing any document showing that Criteo
16    charges a negative platform fee on occasion?
17    MR. BRISKIN: Objection to form.
18    THE WITNESS: I reviewed hundreds of
19    documents in this case. I -- I don't recall that
20    one way or another.
21    BY MS. GOODMAN:
22    Q   Okay. You conducted a profitability

Page 277

1    analysis in this case, right?
2    A   I did.
3    Q   And you understood that Professor Lee
4    may rely on your profitability analysis, correct?
5    A   Yes.
6    Q   And you understand Professor Lee did not
7    in fact rely on your profitability analysis,
8    correct?
9    MR. BRISKIN: Objection to the form.
10    THE WITNESS: That is my understanding.
11    BY MS. GOODMAN:
12    Q   And in your rebuttal report you say that
13    you would not use a DVAA P&L excluding AdMob to
14    reach any conclusion about the profitability --
15    profitability of products in the relevant product
16    markets, correct?
17    MR. BRISKIN: Objection to form.
18    THE WITNESS: Those -- those sounds like
19    the words I -- I used.
20    BY MS. GOODMAN:
21    Q   I'm looking at paragraph 56.
22    A   In which report?

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

1    Q    The rebuttal.
2    A    Yes.
3    Q    And the DVAA P&L excluding AdMob to
4    which you are referring in paragraph 56 is a
5    figure that you created in -- or that Dr. Respess
6    created in his initial report, correct?
7    A    There is a figure that relates to the
8    profitability of DVAA excluding AdMob in the
9    Respess report.
10   Q    Okay.  And that's Figure 28 on page 49
11   of the Respess report, correct?  If you can look
12   at that.
13   A    Okay.  Hold on a second.
14        Which page?
15   Q    Forty-nine, Figure 28.
16   A    I see that.
17   Q    And is that the DVAA P&L to which you
18   are referring in paragraph 56 of your rebuttal
19   report?
20   A    Yes, I believe so.
21   Q    Okay.  And then looking at Figure 28 in
22   the initial Respess report, that figure shows that

Page 279

1    DVAA excluding AdMob took operating profit losses
2    from 2015 to 2017, correct?
3        MR. BRISKIN:  Objection to form.
4        THE WITNESS:  It -- it shows negative
5    amounts for operating profit for those years.
6        There is an errata version of this
7    figure in my rebuttal report.
8    BY MS. GOODMAN:
9    Q    That's what we're looking at.
10   A    Oh, I was looking at --
11   Q    No.  You're --
12   A    Sorry, am I looking at the errata
13   version?
14   Q    Yes, ma'am.
15   A    Got it.
16   Q    Okay.  So your Figure 28, which is Lim
17   Exhibit 1, shows operating profit losses from 2015
18   to 2017, right?
19   A    Sorry, there's -- I was getting confused
20   between the errata version and the updated
21   version.  There's an updated version as well in --
22   in my rebuttal report.  But we -- we can keep on

Page 280

1    the errata version if you'd like.
2    Q    Yes.
3    A    So, sorry, ask your question again.
4    Q    This Figure 28 shows that DVAA excluding
5    AdMob took operating profit losses from 2015 to
6    2017, right?
7    A    Yes.
8    Q    Okay.  And you agree that this Figure 28
9    shows that AdMob is more profitable than DVAA on
10   average?
11       MR. BRISKIN:  Objection to form.
12       THE WITNESS:  One more time.
13   BY MS. GOODMAN:
14   Q    You agree that this Figure 28 shows that
15   AdMob is more profitable than DVAA on average?
16       MR. BRISKIN:  Objection to form.
17       THE WITNESS:  The results of this table
18   compared to the DVAA P&L including AdMob suggests
19   that AdMob is more profitable than DVAA on
20   average.
21   BY MS. GOODMAN:
22   Q    So you stand by the sentence in

Page 281

1    paragraph 99 that "Operating profit margin in this
2    modified DVAA P&L excluding AdMob drops relative
3    to the pure DVAA P&L in almost all years,
4    suggesting that AdMob is more profitable than DVAA
5    on average," correct?
6    A    Yes.
7    Q    Okay.  So let's go back to your
8    paragraph 56 in your rebuttal report.
9        The DVAA P&L excluding AdMob that you
10   would not use to reach any conclusion about the
11   profitability of products in the relevant product
12   markets, does that also include Figure 2 in your
13   rebuttal report?
14       MR. BRISKIN:  Objection to form.
15       THE WITNESS:  That's the updated one I
16   was talking about.  Yes, that -- wherever that was
17   the sentence you read me.  Sorry.
18   BY MS. GOODMAN:
19   Q    Paragraph 56.
20   A    I would -- I would also not use the DVAA
21   P&L excluding AdMob figures in Figure 2 of the
22   rebuttal report to reach any conclusion about the

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

1  profitability of products in the relevant product
2  markets.
3      Q   Okay.  And both Figure 2 in your
4  rebuttal report and Figure 28 in the corrected for
5  errata Respess report show DVAA excluding AdMob on
6  a booked-revenue basis, correct?
7      A   They do.
8      Q   And thus you would not rely on any P&L
9  on a booked-revenue showing -- created on a
10 booked-revenue basis to make any conclusions about
11 the profitability of products in the relevant
12 product markets, correct?
13     A   Correct.
14     Q   Okay.  And Figures 2 and Figures 28 both
15 reflect out-of-scope activity, correct?
16     A   They --
17         MR. BRISKIN:  Objection to form.
18         THE WITNESS:  They both reflect -- they
19 both include activity that is not in the relevant
20 product markets.
21 BY MS. GOODMAN:
22     Q   Okay.  And are you aware of any expert

Page 283

1  for the plaintiffs who rely on your profitability
2  analyses in their reports?
3      A   I am not.
4      Q   And Figure 2 and Figure 28 also show in
5  the MECE view that in 2021 and 2022 -- withdrawn.
6         Figures 28 and 2 also show that DVAA
7  profitability excluding AdMob decreased from 2021
8  to 2022, correct?
9      A   Yes.
10     Q   Do you agree that the principal versus
11 agent consideration is not -- withdrawn.
12         Do you agree that the principal versus
13 agent standard in ASC 606 does not permit
14 optionality?
15         MR. BRISKIN:  Objection to form.
16         THE WITNESS:  I'm not sure what you mean
17 by "optionality."  Can you explain that -- can you
18 explain further what you mean?
19 BY MS. GOODMAN:
20     Q   That it's not -- that it's not a -- it
21 doesn't allow for both conclusions to be drawn.
22         MR. BRISKIN:  Objection to form.

Page 284

1         THE WITNESS:  One could not arrive at
2  a -- a -- one could not simultaneously apply both
3  a principal and agent treatment to the same
4  transaction.  Sorry, I'm not --
5  BY MS. GOODMAN:
6      Q   Sure.  Understood.  Let me ask again.
7         And it's not possible for -- do you
8  agree it's not possible to conclude that, on the
9  set of facts and circumstances for any given
10 transaction, that a registrant could treat itself
11 as a principal or an agent?
12         MR. BRISKIN:  Objection to form.
13         THE WITNESS:  Sorry, can you ask your
14 question again?
15 BY MS. GOODMAN:
16     Q   Do you agree that when applying topic
17 606 to any set of facts and circumstances, it is
18 not permitted under that guidance to reach a
19 conclusion that the registrant can be either a
20 principal or an agent?
21         MR. BRISKIN:  Objection to the form.
22         THE WITNESS:  I think the guidance with

Page 285

1  regard to principal/agent treatment requires a
2  high level of judgment and reasonable accountants
3  could arrive at different conclusions with regard
4  to whether -- given the same set of facts and
5  circumstances -- as to whether a company should be
6  considered a principal or whether a company should
7  be considered an agent.
8  BY MS. GOODMAN:
9      Q   And you agree that the principal versus
10 agent assessment is often fact specific and
11 judgment based?
12     A   It is fact specific and requires
13 judgment.
14     Q   And because it is fact specific and it
15 requires judgment, do you agree that companies
16 should be cautious about relying on benchmarking
17 to their peer's accounting?
18         MR. BRISKIN:  Objection to form.
19         THE WITNESS:  I think the SEC says --
20 says something along -- or SEC staff has said
21 something along the lines that one can't -- one
22 can't look at another company's accounting with

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

1  regard to the principal/agent determination and
2  without doing its own determination simply just
3  copy what the other company has done.
4  BY MS. GOODMAN:
5      Q.  Okay.  And do you agree that significant
6  judgment does not mean that the -- the standard
7  permits optionality?
8          MR. BRISKIN:  Objection to form.
9          THE WITNESS:  There's that "optionality"
10  word again.  Maybe you could rephrase that
11  question because that's confusing me.
12  BY MS. GOODMAN:
13      Q.  Okay.  So are you unable to answer the
14  question as I phrased it to you?
15      A.  I'm sorry, I cannot.  It's not clear to
16  me.
17      Q.  Okay.  And do you agree that an area of
18  significant judgment does not mean that the
19  standard permits optionality?
20          MR. BRISKIN:  Objection to form.
21          THE WITNESS:  It's the "optionality"
22  word that -- that I'm getting hung up on.  Maybe

Page 287

1  you can rephrase the question without using that
2  word.
3  BY MS. GOODMAN:
4      Q.  Okay.  And do you agree that in order to
5  make the judgments needed in applying ASC 606,
6  registrants need to roll up their sleeves to
7  understand the nuances of the transactions they're
8  evaluating and apply the standard to their
9  specific set of facts and circumstances?
10          MR. BRISKIN:  Objection to form.
11          THE WITNESS:  I would agree with that.
12  BY MS. GOODMAN:
13      Q.  You -- it's your opinion it would also
14  be reasonable to consider the specified good or
15  service that Google provides advertisers to simply
16  be publishers' ad inventory, correct?
17          MR. BRISKIN:  Objection to form.
18          THE WITNESS:  It's my opinion that it
19  would be reasonable to consider the good or
20  service that an advertiser receives to be
21  publisher inventory.
22  BY MS. GOODMAN:

Page 288

1      Q.  Okay.  Let's look at page 52 of the
2  Respess initial report corrected for errata.
3      A.  Okay.  Okay.  I'm there.
4      Q.  The last sentence of paragraph 104 says,
5  "However, I believe it would also be reasonable to
6  consider the specified good or service that Google
7  provides advertisers to simply be publishers' ad
8  inventory."
9          Did I read that right?
10      A.  You read that right.
11      Q.  And is that your opinion?
12      A.  I think the -- the words "Google
13  provides advertisers" is a little ambiguous in
14  that sentence.  I believe it would be reasonable
15  to consider the specified good or service that
16  advertisers receive to be simply publisher ad
17  inventory.
18      Q.  Okay.  Is that what you are meant to --
19  is that what registrants are required to evaluate
20  under ASC 606, whether the good or service that is
21  received, or are they supposed to evaluate the
22  good or services provided?

Page 289

1          MR. BRISKIN:  Objection to form.
2          THE WITNESS:  I don't -- I don't want to
3  get hung up on a semantics thing, but -- but the
4  first step is to identify the specific goods or
5  services to be provided to the customer.  I
6  didn't -- I didn't mean anything by "received"
7  versus "provided."
8  BY MS. GOODMAN:
9      Q.  Okay.
10      A.  It's just that, you know, one party
11  provides, another party receives.
12      Q.  And ASC 606 talks about the provision of
13  goods and services, right?
14          MR. BRISKIN:  Objection to form.
15          THE WITNESS:  It does.
16  BY MS. GOODMAN:
17      Q.  And this sentence in paragraph 104 which
18  we just read, you don't cite any documents in
19  support of your belief that it would also be
20  reasonable to consider the specified good or
21  service that Google provides advertisers to simply
22  be publishers' ad inventory, correct?

73 (Pages 286 - 289)

CONFIDENTIAL

Page 318

1    Q    When you worked at Ernst & Young -- what
2    time period did you work at Ernst & Young?
3    A    '95 through '98.
4    Q    Other than in this case, have you looked
5    at Ernst & Young audit reports since -- over the
6    time -- over the time period of 2015 to the
7    present let's say?  In the course of your work
8    have you had occasion to look at EY audit reports?
9    A    For any company?
10   Q    Yes.
11   A    Audit opinions, yes.
12   Q    Okay.  And in the course of your work on
13   this case you do not disagree with anything that
14   EY concluded as to the principal/agent
15   determination that Google made, correct?
16        MR. BRISKIN:  Objection to form.
17        THE WITNESS:  I -- I don't agree or
18   disagree with EY not taking exception to Google's
19   treatment of itself as a principal in most of its
20   transactions.
21   BY MS. GOODMAN:
22   Q    Okay.

Page 319

1        MR. BRISKIN:  Counsel, we're at five
2    minutes over seven hours.
3        MS. GOODMAN:  I have one more question
4    if I may.
5        MR. BRISKIN:  Okay.
6        MS. GOODMAN:  Thanks.
7    BY MS. GOODMAN:
8    Q    You do not recall reviewing or seeing
9    testimony from representatives of the Navy in
10   which they testified the only ad network or DSP
11   that they ever used to buy open web display ads
12   was The Trade Desk, correct?
13        MR. BRISKIN:  Objection to form.
14        THE WITNESS:  I -- I reviewed thousands
15   of documents in this case.  I -- I don't recall
16   that one way or the other.
17        MS. GOODMAN:  Okay.  I pass the witness.
18        MR. BRISKIN:  We have no questions.
19        VIDEO TECHNICIAN:  All right.  If that's
20   everything, off the record on February 29th, 2024
21   at 7:28 p.m.
22        (Discussion off the record.)

Page 320

1        MS. GOODMAN:  We just went back on the
2    record and I just want to note for the record that
3    I am reserving my rights to bring Ms. Lim back for
4    additional questioning based on the filibustering,
5    evasive answers, and nonresponsiveness to my
6    questions.  So I just wanted to state that for the
7    record.
8        MR. BRISKIN:  Well, we dispute that.  We
9    don't agree with your characterizations.
10       MS. GOODMAN:  Okay.  Thank you.
11       (Whereupon, at 7:28 p.m., the
12       deposition of ADORIA LIM
13       was concluded.)
14            *  *  *  *  *
15
16
17
18
19
20
21
22

Page 321

1        CERTIFICATE OF NOTARY PUBLIC
2        I, SHARI R. BROUSSARD, the officer before
3    whom the foregoing deposition was taken, do hereby
4    certify that the witness whose testimony appears
5    in the foregoing deposition was duly sworn by me;
6    that the testimony of said witness was taken by me
7    in stenotype and thereafter reduced to typewriting
8    under my direction; that said deposition is a true
9    record of the testimony given by said witness;
10   that I am neither counsel for, related to, nor
11   employed by any of the parties to the action in
12   which this deposition was taken; and, further,
13   that I am not a relative or employee of any
14   counsel or attorney employed by the parties
15   hereto, nor financially or otherwise interested in
16   the outcome of this action.
17
18
19            SHARI R. BROUSSARD
20            Notary Public in and for the
             District of Columbia
21
     My commission expires:
22   August 14, 2025

81 (Pages 318 - 321)