# EXHIBIT 117

# PUBLIC

## In the Matter Of:

*UNITED STATES vs*

*GOOGLE*

*BRIAN O'KELLEY*

*September 29, 2023*



```
                                                              1

  1         IN THE UNITED STATES DISTRICT COURT

  2       FOR THE EASTERN DISTRICT OF VIRGINIA

  3               ALEXANDRIA DIVISION

  4                    - - -

  5
     UNITED STATES OF        :  CASE NO.
  6  AMERICA, et al.,        :  1:23-cv-00108
                             :  -LMB-JFA
  7       Plaintiffs,        :
                             :
  8       v.                 :
                             :
  9  GOOGLE, LLC,            :
                             :
 10       Defendant.         :

 11          - HIGHLY CONFIDENTIAL -

 12                    - - -

 13            September 29, 2023

 14                    - - -

 15

 16            Videotaped deposition of
     BRIAN O'KELLEY, taken pursuant to notice,
 17  was held at the law offices of Goodwin
     Procter LLP, The New York Times Building,
 18  620 Eighth Avenue, New York, New York,
     beginning at 9:03 a.m., on the above
 19  date, before Michelle L. Gray, a
     Registered Professional Reporter,
 20  Certified Court Reporter, Certified
     Realtime Reporter, and Notary Public.
 21

 22                    - - -

 23

 24
```

## Page 2

```
 1   APPEARANCES:
 2
       US DEPARTMENT OF JUSTICE
 3     ANTITRUST DIVISION
       BY:  JULIA TARVER WOOD, ESQ.
 4     (In person)
       BY:  AMANDA STRICK, ESQ.
 5     (In person)
       450 Fifth Street, NW
 6     Suite 8700
       Washington, D.C. 20530
 7     202.307.0924
       julia.wood@usdoj.gov
 8     amanda.strick@usdoj.gov
       Representing the United States of
 9     America
10
       AXINN, VELTROP & HARKRIDER LLP
11     BY:  BRADLEY JUSTUS, ESQ.
       (In person)
12     1901 L Street NW
       Washington, D.C. 20036
13     202.912.4700
       bjustus@axinn.com
14
          - and -
15
       AXINN, VELTROP & HARKRIDER LLP
16     BY:  BLAKE E. PESCATORE, ESQ.
       (In person)
17     BY:  CHRISTOPHER ERICKSON, ESQ.
       (Zoom)
18     114 West 47th Street
       New York, New York 10036
19     212.728.2200
       bpescatore@axinn.com
20     cerickson@axinn.com
       Representing The Defendant, Google
21
22
23
24
```

## Page 3

```
 1   APPEARANCES:  (Cont'd.)
 2
       PAUL, WEISS, RIFKIND, WHARTON &
 3     GARRISON LLP
       BY:  ERICA SPEVACK, ESQ.
 4     (Zoom)
       BY:  WILLIAM A. ISACCSON, ESQ.
 5     (Zoom)
       BY:  JEANNIE S. RHEE, ESQ.
 6     (Zoom)
       2001 K Street, NW
 7     Washington, D.C. 20006
       202.223.7300
 8     espevack@paulweiss.com
       wisaacson@paulweiss.com
 9     jrhee@paulweiss.com
       Representing the Defendant, Google
10
11   GOODWIN PROCTER, LLC
       BY: JORDAN D. WEISS, ESQ.
12     (In person)
       The New York Times Building
13     620 Eighth Avenue
       New York, New York 10018
14     212.813.8800
       jweiss@goodwinlaw.com
15     Representing the Witness
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1   APPEARANCES:  (Cont'd.)
 2
 3   ALSO PRESENT:
 4
     VIDEOTAPE TECHNICIAN:
 5
        Lem Lattimer - in person
 6     (Lexitas)
 7
     ZOOM MONITOR:
 8
        Nathaniel Avila - zoom
 9     (Lexitas)
10
11
12              - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 5

```
 1              - - -
 2            I N D E X
 3              - - -
 4
     Testimony of:          BRIAN O'KELLEY
 5
        By Ms. Wood           11, 344
 6
        By Mr. Justus              193
 7
 8
 9
                        - - -
10
            E X H I B I T S
11
                        - - -
12
13   NO.         DESCRIPTION          PAGE
14   O'Kelley
     Exhibit 1   Amended and Restated  199
15               Display Media Services
                 Agreement
16               MSFT-0001492336-98
17   O'Kelley
     Exhibit 2   E-mail Thread         211
18               8/7/11
                 Subject, Google-AdMeld
19               DOJ Investigation
                 DOJ-ADS-0000077953
20
     O'Kelley
21   Exhibit 3   E-mail Thread, 5/4/20 217
                 Subject, Highly Confidential
22               OKELLEY000346-49
23
24
```

Page 298

1  reading it right, matches to that
2  statement.
3      Q.   And what is the first
4  sentence of your Comment BO 15?
5      A.   "I don't think this stands
6  up."
7      Q.   Why doesn't looking at
8  intermediary services in the ad tech
9  stack, a separate antitrust market, stand
10 up?
11          MS. WOOD:  Objection to the
12      form.  Misstates.
13          THE WITNESS:  So she's
14      saying different firms offered
15      independent ad tech services, and,
16      therefore, they are each separate
17      from an antitrust perspective.
18          I guess she's saying, like,
19      SSP is a market and DSP is a
20      market, whatever.  And I'm saying
21      you can't be -- I think I'm
22      saying -- you can't -- the
23      independent ad serving market has
24      been obliterated is good evidence

Page 299

1      that if you're just an ad server,
2      you can't survive.
3          And I state FreeWheel, which
4      is a video ad server owned by
5      Comcast.  You know, I was saying
6      that Comcast was buying other ad
7      tech companies, and I'm presuming
8      that they are trying to have
9      enough pieces to be able to
10     compete with Amazon or Google.
11 BY MR. JUSTUS:
12     Q.   Mr. O'Kelley, when you say,
13 "I don't think this stands up," are you
14 expressing the view that you should not
15 look at the different intermediary parts
16 at the ad tech stack as separate
17 antitrust markets?
18          MS. WOOD:  Objection --
19          MR. WEISS:  Objection.
20     Asked and answered.
21          MS. WOOD:  Objection to the
22     form.  Foundation.  Calls for a
23     legal opinion.
24          THE WITNESS:  Just what I

Page 300

1      think I'm saying or what I
2      remember saying here is about
3      independent firms offering various
4      services necessary to match supply
5      and demand.
6          I'm saying that each of
7      those services -- yeah, I think
8      I'm just saying that my opinion is
9      that doesn't follow logically.
10 BY MR. JUSTUS:
11     Q.   All right.  Let's go --
12 let's move on.
13          Let's go to Page 301 at the
14 bottom right.
15     A.   Okay.
16     Q.   Do you see BO 27?
17     A.   Yes.
18     Q.   You say, "Careful here.
19 High price is good for publishers.  Price
20 isn't fully set by Google because of
21 header bidding and direct sales by
22 publishers.  Google's take rate is highly
23 variable."
24          Did I correctly read your

Page 301

1  paper on Ms. Scott Morton's paper?
2          MS. WOOD:  Objection to
3      form.
4          It obviously goes on.
5          THE WITNESS:  That's the
6      beginning of my comment, yes.
7  BY MR. JUSTUS:
8      Q.   Is -- and so you agree the
9  price Google charges publishers is
10 constrained by header bidding?
11         MS. WOOD:  Objection to the
12     form.
13         THE WITNESS:  I'm saying
14     that header bidding provides some
15     pushback on Google's ability to
16     fully set price for publishers,
17     yes.
18 BY MR. JUSTUS:
19     Q.   And the same for direct --
20 let me ask a better question.
21         And the price Google charges
22 publishers is also constrained by
23 publisher direct sales?
24         MS. WOOD:  Objection to the

Page 302

1    form.
2         THE WITNESS:  So if
3    publishers sell directly, Google
4    has to, in some way, honor the
5    direct-sold campaigns.
6  BY MR. JUSTUS:
7    Q.   Does that constrain Google's
8  open auction take rate, in your view?
9         MS. WOOD:  Objection to the
10    form.
11        THE WITNESS:  I'm just
12    reading this again.
13        So she's saying the price
14    will be too high if Google has
15    market power, and I'm saying they
16    don't have total pricing power
17    because there's competition from
18    header bidding and from publisher
19    direct sales.  Yeah.
20 BY MR. JUSTUS:
21   Q.   All right.  Let's move on.
22        Go on to -- a little bit
23 later, where you say -- actually, BO 27.
24        Do you see where it says,

Page 303

1  "Google had a strong argument here that
2  when they win, it's in a fair auction
3  that is in the benefit of both the buyer
4  and the seller, and that since AdSense
5  bids on inventory, whether or not they
6  are the exchange and since the exchange
7  is open to all buyers, this price setting
8  is a consequence of being good at their
9  job, not their monopoly position."
10       "There" -- let me stop
11 there.  Did I read that right?
12       MS. WOOD:  Objection.
13    Incomplete.
14 BY MR. JUSTUS:
15   Q.   You can still answer.
16   A.   You read what you read
17 correctly.
18   Q.   What does that mean?  It's
19 your comment.  What does that mean?
20   A.   I'm speculating that if
21 Google pays the highest price to the
22 publisher and drives good result for the
23 advertiser, then the price they take is
24 earned, in essence, because they are

Page 304

1  doing their job.
2         And I'm particularly not --
3  whether that's the case or not, I'm just
4  saying that would be an argument to make
5  about why Google charges more than
6  competitors.
7    Q.   Let's go on to -- let's go
8  back to Page 299.
9         Do you see where it says at
10 the bottom, Ms. Scott Morton writes in
11 her paper, "All roads lead through
12 Google."
13        Did I read that right?
14   A.   Yep.  Yep.
15   Q.   And then you comment,
16 "Google is going to point to the way that
17 Amazon and others are injecting ads into
18 publishing, using header bidding to avoid
19 routing through the ad server as evidence
20 that there are plenty of ways to not pay
21 the Google tax."
22        Did I read that -- did I
23 read your comment correctly?
24        MS. WOOD:  Objection.

Page 305

1    Again, incomplete.
2         THE WITNESS:  What you read
3    is the first sentence, yes.
4  BY MR. JUSTUS:
5    Q.   Is it fair to say that
6  Amazon is an alternative to buying and
7  selling digital ads through Google?
8         MS. WOOD:  Objection to the
9    form.
10        THE WITNESS:  I would say
11    that Amazon has competitive
12    products to Google but not all
13    parts of Google.  So they are
14    competitive in some areas.
15 BY MR. JUSTUS:
16   Q.   What areas?
17   A.   Amazon has a DSP, as does
18 Google.  Amazon has an SSP that is
19 somewhat competitive to AdX.  And they
20 have -- you know, they are a publisher in
21 the sense of, like, all their e-commerce
22 inventory, they sell ads on their own
23 e-commerce stack.  I don't think that's
24 directly comparable to Google, but they

Page 306

1  don't have a publisher ad server like
2  DFP.
3         Q.    Let's go, Mr. O'Kelley, to
4  Page 386 now.  I'm sorry to skip back and
5  forth.
6               Do you see where
7  Ms. Scott Morton writes, kind of the
8  middle of the page, "But given the
9  enormous profits to be made, as indicated
10 by Google's 40 percent return on
11 investment, we also would expect to see
12 new entrants" -- let me withdraw that
13 question and read a little more, because
14 it's a little hard to parse from that.
15              "Fewer and fewer companies
16 service the digital advertising market.
17 This is not in itself unusual, even in a
18 competitive market.  But given the
19 enormous profits to be made, as indicated
20 by Google's 40 percent return on
21 investment, we also would expect to see
22 new entrants."
23              Did I read that portion of
24 Ms. Scott Morton's paper accurately?

Page 307

1         A.    Yep.
2         Q.    And then, Mr. O'Kelley, what
3  did you comment in response?
4         A.    I said, "Don't know.  Most
5  people think ad tech was massively
6  overbuilt and overfunded over the past
7  10 to 15 years, so lack of new entrants
8  right now would be a consequence of that
9  too."
10        Q.    All right.  You can put that
11 document aside.
12              During your time at
13 AppNexus, Mr. O'Kelley, was protecting
14 against fraud, ad fraud, a major
15 competitive concern?
16        A.    Yes.
17              MS. WOOD:  Objection to the
18        form.
19              MR. WEISS:  Yeah, I'm going
20        to join that objection.
21              MR. JUSTUS:  Can I have
22        Tab 35.
23              (Document marked for
24        identification as O'Kelley

Page 308

1         Exhibit 11.)
2  BY MR. JUSTUS:
3         Q.    Now, Mr. O'Kelley, I'm
4  showing you what we are marking as
5  O'Kelley Exhibit 11.  Do you recognize
6  this document?
7         A.    Yes.  It's our 2011
8  strategic plan.
9         Q.    I should note it's the
10 metadata on top.
11        A.    Yep.
12        Q.    Does -- any reason to doubt
13 this is a true and accurate copy of
14 AppNexus's 2011 strategic plan?
15        A.    This may not be the final
16 version of it.
17        Q.    Any reason to doubt it's a
18 true and accurate copy of at least a
19 version of AppNexus's 2011 strategic
20 version?
21        A.    Definitely a version of it.
22        Q.    All right.  We're going to
23 have to do the same exercise we did a few
24 minutes ago, and I'm sorry for that.  But

Page 309

1  we're going to look for Slide 25 notes.
2               The crazy part is I've
3  marked this in advance, obviously, and I
4  have trouble finding it.
5               MR. WEISS:  It's, like, just
6         a couple off the back.
7               THE WITNESS:  Okay.  I see
8         Slide 25 notes.
9  BY MR. JUSTUS:
10        Q.    Okay.  And then we're
11 actually going to talk about, this time,
12 the slide immediately before it.
13        A.    Okay.
14        Q.    Do you see the slide
15 entitled "Preventing Disaster"?
16        A.    Yes.
17        Q.    And then the first line
18 says, "Why important.  Our reputation
19 equals everything.  It's critical to
20 ensure the market tells us that we're as
21 good as we say we are."
22              Did I read that right?
23        A.    You did.
24        Q.    Under "Auditing, Fraud,

Page 310

1  Malware, Et Cetera," it says, "Will ruin
2  our relationship with Microsoft faster
3  than anything else.  We saw this at Right
4  Media."
5          Did I read that right?
6      A.  Yes.
7      Q.  What happened at Right Media
8  related to fraud?
9          MS. WOOD:  Objection to the
10         form.
11         THE WITNESS:  I don't
12         remember, right this second, what
13         this is referring to.
14 BY MR. JUSTUS:
15     Q.  Okay.  It continues under
16 "Auditing, Fraud, Malware," "One-strike
17 rule on critical inventory partners may
18 be zero.  Ditto buyers."
19         Did I read that right?
20     A.  You did.
21     Q.  Were you worried that
22 Microsoft, as your biggest customer,
23 would move away from AppNexus if there
24 were fraud issues?

Page 311

1      A.  I don't know that we were
2  worried that Microsoft would move away
3  from us, per se.
4          I think it was more about
5  our reputation, that, you know, to help
6  all of our partners, especially
7  Microsoft, we had to have a great
8  reputation.  And that if people were
9  using our platform for fraud, that would
10 hurt our reputation.
11     Q.  And cause customers to move
12 away, potentially?
13     A.  Potentially.
14     Q.  Did AppNexus subsequently
15 experience issues with ad fraud?
16     A.  We did.
17     Q.  What happened?
18     A.  It wasn't just AppNexus.  It
19 was the entire industry had -- partially,
20 because it was such a new set of
21 technologies, there were many loopholes
22 where bad actors could insert various
23 kinds of invalid traffic into --
24 basically, into this set of programatic

Page 312

1  platforms.
2          And so, for years, the whole
3  industry was fighting this through
4  third-party technologies, through, you
5  know, data science, through, you know,
6  all kinds of things.  So I think
7  AppNexus, like everybody else, had a team
8  of people focusing on fraud and trying
9  really hard to get that fraud off the
10 platform.
11         MR. JUSTUS:  Can I have
12         Tab 36.
13         (Document marked for
14         identification as O'Kelley
15         Exhibit 12.)
16         MR. WEISS:  Are you done
17         with this?
18         MR. JUSTUS:  You can set
19         that aside.
20 BY MR. JUSTUS:
21     Q.  Mr. O'Kelley, I'm showing
22 you what we've marked as O'Kelley
23 Exhibit 12.  Do you recognize this
24 document?

Page 313

1      A.  Not specifically, but it
2  looks like an article by Zach Rodgers and
3  AdExchanger.
4      Q.  What is AdExchanger?
5      A.  AdExchanger is a website and
6  e-mail newsletter that talks about the
7  programatic industry.
8      Q.  Do you know Zach Rodgers, in
9  particular?
10     A.  I do.  I do.  He's
11 interviewed me for a number of pieces
12 over the years.
13     Q.  Is he -- he is a good
14 journalist?
15         MS. WOOD:  Objection to the
16         form.
17         THE WITNESS:  He seems like
18         a good journalist.
19 BY MR. JUSTUS:
20     Q.  So at the top of Page 3 --
21 these are, mercifully, numbered, so if
22 you flip --
23     A.  All right.
24     Q.  It says, "Two months into a

|  | Page 314 |  | Page 315 |
|---|---|---|---|
| 1 | quality-control effort designed to curb | 1 | data center or a cloud computing, like, |
| 2 | fraud, domain masking, and other sketchy | 2 | server -- servers faking -- pretending to |
| 3 | practices in its marketplace, AppNexus | 3 | be humans browsing web pages, to generate |
| 4 | has offered some details on those cleanup | 4 | ad traffic that is not really from |
| 5 | efforts and even given them a name." | 5 | people. |
| 6 |     Did I read that right? | 6 |     Q.    What's domain masking? |
| 7 |     A.    Yes. | 7 |     A.    Domain masking is when you |
| 8 |     Q.    So in addition to fraud and | 8 | have real people on a website, but |
| 9 | domain masking, what were some of the | 9 | it's -- when it gets sent to an ad |
| 10 | other sketchy practices in the AppNexus | 10 | exchange, you tell the exchange, say, |
| 11 | marketplace AppNexus was experiencing in | 11 | from The New York Times, or you say, hey, |
| 12 | 2015? | 12 | this is confidential. I'm not going to |
| 13 |     MS. WOOD:  Objection to the | 13 | share the name of the domain, so the |
| 14 |     form. | 14 | buyer might not want to buy traffic from |
| 15 |     **THE WITNESS:  I don't know** | 15 | some random site they've never heard of, |
| 16 |     **exactly what he's referring to.  I** | 16 | but they would be willing to buy -- they |
| 17 |     **think that fraud is a pretty** | 17 | might have an exclusion list that says |
| 18 |     **generic term, so I think it's** | 18 | don't buy that site, but if you mask the |
| 19 |     **anything that didn't feel** | 19 | name of the domain or pretend to be |
| 20 |     **legitimate to us at that time.** | 20 | somebody else, then it would get |
| 21 | BY MR. JUSTUS: | 21 | purchased. |
| 22 |     Q.    What are some examples of | 22 |     So the buyer isn't buying |
| 23 | common fraud? | 23 | what they expect to buy or they're not |
| 24 |     A.    Generating traffic from a | 24 | blocking what they expect to buy. |

|  | Page 316 |  | Page 317 |
|---|---|---|---|
| 1 |     Q.    What are the user security | 1 |     **pulling money from high-quality** |
| 2 | threats from ad fraud? | 2 |     **journalism, and you're taking** |
| 3 |     MS. WOOD:  Objection to the | 3 |     **money out of the quality side of** |
| 4 |     form. | 4 |     **the internet.** |
| 5 |     **THE WITNESS:  When you say** | 5 |     **But I think most of this has** |
| 6 |     **user security, what do you mean?** | 6 |     **to do with sort of ad tech** |
| 7 | BY MR. JUSTUS: | 7 |     **gimmicks, not, you know, user --** |
| 8 |     Q.    Is it potentially harmful | 8 |     **end-user outcomes.** |
| 9 | for users of the internet when there's ad | 9 | BY MR. JUSTUS: |
| 10 | fraud? | 10 |     Q.    Are there some types of ad |
| 11 |     MS. WOOD:  Objection to the | 11 | fraud on the internet that can lead to |
| 12 |     form. | 12 | bad -- specifically, bad user outcomes? |
| 13 |     **THE WITNESS:  Well, I mean,** | 13 |     Let me ask a more specific |
| 14 |     **most of what we talked about was** | 14 | question. |
| 15 |     **invalid traffic, meaning not** | 15 |     Is it possible that some |
| 16 |     **humans pretending to be human.  So** | 16 | sort of scam can be accomplished through |
| 17 |     **in those cases, there's no harm to** | 17 | ad fraud? |
| 18 |     **the humans because they're not** | 18 |     MS. WOOD:  Objection to the |
| 19 |     **actually doing anything.** | 19 |     form. |
| 20 |     **I think there's a couple of** | 20 |     **THE WITNESS:  The kind of --** |
| 21 |     **indirect reasons that fraud is bad** | 21 |     **the kind of fraud that we're** |
| 22 |     **for humans.  One is, if you're** | 22 |     **referring to is people tricking** |
| 23 |     **monetizing sites that probably** | 23 |     **advertisers into buying things** |
| 24 |     **shouldn't be monetized, you're** | 24 |     **that they shouldn't.** |

UNITED STATES v.
GOOGLE
Case 1:23-cv-00108-LMB-JFA   Document 1185-4   Filed 08/20/24   Page 10 of 10 PageID# 87147
Highly Confidential
Brian O'Kelley
September 29, 2023

Page 346

1 more?
2     MR. JUSTUS:  Another hour.
3     MS. WOOD:  If you want to
4 talk for an hour about AdX's take
5 rates, sure.
6     MR. JUSTUS:  We don't have
7 any more questions.
8     THE VIDEOGRAPHER:  3:52.  We
9 are off the record.
10     ************
11     (Excused.)
12     (Deposition concluded at
13 approximately 3:52 p.m.)

Page 347

2     CERTIFICATE

5     I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6 deposition is a true record of the
testimony given by the witness.

8     It was requested before
completion of the deposition that the
witness, BRIAN O'KELLEY, have the
9 opportunity to read and sign the
deposition transcript.

12     _____ Michelle L. Gray _____
    MICHELLE L. GRAY,
13     A Registered Professional
    Reporter, Certified Shorthand
14     Reporter, Certified Realtime
    Reporter and Notary Public
15     Dated:  October 3, 2023

18     (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)

Page 348

1     INSTRUCTIONS TO WITNESS

3     Please read your deposition
4 over carefully and make any necessary
5 corrections.  You should state the reason
6 in the appropriate space on the errata
7 sheet for any corrections that are made.
8     After doing so, please sign
9 the errata sheet and date it.
10     You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14     It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.

Page 349

    - - - - - -
            E R R A T A
    - - - - - -

4 PAGE   LINE   CHANGE
5 ____   ____   _____
6     REASON: _____
7 ____   ____   _____
8     REASON: _____
9 ____   ____   _____
10    REASON: _____
11 ____   ____   _____
12    REASON: _____
13 ____   ____   _____
14    REASON: _____
15 ____   ____   _____
16    REASON: _____
17 ____   ____   _____
18    REASON: _____
19 ____   ____   _____
20    REASON: _____
21 ____   ____   _____
22    REASON: _____
23 ____   ____   _____
24    REASON: _____