**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' OMNIBUS MOTION IN LIMINE**

Plaintiffs' omnibus motion in *limine* seeks to preclude Google LLC ("Google") from presenting evidence and argument at the upcoming trial in this matter related to the following topics:

(1)   Google's suggestion that there should be one single relevant product market consisting of multiple tools that both publishers and advertisers use, in direct conflict with Google's prior position before a different tribunal;

(2)   past antitrust enforcers' review, comments, and decisions not to challenge Google's acquisitions of DoubleClick and AdMeld; and

(3)   hearsay and double-hearsay statements contained in Advertiser Perceptions surveys produced from Google's files without independent expert disclosure or verification.

Precluding such evidence on each of the above topics will "streamline the trial by keeping irrelevant and improper evidence out of the courtroom." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc*., 2012 WL 12833699, at *1 (E.D. Va. Apr. 3, 2012) (Brinkema, J.).

1

**PLAINTIFFS' REQUESTED RELIEF NO. 1**

## I.   <u>Google Should Be Precluded from Introducing Evidence of a Single Ad Tech Market Pursuant to Judicial Estoppel</u>

Plaintiffs respectfully move to preclude Google from introducing evidence or argument at trial that the multiple ad tech products at issue in this case constitute one single product market for antitrust purposes because Google has argued the opposite in prior litigation. At trial, Plaintiffs will present evidence of Google's sustained and self-reinforcing anticompetitive conduct as well as its durable monopoly power in a relevant product market, which is an analytical tool courts use to contextualize and understand the impact of anticompetitive conduct. In this case, Google contends that the three separate product markets alleged by Plaintiffs— publisher ad server, ad exchange, and advertiser ad network—are improper in part because the full ad tech "stack" of products used by both publishers and advertisers of open-web display advertising constitute one single product market. Plaintiffs will demonstrate at trial that Google's single-market argument is wrong on the merits, supported by the testimony of customers and competitors of Google, Google's own documents, and the opinions of expert economists. The doctrine of judicial estoppel precludes Google's position—whether through argument or testimony—that the entire "stack" of multiple ad tech products, used by separate groups of customers, represent a single product market because Google has previously taken the opposite position, to its benefit. Google should not be permitted to make a factual claim to one court and then make the opposite claim to this Court to secure litigation advantage. Simply put, Google cannot have it both ways.

In 2021, Google took a position irreconcilable with the position it takes now. In front of another federal court in California, Google maintained that a single market combining all the various tools used by publishers and advertisers across the ad tech "stack"—the very market

Google proposes here—was improper. The California court agreed with that position as a basis for dismissing a private antitrust claim against Google which alleged a single relevant product market. *In re Google Digital Advertising Antitrust Litig.*, 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021) (the "N.D. California case"). Having successfully argued that a single product market could not be "comprised of four different services and/or products," which a plaintiff alleges includes "distinct" products that are "essentially complementary," Google cannot now reverse itself on the underlying factual proposition—through the testimony of its lead economic expert—that distinct and complementary ad tech products *do* in fact constitute one single product market. Because the two factual positions are irreconcilable with each other, and because Google has already benefited from adopting one of them, judicial estoppel precludes it from adopting the other here.

    A.  <u>**Background of Google's Positions**</u>

    <u>**Google's Position in 2021.**</u>  In 2020, advertisers filed a class action against Google in the Northern District of California alleging, among other things, that Google's conduct in the digital ad technology industry violated Section 2 of the Sherman Act and California unfair competition law.[1] In their First Amended Complaint, the advertisers alleged a single "market for online display advertising services, encompassing the overall system or process that connects online display advertisers and publishers (including Google) . . . colloquially known as the 'ad tech stack[.]'" Ex. 1, Excerpts of First Amended Complaint, 20-cv-03556-BLF (N.D. Cal.), ECF No. 52 (Dec. 4, 2020) ¶ 183. The advertisers alleged that this single "ad tech stack" market included

---

[1] This case was subsequently consolidated in the MDL before Judge Castel in the Southern District of New York.

four ad tech products, two of which are used only by advertisers, and two of which are used only by publishers. *See id*. ¶¶ 55-56, 186.

Google moved to dismiss because (among other reasons) "a relevant market definition may not encompass products that are not `reasonably interchangeable by consumers for the same purposes.'" Ex. 2, Mot. to Dismiss, ECF No. 66, 2021 WL 7083558, at 6 (Jan. 15, 2021) (citation omitted). Specifically, Google took the position that "a *single market* . . . comprised of four different services and/or products" failed because, assuming plaintiffs' allegations as true, the four services, which plaintiffs alleged were "distinct," are "essentially complementary of one another . . . rather than . . . substitutes." *Id*. at 7 (emphasis added). Ultimately, "because their purported market includes products and services that Plaintiffs and other advertisers admittedly do not purchase or use" Google took the position that no relevant product market existed. *Id*.

In ruling on Google's motion to dismiss, the district court characterized Google's argument as follows: "Plaintiffs' proposed market improperly includes services for both advertisers and publishers." *In re Google Digital Advertising Antitrust Litig.*, 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021). The Court then "agree[d] with [Google]" that a product market could not properly include products for both advertisers and publishers, and it dismissed the advertisers' claims in part on that basis. *Id*.

**Google's Position Now.**  Google's lead economic expert in this case, Mark Israel, criticizes Plaintiffs' three distinct product markets by suggesting—contrary to the position Google took in the N.D. California case—that there should be just one single ad tech intermediation market that includes all three products, one of which is used only by advertisers and one of which is used only by publishers. For example, in Professor Israel's report, he states:

- Plaintiffs "artificially focus[] separately on particular sub-pieces of the overall ad tech stack" and "wrongly call[] those sub-pieces markets." Ex. 3, Expert Report of Mark Israel ("Israel Rep.") at 6, ¶ 17.

- Plaintiffs "artificially divide the match-making process into sub-components and define them as separate antitrust product markets." *Id.* at 9, ¶ 22.

- "Plaintiff's approach of carving up the ad tech stack and defining markets around individual components obscures the overarching competition that exists to create matches between advertisers and publishers' impressions." *Id.* at 86, ¶ 119.

- "[C]onsidering a market for ad tech products as a whole—meaning as a single two-sided market—addresses many of the shortcomings of Plaintiffs' approach to market definition and better captures the competitive constraints facing Google." *Id.* at 261, ¶ 344.

- "A two-sided market definition that considers the various ad tech components as a single platform that matches advertisers and publishers provides the proper conceptual framework with which to understand Google's behavior and the competitive environment in which it operates." *Id.* at 262, ¶ 347.

**B.  Legal Standard**

The doctrine of judicial estoppel "precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation. The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *1000 Friends of Md. v. Browner*, 265 F.3d 216, 226 (4th Cir. 2001). For judicial estoppel to apply, four elements must be satisfied: (1) "the party sought to be estopped [is] seeking to adopt a position that is inconsistent with a stance taken in prior litigation," (2) "the position [is] one of fact rather than law or legal theory," (3) "the prior inconsistent position [was] accepted by the court," and (4) "the party sought to be estopped intentionally misled the court to gain unfair advantage." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996). Courts regularly examine judicial estoppel through motions *in limine*. *See, e.g. Jackson v. United Airlines, Inc.*, 2009 WL 1706681, at *3 (E.D. Va. June 17, 2009); *TecSec v. Adobe Inc.*, 2018 WL 11388472, at *9 (E.D. Va. Nov. 21, 2018).

### C.  Argument

Because all four elements of judicial estoppel are met, Google should be precluded from reversing its position in the N.D. California case by eliciting testimony or argument in this case that both publisher-only and advertiser-only ad technology tools properly combine into a single product market.

####   1.  Google Has Advanced Inconsistent Positions in the N.D. California Case and This Case

Google is "advancing an assertion" here "that is inconsistent with a position taken during previous litigation." *1000 Friends of Md. v. Browner*, 265 F.3d at 226. In the N.D. California case, Google argued that "a single intermediation market'" that included advertising technology tools for both advertisers and publishers should be rejected as a relevant antitrust product market. Ex. 2 at 7; *see supra* at 2-3. Yet in this case, Google intends to elicit testimony from its lead economic expert that the *failure* to allege a single intermediation market results in an "[un]sound economic framework." Ex. 3 ¶ 48 (at 30); *see supra* at 3-4. These two positions cannot be squared with one another and are therefore "inconsistent."

####   2.  The Composition of a Relevant Product Market Is a Question of Fact

The nature of Google's inconsistent positions is also factual, not legal. The relevant question in both cases is what products constitute a relevant market for antitrust purposes, which courts, including the Fourth Circuit, hold "is a question of fact," not of law. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442 (4th Cir. 2011); *see also HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007) ("The relevant product market is a

question of fact[.]"); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023) ("We review relevant market definitions as fact findings.").[2]

Google argued in the 2021 case that the N.D. California Plaintiffs should have alleged narrower product markets to reflect the commercial realities of the ad tech stack, but when Plaintiffs here alleged narrower product markets that addressed the very same commercial realities previously identified by Google, Google reversed itself by offering expert testimony squarely contradicted by its prior assertion: that only a single product market will suffice for antitrust purposes.

### 3. A Court Accepted Google's Prior Argument that the Ad Tech Stack Market Was Not a Single Product Market

Google's "prior position" was also "accepted by the court in the first proceeding'' *Mullinex v. John Crane Inc.*, 2021 WL 8533035, at *4. Google persuaded the court in the N.D. California case to dismiss the advertisers' claims, in part for failure to plead a relevant product market. In doing so, the court "agree[d] with" Google's argument that "Plaintiffs fail to adequately plead a *single* relevant product market—because their purported market includes products and services that Plaintiffs and other advertisers admittedly do not purchase or use." *In re Google Digital Advert.*, 2021 WL 2021990, at *3.

### 4. Google Has Acted Intentionally

The fourth element of judicial estoppel requires intent. *See Tenneco Chemicals v. William Burnett & Co.*, 691 F.2d 658, 665 (4th Cir.1982) ("whether the [party] intentionally misled the court to gain unfair advantage" is the "determinative factor" in the application of judicial

---

[2] Positions taken by litigants in the context of a motion to dismiss can serve as the basis for judicial estoppel. *See, e.g., Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 34–35 (1st Cir. 2004) (litigant was estopped from taking inconsistent position from the position taken at the motion to dismiss stage).

estoppel. The fact that a party has knowledge of the factual issue that they have benefited from is sufficient to demonstrate intent. *See Weinberg v. JPMorgan Chase & Co.*, 2016 WL 1070817, at *4 (E.D. Va. Mar. 15, 2016) (non-disclosure of asset in Chapter 7 bankruptcy petition was not "inadvertence or mistake" because party had asserted right to asset before filing for bankruptcy.); *see also Vanderheyden v. Peninsula Airport Comm'n*, 2013 WL 30065, at *12 (E.D. Va. Jan. 2, 2013) (describing how the court can infer intentionality of a debtor's prior claims in bankruptcy if the debtor has "knowledge of the undisclosed claims" and "has motive for concealment").

Here, Google has taken irreconcilable positions on the same factual question in a conscious effort to gain a dual litigation advantage—once in the N.D. California case and again here. Google is a sophisticated party, advised by able counsel in both cases. There can be no credible suggestion that the arguments made by Google in the 2021 case were "inadvertent." Likewise, the positions offered by Google's lead economic expert here are not by happenstance. Google retained Dr. Israel as its lead economic expert and was aware of his opinions, including those which squarely contradict the position taken by Google in a similar case just three years ago, when it decided to endorse Dr. Israel as an expert here. Litigants are not permitted to take contrary factual positions in related cases merely because the opportunity suits them to avoid liability. Where, as here, Google has acted intentionally, and not by mistake or inadvertence, the Court should judicially estop Google seeking to benefit from two contrary positions taken on the same factual question.

Because Google has previously argued, and the court accepted, that a single ad tech product market is inconsistent with the facts of how the components of the ad tech stack interact with each other, Plaintiffs respectfully request that Google be estopped from introducing evidence or argument to that effect in this case.

**PLAINTIFFS' REQUESTED RELIEF NO. 2**

**II.**    **Evidence of Prior Antitrust Enforcers' Review of Google's Acquisitions of DoubleClick and AdMeld Is Not Probative of Section 2 Liability and Would Waste Time**

Evidence presented at trial will necessarily include Google's acquisitions of DoubleClick in 2007 and AdMeld in 2011 because they are central ingredients to Google's anticompetitive course of conduct. Acquiring DoubleClick gave Google its publisher ad server and ad exchange, which are key source of its monopoly power that it tied together to exclude competitors. And acquiring AdMeld allowed Google to neutralize an important source of competition.

When Google proposed to acquire DoubleClick and AdMeld over 10 years ago, those transactions were reviewed by the Federal Trade Commission ("FTC") and the Antitrust Division of the U.S. Department of Justice (the "Antitrust Division" or the "Division"), respectively, and in both cases the agencies elected at those times not to challenge the acquisitions under Section 7 of the Clayton Act, 15 U.S.C. § 18. Google may seek to elicit evidence and argument about those discretionary decisions made over a decade ago. Indeed, Google's exhibit list includes press releases and statements made by these agencies at the time of their review.

Evidence or argument about past agency decisions made under a different forward-looking standard of review is not probative of liability under Section 2 of the Sherman Act. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 714 (4th Cir. 2021) (finding agency "decision not to pursue [a merger challenge] isn't probative as to the merger's legality"). The question for this Court is how Google's mergers, and the conduct facilitated by the mergers, violated Section 2 of the Sherman Act *today*. Unlike the antitrust enforcers' application of Section 7 to predict potential competitive harm, under Section 2 the Court is permitted, and in

fact required, to review Google's acquisitions with the benefit of hindsight, including Google's 15-year course of anticompetitive conduct. Recognizing this distinction, the Clayton Act explicitly provides that "any failure of the [antitrust enforcers] to take any action under this section shall not bar any proceeding or any action with respect to such acquisition at any time under any other section of this Act or any other provision of law." 15 U.S.C. § 18a(i)(1). Therefore, evidence of a prior, limited review under Section 7 is not probative of any claim or element at issue today and should be excluded, including but not limited to any claim or argument that the historical review of past transactions somehow immunizes Google or otherwise limits this Court's ability to evaluate the transactions under Section 2 today. *Steves & Sons*, 988 F.3d at 714. Permitting evidence of such limited probative value would result in time wasted on irrelevant issues like what the antitrust enforcers knew or did not know at the time they made their decisions not to challenge the mergers. Fed. R. Evid. 403.

### A. Background of the DoubleClick and AdMeld Acquisitions

***DoubleClick.*** In April 2007, Google announced its acquisition of DoubleClick, including the publisher ad server DoubleClick for Publishers ("DFP") and the nascent ad exchange AdX. Def.'s Mem. Supp. Summ. J., Statement of Undisputed Facts ("Def.'s SUF") ¶ 31, ECF No. 1130-1. On December 20, 2007, the FTC announced that, following a split vote by the Commission, it would not file suit to block Google's acquisition of DoubleClick under Section 7 of the Clayton Act. Ex. 4 (Def.'s Trial Ex. List, DTX22, ECF No. 894). In its statement concerning the closure of its investigation, the FTC explained that it assessed the prospective "potential competitive harm" from the acquisition and concluded that the acquisition was "unlikely to substantially lessen competition." Ex. 5 at 6 (ECF No. 894, DTX23).

Both the FTC announcement and the related statement by the commissioners that voted not to file suit to block the acquisition emphasized that the "markets within the online advertising

space continue to quickly evolve, and predicting their future course is not a simple task." Ex. 5 at 13; Ex. 4 at 2. The announcement identified several predictions that informed the FTC's decision, including that "it was unlikely that Google could manipulate DoubleClick's third-party ad serving products in a way that would competitively disadvantage Google's competitors in the ad intermediation market" and "competition among firms in [the publisher ad serving] market is vigorous, and will likely increase." Ex. 4 at 2. The FTC also noted that it would "closely watch these markets and, should Google engage in unlawful tying or other anticompetitive conduct, the Commission intends to act quickly." Ex. 5 at 13; Ex. 4 at 2.

The dissenting commissioner also issued a statement, explaining that she "ma[d]e alternate predictions about where this market is heading, and the transformative role the combined Google/DoubleClick will play if the proposed acquisition is consummated," Ex. 4 at 2, and explaining that "the combination of Google and DoubleClick likely will affect the evolution of the entire online advertising market – especially in light of existing network effects, and the tremendous additional network effects the transaction will generate," Ex. 6 at 4, DoubleClick/Google, F.T.C. File No. 071-0170, Dissenting Statement of Commissioner Pamela Jones Harbour (Dec. 20, 2007). Another commissioner who voted to close the investigation (William Kovacic) later stated, "If I knew in 2007 what I know now, I would have voted to challenge the DoubleClick acquisition." Ex. 7 at 3, Steve Lohr, *This Deal Helped Turn Google Into an Ad Powerhouse. Is That a Problem?*, N.Y. Times (Sept. 21, 2020, updated Oct. 20, 2020).

**AdMeld.** In 2011, Google acquired AdMeld, a yield manager that allowed publishers to "compare offers from multiple buy-side sources at the same time" and offered "ad exchange

functionality." Def.'s SUF ¶ 67. On December 2, 2011, the Antitrust Division issued a statement announcing it was closing its review of that acquisition. Ex. 8 (ECF No. 894, DTX0096).

The Antitrust Division explained that its "investigation focused on the ***potential*** effect of the proposed transaction on competition in the display advertising industry." *Id.* at 2 (emphasis added). The Division "concluded that this particular transaction was unlikely to cause consumer harm," but noted that it would "continue to be vigilant in the enforcement of the antitrust laws to protect competition in display and other forms of online advertising." *Id.* at 1. The Division also explained that "[e]nforcement decisions are made on a case-by-case basis, and the analysis and conclusions discussed in this statement do not bind the [D]ivision in any future enforcement actions." *Id.* at 3.

Soon after acquiring AdMeld, Google incorporated some, but not all, of AdMeld's functionality into AdX and DFP and then deprecated key features that would have allowed greater competition among publisher ad servers and ad exchanges. Pls.' Opp. Mot. Summ. J., Statement of Additional Material Facts ("SAMF") ¶ 4, ECF No. 1127. For example, AdMeld's real-time bidding capabilities, which had been used by many publishers to reduce their reliance on AdX, was not integrated into AdX. Pls.' Opp. Mot. Summ. J., Response to Google's "Statement of Undisputed Facts" ("RSUF") ¶¶ 71–72, ECF No. 1127. Google's acquisition and subsequent deprecation of AdMeld also eliminated a nascent direct competitor to DFP and AdX. RSUF ¶ 75.

**Google's Arguments.** In this case, Google has claimed that the decisions by the FTC and the Antitrust Division not to challenge Google's acquisitions of DoubleClick and AdMeld indicate that the FTC and the Division previously found that the acquisitions did not harm competition. Def.'s Mem. Supp. Mot. Dismiss 19–20, ECF No. 73. To that end, Google has

sought to introduce facts and evidence concerning the FTC's and Antitrust Division's closure of their investigations into the DoubleClick and AdMeld acquisitions, Def.'s SUF ¶¶ 32, 70, and it has listed documents solely about those issues on its trial exhibit list, *see* Ex. 4 (FTC press release on the closure of its investigation into Google's DoubleClick acquisition); Ex. 5 (statement of assenting commissioners on the closure of FTC's investigation into Google's DoubleClick acquisition); Ex. 8 (the Antitrust Division's press release and statement on the closure of its investigation into Google's AdMeld acquisition).

### B. <u>An Enforcer's Decision Not to Pursue a Forward-Looking Merger Challenge Pursuant to Section 7 of the Clayton Act Is Not Probative of Whether that Merger Was—with the Benefit of a Fulsome Record and the Passage of Time—in Fact Unlawful under Section 2 of the Sherman Act</u>

Antitrust enforcers' "decision not to pursue [a merger challenge] isn't probative as to the merger's legality because many factors may motivate such a decision." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 714 (4th Cir. 2021) (citing *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664 (7th Cir. 2002)); *see also Altria Grp., Inc. v. Good*, 555 U.S. 70, 89–90 (2008) ("agency nonenforcement of a federal statute is not the same as a policy of approval"); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("an agency decision not to enforce often involves a complicated balancing of a number of factors"). Thus, in *Steves & Sons*, which was a private action challenging the legality of a merger, the Fourth Circuit approved of the district court's decision to "forb[id] evidence" at trial "that the [Division] had twice investigated the merger without challenging it." 988 F.3d at 713-14. That holding is consistent with Congress's directive.  Indeed, the Clayton Act expressly states that "any failure of the Federal Trade Commission or the [Antitrust Division] to take any action under this section shall not bar any proceeding or any action with respect to such acquisition at any time under any other section of this Act or any other provision of law." 15 U.S.C. § 18a(i)(1).

Other courts have reached a similar result. For example, in a patent infringement action, the court precluded the plaintiff from admitting at trial an FTC letter relating "to a finding by the FTC that" the end-user restrictions the plaintiff had placed on its products "did not appear to call for antitrust enforcement action." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 749 F. Supp. 2d 542, 556 (E.D. Ky. 2010), *aff'd in part, rev'd in part on other grounds*, 697 F.3d 387 (6th Cir. 2012), *aff'd*, 572 U.S. 118 (2014). The court held that the plaintiff "could not use the FTC's decision not to take action as a sword because inaction on the part of the government cannot be used to prove innocence, and therefore such inaction is irrelevant." *Id.*; *accord Steves & Sons*, 988 F.3d at 714 (citing *Static Control* with approval); *see also In re Carbon Black Antitrust Litig.*, 2005 WL 2323184, at *1 (D. Mass. Sept. 8, 2005) (holding that companies defending against Sherman Act conspiracy claims "will not be permitted to introduce evidence on the merits that the closing of the investigations [by antitrust enforcers] is somehow evidence that no conspiracy exists").

As in *Steves & Sons* and *Static Control*, antitrust enforcers' decisions not to challenge Google's acquisitions of DoubleClick and AdMeld under the Clayton Act are not probative of whether Google has violated the Sherman Act and should therefore be excluded from trial. *First*, admitting such evidence would allow Google to "use an enforcement authority's 'decision not to take action as a sword,'" which it "may not" do. *Steves & Sons*, 988 F.3d at 714 (quoting *Static Control*, 749 F. Supp. 2d at 556). *Second*, as the enforcers' decisions at the time made clear, *see* Ex. 4 at 2; Ex. 5 at 13; Ex. 8 at 3, the prior decisions were made under a predictive, forward-looking legal standard that is different from Section 2 of the Sherman Act, which, as here, can afford the Court the benefit of retrospective record. *See, e.g., FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967) ("core question" under Section 7 "is whether a merger may substantially

lessen competition," which "necessarily requires a prediction of the merger's impact on competition, present and future"); *cf. United States v. Grinnell Corp.*, 384 U.S. 563, 567 (1966) (affirming monopolization finding under Section 2 of the Sherman Act because, among other conduct, earlier acquisitions by the defendant "perfected the monopoly power to exclude competitors and fix prices"); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) ("A firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct[.]").[3] *Third*, the prior decisions evaluated the mergers in isolation, whereas under Section 2, "[i]t is foundational that alleged anticompetitive conduct must be considered as a whole." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, -- F.4th --, 2024 WL 3642432, at *11–12 (4th Cir. Aug. 5, 2024).

The predictive nature of the agencies' past enforcement decisions underscore why they are of limited to no probative value here. For example, the FTC justified its non-enforcement decision in part based on its assessment that, as of 2007, competition in the publisher ad server market was "vigorous, and will likely increase." Ex. 4 at 2. With the benefit of hindsight, the record at trial will show that Google's publisher ad server quickly grew to dominate the market and for many years has had a durable market share of about 90 percent. Ex. 9 ¶ 445, Fig. 45, Expert Report of Prof. Robin Lee. Similarly, the FTC predicted that "it was unlikely that Google could manipulate DoubleClick's third-party ad serving products in a way that would competitively disadvantage Google's competitors in the ad intermediation market." Ex. 4 at 2.

---

[3] Indeed, the Supreme Court has held that acquisitions can be reassessed even under the Clayton Act to account for their actual effects on competition. *See Untied States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 597 (1957) (challenging acquisition 30 years after the fact); *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 242 (1975) (observing that "there can be a violation at some time later even if there was clearly no violation—no realistic threat of restraint of commerce or creation of a monopoly—at the time of the initial acts of acquisition").

The market did not develop that way, however. Rather, despite its representations to enforcers during the merger review process,[4] Google, in fact, used its control over the publisher ad server to rig auctions that favored Google's ad exchange, including giving its own ad exchange "first look" and "last look" advantages over rival exchanges. SAMF ¶¶ 5, 9.

### C.   Introduction of Prior Enforcement Decisions Risks a Trial-Within-A-Trial that Distracts and Delays from the Issues Now Before the Court

Evidence of the FTC's and the Antitrust Division's investigations of Google's acquisitions should also be excluded because it risks creating a trial-within-a-trial that wastes time. Fed. R. Evid. 403. Google is attempting to inject evidence of enforcers' prior decisions to "effectively ask[] the Court to review these acquisitions without the benefit of hindsight, as if it were 2007 (for DoubleClick) or 2011 (for AdMeld)." Pls.' Opp. Mot. Dismiss 23, ECF No. 101. Doing so would counsel in favor of the Court considering, at a minimum, what enforcers knew and did not know at the time they made their decisions, as well as probing what Google represented to enforcers. However, the time and effort that would be wasted doing so—if doing so is feasible at all—would far outweigh any minimal value the evidence might have. *Cf. United States ex rel. Feldman v. van Gorp*, 2010 WL 2911606, at *3 (S.D.N.Y. July 8, 2010) (excluding under Rules 402 and 403 "evidence relating to the DOJ's decision not to intervene [in a qui tam suit]" because admitting such evidence would "draw the parties into 'a protracted and unproductive struggle over how the evidence admitted at trial compared to the evidence

---

[4] In a September 12, 2007, letter to the FTC, Google's counsel represented that although "[a]cquiring DoubleClick and its publisher relationships puts Google in a good position to pitch the value of AdSense [Google's ad intermediation product at the time since Google had not yet acquired AdX from DoubleClick] to these publishers," this did "not mean . . . that Google would have an exclusive or indeed *any* right to provide advertisements to those publishers. To be successful in its pitch, Google will need to demonstrate on the merits that AdSense is the best possible use of a portion of the publisher's inventory." Ex. 10 at 6 (FTC_US-GOOGLE-000004681).

considered by the agency'" (quoting *Paolitto v. John Brown E & C, Inc.*, 151 F.3d 60, 65 (2d Cir. 1998)).

For the foregoing reasons, Plaintiffs respectfully request that the Court exclude evidence and argument regarding the FTC's 2007 investigation of Google's DoubleClick acquisition and the Antitrust Division's 2011 investigation of Google's AdMeld acquisition.

**PLAINTIFF 'S REQUESTED RELIEF NO. 3**

**III.    <u>Third-party Advertiser Perceptions Surveys Are Hearsay and Should Be Precluded</u>**

Plaintiffs move the Court to prohibit Google from introducing into evidence twenty-one (21) survey reports conducted by third-party market research firm Advertiser Perceptions (collectively, the "AP Reports") and a summary exhibit compiling data from nine of these reports.  *See* Appendix (citing Def.'s Trial Ex. List, ECF No. 894). Google did not disclose Advertiser Perceptions ("AP") as a witness with relevant knowledge in its pre-trial initial disclosures, nor is anyone from AP listed as a trial witness by either party.  For the reasons explained below, the AP Reports should be excluded under Federal Rule of Evidence 802 because they themselves are out-of-court statements, and they contain additional out-of-court statements, all being offered for their truth. They are therefore inadmissible hearsay.

**A.  <u>Background of Advertiser Perceptions Surveys</u>**

Google uses AP, a market research firm that surveys advertisers, publishers, and others about issues affecting the ad tech industry.  *See* Ex. 11 (GOOG-AT-MDL-002447436) (detailing AP's business relationship with Google since 2012 and other company information).  AP periodically provides Google with reports collecting, summarizing, and analyzing survey results. *See id.* at -436–41.  Google has produced 21 such reports (and a summary exhibit, Ex. 12 (ECF. No. 894, DTX2055), compiling data therein) as proposed trial exhibits.  *See* Appendix.

Outside of one or two cursory slides where the reports generically describe the respondent set, *see*, *e.g.*, Ex. 13 at 2–3 (ECF No. 894, DTX861), Plaintiffs have no evidence about how these surveys were conducted.   Google did not disclose AP as an entity with relevant knowledge in this case.  *See* Ex. 14, Def.'s Fourth Suppl. Initial Disclosures.  No one from AP is on Google's witness list such that AP could be examined about its survey methodologies.  *See* Def.'s Witness List/Rule 26(a)(3) Disclosures, ECF No. 891.

Further, the AP Reports are not truly independent, third-party reports, but are tailored to requests from AP's client, Google.  *See* Ex. 15 (GOOG-AT-MDL-B-001298843) (discussing Google's custom questions); Ex. 16 (GOOG-AT-MDL-B-001297530) (Google's Head of Publisher Marketing and AP's Chief Strategy Officer crafting header bidding questions for upcoming survey); *see also* Ex. 17 at 8 (ECF No. 894, DTX291) (listing Google's Director of Brand Ads and Platforms Marketing as one of AP's Advisory Board Members, "who directly advise [AP] in its development and deployment of research-based products and services").  The AP Reports purport to convey statements from unidentified people in response to survey questions from AP concerning ad tech vendors used by the largely unidentified respondents. *See*, *e.g.,* Ex. 13.[5]

Indeed, Google employees have internally criticized AP's reports as unreliable.  For example, regarding a DSP report, one Google employee noted "we don't have a very high degree of confidence in the fidelity of [AP's] research / methodologies… in just about every survey there is a crazy data point that doesn't make much sense (and which [AP] can't explain) and calls into question the validity of [AP's] work overall."  Ex. 18 (GOOG-AT-MDL-B-001296996).

---

[5] Ex. 13 is a representative AP Report.  Plaintiffs have not attached other AP Report exhibits listed in the Appendix but will promptly provide them to the Court upon request.

Google's Head of Publisher Marketing agreed, calling AP's "pool of participants suspect." *Id.; see also* Ex. 19 at -381 (GOOG-AT-MDL-002038381) (questioning whether AP's reports are "robust & reliable enough for us to track" performance).  With respect to yet another AP report, Google bristled: "Advertiser Perceptions is a junky company.  These results are ridiculous."  Ex. 20 at -633 (GOOG-DOJ-13480633). Despite Google's internal criticisms about the reliability of AP's reports, Google used the reports externally to "push back on common themes in competition narratives about our ad tech business." Ex. 21 at -378 (GOOG-AT-MDL-010657378); *see also* Ex. 22 at -193 (GOOG-DOJ-AT-00038192) (antitrust talking points document citing an AP report).

**B.  The Advertiser Perceptions Reports are Inadmissible Hearsay**

 "Hearsay is generally defined as an out-of-court statement offered 'to prove the truth of the matter asserted in the statement'" and "is not admissible" absent an applicable exception. *United States v. Huskey*, 90 F.4th 651, 667 (4th Cir. 2024) (quoting Fed R. Evid. 801(c)(2) and Fed. R. Evid. 802)).  Moreover, "when a party seeks to introduce a document that contains hearsay within hearsay, any double hearsay statements are inadmissible unless a hearsay exception applies to each level of hearsay." *United States v. Habteyes*, 356 F. Supp. 3d 573, 586 (E.D. Va. 2018) (citing Fed. R. Evid. 805); *see also United States v. Cervantes*, 107 F.4th 459, 472 (5th Cir. 2024) ("A statement to person X about what person Y said to person Z is double hearsay.").

Page nine of Exhibit 13 is a representative slide illustrating why the AP Reports Plaintiffs challenge are inadmissible hearsay.  That slide presents a survey question asked to respondents about certain ad tech-related preferences and includes six statements attributed to unidentified non-parties ostensibly offered in response.  Another slide purportedly reflects statements of unidentified non-parties in response to a question about the effect Google's pricing policy

changes had on their businesses. *Id.* at 6.  The slide also includes AP's conclusion, apparently based on these non-party statements, that "few continue to see Google pricing changes as negative."  *Id.*

These illustrative slides highlight the multiple layers of hearsay endemic to the AP Reports: (1) the respondents' statements (their survey responses) and (2) AP's statements to Google (summarizing the respondents' collective statements).  As depicted in the Appendix, Google intends to offer the AP Reports at issue for their truth, *e.g.*, to prove that Google's conduct is not harmful to (or benefits) advertisers or publishers or that Google's ad tech products are superior to alternatives. Google's testifying experts rely on AP reports for this very purpose. *See, e.g.*, Ex. 23, Excerpts of January 23, 2024, Expert Report of Judith Chevalier ¶¶ 103–04 & n.235 (opining that AP survey is "evidence showing that publishers benefited from [Unified Pricing Rules]," which is Google conduct Plaintiffs allege was anticompetitive); Ex. 24, Excerpts of January 23, 2024, Expert Report of Paul Milgrom ¶¶ 452–53 & n.811 (citing AP survey to support opinion that "UPR also benefited publishers"). This expert testimony underscores that Google's purpose for offering the AP Reports is to prove their truth because "[i]f an expert . . . conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Smith v. Arizona*, 144 S. Ct. 1785, 1798 (2024).  And although Federal Rule of Evidence 703 permits "some leeway" for experts to consider inadmissible evidence, it does not rubber stamp such evidence for its substantive admissibility.  *Wi-Lan Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1375 (Fed. Cir. 2021) (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013)).  Google "cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."  *Id.*

20

The AP Reports are also not admissible as an exception to the hearsay bar. "Survey evidence is admissible as an exception to the hearsay rule only if the survey is 'material, more probative on the issue than other evidence and if it has guarantees of trustworthiness.'" *Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*, 188 F.3d 501, 1999 WL 639165, at *5 (4th Cir. Aug. 20, 1999) (unpublished table decision) (quoting *Harold's Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996)). To be trustworthy, a survey must be "conducted according to generally accepted survey principles," such as sampling "an adequate or proper universe of respondents." *Id*. (citations omitted); *see also Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552 (7th Cir. 1980) (for surveys to be "independently inadmissible" under hearsay rule, "there must be a substantial showing of reliability"). However, not even Google itself believes the AP Reports are trustworthy. Rather, Google's employees believe AP reports are "junky," "suspect", and contain "crazy data point[s]" that "do[]n't make much sense." *See* Ex. 20 at -633; Ex. 18. Moreover, Google will be unable to present any evidence at trial to contradict its own employees' statements and show that the AP surveys were trustworthy, much less evidence that the surveys used representative samples and other appropriate methodologies. Google's experts that relied on these surveys conceded that they did not know how the surveys were conducted,[6] and no witness from AP will testify at trial.

---

[6] *See* Ex. 25 at 182:18-183:5, Mar. 5, 2024, Deposition of Judith Chevalier (". . . I don't have data on exactly how Advertiser Perceptions conducts its survey"), 185:20-186:19(". . . I don't know what the respondents are including in their assessments [when ranking Google Ad Manager]"); Ex. 26 at 395:8–14, Mar. 4, 2024, Deposition of Paul Milgrom ("Q. Is it fair to say you have not closely studied the Advertiser Perceptions survey that relates to UPR? . . . A. I have not closely studied [it]. I'm merely citing its result."). Dr. Israel also uses the AP Reports, *see* Appendix, but there is no indication he has any understanding of the underlying surveys.

Nor are the survey responses admissible as statements of respondents' "then-existing state of mind," because Google is offering the survey responses not merely to prove what survey respondents believed but instead "to prove the fact . . . believed." Fed. R. Evid. 803(3); *see also United States v. Holland*, 417 F. App'x 359, 361 (4th Cir. 2011) (excluding defendants' statement "that he thought he had given [a firearm] back" because it was offered to prove he "had not knowingly possessed the [firearm]"). Prohibiting state-of-mind statements to show the truth of what a declarant claims to believe "is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind . . . to serve as the basis for an inference of the happening of the event which produced the state of mind." Fed. R. Evid. 803(3) advisory committee's note to 1972 proposed rules. As discussed above, Google seeks to admit the AP Reports for precisely that prohibited inference, *i.e.*, that survey respondents' stated beliefs reflect market realities. It cannot be otherwise because if the statements are divorced from market realities, they have no probative value. Nor can Google show that AP survey respondents' statements were "made more or less contemporaneously with the genesis of the state of mind," as opposed to a historically held belief or "evidence of an action taken in the past." *Sea Marsh Grp., Inc. v. SC Ventures, Inc.*, 111 F.3d 129, 1997 WL 173232, at *7 (4th Cir. Apr. 11, 1997) (unpublished table decision).

Even if the statements of AP survey respondents were not inadmissible hearsay on their own (they are), the AP Reports would still be inadmissible because the second "level of hearsay"—AP's statement of the survey responses to Google—independently renders the reports inadmissible. *Habteyes*, 356 F. Supp. 3d at 586. Like the survey responses themselves, the AP Reports, *i.e.*, AP's statements to Google conveying the survey responses, are out-of-court statements that Google intends to offer for their truth. *See Smith*, 144 S. Ct. at 1798. And, again,

no AP witness will testify about the provenance of these reports and be subject to cross-examination about the methodology used to construct these surveys. Therefore, for example, no "qualified witness" can attest that these reports are records of any regularly conducted activity. *See* Fed. R. Evid. 803(6)(D). Indeed, Google will be unable to present any "witness with knowledge" who can testify that the exhibits at issue are even "what [Google] claims" they are. Fed. R. Evid. 901(b)(1). This lack of proof renders the AP Reports inadmissible multiple times over.

For the foregoing reasons, all of the exhibits listed in the Appendix should be excluded from evidence.

Dated: August 16, 2024


Respectfully submitted,

JESSICA D. ABER
United States Attorney


/s/ Dennis Barghaan
Dennis Barghaan
Chief, Civil Division
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Dennis.Barghaan@usdoj.gov


/s/ Julia Tarver Wood
JULIA TARVER WOOD
/s/ Amanda Strick
AMANDA STRICK
/s/ Victor K Liu
VICTOR K LIU
/s/ Chase E. Pritchett
CHASE E. PRITCHETT
/s/ Michael Freeman
MICHAEL FREEMAN


United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Michael.Freeman@usdoj.gov


Attorneys for the United States

JASON S. MIYARES
Attorney General of Virginia

/s/ Tyler T. Henry
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for the Commonwealth of Virginia
and local counsel for the States of Arizona,
California, Colorado, Connecticut, Illinois,
Michigan, Minnesota, Nebraska, New
Hampshire, New Jersey, New York, North
Carolina, Rhode Island, Tennessee,
Washington, and West Virginia