# Plaintiffs' Exhibit 6
# (Redacted)

HIGHLY CONFIDENTIAL

Page 1

H I G H L Y   C O N F I D E N T I A L

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION
-------------------------------x
UNITED STATES, et al.,
         Plaintiffs,
    vs.          Case No.
                  1:23-cv-000108
GOOGLE LLC,
         Defendant.
-------------------------------x

HIGHLY CONFIDENTIAL
VIDEOTAPED DEPOSITION OF LUKE LAMBERT
New York, New York
Tuesday, August 29, 2023
9:37 a.m.

Reported by:
Jennifer Ocampo-Guzman, CRR, CLR
Job No. CS6079449

Page 18
1        LAMBERT - HIGHLY CONFIDENTIAL
2    receive.  The insertion order would be
3    activated inside of Centro, more often than
4    not, in a programmatic environment, a search
5    environment or a social environment.
6        Q.   How long were you at Centro?
7        A.   Four years.
8        Q.   So that was until 2016?
9        A.   Correct.
10       Q.   Okay.  And then where were you?
11       A.   Omnicom.
12       Q.   What was your first role at
13   Omnicom?
14       A.   Managing director of Accuen.
15       Q.   Accuen?
16       A.   A-C-C-U-E-N.
17       Q.   What is Accuen?
18       A.   Accuen was our programmatic trading
19   small business unit.  It is now a defunct
20   unit.  It has now been absorbed into the
21   various brand agencies.
22       Q.   Did you say --
23           MS. MORGAN:  I'm having a problem
24   with the realtime, following.
25       Q.   Did you say that it was a

Page 19
1        LAMBERT - HIGHLY CONFIDENTIAL
2    programmatic training?
3        A.   Trading.
4        Q.   Trading.  How long were you in that
5    role?
6        A.   Until we were absorbed into the
7    brand agency, I moved into OMD, which is
8    where I am at currently, I believe that was
9    within are six to twelve months.  And then
10   officially, I want to say about 18 months
11   after I started, when we officially moved
12   under the OMD umbrella.
13       Q.   Has your title changed since you
14   have been at OMD?
15       A.   It has.
16       Q.   What have your -- why don't you
17   just give me like a little summary of what
18   your titles have been since you've been
19   there?
20       A.   Sure.  After Accuen, my role at OMD
21   was running the Chicago office for search,
22   social and programmatic, strictly as the
23   managing director of the office, for the
24   region.  From there, I moved into a
25   programmatic focused role nationally as the

Page 20
1        LAMBERT - HIGHLY CONFIDENTIAL
2    head of the programmatic.  I moved from there
3    into our head of and ultimately the chief of
4    activation, and recently appointed our chief
5    innovation and product solutions officer.
6        Q.   What were you doing when you were
7    the chief of activation?
8        A.   Overseeing product and practices
9    for activation roles.  The practices are your
10   buying teams, that's what we would consider
11   to be activation.  So consistent with my
12   initial role overseeing search, social,
13   programmatic, and digital direct buyers.
14       Q.   And how has your role changed since
15   you became the chief innovation and product
16   solutions officer?
17       A.   I would say I spend more time with
18   the total community, so including the
19   planning, cross-media planning and
20   communications plannings teams.  I also work
21   quite a bit on new business, proposals and
22   pitches.  I'm marketplace facing, create
23   products out of platform.  All of those seem
24   net new to me versus what I was previously
25   doing.

Page 21
1        LAMBERT - HIGHLY CONFIDENTIAL
2        Q.   What does cross-media planning
3    mean?
4        A.   It's hard to answer that without
5    just saying what it is.  Cross-media planning
6    is a process of evaluating where to invest by
7    goal, and then what channel will deliver
8    against that goal.
9        Q.   What kinds of channels can be used
10   to fulfill a goal in cross-media planning?
11       A.   All media channels, digital out of
12   home is such a channel.
13       Q.   What are some other examples?
14       A.   Search, social, programmatic,
15   linear television, legacy out of home, audio,
16   radio, print.
17       Q.   What falls into the category of
18   programmatic?
19       A.   I would prefer to call it
20   "programmatically," with an L-Y.
21       Q.   Why is that?
22       A.   We've evolved, programmatic at one
23   point was something that you bought, often
24   via IO, like a managed service, even
25   internally it was bought that way within

HIGHLY CONFIDENTIAL

Page 66

LAMBERT - HIGHLY CONFIDENTIAL

 2    MS. MORGAN: I am going to mark a
 3  document as Omnicom Exhibit 1.
 4    Q.  Mr. Lambert, I am going to hand
 5  this to you without getting entangled with my
 6  microphone.
 7    (Omnicom Exhibit 1, PowerPoint
 8    document entitled, "21 NMTF," Bates Nos.
 9    OMD_000236 through OMD_000421, marked
10    for identification, this date.)
11    MR. LYNCH: Just note this is a
12  185-page PowerPoint presentation.
13    MS. MORGAN: This document is Bates
14  stamped OMD_0002236 and it's a deck
15  titled, "21 NMTF."
16    Q.  Do you see that?
17    A.  I do.
18    Q.  Do you recognize this document?
19    A.  Yes.
20    Q.  What is it?
21    A.  This is the 2121 tactical reco.
22    Q.  Did you work on the Army campaign
23  at this time?
24    A.  I did not.
25    Q.  Were you at OMD at this time?

Page 67

LAMBERT - HIGHLY CONFIDENTIAL

 2    A.  I was.
 3    Q.  What is Team DDB?
 4    A.  Team DDB is the integrated agency
 5  team.
 6    Q.  What are the -- what does that
 7  mean?
 8    A.  It has the creative agency, DDB is
 9  an example.  I gave you BBDO as example
10  earlier.  OMD is the media agency of record.
11  Annalect is the tech agency, media agency,
12  measurement agency of record.
13    Q.  Okay.  So do you see that this
14  document has at the top corner something that
15  says, "Team DDB"?
16    A.  I do.
17    Q.  What does that indicate about this
18  document?
19    A.  That it has gone through Team DDB
20  for creation.
21    Q.  And Team DDB includes OMD and also
22  DDB, the creative agency, and also another
23  entity that's an analytics related entity?
24    A.  Yes, yes.
25    Q.  Is this document created in the

Page 68

LAMBERT - HIGHLY CONFIDENTIAL

 2  normal course of OMD's business?
 3    A.  A tactical recommendation, yes.
 4    Q.  This is a very long document.  So
 5  I'm going to ask you about specific things in
 6  here.  If you would like to take some time to
 7  flip through it, that's totally fine, and you
 8  can feel free to read any context as we're
 9  going through it.  I am going to ask you
10  questions, if you're like, I need to look
11  back, just let me know.
12    I want to start on the third page,
13  which has a little Bates stamp in the bottom
14  that says 000238.  Do you see that?
15    A.  I do.
16    Q.  What is B-L-U-F?
17    A.  It's the code for the campaign,
18  basically in response to the order from the
19  U.S. Army.
20    Q.  This says the FY -- "FY22 Tactical
21  Media Plan is built on FY21 performance
22  insights to generate awareness and increase
23  consideration with Core and Growth Prospects
24  to meet 100 percent of Media Lead and EMM
25  Contract Goal."

Page 69

LAMBERT - HIGHLY CONFIDENTIAL

 2    What is the FY22 Tactical Media
 3  Plan?
 4    A.  Everything that follows this page.
 5    Q.  What is the purpose of the
 6  document?
 7    A.  To gain alignment with the U.S.
 8  Army clients that the tactics themselves
 9  would deliver on, we will call it a business
10  goal, the sort of channels we're going to
11  activate, the purpose of channel, the
12  specifics within the channel, partners,
13  publishers, platforms.
14    Q.  Does this tactical media plan cover
15  multiple campaigns?
16    A.  Can you define "campaign"?
17    Q.  Maybe you should define campaign.
18  You're probably better at it than I am.
19    How would you define a campaign?
20    A.  Well, it has the media plan
21  details.  So my understanding is that this is
22  capturing all the media plan details.  So
23  this may be the entire year's annual plan.
24    Q.  This sentence refers to "FY21
25  performance insights."  Do you have an

Page 78

LAMBERT - HIGHLY CONFIDENTIAL

just want to make walk through and make sure I understand it.

You talked at some point about programmatic guaranteed. Do you remember that? What is programmatic guaranteed?

A. A direct contract with a publisher to buy a set amount of inventory with prerequisites against that inventory. It's a type of deal.

Q. Are you familiar with just a direct sale, not programmatic?

A. Yes.

Q. What's the difference between a direct sale and a programmatic guaranteed sale?

A. In what environment?

Q. For purchase?

A. In what environment?

Q. I guess for digital display.

A. The difference is in the process, not in the product.

Q. So when you do -- when an advertiser enters into a programmatic guaranteed sale, purchase -- sorry -- do they

Page 79

LAMBERT - HIGHLY CONFIDENTIAL

know when that inventory is going to be filled that they're buying?

MS. CLEMONS: Objection, form.

A. For the most part, yes.

Q. What do you mean, "For the most part"?

A. The expectation of the contract is delivered within the campaign.

Q. Are you familiar with preferred deals?

A. I am.

Q. What are preferred deals?

A. Those are programmatic guaranteed.

Q. They're the same exact thing as programmatic guaranteed.

Are you familiar with the private marketplace deals?

A. I am.

Q. What's that?

A. It is a negotiated deal, again directly with the publisher, but not guaranteed.

Q. What does that mean, for it to not be guaranteed?

Page 80

LAMBERT - HIGHLY CONFIDENTIAL

A. It means we negotiate the price with the publisher and sometimes various constraints on their side.

Q. What kind of constraints?

A. Viewability, we may only want to buy viewable impressions in the deal.

Q. Are you familiar with the open auctions?

A. Yes.

Q. What are open auctions?

A. Open auctions are the legacy standard for programmatic buys. They are the point of bid transaction between the buyer and the seller, across the rest of the internet.

Q. What's the difference between an open auction and a private marketplace programmatically bought at?

A. Open auction is inclusive to anyone who wants to buy that impression. Programmatic guaranteed is limited just to me. Private marketplaces are a transparent floor, more often than not that I know I am going to have to pay.

Page 81

LAMBERT - HIGHLY CONFIDENTIAL

Q. This category of digital display that we were just looking at, did that include digital display ads that are bought using, that are bought directly and are bought using all of these different ways of programmatic buying?

MS. CLEMONS: Objection, form.

A. If it can be bought programmatically, it was bought programmatically.

Q. But does this category include preferred programmatic guaranteed or preferred deals, as well as private marketplace deals, as well as open auction deals?

MS. CLEMONS: Objection, form.

A. More of your programmatic guaranteed deals are going to need video, but yes it would include PMPs?

Q. Are the digital display ads that fall into this category served on apps in addition to on publisher websites and walled gardens?

MS. CLEMONS: Objection, form.

Page 82

LAMBERT - HIGHLY CONFIDENTIAL

 1  A.  Yes.
 2  Q.  Are they also on the apps for walled gardens?
 3  A.  Yes.
 4  Q.  You mentioned social as a walled garden.  What kind of social?
 5  A.  The Meta suite of platforms is social, TikTok is social, SnapChat is social, Pinterest is social.
 6  Q.  Right below that, the "Digital Display" category, there's a category called "Paid Social."  What does that cover?
 7  A.  The platforms I just laid out.
 8  Q.  Okay.  How is that distinct from digital display?
 9  A.  Digital display is an ad unit.  In this case we're talking about digital display outside of social, similar to the programmatic/programmatically differentiation.  Display ads can run on social, but the social environment itself is not transferrable between other publishers the way it is in digital display ad, open web, private marketplaces.

Page 83

LAMBERT - HIGHLY CONFIDENTIAL

 Q.  What does that mean?
 A.  It means that I only operate within the native environment of the social platform.
 Q.  Below that is Reddit?
 A.  Uh-huh.
 Q.  Why is Reddit itself a category?
 A.  Reddit refuses to be defined as anything.
 Q.  What kind of ads run on Reddit?
 A.  Mostly display ads but video as well.
 Q.  Below that is "Search."  What falls into that category?
 A.  Search-based buys in this box here are a direct reference to search portals.
 Q.  What do you mean when you say "search portals"?
 A.  We operate Google's product that also gives us access to Bing, so Google and Bing.
 Q.  How do you decide which search portals you are going to operate within?
 A.  Since this is coming off of a

Page 84

LAMBERT - HIGHLY CONFIDENTIAL

previous year, it's been based on the previous year's performance, volume, prediction are also included.
 Q.  Is that something you talk about with the client?
 A.  Which part?
 Q.  How you are going to choose the search portals you will be on?
 A.  Yes.
 Q.  Do they get a choice in what the search portals are?
     MS. CLEMONS:  Objection, form.
 A.  Choices relevant.
 Q.  What's Google Discovery?
 A.  It's a broker product that is designed to capture and drive leads.
 Q.  How does the product, like what does the product do?
 A.  It goes a little bit further than your standard search product.  It can be inclusive of things like maps or displays, things like that.  How they focused again on acquisitions, and in this case, it's lead acquisition.

Page 85

LAMBERT - HIGHLY CONFIDENTIAL

 Q.  Let's go to page 17, which is, it's got like a little 252 down in the lower right corner.
     Do you see that?
 A.  I do.
 Q.  I will just give you a second to look at it.  And when you've looked at it, my first question is going to be, what is a tactical pivot, but take your time.
 A.  Can you repeat that question?
 Q.  What is a tactical pivot?
 A.  This is an optimization.
 Q.  What does that mean?
 A.  We are moving dollars from one channel, in this case, to another, a reallocation of investment at a channel level and that can also happen within the channel as well across the forum.
 Q.  When you talk about reallocation, is there a budget that you're working within?
     MS. CLEMONS:  Objection, form.
 A.  The total budget of the campaign.
 Q.  If you have a total budget for the campaign, am I right that in order to

Page 214

1  LAMBERT - HIGHLY CONFIDENTIAL
2      A.  Yes.
3      Q.  What would happen?
4      A.  You would not be able to work with
5  Google anymore.  Air Force would not be able
6  to work with Google anymore.
7      Q.  Would Omnicom have to pay the
8  amount under the insertion order owed to
9  Google?
10         MS. CLEMONS:  Objection, form.
11     A.  No.
12     Q.  Would Omnicom -- which agencies at
13 Omnicom work at the Army?
14     A.  DDB, the creative agency of record,
15 OMD, the media agency of record, and
16 Annalect.
17     Q.  How long has Omnicom or DDB been
18 working with the Army?
19     A.  Since the inception of the award.
20     Q.  Do you know when that was?
21     A.  I did.  I don't now.
22     Q.  Is it more than five years?
23     A.  Roughly five years.
24     Q.  That time has DDB worked on all of
25 Army's campaigns?

Page 215

1  LAMBERT - HIGHLY CONFIDENTIAL
2         MS. CLEMONS:  Objection, form,
3      foundation.
4      A.  All campaigns that came with a task
5  order for DBD to execute.
6      Q.  Do you know if during that time the
7  Army had used another ad agency or media
8  agency?
9      A.  There may -- there may be an
10 engagement with TMA, which is the marketing
11 arm, another Omnicom agency that sits with
12 us.  It's a bit speculative, but...
13     Q.  That's also an Omnicom agency?
14     A.  Uh-huh.  Another full service
15 agency.
16     Q.  Do you know if the Army has ever
17 worked with any media agencies outside of the
18 Omnicom group?
19     A.  I do not know.
20     Q.  Do you know if the contract that
21 DDB has with the Army is materially different
22 than the contract between GSD&M and the Air
23 Force?
24         MS. CLEMONS:  Objection, form,
25     foundation.

Page 216

1  LAMBERT - HIGHLY CONFIDENTIAL
2      A.  Yes.
3      Q.  Yes, you know?  Or yes, it's
4  different?
5      A.  Yes, I know and, yes, it's
6  different.
7      Q.  How is it different?
8      A.  One is a full service agency
9  contract with creative and media baked into
10 it, at -- underneath the team DDB umbrella,
11 where OMD is in one way -- maybe you can
12 consider them a subcontractor, I wouldn't
13 because they're part of the contract term --
14 whereas, the Air Force/GSD&M relationship I
15 believe it to be one to one.
16     Q.  Does -- do the Omnicom agencies
17 that work with the Army use Google products
18 or services in connection with their work for
19 the Army?
20     A.  Yes.
21     Q.  Which products and services?
22     A.  DV360, Campaign Manager, Ads 360.
23     Q.  Do the Omnicom agencies that work
24 with the Army enter into insertion orders in
25 connection with their use of each one of

Page 217

1  LAMBERT - HIGHLY CONFIDENTIAL
2  those separate tools on behalf of the Army?
3         MS. CLEMONS:  Objection, form.
4      A.  No.
5      Q.  Why not?
6      A.  We have evergreen agreements with
7  Google, and those agreements apply to all of
8  our clients.  Insertion orders are task
9  oriented at a campaign level, usually given
10 to supporting services.
11     Q.  So am I correct that you have one
12 agreement with Google at OMD that applies to
13 all of your clients?
14     A.  Yes.
15     Q.  And do you enter into insertion
16 orders on behalf of the Army with Google for
17 use of Google's products in addition to
18 having that evergreen contract?
19     A.  This is a really a systems question
20 on our end.  We use a product called Prisma
21 for ordering.  Typically your insertion
22 order, like this one, is going out to Google.
23 Internally, though, the system now requires
24 us to send an insertion order effectively to
25 ourselves to use the Google product.  It's a

Page 238

1   LAMBERT - HIGHLY CONFIDENTIAL
2       A.  It is.
3           And I also want to edit my answer.
4   I believe they purge after three years on
5   data.
6           And I wanted to clarify, we had a
7   question with like a bit of a hanging chat on
8   did I talk to them about being a witness.
9       Q.  Oh, yeah.
10      A.  I talked with my counsel about
11  being in the next stage in this, about could
12  I be called as a witness for whatever that
13  next round is, and they said, yes, Google or
14  the DOJ could do that and I said okay.
15      Q.  Thank you for the clarification.
16          So you have data, Omnicom has data
17  going back at least three years that shows
18  purchases on Army's behalf for Google's
19  products?
20      A.  Yes.
21      Q.  Did you offer that data to the
22  Department of Justice?
23      A.  That would be the template we were
24  speaking about.
25      Q.  And you said that after the second

Page 239

1   LAMBERT - HIGHLY CONFIDENTIAL
2   meeting you had with the Department of
3   Justice, they never followed up with you on
4   getting that template?
5       A.  That's correct.
6           MS. CLEMONS:  Objection, form,
7       foundation.
8       A.  That's correct.
9       Q.  Do you know if DOJ has tried to get
10  that data from Omnicom since your meeting?
11      A.  I do not believe they have.
12          MS. MORGAN:  I have no further
13      questions for now.  I'll just reserve
14      the rest of my time.
15          MR. LYNCH:  Do you want take
16      another break?
17          MS. CLEMONS:  If we could take like
18      ten minutes, that would be helpful.
19          MR. LYNCH:  Sure.
20          THE VIDEOGRAPHER:  The time is
21      3:49 p.m. and we are going off the
22      record.
23          (A brief recess was taken.)
24          THE VIDEOGRAPHER:  The time is
25      4:09 p.m.  We are back on the record.

Page 240

1   LAMBERT - HIGHLY CONFIDENTIAL
2   EXAMINATION BY
3   MS. CLEMONS:
4       Q.  Mr. Lambert, I am going to ask you
5   to refer back to Exhibit 1, if you have that
6   somewhere available.
7           THE WITNESS:  I gave them all to
8       the court reporter.
9           Thank you.
10      Q.  Do you recall testifying earlier
11  about this document?
12      A.  I do.
13      Q.  And you described this document as
14  a tactical recommendation or reco I think is
15  the term you used; is that right?
16      A.  That's correct.
17      Q.  So is it fair to say, based on the
18  title of this document and the use of
19  recommendation throughout, that this was not
20  a final approved plan at the time that DDB
21  created the document?
22      A.  That's exactly --
23          MS. MORGAN:  Objection, form.
24          MR. LYNCH:  You can answer.
25      A.  That's exactly right.

Page 241

[redacted]

HIGHLY CONFIDENTIAL

Page 242

[Lines 1–24 redacted]

25   Q. If you turn to page 98 in the

Page 243

1        LAMBERT - HIGHLY CONFIDENTIAL
2   document, which is --
3        A. Got it, "Enlisted - Compo 1/3."
4        Q. The top says, "Enlisted - Compo
5   1/3: Mid Funnel Programmatic Display." Do
6   you see that?
7        A. I do.
8        Q. Under that heading there is a box
9   that says, "Dynamic Creative" and one that
10  says "Native Ads." Do you see that?
11       A. I do.
12       Q. Are native ads as referred to on
13  this slide a form of programmatic display
14  advertising?
15       A. Yes.
16       Q. Are there other forms of native ads
17  that are not display advertising?
18       A. Yes.
19       Q. What kinds of native ads are there
20  that you can think of that are not display
21  advertising?
22       A. Within display I would include rich
23  media, but video assets can also be in native
24  environments.
25       Q. Can print advertisement be in

Page 244

1        LAMBERT - HIGHLY CONFIDENTIAL
2   native environments?
3        A. They can. It would be called an
4   advertorial.
5        Q. Can radio advertisements be native
6   ads?
7        A. I would not call those native ads.
8   I would call them things like pre-reads or
9   integrations or sponsorships.
10       Q. So is native advertising its own,
11  separate channel of advertising, or is it a
12  format of different channels of advertising?
13          MS. MORGAN: Objection to form.
14       A. Native would be a tactic. Yeah,
15  native would be a tactic that we would
16  execute.
17       Q. And you mentioned earlier that
18  tactics are within channels; is that right?
19       A. Yes, it's not the lowest form of
20  what we do, but it's close to it.
21       Q. Okay. So a native display ad that
22  is purchased programmatically is still a
23  display ad; is that right?
24       A. Yes.
25          MS. CLEMONS: Thank you. I think

Page 245

1        LAMBERT - HIGHLY CONFIDENTIAL
2   you can set that aside.
3        Q. Have you ever heard the term, do
4   not buy list?
5        A. I've heard it, yes.
6        Q. To your understanding, what is the
7   do not buy list?
8        A. It's an exclusion list. We use
9   both the positive and the negative with the
10  phrase. We use inclusion lists and exclusion
11  lists. Exclusion lists are hard to keep up
12  with because every single moment there is a
13  new site, a new product, a new content piece
14  that we have to try and avoid. So exclusion
15  lists only do so much, but ultimately they
16  are curated at the client level to ensure
17  that when we are buying in the open exchange,
18  we are not buying against anything that has
19  been deemed unworthy of our clients.
20       Q. Okay. So are the things, the
21  things that are not to be bought publisher
22  inventory or websites, or what is on the
23  list?
24       A. Yeah, for the most part, it would
25  be things like long tail, long tail being

Page 246

1  LAMBERT - HIGHLY CONFIDENTIAL
2  sites that are really not attached to any
3  particular publishing house or group.  It's
4  not professionally done.  I think more blog
5  experience than anything.  If you ever looked
6  up a recipe online, you know how hard it is
7  to get to the recipe, all of those ads in
8  between you and that.  That is something we
9  don't want to buy.
10       It's also things that are just not
11 safe for brand.  So a Breitbart would be on
12 an exclusion list.  Right.  So anything with
13 disinformation or misinformation would be on
14 an exclusion list, do not buy list.  And then
15 for the most part any site that has been
16 created, kind of exclusively for the purpose
17 of serving ads, we would put on the exclusion
18 list, right.  So no one is there on purpose
19 really and when they are, they are trying to
20 leave.
21    Q.  Okay.  And you mentioned that that
22 was curated on a client basis; is that right?
23    A.  Yep.  There is an OMG Center of
24 Excellence built inclusion and exclusion
25 lists, that has to be deployed on all

Page 247

1  LAMBERT - HIGHLY CONFIDENTIAL
2  programmatic campaigns.  We also take those
3  lists to clients and try to cull down
4  specifically for those clients.  There will
5  be times where clients sit, maybe middle of
6  the road, and don't want to lean in one way
7  or the another, like politically, and so
8  they'll buy news from both sides.  It's rare,
9  but it exists.
10       Yeah, I think that answers it.
11    Q.  To your knowledge, is there a do
12 not buy list or a do buy list, I think you
13 said, there is an inclusion list as well, for
14 the Army and the purchasing that OMD does on
15 Army's behalf?
16    A.  Inclusion lists and exclusion lists
17 are standard protocol for all programmatic
18 campaign.
19    Q.  And was Army involved in creating
20 and curating that list?
21       MS. MORGAN:  Objection to form.
22    A.  The process is to in include the
23 client.  I do not know if this client was
24 included in any culling of the list, but the
25 list should be on the campaigns.

Page 248

1  LAMBERT - HIGHLY CONFIDENTIAL
2    Q.  And if Army said they didn't want
3  their creative appearing on particular
4  websites, would OMD continue to purchase
5  inventory on its behalf on that website?
6    A.  It would go on the exclusion list.
7    Q.  And would then OMD stop purchasing
8  inventory on those websites on Army's behalf?
9    A.  Yes.
10    Q.  If --
11       MS. CLEMONS:  Strike that.
12    Q.  Is that true as well for the other
13 federal agency advertisers served by Omnicom
14 agencies?
15    A.  Inclusion and exclusion lists are
16 standard protocols for OMG.  We have had
17 conversations with our partners and sister
18 agencies to implement those same standards.
19 I do not know if they've actually done so.
20    Q.  If Army were to tell DDB or OMD
21 that they no longer wanted to use a
22 particular vendor to purchase a certain kind
23 of advertising, would OMD continue to use
24 that vendor?
25       MS. MORGAN:  Object to the form.

Page 249

1  LAMBERT - HIGHLY CONFIDENTIAL
2    A.  It wouldn't be an instant reaction,
3  if they said no more this vendor, we would
4  likely assess that vendor's removal would
5  impact us to a certain extent, and then bring
6  back an assessment or a response to the Army.
7       THE WITNESS:  Gesundheit.
8    Q.  And are the particular vendors that
9  will be used to purchase media on Army behalf
10 a part of the tactical recommendations that
11 happen annually?
12       MS. MORGAN:  Object to the form.
13    A.  Yes, yes, the tactical
14 recommendation is quite specifically the
15 platforms we're going to buy, the units
16 within those platforms we're going to buy,
17 the targeting we would do on those platforms.
18 So inherently, yes, it's more than just this
19 platform we will use for this thing.
20    Q.  I believe you testified earlier
21 that transparency is important to Omnicom
22 with respect to platforms and vendors that it
23 uses to purchase advertising on its clients'
24 behalf; is that accurate?
25    A.  Very much so.

HIGHLY CONFIDENTIAL

Page 250
LAMBERT - HIGHLY CONFIDENTIAL

[redacted]

Page 251

[lines 1-18 redacted]

19  Q.  And why is that a concern for
20  Omnicom on behalf of its clients?
21      MS. MORGAN: Objection, form.
22  A.  Transparency in general is
23  important. Clients expect their media
24  dollars to be working media dollars, which is
25  what ultimately gets to the publisher. We

Page 252
LAMBERT - HIGHLY CONFIDENTIAL
talked a bit about the history of how we've
gotten to where we are today, and there was a
point in time before the supply-side
platforms, the SSPs existed, where ad
networks were "the thing." You would buy
them via an IO. They would deliver against a
KPI, but you would have no idea, you know,
how much they margin they took versus what
they gave to the publishers that they were
buying on your behalf. That kind of way of
working hadn't changed, even though they
became SSPs and tied into the exchange
marketplace.
    So it's always kind have been an
issue. We provide our clients complete
transparency in everything that we do, but we
can't guarantee transparency from the
marketplace, and then that frustrates our
clients.
    Q.  So you've been referring to
transparency in terms of the take rate from
the SSP, right?
    A.  Yes, from all SSPs. This is an SSP
consistent issue.

Page 253
LAMBERT - HIGHLY CONFIDENTIAL
    Q.  And that includes Google SSP, AdX?
    A.  AdX, yep.
    Q.  Are there also issues with
transparency in terms of which bids win and
what amounts?
    MS. MORGAN: Objection, form.
    A.  Yes. There's always been concern
about how we know we're winning the bids that
we're participating in. We've seen the
entire ecosystem move to a first price
auction scenario, instead of a second price
auction, which is now standard protocol. It
says, you evaluated what you're willing to
spend, and that's what you should spend.
    We don't necessarily know though if
we're competing and winning versus, you know,
a similar, or the same bid, or if we're
getting it from, you know, our DSP versus
somebody else's DSP and what that competition
looks like. So there's just -- you know,
it's hard to know. We know what we are
clearing at. We just don't know what else is
happening there behind the scenes.
    Q.  Would additional transparency be

Veritext Legal Solutions
800-567-8658                                    973-410-4098

Page 254

1  LAMBERT - HIGHLY CONFIDENTIAL
2  able to better serve your advertiser clients?
3      MS. MORGAN: Objection to form,
4   lacks foundation.
5      A.  I don't know if it's a better path
6  to service with the clients. What we do is
7  we buy. I think it would possibly open up
8  new places for negotiation from the buy side,
9  where typically the supply side is
10 negotiating it. But I don't necessarily
11 think it changes my ability to service our
12 clients. I think we can continue the way we
13 are servicing the clients.
14     Q.  Does Google inform Omnicom when it
15 changes the way that it operates the
16 algorithm is used to determine the winning
17 bid auctions for display advertising?
18     MS. MORGAN: Objection, form, lacks
19  foundation.
20     A.  We're generally kept up to speed
21 with platform updates and changes to the
22 platform, including algos. It's the details
23 behind it, again, that we may not be
24 completely clear on, and that's beyond DV360.
25     Q.  So for -- let's take Army for

Page 255

1  LAMBERT - HIGHLY CONFIDENTIAL
2  example. Are you able to tell Army how much
3  AdX took out of Army's winning bids into AdX
4  when you are reporting back on KPIs and other
5  metrics related to Army campaigns?
6      MS. MORGAN: Objection to form,
7   lacks foundation.
8      A.  I would have to review our contract
9  to see if we have a negotiated rate inside of
10 AdX. At one point in time we did. I don't
11 know if it's in the current GMP of our
12 contract anymore.
13     Q.  And when you talked earlier about
14 the eight and a half percent plus two
15 cents -- per impression; is that right?
16     A.  Per CPM, this is a CPM.
17     Q.  For CPM.
18        -- the eight and a half percent and
19 the two cents CPM, are those fees ultimately
20 paid by the advertiser client, specifically
21 Army?
22     A.  Yeah. 100 percent of the media
23 dollar is paid for by the client. It's not
24 our investment. It's theirs. We're strictly
25 the service arm.

Page 256

1  LAMBERT - HIGHLY CONFIDENTIAL
2      Q.  And so if that fee went up, the
3  increase in those fees would be born by the
4  advertiser as well; is that right?
5      A.  Yes, but we've done a good job of
6  going the other way with fees.
7      Q.  So earlier you testified about some
8  meetings between OMD and your counsel and the
9  Department of Justice with respect to Army
10 data. Do you remember that testimony?
11     A.  I do.
12     Q.  Does OMD ordinarily produce
13 campaign reports in the terabytes of data on
14 the details of purchases to Army under the
15 Army contract?
16     A.  No.
17     Q.  So is it fair to say that reports
18 at that level of detail and that volume are
19 not ordinary course deliverables under the
20 Army DDB OMD contract?
21     A.  I would question how it could even
22 be done.
23     Q.  Do you personally work with
24 contract modifications on behalf of DDB with
25 respect to Army contracts?

Page 257

1  LAMBERT - HIGHLY CONFIDENTIAL
2      A.  No, I don't personally. Any direct
3  Army contracts are really third-party tech,
4  things that would be are managed by Annalect.
5      Q.  Do you know who owns the overall
6  contracting relationship at Omnicom with
7  respect to Army?
8      A.  DDB, our scope contract within Army
9  is DDB.
10     Q.  Do you have any idea what would
11 need to be done to modify the contract so
12 that Army could receive nonordinary course
13 reports of detailed data like you referred to
14 before?
15     A.  Yes, the scope will most certainly
16 have a section in there on reporting,
17 reporting cadence, reporting content,
18 meetings on reports, tools used to deliver
19 reporting, dashboarding, all of that would be
20 in the scope. So we would need to update
21 that portion of the scope if we wanted to
22 update the sort of volume of data that they
23 wanted to have access to. But typically
24 campaign reporting is the goal, the campaign
25 that we are working on, I would need to know

HIGHLY CONFIDENTIAL

Page 266

LAMBERT - HIGHLY CONFIDENTIAL

A. Yes.

Q. You testified earlier that in the second meeting you had with the Department of Justice, that they could not tell Omnicom what they needed, so Omnicom could make it easier on them. Do you remember testifying about that?

A. I do.

Q. In the meeting that you were discussing, did the Department of Justice tell you that there were specific pieces of data that they were looking for?

A. No.

Q. Did you ask if there were specific pieces of data you could provide them that would be helpful?

A. Yes.

Q. Did they ever ask you for data after that meeting in response to your question about whether there were specific pieces of data that could be helpful?

MS. CLEMONS: Objection to form.

A. If -- they did not ask me, no.

MS. MORGAN: Thank you. All right.

Page 267

LAMBERT - HIGHLY CONFIDENTIAL

Mr. Lambert, I think we can thank you for your time.

THE WITNESS: Thanks.

MR. LYNCH: So this is concluded?

MS. MORGAN: Yes.

THE VIDEOGRAPHER: The time is 4:46 p.m. We're going off the record.

(Time noted: 4:47 p.m.)

Page 268

STATE OF _____ )
                      ) :ss
COUNTY OF _____ )

I, LUKE LAMBERT, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

_____
LUKE LAMBERT

Sworn and subscribed to before me, this      day of
         , 2023.

_____
Notary Public

Page 269

CERTIFICATE

STATE OF NEW YORK   )
                    : ss.
COUNTY OF NEW YORK  )

I, Jennifer Ocampo-Guzman, a Certified Realtime Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That LUKE LAMBERT, the witness whose deposition is hereinbefore set forth, was duly sworn, and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of September 2023.

*J. Ocampo-Guzman*
JENNIFER OCAMPO-GUZMAN, CRR, CLR

HIGHLY CONFIDENTIAL

Page 270

```
 1
 2   -------------- I N D E X -----------------
 3   WITNESS        EXAMINATION BY      PAGE
 4   LUKE LAMBERT   MS. MORGAN          7, 264
 5                  MS. CLEMONS         240
 6   -------------- EXHIBITS ------------------
 7   OMNICOM                        FOR ID
 8
     Exhibit 1, PowerPoint document     66
 9   entitled, "21 NMTF," Bates Nos.
     OMD_000236 through OMD_000421
10
     Exhibit 2, PowerPoint document    101
11   entitled, "The U.S. Army, FY21 Q4
     Marketing Mix Modeling," Bates Nos.
12   ARMY-ADS-0000187048 through
     ARMY-ADS-0000187065
13
     Exhibit 3, E-mail dated 5/17/19,  119
14   Bates Nos. OMC-GOOG-00045175
     through OMC-GOOG-00045282
15
     Exhibit 4, E-mail dated 1/23/2020, 148
16   Bates Nos. OMC-GOOG-00053831
     through OMC-GOOG-00053832 and
17   OMC-GOOG-00053867 through
     OMC-GOOG-00053893
18
     Exhibit 4A, PowerPoint document   162
19   entitled, "Programmatic DSP Final
     RFI Results," [not Bates stamped]
20
     Exhibit 5, E-mail dated 1/28/2020, 175
21   Bates Nos. OMC-GOOG-00101115
     through OMC-GOOG-00101116
22
     Exhibit 6, Document entitled,     197
23   "Solicitation, Offer and Demand,"
     Bates Nos. USAF-ADS-0000416385
24   through USAF-ADS-000041420
25
```

Page 271

```
 1
 2
        EXHIBITS (Continued):          FOR ID
 3
 4   Exhibit 7, Document entitled,     207
     "Google Advertising Service
 5   Agreement," Bates Nos. GSDM_000004
     through GSDM_000007
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 272

```
 1  Niall Lynch, Esq.
 2  niall.lynch@lw.com
 3          September 1st, 2023
 4  RE:   United States, Et Al v. Google, LLC
 5    8/29/2023, Luke Lambert (#6079449)
 6    The above-referenced transcript is available for
 7  review.
 8    Within the applicable timeframe, the witness should
 9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  (ERRATAS-CS@VERITEXT.COM).
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25
```

Page 273

```
 1  United States, Et Al v. Google, LLC
 2  Luke Lambert (#6079449)
 3        E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Luke Lambert              Date
25
```

# ERRATA SHEET FOR DEPOSITION TRANSCRIPT OF
Luke Lambert
Deposition Date: August 29, 2023
*United States et al. v. Google, LLC* (E.D. Va. Case No.1:23-cv-00108)

| Page | Lines | Transcript Text | Corrected Text | Reason for Change |
|---|---|---|---|---|
| 10 | 11-12 | "teams for the U.S. Air Force, for NHTSA, for CMS" | "teams for NHTSA, for CMS" | Clarifying edit |
| 14 | 11-12 | "University of Illinois, in Champagne, Urbana" | "University of Illinois Urbana-Champaign" | Transcription error |
| 15 | 4 | "Tribunal" | "Tribune" | Transcription error |
| 16 | 17 | "8 to 18 Media" | "8to18 Media" | Transcription error |
| 16 | 20 | "programing" | "programming" | Transcription error |
| 19 | 9 | "within are six" | "within six" | Transcription error |
| 26 | 11 | "agencies do do some" | "agencies do some" | Typographical error |
| 29 | 11 | "don't not own" | "don't own" | Typographical error |
| 43 | 22 | "tactical one" | "tactic one" | Transcription error |
| 48 | 13 | "environments been created" | "environments be created" | Transcription error |
| 60 | 18 | "Cost per mil" | "Cost per mille" | Transcription error |
| 60 | 20 | "Mil is latin" | "Mille is Latin" | Transcription error |
| 60 | 21 | "Cost per mil" | "Cost per mille" | Transcription error |
| 66 | 21 | "the 2121 tactical" | "the 2021 tactical" | Typographical error |
| 81 | 20 | "would include PMPs?" | "would include PMPs." | Typographical error |
| 84 | 14 | "Choices relevant" | "Choice is relevant" | Transcription error |
| 92 | 19 | "Displaying video" | "Display and video" | Transcription error |
| 107 | 21-22 | "tact optimization" | "tactic optimization" | Transcription error |
| 140 | 8 | "This old" | "This is an old" | Transcription error |
| 150 | 21 | "is the RFI" | "the RFI" | Transcription error |
| 152 | 10 | "McDonald's client" | "McDonald's as a client" | Transcription error |
| 154 | 7 | "with it was" | "with them it was" | Transcription error |
| 154 | 9 | "they say would" | "they would" | Transcription error |
| 156 | 3 | "was partner part of" | "was part of" | Transcription error |

| 157 | 20-21 | "was start to go tow the water into" | "was starting to toe the water into" | Transcription error |
|---|---|---|---|---|
| 160 | 5 | "of he brand safety" | "of brand safety" | Transcription error |
| 161 | 7 | "a bubble measurement" | "a mobile measurement" | Transcription error |
| 161 | 29 | "if anything you want" | "if there is anything you want" | Transcription error |
| 167 | 3 | "told me move that" | "told me that" | Transcription error |
| 169 | 24 | "the vast major of" | "the vast majority of" | Transcription error |
| 173 | 7 | "took this to the" | "could lose in the" | Transcription error |
| 173 | 13 | "each of these of goes" | "each of these goes" | Transcription error |
| 173 | 14-15 | "You will 'Placed'" | "You will see 'Placed'" | Transcription error |
| 173 | 21 | "the place dataset" | "the Placed dataset" | Clarifying edit |
| 174 | 6 | "Everyone of them" | "Every one of them" | Typographical error |
| 174 | 22 | "our focus" | "are focused" | Transcription error |
| 178 | 15 | "one PG" | "one for PG" | Transcription error |
| 178 | 16 | "not for PNP" | "not for PMP" | Transcription error |
| 183 | 25 | "have moved in the" | "have moved into the" | Transcription error |
| 190 | 7 | "that states the same" | "that stays the same" | Typographical error |
| 196 | 8 | "that have worked" | "have worked" | Transcription error |
| 196 | 25 | "as of their" | "as they're" | Transcription error |
| 197 | 1 | "they doe" | "they do" | Typographical error |
| 198 | 20 | "Uh-huh" | "Yes" | Clarifying edit |
| 200 | 19 | "first of which is" | "first one is" | Transcription error |
| 201 | 24 | "at gratus" | "at gratis" | Typographical error |
| 205 | 18 | "the ad servers also" | "the ad server is also" | Transcription error |
| 210 | 20 | "under in insertion" | "under the insertion" | Transcription error |
| 211 | 11-12 | "that the GSD&M would be invoicing in" | "that GSD&M would be invoiced in" | Transcription error |
| 215 | 5 | "DBD" | "DDB" | Transcription error |
| 215 | 14 | "Uh-huh" | "Yes" | Clarifying edit |
| 230 | 8 | "you the" | "you had the" | Transcription error |
| 233 | 7 | "where being, quite" | "where being made, quite" | Transcription error |
| 235 | 10 | "Are they have the" | "Are they the" | Transcription error |

| 246 | 11 | "for brand" | "for the brand" | Transcription error |
|---|---|---|---|---|
| 246 | 23 | "There is an OMG" | "There are OMG" | Transcription error |
| 246 | 25 | "has to be" | "have to be" | Transcription error |
| 247 | 22 | "to in include" | "to include" | Typographical error |
| 248 | 16 | "OMG" | "OMD" | Transcription error |
| 249 | 4 | "assess that vendor's" | "assess how that vendor's" | Transcription error |
| 251 | 6 | "cost per mil" | "cost per mille" | Transcription error |
| 252 | 9 | "how much they margin" | "how much of a margin" | Transcription error |
| 257 | 4 | "would be are managed" | "would be managed" | Transcription error |
| 260 | 11 | "which I will do" | "which I would" | Transcription error |
| 262 | 22 | "a visual story" | "an audio story" | Clarifying edit |

    I, Luke Lambert, do hereby certify: that I have read my deposition transcript dated August 29, 2023; that the changes and corrections to my deposition transcript set forth above are necessary to render the same true and correct; that having made such changes, I hereby subscribe my name to the deposition. I declare, under penalty of perjury, that the foregoing is true and correct.

    Executed this __2__ day of October, 2023 at __NYC, NY__
(City/State)

_Luke Lambert_