# Plaintiffs' Exhibit 12

HIGHLY CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES, et al.       §
                            §
VS.                         §   NO. 1:23-cv-00108-LMB-JFA
                            §
GOOGLE, LLC                 §

ORAL AND VIDEOTAPED DEPOSITION OF BO BRADBURY

SEPTEMBER 8, 2023

HIGHLY CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF BO BRADBURY, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above styled and numbered cause on Friday, September 8, 2023, from 9:39 a.m. to 4:56 p.m., before Janalyn Elkins, CSR, in and for the State of Texas, reported by computerized stenotype machine, at the JW Marriott, 112 E. 2nd Street, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Job No. CS6091854

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
KATHERINE E. CLEMONS
ISABEL AGNEW
U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION
450 Fifth Street, NW, Suite 7000
Washington, DC  20530
Tel:  (202) 598-2372
Katherine.Clemons@usdoj.gov
Isabel.agnew@usdoj.gov

FOR THE DEFENDANT:
LAUREN KAPLIN
LIJUN ZHANG
FRESHFIELDS
700 13th Street, NW, 10th Floor
Washington, DC  20005
Tel:  (202) 777-4518
lauren.kaplin@freshfields.com
Lijun.zhang@freshfields.com

FOR THE WITNESS:
NIALL LYNCH
LATHAM & WATKINS
505 Montgomery Street, Suite 2000
San Francisco, California  94111
Tel:  (415) 391-0600
niall.lynch@lw.com

Also Present:
PETER ZIERLEIN
KAILEN MALLOY

Page 3

I N D E X
                                    PAGE
Appearances ................................ 2
Stipulations ............................... 5

BO BRADBURY
Examination by Ms. Kaplin .................. 5
Examination by Ms. Clemons ................. 99
Further Examination by Ms. Kaplin ............ 200
Further Examination by Ms. Clemons............ 209

Signature and Changes........................ 214

Reporter's Certificate....................... 216

E X H I B I T S

NO.        DESCRIPTION              PAGE
Exhibit 1   Email                    34
Exhibit 2   Email                    62
Exhibit 3   Email                    76
Exhibit 4   Contractor Performance
            Assessment Report        82
Exhibit 5   Solicitaion, Offer, and
            Award                    92
Exhibit 6   Invoice                  159
Exhibit 7   Invoice                  180
Exhibit 8   Invoice                  187
Exhibit 9   Invoice                  187

Page 4

1  THE REPORTER:  Mr. Lynch, are you going to
2  want a copy?
3  MR. LYNCH:  Yes.
4  THE REPORTER:  And do you want a rough
5  draft and real time?
6  MR. LYNCH:  Whatever everyone else is
7  getting.
8  THE REPORTER:  And Ms. Clemons, do you want
9  an expedite?
10  MS. CLEMONS:  Yes.
11  VIDEOGRAPHER:  Here begins the deposition
12  of Bo Bradbury.  Today's date is September 8, 2023.  The
13  time is 9:40 a.m.  Will counsel please identify
14  themselves for the record, after which the court
15  reporter will swear in the witness.
16  MS. KAPLIN:  Lauren Kaplin here with
17  Freshfields on behalf of Google.
18  MR. ZHANG:  Lijun Zhang with Freshfields on
19  behalf of Google.
20  MR. LYNCH:  Niall --
21  MS. BOSCO:  Sorry, I'm on Zoom here, but
22  Veronica Bosco, also from Freshfields on behalf of
23  Google.
24  MR. LYNCH:  Niall Lynch from Latham &
25  Watkins on behalf of Omnicom and the witness Bo Bradley.

Page 5

1  MS. MALLOY:  Kailen Malloy from Latham &
2  Watkins, also on behalf on Omnicom and the witness.
3  MS. CLEMONS:  Katherine Clemons, the
4  Department of Justice on behalf of the United States of
5  America.
6  MS. AGNEW:  Isabel Agnew on behalf of
7  United States.
8  BO BRADBURY,
9  having been duly sworn, testified as follows:
10  EXAMINATION
11  Q.  (BY MS. KAPLIN)  Good morning, Mr. Bradbury.
12  A.  Good morning.
13  Q.  My name is Lauren Kaplin.  I just introduced
14  myself.  I'm here representing Google.  Can you state
15  your full name again for the record?
16  A.  Yes.  Full name, Robert Easton Bradbury, III.
17  Bo is the nickname, so more manageable.
18  Q.  Thank you.
19      And who's your current employer?
20  A.  GSD&M.
21  Q.  Okay.  Your job title currently?
22  A.  Senior vice president, managing director.
23  Q.  Okay.  And where do you live?
24  A.  Austin, Texas.
25  Q.  You're represented here by counsel today?

2 (Pages 2 - 5)

Page 154

1  of.
2          Are there particular -- can you think of
3  any examples of particular use cases where programmatic
4  online display advertising is particularly useful for
5  Air Force campaigns in particular?
6          MS. KAPLIN:  Object to form.
7          THE WITNESS:  Yes.
8      Q.  (BY MS. CLEMONS)  What are some of those
9  examples?
10     A.  Instances where there are, again, hard to reach
11  audiences, where there may be unique data signals that
12  are important to us, are easier to follow -- find and
13  follow in a programmatic setting than in a direct
14  publisher-type environment.  And then combined with that
15  would be the scale in which to reach them as well.
16  Another benefit would be, in a programmatic sense, is
17  again thinking about approaching an engagement into a
18  display universe, so to speak, at a common point of
19  entry, via DSP, is there is typically greater data --
20  data quality in terms of frequency and exposure.
21  Meaning that you have greater confidence in the data
22  you're sending of how often the audiences are seeing a
23  particular message.  As that is beneficial for a brand
24  and an agency and so forth in that we are able to
25  implement what's referred to as frequency capping.

Page 155

1          We can determine how much advertising
2  someone is seeing and be judicious and when we've hit
3  the levels we want, know that we've reached those and
4  save dollars potentially for the client.  So those are
5  some top of line examples in my mind where that would be
6  advantageous.
7      Q.  Okay.  And you mentioned earlier "walled
8  gardens."  Is there a reason that Air Force, for
9  example, cannot restrict its display advertising to
10  walled gardens like mentioned earlier, like Facebook?
11     A.  No, there's no reason it would have to restrict
12  it.
13     Q.  Okay.  Are there reasons why Air Force wouldn't
14  want to restrict its advertising to walled gardens?
15         MS. KAPLIN:  Object to form.
16         THE WITNESS:  If the channel/platform,
17  again, reached a unique, important audience and perhaps
18  did that in a manner with kind of creative units or
19  there was some content, or contextual content there that
20  was beneficial, then it may very well make sense to make
21  that selection to deploy an initiative solely within the
22  walls of a walled garden, if -- if it was of value to
23  the brand and the Air Force.
24     Q.  (BY MS. CLEMONS)  Okay.  Will that -- would
25  Air Force be at a disadvantage if walled gardens were

Page 156

1  its only option for a display advertising?
2          MS. KAPLIN:  Object to form.
3          THE WITNESS:  Not necessarily.
4      Q.  (BY MS. CLEMONS)  Okay.  If you have a
5  particular audience that the Air Force is trying to
6  reach, 18 to 24, for example, if a potential recruit is
7  not an account holder with Facebook, for example, is it
8  possible for that Facebook ad to reach that potential
9  recruit?
10         MS. KAPLIN:  Object to form.
11         THE WITNESS:  In that instance, no.  A
12  Facebook ad would not.  If they were not a Facebook
13  account holder, correct.
14     Q.  (BY MS. CLEMONS)  If a potential recruit had a
15  Facebook account, but didn't regularly check that
16  Facebook account, would it be possible for Air Force to
17  reach that recruit through a Facebook ad?
18         MS. KAPLIN:  Object to form.
19         THE WITNESS:  Not through a Facebook ad.
20  But they could reach them through other means outside of
21  the walled garden.
22     Q.  (BY MS. CLEMONS)  Right.  So is there an
23  advantage to open web, non-walled garden display
24  advertising with respect to the breadth of reach across
25  different kinds of audiences?

Page 157

1          MS. KAPLIN:  Object to form.
2          THE WITNESS:  Yes, there's advantage, and
3  that advantage would be scale.  Access to a value -- an
4  audience which may be of importance to an advertiser.
5      Q.  (BY MS. CLEMONS)  Are you familiar with the
6  term "retargeting"?
7      A.  Yes.
8      Q.  What is your understanding of retargeting?
9      A.  Retargeting is a brand or an advertiser's
10  ability to typically reference in a digital setting
11  to -- based on some previously taken action to deliver
12  advertising or communications to them based on that
13  previous action.
14     Q.  Is retargeting a tactic?
15     A.  I would characterize it as such.
16     Q.  And is that a tactic that can be used in
17  multiple different media channels?
18     A.  In some channels, yes.
19     Q.  What are the channels in which retargeting can
20  be used?
21     A.  Certainly digital, as you would expect.  But
22  you could also think, too, of direct marketing, for
23  instance.  So say, for instance, someone responded to an
24  email or a direct mail piece, for instance.  Then
25  another piece of communications could be triggered as a

HIGHLY CONFIDENTIAL

Page 158

1 result of that. Another example within using Air Force
2 as a scenario, our mobile tours, for instance, are a
3 potential kind of reengagement trigger. So say a young
4 woman or man interacts with a mobile tour, provides the
5 Air Force contact information via an opt in, they could
6 be communicated with afterwards via multiple ways.
7 It could be if they have provided us a phone number
8 literally a recruiter could contact them or an email
9 stream could be initiated or a direct mail piece could
10 be sent to their home address.
11     Q. Are there particular types of advertising
12 within the digital sphere that retargeting is more
13 effective than others?
14         MS. KAPLIN: Object to form.
15         THE WITNESS: Yes.
16     Q. (BY MS. CLEMONS) Which ones?
17     A. For a specific example tied to -- to Air Force,
18 I would say a key driving variable to initiate a
19 retargeting stream for GSD&M and the Air Force would be
20 visitations to a website. And so an individual has
21 visited a website. If they have opted in to the
22 permissions settings that are outlined there, then that
23 could initiate retargeting to continue a conversation or
24 prompt further conversation with a prospect.
25     Q. And so if a potential recruit visits the

Page 159

1 Air Force's website, does that mean that Air Force could
2 then retarget that potential recruit with advertising on
3 a different website?
4     A. With -- if permissions are granted and then,
5 again, this is a very fluid space as the privacy
6 landscape is changing very constantly, and so -- so yes.
7 But it's something we have to monitor continuously.
8     Q. Is retargeting a feasible tactic to be used
9 when an advertiser has made a direct deal with a website
10 publisher for display advertising?
11     A. I don't know. I would assume so. But I'm not
12 fully clear. It would depend on the publisher, I
13 believe.
14     Q. Okay. So we're going to shift gears a little
15 bit. I am going to -- I'm handing you a document or
16 handing the court reporter a document. But I think
17 we're at Bradbury Exhibit 6.
18         (Exhibit No. 6 was marked.)
19     Q. (BY MS. CLEMONS) And this document is, on the
20 first page, has a Bates stamp at the bottom
21 USAF-ADS-0000482174.
22         Mr. Bradbury, do you recognize this
23 document?
24         MS. CLEMONS: Yeah. I'm just going to put
25 on the record that the copy that I brought with me

Page 160

1 today, there's a Bates stamp on the first page and then
2 the rest of the document is a printout in color of the
3 native version of the document which is not part of the
4 production. We have it in here for the color, I
5 believe. And so there are not Bates stamps on the
6 remainder of the pages, but they are -- I will represent
7 that they are identical to the Bates stamped version of
8 the remainder of this document.
9         MS. KAPLIN: Can I ask that you produce the
10 native version?
11         MS. CLEMONS: I'm happy to. Well, I'm
12 giving you this copy.
13         MR. LYNCH: What's the Bates stamp range in
14 the one that Bates -- is Bates stamped?
15         MS. CLEMONS: We can -- I can look that up
16 and hopefully put it on the record before the deposition
17 is over.
18         MR. LYNCH: Okay.
19         MR. ZHANG: Is it -- ends with 194.
20         MS. CLEMONS: I don't have the -- I don't
21 have it in front of me. I apologize. This is a -- just
22 a clerical error that resulted from the United States
23 not having printing facilities in Texas, so...
24     Q. (BY MS. CLEMONS) Do you recognize this
25 document, Mr. Bradbury?

Page 161

1     A. Yes. This is an example -- or is a monthly
2 billing statement which GSD&M produces and provides to
3 the United States Air Force.
4     Q. Okay. And are you familiar with how GSD&M
5 invoices Air Force for paid media?
6     A. Yes.
7     Q. And is this an example of a typical invoice
8 that GSD&M would send to the Air Force monthly?
9     A. Correct, it is.
10     Q. Okay. If you go down to where it says,
11 "Contract Number."
12         Do you see that, just below the address on
13 the left?
14     A. Yes.
15     Q. Is it your understanding that that contract
16 number is the current umbrella contract, as you referred
17 to it, that we -- that we looked at earlier, Exhibit 5?
18     A. Yes, it is.
19     Q. Okay. Are you familiar with the types of
20 information included in invoices from GSD&M to
21 Air Force?
22     A. Yes, I'm familiar with some, maybe not all, but
23 some, yes.
24     Q. If you go down to below where it says, "Total
25 Amount Due," do you see where it says, "Cost

HIGHLY CONFIDENTIAL

Page 162

1  reimbursable - provisional payment"?
2     A. Yes.
3     Q. Do you know what that means?
4     A. I do not.
5     Q. Right above that where it says, "Total Amount
6  Due," do you know if that represents the amounts that
7  GSD&M submitted to the Air Force for payment in the
8  month of November 2021?
9     A. That is correct, yes, this represents that
10 total.
11    Q. If you look right above that, where it says,
12 "Number," there are a series of numbers.  First one
13 starts with a PD.  Next two start with an I, M, T, and
14 B.
15       Do you have any understanding of what those
16 numbers refer to?
17    A. Yes.
18    Q. What are those?
19    A. Each one of these numbers denotes a specific
20 component that is -- or an activity that is being billed
21 in this particular month.  The billing that you're
22 seeing here or in any of these forms that we provide on
23 a monthly basis would cover -- could range from media
24 purchases to production of a commercial to other costs.
25 So these numbers align with specific expenses that

Page 163

1  occurred in this time period in the invoice.
2     Q. Okay.  Do the prefixes, those letters at the
3  beginning of these numbers, have any particular meaning?
4     A. No.
5     Q. Okay.  And do you know, in the next column over
6  where it says, "Estimate Number," looks like only one of
7  these has an estimate number.  Do you know what the
8  estimate number is?
9     A. Yes.  This represents -- this is a internal job
10 number that is created at GSD&M that we use to guide,
11 capture activities, spend, and so forth.
12    Q. And going back a little bit to the left where
13 it says "001" by itself -- 0001, apologies.
14       Do you see that?
15    A. Yes.
16    Q. Is it your understanding that that aligns with
17 item numbers in the contract itself?
18    A. It's my understanding it does.
19    Q. Okay.
20    A. But I'm not our contract expert.  My contract
21 manager provides that guidance for me.
22    Q. Understood.
23       Have you heard of a CLIN, C-L-I-N?
24    A. Yes.
25    Q. What is a CLIN?

Page 164

1     A. I would characterize CLIN as basically a -- a
2  billing path or types of expenses that the Air Force
3  provides guidance for us to -- to bill within.  It's a
4  prescribed path of billing as dictated by the Air Force
5  which we are asked to follow.
6     Q. Okay.  Do different CLINs have different fee
7  arrangements?
8     A. They do.  I'm not as familiar with that --
9  don't have that level of knowledge.
10    Q. Understood.
11    A. I would rely on my subject matter expert for
12 support there.
13    Q. If you go down to where it says, "Analysis of
14 Claimed Current and Cumulative Costs."  Actually, if you
15 flip to the next page, it's slightly easier to read of
16 the same page essentially.  Where it says, "Analysis of
17 Claimed Current and Cumulative Costs"?
18    A. Yes.
19    Q. Can you see that at the top in that gray box,
20 very difficult to read, it says, "Major Cost Element"?
21    A. I do.
22    Q. And under that it says, "Subcontract, Media,
23 Labor," and so on.
24       Do you see that?
25    A. I do.

Page 165

1     Q. Do you have an understanding of what is
2  included in the media category of a major cost element?
3     A. I do.
4     Q. What is included in that?
5     A. This would be the purchase of media inventory
6  as designated under this specific task order.
7     Q. And then in -- in the next box over, the top
8  says, "Estimated Cost."
9        Do you see that?
10    A. I do.
11    Q. And then two down, just across from media in
12 that column, there is a figure $38,652,541.
13       Do you see that?
14    A. I do.
15    Q. Do you have an understanding of what that
16 number represents?
17    A. I do.
18    Q. What -- what is that?
19    A. Under this particular task order, which is Task
20 Order 32, that is the -- essentially the -- the media
21 budget for this particular line of effort.
22    Q. Okay.  So does GSD&M send separate invoices for
23 each task order that is active under the umbrella
24 contract?
25    A. Yes, that's correct.

HIGHLY CONFIDENTIAL

Page 166

1    Q.  Do you know by any chance what Task Order 32
2  covers?  Did you just --
3    A.  I do.  This one actually, it was -- if you're
4  within this document on page 2, ma'am, if you look at
5  the upper left-hand corner where it has COTR Captain
6  Lane, et cetera, et cetera.  If you look right beneath
7  the address of Joint Base Randolph you'll see sight,
8  sound, and motion.  That was the title of this
9  particular task order, TO 32.
10        Sight, sound, and motion in this particular
11  task order, as we discussed earlier, represents video
12  investment.  And so in this particular task order, that
13  video investment would have, if we had leveraged, I
14  apologize, I can't recall specifically, if we had
15  leveraged linear television, traditional television,
16  that would appear in here as that is video.  Certainly,
17  if there was video delivered through digital means, that
18  would be, I believe, captured in here.  And then also
19  you may see as part of that, the development of some
20  actual creative messaging advert -- you know, the ads
21  itself, the production of those, at this point in time,
22  would have been housed under sight, sound, and motion in
23  this particular fiscal year under TO 32.
24    Q.  Do you know was there any display advertising
25  in this task order?

Page 167

1    A.  I have to look quickly here.  Oh, thank you.
2  Yeah, it looks to be some, clearly there is under, if
3  you look under page 2, you'll see a notation there,
4  Google Programmatic.  So, for instance, you'll find
5  display there.
6    Q.  Do you have an understanding of what -- what
7  kinds of advertising are included in that description on
8  page 2 of the programmatic display?
9    A.  Not specifically, no.
10    Q.  Okay.  So staying on page 2, up at the very top
11  corner, there's a red box that says "AIR" and then a
12  bunch of numbers and letters, 000 -- 0032 A, 104 RR, and
13  then a total -- a financial amount of $568,309.50.
14        Do you see that?
15    A.  I do.
16    Q.  Do you have an understanding of what that is
17  referring to?
18    A.  Yes.
19    Q.  What is that referring to?
20    A.  An AIR is -- refers to an advertising
21  instruction record.  It is the equivalent of a signed
22  estimate, if you will, from our clients to expend
23  dollars on their behalf.  So when a recommendation is
24  made to the Air Force to spend dollars, whether that's a
25  media purchase or something else, we submit an AIR

Page 168

1  request.  If -- it's reviewed by the client team, they
2  approve that.  And then at that point in time, the
3  corresponding number that you see here is generated and
4  then that becomes a traveling item that goes through the
5  billing system.
6    Q.  What types of information are included in the
7  AIR request?
8        MS. KAPLIN:  Object to form.
9        THE WITNESS:  An AIR -- an AIR request
10  would include some descriptions of actually what is --
11  what is being recommended to be purchased on behalf of
12  the Air Force in the event of media as in here.  Some
13  description of what that media would entail and what
14  potentially it would support.  An AIR request would also
15  be used for -- and again, any other expenditures, so it
16  could be the production cost of a television commercial,
17  it could be the building of a mobile tour, et cetera.
18  In this instance, it's media.
19    Q.  (BY MS. CLEMONS)  How often does GSD&M submit
20  AIR requests for approval to Air Force?
21        MS. KAPLIN:  Objection.
22        THE WITNESS:  Frequently.
23    Q.  (BY MS. CLEMONS)  How frequently, is there a
24  number that you're -- can you estimate?
25    A.  Over the span of the entire level of effort,

Page 169

1  again, venturing as a ball park, it could be five, ten a
2  week maybe.  It would certainly ebb and flow.  But
3  depends on the volume of activity.  But it's again, our
4  permission to spend dollars on the behalf.  So it does
5  ebb and flow with that work.
6    Q.  Okay.  And so does GSD&M seek and wait for
7  approval from Air Force on these AIR requests before it
8  expends those dollars on Air Force's behalf?
9    A.  Yes, ma'am.  Contractually we are not allowed
10  to pursue that without that approval.
11    Q.  Okay.  And how far in advance before -- before
12  a purchase is executed does GSD&M seek approval of the
13  the AIR?
14    A.  AIRs within a task order, which is -- we
15  discussed earlier, typically are a 12-month time period.
16  So an AIR has to be submitted 30 days prior to the end
17  of that task order.  And then a working guidance for us
18  is ten business days to allow the Air Force client team
19  to review.
20        THE REPORTER:  Are you saying air or error?
21        MS. CLEMONS:  Air, A-I-R, all caps.
22    Q.  (BY MS. CLEMONS)  And so staying on page 2,
23  this -- at the top says, "Invoice I-1A-0018."
24        Do you see that towards the upper right?
25    A.  I do.

Veritext Legal Solutions
800-567-8658                                                                                    973-410-4098

Page 170

1  Q. Is it your understanding that that corresponds
2  to the same number listed on the previous page, the
3  front cover of the invoice?
4  A. Yes, it does.
5  Q. Okay. And on that -- on that front page still,
6  across from I-1A-0018, do you see that it says
7  568,309.50?
8  A. I do.
9    MS. KAPLIN: I'm sorry. Can you direct
10 where you are?
11   MS. CLEMONS: Yeah. On the -- on the cover
12 page of the invoice under number, the second number,
13 I-1A-0018, if you look across over to where it says
14 amount. The amount listed for that invoice number is
15 568,309.50.
16 Q. (BY MS. CLEMONS) And turning back to the
17 second page of the invoice, do you see, in that right
18 box at the top, that 568,309.50?
19 A. I do.
20 Q. Okay. Is that the amount in your understanding
21 of what is being invoiced or what was approved in the
22 AIR?
23 A. It's my understanding that is what is approved
24 in the AIR.
25 Q. Okay. And so looking down, still on Page 2, I

Page 171

1  see there is a section under "Google Programmatic." And
2  then there's also, a little bit farther down around the
3  middle of the page, I see "Google Ad Serving."
4    Do you have an idea of what is meant by
5  Google Programmatic and Google ad serving in this
6  invoice?
7  A. Yes.
8  Q. All right. Can you explain both of those,
9  please?
10 A. Yes. Under the programmatic line item would be
11 the actual media inventory that was secured via Google
12 Programmatic, in this case DV360. Ad serving is again,
13 as the title implies, we leverage Google technology to
14 distribute, i.e., ad serve communications. And those
15 are a variable cost that a company that, when
16 advertising, is deployed. So that's what the bottom
17 portion represents.
18 Q. What Google platform does Air Force use for ad
19 serving?
20 A. Campaign Manager.
21 Q. Okay. So it's your understanding that the fees
22 under Google ad serving are the fees associated with
23 Air Force's use of Campaign Manager for that time
24 period?
25 A. That is my understanding. But I'm not that

Page 172

1  technical expert.
2  Q. For the Google Programmatic section, do you
3  know what platform or platforms would be covered by
4  Google Programmatic as listed here in this invoice?
5  A. My assumption is DV360. But again, I would
6  have to defer to my subject matter expert colleagues.
7  Q. Are there fees associated with the use of
8  DV360?
9  A. Not that I'm aware of.
10 Q. Do you see at the top of this page, below the
11 sort of header information, there are three columns over
12 to the right, "Gross Billable," "Net Billable," and "Net
13 Billing"?
14 A. I do.
15 Q. Do you have an understanding of what those
16 columns represent?
17 A. I do.
18 Q. Could you explain those, please?
19 A. Yes. Net billing and net billable, vis-à-vis
20 gross billable. I should note that from GSD&M's
21 relationship with the Air Force, we bill everything as a
22 passthrough cost. So everything is billed as net. What
23 you're seeing in here in gross billable is a function
24 and a setting that is kind of almost a default within
25 Mediaocean, which is our billing piece. So this is

Page 173

1  really in the construct of some advertising
2  relationships employ a commission model. And so when
3  you see gross billable, this is assuming that -- a
4  markup, if you will. However, from an Air Force
5  perspective and a GSD&M perspective, we only bill net.
6  So this is -- Mediaocean is a product which services
7  advertisers across the entire industry. Our
8  relationship with the Air Force is different than kind
9  of what you see reflected in this diagram.
10 Q. Okay. So is it accurate that this gross
11 billable column is sort of an artifact of what might
12 happen in another relationship, but doesn't actually
13 have any meaning to what GSD&M is billing Air Force?
14 A. Yes, ma'am.
15 Q. Okay. And so, to your understanding, where it
16 says, you know, October 1/21 display and there is a
17 number under net billable and net billing for
18 $286,172.42.
19    Do you see that?
20 A. Yes, I do.
21 Q. Is it your understanding that that is
22 100 percent of the -- of the cost of the media purchased
23 through DV360 for that month?
24 A. Yes. Yes.
25 Q. Okay. And it is Air Force's obligation to pay

HIGHLY CONFIDENTIAL

Page 174

1  100 percent of the cost of that media --
2      A.  Yes.
3      Q.  -- under the contract?
4          MS. KAPLIN:  Object to form.
5      Q.  (BY MS. CLEMONS)  Okay.  Up at the top of the
6  page in the upper left, under where it says "Invoice,"
7  it says "Due date," "client."
8          Do you see that?
9      A.  I do.
10     Q.  Right under client, there are two lines, one
11 for product and one for estimate.  Do you have an
12 understanding of what product and estimate are referring
13 to?
14     A.  Partial.  Yes.
15     Q.  Okay.  All right.  Can you provide your partial
16 understanding?
17     A.  Certainly.  From a product perspective, you'll
18 see each task order, in this case task order 32 or
19 technically 0032, has a title describing what services
20 are to be provided under that.  And as we had discussed,
21 this one captures sight, sound, and motion activities.
22 So you will see that as T00032 sight, sound, mo,
23 abbreviated there a bit.  And then underneath that, an
24 estimate, just a little SSM, it will be a acronym we use
25 to collapse sight, sound and motion.  And then media, as

Page 175

1  you see there, would be a designation for -- that this
2  is a media expenditure.  And then underneath that,
3  you'll see the -- again, reference the corresponding AIR
4  number which mirrors what is in the top in red.
5      Q.  Okay.  Thank you.  So below -- just below that,
6  it says, "Insert Date," right above Google Programmatic.
7          Do you see that?
8      A.  Yes.
9      Q.  And then there appear to be several insert
10 dates shown below there, August 1, '21; September 1,
11 '21; October 1, '21; November 1, '21.
12         Do you see that?
13     A.  I do.
14     Q.  Do you know what is meant by insert date?
15     A.  Insert date, again, I think gets back to kind
16 of a legacy term, if you will, from a media perspective.
17 So thinking back to a world of print, newspapers and so
18 forth, it would be technically an insertion within
19 there, when that's in there.  So this refers to
20 essentially the time in which the advertising is being
21 placed.  If this was another medium, that may be a
22 singular date.  For instance, if a television execution
23 ran on September 15th, you may see September 15th, given
24 the nature in which this work spans, it's over a time
25 horizon of a month.  So you'll see the designations

Page 176

1  there of August 1, September 1, November, 1, et cetera.
2      Q.  Okay.  And is this the date that the
3  advertising ran or the date that they're being billed or
4  something else?
5      A.  We --
6          MS. KAPLIN:  Object to form.
7          THE WITNESS:  Cannot confirm.  I will share
8  my best.  We obviously have to bill 30 days after
9  something has completed in order to get resolution on
10 what transpired that month.  So you'll notice, on the,
11 top, you'll see that billing trailing a month.
12 Concurrently, as you can see within this document,
13 there's also some spinning reconciliations that happened
14 over time.  And if you see a credit noted from a time
15 period, you'll see those reflected here as well.
16     Q.  (BY MS. CLEMONS)  Do you have an understanding
17 of what those credits might represent?
18     A.  Yes.
19     Q.  What might they represent?
20     A.  As an example, not necessarily tied to these
21 specific line items, say there was a -- an estimated
22 media spend per month for an effort at $5,000.  And in
23 terms of placing executions in front of an audience,
24 what if enough inventory couldn't be secured that
25 matches your specifications and you only spent $4,900

Page 177

1  worth.  Then you would have a credit of $100 in which
2  case that would be -- what's typically done is that
3  would be -- again, it's committed to and then those
4  dollars would be applied to the next month to secure the
5  deliveries you're looking for.  So that's the
6  description I would -- I would characterize it as.
7      Q.  So are those credits against what is owed by
8  Air Force or what has already been paid by Air Force?
9      A.  They would be, I believe, what has been -- it
10 could -- let me rephrase that.  It could be both.
11 Sometimes a payment may have been made, a credit may be
12 in the -- seen later, in which case it's being
13 reimbursed.  Sometimes, a credit may be realized in more
14 real time so it's actually not paid for and then
15 reimbursed if that is clear.  I think it would -- I
16 would have to defer to my colleagues in finance and
17 accounting of the logistics of that.
18     Q.  Okay.  Under what circumstances might a credit
19 not be seen for several months?
20         MS. KAPLIN:  Object to form.
21         THE WITNESS:  I -- if it was a campaign
22 horizon that was maybe longer than one month or it was a
23 certain period of time and over the course of that
24 duration, whatever that duration may be, if there was
25 some event that triggered a credit, that's where it

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

1 could extend beyond a month.
2    Q. (BY MS. CLEMONS) Okay. And then this -- the
3 date of this invoice at the top, it says it's
4 October 2021.
5       Do you see that?
6    A. Yes, I do.
7    Q. And there is a line under Insert Date under
8 Google Programmatic for November 1, '21.
9       Do you see that?
10   A. I do.
11   Q. And then there are amounts in the gross and net
12 billable and billing column.
13      Do you have an understanding of what the
14 amounts for -- listed for November represent if this
15 invoice was issued in October?
16   A. Yes. As I understand it, this is where we are
17 allowed to bill the Air Force for that media that is
18 going to be run so that GSD&M is not serving as the
19 government's bank, so to speak, for payment of those.
20   Q. Okay. So you are securing the funds from
21 Air Force prior to making media --
22   A. Yes. In some instances, yes, ma'am.
23   Q. -- executing the media buys?
24   A. Yes, ma'am.
25   Q. Okay. And so that then may need to be

Page 179

1 reconciled later if more funds were transferred than
2 ended up being able to be spent for that month; is that
3 right?
4    A. Yes.
5    Q. Okay. And do you have an understanding of how
6 these invoices are reconciled back to the invoices that
7 GSD&M receives from Google for Air Force's purchases?
8    A. Yes. From a Google perspective, they are
9 provided through -- one of two ways. It comes through
10 what's referred to as Google -- Google payment center,
11 which is a web interface where invoices come in, in
12 which case our finance and accounting team are
13 extracting those to begin an assessment to make sure
14 they're lining up with what was planned. There also may
15 be some instances where an invoice for some reason may
16 have to be emailed or whatever it might be. So an
17 invoice is received by our accounting team, they are
18 reviewing it, working with, again, our colleagues and
19 our media group to make sure it is accurate.
20      And once that process continues ultimately
21 into manifest itself into our billing which occurs
22 through Mediaocean which is, again, our tool which we
23 leverage for media investments and billing, whether it's
24 Google or any other property.
25   Q. Okay. And so when GSD&M receives an invoice

Page 180

1 from Google for Air Force's media purchases, does GSD&M
2 then pay that invoice with the funds received from
3 Air Force?
4       MS. KAPLIN: Object to form.
5       THE WITNESS: Yes, it does. Yes.
6    Q. (BY MS. CLEMONS) I'm going to show you another
7 document. I'm going to hand the court reporter a
8 different document. I'm going to hand the court
9 reporter another document.
10      (Exhibit No. 7 was marked.)
11   Q. (BY MS. CLEMONS) This one is --
12      THE REPORTER: Hold on.
13      MS. KAPLIN: Go ahead.
14   Q. (BY MS. CLEMONS) And this one is Bates
15 stamped, at the bottom right, GOOG-AT-MDL-004388417.
16      Do you see that?
17   A. 411 -- I'm sorry. I was looking at the bottom.
18 I'm seeing ending 414.
19      MS. CLEMONS: I may have the wrong...
20      MS. KAPLIN: The one you gave me ends in
21 417.
22      MS. CLEMONS: Can we go off the record for
23 just one moment?
24      VIDEOGRAPHER: Going off the record. The
25 time is 3:48.

Page 181

1       (Discussion off the record.)
2       VIDEOGRAPHER: Back on the record, this
3 marks the beginning of Media Unit No. 5. The time is
4 3:49.
5    Q. (BY MS. CLEMONS) All right. Before,
6 Mr. Bradbury, before we took a very short break, I had
7 read the wrong Bates number for -- for the document that
8 is being marked as Bradbury Exhibit 7. This one is now
9 correct. GOOG-AT-MDL-004388414. Does that match the
10 document that you have in front of you?
11   A. Yes, it does.
12   Q. Okay. Perfect. So are you familiar with the
13 Google invoices that GSD&M receives for Air Force media
14 purchases?
15   A. Yes, at a high level, yes.
16   Q. And is this, to the best of your knowledge, the
17 document that you're looking at, one of those invoices?
18   A. That's correct.
19   Q. Okay. Is this invoice, feel free to take a
20 moment and look through it, is this invoice typical of
21 the type of invoice that you -- GSD&M would receive from
22 Google for Display & Video 360 purchases on behalf of
23 Air Force?
24   A. It is.
25   Q. If you flip to the second page, page 203, up in

Page 194

1  that connection. I do not know.
2     Q. (BY MS. CLEMONS) Okay. If you stay on the
3  page that ends in 2137 -- sorry, 2135, do you see up at
4  the top it says, "AIR 263 S 215 R 1"?
5     A. Uh-huh.
6     Q. And then there's a monetary amount of
7  $561,836.67.
8        Do you see that?
9     A. I do.
10    Q. If you go down to where it says "Estimate"
11 about five lines below that.
12       Do you see that?
13    A. I do.
14    Q. Over to the right of that it says "TO 0063 USSF
15 ENG & REC."
16       Do you see that?
17    A. I do.
18    Q. Do you have an understanding of what that
19 represents?
20    A. I do. That would denote, under Task Order 63,
21 specific support for the United States Space Force
22 and -- and engage and recruit tactics and that would be
23 our acronym. So to condense it to fit in the field
24 there.
25    Q. Okay. And then do you see down below that,

Page 195

1  there are two sections where there are insert dates
2  listed. The first says, "Google DoubleClick" and the
3  second says "Google Programmatic."
4        Do you see that?
5     A. I do.
6     Q. Do you have an understanding of what Google
7  DoubleClick is?
8     A. I do not.
9     Q. Okay. And then if you go down to where it
10 says, "Google Programmatic," there are months listed;
11 January, February, March, April, and May of 2023.
12       Do you see that?
13    A. I do.
14    Q. Under -- across from May 1, '23, it says,
15 "Display" under Space.
16       Do you see that?
17    A. I do.
18    Q. Is it your understanding that this represents
19 Air Force spend on programmatic display advertising via
20 DV360?
21    A. Correct, yes. Specifically Space Force
22 advertising. But, yes.
23    Q. Okay. The Space Force -- apologies. Was it
24 engineering and recruitment?
25    A. Engage -- engage and recruit.

Page 196

1     Q. Okay. And then if you go over to where it says
2  "net billable" which I understand is what is actually
3  being billed --
4     A. Yes.
5     Q. It says $453,671.18.
6        Do you see that?
7     A. I do.
8     Q. Bear with me. Heading back over to Exhibit 8,
9  the total amount due on that invoice is $466,630.50.
10       Do you see that?
11    A. I do.
12    Q. Do you know if this 453,000 and 466,000 on
13 these two documents are -- are representing the same
14 spend?
15    A. I do not.
16    Q. Okay. If you needed to know how the Google
17 invoice lined up with the GSD&M invoice reconciling all
18 those numbers, who would you speak to?
19       MS. KAPLIN: Objection to form.
20       THE WITNESS: I would work with my
21 colleagues in finance and accounting.
22    Q. (BY MS. CLEMONS) Okay. And back to -- is
23 there a particular person in financing and accounting
24 who you would go to who you understand works on these
25 bills?

Page 197

1     A. My initial thought would be a colleague by the
2  name of Sarah Brauner.
3     Q. And Exhibit 9 is in -- the invoice date says
4  April 24th, 2023; is that right?
5     A. Yes, that's correct.
6     Q. Does that mean that it was sent out April 24th,
7  2023?
8     A. At that date or probably close to it. I can't
9  confirm.
10    Q. Okay. And again, on the page ending 135, there
11 is an amount listed for display from May of 2023 which
12 is the following month after this invoice would have
13 been sent; is that right?
14    A. Correct.
15    Q. So is it your understanding that the amount
16 listed after May 1, '23 display is an estimated amount
17 of how much -- how much GSD&M is requesting Air Force
18 send so that it can make that amount in purchases --
19    A. It's my understanding, yes.
20    Q. -- on Air Force's behalf in the month of May?
21    A. Yes, ma'am.
22       MS. KAPLIN: Object to form.
23    Q. (BY MS. CLEMONS) And if this May Google
24 invoice -- or if the invoice coming in for the spending
25 in May were more or less than the amount advanced, would

50 (Pages 194 - 197)

Page 198

1  that be reflected in later invoice adjustments in
2  following months?
3      A.  That's correct.
4          MS. KAPLIN:  Objection, form.
5          THE WITNESS:  Correct.  Adjusted
6  accordingly, it would, yes.
7      Q.  (BY MS. CLEMONS) Okay.  And so are all of the
8  media purchases made under the contract, in particular
9  for display through DV360, are all of those purchases
10 paid by Air Force?
11         MS. KAPLIN:  Objection to form.
12         THE WITNESS:  They would be paid by GSD&M
13 and in turn would be reimbursed by the Air Force.
14     Q.  (BY MS. CLEMONS) Or paid in advance by the
15 Air Force and that money is used to pay Google?
16     A.  Yes, ma'am.  Yes, ma'am.
17         MS. KAPLIN:  Objection to form.
18     Q.  (BY MS. CLEMONS) Are you familiar with the
19 term "sequential liability"?
20     A.  Familiar with it, topically, but not in depth.
21     Q.  Do you have any understanding of whether or how
22 sequential liability applies to GSD&M's contract for
23 DV360 access with Google?
24         MS. KAPLIN:  Objection, calls for a legal
25 conclusion.

Page 199

1          THE WITNESS:  Not specifically.  I'm sorry.
2          MR. LYNCH:  You can answer.
3          THE WITNESS:  Not specifically.  Please
4  repeat the question, sorry.
5      Q.  (BY MS. CLEMONS) Sorry.  I was just wondering
6  if you had any idea of whether the concept of sequential
7  liability applied with respect to GSD&M's relationship
8  with Google?
9          MS. KAPLIN:  Objection, calls for a legal
10 conclusion.
11         THE WITNESS:  I don't know.
12         MS. CLEMONS:  Okay.  I think that's about
13 all that I have, but I may just take a minute.  So if we
14 can go off the record and I'll double check.  Thank you.
15         VIDEOGRAPHER:  Going off the record.  The
16 time is 4:33.
17         (Discussion off the record.)
18         VIDEOGRAPHER:  Back on the record.  The
19 time is 4:36.
20         MS. CLEMONS:  Mr. Bradbury, that is all
21 that I have for you today.  I will turn -- turn
22 questioning back over to Google's counsel and reserve
23 the remainder of my time.
24         MS. KAPLIN:  I just have a few more
25 questions for you, Mr. Bradbury.

Page 200

1               FURTHER EXAMINATION
2      Q.  (BY MS. KAPLIN) So you were talking a moment
3  ago about on occasion or in some instances GSD&M paid --
4  is paid in advance by the US Air Force for its purchases
5  for the US Army -- I'm sorry, for the US Air Force all
6  in DV360; is that right?
7      A.  Yes.
8      Q.  And that's based on GSD&M's estimates of what
9  it will purchase for the US Air Force?
10     A.  That is correct.
11     Q.  And essentially, does that sum act as a budget
12 for GSD&M's purchases?
13         MS. CLEMONS:  Objection, form.
14         THE WITNESS:  It does.
15     Q.  (BY MS. KAPLIN) And does GSD&M have some
16 discretion to allocate that spend across, for example,
17 whitelisted pages?
18         MS. CLEMONS:  Objection, form.
19         THE WITNESS:  Yes.
20     Q.  (BY MS. KAPLIN) And to optimize that spend in
21 other way -- other ways?
22         MS. CLEMONS:  Objection, form.
23         THE WITNESS:  Yes.  And if it was a
24 significant strategic change in coordination with our
25 Air Force clients.

Page 201

1      Q.  (BY MS. KAPLIN) So just to sum that up.  After
2  obtaining US Air Force funds to use in its digital
3  display advertising, what does -- what, if anything,
4  does GSD&M have discretion -- what types of decisions,
5  if any, does GSD&M have decisions -- have over -- sorry.
6  Let me rephrase.
7          After obtaining US Air Force funds to use
8  in its digital display advertising, what discretion, if
9  any, does GSD&M have in allocating those funds?
10         MS. CLEMONS:  Objection to form.
11         THE WITNESS:  We would be able to shift
12 within a designated whitelist or an inclusive list to
13 sites that were providing positive performance vis-a-vis
14 others which may be performing under expectation.
15     Q.  (BY MS. KAPLIN) And I'm going to direct your
16 attention back to Exhibit 7, which is a Google invoice
17 to GSD&M Bates stamped -- Bates No. ending 414.  And I'm
18 going to direct your attention to the second page ending
19 in 415 of the exhibit.
20         So previously we -- you had described why
21 different types of advertising might be listed out
22 separately in this invoice; is that right?
23     A.  Yes.
24     Q.  So just to direct your attention to the first
25 row, that ends with display ID 20797843.  Do you have an

Page 214

```
     ERRATA PAGE
1
2  WITNESS NAME: BO BRADBURY    DATE: 09/08/2023
3  PAGE  LINE  CHANGE            REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
   Job No. CS6091854
```

Page 215

```
1           ACKNOWLEDGMENT OF DEPONENT
2
3       I, BO BRADBURY, do hereby certify that I have
4  read the foregoing pages and that the same is a correct
5  transcription of the answers given by me to the
6  questions therein propounded, except for the corrections
7  or changes in form or substance, if any, noted on the
8  attached errata page.
9
10  _____
        BO BRADBURY            DATE
11
12
13  THE STATE OF TEXAS   )
                         )
14  COUNTY OF _____ )
15
          Before me,            , on this day
16  personally appeared BO BRADBURY, known to me (or proved
    to me under oath or through
17  (description of identity card or other document) to be
    the person whose name is subscribed to the foregoing
18  instrument and acknowledged to me that they executed the
    same for the purposes and consideration therein
19  expressed.
20      Given under my hand and seal of office this
        ____ day of          ,     .
21
22
            NOTARY PUBLIC IN AND FOR
23             THE STATE OF
24
25  Job No. CS6091854
```

Page 216

```
1            REPORTER'S CERTIFICATION
             DEPOSITION OF BO BRADBURY
2             TAKEN SEPTEMBER 8, 2023
3        I, Janalyn Elkins, Certified Shorthand
4  Reporter in and for the State of Texas, hereby certify
5  to the following:
6        That the witness, BO BRADBURY, was duly sworn
7  by the officer and that the transcript of the oral
8  deposition is a true record of the testimony given by
9  the witness;
10       That the original deposition was delivered to
11 LAUREN KAPLIN;
12       That a copy of this certificate was served on
13 all parties and/or the witness shown herein on
14 _____.
15       I further certify that pursuant to FRCP No.
16 30(f)(i) that the signature of the deponent was
17 requested by the deponent or a party before the
18 completion of the deposition and that the signature is
19 to be returned within 30 days from date of receipt of
20 the transcript.  If returned, the attached Changes and
21 Signature Page contains any changes and the reasons
22 therefor.
23       I further certify that I am neither counsel
24 for, related to, nor employed by any of the parties in
25 the action in which this proceeding was taken, and
```

Page 217

```
1  further that I am not financially or otherwise
2  interested in the outcome of the action.
3        Certified to by me this 10th day of September
4  2023.
5
6           [signature: Janalyn Elkins]
            JANALYN ELKINS
7           Texas CSR 3631
            Expiration Date 1/31/2025
8           Veritext Legal Solutions
            300 Throckmorton Street, Suite 1600
9           Fort Worth, Texas  76102
            Firm Registration No. 571
10          PH: (817) 336-3042
```

## ERRATA SHEET FOR DEPOSITION TRANSCRIPT OF
Bo Bradbury
Deposition Date: September 8, 2023
*United States et al. v. Google, LLC* (E.D. Va. Case No.1:23-cv-00108)

| Page | Lines | Transcript Text | Corrected Text | Reason for Change |
|---|---|---|---|---|
| 5 | 2 | "on behalf on" | "on behalf of" | Transcription error |
| 10 | 4-19 | "Q. Okay. Did you share any document with them on that call?<br>A. Correct.<br>…<br>Q. So you shared documents with them that provided that information about the allocation of investments?<br>A. Correct. They were requested." | Documents were not shared on this call. | Clarifying edit |
| 11 | 7-16 | "Q. Going back to the documents you shared, approximately how many documents did you share on this meeting, during this meeting?<br>A. From what I recall, maybe two or three.<br>Q. And you put them up on a screen and then provided them to the Department of Justice after?<br>A. This was information that was requested by the Department of Justice earlier in the process, in which case we provided to counsel, counsel provided presumably to the Department of Justice team." | Documents were not shared on this call. | Clarifying edit |
| 15 | 11 | "some package goods" | "some packaged goods" | Transcription error |
| 16 | 17 | "team lead by you" | "team led by you" | Transcription error |
| 19 | 17-18 | "where are 18 to 24-year-olds are spending" | "where are 18 to 24-year-olds spending" | Transcription error |

| | | | | |
|---|---|---|---|---|
| 22 | 12 | "what the objective" | "where the objective" | Transcription error |
| 26 | 7 | "in terms of as creative" | "in terms of creative" | Transcription error |
| 29 | 17 | "Major General Christopher Amrhein" | "Brigadier General Christopher Amrhein" | Clarifying edit |
| 38 | 13 | "one was to video." | "one was video." | Transcription error |
| 51 | 5 | "on the objectives that at hand" | "on the objectives at hand" | Transcription error |
| 54 | 6 | "to align my technical" | "to rely on my technical" | Transcription error |
| 55 | 12-13 | "for in the engage" | "for the engage" | Transcription error |
| 69 | 13 | "of what is" | "of what has" | Transcription error |
| 83 | 15 | "as well, are supporting" | "as well, we are supporting" | Transcription error |
| 94 | 11 | "deliverabled" | "deliverables" | Transcription error |
| 113 | 20 | "Air Force review with" | "Air Force for review with" | Transcription error |
| 115 | 4 | "which arguably" | "which would arguably" | Transcription error |
| 116 | 1 | "an ad op request" | "an ad hoc request" | Transcription error |
| 117 | 9 | "contract officing representatives" | "contract officer representatives" | Transcription error |
| 121 | 7 | "but need development decisions" | "but development decisions" | Transcription error |
| 143 | 24 | "of being creating" | "of creating" | Transcription error |
| 179 | 20-21 | "ultimately into manifest itself into" | "ultimately it will manifest itself into" | Transcription error |
| 184 | 21-22 | "members of or our consumer" | "members of our consumer" | Transcription error |
| 190 | 15 | "TO 673" | "TO 63" | Transcription error |
| 204 | 7 | "Ms. Debinet" | "Ms. Depinet" | Transcription error |
| 207 | 19 | "content. That would" | "content that would" | Transcription error |
| 210 | 2 | "No, that's correct." | "Yes, that's correct." | Clarifying edit |

I, Bo Bradbury, do hereby certify: that I have read my deposition transcript dated September 8, 2023; that the changes and corrections to my deposition transcript set forth above are necessary to render the same true and correct; that having made such changes, I hereby subscribe my name to the deposition. I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 25th day of October, 2023 at _Austin, Texas_
(City/State)

_Bo Bradbury_
Bo Bradbury