# Plaintiffs' Exhibit 30

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:23-cv-00108-LMB-JFA |
| GOOGLE LLC, | ) ) ) | |
| Defendant. | ) | |

### DECLARATION OF ROSA M. ABRANTES-METZ IN SUPPORT OF PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT

Rosa Abrantes-Metz, PhD., being duly cautioned, declares as follows:

1. I am over 21 years old and am competent to testify about the matters in this Declaration based on my personal knowledge.
2. Attached hereto as Exhibit A is a true and correct copy of the December 22, 2023, Expert Report of Rosa M. Abrantes-Metz, PhD. Attached hereto as Exhibit B is a true and correct copy of the February 13, 2024, Expert Rebuttal Report of Rosa M. Abrantes-Metz, PhD.
3. I authored the attached Expert Reports identified in Item (2) above and understood at the time I signed them that they were being prepared for use in this litigation. I am prepared to testify at trial, under oath, to the matters set forth in these reports. My statements set forth in these reports are true and correct to the best of my knowledge.
4. The exhibits attached to the reports described in Item (2) are true and correct copies.

I declare under penalty of perjury that the foregoing statements in this Declaration are true and correct.

Dated:

Signed: _____

Rosa M. Abrantes-Metz, PhD.

County and State: Orange County, NY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| United States of America, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Google LLC, <br><br> Defendant. | Case No. 1:23-cv-00108-LMB-JFA <br><br> Hon. Leonie H. M. Brinkema |

# EXPERT REBUTTAL REPORT OF ROSA M. ABRANTES-METZ, PH.D.

**February 13, 2024**

HIGHLY CONFIDENTIAL - Privileged & Confidential

Expert Rebuttal Report of Rosa M. Abrantes-Metz, Ph.D.

of the market and the conditions under which it was implemented. Therefore, my conclusion that the imposition of UPR "foreclosed competition from rivals in the Advertiser Ad Network market and the Ad Exchange market" stands.[420]

## G. Other Conduct by Google Exacerbated the Anticompetitive Effects of the Conduct at Issue

285. Dr. Israel and Professor Milgrom address other Google conduct which was discussed in my Initial Report including Project Bernanke, Project Poirot, and Sell-Side Dynamic Revenue Sharing ("DRS").[421] As Dr. Israel acknowledges, I do not explicitly allege that these programs were anticompetitive standing alone based on the information available to me,[422] but understanding these programs is critical to understanding the context of Google's other anticompetitive conduct. My discussion of these programs is to show that they exacerbate the anticompetitive effects of the Google conduct at issue by directing more transactions toward AdX and denying those transactions and operating scale to third-party exchanges.

286. Specifically, Project Poirot "lowered the bids DV360 submitted to AdX's rivals, but not to AdX," and "shifted spending toward AdX."[423] While "Last Look, coupled with Google's bid manipulation schemes, DRS and Bernanke" enabled AdX to win transactions that it could not "at its usual take rate" and allowed "AdX to capture impressions it otherwise would not win, denying transactions (and scale) to third-party exchanges."[424] This exacerbated the impact of AdX's exclusive First and Last Look. "Google's programs such as Bernanke and DRS allow AdX advertisers with lower willingness to pay to sometimes win impressions over non-AdX

---

[420] Abrantes-Mez Initial Report, at ¶ 460.

[421] Israel Initial Report, at ¶¶ 687 – 706, 750 – 761 and 766; Milgrom Initial Report, at ¶¶ 141 – 176, 192 – 251 and 365 – 413; and Abrantes-Metz Initial Report, at ¶¶ 258 – 291.

[422] Israel Initial Report, at ¶¶ 687, 751, and 766.

[423] Abrantes-Metz Initial Report, at ¶¶ 286 – 289.

[424] Abrantes-Metz Initial Report, at ¶¶ 358 – 362.

Expert Rebuttal Report of Rosa M. Abrantes-Metz, Ph.D.

advertisers with greater willingness to pay. This sacrifices advertiser surplus to Google's effort to capture transactions from its competitors."[425]

287. Nothing presented by Google's experts related to these programs alters my opinion that "These bid manipulation schemes exploited informational advantages that Google exclusively obtained by virtue of its scale. Through each program, Google's bid adjustments had the effect of allowing AdX to win transactions that might have otherwise been acquired by Google's rivals."[426]

288. Google's experts have argued that some of these programs, by themselves, were output-enhancing.[427] I do not dispute that that is possibly true, but I would point out that the question is not as simple as Google's experts would suggest. Merely documenting, for example, that DRS allowed AdX to win a transaction does not necessarily mean that that transaction would not have been won anyway by a different exchange. Also, publishers were likely adjusting their floor prices in response to programs like DRS. That would suggest that absent DRS, floor prices may have been different, and the volume of transactions may not have changed. These bid manipulation schemes may have changed the allocation of the auction surplus more than they changed total output. But be that as it may, my opinions relate to interplay between Google's bid manipulation programs and its anticompetitive conduct, not to the programs themselves.

## V. Google's Experts Do Not Effectively Dispute That Google's Conduct Harmed Advertisers, Publishers and End-Consumers

289. In my Initial Report, I describe how Google's conduct harmed publishers, advertisers, and end-consumers of open web content.[428] Google's conduct allowed AdX to charge a supra-

---

[425] Abrantes-Metz Initial Report, at ¶ 479.
[426] Abrantes-Metz Initial Report, at ¶ 259.
[427] Israel Initial Report, at ¶¶ 694 – 697; Milgrom Initial Report, at ¶¶ 170 – 171, and 367.
[428] Abrantes-Metz Initial Report, at Section IX.

Expert Rebuttal Report of Rosa M. Abrantes-Metz, Ph.D.

316. Figure 1 uses take rate data from the "indirect web non-video" table presented in the Israel Report backup materials.[453] The chart shows that AdX had a higher take rate than competing exchanges, on average, by over 10% between 2020 and 2022. Additionally, the difference between AdX's exchange take rate and that of other exchanges shows a rising trend that is increasing year-over-year. By 2022, the AdX take rate is 15.3% larger, on average, than that of competing exchanges. Limiting the ad spend in Dr. Israel's analysis to the subset more closely relevant for Professor Lee's market definition and measuring the differences with the proper concept confirms my opinion that AdX charged a supra-competitive fee for open web display transactions on AdX.

317. I reserve the right to update my opinions if and when more information becomes available.

Respectfully submitted,

*[signature: Rosa M. Abrantes-Metz]*

_____

Rosa M. Abrantes-Metz, PhD

February 13, 2024

---

[453] The Israel Initial Report backup materials notes suggests that Sovrn's fees are limited to web non-video display, but not to indirect only.