# Plaintiffs' Exhibit 33

CLEARY GOTTLIEB STEEN & HAMILTON LLP

CONFIDENTIAL

October 25, 2007

## Case COMP M.4731 – Google/DoubleClick

### Submission On The Alleged Anti-Competitive Effects In The Hypothetical Market For Intermediation Services

GOOG-DOJ-01657206

### EXECUTIVE SUMMARY

This submission summarizes the reasons why Google's acquisition of DoubleClick will not give rise to any horizontal anti-competitive effects due to the elimination of potential competition in a hypothetical market for "intermediation services" or "indirect sales" of online ad space.  As set out in the EC Horizontal Merger Guidelines, such a concern can only be justified if a potential entrant is uniquely placed to enter, is likely to grow into an effective competitive force, and, furthermore, only if actual competition cannot be relied upon to result in competitive outcomes.

DART for Publishers ("DFP") does not make DoubleClick a unique or significant competitor in indirect sales of online ad space or as the Commission has referred a hypothetical market for intermediation.  While Google understands that third parties have alleged that DFP's technology, its customer base, and hypothetical aggregation of data may render DoubleClick a significant potential competitor, each of these theories is unfounded.  DoubleClick's ad exchange in development ("Ad Exchange") is not expected to become a significant competitive constraint in any hypothetical narrow market for intermediation.  Even assuming the existence of such a hypothetical narrow market for indirect sales of online ad space (which is not the relevant market, given the strength of competition from direct sales, and from other forms of advertising), the proposed transaction would thus not give rise to a significant impediment to effective competition as a result of the elimination of potential competition.

**(A)    DFP's Technology Does Not Provide DoubleClick With A Unique Advantage As A Potential Entrant Into The Indirect Sales Segment**

- ▪    DFP is subject to the competitive pressure of many actual and potential competitors, and customers can and do switch easily from DFP to competing providers of publisher-side display ad serving.  This has resulted in significant price reductions, and establishes that DFP technology cannot be used to lock in customers, nor can it be "leveraged" by DoubleClick.  The commercial reality is that DoubleClick cannot impose conditions on its publisher customers, and in fact is doing everything it can to defend itself from losing these customers, as evidenced by the significant price reductions DoubleClick has had to offer and the increased R&D spending that DoubleClick has had to invest to improve product development.   Such pressures will continue post-Transaction.  Indeed, the competitive environment has only intensified since Microsoft, Yahoo!, WPP, and AOL have entered the segment.

- ▪    Importantly, a publisher's choice of display ad serving technology does not determine how it sells its inventory.  A publisher's ultimate concern is how it can best maximize its revenue, and it makes its revenue monetization decisions based on which sales channels will allow it to best maximize the yield on the sale of its inventory, not based on its display ad serving provider.  Because the revenue to be earned from a given ad sale is generally orders of magnitude greater than the cost of ad serving, no publisher would hold its revenue monetization strategy hostage to its display ad serving decision.

HIGHLY CONFIDENTIAL

to using the Google toolbar, these comprise less than 2% of Internet users, and the data are used to report impressions and clicks to the advertiser, and are not used for retargeting the user. As Google and DoubleClick use different cookies to collect or process data and different methodologies to analyze data, it is far from clear whether it would ever be technically possible to combine or compare these two different data sets, even if doing so were not already prohibited by contract.[53]

It should also be noted that there are a number of additional reasons why access to data does not operate as a barrier to entry or foreclose competition:

- First, user data is not exclusively available to one firm or another. For example, an ISP can track all of its users' web browsing activity on all sites they visit, the websites visited themselves collect information on users' activity on their sites, and advertisers whose ads appear on those websites also have data about which ads users have seen and where. If their ads are placed through ad networks, those networks may have this same data as well. In short, it is possible for many players to simultaneously have overlapping information on the behavior of a large portion of the Internet population.

- Second, there are diminishing marginal returns to dataset size. Although a larger sample of data may lead to a higher degree of accuracy in discerning patterns, the additional gain declines as the sample size increases.

- Third, technology is a more important determinant of targeting capability than the size of an ad network. Thus, ad networks with superior technology for behavioral targeting, such as Tacoda (owned by TimeWarner/AOL) and BlueLithium (owned by Yahoo!), may offer more accurate targeting than larger competitors with higher reach.

- Fourth, any quality improvement in Google's ad targeting services to advertisers would constitute an efficiency benefiting consumers, such that any objection to the merger on the grounds that supposed "data pooling" would confer an "informational advantage" would amount to an efficiency offence. The burden of proof for a finding of competitive harm is high and unlikely to be discharged in the present case, where the markets involved are characterized by effective competition and are extremely dynamic.[54]

## II.   AD EXCHANGE IS NOT EXPECTED TO GROW INTO A SIGNIFICANT COMPETITIVE FORCE

Ad Exchange is not expected to grow into a significant competitive force, for the following reasons:

---

[52]   *See* Response to the Commission's Questionnaire of October 15, 2007, submitted October 16, 2007.

[53]   *See* Response to the Commission's Questionnaire of October 15, 2007, submitted October 16, 2007.

[54]   *See* Submission on Alleged Informational Barriers, submitted October 2, 2007.

                                                                       GOOG-DOJ-01657228

A.    There is no guarantee that Ad Exchange would be commercially viable;

B.    Even if successfully introduced, Ad Exchange would account for the sale of only a tiny fraction of indirect sales of ad space;

C.    Ad Exchange did not form any part of Google's valuation of DoubleClick;

D.    Ad Exchange would not be a close competitor to Google's AdSense network.

These facts (which are explained in detail below), coupled with the lack of any unique advantage enjoyed by DoubleClick (see Section I above), further confirm that the proposed transaction would not give rise to a significant impediment to effective competition as a result of the elimination of potential competition in the hypothetical market for indirect sales of online ad space.

### A.    There Is No Guarantee That Ad Exchange Would Be Commercially Viable

The Ad Exchange that DoubleClick is developing is still in beta testing in the U.S.[55]  To date, only 15 potential participants have signed up to participate in the ad exchange in Europe. Only 4 of the 15 are publishers.  Moreover, only a single publisher in Europe has signed up to participate in *beta* testing of the exchange.  To date, the exchange has not earned any revenue in Europe and in the United States has generated only about US$8,200 in revenue from *beta* testing.

DoubleClick has no guarantee that once Ad Exchange is commercially launched, it will have a viable customer base.  Although DoubleClick has signed up a total of approximately 70 companies to participate in the Ad Exchange when it becomes operational, none has guaranteed any volume of inventory to the exchange.  Moreover, any company may drop out at any time without penalty.  It is therefore difficult to predict or estimate with any accuracy what, if any, share of sales DoubleClick's Ad Exchange might account for in the future.  Based on the current state of development, DoubleClick does not expect to launch the ad exchange commercially until the first half of 2008, and there is no guarantee that it will ever be commercially viable.

The Ad Exchange still lacks many of the core features and functionalities of existing ad exchanges, including bid rules, trafficking tools, and workflow improvements. As it currently lacks an application programming interface (API), the Ad Exchange cannot interface directly with other ad management software.  Therefore, sell-side users must login to the Ad Exchange user interface and manually allocate inventory to the Exchange, while buy-side users must login and manually enter bids for inventory.  Reports must be viewed through the user interface and cannot be automatically integrated into campaign-wide reports. Ad Exchange lacks the ability to pace ads and enable advertisers to spread their media budgets over time. Absent these features, DoubleClick has encountered difficulties marketing the Ad Exchange in the U.S. against established exchanges, such as Yahoo!'s Right Media and Microsoft's AdECN, with proven abilities to serve and report on large impression volumes.

---

[55]    *See* pages 105-106 of the Form CO.

                                                                                                    GOOG-DOJ-01657229

The Ad Exchange technology also lacks several features that are unique, yet critical, to the EU marketplace. The product currently operates in English only and has not been localized for different EU countries to provide additional language capabilities. In addition, until DoubleClick is able to develop multi-currency support, Ad Exchange will remain unable to process bids in Euros, pounds or any other European currency; the exchange can record transactions in U.S. dollars only.

**B.     Even If Successfully Introduced, Ad Exchange Would Account For The Sale Of Only A Tiny Fraction Of Indirect Sales Of Online Ad Space**

Even if DoubleClick's Ad Exchange were successfully introduced, it would account for only a tiny proportion of ad space sold indirectly.

The parties' best, rough estimate of the size of the indirect sales channel in the EEA is about €2,206 million in 2006. Even with the assumption that the relevant market is limited to the indirect sales channels (which, as explained below, is incorrect), in 2006 Google had approximately an 11.3% share, and DoubleClick had a 0% share.[56] The Ad Exchange that DoubleClick is developing, even if successful, would account for the sale of only a tiny fraction of this segment in terms of impressions, and likely an even smaller fraction measured by revenue. To date, DoubleClick has signed just 15 potential participants in the EU, only 4 of which are publishers. Only 1 publisher out of Nielsen/NetRatings' top 50 websites has signed up to beta test the Ad Exchange in the EU.

In light of this sign-up rate, it is impossible to even hypothesize any correlation between DoubleClick's DFP customer base and the potential customer base of Ad Exchange. Indeed, as noted above, many DFP and DFA customers use established ad exchanges such as Right Media.

So far, in connection with its *beta* testing activities in the United States, DoubleClick's Ad Exchange transaction volume is only about 0.06% of the volume reportedly handled by the leading ad exchange, Yahoo!'s Right Media, which publicly stated in July 2007 that it was performing 145 to 150 *billion* transactions per month.[57] Other ad exchanges also reported transaction volumes many orders of magnitude greater than DoubleClick's Advertising Exchange. For example, DoubleClick's present transaction volume is about 0.2% of the 40 *billion* transactions per month reported for AdBrite.

Even when launched, DoubleClick is projecting only $2.3 million in revenue in the EU from the Ad Exchange for all of 2008 and only $18.3 million by the end of 2009. Such projected revenues are quite small and pale by comparison to the revenues generated by established ad exchanges and ad networks. DoubleClick projects its worldwide revenues for the Ad Exchange for 2008 will be approximately $13.6 million. In comparison, Right Media had $34.8 million in worldwide revenue in 2006[58] and is growing quickly[59] while AdBrite had about $20 million in

---

[56]    *See* Response to the Commission's Questionnaire of October 12, 2007, submitted October 15, 2007.

[57]    *See* Nanette Marcus, *Ad Exchanges at a Glance*, iMedia Connection, July 18, 2007, http://www.imediaconnection.com/content/15815.asp.

[58]    inc500, Right Media – Advertising & Marketing, inc5000 Article, http://www.inc.com/inc5000/2007/company-profile.html?id=200700430. EU-only figures are not publicly available.

worldwide revenue in 2006.[60]  Moreover, many ad networks also report revenue figures far greater than DoubleClick's projections for the Ad Exchange.  For example, ValueClick had European revenues alone of about $70 million in 2006, most of which can be attributed to ad network operations,[61] while Advertising.com had worldwide revenues of $455 million in 2006.[62]  Thus, to take just one example, *if* AOL's Advertising.com display ad network stays at its 2006 size in the year 2008 *and if* DoubleClick's Ad Exchange meets its 2008 revenue projection, DoubleClick's exchange will be *less than 3%* of the size of just this one display ad network.

Finally, it is essential to note that, at most, the Ad Exchange will be used for a small fraction of a publisher's inventory. It would not make sense (nor would it be feasible) to require any publisher who will participate in the Ad Exchange to commit to any form of exclusivity. As noted above, DoubleClick's proposed contracts with potential customers do not include any provisions for exclusivity for this obvious commercial reason.  Moreover, DoubleClick's Ad Exchange contracts provide that a customer may cancel at any time simply on written notice. DoubleClick's hope is that publishers might use its Ad Exchange to sell a fraction of their inventory, especially their lower value inventory that might otherwise go unsold.  Publishers participating in the Ad Exchange plainly will continue to sell their inventory through numerous channels, including directly (by their direct sales forces) and indirectly (through other ad networks [63] and/or ad exchanges).  The Ad Exchange is simply intended to provide publishers with one more way – one of many – for them to monetize their inventory, none of which are mutually exclusive.

In sum, DoubleClick's Ad Exchange, even if extremely successful, will account for the sale of only a tiny fraction of one percent of the indirect sales channel.  DoubleClick's Ad Exchange is not in any way uniquely positioned to provide any competitive constraint on existing ad exchanges and ad networks.

---

[59]   *See* Press Release, Right Media, Right Media Exchange Revenue Grows 81% in Six Months (February 28, 2007),  *available at*  http://www.rightmedia.com/content/right-media-exchange-revenue-grows-81-in-six-months/5,689.

[60]   Mark Walsh, *AdBrite Network Adopts Auction Model*, MediaPost Online Media Daily (Nov. 6, 2006), http://publications.mediapost.com/index.cfm?fuseaction=Articles.showArticleHomePage&art_aid=50672.  EU-only figures are not publicly available.

[61]   ValueClick, Inc., Annual Report (Form 10-K), at F-39 (Mar. 1, 2007).

[62]   Time Warner, Inc., Annual Report (From 10-K), at 99 (February 23, 2007).  (EU-only figures are not available).

[63]   Traditional ad networks report impression volume far higher than DoubleClick's Advertising Exchange. According to a February 2007 analyst report, over 100 billion impressions per month flowed through the top four ad networks, and the top 35 networks served a combined 240 billion ad impressions per month.  *See* Piper Jaffray, The User Revolution 280 (February 2007) (noting that Advertising.com had 40 billion monthly impressions, ValueClick had 24 billion, Casale Media Network had 20 billion, and Tribal Fusion had 17 billion).  DoubleClick's expected transaction volume simply pales relative to such volumes.

HIGHLY CONFIDENTIAL