# Plaintiffs' Exhibit 98

# In the Matter Of:

*United States vs*

*Google*

## KENNETH MARCO HARDIE

## November 14, 2023



Case 1:23-cv-00108-LMB-JFA   Document 1194-15   Filed 08/22/24   Page 3 of 13 PageID#
88163
United States v.
Google
Kenneth Marco Hardie
November 14, 2023

Page 6

```
 1            KENNETH MARCO HARDIE
 2    having been duly sworn, testified as follows:
 3                   EXAMINATION
 4   BY MS. CLEMONS:
 5       Q.   Okay.  Mr. Hardie, I'm Katherine
 6   Clemons.  We met off the record, but I will
 7   introduce myself, for the record.
 8            I'm an attorney with the United
 9   States antitrust division.
10            Can you please state and spell your
11   full name for the record?
12       A.   Sure.  Kenneth Marco Hardie,
13   K-e-n-n-e-t-h, M-a-r-c-o, H-a-r-d-i-e.
14       Q.   And Mr. Hardie, do you go by Marco?
15       A.   Yes.
16       Q.   And are you currently working at
17   Google, LLC?
18       A.   Yes.
19       Q.   What is your position with Google?
20       A.   My title is head of industry.
21       Q.   What does that mean, head of
22   industry?
```

Page 7

```
 1       A.   I lead the sales team associated
 2   with Google, specifically government and
 3   advocacy, within the government advocacy
 4   protocol.
 5       Q.   And is that specific to Google's
 6   ad's business or all Google products?
 7       A.   It is specific to Google's ad
 8   business.
 9       Q.   Okay.
10       A.   So within that search video and
11   then the display.
12       Q.   So is the industry the government
13   industry or what is industry referring to in
14   your title, if you know?
15       A.   It is referring to the industry,
16   itself, like there are a number of heads of
17   industry across Google, and it pertains to the
18   specific what we would call vertical, that they
19   work in, that's how we would define it or how we
20   would use the term, which is the various
21   industries that we serve.
22       Q.   And what is the vertical that you
```

Page 8

```
 1   are the head of industry for?
 2       A.   I work within the government and
 3   advocacy vertical.
 4       Q.   Okay.  And you said you lead the
 5   sales team for Google's products to government,
 6   and I don't know what advocacy is, but to
 7   government clients?
 8       A.   Primarily government clients, yes,
 9   I lead a sales team.
10       Q.   Okay.  Are there other people who
11   lead sales teams, selling Google's advertising
12   products to government clients?
13       A.   Yes.
14       Q.   Who are those other people at
15   Google?
16       A.   Can -- rephrase the question again
17   so I -- I'm trying to understand the universe of
18   people you're asking for.
19       Q.   Yeah, you had mentioned that you
20   lead a sales team.
21       A.   Yes.
22       Q.   Are there other sales teams, led by
```

Page 9

```
 1   other people, within that government and
 2   advocacy vertical?
 3       A.   Yes.
 4       Q.   And who leads those sales teams?
 5       A.   They would be other heads of
 6   industry.
 7       Q.   Okay.  And what would other heads
 8   of industry be doing, that is different from
 9   what you and your sales team do?
10       A.   They essentially do the same thing.
11   The difference would be the particular industry
12   they serve.
13            And so within government and
14   advocacy, for example, that covers the United
15   States government, that covers major
16   non-profits, it covers election advertisers.
17            So my other colleagues within
18   government advocacy represent different elements
19   of those, of the public sector.
20       Q.   Okay.  So yours, your
21   responsibilities for your sales team, are the
22   United States government, major non-profits, and
```

## Page 62

1  federal agency advertiser purchases?
2       A.   Yes.  I mean, when we're talking
3  about metrics I am generally thinking about
4  campaign metrics or media metrics, and so
5  there's a distinction.  There's definitely a
6  distinction between revenue and campaign metrics
7  or media metrics.
8       Q.   And are those two terms
9  interchangeable for you, campaign metrics and
10 media metrics?
11      A.   They can be, but not necessarily.
12      Q.   Okay.  What do you mean by campaign
13 metrics?
14      A.   So a campaign metric can be
15 associated with a specific campaign.  Whereas, I
16 say a media metric, I am tending to think a
17 little bit more broadly.  So there may be one --
18 you know, let's say, for example, the -- the
19 census may have a number of campaigns running,
20 so we may care about -- and each of those
21 campaigns may have a different goal, right?
22      Q.   Okay.

## Page 63

1       A.   So one goal could be -- it could be
2  related to, you know, reaching a certain type of
3  person versus another type of person, so that is
4  a campaign metric and they will have very
5  specific campaign metrics versus how is this
6  performing, versus a media metric is are we
7  helping them meet their overarching goal, to
8  carry the census example, how many census
9  startups are we driving?
10           So ultimately there is a difference
11 in the type of metric, that there are campaign
12 metrics and there could be broader business
13 metrics, there's a distinction.
14      Q.   Okay.  And is -- does Google seek
15 that either campaign metrics or business metrics
16 or media metric information in order to better
17 support the -- the federal agency advertiser in
18 its campaigns?
19      A.   Yes, absolutely, so campaign
20 metrics and media metrics are -- ultimately we
21 spend more time kind of probably focused on
22 those than the revenue metric, because revenue

## Page 64

1  is a lagging indicator for us helping them reach
2  their goals.
3       Q.   Okay.  Do you have any estimate of
4  about how much of your team members' time is
5  spent supporting the federal agency advertisers
6  as opposed to the other advertiser accounts in
7  their portfolio?
8            MR. RYBNICEK:  Objection to the --
9  objection to form.
10      A.   Broadly, but not within my -- very
11 broadly.
12      Q.   What is your broad estimate?
13      A.   And currently, I would say
14 currently, because, again, over the course of my
15 career with Google who is spending money when
16 and what time obviously can vary.
17           Currently, I would say they
18 probably spend two-thirds of their time on US
19 government advertisers.
20      Q.   Okay.  Is that your entire team or
21 just the two that we talked about, that are
22 supporting I believe it was USPS?

## Page 65

1       A.   Broadly, my entire team.
2       Q.   Okay.  Do the other team members,
3  other than Megan and Jill, also help support
4  USPS and its -- and Veteran's Affairs and census
5  on your team?
6       A.   Yes.  So an account manager and an
7  account executive would work on the specific
8  advertiser.
9       Q.   Okay.  And do you think that the --
10 that two-thirds estimate is the same for Sean's
11 team?
12      A.   No.  They probably spend a little
13 bit more time, just because their -- parts of
14 their business are a little bit more
15 consolidated; that said, within the public
16 health space they serve a lot of non-US
17 government clients, as well.
18           And so I -- I -- I couldn't begin
19 to say how much time exactly they spend or
20 wouldn't feel comfortable saying exactly how
21 much time they spend, but I would surmise that
22 they are spending a significant amount of time

Case 1:23-cv-00108-LMB-JFA   Document 1194-15   Filed 08/22/24   Page 5 of 13 PageID# 88165

United States vs. Google | Kenneth Marco Hardie
November 14, 2023

Page 66

1  as well, covering those areas.
2          MS. CLEMONS:  Okay.  We've been
3  going about an hour, I don't know if you want to
4  take a break?  I'm happy to keep going.
5          MR. RYBNICEK:  Do you?
6          THE WITNESS:  Yeah.
7          THE VIDEOGRAPHER:  Off the record.
8          The time is 3:08.
9          (Recess.)
10         THE VIDEOGRAPHER:  On the record.
11         The time is 3:24.
12 BY MS. CLEMONS:
13     Q.  All right.  We are back from break.
14         Mr. Hardie, did you have any
15 discussions with your counsel while we were on
16 break?
17     A.  Yes.
18     Q.  And did you discuss the -- the
19 substance of your testimony or any of the
20 testimony that you've given so far today?
21     A.  Broadly.
22     Q.  Okay.  What did you discuss with

Page 67

1  your counsel during the break about the
2  testimony that you've given, broadly?
3      A.  Doing a good job.
4          MR. RYBNICEK:  Objection,
5  objection, ask you -- instruct you not to answer
6  to the extent it would reveal communications
7  with attorneys, your attorneys.
8  BY MS. CLEMONS:
9      Q.  First of all, are you going to take
10 the instruction of your counsel?
11     A.  Yes.
12     Q.  Did your attorneys tell you --
13 get -- provide you any information or talk to
14 you about specific testimony that you gave or
15 testimony that you should give?
16     A.  No.
17     Q.  Okay.  Okay.
18         A couple of things, before we went
19 on break I think at one point you had mentioned
20 that sales connect was, like, a CRM platform?
21     A.  Mm-hmm.
22     Q.  By CRM are you referring to

Page 68

1  customer relationship management?
2      A.  Yes.
3      Q.  Okay.  Do you -- do you, your team
4  or Mr. Harrison's team, track any information
5  about the federal agency advertisers outside of
6  sales connect?
7      A.  No.
8      Q.  Okay.  You don't have any, like,
9  Excel trackers that you're keeping?
10     A.  Oh, no, there could be -- there
11 could be an Excel tracker for various things.
12     Q.  Okay.  Do you -- can you think of
13 any examples of Excel trackers that you keep
14 related to the federal agency advertisers?
15     A.  Most of the time our internal
16 trackers are, like, related to our work.
17 There's more of a dashboard I can use as an
18 example, on the census we were keeping track of
19 their, like, search impression data, so search
20 impression -- not search impression data, search
21 impression chair, because they had a goal of
22 north of 90 percent impression chair.  So we

Page 69

1  were making sure we were, like, tracking and
2  hitting those types of things.  So that might be
3  an example of something where -- but it's not
4  tracking revenue, if that's the question.
5      Q.  Okay.  For the other metrics, the
6  campaign metrics or the business metrics we
7  talked about before, are those being tracked in
8  sales connect or in some other system or
9  document?
10     A.  No, it is probably within Connect
11 Sales or Google Ads, I should say, if you're
12 talking about campaign metrics, Google Ads.
13     Q.  Okay.  So that is, like, a Google
14 Ads?
15     A.  It's the platform.
16     Q.  Okay.
17     A.  It is the platform, so if someone's
18 operating in the platform, wherever they are,
19 ads are being purchased, that is where campaign
20 performance is typically tracked.
21     Q.  Okay.  And are you running reports
22 out of the Google side of Google Ads?

United States vs.
Google
Case 1:23-cv-00108-LMB-JFA   Document 1194-15   Filed 08/22/24   Page 6 of 13 PageID#
88166
Kenneth Mario Hardie
November 14, 2023

Page 78

1  the eight federal agency advertisers?
2      A.   I believe she worked on the army.
3  She did some stuff on the census.
4      Q.   Okay.  Does your team produce up or
5  out any periodic reports or presentations to
6  you, whether your supervisors or other -- other
7  teams at Google in the ad space?
8      A.   When you say present up or out
9  reports, like, what do you mean?
10     Q.   Yeah, so is your team reporting out
11 to other parts of -- of Google on the
12 performance of your client accounts, for
13 example?
14     A.   When you say:  Other parts of
15 Google, I mean, there's our natural reporting
16 chains to my director.  I might have, obviously,
17 a conversation with my director on how things
18 are going and potentially, at periodic times,
19 like, our VP.
20          But in terms of out to other parts
21 of Google, related to the performance of
22 campaigns, broadly, no.

Page 79

1      Q.   Okay.  What about the -- the Google
2  platform team?
3          MR. RYBNICEK:  Objection to form.
4      A.   It would be hard for me to say.  I
5  would presume, broadly, no, in terms of when you
6  say out, how are you defining out is really kind
7  of what --
8      Q.   Yeah, is your team creating any
9  sort of regular report or presentation to inform
10 other teams about how your accounts are doing?
11     A.   When you say other teams, what do
12 you mean?
13     Q.   So the Google platform team or the
14 billing and financial teams or other teams that
15 might interact with federal agency
16 advertisers --
17     A.   So again --
18     Q.   -- or the ad agencies?
19     A.   -- like, the billing and
20 advertising -- the billing team would never
21 interact with a federal agency employee, for
22 example.  So in that sense, no, if that is the

Page 80

1  question, the answer is no.
2      Q.   Okay.
3      A.   Because they don't do it.
4      Q.   But your team isn't having a
5  regular meeting with the platform team about
6  government accounts or anything like that?
7      A.   That -- I mean, again, technically,
8  in that sense, as other times -- for an example,
9  if I have my team meeting, and we're talking
10 about our accounts, could someone from, like,
11 the account executive, the programmatic account
12 executive that covers the accounts be present in
13 the meeting, of course, yes.
14          But I would not -- I would not
15 characterize it as, like, presenting out to
16 other areas of Google.  They are -- they sit
17 within kind of, like, the normal course of
18 business of how our team operates.
19     Q.   Okay.  Do you know who Tiffany
20 Miller is?
21     A.   I do.
22     Q.   Who is Tiffany Miller?

Page 81

1      A.   Tiffany Miller is the former
2  director for programmatic, within CG&E, which is
3  consumer government and entertainment, the
4  sector we sit.
5      Q.   And was that -- is that a part of
6  your team or a different head of industries?
7      A.   So that is even broader, right?  If
8  we kind of go back to I manage a government
9  team, that sits within the government and
10 advocacy vertical, the government and advocacy
11 vertical sits within the CG&E sector, which is
12 consumer government entertainment.
13     Q.   Okay.  Did you do any work on the
14 decennial census campaign for the 2020 census?
15     A.   Yes.
16     Q.   What was your role with respect to
17 the census campaign?
18     A.   My role was to lead the ads effort
19 for Google.
20     Q.   Okay.  And what did that entail?
21     A.   That entailed leading the team,
22 that entailed working with the myriad of ad

Case 1:23-cv-00108-LMB-JFA   Document 1194-15   Filed 08/22/24   Page 7 of 13 PageID#
88167

United States v.
Google

Kenneth Mauro Hardie
November 14, 2023

Page 82

1  agencies responsible for the census.  I mean,
2  the simplest, my goal was to help us be a good
3  partner to the advertising agencies that were
4  responsible for executing the census.
5       Q.   Okay.  And were you also trying to
6  be a good platform partner or vendor for the
7  census?
8       A.   I mean, ultimately, we want to do a
9  good job, and so we want the census to be happy
10 with the work that we're doing for them.
11      Q.   Do you recall there being any
12 issues, at any point, with the execution of the
13 census campaign in 2020?
14           MR. RYBNICEK:  Objection to form.
15      A.   The 2020 campaign is -- was, quite
16 possibly, the largest media campaign in the
17 history of government.  The census -- the 2020
18 census is, quite literally, outside of war, the
19 2020 census is the largest mobilization of the
20 US government.  So I can imagine there were
21 complications and issues along the way.
22      Q.   Realizing it's been several

Page 83

1  years --
2       A.   Yeah.
3       Q.   -- do you recall a time when the
4  wrong URL was white listed by Google's team and
5  it caused census's ads to go dark for a period
6  of a couple of days?
7       A.   I do not recall that.
8       Q.   Okay.  Do you know what a make good
9  is?
10      A.   Yes.
11      Q.   What is a make good?
12      A.   A make good is essentially a
13 credit, essentially an ad credit that can be
14 delivered.
15      Q.   Okay.  And what is the reason that
16 an ad credit would be delivered as a make good?
17      A.   It's very broad.
18      Q.   What are some examples of reasons
19 that a make good could be delivered?
20      A.   It can range from something not
21 running the way that it was supposed to, some
22 sort of bug that caused an issue, but it can

Page 84

1  range all the way to somebody at an ad agency
2  clicked the wrong thing and an ad didn't
3  surface.  There's a wide range of reasons why
4  someone could -- almost -- why that make good
5  should be issued.
6       Q.   Okay.  And is there an approval
7  process for make goods?
8       A.   Once it -- there are certain levels
9  associated with how large the make good is, that
10 would trigger certain levels of approval.
11      Q.   Okay.  And who would handle a
12 request for a make good from an advertiser, from
13 a federal agency advertiser at Google?
14      A.   So when you said -- again, when you
15 say a federal advertising agency advertiser
16 requesting a make good, very like -- very likely
17 would not be coming from the federal agency
18 advertiser, it would be coming from the
19 advertising agency, themselves, because the --
20 any make good would be going to the advertising
21 agency, because it is their account,
22 essentially, that is -- had some issue, and they

Page 85

1  would need something to be made good.
2       Q.   Right.  But are they -- strike
3  that.
4            The ads that are being purchased --
5       A.   Mm-hmm.
6       Q.   -- are ads for the advertiser;
7  right?
8       A.   In theory, yes.
9       Q.   Okay.  So we're talking about
10 situations where an advertiser is -- is
11 purchasing ads through Google platforms through
12 their ad agency?
13           MR. RYBNICEK:  Objection to form.
14      A.   Yeah, I mean, like, the advertising
15 agency is purchasing the ads.  And, in
16 particular, we were talking about the census,
17 especially, but there is an advertising agency
18 that owns that seat, for lack of a better word,
19 that owns that -- that ads -- that GMP placed in
20 order to buy ads.  So that make good would quite
21 literally go to them, in theory, that could go
22 to them, and we don't know where it goes after

Page 106

1    A.   We didn't get into -- we weren't
2    going -- we weren't going -- if your question is
3    we were not going through this level of detail
4    in terms of individual GMP contracts.
5         MR. RYBNICEK:  Counsel, we're going
6    to object, because I don't think the topic calls
7    for a legal understanding of the terms effect.
8    He was prepared on -- in understanding what
9    contracts exist and what terms are contained in
10   them.
11        Asking questions about what the
12   legal effect of terms are goes beyond the scope
13   of the topics in the 30(b)(6) notice.
14        MS. CLEMONS:  Can we go off the
15   record?
16        THE VIDEOGRAPHER:  Off the record.
17        The time is 4:06.
18        (Recess.)
19        THE VIDEOGRAPHER:  On the record.
20        The time is 4:08.
21   BY MS. CLEMONS:
22        Q.   Mr. Hardie, did you discuss any

Page 107

1    other contract terms, besides the -- did you
2    prepare to testify as to any other contract
3    terms, besides the -- which platforms the ad
4    agencies have agreements with respect to?
5         A.   I would not characterize my prep as
6    focused on specific contract terms.
7         Q.   Okay.  So do you know what the
8    platform fees are for DV360 for the federal
9    agency advertisers?
10        A.   So in this case, there wouldn't be
11   plays and fees, agency platform fees specific
12   for the advertiser, because the advertising
13   agency is who has the seat or who has the
14   contract with Google.
15        And many times, like, again, to
16   example we use with Google is a massive
17   conglomerate of agencies, which does billions of
18   dollars with revenue through GMP across many,
19   many clients over the course of, you know, a
20   year, and so I -- I would -- I cannot speak to
21   what volume discounts each holding company would
22   have, so I -- I don't -- I don't know.

Page 108

1         Q.   Okay.  Do you know whether there
2    are any contracts with advertising agencies that
3    are specific to particular advertisers,
4    particularly federal agency advertisers?
5         A.   Can you repeat the question or
6    rephrase the question?
7         Q.   Does Google have any contracts with
8    advertising agencies that are specific to a
9    particular advertiser?
10        A.   Current contracts, I'm not -- I
11   can't say for sure.
12        Q.   Do you know if Google had any
13   contracts with advertising agencies related to
14   the 2020 decennial census campaign?
15        A.   Yes.
16        Q.   Were they specific to census?
17        A.   There were specific parts of GMP
18   contracts that were related to census.
19        Q.   What specific parts of GMP
20   contracts were related to census?
21        A.   So the census, itself, was, again,
22   as we've talked about earlier, an incredibly

Page 109

1    large and complicated campaign.  There were at
2    least eight media agencies buying media, and
3    they were all doing it through -- the plan was
4    for them to do it through the Wave Maker Seat,
5    which is one the agencies there.  And the only
6    way that we could -- or the campaign, itself,
7    could effectively be managed was if it was all
8    bought through the Wave Maker Seat.
9         That is not normal practice,
10   because normally multiple advertising agencies
11   aren't working on the same campaign in that way.
12   And so there were certain things that we had to
13   do or that Google had to do in order to allow
14   the census agencies, the advertising agencies,
15   to be able to operate within -- within that
16   instance to execute the campaign.
17        Q.   Okay.  So in that case, in the case
18   of the census 2020 campaign --
19        A.   Mm-hmm.
20        Q.   -- Google executed specific
21   contracts with Wave Maker and other advertising
22   agencies that only governed purchases related to

Case 1:23-cv-00108-LMB-JFA   Document 1194-15   Filed 08/22/24   Page 9 of 13 PageID# 88169

United States vs. Google · Kenneth Marco Hardie · November 14, 2023

## Page 110

1  the 2020 census campaign; is that right?
2  A.  Yes, because there was no other
3  way -- no other feasible way for the campaign to
4  run.  It was such a unique and bespoke example,
5  that the normal processes would not have been
6  able to -- would not have been feasible in order
7  to make the campaign actually run.
8  Q.  Okay.  Are you aware of any other
9  federal agency advertisers that have had
10 specific mention in advertising agency contracts
11 with Google?
12 A.  Say that again.
13 Q.  Are you aware of any federal agency
14 advertisers -- strike that.
15     Are you aware of any contracts that
16 Google has with ad agencies, other than the one
17 for the census, that are specific to a
18 particular advertiser?
19 A.  I'm not aware.
20 MS. CLEMONS:  Okay.  Do -- all
21 right.  I think we're going to take a short
22 break, and then we'll come back on the record

## Page 111

1  and finish up.
2  THE VIDEOGRAPHER:  Off the record.
3  The time is 4:13.
4  (Recess.)
5  THE VIDEOGRAPHER:  On the record.
6  The time is 4:25.
7  BY MS. CLEMONS:
8  Q.  Okay.  Mr. Hardie, I just have a
9  couple more quick questions for you.
10 A.  Okay.
11 Q.  Maybe more than a couple, but do
12 you know who Erin Corkins is?
13 A.  That name sounds familiar.
14 Q.  Okay.  Do you know if she works
15 with Anthony Altimari or in that group?
16 A.  I don't believe she actually works
17 with Anthony Altimari --
18 Q.  Okay.
19 A.  -- if I remember correctly.
20 Q.  Okay.  Do you know what a DVIP is?
21 A.  Yes.
22 Q.  What is that?

## Page 112

1  A.  Display and video incentive
2  program.
3  Q.  And, briefly, what is a -- what is
4  the display and video incentive program?
5  A.  It is essentially a volume discount
6  for a certain level of display and video spend.
7  Q.  Okay.  And is that volume discount
8  for an ad agency broadly or for a specific
9  advertiser?
10 A.  It actually could be both or
11 either, I should say.
12 Q.  Are you aware of any DVIPs that are
13 specific to federal agency advertisers?
14 MR. RYBNICEK:  Objection to form.
15 A.  There have been DVIPs on behalf of
16 federal agencies before.
17 Q.  Do you recall any specific ones in
18 the past five years?
19 A.  Veteran's Affairs.
20 Q.  Okay.  So there was a specific
21 display and video incentive plan for Veteran's
22 Affairs?

## Page 113

1  A.  Yes.
2  Q.  Okay.  Was that signed by Veteran's
3  Affairs or by their ad agency?
4  A.  It was signed by Reingold.
5  Q.  Okay.  DV360 -- I'm sorry to jump
6  around here -- is DV360, does that include
7  YouTube Select?
8  A.  YouTube Select is the most premium
9  inventory on YouTube.  YouTube can be bought
10 through DV360, so kind of translative property
11 there, you can buy YouTube Select DV.
12 Q.  Okay.  So it can include YouTube
13 Select?
14 A.  Yes, it can.
15 Q.  Or folks can buy YouTube Select
16 through other --
17 A.  You can buy YouTube Select directly
18 through Google Ads.
19 Q.  Okay.  Are you familiar with GMP
20 order forms?
21 A.  Specific order forms?
22 Q.  Or just the concept of Google

Case 1:23-cv-00108-LMB-JFA   Document 1194-15   Filed 08/22/24   Page 10 of 13 PageID# 88170

United States vs. Google — Kenneth Marc Hardie — November 14, 2023

## Page 114

1  Marketing Platform order forms?
2      A.  Broadly.
3      Q.  Do you know if those order forms
4  are specific to a particular advertiser with an
5  ad agency or just the ad agency, broadly?
6      A.  I know that they could be specific
7  to an advertiser, an advertiser specifically.
8  But in terms of the various machinations and
9  platforms that they could take, I couldn't say
10 for sure.
11     Q.  Okay.  Are you familiar with
12 insertion orders?
13     A.  Yes.
14     Q.  Do you know if those are specific
15 to particular advertisers?
16     A.  Those are usually an IO level that
17 usually specific to a campaign.  So then if it's
18 specific to a campaign, therefore, it would
19 naturally be specific to a particular
20 advertiser.
21     Q.  What is an insertion order?
22     A.  It's basically like an order form,

## Page 115

1  it's, like, an order for ads to be placed.
2      Q.  Okay.  Do you know what a joint
3  business plan is?
4      A.  Yes.
5      Q.  Do you sometimes abbreviate that
6  JBP?
7      A.  Yes.
8      Q.  What is a joint business plan?
9      A.  It is a non-binding broad agreement
10 on how we might work with an advertising agency
11 on behalf of the ultimate advertiser over the
12 course of a given period.
13     Q.  Are there joint business plans in
14 place for the federal agency advertisers?
15     A.  Not all federal agency advertisers
16 would have a joint business plan, but most
17 larger government federal agencies would have a
18 joint business plan associated with them, to be
19 clear, it would not be with the federal agency,
20 themselves, it's probably, again, it's a matter
21 of, like, how we work.
22     Q.  Right.

## Page 116

1      A.  So in colloquial terms, it is kind
2  of like the agreement we are going to work with
3  this advertising agency on this ad over the
4  course of the next year, and here's
5  strategically what we are going to agree what
6  are the things we're trying to do and how are we
7  going to work.
8      Q.  Okay.  Who maintains the joint
9  business plans for the federal agency
10 advertisers to have them?
11     A.  When you mean maintain what do you
12 mean?
13     Q.  What group at Google is responsible
14 for creating and overseeing the joint business
15 plans?
16     A.  It would be the sales team.
17     Q.  So your team?
18     A.  Yes.
19     Q.  With respect to yours, and Sean
20 Harrison's team with respect to the other four?
21     A.  Correct.
22     Q.  Okay.  Where are those stored at

## Page 117

1  Google?
2      A.  There isn't necessarily a specific
3  place, per se.  Again, they are -- they are,
4  broadly, informal documents.  And so they just
5  live in Google drive or, you know, we'll have --
6  maybe have a dashboard, as a team, but where --
7  not even a dashboard but, like, a drive folder.
8      Q.  Okay.  Do you have an understanding
9  of whether your team's Google drive folders were
10 produced in this litigation?
11     A.  No.
12     Q.  Okay.  With respect to your
13 personal e-mail practices --
14     A.  Mm-hmm.
15     Q.  -- do you typically communicate
16 internally and externally via e-mail?
17     A.  Typically?  So internally and
18 externally are two different things.
19 Internally, primarily, I -- I -- I wouldn't say
20 primarily, I guess primarily, technically.  I
21 mean, how we -- how we defining primarily?
22     Q.  How many -- how many e-mails would

Case 1:23-cv-00108-LMB-JFA   Document 1194-15   Filed 08/22/24   Page 11 of 13 PageID# 88171

United States vs. Google — Kenneth Marco Hardie — November 14, 2023

Page 126

1    MR. RYBNICEK:  Thank you.
2    **THE WITNESS:  Thank you.**
3    THE VIDEOGRAPHER:  This concludes
4  today's deposition.
5        We are off the record at 4:42.
6        (Signature having not been waived,
7  the deposition of KENNETH MARCO HARDIE was
8  concluded at 4:42 p.m.)
9        ACKNOWLEDGMENT OF DEPONENT
10       I, KENNETH MARCO HARDIE, do hereby
11 acknowledge that I have read and examined the
12 foregoing testimony, and the same is a true,
13 correct and complete transcription of the
14 testimony given by me and any corrections appear
15 on the attached Errata sheet signed by me.
16
17 _____        _____
18    (DATE)                  (SIGNATURE)

Page 127

1    CERTIFICATE OF SHORTHAND REPORTER
2        I, Cassandra E. Ellis, Registered
3  Professional Reporter, the officer before whom
4  the foregoing proceedings were taken, do hereby
5  certify that the foregoing transcript is a true
6  and correct record of the proceedings; that said
7  proceedings were taken by me stenographically
8  and thereafter reduced to typewriting under my
9  supervision; and that I am neither counsel for,
10 related to, nor employed by any of the parties
11 to this case and have no interest, financial or
12 otherwise, in its outcome.
13       IN WITNESS WHEREOF, I have hereunto
14 set my hand this 15th day of November 2023.
15
16
17 *Cassandra E. Ellis*
18 _____
19 CASSANDRA E. ELLIS, CSR-CA #14448, CCR-WA #3484,
20       CSR-HI #475, RPR, RMR, RDR,
21       CRR, REALTIME SYSTEMS
22       ADMINISTRATOR #823848

Page 128

1    E R R A T A   S H E E T
2    IN RE:  UNITED STATES OF AMERICA, v. GOOGLE,
3  LLC
4  RETURN BY: _____
5  PAGE    LINE    CORRECTION AND REASON
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20
21  _____   _____
22    (DATE)            (SIGNATURE)

Page 129

1    E R R A T A   S H E E T   C O N T I N U E D
2    IN RE:  UNITED STATES OF AMERICA, v. GOOGLE,
3  LLC
4  RETURN BY: _____
5  PAGE    LINE    CORRECTION AND REASON
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20
21  _____   _____
22    (DATE)            (SIGNATURE)

**HIGHLY CONFIDENTIAL**

# ERRATA SHEET FOR THE TRANSCRIPT OF M. HARDIE

Case Name: *United States et al. v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.)

Dep. Date: November 14, 2023

Deponent: K. Marco Hardie

| Page | Line | Correction | Reason for Correction |
|---|---|---|---|
| 16 | 7 | The phrase "other similar" should read "other civil" | Transcription error |
| 18 | 7 | The phrase "Have you spoken to anyone" should read "Have you met or spoken with anyone" | Transcription error |
| 21 | 16-17 | The phrase "military base" should read "military business" | Transcription error |
| 33 | 18 | The phrase "the US government client" should read " a US government client" | Transcription error |
| 40 | 14 | The phrase "centennial" should read "decennial" | Transcription error |
| 41 | 21 | The phrase "Michelle Henke" should read "Michelle Hinkes" | Transcription error |
| 48 | 10 | The phrase "advertiser products" should read "advertising products" | Transcription error |
| 54-55 | 22-1 | The phrase "with federal eight" should read "with federal agencies" | Transcription error |
| 55 | 16-17 | The phrase "Google-to-marketing platform team" should read "Google Marketing Platform team" | Transcription error |
| 68 | 20-21 | The phrase "search impression chair" should read "search impression share" | Transcription error |
| 68 | 22 | The phrase "90 percent impression chair" should read "90 percent impression share" | Transcription error |
| 71 | 7 | The phrase "if the campaign is running" needs to be inserted after "that is broadly meaning" | Transcription error |
| 71 | 7-8 | The phrase "if there's ads being run" should read "and there's ads being run" | Transcription error |
| 71 | 8 | The phrase "and data being generated" should read "and data being generated as a result" | Transcription error |
| 71 | 11 | The phrase "here's how my campaign is running" should read "here's how a campaign is running" | Transcription error |

1

**HIGHLY CONFIDENTIAL**

| 81 | 12 | The phrase "consumer government entertainment" should read "consumer government and entertainment" | Transcription error |
| --- | --- | --- | --- |
| 84 | 3 | The phrase "surface" should read "serve" | Transcription error |
| 88 | 10 | The phrase "amount of money and other vendors" should read "amount of money with other vendors" | Transcription error |
| 107 | 10-11 | The phrase "there wouldn't be plays and fees" should read "there wouldn't be platform fees" | Transcription error |
| 116 | 3 | The phrase "on this ad" should read "on behalf of this advertiser" | Transcription error |

I have inspected and read my deposition and have listed all changes and corrections above, along with my reasons therefore.

Date: <u>January 3, 2024</u>   Signature: <u>*/s/ K. Marco Hardie*</u>

2