# Plaintiffs' Exhibit 182

# In the Matter Of:

## United States of America v Google, LLC

## JUDITH CHEVALIER, PH.D.

## March 05, 2024



Case 1:23-cv-00108-LMB-JFA   Document 1200-18   Filed 08/22/24   Page 3 of 7 PageID# 88719

United States of America v.
Google, LLC

Highly Confidential

Judith Chevalier, Ph.D.
March 05, 2024

Page 254

1  about those -- those fees, we
2  have to think about -- we have to
3  apportion them.
4       So apportionment is
5  required of fees directly or
6  indirectly paid that -- looking
7  at apportionment or thinking
8  about apportionment is an input
9  for any fees along this stack,
10 whether they are direct checks
11 written by the FAAs or indirect.
12 BY MS. CLEMONS:
13     Q.   So your apportionment
14 criticisms would differ if an FAA wrote a
15 check to Google instead of to its ad
16 agency?
17          MR. JUSTUS:  Objection.
18     Form.
19          THE WITNESS:  Do you mean
20     if there was no ad agency in
21     between?
22 BY MS. CLEMONS:
23     Q.   No.  If the ad agency was
24 still involved in the exact same way, but

Page 255

1  the payment went from the FAA to Google
2  without going through the ad agency,
3  would your analysis of the -- of Simcoe's
4  apportionment analysis change?
5       A.   So my analysis of the
6  apportionment would not change --
7  would -- would -- I would still think
8  those fees need to be apportioned whether
9  the ad agency fees need to be considered
10 an apportionment, whether they are paid
11 separately from payments to Google or
12 together with payments to Google.
13     Q.   And very quickly.  How would
14 that affect whether the ad agencies
15 absorb any potential overcharge by AdX?
16     A.   So, again, my criticism of
17 Professor Simcoe and Dr. Respess is they
18 haven't undertaken an analysis of this,
19 despite agencies being a part of the
20 process and part of the costs of
21 purchasing AdTech products.
22          But my analysis of their --
23 my concerns with their apportionment
24 would be true whether -- no matter how

Page 256

1  the payments flowed.
2          MS. CLEMONS:  Okay.  We can
3     take a break.
4          THE VIDEOGRAPHER:  Going
5     off record.  The time is 1621.
6          (Short break.)
7          THE VIDEOGRAPHER:  Going
8     back on the record.  The time is
9     1647.
10 BY MS. CLEMONS:
11     Q.   Before we went on break,
12 Professor Chevalier, you had mentioned
13 that advertisers don't directly pay for
14 exchange services.
15          Do you recall that
16 testimony?
17     A.   Yes.
18     Q.   What is your assessment
19 based on, that advertisers don't directly
20 pay for exchange services?
21     A.   So advertisers, you know,
22 enter -- well, advertisers or their
23 agencies enter into contracts or
24 relationships with, you know, contract

Page 257

1  for the ad buying tools.  And then the ad
2  buying tools, when they submit bids to ad
3  buying tools, they're -- you know, they
4  will pay a fee for the use of those ad
5  buying tools.
6          And then the fee that's
7  being paid to the ad exchange is
8  subtracted from the bid so that the bid
9  is -- so that the publisher is -- you
10 know, the publisher is choosing between
11 bids.  But the publisher is the one who
12 enters into a contractual relationship
13 with the ad exchange.
14     Q.   So is your statement that
15 advertisers don't directly pay for
16 exchange services based on advertisers
17 not having a contract to pay for exchange
18 services?
19     A.   So the exchange services
20 are -- the exchange -- the exchange
21 services are deducted from the bid when
22 the bids are being, you know, evaluated
23 by the publisher.
24          And so, you know, I think

Case 1:23-cv-00108-LMB-JFA   Document 1200-18   Filed 08/22/24   Page 4 of 7 PageID# 88720
United States of America v.                                                        Judith Chevalier, Ph.D.
Google, LLC                           Highly Confidential                             March 05, 2024

Page 258

```
 1   that's the sense in which I mean that.
 2   Like, the advertiser pays kind of an
 3   explicit fee off the top for the ad
 4   buying tools, but the fee is deducted
 5   from the bid for the publisher.
 6       Q.   So does the publisher
 7   directly pay Google the AdX take rate?
 8       A.   So the -- if, for example, a
 9   publisher has a special deal with regard
10   to a take rate, that would be between the
11   publisher and the ad exchange.
12            And so in that sense, the --
13   in that sense, the publisher -- the
14   publisher pays.  The -- I mean, the fees
15   are deducted from the middle, and so the
16   actual, I think, as we know, incidence of
17   the fee depends on, you know, marketplace
18   dynamics.
19       Q.   So when the fees are
20   deducted from the middle --
21       A.   Mm-hmm.
22       Q.   -- where does the money come
23   from to cover Google's portion of the
24   revenue share?
```

Page 259

```
 1       A.   So we might want to stick
 2   with a situation in which the advertiser
 3   isn't paying on a cost-per-click basis,
 4   to start.  Just, I think, for ease of
 5   description.  But I mean, the -- the ad
 6   exchange fee is deducted from the -- is
 7   deducted from the bid.
 8            So, ultimately, both -- you
 9   know, ultimately, it may have incidence
10   on the advertiser and the publisher, but
11   it comes from the bid and is contracted
12   for by the publisher.
13       Q.   And who pays for the bid,
14   the winning bid, in an ad auction on AdX?
15       A.   So the -- well, the ad
16   buying tool pays the bid and the
17   advertiser pays the ad buying tool.
18       Q.   If the ad buying tool is a
19   Google ad buying tool, who pays the bid?
20       A.   So if the ad buying tool is
21   a Google ad buying tool -- well, the --
22   the bid is ultimately paid by the
23   advertiser or an agency, if an agency is
24   managing the transaction.
```

Page 260

```
 1       Q.   And then Google pays the
 2   contractually agreed upon revenue share
 3   out to the publisher, after it receives
 4   the winning bid from an advertiser,
 5   right?
 6       A.   No.  Google pays out the bid
 7   paid by the ad buying tool net, of the
 8   contractually agreed revenue share,
 9   before passing it on to the publisher.
10       Q.   Right.  So it pays the
11   portion of the total bid that is owed to
12   the publisher under the publisher's
13   contract with Google to share the revenue
14   from that bid, right?
15       A.   Yes.  It pays out the bid
16   net of the fee, and the fee is according
17   to the publisher's contract.
18       Q.   Okay.  And so when you said
19   advertisers don't directly pay for
20   exchange services, were you referring --
21   strike that.
22            When you said advertisers
23   don't directly pay for exchange services,
24   who were you thinking, in the scenario we
```

Page 261

```
 1   just discussed, does directly pay Google
 2   for exchange services?
 3       A.   So the ad buying tool is
 4   typically the step in the chain before
 5   the exchange services.
 6       Q.   And when Google owns the ad
 7   buying tool, does it pay itself?
 8       A.   So my understanding is that,
 9   for example, for a DV360 to AdX
10   transaction, effectively, yes, in that
11   that's the -- that kind of generates the
12   bookkeeping for both the -- for the
13   supply side.
14       Q.   But in any event, the fee
15   for exchange services comes out of the
16   winning bid in AdX; is that right?
17       A.   The fee for exchange
18   services comes out of the winning bid,
19   yes.
20       Q.   Did you, as part of your
21   work on this case, calculate a but-for
22   take rate for AdX?
23            MR. JUSTUS:  Objection.
24       Form.
```

Page 262

```
 1            THE WITNESS:  So as part of
 2       my work on this case, I
 3       calculated but-for take rates
 4       that I'm not affirmatively
 5       asserting are but-for take rates,
 6       but but-for take rates that are
 7       related to the methodologies put
 8       forth by -- or adjustments to the
 9       methodologies put forth by
10       Professor Simcoe.
11  BY MS. CLEMONS:
12       Q.   But you didn't do an
13  independent assessment of what a but-for
14  take rate would be in a world in which
15  Google's conduct were found to be in
16  violation of the antitrust laws, did you?
17            MR. JUSTUS:  Objection.
18       Form.
19            THE WITNESS:  So just to be
20       clear, the but-for take rates, as
21       I understand it, that I'm
22       adjusting Professor Simcoe's, are
23       but-for take rates not under the
24       assumption -- I mean, just to be
```

Page 263

```
 1  clear, are the but-for take rates
 2  that he's asserting in the
 3  circumstance in which the DFP,
 4  the so-called DFP-AdX tie and the
 5  Google Ads-AdX tie, are found to
 6  be illegal.
 7       So his -- his -- my
 8  understanding is that his but-for
 9  take rate is only under the --
10  only speaks to those two conducts
11  both being found to be illegal.
12       And then what he says about
13  UPR is a little bit
14  contradictory, but possibly also
15  UPR.
16       He asserts in his report
17  that his -- he asserts in his
18  initial report that he's looking
19  at those three conducts.
20       So I am responding only to
21  those -- you know, those
22  assertions.  And I'm calculating
23  take rates in circumstances, the
24  but-for take rates, that I assert
```

Page 264

```
 1       are improvements over his
 2       methodologies.
 3            But I'm not asserting that
 4       those are but-for take rates
 5       either for the specific conducts
 6       that he says he's evaluating or
 7       other conducts accused in this
 8       case more generally.
 9  BY MS. CLEMONS:
10       Q.   So do I understand correctly
11  that you are criticizing Professor
12  Simcoe's proffered but-for take rates,
13  but you have not offered an opinion of
14  your own as to what the correct but-for
15  take rate should be if Google's conduct,
16  the specific conduct that you mentioned,
17  is found to have been in violation of the
18  antitrust laws?
19            MR. JUSTUS:  Objection.
20       Form.
21            THE WITNESS:  Right.  So I
22       am offering opinions about better
23       calculations of but-for take
24       rates, and more appropriate
```

Page 265

```
 1       results with regard to but-for
 2       take rates.
 3            But I'm not asserting that
 4       I have identified a specific
 5       but-for take rate associated with
 6       the particular subset, the
 7       particular conducts that
 8       Professor Simcoe says he
 9       evaluates.
10  BY MS. CLEMONS:
11       Q.   And Dr. Respess and Ms. Lim
12  calculated an overcharge attributable to
13  AdX for the FAAs using Dr. Simcoe's
14  but-for take rates, right?
15       A.   So Dr. Respess calculates
16  AdX damages -- damages from -- sorry.
17  I'm just being hesitant because
18  Dr. Respess proposes two categories of
19  damages.
20            But the first category of
21  damages is damages that are based on the
22  but-for take rates proposed by two of the
23  but-for take rates proposed by Professor
24  Simcoe, as well as a 10 percent but-for
```

Case 1:23-cv-00108-LMB-JFA   Document 1200-18   Filed 08/22/24   Page 6 of 7 PageID# 88722

United States of America v.
Google, LLC

Highly Confidential

Judith Chevalier, Ph.D.
March 05, 2024

Page 326

1     A.   So, one -- one
2  characteristic that we could use to
3  assess that is, for example, the
4  interquartile range of the data, and his
5  analysis with the 100,000-advertiser
6  cutoff -- and my analysis actually has a
7  quite similar interquartile range.
8          But, yes, in general,
9  smaller sample sizes would lead to more
10 sampling error.
11         MS. CLEMONS:  Can we go off
12    the record?
13         MR. JUSTUS:  Sure.
14         THE VIDEOGRAPHER:  Going
15    off the record.  The time is
16    1845.
17         (Short break.)
18         THE VIDEOGRAPHER:  Going
19    back on the record.  The time is
20    1854.
21         MS. CLEMONS:  Thank you so
22    much for your time today,
23    Professor Chevalier.  I pass the
24    witness.

Page 327

1     MR. JUSTUS:  Nothing from
2  me.
3     MS. CLEMONS:  Go off the
4  record.
5     THE VIDEOGRAPHER:  This
6  marks the end of the deposition
7  of Judith Chevalier.
8     We're going off the record
9  at 1854.
10    **********
11    (Excused.)
12    (Deposition concluded at
13 approximately 6:54 p.m.)

Page 328

1
2                CERTIFICATE
3
4
5          I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
            It was requested before
8  completion of the deposition that the
   witness, JUDITH A. CHEVALIER, Ph.D., have
9  the opportunity to read and sign the
   deposition transcript.
10
11   *Michelle L Gray*
12
   MICHELLE L. GRAY,
13 A Registered Professional
   Reporter, Certified Shorthand
14 Reporter, Certified Realtime
   Reporter, Certified Court
15 Reporter and Notary Public
   Dated:  March 6, 2024
16
17
18         (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Page 329

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8          After doing so, please sign
9  the errata sheet and date it.
10         You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14         It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Case 1:23-cv-00108-LMB-JFA   Document 1200-18   Filed 08/22/24   Page 7 of 7 PageID# 88723

United States of America v.
Google, LLC

Highly Confidential

Judith Chevalier, Ph.D.
March 05, 2024

Page 330

```
 1            - - - - -
                 E R R A T A
 2            - - - - -
 3
 4   PAGE  LINE  CHANGE
 5   ____  ____  _____
 6      REASON:  _____
 7   ____  ____  _____
 8      REASON:  _____
 9   ____  ____  _____
10      REASON:  _____
11   ____  ____  _____
12      REASON:  _____
13   ____  ____  _____
14      REASON:  _____
15   ____  ____  _____
16      REASON:  _____
17   ____  ____  _____
18      REASON:  _____
19   ____  ____  _____
20      REASON:  _____
21   ____  ____  _____
22      REASON:  _____
23   ____  ____  _____
24      REASON:  _____
```

Page 332

```
 1            LAWYER'S NOTES
 2   PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```

Page 331

```
 1
 2         ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5   hereby certify that I have read the
 6   foregoing pages, 1 - 332, and that the
 7   same is a correct transcription of the
 8   answers given by me to the questions
 9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15     _____
16    JUDITH A. CHEVALIER, Ph.D.     DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
     _____
23   Notary Public
24
```