# Exhibit 9



```
                                                        6
 1                       C. LASALA
 2   off the record, but, again, my name is David
 3   Teslicko and I'm joined here today with my
 4   colleague, Kelly Garcia, and we are
 5   representing the United States of America in
 6   this matter.
 7              Can you please state your full
 8   name for the record again?
 9        A.    Yeah, Chris -- Christopher LaSala.
10        Q.    Mr. LaSala, are you represented by
11   counsel here today?
12        A.    I am.
13        Q.    Which counsel is that?
14        A.    The gentlemen to my right here,
15   Axinn and -- I'm forgetting it.  Joe and
16   Daniel.
17        Q.    Mr. LaSala, did you sign a
18   retention agreement with counsel that's
19   present here today?
20        A.    I believe that document was a
21   retention agreement.  Yeah, that's right.
22        Q.    And your understanding is that
23   they represent you in your individual
24   capacity today?
25        A.    Yes.  Yeah.
```

14

1                    C. LASALA

2   deposition, October 2020, you were the global

3   product lead or global strategy lead; is that

4   correct?

5        A.   Yes.

6        Q.   And it looks like, based on your

7   resume that we found, your official title was

8   managing director, global commercialization

9   for publisher advertising products; is that

10  correct?

11       A.   Yes.

12       Q.   And you held that title for the

13  period of 2013 through 2022?

14       A.   I don't recall, but it sounds

15  reasonable.

16       Q.   In that role, you and the team you

17  oversaw were responsible for taking feedback

18  from Google sales teams through the

19  go-to-market teams and bringing that to

20  Google's engineering teams and product teams?

21       A.   Yes.

22       Q.   In that role, how many times, on

23  average, did you meet with publishers each

24  year?

25       A.   Less frequently than -- I don't

```
 1                    C. LASALA
 2   know, five to ten, maybe.
 3        Q.   On average, how many times per
 4   year in that role did you meet with
 5   advertisers?
 6        A.   Hardly ever.  Maybe never.
 7        Q.   I think in your prior deposition,
 8   Mr. LaSala, you said you probably hadn't
 9   spoken to an advertiser in 15 years.
10             Does that still sound accurate?
11        A.   Probably, yeah.
12        Q.   You and your team were also
13   responsible for taking whatever Google's
14   product teams decide to build and bringing
15   that back to Google's sales team; is that
16   correct?
17        A.   That's correct.
18        Q.   Are you still in the managing
19   director of global commercialization for
20   publisher advertising products role?
21        A.   No, I'm not.
22        Q.   And when did you -- when did you
23   leave that role?
24        A.   I think officially, left Google on
25   January 15th of -- what is it, '01, '02?
```

16

                          C. LASALA

1
2              '02.  About a year and a half ago.
3         Q.   Okay.  So you left Google in
4    around January 15, 2022?
5         A.   I should know this, but it's been
6    that long -- I think it's been that long.  It
7    wasn't on LinkedIn.
8         Q.   Understood.
9              I think that's good enough, thank
10   you?
11        A.   Okay.
12        Q.   Why did you leave Google?
13        A.   I've always wanted to sort of
14   pivot my career into education and I -- it
15   was just a good opportunity to do so.  I
16   thought, you know, if not then -- if not now,
17   when, you know -- in my, you know, 50s,
18   and -- I don't know, COVID.  A lot going on
19   and I just thought life is too short.
20             And I have been an adjunct
21   professor at Duke University for five or six
22   years.  I was a -- I did some other things
23   with higher education, different schools, and
24   it was just time.  It was just time.
25        Q.   The opportunity that you just

```
                                                              385
 1                        C. LASALA
 2    simplify this business, all of which is, sort
 3    of, articulated here.
 4         Q.    You can put that document aside.
 5               I want to change topics quickly,
 6    Mr. LaSala.
 7               Am I correct that your e-mail
 8    address at Google is Chrisl@google.com?
 9         A.    Was.
10         Q.    Was.  Fair point.
11               Was that your work e-mail address
12    during your entire time at Google?
13         A.    Yeah, I think so.
14         Q.    Did you ever use any other e-mail
15    address to conduct business during your time
16    at Google?
17         A.    I don't think so, unless it was a
18    mistake.
19         Q.    Okay.  Without revealing the
20    substance of any communications with counsel,
21    did you receive a litigation hold in this
22    case?
23         A.    Like, when I was at Google?
24         Q.    Yes.
25         A.    Oh, yeah.
```

386

1                       C. LASALA

2       Q.   Okay.  Do you recall when?

3       A.   No.

4       Q.   Any idea if it was before or after
5  October of 2020?

6       A.   I don't remember at all.

7       Q.   Do you -- did you use Chats to
8  communicate with co-workers at Google?

9       A.   I did.

10      Q.   Okay.  Did you ever use Chats to
11 communicate with co-workers about any aspect
12 of Google's digital advertising business?

13      A.   Yeah.  I mean, I pretty much used
14 it all the time for a lot of things.

15      Q.   Okay.  Who did you talk to on
16 Chat?

17      A.   I mean, lots -- product managers.
18 I mean, lots -- everyone we worked with.

19      Q.   And was the substance of your
20 chats similar to the substance of your e-mail
21 discussions?

22      A.   It could have been.

23      Q.   Any difference in substance
24 between your e-mails and your chats?

25      A.   I don't know, but --

1                        C. LASALA

2        Q.    Is it fair to say you used Chat

3   and e-mail interchangeably to conduct

4   business at Google?

5        A.    Yeah, interchangeably.  The more

6   structured I thought something needed to be,

7   I would drop it into an e-mail or document.

8   And the more, I don't know, Chat was more,

9   like, quick hits type stuff, not like long.

10       Q.    Got it.

11             But you still had substantive

12  discussions in your Chats?

13       A.    I think that's fair.  I don't

14  remember them.  I'm just suggesting that I

15  used it a lot, so...

16       Q.    Did you take any steps to preserve

17  Chats since you received a litigation hold

18  for this case?

19       A.    Only after.  So you are asking a

20  question about, like -- during my time at

21  Google, had I used Chats.  So that's mostly

22  how I used Chat.

23             Then there was litigation hold,

24  and we actually had training.  And I'm

25  forgetting the details of the training, where

388

1               C. LASALA

2    it was suggested we should toggle Chat

3    between on the record and off the record or

4    something like that, when we are talking

5    about business opportunities.

6              So at that point I changed my

7    behavior, because that was, like,

8    logistically complicated.  So then I moved to

9    any business related things being in

10   meetings, e-mail, or documents, and then

11   Chat.

12             So the only time I would use this

13   on the records/off the record toggle is if

14   somebody chatted me, and I think I did it a

15   handful of times, and said some strategy

16   thing.  And I didn't even know how it worked.

17   I would, like, go on the record and then

18   suggest that we should, you know, have a

19   meeting.

20             So once I got guidance from

21   counsel, I just changed my behavior.  And

22   then Chat became, like, meeting schedules or

23   it was more just admin work.

24        Q.   When did you receive this training

25   from counsel?

1                      C. LASALA

2        A.    Consistent with when we were
3    getting litigation holds and --
4        Q.    So close in time to when you first
5    received a litigation hold?
6        A.    I don't remember the details,
7    but...
8        Q.    Do you recall if it was close in
9    time or months later?
10       A.    Close in time.  I mean, I vaguely
11   remember the e-mail saying that -- like,
12   writing it.  I don't know.
13       Q.    When you said you switched to
14   meetings and e-mails, when you refer to
15   meeting there, you mean, an in-person meeting
16   or a meeting technology?
17       A.    Like a Zoom call?
18       Q.    Is that what you are referring to
19   when you said meeting?
20       A.    Yeah, meeting, like, just meeting,
21   yeah.
22       Q.    Were you aware that the default
23   setting in a Chat group was history off?
24       A.    I was not.
25       Q.    And you first became aware of that

390

1                    C. LASALA
2  during the training?
3       A.    This whole thing, that's right.  I
4  pretty much operated under the assumption
5  that everything was being tracked.
6       Q.    What was your total compensation
7  from Google for the year 2022?
8       A.    I don't remember.
9       Q.    Approximately?
10      A.    A million dollars.
11      Q.    How about 2021?
12      A.    Less than that.
13      Q.    Close to a million dollars?
14      A.    Maybe.
15      Q.    Okay.  Does that include your
16 salary and bonus --
17      A.    Yes, everything, full
18 compensation.
19      Q.    Do you currently own any Google
20 stock?
21      A.    I do, yeah.
22      Q.    Approximately how much?
23      A.    I guess I have to answer that
24 question.
25            I think around 200,000.

```
                                                        415
 1                      C. LASALA

 2

 3         MR. MADDEN:  Can we take a

 4   five-minute break?  I'm done with --

 5         You can put the document aside.

 6         We can go off the record.

 7         THE VIDEOGRAPHER:  The time is

 8   4:54 p.m.  We are off the record.

 9         (Whereupon, at 4:54 p.m., the

10   Examination of this Witness was

11   adjourned.)

12

13

14       _____
               CHRIS LASALA
15
     Subscribed and sworn to before me
16   this _____ day of _____, 2023.

17   _____
            NOTARY PUBLIC
18

19

20

21

22

23

24

25
```