**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO
GOOGLE'S MOTION *IN LIMINE* TO EXCLUDE NON-PARTY LAY OPINIONS
REGARDING GOOGLE'S ALLEGED MONOPOLY OR ANTICOMPETITIVE
CONDUCT**

At trial, Plaintiffs will present testimony from market participants—including Google's own customers and competitors—who collectively have observed market dynamics in the relevant industry for decades. These market participants live and breathe the give-and-take of competition in the ad tech industry every day and are positioned as well or better than anyone else to testify to how Google's conduct has affected them. Plaintiffs will rely on that and much other evidence to establish Google's monopoly power and exclusionary conduct in the ad tech markets at issue here. Each witness will testify based on his or her own personal experiences and personal perception of their companies' business operations in the industry. Google seeks to prevent these witnesses from testifying based on a flawed interpretation of what lay witnesses can testify about, especially in an antitrust trial. The testimony from witnesses who purchase services from Google, sell products in the marketplace, and observe how Google operates is highly relevant and critical evidence of how competition operates in the markets at issue. Notwithstanding what Google may fear about these market participants speaking the truth about Google's conduct, all of this is testimony is not only admissible under the Federal Rules of Evidence but is also especially valuable testimony of people

1

who observe how competition (or lack thereof) plays out in the relevant markets. Google's motion is an extraordinary request to silence some of the very people who Google has harmed through its course of anticompetitive conduct and to limit this trial only to the views of expert witnesses and Google's own employees. Imposing such a one-sided limitation on the presentation of evidence in this matter would be contrary to the Rules of Evidence and would provide this Court with only a blinkered and insufficient view of the commercial and market realities of the ad tech industry.

The Court should reject Google's attempt to artificially constrain the proof in this case for three key reasons: *First*, opinion testimony "rationally based on the witness's perception" and "based on their first-hand experience on the job" falls well within the scope of permissible lay opinion. *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017), *as amended* (Mar. 7, 2017); *MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990); Fed. R. Evid. 701. *Second*, the views of market participants about how they conduct their businesses will be helpful to the Court, as factfinder, to determine the boundaries of the relevant markets in this case; the extent of Google's ability to control prices and competitors; the effects of Google's conduct on other ad tech providers' ability to compete; and whether Google's actions were taken without concern that its customers might go elsewhere—"something only a firm with monopoly power could do." *United States v. Google LLC*, No. 20-cv-3010 (APM), 2024 WL 3647498, at *75 (D.D.C. Aug. 5, 2024) (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001)). *Third,* this case will be tried to the Court, and live testimony will be subject to robust cross examination; the Court is well-equipped to "hear relevant evidence, weigh its probative value and reject any improper inferences." *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994).

A wholesale prohibition on the introduction of factual evidence from market participants, pre-trial, is unnecessary and inappropriate in these circumstances.

## BACKGROUND

In its motion, Google seeks to bar two types of lay testimony: (1) testimony from Google's publisher customers, and (2) testimony from Google's "competitors," who are also customers.

**A.  Google objects to the admission of testimony from its customers.**

Google takes issue with sworn statements of Google's own publisher customers, who use both Google's publisher ad server (DoubleClick for Publishers, or "DFP") and its ad exchange (AdX). These are experienced business executives whose jobs require careful monitoring of digital advertising revenue streams; strategic decision-making about how, when, and to whom to sell their digital advertising inventory; and oversight of complex contracts with providers of different ad tech tools. Among others, Google challenges testimony offered by executives from NewsCorp and Vox.[1]

**NewsCorp (Minkin)**. David Minkin, Vice President of Digital Operations and Client Success for NewsCorp, offers testimony based in his first-hand experiences over the course of twenty-four years of experience in the ad tech industry. Google Mot., Ex. I, David Minkin 30(b)(6) (NewsCorp) Dep. Tr. 199:15–20. In his current role, he oversees the programmatic sale of inventory. *Id.*, at 14:4-10. Mr. Minkin testified that Google's publisher ad server and Google's ad exchange are "dominant." Google Mem. at 12 (citing Google Mot., Ex. I, Dep. Tr. 189:19–190:4; 199:10–20). This view is based on information he obtained in his various roles involving sales and operations of digital advertising and his review of reports reflecting the sources of digital advertising revenue generated by NewsCorp. Google Mot., Ex. I, Dep. Tr. 198:18–199:20. When

---

[1] Google's motion suggests that the scope of Google's motion to exclude encompasses testimony from additional third-party publishers, even though many of these were not chosen for Google's "sample." *See* Google Mem. at 3.

asked, Mr. Minkin provided additional detail about these reports, explaining that NewsCorp's systems allow him to generate reports that reflect how much revenue is driven by each of the ad exchanges used by NewsCorp. *Id.*

**Vox (Pauley)**. Ryan Pauley, President of Revenue and Growth for Vox, has worked at Vox since 2011, has at least ten years of experience with programmatic display ads, and oversees a variety of the commercial aspects of Vox's business, including advertising. Google Mot., Ex. K , Ryan Pauley (Vox) Dep. Tr. 6:25–7:14, 8:22–25 (ECF No. 1164-12). Mr. Pauley testified that there is not "much competition at the scale that AdX is operating at for our business." Google Mot., Ex. K, Dep. Tr. 15:20–16:3. He also explained the foundation for this testimony: through negotiations that he managed, Vox tried to negotiate for lower take rates both from AdX and from smaller exchanges. Ex. W, Dep. Tr. 11:10–12:20.[2] Vox was able to successfully negotiate with smaller exchanges, because Vox had alternatives that it could turn to in order to replace their volume. Google Mot., Ex. K, Dep. Tr. 14:13–15:13. But Vox was unable to negotiate for a lower take rate from AdX. Ex. W, Dep. Tr. 12:8–15. AdX's accounting for a larger percentage of Vox's business, and being the largest exchange, meant that, according to Mr. Pauley, Vox did not have a reasonable alternative to working with AdX, reducing Vox's negotiation leverage. Ex. W, Dep. Tr. 12:21–15:13.

Mr. Pauley also testified that Google's Unified Pricing Rules (which prohibited publishers from setting different price minimums for different ad exchanges) seemed to limit the ability of third-party ad exchanges (sometimes referred to as Supply Side Platforms, or SSPs) to compete

---

[2] All exhibits hereto are excerpted to include only the relevant portions of transcripts that have been designated by a party in this case. Testimony that was not designated by either party has been extracted.

against AdX for Vox's business. Google Mot., Ex. K, Dep. Tr. 29:13–19. Mr. Pauley explained the basis for this testimony as well. Mr. Pauley stated that, in negotiations that he manages, Vox entered into agreements with other SSPs under which the other SSP would lower its take rate. Ex. W, Dep. Tr. 22:3–17. According to Mr. Pauley, UPR limited the revenue potential for those deals, Google Mot., Ex. K, Dep. Tr. 25:15–23, limiting their ability to compete for Vox's inventory, Google Mot., Ex. K, Dep. Tr. 30:11–31:10. Mr. Pauley also testified that UPR increased Vox's dependence on AdX, Google Mot., Ex. K, Dep. Tr. 28:17-24, and compounding the negotiation leverage problem described above.

### B.  Google objects to the admission of testimony from its "competitors."

Google casts third parties like AppNexus (Microsoft/Xandr), Equativ, Index Exchange, Magnite, Kargo, and OpenX as merely "competitors." However, these third-party ad exchanges are not just *competitors* of Google's ad exchange, AdX, they are also *customers* of Google's demand side platform, DV360, and reliant upon Google's publisher ad server, DFP, to reach their own publisher customers. These exchanges make business decisions based in part on their reliance on Google, on both sides of the ad tech stack, to reach publishers and advertisers. Regardless, their testimony about being unable to compete with Google's AdX is based on first-hand knowledge gathered on the job. Moreover, some third parties have tried—with varying degrees of success— to offer their customers a publisher ad server tool, and lay witnesses with first-hand experiences developing and marketing such a tool can attest to the impact Google's policies have had on their ability to develop and market alternatives or workarounds to Google's DFP.

**Microsoft/Xandr (John).** Ben John, Vice President of Engineering at Microsoft and formerly the Chief Technology Officer for Xandr (a Microsoft subsidiary), has worked at Xandr or its predecessor companies since 2013. Google Mot., Ex. H, Dep. Tr. 7:12–9:18. Xandr operates

5

a supply-side platform, and offered a competing ad server that had "no success" in the United States. Ex. N, Dep. Tr. 158:2–159:13. Mr. John testified that publishers' inability to access Google Ads demand, without also using Google's DFP, as well as the high costs to publishers of switching ad servers, meant that Xandr was unable to convince publishers to choose Xandr's ad server over DFP. Ex. N, Dep. Tr. 180:25–181:11. His views that DFP was not winning because it had the best product were based on his understanding of customer needs from his own involvement responding to publishers' requests for proposals ("RFPs") and meetings he had with specific publishers as part of Xandr's development of its own ad tech products. *See* Google Mot., Ex. H, Dep. Tr. 188:8–17; *see also* Ex. N, Dep. Tr. 180:25–181:11. Mr. John concluded from these first-hand experiences that it was "very difficult" for Xandr to compete with DFP. Google Mot., Ex. H, Dep. Tr. 183:13–184:5.

**Equativ (Creput).** Mr. Creput is the CEO of Equativ, a French company that operates an exchange and publisher ad server. Google Mot., Ex. D, Arnaud Creput 30(b)(1) (Equativ) Dep. Tr. 7:21–23 (ECF No. 1164-5). His main office is in Paris, and he has been CEO since 2018, and CFO since 2015. Google Mot., Ex. D., Dep. Tr. 7:24–8:3, 9:9–14. Among other things, Mr. Creput testified that Equativ attempted to compete with DFP in the publisher ad server business. *See* Ex. O, Dep. Tr. 16:23–19:2. Mr. Creput explained that Equativ did not lose clients based on issues relating to products, functionality, quality of service, or support. Ex. O, Dep. Tr. 26:16–23. Based on his personal perceptions of customer behavior, Mr. Creput concluded that publishers would not risk being unable to access AdX and its underlying demand, and customers were not willing to bear the other costs involved in switching ad servers. Ex. O, Dep. Tr. 16:23–19:2, 28:8–29:17.

Mr. Creput also testified that Google's DFP product was configured in a way that made it difficult for Equativ's ad exchange to compete against Google's AdX. *See* Ex. O, Dep. Tr. 33:11–

24, 35:16–36:14, 62:5–22 (explaining DFP gave AdX access to data that Equativ could not access, and DFP allowed AdX to have a last look over other exchanges, resulting in AdX having a higher win rate than competitors like Equativ). To describe DFP's ubiquitous use among Equativ's publishing customers, Mr. Creput used the terms "dominating" and "monopolistic." Google Mot., Ex. D, 23:22-24:9. Google's position as the ad server for, as far as Mr. Creput was able to perceive, nearly all publishers, created challenges for Equativ in the exchange business. *Id.*

**OpenX (Gentry)**. Mr. Gentry is the CEO of OpenX, which operates an ad exchange and previously attempted to compete with Google in the publisher ad server market. *See* Google Mot., Ex. F, John Gentry (OpenX) Dep. Tr. 10:6–12, 12:24–13:9. Mr. Gentry explained that, in his experience, OpenX has not been able to convince customers to drop AdX, in part because AdX is the "delivery point for the largest source of demand in the display business." Google Mot., Ex. F, Dep. Tr. 41:2–8. Mr. Gentry explained that when OpenX competes to win publishers and advertisers, it typically takes share from other exchanges, like PubMatic, Magnite, or Index Exchange, rather than AdX, and as a result, OpenX does not "see [AdX] in our day-to-day competitive set." Ex. P, Dep. Tr. 98:8-12.

Regarding OpenX's attempt to develop a competing publisher ad server, Mr. Gentry explained why OpenX ultimately exited the business. Google Mot., Ex. F, Dep. Tr. 13:7–11, 16:22–17:6. This included his own assessment of Google's DFP product, and his own understanding of why publishers could not be convinced to use an OpenX solution in lieu of Google's DFP. Mr. Gentry testified that Google "control[s] the ad server" and has "such a

dominant position that no publisher . . . has any realistic opportunity [to] . . . switch[] off of Google's ad server." Google Mot., Ex. F, Dep. Tr. 30:25–32:7.[3]

**AppNexus (O'Kelley)**. Brian O'Kelley founded AppNexus in 2007 and has been involved in ad tech since 2000. Ex. Q, Brian O'Kelley (AppNexus) Dep. Tr. 57:22–23, 13:18–14:7. He testified that AppNexus developed a SSP before 2010, and built a publisher ad server in 2014. Google Mot., Ex. J, Brian O'Kelley (AppNexus) Dep. Tr. 68:11-69:9; 76:9-77:8. Mr. O'Kelley explained that AppNexus's publisher ad server "never got meaningful traction in the U.S." and had only a handful of large publishers worldwide. Google Mot., Ex. J, Dep. Tr. 76:9–77:8. Mr. O'Kelley explained how AppNexus saw header bidding as an opportunity "to compete with Google in the ad tech space," Google Mot., Ex. J, Dep. Tr. 111:7–9, 111:12–112:17, and allowed AppNexus to offer what its publisher customers wanted—the ability "to work with more exchanges than just Google." Ex. Q, Dep. Tr. 167:24–168:20.

From AppNexus's vantage point as a competitor to both DFP and AdX, Mr. O'Kelley understood that Google provided a "last look" to AdX to allow it to bid "just a tiny bit more" than other ad exchanges to win an auction. Google Mot., Ex. J, Dep. Tr. 124:1–125:11. Mr. O'Kelley explained how Google's access to "full information," not available to AppNexus, allowed DFP

---

[3] Relatedly, Google objects to Mr. Gentry's testimony that shifting transactions from AdX to other exchanges could make the exchange market more competitive. Google Mot., Ex. F, Dep. Tr. 32:19–22. This testimony was part of an explanation by Mr. Gentry for why Google's imposition of so-called unified pricing rules ("UPR") made it harder for OpenX and other exchanges to compete in the exchange market. As he explained, publishers had previously floored AdX higher than other exchanges in part to shift impressions from AdX to other exchanges to diversify their revenue. Google Mot., Ex. F, Dep. Tr. 29:18–30:13. UPR removed publishers' ability to floor AdX higher, 30:25-31:7, "reducing the opportunity for non-Google SSPs to capture [business from] publishers." Google Mot., Ex. F, Dep. Tr. 32:25–33:8.

and AdX to "manipulate auctions and manipulate the decisioning process, in [Google's] benefit." Google Mot., Ex. J, Dep. Tr. 125:13–126:19.

**Kargo (Shaughnessy)**.  Michael Shaughnessy is the Chief Operating Officer at Kargo, a SSP. Google Mot., Ex. L, Michael Shaughnessy (Kargo) Dep. Tr. 8:9–9:14. In his role, Mr. Shaughnessy interacts with the largest publishers, such as Meredith, Hearst, CBS, NBC, and Discovery, Google Mot., Ex. L, Dep. Tr. 8:25–9:14, and the largest advertising agencies, Google Mot., Ex. L,  Dep. Tr.  9:18–25. Between 2013 and 2018, prior to his employment at Kargo, Mr. Shaughnessy was a digital publishing executive and interacted directly with SSPs and ad exchanges. Google Mot., Ex. L, Dep. Tr. 7:2–8:5, 15:3–16:3. Mr. Shaughnessy testified that Kargo and the publisher companies he worked at would have to "build all of their infrastructure and their architecture around the Google ad server." Ex. R, Dep. Tr. 20:13–20. Among other things, Mr. Shaughnessy testified about how the ubiquitous use of DFP by publisher customers affects Kargo—it "influenced product and engineering investments," and "influences the way that we deliver our campaigns." Ex. R, Dep. Tr. 36:11–20, 38:17–20, 38:23–39:10.

**Soroca (Magnite)**. Adam Soroca is the Chief Product Officer for the ad exchange Magnite. Google Mot., Ex. M, Adam Soroca 30(b)(6) (Magnite) Dep. Tr. 11:20–22, 13:4–18 (ECF No. 1164-14).  Mr. Soroca testified that Google's dominance across the ad tech stack had created challenges for Magnite, including that it creates a "ceiling on which [Magnite] can gain ground," Google Mot., Ex. M, Dep. Tr. 22:5–11, and that it "limits [Magnite's] ability to grow," Google Mot., Ex. M, Dep. Tr. 28:10-12. As an example, Mr. Soroca explained how Magnite approached various advertising agencies, in an attempt to secure larger contracts, and the agencies indicated that they were limited in terms of the commitments they could provide to Magnite, because "they're going to end up spending a substantial amount through [Google's demand side platform,

DV360] that they don't have control over." Google Mot., Ex. M, Dep. Tr. 28:20–29:5, 29:7–9, 29:11–16.  Additionally, Mr. Soroca explained that, since Google operates the publisher ad server, this gives Google the ability to advantage AdX by providing AdX with the "last look" in a DFP auction, which "limits the amount of share that . . . Magnite and other exchanges can get."  Ex. S, Dep. Tr. 32:21–33:1, 33:3–6.

**Index Exchange (Casale)**. Index Exchange operates an ad exchange. Andrew Casale has worked at Index Exchange for twenty years and is currently its President and CEO. Google Mot., Ex. C, Dep. Tr. 12:10-25. Among other things, Mr. Casale testified that his understanding of the size and unique demand of Google Ads (Google's advertiser ad network) is derived from feedback from his customers that they "see far more demand from [Google Ads] through AdX than through Index." Ex. T, Dep. Tr. 129:19–25. He also testified that his customer began to use Google's product, Open Bidding, which "mechanically was very similar to header bidding." Google Mot., Ex. C, Dep. Tr. 197:19–25. Google objects to Mr. Casale's testimony that Index Exchange's market share is smaller than AdX's. *Id.* at 147:5-12. This testimony provides context for Mr. Casale's explanation regarding how challenging it is for Index to compete with AdX. As Mr. Casale explained in his deposition, scale is a "very valuable input" into a lot of the optimization problems that ad exchanges solve. *Id.* at 147:16-148:20. If Index had a larger market share, it would have more scale, and it would therefore be able to handle those challenges more effectively.  *Id.*   For this and other reasons, he believes that it is difficult for Index to compete with AdX.  *Id.* at 155:4-19.

**Kevel (Avery).** James Avery is the CEO of Kevel, a publisher ad server company that Mr. Avery founded in about 2009. Google Mot., Ex. A, James Avery (Kevel) Dep. Tr. 11:11–12, Ex. U, James Avery (Kevel) Dep. Tr. 18:10–13. Since he started his company, Mr. Avery has been

personally involved in developing Kevel's ad server product as well as selling and talking to publisher customers. Google Mot., Ex. A, Dep. Tr. 11:13–25, 12:3–11. Mr. Avery testified that Kevel has not been able to convince any publishers to switch away from Google's publisher ad server to Kevel's platform for programmatic open-web display advertising in the last decade. Ex. U, Dep. Tr. 19:18–23, 48:5–11. He testified that Google's unwillingness to integrate AdX with non-DFP publisher ad servers like Kevel forced Kevel to change its business model. Ex. U, Dep. Tr. 24:20–25, 44:21–45:1.

**The Trade Desk ("TTD") (Dederick).** John Dederick is currently the Chief Client Officer and Executive Vice President of The Trade Desk, where he has worked since 2012, in roles that involved fostering relationships "across the industry" and managing TTD's "North American sales organization." Google Mot., Ex. E, John Dederick 30(b)(6) (The Trade Desk) Dep. Tr. 8:3–8, 152:5–24 (ECF No. 1164-6). Mr. Dederick testified that TTD is a demand side platform (DSP), like Google's DV360, that "submit[s] bids on behalf of buyers and advertisers" into sell-side platforms (e.g., AdX), which then sends the transaction to a publisher ad server (e.g., DFP), which allocates and serves the ad. Ex. V, Dep. Tr. 115:13–116:19. Put simply, TTD works on behalf of advertisers to evaluate available inventory on sell-side platforms and ad exchanges and submits bids to those exchanges as part of a series of steps that must occur before an open-web display advertisement can be served on a publishers page.

Mr. Dederick's testimony was expressly based on personal knowledge required for Mr. Dederick to be effective in his role, including "knowledge of how publisher ad servers interact with ad exchanges and DSPs" and "11 years of representing buyers." Google Mot., Ex. E, Dep. Tr. 207:25–208:8. Although The Trade Desk competes directly with Google's demand side platform, DV360, The Trade Desk depends on access to Google's ad exchange, AdX. Mr.

Dederick testified that AdX, has "the largest pool of inventory that [The Trade Desk] look[s] at programmatically, so any DSP has to buy AdX in order to be competitive." Google Mot., Ex. E, Dep. Tr. 162:7–22.

Plaintiffs submit that the Court can assess whether the proper foundation has been established for the testimony described above at the time of trial and give this testimony whatever weight the Court deems appropriate.

## ARGUMENT

### A. The views of market participants are highly relevant on issues of relevant markets, monopoly power, and anticompetitive effects of Google's conduct.

Google's insistence that issues of market definition, monopoly power, and the anti-competitive effects of Google's conduct should be confined to expert testimony ignores the crucial role that lay testimony plays in an antitrust case. While expert testimony serves an important role, "market realities matter more than what is theoretically possible." *Search*, 2024 WL 3647498, at *100. Testimony from industry participants is often the best evidence of market definition, market power, harm to competition, and a lack of legitimate business justifications. *See, e.g.*, *id.*, at *91-92 (describing testimony from advertisers and concluding "[a]dvertisers confirmed Google's market dominance"); *id.*, at *77 (citing testimony from Google's biggest competitor and a company that tried to compete with Google and failed); *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, 2024 WL 3302068, at *12-13 (N.D. Cal. July 3, 2024) (citing testimony from app developer in support of Plaintiffs' claim that Google engaged in unlawful tying). Industry or public recognition "matters because [courts] assume that economic actors usually have accurate perceptions of economic realities." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 n.4. (D.C. Cir. 1986); *Search*, 2024 WL 3647498, at *70 ("Plaintiffs have presented

significant evidence that market participants consider [General Search Engines] to be a distinct product with no adequate substitutes.").

Industry recognition of a separate product market is one of several "practical indicia" of the boundaries of a relevant market, under seminal Supreme Court precedent on antitrust law. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("[P]ractical indicia" includes "industry or public recognition" of the boundaries of a relevant market, as well as "the product's peculiar characteristics and uses," "distinct customers," "specialized vendors."). Courts routinely rely upon lay testimony from industry participants to identify the appropriate boundaries of a relevant product market in antitrust cases. *See, e.g.*, *Search*, 2024 WL 3647498, at *90 (citing testimony of lay advertiser witnesses as support for the Court's conclusion that "general search text advertising" was a relevant product market); *Fed. Trade Comm'n v. Staples, Inc.,* 190 F. Supp. 3d 100, 123 (D.D.C. 2016) (citing testimony from customers about their own behavior and market trends); *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966, at *23 (N.D. Cal. Jan. 8, 2014) (noting that "competitors and former competitors" recognized a distinct relevant product market). Participants in the industry have testified and will testify at trial that they recognize these ad tech tools are separate and distinct from tools with different characteristics, offered to different types of customers, for distinct uses. This is appropriate and admissible lay testimony.

For example, Google moves to exclude Mr. Casale's testimony concerning the unique characteristics of Google Ads. Google Mot., Ex. C, Andrew Casale 30(b)(6) (Index Exchange) Dep. Tr. 132:17–133:8 (describing demand from "either hundreds of thousands or millions of SMBs [small and medium-sized businesses], which is a very, very unique source of demand"). Google moves to exclude testimony from Mr. Pauley of Vox that two different ways of selling

digital ads are complements, not substitutes, because they use different methods and sell at different prices. Ex. W, Dep. Tr. 67:13–69:6.[4] This testimony is highly probative of industry recognition of the products as distinct, as well as the products' peculiar characteristics, lending support for a relevant product market for advertiser ad networks and for product markets that exclude direct ad sales.

As described above, Google asks the Court to exclude third party testimony about the ways in which Google's conduct and restrictive policies made it impossible for others in the industry to compete. Courts often rely on lay witness testimony from rival companies who tried to compete against a monopolist and failed. Indeed, in *Search*, the district court cited the testimony of a rival that had tried but failed to compete with Google as "particularly compelling" evidence of how Google's conduct harmed competition. *Search*, 2024 WL 3647498, at *97 (D.D.C. Aug. 5, 2024); *see also Realcomp II, Ltd. v. F.T.C.,* 635 F.3d 815, 830 (6th Cir. 2011) (citing testimony from "limited-service brokers . . . that Realcomp's policies placed them at a competitive disadvantage"); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 22 (1984) (citing testimony from health care providers that certain services were, "[a]s a matter of actual practice," provided separately as the basis for concluding that requiring patients to purchase these services together was unlawful tying). Testimony from market participants allows a fact-finder to understand the impact of a monopolist's conduct on companies struggling to compete in the real world. *See United States v. Microsoft Corp.*, 253 F.3d 34, 62 (D.C. Cir. 2001) (citing testimony from OEMs about how Microsoft's licensing terms affected their behavior and ultimately affected Netscape, a nascent competitive

---

[4] Although this excerpt does not appear in Google's Motion, Google lodged objections on Rule 701 grounds, raising concerns that Google's request for an advisory opinion would apply to exclude this evidence. *See* Google Mem. at 3.

threat to Microsoft's operating system monopoly); *United States v. Am. Tel. & Tel. Co.*, 524 F. Supp. 1336, 1357 (D.D.C. 1981) (citing witness testimony about how a company's conduct created difficulties impacting deliveries, installations, and repair procedures).

Google also moves to exclude testimony from publishers, recounting their first-hand experience of having no viable alternatives to Google's DFP and AdX products. For example, publisher NewsCorp testified that the company considered alternatives in 2017, analyzed whether those alternatives were feasible, and concluded that they were not. NewsCorp's corporate representative explained that there were "no other viable alternatives" to Google's products, based on NewsCorp's 2017 analysis, because "by moving to AppNexus, for instance, now Xandr, you would lose all the unique [Google Ads] demand that comes with Google Ad Manager and only through Google Ad Manager." Ex. V, Dep. Tr. 68:20–69:10, 187:11–188:11.[5] Testimony from Google's customers and others in the industry about lacking options to Google's products is direct evidence of Google's monopoly power. *See, e.g.*, *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015) (crediting testimony from the director of a regional health plan, who was not an expert, that "there's really no place for prescribers to, to go"); *see also Search*, 2024 WL 3647498, at *75 ("The fact that Google makes product changes without concern that its users might go elsewhere is something only a firm with monopoly power could do."); *Microsoft*, 253 F.3d at 58 (noting that setting prices "without considering rivals' prices" is "something a firm without a monopoly would have been unable to do").

Similarly, the view of a competitor that Google does not offer the "best" publisher ad server product, rationally based on that witness's first-hand perception of how the quality of different

---

[5] Google's motion suggests that even these well-founded perceptions are within the scope of Google's motion to exclude, even if not chosen for their "sample." *See* Google Mem. at 3.

products compare, is probative of whether Google's conduct has stifled innovation in the market for publisher ad servers. If competitors view Google's product as inferior, and yet they cannot convince customers to switch away from Google's product, those competitors are likely to abandon attempts to innovate.

Elsewhere, Google's motion sweeps in testimony that not opinion evidence. For example, industry participants testified to the fact that a publisher ad server is a tool that publishers "will use to determine who buys their ads, who has access, what those will be priced at and in what sort of order or rank of priority." Google Mot., Ex. E, Dep. Tr. 155:15–156:7. Google also objects on Rule 701 grounds to testimony that Google offers the largest ad exchange, *see* Google Mot., Ex. E, Dep. Tr. 159:2–4; *see also* Google Mot., Ex. L, Dep. Tr. 14:23–15:2, and testimony that Google Ads demand "contributes significantly to [publishers'] top-line revenues," Ex. R, Dep. Tr. 60:3–13. Where the relevant testimony is not opinion evidence, Rule 701 does not apply.

### B. Lay opinion testimony based on personal knowledge and firsthand perception is admissible under Rule 701.

"Federal Rule of Evidence 701 permits a lay witness—with no need for expert qualification—to give opinion testimony that is 'rationally based on the witness's perception' and helpful to determining a fact in issue, so long as it is not based on the same 'scientific, technical, or other specialized knowledge' covered by Rule 702." *Lord & Taylor*, 849 F.3d at 575; *MCI Telecomms.*, 897 F.2d at 706 ("A lay witness in a federal court proceeding is permitted under Fed. R. Evid. 701 to offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived."). For example, where opinion testimony is based on an executive's current knowledge of the success or failure of past negotiations, those opinions are admissible under Rule 701. *See Steves and Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16cv545, 2018 WL 359479, at *2 (E.D.

16

Va. Jan. 10, 2018) (permitting testimony based on a lay witness's previous interactions with a supplier).

With respect to designated deposition testimony, some of which is summarized above, the record makes clear that these witnesses have drawn on personal knowledge gleaned from events they perceived in their day-to-day experiences. At deposition, Google's counsel engaged in "robust cross-examination" concerning any "perceived deficiencies in the testimony." *Id.* To the extent Google argues that a witness's experience is insufficient to form the basis of their lay opinion, this argument should go "to the weight to be given to [the witness's] testimony, not to its lay character or admissibility." *Lord & Taylor*, 849 F.3d at 576. Google appears to concede as much, noting: "Defendant brings this motion understanding that the trial here will be before the Court, which can give no weight to loose references to terms like monopolist or dominance." Google Mem. at 2.

Moreover, cross examination—not exclusion—is the cure for any of Google's concerns about improper live witness testimony. Plaintiffs intend to call several industry participants to testify at trial, including Messrs. Casale, Dederick, and Avery, whose deposition testimony is described above. The Court can assess whether the proper foundation has been established for their testimony at the time of trial, and counsel for Google will have the ability to cross examine each witness.

Google's reliance on *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200 (4th Cir. 2000) is misplaced. The court in *Sinkovich* considered whether it was proper to admit testimony about conditions surrounding a boating accident, where the opinion was offered by a lay witness who did not see the accident. *Id.* at 203–04. The court noted that the witness "did not have any first-hand knowledge of the accident nor were his conclusions ones that a normal person

17

would form based upon his perceptions." *Id.* Here, Google suggests terms like "dominant" and "monopolist" are inadmissible if spoken by industry participants, even if those participants are basing those statements on their own perceptions of interactions directly with Google and using those terms in the lay sense, *i.e.*, referring to a competitor or business counter-party that is unusually powerful, not with any specific legal import. These statements are offered by individuals who oversaw negotiations with Google and observed how those negotiations stood in stark contrast to negotiations with other suppliers. The experiences of being strongarmed in a negotiation or otherwise left without choice are well within the purview of non-expert businesspeople, do not require specialized knowledge in economics or industrial organization, and as noted above are frequently cited by courts in antitrust cases. Where that opinion is expressed using a term of art, the Court can give witness testimony appropriate weight, without imposing a categorical bar on words that lay witnesses may or may not deem appropriate to describe their well-founded concerns.

### C. Objections to deposition testimony on foundation and speculation grounds were waived unless Google objected on the record.

Although framed as a motion to exclude evidence barred by Federal Rule of Evidence 701, Google argues throughout its motion that third-party witness testimony lacks sufficient foundation or that these witnesses were otherwise asked to speculate. Timely objections to specific questions would have given the questioner the opportunity to cure the testimony, if such a cure was warranted, by laying additional or different foundation. Where Google did not object contemporaneously on the record to foundation and speculation, such objections were waived. *See* Fed. R. Civ. P. 32(d)(3)(A) and (B); *House v. Players' Dugout, Inc.*, No. 3:16-cv-00594-RGJ, 2021 WL 4898071, at *9 (W.D. Ky. Oct. 20, 2021) ("As Plaintiffs' objections to foundation and speculation could have been cured at the time of the deposition or relate to the form of the question or answer, they are waived under Fed. R. Civ. P. 32(d)(3)(A) and (B)."); *see also Jordan v. Medley*,

711 F.2d 211, 218 (D.C. Cir. 1983) (Scalia, J.) (Rule 32(d)(3(A) "obviously envisions . . . a situation in which a timely objection (*e.g.,* on the ground of failure to lay an adequate foundation) could have enabled the problem to be remedied" (citation omitted)). Google waived all objections on foundation and speculation grounds unless those objections were raised at deposition.

Google's counsel had ample opportunity to object at deposition, to question each witness on the record and ask them about their foundation for any of these statements, and to counter-designate any testimony that Google believes the Court should consider when weighing the evidence. Where Google's counsel chose not to object on the record, the Court should reject Google's arguments about speculation or foundation on the independent basis of waiver.

**D. Google's hearsay arguments have no merit.**

This case will be tried to the Court, and the Court is well-equipped to "hear relevant evidence, weigh its probative value and reject any improper inferences." *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994). Google contends that third-party testimony will repeat out-of-court statements and will be offered into evidence to prove the truth of the matter asserted therein. Testimony that summarizes, paraphrases, or generalizes, rather than repeats verbatim, information collected from various sources is "[k]nowledge acquired through others" which is appropriate to establish that these witnesses have "personal knowledge within the meaning of Fed. R. Evid. 602." *Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989); *see also U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, 2006 WL 2136249, at *11 (S.D.N.Y. Aug. 1, 2006) (admitting lay witness deposition testimony that "six or seven firms compete in the medium size cabling market in New York" over defendants' hearsay objection, "because the cited testimony is founded on personal knowledge acquired from others," as distinct from hearsay). Because "most knowledge has its roots in hearsay," and speaking with others "is a common and

reliable way of obtaining knowledge," *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 739 (1st Cir. 1982), inferences drawn from these customary discussions from others, "as long as they are the sort of inferences that businessmen customarily draw . . . count as personal knowledge, not hearsay," *Agfa-Gevaert*, 879 F.2d at1523; *see also United States v. Simmons*, 773 F.2d 1455, 1461 (4th Cir. 1985) (testimony "based on the personal knowledge of an experienced witness who was available for cross-examination" was "not hearsay"); *United States v. Vosburgh*, 602 F.3d 512, 539 n.27 (3d Cir. 2010) ("Testimony that conveys a witness's personal knowledge about a matter is not hearsay.") (citing *Simmons*, 773 F.2d at 1460–61).

Google points to testimony that is not repetition of an out of court statement, but rather, knowledge gained from years of experience with the executives' own products and engagement with customers. Take, for example, Google's objections to ad exchange testimony reflecting publisher feedback. Google Mem. at 19–20. Testimony from an ad exchange about the feedback the exchange received from its customers is squarely "personal knowledge acquired through others," as distinct from hearsay.

Moreover, whether an out-of-court statement constitutes hearsay depends on its use at trial. *In re C.R. Bard, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913, 926 (4th Cir. 2016). Statements may be offered to show what other industry participants believed—and to show the effect that those statements had on the listener. For example, Google objects on hearsay grounds to Mr. Avery's testimony that AdX represents the largest source of programmatic display advertising, based on discussions with publishers. *See* Google Mot., Ex. A, Dep. Tr. 50:25–51:13. This statement is relevant for its effect on the listener, however, because publishers' inability to use Kevel's publisher ad server to access AdX demand led Kevel to conclude that competing with

DFP was "almost impossible," Google Mot., Ex. A, Dep. Tr. 96:23–97:6, and caused Kevel to reposition and focus on serving a different type of customer.

## **CONCLUSION**

As reflected in Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Plaintiffs will present extensive expert testimony to support a conclusion that Google has monopoly power in each of the relevant markets and Google's conduct has caused anticompetitive effects. Nonetheless, the perspectives of Google's own customers and fellow market participants, based on their own first-hand experiences with Google in this market, have an important role to play in the trial of this case, and can be managed appropriately by the Court as the trial progresses.

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Google's motion to exclude lay opinion testimony.

Dated: August 23, 2024

Respectfully submitted,

JESSICA D. ABER
United States Attorney

*/s/ Gerard Mene*
GERARD MENE
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

*/s/ Julia Tarver Wood*
JULIA TARVER WOOD
KELLY D. GARCIA
ISABEL M. AGNEW
MILOSZ GUDZOWSKI
AARON M. TEITELBAUM
JEFFREY VERNON
MICHAEL E. WOLIN
United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Julia.Tarver.Wood@usdoj.gov

Attorneys for the United States

JASON S. MIYARES
Attorney General of Virginia

*/s/ Tyler T. Henry*
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for the Commonwealth of Virginia
and local counsel for the States of Arizona,
California, Colorado, Connecticut, Illinois,
Michigan, Minnesota, Nebraska, New
Hampshire, New Jersey, New York, North
Carolina, Rhode Island, Tennessee,
Washington, and West Virginia