# EXHIBIT 5

Dena C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

Tina Wolfson (State Bar No. 174806)
Theodore W. Maya (State Bar No. 223242)
Rachel Johnson (State Bar No. 331351)
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel.: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
rjohnson@ahdootwolfson.com

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| **IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | Case No. 5:20-cv-03556-BLF |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CONSOLIDATED COMPLAINT** |
| | Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

INTRODUCTION................................................................................................1

ISSUES TO BE DECIDED..................................................................................2

RELEVANT BACKGROUND.............................................................................3

LEGAL STANDARD .........................................................................................4

ARGUMENT ......................................................................................................4

I.     PLAINTIFFS STATE A CAUSE OF ACTION UNDER THE SHERMAN
ACT. ....................................................................................................4

    A.    Plaintiffs Allege Facts Sufficient to Give Them Standing to Sue.................4

    B.    Plaintiffs Sufficiently Allege That Google Monopolized the Market for
Display Advertising Services for Advertisers.....................................5

        1.    Industry recognition of the submarket as a separate economic
entity. ..................................................................................7

        2.    The product or service's peculiar characteristics and uses.................7

        3.    Unique production capabilities. ....................................................11

        4.    Distinct customers and prices. .......................................................13

        5.    Specialized vendors. ....................................................................13

    C.    Plaintiffs Adequately Plead Anticompetitive Conduct. ...............................14

        1.    The FAC alleges facts sufficient to show an unlawful scheme to
monopolize, including through Google's acquisition of rivals. .......14

            a.    Google's documents show that the acquisitions were
anticompetitive.................................................................15

            b.    Plaintiffs' claims are timely. .................................................16

        2.    The FAC alleges facts sufficient to show coercive tying
contributed to Google's monopolization scheme. ..........................18

        3.    The FAC alleges facts sufficient to show Google unlawfully
maintained its monopoly in part by denying interoperability. .........21

        4.    The FAC alleges facts sufficient to show Google concealed data
with anticompetitive effects...........................................................22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC
CASE NO. 5:20-cv-03556-BLF

D.    The Government Actions and Investigations Further Demonstrate the Plausibility of Plaintiffs' Antitrust Claims........................................................23

II.    PLAINTIFFS ADEQUATELY ALLEGE UCL VIOLATIONS. ...........................24

III.    PLAINTIFFS MAY PURSUE A PUBLIC ANTITRUST INJUNCTION AGAINST GOOGLE IN COURT. ........................................................................24

CONCLUSION ........................................................................................................25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC
CASE NO. 5:20-cv-03556-BLF

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Dairy Farmers of Am., Inc.*
   748 F. Supp. 2d 323 (D. Vt. 2010) ............................................................................... 6

*Apple iPod iTunes Antitrust Litig.*
   2009 WL 10678940 (N.D. Cal. Oct. 20, 2009) ........................................................... 20

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ...................................................................................................... 4

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp*
   472 U.S. 585 (1985) .................................................................................................... 22

*Beatrice Foods Co. v. FTC*
   540 F.2d 303 (7th Cir. 1976) ........................................................................................ 7

*Blair v. Rent-A-Center, Inc.*
   928 F.3d 819 (9th Cir. 2019) ................................................................................. 24, 25

*Brooks Fiber Commc'ns of Tucson, Inc. v. GST Tucson Lightwave, Inc.*
   992 F. Supp. 1124 (D. Ariz. 1997) ............................................................................. 12

*Brown Shoe v. United States*
   370 U.S. 294 (1962) ................................................................................................. 6, 7

*Carefusion Corp. v. Medtronic*
   2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) ............................................................. 16

*Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*
   148 F.3d 1080 (D.C. Cir. 1998) .................................................................................. 22

*Cascade Health Sols. v. PeaceHealth*
   515 F.3d 883 (9th Cir. 2008) ................................................................................ 18, 19

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*
   20 Cal. 4th 163 (1999) ................................................................................................ 24

*Church & Dwight Co. v. Mayer Labs., Inc.*
   2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) .............................................................. 14

*City of Anaheim v. S. Cal. Edison Co.*
   955 F.2d 1373 (9th Cir. 1992) ......................................................................... 14, 15, 17

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*
   858 F.2d 499 (9th Cir. 1988) ...................................................................................... 17

*Continental Ore Co. v. Union Carbide & Carbon Corp.*
  370 U.S. 690 (1962)..................................................................................................... 14

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*
  99 F.3d 937 (9th Cir. 1996) ......................................................................................... 4

*Cottrell v. AT&T Inc.*
  2020 WL 2747774 (N.D. Cal. May 27, 2020)............................................................ 25

*Creative Copier Servs. v. Xerox Corp.*
  344 F. Supp. 2d 858 (D. Conn. 2004).......................................................................... 22

*Dang v. San Francisco Forty Niners*
  964 F. Supp. 2d 1097 (N.D. Cal. 2013)........................................................................ 7

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*
  637 F.3d 435 (4th Cir. 2011) ....................................................................................... 6

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*
  504 U.S. 451 (1992) .............................................................................................. 7, 19

*Eastman v. Quest Diagnostics Inc.*
  724 F. App'x 556 (9th Cir. 2018) ............................................................................... 16

*Eiess v. USAA Fed. Sav. Bank*
  404 F. Supp. 3d 1240 (N.D. Cal. 2019)...................................................................... 25

*Epic Games, Inc. v. Apple Inc.*
  2020 WL 5993222 (N.D. Cal. Oct. 9, 2020) ......................................................... 14, 23

*Evergreen Helicopters, Inc. v. Erickson Air-Crane Inc.*
  2011 WL 285201 (D. Or. Jan. 26, 2011)..................................................................... 22

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*
  720 F.3d 33 (1st Cir. 2013).......................................................................................... 5

*Foam Supplies, Inc. v. The Dow Chem. Co.*
  2006 WL 2225392 (E.D. Mo. Aug. 2, 2006)................................................................ 3

*Fortner Enters., Inc. v. U.S. Steel Corp.*
  394 U.S. 495 (1969) ................................................................................................... 20

*Free FreeHand Corp. v. Adobe Sys. Inc.*
  852 F. Supp. 2d 1171 (N.D. Cal. 2012)...................................................................... 16

*FTC v. Sysco Corp.*
  113 F. Supp. 3d (D.D.C. 2015)............................................................................. 10, 13

iv

*FTC v. Warner Commc'ns Inc.*
  742 F.2d 1156 (9th Cir. 1984) ............................................................................. 7

*Gen. Foods Corp. v. FTC*
  386 F.2d 936 (3d Cir. 1967) ............................................................................... 11

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*
  386 F.3d 485 (2d Cir. 2004) .......................................................................... 6, 10

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*
  352 F.3d 367 (9th Cir. 2003) ............................................................................... 5

*Greenley v. Avis Budget Grp. Inc.*
  2020 WL 1493618 (S.D. Cal. Mar. 27, 2020) .................................................. 25

*Henry v. Chloride, Inc.*
  809 F.2d 1334 (8th Cir. 1987) ........................................................................... 13

*Hicks v. PGA Tour, Inc.*
  897 F.3d 1109 (9th Cir. 2018) ..................................................................... 10, 11

*Hinds Cty., Miss. v. Wachovia Bank N.A.*
  700 F. Supp. 2d 378 (S.D.N.Y. 2010) .............................................................. 23

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*
  125 F.3d 1195 (9th Cir. 1997) ..................................................................... 18, 21

*In re Aggrenox Antitrust Litig.*
  199 F. Supp. 3d 662 (D. Conn. 2016) .......................................................... 10, 13

*In re Auto. Parts Antitrust Litig.*
  2017 WL 7689654 (E.D. Mich. May 5, 2017) ................................................. 17

*In re Cathode Ray Tube (CRT) Antitrust Litig.*
  738 F. Supp. 2d 1011 (N.D. Cal. 2010) ............................................................ 17

*In re IBM Peripheral EDP Devices Antitrust Litig.*
  481 F. Supp. 965 (N.D. Cal. 1979) ................................................................... 21

*In re Local TV Advertising Antitrust Litigation*
  2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ..................................................... 11

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*
  562 F. Supp. 2d 392 (E.D.N.Y. 2008) ................................................................ 9

*In re Resistors Antitrust Litig.*
  2017 WL 3895706 (N.D. Cal. Sept. 5, 2017) .................................................. 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Tableware Antitrust Litig.*
   363 F. Supp. 2d 1203 (N.D. Cal. 2005) ...................................................................... 23

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*
   99 F. Supp. 3d 610 (D. Md. 2015) ............................................................................. 6

*Kwikset Corp. v. Superior Court*
   51 Cal. 4th 310 (2011) ............................................................................................... 24

*Le v. Zuffa, LLC*
   216 F. Supp. 3d 1154 (D. Nev. 2016) ......................................................... 6, 14, 15

*LePage's Inc. v. 3M*
   324 F.3d 141 (3d Cir. 2003) .............................................................................. 14, 20

*LiveUniverse, Inc. v. MySpace, Inc.*
   2007 WL 6865852 (C.D. Cal. June 4, 2007) ............................................................ 23

*LiveUniverse, Inc. v. MySpace, Inc.*
   304 F. App'x 554 (9th Cir. 2008) ............................................................................. 22

*Lorain Journal Co. v. United States*
   342 U.S. 143 (1951) ............................................................................................. 19, 21

*Mahroom v. Best W. Int'l, Inc.*
   2009 WL 248262 (N.D. Cal. Feb. 2, 2009) .............................................................. 25

*McGill v. Citibank, N.A.*
   2 Cal. 5th 945 (2017) ......................................................................................... 24, 25

*MetroNet Servs. Corp. v. Qwest Corp.*
   383 F.3d 1124 (9th Cir. 2004) .................................................................................. 23

*Minnesota Mining & Mfg. Co. v. Appleton Papers, Inc.*
   35 F. Supp. 2d 1138 (D. Minn. 1999) ....................................................................... 4

*Moore v. Mars Petcare US, Inc.*
   966 F.3d 1007 (9th Cir. 2020) .................................................................................... 4

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*
   909 F.2d 1245 (9th Cir. 1990) .................................................................................... 4

*Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*
   247 F.R.D. 253 (D. Mass. 2008) ................................................................................ 3

*Newcal Indus., Inc. v. Ikon Office Sol.*
   513 F.3d 1038 (9th Cir. 2008) ...................................................................... 6, 11, 20

vi

*Nguyen v. Tesla, Inc.*
   2020 WL 2114937 (C.D. Cal. Apr. 6, 2020) ........................................................... 25

*Oliver v. SD-3C LLC*
   751 F.3d 1081 (9th Cir. 2014) ........................................................................ 16

*Paladin Assocs. v. Mont. Power Co.*
   328 F.3d 1145 (9th Cir. 2003) ........................................................................ 20

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*
   604 F.3d 1291 (11th Cir. 2010) ........................................................................ 4

*Realcomp II, Ltd. v. FTC*
   635 F.3d 815 (6th Cir. 2011) ........................................................................ 22

*Rebel Oil Co. v. Atl. Richfield Co.*
   51 F.3d 1421 (9th Cir. 1995) ........................................................................ 4, 6

*Reveal Chat Holdco, LLC v. Facebook, Inc.*
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ........................................................ 17, 22, 23

*RSR Corp. v. FTC*
   602 F.2d 1317 (9th Cir. 1979) ........................................................................ 7

*Snarr v. HRB Tax Group, Inc.*
   2020 WL 7249334 (9th Cir. Dec. 9, 2020) .................................................. 24, 25

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*
   431 F.3d 917 (6th Cir. 2005) ........................................................................ 8

*Syufy Enters. v. Am. Multicinema, Inc.*
   793 F.2d 990 (9th Cir. 1986) ........................................................................ 6

*Todd v. Exxon Corp.*
   275 F.3d 191 (2d Cir. 2001) ........................................................................ 6, 11

*Trompeter v. Ally Fin., Inc.*
   914 F. Supp. 2d 1067 (N.D. Cal. 2012) ........................................................ 25

*United States v. Gillette Co.*
   828 F. Supp. 78 (D.D.C. 1993) ........................................................................ 6

*United States v. Microsoft Corp.*
   253 F.3d 34 (D.C. Cir. 2001) ........................................................................ 21

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*
   540 U.S. 398 (2004) ........................................................................ 21

vii

*Viamedia, Inc. v. Comcast Corp.*
   951 F.3d 429 (7th Cir. 2020) ................................................................................................ 18, 20, 22

*Volvo N. Am. Corp. v. Men's Intern. Prof'l Tennis Council*
   857 F.2d 55 (2d Cir. 1988) ........................................................................................................ 15

**Statutes**

15 U.S.C. § 2 ..................................................................................................................... *passim*

15 U.S.C. § 18 ............................................................................................................................ 17

Cal. Bus. & Prof. Code § 17200 *et seq.* ............................................................................. 24, 25

Cal. Civ. Code § 3513 ......................................................................................................... 24, 25

**Rules**

Fed. R. Civ. P. 8 ........................................................................................................................... 4

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 4, 6, 10

Fed. R. Civ. P. 15(a)(2) ............................................................................................................. 25

Fed. R. Civ. P. 23(c)(5) ............................................................................................................... 3

**Other Authorities**

ABA, *Antitrust Law Developments* (8th ed.) ........................................................................... 18

Areeda & Hovenkamp, *Antitrust Law* (4th ed.) ................................................................ 5, 9, 14, 15

Sullivan, *Antitrust* (1st ed.) .................................................................................................. 5, 14

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC
CASE NO. 5:20-cv-03556-BLF

# INTRODUCTION

Plaintiffs are small business owners who used Google's intermediation services to place display advertisements on third-party websites. Google's suite of services consists of integrated platforms that load, store, broker and refine the placement, and monitor the performance of advertisements on third-party websites. Plaintiffs allege that they have overpaid for these services because Google monopolizes the market. The Court need not reach Google's publisher-related arguments at this stage, and it should reject Google's challenge to the advertiser Plaintiffs' standing to sue. The First Amended Complaint ("FAC") provides the details of Plaintiffs' respective transactions with Google and alleges that the same violations that eliminated competition caused harm to their business or property.

Google does not (and cannot) dispute its monopoly power, and there is thus no need for a detailed relevant market inquiry. Following the Court's guidance, the relevant market for purposes of this motion is limited to the display advertising services provided to the advertiser subclass. Google's market definition arguments implicate questions of fact that are inappropriate for resolution at the pleading stage. The jury could readily conclude that the services Google provides to display advertisers form a distinct market, and, as is standard, that determination should be left to the jury.

The traits of the "programmatic" display advertising services market, which depends on instantaneous bidding by a large number of websites to match advertiser to publisher, have caused ad agencies and other industry players to treat this market as a unit. Placing ads using these services provides advertisers the unique ability to target potential customers, reaching people whose online activities suggest they may wish to buy the advertised product or service even when they have not searched for it or do not know about it. Improperly drawing inferences in its favor, Google argues that certain alternative forms of advertising can be a reasonable substitute for Google's display advertising services. But the complaint alleges the opposite, and there is no basis to conclude as a matter of law that any alternative is such a complete substitute that it prevents Google from charging advertisers supra-competitive prices. As the FAC alleges, direct placement of display ads is infeasible for nearly all advertisers who instead rely on Google to broker ad placements. Google's display advertising service provides a unique "re-marketing" feature that presents banner or sidebar ads relevant to a page the user previously visited, nudging the consumer to return to the advertiser's site and complete a purchase, for

1

example. Contrary to Google's assumption, and its attempt to distract from the monopolized services by arguing about Facebook and other websites, the FAC's market definition covers the use of Google's brokering *services* to place display advertisements on any and all third-party websites. The October 2020 congressional report found this market for display advertising services "separate" (FAC ¶ 205), and the jury could find the same.

Google eliminated competition in the submarket for advertiser services through a panoply of coordinated practices. Google bought rivals to avoid competing with them, and after consolidating power, barred any customer doing business with a competing display-ad exchange from accessing key search-ad performance data. Google's anticompetitive acquisitions and tying of its monopoly power in one market (search advertising) to monopolize another (display advertising) are well-trodden strategies for acquiring and maintaining a monopoly. Google's statute of limitations defense improperly isolates its acquisitions from the rest of its scheme, overlooking the coercive restrictions it later imposed during the limitations period. Google's remaining conduct arguments also misread the FAC and fail: Plaintiffs base their antitrust claim not on some independent legal duty to disclose data or to make electronic systems compatible but, rather, on Google's entrenched power and the purpose and effects of its *combined* activity including its policies of secrecy and preventing systems interface to hinder competition. Plaintiffs' allegations of fact produce a strong inference that Google committed anticompetitive acts.

The Court also should reject Google's efforts to force two of the named plaintiffs into arbitration. Under California law, these Plaintiffs may pursue injunctive relief benefiting the public in court because Google's clause purports to cut off the ability to obtain this relief. As such, the motion to dismiss should be denied in its entirety.

## ISSUES TO BE DECIDED

1. Whether Plaintiffs have standing to sue Google for monopolization: **Yes**. (Part I.A.)

2. Whether the FAC adequately defines the relevant market in which Google holds monopoly power: **Yes**. (Part I.B.)

3. Whether the FAC sufficiently alleges Google's anticompetitive conduct: **Yes**. (Part I.C.)

4. Whether the FAC states a claim under the Unfair Competition Law: **Yes**. (Part II.)

5. Whether Plaintiffs may seek a public injunction against Google in court: **Yes**. (Part III.)

2

**RELEVANT BACKGROUND**

On May 27, 2020, Plaintiffs filed a class action complaint against Google for monopolizing the intermediary services that connect advertisers and publishers of display advertisements. ECF 1. Plaintiffs filed the operative First Amended Complaint on December 4. ECF 52. Plaintiffs are advertisers, and the class proposed in the FAC included both advertisers and publishers. ¶¶ 4, 225. On January 15, Google moved to dismiss. ECF 66 ("Mot."). In light of cases later filed by publishers on behalf of proposed classes limited to publishers, the Court directed Google and Plaintiffs in this action to proceed with briefing Google's motion to dismiss at this time only "as to the advertisers[.]" 2/4/21 Hr'g Tr. at 33-34.

In accordance with the Court's guidance, the proposed class for present purposes—and Google's arguments—are limited to the following subclass, defined in the first prong of the class definition alleged in the FAC:

> All persons and entities in the United States that, from January 1, 2016 to the present, used Google's display advertising services to ~~(1)~~ place an ad on a website operated by another entity (advertisers) ~~or (2) place an ad from a third party on their own website (publishers)~~

¶ 225. *See* Fed. R. Civ. P. 23(c)(5) (authorizing the court to designate subclasses). In addition, courts in private antitrust cases limit the class to persons who transacted in the restrained market. *See, e.g.*, *Natchitoches Par. Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 256 (D. Mass. 2008) ("By definition, the proposed class contains only direct purchasers of [the products] in the relevant market"); *Foam Supplies, Inc. v. The Dow Chem. Co.*, 2006 WL 2225392, at *5 (E.D. Mo. Aug. 2, 2006) (approving of market definition pegged to purchasers in that market), *overruled on other grounds by Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450-53 (2009). In this case, because the advertisers only purchased Google's display advertising services *for advertisers*, the subclass limitation operates to narrow the relevant product market to a corresponding submarket:

> The market for online display advertising services [to advertisers], encompassing the overall system or process that connects online display advertisers [to] ~~and~~ publishers (including Google)

¶ 183.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC
CASE NO. 5:20-cv-03556-BLF

**LEGAL STANDARD**

On a motion to dismiss, all allegations of material fact in the complaint are assumed to be true and construed in the light most favorable to Plaintiffs. *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020). The plausibility standard of Rule 8 asks whether the allegations, considered as a whole, raise "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**ARGUMENT**

**I.     PLAINTIFFS STATE A CAUSE OF ACTION UNDER THE SHERMAN ACT.**

The elements of a claim under Section 2 of the Sherman Act are (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1254 (9th Cir. 1990). The FAC sets out sufficient facts to make it plausible that Plaintiffs will meet each element at trial.

**A.     Plaintiffs Allege Facts Sufficient to Give Them Standing to Sue.**

The FAC, "to survive a motion to dismiss under Rule 12(b)(6), . . . 'need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws.'" *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996). The FAC clears that hurdle, alleging that each Plaintiff "sustained antitrust injury by paying supra-competitive prices to Google to broker the placement of its display advertisements on third-party websites. These anticompetitive overcharges directly and proximately resulted from Google's monopolization of the relevant market." ¶¶ 13, 18, 23.

Prices rose, causing antitrust injury (¶¶ 123-27), and Plaintiffs allege that Google's wrongful exercise of monopoly power has harmed competition. ¶¶ 207-11. Therefore, because antitrust injury is "loss flow[ing] from an anticompetitive aspect or effect of the defendant's behavior," *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995), Plaintiffs' injury allegations give them standing. *See, e.g., Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1303 (11th Cir. 2010) (reversing dismissal of a complaint alleging tying violations that resulted in higher prices and fewer choices, "precisely the type of harm that we allow plaintiffs to vindicate through the antitrust laws."); *Minnesota Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1147

1   (D. Minn. 1999) (antitrust injury was a "hotly disputed issue of fact.").

2         The FAC states how much each Plaintiff paid Google to broker ad placements, on what sites,

3   for what purposes, and during what time period and alleges that Plaintiffs paid overcharges due to

4   Google's monopolization. ¶¶ 8-23. Google seeks details of the "particular display . . . services" and

5   "what particular 'intermediation services'" Plaintiffs used (Mot. at 19:9, 19:24), but Plaintiffs need not

6   plead with such particularity. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 50 (1st

7   Cir. 2013) (reversing where "the district court improperly applied a heightened pleading standard" to

8   antitrust claims). Google argues that Plaintiffs use AdWords to place search ads even though it is clear

9   that they also paid Google for display services. *Compare* Mot. at 2:12-14, *with* ¶¶ 8, 14, 19. Google's

10  demand for more details about particular advertising tools (Mot. at 19:9-17) is unsupported by case law

11  and ignores the allegations that its conduct gave it control over the *entire* market for these intermediary

12  services, all of which saw price increases. ¶¶ 59-62, 123-27, 136, 186-88. Thus, Plaintiffs sufficiently

13  allege standing because regardless of what intermediation services they used, they were injured and

14  they participated in the market Google monopolized by using Google's intermediary services to broker

15  the placement of their display advertisements on third-party websites. ¶¶ 8, 14, 19. *See Glen Holly*

16  *Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (requiring only that an antitrust

17  plaintiff "be a participant in the same market as the alleged malefactor[,]" e.g., by being "a consumer of

18  the alleged violator's goods or services") (internal quotation marks and citations omitted).

19         **B.    Plaintiffs Sufficiently Allege That Google Monopolized the Market for Display**
20                 **Advertising Services for Advertisers.**

21         The FAC alleges Google has gained more and more control over the advertiser-facing services

22  at issue. ¶¶ 74-75, 186-88 (specifying percentage shares). Google's power has enabled it to increase ad

23  pricing at rates several times higher than the rate of inflation. ¶¶ 123-27. Google's profits also surged,

24  to almost three times the average corporate profit margin—well over 20%. ¶¶ 127, 130. Google's high

25  profits have persisted (¶ 130) and "there is no better evidence of power" than sustained high profits

26  because "factors like a new innovation or a recent demand surge cannot explain" the margins.

27  Sullivan, *Antitrust* § 27; IIA Areeda & Hovenkamp, *Antitrust Law* ¶ 516b, at 116 (2d ed.).

28         Because the ability of market participants to switch to a substitute restricts a firm's ability to

---

5

depart from competitive pricing, "relevant product market hinges on a determination of those products to which consumers will turn given reasonable variations in price." *United States v. Gillette Co.*, 828 F. Supp. 78, 81 (D.D.C. 1993); *see Rebel Oil*, 51 F.3d at 1434. Common sense favors the FAC's market definition under this antitrust principle. For instance, a 2018 study by eMarketer focusing on programmatically purchased ads across the open internet found that ad prices have gone up in all major display categories: desktop, mobile, mobile app, and video. ¶ 125. Far from switching to other online advertising services, however, advertisers have fueled the rapid growth of the market for display brokering services *despite* Google's higher prices. ¶¶ 29, 37, 123-27. Therefore, the FAC gives rise to a strong inference that demand is inelastic and no other services are reasonably interchangeable.

Google does not deny its monopoly power in the relevant product market as defined (¶¶ 74-75, 186-88); nor does it dispute that the relevant geographic market is the United States (¶ 184). Google instead challenges the market definition. Mot. at 4-9. Defining a relevant antitrust market is a fact-intensive inquiry. *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986) (holding that "[r]elevant market is a factual issue which is decided by the jury"); *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (Sotomayor, J.) (stating that "market definition is a deeply fact-intensive inquiry"); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) (noting that dismissals based on market definition "'remain relatively rare and are generally limited to' certain types of 'glaring deficiencies,' such as failing to allege a relevant market") (citing *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 339 (D. Vt. 2010)); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 99 F. Supp. 3d 610, 620 (D. Md. 2015). "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1164 (D. Nev. 2016) (citing *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)). The FAC surpasses that standard, and the motion's attempts to portray the market as overly complex weigh *against* dismissal prior to factual development.

"Reasonable interchangeability sketches the boundaries of a market, but there may also be cognizable submarkets which themselves constitute the appropriate market for antitrust analysis." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (citing *Brown Shoe v.*

6

*United States*, 370 U.S. 294, 325 (1962)); *see, e.g.*, *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1107 (N.D. Cal. 2013). In *Brown Shoe*, the Supreme Court ruled that "within [a] broad market, well-defined submarkets may exist" whose boundaries "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325 (internal citation omitted). These factors "are to be used as practical aids," *RSR Corp. v. FTC*, 602 F.2d 1317, 1321 (9th Cir. 1979), for assessing whether a market is defined such that a firm would or would not be constrained from restricting output or pricing at noncompetitive levels.

Applying the *Brown Shoe* factors here further bolsters the FAC's factual explanation for why display-ad intermediation services have no reasonable substitute.

### 1. Industry recognition of the submarket as a separate economic entity.

Knowledgeable industry participants treat the market for display ads placed through automated, real-time bidding as a distinct entity for purposes of monitoring and analyzing the pricing and volume of transactions and other economic trends. *E.g.*, ¶¶ 37, 50, 125. In short, this market is "treated by advertisers and marketing firms as distinct" (¶ 197), which favors doing the same in court. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1163 (9th Cir. 1984) (affirming finding of separate markets where evidence showed industry participants regarded prerecorded music as distinct from "home tapes" and that increasing the price of prerecorded music "would not cause a massive shift to home taping."); *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 308 (7th Cir. 1976).

### 2. The product or service's peculiar characteristics and uses.

Google offers advertisers a bundle of services for loading, storing, brokering and adjusting the placement of, and monitoring advertisements on third-party websites. These services are used by advertisers for the same purpose, and they have unique characteristics, relying on (1) matching of advertisers to publishers to fill a website's ad-space inventory with precisely targeted ad placements, and (2) instantaneous bidding in the milliseconds during which the page loads. ¶¶ 54, 56, 91.

Google contends that the relevant product market is defined both too broadly and too narrowly. But Plaintiffs' definition matches digital advertising realities. *See Eastman Kodak Co. v. Image Tech.*

---

7

*Servs., Inc.*, 504 U.S. 451, 482 (1992) ("The proper market definition . . . can be determined only after a factual inquiry into the 'commercial realities' faced by consumers.") (citation omitted).

Arguing "too broad," Google first observes that the advertisers do not use the publisher-side tools. Mot. at 5:8-14, 19-22. But, as noted above, Google's motion as limited to an advertiser subclass also limits the relevant services to those used by Plaintiffs and this subclass. *See* 2/4/21 Hr'g Tr. at 20:25-21:1 (Google's counsel stating that "obviously that takes away one of our arguments"). Further, Google admits to bundling "services for advertisers *with other services for advertisers*" (Mot. at 5:19-20), undermining any claim that the advertiser services are too varied to comprise a submarket. *See* ¶ 76. Plaintiffs allege Google's monopoly power resulted in supracompetitive prices for all of the services in this bundle. ¶¶ 56-58; 123-27.

Reversing course, and arguing "too narrow," Google then emphasizes that a relevant market must include services that are reasonably interchangeable "for the same purposes." Mot. at 4:25. As an initial matter, advertisers use Google's *services* to place ads with digital publishers to attract potentially interested customers, and the *services* are what provide access to display advertising. Other, non-display forms of *advertising* (like search) do not serve the same function, and therefore are not substitutes, for the *services* that advertisers use to access display-ad space. Ignoring the differences between advertising and advertising services, Google asserts that non-digital forms of advertising can substitute for Google's online exchange system. Mot. at 8-9. But Plaintiffs' complaint alleges the opposite. ¶¶ 195-96. The FAC alleges facts showing that Google's display intermediation services to advertisers contain unique qualities, serve distinct purposes, and hence are purchased in a discrete submarket. *See, e.g.*, *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 933 (6th Cir. 2005) (air-travel services to passengers traveling for leisure occupied their own product market).

The "programmatic" display-ad market lets advertisers use display advertising services to access a *range* of web-based publication options and thereby reach a broader group of users. ¶ 203. It is this distinctive quality, not merely "increased effectiveness" (Mot. at 9:1), that has caused this market to boom despite the additional costs from Google's price hikes. ¶¶ 37, 123-27. The FAC explains that "[t]he online user population is fragmented across hundreds of thousands of publishers, preventing advertisers from reaching desired customers without assistance from an intermediary." ¶ 189. Google's

8

intermediary services rely on data and algorithms to optimize ad placements on sites "likely to be viewed by the advertiser's target audience or by those most likely to purchase the advertised products or services." ¶ 35. Hence, by participating in this broad exchange market, advertisers can access likely customers they otherwise could not; no other market can accomplish this function.

Placing ads in this display-ad market allows advertisers to reach a distinct group of consumers consisting of those who have not searched for the product or service and who may not know about it, but whose browsing activities suggest they might want to buy it. ¶ 85. Display ads therefore "create demand," complementing the search ads that "satisfy demand," as Google's own economist recognized. ¶ 199. *See* IIA Areeda & Hovenkamp, *Antitrust Law* ¶ 565 (4th ed.) (discussing the principle that complements are not substitutes).

Open-web display advertising also provides a "re-marketing" capability that is entirely unique to display advertising. Consumers who indicated previous interest in a product, service, or website are shown display ads that seek to redirect that consumer back to the advertiser's product. ¶ 198. This feature also distinguishes display advertising from other forms of advertising such as television, radio, or print ads. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 403-05 (E.D.N.Y. 2008) (holding that the facts as alleged could prove that network services for MasterCard are not interchangeable with other forms of payment, for when "a product's characteristics make it unique or circumstances prevent consumers from substituting alternatives for the same purposes, it may be alone in the relevant product market.").

Google attempts to draw inferences contrary to Plaintiffs' allegations that "[d]igital advertising is different in kind" from traditional advertising, in that "it reaches targeted customers individually and because digital advertisements can be continuously updated and improved based on data showing how consumers are responding." ¶ 196. Real-world data confirm display advertising is economically distinct:

> [A] 2018 Google study reported that the prices for ad space trading on Google's exchange drop by half or more when advertisers cannot identify users associated with the ad space for sale. Relatedly, according to Index Exchange, the number of bids for ad space on Mozilla Firefox pages declined by 38% after that internet browser started blocking cookies. In short, unless they can know the identity of the users being targeted, advertisers often avoid ad auctions altogether.

¶ 195. The reduction in use of display advertising when it is stripped of its essential qualities,

9

individual targeting and continuous refinement based on data, demonstrates other forms of advertising are *not* a reasonable substitute and that advertisers use display advertising precisely because of these features. The same is true of publishers, as shown by Nexstar Media's sharply reduced sales when it temporarily stopped using Google's intermediation services. ¶ 75. And the rapid growth of display advertising in spite of rising prices is itself a strong sign of inelastic demand and market cohesion. ¶¶ 29, 37, 123-27. *See Geneva Pharm.*, 386 F.3d at 497 (fact that customers are "loyal despite . . . conspicuously higher prices strongly suggests inelastic demand.").

Google's argument depends on the faulty presumption that *any* degree of substitutability between one service and other services precludes the existence of a relevant market. In fact, however, where a service "competes against imperfectly interchangeable substitutes, prices may be somewhat supracompetitive within limits determined by the degree of effective interchangeability" and "it would not be correct to conclude . . . that there would be no market power and no supracompetitive price." *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 668 (D. Conn. 2016); *see also FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 30-32 (D.D.C. 2015). So the simple fact that another form of advertising is interchangeable to some degree with the services in question would not support a finding that the services do not comprise a relevant market as a matter of law (i.e., what would be needed to support dismissal under Rule 12(b)(6)). The facts discussed above make it plausible that non-digital forms of advertising are not perfect substitutes for display advertising, much less for display-ad *services*.

Google cites *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018), a case involving advertising to a niche group—golf fans—who could be reached through ads in various media given their specific interest in professional golf. *Hicks* is distinguishable. For one thing, *Hicks* did not discuss whether one type of advertising can be a substitute for the *services* used to access a discrete advertising market, which would be illogical. *Hicks* also recognizes that advertising submarkets may exist, *see id.* at 1121 n.8, and illustrates the fact-bound nature of defining a relevant product market under Section 2 and the importance of considering real-world data.

The plaintiffs in *Hicks* were caddies who complained about being required to wear promotional bibs during televised PGA tournaments, and who claimed that "advertisements to golf fans" were in their own product market and that they participated in a golf "endorsement" submarket, *id.* at 1114-15,

10

1121-22, asserting "professional golf fans constituted a unique market for certain advertisers." *Id*. at

1116. Plaintiffs' display-ad services market definition recognizes what the unrealistic definitions in

*Hicks* did not: "The consumers do not define the boundaries of the market; the products or producers

do." *Newcal*, 513 F.3d at 1045. While Plaintiffs properly define the market by reference to a set of

advertising products, the *Hicks* plaintiffs proposed a market limited to golf fans, and the court applied

common sense to find it implausible that the group influenced by ads on caddies' clothing was

"distinct for advertising purposes from the typical group of *golf* fans" who could also be reached

through golf-oriented radio programs and other media. 897 F.3d at 1121-22 (emphasis added).

The market defined in the FAC, in contrast, is not focused on a single group of consumers with

known interests that make it feasible to reach them in other forums, as in *Hicks*. The market covers

display advertising *services* to web users in the market for *any* product or service. Even if advertising

and advertising services were conflated, the FAC adequately alleges why no other type of advertising

can reasonably substitute for display ads reaching, on a whole swath of websites, web surfers who

might be interested in a product or service as suggested by user activity and demographic or other

data. ¶¶ 27-28, 35, 189, 195-98.

That Google overreads *Hicks* is confirmed by its bracketed substitution of "potential" for

"golf" to modify the word "consumers" in the quoted sentence from the opinion. Mot. at 8:27. None of

the older cases cited in *Hicks* involve digital advertising, and *Hicks* has already been distinguished.

The court in *In re Local TV Advertising Antitrust Litigation* sustained allegations that "broadcast

television spot advertising" is "not readily interchangeable with other forms of advertisement,"

holding that "the scope of a product market is a fact-intensive inquiry" and that dismissal is

unwarranted except where the "alleged relevant market 'clearly does not encompass all

interchangeable substitute products[.]'" 2020 WL 6557665, at *12 (N.D. Ill. Nov. 6, 2020) (citing,

*inter alia*, *Todd*, 275 F.3d at 199-200).

### 3. Unique production capabilities.

Google's considerable advantage in collecting user data gives it unique abilities to undertake

and refine the placement of display advertising. ¶¶ 88-98. Google's brokering services are specialized,

unmatched by any other firm, and protected by prohibitive entry barriers. ¶¶ 53, 76, 130, 201-02. *See,*

11

*e.g.*, *Gen. Foods Corp. v. FTC*, 386 F.2d 936, 943 (3d Cir. 1967) ("trade realities" that supported market definition included, on the supply side, existence of specialized production machinery).

Google asserts that the FAC's relevant market improperly excludes advertising on certain types of websites—"major media sites, "closed-ended" sites, "social-media display advertising," and "online markets" like Amazon (Mot. at 6:14-25, 7:10-22)—as well as advertising placed directly with publishers (Mot. at 6:26-7:9). These arguments misconstrue Plaintiffs' claims and are legally unsound.

Plaintiffs' market definition does *not* exclude ads placed on certain websites. The FAC defines the relevant market based on the nature of the intermediation services, which connect entities (¶ 203), not based upon the identity or nature of the website publisher. *Cf.* Mot. at 3:7-10, 6:14-7:22. The market therefore appropriately includes third-party brokering services, while it excludes the separate and distinct market for "first-party," *directly* negotiated placement of display ads through a "closed-end system" not using third-party brokerage (such as Facebook's). Thus, a transaction involving a display advertisement placed on *any* website using third-party brokering services occurs in the relevant market. ¶¶ 183, 190, 204. *See, e.g.*, *Brooks Fiber Commc'ns of Tucson, Inc. v. GST Tucson Lightwave, Inc.*, 992 F. Supp. 1124, 1130 (D. Ariz. 1997) (finding that "conflicting inferences may be drawn" as to market definition based in part on "[d]ifferences in service[s]" and should be "reserved for the factfinder.").

The FAC notes the economic reality that "[n]early all advertisers lack the resources and access to be able to negotiate directly with particular publishers . . . and even advertisers with the ability to do so prefer not to limit their placement of display advertisements to discrete websites." ¶ 191; *see also* ¶¶ 189-90, 192-94. Relying on a third-party broker solves the "matching problem" that advertisers face. ¶ 189. By contrast, direct placement not only requires scarce time and resources but it also forfeits a key advantage of exchange placement—making your product or service visible on a wide range of sites that can be adjusted in real time. ¶¶ 35, 189, 203-04. Direct placement is therefore not a reasonable or perfect substitute, and amounts to a very low percentage of display advertising overall. ¶ 193.

Likewise misplaced is Google's argument that publishers compete to place ads. Mot. at 2:26-3:10. The relevant question is whether other advertising *services* compete with Google's intermediation services, and the FAC alleges they do not. Companies like Facebook and Amazon are not in the business of providing brokering services to advertisers and other publishers. Facebook

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC
CASE NO. 5:20-cv-03556-BLF

presents display ads on Facebook, and Amazon for products sold on Amazon. ¶¶ 200, 204; *see also* ¶¶ 190-93. The services they offer for placing ads on their own sites cannot, therefore, replace the brokering services at issue here. *See* ¶¶ 203-05 (industry participants distinguish Facebook's "close-ended" services from Google's "open-ended system").

Even if advertisers could, to some degree, move away from brokered placement towards advertising on specific websites, whether through direct negotiation, closed-ended platforms on highly trafficked websites, or otherwise, there is no reason to think that such switching would prevent Google from wielding sufficient market power over *open*-ended placements to allow it to charge advertisers supra-competitive prices and pay publishers sub-competitive prices. The "reasonable" substitute standard is not an "any" substitute standard, and does not require including alternative channels in a product market. *See Sysco Corp.*, 113 F. Supp. 3d at 25-32; *In re Aggrenox*, 199 F. Supp. 3d at 668.

### 4. Distinct customers and prices.

Proceeding with submarkets corresponding to advertiser and publisher subclasses also resolves Google's concern that the relevant market includes differently situated customers. Mot. at 4-5. With the advertiser and publisher customers separated into different groups, each of which uses Google's services for the same or similar business purposes, its argument is mooted. And while display advertisers are connected to publishers through Google's intermediation services, the prices the advertiser group paid for those services have increased uniformly. *See* ¶¶ 123-27.

### 5. Specialized vendors.

The final *Brown Shoe* factor considers whether a service is delivered in a unique way, i.e., by a vendor with specialized knowledge. *See, e.g., Henry v. Chloride, Inc.*, 809 F.2d 1334, 1342 (8th Cir. 1987). Plaintiffs here allege that Google, exercising its monopoly power, uses specialized algorithms and its unparalleled access to data to provide services for brokering, managing, and refining display-ad placements in the exchange market. ¶¶ 28, 53, 70, 88-98. This factor, therefore, further favors Plaintiffs' market definition.

\* \* \*

Considered under the *Brown Shoe* factors, the facts as alleged give rise to a plausible inference that the ad-placing services Google provides Plaintiffs have no reasonable substitute.

13

### C. Plaintiffs Adequately Plead Anticompetitive Conduct.

Section 2 condemns "abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market." *Epic Games, Inc. v. Apple Inc.*, 2020 WL 5993222, at *9 (N.D. Cal. Oct. 9, 2020) (citation omitted). A plaintiff who has shown the defendant's monopoly power in a relevant market "need only show anticompetitive behavior *capable* of contributing to monopoly[.]" III Areeda & Hovenkamp, *Antitrust Law* ¶ 650c, at 69 (2d ed.) (emphasis added); *see also* Sullivan, *Antitrust* § 34. To obtain and cement its market power Google acquired rivals, coerced advertisers to use only its display-ad services (including by conditioning access to search and video advertising data on the purchase of its display-ad services), prevented its advertising systems from being able to interface with others, and suppressed information. ¶¶ 59-160.

"[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003). Google's attempts to isolate and defend aspects of this scheme are thus misplaced. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (concluding it would "not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their *overall combined effect*") (emphasis added); *Le*, 216 F. Supp. 3d at 1168; *Church & Dwight Co. v. Mayer Labs., Inc.*, 2011 WL 1225912, at *15-16 (N.D. Cal. Apr. 1, 2011) (sustaining cumulative claim "even if the additional claims viewed separately were insufficient to state independent Sherman Act violations"). For this reason, the Court need not consider whether Plaintiffs could state a claim by alleging *only* that Google acquired or maintained its monopoly through anticompetitive acquisitions, tying, denying interoperability, or concealing information; Plaintiffs plausibly allege that Google's practices had the "overall combined effect" of entrenching its monopoly power. ¶ 135.

#### 1. The FAC alleges facts sufficient to show an unlawful scheme to monopolize, including through Google's acquisition of rivals.

Plaintiffs plausibly allege that Google's strategy of buying up rivals that posed a competitive threat served to exclude competition. Indeed, "a monopolist's acquisition of the productive assets or stock of an actual or likely potential competitor *is properly classified as anticompetitive*, for it tends to augment or reinforce the monopoly by means other than competition on the merits." III Areeda &

14

Hovenkamp, *Antitrust Law* ¶ 701a, at 140 (2d ed.) (emphasis added) (footnote omitted); *see, e.g.*, *Le*, 216 F. Supp. 3d at 1162 ("[T]hat defendant acquired its prior competitor, thus eliminating its only serious competition in the market, is further evidence of anticompetitive conduct") (citation and alterations omitted); *Volvo N. Am. Corp. v. Men's Intern. Prof'l Tennis Council*, 857 F.2d 55, 73 (2d Cir. 1988) (reinstating claims of unlawful monopoly maintenance in part through a merger).

              **a.**      **Google's documents show that the acquisitions were anticompetitive.**

Google's strategy, as revealed in its internal documents produced to Congress, was to acquire a series of ad-tech competitors and combine products to foreclose competition. ¶¶ 61-62, 71-75. The FAC plausibly alleges that these acquisitions had anticompetitive effects. ¶¶ 59-61. As an initial matter, the FAC must not be read to be challenging each acquisition as a separate violation or claim. *See* ¶ 136. *See City of Anaheim*, 955 F.2d at 1376. Moreover, Google's claim that the FAC "does not say" what the acquisitions "have to do with Plaintiffs' antitrust claims" is incorrect. The FAC alleges that Google's acquisition of several rivals destroyed competition and was followed by other exclusionary acts, which ultimately permitted Google to "control[] the ad stack as a whole" leaving advertisers and publishers with no real choice but to use its intermediation services. ¶¶ 59, 74-75. Google's intent was to "absorb[] competing firms to avoid competing with them with the purpose and effect of building and consolidating its monopoly." ¶ 61. Plaintiffs identify the acquisitions that were part of the scheme and allege how Google used them to solidify its power, capitalizing on what its documents call "the synergies/inter-relationships from owning all these pieces." ¶¶ 62, 71. Plaintiffs also allege the adverse impact of Google's conduct on rivals—after its acquisitions conferred monopoly power in the display-ad services market, "the early exchanges that had initially outperformed Google were selling at a discount price or had folded." ¶ 70. Google thus achieved its stated goal of gaining dominance by "eliminating the disintegration risk" from competing firms. ¶¶ 72, 99.

The Court should decline Google's invitation to predetermine that the combined effect of the acquisitions (and Google's other conduct at issue) was procompetitive. While Google demands specificity as to "how much each acquisition increased Google's share of any relevant market" (Mot. at 16:25-26), that is a fact question for discovery. And the FAC does allege that "the differential in allocation of advertising revenues between Google and non-Google properties has consistently

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC
CASE NO. 5:20-cv-03556-BLF

increased," rising from 64% in 2007 to 75% in 2014 and then even further to 84% in 2019. ¶ 153. As the FAC alleges, "[t]hese widening percentages well demonstrate the market distortions now favoring Google, and they correspond to—and resulted from—Google's steady acquisition of monopoly power in the ad tech stack." *Id.*

In response to Google's prior argument that the FTC blessed the DoubleClick acquisition (ECF 41 at 18), Plaintiffs included detailed allegations that Google misled the FTC about the consequences of that acquisition and its later acquisition of AdMob. ¶¶ 63-69. Google now misconstrues Plaintiffs' allegations of anticompetitive effects as resting on that deception (Mot. at 16:8-22) when the point instead is that Google's deceit renders the FTC's approval of no relevance at all. *See, e.g.*, *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1181 (N.D. Cal. 2012) (the "mere fact" that DOJ "'cleared' the merger" did not preclude plaintiffs from pursuing relief based on its effects). Even if any particular Google acquisition could eventually be deemed lawful, "[t]his is not a case 'where none of the alleged conduct was anticompetitive, even when combined.'" *Id*. (citations omitted).

Google's cases do not compel a contrary ruling. The unpublished opinion in *Eastman v. Quest Diagnostics Inc*. recognizes that "the merging of competitors to form a monopoly may violate § 2 of the Sherman Act." 724 F. App'x 556, 559 (9th Cir. 2018). Also, at least one of the acquisitions in that case was "not the typical merger" because the FTC required a divestiture that resulted in a "new significant competitor" entering the market, which did not happen in this case. *Id.* And, unlike here, in *Carefusion Corp. v. Medtronic* "[m]ost of Plaintiffs' allegations of 'illegal acquisition' relate[d] to Defendants' conduct *pre*-merger." 2010 WL 4509821, at *8 (N.D. Cal. Nov. 1, 2010) (emphasis added).

### b. Plaintiffs' claims are timely.

Google carried out its alleged scheme during the limitations period, so Plaintiffs' monopolization claim is timely. Google does not contend that the overall scheme, or any portion of it *other than* the acquisitions, occurred before the limitations period, and the FAC describes anticompetitive conduct within the limitations period. *E.g.*, ¶¶ 119, 217. Accordingly, Google's statute of limitations argument fails. *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086-87 (9th Cir. 2014).

Google's argument wrongly assumes that the Plaintiffs allege separate claims based on each acquisition. But Plaintiffs bring a single Section 2 count, encompassing all of Google's conduct, and

16

Google's anticompetitive conduct must not be chopped into individual acts and considered separately. *City of Anaheim*, 955 F.2d at 1376. Google's citation to the Court's analysis of the continuing violation doctrine in the context of a Section 7 claim (Mot. at 17:10-11) is inapposite because Plaintiffs do not bring that claim. And even if the pre-2016 acquisition portion of Google's scheme were considered in isolation, Google's fraudulent concealment tolls the statute of limitations.

First "it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010) (citation omitted); *see In re Resistors Antitrust Litig.*, 2017 WL 3895706, at *3 (N.D. Cal. Sept. 5, 2017) (inquiry "calls for an even more plaintiff-friendly view") (citing *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc*., 858 F.2d 499, 504-05 (9th Cir. 1988)).

Second, Google's plan to use the acquired markets to acquire or maintain a monopoly could not have been discovered until the limitations period, particularly because all other components of Google's anticompetitive scheme occurred within that period. ¶ 216. The subsequent conduct and the other restrictions discussed below alone distinguish this case from *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 988-89 (N.D. Cal. 2020). The Ninth Circuit, moreover, "has made clear that '[t]he requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a reasonable person,'" *In re Resistors*, 2017 WL 3895706, at *3 (quoting *Conmar*, 858 F.2d at 504), and until recently there was no public information that would have led a reasonable person to inquire into Google's monopolization of the relevant market. ¶ 216. Google has "identified no avenues [Plaintiffs] should have explored that would have provided them the necessary factual basis to file a complaint." *In re Auto. Parts Antitrust Litig.*, 2017 WL 7689654, at *5 (E.D. Mich. May 5, 2017). In public statements Google repeatedly (misleadingly) denied that it had abused market power and as late as December 2019 sought to misdirect its customers by claiming that its behavior that prompted France's $167 million fine was "needed to 'protect [people] from exploitative and abusive ads.'" ¶¶ 220-21. Google also publicly misrepresented, after the DOJ disclosed its antitrust investigation, that "publishers and marketers have enormous choice" when most have no choice but to deal with Google. ¶¶ 75, 210, 221. This affirmative deception goes beyond a "mere failure to own up to illegal conduct," *Reveal Chat*, 471 F. Supp. 3d at 992-93 (citation omitted), and

17

Plaintiffs specify the "who," "what," and "when" of Google's misleading statements (¶¶ 220-21) and describe why Google's anticompetitive conduct was self-concealing and unknown to Plaintiffs exercising reasonable diligence. ¶¶ 214-16, 219, 222. Google's statute of limitations defense accordingly fails, and for the same reasons, Plaintiffs' claims are not barred by laches.

> **2.  The FAC alleges facts sufficient to show coercive tying contributed to Google's monopolization scheme.**

The FAC alleges facts sufficient to show that Google engaged in coercive tying conduct to further its scheme to monopolize. ¶¶ 100-33. While courts typically condemn an unlawful tie under Section 1 of the Sherman Act, tying conduct also may violate Section 2—and "tying-like conduct that may not satisfy the traditional requirements for a tying claim under Section 1 may nonetheless violate Section 2." ABA, *Antitrust Law Developments*, at 255 (8th ed. 2017) (citing, *inter alia*, *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1201, 1217 & n.10 (9th Cir. 1997)); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468-69 (7th Cir. 2020) (reversing dismissal of Section 2 claims). The allegations of Google's tying satisfy the conduct element of Section 2 at the very minimum.

To begin with, after setting Google Ads as the display advertising provider for new search advertising customers, Google prevents those customers from using third parties to purchase Google Search inventory. This restriction creates significant pressure to use only Google's services to broker the entire digital campaign, including in the relevant submarket. ¶¶ 101-02, 120. Furthermore, Google withholds crucial search advertising data unless the advertiser relies solely on Google to place its display ads. ¶¶ 103-07. All Plaintiffs used Google's search *and* display advertising services. ¶¶ 8-11 (Hanson); ¶¶ 14-16 (Surefreight Global); ¶¶ 19-21 (Lindo). Google also restricts access to its popular YouTube site to video advertisers using its display advertising services. ¶¶ 113-20. The combined effect of these restrictions has been noncompetitive pricing and substantial barriers to competition. ¶¶ 123-33.

Plaintiffs adequately allege that Google tied together the purchase of two different types of services, satisfying the first element of a traditional tying claim. *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912-13 (9th Cir. 2008). Google does not dispute that Plaintiffs sufficiently define a relevant market for <u>search advertising</u>—the tying market. ¶¶ 45-47, 77-88; *see* Mot. at 11-12. Nor does Google dispute that Plaintiffs adequately allege Google's power in that market was sufficient to coerce acceptance of the tied <u>display brokering services</u> (the second element). *Cascade Health*, 515 F.3d at

18

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC
CASE NO. 5:20-cv-03556-BLF

912-13. Google instead asserts that the allegations of its coercive tying are a "rehash[]" of "leveraging" allegations or reflect innocuous "rebranding." Mot. at 12:2, 13:1. These arguments are unpersuasive. Whether conceived as tying or as leveraging its search advertising monopoly, Google's restrictions have anticompetitive effects. Google insists that, absent other anticompetitive conduct, leveraging a monopoly is permissible. *See* Mot. at 9-10. But setting aside that Plaintiffs here *have* alleged other anticompetitive conduct, the Supreme Court "has held many times that power . . . can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'" *Eastman Kodak*, 504 U.S. at 479 n.29 (citation omitted). And, contrary to Google's suggestion that a company has the unfettered ability to deal as it sees fit, business conduct motivated by "any purpose to create or maintain a monopoly" is illegal. *Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951).

Plaintiffs allege that Google conditions advertisers' access to search advertising performance and other data on their exclusive use of Google display advertising services, and that this restrictive policy prevents an advertiser from "track[ing] the performance of its search ads unless it relies only on Google to place its display ads." ¶ 104. If, in turn, an advertiser cannot track search-ad performance, it cannot refine and optimize its campaign. ¶¶ 28, 104, 109. The resulting coercion is especially pronounced because search advertising is indispensable to digital advertising. ¶ 101. *See Cascade Health*, 515 F.3d at 914 (tying can arise "as a matter of economic imperative").

Just as Google's search-ad restrictions coerced advertisers to use only Google to place display ads, the same effect resulted from Google's decision to take YouTube off the ad exchanges and restrict access to Google customers—which "of course had a crippling effect on Google's rivals," Senator Klobuchar said. ¶ 118. Advertisers whose digital campaigns include video ads can only place YouTube ads and analyze their performance using Google's tools. As a result, video advertisers are coerced into using only Google tools for their entire campaign—display, search, the whole thing. ¶¶ 116-21. Exacerbating this coercion, most advertisers use only one demand-side platform per digital campaign since doing so increases the effectiveness of the advertising, "allow[ing] them to manage frequency caps (limits on the number of times the same user is shown an ad) during the campaign and facilitat[ing] audience management and reporting. Thus, if an advertiser wished to advertise on YouTube, Google Search, and other publisher websites, the advertiser would bear significant costs

19

and inefficiencies from using a different advertising service provider[.]" ¶ 120.

Google's attempt to justify its coercive practices by pointing to *Apple iPod iTunes Antitrust Litig.*, 2009 WL 10678940, at *5 (N.D. Cal. Oct. 20, 2009), is self-defeating. Google quotes the phrase that "if the buyer is free to take either product by itself, there is no tying" (Mot. at 13); yet, due to Google's restrictive policy changes, advertisers are *not* free to advertise on YouTube unless they also use Google ad-placement services. Likewise, Google merged its advertiser ad server and its demand-side platform into a single product, "Display & Video 360," such that the combined set of services can no longer be freely purchased on a standalone basis. ¶ 76; *see also* ¶ 109.

Unable to address or dispute the anticompetitive effects of its various restrictions, as set forth in the complaint, Google instead demands that the complaint define a "video-ad publishing market." Mot. at 12:13-15. That is unnecessary, first, because Google's argument again isolates one type of anticompetitive behavior without regard to how it amplifies Google's other restraints. *See, e.g.*, *Viamedia*, 951 F.3d at 468-69 (explaining that "[w]hen the defendant is a dominant firm . . . the special screening function of the tying factors is largely unnecessary, and the more general standards of § 2 become relevant") (internal quotation marks, alteration, and citation omitted); *LePage's*, 324 F.3d at 162 (reiterating that "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."). Second, even focusing on the video advertising market segment, Google's power "may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes." *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969) (citation omitted). The FAC describes how placing video ads at the start of YouTube videos is an important and fast-growing component of digital campaigns. ¶¶ 114-19. The FAC further alleges that nearly every advertiser that pays for video ads places them on YouTube, which carries more than three times the traffic of Facebook and Twitter. ¶ 114. Given these facts, the FAC sufficiently alleges that Google's control over YouTube—one of the advertising platforms it gobbled up (¶ 116)—gives it "appreciable economic power" to coerce use of its display advertising services. *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003); *see also Newcal*, 513 F.3d at 1052 (holding that the existence of market power for the tying product "is a factual question").

20

### 3. The FAC alleges facts sufficient to show Google unlawfully maintained its monopoly in part by denying interoperability.

The allegations that Google wrongfully disadvantaged ad-service rivals by imposing technological barriers are plausible. Google altered its advertising systems so that they cannot interoperate with the systems of its rivals, curtailing business to those rivals and further increasing Google's market share while allowing it to favor its own publishing platforms. ¶¶ 134-45. For example, Google scrambled users' DoubleClick IDs for *non*-Google buying tools and prevented its systems from working with the nascent competitive "header bidding" system, giving itself a decided advantage in instantaneous auctions. ¶¶ 140-43. As a result, an industry expert observed, "[t]he power to interoperate among buy-side, sell-side and measurement software went from being a feature of the exchange ecosystem to a capability exclusive to Google." ¶ 145.

Google argues there is "no duty to aid competitors" and so it need not "make its services interoperable." Mot. at 13 (internal citations omitted). But what Plaintiffs seek is freedom *not* to deal with Google, rather than invoking a "duty to deal," and they allege Google protected its monopoly by taking affirmative acts to negate the interoperability of systems that previously *were* interoperable. Thus, Plaintiffs base their claims not on any failure to aid rivals but on Google's active use of its market position to disadvantage rivals and frustrate competition. *See Image Tech.*, 125 F.3d at 1210-11 (holding that the right to deal freely is not "unqualified" but is subject to the exception for conduct in furtherance of "any purpose to create or maintain a monopoly.") (citing *Lorain Journal*, 342 U.S. at 155).[1] In *Trinko*, by contrast, the legal claims and holding focused singularly on an alleged failure to aid rivals. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004).

---

[1] *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (recognizing that "exclusion of nascent threats is the type of conduct that is reasonably capable of contributing significantly to a defendant's continued monopoly power"); *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1003 (N.D. Cal. 1979) (stating in dicta that "if a monopolist frequently changed the teleprocessing interface by which its computers communicate with remote terminals in such a way that its terminals would continue to function while others would fail, and, if the only purpose and effect of the change was to gain a competitive advantage in the terminal market (where the monopolist lacked monopoly power), that use of monopoly power would be condemned.").

---

In any event, Google's alleged behavior qualifies for the *Aspen Skiing* exception to the general rule that a firm has no duty to aid competitors. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*, 472 U.S. 585 (1985). The FAC sufficiently identifies "some of the key anticompetitive characteristics identified in *Aspen Skiing*." *Viamedia*, 951 F.3d at 462. First, by changing its interoperability standards and implementing new means of preventing rivals from participating in competitive processes (¶¶ 139-44), Google unilaterally terminated "a voluntary and profitable course of dealing." *Reveal Chat*, 471 F. Supp. 3d at 1002. Second, indicating an anticompetitive motive, Google impeded other ad brokers from participating in auctions in which it was taking a cut with the result that it could prioritize its own bids, thereby giving up short-term benefits (business from auctions) for longer-term gain (winning auctions). ¶¶ 142-43. *See, e.g.*, *Viamedia*, 951 F.3d at 454, 460-63; *Creative Copier Servs. v. Xerox Corp.*, 344 F. Supp. 2d 858, 865-67 (D. Conn. 2004) (refusing to dismiss Section 2 claim raising "fact-specific" issue of whether the defendant's restrictions "made it difficult" for a competitor to deal with it so as "to stifle or unnecessarily impair competition."). And a third element, that the defendant already sell in the market, also is met. The unpublished case Google relies on—*LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554 (9th Cir. 2008)—"is not precedent" and "existing precedent allows the court to consider the termination of a prior course of dealing as a factor related to a defendant's intent[.]" *Evergreen Helicopters, Inc. v. Erickson Air-Crane Inc.*, 2011 WL 285201, at *6 (D. Or. Jan. 26, 2011).

4. **The FAC alleges facts sufficient to show Google concealed data with anticompetitive effects.**

Google also suppresses basic transaction details such as its take rate, where ads were placed, time-stamps, and other information that would allow advertisers to better understand if their ads were seen by humans or bots, or even displayed at all. ¶¶ 146-52. The relative novelty of this concealment affords no immunity—anticompetitive conduct "come[s] in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (reversing dismissal of complaint that alleged defendants protected their monopoly by misrepresenting facts to advertisers and the government)); *see also Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 830-31 (6th Cir. 2011) (declining to disturb FTC finding of anticompetitive effects from real-estate brokerage database operator's website policy restricting access to property listings).

22

Keeping customers in the dark serves Google's monopoly. Google's secretive practices disadvantage advertisers and are made possible by, and exacerbate the conflicts of interest that arise from, Google's power. ¶¶ 146-53. Non-transparent pricing enables Google to engage in arbitrage out of view, and to increase its monopoly rents. ¶ 152. Google conceals not just its brokering fees but also other information (e.g., time-stamp data, impression rates) that would (and should) enhance advertising choice and effectiveness in an unrestrained market. ¶ 150. Google's data suppression helps it maintain its monopoly, but in a competitive market Google would risk losing business to more transparent rivals because the information withheld would assist with its customers' advertising efforts. ¶ 151.

Plaintiffs do not suggest that Google is obligated to "aid competitors" by providing transaction details to potentially competing ad-exchange platforms, nor that the Court should "order defendant to share a product not available to the public," as in *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004). Rather, as explained above, Plaintiffs in this case are (over)paying customers of Google, not competitors. This distinction is critical. *See Reveal Chat*, 471 F. Supp. 3d at 998 (limiting injury holding to competitors). Google's argument that it has no duty to aid competitors is irrelevant because the advertiser Plaintiffs do not compete with Google. Mot. at 15:3-15. Similarly, Google's case authority, *LiveUniverse, Inc. v. MySpace, Inc.*, 2007 WL 6865852 (C.D. Cal. June 4, 2007), has nothing to do with a monopolist's transparency toward its customers. Instead, after acknowledging a social-networking product market, *id.* at *4-7, the court held that MySpace could prevent its *users* from posting links to the plaintiff's social-media site, a different issue. *Id.* at *13-14.

In sum, Plaintiffs allege that Google exerts its power as monopoly broker to raise the prices it charges Plaintiffs and restrain competition, *including* by hiding key transaction details. *E.g.*, ¶¶ 123, 129, 147. Google's concealment satisfies Section 2's conduct element, evidencing Google's "anticompetitive abuse [and] leverage of monopoly power." *Epic Games*, 2020 WL 5993222, at *9.

**D.** **The Government Actions and Investigations Further Demonstrate the Plausibility of Plaintiffs' Antitrust Claims.**

The FAC's description of governmental actions, investigations, and hearings lends strong support to Plaintiffs' claims. ¶¶ 161-79. *See Hinds Cty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (citing *In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005)). U.S. Senators across party lines (¶¶ 173-75) and France's competition authority (¶ 177)

23

reprimanded Google for abusing its power in digital advertising markets, and the U.K.'s Competition Markets Authority found that Google's policies "mak[e] it harder for third-party intermediaries to compete" and that "greater competition and transparency would put downward pressure on" fees. ¶ 178. The State of Texas, joined by nine other states, filed a civil enforcement action arising out of these same facts. ECF 54. Google mentions only the October 2020 report of the House subcommittee, which finds harm to competition from "Google's commanding position across the digital ad tech market." ¶ 172. Google warps the accompanying recommendations for strengthening antitrust law. Mot. at 17:18-19. After discussing the pernicious effects of monopolies, the subcommittee presented ideas for reforms to *ensure* the courts will uphold congressional intent by reining in monopolies like Google's (pp. 391-98).

## II.   PLAINTIFFS ADEQUATELY ALLEGE UCL VIOLATIONS.

For all the reasons Plaintiffs state a Sherman Act claim, they adequately plead a UCL claim. ¶¶ 245-51. *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (holding that the UCL has "independent force" and prohibits a practice "as unfair or deceptive even if not unlawful and vice versa.") (internal quotation marks and citations omitted).

## III.   PLAINTIFFS MAY PURSUE A PUBLIC ANTITRUST INJUNCTION AGAINST GOOGLE IN COURT.

An injunction is the principal remedy for UCL violations, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 337 (2011), and California law does not permit a company to shield itself from an injunction primarily benefiting the public. *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 961 (2017) (citing, *inter alia*, Cal. Civ. Code § 3513). Yet Google's arbitration clause purports to do just that, providing that an arbitrator may award injunctive relief "only to the extent necessary to provide relief warranted by that party's individual claim without affecting other Google users or other customers or advertisers." ECF 66-3 at p. 7 of 8 & ECF 66-6 at pp. 6-7 of 8. Because this provision runs afoul of *McGill*, the Court should deny Google's motion to dismiss the claims of Plaintiffs Surefreight Global LLC d/b/a Prana Pets and Vitor Lindo in favor of arbitration.

The Ninth Circuit recently applied the *McGill* rule to affirm denial of an arbitration motion where the defendant's clause stated that relief in arbitration "must be individualized to you and will not affect any other client." *Snarr v. HRB Tax Group, Inc.*, 2020 WL 7249334, at *1 (9th Cir. Dec. 9, 2020). *see also Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 830-31 (9th Cir. 2019). Like the provisions in those

24

cases, Google's provision "waives the right to seek public injunctive relief in any forum" and is consequently unenforceable. *Id.*; *see Cottrell v. AT&T Inc.*, 2020 WL 2747774, at *5 (N.D. Cal. May 27, 2020) (declining to enforce an arbitration clause with the same operative language as Google's clause).

Contrary to Google's assertion that Plaintiffs omit the object of their requested injunction (Mot. at 23), Plaintiffs seek public injunctive relief "to halt Google's monopoly conduct"—discussed above—"and restore competition in the relevant market." ¶¶ 243, 245, 251. Further details will be "crystallized at later stages of the proceedings, such as summary judgment and trial." *Mahroom v. Best W. Int'l, Inc.*, 2009 WL 248262, at *2 (N.D. Cal. Feb. 2, 2009). Injunctive relief against Google will "benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly" (¶ 251), particularly considering that advertisers pass through price increases to consumers (¶ 133). The fact that Plaintiffs "*also* seek[] other relief more narrowly tailored to a similarly situated class is immaterial," *Cottrell*, 2020 WL 2747774, at *8, and injunctions against California competition law violations provide public relief.

The "unequivocal holding" of *McGill* is that an injunction against unfair or deceptive trade practices "generally benefits the public[.]" *Nguyen v. Tesla, Inc.*, 2020 WL 2114937, at *4-5 (C.D. Cal. Apr. 6, 2020) (internal quotation marks and alterations omitted) (citing *McGill*, 2 Cal. 5th at 955). In *Blair* the Ninth Circuit "similarly held that relief was public when it enjoined future violations of the UCL and CLRA related to pricing." *Snarr*, 2020 WL 7249334, at *1-2 (citing *Blair*, 928 F.3d at 831 n.3); *see also, e.g.*, *Greenley v. Avis Budget Grp. Inc.*, 2020 WL 1493618, at *7 (S.D. Cal. Mar. 27, 2020); *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1258 (N.D. Cal. 2019) (finding that a UCL plaintiff "clearly" sought public injunctive relief).

Thus, *McGill* precludes enforcing Google's clause. Nor is severance of the two Plaintiffs' damage claims warranted, given that a third Plaintiff will be prosecuting the damage claims for the class and Google's arbitration agreement is "tainted with illegality," violating Civil Code section 3513. *See, e.g.*, *Trompeter v. Ally Fin., Inc.*, 914 F. Supp. 2d 1067, 1076 (N.D. Cal. 2012).

## CONCLUSION

For the reasons stated, the Court should deny Google's motion. If the Court dismisses any claim in whole or part, Plaintiffs respectfully request leave to replead under Rule 15(a)(2).

| | |
|---|---|
| 1 | Dated: February 15, 2021 |

Respectfully submitted,

By:    /s/ *Jordan Elias*

Dena C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

Tina Wolfson (State Bar No. 174806)
Theodore W. Maya (State Bar No. 223242)
Rachel Johnson (State Bar No. 331351)
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Los Angeles, CA 90069
Tel.: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
rjohnson@ahdootwolfson.com

Scott L. Silver (*pro hac vice* forthcoming)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
Tel: (954) 755-4799
ssilver@silverlaw.com

*Attorneys for Plaintiffs*

26