# EXHIBIT 6

JUSTINA K. SESSIONS, State Bar No. 270914
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2197
Facsimile: (415) 947-2099
Email: jsessions@wsgr.com

JONATHAN M. JACOBSON, New York State Bar No. 1350495
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7758
Facsimile: (212) 999-5899
Email: jjacobson@wsgr.com

*Attorneys for Defendant*
*Google LLC and Alphabet Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | CASE NO.: 5:20-CV-03556-BLF |
| | **REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | Date: April 8, 2021<br>Time: 9:00 a.m.<br>Dept: Courtroom 3 |
| | Before: Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

Page

I. PLAINTIFFS HAVE NOT ALLEGED A PLAUSIBLE RELEVANT MARKET .......... 1

    A. Exclusion of Services for Facebook, Amazon, and Other Display Sites ............... 2

    B. Exclusion of Directly-Served Sites ............................................................. 4

    C. Exclusion of Other Types of Advertising...................................................... 5

    D. *Brown Shoe* Factors ................................................................................ 5

II. PLAINTIFFS HAVE NOT ALLEGED EXCLUSIONARY CONDUCT ....................... 6

    A. Acquisitions ........................................................................................... 6

    B. Leveraging/Tying .................................................................................... 7

        i. Conditioning Search Data Access on Use of Google Display Service ....... 8

        ii. Preventing Rival Service Providers from Purchasing Google Search Inventory .............................................................................................. 8

        iii. Preventing Rivals from Selling YouTube Advertising ............................... 8

        iv. Leveraging .......................................................................................... 9

    C. Denying Interoperability .......................................................................... 9

    D. Limiting Certain Data Access .................................................................. 10

    E. Combined Effect .................................................................................... 10

III. PLAINTIFFS LACK STANDING ...................................................................... 11

IV. PLAINTIFFS HAVE NO ACTIONABLE UCL CLAIM ........................................ 11

V. MR. LINDO AND SUREFREIGHT GLOBAL MUST ARBITRATE ALL OF THEIR CLAIMS .......................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ................................................................. 9

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ................................................................ 10

*Am. Online, Inc. v. GreatDeals.Net*,
    49 F. Supp. 2d 851 (E.D. Va. 1999) ..................................................... 5

*Azjenman v. Office of Comm'r of Baseball*,
    2020 WL 6037140 (C.D. Cal. Sept. 14, 2020) .................................... 12

*Bayou Bottling Co. v. Dr Pepper Co.*,
    725 F.2d 301 (5th Cir. 1984) ................................................................. 9

*Broadcast Music, Inc. v. CBS*,
    441 U.S. 1 (1979) ................................................................................... 1

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ....................................................................... 1, 5, 6

*Cal. Computer Prods., Inc. v. IBM*,
    613 F.2d 727 (9th Cir. 1979) ............................................................ 9, 11

*California v. Sutter Health Sys.*,
    84 F. Supp. 2d 1057 (N.D. Cal.),
    *aff'd mem.*, 217 F.3d 846 (9th Cir. 2000) ........................................ 3, 4

*Christy Sports, LLC v. Deer Valley Resort Co.*,
    555 F.3d 1188 (10th Cir. 2009) ............................................................ 8

*City of Groton v. Connecticut Light & Power Co.*,
    662 F.2d 921 (2d Cir. 1981) ............................................................... 11

*Clifford v. Quest Software Inc.*,
    38 Cal. App. 5th 745 (2019),
    *review den.* (Nov. 13, 2019) ........................................................ 12, 14

*Cottrell v. AT&T Inc.*,
    2020 WL 2747774 (N.D. Cal. May 27, 2020) .................................... 13

*Doe v. Abbott Labs.*,
    571 F.3d 930 (9th Cir. 2009) ................................................................. 9

*Dreamstime.com LLC v. Google LLC*,
  2019 WL 341579 (N.D. Cal. Jan. 28, 2019) ............................................................ 10, 11

*Eiess v. USAA Fed. Sav. Bank*,
  404 F. Supp. 3d 1240 (N.D. Cal. 2019) ...................................................................... 13

*Facebook, Inc. v. Power Ventures, Inc.*,
  2010 WL 3291750 (N.D. Cal. July 20, 2010) .............................................................. 9

*Feitelson v. Google Inc.*,
  80 F. Supp. 3d 1019 (N.D. Cal. 2015) ........................................................................ 11

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
  703 F.2d 534 (9th Cir. 1983) ........................................................................................ 9

*FTC v. Cardinal Health, Inc.*,
  12 F. Supp. 2d 34 (D.D.C. 1998) ................................................................................. 4

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ........................................................................................ 6

*Garrison v. Oracle Corp.*,
  159 F. Supp. 3d 1044 (N.D. Cal. 2016) ....................................................................... 7

*Greenley v. Avis Budget Group Inc.*,
  2020 WL 1493618 (S.D. Cal. Mar. 27, 2020) .............................................................. 13

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) .................................................................................. 2, 5

*ILC Peripherals Leasing Corp. v. IBM Corp.*,
  448 F. Supp. 228 (N.D. Cal. 1978),
    *aff'd per curiam sub nom. Memorex Corp. v. IBM*,
  636 F.2d 1188 (9th Cir. 1980) ...................................................................................... 9

*In re Apple iPod iTunes Antitrust Litig.*,
  2009 WL 10678940 (N.D. Cal. Oct. 30, 2009) ............................................................ 8

*KinderStart.com LLC v. Google Inc.*,
  2007 WL 831806 (N.D. Cal. Mar. 16, 2007) ............................................................... 5

*Kramer v. Enter. Holdings, Inc.*,
  829 F. App'x 259 (9th Cir. 2020) ................................................................................. 12

*LiveUniverse, Inc. v. MySpace, Inc.*,
  2007 WL 6865852 (C.D. Cal. June 4, 2007) ................................................................ 10

*Lusson v. Apple, Inc.*,
  2016 WL 10932723 (N.D. Cal. Oct. 19, 2016) ............................................................ 7

*M Resorts, Ltd. v. New England Life Ins. Co.*,
   2019 WL 6840396 (S.D. Cal. Dec. 16, 2019) ............................................................... 13

*McGill v. Citibank, N.A.*,
   2 Cal. 5th 945 (2017)...................................................................................................... 13

*Nguyen v. Tesla*,
   2020 WL 2114937 (C.D. Cal. Apr. 6, 2020) .................................................................. 13

*NSS Labs. v. Symantec Corp*,
   2019 WL 3804679 (N.D. Cal. Aug. 13, 2019) .................................................................. 2

*Ohio v. American Express*,
   138 S. Ct. 2274 (2018) .................................................................................................... 2

*Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*,
   797 F.2d 370 (7th Cir. 1986)........................................................................................... 8

*Pacific Bell Tel. Co. v. linkLine Comm., Inc.*,
   555 U.S. 438 (2009) ...................................................................................................... 11

*Rebel Oil Co. v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)........................................................................................... 2

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) .................................................... 5, 6, 7, 10, 11

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ........................................................................................ 6

*Ryan v. Microsoft Corp.*,
   147 F. Supp. 3d 868 (N.D. Cal. 2015) ............................................................................ 7

*Snarr v. HRB Tax Group, Inc.*,
   2020 WL 7249334 (9th Cir. Dec. 9, 2020) ................................................................... 13

*Thurman Indus. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989)...................................................................................... 2, 4

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
   512 F.2d 1264 (9th Cir.1975)........................................................................................... 5

*United States v. E.I. duPont de Nemours & Co.*,
   351 U.S. 377 (1956) ........................................................................................................ 5

*United States v. SunGard Data Sys.*,
   172 F. Supp. 2d 172 (D.D.C. 2001) ................................................................................ 4

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ...................................................................................... 6, 8, 9, 10

*Z Techs. Corp. v. Lubrizol Corp.*,
 753 F.3d 594 (6th Cir. 2014) ............................................................................ 6, 7

**STATUTES**

15 U.S.C. § 2 ............................................................................................*passim*

15 U.S.C. § 15b ...................................................................................................... 6

Cal. Bus. & Prof. Code § 17200 *et seq.* .............................................................. 6

**RULES**

Fed. R. Civ. P. 9(b) ............................................................................................... 7

**OTHER AUTHORITIES**

ABA Section of Antitrust Law,
 Antitrust Law Developments (8th ed. 2017) ...................................... 3, 4, 6

U.S. Dep't of Justice & FTC,
 Horizontal Merger Guidelines (2010), *available at*
 https://www.justice.gov/atr/horizontal-merger-guidelines-08192010 ...................... 2, 3, 4

# ABBREVIATIONS AND CONVENTIONS

- All emphases are added.

- Citations to internal quotations are omitted.

- Plaintiffs' Opposition to Defendants' Motion to Dismiss First Amended Consolidated Complaint, *In re Google Digital Advert. Antitrust Litig.*, No. 5:20-cv-03556-BLF (N.D. Cal. Feb. 15, 2021), Dkt. No. 93 ("**Opp**.").

- First Amended Consolidated Class Action Complaint, *In re Google Digital Advert. Antitrust Litig.*, No. 5:20-cv-03556-BLF (N.D. Cal. Dec. 4, 2020), Dkt. No. 52 ("**Compl**.").

- Defendants' Notice of Motion and Motion to Dismiss First Amended Consolidated Class Action Complaint: Memorandum of Points and Authorities in Support Thereof, *In re Google Digital Advert. Antitrust Litig.*, No. 5:20-cv-03556-BLF (N.D. Cal. Jan. 15, 2021), Dkt. No. 66 ("**MTD**").

Google's ad services must balance the divergent, and at times competing, interests of differently situated users. Through its innovations, Google has largely succeeded: helping advertisers, large and small, grow their businesses efficiently by reaching the right customers, while giving publishers an easy and effective way to maximize the value of their websites – all while ensuring users have a positive experience on a free and open Internet. Indeed, Plaintiffs trumpet the "rapid growth [of display advertising]," Opp. 6, calling it "the fastest growing segment of the advertising business," Compl. ¶ 29, with a "14% year-over-year increase." *Id.* ¶ 37. In contrast, antitrust law seeks to prevent practices that restrict market output, leading to higher prices, lower quality, and reduced innovation. *See, e.g.*, *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 20 (1979). Plaintiffs' attempt to reframe Google's conduct as anticompetitive is thus belied by their own allegations. Google's innovation and competition in digital advertising is just what the antitrust laws were designed to promote, not condemn.

The Motion to Dismiss identified multiple fatal flaws in the Amended Complaint – Plaintiffs' failure to plead facts supporting a plausible relevant market, their failure to identify any actionable exclusionary conduct, their lack of standing, and the agreement by all but one of the named plaintiffs to pursue their claims in arbitration. Nothing in Plaintiffs' opposition overcomes these deficiencies.

## I.   PLAINTIFFS HAVE NOT ALLEGED A PLAUSIBLE RELEVANT MARKET

Although the Amended Complaint asserted a relevant market including display advertising services for both advertisers and publishers, Compl. ¶ 183, Plaintiffs now assert a relevant market limited to "display advertising services provided to the advertiser subclass." Opp. 1. That revision neither addresses nor cures the defects identified in Google's Motion.

Plaintiffs claim that their market definition is aided by the "*Brown Shoe* factors," but *Brown Shoe* provides no support. Opp. 6-13; *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Plaintiffs allege no facts sufficient to exclude advertising services for Facebook or Amazon, direct sales, or other forms of advertising, and nothing in *Brown Shoe* or Plaintiffs' brief supports their exclusion either. As the Ninth Circuit has explained, "the *Brown Shoe* indicia are practical aids for identifying the areas of actual or potential competition and . . . their presence or

absence does not decide automatically the submarket issue." *Thurman Indus. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1375 (9th Cir. 1989). The question instead is whether the factors are "economically significant." *Id.* The answer to that question depends, not on a count of factors, but on the degree of competitive constraint the defendant faces. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995); *NSS Labs. v. Symantec Corp*, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019). Specifically, what products *constrain* the competitive behavior (such as pricing or product design) of the defendant? *E.g.*, *Hicks*, 897 F.3d at 1120-21 (market should include "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business"); U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines § 1 (2010), *available at* https://www.justice.gov/atr/horizontal-merger-guidelines-08192010 (hereinafter "Merger Guidelines"). Plaintiffs fail to address these issues. Nor do they attempt to discuss the implications of a possible two-sided market analysis under *Ohio v. American Express*, 138 S. Ct. 2274, 2276-78 (2018), though they clearly recognize the issue. *Cf.* Lead Counsel Motion of Boies Schiller et al., Dkt. No. 101, at 2 (filed Feb. 25, 2021) ("publishers and advertisers square off at opposite ends of a buy-sell transaction, a transaction in which publishers push for higher prices and advertisers seek to pay less"); Girard Sharp Lead Counsel Motion, Dkt. No. 102, at 5 (filed Feb. 25, 2021) ("the reason publishers and advertisers use Google's services is to connect them with participants on the other side"). Plaintiffs' proposed market ignores significant competitive constraints on display ad tech and cannot be sustained.

## A. Exclusion of Services for Facebook, Amazon, and Other Display Sites

To anyone with a computer, tablet, or phone, it is readily apparent that there is extensive display advertising on Facebook and other "social" sites, as well as on Amazon and other "shopping" sites. *E.g.*, Compl. ¶ 114 (video ads on Facebook and Amazon). Plaintiffs must exclude services for advertising on all these sites from their proposed relevant market because, if they do not, any claim of monopoly falls apart immediately. Neither their Amended Complaint nor their Opposition Brief, however, provide any basis for ignoring these substitutes.

Plaintiffs argue that because their allegations focus on "intermediation services," the ability to place ads directly on these powerful websites does not matter. Opp. 8, 12. That gerrymandered approach omits consideration of some of the most important constraints on Google's services. Advertisers plainly can substitute display advertising on Facebook or Amazon, without Google's ad tech, for advertising on sites served by Google's ad tech. *See* Compl. ¶ 114 ("about half of all video ads not appearing on Facebook and Amazon appear on YouTube").

Plaintiffs concede that Amazon and Facebook also provide "services" that allow advertisers to "publish advertisements on their own sites." Compl. ¶ 204. And Plaintiffs' argument that advertisements placed on Facebook and Amazon reach only visitors to those websites is equally true of advertisements placed on YouTube (which Plaintiffs allege is a "website"); yet Plaintiffs include Google's ad tech services for YouTube in their alleged market. *See, e.g.*, Compl. ¶¶ 49, 114. Their inconsistent treatment of single or "closed" websites aside, Plaintiffs' argument makes no sense. Plaintiffs' argument that Facebook's and Amazon's services are not competitive constraints on Google's services because they connect advertisers with their own inventory only is like arguing that American Express does not compete with Visa and Mastercard because American Express bypasses bank intermediaries and facilitates transactions with its own cardholders only. *See California v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1067 (N.D. Cal. 2000), *aff'd mem.*, 217 F.3d 846 (9th Cir. 2000) (holding Kaiser in the acute inpatient care services market even though its services are provided only to Kaiser members).

Whether ad tech services are used or not, an advertiser's decision to place an ad, *e.g.*, on Facebook, reduces its need to place the ad on a Google-served site, thus constraining any market power Google might exercise. *See id.* at 1067. This is why one must look at downstream conditions when defining the boundaries of the relevant market for the intermediate services in issue. As a leading treatise explains: "In the case of intermediate goods, examining only the demand substitutability of potentially competing inputs to the exclusion of downstream market conditions can lead to an inaccurate relevant product and geographic market definition." ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 620 (8th ed. 2017) (hereinafter "ANTITRUST LAW DEVELOPMENTS"). That is why the MERGER GUIDELINES "explicitly call for taking into

account downstream competition when defining relevant markets." *Id.* (citing MERGER GUIDELINES § 4.1.3). Plaintiffs provide no basis for ignoring the constraints on ad tech services that sites such as Facebook and Amazon provide, and their failure even to address downstream conditions means their market fails as a matter of law.

### B.     Exclusion of Directly Served Sites

Plaintiffs' exclusion of major sites (such as *The New York Times*) that contract directly with advertisers or agencies for ad placement is equally indefensible. Their excuses are that small and medium-sized advertisers cannot afford direct placement and that advertisers prefer to have their ads appear on multiple websites. Compl. ¶¶ 192-93; Opp. 12. Yet Plaintiffs place all advertisers, regardless of size, in their proposed class. Compl. ¶ 225. And critically, Plaintiffs plead no *facts* to support the conclusory assertion that many advertisers cannot afford direct placement, providing nothing as to the costs of one versus the other. Plaintiffs' other assertion, that advertisers have a preference for advertising on multiple sites, is irrelevant; Plaintiffs plead no facts suggesting that an advertiser is prevented from advertising on multiple websites if it has contracted for direct placement on one. Loss of advertisers to direct placement is plainly a threat to Google's services business, especially since (according to Plaintiffs) the largest and most valuable customers are the ones most likely to be lost. Compl. ¶ 192.

Direct sales in this context are a form of captive production, bypassing Google's or other ad tech services and thus taking sales away from outside service providers such as Google. *See Thurman Indus.*, 875 F.2d at 1375; *Sutter Health Sys.*, 84 F. Supp. 2d at 1067. "Courts have generally recognized that when a customer can replace the services of [an external product] with an internally-created [] system, this 'captive output' (i.e., the self-production of all or part of the relevant product) should be included in the same market." *FTC v. Cardinal Health, Inc.,* 12 F. Supp. 2d 34, 48 (D.D.C. 1998); *United States v. SunGard Data Sys.,* 172 F. Supp. 2d 172, 186 (D.D.C. 2001); MERGER GUIDELINES § 5.1. Here, if ad tech prices were to rise or quality to decline, advertisers can switch to direct placement. Other than the most conclusory allegations of cost and advertiser size, Plaintiffs provide no facts to suggest that a price increase could not be defeated entirely through the loss of enough customers, especially large customers, to direct placement to

render the price increase unprofitable.  Plaintiffs have alleged no reason to exclude the threat of direct placement from the relevant market.

### C. Exclusion of Other Types of Advertising

Plaintiffs also exclude from their market every other type of advertising – including print, radio, television, billboards, and even online "search" advertising.  Plaintiffs' argument is that these types of advertising have different attributes and are priced differently.  We can assume for present purposes that all that is true.  Still, that argument does not address the key question of competitive constraints: will a price or quality change for one type of advertising result in a supply response in one or more of the others?  *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir.1975) (citing *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 401 (1956)).  Plaintiffs never address that question in the Amended Complaint or their opposition brief.  In contrast, many courts that have addressed that question have concluded that an advertising-focused market must include at least some of the alternatives Plaintiffs exclude.  *Hicks*, 897 F.3d at 1121-23 (citing *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 858 (E.D. Va. 1999) (all advertising)); *KinderStart.com LLC v. Google Inc.*, 2007 WL 831806, at *6 (N.D. Cal. Mar. 16, 2007) (same); *see also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1000 (N.D. Cal. 2020).  The facts alleged in the Amended Complaint provide no basis for concluding otherwise.

### D. *Brown Shoe* Factors

Plaintiffs' extended argument (Opp. 7-13) about the *Brown Shoe* factors changes nothing, as the "practical indicia" that emerge from the various factors provide no support for the market Plaintiffs allege.  (i) The Amended Complaint has nothing to suggest there is "**industry recognition**" of the market Plaintiffs purport to define.  The paragraphs cited, Opp. 7 (citing Compl. ¶¶ 37, 50, 125), hint at no such thing.  (ii) Plaintiffs cannot and do not even attempt to argue that the vast number of **customers** for display ad services are in any way "**distinct**."  Opp. 13.  For "**unique production**" and **specialized vendors**, Plaintiffs assert only that Google has proprietary algorithms as well as data that it collects.  *Id.* at 11-13.  Of course it does.  So do dozens of other competitors, including Facebook and Amazon.  What Google does may be better, but there is

nothing in the Amended Complaint to suggest that it is unique in any sense that would warrant carving out a separate market. That leaves "**peculiar characteristics and uses**" as the one remaining *Brown Shoe* factor. But even if that factor favored Plaintiffs, it cannot carry the day in the light of the failure of the other factors and, far more importantly, the lack of any plausible allegations relating to competitive constraints, as discussed above.

Finally, Plaintiffs repeatedly describe their proposed market as merely a "submarket." *E.g.*, Opp. 7. But a submarket must meet the criteria for a relevant market in any event, *e.g.*, *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 & n.4 (D.C. Cir. 1986); ANTITRUST LAW DEVELOPMENTS 597, so that characterization helps Plaintiffs not at all.

\*   \*   \*

Plaintiffs have failed to meet their burden of pleading a plausible relevant market. As that is an essential element of each of Plaintiffs' claims, the Amended Complaint should be dismissed in its entirety.

## II.    PLAINTIFFS HAVE NOT ALLEGED EXCLUSIONARY CONDUCT

Even if Plaintiffs had alleged a relevant market, they would have had to allege conduct qualifying as exclusionary under the law. *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990-94 (9th Cir. 2020). But Plaintiffs have failed to plausibly allege this element of their claim as well. None of the conduct they allege – acquisitions, leveraging/tying, interoperability, data practices, or all of them combined – is prohibited by Section 2 of the Sherman Act or the California Unfair Competition Law. 15 U.S.C. § 2; CAL. BUS. & PROF. CODE § 17200 *et seq*.

**A. *Acquisitions*.** Plaintiffs claim to be challenging five of Google's acquisitions, including DoubleClick and AdMob. Opp. 2, 15-16. All took place well before the four-year period preceding the Complaint. *See* 15 U.S.C. § 15b (four-year limitations period). Google's Motion pointed out that any claim based on them is time-barred, and that the continuing violation theory does not apply to consummated acquisitions such as these. MTD 17-18; *see Reveal Chat*, 471 F. Supp. 3d at 994; *see also Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599 (6th Cir. 2014). Plaintiffs now deny that they are pursuing a continuing violation approach and persist in asserting that the limitations

period was tolled by "fraudulent concealment." Compl. ¶¶ 219-24; Opp. 17. Neither argument holds up.

Although Plaintiffs now say their claims are not based on a continuing violation theory, Opp. 17, that is just not accurate. The Amended Complaint alleges at length that the acquisitions made possible and enabled later higher prices that Plaintiffs now challenge as unlawful. Compl. ¶¶ 61-71, 217. That *is* the continuing violation theory. *Reveal Chat*, 471 F. Supp. 3d at 994; *Z Techs.*, 753 F.3d at 599. For the reasons stated above and in Google's Motion, that theory fails.

Plaintiffs' fraudulent concealment argument equally fails to save their claim. Under Rule 9(b), Plaintiffs were required to plead with specificity that Google took deliberate, affirmative acts to mislead Plaintiffs and that Plaintiffs acted diligently to uncover the facts giving rise to their claims. *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 886 (N.D. Cal. 2015); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1073-74 (N.D. Cal. 2016); *Lusson v. Apple, Inc.*, 2016 WL 10932723, at *2-3 (N.D. Cal. Oct. 19, 2016). As Google explained in its Motion, the Amended Complaint alleges no such facts. MTD 17-18. All Plaintiffs argue in their opposition is that Google has repeatedly denied any abuse of market power and has said that advertisers and publishers have many choices. Opp. 17-18. These statements are hardly fraudulent; they are true. Plaintiffs cite no case to suggest that such statements somehow tolled the statute of limitations, and they do not: simply denying antitrust liability, which is all these statements do, unquestionably fails to establish fraudulent concealment. *Reveal Chat*, 471 F. Supp. 3d at 992-93; *Ryan*, 147 F. Supp. 3d at 886.

**B. *Leveraging/Tying*.** Plaintiffs assert that Google (i) "conditions advertisers' access to search advertising performance and other data on their exclusive use of Google display advertising services," Opp. 19, (ii) "prevents [display] customers from using third parties to purchase Google Search inventory," *id.* at 18; and (iii) only sells YouTube inventory itself, *id.* at 19. They also claim that (iv) leveraging violates Section 2 even absent anticompetitive conduct. Plaintiffs' arguments all fail. (Their brief never mentions and appears to have abandoned the prior allegation that Google Ads for search includes a default for display ads as well. That claim is meritless, too, as Google explained. *See* MTD 12.)

*i. Conditioning Search Data Access on Use of Google Display Services*.  The Amended Complaint alleges that Google "withholds [Google search] data from rival DSPs and advertisers using rival service providers."  Compl. ¶ 104.  Setting aside the privacy concerns that might arise from such data sharing, Plaintiffs' claim fails for two independent reasons.  First, Google has no antitrust duty to share data with competing service providers.  *See, e.g.*, *Trinko*, 540 U.S. at 407-09.  That alone should bar the claim.  Second, it simply is not a tie where, as here, Google does not force advertisers to not use competing service providers.  *See In re Apple iPod iTunes Antitrust Litig.*, 2009 WL 10678940, at *5 (N.D. Cal. Oct. 30, 2009).  But that is all Plaintiffs allege: that when they use rivals' ad tech services, they cannot access Google search data through those services.  Plaintiffs point to no facts that show Google conditions access to its search data on exclusive use of its display ad services or that Google otherwise coerces advertisers into (exclusive) use of Google's display ad services.  *See id.* ("if the buyer is free to take either product by itself, there is no tying").  Any suggestion of an actual "tie" is thus at best conclusory and misleading.

*ii. Preventing Rival Service Providers from Purchasing Google Search Inventory*.  Plaintiffs assert that "[t]his restriction creates significant pressure to use only Google's services to broker the entire digital campaign, including in the relevant submarket.  [Compl.] ¶¶ 101-02, 120."  Opp. 18.  This again is no tie.  Google has no obligation to let rivals sell its own inventory.  *See, e.g.*, *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 376-80 (7th Cir. 1986) (no obligation to let rivals sell defendant's inventory; "So if a firm went to a monopolist and said, 'Please — for the sake of competition — give me a loan so I can compete with you and make this a competitive market,' and it was turned down, it could not invoke the Sherman Act."); *accord, e.g.*, *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1194-96 (10th Cir. 2009) (resort owner not obligated to let third party continue to sell ski equipment on its premises; "having created a resort destination, antitrust will not force a resort developer to share its internal profit-making opportunities with competitors").  Plaintiffs offer no reasoning and no precedent for departing from these long-settled principles.

*iii. Preventing Rivals from Selling YouTube Advertising*.  Plaintiffs claim that "Google also restricts access to its popular YouTube site to video advertisers using its display advertising

services. [Compl.] ¶¶ 113-20." Opp. 18. This claim that rival service providers cannot sell ads or ad services on YouTube is based on the same flawed reasoning as Plaintiffs' search-inventory claim and should be rejected for the same reasons. Chevy does not allow Ford to sell Chevys. *Cf. Bayou Bottling Co. v. Dr Pepper Co.*, 725 F.2d 301, 304 (5th Cir. 1984) (Coke not obligated to allow Pepsi to be sold in Coke-supplied vending machines). There is nothing remotely anticompetitive about that.

*iv. Leveraging.* Plaintiffs also assert that "leveraging" – which they describe as using monopoly power in one market to enhance the defendant's position in another – can be condemned even in the absence of exclusionary conduct. Opp. 19. But that argument has been specifically rejected both by the Supreme Court, *Trinko*, 540 U.S. at 415 n.4 ("leveraging presupposes anticompetitive conduct"), and the Ninth Circuit, *Doe v. Abbott Labs.*, 571 F.3d 930, 931 (9th Cir. 2009); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 548-49 (9th Cir. 1991) ("Monopoly leveraging is just one of a number of ways that a monopolist can *permissibly* benefit from its position.").

**C. *Denying Interoperability.*** Plaintiffs say: "Google altered its advertising systems so that they cannot interoperate with the systems of its rivals, curtailing business to those rivals and further increasing Google's market share while allowing it to favor its own publishing platforms. [Compl.] ¶¶ 134-45." Opp. 21. The claim fails. "[M]erely introducing a product that is not technologically interoperable with competing products is not violative of Section 2." *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at \*13 (N.D. Cal. July 20, 2010); *accord, e.g.*, *ILC Peripherals Leasing Corp. v. IBM Corp.*, 448 F. Supp. 228, 230-32 (N.D. Cal. 1978), *aff'd per curiam sub nom. Memorex Corp. v. IBM*, 636 F.2d 1188 (9th Cir. 1980); *see* MTD 13.

Product design changes have invariably been upheld by the Ninth Circuit – even when undertaken by a monopolist and even when rivals have been harmed as a result. In *Cal. Computer Prods., Inc. v. IBM*, 613 F.2d 727, 743-44 (9th Cir. 1979) ("*CalComp*") and *ILC Peripherals*, 448 F. Supp. at 230-32, for example, IBM designed its new mainframes in a manner that precluded use of third-party peripheral equipment. In *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 539-543 (9th Cir. 1983), Kodak designed its new film with new and different chemicals and

paper that could only be obtained from Kodak, not rivals.  And in *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999-1000 (9th Cir. 2010), Tyco introduced a new set of sensors in a manner that required customers to buy associated products available only from Tyco.  All these design changes were upheld.

Plaintiffs, moreover, fail to allege (and cannot allege) that Google's design changes were not product improvements.  In some instances, in fact, the Amended Complaint concedes that products were improved.  *E.g.*, Compl. ¶ 155 ("By limiting the types of programming codes that can be used on a page, AMP pages load faster than they otherwise would.").  Their claim, therefore, is contrary to the settled and "uncontroversial proposition that product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." *Allied Orthopedic*, 592 F.3d at 999-1000.

**D.  *Limiting Certain Data Access*.**  Plaintiffs next complaint is that Google "suppresses basic transaction details such as its take rate, where ads were placed, time-stamps, and other information that would allow advertisers to better understand if their ads were seen by humans or bots, or even displayed at all.  [Compl.] ¶¶ 146-52."  Opp. 22.  Even were this true, such conduct does not violate the antitrust laws.  Plaintiffs identify no legal duty to provide access to the data in question.  *See Reveal Chat*, 471 F. Supp. 3d at 1000–01.  As Judge Alsup has explained, capturing data represents competition on the merits: "Although the data collection likely gives Google an advantage in the online search advertising market over its rivals, a monopolist utilizing its competitive advantage does not equate to anticompetitive conduct."  *Dreamstime.com LLC v. Google LLC*, 2019 WL 341579, at *8 (N.D. Cal. Jan. 28, 2019) (citing *Trinko*, 540 U.S. at 415-16); *see also LiveUniverse, Inc. v. MySpace, Inc.*, 2007 WL 6865852, at *13 (C.D. Cal. June 4, 2007).  Plaintiffs' allegation, moreover, is the opposite of exclusionary conduct.  To the extent that the perceived quality of Google's services is lessened by withholding data as the allegations maintain, Compl. ¶ 151, that makes competitor offerings more, not less, attractive.

**E. *Combined Effect*.**  As a final effort to stave off dismissal, Plaintiffs argue that, even if their various claims all fail, they can succeed by arguing that "Google's practices had the 'overall combined effect' of entrenching its monopoly power.  [Compl.] ¶ 135."  Opp. 14.  That argument

REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FIRST
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO.: 5:20-CV-03556-BLF

-10-

is meritless too, as the courts have consistently "reject[ed] the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act." *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981). In *Pacific Bell Tel. Co. v. linkLine Comm., Inc.*, 555 U.S. 438 (2009), for example, the Supreme Court said that the plaintiffs there could not "join a wholesale claim that cannot succeed with a retail claim that cannot succeed, and alchemize them into a new form of antitrust liability . . . . Two wrong claims do not make one that is right." *Id.* at 457; *accord, e.g.*, *Dreamstime.com*, 2019 WL 341579, at *8-9 ("Taking the synergistic effect of the alleged predatory acts together as an overall scheme, this maintenance theory still does not succeed as a Section 2 monopolization claim as 'there can be no synergistic result' if none of the acts alleged is an antitrust violation.") (quoting *CalComp*, 613 F.2d at 746).

\* \* \*

Plaintiffs must allege facts that plausibly show exclusionary conduct and have failed to do so. Even if their faulty market definition were sustained, therefore, the Amended Complaint should be dismissed in its entirety.

## III.     PLAINTIFFS LACK STANDING

As Google's Motion pointed out, MTD 19-20, Plaintiffs have not identified what actual "intermediation services" they purchased from Google. Nothing in the opposition brief cures that deficiency, and Plaintiffs therefore fail to trace a link between the unlawful conduct and any injury to themselves. As discussed above, Plaintiffs also have failed to allege a cognizable antitrust violation. Because identification of the services actually purchased and sufficient allegations of antitrust injury (which requires a violation) are essential components of standing, the Amended Complaint can be dismissed for lack of standing as well. *E.g.*, *Reveal Chat*, 471 F. Supp. 3d at 998.

## IV.     PLAINTIFFS HAVE NO ACTIONABLE UCL CLAIM

Plaintiffs effectively concede that their UCL claim is premised entirely on their Sherman Act allegations. Compl. ¶¶ 245-51; Opp. 24. The failure of those claims therefore requires dismissal of the UCL claim as well. *E.g.*, *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1034

1   (N.D. Cal. 2015) (holding that the UCL claim based on unfair competition "rises and falls" with

2   the Sherman Act claims).

3   ## V.  MR. LINDO AND SUREFREIGHT GLOBAL MUST ARBITRATE ALL OF THEIR
       CLAIMS

4

5       Mr. Lindo and Surefreight agreed to arbitrate all of their claims against Google.  They do

6   not dispute that the agreement applies to their Count I, under the Sherman Act, or to so much of

7   their claim under Count II, under the UCL, as seeks damages.  The only question they claim remains

8   is whether they "may seek a public injunction against Google in court."  Opp. 2.  The answer is no.

9       In its Motion, Google explained that Plaintiffs have not asked for any specific injunction,

10  let alone one that would primarily benefit the public.  Plaintiffs' response conflates the aspirational

11  *goal* of their injunction with the relief requested.  While it is true that in Count II Plaintiffs

12  nominally seek "injunctive relief" whose "primary purpose . . . will be to benefit the public from

13  lower prices and greater innovation," Plaintiffs never describe what exactly that injunctive relief

14  would be.  They never say what they want the Court to order Google to do or not do.  Similarly,

15  their general prayer for "injunctive relief to restore competition in the relevant market and its

16  constituent submarkets," and request under the Sherman Act to "halt Google's monopoly conduct"

17  lack any specificity.  A vague, generalized request that the defendant comply with the law does not

18  create a request for a public injunction.  *See, e.g.*, *Azjenman v. Office of Comm'r of Baseball*, 2020

19  WL 6037140, at *6 (C.D. Cal. Sept. 14, 2020).

20      Plaintiffs also do not explain how their unspecified injunction would primarily benefit the

21  general public, rather than the specific class of advertisers they seek to represent.  Instead, Plaintiffs

22  appear to argue that *all* requests for injunctive relief under the UCL are public injunctions.  *See*

23  Opp. 25.  But claims for private injunctive relief and restitution under the UCL are arbitrable, and

24  so the Court must look beyond Plaintiffs' chosen label.  "California courts scrutinize plaintiffs'

25  injunction requests to determine if they are seeking public injunctive relief."  *Kramer v. Enter.*

26  *Holdings, Inc.*, 829 F. App'x 259, 260 (9th Cir. 2020); *see also Clifford v. Quest Software Inc.*, 38

27  Cal. App. 5th 745, 748 (2019), *review den.* (Nov. 13, 2019) ("*Cruz* does *not* bar arbitration of a

28  UCL claim for private injunctive relief or restitution, which is precisely what the UCL claim here

seeks.").  In this case, an injunction that would supposedly "restore competition" in Plaintiffs' gerrymandered market of open-web programmatic-display-advertising services for advertisers would primarily benefit only a "group of individuals similarly situated to the plaintiff[s]." *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017).  Any benefits to the general public would necessarily be "merely incidental to" the benefits to the putative advertiser class.  *See M Resorts, Ltd. v. New England Life Ins. Co.*, 2019 WL 6840396, at *5 (S.D. Cal. Dec. 16, 2019).  Indeed, Plaintiffs' argument that the public would benefit if advertisers passed through price decreases, Opp. 25, proves Google's point that any benefit to the public would derive from benefits to the advertiser class.

The cases that Plaintiffs cite do not support an argument that Surefreight and Mr. Lindo can keep their UCL injunction claim in court.  Surefreight and Mr. Lindo challenge (and presumably seek to enjoin) conduct that was directed at them as digital advertisers, not as members of the public.  By contrast, the cases that Plaintiffs cite all involved allegedly deceptive practices that were directed *at the public*.  For example, in *Snarr v. HRB Tax Group, Inc.*, 2020 WL 7249334 (9th Cir. Dec. 9, 2020), the plaintiff brought CLRA and UCL claims "based on HRB's marketing and operating of its publicly-accessible tax-filing webpages."  *Id.* at *1.  *Nguyen v. Tesla*, 2020 WL 2114937 (C.D. Cal. Apr. 6, 2020), concerned specific alleged misrepresentations that Tesla made in advertising and marketing distributed to the public.  *Id.* at *4.  *See also Greenley v. Avis Budget Group Inc.*, 2020 WL 1493618, at *7 (S.D. Cal. Mar. 27, 2020) (seeking injunction "to stop Defendant from allegedly 'exposing personal information,' [and] to 'alert consumers to the risk to their personal data uploaded to the Defendant's infotainment systems'"); *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1260 (N.D. Cal. 2019) (holding that request to "enjoin[ ] USAA from misrepresenting its NSF Fee policy" could not be arbitrated but the rest of plaintiffs' claims had to be); *Cottrell v. AT&T Inc.*, 2020 WL 2747774, at *8 (N.D. Cal. May 27, 2020) (seeking to enjoin AT&T's "deceptive practices in inducing members of the public to enroll in free trials of AT&T services").

Mr. Lindo and Surefreight's other claims must also be arbitrated.  Plaintiffs do not dispute that they are bound to arbitrate their Sherman Act claims.  Although they assert that the entire

REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS FIRST
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO.: 5:20-CV-03556-BLF

-13-

agreement is "tainted with illegality," Opp. 25, they make no attempt to show that the entire agreement is unenforceable. Thus, even if Surefreight and Mr. Lindo's UCL injunctive-relief claims were non-arbitrable, all of their damages claims should be arbitrated. *See Clifford*, 38 Cal. App. 5th at 750.

Dated: March 17, 2021

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


*/s/ Justina K. Sessions*
Justina K. Sessions, SBN 270914
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2197
Facsimile: (415) 947-2099
Email: jsessions@wsgr.com

Jonathan M. Jacobson, New York SBN 1350495
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7758
Facsimile: (212) 999-5899
Email: jjacobson@wsgr.com

*Attorneys for Defendant*
*Google LLC and Alphabet Inc.*