# EXHIBIT 7

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | Case No. 20-cv-03556-BLF<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** |

This is a putative class action antitrust lawsuit brought by Plaintiffs Hanson Law Firm, PC, Surefreight Global LLC d/b/a Prana Pets, and Vitor Lindo (collectively, "Plaintiffs") against Defendants Google LLC and Alphabet Inc. (collectively, "Defendants" or "Google"). First Amended Consolidated Complaint ("FAC"), ECF 52. Before the Court is Google's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) & (6) on the grounds that Plaintiffs fail to plead claims under the Sherman Act and California's Unfair Competition Law and that some of the Plaintiffs are bound to arbitration. Mot. to Dismiss ("Mot.") 1, ECF 66. Plaintiffs oppose. Opp. to Mot. ("Opp."), ECF 93. The Court heard oral argument on this motion on April 8, 2021. For the reasons stated on the record and detailed below, the Court GRANTS Google's motion and DISMISSES WITH LEAVE TO AMEND.

## I.  BACKGROUND[1]

Digital advertising consists of search advertising and display advertising. FAC ¶ 30. Search advertising is the placement of advertisements above or alongside the results generated by a search engine. *Id.* ¶ 31. A search advertisement appears when a consumer performs a search that has a

---

[1] Plaintiffs' well-pled factual allegations are accepted as true for purposes of the motion to dismiss. *See Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).

1 connection to a product or service offered by a company sponsoring the advertisement. *Id*. When a consumer clicks on the advertisement, the advertiser pays based on a cost-per-click rate. *Id*. Display advertising, on the other hand, appears next to website content. *Id*. ¶ 34. Unlike search advertising, which generally appears in a text-only format, display advertising comes in many forms, such as banners, images, and videos. *Id*. Display advertisers place their advertisements on websites likely to be viewed by their target audience. *Id.* ¶ 35. Suppliers of display advertising space are website operators and are referred to as publishers. *Id.* ¶ 36. Publishers rely on third-party tools to find advertisers willing to purchase available ad space. *Id.* In 2019, $69.9 billion was spent on digital display advertising in the United States, which accounted for about half of the digital advertising market. *Id*. ¶¶ 37-38. Many publishers rely on display advertising as a major source of revenue. *Id*. ¶ 38.

Google is a technology company that provides internet services and products, including online advertising technologies and a search engine. FAC ¶ 24. According to Plaintiffs, "Google is the dominant supplier in the search advertising market and has moved rapidly to control all stages of the display advertising market, as well." *Id*. ¶ 40. In 2019, Google earned $135 billion from search and display advertising. *Id*. Because Google owns the dominant internet search engine, it is "by far the largest supplier of digital search advertising in the United States. Over the last ten years, Google's share of the digital search advertising supply has ranged between 89% and 93%." *Id*. ¶ 45. Google makes space on its search results pages available through an auction process that occurs each time a user runs a search. *Id*. ¶ 46. According to Plaintiffs, "Google controls (and frequently raises) the price of its search advertising by setting a high reserve price. Doing so enables Google to directly set the price of its search advertisements because an ad will not sell unless its price meets or exceeds the reserve price." *Id*. ¶ 47.

With respect to online display advertising, 86% of ad space in the United States is bought and sold in real time on electronic trading venues, referred to as advertising exchanges or programmatic real-time bidding. FAC ¶ 50. On the supply side of exchanges, publishers employ publisher ad servers (PAS) to accept, store, and manage ads, choose where and when ads appear, and track the effectiveness of ad campaigns. *Id*. ¶ 55. Publishers rely on supply-side platforms

2

(SSPs) to run auctions, interface directly with their demand-side equivalents (i.e., advertisers), and optimize available inventory. *Id*. The demand side of exchanges are comprised of advertisers and media agencies. Advertisers and media agencies rely on advertiser ad servers (AAS) to store ads, deliver them to publishers, and record transactions. *Id*. ¶ 56. Advertisers and media agencies employ demand-side platforms (DSPs) to purchase digital advertising space by bidding in auctions and to manage their bids. *Id*. The DSP connects to an exchange, which combines inventory from ad networks and SSPs with third-party data from a data management platform or data broker. When an ad space on a publisher's site becomes available, the ad exchange holds an auction in which the DSP bids on the impression submitted by the ad network or SSP. According to Plaintiffs, Google owns and operates the dominant ad exchanges. *Id*. ¶¶ 48-50.

The PAS, SSPs, AAS, and DSPs—the set of intermediary exchanges and platforms that advertisers and publishers use to buy, sell, and place display ads—make up the ad tech stack:



FAC ¶ 48, 58. Google "captures well over 50% of the market across the ad tech stack." *Id*. ¶ 48. In the past, different entities provided the various functions across the stack, and intermediaries in the stack did not own publishers or advertisers. *Id*. ¶ 59. This is no longer the case because, after a series of acquisitions, "Google now dominates and controls the ad stack as a whole." *Id*. ¶ 59.

According to Plaintiffs, Google's acquisitions in the ad tech stack over the past fifteen years have "[given] it access to and made it a major player at every level of the display advertising service industry, and have enabled Google to exclude competition through a variety of anticompetitive policies and activities." FAC ¶ 60; *see, e.g., id*. ¶¶ 61-76 (detailing acquisitions). Plaintiffs further contend that Google has leveraged its dominance in search and search advertising and its control of user data to gain a monopoly in the brokerage of display advertising. *Id*. ¶¶ 77-99. Google also allegedly harms purchasers and sellers within the online advertisement ecosystem by tying its

3

display advertising services to its search advertising services. *Id*. ¶¶ 100-133. Finally, Google purportedly exploits user data and forecloses technological compatibility. *Id*. ¶¶ 134-136. Google's conduct allegedly restrains competition in the market for online display advertising services, which encompasses the overall system that connects display advertisers and publishers. *Id*. ¶ 183; *see also id*. ¶¶ 183-206 (describing "Relevant Market").

Based on the above allegations, Plaintiffs filed their class action complaint on May 27, 2020. ECF 1. The operative complaint asserts two causes of action for (1) monopolization in violation of Section 2 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 2, for acquiring and maintaining a monopoly in the relevant market of programmatic display advertising services; and (2) violations of California' Unfair Competition Law ("UCL"), Cal. Bus. Prof. Code § 17200 *et seq*. FAC. ¶¶ 236-251. Plaintiffs further request injunctive relief "to restore competition in the relevant market and its constituent submarkets." *Id*. at § XI.

## II. LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9thCir. 2011) (quoting *Navarro v. Block*, 250 F.3d729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc*., 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially

4

noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2009). A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1)undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. *Eminence Capital*, 316 F.3d at 1052. "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight." *Id*. However, a strong showing with respect to one of the other factors may warrant denial of leave to amend. *Id*.

### III. ANALYSIS

#### A. Failure to State a Claim: Sherman Act

Defendants first argue that Plaintiffs have failed to adequately plead a Sherman Act claim because they have not alleged a plausible relevant market, Mot. at 4-9, or actionable anticompetitive conduct, *id*. at 9-18. They also contend that Plaintiffs have failed to plead antitrust standing. *Id*. at 19-20. The Court addresses each concern in turn.

##### 1. Relevant Market

To state an antitrust claim under the Sherman Act, "plaintiffs must plead a relevant market." *Hicks v. PGA Tour, Inc*., 897 F.3d 1109, 1120 (9th Cir. 2018). "While plaintiffs need not plead a relevant market with specificity, 'there are some legal principles that govern the definition of an antitrust "relevant market," and a complaint may be dismissed under Rule 12(b)(6) if the complaint's "relevant market" definition is facially unsustainable.'" *Id*. (brackets and alterations omitted) (quoting *Newcal Indus., Inc. v. Ikon Office Sol*., 513 F.3d 1038, 1045 (9th Cir. 2008)). The relevant market must include a product market, and the product market "must encompass the product at issue as well as all economic substitutes for the product." *Id*. (internal quotation marks omitted). "Economic substitutes have a reasonable interchangeability of use or sufficient cross-elasticity of demand with the relevant product." *Id*. (internal quotation marks omitted).

5

1    Defendants raise two main flaws with Plaintiffs' alleged market. First, they contend that Plaintiffs' proposed market improperly includes services for both advertisers and publishers. Mot. at 5-6 ("Plaintiffs fail to adequately plead a *single* relevant product market—because their purported market includes products and services that Plaintiffs and other advertisers admittedly do not purchase or use." (emphasis added)). Second, they contend that Plaintiffs' proposed relevant market improperly excludes alternative means of accessing online display advertising. Mot. at 6-7.

The Court agrees with Defendants. While Plaintiffs filed a class action complaint against Google for monopolizing the intermediary services that connect advertisers and publishers of display advertisements, *see generally* FAC, Plaintiffs do not dispute that any future amended complaint will be narrowed to address only the claims of digital advertisers, not digital publishers, s*ee* Opp. at 3, 8; ECF 84 at 20:25-21:1. Second, the Court agrees with Defendants that "the alleged market for 'online display advertising services' on the 'open web' improperly excludes other ways for advertisers to reach publishers without using Google's services." Mot. at 6 (quoting FAC ¶ 189). The Court is particularly concerned that Plaintiffs' market excludes social-media display advertising and direct negotiations. *See id*. at 6-7. Plaintiffs must allege additional facts that indicate that the categories excepted from the identified market are not economic substitutes to "[d]isplay advertising brokering services." FAC ¶ 190; *see Hicks*, 897 F.3d at 112 (relevant market must include "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business."). It is not sufficient for Plaintiffs to allege, for example, that "[t]he close-ended advertising services offered by Facebook, Amazon, Twitter, and Snapchat (among other web businesses) are not . . . reasonable substitutes for the open-ended system Google offers and do not compete for the same business." FAC ¶ 206. Although recognizing that market definition can be largely factual in nature, *see Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 482 (1992), the Court nonetheless finds pleading amendments are necessary here and will serve to crystalize Plaintiffs' theory of the liability and the relevant market definition.

### 2. Anticompetitive Conduct

Defendants next argue that Plaintiffs have failed to adequately plead a Sherman Act claim as they have not alleged actionable anticompetitive conduct. Mot. at 9-18. Under Section 2 of the

6

Sherman Act, it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. "To plausibly plead a monopolization claim, plaintiffs must allege: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019) (internal quotation marks omitted). To plead "the willful acquisition or maintenance of monopoly power," Plaintiffs must plead facts sufficient to show that Google engaged in anticompetitive acts; "mere possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *PNY Techs. v. SanDisk Corp.*, 2012 WL 1380271, at *10 (N.D. Cal. Apr. 20, 2012).

The FAC identifies five areas of alleged anticompetitive conduct: monopoly leveraging, tying, denial of interoperability, the acquisition of rivals, and restricting competitors' access to information. FAC ¶¶ 126, 238. Defendants argue that (1) Plaintiffs' monopoly leveraging allegations fail to detail anticompetitive conduct in either the search and digital advertising market, (2) Plaintiffs' tying allegations fail to plead relevant markets and fail to detail coercive, anticompetitive conduct, (3) Plaintiffs' denial of interoperability allegations fail to establish that Google has a duty to aid competitors, (4) Plaintiffs' acquisition of rival allegations fail to establish conduct in violation of Section 2 or within the four-year statute of limitations, and (5) Plaintiffs' restriction of information access allegations lack detail and fail to detail anticompetitive conduct. Mot. at 9-18.

The Court has reviewed Plaintiffs' allegations and the relevant case law and generally credits Defendants' arguments. As an initial matter, the Court rejects Plaintiffs' suggestion that their theory may rest on pleadings of the anticompetitive *effects* of Google's conduct. *See* Opp. at 14 ("Plaintiffs plausibly allege that Google's practices had the 'overall combined effect' of entrenching its monopoly power."). Not so. "[M]ere possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *PNY Techs.*, 2012 WL 1380271, at *10 (emphasis added). Thus, as to each category of conduct Plaintiffs identifies, they

7

must identify facts illustrating the anticompetitive *acts* Google took to obtain and maintain a monopoly over the digital advertising intermediary services market. For example, with respect to Plaintiffs' tying allegations, Plaintiffs must allege facts that illustrate what exclusionary agreements or tying arrangements Google used. They must further allege facts that establish why Google's conduct was coercive, as opposed to merely persuasive.

The Court further finds that the statute of limitations poses a significant problem to Plaintiffs' acquisition-based allegations. *See* 15 U.S.C. § 15b (four-year limitations period). Plaintiffs explain that the four-year limit does not bar their claim because (1) "Plaintiffs bring a single Section 2 count, encompassing all of Google's conduct" and (2) "Google's fraudulent concealment tolls the statute of limitations." Opp. at 16-17. But for Plaintiffs first theory to survive, they must plead factual allegations that Google's acquisitions were made in concert with the company's other anticompetitive conduct. And for Plaintiffs' fraudulent concealment theory to survive, they must meet the lofty pleading standards set forth in Fed. R. Civ. P. 9(b) and plead with specificity that Google took deliberate, affirmative acts to mislead Plaintiffs and that Plaintiffs acted diligently to uncover the facts giving rise to their claims. *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 886 (N.D. Cal. 2015). Plaintiffs have failed to do either in the operative complaint.

Finally, the Court has serious concerns that some of Plaintiffs' allegations rely on a "duty to deal" theory of antitrust. In particular, the Court highlights Plaintiffs' allegations regarding Google's alleged denial of interoperability. For example, Plaintiffs allege that "a user of Google's DoubleClick ad server has "a much harder time using . . . non-Google buying tool[s]" compared to using Google's buying tools. FAC ¶¶ 140-141. Plaintiffs insist that these allegations are based on a theory that "Google protected its monopoly by taking affirmative acts to negate the interoperability of systems that previously were interoperable." Opp. at 20. But "a monopolist has no duty to help its competitors survive or expand when introducing an improved product design." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1002 (9th Cir. 2010). And the Court is unlikely to entertain any allegations based solely on the Supreme Court's reasoning in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*, 472 U.S. 585 (1985). *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 411 (2004) ("we do not believe that traditional

1 antitrust principles justify adding the present case to the few existing exceptions from the proposition that there is no duty to aid competitors"); *see also Reveal Chat*, 471 F. Supp. 3d at 1002 (applying *Aspen Skiing*). The Court thus encourages Plaintiffs to plead additional facts to establish that Google's denial of interoperability conduct falls under the ambit of Section 2. *See, e.g., Allied Orthopedic,* 592 F.3d at 1002 ("A monopolist's discontinuation of its old technology may violate Section 2 if it effectively forces consumers to adopt its new technology."); *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1003 (N.D. Cal. 1979) ("if a monopolist frequently changed the teleprocessing interface by which its computers communicate with remote terminals in such a way that its terminals would continue to function while others would fail, and, *if the only purpose and effect of the change was to gain a competitive advantage* in the terminal market (where the monopolist lacked monopoly power), that use of monopoly power would be condemned." (emphasis added)).

### 3. Antitrust Standing

Finally, Defendants contend that Plaintiffs have failed to plead antitrust standing. The Ninth Circuit has held that an antitrust injury consists of five elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, ... (4) that is of the type the antitrust laws were intended to prevent," and (5) "the injured party [is] a participant in the same market as the alleged malefactors." *Somers v. Apple, Inc*., 729 F.3d 953, 963 (9th Cir. 2013) (internal quotation marks omitted). In particular, Defendants argue that (1) "Plaintiffs still do not identify what particular 'intermediation services' they purchased from Google, and thus fail to trace a link between the unlawful conduct and any injury to them" and (2) "the only form of advertiser injury alleged by the FAC is that 'advertisers have paid more than they otherwise would have paid.'" Mot. at 19-20.

Plaintiffs have sufficiently pled antitrust standing. The FAC alleges that each Plaintiff "sustained antitrust injury by paying supra-competitive prices to Google to broker the placement of its display advertisements on third-party websites. These anticompetitive overcharges directly and proximately resulted from Google's monopolization of the relevant market." FAC ¶¶ 13, 18, 23. Plaintiffs further allege that Google's conduct gave it control over the *entire* market for digital

9

advertising intermediary services, and that each segment of the market experienced price increases. *Id*. ¶¶ 59-62 (discussing Google's acquisitions within ad tech stack), 123-27 (discussing price increases), 136 (identifying anticompetitive conduct), 186-88 (discussing Google's control over submarkets within the ad tech stack). While Defendants believe Plaintiffs must plead additional details regarding the particular tools Plaintiffs used, such granularity is not required in light of Plaintiffs' overreaching theory. Indeed, Plaintiffs plead that Google controlled the entire intermediary market—not just a particular tool within the market. Defendants second objection, that Plaintiffs must plead additional facts regarding their advertising purchases, fails for similar reasons. In the context of the FAC and Plaintiffs' holistic theory of liability, the Court is satisfied that Plaintiffs have pled facts tracing their injury, *see id*. ¶¶ 8-23 (detailing Plaintiffs' advertising expenditures), to Google's alleged unlawful conduct, *see id*. ¶ 136 (summarizing anticompetitive conduct). *See Reveal Chat Holdco, LLC v. Facebook, Inc.,* 471 F. Supp. 3d 981, 997 (N.D. Cal. 2020) (plaintiffs must allege an injury "flow[ing] from that which makes the conduct unlawful").

\*\*\*

The Court DISMISSES Plaintiffs' Sherman Act claim WITH LEAVE TO AMEND.

### B. Failure to State a Claim: UCL

Defendants next argue that Plaintiffs fail to plausibly plead a violation of the UCL. Mot. at 20. Both parties agree that Plaintiffs' UCL claim rises and falls with Plaintiffs' Sherman Act claim. *See id*. at 20 ("Plaintiffs' UCL claim should be dismissed for the same reasons as their Sherman Act claim"); Opp. at 24 ("For all the reasons Plaintiffs state a Sherman Act claim, they adequately plead a UCL claim."). Because the Court has dismissed Plaintiffs' Sherman Act claim, the Court DISMISSES Plaintiffs' UCL claim WITH LEAVE TO AMEND.

### C. Arbitration

Finally, Defendants argue that Plaintiffs Surefreight Global LLC and Lindo are bound to arbitrate their claims, and that their claims should therefore be dismissed pursuant to Fed. R. Civ. P. 12(b)(1)&(6). Mot. at 20-24. Plaintiffs respond that Google's arbitration clause improperly bars injunctions for public relief in violation of *McGill v. Citibank*, N.A., 2 Cal. 5th 945 (2017).

"[P]ublic injunctive relief under the UCL, the CLRA, and the false advertising law is relief

10

that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public." *McGill*, 2 Cal. 5th at 955 (2017) (quoting *Broughton v. Cigna Healthplans of Cal.*, 21 Cal. 4th 1066, 1077 (1999)). In *McGill*, the California Supreme Court held that an arbitration provision that waives the right to seek public injunctive relief in any forum is "contrary to California public policy and is thus unenforceable under California law." *Id.* at 952, 961; *see also Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 830-31 (9th Cir. 2019) (holding that "the FAA does not preempt the *McGill* rule").

Pursuant to their UCL claim, Plaintiffs seek injunctive relief "to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly." FAC ¶ 251. They also request "equitable relief as appropriate to halt Google's monopoly conduct and restore competition in the relevant market." FAC ¶¶ 243, 245. Defendants argue that Plaintiffs' injunction is vague and benefits only class member publishers and advertisers—not the public as a whole. Mot. at 23-24. They further contend that Surefreight Global LLC and Lindo may not seek *any* public injunctive relief under the Sherman Act. Mot. at 23. Plaintiffs respond that "[f]urther details [of the injunction] will be 'crystallized at later stages of the proceedings, such as summary judgment and trial.'" Opp. at 25 (quoting *Mahroom v. Best W. Int'l, Inc.*, 2009 WL 248262, at *2 (N.D. Cal. Feb. 2, 2009)).

Plaintiffs' requested injunctive relief is focused on "prohibiting unlawful acts that threaten future injury to the general public." *McGill*, 2 Cal. 5th at 951. The purpose of antitrust is to protect and promote competition to properly allocate economic resources. *See City of Lafayette, La. v. Louisiana Power & Light Co.*, 435 U.S. 389, 398, 98 S. Ct. 1123, 1129, 55 L. Ed. 2d 364 (1978) (explaining that Congress "sought to establish a regime of competition as the fundamental principle governing commerce in this country" in passing the Sherman Act"); *Reiffin v. Microsoft Corp.*, 158 F. Supp. 2d 1016, 1034 (N.D. Cal. 2001) ("The Sherman Act was enacted 'to preserve the health of the competitive process'"). The Court is unpersuaded that the injunctive relief Plaintiffs request pursuant to their UCL claim—which is derivative of Plaintiffs' Sherman Act claim—falls outside the scope of conduct prescribed by *McGill*. *See, e.g., Snarr v. HRB Tax Grp., Inc.*, 839 F. App'x 53, 55 (9th Cir. 2020) (public relief includes relief that enjoins "deceptive practices directed at the

11

public" or "future violations of the UCL and CLRA related to pricing").

The Court credits Defendants' concern that Surefreight Global LLC and Lindo may not seek public injunctive relief under the Sherman Act. *See Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 919 (N.D. Cal. 2020) ("The public injunction is a creature of California law . . . ."). Plaintiffs' brief overture to the contrary, Opp. at 25, fails to convince the Court that Surefreight Global LLC and Lindo's Sherman Act claim survives. Nonetheless, the Court is not prepared to bind Surefreight Global LLC and Lindo to arbitration on the claim at this juncture in light of the amendments discussed above and (2) the fact that Hanson Law Firm, PC's Sherman Act claim is not subject to arbitration. This conclusion is buttressed by the fact that the Court has not yet had an opportunity to fully analyze Plaintiffs' UCL claim and its interplay with Plaintiffs' requested relief under the Sherman Act. The Court will analyze this issue further in light of Plaintiffs' best pleadings. The Court also invites the parties to further consider the implications of *Rogers v. Lyft* in future motion practice. *See* 452 F. Supp. 3d at 918-921.

## IV. ORDER

The Court GRANTS Defendants' Motion to Dismiss WITH LEAVE TO AMEND. Plaintiffs SHALL file an amended complaint **no later than June 14, 2021**.

**IT IS SO ORDERED.**

Dated: May 13, 2021

BETH LABSON FREEMAN
United States District Judge

12