# EXHIBIT 9

Statement
*of*
FEDERAL TRADE COMMISSION
*Concerning*
Google/DoubleClick
FTC File No. 071-0170

The Federal Trade Commission has voted 4-1[1] to close its investigation of Google's proposed acquisition of DoubleClick after a thorough examination of the evidence bearing on the transaction.

The Commission dedicated extensive resources to this investigation because of the importance of the Internet and the role advertising has come to play in the development and maintenance of this rapidly evolving medium of communication.[2]  Online advertising fuels the diversity and wealth of free information available on the Internet today.  Our investigation focused on the impact of this transaction on competition in the online advertising marketplace.

The investigation was conducted pursuant to the Commission's statutory authority under the Clayton Act to review mergers and acquisitions.  If this investigation had given the Commission reason to believe that the transaction was likely to harm competition and injure consumers, the Commission could have filed a federal court action seeking to enjoin the transaction under Section13(b) of the Federal Trade Commission Act ("FTC Act") and Section 15 of the Clayton Act.  The standard used by the Commission to review mergers and acquisitions is set forth in Section 7 of the Clayton Act.  That statute prohibits acquisitions or mergers, the effect of which "may be substantially to lessen competition, or to tend to create a monopoly."  The Commission can apply Section 7 (as well as Section 1 of the Sherman Act and Section 5 of the FTC Act) to challenge transactions that threaten to create, enhance, or facilitate the exercise of market power.  As the Department of Justice and Federal Trade Commission Horizontal Merger Guidelines explain,[3] transactions that generate market power harm consumers by providing sellers an ability to maintain prices above competitive levels for a significant period of

---

[1] Chairman Majoras and Commissioners Leibowitz, Kovacic and Rosch have voted to close the investigation and join in this statement of the Commission.

[2] In the nearly eight months since the investigation was opened, the Bureau of Competition staff has conducted a comprehensive investigation that involved over 100 interviews, and a review of more than 2 million pages of documents produced by the parties, as well as thousands of documents obtained by subpoena from third parties.  The investigation also involved close coordination with foreign competition agencies, including those from Australia, Canada, and the European Union.

[3] Department of Justice and Federal Trade Commission Horizontal Merger Guidelines, § 0.1.

time.[4]  In addition, the exercise of market power may harm consumers when it results in diminished quality, selection, or service.

At the outset, we note that some have urged the Commission to oppose Google's proposed acquisition of DoubleClick based on the theory that the combination of their respective data sets of consumer information could be exploited in a way that threatens consumers' privacy. Of course, the consumer privacy issues presented by "behavioral advertising"[5] are not unique to Google and DoubleClick.  To the contrary, these issues extend to the entire online advertising marketplace.

We take these consumer privacy issues very seriously.  The Commission and its Bureau of Consumer Protection and Bureau of Economics staff have investigated and considered behavioral advertising issues for more than a decade.  This work continues in earnest. Commission staff regularly investigates a wide range of practices that appear to impinge unlawfully  upon consumer privacy.  Further, in the past year, the Commission staff examined behavioral advertising with numerous consumer representatives, industry members, academics, technologists, and others to gain a better understanding of current and anticipated online advertising models.  Additionally, we held two public forums addressing the issues: in November 2006, we held hearings over several days on "Protecting Consumers in the Next Techade," and last month, we convened a Town Hall Meeting on the issues raised by behavioral advertising.  In the wake of that meeting, Commission staff has today released a set of principles that could serve as a model for industry-wide, self-regulatory standards governing online behavioral advertising.  We urge privacy advocates, law enforcement agencies, advertisers, publishers, online advertising agencies, and all interested parties to study these proposed principles, comment on them, and respond to staff's requests for additional information.

This is not the first time that the Commission has been asked to block a merger, notwithstanding that the transaction is not likely to create, enhance, or facilitate market power in violation of the antitrust statutes we enforce.  The Commission has been asked before to intervene in transactions for reasons unrelated to antitrust concerns, such as concerns about environmental quality or impact on employees.  Although such issues may present important policy questions for the Nation, the sole purpose of federal antitrust review of mergers and acquisitions is to identify and remedy transactions that harm competition.  Not only does the Commission lack legal authority to require conditions to this merger that do not relate to antitrust, regulating the privacy requirements of just one company could itself pose a serious detriment to competition in this vast and rapidly evolving industry.  That said, we investigated the possibility that this transaction could adversely affect non-price attributes of competition,

---

[4]*Id.*

[5]Commission staff has applied a broad definition of "behavioral advertising" that includes the tracking of a consumer's activities online – such as the search terms used, the web pages visited and the content viewed – for the purpose of delivering advertising targeted to the individual consumer's interests.

such as consumer privacy. We have concluded that the evidence does not support a conclusion that it would do so. We have therefore concluded that privacy considerations, as such, do not provide a basis to challenge this transaction.

I.    Background

The Internet reaches billions of people around the world and serves as a virtual marketplace for products, information, and ideas. The Internet, and more importantly its audience, is also an increasingly attractive forum for advertisers. Advertising online allows advertisers to target their campaigns more precisely and effectively than advertising in other media. The growing revenues derived from sales of advertising space have driven the diversity and breadth of free information available on the Internet and thus benefit consumers.

A.    The evidence in this case shows that advertisers buy online advertising space from both search engine providers, like Google, and content providers (referred to as publishers in the online advertising business). However, the evidence in this case shows that the advertising space sold by search engines is not a substitute for space sold directly or indirectly by publishers or vice versa. Or, to put it in terms of merger analysis, the evidence shows that the sale of search advertising does not operate as a significant constraint on the prices or quality of other online advertising sold directly or indirectly by publishers or vice versa.

Search engines allow users to find specific information on the Internet by typing a query into a search query box. In addition to providing the user with results, search engines serve advertisements that are keyed off the search terms typed in by the user. For example, the search results for "football" may also include advertisements for replica jerseys or a sporting goods store. Thus, search engines provide a unique opportunity for advertisers to reach potential customers.

Advertisers view online content providers differently. A user's visit to a particular content page may reveal some insight into that user's interests. However, users visiting a content page do not declare their interests in the same way they do when they type in a keyword on a search engine. As they do in other media, advertisers wishing to direct their advertising to customers based on their interests must decide where to place advertising after determining which websites are popular with the advertisers' target customers. For example, a manufacturer of hybrid vehicles may purchase advertising space on an online magazine's feature on climate change.

Google, through its AdWords business, is the dominant provider of sponsored search advertising, and most of its online advertising revenue is generated by the sale of advertising space on its search engine results pages. DoubleClick does not sell sponsored search advertising. In fact, it does not currently sell any form of advertising.

B.    The sale of advertising space is publishers' primary source of revenue. The evidence shows that today large publishers use two channels to sell their inventory of available advertising space. The first channel is direct sales, with publishers using their own sales forces.

Publishers enjoy the biggest profits on direct sales of their advertising inventory, and they try to maximize those sales.  Directly negotiating with publishers offers advantages for advertisers as well.  Direct negotiations with publishers allow advertisers to guarantee a specific placement and a specific time frame within which their advertisements will run.  Directly purchased online advertising inventory is almost exclusively filled with what is commonly referred to as display advertising.  These ads commonly include text and a variety of rich media, such as audio, video and interactive features designed to attract users' attention.

The second channel large publishers use to sell their advertising inventory is indirect sales, with publishers and advertisers using the services of ad intermediation firms to place advertisements.  Advertisers distinguish between so-called premium and non-premium advertising when placing display advertisements.  Premium advertising space is typically the space at the top and upper-half of a web page on websites with large audiences.  It is sold most frequently by the publishers' direct sales forces.  Non-premium advertising inventory typically includes space at the bottom half of a web page (i.e., "below the fold") or advertising space available on websites with small audiences.  Non-premium advertising space (often called "remnant inventory") is most frequently sold and purchased indirectly by ad intermediation firms.  Ad intermediation firms allow publishers to monetize remnant or non-premium advertising space.  These firms aggregate inexpensive inventory from a network of websites and offer various means of targeting users on those websites.

The evidence shows that ad intermediation is not a substitute for publishers and advertisers who place display ads into directly acquired ad inventory or vice versa.  (In other words, ad intermediaries placing ads indirectly do not significantly constrain the pricing or quality of ads placed directly, or vice versa).  Publishers with direct sales forces are able to charge prices several times higher for directly sold ad inventory than for inventory filled by ad intermediation providers, and those publishers rely on publisher side ad serving to place ads into that premium inventory.  Given the substantial disparities in the potential revenues, publishers sell as much inventory as possible directly to advertisers.  Directly sold ads usually are served by a third party ad server.  In addition, ads served by intermediaries cannot be as effectively controlled by the websites, creating the risk that inappropriate ads may appear.  For this reason as well, publishers with direct sales forces are unlikely to turn to ad intermediation providers to fill anything other than remnant inventory.

Likewise, from the advertisers' perspective, ads served by intermediaries are not substitutes for directly placed ads.  For many advertisers, the premium inventory they desire is only available directly from the publisher.  Equally important is the fact that the use of advertiser side ad servers to place ads in directly sold places on a website allows them to maintain control over their ads and secure a guarantee that those ads will be served.  In contrast, an advertiser purchasing ad space through an ad intermediation provider may not be able to acquire space in an attractive location, on a desired website, or on any website that meets its criteria.  For example, a sporting goods advertiser may know the category of websites into which its ads may be placed (e.g., sports), but would not know the specific websites on which its ads would run, or on which pages within the site.  And because publishers almost always reserve the right to pre-empt ads served through an intermediary with directly acquired, guaranteed ad placements, there

is no certainty that an ad will be placed within the desired time frame. Thus, it is difficult, if not impossible, to run precisely targeted ad campaigns through ad intermediation providers.

There are two types of ad intermediation products: ad networks and ad exchanges. Ad networks and ad exchanges are alike in that they both aggregate advertising inventory. Ad networks are intermediaries that aggregate or purchase advertising inventory from a group of websites and sell this inventory to advertisers or ad agencies, taking a share of the revenue from each sale. Ad exchanges differ in that they aggregate inventory by providing platforms for advertisers and publishers to list and bid for inventory. The evidence shows that the market in which ad networks and ad exchanges compete is relatively nascent, dynamic, and highly fragmented.

Google is an ad intermediary. The ad intermediation market in the United States was transformed recently by a series of acquisitions by established firms such as AOL, Microsoft, and Yahoo!. AOL, for example, recently acquired TACODA, a leading behavioral targeting network, and has announced its intention to acquire Quigo, a contextual ad network. Likewise, Yahoo! acquired the Right Media Exchange, the leading ad exchange, as well as BlueLithium, a behavioral targeting network. Microsoft acquired AdECN, an ad exchange, as well as the DRIVEpm ad network (through its acquisition of aQuantive), both of which complement Microsoft's existing adCenter network. The evidence shows that this evolving market is, at most, moderately concentrated.

C. Contextual advertising is a type of targeting technology used by certain ad intermediaries. Contextual ads are predominantly text ads that are delivered to a web page using technology that scans the text of a web page for key words and delivers ads to the page based on what the user is viewing. For example, a user reading a review of a recent movie on the local newspaper's website may be served with an advertisement placed by local theaters. Contextually targeted advertising is offered by intermediaries.

The evidence shows that, as with other ads placed through ad intermediaries, most advertisers do not consider contextually targeted ads sold through ad intermediaries to be substitutes for directly purchased display ads. Not only are these forms of advertising sold through different channels, but they serve distinct purposes. Search and contextual advertisements are generally used for direct response advertising, which is intended to elicit a response from a consumer, such as the purchase of a product or signing up for a service. The cost-per-click payment model typically used for these ads is tailored to the direct response nature of search and intermediated contextual ads. In contrast, directly purchased display ads are generally used for brand advertising. Brand advertising is advertising that increases awareness of, or reinforces the image associated with, a product or service, and advertisers are interested primarily in presenting the ad to consumers rather than having them act on it. As a result, the cost of the ad is most often dictated by the number of times the ad is served, or on a cost per thousand impressions basis, rather than the cost-per-click basis used for search ads. Thus, the prices and quality of contextual text ads are not constrained by ads sold directly by publishers to advertisers (and vice versa). However, the evidence shows that the prices and quality of contextual ads are constrained by other forms of display ads sold by ad intermediaries (and vice

versa). We therefore determined that contextually targeted ads do not constitute a separate market; rather they are part of a broad market that includes all ads sold by intermediaries.

Google's ad intermediation product, AdSense, is a leading provider of contextual advertising. The evidence shows that contextually targeted advertising is part of the broader ad intermediation market that includes all ads sold by intermediaries. DoubleClick does not provide contextual advertising, and it does not currently act as an intermediary.

D. The evidence shows that third party ad servers play an important role in the delivery and tracking of online advertisements. On the publisher side, third party ad servers manage the flow of advertising on publishers' websites by selecting the advertisements that generate the greatest revenue consistent with a publisher's contractual obligations with its advertisers. For example, if an advertiser directly contracts to have ads placed in a particular sequence, or a certain number of times, the publisher side ad server is the tool used to ensure compliance with that agreement. If there is no directly sold ad that can be served into the space, the publisher side ad server selects from a list of ad intermediation providers that have been prioritized by the publisher to fill the remnant inventory. The publisher sets the criteria by which the server determines which ad intermediation suppliers' ads to serve, typically designating suppliers whose ads will generate the greatest revenues. Aside from managing the serving of directly sold and intermediated ads, publisher side ad serving tools also provide reporting and forecasting features that support sales efforts. Compensation for use with publisher side ad serving tools typically is based on cost per thousand ads served.

Ad server products are also used on the advertiser side to ensure that the ads selected by the publishers' tools are transmitted to the publishers' sites and served. When a publisher side ad server makes a call to retrieve an advertisement, the advertiser side ad server determines the optimal advertisements, pulls that ad from its inventory, and serves it into the designated place on the publisher's web page. Advertiser side ad servers also provide key data that is used to plan, manage, maintain, track, and analyze the results of online campaigns across multiple publisher websites. Like publishers, advertisers pay for the use of ad serving services on a cost per thousand ads served.

DoubleClick is the leading firm in the third party ad serving markets. It faces competition from several significant competitors in the United States, such as 24/7 Real Media, aQuantive, and ValueClick. A number of smaller recent entrants also compete head-to-head with these better established competitors. Further, the competitive dynamics of these markets have been altered by recent transactions, such as Microsoft's acquisition of aQuantive, WPP's acquisition of 24/7 Real Media, and AOL's acquisition of AdTech. To date, Google has not released or sold a commercially viable ad serving product in the United States.

II.   Competitive Effects Analysis

After carefully reviewing the evidence, we have concluded that Google's proposed acquisition of DoubleClick is unlikely to substantially lessen competition. We analyzed three principal theories of potential competitive harm in the course of this investigation.

A.  First, we assessed whether the evidence supported a challenge to this merger based on the theory that it threatened to eliminate direct and substantial competition between Google and DoubleClick.  We concluded that it did not.  As discussed above, Google sells advertising on its search engine and through its ad intermediation product, AdSense.  It had been developing a third party ad serving solution prior to its agreement to purchase DoubleClick, but it had not released a commercially viable product.  DoubleClick sells two third party ad serving products – DART for Advertisers ("DFA") and DART for Publishers ("DFP").  It does not buy or sell advertisements or advertising inventory.

It has been suggested that the transaction would eliminate competition between Google and DoubleClick in an "all online advertising" market that would include search advertising, ads sold through intermediaries, and directly sold ad inventory.  The evidence, however, indicates that all online advertising does not constitute a relevant antitrust market.  Advertisers purchase different types of ad inventory for different purposes, and one type does not significantly constrain the pricing of another.  For instance, advertisers primarily purchase search advertising space to implement direct response ad campaigns, while directly sold ad inventory is generally purchased for brand advertising campaigns.  And, even if the market included all types of online advertising, we would still conclude that the proposed transaction would still not eliminate direct competition, because DoubleClick, unlike Google, does not currently sell advertising inventory.

It also has been suggested that Google's AdSense and DoubleClick's DFA and DFP products are each other's closest substitutes, despite the substantial differences between the two companies' products.[6]  The theory is that if Google acquires DoubleClick, Google will find it profitable to increase the price of DFA or DFP because some portion of lost sales resulting from price increases in DoubleClick's ad serving products may be diverted to Google's AdSense product.  However, in order for that theory to be viable, there would have to be evidence that an increase in the price of DoubleClick's third party ad serving products would result in publishers and advertisers replacing directly sold and purchased ads with ads intermediated by AdSense in sufficiently large numbers that the increase in revenue and profits gained by AdSense would exceed the losses sustained by DoubleClick's third party serving products.  The evidence indicates that this is unlikely to occur.

---

[6]Google's AdSense offers "placement targeting" of ads on specific publisher websites to advertisers, but there is no evidence that this function makes Google and DoubleClick direct competitors.  Although placement targeting through AdSense allows for more targeted placement of ads, it is still not a viable substitute for advertiser side third party ad servers.  First, AdSense ads may still be pre-empted by a publisher (for example, if the publisher will generate more revenue by directly selling the inventory).  Second, advertisers do not know exactly when an AdSense ad might run.  Third, advertisers would not have access to the same detailed metrics they would receive from placing the ad directly with the publisher and serving the ad with a third party ad server.  Fourth, advertisers would be unable to place ads with publishers outside of the AdSense network.  Finally, the evidence suggests that the closest alternative to DoubleClick is not Google's AdSense (or any other ad intermediation firm), but other third party ad serving products like those offered by aQuantive or 24/7 Real Media.

7

To be sure, a third party ad server may be used to place advertisements that are sold indirectly through intermediaries. As discussed above, Google competes as an intermediary through its AdSense product. However, the evidence shows that even a significant increase in ad serving costs would be unlikely to cause an increase in the number of ads delivered through intermediaries, because the cost of serving a directly sold display ad is an insignificant percentage of the total cost of the ad. Moreover, even accounting for Google's AdSense product, Google is not so significant as an intermediary that it would likely recoup substantial additional revenue or profits if the diversion hypothesized were to occur. Indeed, the evidence shows that most publishers and advertisers would not increase their use of AdSense if Google raised the price of DFP and DFA following the acquisition. The evidence of their past behavior supports these positions. For all of these reasons, we have concluded that this transaction is not likely to cause competitive harm by eliminating significant current competition between Google and DoubleClick.[7]

B.  Second, we assessed whether the evidence supported a challenge based on the theory that the transaction threatened to eliminate potential competition in any relevant market. We have concluded that it does not. Google had been attempting to develop a third party ad serving solution at the time of the transaction, and therefore is a potential future competitor of DoubleClick and other third party ad serving firms.[8] For the elimination of this potential competition to be a competitive concern, Google must be uniquely positioned to have a substantial competition-enhancing effect on the third party ad serving markets.

A pivotal consideration in any potential competition case is the current market dynamic. In this case, Google's entry is unlikely to have a significant procompetitive effect because the evidence shows that the third party ad serving markets are competitive despite relatively high levels of concentration in both markets. Although DoubleClick enjoys a significant share of today's third party ad serving markets, it does not appear that DoubleClick has market power in these markets. More specifically, prices and margins in the third party ad serving markets have eroded substantially over the past few years. The evidence shows that this decline in prices and

---

[7]Because Google and DoubleClick do not presently compete in the same relevant market these two companies do not act as significant competitive restraints on one another. In practical terms, this means that the parties do not significantly affect each other's prices, nor non-price product attributes, such as consumer privacy protections or service quality.

[8]We also evaluated the elimination of potential competition in the ad intermediation market given that DoubleClick was developing an ad exchange product that would compete with Google's AdSense and other ad intermediation firms. The evidence did not suggest that the elimination of this potential competition was likely to harm competition in the ad intermediation market. The ad intermediation market today is highly fragmented and correspondingly competitive, and there is no evidence suggesting that DoubleClick is uniquely positioned to significantly enhance competition in this market. We therefore concluded that the elimination of DoubleClick as a potential competitor is not likely to have a meaningful impact on competition in the ad intermediation market.

margins is largely attributable to aggressive competition. Further, the evidence indicates that ad serving has become a commodity good, as competition from small third party ad serving competitors has forced larger competitors to slash prices. The recent acquisitions of existing third party ad servers by firms with significant financial resources are likely to increase further the competitiveness of this market.

In addition, there is no evidence that Google's developmental product is unique relative to existing third party ad servers, nor is the evidence clear that Google is certain to be successful in winning customers for these products. For these reasons, we have concluded that it is unlikely that the elimination of Google as a potential competitor in the third party ad serving markets would have a significant impact on competition.

C.    Finally, we assessed whether the evidence supported a challenge based on any non-horizontal theory of harm, such as the possibility that Google could leverage DoubleClick's leading position in third party ad serving to its advantage in the ad intermediation market. A number of potential leveraging theories were proffered that could, in principle, raise competitive concerns.[9] We have concluded, however, that these theories are not supported by the record evidence in this matter. Unquestionably, Google is the most popular search engine on the Internet today by almost any metric. As a result, it has a high market share in sponsored search advertising. The evidence also suggests that Google, by virtue of its AdSense product, enjoys a leading, but not dominant, position in the ad intermediation market. As discussed above, DoubleClick is the leading third party provider of ad serving technology.

The market positions of Google and DoubleClick suggest that the combined firm could engage in a number of potential anticompetitive strategies to further enhance its positions in the various markets at issue. For example, it has been suggested that Google could bundle or tie DoubleClick's ad serving technology with its AdSense product in an effort to force publishers to use AdSense. It also has been suggested that Google could manipulate the DoubleClick software in an effort to steer publishers to AdSense. Finally, it also has been suggested that Google would gain access to competitively sensitive information in this acquisition that it could use to its advantage in the ad intermediation market. These arguments would raise antitrust concern if the evidence supported the conclusion that such conduct is likely to provide Google market power in the ad intermediation market. However, we have found that the evidence does not support that conclusion.

For each of these concerns, the threshold issue is whether DoubleClick (as the putative acquired party) enjoys significant market power in third party ad serving.[10] A leveraging

---

[9]The clear majority of third parties expressing such concerns were Google's current or potential competitors.

[10]Google's position in the search advertising market has led some to argue that it could leverage its power in that market to its advantage in other online advertising markets. For example, it was alleged that Google could bundle or tie its search advertising to other forms of

9

strategy cannot be effective, and thus anticompetitive, unless the merged firm has market power in one of the complementary products. As discussed above, the evidence suggests that DoubleClick does not have market power despite its high market share. The third party ad serving markets are competitive and are likely to become even more so in the future.

It has been suggested that DoubleClick's customers would face high switching costs if they decided to adopt a different ad server post-transaction. That might be so for the very largest online publishers and advertisers, particularly because many have chosen to customize their ad serving platforms. The evidence shows that those large firms can exercise counter measures, including the development or acquisition of alternative ad serving products and the securing of favorable contractual terms. The evidence also shows that firms can and do switch ad serving firms when it is in their self-interest to do so. For instance, the evidence suggests that some customers that do not wish to do business with Google have already switched away from DFP to another third party ad server. Thus, an attempt by Google to strongarm DoubleClick's customers into using AdSense would likely be defeated by customers switching to one of the other third party ad serving products. These leveraging theories are no more viable if Google were to exclusively bundle AdWords with AdSense and DFP. If this were a viable strategy, Google would have already successfully forced an exclusive bundle of AdWords and AdSense, or used such a bundle to force customers to adopt the beta version of Google's third party ad server. While there is some evidence that Google has offered a bundle of these products, that evidence does not show that Google has forced the bundle or offered it in exchange for exclusive dealing. Nevertheless, we sought to test the various theories of harm outlined above.

1. We closely reviewed the suggestion that, post-merger, Google would bundle or tie DoubleClick's publisher products with AdSense and AdWords in an effort to force DoubleClick's customers to use AdSense and that this strategy would be particularly pernicious in the ad intermediation market because of the presence of network effects. Specifically, it was argued that the incremental volume Google could gain from this strategy would be enough to "tip" the ad intermediation market to Google. According to this theory, post-merger Google would have the largest pool of remnant advertising space and the greatest ability to target that space for advertisers. That position would make Google more attractive to advertisers which, in turn, would make it more attractive to even more publishers.

However, the evidence shows that the ad intermediation market is unlikely to "tip." As previously discussed, the ad intermediation market is a fragmented, competitive market with dozens of competitors. Most publishers utilize multiple ad intermediation providers in order to obtain the highest possible value for their non-premium inventory, and most advertisers rely on multiple ad intermediation providers to ensure that they can effectively target their ad campaigns

---

online advertising in an attempt to force advertisers to buy advertising space from Google. However, there is no evidence that the acquisition of DoubleClick would enhance Google's ability to engage in those strategies. In other words, Google could engage in these strategies today independently of DoubleClick and there is no evidence that this transaction changes that dynamic.

10

at the lowest cost.

Moreover, ad intermediation is a market in which firms compete with highly differentiated products, and the size of an ad network is but one factor customers consider. For instance, the quality of the ad inventory offered is important to customers. The evidence showed that certain ad intermediation firms only include particular publishers in their networks to ensure that they offer only the highest quality inventory to advertisers. Although these firms have small networks, and therefore access to a small amount of inventory, they are among the more successful ad intermediation firms. Another factor important to ad intermediation customers is the type and quality of the targeting technology used by ad intermediation providers.[11] The various online ad intermediation firms utilize a host of different targeting technologies, including contextual, geographic, demographic, and behavioral targeting. An ad intermediation product with a strength in behavioral targeting may offer superior results for brand advertising, while an intermediation product that relies on contextual targeting may work well for direct response advertising. For these reasons, we have concluded that the ad intermediation market is not likely to "tip" to a single ad intermediation provider.

2.  We also carefully reviewed whether Google was likely to manipulate DoubleClick's products to its advantage in the ad intermediation market and thereby diminish the competitiveness of other ad intermediation companies. As discussed above, DoubleClick's ad serving products are used by publishers to determine which ad intermediation firm's ads will be placed into unsold advertising inventory.

However, the evidence shows that it is the publishers who program an ad server's preferences to determine which ad intermediation firm's ads to serve into remnant space. Thus, publishers typically program the ad server to serve premium ads in its guaranteed inventory first, followed by ads from its best performing ad network, followed by ads from its second preference of ad network, and lastly, if no ad is available from these sources, a house ad (e.g., advertising the availability of advertising space). Further, the evidence shows that publisher side customers are sophisticated, and that they constantly review reporting from multiple sources to ensure that they are monetizing their inventory appropriately. Consequently, publishers would likely be able to detect any manipulation of the third party ad server before it had a meaningful effect. Indeed, this may be why most of the publishers are not concerned that Google would manipulate the ad server to benefit AdSense.

Also, the adverse consequences to Google manipulation of the DoubleClick product in

---

[11] These preferences and offerings may well change as firms address consumers' evolving privacy expectations. For instance, Ask.com recently launched AskEraser, a tool that allows users to delete completely future search queries and associated cookie information. *See* Ask.com Puts You in Control of Your Search Privacy With the Launch of 'AskEraser' (Dec. 11 2007), *available at* http://www.irconnect.com/ask/pages/news_releases.html?d=132847.

11

the fashion hypothesized could be severe. If any manipulation were discovered, the impartiality of DoubleClick's ad serving products would be compromised and it (and Google) would likely be punished in the marketplace. Thus, even if Google had the ability to engage in the conduct suggested, it is by no means clear that it would have the incentive to do so. For these reasons, we have concluded that the evidence does not support this scenario.

3.  Finally, we assessed the suggestion that the combination of Google's database of user information and the data respecting users and competitive intermediaries collected by DoubleClick on behalf of its customers would give Google an overwhelming advantage in the ad intermediation market. The popularity of Google's search engine and its technical prowess already give Google abundant customer information even pre-transaction.

However, the customer and competitor information that DoubleClick collects currently belongs to publishers, not DoubleClick. Restrictions in DoubleClick's contracts with its customers, which those customers insisted on, protect that information from disclosure, and we understand that Google has committed to the sanctity of those contracts.

Furthermore, if, post-transaction, Google were to change or breach those contracts, the evidence does not support the conclusion that the aggregation of consumer or competitive information accessible to Google as a result of its acquisition of DoubleClick is likely to confer market power. The evidence, for instance, does not support the suggestion that Google would be able to use competitively sensitive information in DFP – particularly pricing information – to disadvantage its ad intermediation competitors. DFP captures very little pricing data because only a small number of publishers, by choice, input data regarding prices paid by ad intermediaries. Further, the evidence shows that the small amount of pricing data available lacks the completeness necessary to provide Google an anticompetitive advantage against other ad intermediaries, because DFP does not typically capture data describing the revenue share between the intermediary and the publisher. The evidence also suggests that, even if the pricing data were perfect, it is still not clear that it would have any utility to Google, because AdSense uses a different payment model, targeting technology, and advertiser buy-in process than many of its intermediation competitors, making the available pricing data of little competitive value to Google. Further, much of the other data available to DoubleClick, such as clickthrough rates or inventory allocation, are readily available to Google today, or are accessible from sources other than DFP. Even if the data could generate some additional leads, Google already has ample alternative ways to generate leads. For these reasons, the evidence failed to show that the accessibility to Google of any additional data would likely enable it to exercise market power.

At bottom, the concerns raised by Google's competitors regarding the integration of these two data sets – should privacy concerns not prevent such integration – really amount to a fear that the transaction will lead to Google offering a superior product to its customers. Yet, the evidence indicates that neither the data available to Google, nor the data available to DoubleClick, constitutes an essential input to a successful online advertising product. A number of Google's competitors have at their disposal valuable stores of data not available to Google. For instance, Google's most significant competitors in the ad intermediation market, Microsoft, Yahoo!, and Time Warner have access to their own unique data stores. These firms own popular

search engines, and will have access to consumer information from their internal ad servers, ad intermediation services, other web properties, and software.  The entry and expansion of these well-financed competitors has transformed the ad intermediation marketplace over the last six months.  All of these firms are vertically integrated, and all appear to be well-positioned to compete vigorously against Google in this new marketplace.

       The markets within the online advertising space continue to quickly evolve, and predicting their future course is not a simple task.  Accounting for the dynamic nature of an industry requires solid grounding in facts and the careful application of tested antitrust analysis.  Because the evidence did not support the theories of potential competitive harm, there was no basis on which to seek to impose conditions on this merger.  We want to be clear, however, that we will closely watch these markets and, should Google engage in unlawful tying or other anticompetitive conduct, the Commission intends to act quickly.