```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3   ---------------------------x
     UNITED STATES, et al.,    :    Civil Action No.:
 4                             :    1:23-cv-108
             Plaintiffs,       :
 5        versus               :    Tuesday, August 27, 2024
                               :    Alexandria, Virginia
 6   GOOGLE LLC,               :
                               :    Pages 1-33
 7            Defendant.       :
     ---------------------------x
 8

 9        The above-entitled motions hearing was heard before
     the Honorable Leonie M. Brinkema, United States District
10   Judge.  This proceeding commenced at 10:04 a.m.

11              A P P E A R A N C E S:

12   FOR THE PLAINTIFFS:   GERARD MENE, ESQUIRE
                           OFFICE OF THE UNITED STATES ATTORNEY
13                         2100 Jamieson Avenue
                           Alexandria, Virginia  22314
14                         (703) 299-3700

15                         JULIA TARVER WOOD, ESQUIRE
                           KATHERINE CLEMONS, ESQUIRE
16                         AARON TEITELBAUM, ESQUIRE
                           UNITED STATES DEPARTMENT OF JUSTICE
17                         ANTITRUST DIVISION
                           450 Fifth Street, NW
18                         Washington, D.C.  20530
                           (202) 894-4266
19
                           MATTHEW HUPPERT, ESQUIRE
20                         UNITED STATES DEPARTMENT OF JUSTICE
                           950 Pennsylvania Avenue, NW
21                         Room 3109
                           Washington, D.C.  20530
22                         (202) 476-0383

23                         TYLER HENRY, ESQUIRE
                           OFFICE OF THE ATTORNEY GENERAL
24                         OFFICE OF THE SOLICITOR GENERAL
                           202 North Ninth Street
25                         Richmond, Virginia  23219
                           (804) 786-7704
```

1

```
1                    A P P E A R A N C E S:

2    FOR THE DEFENDANT:    CRAIG REILLY, ESQUIRE
                           LAW OFFICE OF CRAIG C. REILLY
3                          209 Madison Street
                           Suite 501
4                          Alexandria, Virginia  22314
                           (703) 549-5354
5
                           KAREN DUNN, ESQUIRE
6                          JEANNIE RHEE, ESQUIRE
                           AMY MAUSER, ESQUIRE
7                          WILLIAM ISAACSON, ESQUIRE
                           ANITA LIU, ESQUIRE
8                          PAUL, WEISS, RIFKIND,
                           WHARTON & GARRISON LLP
9                          2001 K Street, NW
                           Washington, D.C.  20006
10                         (202) 223-7300

11   COURT REPORTER:       STEPHANIE M. AUSTIN, RPR, CRR
                           Official Court Reporter
12                         United States District Court
                           401 Courthouse Square
13                         Alexandria, Virginia  22314
                           (607) 743-1894
14                         S.AustinReporting@gmail.com

15        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

16

17

18

19

20

21

22

23

24

25
                                                              2
```

```
1                   P R O C E E D I N G S

2            THE DEPUTY CLERK:  Civil Action

3   Number 1:23-cv-108, United States of America, et al. versus

4   Google LLC.

5            Will counsel please note their appearance for the

6   record, first for the plaintiff.

7            MR. MENE:  Good morning, Your Honor.  Gerard Mene

8   with the U.S. Attorney's Office.

9            THE COURT:  Morning.

10           MS. WOOD:  Good morning, Your Honor.  Julia Tarver

11  Wood from DOJ for the United States.  With me are my

12  colleagues Katherine Clemons, Matthew Huppert and Aaron

13  Teitelbaum.

14           THE COURT:  Good morning.

15           MR. HENRY:  And good morning, Your Honor.

16  Ty Henry from the Virginia Attorney General's Office on

17  behalf of the plaintiff states.

18           MS. DUNN:  Good morning, Your Honor.  Karen Dunn

19  on behalf of Google.  And with me today are Jeannie Rhee,

20  Amy Mauser, Bill Isaacson, Anita Liu and Craig Reilly.

21           THE COURT:  Good morning.  We have a couple of

22  logistical things I want to talk to you about first before

23  we get to the actual motion that's on the docket for today.

24           Ms. Wood, have you had a chance to consult with

25  the other plaintiffs in this case to be able to give me a
```

3

```
 1    sense as to how many attorneys representing the various

 2    states plan to attend the trial?

 3             MS. WOOD:  We do not have a definitive number,

 4    Your Honor, but we can get that promptly.  We can get that

 5    by the end of the day, if you would like.

 6             THE COURT:  Come up.  Do you have a ballpark

 7    figure?

 8             MR. HENRY:  Yes, Your Honor.  I can say the

 9    Commonwealth will be here, of course, every day.

10             THE COURT:  Yes.

11             MR. HENRY:  And the states of New York and

12    California plan to attend somewhat regularly.  Most other

13    states will not be able to be here on any regular basis.

14             THE COURT:  Because seating in this courtroom may

15    be a bit at a premium.  I want to maintain the jury box

16    for -- and I think I had said earlier that I was going to

17    have the jury box available for state attorney generals'

18    counsel.

19             So if I reserve four seats in that box for

20    representatives of state attorney generals, is that going to

21    be enough?

22             MR. HENRY:  That should be adequate, Your Honor,

23    yes.

24             THE COURT:  Okay.  All right.  Then how many

25    attorneys are actually going to be participating in this
```

                                                              4

1   case on behalf of the plaintiffs, Ms. Wood?  How many, over

2   the course of the entire trial, are going to have some

3   speaking part in the trial itself?

4           MS. WOOD:  I would anticipate that number

5   somewhere between 10 and 12 attorneys.

6           THE COURT:  All right.

7           MS. WOOD:  But over the course of a trial,

8   obviously not on any given day.

9           THE COURT:  So they could sit as well in this box?

10          MS. WOOD:  Yes, Your Honor.

11          THE COURT:  And they're coming to trial every day?

12          MS. WOOD:  Not all of them will be in the

13  courtroom all day every day.  Some will be assisting with

14  preparations outside the courtroom throughout the trial.

15          THE COURT:  All right.  On an average, how many of

16  them will be here, do you think?

17          MS. WOOD:  I would estimate that if we had five to

18  six slots dedicated for DOJ attorneys each day, that would

19  be sufficient.

20          THE COURT:  All right.  That's fine.  That gives

21  me a sense of what's going on here.

22          We've had a request from Mr. Mene, as I understand

23  it, to reserve a certain number of rows in the courtroom for

24  Department of Justice antitrust attorneys who have worked in

25  the background on this case who would like to be present.

                                                              5

1              Mr. Mene, is that correct?

2              MR. MENE:  Yes, Your Honor.  We would like to

3     reserve two to three rows there, those benches, so they

4     could sit there every day and not sort of be -- you know,

5     lose them to the public or the press.

6              THE COURT:  All right.  And you're going to be

7     able to police that?

8              MR. MENE:  Yes, Your Honor.

9              THE COURT:  All right.  I will direct that the

10    first two rows on my left be reserved for DOJ staff, as well

11    as any overflow seats in the jury box.  It sounds as

12    though -- we have 18 seats in that box.  So it sounds as

13    though we're not going to be using all 18 for state attorney

14    generals and actual trial participants.  All right.

15             MR. MENE:  Yes, Your Honor.

16             THE COURT:  So you'll fill those two rows first,

17    and if there's a few extra people who didn't get a seat and

18    there's space in the box, then they can sit in the jury box;

19    all right?

20             MR. MENE:  Thank you, Your Honor.

21             THE COURT:  All right.  If there are any folks

22    here from the media, I am going to do something similar for

23    properly-credentialed media folks, on the right side of the

24    courtroom, so you have access to the witness and the witness

25    box and you'll be able to see the screen for evidence

                                                        6

```
 1    presentation.  I haven't decided yet how we're going to do

 2    credentialing.

 3            Again, the rest of the courtroom is going to be

 4    open, you know, to anybody for any reason, and the courtroom

 5    right across the hall, 701, is also going to be set up so

 6    that anybody -- any overflow can be accommodated in that

 7    courtroom.  So that's how we're going to accommodate.  And

 8    anything beyond that, the seating capacity is what it is.

 9    That will be it.  Okay.

10            Number 2, I had talked with you some weeks ago,

11    might have been months ago at this point, on whether or not

12    the case was going to start with a tutorial.  And, remember,

13    the guidelines on that was if both sides could completely

14    agree, if you can't agree, then, you know, we'll just not do

15    one.

16            Have you agreed on one or not?

17            MS. WOOD:  Your Honor, I believe I raised this at

18    the hearing at which the trial was officially converted to a

19    bench trial, and, at that time, I understood Your Honor's

20    inclination to be just to proceed with a tutorial through

21    witnesses but not a separate tutorial.

22            THE COURT:  All right.

23            MS. WOOD:  So we've not made further efforts in

24    that regard, but we would be happy to do so if that's Your

25    Honor's preference.
```

```
 1              THE COURT:  That's fine.  I just want to make

 2   sure, because that affects then, to some degree, possibly

 3   the opening statements.

 4              Have you and your -- I assume you're going to open

 5   for the government?

 6              MS. WOOD:  Yes, Your Honor.

 7              THE COURT:  Ms. Rhee, are you going to open, or

 8   Ms. Dunn?

 9              MS. RHEE:  Ms. Dunn.

10              THE COURT:  All right.  Ms. Dunn, have you two

11   talked about how much time you would like?  Of course I

12   listen to what lawyers would like, and if it's reasonable,

13   they often get it; and if it's unreasonable, then I cut it

14   down.  But anyway, have you talked about how much you would

15   like for an opening statement?

16              MS. WOOD:  Your Honor, you had previously

17   indicated that both sides would be afforded 30 minutes per

18   side, and the government is fine with that and appreciative

19   of the opportunity to open, even in a bench trial.  I think

20   Ms. Dunn may have a request.

21              THE COURT:  Yes, ma'am.

22              MS. DUNN:  Your Honor, we're hoping to have a very

23   reasonable 45 minutes for both sides.

24              THE COURT:  Thirty for each side.

25              MS. DUNN:  Thank you, Your Honor.
```

```
 1              THE COURT:  Okay.  That's more generous than I
 2    normally allow.  But again it's a bench trial, and so I
 3    think that's going to be okay.  All right?  Okay.  Took care
 4    of that.
 5              And I do want to commend both sides that you're
 6    beginning to send through stipulations, so we're not going
 7    to waste time on, you know, foundational issues, which are
 8    not necessary.
 9              All right.  So then that brings us to the actual
10    motion that is on the docket today, the motion for an
11    adverse inference to be taken from the way in which chats
12    were preserved or not preserved, and basically the way in
13    which, frankly, the litigation hold was enforced by Google.
14    I've read your papers, so I don't need to hear a repeat of
15    what's in your arguments, but I do have some questions.  And
16    so, Ms. Wood, I'll ask you first.
17              You know, one of the main arguments Google is
18    making is that this motion for spoliation is filed late in
19    the game, and that you've been on notice for several years
20    now about this policy, which was reflected in this email
21    from counsel of, what, 2008, frankly, it's been the policy
22    in terms of how they're maintaining the chats, and that
23    there was never any -- as far as I can tell from the record,
24    any request that they change their policy as to the chats.
25              Do you want to address that issue?
```
9

```
 1            MS. WOOD:  Yes, Your Honor.
 2            First, to be clear, the email that you're
 3   referring to from 2008 was an email that was produced in
 4   discovery in this case, or in the investigation; it was not
 5   an email that was produced.
 6            What the United States was told -- and I would
 7   refer Your Honor to Exhibit 15 -- is first the United States
 8   was told that auto deletion was suspended, as one would
 9   presume in a normal case, auto deletion should be suspended
10   in any circumstance where material evidence could be
11   relevant to a future anticipated litigation.
12            However, there were numerous factors that the
13   United States did not become aware of over time, including,
14   for example, that chats were deleted after 24 hours, and
15   that all default chats were set to delete automatically
16   for -- delete automatically after 24 hours.
17            The United States did not learn until much, much
18   later that employees had to manually toggle chats to history
19   on, a very cumbersome process that the evidence we've
20   established for the Court shows that employees didn't know
21   how to do and weren't trained how to do.  That literally,
22   for every chat they received, they had to stop, think in
23   that moment, is this chat relevant to a litigation hold, if
24   so, before I respond, I need to go into the system and
25   toggle the history on so the chat would be preserved.  And
```

10

1    we have voluminous evidence that not only was that not

2    complied with, indeed, Google concedes that for the nine

3    employees who admitted to using chats, eight of them, eight

4    out of nine, failed to turn the toggle on to preserve the

5    chats.  So there was not compliance with this purported

6    basis to preserve even chats that were otherwise going to be

7    automatically deleted.

8          And, in fact, the evidence shows that Google --

9    the employees were repeatedly deliberately moving

10   communications to off-the-record chats so that they wouldn't

11   be discovered.  Indeed, we have one instance we've cited to

12   the Court involving one of the trial witnesses, Mr. Korula,

13   who was literally instructed by a Google attorney to turn

14   his history off when discussing substantive matters.

15         So this was essentially part of a three-prong

16   process that Google implemented, not all of which was made

17   clear to the United States, and certainly wasn't made clear

18   during the investigation or the early days of this case.

19         So the United States brought this motion at the

20   appropriate time, at the time for pretrial motions.  This is

21   not a motion that seeks further discovery, it doesn't seek

22   enforcement of the specific discovery order, and it is a

23   motion designed to deal with how this evidence will be

24   treated at trial, and so it was appropriately brought, in

25   the United States' estimation, at the pretrial phase.

11

1          The Court will recall that up until May of this

2     year, this case was intended to proceed by jury trial, and

3     the United States was prepared to file a motion for jury

4     instructions for an adverse inference on these issues, but

5     prudentially wanted to gather evidence about exactly how

6     these missing chats were going to impact the trial of this

7     case.  The United States anticipated the Court would have

8     questions about the specific and concrete prejudice that the

9     United States has suffered, and so the Court -- the United

10    States has waited until the exhibit lists were produced, the

11    witness lists were produced, so that we can put the scope of

12    this conduct into appropriate context.

13         So this was not a situation where any kind of

14    delay was tactical on the United States' part; it was a

15    prudential judgment we made to give the Court complete

16    context and the complete picture before raising this serious

17    motion.

18         THE COURT:  Wait.  Can you tell me, when do you

19    think the government first became aware of the Walker memo?

20         MS. WOOD:  The Walker memo I believe was produced

21    during discovery.  Whether it was produced during the

22    investigation or during the litigation, I can't say

23    specifically.  But the Walker memo was not produced, you

24    know, in the first days of discovery.

25         THE COURT:  Well, once it was produced, it clearly

                                                              12

1  would have put you on notice that there was this policy

2  about deleting most chats.  In fact, in particular, that the

3  default was being set such that the chats were automatically

4  going to be deleted.

5          MS. WOOD:  I believe that information first came

6  to light in the context of the proceeding in the Northern

7  District of California in January of 2023.  And while that

8  predated the litigation here, what we didn't know was, A,

9  how it impacts our witnesses in particular; and B, and

10  perhaps more importantly, the difficulty and cumbersome

11  process that was required to convert history-on chats to

12  history -- or history-off chats to history-on chats.

13          That is a pivotal distinction in our mind, because

14  if it were a simple process of employees being able to, once

15  they're on a litigation hold, go into their system and for

16  all their chats from today for the next five years just

17  toggle history on, I think we would be in a very different

18  situation, Your Honor.  And that we did not learn until much

19  later through the course of discovery.

20          And remember also that many of the chats that were

21  produced that we've cited as evidence here were produced

22  well after the original fact discovery cutoff, and some were

23  produced even more recently than that, as Google has

24  continued to comply with their discovery obligations by

25  producing documents later and later.

                                                          13

1           And so it is a question, if we had had full and

2    complete information at a different time, we would be in a

3    very different situation, although I still believe that in

4    that context it would still be prudential to bring the

5    motion at an appropriate pretrial phase, either in

6    connection with a motion for an adverse inference to be

7    charged to the jury or with respect to the Court.  But the

8    case law is clear, that when the spoliation conduct is

9    serous, that outweighs any concern about purported

10   timeliness.

11          I'll also offer to Your Honor that Google has been

12   unable to articulate any form of prejudice or harm due to

13   the timing of this motion, and there is none.  Because any

14   arguments they would have had back in October, November,

15   December about the timing, if the motion had been filed

16   then, could easily be made now.  They have not lost any

17   arguments in the interim.  We are not seeking a delay in the

18   trial, we are not seeking additional discovery, we are not

19   seeking to supplement the evidentiary record in any way.

20   What we are seeking is a trial-related relief, and that, we

21   believe, comports with the case law about the appropriate

22   timing for motions such as these, and we believe it was --

23   in our view, we were mindful of the Court's admonition to

24   focus on the merits, to proceed with the case accordingly,

25   and to give concrete examples and context for any alleged

                                                            14

 1    prejudice.  And so that is the reason why we determined it

 2    to be most prudential to see what witnesses were on both

 3    sides of the witness list, what exhibits were on the exhibit

 4    list, and exactly how Google's conduct has threatened a fair

 5    trial in this case.

 6              THE COURT:  All right.  Thank you.  All right,

 7    Ms. Rhee.

 8              MS. RHEE:  Thank you, Your Honor.

 9              THE COURT:  There are a whole bunch of problems

10    with how Google approached the preservation of evidence in

11    this case.  I mean, the Walker memo of course goes back to

12    before litigation was actually started, but there's

13    incredible smoking guns within that document.  I mean,

14    there's a clear recognition, you know, "as you know, Google

15    continues to be in the midst of several significant legal

16    and regulatory matters, including government review of our

17    deal with Yahoo."  And then it goes on.  And then -- you

18    know, so it sets the setting for an argument that there was

19    definitely a very clever approach to try to hide relevant

20    information going back to 2008.

21              And then my concern from the record of this

22    case -- and I'm looking at Appendix B that was attached to

23    the government's motion -- which talks about the litigation

24    hold and the incredible delay in which various witnesses

25    were notified about that litigation hold.  Because that has

                                                              15

1    a huge impact, given the fact that there was this automatic

2    deletion as to chat messages that just indicates that an

3    awful lot of evidence has likely been destroyed.

4              You need to address those issues.

5              MS. RHEE:  Thank you, Your Honor.

6              So we think that the Court is right to focus on

7    timeliness here.

8              With respect to the Walker memo, the date of that

9    is 2008, as the Court rightly noted.  That was well before

10   the --

11             THE COURT:  Well, it's before this case was filed,

12   but it recognizes that even back then, Google was being

13   looked at by regulators.  All right.

14             And so, you know, is it wise to tell your people,

15   hey, the government's going to be looking at us, we want to

16   make sure that sensitive information is not kept, because if

17   it's kept, then we might have -- in fact, it says that in

18   the memo, our discovery obligations, we have to turn it

19   over.

20             So, you know, it's not saying to them directly,

21   destroy any relevant evidence; it's sort of a wink and a

22   nod.  But, I mean, it's clearly giving a message to

23   employees that there are different ways of communicating

24   this particular way through chats we can kind of control.

25             And corporation-wide, there was this default put

                                                        16

 1    in, as I understand it.  So if you were involved in a chat

 2    and you're a Google employee, there was automatically a

 3    default that that conversation would be destroyed within a

 4    few hours unless the employee did something.  So you put the

 5    burden on the ordinary employee to decide whether or not

 6    that particular chat needed to be preserved, and, even then,

 7    the length of preservation, as I understand it, the max was,

 8    what, 18 months.

 9         And the other thing that's strange in this case --

10    and someone has to explain exactly how this would operate in

11    a chat conversation -- is that even if I, the Google

12    employee, took off the default and so now I wanted it

13    preserved, the recipient, the other member of that chat also

14    had to do something; right?

15         MS. RHEE:  No, Your Honor.  Any one of the

16    participants who had a history on would preserve that

17    particular conversation or thread.

18         THE COURT:  Both sides of it?

19         MS. RHEE:  Yes, both sides of it.  Because it's

20    instantaneous, equivalent of text messaging.  So unlike

21    emails, you're not going to have both sides of it.  So with

22    respect to the way that it functioned, if one of the

23    participants had a history on, then it would be a history-on

24    conversation.

25         THE COURT:  And so that the other -- what if the

                                                            17

```
1    other side hit history off, if there was another Google
2    employee?
3            MS. DUNN:  Even if they had a history off, at
4    least for the custodian with the history on, that would be
5    preserved, and the entirety of that text exchange would be
6    preserved.
7            THE COURT:  Right.  Now, how do you respond to
8    Appendix B?  And that is that the length of time between the
9    time that the litigation hold was requested and the time in
10   which the litigation hold was actually communicated to the
11   particular employee?
12           MS. RHEE:  Yeah.  I mean, I think there what you
13   can see in Google's filing and response, Your Honor, is a
14   corrected Appendix B, because upon review of all of the
15   underlying hold notices, what was properly reflected was not
16   always the earliest time hold notice that those recipients
17   actually got in connection with the topics of this
18   investigation.
19           And so, again, when you actually look at the
20   attachments to Google's reply to the government's motion,
21   the corrected dates of the very first-in-time hold notices
22   that were issued reflect that actually there wasn't an undue
23   delay on the company's part to issue the hold notices.
24           Of course, the government continues to contend
25   that those hold notices and the processes around them were
```

18

1   less than ideal, certainly, but at least with respect to the

2   Appendix B and the allegation that there was undue and

3   unreasonable delay in the issuance of the hold notices to

4   the custodians, I think that the correction does actually

5   correct that.

6            THE COURT:  Ms. Wood, do you want to respond to

7   that?

8            MS. WOOD:  Yes, Your Honor.  May I respond briefly

9   to both points.

10           First of all, my understanding is that any

11  participant in a chat, if one participant turns the chat on,

12  the chat is on, but if the next participant turns it off,

13  it's off.  So I can't understate -- or overstate, rather,

14  how critical this is that for every single chat, this has to

15  be manually done on a chat-by-chat basis.

16           THE COURT:  I understand.

17           MS. WOOD:  And I think that's a fundamental

18  problem.

19           With respect to the corrected Appendix B, again,

20  it's unfortunate that we got discovery responses from Google

21  itself that were just incorrect and that Google didn't

22  notice the error.  I think they corrected some 90 different

23  custodians' lit hold date.  But the problem for Google is

24  that doesn't solve the issue, because while the lit holds

25  may have been provided earlier than we were told during

                                                          19

1   discovery, what that means is that many additional

2   custodians who actually were under a lit hold, we have clear

3   evidence that they were seeking to move their chats to

4   history off.  As we indicated, there are -- you know, the

5   Google employees somewhat reveled in this.  They referred to

6   these off-the-record chats as Vegas.  What happens in Vegas

7   stays in Vegas.

8          So though these multiple custodians were on lit

9   holds going back further than we were led to believe during

10  discovery, what we know is that those very same employees

11  were still saying let's take this to a history-off chat.

12  Indeed, we have one custodian who was told by a Google

13  attorney:  Let's move this to a history-off chat.

14         So, you know, I don't -- I think in context the

15  three steps that Google took to implement this overall

16  scheme was one, to have all chats auto deleted; two, to

17  train employees to speak about sensitive matters that might

18  hurt the company in off-the-record chats; and then three, as

19  Your Honor said, with a wink and a nod, tell employees that

20  they need to manually, chat-by-chat, day-by-day,

21  hour-by-hour, change their chat setting to preserve

22  litigation documents.  And Google well knew, as any

23  reasonable corporate body would know, that its employees

24  were either unwilling or uncapable of complying with those

25  cumbersome instructions.  And that's why we are where we

                                                          20

```
 1    are, where the vast majority of custodians, including

 2    witnesses who will sit in that box over there at trial, did

 3    not turn history on for their chats.

 4           And, in fact, it's remarkable that we actually

 5    have evidence of them doing the precise opposite.  It's not

 6    just the evidence that we're missing; it's the evidence

 7    we've gathered that says, hey, let's not talk about this

 8    here, let's go talk about this over here in Vegas where we

 9    can be sure that our regulators and litigants will never

10    know about it.

11           Here, prejudice, as Your Honor is aware, is not

12    required once you have an intent to deprive.  But I think we

13    have established, through the evidence that we've presented

14    to the Court, that there is prejudice, and that these chats

15    reflected unusually candid, unsanitized versions of the

16    truth from key witnesses at this trial.

17           THE COURT:  All right.  The other -- you can stay

18    there, Ms. Wood.

19           The other exhibit that you attached that certainly

20    got my attention, and I'm curious as to whether there was

21    much -- and I didn't get a chance to talk to Judge Anderson

22    about this.

23           Did you have issues with the Vaughn index or any

24    problems with the invoking of the attorney/client privilege

25    in obtaining documents in this case?
```

                                                            21

1              MS. WOOD:  We did, Your Honor.  We have had

2    repeated problems throughout with Google employees, again,

3    under the exact same Communicate-with-Care policy, being

4    instructed that when they want to talk about sensitive

5    matters that relate in any way to antitrust or competition

6    concerns, they should slap a privileged and confidential

7    label on it and copy an attorney, even when the attorney is

8    not being asked for legal advice, and even when the record

9    shows the attorney doesn't provide legal advice.

10             THE COURT:  So am I correct, your Exhibit 25,

11   which is this screenshot of Communicate with Care --

12             MS. WOOD:  Yes, Your Honor.

13             THE COURT:  -- and it has three bullets.  It says

14   "lawyer" in the To field.  "Mark attorney/client privileged.

15   Asked the lawyer a question."  And then it says underneath:

16   "If you're dealing with a sensitive matter, it's important

17   to communicate with care over email."  And there's no

18   problem with that.  "You can follow these steps to ensure

19   your email communication is privileged in these situations."

20   And then you've got some examples here of where that heading

21   was put on, I think the president of Google, some of his

22   emails, that absolutely would not be calling for a legal

23   opinion.

24             Did Judge Anderson do anything with that during

25   the course of discovery?

                                                          22

1          MS. WOOD:  Your Honor, no.  We had sought

2    different forms of relief, but he did not.

3          THE COURT:  Okay.

4          MS. RHEE:  Your Honor, if I can have the

5    opportunity to address what happened before Judge Anderson.

6          THE COURT:  Yes.

7          MS. RHEE:  I mean, there are just a number of

8    things to be clarified here.

9          Before Judge Anderson, throughout the very

10   extensive period of discovery and the many times that the

11   parties appeared before Judge Anderson, there was only one

12   privilege motion filed and it was for a very discrete set of

13   documents.  Judge Anderson did an in-camera review of those,

14   and for the most part, Google prevailed on that.

15          The things that are being cited by Ms. Wood today,

16   and they were cited in the government's papers, really are,

17   you know, policies, practices, procedures, processes,

18   really, that are from long ago, including the Walker memo in

19   2008.

20          A lot of the things that are being talked about

21   back and forth have nothing to do with the issue here, which

22   is, after there was an obligation to preserve, which by the

23   earliest date is October 2019, did the government have

24   timely and sufficient notice about the practices.  As the

25   Court rightly knows, it's not as if the Walker memo was a

                                                              23

1  secret.  It did not all of a sudden magically appear in

2  2023.  All of that was produced well before there was this

3  actual complaint.

4          Moreover, during the CID period, as is articulated

5  in the papers, as well as in the attachments, both the

6  Government's Plaintiff Exhibit 21 and Google's Exhibit 2, in

7  2019, after the launch of the CID, there was a prompt

8  disclosure of the hold practices, as well as an attachment

9  and a compendium of the preservation policy that talks about

10  history on with respect to chats.

11          If that's not enough, in the summer of 2021, while

12  DOJ was engaged in its investigative phase, it got discovery

13  with respect to chats, noticed that there were chats on

14  versus discussion of chats off, asked questions about the

15  chats off, asked for a breakdown with respect to specified

16  custodians, how much was produced on chats versus other

17  documentary formats like emails.  That was all promptly

18  responded to in the summer of 2021.

19          Again, then fast-forward after the initiation of

20  this complaint, before the repeated appearances in front of

21  Judge Anderson, none of these other issues were raised.  And

22  on the issue of privilege, which is really a lot of what is

23  informing this back-and-forth discussion in the court today,

24  there were no privilege issues other than that discrete

25  in-camera review that were brought before this Court, in

24

1    this proceeding, and in this matter.

2         Now, I think as the Court is aware, there were

3    lots of additional and supplemental productions of materials

4    that had initially been marked as privileged, but consistent

5    with the party's obligation to do a careful review of the

6    materials and to make sure that there were proper assertions

7    of privilege, that was actually undertaken by the company,

8    and that is the reason why all of these materials are in the

9    various productions because privilege was not asserted.

10        THE COURT:  All right.

11        MS. WOOD:  Your Honor, may I respond briefly --

12        THE COURT:  Yes, Ms. Wood.

13        MS. WOOD:  -- just to correct the record?

14        First, with respect to the privilege issues,

15   privilege has been a recurring problem between the

16   Department of Justice and Google's counsel throughout the

17   investigation and litigation.  In June of 2024, two months

18   ago, 40,000 deprivileged documents were produced.

19        We are not running into court to claim a delay in

20   the trial.  We want to see justice done, and we want to see

21   justice done expeditiously.  But these problems that have

22   been created by Google's Communicate-with-Care policies have

23   subjected significant hardship on the United States in

24   dealing with constant claims of a document's produced, then

25   it's clawed back, then it's produced again, it's used in a

                                                        25

 1   deposition, it's quoted in the complaint, then it's clawed

 2   back.  There have been multiple, multiple rounds of these

 3   privilege issues.

 4           It is true that we brought this issue to

 5   Judge Anderson during discovery in this matter, and when we

 6   did, we cited 20 documents and requested that Judge Anderson

 7   review those 20 documents in camera.  And Google, in their

 8   opposition, removed the privilege for approximately 18 of

 9   the 20.  There were two documents left.  Which proves the

10   point, frankly, that it was not until we raised the issue

11   with the Court that they backed down from the privilege

12   assertion.

13           So we then requested from Judge Anderson the

14   opportunity to bring -- to supplement 18 more to see if the

15   Court would be willing to see them in camera, and he viewed

16   the matter as resolved because Google was withdrawing the

17   privilege assertion.  And I understand why he did that.

18   That's efficient if Google's no longer pressing the

19   assertion, but it fundamentally left us in a situation

20   where, until we are able to bring the matter to a court, we

21   have difficulty getting the other side to properly assert

22   privilege and properly not assert privilege.  But the only

23   reason we've raised privilege in this context is we believe

24   it is consistent with the broader intent, to withhold

25   relevant information from the trial.

                                                              26

 1          Thank you, Your Honor.

 2          THE COURT:  Well, obviously if this case were a

 3  jury trial, this would be completely appropriate to be

 4  raising this pretrial because it would absolutely affect the

 5  jury instructions.  I also find, even as a bench trial, it's

 6  a very appropriate issue to have been raised before we

 7  actually start taking evidence.

 8          I've looked at the record of this case.  I've also

 9  looked at the California-related litigation where there was

10  a clear finding by the judge there.  But that was a jury

11  trial, and he needed to make a decision as to how to

12  instruct the jury.  He did give the jury a spoliation

13  instruction.  And of course Judge Mehta also had the issue

14  presented, also made, you know, obviously some findings but

15  did not actually have to use a spoliation decision in

16  reaching the decision ultimately that he reached.

17          And I'm going to take an approach somewhat similar

18  to Judge Mehta's in the sense that I certainly do not mind

19  saying right now from the bench that the policy -- the

20  Communicate-with-Care policy, in my mind, is not the way in

21  which a responsible corporate entity should function.

22  Slapping on the -- you know, attorney on email -- in many

23  cases routine email messages just to be able to throw up a

24  smoke screen of, you know, attorney-client privilege is, in

25  my view, a clear abuse of the privilege.

                                                          27

1          And as I once told you at an earlier proceeding,

2    when I do that kind of a review -- I've been doing it, to

3    some degree, under sealing motions as well -- if I find that

4    a privilege is being abused, I stop looking at all the other

5    ones.  So there might be a couple of meritorious ones, but I

6    wouldn't give that party the benefit of the privilege if I

7    see it being abused.  I think it clearly -- this approach,

8    putting the attorney communication business on almost all

9    communications that are at all sensitive is absolutely

10   inappropriate and improper, and I would draw inferences from

11   that.

12          I do not understand, frankly, why the

13   history-on/history-off default concept was not changed as

14   soon as Google realized that it was going to be truly under

15   the gun.  I mean, I understand why they did it, but it was a

16   foolish decision.  I think that should have been changed

17   quickly.  And that would have avoided this whole problem,

18   frankly, that we have now, because then the government could

19   see with a particular chat, oh, this one, the delete was put

20   on.  And if the default was it's always historically

21   preserved, but in this particular case somebody deleted it,

22   then you could focus on why was that deleted.  You've lost

23   that ability in this case because everything is deleted

24   unless it's saved.

25          So certainly, as you call your witnesses, this

                                                              28

```
 1   will be an issue that the Court will take into consideration
 2   in evaluating the credibility of that witness.  Whether I
 3   have to make a formal spoliation decision at the end of the
 4   day, I'll wait and see how all the evidence comes in, but I
 5   think this was very serious -- this record creates a very
 6   serious problem for Google in terms of how much credibility
 7   the Court will be able to apply.  Intent is a serious issue
 8   in this case, and I think it's going to be a problem given
 9   this history.
10            So that's how I'm sort of resolving this matter,
11   much like Judge Mehta.  I've heard it, I don't like what
12   I've heard.  I'm going to see how it plays into the final
13   evaluation of the case.  All right.
14            All right.  So what we next have on the line for
15   this case for next week, as I understand it, is we have
16   various motions from third parties in terms of subpoenas,
17   and we also have the motions in limine.  And that's what's
18   on the calendar for next week; correct?
19            MS. WOOD:  Yes, Your Honor.  We also would ask the
20   Court's indulgence.  We have a list of housekeeping items
21   that we thought might be helpful to discuss at that final
22   conference, or today at your Court's pleasure.  But we
23   thought we might submit something in writing to the Court so
24   we could tee those up for discussion on the 4th as well.
25            THE COURT:  Well, both sides should do that --
```

29

```
 1              MS. WOOD:  Both sides, yes.

 2              THE COURT:  -- so we can get as much of this

 3      resolved as possible.

 4              MS. WOOD:  Yes.

 5              THE COURT:  And the only other thing I need to

 6      alert you to, because this is not the only case I have over

 7      the next several weeks.  I'm trying to give you as much time

 8      as I can, and I'm trying to give you as structured a week as

 9      I can.  Tuesdays are my normal criminal docket day.  I am

10      going to try to start my criminal docket at 8:30 on Tuesday

11      mornings, and hopefully have all that cleared so that we can

12      start Tuesdays, you know, as close to a 9:00 start.  But I

13      think on Tuesdays I may just tell you a 9:30 start so you

14      can plan accordingly.  And hopefully I will have finished

15      the criminal docket and don't have to delay you all.

16              It is necessary, however, that whenever I have

17      other matters, you have to clear your tables, so that adds a

18      little extra time at the end of the trial day.  So Monday is

19      our first trial day.  You'll have to clear your desks; I do

20      have a Tuesday morning docket.  But Tuesday we'll start at

21      9:30 rather than 9:00.  All right.  And there may be a

22      couple of days where we have to stop a little bit early.

23      There's a bar function that I have to attend later on in

24      September.  Some of the attorneys here may also --

25      Mr. Reilly, I think you're going to that as well.  So I'll
```

                                                                    30

1    keep you posted.

2              And, remember, I do want -- and I think we talked

3    about this before -- certainly no later than the end of each

4    trial day, you need to give a list of the witnesses in the

5    order you're planning to call them so I know and opposing

6    counsel knows.

7              MS. WOOD:  We've actually agreed to provide them

8    two weeks' notice.  So we've already given them two weeks'

9    notice of our first week's worth of witnesses and the order

10   they'll be called in.

11             THE COURT:  Remember, right now COVID is around.

12   We've had several court matters that actually, for other

13   judges, have been postponed.  So there may obviously -- for

14   a trial that's going to go a couple of weeks, there will

15   probably be some rearranging of schedules.  We also haven't

16   gotten through all these third-party motions to quash.  That

17   may affect some things as well.

18             But I commend you for doing that, but you will be

19   forgiven if you have to make -- both sides, if you have to

20   amend those matters.

21             MS. WOOD:  Thank you, Your Honor.

22             THE COURT:  All right.  So get your list of

23   housekeeping matters to us as quickly as you can so we can

24   be looking at them in advance.

25             Is there anything else, though, while I have you

31

```
 1   here today that either side wants to address?
 2              MS. RHEE:  Your Honor, I would just ask, based on
 3   the conversation at the start of this proceeding with
 4   respect to some reservation --
 5              THE COURT:  Ms. Rhee, you really want to be right
 6   there.  That's where the microphone is.
 7              MS. RHEE:  Okay.  Sorry about that, Your Honor.
 8              Just with respect to some available seating for
 9   the defense team, I just want to understand --
10              THE COURT:  Okay.  How many lawyers are you
11   planning to have?
12              MS. RHEE:  I think very similar to the plaintiffs'
13   side.  There will be a core set who are here in the
14   courtroom every day, but then depending on the witness, some
15   supplemental/subbing in as needed.  I think we don't need
16   two rows here, but if we could at least have one dedicated
17   so that the team can appropriately support.
18              THE COURT:  All right.  We'll probably use some
19   tape.  I'll give you a few areas in the center section on
20   your side of the courtroom so they would have relatively
21   quick access.  All right.  And we'll see how that works.
22   All right.
23              Anything else at this point?
24              MS. WOOD:  No thank you, Your Honor.
25              THE COURT:  No.  All right.  We'll recess court
```

                                                                    32

```
 1   for the day.

 2             MS. RHEE:  Thank you.

 3               (Proceedings adjourned at 10:44 a.m.)

 4             -----------------------------------

 5   I certify that the foregoing is a true and accurate

 6   transcription of my stenographic notes.

 7

 8                          _Stephanie Austin_

 9                     Stephanie M. Austin, RPR, CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```