**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 1:23-cv-00108-LMB-JFA |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**PLAINTIFFS' OMNIBUS MOTION IN LIMINE**

Google's response to Plaintiffs' omnibus motion in *limine* (Dkt. 1234) fails to establish why (1) Google should be allowed to argue a position about the relevant market that conflicts with its prior position in a different case; (2) past antitrust enforcers' comments and decisions about the DoubleClick and AdMeld acquisitions are legally relevant today in the context of a Section 2 case; and (3) unreliable Advertiser Perceptions surveys should be admitted for the truth of the matter when they constitute hearsay and double hearsay, at best.

## PLAINTIFFS' REQUESTED RELIEF NO. 1

### I.      Judicial Estoppel is Appropriate

Plaintiffs respectfully request that the Court preclude Google from presenting evidence and argument that the ad tech products at issue in this case represent one single relevant product market, in conflict with the position Google took before a different court. First, Plaintiffs' request to exclude improper evidence and argument is appropriate to raise via a motion *in limine*. Second, Google's prior inconsistent position was factual—not legal—and the inconsistent position was accepted by the N.D. California court. Because Plaintiffs meet the requirements, judicial estoppel is appropriate.

### A. Plaintiffs Properly Seek to Exclude Google's Single Product Market Argument and Evidence

Google seeks to present evidence and argument at trial that the Court should adopt a single product market formulation, contrary to its prior statements to another court. *See* Pls.' Mem. Of Law in Support of Pls.' Omnibus Motion *in Limine* 4-5, ECF No. 1158 ("Pls.' Opening Br."), Def.'s Opp. to Pls.' Omnibus Motion *in Limine* 1, ECF No. 1234 ("Def.'s Opp."). The exclusion of evidence at trial is paradigmatically the purpose of motions *in limine*. Indeed, courts in this district regularly consider estoppel issues in the context of a motion *in limine*. *See*, *e.g.*, Pls.' Opening Br. 5 (citing cases); *Burgess v. Bowen*, No. 1:09-cv-763, 2012 WL 4682157, *3-4

(E.D. Va. Oct. 2, 2012); *Mullinex v. John Crane, Inc.*, No. 4:18-cv-00033, 2021 WL 8533035, at

*1 (E.D. Va. Oct. 5, 2021). The issue is ripe for resolution by the Court at this time, as evidenced

by magistrate judges that have deferred similar motions to ruling by the trial judge. *See, e.g.*,

*Payne v. Wyeth Pharms., Inc.*, No. 2:08-cv-119, 2008 WL 8743417, at *1 (E.D. Va. Nov. 12,

2008) ("The issue of whether Plaintiff should be precluded from seeking damages in excess of

$1 million pursuant to the doctrine of judicial estoppel is deferred to the trial judge.").

Plaintiffs' motion *in limine* is the appropriate vehicle for this issue because the relief the

motion seeks is narrower than summary judgment, but broader than *Daubert*. Unlike the plaintiff

in *Audio Technica U.S., Inc. v. United States*, 963 F.3d 569 (6th Cir. 2020), Plaintiffs did not and

do not seek "judgment as a matter of law," *id*. at 575, on the issue of market definition because

other factual disputes remain on that issue. *See, e.g.*, Def.'s Proposed Findings of Fact ("Def.'s

PFOF") 106, 131, ECF No. 1177. Conversely, a *Daubert* motion limited only to the opinions of

Dr. Israel would be too narrow because Google's estopped position could be expressed through

fact witnesses and lawyer argument. Preventing Dr. Israel from testifying would have still left

Google free to offer its inconsistent and conflicting market definition position. By eliciting

testimony in this case that conflicts with a position Google took in the N.D. California case,

Google—by and through its lawyers and any witnesses it endorses or examines—is bound by the

principles of estoppel and barred from presenting facts and arguments that conflict. Unlike in

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, there was no prior "invitation" from the Court to raise

this issue sooner. No. 3:16-cv-545, 2018 WL 2214035, at *3 n.2 (E.D. Va. May 11, 2018).[1]

---

[1] Google's response also makes a brief reference—without elaboration of the connection to this
motion—to *Ohio v. American Express Co.*, 585 U.S. 529 (2018) ("*Amex*"). *See* Def.'s Opp. 4. To
the extent Google seeks another opportunity to litigate the legal import of the fact that Plaintiffs

**B. Google's Prior Position Was Factual, Inconsistent, and Accepted by the Court**

First, Google's position in the N.D. California case was factual, rather than legal. It concerned facts about products *offered by Google*—specifically, that a combined market for "advertising services and platforms, and publishing services and platforms" was "implausible" because of the differences between services used by advertisers and publishers. Def.'s Opp. Ex. 3, at 2, 4, 5. For example, Google described the *fact* that publishers, but not advertisers, "would use the publisher-facing services described in the FAC." Def.'s Opp. Ex. 2, at 6. Google's N.D. California motion included other factual assertions, such as that Facebook was "the single most popular website hosting display advertising" and that Amazon was "another extraordinarily popular website with advertisers." *Id.* at 3. And as noted above, Google challenged the advertiser plaintiffs' allegations on the basis that "their purported market includes products and services that Plaintiffs and other advertisers admittedly do not purchase or use." Def.'s Opp. Ex. 2, at 8. These are, of course, all assertions of fact. That those assertions arose in the context of a motion to dismiss does not fundamentally transform their character.

Second, Google's Proposed Findings of Fact in this case confirm that its current factual position cannot be reconciled with the positions Google took in the N.D. California case. Google now states as a matter of fact, for example, that "[i]ndustry participants view their products as connecting ad space buyers and sellers in transactions—not just particular components of the stack." Def.'s PFOF ¶ 271. And it takes the position that "different sets of ad tech tools . . . exert

---

will demonstrate harm to both advertisers and publishers, that topic is amply covered by Plaintiffs' Proposed Conclusions of Law ("Pls.' PCOL") ¶¶ 28-32, ECF No. 1172. Google does not—and cannot—argue that *Amex* stands for the proposition that two different groups (here, advertisers and publishers) must be joined together in a single market for market definition purposes, which is the subject of its inconsistent—and estopped—factual assertions. Therefore, the citation to *Amex* in Google's response is a red herring, and the Court need not look to *Amex* to resolve the issue before the Court in this motion.

competitive pressure on each other." Def.'s PFOF ¶ 269. In short, Google is now taking the same position that it told the N.D. California court was factually implausible. Courts rightly have discretion to apply judicial estoppel in circumstances like these to "prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *1000 Friends of Maryland v. Browner*, 265 F.3d 216, 226 (4th Cir. 2001) (quoting *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996)); *King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998) ("As an equitable doctrine, judicial estoppel is invoked in the discretion of the district court . . . ."); *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 262 (5th Cir. 2012) (deferential review of judicial estoppel rulings includes upholding fact findings unless "clearly erroneous").

Finally, the procedural history in the N.D. California case shows that the court relied on Google's position. Advertiser plaintiffs filed an amended complaint on December 4, 2020, and Google filed its motion to dismiss—asserting the facts currently at issue—on January 15, 2021. Def.'s Opp. Ex. 3, at 1, 4-6. On February 4, 2021, the court held a conference to discuss several complaints filed recently by publishers. Def.'s Opp. Ex. 4. Google's motion to dismiss was pending but not fully briefed, and the court stated that it would "go forward with [Google's] motion to dismiss," *i.e.* it would decide that motion rather than have advertisers pursue further amendments to coordinate their pleadings with publishers. Def.'s Opp. Ex. 4, at 28. On Feb. 15, 2021, advertiser plaintiffs filed a response brief that defended their existing allegations. Def.'s Opp. Ex. 5, at 11 (arguing that "[p]laintiffs properly define the market by reference to a set of advertising products"); *id.* at 15 (arguing that Google's conduct "conferred monopoly power in the display-ad services market").

Three months later, in ruling on the motion and dismissing the claim, the "Court agree[d] with Defendants." *In re Google Digital Advertising Antitrust Litig.*, 2021 WL 2021990, at *3

(N.D. Cal. May 13, 2021). The court then allowed the advertisers' claims to be re-pled if "narrowed to address only the claims of digital advertisers, not digital publishers." *Id.* If Google's position regarding a single product market in this case is correct, then the N.D. California court was misled. Google has presented no principled reason why the N.D. California court's action re-framing the case in this way is not the type of "judicial acceptance" that should trigger judicial estoppel to avoid the "perception that either the first or the second court was misled." *New Hampshire*, 532 U.S. at 750.

Google's cited cases do not undo the legal significance of its factual reversal. *Konstantinidis v. Chen* is inapposite because it merely explains the requirement that the party have "procure[d] a favorable decision from any judicial body." 626 F.2d 933, 939 (D.C. Cir. 1980) (explaining that "judicial estoppel should not be applied if no judicial body has been led astray"). Similarly, *Teledyne Industries, Inc. v. NLRB* makes clear, contrary to Google's argument, that "judicial acceptance" can occur "either as a preliminary matter or as part of a final disposition." 911 F.2d 1214, 1218 (6th Cir. 1990). Finally, Google cites cases that suggest a "final disposition" is necessary but does not explain why a court order granting a motion to dismiss and requiring plaintiffs to plead different relevant markets is not sufficiently "final." Google has cited only a bankruptcy case and a civil case where judicial estoppel applied based on a prior guilty plea—neither of which illuminates why the N.D. California court's decision was not final. *See In re Merry-Go-Round Enters., Inc.*, 229 B.R. 337, 347 (Bankr. D. Md. 1999) (explaining the meaning of "final disposition" in the narrow situation "[w]here a party is attempting to estop a debtor's successor in interest on the basis of statements made by a debtor in possession"); *Lowery v. Stovall*, 92 F.3d 219, 225 (4th Cir. 1996) (holding that "the trial judge accepted Lowery's [prior] position when he accepted his guilty plea").

To uphold the integrity of the judicial process, the Court should estop Google from introducing evidence and argument in this trial that a single ad tech product market exists, when Google previously induced the N.D. California court to issue an order holding that such a single product market was implausible.

## PLAINTIFFS' REQUESTED RELIEF NO. 2

I. **Prior Prospective Review of a Merger under the Clayton Act Is Not Probative of Liability under Section 2 of the Sherman Act**

In 2007 and 2011, Google advocated to the FTC and the Antitrust Division that its proposed acquisitions of DoubleClick and AdMeld were legal and did not raise concerns under the predictive, prophylactic standards of the Clayton Act. Based in part on the representations and characterizations provided by Google, the FTC and Antitrust Division made—as they were required to under the structure and process of the Hart-Scott Rodino Act—assessments, judgments, and predictions. Those assessments, judgments, and predictions were premised on a distinct set of representations, documents, economic models, and predictive exercises from a time when the future—by definition—had not yet unfolded. But now the Court is presented with an entirely different set of representations, documents, models, and analyses. That is why statements and judgments made in the context of a forward-looking analysis conducted pursuant to a different legal framework and with a different record are not probative of the issue before the Court today, namely whether Google has "engag[ed] in exclusionary conduct" under Sherman Act Section 2.[2] *United States v. Microsoft Corp.*, 253 F.3d 34, 58, 80 (D.C. 2001) (en banc); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 714 (4th Cir. 2021) ("The

---

[2] Google repeats its erroneous claim that Plaintiffs bear the burden of establishing "that the factfinder could find 'no valid business reason or concern for efficiency in the [alleged monopolist's] choice." Def.'s Opp. 13. As Plaintiffs explained in their Proposed Conclusions of Law, Google has incorrectly reversed the burdens. Pls.' PCOL ¶ 4.

[Antitrust Division's] decision not to pursue [a merger challenge] isn't probative as to the merger's legality[.].").

Plaintiffs do not allege that these acquisitions, standing alone, violated Section 7 of the Clayton Act, which was the only question presented to antitrust enforcers that reviewed the mergers at the time they were proposed. Instead, Plaintiffs focus on the role these acquisitions played in making possible Google's much broader course of anticompetitive conduct, violating Section 2 of the Sherman Act. *See Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, -- F.4th --, 2024 WL 3642432, at *11–12 (4th Cir. Aug. 5, 2024) (for Sherman Act Section 2 cases, "alleged anticompetitive conduct must be considered as a whole").

Google, however, impermissibly suggests that this Court should view these transactions and their effects in isolation in order to justify the putative relevance of the FTC and the Antitrust Division's decade-old statements. Ignoring controlling law, Google seeks to introduce incomplete and non-probative evidence at trial. That preview reveals how Google's use of these assessments and predictions regarding market conditions from prior decades would lead precisely to the kind of trial-within-a-trial that the law rightly forecloses. Pls.' Opening Br. 16–17.

### A. An Antitrust Enforcer's Decision Not to Pursue a Merger Challenge Isn't Probative as to the Merger's Legality

The Fourth Circuit has squarely held that the Antitrust Division's "decision not to pursue [a merger challenge] isn't probative as to the merger's legality[.]" *Steves & Sons*, 988 F.3d at 714. This is because, "in general, a defendant may not use an enforcement authority's 'decision not to take action as a sword because inaction on the part of the government cannot be used to prove innocence.'" *Id.* (quoting *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 749 F. Supp. 2d 542, 556 (E.D. Ky. 2010)); *see also* 15 U.S.C. §18a(i)(1). For these reasons, the district

court in *Steves & Sons* correctly excluded evidence of the Antitrust Division's merger investigation because "the DOJ did not have the benefit of the extensive and persuasive evidence presented to the jury: evidence that showed a substantial lessening of competition and that proved that JELD-WEN had" engaged in actual exclusionary conduct. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 2019 WL 1199522, at *4 (E.D. Va. Mar. 13, 2019), *aff'd in relevant part*, 988 F.3d at 713–14. Similarly, here, the antitrust enforcers reviewing the DoubleClick and AdMeld acquisitions did not have the benefit of 15 years' worth of evidence concerning Google's course of anticompetitive conduct and their harmful effects on competition subsequent to and resulting from the acquisitions.

Google's attempts to distinguish *Steves & Sons* on its facts are unpersuasive. The length of the agency's investigation or whether the agency publicly commented on its reasons for closing that investigation do not overcome the reason why *Steves & Sons* found a decision not to pursue a merger challenge probative: "inaction on the part of the government cannot be used to prove innocence," *Steves & Sons*, 988 F.3d at 714 (citation omitted). Similarly, that this is a bench trial rather than a jury trial does not imbue otherwise non-probative evidence with relevance. Although the Court can of course give evidence its proper weight, a bench trial is not a license for Google to extend the length of this trial through introduction of evidence that does not bear on the questions to be decided by this Court under today's facts.

## B. Past Predictions Are Not Probative of the Section 2 Claims in This Case

Contrary to Fourth Circuit law, Google reveals in its opposition brief that it intends to offer the FTC and the Antitrust Division's past predictions to show that its DoubleClick and AdMeld acquisitions did not, by themselves, result in harm to competition. Def.'s Opp. 13–14. That, however, is not probative of the claims in this case, which concern the foundational role

those acquisitions played in Google's broader anticompetitive course of conduct. *See Duke Energy*, 2024 WL 3642432, at *11–12.

Even if the FTC and the Division's statements are somehow probative to the claims at issue here—they are not—Google improperly plucks phrases from the antitrust enforcers' statements concerning market conditions, ignores terms whose meanings have shifted since prior decades, and exploits their vagueness and generality to argue that market conditions have not changed in 17 years, and that therefore the FTC and the Antitrust Division's predictions "continue to hold true today." Def.'s Opp. 16. By doing so, Google contradicts its own proposed finding of fact that the ad tech market is "constantly changing." Def.'s PFOF ¶ 3.

For example, Google claims that the FTC's statement that publishers and advertisers use "multiple ad intermediation providers" refers to the "very same facts" as its proposed findings of fact that "advertisers and ad agencies alike often multi-home by using multiple buying tools simultaneously, including 'advertiser ad networks' and demand-side platforms at the same time." Def.'s Opp. 13–14 (quoting Def.'s Opp. Ex. 9, at 10–11, ECF No. 1234-9 and citing Def.'s PFOF ¶ 394.4). Google, however, fails to connect the "ad intermediation products" the FTC referred to 17 years ago and the advertiser buying tools relevant to this case. The only "ad intermediation product" the FTC mentions is Google's AdSense,[3] which Google, in its Proposed Findings of Fact, describes as "its first ad network for non-Google ***publishers***," Def.'s PFOF ¶ 114.1 (emphasis added). There is no indication that "ad intermediation product" refers to advertiser "buying tools."

---

[3] Pls.' Opening Br. Ex. 4 (DTX22), ECF No. 1158-4 ("Ex. 4"); Pls.' Opening Br. Ex. 5 (DTX23), ECF No. 1158-4 ("Ex. 5").

Google similarly claims that the Division's statement that "web publishers often rely on multiple display advertising platforms" refers to the "same fact" as its proposed finding of fact that "[a]d space sellers multi-home across exchanges." Def.'s Opp. 13 (quoting Def.'s Opp. Ex. 8, at 2, ECF No. 1234-8 and citing Def.'s PFOF ¶ 421). First, it is unclear from the face of the statement what product(s) the term "display advertising platforms" references. Further, SSPs and ad exchanges have evolved since the 2011 press release, such that comparing the Division's 2011 statements to current market conditions would be inapposite in any event. Def.'s PFOF ¶¶ 24, 26 (distinguishing between the functionality of ad exchanges and SSPs); Pls.' Pre-Trial Proposed Findings of Fact ("Pls.' PFOF") ¶ 43 (explaining that, today, "[a]d exchanges are sometimes referred to as . . . 'SSPs'"), ECF No. 1172.

For both statements, "fairness" would permit Plaintiffs "to rebut" Google's evidence and argument. *Coles v. Perry*, 217 F.R.D. 1, 10 (D.D.C. 2003). That Google would likely object to such rebuttal evidence as speculative and irrelevant underscores why the FTC's and Division's statements lack probative value to this case and the potentially time-consuming consequences of admitting them. Google should not be permitted to open the door to such "a protracted and unproductive struggle over how the evidence admitted at trial compared to the evidence considered by the agency." *Dodson v. CBS Broad., Inc.*, 423 F. Supp. 2d 331, 334 (S.D.N.Y. 2006) (quoting *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 65 (2d Cir. 1998)).

Google implies that one of Plaintiffs' economic experts, Professor Robin Lee, "relied" on the FTC's DoubleClick statement for his opinions concerning "the alleged competitive effects resulting from Google's conduct," and that therefore "Plaintiffs implicitly concede the relevance of the FTC's and DOJ's closing statements in the DoubleClick and AdMeld acquisitions as evidence in this case." Def.'s Opp. 15. This is a gross mischaracterization. Prof. Lee cited the

statement in an appendix to his report in the context of reciting the historical circumstances around the acquisition. Ex. 27, at L-5, ¶ 22, Expert Report of Robin S. Lee, Appendix L.[4] He did not rely on FTC's statement to draw any conclusions about the effects of the acquisition itself. In fact, Professor Lee opines on the importance of Google's acquisition of DoubleClick, which brought Google its publisher ad server DFP, which "Google could [use to] lock in customers and enhance its market power across the ad tech stack." *Id.* ¶ 587.

### C.  Past Predictions About Individual Acquisitions Are Not Probative of Whether Google's Subsequent Course of Conduct Harmed Competition

In a complex Section 2 case like this one, often "motive and intent play leading roles." *Duke Energy*, 2024 WL 3642432, at *21 (citation omitted). Google attempts to rely on the FTC's and Division's predictive statements to rehabilitate its intent for acquiring DoubleClick and AdMeld, *see* Def.'s Opp. 14–15, but that effort fails. Those predictive statements were informed in part by Google's representations, advocacy, and limited disclosures; Google's subsequent anticompetitive course of conduct, made possible by the acquisitions, could not have been known by the antitrust enforcers at the time. For that reason, any insight into Google's "motive and intent," *Duke Energy*, 2024 WL 3642432, at *21, that could be gleaned from the antitrust enforcers' statements is minimal or nonexistent.

Moreover, the FTC and Division statements shed no light on Google's putative procompetitive rationales for acquiring DoubleClick and AdMeld. For example, Google points to the FTC's statement that "the quality of the ad inventory offered is important to customers," Def.'s Opp. 14 (quoting Def.'s Opp. Ex. 9, at 11, ECF No. 1234-9), but it is an unremarkable— and undisputed—fact that customers place value on quality. Google stretches the import of this

---

[4] Plaintiffs have continued exhibit numbering from the opening brief. Exhibits 1–26 were attached to the opening brief, and Exhibits 27–29 are attached to this reply brief.

fact beyond recognition, claiming that it "reinforces Google's business justifications" for acquiring DoubleClick, that is, "to be able to provide its advertiser customers with access to more high quality ad inventory," *id.* at 14. Simply pointing to a generic customer preference does not make it any more or less likely that Google was specifically motivated by that preference or that it succeeded in satisfying that preference. Similarly attenuated is Google's attempt to connect the Antitrust Division's prior statement about entry in the ad exchange market with Google's putative desire to add features to its products. *See* Def.'s Opp. 14–15.

Tellingly, Google does not dwell on the FTC's prediction, no doubt based in part on Google's representations and advocacy, that "it was unlikely that Google could manipulate DoubleClick's third-party ad serving products in a way that would competitively disadvantage Google's competitors in the ad intermediation market," which turned out to be wrong—Google did use its control over the publisher ad server it acquired to rig auctions that favored Google's exchange. Pls.' Opening Br. 15–16 (quoting Ex. 4, at 2).

### D. Google's Other Arguments Are Meritless

Google argues that because the district court in *Steves & Sons* "admitted into evidence the plaintiff's statement to the DOJ that it did not object to the same merger it later challenged," the Division's 2011 press release is "probative" because "[h]ere, the plaintiff *is* the DOJ." Def.'s Opp. 19–20 (citing *Steves & Sons*, 988 F.3d at 713–14). The plaintiff, however, was a market participant in the relevant market, *Steves & Sons*, 988 F.3d at 699–700, and the evidence of its participation in that market was clearly probative, *id.* at 713 (permitting plaintiff's prior statements that it "didn't object to the merger" and "that the prices that it was paying [the defendant] had been flat" but "barring evidence that these statements were made to the Justice Department"). Here, Plaintiffs do not seek to exclude such evidence from market participants. Instead, Plaintiffs, consistent with clear Fourth Circuit precedent, seek to exclude predictive

12

statements from the FTC and Antitrust Division that, for the reasons described above, introduce entirely distinct factual and legal questions on the one hand and do not assist the Court in resolving the questions before the Court today on the other hand.

While Google claims that courts "regularly" find the "decisions of antitrust agencies to close [a merger] investigation" relevant "in evaluating a later challenge to that same transaction," Google fails to cite to any cases supporting that proposition. Def.'s Opp. 17–18. In the only reported case Google cites, *Ginsburg v. InBev NV/SA*, 623 F.3d 1229 (8th Cir. 2010), and contrary to Google's representation to the Court, the Antitrust Division did not "close an investigation," and the case was not "a later challenge to that same transaction." Def.'s Opp. 17. Instead, that case involved a settlement of a merger challenge brought by the Antitrust Division, which the plaintiffs objected to and then filed a contrary private merger challenge *before* a final judgment on the settlement had even been proposed. *Ginsburg*, 623 F.3d at 1231–32. Such a resolution where enforcers seek and obtain relief for an alleged violation of Section 7 is a far cry from the discretionary decisions of antitrust agencies to close a merger investigation that Google seeks to use in this case over a decade later.[5] *Cf. Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985) (explaining that agency's enforcement discretion is unsuitable for judicial review because

---

[5] *Eastman v. Quest Diagnostics Inc.* 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) did not involve the mere closure of a merger investigation; it involved an FTC *adjudication* that required a divestiture to address its concerns of potential competitive harm. Similarly, *Blessing v. Sirius XM Radio Inc.*, 2011 WL 3739024, at *2 (S.D.N.Y. Aug. 24, 2011), involved an adjudicated FCC *order* in which the defendant "agreed to specific limitations on the exercise of its 'enhanced market power' and promised that the merger would result in increased efficiencies that would be passed to the consumer in the form of lower prices," *Blessing v. Sirius XM Radio Inc.*, 756 F. Supp. 2d 445, 449 (S.D.N.Y. 2010). The plaintiff also alleged that the defendant had been deceptive "during the FCC approval process" of the merger in that case, such that the FCC's investigation was itself at issue. *Id.* at 450.

13

"an agency decision not to enforce often involves a complicated balancing of a number of factors").

**PLAINTIFFS' REQUESTED RELIEF NO. 3**

**I.     The Advertiser Perceptions Reports Are Inadmissible**

Google's opposition fails to demonstrate the reliability of the Advertiser Perceptions reports ("AP Reports") and argues that Google should be permitted to introduce those documents "regardless of whether those survey results were actually accurate representations." Def.'s Opp. 24. In its effort to introduce these unreliable reports, Google makes two arguments—one contradictory to Google's proposed findings of fact and witness list, the other contrary to basic requirements for trustworthiness and reliability under both the hearsay doctrine and Federal Rule of Evidence 703.

As such, Plaintiffs respectfully request that the Court preclude Google from introducing into evidence all exhibits identified in the Appendix of Plaintiffs' Opening Brief, *i.e.*, the AP Reports and related summary exhibit.  *See* ECF No. 1191-1. Doing so now is appropriate and necessary to ensure the orderly and efficient presentation of evidence without interruption and delay for evidentiary arguments that will mirror arguments already before the Court through the motion *in limine*, and will provide clarity to the parties about admissible topics and exhibits, which will further sharpen both sides' trial preparation.

**A.   The AP Reports are Hearsay Because Google Seeks to Admit the AP Reports for Their Truth**

Google claims it seeks to admit the AP Reports not for their truth, but for the "effect those survey presentations [had] on Google" and to "provide evidence of Google's state of mind." Def.'s Opp. 24-25. First, Google's three "effect on the listener" hypotheticals are unfounded and

nonsensical.[6] A defendant's subjective beliefs about who its rivals are, what the quality of its products are, or whether its conduct benefits or harms its customers, particularly where—as here—Google employees routinely questioned the veracity and import of the AP reports, is not relevant to what the relevant market actually is or whether Google's conduct was in fact justified. *See* Def.'s Opp. 24-26. If, on the one hand, Google's beliefs are not grounded in market reality, then they are not probative of these issues. If, on the other hand, Google offers its beliefs (and the hearsay underlying them) to prove that what it believed was true, then it is improperly offering the underlying hearsay for its truth. *See* Pls.' Opening Br. 22.

More critically, though, two recent Google filings demonstrate that Google's "effect on the listener" arguments are pretexts to admit inadmissible hearsay for its truth. First, in Google's Proposed Findings of Fact, Google advocates that the Court find that "[a] third-party 2020 survey [an AP Report] provided to Google informed Google that only 4 percent of sellers claimed UPR had a negative impact on them, while 30% saw a positive impact and 65% were neutral or did not know." Def.'s PFOF ¶ 613 (citing DTX 861, ECF No. 894, at 6). In other words, Google asks the Court to accept the contents of the AP Report for its truth. Yet in opposing Plaintiffs' motion, Google turns on a dime, claiming that the same exhibit, DTX 861, would be introduced not for the truth but to "demonstrate that Google believed that UPRs were . . . beneficial." Def.'s Opp. 26.

Second, on July 5, 2024, Google filed its witness list indicating it intended to call numerous Google employees. *See* ECF No. 891. Most of the AP Reports do not appear to have been received by any of these trial witnesses, further demonstrating that they are not likely to be

---

[6] These thin justifications also do not apply to the summary exhibit compiling AP Reports' data that Plaintiffs seek to exclude, DTX 2055. ECF No. 1191-1 at 6.

offered for the supposed "effect" any of them had on Google's "beliefs," as Google claims. For the handful of reports apparently possessed by certain of Google's proposed trial witnesses,[7] Google has provided no evidence that the potential witnesses relied on the information to make any decision. Given this disconnect to trial witnesses and the apparent absence of any foundation for Google's suppositions about "effect on the listener," Google's argument about seeking admission of the AP Reports for non-hearsay purposes is not credible.

**B.   The AP Reports Do Not Satisfy Any Hearsay Exception**

Google and Plaintiffs agree on what law applies. *See* Def.'s Opp. 27-28 (citing Pls.' Opening Br. 20-21). Hearsay evidence like the AP Reports "may be admitted as an exception to the hearsay rule if the survey is material, more probative on the issue than other evidence and if it has guarantees of trustworthiness." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 522-23 (10th Cir. 1987) (upholding trial court's admission of survey evidence because the "record reflect[ed] that adequate foundation was laid to admit the survey" and the opposing survey expert testified that the challenged survey appeared to have been conducted according to acceptable survey methodologies).

However, Google has not and cannot meet the requisite guarantee of trustworthiness Google concedes the AP Reports must possess to be admissible. It offers no evidence of how the surveys were designed or conducted and has endorsed no such witness to explain the same to the Court. It can offer no evidence that the surveys are a reliable representation of the populations they purport to survey.

---

[7] Dan Taylor is a custodian of DTX 368 and DTX 511. Nitish Korula is a custodian of DTX 664, DTX 735, and DTX 861. Apparent duplicate versions of DTX 645, DTX 854, DTX 1044, and DTX 1184 look to be included in the custodial files of Dan Taylor and Adam Stewart.

16

Google instead offers two thin pieces of evidence that are belied by the overwhelming weight of the record.  First, Google cites a single document reflecting a single Google employee's view that AP surveys were a "good input."  Def.'s Opp. 27 (citing Ex. 16, ECF No. 1235-1). The other evidence Google cites, Def.'s Opp. Ex. 27, ECF No. 1235-2, does not reflect how "Google employees . . . valued" AP's surveys, as Google claims. Def.'s Opp. Ex. 27. Rather, it is an email in which *AP's* own Chief Strategy Officer said *he* felt Google viewed his firm as "rigorous," *id.*, though Google employees several months later criticized AP as "junky" and "suspect," Pls.' Opening Br. 21 (citing Ex. 20, ECF No. 1191-10).  And those Google criticisms are not outliers. The examples Plaintiffs cited in their opening brief were just illustrative; there are additional documents conveying similar skepticism by Google employees toward AP's reports.  *See e.g.,* Ex. 28 (GOOG-DOJ-04824744) at -744 ("the report seems a little funky overall"). The second sliver of evidence Google puts forth is its claim that "[e]ven Plaintiffs' own survey expert, Dr. Wayne Hoyer, testified that AP is a reliable survey taker," Def.'s Opp. 27 (citing Def.'s Opp. Ex. 28, ECF No. 1235-13, Hoyer Dep. 38:1-14), but that claim is not true.  As the cited testimony shows, Prof. Hoyer never testified that "AP is a reliable survey taker." Def.'s Opp. Ex. 28.  In fact, just moments before the cited testimony (on a page missing from Google's Exhibit 28, attached to its opposition), Prof. Hoyer noted that he had never heard of AP prior to his work on this case.  Ex. 29, Hoyer Dep. 37:14-22. Any confusion as to whether Prof. Hoyer thought a company he had not heard of was a "reliable survey taker" should have been dispelled a few minutes later when he affirmed he did not "ascertain the quality of Advertiser Perceptions'

methodology for assembling a panel" "because it wasn't germane to [his] opinion." *Id.* 46:16-22.[8]

At bottom, Google cannot demonstrate even the most rudimentary of indicia of trustworthiness for the AP Reports, let alone establish the "guarantees of trustworthiness" that are needed to make those surveys admissible. *Brunswick Corp.*, 832 F.2d at 522. Therefore, the surveys are inadmissible.

### C. The AP Reports Are Inadmissible Under Rule 703

The AP Reports are also not admissible under Rule 703 because they lack reliability and only support experts' opinions if offered for their truth (which Google apparently now disclaims). Rule 703 allows experts to use inadmissible hearsay as a basis for their opinions, but only (1) "if the bases meet minimum standards of reliability," *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985), and only if (2) "the statement supports that opinion," *Smith v. Arizona*, 144 S. Ct. 1785, 1798 (2024); *cf. Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983) (excluding survey and expert opinions based on the survey because the court "did not find them to have sufficient indicia of trustworthiness"). The AP Reports satisfy neither requirement.

First, the AP Reports do not satisfy minimum standards of reliability for the reasons stated *supra* at 16-18. The Google experts who rely on the AP Report in question concede they know nothing about the how the surveys were conducted, and no one from AP will testify about them. *See* Pls.' Opening Br. 21. In turn, unfounded data referred to as "ridiculous" and "crazy"

---

[8] Google's second reference to Professor Hoyer's testimony is also misleading, albeit perhaps less so than its first misrepresentation, *supra* at 17 (citing Def.'s Opp. 27). Google claims that "[Prof. Hoyer] testified that it was not inappropriate for Google's survey expert to rely on AP." Def.'s Opp. 28. Prof. Hoyer did not weigh in on the appropriateness of AP; he merely said it is not inappropriate to use a third-party firm in general. *See* Def.'s Opp. Ex. 28.

by Google's own employees, *id.*, is precisely the type that is "so lacking in probative force" as to make these experts' reliance unreasonable, and thus barred by Rule 703. *In re Agent Orange*, 611 F. Supp. at 1245.

Second, Google effectively admits that the AP Reports support the opinions of its experts "only if true," which means that the surveys are, by definition, "offered for the truth of what [they] assert[]." *Smith*, 144 S. Ct. at 1798. Google admits that it will ask Dr. Israel to introduce this hearsay by opining that the AP Reports substantiate Google's "procompetitive justifications," Def.'s Opp. 29, even though the AP Reports would only arguably support such an opinion if they were a true reflection of market reality. As discussed above, Google's subjective belief that its conduct was helping competition does not a justification make.

### D. Google Fails to Justify the AP Reports' Second Level of Hearsay

Google does not dispute that the AP Reports contain two levels of hearsay—(1) the survey responses themselves and (2) AP's statement of those responses to Google. Nor does it dispute that it must show that "a hearsay exception applies to each level of hearsay." *United States v. Habteyes*, 356 F. Supp. 3d 573, 586 (E.D. Va. 2018). Yet, Google does not even attempt to show that any hearsay exception applies to AP's statement of the survey results to Google. Google just states in passing that one other court admitted survey results for their truth. Def.'s Opp. 28 n.12. Setting aside that the one case Google cites did not address two separate levels of hearsay, *see Safeway Inc. v. CESC Plaza Ltd. P'ship*, 261 F. Supp. 2d 439, 447 n.4 (E.D. Va. 2003), merely citing that case does not explain why *these* survey results are admissible for their truth.

Plaintiffs' witness list includes actual market participants who will be able to describe for the Court, in person, what their observations of and experiences with Google's products were and

are. In this context, it would be inappropriate to admit AP Reports that are so lacking in foundational reliability and represent not one but two levels of inadmissible hearsay.

For the reasons identified above, Plaintiffs respectfully request this Court exclude the AP reports as inadmissible hearsay that is not sufficiently trustworthy to be admitted at into evidence.

Dated: August 28, 2024

Respectfully submitted,

JESSICA D. ABER
United States Attorney

/s/ Gerard Mene
Gerard Mene
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Email: Gerard.Mene@usdoj.gov

/s/ Julia Tarver Wood
JULIA TARVER WOOD
ANDREW KLINE
VICTOR K LIU
CHASE E. PRITCHETT
MICHAEL FREEMAN

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (202) 307-0077
Fax: (202) 616-8544
Email: Michael.Freeman@usdoj.gov

Attorneys for the United States

JASON S. MIYARES
Attorney General of Virginia

/s/ Tyler T. Henry
TYLER T. HENRY
Assistant Attorney General

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 692-0485
Facsimile: (804) 786-0122
Email: thenry@oag.state.va.us

Attorneys for the Commonwealth of Virginia
and local counsel for the States of Arizona,
California, Colorado, Connecticut, Illinois,
Michigan, Minnesota, Nebraska, New
Hampshire, New Jersey, New York, North
Carolina, Rhode Island, Tennessee,
Washington, and West Virginia