**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

UNITED STATES, *et al.,*

                      *Plaintiffs,*

      vs.

GOOGLE LLC,

                      *Defendant.*

No. 1:23-cv-00108-LMB-JFA

**DEFENDANT GOOGLE LLC'S CORRECTED OPPOSITION
TO PLAINTIFFS' OMNIBUS MOTION IN LIMINE**[*]

---

[*] Google's corrected opposition corrects a page number citation in the sixth line of page 10.

# INTRODUCTION

Each of Plaintiffs' requests in their Omnibus Motion In Limine fails based on the applicable law and facts.  First, Plaintiffs' request to preclude Google from presenting evidence of a two-sided market for ad tech tools on the basis of judicial estoppel fails because the decision they cite as the basis for judicial estoppel did not even address whether the market at issue was one-sided or two-sided.  Second, the conclusions of two federal agencies, including one of the Plaintiffs here, that Google's acquisitions of AdMeld and DoubleClick were not anticompetitive are plainly relevant to this case.  Third, Plaintiffs admit that the Advertiser Perceptions Surveys they seek to exclude as hearsay may be presented at trial under multiple theories.  And despite Plaintiffs' purported concerns to the contrary, the Court is readily able—in this bench trial—to hear, weigh, and manage the relevant evidence appropriately.  For these reasons and those that follow below, the Court should deny Plaintiffs' Omnibus Motion in Limine and adjudicate the merits of this case on a full and fair record.

## OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1:

### Evidence About A Single Ad Tech Market Is Admissible Because Plaintiffs' Motion Is Procedurally Improper And Plaintiffs Have Not Met Requirements For Judicial Estoppel

Google's consistent position has been that the appropriate market in this case is a single two-sided market that includes all ad tech tools that facilitate the matching of ad space buyers and sellers.  This is clearly set forth in Google's expert disclosures for Mark Israel, and its Proposed Findings of Fact and Conclusions of Law.[1]  Plaintiffs did not challenge Dr. Israel's opinions in a *Daubert* motion.  Nor did they seek summary judgment on this issue.  Instead, they stood silent only to contend at the eleventh hour and on the eve of trial that Google should be judicially

---

[1] Hereinafter referred to as "Proposed Findings," with citations to "FoF" for the Findings of Fact section, and "CoL" for the Conclusions of Law section.

estopped from offering Dr. Israel's opinions on market definition—based on the voluminous record adduced in this case—on the grounds that they purportedly conflict with a legal argument Google advanced in a different case in the Northern District of California over 3 years ago in an early motion to dismiss (*In re Google Digital Advertising Antitrust Litigation*, No. 20-cv-03556-BLF (N.D. Cal.)) (hereinafter referred to as the "N.D. Cal. case").   This Court should deny Plaintiffs' motion in limine No. 1 for the following reasons:

First, Plaintiffs' in limine motion is procedurally improper because it is not seeking to resolve an evidentiary issue.

Second, Plaintiffs fail to establish that Google took inconsistent factual positions in the N.D. Cal. case and this one.   In the N.D. Cal. case, Google challenged only the legal sufficiency of the advertiser plaintiffs' pleadings, i.e., that they failed to plausibly allege a two-sided market that contains both advertiser products and publisher products.   Google never said ad tech was not a two-sided market.   Arguments made in support of a defendant's motion to dismiss—which are about the <u>legal</u> sufficiency of the factual allegations, accepted as true—are not <u>factual</u> positions that can form the basis for judicial estoppel.

Third, the N.D. Cal. court did not rely on the argument in Google's motion to dismiss that forms the basis of Plaintiffs' in limine motion.   Indeed, the N.D. Cal. court never had any occasion to address—much less decide—whether the market alleged in the N.D. Cal. case was a two-sided market because the issue was taken off the table by procedural events omitted from Plaintiffs' in limine motion.   The claims initially filed in the N.D. Cal. case were by advertisers who alleged a market that included products purchased by both publishers and advertisers.   Before the Court even read Google's opening brief, the Court proposed at a case management conference that publishers proceed with their own separate case, and the advertisers revise their market definition to include

only advertiser products and services.  The advertiser plaintiffs, in turn, proposed amending their complaint to limit the market definition to advertiser products and services before the N.D. Cal. court addressed any motion to dismiss. The court proposed instead that the advertisers and Google complete briefing on the motion, with the understanding that the alleged market would be narrowed to advertiser products and services.  That effectively mooted the two-sided market argument Google made in its opening brief.  The N.D. Cal. court therefore never considered or resolved Google's argument in its opening motion to dismiss briefing that the advertiser plaintiffs failed to sufficiently allege a market that included both publisher and advertiser products and services.[2]

For all these reasons, Plaintiffs' in limine motion alleging judicial estoppel should be denied.

## I.   Plaintiffs' Motion Is Procedurally Improper

The purpose of a motion in limine is to "exclude anticipated prejudicial evidence before the evidence is actually offered."  *Louzan v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013). The proper mechanism "to resolve *non*-evidentiary matters prior to trial [is] the summary-judgment motion."  *Id.* (emphasis added).  It is accordingly "improper for [a] district court to consider judicial estoppel within the context of a motion in limine [if,] [r]ather than addressing the admissibility of certain pieces or types of evidence, [the] motion ask[s] the court to bar the [factfinder] from hearing one side's argument."  *Audio Technica U.S., Inc. v. United States*, 963

---

[2]  For purposes of this brief and consistency of terminology with the descriptions in the N.D. Cal. case, Google has adopted the terminology that was used in the N.D. Cal. case—"advertisers" and "publishers."  In its Proposed Findings in the present action, Google has instead used the terms "ad space buyers" and "ad space sellers" to reflect two commercial realities.  First, each display ad transaction involves the simultaneous matching of an ad space buyer and an ad space seller. Second, Plaintiffs' allegations concern a broader set of digital content providers that produce digital content and sell ad space on that content (such as retail sites like Amazon and streaming TV providers like Disney), not just traditional "publishers."

F.3d 569, 575 (6th Cir. 2020); *see also Steves and Sons, Inc. v. JELD–WEN, Inc.*, 2018 WL 2214035, at *3 n.2 (E.D. Va. May 11, 2018) (denying motion in limine noting "[plaintiff] had the chance to address the inconsistent verdict issue in its summary judgment papers, but for some reason declined the Court's invitation to seek leave to do so").  This is because doing so would "essentially grant[] [the movant] judgment as a matter of law on that point." *Audio Technica*, 963 F.3d at 575.

Plaintiffs' desire to avoid the application of the Supreme Court's decision in *Ohio v. American Express Co.*, 585 U.S. 529 (2018), is understandable because, as set forth in Google's Proposed Findings, that decision, as it pertains to the facts of this case, is dispositive of their claims. A motion in limine, however, is not the appropriate vehicle to make an end-run around summary judgment to obtain judgment as a matter of law on a dispositive market definition argument and for that reason alone the motion should be denied.[3]

## II.   Plaintiffs Have Not Met Any of The Requirements For Judicial Estoppel

Plaintiffs' motion should also be denied because the judicial estoppel doctrine has no applicability here.  As Plaintiffs acknowledge, to establish the judicial estoppel, Plaintiffs must demonstrate that:  (1) Google "seek[s] to adopt a position that is inconsistent with a stance taken in prior litigation"; (2) "the position [is] one of fact rather than law or legal theory"; (3) "the prior

---

[3] None of Plaintiffs' cases hold otherwise.  Plaintiffs contend that "[c]ourts regularly examine judicial estoppel through motions in limine," Plfs.' Mem. at 5, but in the two cases they cite, the non-movants did not challenge the procedural propriety of raising judicial estoppel on a motion in limine, and the issue was thus not before either court.  *See* Ex. 1,  Plfs.' Resp. Trans States Mots. in Limine at 1–2, *Jackson v. United Air Lines, Inc.*, No. 08-cv-00182 (E.D. Va. Feb. 13, 2009), ECF No. 88 (making no legal arguments and citing no law); Tecsec, Inc.'s Opp. Adobe's Omnibus Mot. in Limine at 16–17, *TecSec, Inc. v. Int'l Bus. Machines Corp.*, No. 1:10-cv-00015 (E.D. Va. Oct. 26, 2018), ECF No. 1229 (making no argument concerning procedural impropriety). Furthermore, in *Jackson*, the court denied the motion seeking judicial estoppel, Ex. 2, *Jackson v. United Airlines, Inc.*, 2009 WL 1706681, at *3 (E.D. Va. June 17, 2009), and in *TecSec*, the court deferred ruling, *TecSec v. Adobe Inc.*, 2018 WL 11388472, at *9 (E.D. Va. Nov. 21, 2018).

inconsistent position [was] accepted by the court"; and (4) Google advanced its inconsistent factual position to "intentionally [mislead] the court to gain unfair advantage." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996); Plfs.' Mem. at 5.  As set forth below, Plaintiffs cannot make any of those showings here because (1) Google did not assert a <u>factual</u> position in the N.D. Cal. case inconsistent with the factual positions Google has taken in this action, and (2) the court in the N.D. Cal. case did not accept any position, let alone a factual one, advanced by Google in its initial motion to dismiss because the two-sided market was no longer before the court by the time briefing was complete.

### A. Google Did Not Assert a Contrary Factual Position in the N.D. Cal. Case, and Its Arguments Challenging the Legal Sufficiency of the Complaint in the N.D. Cal. Case Were Legal Arguments Not Subject to Judicial Estoppel

Plaintiffs' motion fails because judicial estoppel requires that the prior inconsistent position was "one of fact rather than law or legal theory." *Lowery*, 92 F.3d at 224.  Google's previous argument in the N.D. Cal. case was a legal argument, not a factual one.[4]

In its N.D. Cal. motion to dismiss, Google argued only that the plaintiffs' pleadings were legally deficient because they were insufficient on the face of the allegations.  *See* Ex. 3, ECF No. 66 at 5 ("Plaintiffs have not adequately alleged facts to support a relevant market comprising a collection of products and services used by different customers for different purposes.").  Arguments made in support of a defendant's motion to dismiss—which are generally about the <u>legal</u> sufficiency of the plaintiff's factual allegations, accepted as true—are not factual positions

---

[4] For similar reasons, Plaintiffs' judicial estoppel claim also fails because Google's position in the N.D. Cal. case was not inconsistent with Google's position in this action.  Google never argued in the N.D. Cal. case that "'a single intermediation market' that included advertising technology tools for both advertisers and publishers should be rejected as a relevant antitrust product market." Plfs.' Mem. at 6.  To the contrary, and as explained below, Google argued that the digital ads complaint was facially deficient because it was internally inconsistent and failed to plausibly plead a market.

of the moving party that can form the basis for judicial estoppel. *See, e.g.*, *HTC Leleu Fam. Tr. v. Piper Aircraft, Inc.*, 2013 WL 12092211, at *1 (S.D. Fla. Feb. 6, 2013) (judicial estoppel inapplicable where "[d]efendant simply argued that Plaintiff's allegations, which had to be accepted as true at the motion to dismiss stage, failed to state a claim"); *Lehman Bro. Holdings, Inc. v. Hirota*, 2007 WL 6881841, at *2 (M.D. Fla. Nov. 28, 2007) (same where defendant "assumed Plaintiff's factual allegations as true and argued that the tort claims were barred"); *Hijeck v. United Techs. Corp.*, 24 F. Supp. 2d 243, 251–52 (D. Conn. 1998) (same where "[d]efendant, accepting the allegations of plaintiff's complaint as true for its motion to dismiss, took no position on this issue"); *Brown v. City of Central*, 2023 WL 2950613, at *6 (M.D. La. Jan. 13, 2023) (at the motion to dismiss stage, "the Court does not consider any factual assertions made by Defendants" for purposes of estoppel).

The same principle applies in the market definition context. "It is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). But that is precisely why, at the <u>motion to dismiss</u> stage, an antitrust defendant cannot introduce factual positions about market definition. Instead, the defendant can only argue that the complaint fails, as a matter of law, to allege a relevant antitrust market.[5] *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442–48 (4th Cir. 2011) (reversing district court's dismissal of alleged geographic market because district court based its ruling on facts about commercial realities); *Queen City*, 124 F.3d at 436 ("Where the plaintiff fails to define its proposed

---

[5] Plaintiffs cite a single case for the proposition that "positions taken by litigants in the context of a motion to dismiss can serve as the basis for judicial estoppel." Pls.' Br. at 7 n.2. In that case, the plaintiff asserted in opposition to a motion to dismiss that it was not alleging a certain breach of contract claim. *See Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 34 (1st Cir. 2004). That kind of factual assertion about what claims a party was or was not bringing as a matter of fact bears no similarity to a defendant's legal argument that a plaintiff's pleading is legally deficient.

relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, . . . the relevant market is legally insufficient and a motion to dismiss may be granted."); *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238–39 (2d Cir. 2008) (affirming dismissal of proposed market as "legally insufficient"); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (antitrust "complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable").

Google's motion to dismiss the N.D. Cal. case was precisely in line with this well-settled precedent.  Google argued:  (1) the digital ads complaint "<u>alleged</u> only the bundling of services for advertisers with other services for advertisers"; (2) the complaint "<u>described</u> various services for advertisers (or publishers) as essentially complementary of one another"; and (3) because the complaint <u>asserted a tying claim</u>, as a matter of law the plaintiffs "had no choice but to characterize the services as 'distinct.'"  Ex. 3, ECF No. 66 at 5–6.  In a footnote, Google even acknowledged that development of additional facts might actually support the market the plaintiffs initially asserted—but no such facts had been alleged.  Google wrote:  "Although business practices impacting the products and services offered to *publishers* surely could have important consequences for *advertisers*, that is not sufficient, <u>absent other allegations not made here</u>, to support the broad overarching services market pled by Plaintiffs here."  *Id.* at 5 n.2 (underline emphasis added).

Nowhere in its motion to dismiss did Google make a single factual argument (which would have made no sense on a motion to dismiss) about how advertisers or publishers use the ad tech products at issue in the case, or any other substitution analysis of ad tech tools.  Google did not adopt any factual position that could be inconsistent with what Google now argues—a position adopted after the benefit of extensive discovery to develop relevant facts about substitution in ad

tech.  Judicial estoppel therefore does not apply because "judicial estoppel exists to deter the use of facts from other litigation to manipulate a subsequent court that is unfamiliar with the prior factual positions assumed by the litigants."  *Emergency One, Inc. v. Am. Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 274 (4th Cir. 2003) (rejecting application of judicial estoppel to "a legal argument about what issues were raised and resolved at trial").

### B.  The N.D. Cal. Court Did Not Accept Any Factual Representation by Google

Plaintiffs' judicial estoppel argument fails for another, separate reason:  Plaintiffs have not established that any "prior inconsistent position [was] accepted by the court," *Lowery*, 92 F.3d at 224, which is an essential requirement for judicial estoppel to exist.  The Court in the N.D. Cal. case never addressed whether advertiser and publisher products or services are in the same market, and whether any market for those products and services is one-sided or two-sided.

For purposes of judicial estoppel, "judicial acceptance means" "that the first court has adopted the position urged by the party . . . as part of a final disposition."  *Id*.  This element "requires that the court adopt the party's position."  *In re Merry-Go-Round Enterprises, Inc.*, 229 B.R. 337, 347 (D. Md. 1999).  The acceptance element serves an important function, because "[w]ithout the court's adopting the party's position, it cannot be said that the integrity of the judicial process has been compromised."  *Id.*; *see also Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C. Cir. 1980) ("[J]udicial estoppel should not be applied if no judicial body has been led astray.").  Accordingly, "where the court's disposition of a matter does not reflect an awareness of the party's position, the judicial acceptance element of judicial estoppel is not satisfied."  *In re Merry-Go-Round*, 229 B.R. at 347.  For example, settlements or the court's entering of a consent order that is not based on factual findings do not constitute judicial acceptance of all statements made by the parties.  *See, e.g.*, *id.*; *Konstantinidis*, 626 F.2d at 639; *Teledyne Indus., Inc.*, *v. NLRB*, 911 F.2d 1214, 1218–19 (6th Cir. 1990).

Plaintiffs' estoppel theory proceeds from a false premise that the N.D. Cal. court held, based on Google's argument in a motion to dismiss, that a relevant product market cannot contain both advertiser products and publisher products. But in making their argument, Plaintiffs omit key facts that lay waste to their motion. The N.D. Cal. court never ruled on a single two-sided market because the advertiser plaintiffs withdrew that asserted market before the court even read Google's opening motion to dismiss brief. The N.D. Cal. case originally involved a putative class action on behalf of advertisers, but alleged a market that also included publisher tools. Google's opening motion to dismiss brief argued, among other things, that, as pleaded, the relevant market could not contain tools used by different customers—i.e., publishers—who were not parties to the case. Ex. 3, Mot. to Dismiss, N.D. Cal. case, ECF No. 66 at 5–6.

After Google's opening brief was filed, it was agreed at a case management conference on February 8, 2021, that publisher tools would be addressed in a separate case filed by publishers, and that the complaint filed by advertisers would assert a different market—one limited to only advertiser tools. Ex. 4, N.D. Cal. case, ECF No. 84 at 20:8–13, 28:14–22. The court directed new publisher plaintiffs, who had not been part of the complaint, to file a separate consolidated complaint. *Id.* at 8:23–9:4, 10:19–21, 27:7–28:6. At the conference, the advertiser plaintiffs had not yet filed their opposition to Google's motion to dismiss. Nor had the court read Google's opening motion to dismiss brief, explaining to Google: "I don't read opening briefs until a case is fully briefed, so I have not looked at your motion to dismiss." *Id.* at 20:5–13 (emphasis added). The court explained that, moving forward, it would only consider just those arguments in Google's motion to dismiss that were not rendered moot by the parties' agreement. *Id.* at 28:14–22. Counsel for Google observed that the advertisers' change in their alleged market "obviously . . . takes away one of [Google's] arguments" in its opening brief—namely, that plaintiffs had not plausibly

pleaded a two-sided market.  *Id.* at 20:25–21:1.  Consistent with the February 8, 2021 conference, the advertiser plaintiffs' opposition to Google's motion to dismiss and Google's reply brief did not raise arguments relating to a single two-sided market containing advertiser and publisher products, only advertiser plaintiffs' new market containing advertiser products.  Ex. 5, Opp'n to Mot. to Dismiss, N.D. Cal. case, ECF No. 93 at 3; Ex. 6, Reply in Supp. Mot. to Dismiss, N.D. Cal. case, ECF No. 116 at 1.[6]

The N.D. Cal. court decided Google's motion based on Google's remaining arguments, and dismissed the complaint with leave to amend.  Consistent with the understandings reached at the February 8, 2021 case management conference, in addressing market definition, the N.D. Cal. court stated:

> While Plaintiffs filed a class action complaint against Google for monopolizing the intermediary services that connect advertisers and publishers of display advertisements, *see generally* FAC, **Plaintiffs do not dispute that any future amended complaint will be narrowed to address only the claims of digital advertisers**, not digital publishers, *see* Opp. at 3, 8; ECF 84 at 20:25–21:1.  Second, the Court agrees with Defendants that "the alleged market for 'online display advertising services' on the 'open web' improperly excludes other ways for advertisers to reach publishers without using Google's services."

Ex. 7, Order, N.D. Cal. case, ECF No. 143, at 6 (emphasis added).  In their motion in limine, Plaintiffs omit this portion of the decision, which cites the transcript of the February 8, 2021 conference as the basis for the N.D. Cal. plaintiffs agreeing to narrow any future amended complaint to advertiser tools.

In sum, no court has accepted or even relied upon the argument Google made in its opening

---

[6] In reply, Google argued that the advertiser plaintiffs' new asserted market failed to discuss "the implications of a possible two-sided market analysis under *Ohio* v. *American Express*."  Ex. 6, Reply In Supp. Mot. to Dismiss, N.D. Cal. case, ECF No. 116 at 2.  That legal position related to the advertiser plaintiffs' <u>new</u> asserted market, in tools used only by advertisers.  It is consistent with what Google has argued in this case, and does not form the basis for Plaintiffs' motion in limine.

motion to dismiss brief in the N.D. Cal. case concerning a two-sided market.  Google's argument was, as its counsel stated on the record, "take[n] away," Ex. 4, N.D. Cal. case, ECF No. 84 at 20:25–21:1, before the court could "rely upon or so much as take notice of" the argument.  *In re Merry-Go-Round*, 229 B.R. at 347.  Plaintiffs' claims were limited to advertiser products and services <u>before</u> the N.D. Cal. court even reviewed Google's motion to dismiss.  Judicial estoppel therefore cannot apply.  *See Konstantinidis*, 626 F.2d at 939.

For the foregoing reasons, Google requests that the Court deny Motion In Limine No. 1.

**OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 2:**

**Evidence Of Agency Closing Statements From Their
Investigations Of Google's AdMeld And Doubleclick Acquisitions Is Admissible**

Plaintiffs take the extraordinary position that, in defending against their antitrust challenge of the AdMeld and DoubleClick acquisitions, Google should be precluded from introducing evidence that Plaintiff (the Department of Justice, or "DOJ") and the Federal Trade Commission (the "FTC") extensively investigated those acquisitions and concluded they were not anticompetitive.  Plaintiffs' motion in limine No. 2 should be denied for at least three reasons.  First, the evidence Google intends to introduce is probative.  The DOJ's and FTC's closing statements from their investigations of the AdMeld and DoubleClick acquisitions contain detailed contemporaneous findings regarding the same theories of harm that Plaintiffs have put forward in support of their Section 2 Sherman Act claims in this case.  Tellingly, Plaintiffs' own economic expert relied on the FTC closing statement in his report, which—consistent with the closing statement—does not include an opinion that the DoubleClick acquisition was anticompetitive.  Second, Plaintiffs' position is contrary to case law and the cases they rely on are inapposite—none involved closing statements from antitrust agencies detailing their reasons to forego an enforcement action like the ones present here.  And none of the cases Plaintiffs rely on support the

exclusion of past agency enforcement decisions in the context of a bench trial. Third, introduction of this probative evidence will not "waste time," particularly given the Court's authority to manage its bench trial.

## I.     The Challenged Evidence is Probative of Relevant Facts

The FTC and DOJ closing statements are relevant to Plaintiffs' Section 2 Sherman Act claims and thus admissible. *See* Fed. R. Evid. 402. The closing statements contain conclusions by antitrust regulators (including one of the Plaintiffs in this case) about the transactions' effects on competition, the industry dynamics existing at the time of the acquisitions, and Google's rationale for the acquisitions—all based on the agencies' months-long review of an expansive record of documents and interviews. The conclusions of the FTC and DOJ are therefore relevant as they make facts Google intends to establish at trial more probable and undermine Plaintiffs' flawed antitrust claims. *See* Fed. R. Evid. 401.

 Because the closing statements are relevant, it is for the factfinder, not Plaintiffs, to "give the fact[s] the appropriate weight in effecting persuasion." *United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997) (internal citation omitted); *see also Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, 2023 WL 3686963, at *1 (E.D. Va. Jan. 11, 2023) (quoting *Teel v. City of Greenville (NC) Police Dep't*, 2007 WL 9760002, at *1 (E.D.N.C. Sept. 21, 2007)) (in the context of a bench trial, "the exclusion of evidence is generally disfavored.").

### A.  The FTC's and DOJ's Closing Statements
###     Address Key Elements of Plaintiffs' Claim

As set out in more detail in Google's Proposed Findings, to prevail on their Section 2 Sherman Act claims, Plaintiffs must establish, *inter alia*, that the challenged conduct harmed

competition,[7] and that the factfinder could find "no valid business reason or concern for efficiency in the [alleged monopolist's] choice."[8]  With respect to Plaintiffs' attempted monopolization claim, Plaintiffs must also prove, *inter alia*, a specific intent to monopolize a relevant market.  *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 177 (4th Cir. 2014) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).  In closing their investigations of the DoubleClick and AdMeld acquisitions, the FTC and DOJ made specific factual findings that are relevant to the assessment of these elements of Plaintiffs' claims and consistent with facts Google expects to establish in its defense against those claims.

First, the FTC and DOJ considered, and rejected, in their closing statements that the DoubleClick and AdMeld transactions would harm competition.  The DOJ concluded that the AdMeld acquisition was "not likely to substantially lessen competition in the sale of display advertising" in significant part because "web publishers often rely on multiple display advertising platforms and can move business among them in response to changes in price or the quality of ad placements."  Ex. 8 (DTX0096, ECF No. 894) at 1–2.  This same fact is highlighted in Google's Proposed Findings.  FoF ¶¶ 421, 430, 623; CoL ¶¶ 66.4, 211, ECF No. 1178.  Similarly, the FTC concluded "after carefully reviewing the evidence" that the DoubleClick acquisition was "unlikely to substantially lessen competition," among other reasons, because (i) the market "is a fragmented, competitive market with dozens of competitors," (ii) "most publishers utilize multiple ad intermediation providers in order to obtain the highest possible value for their non-premium inventories," and "most advertisers rely on multiple ad intermediation providers to ensure that they

---

[7] "The offense of monopolization requires a showing of anticompetitive effect."  *Dickson* v. *Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002) (internal marks and citations omitted).

[8] *Oksanen* v. *Page Memorial Hosp.*, 945 F.2d 696, 710 (4th Cir. 1991) (en banc) (quoting *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 105 (4th Cir. 1987)) (holding that plaintiffs must prove the "willful acquisition or maintenance of monopoly power" by showing no valid business justification or efficiency concern).

can effectively target their ad campaigns at the lowest cost." Ex. 9 (DTX0023, ECF No. 894) at 6, 10–11.  Again, these very same facts appear in Google's Proposed Findings.  FoF ¶¶ 42–45, 48, 394.4, 408, 549, 653; CoL ¶¶ 66.4, 128, 129, ECF No. 1178.

Second, the DOJ's and FTC's closing statements support Google's business justifications and stated intent for the challenged conduct in the case at hand.  For example, in closing its investigation of the DoubleClick acquisition, the FTC considered that firms operating ad networks or ad exchanges "compete with highly differentiated products, and the size of an ad network is but one factor customers consider.  For example, the quality of the ad inventory offered is important to customers." Ex. 9 at 11.  The FTC's finding concerning the importance of ad inventory quality reinforces Google's business justifications for both the DoubleClick acquisition itself and for product design decisions that Plaintiffs in this case challenge as anticompetitive.  As Google will establish at trial, its rationale for acquiring DoubleClick was in part to be able to provide its advertiser customers with access to more high quality ad inventory than it could before the acquisition with its AdSense product.  In addition, as Google likewise intends to establish at trial, it was careful about bidding into third-party ad exchanges on behalf of its advertiser customers because that entailed more risk of buying low quality ad inventory.  FoF ¶¶ 145, 147–49, 156–59, 535–36, 543; CoL ¶¶ 177, 181, ECF No. 1178.

Similarly, in closing its investigation of the AdMeld acquisition, a "significant consideration[]" for DOJ was that the transaction "was unlikely to cause consumer harm," because "there ha[d] been recent SSP and advertising exchange entrants in the display advertising industry." Ex. 8 at 2.  Consistent with this view, Google intends to show that at the time of the AdMeld transaction its products were missing key features desired by publisher customers and

offered by these SSP entrants. Filling this gap in its product offering was a key motivation for acquiring AdMeld.

These contemporaneous assessments by the FTC and DOJ are particularly probative here where over a decade has passed since those acquisitions. Plaintiffs implicitly concede the relevance of the FTC's and DOJ's closing statements in the DoubleClick and AdMeld acquisitions as evidence in this case. Their own economic expert, Professor Robin Lee, relied on the FTC's closing statement in his report concerning, *inter alia*, the alleged competitive effects resulting from Google's conduct. Ex. 10 (Expert Report of Dr. R. Lee) at App'x L-5 ¶ 22 n. 1383 (citing "Statement of the Federal Trade Commission concerning Google/DoubleClick"). Notably, while Professor Lee opines that various conduct by Google harmed competition (Ex. 10 at ¶ 580, Fig. 61), he does not opine that the DoubleClick acquisition was anticompetitive, consistent with the FTC's conclusion back in 2007 that the transaction was unlikely to substantially lessen competition. *See id*.

### B. The FTC's and DOJ's Closing Statements Were Based on Extensive Investigation

In arguing that the FTC's and DOJ's decisions to close their investigations of the DoubleClick and AdMeld acquisitions are "not probative" in this action, Plaintiffs not only ignore the detailed public closing statements that the FTC and DOJ issued, but they also attempt to downplay the significance of the FTC's and DOJ's investigations, calling them "limited." Plfs.' Mem. at 10. Plaintiffs likely did so because the DOJ investigations involved in the primary case on which they rely for their arguments—*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021)—were limited. But the FTC and DOJ decisions here were the product of months-long, in-depth investigations, culminating in detailed closing statements explaining the reasons for their decisions. The FTC investigated Google's acquisition of DoubleClick for nearly eight

months, conducting "over 100 interviews," reviewing more than "2 million pages" of documents from the parties, and "thousands of documents" from third-parties. Ex. 9 at 1 n.2. Similarly, the DOJ closed its investigation into Google's acquisition of AdMeld after a six-month investigation, which the DOJ itself described as a "thorough review of the evidence" based upon "extensive information" gathered from both the parties and market participants, which included investigative depositions of some of the same witnesses as were deposed in the case at hand. *See* Ex. 8 at 1 (DOJ statement announcing close of its investigation on Dec. 2, 2011); Ex. 11 (GOOG-DOJ-21029775) (DOJ's preliminary investigation began on or before June 27, 2011).

### C. Agency Reviews Are Not Less Probative Simply Because They Were Conducted Under Clayton Act Section 7

Plaintiffs make a half-hearted attempt to dispute the probative value of the FTC's and DOJ's DoubleClick and AdMeld investigations and closing statements on the ground that they were based on Section 7 of the Clayton Act. They incorrectly argue that the FTC and DOJ investigations and closing statements are not probative because Section 7 involves a "predictive, forward-looking legal standard," while their Section 2 claims are backward looking, based on past conduct that occurred after the FTC and DOJ conducted their investigations. Plfs.' Mem. at 14–15.

As explained above, the FTC and DOJ concluded the acquisitions were unlikely to harm competition or lead to a monopoly based on an extensive factual record that reflected market realities, such as multi-homing and market entry, that continue to hold true today.[9] Moreover,

---

[9] Plaintiffs also attempt to discredit the probative value of the FTC closing statement by highlighting purported inconsistencies with alleged post-acquisition facts. *See* Plfs.' Mem. at 15. But the FTC closing statement is consistent with the post-acquisition record. *See* Ex. 12 (DTX1872, ECF No. 894) (Fig. 52, Expert Report of Dr. Mark Israel) (Google's market share in publisher ad serving is 45% or lower); Ex. 13 (DTX1873, ECF No. 894) (Fig. 53, Expert Report of Dr. Mark Israel) (same); FoF ¶¶ 588–592 (publishers are able to configure the priority of ad exchanges within Google's publisher ad server).

Plaintiffs' trial exhibit list and deposition designations suggest that they intend to present evidence from the time periods before or during the FTC's and DOJ's investigations, such as evidence related to Google's rationale and business justifications for the acquisitions.  For those time periods, the FTC's and DOJ's contemporaneous investigations of the evidence available at the time would be even more rather than less reliable.  Notably, several of the documents on DOJ's trial exhibit list in this case relating to the 2011 AdMeld acquisition predate the acquisition and relate to Google's motivation for that acquisition.  *See, e.g.*, Ex. 14 (Pls.' Am. Trial Ex. List, PTX1352, ECF No. 923); Ex. 15 (PTX0060, ECF No. 923).  In any event, whether "hindsight" evidence is *more* probative than the FTC's or DOJ's closing statements based on investigations of contemporaneous evidence is not relevant to the salient question of whether such agency statements have *any* probative value.  *See United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997) (stating that evidence need not "have strong, full, superlative, and probative value and does not need to involve demonstration or to produce persuasion by its sole and intrinsic force;" it "merely needs to be worth consideration" by the factfinder who will weigh the evidence) (quoting *Wigmore on Evidence* § 29, at 435–36 (Peter Tillers rev. ed. 1983)).

## II.   *Steves & Sons* Does Not Control This Case

Courts regularly conclude that decisions of antitrust agencies to close an investigation into a transaction are relevant in evaluating a later challenge to that same transaction.  *See, e.g.*, *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1234 (8th Cir. 2010) (in an appeal from judgment on the pleadings, weighing the fact that the DOJ, after "reviewing 400,000 pages" of documents, largely did not challenge the at-issue merger); *Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) (on motion to dismiss, merger clearance "weigh[ed] against the conclusion" that the acquisition could be "plausibly characterized as an unreasonable restriction on competition"), *aff'd*, 724 F. App'x 556 (9th Cir. 2018); *Blessing v. Sirius XM Radio*

*Inc.*, 2011 WL 3739024, at *2 (S.D.N.Y. Aug. 24, 2011) (in assessing plaintiffs' likelihood of success on the merits of a merger challenge as part of a motion to approve a settlement, the court observed that but-for a settlement, plaintiffs would have to contend with convincing a jury that the conclusions of two federal agencies that allowed the transaction to close were wrong), *aff'd*, 507 F. App'x 1 (2d Cir. 2012).

Yet, Plaintiffs argue the opposite. They largely rely on a single, readily distinguishable case to support their proposed exclusion of highly probative evidence by incorrectly suggesting a bright-line rule that "[e]vidence or argument about past agency decisions made under a different forward-looking standard of review is not probative of liability under Section 2 of the Sherman Act." Plfs.' Mem. at 9 (citing *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690 (4th Cir. 2021)). This is not the legal principle in *Steves* or in any other case cited by Plaintiffs.[10]

In *Steves*, the Fourth Circuit concluded that the district court did not exceed its discretion in a jury trial in applying Rule 403 to exclude evidence that the DOJ twice investigated the merger being challenged by private litigants under Section 7 of Clayton Act. 988 F.3d at 713–14. The Fourth Circuit reasoned that evidence of the fact that the DOJ simply did not challenge the at-issue merger could have "misled the jury into *thinking* that the Department deemed the merger to be legal 'when no such determination ha[d] been made.'" 988 F.3d at 714 (emphasis in original) (quoting *United States v. Candelaria-Silva*, 166 F.3d 19, 35 (1st Cir. 1999)). The logic of the decision in *Steves* is not applicable in this case.

First, unlike in *Steves*, this is not a jury trial but a bench trial. The Court, of course, will not be confused in properly weighing the probative value of the evidence before it. *See, e.g.*,

---

[10] Plaintiffs' argument appears to be guided by the mistaken assumption that Google intends to argue that the fact of these investigations immunizes Google from antitrust liability. *See* Mem. at 10. Google does not intend to make such an argument.

*Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) ("Rule 403 was designed to keep evidence not germane to any issue outside the purview of the jury's consideration.  For a bench trial, we are confident that the district court can hear relevant evidence, weigh its probative value and reject any improper inferences."); *Moke Am. LLC*, 2023 WL 3686963, at *1 ("The exclusion of evidence is generally disfavored in a bench trial.") (internal marks and quotations omitted).

Second, in *Steves*, the DOJ closed its initial investigation into the transaction after approximately sixty days without comment, apparently providing no indication of what it reviewed or why it did not further investigate or take any additional action regarding the deal.  988 F.3d at 700.  It similarly closed its second investigation without any apparent comment considered by the court.  *Id.* at 702.  In sharp contrast, in the case of both DoubleClick and AdMeld, the FTC and DOJ issued "second requests," extensive and wide-ranging requests for documents and information about the businesses at issue, investigated for many months, and, in closing their investigations, offered detailed public accountings of their findings and reasoning.  *See* Ex. 8; Ex. 9; Ex. 11.  In other words, the Court need not guess why the FTC and DOJ closed their investigations or impute any undue weight to the fact of the closures because the Court has the FTC's and DOJ's contemporaneous public statements of what, why, and how they reviewed the proposed acquisitions and why they ultimately concluded that the transactions were unlikely to harm competition.  *Compare* Ex. 8 and Ex. 9, *with Steves*, 988 F.3d at 714 (reasoning that the fact of DOJ's decision not to investigate the merger was not probative of its legality because "many factors may motivate such a decision").

Third, even in *Steves*, the district court admitted into evidence the plaintiff's statement to the DOJ that it did not object to the same merger it later challenged.  988 F.3d, at 713–14.  Here,

the plaintiff *is* the DOJ, and thus, even under Plaintiffs' strict reading of *Steves*, the DOJ's earlier

views on the same acquisition it now challenges (AdMeld) would be probative.

The other cases cited by Plaintiffs—*Altria Grp., Inc. v. Good*, 555 U.S. 70, 89–90 (2008);

*Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *Static Control Components, Inc. v. Lexmark Int'l,*

*Inc.*, 749 F. Supp. 2d 542, 556 (E.D. Ky. 2010), *aff'd in part, rev'd in part on other grounds*, 697

F.3d 387 (6th Cir. 2012), *aff'd*, 572 U.S. 118 (2014); and *In re Carbon Black Antitrust Litig.*, 2005

WL 2323184, at *1 (D. Mass. Sept. 8, 2005)—are even less relevant.  Like *Steves*, both *Static*

*Control* and *Carbon Black Altria* involved or anticipated jury trials.  *See Static Control*

*Components, Inc*, 749 F. Supp. 2d at 548 (motion for a new trial after jury verdict); First Am.

Compl. ¶ 78, *In re Carbon Black Antitrust Litig.*, No. 03-CV–10191 (D. Mass. May 7, 2004), ECF

No. 109 (jury trial demand).  *Atlria* and *Heckler* address no evidentiary issues.  Instead, in *Altria*,

the Court evaluated whether a claim brought under the Maine Unfair Trade Practices Act was

preempted by the Federal Cigarette Labeling and Advertising Act, 555 U.S. 70, while in *Heckler*,

the Court considered whether a decision of an administrative agency to exercise its "discretion"

not to undertake certain enforcement actions is subject to judicial review under the Administrative

Procedure Act in a case brought by prison inmates to compel the Food and Drug Administration

to take enforcement action under the Federal Food, Drug, and Cosmetic Act regarding drugs used

for lethal injections to carry out the death penalty.  470 U.S. at 823.

## III.    Consideration of the Evidence Will Not "Waste Time"

Plaintiffs also speculate as to a risk that admitting the closing statements will lead to a

"trial-within-a-trial" and "waste time."  Plfs.' Mem. at 16.  Plaintiffs do not contend that they plan

to call witnesses on the subject, and there are no such witnesses on their witness list.  *See* DOJ FoF

at 8–11, ECF No. 1173.  Nor do they explain how Google introducing two closing statements at

trial would "waste time."  In any event, the Court is well equipped to manage the trial without excluding evidence.  *See United States v. Siegel*, 536 F.3d 306, 320 (4th Cir. 2008) (A district court has "other tools available," besides the exclusion of evidence, "to ensure that the trial proceeds as expeditiously as possible").

Moreover, Plaintiffs mischaracterize the only case they cite in support of their argument, *U.S. ex rel. Feldman v. van Gorp*, 2010 WL 2911606 (S.D.N.Y. July 8, 2010).  Plaintiffs assert that in a *qui tam* False Claims Act case, the court excluded evidence of the DOJ's decision not to intervene out of concern that permitting such evidence would "draw the parties into 'a protracted and unproductive struggle over how the evidence admitted at trial compared to the evidence considered by the agency.'"  Plfs.' Mem. at 16 (quoting *Feldman,* 2010 WL 2911606 at *3).  The quoted language, however, regards the court's decision to exclude evidence of the American Psychological Association's (APA) decision not to open an ethics investigation under its own ethics rules, not the DOJ's decision not to intervene.  Assessing what evidence a non-governmental organization like the APA might have considered in enforcing its own ethics rules in a False Claims Act case may well have been a waste of time, but the scenario bears little resemblance to the situation at hand, especially since *Feldman* involved a jury trial, not a bench trial.  *See id.*

 For the foregoing reasons, Google requests that the Court deny Motion In Limine No. 2.

**OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 3**

**Plaintiffs' Motion To Exclude All Evidence of Advertiser
Perceptions Survey Reports Is Premature And Overbroad**

Plaintiffs' motion to exclude as hearsay 21 survey reports conducted by Advertiser Perceptions (hereinafter, "AP Surveys") is premature and overbroad.  In advance of Google seeking to introduce the AP Surveys into evidence, including whether Google can establish their admissibility, Plaintiffs ask this Court to wholesale exclude—based on speculation—robust and

contemporaneous industry survey evidence in this case.  The AP Surveys are valuable evidence of what Google believed the state of competition and the industry to be, and it is important that the Court assess their admissibility as the evidence is introduced, giving Google the opportunity to lay the foundation for the survey's admissibility and relevance.  That is particularly true in the bench trial context, in which the Court will be able to parse whether the AP Surveys are offered for the truth of the matter asserted, as well as evaluate the applicability of relevant exceptions to the hearsay rule.  For these reasons and as set forth below, the Court should reserve judgment and evaluate any AP Surveys that Google offers in context, rather than deciding on their admissibility now.

Courts are "almost always better situated during the actual trial to assess the value and utility of evidence" than to decide the issue in advance of trial.  *United States v. Verges*, 2014 WL 559573, at *3 (E.D. Va. Feb. 12, 2014).  That is especially true when, as here, a party seeks to "exclude broad categories of evidence" because courts are necessarily "handicapped in any effort to rule on subtle evidentiary questions outside a factual context."  *Id.* at 3.

Here, Plaintiffs admit that the AP Surveys may be admissible for a number of reasons.  Plfs.' Mem. at 19–20.  Plaintiffs nevertheless ask the Court to exclude *all* of the AP Surveys *in their entirety* now.  They have not established that the Court should prejudge the admissibility of all 21 AP Surveys on this basis because the Court can "reserve judgment until trial so that the disputed evidence is placed in the appropriate factual context."  *Verges*, 2014 WL 559573, at *3; *see also Tailored Chem. Prods., Inc. v. DAFCO Inc.*, 2023 WL 5944162, at *2 (W.D.N.C. Sept. 12, 2023) (declining to rule on hearsay objection in motion in limine "prior to hearing the actual question being asked").

It would be particularly inappropriate to prejudge the admissibility of the AP Surveys here, where Plaintiffs cannot dispute that Google <u>could</u> have proper grounds to introduce them at trial. The AP Surveys could be admitted for non-hearsay purposes, and Plaintiffs admit both that (i) expert witnesses may testify about their reliance on otherwise inadmissible information, and (ii) survey evidence like the AP Surveys is often admissible notwithstanding the hearsay rule.

## I.     The AP Surveys Can Be Admitted For Non-Hearsay Purposes

Plaintiffs argue that the AP Surveys cannot be admitted for the truth of the survey responses, but even otherwise inadmissible hearsay can be admitted if offered for a non-hearsay purpose.[11] Plfs.' Mem. at 21–22. Here, Google may seek to admit the surveys on non-hearsay bases—namely, not for the truth of the responses, but for the effect of AP's report of the survey results on Google.

### A.   Google Can Offer the AP Surveys to Establish Their Effect on the Listener, Google

It is well-established that out-of-court statements are admissible if they are offered to show the effect on the listener, not for the truth of the statements. *See United States v. Love*, 767 F.2d 1052, 1063 (4th Cir. 1985) ("[The] testimony was offered not for its truth but only to explain why the officers and agents [acted as they did]. As such, it was not inadmissible hearsay."). All of the AP Surveys on Google's exhibit list were reports made to Google. And contemporaneous evidence, consisting of emails from Google employees, demonstrates that the surveys had an effect on the listener: Google employees circulated the survey reports, reviewed them, discussed them, and considered their results relevant to inform Google's decision-making, describing them as

---

[11] Plaintiffs incorrectly contend that their Appendix demonstrates that Google must intend to offer at trial all AP Surveys "for their truth." Plfs.' Mem. at 20. The Appendix shows only that three of Google's expert witnesses cited some portion of some of the AP Surveys in their expert reports. That does not address testimony by lay Google witnesses describing how they relied on the survey results in the ordinary course of business.

23

"good input to inform our strategy and narratives."  Ex. 16 (DTX0643, ECF No. 894); *see also* Ex. 17 (DTX0483, ECF No. 894) ("Sharing as I am sure this group would be interested in findings as well"); Ex. 18 (DTX0898, ECF No. 894); Ex. 19 (DTX0973, ECF No. 894), Ex. 20 (DTX0735, ECF No. 894).  Admission of the AP Surveys is relevant to demonstrate what Google believed based on results that it reviewed and analyzed—regardless of whether those survey results were actually accurate representations.

The effect that the AP Surveys had on Google is relevant to issues in this case.  For example, Plaintiffs' market definition arguments depend in large part on excluding certain ad tech tools from their asserted markets based on, among other factors, whether industry participants, including Google, recognize the ad tech tools and functionality that Plaintiffs exclude as reasonably interchangeable with ad tech tools and functionality within Plaintiffs' markets.  A number of the AP Surveys reported on what products the surveyed respondents considered to compete with Google's.  *E.g.*, Ex. 21 (DTX0511, ECF No. 894) at 14–22 (reporting to Google on competition for ad buying tools between Google and Amazon, including the ad formats and channels that attracted ad space buyers); Ex. 22 (DTX0555, ECF No. 894) at 11 (reporting to Google on the ad formats that ad space sellers believe it is important for a supply-side platform to support); Ex. 23 (DTX0664, ECF No. 894) at 70–71 (reporting to Google on the trend of ad space sellers moving their inventory management in-house, and why that benefited sellers).  The effect of those survey presentations on Google is directly relevant to which rivals Google considered itself to compete with for ad spend, and how it responded to that competition.  *E.g.*, Ex. 16 at 1–2 (Google employees reacting to AP Survey noting that "competitive factors" to Google's ad buying tools included "Facebook" and "Amazon's rapid progress as a 'must buy'"—both of which are products excluded from Plaintiffs' markets).

The effect of the AP Surveys on Google also provide evidence of Google's state of mind in making product design decisions, which are relevant to Google's business justifications for those decisions.  *See In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 545 F. Supp. 3d 922, 936 n.12 (D. Kan. 2021) (scholarly articles properly introduced as evidence of their effect on defendant and defendant's business justifications for the challenged conduct), *reconsideration denied*, 568 F. Supp. 3d 1184 (D. Kan. 2021).  Google's justifications—and the bases for those justifications—are relevant because Plaintiffs argue that Google lacks procompetitive and non-pretextual justifications for its challenged product design decisions.  DOJ CoL ¶¶ 93–104, ECF No. 1173.  Plaintiffs claim that "a wealth of contemporaneous documents demonstrate Google's anticompetitive intent and that its justifications are pretextual," *id.* ¶ 101, but the AP Surveys can demonstrate what Google believed was important to its customers and how it should innovate in response to the customer information provided by the surveys, *e.g.*, Ex. 24 (DTX0649, ECF No. 894) at 10 (AP Survey reporting to Google that a top "hurdle" to adoption of supply-side platforms was "controlling bots, fraud and malware").

Plaintiffs challenge, for example, Google's justification for deliberately expanding Google Ads bidding onto third-party exchanges only when it could account for—and address—the safety and quality of inventory on third-party exchanges.  DOJ FoF ¶¶ 214–15, ECF No. 1173.  According to Plaintiffs, "Google's AdX" is "not better at preventing cybersecurity issues than other exchanges or header bidding."  *Id.* ¶ 215.  The AP Surveys are relevant evidence of what Google believed about the inventory quality of AdX as compared to other exchanges.  In a slide deck, Google cited an AP Survey as evidence that AdX "continually score[d] and outperform[ed] the other exchanges," and that Google Ads (referred to as "Google Display Network" in the survey) was perceived to have the highest quality.  Ex. 25 (DTX0348, ECF No. 894) at 5.  Regardless of

25

whether the survey accurately reported that Google's inventory was in fact the highest-quality, Google can introduce this survey to show that Google <u>believed</u> that the quality of other exchanges was lower than Google's, differentiating Google's exchange from other exchanges, providing its advertiser products a source of competitive advantage, and guiding its product design decisions. That evidence would support Google's asserted procompetitive justifications, and contradict Plaintiffs' assertions of pretext for its product design decisions.

As another example, Google may introduce one or more of the AP Surveys to demonstrate that Google adopted the Unified Pricing Rules to make Google's ad tech auction simpler, more fair, and more transparent for both ad space buyers and sellers.  Plaintiffs argue instead that Google actually adopted the Unified Pricing Rules for pretextual reasons that "ignore[d] harm to DFP publishers."  DOJ CoL ¶¶ 223–28, ECF No. 1173.  However, an AP Survey that was presented to Google in 2020 after the adoption of the Unified Pricing Rules reported that 30% of ad space seller respondents described UPRs as having a positive impact on their business, while only 4% described UPRs as having a negative impact.  Ex. 26 (DTX0861, ECF No. 894) at 6.  Google can introduce this AP Survey to demonstrate that Google believed that UPRs were a net beneficial and attractive product feature for ad space sellers, disproving Plaintiffs' allegation that Google intentionally degraded its ad server to the detriment of its ad space seller customers.

### B. Challenges to Google's Opinion of the Trustworthiness of the AP Surveys Go to Weight, Not Admissibility

In seeking to exclude the surveys, Plaintiffs challenge their trustworthiness, arguing that "not even Google itself believes that the AP Reports are trustworthy."  Plfs.' Mem. at 21.  As a threshold matter, that argument assumes Google is seeking to admit the surveys for their truth, rather than their impact on Google in making business decisions.  Plaintiffs' trustworthiness argument also fails because it is based solely on two comments by individual Google employees

who disagreed with the results of just two particular AP Surveys.  Such isolated comments are, however, counterbalanced by other evidence that Google employees did rely on the survey results and valued the insights provided, even if they disagreed with particular results.  *See, e.g.*, Ex. 27 (GOOG-DOJ-11540172) (Advertiser Perceptions' "key takeaways" from meeting with Google include "You see us a[s] 'rigorous,' in our gathering of market intelligence, with a unique perspective based on our knowledge of the market and our continual conversations with the leaders in the business."); Ex. 16 (Google employee circulating AP analysis and observing "[g]ood input to inform our strategies and narratives"); *see also* Ex. 17; Ex. 18; Ex. 19; Ex. 20.  Google has consistently requested and used AP Surveys since at least 2012.  Plfs.' Ex. 11 at -437, ECF No. 1158-11.

Moreover, Advertiser Perceptions is a widely used and reputable industry resource that companies such as Twitter have referred to as "the voice of Madison Avenue."  Plfs.' Ex. 17 at 17, ECF No. 1158-17.  Even Plaintiffs' own survey expert, Dr. Wayne Hoyer, testified that AP is a reliable survey taker, and made clear that it is very common in the industry to use a third-party company to assemble a panel of survey respondents, and that he has done so "on every survey [he] did."  Hoyer Dep. 38:1–14, Ex. 28.

At best, Plaintiffs' challenge to the trustworthiness of the AP surveys goes to their weight— not their admissibility, as the Court can accord the surveys the weight it deems appropriate based on trial testimony.

## II.     Plaintiffs Admit That Survey Documents Like the AP Surveys Often Are Excepted From The Hearsay Bar

Google may also offer the AP Surveys for their truth because Plaintiffs concede where "the survey is material, more probative on the issue than other evidence and . . . it has guarantees of trustworthiness," it is excepted from the hearsay rule.  Plfs.' Mem. at 21 (quoting *Dick's Sporting*

*Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*, 188 F.3d 501, 1999 WL 639165, at *5 (4th Cir. Aug. 20, 1999) (unpublished table decision) (quoting *Harold's Stores, Inc. v. Dillard Dep 't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996) (cleaned up))).  While Plaintiffs argue that the AP Surveys supposedly lack trustworthiness, even Plaintiffs' own survey expert testified that it was not inappropriate for Google's survey expert to rely on AP.[12]  *See supra* Section I.B.  Indeed, Google has valued the industry insights AP provides for well over a decade.  *See id.*

### III.    Plaintiffs Admit That Expert Witnesses May Rely On Otherwise Inadmissible Information

As Plaintiffs also acknowledge, Plfs.' Mem. at 20, Federal Rule of Evidence 703 explicitly states that experts may rely on inadmissible evidence in forming their opinions, and may disclose that inadmissible evidence to a jury in certain circumstances.  Fed. R. Evid. 703.

To the extent that Google's experts relied on the AP Surveys in forming their opinions, they may rely on that evidence—regardless of its independent admissibility—at trial.  In a bench trial, as the Supreme Court has explained:

> the Federal Rules place no restriction on the revelation of such information to the fact finder.  When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose.

*Williams v. Illinois*, 567 U.S. 50, 69 (2012) (plurality opinion) (emphasis in original) (*abrogated on other grounds by Smith v. Arizona*, 144 S. Ct. 1785 (2024)); *see also Ambrose v. Roeckeman*, 749 F.3d 615, 621 (7th Cir. 2014) (quoting *Williams* and observing that "Rule 703 effectively recognizes th[e] distinction [between a bench trial and a jury trial] in limiting the admissibility of

---

[12]  Plaintiffs' additional argument that AP Surveys are subject to a "second level of hearsay," Plfs.' Mem. at 22, also fails. Surveys inherently involve hearsay-within-hearsay (the individual responses to the survey and the aggregated survey results) and are nonetheless routinely admitted for their truth. *See, e.g.*, *Safeway Inc. v. CESC Plaza Ltd. P'ship*, 261 F. Supp. 2d 439, 447 n.4 (E.D. Va. 2003) (telephone and customer intercept surveys admissible for truth).

such evidence only as to juries"); *cf. Disney Enters., Inc. v. Kappos*, 923 F. Supp. 2d 788, 800 (E.D. Va. 2013) (denying motion in limine to exclude expert opinion under Rule 702 in part because "this proceeding will be a bench trial and accordingly the gatekeeping function of the court is relaxed" (cleaned up)).  Google's economics expert, Dr. Israel, may testify, for example, that the AP Surveys are evidence that Google's conduct had procompetitive justifications that were not pretextual.  At a bench trial, there is minimal risk that this Court will misuse inadmissible information on which experts rely.

Plaintiffs concede that the AP Surveys may be presented to the Court under multiple theories. The Court should reject Plaintiffs' invitation to prejudge their admissibility on this premature motion.

For the foregoing reasons, Google requests that the Court deny Motion In Limine No. 3.

## CONCLUSION

For the foregoing reasons, Google requests that the Court deny Plaintiffs' Omnibus Motion In Limine.

Dated:  August 23, 2024

Eric Mahr (*pro hac vice*)
Andrew Ewalt (*pro hac vice*)
Julie Elmer (*pro hac vice*)
Justina Sessions (*pro hac vice*)
Lauren Kaplin (*pro hac vice*)
Jeanette Bayoumi (*pro hac vice*)
Claire Leonard (*pro hac vice*)
Sara Salem (*pro hac vice*)
Tyler Garrett (VSB # 94759)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
eric.mahr@freshfields.com

Daniel Bitton (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
55 2nd Street
San Francisco, CA 94105
Telephone: (415) 490-2000
Facsimile: (415) 490-2001
dbitton@axinn.com

Bradley Justus (VSB # 80533)
David Pearl (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 912-4700
Facsimile: (202) 912-4701
bjustus@axinn.com

Respectfully submitted,

*/s/ Craig C. Reilly*
Craig C. Reilly (VSB # 20942)
THE LAW OFFICE OF
 CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA 22314
Telephone: (703) 549-5354
Facsimile: (703) 549-5355
craig.reilly@ccreillylaw.com

Karen L. Dunn (*pro hac vice*)
Jeannie S Rhee (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
Martha L. Goodman (*pro hac vice*)
Bryon P. Becker (VSB #93384)
Erica Spevack (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile (202) 223-7420
kdunn@paulweiss.com

Erin J. Morgan (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3387
Facsimile:  (212) 492-0387
ejmorgan@paulweiss.com

*Counsel for Google LLC*