```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3    --------------------------x
      UNITED STATES, et al.,    :   Civil Action No.:
 4                              :   1:23-cv-108
               Plaintiffs,      :
 5         versus               :   Wednesday, September 11, 2024
                                :   Alexandria, Virginia
 6    GOOGLE LLC,               :   Day 3 a.m.
                                :   Pages 1-147
 7             Defendant.       :
      --------------------------x
 8

 9         The above-entitled bench trial was heard before the
      Honorable Leonie M. Brinkema, United States District Judge.
      This proceeding commenced at 8:59 a.m.
10

11              A P P E A R A N C E S:

      FOR THE PLAINTIFFS:   GERARD MENE, ESQUIRE
12                          OFFICE OF THE UNITED STATES ATTORNEY
                            2100 Jamieson Avenue
13                          Alexandria, Virginia  22314
                            (703) 299-3700
14
                            JULIA TARVER WOOD, ESQUIRE
15                          AARON TEITELBAUM, ESQUIRE
                            JEFFREY VERNON, ESQUIRE
16                          MICHAEL FREEMAN, ESQUIRE
                            DAN GUARNERA, ESQUIRE
17                          MICHAEL WOLIN, ESQUIRE
                            UNITED STATES DEPARTMENT OF JUSTICE
18                          ANTITRUST DIVISION
                            450 Fifth Street, NW
19                          Washington, D.C.  20530
                            (202) 894-4266
20
      (State of VA)         JONATHAN HARRISON, ESQUIRE
21                          OFFICE OF THE ATTORNEY GENERAL
                            OFFICE OF THE SOLICITOR GENERAL
22                          202 North Ninth Street
                            Richmond, Virginia  23219
23                          (804) 786-7704

24

25
                                                              1
```

```
1                        A P P E A R A N C E S:

2    FOR THE PLAINTIFFS:    ELLIOTT DIONISIO, ESQUIRE
     (State of CA)          OFFICE OF THE CALIFORNIA ATTORNEY
3                           GENERAL
                            300 South Spring Street
4                           Suite 1700
                            Los Angeles, California  90013
5                           (213) 269-6681

6    FOR THE DEFENDANT:     CRAIG REILLY, ESQUIRE
                            LAW OFFICE OF CRAIG C. REILLY
7                           209 Madison Street
                            Suite 501
8                           Alexandria, Virginia  22314
                            (703) 549-5354
9
                            JEANNIE RHEE, ESQUIRE
10                          WILLIAM ISAACSON, ESQUIRE
                            BRYON BECKER, ESQUIRE
11                          PAUL, WEISS, RIFKIND,
                            WHARTON & GARRISON LLP
12                          2001 K Street, NW
                            Washington, D.C.  20006
13                          (202) 223-7300

14   COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
                            Official Court Reporter
15                          United States District Court
                            401 Courthouse Square
16                          Alexandria, Virginia  22314
                            (607) 743-1894
17                          S.AustinReporting@gmail.com

18        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

19

20

21

22

23

24

25
                                                              2
```

```
 1                    TABLE OF CONTENTS

 2                        WITNESSES

 3   On behalf of the Plaintiffs:

 4   BRAD BENDER

 5   Direct examination by Mr. Freeman ........5
     Cross-examination by Ms. Rhee ............42
 6   Redirect examination by Mr. Freeman ......74

 7   RAMAMOORTHI RAVI

 8   Direct examination by Mr. Vernon .........91

 9                         EXHIBITS

10   On behalf of the Plaintiff:
     Admitted
11
     Number 587 ...............................28
12   Number 1736 ..............................31
     Number 1814 pgs 742 to 750(later modified).42
13   Number 1814 ..............................74
     Number 1780 ..............................93
14   Number 551 ..............................104
     Number 542, Bates 335 ...................119
15   Number 1040 .............................145

16   On behalf of the Defendant:
     Admitted
17
     Number 1508 ..............................43
18   Number 549 ...............................54
     Number 259 ...............................57
19   Number 129 ...............................61
     Number 705 ..............................132
20   Number 697 ..............................145

21                       MISCELLANY

22   Proceedings September 11, 2024 ...........4
     Certificate of Court Reporter ...........147
23

24

25
                                                    3
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

```
 1                    P R O C E E D I N G S

 2           THE DEPUTY CLERK:  Civil Action Number

 3   1:23-cv-108, United States of America, et al. versus Google

 4   LLC.

 5           Will counsel please note their appearance for the

 6   record, first for the plaintiff.

 7           MR. HARRISON:  Good morning, Your Honor.  Jonathan

 8   Harrison on behalf of the Virginia Attorney General's Office

 9   here representing the plaintiff states.

10           With me today is Elliott Dionisio from the

11   California Attorney General's office.

12           THE COURT:  Good morning.  We've got you first

13   today, that's good.

14           MS. WOOD:  We decided it was their turn.

15           THE COURT:  Yes.

16           MS. WOOD:  Good morning, Your Honor.  Julia Tarver

17   Wood from the Department of Justice on behalf of plaintiffs.

18   With me are my colleagues Aaron Teitelbaum, Michael Freeman,

19   Dan Guarnera, Michael Wolin, and of course Mr. Mene from the

20   U.S. Attorney's Office.

21           THE COURT:  Good morning.

22           MS. RHEE:  Good morning, Your Honor.  Jeannie Rhee

23   for Google.  I think you know the usual cast of characters.

24   But I also want to do note for the record Bryon Becker is

25   joining me at counsel table today.
```
                                                              4

Direct examination - B. Bender

```
 1              THE COURT:  Good morning.  And I think before we
 2    get started today, just recognition that today is
 3    September 11th.  And some of you may know that the only
 4    trial of that case occurred in this very courtroom where
 5    you're sitting today.  All right.
 6              We'll now proceed with the case.
 7              MR. FREEMAN:  Plaintiffs would call Brad Bender.
 8              THE DEPUTY CLERK:  Can you raise your right hand.
 9    Thereupon,
10                        BRAD BENDER,
11    having been called as a witness on behalf of the plaintiffs
12    and having been first duly sworn by the Deputy Clerk, was
13    examined and testified as follows:
14                   (Time noted:  9:01 a.m.)
15              THE DEPUTY CLERK:  Thank you.
16              MR. FREEMAN:  Good morning, Your Honor.  Michael
17    Freeman.
18              May I proceed?
19              THE COURT:  Yes, sir.
20                      DIRECT EXAMINATION
21    BY MR. FREEMAN:
22    Q    Good morning, Mr. Bender.  We haven't met.  My name is
23    Michael Freeman.  I work with the United States Department
24    of Justice.
25              Good morning.
```

5

Direct examination - B. Bender

```
 1   A      Good morning.
 2   Q      Could you please state your name, spelling both your
 3   first and last name.
 4   A      My name is Brad Bender, B-R-A-D B-E-N-D-E-R.
 5   Q      I want to talk to you just very briefly about prior
 6   testimony in this case and a related case that you had
 7   previously given.
 8           You were deposed in October of 2020; is that
 9   right?
10   A      That sounds right.
11   Q      Now, at the time you were still employed by Google?
12   A      That's correct.
13   Q      Now, at that deposition you were represented by counsel
14   for you and Google; is that right?
15   A      That's correct.  I was represented by Google in-house
16   counsel as well as outside counsel for Google.
17   Q      And then much more recently in June of this year, 2024,
18   you were also deposed about Google's ad techs in the MDL; is
19   that right?
20   A      That's correct.
21   Q      And you were represented by counsel at that deposition
22   as well?
23   A      That's correct.
24   Q      And again, that was counsel for Google and yourself;
25   right?
```

<span style="float:right">6</span>

Direct examination - B. Bender

```
 1    A     That's correct.

 2    Q     At that deposition in June of 2024, you were no longer

 3    employed at Google?

 4    A     That's correct.

 5    Q     Prior to your June 2024 deposition, did you meet with

 6    Google's counsel prior to prepare for that deposition?

 7    A     I would have, you know, met with both the outside

 8    counsel and Google counsel, yes.

 9    Q     Just so we're clear about when you say Google's outside

10    counsel, you mean just like a private law firm still

11    representing Google; right?

12    A     That's correct, yeah.

13    Q     Okay.  Do you hold Google stock?

14    A     I do.

15    Q     And is the estimated value at least over $1 million?

16    A     That's fair.

17          MR. FREEMAN:  Your Honor, at this time we seek

18    permission pursuant to Rule 611(c) to proceed with leading

19    questions as this witness has identified with the adverse

20    party, that being Google.

21          THE COURT:  Any objection?

22          MS. RHEE:  No, Your Honor.

23          THE COURT:  I don't mind telling counsel you can

24    do that.  I've always distrusted testimony that comes in in

25    response to leading questions so be careful.
```

7

Direct examination - B. Bender

```
 1              MR. FREEMAN:  Understood, Your Honor.  Thank you.
 2              THE COURT:  All right.
 3   BY MR. FREEMAN:
 4   Q    All right.  So I'd like to start with some of just your
 5   professional background, which we can run through fairly
 6   quick, but you started working in digital advertising for a
 7   company called DoubleClick; right?
 8   A    That's right.
 9   Q    What was DoubleClick?
10   A    DoubleClick was an Internet advertising solutions
11   company.
12   Q    And did DoubleClick provide tools to web publishers?
13   A    Sure.
14   Q    Just prior to the acquisition by Google, who was the
15   CEO of DoubleClick?
16   A    That would have been David Rosenblatt.
17   Q    And what were some of the main tools that DoubleClick
18   had prior to the acquisition?
19   A    Can you -- can you restate the question?
20   Q    Sure.  What I'm trying to get at is did
21   DoubleClick offer -- what tools did it offer a publisher, a
22   web publisher?
23   A    There were a myriad of products on offer to web
24   publishers.
25   Q    Is one of -- is one of the products that was offered go
```

8

Direct examination - B. Bender

```
 1   by the acronym DFP?

 2   A     That's true at the time.

 3   Q     And DFP would be considered a publisher ad server?

 4   A     That's fair.

 5   Q     Also, DoubleClick had a product called an ad exchange;

 6   is that right?

 7   A     That's correct.

 8   Q     You came to work for Google after the acquisition of

 9   DoubleClick in roughly 2008; right?

10   A     That's right.

11   Q     And once you were officially part of Google, you spent

12   some of your early days helping to -- joint strategy

13   planning to integrate DoubleClick with Google; is that fair?

14   A     That's a fair characterization, yeah.

15   Q     Again, shortly after joining Google did you take any

16   leadership role in what I'll call the buy-side of digital

17   display advertising?

18   A     I would characterize it slightly differently.  I was --

19   I was asked to take the leadership on helping build a

20   display network to support advertisers and marketers, which

21   would be a subset of the full buy-side offerings that Google

22   had at the time.

23   Q     Okay.  We will -- we'll get to that ultimately, but

24   again, you shortly after joining Google, you were then

25   working with advertisers and marketers in those products;
```

9

Direct examination - B. Bender

1    right?

2    A    That's true.

3    Q    What I'm trying to make a distinction, at that time you

4    were not working with publishers; right?

5    A    That's correct, yeah.

6    Q    In particular, did you eventually get a promotion while

7    you were on -- with Google on the buy-side to take on more

8    responsibility?

9    A    Yes.  I was asked to take on more responsibility over

10   my tenure.

11   Q    Did you get a promotion strictly to take more

12   responsibility on the buy-side or the buy ad tools; right?

13   A    If my recollection serves, the promotions may or may

14   not have been tethered to the expansion of my scope.

15   Q    I want to just talk briefly about some of the products

16   that you were responsible for.

17        One of them would be a demand side platform known

18   as DV360; is that right?

19   A    That is one of the names that it went by over my

20   tenure.

21   Q    And another one I know went through another, you know,

22   rebranding was originally maybe Google Content Network; is

23   that right?

24   A    Yes.  That's -- that was the original name.

25   Q    And then it changed to Google Display Network?

Direct examination - B. Bender

```
 1    A    Once we had built display features into it, we

 2    rebranded it, the Google Display Network.

 3    Q    And then eventually Google Display Network became under

 4    the umbrella of what is known as Google Ads; is that right?

 5    A    That's fair.  Yep.

 6    Q    After about four years of working for Google, did you

 7    also gain responsibility for what I'll call sell-side

 8    products within digital display advertising?

 9    A    I don't think that timing is accurate.

10    Q    Okay.  In roughly what year do you think you took over

11    responsibility for what I'll call sell-side products?

12    A    I believe that was 2018.

13    Q    What products did you gain responsibility for on the

14    sell-side once you took that responsibility?

15    A    That would -- at that time would have included the

16    Google Ad Manager, which was a rebrand of what historically

17    would have been DFP.  It would have included AdSense and it

18    would have included the exchange.

19    Q    Where you took over responsibility for the sell-side,

20    did you lose responsibility on the buy-side?

21    A    I did not.

22    Q    So at least beginning in 2018, you were in charge of

23    products both that advertisers used and products that

24    publishers used?

25    A    That's correct.
```

11

Direct examination - B. Bender

```
 1    Q    I just want to finish up briefly your time at Google
 2    and then we'll kind of go back.
 3              You eventually left Google display advertising to
 4    go to Google news; is that right?
 5    A    That's correct.
 6    Q    And that was roughly November of 2019?
 7    A    Yes.
 8    Q    And I think we talked about it, you then left Google in
 9    its entirety in November of 2022; is that right?
10    A    That's correct.
11    Q    And just so I have my timeline correct about your time
12    at Google, you were in display advertising from shortly
13    after the acquisition in 2008 to roughly 2019; is that
14    right?
15    A    That's correct.
16    Q    Okay.  I want to go back then to your time just prior
17    to Google acquiring DoubleClick.
18              The CEO that you mentioned, David Rosenblatt, did
19    he also come over and was a Google employee after the
20    acquisition?
21    A    Yes.  I believe he was.
22    Q    All right.  There's going to be a binder and a screen,
23    so whatever is more comfortable for you, but I want you to
24    flip to in the binder that's going to be handed to you, the
25    exhibits.
```

Direct examination - B. Bender

```
 1   A     Okay.

 2   Q     So I'm going to talk to you in PTX language, that's

 3   what the tabs are.

 4   A     Okay.

 5   Q     So in PTX 1814, so it would be towards the end of that

 6   particular binder.

 7              THE COURT:  Is there any objection to 1814?

 8              MS. RHEE:  No, Your Honor.

 9              THE COURT:  All right.  Are you going to use the

10   whole exhibit or just portions of it?

11              MR. FREEMAN:  Just portions of it, Your Honor.

12              THE COURT:  All right.  So we'll follow the rule

13   we talked about yesterday, that is only those portions being

14   discussed will be the actual evidence in the case.

15              MR. FREEMAN:  Well, just so -- I should clarify.

16   There's no, like, additional email that's included.  There's

17   only one email of this particular exhibit.

18              What I meant by that is I will only be referencing

19   portions of that email, but it is only a singular email.

20              THE COURT:  Basically are you going to be relying

21   on the pages that end in 742 to 788 or -- yeah, 788?  In

22   other words, is the entire document coming in?

23              MR. FREEMAN:  That would be our intention but

24   specifically, if the Court is not inclined, at least to 750,

25   the actual email itself.
```

Direct examination - B. Bender

```
 1              THE COURT:  Is there any objection to the whole
 2    document going in?
 3              MS. RHEE:  Your Honor, with this witness given
 4    that he is literally only on the top portion of the email
 5    and that is for which he is the speaker, we don't have any
 6    objection.
 7              With respect to what really is essentially an
 8    attachment to that email, it's just in email form, totally
 9    depends on what this witness -- or what the examination will
10    be.
11              THE COURT:  All right.  Well, let's get started on
12    the top part first.
13              MR. FREEMAN:  Okay.
14    BY MR. FREEMAN:
15    Q    Like I said, you can look at your binder or the screen,
16    whatever is easiest for you.
17              Just to orient ourselves about this particular
18    document, this is an email from you, Mr. Bender, in January
19    of 2009; right?
20    A    That's correct.  It looks to be.
21    Q    And you sent this email then to -- you sent it to one
22    group and then cc'd another group.  That being you sent it
23    to the display GCN as we talked about, the network,
24    engineering leads; is that right?
25    A    That's who's on the to line, correct.
```

                                                           14

Direct examination - B. Bender

```
 1   Q    Then you also copied the GCN PMs or product manager
 2   team as well?
 3   A    That's correct.
 4   Q    And the subject of this particular email says, David
 5   Rosenblatt's overview of Google display strategy; right?
 6   A    That's the subject listed here, yes.
 7   Q    When Mr. Rosenblatt came over from DoubleClick to
 8   Google, was he then working in Google's display advertising
 9   business?
10   A    I don't recall exactly where David was situated
11   organizationally after he came across.  He wasn't in an
12   operational role as far as I recall.
13   Q    But his duties weren't with the search engine; right?
14   A    I don't actually know where he spent his time over that
15   tenure.  But I do know he wasn't in an operational role.
16   Q    Well, in 2009, you shared his overview of Google's
17   display strategy; right?
18   A    That's accurate, yes.
19   Q    And in particular, this, referring to the first
20   paragraph, you sent it to your two teams because in your
21   words, you found that it to be worthwhile to get his
22   perspective; right?
23   A    If you would give me a minute, I'd like a chance to
24   review the document and then we can answer further questions
25   about it.  Thank you.
```
                                                              15

Direct examination - B. Bender

```
 1   Q     Absolutely.
 2               I could see you turn the page, Mr. Bender.
 3               What I was referring to was just that introductory
 4   paragraph that you put on this particular email.
 5   A     Sure.  Yeah.  I don't know who else can see the
 6   exhibit, so it appears as if I have forwarded notes taken by
 7   a colleague about a talk that David had given in Europe, and
 8   that this is basically a notes document of that talk.
 9   Q     Right.  And that talk, though, was to Google, that
10   being GCN display and YouTube sales team, so it was an
11   internal presentation; right?
12   A     It looks to be an internal presentation, that's
13   correct.
14   Q     And what you were forwarding, your words before,
15   sharing his display strategy was you characterize it as it
16   was worthwhile to get his perspective?
17   A     Those are the words I used here, yes.
18   Q     I then want you to flip to page -- three pages on that
19   particular document, and there will be a heading at the
20   bottom that will say, value of the platform.
21   A     Okay.  I see that.
22   Q     So Google's display strategy, at least in 2009, was
23   that the value of the platform by owning the primary ad
24   server allowed the network to have a first look at each
25   impression; right?
```

16

Direct examination - B. Bender

```
 1    A     That is what is written here.
 2    Q     Not only what is written but also what you shared with
 3    your team?
 4    A     That's correct.
 5    Q     And part of the value of owning the platform, and just
 6    so we're clear here we're talking about the publisher ad
 7    server; right?
 8    A     I believe so.
 9    Q     Well, do you see in the first paragraph under value of
10    the platform, in the second sentence, it says:  "It turns
11    out that the most efficient way to access that inventory is
12    by owning the primary ad server."
13    A     I see that.
14    Q     So the platform that is being discussed in this
15    particular paragraph is the publisher ad server?
16    A     That makes sense.
17    Q     And for Google, that meant DFP?
18    A     Yes.  That would be the ad server name at the time.
19    Q     And part of that -- of the value of owning DFP, was
20    that there were huge switching costs; right?
21    A     I don't personally know.  There's a comment here that
22    says that.  I wasn't necessarily spending time on that side
23    of the business to know.
24    Q     And the origin of Google's interest in DoubleClick is
25    because Google was having difficulty making their own
```

17

Direct examination - B. Bender

```
 1   publisher ad server; right?
 2   A    Well, I don't know.  I wasn't on the Google side to --
 3   in terms of how they decided to acquire DoubleClick.
 4   Q    I'm sorry.
 5        If you look at the second sentence of the last --
 6   on the very bottom of this particular page, page 3, it says:
 7   "The origin of Google's interest was Google was way ahead
 8   intellectually but was having trouble building its own
 9   primary ad -- if you go to the next page -- server"; right?
10   A    Okay.
11   Q    And so the value of owning DFP to Google was that it
12   could acquire inventory to monetize their network in this
13   particular case going by GCN; right?
14   A    That's what's written here.
15   Q    That's what's written and what you shared to your team?
16   A    That's correct.  I shared these verbal comments with my
17   team.
18   Q    Going back to the switching cost, that switching your
19   publisher ad server is a nightmare; right?
20   A    I wouldn't characterize it that way.  I don't have
21   personal experience with that.
22   Q    Okay.  Well, on page 4 of this particular exhibit
23   about, you know, a fourth of the way down, there's an
24   asterisk in the question and then do you see a second
25   asterisk in the question?
```

                                                              18

Direct examination - B. Bender

```
 1   A    I'm sorry, are we on the previous page we were on?

 2   Q    Page 4.  So if you look at the very bottom, there's

 3   like a bunch of string of numbers where it says -- it will

 4   end in 745.

 5   A    Okay.  745.  Okay.  Okay.

 6   Q    And then there's an asterisk in the question and then

 7   right below that there's an asterisk in the question.

 8   A    Okay.

 9   Q    And in that particular question is:  "Is it sustainable

10   to be ahead on the exchange if you don't have the platform";

11   right?

12   A    I see.  I see the -- I see the area that you're talking

13   about, uh-huh.

14   Q    And it says, asterisk David, it says:  "My view is

15   nothing really matters but the platform, nothing has such

16   high switching cost.  If there's a better network or

17   exchange, you can switch it.  Switching platforms is a

18   nightmare"; right?

19   A    Yeah, it looks like that was David's commentary there.

20   Q    And he further says:  "It takes an act of God to do

21   it"; right?

22   A    It seems like an overstatement.

23   Q    I'm sorry, I missed that.  It seems like what?

24   A    Overstatement.

25   Q    An overstatement.
```

                                                              19

Direct examination - B. Bender

1              Did you say in your first paragraph to your team

2    that be careful, there's overstatements in here?

3    A    I said that they would find it interesting.

4    Q    And you also said it was worthwhile?

5    A    To get his perspective.

6    Q    And so at no point when you sent it to your two teams

7    did you put any caution about, you know, things you disagree

8    with?

9    A    Not in this email.

10   Q    I want to go then to the other side on the network,

11   just at the very bottom of that particular exhibit, still on

12   page 4 ending in 745 where it says, Implications for the

13   network; do you see that?  The very bottom.  It's in bold on

14   the left-hand side.

15   A    Oh, I see it.  It's just the title.

16   Q    Just the title.

17   A    Okay, yeah.

18   Q    Okay.  If you go then over to the next page, that the

19   ad exchange that DoubleClick had that Google acquired was

20   comparable to building the New York Stock Exchange or the

21   London Exchange?

22   A    I see the -- I see the area you're referencing, yep.

23   Q    You shared with your team that what Google has created

24   is what's comparable to the New York Stock Exchange or the

25   London Stock Exchange?

                                                              20

Direct examination - B. Bender

```
 1   A    Any time you're trying to describe a complex system,

 2   metaphors or analogies can be helpful to understanding.

 3   It's clear that we weren't building another financial

 4   exchange.  So definitionally, it is a metaphor, and that's

 5   how I took it at the time and my team would have taken it.

 6   Q    Understood.

 7         And so in other words, Google was intending to do

 8   to display what Google did to search; right?

 9   A    I wouldn't agree with that characterization but that is

10   what's here.

11   Q    Again, though, you didn't share that with your team

12   that you disagreed with anything in here; right?

13   A    I forwarded the whole of the notes intact.

14   Q    With no words saying that you disagreed with any

15   portion of it?

16   A    I would have shared a variety of things with my team,

17   some of which I agreed with; some of which I disagreed with.

18         At the beginning of the email, it noted that we

19   had a GCN vision meeting occurring the following week where

20   we might have had discussion about all of these things.

21   Q    And if you go to the next page, so ending in four -- or

22   747, excuse me, do you see that?

23         When talking about the Google content network, so

24   staying on the financial analogy or metaphor, is that the

25   GCN, the advertising ad network, was like Goldman in
```

21

Direct examination - B. Bender

1   relationship -- as Goldman in relationship to the New York

2   Stock Exchange; right?

3   A    David himself says:  "This isn't a perfect analogy."

4   Q    Right.  But it is an analogy?

5   A    It is one analogy that one could use.

6   Q    And the analogy is that Google would be both Goldman

7   and own the New York Stock Exchange?

8   A    As a metaphor, at a very high level, I think it's

9   useful to simplify a very complex dynamic.  The reality is,

10  these things are very different when you get to a deeper

11  level.

12  Q    And in particular, though, the way it was structured is

13  that Google was hedged a bit.  Meaning that if another

14  network turns out to be better, Google still makes money;

15  right, through the exchange?

16  A    That is what's written here.

17  Q    And when we're talking about the exchange, we're

18  talking about Google's AdX; right?

19  A    That would be -- that would be what he would be

20  referring to, yes.

21  Q    We can get to this later, but the take rate of AdX was

22  20 percent; right?

23  A    That -- that sounds right.

24  Q    And that was consistent throughout your time at Google

25  display?

                                                        22

Direct examination - B. Bender

```
 1    A     I believe so.
 2    Q     And then if you go just two more pages up to page 8 of
 3    the actually document but it ends, if you're looking at the
 4    bottom right, in 749.
 5          Are you with me?
 6    A     749.  Uh-huh.
 7    Q     So the goal of Google's display strategy in 2009 was
 8    that if you executed on these things, you would be able to
 9    crush other networks and that's the goal; right?
10    A     So I would disagree with that.
11    Q     That's what you sent to your team, describing it as a
12    worthwhile read, was the ultimate goal was to crush other
13    networks?
14    A     Again, I called it an interesting read.  It would have
15    been something we discussed, and this would not have been
16    how I felt about it at the time.
17    Q     Not only did you say it was interesting, though, we've
18    gone over this, you also said it was worthwhile to read?
19    A     I did.
20    Q     I want to then jump to your time in terms of the
21    buy-side when you were just overseeing the buy-side
22    products.
23    A     Okay.
24    Q     So we've talked about it.  There was I know different
25    names but DV360 was one of them, and then ultimately was a
```

23

Direct examination - B. Bender

1    network, which is now under the umbrella of Google Ads;

2    right?

3    A    That's right.

4    Q    Okay.  I just know all the name changes can get

5    confusing all the time.

6              So I just want to establish some of the

7    differences between those two things, the ad network and the

8    demand-side platform.

9    A    Okay.

10   Q    Okay.  And so Google Ads you have previously described

11   as simpler or a turnkey solution; is that right?

12   A    Yes.  That was one of the value propositions we tried

13   to build on the network.

14   Q    And the advertising ad network typically paid Google by

15   a cost-per-click basis; is that right?

16   A    So advertisers and marketers were able to describe

17   their objectives in the interface, and then had the

18   opportunity to pay in various ways.  Cost-per-click was one

19   of those ways.  They could also pay cost per view, cost per

20   acquisition, cost per mille or CPM.

21             There were multiple ways, but I would say the

22   majority way that these advertisers and marketers chose to

23   bid was on a cost-per-click basis, and so then they would

24   pay only if their advertisement received a click.

25   Q    At the time your took responsibility for the ad

24

Direct examination - B. Bender

```
 1   network, were advertisers using the ad network purchasing
 2   inventory on third-party exchanges?
 3   A    At the time I took over responsibility, I -- no, I
 4   don't think so.
 5   Q    Meaning kind of the inverse of that question then,
 6   meaning when you took over, the ad network was only buying
 7   inventory on things coming through Google's AdX?
 8   A    I wouldn't characterize it that way.
 9   Q    How would you characterize it?
10   A    There were multiple sources of inventory for the
11   network.  The starting point would have been the AdSense
12   tags that existed on many publishers across the web.  When
13   the ad exchange came across with the acquisition, that was
14   another place that an integration was made.  Over time there
15   was backfill from the AdMob network, there's backfill from
16   YouTube.
17        So there was a variety of inventory sources over
18   time that were available to buyers who were using the
19   network.
20   Q    Appreciate that.
21        So the only exchange used by the ad network when
22   the time you took over -- I know it changes which we'll get
23   to -- the time you took over, was only using the exchange of
24   AdX; is that fair?
25   A    The initial exchange that the network was integrated
```

Direct examination - B. Bender

```
 1   into was the exchange, yes.  That came across in the
 2   acquisition.
 3   Q    And that is different than DV360, meaning at the time
 4   you took over DV360, DV360 was buying inventory on
 5   third-party exchanges.
 6   A    That's correct.
 7   Q    During your time when you were in a leadership role on
 8   what I'll call the buy-side, did publishers start using a
 9   technology called header bidding?
10   A    I believe they did during that time frame.
11   Q    And header bidding allowed publishers and advertisers
12   to bid on inventory without using any of Google's products;
13   right?
14   A    That sounds right.
15   Q    And some of the inventory from header bidding then was
16   made available on third-party exchanges; right?
17   A    I believe that's accurate.
18   Q    And if an inventory was sold by header bidding through
19   a third party exchange, okay; are you with me?
20   A    Yep.
21   Q    Then that meant that Google's AdX wouldn't be able to
22   use or take their take rate; right?
23   A    That -- that sounds right.
24   Q    When DV360 was purchasing inventory made available on
25   third-party exchanges, did Google implement any spam or
```

26

Direct examination - B. Bender

```
 1   cybersecurity filters?

 2   A     I don't -- I don't recall.

 3   Q     Do you recall any effort within digital display

 4   advertising to have in-house, let's start with, spam

 5   filters?

 6   A     So generally, yes.

 7   Q     And did those spam filters also apply to DV360 when

 8   they were buying on third-party exchanges?

 9   A     Yeah, that's what I don't -- I don't recall.

10   Q     So you're saying it's possible that Google was

11   permitting advertisers to buy on third-party exchanges with

12   no spam filter?

13   A     I think part of the value proposition of DV360 is that

14   it's a conduit for advertisers to be able to buy across

15   multi exchange.  And there's an understanding there that if

16   something fraudulent or spammy happens in those cases, that

17   the -- you know, that would be -- the onus would be on the

18   advertiser.

19   Q     Were you ever told that DV360's or customers using

20   DV360 were providing a huge chunk of revenue to publishers

21   using header bidding?

22   A     I believe I may have been, yes.

23   Q     And you can go back either to the screen or -- this is

24   PTX 587.

25              THE COURT:  Any objection to 587?
```

27

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

```
 1              MS. RHEE:  Court's indulgence.  No, Your Honor.

 2              THE COURT:  All right.  It's in.

 3       (Plaintiffs' Exhibit Number 587 admitted into evidence.)

 4  BY MR. FREEMAN:

 5  Q    I want to start then with the email about midway or

 6  just past, on the first page, where it says forward message

 7  but from Jonathan Bellack; do you see that?

 8  A    I do.

 9  Q    So this email was sent on March 16th of 2018 to you?

10  A    Yes.

11  Q    Who is Jonathan Bellack?

12  A    Jonathan Bellack is a product director at this time

13  responsible for the sell-side platform.

14  Q    When you took responsibility over the sell-side or

15  products within the sell-side, did Mr. Bellack report to

16  you?

17  A    Yeah, he would have when that team rolled over to me.

18  Q    In particular, in this email he communicates to you

19  that a huge chunk of publisher header bidding revenue is

20  Google demand going outside our ecosystem; right?

21  A    I see that's the way he characterizes it, yes.

22  Q    Okay.  And then just above it is from the same day, you

23  know, later that afternoon you see 12:59 from you; do you

24  see where I am?

25  A    I see my forward of the email, yes.
```

Direct examination - B. Bender

1    Q    And you forward the email then to you say Payam; do you

2    see that?

3    A    I do.

4    Q    And then I think we can connect the dots, that it's

5    Payam Shodjai?  Apologies if I'm mispronouncing his last

6    name.

7    A    That's who I was forwarding it to, yes.

8    Q    And who is or who was Payam to you?

9    A    So Payam was responsible -- so it was another product

10   director on my team responsible for the bid manager product.

11   Q    And the bid manager product would have then been at

12   least a subset of the DV360 product that we're talking

13   about?

14   A    That's correct.

15   Q    So you forward to Payam and your response was:  "This

16   seems pretty broken"; do you see that?

17   A    I do.

18   Q    So what you thought was broken was that Google was a

19   huge chunk of publisher header bidding revenue outside your

20   ecosystem; right?

21   A    By this time we had a better understanding of some of

22   the problems with header bidding, and so having things flow

23   to header bidding inventory would have been broken in my

24   mind.

25   Q    And then you see then at the top email Payam responds

29

Direct examination - B. Bender

1    to you, and says:  "Agree, this is broken"; do you see that?

2    A    I do.

3    Q    And the problem that he identifies with header bidding

4    is that it merely exists; right?

5    A    That is what is written here, yeah.

6    Q    And in particular he says:  "The origin of header

7    bidding is because publishers felt locked in by Dynamic

8    Allocation in DFP"; right?

9    A    Again, it's not my email, so that is his

10   characterization, which I don't necessarily agree with.

11   Q    Did you respond to that and say you disagree with it?

12   A    I don't recall.

13   Q    Well, let's talk about your potential response then.

14        You used Google's chats as you were an employee at

15   Google; is that right?

16   A    Sure.  On occasion.

17   Q    And, in particular, you used chats for substantive

18   purposes; right?

19   A    I wouldn't say that.  I generally wouldn't use chats

20   for substantive conversations.

21   Q    Were you ever contacted then in this particular

22   litigation to ask that question of whether you used chats

23   for substantive purposes?

24   A    I believe I was.  I was surveyed, and I would have said

25   something to the same effect.

30

Direct examination - B. Bender

```
 1   Q    So your testimony is that you did not use chats for
 2   substantive purposes, that's what you're saying?
 3   A    I said I generally wouldn't use chats for substantive
 4   purposes.  If there was something substantive, it would have
 5   come up in another form factor, an email, a document, a
 6   meeting.
 7   Q    So you're saying if the result communicated to the
 8   Department of Justice was you used occasionally substantive
 9   chats, that would have been an inaccurate representation?
10   A    I'm saying in general, I wasn't using chats for
11   substantive conversations.
12   Q    But you were using chats then, to some degree, for
13   substantive purposes?
14   A    I would say it's possible that there was something like
15   that, but likely we would have moved those to another form
16   factor, such as a meeting, a document or an email.
17   Q    Well, let's remove the doubt and look at PTX 1736.
18            THE COURT:  Any objection?
19            MS. RHEE:  No, Your Honor.
20            THE COURT:  All right.  It's in.
21    (Plaintiffs' Exhibit Number 1736 admitted into evidence.)
22   BY MR. FREEMAN:
23   Q    Are you with me?
24   A    I am.
25   Q    Do you see the format of PTX 1736 is not like an email
```
                                                              31

Direct examination - B. Bender

1    but like a chat; right?

2    A    It looks like a chat, yes.

3    Q    And you're discussing in this chat with Payam, the same

4    person who was on the email that we just looked at; right?

5    A    That's correct.

6    Q    Now, I don't want to get into specifics necessarily,

7    but you would agree this is a substantive chat; right?

8    A    And the history would have been on to capture this

9    substantive chat; correct?

10   Q    Well, we can talk about that.

11         So would you agree, though, let's start here of

12   this substantive -- you agree that you were communicating

13   with Payam substantively in PTX 1736; right?

14   A    This was fact-finding, as far as I can tell.  And then

15   we would have had this discussion again where later on I say

16   it's worth reopening.

17   Q    I have a simple question.  1736 is a substantive chat;

18   right?

19   A    It seems to be.

20   Q    Okay.  And, in particular, were you ever notified by

21   Google, or were you aware that you were to preserve chats

22   pursuant to a litigation hold?

23   A    I would have been, sure.

24   Q    When did you become aware that you were to preserve

25   chats pursuant to a litigation hold?

                                                              32

Direct examination - B. Bender

```
 1    A     In -- I believe in October 2019 I would have received a
 2    litigation hold related to this matter.
 3    Q     And a default setting then for chats for you was
 4    history off; right?
 5    A     I would have left the defaults at whatever it was set
 6    to.
 7    Q     So did you take any affirmative steps to turn history
 8    on in order to save substantive chats?
 9    A     I -- I don't recall, by the way.
10    Q     But you don't recall taking any affirmative step to
11    save substantive chats?
12    A     That's fair.
13          MR. FREEMAN:  Your Honor, I think we already did
14    this, but we would seek the full admission of 1736.
15          THE COURT:  It's in evidence.
16          MR. FREEMAN:  I must have missed it.  We would
17    seek the admission of 1736.
18          THE COURT:  Yeah.  It's in.
19          MR. FREEMAN:  Okay.  Thank you.
20    BY MR. FREEMAN:
21    Q     I'd like then to go back to the email that we were
22    discussing.
23    A     Can you remind me of the number?
24    Q     Yeah.  PTX 587.
25    A     Thank you.
```

33

Direct examination - B. Bender

1   Q    And so back to Payam indicating that "header bidding

2   was born because publishers felt locked in by Dynamic

3   Allocation"; right?

4   A    That that's his language here.

5   Q    And Payam indicated that header bidding gives many

6   publishers better yield; right?

7   A    Again, his language in this email.

8   Q    Yield is more money; right?

9   A    That's right.

10  Q    And so it was a no-brainer for a publisher to adopt

11  header bidding; right?

12  A    Yeah.  Again, that's what he writes here.

13  Q    And at the time, at least in 2018, Google was having

14  difficulty having distinction between what is header bidding

15  inventory and what is non header bidding inventory?

16  A    I believe that's true.

17  Q    So one of the proposed solutions to the rise of header

18  bidding, do you see where -- "but none were going to be

19  silver bullets"; right?

20  A    I see that section, yeah.

21  Q    And the first one that Payam suggests is Exchange

22  Bidding, also known as EB; right?

23  A    Yep.

24  Q    What is Exchange Bidding?

25  A    I don't recall to give you a good definition.

34

Direct examination - B. Bender

```
 1   Q    You don't recall that Exchange Bidding was then

 2   allowing for more purchases in real time?

 3   A    That -- that sounds right.  It's been a number of years

 4   since I was involved in the business, so ...

 5   Q    And the problem that Payam identifies with Exchange

 6   Bidding is "it stems the bleeding"; right?

 7   A    I see.  I see that's what he writes here.

 8   Q    "And Google thinks it's better to cannibalize ourselves

 9   than to see others take share from us"; right?

10   A    Yeah.  I don't know what he meant by that.

11   Q    But the problem with Exchange Bidding was that it had

12   too low of a margin of 5 percent; right?

13   A    Yeah.  Again, this is -- this is what Payam's writing

14   here.

15   Q    Well, Payam worked for you; right?

16   A    He did.

17   Q    And this is him communicating in real time his thoughts

18   to his boss -- that being you -- in 2018; right?

19   A    That's true.

20   Q    And he would have done his best at that particular time

21   to be truthful and accurate with you; right?

22   A    That's fair.

23   Q    And the low Exchange Bidding margin of 5 percent is

24   significantly different than AdX's take rate of 20 percent;

25   right?
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - B. Bender

```
 1    A     That sounds accurate.

 2    Q     You were also a proponent or advocate of the

 3    advertising ad network -- of the advertising ad network

 4    buying on third-party exchanges; right?

 5    A     That's true.

 6    Q     And just one point of clarification before we move on.

 7          One of the proposed solutions for -- to stem

 8    header bidding was Poirot; right?

 9          (Reporter interrupted for clarification.)

10          MR. FREEMAN:  Poirot.  Sorry.  P-O-I-R-O-T.

11          THE WITNESS:  I don't -- I don't recall.

12    BY MR. FREEMAN:

13    Q     But that was at least -- do you still have PTX 587 in

14    front of you?

15    A     I do.

16    Q     That was one of the suggestions that Payam made?

17    A     It's listed here.  Poirot, from what I can recall, was

18    related to how do you handle first-price auctions.

19    Q     Going back to -- you were a proponent or advocate,

20    however you would describe it, of the ad network buying on

21    third-party exchanges?

22    A     I was, yes.

23    Q     And you continued to be like that through your time at

24    Google Display?

25    A     I believe I, yeah, kept that stance.
```

36

Direct examination - B. Bender

1    Q    And you kept that stance of advocating for the ad

2    network to buy on third-party exchanges knowing that at

3    least some header bidding inventory was being made available

4    on those third-party exchanges?

5    A    I -- I wouldn't characterize it that way.

6    Q    Well, we just went over, through PTX 587, that you were

7    told that header bidding inventory was being made available

8    on third-party exchanges; right?

9    A    So the date of the email we just looked at was 2018.

10   My advocacy for the AdWords bidder started before that,

11   likely before the phenomenon of header bidding existed.  And

12   one of the -- one of the concerns we had with buying into

13   third-party exchange environments from the network was

14   protecting the network buyers from spam and fraudulent

15   inventory.  So building up those defenses was paramount to,

16   you know, enable us to do that rollout.

17   Q    That's why I asked you, though, that your position on

18   the ad network buying on third-party exchanges remained

19   consistent, and you said correct.

20   A    I would say largely consistent.  My understanding of

21   the dynamic certainly evolved over my tenure.

22   Q    But at no point did you advocate that the advertising

23   ad network or the demand-side platform should no longer bid

24   on third-party exchanges; right?

25   A    That's fair.

37

Direct examination - B. Bender

1    Q    So back to my question, which is:  Even after being

2    told that header bidding inventory is made available on

3    third-party exchanges, you wanted to bring in more of

4    Google's customers into the third-party exchanges?

5    A    I -- I wouldn't characterize it that way.

6    Q    Well, adding customers using the ad network to

7    third-party exchanges, that would be increasing the number

8    of buyers; right?

9    A    Potentially.

10   Q    And so, potentially, you were advocating then for more

11   buyers to bid on header bidding inventory on third-party

12   exchanges?

13   A    What I'm saying is temporally, I am not sure about what

14   you just said.

15   Q    But temporally, like you said, you never advocated to

16   pull out of bidding on third-party exchanges?

17   A    That -- that is -- that is fair.

18   Q    Even after receiving the email of 587; right?

19   A    That's fair.

20   Q    And just so we can put a name to it because there's so

21   many names and acronyms in this case, the actual product of

22   rollout of the ad network buying on third-party exchanges

23   was AWBid or A-W-B-I-D; right?

24   A    Yes, that's correct.  It would have previously been

25   called XBid.

Direct examination - B. Bender

```
 1    Q     X standing for cross exchange?

 2    A     Correct.

 3    Q     But the rollout of the product AWBid, did that allow

 4    the advertising network to bid on any inventory on

 5    third-party exchanges?

 6    A     No.

 7    Q     What did it limit it to?  What type of inventory, is my

 8    question.

 9    A     So the initial rollout of AWBid was focused on the

10    remarketing use case.

11    Q     Just at a high level, can you describe what remarketing

12    advertising is?

13    A     Sure.  There are many ways remarketing could be used.

14    I'd say the exemplar use case is a -- a user who's using a

15    browser like Chrome, goes to a website, puts something into

16    their shopping chart and then doesn't make the purchase.

17    And what this technology will do is establish two lists of

18    browser IDs, the ones who landed on the shopping cart page,

19    and also the ones who landed on the thank-you-for-purchasing

20    page.  And what you can do is a Boolean operation where you

21    remove the IDs that had successfully completed the purchase,

22    you're left remaining with a set of very interested, you

23    know, browser IDs in effect.  And what remarketing does is

24    where you see those browser IDs in your advertising, you

25    could reach them with a specific message, hopefully helping
```

39

Direct examination - B. Bender

```
 1  complete the purchase.
 2  Q    And, again, when AWBid was launched, it allowed for
 3  bidding Google's customers to bid on third-party exchanges
 4  but only in the context of remarketing inventory?
 5  A    As it relates to the network, yeah.  Customers who were
 6  using that front door.  Google customers could use the
 7  network and/or DBM or, you know, DV360.  If they wanted to
 8  buy multi-exchange, they could use DV360; and if they wanted
 9  the more turnkey solution, they could use the network for
10  that.
11  Q    Just one point of clarification to make sure -- because
12  there's so many acronyms.
13        You said using DV360 was the more -- the buyer had
14  more control over what they purchased; is that fair?  Less
15  automated is what I'm trying to get at.
16  A    I would say DV360 enabled buyers to buy across that
17  full range of third-party exchange inventory, and they would
18  manage those campaigns themselves but did also use some
19  automation.
20  Q    And then when you talk about the network, I think we've
21  already established that that is under the umbrella of
22  Google Ads now?
23  A    Right.  Google Ads' customers largely would come into
24  the AdWords interface, set up their campaign objectives.  If
25  their campaign type was remarketing type, in those cases,
```

Direct examination - B. Bender

```
 1   those campaigns could run across the third-party exchanges

 2   that we had integrated with.

 3              THE COURT:  And if they were not interested in

 4   remarketing, then what?

 5              THE WITNESS:  If they were not interested -- on

 6   the network side?  They would run across the side swath of

 7   inventory that we already had available there.

 8              THE COURT:  And stayed within the Google network.

 9              THE WITNESS:  It would have been AdSense, the

10   AdExchange, AdMob backfill, YouTube backfill, yeah.

11   BY MR. FREEMAN:

12   Q    At the time you left Google display advertising, was

13   what you just described true, meaning Google Ads -- just for

14   clarity, Google Ads could buy in third-party exchanges, but

15   only in the context we've just gone over?

16   A    As far as my recollection, that's true.

17              MR. FREEMAN:  One moment, Your Honor.

18                        (Pause.)

19              MR. FREEMAN:  Your Honor, I have nothing further.

20              Just for clarity, PTX 1814, we move the first nine

21   pages for it to be -- meaning the full email, but as

22   Ms. Rhee has already indicated, we are not seeking to admit

23   the attachments.

24              THE COURT:  All right.  Hold on one second.  So

25   the first nine pages stop at one Bates stamp number?  57, is
```

                                                                41

Cross-examination - B. Bender

```
 1   that right?
 2            MR. FREEMAN:  For completeness, it would be 750,
 3   but 750 merely just has Mr. Bender's email address on it.
 4   But that would not be an attachment.
 5            So we would move from 742 to 750, but not any
 6   pages after 750, which are the attachments.
 7            THE COURT:  Let me make sure everybody agrees with
 8   that then.  So 742 to 750, that is what is in for
 9   Exhibit 1814 and nothing more; right?
10            MR. FREEMAN:  That's correct, Your Honor.
11            THE COURT:  All right.  Very good.
12            MR. FREEMAN:  Thank you.  We pass the witness.
13       (Plaintiffs' Exhibit Number 1814 pgs 742 to 750 (later
14              modified) admitted into evidence.)
15                      CROSS-EXAMINATION
16   BY MS. RHEE:
17   Q    Good morning, Mr. Bender.
18   A    Good morning.
19   Q    My name is Jeannie Rhee, I represent Google, and I will
20   be asking you a couple of questions this morning; okay?
21   A    Yep.
22            THE COURT:  Do we have books for ...
23            MS. RHEE:  Oh, of course, Your Honor.
24            THE COURT:  All right.  Ms. Rhee.
25   BY MS. RHEE:
                                                          42
```

Cross-examination - B. Bender

```
 1   Q    Now, Mr. Bender, I just want to go back to the
 2   beginning.
 3          When you joined Google in 2008, just from your
 4   direct examination we take it that you were working on
 5   Google's buy-side tools?
 6   A    From early on after I joined, I was working on the
 7   development of what became the Google Display Network.
 8   Q    And that's now Google Ads?
 9   A    Yes.
10   Q    And, to your knowledge, does Google Ads enable the
11   purchase of ads that appear in apps?
12   A    Yes, it would.
13   Q    And what about native ads?
14   A    Yes as well.
15   Q    And what about the purchase of instream video ads?
16   A    Yes, that's true.  Uh-huh.
17   Q    So if I could direct your attention to the binder in
18   front of you, and it's tab 1.
19          MS. RHEE:  And for the record, that's DTX 1508.
20          THE COURT:  Is there any objection to
21   Defense 1508?
22          MR. FREEMAN:  No, Your Honor.
23          THE COURT:  All right.  It's in.
24     (Defense Exhibit Number 1508 admitted into evidence.)
25   BY MS. RHEE:
```

43

Cross-examination - B. Bender

```
 1    Q    And if I could direct your attention to Slide 8 of this
 2    deck.
 3            MS. RHEE:  And Mr. Spalding, with your assistance,
 4    actually.  Thank you.
 5            THE COURT:  And that's Bates ending 863; is that
 6    right?
 7            MS. RHEE:  Yes, Your Honor.
 8            THE COURT:  All right.
 9    BY MS. RHEE:
10    Q    Now, Mr. Bender, where you see a graphic in front of
11    you, you see at the top there's a box that's labeled DV3; do
12    you see that?
13    A    Sure.
14            MS. RHEE:  And the box actually that is the white
15    one over there.  Thank you.
16    BY MS. RHEE:
17    Q    And, again, is that just shorthand for DV360?
18    A    Yes, that would be.  Uh-huh.
19    Q    Okay.  And then the next box is Google Ads, which we've
20    just been talking about; right?
21    A    That's right.
22    Q    Okay.  And then the third box is AdX buyers; do you see
23    that?
24    A    I do.
25    Q    And what are AdX buyers?
```

                                                                44

Cross-examination - B. Bender

1    A     So those are buyers into the ad exchange.  That could

2    be other networks, it could be agency trading desks, those

3    types.

4    Q     And now when you see the lines going down to the boxes

5    at the bottom -- let's go through each of the boxes at the

6    bottom in turn; okay?

7    A     Sure.

8    Q     Okay.  So the first box is non-Google.

9          What does that represent?

10   A     There may be more there than I'm aware of, but

11   certainly as it relates to the Google Ads' case, that would

12   be the third-party exchanges that remarketing was able to

13   run on.

14   Q     And with respect to the next box, AdMob, what is that?

15   A     Sure.  AdMob is an app network, and Google Ads had the

16   ability to run into those environments as well.

17   Q     Because Google Ads can serve and transact mobile app

18   transactions; is that right?

19   A     Yes.

20   Q     Okay.  And then AdX, we've already talked about that.

21          And what is AdSense, the box there at the bottom?

22   A     Yeah.  AdSense, what I was referring to earlier, that's

23   a separate tag that many publishers across the Internet have

24   installed in order to get advertising from Google.

25   Q     And now when you see all the various lines in many,

                                                               45

Cross-examination - B. Bender

```
 1   many different colors, let's try to take each one of them in
 2   turn.  Okay.
 3           So starting with DV360, when you look at this
 4   graphic, is DV360 able to connect to the non-Google
 5   exchanges?
 6   A    Yes.  That would be the case.
 7   Q    And then, similarly, D360 allows its buyers to connect
 8   with AdMob; is that right?
 9   A    Correct.
10   Q    And similarly with AdX; is that right?
11   A    Yes.
12   Q    And then finally with AdSense; is that right?
13   A    That's correct.
14   Q    Okay.  And then turning to Google Ads, similarly is
15   Google Ads, through cross exchange bidder or AWBid, able to
16   connect with non-Google exchanges?
17   A    That's correct.
18   Q    Okay.  And what about AdMob?
19   A    Yes.
20   Q    Okay.  And what about AdX?
21   A    Yes.
22   Q    And what about AdSense?
23   A    Certainly.
24   Q    Okay.  And finally, the AdX buyers.  So those buyers
25   who are connecting through AdX, are they able to buy on
```

46

Cross-examination - B. Bender

```
 1    AdMob?

 2    A     It appears so.

 3    Q     And what about AdX?

 4    A     Certainly.

 5    Q     And what about AdSense?

 6    A     They can there as well.

 7    Q     Okay.  So now, Mr. Bender, you remember being asked on

 8    your direct examination about DV360 versus what was formerly

 9    the Google Display Network and now is referred to as Google

10    Ads; do you remember those questions?

11    A     Sure.

12    Q     Okay.  Now, what did you mean by the value proposition

13    of DV360 versus an advertiser who would choose to go and

14    purchase on the network?

15    A     There are -- you know, our customers broadly on the

16    buy-side are agencies, marketers who have a variety of

17    goals, and depending on those goals, some choose to use

18    Google Ads; some choose to use DV360, or, you know, DBM, and

19    some choose to multi-home, which is used in both, and we saw

20    a lot of customers doing that.

21          But what we wanted to do was help point customers

22    appropriately to basically the best what we call front door

23    for their goals.

24    Q     And when you say the best front door, what do you mean

25    by that?
```

Cross-examination - B. Bender

```
 1    A     Depending on the campaign, you know, you may be an
 2    agency who has a wide variety of clients, and there are some
 3    clients that want to deploy a more turnkey optimized
 4    campaign, and in those cases, we may suggest to them that
 5    they use Google Ads.
 6           There may be other customers who really are
 7    optimizing for broad reach who want to manage those
 8    campaigns themselves and run in a multi-exchange
 9    environment, and those customers we would point to use DBM,
10    and then there are customers, like I say, multi-home, they
11    find there's value in both, and over time they learn how to
12    set those up so that they're as complementary as possible.
13    Q     Now, you talked about how, at least at the outset when
14    DV360 was built out at Google, that if advertisers choose
15    DV360, the value proposition was something to the effect --
16    if I'm remembering your direct testimony, the onus is on the
17    advertiser to make sure that they took care of the quality
18    of the inventory on the other side.
19           Have I gotten that correct?
20    A     Yeah, that's fair.
21    Q     And why was the value proposition, at least with
22    respect to the onus of making sure that the quality of the
23    third-party inventory was what the advertiser wanted, why
24    was that different at the network?
25    A     Yeah.  So maybe it's worthwhile just talking for a
```

                                                              48

Cross-examination - B. Bender

```
 1    second about the nature of a platform relative to a network.
 2    Because I think that historically there was a deal that
 3    would have been done between a publisher website and an
 4    individual advertiser.  And they may have used the
 5    DoubleClick ad server on the buy-side to send those tags
 6    over to the publisher ad server, which may or may not have
 7    been the DoubleClick ad server.  But really the media on
 8    which that's all transacting are outside of any certainly
 9    Google media.
10            So that's -- it just -- from a philosophy
11    standpoint, things on the platform are set up to just enable
12    those transactions to happen broadly.
13            When it comes to advertisers coming to AdWords or,
14    you know, the network in this case, the -- there's a bit of
15    a different expectation that we had helped set, which was
16    that we would enable these advertisers and marketers to best
17    reach their business goals, whatever they may be, and I laid
18    some of those out earlier.  And part of that is that they
19    would be running in an unsafe, high-quality inventory.  That
20    was part of the value proposition.  And so I hope I answered
21    your question there.
22            THE COURT:  I want you to follow up.  I thought
23    you were going to make a clear distinction between platforms
24    and networks.
25            THE WITNESS:  Sure.  I could go into more detail
```

49

Cross-examination - B. Bender

```
 1   there.

 2              THE COURT:  Yeah.

 3              THE WITNESS:  So maybe going back a step in the

 4   history of a network, which is --

 5              THE COURT:  Well, a network consists of several

 6   platforms?

 7              THE WITNESS:  So I would explain it slightly

 8   differently.

 9              THE COURT:  All right.

10              THE WITNESS:  So historically if an advertiser

11   wanted to sell some sports shoe, they would potentially have

12   to reach out to many publishers individually, tens, hundreds

13   of publishers, and just the transactions there would be

14   individual, they would be negotiating with each of them for

15   the rate to run on their site, and then they would have to

16   send them an ad tag.  And so there's a lot of overhead, just

17   historically, in terms of how that worked.  It's more

18   similar even to how magazines used to work as far as these

19   individual publishers.

20              So the notion of a network was just to help

21   simplify that part of buying, where the publishers would

22   make some of their available -- some of their inventory,

23   rather, available for aggregation.  And so then an

24   advertiser would just have to come to a single network and

25   say I want to buy, you know, in your sports vertical.  And
```

50

Cross-examination - B. Bender

```
 1   this network may have a sports vertical, a travel vertical.
 2   And that represents, itself, maybe 100 sites.  But instead
 3   of having to transact with 100 different sites, they could
 4   share one single tag.
 5          So that's kind of what really the historical part
 6   of a network is, and then, you know, we added capabilities
 7   at Google to improve it beyond that.  But that's kind of the
 8   historically kind of perspective.
 9          A platform is really, you know, a term that's
10   used.  It's a mechanism for enabling ad serving, but it
11   doesn't necessarily have to do with the media at all.  So,
12   you know, many websites -- you know, CNET had its own ad
13   server.  And so, you know, when somebody comes -- an
14   advertiser comes and asks to run a campaign, they would
15   traffic it in their ad server, and it would run on the
16   appropriate days.
17          THE COURT:  But the server is basically -- loosely
18   spoken, that's the platform.
19          THE WITNESS:  That's right, yeah.  And I would say
20   it's kind of independent, just as far as these publishers
21   and advertisers who are using a platform can think of it as
22   their instance of a proprietary technology.
23          THE COURT:  Got it.
24   BY MS. RHEE:
25   Q    Just following up on the Court's question.
```

51

Cross-examination - B. Bender

```
 1              Mr. Bender, when you talk about the historical
 2   origin of the network and the aggregation of publisher
 3   inventory, what, if anything, did Google do to curate or
 4   call or ensure the quality of that publisher inventory made
 5   available on the network?
 6   A    So there's a lot of work done there.  You know, I'd say
 7   from when I started at Google, there was even just what we
 8   would call parity functionality that needed to be built for
 9   Google such that the network that we had would even work for
10   display advertising buyers, and part of that was ensuring
11   that the inventory was safe and of high quality.
12              And so that would have been work that carried
13   forward throughout my entire tenure, because the bad actors
14   in the ecosystem of course were continuing to evolve, and so
15   in order to be able to maintain quality, that work, you
16   know, fighting spam, fighting fraud, you know, continued
17   throughout.
18   Q    Now I want to turn your attention to O&O, otherwise
19   known as owned and operated properties.
20              Are there examples of owned and operated buying
21   tools that are available in the market?
22   A    Sure.
23   Q    And can you think off the top of your head about what
24   some of those might be?
25   A    Sure.  So to buy Facebook, you would go to their buying
```

Cross-examination - B. Bender

```
 1   tool.  That's where they make their site available for
 2   targeting.
 3   Q    And does Amazon have a buying tool available if there
 4   is one?
 5   A    Amazon would have one as well, yeah.
 6   Q    And so if a Google Ads' advertiser feels like it is not
 7   reaching its campaign goal or objective using Google Ads,
 8   are they free to choose to switch their spend to any of the
 9   other ad-buying tools out there, including Facebook and
10   Amazon?
11   A    Oh, yeah.  Absolutely.
12   Q    And in the time that you were at Google, how often
13   would you see that phenomenon?
14   A    I would say fairly frequently.  It's a very competitive
15   ecosystem.  The players would have evolved over my tenure.
16   But certainly, yeah, advertisers can move their money
17   elsewhere if they want.
18   Q    And does that include smaller advertisers?  Are they in
19   any way prohibited from choosing to buy through Facebook or
20   Amazon?
21   A    Yeah, certainly not, as far as I'm aware.
22   Q    I want to direct your attention to DTX 549, and that is
23   tab 2 in the binder in front of you.
24              THE COURT:  Any objection to 549?
25              MR. FREEMAN:  No, Your Honor.
```

                                                                  53

Cross-examination - B. Bender

```
 1              THE COURT:  All right.  It's in.
 2         (Defense Exhibit Number 549 admitted into evidence.)
 3    BY MS. RHEE:
 4    Q    And, in particular, I want to direct your attention to
 5    page 24 of this AdWords display overview.
 6              You see this is a slide that is -- and if you just
 7    turn and flip two pages beforehand under the section called
 8    market and competitive landscape.
 9    A    Yeah, I see that.
10    Q    Okay.  So let's actually just look at --
11              MS. RHEE:  Thank you so much.  Could we make that
12    even a little bit bigger for eyes?  Thank you.
13    BY MS. RHEE:
14    Q    Now, this is a projection into 2020, as well as it
15    looks like a historical overview; is that fair?
16    A    That seems to be what this slide is, yes.
17    Q    Okay.  And on the key code of this graphic, you see the
18    green represents Google, the various shades of green down
19    there?
20    A    Right.  Yeah.
21    Q    And you see the blue represents FB, Facebook; is that
22    right?
23    A    Yeah.  That would stand for Facebook.  Uh-huh.
24    Q    Okay.  There is an orange reference to Amazon, and
25    we'll get to why you don't see it in the graphic.
```

54

Cross-examination - B. Bender

1    A    Uh-huh.

2    Q    And then the purple is Criteo; do you see that?

3    A    I do.

4    Q    And the red is other; is that right?

5    A    Yes, that looks right.

6    Q    And then there are some bullets to accompany this

7    graphic, and the first bullet says:  "Google's share in

8    display is expected to stay largely flat"; do you see that?

9    A    Yeah, I do.

10   Q    And with a 19 percent CAGR.  Is that compound annual

11   growth rate?

12   A    That would be, yes.

13   Q    Okay.  Is that consistent with what you observed during

14   your time in the display ad business in terms of Google's

15   share?

16   A    Yeah.  I don't have any reason to dispute this.

17   Q    And, in fact, when we look at the graphic, it looks

18   like that green slope is very gently sliding down.

19   A    Yes.

20   Q    Okay.  Now, what about the blue -- because you see the

21   bullet point that starts with FB; right?

22   A    Right.

23   Q    And does it say here:  "FB is poised to outpace the

24   market at 24 percent compound annual growth, growing to a

25   56 percent share by 2020"; is that right?

55

Cross-examination - B. Bender

```
 1    A     Yeah, that's what it says.  Uh-huh.

 2    Q     And is that consistent with your observation of the

 3    competitive landscape while you were in the display --

 4    A     That is definitely consistent.

 5    Q     And then when you look at the graphic, you see the blue

 6    part of this graphic going up?

 7    A     Yep.

 8    Q     Okay.  And then, finally, you see the last bullet,

 9    which is 46 percent of the 2017 market -- because this is a

10    2017 doc -- is managed by others largely fragmented, Amazon

11    poses a new threat, but they are still expected to remain

12    very small through 2020; you see that?

13    A     Yeah, I do.  Okay.

14    Q     And, hence, we don't see a whole lot of the orange,

15    because in 2017, Amazon was just arriving on the horizon; is

16    that right?

17    A     Yeah, that's fair.  Yeah.

18    Q     Okay.  So now similarly, let's turn --

19          THE COURT:  I'm sorry.  Let me ask you a question.

20          Do you know whether this is directed to U.S.

21    market or world market, if you know?

22          THE WITNESS:  Yeah, I -- I don't know.  There

23    are -- I see some footnotes here that are possibly helpful,

24    but I don't believe I put together this slide.

25          THE COURT:  If you can read that footnote, you
```

Cross-examination - B. Bender

```
 1   have incredible vision.

 2           Does anybody know, for the record?

 3           MS. RHEE:  Your Honor, we will get back to you

 4   very shortly while we continue the examination for

 5   efficiency sake.  Is that all right?

 6           THE COURT:  Yes.  Thank you.

 7           MS. RHEE:  Okay.

 8   BY MS. RHEE:

 9   Q   Now, Mr. Bender, if I could direct your attention to

10   DTX 259, hopefully tab 3 in your binder.

11   A   Got it.

12           THE COURT:  Any objection?

13           MR. FREEMAN:  No objection, Your Honor.

14           THE COURT:  All right.  It's in.

15       (Defense Exhibit Number 259 admitted into evidence.)

16           MS. RHEE:  So now if we could go to page 4 of that

17   slide.  And again, for -- thank you, Mr. Spalding.  Okay.

18   BY MS. RHEE:

19   Q   And now this is a -- an assessment in the summer of

20   2015.  If you could see the bottom of the competitive

21   analysis internal to the company; is that right?

22   A   Yes, that looks to be.

23   Q   Okay.  And the top here begins with -- at the very top

24   of the white box:  The programmatic competitive landscape is

25   comprised of competitors with two types of solutions,
```

Cross-examination - B. Bender

```
 1    management and measurement.  Just paraphrasing to make this
 2    go faster.  Do you see that?
 3    A    Yeah.  I do.  Yeah.
 4    Q    Okay.  So if I could direct your attention, Mr. Bender,
 5    to the management players.  You see --
 6              MS. RHEE:  And, Mr. Spalding, maybe if you could
 7    make that -- yeah.  Just to make sure that people can read
 8    it.  Okay.
 9    BY MS. RHEE:
10    Q    Okay.  So in the paren, it says:  "Players we compete
11    against for share"; do you see that, Mr. Bender?
12    A    Yeah, I do.
13    Q    What does that mean?
14    A    My take and what I'm seeing here is this is a
15    representative sample of -- because the competitive space in
16    display and video advertising is very large.  Many
17    competitors, you know, on the order of hundreds.  But this
18    would have been, you know, a subset of those kind of used to
19    highlight the competitors in these areas, more on like what
20    we would consider the media side, which should be, you know,
21    where our network, what I was talking about before, would
22    play.  And then on ad tech, that would be where, you know,
23    some of our platform solutions would compete.
24    Q    And now, in fact, if I could direct your attention to
25    the paren at the bottom of the second column where it says
```

58

Cross-examination - B. Bender

```
 1    "list not exhaustive."

 2    A    Right.  I agree with that.

 3    Q    "Highly saturated competitive space."

 4         Is that consistent with what you were just

 5    explaining for us?

 6    A    Yes.  Absolutely.

 7    Q    Okay.  And also to the much smaller note at the bottom,

 8    it says:  "This segmentation is not meant to be entirely

 9    comprehensive."

10    A    Right.

11    Q    "Competitors here are representative only, and they've

12    been selected for analysis based on size of threat," and so

13    on; do you see that?

14    A    I do.  I see that.

15    Q    Okay.  And is that consistent with what you just

16    explained for us?

17    A    Yeah.  That's very consistent with what I just said.

18    Q    Okay.  And is this competitive analysis, at least in

19    the summer of 2015, consistent with your experience of the

20    competitive landscape while you were in the Google display

21    ads business?

22    A    It certainly is.  I was saying before, the shape of

23    which competitors were strongest at any given point in time

24    certainly evolved over my tenure.  This feels accurate to

25    me.
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Cross-examination - B. Bender

```
 1   Q    During your time in the display business at Google,

 2   Mr. Bender, was there ever a point in time in which the

 3   competitive landscape felt less competitive and not more

 4   competitive?

 5   A    No.

 6   Q    So I now want to switch topics since some portion of

 7   your direct examination was talking about AWBid or cross

 8   exchange bid; do you remember that?

 9   A    I do.  Yes.

10   Q    Okay.  Now, at Google when a product is piloted or

11   launched in full, is there a documentation called a products

12   requirement document or PRD?

13   A    Yes, there usually would be.

14   Q    Okay.  And is that customary and the practice at

15   Google?

16   A    Yeah.  I would say broader than Google, software

17   development techniques use PRDs, and they were used at

18   Google.

19   Q    So I want to direct your attention to DTX 129, and,

20   again, hopefully tab 4 in your binder.

21   A    Okay.

22         THE COURT:  Any objection to Defense 129?

23         MR. FREEMAN:  We do object to this, Your Honor, on

24   hearsay grounds.  It did not appear to be written by

25   Mr. Bender.  His name appeared nowhere on this document as
```

60

Cross-examination - B. Bender

```
 1   far as I can see.
 2              THE COURT:  Have you seen this document before?
 3              THE WITNESS:  I have.
 4              THE COURT:  I mean, not because you're getting
 5   ready for litigation.  But, I mean, during your course at
 6   Google, do you --
 7              THE WITNESS:  I don't recall.
 8              THE COURT:  Have you seen documents like this?
 9              THE WITNESS:  Certainly.
10              THE COURT:  I'm going to allow it in.
11              Overruled.  Go ahead.
12         (Defense Exhibit Number 129 admitted into evidence.)
13   BY MS. RHEE:
14   Q    So now before we look at just some specific portions of
15   this document, Mr. Bender, based on your direct examination,
16   I take it that you were a proponent of AWBid; is that right?
17   A    I was, and my views did evolve over my time.
18   Q    That's exactly what I was going to follow up on.
19              When you say that your views about AWBid, despite
20   being a proponent throughout, evolved over time.
21              Can you explain to the Court why they evolved?
22   A    I'd say, to start, when you're operating a buy-side
23   network, there's a naive idea that incremental inventory is
24   a good thing.  And I would say that's true, but not true if
25   that inventory is spammy or fraudulent or, you know,
```

61

Cross-examination - B. Bender

1    nefarious in some way.  And, you know, I would say that was
2    part of my education as we were pursuing this pilot was
3    to -- you know, to understand the work that we were required
4    in order to try to run incremental inventory sources that
5    potentially had those types of issues.
6    Q    So if I could direct your attention to page 3 of this
7    document under Roman Numeral V, brand safe protections; do
8    you see that?
9    A    Yeah.
10   Q    And you see as part of this PRD to launch the AWBid
11   pilot, there is an explanation that AWBid will require a
12   brand safe list of domains and publishers to protect GDN for
13   low quality or unsafe content; do you see that?
14   A    I do.
15   Q    And why is that?
16   A    Well, the expectation of advertisers and marketers that
17   are running campaigns on the network was that they would run
18   efficient and effective campaigns that would run on
19   brand-safe high-quality inventory.  And so it was important
20   that we solve that issue on their behalf.
21   Q    And just to back up so the Court can maybe understand
22   the context here.
23        Why is it easier to ensure when it's entirely
24   contained within Google, within the network, to provide
25   quality and safety of the inventory for your advertisers

Cross-examination - B. Bender

```
 1    versus integrating to a third-party exchange?
 2    A    So I'm not an expert at the art of brand safety, but I
 3    can give a high-level, which is --
 4         MR. FREEMAN:  Your Honor, I'm going to object on
 5    hearsay grounds.  He just said he does not know.  He has no
 6    personal knowledge.
 7         THE COURT:  Do you have personal knowledge?
 8         THE WITNESS:  Sure.  I've been in meetings where
 9    this is discussed.  I'm just -- I'm not a technical expert
10    in this space.
11         THE COURT:  Given his experience in the industry,
12    I'm going to allow him.  He's not an expert, he's just a
13    person who's got experience in the industry talking about
14    his experience and his understanding.
15         Overruled.  Go ahead.
16    BY MS. RHEE:
17    Q    If you could please --
18    A    Sure.
19    Q    -- answer for the Court.
20    A    Yeah.  So basically in order to be able to detect
21    whether fraud or spam is happening on an inventory, you need
22    to be able to evaluate that inventory.  And so the teams
23    underneath ad quality and brand quality worked on these
24    types of kind of filters and sniffers to be able to evaluate
25    the inventory that was flowing through either of the ad
```

63

Cross-examination - B. Bender

 1    exchange or through AdSense, and that would be capability

 2    that was built out over time.

 3            That capability didn't exist as it related to

 4    inventory that was available on these third-party exchanges.

 5    So those capabilities of being able to do the spam

 6    filtration, being able to detect fraud, et cetera, that was

 7    an incremental engineering build that was required in order

 8    to kind of ensure that same kind of level of safety and

 9    quality.

10    Q    So with respect to the AWBid pilot launch, in light of

11    what you just said, Mr. Bender, was there a reason, and, if

12    so, why focus on remarketing?

13    A    Yeah.  Well, as mentioned earlier, you know, part of

14    the value of remarketing is finding these browser IDs very

15    shortly after they've potentially abandoned the shopping

16    cart.  That's the most likely time that they will then

17    return to complete that purchase.

18            So there was a high value of being able to see

19    browser IDs in more places to that remarketing use case, and

20    so that kind of value tradeoff -- understanding that there

21    would be incremental work in order to support it -- it was

22    deemed valuable enough to do this for this targeting type.

23    Q    So now I want to fast-forward after the pilot launch to

24    DTX 230, and that is tab 5 in your binder.

25            THE COURT:  Any objection to 230?

                                                                    64

Cross-examination - B. Bender

```
 1            MR. FREEMAN:  Yes, Your Honor.  Objection on
 2   hearsay and double hearsay grounds.  There's comments all
 3   throughout this attributed to no one.
 4            MS. RHEE:  So if I may lay a foundation, Your
 5   Honor.
 6            THE COURT:  Go ahead.
 7   BY MS. RHEE:
 8   Q    You see in your binder DTX 230 is titled AWBid
 9   Publisher Quality Investigation; is that right?
10   A    I see that, yes.
11   Q    Now, when you were at Google, did you and your team, or
12   the team that you oversaw, routinely conduct investigations
13   into the quality of ad traffic and then actually report out
14   the findings of that investigation in the ordinary course of
15   running your business?
16   A    That absolutely would have been the case, and
17   especially for a project like AWBid.
18   Q    And when you say "especially for a project like AWBid,"
19   why is that?
20   A    Well, there was a concern that the inventory that was
21   available on these third-party exchanges had higher degrees
22   of spam, higher degrees of fraud, and understanding that
23   better would have been important for us to be able to
24   determine the work that we would need to put in in order to
25   safely run on that supply.
```

Cross-examination - B. Bender

```
 1              MS. RHEE:  Your Honor, at this time Google would
 2    seek to admit DTX 230.
 3              MR. FREEMAN:  We still object, Your Honor.
 4    There's still a double hearsay problem.
 5              THE COURT:  Yeah.  Yeah.  I'm going to sustain the
 6    objection for this one.
 7    BY MS. RHEE:
 8    Q    So now I'd direct your attention to DTX 545 then.  And
 9    right now I think we don't have it in the binder, but if we
10    might pull it up on the screen.
11    A    Okay.
12              MS. WOOD:  Do you have a copy for us, Counsel?
13              MS. RHEE:  I do in --
14              THE COURT:  Defense 545?
15              MS. RHEE:  Yes.  DTX 545.
16              THE COURT:  And that's not in this book; is that
17    right?
18              MS. RHEE:  No, Your Honor.  Given the Court's
19    ruling, I'm going to use another document.
20              THE COURT:  All right.  I need to see it as well.
21              MS. RHEE:  Yes, of course.
22              THE COURT:  Is there any objection to 545?
23              MR. FREEMAN:  Yes, Your Honor.  A similar
24    objection.  There are notes in the summary on page 2 that
25    are not attributed to anyone, including Mr. Bender.  A
```

                                                                  66

Cross-examination - B. Bender

```
 1    double hearsay problem.
 2              MS. RHEE:  Your Honor, first of all, we're seeking
 3    to admit the slide itself, and we can lay a foundation.
 4              THE COURT:  Well, see if you can lay a foundation.
 5    BY MS. RHEE:
 6    Q    You see the slide that is DTX 545, Mr. Bender?
 7    A    I do.
 8    Q    Now, is this something that you actually had direct
 9    knowledge and participation in?
10    A    I would have been on top of these types of materials,
11    yeah.
12    Q    And, in fact, was this an update to your boss?
13    A    I --
14              MR. FREEMAN:  Objection, Your Honor.  Leading in
15    terms of foundation.
16              THE COURT:  What does the word "custodian" mean?
17    Not the people who are cleaning the building.  So tell me
18    why you are using that term.
19              THE WITNESS:  I -- you can --
20              MS. RHEE:  No.  No.  No.  This is a question to
21    you.
22              THE WITNESS:  Oh, for me.
23              I believe this would have been sourced out of my
24    collection of documents.  So this would have been in my
25    document file that the legal teams have access to.
```

Cross-examination - B. Bender

```
 1              THE COURT:  So I'm not even sure I understand

 2   this.  You've got a time created.  Something was created in

 3   October of 2017, and then there's -- something was modified

 4   in March of 2018.

 5              I mean, have you seen this kind of structure

 6   before on communications at Google?

 7              THE WITNESS:  Yeah.  This appears to be metadata

 8   about the file.

 9              THE COURT:  Right.  So the -- it was initially

10   created in 2017, and several months later there was some

11   additions made to it or corrections?

12              THE WITNESS:  That's possible.

13              THE COURT:  I'm going to sustain the objection.

14              MS. RHEE:  So using the documents just to refresh

15   recollection and not to move them in --

16              MR. FREEMAN:  Objection, Your Honor.

17              THE COURT:  We haven't got a foundation yet.  You

18   haven't asked the question to which he was unable to answer.

19   All right.

20              Sustained.

21   BY MS. RHEE:

22   Q    You previously just testified to having a particular

23   concern with respect to the quality of ad traffic that was

24   coming in from third-party exchanges after the AWBid pilot

25   launch, just to level set to where we dropped off before all
```

Cross-examination - B. Bender

```
1   of the more technical discussion about documents; do you
2   remember that?
3   A    That's correct.  Yes, that's correct.
4   Q    Okay.  Now, do you recall having your team do some
5   investigation around the quality of ad traffic that was
6   coming through the third-party exchanges after the AWBid
7   launch?
8   A    That would have been something that we reviewed, yes.
9   Q    And what, if anything, do you remember about those
10  investigative findings or what the team was seeing after the
11  AWBid pilot launch with respect to the quality of inventory
12  coming in from third-party exchanges versus the quality of
13  inventory that already existed on the network?
14  A    So my recollection serves that there were instances of
15  spam and fraud detected in those additional source of
16  inventory, and in order to protect our customers, there
17  would be incremental engineering work required in order to,
18  you know, ensure that safety.
19  Q    And when you say that there were instances, is this a
20  one-off?  A two-off?  One single piece of inventory here?
21  One single inventory there?
22  A    Yeah, no.  My recollection would be that it was fairly
23  widespread.
24  Q    Now, when you left the display ad business in 2019, I
25  believe your testimony on direct is you left in November; is
```

69

Cross-examination - B. Bender

```
 1   that right?

 2   A    That's correct.

 3   Q    And after you left, even though you stayed at Google

 4   for a little while longer, did you have any involvement in

 5   the display ads business?

 6   A    No.

 7   Q    So I want to direct your attention to what the

 8   government showed you with respect to a 2016 chat.  Do you

 9   recall that Q and A with the government attorney?

10   A    I -- we talked about a bunch of things, but I'll take a

11   look.

12   Q    Just to be helpful, it's PTX 1736.

13   A    Okay.

14        MS. RHEE:  If we can just again highlight the date

15   at the top there.  Okay.

16   BY MS. RHEE:

17   Q    In 2016, Mr. Bender, what, if anything, did you know

18   about any DOJ or state attorney general investigation?

19   A    I wouldn't have.

20   Q    And to your knowledge, are you aware of whether or not

21   there even was one?

22   A    No.

23   Q    And in this communication with Mr. Shodjai here when

24   you wrote the chat, was there any intention on your part to

25   keep the subject of the chat away from regulatory scrutiny
```

70

Cross-examination - B. Bender

```
 1   or investigative discovery?

 2   A    No.

 3   Q    And finally just with respect to Mr. Shodjai, at that

 4   point in time, how many employees reported to you?

 5   A    On the order of 50.

 6   Q    And when you were part of the display ads business, at

 7   any point in time did all of the employees who reported to

 8   you agree with each other?

 9   A    No.

10   Q    And when employees wrote to you with their thoughts,

11   what, if anything, did that reflect of your views?

12   A    It would have been information to me, but, you know,

13   like I said earlier, anything substantive would have been

14   discussed in other formats, whether it was a document or a

15   meeting, to, you know, make decisions about.

16   Q    And at Google when you were there, especially in the

17   display ads business, was there a robust discussion about

18   topics of disagreement?

19          MR. FREEMAN:  Objection, Your Honor.  Vague.

20   Robust.

21          THE COURT:  No.  We know what robust means.  No.

22   Overruled.

23   BY MS. RHEE:

24   Q    If you could answer the question.

25   A    Yeah, I would say so.  We had very active discussions
```

71

Cross-examination - B. Bender

```
 1    of ranges of options, you know, some of which were never
 2    pursued.
 3    Q    Now, I want to direct your attention to this document
 4    that the government talked to you at length about in the
 5    direct examination, and that is PTX -- apologies, let me
 6    find it -- 1814.
 7              Now if we could start at the very top again just
 8    so we can orient everybody to the date.
 9    A    Yep.
10    Q    In January of 2009, how long had you been at Google?
11    A    I believe we joined in April 2008.  So just shy of a
12    year.
13    Q    So if I've done my math correctly, is that eight months
14    or so?
15    A    Sounds right.
16    Q    Okay.  And when you answered, you said that "we" had
17    been at Google just shy of a year or eight months.
18              Who's the "we" in that answer?
19    A    Oh.  Well, anyone who would have come across with the
20    acquisition.  So that would include, you know, someone like
21    David.
22    Q    Okay.  And on direct examination, you talked about how
23    Mr. Rosenblatt, when he came over to Google at this time
24    eight months in, I believe you said on direct, he did not
25    have an operational role; is that right?
```

Cross-examination - B. Bender

```
 1    A      That's my recollection, yeah.
 2    Q      Okay.  What do you mean by an operational role?
 3    A      So my understanding is he didn't have a team, nor was
 4    he, you know, responsible for day-to-day decisions for the
 5    business.  But he -- I think he was there to lend advice to
 6    ensure that the acquisition, you know, was successful until
 7    he left.
 8    Q      And when did he leave, if you remember?
 9    A      I don't recall, but I -- it's likely around the year
10    mark of the acquisition.  So it would have been likely
11    around April of that year.
12    Q      Okay.  So after this email, is it your best
13    recollection that he left very shortly thereafter?
14    A      Yeah, that's fair.
15    Q      Okay.  Now, directing your attention to just what you
16    wrote in this email, you said:  "It's a long read, but when
17    you have a chance, it's worthwhile to get his perspective."
18            Who is the "his" in that sentence that you wrote?
19    A      That would refer to David.  So it would be David's
20    perspective.
21            I would just note, it seems like I also attached a
22    recent analyst's report, which would be yet another
23    perspective, the idea being giving some of my team members
24    some additional perspectives in advance of a meeting that I
25    was having the following week.
```

                                                                    73

Redirect examination - B. Bender

```
 1   Q    And when you say another attachment, is that the

 2   attachment that the government referred to in the

 3   examination that they did not take you through?

 4   A    I -- that may be the case.

 5   Q    Okay.  And --

 6            MS. RHEE:  I think with that, Your Honor, I would

 7   pass the witness back.

 8            THE COURT:  All right.  Any redirect?

 9            MR. FREEMAN:  Yes, Your Honor.

10            Before I get started, there was an insinuation as

11   if we were hiding some part of 1814, so we move to admit all

12   of it, Your Honor, including the attachments.

13            THE COURT:  Any objection?  Because you did open

14   the door, to some degree.

15            MS. RHEE:  No objection, Your Honor.

16            THE COURT:  All right.  So we'll change the

17   ruling.  So all of 1814 is in evidence.

18     (Plaintiffs' Exhibit Number 1814 admitted into evidence.)

19            MR. FREEMAN:  Thank you, Your Honor.

20                      REDIRECT EXAMINATION

21   BY MR. FREEMAN:

22   Q    I want to start with one of the exhibits you were

23   talking about on cross-examination, DTX 1508.  It should be

24   the first tab of the binder that you were given.

25   A    Yeah.  I got it.
```

74

Redirect examination - B. Bender

```
 1   Q    The first one is starting with that first page, which
 2   we talked about before.
 3            Your name is nowhere near -- I'm sorry.  Not on
 4   the custodian field?
 5   A    That is correct, yep.
 6   Q    Nor is your name on the all custodian field?
 7   A    Correct.
 8   Q    And, in fact, throughout this entire exhibit -- which I
 9   believe is 22 pages -- your name does not appear anywhere;
10   right?
11   A    I haven't reviewed the full document, but that may be
12   the case.
13   Q    Okay.  We can look at the first opening slide.
14            Your name doesn't appear as the author of this
15   particular slide deck, and there's no author on it; right?
16   A    That's true.  Yep.
17   Q    Okay.  And then, in particular, you were shown page 8
18   of this exhibit; right?  And you were --
19   A    Yes, I recall that, yep.
20   Q    And you walked through various questions about this
21   particular graph that we're talking about; right?
22   A    Yep.
23   Q    And in particular, there's questions that this graph
24   shows a direct line from Google Ads to non-Google; do you
25   see the blue line?
```

75

Redirect examination - B. Bender

```
 1   A     I do.
 2   Q     That is not -- that pattern is not the same in terms of
 3   quantity of inventory; right?  Of the other lines.
 4   A     I believe that's true.
 5   Q     And it makes no distinction, this graph, between
 6   remarketing inventory and all other buckets of inventory;
 7   right?
 8   A     That's fair.  Yep.
 9   Q     So it overly simplifies it to show all buckets of
10   inventory as the same?
11   A     That's your characterization.
12   Q     I'm asking you what distinction are they making.
13   A     It's not my graphic, so I don't know.
14   Q     Well, you testified in great detail about it in
15   cross-examination, and now you don't know?
16   A     What I was saying is, I could identify that DV3 does
17   run on non-Google and AdMob and AdX and AdSense.  Just the
18   words on this page, it's helpful from that standpoint, but I
19   wasn't asked about any other detail, of which I don't claim
20   to have further detail.
21   Q     And, in particular, if you could then go to DTX 549,
22   which is tab 2.  Just starting on the first page.  This is a
23   slide deck, right, that was marked confidential and
24   privileged; right?
25   A     Okay.
```

Redirect examination - B. Bender

```
 1   Q     Correct?

 2   A     It says it there, yes.

 3   Q     And was it Google's practice to mark slide decks as

 4   confidential and privileged even though there were business

 5   decisions being discussed?

 6   A     I don't think so.

 7   Q     You don't think so.

 8         So then take your time in DTX 549 and show me

 9   where a legal question is being asked.

10         MS. RHEE:  Your Honor, this is the exhibit that

11   the government objected to for which we were not able to ask

12   any questions of the witness.

13         MR. FREEMAN:  I don't believe that's correct.

14         MS. RHEE:  I apologize, Your Honor.

15         THE COURT:  That's not, yeah.

16   BY MR. FREEMAN:

17   Q     Maybe we can go to page 3.

18         The agenda for this particular slide deck says:

19   Evolution of value proposition, 2017 revenue, customers,

20   competitive landscape, products, and display strategy and

21   forecast; right?

22   A     I see that, yeah.

23   Q     Right.  And nothing on there says legal or legal

24   question?

25   A     Not on this agenda side, that's correct.
```

77

Redirect examination - B. Bender

```
 1    Q     And so when you said it was not the practice at Google
 2    to mark things as confidential and privileged for business
 3    decisions, this is just the anomaly; is that what you're
 4    saying?
 5    A     That is not what I said.
 6    Q     Okay.  What did you say?
 7    A     I don't believe I said much.  I can talk to -- the
 8    training that happened would have helped educate people
 9    about the appropriate use of attorney/client privilege.  It
10    may or may not have been universally adopted.
11    Q     And the training you're talking about was called
12    Communicate With Care; is that what you're referring to?
13    A     Yep.
14    Q     And the instructions you got through Communicate With
15    Care was to mark things as confidential and privileged for
16    sensitive topics?
17    A     As far as I recall, it would have been largely in two
18    buckets.  One is if you have a question for a lawyer, you
19    would try to ensure that the appropriate lawyer was on the
20    email, and insofar as that was legal kind of communication,
21    that would be privileged.
22          There were other cases when there was work product
23    that was directed by the legal team, and that would be
24    another case where I think attorney/client privilege would
25    have been warranted.
```

78

Redirect examination - B. Bender

```
 1   Q    But then there's a third bucket, as indicated in
 2   DTX 549, of marking things privileged where the agenda were
 3   business decisions; right?
 4   A    Again, you asked me about the training.  That's what I
 5   recall from the training.
 6   Q    Okay.
 7   A    So I don't believe the -- I don't remember if the
 8   training included anything like what you're talking about.
 9   Q    In particular, if you can go to page 14.  There's a pie
10   graph you should see.
11   A    Uh-huh.
12   Q    And do you see AWBid there on the right-hand side of
13   6.1 percent?
14   A    I do.
15   Q    So that line that you were shown in the previous
16   exhibit -- and we can pull it up if you want in 1508 -- that
17   line only represented 6.1 percent of AdWords display
18   inventory sources?
19   A    The way this reads to me is that this is a spend
20   figure, not necessarily an inventory quantity figure.
21   Q    So the spend figure of AWBid was only 6.1 percent;
22   right?
23   A    That's what's written here, yep.
24   Q    And then going then to the graphic that you spent some
25   time on on page 24 of DTX 549.
```

79

Redirect examination - B. Bender

```
 1   A     Yes, I see that.

 2   Q     First off, you didn't make this graph; right?

 3   A     I don't believe I did.

 4   Q     And you don't remember any of the underlying data to

 5   support this graph; right?

 6   A     No.  I see the footnotes the same as you.

 7   Q     And this graph that you testified about, these are mere

 8   projections; right?  Not actual statistics?

 9   A     If my recollection serves, this would have included

10   actual data per these sources up through maybe 2017, and

11   then the projection would be beyond that.

12   Q     So this is only Google's in-house projection of the

13   market in 2019 and in 2020?

14   A     I believe it would be projections including 2018 as

15   well.

16   Q     So the last three years on the right-hand side of the X

17   axis, if you're with me, are projections, not data?

18   A     That sounds -- that sounds right based on my

19   understanding.

20   Q     And then moving to DTX 259, in particular page 4 you

21   spent some time on.

22   A     Okay.  Yeah.

23   Q     And there were some questions related to -- I believe

24   it was phrased in the questions and on the slide as the

25   competitive landscape; right?  Correct?
```

80

Redirect examination - B. Bender

```
 1   A    That's what it's called on the slide, yes.

 2   Q    And you stated that this was a fair representation of

 3   the competitive landscape as you understood it?

 4   A    I believe if we look at the record, I was saying the

 5   set of competitors was much larger than what this slide

 6   includes.  But this is a, you know, representative sample at

 7   the time, and that feels fair to me.

 8   Q    All right.  But you didn't make this slide; right?

 9   A    No.

10          THE COURT:  What do you understand the term "media

11   agnostic" to mean?

12          THE WITNESS:  So in my mind, this would be more of

13   a -- the ad tech players.  So more similar to that platform

14   that I was talking about earlier where they weren't

15   necessarily managing media themselves, but other media

16   players were using their technology to enable ad serving in

17   some form.

18          THE COURT:  Versus the tech titans in the first

19   column?

20          THE WITNESS:  Yeah.  The first column,

21   constituency would have had their own media to manage as

22   well.

23   BY MR. FREEMAN:

24   Q    Just to follow up on the Court's question, what do you

25   understand, in the first column under tech titans, garden
```

81

Redirect examination - B. Bender

```
 1    potential, what does that mean?
 2    A    There's a term that gets used in a variety of ways, the
 3    distinction between the open web and a walled garden.  A
 4    walled garden can mean a variety of things, actually.
 5              But in some cases, it's a set of media that you
 6    can only access through a log-in, would be an example of --
 7    it's not on the open web, it's not necessarily searchable on
 8    the open web.  The purchase of that inventory by buyers may
 9    also be a proprietary kind of user interface like we were
10    talking about with Facebook as an example.
11    Q    Your understanding of the competitive landscape as you
12    testified on cross was much different than you testified
13    three months ago in June of 2024; right?
14    A    I -- I don't recall.
15    Q    Do you recall just in June of this year stating that
16    you didn't know how the technology of header bidding worked;
17    right?
18    A    I -- yeah.  I believe I said something similar today.
19    Q    And you stated that you didn't know who participated in
20    header bidding?
21    A    Off the top of my head, that's correct.  That would
22    have been publishers who were implementing that, which is a
23    different set of folks in general from some of the names
24    listed on this slide.
25    Q    Well, in particular when we talk about parts of this
```

82

```
 1    slide, you were asked what -- whether other exchanges are

 2    non-Google exchanges, to which you said you didn't know;

 3    right?

 4    A    I don't know.  I don't recall the exact question I was

 5    asked.

 6    Q    Sure.

 7    A    I was trying to ask it -- and answer, you know,

 8    factually based on my information on that day.

 9    Q    So you didn't know who participated in header bidding

10    three months ago?

11    A    Yeah.  Off the top of my head, I couldn't tell you the

12    list of publishers that were participating.

13    Q    You didn't know whether Facebook allowed advertisers to

14    buy inventory on their website three months ago; right?

15    A    That doesn't sound right, but we could take a look at

16    the transcript.

17    Q    Okay.  So behind you is a binder -- a different binder.

18            THE COURT SECURITY OFFICER:  This one, Counsel?

19            MR. FREEMAN:  Yeah.  The one that says deposition

20    testimony.

21    BY MR. FREEMAN:

22    Q    There's two tabs of your depositions, the one that says

23    MDL deposition tab.

24    A    Yeah.

25    Q    And we'll start with -- on page 55.
```

Redirect examination - B. Bender

1    A    Yep.

2    Q    On line 17 you were asked a question:  "What categories

3    PubMatic -- what categories are PubMatic and Rubicon in"; do

4    you see that?

5    A    Yep.  I do.

6    Q    Does reading your answer refresh your recollection of

7    you didn't know whether they were exchanges; they were just

8    merely on the sell-side?

9    A    Yeah.  I said they were on the sell-side, and I didn't

10   recall if they had an exchange.

11   Q    And then staying on that page on page 55 at the

12   beginning -- at the very top, you see you were asked about

13   Criteo?

14   A    Uh-huh.

15   Q    "Is Criteo a rival exchange?"  Do you remember what you

16   said there?

17   A    I could read it back.  It says:  "I wouldn't

18   characterize them that way."

19   Q    And then it says:  "Are they a rival ad-buying tool?"

20   A    And I stand by this answer:  "They were focused, as far

21   as I can recall, on helping buyers reach their campaign

22   objectives."

23   Q    And then in particular:  "Would you describe Criteo as

24   an ad-buying tool?"  And your response is you didn't know?

25   A    Yeah.  I said:  "I think they were another solution

84

Redirect examination - B. Bender

```
1    that advertiser marketers used to help reach their campaign

2    objectives."

3    Q     Yeah.  So you didn't know what tools Criteo offered

4    three months ago?

5    A     They offered a solution.  You can call it a tool.  But

6    I didn't know their specific tools.  Advertisers would use

7    Criteo to try to reach their business objectives.  They were

8    very competitive in their remarketing space.

9    Q     Okay.  And going back to page 49.

10   A     Uh-huh.

11   Q     Starting on line 19, you were asked a question:

12   "Facebook doesn't allow advertisers to use GDN to buy web

13   inventory on Facebook's page; is that right?"  And you said

14   you didn't know; right?

15   A     Yeah.  I think that was a question of whether GDN

16   itself could buy on Facebook, and my answer is I'm not sure.

17   Yeah.

18   Q     All right.  So even though you're in charge of the

19   buy-side, including GDN for years, your testimony three

20   months ago is that you didn't know whether you could buy

21   Facebook inventory?

22   A     I'd say over my tenure, things evolve.  It's possible

23   that some of that inventory was available in one of these

24   new places that we bought, and I wouldn't want to testify

25   inaccurately.
```

85

Redirect examination - B. Bender

```
 1   Q    Right.  So three months ago you testified you didn't

 2   know; right?

 3              THE COURT:  Counsel, it's been repeated.  Move on.

 4              MR. FREEMAN:  Understood.

 5   BY MR. FREEMAN:

 6   Q    Moving on to you answered a lot of questions about

 7   brand safety in particular to AWBid; right?

 8   A    Uh-huh.

 9   Q    But there were spam problems or ad fraud problems

10   within Google's products; right?

11   A    There would have been.

12   Q    Right.  So there was problems in spam coming through

13   Google's AdX?

14   A    That sounds right.

15   Q    Are you familiar with an actor group called 3Ve, but

16   spelled 3-V-E?

17   A    Not offhand.

18   Q    And going back to PTX 587.

19   A    Uh-huh.

20   Q    This is an email exchange we talked about discussing

21   header bidding revenue going outside the ecosystem?

22   A    Uh-huh.

23   Q    And so when you, Mr. Bellack and Mr. Shodjai were

24   discussing in real time the problems with header bidding on

25   third-party exchanges, there's no discussion at all about
```

86

Redirect examination - B. Bender

```
 1   brand safety; right?

 2   A    That would have been well known, but it's not here in

 3   the doc.

 4   Q    There was no discussion about spam inventory being on

 5   third-party exchanges?

 6   A    Not in this email.

 7   Q    And the only problem that the three of you leadership

 8   roles at Google, was the problem was that header bidding

 9   exists; right?

10   A    I don't agree with that.

11   Q    You don't agree that, in real time, that's what was

12   said?

13   A    I -- we can see that that's what Payam wrote.

14   Q    That's right.

15   A    But I can also say I don't agree with that.

16   Q    But there's nothing within this email that you

17   indicated when you forwarded to Payam that you disagreed

18   with any fact?

19   A    His -- this is a response from Payam to me.

20   Q    There's nothing in PTX 587 that talks about what you're

21   talking about; right?

22            MS. RHEE:  Your Honor, at this point that's --

23            THE COURT:  Sustained.

24   BY MR. FREEMAN:

25   Q    You talked about briefly chats on cross-examination.
```

87

Redirect examination - B. Bender

```
 1              Just how many chats did you intentionally preserve
 2    after you were given a litigation hold in 2019?
 3    A    Well, I would note I believe I got the litigation hold
 4    in October, and I left the ads team in November.  So from --
 5    Q    That's not my question.
 6    A    That context is important.
 7              I was not on the ads team for very long.  And, as
 8    previously noted, I didn't generally engage in substantive
 9    conversations over chat.  So I don't recall toggling it on,
10    because if I -- you know, I would be following the
11    instruction, but I also would have generally not been
12    engaging in substantive chat.
13    Q    So you don't recall whether you ever saved anything
14    after receiving the litigation hold of chats?
15    A    I think I've already answered that question.
16    Q    I don't think you have.
17              THE COURT:  We're not going to have an argument.
18              Just so we're clear, when did you get the
19    litigation hold?
20              THE WITNESS:  I believe it was October of 2019.
21              THE COURT:  And you left in November of 2019?
22              THE WITNESS:  That's correct.
23              THE COURT:  All right.  From the time you got the
24    litigation hold to the time you left, did you do anything to
25    change the default option on your system?
```

Redirect examination - B. Bender

```
 1                 THE WITNESS:  I don't believe I did.
 2                 THE COURT:  So you didn't just switch -- as I
 3       understand, it's basically switching a button to go from
 4       erase, or whatever it's called, to history, you didn't do
 5       that?
 6                 THE WITNESS:  No.  I would have -- I left the
 7       defaults as is.
 8                 THE COURT:  Why?
 9                 THE WITNESS:  In general, I wasn't engaging in
10       substantive conversations over chat.  And so the way I would
11       use chat, because we were geographically dispersed, it's
12       more like bumping into someone in the hall and saying, hey,
13       we should talk.
14                 THE COURT:  Yeah.  But didn't the litigation hold
15       say save everything?
16                 THE WITNESS:  I believe it said if you engage in
17       substantive conversation, then you should save it.
18                 THE COURT:  Down the road, for the record, you can
19       give me the litigation hold documents; all right?
20                 MR. FREEMAN:  Yes, Your Honor.
21                 THE COURT:  What the instructions were to the
22       people.
23                 MR. FREEMAN:  Yes, Your Honor.
24                 THE COURT:  All right.
25                 MR. FREEMAN:  I have nothing further, Your Honor.
```

89

Redirect examination - B. Bender

```
 1              THE COURT:  All right.  Is there any recross?

 2              MS. RHEE:  No, Your Honor.

 3              THE COURT:  All right.  This is the perfect time,

 4    we'll take our morning break.

 5              Does anyone anticipate calling this witness again

 6    during the course of the trial?

 7              MR. FREEMAN:  No, Your Honor.

 8              THE COURT:  How about from Google's standpoint?

 9              MS. RHEE:  No, Your Honor.

10              THE COURT:  All right.  Then, Mr. Bender, you are

11    now excused as a witness.  That means you may stay and watch

12    the proceedings or leave, but you're not to discuss your

13    testimony with any witness who has not yet testified.

14              All right.  And we'll take our morning break.

15    We'll start up again at 11:30.  Thank you.

16                        (A recess was taken.)

17              THE COURT:  All right.  Are we all set for the

18    next witness?

19              MR. VERNON:  Good morning, Your Honor.  Jeff

20    Vernon for the United States.

21              Plaintiffs call Professor Ravi.

22              THE COURT:  All right.

23              THE DEPUTY CLERK:  Can you raise your right hand.

24    Thereupon,

25                        RAMAMOORTHI RAVI,
```

90

Direct examination - R. Ravi

1   having been called as a witness on behalf of the plaintiffs

2   and having been first duly sworn by the Deputy Clerk, was

3   examined and testified as follows:

4                   (Time noted: 11:32 a.m.)

5               THE DEPUTY CLERK:  Thank you.

6                       DIRECT EXAMINATION

7   BY MR. VERNON:

8   Q    Good morning, Professor Ravi.

9   A    Good morning.

10  Q    Can you please describe your professional background.

11  A    I'm a professor of operations research and computer

12  science at Carnegie Mellon University.  I have an

13  undergraduate degree in computer science from the Indian

14  Institute of Technology at Madras.  And I have a master's

15  and doctoral degree, both in computer science, from Brown

16  University.  And I'm currently broadly working in the area

17  of discrete optimization.

18  Q    And what is discrete optimization?

19  A    Discrete optimization is an area of applied

20  mathematics, computer science that has to do with the

21  optimal allocation of discrete or whole number decisions.

22           So one example would be deciding how many truck

23  drivers you would need to satisfy all the deliveries in a

24  particular county.  So that's a discrete decision.  So

25  that's an example.

                                                            91

Direct examination - R. Ravi

```
1   Q    And what is the relationship between discrete

2   optimization and auction design?

3   A    Many of the conducts in this case involve solving

4   discrete optimization problems.  So there is a lot of

5   application of discrete optimization broadly in digital

6   advertising as well.

7   Q    And what consulting work have you done?

8           THE COURT:  Well, is there any objection about the

9   qualifications of Dr. Ravi?

10          MR. ISAACSON:  No, Your Honor.

11          THE COURT:  All right.  Are you moving him in as

12  an expert?

13          MR. VERNON:  Yes, Your Honor.

14          THE COURT:  In the field of discrete optimization?

15          MR. VERNON:  That's right.

16          THE COURT:  All right.  Then he is so qualified.

17  Just give me the exhibit number so it's in the record and

18  we'll move on.

19          MR. VERNON:  You mean the exhibit of his CV?

20          THE COURT:  Yes.

21          MR. VERNON:  It's 1780.  The United States would

22  move to admit PTX 1780.

23          THE COURT:  Any objection to 1780?

24          MR. ISAACSON:  No objection.

25          THE COURT:  All right.  It's in.
```

Direct examination - R. Ravi

```
 1      (Plaintiffs' Exhibit Number 1780 admitted into evidence.)

 2    BY MR. VERNON:

 3    Q    Let's turn to your opinions in this case, Professor

 4    Ravi.

 5              What aspects of Google's display auctions did you

 6    analyze?

 7    A    I analyzed several conducts, and among them were first

 8    look, last look, Project Poirot and UPR.

 9    Q    How did you analyze those conducts?

10    A    I reviewed the PRDs or design documents that were

11    discussed earlier, dozens of them.  I then also reviewed the

12    discussions surrounding them, including experiments

13    conducted on various portions of them.  I also looked at

14    interim documents that converted these design documents into

15    sort of pseudocode, code that can be then converted into

16    software.  And I also looked at several snapshots of

17    Google's source code implementing these conducts.

18    Q    Just at a high level, how did you use your computer

19    science background in the work that you just described?

20    A    Many of these design documents involved formulations of

21    these discrete optimization problems.  They also involved

22    having to read through the pseudocode that implements the

23    details of how the algorithms were actually coded.  And also

24    my computer science background was very useful in reading

25    and understanding the source code that implemented the logic
```

93

Direct examination - R. Ravi

```
  1    in these documents.
  2    Q    And can you summarize your conclusions with respect to
  3    the four conducts that you mentioned?
  4    A    The conducts that I mentioned I concluded that, broadly
  5    speaking, they were not implemented in an optimal way to
  6    sell these impressions on behalf of Google's customers.  I
  7    also concluded that these design decisions typically
  8    advantaged Google's own products and disadvantaged the other
  9    products that were available in the ad tech stack.
 10    Q    Before we discuss this conduct, let's discuss a few
 11    quick points about auctions.
 12         First, why are auctions useful in selling
 13    impressions in this business?
 14    A    So auctions are broadly useful when you don't know what
 15    the price or the value of an item is.  So when you're
 16    selling an impression, which has several characteristics
 17    about it, with unknown value, an auction is a particularly
 18    good way to try to get the best price you can for, and
 19    that's why auctions are relevant to this case.
 20    Q    Let's walk through the difference between a first-price
 21    and a second-price auction.
 22         Starting with the first-price auction, can you
 23    explain what that is?
 24    A    Yes.  We've been through this a few times.
 25         A first-price auction is one where bids are
```

94

Direct examination - R. Ravi

1    solicited, and in this case an impression is given to the

2    highest bidder.  And it's called a first-price auction

3    because the price that the person pays is the highest price,

4    the highest bid.

5    Q    And can you explain what a second-price auction is?

6    A    The same setup.  We have bidders bidding, the

7    impression is still given to the highest bidder, but the

8    price is the second highest bid in the auction.

9    Q    And can you turn in your binder to Demonstrative AA.

10   A    Oh, it's here.

11   Q    Can you use this demonstrative to explain an example of

12   the difference between a first-price and second-price

13   auction?

14   A    Yes.  In this auction, we see three bidders, A, B and

15   C.  In the first-price auction, the first panel on the left,

16   the highest bidder, the one who submitted the bid of $5, A,

17   wins.  And because it's a first-price auction placed, his or

18   her own bid, that's $5.

19          In the right panel, it's the same setup, same

20   bids.  The winner and still the highest bidder, A, but now

21   the price that he or she pays is the second highest bid,

22   which is the $3 bid of Bidder B.

23   Q    What is a price floor?

24   A    A price floor is an additional control mechanism in

25   this auction.  It's a floor below which the seller does not

95

Direct examination - R. Ravi

1    want to sell the item.

2    Q    And in a second-price auction, how does the price floor

3    affect the price that the buyer pays?

4    A    So a price floor is a number such that any bid below

5    that is just rejected.  So if the price floor did happen to

6    lie between that 3 and $5, then the price that the highest

7    bidder would pay would be the price floor.  So that's how it

8    sometimes sets the price in a second-price auction.

9    Q    So we can set Demonstrative AA aside.

10           Let's discuss first look.  Before the emergence of

11   header bidding, when a publisher used DFP as its ad server,

12   which exchange typically bids first?

13   A    So the way that DFP was set up, AdX, that is Google's

14   own AdX exchange, would go first.

15   Q    And how would that affect publishers' revenue?

16   A    It would give them less revenue, because sometimes the

17   highest valued bidder is not coming through AdX, and AdX

18   might have bought that same impression for a lower floor

19   price.

20   Q    How would AdX bidding first affect whether impressions

21   are matched with the advertiser willing to pay the most

22   amount of money for the impression?

23   A    Well, again, if the advertiser who's willing to pay the

24   most money is further down the line and does not get to win

25   that impression, this impression is not going to the

96

Direct examination - R. Ravi

1    advertiser that wants it the most.  The match is not

2    efficient.

3    Q    And how did AdX bidding first affect exchanges?

4    A    It deprived them of even the opportunity to look at the

5    impressions that AdX already won.

6    Q    Let's talk about first look and real time as compared

7    to static bids.  And I think the first question is, what is

8    a static bid?

9    A    A static bid in this context is one that represents an

10   average price that an exchange is willing to pay.  So, in

11   this case, the static bid would typically be computed as

12   something like the average revenue or the average number of

13   impressions.

14          More broadly, a static bid is one that is unable

15   to take into account the real-time features of this

16   impression that's being sold.  It's just an average price

17   given to all the impressions of this particular type.

18   Q    I think you said a static bid would be unable to take

19   into account some real-time features of the impression.

20          Can you just give an example of how that would

21   work in practice?

22   A    Sure.  So let's say we have a page view, an impression

23   generated by someone who's interested in buying a car.  If I

24   was going to submit a static bid to buy an impression like

25   that of that type, that static bid is just an amount that

97

Direct examination - R. Ravi

```
 1    I'm willing to pay for all impressions of that type, and I
 2    wouldn't be able to adjust that static bid up or down
 3    depending on whether I'm talking to or I'm looking at an
 4    impression from someone who's more or less interested.  So
 5    it really does not use the power of real-time bidding at
 6    all; it's just an average number that I'm assigning to a
 7    certain slice of impressions I'm interested in.
 8    Q    And so in contrast to a static bid, what is a real-time
 9    bid?
10    A    It is the one that takes into account all this
11    information coming along with the impression in the form of
12    user interest, user demographics, the so-called cookie
13    information, for example.
14    Q    So if one exchange is bidding on a real-time basis and
15    another exchange is bidding on a static basis, which
16    exchange is more likely to win more valuable users?
17    A    Intuitively, the one that is able to take into account
18    the particulars of that real-time information, and thereby
19    take into account its value better is able to more likely
20    win that auction against a static bid.
21    Q    And just to back up really quickly, a minute ago you
22    referred to cookie information.
23         Can you just describe what that is briefly?
24    A    So when impressions are sold, they come usually
25    attached with information that describes what time of day is
```
98

Direct examination - R. Ravi

```
 1   it, and what is the geographic location, is there any more
 2   information we can gather about the user's interest based on
 3   the other websites that she has visited.  So these are the
 4   examples of real-time information that's incorporated that
 5   real-time bid can take into account that a static bid
 6   cannot.
 7   Q    And when DFP is the publisher ad server, how is the
 8   floor that is sent to AdX calculated?
 9   A    So when AdX tries to run its auction in DFP, the floor
10   price is typically the highest static bid submitted by the
11   other exchanges further down the waterfall.
12   Q    And when AdX bids, does it submit real-time bids or
13   static bid?
14   A    AdX runs an auction for its buyers, and they are able
15   to generate or submit real-time bids.
16   Q    How does AdX submitting real-time bids against a floor
17   that is based on static bids affect who wins the more
18   valuable impressions?
19   A    As we were just saying a little while ago, a real-time
20   auction, one that is able to provide real-time bids based on
21   the real-time information, is more likely to win
22   particularly the more valuable impressions, the ones where
23   there's real value reflected in that information.
24   Q    Can you turn to Demonstrative AB.
25              Can you explain what this demonstrative shows with
```

99

Direct examination - R. Ravi

1    respect to how the floor is set for AdX?

2    A    Yes.  This is a demonstrative that shows the waterfall.

3    And you see the static bids associated with the floor

4    exchanges on the right, and the highest of them is $1.06

5    from PubMatic at the second position.  And that highest of

6    the static bids from the other exchanges is used as the

7    floor price -- that's what you see in the left-most block,

8    as the $1.06 -- and that floor price triggers an auction in

9    AdX.  And you see in the second cylinder marked AdX, that

10   AdX actually, in that triggered auction, has a bidder who's

11   willing to pay $1.07.

12          And just as we discussed a little while ago, since

13   the floor price of the auction is $1.06, and assuming

14   there's no other bidder between $1.07 and $1.06, that bidder

15   in AdX would win that impression for the floor price of

16   $1.06.  That's what the checkmark corresponds to.

17   Q    What does this demonstrative show regarding how first

18   look affects advertisers?

19   A    Well, you also see in red on top of those other

20   exchanges in the waterfall, the actual amount that the

21   advertisers in those exchanges are willing to pay.  So you

22   see they have an advertiser willing to pay $1.10 in

23   PubMatic, $1.08 in Index Exchange, but because AdX was able

24   to win that impression at $1.06, we never even get to expose

25   this impression to the others down the line, and, therefore,

100

Direct examination - R. Ravi

```
 1    that advertiser with the $1.10 value or the exchange that
 2    hosts that advertiser don't get to win that impression.
 3    Q    You can set that aside.
 4             And let me step back for one minute.  At a high
 5    level for your opinions overall, not just for first look,
 6    are you offering an economic opinion on whether any
 7    particular conduct is "anticompetitive"?
 8    A    No.  I'm an expert in discrete optimization, so my
 9    opinions are about the optimization and the auction design
10    aspects of this conduct.  I'm not offering opinions on
11    whether this was anticompetitive or not.
12    Q    And have you done your own quantitative analysis of
13    Google's conduct?
14    A    I mainly relied on documents that did quantitative
15    analysis, but I did not personally do any quantitative
16    analysis on the data produced in this case.
17    Q    And why did you not do your own quantitative analysis
18    based on the data produced in this case in your work?
19    A    Well, first of all, I did not have to do that analysis
20    to arrive at the opinions that I did.  And, secondly, I
21    believe there are other experts who are looking more deeply
22    at this data and carrying out such analysis.  And finally,
23    to the extent that I rely on results that portray
24    quantitative analysis in my report, they were just results
25    from communications within Google about the results of
```

101

Direct examination - R. Ravi

1    experiments that they perform as a normal course of their

2    business.  So I found them to be pretty reliable.

3    Q    With that as a background, did you rely on any

4    quantitative evidence regarding the effects of first look?

5    A    First look, yes, I do have some evidence I examined,

6    and one of the things I found out was right around 2014,

7    there was a document that cited that, because of first look,

8    AdX got to win 53 percent -- that's over half -- of all the

9    impressions that it got to see from DFP.

10   Q    What informational advantages does first look create?

11   A    Well, first look, because of the fact that the other

12   exchanges don't even get to see the impressions that AdX

13   wins, it supplies AdX with all of the impressions -- or most

14   all of the impressions that are available for sale by

15   auctions.  So AdX sees the impressions that it won, that

16   53 percent.  It also sees the 47 percent that it lost.  And

17   also it essentially cuts off the signal about that

18   53 percent from the other exchanges.

19   Q    You mentioned before that AdX's floors were based on

20   the historic average price of other exchanges?

21   A    Yes.

22   Q    How does first look change that historical average

23   price over time?

24   A    So when -- as we were talking about a little earlier,

25   the real-time bids from AdX are able to win the more

Direct examination - R. Ravi

```
 1    valuable impressions that come up for sale against the
 2    static bids.  So as a consequence, the less valuable
 3    impressions go down the waterfall, and those valuable --
 4    less valuable impressions eventually set the floor price,
 5    because that's what's accounted for in the historical -- in
 6    the historical average revenue that they generate.  So, as a
 7    result, the floor prices that AdX would face over time would
 8    also go down.
 9    Q    And so how does the fact that AdX's floor prices go
10    down over time affect AdX?
11    A    Well, it makes it even more likely to win the
12    impressions that it's facing.
13    Q    Please turn in your binder to PTX 551.
14              THE COURT:  Is there any objection to 551?
15              MR. ISAACSON:  I don't object to it being admitted
16    for the purpose that the expert's relied on it.
17              MR. VERNON:  Your Honor, consistent with our
18    discussion with the Court earlier in the case, we would like
19    to move a select number of documents in through Professor
20    Ravi.
21              This particular document, it is a document written
22    by Google in the ordinary course.  It's also the subject of
23    a stipulation between Google and the United States under
24    which Google agreed not to object on certain grounds,
25    including lack of a sponsoring witness.
```

103

Direct examination - R. Ravi

```
 1              MR. ISAACSON:  We said that from the beginning.
 2    If we stipulated, we stipulated.
 3              THE COURT:  All right.  It's in.  It's in.
 4      (Plaintiffs' Exhibit Number 551 admitted into evidence.)
 5    BY MR. VERNON:
 6    Q    Okay.  Let's focus on the third paragraph which begins
 7    with -- which has the phrase first look advantage in it on
 8    the first line; do you see that?
 9    A    Yes.
10    Q    Can you explain what this first sentence shows about
11    first look?
12    A    Yes.  The first sentence talks about, with the
13    highlights, the same thing I was just describing a moment
14    ago, which is the access to the highest value queries, the
15    more valuable impressions, are a competitive advantage for
16    AdX.
17              I guess the way that this email phrases it is that
18    if AdX were to launch into some other server that's not DFP,
19    then the advantage I was talking about, which is having this
20    ability to win more of the higher value impressions, would
21    be destroyed.  So that's the way that this particular email
22    phrases what I characterized earlier.
23    Q    If you look at that same paragraph, starting at the end
24    of the second line, there's a sentence that refers to a
25    self-fulfilling prophecy; do you see that?
```

104

Direct examination - R. Ravi

```
 1    A     Yes, I see that.

 2    Q     What do these sentences show regarding the effects of

 3    first look?

 4    A     Again, these sentences are a different way of

 5    characterizing what I was saying earlier about the AdX floor

 6    decreasing over time.  And this sentence says:  "Less

 7    valuable inventory begets lower CPMs."  That is the price,

 8    lower prices, historical prices.  And "publishers react to

 9    those lower CPMs by decreasing the inventory access that

10    they provide, which begets even lower CPMs."

11              So this is the same effect that we were talking

12    about where the prices faced by AdX would decrease over

13    time; it's just phrased in a different way here.

14    Q     Are you familiar with the phrase "feedback loop"?

15    A     Yes.

16    Q     How does the phrase feedback loop apply to first look?

17    A     The characterization here of a self-fulfilling prophecy

18    is just another way of phrasing that feedback loop.  So the

19    feedback loop here is that since AdX wins the more valuable

20    impressions, the less valuable impressions go down to the

21    waterfall, the historical prices go down as a consequence,

22    thereby AdX gets a lower floor, it's able to win even more.

23    That's the feedback loop that we are talking about here, and

24    the self-fulfilling prophecy in this email.

25    Q     All right.  Thank you, Professor Ravi.  We can set that
```

105

Direct examination - R. Ravi

```
 1  document aside.
 2          Let's talk about professional work-arounds to
 3  first look.  And let's ignore header bidding for the moment.
 4          Prior to the emergence of header bidding, were
 5  there any ways in which publishers could call other
 6  exchanges before AdX when DFP was the ad server?
 7  A    I did find some ways that exchanges could be placed
 8  ahead of AdX, and I remember them being related to using the
 9  so-called sponsorship line items.
10  Q    And just briefly, can you explain what the sponsorship
11  line items were or are?
12  A    Sponsorship line items are a part of the direct
13  channel, the one where the publisher gets into a direct
14  agreement with an advertiser to sell, and a sponsorship is
15  one of those kinds of contracts.  And a sponsorship,
16  100 percent for example, would be a direct contract where
17  100 percent of a certain type of impression would just go,
18  would be transacted between that pair.
19  Q    And based on what you've seen, how common was it that a
20  publisher would use this work-around where they would put an
21  exchange in these sponsorship line items?
22  A    They were not very common.
23          MR. ISAACSON:  Objection.  Foundation.
24          THE COURT:  Sustained.
25  BY MR. VERNON:
```

106

Direct examination - R. Ravi

```
 1   Q    Can you explain just the purpose of what a sponsorship
 2   line item was?
 3   A    A sponsorship line item is a way to -- for the -- for
 4   AdX -- for DFP to deliver the direct negotiated contract to
 5   the advertisers.
 6   Q    Given that purpose of the sponsorship line item, what
 7   effect, if any, would putting an exchange in the sponsorship
 8   line item have on publishers' direct deals?
 9   A    Well, it would interfere with that, of course.
10   Q    Did you review the document from News Corp discussing
11   News Corp's experiment deprioritizing AdX?
12   A    Yes, I did.
13   Q    What did News Corp do in that experiment?
14        MR. ISAACSON:  I'm going to -- do we have an
15   exhibit here?  I object to --
16        MR. VERNON:  We do.  We do have an exhibit.  It's
17   placed in the first kind of folder portion of the binder.
18   It's the exhibit from yesterday that was admitted in
19   Ms. Layser's deposition.
20        MR. ISAACSON:  All right.  Thanks.
21        THE COURT:  All right.  So --
22        MR. VERNON:  It's DTX 655.
23        MR. ISAACSON:  Is this -- are you saying he
24   considered this in his report?
25        MR. VERNON:  I'm asking him if he reviewed it.
```

107

Direct examination - R. Ravi

```
 1                MR. ISAACSON:  I will object if this is just
 2   something he reviewed for trial testimony and it was not
 3   disclosed in his reports.
 4                THE COURT:  Ask the question.  Let's see.
 5   BY MR. VERNON:
 6   Q    Did you review this document?
 7   A    Yes, I did.
 8                THE COURT:  Wait.  But when?  In context of
 9   preparing your expert report or your deposition during
10   discovery?
11                MR. VERNON:  We're not contending that he reviewed
12   it before.
13                THE COURT:  I'm sorry?
14                MR. VERNON:  We're not contending that he reviewed
15   it before Ms. Layser's testimony yesterday.
16                THE COURT:  Well then I think it's an appropriate
17   objection.
18                MR. VERNON:  Okay.  We'll move on.
19                THE COURT:  Sustained.
20   BY MR. VERNON:
21   Q    Let's set this document aside.
22                Does the existence of some work-arounds to first
23   look change your opinion about first look?
24   A    No, it does not.
25   Q    Why not?
```

108

Direct examination - R. Ravi

1  A    Because they were not, in my opinion, very effective,

2  and they were not very prevalent.

3         MR. ISAACSON:  I would object to the testimony

4  about prevalence.  That's a factual assertion; not a subject

5  of expert testimony.

6         MR. VERNON:  Let me --

7         THE COURT:  What's the foundation for that

8  statement?  How is it that you know that it was not very

9  effective?

10        MR. ISAACSON:  I was objecting to the word

11 "prevalence," Your Honor.  I'm sorry for interrupting.

12        THE COURT:  I'm sorry?  You should be at the

13 lectern when you speak.

14        MR. ISAACSON:  He can talk about effectiveness,

15 he's got a technical background.  He's also saying

16 "prevalent," and it's that to which I am objecting.  Like

17 how often this was happening.

18        THE COURT:  If he knows.  If he's done studies,

19 yeah.

20        MR. ISAACSON:  Right.  I'm saying -- but that's

21 what I'm saying is, you were asking him about effectiveness,

22 and my objection is to prevalence.  That's all I'm saying.

23        THE COURT:  All right.

24        MR. VERNON:  Can I ask one question on this, Your

25 Honor?

                                                        109

Direct examination - R. Ravi

1          THE COURT:  Go ahead.

2     BY MR. VERNON:

3     Q    In your rebuttal report, what evidence did you discuss

4     regarding the prevalence of work-arounds to first look?

5     A    Yes.  So I did read in one of the expert reports of

6     Google about the sponsorship line item as one possibility,

7     and when I looked at all the evidence I had examined, I was

8     able to find I think at least four or five different

9     documents and exchanges that characterize that this was not

10    very effective.

11          For example, I remember one by a Google executive,

12    Mr. LaSala, I remember this was in my expert rebuttal

13    report.  I also -- yeah, that's an example, yeah.

14    Q    And can I ask you to remind us again of the

15    quantitative evidence that you relied on regarding the

16    significance of first look?

17    A    Yeah.  That was the one that was in my original report

18    from 2014.  The win rate of AdX and DFP was 53 percent.

19    That was in my original report.

20    Q    So what conclusion do you draw from that about --

21    sorry.  Let me rephrase.

22          Earlier I was asking you why the existence of some

23    work-arounds do not change your opinion about first look.

24    And why is that?

25    A    It's because when I looked at these other possible ways

110

Direct examination - R. Ravi

```
 1    of trying to use -- of working around AdX so-to-speak and

 2    getting ahead of it, none of them really seem to be

 3    effective as I cited in my rebuttal report, and, therefore,

 4    I didn't see that it substantially changed anything about

 5    the effectiveness of the waterfall and the first look

 6    advantage.

 7    Q    Let's turn -- or move forward in time a little bit.

 8              What, if anything, did publishers do to try to

 9    overcome the downsides of first look?

10    A    Header bidding was the main response of publishers

11    starting around 2014/'15.  Yeah.

12    Q    And after the emergence of header bidding, what

13    happened to first look?

14    A    As publishers started trying to insert their header

15    bids into DFP, which was still their publisher ad server,

16    first look turned into what is characterized as last look.

17    Q    Let's focus on last look.

18              At a high level, how did last look work?

19    A    When a publisher sought header bids outside of DFP and

20    had to insert it to deliver because AdX -- the particular

21    way they had to insert it into DFP to be delivered, the

22    typical way was to insert a line item which had the price at

23    which they had procured the header bid.  And the first

24    position of AdX in the chain of events that got triggered

25    gave AdX that header bid that the publisher has procured as
```

111

Direct examination - R. Ravi

```
 1   the floor price in that AdX auction.
 2   Q    So with the emergence of header bidding, what did first
 3   look turn into?
 4   A    So that's how -- since AdX now has that floor price,
 5   which is the best header bidding price, that first position,
 6   that first look advantage, now became a last look because
 7   you're now seeing it after all of the other header bidders
 8   have finished bidding and the result is announced.
 9   Q    And can you give an example of how last look would work
10   in a particular auction?
11   A    Sure.  Like let's say we had a header bidding auction
12   where the publisher has gone out and gotten an external
13   header bid of $1, when they tried to serve that add through
14   DFP, that dollar would become the floor for an auction that
15   would be triggered in AdX, and if AdX had at least one
16   bidder who was willing to pay anything above that dollar,
17   that impression would now go to the AdX winner and not the
18   header bidder winner.
19   Q    How did last look allow AdX to revise the price that
20   the AdX bidder pays after seeing the highest other bid?
21   A    So there are two ways in which this happened.  One, and
22   the simpler way, is when AdX gets this floor, this header
23   bidding -- the best header bidding bid as the floor, just
24   because AdX runs what's normally a second-price auction --
25   and as we discussed earlier, the floor can sometimes tell
```

112

Direct examination - R. Ravi

```
 1    you what's the minimum price you are to pay.  So if AdX had

 2    just a single bidder above that floor price, AdX would be

 3    able to win that same impression for exactly the same price

 4    as the header bidder was willing to pay.  So instead of

 5    giving it to the header bidder, we would just give it to the

 6    AdX bidder at the floor price.

 7           Of course if there was a second AdX bidder that

 8    was bidding even above the floor, that would be the price

 9    that AdX would pay just because of the mechanics of that

10    second-price auction we were talking about.

11           So that's the first way of how AdX was able to use

12    the last look advantage.

13    Q    And what was the second way?

14    A    The second way is a conduct that I also examined

15    extensively, it's called sell-side Dynamic Revenue Sharing

16    or sell-side DRS for short.  And this was a conduct where

17    this last look information was also particularly valuable.

18    Q    Please turn to Demonstrative AC.

19           Can you explain what this demonstrative shows?

20    A    Yes.  This demonstrative shows that first advantage I

21    was talking about of having the last look.  We have a header

22    bidder who has put in a winning bid of $1.  This is outside

23    of the Google ecosystem.  And then it comes into DFP as the

24    floor price that's triggered in AdX.  And in the third

25    panel, you see the AdX auction with that price floor, AdX
```

113

Direct examination - R. Ravi

1    only has three bidders, one of them is above the price floor

2    of $1, and by mechanics of the second-price auction, we, at

3    DFP, gives that impression to AdX for the floor price of $1,

4    and that's what you see in the right-most panel.

5    Q    You can set that aside.

6          Let's talk about how sell-side Dynamic Revenue

7    Share or sell-side DRS interacted with last look.

8          And, first, can you just explain what sell-side

9    DRS was?

10   A    So a platform like AdX usually takes a revenue share or

11   a take rate, normally 20 percent, and it usually takes this

12   off of the bid that it gets before it sends that amount as

13   an effective bid into the AdX auction.

14         So sell-side DRS -- sell-side because we are on

15   the AdX side -- is a way where that take rate of 20 percent

16   is varied dynamically -- that's the D -- on an

17   impression-by-impression basis.  So one impression might

18   have a revenue share of just, say, 10 percent, and the next

19   one might have a revenue share of 13 percent.  So that's the

20   dynamic revenue sharing.

21   Q    And how did last look interact with sell-side DRS?

22   A    Last look gave a floor price, which was the highest

23   header bid that the publisher had gotten outside of the

24   platform, as a target to meet or beat.  So last look

25   provided this target.  And now sell-side Dynamic Revenue

114

Direct examination - R. Ravi

```
 1   Share -- because it was designed to adjust that 20 percent
 2   up and down -- would then be able to realize in some cases
 3   if I actually reduced my revenue share, I could meet that
 4   floor, so that way last look gave the informational
 5   advantage that can be exploited by sell-side Dynamic Revenue
 6   Sharing.
 7   Q    Would sell-side DRS always result in AdX lowering its
 8   take rate?
 9   A    In the very first version of sell-side DRS that I
10   examined, that was the case, but Version 2 onwards, AdX
11   sometimes also increased its take rate in addition to
12   lowering it on some impressions.
13   Q    Can we turn to Demonstrative AD.
14             Can you explain what this demonstrative shows?
15   A    This is -- this is a demonstrative that shows two
16   different impressions in the top and the bottom.  In the
17   first impression, and in both cases, we assume that we have
18   the same highest header bidding bid of $1.  That's the AdX
19   floor price on the left.  So in the first impression on top,
20   we have the highest bidder within AdX willing to pay $1.10.
21   That's in the middle panel.
22             Now, if you took away the 20 percent Dynamic --
23   20 percent revenue share -- sorry, not dynamic, but the
24   regular revenue share -- from the $1.10, that would be
25   22 cents.  So the effective bid, or the net bid, would be
```

115

Direct examination - R. Ravi

1    $1.10 minus 22 cents, that's the 88 cents.  But 88 cents is

2    below the floor price of $1.  So, in this case, AdX would

3    provide a discount, that is it would reduce the revenue

4    share, and top up that effective bid from 88 cents to $1.

5    And, in that way, it would be able to win that impression,

6    and that's what you see on the right panel.

7    Q    And can you explain the bottom row that is in purple?

8    A    So the bottom row is another impression.  Here the

9    highest bidder is willing to pay $1.40.  So $1.40 times

10   20 percent is 28 cents.  So if you shave that off the top,

11   you get a net rate of $1.12.  But $1.12 is more than enough

12   to clear the floor price of $1, so, in this case, AdX might

13   add a surcharge of 12 percent.  In other words, it's

14   increasing its revenue share so that it's able to recoup

15   what it might have lost in terms of debt in the top

16   impression.

17   Q    You can set that demonstrative aside.

18        Please turn in your binder to PTX 542.

19        MR. VERNON:  And just to potentially move this

20   along, this was also mentioned in the stipulation.

21        MR. ISAACSON:  I've now been apprised of the

22   stipulation.  It was that documents could be entered without

23   a sponsoring witness --

24        THE COURT:  Counsel, you need to be at the

25   lectern.

116

Direct examination - R. Ravi

```
 1              MR. ISAACSON:  -- but not that we were waiving our
 2    objections.
 3              THE COURT:  No, I want you at the lectern when
 4    you're speaking.
 5              MR. ISAACSON:  I'm sorry.
 6              THE COURT:  Yeah.  All right.
 7              MR. ISAACSON:  My colleague has helpfully informed
 8    me that our stipulation was that these documents were in a
 9    group that could be admitted without a sponsoring witness
10    and not that we were waiving our objections to these.
11              THE COURT:  Right.  So relevance or hearsay,
12    whatever, were not waived in that stipulation.
13              MR. ISAACSON:  Right.  Right.
14              And you can see there's discussions of -- with
15    someone from The Guardian in here.  And I'm waiting for
16    the --
17              MR. VERNON:  May I respond, Your Honor?
18              The stipulation -- under the stipulation, Google
19    agreed not to object on the grounds of both sponsoring
20    witness, also hearsay, authenticity and foundation.  If -- I
21    think they did preserve their right to object to hearsay
22    within hearsay.
23              MR. ISAACSON:  Yes, we did.
24              MR. VERNON:  If that's what my colleague is
25    standing on, we aren't seeking to admit the hearsay within
```

117

```
 1    hearsay.

 2              MR. ISAACSON:  Right.

 3              THE COURT:  Well, what portions of this avoid that

 4    problem?

 5              MR. VERNON:  We are focusing on the -- it's the

 6    bottom email in the first page from Mr. Pal, Martin Pal,

 7    P-A-L.  And I'll allow counsel a minute to review it.  But I

 8    don't think that that's the hearsay-within-hearsay problem.

 9              MR. ISAACSON:  Except what he's responding to is

10    something that someone from The Guardian is saying.

11              MR. VERNON:  Well, I think --

12              MR. ISAACSON:  So it's my take is the main culprit

13    is talking about something that The Guardian is talking

14    about.

15              MR. VERNON:  I think if he's responding to

16    something that The Guardian said, then whatever The Guardian

17    said wouldn't be relevant for the truth.

18              THE COURT:  All right.  We need to move this

19    along.

20              542 I'm admitting only the last small paragraphs

21    on the first page.  So it's the email dated August 11, 2017

22    at 7:56 a.m.  All right.  And I think -- does that go --

23    does that go onto the other page?  No.  That's the only part

24    of it you want?

25              MR. VERNON:  Yeah.  We were only focused on this
```

Direct examination - R. Ravi

```
1   email from Mr. Pal.

2           MR. ISAACSON:  I -- if we're going to do that, I

3   would also like to admit the paragraph higher on the page

4   that has "I" and then "think" with the little marks around

5   it, whatever, the asterisks.

6           THE COURT:  Well, we're not going to parse it that

7   much.  It's going to be the whole first page then if we're

8   going to use it.

9           MR. ISAACSON:  All right.  That would be fine.

10          THE COURT:  The whole first page, and only the

11  first page, which is Bates Number 335 of this exhibit is in.

12   (Plaintiffs' Exhibit Number 542, Bates 335 admitted into

13                       evidence.)

14          MR. VERNON:  Your Honor, do you want us to submit

15  a redacted version of the last pages or submit it as is?

16          THE COURT:  We'll just have to White Out the other

17  side.  It's a two-page ...

18          MR. VERNON:  All right.

19  BY MR. VERNON:

20  Q    So focused on Mr. Pal's email at the bottom of the

21  first page, in particular, the second and third paragraphs,

22  the second paragraph begins:  "AdX to pay high"; do you see

23  that?

24  A    Yes, I do.

25  Q    What does this language show about how last look
```

119

Direct examination - R. Ravi

```
 1   interacts with south side DRS?

 2   A     This is a specific example calling out exactly what I

 3   was describing a little bit earlier.

 4           When the description says AdX gets to pay high and

 5   win whenever AppNexus is present with a high CPM, it's just

 6   saying that when it gets a high header bid, it's able to pay

 7   that high amount.  This is in the context of Dynamic Revenue

 8   Sharing that we were just talking about.  And it can pay low

 9   when it bids low.  So, again, it's those two panels I was

10   talking about.  And the second sentence says that, in

11   contrast, AppNexus -- which is the other exchange -- cannot

12   reliably save money on the queries when AdX bids low.

13   Q     And the next paragraph says:  "This has fundamentally

14   nothing to do with Dynamic Rev Share.  Dynamic Rev Share is

15   just yet another way for AdX to exploit the last look

16   advantage."

17           What does that show with respect to the

18   interaction between DRS and last look?

19   A     Dynamic Revenue Share is another way for AdX to exploit

20   the last look advantage.  That's the summary of the second

21   look advantage of last look.

22   Q     You can set that aside.

23           Turning back to last look, what affect does last

24   look have on publishers' revenue?

25   A     It doesn't give them the highest revenue possible.  So
```

120

Direct examination - R. Ravi

```
1    it reduces the revenue.

2    Q    And why is that?

3    A    It's because essentially last look takes the auction

4    pressure off of AdX because it is given the very highest

5    price it has to beat from the other header bidders, and AdX

6    just has to beat that floor for it to get that impression

7    from the other header bidders.  So that's why the revenue

8    would be lower than if all of them went together.

9    Q    And how does last look affect whether the advertiser

10   that values the impression the highest actually ends up

11   winning it?

12   A    Well, it doesn't allow this possibility sometimes,

13   because, yeah, it -- it's the same inefficiency.  If the

14   publisher is not making the highest money, that means the

15   person who is willing to pay the highest is also not getting

16   that impression.

17   Q    And how does the last look affect exchanges?

18   A    Well, last look, in particular, still survey the header

19   bids that the other exchanges sometimes solicit.  And

20   because of this second advantage, it reduces the amount of

21   impressions they are able to win.

22   Q    Let's turn to Project Poirot and bid shading.

23        And I think first just as a background, can you

24   explain what bid -- I'll let you drink a cup of water.

25        Can you explain what bid shading is?
```

121

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

1    A    Bid shading is a bidding strategy whereby the bidder

2    doesn't put in their whole value or the so-called true value

3    for the impression, but, instead, shades it down a little

4    bit.

5    Q    And in what auction formats does a buyer typically bid

6    shade?

7    A    Typically in first-price auction, it's a reasonable

8    strategy to bid shade.

9    Q    And why would an advertiser bid shade or just a buyer

10   bid shade in a first-price auction?

11   A    If a buyer does not bid shade in a first-price auction

12   and she wins that impression, she pays what she values the

13   impression at, and so she would not have any what's

14   typically called surplus or savings from having participated

15   in this transaction.  So it makes logical sense to go a bit

16   below your value, and then when you win, you accrue that

17   difference as the savings for having participated in the

18   auction.

19   Q    And does a buyer --

20        THE COURT:  Sorry.  One's bidding against oneself

21   in that?

22        THE WITNESS:  No.  This is not that.

23        THE COURT:  You don't think so?

24        THE WITNESS:  No.  This is not that.

25        This is if someone is trying to win something for

                                                              122

Direct examination - R. Ravi

```
 1    a certain price --

 2              THE COURT:  And I don't -- I don't offer the full

 3    amount.

 4              THE WITNESS:  Right.

 5              THE COURT:  Right.

 6              THE WITNESS:  Right.

 7              THE COURT:  Okay.

 8              THE WITNESS:  Right.

 9              THE COURT:  If I were to offer the full amount, I

10    might be bidding against myself in the sense that I wanted

11    to try to pay a lower price.

12              THE WITNESS:  I wouldn't characterize it that way,

13    Your Honor.

14              Usually when bidding against yourself is raised,

15    it's usually the possibility of your own bid showing up from

16    two different channels.  So, in other words, the price that

17    you're bidding against is your own price coming through some

18    other channel.  This is something I would simply say is,

19    yeah, just trying to make some savings for yourself.

20              THE COURT:  But all these biddings we're talking

21    about so far, I'm thinking about a standard auction, not the

22    auctions involved here, many times bidders get a chance to

23    rebid.  You get to see what everybody's bids are, and if you

24    really want the item, you can up your bid.  And that doesn't

25    happen in this system; does it?
```

123

Direct examination - R. Ravi

```
 1                THE WITNESS:  This is not that auction.  You get
 2     only one shot.
 3                THE COURT:  In your review of these -- because,
 4     again, you talk about optimization.
 5                In your review of this whole industry, is there
 6     any place that you saw where, in fact, that kind of what I
 7     would call dynamic bidding or multiple bidding goes on?  Are
 8     there any auctions where that is permitted?
 9                THE WITNESS:  Not for the same impression.
10                THE COURT:  Is that because of the latency issues?
11     In other words, this has to still, at some point, result in
12     an immediate impression showing up; yes?
13                THE WITNESS:  Yes.  That's probably primarily the
14     reason.
15                And we have seen, for example, when you're going
16     through a waterfall, you have to time out at some point
17     because you have to render that page.
18                THE COURT:  But if technology got better and
19     faster, one could have that type of a more dynamic auction
20     environment.
21                THE WITNESS:  That is likely, but the speed of
22     light is an impediment, I guess.
23                THE COURT:  Okay.  All right.  Thank you.
24     BY MR. VERNON:
25     Q    Okay.  For bid shading, would a buyer normally bid
```

124

Direct examination - R. Ravi

1   shade in a "clean" second-price auction?

2   A     In a second-price auction, it doesn't make sense to bid

3   shade.

4   Q     And can you explain why?

5   A     Yeah.  So this is interesting.  In a second-price

6   auction, if you bid shade -- let's just take an example.

7   Let's say you value something at $5 and the next highest

8   bidder is at $3.  Let's say you bid shade to $4, you still

9   win, but your bid shading has no consequence on what price

10  you want that impression for.  You still pay the same $3.

11  So bid shading doesn't affect how much you pay.

12          On the other hand, if there was somebody who was

13  willing to pay, say, $4.50 and they were in this set of

14  bidders, then you actually lost what you might have wanted

15  for $4.50 because you still value it at $5.

16          So that's the reason why you would not want to bid

17  shade.  You potentially might lose that auction, and there's

18  absolutely no gains in trying to shade your bid in terms of

19  actually winning the auction or setting the price.  So bid

20  shading would -- I mean, you can formally prove that bid

21  shading would not be the logical rational thing to do in

22  second-price auctions.

23  BY MR. VERNON:

24  Q     Okay.  So with that as a background, let's turn to

25  Project Poirot.

125

Direct examination - R. Ravi

```
1            And just at a high level, what was Project Poirot?

2   A    Project Poirot was a bid-shading program employed by

3   DV360 -- that's Google's DSP -- when it was bidding into

4   third-party exchanges that's non-AdX.

5   Q    Under Project Poirot, prior to the end of 2019, did

6   DV360 bid shade on AdX?

7   A    No.  DV360 did not bid shade into AdX until 2019.

8   Yeah.

9   Q    And do you recall approximately when Project Poirot was

10  first implemented?

11  A    It should be around 2016 or so, if my memory serves me

12  well.

13  Q    How did DV360 not bid shading on AdX affect

14  advertisers?

15  A    There's a potential surplus that advertisers could have

16  gained if Poirot did bid shade on AdX as well.

17  Q    And can you explain what you meant by there was a

18  potential surplus that advertisers could have gained?

19  A    So, again, recall that if you're facing an auction that

20  is not -- that's running a first-price auction, it's a

21  reasonable strategy to try and bid a little bit lower.  And

22  this potential savings that an advertiser could have gained

23  was because there were some of the time when AdX was acting

24  like a first-price auction.  So there was some set of

25  impressions when AdX had optimization features that would
```

126

Direct examination - R. Ravi

```
 1   have made AdX look like a first-price auction.  So in those
 2   auctions, it would be rational to save something for the
 3   advertisers by bid shading on AdX.
 4   Q    And can you give an example of one of those features
 5   that made AdX somewhat like a first-price auction at that
 6   time?
 7   A    So, broadly speaking, there are two features in AdX
 8   that make it not a second-price auction.  One is what we
 9   were just discussing a little while ago, that is the Dynamic
10   Revenue Sharing.  And so if you are subject to Dynamic
11   Revenue Sharing and you're a bidder, you pay what you bid
12   for part of the time.  So that makes it not like a
13   second-price auction; more like a first-price auction.
14           There's a second one, and the second optimization
15   feature in DFP and AdX that makes it not like a second-price
16   auction is something called reserve price optimization or
17   RPO.
18   Q    Can you explain just at a high level what reserve price
19   optimization or RPO is?
20   A    Reserve price optimization is a feature in AdX, I
21   believe, or DFP, I'm not exactly sure, that allows
22   publishers to set their floor prices or reserve prices
23   optimally.  And the way it works is that if it finds that,
24   for certain impressions, the historical bids have been high
25   for a particular buyer, then it would automatically try and
```

127

Direct examination - R. Ravi

 1   increase that reserve price for that particular buyer so

 2   that they can try to maintain that high price.

 3          On the other hand, if there was a buyer who was

 4   historically submitting lower bids, right, it would not

 5   be -- it would not be able to raise that reserve price.  So

 6   it's just a way of trying to set the reserve prices for

 7   different buyers differently based on their historical

 8   patterns.  That's how reserve price optimization worked.

 9   Q    And why did reserve price optimization mean that AdX

10   was operating at least somewhat like a first-price auction

11   at this time?

12   A    Well, it's intuitive to see, because if you

13   consistently bid high over time, you know that your

14   historical bids are going to eventually set your floor.  So

15   there is -- it is in my best interest not to always bid high

16   knowing that I'm subject to this floor that's creeping up on

17   me.

18   Q    And let's take one step backwards.

19          You mentioned sell-side DRS.  At this time, at

20   least prior to the existence of truthful DRS, which we won't

21   get into right now, did sell-side DRS apply to DV360?

22   A    One of the things I found in my source code analysis

23   was that sell-side DRS was turned off inside AdX for bids

24   coming from DV360.

25   Q    And what about RPO?  Was RPO applied to bids coming

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - R. Ravi

1   from DV360?

2   A    RPO continued to be effective on the bids coming from

3   DV360.

4   Q    Let's turn to Demonstrative AE.

5        Can you explain what this demonstrative shows?

6   A    This demonstrative is putting in some numbers for the

7   effect I was trying to describe a little earlier of RPO.  We

8   have an impression that -- a type of impression for which we

9   have two bidders, advertisers.  The left panel is an

10  advertiser who has historically bid high, and the right

11  panel is the one who has historically bid low.

12       The publisher sets a floor of $1, and what RPO

13  does is overrides it.  That's the strike through.  And you

14  see that it overrides it with a higher reserve price of $3

15  for the historically higher bidder, and only $2 for --

16  sorry, it's -- I'm getting ahead of myself.  The second row

17  is actually the historical average bid of the two types of

18  buyers.  So that's $3 and $2 respectively.  So in the third

19  row, you see that the $1 floor has been overridden, and it's

20  now replaced with $2 for the high bidder and $1.50 for the

21  low historical bidder.

22       And so you see that the minimum price for these

23  two different advertisers to win the same impression is now

24  differentiated by this sell price optimization feature.

25  Q    And can you explain using this demonstrative how UPR

129

Direct examination - R. Ravi

```
 1  gives an incentive for a buyer to bid shade when RPO exists?
 2  A    So if I were the left buyer and I knew that RPO was in
 3  effect, then it does make sense for me, from time to time,
 4  to not keep submitting these high historical average bids,
 5  because I know that they would eventually set the $2 floor
 6  that RPO comes up with.
 7  Q    You can set that aside, and let's turn back to Poirot.
 8           What impact, if any, did Poirot have on exchanges
 9  other than AdX?
10  A    The exchanges on which Poirot was effective on, the
11  ones on which the bids were being lowered, they introduced
12  the ability of those exchanges to transact more impressions.
13  Q    I'm sorry.  Can you repeat that?  What impact, if any,
14  did Poirot have on exchanges other than AdX?
15  A    It reduced the scale of transactions that they were
16  able to -- they were able to transact.
17  Q    Did you say reduced or introduced?
18  A    So when Poirot was acting on third-party exchanges, it
19  reduced -- it shades the bid on them.  Right.  So that means
20  that the bids that they are facing are lower priced.  So
21  that means they were able to win less of those transactions.
22  But Poirot was not acting on AdX relatively, so the bids
23  that went into AdX were higher, they were not shaded.  So
24  they sometimes they even transferred some of the wins from
25  these third-party exchanges to AdX.
```

130

Direct examination - R. Ravi

```
 1   Q     Now let's move to UPR.

 2              Just very briefly, what is UPR?

 3   A     UPR is the Unified or Uniform Pricing Rules that was

 4   bundled with the Unified First Price Auction in 2019.  And

 5   UPR refers to DFP not letting the publishers set different

 6   floor prices for different exchanges and buyers with the

 7   advent of this Unified First Price Auction.

 8   Q     What impact did UPR have on a publisher's ability to

 9   set a floor higher for AdX than for other exchanges?

10   A     UPR essentially took away the ability of a publisher to

11   floor AdX higher and the other exchanges lower.

12   Q     And why would a publisher have an incentive to set a

13   higher floor for AdX than for other exchanges?

14   A     There could be several reasons for publishers wanting

15   to control the floor prices.  I cite at least three.  I

16   believe one is the natural concern of diversifying revenue

17   away from Google into other channels.  Another one could be

18   to try and use the price floor as a control to not allow low

19   priced advertisements which may be low quality, you know,

20   the spam, those kinds of ads.

21              And then yet another issue with -- yet another

22   control that the publishers can exercise with setting

23   different floor prices could just be, you know, contracts

24   that they may have with a particular -- particular

25   exchanges.  So if they transacted more volume, they might
```

131

Direct examination - R. Ravi

1    get a lower take rate, things like that.

2    Q    What impact did UPR have on exchanges other than AdX?

3    A    It essentially moved some of the impressions that were

4    won by these other exchanges to AdX because UPR reduced the

5    floors for AdX, and sometimes thereby allowed AdX to win

6    over some of those impressions.

7         MR. VERNON:  Let me turn to PTX 705.  And to try

8    to streamline this slightly, this is not in the sponsoring

9    stip, but it is on defendant's exhibit list at DTX 661, and

10   it is something Professor Ravi relied upon in his report.

11        THE COURT:  It's hard to object to your exhibit.

12        MR. ISAACSON:  I've always found that a difficult

13   thing to do.  So no objection.

14        THE COURT:  It's in.  705 is in.

15     (Defense Exhibit Number 705 admitted into evidence.)

16        MR. VERNON:  Can we turn to the page ending in

17   085.  And if we could focus on the smaller chart on the left

18   side.  It's kind of got a tree-like graphic.

19   BY MR. VERNON:

20   Q    What does this chart show?

21   A    This chart shows the -- an analysis of the queries that

22   were won by AdX as a result of floors.  So let's make sure

23   we understand this carefully.

24        On the left side of that topmost branch, you see

25   that header bidders won 34 percent of the queries that were

132

Direct examination - R. Ravi

1    eligible.  Thank you.  And then proceeding down that branch,

2    we see that among that 34 percent, 42 percent, that's

3    already in the red box, were queries where AdX floor price

4    was higher than the price for which it was sold.

5            So some header bidder won all of these queries,

6    not the same header bidder, but a header bidder won all of

7    these queries, and in 42 percent of that 34 percent, AdX

8    floor was higher than the price that the header bidder won

9    it for.  Right.

10           And then moving further down, you see that in

11   40 percent of that 42 percent -- it's getting complicated --

12   we see that the AdX actually had a bidder who was willing to

13   pay more than the winning price.

14           So just to sum it up, in 40 percent of 40 [sic]

15   percent, so roughly about 16 percent of all of these

16   queries, AdX had someone who was willing to pay higher than

17   the highest header bidder but was floored away.

18   Q    And what does this 40 plus, 42 percent, or roughly

19   16 percent, number show about the potential effects of UPR?

20   A    So if UPR had driven down the floor of AdX so that it

21   would have been able to submit its bid in that 16 percent,

22   it would have won all of those 16 percent of the

23   impressions.

24   Q    You can set that aside.

25           Did you review any other evidence -- quantitative

133

Direct examination - R. Ravi

```
 1    evidence relating to the effects of UPR?

 2    A    I have a couple other references to such quantitative

 3    evidence.  I remember one from I believe another exchange,

 4    it might have been Rubicon, where they noticed right after

 5    this UPR was introduced that there -- their winning rate

 6    went down from 30 to 24 percent.  So there are some other

 7    documents that I cite about the similar effect of UPR.

 8    Q    And just for completeness, other than the Rubicon and

 9    this tree chart that we just cited, was there any other

10    evidence in your report about the quantitative size of the

11    effects of UPR on other exchanges?

12    A    There may have been some.  I don't completely remember.

13    Q    And I don't want to test your memory completely, but

14    just do you remember for that other evidence, were the

15    effects smaller or higher than the 16 percent?

16    A    They're probably typically smaller.

17    Q    Let's talk briefly about scale.

18          What conclusions have you drawn about the

19    importance of scale for exchanges?

20    A    So let me first clarify what I mean by scale.  There

21    are two aspects of scale in the display ads market.  One is

22    the number of participants that are in a particular product.

23    We think of that as the thickness of the market.  And the

24    second is the number of transactions that are won by a

25    particular product, and that's what you might think of as a
```

134

Direct examination - R. Ravi

```
 1    traffic scale.

 2              So I broadly concluded that scale is quite

 3    critical for these ad tech products to be successful, and

 4    that's because scale provides them with data that is the

 5    fodder for optimization, which, in turn, is the way in which

 6    the different quality features of these products are

 7    implemented.

 8    Q    When you conclude that scale is important for

 9    exchanges' optimization, how does your own expertise inform

10    that conclusion?

11    A    A lot of my work has to do with trying to find the

12    effect of -- the improved effectiveness of an algorithm with

13    increasing data or higher scale.  So that's how it's

14    relevant.

15    Q    And in your analysis of scale, did you analyze the

16    scale of Google's rivals?

17    A    I mainly focused on Google in my analysis, but I did

18    come across some other documents and evidence that sometimes

19    talk about effects on rivals.

20    Q    Let's walk through one example showing how scale

21    impacts these optimization algorithms.

22              Earlier we discussed how exchanges can vary their

23    take rates for different impressions; do you remember that?

24    A    Yes.  The sell-side DRS.

25    Q    Can you explain how -- and sell-side DRS was a Google
```

135

Direct examination - R. Ravi

 1  program?

 2  A     Yes.  This was a Google program by AdX that changed

 3  those take rates from 20 percent up and down.  It's that

 4  conduct.

 5  Q     Can you explain how sell-side DRS's debt recoupment

 6  system worked?

 7  A     So it was in that demonstrative.  We can go back to it

 8  if needed.

 9        This was an example where, in one of these

10  impressions, AdX would provide a discount.  So that meant it

11  wouldn't take the whole 30 percent take rate; it would take

12  something smaller.  So when that happened, a nominal debt

13  was incurred.  So that would be like a virtual debt.  And

14  then there would be an account keeping track of that debt.

15  And when another impression like a second one came along,

16  AdX would increase the take rate, and thereby, you know,

17  take back that debt.  So there was this system keeping track

18  of virtual debts that were due to AdX and would recoup them

19  over time.

20  Q     And how, if at all, does scale affect Google's ability

21  to run sell-side DRS?

22  A     A scale is crucial for being able to recoup all the

23  debt because, you know, you have to have sufficient volume

24  of transactions so you're provided the opportunity to

25  recover back that debt at a later auction where you had that

136

Direct examination - R. Ravi

 1   margin to collect back the debt.

 2   Q    Did Google run any experiments showing how greater

 3   scale affects DRS?

 4   A    Yes.  There are documents associated with the

 5   performance of different versions of DRS.  And I remember

 6   one of them that I cite in my report where, for example, if

 7   you ran an experiment on Version 2 of that sell-side DRS,

 8   the increase in profit was something like 3.6 percent.  But

 9   when you scaled up that same experiment to 25 percent from

10   5 percent, then the effect on the profit doubled roughly to

11   7 percent.  So that's an example where, as you increase

12   scale, the effectiveness of the conduct or the optimization

13   conduct improves.

14   Q    Let me ask you to explain one portion of that slightly.

15        You mentioned a 5 percent and a 25 percent and a

16   scaling up?

17   A    Yes.

18   Q    Can you just explain what you were describing there.

19   A    Sure.  When you try to implement an optimization

20   algorithm, you have to experiment with small slices of the

21   traffic to see how it would perform when it was fully

22   deployed.

23        So the 5 percent would be the size of the traffic

24   in which one of the experiments was run, and that recorded a

25   profit of 3.6 percent, let's say.  And then they would scale

137

Direct examination - R. Ravi

```
 1    it up to 25 percent, so they're now running it in fivefold
 2    higher traffic.  And now they find that the profit number
 3    they were tracking has doubled to 7 percent.  So that's what
 4    I mean when I say as you make the scale higher, typically
 5    the effects that you expect from these optimization conducts
 6    get better.
 7    Q    And what is truthful DRS?
 8    A    Truthful DRS was the very last version of this DRS
 9    conduct, and it's called so because it was more -- it was
10    designed as to appear like a truthful -- appear -- make AdX
11    appear like a truthful auction.
12             In a sense, truthful DRS did not -- did something
13    different than the earlier versions in that it would use
14    machine learning to try and figure out whether on a
15    particular impression it should take a 0 percent take rate
16    or a 20 percent take rate.  And if it determined that it
17    could still win with a 20 percent take rate, it would take
18    that, otherwise it would knock it down to 0 percent, and,
19    you know, put the full bid in.  And so that was the last
20    version of DRS.
21    Q    Did Google run any experiments showing how scale
22    affected this truthful DRS?
23    A    Yes.  Truthful DRS relies even more on scale because of
24    this prediction or machine learning element.  So that
25    requires even more data.  And so one of the experiments that
```

138

Direct examination - R. Ravi

```
1    I viewed and cited talks about the initial experiment with
2    truthful DRS actually causing something like a 1.6 percent
3    reduction in the profit.  But then there's a discussion that
4    says once you scale it up, that reduction will go away and
5    we'll be able to recoup back that debt according to these
6    adjustments we were talking about earlier.  So that's
7    another example where scale was useful in being able to
8    deploy it.
9    Q    Let's step back a little bit.
10          Just overall for the four conducts that we've
11   discussed, first look, last look, UPR and Poirot, how did
12   these conducts affect the scale of exchanges other than AdX?
13   A    So, overall, these four conducts reduced the scale of
14   other exchanges in AdX because they were mainly, as I was
15   describing earlier, trying to increase the transactions
16   going through AdX.
17   Q    And how would that reduction in scale affect those
18   other exchanges?
19   A    So reduction in the traffic that these other exchanges
20   were able to see and win would, as you were saying before,
21   reduce their ability to do optimizations.  And these
22   optimizations helped them do things like pricing, targeting,
23   and even more experimentation better.  So this reduction in
24   scale that they see would affect their ability to keep and
25   improve the quality of their products over time.
```

139

Direct examination - R. Ravi

```
1    Q    When did first look end?
2    A    First look, it didn't really end, it started becoming
3    less relevant after the popularity of header bidding, and
4    that would have been around 2015 or so.
5    Q    And when did last look end?
6    A    So last look would have started around 2015.  It's that
7    same positional advantage.  And that positional advantage
8    ended with the universal first-price auction September 2019,
9    I believe.
10   Q    And we discussed before how, for a time period, DV360
11   did not bid shade on AdX; do you remember that?
12   A    Yes.  Up until 2019.
13   Q    And during what time period did UPR apply?
14   A    UPR applied with the beginning of the universal
15   first-price auction.  So from 2019.
16   Q    And there's one thing that we haven't talked about yet
17   on your direct, Google Ad's exclusivity on to AdX.
18             Can you explain that in just one sentence?
19   A    That just refers to the mere exclusive availability of
20   the demand from Google Ads in the AdX platform.
21   Q    And how does Google Ad's exclusivity into AdX affect
22   the scale of other exchanges, meaning exchanges other than
23   AdX?
24   A    Well, they just don't have access to that demand.  So
25   that means their scale is reduced as a result.
```

Direct examination - R. Ravi

```
1    Q     And during what time period did that exclusivity apply?

2    A     That exclusivity has continued pretty much all along.

3    Q     How would conducts that ended in the past, like last

4    look, as an example, affect rivals today?

5    A     As I was explaining a little earlier, the reduction of

6    scale at one point of time would inhibit the ability of that

7    exchange to be able to do all these quality improvements

8    with optimization.  And so over time, that would be

9    reflected in that exchange attracting fewer advertisers and

10   publishers to transact through them.

11          We now have another feedback loop here.  This is

12   because an exchange is -- has the so-called indirect network

13   effects at work here.  So that simply means if I have fewer

14   people on one side of this platform, like the publishers,

15   that would want -- that would attract fewer advertisers to

16   join it, and vice versa, fewer advertisers means fewer

17   publishers.

18          So this reduction in quality over time would also

19   reduce the number, the thickness of these exchanges, so they

20   would continue to impact how these exchanges are able to

21   evolve and grow up until now.

22   Q    So I think we've talked about first look, last look,

23   UPR and Poirot.

24          Overall, how would you assess these conducts from

25   a discrete optimization perspective?
```

141

Direct examination - R. Ravi

```
 1   A    So from an optimization point of view, these conducts
 2   were not well designed to optimally allocate these
 3   impressions on behalf of customers.  And they also seem to
 4   have been designed to advantage Google's own products and
 5   the tech stack, particularly AdX, and also disadvantage the
 6   others as a consequence.
 7   Q    And let me just ask you one question.
 8        A minute ago when we were talking about scale, you
 9   used the word thickness.
10   A    Yes.
11   Q    Can you just explain briefly what that means.
12   A    Thickness is the number of participants in a product.
13   So in AdX, the thickness would be the number of publishers
14   that are transacting through AdX and the number of
15   advertisers.  That would be the thickness scale.  Yep.
16   Q    Thank you.
17        MR. VERNON:  Your Honor, we are done with our
18   direct but have one housekeeping matter relating to moving
19   in documents.
20        THE COURT:  All right.  Let's hear it.
21        MR. VERNON:  So there are two documents -- and I
22   can get to each of them -- that we would like to move into
23   evidence as related to Professor Ravi's testimony,
24   specifically about sell-side DRS.  They're both documents he
25   cited in his report.
```

Direct examination - R. Ravi

```
 1                The first one is subject to the stipulation; the
 2      second one is not.  They're 697 and 1040.  They are
 3      documents that help describe how sell-side DRS works, and so
 4      we would just, in the interest of efficiency, move them in
 5      so we can cite them in any findings that we later do.
 6                THE COURT:  All right.  So 1040 is the first one;
 7      right?  It's dynamic sell-side rev share on AdX.
 8                MR. ISAACSON:  You'll see, Your Honor, on 1040
 9      there's all these comments from unknown people similar to
10      the document.
11                MR. VERNON:  So the comments are -- if it's a
12      Google document, the comments are likely by Google
13      employees.
14                MR. ISAACSON:  Well, your colleague objected to a
15      Google document with Google comments from unknown Google
16      employees.
17                MR. VERNON:  That's different.  That's a party --
18                THE COURT:  Do we really need these?  Is it not
19      clear enough?
20                MR. VERNON:  I think we are mostly not focused on
21      the comments, Your Honor.  These are design documents that
22      explain how sell-side DRS works.  It's not particularly
23      exciting; it's kind of going through what Professor Ravi
24      said about the take rate goes up, the take rate goes down,
25      that sort of stuff.  That's what we're going for.
```

143

Direct examination - R. Ravi

```
 1                 MR. ISAACSON:  I think they can --

 2                 THE COURT:  Wait a minute.  Just a second.

 3                 I mean, it's clear the comments are coming from

 4       somebody at Google because we see the names; right?  And we

 5       see cell phone numbers, Google New York.

 6                 MR. VERNON:  Yeah.  And we would add, Your Honor,

 7       that when we are seeking to admit these documents, they are

 8       party admissions, which that's a one-way thing.

 9                 THE COURT:  Yeah, I think that's correct.

10                 MR. ISAACSON:  Well, you have to be a certain

11       level to be a party admission, and when you're unidentified

12       people, that's not a party -- even within a company, that's

13       not a party admission.

14                 MR. VERNON:  That's not my understanding of the

15       standard.  I think the standard is it has to be employees

16       who are working on something within the scope of their

17       employment.  It is likely that the employees that are

18       commenting on a sell-side DRS design document was doing so

19       because that was part of their employment.

20                 Again, we don't want to overstate the haughtiness

21       of this document.  It is simply a design document describing

22       how sell-side DRS works.

23                 THE COURT:  I'm going to permit it in and let you

24       take out the comments.  That's easy.  You can just black

25       that out.
```

144

Direct examination - R. Ravi

```
 1              MR. VERNON:  All right.
 2              THE COURT:  So Plaintiffs' Exhibit 1040 is in with
 3   all of the little comments redacted.
 4     (Plaintiffs' Exhibit Number 1040 admitted into evidence.)
 5              MR. VERNON:  And does the same apply to 697?
 6              THE COURT:  Hold on one second.  I have to find it
 7   first.
 8              MR. VERNON:  Your Honor, they're organized by
 9   number.
10              THE COURT:  Yeah.  I've got it.  697.
11              MR. ISAACSON:  We have no objection to 697.
12   There's a comment --
13              MR. VERNON:  I see the comment, maybe a couple
14   comments.
15              THE COURT:  Same issue with the comment?
16              MR. ISAACSON:  Yes.
17              MR. VERNON:  That's fine.
18              THE COURT:  697 is also in as redacted.
19              MR. VERNON:  Your Honor, I've been informed 697 is
20   covered by the stip.
21              Does that allow us to also get the comments?
22              THE COURT:  Well, I'm assuming it was reviewed
23   before there was a stipulation, so it will come in then as
24   it is.  All right.  Without redactions.
25     (Plaintiffs' Exhibit Number 697 admitted into evidence.)
```

145

Direct examination - R. Ravi

```
 1                MR. VERNON:  Okay.

 2                MR. ISAACSON:  And I don't care for this document,

 3     Your Honor, it's just one comment.

 4                But just to be clear, the stipulation --

 5                THE COURT:  At the lectern.

 6                MR. ISAACSON:  The stipulation is that documents

 7     can come in without a custodian, but objections were

 8     reserved.

 9                THE COURT:  No.  We've just been through that.

10     Ms. Wood said that's not it.

11                MR. ISAACSON:  Certain objections have been

12     preserved, and some haven't.  And I'm not -- I'm just

13     informing you this for the future.  I don't care about this

14     comment.  It can come in with the comment.  But in case it

15     comes up for future documents, I wanted you to know that.

16                THE COURT:  Well then we'll need to have those

17     stipulations ready.  You have it there?  All right.  Let's

18     look at it.

19                MR. VERNON:  Yes, Your Honor.

20                So the stipulation goes through -- it's ECF 1276

21     from August 26th.  We do list certain objections that Google

22     had agreed to waive and others they did not.  The ones they

23     waived are described in the first paragraph.

24                THE COURT:  All right.  I don't want to spend time

25     on this now.  Just as the exhibits come along, if there's an
```

146

Direct examination - R. Ravi

1    objection, we'll have to hear it at that point; all right?

2            MR. VERNON:  Yes, Your Honor.

3            THE COURT:  All right.  So we've completed the

4    direct examination.  It is now 1:00, so this is a good time

5    to take the break.

6            Professor, you'll need to be back here in your

7    seat by 2:00.  We'll give you a card so that you can get

8    through the line a little bit faster.  Make sure you give it

9    back to the court security officer when you come back.

10           Anything further?  No.  All right.  We're on

11   recess.

12           (Court recessed for lunch at 12:58 p.m.)

13           ----------------------------------

14   I certify that the foregoing is a true and accurate

15   transcription of my stenographic notes.

16

17   _____

18           Stephanie M. Austin, RPR, CRR

19

20

21

22

23

24

25

147