```
1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
2                       ALEXANDRIA DIVISION

3    --------------------------x
     UNITED STATES, et al.,     :   Civil Action No.:
4                               :   1:23-cv-108
               Plaintiffs,      :
5         versus                :   Thursday, September 12, 2024
                                :   Alexandria, Virginia
6    GOOGLE LLC,                :   Day 4 a.m.
                                :   Pages 1-169
7               Defendant.      :
     --------------------------x
8

9         The above-entitled bench trial was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
     This proceeding commenced at 9:00 a.m.
10

              A P P E A R A N C E S:
11

     FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
12                          OFFICE OF THE UNITED STATES ATTORNEY
                            2100 Jamieson Avenue
13                          Alexandria, Virginia  22314
                            (703) 299-3700
14
                            JULIA TARVER WOOD, ESQUIRE
15                          AARON TEITELBAUM, ESQUIRE
                            TIMOTHY LONGMAN, ESQUIRE
16                          KATHERINE CLEMONS, ESQUIRE
                            DANIEL GUARNERA, ESQUIRE
17                          MICHAEL WOLIN, ESQUIRE
                            UNITED STATES DEPARTMENT OF JUSTICE
18                          ANTITRUST DIVISION
                            450 Fifth Street, NW
19                          Washington, D.C.  20530
                            (202) 894-4266
20
     (State of VA)          JONATHAN HARRISON, ESQUIRE
21                          OFFICE OF THE ATTORNEY GENERAL
                            OFFICE OF THE SOLICITOR GENERAL
22                          202 North Ninth Street
                            Richmond, Virginia  23219
23                          (804) 786-7704

24

25
                                                             1
```

```
 1                  A P P E A R A N C E S:

 2   FOR THE PLAINTIFFS:    ELLIOTT DIONISIO, ESQUIRE
     (State of CA)          OFFICE OF THE CALIFORNIA ATTORNEY
 3                          GENERAL
                            300 South Spring Street
 4                          Suite 1700
                            Los Angeles, California  90013
 5                          (213) 269-6681

 6   FOR THE DEFENDANT:     CRAIG REILLY, ESQUIRE
                            LAW OFFICE OF CRAIG C. REILLY
 7                          209 Madison Street
                            Suite 501
 8                          Alexandria, Virginia  22314
                            (703) 549-5354
 9
                            KAREN DUNN, ESQUIRE
10                          MARTHA GOODMAN, ESQUIRE
                            JESSICA PHILLIPS, ESQUIRE
11                          WILLIAM ISAACSON, ESQUIRE
                            PAUL, WEISS, RIFKIND,
12                          WHARTON & GARRISON LLP
                            2001 K Street, NW
13                          Washington, D.C.  20006
                            (202) 223-7300
14
                            JUSTINA SESSIONS, ESQUIRE
15                          FRESHFIELDS BRUCKHAUS DERINGER, LLP
                            855 Main Street
16                          Redwood City, California  94063
                            (212) 277-4000
17
     THE TRADE DESK:        ELIZABETH PREWITT, ESQUIRE
18                          LATHAM & WATKINS LLP
                            1271 Avenue of the Americas
19                          New York, New York  10020
                            (212) 906-1200
20
                            AARON CHIU, ESQUIRE
21                          LATHAM & WATKINS LLP
                            505 Montgomery Street
22                          Suite 2000
                            San Francisco, California  94111
23                          (415) 646-7839

24

25
                                                            2
```

```
 1   COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
                            Official Court Reporter
 2                          United States District Court
                            401 Courthouse Square
 3                          Alexandria, Virginia  22314
                            (607) 743-1894
 4                          S.AustinReporting@gmail.com

 5          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                                3
```

```
 1                        TABLE OF CONTENTS

 2                           WITNESSES

 3   On behalf of the Plaintiffs:

 4   RAHUL SRINIVASAN

 5   Direct examination by Ms. Wood ............6
     Cross-examination by Ms. Phillips .........109
 6   Redirect examination by Ms. Wood ..........149
     Recross examination by Ms. Phillips .......154
 7
     JOHN "JED" DEDERICK
 8
     Cross-examination by Ms. Dunn .............155
 9
                           EXHIBITS
10
     On behalf of the Plaintiffs:
11   Admitted

12   Number 426 ................................17
     Number 469 ................................23
13   Number 534 ................................27
     Number 609 ................................31
14   Number 611 ................................35
     Number 625 ................................46
15   Number 698 ................................51
     Number 699 ................................59
16   Number 715 ................................62
     Number 1853 and 1854 ......................69
17   Number 751 ................................78
     Number 748 ................................85
18   Number 784 ................................91
     Number 763, 768 and 819 ...................96
19   Number 850 ................................100

20   On behalf of the Defendant:
     Admitted
21
     Number 701 ................................110
22   Number 829 ................................143

23                          MISCELLANY

24   Proceedings September 11, 2024 ............5
     Certificate of Court Reporter ............169
25
```

4

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

```
1                       P R O C E E D I N G S

2       (Under seal discussion provided under separate cover.)

3               THE COURT:  All right.  In the interest of keeping

4       the case as transparent as possible, I assume we have some

5       folks from the media here.

6               We did have an under-seal hearing at 8:30, at

7       which time the objections to some of the exhibits were

8       discussed.  I'm pleased to announce we were able to resolve

9       all but I think three sentences, so very little will be

10      redacted.  All right.

11              Are we ready to proceed?

12              MS. WOOD:  Yes, Your Honor.  The plaintiffs call

13      Rahul Srinivasan to the stand.

14              THE COURT:  All right.

15              THE DEPUTY CLERK:  Can you raise your right hand.

16      Thereupon,

17                       RAHUL SRINIVASAN,

18      having been called as a witness on behalf of the plaintiffs

19      and having been first duly sworn by the Deputy Clerk, was

20      examined and testified as follows:

21                       (Time noted: 9:01 a.m.)

22              THE DEPUTY CLERK:  Thank you.

23              MS. WOOD:  May I proceed?

24              THE COURT:  Yes, Ms. Wood.

25                       DIRECT EXAMINATION
```

Direct examination - R. Srinivasan

```
 1   BY MS. WOOD:

 2   Q    Good morning, Mr. Srinivasan.  How are you?

 3   A    I'm good.

 4   Q    Good.

 5        By whom were you employed in the years 2016 to

 6   2019?

 7   A    Google.

 8        THE COURT:  You're going to need to keep your

 9   voice up.

10        MS. WOOD:  I think it would be fine if you scoot a

11   little bit closer to that microphone, it helps a lot.  That

12   microphone is that black bar.  There you go.

13   BY MS. WOOD:

14   Q    Did you give a deposition in this matter, sir?

15   A    Yes.

16   Q    And at that deposition, were you represented by the

17   same counsel representing Google?

18   A    No.

19   Q    Who were you represented by at that -- at that

20   deposition?

21   A    At the deposition, I was represented by Axinn.

22   Q    And are you aware that Axinn represents Google?

23   A    Yes.

24   Q    Okay.  So you were represented by the same lawyer that

25   was also representing Google at that deposition; correct?
```

6

Direct examination - R. Srinivasan

```
1    A    Yes.

2    Q    Okay.

3         MS. WOOD:  Your Honor, I'm mindful of Your Honor's

4    words the other day about leading questions, but I would

5    like, on occasion, to lead the witness if necessary for

6    efficiency and other reasons.  So I do believe we've met the

7    standard for adverse questions, leading questions under

8    Federal Rule of Evidence 611(c)(2).

9         THE COURT:  I'm satisfied you are.

10        MS. WOOD:  Thank you.

11   BY MS. WOOD:

12   Q    Now, you joined Google in the summer of 2016; right?

13   A    That's correct.

14   Q    And you joined in the position of product manager;

15   correct?

16   A    Yes.

17   Q    And you initially worked on Google's AdX ad exchange

18   product; correct?

19   A    Yes.

20   Q    And then subsequently, Google made the decision to

21   combine the AdX exchange and the DFP publisher ad server

22   into one product called Google Ad Manager; correct?

23   A    I don't recall specifically when the decision was made.

24   But, yes, the decision was made at some point in time.

25   Q    Okay.  So you worked on products on the sell-side of
```

                                                                7

Direct examination - R. Srinivasan

1   Google's business; correct?

2   A     Yes.

3   Q     And the sell-side refers to products that were used by

4   Google's publisher customers to sell their ad inventory;

5   right?

6   A     Yes.

7   Q     But you were aware Google also operated ad tech tools

8   on the buy-side of the industry for advertisers; right?

9   A     Yes.

10  Q     And Google operates a demand-side platform called

11  DV360; is that right?

12  A     Yes.

13  Q     And Google also operates an advertiser ad network

14  called Google Ads; right?

15  A     Yes.

16  Q     In fact, Google Ads is the largest buyer on AdX; isn't

17  that right?

18  A     Google Ads is one of many buyers.  I suspect it's the

19  largest one, but I don't recall the specifics right now.

20  Q     Okay.  Do you believe that Google Ads is one of the

21  largest buyers on AdX at the time that you worked on the AdX

22  products?

23  A     I would not be surprised if that were the case.

24  Q     Okay.  Do you recall giving testimony in this matter

25  where you indicated that Google Ads was one of the largest

8

Direct examination - R. Srinivasan

1    buyers on AdX?

2    A     Was one of the larger buyers, yes.

3    Q     Okay.  Now, you knew, as a product manager for Google

4    AdX, that AdX's mere exclusive access to Google Ads made AdX

5    a more attractive ad exchange; right?

6    A     Demand on AdX did make it attractive, and Google Ads

7    was one of the larger buyers, and hence, yes, Google Ads'

8    demand was an attractive aspect of ad exchange, but I don't

9    believe the ad exchange was the only place in which Google

10   Ads bought inventory.

11   Q     It was the only exchange where Google Ads could

12   purchase without restriction; isn't that right?

13   A     When you say "without restriction," what do you mean?

14   Q     Google Ads' advertisers could purchase any ad they

15   wanted on Google's AdX, but if they wanted to purchase on a

16   third-party exchange, it had to be limited to retargeting;

17   is that right?

18   A     Again, I think Google Ads' purchase of inventory on AdX

19   was governed by constrains or controls that publishers would

20   specify on their inventory, but I do not recall whether

21   Google Ads' purchase on ad exchanges was restricted to just

22   remarketing, though I suspect that that may be true.

23   Q     Okay.  You suspect that may be true?

24   A     Yes.  Yes.

25   Q     Okay.  And you also agree that ad inventory of the type

                                                                    9

Direct examination - R. Srinivasan

```
 1   we're talking about that goes through an ad exchange, that
 2   is a perishable item; correct?
 3   A    When you say "perishable," could you elaborate on that?
 4   Q    Well, you've heard that term before today; correct?
 5   A    Today?  No.
 6   Q    You've heard that term before you came into court this
 7   morning?
 8   A    Oh.  Yes, I have.
 9   Q    And you've heard that term in connection with display
10   ads; correct?
11   A    Yes.
12   Q    Okay.  And so with that understanding of the term
13   perishable, something that disappears if not used, you knew
14   that Google -- that ad inventory on websites was a
15   perishable item; right?
16   A    Yes.
17   Q    Okay.  Now, for the entire time that you worked on
18   Google's ad exchange product, Google's standard rate card
19   for AdX for Open Auction impressions was 20 percent; right?
20   A    That was the list price, yes.
21   Q    Okay.  And as one of the product managers for AdX for
22   three years, you don't actually know why AdX charged a
23   20 percent take rate; is that right?
24   A    I was not around at Google when the decision to list
25   the ad exchange Open Auction pricing was 20 percent, but
```

10

Direct examination - R. Srinivasan

```
 1   through conversations with publishers, it became clear that

 2   we did add a lot of value that justified the 20 percent take

 3   rate.

 4   Q    You testified previously that you didn't know why AdX

 5   charged a 20 percent take rate; do you recall that?

 6   A    I was not around when the decision was made, so I would

 7   not know what informed the decision at the time.

 8   Q    Okay.  And you were, in fact, part of a team that

 9   undertook a review of AdX's take rate at one point in time;

10   correct?

11   A    Yes.

12   Q    And yet you didn't know what the standard rate for Open

13   Auction transactions were on other ad exchanges; is that

14   correct?

15   A    I would not say I knew categorically what the pricing

16   on other exchanges were, no.

17   Q    Well, do you recall testifying that you don't recall

18   being aware of other exchanges' list prices for Open Auction

19   transactions?

20   A    I definitely don't recall what the pricing is right

21   now.

22   Q    I'm not asking you what the pricing is.

23        I'm asking you, do you recall that at the time

24   that you were deposed in this case, you did not remember

25   knowing, ever, the other exchanges' list prices for Open
```

Direct examination - R. Srinivasan

1   Auction?

2   A    Again, I will repeat, I did not -- I do not recall

3   today what the list price on other exchanges were, and I

4   don't believe I recalled during the time of the deposition

5   either what the list price on other exchanges were.

6   Q    All right.  Now -- and also at the time of that

7   deposition -- you were deposed in August of last year;

8   right?

9   A    I believe that's right.

10  Q    And at the time of that deposition, you also weren't

11  aware of any features that any competing ad exchanges

12  offered; correct?

13  A    At the time of the deposition, I did not remember the

14  other features on the other exchanges, yes.

15  Q    Okay.  Now, as product manager for AdX, which was later

16  rebranded GAM, you were aware that prior to header bidding,

17  AdX, and AdX alone, was able to bid in real time in the DFP

18  waterfall setup; correct?

19  A    AdX doesn't really bid; AdX solicits bids from other

20  demand sources and granted all them auction to determine

21  what the winning price is.  So AdX did not conduct any

22  bidding; AdX sought bids from other demand sources and

23  determined the winner of the auction in real time.

24  Q    You were aware that AdX was competing against line

25  items for other exchanges where AdX was competing on a

                                                          12

Direct examination - R. Srinivasan

```
 1   real-time basis, and those other exchanges were competing on
 2   a static line item basis; isn't that true?
 3   A    Google Ad Manager did have a product called Exchange
 4   Bidding which allowed real-time prices to compete in the
 5   Google Ad Manager auction.
 6   Q    So let me stop you there.
 7           My question was -- before we got into whether AdX
 8   bids or doesn't bid, my question was, prior to header
 9   bidding -- we can agree that Exchange Bidding didn't happen
10   until header bidding; right?
11   A    Exchange Bidding came after header bidding.  That is
12   correct.
13   Q    Okay.  So I'm talking about before header bidding.
14           Before header bidding when AdX competed in an
15   auction, AdX competed with a real-time price, and other
16   exchanges competed on a static line item price; correct?
17           MS. PHILLIPS:  Objection, Your Honor.  I'm going
18   to object to the basis of foundation.  She's asking about
19   something that happened prior to header bidding, which was
20   in 2016.  Earlier, Mr. Srinivasan testified that he joined
21   Google in the middle in the summer of 2016 --
22           THE COURT:  All right.
23           MS. PHILLIPS:  -- so she's asking him about --
24           MS. WOOD:  Your Honor, may I respond, please?
25           THE COURT:  Let her finish first.
```

Direct examination - R. Srinivasan

```
 1                 MS. PHILLIPS:  Thank you.

 2                 -- before his time.

 3                 THE COURT:  All right.  You may respond.

 4                 MS. WOOD:  He's already testified about this

 5      extensively in his deposition where he admitted this.  I can

 6      just move straight to impeachment if that's necessary.

 7                 THE COURT:  Ask the question.

 8                 Overruled.

 9      BY MS. WOOD:

10      Q    Isn't it true that prior to header bidding and Exchange

11      Bidding, AdX, and AdX alone, competed on a real-time basis

12      while other exchanges competed against static line items?

13      A    Prior to header bidding, yes.  The only -- the only

14      real-time bids from ad exchange would be compared against

15      static line item prices in Google Ad Manager because the

16      technology did not exist to solicit bids from other

17      competing exchanges.

18      Q    Okay.  When you testified in this matter, you didn't

19      testify that the technology didn't exist for any other

20      exchanges; you testified only that AdX, and AdX alone, could

21      compete in real time, whereas other exchanges competed with

22      static line items; isn't that true, sir?

23      A    I do not recall the specifics of my testimony, but I

24      can clarify that this is --

25      Q    I don't need you to clarify.  Your counsel can have you
```

                                                                14

Direct examination - R. Srinivasan

```
 1    clarify when they get -- they'll have a chance to examine
 2    you after I'm done.  For now, if you could just stick to
 3    answers to my question.
 4    A    Sure.
 5    Q    So let's try one more time.
 6              Prior to header bidding and Exchange Bidding, only
 7    AdX was able to compete against other exchanges on a
 8    real-time basis against static line items; isn't that true?
 9    A    Yes.
10    Q    Okay.  Now, eventually the market moved to something
11    called header bidding; right?
12    A    Yes.
13    Q    And you viewed header bidding as a technology that
14    publishers hacked to solicit bids from other exchanges to
15    increase the value of their inventory; right?
16    A    Yes.
17    Q    And Google refused to participate in header bidding;
18    isn't that right?  Prior to Exchange Bidding.
19    A    Yes.
20    Q    And Google viewed header bidding as a competitive
21    threat; did it not?
22    A    It was one of many competitive threats, yes.
23    Q    Okay.  And you would agree that header bidding was a
24    mean by which publishers could work outside of DFP to
25    solicit real-time bids from other exchanges besides AdX;
```

15

Direct examination - R. Srinivasan

```
 1    correct?

 2    A    Yes.  It was one of many ways in which publishers could

 3    leverage real-time bids from other exchanges.

 4    Q    Okay.  So other exchanges did have real-time bid

 5    capability, they just needed to go into header bidding to

 6    use it, not DFP; right?

 7    A    Could you repeat your question, please.

 8    Q    Yeah.  Other exchanges at the time we're talking about,

 9    header bidding, did have real-time bidding technology

10    because they were using that to bid into header bidding,

11    they just weren't allowed to use that to bid into DFP;

12    correct?

13    A    We had not built the technology for publishers to

14    solicit bids from other exchanges into DFP in real time --

15    Q    Okay.

16    A    -- until Exchange Bidding.

17    Q    Who is Jerome Grateau?

18    A    I don't specifically recall, but I believe he was

19    someone in our sales organization back at Google.

20    Q    Okay.  And do you recall that Google was making

21    attempts to dry out header bidding?

22    A    I do not understand what that term means.

23    Q    Let's see if we can refresh your recollection.

24         MS. WOOD:  Can we show the witness -- it should be

25    in the binder in front of you -- PTX 426.  And I believe
```

16

Direct examination - R. Srinivasan

```
 1   they are in numerical order.  It's also up on the screen if
 2   that is easier for you.
 3             THE COURT:  Is there any objection to 426?
 4             MS. WOOD:  I will note that this was also pursuant
 5   to our stipulation.
 6             THE COURT:  All right.
 7             MS. PHILLIPS:  No objection, Your Honor.
 8             THE COURT:  All right.  It's in.
 9    (Plaintiffs' Exhibit Number 426 admitted into evidence.)
10             THE WITNESS:  Okay.  Could I take a minute to read
11   this, please?
12   BY MS. WOOD:
13   Q    Sure.  I'm just going to tell you, all I'm interested
14   in is the top email from Mr. Grateau where he says:  "Only
15   buy on AdX impressions that are exposed through AdX and
16   multiple SSP, i.e., dry out header bidding SSP"; do you see
17   that?
18   A    I do.
19   Q    And do you see he writes:  "I believe the most urgent
20   step to take is to make our buying approach even more
21   intelligent for GDN, AWBid and DBM"; do you see that?  The
22   first sentence of his email.
23   A    Yes.
24   Q    And AWBid, that is the program in which Google Ads was
25   only -- was allowed to bid on third-party exchanges but only
```
17

Direct examination - R. Srinivasan

```
 1   for retargeting impressions; isn't that right?
 2   A    Again, I did not work on the buy-side, so my
 3   recollection here might not be precise, but I believe that
 4   is the case.
 5   Q    Okay.  And the GDN here, that's short for Google Ads;
 6   right?
 7   A    It stands for Google Display Network, which was
 8   subsequently rebranded as Google Ads.
 9   Q    Okay.  So if I refer to it as Google Ads today, you'll
10   understand what I'm referring to?
11   A    Yes.
12   Q    Okay.  And Google Ads, as you know, is a buy-side tool;
13   correct?
14   A    Yes.
15   Q    And it's not a sell-side product; right?
16   A    Yes.
17   Q    And DBM -- we have a lot of acronyms here, but DBM is
18   another name for DV360; right?
19   A    Yes.
20   Q    And that's Google's demand-side platform?
21   A    Yes.
22   Q    And, again, that's a buy-side tool; right?
23   A    Yes.
24   Q    And Mr. Grateau worked on the sale side of the
25   business?
```

18

Direct examination - R. Srinivasan

```
 1    A    I do not recall.

 2    Q    You don't recall whether he worked on the sale side or

 3    the buy-side?

 4    A    On the sales team.  I'm not sure whether he was on the

 5    buy-side or the sell-side sales team.

 6    Q    Sales -- what was he selling?

 7    A    Advertising tooling to publishers and advertisers.  I

 8    just don't know which side of the business he was on.

 9    Q    Okay.  And you see that he says that, as he puts it:

10    "We need to dry out HB SSP"; right?

11    A    I see that in his email.

12    Q    And you agree with me that HB refers to header bidding;

13    right?

14    A    I would assume so.

15    Q    And SSP, that's another term for supply-side platform,

16    which is another term that could be used for AdX exchanges;

17    correct?

18    A    Yes.

19    Q    Okay.  Now I want to turn to the subject of Google's

20    imposition of so-called Unified Pricing Rules.

21         You were in charge of Google's rollout of the new

22    so-called Unified Pricing Rules in 2019; were you not?

23    A    I was the product manager on the rollout.

24    Q    Okay.  And at the time that Google imposed Unified

25    Pricing Rules, you and others at Google knew that publishers
```

Direct examination - R. Srinivasan

```
 1   had historically given different floor prices to different
 2   exchanges and buyers in DFP; right?
 3   A    I would assume it is common practice as part of
 4   flooring strategies to set different floor prices across
 5   different dimensions, including buyers.
 6   Q    Okay.  And just for clarity, a floor price is just the
 7   minimum price that a publisher is willing to accept for a
 8   given impression; right?
 9   A    Yes.
10   Q    And you knew that publishers had multiple reasons for
11   setting different floor prices for different exchanges;
12   right?
13   A    Different exchanges?
14   Q    Different buyers, different exchanges, both.
15   A    Yes.
16   Q    Okay.  And you understood that publishers saw benefits
17   to those different -- ability to put different price floors;
18   correct?
19   A    The subset of publishers I've spoken to did indicate
20   there were benefits associated with it.
21   Q    Okay.  So you knew there were benefits; right?
22   A    I would not be able to say whether there were benefits
23   or not.  Publishers have indicated to me that there were
24   sometimes benefits.
25   Q    Okay.  Did you think they were being dishonest when
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - R. Srinivasan

```
 1    they told you there were benefits?
 2    A    I had no reason to believe they were dishonest, but I
 3    don't know what the evidence behind that statement
 4    necessarily is.
 5    Q    Okay.  So you didn't trust them; you would want to see
 6    the evidence first?
 7    A    It's not that I didn't trust them; I just would not
 8    know categorically whether there were benefits or not.
 9    Q    Okay.  And you weren't the only one at Google who knew
10    that publishers believed there were benefits to having
11    varying price floors; correct?
12    A    I would assume so.
13    Q    You would assume so; or do you recall that, in fact,
14    many people at Google knew that publishers liked having
15    different price floors?
16    A    Again, my recollection is a little hazy right now, but
17    I would assume, yes, there were multiple people where we had
18    discussions around this.
19    Q    So it was discussed often with groups of people at
20    Google that publishers valued having the ability to set
21    different price floors; right?
22    A    Again, my recollection is hazy, but I would assume so.
23    Q    Okay.  And one of the reasons that publishers set a
24    different price floor was to ensure revenue diversity; isn't
25    that right?
```

21

Direct examination - R. Srinivasan

```
 1   A     I believe that was one of many reasons cited by
 2   publishers, yes.
 3   Q     They didn't want to be beholden just to Google for all
 4   of their revenue; right?
 5   A     That would be accurate -- an accurate interpretation of
 6   revenue diversity.
 7   Q     Okay.  Now, do you recall having a discussion -- you
 8   don't remember that you worked with Mr. Grateau on the
 9   sell-side?
10   A     I don't recall whether he was on the sell-side or the
11   buy-side, but I remember he was on the sales team.
12   Q     Well, did you work with salespeople on the buy-side
13   since you didn't work on buy-side products?
14   A     There were certain rollouts that had to be coordinated
15   across the buy-side and the sell-side given the ad exchange
16   catered to both buy-side customers and sell-side customers.
17   Q     Okay.  Do you recall discussing with Mr. Grateau the
18   fact that publishers didn't trust Google with all their
19   revenue?
20   A     I do not have any recollection of that.
21   Q     And do you remember that -- well, let me just show you
22   the document.
23         I will show you what's been marked for
24   identification as PTX 469.  I think it's the next tab in
25   your binder.  It's also pursuant to our stip.
```

22

Direct examination - R. Srinivasan

```
1              THE COURT:  Any objection?

2              MS. PHILLIPS:  Court's indulgence for a moment to

3    look, please.

4              No objection, Your Honor.

5              THE COURT:  All right.  It's in.

6     (Plaintiffs' Exhibit Number 469 admitted into evidence.)

7    BY MS. WOOD:

8    Q    And this is an email from Mr. Grateau dated

9    February 14th, 2017; do you see that?  It's on the top.

10   A    Could I take a minute just to read through the

11   document?

12   Q    Well, I'm only going to ask you about the top email and

13   the top line.  If you want to read about it further for

14   context, you can do that with -- you'll have a chance to do

15   that on redirect as well -- I mean on cross-examination or

16   friendly cross or whatever we're calling it.

17   A    I've read through the top email.

18   Q    You see in the second paragraph, Mr. Grateau is writing

19   to Chris LaSala; right?

20   A    It appears so.

21   Q    Who was Chris LaSala in February of 2017?

22   A    He was a sell-side director.  I believe his title was

23   something along the lines of product strategy lead, so he

24   led the product strategy lead team.

25   Q    So he was definitely on the sell-side; right?
```

                                                                 23

Direct examination - R. Srinivasan

```
 1   A     He was definitely on the sell-side.

 2   Q     But you're still not sure if Mr. Grateau was?

 3   A     I do not remember where Mr. Grateau was.

 4   Q     And the second paragraphs said:  "Pubs are also

 5   rationale" -- I think it might be rational -- "when they

 6   decide to diversify their source of revenues, it helps them

 7   to keep Google at bay and put pressure on similar to any

 8   industry"; do you see that?

 9   A     I do.

10   Q     And that was consistent with the understanding that you

11   and others at Google had at the time, that the ability to --

12   for publishers to diversify their revenue away from Google

13   was important to them because they didn't like being

14   beholden to one revenue source; right?

15   A     Again, I did not know what Mr. Grateau meant in his

16   framing of this email, but I will at least say that

17   publishers did value diversity of revenue.

18   Q     Okay.  And you knew that, too; right?

19   A     That publishers valued diversity of revenue?  Yes.

20   Q     Right.  Okay.

21         Now, who was Jim Giles?

22   A     Jim Giles was one of our engineering directors on Ad

23   Manager.

24   Q     Okay.  And we talked a little bit about Exchange

25   Bidding at some point earlier in your testimony today, and
```

24

Direct examination - R. Srinivasan

```
 1    Exchange Bidding was a product offering that Google offered
 2    in lieu of header bidding; correct?
 3    A    Exchange Bidding was, in our opinion, a product that
 4    sought bids from other exchanges similar to header bidding,
 5    but with additional protections for publishers that we
 6    thought made it a more valuable product.
 7    Q    And so Google was trying to convince the market to move
 8    away from header bidding and toward Exchange Bidding that
 9    was run by Google; right?
10    A    We saw a market need based on publisher behavior and
11    decided to build a product more natively that we thought was
12    a more superior product.
13    Q    So if you could try to answer my question, I'd
14    appreciate it.  I know you may have things you want to
15    explain, and you'll get a chance when Google's counsel
16    examines you to explain.
17              My question was:  Google was trying to move the
18    market away from header bidding and towards Exchange
19    Bidding, which was run by Google; isn't that true?
20    A    Again, I don't know if it was necessarily the case that
21    we were trying to move all header bidding traffic over to
22    Exchange Bidding.  Like I mentioned, we just tried to launch
23    a superior product in response to competition from header
24    bidding.
25              THE COURT:  That was the long answer.  The answer
```

25

Direct examination - R. Srinivasan

```
 1   is yes or no.
 2            Ms. Wood, ask the question again.
 3   BY MS. WOOD:
 4   Q    Google was trying, through Exchange Bidding, to move
 5   the market away from header bidding and towards Exchange
 6   Bidding which was the product that Google was offering in
 7   lieu of header bidding; correct?
 8   A    Yes.
 9   Q    And that project where you were developing Exchange
10   Bidding came to have a code name; right?
11   A    I believe so, yes.
12   Q    And the code name was Jedi?
13   A    Yes.
14   Q    Okay.  And do you recall learning, in association with
15   Jedi, that Google received data from the Jedi Exchange
16   Bidding process that proved that pubs -- publishers were
17   putting AdX at higher price floors?
18   A    Again, I don't recall any specific proof to that
19   effect.
20   Q    Let me show you what's been marked for identification
21   as PTX 534.
22            THE COURT:  Any objection to 534?
23            MS. WOOD:  It's also pursuant to our stipulation.
24            MS. PHILLIPS:  There's no objection.  Thank you.
25            THE COURT:  It's in.
```

                                                              26

Direct examination - R. Srinivasan

```
 1      (Plaintiffs' Exhibit Number 534 admitted into evidence.)

 2   BY MS. WOOD:

 3   Q    And PTX 534 is an email from Mr. Giles to

 4   Mr. Lipkovitz, who the Court's already heard from, with the

 5   subject line "Display Rev Force"; do you see that?

 6   A    Yes.

 7   Q    And do you see the top line, the very first sentence of

 8   Mr. Giles' email he writes:  "We suspected higher AdX floors

 9   is what was happening, both for header bidding and for Jedi,

10   but without the Jedi data, we didn't have a way to

11   conclusively prove it."

12           Does that refresh your recollection that the data

13   that Google received from running the Exchange Bidding

14   product Jedi, allowed it to confirm the price floors?

15   A    Again, I -- you might need to speak to Jim about this,

16   because I'm not necessarily sure what data he is referring

17   to here.

18   Q    Okay.  He goes on to write:  "Now that we know for

19   sure, there's several things we can do about it.  Early in

20   the design of Jedi, we talked about Jedi floors that would

21   override AdX and apply to everyone, but we decided not to do

22   it right away because of complexity for publisher, and that

23   it would add a barrier to adoption.  Is it something that we

24   will revisit"; do you see that?

25   A    Yes.
```
                                                                27

Direct examination - R. Srinivasan

```
 1   Q    Do you recall that being something that was discussed
 2   in connection with Jedi, a unified price floor, but that was
 3   abandoned because you were worried that the market wouldn't
 4   leave header bidding and join Exchange Bidding if you
 5   imposed unified pricing floors at that time?
 6   A    Again, I don't recall the specifics of this discussion
 7   necessarily.
 8   Q    Now, who was Max Lin?
 9   A    Max Lin was one of the engineers on the sell-side.
10   Q    And the next paragraph reads:  "Max Lin also has an
11   idea that would make publishers strictly more money and
12   solve this issue, at least for Jedi.  On a per-query basis,
13   if any bid from an exchange is lower than the AdX floor,
14   then we would ignore the AdX floor and let AdX compete"; do
15   you see that?
16   A    I do.
17   Q    Do you recall a discussion about allowing AdX to ignore
18   a floor and just let AdX compete?
19   A    Again, I personally don't recall this discussion, no.
20   Q    Mr. -- the email goes on:  "Unlike last look that only
21   benefits us."  What was last look, sir?
22   A    Last look was an industry terminology that came about
23   by which what was previously designed as static line items
24   within the Ad Manager with the rise of header bidding were
25   used to inform real-time price bids.  And in a world before
```

Direct examination - R. Srinivasan

```
 1   header bidding, the way we maximized revenue for publishers
 2   was to allow the AdX bids to be floored by those static line
 3   items.  So the static line items would be, I'm on average
 4   getting $3 from this demand source, so let me use that $3 as
 5   a floor in the AdX auction.
 6            With the rise of header bidding, those static line
 7   items now became informed by real-time bids from competing
 8   exchanges, and, hence, this previous publisher optimization
 9   strategy of using that price to floor the AdX bids became I
10   guess construed as an advantage that AdX gets, and that is
11   now referred to as last look.
12   Q    And the industry viewed that as a strategic advantage
13   for Google, that it got the last look and could increase the
14   price; correct?
15            MS. PHILLIPS:  Objection, Your Honor, to the
16   entire industry and his knowledge of what that industry
17   thought.
18            THE COURT:  Sustained.
19            MS. WOOD:  Your Honor, again, I can lay a
20   foundation.
21            THE COURT:  All right.  Try.
22            MS. WOOD:  I'll come back to it.  We have it out
23   of his own mouth, I think, so we'll listen to that a little
24   bit later.
25   BY MS. WOOD:
```

29

Direct examination - R. Srinivasan

```
 1  Q    Who came up with the idea for Unified Pricing Rules?
    Was it Mr. Lin?
 3  A    Again, I don't recall.  I don't believe it was one
    specific person.  It probably came about through multiple
 5  discussions, so I don't recall who specifically came up with
    it.
 7  Q    Do you know who Sam Cox is?
 8  A    Yes.
 9  Q    Who is Sam Cox?
10  A    Sam Cox was one of the product managers on the Google
11  sell-side that worked with buyers on our exchange.
12  Q    Did Mr. Cox come up with the idea for UPR?
13  A    Again, I don't recall if any specific individual came
14  up with that idea.
15  Q    So it was a bunch different people who came up with the
16  idea?
17  A    It came about through multiple discussions, I would
18  imagine.
19  Q    And do you remember when the idea first arose?  Was it
20  in that email from Mr. Giles we just saw where he referenced
21  Mr. Lin's idea?
22  A    Again, I'm not sure if -- when specifically that came
23  about.
24  Q    Was it your idea?
25  A    Again, it was a group discussion.  I would not be able
```

30

Direct examination - R. Srinivasan

```
 1    to attribute it to any individual.

 2    Q    Okay.  Let me show you what we've marked for

 3    identification as PTX 609.  It's next in your binder, and it

 4    is also pursuant to a stipulation between the parties.

 5              MS. PHILLIPS:  No objection.

 6              THE COURT:  All right.  It's in.

 7      (Plaintiffs' Exhibit Number 609 admitted into evidence.)

 8    BY MS. WOOD:

 9    Q    And if we could turn to the second page of the

10    document.  You know we read emails in reverse chronological

11    order, so the first email in time is on the second page.

12              And do you see the email on May 29th, 2018 from

13    Mr. Sam Cox?

14    A    Yes.

15    Q    Okay.  And he writes:  "I keep thinking about pubs

16    setting high floors for the AdX in order to push Google

17    harder.  It makes me want to turn off the ability to floor

18    the whole market as a single unit.  Can we force pubs to

19    segment their demand by turning off the ability to floor the

20    whole exchange and instead giving them -- only -- giving

21    them buyer-only floor controls.  Just a thought"; do you see

22    that?

23    A    I do.

24    Q    Do you recall this discussion with Mr. Cox?

25    A    I do not.
```

31

Direct examination - R. Srinivasan

```
 1   Q    And then Mr. Levitte responds.  Who is George Levitte

 2   or Levitte?

 3   A    George Levitte.

 4   Q    Levitte.

 5   A    He was also a product manager on Google Ad Manager.

 6   Q    And he writes:  "I thought we wanted the reverse, not

 7   allowing floors per buyer, because it's the key mechanism

 8   that allows funny yield management games where DBM" --

 9   that's DV360; right?

10   A    Yes.

11   Q    -- "is exposed to a waterfall of floors across

12   exchanges.  We were hoping to replace existing AdX rules

13   with new rules that wouldn't allow buyer-base price

14   discrimination.  I think the strategy of 'push Google

15   harder' is more difficult in a world without the ability to

16   set floors per buyer"; right?

17   A    I see that.

18   Q    And so part of what Google was trying to do was prevent

19   its own customers from pushing Google's AdX harder; right?

20   A    With respect to the Unified Pricing Rules rollout?

21   Q    Yes.

22   A    Again, I think it was one of many reasons.  But, yes, I

23   think having a cleaner ecosystem for buyers to bid into our

24   exchange so that there's improved trust in the exchange was

25   also one factor that informed that change.
```

32

Direct examination - R. Srinivasan

```
 1   Q     All right.  And then you respond -- do you see that if

 2   you turn back to the first page of the document?  You

 3   respond the next day on May 30th, 2018.  And you write in

 4   the first sentence there -- the second sentence there, I'm

 5   sorry.  "Pubs" -- that means publishers; right?

 6   A     Yes.

 7   Q     -- "set higher floors for AdX as a whole, specific

 8   buyers because," and then you list four different reasons

 9   why pubs like different floors; right?

10   A     Yes.

11   Q     And the first one is:  AdX has last look; do you see

12   that?

13   A     Yes.

14   Q     And so you write:  "AdX has last look against remnant

15   line items, and hence they want AdX to work harder"; do you

16   see that?

17   A     Yes.

18   Q     And the second reason is:  "Publishers have the

19   perception that undesirable ads on AdX, primarily from

20   AdWords unclassified advertisers, is correlated with low

21   CPMs, and setting higher floors will protect them"; do you

22   see that?

23   A     Yes.

24   Q     And then the third reason was to put different floors

25   to simulate a real-time waterfall; right?
```

33

Direct examination - R. Srinivasan

```
 1   A     Yes.

 2   Q     And the fourth one had to deal with Global Bernanke and

 3   pubs seeing yield benefit in increasing floors on AdX;

 4   right?

 5   A     Yes.

 6   Q     So this email that you sent was in May of 2018.

 7         Unified Pricing Rules rolled out when?

 8   A     If memory serves me right, sometime in 2019.

 9   Q     So a full year before Unified Pricing Rules rolled out,

10   you and other people at Google working on the sell-side are

11   discussing all the reasons why pubs liked to have those

12   different price floors; right?

13   A     Yes.

14   Q     And then again there's a response just above your email

15   from Nitish Korula.  Who is he?

16   A     Nitish is also one of the engineering managers on

17   Google Ad Manager.

18   Q     And he writes:  There's also Number 5.  You only listed

19   four, Rahul, I've got one more.  "Some perceived benefit

20   from wanting revenue diversity, publishers have indicated

21   being willing to tolerate some revenue loss in exchange for

22   reduced dependence on GDN/DBM and Google, including RTBs as

23   a whole"; do you see that?

24   A     Yes.

25   Q     And that was true at the time; right?
```

34

Direct examination - R. Srinivasan

```
 1   A    Like I mentioned, I've heard certain publishers specify
 2   that.  I don't know how universally true it was.
 3   Q    Okay.  So you knew, and others at Google knew, that not
 4   only did pubs want different price floors, but they were
 5   willing to incur their own loss of revenue to ensure that
 6   they were not overly dependent on Google; isn't that right?
 7   A    That's what the statement says, yes.
 8   Q    Okay.  Now, we talked a little bit about Jedi already,
 9   and in July -- when was Jedi officially launched; do you
10   remember?
11   A    I actually don't recall.  I believe it was sometime in
12   2018, but I'm not certain.
13   Q    Okay.  Let's see if this maybe refreshes your
14   recollection.  I'm going to show you what's been marked for
15   identification as PTX 611.
16             MS. WOOD:  This is also pursuant to our stip.
17             THE COURT:  Any objection to 611?
18             MS. PHILLIPS:  No, Your Honor.
19             THE COURT:  All right.  It's in.
20     (Plaintiffs' Exhibit Number 611 admitted into evidence.)
21   BY MS. WOOD:
22   Q    And do you recall PTX 611 just from the cover page?
23   A    Not completely.  If you can give me a second just to go
24   through it.
25   Q    Let me ask you a question.
```

                                                                    35

Direct examination - R. Srinivasan

```
 1              Since you're no longer at Google, is there any
 2    sensitivity to me reading your email address?  Your former
 3    Google email address.
 4    A    No.
 5    Q    Okay.  Was your email address rahulsr@google.com?
 6    A    Yes.
 7    Q    And so I will just represent to you that the metadata
 8    for this document indicates that you are the e-author.
 9              Do you know what e-author means?
10    A    Okay.  Is that the primary author?
11    Q    I'm asking you if you know.
12    A    I don't know.
13    Q    Okay.  You are the only author listed in the metadata,
14    if that's helpful.
15    A    Okay.
16    Q    Okay.  Does this refresh your recollection that this
17    was a document you prepared on or around July 2018?
18    A    It would not surprise me if this was a document I
19    prepared.
20    Q    Okay.  You have no reason to doubt that this is a
21    document you prepared?
22    A    No.  I have a vague recollection of some of these
23    slides, and the formatting seems similar to what I would put
24    together, so I would not suspect otherwise.
25    Q    Okay.  I know we all stick on our formats; I do the
```

Direct examination - R. Srinivasan

```
 1    same.

 2    A    Yes.

 3    Q    Okay.  So if we turn to the first substantive page

 4    there's an agenda; do you see that?

 5    A    Yes.

 6    Q    And it says:  "Update on Jedi progress."  We, again,

 7    know that Jedi is the code name inside Google for the

 8    Exchange Bidding product; right?

 9    A    That is correct.

10    Q    And then the second bullet point says:  "Discussed

11    strategy framework and some initial ideas for unified yield

12    management"; do you see that?

13    A    Yes.

14    Q    And then under executive summary, it says:  "EB

15    performance strong after GA."

16              What's GA?

17    A    I would imagine general availability.

18              THE COURT:  I'm sorry, what?

19              THE WITNESS:  General availability.

20    BY MS. WOOD:

21    Q    Does that refresh your recollection as to when Exchange

22    Bidding was launched?

23    A    Again, it seemed to suggest it was after -- before

24    July 2018, but I still don't recall when specifically it was

25    launched.
```

                                                                    37

Direct examination - R. Srinivasan

1    Q    And then it goes on to say:  "EB performance strong

2    after GA" -- general availability -- "but pubs continue to

3    multi-list inventory across HB/Jedi/AdX for overlapping

4    demand with higher floors on AdX"; do you see that?

5    A    Yes.

6    Q    And then the second bullet point says:  "Our unified YM

7    strategy is to" -- and the second bullet point below that

8    says:  "Improve Google net revenue by mitigating impact of

9    inventory multi-listing through changes to" -- and the first

10   bullet below that is:  "To auction dynamics, including

11   'unify floors across AdX/EB/remnant'"; do you see that?

12   A    Yes.

13   Q    So is it fair to say that what was being discussed at

14   this meeting was a desire to improve Google's net revenue

15   by, among other things, imposing unified price rules?

16   A    It was likely one of many reasons why we decided to go

17   down that path, yes.

18   Q    Okay.  So let's turn to a page in this document that

19   ends in 792.

20          Do you see the heading -- it's also up on the

21   screen, whichever is easier.

22   A    Oh.  This one?  Okay.

23   Q    Yeah.  Do you see the heading "and floors tend to be

24   higher for AdX bids"?

25   A    Yes.

                                                              38

Direct examination - R. Srinivasan

```
 1    Q     And do you see this is analysis -- quantitative
 2    analysis that Google did about where price floors were set
 3    for AdX relative to other line items including header
 4    bidding?
 5    A     Sorry.  Could you repeat the question?
 6    Q     Yes.  Do you see on the left-hand side "AdX versus HB"?
 7    A     Uh-huh.
 8    Q     Okay.
 9    A     Yes.
10    Q     And do you see that that is based on an analysis by
11    Google of "42 percent of header-bidding-won inquiries have a
12    higher AdX floor than the header bidding LI" -- meaning line
13    item -- "price"; do you see that?
14    A     Yes.
15    Q     This is an analysis that Google conducted; right?
16    A     I would imagine so, yes.
17    Q     And this analysis was showing that header bidding was
18    doing well because AdX was floored at a higher price; right?
19    And so AdX was losing to header bidding?
20    A     I would make a more precise -- I would make a more
21    precise tape in.
22              (Reporter interrupted for clarification.)
23              THE WITNESS:  I would make a more precise tape in.
24              All it says is that on certain segments of
25    inventory, the AdX floor was higher than header bidding line
```

39

Direct examination - R. Srinivasan

```
 1    item prices.  I would not conclude that header bidding was

 2    doing better purely because of this.

 3    BY MS. WOOD:

 4    Q    Okay.  But header bidding was coming in with a

 5    different floor that AdX could not beat because of AdX

 6    having a higher price floor; correct?

 7    A    For certain segments of inventory, yes.

 8    Q    Okay.  And do you see if you turn to the next page

 9    ending in 793, it talks about:  "Our goal is to improve

10    platform attractiveness and increase net revenue"; do you

11    see that?

12    A    Yes.

13    Q    And again, when we talk about increasing net revenue,

14    we're talking about increasing Google's net revenue, not

15    your publishers' net revenue; right?

16    A    The title says Google net revenue.  So yes.

17    Q    Okay.  And under increase Google net revenue it says:

18    "Increase proportion of transactions through DRX

19    programmatic pipes"; right?

20    A    Yes.

21    Q    Okay.  And then if you turn to the page ending in Bates

22    stamp 795, do you see on the far right there's a topic:

23    "Change web pricing to improve AdX attractiveness"; do you

24    see that?

25    A    Yes.
```

40

Direct examination - R. Srinivasan

1    Q    And so among the things you were thinking about to get

2    more business on to AdX was actually lowering your take

3    rate; right?

4    A    It was one option.

5    Q    And that's a pretty classic way to win more business is

6    to just lower your take rate and, you know, if you offer a

7    cheaper product, you'll get more business; right?

8    A    Lowering take rate would likely increase volume.

9    Q    Okay.  And so the proposal being discussed here was to

10   decrease AdX pricing in line with competition; right?  Do

11   you see that?

12   A    I do.

13   Q    So Google was aware that the competition was charging

14   higher prices, and Google could actually compete by lowering

15   its price; right?  That's what you were considering?

16   A    Again, the clarification I would make is maybe some

17   competition was lower priced, and I'm not sure if the

18   universe of our competitors always charged lower pricing.

19   Q    It doesn't say "some competition"; right?  Right?

20   A    True.  It doesn't.

21   Q    Okay.  And did Google ever lower its price to compete

22   for AdX Open Auction?

23   A    During my time there, the list price stayed the same.

24   Q    Okay.  Do you know if it's lower today?

25   A    I do not.

                                                              41

Direct examination - R. Srinivasan

```
 1   Q     Now let's turn to the page ending in 800.

 2           Do you see the title?

 3   A     I'm sorry, I'm not yet at 800.  Yes.

 4   Q     And the title of the slide is:  "Why Do Pubs Use HB";

 5   right?

 6   A     Yes.

 7   Q     Why do pubs want to do header bidding; right?

 8   A     Uh-huh.  Yes.

 9   Q     Because you knew that header bidding was outside of

10   Google's systems.  Pubs were leaving Google's system to do

11   something outside of Google's system instead; right?

12   A     The auction was outside the Google system, but the ad

13   would still be served by Google.

14   Q     Understood.

15           But pubs felt it was necessary to exit Google's

16   system to run an auction to get real-time competition from

17   other exchanges; right?

18   A     Yes.  The auction was outside Google.

19   Q     Okay.  And so this lists several reasons why pubs were

20   using header bidding.  One was incremental demand, one was

21   increasing yield, and the third was, we've discussed several

22   times, their desire to diversify revenue and reduce their

23   revenue dependence on Google; right?

24   A     Yes.

25   Q     And those were all reasons Google understood that
```

Direct examination - R. Srinivasan

```
1    publishers were using header bidding; right?

2    A    Based on conversations with publishers, yes.

3    Q    Okay.  And then if you turn to the next page ending in

4    801, this slide says:  "Header bidding undermines some of

5    our core principles for 3P yield"; do you see that?

6    A    Yes.

7    Q    And then in Number 3, it says -- well, let's start with

8    Number 1.  Sorry.  Platform strength.  "Header bidding

9    technology makes third-party yield solutions more

10   attractive, undermining the value of DRX as a must-call

11   platform"; right?

12   A    Yes.

13   Q    "Must-call platform," were those words you chose when

14   you authored this document?

15   A    Again, it's been a few years, so I don't know if these

16   were my words, but I was an author on the document.  It's

17   hard for me to comment on who specifically added those

18   words.

19   Q    Okay.  But you wouldn't have included them in the

20   document if you thought that they were inaccurate; right?

21   A    Again, we collaborated on the slide deck, so I'm not

22   completely sure.  I didn't think it was inaccurate.

23   Q    Okay.  Great.

24        And DRX, just for purposes of the record, because

25   I'm sure we all have been looking for another acronym, is
```

43

Direct examination - R. Srinivasan

```
 1    the same as GAM; right, G-A-M?

 2    A    Yes.

 3    Q    Okay.  And GAM, Google Ad Manager, is the combined

 4    rebranded product of the DFP publisher ad server and the AdX

 5    ad exchange; right?

 6    A    That is correct.

 7    Q    So the concern, to put all the language together now,

 8    was that header bidding technology undermined the value of

 9    DFP and AdX as a must-call platform; right?

10    A    That's what the document states.

11    Q    Okay.  And that's what you believed at the time?

12    A    Yes.

13              THE COURT:  3P yield, what does that mean?

14              THE WITNESS:  That refers to third-party yield.

15              THE COURT:  Okay.  Thank you.

16              THE WITNESS:  So essentially the way we thought

17    about our sort of demand sources was it was first party,

18    which was Google Ads and DV360, and then there's third-party

19    sources of demand, which is other exchanges and other buyers

20    on the platform.

21              THE COURT:  Thank you.

22    BY MS. WOOD:

23    Q    Now, the third item on this is:  "Header bidding takes

24    some transactions away from DRX pipes, even when the same

25    demand is available on DRX"; right?
```

<span style="text-align: right; display: block;">44</span>

Direct examination - R. Srinivasan

```
 1   A     Yes.

 2   Q     And also this is Number 4:  "By moving the auction

 3   logic outside of DFP, header bidding reduces our ability to

 4   gain a comprehensive understanding of the 3P ecosystem"; do

 5   you see that?

 6   A     Yes.

 7   Q     And that's a reference to the fact that when things

 8   occur outside of the DRX or DFP, Google doesn't have as much

 9   data about what's going on; right?

10   A     Google doesn't have as much visibility, yes.

11   Q     And that makes it harder to compete; right?

12   A     It makes it harder to understand what's happening in

13   the auction and what the competitive bid landscape was.  I

14   wouldn't go so far to say it's harder to compete,

15   necessarily.

16   Q     Well, wouldn't you see that understanding what's

17   happening in the auction and understanding the competitive

18   landscape helps you compete?

19   A     Insomuch as it informs specific features like how to

20   set reserve prices, yes.  But, more broadly, I don't know if

21   that lack of visibility directly undermines competitiveness

22   of DFP.

23   Q     Okay.  But, again, one of the things you were concerned

24   about was that lack of visibility for Google; correct?

25   A     Yes.
```

Direct examination - R. Srinivasan

```
1    Q    And then we can turn to the next page that ends in
2    Bates stamp 802.  And the title of the slide is "Why Do Pubs
3    Set Up Higher Floors On AdX."  And I won't repeat all this
4    because I know we've gone over this a couple of times now,
5    but just the fourth bullet point you wrote -- or the author
6    of this document, which appears to be you, wrote:  "Pubs
7    have been willing to tolerate some revenue loss in exchange
8    for reduced dependence on Google as a whole"; right?
9    A    Again, I'm not 100 percent sure I was the one that
10   included that comment, but I would not be surprised if that
11   were the case.
12   Q    And you don't disagree with the comment in any event?
13   A    I don't, no.
14   Q    Okay.  So let me show you -- do you recall
15   participating in the sell-side pricing 2.0 review in 2018
16   around the same time that you're talking about Exchange
17   Bidding and Jedi?
18   A    I was involved in a pricing review.  I don't know if
19   it's specifically the one you were referring to.
20   Q    Okay.  Let's look at PTX 625.
21             THE COURT:  Any objection?
22             MS. PHILLIPS:  No objection, Your Honor.
23             THE COURT:  All right.  It's in.
24             MS. PHILLIPS:  Thank you.
25     (Plaintiffs' Exhibit Number 625 admitted into evidence.)
```

46

Direct examination - R. Srinivasan

```
 1   BY MS. WOOD:
 2   Q    Do you see Mr. Bellack's name on PTX 625 at the top?
 3   A    Yes.
 4   Q    And Mr. Bender's name?
 5   A    Yes.
 6   Q    And do you see neither Bellack -- neither Mr. Bellack
 7   nor Mr. Bender are attorneys; right?
 8   A    No.
 9   Q    Okay.  And if you look at the top of -- the subject
10   line says "attorney/client priv"; right?
11   A    Yes.
12   Q    Okay.  If you look at the bottom comment from you at
13   the bottom of page 1, do you see Rahul Srinivasan?
14   A    Yes.
15   Q    And you write:  "Unifying floors across AdX Exchange
16   Bidding and header bidding, same floor for DBM irrespective
17   of channel will address some of these gaps.  We could launch
18   a new first-price auction floor product on DRX, which would
19   apply uniformly to all these channels and move GDN and DBM
20   to a one-price auction, i.e., they would no longer be
21   subject to the existing high AdX floors"; do you see that?
22   A    I do.
23   Q    Was this part of your suggestion to move to a Unified
24   First Price Auction in connection with the discussion of
25   Jedi?
```

47

Direct examination - R. Srinivasan

1    A    Again, I'm not completely sure what the context of this
2    discussion was.  It appears to be a comment thread for a
3    document related to sell-side pricing.  I'm not familiar
4    with the contents of that document at this point, so I'm not
5    sure what context this comment was made.
6    Q    Well, putting aside the context of this document, do
7    you recall, in the context of the sell-side pricing review
8    and Jedi, that there was discussion about moving to a
9    Unified First Price Auction and also imposing Unified
10   Pricing Rules?
11   A    There was discussion about that, yes.  I don't know if
12   it was in relation to sell-side pricing 2.0.
13   Q    Okay.  And do you see in the middle of the page Sissie
14   is it Hsiao?
15   A    Sissie Hsiao.  That's right.
16   Q    You see Sissie Hsiao, she writes:  "If we already have
17   relationships with the 78 percent of the 3P inventory, why
18   are we not winning it through our own access point?"  Do you
19   see that?
20   A    I do.
21   Q    And the concern being expressed there was that header
22   bidding was allowing third parties to gain access to
23   inventory that Google also had but wasn't winning; right?
24   A    Again, I am not sure what Sissie's concerns here
25   specifically were, and at some point she managed both the

48

Direct examination - R. Srinivasan

1   buy-side and the sell-side.  So I'm not clear on -- with

2   what lens she was making this comment.

3   Q    Well, but do you remember generally that people at

4   Google were concerned that header bidding auctions were

5   taking inventory that Google had available to it but just

6   wasn't winning in the auction?

7   A    Again, if I remember right, buy-side folks were

8   concerned about buying inventory that was available on our

9   exchange through third-party exchanges because they did not

10  have the same level of trust associated with inventory

11  present on other exchanges, which could have raised this

12  concern.  But, again, I'm not sure what was behind Sissie's

13  concern here.

14  Q    Well, and also just to say the quiet part out loud, if

15  the -- Google's buy-side tool didn't get the auction win, it

16  also didn't get the revenue associated with that; correct?

17  A    Again, I will not be able to comment on the buy-side's

18  thought process here.

19  Q    Okay.  Fair enough.

20         And then do you see -- so she's concerned about

21  third-party inventory not being won through Google.

22         Can we agree that's what she's concerned about?

23  A    That's what her comment suggests.

24  Q    Okay.  And then Mr. Giles responds:  "There is some

25  progress on this already, Poirot, for example"; do you see

49

Direct examination - R. Srinivasan

```
 1    that?

 2    A     Yes.

 3    Q     What was Poirot?

 4    A     It was a buy-side experiment.  I am not familiar with

 5    the details at this point, but it had something to do with

 6    bidding strategies off the buy-side.

 7    Q     And those bidding strategies would help get those

 8    inventory back on Google's pipes; correct?

 9    A     Again --

10          MS. PHILLIPS:  Objection, Your Honor.  He just

11    testified that he doesn't know what Poirot was.  He doesn't

12    have any background in it.

13          THE COURT:  You need to lay a foundation.

14          Sustained.

15          MS. WOOD:  We'll follow through with that with

16    other witnesses, Your Honor.

17    BY MS. WOOD:

18    Q     Now, do you recall that there were, in fact, many

19    exchanges that moved to a first-price auction before Google

20    moved to a first-price auction?

21    A     I believe that's correct, yes.

22    Q     And what is, at Google, an ACM meeting?

23    A     I forget what the acronym stood for, but I believe it

24    was ads and commerce meeting.  But it was essentially a

25    review meeting with high-level execs at Google.
```

50

Direct examination - R. Srinivasan

```
1    Q     So high-level executive meeting?

2    A     Yes.

3    Q     And it was a big deal to present at an ACM meeting;

4    right?

5    A     Consequential decisions would bubble up to the ACM.

6    Q     Okay.  Do you recall participating in an ACM in

7    January 2019?

8    A     I don't recall the specific date, but I was involved in

9    one ACM, yes.

10   Q     And I apologize if I misspoke.  It may have been in

11   December 2018.  Do you recall one way or the other?

12   A     No.

13   Q     Okay.  Let me show you what we've marked for

14   identification as PTX 698.

15            THE COURT:  Any objection to 698?

16            MS. PHILLIPS:  No, Your Honor.

17            THE COURT:  All right.  It's in.

18      (Plaintiffs' Exhibit Number 698 admitted into evidence.)

19   BY MS. WOOD:

20   Q     And if we can start with the email on page 2.  On

21   Wednesday, December 19th, 2018, you can look and you see the

22   bottom two emails talk about the ACM review; do you see

23   that?  A January 10 ACM review.

24   A     Yes.

25   Q     And then who was Sam Temes?
```

                                                              51

Direct examination - R. Srinivasan

```
 1    A    Again, I don't recall the specifics, but I believe he
 2    had some role to play on the buy-side.
 3    Q    Okay.  And it says FWIW.  That's for what it's worth;
 4    right?  The 11:02 email.
 5    A    11:02.
 6    Q    It may help you on your screen.  It's up to you.
 7    A    Yes.
 8    Q    You see the 11:02 email?
 9    A    Yes.
10    Q    Okay.  And he writes:  "For what it's worth, we have
11    already dealt with 1P auction on most other SSPs, so the
12    buy-side is generally prepared for this"; do you see that?
13    A    Yes.
14    Q    So is it your recollection that by December 2018, most
15    other SSPs had already transitioned to a first-price
16    auction?
17    A    Again, I'm not sure what Sam was basing this on, but I
18    do remember there were other SSPs.  I don't know if the
19    characterization of most other SSPs is accurate.
20    Q    Okay.  And you wrote back on this chain, two emails
21    later, your email starts at the bottom of page 1.
22              Nowhere in your email do you correct Mr. Temes and
23    say, hey, it may not be most other SSPs?
24    A    I mean, I had no reason to correct him.  I just don't
25    know what basis he was making that statement on.
```

Direct examination - R. Srinivasan

```
 1   Q    Okay.  But if you thought he was wrong, would you have
 2   corrected him?
 3   A    Potentially, yes.
 4   Q    Okay.  Presumably if it was important enough and you
 5   thought he was wrong, you would have corrected him?
 6   A    Yes.
 7   Q    Okay.  So the email -- your email actually starts on
 8   the bottom of page 1, but I'm going to actually have you
 9   read at the top of page 2.
10        Just for context, do you see the FYI at the bottom
11   of your email, which is at the top of page 2, you say:
12   "FYI, we have a review with Suresh on this topic on the 10th
13   of January followed by an ACM on the 11th"; do you see that?
14   A    Yes.
15   Q    Who was Suresh?
16   A    Suresh was one of the VPs that had responsibilities
17   across the buy and sell-side.
18   Q    And what is Suresh's last name?
19   A    I believe it was Suresh Kumar.
20   Q    Okay.  And what was the topic for the ACM meeting on
21   January 11th, if you recall?
22   A    Again, I don't recall the specifics, but I remember it
23   being related to the bundle of changes that we were making
24   in terms of moving to a first-price auction, rolling out
25   Unified Pricing Rules, removal of AdX last look, and
```

53

Direct examination - R. Srinivasan

```
 1   improving bid data transparency.
 2   Q    Okay.  And the fact that this was being presented to an
 3   ACM was a reflection of the fact that this was a very
 4   important business decision; right?
 5   A    Yes.
 6   Q    Okay.  And then you write in your email at the top of
 7   the second page:  "If this migration" -- and that's the
 8   migration to a first-price auction with Unified Pricing
 9   Rules; right?
10   A    I'm sorry.  I'm trying to locate the sentence here.
11   Q    So at the very top sentence on page 2.
12   A    On page 2.  Okay.
13   Q    Which is a continuation of your email that begins on
14   page 1.
15   A    I see it.
16   Q    You write:  "If this migration".  I just want to
17   clarify.  The migration is the migration to a first-price
18   auction and imposition of Unified Pricing Rules; right?
19   A    The entire bundle of changes, but yes.
20   Q    Which included Unified Pricing Rules?
21   A    Yes, that's right.
22   Q    Okay.  "If this migration ends up shifting, a visible
23   portion of DBM spend from 3PE to AdX" -- so let's take a
24   minute, because, again, our favorite acronyms -- "a visible
25   portion of DBM spend is talking about spend on Google's
```

Direct examination - R. Srinivasan

```
 1    demand-side platform, DV360"; right?

 2    A    Yes.

 3    Q    And you're anticipating that there could be a visible

 4    portion of DV360 spend from third-party exchanges moving to

 5    AdX instead; right?  Is that how you read this sentence?

 6    A    Less of an anticipation and more as a risk that we

 7    might need to think through.

 8    Q    Okay.  So if this migration ends up shifting a visible

 9    portion of DV360 spend from third-party exchanges to AdX,

10    and then you write "which could happen because of lower AdX

11    floors"; right?

12    A    Yes.

13    Q    So you were indicating that lower AdX floors could lead

14    to DV360 spending more on AdX and less on third-party

15    exchanges; right?

16    A    Yes.

17    Q    Okay.  And then if you look at the bottom of the first

18    page, Mr. Temes responds to your email that we were just

19    reading, and he writes:  "Thanks, Rahul.  This is really

20    helpful, and the concern about how we comms" -- C-O-M-M-S --

21    "even more spend shift into AdX will be tricky"; do you see

22    that?

23    A    Yes.

24    Q    And comms there means what?

25    A    I would imagine he's referring to communication
```

                                                                    55

Direct examination - R. Srinivasan

```
 1   strategy for these changes.
 2   Q    And so Google was concerned about how you were going to
 3   handle this from a public relations perspective, this shift
 4   of additional spend from third-party exchanges to AdX;
 5   right?
 6   A    I think any product launch we discuss communication
 7   strategies, so this was probably just a part of that.  But,
 8   yes, given that it was a risk that we had flagged, it was
 9   probably in relation to that.
10   Q    Well, and it's common to have a PR strategy for new
11   products, but which is one where you were worried that the
12   comms was going to be tricky; right?  That's the word he
13   uses, the comms would be tricky?
14   A    I mean, those were Sam's words, yes.
15   Q    Okay.  And then looking at the top email, it's the
16   second email in time which is from you on January 3rd, 2019
17   at 5:58, you were responding to Sam.  I'm sorry, let me do
18   one in between.  I skipped one.
19           The email right before that from Sam Temes at
20   3 p.m.
21   A    Yes.
22   Q    Do you see that email?
23   A    Yes.
24   Q    He says:  "Looking at the slides and implications of
25   unified auctions, it appears DV3 purchased EB inventory
```

56

Direct examination - R. Srinivasan

```
 1   essentially going to go away completely"; do you see that?

 2   A    Yes.

 3   Q    "This will mean we spend way less on partners who are

 4   large EB partners such as Index"; do you see that?

 5   A    Yes.

 6   Q    Index, that's another ad exchange?

 7   A    Yes.  It's another SSP.

 8   Q    Okay.  And so the concern was they will -- Google will

 9   spend way less on partners that are large Exchange Bidding

10   partners, including Index; right?

11   A    That was a hypothesis, yes.

12   Q    So that was one of the consequences you expected in

13   association with this move to a Unified First Price Auction

14   and imposition of Unified Pricing Rules; correct?

15   A    It was a hypothesis.  It's unclear whether that was

16   subsequently tested.  But, yes, it was a hypothesis that was

17   flagged.

18   Q    Okay.  Well, you're calling it a hypothesis.  Isn't it

19   a fact that you viewed this as a "natural consequence"?

20   A    I would not say that, no.

21   Q    Well, you did, sir.  Look at the email right in the

22   paragraph above that.

23        Do you see where you wrote:  "So there could be

24   some spend shift as a natural consequence"?

25   A    Yes.
```

Direct examination - R. Srinivasan

```
 1   Q      Those are your words; right?
 2   A      But it does highlight the some spend shift as opposed
 3   to Sam's response of completely going away.
 4   Q      You knew that spend shift was a natural consequence of
 5   moving and imposing Unified Pricing Rules; right?
 6   A      Some spend shift, yes.
 7   Q      Some spend shift would be a natural consequence; right?
 8   A      Yes.
 9   Q      Now, because you anticipated that Google's publisher --
10   well, let me just ask the question.
11          Did you anticipate that Google's publisher
12   customers would be upset about the imposition of so-called
13   Unified Pricing Rules?
14   A      We thought some publishers might be upset.
15   Q      Okay.  And because of that, Google coupled the
16   announcement of the Unified Pricing Rules with the shift to
17   the first-price auction; correct?
18   A      I would say that was one of many factors that
19   involved -- that informed the reason to bundle those changes
20   together.
21   Q      And Google understood that publishers would probably
22   like the shift to a first-price auction because that stood
23   to potentially increase publisher revenues; right?
24   A      Our hypothesis was that publishers would like the first
25   price shift.
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - R. Srinivasan

```
1    Q    And so Google wanted to couple the bad news of Unified
2    Pricing Rules with what it thought would be good news, which
3    is the shift to the first-price auction; right?
4    A    If I were to -- if you were to allow me to explain
5    myself, we also --
6    Q    You can explain on -- when Google's counsel gets a
7    chance.  I would just like an answer to the question.
8    A    That was not the primary reason to bundle it, in
9    response to your question.
10   Q    Huh?  Pardon me?
11   A    That was not the primary reason to bundle it together.
12   Q    Okay.  Let me show you what's been marked for
13   identification as PTX 699.
14            THE COURT:  Any objection?
15            MS. PHILLIPS:  No, Your Honor.
16            THE COURT:  All right.  It's in.
17      (Plaintiffs' Exhibit Number 699 admitted into evidence.)
18   BY MS. WOOD:
19   Q    If you look at the first page of the exhibit, this is
20   an email from Nitish Korula dated January 4th, 2019; do you
21   see that?
22   A    Yes.
23   Q    And he was a Google engineer; right?
24   A    That's right.
25   Q    And do you see the all caps header "attorney/client
```

59

Direct examination - R. Srinivasan

```
 1    privilege and confidential" on the email?

 2    A    Yes.

 3         MS. WOOD:  I'll let the Court decide if there's

 4    any request for legal advice.  I mean, I can ask the witness

 5    that, but --

 6         THE COURT:  We don't need to go through that.

 7         MS. WOOD:  Okay.

 8    BY MS. WOOD:

 9    Q    And Mr. Korula writes to you and others with the

10    current plan.  Do you see this is in the second paragraph?

11    "With the current plan, common floors are removing per-buyer

12    pricing, we would be taking away some functionality that

13    publishers have today"; do you see that?

14    A    Yes.

15    Q    "We could likely sell it to them as part of this

16    broader change"; do you see that?

17    A    Yes.

18    Q    But it -- and I'm skipping the parentheses -- well,

19    I'll read it.  "There's less need for it in the first-price

20    world.  But if we offer it in a first-price world, I think

21    it would be very hard for us to take it away later"; do you

22    see that?

23    A    Yes.

24    Q    And then Mr. Korula writes:  "It would be viewed as a

25    pressure loss of functionality that we are doing for our own
```

60

Direct examination - R. Srinivasan

```
 1   (perceived nefarious self-serving reasons)"; do you see
 2   that?
 3   A    Yes.
 4   Q    That was the concern Google had, was that if you
 5   imposed UPR by itself, it would be viewed as "pure loss of
 6   functionality that Google was doing for their own perceived
 7   nefarious self-serving reasons"; right?
 8   A    Taking away functionality is always viewed negatively.
 9   I think taking away functionality that we deemed it
10   unnecessary because of the first-price change was going to
11   be easier.  That was the rationale behind this.
12   Q    That was the rationale by combining the two changes
13   together; correct?
14   A    Because we believed that pricing rules were less
15   relevant in a first-price world.
16   Q    Okay.  But what you had wanted from a year before --
17   we've seen the emails just this morning -- was to impose
18   this rule, and now you have the chance because you were
19   going to bundle it with something you thought publishers
20   might like that would give you a justification for imposing
21   it; right?
22   A    We had always discussed Unified Pricing Rules in the
23   context of also moving to a first-price auction.
24   Q    Well, we'll let the record speak for itself.
25        THE COURT:  We don't need comments, Ms. Wood.
```

Direct examination - R. Srinivasan

```
 1              MS. WOOD:  Okay.
 2    BY MS. WOOD:
 3    Q    Okay.  So let me show you what we have marked for
 4    identification as PTX 715.
 5              MS. WOOD:  It is also subject to our stipulation.
 6              THE COURT:  Any objection for the record?
 7              MS. PHILLIPS:  Sorry.  One moment, Your Honor.
 8              No objection, Your Honor.
 9              THE COURT:  All right.  It's in.
10     (Plaintiffs' Exhibit Number 715 admitted into evidence.)
11    BY MS. WOOD:
12    Q    And if we can start on the page ending in Bates stamp
13    001, it's the second page of the document.
14              And this is an email on January 15th, 2019 that
15    you wrote; correct?
16    A    It appears so, yes.
17    Q    And this time you've written "privileged and
18    confidential" in all caps; right?
19    A    That's correct.
20    Q    Sorry.  Let's get the right one up on the screen.
21    There we go.
22              And do you know what legal advice you were asking
23    for here?
24    A    Could I take a second to read through the email?
25              I don't remember what legal advice I was
```

Direct examination - R. Srinivasan

```
 1  specifically asking for here.

 2  Q    Okay.  Now, you start your email:  "Based on feedback

 3  from pubs, there seem to be a few other reasons that pubs

 4  see 'benefits'" -- and you put benefits in scare quotes --

 5  "from setting differential floors from different buyers

 6  today"; do you see that?

 7  A    Yes.

 8  Q    So this is January 15th, 2019.  You've already begun to

 9  solicit input from publishers about how they might react to

10  unified price floors; correct?

11  A    I don't know if it was specifically in relationship to

12  feedback on Unified Pricing Rules, but more an analysis of

13  the market of why publishers set floors.

14  Q    Okay.  Okay.  And, again, I won't belabor the point

15  because we've seen it several times in the document so far,

16  but you see many of the same four reasons we've talked

17  about.  Number 1, to simulate a real-time waterfall;

18  Number 2, Global Bernanke; Number 3, revenue diversity;

19  Number 4, concern about undesirable ads; do you see that?

20  A    Yes.

21  Q    Okay.  And then you write:  "Benefits from one and two

22  will be reduced through the move to a first-price auction";

23  do you see that?

24  A    Yes.

25  Q    And Benefit 4 is reduced to:  "Certain extent through
```

63

Direct examination - R. Srinivasan

```
 1  our improvements in advertiser classification and pub

 2  protection controls"; right?

 3  A    Yes.

 4  Q    "But wouldn't Number 3" -- this is -- Number 3 was

 5  revenue diversity; right?

 6  A    Yes.

 7  Q    "Wouldn't Number 3 and the short-term benefits that

 8  pubs see from the remaining buyers who continue responding

 9  to floors in a 1P auction still be valid reasons for pubs to

10  push back on the removal of this functionality?"  That's

11  what you wrote; right?

12  A    Yes.

13  Q    You write:  "Pubs are also not always scientific in

14  determining whether there is true yield benefit in setting

15  differential floors and may arrive at conclusions slightly

16  different from ours and still be loathe to give up this

17  per-buyer reserve functionality"; right?

18  A    Yes.  That's what the email states.

19  Q    And you said:  "The above concerns are still valid in a

20  world where we unilaterally take floors away."

21          What did you mean by "unilaterally take floors

22  away"?

23  A    Meaning deprecate the ability to set floors for

24  specific segments of demand.

25  Q    Okay.  So you knew that even with a shift to the
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - R. Srinivasan

```
1    first-price auctions, these concerns could still be valid;

2    right?

3    A    Yes.

4    Q    And it says:  "But it may be the best opportunity we

5    have to clean this up.  Wouldn't it be more effective in

6    getting us to our end goal rather than relying on pubs to

7    voluntarily give up this functionality?"; right?

8    A    Yes.

9    Q    And then Mr. Pal -- who is Martin Pal?

10   A    He was also an engineer on Google Ad Manager.

11   Q    And he writes in the email at the bottom of the page:

12   "We fear this may generate pushback from pubs who may view

13   the move as us taking away functionality they are rather

14   attached to"; do you see that?

15   A    Yes.

16   Q    And he goes on to say:  "And consider critical to their

17   business"; do you see that?

18   A    Yes.

19   Q    So people at Google knew that pubs thought this

20   functionality was critical to their business; right?

21   A    Again, I can't speak to Martin's state of mind when he

22   mentioned this, but it seems like Martin believed that in

23   his email.

24   Q    If we turn to the page that ends in -007.  I do not

25   remember if we discussed Mr. Amini yet.
```

65

Direct examination - R. Srinivasan

```
 1              Who is Mr. Ali Amini?

 2   A    I'm sorry, who?

 3   Q    Ali Amini.  It's actually on the bottom of 006.

 4   A    Yes.

 5   Q    Who is Mr. Amini?

 6   A    He was, I believe, an engineering director on the

 7   buy-side.

 8   Q    Okay.  And then his email carries over to the next page

 9   that ends in Bates -007.  And in the second paragraph -- or

10   the first paragraph under background he writes:  "Last look

11   is a feature that provides more incentives, advantages for

12   such RTB buyers, and it helps GDN/DBM to some extent, too;

13   however, sell-side is under pressure, as last look is

14   considered as an unfair advantage that sell-side gives to

15   its own demand"; do you see that?

16   A    Yes.

17   Q    Does that refresh your recollection that last look was

18   perceived in the market as an unfair advantage?

19   A    I have heard some publishers characterize it as an

20   unfair advantage.

21              MS. WOOD:  Okay.  Your Honor, at this point we

22   have an -- well, let me try to establish a little

23   foundation.

24   BY MS. WOOD:

25   Q    Ultimately Google held a meeting with many of its
```

66

Direct examination - R. Srinivasan

```
 1    publisher customers to discuss the rollout of these
 2    so-called Unified Pricing Rules; correct?
 3    A     Again, the rollout was a bundle of changes, one of
 4    which was Unified Pricing Rules, yes.
 5    Q     And you held a meeting with your publisher customers to
 6    discuss it before it was rolled out officially; correct?
 7    A     A subset of publisher customers, yes.
 8    Q     Do you remember approximately how many publishers --
 9    this was an in-person meeting?
10    A     It was, yes.
11    Q     And it also had an either Zoom or web-related broadcast
12    as well?
13    A     I don't recall.  I believe there was a recording.  I
14    don't know if there was a live stream, but I would not be
15    surprised if that were the case.
16    Q     Okay.  And how many people were in the room?
17    A     I'd say between 30 and 50.  But, again, I'm not
18    completely sure.
19    Q     And of that 30 and 50, how many were Google's publisher
20    customers?
21    A     Probably between 30 and 40.
22    Q     Okay.  And this was in person in New York?
23    A     Yes.
24    Q     And you were one of the presenters at that meeting on
25    behalf of Google; correct?
```

67

Direct examination - R. Srinivasan

```
 1   A     Yes.

 2   Q     And you just indicated that Google recorded the audio

 3   of that meeting?

 4   A     I believe so, yes.

 5   Q     And did Google tell its publisher customers that it was

 6   recording the meeting?

 7   A     I do not recall.

 8   Q     Do you know if Google told its publisher customers that

 9   it was recording the things they were saying in that

10   meeting?

11   A     I do not recall.

12   Q     Okay.

13           MS. WOOD:  Your Honor, at this time, we would like

14   to move into evidence that audio recording, PTX 1853, along

15   with a transcript that's been prepared of that recording,

16   PTX 1854.

17           THE COURT:  Any objection?

18           MS. PHILLIPS:  Yes, Your Honor.  I have a hearsay

19   objection.  This was a multiple-hour-long meeting with

20   multiple participants speaking, and I just want to ensure

21   that those statements are not coming in for the truth of the

22   matter asserted.

23           THE COURT:  This is being offered as possibly just

24   corroborative evidence of, A, what was said to publishers;

25   and, B, perhaps what publishers -- or how they may have
```

                                                          68

Direct examination - R. Srinivasan

```
 1   reacted to that?
 2              MS. WOOD:  Yes, Your Honor.  There are multiple
 3   bases on which we would argue its admission, including a
 4   statement of party-opponents.
 5              THE COURT:  Right.  I'm overruling the objection.
 6   It's in.
 7              MS. WOOD:  Thank you, Your Honor.
 8              THE COURT:  All right.
 9              MS. PHILLIPS:  May I just make a clarification for
10   the record, Your Honor?
11              I just want to make sure that the statements from
12   the publishers, not Google, but from the publishers are
13   being admitted for their impacts and not for the truth of
14   their statement; is that right?
15              THE COURT:  Correct.
16              MS. PHILLIPS:  Perfect.  Thank you, Your Honor.
17              THE COURT:  In other words, they're admitted to
18   show what information Google had as to their reaction to the
19   project.  Okay.
20              MS. PHILLIPS:  Thank you, Your Honor.
21              MS. WOOD:  Thank you.
22              THE COURT:  So for the record, 1853 and 1854 are
23   in.
24     (Plaintiffs' Exhibit Numbers 1853 and 1854 admitted into
25                      evidence.)
```
                                                              69

Direct examination - R. Srinivasan

```
1              MS. WOOD:  Yes, Your Honor.  So 1853 is the audio
2    recording itself; 1854 a transcript that has been prepared
3    to help facilitate the review, and that transcript is in
4    your binder at PTX 1854.
5    BY MS. WOOD:
6    Q    It's also in your binder, too.  Do you see it, sir?
7    A    Yes, I do.
8    Q    Okay.  Good.
9              Okay.  So let's all travel back in time together.
10   This is April 2019 in New York City.  And I'm going to --
11             MS. WOOD:  Obviously, Your Honor, I'm not going to
12   play the whole thing, but I am going to play some excerpted
13   clips that are quite short.
14             THE COURT:  Does the transcript show those?
15             MS. WOOD:  Yes.  What I will do is as I play the
16   clips, I will indicate where in the transcript we are.
17             THE COURT:  All right.  Then only those portions
18   of the transcript that relate to what we're hearing in court
19   today will actually go into evidence.
20             MS. WOOD:  Okay.  So you want us to redact the
21   other portions of the transcript?
22             THE COURT:  Right.
23             MS. WOOD:  We'll do that.
24             THE COURT:  Well, for purposes of what you have to
25   post tomorrow; right?
```

Direct examination - R. Srinivasan

```
 1              MS. WOOD:  Yes.  Thank you, Your Honor.
 2              THE COURT:  Okay.
 3              MS. WOOD:  Okay.  So let me start -- we'll start
 4    by -- and for folks that are looking at the transcript, I'm
 5    going to start on page 12, line 16.  And I would ask
 6    Mr. Klein if he can play a stamp that goes from minute --
 7    I'm going to be referring to the minutes of the audio
 8    recording.  From minute 23 and 44 seconds, to 24 and
 9    16 seconds.
10                        (Audio played.)
11    BY MS. WOOD:
12    Q    And that's your voice, is that not right,
13    Mr. Srinivasan?
14    A    Yes.
15    Q    And, again, what you're summarizing there is how Google
16    has bundled all three of these changes together in one
17    announcement; is that right?
18    A    Yes.
19    Q    Okay.  And part of that, in addition to shifting to a
20    first-price auction, which you anticipated publisher
21    customers would be happy about, you were also removing last
22    look, which you thought publisher customers would be happy
23    about; right?
24    A    Yes.
25              MS. WOOD:  Okay.  If we can go then to -- for
```

Direct examination - R. Srinivasan

```
 1    folks in the transcript, let's go to page 25 of the

 2    transcript, line 1.  And if I could ask Mr. Klein to play

 3    3622 to 3638, please.

 4                        (Audio played.)

 5    BY MS. WOOD:

 6    Q    Now, do you recognize that voice, Mr. Srinivasan?

 7    A    I don't recognize the words, but from the transcript,

 8    is seems to be Stephanie Layser.

 9    Q    Does that sound like -- have you ever met -- you've met

10    Stephanie Layser before?

11    A    I've met her, but I don't have a recollection of her

12    voice at this point.

13    Q    Okay.  You have no reason to doubt that's Stephanie

14    Layser?

15    A    No.

16    Q    Okay.  And she's expressing concern that by imposing

17    this new rule, Google's taking away control from its

18    publisher customers; isn't that right?

19    A    That appears to be her statement, yes.

20    Q    And then do you recall suggesting to her that this was

21    all necessary to move forward to more of a financial markets

22    model?

23    A    I may have made that statement elsewhere, but, yes, I

24    think the response to Stephanie Layser's question, per the

25    transcript, was that we needed to do this to move to a more
```

                                                              72

Direct examination - R. Srinivasan

```
 1   sustainable ecosystem.
 2            MS. WOOD:  Let's move to page 26, line 10, and if
 3   I could ask Mr. Klein to play the clip that starts at minute
 4   3755 seconds.
 5                          (Audio played.)
 6   BY MS. WOOD:
 7   Q    So you indicated to Ms. Layser that that was a
 8   completely fair point that she raised; is that right?
 9   A    Yes.
10            MS. WOOD:  Okay.  Let me play another portion of
11   the transcript -- of the audio, and that would be page 35,
12   line 1.
13   BY MS. WOOD:
14   Q    And again, Exchange Bidding is Google's alternative to
15   header bidding that was part of Project Jedi; correct?
16   A    Yes.
17            MS. WOOD:  Okay.  Let's play from 4705 to 4746.
18                          (Audio played.)
19   BY MS. WOOD:
20   Q    Do you recognize that voice?
21   A    Again, don't recognize it specifically, but it seems to
22   be from Jana.
23   Q    And do you recall hearing that feedback from publishers
24   that these rules were making it difficult for Google to
25   increase -- sorry.  That these changes were making it
```

Direct examination - R. Srinivasan

1    difficult for publishers to increase their yield with

2    partners other than Google?

3    A    I would clarify that this has nothing to do with the

4    set of changes that we were rolling out.  What Jana's

5    feedback on was the Exchange Bidding product and reporting

6    associated with that.  That had nothing to do with the

7    changes we were rolling out.

8    Q    Well, she's saying that all of these things together,

9    including Exchange Bidding, are making it difficult for

10   publisher customers to increase yield with other partners

11   instead of Google's; isn't that right?

12   A    Again, I will clarify that this has nothing to do with

13   the changes that were the topic of the discussion of the

14   meeting.  This was feedback in relation to the Exchange

15   Bidding product, which was not part of anything that we were

16   changing here.

17   Q    But Exchange Bidding and first-price auctions were all

18   occurring at a similar time period; correct?

19   A    Exchange Bidding had been, like, well before we were

20   making these changes on first-price auctions and Unified

21   Pricing Rules.

22   Q    Okay.  Did that mean that you weren't concerned about

23   her comments about why Exchange Bidding was making it

24   difficult for publishers to increase their yield with

25   partners other than Google?

                                                              74

Direct examination - R. Srinivasan

```
 1   A    I was concerned about it inasmuch as we needed to

 2   improve the Google Ad Manager product as a whole, but it had

 3   nothing to do with the set of changes we were proposing at

 4   that meeting.

 5   Q    And so what changes were made to address Ms. Meron's

 6   concerns?

 7   A    I would not be able to comment on that because I left

 8   the team shortly after.

 9           MS. WOOD:  Okay.  If we could go in the transcript

10   to page 44, line 1 to line 14.  And if I could ask Mr. Klein

11   to play the clip from 5604 to 5644.

12                        (Audio played.)

13   BY MS. WOOD:

14   Q    Do you recall publishers telling you that they were

15   frustrated that this was control, that Google was resting

16   away from them and giving to itself?

17   A    Yes.  I think some set of local publishers did mention

18   that.

19           MS. WOOD:  And if we could go in the transcript to

20   page 53, line 21.  And this is one of our longest ones, it's

21   a couple of minutes.  But we'll go to about page 56, line 6.

22   So if we could start in the audio at 1:06:41, please,

23   Mr. Klein.

24                        (Audio played.)

25           MS. WOOD:  Can you pause it there.
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - R. Srinivasan

1    BY MS. WOOD:

2    Q    Do you remember being asked in connection with the

3    imposition of Unified Pricing Rules by your publisher

4    customers, well, you know, one alternative to -- if you want

5    everything fair across the board is, can you match other ad

6    exchanges' take rates; do you remember being asked that?

7    A    I do.

8    Q    And what was Google's reaction?

9    A    That the premise behind Felix's question was mistaken

10   because the way the auction is conducted, it is net of rev

11   share to ensure that the highest bid wins.  So the premise

12   behind his question was not valid because there is no

13   priority given to any buyers, and any bid is net of rev

14   share in the auction.

15   Q    But suffice it to say, Google wasn't willing to match

16   the lowest rev shares that its publishers got from other

17   buyers; right?

18   A    Yes, because the argument that Mr. Felix here was

19   making is not -- the conclusion to that argument is not

20   lowering rev share.

21   Q    All right.  Well, let's listen as you and Mr. Zeng

22   debate this a little bit in the meeting.

23                      (Audio played.)

24          MS. WOOD:  Can you pause for a second.

25   BY MS. WOOD:

                                                              76

Direct examination - R. Srinivasan

```
 1   Q    So, again, we hear the concept from Mr. Zeng that
 2   publishers are willing to sacrifice yield on a small bid of
 3   impressions in order to get concessions on other things
 4   because their relationships with other third-party providers
 5   are important to them; right?
 6   A    That is correct.
 7   Q    Okay.
 8            MS. WOOD:  Go ahead.
 9                     (Audio played.)
10            MS. WOOD:  So pause there, please.
11            So I admit we've all tried to listen to this many,
12   many times.  It is very difficult to understand, because I
13   think the microphone is sometimes passed to audience
14   members, and sometimes it's not.  And, here, Ms. Meron seems
15   to be saying this was all built for header bidding and the
16   rest is inaudible.
17            To that end, we would like to offer -- sorry --
18   PTX 751, which is subject to our stip.  These were notes
19   that were also taken of this same meeting where someone took
20   down the notes of what was said.  It's not attributed to her
21   specifically, but in context it lines up with the
22   transcript, Your Honor.
23            THE COURT:  And is there any objection to 751?
24            MS. PHILLIPS:  Yes.  To the extent that these are
25   notes of this, I have the same hearsay objection that I did
```

77

Direct examination - R. Srinivasan

1    with regard to the audio and the transcript.  I just want to

2    ensure that if this comes into evidence, it's not for the

3    truth.

4              THE COURT:  It will be accepted in that format,

5    yes.

6              MS. PHILLIPS:  Thank you, Your Honor.

7              MS. WOOD:  Again, the statements made by Google, I

8    believe, should be accepted for the truth as statements of a

9    party-opponent, and among other things, the statements that

10   are attributed among publishers that are in quotation marks,

11   that can be for the effect on the hearer.

12             THE COURT:  Yes.

13             MS. PHILLIPS:  Your Honor, if I may say, I don't

14   think on this document, 751, that any speakers from Google

15   are identified versus other speakers.

16             MS. WOOD:  Your Honor, that's not accurate.  I'm

17   happy to go through the document and point out that many

18   places where Google is taught high-level themes we need to

19   address on the page ending in 123.

20             THE COURT:  Yeah.  We're not going to get into the

21   weeds on that one.  If necessary, one could compare it to

22   the transcript.

23             MS. WOOD:  Thank you, Your Honor.

24             THE COURT:  So 751 is in.

25       (Plaintiffs' Exhibit Number **751 admitted into evidence.**)

                                                              78

Direct examination - R. Srinivasan

1              MS. WOOD:  Can you just pause the recording but

2    then still also pull up 751?  Is that technologically

3    possible?  Sorry, Mr. Klein.

4              I just want to try to clarify what that inaudible

5    portion of the transcript was, Your Honor.

6              THE COURT:  Well, is this going to be anything

7    new?  In other words, we've heard multiple times now that

8    the publishers were unhappy, they were frustrated and the

9    various reasons why.  Is she adding something new?

10             MS. WOOD:  The quote in Google's notes is:  "This

11   was built for header bidding not to exist."  And so I think

12   the notion -- this is new.  The notion that UPR and the

13   Unified First Price Auction is Google's attempt to combat

14   header bidding.

15             THE COURT:  Well, don't you have that, though, in

16   the actual transcript?  Because that's going to be --

17             MS. WOOD:  That's the portion where --

18             THE COURT:  All right.  Just -- I think all we

19   need is that portion of the transcript.  Where are you?

20             MS. WOOD:  That portion of the transcript is

21   page 56, lines 7 to 8.  Line 7, Ms. Meron says:  "It seems

22   to me this was on the built for header bidding," and then

23   the transcript says inaudible.  And then if you look at

24   PTX 751, it says:  "This was built for header bidding not to

25   exist."  And then it says:  "A few claps."  Whereas the

                                                              79

Direct examination - R. Srinivasan

```
 1    transcript says:  "Laughter.  Clapping."

 2            THE COURT:  Yeah, but that's her statement.

 3            MS. WOOD:  Correct.

 4            THE COURT:  This is her view.

 5            MS. WOOD:  Correct.

 6            THE COURT:  All right.  Well, let's move on.

 7    We've already heard that before.

 8            MS. WOOD:  Okay.  Okay.

 9            Can we continue on with the recording.

10                    (Audio played.)

11    BY MS. WOOD:

12    Q    Do you recall that Google's publisher customers were

13    indicating, among other things, that it hand ties us what

14    Google was doing?

15    A    I don't recall that.

16            THE COURT:  It speaks for itself.  Let's move on.

17            MS. WOOD:  Okay.  Would you prefer, Your Honor,

18    that I just note the transcript and not play the rest?  We

19    have probably three or four more places in the recording.

20            THE COURT:  The point, it's getting repetitive.

21    All right.  We don't need to hear it five times.  I don't

22    need to hear it five times.

23            MS. WOOD:  I just want it clear that the comments

24    are not made from a -- they're made from different people

25    throughout the course of the meeting.
```
                                                              80

Direct examination - R. Srinivasan

```
 1              THE COURT:  All right.
 2              MS. WOOD:  For the purposes of the record and
 3    getting the documents up on the website, can I indicate the
 4    other pages of the transcript that I would play but we don't
 5    need to do that now?
 6              THE COURT:  How many more do you have?  How much
 7    more time is it going to take?  Because we're running now --
 8              MS. WOOD:  I don't need to play the recording; I
 9    can just give you the line cites in the transcript.
10              THE COURT:  Any objection to proceeding that way?
11              MS. PHILLIPS:  No, Your Honor.
12              THE COURT:  All right.  And they'll be available
13    online tomorrow.
14              MS. WOOD:  I'm referring to transcripts.  Page 57,
15    line 9 to line 15, which is in the audio at 1:10:18 to
16    1:10:36.  And then 1:10:38 in the audio.
17              MS. PREWITT:  You just said 1:10?
18              MS. WOOD:  This is for the audio.
19              MS. PHILLIPS:  I apologize.
20              MS. WOOD:  I'm trying to give both the audio clip
21    and the transcript clip.
22              So the transcript then from 57, line 15, to 59,
23    line 2.  And the audio of that would be 1:10:38 to 1:12:10.
24    And then transcript page 62, lines 1 to 12.  And the audio
25    is 1:14:51 to 1:15:23.  And then transcript page 63, line 22
```
                                                              81

Direct examination - R. Srinivasan

```
 1    to page 64, line 5.  For the audio, that is 1:16:40 to
 2    1:17:00.  And then transcript page 79 from lines 5 to 16.
 3    And the audio, that's at 1:31:02 to 1:31:07.  Transcript
 4    page 94, line 5 to 7.  And the audio, that's 2:06:38 to
 5    2:06:45.  Transcript page 105, line 8 to 106, line 14.
 6    That's audio 2:21:10 to 2:22:55.  And I have one last
 7    one-minute clip, Your Honor.
 8              THE COURT:  All right.
 9              MS. WOOD:  And the transcript is on page 65,
10    line 13.
11              And, Mr. Klein, if you could play the audio clip
12    that begins at 1:18:02 to 1:19:10, please.
13                       (Audio played.)
14              MS. WOOD:  So let me pause there.
15    BY MS. WOOD:
16    Q    Did you ever get back to Ms. Layser and tell her how
17    she could access full Google Ads or AdWords demand through a
18    source other than AdX?
19    A    I don't believe I did, but I also left the ads team
20    shortly thereafter later that year.
21              MS. WOOD:  All right.  And then the last page is
22    page 66, line 19 picks up right there to page 67, line 19.
23    It's at audio 1:19:10 to 1:20:07.
24                       (Audio played.)
25    BY MS. WOOD:
```

82

Direct examination - R. Srinivasan

1    Q    Do you hear -- or do you read in the transcript
2    Ms. Layser is asking about AdX tags; do you see that?
3    A    I do, yes.
4    Q    Okay.  And Ms. Layser's indicating that Google will
5    give you tags, but it will not insert the price, and that's
6    a reflection of the fact that when you use AdX direct
7    through a different publisher ad server, you don't get a
8    price out of AdX, you only get a yes or no on the
9    impression; correct?
10   A    Again, I was not the product manager responsible for
11   AdX tags.  I wouldn't be able to speak authoritatively to
12   that.
13   Q    All right.  Now, do you recall after this meeting,
14   there was some reconsideration within Google about whether
15   Google should, in fact, move forward with this plan to
16   impose Unified Pricing Rules on its customers who were not
17   pleased with the idea?
18   A    I'm not sure about what reconsideration you're
19   specifically referring to.
20   Q    Well, do you recall generally that there was some
21   reconsideration of that decision at that time?
22   A    We had conversations about how to incorporate publisher
23   feedback into the rollout and whether we needed to make any
24   changes to our product.
25   Q    Okay.  And Fabrizio Angelini, he also presented at the

83

Direct examination - R. Srinivasan

```
 1   UPR meeting; correct?

 2   A    I recall a Julio presented at the meeting.  I am not

 3   sure if Fabrizio also presented at the meeting.

 4   Q    Oh, sorry.  I may have conflated two individuals.

 5   Apologies for that.

 6            Who was Fabrizio Angelini?

 7   A    Fabrizio was also on the sell-side.  I forget his exact

 8   title.  It was -- he was on the go-to-market team.

 9            MS. WOOD:  Okay.  Can we pull up PTX 748, please.

10            THE COURT:  Any objection to 748?

11            MS. WOOD:  This was, I believe, no objection is

12   what I was told.

13            MS. PHILLIPS:  Is it already in, is that what you

14   said?

15            MS. WOOD:  I believe this was -- there was an

16   indication there was no objection to this document, but ...

17            MS. PHILLIPS:  Sorry.  You're suggesting it's

18   already in evidence, is that what you're saying?

19            MS. WOOD:  No.  No.  My understanding is it was

20   represented to us that Google no longer had an objection to

21   this document, but if you have an objection --

22            MS. PHILLIPS:  I just want a chance to look at it,

23   that's all.

24            MS. WOOD:  Okay.

25            THE WITNESS:  I'm sorry, I can't locate 748.
```

                                                                84

Direct examination - R. Srinivasan

```
1                MS. WOOD:  748.

2                THE WITNESS:  I have 784.

3                THE COURT:  Look back earlier in the book.

4                THE WITNESS:  Earlier.

5                THE COURT:  Is there an objection from Google?

6                MS. PHILLIPS:  There is not, Your Honor.

7                THE COURT:  There is not.  Then it's in evidence

8      then.

9                MS. WOOD:  Okay.  Great.

10       (Plaintiffs' Exhibit Number 748 admitted into evidence.)

11     BY MS. WOOD:

12     Q    Now, if you see, Mr. Angelini writes here -- this is

13     shortly after the meeting that we just heard excerpts of.

14     And he writes in the second paragraph:  "Another reason

15     might be business-related.  A publisher could be looking to

16     limit their reliance on us for demand and make us as much of

17     their demand as possible -- and make sure as much of their

18     demand as possible gets filled through 3P sources.  This

19     could be policy-related or because they have a lower rev

20     share with those partners"; do you see that?

21     A    Uh-huh.  Yes, I do.

22     Q    And then he writes:  "Either way" -- this is two

23     paragraphs later.  "Either way, publishers have these lines

24     set up for a reason, it's generating real revenue for them,

25     and I'm concerned, we can't really tell them that the
```

Direct examination - R. Srinivasan

```
 1    revenue won't go away with this change or how they can
 2    rework their HB setup to ensure that doesn't happen"; do you
 3    see that?
 4    A     Yes.
 5    Q     And does this refresh your recollection that there were
 6    concerns within Google after this meeting about continuing
 7    to move forward with this plan?
 8              MS. PHILLIPS:  Objection, Your Honor.  This
 9    document is dated April 12th.  The meeting was April 18th,
10    2019.  So this document was first in time before the
11    meeting.
12              MS. WOOD:  Okay.  Apologies for that, Your Honor.
13    BY MS. WOOD:
14    Q     This follows a meeting on April 12th, 2019 that was a
15    UPR training in advance; is that right?  With Mr. Barber.
16    Do you know who Richard Barber is?
17    A     I do not know who Richard Barber is.
18              MS. WOOD:  Okay.  I'll move on.
19              THE COURT:  All right.
20              MS. WOOD:  Let's look at PTX 762.  And, again,
21    this is pursuant to the stip.
22              MS. PHILLIPS:  No objection, Your Honor.
23              THE COURT:  All right.  It's in, but I think 748,
24    at this point, should be out.
25              MS. WOOD:  Well, Your Honor, I still think it's
```

86

                   Direct examination - R. Srinivasan

```
 1    relevant to the state of mind of Google going into the

 2    publisher ad server meeting.

 3              THE COURT:  But it's getting increasingly

 4    cumulative.  I don't think it changes anything.  So I will

 5    have 748 not in at this point.  All right.

 6              MS. WOOD:  Okay.  Well, may -- one response, Your

 7    Honor, because I do think one thing is new that we haven't

 8    heard before.

 9              I don't mean to try your patience, but the new

10    thing is in the second paragraph where he says:  "We can't

11    really tell them the revenue won't go away with this

12    change."  Whereas the arguments made during the meeting, and

13    also by Mr. Srinivasan on the stand, is that they don't need

14    these floors with the shift to a first-price auction.  This

15    document is indicating why they do need these even with the

16    shift to the first-price auction.  So I do believe it is

17    additional information that's not cumulative on that point.

18              THE COURT:  Does Google want to be heard on that?

19    If you don't care, we'll leave it in for the record.

20              MS. PHILLIPS:  I don't have an objection to

21    leaving that in.

22              THE COURT:  All right.  Then it's still in.

23              MS. WOOD:  Thank you, Your Honor.

24    BY MS. WOOD:

25    Q    Now, who was Brad Bender at this time?
```
                                                            87

Direct examination - R. Srinivasan

```
 1   A    Again, I'm not sure, given the timelines.  His roles
 2   had changed over time.  But he was one of the VPs initially
 3   responsible for buy-side.
 4   Q    Okay.  And there was a certain point where he became
 5   responsible for both the buy and the sell-side; isn't that
 6   right?
 7   A    That is correct, yes.
 8   Q    And you just don't know whether he had both sides at
 9   this time?
10   A    That is correct.
11   Q    Okay.  And what about Sagnik Nandy, who is that?
12   A    Again, Sagnik is someone whose roles also changed over
13   time, but at one point he was the engineering VP for
14   sell-side.
15   Q    And fair to say, Mr. Bender, Mr. Nandy were senior
16   executives at Google responsible for the display business?
17   A    Yes.
18   Q    Okay.  And what about Mr. Amini, would you put him in
19   that category as well?
20   A    I don't believe he had the same seniority.  But, yes,
21   he was a director, engineering director at the time.
22   Q    Okay.  So I want to look at the email that's first in
23   time on page 2 from Mr. Amini to Mr. Bender and Mr. Nandy.
24   And in the second paragraph he writes:  "Initially, the
25   feedback from first-price announcement was positive;
```

88

Direct examination - R. Srinivasan

```
 1   however, recently, as we shared details of removing floor
 2   pricing options, the feedback has changed dramatically"; do
 3   you see that?
 4   A    Yes.
 5   Q    "Furthermore, this issue, which is independent of
 6   first-price versus second-price decision, has been perceived
 7   as an integral part of first-price migration.  I think we
 8   may need to reconsider our options here.  I'm worried that
 9   we are paying an unnecessary price for a change that will be
10   a no-op change if we just wait a few months.  Publishers'
11   backlash looks serious to me, but I feel sell-side team
12   thinks that it is not as serious as it may look"; do you see
13   that?
14   A    Yes.
15   Q    Now, were you aware that there was an attempt at
16   reconsideration of the UPR rule after the publisher meeting
17   we just heard?
18   A    I don't believe I was marked on any of these emails, so
19   I was not aware of this exchange.
20   Q    Well, putting aside whether you were on the email, were
21   you aware, whether verbally or through chats or some other
22   mechanism, that this was a percolating issue?
23            MS. PHILLIPS:  Objection, Your Honor.  That was
24   already asked and he answered.  He was not aware.
25            THE COURT:  No, I think it's a slightly different
```

89

Direct examination - R. Srinivasan

```
 1    question.

 2              Overruled.

 3              THE WITNESS:  Again, I don't recall any specific

 4    reconsideration.  There were discussions about how to

 5    navigate the publisher feedback we received.  I was, at

 6    least at this point, don't recollect any specific

 7    reconsideration more holistically.

 8    BY MS. WOOD:

 9    Q    All right.  And then let's turn to the first page of

10    the document, which is where the email chain continues.

11              Mr. Nandy writes:  "Let's discuss, but I do feel

12    that it is non-trivial to revisit this.  The presence of

13    per-demand floors really hurts us and has been one of the

14    biggest challenges for AdX as a platform versus some of the

15    other exchanges"; do you see that?

16    A    I do.

17    Q    And that's a recognition by Mr. Nandy that the

18    per-demand floors are hurting AdX's ability to compete;

19    correct?

20    A    That seems to be his statement.

21    Q    And then he says he's worried about imposing Unified

22    Price Rules.  He writes in Number 1:  "Doing this by itself

23    makes it look extremely self-serving"; do you see that?

24    A    Yes.

25              MS. WOOD:  Okay.  All right.  I'd like to turn now
```
                                                              90

Direct examination - R. Srinivasan

```
 1   to PTX 784, again, subject to our stip.

 2              THE COURT:  Any objection?

 3              MS. PHILLIPS:  No, Your Honor.

 4              THE COURT:  All right.  It's in.

 5      (Plaintiffs' Exhibit Number 784 admitted into evidence.)

 6   BY MS. WOOD:

 7   Q    So if you turn to the first page -- sorry, the second

 8   page, which is the first-in-time email dated May 6th, 2019,

 9   there's an email from Payam Shodjai.  Do you remember

10   Mr. Shodjai?

11   A    Yes.

12   Q    And who was he?

13   A    He was -- I forget his exact title, but either a

14   director or a VP of product management on the buy-side.

15   Q    And he writes you an email on May 6th, 2019:  "As

16   someone who hasn't been closely involved in the first price

17   changes, I have a basic question which stems from some of

18   the difficult PR we've received on this launch.  What is the

19   motivation behind removing publisher controls, i.e.,

20   different floors per buyer?  Couldn't we just make the

21   change to first price without removing the controls?"; do

22   you see that?

23   A    Yes.

24   Q    Do you remember him asking you that question in light

25   of the difficult PR?
```
                                                              91

Direct examination - R. Srinivasan

```
 1   A     I have a vague recollection, yes.
 2   Q     And then you write back to him.  I'm still on the
 3   second page.  You say:  "The primary internal objective for
 4   the entire launch is to ensure that Google buy-side,
 5   authorized buyer, Exchange Bidding and header bidding
 6   compete on an equal footing in the Ad Manager auction from a
 7   price-based inventory-access perspective"; right?
 8   A     Yes.
 9   Q     And you write:  "We could achieve" -- and then the
10   secondary objective is that Google buy-side and Facebook get
11   access to the same first-price auction dynamics; right?
12   A     Yes.
13   Q     And you write:  "We could achieve the secondary
14   objective by just moving to first price, but we'd need to
15   remove some floor control to achieve the primary objective.
16   If not, pubs could set different floors for AdX, which we're
17   looking to move away from; do you see that?
18   A     Yes.
19   Q     And then two bullet points or three bullet points later
20   you write:  "The reason we're bundling these two launches
21   together is that moving to a first-price auction provides us
22   additional justification to remove some these controls"; do
23   you see that?
24   A     Yes.
25   Q     And then the next bullet point you write:  "The removal
```

92

Direct examination - R. Srinivasan

```
 1   of control has caused some backlash among publisher, but we
 2   are defusing some of this tension through individual
 3   conversations with top partners.  We believe we can get past
 4   this phase once pubs get over their 'initial control loss
 5   aversion'"; do you see that?
 6   A    Yes.
 7   Q    Do you -- strike that.
 8        And then do you see on the next page you write --
 9   again in the continuation of the email -- and now, again,
10   you've written "privileged and confidential" in all caps; do
11   you see that?
12   A    Yes.
13   Q    And can you tell us where in that email that you're
14   seeking legal advice?
15   A    I don't see any specific asks for legal advice.
16        MS. WOOD:  Your Honor, I note we're a little past
17   our morning break time, and I apologize for that.  I could
18   use a minute to try to consolidate the rest and finish up in
19   probably another 10, 15 minutes.
20        THE COURT:  All right.  How long does the cross --
21   how long do you think your cross is going to be?  Because we
22   were trying to get the other witness from yesterday in
23   around 11:30.
24        MS. PHILLIPS:  I would say I've got -- I
25   apologize, Your Honor.
```

Direct examination - R. Srinivasan

```
 1                THE COURT:  At the lectern.  Even better.  Yeah.

 2                MS. PHILLIPS:  Okay.  Thank you.

 3                MS. WOOD:  Sure.

 4                MS. PHILLIPS:  I would say probably about 40,

 5     45 minutes.

 6                THE COURT:  All right.  And that's all?

 7                MS. PHILLIPS:  That is my best guess at this

 8     point.  I obviously don't know what she has for the rest of

 9     the 15 minutes, and I do need to go back through some of the

10     documents where portions of the documents were not shown to

11     the witness that I believe are obviously pertinent and

12     relevant to this discussion.

13                THE COURT:  All right.  As for Mr. Dederick, how

14     much more time is going to be expected with him?

15                MS. WOOD:  Ms. Dunn.

16                MS. DUNN:  I think the cross will probably take

17     somewhere between an hour and an hour and a half.

18                THE COURT:  All right.  I think what we're going

19     to do is -- and then you have a California witness scheduled

20     for this afternoon?

21                MS. WOOD:  Two, Your Honor.

22                THE COURT:  Well, they may not both get through

23     today.

24                MS. WOOD:  Understood.

25                THE COURT:  Yeah.  All right.  We're going to take
```
                                                              94

Direct examination - R. Srinivasan

```
 1    our morning break.  Try to get this thing shortened; all
 2    right?
 3              MS. WOOD:  I will, Your Honor.
 4              THE COURT:  All right.  We'll try to finish this
 5    witness and get Mr. Dederick finished before the lunch
 6    break.  All right.  That's hopefully the plan.  If not
 7    completely finished, at least, you know, almost there.
 8              MS. DUNN:  Yes.
 9              THE COURT:  And then you'll get to call your first
10    California witness mid-afternoon; all right?
11              MS. WOOD:  Understood, Your Honor.
12              THE COURT:  All right.
13              MS. DUNN:  Thank you, Your Honor.
14              THE COURT:  We'll take a recess, 15 minutes.
15                   (A brief recess was taken.)
16              THE COURT:  All right.
17              MS. WOOD:  Your Honor, I've conferred with
18    opposing counsel, and in the interest of time, I'm going to
19    move in, by agreement and stipulation, PTX 763.
20              THE COURT:  763.  Go ahead.
21              MS. WOOD:  And 768.
22              THE COURT:  768.
23              MS. WOOD:  With the ability to reference those
24    later.
25              THE COURT:  Yes, ma'am.
```

Direct examination - R. Srinivasan

```
 1              MS. WOOD:  And we're going to offer PTX 819.  I
 2   believe there's no objection to that as well.  And I would
 3   like to show that briefly to the witness.
 4              MS. PHILLIPS:  That is correct.  No objection.
 5              THE COURT:  Very good.
 6   (Plaintiffs' Exhibit Numbers 763, 768 and 819 admitted into
 7                          evidence.)
 8   BY MS. WOOD:
 9   Q    So after the imposition of Unified Pricing Rules,
10   Google tracked what impact those new rules had on shift of
11   spend to AdX; isn't that right?
12   A    If I remember right, there was some experiments to
13   evaluate the impact, yes.
14   Q    Okay.  And we put in front of you PTX 819.  If you turn
15   to the second page ending in Bates stamp 318.
16              And Exhibit 819, for the record, is an email sent
17   from you; correct?
18   A    Yes.
19   Q    And it also is labeled "privileged and confidential"?
20   A    Yes.
21   Q    And you can take a look as we go through it, but I
22   don't -- you'll let us know if you identify any legal
23   questions you requested; okay?
24   A    Okay.
25   Q    Okay.  On page 2, do you see the headline "Revenue
```

Direct examination - R. Srinivasan

```
 1   Impact"?

 2   A     Yes.

 3   Q     And below that it talks about first giving up last

 4   look; do you see that?

 5   A     Yes.

 6   Q     And do you see that giving up last look actually

 7   decreased AdX revenue?

 8   A     This is in reference to the second-price auction.  But,

 9   yes, on the second-price auction, it decreased AdX's

10   revenue.

11   Q     Okay.  So giving up that last look, advantage decreased

12   AdX revenue, here the result is 8 percent; correct?

13   A     Again, for a second-price traffic, yes.

14   Q     Okay.  So it's negative 9.5 percent on Open Auction and

15   Private Auction; correct?

16   A     Yes.

17   Q     And a 7.6 decrease in impressions; correct?

18   A     Yes.

19   Q     Okay.  And then next you discuss moving from Legacy AdX

20   Pricing Rules to Unified Pricing Rules; do you see that?

21   A     Yes.

22   Q     And you write:  "The effect is estimated as

23   6.4 increase in the value of Open Auction plus private

24   auction impressions won by AdX and a 32.6 percentage

25   increase in impressions"; do you see that?
```

97

Direct examination - R. Srinivasan

1    A    Yes.

2    Q    Okay.  And then below that you also say:  "This also

3    has a negative effect on external exchange spend"; do you

4    see that?

5    A    Yes.

6    Q    And that means that Google was aware that third-party

7    exchanges would have their -- it would have a negative

8    revenue effect on them; correct?

9    A    Based on this experiment, yes.

10   Q    Okay.  I want to switch topics now.

11         You're familiar with Google's training program

12   Communicate With Care?

13   A    Yes.

14   Q    And you and all other Google employees are mandated to

15   take regular trainings on Communicate With Care; is that

16   right?

17   A    Yes.

18   Q    And, in fact, you -- in 2019, you were at some point

19   placed on a litigation hold in this case; correct?

20   A    I don't recall the specific date, but yes, I was placed

21   on a litigation hold at some point.

22   Q    All right.  We'll come back to that in a bit.

23         I'd like to show you what's been marked for

24   identification as PTX 884.

25         THE COURT:  Any objection?

98

Direct examination - R. Srinivasan

```
 1              MS. PHILLIPS:  No objection.
 2              THE COURT:  All right.  It's in.
 3   BY MS. WOOD:
 4   Q    And the only purpose I'm using this document, do you
 5   see that it is labeled "privileged and confidential," and
 6   it's copying a lawyer?
 7   A    Yes.
 8   Q    And you also remind the team here to -- "I'd like to
 9   remind this group to communicate with care."  And
10   "communicate with care" is underlined; right?
11   A    Yes.  It's underlined and --
12   Q    Is that a link to a document?  A link to the
13   Communicate With Care document?
14   A    That would have been my assumption, yes.
15   Q    And it says:  "We should be particularly careful when
16   framing something as a circumvention for EG.  Avoid
17   characterizing the use of house ads as a circumvention since
18   house ads are legitimately exempt from UPR enforcement."
19   You viewed -- strike that.
20              Do you see there it says:  "We should avoid any
21   suggestion that our intent is to directly impact header
22   bidding"?
23   A    I see that.
24   Q    "We should assume every document and email we generate
25   will likely be seen by regulators"; do you see that?
```

                                                                99

Direct examination - R. Srinivasan

```
 1   A    Yes.
 2   Q    Now, do you recall being part -- do you remember
 3   receiving a document called The Five Rules of Thumb in
 4   connection with the Communicate With Care training?
 5   A    It might have been the case, but I don't recall the
 6   name of the document.
 7   Q    I'll show you what's been marked as PTX 850.
 8             THE COURT:  Any objection to 850?
 9             MS. PHILLIPS:  No, Your Honor.
10             THE COURT:  All right.  It's in.
11      (Plaintiffs' Exhibit Number 850 admitted into evidence.)
12   BY MS. WOOD:
13   Q    You see that the title of the document is Five Rules of
14   Thumb?
15   A    I do.
16   Q    And do you see it says:  "Words matter, especially in
17   antitrust law"?
18   A    Yes.
19   Q    It says:  "Courts and regulators often focus on the
20   intent behind a decision, and they typically determine that
21   intent based on email, notes and Post-its"; do you see that?
22   A    Yes.
23   Q    And then it says:  "To help ensure that we write
24   accurately -- that what we write accurately reflects our
25   intent, here are a few quick guidelines.  We are out to help
```

100

Direct examination - R. Srinivasan

```
 1    users not hurt competitors"; do you see that?
 2    A    Yes.
 3    Q    Number 2:  "Our users should always be free to switch,
 4    and we don't lock anyone in"; do you see that?
 5    A    Yes.
 6    Q    Number 3:  "We've got lots of competitors, so don't
 7    assume we control or dominate any market."
 8    A    Yes.
 9    Q    Number 4:  "Don't try and define a market or estimate
10    our market share"; do you see that?
11    A    Yes.
12    Q    And Number 5:  "Assume every document you generate,
13    including email, will be seen by regulators"; do you see
14    that?
15    A    Yes.
16    Q    And these were the Five Rules of Thumb that you and
17    other Google employees were trained on; is that right?
18    A    Again, I don't recall the specifics of the training,
19    but it appears so, yes.
20    Q    Okay.
21             MS. WOOD:  Your Honor, we also -- well, let me --
22    BY MS. WOOD:
23    Q    Do you recall being a member of the inquiry response
24    training team in connection with your time at Google?
25    A    That does not ring a bell.
```

101

Direct examination - R. Srinivasan

```
1   Q    Do you recall that there was a group of individuals

2   from the Ad Manager team who were gathered together to

3   participate in trainings and be part of responses to

4   regulators, including regulators in the European Union?

5   A    I don't recall any training around it.  But, yes, I was

6   part of a group that helped draft responses to regulators.

7              MS. WOOD:  Okay.  Your Honor, at this time, we

8   would like to offer -- what's the next exhibit?

9              THE COURT:  884?

10             MS. WOOD:  PTX 1856.  This is a document that

11  bears Bates stamp GOOGAT-MDL-B-004853887 through 915.

12             THE COURT:  Hold on a second.  What number,

13  though, for purposes of this case have you put on this?

14             MS. WOOD:  PTX 1856.  It's in your binder.

15             THE COURT:  I have it.  I have it.

16             MS. WOOD:  Okay.

17             THE COURT:  Any objection?

18             MS. PHILLIPS:  I will just note for the record,

19  Your Honor, this was not on plaintiffs' exhibit list, so

20  this is the first I'm seeing it.

21             MS. WOOD:  And, Your Honor, I'm happy to explain.

22             THE COURT:  All right.

23             MS. WOOD:  Your Honor, this document was first

24  produced well after the fact discovery cutoff, and it was

25  unclear to us at what point Mr. Srinivasan was part of this
```

102

Direct examination - R. Srinivasan

```
 1    litigation response inquiry training team.  But this does

 2    indicate the Communicate With Care training he received at

 3    or around the time that he was involved in creating all the

 4    other documents we've seen with the privileged and

 5    confidential stamps and the like.  So it's further of our

 6    request for an adverse inference, Your Honor.

 7              THE COURT:  Well, I don't know whether you need

 8    the document for that.  You've asked the questions.  You can

 9    ask your questions based on the document, but at this point,

10    if it was not produced during discovery and no pretrial

11    motion was filed to add an additional exhibit, I'm going to

12    grant the --

13              MS. WOOD:  That's true, Your Honor.

14              THE COURT:  All right.  So it's not coming in, but

15    you may ask questions about it.

16    BY MS. WOOD:

17    Q    Do you remember as part of your Communicate With Care

18    training in 2019, that all Google employees were required to

19    take refresher training on Communicate With Care?

20    A    Again, I'm not sure when or whether I received a

21    refresher training, but it was common practice to receive

22    refresher trainings.

23    Q    Okay.  And do you recall in connection with that

24    refresher training, that you and other Google employees were

25    told that the training was intended to ensure that Google
```

103

Direct examination - R. Srinivasan

```
 1    didn't compromise Google or its employees' careers?

 2              MS. PHILLIPS:  Objection, Your Honor.  He just

 3    testified he doesn't remember if he went through the

 4    training.

 5              MS. WOOD:  Well, I'm asking him a question about

 6    the treatment to see if that refreshes his recollection

 7    about the training.

 8              THE COURT:  Do you recall anything along those

 9    lines having ever been communicated to you as part of your

10    training?

11              THE WITNESS:  I do not.

12              THE COURT:  All right.

13    BY MS. WOOD:

14    Q    Do you recall being told that if you ran afoul of the

15    Communicate With Care, disciplinary action could be taken

16    against you?

17    A    I do not.

18              MS. WOOD:  Your Honor, I would move the admission

19    of PTX 1856 as a demonstration of the Google document

20    telling their employees that if they failed to abide by

21    Communicate With Care, their careers would be threatened.

22              THE COURT:  Do you have evidence that this was

23    sent to this particular person?

24              MS. WOOD:  His name is referenced in it.  It says

25    Rahul.  It doesn't use his last name.  But it does use his
```

104

Direct examination - R. Srinivasan

```
1    name on the page ending in Bates stamp 897.  It talks about

2    the fact that Rahul was moving on to a new gig, because, in

3    fact, Mr. Srinivasan did move to a different part of Google

4    at this time.

5              THE COURT:  Where on 897?

6              MS. WOOD:  If you look, do you see the word

7    "graveyard," Your Honor?

8              THE COURT:  Yes.

9              MS. WOOD:  Like three paragraphs below that under

10   "we're focusing on Work Stream 1."  And then it says:

11   "Team, save for Rahul.  Moving on to a new gig.  This team

12   hasn't changed much over the last two months."

13             THE COURT:  Yeah, but his name is not listed above

14   on the response team.

15             This is not going very far, so I'm going to

16   continue the objection.  Let's move this along.

17             MS. WOOD:  Okay.  No further questions for this

18   witness.

19             THE COURT:  All right.  Cross-examination.

20             MS. WOOD:  Oh, wait.  I'm sorry.  I do have one,

21   it's really a housekeeping matter, but it does relate to

22   this witness.

23             THE COURT:  Go ahead.

24             MS. WOOD:  Your Honor will recall that with

25   request to Mr. Bender, you instructed Google's counsel to
```

105

Direct examination - R. Srinivasan

```
 1    produce copies of the litigation holds for the Google

 2    employees.  This is what we got last night.  It's just

 3    emails and dates but not the text of the litigation hold.

 4              We would like for Google to produce the actual

 5    text of the instructions of the litigation hold.  We think

 6    that is necessary in light of the issues that have been

 7    raised under Communicate With Care in this case.

 8              THE COURT:  All right.

 9              MS. WOOD:  And so we would like unredacted copies,

10    including for this witness.  I mean, I have his name

11    highlighted in yellow, but it doesn't tell me anything about

12    what he was or was not instructed to do with respect to the

13    litigation hold.

14              THE COURT:  All right.  Any objection to doing

15    that?

16              MS. PHILLIPS:  Your Honor, my colleague,

17    Ms. Sessions, will answer this.

18              THE COURT:  All right.

19              MS. SESSIONS:  Good morning, Your Honor.

20    Justina Sessions for Google.

21              We did provide the government with copies of the

22    hold notices that had been sent to the list of people that

23    they had indicated they wanted the hold notices for.  They

24    are redacted.  We unredacted the instructions with respect

25    to the retention of chat messages, which we understood to be
```

106

Direct examination - R. Srinivasan

```
 1    the subject of Your Honor's direction.  The remainder of the
 2    hold notices, Your Honor, it's our position is privileged --
 3              THE COURT:  All right.
 4              MS. SESSIONS:  -- because those are
 5    instructions --
 6              THE COURT:  To shorten this.  Number 1, are they
 7    all exactly the same?
 8              MS. SESSIONS:  They are not all exactly the same,
 9    but we provided the emails in which every one of the
10    witnesses received the hold.  So there are a couple of
11    different versions of them, and we provided all of those
12    versions.
13              THE COURT:  Yeah.  But it's -- you'll need to
14    provide to me -- I'll do an in-camera review of them during
15    the lunch break.
16              MS. SESSIONS:  Yes, Your Honor.
17              THE COURT:  I want to see all versions.  All
18    right.  I'm hoping there are not seven or eight different
19    ones.
20              MS. SESSIONS:  I think there are -- I think it's
21    four off the top of my head, but we can provide those to
22    Your Honor, yes.
23              THE COURT:  I will look at them.  If I'm satisfied
24    that there's a genuine basis on attorney/client privilege, a
25    legitimate one -- but this is an important issue in this
```

107

Direct examination - R. Srinivasan

```
 1    case.  As you know, the spoliation issue has come up, it
 2    came up in other cases as well.  I want to take a careful
 3    look at what the holds look like; all right?
 4              MS. SESSIONS:  Understood, Your Honor.
 5              THE COURT:  All right.
 6              MS. WOOD:  Your Honor, I would just note for the
 7    record that we received an email last night from
 8    Ms. Sessions in which the position taken by Google was that
 9    these lit holds are work product, not attorney/client,
10    which, as Your Honor is aware, is a different standard.
11              THE COURT:  I'm still going to look at them, and
12    I'll decide whether they should be a part of this record or
13    not.
14              MS. WOOD:  Thank you, Your Honor.
15              MS. SESSIONS:  Thank you.  And, Your Honor, I
16    did -- it was -- I think I sent that email at 1:10 or so in
17    the morning.
18              THE COURT:  You're forgiven then if --
19              MS. SESSIONS:  Thank you, Your Honor, for my mixed
20    up between privilege --
21              MS. WOOD:  It is 8:13 this morning, but same
22    point.
23              MS. SESSIONS:  Okay.  Thank you, Your Honor.
24              THE COURT:  All right.  Cross-examination, please.
25              MS. PHILLIPS:  Thank you.
```

108

Cross-examination - R. Srinivasan

```
 1                       CROSS-EXAMINATION
 2  BY MS. PHILLIPS:
 3  Q    Good morning, Mr. Srinivasan.
 4  A    Good morning.
 5  Q    Nice to meet you.
 6  A    Likewise.
 7  Q    My name is Jessica Phillips.  And I'm an attorney for
 8  Google.  I'll be asking you some additional questions this
 9  morning.
10          Do you recall when you were being asked by my --
11          THE COURT:  Let me stop you.  Is there a book or
12  not?
13          MS. PHILLIPS:  There certainly is.  I apologize.
14          May I proceed, Your Honor?
15          THE COURT:  Yes, ma'am.
16          MS. PHILLIPS:  Thank you.
17  BY MS. PHILLIPS:
18  Q    Mr. Srinivasan, do you remember questions this morning
19  about the April 18th, 2019 meeting that you held in person
20  with publishers in New York?
21  A    Yes.
22  Q    Did you also present a PowerPoint presentation during
23  that discussion that you had with the publishers?
24  A    Yes.
25  Q    If you would please turn to DTX 701 in your binder that
```

109

Cross-examination - R. Srinivasan

```
 1   was just handed to you.  The black binder.
 2            THE COURT:  Any objection to Defense 701?
 3            MS. WOOD:  Your Honor, I do believe there is a
 4   difference when Google offers its own business records
 5   affirmatively for the truth of the matter versus when we
 6   offer them as a statement of a party-opponent.  So my
 7   objection would be hearsay because this is being offered by
 8   the owned company.  They can establish this material through
 9   him, but I think the document itself is hearsay.
10            THE COURT:  Well, I don't think it's being offered
11   for the truth of its contents; it's being offered to explain
12   what it was that was communicated to at the conference.
13            I'm going to permit it.
14            MS. WOOD:  If that's the only purpose, then we're
15   fine, Your Honor.
16            THE COURT:  All right.
17      (Defense Exhibit Number 701 admitted into evidence.)
18   BY MS. PHILLIPS:
19   Q   All right.  So if you're there, if you can, please,
20   Mr. Rahul, turn to page 11 in the deck.  Actually, let me
21   first ask you just to turn to page 6.
22            And do you see on page 6 there's a slide that
23   says:  "Product vision, the unified auction," and then it
24   has your name; do you see that?
25   A   Yes.
```

110

Cross-examination - R. Srinivasan

1    Q    Okay.  Now please turn to page 11 of this deck.  And

2    the title of this slide is:  "Ever Increasing Complexity in

3    the Ecosystem."

4           What was the complexity in the ecosystem that you

5    were trying to depict in this slide when you presented it to

6    publishers?

7    A    Yes.  So the ecosystem around us had evolved to a place

8    over the course of a decade whereby not all sources of

9    demand were being subjected to the same set of rules --

10   consistent set of rules in determining the winner of the

11   auction.

12          MS. WOOD:  Objection, Your Honor.  Again, I think

13   this is being offered for the truth at this point.

14          THE COURT:  I agree.  Sustained.

15          MS. WOOD:  Motion to strike just his last answer.

16          THE COURT:  It's in the record.  We don't strike.

17          MS. WOOD:  Okay.

18   BY MS. PHILLIPS:

19   Q    Mr. Srinivasan, apart from the document, let me ask you

20   a question.

21          What were the reasons why Google was interested in

22   moving from a Unified First Price Auction -- or, excuse me,

23   from a second-price auction to a Unified First Price Auction

24   among one of several changes that were announced to GAM in

25   2019?

                                                            111

Cross-examination - R. Srinivasan

```
 1    A     Got it.  So as I was saying, the ecosystem around us

 2    had evolved to a point where there was incredible complexity

 3    when it came to the auction mechanics, whereby consistent

 4    rules were not being applied to different sources of demand

 5    in determining who the winner for a particular impression

 6    was, alongside a lack of understanding amongst both

 7    publishers, buyers and even people at Google in terms of how

 8    the auction mechanics worked, because we had a cascading set

 9    of auctions, which also led to a lot of inefficiencies,

10    market inefficiencies that compromised publisher yield.

11    Q     Okay.  So if you look on the speaker's notes of the

12    document where they say -- and, again, I'm on page 11, that

13    same slide.

14          "To make things worse, each channel competes with

15    different rules, auction dynamics, floors, information

16    access."

17          MS. WOOD:  Objection again.  Same issue.  This is

18    being offered for the truth.

19          MS. PHILLIPS:  I'm asking him to explain what that

20    means, and he's here for redirect if they want to ask him

21    about it.

22          MS. WOOD:  Then I think it's leading, Your Honor.

23    I think if you're showing him a statement -- out-of-court

24    statement and then asking him to summarize it, I think

25    that's clearly leading.
```

112

Cross-examination - R. Srinivasan

```
 1              MS. PHILLIPS:  I haven't asked the question yet,
 2   Your Honor.
 3              THE COURT:  The government introduced the meeting
 4   and had a lot of publishers' comments played and had some of
 5   Google's responses to those played, and we're going to let,
 6   on cross-examination, questions about other materials that
 7   were presented at the conference.  That is how I see it; all
 8   right?
 9              MS. WOOD:  Understood, Your Honor.
10              THE COURT:  All right.  The objection is
11   overruled.
12              MS. PHILLIPS:  Thank you, Your Honor.
13   BY MS. PHILLIPS:
14   Q    So, Mr. Srinivasan, my first question is:  Can you
15   explain what this concern was?
16              THE COURT:  Well, it speaks for itself.  The
17   concern is there.
18              MS. PHILLIPS:  Okay.
19   BY MS. PHILLIPS:
20   Q    Mr. Srinivasan, how were the product changes that you
21   were announcing in April of 2019 addressing this issue
22   that's in this document?
23   A    Yes.  So the set of changes that we were rolling out
24   were three -- fourfold, essentially.
25              One is moving AdX to a first-price auction, and
```

113

Cross-examination - R. Srinivasan

```
 1    that helped, again, unified auction rules because AdX was
 2    one of the few SSPs that were still operating in a second
 3    price world with header bidding coming -- header bidding
 4    demand coming in through in a first-price auction and
 5    Exchange Bidding demand coming in a first-price auction.  So
 6    to unify the auction, moving the entire price to a
 7    first-price auction, moved us incrementally into a world
 8    where all demand sources were subjected to the consistent
 9    rules across the board.
10           The second change was unifying pricing rules.
11    Again, publishers previously did not have the option or
12    ability to configure pricing rules within the AdX exchange
13    that applied to -- where they could control their pricing
14    rules across all demand sources.  So the Unified Pricing
15    Rules did two things.  One is extended the ability for
16    publishers to configure rules across all demand rules; and
17    second, removing the buyer-specific floors which we deemed
18    unnecessary in a first-price world.  So that, again, moved
19    us to a simpler and more consistent auction.
20           And the third set of changes was around removing
21    this notion of AdX last look, which the industry had coined
22    over time.  And the AdX last look allowed ad exchange to
23    have some additional visibility into bids from header
24    bidding demand, which was deemed unfair, and hence in an
25    effort to clean up the auction, simplified to make it more
```

114

Cross-examination - R. Srinivasan

1    consistent, we made all of these three changes in tandem.

2    In parallel we also additionally --

3                (Reporter interrupted for clarification.)

4                THE WITNESS:  In an effort to make it a much more

5    consistent and simple auction, we made all these three

6    things in tandem.

7                And, in addition, we also provided increased

8    transparency into the auction to aid in understandability of

9    auction dynamics.

10   BY MS. PHILLIPS:

11   Q    Okay.  You mentioned something about the need for

12   publishers to set a higher floor price in AdX was reduced

13   when you moved to a first-price auction.

14               Can you please explain that?

15   A    So in a second-price auction, the reserve price that

16   publishers configure can add price pressure in determining

17   the final price that the bidder pays.

18               So, for example, if there's a $10 bid from a

19   source of demand and the floor price is $5 and there is no

20   other bid in the auction, then the winner is that $10 bid,

21   but they pay $5.  In the absence of that $5 price pressure,

22   it would be close to $0 or 1 cent.  So the floor price had

23   the mechanism of adding pricing pressure in the auction

24   because it's a second-price auction, to allow publishers to

25   gain more revenue.

1          In a first-price world, the floor price does

2   nothing to determine what the winning price of the

3   impression was.  All the floor price does is filter out

4   bids.  So if you have a $5 first-price bid and a $3

5   first-price bid and your reserve price is $1, the $1 doesn't

6   influence anything around the outcome of the auction, and

7   hence the need to specify floor prices for different buyers

8   reduces meaningfully in a first-price world.

9   Q    Are you familiar with -- well, let me ask it this way:

10          Prior to the 2019 changes to GAM, was buyers

11   throttling queries an issue?

12   A    Yes.

13   Q    Can you explain that issue, please.

14   A    We had heard this loud and clear from Criteo, who was

15   one of the buyers on our exchange that they were receiving

16   an exponential number of queries for the same impression

17   across different channels of selling the inventory.  For

18   example, they would get one call from ad exchange, one call

19   from competing exchanges, multiple calls from header bidding

20   partners, all for the same segment of inventory.  And that

21   technology had not been built to a level of sophistication

22   where they can handle 15 queries for the same impression,

23   and now multiply this by, like, billions of queries that one

24   needs to handle on a daily basis.  So a lot of buyers were

25   struggling with the fact that they didn't have the

116

Cross-examination - R. Srinivasan

```
 1   technology to handle and navigate that exponential increase

 2   in queries for the same inventory.

 3   Q     Okay.  If you would look at page 13 in DTX 701, there's

 4   a slide with an example of buyer throttling queries; do you

 5   see that?

 6   A     Yes.

 7   Q     Can you please explain the example in the slide on

 8   page 13.

 9   A     Yeah.  So this goes back to the explanation I was

10   giving where Criteo, in an effort to handle this exponential

11   increase in queries, had some logic on their end to

12   essentially ignore a bunch of queries because they could not

13   handle it.

14            MS. WOOD:  Objection, Your Honor.  Foundation to

15   the extent he's talking about what Criteo would or wouldn't

16   do.

17            MS. PHILLIPS:  May I respond, Your Honor?

18            THE COURT:  Yes.  Go ahead.

19            MS. PHILLIPS:  She's using Criteo as an exemplar

20   of what they were seeing and what they were trying to

21   address in 2019.  Again, this exact example was presented to

22   publishers in the April 18th meeting.

23            THE COURT:  I'm not accepting it as the truth of

24   its content, that is whether or not this entity had this

25   problem.  But it was given to the conference, and I'm going
```

117

Cross-examination - R. Srinivasan

```
 1    to permit it in that respect only.
 2            MS. WOOD:  Thank you, Your Honor.
 3            MS. PHILLIPS:  Thank you.
 4    BY MS. PHILLIPS:
 5    Q    In Example 1, what is the consequence of the scenario
 6    depicted here with the throttling?
 7    A    So when buyers throttle queries, they do not submit
 8    bids for the queries that they throttle, and if they do not
 9    submit bids for queries that they throttle that results in
10    less bids into the auction ultimately, reducing the revenue
11    associated with that impression.
12    Q    Okay.  If you can go, was -- for publishers -- we were
13    just talking about issues with buyers.  For publishers, was
14    an issue prior to the 2019 changes complex yield strategies?
15            MS. WOOD:  Objection.  Leading.
16            THE COURT:  Sustained.
17    BY MS. PHILLIPS:
18    Q    Can you explain on the publisher side, what were some
19    of the issues that you saw that you were trying to address
20    with the 2019 changes?
21    A    Yes.  So there were a couple of different issues.  One
22    was in relation to the fact that, as previously explained,
23    the option dynamics were exceptionally complicated to
24    understand and reason through because different sources of
25    demand were subjected to different rules, inconsistent
```

Cross-examination - R. Srinivasan

```
 1    rules.  So understandability of the auction was one main
 2    theme that I had heard repeatedly from publishers.
 3              The second one was configuring pricing rules for
 4    the auction also led to a lot of complexity because there
 5    were a variety of different dimensions along which pricing
 6    rules could be configured.  So you could configure pricing
 7    rules for different buyers, you could configure pricing
 8    rules for different advertisers, which are the ultimate
 9    sources of the budget.  You could configure pricing rules
10    for different formats of inventory.  So there were probably,
11    like, five -- upwards of five dimensions along which pricing
12    rules could be configured, which sometimes led to publishers
13    having multiple thousands of rules, which made it harder to
14    reason through which rule actually -- which pricing rule
15    applied to any given single auction, and sometimes resulting
16    in filtering of bids that would have otherwise been
17    accretive to publishers.
18    Q    And how did the changes implemented by Google in 2019
19    address those issues?
20    A    So we did two things to address those issues.  One is
21    obviously in a -- in moving to a first-price auction, the --
22    given that the buyer specific rules were no longer effective
23    as a pricing or a yield optimization strategy, we simplified
24    the pricing rules by removing certain dimensions along which
25    pricing rules can be set.
```

119

Cross-examination - R. Srinivasan

1          And the second change that we made was to limit

2    the number of pricing rules a publisher can configure to

3    push us more towards a much simpler setup where publishers

4    don't have legacy rules that have been built up over

5    multiple years that they don't know or understand how they

6    operate.

7    Q    If you could look at page 15 in the same document,

8    DTX 701.  This is the second example that you presented in

9    the April 18th, 2019 meeting.

10          Can you please describe the problem that you were

11   trying to illustrate with Example Number 2?

12   A    Yeah.  Example Number 1 had to do with buyers

13   throttling queries.  Example Number 2 had to do with auction

14   dynamics being different for different sources of demand.

15          So as previously communicated, Exchange Bidding,

16   which was a parallel product to ad exchange or AdX ran a

17   first-price auction.  AdX, on the other hand, ran a

18   second-price auction.  So you could conceive of an example

19   where the buyers on AdX or buyers on a second-price auction

20   had a higher willingness to pay for an impression compared

21   to someone bidding through a first-price auction, but that

22   doesn't necessarily -- because of the difference in auction

23   dynamics, it doesn't always result in the highest bid

24   winning because the auction dynamics ensure that the highest

25   bid from ad exchange could be floored at a very low price

Cross-examination - R. Srinivasan

```
 1   and, hence, effectively translate to a low first-price bid
 2   in the ultimate unified auction.
 3   Q    So, again, just what is the consequence of that
 4   particular problem?
 5   A    The consequence is that publishers aren't able to
 6   maximize the revenue on their inventory because the highest
 7   bid doesn't always win.
 8   Q    And is another way to say that is that they lost money?
 9             MS. WOOD:  Objection.  Leading.
10             THE COURT:  That's really not leading.
11             Overruled.
12             THE WITNESS:  Yes.
13   BY MS. PHILLIPS:
14   Q    Okay.  In the picture -- if you can look at Example
15   Number 2 in the picture, The Trade Desk, being used as an
16   exemplar, appears to have bid twice for the same impression.
17             Was that a problem in the old system before -- in
18   the old ecosystem before the 2019 changes?
19   A    So I would say it was not a problem from a publisher
20   perspective.  It was a problem from a buyer perspective for
21   reasons around query throttling and getting multiple queries
22   for the same impression that was highlighted previously.
23   Q    Okay.  If you could look at page 16 in this same
24   document.  This shows the third example that you presented
25   on April 18th, 2019.
```

121

Cross-examination - R. Srinivasan

```
 1              Can you please explain what problem you were
 2    trying to illustrate here with Example Number 3?
 3    A    Yes.  So in this example, we were trying to explain how
 4    different floor prices for different sources of demand could
 5    again compromise publisher revenue.  And, in this example,
 6    Criteo had a rate of $6 and Trade Desk had a bid of $3.  In
 7    an ideal world, you would assume that the highest bid wins,
 8    which would be the Criteo $6 bid.  But because of
 9    differential floor prices, the Criteo bid was subject to a
10    floor price or a reserve price of $10 and hence was filtered
11    out and was not eligible to participate in the auction,
12    which meant that the only bid available in the auction was
13    The Trade Desk bid of $3, and hence publishers in this
14    example lost $3 of additional revenue.
15    Q    Thank you.  Please turn to page 19 in the same
16    document.
17              What does this slide show?
18    A    Yeah.
19    Q    What does this slide show?
20    A    Oh.  This summarizes a bunch of the changes that we
21    were trying to roll out simultaneously, given that our
22    vision was to move to a consistent transparent unified
23    auction.  And the changes listed are that the first one
24    relates to ad exchange moving to a first-price auction.  So
25    all bids would come in as a first-price bid instead of a
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Cross-examination - R. Srinivasan

```
 1    second-price bid, again, in an attempt to unify auction

 2    mechanics across AdX and all other sources of demand.

 3           The second change relates to again ensuring

 4    consistent rules across all sources of demand where the

 5    floor price would be consistent across all demand sources.

 6           And then the third change relates to the removal

 7    of AdX last look, where any programmatic demand does not

 8    have visibility into the price to beat from other demand

 9    sources before they bid into the auction.

10    Q    How, if at all, did you think that these changes in

11    2019 would benefit publishers?

12    A    Yeah.  So our hypothesis at that time was that some of

13    these changes would improve understanding and transparency

14    into the auction and not allow publishers to treat it as a

15    black box that they do not understand.  And also some of

16    these changes would increase publisher revenue as well,

17    namely the movement to a first-price auction.

18           And some of these changes would also benefit, you

19    know, the buyers on our exchange and Google Ads more

20    broadly, given they would also stay customers of our

21    products, whereby they don't need to engage in strategies

22    like query throttling, and they also have a consistent

23    picture and understanding of how the auction mechanics work.

24    And the goal of --

25    Q    And were -- I apologize.  Please finish.
```

123

Cross-examination - R. Srinivasan

```
 1   A     Yeah.  And the goal of all of these packages was
 2   changes was to clean up, or rather improve the quality of
 3   the ecosystem so that we could attract more ad dollars into
 4   additional advertising more broadly, because the current
 5   ecosystem was not sustainable, in our opinion.
 6   Q     Okay.  You used The Trade Desk and Criteo in these
 7   three examples that we've seen as exemplars.
 8             How, if at all, did you think that the changes
 9   would benefit companies like those?
10             MS. WOOD:  Objection.  Foundation.  Speculation.
11             THE COURT:  Lay a foundation first.
12             MS. PHILLIPS:  Sure.
13   BY MS. PHILLIPS:
14   Q     Was there internal discussion at Google during this
15   time period about the possible impact or benefit to other
16   SSPs due to these things?
17             MS. WOOD:  Objection.  Hearsay.
18             THE COURT:  Well, he's got to lay a foundation.
19             I mean, again, did you have any -- yourself, any
20   direct involvement with these other exchanges like Trade
21   Desk?
22             THE WITNESS:  With the other buyers, no.  No
23   direct involvement.  No.
24             MS. PHILLIPS:  I'll move on, Your Honor.
25             THE COURT:  All right.  Move on.
```

                                                              124

Cross-examination - R. Srinivasan

```
 1    BY MS. PHILLIPS:

 2    Q    Okay.  You mentioned additional transparency in terms

 3    of sharing information that was part of these changes.

 4              What is min bid to win?

 5              THE COURT:  I'm sorry, what is that?

 6              MS. PHILLIPS:  Min bid to win.

 7              THE COURT:  Which means what?  Minimum bid to win?

 8    BY MS. PHILLIPS:

 9    Q    Can you explain what min bid to win is, please.

10    A    It's minimum bid to win.  So in an auction you have a

11    $10 bid, a $5 bid and a $3 bid, we were -- in addition to

12    giving publishers transparency into all of those bids into

13    the auction which previously was not available, buyers also

14    had visibility into what the other next highest bid in the

15    auction was.

16              So, for example, the $10 bidder would have

17    visibility into the fact that the second price -- the second

18    bid, second highest bid in the auction, was $5.  The $5

19    bidder would have visibility into the fact that the bid that

20    they lost to was $10.

21              So it was a way to provide buyers' transparency

22    into data points that could inform their bidding strategies

23    and provide publishers' transparency into the bid density in

24    their auctions.

25    Q    And this was a change instituted as part of these
```

125

Cross-examination - R. Srinivasan

```
 1   changes in 2019?

 2   A     That is correct.

 3   Q     Okay.  Did Google place any restrictions on who

 4   publishers could share the min bid to win information with?

 5   A     No.

 6   Q     And, in your view, what was the intent of sharing all

 7   of this information with publishers and buyers as part of

 8   these changes in 2019?

 9             MS. WOOD:  Objection.  Foundation.

10             MS. PHILLIPS:  I just asked what was his intent.

11             THE COURT:  Well, his intent is not really that

12   relevant, so I'm going to sustain the objection.

13   BY MS. PHILLIPS:

14   Q     All right.  What was Google's intent in sharing all of

15   this information with publishers and buyers?

16             MS. WOOD:  Objection.  Foundation.

17             THE COURT:  Sustained.

18             MS. PHILLIPS:  Your Honor, may I attempt to lay

19   the foundation?

20             THE COURT:  Go ahead.

21   BY MS. PHILLIPS:

22   Q     You had internal conversations at Google about why you

23   were instituting -- did you have conversations internal to

24   Google about why you were making these changes in 2019?

25   A     Yes.
```

126

Cross-examination - R. Srinivasan

1    Q    Okay.  And was part of those conversations anything

2    with regard to this additional sharing of information?

3    A    Yes.

4    Q    And what was that intent?

5    A    We had received feedback from publishers that they

6    wanted increased visibility into how many bids were eligible

7    in each auction for the impressions that they were selling.

8         So publishers wanted additional visibility into,

9    you know, the fact that they had three bids for one

10   impression and only one bid for another impression, which

11   allows them to charge higher prices for impressions where

12   there's more competition.

13   Q    Okay.  Thank you.

14        You were shown the transcript which is PTX 1854 of

15   the publisher meeting that you presented at; do you remember

16   that?

17   A    Yes.

18   Q    Okay.  If you can turn to page 25.  You were played

19   page 25, lines 1 through 6.

20        Can you please look at lines 7 through 9 at your

21   response to Ms. Layser's comment that was played to you.

22   A    Yes.

23   Q    And describe the response that you give -- you gave

24   Ms. Layser, please.

25   A    Yeah.  I believe what I was trying to clarify to

                                                              127

Cross-examination - R. Srinivasan

1    Ms. Layser was that the goal of these changes was not taking

2    control away from publishers.  But, as I mentioned, the

3    vision here was to move to a more transparent and consistent

4    auction, and that was what all of these changes were about,

5    highlighting some of the examples that we already spoke

6    about.

7    Q    All right.  And if you look at page 26, Ms. Wood played

8    for you lines 10 through 22, including your response at the

9    end, "that's a completely fair point," but she omitted

10   playing the rest of your response at 27, lines 1 through 14.

11          MS. PHILLIPS:  Your Honor, I would just ask that,

12   as part of what we are ultimately admitting in through this

13   exhibit, that that -- the rest of Mr. Srinivasan's response

14   be included.

15          MS. WOOD:  Your Honor, if we want to enter the

16   entire exhibit, the government is amenable to entering the

17   entire transcript.  But, you know --

18          THE COURT:  Hold on a second.

19          Do you have an objection to the whole transcript

20   going in?

21          MS. PHILLIPS:  I already raised my objection which

22   was a hearsay objection as it related to the publishers.  I

23   believe you agreed that the portions that were played from

24   publishers would not be admitted for the truth of the

25   matter, but rather just to demonstrate that publishers were

                                                            128

Cross-examination - R. Srinivasan

```
 1   raising these concerns with Google.

 2            THE COURT:  Yeah.  But it's still part of the

 3   record.

 4            MS. PHILLIPS:  In the same vein, I don't have a

 5   problem with that, so long as the publisher statements in

 6   this are not admitted for the truth.

 7            THE COURT:  The whole thing is being admitted as a

 8   demonstration to the publishers.  All right.

 9            MS. PHILLIPS:  Okay.

10            THE COURT:  So the point is, is the whole exhibit

11   going in?  Any objection?

12            MS. PHILLIPS:  No.

13            THE COURT:  All right.

14            MS. WOOD:  That satisfies my concern.

15            THE COURT:  So that makes it easier for you people

16   tomorrow morning.

17            MS. WOOD:  Yes.  Thank you.

18            THE COURT:  That's fine.

19            MS. PHILLIPS:  We'll skip this and move to 701,

20   please.  Oh, not 701.  Pardon me.

21            THE COURT:  7 what?

22            MS. PHILLIPS:  Sorry.  I misspoke.  Not 701.

23   BY MS. PHILLIPS:

24   Q   We'll look at PTX 819 which you saw with Ms. Wood.  Can

25   you pull that up, please.
```

129

Cross-examination - R. Srinivasan

```
 1   A     Yes.
 2              THE COURT:  All right.  This is Plaintiffs' 819?
 3              MS. PHILLIPS:  819.  Yes.  And it's already in.
 4              THE COURT:  Yes.
 5   BY MS. PHILLIPS:
 6   Q     All right.  So, Mr. Srinivasan, at the top of the
 7   document it says:  "This is part of a series of updates on
 8   the upcoming changes to the Ad Manager and AdMob auctions."
 9              Did you write each of those updates?
10   A     I don't recall if I wrote each of those updates, but I
11   was responsible for at least some of them.
12   Q     Okay.  And did you write this update?
13   A     I believe so with contributions from other colleagues.
14   Q     Okay.  If you can look at the middle of the first page
15   under summary, it says:  "Launch timing.  Aiming for a
16   100 percent launch in early September."
17              Do you recall when the changes to the Ad Manager
18   and AdMob auctions actually launched?
19   A     I would believe it's sometime in September the 2019.
20   Q     Okay.  And to what extent did that launch refer to both
21   the Unified First Price Auction and the Unified Pricing
22   Rules?
23   A     All three -- all four launches were simultaneous.
24   Q     Okay.  Under market perception -- do you see that?  It
25   says:  "Improved over the last three months, due to
```

130

Cross-examination - R. Srinivasan

1    continued dialogue with publisher partners and the press and

2    incorporation of some publisher feedback into product

3    changes."

4            What is that a reference to from this email that

5    is dated August 13th, 2019?

6    A    Are you asking specifically around the product changes?

7    Q    I'm asking specifically around the dialogue with

8    publisher partners.

9    A    So both the meeting that we had that we were referring

10   to in April, I believe, we had multiple conversations

11   one-on-one with a lot of our top partners, publisher

12   partners, and heard their concerns in more detail in depth

13   because we weren't able to get to the depth that we deemed

14   was necessary in the broader conference.  And through that

15   continued dialogue, we got to the root of a lot of the

16   concerns that publishers had and were able to propose some

17   changes to our product that address some of those concerns.

18           MS. WOOD:  I'm going to object to all of that as

19   hearsay, and also speculation and lack of foundation to the

20   extent of whether publishers did fully satisfy --

21           THE COURT:  For these long objections, you do need

22   to be at the lectern.  Yeah.

23           MS. WOOD:  Apologies, Your Honor.

24           I'm going to object to that previous answer as

25   being a mixture of hearsay and lack of foundation.  Hearsay

131

Cross-examination - R. Srinivasan

```
 1   to the extent the conversations with publishers,

 2   unidentified publishers and with respect to whether the

 3   changes Google made somehow satisfied the publishers'

 4   concerns or did not.

 5              THE COURT:  Well, he can't say whether it

 6   satisfied them or not, and clearly it hasn't because we had

 7   testimony already in the trial that it didn't.  But he can

 8   certainly testify -- this is a memo that he sent out upon

 9   which he said he did work.

10              I don't think there's a basis for the objection at

11   this point.

12              MS. WOOD:  Okay.

13              THE COURT:  All right.  Overruled.

14   BY MS. PHILLIPS:

15   Q    Did you personally participate in the ongoing current

16   dialogues that continued with the publisher partners in the

17   summer of 2019?

18   A    Yes.

19   Q    If you stay on that same page, under biggest risk it

20   says:  "Performance, publisher and Google revenue.

21   Advertiser performance may be worse than the status quo,

22   particularly on AdX web.  We believe this will improve over

23   time, and it is under active investigation and development."

24              What is the reference to "under active

25   investigation and development"?
```

132

Cross-examination - R. Srinivasan

```
 1   A     As mentioned before, we were frequently running

 2   experiments and analysis to determine the impact on

 3   publishers' buyers of the rollout of these changes, and one

 4   risk that we identified was that publisher and Google

 5   revenue may actually decrease in the short term.

 6   Q     At the bottom of page 1 and then continuing onto the

 7   second page, you'll see it refers on the second page to

 8   several dates in a row.  It begins, I think, with February

 9   of 2019 and goes down to July.  The June and July dates

10   refer to a migration of 1 percent, 5 percent and 10 percent

11   of Ad Manager traffic to the new auction model.

12            Why was the rollout done in this way?

13   A     Again, as part of any good sort of product launch

14   process, we would do any major rollout in a staged and

15   staggered manner, and this was our effort to be cautious

16   about the rollout and continually evaluate the impact on all

17   of our customers before we completely roll out the set of

18   changes.

19   Q     If you look down on the same page further down to under

20   revenue impact, it says:  "The effect is estimated at

21   6.4 percent increase in value of Open Auction plus Private

22   Auctions won by AdX, and a 32.6 percent increase in

23   impressions, which are currently blocked due to high legacy

24   pricing floorings."

25            Can you explain the "blocking due to high level
```

133

Cross-examination - R. Srinivasan

1   pricing floorings"?

2   A    Yeah.  So I think essentially the floor prices that are

3   set by publishers have an effect of blocking and filtering

4   bids in the auction, and in general lower prices would

5   increase revenue and increase sort of the set of bids

6   eligible in an auction.  And this, I believe, was an

7   estimation of what that impact was based on the current set

8   of floor prices configured by the publishers.  I would add

9   that that's dynamic in that it is in the control of

10  publishers regarding how they set their floor prices.

11  Q    If you turn to page 3 in the same document, it says

12  under current performance:  "GDN plus DV3 using bid

13  translation."  If you look at the third paragraph down, it

14  says:  "Overall publisher revenue is neutral; however, this

15  assumes that header bidding revenue, as entered in Ad

16  Manager, is accurate.  In practice, for many publishers,

17  this is not true since they apply a boost to header bidding

18  bids."

19         What does that reference, "boost to header bidding

20  bids," refer to?

21  A    So sometimes publishers would configure the setup

22  whereby a $3 bid in the header bidding auction is actually

23  reflected as a $4 bid in the Ad Manager auction.  So

24  essentially they would sort of inflate the price of the bid

25  when it competes with AdX and other sources of demand.

Cross-examination - R. Srinivasan

```
 1    Q    What was the practical effect of publishers doing that?

 2    A    The practical effect would be to give a leg up to

 3    header bidding demand sources in comparison to AdX.

 4    Q    Was it similar to the effect of raising the floor price

 5    in AdX?

 6    A    Yes.

 7    Q    Okay.  And was that practice that you just described

 8    that publishers were engaging in, was that available prior

 9    to the implementation of these changes in 2019?

10    A    It was available prior and post the changes.

11    Q    And post.  Okay.

12         Was that a practice that Google recommended

13    publishers use?

14    A    No.

15    Q    Can you explain why not?

16    A    Because, again, our goal was to run a fair and

17    consistent auction, and this would result in demand sources

18    being subjected to different rules, and hence our guidance

19    was always that that might result in publishers getting

20    lesser revenue than they otherwise would, but we did not do

21    anything to prevent those setups.

22    Q    If you look back at the document, please -- and we're

23    on page 4 -- there's a title for Ad Manager -- I think it's

24    towards the bottom:  "Ad Manager Pricing Rules and

25    Protections"; do you see that?
```

135

Cross-examination - R. Srinivasan

```
 1   A    Sorry.  I'm trying to figure out which page this is.
 2             Yes.  I see it.
 3   Q    Okay.  And under that it says:  "Product changes"; do
 4   you see that?
 5   A    Yes.
 6   Q    Okay.  And if you look to the next page, it says:  "May
 7   to June, 2019.  Incorporated changes based on publisher
 8   feedback, including increasing limits on numbers" -- excuse
 9   me, "on number of a rules a publisher, extending
10   functionality to block specific buyers for brand-safety
11   reasons."
12             What did this "extended functionality" referred to
13   here allow publishers to do?
14   A    This allowed publishers, for example, to specify that
15   on certain segments of inventory, they did not want Google
16   Ads to bid or compete.  And this was, again, something that
17   could resolve some of the revenue diversity-related concerns
18   publishers had.
19             THE COURT:  So let me ask you so I'm clear on
20   this.
21             In other words, if the Google buyer end had an
22   advertiser for adult pornography and they wanted that to
23   appear on the New York Times editorial page, New York Times
24   could block it?
25             THE WITNESS:  Yes.
```

136

Cross-examination - R. Srinivasan

```
 1              THE COURT:  Okay.  Thank you.

 2    BY MS. PHILLIPS:

 3    Q    Why did Google extend that functionality?

 4    A    It was, again, going back to some of the -- our

 5    hypothesis on why publishers leveraged floor prices in the

 6    way that they did.  One hypothesis was that they used floor

 7    prices as a way to block certain segments of demand that

 8    they deemed were undesirable.  And a more effective way of

 9    achieving that goal would be to offer controls where they

10    can actually block certain buyers from bidding on certain

11    segments of inventory.

12    Q    So to what extent was this change in product in August

13    of 2019 in an extended functionality a response to the

14    publisher concerns that you had heard over that summer?

15    A    It was informed by some of the publisher feedback.  It

16    was an idea that we had been discussing previously, but we

17    accelerated that in response to publisher feedback.

18    Q    Right under that it says:  "Current state.  We see

19    significant reduction in effective floors which will improve

20    inventory access for buyers."

21              What did that mean?

22    A    This goes back to a point that I made that reducing

23    floors would mean fewer bids in the auction were filtered

24    out, and hence improves access for buyers to bid on that

25    inventory.
```

137

Cross-examination - R. Srinivasan

1    Q    Under upcoming product changes on that same page, it

2    says:  "Mid August.  Extending functionality to offer

3    discounted floors for specific advertisers to achieve

4    specific business objectives that are not related to yield

5    management"; do you see that?

6    A    Yes.

7    Q    Did Google extend this functionality?

8    A    Yes.

9    Q    Okay.  And what did this functionality allow publishers

10   to do?

11   A    Again, through the conversations that we had with

12   publishers, one desire that they had was to be able to

13   prioritize certain advertiser relationships.  And this was a

14   tool to allow them to do so where if you had a special

15   relationship or a contract with a specific advertiser like

16   the New York Times or Nike, they're able to set lower floors

17   for Nike to prioritize that relationship.

18   Q    And why did Google extend this functionality?

19   A    Again, this was in response to feedback that we

20   received from publishers around some of the Unified Pricing

21   Rule changes where the floor price would all be uniform

22   across all demand sources.  And one of the reasons why

23   publishers set those floor prices differentially was because

24   they wanted to prioritize certain sources of demand, so this

25   achieved that.

                                                            138

Cross-examination - R. Srinivasan

1  Q    Under October it says:  "Extending functionality to

2  define different floor prices for different formats for EG

3  outstream video versus display ads"; do you see that?

4  A    Yes.

5  Q    Can you explain what is this extended functionality?

6  A    So within the ads ecosystem, you have different formats

7  of ads.  For example, you have banner ads, you have app ads,

8  you have video ads, outstream, display.  Multiple sort of

9  pools of inventory that publishers sell ads for.  And one,

10 again, bit of feedback that we received from publishers was

11 having a unified role is not sufficient because we do price

12 differing formats differently, and this provided additional

13 flexibility and granularity for publishers to specify rules

14 differently for different formats of inventory.

15 Q    And why did Google extend this functionality?

16 A    Again, this was in response to publisher feedback.

17 Q    Okay.  If you can turn to page 6 of 7.  And I'm looking

18 specifically under "publisher press updates"; do you see

19 that?

20 A    Yes.

21 Q    Okay.  If I -- I'll direct your attention to May to

22 June.  It says:  "Extensive partner education through

23 individual, more than 20 one-on-one PM and pub meetings and

24 group engagements, EGUS/EMEA user groups around the benefits

25 of the upcoming changes reaching more than 400 pubs"; do you

139

Cross-examination - R. Srinivasan

1    see that?

2    A    Yes.

3    Q    And, again, were you involved in at least some of these

4    one-on-one publisher meetings?

5    A    I was involved in most of these, yes.

6    Q    Okay.  And in -- if we go down a little bit further

7    from May to June 2019, it says:  "Positive feedback received

8    from a variety of publishers, including The Washington Post,

9    Vice Media, New York Times, MailOnline," et cetera.  And

10   then there are two quotes underneath there.

11         The first is from MailOnline:  "Google's move to

12   first-price auctions and unified pricing is an opportunity

13   to improve transparency throughout the ecosystem, including

14   improved visibility of their own actions and practices,

15   which I believe should benefit everyone."

16         And the second one from Vice Media says:  "We

17   welcome Google's move to first-price auctions and Unified

18   Pricing Rules.  These changes will help us simplify how we

19   implement our most advanced pricing strategies between our

20   header bidding partners, Ad Manager and exchange bidders.

21   We believe this will help create a level playing field for

22   non-guaranteed transactions and help us review the

23   performance of our demand partners"; do you see that?

24         MS. WOOD:  Objection.  Hearsay.  It's not being

25   offered for the truth, that's one thing, but --

140

Cross-examination - R. Srinivasan

```
 1              THE COURT:  It's not being offered for its truth;
 2    it's just statements that were made.
 3    BY MS. PHILLIPS:
 4    Q    Did you receive other publisher feedback like this
 5    feedback?
 6    A    I don't recall specific feedback topics, but, yeah, I
 7    think this broadly covers the positive feedback that we got.
 8    Q    If you can go to the next page, 7 of 7 under
 9    August 19th.  It says:  "We recently shared some aggregated
10    experiment data with a very small set of strategic partners
11    to give them some visibility into experiment performance";
12    do you see that?
13    A    Yes.
14    Q    It says:  "Results were mostly mutual to mildly
15    positive."
16              What does that mean?
17    A    That the impact on publisher revenue was neutral to
18    positive for some of our top publishers.
19    Q    Mr. Srinivasan, if you can turn to -- sorry.
20              MS. PHILLIPS:  I apologize, Your Honor.  I'm
21    trying to speed it up.
22    BY MS. PHILLIPS:
23    Q    Okay.  If you can turn to DTX 829, please.
24    A    Yes.
25    Q    And this is an email dated November 1st, 2019; do you
```

Cross-examination - R. Srinivasan

```
 1   see that?
 2            MS. WOOD:  Page 29?
 3            MS. PHILLIPS:  I think so.
 4            THE WITNESS:  I'm sorry, is this 616?
 5            THE COURT:  829.  Okay.  We got it.
 6            MS. PHILLIPS:  It's possible I have the wrong ...
 7            THE WITNESS:  Oh, yeah.  I've got it.
 8            MS. PHILLIPS:  You've got it.  Okay.
 9            THE COURT:  It's a November 1st, 2019; is that
10   what you've got?
11            MS. PHILLIPS:  I believe so.
12            THE COURT:  All right.
13            MS. WOOD:  Objection if it's coming in for the
14   truth of the matter.
15            MS. PHILLIPS:  Your Honor, this is a business
16   record for Google prepared in the ordinary course of
17   business.  It's an email exchange with regard to these
18   issues.
19            MS. WOOD:  Well, I don't see that Mr. -- I don't
20   see that Mr. Srinivasan prepared it.  I don't believe a
21   foundation has been laid that it's prepared in the normal
22   course.  It has the same Communicate With Care markings that
23   we've seen, the privileged and confidential, et cetera.  And
24   so we would object to it on any basis other than -- unless
25   it's being offered not for the truth of the matter.
```

142

Cross-examination - R. Srinivasan

```
 1              THE COURT:  I'm letting it in.  I'm overruling the

 2    objection.  What it is evidence of is chat communications

 3    going on at Google.  All right.

 4              Go ahead.

 5              MS. PHILLIPS:  Thank you, Your Honor.

 6    BY MS. PHILLIPS:

 7    Q    All right.  And, Mr. Srinivasan, of the --

 8              THE COURT:  I'm sorry.  Yeah, this is a defense

 9    exhibit, I want to make sure because we have both.

10              MS. PHILLIPS:  I apologize.  DTX.

11              THE COURT:  829 is in.

12              MS. PHILLIPS:  I just misspoke.  Thank you.

13              THE COURT:  Thank you.

14       (Defense Exhibit Number 829 admitted into evidence.)

15    BY MS. PHILLIPS:

16    Q    I'm looking on page 2 of 3, Mr. Srinivasan, in the

17    section on "why was this launch hard"; do you see that?

18    A    Yes.

19    Q    Also, for the record, like I said, what I'm actually

20    looking at now is an October 25th, 2019 email.

21              And in the second and third line, it says:  "This

22    was a massive technical undertaking across dozens of

23    engineers."

24              What was that in reference to?

25    A    This was in reference to the changes that we were
```

143

Cross-examination - R. Srinivasan

```
 1    making to the auction model being very complex and requiring
 2    a lot of engineers.
 3    Q    Okay.  If says:  "The effort entailed hundreds of
 4    one-on-one meetings with top sell-side and buy-side
 5    partners"; do you see that?
 6    A    Yes.
 7    Q    Okay.  And then under that it says:  "Overall,
 8    publishers experienced a neutral to positive impact in
 9    revenue.  Our top 500 publishers saw a median increase of
10    2.7 percent in auction revenue"; do you see that?
11    A    Yes.
12    Q    Okay.  Would you explain why these changes created
13    increased revenue from header bidding?
14    A    So in general, we were expecting the set of changes to
15    have differential impact on a different set of demand
16    sources, and with respect to header bidding, they were more
17    competitive with AdX demand with the removal of AdX last
18    look, which resulted in AdX losing more impressions.  And
19    also moving to a first-price auction, depending upon how
20    sophisticated the buyers were in bidding into that auction,
21    there could be segments of inventory where header bidding
22    was better off and segments of inventory where AdX was
23    better off.
24    Q    Okay.  Thank you.
25             If you can turn back to the white binder that
```

144

Cross-examination - R. Srinivasan

```
 1   Ms. Wood handed you.  I'd like to ask you a couple of
 2   questions about a few documents that you were shown earlier
 3   this morning.
 4            If you can look at PTX 611, this was the
 5   PowerPoint presentation where it was represented that you
 6   had some hand in writing this?
 7   A    Yes.
 8   Q    If you can turn to -- I'll refer to -- there are no
 9   page numbers, so I'll refer to the small number on the
10   bottom right-hand corner of the documents; do you see that?
11   A    Uh-huh.
12   Q    Okay.
13   A    Yes.
14   Q    So if you can turn to -- you were not shown this
15   particular slide.  803.  It says -- the top of this say:
16   "HB, header bidding, adoption and impression share still
17   growing"; do you see that?
18   A    Yes.
19   Q    And then underneath that there's a green box that says:
20   "We expect publishers to continue using header bidding as
21   long as there is incremental yield to be made"; do you see
22   that?
23   A    Yes.
24   Q    And did publishers, in fact, continue using header
25   bidding?
```

145

Cross-examination - R. Srinivasan

```
 1   A     Yes.

 2   Q     Did they do so after the changes that we've been

 3   discussing in 2019?

 4   A     Yes.

 5   Q     Okay.  And can you turn to page 805 in that same

 6   document.  You were also not shown this document by

 7   Ms. Wood.

 8            At the top it says:  "Our focus" --

 9            MS. WOOD:  You mean the page, the entire page.

10            MS. PHILLIPS:  Sorry.  I misspoke again.  I

11   apologize.  The page.

12   BY MS. PHILLIPS:

13   Q     "Our focus with Jedi is not to directly stop header

14   bidding but improve platform attractiveness and increase net

15   revenue."

16            Were those the goals with these changes as they

17   related to header bidding?

18   A     Yes.

19   Q     Okay.  Can you please turn to Document PTX 625 that you

20   looked at this morning.

21   A     Yes.

22   Q     Okay.  And at the very top under Jonathan Bellack's

23   name it says:  "The DBM model was built on the assumption

24   that there was inventory only available through middlemen

25   exchanges, but in reality, 78 percent of DBM -- that's DV36
```

146

Cross-examination - R. Srinivasan

```
 1   and AWBid -- spend on 3PE -- third-party exchanges -- is now

 2   on sites we already have a platform relationship with."

 3              What does this refer to?

 4   A    I'm not -- I'm not completely sure what Jonathan was

 5   referring to here, but if I were to guess --

 6              THE COURT:  No guessing.

 7              THE WITNESS:  Okay.

 8   BY MS. PHILLIPS:

 9   Q    We'll move on.

10              If you can turn to -- sorry.  If you can turn to

11   PTX 699, please.  Again, another document that you looked at

12   this morning.

13   A    Yes.

14   Q    Let me know when you're there.  Okay.

15              In sort of the second paragraph towards the bottom

16   it says:  "Removing" -- there's a reference to "removing

17   functionality that doesn't make as much sense in the

18   first-price world."

19              Can you explain that, please.

20   A    Yeah.  I think I might have explained this before.

21              But in a second-price auction, the floor price has

22   an effect in determining the price that publishers get paid

23   in the auction.  So if you have a $10 bid and a $5 floor

24   price and that's the only bid in the auction, the price

25   per -- the price that's being paid is $5.  In a first-price
```

147

Cross-examination - R. Srinivasan

```
 1    world, the $10 first-price bid and a $5 floor, the $5 has no

 2    effect in determining what the final price of the auction

 3    is, because it's a first-price auction that the buyer bids

 4    $10 and they pay $10, so the floor price has no effect on

 5    the price.

 6    Q    Thank you.

 7              And if you can turn to PTX 784, please.  You

 8    looked at this document this morning, and I'll direct you to

 9    the second page.

10              First, if you could look at the fourth bullet

11    down, it says:  "Having granular control also incentivize

12    pubs to call the same demand source multiple times through

13    different channels with different floor prices.  EG DBM is

14    called through AdX.  EB and HB" -- Exchange Bidding and

15    header bidding -- "with different floor prices to

16    effectively fish for the highest price."

17              What does that refer to?

18    A    So essentially in the conversation around query

19    throttling, I mentioned that the same buyer could be called

20    for the same rectangle on the newyorktimes.com multiple

21    times, and not a lot of buyers have the smarts to dedupe or

22    figure out that it's the same rectangle that's being sold.

23    And sometimes what publishers do is for the same rectangle,

24    they would say on this channel, the floor price is $3, and

25    on this channel the floor price is $4, and on this channel
```

148

Redirect examination - R. Srinivasan

```
 1   the floor price is $5 in an effort to figure out which
 2   channel gives them the maximum inventory because they don't
 3   know how to set the floor prices.
 4           MS. PHILLIPS:  Thank you.  I don't have anything
 5   further, Your Honor.
 6           THE COURT:  All right.  Ms. Wood.
 7           MS. WOOD:  Briefly, Your Honor.
 8                   REDIRECT EXAMINATION
 9   BY MS. WOOD:
10   Q    First let's pull back up DTX 829.  It's an email with
11   Ms. Hsiao, Mr. Dukellis.
12           Is your name on this email?
13   A    I cannot tell, but I believe I did receive this email.
14   Q    You believe you did receive it?
15   A    I believe so, but I'm finding it hard to locate my
16   name.
17   Q    You don't see it as you sit here now?
18   A    So I was part of some of the mailing groups here.  DRX
19   all referred to the entire team that was working on some of
20   these changes.  So I was definitely involved in that.  And I
21   can also see my name listed on the second page in terms of
22   who was responsible and worked on some of these changes.
23   Q    Okay.  And this is an email, this is not a chat
24   communication; correct?
25   A    This is an email.
```

149

Redirect examination - R. Srinivasan

1    Q    Okay.  And this email is marked privileged and

2    confidential; is that right?

3    A    I see Duke had marked it privileged and confidential.

4    Q    And that's consistent with the Communicate-with-Care

5    policy; correct.

6    A    I would not be able to speak with why Duke included

7    this.

8    Q    Okay.  You don't see legal advice in the email;

9    correct?  Or a request for legal advice.

10   A    I don't, but I don't know what was Duke's rationale for

11   including this.

12   Q    Okay.  And in this time period in October of 2019, this

13   is exactly when you were getting that refresher on

14   Communicate With Care and the litigation hold; correct?

15   A    Again, I don't recall when the refresher was there or

16   whether I received it, so I would not be able to comment on

17   that question.

18   Q    You do recall getting a litigation hold?

19   A    I do recall getting a litigation hold.

20   Q    Okay.

21   A    I do not recall the timing of the litigation hold.

22   Q    Let's pull up PTX 884, which is already in evidence.

23   A    Sorry, which binder is this?

24   Q    That would be in the white binder.  It's also on the

25   screen, if that's easier.

                                                              150

Redirect examination - R. Srinivasan

```
 1   A     Oh, yes.

 2   Q     PTX 884 is when you remind your colleagues to

 3   communicate with care in October 2019; correct?

 4   A     Correct.

 5   Q     And you put a link to the Communicate With Care

 6   document, in fact; correct?

 7   A     Again, I can't state it to a fact, but it would appear

 8   so.

 9   Q     And you also copy a lawyer; correct?

10   A     Yes.

11   Q     And you write "privileged and confidential"; correct?

12   A     Yes.

13   Q     And as we discussed before, you don't actually ask for

14   any legal advice; correct?

15   A     Again, I think the context behind this email is to

16   ensure that we are communicating with care, which does have

17   legal implications, which was probably behind my rationale

18   to include a lawyer.

19   Q     But we've seen other documents where you copied a

20   lawyer and wrote "privileged and confidential" where you

21   couldn't see any legal advice, at least today?

22   A     This is not one of them at least.

23   Q     Okay.  And in this one you say:  "We should avoid any

24   suggestion that our intent is directly to impact header

25   bidding"; right?
```

151

Redirect examination - R. Srinivasan

```
 1    A     The email does state that.

 2    Q     So you knew at the time, and other Google employees

 3    knew at the time that you should be careful in what you

 4    write in documents and you shouldn't write anywhere in

 5    documents that Google's goal was to impact header bidding;

 6    right?

 7    A     I think the intent behind this was to make sure we

 8    frame our intent accurately.

 9    Q     If you could just answer my question yes or no.

10    A     Could you repeat the question?

11    Q     Yes.

12          You knew and other Google employees knew at the

13    time that in the documents, they should communicate with

14    care and avoid any suggestion that it was Google's intent to

15    directly impact header bidding; correct?

16    A     Yes.

17    Q     And so if we look at what you were just shown, PTX 611,

18    if you could turn to the page ending in Bates stamp 805,

19    this is the document you're listed as the e-author for; do

20    you recall that?

21    A     Yes.  This was shown to me before earlier today.

22    Q     And do you see on page ending in Bates stamp 805 --

23    A     Yes.

24          MS. WOOD:  805, Mr. Klein.

25    BY MS. WOOD:
```

152

Redirect examination - R. Srinivasan

```
 1   Q    "Our focus with Jedi is not to directly stop header
 2   bidding."  That's what you wrote in the title, right?
 3   A    I am not sure who wrote the title, but yes, that's what
 4   the document reflects.
 5   Q    And so the title avoids any suggestion that Google's
 6   intent is to avoid header bidding; right?
 7   A    Because the intent was not to stop header bidding.
 8   Q    And you went through a bunch of documents with counsel
 9   about the reasons that you told publishers you thought UPR
10   was a really good idea for them; right?  The three examples
11   you went on.  Okay.
12            Fair to say that even after you explained all that
13   to them, they disagreed; right?
14   A    Some publishers disagreed.
15   Q    And, in fact, of all the publishers who attended the
16   meeting, none of them supported the move to UPR in the
17   meeting?
18   A    None of them vocally supported it, but that doesn't
19   mean they didn't support it.
20   Q    You could read their minds?
21   A    No.
22            THE COURT:  We don't need that.  We don't need
23   that.
24            MS. WOOD:  No further questions.
25            THE COURT:  Any recross?
```

                                                              153

Recross-examination - R. Srinivasan

```
 1              MS. PHILLIPS:  Just one quick question.
 2                    RECROSS EXAMINATION
 3   BY MS. PHILLIPS:
 4   Q    That was an implication with regard to the questions on
 5   Communicate With Care as it related to header bidding.
 6              Do you recall in the April 18, 2019 meeting
 7   discussing header bidding?  And I'll refer you to page 57 of
 8   PTX 1854.  You explain:  "I am the Exchange Bidding product
 9   manager as well.  I don't think header bidding is going
10   away.  I think we initially thought that that was our
11   vision.  For example, that we would build a better product
12   that all publishers would opt and use, but we recognize the
13   fact that header bidding is not going away, and we have
14   accepted that, which is why we're building tools that help
15   you manage sources of demand across all different channels
16   in a way that you actually want to."
17              Do you remember saying that publicly in front of
18   publishers as it related to the changes in 2019 that
19   impacted header bidding?
20   A    Again, my recollection is hazy, but it would appear I
21   said that, yes.
22              MS. PHILLIPS:  Nothing else, Your Honor.
23              THE COURT:  All right.  Does anybody anticipate
24   calling this witness again?
25              MS. WOOD:  I don't think so, Your Honor.
```

154

Direct examination - J. Dederick

```
 1                    THE COURT:  All right.

 2                    MS. PHILLIPS:  No.

 3                    THE COURT:  Mr. Srinivasan, you're now cleared as

 4     a witness.  That means you can stay and watch the

 5     proceedings -- although we're going to break for a lunch in

 6     a few minutes -- or you may leave, but you're not to discuss

 7     your testimony with any witness who has not yet testified.

 8     Thank you.

 9                    THE WITNESS:  Thank you.

10                    (Witness excused at 12:44 p.m.)

11                    THE COURT:  All right.  What do we do next?  We

12     have a few minutes before lunch.

13                    MS. WOOD:  We could bring in Mr. Dederick back and

14     get a few minutes in before lunch.

15                    THE COURT:  All right.  Let's do that.

16                    MS. WOOD:  Dederick, I'm sorry.

17                    THE COURT:  Dederick.  All right.  Mr. Dederick,

18     you're still under your oath from yesterday.

19                    THE WITNESS:  Okay.

20                    THE COURT:  All right, Ms. Dunn, go ahead.

21                    MS. DUNN:  Thank you, Your Honor.

22                            CROSS-EXAMINATION

23     BY MS. DUNN:

24     Q    Welcome back, Mr. Dederick.

25     A    Thank you.
```

155

Direct examination - J. Dederick

```
 1   Q    How many times did you meet with the Department of

 2   Justice after the complaint was filed in this case and

 3   before your testimony yesterday?

 4   A    I spent one hour on the phone with the Department of

 5   Justice.  Yeah.

 6   Q    And when was that?

 7   A    A week ago.

 8   Q    Okay.  So you met with them once a week ago in advance

 9   of your testimony yesterday, but didn't you also meet with

10   them after the complaint was filed and before your

11   deposition?

12   A    I honestly don't recall because it was over -- I think

13   that was over a year ago.

14   Q    Okay.  During your deposition -- and I'm happy for you

15   to look at it, but it may not be necessary -- you testified

16   that you met with the Department of Justice -- you said at

17   that time also you met for an hour with the Department of

18   Justice a month before your deposition; do you recall saying

19   that?

20   A    I will take your word for it if it's in the deposition.

21   Q    Okay.

22   A    I don't recall the call or -- but I'll take your word

23   for it.

24   Q    Okay.  So in addition to last week and a month before

25   your deposition, did you -- you also testified, didn't you,
```

156

```
 1    that you met with the Department of Justice during the

 2    investigatory phase of this case?

 3    A    I do have a recollection of the Department of Justice

 4    reaching out to me, I believe it was several years ago.  So,

 5    yeah, I have a recollection of that phone call.

 6    Q    Okay.  And did you meet with them when they reached out

 7    to you?

 8    A    We had a phone call.

 9    Q    Okay.  So three phone calls.

10         And then you're also aware that other C-Suite

11    executives from The Trade Desk also met with the Department

12    of Justice during this case; correct?

13         MR. GUARNERA:  Your Honor, we object.  This is

14    cumulative testimony at this point.

15         THE COURT:  It also -- you know, any witness who

16    has not met with attorneys who are calling that witness to

17    testify, the attorney is committing malpractice.  I mean,

18    this doesn't go very far.  All right.

19         MS. DUNN:  Your Honor, the reason we ask is -- I

20    agree with respect to the investigative phase, but I do

21    think with respect to examining this witness --

22         THE COURT:  But you know yourself, you've talked,

23    I'm sure, to all your witnesses before you put them on the

24    stand, and if you haven't, I'm surprised, because I

25    certainly did it when I was a trial lawyer.  So this doesn't
```

                                                              157

Direct examination - J. Dederick

```
 1    go very far with the Court.  Let's move on.
 2              MS. DUNN:  Let's switch gears.
 3    BY MS. DUNN:
 4    Q    Mr. Dederick, you said yesterday The Trade Desk is a
 5    public company; right?
 6    A    Yes.
 7    Q    And every quarter The Trade Desk announces earnings and
 8    walks its investors through its SEC filing; right?  Like
 9    every other public company.
10    A    Yes.
11    Q    And you're the chief revenue officer of the company?
12    A    Yes.
13    Q    And you testified yesterday that in your role as the
14    chief revenue officer, you oversee company revenue; right?
15    A    Yes.
16    Q    And you --
17    A    Responsible -- I believe the words I said were
18    responsible for company revenue.
19    Q    You said I am overseeing company revenue.
20    A    Okay.
21    Q    And you said that you manage revenue operations, and
22    you said on the Trade Desk's executive team doing business
23    strategy, product strategy and partner strategy; correct?
24    A    Yes, that sounds right.
25    Q    Okay.  And you testified yesterday about The Trade
```

158

Direct examination - J. Dederick

```
 1    Desk's inability to succeed in display advertising; correct?
 2    A    Well, we have had a harder time growing the -- our
 3    display business at other channels, certainly.
 4    Q    Okay.  And you recall that on August 8th, The Trade
 5    Desk announced earnings publicly; correct?
 6    A    I believe so, yes, that sounds right.
 7    Q    Okay.  And you recall that about a month ago, you
 8    posted on your LinkedIn page about the August 8th earnings
 9    announcement?
10    A    Yes.
11    Q    Right.  And you said yesterday:  "On our earnings call,
12    Jeff Green" -- your CEO -- "described how buying great
13    advertising on great content grows businesses in a way that
14    buying cheap reach does not.  From my lens as CRO, I see
15    that every day"; do you recall that?
16    A    Yes.
17    Q    And you linked to an article about the earnings
18    announcement; right?
19    A    Yes.
20    Q    Okay.  If you could turn in your binder, there is a tab
21    that is for the August 8th earnings announcement that you
22    posted about.  It should be towards the back of your binder.
23    A    Do you know what number?
24    Q    It's labeled 20240808.
25    A    Okay.  Give me a minute.
```

159

Direct examination - J. Dederick

```
 1    Q    Which was the date of the announcement.

 2              THE COURT:  Way at the back.

 3              MS. DUNN:  Yeah, way at the bottom.

 4              MR. GUARNERA:  Your Honor, we object as hearsay

 5    unless -- yeah, we object as hearsay, Your Honor.

 6              THE COURT:  Does this reflect an SEC filing?

 7              MS. DUNN:  Yes.

 8              THE COURT:  Overruled.

 9    BY MS. DUNN:

10    Q    All right.  Mr. Dederick, do you have in front of you

11    the 08/08 earnings announcement?

12    A    It's titled:  The Trade Desk, Inc. NASDAQ-GM:TTD.  That

13    one?

14    Q    I believe so.

15    A    Okay.  Yes.  Give me -- please give me a minute to look

16    that up.

17              THE COURT:  Mr. Dederick, you've got to speak

18    louder and into the mic.

19              THE WITNESS:  Oh, I'm sorry.

20              Please give me a minute just to look at it.

21              MR. GUARNERA:  Your Honor, while Mr. Dederick's

22    reviewing that, this is the transcript of an earnings call

23    in which people other than Mr. Dederick are making

24    statements, and simply those statements are recorded in this

25    transcript, these are out-of-court statements being
```

160

Direct examination - J. Dederick

```
 1    admitted.

 2              THE COURT:  I'm sorry.  Maybe we're looking at two

 3    different things.  It says earnings call, but it looks like

 4    it's a -- I don't see any quotes of people or anything like

 5    that, and I'm not looking at the rest of it.  It's just this

 6    one page, right, that you're talking about?

 7              MS. DUNN:  It's one document.  This is the

 8    earnings announcement that The Trade Desk made on August 8th

 9    of 2024.

10              THE COURT:  Right.

11              MS. DUNN:  So the top should say August 8th, 2024.

12              THE COURT:  Are you only offering page 1?

13              MS. DUNN:  I am going to examine the witness based

14    on -- yesterday he talked about The Trade Desk --

15              THE COURT:  No, I understand.  I mean, there's

16    more to it.  There's a presentation, there's operator, and

17    there are -- apparently, if this is a transcript, it's

18    transcripts of various people.

19              MS. DUNN:  So it is -- I'm going to examine him --

20    I plan to examine him on more than one page of this

21    document, and maybe if we took it step by step.

22              MR. GUARNERA:  Your Honor, if Google wanted to

23    talk to Chris Toth --

24              THE COURT:  You need to be at the lectern,

25    Counsel.
```

161

Direct examination - J. Dederick

```
 1              MR. GUARNERA:  Your Honor, if Google wanted to ask

 2    any of the people on this call what they thought or why they

 3    said what they said, they can, but Mr. Dederick's not on

 4    this transcript.  These are out-of-court statements that

 5    Google's trying to admit.

 6              THE COURT:  If they're being offered for the truth

 7    of the contents to establish the profits or the improved

 8    profits or the financial situation of The Trade Desk, then

 9    I'm going to sustain the objection.  All right.

10              If they're being offered for some other reason, or

11    if you have an official filing with the U.S. Government,

12    because they're under the penalty of perjury, I would accept

13    it representing the revenue of the entity, I'll accept it in

14    that format.

15              MS. DUNN:  I am using it as a basis to examine

16    this witness.  If he does not agree, he can so testify, but

17    this --

18              THE COURT:  I'm sorry.  Just ask the question, and

19    if he can't answer it, then that's going to be it; all

20    right?

21              MS. DUNN:  Okay.

22    BY MS. DUNN:

23    Q    Mr. Dederick, can you direct your attention, please, to

24    page 4.

25              THE COURT:  No.  No.  Ask the question.
```

162

Direct examination - J. Dederick

```
 1              MS. DUNN:  Okay.  I apologize.
 2   BY MS. DUNN:
 3   Q    Mr. Dederick, it's the case, isn't it, that on
 4   August 8th of 2024, The Trade Desk told investors that
 5   revenue was up 26 percent to $585 million that quarter?
 6   A    I would have to look through the document.  I don't
 7   memorize the exact numbers, so I would have to look at the
 8   document.
 9              THE COURT:  I don't care about the exact numbers.
10              THE WITNESS:  Okay.
11              THE COURT:  Is it, in fact, the case that in
12   August 8, a Trade Desk reported that it had an increase in
13   revenue?
14              THE WITNESS:  Yes.
15              THE COURT:  And that the increase in revenue was
16   not 1 or 2 percent, but it was a decent increase?
17              THE WITNESS:  Yes.
18              THE COURT:  Fine.  Let's go.
19   BY MS. DUNN:
20   Q    Okay.  And do you recall The Trade Desk reporting that
21   The Trade Desk's growth rate significantly outpaced the rest
22   of the digital marketing industry, just as it has every
23   quarter for the last few years?
24   A    I don't remember me saying that.  So I don't know
25   who --
```

163

Direct examination - J. Dederick

```
 1    Q    Sir, that was not my question.  And the judge says if
 2    you recall that this was something that The Trade Desk
 3    announced to investors, if you recall that, you can so
 4    testify.
 5    A    I remember similar language.  I really -- I don't have
 6    an exact memory of what was said on this phone call, but
 7    that -- I remember similar language to that.
 8    Q    Okay.  And do you recall that The Trade Desk told
 9    investors that:  "It will continue to outpace the market in
10    years to come led by areas such as connected TV"?
11         MR. GUARNERA:  Your Honor, we object again.  She's
12    reading from this transcript, which are out-of-court
13    statements.
14         THE COURT:  No.  Overruled.  Let's go.
15         THE WITNESS:  I'm so sorry.  Will you please
16    repeat that?
17         MS. DUNN:  Yes, sir.
18    BY MS. DUNN:
19    Q    Do you recall that The Trade Desk told investors:  "It
20    will continue to outpace the market in the years to come led
21    by areas such as connected TV"?
22    A    You know, again, I really don't remember the words that
23    were said.  I know that we spoke on this earnings call about
24    connected television, and so it sounds right that we would
25    be talking about the success of our connected television
```

164

Direct examination - J. Dederick

```
 1   business on an earnings call.
 2   Q    Okay.  Where you -- I'm sorry.
 3   A    That's all right.
 4   Q    And when you say we spoke on the earnings call about
 5   connected TV, do you recall that you said -- that The Trade
 6   Desk said connected TV is only getting stronger?
 7   A    I really don't remember the quotes.  I was not -- I
 8   don't participate in writing these scripts, I'm not present
 9   when these are happening.  I'm listening on the phone like
10   the investors.
11   Q    Okay.  So you listened on the phone?
12   A    Yes.
13   Q    Okay.  Do you agree that connected TV is only getting
14   stronger?
15   A    I mean, it would really depend on your definition of
16   stronger.
17          What I will say is, connected television has been
18   a key growth driver for our company, we've been very open
19   about that with investors.  So is it only getting stronger?
20   I don't -- depends on your definition and what you're
21   referring to.  It has been strong with our business for
22   years.
23   Q    Okay.  As the chief revenue officer of The Trade Desk,
24   would you agree that The Trade Desk's focus on connected TV
25   but also digital audio is helping drive its profitability?
```

165

Direct examination - J. Dederick

```
 1   A     I would frame it differently.  I would say that our
 2   investments in these separate channels are driving top-line
 3   revenue growth.  That's really what I pay attention to.  I
 4   pay attention to top-line revenue, and what I mean by that
 5   is spend through the platform.  Right.  So how much spend is
 6   going through, not necessarily how much margin we're making
 7   off of it.
 8           But I would say particularly connected television
 9   has been --
10   Q   Sir, my question was only whether you agree that
11   connected TV and digital audio was helping you drive your
12   company's profitability.  If you do not agree, you can so
13   say.
14   A     Yeah, I don't agree with how you've asked that
15   question.
16   Q     Okay.  And you have -- you have testified previously
17   that the Trade -- you've said that "The Trade Desk is
18   focused on connected TV because Google has monopolized
19   display"; do you recall testifying to that?
20   A     I don't have the deposition testimony in front of me,
21   but I do believe that a lot of our investments and growth in
22   connected television are because we don't have a player with
23   the level of dominance in connected television that Google
24   has in open-web display.
25   Q     Okay.  And do you recall when you were listening on the
```

166

Direct examination - J. Dederick

```
 1    phone to what The Trade Desk was telling investors during

 2    earnings, that you heard that the reason for the large

 3    commercial shift to connected TV and digital audio was the

 4    global pandemic?

 5    A    I need you to -- could you shorten that question?  I

 6    just lost you along the way.

 7    Q    Yes.

 8              When you were listening on the phone --

 9    A    Yep.

10    Q    -- to The Trade Desk's announcement of earnings --

11    A    On August 8th.

12    Q    -- on August 8th, a month ago --

13    A    Yep.

14    Q    -- do you recall hearing that it was the global

15    pandemic, which was the occasion for a large commercial

16    shift to connected TV and digital audio?

17    A    No, I don't recall hearing that.

18    Q    Okay.  You don't recall that your CEO said that?

19    A    Again, I listened to this whole call.  I don't remember

20    every word he says.  I don't remember those words, but if

21    it's in the transcript, I mean ...

22    Q    And are you aware separately that, in fact, it is the

23    case that we had a global pandemic in 2021, and one result

24    of that was an enormous increase in people and consumer's

25    use of connected TV --
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - J. Dederick

```
1              MR. GUARNERA:  Your Honor, we object.
2    BY MS. DUNN:
3    Q    -- otherwise known as streaming?
4              MR. GUARNERA:  Your Honor, we --
5              THE COURT:  I don't want a million objections,
6    Counsel, please.
7              THE WITNESS:  How I would talk about this would
8    be -- I believe we -- wasn't it 2020?
9              MS. DUNN:  I mean ...
10             THE WITNESS:  Yeah, but there was a global
11   pandemic.
12   BY MS. DUNN:
13   Q    We can agree at least there was a pandemic; right?
14   A    We're on the same page about that.  Yeah.  Yeah.  That
15   was tough.
16             So, yeah, I do think that media consumption
17   habits, particularly in television, accelerated toward
18   digital- and Internet-connected streaming.  So that's really
19   about the consumer viewership, which does create advertising
20   opportunity.
21   Q    Right.
22   A    So that is one of the results that we saw or one of the
23   trends that we saw happening.
24   Q    Right.  And we can agree that advertiser spend follows
25   consumer eyeballs; right?
```

                                                                168

Direct examination - J. Dederick

```
 1    A    Unfortunately, no.

 2    Q    Okay.  You don't agree with that?

 3    A    No.

 4    Q    People don't spend money to reach where the consumers

 5    are?

 6    A    They want to.  But, unfortunately, you know, what we

 7    talk about a lot --

 8    Q    Sir --

 9    A    -- on average --

10    Q    -- if you don't agree, it's okay.  Your counsel can

11    follow up.

12    A    I'd love to give you statistics.

13         THE COURT:  No, there's no question pending.  It's

14    time for a lunch.  We're in recess until 2:00.

15         MS. DUNN:  Thank you, Your Honor.

16         (Court recessed for lunch at 1:01 p.m.)

17         ----------------------------------

18    I certify that the foregoing is a true and accurate

19    transcription of my stenographic notes.

20

21         _____

22              Stephanie M. Austin, RPR, CRR

23

24

25
```

169