```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3    --------------------------x
      UNITED STATES, et al.,     :    Civil Action No.:
 4                               :    1:23-cv-108
                 Plaintiffs,     :
 5         versus                :    Friday, September 13, 2024
                                 :    Alexandria, Virginia
 6    GOOGLE LLC,                :    Day 5 a.m.
                                 :    Pages 1-163
 7                Defendant.     :
      --------------------------x
 8

 9         The above-entitled bench trial was heard before the
      Honorable Leonie M. Brinkema, United States District Judge.
10    This proceeding commenced at 9:28 a.m.

11                     A P P E A R A N C E S:

12    FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                             OFFICE OF THE UNITED STATES ATTORNEY
13                           2100 Jamieson Avenue
                             Alexandria, Virginia  22314
14                           (703) 299-3700

15                           JULIA TARVER WOOD, ESQUIRE
                             AARON TEITELBAUM, ESQUIRE
16                           KELLY GARCIA, ESQUIRE
                             DAVID TESLICKO, ESQUIRE
17                           DANIEL GUARNERA, ESQUIRE
                             MICHAEL WOLIN, ESQUIRE
18                           UNITED STATES DEPARTMENT OF JUSTICE
                             ANTITRUST DIVISION
19                           450 Fifth Street, NW
                             Washington, D.C.  20530
20                           (202) 894-4266

21    (State of VA)          TYLER HENRY, ESQUIRE
                             OFFICE OF THE ATTORNEY GENERAL
22                           OFFICE OF THE SOLICITOR GENERAL
                             202 North Ninth Street
23                           Richmond, Virginia  23219
                             (804) 786-7704

24

25
                                                            1
```

```
 1                    P R O C E E D I N G S

 2   FOR THE PLAINTIFFS:    ELLIOTT DIONISIO, ESQUIRE
     (State of CA)          OFFICE OF THE CALIFORNIA ATTORNEY
 3                          GENERAL
                            300 South Spring Street
 4                          Suite 1700
                            Los Angeles, California  90013
 5                          (213) 269-6681

 6   FOR THE DEFENDANT:     CRAIG REILLY, ESQUIRE
                            LAW OFFICE OF CRAIG C. REILLY
 7                          209 Madison Street
                            Suite 501
 8                          Alexandria, Virginia  22314
                            (703) 549-5354
 9
                            ERIC MAHR, ESQUIRE
10                          WILLIAM ISAACSON, ESQUIRE
                            TINA LARITZ, ESQUIRE
11                          PAUL, WEISS, RIFKIND,
                            WHARTON & GARRISON LLP
12                          2001 K Street, NW
                            Washington, D.C.  20006
13                          (202) 223-7300

14   COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
                            Official Court Reporter
15                          United States District Court
                            401 Courthouse Square
16                          Alexandria, Virginia  22314
                            (607) 743-1894
17                          S.AustinReporting@gmail.com

18        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

19

20

21

22

23

24

25
                                                            2
```

```
 1                        TABLE OF CONTENTS

 2                            WITNESSES

 3   On behalf of the Plaintiffs:

 4   TOM KERSHAW

 5   Direct examination by Ms. Garcia ..........5
     Cross-examination by Mr. Mahr .............12
 6   Redirect examination by Ms. Garcia .......32

 7   CHRISTOPHER LASALA

 8   Direct examination by Mr. Teslicko .......36
     Cross-examination by Mr. Isaacson ........140
 9
     On behalf of the Defendant:
10   Admitted

11   Number 463 ...............................162

12                            EXHIBITS

13   On behalf of the Plaintiff:
     Admitted
14   Number 549 ...............................44
     Number 624 ...............................50
15   Number 612 ...............................64
     Number 719 ...............................68
16   Number 719 ...............................75
     Number 864 ...............................77
17   Number 114 ...............................85
     Number 118 ...............................90
18   Number 433 ...............................94
     Number 254 ...............................98
19   Number 238 ...............................103
     Number 444 ...............................109
20   Number 613 ...............................114
     Number 317 ...............................117
21   Number 925 ...............................124
     Number 927 ...............................126
22   Number 1777 ..............................128
     Number 992 ...............................132
23   Number 1818 ..............................134
     Number 590 ...............................149
24                           MISCELLANY

25   Proceedings September 13, 2024 ...........4
     Certificate of Court Reporter ............163    3
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

1                    P R O C E E D I N G S

2           THE DEPUTY CLERK:  Civil Action Number

3    1:23-cv-108, United States of America, et al. versus Google

4    LLC.

5           Would counsel please note their appearance for the

6    record, first for the plaintiffs.

7           MR. HENRY:  Good morning, Your Honor.  Ty Henry

8    from the Virginia Attorney General's Office on behalf of the

9    plaintiffs.  Your Honor, with me this morning I have, again,

10   Elliott Dionisio from the California Attorney General's

11   office.

12          THE COURT:  Good morning.

13          MS. WOOD:  Good morning, Your Honor.  Julia Tarver

14   Wood for the Department of Justice for the United States.

15   With me are my colleagues, Aaron Teitelbaum, Kelly Garcia,

16   Dan Guarnera and Michael Wolin, and Mr. Mene from the U.S.

17   Attorney's Office.

18          THE COURT:  Good morning.

19          MR. MAHR:  Good morning, Your Honor.  Eric Mahr on

20   behalf of Google.  With me today is my colleagues Tina

21   LaRitz, Mr. Isaacson and Mr. Reilly.

22          THE COURT:  You have not spoken in this case.

23          MR. MAHR:  I have not.  Yet glad to be back into

24   it.

25          THE COURT:  Very good.  And we have the witness

                                                            4

Direct examination - T. Kershaw

```
 1    still on the stand from yesterday, and you're still under
 2    your oath from yesterday's testimony.  All right.
 3              MS. GARCIA:  Good morning, Your Honor.  May I
 4    proceed?
 5              THE COURT:  Yes, ma'am.
 6                          DIRECT EXAMINATION
 7    BY MS. GARCIA:
 8    Q    Good morning, Mr. Kershaw.
 9    A    Good morning.
10    Q    Yeah.  We covered a lot of ground in a brief period of
11    time.  I'm going to ask you a few more questions this
12    morning.
13              First, can you just remind us, Rubicon was an ad
14    exchange at the time you worked there; correct?
15    A    That is correct.
16    Q    And while you were CTO of Rubicon from approximately
17    2016 to 2021, what other ad exchanges did your publisher
18    customers use besides Rubicon?
19    A    The most common ones were Google AdX, PubMatic, Index
20    Exchange, AppNexus and OpenX.  And then there were other
21    small --
22              THE COURT:  Again, Mr. Kershaw, you've got to keep
23    your voice up.  It tails off at the end; all right?
24              THE WITNESS:  I apologize.
25              THE COURT:  Okay.
```

5

Direct examination - T. Kershaw

```
 1              THE WITNESS:  Index Exchange, AppNexus, PubMatic,
 2    OpenX.  And then there was some smaller ones that were used
 3    in these specialized cases, but those were the main
 4    exchanges.
 5    BY MS. GARCIA:
 6    Q    And yesterday we spoke about Prebid.
 7              Approximately how many publisher customers used
 8    Prebid's header bidding wrapper when you left Rubicon in
 9    about 2021?
10    A    By '21, I would say the vast majority of them used
11    Prebid.  At least 60 percent or so were using the Prebid
12    wrapper.
13    Q    And in 2021 when you left your position, roughly how
14    many of Rubicon's publisher customers used Google's DFP?
15    A    All of them, pretty much.  You could count the ones
16    that were not using DFP on one hand, and it was
17    extraordinary when you found one.  It was kind of like
18    finding a needle in a haystack.
19    Q    And when you left in 2021, were you aware of any
20    publishers using a header bidding wrapper such as Prebid
21    instead of DFP?
22    A    No.  That's not technically possible.
23    Q    Can you please explain?
24    A    The ad server covers a wide range of potential
25    advertisements.  Programmatic, which is what Prebid dealt
```

6

Direct examination - T. Kershaw

1   with, but also direct sold, an inventory that was sold

2   outside the programmatic exchange.  So before you could

3   decide what to put on the page, you had to call the ad

4   server because the ad server knew if there had been a

5   pre-sold inventory or some prior arrangement.  So there's no

6   way for Prebid to serve as an ad server.

7           Prebid also doesn't have a relationship to put ads

8   on the page.  So the only way that Prebid could function is

9   talking to an ad server.

10  Q    Now, switching gears a bit.

11          You mentioned yesterday that DV360 was a DSP that

12  purchased transactions through Rubicon; do you recall that?

13  A    Yes, I do.

14  Q    Approximately how much revenue flowed through Google's

15  DSP to Rubicon's ad exchange?

16  A    Our largest DFP from a purchase volume perspective in

17  dollars was Google DBM, we called it, DV360, was about

18  40 percent of our revenue.

19  Q    Have you heard of AWBid?

20  A    I have.

21  Q    What is AWBid?

22  A    AWBid is a service from Google that allows their

23  traditional search buyers to purchase on third-party

24  exchanges.  This is significant because the search buyers

25  was a unique asset that Google had that no other exchange

                                                          7

Direct examination - T. Kershaw

```
 1   could have because no one else had a search business.  And

 2   what that allowed them to do was harness that mid-tier small

 3   business-type demand that no one else had the scale to get

 4   to.

 5           So that was -- it was a unique demand that a

 6   publisher had to have by not connecting to -- not having

 7   access to that demand hurt your overall ability to make

 8   money as a publisher.

 9   Q    So then did AWBid allow Rubicon to buy Google Ads

10   demand?

11   A    They directed pieces of the search demand to exchanges

12   like ours via AWBid, but it was a small percentage of the

13   total.

14           The way search ads or Google AdWords worked is you

15   could buy all kinds of different categories.  You could buy

16   sports pages, you could buy entertainment.  There was one

17   specific type called retargeting that they made available to

18   us, but all of the other demand was not -- we never saw that

19   demand.

20   Q    I'm sorry.  You said you never saw that?

21   A    No.  We only saw the retargeting demand.  All of the

22   rest, I'd say 80 percent plus of the AdWords demand was

23   self-contained within Google and was not -- was not

24   available to us or any other exchange outside of Google AdX

25   or Google's inventory.
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - T. Kershaw

```
 1   Q    And a moment ago you referred to that as small
 2   business-type demand; do you recall that?
 3   A    Yes.
 4   Q    Can you explain what you mean by that?
 5   A    Well, I mean, all of the exchanges would go after the
 6   Ford Motor companies and the Audis or the big companies, but
 7   we didn't have the resources to call Joe's Pizza Shop or the
 8   local car dealer.  But they purchased ads, and they
 9   purchased them at list price.  So that's what I mean, that
10   mid-tier.  People that have to buy search ads, which is why
11   they had those relationships, but didn't typically buy
12   display ads.  So that mid-tier of the market is what came
13   via the Google demand.
14   Q    So then why didn't Rubicon create your own demand
15   source in order to reach those smaller advertisers?
16   A    We could have hired 100 people, called a bunch of auto
17   dealers and lost a ton of money and went out of business,
18   but we didn't have the scale to -- if you sign up Joe's
19   Pizza Shop, they're not going to buy enough ads to make that
20   worthwhile, and we didn't have the size or the scale to do
21   that.
22   Q    And now shifting gears just a bit.
23        Have you heard of Exchange Bidding?
24   A    I have.
25   Q    What is Exchange Bidding?
```

9

Direct examination - T. Kershaw

1    A    Exchange Bidding is -- if you follow the header bidding

2    example, it is a server-side version of that.  So Exchange

3    Bidding used the ad server.  So the way the ad server used

4    to work is using a thing called line items.  So it's a

5    sequential process.  First you call this source, then you

6    call that source, then you call the next source.

7            What Prebid does is make it all one auction so

8    everyone competes with each other in a competitive auction.

9    EBDA, or Exchange Bidding, put that into the Google server

10   as a line item, so for the first time they allowed for a

11   unified auction where multiple exchanges bid on the same

12   piece of inventory.

13   Q    Did Rubicon participate in Google's Exchange Bidding?

14   A    We had eventually.  At first we did not.  But after a

15   period of time, we were pretty much forced to do so because

16   of the economics around it.  Much of the publisher inventory

17   was in EBDA, so in order to access that, we had no choice

18   but to bid on it or to participate.

19   Q    And based on what you observed as CTO, or chief

20   technology officer, of an ad exchange in the time period

21   we've been discussing, did Google's exchange product make it

22   easier to compete with Google AdX?

23   A    No, it did not do that.  It gave us the ability to see

24   inventory, but we had the same inventory available largely

25   through Prebid, so it was an alternative to Prebid.  But it

10

Direct examination - T. Kershaw

 1   did not make it easier for us to compete.  In fact, in some

 2   ways it made it harder for us to compete because it competed

 3   with Prebid.

 4              EBDA was a competitor to Prebid, and when EBDA was

 5   launched, it was partly to take the wind out of Prebid and

 6   slow down the adoption of header bidding in the industry.

 7   So as a result, I don't view it as something that helped

 8   competitively.

 9   Q    Briefly could you explain the differences, based on

10   your understanding, between Google's Exchange Bidding and

11   the header bidding wrapper, Prebid?

12   A    The differences?  Well, there's many differences.  One

13   of them runs on the page.  So it's JavaScript that runs on

14   the physical web page, which is not very efficient.  The

15   Google Exchange Bidding product was server-side, so it sat

16   on the network, so it was faster and more efficient.

17   However, to participate in Prebid costs you nothing, it was

18   free.  To participate in Google's EBDA, they charged

19   5 percent to the participants.  So you had a 5 percent

20   discount on whatever you bid.  If you bid $1, they would

21   actually bid 95 cents into the auction.  Google didn't

22   charge itself this 5 percent.  So think about it as a

23   5 percent tax on everyone except for Google in an auction,

24   which means we had to have higher bids by 5 percent just to

25   compete.

                                                              11

Cross-examination - T. Kershaw

```
 1              There was also the fact that, in Prebid, the
 2    publisher sees all the bids and is in control is
 3    transparent.  Everybody knows what's going on in the
 4    auction.  At EBDA, we didn't see anyone else's bids or
 5    Google's, but Google saw all of ours.  So that created an
 6    information disequilibrium.  If I know everyone else's bid,
 7    I can bid more efficiently; if I don't know everyone else's
 8    bid, I'm at a disadvantage, and that was one of the big
 9    limitations.
10              MS. GARCIA:  Thank you so much, Mr. Kershaw.
11              We pass the witness.
12              THE COURT:  All right.  Do we need a book for the
13    cross?
14              MR. MAHR:  Yes.  It's a very short book.
15              THE COURT:  All right.
16              MR. MAHR:  My I proceed, Your Honor?
17              THE COURT:  Yes, sir.
18                       CROSS-EXAMINATION
19    BY MR. MAHR:
20    Q   Good morning, Mr. Kershaw.  My name is Eric Mahr.  I
21    represent Google.  I have a few questions for you.
22    A   Sure.
23    Q   So you haven't worked in ad tech for over three years?
24    A   That is correct.
25    Q   Not since you left Magnite, was that in 2021?
```

                                                                    12

Cross-examination - T. Kershaw

1   A    That is correct.

2   Q    Magnite was known as the Rubicon Project when you first

3   joined?

4   A    That is also correct.

5   Q    Rubicon Project was a competitor to Google's display

6   ads business?

7   A    That's correct.

8   Q    And since the name changed while you were there, is it

9   okay if I just refer to it as the Rubicon Project?

10  A    You can refer to it however you wish.

11  Q    So we'll both understand that I'm referring to it as

12  both Magnite and Rubicon.

13  A    That is fine.

14  Q    Good.

15       And while you were at the Rubicon Project, you

16  founded an organization called prebid.org?

17  A    Cofounded.

18  Q    Cofounded it.

19       You were also the chairman of that board?

20  A    That was correct.  Is correct.

21  Q    Now, on the board -- on the direct, you mentioned that

22  Prebid -- something called Prebid.js.

23       Am I correct that Prebid.js refers to the actual

24  JavaScript technology?

25  A    That's correct.  JavaScript is code that runs on a

                                                              13

Cross-examination - T. Kershaw

```
 1    page.
 2    Q    And again just to get the vocabulary down, prebid.org
 3    is the organization that runs the technology?
 4    A    Correct.  Prebid.org is an open-source community
 5    organization with governance rules.  It administers and owns
 6    the code, including Prebid.js, the stuff that runs on the
 7    page, as well as Prebid server, as well as other
 8    technologies that we contributed to the industry.
 9    Q    Just to try to keep things simple, I'm going to try to
10    just say Prebid, but if there's any point where we need to
11    be specific about Prebid.js or prebid.org, please let me
12    know.
13    A    That's fine.
14    Q    Okay.  So you said yesterday that publishers can use
15    this Prebid ecosystem, I think you called it, to take over a
16    process that previously had been done by the publisher ad
17    server; is that right?
18    A    That's correct.
19    Q    And with Prebid then, publishers can run an auction and
20    actually render the advertisement on their app or web page
21    without having to use the publisher ad server?
22    A    That's not correct.  You can run an auction and have
23    the winner of that auction essentially die, but in order for
24    you to get that winner into the page, you have to send that
25    winner to Google, and Google's ad server will receive that
```

14

Cross-examination - T. Kershaw

```
 1   ad in the line item, compare that to the other inventories

 2   and instructions in the ad server, and place that on the

 3   page.  There is no way for Prebid to place ads on the page,

 4   Prebid.js anyway.

 5   Q    So if you could turn to tab 1 in your binder.

 6          MR. MAHR:  And, Your Honor, we're just using this

 7   that's a demonstrative.

 8          THE COURT:  All right.

 9   BY MR. MAHR:

10   Q    I'll represent to you, sir, that this is a page from

11   the Prebid website; do you see that?

12   A    I do.  Yes, I do.

13   Q    And you see the title is running Prebid.js without an

14   ad server?

15   A    Uh-huh.

16   Q    And if you look down to the language that's in gold --

17   I'm sorry, in blue.  This example demonstrates running an

18   auction and rendering without an ad server?

19   A    Right.

20   Q    Rendering refers to actually putting the ad on the

21   site; doesn't it?

22   A    What was that?

23   Q    Rendering refers to actually delivering the ad?

24   A    Rendering does refer to delivering the ad.

25   Q    So this example from the Prebid website shows how -- or
```

                                                            15

Cross-examination - T. Kershaw

```
 1   allows publishers to run an auction and render the ad
 2   without an ad server; correct?
 3   A    Yes.  That's what this says.
 4           THE COURT:  But are you saying in reality that
 5   could not, in fact, be done?
 6           THE WITNESS:  That could not.  It's like saying I
 7   could walk to China right now, which I could, but it would
 8   be very difficult.
 9           All publishers have direct sold inventory, they've
10   got complex logic on the page.  So if you were a tiny
11   publisher or you were experimenting, perhaps you could do
12   that.  But there's no scale publisher who could possibly
13   without an ad server, because all of their page logic lived
14   on the ad server, all their direct sold inventory was only
15   visible to the ad server, and -- well, of course, Google's
16   demand is only available via the ad server because Google
17   did not participate in Prebid.  So from a practical
18   perspective, there's no way for any scaled publisher to
19   operate just with Prebid.
20   Q    Let's explore that, because you're saying any scaled
21   publisher, but the vast majority of publishers on the web or
22   on apps are not scaled so that they have independent sales
23   forces; right?
24   A    That's correct.  But apps -- Prebid didn't work on
25   apps; Prebid.js only works on web pages.
```

16

Cross-examination - T. Kershaw

```
1    Q     So on the web.

2           The vast majority of web publishers are not

3    massive scale websites?

4    A     That's correct.

5    Q     There are a lot of small to medium size businesses;

6    right?

7    A     That is correct.

8    Q     So if you don't have any direct inventory, like a small

9    to medium size publisher would, you could use this and

10   render the ad; correct?

11   A     Not easily, because all the small websites used Google

12   exclusively as their provider, they didn't have ad servers.

13   The small websites used separate Google products.  No

14   exchange could have the scale or the resources to be able to

15   contact these tiny websites.  So we didn't deal with tiny

16   websites, so it really wasn't relevant.

17   Q     But could the small -- not tiny, but small to medium

18   size businesses log onto prebid.org, use this JavaScript

19   to -- instead of using Google, use --

20   A     Most small business owners can barely fire up a laptop

21   and get on the Internet much less run JavaScript on a web

22   page, which is fairly complicated to do.  So, in theory,

23   that could happen; in reality, it did not happen.

24   Q     And so this is not on -- this is on here for no reason

25   on the Prebid website; is that your --
```

Cross-examination - T. Kershaw

```
 1   A     Prebid is a scientific organization.  It's a bunch
 2   of -- we are engineers, all of us in Prebid, and so we were
 3   constantly experimenting.  We would put out versions of
 4   Prebid so that we could try things in the market, and that's
 5   how innovation occurs is by trying things.  So there was a
 6   lot of things we did in Prebid that weren't necessarily
 7   related to practical business purposes, but were there to
 8   spark innovation.  But I am not aware personally -- and I
 9   was a chairman of Prebid -- of any of the websites that we
10   dealt with daily that were running their ads in this manner.
11   Q     You said yesterday that the header bidding set is let's
12   not rely entirely on the ad server; let's run script on the
13   page itself so the publisher can be in control of who's
14   bidding on our inventory, not the ad servers; do you
15   remember saying that?
16   A     Yes, I do.
17   Q     And you also said yesterday that that was the
18   innovation that header bidding brought was this ability to
19   give publishers control over who bid, when they bid, what
20   floors they bid, instead of having that controlled by and
21   configured inside of the ad server; do you remember that?
22   A     Yes, I do.
23   Q     And you stand by that testimony?
24   A     I do.
25   Q     Now, this entire Prebid process takes place on the
```

18

Cross-examination - T. Kershaw

1    publisher's website before Google even knows the impression

2    is becoming available; right?

3    A    That's absolutely correct.

4    Q    And so with Prebid, the publisher has this choice after

5    the header bidding auction either to render the ad or to

6    send it to DFP to deal with its direct, if it has direct

7    inventory?

8    A    Again, I don't view that as a choice.  The way it was

9    done in reality is Prebid was configured as a line item in

10   DFP, we would run our auction before Google was called, the

11   winner was selected and sent into the line item, which was

12   then processed based on the rules that DFP had.  That's the

13   way it worked.

14   Q    But you didn't have to send it as a line item; you

15   could send it in to have it rendered by DFP; couldn't you?

16   A    Well, the way you talked to everything in DFP is via

17   line item.  So you come into DFP, and if the publisher had

18   nothing else set up except for that, Google would just

19   render the page.  But typically Google would check to see if

20   there was a direct sold line item.

21        If the publisher wanted AdX demand, which they all

22   did because they needed that long-tail demand.  No one else

23   had that demand, nobody.  So you could theoretically not use

24   AdX and bypass them, but from a revenue perspective, most

25   publishers did not want to do that.  They wanted that unique

                                                            19

Cross-examination - T. Kershaw

```
 1   demand that Google AdX brought, and AdX would not bid into
 2   Prebid; they would only bid via DFP.
 3   Q    But the publisher very much had the ability, if it
 4   chose to, as you just said, to just have the ad go to DFP
 5   and serve?  And it's only if the publisher wanted to take
 6   advantage of AdX demand, as you said, that it would set it
 7   up so that you --
 8   A    Right.  I have the option to starve to death.  I don't
 9   choose to take that option.  I think this is the equivalent.
10   I think that in this case you could bypass the largest
11   demand pool in the industry and just go at it alone on
12   principle, but that's not advisable for a publisher because
13   they -- you want to have as much demand as possible.  So I
14   don't think it was practical, at least for the members of
15   Prebid that I dealt with, to not call the ad server or to
16   just have Prebid demand only.
17   Q    But I just want to make clear, because I understand
18   that fundamental to Prebid is the idea of publisher choice;
19   right?
20   A    Publisher choice, yes.
21   Q    And so the publisher has the choice after Prebid gets
22   the auction -- the impression first, runs its auction, the
23   publisher has the choice to take advantage of what you
24   referred to as AdX demand or not when it sends the winner of
25   the Prebid to DFP?
```

20

Cross-examination - T. Kershaw

```
1    A    The publisher has the choice to turn off AdX demand.  I

2    am not aware of that being done ever.

3    Q    But you haven't taken any kind of survey of all the

4    publishers to see how they run their ads?

5    A    No, I have not personally done a survey of all

6    publishers to figure that out.

7    Q    And I just want to be clear, you're not here to testify

8    on behalf of prebid.org; right?

9    A    No, I am not.

10   Q    And not on behalf of the Rubicon Project either?

11   A    No, I am not.

12   Q    The views you're sharing with the Court today, these

13   are your personal views?

14   A    No, it's technically how it worked.  So my view is to

15   tell you how things actually worked in the real world

16   because that's what I did.  I wrote that software, I

17   administered that software, and that software works in a

18   certain way.  So I'm here to just explain how it works.

19   There's no judgment.

20   Q    I understand.  I just mean from Tom Kershaw's

21   perspective, not from Magnite or from Prebid; correct?

22   A    Yeah, that's correct.

23   Q    And, personally, you're clearly a great supporter of

24   header bidding; right?

25   A    Not necessarily.  I'm not a supporter -- I'm a
```

Cross-examination - T. Kershaw

```
 1   supporter of transparent Open Auctions that follow
 2   mathematical principles.  But I'm not necessarily a huge
 3   supporter of Prebid.  I'm not sure what that means.
 4   Q    Well, if I could take you back to the 2016/2017 time
 5   period when you started at the Rubicon Project.
 6   A    Uh-huh.
 7   Q    You believed at that point that header bidding had
 8   changed the entire ad tech ecosystem forever; didn't you?
 9   A    Yes.  I think header bidding and open unified auctions
10   where everybody bids at once did change the industry.
11   Q    And you believed at the time that that was a good
12   thing?
13   A    Yes.
14   Q    And as you said on your direct, that allowed the
15   Rubicon Project to see much, much more inventory than it had
16   previously?
17   A    That's correct.
18   Q    And this is just a question.  When I'm thinking of
19   header bidding, is it accurate to call header bidding an
20   auction of auctions, to think of it that way?
21   A    Not necessarily.  I mean, I consider it a unified
22   auction.  These are semantic terms what you call things.  I
23   considered a unified auction -- so instead of a sequential
24   auction where everyone bids, like first you bid, then I bid,
25   then the next person bids, everyone bids at once.
```

<div align="right">22</div>

Cross-examination - T. Kershaw

```
 1              Again, the theory, the mathematics behind is that
 2    if everyone bids at once, the bids go up and the total
 3    dollar value in the auction increases, the publisher makes
 4    more money.  That's the theory behind the unified auction.
 5    Q    And even as a great supporter of header bidding, you
 6    recognize, back in this early period, 2016/2017, that header
 7    bidding had some challenges with it?
 8    A    Correct.
 9    Q    And you haven't been at the whole trial, so you don't
10    have to go into this in depth, but latency was one of those
11    challenges; right?
12    A    Correct.
13    Q    And you said latency is a very important part of what
14    you were doing, given that the whole thing happens in
15    250 milliseconds?
16    A    Latency frames every decision, technically, that we
17    made in the industry.  The industry was around latency.  You
18    literally paid for things with milliseconds.
19              When you think about budgets in normal businesses,
20    it will cost me $1,000 to buy this.  The way we talked in
21    advertising was that was going to cost 10 milliseconds.
22    I've got to go find 10 milliseconds somewhere else to make
23    up for it, because if you run out of time, you literally
24    don't get a chance to be on the page.
25    Q    Thank you.  Thank you.
```

23

Cross-examination - T. Kershaw

```
 1              I want to talk about another challenge you raised
 2    with header bidding that you raised in that 2016/2017 period
 3    that I think Prebid was designed to address, and that is the
 4    amount of resources that the Rubicon Project and other
 5    exchanges had to use to integrate with other header bidding
 6    exchanges before Prebid.
 7    A    I'm not sure I follow the question.
 8    Q    Do you recall back in 2016/2017 that a challenge with
 9    header bidding was the amount of resources that the Rubicon
10    Project had to use to integrate with other exchanges?
11    A    Yes, I do recall that.
12    Q    And those other exchanges were Rubicon Project's
13    competitors?
14    A    Well, actually, I shouldn't say integrate with other
15    exchanges; it was to integrate with other header bidding
16    systems that may be operated by an exchange, may be operated
17    by whomever, but each system you had to interoperate with
18    created additional resource constraints.
19    Q    And before Prebid came along, these individual
20    exchanges or individual technologies had to interoperate on
21    the publisher's website in order to make header bidding
22    work?
23    A    Correct.  Each of them had their own competing header
24    bidding wrapper, as it's called.  So that would have been
25    six different integrations we would have to do, so we wanted
```

                                                                    24

Cross-examination - T. Kershaw

1    to simplify that.

2    Q    Yeah.  Because in the early stage before Prebid, those

3    different header bidding wrappers had had been trying to

4    differentiate themselves from one another through their

5    proprietary header bidding technologies?

6    A    Correct.

7    Q    And all that differentiation created even more

8    challenges in terms of integration?

9    A    Again, it wasn't really differentiation.  JavaScript on

10   a page is pretty basic engineering stuff.  My JavaScript

11   compared to your JavaScript, it's the same.  So it was just

12   a methodology for us to be able to participate in the

13   auction.  The competition happens once you're in the

14   auction.  And all Prebid, or any header bidding technology

15   does, is allow you to participate in the auction.  So I

16   don't view those as highly competitive, which is why nobody

17   really, you know, cared about it.

18   Q    But they were -- but before Prebid, there were all

19   these differentiated wrappers, and that -- I think you said

20   at one point integrating with other exchanges had become

21   your full-time job?

22   A    Yeah.  I mean, that is true.  Full-time job is probably

23   a little bit of an exaggeration on my part.  But certainly

24   every time you have to do an integration with another piece

25   of technology, there's testing involved, there's lots of

                                                              25

Cross-examination - T. Kershaw

```
 1    work that's involved, and that was a resource sucker for us.
 2    Q    Understood.
 3             And because you were spending so much time on
 4    integration, that meant that you didn't have resources to
 5    build new features for publishers at that time?
 6    A    That's accurate.
 7    Q    And you couldn't put new reporting features in place
 8    for publishers at that time?
 9    A    The way I would put it is, it competed with other
10    features that we wanted to build in the exchange.  So, yes,
11    that is accurate-ish.
12    Q    And those kind of features, those are one of the main
13    ways exchanges compete with one another with the different
14    kind of features they offer?
15    A    Correct.  To be clear, the main way we compete is by
16    bidding the highest.  In the end, it's about the dollars.
17    Right.  So most of the technology we were building was to
18    optimize our bids so they were as accurate as possible.  You
19    bid too high, you're leaving money on the table; you bid too
20    low, you lose.  So our main job, and 90 percent of what I
21    really was doing, was trying to make sure that we bid
22    correctly.
23    Q    And those features are exactly what helped you bid
24    correctly, bid more accurately?
25    A    That is correct.
```

26

Cross-examination - T. Kershaw

```
 1    Q    And so not being able to develop new features put
 2    Rubicon Project at a competitive disadvantage for a period?
 3    A    Yes, you could argue that's true.
 4    Q    And this is where Prebid comes in; yes?
 5    A    Correct.
 6    Q    Because you believed that Prebid was the best way to
 7    address these issues by having industry players come
 8    together to create a shared infrastructure for header
 9    bidding?
10    A    That's correct, but I'm not convinced that the resource
11    impact on Rubicon was the main driver; the main driver was
12    standardization in transparency.
13          One of the things about ad tech that was
14    frustrating for publishers and for me was that everything
15    was opaque, it wasn't clear how things worked.  And what
16    Prebid did is ended that regime and opened it up so it was
17    visible to all and created what we intended to be intending
18    to be a level playing field.
19    Q    A level playing field that all the exchanges owned
20    collectively?
21    A    Correct.  And not the exchanges.  I mean, Prebid is a
22    community organization that included publishers, buyers, ad
23    agencies and just individuals off the street.  I mean, it
24    was a community organization in the truest sense of the
25    word.
```
                                                                    27

Cross-examination - T. Kershaw

```
 1    Q    Community property?

 2    A    Correct.

 3    Q    And you stated at that time that the industry's old

 4   approach had been to develop this software and it's super

 5   secret, and my software is amazingly different than everyone

 6   else's, and you thought that was the wrong approach; right?

 7    A    Correct.

 8    Q    You thought the better approach was, let's contribute

 9   our software and our thinking and our better ideas to the

10   industry and own that collectively?

11    A    Yes.

12    Q    And to put that vision into reality, the Rubicon

13   Project teamed up with other exchanges to create Prebid?

14    A    Correct.  Again, it wasn't just other exchanges; it was

15   publishers, it was any community member who wanted to join

16   was part of Prebid.

17    Q    AppNexus and PubMatic, they were exchanges that were

18   cofounders with you; right?

19    A    PubMatic was not a co-founder; AppNexus was.

20    Q    PubMatic was an early member?

21    A    They were an early member.  Depends how you define

22   "early."  But the cofounders were AppNexus and Rubicon.

23    Q    And OpenX was a member?

24    A    They were a member, yes.

25    Q    Index Exchange was a member?
```

28

Cross-examination - T. Kershaw

```
 1   A    Not until much later.  Much later.

 2   Q    They are a member now?

 3   A    I believe they are, yes.

 4   Q    FreeWheel?

 5   A    FreeWheel is a video-focused ad server.  They -- right

 6   now -- again, I left the industry in 2021, so I'm not as up

 7   to date on all of the things going on in Prebid, but as a

 8   general rule, pretty much everybody is in Prebid now.

 9   Q    Everybody's in Prebid, including Criteo?

10   A    Criteo, yeah.

11   Q    You said publishers.  Gannett?

12   A    Gannett's in Prebid, yes.

13   Q    News Corp?

14   A    News Corp, yes.

15   Q    And The Weather Company?

16   A    Yes.

17   Q    Just to be clear, not only exchanges operated -- could

18   operate header bidding wrappers; right?  Could provide

19   header bidding wrappers.

20   A    In most cases, the publisher ran it themselves.

21   Q    The publisher can have its own wrapper and compete the

22   same way?

23   A    Right.  That was the intent.  I mean, it was intended

24   as a publisher tool so publishers could decide who got to

25   compete.
```

<div align="right">29</div>

Cross-examination - T. Kershaw

1            Again, which JavaScript you ran on the page wasn't

2       super relevant, that just gets you in the auction where you

3       compete.  It's a ticket to get in, to get on the field.

4       Q    And by having the standardized collectively-owned

5       header bidding infrastructure, Prebid addressed what you saw

6       first as the problem of competitors wasting resources trying

7       to integrate with one another; correct?

8       A    Again, the real issue with Prebid is creating a

9       transparent auction that we could compete in.  You don't

10      compete in the -- you have to be in the auction to compete.

11      So Prebid was just saying let's all follow the same rules

12      for how the auction is going to work so that we can all

13      compete on transparent open principles.

14      Q    I understand the big picture that you're conveying, but

15      I'm asking you a specific question about whether that, in

16      addition, addressed this problem of the Rubicon Project and

17      other competitors wasting resources trying to integrate with

18      one another?

19      A    Yes.  It allows us to take those hours and do other

20      things with them that we viewed more productive to the

21      industry.

22      Q    Now, not all of the competitors in the ad tech

23      ecosystem joined onto Prebid; right?

24      A    Not initially, but at this point, I think pretty much

25      everybody is in Prebid.  There may be some examples where

                                                                    30

Cross-examination - T. Kershaw

```
 1   they don't.
 2   Q    Google does not participate in Prebid; does it?  It's
 3   not a member?
 4   A    I don't believe so.  I don't believe so.
 5   Q    Did you invite Google to the space?
 6   A    Yes, of course.
 7   Q    And they declined?
 8   A    Declined.  Multiple times.
 9   Q    Multiple times.  Okay.
10        And instead of joining Prebid, I think you
11   explained that Google launched a competing solution called
12   Open Bidding -- Exchange Bidding and then later Open
13   Bidding?
14   A    It had many names.  But yes, EBDA, Open Bidding,
15   whatever.
16   Q    And Exchange Bidding was a competitor to Prebid?
17   A    Right.  It was an alternative way of running the
18   auction.
19   Q    It was Google's competitive response to header bidding;
20   right?
21   A    Correct.
22   Q    And they still compete today?
23   A    I believe they do.
24   Q    But even without Google's participation as part of
25   Prebid, that organization is still thriving today?
```

31

Redirect examination - T. Kershaw

```
 1   A    Correct.  That is how important the unified auction is
 2   to the publisher community, that they're willing to forgo
 3   many things in order to have that Open Auction option.
 4   Q    And header bidding itself is alive and well today?
 5   A    It is alive and well today.
 6             MR. MAHR:  Your Honor, that's all I have.
 7             THE COURT:  All right.  Any redirect?
 8             MS. GARCIA:  Just briefly, Your Honor.
 9                      REDIRECT EXAMINATION
10   BY MS. GARCIA:
11   Q    Hello again, Mr. Kershaw.
12   A    Hello.
13   Q    On cross, Counsel asked you about the before and after
14   development of Prebid; do you recall that?
15   A    I do recall that.
16   Q    Approximately what period of time was that?
17   A    Before and after?
18   Q    Uh-huh.
19   A    Prebid was really launched in mid 2017, so prior to
20   that, header bidding was very, very -- it was uncommon, and
21   it took a year or two for it to get to, you know, any
22   noticeable adoption level.  So say it was adopted at scale
23   in 2018 and '19.
24   Q    So by 2018 or '19, could you describe this status of
25   the Prebid header bidding wrapper?
```

32

Redirect examination - T. Kershaw

```
 1   A     I'm not sure I follow the question.

 2   Q     I'll rephrase.

 3         You mentioned on cross that there were some

 4   technical issues that the Prebid organization was coming

 5   together to resolve; do you recall that?

 6   A     Yes.

 7   Q     By mid 2018 when you said header bidding's popularity

 8   took off -- I don't mean to mischaracterize anything.  But

 9   by mid 2018, could you describe whether or not any of those

10   issues that you had initially undertaken at Prebid had been

11   resolved?

12   A     We had resolved some, but, you know, when you're

13   running JavaScript on the page, latency will always be an

14   issue unless you can move to a server-side environment.

15         So we were continuously improving things, bringing

16   new options and features.  It was all about publisher

17   controls so that they could set very tight parameters about

18   who they called and how they called them.  So those were the

19   main features we developed.  We were also attempting to

20   develop solutions from video and mobile app.  Those were

21   less successful in the market, to be frank.

22   Q     After joining Prebid, did Rubicon stop developing its

23   own new features?

24   A     No.

25   Q     Can you explain?
```

33

Redirect examination - T. Kershaw

```
 1   A    We stopped trying to run auction software that had
 2   nothing to do with what we did.  What we did was run an
 3   exchange.  We received inventory from publishers and found
 4   demand and put it on the page.
 5           The Prebid -- what Prebid does and what EBDA does
 6   was not our business, it was just the way the publisher got
 7   us into the auction.  So we continued to work on our
 8   exchange, that was our -- that was my job was to work on the
 9   exchange.
10   Q    And you mentioned on cross that Prebid allowed you to
11   take certain hours and do other things with them?
12   A    Correct.
13   Q    What types of features did Rubicon develop with that
14   extra time?
15   A    Better auction bidding, learning to determine, you
16   know, what buyers would match to what inventory so we're
17   only calling buyers for relevant inventory, better reporting
18   capabilities, the support for video, support for mobile app,
19   support for different ad size units.  All these technical
20   things that you have to do when you run an exchange.
21           MS. GARCIA:  Thank you.  No further questions.
22           THE COURT:  Any recross?
23           MR. MAHR:  Nothing further.
24           THE COURT:  All right.  Does anybody intend to
25   call Mr. Kershaw again in the course of the trial?
```

<div align="right">34</div>

Redirect examination - T. Kershaw

```
 1              MS. GARCIA:  Your Honor, it's possible that
 2      plaintiffs would like to call him for rebuttal.
 3              THE COURT:  All right.  Then Mr. Kershaw, I'm
 4      excusing you today, and you can go home.  It's possible you
 5      may have to come back again if you're needed for rebuttal,
 6      so you'll need to make sure your contact information is
 7      still accurate, and you're not to discuss your testimony
 8      with any witness who has not yet testified; all right?
 9              THE WITNESS:  Okay.
10              THE COURT:  You're free to go at this point.
11              THE WITNESS:  Thank you.
12              (Witness excused at 10:06 a.m.)
13              THE COURT:  All right.  Your next witness.
14              MR. TESLICKO:  Good morning, Your Honor.  David
15      Teslicko for the United States.  Plaintiffs call Chris
16      LaSala to the stand.
17              THE COURT:  All right.  That does mean that the
18      list of witnesses you've given me is not accurate.  Unless
19      somebody gave me the wrong list, I have Mr. Boland next.
20      It's all right, I just want to make sure.
21              MS. WOOD:  My apologies, Your Honor.  Mr. LaSala
22      was always the designated spot this morning.  That was my
23      mistake.  I apologize.
24              THE COURT:  All right.  Is the rest of the list in
25      proper order?
```

35

Direct examination - C. LaSala

```
 1              MS. WOOD:  Yes.  Yes.

 2              THE COURT:  All right.  We shouldn't have a lot of

 3      confusion when the affirmation is being given to a witness.

 4      Thereupon,

 5                        CHRISTOPHER LASALA,

 6      having been called as a witness on behalf of the plaintiffs

 7      and having been first duly sworn by the Deputy Clerk, was

 8      examined and testified as follows:

 9                   (Time noted: 10:07 a.m.)

10              THE COURT:  Sir, please state your full name and

11      spell your last name.

12              THE WITNESS:  Christopher LaSala, L-A-S-A-L-A.

13              THE COURT:  Are we ready?

14              MR. TESLICKO:  Yes, Your Honor.

15              THE COURT:  We need the book.

16              MR. TESLICKO:  We're still handing out the exhibit

17      binders with the -- Court's indulgence for one more moment.

18              MS. WOOD:  These are the depositions.  We're also

19      passing out the deposition and the exhibit binders.

20              THE COURT:  Are you ready?

21              MR. TESLICKO:  Yes, Your Honor.

22              THE COURT:  Go ahead.

23                        DIRECT EXAMINATION

24      BY MR. TESLICKO:

25      Q    Good morning, Mr. LaSala.
```

                                                              36

Direct examination - C. LaSala

```
 1    A    Good morning.

 2    Q    You've already stated your name for the record.

 3              Where were you employed between 2009 and 2022?

 4    A    Where was I employed?  At Google.

 5    Q    And were you deposed in connection with the

 6    government's investigation and litigation of this matter?

 7    A    Yes.

 8    Q    Who did you work for at the time of the first

 9    deposition?

10    A    Google.

11    Q    At each deposition were you represented by Google?

12    A    Yes.

13    Q    And did you prepare for each deposition with those

14    counsel?

15    A    Yes.

16    Q    Those counsel also represented Google at the

17    depositions; correct?

18    A    Yes.

19    Q    And who paid for the attorneys that represented you at

20    the depositions?

21    A    Google.

22    Q    Approximately how much Google stock do you own,

23    Mr. LaSala?

24    A    $250,000.

25    Q    Okay.  I --
```

                                                              37

Direct examination - C. LaSala

```
 1   A     Directly.  Directly.

 2   Q     Understood, Your Honor.  Or understood, Mr. LaSala.

 3   A     Thank you.

 4   Q     I want to turn to your background now.

 5         You first joined Google's ad tech business in

 6   2009; is that right?

 7   A     I don't remember the exact year that I transitioned

 8   from my jobs at Google.

 9   Q     Was it roughly 2009?

10   A     It sounds right.

11   Q     Okay.  And from 2013 through 2022, you were the

12   managing director for global commercialization; right?

13   A     Probably.

14   Q     And in that role, you were known as the global product

15   lead or the global strategy lead?

16   A     Yes.

17   Q     Your role focused on the sell-side of Google's ad tech

18   business; right?

19   A     Yes.

20   Q     And those were the AdX ad exchange product and the DFP

21   publish ad server product?

22   A     Yes.

23   Q     As the global strategy lead, your role and your team's

24   role was to take feedback from Google's sales team and bring

25   it to Google's product management and engineering teams;
```

38

Direct examination - C. LaSala

```
 1   right?

 2   A    Yes.

 3   Q    And it worked the other way.  So you and your team took

 4   information from Google's product and engineering teams and

 5   brought it to the sales teams; right?

 6   A    Yes.

 7   Q    And as part of your role, you met personally with

 8   publishers five or ten times a year; is that fair?

 9   A    Yes.

10   Q    I want to focus on pricing of Google's products for a

11   few moments.

12           As the global strategy lead, you played a role in

13   setting the prices for Google's publisher ad server and

14   Google's AdX ad exchange; right?

15   A    I had input.

16   Q    Sorry?

17   A    I had input.

18   Q    You were a member of the group responsible for

19   approving discounts to the fees that Google charged for

20   those products?

21   A    For some of my tenure, not all of it.

22   Q    Is that roughly 2015 through 2022?

23   A    I don't recall.

24   Q    Is that approximately correct?

25   A    It's reasonable to assume so.
```

                                                              39

Direct examination - C. LaSala

```
 1    Q    Okay.  And just because this comes up in the documents

 2    a number of times, that group had a number of names over the

 3    years; right?  The group that --

 4    A    That approved the discounting?  I don't even remember,

 5    actually.

 6    Q    One of the names was PBSx, which stood for partner

 7    business solutions cross functional; does that sound right?

 8    A    Yes, it does.

 9    Q    And at another time, that same group was called GPx or

10    google partnerships cross functional?

11    A    That's correct.

12    Q    For simplicity today, because there's so many acronyms,

13    you would understand if I referred to that as the discount

14    review group?

15    A    Sure.

16    Q    You represented the sales organization as part of the

17    discount review group?

18    A    Yes.

19    Q    And as part of the discount review process, you tried

20    to make sure Google didn't have a culture of discounting;

21    right?

22    A    No.

23    Q    Let me just confirm, Mr. LaSala.  The input you

24    provided to the discount review process on behalf of sales

25    was mainly trying to make sure that we weren't -- we didn't
```

40

Direct examination - C. LaSala

```
 1    have a culture of discounting when we didn't need to; is
 2    that fair?
 3    A    Well, the reason I answered no is it was dependent on
 4    the deal that was put in front of us.
 5              THE COURT:  I'm sorry.  You need to keep your
 6    voice up.  That's the microphone.
 7              THE WITNESS:  Is this working?
 8              THE COURT:  That's the microphone, so speak into
 9    that.
10              THE WITNESS:  Is that better?
11              THE COURT:  Much better.  Yeah.
12              THE WITNESS:  Anyway, we can move on.
13              THE COURT:  We're talking about discounts.
14              THE WITNESS:  Yes.
15              MR. TEITELBAUM:  I can ask the question again.
16              THE WITNESS:  Yes.
17              THE COURT:  All right.  The culture of discounts,
18    were you trying to avoid any discounts.
19              THE WITNESS:  I just -- no, I wouldn't describe it
20    as that because we offered discounts.  We offered discounts
21    quite a bit for our partners.
22    BY MR. TESLICKO:
23    Q    Mr. LaSala, just to confirm, the input you provided as
24    part of the sales organization as part of those discount
25    review process meetings was not to ensure Google didn't have
```

                                                              41


Direct examination - C. LaSala

```
 1    a culture of discounting when we didn't need to?

 2    A    I would characterize it as to not provide discounts

 3    unless we needed to.

 4    Q    Okay.  The role of the discount review process was to

 5    approve or deny publisher discount requests; right?

 6    A    Yes.

 7    Q    And those were discounts from what is known as the rate

 8    card rate?

 9    A    Yes.

10    Q    The rate card rate for Open Auction transactions on the

11    AdX ad exchange was 20 percent?

12    A    Yes.

13    Q    And Open Auction transactions, those are the most

14    common type of transactions on the AdX ad exchange?

15    A    Yes.

16    Q    And that 20 percent rate card rate that Google charged

17    for AdX, that was the same for the entire time you worked on

18    the AdX ad exchange; right?

19    A    Yes, the standard rate.

20    Q    For about ten years; right?

21    A    Yes.

22    Q    And each year, publishers requested discounts to the

23    AdX ad exchange rate; right?

24    A    Some.

25    Q    About how many times per year would you estimate that
```

42

Direct examination - C. LaSala

```
 1   publishers asked for discounts to the AdX ad exchange rate?
 2   A    I would have to speculate.  I don't remember.  Not
 3   frequent.
 4   Q    Okay.  And those discount requests were out of the
 5   thousands of publishers that used the AdX ad exchange?
 6   A    Yes.
 7   Q    But ultimately, Google did not discount the AdX fee
 8   often; right?
 9   A    Not often.
10   Q    Discounts were rare?
11   A    Yes.
12   Q    And overall, that meant there was minimal discounting
13   to AdX's fee?
14   A    Yes.
15   Q    Instead, in your experience, the AdX 20 percent take
16   rate seemed to hold?
17   A    Yes.
18   Q    Let's take 2017 as an example.
19            Out of the thousands of large publishers that used
20   AdX, fewer than 15 had an approved discount for Open Auction
21   transactions; does that sound right?
22   A    That sounds in the ballpark.
23   Q    And less than half of those actually had enough volume
24   to trigger their approved discounts; does that sound right?
25   A    I'm sorry.  Can you repeat the question?
```

43

Direct examination - C. LaSala

```
1   Q     Sure.

2         Less than half of the publishers that had approved

3   discounts actually had enough volume to take advantage of

4   their approved discounts?

5   A     Oh, meaning the structure was such that.  I don't know.

6   Q     Okay.  Let's take a look at the -- sorry.

7         Were you part of a joint effort that reviewed the

8   extent of discounting in 2017?

9   A     I don't remember.

10  Q     Okay.  Let's take a look at the results of that review,

11  which are in a document.  If I could ask you to look at the

12  exhibit binder in front of you and turn to the tab labeled

13  PTX 549; do you see that?

14            THE COURT:  Is there any objection to 549?

15            THE WITNESS:  I see it.  I see it.  Yes, I see it.

16            MR. ISAACSON:  No objection, Your Honor.

17            THE COURT:  All right.  So 549 is in evidence.

18    (Plaintiffs' Exhibit Number 549 admitted into evidence.)

19  BY MR. TESLICKO:

20  Q     If you look at page 1 of that document, the

21  presentation is labeled "PBSx Discount Guidance"; do you see

22  that?

23  A     Yes.

24  Q     And PBSx refers to the discount review group we've been

25  discussing?
```

44

Direct examination - C. LaSala

```
 1   A     Yes.

 2   Q     If you look at page 2 of that document, there's a notes

 3   section at the bottom; do you see that?  Right below the

 4   slides.

 5   A     Yes.

 6   Q     And it names a number of people involved in a joint

 7   effort; right?

 8   A     Yes.

 9   Q     And that includes sell-side GSL team Chris L., Pooja?

10   A     Yes.

11   Q     Chris L is you Mr. LaSala?

12   A     Yes.

13   Q     If you turn to Slide 5 which is on page 6 of the actual

14   document, it's titled "Findings From 2017 Sell-Side Rate

15   Card Review"; do you see that?

16   A     Yes.

17   Q     And then turn to the next page which has the results,

18   which is page 7 of the document.  And if you look in the

19   middle of this slide, there's a section called "data"; do

20   you see that?

21   A     Yes.

22   Q     And you could also look at the screen if that's easier.

23   It's up to you, Mr. LaSala.

24         And below that data section, it reports statistics

25   for different transaction types; right?
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - C. LaSala

1    A      Yes.

2    Q      OA is the first, and that refers to Open Auction

3    transactions?

4    A      Yes.

5    Q      Those are the most common transactions on the ad

6    exchange?

7    A      Yes.

8    Q      And next to that, the slide reports that 3,815

9    publishers are live with Open Auction transactions; right?

10   A      Yes.

11   Q      And only 13 LPS publishers -- and we'll come back to

12   what that means -- had exceptions to the rate card rate;

13   right?

14   A      Yes.

15   Q      Now, LPS refers to large publishers at Google; right?

16   A      Yes.

17   Q      Those are -- those large publishers are the ones that

18   would have the most negotiating leverage in negotiation with

19   Google?

20   A      Yes.

21   Q      And the fact that only 13 large publishers had an

22   exception to the rate card rate is consistent with discounts

23   not being given often; right?

24   A      Yes.

25   Q      And reading a little further over on that same row, it

46

Direct examination - C. LaSala

```
 1   reports that the average revenue share is 19.8 percent;

 2   right?

 3   A     Yes.

 4   Q     That's .2 percent less than the 20 percent rate card

 5   rate we've been discussing?

 6   A     Yes.

 7   Q     That's consistent with discounting on AdX being

 8   minimal; right?

 9   A     Yes.

10   Q     And let's look below the table, same page, but below

11   the table, to the outcome of the review; do you see that?

12   A     Yes.  Well, the notes?

13   Q     The notes, yes.

14   A     Yes.

15   Q     And looking at the first item in the list, it says:

16   "For OA, there is no evidence that we need to change the

17   rate cards due to limited amount of exceptions and limited

18   amount of discounted revenue"; did I read that right?

19   A     Yes.

20   Q     And based on this review in 2017, Mr. LaSala, Google

21   did not change its rate card rate for AdX; correct?

22   A     No.

23   Q     If you could turn to Slide 12, it's page 16 of the

24   actual document.  And if you look at the Bates, which are

25   the numbers in the bottom right, it's 88.
```

47

Direct examination - C. LaSala

```
 1              This slide has "recommendation" at the very top;
 2  do you see that?
 3  A    Yep.  Yes.
 4  Q    And looking down midway on the slide, the
 5  recommendation is:  "OA discounts are last resort.  We are
 6  holding firm on this position"; did I read that correctly?
 7  A    I assume you did.  I can't find it.  Where is it?
 8  Q    It's --
 9              THE COURT:  If you look at the screen.
10  BY MR. TESLICKO:
11  Q    If you look at the screen, it might be easier.
12  A    Yes.  OA discounts.  Yes.
13  Q    Trying to help you out a little with some of these
14  documents?
15  A    Yes.
16  Q    "Last resort" is bolded in the original here; correct?
17  A    Yes.
18  Q    And the discount review group followed this
19  recommendation; right?
20  A    Yes.
21  Q    To make discounts on AdX a last resort?
22  A    Yes.
23  Q    And, in fact, you don't recall any instance in which
24  you specifically recommended discounting AdX's fee in
25  response to a publisher request?
```
                                                            48

Direct examination - C. LaSala

```
 1   A    I don't remember.

 2   Q    Let's talk a little bit more about how Google evaluated

 3   discount requests.  So you can put that document to the

 4   side.

 5   A    Okay.

 6   Q    When assessing a publisher's discount request, you had

 7   to decide whether there was a credible threat that the

 8   publisher would switch away from AdX; right?

 9   A    Yes.

10   Q    And --

11   A    Yes.  Are you -- switch away?  I would argue stop

12   using.

13   Q    Understood, Mr. LaSala.

14   A    Thank you.

15   Q    You can't recall any publisher that ever completely

16   switched away from AdX during your time at Google; right?

17   A    I don't recall.

18   Q    And that's even though Google denied almost all

19   discount requests for AdX?

20   A    That's a fair statement.

21   Q    Okay.  I want to shift gears a little, Mr. LaSala, and

22   talk about demand on the AdX ad exchange.

23        Now, AdX had exclusive or nearly exclusive access

24   to Google Ads advertising demand during your time at Google;

25   right?
```

49

Direct examination - C. LaSala

```
 1  A    Yes.  Nearly.

 2  Q    Publishers needed to make their inventory available to

 3  AdX to reach those Google Ads advertisers.

 4  A    Yes.

 5  Q    Because it was unique?

 6  A    Unique, as we discussed in the deposition, is a

 7  questionable term.

 8  Q    It's one that you used, Mr. LaSala; correct?

 9  A    We did use it.

10  Q    Okay.  And that unique demand from Google Ads is what

11  insulated Google from pricing pressure on its 20 percent AdX

12  rate; right?

13  A    Not necessarily.

14  Q    But it did; right?

15  A    It contributed.

16  Q    Okay.

17  A    It contributed.

18  Q    Let's look at the next document.  If you could turn in

19  your binder to the tab marked PTX 624.

20           THE COURT:  Is there any objection to 624?

21           MR. ISAACSON:  No objection, Your Honor.

22           THE COURT:  All right.  It's in.

23      (Plaintiffs' Exhibit Number 624 admitted into evidence.)

24  BY MR. TESLICKO:

25  Q    This is an email exchange that includes you from June
```
                                                              50

Direct examination - C. LaSala

```
 1    of 2018; right?

 2    A    Yes.

 3    Q    And if you could turn to the second page on the email

 4    chain, you sent an email on June 25th, 2018; do you see

 5    that?

 6    A    Yes.

 7    Q    And in the fourth bullet of your email, you write

 8    what's on the screen:  "The AdX sell-side fee of 20 percent

 9    holds today not because there is 20 percent of value in

10    comparing two bids to one another, but because it comes with

11    unique demand via AdWords that is not available any other

12    way."

13              Did I read that correctly?

14    A    Yes.

15    Q    And the 20 percent you're referring to in this email is

16    again the same 20 percent that we've been discussing for the

17    AdX ad exchange?

18    A    Yes.

19    Q    And that held throughout your time at Google?

20    A    Yes.

21    Q    Okay.  And you reference AdWords in this email.  Just

22    to be clear, AdWords is just another name for Google Ads?

23    A    Yes.

24    Q    That's Google's advertiser ad network?

25    A    Yes.
```

                                                              51

Direct examination - C. LaSala

1    Q    Which almost exclusively bought on AdX?

2    A    Yes.

3    Q    And here you described Google Ads demand as unique, and

4    you started to say something on this.  I want to make sure I

5    understand what that meant to you, Mr. LaSala.

6              So first Google Ads is unique partly because some

7    of the millions of advertisers only use Google Ads to buy

8    display ads; right?

9    A    That would not be consistent with my assumption.

10   Only -- can you just repeat that?

11   Q    Let me repeat that.

12             Some of the millions of advertisers on Google Ads

13   only use Google Ads to buy display advertising?

14   A    I wouldn't know that.

15   Q    You don't know one way or the other?

16   A    That's fair.  It's not consistent with my assumption.

17   But, no, I don't know.

18   Q    Google Ads is also unique because it buys advertising

19   in a way that's different from the way other ad networks and

20   DSP's buy; right?

21   A    Yes.

22   Q    Google Ads buys using data available to Google; right?

23   A    Yes.

24   Q    Data that might be different from data used by other

25   advertiser buying tools?

Direct examination - C. LaSala

```
 1   A    Yes.

 2   Q    And, for example, Google Ads uses contextual data to

 3   buy advertising?

 4   A    Yes.  Although I'm not an expert on how -- what data

 5   they use.  It wasn't my part of the business.

 6   Q    But you know that --

 7   A    That's consistent.

 8   Q    And contextual data, just to be clear, is data about

 9   the content of a web page; right?

10   A    Yes.

11   Q    And part of the reason that Google Ads uses contextual

12   data is because originally it was known as a contextual

13   network; correct?

14   A    Yes.

15   Q    And that, in part, is because Google's search business

16   also uses contextual data for its business?

17   A    Yes.

18   Q    Now, Google Ads also reads the data it has, the data

19   signals it has, differently than other advertiser buying

20   tools; right?

21   A    I don't -- I don't know.

22   Q    Based on your experience with Google Ads, do you

23   believe that Google Ads reads signals differently than other

24   advertiser ad networks?

25   A    I can't purport to be an expert on the buy-side product
```

Direct examination - C. LaSala

```
 1    and how it reads ads.  It wasn't my product.

 2    Q    Mr. LaSala, you were deposed in this litigation?

 3    A    Yes.

 4    Q    Would it be helpful to look at your deposition

 5    testimony to refresh your recollection about what you

 6    understood?

 7    A    Sure.  Sure.

 8    Q    If I could direct you to the deposition binder.  This

 9    is Volume 1, so it's Day 1 of your litigation.  Your

10    litigation deposition.  Sorry.

11    A    Okay.

12    Q    And if you turn to 361.

13    A    Is that a page number?

14    Q    Yes.  Page 361.  And it is behind the second tab in

15    that binder.

16    A    Okay.

17    Q    And if you look at line 13 on that page, you were

18    asked:  "What did you mean when you used the word unique in

19    this email?"

20    A    Okay.

21    Q    Are you there, Mr. LaSala?

22    A    361.  Yes.

23    Q    361, line 13.

24    A    Yep.

25    Q    You were asked:  "What did you mean when you used the
```

54

Direct examination - C. LaSala

```
 1   word unique in this email?"  And you responded:  That the
 2   demand -- skipping ahead a little "that the demand" --
 3   A    I see.
 4   Q    -- "the tool that GDN is to buy an inventory is a
 5   different product than the tool that would be used by other
 6   networks when buying on publisher inventory, which would
 7   make it unique.  It's different because it reads signals
 8   differently.  It might have been different like we were
 9   historically a contextual network."
10        Does that refresh your recollection about Google
11   Ads buying differently than other tools?
12   A    Yeah, it does.  It just -- don't really know if it's --
13   you know, if it actually reads signals differently.  So in
14   the flow of the conversation, I clearly said that.  I'm just
15   saying I don't know.
16   Q    Understood, Mr. LaSala.  You can put that to the side.
17   Thank you.
18        In rounding this out, Google Ads has different
19   buying objectives than some other advertiser buying tools;
20   right?
21   A    Google Ads -- probably.
22   Q    Google Ads, for example, typically buys on a
23   cost-per-click basis?
24   A    Oh, yes.  Yes.
25   Q    Other advertiser tools, like DV360, buy for a variety
```
                                                          55

Direct examination - C. LaSala

```
 1    of different objectives; correct?

 2    A    You're skirting outside the realm of my expertise.

 3              It sounds like a reasonable assumption.

 4    Q    Okay.  Because of all of this, Mr. LaSala, that makes

 5    Google Ads advertising demand unique or special, to use your

 6    terms?

 7    A    Yeah.  I would use the word special.

 8    Q    And that's true even if the advertiser buying through

 9    Google Ads is not unique versus every other advertiser

10    buying tool out there; right?

11    A    Yes.

12    Q    Okay.  And because of that, even if the advertiser's

13    not unique, Google Ads spend is special for publishers;

14    correct?

15    A    Yes.

16    Q    Okay.  Let's go back to that -- the exhibit we were

17    looking at, which is 624.

18    A    Yes.

19    Q    And reading from that same bullet that we were looking

20    at before, you go on to write:  "AWBid puts pressure on this

21    narrative, but it is not as big a concern, because even with

22    AWBid, we can take our 32 percent"; did I read that right?

23    A    Yes.

24    Q    And AWBid here was just where Google Ads bought some

25    inventory outside of AdX; right?
```

56

Direct examination - C. LaSala

```
 1    A     Yes.

 2    Q     Prior to the launch of AWBid, Google Ads didn't buy any

 3    inventory outside of AdX in terms of exchanges?

 4    A     That's my understanding.

 5    Q     And even where Google allowed Google Ads to bid on

 6    other exchanges, it charged a 32 percent fee; right?

 7    A     I don't know.  That was my understanding.  I don't know

 8    if they charged it, per se.

 9    Q     That's the 32 percent reference in your email?

10    A     Yeah.  My assumption, which I don't know definitively,

11    is that we got 32 percent.

12    Q     Okay.  And the 32 percent fee you put in your email

13    here, that's more than double the fee Google Ads charges

14    when it bids into the AdX ad exchange; right?

15    A     It's consistent with a network fee model, but, yes,

16    more than the ad exchange.

17    Q     I just want to make sure I'm clear.

18          Google Ads, when it buys on other exchanges,

19    charges advertisers double what it charges those same

20    advertisers to buy on the AdX ad exchange; right?

21    A     That's how I wouldn't characterize it.

22          (Reporter interrupted for clarification.)

23          THE WITNESS:  I would not characterize it that

24    way.

25    BY MR. TESLICKO:
```
                                                              57

Direct examination - C. LaSala

```
 1    Q     The fee that Google charges when Google Ads buys
 2    outside of AdX is more than the fee Google Ads charges for
 3    purchases on AdX; correct?
 4    A     That's not my understanding.
 5    Q     I'm understanding a different question.  I'll ask it
 6    again to be clear, Mr. LaSala.
 7    A     Okay.
 8    Q     And Google Ads buys inventory outside of Google on
 9    other exchanges, it charges more than when Google Ads buys
10    on AdX; correct?
11    A     No, I don't think that's correct.
12    Q     Okay.  We'll move on.
13            THE COURT:  Well, explain right now so I
14    understand.
15            Why do you think that's not correct?
16            THE WITNESS:  So our original network model that
17    was discussed earlier was buyers buy via Google Ads, and
18    then they pay -- excuse me, and then the tag is just on a
19    page on a publisher's website.  And that, on average, we
20    would take 32 percent of the revenue that we got from the
21    advertiser and give it to the publisher.
22            When we evolved the business model to include AdX
23    at a later date -- so an exchange model -- Google Ads
24    continued to buy into that ad exchange, and then the ad
25    exchange, because it held -- it compared other demand
```

58

Direct examination - C. LaSala

 1    sources and ran an auction, there needed to be a stated rate

 2    for all of the demand sources, and that was the 20 percent

 3    stated rate.

 4         So in this case -- and now, again, I don't know

 5    the details, this is my understanding, but it wasn't my side

 6    of the business -- when Google Ads bought in the ad

 7    exchange, instead of taking the 32 percent, they took, let's

 8    call it 12, such that then the 20 percent -- 20 percent ad

 9    exchange rate was applied so that Google Ads, buying through

10    ad exchange to the publisher, was 32, roughly the same as if

11    they just used AdSense.

12         THE COURT:  You're going to have to go over that

13    again.  I don't understand that at all.

14         MR. TESLICKO:  If I could ask a couple questions,

15    maybe I could draw this out, Your Honor.

16         THE COURT:  All right.

17         THE WITNESS:  I'm happy to Your Honor.

18    BY MR. TESLICKO:

19    Q    Let's start with what's in your email.

20         When you wrote:  "We can take our 32 percent,"

21    you're referring to a fee that Google charges its customers

22    of 32 percent; right?

23    A    Yeah.  I mean, I'm hesitating on the word "fee,"

24    because we just took the money off of -- like, there wasn't

25    a negotiation or a stated rate.  We just took 32 percent and

                                                              59

Direct examination - C. LaSala

```
 1    then passed 68 percent through.  That's how I understood it.
 2    Q    Okay.  Let me try to use another word.
 3    A    But you could use the word fee if you would like.
 4    Q    Google took 32 percent of an advertiser's bid and kept
 5    it for Google?
 6    A    Yes.  Yes.
 7    Q    Okay.  And when a Google Ads advertiser buys through
 8    the AdX ad exchange, the fee that Google Ads takes is less
 9    than 32 percent; right?
10    A    Yes.
11    Q    Okay.
12    A    That's what I was trying to explain.
13    Q    And the 32 percent that Google Ads takes when an
14    advertiser buys on another exchange, that makes that bid
15    less attractive, less likely to win an auction?
16    A    Can you repeat that?
17    Q    Sure.
18         If Google takes a higher fee from an advertiser's
19    bid when it bids on another ad exchange, that makes it a bit
20    less attractive?
21    A    So it takes a higher fee when it bids on another ad
22    exchange?
23         THE COURT:  Let me see if I understand it.
24         So there's a bidder, they're going to bid $1.  If
25    they bid the dollar on the exchange outside of Google's AdX,
```

<div align="center">60</div>

Direct examination - C. LaSala

```
 1    that would be what 68 cents.

 2              THE WITNESS:  .68.

 3              THE COURT:  So that would be the offer that that

 4    bidder is actually communicating?

 5              THE WITNESS:  That's correct.

 6              THE COURT:  .68, not $1?

 7              THE WITNESS:  Yes.

 8              THE COURT:  All right.  However, if the same bid

 9    was going through AdX, the Google exchange, let's say it's a

10    20 percent take, it would be 80 cents that would be the bid

11    that's being reflected?

12              THE WITNESS:  Well, I think it would be the 80 --

13    the 80 plus another 12, because they would take the -- they

14    would take a 12.  They would -- so the buy-side still

15    took -- again, not my business, but as I understood it, they

16    took the -- a smaller take rate.

17              THE COURT:  How much of a $1 bid that's being

18    communicated across Google's exchange is going to be

19    communicated?

20              THE WITNESS:  My understanding is 32.

21              THE COURT:  No.  No.  How much of the $1?  What is

22    going to appear?

23              THE WITNESS:  Oh, my understanding -- and, again,

24    I know, it would be 68 cents.

25    BY MR. TESLICKO:
```
                                                                61

Direct examination - C. LaSala

```
 1    Q    And when Google Ads sends a bid to AdX, out of that $1

 2    bid 85 cents would be communicated to AdX; right?

 3    A    I'm sorry.  Repeat that again.

 4    Q    When Google Ads bids on AdX, the $1 bid from the

 5    advertiser would be 85 cents, not the 68 cents in Your

 6    Honor's example; right?

 7    A    I don't know.  I don't know actually when the -- I

 8    don't know when the -- all of the fees are taken in relation

 9    to when the bid is placed.  So I don't know.

10    Q    Okay.  Fair to say, though, from your email here,

11    Mr. LaSala, you didn't view AWBid as a big concern for

12    Google's competitive position; right?

13    A    That's what I wrote here, but I did think AWBid was not

14    in Google's best interest.

15    Q    Okay.  And then finally --

16    A    I was alone in that opinion.

17    Q    Sorry.  I didn't mean to cut you off, Mr. LaSala.

18         Finally you write here:  "I think we are all in

19    agreement that exchange functionality is not worth

20    20 percent and value comes from sourcing demand"; did I read

21    that correctly?

22    A    You did.

23    Q    And the demand that AdX is sourcing includes unique

24    Google Ads demand?

25    A    It does.
```

                                                              62

Direct examination - C. LaSala

```
 1   Q    If you could turn to the next document we're going to
 2   talk about, which is 612 in your binder.
 3   A    Okay.
 4            THE COURT:  Any objection to 612?
 5            MR. TESLICKO:  To make this easier, Google had
 6   originally objected to completeness because this offers to
 7   an attachment, and we also have 712 in the binder and would
 8   offer that for admission at the same time if it would
 9   resolve Google's objection.
10            THE COURT:  Hold on a second.
11            MR. ISAACSON:  I'm sorry.  Your Honor, I'm trying
12   to figure out the basis of the connection between these two
13   documents.  Maybe you could point it out.
14            THE COURT:  Hold on.  Number 1, is there any
15   objection to 612?
16            MR. ISAACSON:  Well, it goes to the completeness.
17   This is talking about another document.
18            THE COURT:  All right.  And the other document
19   appears to be 712.
20            MR. ISAACSON:  And I'm not sure why that is.
21            MR. TESLICKO:  I could represent to you it's based
22   on the metadata produced.  We could also not admit 712 or
23   only seek the admission of --
24            MR. ISAACSON:  Why don't you ask the witness, who
25   will probably know better than I, if the comments have to do
```

63

Direct examination - C. LaSala

```
 1   with these two things.
 2           MR. TESLICKO:  Okay.  Let's do that.
 3   BY MR. TESLICKO:
 4   Q    Mr. LaSala, if you look at 612.
 5   A    Okay.
 6   Q    It says at the top these are comments on a sell-side
 7   pricing 2.0 document?
 8   A    Yes.
 9   Q    And if you look at 712, does that appear to be the
10   sell-side pricing document?
11   A    712.  I can only -- I could only guess.  It's called
12   sell-side pricing strategy review, so it could be.  I mean,
13   I don't remember.
14   Q    Okay.
15           MR. TESLICKO:  Your Honor, for right now just in
16   the interest of proceeding efficiently, we would just move
17   in 612, absent objection.
18           THE COURT:  I'm going to allow 612 in.  That's the
19   only one right now.
20           MR. TESLICKO:  Okay.
21    (Plaintiffs' Exhibit Number **612 admitted into evidence.)**
22   BY MR. TESLICKO:
23   Q    Okay.  Looking at 612, Mr. LaSala, below your name at
24   the top of the first comment about midway through the block
25   of text there, you wrote:  "Said more precisely, I don't
```

<div align="right">64</div>

Direct examination - C. LaSala

```
 1    think there is 20 percent of value in comparing two bids.

 2    AdX is not providing additional liquidity to the market; it

 3    is simply running the auction.  The value of our platform is

 4    not in AdX; it is in other parts."

 5              Did I read that right?

 6    A    Yes.

 7    Q    And the other parts you're referring to here,

 8    Mr. LaSala, those are the other ad tech products controlled

 9    by Google?

10    A    I don't remember what I was referring here.

11    Q    Continuing in that section, you suggest "we should

12    disrupt ourselves and commoditize the exchange business"; do

13    you see that?

14    A    Yes.

15    Q    And when something becomes commoditized, prices

16    typically fall; right?

17    A    Yes.

18    Q    Looking at the next block of text, toward the end you

19    write that "Google should stop continuing to extract

20    irrationally high rent from the AdX."

21              Did I read that correctly?

22    A    Yes.

23    Q    Rent here just refers to the fees that Google charges

24    for AdX?

25    A    Yes.
```

65

Direct examination - C. LaSala

```
 1   Q    That's the 20 percent fee we've been talking about?

 2   A    Yes.

 3   Q    And that's the same fee that Google continued to charge

 4   through the time you left in 2022?

 5   A    Yes.

 6   Q    You go on to write:  "One might ask why the market

 7   continues to bear 20 percent.  It may be because of AdWords

 8   bringing liquidity from a long tail"; do you see that?

 9   A    Yes.

10   Q    And long tail here refers to the large number of small

11   advertisers on Google Ads?

12   A    Yes.

13   Q    That's more than a million advertisers of that size on

14   Google Ads; right?

15   A    I don't know, but that sounds reasonable.

16   Q    And looking down at the page to the next set of

17   comments, there's some comments from Jonathan Bellack; do

18   you see those?

19   A    Yes.

20   Q    Now, Mr. Bellack, he was a director of product

21   management at Google?

22   A    Yes.

23   Q    He was the product management lead for the AdX ad

24   exchange?

25   A    Yes.
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - C. LaSala

```
 1    Q    And Mr. Bellack joined Google from DoubleClick in 2008
 2    after the acquisition; right?
 3    A    It sounds right, but I don't know, but yeah.
 4    Q    Fair to say he had a lot of experience in these
 5    products?
 6    A    Yes.  Yes.
 7    Q    In his comment, Mr. Bellack agrees with you and writes:
 8    "I think you are right that AdX buyers at 20 percent is not
 9    long-term defensible"; did I read that right?
10    A    Yes.
11    Q    But Google was able to defend the rate through the time
12    you left in 2022?
13    A    Yes.
14    Q    You can put that document to the side.
15              Now, Mr. LaSala, you had a general understanding
16    that other ad exchanges charged lower fees than AdX; right?
17    A    Yes.
18    Q    You believed Google charged for AdX about two times
19    what its rivals charged?
20    A    Yes.
21    Q    If you look at the next document we're going to go to,
22    it's 719 in your binder.
23              THE COURT:  Any objection to 719?
24              MR. ISAACSON:  No objection, Your Honor.
25              THE COURT:  All right.  It's in.
```

Direct examination - C. LaSala

```
 1      (Plaintiffs' Exhibit Number 719 admitted into evidence.)

 2   BY MR. TESLICKO:

 3   Q    Looking at 719, Mr. LaSala, this is an email exchange

 4   that includes you from January of 2019; right?

 5   A    Yes.

 6   Q    Looking at your email at the bottom of the fifth page,

 7   so flipping a couple of pages, you're going to want to look

 8   at the Bates ending in 004; do you see that?

 9   A    Yes.

10   Q    Mr. LaSala, there you wrote:  "This statement is

11   consistent with the notion that we can only retain

12   20 percent rev share, given AdX mostly brings unique demand

13   in GDN"; did I read that right?

14   A    Yes.

15   Q    And GDN refers to again Google Ads; right?

16   A    Yes.

17   Q    Okay.  You go on to write:  "I'm still convinced that

18   is the only reason we can sustain 20 percent"; right?

19   A    Yes.

20   Q    And you didn't identify in this email, Mr. LaSala, any

21   other reason that justified the 20 percent fee Google

22   charged for the AdX ad exchange; right?

23   A    I would have to read the entire email to answer that

24   question.  I don't know if --

25   Q    If you want to take a look in that email, do you
```

68

Direct examination - C. LaSala

```
 1   mention at any point the quality of the ad exchange at
 2   processing transactions?
 3   A    Do you want me -- it might take five, ten minutes to
 4   read the entire email.
 5   Q    Maybe I could focus your attention just now on the
 6   email you sent on December 19th at 9 p.m. when you made this
 7   statement.
 8            You didn't mention in that email, Mr. LaSala, the
 9   quality of the ad exchange at processing transactions, for
10   example; right?
11   A    Again, I guess if you want me to read the whole email,
12   I'll read the whole email.
13            THE COURT:  No, we don't have time for that.
14            THE WITNESS:  Okay.
15   BY MR. TESLICKO:
16   Q    You don't mention in this particular email protections
17   for publishers or advertisers; right?
18   A    I haven't read the email.
19   Q    Okay.  But the only reason, to use your language, that
20   you identify for the 20 percent is unique demand from Google
21   Ads; right?
22   A    Yes.
23   Q    Okay.
24   A    That's what I wrote.
25   Q    Let's look farther up the email chain, so go to page 3.
```

69

Direct examination - C. LaSala

```
 1    That's the Bates ending in 002 at the bottom.

 2    A    Okay.

 3    Q    Mr. Bellack writes to you and others; do you see that

 4    at 10:26 a.m.?

 5    A    Yes.  Yep.

 6    Q    And he applies an attorney/client privilege legend

 7    there and notes "the best" -- notes that "best practice is

 8    to always get the legal POV on pricing discussions, not just

 9    have them in an email"; did I read that right?

10    A    That's what it says.

11    Q    Was that your practice as well, Mr. LaSala, to include

12    lawyers on emails about pricing discussions?

13    A    I don't remember specifically whether it was a practice

14    or not a practice.

15    Q    You don't remember one way or the other whether you

16    included lawyers on pricing discussion emails?

17    A    Yeah.

18    Q    Looking to the body of Mr. Bellack's email, he also has

19    a numbered list that continues onto the next page, and the

20    first item on that list I want to direct your attention to.

21         The first item in the list says:  "Get Ad Manager

22    OA rev shares in line with market value.  Could still be

23    higher than competition, but shouldn't be double the price."

24         Did I read that right?

25    A    Yes.
```

                                                                70

Direct examination - C. LaSala

```
 1   Q     And Ad Manager OA rev shares here means that same

 2   20 percent fees that Google charges for the AdX ad exchange?

 3   A     Yes.

 4   Q     And Mr. Bellack is saying Google shouldn't charge twice

 5   the price of competitors; right?

 6   A     That's what it says.

 7   Q     Meaning he understood at the time based on this email

 8   that competing exchanges charged 10 percent, roughly?

 9   A     I don't know what he understood or didn't understood,

10   but that's what he wrote.

11   Q     Well, we'll turn to your email now then on the first

12   page of the document.

13         You write on January 4th, and you also apply a

14   privilege legend; do you see that?

15   A     Yes.

16   Q     And this email is still about pricing; right?

17   A     Yes.

18   Q     Does that refresh your recollection about your practice

19   of applying attorney/client privilege legends to emails?

20   A     Well, you asked me a specific question about pricing,

21   not a generic question about when I apply attorney/client

22   privilege.  And, in this case, I don't remember this, but if

23   someone else did it, I typically just added it as well.

24   Q     You typically copy/pasted attorney/client privileged

25   legends from one person's email into your own email; right?
```

71

Direct examination - C. LaSala

```
1   A    Yeah.  That would be a practice if it started that way,
2   without thinking about it too much.
3   Q    Under Item 2 in your list you write:  "My summary POV
4   is a sell-side rev share should probably top out at
5   10 percent for OA, comparing two bids with layers of
6   protection."
7             Did I read that right?
8   A    I did.  And even as we're through this now, I've added
9   layers of protection as part of the value to the comparing
10  of the two bids.  So, yes, I did add better value.
11  Q    Okay.  And I want to get to the layers of protection,
12  but just to confirm, rev share here means the AdX fee that
13  Google charges; right?
14  A    Yes.
15  Q    And your point of view is that the fee Google should
16  have charged topped out at 10 percent?
17  A    That's what I wrote.
18  Q    Versus the 20 percent Google actually charged?
19  A    That's what I wrote.
20  Q    Okay.  And that's consistent with Mr. Bellack's view
21  that we looked at in a prior email; correct?
22  A    Yes.
23  Q    Now, when you refer to layers of protection here,
24  you're referring to things like ad fraud and malware
25  protections; right?
```

72

Direct examination - C. LaSala

```
 1   A    I don't remember writing this email, but that could be
 2   part of it, yeah.
 3   Q    Well, what else is covered by layers of protection?
 4   A    Well, there's brand protection, so make sure that the
 5   ad shows up against good content.  I guess there is malware,
 6   there's fraud.  And fraud being defined as, like, is the
 7   impression even real or is it some sort of click farm or
 8   garbage content.  I mean, I'm far removed from this
 9   business.
10   Q    And in your email here in January 2019, your view was:
11   "Comparing two bids with all those layers of protection you
12   just described should still probably top out at 10 percent";
13   right?
14   A    That's what I wrote.
15   Q    Okay.  I want to quickly spend a few more minutes on
16   your use of a privilege legend here.
17        On this email chain, you did not ask any questions
18   of counsel specifically; right?
19   A    I would have to read it again to know, but --
20   Q    Do you recall reading this email at your deposition,
21   Mr. LaSala?
22   A    I don't know.  I mean, I might have.  I'm just saying.
23   Q    Okay.  That's fine.
24        MR. TESLICKO:  Your Honor, we're done with this
25   document.
```

Direct examination - C. LaSala

1          One minor housekeeping matter.  For purposes of

2     the record, we would also like to move in Plaintiffs' Trial

3     Exhibit 700, which is in your binder.  It's just another

4     version of the same emails we've been talking about, but

5     it's almost fully redacted, and we think it's important to

6     have that as part of the record.

7          THE COURT:  Hold on a second.  So 700 is the

8     redacted version of 719?  Is that what you're saying?

9          MR. TESLICKO:  It contains many of the emails from

10    719, but they're redacted in 700; they're not redacted in

11    719.

12         THE COURT:  So 700 is the item that you want on

13    your website tomorrow for a public review?

14         MR. ISAACSON:  Your Honor, I --

15         THE COURT:  I'm not sure I understand what you're

16    asking.

17         MR. ISAACSON:  I would object, Your Honor.  What

18    he's pointing to is the document was produced once with

19    redactions, and then redactions were removed, and it was

20    produced again later.  And so taking -- just making a point

21    of that for the point of the public is irrelevant.

22         MR. TESLICKO:  Just to clarify my request, Your

23    Honor we seek admission of both 700 and 719.  700 to show

24    that a number of emails were redacted for attorney/client

25    privilege in one version of the document, but not the other,

74

Direct examination - C. LaSala

```
 1    and those correspond to the privilege legends that

 2    Mr. LaSala applied to those emails and that Mr. Bellack

 3    applied to those emails.

 4              MR. ISAACSON:  That has nothing --

 5              THE COURT:  I'm going to sustain the objection.

 6              MR. TESLICKO:  Fine, Your Honor.

 7              THE COURT:  Just 719 is in.

 8      (Plaintiffs' Exhibit Number 719 admitted into evidence.)

 9    BY MR. TESLICKO:

10    Q    Mr. LaSala, notwithstanding that both you and

11    Mr. Bellack -- let me move on in the interest of time.

12              Now, Mr. LaSala, when Google collects a fee for

13    its ad tech products, that means less of the money paid by

14    an advertiser for a transaction ultimately makes it to the

15    publisher; right?

16    A    Yeah.  When any demand source collects a fee, yes.

17              THE COURT:  I'm sorry.  I couldn't hear the

18    answer.

19              THE WITNESS:  When any demand source collects a

20    fee, yes.

21    BY MR. TESLICKO:

22    Q    More of the money goes to what's called the middle, or

23    middlemen; right?

24    A    Yes.

25    Q    The middle includes ad tech intermediaries like Google?
```

<div align="right">75</div>

Direct examination - C. LaSala

```
 1   A     Yes.

 2   Q     And Google's ad tech products that act as the middle

 3   include Google's advertiser ad network?

 4   A     Yes.

 5   Q     Google's DSP, DV360?

 6   A     Yes.

 7   Q     The ad exchange?

 8   A     Yes.

 9   Q     And the public ad server?

10   A     Yes.

11   Q     We've mostly been talking about the AdX fee, but each

12   of those products charges a fee when a transaction flows

13   through them; right?

14   A     Yes.

15   Q     And you would agree that Google has taken an outsized

16   share of advertisers' money before it reaches publishers;

17   right?

18   A     I know that showed up in a deposition and I wrote that

19   statement.

20   Q     Okay.  Let's look at your statement.

21         Do you agree with that statement first?

22   A     Can I look at the statement again?

23   Q     Sure.  Let's go to the statement.  864 in your binder.

24   PTX 864.

25         MR. TESLICKO:  And we would offer PTX 864 for
```

76

Direct examination - C. LaSala

```
 1    admission.

 2              THE COURT:  Is there any objection?

 3              MR. ISAACSON:  No objection.

 4              THE COURT:  All right.  It's in.

 5      (Plaintiffs' Exhibit Number 864 admitted into evidence.)

 6    BY MR. TESLICKO:

 7    Q    Now, this, Mr. LaSala, is an October 2019 chain with

 8    you and a number of senior executives at Google; right?

 9    A    Yes.

10    Q    Yes.  Looking at the third page of the email chain,

11    there is an email from Prabhakar Raghavan, and he's

12    responding to a news article that was distributed by Kent

13    Walker.

14              Now, Kent Walker was Google's president of Google

15    affairs; right?

16    A    Yes.

17    Q    And Mr. Raghavan was the senior vice president for ads

18    and commerce; right?

19    A    Yes.

20    Q    And that means Mr. Raghavan was the individual

21    responsible for search, display, video advertising,

22    analytics, shopping, payments, travel, all of those

23    businesses at Google?

24    A    I think so.  I don't know what he covered.

25    Q    Mr. Raghavan wrote:  "Until we find a better way to
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - C. LaSala

```
 1   articulate to the world that we're not hanging on to an

 2   outsize chunk of money, there will continue to be this noise

 3   from publishers"; do you see that?

 4   A    Yes.

 5   Q    Let's turn to your email on the first page now at

 6   9:01 a.m.

 7   A    Yes.

 8   Q    You copy in in-house counsel, Ted Lazarus, and label

 9   the document privileged and confidential; right?

10   A    Yes.

11   Q    This is the email chain about the fees charged by ad

12   tech intermediaries; right?

13   A    Yes.

14   Q    You don't see any request for attorney/client advice on

15   here?

16   A    I would have to read the whole document.

17   Q    Okay.  You can skip that for now.

18        You provide some detailed thoughts on this

19   important issue, and you write:  "There is a continued call

20   from buyers and publishers for transparency.  It is

21   reasonable and should not be dismissed because the middle

22   takes more share of the marketers' dollars than the content

23   producer."

24        Did I read that right?

25   A    Yes.
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - C. LaSala

1   Q    And the middle here again refers to intermediaries like

2   Google's ad tech tools; right?

3   A    Yes.

4   Q    Skipping ahead you write:  "In the lowest scenario, it

5   is 50 cents on the dollar, probably more."

6        Did I read that right?

7   A    Yes.

8   Q    And what you're saying here is that before the

9   advertiser's money reaches the publishers, the middle takes

10  more than half.  That's what you wrote?

11  A    I'm sorry.  You didn't just read my statement, so can

12  you repeat the question?

13  Q    What you're saying here, Mr. LaSala, is that before the

14  advertiser's money reaches the publishers, the middle takes

15  more than half?

16  A    Yes.  That's what I'm saying.

17  Q    In the lowest scenario?

18  A    That's what I'm saying here.

19  Q    And skipping ahead, you continue:  "I half agree with

20  Prabhakar's point."  That's referring back to Mr. Raghavan;

21  right?

22  A    That's what I wrote.

23  Q    "The middle does take an outsized share, and we are

24  only part of the middle.  Yet, one could argue that when we

25  are the middle for both buy and sell-side, we are taking an

79

Direct examination - C. LaSala

```
 1   outsized share."

 2           Did I read that right?

 3   A    You did, even though my email has some sloppy mistakes

 4   in it.

 5   Q    Do you correct your mistakes in a subsequent email

 6   here, Mr. LaSala?

 7   A    No.  Just specifically saying, like, Prabhakar's point,

 8   the middle takes an outsized share, where actually Prabhakar

 9   said they don't.  But, anyway, that's -- I don't know if

10   that's relevant.

11   Q    And Mr. LaSala --

12   A    And then I say one could argue versus one does.

13   Q    Mr. LaSala, when you wrote "we are only part of the

14   middle," the "we" there is Google; right?

15   A    Yes.

16   Q    You go on to write on the next page:  "It is

17   questionable that 20 percent for OA is reasonable

18   long-term"; do you see that?

19   A    Yes.

20   Q    And that's the 20 percent fee for AdX that we've been

21   talking about?

22   A    Yes.

23   Q    Same AdX fee that, in fact, was sustainable for the

24   long term during your time at Google; right?

25   A    I'm sorry.  I was reading.  Can you repeat the
```

<div align="right">80</div>

Direct examination - C. LaSala

```
 1    question.
 2    Q    Sure.
 3          The same 20 percent fee that, in fact, was long
 4    term sustainable during your time at Google?
 5    A    I'm sorry.  You're asking -- repeat the question again.
 6    Q    Sure.  The 20 percent referred to here is the same
 7    20 percent --
 8    A    Oh, yes.
 9    Q    -- fee that held for the entire time you were at
10    Google?
11    A    Yes.  Yes.
12    Q    And going back to the document, you wrote:  "Pubs
13    accept it because it brings demand, Google Ads.  If Google
14    Ads bought everywhere else, I think we would see pubs move
15    to other SSPs for OA, and we'd lose the 20 percent."
16          Did I read that right?
17    A    Yes.
18    Q    And Mr. LaSala, in October of 2019, you believed that
19    if Google Ads bought freely on other exchanges, SSPs, Google
20    could no longer charge the 20 percent fee for AdX; right?
21    A    I'm sorry.  Repeat the question.
22    Q    Sure.
23          In October of 2019, you believed that if Google
24    Ads bought freely on other exchanges, referred to as SSPs,
25    Google could no longer charge the 20 percent fee for AdX?
```

Direct examination - C. LaSala

```
 1    A    So I wrote that, but I don't think the data suggested

 2    it was an accurate perspective.  This is all perspective.

 3    Q    Google, in fact, never allowed Google Ads to buy freely

 4    on all other exchanges during the time you were at Google;

 5    right?

 6    A    They were increasing the rate of buying of AWBid off

 7    exchange.

 8    Q    Google Ads was never allowed to buy everywhere else;

 9    right?

10    A    I don't know.

11    Q    Okay.  And, finally, under the "my POV" bullet, you

12    wrote:  "To the extent we want to be in the pipes biz, DV3

13    and/or Ad Manager, we should accept downward pressure unless

14    we can tie our buy and sell-sides together to create unique

15    differentiated value to buyers and sellers."

16          Now, the bolding here appears in the original;

17    right?

18    A    Yes.

19    Q    Okay.  And Google did exactly what you said here;

20    right, Mr. LaSala?  It tied together its buy-side, Google

21    Ads; and its sell-side, DFP, via the AdX ad exchange; right?

22    A    No, it didn't, as much as I was -- I was articulating a

23    perspective that it would be better -- on all of these

24    documents that we continued to sort of make the same point

25    ad nauseam.
```

<div align="right">82</div>

Direct examination - C. LaSala

1              But the backdrop is, it was my personal opinion

2     that there was longer-term value for Google specifically if

3     we sort of focused our business almost where we began as a

4     tightly controlled closed ad network instead of buying into

5     an open -- sort of an open marketplace.  So I was always

6     advocating for that position.  So, in my perspective, we

7     weren't, especially DV3.  DV3 did whenever they wanted.  And

8     AWBid, Google Ads did whatever they wanted.

9              So I was almost alone in the position that we

10    should sort of move away from this sort of -- this

11    complicated ad tech business and move back towards a closed

12    network model where we were seeing like real competition

13    from Amazon, specifically, and Facebook Audience Network,

14    specifically, because it's my belief that it's the power of

15    the data plus the power of the -- of what you do with the

16    data that really drives long-term value for advertisers and

17    publishers.

18             So for all of this, the backdrop and the nuance

19    that's not sort of coming out of this discussion is, I

20    didn't like this business, right, so I was trying to

21    influence us to do something else.

22    Q    I want to make sure I understand the point you had

23    there.

24             You advocated for additional restrictions on where

25    Google's publisher customers could sell their inventory;

Direct examination - C. LaSala

```
 1  right?

 2  A    Yeah.  I advocated for that, to which I was strongly

 3  rejected, sometimes emotionally, by the owners of the

 4  buy-side of the business that said my opinion wasn't really

 5  necessary.

 6  Q    And as global strategy lead, you also pushed for more

 7  restrictions on where Google's advertiser customers could

 8  buy publisher inventory; right?

 9  A    That was my, yeah, perspective, which, again, the

10  people that made those decisions didn't really appreciate my

11  perspective.

12  Q    Okay.  Let's shift gears now.  We've mostly been

13  talking about the impact of the connection between Google

14  Ads and AdX.

15           I want to turn now to a different aspect of the

16  case, and that's the connection between the AdX ad exchange

17  and Google's publisher ad server, DFP.

18  A    Okay.

19  Q    So Google's ad exchange provided real-time bids for

20  publisher inventory on DFP; right?

21  A    Yes.

22  Q    Real-time bidding is valuable, was valuable to

23  publishers?

24  A    Yes.

25  Q    And Google used exclusive access to that -- those
```

84

Direct examination - C. LaSala

```
 1    valuable real-time bids from AdX to pull publishers onto DFP
 2    and lock them in; right?
 3    A    No.
 4    Q    Okay.  Let's look at a document in your binder.
 5    A    I just want to be, like, clear on that.
 6              DFP was an ad server.  So I don't know -- we'll go
 7    to whatever document.
 8    Q    Yeah.  There's no question pending right now,
 9    Mr. LaSala.  If we could just look at the document.
10    A    Okay.
11    Q    I think you answered my question.
12              PTX 114.
13    A    PTX.
14    Q    And we would seek to admit this document into evidence.
15              THE COURT:  Any objection?
16              MR. ISAACSON:  No objection.
17     (Plaintiffs' Exhibit Number 114 admitted into evidence.)
18    BY MR. TESLICKO:
19    Q    Now, Mr. LaSala, this is a September 2012 email from
20    Marc Theermann, and he was the head of mobile platform
21    sales; right?
22    A    Yeah.  I guess I'll just read it here.  I'm having
23    trouble finding it.  Go ahead.  I'll just read it here.
24              THE COURT:  Right at the beginning of the book.
25              THE WITNESS:  Thank you.  Thank you so much.
```

Direct examination - C. LaSala

1    Okay.

2    BY MR. TESLICKO:

3    Q    I'll ask again, Mr. Theermann, Marc Theermann, he was

4    the head of mobile platform sales?

5    A    I don't remember what his title was at this time.  He

6    had a couple of jobs.

7    Q    In his email, Mr. Theermann notes he's concerned about

8    three things, and the third of those is:  "While I know I

9    might be in the minority, I would like to stress that I

10   think it is too early to give AdX to non-XFP partners"; do

11   you see that?

12   A    Can I see that?  Yeah.

13   Q    And XFP is just another acronym for DFP; right?

14   A    I think so.

15   Q    Mr. Theermann is writing this about three years after

16   Google acquired AdX and DFP from DoubleClick; right?

17   A    I don't know the timing, but it sounds reasonable.

18   Q    Roughly accurate?

19   A    Sure.

20   Q    Okay.  Mr. Theermann goes on to write:  "This is an

21   amazing time to lock in impressions by offering XFP to

22   publishers with full AdX Dynamic Allocation.  AdX can serve

23   as a tool to pull publishers on to XFP."

24           Did I read that right?

25   A    You did.

                                                              86

Direct examination - C. LaSala

```
 1    Q    And full AdX Dynamic Allocation, that refers to
 2    real-time bids from AdX; right?
 3    A    Say that again.  I'm sorry.
 4    Q    Sure.  Full AdX Dynamic Allocation that Mr. Theermann's
 5    referring to here, that just refers to real-time bids from
 6    AdX; right?
 7    A    I'm sorry.  I'm just trying to -- I'm half listening
 8    and half reading, so I apologize to the Court for doing
 9    that.
10         So just one more time.  So I'm in paragraph C?
11    Where am I?  Start me over.
12    Q    Sure.  You don't have to look at the document for this,
13    Mr. LaSala.  It's just a question about a term.
14    A    It's not written --
15    Q    It is in the document, but I'm asking you based on your
16    experience at Google.
17         Full AdX Dynamic Allocation, that typically, in
18    Google's business, refers to real-time bids from AdX; right?
19    A    Well, even when you said full -- Dynamic Allocation in
20    AdX business, is that how you said it?  Because Dynamic
21    Allocation was a feature in the ad server, not in AdX, as I
22    understood it.  So I guess I'm just sort of factually
23    confused about your question, which is why I'm struggling.
24    Q    Okay.  We can move on, Mr. LaSala.
25         Mr. Theermann also writes:  "By allowing third
```

                                                          87

Direct examination - C. LaSala

```
 1    parties to integrate with AdX mobile web app, we are giving

 2    away this advantage"; do you see that?

 3    A    Okay.  Yep.  I see it.

 4    Q    Now, Google's ad server had an advantage as compared to

 5    third-party ad servers because it, alone, had access to

 6    real-time bids from AdX; right?

 7    A    So I don't know.  Because I do remember that AdX bought

 8    into -- directly onto a publisher's page, and it bought into

 9    some third-party ad servers.

10    Q    You have no reason to believe that AdX provided

11    real-time bids to third-party ad servers; right?

12    A    I don't know.

13    Q    If we look a little down, Mr. Theermann mentions

14    another advantage.  He writes:  "Dynamic Allocation allows

15    AdX to see all XFP impressions" -- those are DFP

16    impressions; right?  And he goes on to say:  "We lose this

17    advantage behind other ad servers"; do you see that?

18    A    I do.

19    Q    And via first look, AdX was able to see and bid in real

20    time on publisher impressions via DFP; right?

21    A    I don't remember how --

22    Q    You don't remember how --

23    A    -- first look worked, or even Dynamic Allocation, for

24    that matter.

25    Q    And, finally, Mr. Theermann writes:  "Ad servers are
```

                                                                88

Direct examination - C. LaSala

```
 1    sticky and hard to replace"; do you see that?

 2    A    Yes.

 3    Q    And that's consistent with your experience, Mr. LaSala,

 4    that publishers rarely, if ever, switched publisher ad

 5    servers?

 6    A    It was a heavy lift to change.  They did, but it was --

 7    wasn't easy.

 8    Q    You can't recall any publisher ad server that

 9    switched -- sorry.  I'll say that again.

10         You can't recall any publisher that switched away

11    from Google's DFP publisher ad server; can you?

12    A    I can only think of one because it was -- I think they

13    did.  That was contentious.  But there might have been more.

14    I can remember one.

15    Q    Who is that, Mr. LaSala?

16    A    It was Disney, I think, made a decision to move away.

17    I think they built their own.

18    Q    And Disney continued to use Google's DFP for display

19    ads; right?

20    A    I don't remember.

21    Q    You don't remember either way?

22    A    I don't, no.

23    Q    Okay.  Shifting gears a little, publishers using the

24    AdX ad exchange, they have contracts with Google; right?

25    A    Yes.
```

                                                                    89

Direct examination - C. LaSala

```
 1    Q     They're bound by Google's publisher guidelines?

 2    A     Yes.

 3    Q     And those guidelines prohibited publishers from putting

 4    AdX bids into real-time competition with other sources of

 5    demand within rival ad servers; right?

 6    A     I don't remember.

 7    Q     You don't remember either way?

 8    A     No.

 9    Q     Okay.  To refresh your recollection, and we're going to

10    move it into evidence, can you look at PTX 118.

11              THE COURT:  Any objection to 118?

12              MR. ISAACSON:  No objection.

13              THE COURT:  All right.  It's in.

14      (Plaintiffs' Exhibit Number 118 admitted into evidence.)

15    BY MR. TESLICKO:

16    Q     Mr. LaSala, this is another email involving you and

17    Mr. Theermann and others in the ad tech business; right?

18    A     Yes.

19    Q     And per the subject of this email, Mr. Theermann's

20    writing you about a meeting with Bonita.  Bonita is likely

21    Bonita Stewart; correct?

22    A     Yes.

23    Q     Bonita was the vice president for global partnerships

24    and responsible for large publishers?

25    A     Yes.
```

Direct examination - C. LaSala

```
 1   Q    Looking at the second page of the email, and it's not
 2   Bates 323 at the bottom, Mr. Theermann wrote to you -- or
 3   wrote, not to you:  "We are saying that AdX cannot be called
 4   from any third-party SSP and yield management system, and,
 5   in consequence, AdX mobile cannot be called from third-party
 6   mobile ad servers that incorporate these functionalities."
 7            Did I read that right?
 8   A    You did.
 9   Q    Now, you're familiar with yield management technology;
10   right, at a high level?
11   A    At a high level, yeah.
12   Q    Yield management technology is just technology that
13   allows publishers to optimize across different sources of
14   advertising demand?
15   A    Yes.
16   Q    And that allows them to figure out where the best place
17   is to sell their publisher inventory; correct?
18   A    Yes.
19   Q    Publisher ad servers have yield management systems;
20   right?
21   A    Yes.
22   Q    And because yield management technology -- and that's
23   because yield management technology is important to
24   publishers?
25   A    Yes.
```

91

Direct examination - C. LaSala

```
 1   Q    Now, looking back at the document, Scott Spencer
 2   writes:  "These restrictions are in the existing contract.
 3   It's just a case of making it clear to sales what
 4   constitutes compliance"; do you see that?
 5   A    I see that, yes.
 6   Q    Who's Mr. Spencer?
 7   A    He was a product manager for the ad exchange.
 8   Q    Familiar with the ad exchange and its policies?
 9   A    Presumably.
10   Q    And the restriction Mr. Spencer is talking about here
11   refers to the restriction that AdX cannot be called by a
12   publisher using a third-party ad server with yield
13   management functionality; right?
14   A    I think that's what it says.
15   Q    And that was found in Google's contract with publisher
16   customers; correct?
17   A    I don't know.  That's just what it states here, but I
18   can't attest to it.
19   Q    Okay.  Let's shift gears to a different topic,
20   Mr. LaSala.
21          Now, there was general alignment within Google
22   that the primary objective of Google's sell-side business
23   was to provide access for Google's buy-side business; right?
24   A    There was a robust debate about that, and we oscillated
25   back and forth.
```

Direct examination - C. LaSala

```
 1   Q     Let me ask for your view.
 2             In your view, the primary objective of Google's
 3   sell-side business was to provide access for Google's
 4   buy-side business; right?
 5   A     In my utopic, forward-looking view, I don't remember
 6   the details, but it would have been reasonable that I would
 7   have espoused that opinion.
 8   Q     And because you espoused that position, you pushed for
 9   Google to design its ad tech products to be only as open as
10   Google needed them to be; right?
11   A     I don't know that it was designed that way, but we were
12   debating whether it should be.
13   Q     Contrary to your view, Google's DSP, DV360,
14   historically was relatively open; right?
15   A     Yeah.
16   Q     It bought publisher inventory, both on AdX and --
17   A     I'm sorry, the DS -- which was relatively open?
18   Q     Sure.  I'll clarify.
19             Google's DSP, DV360, was relatively open?
20   A     Yes.  Yes.  Yes.
21   Q     And that's because DV360 bought inventory on AdX and
22   other ad exchanges; right?
23   A     Yes.
24   Q     And as a result after header bidding became a thing,
25   Google's DV360 bought inventory on rival ad exchanges that
```

93

Direct examination - C. LaSala

```
 1    was made available through header bidding; right?

 2    A    Yes.

 3    Q    And in doing so, DV360 was indirectly supporting header

 4    bidding in your opinion?

 5    A    Yeah.

 6    Q    But you viewed header bidding as an existential threat

 7    to Google's ad tech business; right?

 8    A    The entire ad tech business, not just ours.

 9    Q    If you could go to 433 in your binder.  I should

10    clarify, PTX 433.

11              THE COURT:  Any objection to 433?

12              THE WITNESS:  Yes.

13              MR. ISAACSON:  No objection.

14              THE WITNESS:  Oh, sorry.  I'm sorry.

15              THE COURT:  I like it.

16              THE WITNESS:  I didn't -- that was funny, and I

17    didn't even mean it to be.

18              MR. ISAACSON:  Feel free to come on over here.

19              THE WITNESS:  I was going to say, are you going to

20    hire me?  I object to all of this.

21      (Plaintiffs' Exhibit Number 433 admitted into evidence.)

22              THE COURT:  By the way, since we're having a

23    break, it is mid-morning, we should take our mid-morning

24    break.

25              MR. TESLICKO:  Yes, Your Honor.
```

94

Direct examination - C. LaSala

```
1              THE COURT:  We'll be in break until 11:30.

2                    (A recess was taken.)

3              MR. TESLICKO:  Thank you, Your Honor.

4              THE COURT:  I think we were at Exhibit 433.

5              MR. TESLICKO:  Correct, Your Honor.

6    BY MR. TESLICKO:

7    Q    Welcome back, Mr. LaSala.

8              We were turning to document PTX 433.  Do you see

9    that in your binder or on the screen?

10   A    Yes.

11   Q    This is an email you sent your boss, Jason Spero, in

12   December of 2016; is that right?

13   A    Yes.

14   Q    And in that email you set out the 2017 sell-side

15   priorities?

16   A    Yes.

17   Q    And the very first of those is AdX value update and

18   header bidding and FAN response; do you see that?

19   A    Yes.

20   Q    And you wrote:  "Need to fight off the existential

21   threat posed by header bidding and FAN"; right?

22   A    Yes.

23   Q    Now I want to make sure I understand what you meant

24   here.

25              You viewed header bidding as an existential threat
```

95

Direct examination - C. LaSala

```
 1    to Google's ad exchange business; right?

 2    A     To all ad exchange businesses.

 3    Q     You viewed header bidding as an existential threat to

 4    Google's publisher ad server business, too; right?

 5    A     I don't think so.

 6    Q     And header bidding was an existential threat to

 7    Google's publisher ad server business because it moved part

 8    of the decision-making function outside of the ad server;

 9    right?

10    A     Again, this is -- we're, like, pushing ten years on

11    this.  But I think you still need an ad server to serve an

12    ad after it is -- after, like, whatever happens in the

13    header happens.  I think you still need an ad server.

14    Q     You still need an ad server; right?

15    A     Yeah.

16    Q     Okay.  Now, you also mentioned FAN here.

17          FAN refers to the Facebook Audience Network;

18    right?

19    A     Yes.

20    Q     And you're aware that FAN no longer even buys open web

21    display advertising; right?

22    A     Yeah.

23    Q     They exited the market some years ago?

24    A     Yes.

25    Q     Okay.  Going back to the statement in 2017, you viewed
```

96

Direct examination - C. LaSala

1    fighting off header bidding as your personal Number 1

2    priority for the year; right?

3    A    Yes.  That's what I wrote.

4    Q    And you believed that if we do nothing else, this needs

5    to be an all hands-on-deck approach.

6              Did I read that right?

7    A    Yes.

8    Q    And that meant that everyone in Google's ad tech

9    business needed to be involved?

10   A    No.  The context for this email is for marketing

11   resources, so I'm asking for support from our marketing team

12   to help us.  And we were historically an under-resourced

13   division in terms of marketing resources, so I was

14   desperately trying to get marketing resources.

15   Q    You felt that people on Google's sell-side business

16   should be involved in the response to header bidding?

17   A    Yeah.

18   Q    And employees working on the buy-side of Google's ad

19   tech business needed to be involved in the response to

20   header bidding; right?

21   A    That's fair.

22   Q    Now, you understood, Mr. LaSala, that header bidding

23   was a response to Google's dominance; right?

24   A    No.

25   Q    Okay.  Let's look at the next document in your binder,

97

Direct examination - C. LaSala

```
 1    which is PTX 0254.

 2              THE COURT:  Any objection to 254?

 3              THE WITNESS:  What was it, 254?

 4              MR. ISAACSON:  No objection, Your Honor.

 5              THE COURT:  All right.  It's in.

 6      (Plaintiffs' Exhibit Number 254 admitted into evidence.)

 7    BY MR. TESLICKO:

 8    Q    Correct, 254.  Either on your binder or on the screen.

 9    Your preference, Mr. LaSala.

10              This is an October 2015 email chain that involves

11    you and others from Google's ad tech business; right?

12    A    I'm sorry.  Can you ask the question again?

13    Q    Sure.  This email involves you and others from the

14    Google ad tech business; correct?

15    A    Yes.

16    Q    And it begins with an email from someone named Lisa

17    Lehman; do you see that?  Apologies if I misstated her name.

18    A    Okay.  Yes.

19    Q    She was the strategic partner lead for news and

20    magazine, at least based on the signature block at the end

21    of her email?

22    A    Sure.

23    Q    And Ms. Lehman joined Google from Rubicon, what is now

24    the Magnite ad exchange; right?

25    A    I don't know.
```

98

Direct examination - C. LaSala

 1   Q     If you look at page 2 of the email, it references this.

 2         Does that refresh your recollection of where

 3   Ms. Lehman came from?

 4   A     Can you show it to me on the screen?

 5   Q     Sure.  It's the second block of text at the very top of

 6   the document.  Lisa joined my team from Rubicon.  Above

 7   that.

 8   A     Okay.  Noted.

 9   Q     And looking at still page 2 of the document but going

10   down to Ms. Lehman's email, she wrote about midway down:

11   "Right now we are the de facto preferred ad server of choice

12   for 90 percent of publishers"; do you see that?

13   A     Okay.  Yep.

14   Q     And Google's publisher ad server was DFP; right?

15   A     Yes.

16   Q     And Ms. Lehman goes on to write:  "By having that, we,

17   A, have a relationship with all pubs; B, get to see all

18   their inventory, even that which we don't monetize; C,

19   almost always give AdX demand access to their inventory; and

20   D, maybe even allow AdX first look at every single

21   impression."

22         Did I read that right?

23   A     You did.

24   Q     At least items B through D in Ms. Lehman's list, that

25   refers to the first look advantage that Google had afforded

99

Direct examination - C. LaSala

```
 1    its AdX ad exchange; right?

 2    A    I don't know the details of first look.  I think we

 3    covered this.

 4    Q    D specifically refers -- uses the words "first look";

 5    right?

 6    A    Yeah.  Yeah.

 7    Q    Looking a bit down the page talking about header

 8    bidding, Ms. Lehman writes:  "By invalidating the need for

 9    an ad server, we are setting the stage for Google to

10    actually have to compete alongside the SSPs (or whatever

11    these platforms are called) for any access to any publisher

12    inventory in the future."

13              Did I read that right?

14    A    You did.

15    Q    And SSP is just another word for an ad exchange;

16    correct?

17    A    Yes.

18    Q    Prior to header bidding, AdX didn't need to compete

19    against real-time prices from rival ad exchanges; right?

20    A    Say that again.  That's what she wrote, or are you

21    asking me?

22    Q    I'm asking you based on your experience in the

23    industry.

24              Prior to header bidding, AdX did not need to

25    compete against real-time bids from other ad exchanges;
```

100

Direct examination - C. LaSala

```
 1   right?

 2   A    I believe that's true.

 3   Q    Ms. Lehman -- going back to the document, Ms. Lehman

 4   goes on to write:  "And will be disadvantaged at that point.

 5   Unlike our competitors, pubs have been viewing us as a

 6   necessary evil instead of a responsive innovative partner,

 7   so they're eager to find out how to cut us out all

 8   together."

 9            Did I read that right?

10   A    You did.

11   Q    And you agreed with Ms. Lehman; right?

12   A    I don't remember this email exchange at all.

13   Q    Let's look at the very top of that document,

14   Mr. LaSala.

15            You send a response to the email thread; correct?

16   A    Correct.

17   Q    And you start that email response with:  "Great

18   writeup"?

19   A    I do.

20   Q    Okay.  Putting aside the document for a moment.

21            Mr. LaSala, you, too, thought that Google had

22   gotten to the point where it was so big it was hard to

23   innovate quickly; right?

24   A    Like, as a generic proposition?

25   Q    I'm asking you, Mr. LaSala.
```

101

Direct examination - C. LaSala

```
 1              You, too, thought that Google, as of this time,
 2   had gotten to the point where it was so big, it was hard to
 3   innovate quickly?
 4              MR. ISAACSON:  I'll object to the "you, too."
 5              THE WITNESS:  Yeah.  I mean, are you reading
 6   something from an email that you told me --
 7              THE COURT:  That's a minor point.  The question is
 8   to this witness.
 9              MR. TESLICKO:  I could rephrase, Your Honor.
10   BY MR. TESLICKO:
11   Q    Mr. LaSala, you thought that Google had gotten to the
12   point where it was so big it was hard to innovate quickly;
13   right?
14   A    Are you reading it from an email that you -- that you
15   just told me to stop reading?
16   Q    I'm asking if that was your view, but if it would be
17   helpful, we could go to your deposition testimony where you
18   gave a similar statement to refresh your recollection.
19   A    I don't know if we're asking, like, a specific
20   question.  But the generic statement is, as companies grow,
21   it gets harder to move fast.  So I would contend with that,
22   and, in Google, it was harder to move quickly.
23   Q    And, by contrast, smaller companies at that time were
24   able to innovate more quickly because of their size; right?
25   A    That seems like an academic conversation, like, in
```

102

Direct examination - C. LaSala

```
 1   theory if they had the resources.

 2   Q    Putting aside whether it's academic or not, you agree

 3   with that statement; right, Mr. LaSala?

 4   A    It's a reasonable statement in general.

 5   Q    Okay.  Ms. Lehman wasn't alone in expressing her views

 6   about Google as a non-responsive partner for publishers;

 7   right?

 8   A    I don't remember.

 9   Q    Okay.  Let's turn to the next tab, PTX 238.

10           MR. TESLICKO:  And we would move this document

11   into evidence as well.

12           MR. ISAACSON:  Any objection?

13           THE COURT:  I would object to the portion of the

14   document that's quoting an article that's hearsay within

15   hearsay, but other than that, I have no objection.

16           MR. TESLICKO:  And, Your Honor, we're not seeking

17   to admit the portion of the document that reports on -- that

18   relays a news article for the truth of the matter, only for

19   context and effect on the listener.

20           THE COURT:  I'm allowing it in for the effect,

21   because it's within the context of this, but not for the

22   truth of anything within it.  So it's in.

23           Go ahead.

24     (Plaintiffs' Exhibit Number **238 admitted into evidence.**)

25   BY MR. TESLICKO:
```
                                                                103

Direct examination - C. LaSala

```
1   Q    Mr. LaSala, this is an email exchange involving you and
2   others in Google's ad tech business in June of 2015; right?
3   Or, sorry, August 2015.
4   A    I think I have the right one.  So this is an email
5   exchange between -- say that again.
6   Q    You and others in Google's ad tech business.
7   A    I don't know if it's between.  I can't say if I was,
8   like, just copied on it or if I, you know -- I mean, you
9   could tell me and we could save some time today.  Did I
10  contribute to this email?
11  Q    We could put aside that question and just go to the
12  substance of the email.
13  A    Okay.
14  Q    If you look at page 4 of the document with the Bates
15  ending in 610, there's an email from Michelle Sarlo
16  Dauwalter.  Again, apologies if I misstated her name.
17           She sends an email to the group; right?
18  A    Okay.  Yep.  I see it.
19  Q    And she was the global director for programmatic
20  account strategy at the time; does that sound right?
21  A    Yes.
22  Q    And discussing the rise of header bidding, she wrote:
23  "If we are committed to competition and we believe
24  competition drives revenue, we should allow for all sources
25  of demand to compete fairly in real time, or as close to
```

104

Direct examination - C. LaSala

```
 1    real time as possible."
 2              Did I read that right?
 3    A    Yes.
 4    Q    And at this point in time in 2015, Google did not allow
 5    publishers using DFP to have all sources of demand compete
 6    fairly; right?
 7    A    So I don't remember the timing and when features were,
 8    but the way you even just phrased that, all sources of
 9    demand did compete fairly in AdX and DFP.
10              And just to be clear, so we're talking about ad
11    exchanges competing with each other.  So the reason I
12    answered that way is that DSPs and ad networks buying to ad
13    exchanges, and all of those DSPs competed fairly in the ad
14    exchange.  There's another question about whether then those
15    ad exchanges competed against each other.  So it's a
16    different question.
17    Q    Okay.  Within the DFP publisher ad server in 2015, all
18    exchanges did not compete in real time; right?
19    A    Exchanges, correct.
20    Q    Okay.  And at that time, Google had a first-look
21    advantage as well or a last-look advantage over other
22    exchanges; right?
23    A    I don't recall the details of first and last look.
24    Q    And at this point in time, Google did not allow
25    publishers to -- sorry.
```

105

Direct examination - C. LaSala

```
 1              Publishers could only obtain real-time pricing
 2    from AdX if they used the Google publisher ad server; right?
 3    A    We did have a product called AdX direct where you could
 4    just put AdX as a tag on your page.  So it's very fuzzy for
 5    me, it's been a while, so I don't know if that statement is
 6    entirely accurate.
 7    Q    Okay.  And you don't recall if AdX direct provided
 8    real-time pricing to publishers using non-Google ad servers;
 9    right?
10    A    I don't know.
11    Q    Okay.  Ms. Dauwalter goes on to write:  "While I can
12    help our sales team build a story around latency and lost
13    impressions when trying to build waterfalls and header
14    bidding, the fact remains that if we allowed for real-time
15    competition across all demand sources, we wouldn't even need
16    to have that conversation."
17              Did I read that right?
18    A    You did.
19    Q    And in response to header bidding, Google's sales team
20    pushed stories about latency; right?
21    A    I don't have any recollection of that.
22    Q    You don't remember Google saying -- pushing out stories
23    about the latency associated with header bidding?
24    A    Well, just the way you phrased the question.  We
25    definitely thought that header bidding increased latency on
```

106

Direct examination - C. LaSala

```
 1   the page, and that was a problem, and the publishers should
 2   know.
 3   Q    And Google pushed out stories about lost impressions
 4   caused by header bidding; right?
 5   A    I don't know what you mean by story.  Like, narrative?
 6   Q    Okay.  She goes on to write:  "If all demand sources
 7   competed fairly, we could start stripping away the
 8   waterfalls, would immediately gain more access to inventory,
 9   make more money for publishers, increase ad viewability and
10   engagement, and ultimately make the Internet a better
11   place."
12             Did I read that right?
13   A    You did.
14   Q    And you agree with Ms. Dauwalter that real-time
15   head-to-head competition was better for publishers?
16   A    Well, that statement she doesn't even say that.
17   Q    Okay.  Do you agree that real-time head-to-head
18   competition is better for publishers?
19   A    For demand sources.
20   Q    Real-time head-to-head competition is better for
21   advertisers?
22   A    Yeah.  For DSPs and networks, yes.
23   Q    And better for Internet users as a whole?
24   A    Not for exchanges.
25             THE COURT:  I'm sorry.  I didn't hear the last
```

107

```
 1   question.
 2            THE WITNESS:  I said -- I'm just being clear on my
 3   perspective.  It's just kind of a wonky way to get at my
 4   opinion.
 5            But I believe that a real-time auction exchange
 6   between the owners of, like, the demands -- so Google Ads,
 7   we were talking about DV3 and other DSPs buying into an
 8   exchange and have all of their demand is good for the
 9   ecosystem.
10            When all of those demand sources then buy into
11   multiple exchanges -- which is what they did.  So each of
12   those demand sources would buy, for the most part, demand --
13   into those different exchanges.  And then what I'm
14   suggesting is that taking the output of all of those
15   auctions and then comparing them again isn't necessarily
16   good for the ecosystem, and that's what header bidding was
17   doing in its incarnation.
18   BY MR. TESLICKO:
19   Q    I want to turn now, Mr. LaSala, to some of Google's
20   responses to header bidding.
21            One of those responses was to launch Exchange
22   Bidding or what became known as Open Bidding; right?
23   A    Yes.
24   Q    And we can just quickly look at a document that
25   generally discusses the purposes of Exchange Bidding, that's
```

108

Direct examination - C. LaSala

```
 1   PTX 444.

 2           THE COURT:  Any objection to 444?

 3           MR. ISAACSON:  No objection.

 4           THE COURT:  All right.  It's in.

 5    (Plaintiffs' Exhibit Number 444 admitted into evidence.)

 6   BY MR. TESLICKO:

 7   Q    Looking on the first page of this document, Mr. LaSala,

 8   you explain the reason Google built Exchange Bidding.  You

 9   write:  "The reason we are building this, namely to move

10   pubs away from HB and into EB."

11           Did I read that right?

12   A    If you could just show me where it is.

13   Q    Sure.  It's in your email of January 4th, 2017 midway

14   through that paragraph.  It's the paragraph that starts --

15   or the email that starts with "I agree with Max."

16   A    I agree with Max.  Okay.

17           Okay.  Yes.  I see it.

18   Q    And here, HB is header bidding?

19   A    Yes.

20   Q    EB is Exchange Bidding?

21   A    Yes.

22   Q    And because of this view -- or because of this reason

23   for building Exchange Bidding, in your view -- let's turn to

24   page 7 toward the bottom.  In your view, the Holy Grail of

25   Exchange Bidding --
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - C. LaSala

```
 1              MR. ISAACSON:  I'm sorry.  I don't have --
 2              MR. TESLICKO:  Bates 652.  I'll start over.
 3    BY MR. TESLICKO:
 4    Q    Looking at 652, in your view, Mr. LaSala:  "The Holy
 5    Grail of Exchange Bidding was the impact of EB on the
 6    reduction of HB."
 7              Did I read that right?
 8    A    Yes, you did.
 9    Q    And because of that, you asked others at Google to
10    track the success of header bidding -- or of Exchange
11    Bidding by tracking the decline in header bidding on other
12    exchanges; right?
13    A    On other exchanges?  I mean, it's reasonable to think
14    that I was looking to track the decline in header bidding.
15    Q    And, in fact, if we go back to the first page to the
16    same email we were looking at before, the one with "I'm okay
17    with the 100 million."
18    A    Yes.
19    Q    You ask -- you suggest that Google track the decline in
20    header bidding; right?
21    A    I don't know that I asked that somewhere.
22    Q    It's the second-to-last line of your email at 2:04 p.m.
23    A    Yes.  Okay.  I see it.  Yeah.
24    Q    Okay.  And that's how you thought Google should measure
25    the success of Exchange Bidding; right?  The decline in
```

110

Direct examination - C. LaSala

```
 1   header bidding?

 2   A    Yes.  I didn't think it was a very good product.

 3   Q    You didn't ask in this email to track how much Exchange

 4   Bidding increased publisher yields overall?

 5   A    In this email, I don't know if I did.

 6   Q    You didn't ask anyone to track whether Exchange Bidding

 7   improved the quality of ad matches; right?

 8   A    I'll assume the answer is no without reading it.  I

 9   don't know.  I'd have to read the whole email.

10   Q    Okay.  Put that document aside for a second,

11   Mr. LaSala, just to ask one question.

12          In order to attract more exchanges to participate

13   in Exchange Bidding, Google offered to share AdX's last look

14   with those exchanges; right?

15   A    I don't remember.

16   Q    Going back to 444, if you could go to the sixth page.

17          THE COURT:  Again, what's the Bates stamp for

18   that?

19          MR. TESLICKO:  Sure.  The Bates ending in 651.

20          THE COURT:  Thank you.

21   BY MR. TESLICKO:

22   Q    And Mr. Giles there sends an email.  Who is Mr. Giles

23   or Giles?

24   A    He was an engineer.

25   Q    Was he the director of ad serving?  Does that sound
```

111

Direct examination - C. LaSala

```
 1   right?

 2   A     That sounds right.

 3   Q     Okay.  Mr. Giles wrote:  "Jerome re last look, there

 4   are several important reasons why we will be moving forward

 5   with testing in the open beta.  One, because both publishers

 6   and exchanges have very strongly complained about the

 7   fairness of it."

 8            Did I read that right?

 9   A     Yes.

10   Q     And I know you said you didn't remember the details,

11   but do you remember generally that last look refers to the

12   ability of AdX to see the winning header bidding bid before

13   running its own auction?

14   A     No.

15   Q     You have no recollection at all about what last look

16   was?

17   A     No.

18   Q     Okay.  And you had heard, Mr. LaSala, publishers in

19   exchanges complaining about last look at least; right?

20   A     We had a product called first look and a product called

21   last look.  It's reasonable that -- based on this

22   conversation, that, yeah, that would have come across my

23   desk then.

24   Q     Mr. Giles adds:  "This was one of the biggest

25   objections raised in the recent EB steering committee
```

112

Direct examination - C. LaSala

```
 1    meeting with exchanges.  If we want exchanges to give up HB
 2    and move to EB, we need to give some concessions."
 3              Do you see that?
 4    A    I do.
 5    Q    And that concession that Google ultimately made was to
 6    share last look with exchanges that participated in Exchange
 7    Bidding; right?
 8    A    I don't recall.
 9    Q    Okay.  Look at Number 3 in Mr. Giles' email.  He wrote:
10    "It creates a clear differentiation between EB and HB.
11    Exchanges that go through HB are subject to last look, and
12    those that go through EB are not.  This gives a pretty big
13    incentive to switch."
14              Did I read that right?
15    A    You did.
16    Q    Does that refresh your recollection about Google's
17    sharing last look with Exchange Bidding partners?
18    A    Not at all.
19    Q    Okay.  In response to -- you can put that document to
20    the side, Mr. LaSala.
21              In response to header bidding, Google also
22    adjusted the way that its advertiser buying tools purchased
23    ad inventory; right?
24    A    I don't know.
25    Q    Do you recall that DV360 adjusted how it bid for
```

113

Direct examination - C. LaSala

```
 1   publisher inventory in response to header bidding?

 2   A    I don't recall.

 3   Q    Okay.  Let's look at a document, 613.  PTX 613 in your

 4   binder.

 5   A    Okay.

 6          MR. TESLICKO:  And we would seek admission of this

 7   document, Your Honor.

 8          THE COURT:  Any objection to 613?

 9          MR. ISAACSON:  No objection.

10          THE COURT:  All right.  It's in.

11    (Plaintiffs' Exhibit Number 613 admitted into evidence.)

12   BY MR. TESLICKO:

13   Q    This is a June 2018 email exchange that includes you on

14   the email; right?  Here on the to line.

15   A    Yes.

16   Q    Look at the first page.  You ask in Number 2:  "Can we

17   see how much the growth of EB is coming from DBM through

18   EB?"

19          Do you see that?

20   A    I do.

21   Q    And you asked that because you were concerned that

22   DV360 was buying inventory on rival ad exchanges rather than

23   AdX; right?

24   A    I don't remember this email.

25   Q    Okay.  And you go on to write:  "With my Google hat on,
```

114

Direct examination - C. LaSala

1    the right answer is not to do something different with EB

2    and ask our sales team to jump through hoops, but rather

3    suggest that DBM stop buying on 3PEs when they know they can

4    see the impression in AdX."

5            Did I read that right?

6    A    Yes.

7    Q    And you were suggesting here with your Google hat on

8    that DV360 stop buying on third-party exchanges?

9    A    Well, what I was suggesting is that I thought header

10   bidding -- back to existential threat, header bidding was

11   such a poor product for users, as it added increased latency

12   to the page for marketers whose ads would then go through

13   this subpar technology, and likely over time be sort of less

14   effective, and less value to the publisher in the long term

15   because of the poor experience.  And so for the ecosystem, I

16   thought no one should buy via header bidding.

17           So my suggestion was again to -- for the buy-side

18   was, look, if you care about the ecosystem and you can get

19   access to the inventory other ways, just get access to it

20   other ways because this is not a great piece of technology.

21   So that was sort of my perspective.  Again, I didn't have

22   any say what they did.

23   Q    Let me ask more specifically, Mr. LaSala.

24           Your suggestion here was that DV360 stop buying on

25   third-party exchanges if that inventory could be found at

115

Direct examination - C. LaSala

```
 1    all on AdX; right?

 2    A    That's what I wrote.

 3    Q    Okay.  And you suggested that rather than asking Google

 4    sales team to jump through hoops to make Exchange Bidding

 5    more attractive?

 6    A    I didn't say that.

 7    Q    Well, you wrote, Mr. LaSala -- you were suggesting --

 8    A    I used the word more attractive.

 9    Q    I'm just asking you a question.  I'll rephrase the

10    question.

11          Mr. LaSala, here you said:  "The right answer is

12    not to do something different with EB and ask our sales team

13    to jump through hoops."

14    A    I did say that.

15    Q    Do you see that?

16    A    Yes.

17    Q    Your recommendation is you didn't want the sales team

18    to have to jump through hoops; right?

19    A    That's what I wrote, but I don't remember this email.

20    Q    You thought it was better for DV360 to just stop buying

21    on third-party exchanges?

22    A    That's what the sentence says.  I don't remember this.

23    I'm not sure what he's asking.

24    Q    That plan, in fact, was implemented in part through

25    what was called Project Poirot; right?
```

116

Direct examination - C. LaSala

```
 1   A    I don't remember the details of Poirot.

 2   Q    Okay.  Do you remember that DV360 bid shade on

 3   third-party exchanges?

 4   A    No.

 5   Q    Mr. LaSala, as of 2016, Google's AdX ran a modified

 6   second-price auction; right?

 7   A    I don't remember.  I don't remember the details of how

 8   the auction ran.

 9   Q    Do you remember that it did not run a pure second-price

10   auction as of 2016?

11   A    No.

12   Q    Okay.

13   A    I just don't know either way.

14   Q    Okay.  That's fine.  Let's look at a document in your

15   binder, PTX 317.

16           THE COURT:  Any objection to 317?

17           MR. ISAACSON:  No objection.

18           THE COURT:  All right.  It's in.

19    (Plaintiffs' Exhibit Number 317 admitted into evidence.)

20   BY MR. TESLICKO:

21   Q    Looking at this March 2016 email, you wrote in the

22   middle of page 1 in the first page of the document:  "First

23   and foremost I would like to work with PM buy/sell to look

24   at how we would communicate the reality that our auction

25   acts as a modified second-price auction."
```

117

Direct examination - C. LaSala

```
 1              I read that right?
 2    A    Yes, you did.
 3    Q    And you're talking about AdX here; right?
 4    A    Yeah.
 5    Q    And you go on to explain why, in March of 2016, AdX was
 6    a modified second-price auction.  You wrote:  "It was
 7    because of 'things like RPO, dynamic rev share and boost in
 8    OPA'"; do you see that?
 9    A    I do.
10    Q    RPO is reserve price optimization?  Does that sound
11    right?
12    A    It sounds right.
13    Q    OPA is optimized Private Auctions?
14    A    That sounds right.
15    Q    And RPO, dynamic revenue share, and boost in OPA in
16    your view, in March of 2016, all have the impact of
17    optimizing the second-price auction -- sorry, the second
18    price in some way.  That's from the document; do you see
19    that?
20    A    Yes.  Yep.
21    Q    Which made AdX a modified second-price auction?
22    A    Yes.
23    Q    Okay.  You can put that document to the side.
24              I want to turn now, Mr. LaSala, to one final
25    topic, and those are your communication practices at
```

                                                              118

Direct examination - C. LaSala

```
 1   Google --
 2   A    Okay.
 3   Q    -- and what you did or didn't do after the Department
 4   of Justice began its investigation.
 5             So let's start with some basic facts.  You
 6   received a litigation hold for this matter on October 4th,
 7   2019; right?
 8   A    Yes.
 9   Q    Okay.  And if you turn to the last page in your -- last
10   tab in your exhibit binder, this is the litigation hold that
11   we received yesterday, I believe, from Google.
12             MR. TESLICKO:  And I defer to the Court's
13   practice, but we could simply label this as the last
14   PTX number in our sequence, if the Court's amenable to that.
15             THE COURT:  Well, in your total sequence.
16             MR. TESLICKO:  In our total sequence.  I believe
17   it would be PTX 1857.
18             THE COURT:  All right.  1857 is the currently
19   redacted litigation hold which may be subject to review
20   since I understand there's going to be a motion filed.
21             MS. WOOD:  Yes, Your Honor.
22             THE COURT:  All right.
23   BY MR. TESLICKO:
24   Q    And I understand Google has some confidentiality
25   concerns with email addresses on the screen, so we're not
```

119

Direct examination - C. LaSala

```
 1    going to put the email address portion on the screen.  But
 2    if you could look in your binder at the document, do you see
 3    your email address on the litigation hold email of
 4    October 4th, 2019?
 5    A    Yes.
 6    Q    Okay.  Mr. LaSala, do you view your former email
 7    address at Google as confidential for any reason?
 8    A    I've never thought about it.  Can I say I don't know?
 9    Q    Okay.  And if you look at the small portion of this
10    email that's unredacted, it informed you that the U.S. House
11    of Representatives Judiciary Committee, the Department of
12    Justice Antitrust Division, and a coalition of state
13    attorneys general had launched investigations of Google's
14    search and advertising products; do you see that?
15    A    Yes.
16    Q    And it instructed you, if we go to the -- farther down
17    in the document, that if you did use chats to discuss any
18    topic covered by the hold, to "make sure the settings
19    preserve the messages such as switching to history on for
20    chat"?
21    A    Yes.
22    Q    Do you see that?
23    A    I do.
24    Q    Do you remember receiving this litigation hold back in
25    October 2019?
```

                                                              120

```
 1   A     I do.

 2   Q     Okay.  And close in time to receiving the litigation

 3   hold, you also received training from counsel; right?

 4   A     I don't know the distance between receiving it and the

 5   training.

 6   Q     It would be fair to say it was close in time; right?

 7   A     I don't know.

 8   Q     If you could -- if it would be helpful, I can refresh

 9   your recollection with your litigation deposition in which

10   you recall that it was close in time.

11         Do you want to look at your litigation --

12   A     I trust you.  Sure.

13   Q     If you turn to litigation deposition --

14   A     I was just saying I trust that it's accurate.

15   Q     Sorry.  I misheard you, Mr. LaSala.  Apologies.

16   A     Okay.

17   Q     And at that training, you were informed you needed to

18   toggle history on to preserve a chat; right?

19   A     My recollection was that we were instructed if we were

20   going to speak about the business topics in chat, we should

21   do it with history on or just use email and other forms of

22   communication.

23   Q     And you understood, based on that training and this

24   litigation hold, that the default for chat was history off;

25   right?
```

121

Direct examination - C. LaSala

```
 1   A    Yes, sir.  Yeah.  That's how I used it for about a
 2   decade.  Whenever it was created.
 3   Q    And you found the instructions you were given to turn
 4   history on to be logistically complicated; right?
 5   A    Well, you had to change it for every individual chat.
 6   Q    Could you explain that a little bit more, Mr. LaSala?
 7   A    Well, if you started a chat with someone, the way I
 8   understand it, there's no way to be an all default on or all
 9   default off.  I could be wrong, but it was each one, I
10   think.
11   Q    And to make sure I understand your understanding --
12   A    Yes.
13   Q    -- was that by default, history was off for chats;
14   right?
15   A    That's my understanding, yes.
16   Q    And that meant the chats were destroyed after a short
17   period of time, absent some intervention by you; right?
18   A    I didn't know what it meant that it was destroyed.  In
19   fact, I assumed everything on the Internet was just kept.
20   Q    You assumed that even after --
21   A    No.  No.  Just in general.  Like a general concept.
22   Q    Okay.  I want to be really precise here.
23        After the litigation hold in October of 2019 and
24   the training you received --
25   A    Yes.
```

122

```
 1   Q    -- you understood that by default, the history for

 2   chats was history off; right?

 3   A    Yes.

 4   Q    Okay.  And that meant that chats were not preserved;

 5   right?

 6   A    Yes.

 7   Q    And you understood that to preserve a chat, you had to,

 8   for each chat, toggle history on; right?

 9   A    Yes.

10   Q    Otherwise the chat would be lost; right?

11   A    Yes.

12   Q    Okay.  And you found the burden of switching history on

13   for every single chat that related to business

14   communications to be logistically complicated; right?

15   A    On a daily basis, yeah.

16   Q    Sorry.  What was your answer?

17   A    Yes.

18   Q    By February of -- you can put that document to the

19   side.

20   A    Okay.

21   Q    And just so the record is very clear, your

22   understanding was you couldn't change history on for all

23   chats going forward in time; right?

24   A    I didn't know that I could if I could.

25   Q    Okay.  Based on your understanding, you thought you had
```

123

Direct examination - C. LaSala

| | |
|---|---|
| 1 | to switch history on for each individual chat? |
| 2 | A    That's how I used it.  I don't know that I had an |
| 3 | understanding. |
| 4 | Q    By February 2020, Mr. LaSala, you were part of the ads |
| 5 | working group for U.S. competition investigations; right? |
| 6 | A    I don't recall. |
| 7 | Q    If you could look at Document 925 in your binder, |
| 8 | PTX 925. |
| 9 | A    Yeah. |
| 10 |            THE COURT:  Any objection to 925? |
| 11 |            MR. ISAACSON:  No objection. |
| 12 |            THE COURT:  All right.  It's in. |
| 13 |   (Plaintiffs' Exhibit Number **925 admitted into evidence**.) |
| 14 | BY MR. TESLICKO: |
| 15 | Q    If you look at the subject of that email, Mr. LaSala. |
| 16 | A    Yes. |
| 17 | Q    It says ads working group U.S. competition |
| 18 | investigations; right? |
| 19 | A    Yes. |
| 20 | Q    And this is you sending an email to your boss, Jason |
| 21 | Spero? |
| 22 | A    Yes. |
| 23 | Q    You write in your email -- putting that aside. |
| 24 |            Does this refresh your recollection that by |
| 25 | February 2020, you thought you might have to testify as part |

124

Direct examination - C. LaSala

```
 1    of the U.S. antitrust investigation?
 2    A    Well, I don't remember this email, but it says it in
 3    here.
 4    Q    Okay.  If you look at the third bullet, which is me,
 5    that's you; right, Mr. LaSala?
 6    A    Yeah.  Right.  That's what I'm suggesting, yeah.
 7    Q    It says:  "Reviewing response to ensure I agree with
 8    all the content so that if I'm asked to testify, I do not
 9    contradict our answers"; do you see that?
10    A    Yeah.
11    Q    In February 2020, did you think there was a chance you
12    would have to testify in a U.S. antitrust investigation?
13    A    I don't remember this email.
14    Q    All right.  And according to the email, you were
15    spending 15 to 20 percent of your time reviewing responses
16    to antitrust investigators; isn't that right?
17    A    That's what it says.  Now I'm following.  Okay.  Yeah.
18    Q    Now, Mr. LaSala, you're familiar with something known
19    as communicate with care at Google; right?
20    A    Vaguely.
21    Q    Sorry?
22    A    Vaguely.
23    Q    And in light of the Department of Justice's
24    investigation, you reminded others at Google to communicate
25    with care; right?
```

125

Direct examination - C. LaSala

```
 1   A     I might have.

 2   Q     Okay.  Let's look at PTX 927.

 3              THE COURT:  Any objection to 927?

 4              MR. ISAACSON:  No objection.

 5              THE COURT:  All right.  It's in.

 6      (Plaintiffs' Exhibit Number 927 admitted into evidence.)

 7   BY MR. TESLICKO:

 8   Q     This is an email, Mr. LaSala, you sent on February 6th,

 9   2020; right?

10   A     Yes.

11   Q     You sent it to a number of people at Google?

12   A     Yes.

13   Q     About four months after you had received a litigation

14   hold?

15   A     Yes.

16   Q     And the same month that you had sent the prior document

17   we just looked at that talked about your work on the ads

18   working group for U.S. competition investigations; right?

19   A     Yes.

20   Q     And you address this email to a sell-side leads.

21              Who were those?

22   A     They were probably the leaders of each of the

23   cross-functional teams that worked on the sell-side.

24   Q     That included people with the title vice president;

25   right?
```

126

Direct examination - C. LaSala

```
 1    A     Yes.

 2    Q     Okay.  And you write in the email, the third bullet --

 3    second bullet.  Sorry.

 4    A     Yes.

 5    Q     "Reminder to always communicate with care and review go

 6    competition and go five rules"; do you see that?

 7    A     I do.

 8    Q     And that refers to Google's Communicate With Care

 9    policy; right?

10    A     I don't know.

11    Q     Did you ever use the phrase communicate with care to

12    refer to something other than Google's policy related to

13    Communicate With Care?

14    A     I don't remember writing this email, and I don't even

15    know if I authored it.  Like, I might have sent it, so I

16    don't know.

17    Q     Okay.  And you reference go five rules.  We don't need

18    to spend time on that, I understand that was admitted into

19    evidence yesterday.

20            Let's look at the very end of your email here.

21    You write:  "Also a good reminder to teams to stick to our

22    scripts"; do you see that?

23    A     Yes.

24    Q     What was the script, Mr. LaSala?

25    A     I have no recollection of this email.
```

127

Direct examination - C. LaSala

```
1   Q     No recollection of any script in response to the DOJ

2   investigation referenced in the subject line of this email?

3   A     No recollection.

4   Q     Okay.  If you could flip to PTX 1777.

5              THE COURT:  Any objection?

6              MR. ISAACSON:  I'm sorry, what number?

7              MR. TESLICKO:  1777.

8              THE WITNESS:  I can't find it.

9              MR. TESLICKO:  It might be stuck behind another

10  tab.  They're in numerical order, so 1777 might be right in

11  front of 1818.

12             MR. ISAACSON:  No objection.

13             THE COURT:  It's in.

14   (Plaintiffs' Exhibit Number 1777 admitted into evidence.)

15  BY MR. TESLICKO:

16  Q     If you could turn to the third page of that document,

17  it's got the title of the presentation.  And I'll represent

18  to you that this is a training presentation which explains

19  the wonky format.

20  A     Okay.

21  Q     You'll see that the training deck is titled "You Said

22  What Ten Things to Ensure You Are Communicating With Care."

23  A     Okay.

24  Q     You could feel free to flip through.

25             Does this look like a reproduction of the
```

128

Direct examination - C. LaSala

```
 1    Communicate With Care training you received when you were a

 2    Google employee?

 3    A    It doesn't look familiar.

 4    Q    Sorry?

 5    A    I don't remember it.

 6    Q    Does it look familiar at all?

 7    A    Not specifically, but -- I mean, I know I did these

 8    sort of online trainings, so ...

 9    Q    And you did receive Communicate With Care training at

10    some point during your time at Google; right?

11    A    I don't remember.  I assume I did.

12    Q    Okay.  You can put that document to the side,

13    Mr. LaSala.  I want to turn to how you personally

14    communicated.

15         So in the course of your work at Google, you used

16    the chat function all the time; right?

17    A    Yeah, I did, as a sort of ...

18    Q    And it would be fair to say that you used chat and

19    email interchangeably to conduct business at Google; right?

20    A    I don't know about interchangeably.  I used chat more

21    for hallway-like conversations.  Like, I used it as an

22    environment where -- an environment where we would sort of

23    exchange ideas, and, you know, shoot the, you know,

24    so-to-speak.  Even so much I remember when I first started

25    that I used to put in my chat -- I don't know if you can do
```

129

 1   it anymore -- like an intro that says in hallway.

 2   Q    Mr. LaSala, are you answering the question I asked?  I

 3   feel like you answered it a while ago.

 4   A    What was the question?

 5   Q    Let me ask a more specific question.

 6            Is it your testimony today that it would not be

 7   fair to say you used chat and email interchangeably to

 8   conduct business at Google?

 9   A    I used them quite a bit, all of them, but my degree of,

10   like -- like, the more specific I wanted to be, the more I

11   used email on the documentation.

12            THE COURT:  I'm sorry.  What was that answer?

13            THE WITNESS:  Meaning like on a continuum, chat

14   was, like, mostly quick hit sort of things.  Email was like

15   reasonably well thought out but still could be wonky,

16   sloppy.  And then documentation would be the most thoroughly

17   constructed.  That's what I was trying to communicate.

18            THE COURT:  And documentation would be a

19   standalone document?

20            THE WITNESS:  Exactly.  Like a slide deck or a

21   Word document.

22   BY MR. TESLICKO:

23   Q    Mr. LaSala, if you could pick up the deposition binder

24   behind you, Volume 1 and turn to the tab for lit depo Day 1.

25   A    Which page?

                                                              130

Direct examination - C. LaSala

```
 1   Q     Page 387 in the lit depo Day 1 tab.

 2         And just to confirm, you testified under oath when

 3   you were deposed in this matter; right?

 4   A     Yes.  What page again?

 5   Q     387, line 2 through 5.

 6   A     Okay.

 7   Q     And if you could read it to yourself as I read it.

 8   Were you asked the following question and gave the following

 9   answer:  "Is it fair to say you used chat and email

10   interchangeably to conduct business at Google?"  Answer:

11   "Yeah.  Interchangeably."

12   A     Okay.

13   Q     Is that right?

14   A     Yes, I said that.

15         THE COURT:  Yeah.  But if you read the whole

16   answer, it's not inconsistent with what he said.

17         He goes on to say:  "The more structured I thought

18   something needed to be, I would drop it into an email or

19   document.  And the more -- I don't know, chat was more like

20   quick hit type stuff, not, like, long."

21         I mean, that's not good impeachment, in my view.

22         MR. TESLICKO:  Understood, Your Honor.

23   BY MR. TESLICKO:

24   Q   Can I ask a follow-up question, which is:  Was the

25   substance of chat similar to the substance of your email
```

131

Direct examination - C. LaSala

```
 1    communications?

 2    A    Yes.

 3    Q    Okay.  Now, sometimes you used chats for topics that

 4    were too sensitive for email; right?

 5    A    I wouldn't characterize it --

 6    Q    Okay.  Let's look at another document in your exhibit

 7    binder.  So if you could pass that one up and turn to

 8    PTX 992.

 9              THE COURT:  Any objection to 992?

10              MR. ISAACSON:  No objection.

11              THE COURT:  All right.  It's in.

12       (Plaintiffs' Exhibit Number 992 admitted into evidence.)

13    BY MR. TESLICKO:

14    Q    Mr. LaSala, this is a chat record from September of

15    2020 with you and Mr. Nash Islam; do you see that?

16    A    Yes.

17    Q    Who was Mr. Islam?

18    A    He worked for me.

19    Q    He was a subordinate that reported to you?

20    A    Yes.

21    Q    Okay.  In this chat you're discussing IDFA consent

22    issues; do you see that at the very top?

23    A    Yes.

24    Q    Those relate to the targeting events?

25    A    Yes.
```

Direct examination - C. LaSala

```
 1    Q    Okay.  And in the chat, Mr. Islam wrote at the bottom

 2    of the first page:  "Should I send an email to Duke and

 3    Naomi right now on this?"; do you see that?

 4    A    Yes.

 5    Q    And Mr. Islam goes on to write a few lines down:  "Or

 6    too sensitive for email so keep on ping"; do you see that?

 7    A    Yes.

 8    Q    And ping is a term used within Google to refer to chat;

 9    right?

10    A    Yes.

11    Q    Okay.  And you respond:  "Start a ping with history

12    turned off"; do you see that?

13    A    Yes, I do.

14    Q    That means start a new chat with the history setting

15    off; correct?

16    A    Yes.

17    Q    And this was nearly a year after you received a

18    litigation hold in this matter; correct?

19    A    Yes.

20    Q    Okay.  If you could turn to another chat, which is

21    PTX 1818.

22    A    Yes.

23    Q    This is another chat with Mr. Islam from August 2020

24    this time.

25    A    Yep.
```

<div align="right">133</div>

```
 1                THE COURT:  All right.  Wait.  Is there any

 2   objection to 1818?

 3                MR. ISAACSON:  No objection.

 4                THE COURT:  All right.  It's in.

 5     (Plaintiffs' Exhibit Number 1818 admitted into evidence.)

 6   BY MR. TESLICKO:

 7   Q    This is, again, taking place almost a year after you

 8   received a litigation hold in this matter; right?

 9   A    Yes.

10   Q    And in this chat on the first page at 11:53:16,

11   Mr. Islam raises what he calls burning issues with a

12   multi-call launch; do you see that?

13   A    Yes.

14   Q    Multi-call refers to an ad tech product being called

15   multiple times for a single impression; right?

16   A    Yes.

17   Q    He goes on to write at 11:53:39 that there will "likely

18   be VP escalations on the issue"; right?

19   A    Yes.

20   Q    Only significant issues within the ad tech business got

21   raised to the VP level; right?

22   A    We didn't waste their time.

23   Q    And at 11:54:27, he explains the multi-call launch

24   could have "major negative impact to a number of off

25   platform pubs."
```

                                                               134

Direct examination - C. LaSala

```
 1               Did I read that right?
 2    A     Yes.
 3    Q     And then turning to page 3 at 13:03:18.
 4    A     Yes.
 5    Q     You write:  "Also maybe start an off-the-record ping
 6    with Duke, you, me, about this."
 7    A     Yes.
 8    Q     An off-the-record ping thread is an off-the-record
 9    chat; right?
10    A     Yes.
11    Q     And Duke -- I'm sorry, I got ahead of myself.
12               Duke -- who does Duke refer to?
13    A     He was a product manager.
14    Q     Sorry?
15    A     He was a product manager in the business.
16    Q     He was a director of product management, in fact?
17    A     Yeah.
18    Q     He was heavily involved in Google's ad tech business;
19    right?
20    A     Yes.
21    Q     At the time, was he also involved in working on
22    responses to the U.S. antitrust investigation of Google?
23    A     I don't know who received that letter.
24               (Reporter interrupted for clarification.)
25               THE WITNESS:  I don't know who received litigation
```

135

Direct examination - C. LaSala

```
 1   holds.
 2   BY MR. TESLICKO:
 3   Q    At this time, Mr. Dukellis was responsible for the
 4   sell-side aspects of display, video and app advertising;
 5   right?
 6   A    Yes.
 7   Q    And at 13:03:57, so going back to the document,
 8   Mr. Islam responds to your suggestion:  "K.  Kicking off
 9   now"; do you see that?
10   A    Yes.
11   Q    Fair to say that Mr. Islam knew what you meant by an
12   off-the-record ping; right?
13   A    Yes.
14   Q    Did he get that understanding from you as his
15   supervisor?
16   A    It was just how we spoke.  I don't know what you mean.
17   Everyone used the phrase off-the-record ping.
18   Q    Did you ask other people to take chats off the record,
19   Mr. LaSala?
20   A    I mean, not that I recall.
21   Q    Could you have?
22   A    It would be unusual.  My MO was mostly off the record.
23   So old -- you know, old tricks die hard.  So that's how I --
24   that's how I was sort of used to working to get on the same
25   page.
```

136

Direct examination - C. LaSala

```
 1    Q    I want to understand better why you asked to take this
 2    particular chat off the record.
 3              You knew based on the litigation hold that we just
 4    reviewed that the government was investigating Google's ad
 5    tech business; right?
 6    A    I did.
 7    Q    And you knew, based on your training at Google, that
 8    documents related to the ad tech business likely would be
 9    turned over to the government at some point; right?
10    A    I did.
11    Q    And that was covered in Communicate With Care training,
12    for example?
13    A    It was covered in the training.
14    Q    And so you asked to go off the record here in a way
15    that ensured whatever was said in that subsequent
16    off-the-record chat would never be produced to the
17    government; right?
18    A    No.
19    Q    Let me unpack that a little, Mr. LaSala.
20              You understood that off-the-record chats were not
21    preserved as of the time of this chat in August of 2020;
22    right?
23    A    Yes.
24    Q    And so if the document is not preserved, it can't be
25    produced to the government; right?
```

137

Direct examination - C. LaSala

```
 1   A    Yes.

 2   Q    Okay.  Now, we've reviewed two chats right now because

 3   a portion of those chats was preserved on the record.

 4        Do you recall ever toggling history on after you

 5   received the litigation hold in October of 2019?

 6   A    I don't really recall.  I do have one recollection of

 7   where, right after we got the training, one of my colleagues

 8   texted me, pinged me, it was history off, but I didn't

 9   initiate it.  It had substance, so then I went and turned

10   history on, but it wasn't clear to me that, like, if I turn

11   history on if it retroactively gets everything.  And then I

12   put it into an email because I thought -- I was trying to

13   figure out how to do this.

14        So I -- broadly speaking, I tried to follow the

15   terms of the litigation hold and do things in a way that

16   were different than how I had done them for a decade.  And

17   obviously, like, I made a mistake, but it wasn't

18   intentional.

19   Q    And I want to make sure I understand what you just

20   said.

21        Your understanding, at the time at least, was that

22   if someone sent you a chat with history off by default, even

23   if you turned history on, it wouldn't save the prior chats;

24   right?

25   A    I didn't know.
```

138

Direct examination - C. LaSala

```
 1   Q    But your belief was it wouldn't save them, that's why
 2   you send yourself a copy of the chat you're recalling;
 3   right?
 4   A    In that case, yeah.
 5   Q    Okay.  Do you have any sense of how many other chats
 6   related to the ad tech business were destroyed because you
 7   didn't switch them to history on after receiving the
 8   litigation hold in October of 2019?
 9   A    No.
10   Q    More than 50?
11   A    No.  I have no -- I don't even -- we documented -- I
12   think it's proved by all of this -- every decision that we
13   made.  The lead-up debating to the decision, the actual
14   decision, the implementation plan with the decision.
15           The one thing I do know is that we were really
16   good at documenting and debating, and to the extent I made a
17   mistake a couple times, it was not intentional.  It was not
18   to hide anything.  It was to -- everything was written down
19   everywhere.
20   Q    I want to understand that a little better.
21           We've looked at two chats where you asked to go
22   off the record after October of 2019.
23           Sitting here today, do you have any estimate of
24   the number of other chats related to the ad tech business
25   that were off the record after 2019?
```

139

Cross-examination - C. LaSala

```
 1   A    No.  No.

 2   Q    You have no idea if it could be more than 200, say?

 3   A    No.  I tried my hardest.  That would be unusual.  I

 4   tried my hardest not to.

 5           MR. TESLICKO:  Okay.  With that, Your Honor, we

 6   pass the witness.

 7           THE COURT:  All right.  Will you be using the

 8   depositions at all in cross-examination?

 9           MR. ISAACSON:  No.

10           THE COURT:  All right.

11                         CROSS-EXAMINATION

12   BY MR. ISAACSON:

13   Q    Mr. LaSala, I'm Bill Isaacson, an attorney for Google.

14           Let's introduce yourself a little bit more.  Where

15   do you work currently?

16   A    Currently?

17   Q    Yeah.

18   A    Columbia Business School.

19   Q    And what are you doing at Columbia?

20   A    Teaching product management.

21   Q    Okay.  And what are -- what curriculum are you teaching

22   there?

23   A    It's around building software products.  Product

24   management.  Software products.

25   Q    And you've been at Columbia how long?
```

140

Cross-examination - C. LaSala

```
 1   A     Two and a half years.

 2   Q     Is this the first time you've been a teacher?

 3   A     Excuse me?

 4   Q     Is this your first time as a teacher?

 5   A     No.  No.

 6   Q     Okay.  What else have you done?

 7   A     I was an adjunct professor at Duke's Business School

 8   before that.

 9   Q     Okay.  And what course -- did you teach courses at

10   Google?  Oh, I'm sorry.  You taught at Duke while you were

11   at Google?

12   A     While I was working at Google.

13   Q     Okay.  What did you teach at Duke?

14   A     Digital platforms.

15   Q     Okay.  And the -- when you left Google, did you enter

16   into any type of severance or other agreement with Google?

17   A     No.

18   Q     Are you limited in any way by any agreement with

19   Google?

20   A     No.

21   Q     And what's your educational background?

22   A     I have an undergraduate degree in accounting and a

23   graduate -- an MBA.

24   Q     Where did you get the -- your degrees from?

25   A     Boston College undergrad, and Duke MBA.
```

141

Cross-examination - C. LaSala

```
 1   Q     Okay.  All right.  And do you have experience or

 2   training in computer programming or engineering?

 3   A     No.

 4   Q     All right.  You mentioned the sell-side and the

 5   buy-side.  I think you described your work on the sell-side,

 6   and then you express more limitations about the buy-side.

 7           Would you explain to the Court what was your

 8   involvement, if any, on the buy-side?

 9   A     Well, I worked on a team that had buy-side, similar

10   roles that I had but for the buy-side.  So I talked to them

11   and knew them.  But they ran their business with their

12   product managers, and we ran our business with our product

13   managers.

14   Q     Okay.  And then with your -- in your role at sell-side,

15   what Google products were you focused on?

16   A     AdX and DFP, AdSense and AdMob.

17   Q     Okay.  And were you involved in the ultimate

18   decision-making for new product features or launches?

19   A     No.  I provided input into the process, but I wasn't a

20   decision-maker.

21   Q     Who were the ultimate decision-makers on the strategy

22   decisions?

23   A     Product and engineering.

24   Q     And was your team -- were you or your team responsible

25   for deciding how products would be priced?
```

142

Cross-examination - C. LaSala

```
 1   A     No.  We had input into the process to share opinions.
 2   Q     Okay.  And who were the ultimate decision-makers on
 3   Google's product pricing?
 4   A     The product team.
 5   Q     All right.  Let me first talk to you about some of the
 6   documents that my colleague from the plaintiff showed you.
 7   And I shouldn't put that there.  That's unwise.  And I'm
 8   going to try and do these.
 9            So I'll be talking to you about documents that are
10   in the binder that you were given by plaintiffs.
11            MR. ISAACSON:  And we need to have the other
12   binder ready to hand up after that.
13   BY MR. ISAACSON:
14   Q     If you could look at PTX 114.
15   A     Yes.
16            MR. ISAACSON:  In order to make this more
17   efficient, I'm not going to necessarily do this logically
18   into subject matter, but I'm just going to go through these
19   in numerical order so it's easy to find.
20            THE COURT:  Just do it.  Just do it.
21   BY MR. ISAACSON:
22   Q   So 114, that was an email that was back in 2012, and it
23   was talking about -- you were read language about locking in
24   impressions.
25            What is the product that's being discussed here?
```

143

Cross-examination - C. LaSala

```
 1  A     It looks like DFP.

 2  Q     And what -- and then there's a reference in the subject

 3  matter to what?

 4  A     I'm sorry.  Where should I be looking?

 5  Q     The subject matter of the email.

 6  A     Oh.  AdX mobile standalone.

 7  Q     Right.  So what is AdX mobile?

 8  A     I'm guessing it's AdX serving into a mobile

 9  environment.  Mobile 2012.  Mobile environment.  Yeah.

10  Mobile app environment.

11  Q     Right.  So the discussion here is talking about

12  impressions with relationship to AdX mobile; is that right?

13  A     Yes.

14  Q     All right.  If you turn to PTX 238.  And this was an

15  email chain.  And if you turn to 610 at the bottom.

16  A     Yes.

17  Q     All right.  You were read an email from someone named

18  Michelle Dauwalter --

19  A     Yes.

20  Q     -- about whether -- about being committed to

21  competition.  That's followed in this discussion by an email

22  from Martin Blais.  Do you know if I'm saying his name

23  right?

24  A     I don't know him, so ...

25  Q     Okay.  And in this discussion on the next page, he
```

144

Cross-examination - C. LaSala

1  writes:  "We, Google" -- this is the first full paragraph.

2  "We, Google, have a substantial proportion of that traffic,

3  and competition constantly strives to take that away from us

4  by providing ways to install mechanisms upstream from ours.

5  It used to be TYM.  This time around it's header bidding.

6  Whatever.  We turn around and try to provide competing

7  mechanisms, and this dance goes on."

8           Do you remember what TYM is?

9  A    Total yield management.

10          (Reporter interrupted for clarification.)

11          THE WITNESS:  I'm sorry.  I'm losing my voice.

12  Total yield management.

13  BY MR. ISAACSON:

14  Q    All right.  PTX 254.  On page 238, you were read

15  language from Lisa Lehman --

16  A    Yes.

17  Q    -- and about being the de facto preferred ad server

18  choice.  And all of that is predicated in bold on the fact

19  that publishers need an answer.  At the end of that

20  paragraph that says all that is predicated on the fact that

21  publishers needs an ad server, it says:  "That is all

22  changing."

23          Now, the date of this -- this discussion is in

24  2015.  It says Google -- goes on to say:  "Google's products

25  and approach in public statements, Neal Mohan has said that

145

Cross-examination - C. LaSala

 1    everything will be bidded!  Are slowly but surely eroding

 2    the need for DFP, as the publisher ad serving and

 3    decisioning engine.  I'm not thinking next year, but in

 4    three to five years.  In a world where nearly everything

 5    that currently happens in DFP today can be executed via

 6    real-time bidding pipes, ad exchange, SSPs really truly can

 7    replace the ad server."

 8              Regardless of how things turned out, were there

 9    discussions in 2015 that the ad server was at risk of being

10    replaced?

11    A    No, not that I remember.

12    Q    Okay.  Ms. Lehman then goes on to say on the next page,

13    Point 2:  "We need to preserve the importance of the ad

14    server."  At the end of paragraph 3 says:  "The modern

15    publisher ad server needs to allow as many demand sources as

16    the publisher wants to compete in real time for a given

17    impression while following whatever rules and contractual

18    agreements between buyer and sellers have been established."

19              Did DFP allow for the use of header bidding?

20    A    Oh, yes.  In fact, we went out of our way to make it

21    work.  Like, we had to do extra things with DFP using the

22    product as it wasn't intended to support a publisher's use

23    of header bidding.  Specifically, increasing the number of

24    line items, which is kind of getting into the weeds a little

25    bit, but the number of line items from like thousands to

                                                            146

Cross-examination - C. LaSala

```
 1   tens and in some cases, hundreds of thousands.
 2   Q    And if you look at the first page of the email, you
 3   were shown the language about in your response to
 4   Ms. Lehman, great write-up.  The other thing you said,
 5   beginning in the third paragraph:  "Your point about
 6   modernizing the ad server is dead-on."
 7           Now, I realize this is almost ten years ago, but
 8   you would agree with that in the context of this, that you
 9   were not only saying to Ms. Lehman great write-up, including
10   her language about in three to five years we may be in a
11   world where nearly everything that currently happens in DFP
12   today can be executed via RT pipes and ad exchanges, SSPs
13   really can replace the ad server, you were saying that that
14   is a great write-up, and the point about modernizing the ad
15   server to respond to that is dead-on.
16   A    Yeah.  To be -- I don't remember this exchange, so I
17   can't recall exactly what I meant by great write-up or
18   dead-on or ...
19   Q    All right.  Can you turn to PTX 433.
20           And so you were read the language here about need
21   to fight off the existential threat posed by header bidding
22   and FAN.
23           This is December 2016.  You were asked if FAN got
24   out of the business of open-web display.  FAN continued with
25   respect to apps and mobile; right?
```

147

```
1   A     Yes.

2   Q     And when did it shift to the business of apps and

3   mobile?

4   A     When did FAN?  I don't remember the date.

5   Q     It was a number of years after this; right?

6   A     It sounds reasonable.

7   Q     Okay.  So during this period of time and through the

8   period until FAN shifted to -- well, is there some point

9   where you thought while you were at Google that FAN was no

10  longer an existential threat?

11  A     No.

12  Q     All right.  And at risk of having -- being at risk of

13  being accused of misleading you, I want to look at one

14  document in the black binder now.

15  A     Okay.

16  Q     And I will come back to the white binder.

17  A     Okay.

18  Q     Is DTX -- do you have a DTX 590 in your binder?

19  A     Yes.

20  Q     All right.  And you've told the Court about header

21  bidding being an existential threat to all of Google's ad

22  tech.  I think that's what you said?

23  A     I did.

24  Q     All right.  And if it assists you -- first of all,

25  PTX 590 is an email that you wrote on March 23rd, 2018;
```

148

Cross-examination - C. LaSala

```
 1   correct?

 2           THE COURT:  Hold on.  Is there an objection to

 3   590.

 4           MR. TESLICKO:  No objection, Your Honor.

 5           THE COURT:  All right.  It's in evidence.

 6   BY MR. ISAACSON:

 7   Q    All right --

 8           MR. TESLICKO:  Sorry, Your Honor.  I heard --

 9   PTX 590?  PTX or DTX.

10           THE COURT:  I'm sorry, a plaintiff or defense

11   exhibit?  Which is it?

12           MR. ISAACSON:  This is PTX 590.  I'm seeking to

13   admit one of their own exhibits.

14           MR. TESLICKO:  Understood, Your Honor, DTX was on

15   the screen.

16           THE COURT:  Well, I thought it was plaintiff.  It

17   says PTX.  All right.  Plaintiffs' Exhibit 590 is in.

18      (Plaintiffs' Exhibit Number 590 admitted into evidence.)

19   BY MR. TESLICKO:

20   Q    There's a section called price, and it says:  "We went

21   out at 5 percent with EB."  That's Exchange Bidding or Open

22   Bidding; right?

23   A    Yes.

24   Q    "Because we -- our goal was to combat the threat of

25   header bidding and free header bidding wrapper solutions.
```

149

Cross-examination - C. LaSala

 1    There was an existential threat to demand leaving the ad

 2    server, and our pricing reflected that market reality."

 3           So the ad server is the publisher ad server DFP;

 4    correct?

 5    A    Yes.

 6    Q    Okay.  And this is talking about the pricing of

 7    Exchange Bidding was set taking into account what you were

 8    saying was this existential threat?

 9    A    Yes.

10    Q    Now, returning to the white binder, PTX 612, if you

11    could.  All right.  And this was a document where you were

12    read language that you didn't think there was 20 percent of

13    value in comparing two bids.  Right.

14           Now, is AdX doing more than comparing two bids?

15    A    Yes.

16    Q    Would you explain what AdX is doing more than comparing

17    two bids?

18    A    So AdX is a demand aggregator, so Google demand and DV3

19    and then other third-party demand.  AdX then runs sort of a

20    fair, clean auction against all of those demand sources.

21    AdX does sorting and analytics for our customers, and it

22    does so in an environment where it makes sure you can trust

23    the integrity of the auction.  We covered some of this

24    earlier, but it provides protections around fraud, around

25    malware, around brand protections.

                                                              150

Cross-examination - C. LaSala

```
 1              So, you know, a lot of what I was -- as we were
 2    moving into the pricing conversations, at some point -- I'm
 3    forgetting the details when -- one of the things I was
 4    trying to do was to really figure out, like, how you would
 5    parse -- how each one of those things I said equates to some
 6    sort of value.  So, like, how much does aggregating
 7    third-party demand bring in value, you know, what
 8    percentage.  How much running the auction, you know.  I
 9    included in some of these things that it was, like, not 20.
10    Definitely just running an auction is not worth 20.  But how
11    much is it worth?  And how much is the aggregating demand?
12    How much is the protections?  We never got there, but that
13    was sort of the direction I was headed.
14    Q    All right.  And in the next -- there's a paragraph that
15    has a dash in front of it, and you were read the language at
16    the end about extracting irrationally high rent from the
17    AdX.
18              The whole paragraph reads:  "This would also put
19    appropriate pressure on Google to compete on targeting where
20    it is reasonable to assume that Amazon and Facebook actually
21    have better data, so we need to up our game and focus on
22    winning the game."  And then it has the language that was
23    read.
24              Now, what does targeting refer to here?
25    A    Targeting the advertiser spend to a position on a
```

```
 1   content on the web or an app or whatever.

 2   Q    And what concerns did you have about Amazon and

 3   Facebook having better data than Google for that?

 4   A    So I alluded to this earlier, but my feel was that the

 5   companies with the best data and the companies with the best

 6   technology would be the companies that would sort of prevail

 7   in this long-term game.  And Facebook knows what you're

 8   doing and has really good audience data.  And, Amazon,

 9   frankly when they started to get into this business scared

10   me even more than Facebook because they have such great

11   commercial intent data, people shopping on them.  So my real

12   paranoia kicked up actually years later when Amazon created

13   their ad network and their DSP using their own data.

14   Q    All right.  Now, in the next paragraph, you say:  "One

15   might ask why the market continues to bear 20 percent.  It

16   may be because of AdWords bringing liquidity from a long

17   tail."

18             AdWords is Google Ads; right?

19   A    Yes.

20   Q    And the long tail, is that the demand from -- the

21   Google demand that you were talking about?

22   A    That's all the advertisers that buy on Google.

23   Q    Right.

24             And just to be clear, when we're talking about

25   demand from Google, you're talking about the customers at
```

```
 1  Google?
 2  A    Yes.
 3  Q    All right.
 4          And then it says:  "With respect to that demand,
 5  that long tail, even that position is under attack, as
 6  Facebook and Amazon prove they can also fill at high rates."
 7          What does "fill at high rates mean"?
 8  A    It means they could take the advertiser's dollar, spend
 9  it really efficiently on a publisher content provider's
10  website.
11  Q    If you turn to PTX 613.
12  A    So fill the ad slot.  So -- I have to retrain my
13  memory.  So the publishers provided their inventory
14  available to buyers and networks, and then when it was --
15  like it was filled.  So not 100 percent was always filled.
16  But I guess what I'm remembering -- suggesting here is
17  Facebook and Amazon actually did a really good job of
18  winning auctions so that they filled the ad impression.
19  Q    Okay.  If we could turn to PTX 613.
20          All right.  And you were read from Item 2 on the
21  first page about where it says "with my Google hat on."
22          "The right answer is not do something different
23  with Exchange Bidding and ask our sales team to jump through
24  hoops, but rather suggest that DBM" -- that's DV360 -- "stop
25  buying on third-party exchanges when they know they can see
```

153

Cross-examination - C. LaSala

1    the impression in AdX."

2              Was a suggestion that DV360 stop buying on

3    third-party exchanges accepted?

4    A    No.

5    Q    You referred -- when you talked about this suggestion,

6    you refer to header bidding and technology being subpar

7    technically.

8              What did you mean by that?

9    A    I think I covered some of this.  But the ad tech

10   ecosystem that we're talking about, there's a lot of

11   investment in making sure these auctions and ad servers run

12   really clear and there's access to the signals that you have

13   to do all this.

14             When -- and, again, I'm not like a technical

15   expert, but my understanding was, once it went to -- it went

16   to the headering, we lost signal quality.  The way it was

17   implemented, it just took a lot longer for the signals to go

18   back and forth between the header and all of the exchanges,

19   and it created latency on the page.

20             So, I mean, it was sort of both things in that

21   case.

22   Q    Okay.  If you could turn to PTX -- sorry -- 719.  And

23   turn to the second-to-last page, 002 at the bottom.  Oh,

24   wait.  No.  002 at the bottom.

25   A    All right.

                                                           154

Cross-examination - C. LaSala

1   Q    And there was an email from Jonathan Bellack that was

2   read to you in part.  And in the middle of that paragraph it

3   also says:  "Something similar happened."  And this is a

4   discussion in 2018.  "Something similar happened back in the

5   DoubleClick days with DFP.  Falk made in-roads in the market

6   with prices.  One-third of DFPs, and then we lowered DFP

7   prices to a fair market value.  Still 25 to 50 percent

8   higher than Falk.  Falk and the other ad servers out there

9   kept lowering prices in an effort to win business.  They

10  kept lowering even to the point where some of their deals

11  were losing money because their alternative was to have no

12  revenue and go out of business.  We did well because we

13  delivered really solid value for the prices we charged, but,

14  more importantly, we did not let our prices get out of whack

15  with the market."

16           Do you remember who Falk was?

17  A    I don't.

18  Q    If we could go to PTX 864.  All right.  First of all on

19  the first page, I think you said this, but I want to give

20  you the opportunity to make sure we have this clear.

21           At the end of the first bullet it says:  "The

22  middle does take an outside share, and we are only part of

23  the middle.  Yet, one could argue that we are the middle for

24  the both buy and sell-sides, we are taking an outsized

25  share."  And you discussed whether the first part of that

                                                      155

Cross-examination - C. LaSala

```
 1    should have had a "not" in it.
 2              Would you explain your answer?
 3    A    Well, Prabhakar referenced them -- what did he say.  He
 4    referenced -- what he said was:  "Until we find a better way
 5    to articulate to the world that we're not hanging onto an
 6    outside" --
 7              (Reporter interrupted for clarification.)
 8              THE WITNESS:  "An outside chunk of money" -- so
 9    "until we find a better way to articulate to the world that
10    we're not hanging onto an outsized chunk of money, there
11    will continue to be this noise from publishers."
12              And then I say I half agree with Prabhakar, and
13    then I don't state what he said.
14    BY MR. ISAACSON:
15    Q    All right.
16    A    He would have said not.
17    Q    All right.  And then there was discussion -- you were
18    read language about transparency.  And moving down to, on
19    that first page below Ad Manager's SSP.  It talks about your
20    rate card.
21              And this would be your rate card for publishers?
22    A    Yes.
23    Q    And it says:  "These are transparent to publishers, so
24    I'm not sure what their beef is.  I think buyers want to
25    know how much we're taking from the pub."  All right.
```

156

Cross-examination - C. LaSala

```
 1              The people -- your rate cards for publishers were
 2   transparent to the publishers; correct?
 3   A     Yes.
 4   Q     Okay.  And then you were shown language on the next
 5   page.  The second bullet:  "It's questionable that
 6   20 percent for OA is reasonable long-term.  Pubs accept it
 7   because it brings demand Google Ads.  If Google Ads bought
 8   everywhere else, I think we would see pubs move to other
 9   SSPs for OA, and we would lose the 20 percent."
10              I think you talked about, like, that was something
11   you were advocated within Google.  Would you explain that?
12   A     What was I advocating?
13   Q     You were talking about the positions you were taking
14   about whether there should be integrations with other
15   exchanges, for example.
16   A     With our buy-side?
17   Q     Let me move on.  I'll just go on to -- it goes on to
18   say:  "Amazon will put the biggest pressure on us over time.
19   If they care to continue to invest here, they have the
20   resources to be a fully functioning SSP via TAM and could
21   suck out all third-party demand from our auction over time.
22   This has not yet happened, but is a risk to watch."
23              All right.  Would you explain what your perception
24   was of Amazon as a competitor at this date, which is
25   October 2019?
```

157

1    A    So Amazon was a buyer, so, like, a DSP in network, and

2    they were buying inventory, competing with all other buyers,

3    including Google.  But they were also starting to invest in,

4    like, exchange functionality.  And just given that -- how

5    good they were as a buyer -- and they were just getting

6    started and they were good.  I can't even imagine how good

7    they are now with all the investment they've had in it.  I

8    thought, well, they're definitely a competitor for our

9    network products.

10          But then I thought, they also could easily be a

11   competitor for our SSP products -- could be a competitor for

12   our SSP products, as well as our ad serving products,

13   insofar as they had lots of resources.  And, in my opinion,

14   they really didn't have any skin in the game in the -- in

15   how the Internet functioned.  Meaning, Google's business

16   model was, hey, let's make sure there's a robust content

17   creation ecosystem that evolves over time across all web

18   app, connected TV, video, whatever, and let's make sure that

19   our tools continue to do that.  And then we have advertising

20   tools that we could use to support that content creation,

21   everything we've sort of talked about.

22          Amazon was looking for an incremental revenue

23   stream.  It didn't have skin in the game in a -- in my

24   opinion in like a functioning content creation ecosystem.

25   They had skin in the game in, like, e-commerce, which

                                                              158

Cross-examination - C. LaSala

```
 1    they're really good at.

 2             So it was feasible to think that, because they

 3    were doing it, they created this SSP called TAM and another

 4    one called UAM.  And then I was worried that they would

 5    essentially give it away.  And if they gave it away,

 6    practically speaking, demand would flow through there.  Not

 7    all of it, some of it, but this was the risk.  And in which

 8    case if demand stopped flowing through our SSP and, frankly,

 9    other SSPs, you lose the funding mechanism to actually

10    invest in what makes the exchange safe and a fair auction.

11             So I was really skeptical.  I didn't trust them.

12    Q    All right.  And right below that there's a description

13    of your fraud protections.  "I think the market does

14    appreciate what our platforms buy and sell do to protect the

15    integrity of the auction, protect advertisers, protect

16    pubs" -- that is publishers -- "protect users, even if they

17    are vocally hard on us when bad things slip through.  I'm

18    not sure we are selling this to the market strongly enough

19    so that we can better equate value with price."

20             What was your view on the value of these

21    protections that you thought should be communicated?

22    A    This is exactly the point I was trying to make earlier

23    where all of these things -- so integrity of the auction,

24    protect advertisers, protect pubs, protect users.  The

25    platform did -- as well as aggregate demand, our demand and
```

159

Cross-examination - C. LaSala

```
 1   other demand.  So the narrative in the market that I, you
 2   know, shared in these documents, too, is that, oh, it's
 3   just, you know, 20 percent, it's the auction rate, but it's
 4   really all of -- I mean, comparing -- for comparing two
 5   bids, but it's really all of these things.
 6   Q    All right.  If you could look at PTX 927.  There's an
 7   email on the first page, and you were read the paragraph at
 8   the bottom.  "It's also worth noting" -- well, you were read
 9   part of this.  "It is also worth noting that we seem to have
10   some leaks about how we are approaching this work.  As in
11   some of the content in articles, tweets, et cetera sound a
12   bit too familiar, so also a good reminder to teams to stick
13   to our scripts."
14          It was suggested to you that you had a script for
15   investigations as opposed to communicate -- public
16   communications --
17          MR. TESLICKO:  Objection, Your Honor.  Misstates
18   the question and the answer from the prior testimony.
19          THE COURT:  No.  I'm going to overrule the
20   objection.
21   BY MR. ISAACSON:
22   Q    Would you clarify, in this last paragraph, are you
23   talking about what I would call --
24          THE COURT:  What are you talking about?
25   BY MR. ISAACSON:
```

                                                              160

Cross-examination - C. LaSala

```
 1   Q    Yeah.  What are you talking about here?

 2   A    Sorry.  I don't remember writing the email.  I honestly

 3   don't remember this.

 4   Q    The -- now if we can go to our little black binder.

 5   All right.  If you could look at DTX 463 in that binder.

 6              THE COURT:  Any objection to 463?

 7              MR. TESLICKO:  Your Honor, this appears to be

 8   hearsay.

 9              MR. ISAACSON:  I'm happy to --

10              MR. TESLICKO:  And no connection to Mr. LaSala, as

11   far as I can tell.

12              THE COURT:  All right.  Lay a foundation.

13   BY MR. ISAACSON:

14   Q    I'm showing you what's been marked DTX 463, it's titled

15   "Sell-Side Competitive Review, Facebook and Amazon" dated

16   August 7th, 2017.

17              Have you seen this document before?

18   A    Yes.

19   Q    What was your role in this document?

20   A    I reviewed it.  It was presented to me.

21              THE COURT:  I'm sorry?

22              THE WITNESS:  Excuse me, Your Honor.

23              It was presented to me.  I was a reviewer.

24              THE COURT:  During that time period for your

25   litigation purposes?
```

161

Cross-examination - C. LaSala

```
 1                    THE WITNESS:  Oh, during the time period.

 2                    THE COURT:  I'm sorry?

 3                    THE WITNESS:  During the time period.

 4                    THE COURT:  All right.

 5    BY MR. ISAACSON:

 6    Q    It's titled "Sell-Side Competitive Review."

 7                    What is a sell-side competitive review?

 8    A    Well, we would sort of periodically annually ask our

 9    go-to-market teams and GBL teams to kind of update the

10    nature of the market.

11                    MR. ISAACSON:  I move to admit DTX 463.

12                    MR. TESLICKO:  Your Honor, I don't believe there's

13    a foundation yet that's been laid to admit this as an

14    exception to the hearsay rule.

15                    THE COURT:  Well, it's a document -- is this a

16    regularly produced type of document from your experience at

17    Google?

18                    THE WITNESS:  Yes.  They would look different,

19    like they weren't always the same format.  But we talked

20    about competition all the time.

21                    THE COURT:  I'm permitting it.  It's overruled.

22       (Defense Exhibit Number 463 admitted into evidence.)

23                    THE COURT:  Just so we're clear, though, I see

24    some blue sheets in here.  Are we getting two versions of

25    this?
```

162

Cross-examination - C. LaSala

1              MR. ISAACSON:  Is this one of the ones with the

2    natives?  No.  Oh.  Some of these have charts -- exhibits

3    have charts in it that are very hard to read, and so just

4    for the ease of readability, we've put the native versions

5    on the back, which are bigger in case we need to look at

6    them.  We're not seeking to move the natives or anything,

7    it's just a visual aid.

8              THE COURT:  All right.  We're not talking

9    redaction issues?

10             MR. ISAACSON:  No.  There's no redaction issues.

11   This is --

12             THE COURT:  All right.  That's fine.

13             And, you know what, it's just about 1:00, and

14   since we're starting a new topic, why don't we take the

15   lunch break now.  We'll start up again at 2:00.  All right.

16             (Court recessed for lunch at 12:59 p.m.)

17             ----------------------------------

18   I certify that the foregoing is a true and accurate

19   transcription of my stenographic notes.

20

21   _____

22              Stephanie M. Austin, RPR, CRR

23

24

25
                                                              163

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894