```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION


 3     -------------------------x
       UNITED STATES, et al.,     :    Civil Action No.:
 4                                :    1:23-cv-108
                  Plaintiffs,     :
 5         versus                 :    Monday, September 16, 2024
                                  :    Alexandria, Virginia
 6     GOOGLE LLC,                :    Day 6 a.m.
                                  :    Pages 1-136
 7                  Defendant.    :
       -------------------------x
 8

 9          The above-entitled bench trial was heard before the
       Honorable Leonie M. Brinkema, United States District Judge.
10     This proceeding commenced at 8:59 a.m.

11                    A P P E A R A N C E S:

12     FOR THE PLAINTIFFS:   GERARD MENE, ESQUIRE
                             OFFICE OF THE UNITED STATES ATTORNEY
13                           2100 Jamieson Avenue
                             Alexandria, Virginia  22314
14                           (703) 299-3700

15                           JULIA TARVER WOOD, ESQUIRE
                             AARON TEITELBAUM, ESQUIRE
16                           TIMOTHY LONGMAN, ESQUIRE
                             DAVID TESLICKO, ESQUIRE
17                           MICHAEL WOLIN, ESQUIRE
                             UNITED STATES DEPARTMENT OF JUSTICE
18                           ANTITRUST DIVISION
                             450 Fifth Street, NW
19                           Washington, D.C.  20530
                             (202) 894-4266

20     (State of VA)         JONATHAN HARRISON, ESQUIRE
                             OFFICE OF THE ATTORNEY GENERAL
21                           OFFICE OF THE SOLICITOR GENERAL
                             202 North Ninth Street
22                           Richmond, Virginia  23219
                             (804) 786-7704
23

24

25
                                                              1
```

```
1                    P R O C E E D I N G S

2    FOR THE DEFENDANT:    CRAIG REILLY, ESQUIRE
                           LAW OFFICE OF CRAIG C. REILLY
3                          209 Madison Street
                           Suite 501
4                          Alexandria, Virginia  22314
                           (703) 549-5354
5
                           KAREN DUNN, ESQUIRE
6                          JEANNIE RHEE, ESQUIRE
                           ERICA SPEVACK, ESQUIRE
7                          WILLIAM ISAACSON, ESQUIRE
                           PAUL, WEISS, RIFKIND,
8                          WHARTON & GARRISON LLP
                           2001 K Street, NW
9                          Washington, D.C.  20006
                           (202) 223-7300
10
                           JUSTINA SESSIONS, ESQUIRE
11                         FRESHFIELDS BRUCKHAUS DERINGER, LLP
                           855 Main Street
12                         Redwood City, California  94063
                           (212) 277-4000
13
     COURT REPORTER:       STEPHANIE M. AUSTIN, RPR, CRR
14                         Official Court Reporter
                           United States District Court
15                         401 Courthouse Square
                           Alexandria, Virginia  22314
16                         (607) 743-1894
                           S.AustinReporting@gmail.com
17
              COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
18
19
20
21
22
23
24
25
```

```
 1                        TABLE OF CONTENTS

 2                            WITNESSES

 3   On behalf of the Plaintiffs:

 4   NEAL MOHAN

 5   Direct examination by Mr. Teitelbaum ......5
     Cross-examination by Ms. Rhee ............54
 6   Redirect examination by Mr. Teitelbaum ....121

 7                            EXHIBITS

 8   On behalf of the Plaintiff:
     Admitted
 9
     Number 0014, page 242 ....................12
10   Number 51 ...............................18
     Number 32 ...............................20
11   Number 41 ...............................23
     Number 59 ...............................30
12   Number 46 ...............................33
     Number 44 ...............................35
13   Number 60 ...............................36
     Number 85 ...............................38
14   Number 88 ...............................43
     Number 58 ...............................45
15   Number 112 ..............................48
     Number litigation deposition, Page 101, ...53
16   line 9, to page 103, line 7 only (sealed
     exhibit)
17
     On behalf of the Defendant:
18   Admitted

19   Number 37 ...............................61
     Numbers 59, 76, 101, 18 ..................62
20   Number 47 ...............................74
     Number 80 ...............................79
21   Number 184 ..............................88
     Number 45 ...............................95
22   Number 126 .............................112
     Number 150 .............................114
23
                            MISCELLANY
24
     Proceedings September 16, 2024 ...........4
25   Certificate of Court Reporter ...........136
```

3

```
1                    P R O C E E D I N G S

2             THE DEPUTY CLERK:  Civil Action

3    Number 1:23-cv-108.  United States of America, et al. versus

4    Google LLC.

5             Counsel, will you please note your appearances for

6    the record.

7             MR. HARRISON:  Yes, good morning.  Jonathan

8    Harrison from the Virginia Attorney General's Office on

9    behalf of the plaintiff states.

10            THE COURT:  Good morning.

11            MS. WOOD:  Good morning, Your Honor.  Julia Tarver

12   Wood from the Department of Justice on behalf of the United

13   States.  With me are my colleagues, Aaron Teitelbaum, Tim

14   Longman, Michael Wolin and David Teslicko, and Mr. Mene from

15   the U.S. Attorney's Office.

16            THE COURT:  Good morning.

17            MS. DUNN:  Good morning, Your Honor.  Karen Dunn

18   for Google, and with me is Jeannie Rhee, Erica Spevak,

19   Bill Isaacson, Craig Reilly, Tina Sessions and Matt

20   Spalding.

21            THE COURT:  All right.  Good morning.  All right.

22   We'll proceed with the next witness.

23            MR. TEITELBAUM:  Good morning.  Aaron Teitelbaum

24   for the United States.

25            The plaintiffs call Mr. Neal Mohan.
```

                                                              4

Direct examination - N. Mohan

```
 1              THE COURT:  All right.
 2              THE DEPUTY CLERK:  Please raise your right hand.
 3    Thereupon,
 4                        NEAL MOHAN,
 5    having been called as a witness on behalf of the plaintiffs
 6    and having been first duly sworn by the Deputy Clerk, was
 7    examined and testified as follows:
 8                   (Time noted: 9:01 a.m.)
 9              THE DEPUTY CLERK:  Thank you.
10              MR. TEITELBAUM:  May I proceed?
11              THE COURT:  Yes.
12              MR. TEITELBAUM:  Thank you.
13                    DIRECT EXAMINATION
14    BY MR. TEITELBAUM:
15    Q    Good morning, Mr. Mohan.
16    A    Good morning.
17    Q    How are you doing?
18    A    Good.
19    Q    Would you please state your name and spell your last
20    name for the record.
21    A    Yes.  Neal Mohan.  M, as in Mary, O-H-A-N.
22    Q    And you currently work for Google; is that right?
23    A    Correct.
24    Q    You're the chief executive officer of YouTube?
25    A    That's correct.
```

                                                            5

Direct examination - N. Mohan

```
1   Q    That's a business unit within Google?

2   A    Yes.

3   Q    And you've worked at Google in some fashion since about

4   2008; is that fair?

5   A    That's correct.

6   Q    Okay.  Let's just talk a little bit about your

7   professional background before you joined Google.

8             So fair to say that you worked for a company

9   called DoubleClick in the late 1990s into the early 2000s?

10  A    That's correct.  I took -- there was a couple years off

11  when I went to grad school in between, but that's roughly

12  correct.

13  Q    Okay.  And so you took some time off from DoubleClick

14  and went to business school; is that fair?

15  A    Correct.

16  Q    And then you came back to DoubleClick in about 2005?

17  A    That's right.

18  Q    And then you ultimately came over to Google as part of

19  Google's acquisition of DoubleClick; right?

20  A    That's right.

21  Q    Okay.  And that was in 2008 that the acquisition

22  closed?

23  A    Yes.

24  Q    Immediately before coming over to Google, your last

25  position at DoubleClick was senior vice president of
```

6

Direct examination - N. Mohan

```
 1    strategy and product management; does that sound right?
 2    A    Yes.
 3    Q    Okay.  I want to talk also just a little bit about the
 4    positions you've held at Google.
 5              Fair to say you started with various roles on the
 6    advertising side of the business at Google?
 7    A    Yes.  Product management roles.
 8    Q    Okay.  So you were -- for a time, you were the director
 9    of display ads?
10    A    Display ads product management, yes.
11    Q    Okay.  And part of your responsibilities included the
12    DoubleClick products like DoubleClick for publishers that
13    Google had acquired; right?
14    A    Yes, that's correct.
15    Q    Okay.  And your responsibilities eventually grew to
16    include other ad tech products as well?
17    A    Other parts of the display portfolio, yes.
18    Q    Okay.  So, for instance, the DoubleClick ad exchange
19    was in your portfolio?
20    A    Yes.
21    Q    And that became AdX, as branded by Google?
22    A    Google ad exchange, yes.
23    Q    And it also displayed the Google Display Network or
24    GDN; right?
25    A    Correct.
```

7

Direct examination - N. Mohan

```
 1   Q    Okay.  And eventually you were promoted at one point
 2   from director to vice president; right?
 3   A    Yes.
 4   Q    And then ultimately your last role on the display ads
 5   side of the business was senior vice president of display
 6   and video ads; right?
 7   A    That's correct.
 8   Q    Okay.  And so then in 2015, you left Google's display
 9   ads business all together for YouTube?
10   A    That's right.
11   Q    Okay.  And then your first role at YouTube was chief
12   product officer?
13   A    That's correct.
14   Q    And how long ago did you become CEO, roughly?
15   A    February of last year.  February of 2023.
16   Q    Okay.  So before we get into some more detail about
17   your time at Google, I'd like to briefly discuss the end of
18   your time at DoubleClick when the acquisition was under
19   consideration.
20        So if we could please take a look at what's been
21   marked for identification as PTX 0014.  And, Mr. Mohan, it's
22   entirely up to you, this is going to come up on the screen
23   next to you, and it's also the very last tab in this binder.
24        THE COURT:  I'm sorry.  Is there any objection to
25   0014?
```

8

Direct examination - N. Mohan

```
 1              MS. RHEE:  Depends on whether or not the
 2   foundation is sufficiently laid, Your Honor, because this
 3   document is from Google that predates Mr. Mohan just by the
 4   testimony that's already in evidence.
 5              MR. TEITELBAUM:  Your Honor, I think I can lay a
 6   foundation that the first page is from Google before
 7   Mr. Mohan joined, but the rest is a DoubleClick document
 8   from when Mr. Mohan was the senior vice president there.
 9              THE COURT:  And, I'm sorry, it's Exhibit Number
10   what?
11              MR. TEITELBAUM:  0014, which is the very last tab
12   in the binder.
13              THE COURT:  Okay.  All right.
14              Go ahead.
15              MS. RHEE:  Again, that depends on whether or not
16   that foundation is laid, Your Honor.
17              THE COURT:  All right.  Lay the foundation,
18   please.
19              MR. TEITELBAUM:  Certainly.
20   BY MR. TEITELBAUM:
21   Q    So, Mr. Mohan, if you take a look at PTX 0014.
22   A    By the way, the document's not coming up on this
23   screen.
24   Q    All right.  So while we're working on that, maybe we
25   should --
```

9

Direct examination - N. Mohan

```
1              THE COURT:  They're not up.
2              MR. TEITELBAUM:  It's not in yet, Your Honor, just
3   for the record.  But if it's all right with the Court, we
4   could bring it up now.
5              THE COURT:  We can show it to -- well, actually,
6   we can show it to the witness alone.  Can you do that?
7   Okay.  Hold on.  You've got it now?
8              THE WITNESS:  I don't have it yet, Your Honor.
9   BY MR. TEITELBAUM:
10  Q    So let's bring up the very first page of the exhibit,
11  if we could.
12  A    I see -- I do see it now.
13  Q    Yes.  And I think right now you're looking -- there we
14  go.  Here's the first page of the exhibit.  All right.
15            So the very first page of the exhibit is some
16  Google email correspondence from 2007; right?
17  A    It looks to be that way, yes.
18  Q    Okay.  And so I think we can agree, you did not work
19  for Google in 2007; fair to say?
20  A    That's correct.
21  Q    All right.  If we could please look at the third page
22  of the exhibit, it's the Bates ending in 242.
23  A    I see the title, yes.
24  Q    Okay.  And so this is the beginning of a PowerPoint
25  slide presentation that was prepared by DoubleClick;
```

                                                                    10

Direct examination - N. Mohan

```
 1    correct?

 2    A     I'm not sure, but it looks that way.

 3    Q     Okay.  And if you need to take a minute to look through

 4    the subsequent pages in your binder, you should feel free.

 5               I mean, my first question for you is:  These

 6    presentations were made and kept in the regular course of

 7    business at DoubleClick; correct?

 8    A     Yes.  Do you mind if I just briefly scroll through

 9    this?

10    Q     Certainly.  And you can -- I don't think you can scroll

11    on the touch screen, but you can do it in the binder, if

12    that would be --

13               THE COURT:  The very last one in the binder.

14               THE WITNESS:  Okay.  Yes.  I've briefly glanced at

15    it.

16    BY MR. TEITELBAUM:

17    Q     Okay.  And so fair to say that presentations like these

18    were made and kept in the regular course of business at

19    DoubleClick?

20    A     Yes.  This looks like to be something made specially

21    for the acquisition, but, again, I'm not sure.

22    Q     And a presentation like this would have been at or near

23    the time of the contemplated acquisition; correct?

24    A     Yes.

25    Q     And it would have been made by persons with knowledge
```

11

Direct examination - N. Mohan

```
 1    of the relevant subject matter; correct?

 2    A    Yes.

 3              MR. TEITELBAUM:  Okay.  With the exception of the

 4    Google cover email, which we believe is a party-opponent

 5    statement, Your Honor, we would offer the remainder of this

 6    exhibit as a business record of DoubleClick.

 7              THE COURT:  Any objection?

 8              MS. RHEE:  No objection as to the presentation,

 9    Your Honor.

10              THE COURT:  All right.  The presentation is in.

11    So for -- it starts at 242.  So the first full page.  240

12    and 241 do not come in.

13              MR. TEITELBAUM:  Understood, Your Honor.

14      (Plaintiffs' Exhibit Number 0014, page 242 admitted into

15                           evidence.)

16              MR. TEITELBAUM:  And if we could please -- and if

17    we could please now publish that, Your Honor.

18              THE COURT:  Go ahead.

19              MR. TEITELBAUM:  And move forward to Bates ending

20    in 258, Mr. Klein.  It's page 19 of the .pdf.  We want 258,

21    please.

22              THE COURT:  All right.  Do you have a question?

23              MR. TEITELBAUM:  Yes, Your Honor.  Unfortunately

24    we're still not at 258.  I think we're at 253, but I can see

25    that the Court's there.
```

Direct examination - N. Mohan

```
 1   BY MR. TEITELBAUM:
 2   Q    So in the interest of time, I'm going to just ask you,
 3   Mr. Mohan, do you have 258 in front of you?  That's with the
 4   little number 17 at the bottom.
 5   A    This one right here?
 6   Q    It looks like you do.  Yeah.
 7          Do you see the second bullet point from the top
 8   there, it reads:  "Due to its position as the operating
 9   system for ad sales, switching costs are very high."
10          Did I read that right?
11   A    Yes.
12   Q    And this is a slide about DART for Publishers, which
13   later became Google's DFP; correct?
14   A    Correct.
15          MR. TEITELBAUM:  Okay.  We can take that document
16   down and move on to something else.
17   BY MR. TEITELBAUM:
18   Q    So let's go back to your time at Google now, and we can
19   leave DoubleClick for the time being.
20          With respect to Google's display advertising
21   strategy in the time shortly after the DoubleClick
22   acquisition, the objective was to have a comprehensive
23   solution for advertisers and publishers; right?
24   A    The Google Ads' strategy, is that your question?
25   Q    Yes.  Once you came over from DoubleClick.
```

                                                                13

Direct examination - N. Mohan

```
1    A    Yes.  The objective was to build the most -- the best
2    advertising solution stack for publishers, as well as also
3    build capabilities for advertisers.
4    Q    And the DoubleClick acquisition itself was a component
5    of that strategy; right?
6    A    Yes.
7    Q    And one of the reasons why the DoubleClick acquisition
8    was important was because Google did not have a viable
9    publisher ad server prior to acquiring DoubleClick's; right?
10   A    Yes.  Google was building an ad serving product.  It
11   was in the early days, from what I remember.  But
12   DoubleClick had two ad serving solutions, DoubleClick for
13   Publishers, DART for Publishers, and also a software product
14   called DART Enterprise, which was also an ad server what was
15   sold to publishers.
16   Q    And DART for Publishers was superior -- well, was
17   farther along in progress than Google's own attempts at
18   building a publisher ad server; correct?
19   A    DART for Publishers was offered to publishers for
20   several years, yes.
21   Q    Okay.  And the acquisition also secured for Google the
22   ad exchange that DoubleClick had built; right?
23   A    The ad exchange that DoubleClick was building at the
24   time was really quite nascent, unlike the DoubleClick for
25   Publishers, product which was available to publishers for
```

14

Direct examination - N. Mohan

 1    quite some time.

 2    Q    Okay.  But the acquisition did secure for Google that

 3    nascent ad exchange?

 4    A    Yes.

 5              MR. TEITELBAUM:  Okay.  If we could please take a

 6    look at what's been marked for identification as PTX 51.

 7              And, Mr. Mohan, once again it's up to you, the

 8    binder or the screen.  And from now on, these exhibits

 9    should be in ascending numerical order in the binder.

10              THE COURT:  All right.  Is there any objection to

11    51?

12              MS. RHEE:  Yes, Your Honor.  There's no -- there's

13    no identification of the author and exactly what these

14    represent.

15              THE COURT:  All right.  All right.  Let's see if

16    you can lay a foundation.

17              MR. TEITELBAUM:  Understood, Your Honor.

18              And just for the Court's awareness, these are all

19    Google documents produced by Google.  So I think we're

20    all -- even without additional foundation, they're

21    party-opponent statements.

22              THE COURT:  Let me stop you so we don't waste our

23    time.

24              Is there any dispute that these are Google

25    documents?

                                                            15

Direct examination - N. Mohan

```
 1              MS. RHEE:  No.  They're produced by Google.
 2    Exactly what they represent, though, and whether or not
 3    there's a sufficient foundation so that they are an
 4    admission of a party-opponent is what's at question.
 5              THE COURT:  All right.  Go ahead.
 6    BY MR. TEITELBAUM:
 7    Q    Mr. Mohan, you see at the top --
 8    A    The slide's not coming up again.
 9              THE COURT:  That's because -- yeah, we just -- do
10    you have it now?
11              THE WITNESS:  I don't, Your Honor.  I do now.
12    Something just popped up.
13    BY MR. TEITELBAUM:
14    Q    Okay.  Mr. Mohan, the very first page of this exhibit,
15    it's an email from Mr. Duggal at google.com, and the subject
16    is "OCQ meeting notes"; right?
17    A    Yes.
18    Q    And a little further down on the first page we have Q1
19    2010 OCQ.
20              Do you have a specific recollection of what OCQs
21    were?
22    A    I do not.
23    Q    Okay.  But we see here your name is listed under the
24    action items; right?  Under -- next to:  "Review of Project
25    Butterfly, bring the facts and tradeoffs, quantify the
```

16

Direct examination - N. Mohan

```
 1   opportunity"?

 2   A     I do see my name, yes.

 3   Q     And the other people listed here, Mr. Henrique, Alan,

 4   Joerg, these are all Google employees; right?

 5   A     Joerg and Henrique I remember.  I'm not sure about

 6   Alan.  There's no reason to believe he wasn't.

 7   Q     Any reason to believe that any of the people that

 8   contributed to this document were anything other than Google

 9   employees?

10          MS. RHEE:  Objection, Your Honor.  Lacks

11   foundation with respect to whether or not those individuals

12   contributed to this document.

13          THE COURT:  Well, the more important question is,

14   have you seen documents like this before in your time at

15   Google?

16          THE WITNESS:  I have seen documents similar to

17   this, Your Honor.  I don't recall this specific document.

18          THE COURT:  But just briefly looking at the ones

19   that reference your name, are some of those issues matters

20   about when you remember working?

21          THE WITNESS:  I don't remember exactly what this

22   Project Butterfly is.  I'm sure I could jog my memory by

23   looking at these things.

24          The nature of these documents were -- they look

25   like notes taken by somebody who participated in the
```

17

Direct examination - N. Mohan

```
 1    meeting.  So I'm not sure what I've been assigned to or what

 2    I said in them, but they look like meeting notes, Your

 3    Honor.

 4              MR. TEITELBAUM:  And on that basis, Your Honor, I

 5    think these are both party-opponent statements by employees

 6    at Google acting within the scope of their employment, and

 7    they are also, separately, business records, you know,

 8    contemporaneous notes of a meeting.

 9              So I think whether or not Mr. Mohan specifically

10    recognizes this document is beside the point given that

11    we're dealing with Google documents.

12              THE COURT:  All right.  I'm going to overrule the

13    objection.  It's in.

14      (Plaintiffs' Exhibit Number 51 admitted into evidence.)

15              MR. TEITELBAUM:  And if we could please publish

16    that to the gallery and turn to the Bates number ending in

17    726 of this exhibit.  And just let me know when you're

18    there, Mr. Mohan.  I'm sorry, Mohan.

19    A    I see, yes.  I see an ending in 726.

20    Q    Okay.  So you've got a page that says, at the very

21    first bullet point:  "AdX is the big bet for next year"?

22    A    I see that, yes.

23    Q    Okay.  And then there's a second bullet point, and then

24    a little square bullet point under that one.  So it's the

25    third bullet of this document and it reads:  "Didn't buy
```

                                                              18

Direct examination - N. Mohan

```
 1    DCLK for the revenue (and growth), bought it for enabling

 2    the exchange and backfill strategy."

 3            Did I read that correctly?

 4    A    I do see that, yes.

 5    Q    And that's just a reflection that the DoubleClick

 6    acquisition was a foundational part of Google's display

 7    advertising strategy; right?

 8    A    It's a reflection of what we considered our strength,

 9    which was product innovation.  We brought a certain set of

10    capabilities to Google, yes.

11            MR. TEITELBAUM:  Okay.  So we can take that

12    document down.

13    BY MR. TEITELBAUM:

14    Q    And let me just ask you more generally with respect to

15    Google's display advertising strategy, one of the names that

16    you used for this strategy was a three-pillar strategy;

17    correct?

18    A    Yes.  As a kind of simple way of explaining it.

19    Q    And the reason that there were three pillars was

20    because Google recognized that there were three different ad

21    tech markets that it had to control in order to succeed in

22    its display advertising strategy; correct?

23    A    No.  The reason there were three pillars was that was

24    the set of solutions that we needed to offer a comprehensive

25    solution to our publisher customers.  It was an incredibly
```

19

Direct examination - N. Mohan

1    competitive space where publishers were looking for

2    comprehensive yield management solutions, and our belief was

3    we needed to have an ad server, as well as this indirect

4    yield management capability called an exchange, and that's

5    what we would offer to publishers.  And at the same time, in

6    order -- because display advertising, by definition, really

7    is a two-sided market.  At the same time, we also felt that

8    we needed a strong solution for our advertisers, and that's

9    where the Google Display Network came in.  That was the

10   third pillar of the strategy.

11   Q    Okay.  So let's take a look at PTX 32 for

12   identification.  And we'll just wait.

13            THE COURT:  Any objection?

14            MS. RHEE:  No, Your Honor.

15            THE COURT:  All right.  32 is in.

16     (Plaintiffs' Exhibit Number **32 admitted into evidence.**)

17   BY MR. TEITELBAUM:

18   Q    All right.  Mr. Mohan, if you look at the middle of the

19   page there and you see that we have an email from you from

20   September of 2008 just before we get to the magnification.

21            MR. TEITELBAUM:  And, Mr. Klein, that's in the

22   middle of the page from Mr. Mohan there.  Okay.

23   BY MR. TEITELBAUM:

24   Q    Do you see that?

25   A    I do see that, yes.

                                                              20

Direct examination - N. Mohan

```
 1    Q    Okay.  And then within that email from you, you write
 2    about the current state of product strategy (three pillars);
 3    right?
 4    A    I see that, yes.
 5    Q    Okay.  And the first of those pillars is a platform to
 6    access the desired inventory; right?
 7    A    I see that sentence.
 8    Q    And that's a reference to publisher ad serving;
 9    correct?
10    A    That -- this particular paragraph is a reference to
11    publisher ad serving, yes.
12    Q    Okay.  And then paragraph B:  "An ad exchange to
13    aggravate the inventory that the platform piece gives us
14    access to," that's a reference to the ad exchange that
15    ultimately became AdX; right?
16    A    That's correct.
17    Q    Okay.  And then letter C is "the Google Content Network
18    to monetize the inventory we aggregate via ad exchange and
19    all our AdSense deals."
20         Did I read that right?
21    A    Correct.
22    Q    And that's a reference to advertiser-facing tools such
23    as what ultimately became GDN; right?
24    A    The Google Content Network eventually became GDN,
25    that's correct.  AdSense was actually a publisher-facing
```

21

Direct examination - N. Mohan

```
 1    tool.  We offered a number of solutions to publishers.

 2    DoubleClick for Publishers was one, which you reference in

 3    the first paragraph, but AdSense was also a publisher

 4    solution that Google offered to other publishers.

 5    Q    I can just -- my question was only about the Google

 6    Content Network, so just for the sake of time, I think we

 7    can move on.

 8           All right.  And so even in 2008, what's reflected

 9    here in this document is you recognized that the platform or

10    publisher ad serving was going to be essential to Google's

11    success in display advertising; is that fair?

12    A    Yes, because it was essential to our publishers'

13    business.  By definition, publishers couldn't really manage

14    their display advertising without an ad server.

15    Q    And you also recognize that having a really fantastic

16    buying tool on its own for advertisers was not going to be

17    enough for Google to be competitive if someone else, another

18    company, had control over publisher inventory; is that fair?

19    A    No.  The way I would characterize it is, display

20    advertising, by definition, has two sides of it.

21    Advertisers' demand needs to run on publishers' inventory.

22    Publishers cannot monetize their inventory without

23    advertiser demand.  And so access to inventory is a

24    prerequisite of the Google Display Network so that they can

25    fulfill the goals on behalf of Google's advertising
```

22

Direct examination - N. Mohan

1    publisher.  So that's the way I would describe that third

2    pillar.

3    Q    So your answer is your disagree with my

4    characterization then?

5    A    Yes.  I'm just adding a little bit more context in

6    terms of the nuance behind the strategy.

7    Q    Okay.  Let's take a look at PTX 41, please.

8              THE COURT:  Any objection to 41?

9              MS. RHEE:  Court's indulgence.

10             No objection, Your Honor.

11             THE COURT:  All right.  It's in.

12      (Plaintiffs' Exhibit Number **41 admitted into evidence.**)

13   BY MR. TEITELBAUM:

14   Q    All right.  And at the very top of this exhibit,

15   Mr. Mohan, that's an email from you from March of 2009;

16   right?

17   A    Yes, it appears so.

18   Q    Okay.  And if we could take a look at letter D, as in

19   David, on the very first page.

20             What you write here:  "As of 2009, our competitors

21   have essentially the same three-pillared strategy (platform

22   AdX network strategy) as we do and have realized that the

23   most strategic battle is about the publisher platform and so

24   are focusing on it pretty aggressively."  And then just for

25   the sake of brevity in parenthesis your refer to Yahoo

23

Direct examination - N. Mohan

```
 1    Microsoft and AOL.

 2            Did I read that correctly with the paraphrase at

 3    the end?

 4    A    Yes, sir, you did.

 5    Q    And then what you write in the last sentence is:  "If

 6    we lose platform share, we can build the best GCN in the

 7    world, but would still be at a severe risk if

 8    disintermediated if Y, M owned the ad tag on the publisher

 9    page."

10            Did I read that right?

11    A    Yes.

12    Q    And so GCN is, once again, a reference to what

13    ultimately became GDN; correct?

14    A    That's correct.

15    Q    And that, at later times, was also sometimes referred

16    to as Google Ads; right?

17    A    I believe so.  At that point, I had long left the

18    business, but GDN, yes.

19    Q    Okay.  And Y and M are references to Yahoo and

20    Microsoft?

21    A    Yes.

22    Q    Okay.  So this was just a recognition of how -- you

23    recognized back in 2009 about the strategic importance of

24    the publisher ad server specifically compared to the other

25    components of the three pillars; right?
```

24

Direct examination - N. Mohan

1   A     Yes.  I didn't -- this is really just another

2   description of what I just answered in your previous

3   question, which is why -- the reason why the ad server and

4   the exchange were important was they represented the

5   publisher side of the inventory.  And the reason, obviously,

6   by GCN or GDN was important is they represented the

7   advertiser demand.

8           You couldn't fulfill, as I point out in this

9   paragraph, the advertiser demand unless you actually had

10  some inventory to which to run those ads, and so that's

11  specifically what this means.

12          MR. TEITELBAUM:  Okay.  We can take that document

13  down.  And actually we don't need the document for this.

14  BY MR. TEITELBAUM:

15  Q     But disintermediated, that just means having some other

16  component get in the way of Google's access; right?

17  A     It really just means that, at that time, publishers had

18  a lot of different choices.  I laid out some of the biggest

19  competitors here, but there were many other competitors that

20  publishers could choose for their ad server or indirect

21  monetization.  At that time in the ad industry, there were

22  lots of networks.  And so what this meant in this context

23  was those publishers could use one of those competitive

24  solutions and not the Google solution, and, at that point,

25  the Google solution would have been removed by those

25

Direct examination - N. Mohan

1    publishers in favor of the ones that I highlighted here but

2    also others.  That's what I meant.

3    Q    Okay.  And "own the tag" is actually a phrase that

4    Google also uses to refer to its publisher ad serving

5    strategy; right?

6    A    It's really a shorthand for saying that the publishers

7    chose to work with Google's publisher ad server as opposed

8    to one of the other many competitive ad servers that were

9    available to publishers at the time.

10   Q    But when we say "own the tag," it's Google that owns

11   the tag; right?  Not the publisher?

12   A    But the publisher's ad server is the ultimate -- the

13   publisher is the one who actually decides how the -- the

14   publisher basically sets the rules in the ad server; the tag

15   just refers to the HTML snippet that goes into the

16   publisher's website that -- into which ads are trafficked.

17   And so it's just a shorthand to represent who the publisher

18   is using for its ad serving solutions.  So if it's using a

19   Google publisher, DoubleClick for Publishers, then it would

20   be a DoubleClick tag.  If it's a Microsoft one, it would be

21   a Microsoft tag.

22   Q    All right.  So just to move this along, Mr. Mohan, my

23   question is just, in the phrase "own the tag," the subject

24   of that sentence is Google; correct?

25   A    Well, the tag is not really Google's tag; it's the

26

Direct examination - N. Mohan

1   publisher's ad serving tag.

2   Q    Okay.  Let's move on within this document to Letter B

3   at the top of page 2.

4         And so one of the things -- and before we get

5   specifically to the document, Mr. Mohan, one of the things

6   you recognized was that letting Google's customers pick and

7   choose which of Google's products to use within the ad tech

8   ecosystem was not going to generate sufficient revenue;

9   correct?

10  A    I disagree with that characterization.  Publishers were

11  free to choose.

12  Q    That sounds like an answer to my question, so I think

13  we can move on.

14        So what you decided was that you needed to impose

15  conditions on your customers that would compel them to use

16  more than one product together; correct?

17  A    No.

18  Q    Okay.  So why don't we take a look at Letter B on the

19  second page of PTX 41.

20        So what you write here is:  "I do think we need

21  tight XFP AdX/GCN bundles, and the terms will vary by deal."

22        Did I read that correctly?

23  A    Correct.

24  Q    And XFP was another acronym that was used to refer to

25  DFP, as it was continuing on along as a Google product;

27

Direct examination - N. Mohan

```
 1    right?
 2    A    It was an internal reference for rebuilding the
 3    DoubleClick for Publishers technology which Google had
 4    acquired on the Google technology stack.
 5    Q    But XFP was referring to DFP after it was owned by
 6    Google; is that fair?
 7    A    Yeah.
 8    Q    Okay.  And then going down to Letter D in this same
 9    document, what you recognized here was that "fundamentally,
10    the glue that seals DFP to GCN is AdX, and that is why it is
11    the second pillar of our three-pillar strategy."
12             Did I read that right?
13    A    You read that right.
14    Q    Okay.
15             MR. TEITELBAUM:  We can take that document down.
16    BY MR. TEITELBAUM:
17    Q    So at the same time as being focused on this
18    three-pillared strategy, you recognized that there was going
19    to be an inherent conflict of interest within Google as a
20    result of it having control over a comprehensive set of AdX
21    tools; correct?
22    A    I'm not sure what you refer to as conflict of interest.
23    Q    Okay.  You were concerned about a conflict of interest
24    arising from control of tools both on the advertiser side
25    and also on the publisher side at the same time; correct?
```

Direct examination - N. Mohan

```
 1   A    Well, as I said earlier, the way that I saw the display
 2   advertising space is, by definition, it had both those sides
 3   of the picture.  And so in order to provide higher yield,
 4   meaning more revenue to our publisher customers -- because
 5   remember at the time they had many other choices, so we were
 6   competing for generating more revenue for them.  We also
 7   needed to bring the best advertiser demand to those
 8   publishers, and the way that we brought the best advertiser
 9   demand was to have a product that generated the most ROI for
10   advertisers.  That was the advertiser's side of the
11   solution.
12            And so, in that sense, having a strong advertiser
13   side benefit benefited our publishers, and having a strong
14   publisher side benefited our advertisers.  That was, in
15   essence, what the three-pillar strategy was.
16   Q    Okay.  So that was a no to my question, in other words?
17   You don't agree with what I said?
18   A    Yeah.  I'm just explaining exactly sort of what the
19   strategy was.
20   Q    Okay.  You'll have an opportunity to do that more on
21   examination by Google's counsel, but why don't we move on to
22   PTX 59, please.
23            THE COURT:  Any objection to 59?
24            MS. RHEE:  No, Your Honor.
25            THE COURT:  All right.  It's in.
```

29

Direct examination - N. Mohan

1      (Plaintiffs' Exhibit Number **59 admitted into evidence.**)

2    BY MR. TEITELBAUM:

3    Q    And, Mr. Mohan, this is a 2010 email from you; correct?

4    A    Yes, it looks to be.

5    Q    And what you write here -- the subject line is AdX in

6    buy-side team; right?

7    A    Yes.

8    Q    And what you write here is:  "One other very, very

9    important reason to keep AdX out of the buy-side team is

10   that would be a huge conflict perception in the market."

11          Is that what you wrote there?

12   A    Correct.

13   Q    And that was just your recognition that there was going

14   to be at least a perception of a conflict of interest as a

15   result of Google having tools that both served publishers

16   and advertisers; right?

17   A    No.  What I meant by this was DFP and AdX, the first

18   two pillars of the three-pillar strategy, were squarely

19   oriented around generating more revenue for publishers.  And

20   the buy-side GDN team was squarely oriented at generating a

21   higher ROI for advertisers.  And so being clear about those

22   objectives of the team was really important.

23   Q    And so that was a recognition by you that Google had

24   personnel within its business that were serving different

25   interests on different sides of the ad tech ecosystem at the

30

Direct examination - N. Mohan

```
 1    same time; right?
 2    A    We did have product teams that focused on making GDN
 3    the best product for our advertisers.  On the GDN side, we
 4    were competing with lots and lots of ad networks and other
 5    solutions.  And we also had teams that really catered to the
 6    needs of our publishers, DFP and AdX, so these were separate
 7    teams.
 8    Q    Is that a yes to my question?
 9    A    Those were separate teams, correct.
10    Q    And ultimately Google had the same manager controlling
11    all of those personnel within the display and video ads
12    business later after 2010; correct?
13    A    You mean on the sell-side?
14    Q    On the product management side.
15    A    On the product management side, yes.  Ultimately,
16    again, back to what I said, which is you needed a good
17    product for advertisers to work for publishers.
18    Q    Okay.  But that was a yes; correct?
19    A    Yes.
20    Q    Okay.  Let's move on to a different topic.
21          Going back to the period shortly after the
22    DoubleClick acquisition, there were some ad tech product
23    offerings called yield managers; correct?
24    A    Correct.  A few years after.
25    Q    Okay.  And so some examples of yield managers included
```

31

Direct examination - N. Mohan

```
 1   AdMeld, PubMatic and Rubicon; does that sound familiar?
 2   A    Yes.
 3   Q    And one of the things that a yield manager facilitated
 4   was it allowed a publisher to evaluate advertiser demand
 5   that was coming from multiple exchanges or other sources at
 6   the same time; right?
 7   A    Not exactly.  It allowed for yield management or so,
 8   evaluation of indirect demand that typically were coming
 9   from other third-party ad networks.  So if a publisher had
10   unsold inventory, then they would oftentimes strike deals
11   with a number of other ad networks.  So what yield managers
12   did at the time was evaluate those deals that that specific
13   publisher had with other ad networks.
14   Q    Okay.  But it did facilitate publishers working with
15   multiple sources of demand at the same time; correct?
16   A    Multiple sources of indirect demand, which is basically
17   what an ad network is.
18   Q    Okay.  And one of the reasons that yield managers
19   existed was because publishers were interested in finding
20   ways to work around the fact that only AdX was allowed to
21   submit real-time bids into DFP; correct?
22   A    No, sir.  I disagree with that characterization.
23   Q    Okay.  Let's take a look at PTX 46.
24            THE COURT:  Any objection to 46?
25            MS. RHEE:  Court's indulgence.
```

                                                                32

Direct examination - N. Mohan

```
 1              No objection insofar as this is about the top of
 2   this email chain and reactions to a news publication, but
 3   the news publication should not be admitted for the truth of
 4   the matter asserted therein.
 5              MR. TEITELBAUM:  That's fine, Your Honor.
 6              THE COURT:  That's fine.  It's in.  It's in.
 7     (Plaintiffs' Exhibit Number 46 admitted into evidence.)
 8   BY MR. TEITELBAUM:
 9   Q    Okay.  Mr. Mohan, at the very top this is an email from
10   you from June of 2009; correct?  So we're going a little bit
11   back in time from 2010?
12   A    Yes, it is.
13   Q    And then leaving aside the news article, this is a
14   thread of emails between you and some other Google personnel
15   such as Jonathan Bellack and Brad Bender; correct?
16   A    Yes.
17   Q    And one of the things -- if we go to the email from
18   Mr. Bellack in the middle of the page, which is June 25th,
19   2009 at 1:32 p.m., one of the things that Mr. Bellack
20   observes about yield managers is:  "On the other hand, it's
21   a work-around for not having real-time bids from everyone."
22              Did I read that right?
23   A    On the other hand -- yes.
24   Q    Okay.  And immediately above that, you respond to
25   Mr. Bellack, and what you say is that "I talked to Noah
```

                                                              33

Direct examination - N. Mohan

```
 1    about this earlier today, but this is the reason why of all
 2    the third-party developer categories, yield managers are the
 3    ones I am most nervous about in terms of access to our new
 4    XFP API.  It's fine if they participate via the AdX seller's
 5    API."
 6              Did I read that right?
 7    A    You did, yes.
 8    Q    And API is an application programming interface; right?
 9    A    That's correct.
10    Q    And that's just a piece of code that allows two
11    different pieces of software to communicate with each other;
12    is that fair?
13    A    Amongst other things, yes.
14    Q    Okay.  And so you were most nervous about giving yield
15    managers the ability to work directly with Google's
16    publisher ad server; right?
17    A    Yeah.  Again, I don't -- I'm happy to read through this
18    email because I'm not actually tracking the context of what
19    Jonathan asked for and what I'm responding to.
20    Q    For the sake of efficiency, we can move on to something
21    else, and we can take that down.
22              More broadly speaking, you and your team
23    recognized that, aside from the functionality that we were
24    just talking about, yield managers were also potential
25    direct competitors to AdX; right?
```

34

Direct examination - N. Mohan

```
 1   A    They were not -- they did not directly do what AdX did,

 2   but they did offer yield management capabilities for

 3   indirect inventory, which is similar to what AdX did.

 4        AdX had a capability called Dynamic Allocation --

 5   real-time Dynamic Allocation, and that was different than

 6   yield managers.

 7   Q    Okay.  So let's take a look at PTX 44.

 8        THE COURT:  Any objection to 44?

 9        MS. RHEE:  Your Honor, same qualification insofar

10   as what's being admitted is the internal Google reaction to

11   a news publication, but the news publication is not being

12   offered for the truth of the matter.

13        THE COURT:  That's right.  That's fine.  It's in.

14    (Plaintiffs' Exhibit Number 44 admitted into evidence.)

15   BY MR. TEITELBAUM:

16   Q    All right.  And if we look first at the very top,

17   Mr. Mohan, that's an email from you in April of 2009; right?

18   A    Yes.

19   Q    Okay.  And then in the middle of the page, what we see

20   is an email from Scott Spencer with you cc'd.  And one of

21   the things that Mr. Spencer observes is:  "Overall we are

22   seeing OpenX, AdMeld, Rubicon and PubMatic all moving

23   towards the exchange model.  This validates the market need

24   but creates a more competitive environment."

25        Did I read that right?
```

Direct examination - N. Mohan

```
 1    A     I do see this from Scott, yes.

 2    Q     Okay.  And then just for context going back to the top

 3    email from you, in the second paragraph starting "for what

 4    it's worth," you say:  "I think Tim (their CEO) is really

 5    good."

 6              That's a reference to Tim Cadogan, the CEO of

 7    OpenX; is that right?

 8    A     I don't recall, but I'm happy to read through this very

 9    quickly.

10    Q     I just want to confirm what you're talking about.

11    There in the very top email is OpenX.

12    A     Let me just, if you don't mind, I could just read that

13    paragraph.

14    Q     Sure.

15    A     Yeah.  It looks like this is referring to the OpenX

16    CEO.

17              MR. TEITELBAUM:  Okay.  We can take that document

18    down.

19              And let's move on to PTX 60 please, 6-0.

20              THE COURT:  Any objection to 60?

21              MS. RHEE:  No, Your Honor.

22              THE COURT:  All right.  It's in.

23      (Plaintiffs' Exhibit Number 60 admitted into evidence.)

24    BY MR. TEITELBAUM:

25    Q     All right.  And, Mr. Mohan, this is another email from
```

36

Direct examination - N. Mohan

```
 1   you.  We're back in October of 2010; do you see that at the
 2   top?
 3   A    I do see that, yes.
 4   Q    Okay.  And this is an email thread once again with you
 5   and Mr. Bellack, and Scott Spencer is cc'd; right?
 6   A    Yes.
 7   Q    And the format that this email appears in is actually
 8   that we've got Mr. Bellack's text that's not bolded, and
 9   your answers to his commentary is in bold underneath each
10   paragraph; right?
11   A    I mean, I'd have to take a quick look at it, but let me
12   see.
13   Q    Okay.  Go for it.
14   A    Yep.  That's what it looks like.
15   Q    Okay.  If we go to the top of page 2 then -- and I
16   really just want to direct your attention to the sentence
17   that starts with "but the reality."  "But the reality is we
18   missed the YM threat both on the AdX side, as well as the
19   DFP side."
20        YM is an abbreviation for yield managers?
21   A    Yes.
22   Q    And this is just a reflection that you viewed AdMeld
23   and other yield managers as a threat to Google's ad tech
24   products around this time in 2010; right?
25   A    No.  It's a reflection of the fact that they had a
```

37

Direct examination - N. Mohan

1    certain capability that I felt was missing from DFP and AdX.

2    Specifically the yield management capability that I

3    described earlier, the ability to actually evaluate indirect

4    static demand that comes from ad networks was a capability

5    that AdX and DFP didn't have because DFP and AdX went after

6    where we thought the market was going to go, which is

7    real-time Dynamic Allocation.

8    Q     Okay.  So, in other words, you thought that yield

9    manager technology was going to be highly valuable to Google

10   to bring into its operation; right?

11   A     I felt that it was a gap in our portfolio.

12   Q     It was a gap that you wanted to fill?

13   A     It was a gap that we wanted to fill, correct.

14   Q     Let's take a look at PTX 85 please.

15               And first we can just --

16               THE COURT:  Is there any objection to 85?

17               MS. RHEE:  No, Your Honor.

18               THE COURT:  It's in.

19      (Plaintiffs' Exhibit Number 85 admitted into evidence.)

20               MR. TEITELBAUM:  Thank you, Your Honor.

21   BY MR. TEITELBAUM:

22   Q     Let's just first take a look at the second page of the

23   exhibit, which is the first page of the slide deck.  It's

24   called "yield management product plan"; right, Mr. Mohan?

25   A     Yes.

                                                              38

Direct examination - N. Mohan

```
 1   Q    And do you see your name underneath there along with

 2   some of your colleagues from the time at Google?

 3   A    I do see my name.

 4   Q    Okay.  So let's first actually go to page 15 of the

 5   overall exhibit, which is the Bates number ending in 726.

 6              And the question that's posed here in this slide

 7   is:  "Should we buy a yield manager?"  And then the answers

 8   are:  "Need to evaluate carefully based on these criteria.

 9   Item 1:  Their technology is irrelevant to us."

10              Did I read that correctly?

11   A    Yes.

12   Q    Okay.  So this slide, in other words, is stating that

13   the functionality that the yield managers had actually was

14   not something that Google needed to incorporate?

15   A    That's not how I felt, no.

16   Q    That's not how you felt?

17   A    No.

18   Q    Let's go now to page 2 of the PowerPoint slide deck,

19   which is page 3 of the overall .pdf.  It's the Bates ending

20   in 714.

21              And so under the executive summary, the first item

22   here is that "yield managers are disintermediating our

23   access to inventory, inhabiting our overall display

24   strategy."

25              Did I read that right?
```

Direct examination - N. Mohan

```
 1   A     Yes.

 2   Q     And so this is a reflection that yield managers were

 3   inhibiting Google's ability to have access and control over

 4   publisher inventory; right?

 5   A     No.  What this refers to is that publishers were

 6   choosing to go with static yield management, static

 7   evaluation of their indirect demand, as opposed to putting

 8   all of their indirect inventory into dynamic -- real-time

 9   Dynamic Allocation, which was represented by what Google AdX

10   did.  And so, therefore, some inventory wasn't being put --

11   made available in AdX for real-time Dynamic Allocation.

12   That's what this refers to.

13   Q     Right.  You were seeing a circumstance where inventory

14   was actually being made available on other ad tech products

15   that Google did not control; correct?

16   A     Yes.  Like I said, this was an incredibly competitive

17   environment.

18   Q     Okay.  So let's take a look at page 5 of the slide

19   deck, which is the Bates ending in 717.

20         MR. TEITELBAUM:  I'll just wait until we're there

21   on the screen as well, and if we could blow that up.

22         MS. RHEE:  Thank you for blowing it up.  It's

23   really small.

24         MR. TEITELBAUM:  If we could please magnify the

25   top half of that slide.
```

Direct examination - N. Mohan

```
1    BY MR. TEITELBAUM:
2    Q    So this is an evaluation of the DoubleClick ad exchange
3    versus the three largest yield managers as of August 2010;
4    is that right?
5    A    It looks to be that, yes.
6    Q    And the way that the scores are done is based on pie
7    charts there with the more pie you have, the better you're
8    doing; right?
9    A    That's what it looks like, yes.
10   Q    Okay.  So AdMeld is the only product here that has
11   three-quarters of the pie as opposed to half?
12   A    It looks to be that way, yes.
13   Q    Okay.  And when we compare within those subcategories
14   there, AdMeld actually outperforms Google in all categories
15   except for yield; right?
16   A    That's correct.
17   Q    And, in fact, under brand control, AdMeld has
18   three-quarters of a pie, and Google only has a quarter;
19   right?
20   A    It looks that way.
21            MR. TEITELBAUM:  Okay.  So we can take that
22   exhibit down.
23   BY MR. TEITELBAUM:
24   Q    And so as part of the calculus about whether to buy a
25   yield manager, you also recognized that yield managers were
```

41

Direct examination - N. Mohan

```
 1    putting AdX's first-look advantage through Dynamic
 2    Allocation at risk; correct?
 3    A    No.  It would be -- I just refer you back to my
 4    statement earlier, which is publishers would work with yield
 5    managers and put some of their indirect demand into yield
 6    managers because they felt comfortable with what yield
 7    managers were doing, they had these relationships that
 8    already existed with ad networks.  So that meant, by
 9    definition, that not all of their indirect inventory was
10    going to go into AdX.  And so it was -- the yield managers
11    were competing with each other, but also were a solution
12    that publishers were choosing to use because, as that slide
13    pointed out, AdX was missing some of that static yield
14    management capability.
15    Q    All right.  Let me just ask you more directly.
16              Yield managers were breaking Google's ability to
17    dynamically allocate from DFP; correct?
18    A    That's not correct --
19    Q    Okay.
20    A    -- because publishers --
21    Q    That sounds like a no to my question, so I think we can
22    move on to PTX 88.
23              MR. TEITELBAUM:  Which I offer into evidence or
24    can lay a further foundation.
25              THE COURT:  Is there any objection?
```

                                                                    42

Direct examination - N. Mohan

```
 1              MS. RHEE:  Based on the Court's prior ruling, no
 2   objection.
 3              THE COURT:  All right.  It's in.
 4        (Plaintiffs' Exhibit Number 88 admitted into evidence.)
 5   BY MR. TEITELBAUM:
 6   Q    All right.  So at the very top of this exhibit,
 7   Mr. Mohan, it's from September of 2010, it's a strategy
 8   sync; right?
 9   A    It looks like this, yes.
10   Q    And you're listed first under the attendees at the top
11   along with some of your other colleagues at the time?
12   A    I am.
13   Q    And then if we go down to the bottom of that page,
14   we're going a little bit back in time to August of 2010.
15   And that's also -- you're listed among the attendees along
16   with Scott Spencer, for instance?
17   A    Yes.
18   Q    So if we could please go to the next page under notes.
19   And there's a bullet point that says:  "Key findings:
20   Strategic."  And that first bullet there says:  "Sell-side
21   platform solution, yield managers most important issue is
22   getting high-quality inventory.  YM break our ability to
23   dynamically allocate from DFP."
24              Did I read that correctly?
25   A    Yes.  And this describes exactly what I said in my
```

43

Direct examination - N. Mohan

```
 1    previous answer.

 2    Q    Okay.  And then next to key competitors, listed there

 3    is AdMeld, Rubicon and PubMatic.  "AdMeld is the largest

 4    concern.  Typically take a 7 percent rev share."

 5         Did I read that right?

 6    A    Yes.

 7    Q    Okay.  And 7 percent, you'd agree with me, is

 8    substantially less than 20 percent; is that fair?

 9    A    It is.

10         MR. TEITELBAUM:  Okay.  We can take that document

11    down.

12    BY MR. TEITELBAUM:

13    Q    Ultimately you decided that it would make sense to buy

14    a yield manager to avoid falling further behind in this

15    particular market; is that right?

16    A    Yes.  Because, as I pointed out, we were missing a

17    certain functionality, this indirect yield management --

18    static yield management capability was not a feature that

19    AdX offered, and so we had a choice there to try to build it

20    ourselves or to acquire it.

21    Q    Okay.  And that was the technology that that slide deck

22    referred to as irrelevant to Google?

23    A    It was related to that, yes.

24    Q    Okay.  So let's take a look at PTX 58, please, which is

25    an email thread within Google, which I would offer into
```

44

Direct examination - N. Mohan

```
 1   evidence at this time.
 2              THE COURT:  Any objection to 58?
 3              MS. RHEE:  No objection, Your Honor.
 4              THE COURT:  All right.  It's in.
 5        (Plaintiffs' Exhibit Number 58 admitted into evidence.)
 6   BY MR. TEITELBAUM:
 7   Q    And once again, Mr. Mohan, this is from October of
 8   2010, it's a thread of emails with you, as well as some of
 9   your other colleagues from the time, including Scott Spencer
10   and Jonathan Bellack; is that right?
11   A    Yes, sir.
12   Q    And then if we go to -- on the second page of the
13   exhibit with the Number 3 there -- and feel free to look
14   back at the beginning of this email from you.  But you're
15   asking a series of questions with numbered paragraphs here;
16   right?  And then Mr. Bellack is responding?
17   A    Yes.  Would you like me to take a look at the document?
18   Q    That was my only question about the email.
19              So if we -- for now -- so if we agree that your
20   questions are next to the numbers, I think there's no need
21   to look.
22   A    If you could go back to it, I could confirm these were
23   from me.
24   Q    Sure.  If we could go back to the bottom of the first
25   page.
```

45

Direct examination - N. Mohan

```
 1    A    Yes.  It looks like I'm asking -- it looks like that's

 2    correct.

 3    Q    Okay.  So let's go to the next page next to the

 4    Number 3.

 5              And you pose the question -- this is about yield

 6    managers:  "What do you guys think about acquiring one of

 7    them?  Is that like giving up before trying?  I am concerned

 8    that it will take a long time to sort out the org stuff

 9    internally.  One way to make sure we don't get further

10    behind in the market is picking up the one with the most

11    traction and parking it somewhere."

12              Did I read that correctly?

13    A    You did, yes.

14    Q    Okay.  And part of what -- Mr. Bellack's response here

15    in the third sentence right underneath there he says:  "It

16    does not solve a ton of problems by itself, but as you say

17    if we bought one and parked it, it would let us solve the

18    problems from a position of strength (market share,

19    knowledgeable, team members.)"

20              So this was part of a reflection that part of

21    Google's strategy was to try to immobilize the leading yield

22    manager while Google had a chance to catch up; correct?

23    A    Absolutely not.

24    Q    Okay.  So the -- what happened shortly after October of

25    2010, Google did, in fact, acquire AdMeld in 2011; right?
```

46

Direct examination - N. Mohan

1    A    Yes.

2    Q    Okay.  And in this email, just so we're clear, you do

3    not respond to Mr. Bellack saying "I wholeheartedly disagree

4    with parking this yield manager somewhere"; right?

5    A    Yes.  And the term "parking" referred to continuing to

6    offer it in the marketplace while we rebuilt it on the

7    Google stack.  The previous little highlighted section you

8    showed me, that's what I was referring to.  So all that

9    stuff about organizational challenges, et cetera, is a

10   reference to the fact that when you acquire a technology,

11   you have to rebuild it on the Google stack that leads to all

12   kinds of organizational and resource challenges.

13   Q    All right.  So let me just ask you then, so parking is

14   a reference to bringing it inside Google's organization and

15   then operating it as quickly as possible, that's what "park"

16   means?

17   A    Continuing to offer it to publishers, because if we

18   didn't offer it to publishers, as I pointed out, it was an

19   incredibly competitive time, we would have fallen further

20   behind, defeating the purpose of the acquisition in the

21   first place.  But, in parallel, also taking resources to

22   build that missing functionality that I described, that

23   yield management functionality, into the DFP and AdX stack.

24   So it was two things.

25   Q    Okay.  So let's take a look just at the top of this

47

Direct examination - N. Mohan

```
 1    email.
 2             The very next thing after this discussion between
 3    you and Mr. Bellack with questions and answers, you say:
 4    "Okay.  Good.  This seems like progress."  And then further
 5    up, there's a discussion here between you and
 6    Mr. Harienstein about setting up a meeting with AdMeld's
 7    CEO; right?
 8    A    Yes.  The slide was a little behind your words, so I'm
 9    just catching up.
10    Q    Sure.
11    A    I see the highlighted part.
12    Q    Okay.  And then your communications with
13    Mr. Harienstein there at the top are about setting up a
14    meeting with AdMeld's CEO?
15    A    Yeah.
16             MR. TEITELBAUM:  Okay.  So we can take that
17    document down, and let's move on to PTX 112, please.
18             THE COURT:  Any objection to 112?
19             MS. RHEE:  No objection, Your Honor.
20             THE COURT:  All right.  It's in.
21      (Plaintiffs' Exhibit Number 112 admitted into evidence.)
22    BY MR. TEITELBAUM:
23    Q    Okay.  So just taking a brief looking at the cover
24    slide just so we're oriented, Mr. Mohan.
25             MR. TEITELBAUM:  The very cover slide of the
```

                                                              48

Direct examination - N. Mohan

```
 1   PowerPoint presentation, please, Mr. Klein.

 2   BY MR. TEITELBAUM:

 3   Q    And the title of this is "Project 17, AdMeld and

 4   PubMatic"; is that right, Mr. Mohan?

 5   A    Yes, it is.

 6   Q    Okay.  And you're one of the deal sponsors on the cover

 7   there; right?

 8   A    Yes.

 9   Q    Okay.  So now -- and this is just an evaluation of the

10   purchase of a yield manager, either AdMeld or PubMatic;

11   right?

12   A    It looks to be that way, yes.

13   Q    So let's take a look at page 11 of the exhibit, which

14   is the Bates ending in 984.

15   A    This one here?

16   Q    Yes.

17        And so what this slide reflects is that Google's

18   estimated valuation of AdMeld was between $182 million and

19   $355 million; right?  That's what the AM stands for there?

20   A    Yeah.  It appears to be the case.

21   Q    Okay.  And then what's noted above is the expected

22   price of $380 million plus retention; right?

23   A    Yes.

24   Q    And so your team is observing here that Google is

25   planning to pay in excess of its actual valuation of AdMeld;
```

                                                          49

Direct examination - N. Mohan

1    right?

2    A    This is an estimation, and oftentimes these are very

3    wide ranges, but it looks like the expected price was higher

4    than whatever range they had come up with.  But, again,

5    these are very broad ranges typically.

6    Q    Okay.  And so at the bottom of this slide there's a

7    reference to this why pay more than Google calculated value,

8    and what the slide says is that -- if there is 100 percent

9    growth for 2012, which appears reasonable based on AdX

10   growth trajectory, that was a recognition by Google that

11   yield managers were growing fast within the ad tech

12   ecosystem; right?

13   A    Yeah.  The whole industry was growing quite fast at the

14   time, I remember.

15   Q    Okay.  And if we go to page 14 of the .pdf, which is

16   the Bates ending in 987.  The all-in cost estimate there

17   next to total ended up being about $448.5 million; right?

18   A    I see the highlighted part.  This looks like a

19   spreadsheet just calculating based on the estimates.

20   Q    So that was nearly -- nearly $100 million above the

21   estimated value that Google had calculated for AdMeld;

22   right?

23   A    Yeah.  I'm not sure what other things they put into --

24   it looks like a lot of this were just deal costs versus the

25   purchase price.

                                                              50

Direct examination - N. Mohan

```
 1    Q    Okay.  We can take that document down, and we are
 2    nearing the wrap-up point here.
 3              Mr. Mohan --
 4              MR. TEITELBAUM:  And, I'm sorry, it looked like
 5    the Court had a question.  I didn't mean to interrupt.
 6    Okay.
 7              Okay.  So turning just briefly to your
 8    compensation at Google, Mr. Mohan, Google has requested that
 9    this information be kept under seal.  So with the Court's
10    indulgence, I would just ask you and the Court to take a
11    look at page 101, line 9 of your litigation deposition, and
12    I just have some questions for you about that.  So we're not
13    putting anything up on the screen.  It's in the binders
14    behind you.  And I think it is the -- it's in the larger
15    binder, and it's the second tab.
16              THE COURT:  Second tab?
17              MR. TEITELBAUM:  Yes, Your Honor.
18    BY MR. TEITELBAUM:
19    Q    And just let me know when you're at page 101, line 9.
20    A    101?
21    Q    Yes.
22    A    I am on page 101.
23    Q    Okay.  And if you could please just read to yourself,
24    not out loud, from page 101, line 9 to page 103, line 7.
25    And just let us know if that testimony was accurate.
```

51

Direct examination - N. Mohan

```
 1   A     So from 101, 9?

 2   Q     Correct.

 3   A     Okay.

 4         THE COURT:  Just for the record, that doesn't

 5   involve salary; that involves --

 6         MR. TEITELBAUM:  Yes.  I apologize.  That was a

 7   sloppily-phrased question.

 8         This is with respect to your Google stock

 9   holdings, Mr. Mohan.

10         THE COURT:  I think for purposes of the record,

11   all that should be out there publicly is it appears that

12   witness owns significant stock in Google.

13         MR. TEITELBAUM:  Understood, Your Honor.

14         And we can talk about this at a housekeeping

15   phase.  We would just ask that -- we're not seeking to

16   remove the seal from this, but we would ask that it become

17   part of the record for the Court's consideration, those

18   deposition page ranges.

19         THE COURT:  Just those three.  We're not going to

20   put the whole deposition in.

21         MR. TEITELBAUM:  That's correct, Your Honor.  Just

22   101 to 103.  Page 101, line 9, to page 103, line 7 only.

23         THE COURT:  Any objection to that?

24         MS. RHEE:  As long as it remains under seal, Your

25   Honor.
```

Direct examination - N. Mohan

```
 1            THE COURT:  Yeah.  This is under seal, but it will
 2    be part of the formal record.
 3     (Plaintiffs' Exhibit litigation deposition, Page 101, line
 4    9, to page 103, line 7 only (sealed exhibit) admitted into
 5                        evidence.)
 6    BY MR. TEITELBAUM:
 7    Q    So just a few more questions, Mr. Mohan.
 8    A    Excuse me.  Is there a question about this that you ...
 9    Q    Just was that testimony accurate when you gave it?
10    A    When I gave it, yes.  The dollar amounts, as you know,
11    fluctuate, and they're different than they are in this
12    today.
13    Q    Understood.
14            So as we talked about a little bit previously, you
15    left the display and video ads business at Google in 2015;
16    right?
17    A    I left the Google display business, yes, in 2015.
18    Q    Okay.  So, in other words, you've been out of the
19    display business for about nine years at this point?
20    A    Yeah.
21            MR. TEITELBAUM:  Okay.  No further questions on
22    direct examination.
23            Thank you, Mr. Mohan.
24            THE COURT:  All right.  Ms. Rhee.
25            MS. RHEE:  Court's indulgence while we pass out
```
                                                              53

Cross-examination - N. Mohan

```
 1   even more binders, Your Honor.
 2            THE COURT:  Will you need the depositions at all?
 3            MS. RHEE:  No, Your Honor.
 4            THE COURT:  We'll get rid of them.
 5            Yes, Ms. Rhee.
 6            MS. RHEE:  Thank you, Your Honor.
 7                           CROSS-EXAMINATION
 8   BY MS. RHEE:
 9   Q   Mr. Mohan, I'm Jeannie Rhee, I represent Google, and
10   I'm going to spend a little bit of time this morning asking
11   you some follow-up questions of the government's examination
12   of you; okay?
13            THE COURT:  Ms. Rhee, just for the record, though,
14   you're not planning to then call Mr. Mohan again in your
15   case?
16            MS. RHEE:  With Court's indulgence.  And I think
17   the scope is going to be contained within the direct
18   examination, but if we can have just a little bit of
19   latitude, then we will not need to call him again.
20            THE COURT:  That is my preference.  All right.  So
21   you'll have to switch from direct, you know, examination and
22   cross.  All right.  So you can lead sometimes and not
23   others.
24            MR. TEITELBAUM:  Your Honor, we would object --
25            MS. RHEE:  I am well aware, Your Honor.
```

                                                                54

Cross-examination - N. Mohan

```
 1              MR. TEITELBAUM:  We would object to leading across

 2   the board because he's a Google party witness.

 3              THE COURT:  I think that is correct.  No leading

 4   at all.

 5              MS. RHEE:  Absolutely, Your Honor.  Only I would

 6   ask for indulgence just to be able to speed it along to just

 7   lead for foundation.

 8              THE COURT:  We'll wait and see because some of the

 9   leading questions have been too long.

10              Let's just get started.  Okay.

11   BY MS. RHEE:

12   Q    Mr. Mohan, in your direct examination you were asked

13   about your DoubleClick days; correct?

14   A    Yes.

15   Q    I just want to rewind and ask you, before DoubleClick,

16   were you at a company called Net Gravity?

17   A    I was, yes.

18   Q    And what was Net Gravity?

19   A    Net Gravity was another ad -- advertising technology

20   company that was one of the many competitors that were in

21   the space at the time.

22   Q    And what kind of technology did Net Gravity provide?

23   A    Net Gravity was one of the really early pioneers in

24   advertising -- Internet advertising technology.  It offered

25   primarily a piece of software that publishers could install
```

Cross-examination - N. Mohan

```
 1   in their data centers to manage their advertising on their

 2   website.  So it was an ad server, but it was a

 3   software-based of ad server.

 4   Q    And what time period are we talking about that you were

 5   at Net Gravity?

 6   A    This was in the late '90s.

 7   Q    And at some point in time, did Net Gravity become

 8   acquired or merge?

 9   A    It did, yes.

10   Q    And with whom?

11   A    DoubleClick.

12   Q    And is that how you came to work at DoubleClick?  It

13   was through an acquisition?

14   A    Yes, that's correct.

15   Q    Next during your DoubleClick years, Mr. Mohan, what

16   were the products that you focused on while working at

17   DoubleClick?

18   A    I worked on a number of products at DoubleClick.  I was

19   at DoubleClick in two stints, from the acquisition of Net

20   Gravity until when I went to graduate school, and then when

21   I came back.  And I worked on publisher-facing ad serving

22   products, as well as advertiser-facing ad serving products

23   kind of throughout my time there.

24   Q    So when you were at DoubleClick, I just want to make

25   sure that I've got that, was DoubleClick offering both
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Cross-examination - N. Mohan

```
 1   publisher and advertising technology solutions?
 2   A     It was, yes.
 3   Q     So turning to the acquisition period, you remember
 4   being asked questions about that on your direct examination?
 5   A     Yes.
 6   Q     And you were presented with a document that was
 7   identified as PTX 14, a DoubleClick presentation to Google;
 8   do you remember that slide deck?
 9   A     Yes.
10   Q     Now, were there other parties other than Google who
11   were interested in acquiring DoubleClick at that time?
12   A     Yes, there were.
13   Q     Who were they?
14   A     Microsoft, Yahoo, AOL --
15   Q     And --
16   A     -- in addition to Google.
17   Q     And do you recall whether or not there were
18   presentations similar to PTX 14 that you presented to those
19   interested parties as well?
20   A     Yes.  I do recall presenting similar materials to those
21   other parties.
22   Q     And now was Microsoft at that time a competitor to
23   Google?
24   A     Yes.
25   Q     What about Yahoo?
```

57

Cross-examination - N. Mohan

```
 1   A     Yes.

 2   Q     And what about AOL?

 3   A     Yes.

 4   Q     Now, you talked on direct examination quite a bit

 5   about, post acquisition, rebuilding DoubleClick technology

 6   onto the Google stack; do you remember the back and forth

 7   with the government attorney about that?

 8   A     I do, yes.

 9   Q     What does it mean to build or rebuild acquired

10   technology onto the Google stack?

11   A     It means that when Google acquired DoubleClick, we

12   wanted to ensure that we were able to wrap -- continue to

13   randomly innovate.  As I said, it was an extremely dynamic

14   time.  We really prided ourselves on being able to be the

15   leaders from an innovation standpoint.  So it meant that we

16   would build, really from scratch, the core ad serving

17   technology, all of that software, onto the Google technology

18   stack.  So it was kind of a very long process to do that.

19   But once we did that, we felt that we would be able to

20   rapidly iterate and add lots and lots of features on behalf

21   of our publishers.

22   Q     And what does it mean when you talk about the Google

23   technology stack?  If you could break down and explain what

24   that phrase means to you.

25   A     Well, it means a lot of software development at Google
```

                                                              58

Cross-examination - N. Mohan

1    happens on what we call the Google technology stack.  It's

2    basically -- it's multiple platforms and capabilities,

3    programming languages, various types of integrations with

4    Google technology.  And in order to benefit from all of that

5    Google technology innovation, any software application that

6    you have, ideally the preference is is to actually build it

7    on that stack so you could inherit all the benefits of the

8    innovation that's what's happening at the platform layer

9    into the core application that you built.  In this case the

10   application was a publisher ad server.  And so once the

11   Google acquisition of DoubleClick was complete, we embarked

12   on this journey to really rebuild it on the stack for those

13   reasons.

14   Q    Now, Mr. Mohan, when you talk about writing the code

15   from scratch, why are you not able just to cut and paste the

16   DoubleClick code and just plop it on to what you call the

17   Google technology stack?

18   A    Oh, I mean, for many reasons.  First, it would be

19   because if you did that, you wouldn't take advantage of all

20   of that innovation that's happening on those core base-level

21   Google technologies.  In order to actually work with them

22   seamlessly, you have to integrate into their APIs, you have

23   to take advantage of their capabilities using their

24   functionality into your software application.  So that's one

25   reason.

Cross-examination - N. Mohan

1              The second reason, as I pointed out in my earlier

2      remarks, the world is not standing still.  You have to not

3      just rebuild the core DoubleClick technology, you have to

4      build ahead of where it was, because publishers are

5      demanding features and functionality constantly.  They're

6      seeing that from competitors, we saw that in the yield

7      management conversation.  So we need to continue to innovate

8      also while we're doing it, and so that's why it's not a

9      simple cut-and-paste job.

10     Q    Now, Mr. Mohan, how common is it after an acquisition

11     to keep an acquired company going while working through this

12     kind of integration?

13     A    It's quite common, especially in really competitive

14     environments.  Because if you don't keep it going, these

15     integrations sometimes can take years.  And you don't want

16     to just be standing still in the market when all of these

17     other competitors are innovating and offering their

18     solutions.  You could lose many years of time.  And by the

19     time you've rebuilt it on your stack, it could be that you

20     are left behind by all the competitors.  So that's why it

21     was very important for us not just to rebuild DFP into XFP

22     that became the Google DFP, but also to continue to offer

23     and innovate the core DFP in the market at the same time.

24     Q    Now I want to direct your attention, Mr. Mohan, to

25     what's been marked for identification as DTX 37.

                                                                60

Cross-examination - N. Mohan

```
 1              THE COURT:  Any objection to this exhibit?

 2              MR. TEITELBAUM:  No objection.

 3              THE COURT:  All right.  It's in.

 4         (Defense Exhibit Number 37 admitted into evidence.)

 5  BY MS. RHEE:

 6  Q    Now, Mr. Mohan, if we could just zero in, and I know

 7  because you have some trouble seeing.

 8  A    Thank you.

 9  Q    Now, are you familiar with this document?

10  A    I am familiar with this document, yes.

11  Q    And was it prepared in the ordinary course where you

12  are writing to the display ads team about the prior year in

13  review and then the following year outlook?

14  A    It was, yes.

15  Q    And did you prepare a similar document at the beginning

16  of each successive year for the initial years that you were

17  running this business?

18  A    Yes.  I recall doing this for several years.

19              MS. RHEE:  And, Your Honor, at this time, in

20  addition to the admission of DTX 37, again to speed things

21  along, we would offer the admission of DTX 59, DTX 76,

22  DTX 101 and DTX 18, which are each of the yearly reviews and

23  outlooks.

24              THE COURT:  Any objection?

25              MR. TEITELBAUM:  If we could have just one moment,
```

Cross-examination - N. Mohan

```
 1   Your Honor.
 2             No objection.
 3             THE COURT:  All right.  They're all in.
 4        (Defense Exhibit Numbers 59, 76, 101, 18 admitted into
 5                          evidence.)
 6             MS. RHEE:  Now, again, if we could maybe blow up
 7   the initial screen for Mr. Mohan so he can see it.
 8   BY MS. RHEE:
 9   Q    Now, Mr. Mohan, this one, which is the year in 2008
10   review with an outlook to 2009, was that the first year that
11   you had come over to Google?
12   A    2008, yes, was the first year I was at Google.
13   Q    Okay.  Now, directing your attention to the screen that
14   is recap of 2008, you see that paragraph in front of you.
15   And, in particular, I want to direct your attention starting
16   at the bottom line.  "Finally, we delivered this continuous
17   stream of innovation for our users, advertisers and
18   publishers while successfully integrating two companies and
19   creating a unified display/content organization.  Sort of
20   like changing the engines on a plane while continuing to fly
21   it"; do you see that?
22   A    I do see that.
23   Q    So I want to take each of those statements in turn.
24             First of all, why did you see the successful
25   integration of the two companies, DoubleClick and Google, as
```

                                                             62

Cross-examination - N. Mohan

```
 1   changing the engines on a plane while continuing to fly it?
 2   A    I certainly felt that way for the reasons I was
 3   describing before.  You know, we had -- we took a lot of
 4   pride in all of our product innovation, but even at Google,
 5   we had limited resources to do this, and we had to do two
 6   things.  We had to, as I described before, rebuild the
 7   DoubleClick ad server onto the Google stack, continue to
 8   innovate on that part of it.  That was a Herculean task, as
 9   I just described.
10           But, at the same time, we needed to remain
11   competitive in this incredibly dynamic market with our
12   existing DFP offering.  And so it was as if, like, the
13   existing DFP offering was the plane and we were changing the
14   engines by building this new, even more capable ad server on
15   the Google stack at the same time.  And it was certainly a
16   proud moment for me, and I wanted to convey that to my
17   entire team.
18   Q    Now, taking the next line, you talk about --
19           MS. RHEE:  And if we could highlight this as well,
20   Mr. Spalding --
21   BY MS. RHEE:
22   Q    -- "the growth in the business year over that year
23   enabled through the launch of dozens and dozens of new
24   products, major upgrades and feature enhancements throughout
25   the year"; do you see that?
```

                                                                63

1    A    I see that.

2    Q    Mr. Mohan, why did you attribute the growth of the

3    business to the launch of dozens and dozens of new products,

4    major upgrades and feature enhancements throughout that

5    year?

6    A    Oh.  I mean, simply put, the basis of our success in

7    conversations with publishers and advertisers fell back to

8    one simple thing, which was the product innovation we were

9    able to offer and the services we provided along with it.

10            So in order to maintain the best set of offerings

11   to our publishers, as well as to our advertisers, we needed

12   new products and new capabilities, we needed to upgrade our

13   existing products that were already in market.  You know,

14   our competitors were trying to do the same thing, and we

15   needed to do all of this at a very vigorous pace to remain

16   competitive in the market.

17   Q    Now, finally, last question with respect to this

18   introductory paragraph.  When you talk about this continuous

19   stream of innovation, you note that it was delivered to

20   users, advertisers and publishers; do you see that,

21   Mr. Mohan?

22   A    I do.

23   Q    Now, why all three and not one or the other?

24   A    Oh, just really this goes back to the previous

25   conversation, which is display advertising ad tech by

64

Cross-examination - N. Mohan

```
 1    definition has two sides of the market.  Advertisers cannot
 2    do what they achieve or are looking to do, which is run
 3    their advertising campaigns, without publishers and
 4    publisher inventory.  Otherwise, there's no place for those
 5    ads to run.
 6          Similarly, publishers cannot maximize their yield
 7    or generate more revenue if they cannot attract advertiser
 8    demand advertisements.  And so publishers and advertisers,
 9    by definition, are two sides of this marketplace, otherwise
10    display advertising, just by definition, does not exist.
11          And, of course, users, all of us as consumers are
12    an important part of this story, too, because we are the
13    ones who actually see the ads.  We're the ones who see the
14    ads and click on them.  And so calling out that all three of
15    these were our stakeholders, we had a duty to all three of
16    these parties was an important part of the strategy that I
17    wanted to make clear to my organization.
18    Q    Now, you remember being asked on direct examination by
19    the government attorney about PTX 32.
20          MS. RHEE:  And if I could get Mr. Spalding's
21    assistance of just pulling that up.
22    BY MS. RHEE:
23    Q    And this pertained to the three-pillar strategy; do you
24    remember that?
25    A    Yes.
```

65

Cross-examination - N. Mohan

```
 1    Q    Now I want to direct your attention to the next page,
 2    which was not walked through with you by the government.
 3    And here, it says:  "Our positioning and value proposition
 4    to advertisers and publishers is tied to our overall themes
 5    of reach, results, relevancy for advertisers and yield and
 6    control for publishers"; do you see that?
 7    A    I see that.
 8    Q    Now, Mr. Mohan, from your entire time in this business
 9    from Netscape to today, can publishers ever succeed without
10    advertisers?
11    A    No.
12    Q    And can advertisers ever succeed without publishers?
13    A    Of course not.
14    Q    And for the entire time that you've been in this
15    business, has the industry always talked about a buy-side
16    and a sell-side?
17    A    Yes.
18    Q    Now, similarly, you were shown by the government in
19    your direct examination PTX 41.
20         MS. RHEE:  And, Mr. Spalding, if I could get your
21    assistance on that as well.
22    BY MS. RHEE:
23    Q    And you remember being directed to subparagraph D that
24    the government walked you through.
25         MS. RHEE:  And if we could get assistance in
```

66

Cross-examination - N. Mohan

```
 1    blowing that up for Mr. Mohan.
 2              THE WITNESS:  Yes, I have it here.
 3    BY MS. RHEE:
 4    Q    Okay.  Great.
 5              Now, you see here a reference to Yahoo and
 6    Microsoft; do you remember being asked about that?
 7    A    Yes.
 8    Q    Now, why were you focused on Yahoo and Microsoft?
 9    A    You know, they were very large formidable competitors
10    in the ecosystem.  There were many others, as I pointed out,
11    but Yahoo and Microsoft were quite formidable competitors in
12    this space.
13    Q    Now, you remember being asked during examination with
14    respect to their document about a so-called conditions on
15    customers to compel customers to use Google products and not
16    competitors; do you remember that line of questioning?
17    A    Uh-huh.
18    Q    Now, Mr. Mohan, can you explain to the Court, was there
19    a prohibition on publishers using Google tools versus Yahoo
20    tools, Microsoft tools, AOL tools?
21    A    No, of course not.  And as I mentioned, there were
22    other tools that they could use in addition to these from
23    the very large companies like Yahoo and Microsoft.
24    Q    And now in discussing this three-pillar strategy,
25    Mr. Mohan, no offense to you, but was this three-pillar
```

Cross-examination - N. Mohan

```
 1    strategy exclusive and proprietary to Google?

 2    A    It was not.  It was really pretty widely held across

 3    the industry.

 4    Q    And what about Microsoft, did they have a

 5    three-pillared strategy?

 6    A    Yes, I believe so.

 7    Q    And what about Yahoo?

 8         MR. TEITELBAUM:  Objection to just about other

 9    company strategies, Your Honor.

10         THE COURT:  Overruled.

11         THE WITNESS:  Yes, I believe so.

12    BY MS. RHEE:

13    Q    And, Mr. Mohan, whether you were at Net Gravity or

14    DoubleClick or into Google, at least from your own

15    perspective, did you ever conceive of running a display ads

16    business that did not serve both advertisers and publishers?

17    A    I did not.  At DoubleClick, we had solutions to -- for

18    both sides, buy-side and sell-side, and that continued at

19    Google just because of what I said earlier, which is display

20    advertising really is a two-sided marketplace.

21    Q    Okay.  I now want to direct your attention --

22         MS. RHEE:  And thank you, Mr. Spalding.  We can

23    put that document down.

24    BY MS. RHEE:

25    Q    I want to direct your attention to the building of the
```

                                                              68

Cross-examination - N. Mohan

```
 1   ad exchange at Google called AdX 2.0.
 2           Do you remember being asked questions about that?
 3   A    Uh-huh.
 4   Q    Okay.  Now, when you were at DoubleClick, you talked in
 5   your examination with the government attorney about the fact
 6   that DoubleClick, at the time of the acquisition, had, I
 7   believe what you referred to as a nascent ad exchange; do
 8   you remember that?
 9   A    Yes.
10   Q    Now, did that DoubleClick ad exchange at the time of
11   acquisition have any real-time bidding functionality?
12   A    It did not.
13   Q    And when you came over to Google and oversaw the
14   building from scratch, that ad exchange onto the Google
15   technology stack, what, if anything, did you do to improve
16   upon that product by incorporating real-time bidding?
17           MR. TEITELBAUM:  Objection.  Leading.
18           MS. RHEE:  I asked a "what" question, Your Honor.
19           THE COURT:  No, I'm going to permit that.
20           Overruled.
21           THE WITNESS:  It was -- it goes back to what I
22   said in terms of sort of flying the plane while putting on
23   the engines.
24           We rebuilt the core yield management functionality
25   of the nascent DoubleClick ad exchange when we were building
```

69

Cross-examination - N. Mohan

```
1    the Google ad exchange, but we continued to innovate, and
2    one of the really core innovations was this concept of
3    real-time bidding, which would result in higher ROI for
4    advertisers, because they could literally bid in real time,
5    and that would translate into a higher yield for publishers,
6    and that was a core innovation of the Google ad exchange.
7    BY MS. RHEE:
8    Q    Now, when did Google launch the AdX on the Google stack
9    AdX 2.0; do you recall?
10   A    Oh, I think it was maybe in 2009.
11   Q    And at that point in time, DoubleClick had been
12   acquired for over a year plus at Google; yeah?
13   A    Yeah.
14   Q    So why did it take so long?  Why did it take so long to
15   rebuild the ad exchange?
16   A    I mean, for the same reason I said.  We had very
17   hard-working teams, but even in this Google context, we had
18   limited resources, and we needed to continue to offer the
19   existing DoubleClick solutions in the market, so that we
20   wouldn't lose out to our competitors while rebuilding this
21   Google -- while rebuilding all this technology on the Google
22   stack, and then also making sure that when we rebuilt it on
23   the Google stack, we weren't just building the old stuff, we
24   were innovating, including this real-time bidding
25   functionality.  And that takes time.  It took -- my
```

70

Cross-examination - N. Mohan

```
 1   experience was that all of these things take -- you know,
 2   you have a certain roadmap and you want to get them done,
 3   but they oftentimes take longer than you originally planned,
 4   and that was the case with AdX as well.
 5   Q    So now I want to direct your attention, Mr. Mohan, to
 6   DTX 59, which has already been admitted into evidence, and
 7   that's the following year recap and outlook.
 8              MS. RHEE:  And again, Mr. Spalding, if we could
 9   get your assistance so that Mr. Mohan can actually see.
10              THE WITNESS:  Yes, I have it.
11   BY MS. RHEE:
12   Q    Okay.  And I want to direct your attention in
13   particular to page 2 that talks about the ad exchange.
14              You see that?
15   A    I do.
16   Q    Is it big enough for you to be able to read?
17   A    I got it.
18   Q    Now you write:  "I believe our ad exchange AdX will
19   transform the display advertising industry"; do you see
20   that?
21   A    I see that.
22   Q    Now, why did you write that?
23   A    I was proud of our innovation.  I really felt that it
24   would really be a win-win for all the parties, publishers,
25   as well as advertisers, and also for our business, but
```

71

Cross-examination - N. Mohan

1    really be revolutionary in the space because it would do

2    things that would solve a lot of the real challenges that

3    the display advertising industry was facing at the time.

4    Q    Now, staying on to this yearly recap and outlook, I

5    want to now direct your attention to the top of this first

6    page -- or, I'm sorry, the top of this page to the first

7    paragraph there with respect to new ad formats.

8           Do you see that, Mr. Mohan?

9    A    Yes.

10   Q    Okay.  And you write:  "We have moved from a network

11   that served text ads and a few type of display banners to

12   one that supports nearly every format relevant for users,

13   graphical ads, video formats, rich media, mobile feeds,

14   expendables and even online streaming audio ads."

15          Do you see that?

16   A    I see that, yes.

17   Q    Now, why were all of these ad formats important for you

18   to build into the Google products that you were in charge

19   of?

20   A    Simply because these were all various forms of display

21   advertising.  So the ad tech solutions we built really had

22   to work seamlessly across them.  They really were

23   interchangeable in the minds of advertisers, and therefore,

24   had to be capabilities that publishers were able to offer to

25   their advertiser clients.  So they really were kind of the

                                                            72

Cross-examination - N. Mohan

```
 1   same thing.
 2   Q    Now, finally, I want to direct your attention again on
 3   this same yearly recap and outlook to page 3, which is about
 4   "growing the display advertising pie for everyone."
 5           Do you see that section of this outlook?
 6   A    I do.
 7   Q    Now, Mr. Mohan, you write here:  "Our strategy is
 8   straightforward.  We want to grow the overall display
 9   advertising pie for everyone in the industry.  By growing
10   the pie for everyone, Google will, of course, continue to
11   grow its own revenues"; do you see that?
12   A    Yes.
13   Q    Now, Mr. Mohan, why try to grow the pie for everyone
14   and not just grow Google's own slice?
15   A    Oh, very simply.  Our business, which was fundamentally
16   a revenue share business, only grew if our publishers'
17   revenues grew.  It was directly correlated with the success
18   of our publishers.  And our publishers' revenue would only
19   grow if they could deliver higher ROI to their advertisers.
20   And so we needed to deliver better return on investment to
21   advertisers, which would translate into higher revenue for
22   publishers, and, as a result, our business would grow
23   because our business was a rev share of publishers' overall
24   revenues.
25           MS. RHEE:  Okay.  If we could take this document
```

73

Cross-examination - N. Mohan

```
 1    down.
 2    BY MS. RHEE:
 3    Q    Now, Mr. Mohan, I want to now direct your attention to
 4    DTX 47.
 5              THE COURT:  Any objection to 47?
 6              MR. TEITELBAUM:  No objection.
 7              THE COURT:  All right.  It's in.
 8        (Defense Exhibit Number 47 admitted into evidence.)
 9              MS. RHEE:  Now if we could actually go to the
10    slide that is -- and blow that up.  Thank you, Mr. Spalding.
11    BY MS. RHEE:
12    Q    Mr. Mohan, you see that this is a deck review, and it
13    is called L&S; do you see that?
14    A    Yes.
15    Q    What does L&S stand for?
16    A    It stands for Larry and Sergey.  Larry Page and
17    Sergey Brin were our founders.
18    Q    Okay.  And was this a presentation for them?
19    A    It appears that way, yes.
20    Q    Now I want to direct your attention to page 24 of this
21    deck.  And you see that blown up here on the screen?
22    A    I do.
23    Q    Okay.  And the title of this slide is "AdWords buyers
24    on AdX sellers"; do you see that?
25    A    Yes.
```

74

Cross-examination - N. Mohan

```
 1    Q    So what perspective, buy-side or sell-side, does this
 2    slide represent?
 3    A    This represents the perspective from the buy-side.
 4    Q    Okay.  And why do you say that based on each of the sub
 5    bullets that are contained here?
 6    A    Because this is the view that these are the types of
 7    things that advertisers, ultimately the advertiser clients
 8    that were buying on Google's advertiser-facing products,
 9    would expect from Google.
10    Q    And if you could walk us through, what are the types of
11    things that they would expect and that Google sought to
12    deliver?
13    A    Well, first and foremost, advertisers really care about
14    protecting the sanctity of their brands, what their brands
15    represent.  And they don't want to have ads that run
16    alongside, you know, shady inventory or low quality
17    inventory.  So they expect that those -- their -- the
18    publishers -- the inventory that comes from publishers
19    that's part of where their ads are running is going to be
20    adhering to Google's policies in that sense.
21         They also expect that they're not going to get
22    defrauded by having, you know, fly-by-night publisher
23    inventory as part of the places where their ads can run.  So
24    that's their expectation and kind of when they choose to
25    spend money with Google's advertising products.
```

75

Cross-examination - N. Mohan

1    Q    And Mr. Mohan, as reflected on this slide, what, if

2    any, controls did Google put in place, even in these early

3    years, to be able to assure the quality of inventory that

4    Google was making available?

5    A    By operating the publisher-side solutions, we were able

6    to do checks on the inventory.  So we had a set of policies,

7    these AdSense policies, AdX policies that were published and

8    that we made clear to our publisher clients, and we would

9    check that.  We would check to make sure that those -- the

10   inventory was compliant with those policies before it was

11   made eligible to AdWords' buyers, GDN buyers.  And so those

12   were the types of controls that we put in place.  And it was

13   really important to have that visibility into that inventory

14   to apply those controls, otherwise, we wouldn't have been

15   able to give this type of a guarantee to the GDN buyers.

16   Q    So now then flipping to the next page, page 25 of this

17   deck to the Google founders, you see the title of this slide

18   is "AdX buyers on AdSense sellers"; do you see that?

19   A    I see that.

20   Q    What side, buy-side or sell-side, does this following

21   slide represent?

22   A    So this is about making sure -- this is now the

23   sell-side.  So this is making sure that AdSense sellers, or

24   sellers of inventory, so publishers in this case, could rest

25   assured that they are working with high-quality advertisers

76

Cross-examination - N. Mohan

1    or high-quality intermediaries that might be representing

2    advertisers, so other ad networks, or what have you, so that

3    they were not running ads that were, you know, low-quality

4    ads, scammy ads, worst case ads that could be injecting

5    malware and therefore turning their readers or their

6    consumers that are on these publisher pages into victims.

7            And so certification and -- of the advertiser side

8    was really important to our publishers.  And so having

9    visibility into the advertisers, who they were, whether they

10   were living up to their certification criteria was really,

11   really important to our publishers.  So that's kind of a

12   little bit of the flip side of what we talked about in the

13   previous slide.

14   Q    Now, directing your attention further on in this deck

15   starting with --

16           MS. RHEE:  Let's go to page 41, Mr. Spalding.

17   BY MS. RHEE:

18   Q    Mr. Mohan, just to move this along, do you see here a

19   deeper dive in this slide with respect to the controls that

20   you were walking us through for buy-side value?

21   A    Yes.  This slide looks to be, you know, a sampling of

22   the types of controls and kind of audit mechanisms that we

23   had to ensure compliance, both on the sell-side, publisher

24   side, as well as the buy-side, advertiser side.

25   Q    And similarly if we could go to Slide 46.

77

Cross-examination - N. Mohan

```
 1              Is this again --
 2    A    Yes.
 3    Q    -- just to move this along, a further elaboration of
 4    the controls that you were walking us through?
 5    A    Yes.  Same concept.  And I'm describing some of the
 6    issues I talked about before, like preventing against, you
 7    know, malware, malicious software, those types of things.
 8              MS. RHEE:  If we could take that slide down.
 9    BY MS. RHEE:
10    Q    Now, turning to another topic, you recall being asked
11    on your direct examination about Dynamic Allocation; do you
12    remember that?
13    A    Uh-huh.  Yes.
14    Q    Now, when you were at DoubleClick, did DoubleClick have
15    Dynamic Allocation, Mr. Mohan?
16    A    We did offer Dynamic Allocation.
17    Q    Okay.  So now if I could direct your attention to
18    DTX 80.
19              THE COURT:  I'm sorry, which number?
20              MS. RHEE:  Eighty, Your Honor.
21              THE COURT:  Thank you.  Any objection to 80?
22              MR. TEITELBAUM:  Yes, Your Honor.  This appears to
23    be a white paper, not a business record.
24              MS. RHEE:  Your Honor, it's a white paper that is
25    copyrighted by Google.
```

78

Cross-examination - N. Mohan

```
 1              MR. TEITELBAUM:  But this is the defendant trying
 2    to introduce their own statement.  So if it's not a business
 3    record, it would be not hearsay, Your Honor.
 4              MS. RHEE:  It was clearly created in the ordinary
 5    course of business for business purposes.
 6              THE COURT:  Hold on a second.
 7              I'm permitting it.  Overruled.
 8         (Defense Exhibit Number 80 admitted into evidence.)
 9              MS. RHEE:  If we could pull up DTX 80.
10              THE WITNESS:  I have it.
11              MS. RHEE:  Okay.  And if we could actually go to
12    the attachment in the first instance.  And if we could blow
13    up that initial introductory paragraph.
14    BY MS. RHEE:
15    Q    Mr. Mohan, you see that this white paper has the
16    following introductory paragraph, which says:  "In mid 2010,
17    we, Google, published the results of a research study
18    quantifying the impact of DoubleClick ad exchange on
19    publishers' effective CPMs for their unsold ad space"; do
20    you see that?
21    A    I see that.
22    Q    And it further goes on to say:  "Our analysis
23    determined a CPM lift of 136 percent compared with fixed,
24    upfront pre-negotiated sales of non-guaranteed inventory."
25              MR. TEITELBAUM:  Your Honor, we would just object
```

79

Cross-examination - N. Mohan

```
 1    to introducing these research study results for the truth,
 2    because this is publishing the results of a research study.
 3    So it's hearsay within hearsay within this Google document.
 4            THE COURT:  I had ruled earlier -- is this similar
 5    to what was raised during the motion in limine as to the
 6    studies?
 7            MS. RHEE:  No, Your Honor.  Those studies were
 8    consumer perception surveys; this is a publication by Google
 9    created in the ordinary course with respect to their
10    experiment results.
11            THE COURT:  I'm not going to necessarily accept it
12    for the truth of its contents, but it's a statement that
13    they've made; all right?
14            MR. TEITELBAUM:  If it's not for the truth, then
15    that's the only objection.
16            THE COURT:  Okay.  All right.
17    BY MS. RHEE:
18    Q    Now, Mr. Mohan, in plain English for those of us who
19    are not in the business, what does it mean that there was a
20    CPM lift of 136 percent for publishers?
21    A    In the simplest terms, it means that as a result of
22    this Dynamic Allocation technology that I was describing
23    earlier, publishers saw 136 percent more money than if they
24    had fulfilled that -- fulfilled that demand in the way that
25    it used to work before, which was pre-negotiated sales with
```

80

Cross-examination - N. Mohan

```
 1   ad networks.

 2           So put another way, as a result of this DFP and

 3   AdX Dynamic Allocation capability, publishers generated

 4   136 percent more money.

 5   Q   And now you see the next --

 6           THE COURT:  Hold on one second, though.

 7           But that's more money compared to the non Dynamic

 8   Allocation approach; correct?

 9           THE WITNESS:  That's correct, Your Honor.

10           THE COURT:  It says nothing about whether, had

11   they been able to have access to other systems, they would

12   have made more money.

13           THE WITNESS:  That's correct.  What I'm -- or what

14   this paper is describing here is the control was basically

15   if you were a publisher and you just, like, worked with a

16   handful of ad networks and you negotiated those deals, took

17   those and put them into your system, you would get let's say

18   $1; here, you're going to get 136 percent of that.

19           THE COURT:  Go ahead.

20           MS. RHEE:  Okay, Your Honor.

21   BY MS. RHEE:

22   Q   Now, Mr. Mohan, you see that the second paragraph

23   states that "this initial study was conducted using the

24   first generation of DoubleClick ad exchange"; do you see

25   that?
```

81

Cross-examination - N. Mohan

```
 1   A     Yes.

 2   Q     Was that the nascent ad exchange that came over with

 3   the DoubleClick acquisition?  Is that what this is referring

 4   to?

 5   A     Yes.

 6   Q     And is that a version of the exchange one that had

 7   real-time bidding?

 8   A     No.  That version did not have real-time bidding.

 9   Q     So did this study and the publication of its results

10   talk about the effect of Dynamic Allocation with or without

11   real-time bidding?

12   A     This would refer to Dynamic Allocation without

13   real-time building.

14   Q     Okay.  Now, if you go to the cover email that this

15   study is appended to, I want to direct your attention to the

16   part that reads "Google's booth."  And you see that it

17   discusses distributing this paper at Google's booth and

18   during the general session.  And here the entire email is

19   about the IAB annual conference; do you see that?

20   A     I see that, yes.

21   Q     Okay.  What is the IAB annual conference?

22   A     The IAB stands for Interactive Advertising Bureau.

23   It's the leading industry body in the ad tech space, in the

24   digital advertising space.  And their leadership -- their

25   leadership conference was their flagship event, it happened
```

Cross-examination - N. Mohan

```
 1    once a year, and it convened publishers, ad tech providers,
 2    sometimes advertisers, ad networks.  Really kind of the
 3    entire -- the leadership of the entire industry on an annual
 4    basis.
 5    Q    So a fancy event?
 6    A    Yeah.  I mean, it was like a thought leadership-type
 7    event for the publishers and advertising industry, yeah.
 8    Q    Why would Google distribute this white paper at the IAB
 9    annual flagship conference?
10    A    For a very simple reason, which was the core
11    proposition of our publisher-side solutions was to help
12    publishers generate more revenue.  Publishers were spending
13    lots of resources producing, you know, all the great content
14    that they do, and they needed to monetize it, and one of the
15    core things that we were telling publishers was that if you
16    work with the DoubleClick ad exchange with DoubleClick for
17    Publishers, you will generate more revenue.  Like, the whole
18    premise of it was to maximize yield.
19            And so the reason why this was so exciting is that
20    we had proof from our standpoint, we could show to them,
21    hey, publishers, if you go about using Dynamic Allocation as
22    opposed to sort of these preordained deals that you were
23    doing with ad networks, you could literally make more money.
24    That inventory would now be 136 percent more valuable.  So,
25    in that sense, it was kind of a watershed moment for the
```

Cross-examination - N. Mohan

1    industry, because now there was this technology that could

2    actually help publishers dramatically make more money.

3              It kind of goes back to what I was saying, which

4    is, wow, now we have this thing that could actually grow the

5    pie for the entire industry, every publisher that uses it.

6    And so that's why it was important to showcase these results

7    when we had them at this type of an event.

8    Q    I now --

9              MS. RHEE:  Thank you, Mr. Spalding.

10   BY MS. RHEE:

11   Q    -- want to direct your attention to -- fast-forward a

12   year to DTX 76, the following outlook and look-ahead.

13             MS. RHEE:  And it's already in evidence.

14             THE COURT:  Right.

15   BY MS. RHEE:

16   Q    And, in particular, I want to direct your attention,

17   Mr. Mohan, to page 3 of this annual outlook on reflections

18   with respect to the ad exchange; do you see that?

19   A    I see that.

20   Q    Okay.  And you write:  "At the beginning of 2010, AdX,

21   our exchange for buying and selling display ads, was

22   transacting 50K in media per day.  There were only 50

23   buyers, and no agency was doing significant spending.

24   Today, AdX regularly sees $1 million days, has hundreds of

25   buyers and sellers, including many of the largest on the

                                                            84

Cross-examination - N. Mohan

1    Internet, and is the primary vehicle through which Google is

2    growing its agency relationships"; do you see that?

3    A    I do.

4    Q    Now, Mr. Mohan, if you can think back, what did it take

5    for you and your team to grow AdX from transacting only 50K

6    a day and having only 50 buyers at the beginning of the year

7    to the results that you were publishing here at the end of

8    the year?

9    A    Really just in the simplest sense, producing results

10   for our publishers.  So higher yield for our publishers,

11   like the 136 percent that I was talking about earlier.  And

12   then also -- which came from, amongst other things, from

13   higher ROI for our advertisers.  That's what I'm alluding to

14   here in terms of agency relationships, et cetera.  So a

15   combination of higher ROI for advertisers and more yield for

16   publishers.

17   Q    Now, Mr. Mohan, is it enough just to have an innovative

18   product in order for you to be able to see these kinds of

19   results, or do you need to do more than that?

20   A    In my experience, the -- it really does start with an

21   innovative product.  But that -- in this marketplace, we

22   needed to go above and beyond that, which is to actually

23   have sales and service and go-to-market capabilities that

24   really understood our publishers and advertisers, understood

25   their businesses.  And so it was a combination of those

Cross-examination - N. Mohan

```
 1    types of things that we needed to to compete in the
 2    marketplace.
 3    Q    Now, you go on in this paragraph to say:  "It has been
 4    recognized" -- "it" being AdX, the Google AdX -- "has been
 5    recognized internally and externally as fulfilling the
 6    promise of transforming the display industry by making it
 7    more open, transparent," et cetera.  And you go on to say:
 8    "Adweek recognized AdX as one of the top ten innovations of
 9    2010, along with Facebook, Twitter, Foursquare," et cetera;
10    do you see that?
11    A    I see that, yes.
12    Q    Now, separate and apart from AdX being recognized as an
13    innovation fulfilling the promise of transforming the
14    industry, I want to focus on the other top ten innovations
15    that you note, starting with Facebook; do you see that?
16    A    I do, yes.
17    Q    What significance, if any, did it have for you that AdX
18    was featured as a top ten innovation that year along with
19    Facebook?
20    A    I took -- frankly speaking, I took a lot of pride in
21    it.  I mean, I'm an engineer by training, a product manager.
22    I build products for a living, and having this product that
23    we worked so hard on recognized by the entire industry as a
24    top ten innovation for me and my team was a source of pride.
25              And, you know, these other companies that were
```

86

Cross-examination - N. Mohan

1    listed there by then, these were some of the marquee names.

2    Obviously many of them are the marquee names today in the

3    technology space.  And so to have a product that we built

4    alongside these types of projects that were sort of

5    capturing the zeitgeist like Facebook, Twitter, et cetera,

6    was something of significance.

7    Q    Now, Mr. Mohan, this is a recap of 2010.

8         How quickly after 2010 did Facebook become a

9    fierce competitor of Google's?

10   A    I believe it might have been -- started to have been a

11   competitor then already.  You know, obviously they're, you

12   know, one of the leading players today, of course.  But

13   they've been a fierce competitor of Google's, and, you know,

14   a strong player in the industry for a very, very long time.

15   Q    Now I want to direct your attention to that and to

16   DTX 184.

17        THE COURT:  Any objection to 184?

18        MR. TEITELBAUM:  I'm just not seeing the evidence

19   of a business records foundation here, Your Honor, so I

20   would object on hearsay.

21        THE COURT:  Well, it appears to be something to

22   which this witness contributed.

23        MR. TEITELBAUM:  Yes, Your Honor, but that would

24   not solve the hearsay issue if it's a prior statement of his

25   out of court.  This is on Google's attempt to introduce,

                                                          87

Cross-examination - N. Mohan

 1   once again, their own statement.  So if it's not a business

 2   record, it would be hearsay regardless of whether Mr. Mohan

 3   is here.

 4          MS. RHEE:  Your Honor has previously admitted

 5   multiple of these competitive analyses.

 6          THE COURT:  Yeah.  I'm letting it in.  Overruled.

 7      (Defense Exhibit Number 184 admitted into evidence.)

 8          MS. RHEE:  If we could publish DTX 184,

 9   Mr. Spalding.

10   BY MS. RHEE:

11   Q    Now you see in front of you, Mr. Mohan, your name as a

12   contributor to this document that is titled "given FB's

13   recent strength, how do we ensure we compete"; do you see

14   that?

15   A    I see that, yes.

16   Q    And is that FB referring to Facebook?

17   A    Yes.

18   Q    Okay.  And in terms of the background and summary, this

19   document begins with FB's Q2.  And here this is Q2 of 2014

20   if you can see the document as a strategy doc from 2014;

21   yes?

22   A    Yes, it looks to be.

23   Q    Okay.  It says:  "Facebook's Q2 mobile earnings were

24   startling.  Their pivot to simple, focused, direct

25   response-type solution-based products along with tight

                                                              88

Cross-examination - N. Mohan

```
 1    format integration and massive user adoption of their news

 2    feed drove over" -- and here it's X'd out -- "growth in

 3    mobile ads revenue"; do you see that?

 4    A     I do see that, yes.

 5    Q     And it goes on to say:  "This is worrisome for Google";

 6    do you see that?

 7    A     Yes, I do.

 8    Q     Why was Facebook's startling earnings and growth

 9    worrisome for Google even in 2014?

10    A     Really I believe this just refers to the fact that they

11    had been and were growing as a formidable competitor in the

12    display space even at that time.

13    Q     And just to put a fine point on it, even though this is

14    a focus on mobile, from your perspective, was Google

15    competing for display ad placement in mobile phones?

16    A     Yes.  And as I pointed out before, mobile web, all of

17    that was basically display advertising, and advertisers were

18    looking for solutions across all of those different types of

19    formats in the same campaign.  So they really -- they were

20    really related in that fashion.

21    Q     Okay.  And so now -- thank you for that little

22    digression into Facebook's competitive offering.

23          MS. RHEE:  If we could go back to DTX 76 where we

24    left off.  And go to page 3 here, which focuses in the

25    year-end recap to DoubleClick for publishers.  Thank you,
```

Cross-examination - N. Mohan

```
 1    Mr. Spalding.
 2    BY MS. RHEE:
 3    Q    Mr. Mohan, can you see the document in front of you
 4    now?
 5    A    Yes.
 6    Q    Okay.  And you write:  "In February" -- and this is
 7    February of 2010 -- "we launched the new DoubleClick for
 8    Publishers after two years of hard work with a revamped work
 9    flow, better forecasting, new reporting, ad server
10    optimization, et cetera"; do you see that?
11    A    I do.
12    Q    Okay.  Mr. Mohan, why did it take two-plus years after
13    the DoubleClick acquisition to launch the new DoubleClick
14    for Publishers at Google?
15    A    For the reasons I highlighted before, which is we were
16    doing two things.  One is we were continuing to maintain and
17    innovate the existing DFP solution, but we were rebuilding
18    from scratch this new even more innovated brand-new Google
19    DFP solution, and that just took a lot of time.
20          I mean we had engineers -- we had a fair amount of
21    engineers working on this kind of non-stop for this time
22    period.  But as I said before, in my experience, every
23    prediction you give of a timeline like this, it always ends
24    up taking longer, because we had to not just rebuild the
25    core functionality, we had to add new capabilities, like the
```

90

Cross-examination - N. Mohan

```
 1    stuff I'm calling out here, better forecasting engine, which
 2    is really important for the direct sales capability of
 3    publishers, new reporting.  Our publishers were asking us
 4    for new reporting capabilities all the time, and so that was
 5    another example of features that we needed to continue to
 6    add.  So for those two big reasons, it just -- you know, it
 7    takes quite some time to do this.
 8    Q    Now, you go on in this paragraph to talk about this
 9    innovation, you talk about first dozens of new features, but
10    then you say:  "This innovation, along with our work on DFP
11    video and DFP mobile"; do you see that?
12    A    I see that, yes.
13    Q    "Has resulted in big new customer wins like the Weather
14    Channel, ESPN, et cetera."
15          What do you mean by innovating DFP video and DFP
16    mobile?
17    A    It just means that in the core DFP product, it wasn't
18    just about ads on web pages; it was about serving ads into
19    mobile environments, serving video ads, rich media ads.
20    Because our publishers existed on all of those environments,
21    and our publishers wanted to offer all of these different
22    types of display inventories to their advertisers.  And so
23    the core DFP product needed to be able to cover mobile,
24    cover video, cover rich media and things like that.
25    Q    Now it goes on to say:  "The small business version of
```

91

Cross-examination - N. Mohan

```
1    DFP continued its momentum with active publishers up
2    64 percent in 2010 to over 12,000."
3              I take it that's 12,000 publishers?
4    A    Yes.
5    Q    Okay.  And that's for what's called the small business
6    version of DFP; you see that?
7    A    Yes.
8    Q    What is the small business version of DFP, Mr. Mohan?
9    A    It was basically an ad server, so similar to DFP that
10   way, but a much more simplified, less sophisticated product
11   that didn't have all the bells and whistles like custom
12   reporting, sophisticated forecasting engines, things like
13   that that the sort of core -- the flagship DFP product had.
14   So it was a product that could be used by a smaller
15   publisher.  In this case, you know, thousands of smaller
16   publishers that needed an ad serving solution but really
17   didn't need, like, the full-fledged kind of heavy-duty
18   DFP-type product or -- you know, that other competitors were
19   building in the core DFP space.
20   Q    Now, Mr. Mohan, if you can recall, when you were in the
21   business, was DFP for small publishers free to those 12,000
22   plus smaller publishers?
23   A    Yes, I believe so it was.
24   Q    And for publishers who were even smaller than the
25   12,000 plus, the fledgling ones just starting out with a
```

92

Cross-examination - N. Mohan

```
 1   blog post or a recipe, newsletter or the like, what, if
 2   anything, did Google offer those smallest of publishers?
 3   A    You mean smaller than, like, DFP small business?
 4   Q    Correct.  Smaller than DFP small business, if you had
 5   anything.
 6   A    So lots of publishers, in fact I would say the vast
 7   majority of publishers, don't have a direct sales force or
 8   don't sell their ads directly themselves, and so for those
 9   publishers, we had AdSense.  And so AdSense was a way for
10   publishers to earn some revenue for their -- you know, in
11   your example, your cooking blog or your gardening blog by
12   implementing Google's AdSense solution in cases where you
13   didn't need an ad serving capability because you didn't sell
14   your ads yourselves.
15   Q    Now, Mr. Mohan, is AdSense still available for the
16   smallest of publishers out there?
17   A    Yes.
18   Q    And how many publishers, at least in your time in the
19   display ads business at Google, were covered by AdSense?
20   A    Oh, I would say it was in the order of maybe millions
21   of publishers.
22   Q    And so I just want to recap.
23        There's AdSense for the smallest of publishers,
24   and your testimony is that in the millions, at least when
25   you were in this business?
```

93

Cross-examination - N. Mohan

```
 1   A     That's correct.

 2   Q     And then there's DFP for small publishers; is that

 3   right?

 4   A     That's correct.

 5   Q     Okay.  And then this whole examination, whether from

 6   the government or from Google up to this point in time, have

 7   we been talking about DFP for only the largest publishers?

 8   A     That's my understanding, yes.

 9   Q     And how many publishers are we talking about for this

10   bells-and-whistles version of DFP for the largest

11   publishers?

12   A     I don't remember the exact number, but it's probably on

13   the order of hundreds, maybe low thousands, but kind of in

14   that -- kind of in that range.

15   Q     Okay.  I now would like to pull up the government's

16   Demonstrative A.  I don't know that you have ever seen this,

17   Mr. Mohan, but it's already in the record.

18         Okay.  Mr. Mohan, you see some of various ad tech

19   tools here represented on this demonstrative, some with red

20   boxes on them; do you see that?

21   A     I do see that, yes.

22   Q     Okay.  I'm not going to ask you anything about the red

23   boxes, but here, do you see anything that represents

24   anything like AdSense that you just talked about with us?

25   A     No.
```

94

Cross-examination - N. Mohan

```
 1   Q    And do you see anything here that represents
 2   DoubleClick or DFP for small publishers represented here?
 3   A    I do not.
 4        MS. RHEE:  Okay.  If we could take that down.
 5   BY MS. RHEE:
 6   Q    I want to now direct your attention to the government's
 7   questions that you answered with respect to the AdMeld
 8   acquisition.
 9        Do you remember talking about that earlier this
10   morning?
11   A    I do.
12   Q    Okay.  Now, I want to actually just back up in time and
13   go to DTX 45.
14        MS. RHEE:  If we could pull that up, Mr. Spalding.
15        THE COURT:  Any objection to 45?
16        MR. TEITELBAUM:  Just that, once again, this is
17   the defendant trying to introduce their own out-of-court
18   statements, Your Honor.
19        THE COURT:  All right.  I'm going to overrule it.
20   It's in.
21     (Defense Exhibit Number 45 admitted into evidence.)
22        MS. RHEE:  If we could pull that up.  I know it's
23   a lot of small font.  So if we could start at the bottom of
24   this chain, Mr. Spalding.  Keep going.  There's a question
25   posed at the bottom.
```

95

Cross-examination - N. Mohan

```
 1    BY MS. RHEE:
 2    Q    Okay.  You see that in front of you, Mr. Mohan?
 3    A    I do.
 4    Q    Okay.  So this is April of 2009, and Ms. Wojcicki, who
 5    was an executive at Google, was posing a question to you; is
 6    that right?
 7    A    Yes, it looks like it.
 8    Q    And the question is:  "How do you answer how our ad
 9    exchange will compare or compares to Rubicon and Vivaki?
10    How are they different and compared to us/right media"; do
11    you see that?
12    A    I do.
13    Q    Okay.  How did you construe the question that
14    Ms. Wojcicki was asking in 2009?
15    A    I think she was looking for some general clarification
16    on the space in terms of capabilities that various
17    publisher-side solutions had.  You know, Rubicon, as we
18    discussed, was a yield manager, we had our exchange, there
19    were a number of other competitors in the market.  So I
20    think she was asking for some clarification on that front.
21    Q    Okay.  And then you respond, and if we could go then to
22    your response to this question posed.
23         Now, you say that these are a few quick points,
24    but they're not so quick so let's try to take them in turn.
25         You see the first numbered item in your response
```

96

Cross-examination - N. Mohan

1    saying:  "Rubicon, PubMatic, AdMeld, et cetera, fall in the

2    category of network yield managers"; do you see that?

3    A    Yes.

4    Q    Now, why did you say that they are network yield

5    managers, and what, if any, significance is that?

6    A    I was trying to define their core functionality.  And

7    so what I meant by "network yield manager," and I think how

8    they referred to themselves was they allowed for evaluation

9    of existing deals that publishers had with third-party ad

10   networks for their indirectly sold inventory.  And so these

11   solutions solved that specific type of problem for

12   publishers.  And I was, as I point out I think later in the

13   rest of the sentence, trying to distinguish it from the way

14   that our exchange, the Google ad exchange, operated.

15   Q    Okay.  And then you go on to say in A:  "Very

16   importantly, they do not have Dynamic Allocation."  We've

17   already talked about that, so I will move on.

18            And then you go on again walking through your view

19   about the key differences to "Rubicon and none of the other

20   yield managers run a real-time auction.  They just make

21   decisions based on historical data.  As you know better than

22   almost anyone, auctions are the most efficient way of

23   allocation of impressions"; do you see that?

24   A    Yes.

25   Q    And you conclude that paragraph by saying:  "Using

Cross-examination - N. Mohan

```
 1    historical data is like trying to manage yield with

 2    imperfect information."

 3            Mr. Mohan, what did you mean by this paragraph?

 4    A    So this was a key thing in what I was trying to allude

 5    to in the previous conversation.  The big difference between

 6    yield managers and what the Google ad exchange offered was

 7    they were trying to make an evaluation of how to fill unsold

 8    inventory at a publisher using historical information.  So

 9    what that publisher might have negotiated with the ad

10    networks ahead of time.  And by "ahead of time," it could be

11    weeks in the past, sometimes months in the past.  And so

12    they were taking this old information, evaluating it, and

13    then deciding what is the best ad to run in that publisher's

14    slot.

15            By contrast, the innovation of Dynamic Allocation

16    was that it did it in real time.  It basically took the

17    latest information about ad networks, sort of put those

18    head-to-head.  Also with all other non-guaranteed inventory

19    that the publisher was making -- or other demand for that

20    non-guaranteed inventory evaluated them all in once in like

21    a real-time auction and generated the ad that would generate

22    the highest amount of revenue for the publisher.

23            So this shift from historical pricing, which is

24    what yield managers did, to real-time dynamic allocation was

25    like a really core innovation and was the result of a
```

98

Cross-examination - N. Mohan

```
1    combination of how DFP and AdX worked together to generate
2    higher yield for publishers.
3              That 136 percent that I was talking about before
4    was in contrast to the way that publishers worked with
5    static networks before.  And what these yield managers were
6    doing was just enhancing the work flow, but not changing
7    that static evaluation process that was existing before.
8    That's why it's sort of like the core difference between
9    yield managers and AdX.
10   Q    Now, Mr. Mohan, you go on having identified these key
11   differences to write in the next following paragraph:
12   "Despite these limitations, they are getting traction and
13   positioning themselves as an alternative to exchanges.  Some
14   of our pubs have tried them out, mostly AdSense pubs since
15   many of them don't have direct sales forces, and therefore
16   care less about Dynamic Allocation"; do you see that
17   paragraph?
18   A    Yes, I do.
19   Q    When you wrote "despite the limitations that you set
20   out, the yield managers are getting traction," from your
21   vantage point, why were yield managers getting traction
22   notwithstanding the significant limitations to their
23   capability as you spelled out?
24   A    So, in my view, the reason why they were getting
25   traction was, I do think that publishers understood the
```

99

Cross-examination - N. Mohan

1    promise of real-time dynamic allocation.  That's why we

2    published that white paper to kind of give them even more

3    comfort, showing them the 136 percent increase in yield.

4    But that was a big leap of faith to basically -- and if you

5    think about it from the vantage point of, you know, the head

6    of ad sales or the VP of ad sales at a publisher, you're

7    asking that person to give up on these existing network

8    relationships that they had where they had some price

9    negotiation, they understood how much roughly that network

10   was willing to pay, and now basically kind of jump into this

11   new pool that's basically saying forget about that, use

12   real-time Dynamic Allocation, it will generate revenue for

13   these that's 136 percent higher.

14          And what we found was that publishers understood

15   that promise, some of them jumped right in, and, you know,

16   basically were very happy with the DFP AdX real-time Dynamic

17   Allocution, but others wanted to remain more cautious, and

18   so they would dip their toes in that new pool and try some

19   Dynamic Allocation, but they didn't want to give up those

20   network relationships that they had.  And so for those, they

21   said, well, I'm going to use this yield manager because I

22   don't want to go full-fledged into, you know, Dynamic

23   Allocation, AdX land; I want to just -- I want to kind of

24   tiptoe my way there.

25          And so that was why I believe those yield managers

100

Cross-examination - N. Mohan

```
 1    were getting traction, even though we had this ad exchange
 2    technology which I believed was superior in terms of
 3    delivering higher yield, more money for publishers.
 4    Q    Now, in 2009, when you were having this exchange
 5    internally, Mr. Mohan, did you think that Google should
 6    develop a traditional yield management solution given the
 7    traction that you were seeing, despite your view about where
 8    the future actually lies?
 9    A    I believe at this point that was not my view.  My view
10    was -- it was almost as if, like, you know, the transition I
11    was seeing in the industry and my team was seeing was --
12    it's almost like going from CDs to streaming.  And so I felt
13    like we had the streaming solution, which was this Dynamic
14    Allocation capability, we had invented this real-time
15    bidding RTB capability, and that's where I felt like the
16    industry was going because that grows the pie for the
17    overall industry, everybody benefits.  And this yield
18    management capability was almost like solving yesterday's
19    problem.  And so that -- that's why initially I was
20    skeptical.
21    Q    Okay.
22              THE COURT:  All right.  Ms. Rhee, it's about
23    11:15.  We normally take our break at this time.
24              MS. RHEE:  Yes, Your Honor.
25              THE COURT:  And so we'll break until 11:30.
```

101

Cross-examination - N. Mohan

```
 1                   (A recess was taken.)

 2              THE COURT:  Ms. Rhee, go ahead.

 3              MS. RHEE:  Thank you, Your Honor.

 4   BY MS. RHEE:

 5   Q    Mr. Mohan, we left off in April of 2009, and with your

 6   indulgence, we're going to stay just a little bit longer in

 7   2009.

 8              MS. RHEE:  And if we could pull up PTX 44 that was

 9   introduced by the government in your examination.  You see

10   that.  And, again Mr. Spalding, with your assistance.  Thank

11   you very much.

12   BY MS. RHEE:

13   Q    Can you read the screen in front of you now Mr. Mohan?

14   A    Yes, I can.

15   Q    Okay.  And, again, do you remember in your direct

16   examination from the government about OpenX's entry into the

17   market?

18   A    I do, yes.

19   Q    Okay.  At the top of this email chain, which I don't

20   believe they went over with you, you see here that you

21   write:  "It's a relatively smaller player offering the same

22   three-pillared approach to the display market as us, Yahoo,

23   Microsoft and AOL"; do you see that?

24   A    I do, yes.

25   Q    Okay.  And we've already talked at length now about the
```

102

Cross-examination - N. Mohan

```
1    three-pillared approach, so I won't go over it more with

2    you.

3              I really want to direct your attention, though, to

4    the bottom of this chain from Scott Spencer to you and

5    others here.

6              You see here again in the government's PTX from

7    that same time period of April 2009, reflected here the same

8    kind of limitations that you set out in the other email

9    exchange that we just went through.  You see here no true

10   Dynamic Allocation, no real-time bidder, and, finally, I

11   just want to direct your attention where it says no ad

12   quality controls, and no inventory quality controls; do you

13   see that?

14   A    I see those, yes.

15   Q    Okay.  And do you agree with that assessment with

16   respect to additional key differentiators between the yield

17   managers out there and the AdX ad exchange?

18   A    Yes, I do.

19   Q    Okay.  Now, fast-forward to 2011, you remember being

20   shown PTX 112, which was about buying one of at least two

21   options out there with respect to yield managers in the

22   market, you remember being shown that and going through it

23   with the government?

24   A    Yes.

25   Q    Okay.  And, in particular, you remember the government
```

103

Cross-examination - N. Mohan

```
1   attorney talking to you at some length about the valuation
2   slides?
3   A    I do, yes.
4            MS. RHEE:  Okay.  And if we could actually go to
5   the page ending in 894, which is the valuation slide that
6   the government pulled up.  Okay.  Yep.  Oh, the first one.
7   Thank you, Mr. Spalding.  Okay.
8   BY MS. RHEE:
9   Q    You see that.  You remember being asked questions about
10  that, Mr. Mohan?
11  A    I do, yes.
12  Q    And in response to the question posed on the slide:
13  "Why pay more than Google's calculated value?"  The bottom
14  of that response, you see "see strategic rationale"?
15  A    Yes.
16  Q    Okay.  And I'm now going to direct your attention to
17  page 6 of this slide presentation, or the page ending at
18  979, yep, which is a slide in this deck that the government
19  did not direct your attention to, which is, in fact, titled
20  strategic rationale; do you see that?
21  A    Yes.
22  Q    Okay.  And the very first bullet point underneath the
23  strategic rationale for buying one of at least two options
24  out there for yield managers is a pressing need for
25  publishers; do you see that?
```

104

Cross-examination - N. Mohan

```
 1   A      I do.

 2   Q      Okay.  And the first bullet underneath that is

 3   "publishers looking for ad network management for non RTB

 4   deals"; do you see that?

 5   A      I do.

 6   Q      Okay.  And, Mr. Mohan, from your perspective, does that

 7   first bullet point highlight why, notwithstanding your view

 8   in 2009, by 2011, you were in support of either buying

 9   versus building this yield management solution?

10   A      Yes, it does.  And it connects to what I was saying

11   before, which is fast-forwarding, you know, a couple of

12   years -- fast-forwarding to this timeline, the analogy of

13   sort of publishers being willing to sort of jump into the

14   pool of real-time Dynamic Allocation RTB versus wanting to

15   also continue to hold onto some of their existing ad network

16   relationships.  That was the specific functionality that

17   these yield managers provided.

18          And it was becoming clear at the time that while

19   we felt that we had the solution that was the way forward

20   and ultimately generated more money for publishers, they

21   still wanted to have -- they wanted to get there maybe in

22   baby steps and wanted to hold onto this older type of

23   technology, and that's where the yield managers were getting

24   some traction, and it was also a capability that we didn't

25   have.
```

105

Cross-examination - N. Mohan

```
1   Q    Okay.  The next bullet point under strategic
2   rationale --
3             THE COURT:  I'm sorry -- go ahead.
4             MS. RHEE:  Are you sure, Your Honor?
5             THE COURT:  Well, I'm looking at the third point.
6   Are you going to get to the third one because I don't know
7   what torso/tail means.
8   BY MS. RHEE:
9   Q    If you could please explain for the Court what
10  torso/tail means.
11  A    Yes.  This is referring to smaller publishers.  So
12  as -- Your Honor, as I was answering earlier the question
13  around DFP and AdX, they tended to be the purview of the
14  largest publishers on the Internet, sort of, you know, some
15  of the ESPNs and, you know, sort of the big publishers.  And
16  so torso and tail refers to -- torso really just refers to
17  more mid-sized publishers, and tail, you know, kind of that
18  mille -- the longer tail of publishers that I was
19  describing.
20            THE COURT:  So in other words, the medium and the
21  tiny?
22            THE WITNESS:  Roughly speaking, yes, Your Honor.
23            THE COURT:  I'm sorry.  You can go back to
24  Bullet 2.
25            MS. RHEE:  Your Honor, we are all here for the
```

106

Cross-examination - N. Mohan

```
 1   Court's pleasure, so I apologize.
 2            THE COURT:  I'm not sure if it's pleasure.  All
 3   right.
 4            MS. RHEE:  Well, now you've hurt my feelings, Your
 5   Honor.
 6   BY MS. RHEE:
 7   Q    Mr. Mohan, if we could go to the next bullet point
 8   under strategic rationale -- and I know you've already
 9   talked about this, so if we could just go through it
10   quickly -- why is the second strategic rationale delivering
11   this yield management solution to the market quickly?
12   A    Really because it -- it was reflecting a gap that we
13   had in our set of solutions.  We felt we had, as I said, the
14   most innovative yield management solution for publishers
15   with this Dynamic Allocation, but clearly publishers also
16   wanted this static network yield management capability, and
17   it was a gap in our set of solutions that our publishers
18   were telling us was a gap, and so we needed to close that
19   gap as quickly as possible.  And so this deck was really an
20   evaluation of could we quickly build that functionality into
21   DFP and AdX and therefore not requiring an acquisition, or
22   was the fastest way to market to acquire a leading player in
23   the market.  And so that's really what the highlighted
24   section refers to.
25   Q    And then the third bullet, again, the third down with
```

107

Cross-examination - N. Mohan

1    respect to strategic rationale for acquiring at least one of

2    two yield managers, you see here, okay, acquire a

3    fast-growing business with significant revenues, but in

4    particular, the sub bullet underneath says complements

5    existing AdX growth; do you see that, Mr. Mohan?

6    A    Yes.

7    Q    Now, why is it a complement and not taking out a

8    competitor?

9    A    For all the reasons that I've been highlighting, which

10   is yield managers did something adjacent to but different

11   than what AdX did.  AdX was real-time Dynamic Allocation

12   with real-time bidding.  That was a technologically

13   innovative way to generate more yield for publishers.

14          What yield managers did was something parallel to

15   that, but not the same.  They evaluated static network

16   relationships and tried to generate higher yield for

17   publishers by evaluating static network relationships.  And

18   so a combination of features of the core yield management

19   features with the real-time Dynamic Allocation features of

20   AdX would actually be complementary because they would

21   provide an even more robust set of capabilities to our

22   publisher clients, and that's what this is referring to.

23   Q    Now, the next bullet, which is "reducing the risk of

24   disintermediation."  I know you already had a fairly lengthy

25   back-and-forth with the government about it, so unless the

                                                            108

Cross-examination - N. Mohan

```
 1    Court has questions, I will move on then to the last
 2    strategic rationale, which is "acquire talented engineering,
 3    service and sales teams"; do you see that?
 4    A    Yes.
 5    Q    Now, Mr. Mohan, did you, in fact, actually keep a lot
 6    of the engineers' service and sales teams after the AdMeld
 7    acquisition?
 8    A    From what I remember, we did.  And the reason for that
 9    is what I stated earlier, which is the primary means to win
10    in this -- to win publishers in this competitive market was
11    to have the best products.  Product innovation was first and
12    foremost, but that wasn't sufficient.  You actually needed
13    go-to-market sales and support capabilities that understood
14    our publishers' business really well, and it felt that the
15    AdMeld team brought some of those to augment the Google and
16    DoubleClick teams that were already speaking with these
17    publishers.
18    Q    Okay.  So if we could then go to the next slide, I
19    believe it is at 7, and it's titled "integration plan."
20    Yep.
21         Do you see that now, Mr. Mohan?
22    A    I do see that.
23    Q    Okay.  Same deck, one slide that was not featured in
24    your direct examination, but here you see in the integration
25    plan there is a short-term integration plan and a long-term
```

109

Cross-examination - N. Mohan

```
 1   integration plan; yes?
 2   A     Yes.
 3   Q     Now, why is that, Mr. Mohan?
 4   A     Really, it's the exact same theme that we've talked
 5   about before, which is the necessity to keep flying the
 6   plane while changing the engines.  Which is we needed to
 7   make sure that we maintained a competitive offering in the
 8   market, hence the need to continue to offer the AdMeld
 9   solution to our publishers.  That was the whole reason for
10   the acquisition in the first place is to actually have that
11   capability.
12             But we also didn't want to just stop there; we
13   wanted to rebuild it on the Google stack to do all the
14   things that I talked about before, which is to bring new
15   innovation to this functionality.  So we needed to do both
16   things.
17             In the short term, do some integration,
18   lightweight integration with AdMeld, continue to offer it to
19   our publisher customers, and then in the long term, really
20   rebuild the rest of the AdMeld features into the Google
21   stack so that we could drive innovation further forward.
22             So that's what I meant by short term and long
23   term.
24   Q    Now, Mr. Mohan, you remember being asked by the
25   government during your direct examination that the purpose
```

110

Cross-examination - N. Mohan

```
 1   of this acquisition was, in effect, to kill a competitor?
 2   A    Yes.
 3   Q    Now, at the time of the proposed acquisition here,
 4   which was the purchase of one yield manager or another, did
 5   it ever cross your mind that by acquiring a yield manager,
 6   that you would be putting AdX's, you know, next biggest
 7   competitor out of business?
 8             MR. TEITELBAUM:  Objection as to "cross your
 9   mind."
10             THE COURT:  I'm going to sustain the objection.
11   BY MS. RHEE:
12   Q    What, if any, intent did you have behind this proposal
13   to acquire one yield manager or another?
14   A    I mean, the intent is really what I described on this
15   slide, which was to address a gap in our portfolio that our
16   publishers were asking for with both a short-term plan to
17   continue to offer AdMeld, do some lightweight integration,
18   as I talked about here, but the long-term plan was to
19   rebuild the best of the AdMeld technology onto the Google
20   stack.  That was the goal of the acquisition.
21             MS. RHEE:  Okay.  So if we could take that down
22   and move on to DTX 126, which is a forward march in time.
23             THE COURT:  Any objection to 126?
24             MR. TEITELBAUM:  No objection.
25             THE COURT:  All right.  It's in.
```

111

Cross-examination - N. Mohan

```
 1        (Defense Exhibit Number 126 admitted into evidence.)

 2   BY MS. RHEE:

 3   Q    Now, if I could actually direct your attention to the

 4   attachment, which is from September of 2012 or Q4 of 2012,

 5   if you see that.

 6   A    Yep.

 7   Q    And it's titled "a brief preview of the combined

 8   platform AdX plus AdMeld"; do you see that?

 9   A    Yes.

10   Q    If I could direct your attention to page 10.

11        MS. RHEE:  And if we could blow that up.  Thank

12   you, Mr. Spalding.

13   BY MS. RHEE:

14   Q    You see this slide is titled the basics, and it begins

15   with:  "In Q1 2013, we are launching a new platform built on

16   AdX technology that integrates the strengths of AdMeld"; do

17   you see that?

18   A    I do.

19   Q    Okay.  And then again, keeping in terms of timeline,

20   you see that the third bullet says:  "Because AdMeld's key

21   features will be available on the new platform when it

22   launches or soon thereafter, we're planning to discontinue

23   AdMeld later in 2013"; is that right?

24   A    I see that.

25   Q    Okay.  So I want to direct your attention, Mr. Mohan,
```

112

Cross-examination - N. Mohan

```
 1   from the time period of the acquisition, which is 2011, all
 2   the way into Q1 of -- or later in 2013.
 3            During this time, what happened to AdMeld?
 4   A    During this time, we continued to offer it to our
 5   publishers while we were rebuilding the AdMeld technology,
 6   as described here onto the Google AdX technology stack.
 7   Q    And if I could direct your attention to page 13 of this
 8   stack, which is a summary slide titled "key features were
 9   moving from AdMeld"; do you see that?
10   A    I see that.
11   Q    And the very first of the identified key features is
12   "traditional ad network optimization"; do you see that?
13   A    Yes.
14   Q    What does that represent?
15   A    This represents the core feature that I've described a
16   few times now, which is the ability to evaluate static
17   network pricing and relationships that the publisher had and
18   generate the highest monetizing ad out of those network
19   optimizations and put that forward.
20            So that was the core functionality -- yield
21   management functionality that I've been describing had been
22   missing from the new Google AdX.  And of course it was the
23   top priority for us to rebuild onto the Google technology
24   stack.
25            MS. RHEE:  Okay.  If we could take that down.
```

113

Cross-examination - N. Mohan

```
 1    BY MS. RHEE:

 2    Q    And then I want to now turn to what is hopefully the

 3    last topic to cover with you today, Mr. Mohan, and that is

 4    about access to third-party exchanges and Dynamic Allocation

 5    and DFP; okay?

 6    A    Okay.

 7    Q    So I want to direct your attention to guide us in this

 8    discussion to DTX 150.

 9              THE COURT:  Any objection to 150?

10              MR. TEITELBAUM:  Just for the record, I'll restate

11    my objection about out-of-court Google statements.

12              THE COURT:  All right.  It's overruled.

13         (Defense Exhibit Number 150 admitted into evidence.)

14              MS. RHEE:  All right.  And if we could actually

15    start at the bottom of this fairly lengthy chain,

16    Mr. Spalding, with your assistance.

17              THE COURT:  Okay.

18              MS. RHEE:  Starting -- I'm sorry -- yep, where

19    Mr. Mohan first weighs in.  Okay.

20    BY MS. RHEE:

21    Q    Mr. Mohan, do you see this is May of 2013, and you

22    write the following:  "I believe we are supporting this for

23    in-house ad servers as a starting point.  I haven't heard

24    anything since we approved that a few months ago"; do you

25    see that?
```

Cross-examination - N. Mohan

```
 1   A     I see that sentence, yes.

 2   Q     Okay.  And that is in response to the underlying email.

 3         MS. RHEE:  If we could just pull down a little

 4   bit, okay.

 5   BY MS. RHEE:

 6   Q     Just to help you contextualize, Mr. Mohan.  Okay.

 7         And the subject of this entire email chain is

 8   titled "Dynamic Allocation with other ad servers."

 9         MS. RHEE:  If we could direct Mr. Mohan's

10   attention to the very top of this email.

11   BY MS. RHEE:

12   Q     Do you see that?

13   A     I do see that, yes.

14   Q     Okay.  So when you wrote in May of 2013, essentially "I

15   thought we had a plan for this.  I believe we are supporting

16   this for in-house ad servers as a starting point."

17         What do you remember about the internal discussion

18   about whether to open up a possible integration with

19   third-party ad servers to grant them access to Dynamic

20   Allocation?

21         MR. TEITELBAUM:  Objection as to internal

22   discussion.  Substance.

23         THE COURT:  I'm going to overrule that objection.

24         THE WITNESS:  I'm sorry.  Would you mind

25   repeating?
```

115

Cross-examination - N. Mohan

```
 1   BY MS. RHEE:
 2   Q    What, if anything, do you remember about internal
 3   discussions at this point in time about possibly granting
 4   access to Dynamic Allocation for third-party ad servers?
 5            THE COURT:  Well, I want to refine that.  I want
 6   this witness to have been a party to that discussion.
 7            MS. RHEE:  Correct, Your Honor.
 8            THE COURT:  All right.
 9            THE WITNESS:  I remember -- I do remember
10   conversations about it, and as you can see from what you've
11   highlighted here, we were open to that.  And so there were
12   concerns, though, and some of them related back to what we
13   were talking about before, which is back to this notion of
14   display ads being a two-sided marketplace.  We needed to
15   make sure that if we did this, we weren't losing insight and
16   visibility into the quality of the inventory on the
17   publisher's side.  And so that's why, you know, perhaps,
18   starting with in-house ad servers where an in-house ad
19   server is basically a solution that is custom built for one
20   particular publisher was a safer way to go in terms of
21   inventory quality, because you know who that publisher is,
22   it's one publisher.  And so I remember, as this points out,
23   being open to these integrations but having some of those
24   quality concerns that I had discussed a little earlier.
25            MS. RHEE:  Your Honor looks like she might be
```

116

Cross-examination - N. Mohan

```
 1    asking a question, so I just want to pause.
 2              THE COURT:  No.  No.  No.  No.
 3    BY MS. RHEE:
 4    Q    So then directing your attention then to a continuation
 5    of this internal discussion that you're on in the middle of
 6    page 4, right, Mr. Spencer writes in and back:  "The AdX
 7    team is working on the solution.  It's been delayed because
 8    of engineering concerns associated with spam detection and
 9    inventory quality controls"; do you see that?
10    A    Yes.
11    Q    And is that consistent with what you just explained to
12    the Court here about why you didn't want to open up just
13    blindly?
14    A    Yes, it is consistent.
15    Q    Okay.  And then continuing on in that thread, Michael
16    Smith then weighs in -- and this is on the middle of page 2
17    here -- and you see that he elaborates:  "We had a client
18    aligned, but the only solution in our pocket was a
19    client-side integration.  And the client quickly backed away
20    from the required work for server-side integration once we
21    explained the integration steps."  He then further goes on
22    to say:  "Integration with pub-owned servers are still
23    possible, but they will require spam and policy work-arounds
24    according to preliminary work by eng and PM."
25              Here, is PM product management -- or product
```

117

1    manager?

2    A    Yes.

3    Q    Okay.  And then Mr. Smith further goes on to say:

4    "Third-party ad servers, i.e., not pub-owned, have shown a

5    continued reluctance to do the integration coding required

6    without rev share, so we haven't pursued this work."

7              Mr. Mohan, let's try to break this down.  What

8    does it mean to have a client-side integration here in this

9    discussion?

10   A    This is -- and I can't speak to the exact technical

11   details here, but this is basically an integration that

12   would involve something happening either on the web page or

13   when that actual page is rendered as opposed to something

14   that might be via an API that's happening at the server

15   where the web page or the mobile app might be getting

16   referred from in the first place.

17   Q    And is this consistent -- this explanation about what

18   the status update is with respect to the exploration of

19   making Dynamic Allocation available to publisher servers

20   other than Google, consistent with your recollection of the

21   challenges posed in exploring that possibility?

22   A    Yes.  As this highlighted section -- the section you

23   highlighted is calling out, a lot of our interest was those

24   spam and policy controls that I've described before.

25   Because it's one of those things where if those weaken, then

118

Cross-examination - N. Mohan

```
 1   your entire premise on the advertiser side in terms of the
 2   quality of the inventory you're representing starts to fall
 3   apart.  And once that starts to erode, it starts to
 4   implicate the quality of the entire Google Display Network
 5   in that sense.  And so that's why we were such sticklers
 6   about making sure that anything that we did would not
 7   compromise the publisher quality standards we needed to make
 8   sure because that would have a serious impact on the
 9   advertiser side of our business.
10   Q    And then, finally, continuing on in this discussion to
11   page 1, I want to direct your attention to Mr. Brian Adams
12   weighing in.
13          You remember that Mr. Adams came over from AdMeld,
14   Mr. Mohan?
15   A    Yes, I do.
16   Q    And do you remember his title or where he was in the
17   pecking order in AdMeld when he came over?
18   A    I believe he was one of the founders and was the chief
19   technology officer.
20   Q    Okay.  And so Mr. Adams weighs in, and here,
21   actually --
22          MS. RHEE:  If we could direct your attention to --
23   I think this is -- this is page 2 where he weighs in with a
24   "thanks, Michael."  Yes.  Thank you.
25   BY MS. RHEE:
```

119

Cross-examination - N. Mohan

```
 1    Q    Okay.  And you see here Mr. Adams writes in:  "Thanks,
 2    Michael.  We did server-side integrations at AdMeld,
 3    including Criteo, and they were plagued with ongoing
 4    issues"; do you see that?
 5    A    Yes.
 6    Q    And then he goes at the beginning of the next
 7    paragraph:  "If we've really limited the prospects to
 8    server-side integrations of pub-owned ad servers and still
 9    have remaining spam and policy work to bring this to life, I
10    have some new concerns about this effort"; do you see that?
11    A    Yes.
12    Q    And then finally in the last paragraph he talks about
13    "doing server-side DA" -- and here that's Dynamic
14    Allocation; right?
15    A    Yes.  Correct.
16    Q    -- "integrations into pub-owned ad servers is a new
17    challenge with every customer"; do you see that?
18    A    I see that, yes.
19    Q    Now, from your perspective, do you agree with the
20    assessment that doing server-side Dynamic Allocation
21    integrations is a new challenge with every customer?
22    A    Yes.  I remember having similar opinions because
23    generally speaking when the publisher built their own ad
24    server, they were all custom built, so basically every ad
25    server was different.  And so the type of integration that
```

120

```
  1    you had to do to enable this Dynamic Allocation
  2    functionality would therefore, by definition, be different
  3    in every single one of those cases.  And the way that you
  4    would have to, you know, have your spam checks and policy
  5    checks and all those types of things would also then
  6    necessarily be different.
  7              MS. RHEE:  And with that, I believe we can pass
  8    the witness, Your Honor.
  9              THE COURT:  All right.  Redirect.
 10              MR. TEITELBAUM:  Yes, Your Honor.
 11              MS. RHEE:  Thank you for that.  I didn't leave
 12    anything else; did I?  Oh, I did.  I'm sorry.
 13              MR. TEITELBAUM:  No worries.
 14                        REDIRECT EXAMINATION
 15    BY MR. TEITELBAUM:
 16    Q    Good morning again, Mr. Mohan.
 17    A    Good morning.
 18    Q    So a few things I'd like to cover with you.
 19              First of all, you testified on cross-examination
 20    that AdMeld and PubMatic were not competitors of Google;
 21    correct?
 22    A    They were, as I described, parallel to what Google AdX
 23    did, correct.
 24    Q    Okay.  So that's a no, they're not competitors?
 25    A    I mean, they were competing for yield management
```

Redirect examination - N. Mohan

```
 1    solutions, yes, but not direct competitors in that they had
 2    all of the AdX functionality.  That's what I meant.
 3    Q    Okay.  And so is it your testimony by contrast that
 4    Facebook was a direct competitor at the time that you were
 5    working in the display ads business?
 6    A    They were certainly a large display competitor, yes.
 7    Q    Okay.  So it's your testimony that Facebook was a
 8    direct competitor, but yield managers were not?
 9    A    Well, yield managers competed in a part of the display
10    ad space, and Facebook, of course, being Facebook, competed
11    in many large parts of the display ad space as well.
12    Q    And that's because there are different tools within the
13    space, and so competitors depend on the tool; right?
14    A    Competitors can vary depending on the features or tools
15    that they offer, yes.
16    Q    Okay.  Speaking of Facebook, let's take a look briefly
17    on the DTX 184, please, that you were shown on
18    cross-examination.  And we can start with the first page.
19         Just briefly at the very top, we have an
20    attorney/client privilege label there; do you see that?
21    A    I do see that.
22    Q    And that was a practice at Google of labeling
23    discussions about competitors or competition issues with
24    attorney/client privilege even when there was no attorney
25    involvement; right?
```

                                                              122

Redirect examination - N. Mohan

```
 1   A    I don't remember any specific practice.  I think,

 2   generally speaking, it was added when there might be a

 3   question that might come up that might be a legal related

 4   question or what have you.

 5   Q    All right.  So it's your testimony that people added

 6   attorney/client privilege labels when there might be a legal

 7   question that might come up?

 8   A    I can't speak to other people.  I'm describing, you

 9   know, if there was an email that I might be sending, that

10   might be where I would add a lawyer and ask them for their

11   advice.

12   Q    Okay.  Let's take a look at page 3 of this exhibit,

13   which is the last one under the heading "game changers."

14   There's a comment there, the last sentence of that first

15   paragraph referring to Facebook:  "Ultimately they could

16   close off and form a walled-garden-type experience ala, AOL

17   circa late 1990s."

18          Walled garden, that's a term that's used within

19   the display ad industry to describe certain types of ad tech

20   products; right?

21   A    I don't think it describes ad tech products, no.

22   Q    Okay.  And there's also a reference in the first

23   sentence there to O&O.  That means owned and operated;

24   right?

25   A    O&O means owned and operated, correct.
```

123

Redirect examination - N. Mohan

```
 1   Q    Okay.  We can move on to a slightly different topic and
 2   take that down.
 3             So we were talking a fair bit -- you were talking
 4   a fair bit on cross-examination about real-time bidding.
 5             Is it your testimony that Google invented
 6   real-time bidding before anybody else?
 7             MS. RHEE:  Objection, Your Honor.  That
 8   mischaracterizes the testimony.
 9             MR. TEITELBAUM:  It's just a question.
10             THE COURT:  You'll have a chance on recross.  I'm
11   permitting it.  Overruled.
12             THE WITNESS:  I'm not sure I said that.  I
13   remember that we were one of the early pioneers in this
14   space.  I can't remember the exact timelines, but I do
15   remember us being very proud of the RTB capability and
16   pitching that to publishers as well as advertisers.
17   BY MR. TEITELBAUM:
18   Q    Okay.  So you can't say with confidence, as you sit
19   here today, that Google was first, you don't know one way or
20   another?
21   A    I can't say 100 percent, but I do remember we were one
22   of the very earliest, if not the first.
23   Q    Okay.  And you were discussing on cross-examination
24   that there's a substantial value to publishers to having
25   real-time bids on their inventory because it increases their
```

124

Redirect examination - N. Mohan

```
 1   revenue; right?

 2   A     Yes.

 3   Q     And it's -- you testified that it was part of Google's

 4   core business to maximize value for publishers?

 5   A     Yes.

 6   Q     Okay.  So if we could take a look again at DTX 45 at

 7   page 2.

 8            And so -- we don't need to go back over all of

 9   this, but this is just an email from you talking about, you

10   know, one of the various reasons why not having real-time

11   bidding is a loss, it's problematic for publishers; right?

12   A     Would you like me to read this?

13   Q     Sure.  You don't have to read it out loud, but I'm just

14   asking if that's what you covered on cross.

15   A     Is there a -- is there a particular section you want me

16   to read here?

17   Q     Sure.  I'm really referring to the letter A.

18   A     Yes, I am describing what the yield managers did

19   relative and in contrast to what AdX does.

20   Q     Okay.  And so Google permitted its publisher customers

21   to receive real-time bids from AdX, but not from other

22   exchanges; correct?

23   A     I disagree with that categorization.  I mean,

24   ultimately any decision that publishers made vis-a-vis their

25   inventory was the publisher's decision.  And in order to
```

125

Redirect examination - N. Mohan

```
 1    use -- from our perspective, publishers could put all of
 2    their inventory available for RTB, but they chose not to.
 3    Q    Let me be a little bit more specific.
 4          Publishers within DFP could only get real-time
 5    bids on their inventory being offered through DFP from AdX;
 6    correct?
 7    A    That's because AdX had RTB.  The other yield managers
 8    did not.  It's like -- it's almost as if those other yield
 9    managers did, then the publishers could get RTB through them
10    or any other sort of vehicle that they worked with, it's
11    just that our solution was the one that had RTB.
12    Q    Well, you would agree with me that Google did not make
13    it possible for other exchanges to bid in real time into DFP
14    auctions; correct?
15    A    Are you talking about the yield managers now, or ...
16    Q    I'm talking about -- yeah, Rubicon or PubMatic.
17    A    My understanding is that those solutions did not offer
18    RTB.
19    Q    And so is it your testimony that any yield manager or
20    ad exchange that had RTB was permitted to bid in real time
21    into DFP?
22    A    A publisher could traffic whatever tags they wanted to
23    in DFP for the indirectly sold part of their inventory, it's
24    just that these yield management solutions didn't have RTB.
25    Q    All right.  So let me just make sure that I understand
```

126

Redirect examination - N. Mohan

```
 1   your testimony.
 2           Is it your testimony that at no time during the --
 3   before you went to YouTube, PubMatic -- let me just try that
 4   question again.
 5           Before you went to YouTube, at no time did
 6   PubMatic have real-time bidding technology?
 7   A    I can't -- I don't recall whether they did or not.
 8   Q    Okay.  So you don't know one way or another.
 9           And similarly with respect to Rubicon, is it your
10   testimony that they never had real-time bidding technology
11   up until you went to YouTube?
12   A    I don't remember if they did or when they built it.  I
13   do remember that when we were evaluating them, they were
14   primarily yield managers that worked with static inventory.
15   Q    Okay.  And so you spoke about Dynamic Allocation on
16   cross, and fair to say you're using that synonymously with
17   the notion of real-time bidding?
18   A    No.
19   Q    Okay.
20   A    Two different technologies.
21   Q    And with respect to Dynamic Allocation as a whole, DFP
22   only made full Dynamic Allocation available to AdX and not
23   to other demand sources; correct?
24   A    The Dynamic Allocation that existed because of the
25   integration of DFP and AdX was, yes, core to that
```

127

Redirect examination - N. Mohan

```
 1    integration.
 2    Q     Okay.
 3    A     Correct.
 4    Q     And it was not available to other demand sources
 5    besides AdX?
 6    A     Are you saying -- the previous thing you said
 7    publishers.
 8    Q     My question is:  Through DFP, Google did not make
 9    Dynamic Allocation available to any other demand sources
10    besides AdX; correct?
11    A     Yes, that is how the DFP AdX integration works --
12    worked.
13    Q     Actually, if we could please -- this is not in the
14    binder because it's just in response to something that you
15    said on cross.  It's PTX 36 that's already in evidence.
16              MR. TEITELBAUM:  And I do have copies for the
17    Court, and we can bring it up on the screen.
18              THE COURT:  All right.
19              MR. TEITELBAUM:  Whichever is preferred.
20              MS. RHEE:  Thank you.
21              MR. TEITELBAUM:  And I can hand these up if that
22    would be helpful.
23    BY MR. TEITELBAUM:
24    Q     And, Mr. Mohan, this is an email communication that
25    includes you at the top, and this is PubMatic asking to be
```

Redirect examination - N. Mohan

```
 1    integrated via APIs into DFP; correct?

 2    A    Can I take a quick read of it?

 3    Q    Of course.

 4              THE COURT:  I'm sorry.  Is Plaintiffs' 36 already

 5    in evidence?

 6              MR. TEITELBAUM:  It is.

 7              MS. RHEE:  Yes, Your Honor.  There's no objection

 8    here.  We believe that that is in evidence.

 9              THE COURT:  Okay.

10              THE WITNESS:  Yes.  Thank you.

11    BY MR. TEITELBAUM:

12    Q    Okay.  And so in the email on the bottom half of the

13    page, this is Mr. Goel from PubMatic asking if PubMatic can

14    integrate into DoubleClick via Google's APIs; right?

15    A    Correct.

16    Q    And then what you say internally at Google in the email

17    above is:  "Generally I am pretty open about working with

18    outside vendors via the API as long as they are brought to

19    us by a competitor.  This, however, seems to be going

20    directly against our Dynamic Allocution value prop with AdX.

21    I.e., if DFP pubs want to do unsold yield management, they

22    should just use AdX and not one of these guys"; right?

23    A    I see that.

24    Q    Okay.  Let's move on to a slightly different topic.

25              You were shown --
```

Redirect examination - N. Mohan

```
 1              MR. TEITELBAUM:  If we could bring up DTX 76,

 2    please.

 3    BY MR. TEITELBAUM:

 4    Q    And you were shown a variety of documents like this

 5    just from different time periods; is that fair?

 6    A    Yes.

 7    Q    These are essentially quarterly or annual updates to

 8    the display team?

 9    A    Annual.  Both retrospective, as well as a little bit

10    forward-looking as well.

11    Q    Okay.  And just from looking at, for instance, the bcc

12    distribution here, there's an extremely large distribution

13    list for these documents; correct?

14    A    Yes.

15    Q    So because, for instance, like the first mailing list

16    that we have under the BCC, that's an AdSense engineering

17    mailing list, that's not a single person that's going to

18    receive that; right?

19    A    Correct.

20    Q    So these are not internal strategy documents between

21    you and just a small group of executives; right?

22    A    They're meant to lay out the high-level strategy for

23    the entire organization.

24    Q    Okay.  For a broad distribution?

25    A    For the -- not the entire company, of course, but for
```

130

Redirect examination - N. Mohan

1    the people relevant to the display business.

2    Q    Okay.  And so sticking with this general topic, if we

3    could go to DTX 126 and just look at the first page.  And

4    this is the email that precedes the slide deck that we saw

5    about AdX plus AdMeld, a brief preview of the combined

6    platform.  Do you remember being asked about this on cross?

7    A    Yes.

8    Q    And what the bolded text here in the middle of the

9    first page says is:  "We now have an externally shareable

10   presentation summarizing our vision for the combined

11   platform"; do you see that?

12   A    Yes.

13   Q    In other words, these are marketing materials?

14   A    Yes, but they represent what we had planned to do.

15   Q    Okay.  And, by contrast, if we look at the text line

16   above, there's a reference to a previous slide deck where it

17   says:  "The ideas and the vision could be discussed with

18   partners, but the slides could not be shared externally."

19   That's from a different presentation; right?

20   A    I'm not sure what it's referring to, but, yes, it could

21   be.

22   Q    Okay.  And then if we could similarly just go, last one

23   on this topic, just go to DTX 80 briefly.  And the first

24   page you were asked a couple questions about Google's booth.

25          That's, once again, because this white paper

131

Redirect examination - N. Mohan

1    that's attached to this email is external-facing promotional

2    material; right?

3    A    It's meant to show to the publishers the core value

4    proposition of DFP and AdX, which was higher yield, which we

5    were very excited about.  But we obviously didn't want to

6    publish any propriety details similar to the previous one on

7    the AdX/AdMeld thing.  We don't want to share a lot of the

8    technical propriety IT, but we wanted to convey the

9    high-level product features.

10   Q    But it was an external-facing promotional material; it

11   was not an internal strategy document; right?

12   A    It was a white paper that we published for consumption

13   internally but also externally.

14   Q    Okay.  And then you were asked a few questions on

15   cross-examination just about concerns with malware and fraud

16   and brand safe and how those affected your decisions about

17   whether to operate with other ad tech tools; do you remember

18   that?

19   A    Yes.

20   Q    There are third-party tools available to address

21   malware, right, that are out there in the marketplace, and

22   that were out there in the marketplace as of 2015?

23   A    There were.

24   Q    And there were similarly third-party tools available

25   out in the marketplace to deal with ad fraud; right?

Redirect examination - N. Mohan

```
 1    A     There were.

 2    Q     And there were third-party ad tech tools out there in

 3    the marketplace to deal with brand safety; right?

 4    A     Yes.  All of them had severe limitations because they

 5    didn't involve the integration either into the inventory or

 6    to the demand side.  And so it was that core visibility that

 7    we had that allowed us to offer those quality controls in a

 8    way that would be better than what these third-party tools

 9    were able to offer.

10    Q     But that's a yes to my question that they were

11    available?

12    A     They were available, but were doing different things in

13    that sense.

14    Q     Okay.  And then when we were talking before about the

15    acquisitions -- and you were asked a few questions on

16    cross-examination.

17          So, first of all, with respect to DoubleClick,

18    DoubleClick had a form of Dynamic Allocation before Google

19    purchased it; right?

20    A     Yes.

21    Q     And Google purchased DoubleClick because it was farther

22    along than Google in developing a publisher ad serving

23    solution at that time; right?

24    A     Yes.  We had one of the leading ad serving solutions.

25    Q     Okay.  And, similarly, Google purchased AdMeld because
```

133

Redirect examination - N. Mohan

```
 1    AdMeld was further along in providing yield management

 2    solutions; right?

 3    A    We did not have that static yield manager, precisely

 4    because of what I -- I answered for you earlier, which is we

 5    felt the world was heading to this more RTB real-time place,

 6    and a lot of publishers eventually got there, but they

 7    needed --

 8    Q    I can ask a very simple question.

 9           Google purchased AdMeld because it, itself, did

10    not have the technology available that AdMeld was covering?

11    A    Correct.

12    Q    That's a yes?

13    A    (Gesturing affirmatively.)

14           MR. TEITELBAUM:  Okay.  If I could have just one

15    moment, Your Honor.

16           THE COURT:  Yes, sir.

17           MR. TEITELBAUM:  Okay.  Nothing further.  Thank

18    you, Mr. Mohan.

19           THE COURT:  All right.  Any recross?

20           MS. RHEE:  No, Your Honor.

21           THE COURT:  All right.  Now, does anybody

22    anticipate calling Mr. Mohan again in their case?  First of

23    all, does the government call him -- do you plan to re-call

24    him?

25           MR. TEITELBAUM:  We do not, Your Honor.
```

134

Redirect examination - N. Mohan

```
1                THE COURT:  All right.  And, Ms. Rhee, did Google

2     get all the questions asked of this witness that it wants?

3                MS. RHEE:  With the Court's indulgence, yes, Your

4     Honor.  Thank you.

5                THE COURT:  All right.  So then I'm going to

6     excuse Mr. Mohan as a witness, and it means he can stay and

7     watch if he wants to.

8                MS. RHEE:  I cannot imagine that he wants to, Your

9     Honor.

10               THE COURT:  In any case, sir, if you want to, you

11    may stay, but you're not to discuss your testimony with any

12    witness who has not yet testified; all right?

13               THE WITNESS:  Yes, Your Honor.  Thank you.

14               THE COURT:  And you're excused now.

15                    (Witness excused at 12:20 p.m.)

16               THE COURT:  All right.  We're going back to the

17    deposition?

18               MS. WOOD:  Yes, Your Honor.

19               THE COURT:  All right.  That's fine.

20               MS. WOOD:  May we proceed, Your Honor?

21               THE COURT:  Yes, ma'am.

22                        (Video played.)

23               THE COURT:  I'm sorry.  Stop one second.

24               What page are we at in the transcript?

25               MS. WOOD:  Page 118.
```

135

Redirect examination - N. Mohan

```
1              THE COURT:  Great.  Okay.  Thank you.

2              MS. WOOD:  Would you like copies of the binders?

3              THE COURT:  I still have them.

4              MS. WOOD:  All right.  Thank you.

5                        (Video played.)

6              THE COURT:  I think we should stop now.  It's

7   1:00.  We'll recess court until 2 for lunch.

8                   (Proceedings adjourned at 1:00 p.m.)

9              ----------------------------------

10  I certify that the foregoing is a true and accurate

11  transcription of my stenographic notes.

12

13                        Stephanie Austin
                          _____

14                        Stephanie M. Austin, RPR, CRR

15

16

17

18

19

20

21

22

23

24

25
```

136

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894