```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3   --------------------------x
     UNITED STATES, et al.,     :   Civil Action No.:
 4                              :   1:23-cv-108
                Plaintiffs,     :
 5         versus               :   Wednesday, September 18, 2024
                                :   Alexandria, Virginia
 6   GOOGLE LLC,                :   Day 8 a.m./p.m. (first part)
                                :   Pages 1-237
 7              Defendant.      :
     --------------------------x
 8

 9        The above-entitled bench trial was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
10   This proceeding commenced at 9:01 a.m.

11                   A P P E A R A N C E S:

12   FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                            OFFICE OF THE UNITED STATES ATTORNEY
13                          2100 Jamieson Avenue
                            Alexandria, Virginia  22314
14                          (703) 299-3700

15                          JULIA TARVER WOOD, ESQUIRE
                            AARON TEITELBAUM, ESQUIRE
16                          KELLY GARCIA, ESQUIRE
                            JEFFREY VERNON, ESQUIRE
17                          MICHAEL WOLIN, ESQUIRE
                            UNITED STATES DEPARTMENT OF JUSTICE
18                          ANTITRUST DIVISION
                            450 Fifth Street, NW
19                          Washington, D.C.  20530
                            (202) 894-4266

20   (State of VA)          TYLER HENRY, ESQUIRE
                            OFFICE OF THE ATTORNEY GENERAL
21                          OFFICE OF THE SOLICITOR GENERAL
                            202 North Ninth Street
22                          Richmond, Virginia  23219
                            (804) 786-7704
23

24

25
                                                             1
```

```
 1                      A P P E A R A N C E S

 2   FOR THE DEFENDANT:     CRAIG REILLY, ESQUIRE
                            LAW OFFICE OF CRAIG C. REILLY
 3                          209 Madison Street
                            Suite 501
 4                          Alexandria, Virginia  22314
                            (703) 549-5354
 5
                            KAREN DUNN, ESQUIRE
 6                          JEANNIE RHEE, ESQUIRE
                            ANITA LIU, ESQUIRE
 7                          AMY MOUSER, ESQUIRE
                            WILLIAM ISAACSON, ESQUIRE
 8                          PAUL, WEISS, RIFKIND,
                            WHARTON & GARRISON LLP
 9                          2001 K Street, NW
                            Washington, D.C.  20006
10                          (202) 223-7300

11                          JUSTINA SESSIONS, ESQUIRE
                            FRESHFIELDS BRUCKHAUS DERINGER, LLP
12                          855 Main Street
                            Redwood City, California  94063
13                          (212) 277-4000

14                          LAUREN VACA, ESQUIRE
                            FRESHFIELDS BRUCKHAUS DERINGER, LLP
15                          3 World Trade Center,
                            175 Greenwich Street
16                          51st Floor, New York, New York  10007
                            (212) 277-4000
17
     COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
18                          Official Court Reporter
                            United States District Court
19                          401 Courthouse Square
                            Alexandria, Virginia  22314
20                          (607) 743-1894
                            S.AustinReporting@gmail.com
21
             COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
22

23

24

25
                                                                    2
```

```
 1                    TABLE OF CONTENTS

 2                        WITNESSES

 3    On behalf of the Plaintiffs:

 4    SCOTT SPENCER

 5    Direct examination by Mr. Teitelbaum ......6

 6    ROSA ABRANTES-METZ

 7    Direct examination by Mr. Vernon ..........34
      Cross-examination by Mr. Isaacson .........57
 8    Redirect examination by Mr. Vernon ........114
      Recross examination by Mr. Isaacson .......122
 9
      MATTHEW WHEATLAND
10
      Direct examination by Mr. Wolin ...........124
11    Cross-examination by Mr. Rhee .............152
      Redirect examination by Mr. Wolin ........186
12    Recross examination by Ms. Rhee ..........190

13    ROBERT "BO" BRADBURY, III - READ-IN .......193

14    APARNA PAPPU - READ-IN ...................200

15    BRYAN ROWLEY - BY VIDEO DEPOSITION ........235

16                        EXHIBITS

17    On behalf of the Plaintiffs:
      Admitted
18
      Number 66 ................................10
19    Number 198 ...............................12
      Number 116 ...............................16
20    Number 124 ...............................19
      Number 997 ...............................28
21    Numbers 208, 333, 686, 421, 499, 578, 832, 33
      485, 1517, 284, 971, 128, 209, 326 and 847
22    Number 141 ...............................61
      Number 159 ...............................63
23    Number 1265 and 1265A ....................101
      Number 1266 and 1266A ....................102
24    Number 1717 ..............................127
      Number 1633 ..............................143
25    Numbers 618 and 572 ......................199
      Numbers 373, 851 and 1033 ................200
```

3

```
 1                          EXHIBITS

 2   On behalf of the Plaintiffs:
     Admitted
 3
     Number 618 ...............................224
 4   Numbers 144, 174, 445, 604, 759, 767, .....236
     792, 953, 978, 993, 1017, 1728
 5
     On behalf of the Defendant:
 6   Admitted

 7   Number 85 ................................111
     Number 2530 ..............................168
 8
                           MISCELLANY
 9
     Proceedings September 18, 2024 ...........5
10   Certificate of Court Reporter ............236

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                     4
```

```
 1                      P R O C E E D I N G S

 2             THE DEPUTY CLERK:  Civil Action Number

 3   1:23-cv-108, United States of America, et al. versus Google

 4   LLC.

 5             Will counsel please note their appearance for the

 6   record, first for the plaintiffs.

 7             MR. HENRY:  Good morning, Your Honor.  Ty Henry

 8   from the Virginia Attorney General's Office on behalf of the

 9   plaintiff states.

10             THE COURT:  Good morning.

11             MS. WOOD:  Good morning.  Julia Tarver Wood on

12   behalf of the Department of Justice on behalf of the United

13   States plaintiffs.  With me are my colleagues,

14   Aaron Teitelbaum and Jeffrey Vernon.

15             THE COURT:  Good morning.

16             MS. WOOD:  And Mr. Mene from the U.S. Attorney's

17   Office.

18             THE COURT:  Yes.

19             MS. DUNN:  Good morning, Your Honor.  Karen Dunn

20   for Google, and with me here are Tina Sessions, Lauren Vaca,

21   Bill Isaacson, Jeannie Rhee, Matt Spalding and Craig Reilly.

22             THE COURT:  Good morning.

23             All right.  Are we ready to proceed?

24             MR. TEITELBAUM:  Yes, Your Honor.  The plaintiffs

25   call Scott Spencer.
```

5

Direct examination - S. Spencer

```
 1                 THE COURT:  All right.

 2                 THE DEPUTY CLERK:  Can you raise your right hand.

 3   Thereupon,

 4                         SCOTT SPENCER,

 5   having been called as a witness on behalf of the plaintiffs

 6   and having been first duly sworn by the Deputy Clerk, was

 7   examined and testified as follows:

 8                    (Time noted:  9:02 a.m.)

 9                 THE DEPUTY CLERK:  Thank you.

10                 MR. TEITELBAUM:  May I proceed?

11                 THE COURT:  Yes.

12                         DIRECT EXAMINATION

13   BY MR. TEITELBAUM:

14   Q    Good morning, Mr. Spencer.  How are you doing?

15   A    Good morning.

16   Q    Could you please state your full name for the record

17   and spell your last name?

18   A    Scott Spencer, S-P-E-N-C-E-R.

19   Q    You left your employment at Google roughly at the

20   beginning of 2023; is that right?

21   A    Yes.

22   Q    Okay.  And you've been deposed a total of two times in

23   that case -- in this case, does that sound right, once this

24   year and once in 2019?

25   A    I believe that's correct.
```

                                                            6

Direct examination - S. Spencer

```
 1   Q    And both of those times Google's lawyers represented
 2   you at those depositions; correct?
 3   A    That's correct.
 4   Q    Okay.
 5        THE COURT:  Mr. Spencer, can you keep your voice
 6   up a bit louder please.
 7        THE WITNESS:  All right.
 8   BY MR. TEITELBAUM:
 9   Q    And the microphones, there's sort of two of them right
10   in front of you there on the ledge, one of them is that long
11   black bar, just for your awareness.
12        And I don't need to say the exact number, but fair
13   to say you own a substantial amount of Google stock as of
14   now?
15   A    Yes.
16   Q    Okay.  Let's talk about your professional background
17   shortly before you came to Google.
18        You worked at DoubleClick from about 2000 to 2008;
19   is that right?
20   A    That's correct.
21   Q    And you worked as a product manager and various other
22   product management roles there?
23   A    That's correct.
24   Q    And did you work with Neal Mohan and Jonathan Bellack
25   while you were there?
```

7

Direct examination - S. Spencer

```
 1  A    I did.

 2  Q    Okay.  And one of the products that you worked on was

 3  DoubleClick for Publishers or DFP?

 4  A    That's correct.

 5  Q    And another product that you worked on was the ad

 6  exchange that DoubleClick was developing as well; right?

 7  A    That's correct.

 8  Q    Okay.  And when you joined Google -- you joined Google

 9  in 2008; is that correct?

10  A    I joined Google as part of the acquisition process

11  which closed in 2008.

12  Q    Okay.  So you came over with Mr. Mohan and Mr. Bellack

13  as part of the acquisition?

14  A    And many others, yes.

15  Q    And many others, okay.

16         So the Court has already heard a fair amount of

17  testimony about a lot of the subject matters in this case,

18  so I think you're going to find that we're going to cover

19  only a few narrow topics from your time at Google.

20         I'd like to start by asking you some questions

21  about AWBid.

22         Fair to say that AWBid was the technology that

23  Google used to implement Google Ads bidding on other

24  exchanges besides AdX; right?

25  A    That's correct.
```

8

Direct examination - S. Spencer

1   Q     And up to a point before the implementation of AWBid,

2   Google Ads did not bid at all on other exchanges besides

3   AdX; right?

4   A     Google Ads would not be bidding on other exchanges.

5   Q     And then AWBid -- after the implementation of AWBid,

6   there was some limited bidding into other exchanges by

7   Google Ads?

8   A     By Google Ads specifically, yes.

9   Q     Okay.  Now, even before the implementation of AWBid,

10  there was a general consensus at Google that Google Ads or

11  AdWords was competitively disadvantaged by its inability to

12  bid into other exchanges; right?

13  A     Well, Google Ads, the advertisers could use Google Ads

14  or DBM.  Google Ads started off as being the buy-side of the

15  network, so it would only be buying on the network.  It was

16  a long time of evolution before it was buying on exchanges.

17  Q     Understood.  But there was a view that looking at

18  Google Ads or AdWords as a standalone product, that it would

19  have been better for that product to bid unrestricted on all

20  exchanges; right, not just AdX?

21  A     There was a view or -- what do you mean by that?

22  Q     The people that worked specifically in product

23  management roles on Google Ads advocated for unrestricted

24  bidding across all exchanges for Google Ads; correct?

25  A     Some did, yes.

9

Direct examination - S. Spencer

1    Q    And there was a somewhat vigorous debate within Google

2    about whether any cross-exchange bidding should be

3    implemented; is that fair?

4    A    Yes, there was a lot of discussion.

5    Q    And that's because there were differing incentives from

6    the sell-side, the folks who worked on the exchange and the

7    publisher ad server, versus on the buy-side; correct?

8    A    There were many different perspectives.

9    Q    Okay.  So if we could please take a look at what's been

10   marked for identification as PTX 66.

11          And Mr. Spencer, you'll have both a binder option

12   there as well as you can look at this on the screen.

13          THE COURT:  Any objection to 66?

14          MS. SESSIONS:  No, Your Honor.

15          THE COURT:  All right.  It's in.

16     (Plaintiffs' Exhibit Number 66 **admitted into evidence.**)

17   BY MR. TEITELBAUM:

18   Q    And Mr. Spencer, just taking a look at the top of

19   PTX 66, this is a February 2011 email that's coming from a

20   mailing list and it's being sent out to a bunch of people,

21   including you and Jonathan Bellack and Brad Bender; do you

22   see that?

23   A    Yes.

24   Q    And below the top email what we have is sort of an

25   informational document about the status of AWBid; do you see

                                                              10

Direct examination - S. Spencer

```
 1   that, with like a quick reminder of what is AWBid?

 2   A    Yes, I see that.

 3   Q    And so when we go to the top of the first page, the

 4   second full paragraph, there's a comment there:  "We

 5   understand that many of you have concerns about how this --

 6   this meaning AWBid -- will affect other parts of our

 7   business, particularly AdX and AdSense.  The AWBid team is

 8   working closely with the product managers for our display

 9   business (GDN, Invite, AdX and AdSense) to understand the

10   strategic implications of this effort and how to manage them

11   thoughtfully"; do you see that there?

12   A    Yes.

13   Q    So this is just a reflection of how there was internal

14   debate about whether to implement AWBid at all and by how

15   much; is that fair?

16   A    This looks like it's talking about -- I mean, how it

17   was going to roll out.

18   Q    How and whether it was going to roll out; right?

19   A    I can't tell if this is before or after the decision.

20   Q    Okay.  But ultimately one of the concerns that the

21   people working on DFP and AdX had was that the exclusive

22   relationship between Google Ads and AdX was one of the

23   primary selling points for AdX; right?  And this is just

24   stepping away from this document, just asking you more

25   generally.
```

11

Direct examination - S. Spencer

```
 1    A      It was a feature.

 2    Q      And you also in fact recognized that the relationship

 3    between Google Ads and AdX was one of the primary

 4    justifications that Google had available to it for the

 5    20 percent revenue share on AdX; is that right?

 6    A      It was one of many features that were part of the value

 7    proposition associated with the exchange.

 8    Q      Okay.  Let's take a look at what's been marked for

 9    identification as PTX 198.

10              THE COURT:  Any objection to 198?

11              MS. SESSIONS:  No, Your Honor.

12              THE COURT:  All right.  It's in.

13      (Plaintiffs' Exhibit Number 198 admitted into evidence.)

14    BY MR. TEITELBAUM:

15    Q      And so once again, Mr. Spencer, this is a -- now

16    looking at a 2014 September email thread that includes you

17    as well as Mr. Bradstock and Mr. Land; do you see that?

18    A      Yes.

19    Q      And so there's an email from you at the bottom of the

20    first page and your first line there is:  "As you know,

21    there are significant concerns over how we can maintain our

22    20 percent revenue share for the auction."

23              The context for this is given that AdWords or

24    Google Ads was starting to bid on other exchanges, you were

25    concerned about being able to maintain the 20 percent
```

Direct examination - S. Spencer

```
 1   revenue share; right?
 2   A     No.  The context for this is the development of Private
 3   Auctions and direct -- programmatic direct, new features
 4   that had different rev shares.
 5   Q     Okay.  But one thing you note here, going back to what
 6   we discussed before, is you say:  "Speaking only from the
 7   perspective of AdWords for Google Ads, we want to buy into
 8   all auctions regardless of what the AdX margin is.  More
 9   importantly, we do not like the idea of AdWords being given
10   a disadvantage compared to the other buyers in order to
11   strengthen the publisher pitch, e.g., uphold the 20 percent
12   margin"; did I read that right?
13   A     Yes.
14   Q     In other words, this is your recognition, first of all,
15   as you mentioned before, that from the perspective just of
16   Google Ads or AdWords, they would make sense to buy into all
17   auctions regardless; right, because that would be a better
18   product?
19   A     It was a -- it was part of what they were looking to
20   do.
21   Q     But you also observed at that time that you did not
22   like the idea that Google Ads was being disadvantaged as a
23   standalone product just for the sake of benefiting other
24   products like AdX that Google was operating; is that fair?
25   A     Here I was representing the AdWords' perspective that
```

Direct examination - S. Spencer

```
 1    they wanted to buy on other exchanges.
 2    Q    Okay.  So then turning from Google Ads' exclusive
 3    relationship with AdX now to AdX's relationship to DFP, you
 4    and your team recognized that AdX's real-time bidding into
 5    DFP but not into other exchanges was a very strong selling
 6    point for DFP; right?
 7    A    Sorry, AdX didn't bid into DFP.
 8    Q    Bidding on inventory in real time that was offered by
 9    DFP?
10    A    No, AdX is not bidding.
11    Q    Fair to say that AdX is relaying a winning bid from an
12    auction that it runs?
13    A    It doesn't relay.  It goes the other direction.
14    Q    Well, so what I'm asking is, real-time bidding was only
15    available for publisher -- real-time bidding from AdX was
16    only available for publishers using DFP and not other
17    publisher ad servers; correct?
18    A    No.  Real-time bidding was, depending on the time
19    period, it was established as a standard for being able to
20    bid on any exchange.
21    Q    All right.  Well, I'm specifically talking about the
22    2012 to 2013 time frame before Open Bidding and I'm
23    specifically talking about the relationship between DFP and
24    AdX.
25    A    But AdX didn't bid on DFP.
```

14

Direct examination - S. Spencer

```
 1              THE COURT:  I couldn't hear the answer.  What was
 2   that?
 3              THE WITNESS:  AdX didn't bid on DFP.
 4   BY MR. TEITELBAUM:
 5   Q    Can you explain that a little bit further?
 6   A    So if you're using DFP, it's your ad server for direct
 7   sales.  You're going to put your -- what you're selling as a
 8   publisher into the system.  And then it would take that
 9   information, so let's say you're about to sell something for
10   a dollar and that's the floor price given to the auction.
11   The bidding happens from DBM or other buyers, AdWords, into
12   the auction on the AdX side.
13   Q    All right.  So let me ask the question a slightly
14   different way.
15              AdX provided the result of a real-time bidding
16   auction to DFP; correct?
17   A    Again, it's the other way around.  So DFP provides to
18   the exchange the price of what it was about to sell
19   something for, and then the logic to decide whether or not
20   the exchange wins against that or not was in the exchange.
21   Q    All right.  I think the Court's heard enough about the
22   relationship between AdX and DFP already in this trial
23   anyway, so I think we can move on.
24              Take a look at PTX 116.
25              THE COURT:  Any objection to 116?
```

                                                                    15

Direct examination - S. Spencer

```
 1              MS. SESSIONS:  No, Your Honor.

 2              THE COURT:  All right.  It's in.

 3       (Plaintiffs' Exhibit Number 116 admitted into evidence.)

 4  BY MR. TEITELBAUM:

 5  Q    And this is an email thread that includes you as well

 6  as Chris LaSala and Marc Theermann from September of 2012;

 7  do you see that?

 8  A    I'm sorry, I'm still trying to find it.

 9  Q    Sure.  And it's also on the screen if that's easier.

10              THE COURT:  It's at the front of the book as well.

11              THE WITNESS:  116.  Yes.

12  BY MR. TEITELBAUM:

13  Q    This is an email thread that includes you and Chris

14  LaSala and Marc Theermann and others from about September of

15  2012; is that right?

16  A    Yes.

17  Q    And Marc Theermann was someone that reported to you at

18  the time; right?

19  A    No.  Marc Theermann I think was in sales.

20  Q    Okay.  But he was also sales related to DFP and AdX?

21  A    Yes.  I think it was publisher sales.

22  Q    Okay.  And so let's go to the bottom of the second

23  page, which is the Bates number ending in 462.

24              And at the bottom, one of the things that

25  Mr. Theermann notes is:  "This is an amazing time to 'lock
```

16

Direct examination - S. Spencer

1   in impressions' by offering XFP to publishers with full AdX

2   Dynamic Allocation.  AdX can serve as a tool to pull

3   publishers on to XFP.  By allowing third parties to

4   integrate with AdX mobile web/app, we are giving away this

5   advantage.  Dynamic Allocation allows AdX to see all XFP

6   impressions.  We lose this advantage behind other ad

7   servers.  Ad servers are sticky and hard to replace.  The

8   next 12 months are a very good time to switch publishers

9   over.  That opportunity will pass.  Do we really want to

10  miss it."

11          Did I read that right?

12  A    I'm not quite sure where you were but that sounds

13  right.

14  Q    Okay.  And Mr. Theermann is just making an observation

15  about the availability of Dynamic Allocation was a strong

16  selling point to pull publishers on to DFP compared to any

17  other publisher ad server out there; right?

18  A    Dynamic Allocation was a unique feature that existed

19  between DFP and the exchange.

20  Q    A unique feature that Google decided not to make

21  available to any third parties; correct?

22  A    I don't think any third parties wanted it.

23  Q    Okay.  So it's your testimony that no third parties

24  wanted access to Dynamic Allocation?

25  A    I think it was offered at times to -- it requires

17

Direct examination - S. Spencer

 1    integration on the actual primary ad server to make it work.

 2    I don't think we ever had anybody who was ever willing to do

 3    that work.

 4    Q    Okay.  But you would agree, just stepping back for a

 5    moment, that the relationship between Google Ads and AdX was

 6    a strong selling point for convincing publishers to use DFP

 7    compared to other publisher ad servers; correct?

 8    A    DFP and AdX worked really well together.  There was a

 9    good integration between them.

10    Q    And the reason they worked particularly well together

11    is because Google imposed a variety of conditions that made

12    it difficult for publishers to just use one or the other;

13    correct?

14    A    No.  We had features that made it so that the inventory

15    would be better understood by the exchange between DFP and

16    the exchange.  You could use either one separately.

17    Q    Okay.  So in other words, it's just a result of

18    features?  There was no intent on Google's part to try to

19    impose conditions to make publishers use both products

20    together?

21    A    They worked better together.  They -- there were

22    restrictions in terms of what types of inventory could come

23    into the exchange and other policies, but they worked well

24    together.

25    Q    Okay.  And prior to, say, 2014, if a publisher was

                                                              18

Direct examination - S. Spencer

```
 1   using a third party publisher ad server, could that
 2   publisher get AdX to tell it a price from an AdX auction?
 3   A    I don't think anyone could.
 4   Q    You don't think anyone could get a price from an AdX
 5   auction?
 6   A    You get the result of the auction when it's done, it
 7   wins.  Whatever the winning bid is, that's what it's taking.
 8   Q    And the winning bid would include the winning amount of
 9   the bid; correct?
10   A    But that's not passed in real time.
11   Q    I'm sorry?
12   A    That's not passed back to the ad server in real time.
13   Q    All right.  Let's move on and talk about PTX 124, just
14   returning to your testimony that it was just a feature that
15   AdX and DFP worked well together.
16             THE COURT:  Is there any objection to 124?
17             MS. SESSIONS:  No, Your Honor.
18             THE COURT:  All right.  It's in.
19     (Plaintiffs' Exhibit Number 124 admitted into evidence.)
20   BY MR. TEITELBAUM:
21   Q    And the very top email here is an email from you from
22   January of 2013; is that right, Mr. Spencer?
23   A    2013, yes.
24   Q    Okay.  And this is an email thread that's talking about
25   deployment of various different features in AdX and DFP;
```

19

Direct examination - S. Spencer

```
 1  right?

 2  A    This is an email about policy.

 3  Q    Okay.  It's an email about policies -- about Google's

 4  policies?

 5  A    Yes.

 6  Q    Okay.  So taking a look at the very top email, the

 7  second paragraph.

 8         What you observe is:  "In terms of your deployment

 9  question, this seems like different attempts to circumvent

10  the policy.  Our goal should be all or nothing.  Use AdX as

11  your SSP or don't get access to our demand.  It's a key

12  feature and we need to use it while it's still proprietary

13  to AdX."

14         So that all-or-nothing approach, is that the

15  feature that you were referring to in your earlier

16  testimony?

17  A    The feature I'm referring to is the demand coming in

18  from AdWords.

19  Q    The demand coming in from AdWords that was not

20  available on third-party exchanges?

21  A    Yes.

22  Q    Okay.  We can move on to a slightly different topic.

23         From your time at Google, you're aware that Google

24  periodically provided information to various regulatory

25  authorities to respond to requests for information; is that
```

                                                        20

Direct examination - S. Spencer

```
 1   fair?

 2   A     I assume we always were.

 3   Q     Okay.  And any reason to doubt that Google would be

 4   accurate in those submissions?

 5   A     No.

 6   Q     Okay.  And we can do this relatively quickly, but if

 7   you would please take a look in your binder at PTX, first,

 8   1092.

 9             THE COURT:  Any objection to 1092?

10             MS. SESSIONS:  Your Honor, we have no objection to

11   the document.  I don't know if Mr. Spencer has any relation

12   to or knowledge of this document, but ...

13             THE COURT:  All right.  Let's lay a foundation

14   first.

15             MR. TEITELBAUM:  Your Honor, these are -- and I

16   can actually move this along just by offering 1092, 1093,

17   1096 and 1099 into evidence.  These are all responses to

18   requests for information from regulatory authorities by

19   Google.  And then I can move on to the next topic.

20             THE COURT:  Is there any objection to that?

21             MS. SESSIONS:  Yes, Your Honor.  These are

22   submissions to foreign regulatory authorities.  So I don't

23   see why they have any relevance to this case or the purpose

24   for which they are being used given these are a submission

25   to French regulatory authority and the European Commission.
```

Direct examination - S. Spencer

```
 1              MR. TEITELBAUM:  Your Honor, if I could be heard

 2     on this, I could explain the relevance.

 3              THE COURT:  All right.  Relevance is one issue,

 4     but are you disputing in any respect that these are

 5     authentic?

 6              MS. SESSIONS:  We don't dispute that these are

 7     authentic, but I just don't see the point of using Google's

 8     submissions to a regulatory authority where the laws are

 9     different and not the laws at issue in this case.

10              THE COURT:  Well, for example, the first one,

11     1092, is simply definitions.  So ...

12              MR. TEITELBAUM:  The first couple pages are

13     definitions, Your Honor, and then going on later, these are

14     factual statements that Google is making.  We're not trying

15     to make any arguments or points about foreign law.  Google

16     is providing factual information about products.

17              THE COURT:  Descriptions about itself and about

18     how its products operate.

19              MR. TEITELBAUM:  Correct, Your Honor.

20              MS. SESSIONS:  Your Honor, I would just note there

21     are descriptions of the products and how they work in here.

22     But, for instance, some of these definitions, I'm not sure

23     whether those definitions were provided by the regulator in

24     their request for information or whether they were provided

25     by Google.
```

                                                              22

Direct examination - S. Spencer

1           So not all of these submissions include --

2    everything in the submission is not going to be a statement

3    of Google's.  Some of this is the questions that the

4    regulator was asking or the framework that the regulator had

5    imposed on Google's responses.

6           MR. TEITELBAUM:  The only thing we want for the

7    truth, Your Honor, is Google's statements.

8           THE COURT:  I'm going to permit these in.

9    Obviously, I'll look at them as I'm making my decision to

10   the extent I think that they're relevant.  But I'm letting

11   them in.

12          These would be statements, in part, by Google

13   about itself, about how its products operate, and we'll see

14   whether there are consistencies or inconsistencies with

15   what's been coming out during the trial.  All right.

16          MS. SESSIONS:  Your Honor, with two caveats.  I

17   understand your ruling.

18          One would be that not everything in these

19   submissions is a statement of Google's, as I just noted.

20   And there may be differences between the way the products

21   work in other jurisdictions or at the time that these

22   submissions were made and now.

23          So I would just note that without the opportunity

24   to discuss particular statements, we have no opportunity to

25   respond to or to correct those issues.

                                                          23

Direct examination - S. Spencer

1          So I might suggest that we meet and confer with

2    the government about the particular purported statements of

3    Google that they intend to admit into evidence from these

4    submissions, and we may be able to agree that some of those

5    could come in, and then the remainder of these submissions

6    would not come in to the extent that they are not -- not

7    statements by Google or not -- do not pertain to the

8    products at issue in this case.

9          MR. TEITELBAUM:  Your Honor, I think these are

10   statements to a regulatory authority.  The document speaks

11   for itself.  They're coming from Google.  We're not seeking

12   to admit anything that's not a Google statement for the

13   truth.

14          And I think it shows on its face what Google is

15   saying.  There's no need for --

16          THE COURT:  No, I think actually Google's argument

17   is well made.  Rather than requiring me to sit and go

18   through dozens of pages of very small print to figure out if

19   it's at all relevant to the case.

20          MR. TEITELBAUM:  I do have --

21          THE COURT:  You should be able to point -- not

22   take up time right now, sit down with counsel and point to

23   the particular answers in the particular exhibits that you

24   feel have relevance to this case and that are not just

25   cumulative.  I don't need to read the same thing over and

                                                          24

Direct examination - S. Spencer

```
 1    over again.  You've given me four different documents here.
 2    All right.
 3            MR. TEITELBAUM:  Understood, Your Honor.  And I do
 4    actually have specific page numbers right now that I could
 5    give to the Court and we could narrow this.
 6            THE COURT:  You all work it out.  All right.
 7            MR. TEITELBAUM:  Understood, Your Honor.
 8            MS. SESSIONS:  Yes, Your Honor.
 9            THE COURT:  I'm going to at this point not have
10    them formally admitted yet.  See what you can work out.
11            MR. TEITELBAUM:  Understood.
12    BY MR. TEITELBAUM:
13    Q    Moving on to a different topic, Mr. Spencer.
14            You had a chat function available to you at Google
15    to communicate with your co-workers; is that right?
16    A    Yes.
17    Q    And as did pretty much every other employee at Google?
18    A    I think every person in the U.S.
19    Q    Fair enough.
20            And at Google specifically, chats could be either
21    on the record or off the record; right?
22    A    There was a feature that would store history or not
23    store history.
24    Q    So history on or history off?
25    A    That's the feature.
```

25

Direct examination - S. Spencer

```
  1   Q    And on the record or history on meant that the chat
  2   would be preserved for a certain amount of time; right?
  3   A    I guess.
  4   Q    Okay.  And off the record or history off meant that the
  5   chat would be deleted after 24 hours; right?
  6   A    I didn't even know it was stored for 24 hours.
  7   Q    Okay.  And in your time at Google, you don't believe
  8   that you ever changed the setting on your chat function to
  9   history on; correct?
 10   A    Not with intention, no.
 11   Q    Okay.  And you received a litigation hold related to
 12   this matter in December of 2019; right?
 13   A    I was on many litigation holds.  That seems right.
 14   Q    No reason to doubt that you received a litigation hold
 15   in December of 2019?
 16   A    No reason to doubt it.
 17   Q    Okay.  And I don't want you to tell me the substance of
 18   these conversations, with one exception, but you had a
 19   conversation with Google attorneys about your use of chats
 20   after receiving the litigation hold; right?
 21   A    I've had many conversations with Google attorneys, I'm
 22   sure I asked the question about what we're supposed to do.
 23   Q    Okay.  And so this is going to be a yes-or-no question
 24   right now.
 25        You told Google attorneys when you were asked
```

26

Direct examination - S. Spencer

```
 1    about your uses of chats, that you did in fact use chats for
 2    substantive communications even after receiving a litigation
 3    hold; correct?
 4    A    My general practice was not to use chats for
 5    substantive conversations.
 6    Q    But you did tell Google attorneys that at least on
 7    occasion, you did use chats for substantive communications;
 8    correct?
 9    A    I'm sure there was at least one example where some
10    thread was going on, that I was on, that was with real
11    content.
12    Q    And to your recollection at no point did you ever turn
13    history on for the chat function; correct?
14    A    Yeah.  I don't know if I even knew how.
15    Q    Okay.  If we could now please take a look at PTX 997.
16               THE COURT:  Any objection to 997?
17               MS. SESSIONS:  Is Mr. Spencer on 997?
18               MR. TEITELBAUM:  The metadata reflects that
19    Mr. Spencer is a custodian and this is a broad distribution
20    email to Google employees.
21               MS. SESSIONS:  Your Honor, we object to 997 as
22    containing hearsay within hearsay.  There's -- it looks like
23    there's some paraphrasing or reproduction of news articles.
24               MR. TEITELBAUM:  Not seeking to introduce the
25    paraphrasing of news articles for the truth, Your Honor,
```

27

Direct examination - S. Spencer

```
 1   just for context.
 2           THE COURT:  I'll overrule the objection.  It's in.
 3    (Plaintiffs' Exhibit Number 997 admitted into evidence.)
 4   BY MR. TEITELBAUM:
 5   Q   And Mr. Spencer, I really just have a couple of
 6   questions.
 7           I'm specifically on the third page, if we could go
 8   to the heading, Internal Reaction.
 9           So this is an email from Google that was sent to
10   Google employees shortly after the filing of the Google
11   search litigation; does that look right to you?
12   A   Hold on.  I'm still trying to figure out where you are.
13   Internal Reaction.
14   Q   So I'm at the third page of the document, which is the
15   Bates ending in 391.  And it's on your screen if that's
16   easier.
17   A   This is a document with reactions to --
18           THE COURT:  Well, do you recall -- wait.  Do you
19   recall, Mr. Spencer, do you recall that there was reaction
20   to the Google search issue, the investigation?
21           Within Google, do you remember there being a
22   reaction when it came to you all's attention that there was
23   this antitrust investigation going into the search features?
24           THE WITNESS:  I mean, people were aware of the
25   news articles.
```

Direct examination - S. Spencer

```
 1              THE COURT:  Okay.  That's the answer.

 2         Let's go.

 3              MR. TEITELBAUM:  Understood, Your Honor.  We're

 4    nearing the end here.

 5    BY MR. TEITELBAUM:

 6    Q    And I just wanted to ask you, Mr. Spencer, do you see

 7    where it says:  "Tone is mostly neutral with Googlers

 8    commenting on Kent's email, noting that the stock is largely

 9    unaffected by the announcement and sharing documents on

10    groups and currents.  Note, a few Googlers are advising

11    their colleagues to communicate with care, and lawyers

12    posted on threads on ENG-MISC and industry info to remind

13    Googlers about communication guidelines"?

14    A    Yes, I see that.

15    Q    So what this reflects is that Google had the technology

16    and the ability to actually scrape and monitor its own

17    employees' internal Google communications even as of October

18    of 2020; right?

19    A    No, that's not my understanding.

20    Q    That's not your understanding from what's written here

21    about observations about what Googlers are saying to each

22    other, including Communicate With Care?

23    A    That's not my understanding, no.

24    Q    Okay.  All right.  Well, despite what it says in this

25    email here, the default for the chat function for the entire
```

Direct examination - S. Spencer

```
 1   time that you were at Google remained as history off;
 2   correct?
 3   A    Again, I don't know what the history settings were.
 4   Q    Well, you testified at your deposition as far as you
 5   knew the default was that the history was off; right?
 6   A    I said that the history settings changed from on or off
 7   at times.  I don't know when those dates were.
 8   Q    Okay.  But you left the defaults undisturbed, whatever
 9   they were?
10   A    Correct.
11            MR. TEITELBAUM:  At this time, Your Honor, also
12   additionally, pursuant to the stipulation, we would offer
13   some additional exhibits into evidence.
14            Google has informed us that they do not have any
15   evidentiary objections to these exhibits.
16            THE COURT:  Go ahead.
17            MR. TEITELBAUM:  PTX 208.  PTX 333.  PTX 686, as
18   narrowed by agreement with counsel.  PTX 421.  PTX 499.
19   PTX 578.  PTX 832.  PTX 485.  PTX 1517.  PTX 284.  PTX 971.
20   PTX 128.  PTX 209.  PTX 326.  And PTX 847.
21            THE COURT:  All right.  Now, one of those exhibits
22   you said as refined or as edited, was that 868 -- 686?
23            MR. TEITELBAUM:  That is 686, Your Honor, that's
24   correct.
25            THE COURT:  The version that we have in our books,
```

30

Direct examination - S. Spencer

```
 1   does that have the corrections or the redactions made to it?

 2              MR. TEITELBAUM:  The version that was submitted to

 3   the Court before the trial commenced is not narrowed and so

 4   we will provide the Court with a narrowed version of that.

 5              And I'll just state for the record that the

 6   narrowed version is the cover page, as well as the pages

 7   ending in 5027, 5028 and 5044.

 8              THE COURT:  Those pages are removed or the only

 9   ones that make up the exhibit?

10              MR. TEITELBAUM:  The only ones that make up the

11   exhibit.

12              THE COURT:  All right.  Now you're going to need

13   to be very careful because again, the thumb drive or disk,

14   however you gave us the record digitally, has to be

15   corrected because that's what will go to the Fourth Circuit.

16              MR. TEITELBAUM:  Absolutely, Your Honor, we will

17   do that and we can also provide a narrowed hard copy if that

18   would be convenient.

19              THE COURT:  Well, we'll need narrowed hard copies

20   for the set that we take back to chambers as well.

21              MR. TEITELBAUM:  Understood.  We will do both of

22   those things.

23              THE COURT:  Is there a generic theme?  Are these

24   all emails?

25              MR. TEITELBAUM:  Not all of them but many of them.
```
                                                              31

Direct examination - S. Spencer

```
1    They are all Google documents.  They relate to the Google
2    Ads, AdX, tie.  They relate to AdX pricing and price
3    competition.  They relate to the integration between AdX and
4    third-party publisher ad servers.  And they relate to policy
5    with respect to yield managers.  And they relate to market
6    definition and last look.
7           And I'll just say that the purpose of moving these
8    in now, they relate both to Mr. LaSala's testimony from last
9    week and Mr. Spencer's testimony.  We did not move some of
10   these in after Mr. LaSala's testimony because we were still
11   meeting and conferring with Google about them.
12          THE COURT:  All right.  And again, because you're
13   moving them in, they will be on the website tomorrow
14   morning.
15          MR. TEITELBAUM:  Absolutely, Your Honor.
16          THE COURT:  All right.
17          Does Google want to be heard on any of that?
18          MS. SESSIONS:  Your Honor, I'll just note for the
19   record we obviously disagree with the government's
20   characterization of those exhibits, but we have no objection
21   to them being put into evidence at this time.
22          THE COURT:  All right.  I'm not crazy about this
23   way of doing it because it doesn't give the Court the
24   opportunity while the case is coming in and while we're
25   taking notes on it, to be able to focus any attention
```

Direct examination - S. Spencer

```
 1   whatsoever.
 2           So I'm going to deem them to be not that
 3   important, frankly.  If it's an important exhibit, it should
 4   be discussed during the trial.
 5           MR. TEITELBAUM:  Understood, Your Honor, and what
 6   we are attempting to balance is the need to continue to move
 7   expeditiously with the -- our concern about just making sure
 8   that we've built a complete record.
 9           We understand that the truly most important
10   exhibits will be covered live in court.
11           THE COURT:  That's fine.
12           MR. TEITELBAUM:  Thank you.
13   (Plaintiffs' Exhibit Numbers 208, 333, 686, 421, 499, 578,
14    832, 485, 1517, 284, 971, 128, 209, 326 and 847 admitted
15                        into evidence.)
16           THE COURT:  You're passing the witness?
17           MR. TEITELBAUM:  I pass the witness, yes.
18           THE COURT:  All right.
19           Cross-examination.
20           MS. SESSIONS:  Well, Your Honor, thanks to you --
21   Justina Sessions, sorry, for Google.
22           Thanks to Mr. Spencer for coming today.  We have
23   no questions for Mr. Spencer.
24           THE COURT:  Are you planning to call him later?
25           MS. SESSIONS:  We are not.
```

33

Direct examination - S. Spencer

```
 1              THE COURT:  Any chance he'll be re-called?

 2              MR. TEITELBAUM:  If Google doesn't need him for

 3    anything, we will release him as well.

 4              THE COURT:  Mr. Spencer, then you drew the lucky

 5    card today.  So you're free to go or you can stay and watch

 6    the proceedings, but you're not to discuss your testimony

 7    with any witness who has not yet testified.  Thank you.

 8              THE WITNESS:  Thank you.

 9              (Witness excused at 9:40 a.m.)

10              THE COURT:  All right.  Call your next witness.

11              Are we going back to the testimony of your expert?

12              MR. VERNON:  Yes, Your Honor, Professor

13    Abrantes-Metz.

14              We believe Your Honor has the binders.  If that's

15    not right, we do have extra copies.

16              THE COURT:  I have them.  I have them.

17              MR. VERNON:  Okay.

18              THE COURT SECURITY OFFICER:  Your Honor, will you

19    want the oath again?

20              THE COURT:  No.

21              You're still under your previous affirmation.

22              MR. VERNON:  May we proceed, Your Honor?

23              THE COURT:  Yes, sir.

24                          DIRECT EXAMINATION

25    BY MR. VERNON:
```

34

Direct examination - R. Abrantes-Metz

1    Q     Welcome back.

2    A     Thank you.

3    Q     So I believe -- there's been an adjournment.  We had

4    covered the relationship between DFP and AdX, we covered the

5    type of analysis you did, we covered quantitative versus non

6    quantitative, we covered Google Ads to AdX, and we were in

7    the middle of first look.

8          I think the next question is:  Were there any

9    work-arounds that allowed publishers to call other exchanges

10   before calling AdX, and again, we're focusing on first look

11   so the period before header bidding?

12   A     Yes.  So there was the possibility for publishers to

13   classify their inventory at a higher priority category than

14   remnant called the sponsorship item.  So if the publishers

15   categorize their inventory that way, that exchange would go

16   first, but the evidence is that publishers did not use these

17   alternative a lot mainly because it interfered with direct

18   deals they had.

19         And in any case, even the situations where it did

20   use -- they did use, these required the inventory to be

21   taken to a higher priority level, and therefore, no longer

22   remnant.

23         So even through these work-arounds, AdX still had

24   the exclusive first look over remnant waterfall.

25   Q     Does the existence of this work-around change your

                                                              35

Direct examination - R. Abrantes-Metz

```
 1   conclusions about the effects of first look?
 2   A    No.  No, it does not.
 3             The reality is that it was not widely used.  Even
 4   some Google documents do support that that was true in 2020
 5   when Google decided to stop allowing this practice, it
 6   mentioned that it would only affect a small number of
 7   publishers.
 8             And so -- and as I mentioned earlier, AdX would
 9   still always be the first exchange exclusively to be
10   contacted within the remnant inventory.
11   Q    Why did you conclude that first look harmed competition
12   even though there is at least one work-around?
13   A    Well, there's -- that work-around potentially was not
14   widely used and providing AdX even within the remnant
15   inventory with the exclusive first look and the right of
16   first refusal, compared to all of the other exchanges, a
17   position that no other exchanges were able to compete for at
18   any price, harmed their ability to grow and to gain scale
19   and allowed AdX to gain every time more transactions, more
20   and more over time, enhancing its market power and enabling
21   it to charge a higher take rate.
22   Q    And how do you know that first look had a significant
23   effect even though there were potentially some work-arounds?
24   A    There were -- there was evidence both from Google
25   internal documents that explained the importance of first
```

                                                              36

Direct examination - R. Abrantes-Metz

```
 1    look, as others have testified here, of among other things,
 2    the fact that AdX could, through this first look
 3    exclusivity, get to better quality impressions.
 4            But there were also various documents from third
 5    parties explaining the impact that first look had on their
 6    business.
 7    Q    Let's move forward in time and cover last look.  And
 8    again, I won't ask you to explain how it works to avoid
 9    repetition, but can you explain for us in practical terms
10    how last look affects the auctions that publishers ran?
11    A    Sure.  So last look essentially is equivalent to the
12    following process.  There's a sealed auction that is ran
13    outside of DFP amongst competing exchanges that is not
14    inclusive of AdX, and it is as if everybody sends their bids
15    sealed to this auction and then the winner is determined.
16            So then when that price, the winning price from
17    the header bidding is determined and is sent to DFP, AdX and
18    only AdX is able to unseal the -- open the envelope for the
19    winning bid, know what the winning bid is, and be able -- is
20    able to bid after everybody else.  And in addition is able
21    to adjust its own bid not to overpay, for example, and to be
22    able to take the transaction away from another exchange at
23    just about the same price.
24            So AdX is bidding after everybody else and with
25    the knowledge of the price to be that none of the other
```

37

Direct examination - R. Abrantes-Metz

```
 1   exchanges are able to do.
 2            THE COURT:  Now that disadvantages the other
 3   exchanges, but it does help the publisher because it gets a
 4   penny or whatever more than what the sealed auction had
 5   resulted in; correct?
 6            THE WITNESS:  Not necessarily, Your Honor.
 7            If you think of a situation where one possibility
 8   for how competition could have developed is that after
 9   everybody else bid, AdX would then put forward its bid
10   without knowing the price to beat.
11            Of course, the publisher always had at least that
12   price guaranteed from the header bidding, but chances are
13   that often AdX would have provided significantly higher than
14   that bid, if it had been bidding without having the
15   advantage of seeing the competitor's price.  But because AdX
16   could see the competitor's price, AdX could then reduce its
17   bid and pay just the minimum price it had to pay to win the
18   transaction.
19            So it is not necessarily true that the publisher
20   is made better off.
21   Q    Very briefly, just to avoid unnecessary repetition, how
22   did last look interact with sell-side DRS?
23   A    So sell-side DRS is the program that allowed -- that
24   allowed AdX to move its take rate up or down in order to, if
25   needed, adjust its bid to win the transaction just above the
```

38

Direct examination - R. Abrantes-Metz

1    price of header bidding winning price.

2            So DRS enhanced and made the effects of last look

3    larger.

4    Q    Why did you find that last look was exclusionary?

5    A    Well, it is exclusionary because it impedes the ability

6    of other exchanges to compete.  If you think of an exchange

7    that is trying to compete with AdX and is trying to compete

8    on price, for example, and they place a really good price

9    forward for the publisher, win the header bidding contest,

10   but then AdX always comes last and is always able to match

11   that price if it wants to, it limits or essentially stops

12   the ability in the sense of competing exchanges to be able

13   to take market share away from AdX by competing on price

14   because AdX can always go last and always adjust its price.

15   Q    As an economist, how would you expect last look to work

16   in a competitive market?

17   A    So as I mentioned earlier, one possibility for what

18   competition would have looked like with respect to last look

19   would have been to ask AdX to provide the bid -- its own bid

20   without having the knowledge of everybody else's bids.

21           Another possibility could have been, for example,

22   to allow for DFP to allow its publisher customer to choose

23   which exchange do they want to give a last look to.  And if

24   the publisher had had that choice, competition for that last

25   look position would have naturally happened and it would not

39

Direct examination - R. Abrantes-Metz

1   have given this exclusive privilege to AdX.

2   Q    How did last look affect competition in the exchange

3   market?

4   A    Well, it impaired competition in the ad exchange

5   market, as I mentioned earlier, made it very difficult for

6   exchanges to compete on price with AdX because so long as

7   AdX header bidding wanted to get that impression, it went

8   last and knew the price to beat.  It was the only exchange

9   knowing the price to beat and could, therefore, take the

10  impression away.

11          And by doing so, on multiple transactions, it made

12  it hard for exchanges to gain scale and effectively compete

13  with AdX.

14  Q    How did last look affect publishers?  I think you

15  mentioned one component of it.

16          How did last look affect publishers with respect

17  to competition on take rates?

18  A    So we mentioned earlier that publishers did not

19  necessarily win from last look.  In fact, some of Google's

20  documents do mention, do discuss how last look didn't really

21  much impact publishers increase their revs, it just

22  increased Google's revenues.

23          And this practice, along with others, concentrated

24  more and more transactions on AdX and enabled AdX to charge

25  a higher take rate than it otherwise would have.  And that

40

Direct examination - R. Abrantes-Metz

1    take rate is -- the excess of the take rate is paid by both

2    advertisers and publishers.  So it harmed publishers in that

3    way as well.

4    Q    And what evidence informed your conclusions about the

5    effects of last look?

6    A    There was a lot of evidence on the effects of last

7    look.  Qualitative evidence, for example, as I mentioned

8    earlier of Google recognizing that last look didn't

9    necessarily meaningfully impact increase the revenues for

10   the publishers, that it mostly represented a lot of revenue

11   for Google.

12           There's experiments ran by Google that estimate

13   the impact of last look -- of ending last look, and some of

14   the experiments talk about losing revenues on AdX by 9 or

15   almost 10 percent of losses in revenues.

16           And there's -- there's also evidence from third

17   parties on how last look impacted their ability to compete.

18   Q    Now let's turn, again moving forward in time a little

19   bit, to UPR.

20           Why did you conclude that UPR was exclusionary?

21   A    Well, UPR forcibly -- so DFP's customers, the

22   publishers, were forced by DFP not to be able to set higher

23   floors for AdX.

24           So they were not forced, they were still allowed

25   to have AdX be sent a lower floor.  So UPR did not impose

41

Direct examination - R. Abrantes-Metz

```
 1    equal floors for everyone; it only forbid publishers from
 2    setting higher floors for AdX, not from setting lower floors
 3    to AdX.
 4           And so because it was an imposition on that side,
 5    the consequence was that by not allowing AdX to have higher
 6    floors, it forced AdX floors to be reduced, and it made it
 7    hard for competing exchanges to compete on price because
 8    they were no longer being able to be floored lower than AdX
 9    and shifted a significant amount of transactions into AdX
10    making it very hard to compete as you would expect on price
11    across exchanges.
12    Q    As an economist, how would you expect DFP to treat
13    price floors in a competitive market?
14    A    Well, just like all of the other conducts of Google
15    that we have been discussing during my testimony, this as
16    well is another example where one of Google's products, in
17    this case DFP, imposed a restriction on its publisher
18    customers which was not welcome and really not wanted by
19    several publishers, but they actually had no place to go, so
20    therefore, DFP was able to impose these undesired
21    restriction without fear of losing the customers consistent
22    with DFP's market power.
23           And in a competitive world where DFP would have
24    faced more competition, if it had imposed such a restriction
25    that was undesirable to its customers, customers would have
```
42

Direct examination - R. Abrantes-Metz

1    gone somewhere else to an alternative.  They didn't, because

2    those alternatives were really not there.

3           And as a contrast, Xandr did recommend floors to

4    be equal across exchanges but did not impose those floors to

5    be equal.  It did let publishers choose whether they wanted

6    those floors to be higher or not even, though the

7    recommendation was that they should be the same.

8    Q    How does UPR affect competition in the exchange market?

9    A    So UPR does not let the publishers set a higher floor

10   for AdX; therefore, it is lowering the floor of AdX and

11   making it more attractive in terms of prices to publishers

12   that had as a consequence to shift a significant amount of

13   transactions that would otherwise have gone to other

14   exchanges that instead went to AdX.

15          And having a meaningful impact over time, it

16   impairs rival exchanges' ability to compete to gain scale

17   and clearly to compete on price.

18   Q    How does UPR affect publishers?

19   A    So publishers wanted the flexibility of having the

20   ability to set higher floors for AdX for a variety of

21   reasons.

22          One reason was that, for example, they may want to

23   develop stronger or new relationships with other demand

24   sources.  And therefore, they wanted the ability to provide

25   those others with a volume discount, which means that they

43

Direct examination - R. Abrantes-Metz

```
 1    would pay a lower price than AdX.

 2             They may just simply have wanted to reduce their

 3    dependence on AdX.  In some cases, I've seen evidence where

 4    the publisher wanted the ability to put higher floors on AdX

 5    because they wanted that ability to negotiate with AdX a

 6    lower take rate.

 7             So all of these things were taken away by DFP as

 8    it forced its customers not to floor AdX higher, and

 9    therefore, they were harmed by that restriction that limited

10    their choices.

11    Q    How does UPR affect competition in the advertiser ad

12    network market?

13    A    So UPR also forced publishers not to floor Google Ads

14    higher than other ad networks.  And for example, there's

15    documents that show that the floors in Google Ads, because

16    of UPR, were reduced from $3.31 to $1.01.

17             That is a very big reduction in price floors for

18    Google Ads, which not surprisingly would have led to a

19    significant amount of transactions to go to Google Ads that

20    otherwise would have gone to competing ad networks.

21    Q    What quantitative evidence did you rely on regarding

22    the effects of UPR?

23    A    There were -- there was several evidence on effects of

24    UPR, not just internal studies as I have mentioned

25    quantifying, for example, the effects of the floor price
```

44

Direct examination - R. Abrantes-Metz

```
1    impositions from Google Ads, but also quantifying percentage

2    of transactions and revenues that moved into AdX because of

3    UPR.  And there were also -- there was also evidence from

4    third parties talking about the consequence of UPR in their

5    own businesses.

6    Q    Last conduct, Google's acquisition of AdMeld.

7              Can you describe -- and please just do this

8    briefly, I think the Court has heard some testimony on this.

9              Very briefly, what was AdMeld prior to the merger?

10   A    So AdMeld was a yield manager, and yield managers --

11   one of the features that was liked about yield managers was

12   that they were able to order the waterfall as we have been

13   discussing the waterfall that AdX had, they had their own

14   waterfall but their waterfall was ordered by highest, by

15   putting on top the demand source that was expected to have

16   the highest price and so on.

17             So by ability or expectation that the demand

18   source will provide higher revenue, that one will go on top,

19   the second highest will go in second, et cetera.  So they

20   had these let's call it more dynamic waterfall, they had

21   prediction models that allowed them to estimate what the

22   price from different demand sources were.

23             They also had another ability which was the RTB

24   capability, real-time bids, where they were able to collect

25   real-time bids from various demand sources, and they were
```

                                                              45

Direct examination - R. Abrantes-Metz

1    then able to send those real-time bids back to publisher ad

2    servers other than DFP.  And so this way they were able to

3    enhance the revenues of publishers.

4    Q    Why did you conclude that Google's acquisition of

5    AdMeld harmed competition I think in the two markets you

6    mentioned, the exchange market and the ad server market?

7    A    So Google saw AdMeld as a threat to DFP.  Google wanted

8    DFP to have control over the remnant inventory to manage how

9    that remnant inventory was sold.  And AdMeld was a threat to

10   that.  In fact, Google saw AdMeld as the largest -- its

11   largest threat among the yield managers.

12          And another reason, for example, that focusing on

13   the publisher ad server market, that AdMeld acquisition

14   further helped DFP was because of the RTB capabilities.

15   AdMeld was being able to send real-time bids from other

16   demand sources to competing publisher ad servers from DFP.

17   And so there was a threat to DFP as well.

18          With respect to the ad exchange market, by

19   enhancing DFP's market power and eliminating a competitive

20   threat, the largest competitive threat as seen by Google,

21   DFP then was able to engage in the -- to have the conducts

22   we talked earlier, the exclusive first and last look to AdX,

23   and later UPR that favored AdX.  And the real time

24   capabilities of AdMeld were also a threat to AdX.

25          So at the end of the day, this acquisition had

46

Direct examination - R. Abrantes-Metz

1    anticompetitive effects both in the publisher ad server

2    market and in the ad exchange market.

3    Q    What features of AdMeld did Google deprecate after the

4    acquisition?

5    A    So after the acquisition, Google deprecated the

6    features of AdMeld that posed risk to its own products.  And

7    that was the ability of AdMeld that AdMeld already had at

8    the time of the acquisition, to send real-time bids to other

9    publisher ad servers.  So publisher ad servers that were

10   competitors to DFP.

11        So Google acquired AdMeld and deprecated the

12   features that were threatening to its products.

13   Q    As an economist, how does the deprecation of a product

14   feature affect your analysis of the competitive effects of a

15   merger?

16   A    That is what many economists commonly call killer

17   acquisitions where a firm acquires a main competitor, in

18   this case what it saw being its main competitor, and

19   deprecates the features or sometimes shuts completely down

20   the competitor, but at least deprecates the features that

21   are a threat to the company's main products.

22        And these acquisitions do tend to lead to

23   anticompetitive effects.

24   Q    Do you recall reviewing evidence about

25   disintermediation in the context of AdMeld?

47

Direct examination - R. Abrantes-Metz

```
 1   A     Yes.

 2   Q     Can you explain what that shows?

 3   A     So the documents show that Google was concerned about

 4   the risk of disintermediation that DFP was facing because of

 5   AdMeld and yield managers in general.

 6           DFP was used by publishers to manage both direct

 7   and remnant inventory, and many publishers were starting to

 8   use AdMeld instead for remnant inventory, and Google saw

 9   that as a threat to the control that DFP had over how

10   remnant inventory is sold.

11   Q     And why was that control important, the control of the

12   remnant inventory?

13   A     Because if you control the remnant inventory, you're

14   then able to help in the decision-making of who's going to

15   purchase that inventory; namely, if DFP is the source

16   controlling the remnant inventory, then that remnant

17   inventory will go through Dynamic Allocation.  And because

18   of that, AdX, as for example its exclusive first look within

19   that process, and therefore, has the right of first refusal.

20           And so by eliminating or diminishing that risk of

21   disintermediation and enhancing DFP's market power, enabled

22   AdX also to enhance its market power.

23   Q     Let's turn in your binder -- in the smaller binder to

24   PTX 88 which has already been admitted.

25           Please turn to the second page which ends in 597.
```

48

Direct examination - R. Abrantes-Metz

 1   And we will all focus on the notes section.  There is a

 2   bullet below that that says:  Key Findings Strategic.  It's

 3   the third.

 4   A    Yes.

 5   Q    In the first bullet point under that says "yield

 6   managers -- sorry, YM break our ability to dynamically

 7   allocate from DFP".

 8        What does this show?

 9   A    This refers to the fear of disintermediation, to the

10   concern the risk of disintermediation that Google had with

11   respect to AdMeld.

12        So they were concerned that publishers were

13   starting to choose more and more AdMeld to control --

14   essentially to decide how their remnant inventory was sold

15   instead of DFP.

16   Q    And then there's a bullet point right below that that

17   says:  Key Competitors.

18        What does that show?

19   A    That shows that Google saw AdMeld, Rubicon and

20   PubMatic, the three yield managers, as their key

21   competitors, and that "AdMeld is the largest concern."  So

22   AdMeld was what Google perceived to be its largest

23   competitor.

24   Q    As an economist, when a merger allows the firm to

25   acquire either the competitor that is its largest concern or

                                                              49

Direct examination - R. Abrantes-Metz

```
 1   a competitor that is one of its three key competitors, how

 2   does that affect your analysis of the effects of the merger

 3   on competition?

 4   A    Well, if there's a large firm that acquires its key

 5   competitor that poses an actual and/or potential threat of

 6   larger competition, that merger is likely just by that

 7   effect to tend to lead to anticompetitive effects.

 8          And those are typically mergers that will call

 9   attention of agencies for review, and that's because

10   acquiring the key competitor means that you're acquiring the

11   force that would have been out there that could put

12   competitive pressure on the firm's potential market power.

13          And therefore, by acquiring such a competitor,

14   there's a higher chance of enhanced market power by the

15   merged firm and a higher chance of, for example, raising

16   prices or lowering output or lowering quality of the product

17   than otherwise.

18   Q    You can set that aside and let's turn to Plaintiffs'

19   Demonstrative K which is I believe the third-ish tab in the

20   binder.

21          What does this demonstrative show?

22   A    This demonstrative illustrates what I mentioned earlier

23   as how publishers used DFP aside from when, for example, a

24   yield manager was not present.

25          So DFP would be used to deal with direct deals
```

50

Direct examination - R. Abrantes-Metz

 1   between the publishers and the advertisers, and also to deal

 2   with remnant inventory with ad exchanges and advertiser ad

 3   networks.

 4   Q     And now please to the next demonstrative, Demonstrative

 5   L which is the next one in the binder.

 6         What does this -- what does this demonstrative

 7   show?

 8   A     This demonstrative shows that AdMeld is now part of the

 9   competitive threat on remnant.  So AdMeld is threatening to

10   take away the ability of DFP to determine and control the

11   tag on remnant inventory and be able to determine who is

12   going to buy that remnant inventory.  And because of that,

13   it was a competitive threat to DFP.

14   Q     You can set that aside.

15         Let's discuss pro competitive justifications.

16         How does an economist assess potential pro

17   competitive justifications for a conduct or for a merger?

18   A     So there's -- a pro competitive justification is

19   obviously something that is a positive effect associated

20   with a conduct, and there are typically three factors that

21   are considered by economists to determine if a particular

22   conduct or a merger have a pro competitive effect.

23   Q     And what are those three factors?

24   A     So the first is that that effect needs to be specific

25   to the conduct, meaning that it would not have existed

                                                            51

Direct examination - R. Abrantes-Metz

1    absent the conduct.

2            The second is that it needs to be enhancing of

3    total welfare, so it needs to increase the surplus in the

4    market.

5            So it cannot be just something that reshuffles

6    surplus between different types of customers; it needs to be

7    something that makes the size of the pie grow, not just

8    cutting the pie in different slices, keeping the size of the

9    pie the same.

10           The third factor is that the conduct needs to

11   have -- needs to be supported by the evidence.

12   Q    I think you -- did you say the conduct needs to be

13   supported?

14   A    I'm sorry, the effect needs to be supported.  The

15   candidate effect needs to be supported by the evidence.

16   Q    Did you reach any conclusions about the pro -- or

17   potential pro competitive effects of these conducts that

18   we've discussed?

19   A    Yes.  I analyzed the candidate pro competitive

20   justifications put forward by Google's experts, and I

21   determined that they were in some cases not conduct

22   specific; in other cases, they did not increase welfare; in

23   other cases, they were unsupported by the evidence; or in

24   some cases, they did not verify two or three of the factors.

25           So they were not pro competitive justifications

                                                              52

Direct examination - R. Abrantes-Metz

```
 1    associated specifically with the conducts that I deemed to
 2    be anticompetitive.
 3    Q    Can you give an example of a pro competitive
 4    justification that Google's experts have put forward that in
 5    your view is not specific to the conduct?
 6    A    Yes.  So for example, with respect to the exclusive
 7    first look to AdX, Google's experts point to studies
 8    conducted by Google that point to the fact that publishers
 9    having access to Dynamic Allocation increased their
10    revenues.
11            And those studies tend to compare a publisher who
12    signs up for Dynamic Revenue against a publisher essentially
13    who does not.
14            Now, signing up to Dynamic Revenue as, you know,
15    Dynamic Revenue can have different meanings at different
16    points in time, but just put it simply, means that the
17    publisher signing up for Dynamic Allocation within DFP is
18    now able to access AdX and is also able to access Google Ads
19    because AdX is the only channel to access Google Ads.
20            And so, not surprisingly, a publisher that
21    accesses Dynamic Allocation is going to increase its
22    revenues because it is going to access a whole new set of
23    demand.
24            Now, I do not put forward an opinion that Dynamic
25    Allocation isn't anticompetitive.  Dynamic Allocation has
```

53

Direct examination - R. Abrantes-Metz

1    several aspects.  It has a waterfall and at the top of that

2    waterfall there's a dynamic process that allows AdX to

3    provide real-time bids, but none of those are the conduct

4    that I opine is anticompetitive.

5            The conduct that is anticompetitive is to grant

6    the exclusive last look to AdX within Dynamic Allocation.

7            And so studies that speak to the positive effect

8    of Dynamic Allocation as a whole do not isolate the effect

9    of exclusive first look to AdX.  And therefore, that

10   benefit, those studies study very many factors changing over

11   time simultaneously and do not -- are not capable of

12   isolating the effect of the conduct that is being studied.

13   Q    And you gave an example of a pro competitive

14   justification that Google's experts have put forward that in

15   your view does not qualify as a genuine justification?

16   A    For example, the acquisition of AdMeld.  Google's

17   experts explain that the acquisition of AdMeld allowed

18   Google to acquire yield management functionality that

19   otherwise did not have.  And that was good for Google, but

20   the question of a pro competitive effect is whether it was

21   enhancing the overall market and so whether it increased the

22   surplus of the overall market.

23           And prior to the acquisition, publishers were

24   already able to access AdMeld's yield management

25   capabilities without AdMeld having been acquired by Google.

                                                              54

Direct examination - R. Abrantes-Metz

1    So the benefit was not welfare enhancing because the same

2    choices were already available prior.

3            In addition, there was -- there were -- there was

4    no evidence put forward by Google's experts as to whether

5    Google could have obtained yield management functionalities,

6    for example, by developing itself, and therefore, having

7    developed those capabilities not necessarily by acquiring

8    AdMeld.

9            So I -- my determination was that these pro

10   competitive candidate did not meet the commonly used

11   criteria to be classified that way.

12   Q    Let's take a step back.

13           What practical effects does Google's conduct have

14   on publishers and advertisers?

15   A    So the conducts that were anticompetitive allowed AdX

16   to enhance its market power and allowed AdX to keep charging

17   a super competitive fee, meaning a fee that was higher than

18   it should have been under competition, and that too high fee

19   works as a tax per transaction.

20           So the tax was too high, and the two parties

21   involved in the transaction, the advertisers and the

22   publishers, they both paid the extra tax that otherwise

23   would not have existed.  So they were both harmed because

24   the advertisers are paying too much for the impression, the

25   publishers are receiving too little for the impression, and

55

Direct examination - R. Abrantes-Metz

1   AdX is keeping an extra chunk in the middle between what the

2   advertisers pay and the publishers receive.

3   Q    How does Google's conduct affect publishers able to

4   choose the ad tech products that best serve their own

5   interests?

6   A    Well, as I explained through my testimony, all of the

7   conducts related to diminishing, limiting or eliminating

8   choices from Google's customers, for example from DFP's

9   customers, those publishers were faced with restrictions

10  they did not like that unfavored them; some of them existed

11  prior and were eliminated; some of the alternatives, and

12  therefore, they were harmed.

13          But the fact that they ended up not switching away

14  from DFP despite the fact that they did not have the ability

15  to choose reflects -- is consistent with market power, and

16  so publishers were harmed by the conduct and their ability

17  to switch was limited.

18  Q    What effect does Google's conduct have on consumers,

19  meaning ordinary people who are not publishers or

20  advertisers?

21  A    Well, it is likely that consumers were harmed.  So

22  consumers of web page content.

23          To the extent that these publishers monetized less

24  than they otherwise would have for impressions in their web

25  pages, it is -- and by reducing either the quantity of

                                                            56

Cross-examination - R. Abrantes-Metz

```
1    impressions and/or the quality of those impressions because
2    they're getting less money for each of the impressions,
3    consumers of those advertisements were -- and products
4    related were likely to have been harmed.
5              MR. VERNON:  Thank you, Your Honor.  We pass the
6    witness.
7              THE COURT:  All right.  Mr. Isaacson, are you the
8    person on board for this?
9              MR. ISAACSON:  We have some binders to pass out,
10   Your Honor.
11             THE COURT:  All right.  Go ahead.
12                          CROSS-EXAMINATION
13   BY MR. ISAACSON:
14   Q    Doctor, it's Bill Isaacson.  I'll be asking you
15   questions today.
16             I'd like to pick up on the last piece of conduct
17   you were talking about.  Can we look at Exhibit L, the
18   demonstrative.
19             Here you were talking about AdMeld, and on this
20   title, Google's DFP Disintermediated By AdMeld, is the
21   disintermediation you're talking about here by the yield
22   management technology?
23   A    It is the fact that AdMeld, the yield manager, was --
24   was presenting an alternative to DFP publishers, and
25   therefore, was at risk of disintermediating DFP.
```

57

Cross-examination - R. Abrantes-Metz

```
 1   Q    Just a simple question, the technology you're talking
 2   about here for the disintermediation was the yield
 3   management technology and not a different type of AdMeld
 4   technology; correct?
 5   A    As opposed to -- I just wanted to clarify -- the RTB
 6   technology?
 7   Q    Yes.
 8   A    Yes, primarily, but of course they both acted to
 9   protect DFP.
10   Q    Okay.  And I want to explain these two different
11   things.
12             When you were talking about the competitive threat
13   to Google and the largest competitive threat to Google, you
14   were referring to the yield management technology of AdMeld;
15   correct?
16   A    No, not necessarily.
17   Q    Okay.  The document that you looked at -- exhibit in
18   your binder from counsel, PTX 88, at page 2 that you looked
19   at, that's referring to the yield management technology;
20   correct?
21   A    That is correct.
22   Q    Okay.  And when you said there are documents that say
23   that AdMeld was the largest threat to Google or a
24   competitive threat, those documents were talking about the
25   yield management technology; correct?
```

58

Cross-examination - R. Abrantes-Metz

```
 1   A    That is my recollection, yes.

 2   Q    All right.  And the other type of technology that we're

 3   talking about here is AdMeld technology that would give

 4   access to real-time bidding to other publisher ad servers;

 5   correct?

 6   A    Yes.

 7   Q    Okay.  And when you said AdMeld deprecated -- I'm sorry

 8   -- that Google deprecated the AdMeld technology, you were

 9   referring to the real-time bidding technology and not the

10   yield management technology; right?

11   A    Yes.

12   Q    Okay.  Let's get this straight.  Okay.

13             All the evidence that you told this Court about a

14   competitive threat from AdMeld was the technology that was

15   not deprecated?

16   A    No, not necessarily.

17   Q    Okay.  Every document that you have cited about a

18   competitive threat from AdMeld technology was referring to

19   yield management technology; right?

20   A    That is correct.  But that is not the only threat I

21   pointed.

22   Q    All right.  But it's the only one you had evidence for;

23   right?

24   A    The only one I recollect that there were documents

25   referring to.
```

Cross-examination - R. Abrantes-Metz

```
 1  Q    All right.  And we are in agreement that Google did not
 2  deprecate -- one of the words I least like in this case --
 3  did not eliminate the yield management technology; it kept
 4  it and offered it to its customers; right?
 5  A    It did keep that technology, yes.
 6  Q    All right.  And the real-time bidding technology, at
 7  the time of your report and deposition, you didn't know how
 8  many AdMeld -- how many customers used that real-time
 9  bidding feature at AdMeld; correct?
10  A    I don't know how many used.  I know that it was a very
11  significant amount of its revenues.
12  Q    From the real-time bidding technology?
13  A    Yes.
14  Q    Okay.  And what are you pointing to for that?  Do you
15  think you cited that in your report?
16  A    There were documents that referred to how quickly the
17  business was growing.
18  Q    All right.  At the time of your deposition, you thought
19  that they had several customers; right?
20  A    I can't recall exactly what I remembered at the time of
21  my deposition.
22  Q    All right.  If you look at the binder that we've given
23  you, and you look at PTX 141, this is a document cited in
24  your report.
25            THE COURT:  141?
```

Cross-examination - R. Abrantes-Metz

```
 1              MR. ISAACSON:  Yes.  PTX 141.  So this is a
 2   plaintiff exhibit that I would move into evidence.
 3              THE COURT:  Any objection?  There shouldn't be.
 4              MR. VERNON:  No objections, Your Honor.
 5              THE COURT:  All right.  Plaintiffs' 141 is in.
 6     (Plaintiffs' Exhibit Number 141 admitted into evidence.)
 7   BY MR. ISAACSON:
 8   Q    All right.  And this document, if you look at the Bates
 9   stamp number 448, there's a -- below the first bolded
10   sentence, "AdMeld can be called via APIs to serve an ad";
11   that's the real-time bidding technology we're talking about;
12   right?
13   A    I'm sorry, where in the page is it?
14   Q    It's also on your screen.
15              Those APIs are the real-time bidding technology
16   we're talking about; right?
17   A    Yes.
18   Q    All right.  And it says:  "There are small handful of
19   AdMeld sellers that currently have API integrations in place
20   at the ad server level.  While these integrations are being
21   considered, they are not currently planned.  The amount of
22   customers that AdMeld had for this feature was a small
23   handful -- small handful"; correct?
24   A    There may have been a small handful set of customers,
25   but those customers may have had important large size
```

61

Cross-examination - R. Abrantes-Metz

```
 1   business.
 2   Q    All right.  And do you know that?
 3   A    I recall seeing documents where RTB was growing quickly
 4   and it was already more than half of AdMeld's revenue.
 5   Q    Okay.  If you look at page -- move earlier in the
 6   document at the page that's 442 at the bottom, it says
 7   Overview at the top?
 8   A    Yes.
 9   Q    And then it says, What you need to know in 30 seconds.
10   First bullet:  "Almost all the great AdMeld functionality is
11   moving into AdX".
12           You don't know of any AdMeld technology that was
13   not of any -- that was not integrated into Google other than
14   the real-time bidding technology; correct?
15   A    That is correct.
16   Q    All right.  And if I can show you PTX 159 which is in
17   your binder.  This is another document you cited in your
18   report.
19           THE COURT:  Are you moving that in?  I'm not sure
20   if --
21           MR. ISAACSON:  Yes, I am moving it into evidence.
22           THE COURT:  All right.  I'm going to just assume
23   any plaintiffs' exhibit there's no objection, so it's in.
24           MR. VERNON:  No objection.
25     (Plaintiffs' Exhibit Number 159 **admitted into evidence.**)
```

62

```
 1   BY MR. ISAACSON:

 2   Q    And this document is a business analysis and you

 3   recognize -- so if you look at the business analysis on

 4   page 2 and down at costs and risks, do you see that it's

 5   talking about the feature of server-side integrations at

 6   AdMeld; right?  This is talking about the real-time bidding

 7   technology; correct?

 8   A    Yes.

 9   Q    And in this business analysis, it says:  "The

10   development for this feature is not easy and this was proved

11   by AdMeld from Brian Adams.  We did several server-side

12   integrations at AdMeld, including with Criteo, and they were

13   plagued with ongoing issues.  At this point I'm more of the

14   mindset of getting folks to flip to DFP than to get them DA,

15   Dynamic Allocation.  The retrofit of DFP's small business

16   was targeted primarily at international customers and it

17   just entered beta.  This gives us a new angle here".

18           It then says in terms of implementation costs for

19   Google:  "Google must do significant work in engineering and

20   PM/policy to make this work" and provides those details.

21           Then under support costs and risks for Google, it

22   says:  "Account managers and the spam team will have a new

23   type of span to manage.  Development will likely be roped in

24   if there are issues in spam determination."

25           In summary, at the end:  "We welcome further
```

                                                              63

Cross-examination - R. Abrantes-Metz

```
 1   business cases and support from sales for building a

 2   business case.  If a cumulative business case does present

 3   itself, such that both the break even and opportunity costs

 4   are excluded, then as always we could schedule this work; as

 5   of right now, the business case does not justify the

 6   development".

 7           That was the business analysis that you saw of why

 8   not to build out this real-time bidding technology that

 9   AdMeld had; right?

10   A    That was part of the documents that I reviewed, yes.

11   Q    All right.  And that it included the actual quote from

12   AdMeld about the problems that they were having with these

13   integrations; correct?

14   A    I'm sorry, I couldn't hear you well.

15   Q    That included the quotes from Brian Adams of AdMeld

16   about the problems that they were having with these

17   integrations; correct?

18   A    Yes.

19   Q    Okay.  Now when you said that -- when there was the

20   merger of AdMeld and Google, or the acquisition, and that

21   that had an effect on reducing competition, what market were

22   you referring to that it reduced competition in?

23   A    Both the publisher ad server market and the ad exchange

24   market.

25   Q    And when you say the publisher ad server market or the
```

64

Cross-examination - R. Abrantes-Metz

```
 1   exchange market, you're referring to the publisher ad server
 2   market and exchange market for open web display?
 3   A    Yes.
 4   Q    And when you say the merger affected competition, is
 5   that because there was a merger that included the yield
 6   management technology?
 7   A    So as I explained earlier, there are two markets that
 8   were affected, and there are two effects in the publisher ad
 9   server market which included that.
10   Q    Not quite my question.
11        I understand that you said that's where the
12   effects happened, okay.
13        Are the effects drawn by the fact that you've
14   merged AdMeld with yield management technology and Google
15   that has DFP and the rest of its technology?
16   A    I don't understand your question.
17   Q    Well, is the -- what part of this merger causes the
18   effect?  Is it the fact that you've now joined Google with
19   the yield management technology or is it something else?
20   A    It is both.  That AdMeld was no longer a threat in two
21   ways to DFP.  If we're just focusing on the publisher ad
22   server market first --
23   Q    I'm just asking you about what technology we're talking
24   about.
25        Is the fact that the merger includes the yield
```

65

Cross-examination - R. Abrantes-Metz

1   management technology?

2   A    And I'm trying to explain that it is both yield

3   management and RTB, those were two concerns leading to

4   anticompetitive effects.

5   Q    That's all I need to know.  Okay.

6        So -- but it's your opinion that when these two

7   companies merged, that when -- because AdMeld had yield

8   management technology, that had an effect on the publisher

9   ad server market for open-web display and for the ad

10  exchange -- or for the exchange market for open-web display?

11  A    Yes.

12  Q    Okay.  And the competitive threat from yield management

13  technology was to the publisher ad server market for

14  open-web display; correct?

15  A    Yes.

16  Q    And it was to the exchange -- the competitive threat

17  from yield management technology was to the exchange market

18  for open web technology -- for open-web display?

19  A    Yes.

20  Q    Was there also a competitive threat to the advertiser

21  ad network market for open-web display in your opinion?

22  A    I did not put that opinion forward.

23  Q    Now, the yield management technology was not a

24  publisher ad server; correct?

25  A    Correct.

66

Cross-examination - R. Abrantes-Metz

1  Q    The yield management technology was not an exchange;

2  correct?

3  A    Not the technology, but the RTB capability wasn't like

4  an early exchange.  They were all part of AdMeld.

5  Q    All right.  But the yield -- my question was about the

6  yield management technology.

7           The yield management technology was not an ad

8  exchange; was it?

9  A    No.

10 Q    And so the yield management technology was a type of ad

11 tech different from an exchange, different from a publisher

12 ad server, but it was a competitive threat in the markets

13 for publisher ad servers with -- for open-web display and

14 exchange for open-web display; I have that correct?

15 A    Yes.  Through -- so in the -- for publisher ad server

16 more directly but then by enhancing as explained here.

17 Q    I don't need to know the reasons.  I just want to make

18 sure I have that correct.

19           That yield management technology, while not being

20 an actual publisher ad server or ad exchange, can be -- was

21 a competitive threat in those markets for open-web display,

22 the publisher ad server and the ad exchange?

23 A    Yes.

24 Q    Okay.  And so in your opinion, this is an example of ad

25 technology that is not an actual, for example, publisher ad

67

Cross-examination - R. Abrantes-Metz

```
 1    server that does have a competitive effect on the publisher
 2    ad server market?
 3    A    Yes.  These had, as I opined, an effect on the
 4    publisher ad server market competition.
 5    Q    A little bit of background.
 6         You don't consider yourself an expert in digital
 7    advertising; correct?
 8    A    Correct.  I'm an economist.
 9    Q    Your only prior experience with digital advertising is
10    consulting on one case that had digital advertising as one
11    of its components; correct?
12    A    No, that is not correct.
13    Q    Your only --
14    A    The case was about digital advertising.
15    Q    All right.  But you have experience in one prior case
16    with digital advertising?
17    A    Specifically with digital advertising, yes.
18    Q    And for your opinions on competitive effects in this
19    case, you relied on your review of what was produced in
20    discovery?
21    A    Match other evidence as well, that it was publicly
22    available and -- so other evidence, not just what was
23    publicly -- what was produced through the case.
24    Q    And what you're referring to as evidence would be
25    things that you read outside of the discovery record?
```

Cross-examination - R. Abrantes-Metz

```
 1   A     Correct.

 2   Q     And is there any document in the discovery in this case

 3   that you recall saying there has been an effect on an ad

 4   tech market involving open-web display advertising by

 5   Google's conduct?

 6   A     No, I don't recall that.  I see that as part of my task

 7   is to make that determination.

 8   Q     All right.  Can we show you figure six of your report.

 9           Do you recognize this diagram from your report?

10   A     Yes.

11   Q     Okay.  And it says:  "This report addresses the

12   category of advertising referred to as open-web display

13   advertising, meaning web display advertising sold through

14   third party intermediating products, as reflected in figure

15   six below".

16           And so the blue boxes are how you're illustrating

17   what you say this case is about.  You start with digital

18   advertising, you narrow that to web display, you exclude

19   search in app, instream video and other, and then you narrow

20   web display to open web and exclude the closed web; right?

21   A     Right.  Though the exclusion is not part of my opinion.

22   Q     Exactly.  But it's how you understand the case, how

23   you're supposed to consider the case?

24   A     Yes, but the opinions that I show that I put forward

25   are consistent with market power even if the markets were
```

69

Cross-examination - R. Abrantes-Metz

```
 1    different.
 2    Q    Doctor, counsel can ask you other questions when you
 3    want to explain some things at the end.
 4    A    Sure.
 5    Q    You've not heard the term open-web display advertising
 6    before this case; have you?
 7    A    I don't recall that I have.
 8    Q    And your understanding of the term open-web display
 9    advertising is that it was simply a name that was given to
10    the relevant antitrust market that Professor Lee delineated
11    for this case; correct?
12    A    I think that was something that I said at my
13    deposition; and yes, it was Professor Lee who delineated the
14    markets, not me.
15    Q    And now, is it Professor Lee that delineated the
16    relevant antitrust markets in this case in the first
17    instance or was it the plaintiffs' complaint?
18    A    As commonly in my experience, complaints do put forward
19    their views of what the relevant markets are, but then it
20    falls into a particular expert to actually delineate the
21    markets.
22    Q    All right.  The -- you talked about the take rate being
23    super competitive.
24         You were referring to the ad exchange -- the AdX
25    take rate; correct?
```

70

Cross-examination - R. Abrantes-Metz

```
 1    A      Yes.

 2    Q      And you have not attempted to quantify to what extent

 3    that take rate is super competitive; correct?

 4    A      Correct.  That is the assignment of another expert.

 5    Q      And you have not offered any opinion that the fees

 6    charged by DFP are super competitive; correct?

 7    A      That's correct.

 8    Q      And you agree that the fee for DFP DoubleClick for

 9    publisher has decreased over time; correct?

10    A      No, I don't put an opinion on that.

11    Q      All right.  Maybe we've -- if we look at your report,

12    opening report at paragraph 100.  I think you've got --

13    A      I don't have the report; do I?

14    Q      It's in the large white binder that plaintiff counsel

15    gave you.  And we have a -- we have plenty of other copies

16    if you need it.

17    A      You said paragraph 100?

18    Q      Paragraph 100.

19           All right.  And what paragraph 100 shows is,

20    first, from 2013 to 2020, the high end of the DoubleClick

21    for publisher fee per 1,000 impressions went from 10.5 cents

22    to 8.5 cents; right?

23    A      So which numbers are you comparing?  I'm sorry.

24    Q      So this would be the numbers for the -- so we're

25    talking about the fees are on a sliding scale; correct?
```

                                                              71

1            The amount per impression is different when you

2    have -- depending on -- the amount per impression is

3    different depending on the quantity of impressions; correct?

4    A    Yes.

5    Q    Okay.  And you see that you have there a fee for

6    10 million impressions per month; right?  And a fee for --

7    from 10 million up to 50 million impressions per month and

8    then the amount for more than 6 billion impressions per

9    month?

10   A    Yes.

11   Q    So the high end of the fee per 1,000 impressions went

12   from 10.5 cents to 8.5 cents; right, from 2013 to 2020?

13   A    Yes.

14   Q    And from 2013 to 2020, the low end of the fee per 1,000

15   impressions went from 2.6 cents to 2.1 cents; right?

16   A    Yes.

17   Q    Okay.  And you've not expressed any opinion that the

18   take rate for Google Ads, which you call the advertiser ad

19   network, is super competitive; correct?

20   A    Correct.

21   Q    Now, you discussed with counsel that Google in your

22   opinion had harmed -- had harmed publishers and advertisers,

23   and you talked about that's because the higher take rate,

24   and that's the -- for AdX, and that's the higher take rate

25   that you have not quantified; correct?

                                                              72

Cross-examination - R. Abrantes-Metz

```
 1    A    I quantified the higher take rate.  It's on average
 2    20 percent.
 3    Q    The AdX rate is 20 percent but you didn't quantify how
 4    much of that was super competitive?
 5    A    Correct.
 6    Q    And in reaching your opinions on competitive effects,
 7    you did not attempt to quantify any adverse effects on
 8    advertisers; correct?
 9    A    In my report I talk about many adverse effects to
10    advertisers due to the various conducts.
11    Q    I agree you list them, but you did not try to quantify
12    any of those adverse effects on advertisers; correct?
13    A    Correct.  For the opinion that I put forward that they
14    were harmed, I didn't have to quantify by how much.
15    Q    All right.  And it's the same for publishers, you did
16    not attempt to quantify any adverse -- quantify any adverse
17    effects on publishers, you didn't think that was necessary
18    to your opinion?
19    A    So I may not have undertaken my own separate analysis,
20    but there are -- there's plenty of evidence, many --
21    Q    I'm asking you about -- can I get an answer to my
22    question?
23    A    Sure.
24    Q    You did not attempt to quantify any adverse effect on
25    publishers from the conduct you have described, you didn't
```

73

```
 1   think that was necessary to your opinion; correct?

 2   A    Correct.  I didn't have to quantify to put forward the

 3   opinion that the effect was anticompetitive.

 4   Q    And in reaching -- and when you said you didn't need to

 5   do that, you were saying that you can reach an opinion about

 6   whether conduct is anticompetitive and compare it to whether

 7   it's pro competitive, you can do that without actually

 8   quantifying the effects on the customers; right?

 9   A    Right, because there was plenty of evidence on the

10   effect of the customers.  I didn't have to do it myself.

11        THE COURT:  All right.  We don't want editorial

12   comments.  That's what the redirect is for.  All right.

13   Just if it's a yes-or-no answer, that's what it should be.

14   BY MR. ISAACSON:

15   Q    Now, you did talk at the beginning of your testimony

16   and sort of throughout, that it's your opinion that the

17   conduct in this case restricted the customer choices of the

18   Google customers; right?

19   A    Yes.

20   Q    And I want to be specific about that.  All right.

21        Now, with respect to the restrictions of real-time

22   bids from AdX to DFP, okay, what you're saying is that the

23   restriction of real-time bids from AdX to DFP restricted

24   customer choice, you're referring to the publishers there as

25   the customers; right?
```

74

Cross-examination - R. Abrantes-Metz

```
 1    A     If I may explain.

 2    Q     I would just like to know if it's the publishers you're

 3    referring to?

 4    A     The publisher customers of AdX.

 5    Q     Yes.  Thank you.

 6            And you are saying that the publisher customers of

 7    AdX could not become customers of rival publisher ad servers

 8    and connect to Google's AdX?

 9    A     I'm sorry, could you please repeat the question?

10    Q     So the choice that these customers of AdX don't have is

11    that they can't become customers of rival publisher ad

12    servers and get a connection to Google's AdX?

13    A     And get the real-time bid from AdX, yes.

14    Q     And you're talking about Google establishing a tactical

15    connection to a competitor, and the fact that Google has not

16    done that is what's denying customer choice?

17    A     No, that is not correct.

18    Q     Well, I thought you just said that the denial of choice

19    here for the customers is that they can't get real-time

20    bidding from Google on a rival publisher ad server; is that

21    right?

22    A     Yes.

23    Q     Okay.  Publishers were free to use rival publisher ad

24    servers, those competitors of Google's, but they just

25    weren't connected to Google's AdX; right?
```

75

Cross-examination - R. Abrantes-Metz

```
 1   A    Well, they were not connected directly in a way that
 2   they could get real-time bids, yes.
 3   Q    And for publishers to have the choice that you are
 4   talking about to use rival publisher ad servers and connect
 5   to Google's AdX, Google's AdX would have to integrate with
 6   its competitors to serve those customers; right?
 7   A    No, because that was a policy of AdX, and publishers
 8   are customers of AdX, they're not its rivals.
 9   Q    But even without the policy -- I mean, the real-time
10   bidding doesn't magically go through the air to the other
11   publisher ad server, Google has to integrate technically
12   with that other ad server; right?
13   A    Yes.  Just like all ad exchanges were doing.
14   Q    Okay.  And does Google deny customer choice every time
15   it declines to integrate with competitors to provide access
16   to real-time bids from AdX?
17   A    So again, that is not my opinion.
18   Q    Okay.
19   A    That Google should be forced to integrate with
20   customers, with rivals.
21   Q    All right.  Now, going back to the real time -- now
22   about AdMeld.
23        Going back to that real-time bidding technology,
24   not the yield management technology, the real-time bidding,
25   we're talking about the same basic principle here because
```

76

Cross-examination - R. Abrantes-Metz

```
 1   that technology would have provided real-time bidding to
 2   third-party ad servers; right?
 3   A     Yes.
 4   Q     It's the same issue of choice that we've just been
 5   discussing?
 6   A     Yes.
 7   Q     All right.  With first look and last look, the
 8   customers who are denied choice there are the publishers who
 9   would want to give a first look or last look to an exchange
10   other than AdX; is that right?
11   A     Yes.  The DFP publisher customers.
12   Q     Right.  The DFP publisher customers.  Thank you.
13         Now, publishers can offer a first look or a last
14   look to any ad exchange they want if they're not using DFP;
15   right?
16   A     Yes.
17   Q     What we're talking about is that Google's DFP would
18   have to be designed to give those customers the choice of
19   giving a first or last look to competitors of Google; right?
20   A     No, that is not my opinion.
21   Q     I thought your opinion was that it's the customers of
22   DFP who are being denied the choice to give first looks or
23   last looks to competitors of Google?
24   A     To competitors of AdX; not competitors of DFP.
25   Q     Right.  Thank you.  So let's just repeat that.
```

77

Cross-examination - R. Abrantes-Metz

1            Is that customers of DFP are being denied the

2    choice to offer a first or last look to competitors of

3    Google's AdX?

4    A    Yes.

5    Q    Okay.  And in order to provide a first look or a last

6    look on DFP to competitor exchanges of AdX, you'd have to

7    make some design changes in DFP; wouldn't you?

8    A    I don't think so.  I didn't see evidence because at

9    least in the but-for world that a possibility that I put

10   forward, it would just be changing the order, for example,

11   putting the second exchange first and the reality is that --

12   Q    Doctor, don't you think that requires technical work?

13   A    Not necessarily because DFP was already connected to

14   those opportunities.

15   Q    Do you know what technical work is required in order to

16   alter the ability to provide a first look or a last look in

17   DFP?

18   A    So my opinion is that --

19   Q    Do you know?

20           THE COURT:  The question just asks for a yes-or-no

21   answer.

22           THE WITNESS:  I do not know and it was not

23   relevant for the opinion I put forward.

24   BY MR. ISAACSON:

25   Q    It is not relevant to your opinions that when Google

                                                              78

Cross-examination - R. Abrantes-Metz

```
 1    has a product that you say is restricting choices of
 2    customers, that Google would have to make technical changes
 3    in order to increase the customer choices to be shared with
 4    Google's rivals; do I have that right?
 5    A    Not exactly.
 6    Q    Pretty close?
 7    A    More or less.
 8    Q    Now, uniform price rules, when you say uniform price
 9    rules limit choice, that refers to limiting the choice of
10    publishers using DFP to set different floor prices; right?
11    A    Not correctly, no.  It is only about -- UPR was about
12    not allowing publishers to floor AdX higher.  It didn't
13    forbid them from flooring AdX lower.
14    Q    Well -- and that's fine.
15         But what we're talking about are the customers
16    that you're talking about are DFP publisher customers who
17    could set different price floors and didn't have to set the
18    same price floors?
19    A    Correct.
20    Q    Okay.  And the choice you are talking about is that DFP
21    would have to be -- would have to permit publishers to use
22    its product to discriminate against Google by setting higher
23    price floors for Google AdX than its rivals; right?
24    A    DFP had always done that and allowed it until it
25    deprecated that feature, yes.
```

Cross-examination - R. Abrantes-Metz

```
 1   Q    And to provide that choice, DFP would also have to
 2   require -- I'm sorry, I'm going to start that over.
 3            To provide that choice, the Google technology
 4   would have to allow publishers to make multiple calls for
 5   the same impressions where you lower -- you've heard the
 6   testimony about lowering the price floors.  You make a call
 7   at $10, the price floor, call it $9, call it $8.
 8            If publishers are going to have choices and you're
 9   not going to have Uniform Pricing Rules, you're going to let
10   publishers do that cascading waterfall of testing different
11   price floors; right?
12   A    Yes.  Like they had always done prior to UPR.
13   Q    And you don't have an opinion about whether that
14   constant process of testing different price floors are good
15   for advertisers; do you?
16   A    No.  I discussed some of that in my reports.
17   Q    So the restrictions of Google Ads to AdX, when you say
18   Google Ads restricting bidding primarily to AdX limits
19   choice, you're referring to the choice of advertisers using
20   Google Ads; correct?
21   A    Yes.  I'm referring to the ability of advertisers on
22   Google Ads to be able to bid across exchanges through Google
23   Ads.
24   Q    All right.  Well, the choice you're talking about, I
25   think we're in agreement here, is that advertisers should be
```

80

Cross-examination - R. Abrantes-Metz

```
 1   able to use Google Ads to bid into AdX and into rival ad
 2   exchanges?
 3   A    Yes.
 4   Q    Okay.  So to provide choice, as you define it, Google
 5   has to provide access to Google Ads advertiser customers to
 6   rival exchanges to AdX; correct?
 7   A    Google just needs -- would need to stop conditioning
 8   the access of Google Ads to AdX.
 9   Q    It's more than that.
10        You're going to have to make the technical
11   connections and integrations to the other exchanges;
12   correct?
13   A    Right.  Like what Google had developed already in 2011.
14   Q    And are you referring to AWBid?
15   A    Well, at the time Google was starting to consider
16   AWBid, it also already had developed the technology to
17   extend the exchange -- the bidding across exchanges more
18   widely.
19   Q    Is it your testimony that in 2011, Google had a fully
20   sufficient, safe, built-out technology that you could just
21   integrate into other exchanges without any difficulties,
22   latency, spam, et cetera?
23   A    No.  That is not the opinion that I'm putting forward.
24   Q    Okay.  Now, when you say Google Ads would have been a
25   better product if it allowed more customer choice and
```

81

Cross-examination - R. Abrantes-Metz

```
 1    allowed what you called multi-homing, you mean that Google
 2    would be -- you mean that the product would be a better
 3    quality if customers were given access to Google
 4    competitors; right?
 5    A    If customers of Google Ads, the advertisers, had been
 6    given the choice to connect to multiple exchanges, yes.  And
 7    exchanges are rivals of AdX.
 8    Q    And when you say -- said to the Court just generally
 9    that Google's product quality was affected by the conduct
10    here, you're again saying that the product quality was
11    affected because customers were not given access to Google
12    competitors for the various reasons you've discussed?
13    A    No.  No.  For example, I was referring to deprecation,
14    for example, features of DFP that always existed and were
15    deprecated, such as UPR.
16    Q    All right.  So, yes, there's some deprecation that
17    you've talked about but you also said that in your opinion,
18    Google's product quality is affected when it doesn't give
19    access to Google's ad tech to Google's competitors; right?
20    A    No, that is not exactly correct.
21    Q    Okay.  Now, in assessing the competitive effect of
22    Google's conduct, did you assess any benefits Google gave to
23    competitors by giving access to DV360 advertiser customers
24    to third-party exchanges?
25    A    No, I did not study DV360, only to the extent that I
```

Cross-examination - R. Abrantes-Metz

 1  mentioned, that DV360 bid across exchanges, and therefore,

 2  was consistent with visibility to do so.

 3  Q    All right.  I'll come back to that just to confirm

 4  that.

 5          But here, in assessing the competitive effects of

 6  Google's conduct, did you assess any benefits Google gave to

 7  competitors by giving access to AdX to buying tools of

 8  competitors?

 9  A    I'm sorry, could you please repeat the question?

10  Q    Sure.

11          You know that AdX gives access to buying tools of

12  competitors that can bid into the ad exchange; right?

13  A    Well, AdX is expected to do so because those are part

14  of its customers.

15  Q    Right.  And they're also buying tools that are

16  competitors of Google; right?

17  A    Well, yes, they're competitors in a different market;

18  but in the ad exchange market, they're customers.

19  Q    All right.  And did you give any assessment -- or the

20  benefits Google gave to competitors who had those buying

21  tools who had access to AdX?

22  A    Well, those buying tools are customers of AdX, so I

23  would expect AdX would want to maximize its customers.

24  Q    All right.  Try to listen to the question.

25          I wasn't asking you about what you would expect

83

Cross-examination - R. Abrantes-Metz

```
 1   Google to do.  Okay.
 2           My question is pretty simple.  In assessing
 3   competitive effects here, did you assess any benefits Google
 4   gave to competitors by giving access to AdX to its buying
 5   tool competitors?
 6   A    The buying tools are, again, customers.  So I didn't
 7   study them as competitors; I studied them as customers.
 8   Q    All right.  Did you -- in assessing the competitive
 9   effects of Google's conduct, did you assess any benefits
10   Google gave to competitors by giving access to header
11   bidding through DFP?
12   A    Could you please explain what it means to give access
13   to header bidding?  Header bidding was ran outside of DFP.
14   Q    And you could run header bidding in DFP; couldn't you?
15   A    Yes.
16   Q    And did you assess the competitive effects of Google's
17   conduct, did you take into account what Google did in giving
18   access to header bidding through DFP?
19   A    In several ways, yes.
20   Q    Okay.  When you assessed competitive effects, did you
21   try to determine whether taken as a whole, Google had helped
22   or hurt competitors through the totality of access it had
23   given to its ad tech?
24           MR. VERNON:  Objection.  Vague.
25           THE COURT:  Sustained.
```

84

```
 1    BY MR. ISAACSON:

 2    Q    Well, then I'll try that again.

 3              You have talked about specific pieces of conduct

 4    and the effects that you saw because there wasn't access

 5    given in certain instances to competitors.

 6              Did you look at the totality of access that Google

 7    has given to competitors and then try to make a

 8    determination as to whether there was an anticompetitive

 9    effect?

10              MR. VERNON:  Objection.  Still vague.

11              THE COURT:  I think that's a vague question.  I am

12    sustaining the objection.

13              MR. ISAACSON:  Okay.

14    BY MR. ISAACSON:

15    Q    In determining whether Google's conduct has been

16    anticompetitive, did you try and look at whether Google has

17    helped rivals more than it hurt them?

18    A    Rivals with respect to which product?

19    Q    Any of them.

20    A    Well, anticompetitive effects have to be focused on the

21    particular market.  Particular markets have different

22    Google's products, so I would need to be specific to which

23    products we are discussing and which market in order to

24    determine rivals.

25    Q    Did you think -- did you attempt to determine whether
```

                                                              85

Cross-examination - R. Abrantes-Metz

```
 1    Google's conduct -- in determining whether Google's conduct
 2    was anticompetitive in the publisher ad server market for
 3    open-web display, did you try to look at whether Google had
 4    helped rivals more than hurt them?
 5              MR. VERNON:  Objection.  Vague.
 6              THE COURT:  I think that question is still very,
 7    very vague.  Try to make it more specific.
 8              MR. ISAACSON:  All right.
 9              THE COURT:  Did you find in any respect that any
10    rivals were helped by these various Google features you've
11    focused on?
12              THE WITNESS:  So, Your Honor, with respect to each
13    of the conducts, that conduct, for example, is originated by
14    DFP let's say, exclusive first look, last look and UPR,
15    their rivals of DFP are publisher ad servers.  Those rivals
16    exited the market.  To a great extent DFP has a 90 percent
17    market share.  They had to change their business line in
18    order to compete less with DFP.
19              So those rivals were harmed and DFP benefited.
20    And for each of the conducts, the analysis is conducted this
21    way focusing on where does the conduct originate and who are
22    competitors of Google's product in that market and what
23    happened to the rivals in that market.
24              THE COURT:  All right.  Thank you.
25    BY MR. ISAACSON:
```

86

Cross-examination - R. Abrantes-Metz

```
 1    Q     With respect to the ad exchange market then, was there
 2    any conduct of Google such as making DV360 advertisers
 3    available that benefited rival ad exchanges?
 4             MR. VERNON:  Objection.  Vague.  Asking about all
 5    conduct of Google.
 6             MR. ISAACSON:  I was trying to repeat the Court's
 7    question with the ad exchange.
 8             THE COURT:  We've got enough on this.  I
 9    understand your argument.
10             MR. ISAACSON:  Okay.
11             THE COURT:  Move on.
12    BY MR. ISAACSON:
13    Q     Just a couple facts here.
14             About the buying tools access, about 22 percent of
15    the sales you found on AdX comes from third-party buying
16    tools; right?
17    A     I can't recall exactly that number.
18    Q     If you look at just paragraph 87 of your report.  And
19    you're reporting there about where sales came from, and you
20    say 22 percent came from third parties; that refers to the
21    third-party buying tools; right?
22    A     Yes.
23    Q     And I think you said DV360 was designed to work with
24    multiple third-party exchanges; right?
25    A     Well, I don't know if I said that exactly, but I
```

87

1    believe that is true, yes.

2    Q    In fact, DV360 makes all of its advertiser demand

3    available to rival third-party exchanges; right?

4    A    That is my understanding, yes.

5    Q    And you found in your report that a significant portion

6    of DV360 advertising spending was on rival exchanges to AdX;

7    correct?

8    A    If you could please point to --

9    Q    Sure.

10   A    -- where it is in my report; but in any case, yes, I do

11   believe that I recall that being the case.

12   Q    So if you look at paragraph 221, and there's a footnote

13   333, and there's numbers here; do you see that?

14   A    Yes.

15   Q    Okay.  So in February 2016, 46 percent of DV360 spend

16   went to AdX; right?

17   A    Is that in a footnote?

18   Q    Yes.  In your footnote 333, it's the first number that

19   you cited there.

20   A    Yes.  Yes.

21   Q    And then in 2017, 47 percent of DV360 went to AdX;

22   correct?

23   A    Yes.

24   Q    Okay.  Then in 2018 and '19, the numbers decline from

25   43 percent -- declined to 43 percent and then to 30 percent;

Cross-examination - R. Abrantes-Metz

```
 1   correct?

 2   A    Yes.

 3   Q    And you've seen from the record in this case that by

 4   2022, the sharing with rival ad exchanges from DV360 was

 5   back up to around 44 percent; right?

 6            Let me help you.  If we can look --

 7   A    Where is the 47 percent?

 8   Q    So if you look at tab -- DTX 1993.

 9            DTX 1993 has numbers for specific dollar figures

10   for exchanges.  And so we have a redacted version that

11   redacts their name.

12            And I guess for the record, I'd move to admit --

13   this is a --

14            You recognize this as a table of data from the

15   report of Dr. Israel that you had the opportunity to review;

16   right?

17   A    Yes.

18   Q    And you had the opportunity to check -- you and your

19   team had the opportunity to check the numbers in here;

20   right?

21   A    Yes.  I do recall this table.

22   Q    Okay.

23            MR. ISAACSON:  So I'd move to admit DTX 1993.  We

24   would also like to submit a 1993A which would be -- have a

25   redaction.  So that 1993 would be under seal and 1993A could
```

Cross-examination - R. Abrantes-Metz

```
 1   go on the public record.

 2           MR. VERNON:  We object if this is being admitted

 3   for the truth.  It's hearsay.  It's from another expert's

 4   report and not Professor Abrantes-Metz.

 5           MR. ISAACSON:  This is data.  No opinions here

 6   from the other expert.  That Dr. Abrantes-Metz had the

 7   chance -- saw the report and had the chance to check for its

 8   accuracy.

 9           THE COURT:  As an expert, are you reasonably

10   comfortable with the accuracy of the information in this

11   exhibit?

12           THE WITNESS:  Your Honor, DV360 is not part of the

13   relevant market in this case, so this was not something that

14   I focused specifically, though I did read Dr. Israel's

15   report.

16           THE COURT:  I'm going to at this point sustain the

17   objection.  Let's move this along.

18           Actually, it's time for the afternoon break.

19           How much longer is your cross going to take?

20           MR. ISAACSON:  I've got a little while to go.

21           THE COURT:  All right.  Then we'll take the break

22   now until 11:30.

23                       (A recess was taken.)

24   BY MR. ISAACSON:

25   Q    One thing you did in this case, Doctor, is you
```

90

Cross-examination - R. Abrantes-Metz

```
 1    investigated the net revenue that Google earned from Google
 2    products in this case, and you found that AdX generated five
 3    times the net revenue of DFP; do you remember that?
 4    A    Not exactly.  Where it is in the report?  No.
 5    Q    Why don't you look at paragraph 94 of your report.  And
 6    then along with Footnote 152.
 7             And do you see -- if you look at that paragraph
 8    and the footnote, am I correct that in -- for the year 2020,
 9    you extrapolated that DFP made 267 million in net revenue?
10    A    Where is it?
11    Q    It's your conclusion at the bottom of Footnote 152.
12    A    Oh, at the bottom.  Yes.
13    Q    Right.
14             And that would be about 7 percent of the total net
15    revenues you say Google reported for its ad tech products;
16    correct?
17    A    For all the products referenced in paragraph 94 all
18    together?
19    Q    Yes.
20    A    I haven't calculated, but that seems more or less.
21    I'll take your word.
22    Q    Okay.  Now, you testified on direct that users of GAM,
23    Google Ad Manager, DFP and AdX, were subject to a provision
24    that required them to make AdX the last source they
25    contacted; do you remember that topic generally?
```

                                                                    91

Cross-examination - R. Abrantes-Metz

```
 1    A     Yes.

 2    Q     Okay.  And I believe what you said, there was a

 3    provision that applied to users of GAM, DFP and AdX to

 4    contact AdX, and then they couldn't contact somebody else

 5    after AdX; do you remember that?

 6    A     Yes.

 7    Q     And if they contacted AdX, AdX had to be the last

 8    source they contacted; that was your testimony?

 9    A     Yes.  So long as AdX did want to take the impression.

10    Q     All right.  Now, at the back of your binder, there

11    should be the Google Ad Manager partner guidelines.

12          And do you recall -- these are cited at

13    Footnote 530 of your report.

14          Do you remember these are the guidelines with the

15    provision that you're referring to, and specifically it

16    would be on page 4 under 2.3 there's a -- there's

17    restrictions on passing and redirecting inventory; do you

18    see that?

19    A     In 2.3?

20    Q     Yes.

21    A     Yes.

22    Q     That's the provision that you're referring to; right?

23    A     Yes.  And second on 2.3.

24    Q     All right.

25          MR. ISAACSON:  Neither side has made this a trial
```

                                                              92

Cross-examination - R. Abrantes-Metz

```
 1    exhibit, Your Honor, so, with your permission, I'll just
 2    read this one paragraph into the record.
 3              THE COURT:  All right.
 4    BY MR. ISAACSON:
 5    Q    "Restrictions on passing and redirecting inventory.
 6    Once partner has made an ad call for Google monetization of
 7    a given impression, partner is not permitted to pass that
 8    impression through any other system, including partner's own
 9    system, that dynamically or programmatically allocates ad
10    calls based on actual or estimated real-time pricing
11    information."
12              This restriction applies one impression at a time;
13    right?
14    A    I'm not a lawyer, but as I read these, yes, even if you
15    only contact one time, so long as that was that one
16    impression, this applies.
17    Q    All right.  So if a publisher decides to give an
18    impression to GAM or AdX or DFP, then this provision applies
19    to that impression?
20    A    And for every such impression, yes.
21    Q    I'm not sure what you mean by "every such impression."
22              You mean the same impression?
23    A    I mean every time there is a contact for an impression,
24    the provision will apply.
25    Q    But we're talking about for one impression.  Let me put
```

93

Cross-examination - R. Abrantes-Metz

```
 1    it a different way.
 2             The next impression you can do what you want with
 3    it, you're not restricted?
 4    A    I'm not sure I understand the question.
 5    Q    Suppose an impression's on a display box up here and
 6    you've submitted it to Google, but there's another box over
 7    here with another impression, you're not restricted with
 8    respect to that other box; are you?
 9    A    I'm not following your question.
10    Q    Okay.  Let's try it this way.  This is all happening
11    very quickly, billions of times every day.  An impression in
12    a box comes up because my colleague, Leah Hibbler, is on the
13    Internet.  And then ten minutes later, one of my colleagues
14    is on the Internet.  That's a different impression; right?
15    A    Yes.
16    Q    The restriction here would be applicable if the
17    impression that was caused by Leah Hibbler being on the
18    Internet or on an app, then this restriction would be in
19    place.  But ten minutes later, it's not -- it doesn't apply
20    to the next impression; does it?
21    A    I do not think these -- I don't think this clause is
22    specific to that in particular.
23             My reading of it is that so long as the impression
24    is passed on to AdX, there may be an impression now and
25    another in 10 minutes and another in 30, but if you do
```

94

Cross-examination - R. Abrantes-Metz

```
 1   choose to send each one of them as they come along, this
 2   clause will apply.
 3   Q    Exactly.  The clause applies if a choice is made to
 4   send an impression to Google as you go along, that's what
 5   we're talking about here, impression by impression?
 6   A    Correct.
 7   Q    Okay.  You described exclusionary conduct or tying, and
 8   you referred to customers who buy Product A and also have to
 9   buy Product B; do you remember that general topic?
10   A    Yes.  I don't believe I referred to it as a tie, just
11   as a restriction or a conditioning.
12   Q    Okay.  We put together a demonstrative, we can show
13   you, Abrantes-Metz Demonstrative 1.  Oh, I'm informed it's
14   Number 2.  Thank you.
15          So this -- if you assume that Google Ad Manager
16   has Product A of AdX and Product B of DFP, and you see
17   there's the real-time bidding that you've been discussing,
18   and then the third-party publisher ad servers are out --
19   those are not part of Google; do you see that?
20   A    Yes.
21   Q    All right.  And when you're talking about selling --
22   putting Product A and Product B together, that's where you
23   would be required to buy and use both Product A and
24   Product B; right?
25   A    Well, yes.  That if you want to buy A, you must buy B.
```

95

Cross-examination - R. Abrantes-Metz

1    Q    Okay.  And do you know if you contract with Google Ad

2    Manager, whether you have to use AdX?  Can you just use DFP?

3    A    So I was not referring to AdX, just the access to

4    real-time bids from AdX.

5    Q    So my question is:  Do you know whether, when you

6    contract -- when you contract with Google Ad Manager, can

7    you use just DFP and not AdX?

8    A    My recollection is that they were integrated, and,

9    therefore, if you get one, you get the other.  But I can't

10   recall whether there was a separate option or not, but I

11   think there might exist.

12   Q    Okay.  Now, the third-party publisher ad servers and

13   the real-time bid issue, right, regardless of whether you

14   have this product sold together or separately, when you're

15   talking about the real-time bidding issue, you need the

16   real-time bids to connect to the third-party publisher ad

17   server; correct?

18          MR. ISAACSON:  Matt, maybe draw a line there for

19   me.

20   BY MR. ISAACSON:

21   Q    All right.  Whether you sell these together or

22   separately, when you're talking about the issue of real-time

23   bidding being exclusive between AdX and DFP, you're talking

24   about the real-time bids need to be connected to the

25   third-party publisher ad servers; right?

96

Cross-examination - R. Abrantes-Metz

```
 1   A    Not just necessarily they would have to be connected,
 2   but that there would be an ability of the third-party
 3   publisher ad server even if we deem DFP to make a comparison
 4   of real-time bids from different sources versus AdX.
 5   Q    All right.  In order to do that, there would have to be
 6   a connection between -- to the third-party publisher ad
 7   server?
 8   A    Naturally, as in all exchanges I was aware at that
 9   time, yes, those connections existed.
10   Q    And so if you just take the box away, the blue box
11   away, if these products are sold completely separately but
12   there's still real-time bids only going from AdX to DFP,
13   from your point of view, the situation is the same, you
14   still don't have the relationship to the third-party
15   publisher ad server that you're looking for?
16   A    I'm not understanding your question.
17   Q    Okay.  When you're talking about the problem -- what
18   you call a problem of real-time bidding not being provided
19   to third-party publisher ad servers, right, if you sell AdX
20   and DFP separately, that doesn't solve that problem; does
21   it?  You still have to have AdX give those real-time bids to
22   the third-party publisher ad servers?
23   A    Yes.  Make it accessible.  That is my opinion.  It's
24   the conditioning of access to real-time bids to AdX to DFP,
25   not that the AdX and DFP cannot be bought separately.
```

97

Cross-examination - R. Abrantes-Metz

```
 1   Q    All right.  As part of your report, you also looked at
 2   information about header bidding, and you wrote -- and you
 3   found that header bidding adoption had exploded by 2015;
 4   right?  If it helps you, look at paragraph 121 of your
 5   report.
 6   A    I'm sorry, was there a question?
 7   Q    Yeah.  As part of your investigation, you reported that
 8   header bidding adoption had exploded by 2015; right?
 9   A    Yes.
10   Q    And you looked at a presentation from Criteo that said
11   70 percent of publishers had adopted header bidding by 2016;
12   right?
13   A    I can't recall exactly -- oh.  That is quoted in here,
14   yes.
15   Q    Yes.  And EMARKETER, the public -- the -- which has
16   available public information, they were estimating that by
17   2019, that nearly 80 percent of the top sites in the U.S.
18   have adopted header-bidding solutions.  You also reported
19   that; didn't you?
20   A    Yes.
21   Q    Okay.  Now, when you were talking about last look, you
22   referred to the bid being in an envelope and that AdX could
23   open the envelope and see what the bid was; do you remember
24   that?
25   A    Yes.
```

Cross-examination - R. Abrantes-Metz

```
 1   Q    And then you said AdX could beat that bid by a small
 2   amount if it wanted to?
 3   A    Yes.
 4   Q    Now, AdX doesn't do any bidding itself; does it?  Its
 5   advertisers on AdX participate in an auction to bid; right?
 6   A    Correct.  That's what I'm referring to as AdX bids
 7   coming from its advertisers.
 8   Q    Yes.  So when you're referring to AdX in this
 9   situation, you're referring to buyers in an AdX auction who
10   all bid for that impression?
11   A    Yes.
12   Q    Okay.  And those buyers don't get an envelope -- a
13   sealed envelope with the results of the header bidding
14   auction; do they?
15   A    Correct.
16   Q    They bid based on the value that they perceive from
17   that impression?
18   A    Yes.
19   Q    And, in fact -- well, I'll leave it at that.
20        If we can look at Plaintiffs' Demonstrative J.
21   This was one of your demonstratives, we'll put it on the
22   screen.
23        Okay.  And this is where you were illustrating how
24   first look, last look and UPR build market power in the ad
25   exchange market; right?
```

99

1    A    Yes.

2    Q    All right.  Now, during -- and first look and last look

3    ended in 2019; right?

4    A    Yes.

5    Q    Okay.  And so after 2019, what you're talking about in

6    terms of the effect of the ad exchange market, the

7    continuing conduct there would be UPR; right?

8    A    Not necessarily, because the effects of first and last

9    look exclusively to AdX would have extended beyond their

10   termination.

11   Q    So the -- the only continuing conduct was UPR, there

12   could be effects from the prior conduct, that's your

13   testimony?

14   A    From this chart, yes, but there are effects of AdMeld

15   and the two restrictions.

16   Q    I'm just talking about the publisher ad server conduct

17   affecting the ad exchange market, which is what you're still

18   illustrating here; right?

19   A    For these three conducts, yes.  As of 2019, UPR was in

20   place, and at the same time, last look was eliminated.

21   Q    Now, I'd like to look at PTX 1265.  It's a plaintiff

22   exhibit.  This is a chart from their expert, Professor Lee.

23             THE COURT:  Hold on a second.

24             All right.  Now 1265 is redacted; correct?

25             MR. ISAACSON:  Yes.  In fact, what I would suggest

100

1    doing is that we -- I would move to admit 1265 under seal

2    and put 1265A, the redacted version, on the public record.

3              MR. VERNON:  No objection, Your Honor.

4              THE COURT:  All right.  And so what I'm looking

5    at --

6              MR. ISAACSON:  I think you have the redacted

7    version.  That's what we put in the binder.

8              THE COURT:  Oh, all right.  That's fine.

9     (Plaintiffs' Exhibit Numbers 1265 and 1265A admitted into

10                         evidence.)

11   BY MR. ISAACSON:

12   Q    All right.  And you recognize this as a chart of the

13   share -- this is worldwide of open-web display spend

14   transacted through ad exchanges for these years, 2018

15   through 2022.

16              You saw this in Professor Lee's report; right?

17   A    Yes.  I can't remember if it was exactly his report,

18   but at least it was a version of this.

19   Q    And the dark blue bars at the bottom, right, that's

20   AdX; right?

21   A    Yes.

22   Q    Okay.  And looking at 2019, you can see those dark blue

23   bars are just a little under 50 percent; aren't they?

24   A    Yes.

25   Q    And then by the end of 2022, worldwide, they've fallen

                                                              101

Cross-examination - R. Abrantes-Metz

```
1   to slightly below 40 percent; right?

2   A    Yes.

3   Q    Okay.  So going back to Exhibit L, your

4   demonstrative -- J, sorry.  During the period 2019 when

5   you're talking about the conduct having an effect on the ad

6   exchange market, Google's share of that market worldwide was

7   declining by about ten points; right?

8   A    Of which conduct are you referring to as of 2019?

9   Q    Any of it.  All together.  After 2019, when you're

10  talking about effects of the publisher ad server on the ad

11  exchange, right, from 2019 to the end of 2022, right,

12  Google's share of the ad exchange market worldwide declines

13  by about ten points; right?

14  A    More or less, yes.

15  Q    And then if we can look at PTX 1266, which I would also

16  move into evidence on the same basis, with 1266A being the

17  public version.

18           THE COURT:  All right.  So both 1265 and 1266 are

19  in evidence, with just the redacted versions being publicly

20  available, and the unredacted, though, need to be in the

21  Court's record.

22   (Plaintiffs' Exhibit Numbers 1266 and 1266A admitted into

23                         evidence.)

24  BY MR. ISAACSON:

25  Q    All right.  Now, this is the same information only for
```

102

Cross-examination - R. Abrantes-Metz

```
 1    the United States; do you recognize that?

 2    A    Yes.

 3    Q    Okay.  And at the beginning of 2019, Google's share is

 4    a little bit over 40 percent; right?

 5    A    Yes.

 6    Q    Okay.  And the Google AdX share at the beginning of

 7    2019 is around 40 percent, and it declines by the end of

 8    2022 to just above 30 percent; right?

 9    A    Yes.

10    Q    On the topic of first look -- I'm shifting topics

11    now -- you made a reference to a simulation by Professor

12    Milgram, and you said that his simulation tested what

13    happens if publishers were not forced to put AdX first; do

14    you remember that general topic?

15    A    Yes.

16    Q    Okay.  And that he found publishers only put AdX first

17    8 percent of the time if they were not forced to put AdX

18    first; is that what you thought he was doing?

19    A    No.  That is my calculation of his own simulations.

20    Q    All right.  And -- right.

21         I think it's your testimony that Professor

22    Milgram's simulations simulated first, in one situation, how

23    often was it if publishers were not forced to put AdX first?

24    A    Now, his simulation calculated a variety of

25    possibilities for publishers to be able to put somebody else
```

```
 1    first, and then I used his numbers to calculate and
 2    contrast.
 3    Q    And the 8 percent number that you -- that you are
 4    pointing to, the situation in that simulation was comparing
 5    publisher outcomes if AdX had real-time bidding and if it
 6    didn't; right?
 7    A    Now that is how he uses it.  That is not how I use his
 8    simulation.
 9    Q    Right.  But his simulation was making a comparison to
10    what publishers would think if they compared AdX with and
11    without real-time bidding; right?
12    A    My recollection is that he let other things change that
13    biased his results.
14    Q    All right.  But in his simulations, publishers did not
15    put AdX first very often if AdX didn't have real-time
16    bidding?
17    A    His simulations biased his conclusions, not
18    necessarily, is my recollection, from the real-time bidding.
19    But because in one situation he was allowing AdX to offer
20    the second price if the price was higher than the floor, and
21    in another comparison, he was forcing AdX to not be able to
22    give back the second price and just accept the floor and
23    that caused a big contrast between -- in his conclusion.
24    Q    And do you agree with me that in one situation, AdX had
25    real-time bidding and the other it didn't?
```

104

1    A    I think that is true, but that was not the core of the

2    comparison, because if the comparison was just to be what's

3    the impact of putting AdX first, then making other things

4    change at the same time confused the results, which is what,

5    in my opinion, he did.

6    Q    I want to ask you as best I can that when --

7              THE COURT:  No preamble.  Just ask the question.

8              MR. ISAACSON:  All right.

9    BY MR. ISAACSON:

10   Q    Turning to -- oh, you mentioned Dynamic Allocation.

11             Dynamic Allocation was an existing feature of DFP

12   when Google click -- when Google acquired DoubleClick;

13   right?

14   A    Yes.  That is my understanding.

15   Q    And first look, what you call the right of first

16   refusal, was part of the DoubleClick technology at the time

17   Google acquired DoubleClick; correct?

18   A    The evidence that I read is not completely clear, but I

19   think there's a high chance that, yes, it was part of it.

20   Q    Okay.  So about Unified First Price Auctions, with the

21   move to a first-price auction, you agree that floors were

22   not expected to directly affect the auction clearing price?

23   A    Yes.

24   Q    And, therefore, a rationale for having different floors

25   across auctions was eliminated with Google's move to the

Cross-examination - R. Abrantes-Metz

1   Unified First Price Auction; correct?

2   A    No, not necessarily.

3   Q    A rationale for differential flooring was eliminated

4   with Google's move to Unified First Price Auction; right?

5   A    I'm not understanding whether your question relates to

6   whether UPR solved that problem, or if just more broadly

7   with respect to moving from a second to a first-price

8   auction.

9   Q    Well, let's look at paragraph 400 of your report.

10         So beginning with the second sentence of

11   paragraph 400, you agree with the statement:  "With the move

12   to a first-price auction, floor prices were not expected to

13   directly affect the auction clearing price"; correct?

14   A    Yes.

15   Q    And you agree with the next statement that:  "Hence, a

16   rationale for differential flooring, e.g., across first

17   price and second-price exchange auctions, was eliminated

18   with Google's move to UFPA."  You agree with that statement;

19   right?

20   A    Yes.

21   Q    Now, you mentioned several times in your testimony that

22   publishers complained about the change to UPR, that this was

23   unwelcome; do you remember that?

24   A    Yes.

25   Q    At the time you wrote your reports and gave your

106

```
 1    deposition, you were able to name only two publishers that
 2    were unhappy with the Uniform Pricing Rules after the summer
 3    of 2019; isn't that correct?
 4    A    I can't recall exactly what I recalled at the time of
 5    my deposition, but those are in my report.
 6    Q    All right.  But -- well, I'm talking about the period
 7    after the summer of 2019.  The Court's heard about a meeting
 8    in April of 2019 and communications with publishers that
 9    happened after April and in the summer.  So I'm talking
10    about by the end of the summer of 2019.
11              Are you aware of -- were you aware in your report
12    to your deposition of any publishers that were unhappy with
13    UPR after the summer of 2019 other than Vox, who you've
14    mentioned in your report, and News America, which would be
15    Ms. Layser, who the Court has heard from?
16    A    To the best of my recollection, that is still what I
17    recall, yes.
18    Q    And it's your opinion that the -- that the Unified
19    First Price Auction and its accompanying changes were
20    overall a net positive; right?
21    A    A net positive for whom?
22    Q    A net positive for publishers.
23    A    I don't think that is necessarily true.  There are
24    studies that point to that, but there were many changes that
25    happened at the same time as UPR.
```

107

```
 1    Q    All right.
 2              THE COURT:  Well, what were some of those other
 3    ones?
 4              THE WITNESS:  Excuse me, Your Honor?
 5              THE COURT:  What were some of the other changes?
 6              THE WITNESS:  So at the same time there were four
 7    changes.  The main changes, really, the three big changes
 8    are elimination of last look, imposition of UPR, and the
 9    move to a first-price auction.
10    BY MR. ISAACSON:
11    Q    All right.  Could I ask you to turn to PTX 1539 in your
12    binder.
13              MR. ISAACSON:  Do I have this right?
14              THE COURT:  I don't think it's in the book.
15              MR. ISAACSON:  Maybe it's a typo.  Would it be
16    539, which I do see in the book.  Oh, it's in their binder.
17    That's why.  That's why I wanted to start there and make it
18    easy, but I forgot it was in their binder.
19              THE COURT:  What's the number?
20              MR. ISAACSON:  1539, which is in their binder, and
21    I believe was, therefore, moved into evidence.
22              THE COURT:  I think it's already in.  Put it on
23    the screen.
24    BY MR. ISAACSON:
25    Q    All right.  Now, this document you cited, if you look
```

108

Cross-examination - R. Abrantes-Metz

```
 1   at paragraph 50 --

 2              THE COURT:  Now, the date on this is 2016, so, I

 3   mean, you're jumping back and forth.  You were in the summer

 4   of 2019.

 5              MR. ISAACSON:  Yes.  At this point I'm going to go

 6   through a couple documents that she cited in her reports to

 7   discuss whether she's accurately describing them, and then

 8   I'm going to be wrapping up.  Okay.  The witness has talked

 9   about her review of the evidence, and that's what she's

10   relying on, which is why I'm doing this.

11   BY MR. ISAACSON:

12   Q    If you look at paragraph 331 of your report -- and it's

13   page 176 -- you write there --

14   A    I apologize.  Which paragraph?

15   Q    331.

16   A    Yes.  Thank you.

17   Q    The Google email notes:  "We manage historically to

18   have an advantage through EDA versus other sources of demand

19   so our demand could win even if we did not provide the best

20   CPM on a specific impression."  All right.  And you cite

21   your Footnote 501, which is PTX 1539.  And that comment is

22   on the second page at the bottom, the unfair advantage.  And

23   I think you talked about that in your direct also; right?

24   A    Yes.

25              MR. VERNON:  Objection.  I'm not sure if this is
```

109

Cross-examination - R. Abrantes-Metz

```
 1  the same document.  I think this might be a different
 2  document.
 3          MR. ISAACSON:  I'm in 1539 right now.
 4          MR. VERNON:  Well, the Bates number is definitely
 5  different.
 6          MR. ISAACSON:  In any event, she talked about this
 7  language in her direct.
 8          MR. VERNON:  Is this from 0501?
 9          MR. ISAACSON:  This is in your binder.
10          MR. VERNON:  My point is 501 is to a different
11  number than 1539.  1539 we did discuss in the trial.
12          MR. ISAACSON:  I'm sorry.  Footnote 500.  I said
13  the wrong footnote number.
14  BY MR. ISAACSON:
15  Q    In any event, you read the language about the unfair
16  advantage that was on page 2 of this document.  You
17  discussed that during your direct and in your report?
18  A    Yes, but I just want to make sure.  That is not the
19  same document as in Footnote 501; right?
20  Q    It's the same document in Footnote 500.  Sorry.
21  A    I'm sorry.  Which footnote?
22  Q    Footnote 500.
23  A    Thank you.
24  Q    Okay.  The -- there's a reply in the email about the
25  unfair advantage.
```

110

Cross-examination - R. Abrantes-Metz

```
1              Mr. Korula says on the first page in the last
2   paragraph:  "Personally, I think EDA is an unfair advantage
3   to Google is entirely in the fiction category.  We
4   explicitly ensured fairness for other parties, but people
5   are good at creating PR narratives."
6              Right.  You were quoting one opinion to rely on it
7   in this email and ignoring the contrary opinion.  That's
8   what was happening here; right?
9   A    No.  That is not what was happening.
10  Q    Okay.  Then if I can show you DTX 85, which would be in
11  the black binder.  DTX 85.  And then if you look at
12  paragraph 314 of your report.
13             THE COURT:  Are you moving 85 in?
14             MR. ISAACSON:  Yes, Your Honor.
15             THE COURT:  Any objection to 85?
16             MR. VERNON:  No Objection.
17             THE COURT:  All right.  It's in.
18       (Defense Exhibit Number 85 admitted into evidence.)
19  BY MR. ISAACSON:
20  Q    All right.  And if you look at paragraph 314 on
21  page 166 of your report, the second bullet.  You say:  "In a
22  2000 email chain, Google forecasted that if GDN Google Ads
23  were allowed to access inventory on third-party exchanges,
24  Google Ads' revenues would increase somewhat, but AdX and
25  AdSense would lose clients."  And then you go on to talk
```

111

Cross-examination - R. Abrantes-Metz

```
 1    about lost impressions.  And then you cite that to

 2    paragraph 4 -- Footnote 477, which is DTX 85; do you see

 3    that?

 4    A    Yes.

 5    Q    All right.  And what you called a forecast is in the

 6    middle of the page, there's an email from someone named

 7    Zachary Goldberg.  And he said separately:  "I want to gut

 8    check some facts with this crowd.  Please respond to this

 9    email with the first thought that pops into your head for

10    the following statements."

11         All right.  These are numbers that he's just

12    saying I want you to give me your opinion about.  You don't

13    know that there's a forecast here; do you?  Or a projection?

14    And if I can point you to the response email.  "Scott and

15    Jonathan, do you agree with the assumptions below?"  All

16    right.

17         We don't know -- you don't know that Zachary

18    Goldberg had done a projection and if it were anything other

19    than numbers that he was assuming for reasons we don't know;

20    do I have that correct?

21    A    No.  The top of the email says:  "I think that

22    Goodman's model is sound."

23    Q    Yeah.  But you don't know what Goodman's model is; do

24    you?

25    A    A fair reading of these emails is that it is the model
```

112

1    generated -- used to generate these numbers --

2    Q    All right.  And so --

3    A    -- that are being asked to assess.

4    Q    And what you're doing now -- and so just in general in

5    terms of your method in terms of reviewing the discovery

6    record, you don't claim any additional expertise as an

7    economist in reviewing documents accurately; do you?

8    A    Correct.  I take the documents as they are.

9    Q    Okay.  PTX 1035.

10   A    Where is PTX 1035?

11   Q    I'll move on from that.

12        DTX 281.

13        THE COURT:  Any objection to 281?

14        MR. VERNON:  Objection to relevance.  I believe

15   this is about Bell.  Irrelevant and scope, I guess.  This is

16   about Bell, which is less of an issue in this case now.

17   Also foundation.  Not foundation.  Relevance and scope.

18        THE COURT:  We're not able to hear those

19   objections, so you're going to need to be at the lectern if

20   it's more than just a one-word objection.

21        MR. VERNON:  Objection.  Relevance and scope.  I

22   believe this document is primarily about Project Bell, which

23   we didn't cover on direct, which is not a big issue in this

24   case.

25        MR. ISAACSON:  Whether or not it's a big issue,

113

Redirect examination - R. Abrantes-Metz

```
 1   what I'm illustrating is that I believe -- this witness has

 2   said over and over again -- she only showed you three

 3   documents -- that she wants to present the evidence and say

 4   this is what the evidence shows.  And so I'm just using a

 5   couple illustrations to say this should not be the job of

 6   this witness, because we don't think she's getting it right,

 7   and the Court can read the evidence in the record and make

 8   the correct determinations.

 9           THE COURT:  This is not going very far,

10   Mr. Isaacson, frankly.

11           MR. ISAACSON:  Okay.

12           THE COURT:  I'm going to sustain this objection,

13   because you need to get this case moving.  It's just not

14   making any sense.

15           MR. ISAACSON:  All right.

16           THE COURT:  So 281 is not in.

17           MR. ISAACSON:  And so for the sake of moving the

18   case forward, I pass the witness.

19           THE COURT:  All right.  Is there any redirect?

20           MR. VERNON:  Very briefly, Your Honor.

21                     REDIRECT EXAMINATION

22                     REDIRECT EXAMINATION

23   BY MR. VERNON:

24   Q    Counsel asked you about the fact that the AdMeld

25   technology that submitted real-time bids to third-party ad
```

114

Redirect examination - R. Abrantes-Metz

```
 1   servers had a small number of customers; do you remember
 2   that?
 3   A    Yes.
 4   Q    As an economist, are you familiar with how economists
 5   analyze what's called mergers involving nascent competitors?
 6   A    Yes.
 7   Q    Can you explain how those principles apply here?
 8   A    Even if those customers were small at the particular
 9   moment in time, namely at the time of the acquisition, to
10   the extent that such business represented a competitive
11   threat into the future because of potential and real growth
12   of that business and therefore growth of those customers,
13   that type of likely future competitive effects are taken
14   into account in these types of mergers.
15   Q    I think counsel also asked you about the quantitative
16   work that you did and did not do, and you started to say
17   that you had plenty of evidence.
18           Will you just explain what you were starting to
19   say?
20   A    With respect to the AdX fee?
21   Q    I think it was more generally counsel was asking you
22   about whether you did sufficient quantitative work of your
23   own.  You had started to say I had plenty of evidence, and
24   then I think the answer stopped.
25           What were you trying to say?
```

115

1    A    Well, that I undertook quantitative analysis of my own

2    where I saw that I needed to do so.  To a great extent,

3    there was a wealth of evidence produced by Google's own

4    studies, and by third-parties' evidence as well that spoke

5    to the size of the effects.  And even when that evidence was

6    not quantitative in nature, which very commonly it was, it

7    was qualitative.  For example, explaining how and why rival

8    publisher ad servers to DFP exited the market.  All of those

9    are examples of qualitative evidence that is considered by

10   the economists in making a determination of competitive

11   effects.

12   Q    Counsel also asked you whether I guess undoing any of

13   the conduct would require forced integration with rivals; do

14   you remember that?

15   A    Yes.

16   Q    I won't go through all of it, but let's take UPR.

17        In a competitive market as an economist, how would

18   you expect DFP to treat price floors?

19   A    Well, in a competitive market, meaning a market where

20   DFP did face competitive pressure, DFP would not have been

21   able to force a change onto its publisher customers that was

22   undesirable by them, because those customers would have left

23   DFP into a competing publisher ad server.

24        So the fact that DFP was able to impose on its

25   customers something that they did not want to and was not

116

Redirect examination - R. Abrantes-Metz

1    afraid of losing those customers somewhere else is an

2    important part of evidence in the determination of

3    anticompetitive effects in this market.

4    Q    And would achieving that world, meaning a world where

5    DFP publishers have the choice of what floors to set for

6    their exchanges, would that require any forced

7    interoperation with exchanges?

8    A    No.  It just required DFP not to deprecate features

9    that it already had.  Prior to UPS -- to UPR, publishers in

10   DFP could set AdX higher floors, and DFP deprecated that

11   feature.

12   Q    Counsel also asked you about first look.

13        What would you expect as an economist to happen in

14   a competitive market with respect to first look?

15   A    With respect to first look, one possibility is for

16   competition to exist for gaining the first position in the

17   remnant waterfall.  That means in a market where, again, DFP

18   faced competitive pressure, it would not have been able to

19   impose the choice of the restriction of putting AdX at the

20   top of the remnant waterfall when that was something that

21   many of its publisher customers would not benefit from

22   because they, under a competition, would have moved

23   somewhere else.

24        And so a competitive world would have been a world

25   where DFP would have served the interests of its publisher

117

Redirect examination - R. Abrantes-Metz

```
1    customers, and if the interest was to put somebody else
2    first, that they would be able to put somebody else first,
3    and that didn't necessarily imply anything drastically to be
4    changed, only that, for example, in the actual world, AdX
5    went first, and if AdX decided not to take an impression,
6    then DFP would call the second-in-line exchange.
7            And in the possibility I'm putting forward is that
8    if the publisher thinks that the second-in-line should
9    instead have been first, then all that would have to be done
10   would be for DFP to call that exchange first rather than
11   calling second.  It's an exchange or demand source DFP was
12   already connected to, it was just a change in the order.
13   Q    Counsel also asked you whether you had an opinion about
14   multiple calls, or I think it's also been called price
15   fishing; do you remember that?
16   A    Yes.
17   Q    And you said you did have an opinion, but you didn't
18   say what it was.
19           What was your opinion?  Did UPR reduce the problem
20   sometimes referred to as price fishing?
21   A    No, no not necessarily.  So as I explained, UPR only
22   forbids publishers from flooring AdX higher than ad
23   exchanges and does not forbid publishers from flooring AdX
24   lower which benefits AdX with respect to ad exchanges.
25           So publishers could still price fish from below.
```

118

Redirect examination - R. Abrantes-Metz

1    They were still able to call for the same impression,

2    multiple sources, trying to play with different floors to

3    try and get a different price.

4              So that was not eliminated, but even if -- to the

5    extent that that were, in fact, a problem, DSPs had already

6    technology developed to deal with those problems, so one

7    could have pursued a less restrictive option if that was the

8    problem that was attempted to be solved.

9    Q    You also mentioned in your direct that pro-competitive

10   justifications have to increase the surplus or increase the

11   size of the pie.

12             Does limiting price fishing do that?

13   A    No, it does not.  It just transfers money from

14   publishers and advertisers or vice versa depending on

15   whether you allow it or not.  Of course to the extent that

16   UPR channels more transactions to AdX, it transfers this

17   surplus between publishers and advertisers but gets AdX to

18   keep a bigger share of it.

19   Q    Can we turn quickly to PTX 1539, which is in the small

20   white binder.

21   A    Yes.

22   Q    Counsel asked you about the language at the bottom of

23   Mr. Korula's email on the first page where Mr. Korula

24   writes:  "Personally, I think 'EDA' is an unfair advantage

25   to Google.  It is entirely in the fiction category"; do you

119

Redirect examination - R. Abrantes-Metz

1    see that?

2    A    Yes.

3    Q    And EDA refers to the mechanism through which Dynamic

4    Allocation allows AdX to compete for some impressions that

5    had previously been reserved for guaranteed; is that right?

6    A    Yes.

7    Q    Did you argue in your direct testimony that EDA was

8    anticompetitive, that aspect of it?

9    A    No.

10   Q    If you look up to Mr. Korula's email where there's a

11   bullet point numbered one; do you see that?

12   A    Yes.

13   Q    He writes:  "Header bidding allows publishers to have

14   competition between real per impressions CPMs from third

15   parties and AdX.  Before this, it was third-party average

16   CPMs and AdX real-time bids, but this, third-party averages

17   versus AdX real bids, was true even with regular Dynamic

18   Allocation pre EDA"; do you see that?

19   A    Yes.

20   Q    Did you express an opinion during your direct about

21   whether AdX competing with real-time bids against

22   third-parties' static bids, was that a part of what you were

23   talking about with first look?

24   A    Yes.  The fact that AdX was granted the exclusive first

25   look in the waterfall, whether it was through Dynamic

120

Redirect examination - R. Abrantes-Metz

```
 1    Allocation or Enhanced Dynamic Allocation.

 2    Q    And is Mr. Korula saying in this paragraph that that

 3    difference, the third party -- third parties having an

 4    average CPM and AdX having a real-time bid, is he saying

 5    that that difference is fiction?

 6    A    No.

 7    Q    Counsel also asked you about the feasibility of Google

 8    Ads buying on other exchanges; do you remember that?

 9    A    Yes.

10    Q    What opinions have you formed about the feasibility of

11    Google Ads buying on other ad exchanges other than AdX more

12    than with respect to remarketing impressions?

13    A    Well, I looked at how the market -- how contemporaneous

14    evidence existed at the time.  And, for example, as

15    mentioned here, DV360 did use a variety of exchanges to bid

16    onto, and that's an -- Google's products.  AWBid is the part

17    of Google Ads that eventually was allowed to bid in other

18    exchanges for primarily remarketing purposes, and,

19    therefore, confirms that those types of connections are

20    feasible.

21             And a variety of other buy-side tools were

22    connected to a multitude of exchanges.  After all,

23    connections is the core of the business of all of these

24    tools.  They cannot function without connecting, and they

25    typically connect to a variety of sources, that's what they
```

121

1    do.

2            And the fact that even as early as 2011 when

3    Google was contemplating potential bidding across exchanges

4    for Google Ads, that capability was being developed, and the

5    evidence seems to point that it may already, to a great

6    extent, have been in place, to have Google Ads bid across

7    exchanges not just for remarketing purposes, primarily, but

8    more widely.  But the reason that it was not implemented was

9    because, as Google stated, they saw Google Ads as the

10   competitive advantage for AdX, and if they let Google Ads be

11   accessed in other ways, nobody would want to use AdX, and

12   even their publisher ad server business would suffer.

13   Q    Thank you, Dr. Abrantes-Metz.  We pass the witness back

14   to Google.

15           THE COURT:  Any recross?

16                    RECROSS EXAMINATION

17   BY MR. ISAACSON:

18   Q    Just one point of clarification just to make sure I

19   didn't misunderstand what you're saying.

20           Under the Uniform Price Rules, there had to be the

21   same floor price for all the exchanges in DFP; correct?

22   A    My understanding of UPR is that it forbids publishers

23   from flooring AdX higher within DFP, not to floor AdX lower.

24   Q    So you believe under the Uniform Pricing Rules that you

25   could have a lower price floor for AdX than the other

                                                              122

1    exchanges?

2    A    That is my understanding of the documents, yes.

3    Q    All right.  Thank you.

4         THE COURT:  All right.  Does anybody expect to

5    call this witness again?

6         MR. VERNON:  We do reserve the right to call

7    Professor Abrantes-Metz on rebuttal.

8         THE COURT:  All right.  So, again, I think you're

9    staying in court.  Just make sure you're not discussing your

10   testimony with any witness who has not yet testified.  Thank

11   you.

12        THE WITNESS:  Yes, Your Honor.  Thank you.

13             (Witness excused at 12:26 p.m.)

14        THE COURT:  All right.  Let's call the next

15   witness.

16        MR. WOLIN:  Your Honor, Michael Wolin for the

17   United States.

18        We call as our next witness, Mr. Matthew

19   Wheatland.

20   Thereupon,

21                  MATTHEW WHEATLAND,

22   having been called as a witness on behalf of the plaintiffs

23   and having been first duly sworn by the Deputy Clerk, was

24   examined and testified as follows:

25             (Time noted: 12:27 p.m.)

123

Direct examination - M. Wheatland

```
1                    THE DEPUTY CLERK:  Thank you.

2                    MR. WOLIN:  May I proceed, Your Honor?

3                    THE COURT:  Yes, sir.

4                              DIRECT EXAMINATION

5     BY MR. WOLIN:

6     Q    Mr. Wheatland, could you please introduce yourself to

7     the Court.

8     A    Yeah.  I'm Matthew Wheatland, chief digital officer at

9     Daily Mail in the U.S.

10    Q    What is The Daily Mail?

11    A    Daily Mail is a news publisher.  We have a print

12    newspaper in the UK.  It's one of the most widely-read

13    newspapers in the UK.  And we've got a detailed website with

14    a global presence.  We currently have roughly 17 million

15    users in the U.S. across our website possessing one of the

16    top ten largest U.S. news websites.

17    Q    You mentioned your role as chief digital officer.

18              What are your responsibilities as chief digital

19    officer for Daily Mail?

20    A    I oversee our indirect monetization in the U.S. and our

21    global commercial data.

22    Q    Before your current position, what other positions did

23    you hold at Daily Mail?

24    A    I've held a couple of other positions.  I was director

25    of programmatic, and I was director of global operations.
```

124

Direct examination - M. Wheatland

```
 1   They've all focused broadly on the area of commercial

 2   operations and programmatic advertising.

 3   Q    And you mentioned that Daily Mail is a publisher.

 4           What type of content does Daily Mail publish?

 5   A    Primarily, Daily Mail publishes sort of breaking news,

 6   general interest reads, entertainment and show biz.  We have

 7   other verticals as well, sport, finance, health content.  We

 8   publish about 1,000 articles a day.

 9   Q    And what countries does Daily Mail operate in?

10   A    We operate globally.  We're headquartered in the UK.

11   We've got offices in Australia, and we've got offices across

12   the U.S. in New York, D.C. and L.A.

13   Q    And how does Daily Mail compare in size to other web

14   publishers?

15   A    Globally, we reach about 170 million users each month.

16   So it puts us as one of the largest English language

17   newspaper websites in the world.  Among other U.S. news

18   sites, I mentioned we're top ten.

19   Q    And what product does Daily Mail use as its publisher

20   ad server?

21   A    At the moment, we use Google's ad server GAM, formerly

22   known as DFP.

23   Q    How long have you used DFP?

24   A    As long as I've been in the business.  So at least

25   12 years.
```

125

Direct examination - M. Wheatland

```
 1   Q    And during that time, has Daily Mail ever analyzed
 2   whether it's possible to switch away from DFP to another
 3   publisher ad server?
 4   A    Yeah, we've looked into this.
 5   Q    Mr. Wheatland, I'm going to ask you to look in your
 6   binder at the document that's marked PTX 1717 and ask you if
 7   you recognize that document.
 8            THE COURT:  Any objection to 1717?
 9            MS. RHEE:  If a foundation would be laid.  I don't
10   know what this document is, Your Honor.
11            THE COURT:  All right.
12            THE WITNESS:  Yeah.  I recognize this.  Yeah.
13   BY MR. WOLIN:
14   Q    Mr. Wheatland, was this document prepared in the normal
15   course of business at Daily Mail?
16   A    Yeah.
17   Q    And what was your involvement in the preparation of
18   this document?
19   A    So it was -- this document was commissioned by my UK
20   counterpart, and the actual individuals that pulled the data
21   were on the data team that reported to me.
22   Q    And you said they reported to you.
23            What -- was the document prepared at a time when
24   those individuals who reported to you had knowledge of the
25   subject matter in the document?
```

Direct examination - M. Wheatland

```
 1  A    Yeah.  Yep.

 2           MR. WOLIN:  Your Honor, we would offer this

 3  document as a business record of Daily Mail.

 4           THE COURT:  I'm permitting it in, yes.

 5           MR. WOLIN:  Thank you.

 6    (Plaintiffs' Exhibit Number 1717 admitted into evidence.)

 7  BY MR. WOLIN:

 8  Q    Mr. Wheatland, you mentioned analysis of switching away

 9  from DFP.

10           What connection does this document have to Daily

11  Mail's analysis of whether it was possible to switch away

12  from DFP?

13  A    This was around the time that we were looking at other

14  ad server alternatives, and one of the things that we

15  learned -- or that we knew and essentially wanted to

16  reaffirm was that you can't access Google AdX demand in real

17  time through any other ad server.  So we basically thought

18  to ourselves how much revenue would we lose if we didn't

19  have access to AdX demand, and that is what this document

20  was calculating.

21  Q    So when did Daily Mail undertake this analysis?

22  A    It was around the middle of 2019.

23  Q    And what other publisher ad servers did you consider as

24  an option at that time in 2019?

25  A    We had spoken to Smart AdServer, and we had spoken to
```

127

Direct examination - M. Wheatland

```
 1   Xandr, formerly known as AppNexus.

 2   Q    So I want to look at the document itself, and we'll

 3   start with the first page, which is on the screen for you

 4   there.  The title is "Google AdX Value."

 5          So why did you analyze the value of Google's AdX

 6   in connection with a decision about whether to switch to

 7   another publisher ad server?

 8   A    Because we assumed that any ad server switch would mean

 9   that we would need to forgo the AdX revenue, and we wanted

10   to calculate what the financial impact would be on our

11   business if we no longer had access to AdX demand.

12          MR. WOLIN:  Could we please turn to the third page

13   of the document and put that up on the screen.  Thank you.

14   BY MR. WOLIN:

15   Q    So this third page of Bates number ending in 644, the

16   slide is titled "How Much AdX Demand Is Unique?"  Do you see

17   that?

18   A    Yeah.

19   Q    And what was analyzed in this slide?

20   A    Here we looked at how much revenue was generated from

21   AdX when AdX was the only bid, and then we could assume that

22   all of that revenue, because AdX was the only bidder in

23   those instances, would have been lost if we didn't have AdX

24   revenue.

25   Q    The slide has the percentages 45 percent and 55 percent
```

128

Direct examination - M. Wheatland

```
 1   in the middle.

 2              What do those refer to?

 3   A    This means of the impressions that Google AdX won,

 4   around 50 percent of the time there was no bid from any

 5   other exchange.

 6   Q    And what did that tell you about the demand that was in

 7   AdX?

 8   A    That the demand was unique and not coming through other

 9   channels.

10   Q    Let's please turn to the next page, the fourth page

11   with Bates number ending in 645.  And the title here is

12   "What Happens When We Replace Currently AdX Impressions With

13   The Next Best Wrapper Bid"; do you see that?

14   A    Yes.

15   Q    Could you explain what this slide was showing?

16   A    So this slide is showing the difference between AdX's

17   winning price and the highest losing bid.  And we assumed

18   that that's the incrementality of AdX when we had a bid from

19   a non-Google bidder, and we would assume we would lose

20   incrementality.  So that's what this was calculating.

21   Q    Please turn to the next page, the fifth page.  The

22   title of this one is "Considering Increased Shading After

23   Losing AdX Auction Pressure."  And, again, could you explain

24   what's being shown on this slide?

25   A    So this is showing -- and this was utilizing a natural
```

129

Direct examination - M. Wheatland

1  experiment that occurred in our data.  When AdX is not live,

2  there's a reduction in auction pressure, which allows

3  non-Google exchanges to win inventory more easily.  So if

4  AdX was not in the auction, not only would you lose the

5  revenue from AdX, there is an additional knock on, and we

6  would put this down to bid shading from non-Google buyers

7  where they could buy a slightly lower price without AdX.

8         MR. WOLIN:  And there's one final slide.  So we'll

9  turn to the last one, please.

10 BY MR. WOLIN:

11 Q    And this sixth page has the title "MailOnline UK.

12 Revenue At Risk If We Pull AdX."

13        And what did Daily Mail -- what conclusion was

14 reached on this slide?

15 A    So we added together the first two revenue numbers, and

16 we were calling that sort of unique AdX demand that we would

17 lose.  And we then took into account bid shading from

18 non-Google exchanges, add that together, and it came to

19 355,000 pounds a month.

20        This was looking across our open-web display

21 revenue in the UK.  So the 355 over the 1268 will give you a

22 number of about 28 percent.  So we concluded that we would

23 lose roughly 28 percent of our programmatic revenue if we

24 switched off AdX.  If we didn't have access to AdX, sorry.

25 Q    And so you said a few moments ago that you considered

                                                          130

Direct examination - M. Wheatland

```
 1   Smart and Xandr as potential possible other ad servers.  I
 2   want to ask you about some other companies.
 3            What ability does Daily Mail have to replace DFP
 4   with technology that's provided by Facebook, which is now
 5   called Meta?
 6   A    Facebook doesn't offer a publisher display ad server.
 7   Q    And what about Amazon, what ability would Daily Mail
 8   have to replace DFP with technology from Amazon?
 9   A    Again, the same situation.  We wouldn't be able to do
10   that.
11   Q    And what about Disney?
12   A    Same answer.  They don't offer a publisher display ad
13   server.
14            THE COURT:  I'm sorry.  What was the last?
15            THE WITNESS:  They don't offer a publisher display
16   ad server.
17   BY MR. WOLIN:
18   Q    What ability does Daily Mail have to replace DFP
19   entirely with a header bidding wrapper?
20   A    I don't think that would be possible.  There's lots of
21   functionality that we required from an ad server, and, for
22   instance, Prebid wouldn't allow us to serve our direct sold
23   campaigns.
24   Q    Is there any other functionality that you would lose if
25   you replaced DFP entirely with a header bidding wrapper?
```

131

Direct examination - M. Wheatland

```
 1   A    Yeah.  I mean, the ad server can deal with inventory

 2   management, the hierarchy of the inventory, inventory

 3   forecasting, they give us a user interface, we have

 4   reporting tools, user management, APIs into other systems,

 5   for instance.  So there's a lot of functionality which is in

 6   the ad server which doesn't exist within Prebid.

 7   Q    I mean, what about the ability to create your own

 8   in-house ad serving technology?

 9   A    Our specialism is producing content and journalism.  We

10   don't specialize in producing sort of enterprise-level

11   software.  So I think not really possible.  And even if we

12   did, we still wouldn't get access to AdX demand, so it

13   wouldn't be worthwhile.

14   Q    And if you did try and attempt to do that, would you

15   have to rebuild all those features that you listed when we

16   were talking about Prebid?

17   A    Yeah.  Yeah.  Pretty much.

18   Q    So what ability does Daily Mail have to replace its

19   Open Auction display impressions that it sells through DFP

20   with selling social media ads instead?

21   A    None.  It's not possible.

22   Q    What ability does Daily Mail have to replace the Open

23   Auction display impressions it sells through DFP with video

24   ads instead?

25   A    Again, not really possible.  Our content is
```

132

Direct examination - M. Wheatland

1  primarily -- while we do produce some video, it's primarily

2  text, text on a page, and you require display ads around

3  that.

4  Q    And, finally, what ability does Daily Mail have to

5  replace the Open Auction web display impressions it sells

6  through DFP with impressions that it's selling through an

7  app?

8  A    Again, not really possible.  There are two different

9  ways to access our website.  To put that into context, we

10  get roughly -- 70 million people in the U.S. each month come

11  to our website.  Our app you would be required to go to an

12  app store, download the app, and we have less than a million

13  users in the U.S. today that utilize our app.  So we

14  wouldn't be able to shift 17 million over to the app.

15  Q    And so what exchanges does Daily Mail use to sell its

16  Open Auction display impressions?

17  A    We use a few different exchanges.  Google AdX is the

18  largest.  Some other examples include PubMatic, Xandr, Index

19  Exchange, Magnite, TripleLift.

20  Q    And how does the amount of impressions transacted

21  through AdX for Daily Mail compare to the amount of

22  impressions transacted through those other exchanges?

23  A    AdX accounts for significantly more impressions.

24  Historically, over the last few years, anywhere between 40

25  to 60 percent of programmatic impressions go through Google

133

Direct examination - M. Wheatland

```
 1    AdX, and the next closest competitor is probably more like
 2    6 percent, 7 percent, something like that maybe.
 3    Q    And so what take rate does Daily Mail pay Google for
 4    the Open Auction impressions sold through AdX?
 5    A    20 percent.
 6    Q    And how does that 20 percent take rate compare to the
 7    take rates that Daily Mail pays other exchanges for Open
 8    Auction transactions?
 9    A    Typically that's around double.  So across some of the
10    other exchanges I mentioned as well, we have roughly around
11    a 10 percent take rate.  We have a couple of exchanges, one
12    operating at 7 percent, one operating at 9 percent.
13    Q    So why did Daily Mail continue working with AdX if
14    AdX's take rate was roughly twice that what you were paying
15    for other exchanges?
16    A    Because that's the only way to access AdX demand.
17    Q    Are you familiar with the term direct sale in the
18    context of digital advertising?
19    A    Yeah.
20    Q    Does Daily Mail make direct sales of web display
21    impressions?
22    A    Yeah, we do.  Yep.  We've got a sales team.
23    Q    And, in brief, what process is required for Daily Mail
24    to implement a direct sale from start to finish?
25    A    It's typically a fairly long process.  You require a
```

134

Direct examination - M. Wheatland

```
 1   sales team and the support staff, creative, marketing.  You
 2   would need to create sales materials, sell your brand into a
 3   media agency or buyer.  You'd need to respond to RFPs.  You
 4   would need to, if you win the RFP, on board creative assets
 5   or tags, you need to traffic that in the ad server.  You
 6   would need to set up billing and reporting with the buyer.
 7   You'd need to monitor the campaign as it was running.  And
 8   then at the end of the campaign, you typically would send a
 9   post-campaign report to explain how the campaign did.
10   Q    And what percentage of Daily Mail's display impressions
11   is Daily Mail able to sell through those direct transactions
12   you just described?
13   A    Of impressions, it's probably roughly globally maybe 10
14   to 20 percent.  A little bit less in the U.S., I guess.
15   Q    So if the take rate that Daily Mail paid for Open
16   Auction transactions increased by a small but significant
17   amount, what ability would Daily Mail have to shift those
18   Open Auction sales to direct sales?
19   A    Very little.  Typically direct sales is higher priced.
20   So it's higher CPM.  So we sell as much as we can direct.
21   Direct sales and open market programmatic, the way we view
22   it, they're not really substitutes, and you can't just move
23   one -- you can't just move Open Auction to -- direct sales
24   typically serves a different purpose as well.  Direct sales
25   are quite often higher impact ad creatives.  The goals of
```

135

Direct examination - M. Wheatland

```
 1   direct sales is more branding; whereas Open Auction, it's

 2   typically standard banners, and the goal is more lower

 3   funnel, sort of direct response marketing.

 4   Q    And are you familiar with the terms programmatic direct

 5   and programmatic guaranteed?

 6   A    Yep.

 7   Q    And what ability would you have to shift Open Auction

 8   transactions to programmatic direct or programmatic

 9   guaranteed?

10   A    We class those internally.  Basically the same as

11   direct.  So very little.

12   Q    I want to ask you about one other term before we move

13   on.

14            Before this case, how familiar were you with the

15   term open-web display advertising?

16   A    Yeah.  I was familiar.  Yep.

17   Q    And what does that term refer to?

18   A    I guess it's got two parts.  Open web, which is

19   typically websites that exist on the Internet outside of the

20   walled gardens, like Google or Facebook, and may use -- may

21   rely on display advertising and use third parties to

22   monetize.  And then display refers to a type of advertising,

23   typically that banner ads exist around content, and they

24   could have text or images or rich media load inside of them.

25   Q    So we'll move onto our next topic and ask you a couple
```

136

Direct examination - M. Wheatland

```
 1    questions about AdX.

 2              Are you familiar with the term AdX-direct tags?

 3    A     Yep.

 4    Q     What is an AdX-direct tag?

 5    A     An AdX-direct tag is a tag-based method to access

 6    Google AdX demand, but it is a fairly inefficient way to do

 7    so.

 8              THE COURT:  I'm sorry.  Can you repeat that,

 9    please.

10              THE WITNESS:  It's a very inefficient way to do

11    so.

12              THE COURT:  To do what?

13              THE WITNESS:  To access AdX demand.

14              THE COURT:  All right.

15    BY MR. WOLIN:

16    Q     Why do you say it's an inefficient way to access AdX

17    demand through an AdX-direct tag?

18    A     Because when you access AdX through Google's ad server,

19    AdX will bid the price into the ad server so it can compete

20    with the other prices in the ad server.

21              When you want to access AdX demand through the

22    AdX-direct tag, that tag will not give you the price back.

23    So it will never insert a price into another auction.

24    Instead, you basically have to tell AdX the price to beat.

25    So basically you have to give AdX last look because you have
```

137

Direct examination - M. Wheatland

1   to have some pricing guidance within AdX so -- for AdX to

2   know whether or not it should take the impression.

3           So, A, it kind of replicates last look; and then,

4   B, tag-based access to AdX in this way is -- would be set up

5   in a waterfall formation, which, again, is an inefficient

6   way.  You end up with latency issues as well.

7   Q    And so would it be feasible for Daily Mail to switch to

8   another publisher ad server and then replace DFP's access to

9   AdX with, instead, these AdX-direct tags that you've been

10  talking about?

11  A    Not really.

12  Q    And related to that, are you aware of a setup in which

13  one publisher uses two ad servers, DFP for AdX, and then a

14  separate publisher ad server for header bidding?

15          MS. RHEE:  Your Honor, that lacks foundation.

16  He's one publisher; he can't speak for all publishers.

17          THE COURT:  Speak for just this publisher.

18          THE WITNESS:  The --

19  BY MR. WOLIN:

20  Q    Are you personally aware of a setup in which one

21  publisher uses two ad servers?

22          THE COURT:  No.  No.  All right.  I'll permit

23  that, if he knows.

24          THE WITNESS:  Yeah.  There's example that floats

25  around of one publisher in Europe, yeah.

                                                           138

Direct examination - M. Wheatland

```
 1              THE COURT:  So there is a publisher in Europe whom
 2    you know who is using two of these servers?
 3              THE WITNESS:  Yeah.  There's one example, yeah.
 4              THE COURT:  All right.
 5    BY MR. WOLIN:
 6    Q    And that's the only example you're aware of all the
 7    publishers that you're aware of in the industry?
 8              MS. RHEE:  Leading, Your Honor.
 9              THE COURT:  That's not leading enough.  Overruled.
10    BY MR. WOLIN:
11    Q    You may answer.
12    A    It's the only example that I personally know of.  Yeah.
13    Q    I mean, do you believe that that would be a feasible
14    option for Daily Mail to use this two ad server setup?
15    A    No.
16    Q    Why not?
17    A    A, for the issues that I mentioned earlier around
18    accessing Google demand through an AdX-direct tag, which
19    essentially those same issues exist.  It's very inefficient
20    to use two ad servers in this way.  And, again, you've got
21    latency issues, you've got no unified auction, you're giving
22    last look to Google in this setup.  So it wouldn't be really
23    a feasible way to do -- to set up your ad server.
24    Q    So let's then shift a little and talk about some other
25    aspects of AdX.
```

                                                              139

Direct examination - M. Wheatland

```
 1           Are you familiar with the term first look in
 2   connection with AdX and the waterfall?
 3   A     Yeah.
 4   Q     Has Daily Mail analyzed how the introduction of header
 5   bidding impacted its revenue in comparison to its revenue in
 6   the time period when AdX had first look?
 7   A     Yes.  So the adoption of client-side header bidding
 8   allowed for essentially the removal of first look for AdX
 9   within the ad server, and it allowed for non-Google
10   exchanges to compete in a unified auction inside of Google
11   Ad Manager.
12           You know, we've seen anything from 50 to
13   100 percent increase in revenue from exchanges when they
14   move from the waterfall setup to a header bidding setup.  So
15   it's -- it increases publishers' revenues considerably.
16   Q     And are you familiar with the term Exchange Bidding in
17   connection with AdX?
18   A     Yes.
19   Q     In the time period before Google introduced Exchange
20   Bidding, were you aware of any way to configure DFP to give
21   another ad exchange a higher priority than AdX among remnant
22   line items?
23   A     I don't think that was possible, no.
24   Q     Are you familiar with sponsorship and standard line
25   items in DFP?
```

140

Direct examination - M. Wheatland

```
 1   A      Yep.

 2   Q      Would it be possible for Daily Mail to place an ad

 3   exchange in a sponsorship or standard line item and then

 4   solicit a real-time bid from that exchange?

 5   A      I mean, it's technically possible.  We could

 6   technically take a bid from header bidding and run that

 7   through a sponsorship or standard-type line items.  But, you

 8   know, it's not really -- in practice, you would never be

 9   able to do that at any great scale.

10          Sponsorship and standard-type line items were

11   designed for direct sales; they were not designed for

12   programmatic advertising.  Sponsorship-type line items don't

13   compete on price in the same way that the remnant line items

14   do.  And the standard-type line items are designed for a

15   direct sales campaign when you have a fixed impression goal

16   and a fixed flight date for the direct campaign.  Which,

17   again, programmatic Open Auction doesn't really have, you

18   know, a fixed flight date, it doesn't have a fixed number of

19   impressions.

20   Q      And could you just explain what you mean when you say a

21   fixed flight date?

22   A      Flight date would be sort of the length of the direct

23   sold campaign.  So, you know, some campaigns will run for a

24   week, two weeks.

25   Q      So how did Daily Mail's adoption of header bidding
```

141

Direct examination - M. Wheatland

```
 1   change the impact of ad fraud on Daily Mail?

 2   A    There's not really any impact, I don't think.

 3   Q    And how did Daily Mail's adoption of header bidding

 4   change the impact of malware on Daily Mail?

 5   A    Again, not really any impact.

 6   Q    And how did Daily Mail's adoption of header bidding

 7   change the impact of latency on Daily Mail?

 8   A    Again, not really any impact.

 9   Q    And how did the latency and ad loading that occurred

10   through header bidding compare to the latency that occurred

11   in the waterfall setup?

12   A    So on header bidding, we have latency controls, so we

13   can put global timeouts.  So we will call our ad server

14   regardless if some client-side header bidding is returned or

15   not.  So there's not really any significant page load

16   latency on client-side header bidding.

17             With the waterfall setup, typically you will get

18   more ad render latency, because if you're trying to reach a

19   bid from an exchange lowdown in the waterfall, you will have

20   to waterfall through multiple different servers in order to

21   find that demand, and that causes your ads to load more

22   slowly.

23   Q    Thank you.  I want to shift to a different topic.

24             Are you familiar with the Unified Pricing Rules or

25   UPR in connection with Google's ad tech products?
```

142

Direct examination - M. Wheatland

```
 1   A     Yep.
 2   Q     And the Court's already heard testimony about UPR, so
 3   we won't go into what it is.
 4         But I do want to ask you about the impact of UPR
 5   on Daily Mail.  And to do that, let's turn to PTX 1633 in
 6   your binder, please.
 7              THE COURT:  Any objection to 1633?
 8              MS. RHEE:  No, Your Honor.
 9              THE COURT:  All right.  It's in.
10   (Plaintiffs' Exhibit Number 1633 admitted into evidence.)
11   BY MR. WOLIN:
12   Q     Mr. Wheatland, did you author the email that's shown in
13   PTX 1633?
14   A     Yep.  By the looks of it.  Yep.
15   Q     And one of the recipients that you sent it to was
16   Richard Caccappolo; is that right?
17   A     Yes, that is correct.
18   Q     Who is Mr. Caccappolo?
19   A     At the time of this email, he was the chief operating
20   officer of Daily Mail's website.
21   Q     And what's his title now?
22   A     He's chief executive officer.
23   Q     And so the email is dated February 18th, 2020.
24         When was that in relation to the implementation of
25   UPR?
```

143

Direct examination - M. Wheatland

```
 1   A     That was post UPR.  So a few months after UPR rolled

 2   out.

 3   Q     And could you read for the Court the second paragraph

 4   of the email that starts with "general"?

 5   A     "General trend is that CPM has decreased a lot since

 6   UPR.  Revenue is up, but that's largely a function of

 7   traffic.  Revenue percentage share is almost stationary

 8   since UPR, but the impression percentage share has increased

 9   from 20 percent to 60 percent.  A huge increase.  AdX is

10   monetizing roughly 3X the amount of our inventory post UPR,

11   but we don't see much change in revenue.  So most of this is

12   coming from low CPM inventory after the floors were taken

13   out."

14   Q     And Mr. Wheatland, is that statement that you just

15   read, including that AdX was monetizing roughly three times

16   the amount of your inventory after UPR, is that an accurate

17   description of the impact that Daily Mail measured of UPR as

18   of February 2020?

19   A     Yep, I think that's accurate.

20   Q     And could you explain the impact of UPR as -- that you

21   measured in this email which you just read out?

22   A     So here we essentially saw that we didn't -- AdX

23   revenue didn't increase, but they took three times the

24   amount of inventory at much lower prices.  And I think this

25   was a reflection of the change from the previous pricing
```

144

Direct examination - M. Wheatland

```
 1    rules to Unified Pricing Rules where flooring strategies
 2    prior to UPR were I guess removed or disabled when UPR got
 3    rolled out.
 4              THE COURT:  So just so I understand that
 5    completely.
 6              So you're saying that more of your inventory was
 7    sold but at a lower price?
 8              THE WITNESS:  Correct.  More inventory was sold to
 9    AdX but at a much lower price.
10              THE COURT:  But that overall, there hasn't been a
11    huge impact on your overall revenue?
12              THE WITNESS:  Yeah.  Revenues were pretty much
13    stationary.
14              THE COURT:  Is that because of the quantity?
15              THE WITNESS:  Yeah.  That's because the CPM that
16    AdX took decreased significantly, and then the volume sort
17    of increased considerably, and then sort of it netted out
18    where there was no change in revenue.
19              THE COURT:  Okay.
20    BY MR. WOLIN:
21    Q    Just looking at the language that the percentage share
22    has increased from 20 to 60 percent, what is that impression
23    share that you're referring to there?
24    A    That's the impression share that Google AdX was winning
25    of our inventory.
```

145

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - M. Wheatland

```
1    Q    And where was there a corresponding decrease in

2    percentage share of impressions, from what source?

3    A    So there would have been a decrease from non-Google, so

4    from the other exchanges.  Yep.

5    Q    So overall, what has the impact been on Daily Mail of

6    Google's introduction of UPR?

7    A    I mean, UPR has stopped our ability to set floors as we

8    would like, and it's stopped our ability to optimize our

9    inventory and better decide how our inventory flows to

10   different exchanges.

11   Q    Okay.  So you could put the binder aside, but I do have

12   one or two additional questions on UPR.  And I won't get

13   into any specifics, but I want to ask you, did you attend a

14   meeting in April 2019 with representatives of Google where

15   the Unified Pricing Rules were announced?

16   A    Yeah.

17        MR. WOLIN:  And, Your Honor, I'll note for a

18   record that a transcript of the recording of that meeting

19   was entered into evidence last week as PTX 1854.

20        THE COURT:  All right.

21   BY MR. WOLIN:

22   Q    And just one question about the meeting, Mr. Wheatland.

23        What did you observe at that meeting about the

24   reaction to Google's announcement of UPR?

25   A    Publishers were unhappy.
```

146

Direct examination - M. Wheatland

```
1    Q    And what ability did Daily Mail have to switch away

2    from DFP in response to Google implementing the Unified

3    Pricing Rules?

4              MS. RHEE:  Your Honor, I think this has already

5    been covered.

6              THE COURT:  Well, not for this particular -- I'm

7    going to permit it, and then we're going to break for lunch.

8    Last question.

9              THE WITNESS:  Very little.  We would still rely on

10   Google AdX demand, and the calculation that we did earlier

11   that would still stand.  We'll loss 25 to 30 percent of our

12   programmatic revenue.

13             THE COURT:  All right.  Does that complete the

14   direct?

15             MR. WOLIN:  No.  We have a few additional

16   questions.

17             THE COURT:  We'll finish them after lunch.

18             MR. WOLIN:  Thank you, Your Honor.

19             THE COURT:  We'll be in recess until 2:00.

20             (Court recessed for lunch at 1:00 p.m.)

21                   AFTERNOON SESSION 2:00 p.m.

22             MR. WOLIN:  May I proceed, Your Honor?

23             THE COURT:  Yes, sir.

24   BY MR. WOLIN:

25   Q    Mr. Wheatland, before we broke for lunch, we were
```

147

Direct examination - M. Wheatland

```
 1    speaking about UPR; do you recall that?

 2    A    Yep.

 3    Q    Is it possible for Daily Mail to increase or inflate

 4    the bids that it receives from header bidding before they're

 5    submitted into DFP as a work-around for the UPR?

 6    A    Yeah.  That is technically possible, yep.  Yep.

 7    Q    Are there downsides to that work-around?

 8    A    Yeah.  There's a number of downsides.

 9         So if you wanted to inflate the client-side header

10    bidding bid before you submit them into the ad server, you'd

11    need to have some kind of logic run on the page to determine

12    how much you should inflate each bid by, which can get quite

13    complex.  Plus, the bids that you'd then be putting into the

14    ad server would actually be sort of incorrect.  So,

15    therefore, when you're looking at the reporting that can

16    come out of the ad server, the reporting would not be

17    accurate, so you wouldn't be able to use it for tracking

18    revenue, for instance.

19    Q    And has Daily Mail ever implemented that bid inflation

20    work-around?

21    A    We've not implemented bid inflation from the page.

22    Q    And why not?

23    A    For the reasons I outlined.  It's quite -- it's

24    technically difficult, plus it's, you know, operationally

25    difficult with reporting.
```

148

Direct examination - M. Wheatland

1   Q    And does UPR prevent Daily Mail from setting a higher

2   floor for other exchanges than it does for AdX?

3   A    We can still floor in other exchanges.  Like, typically

4   flooring is an exchange functionality, and that's still the

5   case.  So we can floor other exchanges higher using their

6   floors and their exchanges.

7   Q    But you can't give them lower floors?

8   A    Correct.  Yeah.

9   Q    So I want to move on to one final set of questions,

10  Mr. Wheatland.

11          So you discussed earlier that Daily Mail has been

12  a customer of Google's DFP and Google's AdX for at least the

13  past 12 years; right?

14  A    Correct.  Yeah.

15  Q    How responsive has Google been to the requests of Daily

16  Mail, Google's customer?

17  A    Not very responsive in many cases.

18  Q    And, in your view, has Google operated DFP and AdX in

19  ways that are in the best interests of Daily Mail, Google's

20  customer?

21  A    No.

22  Q    Why do you believe that?

23  A    Because there are functionality and features that are

24  built inside the ad server that publishers sort of didn't

25  ask for and are not maximizing publisher revenue.

149

Direct examination - M. Wheatland

```
 1    Q    And has Daily Mail filed a lawsuit against Google

 2    related to how Google operates DFP and AdX?

 3    A    Yes.

 4    Q    So we spoke today about AdX demand not being able

 5    except through DFP.

 6         Is that still in effect for Daily Mail today?

 7    A    Yep.  That's still in effect today.

 8    Q    And how does that affect Daily Mail's business today?

 9    A    As we discussed earlier, that's still in place today,

10    so the -- our ability to move ad servers would mean that we

11    would have to forgo that revenue.  So it's not financially

12    feasible to move ad servers and forgo AdX revenue.

13    Q    And what about UPR, is that still in effect for Daily

14    Mail today?

15    A    Yes.

16    Q    How does that affect Daily Mail's business today?

17    A    That stops us flooring by exchange as we want to, and

18    it stops us being able to price our inventory to different

19    buyers as we want to.

20    Q    And Mr. Wheatland, why has Daily Mail continued using

21    DFP as its publisher ad server in spite of Google

22    implementing features like UPR that you said Daily Mail did

23    not think was in their best interest?

24    A    Because losing AdX would be financially detrimental to

25    us.
```

150

Direct examination - M. Wheatland

```
 1   Q    And what overall impact has that had on Daily Mail as a
 2   news publisher?
 3   A    I mean, we were a news publisher that produces content
 4   that we believe Americans find important, interesting, and
 5   the majority of our revenue is generated from display
 6   advertising, which run through Google's systems.  So Google
 7   suppressing prices for publisher inventory lowers publisher
 8   revenue, which, in turn, means that we cannot invest in
 9   journalism in the way that we potentially otherwise could.
10        You know, we see that there are new verticals that
11   we aim to move into, especially in the U.S. market.  And
12   actually fairly recently, we had -- unfortunately had a
13   round of layoffs across U.S. editorial.  So it's challenging
14   to be a news publisher.
15   Q    So, Mr. Wheatland, for the topics that we discussed
16   today about DFP and AdX, did they affect Daily Mail's
17   business today or for Daily Mail were they just in the past?
18   A    Today.
19        MR. WOLIN:  No further -- or we pass the witness,
20   Your Honor.
21        THE COURT:  All right.  Ms. Rhee.
22        MS. RHEE:  Thank you, Your Honor.
23        And while Ms. Mouser is passing the binders, if I
24   could just introduce Ms. Amy Mauser back with the Court.
25   Thank you.
```

151

Cross-examination - M. Wheatland

```
 1              THE COURT:  Go ahead.
 2                       CROSS-EXAMINATION
 3  BY MS. RHEE:
 4  Q    Good afternoon, Mr. Wheatland.
 5  A    Good afternoon.
 6  Q    My name is Jeannie Rhee.  I represent Google.  I'll be
 7  asking you some questions today; okay?
 8  A    Okay.
 9  Q    If I could just have you keep your voice up and maybe
10  speak a little bit slowly.
11  A    Yes.  Of course.
12  Q    Because as lovely as your accent is, I just want to
13  make sure I can understand you.
14  A    Yeah.  Absolutely.
15  Q    Now, the Daily Mail is a UK publication that now is
16  provided globally; is that right?
17  A    Our print operation is in the UK, but our website is a
18  global offering.  And we actually have a larger readership
19  in the U.S. than we do in the UK now.
20  Q    Okay.  But you have globally, I think your testimony
21  was 170 million users; is that right?
22  A    Globally.  It can vary month to month, but around that
23  number, yes.
24  Q    Well, in your direct examination, you didn't qualify
25  it.  I think your testimony was 170 million users worldwide,
```

Cross-examination - M. Wheatland

```
 1   or you said globally; correct?

 2   A    Correct.

 3   Q    And 70 million of those users get the Daily Mail

 4   digitally, and that's in the U.S.; is that right?

 5   A    Correct.

 6   Q    Okay.  Now, you, yourself, just moved to the United

 7   States in the past two years; is that right?

 8   A    No.  I used to live here prior, but I moved back here.

 9   Q    And by "moved back," that is you moved back to the UK?

10   A    I moved back to the U.S.  I moved to the US in 2014.

11   Q    Okay.  Now, the Daily Mail is referred to as a British

12   tabloid, you're familiar with that; right?

13            MR. WOLIN:  Objection.

14            THE COURT:  I don't know why any of this is

15   relevant at this point.  I want this more focused.

16            Objection sustained.

17   BY MS. RHEE:

18   Q    Now, you talked about the Daily Mail, particularly in

19   the U.S. market, moving to new verticals; is that right?

20   That was just your testimony a few minutes ago.

21   A    Correct.

22   Q    And that includes video; right?

23   A    Video's not a specific content vertical.

24   Q    And, in fact, The Daily Mail has publicized about its

25   unveiling of a new global video strategy; right?
```

153

Cross-examination - M. Wheatland

```
 1   A     I believe we have.

 2   Q     Okay.  And The Daily Mail offers its content and

 3   publicizes its offering of content on social media; correct?

 4   A     Correct.

 5   Q     And, in fact, it publicizes that The Daily Mail is

 6   available on X; right?  Formerly Twitter.

 7   A     We may do.

 8            (Reporter interrupted for clarification.)

 9            THE WITNESS:  We may do.  Yeah.  I'm not entirely

10   sure.  We may do.

11            MS. RHEE:  I'm now going to pull up what's going

12   to be marked as Wheatland Demonstrative 1, Your Honor, which

13   is from The Daily Mail website that Mr. Wheatland talked

14   about on direct examination.

15   BY MS. RHEE:

16   Q     Mr. Wheatland, do you see the -- actually, you can see

17   it both in the book, but it might be easier to follow on the

18   screen.

19            Do you see that?

20   A     Could I find it in the book as well?

21   Q     It's Tab 3.

22   A     Tab 3.

23   Q     And you see this is pulled down from

24   thedailymail.co.uk; do you see that?

25   A     Okay.
```

154

Cross-examination - M. Wheatland

1   Q    Now, it says:  "Daily Mail is available on multiple

2   social media platforms"; do you see that?

3   A    Yeah.

4   Q    Okay.  And it says, as you scroll down, how you can get

5   The Daily Mail on Twitter, The Daily Mail on TikTok, and, in

6   fact, it says that "The Daily Mail has become the biggest

7   news publisher on TikTok"; do you see that?

8   A    I see that written, yeah.

9   Q    And it surpassed 10 million followers on that platform;

10  correct?

11  A    Yeah, I see that written here.

12  Q    Okay.  And then it goes on to talk about how The Daily

13  Mail is available on Instagram?

14          MS. RHEE:  Yep.  If we can keep going down.

15          THE WITNESS:  Yeah.

16  BY MS. RHEE:

17  Q    And it says:  "Our most popular stories will be

18  published to the Daily Mail's Facebook page, which you can

19  follow here"; right?  Yes?

20  A    I see that's written here, yes.

21  Q    Okay.  And then The Daily Mail is available on

22  Snapchat; do you see that?

23  A    I see it's written here.

24  Q    And it says the Snapchat is "the home of all of our top

25  picture, photo, and video-related content.  Follow The Daily

155

Cross-examination - M. Wheatland

```
 1   Mail here"; do you see that?
 2   A     Uh-huh.  Yes, I see that.
 3   Q     Okay.  And the reason why The Daily Mail publicizes
 4   itself and actually makes so much of its content available
 5   on all of these different social media platforms is because
 6   that's where the users are; right?
 7              MR. WOLIN:  Objection.  Foundation.
 8              THE COURT:  Overruled.  Can you answer that
 9   question?
10              THE WITNESS:  Some readers can access content that
11   we put onto social media.
12   BY MS. RHEE:
13   Q    And that's the reason why you publicize on your website
14   the fact that you can find The Daily Mail and all of its
15   content on all of these various social media sites; correct?
16   A    We don't publish all of our content onto social media.
17   Q     You publish the top photos; correct?
18   A     That's -- I think they are the words written here.
19   Q     And the top video; right?
20   A     We publish some content.
21   Q     Yes or no?
22   A     We publish some content onto social media.
23   Q     And your top --
24              THE COURT:  Wait.  Wait.  Wait.  Wait.  Let him at
25   least finish.  All right.
```

156

Cross-examination - M. Wheatland

```
 1   BY MS. RHEE:

 2   Q    Can you finish the yes-or-no question?

 3   A    We publish some content onto social media.

 4   Q    And that's the top pictures, the top photos and the top

 5   video content; yes?

 6   A    I don't know how we're -- I don't know.

 7   Q    And it includes your most popular articles; right?  We

 8   just saw that on the Instagram disclosure?

 9   A    Again, we publish some content onto social media.

10            I think --

11   Q    It says on your website you feature your top stories on

12   your Instagram page; correct?

13   A    Yeah.  There's a difference between --

14   Q    Okay.  There's no other question.  Okay.

15            THE COURT:  You do need to listen to the question.

16   If it just calls for a yes-or-no -- it's up to other counsel

17   on redirect to expand if they feel that's necessary; all

18   right?

19            THE WITNESS:  Okay.  Okay.

20   BY MS. RHEE:

21   Q    Now, on direct examination, you told the government

22   lawyer and this Court, that The Daily Mail is -- and I

23   believe the words were -- "one of the largest

24   English-speaking newspapers in the world"; is that right?

25   A    The website, correct.  Yes.
```

157

Cross-examination - M. Wheatland

```
 1   Q    And then you went on to talk about The Daily Mail's

 2   take rate that it pays to AdX versus other exchanges;

 3   correct?

 4   A    Yes.

 5   Q    Okay.  Now, that is based on individual negotiations

 6   that you or somebody else on your team negotiated with each

 7   one of the exchanges; correct?  Yes or no?

 8   A    Correct.

 9   Q    Now, that's from your vantage point and your position

10   as one of the largest publications around the world; right?

11   You can only speak for yourself; right?  Again yes-or-no

12   question.

13   A    I know the take rates of -- that Daily Mail has with

14   exchanges.

15   Q    And that's one publication -- one of the largest

16   publications in the world, according to your testimony;

17   correct?

18   A    Correct.

19   Q    Okay.  Now, you talked on your direct examination with

20   the government attorney about direct deals; do you remember

21   that?

22   A    Yes.

23   Q    And, in fact, The Daily Mail has a new focus and

24   priority of doing direct deals and direct partnerships with

25   advertisers; correct?
```

Cross-examination - M. Wheatland

```
 1   A     I'm not sure what that relates to.

 2   Q     Well, very recently, a very senior executive spoke to

 3   an ad exchanger publication, which is an industry

 4   publication, talking about how, for The Daily Mail, you want

 5   to focus particularly on working directly with brands;

 6   correct?

 7             MR. WOLIN:  Objection.  Hearsay.

 8             THE COURT:  The same thing can be asked -- is

 9   there a preference for direct communication with

10   advertisers?

11             THE WITNESS:  There is a preference to sell

12   advertising directly because we can get higher prices.

13             MS. RHEE:  Thank you so much, Your Honor, and then

14   I'll move on.  That's the only point I wanted to get across.

15             THE COURT:  I will tell you, the leading questions

16   are starting to really drive me crazy.  If we had had a jury

17   trial, both sides would have been cut dramatically.

18             I want few less leading questions.  They're too

19   long.  It's the attorneys who are trying to testify in this

20   case.  I mean, I can see the difference, but I really don't

21   like it, and it's lengthening the trial.  We don't need a

22   lot of preambles.  On direct you said such-and-such, you

23   don't need that.  I heard it.  Okay.

24             I want both sides to try to get this a bit more

25   precise.  All right.  So move on.
```

159

Cross-examination - M. Wheatland

```
 1    BY MS. RHEE:
 2    Q    Direct tags.  AdX direct tags, do you remember talking
 3    about it?
 4    A    (Gesturing affirmatively.)
 5    Q    Okay.  And it is available to you; right?  You, as the
 6    Daily Mail, choose not to use it?
 7    A    It's available for us to generate an AdX direct tag if
 8    we wanted to.
 9    Q    Okay.  And then similarly, you were asked about the
10    ability to submit bids that are higher than the actual
11    header winning bid; yes?
12    A    We spoke around bid multiplication from header bidding
13    bids on the page.
14    Q    Okay.  And is it possible for The Daily Mail to do
15    that?
16    A    As I mentioned, it's technically possible.
17    Q    So is that a yes?
18    A    It's technically possible.
19    Q    Okay.  And The Daily Mail chooses not to do that; is
20    that right?
21    A    To the extent that we're not doing it, it's technically
22    possible.  We don't do it, so to that extent, I guess yes.
23    Q    Okay.  And then in terms of being able to integrate
24    header bidding into DFP, is it possible, technically
25    possible, to go ahead and do that?
```

160

Cross-examination - M. Wheatland

```
 1   A    It's technically possible to run client-side header

 2   bidding bids as line items in the ad server.

 3   Q    Okay.

 4   A    Although it's not set up.

 5   Q    Okay.  And then is it that The Daily Mail chooses not

 6   to do that?

 7   A    Sorry.  Could you repeat the question?  Is it

 8   technically possible to set up header bidding in the ad

 9   server?  Is that your question?

10   Q    Correct.  Yes.

11   A    We run client-side header bidding bids inside the ad

12   server.

13   Q    Okay.  So the answer is, yes, it's technically

14   possible; and, yes, The Daily Mail does it?

15   A    Correct.  Yes.

16   Q    Okay.  Thank you for the clarification, Mr. Wheatland.

17        Now, you talked about what's been moved into

18   evidence as PTX 1717.

19        MS. RHEE:  If we could pull that up.  Thank you.

20   BY MS. RHEE:

21   Q    And let's actually just walk through this.  And that's

22   the first slide, I believe you were shown, ending 644; do

23   you see that in front of you?

24   A    Yes.

25   Q    The title of the slide is "How Much AdX Demand Is
```

161

Cross-examination - M. Wheatland

1   Unique"; is that right?

2   A     Yeah, that's correct.

3   Q     Okay.  And the revenue numbers, is that in pounds, not

4   dollars?  I just want to understand.

5   A     That's in pounds.

6   Q     Okay.  And now when you see the bottom line here which

7   is percentage of AdX revenue, Mr. Wheatland, is that the

8   percentage of AdX revenue that the Daily Mail deemed based

9   upon this review as being unique?

10  A     There's different interpretations of the word "unique."

11  In this instance, on this slide, we're referring

12  specifically to when there's a bid from AdX, but there's not

13  a bid from another exchange, but I would also -- I could

14  also class- --

15  Q     Mr. Wheatland, the question is:  Based on this slide

16  and based on how you defined unique, have I read the last

17  row correctly?  Is it that 18 percent of what you saw coming

18  in from AdX what you deemed to be unique?

19  A     I don't agree with that.

20        THE COURT:  What do you mean by the word "unique"?

21        THE WITNESS:  So on this slide we're saying that

22  there's a bid from AdX, but there's no bid from other

23  demand.

24        THE COURT:  Right.

25        THE WITNESS:  So then we would say that

                                                          162

```
 1    100 percent of AdX's revenue in that instance was sort of

 2    unique.

 3              And then on the next slide, we talk about the

 4    incrementality of AdX revenue over non-AdX revenue.  And

 5    summing those together, which we do on the last slide, we

 6    actually use the word unique again, and we say the 219,

 7    which is the summation of those two numbers, we would say

 8    are sort of the unique AdX demand.

 9              THE COURT:  That's AdX by itself, alone, with

10    nobody else?

11              THE WITNESS:  That's AdX by itself, alone.  Yeah.

12              THE COURT:  Okay.  Got it.

13              MS. RHEE:  So thank you for that clarification.

14    BY MS. RHEE:

15    Q    But I just think I want to try to understand going back

16    to 644.

17              What does 18 percent represent here?

18    A    That simply represents the percentage of AdX revenue

19    when there is no other bid from a non-Google exchange.

20    Q    Okay.  So I just, again, want to make sure I understand

21    this.

22              That 18 percent represents where there is an

23    impression that comes in from AdX that you did not see from

24    another demand source?

25    A    I don't think that's correct.  I don't understand that.
```

163

Cross-examination - M. Wheatland

```
 1   Q    Okay.  I think I'm confused then.

 2             Now, in the summary that you have at the end of

 3   this slide, and it's titled "MailOnline UK Revenue At Risk

 4   If We Pull AdX."

 5             First, why is it UK revenue here, Mr. Wheatland?

 6   A    Because we just -- we knew that the trends are

 7   essentially the same in the UK and the US.  And the analysis

 8   was just run on UK data.

 9   Q    Okay.  So you ran this just on the UK data and not the

10   US data; is that right?

11   A    The trends are the same in both regions, but that's

12   correct, yes.

13   Q    So the answer is yes?

14   A    Yes.

15   Q    Okay.  And then I believe your testimony was, bottom

16   line, your assessment was you would take a 28 percent

17   revenue hit if you chose to move your business away from

18   AdX; is that right?

19   A    Across -- across programmatic, yeah.

20   Q    Okay.  So this is just limited to programmatic?

21   A    This is -- yeah.  This is programmatic revenue.

22   Q    Okay.  And then I want to understand the breakdown

23   here, because there's first a number that is 219K in pounds;

24   is that right?

25   A    Correct.
```

164

1    Q    Okay.  And does that number represent the revenue hit

2    just from what you deemed to be AdX unique demand?

3    A    There's different definitions of the word unique.  I

4    think outside of this document when someone's referring to

5    unique AdX demand, typically they're referring to Google

6    revenue and maybe, to a lesser extent, DV360 revenue.

7           In this document, we were -- so to unique demand,

8    being either there was no bid from a non-Google exchange, or

9    it was the difference between the non-Google exchange bid or

10   the paid price from Google AdX.

11   Q    Okay.  And that's how -- I mean, this document belongs

12   to the Daily Mail; right?

13   A    Correct.

14   Q    And that's how The Daily Mail chose to define unique

15   demand?

16   A    In this document, in this context.

17   Q    Okay.  And then the next line, which has an even higher

18   figure, which is 355K a month in pounds, does that represent

19   at least The Daily Mail's assessment about what happens if

20   you moved away from AdX and it's what the other players

21   would do?

22   A    That 355 is the 219 plus the bid-shading impact across

23   the non-Google exchanges without Google's price support in

24   the auction.

25   Q    Okay.  And so, in other words -- and, sorry, I

165

Cross-examination - M. Wheatland

```
1    apologize that it's really an added figure.

2    A    Correct.

3    Q    But there's some amount in terms of your revenue

4    assessment about what other exchanges would do in the

5    absence of AdX; is that right?

6    A    Correct.

7    Q    Okay.  And it's those two things combined that led to

8    the ultimate assessment about a 28 percent revenue hit; is

9    that right?

10   A    Correct.  Yeah.

11   Q    All right.  And I believe you testified repeatedly on

12   direct examination, it was that revenue hit that you

13   assessed to be the driver of why Daily Mail chose not to go

14   with another ad server; is that right?

15   A    The lost revenue is the primary reason, yes.

16   Q    Okay.  And now in terms of that choice, you testified

17   on direct examination that there were at least two different

18   ad servers that you were thinking about at that time; is

19   that right?

20   A    Yes.  Yep.

21   Q    Okay.  And one was Smart AdServer; correct?

22   A    Correct.

23   Q    And the other one was Xandr; is that right?

24   A    Correct.

25   Q    All right.  Now, you know that Xandr was formerly
```

166

Cross-examination - M. Wheatland

```
 1    called AppNexus; yes?

 2    A    Correct.

 3    Q    And that AppNexus/Xandr, whatever you want to call it

 4    now, has been acquired by Microsoft; yes?

 5    A    Correct.

 6    Q    Okay.  So one of the competitor offerings with respect

 7    to a publisher ad server that you were thinking about was a

 8    Microsoft product?

 9    A    Xandr -- I think -- I'd have to check the exact timing.

10    Xandr was either owned by AT&T or Microsoft at that point.

11    I can't remember.

12    Q    Okay.  Whichever corporate entity owned it, you chose

13    not to go with it?

14    A    Correct.  Yeah.

15    Q    Okay.  And then you were also asked about UPR; do you

16    remember that?

17    A    (Gesturing affirmatively.)

18    Q    Okay.  So now I want to direct your attention to what

19    is now in your binder as Tab 6, I believe.

20           MS. RHEE:  And at this time, we would like to

21    offer it into evidence.

22           MR. WOLIN:  Objection, Your Honor.

23           THE COURT:  Hold on a second.

24           This does not have a defense number on it.

25           MS. RHEE:  No, Your Honor.  This is --
```

167

Cross-examination - M. Wheatland

```
 1              MR. WOLIN:  It's hearsay as well.

 2              MS. RHEE:  I believe the exact same emails by

 3   Mr. Wheatland have been introduced already in the direct

 4   examination.

 5              THE COURT:  I think that's correct, so I'm letting

 6   it in.

 7              What number are we putting on it?

 8              MS. RHEE:  We're going to label this DTX 2530,

 9   just to be safe.  Yes.

10              THE COURT:  2530?

11              MS. RHEE:  Yes, Your Honor.

12              THE COURT:  All right.  It's in.

13      (Defense Exhibit Number 2530 admitted into evidence.)

14   BY MS. RHEE:

15   Q    Mr. Wheatland, you see this email exchange from

16   December of 2018 in front of you; correct?

17   A    Yeah, I see that.

18   Q    So let's start at the bottom, and it's from one of --

19   one of what may be an account representative at Google; is

20   that right?

21   A    Dmitry?

22   Q    Yes.

23   A    Yes.

24   Q    Okay.  Who is Dmitry?

25   A    He was one of our -- I don't remember his exact title.
```

168

Cross-examination - M. Wheatland

```
 1  One of our account managers or someone working on our
 2  account at Google.
 3  Q    Okay.  And that is an email from October of 2018
 4  addressed to you and others at The Daily Mail; yes?
 5  A    Yeah, I see that.
 6  Q    Okay.  And the title of this is called "Unified EB
 7  Pricing Rules - Alpha."
 8  A    Yeah.  I see that.  Yeah.
 9  Q    Okay.  And then if you have a chance to read through
10  it, do you see -- and if you can remember, that's even
11  better -- that you were offered by Google an opportunity to
12  alpha test UPR; do you remember that?
13              MR. WOLIN:  Objection, Your Honor.  This is not
14  Daily Mail's statements; it's a statement by Google, so I
15  renew the objection.
16              THE COURT:  Overruled.
17              THE WITNESS:  So this is -- just looking at it,
18  this is October 2018.
19  BY MS. RHEE:
20  Q    Correct.
21  A    Which is long before Google introduced the
22  functionality of UPR as it was when it was rolled out.
23  Q    I totally agree.
24  A    And this is, I think, just Exchange Bidding.  UPR for
25  Exchange Bidding.
```

169

Cross-examination - M. Wheatland

```
 1   Q    I just want to see if you remember this because this is
 2   the email that was sent to you.
 3            In October of 2018, do you recall that you were
 4   offered -- you, The Daily Mail, were offered the opportunity
 5   to alpha test --
 6            THE COURT:  Ms. Rhee, that's a long question.
 7            The direct question is:  Do you recall ever being
 8   offered the opportunity to participate in an alpha test of
 9   the Unified Pricing Rules?
10            THE WITNESS:  I don't actually recall it, but I
11   guess they reached out in email here, but I don't recall.
12   BY MS. RHEE:
13   Q    Okay.  Let's actually keep going up the chain to see if
14   this refreshes recollection.
15            You see that there's a response from you dated
16   October 24th of 2018 to Dmitry?
17   A    Yeah.
18   Q    And what do you say in response?
19   A    I say:  "Yes, this looks interesting.  Would love to
20   test and happy to give feedback."
21   Q    Okay.  And then does Dmitry then write back?  Do you
22   see that?
23   A    Yeah, I see that.
24   Q    Okay.  Then he follows up, and I think there are more
25   people from both Google and perhaps The Daily Mail.
```

Cross-examination - M. Wheatland

1              What do you see there as of December 6th, 2018?

2    A    Someone is saying "thanks for including us into the

3    alpha.  We'll play around with it on our end and flag if we

4    have any questions."

5    Q    Okay.  And are you reading Mr. Gan's response?

6    A    Yes.

7              MS. RHEE:  If we could pull that up.

8    BY MS. RHEE:

9    Q    Who is Mr. Gan?

10   A    Someone who works on the team at Daily Mail.  He's

11   someone that works on my team at Daily Mail.

12   Q    He's on your team?

13   A    Yes.

14   Q    And do you have any reason to doubt that you actually

15   took Google up on the opportunity to participate in this

16   alpha test?

17   A    I can't remember if we did or didn't.

18   Q    Okay.  But you don't have any reason to question the

19   email exchange that you participated in?

20   A    I could see it written here, yeah.  I can't remember if

21   we did.

22   Q    Okay.  And then after The Daily Mail alpha tested UPR,

23   did Google request feedback from The Daily Mail?

24   A    I can't remember.

25   Q    Okay.  So let's actually direct your attention to

                                                              171

```
 1    what's behind your binder in Tab 7.  And --

 2            MS. RHEE:  And, Your Honor, at this time we would

 3    offer that into evidence as well and mark it DTX 2531.

 4            MR. WOLIN:  We object, Your Honor.  This was never

 5    disclosed on the exhibit list.

 6            THE COURT:  Well, that's a different objection,

 7    and that's more legitimate.  All right.  Just ask the

 8    questions of the witness.

 9            MS. RHEE:  Okay.

10    BY MS. RHEE:

11    Q    You see, Mr. Wheatland, that you are on this email and

12    you write in?

13    A    Yeah, I can see.

14            MS. RHEE:  Okay.  At this time, Your Honor, we

15    would seek to introduce this into evidence.

16            THE COURT:  No.  No.  No.

17            MR. WOLIN:  Objection.

18            THE COURT:  Ask the substantive question and see

19    if the answer can come forward that you're looking for.  If

20    it doesn't, you can use it to refresh his memory, but that's

21    it.  It's not coming in.

22    BY MS. RHEE:

23    Q    You remember being asked -- or The Daily Mail being

24    asked about providing a quote for a Google blog post on the

25    Unified Pricing Rules?
```

172

1  A    Google asked us to assist them and provide a -- or

2  agree to a quote regarding both first-price auction and

3  Unified Pricing Rules.

4  Q    Okay.  And thank you for that clarification.

5        And did The Daily Mail actually approve a quote

6  for Google's use with respect to both the first-price

7  auction and the Unified Pricing Rules?

8  A    We ultimately approved a quote.  I think it's different

9  to this quote listed here, and we sort of I guess hedged and

10  watered it down a little bit more because it was before any

11  of this rolled out, so we weren't actually sure how -- what

12  the impact would be from the rollout.

13  Q    Okay.  So when you wrote here "the wording below seems

14  okay to me," did you mean it?

15  A    I remember speaking after this email thread to Rich

16  about this topic.  And as I say, we ultimately decided to, I

17  guess, water down this quote and say it has -- I think we

18  used the word like the possibility to increase transparency.

19  Something like that.

20  Q    Well, when you look at this email -- and hopefully it

21  refreshes recollection -- you see there's a very specific

22  quote that is teed up for senior executives' approval,

23  including you, and you weigh in "that wording seems okay to

24  me"; do you see that?

25  A    I see that's written here, yeah.

173

Cross-examination - M. Wheatland

```
 1   Q    Okay.  And that quote that you approved by saying "the
 2   wording looks okay to me," does not include the word
 3   "possibility"; right?
 4   A    I don't agree.  I approved to it.  I mean, I wrote
 5   these words, but there was conversations that continued
 6   after this email thread.
 7   Q    Well, let's now turn to DTX 714 --
 8        MS. RHEE:  Which is already admitted into
 9   evidence, Your Honor.
10   BY MS. RHEE:
11   Q    -- and you see, if you move into the second page of
12   this Google blog post about an update on UPR and first-price
13   auctions, that very quote that you were talking about in
14   your email thread here reflected on the Google blog post;
15   correct?
16   A    I think it's -- is it a slightly different quote?
17   Q    Well, you can take a look.
18   A    Yeah.  It's a slightly different quote.
19   Q    Okay.  And the slight difference is "an opportunity" is
20   inserted in the final quote?
21   A    I mean, it is a different quote.  There is a word, "it
22   gives an opportunity."
23   Q    Okay.
24        MR. WOLIN:  Objection, Your Honor.  We don't have
25   this in our records as an admitted exhibit, despite Google's
```

174

Cross-examination - M. Wheatland

```
 1    communication that it was.

 2            MS. RHEE:  I believed it was, Your Honor, with

 3    respect to Mr. Srinivasan.

 4            THE COURT:  Hold on.  Which witness do you think

 5    it came in through?

 6            MS. RHEE:  Mr. Srinivasan.

 7            MS. WOOD:  And the number is?

 8            MS. RHEE:  DTX 714.

 9            MS. WOOD:  Your Honor, I conducted the Srinivasan

10    examination.  I don't have it in my notes from that

11    examination.

12            MS. RHEE:  At least my understanding, and I

13    apologize, Your Honor, if we've got inaccurate notes, but I

14    believe that it came in through the cross-examination of

15    Mr. Srinivasan.

16            THE COURT:  What do you have, Katie?

17            THE DEPUTY CLERK:  I don't have it.

18            THE COURT:  We don't seem to have a record of it.

19            MS. RHEE:  Then I will move on, Your Honor.

20    BY MS. RHEE:

21    Q    Now, The Daily Mail uses the Amazon wrapper to engage

22    in header bidding?

23    A    We utilize Amazon Transparent Ad Marketplace.

24    Q    So yes?

25    A    Yeah.  That's one of their server-side wrapper
```

175

Cross-examination - M. Wheatland

```
 1   solutions.
 2   Q    Okay.  And The Daily Mail uses Google's Open Bidding?
 3   A    Correct.  Yeah.
 4   Q    And does The Daily Mail also use Prebid?
 5   A    Correct.
 6   Q    And are there any other header wrappers that The Daily
 7   Mail uses?
 8   A    They're the three -- they're the three main ones.
 9   Q    And do you recall whether or not there were internal
10   discussions about moving more demand -- or more header
11   bidding demand through Open Bidding and Amazon in comparison
12   to Prebid?
13   A    I think we had discussions around moving some
14   client-side header bidding to server-side header bidding,
15   but we found that, in general, client-side header bidding
16   makes more revenue.
17   Q    And was that despite the fact that the client sider --
18   client-side header bidding creates latency load issues?
19   A    I don't agree that it creates latency load issues at
20   the moment.
21   Q    If I could direct your attention to what's marked as
22   Tab 13 in your binder, Mr. Wheatland.  Let's see if this
23   refreshes your recollection.
24        Do you see here this is an email from you dated
25   May 11th, 2017 at the bottom there on the first page?
```

Cross-examination - M. Wheatland

```
 1   A     Yeah.

 2   Q     You see here -- why don't you read it with respect to

 3   "making the correct decision."

 4   A     Which part would you like me to read?

 5   Q     The last sentence here about "making the correct

 6   decision to move more demand server-side to create more

 7   price pressure while reducing the scripts loading on page";

 8   do you see that?

 9   A     Oh, I think this shows is helping us and that we are

10   making the correct decision to more demand server-side

11   versus via EBDA or -- to create price pressure while

12   reducing the scripts loading on page.

13              I see that's written here.

14   Q     Okay.  So at least as of May 2017, you thought that was

15   the correct decision; correct?

16   A     It was a decision that was discussed by the looks of

17   it.

18   Q     Well, you wrote the words "correct decision"?

19   A     I see it written here, yeah, but I don't remember

20   writing this.

21   Q     Okay.  Well, it has your name on it; yeah?

22   A     Yeah.

23   Q     Okay.  And then you remember being asked about PTX 1633

24   on your direct examination.

25              MS. RHEE:  And it's already introduced into
```

177

 1    evidence, so if we could pull that up.

 2    BY MS. RHEE:

 3    Q    Do you see that?

 4    A    Yeah.

 5    Q    Okay.  And there's a helpful kind of summary slide that

 6    ends in Bates Number 126.

 7              MS. RHEE:  So if we could go there.

 8    BY MS. RHEE:

 9    Q    You see that in front of you?

10    A    Yeah.

11    Q    Okay.  And it says on the first bullet point, the

12    observation:  "Post UPR MOL saw a modest uptick in ad

13    revenue percent share"; is that right?

14    A    I see that written here.

15    Q    Okay.  And what is MOL global?

16    A    MailOnline, which is another name for Daily Mail.

17    Q    Okay.  And so even though the revenue may have been

18    modest, but do I have the assessment right that the post UPR

19    observation is that revenue was up?

20    A    UPR rolled out with the first-price auction change, and

21    typically when exchange is moved to a first-price auction

22    model, you do see a bump in revenue in the short term.

23              Plus, I think traffic could have been up over this

24    time period.  There's many reasons why, you know, we may

25    have seen a modest uptick in AdX revenue percentage share.

178

Cross-examination - M. Wheatland

```
 1   Q    Okay.  I just want to make sure, though.  Whether it's

 2   modest or not, there was an uptick in revenue?

 3   A    It says here there was an uptick in revenue, but both

 4   Unified Pricing Rules and first-price auction was rolled out

 5   together.

 6   Q    Totally understood, and agree with you.

 7        But after the rollout of those different features,

 8   did Daily Mail lose money?

 9   A    We haven't had an increase in revenue from --

10   Q    Well, that's not the question.

11   A    -- the rollout in UPR.

12   Q    That's not the question, Mr. Wheatland.

13   A    And the share that went to Google increased

14   significantly.

15   Q    Let me try this again.

16        Mr. Wheatland, did Daily Mail lose revenue after

17   the rollout of UPR and Unified First Price Auction?

18   A    I don't know off the top of my head.

19   Q    Okay.  And then I want to direct your attention to more

20   of this email back-and-forth around what the Daily Mail

21   observed post UPR.

22        And you see there's an email from a Feifan Chen.

23   Who is Feifan Chen?

24   A    Feifan was someone that worked on my team.

25   Q    Okay.  Reported to you?
```

179

Cross-examination - M. Wheatland

```
 1   A     Yeah.

 2   Q     Okay.  And you're on this email, you're copied; right?

 3   A     Yeah.

 4   Q     And Feifan Chen writes:  "The good part of UPR is that

 5   finally Google starts doing 1PA."

 6             What is 1PA?

 7   A     I would understand 1PA to mean first-price auction.

 8   Q     Okay.  "And the test result shows Google's doing an

 9   honest 1PA after UPR which helped our rev"; yeah?  You see

10   that?

11   A     I don't know how he's come to that conclusion.  I don't

12   know.

13   Q     Okay.  But that is the conclusion that he reached, at

14   least as reported to --

15   A     I see Feifan wrote that here, but I don't know beyond

16   that.

17   Q     I just want to understand.  At least that's the

18   conclusion that somebody on your team reached and reported

19   to who is now the CEO and, to you, his boss?

20   A     Yeah, I see it's written there, yeah.

21   Q     Okay.  And then you talked about on direct examination

22   having one example of a European publisher who has two ad

23   servers; do you remember that?

24   A     Yeah.

25   Q     Who is that publisher?
```

180

Cross-examination - M. Wheatland

```
 1   A     My understanding is that it's Axel Springer.

 2             THE COURT:  I'm sorry, what?

 3             THE WITNESS:  Axel Springer.

 4   BY MS. RHEE:

 5   Q     Axel Springer has a lot of users as well; yeah?

 6   A     I don't know.

 7   Q     Now, with respect to the mechanics of UPR, I got a

 8   little confused in the back-and-forth on direct examination,

 9   so I want to see if we can clear this up.

10             When it comes to AdX, DFP and AdX, can you raise

11   the floor with respect to other exchanges if you are using

12   DFP AdX?

13   A     I don't think you can, no.

14   Q     Okay.  And so your testimony -- I just want to

15   understand.

16   A     Within the ad server?

17   Q     Yeah, within the ad server.

18   A     Within the ad server, but within the exchange.

19   Flooring is typically an exchange feature or technology.  So

20   we can set floors in all of our exchanges, yeah.

21   Q     And that's what I wanted to try to clarify.

22             I think what I heard from your testimony, and I

23   think what I'm hearing you say but want to make sure that

24   everybody's on the same page is, at least when it comes to

25   AdX, when AdX is the exchange, you must set a uniform price
```

181

Cross-examination - M. Wheatland

```
 1   floor; is that right?
 2   A    Correct.  Yeah.
 3   Q    Okay.  But when it comes to the other exchanges, I
 4   think then you're saying, well, the other exchanges may have
 5   different rules?
 6   A    You can set higher floors for other exchanges, for
 7   instance, in their exchange user interface.  So you can set
 8   higher floors for other exchanges than you can on Google,
 9   but you can't set lower floors for your other exchanges
10   versus Google.
11   Q    Okay.  But that's only with respect to the other
12   exchanges; yeah?
13   A    Sorry.  I don't understand the question.
14   Q    I just want to understand that when it comes to AdX as
15   the exchange, the rollout of UPR along with the Unified
16   First Price Auction, was that you needed to have uniformity
17   with respect to the floor; correct?
18   A    So Unified -- Unified Pricing Rules basically moved
19   Google AdX floors from the exchange level out into the
20   ad-server level, and just meant that that floor would
21   encompass all of your remnant or other non-Google demand
22   sources.
23   Q    And when you're testifying about the ability on other
24   exchanges to have higher or lower floors, that's outside of
25   DFP; is that right?
```

182

Cross-examination - M. Wheatland

```
 1   A    We work with a number of exchanges, and in those
 2   exchanges, we can set floors of the exchange level.
 3   Q    Okay.
 4   A    But ultimately the ad server runs a finer auction and
 5   decides what gets loaded on the page and at what price.
 6   Q    Now, finally, you talked about the filing of a lawsuit;
 7   correct?
 8   A    Correct.
 9   Q    Okay.  And you participated in answering questions
10   about the tools and their functionality in preparation for
11   that lawsuit; yes?
12   A    I spoke with our lawyers about the functionality of ad
13   tech.
14   Q    Okay.  And then did you have an opportunity to review
15   the complaint?
16             MR. WOLIN:  Objection.  Relevance.
17             THE COURT:  Well, I can't tell.  I haven't seen
18   the complaint, and I don't know where this is going.
19             Do you have a copy of it there you want me to see?
20             MS. RHEE:  Yes, Your Honor, and I believe that it
21   is in Tab -- Court's indulgence -- Tab 9.  And, in
22   particular, Your Honor, paragraphs 34 and 35.
23             THE COURT:  All right.  So what's the question?
24   BY MS. RHEE:
25   Q    Mr. Wheatland, are you aware that in the complaint that
```
                                                              183

Cross-examination - M. Wheatland

```
1    The Daily Mail filed with your assistance with respect to

2    tool functionality, that The Daily Mail views both Google

3    Ads and DV360 as two DSP offerings?

4    A    I did not write any of this.  This is our lawyers'

5    work.

6    Q    Well, do you agree with that?

7    A    DV360 is a DSP.

8    Q    And you see here that in The Daily Mail complaint, that

9    Google Ads is also referred to as a DSP?

10   A    Google Ads is a demand source that operates within AdX.

11        So the way that that connects into AdX is it will

12   submit a bid into AdX, but there is an ad network component

13   of Google Ads.  So if you're a buyer, you're essentially

14   buying from an ad network, but it will submit a bid into

15   Google AdX.

16   Q    I don't know if that answers my question.

17        Do you agree or disagree with The Daily Mail

18   complaint that Google Ads is also a DSP offering?

19   A    Google can bid into -- Google Ads can bid into Google

20   AdX, but typically a DSP will allow the buyer to set their

21   own sort of parameters and buy campaigns in real time from

22   an exchange.

23        An ad network will allow -- will on board

24   campaigns from buyers and sort of run that across port

25   supply.  So I don't know if I 100 percent agree with the
```

184

Cross-examination - M. Wheatland

```
 1   definition here that Google Ads is a DSP.
 2   Q    Okay.  So thank you for finally answering -- following
 3   up on the answer.
 4           If you don't agree 100 percent that Google Ads is
 5   a DSP offering; do you agree 90 percent?
 6               MR. WOLIN:  Objection.  Relevance.  Vague.
 7               THE COURT:  I'm going to overrule the objection.
 8               THE WITNESS:  So Google Ads buyers are typically
 9   small- and medium-size buyers, and they will input their --
10   the campaign will be run by Google Ads.  So Google Ads,
11   itself, is probably closer to an ad network than it is a
12   DSP, but it can bid into Google AdX.  Typically when you
13   purchase inventory through Google AdWords, you're not
14   necessarily purchasing on a CPM basis.
15   BY MS. RHEE:
16   Q    So I'm not sure if I know the answer to the question.
17           If you don't agree 100 percent that Google Ads is
18   a DSP offering, do you agree 90 percent?
19   A    I don't have an exact percentage to put on it.
20   Q    Is it more than 50 percent?
21   A    It's -- I mean --
22   Q    Yes or no, Mr. Wheatland.
23   A    Google Ads I would call an ad network.
24   Q    So do you agree 50 percent or no?
25   A    So I would call Google Ads an ad network, yeah.
```

185

Redirect examination - M. Wheatland

```
 1    Q    So you disagree with The Daily Mail complaint that was

 2    filed?

 3                MR. WOLIN:  Objection.  Asked and answered.

 4                THE COURT:  Now I'm sustaining it.

 5                MS. RHEE:  No further questions, Your Honor.  We

 6    pass this witness back.

 7                THE COURT:  Okay.  Any redirect?

 8                        REDIRECT EXAMINATION

 9    BY MR. WOLIN:

10    Q    Mr. Wheatland, just a few questions.

11                Do you recall being asked about the email exchange

12    where you discussed an alpha test to UPR?

13    A    Yeah.

14    Q    And at that time, you didn't -- did you know what

15    impact UPR would have on Daily Mail?

16    A    No.

17    Q    Does the document that we looked at, PTX 1633, contain

18    the analysis that you did after UPR was implemented?

19    A    No.

20    Q    What analysis is in PTX 1633?

21    A    This is the analysis when UPR was rolled out and we

22    could see the impact from UPR after it was rolled out.

23    Q    And counsel for Google asked you about a slide that is

24    on the page with Bates number ending in 126 when she asked

25    you about the language modest uptick.
```

186

Redirect examination - M. Wheatland

```
 1   A     Yeah.

 2   Q     And do you recall that?

 3   A     Yeah.  I see that.  Yeah.

 4   Q     And then on the -- did you testify during -- or what

 5   did you testify about on direct about the reason for that

 6   uptick in revenue?

 7   A     Google rolled out first-price auctions.

 8             MS. RHEE:  Your Honor, asked and answered.

 9             THE COURT:  Yeah.  That's not an appropriate

10   question.  Redirect is not to repeat what you said on

11   direct.

12             MR. WOLIN:  Understood.

13             THE COURT:  It's meant to correct what came out on

14   cross.

15   BY MR. WOLIN:

16   Q     So you were also asked about this -- the email from

17   Mr. Chen on the Bates number ending in 124.

18             MR. WOLIN:  Could you pull that up, please.

19             MS. RHEE:  It's the same exhibit?

20             MR. WOLIN:  The same exhibit.  If we could have

21   the next page, Mr. Klein.  And we'll go to the paragraph of

22   the email from Mr. Chen.

23   BY MR. WOLIN:

24   Q     And you were asked about the sentence:  "The good part

25   of UPR is that finally Google started doing 1PA"; is that
```

187

Redirect examination - M. Wheatland

```
1    correct?

2    A     Yeah.  I see that.

3    Q     And what does 1PA refer to?

4    A     It refers to first-price auction.

5    Q     And was that the separate feature from UPR?

6          MS. RHEE:  Your Honor, I think this has already

7    been asked and answered.

8          THE COURT:  Sustained.

9          THE WITNESS:  First-price auction is --

10         THE COURT:  Wait.  Wait.  There's no question.

11         THE WITNESS:  Sorry.

12         THE COURT:  Sustained means I've granted the

13   objection.

14         THE WITNESS:  Sorry.

15   BY MR. WOLIN:

16   Q     So one of the first topics you were asked about was

17   Facebook and social media; do you recall that?

18   A     Yeah.

19   Q     Could Daily Mail uses social media to sell advertising

20   inventory on its website?

21         MS. RHEE:  Your Honor, I think those all have been

22   asked and answered as well.

23         THE COURT:  No, I don't think that's new.  I heard

24   it.

25         MR. WOLIN:  Well, this is responding to the cross.
```

188

Redirect examination - M. Wheatland

```
 1                    THE COURT:  But I --

 2                    MR. WOLIN:  I think I asked a separate question.

 3                    THE COURT:  It's getting late in the day and late

 4      in the trial.  I've heard this.  Okay.  His answer.  I know

 5      what they said -- what he said.

 6                    MR. WOLIN:  Thank you, Your Honor.

 7                    THE COURT:  Let me ask you a question, and if it

 8      raises an issue that you want to address in redirect, and

 9      you can do it on recross.

10                    Does The Daily Mail have video displays on sides

11      or bottom of its page; do you know?

12                    THE WITNESS:  We run some video units on the

13      bottom of our pages.  Typically they are sort of now --

14      there's a gray area between instream versus outstream

15      advertising, and the definition has changed over time.

16      Typically instream advertising occurs when you have content

17      and you will show ads at like -- as like a pre-roll or

18      linear to the content.

19                    Outstream is when there's not any content, per se,

20      but you're just rendering a video ad.  But we do have video

21      ads on our site.

22                    THE COURT:  Are they considered display ads or

23      video ads, or does it depend on what you just said?

24                    THE WITNESS:  I think it depends.  We would --

25      outstream is sometimes -- outstream video is sometimes
```

189

Re-cross examination - M. Wheatland

1    referred to as, like, display ads.  Because it's basically

2    just an ad unit, and in that ad unit, you could have text,

3    you could have image, you could have a little video.  And I

4    think that's kind of separate to proper instream video,

5    which is sort of primarily across, like, YouTube, streaming

6    services.

7           We do have some on our side what I would call sort

8    of proper instream video where we would have, you know,

9    large player size, large video player size on our article

10   where the video content is related to the article that

11   you're reading.  So the user will then click play, the sound

12   will be on, and potentially they'll sit through a pre-roll

13   video ad before the content starts.  But we don't generate

14   much revenue from that type of instream video.

15          THE COURT:  Thank you.

16          MR. WOLIN:  Thank you, Your Honor.

17          And thank you, Mr. Wheatland.  We have no further

18   questions.

19          THE COURT:  Ms. Rhee.

20                   RECROSS EXAMINATION

21   BY MS. RHEE:

22   Q    Just a quick follow-up from the --

23          MS. RHEE:  Thank you, Your Honor.

24   BY MS. RHEE:

25   Q    Mr. Wheatland, just a very quick follow-up from the

190

Recross-examination - M. Wheatland

```
 1    Judge's question.
 2            Those pre-roll video ads, Mr. Wheatland, do they
 3    always appear on the bottom of a Daily Mail website, or can
 4    they appear on the top of the Daily Mail website as well?
 5    A    They can appear in different locations on the website.
 6    Q    Okay.  So not always in the bottom; yeah?
 7    A    Not always in the bottom.
 8    Q    And sometimes on the top where you want to draw the
 9    reader's attention to the thing that follows pre-roll?
10    A    No.  Typically if they're higher than that, they will
11    be in the body of the article where the user's reading an
12    article and the article could be about something that
13    occurred and we have a video of what occurred, and the user
14    could click play, it will be sound on, and they would have a
15    pre-roll video play ahead of that content.
16    Q    Okay.  And if the article is potentially a popular one,
17    you would feature it higher up on the site; yeah?
18    A    Our editors will sort of promote content around the
19    site depending on what they think wants to be read.
20    Q    Okay.  And that all appears on the website version of
21    The Daily Mail?
22    A    That's on the website version.
23            MS. RHEE:  Okay.  Thank you, Your Honor.
24            THE COURT:  All right.  Does anybody anticipate
25    calling Mr. Wheatland again?
```

191

Recross-examination - M. Wheatland

```
 1              MR. WOLIN:  Yes, Your Honor.  We may re-call him

 2    in rebuttal.

 3              THE COURT:  All right.  Sir, I can't release you.

 4    You can go home today -- not back to the UK but to wherever

 5    you are here.  Just stay in touch in case you're needed.

 6    You're not to discuss your testimony with any witness who

 7    has not yet testified.  Thank you.

 8                  (Witness excused at 3:03 p.m.)

 9              THE COURT:  All right.  Who is your next witness?

10              MS. WOOD:  We have two read-ins, Mr. Bradbury and

11    Ms. Pappu, and then we'll have a live witness after that.

12              THE COURT:  Okay.  Now, I need to know, what's the

13    time estimate as to how long the read-ins are going to take?

14              MS. WOOD:  The read-ins are roughly about 25 to

15    30 minutes for the first one, and about 20 minutes for the

16    second one, Your Honor.

17              THE COURT:  All right.  That's fine.  Let me get

18    my clerk in here.

19              MS. WOOD:  Thank you, Your Honor.

20              And, Your Honor, we are reading some of these in

21    for efficiency sake, so we do appreciate the cooperation of

22    chambers with providing us someone to help read them in.

23              The portions that we'll be reading in are in the

24    first tab that says designation digest, and then the full

25    transcript is behind that.
```

Case 1:23-cv-00108-LMB-JFA   Document 1343   Filed 09/30/24   Page 193 of 237 PageID#
98005
Read-in deposition - R. Bradbury

```
 1                 THE COURT:  All right.

 2                 MS. WOOD:  And again, for efficiency, we'll just

 3       have one attorney reading both parts, the examination by

 4       both Google's counsel and plaintiffs' counsel.

 5                 The deposition of Robert Easton Bradbury, III was

 6       read as follows:

 7       Q    My name is Lauren Kaplin.  I just introduced myself.

 8       I'm here representing Google.

 9                 Can you state your full name again for the record?

10       A    Yes.  Full name, Robert Easton Bradbury, III.  Bo is

11       the nickname, so more manageable.

12       Q    And who's your current employer?

13       A    GSD&M.

14       Q    Okay.  Okay.  Your job title currently?

15       A    Senior vice president, managing director.

16       Q    Okay.  So you've been doing marketing and advising then

17       for 30 -- 30 years or so?

18       A    Yes, ma'am.

19       Q    What was your first position at GSD&M?

20       A    Account director in our business development group.

21       Q    And how long did you hold that position for?

22       A    Approximately one year before transitioning into an

23       account director leadership role on a new piece of business

24       that the agency was fortunate enough to secure.

25       Q    What business was that?
```

                                                                    193

Read-in deposition - R. Bradbury

```
 1    A     That was Charles Schwab.

 2    Q     And how long were you in that role?

 3    A     I would say three years or so.

 4    Q     What about after that?

 5    A     Following that, I had the pleasure of supporting many

 6    clients over my time at GSD&M from there, supported some

 7    packaged goods, clients, Dial, Purex, Renuzit, Southwestern

 8    Bell Communications in the technology space, AARP in the

 9    advocacy membership space.  As well as some projects along

10    the way, Texas A&M University, Barbasol.  And then had the

11    pleasure of being asked to lead our United States Air Force

12    partnership when a colleague retired.  So I've been

13    supporting that as the lead role for 12 years, going on 13.

14    Q     Do you consider what types of media to use for a

15    campaign?

16    A     Yes.

17    Q     How?

18    A     It would be twofold, really, of what is the client

19    objective for the particular initiative that is being

20    supported.  Then a consideration of the audience that we're

21    trying to reach to achieve that objective.  And those

22    audiences again each have different habits and practices in

23    terms of communication consumption.

24          And so we rely on certainly syndicated data,

25    first-party data that the Air Force may have, as well as our
```

194

Read-in deposition - R. Bradbury

```
 1    observations as a subject matter expert on behalf of the Air
 2    Force to assess and see and ultimately select the platforms
 3    which we recommend to the Air Force to pursue.
 4    Q    So you mentioned there's a number of things you take
 5    into account, two of them include the audience and the
 6    objective?
 7    A    Yes.
 8    Q    Can you describe the target audience for the US Air
 9    Force?
10    A    Certainly.  I would say the United States Air Force is
11    a large complex organization with many career fields.
12              THE COURT:  Let me stop for a second.
13              The Air Force is out of this case.  Why are we
14    doing this?
15              MS. WOOD:  Because the defendant has listed I
16    believe nine different FAA witnesses on their witness list.
17              THE COURT:  I'm not going to have nine FAA
18    witnesses testify.  I can tell you that right now.
19              MS. WOOD:  Okay.
20              THE COURT:  But, I mean, the Air Force is not
21    here.  It's irrelevant about the Air Force.
22              Now, if there's something more specific --
23              MS. WOOD:  These do go to market definition.  The
24    issues that relate to how advertising agencies such as GSD&M
25    on behalf of the Air Force think about open-web display ads
```

Read-in deposition - R. Bradbury

```
 1   as a category.
 2             THE COURT:  Let's get right to that.  Where in the
 3   transcript?
 4             MS. WOOD:  I will note this is in the part of the
 5   transcript that was designated by defense counsel, so I'm
 6   happy to move on, and they can follow up with Your Honor.
 7             THE COURT:  Well, I'm beginning to think -- I
 8   mean, I don't know how large a redirect -- rebuttal case
 9   we're going to have, if any.
10             But right now, this would not appear to be
11   relevant to the issues that are in this case, and/or it's
12   redundant.
13             I've already heard from other advertiser-side
14   folks about how, you know, you have to match the objectives
15   to the audience.  There's nothing new there.  I don't need
16   to hear it five times; okay?
17             MS. WOOD:  Understood, Your Honor.  If we do have
18   some further information about how the -- this ad agency
19   recognizes open-web display and the unique targeting
20   associated with open, but if Your Honor feels like that's
21   cumulative at this point, we'll move on with a different
22   deposition.
23             THE COURT:  All right.  Let me hear from Google,
24   Ms. Dunn.
25             MS. DUNN:  Thank you.
```

196

Read-in deposition - R. Bradbury

1          Your Honor, we don't intend to call nine federal

2    agency advertisers; we do intend to call some of them,

3    because as counsel for the government just said, this is

4    relevant to market definition, just as the plaintiffs

5    calling various advertisers --

6          THE COURT:  Well --

7          MS. DUNN:  -- was relevant.

8          THE COURT:  -- the market definition doesn't have

9    anything to do with the U.S. Military; it has to do with

10   what is -- whether we're talking about -- the whole fight,

11   as I've thought, or one of the main fights is whether

12   they're talking about simply basically open-web advertising.

13   It doesn't make any difference if it's the U.S. military or,

14   you know, Proctor & Gamble.

15         MS. DUNN:  So I agree that it could be any one of

16   a number of advertisers or market participants, but just as

17   plaintiffs have called Goodway and GroupM and other

18   advertisers, these are the advertisers who were deposed in

19   this case.

20         THE COURT:  It doesn't make any difference.  It

21   doesn't mean we're going to hear them at trial.  We need to

22   keep the case focused; all right?

23         MS. DUNN:  Understood.  And they will not be long

24   exams, entirely not cumulative.  But these are important

25   witnesses to Google's defense in this case, and so we would

                                                          197

Read-in deposition - R. Bradbury

```
 1    like -- we'd ask Your Honor to give us the opportunity to

 2    demonstrate to Your Honor that they are relevant rather than

 3    cutting this off ex ante.

 4              THE COURT:  This is your witness?

 5              MS. DUNN:  There's designations and

 6    counter-designations.  This witness is not our witness.  We

 7    have different witnesses.

 8              THE COURT:  All right.  All right.  Why don't we

 9    do this, you have some live witnesses out there?

10              MS. WOOD:  We do, Your Honor.  We also have some

11    deposition designations of Google adverse witnesses that we

12    would like to play, and we can pivot to those right now.

13              THE COURT:  Let's go to those.  I'll give you,

14    again, overnight.  You can look at this deposition.  If

15    there are new pieces of information, all right, that are

16    relevant to either side's case that are within the

17    designations, we can hear them tomorrow.  All right.  Okay.

18              So who is the next witness?

19              MS. DUNN:  Thank you, Your Honor.

20              MS. WOOD:  The read-in of Ms. Pappu.

21              THE COURT:  I should probably have Ms. Reno come

22    in to do that.  This witness is female; is that right?

23              MS. SESSIONS:  Yes, Your Honor.

24              THE COURT:  I won't switch, but anyway.

25              MS. GARCIA:  Good afternoon, Your Honor.  Kelly
```

198

```
 1    Garcia.
 2            What you're receiving right now should be a binder
 3    that contains the designations from both sides.  It also
 4    will have deposition exhibits that are also being offered
 5    into evidence.  One of those exhibits is PTX 612, which I
 6    understand is already in evidence.  The other two are
 7    PTX 618 and PTX 572.  Those are subject to our stipulation,
 8    and we've met and conferred about this, and I understand
 9    there's no objection.
10            MS. SESSIONS:  That's correct.  No objection.
11            THE COURT:  All right.  They're both in.
12      (Plaintiffs' Exhibit Numbers 618 and 572 admitted into
13                          evidence.)
14            MS. GARCIA:  There are three supplemental
15    documents that we believe buttress and elucidate the
16    testimony and are going to be handed up -- or have just been
17    handed up to you -- are going to be handed up to you now.
18    Those are PTX 373.
19            THE COURT:  Wait.  743?
20            MS. GARCIA:  373.
21            THE COURT:  373.  Go ahead.
22            MS. GARCIA:  373, and those are comments to a
23    document that Your Honor heard about yesterday with
24    Mr. Jayaram.
25            The next one is PTX 851.
```

                                                              199

Read-in deposition - A. Pappu

```
 1               THE COURT:  All right.

 2               MS. GARCIA:  And I believe Your Honor's seen this

 3    before.  This is a reference to chats and the term Vegas.

 4               The last is PTX 1033, and this is also a reference

 5    to the witness's uses of chats.

 6               THE COURT:  All right.  Any objection to those

 7    three coming in?

 8               MS. SESSIONS:  No, Your Honor.

 9               THE COURT:  All right.  All three are in.

10    (Plaintiffs' Exhibit Numbers 373, 851 and 1033 admitted into

11                            evidence.)

12               MS. GARCIA:  And for efficiency sake, I'll be

13    reading the questioning from both plaintiffs and defendant.

14               THE COURT:  All right.

15               The deposition of Aparna Pappu was read as

16    follows:

17    Q    Could you please start by stating your full name on the

18    record?

19    A    Full name is Aparna Pappu.

20    Q    When did you first begin work at Google?

21    A    I -- it's a bit of a complicated answer.  I actually

22    was working for DoubleClick, and I believe it was -- started

23    in 2008, I want to say, or 2007.  And then Google acquired

24    DoubleClick in 2008.  And so, technically, I started on

25    Google when the acquisition completed.
```

Read-in deposition - A. Pappu

1   Q    Did there come a time when your role at Google changed?

2   A    Yes.  Many times.

3   Q    What did you do right after this?

4   A    I don't recall the exact timelines, but my

5   responsibilities increased.  At one point, I was made

6   responsible for the front end, the user interface that

7   publishers, you know, could configure the ad server with,

8   and then progressively became responsible for more and more

9   parts of the publisher ad server.

10  Q    Okay.  You mentioned that after you were responsible

11  for the front-end user interface, your role changed again

12  and you gained more responsibilities.

13       Do you recall approximately when that was?

14  A    After I was running the front end and the forecasting

15  system, I actually changed roles.  I don't recall when.

16  Honestly, can't recall at all when, but I was made

17  responsible for the Google Ad exchange.  The engineering

18  team, I should say.

19  Q    Was that roughly before or after 2013?

20  A    I just can't recall the exact dates.  I don't remember.

21  Q    After 2010?

22  A    Yes.  I believe it was after 2010.  Yes.

23  Q    When you say you were made responsible for Google ad

24  exchange, what were some of your responsibilities?

25  A    One was, you know, running the engineering team, all

201

Read-in deposition - A. Pappu

```
 1   the classic things of, like, making sure that we had great
 2   managers on the team, helped career growth for the folks on
 3   the team that we had meaningful kind of prioritized lists of
 4   work to do and things like that, so just --
 5   Q    Did you have any other roles at Google?
 6   A    After that?
 7   Q    Correct.
 8   A    So after being responsible for the ad exchange, at some
 9   point, I can't remember exactly when, I was made responsible
10   for the DFP, DoubleClick for the Publishers' ad serving
11   team, or the team that -- the team that built the system, as
12   well the ad exchange.  So both those teams.  And then at
13   some point after that was also made responsible for the
14   AdSense team, and then I left the ads team.
15   Q    When did you leave the ads team?
16   A    I left in 2018.
17   Q    You mentioned AdSense.
18        What is AdSense?
19   A    AdSense is a product for publishers also, typically
20   smaller publishers where they can put a tag on their page
21   that allows them to call Google for ads basically.
22   Q    And how did AdSense differ from DFP at that time?
23   A    It's quite a big question, I would say.
24        AdSense was a more -- was a much more simple
25   product with very few controls because it was meant for very
```

202

Read-in deposition - A. Pappu

```
 1   simple kind of publisher-use cases, if you will.
 2   Q    In your prior answer, you mentioned smaller publishers.
 3   A    Yes.
 4   Q    How would you use that term?
 5   A    Meaning publishers who didn't have a team who could
 6   configure, like, could hire people to run an ad server and
 7   things like this, because it requires people to administer.
 8   Q    And then, by contrast, how would you use the term large
 9   publishers?
10   A    A publisher that had a team that would set up inventory
11   that actually had sort of a direct sales team that would
12   sell this inventory and, you know, just more complexity as a
13   result of that.
14   Q    And what product, if any, did Google market towards
15   large publishers?
16   A    DFP was the product that we built for large publishers.
17   Q    Do you uses chats to communicate with co-workers at
18   Google?
19   A    Yes.
20   Q    How do you refer to those chats?
21   A    Chat.
22   Q    Okay.  And have you ever used chats to refer to --
23   excuse me.  Strike that.
24           Have you ever used chats to communicate with
25   co-workers about any aspects of Google's digital advertising
```

203

Case 1:23-cv-00108-LMB-JFA   Document 1343   Filed 09/30/24   Page 204 of 237 PageID#
98016
Read-in deposition - A. Pappu

1    business?

2    A     You mean for work?  Yeah.  We use chat as part of our

3    normal day-to-day.

4    Q     Have you taken any affirmative steps to preserve chats

5    since receiving a litigation hold in this case?

6    A     I just follow whatever the system is.

7    Q     So can you tell me one way or the other whether you

8    took steps to turn history on when discussing substantive

9    matters?

10   A     For work today, I think history is on by default now,

11   but different -- different chat, I gesture, configurations

12   had different settings for these things.  So, yeah.

13   Q     You said history is on by default now.

14              Was there a time when history was not on by

15   default?

16   A     Yes.  I think it depended on I believe ad hoc chats,

17   because these are informal kind of not super relevant in

18   some sense.

19              THE COURT:  All right.  Now let me stop again.

20              This is repetitive.  I've heard it dozens of

21   times.  I'm expecting that these depositions should be

22   further redacted and corrected so I'm only taking my time to

23   hear new information.  All right.

24              Since you said this was going to be short, I'm

25   going to let you get away with it, but I don't want anymore

                                                              204

 1   depositions coming in that are simply repeating what I've

 2   heard multiple, multiple times.

 3           All right.  Go ahead.

 4           MS. GARCIA:  Understood, Your Honor.  And I could

 5   further abbreviate it, but I'm not sure who designated what.

 6           THE COURT:  All right.  Well, you have tonight to

 7   start doing that on any other depositions that either side

 8   plans to introduce.

 9           MS. GARCIA:  Thank you, Your Honor.

10           THE WITNESS:  Like, just chitchat and that kind of

11   thing, and those ad hoc chats, I believe, were history of.

12   Q    And how did you distinguish between the ad hoc chat, as

13   you described it, and a substantive chat?

14   A    Just a force of habit usually to have substantive kind

15   of conversations over email, and chat -- and chat was more

16   chitchat.

17   Q    So just to be clear, were there any different types of

18   chats that you could use at the time to have substantive

19   conversations?

20   A    I don't know what that means.

21   Q    If you wanted to have a conversation, a casual

22   conversation with a co-worker via chat, would you use the

23   same chat system --

24   A    Yes.

25   Q    -- as you would use to have a more substantive

                                                              205

Read-in deposition - A. Pappu

```
  1  conversation?
  2  A    Yes.
  3  Q    You said you left your role in -- on the ad side in
  4  approximately 2018?
  5  A    Yes.
  6  Q    Do you recall whether history was on default at the
  7  time you left your position in 2018?
  8  A    I don't recall.
  9  Q    And if the default setting on a group chat were history
 10  off, to your knowledge, how long would those chats be
 11  preserved?
 12  A    No idea.
 13  Q    When you were managing AdX but not additional products,
 14  can you give me an example of a feature that you developed
 15  during that time?
 16  A    Let's see.  Not very clearly.  But I can remember one
 17  which was about sizes, like creative sizes.  Like,
 18  publishers would say, show an ad of this size or this size,
 19  and then we'd have to make sure that we matched it
 20  correctly.  And it was always tricky because the creative,
 21  you know, you can't always tell for sure if it's the exact
 22  size or not and how do you enforce it and things like this.
 23  So that's the only one I have a vague recollection of.
 24  Q    Okay.  And when you moved to become VP of AdX and DFP,
 25  can you give me an example of a feature that you worked on
```

206

Read-in deposition - A. Pappu

```
 1   during that time?

 2   A    So in 2017 when I was VP -- feature.  So I wouldn't

 3   call it a feature, but there was definitely a lot of work

 4   being done with respect to -- you know, in general I would

 5   say this whole area of how do we make sure that we have

 6   infrastructure that isn't duplicated across the ad exchange

 7   and DFP, which were separate systems.  And then how do we

 8   make sure that when we do ad serving across these systems,

 9   that we were as efficient as possible.  We had a major

10   project around -- at the time that I was leaving around

11   header bidding and something called Exchange Bidding.

12   That's kind of what I recall.

13   Q    Was GDN an advertiser ad network?

14   A    I don't know what that definition is, so it's basically

15   what I described it, so ...

16   Q    Sure.  So if an advertiser participated in both AdX and

17   an alternative ad exchange, could a publisher access that

18   advertiser's budget through either AdX or ad exchange?

19   Excuse me.

20   A    You could, yes.

21   Q    Could publishers uses header bidding as a way to

22   generate more revenue?

23   A    Unclear to me if that is true or not.

24   Q    Just trying to understand what you meant when you said

25   "advertiser budget" before in this context.
```

207

Read-in deposition - A. Pappu

```
 1              The advertiser budget refers to how much an
 2   advertiser is willing to spend?
 3   A     Correct.
 4   Q     And so a publisher might use header bidding to access
 5   that willingness to spend by another publisher?
 6   A     Possibly.
 7              THE COURT:  By another advertiser.
 8              MS. GARCIA:  Advertiser.  Excuse me.
 9              THE WITNESS:  Possibly.  But, you know, most of
10   the time they sell their own inventory, and it's the
11   leftover inventory that goes through the exchanges.  And so,
12   yes, for this additional leftover inventory, the demand you
13   could get from advertisers could be spread out on multiple
14   exchanges, could show up in many ways.  That's a pretty
15   complicated ecosystem, so I don't know that I know the full
16   answer.
17   Q     Do you recall any suggestions by Google executives that
18   Google's buy-side products should only buy on AdX
19   impressions that are exposed through AdX to dry out header
20   bidding?
21   A     We had many discussions on why you should buy on AdX,
22   because it is a clean exchange, and that we protect users,
23   protect advertisers, protect publishers.  And so we were --
24   because I worked on the sell-side, you know, was proud of
25   the AdX that we built.  And so in order to continue to live
```

208

Read-in deposition - A. Pappu

```
 1   up to those principles of healthy ecosystem and so on, I was
 2   always a proponent of buying on the exchange -- on the
 3   Google Ad exchange.
 4   Q    How did AdX protect publishers?
 5   A    There were many publisher features built in the
 6   exchange from protecting against malware, bad JavaScript.
 7   You know, if a publisher said no ads of a certain type of
 8   advertiser, then you would have to make sure that the
 9   winning ad, even if it won, actually met that criteria.
10           So there's a number of things that helped protect
11   the publisher's brand, because you might not want crappy
12   belly-fat ads or whatever on your page.  So all of those
13   things took a lot of engineering to get right.
14   Q    You don't know whether these offerings were unique to
15   AdX; is that right?
16   A    I don't know if they were unique, but I know we had
17   invested a lot, especially in the malware side of the house,
18   and it was -- kind of a difficult problem.  So I don't know
19   if anyone else had something as good.  I'd be surprised, but
20   they could have.
21   Q    You mentioned features of AdX that were good for the
22   ecosystem; do you recall that?
23   A    Yes.
24   Q    Can you give me an example of features of AdX that were
25   good for the ecosystem?
```

209

Read-in deposition - A. Pappu

```
 1   A    The one I just gave about not accidentally loading

 2   malware on the end user's machine, adhering to the rules

 3   that a publisher might have set.

 4           So, for example, if you had, say, show this ad,

 5   show an ad only of this size, it would be pretty bad user

 6   experience if the ad had JavaScript that just took over the

 7   whole page, because that's not what the publisher intended.

 8   So kind of -- those kinds of things are examples.

 9   Q    Sitting here today, are you aware of any specific

10   publisher that considered turning off AdX but decided

11   against it?

12   A    I don't recall these details, no.  Sorry.

13   Q    Do you recall ever telling a publisher that they should

14   not turn off AdX?

15   A    I do not.

16   Q    Do you recall being present when anyone from Google

17   told the publisher that they should not turn off AdX?

18   A    I do not recall.

19   Q    Can you name any specific publishers that previously

20   used AdX and then stopped using it?

21   A    I cannot recall.

22   Q    Setting aside names, do you recall whether or not there

23   were any publishers that used AdX and then stopped using it

24   during your tenure?

25   A    I don't recall if it happened or not, but I'm sure --
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Read-in deposition - A. Pappu

```
 1   publishers change configurations all the time, so it's not
 2   really something I look at.
 3   Q    You can't recall a specific example of a publisher that
 4   stopped using AdX; is that right?
 5   A    That's right.
 6   Q    Ms. Pappu, you are being handed what's been marked
 7   Pappu-lit Exhibit 2, which is a document with a Bates number
 8   beginning GOOG-DOJ-11781035.  The metadata produced with
 9   this document, which is on the first page, indicates that
10   the document was a corresponding attachment with the Bates
11   stamp GOOG-DOJ-28501644.  And the exhibit itself contains
12   both documents.
13          Please take a moment to look it over, and I'll
14   direct you to certain pages again.  But please familiarize
15   yourself, and let me know when you are ready.
16          All right.  Ms. Pappu, are you familiar with this
17   document?
18   A    Not familiar, no.
19   Q    You don't recognize the document?
20   A    I am kind of reaching into my memory, to be honest.  I
21   know the concepts in here.
22   Q    Is there anything about the document that suggests to
23   you that this is not a document that came from your files?
24   A    I'm sure it was in my drive somewhere for sure.
25   Q    And what is it, for the record?
```

211

Read-in deposition - A. Pappu

```
 1   A     It looks like it's a strategy paper.  Usually we do
 2   strategies.  Some of it's in Google, different parts of
 3   Google at different times, and we submit ideas for
 4   discussions.
 5   Q     Okay.  I'm going to start by reviewing the second
 6   document after the blue sheet.  But, first, could you tell
 7   me what the first document is?
 8   A     Oh.  It sounds like it might be comments.  The first
 9   document to a different document.  So I'm not sure which
10   document these comments refer to.
11   Q     So I can represent to you that the metadata reflects
12   that these comments correspond to the pricing strategy
13   document.
14   A     Got it.
15   Q     You mentioned before that you remembered -- strike
16   that.
17         Does reviewing the document refresh your
18   recollection about materials discussed in the document?
19   A     Not really.  It's a long time ago.  So this all
20   computes, but yeah.
21   Q     Do you recall that you were involved in discussions
22   regarding AdX's revenue share levels in July 2018?
23   A     I don't recall, but I see the comments here.
24   Q     It says:  "GDN demand via our sell-side products has
25   the highest value to publishers because they treat networks
```

212

Read-in deposition - A. Pappu

```
 1   like GDN as new revenue that they could not get on their

 2   own"; do you see that?

 3   A    Yes.

 4   Q    This is a reference to GDN demand being available to

 5   publishers almost exclusively through AdX; is that right?

 6   A    That's not right.

 7   Q    At the time, GDN demand was available to publishers

 8   through other means besides through AdX?

 9   A    Yes.

10   Q    What were those other means?

11   A    Through AdSense.

12   Q    Any other ways?

13   A    Those are the two I know of.

14   Q    Was GDN demand available to publishers through any

15   non-Google products?

16   A    GDN, representing the buy-side, could bid and do

17   whatever they wanted.  I know that they had this AWBid

18   product, which allowed them to bid on other exchanges.

19   Q    Okay.  So what is AWBid?

20   A    It was a way for GDN to bid on other exchanges.

21   Q    Was it a feature of GDN?

22   A    You could call it a feature, yes.

23   Q    And approximately when did Google develop AWBid?

24   A    I don't recall.

25   Q    Do you recall whether or not it was during the
```

213

Read-in deposition - A. Pappu

```
 1    five-year period that we were speaking about earlier, 2013

 2    to 2018?

 3    A    Yes.  I think it was in that period, not before.

 4    Q    So other than AdSense and AWBid, can you think of any

 5    other product or any other way that publishers could get

 6    access to GDN demand in July 2018?

 7    A    Not really, no.

 8    Q    I should say, other than AdX -- AWBid and AdX, could

 9    you think of any other way that publishers could get AdX --

10    could get access to GDN demand?

11    A    So sorry.  Say that again.  I lost track of all the

12    acronyms.

13    Q    That's fair.

14              So other than AdSense, AWBid and AdX --

15    A    Yeah.

16    Q    -- can you think of any other way that publishers could

17    get access to GDN demand in July 2018?

18    A    I can't really think of any other way, no.

19    Q    So the sentence we were just reading makes reference to

20    AWBid, and in parentheses says 3.5 percent of GDN gross

21    revenue; do you see that?

22    A    Yes.

23    Q    At this time, less than 4 percent of GDN gross revenue

24    was on AWBid?

25    A    It sounds like it from this sentence.
```

214

Read-in deposition - A. Pappu

1  Q     Before Google developed AWBid, was there a way that

2  publishers could get access to GDN demand other than AdSense

3  and AdX?

4  A     Not that I recall, no.

5  Q     So going over to the next page, the top of the page

6  ending 1646, it says:  "Publishers frequently set a higher

7  floor for AdX"; do you see that?

8  A     Yes, I see that.

9  Q     Could you explain to me what that means?

10 A     A floor price is what I called the minimum price

11 earlier for an auction.  So publishers can decide what the

12 minimum price is if they want AdX to fill that particular

13 slot.

14 Q     And so when it says higher floor for AdX, what makes

15 the -- in comparison to what -- sorry.  Strike that.

16        Publishers would set a higher floor for AdX than

17 they would set for an alternative exchange; is that right?

18 A     That sounds right, yes.

19 Q     Why would publishers set a higher floor for AdX than

20 they would set for an alternative exchange?

21 A     It could be any number of reasons, but one of the

22 reasons was that publishers were weary of low-quality ads.

23 I referred to belly-fat ads earlier.  That was not

24 theoretical.  Those kinds of ads did exist from advertisers

25 on the GDN.  And sometimes setting a high floor prevented

215

Read-in deposition - A. Pappu

```
 1   low-quality ads from showing up.  It was an imperfect way of
 2   doing it, but yeah.
 3   Q    Are there any other reasons why publishers would set a
 4   higher floor for AdX than they would set for an alternative
 5   exchange?
 6   A    That's the only one I remember.
 7   Q    Sitting here today, you cannot think of any other
 8   reason why a publisher would set a higher floor for AdX than
 9   any other exchange?
10   A    No.
11   Q    And your response that this was to avoid low-quality
12   ads.
13        What's the basis for that response?
14   A    Basically this is -- I mean, this was understood at the
15   time.  Now, how we got that knowledge, I don't know whether
16   it was, you know, product research.
17        Also in the early days, you know, when the ad
18   exchange started, it started off with publishers putting
19   their toe in the water with respect to auction-based, you
20   know, demand.  And so perhaps the early experience was all
21   not-so-great ads.
22   Q    And did you learn that by speaking with publishers?
23   A    I did not speak to publishers, but that was a thing,
24   like, known.  Maybe it was publisher feedback through the
25   product or other means of gaining feedback.
```

216

Read-in deposition - A. Pappu

```
 1   Q     So this is something you learned through internal
 2   discussions with others at Google; is that right?
 3   A     Yes.
 4   Q     Who was involved in those discussions?
 5   A     This was back in the early days of AdX.  So probably
 6   either Scott Spencer or someone in his product team.
 7   Q     So to be clear, can you recall a specific conversation
 8   with Scott Spencer in which he conveyed that publisher
 9   feedback was that they used -- they set a higher floor for
10   AdX?
11   A     Wait.  That was a question?
12   Q     Sorry.  You know what, I wasn't done.
13   A     Oh.
14   Q     I'll start over.
15         To be clear, can you recall a specific
16   conversation with Scott Spencer in which he conveyed any
17   publisher feedback to you about AdX?
18   A     I can't recall a specific conversation, but Scott and I
19   talked about publisher stuff all the time as a part of our
20   jobs.
21   Q     Okay.  You mentioned product research.
22         Is there any specific product research that you
23   can recall that would speak to this issue?
24   A     No.  Just the part of a normal product development.
25   Like, we had, you know, user research teams, product teams,
```

217

Read-in deposition - A. Pappu

```
 1    that talked to customers.
 2    Q    So your recollection that publishers would set a higher
 3    floor for AdX than they would set for any alternative
 4    exchange because they were weary of low-quality ads came
 5    solely from discussions with Mr. Spencer?
 6    A    I don't remember.  Like I said, very likely it was one
 7    of our discussions, but --
 8    Q    But you can't recall any other -- speaking with anyone
 9    else about this topic?
10    A    No.
11    Q    And you can't recall reviewing any studies about this
12    topic?
13    A    No.
14    Q    And you can't recall reviewing any other documents
15    about this topic?
16    A    No.
17    Q    Before you referred to the early days and concern to
18    publishers in the early days, approximately what time period
19    was that?
20    A    When the ad exchange -- the first couple of years when
21    it launched.
22    Q    And so concerns excessed by publishers in the early
23    days, you would be referring to concerns expressed by
24    publishers before 2014?
25    A    Yes.
```

218

Read-in deposition - A. Pappu

```
 1   Q    And this document was written in 2018; do you see that?

 2   A    I do not see it.  Yeah.  I see it in the title.

 3   Q    In about 2018, did you have any discussions with others

 4   internally at Google about why a publisher might set a

 5   higher floor for AdX?

 6   A    I don't recall.

 7   Q    So you don't know one way or the other why a publisher

 8   would set a higher floor for AdX in 2018?

 9   A    Yeah.  I do not know one way or the other.

10   Q    Do you recall, setting aside the document, having any

11   specific conversation with Mr. Bellack about AdX revenue

12   share being 20 percent?

13   A    I don't recall specifically, but we had many

14   conversations on rev share.

15   Q    And other than what's written in this document, you

16   don't have any independent recollection of what you

17   discussed with Mr. Bellack about AdX's revenue share at this

18   time?

19   A    Outside of the fact that we would discuss it

20   occasionally, but don't have any specific recollection of --

21   more like a debate, how much it should be, that kind of

22   thing.

23   Q    And who is ultimately responsible for setting AdX's

24   revenue share at this time?

25   A    I don't know who was responsible.  It just was.  It was
```

219

Read-in deposition - A. Pappu

```
 1   20 percent.  So I'm not sure who made that call.
 2   Q    So despite having discussions with Mr. Bellack about
 3   whether AdX's revenue share should be something other than
 4   20 percent, your understanding is that it remained about
 5   20 percent during your tenure?
 6   A    Yes.
 7   Q    Do you recall why AdX's revenue share remained at
 8   20 percent through 2018?
 9   A    I don't recall why.  But, you know, these things are
10   generally -- lots of debates are had, and if there's a
11   reason to go to change something, then it happens, and if
12   there isn't, then it doesn't.
13   Q    The comment references Jim's point of drop AdX buy-side
14   to 10 percent to be competitive.
15        Do you know what he's referring to when he says
16   "competitive" there?  I should say it's your language, so
17   let me back up.
18        You are referencing Jim's point of drop AdX
19   buy-side to 10 percent to be competitive.  What did you mean
20   by "competitive" there?
21   A    "To be competitive," my guess would be basically that
22   other exchanges, like it says in the document, are generally
23   at 10 percent.  So to drop the rev share to be like the
24   other exchanges.
25   Q    How might dropping the rev share make AdX more
```

220

Read-in deposition - A. Pappu

```
 1   competitive?
 2   A    I think it was in line with competition.  If the
 3   competition was generally at 10 percent.
 4   Q    Can you name a specific company that competed with AdX
 5   at this time?
 6   A    Other exchanges you mean?
 7   Q    Yes.
 8   A    So other exchanges, like I said, Index is one that
 9   comes to mind, and Rubicon.
10   Q    And so did you take Mr. Giles's point to be that to
11   remain competitive with Index and Rubicon, AdX should drop
12   its revenue share to 10 percent at this time?
13   A    So that was Jim's point.  I don't know what the
14   question is.
15   Q    It says:  "He and I talked about accredited value over
16   the years for services that pubs pay for outside of -- or
17   outside DFP that are now a part of DFP"; do you see that?
18   A    Yes.
19   Q    Do you recall what discussion that's referring to?
20   A    I don't know what "AIH" stands for, but over time, you
21   know, when there are gaps in the product, in the DFP, for
22   example, I don't know what seasonality specifically refers
23   to.  Then publishers would have to go outside of DFP to be
24   able to get those kinds of capabilities.  And over time, we
25   actually kind of filled those gaps in DFP by building them.
```

221

Read-in deposition - A. Pappu

```
 1    So I think the logic here is, since we improved DFP over the
 2    years to fill these gaps, then just change the price of DFP
 3    to reflect the new value.
 4    Q    When you say publishers would have to go outside of
 5    DFP, would publishers use an alternative publisher ad
 6    server?
 7    A    No.
 8    Q    So how would publishers go outside of DFP?
 9    A    So sometimes there are features.  Likely, you know,
10    seasonality here, for example, might be around our
11    forecasting capabilities, might have been more primitive,
12    and so you might have to offer -- you might have to layer on
13    other seasonality trend detention kind of thing through
14    external systems.
15            They are not actually ad-specific, but sometimes
16    CD analyses and things like this.  So if you build that into
17    DFP, you then reduce the friction for the publisher to have
18    to export this data, do the analysis, and then come back in.
19    Q    So those publishers would keep DFP but then go to
20    another software company for those additional features?
21    A    Yes.
22    Q    But they would remain customers of DFP; is that right?
23    A    In this case, yes.
24    Q    And then when DFP added those features, the publisher
25    didn't have to go to another software company to get
```

222

Read-in deposition - A. Pappu

```
 1    additional features?

 2    A    I think that's the logic here of this sentence.  Yep.

 3    Q    And so at this time, publishers paid the 20 percent rev

 4    share?

 5    A    Correct.  I mean, they were charged the 20 percent.

 6    They didn't pay us.

 7    Q    Can you elaborate?

 8    A    Publishers don't pay us for this transaction.  The way

 9    the auction works is -- remember, we talked about the

10    clearing price and then the transaction.  Whatever the

11    clearing price is, 20 percent of that is what we would keep

12    in the ad exchange for the service, and 80 percent would go

13    to the publisher.

14    Q    At this time, AdX would keep 20 percent of the clearing

15    price, and the remaining 80 percent would go to the

16    publisher; is that right?

17    A    That's right.

18    Q    Let's mark this as Exhibit 3.

19            (Whereupon Pappu-lit Exhibit 3, GOOG-DOJ-32034896

20    through 4898 was marked for identification as of this date

21    by the reporter.)

22            THE COURT:  All right.  Now what I'm going to --

23    not suggest, require, for anymore depositions that get read

24    in is when you're referencing an exhibit, I want the exhibit

25    number for this trial substituted.  This does me no good.
```

223

```
 1   Okay?

 2              MS. GARCIA:  Your Honor, I believe this is

 3   PTX 572.  Yes.

 4              THE COURT:  All right.

 5              MS. GARCIA:  618.  Excuse me.  PTX 618.  Thank

 6   you.

 7              THE COURT:  All right.  Go ahead.

 8     (Plaintiffs' Exhibit Number 618 admitted into evidence.)

 9   BY MS. GARCIA:

10   Q    Ms. Pappu, you've just been handed what's been marked

11   PTX 618, which is a document with a Bates number beginning

12   with GOOG-DOJ-30 -- or, excuse me, 32034896.

13              Please take a moment to review the document and

14   let me know when you're ready.

15              I'm going to start by asking you about the email

16   that begins at the bottom of the page ending 4896, the email

17   from Mr. Bellack from Wednesday, June 20th, 2018, at

18   11:54 a.m.; do you see that?

19   A    11:54.  Sorry.  Are you sure it's 11:54?  Oh.  This

20   one.  Yes.  Yeah.

21   Q    Do you see where I'm looking?

22   A    Yes, I do.

23   Q    So here Mr. Bellack asks:  "How much actual value is

24   there in auction yield management, get bids, compare bids,

25   pick winner"; do you see that?
```

224

Read-in deposition - A. Pappu

```
 1   A    Yes.

 2   Q    What did you understand Mr. Bellack to be saying here?

 3   A    I think he is saying how much value is there to

 4   publishers in that particular aspect of the auction, which

 5   is the actual bidding and the auction itself.

 6   Q    I should have asked, were you familiar with this

 7   document?

 8   A    I don't remember it, no.

 9   Q    But, for the record, what is it?

10   A    It's an email exchange, a group of people discussing

11   pricing ideas.

12   Q    Do you have any reason to doubt that you received this

13   email?

14   A    I do not.

15   Q    And so looking back at the email from Mr. Bellack, he

16   goes on to ask:  "Is there really that much more value in

17   just comparing auction versus reservations?"; do you see

18   that?

19   A    Yes.

20   Q    What did you understand Mr. Bellack to be saying here?

21   A    I actually don't know what he means here.  I feel like

22   apples/oranges, so I'm not sure what he means on this one.

23   Q    Did you ask him for clarification?

24   A    It doesn't look like it.

25   Q    But sitting here today, you don't have any
```

Read-in deposition - A. Pappu

1  understanding of what Mr. Bellack is referring to here?

2  A    No.

3  Q    What do you understand Mr. Bellack to be saying here?

4  A    It sounds like he's saying do we want to have a

5  conversation with publishers about charging more, increasing

6  the prices of DFP ad serving.  It makes an assumption that

7  they don't value it.

8  Q    And why would someone from Google have a discussion

9  with publishers about increasing the pricing of DFP ad

10 serving at this time?

11 A    It's a normal sort of periodic conversation.  I think

12 DFP ad serving prices have gone up over time, so this would

13 be, you know, a normal conversation to have.

14 Q    Do you recall approximately how many times DFP ad

15 serving prices have gone up?

16 A    No.

17 Q    But you do recall that, over time, DFP ad serving

18 prices increased?

19 A    Yes.  For example, when we did the video ad serving, I

20 remember that it was more expensive.  The price to serve a

21 video ad impression then, you know, web because it's just

22 more expensive to build.  The costs were higher.

23 Q    Mr. Bellack suggests that this is -- that Google is

24 considering charging more for something they don't value.

25          Is the "they" in that sentence referring to

226

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Read-in deposition - A. Pappu

```
 1   publishers?

 2   A     I believe so, yes.

 3   Q     And what is he saying publishers don't value?

 4   A     He's making an assumption that publishers don't value

 5   DFP, is my guess here.  Meaning, the ad serving aspect of

 6   it, the reservation ad serving.

 7   Q     Did you ask him what his assumption was based on?

 8   A     I did not.

 9   Q     Do you know one way or the other whether his assumption

10   was based on conversations with publishers?

11   A     I don't know what his assumption is based on.

12   Q     But Mr. Bellack, at this time, was on the product team

13   that interfaced with the publishers; is that right?

14   A     That's right.

15   Q     Okay.  And then your email, under the header AdX you

16   write:  "For all programmatic, i.e., transactions, including

17   AdX and EB."  What is EB referring to there?

18   A     EB refers to Exchange Bidding.

19   Q     So "for all programmatic, i.e., transactions, including

20   AdX and EB, sell-side charges for taking on risk of being a

21   clearinghouse.  So whatever 2 percent to 10, whatever we

22   think the market can bear, but ideally closer to 2 percent."

23         Did I read that correctly?

24   A     Yes.

25   Q     What did you mean when you said "risk of being a
```

227

Read-in deposition - A. Pappu

```
 1   clearinghouse"?
 2   A     What I meant by that is, we do the publisher payout
 3   based on the transactions.  Like we discussed in the
 4   auction, what the clearing price is.  Based on that, the
 5   publisher makes money, and so every month we would pay the
 6   publisher whatever they were owed, whether or not the buyer
 7   paid us.  And we would hope that the buyers would eventually
 8   pay us.  So what the publishers didn't have to worry about
 9   was am I going to be paid or not, which was often kind of a
10   pain for them, so we took away that pain.
11   Q     And here you're suggesting AdX's revenue share should
12   be between 2 percent and 10 percent; correct?
13   A     It seems like it, yes.
14   Q     And then you say it should be ideally closer to
15   2 percent; correct?
16   A     Yes.
17   Q     Why did you think it ideally should be closer to
18   2 percent?
19   A     It was just a stab based on clearinghouse being the
20   thing, the assumption that the clearinghouse is the thing
21   that publishers value.  If they value other things, then
22   that assumption doesn't hold.
23   Q     And then in looking at the email from Noam Wolf, he
24   asked you "why closer to 2 percent is your ideal"; do you
25   see that?
```

228

Read-in deposition - A. Pappu

```
 1    A      Yes.

 2    Q      And you respond:  "Just using credit cards as my

 3    baseline and thinking about the value we provide"; do you

 4    see that?

 5    A      Yes.

 6    Q      And so your understanding was that credit card

 7    companies charge about 2 percent, a 2 percent fee to process

 8    transactions over their network; is that right?

 9    A      I think that was the assumption, yes.

10    Q      And in the case of credit cards, your view is the fee

11    corresponds to the risk of being a clearinghouse?

12    A      Basically, yes.

13    Q      And so are you saying here that AdX changed pipes to be

14    programmatic?

15    A      I know what this means now.  Noam has a reference to

16    something that says "PG" in the line below, so this is

17    referencing that.

18           So it's basically a reservation ad, except it was

19    served programmatically.  And so the programmatic meaning is

20    a bit complicated.

21           Should I explain it?

22    Q      Please.

23    A      Okay.  So, you know, we talked about reservation ads in

24    DFP.  The ad would be placed by us, and then DFP would have

25    to go reconcile at the end of the month with whoever they
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Read-in deposition - A. Pappu

```
 1   sold that inventory to and make sure that they're paid.  And
 2   then they would have to make sure that -- did you share the
 3   impression, per our agreement and, you know, all of that
 4   sort of process.
 5           So by doing it programmatically via this thing
 6   called "PG," I can't recall what it stands for now, I want
 7   to say programmatic guaranteed, yeah, you don't have to do
 8   any of that and that we would take care of that for you.
 9   And so that's what a programmatic line item -- a
10   programmatic reservation meant.
11   Q   That's helpful.  And here you say "unless we bring the
12   demand."
13           What are you referencing there?
14   A   So the reference here is the greatest thing that the
15   publishers did in terms of value to themselves was to
16   actually find great advertisers who want to advertise on
17   their -- you know, their direct sales team and would go out
18   and bring that demand.
19           And so I'm just stating here -- it sounds like
20   that unless we, meaning Google, helps them bring the demand,
21   just doing the automatic reconciliation is not necessarily
22   useful enough to charge 10 percent as the rev share, is the
23   hypothesis here at least.
24   Q   Is part of what AdX did this automatic reconciliation
25   that you just referenced?
```

230

Read-in deposition - A. Pappu

```
 1   A     Yes.  That's what the clearinghouse thing references
 2   earlier.
 3   Q     We spoke earlier about the value of the Google stock
 4   that you currently own; do you recall that?
 5   A     Yes.
 6   Q     Do you know whether the value of your stock is closer
 7   to 5 million in value or 1 million in value?
 8   A     Do you mean the vested stock or the unvested?  How
 9   should I think about this question?
10   Q     Let's start with the vested stock.
11   A     The vested is the part that I have the least view into
12   because it's on some automatic schedule and I -- the machine
13   just runs it.  I have no idea.
14   Q     And what is the value of the unvested stock, roughly?
15         MS. SESSIONS:  And I'm just going to stop.  I
16   think we -- it's possibly our mistake that we did not
17   designate the number in this transcript as confidential,
18   but --
19         THE COURT:  I'm surprised.  But, anyway, yeah.
20         MS. SESSIONS:  I think that was an oversight on
21   our part, but I would ask that the number not be read into
22   the record as the value of Ms. Pappu's stock.
23         THE COURT:  Well, it's in the record now.  We'll
24   just have the transcript that will, at some point, be
25   public, have it stricken from the transcript.
```

231

Read-in deposition - A. Pappu

```
 1              MS. SESSIONS:  Thank you, Your Honor.

 2              MR. BLANCHARD-WU:  Should I read the portion and

 3    leave the number out?

 4              MS. GARCIA:  Your Honor --

 5              THE COURT:  We don't need anything more.

 6              MS. GARCIA:  Thank you, Your Honor.

 7              THE COURT:  All right.  Are there any more

 8    depositions at this time?

 9              MS. WOOD:  We do have a video we could play that's

10    26 minutes from a different Google witness, Mr. Rowley.

11    It's 26 minutes.  Or sorry 23 and a half, I'm told.

12              THE COURT:  All right.  So you don't need my clerk

13    any longer?

14              MS. WOOD:  No.  And then we'll work overnight to

15    narrow them down further.

16              THE COURT:  All right.  That's fine.

17              Thank you, Evan.

18              MS. SESSIONS:  Your Honor, to that end, I would

19    just make a request.  I don't know if this is going to be an

20    issue.  But to the extent that there are additional

21    depositions of the Google witnesses that the Department of

22    Justice intends to make part of the record, we would ask

23    that those be done by video rather than via read in of the

24    transcript, because I do think the inflection and intonation

25    of the witness is important.
```

Read-in deposition - A. Pappu

```
 1              THE COURT:  Oh, I don't know.  Some of the accents
 2   have made it difficult.  And, frankly, I don't know.  So I
 3   can hear Evan very clearly.
 4              But I really want to get a handle on the
 5   depositions.  So since you're on your feet, Ms. Wood, how
 6   many more witnesses, I want the name of the witness and what
 7   they are, if they're a Google employee or if they're a
 8   third-party or what.  Okay.
 9              Who else are you planning to call?
10              MS. WOOD:  Yes.  By deposition?
11              THE COURT:  By deposition.
12              MS. WOOD:  So we started Mr. Bradbury.  We will
13   meet and confer about that.  We just did Ms. Pappu.  We have
14   a Google employee, Mr. Rowley, by video.  We have a
15   third-party publisher ad server witness, Mr. Shaughnessy,
16   which is approximately a 20-minute read-in.  We have a
17   Google employee, Mr. Cox, which is approximately five-minute
18   read-in.  We have a Google employee, Mr. Kim, which is
19   approximately 10- to 15-minute read-in, or video if we need
20   to do that, but I do think the read-ins are faster.  And
21   then we have a Google employee, Ms. Stewart, which is less
22   than ten minutes, and Ms. Hsiao which is less than ten
23   minutes.  But, again, we will narrow those further this
24   evening to ensure --
25              THE COURT:  They need, at this point, to add
```

233

Read-in deposition - A. Pappu

```
 1    something new.  Not just a repeat.  I've heard the

 2    20 percent take a million times.  I don't need to hear it

 3    again; okay?

 4              MS. WOOD:  Understood.  For example, with this

 5    witness, I think you understood her to say she thought

 6    between 2 and 10 percent was an appropriate take rate, so we

 7    consider that new.  The 2 percent I don't believe you've

 8    heard other witnesses say, Your Honor.

 9              THE COURT:  Well, I'm not sure that really is all

10    that valuable anyway.  But, in any case.

11              All right.  Now those are your deposition

12    witnesses at most?

13              MS. WOOD:  And then, I'm sorry, one further one.

14    Mr. Levitte is a Google witness.  I don't have the time

15    estimate with me now, but I think it's approximately

16    30 minutes as well by video.

17              THE COURT:  All right.  And then for live

18    witnesses, who is left?

19              MS. WOOD:  We just have two experts, Dr. Simcoe

20    and Dr. Lee.  And then Mr. Bellack tomorrow morning is the

21    adverse direct of the Google employee -- former Google

22    employee.

23              THE COURT:  All right.  So for this afternoon

24    then, what do we have?

25              MS. WOOD:  This afternoon we were going to
```

234

Video deposition - B. Rowley

```
 1    continue with the Rowley video and then do Mr. Simcoe, and
 2    then we could do some of the additional shorter read-ins if
 3    there's time remaining, or we can dismiss for the day and
 4    consolidate.
 5              THE COURT:  Oh, no.  No.  No.  We're going to keep
 6    moving.
 7              MS. WOOD:  Understood.
 8              THE COURT:  All right.  Let's call the next
 9    witness then.
10              MS. WOOD:  Okay.
11              THE COURT:  Do you want to do the video?
12              MS. WOOD:  The video of Mr. Rowley would be next,
13    Your Honor.
14              THE COURT:  All right.
15               (Video deposition of B. Rowley played.)
16              MS. WOOD:  Can you pause.  We just need to pass
17    out the binders.  And we can identify before we play it.  I
18    believe the one exhibit that is referenced is PTX 278, which
19    is the back of the binder that is already in evidence.  And
20    then we may have some additional documents related to
21    Mr. Rowley that we would like to move in at this time, and
22    they are all subject to the stipulation we have with Google.
23              THE COURT:  Go ahead.
24              MS. WOOD:  They are PTX 144.  PTX 174.  PTX 445.
25    PTX 604.  PTX 759.  PTX 767.  PTX 792.  PTX 953.  PTX 978.
```
                                                              235

Video deposition - B. Rowley

```
 1   PTX 993.  PTX 1017.  And PTX 1728.

 2           And, Your Honor, what we would propose in this

 3   regard for these documents that we are submitting, not

 4   through live examination, we have citations in our proposed

 5   findings of fact to each of these documents, and we could

 6   give Your Honor a written document that would indicate where

 7   precisely in the proposed finding of fact these documents

 8   are cited and quoted for Your Honor's review.

 9           THE COURT:  All right.

10           MS. WOOD:  And here are the documents I just

11   mentioned.

12           And those are all admitted, Your Honor?

13           THE COURT:  Yes.  They're all in.

14    (Plaintiffs' Exhibit Numbers 144, 174, 445, 604, 759, 767,

15     792, 953, 978, 993, 1017, 1728 admitted into evidence.)

16           MS. WOOD:  Thank you.  And, with that, I think

17   we're ready for the Rowley video to play.

18              (Video deposition of B. Rowley played.)

19           THE COURT:  We should stop at this point.  It's

20   Time for the afternoon break.  We're switching our court

21   reporters.  All right.  We'll be back in session at 4:30.

22              (A brief recess was taken.)

23

24

25
```

236

Video deposition - B. Rowley

```
 1              ---------------------------------

 2    I certify that the foregoing is a true and accurate

 3    transcription of my stenographic notes.

 4
                            Stephanie Austin
 5                 _____

 6                 Stephanie M. Austin, RPR, CRR

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                    237
```