```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3    --------------------------x
      UNITED STATES, et al.,     :    Civil Action No.:
 4                               :    1:23-cv-108
                   Plaintiffs,   :
 5         versus                :    Friday, September 27, 2024
                                 :    Alexandria, Virginia
 6    GOOGLE LLC,                :    Day 15 a.m.
                                 :    Pages 1-115
 7                 Defendant.    :
      --------------------------x
 8

 9         The above-entitled bench trial was heard before the
      Honorable Leonie M. Brinkema, United States District Judge.
10    This proceeding commenced at 10:00 a.m.

11                    A P P E A R A N C E S:

12    FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                             OFFICE OF THE UNITED STATES ATTORNEY
13                           2100 Jamieson Avenue
                             Alexandria, Virginia  22314
14                           (703) 299-3700

15                           JULIA TARVER WOOD, ESQUIRE
                             AARON TEITELBAUM, ESQUIRE
16                           MICHAEL WOLIN, ESQUIRE
                             JEFFREY VERNON, ESQUIRE
17                           DANIEL GUARNERA, ESQUIRE
                             UNITED STATES DEPARTMENT OF JUSTICE
18                           ANTITRUST DIVISION
                             450 Fifth Street, NW
19                           Washington, D.C.  20530
                             (202) 894-4266
20
      (State of VA)          TYLER HENRY, ESQUIRE
21                           OFFICE OF THE ATTORNEY GENERAL
                             OFFICE OF THE SOLICITOR GENERAL
22                           202 North Ninth Street
                             Richmond, Virginia  23219
23                           (804) 786-7704

24

25
                                                                 1
```

```
 1                  A P P E A R A N C E S:

 2   FOR THE DEFENDANT:    CRAIG REILLY, ESQUIRE
                           LAW OFFICE OF CRAIG C. REILLY
 3                         209 Madison Street
                           Suite 501
 4                         Alexandria, Virginia  22314
                           (703) 549-5354
 5
                           KAREN DUNN, ESQUIRE
 6                         JEANNIE RHEE, ESQUIRE
                           WILLIAM ISAACSON, ESQUIRE
 7                         AMY MAUSER, ESQUIRE
                           PAUL, WEISS, RIFKIND,
 8                         WHARTON & GARRISON LLP
                           2001 K Street, NW
 9                         Washington, D.C.  20006
                           (202) 223-7300
10
                           SARA SALEM, ESQUIRE
11                         FRESHFIELDS BRUCKHAUS DERINGER, LLP
                           700 13th Street, NW
12                         10th Floor+Washington, D.C.  20005
                           (202) 777-4500
13
     COURT REPORTER:       STEPHANIE M. AUSTIN, RPR, CRR
14                         Official Court Reporter
                           United States District Court
15                         401 Courthouse Square
                           Alexandria, Virginia  22314
16                         (607) 743-1894
                           S.AustinReporting@gmail.com
17
              COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
18

19

20

21

22

23

24

25
                                                                2
```

```
 1                        TABLE OF CONTENTS

 2                            WITNESSES

 3    On behalf of the Defendant:

 4    RYAN PAULEY - Read-in.....................5

 5    BRIAN BUMPERS - Read-in..................22

 6                            REBUTTAL

 7    On behalf of the Plaintiffs:

 8    MATTHEW WHEATLAND

 9    Direct examination by Ms. Wood ...........55
      Cross-examination by Ms. Rhee ............76
10    Redirect examination by Ms. Wood .........108

11    On behalf of the Defendant:
      Admitted
12    Number 1496 ..............................16
      Number 1813 ..............................17
13    Number 244 ...............................21
      Number 1420, cover page, pages 12, 13, 29, 44
14    32
      Number 1071, cover page, page 292 ........44
15    Number 1700, first page and page 14 .......45
      Numbers 211, 214, 230, 298, 352, 371, 376, 47
16    406, 428, 435, 481, 670, 961, 1016, 1169,
      1282, 1303 and 1480

17                            MISCELLANY

18
      Proceedings September 26, 2024 ...........4
19    Certificate of Court Reporter ............115

20

21

22

23

24

25
                                                          3
```

```
 1                    P R O C E E D I N G S
 2           THE DEPUTY CLERK:  Civil Action Number
 3   1:23-cv-108, United States of America, et al. versus Google
 4   LLC.
 5           Will counsel please note their appearance for the
 6   record, first for the plaintiffs.
 7           MR. HENRY:  Good morning, Your Honor.  Ty Henry
 8   from the Virginia Attorney General's Office on behalf of the
 9   plaintiff states.
10           THE COURT:  Good morning.
11           MS. WOOD:  Good morning, Your Honor.  Julia Tarver
12   Wood from the Department of Justice on behalf of the United
13   States plaintiffs.  With me are my colleagues,
14   Aaron Teitelbaum.
15           THE COURT:  Good morning.
16           MS. WOOD:  Jeff Vernon.  Dan Guarnera, Michael
17   Wolin, and this wonderful crew here who I thank for all of
18   their work and assistance in this case.
19           THE COURT:  This sounds like the last day then if
20   you've got the whole team here.
21           All right.  Ms. Dunn.
22           MS. DUNN:  Good morning, Your Honor.  Karen Dunn
23   for Google.  With me today are Jeannie Rhee, Sara Salem,
24   Bill Isaacson, Craig Reilly, and Matt Spalding, and also our
25   fantastic team as well.
```

4

Read-in deposition - R. Pauley

```
 1                THE COURT:  Does the team want to stand up and be
 2   acknowledged.  There you go.
 3                MS. DUNN:  Yes.  We applaud all the teams.
 4                THE COURT:  Very good.  I must say, for a case
 5   with this much at stake, it's been actually a pleasure that
 6   it's been as collegial as it has been.  And, again, I've
 7   said this before, but I'll say it again, I do commend the
 8   lead counsel and the team for having done such a good job.
 9   This is all how civil cases should be handled.  So it's been
10   a good one, and we'll see how it ends.  All right.
11                Ms. Dunn, what have you got on tap for today?
12                MS. DUNN:  Thank you, Your Honor.
13                So we have two read-ins I think that will be
14   relatively brief, particularly on my reading speed.  And
15   then we have some cleanup exhibit issues.
16                THE COURT:  Okay.
17                MS. DUNN:  And then we will rest after that.
18                THE COURT:  Very good.  All right.  So who is our
19   first witness?
20                MS. DUNN:  Our first witness is Ryan Pauley of Vox
21   Media via read-in.  And we have binders for the Court.
22                THE COURT:  Go ahead.
23                MS. DUNN:  Thank you, Your Honor.
24   Q    Can you state and spell your name for the record?
25   A    It's Ryan Pauley.  R-Y-A-N.  P-A-U-L-E-Y.
```

5

Read-in deposition - R. Pauley

```
 1   Q    Okay.  And you work for Vox today; is that right?

 2   A    That's correct.

 3   Q    What is your current title at Vox?

 4   A    It's president of revenue and growth.

 5   Q    And at a high level, what are your responsibilities in

 6   your role today?

 7   A    I oversee all of the commercial operations across our

 8   advertising, subscription, commercial business, commerce

 9   business, as well as marketing communications, events.

10   Q    When did you start working at Vox?

11   A    I started in 2011.  April of 2011.

12   Q    Okay.  About how many years of experience do you have

13   at Vox with programmatic display ads?

14   A    I'd say about ten years at least.

15   Q    Today, approximately what percentage of Vox's

16   programmatic display revenue comes from Google AdX?

17   A    Today, it's about -- probably in the 50 to 60 percent

18   range.

19   Q    Can you give a ballpark of about how much larger AdX is

20   compared to the next largest exchange for programmatic

21   display?

22   A    I think the next largest would be in the maybe 10 to

23   15 percent range.

24   Q    Has Vox tried to negotiate for a lower open auction

25   take rate from AdX?
```

Read-in deposition - R. Pauley

```
 1   A      We have.

 2   Q      And when Vox has tried to negotiate for a lower open

 3   auction AdX take rate, what happened?

 4   A      Nothing.  The take rate stayed -- the AdX take rate

 5   stayed the same.

 6   Q      Did you manage those negotiations?

 7   A      Managed, yeah.

 8   Q      Okay.  Based on your experience and your involvement in

 9   managing them, why has Vox not been able to negotiate for a

10   lower take rate for Open Auction from AdX?

11   A      My opinion is that there is -- we have -- we, Vox

12   Media, has limited leverage in those negotiations.

13   Q      By "those negotiations," are you referring to

14   negotiations with AdX for take rates?

15   A      Specifically for take rates with AdX, yes.

16   Q      Why do you believe that Vox has limited leverage when

17   it's negotiating for lower take rates with AdX?

18   A      Because there is no -- at Vox, we don't currently have

19   any reasonable alternatives to -- for where the Open Auction

20   revenue would otherwise go if not through AdX.

21   Q      How do negotiations with Google's AdX compare to

22   negotiations with other exchanges?

23   A      We have -- we have been able to negotiate more

24   favorable rev shares for Vox Media from other partners,

25   typically.
```

                                                              7

Read-in deposition - R. Pauley

```
 1    Q    Okay.  How did Vox use price floors before UPR?

 2    A    We used price floors -- we had more -- we had different

 3    price floors for different SSPs and different partners.

 4    Q    How, if at all, did UPR affect Vox's ability to set

 5    price floors for different exchanges?

 6    A    It negated the ability to set different price floors

 7    for different exchanges.

 8    Q    And what impact, if any, did UPR have on AdX's share of

 9    Vox's programmatic display revenue?

10    A    Post UPR rollout, AdX's share increased.

11    Q    And do you have a ballpark sense of how big that

12    increase was?

13    A    If I recall correctly, I think it was around a

14    10 percent share gain.  So call it 50 percent before to

15    close to 60 percent after.

16    Q    Okay.  What impact, if any, would the shift from AdX to

17    header bidding have on transparency for the auctions that

18    are run on Vox's behalf?  After UPR became effective and Vox

19    had to level the floors across all of the exchanges, how did

20    Vox do that?  Did it lower AdX's floor?  Did it raise the

21    floor for other exchanges?  Or some combination of the two?

22    A    We tested a number of different flooring strategies,

23    but ultimately the one that seemed to maximize the revenue

24    opportunity for our inventory was lowering AdX's floor.

25    Q    Okay.  So now I'm going to switch to something that's
```

8

Read-in deposition - R. Pauley

```
 1   complicated to me, which is Concert.
 2             First, in the context of Vox and display
 3   advertising, what is Concert?
 4   A    Concert is a premium ad marketplace that we -- a
 5   business that we developed and launched in 2016 whereby we
 6   took ad products and ad technology that we had developed for
 7   our own inventory and took that to other premium publishers
 8   and then sold the network to advertisers.
 9   Q    I think you referred to Concert as a network.
10             What did you mean by that?
11   A    In that it is a collection of inventory that is both
12   Vox -- that consists of Vox-owned inventory, as well as
13   third-party inventory.
14   Q    I guess the first question is, what is the Concert SSP?
15   A    It's a piece of ad technology that is designed to
16   enable the programmatic buying of Concert inventory.
17   Q    Okay.  So now I just want to ask you a little bit more
18   generally about Vox.
19             What is Vox?
20   A    Sure.
21             Vox Media is a digital media company.  We own and
22   operate about 18 editorial brands.  We produce content for
23   our websites for across -- for podcasts, videos, across
24   various platforms, and monetize that content via -- you
25   know, various ways including advertising, direct to
```

9

Read-in deposition - R. Pauley

```
 1    consumer, subscriptions, commerce and a handful of other
 2    things like licensing.
 3    Q    Okay.  And so now I just want to switch gears a little
 4    bit to Concert.
 5              And I believe you testified earlier that you
 6    played a role in Concert's development; is that right?
 7    A    That's correct.
 8    Q    Can you describe for me a little bit that role?
 9    A    Yes.
10              I helped define what the business value
11    proposition would be, helped secure publisher partners, you
12    know, prior to launch and since launch, helped sell to
13    advertisers, and was primarily the person sort of most
14    public-facing to press and the advertising community for
15    Concert.
16    Q    Okay.  And you defined this inventory as "premium
17    inventory."
18              Can you just, I guess, give a little bit more
19    detail about what you mean by that?
20    A    Yes.  It's certainly qualitative in sort of that
21    characterization, I suppose.  But what we mean is scaled,
22    call it unknown to publishers -- sorry, call it known
23    publishers, you know, partners like NBCUniversal or Penske
24    Media, Condé Nast, among many others.  So that's sort of
25    mostly what it would be.
```

10

Read-in deposition - R. Pauley

```
1    Q     Okay.  And, today, does Concert have any other

2    publisher partners?

3    A     We do.  We work with -- I don't know the latest number,

4    but I think close to 70, 80 total publishers.

5    Q     And why does Vox devote these resources to Concert?

6    A     Because we believe it's a unique market product and a

7    unique market opportunity, and I believe there is, you know,

8    continued business growth opportunity for Vox.

9    Q     And can you describe a little bit what you see as the

10   business growth opportunities?

11   A     The -- from -- in our experience with -- advertisers

12   are looking to work with fewer partners in bigger, more

13   strategic ways.  Concert is one of the products in the Vox

14   Media portfolio that enables us to sort of be a strategic

15   partner for marketers.  Like we talked about before, get

16   more scale to their -- for their advertising investment,

17   deliver more performance and more engagement, things like

18   that.

19   Q     And so Vox believes that it has the ability to build

20   more scale with Concert?

21   A     Yes.

22   Q     Can you describe what types of advertisers use

23   Concert's ad network?

24   A     It is largely large-scale advertisers.  Fortune 500

25   Fortune 1000 brands.  Mostly looking for -- still largely
```

11

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Read-in deposition - R. Pauley

```
 1    sort of in the reach awareness engagement as sort of primary
 2    marketing tactics that they are looking to achieve.  That's
 3    the type of advertiser that we are generally working with.
 4    Q    Do advertisers that use Concert's ad network have
 5    access to Vox's first-party audience data?
 6    A    Yes.  They have the opportunity to use it if they
 7    choose to.
 8    Q    Does Vox market this access to advertisers?
 9    A    Yes.  Sort of -- data offering is a part of the
10    proposition.
11    Q    And why is it part of the proposition?
12    A    Because the general industry turned towards leveraging
13    first-party data to enhance the relevance and performance of
14    advertising.  And Vox has a -- due to the breadth of the
15    platform, a unique first-party data offering sort of to
16    leverage the context across our brands, whether you're a
17    sports fan on our sports property or a tech enthusiast on
18    our tech property.
19    Q    Can you -- can you just explain a little bit more what
20    you mean by a unique first-party data offering?
21    A    Yes.  Being able to -- one publisher to bring together
22    these audience insights across the portfolio from sports to
23    tech to gaming to news to food and shopping.  The ability to
24    bring that together is unique in our industry.
25    Q    Can you just talk a little bit more about I guess the
```

Read-in deposition - R. Pauley

```
 1   formats available through Athena?

 2   A    Yes.  So the Athena mostly refers to the sort of

 3   non-standard unique size of the format, both on desktop and

 4   mobile phones.  And there are a number of capabilities that

 5   advertisers can leverage within the format, whether it's a

 6   video ad unit or a shoppable format or just a static image.

 7   So there are different types of formats, and, ultimately,

 8   it's a canvas that can kind of do whatever an advertiser is

 9   interested in doing.

10   Q    And so can advertisers using Concert's ad network

11   execute campaigns across all Athena formats?

12   A    Yes.  They can leverage any -- all -- as many or as few

13   as they want to.

14   Q    And what type of, I guess, display channels is Athena

15   available on?

16   A    It is -- the open web is how -- I guess how I would

17   describe it.  Website.  Mobile websites, desktop websites,

18   that's the inventory.

19   Q    And what is Concert Local?

20   A    Concert Local was an initiative that I believe we

21   initially came up with the idea in the second half of 2019

22   that was designed to take the Athena products and the

23   Concert network to local publishers, local newspapers, local

24   publishers.  There was a dedicated effort for that, because

25   generally most of those local publishers don't have the ad
```

13

Read-in deposition - R. Pauley

```
 1   technology resources necessary to implement a custom ad

 2   product like Athena.

 3   Q    And so did Concert Local have those resources necessary

 4   to implement custom ad products like Athena?

 5   A    We did and partnered with the Google News Initiative to

 6   help sort of fund some resources to help those publishers.

 7   Q    And what's the Google News Initiative?

 8   A    My understanding is that it's a part of Google to help

 9   fund initiatives that are -- I don't know if this is the

10   mission, but to help the industry generally.

11   Q    And when you say "industry," what industry do you mean?

12   A    The digital advertising, digital publishing industry.

13   Q    Does Vox view its Concert Local initiative as

14   successful?

15   A    We do.

16   Q    And why is that?

17   A    Ultimately it got -- we were able to sort of reach a

18   number of local publishers with ad technology, ad products,

19   and ultimately revenue that they otherwise would not have

20   had access to.

21   Q    And are you familiar with Concert Ad Manager?

22   A    I am.

23   Q    What is that?

24   A    That was an initiative to build a self-serve ad

25   creative, ad creation and ad buying tool for Concert
```

14

Read-in deposition - R. Pauley

```
 1    inventory in particular.
 2    Q    Okay.  So could any advertiser buy using Concert Ad
 3    Manager?
 4    A    Yes.  It wasn't restricted.  Yes.
 5    Q    And when did Concert launch its SSP?
 6    A    I believe it was in the fall of 2021.
 7    Q    And prior to its launch, how long had Vox spent
 8    developing the SSP?
 9    A    I'm sorry.  I just want to go back.  I think it was the
10    fall of 2022, if I recall correctly.  The -- we had spent --
11    might have been generally six to nine months developing the
12    SSP.
13    Q    And I believe this morning when you testified, you said
14    that in the future Concert would like to connect with as
15    many DSPs as possible; is that right?
16    A    That's correct.
17    Q    Okay.  And why is that?
18    A    Essentially to make the Concert inventory available to
19    as many buyers as possible.  And, in my view, one way to do
20    that would be to be able on as many DSPs as possible.
21    Q    And you've mentioned that Vox is working on integrating
22    Concert's SSP with other DSPs.
23         What other DSPs is Vox looking at?
24    A    We have talked to the DV360 team, the Google DSP.
25    We've talked to folks like the Yahoo DSP.  I believe we've
```

15

Read-in deposition - R. Pauley

```
 1    talked to Xandr.  And there was a couple other sort of
 2    smaller DSPs that I can't recall the specific names of right
 3    now.
 4    Q    Is Vox talking to Amazon in relation to their DSP?
 5    A    I believe we've had conversations, yes.
 6    Q    What about Adobe?
 7    A    Yes, that sounds right.
 8    Q    What about Adelphic?
 9    A    Potentially.  I'm not exactly sure.
10            MS. DUNN:  Your Honor, move to admit DTX 1496.
11            MR. TEITELBAUM:  No objection.
12            THE COURT:  All right.  It's in.
13      (Defense Exhibit Number 1496 admitted into evidence.)
14    Q    And do you recognize Exhibit Vox 2 as a true and
15    accurate copy of this email thread?
16    A    Yes, it appears so.
17    Q    Okay.  I'll have you turn to the next page, the page
18    marked 264.  And at the very bottom of that page under the
19    heading target, it says:  "We are setting up a new target
20    PMP in the SSP due to the client being dissatisfied with
21    their performance in AdX.  Flight dates and budgets are
22    still being finalized."
23            Did I read that correctly?
24    A    Yes.
25    Q    And can you explain what that sentence means?
```

16

Read-in deposition - R. Pauley

```
 1    A     It means -- it appears to mean we are setting up a
 2    Concert -- a Private Marketplace deal for -- in Concert in
 3    the Concert SSP on behalf of Target, the advertiser, due to,
 4    as it states, the advertiser being dissatisfied with their
 5    performance in AdX.
 6    Q     Okay.  Let's go to the page ending in 267, please.
 7    Okay.  And if you look, there is a heading for Hulu, and
 8    right underneath that it says:  "Deal is moving over from
 9    AdX due to low performance."
10               Did I read that correctly?
11    A     Yes.
12    Q     And have the impressions sold through Concert's ad
13    network increased over time?
14    A     Yes.
15    Q     And have the impressions sold through Concert's SSP
16    increased over time?
17    A     Yes.
18               MS. DUNN:  Your Honor, move to admit DTX 1813.
19               MR. TEITELBAUM:  No objection.
20               THE COURT:  All right.  It's in.
21       (Defense Exhibit Number 1813 admitted into evidence.)
22    BY MS. DUNN:
23    Q     And do you recognize Exhibit Vox 4 as a true and
24    accurate copy of this update memo?
25    A     Yes.
```

17

Read-in deposition - R. Pauley

```
 1   Q    That first sentence states:  "In 1H first half 2021,
 2   Concert grew at 120 percent rate year over year exceeding
 3   first half expectations by 55 percentage points."
 4             Did I read that correctly?
 5   A    Yes.
 6   Q    And can you just explain what that means?
 7   A    It means that in the first six months of the calendar
 8   year 2021, Concert revenue would have more than doubled,
 9   grew at a rate of 120 percent compared to the first
10   six months of 2020 and grew faster than what our
11   expectations were heading into the first half -- the first
12   six months of 2021.
13   Q    I'll have you turn to the next page, please.
14             If you look, the second bullet under the heading
15   deal volume, it says:  "Paired with consistent growth of
16   revenue, share of small, less than 150K deals, Concert is
17   helping Vox Media expand its advertiser base with new and
18   smaller advertisers."
19             Did I read that correctly?
20   A    Yes.
21   Q    So Vox first launches Concert in 2016, and when it
22   launches in 2016, it has an ad network; is that right?
23   A    Correct.
24   Q    Okay.  And then about four years later, it expands the
25   ad network to include Concert Local; is that right?
```

                                                              18

Read-in deposition - R. Pauley

```
 1   A     Yes.
 2   Q     Okay.  And around the same time, Vox also launches
 3   Concert Ad Manager?
 4   A     I believe the Ad Manager was a little after that in the
 5   timeline, maybe a year later.  But yeah.
 6   Q     And then one of the most recent innovations from
 7   Concert has been the SSP?
 8   A     That's correct.
 9   Q     Let's make it clean.  But generally since Concert's
10   launch, you have seen an upward trajectory of growth via
11   revenue?
12   A     Yes.
13   Q     And so Vox views Concert as a success?
14   A     We do.
15   Q     And Vox is looking to continue to expand Concert?
16   A     Yes.
17   Q     And does Vox use header bidding to monetize its
18   properties?
19   A     It does.
20   Q     What exchanges place ads on Vox's properties via header
21   bidding?
22   A     A number of exchanges.  Magnite, Amazon, TripleLift, I
23   believe, PubMatic.  A handful of others.
24   Q     Does Criteo place ads on Vox's property by header
25   bidding?
```

19

Read-in deposition - R. Pauley

```
 1    A     Yes.

 2    Q     Does Index Exchange place ads on Vox's property via

 3    header bidding?

 4    A     Yes.

 5    Q     Does MediaNet place ads on Vox's properties via header

 6    bidding?

 7    A     Yes.

 8    Q     Does OpenX place ads on Vox's properties via header

 9    bidding?

10    A     Yes.

11    Q     Does Securion place ads on Vox's properties via header

12    bidding?

13    A     Yes, I believe so.

14    Q     Do any of these advertisers explicitly buy advertising

15    on Vox's property through one type of sales channel?

16    A     I would say generally it's -- generally it's through

17    multiple of these channels.

18    Q     And why does Vox market itself as being free from

19    fraud, poor performance and untrustworthy content

20    environments?

21    A     Because our view at the time, and still probably today,

22    is that there is two -- marketers and advertisers are

23    spending too much of their digital marketing dollars in

24    places that and in channels that expose them to fraud, poor

25    performance or brand unsafe environments.
```

20

Read-in deposition - R. Pauley

```
 1   Q    In your experience marketing Vox to advertisers, do

 2   advertisers want an environment free from fraud?

 3   A    Generally speaking, yes.

 4   Q    And in your experience -- in your experience marketing

 5   Vox to advertisers, do advertisers want an environment free

 6   of untrustworthy content?

 7   A    They do.

 8   Q    And in your experience marketing Vox to advertisers, do

 9   advertisers want environments free from poor performance?

10   A    Generally, yes.

11          MS. DUNN:  Your Honor, move to admit DTX 244.

12          MR. TEITELBAUM:  No objection.

13          THE COURT:  244 is in.

14      (Defense Exhibit Number 244 admitted into evidence.)

15   BY MS. DUNN:

16   Q    Okay.  Have you seen this document before?

17   A    I have.

18   Q    What is it?

19   A    It appears to be a business review prepared by Google

20   for Vox Media's AdX business.

21   Q    And page 8 of Exhibit Vox 6 features a graph that shows

22   Vox's revenue through AdX over time; is that right?

23   A    Yes.

24   Q    And the bullet below the graph says that there was a

25   large uptick in revenue in Quarter 4 due to DFP launch with
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Read-in deposition - B. Bumpers

```
 1    Dynamic Allocation; correct?

 2    A     That's correct.

 3    Q     And can you explain why Vox made more money as a result

 4    of Dynamic Allocation during this period?

 5    A     We generated more revenue from AdX during this period

 6    due to the combination of -- well, I guess the DFP launch,

 7    and then, thus, through Dynamic Allocation.  The

 8    opportunities that AdX had to monetize Vox Media inventory

 9    increased dramatically, which was evidenced in the ad

10    requests and queries here.  And Dynamic Allocation,

11    essentially, let AdX at the time compete at different

12    priorities in the ad prioritization stack.

13    Q     And this increased Vox's net revenue at the time?

14    A     I believe it increased overall Vox Media net revenue,

15    and then in the document, it's increased AdX net revenue,

16    yes.

17              MS. DUNN:  Thank you, Your Honor.

18              Our next witness will be Brian Bumpers of Zulily.

19    Also via read-in.

20              THE COURT:  All right.

21              MS. DUNN:  Thanks, Your Honor.

22    Q     Mr. Bumpers, what is your position at Zulily?

23    A     I'm marketing analytics manager.

24    Q     And as the marketing analytics manager, Mr. Bumpers,

25    what are your responsibilities?
```

Read-in deposition - B. Bumpers

```
 1   A    I manage all the analytics that -- for the marketing

 2   department, which includes outbound, paid ads, customer

 3   experience, analytics.

 4   Q    Mr. Bumpers, can you please briefly describe Zulily's

 5   business in your own words?

 6   A    Yes.  Zulily is an e-commerce company.  We sell retail

 7   products at a discounted price.  Our main customer is moms

 8   and children.

 9   Q    Okay.  Does Zulily advertise its services on the

10   Internet?

11   A    Yes.

12   Q    So, Mr. Bumpers, what was Zulily's annual spend on

13   digital advertising in 2022?

14   A    58 million, I believe.

15   Q    Where on the Internet does Zulily advertise its

16   services?

17   A    We advertise our services on other websites, mainly

18   just on websites and -- different websites and on Google and

19   Facebook and -- yeah, different places like that.

20   Q    You mentioned Facebook.

21        Does Zulily advertise on Facebook -- Facebook's

22   website?

23   A    Yes.

24   Q    Does it advertise on Instagram?

25   A    Yes.
```

23

Read-in deposition - B. Bumpers

```
 1    Q    Does it advertise on the Instagram app?

 2    A    I was -- I believe so, yes.

 3    Q    Okay.  Does Zulily advertise on connected television?

 4    A    Yes.

 5    Q    Can you provide any examples of what connected

 6  television services Zulily advertises on?

 7    A    Yeah.  Like Tubi, the streaming -- the TV that has ads.

 8  So like Tubi, FuboTV, those types of television -- connected

 9  television.

10    Q    Does Zulily also advertise on Hulu?

11    A    Yes.

12    Q    And when it advertises on connected TV, are Zulily's

13  ads video?

14    A    Yes.

15    Q    Okay.  When Zulily advertises on Facebook, are some of

16  its ads video ads?

17    A    I believe so.

18    Q    And when Zulily advertises on Instagram, are some of

19  Zulily's ads video ads?

20    A    To the best of my knowledge, yes.

21    Q    Mr. Bumpers, does Zulily monitor the performance of its

22  advertising on the Internet?

23    A    We do.

24    Q    How does Zulily monitor the performance of its

25  advertising on the Internet?
```

24

Read-in deposition - B. Bumpers

```
 1   A    When we buy the ads, we get the number of impressions
 2   that -- and we know the cost that we paid for those ads, and
 3   then once the customer comes in, we track how much money
 4   they spent, and so -- and then we can see how well the ads
 5   are performing.
 6   Q    And what sort of metrics do you look at?  I think you
 7   mentioned a few metrics, but what sort of metrics do you
 8   look at to measure the performance of the ad you had at
 9   Zulily?
10   A    So we look at the cost of the ad, the impressions, as I
11   mentioned.  So we have KPIs, like cost-per-million clicks,
12   number of clicks on those ads, click-through rate,
13   conversion.  And we've changed our site, but for last year,
14   we looked at the number of people that signed up at Zulily
15   as well.
16   Q    Have you ever heard of the term return on ad spend?
17   A    Yeah.  ROAS.  Yes.
18   Q    And what happens during the weekly business review?
19   A    We review the performance of each of our different
20   channels, like outbound, paid ads, like our customer
21   experience, sign-ups, that type of stuff.
22   Q    You mentioned outbound.  What does that stand for?
23   A    Outbound is email.  Email, SMS and mobile push.
24   Q    And you mentioned paid ads.  What does that stand for?
25   A    Paid ads is -- sorry.  Paid ads is advertising on
```

25

Read-in deposition - B. Bumpers

```
 1   either, like, CTV, linear TV or online.
 2   Q    Earlier you testified that people during your weekly
 3   business review were saying:  "Let's test spending on this
 4   platform or this type of ad, and we would come to a
 5   consensus and say that's a good idea, and we'll test it"; do
 6   you recall that?
 7   A    Yes.
 8   Q    And so can you give an example of that testing in the
 9   last year?
10   A    Let's see.  For example, an outbound, we'll try a test,
11   we'll talk about -- talk about, and we'll say we'll try a
12   different manual sort instead of doing our algorithmic sort
13   for our daily emails would be an example.
14   Q    Do you have an example that involves paid advertising
15   online of the testing that you referenced earlier during the
16   weekly business review?
17   A    Yeah.  Like we'll say -- we'll shift money from one
18   platform, one like -- from, like, Google to, like, Facebook.
19   We'll say, like, let's try a different way to do it.
20   Q    I see.  And that's an actual -- that's something that
21   Zulily has actually done, shifting money?
22   A    Yes.
23   Q    From Google to Facebook?
24   A    Yes.
25   Q    And what was -- what's the purpose of that testing?
```

Read-in deposition - B. Bumpers

```
 1    A    The purpose of the testing would be to find the most
 2    efficient way to spend our money.
 3    Q    And when you say find the most efficient way to spend
 4    your money, what do you mean by that?
 5    A    We probably go back to ROAS to say you get a higher
 6    ROAS, so you get a better return on investment on your
 7    spending.
 8    Q    So let's go through a few examples here.
 9              Can you provide a few examples of publishers from
10    which Zulily has purchased ads in the past two years?
11    A    Yes.  It would be, you know, Google, Facebook.  We use
12    The Trade Desk to publish our ads.  Criteo that you already
13    mentioned.  Those are the type of people -- companies that
14    we purchase ads or we pay to publish our ads.
15    Q    Does Zulily use Meta Ad Manager to place ads on
16    Facebook?
17    A    To the best of my knowledge, yes.
18    Q    Does Zulily use Meta Ad Manager to place ads on
19    Instagram?
20    A    To the best of my knowledge, yes.
21    Q    Has Zulily purchased ads on TikTok?
22    A    I believe so.
23    Q    Has Zulily purchased ads on Pinterest?
24    A    I believe so.
25    Q    Has Zulily purchased ads on Amazon?
```

27

Read-in deposition - B. Bumpers

```
 1    A    I believe so.

 2    Q    Has Zulily purchased ads on Snapchat?

 3    A    Possibly.  It may be yes.  I would -- probably.

 4    Q    Has Zulily purchased ads on Twitter?

 5    A    Yes.

 6    Q    Can you provide any examples of ad networks?

 7    A    I think there's Google's ad network.  Right.  And then

 8    there's -- I think you mentioned Facebook's ad network, and

 9    then you mentioned TikTok's, and then you mentioned

10    Amazon's.  So those are probably the larger ones, I would

11    think.

12    Q    Okay.

13    A    Can I go back?

14    Q    Yes.

15    A    I would say that -- yeah.  Okay.  So now that I thought

16    about it more, yeah, I think probably The Trade Desk and

17    Criteo would probably be considered an ad network.  I would

18    probably consider it because they're going out to the

19    marketplace for us to do that.  So ...

20    Q    Has Zulily used the Google Display Network to buy ads?

21    A    Yes.

22    Q    Has Zulily used Taboola to buy ads on the Internet?

23    A    I believe so, yes.

24    Q    What is Taboola?

25    A    I really -- Taboola I guess would -- I don't really
```

28

Read-in deposition - B. Bumpers

```
 1   know what Taboola is.  I think they would -- so I guess they
 2   would probably be considered an ad display network.
 3   Q    Has Zulily used Yahoo ad tech to place ads on the
 4   Internet?
 5   A    I would believe so.  A lot of these data view questions
 6   you're asking is in the spreadsheet.
 7   Q    Yeah.  And is Yahoo ad tech an ad network?
 8   A    I believe so.
 9   Q    I think you testified earlier that it's possible that
10   Zulily uses more than ten --
11   A    Yes.
12   Q    -- different ad networks to buy ads on the Internet?
13   A    Yes, I would say so.
14   Q    Okay.  What metrics does Zulily look at to determine
15   how to spend with one ad network versus another ad network?
16   A    So as I mentioned earlier, it would be click-through
17   rate, return on ad spend.  Those are probably some of the
18   main ones.  And the -- obviously the cost.  Let's see.
19   Clicks, impressions, conversion.  Those would probably be
20   the main ones that we would look at.
21   Q    Okay.  Does Zulily reallocate ad spend between
22   different intermediaries based on their performance?
23   A    Yes.
24   Q    Is return on ad spend one of the factors based upon
25   which Zulily has allocated ad spend between Criteo and The
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Read-in deposition - B. Bumpers

```
 1   Trade Desk?
 2   A     I would say so, yes.
 3   Q     I'm not looking for exact numbers here, but do you have
 4   a ballpark sense of how much Zulily spent purchasing ads on
 5   the Google Display Network in 2016?
 6   A     Let me think.  Ads.  So maybe 30 -- 30 million-ish.
 7   Q     Similarly, do you have a rough -- a sense of how much
 8   money roughly Zulily spent on the Google Display Network in
 9   2017?
10   A     My recollection is we dropped our spending.  I think
11   it's somewhere around 9, 10 million, maybe less.  Somewhere
12   around there, I think.
13   Q     So, to your recollection, Zulily reduced its spending
14   on the Google Display Network from 2016 from around
15   30 million to around 8 million in 2017?
16   A     Yes, that is my recollection.
17   Q     To your recollection, did Zulily reduce its spending on
18   the Google Display Network between 2017 and 2018?  Sorry.
19   2016 and 2017 by approximately 20 million?
20   A     That sounds right.
21   Q     Did Zulily's ad spending on Facebook and Instagram
22   increase between 2016 and 2017?
23   A     Yes.
24   Q     Approximately by how much did it -- Zulily's ad
25   spending on Facebook and Instagram increase between 2016 and
```

30

Read-in deposition - B. Bumpers

1   2017?

2   A    I believe -- I believe like $30 million maybe.

3   Something like that.

4   Q    By approximately how much did Zulily decrease its

5   spending on Google's display network between 2016 and 2017?

6   A    25, $30 million, somewhere around there, I think.

7   Q    Well, why did Zulily reduce its ad spending on the

8   Google Display Network between 2016 and 2017?

9   A    We were -- we are -- at Zulily or any marketing, you're

10  trying to optimize your spend.  And so I would imagine,

11  since I wasn't there in 2016, that they were trying out a

12  new way to spend money to be more efficient in the way that

13  they were spending the money and optimize the dollar.

14       Because we have a constrained amount -- a limited

15  amount of resources, and as you -- you have the law of

16  diminishing returns.  So, like, you spend all your money in

17  one place, you will not get the same return that you can by

18  shifting money to another place to increase that amount

19  of -- to get a better return on your dollar that you spend.

20  Q    Has Zulily reallocated spend from the Google Display

21  Network to Facebook or Instagram since 2017?

22  A    Yes, they have.  We have moved resources from Google to

23  other providers.

24  Q    But Zulily has moved resources from the Google Display

25  Network to Facebook or Instagram since 2017?

31

Read-in deposition - B. Bumpers

```
 1   A     Yes.
 2   Q     Since you've been at Zulily, so let's talk about since
 3   2021.
 4   A     Okay.
 5   Q     Has Zulily reallocated ad spend from the Google Display
 6   Network to Facebook or Instagram?
 7   A     I believe we -- we've reduced spending, and -- at the
 8   Google Ad network -- well, we've reduced spending at the
 9   Google Ad network, and we've increased ad spending at
10   Facebook's -- I forget what they call it, but the Facebook
11   ad network.
12   Q     Sorry.  When you say the Facebook ad network, are you
13   referring to ads on Instagram or Facebook itself?
14   A     Yes.
15   Q     Okay.  And why, since 2021, has Zulily reallocated ad
16   spend from the Google Display Network to Facebook or
17   Instagram?
18   A     Yeah.  We've had shifting priorities on the way we
19   target our audiences since I have been there.  So we have
20   had a new CMO.  Previously we had a different CMO, and he
21   was focused on a different population, and we went to
22   Facebook to bring those people in.
23   Q     Have you heard of the phrase in the context of
24   advertising -- oh, sorry.
25               The term audiences, is that a phrase you've heard
```

                                                                  32

Read-in deposition - B. Bumpers

```
 1   in this industry?

 2   A    Yes.

 3   Q    And what does that mean to you?

 4   A    Audience would be -- so Zulily says we want to target,

 5   you know, customers between the age of 21 to 25.  And

 6   that -- everybody that is 21 to 25 would be our audience.

 7   Q    Do the different channels of advertising present

 8   different ways of identifying audiences?

 9   A    I would say yes.  Yes.

10   Q    So would you say that you could target different

11   audiences using different channels?

12   A    Yes.

13   Q    So would you target a different audience using TV than

14   you would display advertising?

15   A    Potentially.  Sometimes the audiences are the same.

16   Q    And could you target a different audience using social

17   than you would display?

18   A    Yes.  Potentially we would.

19   Q    Is it complicated choosing which channels to use for

20   your targeting advertising?

21   A    I would say yes.  Yes.

22   Q    And does the allocation depend on the campaign?

23   A    Yes.

24   Q    And would it be the case that the appropriate channel

25   you used depends on, you know, which type of campaign you're
```
                                                              33

Read-in deposition - B. Bumpers

```
 1   doing?

 2   A    Yes.

 3   Q    And so would it be the case that the appropriate

 4   channel mix for one campaign would not be an appropriate

 5   channel for another campaign?

 6   A    Yes.

 7   Q    So does Zulily use the same channel for each campaign?

 8   A    No.

 9   Q    And why not?

10   A    So what we would be looking for are different -- like,

11   you mentioned audiences.  Different audiences would be --

12   might be better to use another channel to target those

13   people.

14   Q    Are you familiar with the phrase marketing funnel?

15   A    I am familiar with the funnel.

16   Q    What does it mean to you?

17   A    The marketing funnel -- so it's basically what -- it

18   looks like what it is, it's a funnel.  So the top is the

19   door that they come in, that's like your landing page.  And

20   then each step toward the bottom of the funnel it's the

21   completion of whatever you're trying to do.  In our case,

22   it's to make a purchase of that product.  And so the funnel

23   is the top, you open the door, they come in, and the bottom

24   of the funnel is where they check out.

25   Q    And does Zulily consider the different parts of the
```

                                                              34

Read-in deposition - B. Bumpers

```
 1   marketing funnel in choosing which advertising channel to
 2   use?
 3   A    Yes.  When we -- when we market to people -- so our
 4   retention campaign would be -- we call it more of a bottom
 5   of the funnel type campaign because we've already marketed
 6   to them at the top of the funnel.  So now we're trying to
 7   get them to go to the final step of making a purchase --
 8   making a purchase.
 9   Q    So would you use different advertising channels
10   depending upon where you are in the funnel?
11   A    Potentially.  We might use the same one to capture.  So
12   yes and no I would say.
13            Let me correct that.
14            Yes.  You can use the different -- different
15   channels to -- at the top of the funnel and the bottom of
16   the funnel.
17   Q    Mr. Bumpers, we're back on the record doing redirect
18   for Google.  I have a few follow-up questions on things you
19   testified about earlier.
20            So in response to questions from the Department of
21   Justice, you testified about different advertising channels
22   that Zulily uses in its advertising.  And I was going to ask
23   you, could you please repeat what those different
24   advertising channels are that Zulily recognizes?
25   A    Sure.
```

                                                              35

Read-in deposition - B. Bumpers

```
 1              By -- our definition of channels are -- would be

 2    our outbound channel, which is email; paid ads, so different

 3    type of paid ads; and then -- so you have SEM, search engine

 4    marketing; SEO, search engine optimization; and then you

 5    have the display ads, that type of thing.

 6    Q    And so the -- so one of the advertising channels that

 7    Zulily recognized is paid -- I think you said paid ads; is

 8    that right?

 9    A    Paid ads, yes.

10    Q    What does paid ads encompass?

11    A    Paid ads would include SEM, SEO, and then the display

12    ads.  We label it as -- we label it as paid ads.

13    Q    Okay.  And would that include social ads, too?

14    A    Yes.  Yes.  And social ads, yes.

15    Q    So social ads and display ads, SEM ads, they're all

16    within the paid ads marketing channel that Zulily --

17    A    Yes.

18    Q    -- recognizes?

19    A    Yes.

20    Q    And I believe you testified potentially you could reach

21    different audiences with social or display ads; do you

22    recall that?

23    A    I said potentially we could.  So, yes, we potentially

24    can reach different audiences with paid ads, yes.

25    Q    With paid ads?
```

                                                                    36

Read-in deposition - B. Bumpers

```
 1   A     With paid ads, social ads, potentially, yes.  Yes.
 2   Q     Could you also potentially reach -- does Zulily also
 3   reach similar audiences with social and display ads?
 4   A     Yes.
 5             THE COURT:  All right.  Any more depositions?
 6             MS. DUNN:  No more depositions, Your Honor.
 7             THE COURT:  Evan, thank you.
 8             MS. DUNN:  Thank you to our reader.
 9             THE COURT:  Okay.
10             MS. DUNN:  Okay.  So just some cleanup and exhibit
11   issues, Your Honor.
12             The other day we moved to admit pages 29 and 32 of
13   DTX 1420 in connection with the Criteo deposition.  Pages 29
14   and 32 of DTX 1420 were discussed in the deposition
15   designation clips that were played and correspond to
16   Exhibit 1 of the deposition.  Excerpts of DTX 1420 had been
17   previously admitted, so we are only seeking to admit those
18   two additional pages.
19             THE COURT:  So that's 39 and 42?
20             MS. DUNN:  And 32.  29 and 32.
21             THE COURT:  29 and 32?
22             MS. DUNN:  Yes, Your Honor.
23             THE COURT:  Hold on.  Is there any objection,
24   Ms. Wood?
25             MS. WOOD:  No, Your Honor.
```

37

```
1                    THE COURT:  All right.  So for Defense
2   Exhibit 1420, there are only four pages, 21, 29, and 32?
3   Three pages.  Did I miss something?  21, 32 --
4                    MS. DUNN:  29 and 32.
5                    THE COURT:  All right.  So 32 is -- so there's
6   only three pages that we need; is that right?
7                    MS. WOOD:  32 was already in.
8                    THE COURT:  32 was already in?
9                    MS. DUNN:  Right.
10                   THE COURT:  So three pages.  Got it.
11                   MS. DUNN:  I also made a mistake when I cited the
12   exhibit number on the record the other day, and I referred
13   to DTX 1420, which we just discussed, as DTX 1071.  So I
14   just wanted to clarify that for the record.
15                   THE COURT:  I'm sorry.  Hold on.  This is still in
16   the Criteo deposition?
17                   MS. DUNN:  Yes.
18                   THE COURT:  All right.  And so you referenced 1071
19   in the deposition, but it should have been 1420?
20                   MS. DUNN:  Yes, Your Honor.
21                   THE COURT:  Is 1071 in then?  Should it be
22   stricken?  I don't know what 1071 is.
23                   MS. WOOD:  We're checking, Your Honor.
24                   THE COURT:  Okay.
25                   MR. ISAACSON:  Criteo 10-K, which a portion was
```

38

```
 1   in.  1071 is --
 2           MS. DUNN:  Yeah.  So 1071 is the Criteo 10-K from
 3   2020, but the Criteo 10-K that was discussed at the
 4   deposition was DTX 1420.
 5           THE COURT:  So 1071 then should not be in
 6   evidence; is that correct?
 7           MS. DUNN:  Correct.  Yes.
 8           THE COURT:  All right.  If it -- wait a minute.
 9   Mr. Isaacson may have an issue.
10           MR. ISAACSON:  I used a Criteo 10-K, and I -- I'm
11   suspecting we have two Criteo 10-Ks.  So I would refer to
12   1071 in the transcript earlier, I believe.
13           MS. DUNN:  And so actually that's also incorrect.
14           So it's --
15           THE COURT:  I'm glad this is the morning and not
16   the afternoon.  All right.
17           MS. DUNN:  So it is true that Mr. Isaacson used
18   two Criteo 10-Ks in the deposition.  I believe they are
19   DTX 1420, which we just discussed, pages 29 and 32.  And
20   then the second one he used was DTX 1700.  And maybe it's
21   double marked because it's only one number different from
22   DTX 1071 that we discussed.  But I think we are covered in
23   the deposition if we move to admit page 14 of DTX 1700 and
24   pages 29 and 32 of DTX 1420.
25           THE COURT:  I'm completely lost now because we
```

```
 1    were talking about 1071.  So let's get this straight now.

 2              Katie, what are you showing?  Is 1700 in?

 3              MS. DUNN:  So the notes that I have are that we

 4    also require DTX 1700.  So I think we should take just a

 5    moment to look that up and make sure we're not missing

 6    anything.

 7              THE COURT:  All right.  1700 is not in evidence.

 8              MS. DUNN:  Right.

 9              THE COURT:  Our records do not show it's in

10    evidence.

11              Are you telling me that the same document has

12    three different numbers?  It's Defense 1420, Defense 1071

13    and Defense 1700?  Is that what you're saying?

14              MS. DUNN:  No, Your Honor.  The confusion is that

15    there are a number of Criteo 10-Ks that are on the exhibit

16    list, they're from different years.

17              THE COURT:  Okay.

18              MS. DUNN:  And they're not necessarily all the

19    same.  So we just are wanting to make sure that we admit the

20    proper ones.  And the additional complication is that we're

21    trying to only admit the pages we used rather than the whole

22    document.

23              THE COURT:  All right.

24              MS. DUNN:  A-ha.  Okay.

25              So --
```

                                                                40

```
 1                    THE COURT:  Let's go back to the basics.
 2                    MS. DUNN:  Yes.
 3                    THE COURT:  1420 is the report from what year?
 4                    MS. DUNN:  So DTX 1420 is the Criteo 10-K from
 5      2022.
 6                    THE COURT:  All right.  For the year 2022.  All
 7      right.
 8                    And then Exhibit 1071 is --
 9                    MS. DUNN:  Is the Criteo 10-K from 2020.
10                    THE COURT:  Okay.  All right.  And what is 1700?
11                    MS. DUNN:  1700 is the Criteo digital advertising
12      glossary.
13                    THE COURT:  All right.  Now, as to 1071, what
14      pages is the defense moving in?
15                    MS. DUNN:  Okay.  So for 1071, we are moving in
16      the cover page and page 292.
17                    THE COURT:  Just those two pages from that
18      exhibit?
19                    MR. ISAACSON:  14, 20, 12 and 13?
20                    THE COURT:  No.  This is 1071.
21                    MR. ISAACSON:  I did 1420.
22                    MS. DUNN:  Great.
23                    So 1071 we're moving in page 292 and the cover
24      page, and that is the 2020 10-K.
25                    THE COURT:  Any objection, Ms. Wood?
```
                                                                    41

1                  MS. WOOD:  I have that previously from DTX 1071

2      during the Criteo deposition, that the pages that were

3      referenced were pages 14 and 22.

4                  MS. DUNN:  That's the mistake we're trying to

5      correct right now.

6                  MS. WOOD:  And you're saying instead it's what two

7      pages?

8                  MS. DUNN:  So for 1071, we're saying it's page 292

9      of the 2020 10-K.

10                  MS. WOOD:  Okay.  But there were two pages

11      referenced.  So what's the second page referenced?

12                  MS. DUNN:  Just for clarity, that was from the

13      Parsons depo.

14                  MS. WOOD:  Okay.

15                  MS. DUNN:  All right.  DTX 1420 --

16                  MS. WOOD:  Wait.  Wait.  Wait.

17                  THE COURT:  Wait.

18                  MS. DUNN:  Sorry.

19                  MS. WOOD:  My understanding is in connection with

20      the Parsons depo, DTX 1071 was referenced to two different

21      pages other than the cover page.  So you want the cover page

22      plus 292 plus what other page?

23                  MS. DUNN:  Okay.  So that is incorrect.  This is

24      the mistake we're trying to correct.

25                  So 1071, which is the 2020 10-K, was one of two

                                                                    42

```
 1   10-Ks discussed in the deposition.  For the 1071 exhibit, we

 2   need page 292, plus the cover page.

 3            For the second 10-K discussed in the deposition,

 4   which is the 2022 10-K, that is DTX 1420.

 5            THE COURT:  And there's a total of three pages,

 6   21, 29 and 32, according to what we've just talked about

 7   this morning.

 8            MR. ISAACSON:  So during the cross of Lee for

 9   DTX 1420, I admitted pages 12 and 13.

10            MS. DUNN:  Okay.

11            THE COURT:  Two more pages, 12 and 13.

12            MS. DUNN:  So cover page, 12, 13, 29 and 32.

13            MS. WOOD:  Not 21?

14            MS. DUNN:  Do you need 21?

15            THE COURT:  Wait.  Wait.  Wait.  We're mixing up.

16   There's no cover page for 1420.

17            MS. DUNN:  Meaning it doesn't exist?

18            THE COURT:  No, it wasn't admitted.

19            MS. DUNN:  We're asking for it to be admitted,

20   Your Honor.  So that, for the record, everybody knows what

21   it is as opposed to free-floating pages.

22            THE COURT:  All right.  Let's go back.

23            So for the 10-K for the year 2022, which is

24   Exhibit 1420.

25            MS. DUNN:  Yes.
```

43

```
 1              THE COURT:  You want the cover page, you want
 2   pages 12 and 13, 21, 29 and 32; is that correct?
 3              MS. DUNN:  We did not use 21 in the deposition, so
 4   we do not need to admit 21.  We do need to admit 29 and 32,
 5   which were both used in that deposition.
 6              THE COURT:  Okay.  Ms. Wood, is that --
 7              MS. WOOD:  No objection, Your Honor.
 8              THE COURT:  All right.  That's fine for 1420.
 9   (Defense Exhibit Number 1420, cover page, pages 12, 13, 29,
10                  32 admitted into evidence.)
11              THE COURT:  Now for 1071, which is the 2020 year
12   10-K in the Criteo deposition, you want the cover page and
13   page 292; is that correct?
14              MS. DUNN:  Yes, Your Honor.
15   (Defense Exhibit Number 1071, cover page, page 292 admitted
16                       into evidence.)
17              THE COURT:  All right.  And then Exhibit 1700 --
18   these are all defense exhibits.
19              MS. DUNN:  Yes.
20              THE COURT:  Which is the digest glossary -- ad
21   glossary, you want that admitted.
22              MS. DUNN:  Yes.
23              THE COURT:  The whole exhibit or just the pages?
24              MS. DUNN:  Page 14 of DTX 1700.  And I think for
25   the sake of prudence, maybe the first page, since presumably
```
                                                              44

```
 1    that will say what it is.

 2               MS. WOOD:  So do I have a copy of that?  Was that

 3    used in the deposition?

 4               MS. DUNN:  That was used.  It was Exhibit 4 at the

 5    deposition.

 6               MS. WOOD:  Okay.  We have no objection.

 7               THE COURT:  All right.  Those are in.  Katie, is

 8    that nice and clear?

 9               THE DEPUTY CLERK:  Yes.

10         (Defense Exhibit Number 1700, first page and page 14

11                      admitted into evidence.)

12               MS. DUNN:  Great.  Thank you.

13               THE COURT:  Okay.

14               MS. DUNN:  Our other small bit of business is the

15    parties, in the interest of comity have agreed to the

16    admission of certain exhibits, certain DTXs, so I would like

17    to move those in at this time.

18               THE COURT:  Okay.

19               MS. DUNN:  DTX 211.

20               THE COURT:  211.  Go ahead.

21               MS. DUNN:  DTX 214.

22               THE COURT:  214.

23               MS. DUNN:  DTX 230.

24               THE COURT:  Go ahead.  230.

25               MS. DUNN:  DTX 298.
```

45

```
1              THE COURT:  All right.

2              MS. DUNN:  DTX 352.

3              THE COURT:  352.

4              MS. DUNN:  DTX 371.

5              THE COURT:  371.

6              MS. DUNN:  DTX 376.

7              THE COURT:  All right.  376.

8              MS. DUNN:  DTX 406.

9              THE COURT:  All right 406.

10             MS. DUNN:  DTX 428.

11             THE COURT:  All right.

12             MS. DUNN:  DTX 435.

13             THE COURT:  Go ahead.

14             MS. DUNN:  DTX 481.

15             THE COURT:  All right.

16             MS. DUNN:  DTX 670.

17             THE COURT:  670?

18             MS. DUNN:  670.

19             DTX 961.

20             THE COURT:  961.  Okay.

21             MS. DUNN:  DTX 1016.

22             THE COURT:  All right.

23             MS. DUNN:  DTX 1169.

24             THE COURT:  Okay.

25             MS. DUNN:  DTX 1282.
```

46

```
 1                THE COURT:  Go ahead.

 2                MS. DUNN:  DTX 1303.

 3                THE COURT:  All right.

 4                MS. DUNN:  And DTX 1480.

 5                THE COURT:  Now, are those from different

 6    witnesses, or what are these all related to?

 7                MS. DUNN:  These are for different witnesses, Your

 8    Honor.

 9                THE COURT:  All right.

10    (Defense Exhibit Numbers 211, 214, 230, 298, 352, 371, 376,

11     406, 428, 435, 481, 670, 961, 1016, 1169, 1282, 1303 and

12                    1480 admitted into evidence.)

13                THE COURT:  Are there any plaintiff additional

14    exhibits?

15                MS. WOOD:  No, Your Honor.

16                THE COURT:  That's everything, Ms. Dunn?

17                MS. DUNN:  That's everything.

18                THE COURT:  All right.  So now is Google resting?

19                MS. WOOD:  I do have --

20                MS. DUNN:  Do you have something?

21                MS. WOOD:  I do have one matter of clarification.

22                THE COURT:  Yeah.

23                MS. WOOD:  And apologies that I'm raising this.

24                When the deposition of Mr. Glogovsky was read

25    yesterday, I just wanted to ensure that the portions that we
```
                                                              47

```
 1   wanted designated where the Court overruled your objection

 2   to exclude them, were all of those read in?

 3              MS. DUNN:  Yes.

 4              MS. WOOD:  Because I was unable to confirm that.

 5   But they were?

 6              MS. DUNN:  Yes.

 7              MS. WOOD:  Okay.  And if we have an issue with

 8   that we'll raise it.  Assuming that's right, we have no

 9   issues.

10              THE COURT:  All right.  I mean, you have the

11   deposition that was read in.

12              MS. WOOD:  I do.  I don't have it physically in

13   front of me right now, but I will confirm that.

14              THE COURT:  Okay.

15              MS. DUNN:  So are we set with that?

16              THE COURT:  Yeah.  I mean, you represented that it

17   included everything.

18              MS. DUNN:  Yes.  Correct.  It did.

19              Your Honor, Ms. Rhee is here to address the issue

20   that came up yesterday with respect to the motion in limine,

21   if the Court would wish to have that happen prior --

22              THE COURT:  On the California case?

23              MS. DUNN:  Yes.  I believe that there was a

24   request for judicial notice on the plaintiffs' side, so

25   before we rest, we want to make sure we make that request so
```

                                                              48

```
 1    we do it before the defense rests.

 2              MS. WOOD:  My understanding it was the Court's

 3    intention to take that up at closing, but that's just my

 4    recollection.

 5              THE COURT:  I think to make the case complete,

 6    it's a factual issue, so we should do it.  Yeah.

 7              Go ahead.

 8              MS. DUNN:  Yes.

 9              MS. RHEE:  Your Honor, I think the issue is, as

10    the Court had actually ruled in advance of the trial

11    starting, because the government had moved as a motion in

12    limine basically for Google to be estopped from presenting

13    its case and evidence related to the single two-sided

14    market, and the basis for the government's motion, and it

15    was repeated in Mr. Teitelbaum's cross-examination of

16    Dr. Israel yesterday, was to assert that a Google pleading,

17    a motion to dismiss one advertiser/publisher complaint

18    because of the face of the complaint for that particular

19    plaintiff was deficient, somehow precludes as a matter of

20    law Google actually raising the evidence and the defense

21    that it presented with respect to market definition.

22              The reason why we're raising this even before we

23    get to closing, Your Honor, before we rest our case, is that

24    the Court allowed the government to post the Northern

25    District of California ruling with respect to that motion to
```
                                                                49

1    dismiss, and for completeness' sake, we would ask that we,

2    again, as a matter of posting the public documentation here

3    about what's at issue in this case, be able to present the

4    fact that it was a motion to dismiss with respect to a

5    deficiency of the pleading, which, of course, is the legal

6    standard with respect to a motion to dismiss and doesn't at

7    all meet the criteria for which you could take judicial

8    estoppel.

9            THE COURT:  All right.  Well, again, I heard part

10   of this argument during the motion in limine, and obviously

11   the market definition is a core issue that the Court has to

12   resolve in this case.

13           I think it is somewhat of a problem for Google in

14   that you've taken one position as to the market in a federal

15   court, and it worked to your advantage, and you're taking a

16   somewhat different position in this case.

17           However, I've allowed full evidence -- I didn't

18   restrict anybody in presenting evidence on this issue.  It's

19   within the facts that I have to consider.  I'm going to look

20   at the entire mix of information that's been presented

21   during the trial in coming to my decisions.  And obviously

22   in your proposed findings, both sides are free to argue

23   about that issue.

24           MS. RHEE:  We welcome the opportunity to argue

25   that, Your Honor, but, again, we would really like to make

                                                              50

```
 1    clear that it was not a factual position taken by Google in
 2    the Northern District of California case because it was
 3    about the deficiency of the pleading on the face with
 4    respect to the procedural posture at that time, which was a
 5    motion to dismiss the complaint taking the allegations to be
 6    true on the face of that complaint.
 7              THE COURT:  I understand.  All right.
 8              Now, Google is resting?
 9              MS. DUNN:  The defense rests, Your Honor.
10              THE COURT:  All right.  That's fine.
11              Is there a rebuttal case?
12              MS. WOOD:  Very brief, Your Honor.  One witness.
13    We anticipate it being approximately one hour.
14              THE COURT:  That's fine.  I mean, you've all done
15    very well.  We're going to finish today.  Don't feel you're
16    hamstrung in that respect.
17              Who will the witness be?
18              MS. WOOD:  Matthew Wheatland.
19              THE COURT:  Is there an objection?
20              MS. DUNN:  Yes, there is an objection, Your Honor.
21              THE COURT:  Before you do that.  Ms. Dunn [sic],
22    tell me who he is and for what purpose you're calling him.
23    I'm sorry, Ms. Wood.
24              MS. WOOD:  It's all right.
25              Matthew Wheatland is a publisher from The Daily
```

51

1    Mail.  The Court heard some testimony from him on direct.

2              THE COURT:  That's right.

3              MS. WOOD:  All of his rebuttal testimony will be

4    exclusively related to matters raised by various of Google's

5    fact and expert witnesses in their case in chief.  We don't

6    intend to cover ground that's already been covered.  We

7    intend only to ask him questions about certain testimony and

8    opinions that were given in Google's case in chief.

9              THE COURT:  All right.

10             Ms. Dunn.

11             MS. DUNN:  Your Honor, we do object.  We do not

12   believe that this is proper rebuttal testimony.

13             And just as a reminder, Mr. Wheatland -- first of

14   all, he's not an expert, didn't submit any expert rebuttal

15   report.  He is a fact witness, one of many publishers the

16   Court heard from.

17             The Court heard Mr. Wheatland already testify to

18   the following things.  He testified about use of the ad

19   server, he testified extensively about DFP, he testified

20   about the AdX take rate, he testified about direct sales, he

21   testified about AdX-direct tags, he testified about header

22   bidding, Open Bidding, fraud and latency, he testified about

23   UPR, he testified about his dealings with Google, he

24   testified about social media, and -- social media and the

25   web, he testified about the Smart AdServer and about Xandr,

                                                              52

1    about Amazon, about price floors, and about DV360.

2            He is a fact witness, therefore, proper only for

3    his percipient testimony and -- at the time, which Your

4    Honor has been assiduous about.  And so the idea that you

5    can call back a fact witness to respond to facts that came

6    in the case does not speak to his percipient experience and

7    is not proper fact witness testimony.

8            I will also note, however, that he also was one of

9    the very last fact witnesses called by the government in

10   their case.  He testified on Day 8.  The only live fact

11   witness that came after him was Mr. Bellack.  So he

12   certainly had time to think about the facts in the case

13   prior to his testimony, and we do not think as a percipient

14   witness that what he has to say would be proper rebuttal,

15   and, similarly, it's hard to imagine would not be

16   cumulative.

17           THE COURT:  All right.  Well, let me see if

18   Ms. Wood, how she has represented that it will not be

19   cumulative and it is appropriate.  So I understand the

20   objection.  If I find that, in fact, it is not appropriate,

21   it will be even shorter than an hour.  All right.

22           MS. WOOD:  Understood, Your Honor.

23           May I ask one procedural question?

24           My intent with the witness -- the witness is

25   subject to the sequestration rule as a fact witness.  My

                                                              53

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

```
 1    intent with respect to some of the questions would be to say
 2    something to the effect of witnesses in defense case have
 3    suggested X, what is your response.  It's not because he
 4    knows --
 5              THE COURT:  What you should say is:  What is your
 6    response to such and such.
 7              MS. WOOD:  Okay.  That's fine.  I was just trying
 8    to use that as a mechanism to indicate its correlation to
 9    things in their case in chief, but I'm happy to just do that
10    separately.
11              THE COURT:  All right.  I'm not sure how valuable
12    that's going to be as rebuttal, but I'll let you get started
13    and we'll see.  All right?
14              MS. WOOD:  Okay.
15              THE COURT:  All right.  So Mr. Wheatland.
16              MS. WOOD:  Will we be taking a break at noon
17    today?
18              THE COURT:  We're back on our regular schedule
19    so -- oh.
20              MS. WOOD:  That's what I was thinking.  Should we
21    wait and just call him at 11:15?
22              THE COURT:  No.  Let's get him started, because in
23    the next ten minutes if I find it's not going somewhere,
24    that's going to be it.
25              MS. WOOD:  Great.
```

Direct examination - M. Wheatland

```
 1              THE COURT SECURITY OFFICER:  You may be seated.

 2              THE COURT:  We'll swear him in again, it's been so

 3    long.

 4    Thereupon,

 5                   MATTHEW WHEATLAND,

 6    having been called as a witness on behalf of the plaintiffs

 7    and having been first duly sworn by the Deputy Clerk, was

 8    examined and testified as follows:

 9                   (Time noted: 11:01 a.m.)

10              THE DEPUTY CLERK:  Thank you.

11                   DIRECT EXAMINATION

12    BY MS. WOOD:

13    Q    Good morning, Mr. Wheatland.

14              Can you please remind us for whom you work?

15    A    Daily Mail.

16    Q    And how long have you been working in the ad tech

17    industry?

18    A    About 12 years.

19    Q    Do you see that little handheld mic right there?  That

20    might be useful.

21    A    Okay.  Better?

22    Q    Yeah.  Let's try that.  And if that gets tiring, we can

23    put it on your tie, but it may just be easier to hold it.

24    A    Okay.  Yeah.

25    Q    And in those 12 years in the ad tech industry, do you
```

55

Direct examination - M. Wheatland

```
 1   have familiarity with the various ad tech tools?

 2   A    Yeah.  I do, yeah.

 3   Q    And have you used those ad tech tools?

 4        MS. RHEE:  Your Honor, we have already covered

 5   this extensively on direct examination.

 6        THE COURT:  Sustained.

 7        MS. WOOD:  This is foundation for the question

 8   that follows.

 9        THE COURT:  Just ask the question.

10        MS. RHEE:  Objection.

11        MS. WOOD:  Okay.  Okay.

12   BY MS. WOOD:

13   Q    There's been a -- let me rephrase.

14        How would you respond to the notion that the

15   market for ad tech tools consists of one large market with

16   advertisers on one side, publishers on the other side, and

17   all ad tech tool providers in the middle?

18        MS. RHEE:  Objection.

19        THE COURT:  I'm going to sustain the objection.

20        The market is a technical term the Court's going

21   to have to decide.  All right.  This is a fact witness.

22   It's not appropriate.

23   BY MS. WOOD:

24   Q    Can you describe your reaction to the suggestion that

25   the market for publisher ad servers is very competitive?
```

56

Direct examination - M. Wheatland

1              MS. RHEE:  Objection, Your Honor.

2              THE COURT:  Well, that's different.  I mean, he

3    works in the field, and he can say whether it's competitive

4    or not competitive.  That's cumulative.

5              MS. WOOD:  I don't believe he's answered that

6    question, Your Honor.

7              MS. RHEE:  That would also be the basis of the

8    objection.

9              THE COURT:  He may not have, but others have.

10   There's no question this is a very competitive area.

11             MS. WOOD:  Then I would like to -- if that is Your

12   Honor's perception, I would like this witness to be able to

13   answer that question --

14             MS. RHEE:  Objection, Your Honor.

15             MS. WOOD:  -- because I don't believe that's what

16   his answer will be.

17             THE COURT:  One at a time.  One at a time.

18             Let me hear the phrasing of your question again.

19   BY MS. WOOD:

20   Q    As a market participant, how would you respond to the

21   suggestion that the market for publisher ad servers is very

22   competitive?

23             MS. RHEE:  Objection, Your Honor.  This was also

24   discussed --

25             THE COURT:  Sustained.  Sustained.

Direct examination - M. Wheatland

```
 1    BY MS. WOOD:

 2    Q     Are you familiar with a product called AdSense?

 3    A     Yes, I am.

 4    Q     And can you use AdSense rather than DFP to serve your

 5    purposes as a website publisher?

 6    A     No.  AdSense is not a substitute for DFP.

 7    Q     Does the fact that advertisers can shift spending from

 8    open-web display to other forms of digital advertising

 9    impact your negotiations with Google as an ad tech vendor?

10          MS. RHEE:  Objection, Your Honor.  This was also

11    covered on his direct examination with respect to shifts

12    from social media to display and vice versa.

13          MS. WOOD:  No.  This is about the competitive

14    constraint that Dr. Israel testified would apply to

15    publisher ad servers --

16          THE COURT:  Wait.  Wait.  Wait.  Now you're

17    revealing testimony.

18          MS. WOOD:  Well, I'm not trying to, Your Honor.

19          MS. RHEE:  And, Your Honor, there were plenty of

20    government experts who they could have called on rebuttal if

21    that was the purpose of this rebuttal case, but this is a

22    fact witness who has been sequestered for the duration of

23    testimony.  He covered all of these topics on direct

24    examination.

25          MS. WOOD:  Your Honor, with respect, there is no
```

                                                              58

Direct examination - M. Wheatland

```
 1   place in the case law that would exclude a fact witness from
 2   testifying about the commercial realities in which they
 3   operate and limit that exclusively to expert testimony.  He
 4   has more experience dealing with the competitive dynamics in
 5   this market than any expert called by either side.
 6           THE COURT:  Well, I think the fact witnesses
 7   talking about the real world are valuable in a case like
 8   this because the experts don't have that experience.
 9           MS. WOOD:  And that's what we're trying to elicit.
10   He was not asked these questions on direct examination; he
11   was asked about the differences -- may I refer to his
12   testimony?  He was asked about differences between certain
13   types of advertising, but that's different than being asked
14   about the competitive dynamics in the tool -- in the market
15   for tools --
16           THE COURT:  All right.
17           MS. WOOD:  -- for ad tech.
18           THE COURT:  Go ahead.
19   BY MS. WOOD:
20   Q    How does the fact that advertisers may be able to
21   switch their ad campaigns from open-web display to social
22   impact your negotiations with Google as an ad tech vendor?
23   A    That doesn't really impact our negotiations with
24   Google.  If advertisers can change where they run their ad
25   spend, that doesn't help the publisher, per se.  We have an
```
                                                              59

1    open web product, and we make the majority of our revenue

2    from display ads on open web, and we can't shift those open

3    web adverts to some other medium, so it doesn't help us.

4            MS. RHEE:  Your Honor, I would ask for that to be

5    stricken because that part of the testimony with respect to

6    the publisher perspective and whether or not this particular

7    publisher could shift to display and social media and vice

8    versa was covered extensively on direct examination.

9            THE COURT:  I'm going to let this go a little bit.

10           Go ahead.  Overruled.

11   BY MS. WOOD:

12   Q    And how does the fact that more users today are

13   increasing their usage of apps or connected television

14   impact your negotiations with Google as an ad tech vendor?

15   A    It doesn't really.  We're aware that, you know, some

16   social media apps may be growing in popularity.  That

17   doesn't impact or doesn't help publishers' negotiations with

18   Google for their open web publisher display ad server.

19   Q    And how would you characterize Daily Mail's size

20   compared to Google's other publisher customers?

21           MS. RHEE:  Objection, Your Honor.  That was also

22   covered in direct examination.

23           THE COURT:  I think that was covered.

24           MS. WOOD:  His size relative to other publishers?

25   I do not believe it was, Your Honor.

                                                            60

Direct examination - M. Wheatland

```
 1              MS. RHEE:  Your Honor, he can only speak to
 2   himself and --
 3              MS. WOOD:  I can --
 4              THE COURT:  Wait a minute.
 5              MS. WOOD:  I can lay a foundation.
 6              THE COURT:  All right.  Lay a foundation.
 7   BY MS. WOOD:
 8   Q    Do you have an occasion to participate in regular
 9   meetings with other publishers?
10   A    Yes, we do.
11   Q    And can you describe how often you have meetings with
12   other publishers?
13   A    There's various industry events.  Daily Mail hosts an
14   industry event with other news publishers once a quarter.
15   We've done that for the last eight or so years, and we
16   invite 10 or 20 publishers from around New York, sometimes
17   we invite ad tech vendors, Google's attended as well.
18   Q    And can you give us examples of the other publishers
19   that attend those quarterly meetings that you've had for the
20   last eight years?
21   A    The likes of New York Times, News Corp, Forbes,
22   Business Insider, Hearst, Condé Nast, Chegg, Raptive.  Those
23   are a few.
24   Q    And at those meetings, does the subject of Google come
25   up?
```

61

Direct examination - M. Wheatland

```
 1    A     Quite often, yeah.

 2    Q     In what context?

 3    A     Typically around advertising and Google Ad tech.

 4    Q     And at those meetings, does Facebook come up?

 5    A     Not in relation to ad tech.  Since roughly 2020,

 6    Facebook stopped operating their Audience Network.

 7          MS. RHEE:  Your Honor, objection at this point

 8    because this is all calling for hearsay.

 9          MS. WOOD:  Your Honor --

10          MS. RHEE:  He can speak to himself, obviously, but

11    insofar as there are meetings with other publishers and this

12    is a witness for which now the government is trying to

13    introduce conversations with the list of other publishers,

14    that's all hearsay.

15          MS. WOOD:  Your Honor, we're not seeking to elicit

16    any out-of-court statements.  We are seeking to lay a

17    foundation that he knows what other publishers are involved

18    in this ad tech market, and he knows that he has an

19    understanding as to whether Facebook and Google are

20    regularly discussed as topics.  These are not out-of-court

21    statements; these are topics of conversation.

22          THE COURT:  First of all, I'm not sure why it

23    makes any difference whether Facebook or anybody else is

24    discussed at these meetings.  That, by itself, is not

25    terribly helpful one way or the other.
```

Direct examination - M. Wheatland

```
 1              MS. WOOD:  I agree.  I was just laying a
 2    foundation for the previous assertion that he didn't know.
 3    BY MS. WOOD:
 4    Q    So going back to my other question, how would you
 5    characterize Daily Mail's size as a customer of Google in
 6    the ad tech space?
 7    A    We're probably one of the larger publishers they work
 8    with for their publisher ad server.
 9    Q    Now, how would you respond to an assertion that Daily
10    Mail and other publishers should just "work harder" to sell
11    more direct impressions?
12              MS. RHEE:  Objection, Your Honor.
13              THE COURT:  Overruled.
14              THE WITNESS:  We work hard to sell impressions
15    directly already.  You know, we -- we sell as much as we can
16    via direct channels, but it's typically -- it's difficult to
17    sell via direct channels.  The cost of doing business via
18    direct sales is higher, so if you have a direct sale -- if
19    you want to do direct sales, you need a sales team, you need
20    all of the support staff around that.  So you need
21    salespeople, you need client managers, creative, marketing,
22    ad operations, analysts, you need to generate post-campaign
23    reports.
24              THE COURT:  I'm sorry.  That is all cumulative.
25    We've heard that before.
```
                                                              63

Direct examination - M. Wheatland

```
 1   BY MS. WOOD:
 2   Q    To what extent is brand name -- a publisher's brand
 3   name a factor in attracting direct sales?
 4   A    Quite big insofar as if an advertiser is doing direct
 5   sales, they can't do that with 10,000 publishers.  They'll
 6   probably look at Comscore top 50 and pick, you know, the top
 7   publishers of the largest brand names that they want to do
 8   direct deals with.  And for most publishers, advertisers
 9   will then use programmatic and open market to reach sort of
10   the long tail of sites across the Internet.
11   Q    Now, are you aware of a trend in the industry of users
12   spending more time on apps than they do on desktop or mobile
13   web?
14   A    Yeah.  We're aware some apps are very popular.
15   Q    And I believe you've already testified that Daily Mail
16   has an app; is that right?
17   A    Yeah.  We have an app product.
18   Q    Can you tell us, how much did it cost to create that
19   app?
20   A    So running an app is -- there is significant investment
21   that needs to go into running an app.  So you need a
22   separate app for the different operating systems.  So we
23   have an app for Google and for Android, we have an app for
24   apple iOS.  And you need dedicated developer resource to
25   build and maintain your Android app and then your iOS app.
```

Direct examination - M. Wheatland

1              We have something like five dedicated developers

2    on each app, so that's maybe ten full-time employees.  Plus

3    support staff and shared resources are then used for the

4    apps as well around, you know, specific ad integrations or

5    analytics reporting and tracking.

6    Q    And how does Daily Mail's monetization of its app

7    advertising compare to its monetization of open-web display

8    advertising?

9              MS. RHEE:  Your Honor, this was all covered on

10   direct examination.

11             MS. WOOD:  This was not covered.

12             THE COURT:  Overruled.  I'll let it go through.

13             THE WITNESS:  So on web, we tend to have an

14   ability to load more adverts, and we tend to get a higher

15   price for those adverts versus app.  So we make more money

16   per page view, via per article read.  We make more money on

17   mobile web than we do on app.

18             Our app -- the readership on app or the readers

19   that choose to use our app product is very small compared to

20   the readers that choose to visit our website.  So maybe

21   2 percent of our readership chooses to use our app to access

22   our content.

23   BY MS. WOOD:

24   Q    And can you describe -- if someone suggested that you

25   should just shift your users to your app and away from the

                                                              65

Direct examination - M. Wheatland

```
 1   web, can you describe how you would go about doing that?
 2   A    That is -- it is hugely difficult to convert a web user
 3   to be a loyal app user.  You can see that already in our
 4   numbers.  2 percent of our audience or our readership is on
 5   apps.  We have tested in the past to run campaigns to get
 6   users to download our app or to move from being a web user
 7   to being an app user, and we found that it was very
 8   difficult to convert a user to be a dedicated app user.  So
 9   it's not possible to shift all of our readership from web to
10   app.
11        I mean, when you -- when you use web, you're just
12   using a web browser and you can visit, you know, any website
13   you want via a web browser.  When you're using app, you have
14   to go to the app store, you have to type in Daily Mail, you
15   have to download the app, and then you have to remember
16   every time you want to read Daily Mail, you should go to the
17   app and not go into your web browser.
18        And, yeah, we've got a subset of users, small
19   percentage of our users that are super loyal and they really
20   enjoy our app product, but for the majority of our
21   readership, it exists on web.
22   Q    Now, do you have any reason to believe, based on your
23   experience and communications with other publishers, that
24   Daily Mail's experience vis-a-vis web versus app is unique?
25        MS. RHEE:  Objection, Your Honor.
```

Direct examination - M. Wheatland

 1            THE COURT:  Sustained.

 2            In your view, has Google done anything that makes

 3   it difficult for you to do direct sales?

 4            THE WITNESS:  Yes.  So there's products within GAM

 5   that allowed Google AdX to I guess reach up and take away

 6   impressions from direct sales, and only AdX was allowed to

 7   do that.  Other demand was not allowed to do that.

 8            Plus, in general, direct sales is not how the

 9   majority of display advertising runs across the open web.

10   The majority of advertising on the open web is looking to

11   purchase specific audiences across sites, and they're

12   looking to target individual users, and they want to do that

13   on tens of thousands of sites, and these are performance,

14   lower funnel direct response advertisers, and the technology

15   of programmatic allows them to do that to scale.  Yep.

16            THE COURT:  All right.  This is time for the

17   afternoon -- morning break, rather.  We'll be back at 11:30.

18                    (A recess was taken.)

19            THE COURT:  All right.  Ms. Wood.

20   BY MS. WOOD:

21   Q   Mr. Wheatland, how would you characterize the viability

22   of building an in-house publisher ad server?

23            MS. RHEE:  Objection, Your Honor.  That was also

24   covered on direct examination.

25            MS. WOOD:  I don't believe it was covered in

                                                            67

```
 1    connection with the questions I'm about to ask that were

 2    covered in the defense case.

 3              THE COURT:  All right.  Go ahead.

 4              THE WITNESS:  I don't think that's particularly

 5    feasible to build, you know, a full piece of software like

 6    an ad server.  It would require a lot of investment, and

 7    also we would be redirecting resources from elsewhere to

 8    build an ad server.  Even if that was possible, it's

 9    difficult.  It's a lot of risk, and the reward wouldn't be

10    there.  Because even if we were to build our own ad server,

11    you wouldn't be able to access to AdX demand, so we would

12    lose -- we did a calculation.  We would lose 28 percent of

13    our programmatic revenue.

14    BY MS. WOOD:

15    Q    And how viable would it be for Daily Mail to just run a

16    header bidding wrapper and use that to serve an ad directly

17    without DFP?

18              MS. RHEE:  Your Honor, literally every single one

19    of those questions in the form that they've been asked now

20    were covered on direct examination.

21              THE COURT:  Well, I'm going to let the

22    government -- since Ms. Wood said it would be less than an

23    hour, we don't need constant objections.  I do think most of

24    this is cumulative.  I'm going to be generous, since the

25    burden is on the plaintiff, to do this.
```

68

Direct examination - M. Wheatland

```
 1              MS. WOOD:  Thank you, Your Honor.

 2              THE WITNESS:  It's not possible to run -- it's not

 3   feasible to run header bidding demand directly onto the page

 4   before you call your publisher ad server for a couple of

 5   remains.

 6              The main reason is that we run our direct business

 7   in our ad server.  As part of our direct business, we do

 8   guaranteed deals with advertisers, and part of those deals

 9   will have specific criteria that we must meet.  For example,

10   some deals will have 100 percent share of voice.  So we

11   promise when the direct advertisers ad loads onto the

12   website, there will be no other competing adverts on the

13   site.

14              If we were to run header bidding before we called

15   DFP and before we even knew whether or not we had to run a

16   direct campaign, you would have competing advertisers

17   popping up around direct campaigns.  If we did that, our

18   direct clients would call us up and ask for refunds so you

19   wouldn't be able to run your direct business.

20              And then secondly if you're running your header

21   bidding directly on the page, you are decoupling it from

22   competition with AdX which exists only in GAM, so you would

23   make less money from your programmatic business as well.

24   Q   Are you aware of any way to turn off last look such

25   that AdX would not learn of the highest header bidding
```

                                                              69

Direct examination - M. Wheatland

1   winning bid before it bid?

2   A    There was no way to switch off last look, no.

3   Q    Why do you say that?

4   A    Because we know how AdX works with Dynamic Allocation

5   and last look, and there was no setting to -- it wasn't

6   possible to switch off last look.  It wasn't a -- you know,

7   within the user interface, you could speak to Google,

8   there's no way to do that.

9   Q    Based on your experience, is using the AdX-direct tag

10  an economically viable substitute to accessing AdX through

11  DFP?

12  A    No, it's not.  There's a number of issues with

13  accessing AdX via AdX-direct tags.

14          For instance, there's no -- you get no price out

15  of an AdX-direct tag, so you can't put it into price

16  competition with any other demand.  And, indeed, you have to

17  give some pricing guidance to AdX, otherwise AdX would just

18  monetize the impression at any price.  So you have to tell

19  AdX the highest competing bid to put price guidance into AdX

20  when you're running an AdX-direct tag.  So that replicates

21  the last look setup.  Plus, there are technical challenges

22  around latency when you're running an AdX-direct tag because

23  it's basically a waterfall formation and then you end up

24  with slower ad load.

25  Q    Was it your perception that publishers in general

Direct examination - M. Wheatland

```
 1   ultimately came to like UPR?

 2   A    No.

 3   Q    And what options did publishers have if they were

 4   dissatisfied with DFP after the UPR?

 5            MS. RHEE:  Objection, Your Honor.

 6            THE COURT:  Sustained.  He can only testify, in my

 7   view, to his experience at his agency.

 8   BY MS. WOOD:

 9   Q    What option did you have if you were dissatisfied with

10   Google's decision to introduce UPR into DFP?

11   A    We did not have many options.  You know, we still

12   needed to access AdX demand, so we still had to use Google's

13   publisher ad server.  UPR was rolled out.  That

14   functionality, since it rolled out, the core functionality

15   has not changed.  It is still the case that it interferes

16   with our sale of advertising to other exchanges.

17            So to give you an example, if we have an ad and we

18   want to sell it to Index Exchange and we tell them, you

19   know, you have to pay $2 for this and they say we're willing

20   to pay $2, and then we say to AdX, you know, we would sell

21   you this impression for $3 and AdX are not willing to pay

22   $3, Google stops our selling it to Index Exchange for $2.

23   And there's many reasons why we may want to sell to

24   different exchanges for different prices.

25   Q    Now, based on your experience as a publisher in this
```

Direct examination - M. Wheatland

```
1    industry, is one publisher's decision to use variable floors
2    impactful on a different publisher's decision not to use
3    variable floors?
4    A    No, I don't think so.  I think if one publisher was
5    using variable floors -- like one publisher can't make any
6    impact to the market to change anything for another
7    publisher.  You know, if one publisher is doing dynamic
8    floors, that doesn't impact another publisher.
9    Q    And prior to UPR, did publishers have the choice?
10              MS. RHEE:  Objection, Your Honor.
11              THE COURT:  Again, I don't think he can talk about
12   publishers generally.  He can talk about his experience as
13   his publisher.
14              MS. WOOD:  Well, I think this particular question
15   he knows what the rules of DFP were and whether under those
16   rules publishers had a choice or not prior to UPR.
17              THE COURT: All right.  Overruled.
18              THE WITNESS:  Yeah.  We knew how Google's ad
19   server operated, which is the same for -- you know, the core
20   functionality is the same for all publishers.  And before
21   UPR, we could set individual floors on each exchange.  Yep.
22              THE COURT:  Can you explain to me, you said before
23   that if you got a $2 offer from Index, right, and you wanted
24   $3, or it was $3 from AdX, that AdX could prevent you from
25   taking the $2?  Did I understand that correctly?
```

72

Direct examination - M. Wheatland

```
 1              THE WITNESS:  Exactly.  Yeah.

 2              THE COURT:  How did they do that?

 3              THE WITNESS:  So UPR -- so the ad server decides

 4   what ad gets to load onto the page.  UPR runs across the

 5   whole ad server.  So any rule that we set in UPR will impact

 6   all advertisers.  So we can -- in Index's exchange, we could

 7   have a floor for $2 and get that $2 bid, but if we only

 8   wanted to sell that to $3 to AdX, we have to make sure

 9   everyone else bids over $3 as well.  So we can't sell it to

10   another exchange at a lower price than we sell it to AdX.

11   Google's ad server just stops the transaction occurring.

12              THE COURT:  But you can't sell it through AdX?

13              THE WITNESS:  We can't sell -- we couldn't render

14   that impression from the ad server.  So if we had, yeah, a

15   $2 bid from Index, that has to be executed through Google's

16   ad server, and at the ad server level, Google will say, no,

17   you can't do that.

18   BY MS. WOOD:

19   Q    And when did that change that you just talked about,

20   where all of a sudden you could no longer make a better deal

21   with a different exchange?

22   A    That was with the rollout of UPR in 2019.

23   Q    Now, does Daily Mail track ad fraud and ad quality?

24   A    Yeah.  We run different ad quality scanning softwares

25   that can try and prevent bad ads from loading, yeah.
```

Stephanie Austin, RPR, CRR USDC/EDVA (607) 743-1894

Direct examination - M. Wheatland

```
 1    Q     And can you give us an example of some of those
 2    softwares?
 3    A     We've worked with a few.  Confiant, The Media Trust are
 4    a couple.
 5    Q     And based on your experience, how does Google's
 6    products compare to other ad tech vendors in terms of ad
 7    fraud and quality?
 8    A     So we normally look at ad quality in a couple of ways.
 9    There is ad quality that is showing like annoying ads, so
10    sound-on ads or ads that expand when we don't want them to
11    or heavy ads that are loading lots of video.  That's one
12    type of bad quality.  And that's -- that's typically worse
13    in other exchanges.
14              And then we have ads that are sort of fake news
15    ads or scam ads which is sort of misleading the user.
16    They're typically worse through AdX from our experience than
17    other exchanges.
18    Q     And can you describe more of the types of ads you're
19    talking about where AdX is worse?
20    A     You know, these would be like misleading ads that are
21    asking the user to, you know, sign up to some financial
22    product, for instance.  Yeah.  Typically those kinds of ads
23    we find anecdotally as well where we see them on the site.
24    They're more often to be from Google, from my experience.
25    Plus, we see it in the data from our third-party scanning
```

Direct examination - M. Wheatland

1    software.

2    Q    Now, are there benefits to you as a publisher from

3    Google's integration of products across the entire ad tech

4    stack?

5    A    I don't think there are.

6    Q    Well, is it cheaper using Google's products across the

7    ad tech stack, for example?

8    A    It's not cheaper.  We pay -- for instance, our revenue

9    share on Google AdX is double or more than double that of

10   non-Google exchanges, so it's not cheaper.

11           I don't think it's more -- I don't think it's more

12   efficient because there's functionality in the ad server

13   that publishers never asked for and never wanted, and we

14   have to try and kind of try and work around that or just

15   deal with the way the ad server operates, which is

16   inefficient for us.

17           You know, examples, even setting up client-side

18   header bidding in the ad server is hugely inefficient, and

19   we have to set up thousands and thousands of line items to

20   get client-side header bidding to compete with Google AdX.

21   Q    And is the fact that Google offers integrated products,

22   does that, in your perception or experience, make it safer

23   to work with Google products?

24   A    I mean, from our perspective when we're talking about

25   safer, we would be talking about like the quality of the ads

```
 1    that are getting loaded onto our site.  And from my
 2    experience, I don't think it's true to say that Google AdX
 3    has better quality ads than other exchanges, no.
 4    Q    Would Daily Mail prefer to have choice among its ad
 5    tech vendors?
 6    A    Yes.
 7    Q    Do you feel you had that choice?
 8    A    No.
 9    Q    Why not?
10    A    Because we are -- you know, we're forced to purchase
11    Google's ad server if we want to get access to AdX demand.
12    You know, from that perspective, an AdX demand is huge, and
13    it's, you know, valuable to publishers, and if we didn't
14    have AdX demand, we would lose money.  And so because of
15    that requirement to access ad demand, we need to purchase
16    Google's ad server.  You know, in another world, maybe we
17    would like to choose which product we feel operates best.
18              MS. WOOD:  I'll pass the witness.
19              THE COURT:  All right.  Ms. Rhee.
20                        CROSS-EXAMINATION
21    BY MS. RHEE:
22    Q    Good afternoon, Mr. Wheatland.
23    A    Good afternoon.
24    Q    I did not expect to see you so soon again.
25              My name is Jeannie Rhee, I represent Google, and
```

76

Cross-examination - M. Wheatland

1  I'm going to be asking you questions; okay?

2  A    Okay.

3  Q    Now, the first thing that I believe that you were asked

4  about was the publisher ad server; is that right?

5  A    Yeah, I can't remember.  It may be.  Yeah.  Yeah.  It

6  may be.

7  Q    How much does The Daily Mail pay for DFP?

8  A    I don't know the exact amount off the top of my head.

9  DFP is -- we pay maybe in the region of 100,000, $150,000 a

10  month.

11  Q    And for that fee, you get the functionality that you

12  talked about; right?  Management of all of your inventory?

13  A    The ad server can help organize inventory, yes.

14  Q    Including your direct deals and sales; right?

15  A    We can run direct advertising in direct advertising.

16  Q    And all of the header bidding inventory that you choose

17  to put into DFP; correct?

18  A    We can submit header bidding bids into the ad server.

19  Q    All of your programmatic guaranteed; right?

20  A    Every ad that we serve onto our website will run

21  through Google's ad server.

22  Q    Including the private deals, the private programmatic

23  deals that you strike; right?

24  A    When we load an impression onto our website, it will go

25  through Google's ad server, yeah.

77

Cross-examination - M. Wheatland

1  Q    As well as the remnant inventory that you want to make

2  available for sale through Open Auction, that's all through

3  DFP; correct?

4  A    Yep.  Impressions that we load onto the site through

5  DFP.

6  Q    All of the metrics and reporting functionality that DFP

7  provides; right?

8  A    DFP has reporting functionality.

9  Q    So that's a yes; yes?

10  A    DFP has reporting functionality.

11  Q    So when you testified on direct examination, you talked

12  about how the fact that DFP enables you to have both your

13  direct deals and remnant inventory made it a must-have

14  product for you; do you remember just talking about that?

15  A    I mean, the ad server should be able to run, you know,

16  direct and indirect advertising in one place.

17  Q    And Ms. Wood has elicited from you answers to questions

18  about whether Google otherwise helps The Daily Mail with

19  respect to its direct deals versus indirect remnant

20  inventory; do you remember those questions?

21  A    That Google helps Daily Mail?

22  Q    Yes.

23  A    With the sale of direct and indirect advertising?

24  Q    Correct.

25  A    I don't think Google helps with the sale of direct or

78

Cross-examination - M. Wheatland

```
 1   indirect advertising, no.

 2   Q    Okay.  So I'm going to now direct your attention to

 3   what we're going to mark -- let's just call this Wheatland

 4   Demonstrative -- well, Wheatland 2, Demonstrative 1.  And I

 5   want to direct your attention.

 6             MS. RHEE:  Here, let's get the binders out.

 7   Sorry.

 8             THE COURT:  What tab, please?

 9             MS. RHEE:  And, Your Honor, in your binder this

10   would be tab -- the first tab.

11             THE COURT:  Ending in 975?

12             MS. RHEE:  Yes.  Ending in 975.

13             THE COURT:  All right.

14             MS. RHEE:  And a couple of things that I forgot to

15   do when we got started.  First I would like to introduce and

16   thank Ms. Mouser from being here at counsel table with us.

17             THE COURT:  All right.

18   BY MS. RHEE:

19   Q    Also, Mr. Wheatland, you're here just testifying in

20   your personal capacity; right?

21   A    Yeah.  Correct.

22   Q    Okay.  And you work for only one publisher out of the

23   thousands, perhaps millions, of publishers out there; right?

24   A    I work for Daily Mail.

25   Q    Okay.  And you have your own counsel sitting here in
```

79

```
 1    this jury box representing you; correct?

 2    A     Yeah.  My lawyers are over there, yep.

 3    Q     Okay.  And the lead lawyer who represents you is

 4    Mr. Thorne?

 5    A     Yeah.  Correct.

 6    Q     Okay.  And Mr. Thorne has been in the courtroom quite

 7    extensively through this trial because Mr. Thorne represents

 8    you; yes?

 9    A     He represents, yeah, Daily Mail.  Yeah.  He represents

10    Daily Mail.

11    Q     Okay.  And Mr. Thorne also represents the News Corp;

12    correct?

13    A     I don't know.

14    Q     And Mr. Thorne also represents the Gannett network;

15    right?

16              MS. WOOD:  Objection.  Relevance.

17              THE COURT:  Overruled.

18    BY MS. RHEE:

19    Q     Are you aware that Mr. Thorne also represents Gannett?

20    A     I'm aware, yes.

21    Q     Okay.  And are you aware that Mr. Wolfe, on behalf of

22    Gannett, also testified in this Court?

23    A     I think I'm aware of that, yep.  Yep.

24    Q     Represented by your same lawyer, Mr. Thorne?

25    A     I don't know if -- I don't know who represented --
```

                                                               80

Cross-examination - M. Wheatland

```
 1   Q    And you're aware that a former employee of News Corp
 2   also testified in this courtroom; correct?
 3   A    I am aware, yep.
 4   Q    Also represented by Mr. Thorne?
 5   A    I don't know.
 6   Q    Now, if we could turn to this document that is ending
 7   in Bates Number 975 --
 8            MS. RHEE:  And we can pull it up as a
 9   demonstrative.
10   BY MS. RHEE:
11   Q    -- you see here this is The Daily Mail Group, that's
12   what DMG stands for?
13   A    Yeah.
14   Q    You can also look on the screen, Mr. Wheatland, so
15   that --
16   A    It's here.
17   Q    Okay.  You can choose to look at your binder, but it
18   might be easier on the screen.
19   A    Okay.
20   Q    And you also see that Google is on the cover of this
21   document, that is the 2017/'18 joint business plan; correct?
22   A    Yeah, I see that.
23   Q    Okay.  And if you turn to the first page, the mission
24   statement of this joint business plan is to accelerate
25   digital growth whilst offsetting and exceeding the relative
```

81

Cross-examination - M. Wheatland

```
 1    decline in print revenues; do you see that?
 2    A    Yeah.  I see that.  Yeah.  That's written there.  Yep.
 3    Q    Okay.  And then if we turn to page 3, in terms of
 4    overview of the key initiatives with respect to this joint
 5    business plan between The Daily Mail and Google, you see,
 6    Number 1, revenue, drive growth of programmatic globally,
 7    including premium programmatic revenue and look at
 8    opportunities to migrate direct-sold business into
 9    programmatic.
10         Do you see that?
11    A    I see that's written there.
12    Q    Okay.  And that's switching your direct deals, which
13    you testified on direct examination is very expensive to
14    maintain, to programmatic sales; is that right?
15    A    No.  I'm not sure.  I haven't seen this document
16    before.  I don't know who put this document together.  But
17    there's -- you know, as part of our direct-sold business, we
18    class, like, programmatic guaranteed, for instance, as part
19    of our direct sold.  So when I was previously speaking
20    around direct sold, I was referring to ads that have a,
21    like, sales effort behind it in order to on board the spend.
22    And that could be traditional, it could be through
23    programmatic.
24    Q    Let's continue on this joint business plan, and maybe
25    this will help you refresh your recollection.
```

82

Cross-examination - M. Wheatland

```
 1              So let's go to page 4.  Again, of this joint
 2    business plan between Daily Mail and Google, you see the
 3    desired outcome at the top?  And that is to hit revenue
 4    targets set and have a setup within the tech ad stack that
 5    allows all inventory (direct and indirect) to compete on
 6    price; do you see that?
 7    A    I'm not sure if Google put this document together.
 8    Q    I said do you see that.
 9    A    I see that.
10    Q    And, again, even if your testimony today is you didn't
11    know what this document is, you previously testified that
12    Rich Caccappolo -- is that the right pronunciation?
13    A    Yep.
14    Q    Okay.  He's your boss?
15    A    Yes.
16    Q    Okay.  He's on this document.  All right.
17              So now let's go to now page number 6.  And you see
18    here that the joint business plan between The Daily Mail and
19    Google is to support adoption of cross-screen native
20    solutions at the bottom there.
21              MS. RHEE:  If we could highlight that and blow it
22    up.
23    BY MS. RHEE:
24    Q    And as to why, it's because users want great
25    experiences wherever they are consuming content, on the web,
```

83

Cross-examination - M. Wheatland

```
 1   in apps, on every screen.  Savvy publishers have responded
 2   by building smart responsive websites and new app
 3   interaction models.  But improving content experience alone
 4   is not enough.  Publishers need to evolve their advertising
 5   as well from boxy banners to flexible and contextually
 6   relevant native ads at scale; do you see that?
 7   A    Yeah.  It looks like this is a -- Google wrote this
 8   document.  But I see it.
 9   Q    The question is you see that; right?
10   A    I see it's written in this document.
11   Q    Okay.  And you would agree, Mr. Wheatland, that The
12   Daily Mail is a savvy publisher; right?
13   A    I don't know.
14          THE COURT:  Are you sure you want to be on the
15   record with that answer?
16          MS. WOOD:  He has a duty to the truth, Your Honor.
17   BY MS. RHEE:
18   Q    Well, let's go with that.  You said it.  Okay.
19          Now, in terms of desired outcomes, if we can
20   continue on there in terms of the next page, right, you want
21   to -- here, the document, again, a joint business plan
22   between The Daily Mail and Google wants to ensure AdX native
23   demand competes with standard banner inventory on desktop
24   and mobile web; do you see that?
25   A    Okay.
```

                                                              84

Cross-examination - M. Wheatland

```
 1    Q    It's on the screen if you're having trouble finding it.

 2    A    Yeah.  It's right there.  Okay.

 3    Q    Okay.  All right.  And then finally, this also goes on

 4    to talking about video as to why the joint business plan

 5    between The Daily Mail and Google want to focus on video is

 6    because video can be an incredibly powerful medium through

 7    which to tell amazing stories, and, as such, plays an

 8    important role in the online news mix; do you see that?

 9    A    I see that it's written here, yeah.

10    Q    And, in fact, by 2017, this joint business plan states

11    74 percent of all Internet traffic will be video; yeah?

12    A    I see that's written here, yeah.

13    Q    Okay.  So now with respect to these quarterly meetings

14    that you testified on direct with the other large

15    publications, you remember being asked about that?

16    A    I do.

17    Q    Surely, Mr. Wheatland, you don't talk about your

18    individual negotiations with Google with your competitors;

19    do you?

20    A    We don't cover, you know, confidential or contractual

21    information in those meetings.

22    Q    And you don't share your take rate with your

23    competitors; do you?

24    A    You know, we don't share, you know, any specific

25    contractual specifics.
```

Cross-examination - M. Wheatland

```
 1   Q     And you competitors don't share take rates with you?
 2   A     Again, publishers are not going to share confidential
 3   information in those places.
 4   Q     And, in fact, that's the reason why there have been so
 5   many attorneys making sure that the highly confidential
 6   information is not disclosed to the public; correct?
 7          MS. WOOD:  Objection.  Foundation.
 8          THE COURT:  Sustained.
 9   BY MS. RHEE:
10   Q     All right.  Now, one of the companies that participates
11   in these quarterly meetings you said on direct examination
12   is Hearst?
13   A     Yeah.  They have attended, yep, some of the meetings.
14   Q     Okay.  So we're going to now turn to PTX -- and this is
15   the government's document -- 453.  That has already been
16   introduced into evidence.
17          MS. RHEE:  And, Your Honor, it's -- if we could
18   actually pull up on the screen the page ending in 192.
19          MS. WOOD:  Do I have a copy?
20          MS. RHEE:  Here you go.  It's the government's
21   exhibit.  And we can make other copies available to the
22   Court.
23          And if we could blow up at the top of this already
24   admitted, Exhibit Number 3 here, AdX buyers.
25          MS. WOOD:  Objection.  Beyond the scope.
```

86

Cross-examination - M. Wheatland

```
 1              THE COURT:  Let me take a look.
 2              MS. RHEE:  Your Honor, Mr. Wheatland testified on
 3    direct examination and tried to testify for all publishers
 4    about the relative price of AdX versus the other exchanges.
 5              MS. WOOD:  Objection.  Mischaracterizes his
 6    testimony.
 7              THE COURT:  I'm going to sustain the objection.
 8    BY MS. RHEE:
 9    Q    Now, you specifically talked about Hearst participating
10    in these discussions in which Google came up; correct?
11    A    They're one of the publishers that have attended some
12    of the meetings.
13    Q    Okay.  And so are you aware that Hearst is charged
14    15 percent with respect to the ad exchange, the Google ad
15    exchange?
16              MS. WOOD:  Objection.  Beyond the scope.
17              THE COURT:  I've sustained the objection.
18    BY MS. RHEE:
19    Q    Now, on direct examination, you talked about the
20    difference between The Daily Mail's website versus The Daily
21    Mail's app; is that right?
22    A    Yep.
23    Q    And you testified that, well, it takes a lot of steps
24    to download The Daily Mail app; do you remember that
25    testimony?
```

                                                                87

Cross-examination - M. Wheatland

```
 1   A     Yep.  Correct.

 2   Q     Okay.  And that involves going to an app store?

 3   A     Daily Mail app is available on app stores.

 4   Q     Okay.  This was your testimony on direct.

 5         It involves then, at the app store, typing in The

 6   Daily Mail in order to find the app?

 7   A     Yeah.  You would need to search to find the app on the

 8   app store.

 9   Q     Okay.  And then downloading it; right?

10   A     Yeah.  Then you need to download it.

11   Q     So those are the three steps to get to the Daily Mail

12   app, that was your testimony?

13   A     That's how you would download an app from an app store.

14   Q     Okay.  And then in comparison in order to get to the

15   Daily Mail via a web browser, you need to open up a web

16   browser; right?

17   A     Yep.

18   Q     Okay.  And then in order to get to the Daily Mail

19   website in comparison to the billions of websites out there

20   on the Internet, you have to type in www.thedailymail.

21   either the US, the UK or some other version of The Daily

22   Mail; correct?

23   A     No, not necessarily.

24   Q     Well, that's how you get to the Daily Mail through a

25   web browser.
```

88

Cross-examination - M. Wheatland

```
 1    A    One way to reach our website is to type in the URL
 2    directly is one way, yes.
 3    Q    Okay.  And then that's when The Daily Mail website page
 4    loads up for that particular user; right?
 5    A    Correct.
 6    Q    Okay.  So, again, three steps.
 7              Now, for somebody who is a big fan of The Daily
 8    Mail and is one of the millions and millions of people who
 9    have downloaded The Daily Mail app on an app store, once
10    it's downloaded, it's on that person's phone permanently,
11    right, unless that user decides to delete it?
12    A    It will be on their phone, yeah, unless they decide to
13    remove it.
14    Q    Okay.  And it makes it really easy to get to the Daily
15    Mail by app; right?
16    A    I mean, I think you need -- you need to use a habit to
17    go to the app.  But, yeah, you can.
18    Q    It's right there on your phone; right?
19    A    You would be able to access The Daily Mail from the app
20    on your phone, yeah.
21    Q    Versus even on a phone if you want to go to the Daily
22    Mail website, you have to open up a browser; right?
23    A    Not always, but yes.
24    Q    Okay.  And then you have to type The Daily Mail all
25    over again; yep?
```

89

```
 1              MS. WOOD:  Objection.  Asked and answered.

 2              THE COURT:  No.  Now we're on the app.  Overruled.

 3   BY MS. RHEE:

 4   Q    Right?

 5   A    You're referring to the website?

 6   Q    If you want to get to the Daily Mail website on your

 7   phone, rather than on your phone's app.

 8   A    Not necessarily.  You can -- there's many ways to reach

 9   Daily Mail's website.

10   Q    But you talked about how a website is something that's

11   accessible by browser; right?

12   A    Yeah.  Typically.  Yeah.

13   Q    Okay.  So if you have a phone and you haven't

14   downloaded The Daily Mail app, you need to pick up your

15   phone, you need to open up a browser; right?

16   A    That's one way, yes.  Yes.

17   Q    And once that browser is open, then you have to type in

18   The Daily Mail; right?

19   A    That's one way, yes.  That's one way.

20   Q    And then you have to do that each and every time if you

21   want to get to the Daily Mail by web on full; right?

22   A    Not every time.

23   Q    Okay.

24   A    Yes.  The first time you access the website, if you

25   access it directly you would have to type in the URL.
```

Cross-examination - M. Wheatland

```
 1   Q    Well, if you don't want to take all of those steps, you
 2   have to take extra steps on a web browser, like you have to
 3   bookmark it; right?
 4   A    There's many ways to access our content.
 5   Q    Or you could add it to a favorites page; right?
 6   A    Yeah.  There are ways to do it, right.
 7   Q    There are ways, but those require even more extra
 8   steps; right?
 9   A    I mean, our content is served through --
10   Q    Yes or no, Mr. Wheatland?
11   A    Our content is --
12   Q    Mr. Wheatland, that's a yes-or-no question.
13   A    I don't think I can give a yes or no in response to
14   that.
15   Q    Okay.  Now, you also testified on direct examination
16   that, at least for The Daily Mail, there's a lot of cost
17   involved in supporting The Daily Mail's various apps; is
18   that right?
19   A    Yeah.  There is investment required to support apps.
20   Q    Okay.  There's a lot of investment required to support
21   The Daily Mail's website; right?
22   A    Yeah.  That's equally true.  Yeah.
23   Q    Okay.  Now, are you aware, Mr. Wheatland, given that
24   you've been in this business for quite a while, that there
25   are lots of free sites, a lot of free code for somebody to
```

91

Cross-examination - M. Wheatland

```
 1    create an app entirely on their own?
 2              MS. WOOD:  Objection.  Foundation.
 3              THE COURT:  I'm going to sustain that objection.
 4              Let's move this along, Ms. Rhee.
 5    BY MS. RHEE:
 6    Q    Now, you were asked on direct examination about last
 7    look and whether The Daily Mail can choose not to give an ad
 8    impression to Google's ad server through last look; do you
 9    remember that?
10    A    We were asked if we could switch off last look.
11    Q    Okay.  And you testified that The Daily Mail has no
12    ability to switch off last look?
13    A    When -- when last look was in place pre UPR, there was
14    no way to switch off last look if you wanted to access
15    Google AdX demand in real-time.
16    Q    Okay.  So -- well, you didn't actually give that
17    qualifier on direct examination, so I just want to make sure
18    that we now have the record straight.
19              In fact, The Daily Mail, even before UPR and UFPA,
20    could always turn last look off by just not giving that
21    impression to AdX; right?
22    A    I mean, we could switch off AdX and not run AdX, and
23    then you wouldn't have last look from AdX.
24    Q    Okay.  I just wanted to make sure that we were clear
25    about that.
```

                                                                    92

Cross-examination - M. Wheatland

1              Now, you also testified on direct examination

2    about the Index Exchange hypothetical where you, The Daily

3    Mail, wants to offer an individual impression to the Index

4    Exchange for $2 but want to offer that very same impression

5    to Google's ad exchange for $3; do you remember that?

6    A    Yeah.

7    Q    So now, similarly, before UPR and UFPA, if what The

8    Daily Mail really wanted to do was just to give the Index

9    Exchange that impression for $2, you could have turned AdX

10   off and prevented that impression being offered for AdX to

11   bid; correct?

12   A    So are you saying in that scenario we couldn't offer

13   the impression at all to AdX to see what price AdX had?

14   Q    Well, I'm just using the hypothetical that was

15   presented to you.

16              If what the Daily Mail really wanted to do was to

17   give the Index Exchange that impression for $2, The Daily

18   Mail could give that impression to the Index Exchange for $2

19   and not give Google the opportunity to bid on it; correct?

20   A    The impression?

21   Q    Yes or no, Mr. Wheatland?

22   A    It's not a yes-or-no response.

23              So the -- we would get a $2 bid from the

24   client-side header bidding partner.  So we have $2.  We then

25   call the ad server.  The ad server will then decide should

                                                              93

Cross-examination - M. Wheatland

```
 1    we serve a direct campaign, should we serve some other kind
 2    of line item.  And in that instance, there's -- there's no
 3    way to switch off AdX for, like, that specific impression.
 4    The impression has to go into the ad server because you need
 5    to know whether or not you're going to serve your direct
 6    campaign.
 7    Q    So let's break that down.
 8              So in your scenario, Index Exchange participates
 9    in a header bidding auction; is that right?
10    A    Correct.
11    Q    Okay.  And the Index Exchange wins that header bidding
12    auction at $2; is that right?
13    A    So Index Exchange submits the $2.  Yes.  So they close
14    the auction at $2.
15    Q    And that's the winning bid in this hypothetical?
16    A    Is the bid submitted from Index Exchange to go into the
17    ad server?
18    Q    No.  Hold on.
19              The first step is there's a header bidding
20    auction.  That runs outside of DFP or any --
21    A    Correct.
22    Q    -- server; right?
23    A    Yeah.
24    Q    Okay.  Now, in this scenario, Index Exchange has won
25    that auction, that header bidding auction, that exists
```

94

Cross-examination - M. Wheatland

```
 1   completely outside of a publisher ad server; correct?
 2   A    No.  I think that's -- I don't think that question made
 3   sense.
 4            So the --
 5   Q    Let me try this again, because, Mr. Wheatland, I was
 6   listening very closely to your answer.
 7            You said you, The Daily Mail, then takes that
 8   $2 -- that $2 bid from the Index Exchange, and you choose to
 9   enter that as a line item into DFP; correct?
10   A    So we'll run header bidding auctions on our exchanges.
11   They would give us their bids, and we'll submit that into
12   the ad server.
13   Q    Okay.  And the "we" --
14   A    Just by submitting a bid you haven't won the auction.
15            THE COURT:  One at a time.
16   BY MS. RHEE:
17   Q    Okay.  And the "we" in that sentence is The Daily Mail
18   will submit that bid into the ad server; is that right?
19   A    Correct.  Yeah.
20   Q    Okay.
21   A    We'll use technology to do that.
22   Q    Okay.  And The Daily Mail can choose what price floor
23   to set with respect to that particular impression; correct,
24   in the ad server?
25   A    Price floor on AdX.
```

95

Cross-examination - M. Wheatland

```
 1   Q    Yes.

 2   A    So --

 3   Q    Is that a yes or no?

 4   A    Pre UPR, yes.  We could set a different price floor on

 5   AdX before unified price, correct.  Yeah.

 6   Q    But even after the unified price floor and UFPA, the

 7   publisher always sets the price floor; correct?

 8   A    With UPR, we can't set different price floors per

 9   exchange.

10   Q    That's not the question.

11        The question, though, is the publisher always sets

12   the price floor; correct?

13   A    I mean, we're forced to use Unified Price Rules which

14   sets one price floor across everything.

15   Q    But you choose what that price floor is; correct?

16   A    We input the price floor, yes.  It goes across

17   everything.

18   Q    So let's try that again.

19        It's The Daily Mail that always chooses what the

20   amount of that price floor is; correct?

21   A    Not on a per-exchange basis.  And there's many reasons

22   why you would want to sell --

23   Q    My question --

24        THE COURT:  Wait.  You do need to listen to the

25   question.  And it's a yes-or-no answer.  If you can't answer
```

96

Cross-examination - M. Wheatland

```
 1    it, then you just say I can't answer it.  All right.  But

 2    not to start to give an explanation.

 3              All right.  Ask your question, Ms. Rhee.

 4              MS. RHEE:  Thank you, Your Honor.

 5    BY MS. RHEE:

 6    Q    It's The Daily Mail that always chooses the amount of

 7    the price floor; yes or no?

 8    A    Yes.

 9    Q    And that's the same answer before UFPA and UPR, as well

10    as after UFPA and UPR, it's The Daily Mail that sets the

11    amount of the price floor; correct?

12              MS. WOOD:  Objection.  I think in this context

13    that's vague and confusing.

14              THE COURT:  I don't think so.  Overruled.

15              But it's been asked and answered, so we don't need

16    to hear it again.

17              MS. RHEE:  All right.  So I think the Court is in

18    charge, so I will move on.

19              THE COURT:  You don't just think it; you know it.

20              MS. RHEE:  I know the Court is in charge.  Yes.

21    BY MS. RHEE:

22    Q    The next topic that got covered on your direct

23    examination was about ad fraud and ad quality.  So let's

24    turn to that topic.  Okay.

25              Now, in fact, The Daily Mail has been blocked
```

                                                                97

Cross-examination - M. Wheatland

```
 1   numerous times by Google for violations of its brand quality

 2   policies; correct?

 3              MS. WOOD:  Objection.  Beyond the scope.

 4              THE COURT:  Well, but it's within this issue, so

 5   I'm permitting it.  Overruled.

 6   BY MS. RHEE:

 7   Q    Yes or no, Mr. Wheatland?

 8   A    Google has policy blocks that they apply to some

 9   domains, and from time to time, they apply to our domains,

10   yes.

11   Q    So the answer is yes, The Daily Mail has been blocked

12   by Google on numerous occasions for violations of its

13   policies?

14   A    Google has blocked our inventory in GAM from time to

15   time, yes.

16   Q    So the answer is yes?

17   A    Yes.

18   Q    Okay.  So let's look at some of these examples.

19              MS. RHEE:  And if we could turn your attention to

20   what's in the tab as -- it ends in Bates Number 401.

21              MS. WOOD:  I'm going to object on relevance and

22   cumulativeness and 403 prejudice as well.

23              THE COURT:  Look, there's no question here.

24   There's no real issue.  All right.  Let's move this along.

25   All right.
```

Cross-examination - M. Wheatland

```
 1    BY MS. RHEE:
 2    Q    And so, Mr. Wheatland, you see here that --
 3              THE COURT:  I'm sorry.  I should have been more
 4    explicit.  I've sustained the objection.
 5    BY MS. RHEE:
 6    Q    What policy violations has The Daily Mail been
 7    repeatedly blocked by Google with regard to?
 8              MS. WOOD:  Same objection, Your Honor.
 9              THE COURT:  Well, no.  That, I'll permit.
10              THE WITNESS:  Google applies policy blocks to
11    domains within GAM.  Sometimes Google can explain why
12    there's a block; sometimes they can't.  Typically we email
13    Google, and then they will get it unblocked, but it depends.
14    Sometimes Google can explain why; sometimes they can't.
15    BY MS. RHEE:
16    Q    Well, if you look at the document to refresh your
17    recollection here, The Daily Mail was blocked for
18    inappropriate sexual content and --
19              MS. WOOD:  Objection.  I believe this is the
20    subject of the same document that was just sustained, Your
21    Honor.
22              THE COURT:  Yeah, but you also opened the door on
23    the issue of asking him about the quality of -- his
24    experience with the quality of what Google presents.  So
25    this is only fair.
```

Cross-examination - M. Wheatland

```
 1              MS. WOOD:  But that's ad quality, not domain
 2    content.
 3              THE COURT:  Well, but that's the flip side, so I'm
 4    going to permit it just a little bit.
 5              MS. WOOD:  Your Honor, I still believe the
 6    documents themselves are cumulative and 403 prejudicial.
 7              THE COURT:  I'm not letting the document in.
 8    That's not necessary.  You can ask one question along this
 9    line and then we're going to move on.
10    BY MS. RHEE:
11    Q    I believe I've asked the one question along this line.
12    A    That's fine.
13    Q    In fact, The Daily Mail has been blocked by Google for
14    policy violations with respect to showing inappropriate
15    sexual content; yes?
16    A    Google defines what the definitions are of that, and
17    they apply policy blocks.
18    Q    So the answer is, yes, The Daily Mail has been blocked
19    for violating Google's policy on inappropriate sexual
20    content?
21    A    I don't know how Google classifying --
22              THE COURT:  The answer is yes or no.  Has there
23    been a block?
24              THE WITNESS:  There has been blocks, yes.
25              THE COURT:  Okay.
```

                                                              100

Cross-examination - M. Wheatland

```
 1   BY MS. RHEE:
 2   Q    All right.  And, finally, with respect to your
 3   testimony about the relative price of AdX to the other
 4   exchanges that The Daily Mail utilizes, you would agree
 5   there's difference in quality with respect to the exchanges;
 6   correct?
 7   A    Yes.
 8   Q    Okay.  And maybe to assist in this discussion, I want
 9   to direct your attention, Mr. Wheatland, to the document
10   ending in Bates Number 694.  And we can mark this as
11   Wheatland 2, Demonstrative 2.
12            And you see, Mr. Wheatland, this is an email from
13   you dated February of 2017; correct?
14   A    Yeah, I see that.
15   Q    Okay.  And here in terms of your notes -- and,
16   unfortunately, we did not get this produced so that we can
17   see the notes in red.
18            But you're familiar with Mr. Goldstein, correct?
19   A    Yes.
20   Q    And he works for you?
21   A    He's a consultant.
22   Q    Okay.  And so as of 2017, would you agree that DFP was
23   built ten years ago, so 2007, and was not made for the
24   programmatic world?
25   A    As of 2017, DFP didn't have, you know, the
```

101

Cross-examination - M. Wheatland

```
1    functionality to run all of our programmatic demand, yeah,

2    as we had wanted.

3    Q    And, in fact, there was no such thing as header bidding

4    in 2007; right?

5    A    That was before I started in the industry, but I

6    believe not.

7    Q    Okay.  And then header bidding comes along, and would

8    you agree with what's reflected in this document between you

9    and your consultant that header bidding helped publishers?

10   A    Header bidding does help publishers.

11   Q    Okay.  And that, at least as of 2017, you said American

12   Express and all marketers are involved in header bidding?

13   A    I see -- I think I said all SSPs today are in the

14   header.  Maybe I wrote that.

15   Q    Okay.

16   A    I'm not sure who's who on this discussion.

17   Q    Okay.  But the question is, do you agree?  Even as of

18   2017, AmEx and all marketers were involved in header

19   bidding?

20   A    I don't know if that's true that all marketers ran

21   through header bidding, but most -- in 2017, most non-Google

22   exchanges probably had header bidding capabilities by then.

23   Q    Okay.  And by 2017, wrappers had already come along to

24   assist publishers manage the execution of header bidding;

25   yes?
```

102

Cross-examination - M. Wheatland

```
 1   A     Yeah.  I think that's probably true.

 2   Q     And wrappers helped with the issues of timeouts,

 3   latency and return rate?

 4   A     So wrappers -- yeah, they could help with that stuff.

 5   Yeah.

 6   Q     Okay.  And Prebid is a wrapper?

 7   A     Yeah.  Correct.

 8   Q     Okay.  And Amazon TAM is a wrapper?

 9   A     Yeah.  Yeah.  You could call that service a wrapper.

10   Yeah.

11   Q     Okay.  And Exchange Bidding or Open Bidding is a form

12   of wrapper?

13   A     I mean, server-side bidding gives you -- sorry.  Open

14   Bidding gives you server-side connections to exchanges into

15   the ad server.

16   Q     So -- yes.  Okay.

17         Let's go to the next -- whether you can agree with

18   this, which is, server-side header bidding, which is S to S

19   in this document; right?

20   A     Yep.

21   Q     Okay.  By 2017 was gaining transaction and being

22   adopted; right?

23   A     It was in some instances being adopted, yep.

24   Q     Okay.  And the use of multiple SSPs -- and here SSPs

25   are exchanges; right?
```

103

Cross-examination - M. Wheatland

```
 1   A     Yep.

 2   Q     -- creates ecosystem supply-and-demand duplication; do

 3   you agree with that?

 4   A     Yeah.  So if you run an exchange through more than one

 5   integration, then potentially you're duplicating the supply

 6   through that exchange, but -- and, equally, if you ran

 7   multiple different exchanges, then you could have, you know,

 8   the same supply going to multiple different exchanges.  But

 9   then equally on the flip side you'll have, like, the same

10   demand other than Google Ads will run through all the other

11   exchanges.

12   Q     So that was a long answer for yes?

13   A     Yes.

14   Q     And then there are differences in results from these

15   multiple SSPs, and then at least you and your consultant

16   first go on to talk about those differences in results from

17   the publisher's viewpoint; do you see that?

18   A     Yep.

19   Q     Okay.  And the differences in results amongst the

20   various SSPs begin with, well, some SSPs are faster to

21   return ad impressions than others; right?

22   A     Yep.

23   Q     Okay.  And then the next is, well, some SSPs have more

24   effective dynamic flooring, so they return higher prices and

25   are more likely to beat out the other SSPs; do you agree
```

104

Cross-examination - M. Wheatland

```
 1   with that?

 2   A    Yep.  I think that was probably true, yeah.

 3   Q    Okay.  And some SSPs have lower rev share?

 4   A    Yes, that's true.

 5   Q    Okay.  And I skipped one.

 6           And some SSPs have better PMP, that's Private

 7   Marketplace; is that right?

 8   A    Yes.

 9   Q    Okay.  So another area of differentiation amongst SSPs;

10   right?

11   A    Yep.

12   Q    Okay.  Some SSPs have better reporting functionality;

13   right?

14   A    Yep.

15   Q    And some SSPs don't have direct DSP integration, which

16   is what you were just talking about with Open Bidding;

17   right?  Because Open Bidding has direct integration

18   versus --

19   A    No, I don't think.  So I think that's different, my

20   point there.

21   Q    Okay.  And then the last one, at least from the

22   publisher's perspective, is some SSPs have better ad quality

23   due to superior ad curation policies; right?

24   A    Yeah.  I think that's probably --

25   Q    Those are all areas of differentiation in terms of the
```

105

Cross-examination - M. Wheatland

```
 1   quality of one SSP over another; correct?

 2   A    Yes.  I think that's probably true.  Yeah.

 3   Q    Okay.  So price is just one of the many factors with

 4   respect to what differentiates one SSP over another; yes?

 5   A    It's -- yeah.  It's one of the factors, yeah.

 6   Q    Okay.  And then you very helpfully, along with your

 7   consultant, also talk about the difference in quality

 8   amongst the various SSPs from the buyer's perspective; do

 9   you see that?

10   A    Where do I talk about quality?

11   Q    So we'll talk through what those bullets points are.

12        But you then go on to talk about the buyer's

13   viewpoint about why SSPs might not all be the same, you

14   agree; right?

15   A    Yeah, that's written here.

16   Q    And that's because even though you, Mr. Wheatland, work

17   for a publisher, there's no point in offering up ad

18   impressions if you don't have any buyers; right?

19   A    As in send the impression to an exchange if the

20   exchange doesn't have any buyers connected?

21   Q    Well, before we even get into the mechanisms of how you

22   offer it up, at the end of the day what's the point of

23   having any ads for sale if you don't have any buyers; right?

24   A    Okay.

25   Q    Do you agree?
```

106

Cross-examination - M. Wheatland

```
 1   A    Yeah.  You can't sell ads if you don't have any buyers
 2   to buy it, yeah.
 3   Q    Okay.  And so from a buyer's viewpoint as you write
 4   with your consultant, some SSPs have stricter pub timeouts
 5   applied to them, right, versus other SSPs; right?
 6              MS. WOOD:  Objection.  Scope and cumulative.
 7              THE COURT:  Well, I don't know where this is
 8   going.  It seems to be way beyond what the government put on
 9   in what was a very short case.
10              MS. RHEE:  Well, Your Honor, the government had
11   Mr. Wheatland retestify with respect to price differential
12   between the exchanges, and so this is to talk about what
13   other things matter.
14              THE COURT:  Well, I think you've already done a
15   fair amount of that.  But, I mean, this is getting way
16   beyond where I think the direct was.
17              MS. RHEE:  So at this point in time then, Your
18   Honor, to cut it short, we would offer this document as
19   DTX 2540.  And, with that, we could call it a wrap.
20              THE COURT:  Is there any objection to 2540?  It is
21   a statement of the witness.
22              MS. WOOD:  I believe because of the color, it is
23   unclear which parts are the statement of the witness and
24   which parts are from a different individual who does not --
25   who consults for but does not work for Daily Mail.
```

107

Redirect examination - M. Wheatland

```
 1              MS. RHEE:  Which is the reason why we went through
 2    the document, Your Honor.
 3              THE COURT:  You've got the testimony; we don't
 4    need the document.
 5              MS. RHEE:  I pass the witness, Your Honor.
 6              THE COURT:  All right.
 7         MS. WOOD:  Very briefly, Your Honor.
 8                       REDIRECT EXAMINATION
 9    BY MS. WOOD:
10    Q    In your experience, do all newspapers have an app?
11    A    No.
12              MS. RHEE:  Your Honor, this has already been asked
13    and answered.
14              THE COURT:  All right.  It was already answered,
15    so go ahead.
16    BY MS. WOOD:
17    Q    And you were asked some questions about flooring and
18    who sets the floors in connection with both the era before
19    Unified Pricing Rules and the era after Unified Pricing
20    Rules.
21              Can you describe how a publisher is able to set
22    Unified Pricing Rules before and after UPR?
23    A    Yeah.  Before --
24              MS. RHEE:  Your Honor, this has already been
25    covered as well.
```

108

Redirect examination - M. Wheatland

```
 1              MS. WOOD:  This was brought up again directly, and
 2    he was stopped from giving a full answer multiple times.
 3              THE COURT:  Right.  This is going to be short, so
 4    I'm going to permit it.  Overruled.
 5              THE WITNESS:  Before UPR rolled out, we would just
 6    go into each of the individual exchanges and then set the
 7    floor that we want.  And then after UPR, the ad server had
 8    UPR built into it, and then whatever floor we put into UPR,
 9    we will just apply to all demand, so we can't then set
10    different floors per exchange.
11    BY MS. WOOD:
12    Q    And what ad tech tool makes the final decision about
13    what ad from what exchange gets served on a web page?
14    A    The ad server.
15    Q    The ad server?
16    A    The ad server decides what gets loaded on the page.
17    Yeah.  That's the final auction that gets run.
18    Q    Okay.  So the ad server makes the final decision?
19    A    Yes.  Correct.
20    Q    And who is Daily Mail's ad server?
21    A    Google.
22              MS. WOOD:  I'll pass the witness.
23              THE COURT:  Any recross?  That was one question
24    basically.
25              MS. RHEE:  No, Your Honor.
```

109

Redirect examination - M. Wheatland

```
 1              THE COURT:  All right.  Thank you.  All right.

 2   Thank you, Mr. Wheatland.  You may step down.

 3                  (Witness excused at 12:30 p.m.)

 4              THE COURT:  All right.  Anything further from the

 5   United States?

 6              MS. WOOD:  And with that, the United States and

 7   plaintiffs rest.

 8              THE COURT:  All right.  Very good.

 9              So the evidence is now in.

10              Ms. Dunn.

11              MS. DUNN:  Yes.

12              Your Honor, the plaintiffs and we have discussed a

13   possible date for closing.  So I don't know if Your Honor

14   would like to handle that now --

15              THE COURT:  Yeah.

16              MS. DUNN:  -- while we have a proposal.

17              THE COURT:  Chris, can you get my calendar.  Let

18   me get my calendar.

19              MS. DUNN:  Understood.

20              THE COURT:  Yes, ma'am.

21              MS. DUNN:  So we have conferred, and given

22   Thanksgiving and other things, we are hoping that the Court

23   might be available on Friday the 22nd.

24              THE COURT:  Of December?

25              MS. DUNN:  Of November.
```

110

Redirect examination - M. Wheatland

```
 1                 THE COURT:  November.  How about Thursday the
 2      21st?  Does that not work?
 3                 MS. WOOD:  That works for the government, Your
 4      Honor.
 5                 THE COURT:  I would rather do it on a day when I
 6      don't have anything else scheduled, and I actually have
 7      matters already scheduled at both 9:00 and 2:00 on that day.
 8                 MS. DUNN:  Understood.  We'll of course make it
 9      work.  Several members of our team, including me and
10      Mr. Isaacson, have a pretrial conference in another case on
11      the 20th.
12                 MS. WOOD:  We're talking about the 21st.
13                 MS. DUNN:  I understand that.
14                 THE COURT:  Well, is that here or in New York, or
15      where is it?
16                 MS. DUNN:  It is in Delaware.  So we can do it.
17      Obviously not ideal, but we will make it happen.  It's fine.
18      We mostly want to accommodate the Court.  So if that is what
19      works best for the Court.
20                 THE COURT:  I mean, we could also do it on -- let
21      me just double-check.  We could do it on Monday the 25th.
22                 MS. DUNN:  That would work for us.
23                 MS. WOOD:  If that's preferable, the government
24      will make that happen.
25                 THE COURT:  I mean, was there any qualms about
```

Redirect examination - M. Wheatland

```
 1   that?  That is the Monday of Thanksgiving week.
 2          MS. WOOD:  That's my only concern, Your Honor, is
 3   just travel.  But most of us are local, so I think that
 4   would be fine.  I just don't know -- that would be my only
 5   concern.
 6          THE COURT:  All right.  We'll put it on for 10:00.
 7   I'm going to keep the day open, which is not to say, that
 8   you're going to get the whole day to argue.  But I'm not
 9   going to set time limits at this point.  All right.
10          MS. DUNN:  Understood.
11          THE COURT:  Monday, November 25 at 10:00, closing
12   arguments.
13          MS. DUNN:  Another question we had, Your Honor,
14   which may be a premature question, is whether the Court
15   intends, prior to the 25th, argument to release questions to
16   the parties if things that the Court may --
17          THE COURT:  My goal would be, if I have questions
18   that I want you to be able to answer, to get them to you.
19   All right.  Now, it may be during the course of your
20   brilliant closing arguments if something comes up.  I don't
21   think there would be post-argument briefing.  That's not
22   what I anticipate.  All right.  It's going to be
23   pre-argument briefing and then the arguments themselves.
24   We'll see what that leads to; all right?
25          MS. DUNN:  Understood, Your Honor.  Thank you.
```

Redirect examination - M. Wheatland

```
 1                THE COURT:  Okay.

 2                MS. WOOD:  One further question just in terms of

 3    the logistics.

 4                Would we be permitted to have functionally the

 5    same technology and seating arrangements that the Court has

 6    graciously provided for the trial this far?

 7                THE COURT:  That's my plan.  We'll have access to

 8    the courtroom across the hall as well.  We'll have -- you

 9    know, for the overflow capacity.  If there are going to be

10    any demonstratives used, they will be available on the

11    screens.  Yeah.  We'll do it the exact same way.

12                MS. WOOD:  Thank you, Your Honor.

13                MS. DUNN:  I'm sure there will be demonstratives,

14    Your Honor.

15                And just to be clear that no detail is too small,

16    some of the counsel were wondering if we can keep our little

17    badges that get us into the courtroom, or maybe they can be

18    renewed in case it's hard to get into the courthouse that

19    day.

20                THE COURT:  Yeah.  I think -- hold on to what

21    you've got.  All right.  And we'll probably set up the

22    courtroom the same way with a couple of rows for the media,

23    a couple of rows, plus the jury box for counsel.  And that

24    worked pretty well.  All right.

25                MS. WOOD:  Your Honor, is it -- I'm assuming it
```

                                                          113

Redirect examination - M. Wheatland

1   would be appropriate for the plaintiffs to have a rebuttal

2   in the course of their closing?

3           THE COURT:  It's a standard case, so you've got

4   the burden.  So that's why at some point I may decide to

5   give you all a time frame.  And I might give you a phone

6   call just to see what you're thinking about in terms of how

7   much time you need.  All right.

8           MS. WOOD:  Thank you, Your Honor.

9           MS. DUNN:  We appreciate that.

10          And I think on behalf of both parties, we

11  particularly want to thank not just the Court, but also the

12  court staff, including the court reporter who comes in the

13  afternoon who may not be needed today for this.  But I think

14  Ms. Wood and I, on behalf of both our teams, would like to

15  just say thank you very much.

16          THE COURT:  Yeah.  As I said at the beginning of

17  the day, this has been a technically complicated case, but

18  it was made much easier because we had good counsel.  And,

19  again, the way you all worked.

20          We apparently had students visiting yesterday.  I

21  wish we would have had more law students coming in to watch.

22  This is how it should be done.  So I'm very pleased at how

23  the case has gone, and you moved, what, a six-week case we

24  did it in three.

25          MS. WOOD:  We did, Your Honor.

114

Redirect examination - M. Wheatland

```
 1            THE COURT:  Yeah.  That's very good.  So
 2   congratulations, and you all have a good couple-of-week
 3   break, and I'm looking forward to seeing the final papers.
 4   All right.
 5            MS. WOOD:  Thank you so much, Your Honor.
 6            MS. DUNN:  Thank you, Your Honor.
 7            (Proceedings adjourned at 12:37 p.m.)
 8            ----------------------------------
 9   I certify that the foregoing is a true and accurate
10   transcription of my stenographic notes.
11
12            _____
13                 Stephanie M. Austin, RPR, CRR
14
15
16
17
18
19
20
21
22
23
24
25
```

115