1            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF VIRGINIA
2               ALEXANDRIA DIVISION

3    --------------------------x
     UNITED STATES, et al.,    :    Civil Action No.:
4                              :    1:23-cv-108
              Plaintiffs,      :
5        versus                :    Monday, September 9, 2024
                               :    Alexandria, Virginia
6    GOOGLE LLC,               :    Day 1 p.m.
                               :    Pages 1-173
7             Defendant.       :
     --------------------------x
8

9         The above-entitled bench trial was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
     This proceeding commenced at 1:58 p.m..

10
                    A P P E A R A N C E S:
11
     FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
12                          OFFICE OF THE UNITED STATES ATTORNEY
                            2100 Jamieson Avenue
13                          Alexandria, Virginia  22314
                            (703) 299-3700
14
                            JULIA TARVER WOOD, ESQUIRE
15                          AARON TEITELBAUM, ESQUIRE
                            JEFFREY VERNON, ESQUIRE
16                          DANIEL GUARNERA, ESQUIRE
                            MICHAEL WOLIN, ESQUIRE
17                          UNITED STATES DEPARTMENT OF JUSTICE
                            ANTITRUST DIVISION
18                          450 Fifth Street, NW
                            Washington, D.C.  20530
19                          (202) 894-4266

20   (State of VA)          TYLER HENRY, ESQUIRE
                            JONATHAN HARRISON, ESQUIRE
21                          OFFICE OF THE ATTORNEY GENERAL
                            OFFICE OF THE SOLICITOR GENERAL
22                          202 North Ninth Street
                            Richmond, Virginia  23219
23                          (804) 786-7704

24

25
                                                        1

1                         A P P E A R A N C E S:

2    FOR THE PLAINTIFFS:      ELLIOTT DIONISIO, ESQUIRE
     (State of CA)            OFFICE OF THE CALIFORNIA ATTORNEY
3                             GENERAL
                              300 South Spring Street
4                             Suite 1700
                              Los Angeles, California  90013
5                             (213) 269-6681

6    (State of NY)            MORGAN FEDER, ESQUIRE
                              OFFICE OF THE NEW YORK
7                             ATTORNEY GENERAL
                              28 Liberty Street
8                             20th Floor
                              New York, New York  10005
9                             (212) 416-8262

10   (State of WA)            BROOKE LOVROVICH, ESQUIRE
                              OFFICE OF THE WASHINGTON
11                            ATTORNEY GENERAL
                              800 5th Avenue
12                            Suite 2000
                              Seattle, Washington  98104
13                            (206) 587-5510

14   FOR THE DEFENDANT:       CRAIG REILLY, ESQUIRE
                              LAW OFFICE OF CRAIG C. REILLY
15                            209 Madison Street
                              Suite 501
16                            Alexandria, Virginia  22314
                              (703) 549-5354
17
                              KAREN DUNN, ESQUIRE
18                            JEANNIE RHEE, ESQUIRE
                              WILLIAM ISAACSON, ESQUIRE
19                            PAUL, WEISS, RIFKIND,
                              WHARTON & GARRISON LLP
20                            2001 K Street, NW
                              Washington, D.C.  20006
21                            (202) 223-7300

22                            ERIC MAHR, ESQUIRE
                              FRESHFIELDS BRUCKHAUS DERINGER, LLP
23                            700 13th Street, NW
                              10th Floor
24                            Washington, D.C.  20005
                              (202) 777-4500
25

                                                                2

1                          A P P E A R A N C E S:

2                              JUSTINA SESSIONS, ESQUIRE
                               FRESHFIELDS BRUCKHAUS DERINGER, LLP
3                              855 Main Street
                               Redwood City, California   94063
4                              (212) 277-4000

5     COURT REPORTER:          RHONDA F. MONTGOMERY, CCR, RPR
                               Official Court Reporter
6                              United States District Court
                               401 Courthouse Square
7                              Alexandria, Virginia   22314
                               (703) 299-4599
8                              RMontgomery@courtreport.net

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              COMPUTERIZED TRANSCRIPT OF STENOGRAPHIC NOTES

                                                                   3

1                    TABLE OF CONTENTS

2                       WITNESSES

3     On behalf of the Plaintiffs:

4     ANDREW CASALE

5     Cross-examination by Mr. Isaacson .........5
      Redirect examination by MS. WOOD ..........45
6     Recross examination by Mr. Isaacson .......51

7     JOSHUA LOWCOCK

8     Direct examination by Mr. Teitelbaum ......52
      Cross-examination by Ms. Rhee .............79
9     Redirect examination by Mr. Teitelbaum ....112

10    JAMES AVERY

11    Direct examination by Mr. Wolin ...........115
      Cross-examination by Ms. Morgan ...........150
12    Redirect examination by Mr. Wolin .........168

13                       EXHIBITS

14    On behalf of the Defendant:
      Admitted
15    Number 994   .............................98
      Number 1340 .............................100
16

17    On behalf of the Plaintiffs:
      Admitted
18    Number 758 ...............................143

19                      MISCELLANY

20    Proceedings September 9, 2024 ............5
      Certificate of Court Reporter ............173
21

22

23

24

25

Cross-Examination - A. Casale

1                    P R O C E E D I N G S

2              THE COURT:  All right.  Mr. Casale, you're going

3     to need to speak louder and a bit slower.  All right?

4              THE WITNESS:  No problem.

5              THE COURT:  The afternoon in most trials is what I

6     call the witching hours.  People start to get tired and

7     cranky.  So make sure you speak up loud and slow.  Thank

8     you.

9              MR. ISAACSON:  I'm Bill Isaacson, and I'm hoping

10    not to get cranky, so...

11                        CROSS-EXAMINATION

12    BY MR. ISAACSON

13    Q    You were asked -- you used the term, when you were

14    asked questions about the Google Display Network, GDN, the

15    term Google Ads and DV360.  I want to make sure I understand

16    what your understanding of those is so that I can understand

17    your testimony.

18              And I think you also said that Google Ads --

19              THE COURT:  That's one question.  Let him answer

20    that question first.

21              MR. ISAACSON:  Oh, I didn't ask a question yet.

22              THE COURT:  Sorry.  You were asking him to

23    clarify.

24    BY MR. ISAACSON

25    Q    Just by background, you also said -- tell me if I have

                                                              5

Cross-Examination - A. Casale

1   this right.  You said that Google Ads result in 10 percent
2   of the impressions on Index Exchange and DV360, 28 percent?
3   A    Yes.
4   Q    Now, at the time of your deposition, you didn't even
5   know what Google Ads refer to, right?
6   A    That was -- is a marketing rebrand that I was less
7   familiar with at the time, yes.
8          THE COURT:  You're dropping your voice.  You have
9   to keep it up the whole time.  All right?
10          THE WITNESS:  Yes.
11          THE COURT:  Thank you.
12   BY MR. ISAACSON
13   Q    And so the Google Display Network, from your point of
14   view, includes both Google Ads and DV360, correct?
15   A    The Google Display Network is an ad network.  It is
16   mutually exclusive to DV3 as far as my understanding.
17   Q    Now -- so let me just make sure I understand, then,
18   your testimony.  If we can, look -- I put a spiral copy of
19   your deposition there.
20   A    Yep.
21   Q    You would agree with me that, coming into this
22   proceeding, you thought the term "ad network" didn't have
23   any -- have any real formal definition?
24   A    The ad -- "ad network" is a very common term in ad
25   tech.  I've known what an ad network is for a long time.

6

Cross-Examination - A. Casale

 1          MS. WOOD:  Your Honor, might I suggest?  Is there
 2   a way to move the microphone close --
 3          THE COURT:  No, the mic doesn't move; the body has
 4   to move.  All right.
 5   BY MR. ISAACSON
 6   Q    Did you think before this case that there was a real
 7   lack of formality in defining what an ad network is?
 8   A    No.
 9   Q    So if we could look at your deposition -- this is your
10   deposition, which was taken September of last year, about a
11   year ago.  And at page 116 -- I'm sorry -- yes, 116, line 6
12   through 14, were you asked the question, "Can you think the
13   names of any other ad networks or open web display other
14   than Google Display Network?"  And you answered --
15          MS. WOOD:  Your Honor, objection.  I think -- I'm
16   not sure he's established proper impeachment for this.  If
17   he could allow the witness to read it.
18          THE COURT:  Sustained.
19          Does this refresh your memory?
20          THE WITNESS:  Yeah.
21   BY MR. ISAACSON
22   Q    And at the time of your deposition, you thought there
23   was a real lack of formality in defining what an ad network
24   is?
25   A    The question that I was asked was framed in reference

                                                              7

Cross-Examination - A. Casale

1    to ad networks for open web display specifically.  That's

2    what prompted that statement.

3    Q    All right.  So that's good to know.

4            So at the time of your deposition, you thought

5    there was a real lack of formality in defining what an ad

6    network for open web display is, right?

7    A    That was how I answered the question, yes.

8    Q    Okay.  And then proceeding down to line 22 --

9            MS. WOOD:  Objection, Your Honor.

10           MR. ISAACSON:  I have to ask -- you asked me

11   to have him read it.

12           THE COURT:  Well, wait.  What's the question?

13           MR. ISAACSON:  I want him to read the question and

14   the answer that I'm about to point out to him.

15           MS. WOOD:  Your Honor, I don't believe we've

16   established that he had a lack of recollection as to

17   anything.

18           MR. ISAACSON:  I am not trying -- well, yes --

19           THE COURT:  Just ask him the question right now.

20   BY MR. ISAACSON

21   Q    At the time of your deposition, did you define the

22   Google Display Network to include DV360?

23   A    No.

24   Q    All right.  Can I ask you to look at line 22 on that

25   same page, the question about the Google Display Network --

                                                              8

Cross-Examination - A. Casale

1    A    Yep.

2    Q    -- and the answer that you gave about DV360 on the

3    following page?

4    A    Yeah.  That's very clear to me, what I said.

5    Q    At the time of your deposition, you thought that Google

6    Display Network included DV360 and you didn't know what

7    Google Ads was?

8    A    You're completely mischaracterizing this answer.  If I

9    could state the answer, then I think I can articulate the --

10   Q    Please explain.

11   A    So as I said earlier, as of the most recent information

12   that I have, 38 percent of the impressions transacted

13   between DV3 and GDN across the exchange.  GDN is a

14   proportion of that, which is roughly one-third.  This

15   statement specifically says, "Roughly half to a third of the

16   overall ad spend that we see through our connection to DV3

17   is referencing GDN," which is correct and is consistent with

18   what I said earlier today.

19   Q    Yes.  But then at the deposition, you responded -- when

20   you were asked about the portion to GDN, you said, "I would

21   estimate it to be roughly a half to a third of the overall

22   ad spend that we see through our connection to DV3."?

23         MS. WOOD:  Objection.

24   BY MR. ISAACSON

25   Q    And that's's DV360, right?

9

Cross-Examination - A. Casale

1          MS. WOOD:  Objection again.  Improper impeachment.

2          THE COURT:  Well, at this point, no, I will

3    overrule the objection.

4          But let's get this moving.  This is not adding

5    much.

6          THE WITNESS:  I would like to answer that

7    question.

8    BY MR. ISAACSON

9    Q    All I want to say is, when you said DV3 there, you

10   meant DV360?

11   A    That's not reasonable.  The only way GDN spends money

12   is through the DV3 connection.  That's not by our choice;

13   that's through Google's choice.  That's why it was framed

14   that way.  This is ambiguous terminology.

15         THE COURT:  Is DV3 and DV360 two different

16   entities or --

17         THE WITNESS:  DV3 is a demand-side platform, but

18   it's also a pipe-end index.  And so GDN also routes through

19   the same pipe, which in my brain I call DV3.

20   BY MR. ISAACSON

21   Q    To help the judge out, DV3 is DV360?

22   A    Yes.

23   Q    And are you saying that the Google Ads runs through the

24   DV360 pipe?

25   A    That's correct.  That's exactly what I'm saying.

                                                          10

Cross-Examination - A. Casale

1    Q    All right.  And you also testified on direct about your

2    views about the customers for Google Ads or Google

3    advertiser customers.

4              At the time of your deposition, you thought you

5    didn't actually know much about the customers -- Google's

6    advertiser's customers.  You thought there was a lot of

7    mystery about them.

8              MS. WOOD:  Objection.  I'm not sure what the

9    testimony is talking about from direct.

10             MR. ISAACSON:  You asked him for --

11             THE COURT:  I am going to overrule the objection.

12   He can ask the question.

13   BY MR. ISAACSON

14   Q    At the time of your deposition, you thought you didn't

15   know much about Google advertiser customers.  You thought

16   there was a lot of mystery about them, right?

17   A    Can you show me the specific quote that you're

18   referencing?

19   Q    Sure.  If you look at page 269.  All right?

20             You were asked, "Beyond Google bids on Index

21   Exchange -- Exchange, does Index Exchange have a broader

22   understanding of Google's advertiser customers?"

23             You said, "No."

24             MS. WOOD:  Objection.

25

Cross-Examination - A. Casale

1  BY MR. ISAACSON

2  Q    "There's a lot of mystery.  We don't know much.  We

3  know about the bids that are placed.  That's about it."

4           MS. WOOD:  Objection again to counsel reading from

5  the deposition without establishing a basis to do so.  And

6  for context, I also think the previous page, 268,

7  question --

8           THE COURT:  Well, you can take care of that on

9  redirect, Ms. Wood.

10 BY MR. ISAACSON

11 Q    All right.  Other than the actual bids that you saw on

12 Index Exchange, Google customers were a mystery to you at

13 the time of your deposition; you didn't know much about

14 them.  Right?

15 A    Well, what threw me in that question is the term

16 "broader understanding of advertisers -- Google advertiser

17 customers."

18          To me, my brain interpreted that as intimate

19 knowledge of the performance outcomes, the styles of

20 campaigns that were being run, all things that I have

21 absolutely no knowledge of beyond the actual bids that are

22 being placed, which is how I answered the question.

23          I don't have a broader understanding of each

24 individual campaign that is run as part of GDN or Google

25 Ads.

                                                          12

Cross-Examination - A. Casale

1  Q    You also discussed the term "open web display

2  advertising" during your direct testimony.  Those four words

3  are words that you've seen in some partial combinations; but

4  before this case, you had not -- you didn't remember having

5  used -- seen those four words used together, right?

6  A    Can you show me again?  What are you referencing

7  specifically?

8  Q    Well, I'm asking you the question first just from your

9  memory.  I'm happy to show it to you in the deposition.

10          Before this case, "open web display advertising,"

11  did you have any familiarity with all four of those words

12  being used together as opposed to some combination of two --

13  one, two, or three of them?

14  A    All of those words are standard words as part of our

15  ecosystem.  But if I understood the context of the question

16  when I was asked it, I might be able to specifically

17  reference why I might have answered.

18          THE COURT:  No.  That's not answering the

19  question.  The question is he's talking about a four-word

20  phrase, "open web display advertising."  And the question

21  simply is, a year ago, were you aware of what that term

22  meant?

23          THE WITNESS:  That was not a well-understood

24  defined category.  It's usually "open web," and then

25  "display" is separate.  So putting them together is just not

13

Cross-Examination - A. Casale

1    a common way we speak in ad tech.

2    BY MR. ISAACSON

3    Q    All right.  Thank you.

4         You talked about experiments where the take rate

5    was reduced to see the results.  Those -- you weren't

6    specifically involved in conducting those experiments,

7    right?  You were just informed of the results?

8    A    I'm not personally involved in conducting those

9    experiments.

10   Q    To your knowledge, those experiments didn't account for

11   any variables that might affect the result other than the

12   reduction and the take rate, correct?

13   A    Correct.

14   Q    So, for example, when these experiments were being

15   done, no one was comparing the quality of the impressions

16   that were in the experiment.

17   A    I can't speak to whether that was done or not because I

18   was not personally conducting the experiments.

19   Q    Right.  And you don't know, for example, that any

20   experiment was ever run limited to open web display

21   impressions?

22   A    I can't confidently say that, no.

23   Q    I'm not sure you said it.  You do consider Google to be

24   a competitor of Index Exchange right?

25   A    The AdX division of Google, yes.

Cross-Examination - A. Casale

1    Q     And you consider Magnite a competitor of Index

2    Exchange?

3    A     Yes.

4    Q     You consider PubMatic a competitor of Index Exchange.

5    A     Yes.

6    Q     You consider Xandr to be a competitor of Index

7    Exchange?

8    A     Well, Xandr is also a DSP, but the exchange side is

9    Xandr, yes.

10   Q     Your company considers its main competitors to include

11   Facebook, right?

12   A     They're a competitor in the macro market.

13   Q     All right.  The macro market.  What is the macro market

14   which you refer?

15   A     Digital advertising dollars overall.

16   Q     And you consider Facebook to be one of the -- your main

17   competitors in that macro market, correct?

18   A     They are everyone's main competitor, us included.

19   Q     And you also consider Amazon to be one of your main

20   competitors in that larger market?

21   A     In the macro market, yes.

22   Q     Okay.  And have you -- and you have discussions and

23   documents within your company where you identify Facebook

24   and Amazon as some of your main competitors in that macro

25   market?

15

Cross-Examination - A. Casale

1    A    I can't speak to whether we have documents.  We

2    typically focus on exchanges.

3    Q    Have you told regulators in Europe that Facebook and

4    Amazon are amongst your main competitors?

5    A    I can't recall whether that was in any of the

6    questionnaires that we received.

7    Q    All right.  When there were submissions to the CMA back

8    in 2019 by your company, would you have reviewed that?

9    A    I may have.  I don't -- there's a lot of questionnaires

10   that we're getting all the time.  I can't recall them all.

11   Q    Is it your practice as CEO to look at these and make

12   sure they're identifying your competitors accurately?

13   A    As I said, there's many questionnaires that we receive,

14   and I do rely on my team to also participate in the

15   submissions.

16   Q    And you would expect that their identification of

17   competitors to be accurate?

18   A    I would hope they would be accurate, but I don't know

19   what the question that you're asking is in reference to.

20   I'd also say the market does evolve over time.

21   Q    All right.  I'm just going to ask you to look in your

22   binder, not put it on the screen.  There's a tab.  These are

23   in chronological order when they don't have exhibit numbers.

24   So there's one that says 2019, 9-30 or September 30.

25             So you'll see that on the first page this is a

Cross-Examination - A. Casale

1    memo dated September 30, 2019, from Index Exchange.  Do you

2    recognize your general counsel, at least at the time, or

3    associate general counsel on that document?

4    A    Yes.  I recognize both.

5    Q    All right.  And do you recall the submission to the

6    Competition and Markets Authority in the United Kingdom?

7    A    I can't say that I recall this, no.

8    Q    All right.  And if you look at Bates stamp 323, at the

9    very bottom there's a statement from Index Exchange.

10              MS. WOOD:  Objection.  Hearsay.

11              MR. ISAACSON:  This is a statement by his company

12   to a regulatory authority.

13              MS. WOOD:  It's still hearsay, Your Honor.

14              MR. ISAACSON:  And I'm going to ask him whether he

15   agrees with it.

16              MS. WOOD:  Your Honor, the plaintiffs object on

17   hearsay.

18              THE COURT:  Well, this witness is not, apparently,

19   the witness who made the answer.  If he were, I would permit

20   it to come in because he's here to be cross-examined about

21   it.  But we don't have any information as to who actually

22   made the statement, correct?

23              MR. ISAACSON:  Other than the individuals whose

24   names is on it.  But I want to ask him if he agrees with it

25   given that he knows his company submitted this to a

                                                            17

Cross-Examination - A. Casale

1    regulatory authority.  I'm not seeking to admit this

2    document.

3            THE COURT:  Well, he's already said that Amazon

4    and Facebook are major competitors in their macro market.

5    You've already got that testimony.

6            MR. ISAACSON:  I understand, and I'm glad about

7    that.  But this is not the macro market in this statement.

8            THE COURT:  All right.  Why don't you ask the

9    question directly?

10           MR. ISAACSON:  All right.

11   BY MR. ISAACSON

12   Q    As an advertising exchange, does Index Exchange see its

13   main competitors as Google; AppNexus, now a Xandr company;

14   PubMatic; Rubicon; OpenX; SpotX; Amazon; and Facebook?

15   A    What's the question?

16   Q    The question is, as an advertising exchange, does Index

17   Exchange see its main competitors as Google; AppNexus, which

18   is now a Xandr company; PubMatic; Rubicon; OpenX; SpotX;

19   Amazon; and Facebook?

20   A    Today or in 2019 when this question was submitted?

21   Q    2019.

22   A    The reason why I think Facebook was on here in 2019 was

23   because at the time it operated the Facebook Ad Network,

24   which --

25   Q    Can I get an answer to my question?

                                                          18

Cross-Examination - A. Casale

1    A    Yes, in 2019.

2    Q    And as of today, does -- as an advertising exchange,

3    does Index Exchange see its main competitors as those

4    companies that I just listed?

5    A    I don't think in today's version of this question we

6    would include Facebook in this context.

7              THE COURT:  Would you include all the others?  In

8    other words, you've got Google; you've got AppNexus, that

9    which is now Xandr; you've got PubMatic, Rubicon, OpenX,

10   SpotX, and Amazon.

11             THE WITNESS:  I think it would be heavily debated

12   on Amazon.  The reasons to add it would be TAM.  I think we

13   would go 50-50, to be honest, because it's not a direct

14   competitor.

15   BY MR. ISAACSON

16   Q    You think Amazon has become less of a competitor since

17   2019?

18   A    To some degree, yes, I do.

19   Q    Why would Amazon have become less a competitor since

20   2019?

21   A    They have become more of a strategic partner to Index

22   since 2019.

23   Q    I do want to talk about that.  But are you saying that,

24   because you are in a strategic partnership with Amazon, that

25   they are competing with you less?

                                                              19

Cross-Examination - A. Casale

1  A    My understanding of their strategy is that it's

2  evolving and there's no clear sight lines on them launching

3  an exchange.  In 2019, we would have had more doubt that

4  they would have launched a direct competitor to Index.

5  Q    In 2019 Amazon was offering auctions for ads on its

6  site, correct?

7  A    Auctions on its site --

8  Q    For ads.

9  A    That Index participated in or just generally?

10 Q    Just generally.

11 A    I have no idea how they run their business on their

12 website.

13 Q    Now, are you saying that Amazon was one of your main

14 competitors in 2019, but since then, you've formed a

15 strategic relationship with Amazon and that level of

16 competition has diminished so that they're no longer one of

17 your main competitors?

18 A    I can't give you a black-and-white answer to that.  We

19 still view them as being competitivish, but they're less of

20 a competitive threat today than they would have been in

21 2019.

22          In tech there are no finances, no 0/1 binary.

23 Companies can compete with us in a second.  They are in ad

24 tech generally, but I wouldn't say that I would reference

25 them as a primary competitor relative to, say, AdX, Magnite,

20

Cross-Examination - A. Casale

1    or PubMatic in that context outside of the macro market.

2    Q    It's your general view, even this year, that the world

3    of programmatic ad tech is dynamic and unpredictable?

4    A    Yes.

5    Q    And that it continues to encounter numerous

6    transformational events that impact ad tech?

7    A    I would agree with that statement.

8    Q    All right.  And one of those transformational events

9    impacting ad tech is the growth in video and streaming TV,

10   correct?

11   A    Absolutely.  It is a growing channel, and it's evolving

12   ad tech as a result.

13   Q    And Index Exchange has added connected TV as a channel,

14   correct?

15   A    Yes, we have added it as a channel.

16   Q    And you've added it as a channel because you think

17   that's where your customers are moving and you are following

18   suit?

19   A    I -- that characterization would not be consistent with

20   the reason we have entered the channel.  Some of our

21   customers have evolved into streaming; but for the most

22   part, streaming television has represented new customers in

23   a different category for Index for new growth opportunity.

24   Q    I'm sorry.  I didn't mean to talk over you.

25              There's been an expansion of channels by your

Cross-Examination - A. Casale

1   customers that now includes connected TV, and your company

2   has followed suit.  That's correct?

3   A    We have added a new channel of demand into the exchange

4   that's servicing new addressable opportunity, correct.

5   Q    All right.  And connected TV spend was 0 percent for

6   your company two to three years before your deposition.  So

7   that's '21 -- 2021; and by 2023, it was approximately

8   10 percent of the ads spent on Index Exchange, correct?

9   A    That sounds about right, plus or minus.

10  Q    Now, you discussed header bidding.  After header

11  bidding began, at some point you understood that Google's

12  AdX was marketing itself, saying you don't need header

13  bidding because AdX has access to every DSP?

14  A    I heard that from the publisher community.

15  Q    More importantly, what you thought was that Index

16  Exchange had to sell against that particular pitch by

17  Google?

18  A    Absolutely.

19  Q    All right.  And what you then observed was that

20  Google's marketing against header bidding fell apart and was

21  only short-lived?

22  A    Well, Google was attempting to position header bidding

23  as something that was a hack and that was causing latency;

24  but in the end, publishers still adopted it.

25  Q    Publishers adopted it and revenue went up despite the

22

Cross-Examination - A. Casale

1  Google marketing pitch?

2  A    I would agree with that characterization.

3  Q    In fact, I think what you said on direct was that

4  header bidding has brought the exchange market to a -- to

5  where it's hypercompetitive?

6  A    I would agree that header bidding is hypercompetitive.

7  That sounds like something I would say.

8  Q    But you're specific to the exchange market.  The

9  exchange market is hypercompetitive because of header

10 bidding?

11 A    Header bidding made the exchange market

12 hypercompetitive compared to the waterfall era of prior.

13 Q    Right.  And today the exchange market with header

14 bidding remains hypercompetitive?

15 A    I would agree with that statement.

16 Q    And from what you have seen, almost every publisher on

17 the open web leverages some sort of header bidding?

18 A    Plus or minus some publishers.  That sounds about

19 right.

20 Q    And then you talked about open bidding.  From what you

21 saw, open bidding did not kill header bidding.  From what

22 you saw, if anything, it grew header bidding?

23 A    Open bidding did bring new publishers into the

24 paradigm.  Yeah, that did happen.

25 Q    And when you say "brought them into the paradigm,"

23

Cross-Examination - A. Casale

1   that -- new publishers joined because of open bidding, and

2   that grew header bidding?

3   A    In certain cases, not in every case.  But it certainly

4   moved publishers away from the waterfall.

5   Q    All right.  Now, the vast majority of all transactions

6   on Index Exchange are header bidding-type transactions,

7   correct?

8   A    Header bidding-type transactions, yes.

9   Q    Okay.  And by header bidding-type transactions, that

10  would include transactions using Prebid ad tech that we've

11  discussed earlier in court?  Well, you weren't here.

12  A    Yes, this would include Prebid.  Absolutely.

13  Q    It would include Google's Open Bidding?

14  A    Yes, it would include Google's Open Bidding.

15  Q    It includes Amazon's Transparent Ad Marketplace, or

16  TAM?

17  A    Yes, it would include TAM.

18  Q    All right.  And so we're saying, the vast majority of

19  all the transactions on Index Exchange are coming from

20  header bidding; they're coming from Prebid, Open Bidding,

21  and TAM?

22  A    Specifically in the open web.  In streaming or in app,

23  there would be different partners as well.  But those would

24  be three specifically on the web.

25  Q    Okay.  And approximately 50 percent of Index Exchange

24

Cross-Examination - A. Casale

1   revenue comes from Prebid header bidding transactions,

2   correct?

3   A     Approximately.  Yeah, that sounds about right.

4   Q    Now, I mentioned Amazon's Transparent Advertising

5   Marketplace, TAM.  Index Exchange is one of the buyers in

6   Amazon TAM auctions, correct?

7   A     Yes.

8   Q    And Amazon markets TAM as having access to unique

9   Amazon demand as a feature, doesn't it?

10   A     I have heard that framing before.

11   Q    Now, you mentioned a strategic partnership.  Let's talk

12   about what that is.

13          In June of this year, Amazon announced a launch of

14   a certified supply exchange program that includes Index

15   Exchange, correct?

16          MS. WOOD:  Objection.  Foundation and hearsay.

17          THE COURT:  All right.  You need to lay a

18   foundation.

19          MR. ISAACSON:  I'm talking about --

20          MS. WOOD:  And also beyond the scope, Your Honor.

21          MR. ISAACSON:  This is the strategic program that

22   he discussed earlier that he has knowledge of.

23          THE WITNESS:  That is not, actually.  You're

24   drawing a conclusion there.

25

Cross-Examination - A. Casale

1   BY MR. ISAACSON

2   Q    You're right.  Let me -- then I shall ask you if that's

3   the strategic program --

4   A    No.

5   Q    Okay.  What is the strategic program that you're

6   referring to --

7   A    TAM.

8   Q    It's TAM.  Okay.  So you're working with TAM.  In

9   addition to TAM, Index Exchange is part of a certified

10  supply exchange program now with Amazon that was announced

11  in June, correct?

12         MS. WOOD:  Same objections.  Hearsay and beyond

13  the scope and foundation.

14         THE COURT:  Well, I don't know if it's hearsay.

15         First of all, do you have an answer to that --

16  without giving me the answer, do you have an answer for that

17  question?

18         THE WITNESS:  That partnership is correct, but it

19  is in reference to the Amazon DSP, not TAM.  So I just want

20  to be clear on that.

21         MR. ISAACSON:  Yes.  And I wanted to explain that.

22         THE COURT:  I'm going to permit this.  Overruled.

23  BY MR. ISAACSON

24  Q    So explain what the Amazon DSP is.

25  A    The Amazon DSP is a demand site platform that marketers

26

Cross-Examination - A. Casale

1  use to place bids in the programmatic marketplace or cross

2  exchanges, including Index.

3  Q    Right.  And so the Amazon DSP gives you access to

4  third-party ad inventory in Amazon and outside of Amazon,

5  right?

6  A    I don't know how it works in Amazon, but that sounds

7  correct.  But outside of Amazon, that's why they would be

8  working with a company like Index.

9  Q    Right.  So they are making Index Exchange demand

10  available through the Amazon DSP?

11  A    You said "demand."  Did you mean supply?

12  Q    Well, you're the SSP.  I was referring to the Amazon

13  DSP.

14  A    Index Exchange does not make demand available to a DSP.

15  Q    What is it you're making available to the --

16  A    It makes supply available to a DSP.

17  Q    Makes supply available.  So publisher supply.  All

18  right.  Yes.  Thank you.

19        And Amazon, in connection with its DSP, to your

20  knowledge, does it market itself as providing billions of

21  proprietary audience signals?

22  A    I am not versed with their marketing of their DSP.  I'm

23  not their target market.

24  Q    Okay.  Now, Index Exchange once had its own header

25  bidding wrapper, but you stopped that when Prebid became

27

Cross-Examination - A. Casale

1    popular.  Is that right?

2    A     There was a time when Prebid and our header tag wrapper

3    were both in market.  As Prebid adoption grew, we

4    end-of-lifed the header tag wrapper over a period of years.

5    Q     Right.  And so right now Index Exchange supports

6    publishers using Prebid header wrappers?

7    A     We support a variety of header wrappers, including

8    those that are built on Prebid, including those that are

9    proprietary wrappers as well, many of which are inspired by

10   Prebid.  But we are not exclusive to just Prebid.  I just

11   want to make clear.

12   Q     So Prebid wrappers -- Prebid header bidding wrappers,

13   proprietary wrappers which are based on Prebid technology,

14   and then -- and does that include Amazon TAM?

15   A     Amazon TAM is a server-to-server integration that I

16   would frame as proprietary.  It could be based on Prebid,

17   but I do not believe it's based on Prebid, to the best of my

18   knowledge.

19   Q     All right.  You gave some opinions about the dangers of

20   header bidding.  Before the launch of Prebid, would you

21   agree that header bidding was dominated by bad practices and

22   poor standards?

23   A     Before the launch of Prebid, header bidding was an

24   infant.

25   Q     A what?

Cross-Examination - A. Casale

1   A     An infant.  It was barely a technology at all.  And so

2   I think, to a large extent, there was no standard at all.

3   And that, you know, was very true of any technology that's

4   brand new.

5   Q     And Prebid launched around 2015, correct?

6   A     I don't have the exact time stamp in my head, but that

7   is roughly the right time frame.

8   Q     I'm looking at Prebid's announcement.  Does that sound

9   correct?

10  A     It sounds like the right time frame.  I just don't have

11  the date stamp in my head.

12  Q     All right.  Now, we just -- I want to make sure I

13  understand how this is working because we've established

14  that almost all of your revenue is coming through header

15  bidding.  But at the same time, all of your revenue comes

16  from buying tools, or DSPs, right?

17  A     DSPs or buying tools connected to the exchange are the

18  only way to spend money through the exchange.

19  Q     And so they come through the header bidding, or is it

20  the other way around?

21  A     They come into the exchange.  The exchange will places

22  bids into Prebid, into Amazon TAM, into any technology that

23  the publisher is using to run their unified auction.

24  Q     Right.  So the DSPs come to you, and then those bids --

25  and those bids are then placed into header bidding?

Cross-Examination - A. Casale

1   A    That is -- yeah, correct.

2   Q    And Index Exchange integrated with approximately 75

3   DSPs that can bid into an Index Exchange auction?

4   A    Roughly 75.  Again, plus or minus.

5   Q    And index is integrated with Google's DV360, correct?

6   A    Yes.  Correct.

7   Q    All right.  And header bidding provides the same equal

8   access to inventory and consumers as direct buys of

9   advertising, correct?

10  A    I don't think that that's a universal truth.  The

11  question depends upon the publisher and their own

12  implementation.  And every publisher is different.

13          In certain cases, a publisher can make header

14  bidding equivalent to direct.  In other cases, a publisher

15  can prioritize direct above header bidding.

16          So it's impossible to make that statement

17  universally.

18  Q    Well, by using header bidding, would you agree that

19  media buyers can gain the ability to compete with direct

20  buys?

21  A    Using header bidding coupled with a publisher's

22  implementation, typically in the ad server, can facilitate

23  that outcome.

24  Q    Now, Index Exchange also has supply path optimization

25  agreements with media agencies, correct?

                                                          30

Cross-Examination - A. Casale

1    A    Yes, we do.

2    Q    Now, supply path optimization is a way to improve

3    advertising outcomes by reducing the number of

4    intermediaries that media buyers work with; is that

5    generally right?

6    A    I -- to be honest, I -- A, I am not a media agency, and

7    so I don't do SPO agreements myself from the context of why

8    they do it.

9              I can infer from the SPO agreements that we've

10   done with media agencies, there's a variety of reasons,

11   including supply chain hygiene, certainly including the

12   consolidation of vendors, reduced fees.  Those are some of

13   the reasons that I understand.  But I think every agency

14   also does SPO on their own with their own methodologies.

15   Q    And SPOs in general reduce the number of ad tech

16   intermediaries they're working with?

17   A    I think that's a reasonable conclusion, but I don't

18   know specifically how many SPO agreements any given media

19   agency strikes.  I don't have those numbers.

20   Q    And through SPO agreements, supply path optimization

21   agreements, DSPs can also enter into direct relationships

22   with publishers to purchase advertising directly from these

23   publishers?

24              MS. WOOD:  Objection.  Foundation.  I think he's

25   already indicated these are not familiar to him.

Cross-Examination - A. Casale

1        THE COURT:  We don't want you guessing.  We either

2   know or --

3        THE WITNESS:  I'm not privy to those agreements at

4   all.  I couldn't tell you.

5        THE COURT:  Objection sustained.

6        MR. ISAACSON:  Can I -- in his deposition, he said

7   he was familiar with this, Your Honor.  And I can show him

8   that.

9        THE COURT:  All right.  Well, let's --

10  BY MR. ISAACSON

11  Q    All right.  At page 41 of your deposition --

12  A    Sure.

13  Q    Oh, I misstated the question.  So let me rephrase the

14  question.  I apologize.

15       Having not -- just setting aside supply path

16  optimization, DSPs can enter into direct relationships with

17  publishers to purchase advertising directly from those

18  publishers; is that right?

19  A    That is correct.

20  Q    I apologize.

21       And if DSPs buy directly from a publisher, that

22  can divert spend from Index Exchange, correct?

23  A    I have no idea how DSPs allocate their spend; so I

24  can't confidently answer that question.

25  Q    The auctions that Index Exchange has been running, at

32

Cross-Examination - A. Casale

1  one point Index Exchange was running a second-price auction,

2  correct?

3  A    Yes.  The entire industry was.

4  Q    We haven't talked about this yet.  It's in the

5  glossary.  But maybe I'll just take a moment to say -- so in

6  a second-price auction when a buyer pays -- the buyer pays

7  the second-highest bid when they win the auction?

8            MS. WOOD:  Objection.  Beyond the scope.

9            THE COURT:  Well, it may be.

10           A, we don't have a jury.  B, it's a bench trial,

11  and I don't want witnesses to have to come back and forth.

12  So we're going to bend the rules a little bit in that

13  respect.  And, again, on redirect, you can go into it.  All

14  right?

15           MS. WOOD:  Thank you, Your Honor.

16           THE COURT:  All right.  Overruled.

17           THE WITNESS:  Can you rephrase -- or restate the

18  question.

19  BY MR. ISAACSON

20  Q    In a second-price auction, the winning bidder pays the

21  second-highest bid when they win the auction?

22  A    That's partially correct, but there's more to it.  So

23  in a second-price auction, typically it's what it sounds

24  like.  So you pay the second-highest bid or the floor.  So

25  if the floor is higher than the second-highest bid but below

 1   your bid, you would pay the floor.

 2   Q    Yes.  All right.  Thank you for that.

 3            And then Index Exchange shifted to a first-price

 4   auction five or six years ago?

 5   A    That is correct.

 6   Q    A first-price auction is easier to understand for

 7   everybody.  Highest bid wins?

 8   A    And specifically --

 9   Q    As long as they're above the floor price?

10   A    Specifically, though, you pay what you bid.  That's the

11   difference fundamentally.

12   Q    All right.  And the reason -- Index Exchange switched

13   from a second-price to a first-price auction because you

14   thought games were being played by exchanges and SSPs who

15   were running a first-price auction but calling it a

16   second-price auction?

17   A    That was one of the reasons for the switch to the

18   first-price auction.  It wasn't the only reason.  There were

19   more, but that was one of the reasons.

20   Q    All right.  Just focusing on that reason, you thought

21   one reason it made sense to move to a first-price auction

22   was to move everyone to an auction where there weren't those

23   games that were going to be played?

24   A    That is certainly one of the reasons we moved to the

25   first-price auction.

Cross-Examination - A. Casale

1    Q    All right.  I want to understand what you mean by your
2    tiny company.  You started in 2011.  You doubled your
3    revenue every year from 2011 to 2014, right?
4    A    I don't have those numbers in my head, but that's
5    probably right.  I just would need to...
6    Q    All right.  You were profitable in 2014 with
7    $200 million in revenue?
8    A    No.  That's not correct.  You're likely referring to ad
9    spend.  That's not revenue.  Ad spend is not revenue.
10   That's before the take rate that we assume is revenue.
11   Q    And my colleague pointed out I misspoke.  You were
12   founded in 2003, not 2011, right?
13   A    I assumed you were referring to 2011 as the pivot to
14   programmatic.
15   Q    Yes.
16   A    That's how I contextually answered your question.
17   Q    Thank you.
18          Well, let me ask you about this:  So if you look
19   at tab -- the tab with the date, the 2015, February 2; so
20   203.
21          THE COURT:  What's the date again?
22          MR. ISAACSON:  Well, it's missing from my binder.
23   It's probably missing from everybody's binder.
24          MS. WOOD:  February 3.
25          MR. ISAACSON:  February 3?

35

Cross-Examination - A. Casale

1          MS. WOOD:  February 3, 2015.

2          MR. ISAACSON:  Oh, here it is.  No, I have it.  I

3   have it.  All right.

4   BY MR. ISAACSON

5   Q    You recognize -- you see this is from AdExchanger.com,

6   and that's your picture back in 2015?

7   A    Yes.

8   Q    And if you turn to page 4, it says in the fourth

9   paragraph --

10         MS. WOOD:  Objection.  If there's going to be

11   reading from the document, it's -- the objection is to

12   hearsay.

13         MR. ISAACSON:  I thought I'm allowed to read

14   hearsay in cross-examination and ask him about it.  It's

15   cross-examination.  I'm not seeking to admit this.

16         THE COURT:  Well, why don't you just ask the

17   question rather than referring him to the text.  Just ask

18   the question.

19   BY MR. ISAACSON

20   Q    The question is, which is in the fourth paragraph,

21   Index Exchange projects $200 million in gross revenue for

22   the current fiscal year which ends in March.

23         Does that refresh you that, around that period,

24   you were taking in $200 million in revenue?

25   A    Well, you're choosing to ignore the word "gross."

                                                          36

Cross-Examination - A. Casale

1    Gross revenue is not revenue.  Gross revenue is ad spend.

2    That's why the word "gross" is in front of revenue.

3    Q    Okay.  So gross revenue.  So thank you.  I appreciate

4    that.

5             And then over the past 10 years, Index Exchange

6    has seen a five to ten times growth in revenue?

7    A    That sounds about right.  Again, I'd have to look at

8    the numbers, but it sounds about right.

9    Q    And compared to ten years ago, Index Exchange can now

10   handle 400 times more auctions than it could, then, ten

11   years ago?

12   A    That sounds about right, yeah.

13   Q    And the number of publishers using Index Exchange has

14   grown by five to ten times over the last ten years?

15   A    Also sounds about right, yep.

16   Q    You've over 550 employees, at least of last year,

17   right?

18   A    Yes.

19   Q    I want to make -- the $250 billion number -- not

20   dollar -- the 250 billion number that's used, was that bid

21   requests?

22   A    The 250 billion was the volume -- we call them slot

23   requests -- the volume of inbound slot requests from

24   publishers -- so effectively auctions -- for specifically

25   open web display.

37

Cross-Examination - A. Casale

1    Q    All right.  So it's something you would also call an
2    auction request?
3    A    We call them slot requests, but the industry might call
4    them other things, including auction requests.
5    Q    How many of -- was that per day?
6    A    That is per day.
7    Q    Now, you say 250 billion.  Would you look at page 32 of
8    your deposition.  On the last line and continuing on the
9    second page, you'll see there's a discussion of auction
10   requests.  Can you explain to me how -- do you have 250 --
11            MS. WOOD:  Page 32?  I'm sorry.
12            MR. ISAACSON:  Yes.  32, last line, continuing on
13   to the first couple of lines at the top.
14            THE COURT:  Well, rather than looking at the
15   deposition, ask the question.
16            MR. ISAACSON:  Right.  I'm going to ask.
17   BY MR. ISAACSON
18   Q    Should the number be 400 billion auction requests per
19   day, or should it be 250 billion?
20   A    Well, you're again failing to be specific.  Open web
21   display is 250 billion.  This question specifically says,
22   "Approximately how many auction requests does Index Exchange
23   handle on a daily basis?"  Which I interpreted as in
24   totality.
25            So in totality, it is larger than 250.

38

Cross-Examination - A. Casale

1  Q     That's why I ask these questions, to get these things

2  clarified.   So thank you.

3  A     Okay.

4  Q     So you were getting -- and you -- your company, with

5  250 billion auction requests for open web and 400 billion

6  auction requests total, markets itself as having massive

7  scale, correct?

8  A     We have massive scale.   The internet is huge.

9  Q     And almost eight years ago in 2016, you had 4.5

10 petabytes of bid data.   Does that sound right?

11 A     I cannot confirm that, just because that data point is

12 just not something in my brain.   I don't --

13 Q     How many petabytes of data do you have today?

14 A     I do not have that in my brain.

15 Q     All right.   The -- I want to ask you how your petabytes

16 would compare from 2016 to 2024.   If I can ask you to look

17 at Tab 2016 from 10-17.

18 A     Can you repeat the date.

19 Q     Sure.   2016, and then 10-17.   You'll see this is a

20 tweet from you in 2016.

21 A     Okay.   Yep.

22 Q     Does this tweet refresh your recollection that in 2016

23 you were storing 4.5 petabytes of bid data across the

24 exchange?

25 A     That would appear to be what this tweet is saying.

39

Cross-Examination - A. Casale

1    I -- yes.  I can't recall that tweet.

2    Q    And how much -- by how many factors more in petabytes

3    would you have today?

4    A    I really could not confidently answer that because

5    engineers are constantly trying to find new ways to pack

6    data and optimize the data store that we have.  And so the

7    maximum will be the growth in slot requests, but it probably

8    wouldn't be that significant because they've probably found

9    new ways to organize the data.

10              So, again, this is not a statistic that I have in

11   my head.

12   Q    You mentioned that your auctions include things other

13   than open web.  Publishers can use Index Exchange to sell

14   video ads on the web?

15   A    Yes, they can.

16   Q    Publishers can use Index Exchange to sell display ads

17   on mobile apps?

18   A    Yes, they can.

19   Q    They can use Index Exchange to sell video ads on mobile

20   apps?

21   A    Yes, they can.

22   Q    Publishers can use Index Exchange to sell video ads on

23   connected TV?  Maybe we already established that.

24   A    Yes, they can.

25   Q    And you have observed, as part of your work, that

Cross-Examination - A. Casale

1    publishers typically use multiple ad exchanges, correct?

2    A    Most publishers use multiple ad exchanges, correct.

3    Q    You have even seen that some publishers might use up to

4    a dozen ad exchanges.

5    A    That's an arbitrary number.  Yeah, I'm sure that there

6    are publishers that use a dozen, maybe more, maybe less.

7    Like, every publisher has their own strategy.

8    Q    And from your view of the industry, you would say there

9    are about 50 companies in ad tech on the supply side,

10   correct -- programmatic supply side?

11   A    I -- it's really hard for me to say specifically only

12   because businesses are entering and leaving the business all

13   the time.  So that sounds about right.  But it could be too

14   small; it could be too big.  There's a lot of change in the

15   individual businesses these days.

16   Q    Well, at the time of your deposition a year ago, did

17   you think that there were roughly 50 companies, depending on

18   the channel, that are on the supply side of programmatic

19   ad tech?

20   A    It seems like a reasonable guess.  I'm just stating

21   it's a reasonable guess.

22   Q    Based on what you've observed, you think that the

23   markets are on a road to consolidation, correct?

24   A    I do believe the market is on a road to consolidation,

25   correct.

Cross-Examination - A. Casale

1    Q    You think in five years' time there will be three to

2    five exchanges globally to process all channels?

3    A    I do believe over the coming years there will be a

4    small handful of exchanges processing all transactions.

5    Q    And you believe that the ad exchange marketplace is a

6    very competitive marketplace where everybody wants to win,

7    and that's going to accelerate the path towards

8    consolidation, right?

9    A    I do believe the marketplace is very competitive and

10   consolidation will be an artifact of that.  That's a

11   reasonable conclusion.

12   Q    In fact, you think that if DFP and AdX were separated,

13   that would accelerate the path towards consolidation?

14   A    I think that's a possible outcome.

15            MR. ISAACSON:  Can we look at their Demonstrative

16   G.  Your demonstrative.

17            MS. WOOD:  Put up G.

18   BY MR. ISAACSON

19   Q    All right.  You talked about this with counsel.  Now,

20   when you were talking about --

21            THE COURT SECURITY OFFICER:  Judge, it's not

22   coming up on the screen over here.

23                              (Pointing to the witness stand

24                              screen.)

25            THE COURT SECURITY OFFICER:  We've got a blank

                                                              42

Cross-Examination - A. Casale

1    screen here.

2                        (Pause in proceedings.)

3              MS. WOOD:   There should be a copy in the white

4    binder right there.

5    BY MR. ISAACSON

6    Q    Now, when you were testifying about the disadvantages

7    of the waterfall with this illustration, were you talking

8    about before or after Dynamic Allocation?

9    A    I was talking generally about the practice of a

10   waterfall.

11   Q    So this -- what you were talking about would be true

12   before and after Dynamic Allocation?

13   A    I can't confidently answer that question only because

14   the ins and outs of Dynamic Allocation are not something

15   that I intimately understand.  I understand, like, just

16   base-level knowledge on that.

17   Q    Did you know how the waterfall worked before Dynamic

18   Allocation?

19   A    Yes.

20   Q    Is that what you were describing?

21   A    I was describing a conventional waterfall.

22   Q    Well, did you think AdX was first in line before

23   Dynamic Allocation?

24   A    I was simply commenting --

25              MS. WOOD:  Objection.  Foundation.  I think he's

                                                              43

Cross-Examination - A. Casale

1   already indicated he's not familiar with Dynamic Allocation,

2   which is a Google feature and a Google product.

3               MR. ISAACSON:  He testified at length about this

4   chart.  The chart's got AdX first.

5               THE COURT:  I am going to overrule the objection.

6   Again, on redirect you can get into it.

7   BY MR. ISAACSON

8   Q    Did you think after Dynamic Allocation -- that before

9   Dynamic Allocation that AdX was first in line?

10  A    I was commenting based on the chart that I saw, which

11  depicts that AdX was first in line.  That's what I was

12  specifically commenting on.

13  Q    Okay.  So you're just commenting on the chart; you

14  don't actually know whether AdX was first in line or when it

15  was first in line?

16  A    Absolutely not.  That's entirely dependent on each

17  individual publisher and their own strategies.  This is a

18  chart.

19  Q    Yes.  And what you do know -- maybe you don't -- you do

20  know that the price floor that's set is set by publishers?

21  A    That's correct.

22  Q    And do you know how those companies -- why one's first,

23  one's second, third, fourth, or fifth?

24  A    The sequence of the waterfall is set by the publisher.

25  Q    Okay.  And it's set by the publisher based upon the

Cross-Examination - A. Casale

1    expected value from each of those players, correct?

2    A    You're getting into specifics that I don't have.  I

3    don't know how publishers are setting the sequence of the

4    waterfall beyond that we know that they set it.

5    Q    I'm not going to keep you long on this, sir.  I just

6    need to understand.

7              When you were testifying about this chart, you

8    didn't know on what basis these companies are put in this

9    order; you don't know the time period this was true.  You're

10   just looking at the chart and giving opinions about it?

11   A    That's correct, yes.

12             MR. ISAACSON:  No further questions.

13             THE COURT:  All right.  Redirect.

14                       REDIRECT EXAMINATION

15   BY MS. WOOD

16   Q    Mr. Casale, fair to say you've never worked at DFP,

17   Google's publisher ad server?

18   A    That's fair to say.

19   Q    And is Dynamic Allocation a feature of DFP?

20   A    Yes, it is.

21   Q    Now, you indicated earlier in response to counsel's

22   questions about whether Amazon was a competitor.  You said

23   that's debatable.

24             What were you referring to?

25   A    So Amazon has a division called TAM, Transparent Ad

Cross-Examination - A. Casale

1    Marketplace, which operates something like a header tag

2    wrapper service, server to server; and Index is a

3    participant in that service.  It is a sell-side solution.

4    So it's sold to publishers, which brings it into the sell

5    side orbit.

6            But it is not an ad exchange.  It is not an ad

7    exchange like Index.  And that's where it's debatable

8    because they have a product that they sell to publishers on

9    the supply side, but it is not a full-fledged competitive

10   product like an ad exchange.

11   Q    And how are header wrappers, like TAM or Prebid,

12   different than an ad exchange?

13   A    Header wrappers help the publisher generally run the

14   unified auction and solicit demand in parallel from however

15   many exchanges the publisher wants to work with.

16           So a header wrapper, like a TAM or a Prebid, might

17   call Index and five other exchanges.  We will place a bid

18   into the wrapper.  It will pick a winner and push that into

19   the ad server.

20           What makes it different than an ad exchange is, as

21   an ad exchange, our responsibility is to marry a publisher

22   supply with the 75 plus or however many DSPs a given

23   exchange is connected to.

24           So we're submitting bid requests to DSPs.  We're

25   doing everything we can to optimize the GPS that we send

46

Cross-Examination - A. Casale

1    them so that we don't waste their compute.  We are

2    attempting to bring back as many bids as possible.  And

3    we're helping the publisher price and floor as well.

4            So our feature set is just very different and

5    closer to the DSP, whereas the header tag wrapper is really

6    responsible for just soliciting demand from us after we've

7    completed that.

8    Q    Now, you also talked about Amazon having a demand-side

9    platform.

10           Do you recall that?

11   A    Yes.

12   Q    You indicated that Index was not the target market, to

13   your understanding.

14           What did you mean by that?

15   A    A demand-side platform is focused on the buy side of

16   the market.  And so whether it be Amazon's DSP or any other,

17   they have a platform that has, you know, features and

18   functionality that allows advertisers or agencies to place

19   bids on media.

20           We're not a customer to Amazon's DSP.  That's why

21   I made that comment.

22   Q    Now, there were some questions on cross-examination

23   about some marketing materials where Index said it had scale

24   or massive scale, and then there were some questions about

25   petabytes of data.

47

Cross-Examination - A. Casale

1          How would you characterize the amount of data and
2    scale that Index has in this marketplace vis-a-vis Google?
3    A    So when I reference scale in that context, it's access,
4    as in we have access to 250 billion, roughly, auctions or
5    slot requests daily in the open web in display for anyone to
6    buy.  But as we've discussed previously, we clear half a
7    percentage of those.
8          And so when I think of, you know, the value of
9    that scale to our business realized through something that's
10   revenue-generating, it is an insignificant fraction.
11         Now, that scale helps us, from a marketing
12   perspective, attract publishers; it helps us attract DSPs in
13   buy side.  But we don't directly benefit from that scale
14   unless we clear or win the transaction.
15   Q    And, again, the amount of transactions that you win is
16   .5 percent; is that right?
17   A    Roughly a half a percentage, correct.
18   Q    Now, there was some testimony on cross-examination
19   about header bidding increasing the competitiveness of the
20   marketplace and making it, quote, hypercompetitive.
21         Do you remember that?
22   A    Yes.
23   Q    How -- putting aside the auctions, do you believe that
24   header bidding has increased the competitiveness of an
25   auction for an impression?

48

Cross-Examination - A. Casale

1  A    Yes.  Header bidding -- header bidding, compared to the

2  waterfall, has brought much more auction pressure to the

3  market because we can all -- every exchange can place a bid

4  simultaneously.  That's what I mean by hypercompetitive.

5  Q    And is the competitiveness of an auction different than

6  the competitiveness of the marketplace for ad exchanges

7  where you compete against AdX, for example?

8  A    Yeah, that's a reasonable distinction.

9  Q    And what is that distinction?

10 A    Well, we don't have an ad server that has the vast

11 majority of the transactions that we participate on

12 available to index; so we are one step removed from every

13 impression.  We're not rendering the ads either.

14       We can't offer certain products and features, for

15 instance, programmatic guaranteed, which puts us at a

16 disadvantage to the value proposition that AdX could offer

17 to the same publisher, for instance.

18 Q    And when you look at the marketplace for tools that

19 website publishers can use, ad exchanges that website

20 publishers can use to publish -- to sell, rather, open web

21 display ads, would you consider that market for those tools

22 to sell open web display ads as hypercompetitive?

23       MR. ISAACSON:  Objection.  Leading.

24       THE WITNESS:  Could you rephrase the question --

25 or I'm sorry -- repeat it.  I missed it.

                                                        49

Cross-Examination - A. Casale

1          THE COURT:  Sustained.

2     BY MS. WOOD

3     Q    When you refer to the hypercompetitiveness of -- after

4     header bidding, were you referring to the auction being more

5     hypercompetitive or the overall market for ad exchanges or

6     something else?

7          MR. ISAACSON:  Same objection.

8          THE COURT:  It's still leading.

9     BY MS. WOOD

10    Q    Please describe what you meant by the market becoming

11    more hypercompetitive after header bidding?

12    A    It goes back to that waterfall visual where every bid

13    can now compete for a publisher's impression, whereas

14    historically, based on the way the waterfall used to work,

15    we would be burled at the end of a waterfall chain.  And so

16    we would not be able to compete fairly.

17          That's the hypercompetitiveness that we now have.

18          MS. WOOD:  Thank you.  No further questions.

19          THE COURT:  Any recross?

20          MR. ISAACSON:  I just want to clarify.

21          Can you just put G up again.

22          THE COURT:  You need to be at the lectern.

23          TECHNICIAN:  I'm sorry, Counsel.  G?

24          MR. ISAACSON:  G, yeah.

25                    RECROSS-EXAMINATION

Direct Examination - J. Lowcock

1   BY MR. ISAACSON

2   Q    When you refer to the waterfall, is G an illustration

3   of the waterfall to you?

4   A    To me, G looks like a waterfall.  That's how I'm

5   reading it.

6            MR. ISAACSON:  No further questions.

7            THE COURT:  All right.  Does anybody plan to call

8   this witness again in the course of the trial?

9            MS. WOOD:  No, Your Honor.

10           MR. ISAACSON:  No, Your Honor.

11           THE COURT:  All right.  Then, Mr. Casale, you are

12   excused as a witness.  That means you may stay and watch the

13   proceedings or you may leave, but you're not to discuss your

14   testimony or anything you see or hear in court with any

15   witness who has not yet testified.

16           Thank you.

17           THE WITNESS:  Thank you.

18           THE COURT:  All right.  Your next witness.

19           MR. TEITELBAUM:  Plaintiffs call Joshua Lowcock.

20   Thereupon,

21                    JOSHUA LOWCOCK,

22   Having been called as a witness on behalf of the plaintiffs

23   and having been first duly sworn by the Deputy Clerk, was

24   examined and testified as follows:

25                (Time noted:  3:01 p.m.)

Direct Examination - J. Lowcock

1         THE COURT:  We have no books to give, right?

2         MR. TEITELBAUM:  I do, to give to the court

3    security officer, Your Honor.

4         THE COURT:  All right.

5         MR. TEITELBAUM:  These are for the Court.

6         May I proceed?

7         THE COURT:  Yes.

8                        DIRECT EXAMINATION

9    BY MR. TEITELBAUM

10   Q    Good afternoon, Mr. Lowcock.  How are you doing?

11   A    Good afternoon.

12   Q    Could you please spell your last name for the Court.

13   A    Yes.  It's Lowcock, L-O-W-C-O-C-K.

14   Q    Could you please tell the Court where you currently

15   work.

16   A    I currently work as president of media at Quad.

17   Q    What type of company is Quad?

18   A    Quad is a marketing experience company.  We provide

19   advertising agency services, creative agency services, and

20   print production services.

21   Q    And before you worked at Quad -- let me first ask you

22   this:  How long all together, roughly, have you worked at

23   Quad?

24   A    I have worked at Quad for almost a year.

25   Q    And before you worked at Quad, where did you work?

                                                              52

Direct Examination - J. Lowcock

1   A    Prior to working at Quad, I worked for Universal

2   McCann, otherwise known as UM.  It's another advertising

3   agency.

4   Q    How long did you work there all together?

5   A    I worked for UM for about eight years.

6   Q    Could you tell the Court a little bit about how IPG and

7   Universal McCann are set up as companies?

8   A    So UM, Universal McCann, is part of IPG, which is

9   Interpublic Group.  Interpublic Group is described as a

10  holding company, which is a business that owns both

11  advertising agencies and creative agencies.  UM sits within

12  the media agency side of the business.  It is a business

13  unit within Mediabrands, which holds multiple

14  advertising/media agencies.

15  Q    And is "media agency" essentially another term for an

16  advertising agency?

17  A    Yes, it is.

18  Q    You mentioned creative agency as well.  What's that?

19  A    So the difference between a media agency and a creative

20  agency is that a creative agency actually creates the ads

21  that you see, whether those ads are on television or on the

22  internet.  A media agency takes those creative assets and

23  determines where to place them so that they are seen by

24  potential customers and other audiences.

25  Q    Was there any particular activity of a media agency

53

Direct Examination - J. Lowcock

1    that Universal McCann was focused on as opposed to the other

2    companies within IPG?

3    A    So Universal McCann is focused on media activation

4    across all media channels, and by "media channel," I mean

5    digital, social, search, television, radio, out of home.

6    Q    And when you say "media activation," could you explain

7    what that means?

8    A    Media activation is the act of buying or placing media

9    on media channels.

10   Q    Could you please give the Court a brief overview of the

11   different positions that you held at Universal McCann and

12   what your duties and responsibilities were?

13   A    At Universal McCann, I originally joined as the chief

14   digital officer; so I was primarily responsible for every

15   activation that we did on digital media channels.  That

16   includes partnerships and data that we used.

17        I then also had roles that involved client

18   service, client operation; so that's running individual

19   accounts.

20        I then moved on to becoming the chief digital

21   officer and the global brand safety officer.  As global

22   brand safety officer, I'm responsible for the security and

23   integrity of where those ads ran.  I ultimately culminated

24   my career at UM as the global chief media officer.

25   Q    Can you please give the Court an overview of the types

Direct Examination - J. Lowcock

1   of companies that you worked with at Universal McCann?

2   A    So at Universal McCann, by types of companies that I

3   worked with, we would describe them as clients, our clients.

4   I can't name the specific clients, but they were automotive,

5   government, CPG -- consumer product groups -- retailers,

6   fashion brands, movie studios, to name, you know, them in

7   categories.

8   Q    Roughly how many total media campaigns have you worked

9   with throughout the course of your career?

10  A    Oh, thousands.

11  Q    And all together in your career, about how much time

12  have you spent working in some fashion at an advertising

13  agency?

14  A    I've spent the better part of 15 years working at

15  advertising agencies.

16  Q    And before we get to some more details about

17  advertising, have you testified in court before?

18  A    Yes, I have.

19  Q    And did you testify previously as a government witness

20  in the Google search case across the river last year?

21  A    Yes, I did.

22  Q    Okay.  So can you tell the Court a little bit about the

23  purpose of advertising from the perspective of the media

24  agency or the advertising agency?

25  A    So an advertising agency -- the purpose of an

Direct Examination - J. Lowcock

1   advertising agency is to serve our clients.  The word

2   "agent" is very important there.  So we're an agent for our

3   clients.  And the purpose of advertising is to drive,

4   ultimately, sales for our clients.

5   Q    And just from your experience and based on your

6   personal work at media agencies, could you please give the

7   Court a brief overview of how you approach an advertising

8   campaign?

9   A    Yes.  So the way we approach an advertising company --

10  and you need to step back a little bit.  So our clients

11  appoint agencies on an annual or an ongoing basis.  So you

12  have a contract with a client.  A client will then give you

13  a brief and a specific budget with which they want to use in

14  their advertising campaign and some goals.

15          From an agency perspective, what we then do is we

16  identify the right audience to reach.  So modern advertising

17  is very much driven by the data that's available.  We

18  determine the right audience to reach.  We identify the

19  right channels to reach that audience.  We're trying to make

20  a determination whether we want brand or performance

21  advertising.  And then you go out and activate that

22  advertising in market.

23  Q    So you mentioned two different types of advertising --

24  brand and performance.

25          Could you explain to the Court what those two

Direct Examination - J. Lowcock

 1   different types are.

 2   A    Yes.  So a brand campaign -- apologize because I'm

 3   going to introduce additional terms.

 4        A brand advertising campaign is something that we

 5   describe as upper funnel.  So a brand campaign is about

 6   driving awareness about a product or a service.

 7        A performance campaign is typically lower funnel.

 8   So what you're trying to do is drive action and purchase

 9   behavior by an individual much more faster than you would

10   expect for, say, a brand campaign.

11   Q    Can you tell us a little bit more about the funnel that

12   you've referred to.

13   A    Yes.  So classically in marketing, we describe

14   marketing as consisting of a purchase funnel.  So at the

15   high end of the funnel, you're trying to drive awareness,

16   you're trying to get interest, consideration, and finally a

17   decision or a purchase action at the end of it.

18        And the way we think about marketing is different

19   sorts of media channels and media tactics.  So different

20   purposes within the funnel.

21   Q    So just using a car manufacturer -- we don't have to

22   identify a specific one -- could you give the Court sort of

23   an illustration of how a brand campaign for a car

24   manufacturer would work?

25   A    Yeah.  So in a hypothetical car manufacturer example,

                                                            57

Direct Examination - J. Lowcock

1   if you're doing a brand campaign, what you would be looking

2   to do is drive awareness.  So to dimensionalize that example

3   a little bit, let's assume that it was the introduction of a

4   new model.  So people aren't aware of the new model.  They

5   might be aware of the manufacturer, but they're not aware of

6   the new model.

7           So in a brand campaign, what you'd be doing is

8   what's the best way to reach potential purchasers of that

9   vehicle with high-impact brand-effective media, which might

10  be television advertising, out of home, or a display ad.

11  Q    And by contrast, could you also give us an example

12  about how an advertising agency would approach a performance

13  campaign for a car manufacturer?

14  A    So, again, it's probably better if I dimensionalize the

15  example a little bit.

16          So on a performance campaign for a car

17  manufacturer, let's assume the car manufacturer was the end

18  of the year; they were looking to do a promotion to, you

19  know, drive sales of vehicles to run out of stock for the

20  end of the year.

21          What you would be doing is you'd be looking at the

22  data that was available to you as an advertiser to find

23  people that might be both in market for that particular make

24  or model of car; you'd look for things to determine that

25  people might be at the end or near end of their motor

58

Direct Examination - J. Lowcock

1   vehicle lease.  And the intent of the campaign would be for

2   people to take action.  And that would be to either click on

3   the ad, go to a website and book a test drive, or call a

4   dealer and book a test drive.

5   Q    You've been using the word "channels."  Could you

6   explain to us what that means?

7   A    So -- yeah.  Apologies.  So when I talk about channels,

8   I'm talking about different methods in which we place

9   advertising.  So television is a channel.  Display is a

10  channel.  Search is a channel.  Social media is a channel.

11  Q    And to what degree are there differences in how you

12  approach the different types of channels based on whether

13  it's a brand or a performance campaign?

14  A    I mean, the way we'd approach things differently -- the

15  more you get into performance-based advertising, the more

16  you become reliant on data and the more you become reliant

17  on tracking and measuring performance.

18       On brand campaigns, data is equally as important,

19  but your objectives on driving short-term actions shift

20  because in a brand campaign -- let's stick with a motor

21  vehicle example.  People don't go out and buy a car

22  immediately after seeing an ad; so a brand campaign has a

23  longer term on which you're measuring performance.  You

24  might track brand awareness as a metric on a brand campaign.

25  Q    All right.  You mentioned display advertising as one of

Direct Examination - J. Lowcock

1   the channels.

2          Could you tell us what display advertising is?

3   A    So if you go to any website, display advertising is the

4   rectangles or boxes that you would see on a page that can --

5   on a webpage containing an ad.

6   Q    From your work in the advertising industry, are you

7   familiar with the term "open web display advertising"?

8   A    Yes, I am.

9   Q    Could you explain -- or let me first ask you:

10  Approximately how long have you been familiar with that

11  term?

12  A    Oh, for decades.

13  Q    Could you explain to the Court what open web display

14  advertising is?

15  A    Yes.  So open web display advertising is a type of

16  advertising that can appear effectively anywhere on the

17  internet.  It's used as a descriptor in contrast to

18  something called "walled gardens," which probably warrants

19  its own explanation and definition.  But open web display is

20  advertising that can appear effectively on any website.

21  Q    And so you mentioned walled gardens.  So can you please

22  explain to us what a walled garden is and how it's different

23  from the open web?

24  A    Yeah.  So a walled garden is best described as a

25  constrained environment where you can only buy and place

Direct Examination - J. Lowcock

1   advertising on that platform in and of itself.

2           That platform often controls both the tools with

3   which you buy advertising.  It also is the custodian of all

4   of the data on that platform; so not only the data that you

5   use to buy that advertising, but it is also the custodian of

6   the data that gives you indications of how that advertising

7   is performing on that platform.

8   Q    And this is a natural and understandable tendency, but

9   just please make sure to keep the pace of your answers a

10  little bit slower.

11  A    Yes.

12  Q    Thank you.

13          Could you give us a few examples of walled

14  gardens.

15          THE COURT:  I'm sorry.  This is getting

16  repetitive.  I heard it already through other witnesses.

17          MR. TEITELBAUM:  Understood, Your Honor.  I'd be

18  happy to move on to something else.

19  BY MR. TEITELBAUM

20  Q    Let's change topics a little bit, Mr. Lowcock.  Turning

21  back -- are you familiar with the term "the programmatic

22  purchase of advertising"?

23  A    Yes, I am.

24  Q    And are you also familiar with the notion of the direct

25  purchasing of advertising?

Direct Examination - J. Lowcock

1   A    Yes, I am.

2   Q    So from the perspective of your work for advertising

3   agencies, can you explain to the Court to what degree is

4   direct buying of advertising a reasonable substitute for

5   programmatic buying of advertising.

6             MS. RHEE:  Objection.  Foundation.

7             THE COURT:  I think, given the nature of his

8   business and the number of years he's been in it, he can

9   answer that question.

10            Overruled.

11            THE WITNESS:  So the difference between direct and

12  programmatic advertising is direct advertising is bought, as

13  the name would imply, direct.  So you're negotiating direct

14  with the publisher.  You're determining a price in advance,

15  the number of -- and let's use the digital world -- the

16  number of impressions you're going to buy.  So impressions

17  is the number of ads that are going to be seen and the

18  length of time the contract is going to run.  You negotiate

19  that up front on a direct deal, and there's a contract

20  that's exchanged.  And you're working with salespeople on

21  that.

22            Programmatic advertising looks to automate that

23  entire process.  So in programmatic advertising you're not

24  negotiating direct with a publisher.  There's multiple

25  technology platforms that are part of that.  There's

Direct Examination - J. Lowcock

1    supply-side platforms, SSPs.  There's demand-side platforms,

2    DSPs.

3         And I have technical specialists that essentially

4    go into a tool, identify the audience, and buy that media

5    and traffic.  And by traffic, I mean activate that media

6    across multiple websites all at once.  So it's not with one

7    publisher; it's many publishers and many websites at once.

8    BY MR. TEITELBAUM

9    Q    And I take it from the context of your answer that, in

10   your work, you've participated in direct buying of

11   advertising?

12   A    Yes, I have.

13   Q    And have you also participated in the programmatic

14   buying of advertising?

15   A    Yes, I have.

16   Q    Could you explain to the Court to what degree -- just

17   returning to the original question.

18        To what degree is the direct buying of advertising

19   a reasonable substitute for the programmatic buying of

20   advertising?

21        MS. RHEE:  Objection, Your Honor.  Calls for the

22   ultimate conclusions.

23        THE COURT:  Overruled.

24        THE WITNESS:  They're not reasonable substitutes,

25   because again -- as I was explaining -- like, direct

63

Direct Examination - J. Lowcock

1    advertising involves a lot more labor, skills, and resources

2    in negotiation and contracts and relationships versus the

3    skills on programmatic advertising are much more technical

4    skills.  I have separate teams that look after each

5    differently, and those people are not interchangeable.

6    BY MR. TEITELBAUM

7    Q    You're also familiar with a form of advertising called

8    search advertising?

9    A    Yes, I am.

10   Q    Could you just briefly explain what that is.

11   A    Search advertising -- if you go to a search engine --

12   that's the box that you see on a search engine.  You type in

13   your keyword or your query.  The search engine results page

14   loads.  There's an ad that appears.  Those ads are search

15   advertising ads.

16   Q    And when you're purchasing search advertising, what

17   items are you actually bidding on or trying to purchase?

18   A    So in search advertising, I'm capturing intent.  So I'm

19   bidding -- search advertising works on bids.  So I'm bidding

20   on the keywords that people have typed into the search query

21   box.

22          So let's use the automotive example.  You've typed

23   in the name and model of a car.  I'm bidding on those

24   keywords to capture that intent, and I'm placing ads in

25   response to those keywords.

Direct Examination - J. Lowcock

1    Q    And to what degree, based on your work, is search

2    advertising a reasonable substitute for buying a display ad

3    on a newspaper website?

4    A    It's -- search advertising is not a substitute for

5    display advertising.  And the reason why is they serve

6    different purposes both in what we've talked about in terms

7    of the funnel because search captures intent, whereas

8    display advertising has a brand message.

9            I mean, the very obvious differentiation between

10   them all is search advertising is all text-based, whereas

11   display advertising has images, perhaps animation, color,

12   other elements like that.

13   Q    I think we talked a little bit about Facebook before.

14   But I just want to ask you more generally.

15           Are you familiar with social media advertising?

16   A    Yes, I am.

17   Q    That would include advertising on a page like Facebook?

18   A    Yes, I am.

19           MR. TEITELBAUM:  Could we please bring up

20   Plaintiffs' Demonstrative F, as in Frank, to which there's

21   been no objection.

22           THE COURT:  All right.

23   BY MR. TEITELBAUM

24   Q    And, Mr. Lowcock, you can either look at the screen to

25   your left or at the binder, whichever you prefer.

                                                            65

Direct Examination - J. Lowcock

1           THE COURT:  Is the screen working now?

2           THE COURT SECURITY OFFICER:  Yes, ma'am.

3           THE COURT:  All right.

4    BY MR. TEITELBAUM

5    Q    And is that image there, Plaintiffs' Demonstrative F, a

6    fair and accurate example of what social media advertising

7    looks like?

8    A    Yes, it is.

9    Q    And could you tell us a little bit more about what the

10   differences are -- well, first let me ask you.

11           Based on your work in the advertising industry, to

12   what degree is social media advertising a reasonable

13   substitute for buying a display ad on a newspaper website?

14   A    So social media advertising is not a reasonable

15   substitute for display advertising.  There's a number of

16   constraints with social media advertising.

17           First of all, you need to have a -- frequently,

18   you're required to have a presence on the social media

19   platform before you can even buy the advertisement.

20           The second one, social media advertising, by its

21   very nature, is social.  So users can engage or interact

22   either with the ad itself.  You might be able to restrict

23   that.  But even if you don't restrict that, because social

24   media platforms are social, people might start commenting or

25   posting comments about the ad.  Therefore, you need

Direct Examination - J. Lowcock

1   community managers and other support to exist around the

2   back end.

3        The other part that's very important is social

4   media platforms require unique different assets to be much

5   more effective.  So you can't take a display ad and place it

6   on a social media website.  In fact, several social media

7   platforms actively promote the fact that you should not

8   create anything but unique specific content specifically for

9   social media and not to repurpose other assets.

10  Q    Could you give us an example of that phenomenon that

11  you just described.

12  A    I mean, TikTok significantly -- like, primarily TikTok

13  talks a lot about you must make TikToks, not ads, because

14  you cannot repurpose your ads from other channels to be

15  successful on TikTok.

16  Q    And at a practical level, what actually looks different

17  about TikTok compared to a display ad on a newspaper

18  website?

19  A    Well, I mean, TikTok is -- it's a short form or video

20  content.  It will have audio or music or some other, you

21  know, sound element to it.  It will be -- it will always be

22  animated because it's video.  It will be much more engaging.

23  It will encourage the user to interact or share or even

24  potentially remix the ad.

25  Q    And are there any different requirements with respect

Direct Examination - J. Lowcock

1   to advertising budget between social media and buying

2   display ads on a website?

3   A    So yes, there is.  On social media advertising, social

4   media advertising is accessible to anyone.  Whether you're a

5   small business or an agency, you can buy social media

6   advertising with a credit card.

7          Display advertising requires a little bit more

8   sophistication because you need to both create display

9   assets.  You need to find a way to buy display advertising.

10  So you would typically -- people buying display advertising

11  would typically employ an agency to do that.

12  Q    All right.

13         And we can take Plaintiffs' Demonstrative F down.

14  And if we could please display Plaintiffs' Demonstrative B

15  again.

16         Mr. Lowcock, are you familiar with a type of

17  advertising called native ads?  And you don't need to look

18  at the demonstrative quite yet.

19  A    Yes, I'm familiar with native ads.

20  Q    Could you explain to the Court what a native ad is.

21  A    So a native advertisement is an advertisement that's

22  meant to look -- the name sort of almost describes it --

23  look native to the content on the page.  So it's meant to

24  look more like editorial content on a website.

25  Q    So to what degree is a native ad a reasonable

Direct Examination - J. Lowcock

1   substitute for a display ad on a newspaper website, for

2   example?

3   A    A native ad is not a reasonable substitute for a

4   display ad.  There's a number of reasons why.

5   Q    And let's -- now, I think, would be a good time to

6   bring up Plaintiffs' Demonstrative B.

7          And if we could magnify the bottom half of that

8   page as big as we can make it.

9          So let me first ask you, Mr. Lowcock.  On

10  Plaintiffs' Demonstrative B, do you see any native ads there

11  at the bottom?

12  A    Yes, I do.  Those are the ads to the left of the

13  highlighted box.  So there's a 3-by-2 grid of various people

14  holding shoes or applying makeup.  Those are the native ads.

15  Q    And is that -- the red box, does that encapsulate the

16  native ads that you just identified?

17  A    Yes, it does.

18  Q    And just using those native ads as an example, could

19  you explain to the Court why native ads aren't a reasonable

20  substitute for display ads.

21  A    Yeah.  So if we use this example, there's a number of

22  reasons.  And it wouldn't even be limited to this example.

23  Based on my experience, this is true all the time.

24          Native advertisements -- the purpose of a native

25  advertisement is to look like editorial and to elicit a

                                                          69

Direct Examination - J. Lowcock

1    click from a user by teasing some content or message.  They

2    don't contain brand images.

3            So if you use this example on the right-hand side,

4    it looks like a Microsoft ad.  It has Microsoft branding.

5    It talks about Microsoft products.  The native ads don't

6    show a product image.  They don't serve a branding purpose

7    like -- you wouldn't use a native ad for branding.

8    Q    And what do advertisers, based on your work at the

9    agencies, use native ads for?

10   A    So native advertising is -- when I've used it, it's

11   primarily for B2B advertising, or where you're trying to

12   essentially educate a user about a very complex product or a

13   service.

14           So take something like health insurance.  For

15   health insurance, you would have a native advertisement

16   which goes to a page which then provides a lot more detail

17   and information about a product.

18   Q    And you used the term "B2B."  What does that stand for?

19   A    So B2B is business to business.

20   Q    As opposed to business to consumer?

21   A    Yeah, which is B2C.

22           MR. TEITELBAUM:  All right.  We can take down that

23   demonstrative.

24   BY MR. TEITELBAUM

25   Q    Are you familiar with a type of advertising called

Direct Examination - J. Lowcock

1    in-app or mobile app advertising?

2    A    Yes, I am.

3              MR. TEITELBAUM:   And if we could bring up

4    Plaintiffs' Demonstrative E, which also has no objection.

5    BY MR. TEITELBAUM

6    Q    Does Plaintiffs' Demonstrative E look like a fair and

7    accurate example of an in-app or a mobile app advertisement?

8    A    Yes, it does.

9    Q    And based on your work in the industry, could you

10   explain to the Court, to what degree is mobile app

11   advertising a reasonable substitute for buying display

12   advertising on a website like on a newspaper?

13   A    It's not a reasonable substitute.   There's a number of

14   reasons for that.   Mobile app advertising has different

15   characteristics to it which put it in its own separate

16   category.

17   Q    And could you enlighten us on what those categories

18   are?

19   A    So, first of all, for mobile app advertising, the

20   mobile app needs to deploy something called an SDK, a

21   software development kit.   So that's the first thing that

22   needs to occur.   There's also some measurement issues with

23   mobile app advertising, but I won't get into that.

24              The other bits about mobile advertising is -- and

25   I could talk for a lot about this topic.   There are certain

Direct Examination - J. Lowcock

1   data attributes that are only available in mobile apps that

2   aren't normally available anywhere else.  So you take

3   something like location data.  Location data is unique to

4   mobile app advertising because mobile apps can -- if a user

5   consents, can track a user's location, and that provides

6   more information that could be relevant to the advertiser.

7        The other thing is that some mobile apps purely

8   exist as mobile apps.  They don't exist as websites or

9   anything else.  They might have unique ad formats that are

10  only available in the app.  So you take mobile gaming, which

11  is always or frequently app-based.

12       The advertising in a mobile app is not a display

13  ad; it might be more natively integrated into the app

14  experience.  So it might be a compensated -- or like an

15  element in the game that looks more like the brand or

16  carries some brand imaging because it's a power-up that you

17  could use in the game.

18  Q    Could you give us an example of that, if you know one?

19  A    I mean, an example.  So pick a mobile app game.  Like,

20  Candy Crush would have unique attributes to it relative to

21  other types of advertising.

22  Q    And you mentioned some differences about measurement or

23  measurement issues.  Could you expand on that a little bit,

24  please.

25  A    So for mobile advertising to work, you need to have an

Direct Examination - J. Lowcock

1    SDK, a software development kit, to be deployed.  To

2    actually track the performance of mobile advertising, you

3    need to use something called conversion APIs -- the industry

4    abbreviation calls them CAPI -- to actually track the

5    performance and measurement of that.

6         And so those sorts of things become somewhat of a

7    barrier to the effectiveness or using mobile advertising

8    because those come -- while you have benefits of additional

9    data, the measurement trade-offs can create other problems

10   or concerns.

11   Q    And you alluded to -- as an example, I think, on

12   location data, can you give the Court an example of how a

13   mobile app might use location data in advertising.

14   A    So the best example to use -- let's take a ride-sharing

15   app.  So a ride-sharing app requires you to consent to

16   sharing your location for the entire utility of the app

17   because it needs to know where to pick you up from and where

18   to deliver you to.

19        Because it has that information about your

20   location, I can use that information as an advertiser to

21   actually not only place an ad in the app but also place a

22   better-informed ad in that app.  So if I know the

23   destination you're going to and it's near a retailer that

24   might be my client, I can make you aware of a retail offer

25   that might be at that retailer.  You know, perhaps even

Direct Examination - J. Lowcock

1    encourage you to make a stop there before you get to your

2    final destination.

3    Q    Now, let's move on and talk about just the distinction

4    between digital advertising versus advertising that has

5    nothing to do with the internet.

6            So to what degree does advertising outside the

7    internet, is that a reasonable substitute for digital

8    advertising?

9    A    So advertising that's not on the internet -- which in

10   the industry we would call traditional advertising -- is not

11   a reasonable substitute for digital advertising.

12           And the reason why is the advertising industry as

13   a whole is much more focused on using data to inform when

14   and where you place your ads.  There's also limits on the

15   availability of inventory in traditional advertising.

16   There's also significantly different price thresholds and

17   barriers to being able to purchase traditional advertising.

18           So on -- let's take TV as an example.  You might

19   need a significantly higher budget to purchase TV

20   advertising because it's not -- when we were talking about

21   social media before, you can't buy a TV advertisement with

22   your credit card.

23   Q    Let's move to a different topic.  From your work at

24   media agencies, are you familiar with something called

25   "header bidding"?

74

Direct Examination - J. Lowcock

1   A    Yes, I am.

2            MR. TEITELBAUM:   And I'm not going to ask the

3   witness to retread all the same ground, Your Honor.  I'll

4   move on to something specific.

5   BY MR. TEITELBAUM

6   Q    In the context of -- and have you worked on campaigns

7   that used header bidding to purchase display ads?

8   A    Yes, I have.

9   Q    And in the context of digital advertising, are you

10  familiar with a term called "latency"?

11  A    Yes, I am.

12  Q    Could you please explain to the Court what latency is.

13  A    So latency is the time experienced by a user from when

14  they click on a link to go to a webpage for that page to

15  load, displaying both the content and the advertising.  And,

16  specifically, latency, you want low latency.

17           So latency means -- the lower the latency means

18  the faster the ad and the content will render so that both

19  the user sees the content they want but also has an

20  opportunity to see the ad that you want them to see.

21  Q    Does latency matter to advertisers in any fashion?

22  A    So yes, in a broad sense because advertisers, at the

23  end of the day, want their ads to be seen by users.

24           In the advertising industry -- and I have -- for

25  many of my clients, we focus on something called

Direct Examination - J. Lowcock

 1  viewability.  And viewability means -- it's not just enough

 2  to buy an ad; you want it to be viewed by a user.  And so

 3  the lower the latency, the more likely the ad will be

 4  viewable and, therefore, the advertiser will achieve their

 5  business outcomes.

 6  Q    Based on your work on advertising campaigns, to what

 7  extent has header bidding posed latency problems for your

 8  campaigns?

 9  A    So from my experience, I have not -- when header

10  bidding was introduced, I didn't see any degradation in

11  performance on viewability, which is the ultimate metric of

12  the effect of latency.  I also didn't see any negative

13  impact on campaign performance as a result of the

14  introduction of header bidding.  And I would have seen an

15  impact in campaign performance if latency had become an

16  issue.

17  Q    How would that information about performance from

18  latency problems have come to you?  How would you have

19  learned about that?

20  A    So one of -- in the advertising industry, we use tools

21  called third-party verification tools, otherwise referred to

22  as 3PV.  They're provided by independent third parties.

23  Those independent third parties measure viewability; so if

24  the ad was seen and loaded.

25              And so with third-party tools, I would have become

Direct Examination - J. Lowcock

1   aware of latency issues because my viewability scores would

2   have plummeted, and clients demand that we achieve certain

3   viewability levels.

4   Q    I believe you mentioned before that one of the roles

5   that you served at Universal McCann was as the global brand

6   safety officer; is that right?

7   A    Yes, that is correct.

8   Q    Could you tell the Court a little bit more about what

9   your specific responsibilities were in that role.

10  A    So as global brand safety officer, I was responsible

11  for the integrity and security of where and how ads

12  appeared.  That included ensuring ads appeared in

13  environments that were brand-safe, that those ads were not

14  served to bots or in fraudulent environments or on illegal

15  content.

16  Q    And could you give a few examples of the types of

17  issues that you just described, just at a more concrete

18  level.

19  A    So, I mean, some of the issues that can occur that, you

20  know, we were working to prevent is ads could appear on

21  publishers or websites that were subject to the Office of

22  Financial Asset Control; so OFAC lists of sanctioned

23  countries.  There's instances of ads appearing on websites

24  that feature piracy or illegal content or ads for restricted

25  categories, for example, alcohol being served to minors.

Direct Examination - J. Lowcock

1    Q    And based on your work both as the global brand safety

2    officer and on advertising campaigns using header bidding,

3    to what degree did header bidding pose more issues in those

4    areas compared to other ways of purchasing display

5    advertising?

6    A    Header bidding didn't open up any more security issues

7    in that regard compared to any other bidding.  In fact, one

8    of the things I didn't speak about is one of the other big

9    concerns that we're trying to prevent is advertising served

10   fraudulently to bots.

11         So bots manufacture traffic that's not real humans

12   visiting a website.  So it will load the page to load the ad

13   so the bad actor gets paid.  And header bidding actually

14   makes it easier for us to prevent our ads being served to

15   bots because we can detect that it's a bot before the page

16   loads as opposed to after the page and the ad loads.

17   Q    Could you give the Court an overview as to what some of

18   the tools are that are available to counteract some of these

19   brand safety and security issues you've described.

20   A    So there's a number of companies that provide

21   third-party verification tools.  There's companies like

22   DoubleVerify, otherwise referred to in the industry as DV.

23   There's another company called Integral Ad Science,

24   otherwise known as IAS, that provide these tools that are

25   used by agencies.  Oracle used to run one until Oracle shut

Cross-Examination - J. Lowcock

1   down that business unit.

2   Q    Are there any industry standards that govern how

3   digital advertising is supposed to work or standards that it

4   should adhere to?

5   A    So yes, there's industry standards.  The MRC, the Media

6   Ratings Council, defines a lot of standards when it comes to

7   security and fraud and bot detection.

8   Q    What about the IAB?  Does it have any standards?

9   A    So the Interactive Advertising Bureau, the IAB, also

10  has standards.  The IAB standards typically involve defining

11  the standard size metrics for advertising.  By size metrics,

12  I mean the size of the rectangles and boxes on a screen.

13            MR. TEITELBAUM:  Thank you, Mr. Lowcock.

14            No further questions on direct.

15            THE COURT:  All right.

16            Ms. Rhee?

17            MS. RHEE:  Thank you, Your Honor.  If I could get

18  some assistance in just passing the binders out.

19            THE COURT:  All right.

20                  (Brief recess taken.)

21            THE COURT:  Ms. Rhee.

22            MS. RHEE:  Thank you, Your Honor.

23                        CROSS-EXAMINATION

24  BY MS. RHEE:

25  Q    Good afternoon, Mr. Lowcock.

Cross-Examination - J. Lowcock

1   A    Good afternoon.

2   Q    My name is Jeannie Rhee.  I represent, with others

3   here, Google, and we will spend a little bit of time this

4   afternoon asking you questions.  Okay?

5   A    Okay.

6   Q    Now, this is your second time testifying for the United

7   States in less than a year, right?

8   A    Yes.

9   Q    And on the direct examination by the government, you

10  defined "display advertising" as the rectangles or boxes

11  that appear on a webpage.

12       Did I get that right?

13  A    Yes.

14  Q    And you defined "social advertising" as advertising

15  that is bought on social media platforms, such as Facebook;

16  is that right?

17  A    Yes.

18  Q    Now, I want to actually -- and if I could get the

19  assistance of the government to pull back up the Plaintiff's

20  Demonstrative F.

21       Do you see that in front of you, Mr. Lowcock?

22  A    Yes.

23  Q    Oh, I'm glad you have to put your glasses on as well.

24       You see there that the demonstrative Plaintiff's F

25  shows a laptop or a desktop; is that right?

Cross-Examination - J. Lowcock

1   A    Yes.

2   Q    Okay.  And on that desktop, you see the top there is a

3   https/www.facebook.com.  Is that right?

4   A    Yes.

5   Q    That is a website or webpage, isn't it?

6   A    Yes.

7   Q    And if we could just click back out of it.

8        The things labeled "ad spaces" in the green are

9   rectangles or boxes that appear on that webpage.

10       Can we agree?

11  A    Yes.

12  Q    Now, the primary user behavior on social media you've

13  previously testified is to scroll through what you describe

14  as a feed; is that right?

15       MR. TEITELBAUM:  Objection as to asking about

16  previous testimony.

17       THE COURT:  Well, this is cross-examination.

18  That's all right.  Overruled.

19       THE WITNESS:  Yes.

20  BY MS. RHEE:

21  Q    And a feed is a page.  The user scrolls through the

22  social media page; is that right?

23  A    Not necessarily.

24  Q    Why do you say "not necessarily"?

25  A    Because a feed can occur -- in this example, it's a

Cross-Examination - J. Lowcock

1   website.   Facebook operates an app.   Instagram operates an

2   app.   The feed occurs within an app as opposed to a webpage.

3   Q     Okay.   But social media companies and social media

4   sites, like Facebook, operate both websites and apps; is

5   that right?

6   A     But not all social media platforms operate websites.

7   Q     For example, here, Facebook operates a website; is that

8   right?

9   A     This is correct, yes.

10  Q     TikTok operates a website; is that right?

11  A     Only recently.

12  Q     Is that right?

13  A     Yes.   But I would say -- again, I'd say only recently.

14  It was primarily an app first.

15  Q     And you've previously testified that advertising that

16  is inserted on a social media page is similar to display

17  advertising, correct?

18  A     I would say it's similar but it's not the same.

19  Q     You've testified that it is similar, yes?

20  A     Similar but not the same.

21  Q     Well, let's actually have you look at your search trial

22  testimony, and I will direct you to Tab 6 where I have

23  excerpted the pages where you previously testified.

24          So if you could, go to the bottom of that first

25  page in your tab, line 25, and all the way to the next page

Cross-Examination - J. Lowcock

1   on line 28.

2   A    Sorry.  Which section are you referring to?

3   Q    Tab 6.

4   A    Tab 6.  I don't have a line 28.

5   Q    I'm sorry?

6   A    I don't have a line 28.

7   Q    No.  I said it starts on the bottom of the first page

8   on line 25 --

9   A    Okay.

10  Q    -- and it goes to the next page through line 8.

11       Do you see it now?

12  A    Yes.

13  Q    Now, when you were asked, "And in your view, can social

14  advertising effectively be used in the place of search

15  advertising?" you said no.

16       And then the follow-up question was, "Why not?"

17       And your answer was "The primary user behavior on

18  social media platforms is to scroll through what's described

19  as a feed.  So it's a page.  You scroll through the page.

20  Advertising is inserted in the page similar to display

21  advertising."

22       Do you see that?

23  A    Yes, I do.

24  Q    Now, you did not qualify your answer when you

25  previously testified under oath that it's similar but not

                                                              83

Cross-Examination - J. Lowcock

1   the same.  You just answered they're similar, correct?

2   A    I did not qualify the answer at the time because these

3   questions were in relation to the comparison between social

4   media advertising and search advertising.

5   Q    But your answer to that question did not qualify that

6   they're similar but not the same, correct?

7   A    Correct.

8   Q    See the page in front of you.

9   A    Correct.  And, again, I gave you the context for the

10  reason why I did not qualify it at the time.

11  Q    Now, you further went on to testify that, in fact, the

12  vast majority of advertising on social media is display.

13          Do you remember that testimony?

14  A    No, I do not.

15          MR. TEITELBAUM:  Objection.  These are just

16  questions about past testimony as opposed to just factual

17  questions.  Improper impeachment, Your Honor.

18          THE COURT:  I'm not fond of this.  Just ask the

19  direct question to see what the answer is.  If it's

20  inconsistent with prior testimony, then you can impeach.

21          MS. RHEE:  Absolutely, Your Honor.

22  BY MS. RHEE:

23  Q    Mr. Lowcock, the vast majority of advertising on social

24  media is display, is it not?

25  A    No, it's not.

Cross-Examination - J. Lowcock

1   Q    Well, I want to direct your attention to Tab 7.  Again,
2   it's your search trial testimony under oath.  And I have, to
3   facilitate everybody here and speed it up, excerpted the
4   pages.
5           So I want to direct your attention in particular
6   to line 13 through 14.
7           And do you see your testimony here?
8   A    Yes, I do.
9   Q    Okay.  And you testified under oath in that trial "So
10  the vast majority of advertising on social media is
11  display."  Correct?
12  A    Yes.
13  Q    I read your testimony correctly?
14  A    Yes.  Reading it now.  I can see that.
15  Q    Now, staying on the topic of social media, given your
16  15-plus years of experience over this industry, you surely
17  must be aware about how prominent and how popular social
18  media as become, correct?
19  A    Yes.
20  Q    In fact, you must be aware that seven out of ten U.S.
21  adults use Facebook?
22  A    Yes.
23  Q    And you must be aware that, even though TikTok is so
24  relatively new, one in three U.S. adults already use TikTok?
25  A    Yes.

Cross-Examination - J. Lowcock

1  Q    And because of social media's popularity, when you were

2  at Universal McCann -- I'm just going to refer to it as UM

3  as you did in your direct testimony if that's okay.

4  A    Yes.

5  Q    When you were at Universal McCann, you had no clients

6  that did not purchase social ads; is that correct?

7  A    That requires qualification because you're describing

8  social ads broadly, whereas I would clarify that there were

9  clients that did not buy ads on certain social platforms.

10         So they might have bought ads on Facebook, but

11  they might not have bought ads on TikTok or Snap or

12  Pinterest, as examples.

13  Q    But when you testified in the search trial, the

14  question was "Do you have any clients that do not purchase

15  social ads?"  And your answer was no, period, flat.

16  Correct?

17  A    That was correct, but I also qualified it at the time

18  and explained that I have certain clients that did not buy

19  ads on TikTok for certain political reasons.

20  Q    When you were asked the question --

21         THE COURT:  You don't need to repeat it.  I

22  understand.

23  BY MS. RHEE:

24  Q    Now, when you were at UM, you watched the growth of

25  Amazon advertising over the past five to seven years,

Cross-Examination - J. Lowcock

1    correct?

2    A    Correct.

3    Q    Now, your clients at that time, or when you were at UM,

4    were investing more and more money in Amazon advertising,

5    correct?

6    A    Not necessarily correct.

7    Q    Well, let's go to Tab 9, which is, again, your search

8    trial testimony under oath.  And I have excerpted the

9    relevant page for you, and I direct your attention to line 2

10   through 9, 2 through 9.

11          Do you see?

12   A    Yes.

13   Q    And the question was "You pretty much had a front row

14   seat to watching the growth of Amazon advertising over the

15   last five to seven years, correct?"

16          And the answer was yes, period, nothing else.

17          Correct?

18   A    I will note that in lines 10 to 12, I noted that some

19   clients were investing more.

20   Q    Right.  But the question was "You pretty much had a

21   front row seat to watching the growth of Amazon advertising

22   over the last five to seven years, correct?"  And your

23   answer was yes, correct?

24   A    And, again, I would say that --

25          THE COURT:  You need to answer the question.  You

Cross-Examination - J. Lowcock

1    don't need to editorialize it.  It's a very straightforward

2    question.

3    BY MS. RHEE:

4    Q    Yes?

5    A    Repeat the question.

6    Q    Happy to repeat the question.

7              "You pretty much had a front row seat to watching

8    the growth of Amazon advertising over the last five to seven

9    years, correct?"

10   A    Yes.

11   Q    And just a few years ago, TikTok had no advertising at

12   all, correct?

13   A    Correct.

14   Q    And now at UM, when you were there, your clients' ads

15   spend on TikTok grew in the last three years that you were

16   at IPG when you testified during the search trial, correct?

17   A    Correct.

18   Q    Your clients at UM, their ad spend on Instagram also

19   grew while you were there, correct?

20   A    Correct.

21   Q    Now, you very helpfully answered questions on the

22   government's direct about what's called the marketing

23   funnel.

24             Do you remember that testimony?

25   A    Yes.

Cross-Examination - J. Lowcock

1   Q    And you have described the steps of the marketing

2   funnel or the consumer journey, which is another word for

3   marketing funnel, yes?

4   A    Correct.

5   Q    You've described the steps as follows:  Driving

6   awareness, capturing intent, driving consideration, and then

7   ultimately driving a decision to purchase.

8         Have I got that right?

9   A    Correct.

10  Q    So now let's turn to a visual depiction of the funnel

11  that just graphically shows the consumer journey that you

12  just testified to.

13        And if we could publish what is going to be marked

14  as Lowcock Demonstrative 1.

15        Thank you.

16        Now, you've seen this pretty simple visual

17  depiction of the marketing funnel before, haven't you?

18  A    Yes.

19  Q    And you agree with this as a graphical depiction of the

20  testimony that you just gave, yes?

21  A    Yes.

22  Q    Now, display advertising is primarily intended to drive

23  or create demand and drive awareness; is that right?

24  A    I would list it as primarily intended to drive

25  awareness.

Cross-Examination - J. Lowcock

1    Q    So let's go to Tab 15.  Again, this is your search
2    trial testimony under oath, and I excerpted the page.  And I
3    just want to direct your attention to line 12.
4            Do you see that?
5    A    Yes.
6    Q    Okay.  And here you testified under oath, "Display
7    advertising is primarily intended to drive or create demand
8    and drive awareness," correct?
9    A    Yes.
10   Q    Okay.  Now, in other words, display advertising is the
11   upper half of this marketing funnel; is that right?
12   A    Yes.
13   Q    Okay.  Display advertising can create awareness,
14   correct?
15   A    Yes.
16   Q    Good at that, yes?
17   A    Yes.
18   Q    And display advertising can create interest or
19   consideration, correct?
20   A    Yes.
21   Q    Now, similarly, social advertising can create
22   awareness, correct?
23   A    Yes.
24   Q    And social advertising can create interest and
25   consideration as well, correct?

Cross-Examination - J. Lowcock

1  A    Yes.

2  Q    So now if I could show as a demonstrative Lowcock 2.

3  It's the same marketing funnel that we've been taking about.

4  And now there is a red box that just puts into this picture

5  the testimony that you just gave about where display and

6  social ads fall in this marketing funnel, yes?

7  A    So I would say yes, but I would say that they're

8  imperfect substitutes.

9  Q    Well, that wasn't the question.  The question was this

10 picture memorializes the testimony that you just gave,

11 correct?

12 A    Yes.

13 Q    Okay.  So now let's turn to substitutes.

14       Based on your direct examination by the

15 government, I take it you're familiar with the term

16 "substitute," yes?

17 A    Yes.

18 Q    And, in fact, when you testified in the search trial,

19 you were asked to define that very term.

20       Do you remember that?

21 A    No, I do not.

22 Q    Well, let's turn to Tab 20.

23       Again, this is the excerpt of your search trial

24 testimony under oath.  And I want to direct your attention

25 to the bottom of the first page, starting on line 20.

Cross-Examination - J. Lowcock

1          And the question was "Do you recall you used the
2     word 'substitute' or 'substitutable' this morning?"
3          And your answer was "I recall that came up in
4     conversation."
5          Do you see that?
6     A     Yes.
7     Q     And then the next question was "Do you remember at your
8     deposition you were asked to define that term?"
9          And you said yes.
10         Do you see that?
11    A     Yes.
12    Q     Okay.  And then in an exercise much like this one, you
13    were asked whether or not it would help refresh your
14    recollection if you saw the transcript of your deposition.
15         Do you see that?
16    A     Yes.
17    Q     Okay.  And then upon looking at that, you answered that
18    it does refresh your recollection.  Yes?
19    A     Yes.
20    Q     Okay.  And what you had your memory refreshed was that
21    "substitutable," as you defined it under oath, was a shift
22    of budget from one to another, and then you clarified "based
23    on the purpose I'm trying to achieve, yes."
24         Have I got that right?
25    A     Yes.

Cross-Examination - J. Lowcock

1   Q    Okay.  So you define the term "substitute" or
2   "substitutable" as a shift of budget from one ad format to
3   another based on the purpose you are trying to achieve; is
4   that right?
5   A    Yes.
6   Q    Now, the driver of whether to substitute or shift
7   advertising spend from one format to another is sometimes
8   referred to as ROI, or return on investment, agreed?
9   A    Yes.
10  Q    And the goal is to shift or substitute one ad type with
11  another in order to try to achieve the best possible ROI for
12  an advertiser; is that right?
13  A    Yes.
14  Q    And while you were at UM, you, in fact, trained
15  employees to move between channels or ad formats, as you
16  testified to during your direct examination, in order to
17  optimize poor performance, correct?
18  A    Yes.
19  Q    And at UM, you heard of shifting ad spend from display
20  to social, correct?
21  A    Yes.
22  Q    Now, Mr. Lowcock, I want to turn your attention to
23  another of the companies within IPG, which you testified on
24  direct examination is the holding company that also held
25  Universal McCann.  Is that right?

93

Cross-Examination - J. Lowcock

1   A    Yes.

2   Q    And you're familiar with the other companies that were

3   part of the IPG family?

4   A    Yes, broadly.

5   Q    That includes a company called Initiative, correct?

6   A    Correct.

7   Q    And Initiative has an optimization engine that you're

8   familiar with, correct?

9   A    Familiar with, yes.

10  Q    Okay.  And that optimization engine simultaneously

11  recommends budget reallocations away from underperforming

12  channels to outperforming channels for more impactful

13  business outcomes and better ROI versus in-channel

14  optimization only, correct?

15  A    Correct.

16  Q    And the goal of that optimization engine is to shift or

17  substitute one ad type with another in order to achieve the

18  best possible ROI, yes?

19  A    Subject to client approval, yes.

20  Q    And when you say "subject to client approval," the

21  client here is the actual advertiser or the brand, correct?

22  A    Correct.

23  Q    In the hypothetical that the government walked you

24  through, that would be, for example, a car manufacturer that

25  has a brand-new make or model that is just rolling off the

94

Cross-Examination - J. Lowcock

 1  assembly line; is that right?

 2  A    Correct.

 3  Q    Now, you yourself are not and have never been an

 4  advertiser, yes?

 5  A    I'm not sure I understand that question.

 6  Q    You are not the advertiser.  You are not the car

 7  manufacturer, right?

 8  A    I'm not a car manufacturer, but I have bought

 9  advertising on behalf of myself and family and friends as an

10  advertiser.

11  Q    You bought on behalf of others who were the ones who

12  actually wanted to advertise.  Is that your testimony?

13  A    Yes.

14  Q    Okay.  That doesn't make you an advertiser, does it?

15  A    Like, my parents run a store.  I've bought ads for that

16  store as an advertiser.

17  Q    Okay.  But that would be your parents' store, and that

18  would make them the advertiser, correct?

19  A    I'm a co-owner of the store, but... so we can argue

20  semantics.

21  Q    Thank you for that clarification.

22       Turning back to the original train of thought

23  before we asked you to unintentionally divulge your parents'

24  business, the qualification that you gave to the answer

25  about substitution or shift was it was at the client's

                                                          95

Cross-Examination - J. Lowcock

1   direction.

2            Do you remember that?

3   A    Yes.

4   Q    And we agreed that the client here is the advertiser;

5   is that right?

6   A    Yes.

7   Q    That's because, ultimately, it's the client here, the

8   advertiser, that has control and retains control; is that

9   right?

10  A    Yes.

11  Q    So let's actually now turn to a concrete example and

12  not a hypothetical example of a car manufacturer.

13           While you were at UM, one of the U.S. federal

14  agency clients that you had and oversaw the campaigns and

15  accounts for was the United States Postal Service, correct?

16  A    Yes.

17  Q    And UM advised on multiple occasions that USPS shift

18  spend between display and social ads, correct?

19           MR. TEITELBAUM:  Your Honor, I would just object

20  on scope.  If they want to go outside the scope, they should

21  have to ask nonleading questions.

22           MS. RHEE:  This is cross with respect to the

23  testimony by this witness of substitution and reasonable

24  substitution.

25           THE COURT:  Right.  I'm going to overrule the

Cross-Examination - J. Lowcock

1    objection.  It's all right.

2    BY MS. RHEE:

3    Q    Okay.  So do you remember the question?

4    A    Can you repeat the question?

5    Q    Okay.  While you were at UM, UM advised on multiple

6    occasions that USPS shift ad spend between display and

7    social, correct?

8    A    I believe that would be true.

9    Q    Okay.  So let's turn to one actual example.  Okay.  One

10   of the campaigns that UM worked with USPS on was their

11   political mail campaign.

12            Does that ring a bell?

13   A    That rings a bell.

14   Q    Okay.  So now if I could direct you to Tab 27, which is

15   in your witness binder in front of you.

16            MS. RHEE:  And at this time, Your Honor, we would

17   move to admit Tab 27, which is DTX 994.

18            THE COURT:  Hold on a second.  I want to make

19   sure.  Were going to have some confusion in this case at

20   some point.

21            It's Tab 27 in the book.  It has DTX 994 on the

22   bottom.

23            MS. RHEE:  Correct.  And so the --

24            THE COURT:  Those are the numbers we're going to

25   use for the trial?

Cross-Examination - J. Lowcock

1          MS. RHEE:  Correct.  That's correct.  I was just
2     using the tab reference to direct the Court, the witnesses,
3     and the government's attention to the right place.
4          THE COURT:  And there's no objection to 994; is
5     that correct?
6          MR. TEITELBAUM:  Your Honor, only that this is
7     from the federal agency advertisers who are out of the case
8     based on --
9          THE COURT:  Oh, but that's still relevant, I
10    think, to the issues in the case.
11         So I'll overrule the objection, and 994 is in.
12         Go ahead.
13       (Defense Exhibit Number 994 admitted into evidence.)
14         MS. RHEE:  Okay.
15         Help.  That's really small.
16         THE COURT:  Does any of this have to be redacted?
17         MS. RHEE:  No, Your Honor, not this one.
18    BY MS. RHEE:
19    Q    Okay.  Now, you see the exhibit in front of you,
20    Mr. Lowcock?
21    A    Yes.
22    Q    Okay.  And you see the bottom of that first page, it is
23    an employee from UM writing to a representative of USPS.
24    And it begins, "Hi, USPS," very helpfully.
25    A    Yes.

Cross-Examination - J. Lowcock

1   Q    Okay.  And you see that this exhibit states, "As you

2   may recall, a few weeks ago we made the recommendation to

3   shift funds from display into social for political mail."

4         Is that right?

5   A    Yes.

6   Q    Okay.  So that is an example of substitution at work,

7   shifting from display into social, correct?

8   A    There's a number of qualifiers, though, in that

9   recommendation, which are worth noting.  So the first one

10  is --

11  Q    Mr. Lowcock, if you want to clarify, you will be given

12  the opportunity.  My question is have I got the text that

13  was sent to USPS with the recommendation to shift funds --

14  in other words, ad spend -- from display into social with

15  respect to a campaign?  Is that right?

16  A    I would say that you've highlighted the text, but it

17  omits important facts to the recommendation.

18         THE COURT:  Ms. Rhee, just move on, please.

19         MS. RHEE:  Okay.

20  BY MS. RHEE:

21  Q    Let's go to another example.  And if I could direct

22  your attention to Tab 28.

23         MS. RHEE:  And here, Your Honor, for the record,

24  that is DTX 1340.

25         THE COURT:  Any objection to 1340?

Cross-Examination - J. Lowcock

1        MR. TEITELBAUM:  If I could have just one moment,
2    Your Honor.
3        THE COURT:  Okay.
4        MR. TEITELBAUM:  Your Honor, just as to relevance
5    for this particular one.
6        MS. RHEE:  Your Honor, this is another example of
7    substitution at work.
8        THE COURT:  Yup.  I'm permitting it in.
9        1340 is in.
10     (Defense Exhibit Number 1340 admitted into evidence.)
11       MS. RHEE:  Okay.  And if we could publish it and
12   blow it up again for the older eyes in this audience.
13       And, Your Honor, with respect to the Court's
14   question about redaction, here you will see only with
15   respect to amount.
16       THE COURT:  I see.  That's fine.
17       MS. RHEE:  Okay.
18   BY MS. RHEE:
19   Q    Now, Mr. Lowcock, you see this exhibit published in
20   front of you, correct?
21   A    Yes.
22   Q    Now, this is another email from UM to USPS recommending
23   as a potential optimization for this time the avoid
24   surcharge campaign, shifting a redacted amount from social
25   into display.

100

Cross-Examination - J. Lowcock

1           Do you see that?

2    A    I see the text highlighted, yes.

3    Q    Okay.  Now, avoid surcharge was a USPS campaign to show

4    or make aware to the public that the surcharges FedEx and

5    UPS added to some of their prices were based on rising fuel

6    costs.

7           Do you remember that?

8    A    No.  I wasn't intimately involved in this campaign.

9    Q    Okay.  But that sounds like the kind of thing that you

10   talk about when you're talking about campaigns; is that

11   right?

12   A    Yes.

13   Q    Okay.  And you see just at the top of that email the

14   USPS approves that shift, correct?

15   A    Yes.

16   Q    Okay.  And, in fact, the response is, "Hi, Laura, let's

17   make the shift into display."

18           You see that?

19   A    Yes.

20   Q    Okay.  Now, you recall during your direct examination

21   being asked by the government about native ads.

22           Do you recall that?

23   A    Yes.

24   Q    Okay.  Now, I want to show you what's not got a DTX

25   number but I think is relevant here, Tab 29.  And this is

101

Cross-Examination - J. Lowcock

1  yet another communication -- at this point, in slide form --

2  to the USPS.

3           Do you see that?

4  A    Yes.

5  Q    And it's the FY22.  And that's fiscal year, right?

6  A    Yes, I assume so.

7  Q    Okay.  And it's called the travel mail recommendation.

8  Do you see that?

9  A    Yes.

10 Q    Okay.  Now, I want to direct your attention in

11 particular to page 17.

12          Now, you see the title of the slide presentation

13 to USPS on page 17 of this deck is called "Leverage upper

14 funnel tactics to reach the most qualified audience and

15 drive leads with outcome-based marketing."

16          Do you see that?

17          MR. TEITELBAUM:  Objection.  Hearsay, and reading

18 from a document that's not in evidence.

19          THE COURT:  Unless this witness had something to

20 do with the production of this, I think it is problematic.

21 And this is not coming in as an exhibit?

22          MS. RHEE:  It is not coming in as an exhibit, Your

23 Honor.

24          THE COURT:  All right.  I think we'll move on,

25 then.

Cross-Examination - J. Lowcock

```
 1              I'll sustain the objection.
 2              MS. RHEE:  Your Honor, this is cross with respect
 3   to his prior testimony about native advertising.
 4              THE COURT:  Well, he can talk about native
 5   advertising.  You can ask him leading questions but not by
 6   having him look at this.
 7   BY MS. RHEE:
 8   Q    So native advertising is also an upper funnel tactic,
 9   correct?
10   A    It really depends, but yes.
11   Q    And, in fact, again, to USPS, you recommended using
12   Yahoo's DSP to place native ads or, here, native units in
13   order to drive upper funnel tactics, correct?
14   A    I didn't prepare this document; so all I can say is
15   that UM might have recommended it, but it was not my
16   recommendation.
17   Q    Well, when you were at UM, you oversaw the key
18   accounts, including USPS, correct?
19   A    But I didn't review individual materials of everything
20   that was submitted.
21   Q    Well, is the answer yes or no?
22   A    So yes, but "oversaw" needs to be defined.
23   Q    Are you disagreeing with the recommendation that your
24   team gave to USPS about using native advertising in order to
25   drive upper funnel tactics?
```

Cross-Examination - J. Lowcock

1   A     Having not read the entire document and not knowing the

2   context of it, I can't approve or disagree with the

3   contents.

4   Q     You hired that team, right?

5   A     No.

6   Q     Okay.  You just oversaw them?

7   A     So account teams are overseen by an account lead who

8   hires that individual team members.

9   Q     All right.  Let's move on.

10          You consult independent research services like

11  EMARKETER in the course of your work, correct?

12  A     Yes.

13  Q     And you consider EMARKETER to be a reliable source, do

14  you not?

15  A     Yes.

16  Q     And, now, would it come as a surprise to you that

17  EMARKETER captures and publishes data on U.S. display ad

18  revenue by company?  That sounds like the kind of --

19  A     That sounds like something that EMARKETER would

20  publish.

21  Q     Okay.  And are you aware that, when EMARKETER publishes

22  data about U.S. display ad revenue by company, it includes

23  within that definition of display ad revenue Snapchat?

24          Are you aware?

25  A     No.

Cross-Examination - J. Lowcock

1  Q    Pinterest?  Are you aware?

2  A    No.

3  Q    Twitter?  Are you aware?

4  A    No.

5  Q    TikTok?  Are you aware?

6  A    No.

7  Q    Amazon?  Are you aware?

8  A    No.

9  Q    Meta or Facebook?  Are you aware?

10 A    No.

11 Q    But, again, you consider EMARKETER, which is an

12 independent third-party outfit, to be a reliable source of

13 information, correct?

14 A    Within reason, yes.

15 Q    Well, you remember when you testified in the search

16 trial, you were asked that very question.  And you answered

17 that you consider EMARKETER to be a reliable source without

18 qualification.

19         Do you remember that?

20         MR. TEITELBAUM:  Objection.  If there's going to

21 be impeachment, he should have a chance to see his

22 testimony.

23         MS. RHEE:  You can't have it both ways.

24         THE COURT:  With a jury, this might be important;

25 with me, it's not.  These subtle points, I can draw my

Cross-Examination - J. Lowcock

1  conclusions.  All right?

2          Let's move this along.

3  BY MS. RHEE:

4  Q    Now, Mr. Lowcock, you're aware that Google's ad tech

5  tools support multiple ad formats and platforms, correct?

6  A    Yes.

7  Q    Okay.  So, for example, an advertising buyer or someone

8  on whose behalf you might be buying ads can use DV360 to

9  purchase ads over multiple formats, including display,

10  correct?

11  A    Yes.

12  Q    Native, yes?

13  A    Yes.

14  Q    In-app ads, yes?

15  A    Yes.

16  Q    Video, correct?

17  A    Yes.

18  Q    And CTV, or connected television, yes?

19  A    Yes.

20  Q    Okay.  Similarly, you're aware, correct, that

21  advertising buyers can also use Google ads to purchase ads

22  on all of those exact same formats, correct?

23  A    Provided they have the creative assets to execute those

24  ads, yes.

25  Q    Okay.  Now, other demand-side platforms also offer

Cross-Examination - J. Lowcock

1    ad tech tools that offer transactions across multiple

2    channels and formats as well, right?

3    A    Yes.

4    Q    And when you were --

5             MR. TEITELBAUM:  Objection as to the scope just as

6    to the different types of ad tech tools and the nature of

7    them.  We didn't cover that on direct.

8             THE COURT:  Overruled.

9    BY MS. RHEE:

10   Q    Now, when you were at UM, you certainly didn't just use

11   Google tools, correct?

12   A    We used multiple tools.

13   Q    Okay.  So, for example, you used Trade Desk tools,

14   right?

15   A    Yes.

16   Q    They're a very popular buy-side tool platform, right?

17   A    They're one of many populars.

18   Q    You used them, didn't you?

19   A    We used them, yes.

20   Q    And you used them a lot?

21   A    We used them.  I wouldn't say a lot.

22   Q    Okay.  Now, you are aware that Trade Desk also

23   transacts video, correct?

24   A    Yes.

25   Q    CTV, yes?

Cross-Examination - J. Lowcock

1    A    Yes.

2    Q    Display, yes?

3    A    Yes.

4    Q    Native, yes?

5    A    Yes.

6    Q    And social?

7    A    Yes.

8    Q    Okay.  Similarly, just not to belabor the point, you

9    also, when you were at UM, used Criteo, yes?

10   A    Criteo, yes.

11   Q    Okay.  Now, similarly, Criteo transacts, in their tools

12   across multiple ad formats, display, yes?

13   A    Yes.

14   Q    Social, yes?

15   A    Yes.

16   Q    Native, yes?

17   A    Yes.

18   Q    Online video, yes?

19   A    Yes.

20   Q    Okay.  Now, Mr. Lowcock, you left UM right after the

21   search trial testimony that you gave, yes?

22   A    That's correct.

23   Q    Okay.  And then you went immediately to Quad, correct?

24   A    That's correct.

25   Q    All right.  And Quad has a legitimate, valuable

Cross-Examination - J. Lowcock

1   first-party dataset that it owns, yes?

2   A     Correct.

3   Q     And a key area of innovation that differentiates Quad

4   from its competitors includes its large data stack that

5   represents 89 percent of U.S. households, correct?

6   A     Correct.

7   Q     Now, the company -- and this is Quad -- matches

8   clients' data files with its curated database of households,

9   including addresses, to ensure that insights connect to real

10  consumers and not just faceless email addresses, yes?

11          MR. TEITELBAUM:  Just renewing my scope objection,

12  Your Honor.

13          THE COURT:  Sustained.

14  BY MS. RHEE:

15  Q     Mr. Lowcock, you agree -- and you've previous

16  testified -- that ChatGPT will be disruptive to the

17  advertising industry, correct?

18  A     Yes.

19  Q     Now, finally --

20          THE COURT:  Is there an objection?

21          MR. TEITELBAUM:  Scope, Your Honor.

22          THE COURT:  I don't think we've heard a word about

23  ChatGPT.

24          MS. RHEE:  We've heard about AI, Your Honor.

25          THE COURT:  Well, we've heard about AI but not

Cross-Examination - J. Lowcock

1   Chat particularly.  All right.

2   BY MS. RHEE:

3   Q    ChatGPT is a form of AI, is it not?

4   A    It's an implementation of AI, yes.

5   Q    Okay, Mr. Lowcock.

6         THE COURT:  Okay.  Go ahead.

7   BY MS. RHEE:

8   Q    Now, the last thing I want to direct your attention

9   to -- and then I will wrap -- is you think that this

10  industry needs to rethink the importance of scale, correct?

11  A    Yes.

12  Q    And, in fact, you have advised marketers to let go of

13  their obsession of scale; is that right?

14  A    Yes.

15  Q    And that's because that obsession with scale is a thing

16  that enables a whole lot of bad actors to profit because we

17  assume that every page and site is worthy of an impression,

18  and that's not true, correct?

19        MR. TEITELBAUM:  Objection as to scope.  We didn't

20  talk about scale.

21        THE COURT:  I think scale has been mentioned in

22  the trial, but explain to me what you mean by scale.

23        THE WITNESS:  So in digital advertising,

24  there's -- and they used the term.  There's an obsession

25  with buying digital ads everywhere.  So every time there's a

Cross-Examination - J. Lowcock

1    page, an ad should be appearing on the page.  And the

2    industry is obsessed with buying ads on every page that

3    exists.  And that's what they mean by scale because they

4    believe that gives them a better chance of reaching an

5    audience.

6              The counterpoint to that is the more inventory you

7    add to the pool, the more sites you add and the less actual

8    diligence that occurs in adding sites to that pool

9    introduces new and additional problems.

10             And so as the global brand safety officer, half of

11   my time was spent trying to identify problematic inventory

12   that was introduced into the ecosystem by ad platforms and

13   trying to prevent our ads from appearing --

14             THE COURT:  You're talking about tailoring.

15             THE WITNESS:  Sorry?

16             THE COURT:  You're talking about targeting or

17   tailoring rather than --

18             THE WITNESS:  It's about targeting, but it's

19   also -- there's websites out there that probably shouldn't

20   have ads on them at all because they are just not quality

21   sources of inventory or they're operated by bad actors or

22   people who should not be running websites.

23             THE COURT:  Thank you.

24             MS. RHEE:  No further questions, Your Honor.

25             THE COURT:  All right.

Redirect Examination - J. Lowcock

1          Redirect?

2          MR. TEITELBAUM:   Just briefly, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. TEITELBAUM:

5    Q    Mr. Lowcock, you were asked some additional questions

6    about that Facebook page demonstrative.  We don't actually

7    need to bring that back up, but I just have a couple of

8    questions to follow up on what you were asked on cross.

9          To advertise -- for someone to advertise on

10   Facebook, is there a requirement that they have a Facebook

11   page?

12   A    Yes.

13   Q    Does that same requirement exist for a newspaper

14   website, for instance?

15   A    No.

16   Q    And you were also asked a series of questions about

17   shifting spend from one channel to another.  And, first of

18   all, just with respect to the USPS documents that you were

19   shown, did you see that you had authored any of those?

20   A    I did not author those documents.

21   Q    And then just more generally, could you please provide

22   the Court some additional context about what considerations

23   are important to you when you are thinking about whether to

24   shift spend from one channel to another.

25   A    So there's multiple considerations.  So do I have the

                                                          112

Redirect Examination - J. Lowcock

1    creative assets to activate on that channel?  So you can't

2    move to online video, for example, if you don't have video

3    assets to activate.

4            In that question about social media, do I have a

5    presence on the platform; so can I actually move it on that

6    platform?

7            To earlier questions when you asked about direct

8    and programmatic, if it's a direct buy, I might not actually

9    be able to terminate or end that contract without paying a

10   penalty.  So I can't shift that money.

11           Those are sort of the primary things that would

12   come to mind.

13   Q    Are there any -- just at the advertising agency itself,

14   are there any staffing considerations that affect your

15   ability to shift spend from one area to another?

16   A    Yes.  So my programmatic -- the people that buy

17   programmatic advertising are specialists in programmatic.

18   My people that buy direct or television or out-of-home or

19   radio, et cetera, are a different set of specialists.

20           Clients employ us on a contracted basis on a scope

21   of work.  I have certain people that are employed on an

22   account with specialist skills in different areas.  So if a

23   client asks -- if something is not performing, I can't

24   necessarily move money to a different channel because the

25   client might not be paying for the talent or expertise

Direct Examination - J. Avery

1    required to make that shift.

2              MR. TEITELBAUM:  No further questions on redirect.

3              Thank you, Mr. Lowcock.

4              THE COURT:  All right.

5              Any recross?

6              MS. RHEE:  No, Your Honor.

7              THE COURT:  All right.  Does anybody anticipate

8    calling Mr. Lowcock again in the course of the trial?

9              MR. TEITELBAUM:  Potentially just subject to

10   rebuttal, Your Honor.

11             THE COURT:  All right.

12             Then, sir, I cannot allow you to come and watch

13   the proceedings.  We're not going to get to rebuttal for

14   quite a few days.  The main thing is keep in contact with

15   the government lawyers so that they can reach you.  You're

16   not going back -- you have a British accent.  Are you --

17             THE WITNESS:  I'm Australian, but I live on the

18   east coast of the United States.

19             THE COURT:  Okay.  That's fine.  You're not

20   allowed to discuss your testimony with any witness who has

21   not yet testified, but you'll need to leave at this time.

22   Thank you.

23             THE WITNESS:  Understood.  Thank you.

24             THE COURT:  Your next witness?

25             MR. WOLIN:  Your Honor, the plaintiffs call James

Direct Examination - J. Avery

1    Avery.

2              THE COURT:  All right.

3    Thereupon,

4                          JAMES AVERY,

5    Having been called as a witness on behalf of the plaintiffs

6    and having been first duly sworn by the Deputy Clerk, was

7    examined and testified as follows:

8                    (Time noted:  4:40 p.m.)

9                      DIRECT EXAMINATION

10   BY MR. WOLIN:

11   Q    Good afternoon, Mr. Avery.  Could you please introduce

12   yourself to the Court.

13   A    Yes.  Hi.  My name is James Avery.  I'm the founder and

14   CEO of Kevel.

15   Q    When did you first become involved with internet

16   technology, Mr. Avery?

17   A    Yeah.  So I started building websites basically as a

18   teenager, as a 12- or 13-year-old back in the mid-'90s while

19   in high school.

20   Q    And what is your educational background?

21   A    Yeah.  So I -- after building websites for a while, I

22   attended Middle Tennessee State University for one semester,

23   and then I left to go take a job at Dell Computer in, like,

24   '99, 2000.

25   Q    What kind of work did you do at Dell?

                                                              115

Direct Examination - J. Avery

1  A    I started out support and then was building tools for

2  the support team, and so kind of building programming, you

3  know, applications that helped the other support reps.

4  Q    Between the time when you were working at Dell and the

5  time when you founded Kevel, what other experience did you

6  have in the technology industry?

7  A    Yeah, so after working at Dell, I went and worked at a

8  couple of other companies as a software engineer.  And then

9  I started kind of independent consulting.  So I would do

10  consulting with different kind of tech firms like Cintas and

11  Family Heritage Life and people like that, helping them

12  build kind of big enterprise software.

13  Q    How long, Mr. Avery, did you work specifically in the

14  ad tech industry?

15  A    Yeah, so I started working at ad tech in roughly kind

16  of 2007, 2008.

17  Q    So that's been over 14 years?

18  A    Yes.

19  Q    So let's turn to your present company, Kevel.  What is

20  Kevel's business?

21  A    Yeah.  So at Kevel we help power publishers and

22  retailers, their ad platforms.  So we help them serve

23  advertising across the internet.

24  Q    Who are Kevel's customers today?

25  A    Yeah.  So our customers today are companies anywhere

Direct Examination - J. Avery

1   from people like Ticketmaster to kind of large retailers and

2   different, you know, web apps and mobile apps.

3   Q    Would you describe any of your customers as online

4   marketplaces?

5   A    Yes.

6   Q    What are online marketplaces?

7   A    So online marketplaces are companies like eBay or

8   Farfetch where people are, you know -- one side of the

9   marketplace is selling a product and the other side is

10  buying a product.

11  Q    Has Kevel ever been known under a different name?

12  A    Yes.  We were originally founded as Adzerk,

13  A-D-Z-E-R-K.

14  Q    How many employees do you have today at Kevel?

15  A    We have right around 100.

16  Q    Where are those employees based?

17  A    So our employees are kind of spread out across the U.S.

18  as well as Europe and a couple in Southeast Asia.

19  Q    In what countries does Kevel offer its products for

20  sale?

21  A    So pretty much just about every country that we are

22  allowed to offer it for sale.

23  Q    Can you give some examples?

24  A    Yeah.  So, you know, the United Kingdom, Netherlands,

25  Portugal, Singapore, Philippines, of course the United

117

Direct Examination - J. Avery

1    States, Canada, Mexico.

2    Q    What are your responsibilities as CEO of Kevel?  As you

3    said, that is your current role.

4    A    Yeah.  So largely I started out writing a lot of the

5    code for it.  But today I'm mostly managing the team that is

6    running the company.

7            So as CEO, it's a lot of meetings and working with

8    the product team and the sales team and the day-to-day

9    operations.

10   Q    And how does that compare to your responsibilities

11   right after you founded Kevel?

12   A    Yeah.  So it's pretty different now that we're, like,

13   100 people.  When we were five people, I was doing a lot

14   more of everything, including still writing code and being

15   on every sales call and things like that.

16   Q    So we talked a little bit about Kevel generally, but I

17   want to focus on Kevel's products.

18            Are you familiar with the term "publisher ad

19   server"?

20   A    Yes.

21   Q    What is a publisher ad server?

22   A    So a publisher ad server is the technology that a

23   publisher uses to control which ads are going to be shown on

24   a website or a mobile app for the consumers of that app.

25   Q    What types of companies are the customers for publisher

Direct Examination - J. Avery

1  ad servers?

2  A    Everything from traditional publishers to marketplaces

3  to eCommerce to, you know, kind of what we call utility

4  publishers, which is somebody like a -- like a Strava, which

5  people use to track their running and things like that.

6  Q    I'll turn back to that in a couple of minutes.  But I

7  want to ask you, does Kevel offer a publisher ad server

8  product today?

9  A    Yes.

10  Q    Can we put up on the screen Plaintiffs' Demonstrative

11  A, please.

12        Mr. Avery, on the screen you'll see a diagram

13  marked as Plaintiffs' Demonstrative A.

14        Do you recognize what's depicted here?

15  A    Yes.

16  Q    What does it depict?

17  A    Yeah.  So this really depicts the kind of total

18  programmatic ecosystem.

19  Q    Where do Kevel's ad tech products fall in the diagram?

20  A    Yeah.  So we're squarely in the publisher ad server

21  square.

22  Q    As the CEO of a company that offers a publisher ad

23  server, are you familiar with the other companies that offer

24  publisher ad servers?

25  A    Yes.

Direct Examination - J. Avery

1  Q    Did Google offer a publisher ad server?

2  A    Yes.

3  Q    What is Google's publisher ad server called?

4  A    Google Ad Manager or DFP.

5  Q    When did Kevel first begin developing its publisher ad

6  server product?

7  A    Yeah.  So I started writing the code back in 2007,

8  2008.

9  Q    When did Kevel launch its publisher ad server?

10  A    We officially launched it in 2010.

11  Q    During those years when you were working to build

12  Kevel's publisher ad server, what work did you and other

13  Kevel employees have to do to bring it to market?

14  A    Yeah.  So kind of the fun thing about ad serving is

15  that it's very complicated and very complex from an

16  engineering perspective.  So there's a lot of kind of

17  research and development into how to best serve ads to the

18  right person at the right time with the right amount of

19  budget.  So there's a lot of kind of technical complexities

20  in building a publisher ad server.

21  Q    When Kevel launched its publisher ad server in 2010,

22  what type of advertising was the focus of Kevel's publisher

23  ad server?

24  A    Yeah.  So at the time we were really focused on what I

25  call display advertising; so kind of the traditional ad

Direct Examination - J. Avery

1   banners that you see on websites.

2   Q    And when you were focused on that, what type of

3   customers did you focus on attracting?

4   A    Yeah.  We were really going after kind of your

5   traditional -- traditional publishers.

6   Q    You refer to traditional publishers.  What's a

7   traditional publisher?

8   A    Yeah.  So I think of a traditional publisher as

9   somebody like a CNN or *New York Times*, somebody who's

10  publishing articles who's, you know, getting people to come

11  to that site to kind of read the news or read about what's

12  going on that day.

13  Q    In your experience trying to attract those customers,

14  what type of advertising do traditional website publishers

15  sell the most of?

16  A    Yeah.  So for the most part, they're selling kind of

17  traditional banner ads.  So those images that you see on the

18  site when you go there, those are being served through an ad

19  server like us.

20  Q    Why did you choose to focus on creating a publisher ad

21  server for display ads for traditional publishers when you

22  founded Kevel?

23  A    Yeah.  So at the time we really looked at -- kind of

24  Google had recently acquired DoubleClick.  We looked at the

25  market and thought there was an opportunity for a kind of

121

Direct Examination - J. Avery

1    more modern publisher ad server.

2              So there was a lot of opportunities in optimizing

3    how the ads were served and kind of including features and

4    functionality that we didn't see in the competitors of the

5    day.

6    Q    And were those some of the things that you did to try

7    and attract traditional publishers to sign up as your

8    customers?

9    A    Yeah.  We used to focus a lot on just, like, the speed

10   of ad serving, that we could serve a lot faster than any of

11   our competitors.

12   Q    What other publisher ad servers were on the market at

13   the time that Kevel launched its publisher ad server?

14   A    So obviously, GAM, DFP.  Also OpenX.  There's a company

15   called AdTech.  There's also a company called, like, OAS or

16   Real Media 24/7.  So there was a number of them at the time.

17   Q    And one of those was Google's DFP, correct?

18   A    Correct, yes.

19   Q    In those early days, what was your involvement in

20   trying to sell Kevel's publisher ad server to customer?

21   A    Yeah, I mean, pretty early on, as the solo founder, I

22   did a lot of sales.  So I was on a lot of the phone calls

23   and working directly with customers.  To this day I still

24   get on the odd sales call but not as often as back then.

25   Q    So in this time period we're focusing on how many

Direct Examination - J. Avery

1  publishers was Kevel able to convince to switch from

2  Google's DFP to Kevel's publisher ad server?

3  A    Yeah.  I don't know of any that we could get to switch

4  from GAM to Kevel.

5  Q    So how would you describe what it was like in those

6  early days, trying to win publisher ad server customers in

7  competition with Google's DFP?

8  A    Yeah.  I mean, I think we quickly realized it wasn't a

9  market we were going to be able to win in.

10 Q    Why was that?

11 A    Largely because of the tie to Google's demand through

12 kind of AdX.

13 Q    I mean, what do you mean when you refer to the tie to

14 Google's demand through AdX?

15 A    So Google has something called AdX, which is their

16 exchange that is tied into DFP or GAM, and it brings a

17 significant amount of money to publishers.  So when we would

18 go talk to a publisher, they would tell us, you know, we're

19 making X amount of dollars or X percent of our revenue from

20 AdX.  And they would ask us, "How do you replace that

21 revenue?"  And basically, we don't have an answer for that.

22 There's not a way for us to replace that revenue because a

23 lot of it's pretty unique demand coming from Google.

24 Q    When you say that AdX is tied into DFP, what does that

25 mean in a technological sense?

123

Direct Examination - J. Avery

1          MS. MORGAN:  Objection.  Sorry.  Foundation.

2          THE COURT:  This man has enough of a technology

3  background.  Overruled.

4          THE WITNESS:  Sorry.  Can you repeat the question?

5  BY MR. WOLIN:

6  Q    When you say that AdX is tied into Google's DFP, what

7  does that mean in a technological sense?

8  A    Yeah.  So the only way to really get access to AdX in

9  the best way possible, so in like a real-time way, was if

10  you use their ad sever, GAM.

11  Q    And why did that make it difficult, in your view, to

12  compete against Google's DFP?

13  A    Yeah, because we just had no way to replace that big

14  chunk of revenue that the customer would be missing if they

15  moved to Kevel from DFP.

16  Q    I mean, if we could put Plaintiffs' Demonstrative A

17  back up on the screen, please.

18          Could you identify the link that you're referring

19  to as it's depicted -- if it's depicted in this

20  demonstrative?

21  A    Yeah.  So where you see the bid request and bid

22  response going between what's labeled as DFP publisher ad

23  server and AdX, the ad exchange, that's really that direct

24  connection that exists between DFP and AdX.

25  Q    And just to be clear, was Kevel able to give its

                                                          124

Direct Examination - J. Avery

1   publisher customers access to Google ads via AdX?

2   A     No.

3   Q     Do publishers want that access?

4   A     Yes.

5   Q     During the first few years of Kevel's existence, what

6   was your involvement with customers that decided to stop

7   using Kevel's publisher ad server?

8   A     Fairly involved.  Especially if a customer was

9   churning, we would want to know why they were leaving us.

10  Q     Did Kevel lose customers to DFP?

11  A     Yes.

12  Q     Well, what did you attribute losses to?

13  A     Yeah.  So I think there was two main reasons, really.

14  One was because they needed that demand from AdX.  Or the

15  other one was, because we had kind of started to shift our

16  focus away from traditional publishers, our product was, you

17  know, no longer focused on their business.  So that would

18  cause them to also potentially move.

19  Q     Was there an example or any examples of customers that

20  Kevel lost because the publishers wanted access to AdX?

21  A     Yeah.  One of the big ones was Reddit at the time.

22  Q     What is Reddit?

23  A     Reddit is kind of a large community website, public

24  company, where they have, you know, billions and billions of

25  ads that they display a month.

125

Direct Examination - J. Avery

1  Q    Reddit is one example.  But are there others that left

2  for the same reason?

3  A    Yes, absolutely.  I don't know the names off the top of

4  my head.

5  Q    Before we move on to the next topic, could you explain,

6  looking back at this time period, how did the integration

7  between DFP and AdX affect your business in this early time

8  period?

9  A    Yeah.  It really made us second -- it really made us

10  kind of pivot away from targeting on traditional publishers.

11  We really looked at the market and said there wasn't a way

12  we were going to win a more traditional publisher.

13        I remember when OpenX was going out of business,

14  Yellow Pages came in as a lead.  And when we talked to them,

15  they were like, how do we get AdX demand?  We kind of said

16  there wasn't a way, and that was the end of the

17  conversation.

18        So there was a lot of those conversations that led

19  us to kind of pivoting our business to a different market.

20  Q    I referred to the early time period in your previous

21  question.

22        What time are we taking about here?

23  A    Yeah.  So this is in the -- starting in, like, the

24  2012, 2013.  And really, even back as far as 2011 when we

25  were really first starting to scale, that we were starting

Direct Examination - J. Avery

1    to say okay, we need to pivot away from these traditional

2    publishers and find a market where we can really compete.

3    Q    So what did Kevel do in response to its inability to

4    compete, which you just described?

5    A    Yeah.  So, really, we started to pivot the company.  So

6    what we did was we focused on APIs.  So APIs are really the

7    technology that computers use to talk to each other.

8            So what we did was we built the first kind of API

9    ad server, that would let customers go and build what we

10   called native ads, which are --

11   Q    Could you explain a little bit for the Court what an

12   API is and how it works.

13   A    Yeah.  So an API is just a way that a website or an app

14   can call our servers to get back the right ad to serve

15   instead of it kind of relying on JavaScript and client tags

16   and stuff that I'm sure you'll hear about.

17   Q    When did Kevel make this pivot which you referred to a

18   few moments ago?

19   A    Yeah.  So we started to make that pivot all the way

20   back in 2011.  And really by 2012, 2013, we were pretty

21   focused on being an API ad server as opposed to focusing on

22   traditional publishers and banner ads.

23   Q    How did the pivot which you described change the type

24   of advertising that Kevel focused on for its publisher ad

25   server product?

Direct Examination - J. Avery

1   A    Yeah.  So we went from focusing on the more traditional

2   banner ads that you see to really native advertising, which

3   includes things like sponsored listings or any other sort of

4   like native unit.

5   Q    Are native ads still Kevel's focus today?

6   A    Yes.

7   Q    And what is a native ad?

8   A    Yeah.  So a native ad is way to build an ad that's more

9   immersed in the experience of the site or the app that

10  you're using.

11       So the best example is probably Instagram where,

12  if you're on Instagram and you're scrolling through, you see

13  ads that really blended well into the experience of

14  Instagram.

15       Another example is like a sponsored listing where,

16  if you search on Amazon, you'll notice that half the

17  products on Amazon are sponsored.  So that means the brand

18  is paying to move their listing higher.

19       Now, those are all examples of native ads.

20  Q    What type of websites do sponsored listing, which you

21  just described, typically appear on?

22  A    Yeah.  So eCommerce and retailer sites.

23  Q    Could you give some examples of retailer sites that you

24  are referring to?

25  A    Like Amazon or Walmart or eBay, companies like that.

Direct Examination - J. Avery

1  Q   So based on your experience catering to both native ads

2  and display ads in the different time periods, what are the

3  differences between native ads and display ads?

4  A   Yeah.  We believe that native ads are a lot more

5  effective as an advertising medium.  But also one of the big

6  differences is that native ads are normally sold direct, so

7  meaning the publisher is working directly with a brand and

8  taking the money directly, whereas display has largely moved

9  to be all bought and sold programmatically.

10 Q   I'm going to ask you about native ads in just a moment,

11 but before I get there, does Kevel observe how its customers

12 use its products for native ads versus how it uses it for

13 display ads?

14 A   Yeah.  So we can see all the API calls that come in

15 from our customers.  We can't always tell exactly where

16 they're putting the ad, but we have a pretty good idea of

17 which ones are native versus which ones are traditional

18 display or video or things like that.

19 Q   What has Kevel observed about whether publishers switch

20 between native ads and display ads?

21 A   Yeah.  We tend to find that most publishers are focused

22 on one or the other.  You will see, you know, some

23 traditional publishers tend to be very focused on display

24 ads.  They will sometimes have a very small part of their

25 business that's native, but it's never really taken off in

129

Direct Examination - J. Avery

1    the traditional publisher space; whereas, if you go to,

2    like, a large community or eCommerce, they're a lot more

3    focused on native and sponsored listings.

4    Q    And what have you observed about the factors that limit

5    switching between native ads and display ads?

6    A    Yeah.  I mean, I think one of the big factors is that

7    they're sold differently.  So a lot of these publishers over

8    the years don't do any direct sales or do very little direct

9    sales; so they don't even have the teams that do that

10   anymore.

11           You can find pretty large publishers that just

12   have a couple of people running programmatic demand and

13   don't have any direct sales team.

14           And then also, there's technology differences

15   between the two.

16   Q    Before we go on, let me talk about direct sales.  What

17   are direct sales?

18   A    Yeah.  So direct sales is just, like, you have a

19   salesperson that's talking directly to a brand.  So, you

20   know, *New York Times* is calling up Coca-Cola and saying,

21   "We'd like to sell you a premium placement on top of our

22   Summer Olympics coverage" or something like that.

23   Q    You also referred to programmatic sales.  What does it

24   mean to sell display ad programmatically?

25   A    Yeah.  So that's really the -- when we look over the

Direct Examination - J. Avery

1    exhibit, that's the programmatic ecosystem, where somebody

2    like Coca-Cola is instead putting campaigns and putting what

3    they want into a DSP.  That DSP is then buying those ads

4    through the ad exchange through the publisher.  And it

5    basically all happens pretty seamlessly without direct sales

6    and insertion orders and things like that in between.

7    Q    What has Kevel observed about whether publishers shift

8    their sales between programmatic sales and direct sales?

9    A    It's usually -- for the last ten years it's kind of

10   been a one-way direction of mostly towards programmatic when

11   we're talking about traditional publishers, like they're

12   selling more and more programmatically and less direct

13   pretty much every year.

14   Q    Mr. Avery, I want to ask you about the term now.  Are

15   you familiar with the term "open web display advertising"?

16   A    Yes.

17   Q    What does "open web display advertising" refer to?

18   A    Yeah.  So open web display advertising is really all of

19   these display ad units that I was talking about served

20   across kind of nonwalled gardens, so the rest of the

21   internet.

22   Q    And prior to this case, were you familiar with that

23   term?

24   A    Yes.

25   Q    And had you used that term prior to the case?

Direct Examination - J. Avery

1    A    Yes.

2    Q    I believe you referred to walled gardens.  What is a

3    walled garden?

4    A    Yeah.  So a walled garden is a term that people use for

5    companies like Facebook or Meta, people that kind of aren't

6    participating in the kind of programmatic ecosystem.

7    Q    So following Kevel's change in focus, what have you

8    observed about the mix of programmatic and direct

9    advertising that Kevel's customers use?

10   A    Yeah.  So today largely our customers are all doing

11   direct sales, and it's very little programmatic.

12   Q    And why did Kevel stop focusing on publishers that

13   focus on programmatic sales?

14   A    Yeah.  Because we just -- because we can't connect to

15   AdX.  We can't bring that large part of that programmatic

16   demand, which really means that the customers that want more

17   programmatic aren't going to Kevel.

18   Q    Mr. Avery, so we spoke about Kevel's business model and

19   its customers.  I now want to ask you about the

20   functionality of Kevel's publisher ad server.

21          So at a high level, how does the functionality of

22   Kevel's publisher ad server compare to the functionality of

23   DFP?

24   A    Yeah.  I mean, I think we're basically a superset of

25   what DFP offers.  So DFP offers kind of traditional banner

132

Direct Examination - J. Avery

1    display advertising.  What we offer is a lot more for our

2    customers, whether it's the API functionality or it's things

3    focused on what we call retail media, so that more kind of

4    sponsored listings like the Amazons of the world.  So we

5    offer a lot more functionality than what you'd just find in

6    DFP.

7    Q    You spoke earlier about other countries where your

8    product is offered.

9              What, if any, differences are there between the

10   publisher ad server that Kevel offers in the United States

11   and the publisher ad server that Kevel offers in other

12   countries?

13   A    Yeah.  There's no real difference.

14   Q    Does Kevel's publisher ad server allow a publisher to

15   offer impressions for sale on ad exchanges?

16   A    Yes.

17   Q    Which ad exchanges can publishers access through

18   Kevel's publisher ad server?

19   A    Yeah, I don't remember the full list, but off the top

20   of my head, Index Exchange, PubMatic, Magnite, Place

21   Exchange.

22   Q    Does Kevel's publisher ad server allow a publisher to

23   offer its impressions for sale on Google's AdX ad exchange?

24   A    No.

25   Q    Why not?

Direct Examination - J. Avery

1    A    We have never been able to make that direct connection,

2    and we've asked a couple of times.

3    Q    Does Kevel's publisher ad server give any preference to

4    one exchange over other exchanges?

5    A    No.  So we allow our customers to configure their

6    exchanges and how they want to send traffic to them.  So for

7    us, it's really about our customer and what they want.  So

8    if they want to preference one over the other, they can.

9    But we don't have any bias in who gets preference or who

10   goes first.

11   Q    Does Kevel's publisher ad server require that a

12   particular exchange have the opportunity to bid on inventory

13   before other exchanges?

14   A    No.

15   Q    Why not?

16   A    Because again, like, we're focused on what do our

17   customers really want?  If our customer wants to give one

18   exchange preferential treatment, they can do that.

19            But we don't have an exchange; so we don't have,

20   like, a horse in that race.  So we're not going to give

21   anybody preferential treatment over somebody else.

22   Q    Does Kevel's publisher ad server add functionality that

23   compares bids for multiple exchanges at the same time?

24   A    Yes.

25   Q    Can publishers who use Kevel choose to give all

134

Direct Examination - J. Avery

1    exchanges equal opportunity to bid on impressions?

2    A    Yes.

3    Q    And when did Kevel introduce that functionality?

4    A    I don't remember exactly, but it was about five years

5    ago.

6    Q    So why does Kevel give publishers the choice to give

7    exchanges equal access to their publishers' inventory?

8    A    Yeah.  It goes back to we're working for our customers,

9    not anybody else.  So what they want to do is what we're

10   happy to provide for them, so whether it's equal or they

11   want to preference one.  But it's really -- we are not an

12   exchange; so we're not, you know, influencing that.

13   Q    Are you familiar with the term "price floor"?

14   A    Yes.

15   Q    What is a price floor?

16   A    So a price floor is, when a bid is sent to an exchange,

17   the publisher can say the minimum clearing price of how much

18   they want to get for that impression or that ad.

19   Q    Does Kevel's publisher ad server place any restrictions

20   on the price floors that its publishers can set?

21   A    No.

22   Q    Why not?

23   A    It goes back to what I've said before, which is that

24   we're about what our customers want to do.  And so if they

25   want to set up a super low floor or a high floor, it's based

135

Direct Examination - J. Avery

1   on their business and kind of how they want to optimize

2   things.

3   Q    Can a publisher that uses Kevel give different price

4   floors to different exchanges?

5   A    Absolutely.

6   Q    When did Kevel introduce that functionality?

7   A    We built that in the beginning; so roughly five years

8   ago when we first built our kind of exchange integration

9   tech.  We've had that from the beginning.

10  Q    Are you familiar with the term "header bidding"?

11  A    Yes.

12  Q    Without getting into the technical details, what is

13  header bidding?

14  A    Yeah.  So header bidding was kind of a solution built

15  where the kind of ecosystem got together and figured out a

16  way for other exchanges to bid into DFP.  And so some people

17  call it, like, a hack.  But it's a hack in the sense of it's

18  a clever solution that they figured out how to get bids from

19  other exchanges into the auction in DFP.

20  Q    How, if at all, does Kevel's publisher ad server

21  support header bidding?

22  A    So unlike with DFP, they kind of had to find these

23  workarounds.  We actually just went and implemented a direct

24  system so that you can actually send in the actual full

25  price in the header bidding request, as opposed to DFP,

136

Direct Examination - J. Avery

1    there's some workarounds that have to happen.  So I think

2    our implementation is actually better than DFP's.

3    Q    When did Kevel build this integration with header

4    bidding?

5    A    It was a couple of years ago.  I don't remember the

6    exact date.

7    Q    So do Kevel's publisher customers ever give you

8    feedback about the features of Kevel's publisher ad server?

9    A    Yeah.  All the time.

10   Q    What kind of feedback do you receive?

11   A    There's things they like.  There's things they want us

12   to improve.  There's features we don't have that they would

13   like us to add.

14   Q    What is Kevel's approach or philosophy about responding

15   to this customer feedback?

16   A    Yeah, so, I mean, we take into account a lot of things,

17   like how big is the customer?  Are they in the market that

18   we're targeting?  A lot of times, they'll talk to me or

19   they'll talk to my VP of product or one of our product

20   managers, and then we can kind of prioritize that work along

21   with all the other work that we're trying to get done.

22   Q    So to be clear, what does Kevel do when its publisher

23   customers request that Kevel add specific features?

24   A    Yeah, I mean, so largely we listen, and then we think

25   about where can we prioritize this?  And I'd say the vast

Direct Examination - J. Avery

1    majority of the things that we build are driven by customer

2    requests.

3    Q    And looking at it from the other direction, what does

4    Kevel do when it hears feedback from its customers that they

5    don't like the features of Kevel's publisher ad server?

6    A    Yeah, I mean, I think the same in reverse.  Like, we

7    think about other ways we can improve it.  Are there things

8    we can remove?  You know, but I think, again, a lot of the

9    majority of our product development, probably 80 percent

10   plus, is all driven by customer feedback and input.

11   Q    So over -- thinking about the past five to ten years,

12   how would you compare the amount of innovation that you've

13   observed from Kevel to the amount of innovation you've

14   observed in the industry from Google?

15   A    I think that we've built a lot more functionality and

16   kind of, I think, pushed ad serving a lot further forward

17   than what we've seen from Google and DFP.

18   Q    Why do you say that?

19   A    I think when you look at the things that we've built in

20   the retail media side, things around API delivery, things

21   even like that header bidding example, where we took the

22   time to implement this in the correct way, you know, I think

23   are differentiators.

24   Q    So before we move on, let me ask you about the pricing

25   for Kevel's publisher ad server.  How does the pricing work?

Direct Examination - J. Avery

1    A     Yeah, so we have a platform fee.  So kind of like you

2    pay to get access to the software.  And then there's a usage

3    fee based on kind of how many requests that you're making to

4    our API.

5    Q     And without getting into too many specifics, is that

6    fee negotiable?

7    A     Yes.

8    Q     Again, without getting into any confidential specifics,

9    have there been instances where Kevel negotiated a decrease

10   to its fee in order to convince a customer to use Kevel's

11   publisher ad server product?

12   A     Yeah, absolutely.

13   Q     So, Mr. Avery, you mentioned several minutes ago that

14   publishers could not use Kevel's publisher ad server to sell

15   impressions through AdX.  Did Kevel ever ask Google to

16   integrate AdX with Kevel's publisher ad server?

17   A     Yes.

18   Q     When did Kevel make that request to Google?

19   A     Yeah, so the first one was all the way back in -- I

20   want to say it was 2012/2013 time frame, where I asked

21   specifically if there was a way we could integrate with

22   AdX -- integrate AdX into Kevel so that we could get that

23   same access to Google demand that you get from DFP.

24   Q     Why did Kevel want to integrate with AdX in that time

25   frame?

Direct Examination - J. Avery

1    A    Well, I think it goes back to what we hear from our

2    customers, that our customers that we're trying to sell to

3    in this traditional publisher market, they were really

4    looking for access -- you know, demand from AdX.  And if we

5    offered that, we thought we could better compete for their

6    business.

7    Q    In response to your requests, did Google integrate AdX

8    with Kevel's publisher ad server?

9    A    No.

10   Q    Did Google ever tell you why?

11   A    Back then, I think it was something like it doesn't

12   work that way; but there wasn't any further details.

13   Q    I think you mentioned that you had made the request to

14   integrate more recently as well; is that right?

15   A    Yes.  So a year or two ago, I also had another call

16   where we tried to bring up -- I got an introduction to

17   somebody at Google to try to say how can we connect AdX to

18   bring that demand into Kevel?

19   Q    What was the outcome of those communications?

20   A    Basically, we never got anywhere.  I think the person I

21   was talking to first was -- thought that we were trying to

22   buy from AdX, which is maybe why they took the call.  But

23   then when it became clear what we were looking for, it kind

24   of became a dead end.  And I never got a straight answer.

25   Q    You also mentioned several moments ago that Kevel's

                                                              140

Direct Examination - J. Avery

1  publisher ad server integrates with Index Exchange,

2  PubMatic, and other ad exchanges; is that correct?

3  A    Yes.

4  Q    So how difficult was it technologically for Kevel to

5  integrate with Index Exchange and PubMatic?

6  A    Usually it takes about two to four weeks.  So it's,

7  like, one or two engineers for two to four weeks to

8  integrate a new exchange partner.

9  Q    And do you know how difficult it would be for Kevel to

10  integrate with AdX?

11  A    I think if we had the same connection point that we

12  have -- or a similar connection point that we have to, like,

13  Magnite or PubMatic, then it would be two to four weeks with

14  one or two engineers.

15  Q    As CEO of Kevel, do you think it would be beneficial

16  for Kevel if AdX began integrating with Kevel's publisher ad

17  server?

18  A    100 percent.

19  Q    Why do you think that?

20  A    I think it would allow us to compete in this

21  traditional kind of display market that we really can't

22  compete in today.

23  Q    And if Kevel began integrating with AdX, what do you

24  think that would mean for Kevel's customers?

25  A    Yeah, so I think for the customers that want that

Direct Examination - J. Avery

1   demand, they would be able to access it.  And then I think

2   we'd also be able to access a lot of new customers that

3   today don't really have a choice in which ad server they

4   pick.

5   Q    And if AdX began integrating with Kevel's publisher ad

6   server, what would Kevel do next?

7   A    I mean, I think the biggest thing we would do is we

8   would go back to that traditional display market, and we

9   would figure out how do we start to market more in that

10  market?  How do we improve our product for that set of

11  customers?  And, really, we'd have a whole new market open

12  for our business that we could go attack.

13  Q    Mr. Avery, I'd like for you to look in your binder at

14  PTX 758.

15          MR. WOLIN:  Your Honor, we would offer PTX 758.

16          MS. MORGAN:  Your Honor, we object on relevance

17  grounds.  These are allegations from a journalist; they have

18  nothing to do with the facts in this case.

19          THE COURT:  Well, it's an email, correct?

20          MS. MORGAN:  It's an email to a journalist.

21          MR. WOLIN:  It's an email from Mr. Avery to a

22  journalist discussing some of the issues that he's been

23  discussing here today.

24          THE COURT:  I'm going to overrule the objection.

25  It's in.

Direct Examination - J. Avery

1          (Defense Exhibit Number 758 admitted into evidence.)

2               MR. WOLIN:   Thank you, Your Honor.

3               Can we please put 758 up on the screen.   Thank

4    you.

5    BY MR. WOLIN:

6    Q    Mr. Avery, what is the document that we're looking at,

7    PTX 758?

8    A    Yeah, so this an email communication between myself and

9    Sarah Sluis.

10   Q    And who is Ms. Sluis?

11   A    She is a reporter at AdExchanger.

12   Q    Could we please turn to the second page of the document

13   to the email at the bottom of the page.

14             Mr. Avery, do you see the email at the bottom of

15   the second page from Ms. Sluis at 7:52 p.m. on April 24,

16   2019?

17   A    Yes.

18   Q    What's Ms. Sluis asking you about in this email?

19   A    Yeah, so she's asking me about -- there was an exchange

20   I had on Twitter with someone talking about whether

21   AdWords -- and, really, Google ads -- could integrate with

22   other ad servers.   And I was saying that they couldn't.   And

23   I think she was asking about that exchange on Twitter.

24   Q    Let's please scroll up in the document to the email at

25   the middle of the second page.

143

Direct Examination - J. Avery

1           Mr. Avery, do you see --

2           I'd like to see the email from Mr. Avery at

3   10:17 p.m.

4   A    Yes.

5   Q    Do you see that?

6   A    Yes.

7   Q    Could you read aloud the second paragraph of the email,

8   and then I'd like to ask you a few questions about the

9   context for the response that you gave there.

10  A    Yeah.  I said, so -- "But AdX is completely tied to DFP

11  (Ad Manager).  We have worked with some customers who have

12  AdX tags, meaning they can put them in our ad server or

13  another; but no one really wants to use tags anymore since

14  you end up with passbacks and other inefficiencies."

15          MR. WOLIN:  Mr. Klein, could we put the second

16  paragraph up, please.

17  BY MR. WOLIN:

18  Q    You said in that paragraph that you just read that AdX

19  is almost completely tied to DFP.  What did you mean by

20  saying that?

21  A    Yeah, and what I referenced here is, like, with the

22  tags as well is that there's technically a way to integrate

23  with AdX but it's very inefficient.  And so the only way to

24  get real-time demand and, really, bids from AdX is tied to

25  DFP.  There's no way for us to integrate with AdX and get

144

Direct Examination - J. Avery

1   that same level of real-time bids from Google.

2   Q    Is that why you believed that AdX is tied to DFP?

3   A    Yes.

4   Q    In that same email, what do you tell Ms. Sluis in the

5   next-to-last paragraph that starts with "almost"?

6   A    Yeah.  So "Almost every ad server has gone out of

7   business because of this integration between AdX and Ad

8   Manager.  Publishers may want use another ad server, but

9   they would end up giving up a chunk of revenue from AdX.  It

10  turns out monopolies are pretty effective."

11  Q    In that paragraph you referred to Ad Manager.  Does

12  that refer to Google's DFP?

13  A    Yes.

14  Q    You also refer to ad servers that have gone out of

15  business because of the integration between AdX and DFP.

16  What ad servers have gone out of business?

17  A    Yeah, so a lot of companies have shut down their ad

18  servers.  So OpenX shut down their publisher ad server.

19  AppNexus largely shut down their publisher ad server.  Then

20  companies like OAS and AdTech that aren't around anymore.

21  Q    I'm going to ask you about one last section of the

22  email.  So let's turn to the first page, please, into the

23  middle of the page to the email at 11:56 a.m.

24          Do you see the email to Ms. Sluis from you at

25  11:56?

Direct Examination - J. Avery

1    A    Yes.

2    Q    What did you tell her in the final sentence of your

3    email?

4    A    I said, "Yeah, you could possibly hack something

5    together to get AdX to work in the header, but it would be

6    unsupported, and they could break it or tell you to stop.

7    Most publishers are deathly afraid of getting banned from

8    Google or AdX; so they aren't going to take the risk."

9    Q    What's the basis for your statement in that last

10   sentence, "Most publishers are deathly afraid of getting

11   banned from Google or AdX; so they aren't going to take the

12   risk"?

13   A    Yeah, it's just from the customers that we talk to and

14   what we hear from them.

15   Q    And why did you write at that time that most publishers

16   are deathly afraid of getting banned from Google or AdX?

17   A    We have heard that from customers over the years that,

18   whenever we would kind of offer a clever solution like this,

19   they would immediately say we're not going to do something

20   that would risk us getting banned from AdX.

21              MS. MORGAN:  Objection.  Hearsay.

22              THE COURT:  Yep.  I was waiting for it.

23              Sustained.

24              MR. WOLIN:  I'll move on, Your Honor.  Thank you.

25

146

Direct Examination - J. Avery

1    BY MR. WOLIN:

2    Q    One last set of questions, Mr. Avery.  I want to focus

3    on competition that you're facing today.  How many customers

4    does Kevel have for its publisher ad server today?

5    A    About 150.

6    Q    And what is Kevel's pitch to publishers today?

7    A    Yeah, so we've largely pivoted towards what we call

8    retail media, which is really the sponsored listings and

9    working with retailers in marketplaces.  And we believe that

10   we've really built the best retail media ad server out

11   there.  And so that's been the focus today.

12   Q    Do publishers today use Kevel's publisher ad server for

13   programmatic display ads?

14   A    A very small number of publishers do.

15   Q    And how would you describe the types of publishers that

16   use Kevel's publisher ad server for programmatic display ads

17   today?

18   A    So it's either small publishers or sometimes what we

19   call utility publishers, which is people who -- kind of like

20   a Strava or an app that they -- they're not really a

21   traditional publisher but they still kind of fall in that

22   publisher realm.

23   Q    Does Kevel keep track of which customers it wins and

24   loses?

25   A    Yes.

Direct Examination - J. Avery

1  Q    And how does Kevel do that?  What type of analysis?

2  A    We use a tool called HubSpot.

3  Q    Does Kevel evaluate its competitors in the market?

4  A    Yes.

5  Q    How does Kevel do that type of analysis?

6  A    It's a lot of kind of going through their documentation

7  and hearing what we hear from customers.  And then we

8  have -- you know, we have product managers that are looking

9  into competitors and things like that.

10  Q    In trying to attract traditional publisher customers

11  today, do you have any understanding of which publisher ad

12  server Kevel loses to most frequently?

13  A    Yeah, I think if we're going after traditional

14  publishers, we -- it's pretty much a foregone conclusion

15  they're going to go with DFP.

16  Q    And what has Kevel observed about the types of

17  publishers that DFP is strongest in attracting?

18  A    Yeah, I think it's all the traditional publishers.

19  Q    Based on what you and Kevel has observed, why has Kevel

20  been unsuccessful at convincing those types of publishers to

21  switch from DFP to Kevel's publisher ad server?

22  A    Yeah, it just goes back to the demand from AdX and the

23  fact that we can't give our customers that same direct

24  connection to AdX that customers of DFP have.

25  Q    Are there any examples of publishers that Kevel failed

Direct Examination - J. Avery

1    to convince to switch from DFP to Kevel's publisher ad

2    server?

3    A    Yeah, we actually had a customer recently where -- they

4    were acquired and eventually churned.  And then they reached

5    back out.  And they said we're interested in moving off of

6    DFP back to Kevel, but we need to have that demand from AdX.

7           And I kind of had a call with them.  And they

8    said, hey, is there a way to do this?

9           And I said, you know, I've reached out -- this is

10   back when I reached out to them again.  I said I've reached

11   out and I'll let you know if I can get a connection to AdX.

12   But since we haven't been able to, that deal hasn't gone

13   anywhere.

14           But they basically said we are ready.  We want to

15   come to Kevel, but if you could solve the AdX problem.

16   Q    Over the past five to ten years, how many publishers

17   have left Kevel to switch to DFP?

18   A    At least dozens.  I don't know exact number.

19   Q    And when Kevel analyzes why those publishers leave

20   Kevel to switch to DFP, what are Kevel's conclusions?

21   A    Yeah, so I think there's really two reasons.  One is

22   that lack of connection to AdX and that demand from Google.

23           And then the second one would be because we've

24   pivoted and we've focused more on retail and native use

25   cases.  Then we're also not building all the tools and

149

Cross-Examination - J. Avery

1   things that a traditional publisher -- a traditional

2   publisher might want.  And so then that customer might leave

3   just because we've kind of shifted markets.

4   Q    And from your perspective running Kevel's business in

5   the ad tech industry for several years, how would you

6   describe Google's position in the market for publisher ad

7   servers for open web display advertising?

8   A    Yeah, they're the dominant player.

9   Q    Why did you describe DFP as being dominant?

10  A    I think that it's probably 90 percent plus of

11  traditional publishers use DFP.

12  Q    Based on your observations and experiences trying to

13  compete in the publisher ad server market, to what do you

14  attribute the fact that DFP is the dominant publisher ad

15  server?

16  A    Yeah, I mean, I think it's the connection -- the tight

17  connection to AdX that other ad servers can't offer.

18          MR. WOLIN:  Thank you, Your Honor.  We have no

19  further questions at this time.

20          THE COURT:  All right.

21          Cross?

22                      CROSS-EXAMINATION

23  BY MS. MORGAN:

24  Q    Good afternoon, Mr. Avery.

25  A    Hello.

                                                              150

Cross-Examination - J. Avery

1    Q    It's nice to see you again.

2    A    Yeah, you too.

3    Q    I'm Erin Morgan.  We met at your deposition.  I'm just

4    going to ask you a few questions this afternoon.

5           First, I just want to make sure I'm clear on what

6    Kevel does.  Kevel considers itself a publisher ad server,

7    right?

8    A    Yes.

9    Q    And the publisher ad server technology Kevel uses is

10   API-based, right?

11   A    Yes.

12   Q    So Kevel's publisher ad serving technology is API-based

13   so customers can use the APIs to create an in-house custom

14   ad server, right?

15   A    Yes.

16   Q    Kevel has made it possible for lots of companies to

17   build their own internal ad platforms, right?

18   A    Yes.

19   Q    Okay.  You've described Kevel as offering a walled

20   garden in a box.  Do you recall that?

21   A    Yes.

22   Q    Okay.  And when you say it's a walled garden in a box,

23   what you mean is that Kevel provides tools that allow

24   companies to set up their own walled gardens, right?

25   A    Yes.

Cross-Examination - J. Avery

1   Q    And Kevel's tools enable the launch of many walled

2   gardens, right?

3   A    Yes.

4   Q    You believe that most publishers want to build custom

5   in-house ad products like Facebook and Amazon have done,

6   right?

7   A    I think the majority of publishers that we're going

8   after do.  I don't know that traditional publishers really

9   want to do that.

10  Q    Kevel has represented to customers and potential

11  customers on its website that traditional publishers are

12  launching walled gardens, though; isn't that right?

13  A    I think a small number are, but I'd say the vast

14  majority are not.

15  Q    Is that qualification on Kevel's website?

16  A    I'm not sure.

17  Q    Let's go to Tab 6.  I'll show it to you.

18       Do you recognize this as a blog post from the

19  Kevel website titled "Why Traditional Web Publishers are

20  Shifting Their Ad Strategy"?

21  A    Yes.

22  Q    And on the first page there's a URL that says

23  kevel.com/blog/traditional-ad-publishers, right?

24  A    Yes.

25  Q    So you can see that this is on Kevel's website?

Cross-Examination - J. Avery

1   A    Yes.

2   Q    And Sarah Wheeler is one of your employees?

3   A    Yes.

4   Q    I'm going to direct you to the third sentence in the

5   first paragraph.

6   A    Okay.

7   Q    The paragraph starts with the words "Traditional

8   publishers."  Do you see that?

9   A    Yes.

10  Q    Okay.  And the third sentence says, "As nontraditional

11  publishers and marketplaces launch walled gardens and see

12  billions in returns, traditional publishers are following

13  suit."

14         Do you agree with that sentence?

15  A    No.  I think this is a little bit of marketing wishful

16  thinking.  So a lot of times we'll publish blog articles to

17  try to attract different types of customers.  And I think

18  here we're hoping that more traditional publishers will do

19  this.  But I can say that we haven't signed any that are

20  really going and doing what we hoped they would do in this

21  article.

22  Q    Are you planning to take this off your website if you

23  don't think it's accurate?

24  A    No.  I think it's an important part of marketing, is to

25  put out ideas of what we think people could do.  So like a

153

Cross-Examination - J. Avery

1    lot of the companies we list in here, you'll notice most of

2    them or I think none of them are Kevel customers because

3    they're really saying -- we're saying, like, we would love

4    that all recipes to go and do this, but they're not doing it

5    yet.

6    Q    Let me direct your attention also to page 4 in this

7    second paragraph.  It starts with the words "due to these

8    limitations."

9              Do you see that?

10   A    Yes.

11   Q    "Due to these limitations, traditional publishers are

12   increasingly launching homegrown ad platforms to drag new

13   revenue and future-proof their ad offerings."

14             Is it your testimony that that's just marketing

15   and that's not true?

16   A    I think it's largely marketing, yes.

17   Q    Well, it took Facebook years to build its in-house ad

18   product.  Companies can use Kevel's tools to build something

19   similar in much less time, right?

20   A    Yes.

21   Q    In fact, using Kevel's tools, a branch can launch its

22   own ad server in anywhere from a couple of weeks to a couple

23   of months, right?

24   A    Yes.

25   Q    You testified earlier a little bit about the fees that

Cross-Examination - J. Avery

1   Kevel's customers pay, and you described two different type

2   of fees.  We talked about this a little bit at your

3   deposition.

4             Is it correct that Kevel's customers pay on

5   average about $100,000 to $120,000 a year to use Kevel's

6   tools to build their own ad platforms?

7   A    Yeah.  I think the average is probably a little bit

8   higher now, but that's roughly, I'd say, the range of

9   average across all our customers.

10  Q    When you say "now," you mean that the range has gone up

11  since you were deposed in 2023?

12  A    Yes.

13  Q    Kevel's lowest cost option is around $25,000 a year,

14  right?

15  A    At the time I think our lowest is more around 80,000

16  now.

17  Q    So it's gone up -- it's tripled in the last year?

18  A    Yes.

19  Q    Over 200 brands have used Kevel, or formerly Adzerk, to

20  launch an ad server; is that right?

21  A    Yes.

22  Q    Some of those brands include Ticketmaster, right?

23  A    Yes.

24  Q    Bed Bath & Beyond?

25  A    Yes.

Cross-Examination - J. Avery

1    Q    Klarna?

2    A    Yes.

3    Q    And Yelp?

4    A    Yes.

5    Q    Publishers who build an ad server using Kevel's tools

6    can use that ad server to serve many different types of ad

7    formats, right?

8    A    Yes.

9    Q    And Kevel represents that to customers and potential

10   customers, right?

11   A    Yes.

12   Q    That includes sponsored listings, correct?

13   A    Yes.

14   Q    Native listings?

15   A    Yes.

16   Q    Banner ads?

17   A    Yes.

18   Q    Video ads?

19   A    Yes.

20   Q    Mobile ads?

21   A    Yes.

22   Q    And digital out-of-home ads, right?

23   A    Yes.

24   Q    Some of Kevel's customers have actually built in-house

25   ad platforms that can serve banner ads, right?

156

Cross-Examination - J. Avery

1    A    Yes.

2    Q    And you testified on direct quite a bit about native

3    advertising.  So I want to ask you some questions about

4    that.

5         Native advertising means integrating ads

6    seamlessly into your feed home page search results, et

7    cetera, right?

8    A    Yes.

9    Q    And native ads can take a variety of different forms:

10   They can be video ads, they can be sponsored listings, they

11   can be in-feed ads, or native skin ads, right?

12   A    Yes.

13   Q    Kevel represents to its customers and potential

14   customers that more and more advertisers are looking to

15   innovative native display ads rather than standard banners,

16   right?

17   A    Yes.

18   Q    That means that more and more native ads are replacing

19   banner ads, right?

20   A    For certain types of publishers, yes.

21   Q    Right.  Well, the words "rather than" in that sentence

22   mean instead of, right?  So what this is saying, what you

23   are saying to Kevel's customers is that more and more

24   advertisers are looking to innovative native display ads

25   instead of standard banners, right?

Cross-Examination - J. Avery

1   A    Yes.  From an advertising perspective, yes.

2   Q    You understand that statement to be true?

3   A    Yes.

4   Q    Kevel also represents to its customers that advertisers

5   are increasing their native ads -- sorry -- their native ad

6   budgets, and they're hoping to capitalize on higher

7   engagement rates of these ad units, right?

8   A    Yes.

9   Q    And Kevel is growing its business by publishers

10  launching or switching to native advertising, right?

11  A    Yes.

12  Q    How many publisher customers do you have who have not

13  previously done digital advertising that launched native

14  advertising with Kevel?

15  A    I don't know the exact number, but there's a number of

16  customers that have never done any sort of other digital

17  that start with native.

18  Q    How many would you say?

19  A    I don't want to guess, but there's maybe a dozen or

20  more.

21  Q    A dozen or more out of the 200?

22  A    Yes.

23  Q    You also testified on direct about retail media.

24       Do you remember that?

25  A    Yes.

Cross-Examination - J. Avery

1   Q    Retail media is another area of growth in digital

2   advertising, right?

3   A    Yes.

4   Q    Some of the largest retail media companies include

5   Amazon, Walmart, Instacart, eBay, Etsy; is that right?

6   A    Yes.

7   Q    Retail media includes ads that run on a retailer's own

8   website or app, right?

9   A    Yes.

10  Q    That that's called on-site retail media.

11  A    Yep.  Yes.

12  Q    And retail media also offers offsite retail media,

13  right?

14  A    Yes.

15  Q    Offsite retail media is advertising that's placed in

16  third-party channels, like social media networks or other

17  websites or connected TV platforms, right?

18  A    Yes.

19  Q    The growth of retail media is a recent trend in the

20  ad tech industry, right?

21  A    Yes.

22  Q    Kevel has recently deepened its focus on retail media?

23  A    Yes.

24  Q    In March 2024, Kevel launched its retail media cloud,

25  which provides tools to build differentiated world-class

159

Cross-Examination - J. Avery

1  retail media networks, right?

2  A     Yes.

3  Q     And your view is that the next phase of retail media is

4  about bringing it into the programmatic ecosystem, making it

5  less about walled gardens and more about open access, right?

6  A     I believe that's part of the next wave, yes.

7  Q     When you say it's part of the next wave, do you recall

8  that you've made that exact statement before?

9  A     Yes.

10  Q     Okay.  And do you think that you clarified that it was

11  part of the next wave when you made that statement

12  previously?

13  A     I think it's -- I think it's part of what we're seeing

14  in the industry.  Like, I think we also see in-housing as

15  another big part, which I think is one of the first things

16  you quoted, which was that we see retailers taking their

17  technology in-house, but we also think that they're going to

18  open the doors up to have programmatic demand come into

19  retail platforms.

20  Q     One of the things you testified about on direct is that

21  part of your job is assessing Kevel's competition, right?

22  A     Yes.

23  Q     You spent time in your job comparing Kevel to Google,

24  right?

25  A     Yes.

Cross-Examination - J. Avery

1    Q    In fact, you testified about that on your direct,

2    correct?

3    A    Yes.

4    Q    Kevel tells customers on its website why brands

5    normally use Google's ad server, right?

6    A    Yes.

7    Q    Kevel represents to customers that one of the reasons

8    brands use Google's ad server is because it's free to anyone

9    with under 90 million monthly impressions and no other

10   vendor offers such a deal, right?

11   A    Yes.

12   Q    So the kind of entities that have under 90 million

13   monthly impressions are mostly small to medium publishers,

14   right?

15   A    Correct.

16   Q    So you understand that Google's publisher ad server is

17   free to small to medium publishers, right?

18   A    Yes.

19   Q    And you believe that one of the reasons Google's ad

20   server is widely adopted is because it's a deal for small

21   and medium publishers?

22   A    Yes.

23   Q    Kevel also represents to customers that another reason

24   brands use Google's ad server is because it provides instant

25   access to their AdX exchange, potentially increasing the

Cross-Examination - J. Avery

1    CPMs publishers make from programmatic ads, right?

2    A    Yes.

3    Q    I think this is in the glossary that's been presented

4    to the Court, but can you just clarify what CPMs mean?

5    A    Yeah.  So it's like cost per mil, so the cost per a

6    thousand ad impressions.

7    Q    So what you're saying here is that publishers make more

8    money from using GAM?

9    A    Yes.

10   Q    And you believe that's important to publishers, right?

11   A    Yes.

12   Q    Kevel also represents to customers and potential

13   customers that a third reason Google's ad server is widely

14   adopted is because it's reliable both from an infrastructure

15   perspective and a business one?

16   A    Yes.

17   Q    And you agree that Google's ad server is widely adopted

18   because it is reliable from both an infrastructure and

19   business perspective, right?

20   A    One of the reasons, yes.

21   Q    You testified on direct that Google would not permit

22   integration of real-time AdX bids into Kevel.

23        Do you remember that?

24   A    Yes.

25   Q    Real-time bids from AdX have never been available to

Cross-Examination - J. Avery

1    Kevel, correct?

2    A     Correct.

3    Q     And to the best of your knowledge, Google does not

4    integrate its ad exchange with other non-Google third-party

5    publisher ad servers the same way Google integrates AdX with

6    DFP, right?

7    A     Correct.  No other ad servers have had that access to

8    AdX.

9    Q     What you want is for Google to integrate AdX with

10   Kevel's publisher ad server in the same way that Google

11   integrates AdX with Google's publisher ad server; isn't that

12   right?

13   A     Yes.

14   Q     Specifically, your request was that Kevel have the same

15   access to real-time bids from AdX that DFP has, correct?

16   A     Yes.

17   Q     You haven't done any engineering work on Google's

18   tools, have you?

19   A     No.

20   Q     And you don't know how technically challenging it would

21   be for Google to integrate AdX with Kevel's publisher ad

22   server in the same way that Google integrates Google's ad

23   exchange with Google's publisher ad server?

24   A     No, I don't know their internal tech.

25   Q     You've also never worked at a publisher yourself,

163

Cross-Examination - J. Avery

1   right?

2   A    I ran a couple of small ad networks, but I didn't work

3   directly at a publisher.

4   Q    And you've never worked at an ad exchange, right?

5   A    Correct.

6   Q    So to the extent you gave testimony today about what

7   would be good or bad for publishers, that's based on

8   conversations you had with publishers, right?

9   A    Yeah.  Like the 13 years of conversations with our

10  customers.

11  Q    You also testified that AdX is the largest ad exchange

12  in terms of size, right?

13  A    Yes.

14  Q    Your only basis for saying that is -- that AdX is the

15  largest ad exchange for programmatic display advertising is

16  publishers you talked to, right?

17  A    Yes.

18  Q    I'd like to put up PTX 758, which is the document that

19  the DOJ counsel showed you.  And I want to go to the second

20  page of this document.  Do you remember that you just

21  testified about the second email in this page that starts

22  with the sentence "always happy to help"?

23  A    Yes.

24  Q    Do you see that?

25          The government asked you to read starting from the

Cross-Examination - J. Avery

 1   third paragraph down.  I'm going to ask you to read the

 2   second paragraph.  Can you read that out loud.

 3   A     Yeah.  "But AdX is almost completely tied"?  That one?

 4   Q     Oh, no.  The paragraph above that, "I don't know."

 5   A     "I don't know if AdWords bids on other exchanges, but

 6   their DSP definitely bids across lots of different

 7   exchanges."

 8   Q     AdWords is now called Google Ads, right?

 9   A     Yes.

10   Q     So you don't know if Google Ads bids on other

11   exchanges, right?

12   A     Correct.

13   Q     And it says here, "their DSP" -- and you're referring

14   to Google's DSP, right?

15   A     Yes.

16   Q     And by "their DSP," you're referring to DV360, right?

17   A     Yes.

18   Q     So you understand that DV360 definitely bids across

19   lots of different exchanges, correct?

20   A     Yes.

21   Q     And you understood that in 2019 when you wrote this

22   email?

23   A     Yes.

24   Q     You've testified about the demand that's available in

25   the AdX.  DV360 is part of that demand, right?

Cross-Examination - J. Avery

1   A    Yes.

2   Q    And so is Google Ads, right?

3   A    Yes.

4   Q    So you don't know if Google Ads bids into anything

5   else; and you know DV360 does, correct?

6   A    Correct.

7   Q    Kevel also advertises, right?

8   A    Yes.

9   Q    In fact, Kevel uses Google's advertising tools, right?

10  A    We do.

11  Q    And as an advertiser, Kevel has gotten a good return on

12  investment using Google's advertising tools, right?

13  A    Yes.

14  Q    If you didn't get a good return on the investment, you

15  would shift your ad spend to a different supplier, right?

16  A    Correct.

17  Q    You stated in 2020 that you were aware that the

18  Department of Justice was investigating Google and if they

19  are forced to open up AdX, it could be good for Kevel,

20  right?

21  A    Absolutely.  Yes.

22  Q    And by "they opening up AdX," you were referring to

23  Google, right?

24  A    Yes.

25  Q    What you meant by that is that Kevel would financially

Cross-Examination - J. Avery

1   benefit if Google was forced to open up AdX, right?

2   A    If we could compete in the traditional publisher

3   market, it would be good for Kevel.

4   Q    Around that same time in 2020, do you remember also

5   telling people that you had a good, long couple of calls

6   with the Department of Justice?

7   A    Yes.

8   Q    Okay.  Was that true?

9   A    Yes.

10  Q    You also met with the Department of Justice at least

11  once after they filed their complaint, right?

12  A    Yes.

13  Q    When you met with the Department of Justice, did you

14  tell the Department of Justice's lawyers that Kevel tools

15  allow publishers to set up an in-house ad server in as

16  little as two weeks?

17  A    I don't remember exactly the conversation.

18  Q    Did you tell the Department of Justice's lawyers that

19  you thought the future of growth in the industry was in

20  retail media?

21  A    I don't remember.

22  Q    Did you tell the Department of Justice that Kevel stood

23  to financially benefit from a breakup of Google's ad tech

24  business?

25  A    I think I told them that it would be a benefit to us if

                                                              167

Redirect Examination - J. Avery

1   we could compete in the traditional publisher market where

2   we can't compete today.  And it was a matter of if we could

3   get access to that AdX direct demand just like GAM has.

4   Q    So you did tell them that Kevel could financially

5   benefit from a breakup of --

6   A    I don't think I used those exact words.  But I said it

7   would be -- I think it would be good for us and the

8   industry.

9          MS. MORGAN:  I have no further questions.

10         THE COURT:  All right.

11         Redirect?

12         MR. WOLIN:  Very briefly, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. WOLIN:

15  Q    Mr. Avery, let's start with that last point.

16         Counsel from Google asked you about benefiting

17  financially if AdX was forced to integrate with Kevel.

18         Do you recall that?

19  A    Yes.

20  Q    Would Kevel's customers benefit if that occurred?

21  A    Yeah, I think our customers would benefit.  They would

22  get access to demand they don't have access to today.  And

23  then I think all our potential future customers would

24  benefit because they would have choice in what ad server

25  they pick.

Redirect Examination - J. Avery

1   Q    You were also asked about Kevel's use of Google tools

2   to place advertising.  Do you recall that?

3   A    Yes.

4   Q    Why does Kevel use Google's tools to purchase display

5   advertising?

6   A    I mean, Google is, like, the default search engine that

7   everyone uses.  So pretty much every brand has to go to

8   Google if they want to show up on Google's page.

9   Q    When Kevel places advertisements, would Kevel prefer

10  more choices to purchase display advertising?

11  A    Yeah, I mean, if I could avoid giving one of my

12  competitors money, I would.  But I think we all know that

13  the Google search engine is something you pretty much have

14  to buy ads on if you're a brand.

15          MR. WOLIN:  Thank you, Your Honor.  Nothing else.

16          THE COURT:  Any recross?

17          MS. MORGAN:  None from me, Your Honor.

18          THE COURT:  All right.

19          Does anybody anticipate calling Mr. Avery again?

20          MR. WOLIN:  No, Your Honor.

21          THE COURT:  How about from the defense?

22          MS. MORGAN:  No, Your Honor.

23          THE COURT:  All right, then, sir, you are excused

24  as a witness.  We're going to be closing down the trial for

25  today pretty soon because I have housekeeping matters.  So

169

Redirect Examination - J. Avery

1   you can come back tomorrow if you want to watch the

2   proceedings, but you're not to discuss your testimony with

3   any witness who has not yet testified.   Thank you.

4            THE WITNESS:   Okay.   Thank you.

5            THE COURT:   You're free to go.

6            Where are we in terms of the government's case?

7   About where you thought we'd be?

8            MS. WOOD:   Your Honor, you continue to move us

9   along.   So we are actually ahead of schedule even on

10  day one.   We -- at least on our estimate, we're at least one

11  or one and a half witnesses ahead of where we had

12  anticipated.

13           THE COURT:   All right.   Now, so that we don't have

14  any problems, I'm going to have us read the very few

15  exhibits that were actually formally admitted today.

16           However, there's been so much discussion about

17  these demonstratives.   And because of the public and media

18  interest in the case, are you comfortable in having the

19  demonstratives that have been discussed in the trial today

20  also appearing on what we're calling the -- is it a joint

21  website?   I don't know what you-all have set up for access.

22           MS. WOOD:   I believe they're separate websites,

23  but we are comfortable having the plaintiffs' demonstratives

24  appear.

25           I know there were some of defendant's

1    demonstratives that were really in a slightly different

2    format.  There were more documents that they just weren't

3    offering, Bates-stamped documents, for example, that they

4    weren't offering.

5             THE COURT:  Well, I'm talking about the nice

6    visuals.

7             MS. WOOD:  Exactly.  So visual documents, I

8    completely agree should be up on the websites.  And we have

9    no problem with that, Your Honor.

10             THE COURT:  All right.

11             How about Google?  Are you comfortable with any of

12    the nontextual -- in other words, the graphs?

13             MR. ISAACSON:  Any of them regardless of what

14    counsel thinks is visual, yes.

15             THE COURT:  All right.  That's fine.  I'm assuming

16    you can agree on that.

17             Then for the record, let's read in what we

18    believe -- I think there were only three exhibits that were

19    actually admitted.

20             For the record, who is keeping track?

21             THE COURTROOM DEPUTY:  All right.  DTX 994, DTX

22    1340, and PTX 758.

23             MS. WOOD:  That's what I have, Your Honor.

24             THE COURT:  All right.

25             Does Google agree with that?

1          MS. RHEE:  Yes, Your Honor.

2          THE COURT:  All right.  So the only things that --

3     so that everybody knows -- that are going to be appearing on

4     the sites -- probably tonight, I would think -- well, maybe

5     by 10:00 tomorrow morning are the demonstrative exhibits and

6     those three.  All right?  Nothing else.

7          MS. WOOD:  Yes, Your Honor.

8          THE COURT:  I would like to make sure that we have

9     a list of the witnesses you are planning to call.  And be

10    generous.  All right?  Because I'm already hearing a lot of

11    repetition.  I've heard it once; I've heard it twice.  I've

12    got your glossary.  Make sure you streamline the testimony

13    tomorrow so I don't have to hear the same definitions over

14    again.  All right?

15         MS. WOOD:  Understood, Your Honor.

16         THE COURT:  Okay.  And so you give us the witness

17    list for tomorrow.  All right?

18         MS. WOOD:  Do you want me to give you that now, my

19    anticipation, or give that in the morning?  When would the

20    Court prefer?

21         THE COURT:  It's fine in the morning.  You should

22    exchange it, if you haven't already, with Google so

23    everybody knows what's going on.  All right?

24         MS. WOOD:  We have.

25         THE COURT:  Is there anything else we need to

1    address?

2              MS. WOOD:  No, Your Honor.

3              THE COURT:  All right.  Very good.  So I'm giving

4    you a few extra minutes tonight to recover.  And we'll see

5    you tomorrow morning at 9:00.

6              MS. WOOD:  Thank you, Your Honor.

7              (Proceedings adjourned at 5:44 p.m.)

8              -----------------------------------

9

10

11

12

13

14

15

16

17

18

19

20

21

22        I certify that the foregoing is a true and

23    accurate transcription of my stenographic notes.

24

                              _____
                                        /s/
25                            Rhonda F. Montgomery, CCR, RPR

                                                               173