```
 1                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF VIRGINIA
 2                           ALEXANDRIA DIVISION

 3      --------------------------x
        UNITED STATES, et al.,     :    Civil Action No.:
 4                                 :    1:23-cv-108
                   Plaintiffs,     :
 5         versus                  :    Tuesday, September 10, 2024
                                   :    Alexandria, Virginia
 6      GOOGLE LLC,                :    Day 2 p.m.
                                   :    Pages 1-107
 7                 Defendant.      :
        --------------------------x
 8

 9          The above-entitled bench trial was heard before the
        Honorable Leonie M. Brinkema, United States District Judge.
10      This proceeding commenced at 2:00 p.m.

11                      A P P E A R A N C E S:

12      FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                               OFFICE OF THE UNITED STATES ATTORNEY
13                             2100 Jamieson Avenue
                               Alexandria, Virginia  22314
14                             (703) 299-3700

15                             JULIA TARVER WOOD, ESQUIRE
                               AARON TEITELBAUM, ESQUIRE
16                             JEFFREY VERNON, ESQUIRE
                               KATHERINE CLEMONS, ESQUIRE
17                             UNITED STATES DEPARTMENT OF JUSTICE
                               ANTITRUST DIVISION
18                             450 Fifth Street, NW
                               Washington, D.C.  20530
19                             (202) 894-4266

20      (State of VA)          TYLER HENRY, ESQUIRE
                               OFFICE OF THE ATTORNEY GENERAL
21                             OFFICE OF THE SOLICITOR GENERAL
                               202 North Ninth Street
22                             Richmond, Virginia  23219
                               (804) 786-7704

23

24

25          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
                                                               1
```

```
 1                      A P P E A R A N C E S :

 2   FOR THE PLAINTIFFS:      ELLIOTT DIONISIO, ESQUIRE
     (State of CA)            OFFICE OF THE CALIFORNIA ATTORNEY
 3                            GENERAL
                              300 South Spring Street
 4                            Suite 1700
                              Los Angeles, California  90013
 5                            (213) 269-6681

 6   (State of NY)            MORGAN FEDER, ESQUIRE
                              OFFICE OF THE NEW YORK
 7                            ATTORNEY GENERAL
                              28 Liberty Street
 8                            20th Floor
                              New York, New York  10005
 9                            (212) 416-8262

10   FOR THE DEFENDANT:       CRAIG REILLY, ESQUIRE
                              LAW OFFICE OF CRAIG C. REILLY
11                            209 Madison Street
                              Suite 501
12                            Alexandria, Virginia  22314
                              (703) 549-5354
13
                              JUSTINA SESSIONS, ESQUIRE
14                            FRESHFIELDS BRUCKHAUS DERINGER, LLP
                              855 Main Street
15                            Redwood City, California  94063
                              (212) 277-4000
16
                              JEANNIE RHEE, ESQUIRE
17                            WILLIAM ISAACSON, ESQUIRE
                              MARTHA GOODMAN, ESQUIRE
18                            PAUL, WEISS, RIFKIND,
                              WHARTON & GARRISON LLP
19                            2001 K Street, NW
                              Washington, D.C.  20006
20                            (202) 223-7300

21   COURT REPORTER:          RHONDA F. MONTGOMERY, CCR, RPR
                              Official Court Reporter
22                            United States District Court
                              401 Courthouse Square
23                            Alexandria, Virginia  22314
                              (703) 299-4599
24                            RMontgomery@courtreport.net

25
                                                                    2
```

```
 1                        TABLE OF CONTENTS

 2                            WITNESSES

 3    On behalf of the Plaintiff:

 4    JAY FRIEDMAN
```

```
 5    Direct examination by Ms. Clemons  .......4
      Cross-examination by Ms. Goodman ..........5
 6    Redirect examination by Ms. Clemons .......49

 7    EISAR LIPKOVITZ (read)

 8    Direct examination by Ms. Wood ...........72

 9    EISAR LIPKOVITZ (by video)................107
```

```
10

11                            MISCELLANY
```

```
12    Proceedings September 10, 2024 ...........4
      Certificate of Court Reporter ............107
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Direct Examination - J. Friedman

1              P R O C E E D I N G S

2              THE COURT:  All right.  Mr. Friedman, you're still

3    on the stand.

4                   DIRECT EXAMINATION (resumed)

5    Q    Mr. Friedman, before we broke for lunch, we were

6    talking about products that Goodway uses for brand safety

7    and fraud and malware protection.

8              Do you recall that?

9    A    I do.

10   Q    And I believe that you mentioned that Google has said

11   that they have features that do some brand safety and

12   antifraud protection in their products.

13   A    Yes.

14   Q    Does Goodway rely on Google as the primary source of

15   protection from fraud and malware?

16   A    No.

17   Q    And the other products that you use for fraud

18   protection and malware, are you able to turn those off for

19   certain purchases and not for others?

20   A    Yeah, I want to clarify because malware and fraud are

21   very, very different.  And so malware is not something we

22   typically deal with much.  The technology providers

23   themselves typically handle that top to bottom.  Ad fraud,

24   which is different, is something that we have to pursue

25   ourselves.

                                                          4

Cross-Examination - J. Friedman

1  Q    And so for ad fraud is Google one of the tools that you
2  primarily rely on?
3  A    No.
4  Q    And the tools that you do rely on, are you able to turn
5  those on or off depending on which purchases that you are
6  making?
7  A    Yes.
8  Q    Do you use those tools when making display ad purchases
9  through AdX?
10 A    Yes.
11 Q    Do you use those tools when making display ad purchases
12 through other exchanges?
13 A    Yep.
14         MS. CLEMONS:  That's all I have.  I'll pass the
15 witness.
16         MS. GOODMAN:  May I proceed?
17         THE COURT:  Yes.
18                    CROSS-EXAMINATION
19 BY MS. GOODMAN
20 Q    Good afternoon, Mr. Friedman.  I'm Martha Goodman.  I'm
21 a lawyer for Google.  I'm going to be asking you some
22 questions today.
23         You wrote a book titled "30 Days to Paid Digital
24 Media Expertise," correct?
25 A    Yes.

Cross-Examination - J. Friedman

1   Q    And the latest edition was published in 2016, right?

2   A    I don't recall.

3   Q    Okay.  Do you recall there being eight editions of the

4   book?

5   A    I do.

6   Q    And the last edition was the eighth?

7   A    Yes.

8   Q    You also wrote a book in 2019 titled "Prove Your

9   Advertising Works," right?

10  A    Yes.

11  Q    And I want to talk a bit about your books.  We'll start

12  with the book "30 Days to Paid Digital Media Expertise."  In

13  that book, you tell advertisers in the chapter titled

14  "Social Platforms - Instagram, Twitter, Facebook, and More"

15  that all media is just media, right?

16  A    I don't recall.

17  Q    Okay.  Let's look at Tab 4 in the binder.

18            THE COURT:  Wait.

19            Whether you told them that or not, is that your

20  view that all media is the same?

21            THE WITNESS:  Can I contextualize it?

22            THE COURT:  Yes.

23            THE WITNESS:  Yeah, so all media must work toward

24  a marketer's goal.  And --

25            THE COURT:  From a marketer's standpoint?

Cross-Examination - J. Friedman

1            THE WITNESS:  Right.  From a --

2            THE COURT:  They have other purposes in life.

3            THE WITNESS:  Right.  Now, each have different

4    purposes and serve different purposes, but from a marketer's

5    standpoint, they should not be biased toward one medium or

6    another based on the performance as long as performance is

7    considered.

8    BY MS. GOODMAN

9    Q    If you could turn to Tab 4, please, in your binder.

10   A    Yep.

11   Q    To refresh your recollection --

12   A    Sure.

13   Q    -- this is the chapter that I was just referencing on

14   social platforms, right?

15   A    Okay.  Sure.

16   Q    And under "Planning," it says all media is just media,

17   right?

18   A    It does.

19   Q    And that's a simplistically profound point of view?

20   A    I thought so at the time.

21   Q    Do you think that today?

22   A    I think there's more nuance today.

23   Q    And it's your view that, while social media has

24   different aspects than TV or even other digital media, it's

25   not time to start over and rewrite the rule book?

Cross-Examination - J. Friedman

1    A    Absolutely.

2    Q    And so what you tell advertisers is, for any new ad

3    product, to ask yourself does it help me better identify my

4    audience and is it likely to generate a better return on the

5    money I'm spending on it?  Right?

6    A    Yes.

7    Q    And you tell advertisers notice this is not asking if

8    it helps get a better price, correct?

9    A    Correct.

10   Q    So the advice you give advertisers is to focus on the

11   audience, the return on investment, and not on price,

12   correct?

13   A    There's more nuance to it than that, but literally that

14   is what it says.

15   Q    That's what's in your book, right?

16   A    Yes.

17   Q    Now, you've also advised digital advertisers to buy

18   users and not websites, right?

19   A    That is one piece of advice.

20   Q    Okay.  And that's in the piece of advice you have

21   given -- one piece of advice you've given to advertisers,

22   right?

23   A    Well, let me clarify.

24   Q    No.  I'm just asking, sir -- I'm sorry -- if that is

25   one piece of advice.  If my colleague would like you to

8

Cross-Examination - J. Friedman

1    clarify, she can ask you.

2             But I just want to know is one piece of advice

3    you've given advertisers to buy users and not websites?

4    A    Well, if it says that, then that was a piece of advice

5    I gave.

6    Q    Okay.  Well, let me refresh your recollection.  If you

7    turn to Tab 7 in your binder, please.

8             And you see this is also a page from your book --

9    A    Yep.

10   Q    -- "30 Days to Paid Digital Media Expertise."  And at

11   the top you wrote, "As we've mentioned many other times in

12   this book, it's important to focus on buying users and not

13   sites when it comes to online marketing," correct?

14   A    Correct.  That's what it states.

15   Q    Okay.  And so here, are you telling advertisers to buy

16   their audience wherever they may be found?

17   A    I don't believe I say that.

18   Q    Okay.  But is that the sum and substance of the advice

19   that you're giving here, to buy users wherever they may be

20   found and not sites?

21   A    No.  I would not say that is the sum -- I don't know

22   what you just said, sum and substance.  But --

23   Q    Okay.  And you are aware that there are seven out of

24   ten U.S. adults on Facebook today, right?

25   A    I'm not aware of the exact number.

Cross-Examination - J. Friedman

1    Q    Does that sound to be an about correct percentage,

2    seven in ten American adults on Facebook?

3              MS. GOODMAN:  Objection, Your Honor.  We've

4    established that he's not aware.

5              THE COURT:  I'll sustain the objection.

6    BY MS. GOODMAN

7    Q    And so social media platforms like Facebook have a very

8    wide audience, correct, a large audience?

9    A    I would say that, yes.

10   Q    Okay.  And it is likely that the audience that is

11   available to advertisers on a social network like Facebook

12   would include some Ritz-Carlton customers as well as Ramada

13   customers, correct?

14   A    Yes.

15   Q    And I'm referring back to the analogy that you offered

16   in your direct exam this morning.

17             And so when you were comparing on your direct

18   examination to buying direct -- to buying display ads -- to

19   buying social media ads as a comparison between the Ramada

20   and the Ritz-Carlton, you're really making a comparison

21   between two different sites in two different parts of town,

22   right?

23   A    I'm making a comparison of two different sites.

24   Whether or not they're in the same part of town is

25   irrelevant.

Cross-Examination - J. Friedman

1   Q    Well, that is what you said on direct, sir, right?

2   That the two different sites, Ritz-Carlton and Ramada, would

3   likely be in two different parts of town?

4   A    They often will, yes.

5   Q    Okay.  And so when you're telling advertisers to buy

6   users, you're not telling them to focus on the site where

7   they are but rather wherever they may be found, correct?

8   A    That is what's written.

9   Q    Now, you spoke on direct exam about the marketing

10  funnel, correct?

11          Do you recall that?

12  A    Yes.

13  Q    Okay.  And I want to put up a demonstrative that we've

14  used in court before but you haven't seen before.

15          Matt, could you put up -- this is Lowcock

16  Demonstrative 1.

17  A    Yep.

18  Q    Does this look to you like a very simplistic schematic

19  of the marketing funnel?

20  A    Yes.

21  Q    And you agree that the upper funnel goals or the top

22  funnel goals usually focus on awareness?

23  A    Typically, that is -- that is one common outcome or

24  goal.

25  Q    Okay.  So you agree that upper funnel goals usually

                                                        11

Cross-Examination - J. Friedman

1    focus on awareness?

2    A    I wouldn't say usually; I'd say that is one common

3    outcome or goal.

4    Q    Okay.  Can you turn to Tab 8 in your binder, please.

5    A    Yes.

6    Q    And do you recognize this as a blog post available on

7    goodwaymedia.com dated August 21, 2018?

8    A    It certainly appears as such.

9    Q    Okay.  And if I could direct your attention to the

10   bottom five lines where it says, "Let's dive into which

11   goals best match the different parts of the sales funnel."

12   Do you see where I am?

13   A    Yes.

14   Q    Okay.  And you agree your website says, "Upper funnel

15   goals usually focus on awareness since you're attracting

16   customers who might not be aware of your product or might be

17   casually browsing."

18        That's what your website says?

19   A    That's what it says.

20   Q    Okay.  And you have advised advertisers that display

21   advertising can support upper funnel goals, correct?

22   A    It can.

23   Q    Okay.

24        Matt, if you could bear with -- or do a little --

25   follow along with me.  If you could put a red box around the

Cross-Examination - J. Friedman

1    upper funnel and put display advertising in that, that would

2    be helpful as we go along, please.

3              And you've also advised advertisers that other

4    upper funnel ad channels to help drive awareness include

5    advanced TV, correct?

6    A    That's a possibility, yes.

7    Q    Okay.

8              Let's add advanced TV in that red box.

9              And you've advised advertisers that online video

10   is an upper funnel ad channel to help drive awareness,

11   correct?

12   A    I did at a time.

13   Q    Okay.  And that's still on your website today, isn't

14   it?

15   A    Apparently so.

16   Q    I'm sorry?

17   A    Apparently so.

18   Q    Okay.

19             Let's add advanced TV.  Okay.  Great.?

20             MS. GOODMAN:  I'm sorry.  Online video, please,

21   Matt, add to the funnel.

22             And you've also advised advertisers that

23   cross-device display is an upper funnel ad channel to help

24   drive awareness, correct?

25   A    If you point me to where I said that.

                                                              13

Cross-Examination - J. Friedman

1   Q    Sure.  We're in Tab 8 of your binder still.

2            And if you go to the second page of it, it's

3   really at the top.  Can you just read that first full

4   sentence --

5   A    Yeah.  Sure.

6   Q    -- into the record beginning "media channels."

7   A    "Media channels to help drive awareness include

8   advanced TV or online video.  Cross-device display can also

9   factor into upper funnel goals by using broader targeting

10  tactics like site targeting or demographic targeting."

11  Q    Thank you.

12           And you advise advertisers that cross-device

13  display can help reach consumers because they split their

14  time across all of their devices like mobile phones,

15  tablets, and desktops, correct?

16  A    Yes.

17  Q    And you agree that the industry is constantly evolving

18  to create targeting options that work across multiple

19  channels, right?

20  A    Yes.

21  Q    Now, in prior editions of your book "30 Days to Paid

22  Digital Media Expertise," you outlined consumer targeting

23  approaches channel by channel, correct?

24  A    I don't know.

25  Q    You don't remember?

14

Cross-Examination - J. Friedman

1   A    No, I don't remember.

2   Q    Okay.  But in your 2016 edition, the eighth edition,

3   you said that that approach was outdated, correct?

4   A    I believe you if you're bringing it up, but I don't

5   remember.

6             THE COURT:  You have to step back --

7             THE WITNESS:  Oh, sorry.

8             I said I believe her if she's bringing it up, but

9   I don't remember.  I mean, it was eight years ago.

10  BY MS. GOODMAN

11  Q    Sure.  Let me refresh your recollection.  We can go to

12  Tab 10 of your binder.

13  A    Sure.

14  Q    This is another excerpt of your book "30 Days,"

15  "Deploying Targeting and Digital," Chapter 24.  Do you see

16  where I am?

17  A    I'm sorry.  Page?

18  Q    I'm sorry.  Tab 10, and go to page 110.

19  A    Okay.

20  Q    Well, yes.

21            And you see the first --

22  A    Ah, yes.

23  Q    -- full paragraph in the middle of the page in previous

24  editions of this book.  Do you see where I am?

25  A    Yes, I do.

Cross-Examination - J. Friedman

1   Q    Okay.  And you wrote that "In previous editions of this

2   book, we outlined targeting approaches channel by channel;

3   but with the ever-changing technological advances of this

4   industry, this approach would result in this book being

5   outdated within two weeks' time."

6        You wrote that, yes?

7   A    I did.

8   Q    On your direct examination with my colleague

9   Ms. Clemons, you talked about different forms of advertising

10  like native, banner, and in-stream video.  Do you recall

11  that?

12  A    I do.

13  Q    And it's your belief that an effective alternative to

14  native and banner ads is in-stream video, correct?

15  A    I'm sorry.  Can you repeat the question.

16  Q    Sure.

17       It's your belief that an effective alternative to

18  native and banner ads is in-stream video, correct?

19  A    No.  I did not say that.  And if I did, I need to

20  correct myself.

21  Q    All right.

22       Well, Matt, if you can please put up Tab 16 on the

23  screen.

24       And you can turn to it too in your binder,

25  Mr. Friedman.  I asked to put it on the screen because it's

Cross-Examination - J. Friedman

1   kind of hard to read in the binder.

2              This is a Quora post that you made about nine

3   years ago, correct?

4   A     Sure.

5   Q     Yeah.  And at the top the question is, "Is there an

6   effective alternative to native and banner ads?"

7              Do you see that?

8   A     I do.

9   Q     And you wrote, "How about in-stream video?"

10             Correct?

11  A     Yes.

12  Q     Okay.  And you wrote that nine years ago, right?

13  A     Yes.

14  Q     Now, Quora, you understand, is a social media platform,

15  right?

16  A     Yes.

17  Q     And users post questions, and other users post answers?

18  A     Yes.

19  Q     And the idea of Quora is to connect people who have

20  knowledge about a subject to the people who are asking

21  questions about a subject?

22  A     Yes.

23  Q     Okay.  And when you post on Quora, you attempt to be

24  accurate?

25  A     Yes.

Cross-Examination - J. Friedman

1    Q    Now, you also talked on direct examination about

2    programmatic ad buying.  And it is correct, sir, that you

3    can buy programmatically across all types of ad inventory,

4    correct?

5    A    Certainly the majority.  I don't know about all, but

6    I'd have to spend some time thinking about if there are

7    exceptions.

8    Q    Okay.  Let's go to Tab 18 in your binder.  This is also

9    a blog posted on your website goodwaymedia.com, yeah?

10   A    Yes.

11   Q    Okay.  And if you go to the second page, about five

12   lines down, where it says, "All types of inventory are

13   available programmatically, including premium sites."

14         Do you see that?

15   A    I do.

16   Q    And that's on your website today?

17   A    I don't know.  But if you're telling me it is, I have

18   no reason to not believe you.

19   Q    Okay.  And the post that I'm just reading from your

20   blog dated October 26, 2016.  Does that lead you to believe

21   that this has been on your website since 2016?

22   A    Yes.

23   Q    And so when all types of inventory are available

24   programmatically, that means an advertiser can buy

25   programmatically on a site like *The New Yorker* or *The Wall*

18

Cross-Examination - J. Friedman

1    *Street Journal*?

2    A    I don't believe I wrote this article, but I believe it

3    does say this.

4    Q    Okay.  Your employee Amanda Benoist wrote this article,

5    yeah?

6    A    Yeah, it looks to be.

7    Q    And as CEO you stand by what's on your website?

8    A    Broadly, yes.

9    Q    And programmatic ad inventory such as preroll on

10   Twitter, now X, can also be purchased programmatically,

11   correct?

12   A    Correct.  I don't recall.

13   Q    All right.  Well, let's look back at that Tab 18.  Just

14   a little bit further down on page 2.

15           MS. CLEMONS:  Objection, Your Honor.  This is

16   hearsay and improper impeachment.  He didn't write this

17   article.

18           THE COURT:  Well, I think it's simply meant to

19   possibly impeach, right?

20           MS. GOODMAN:  That's correct, and to refresh his

21   recollection as to whether --

22           THE COURT:  Overruled.

23           MS. CLEMONS:  Thank you.

24   BY MS. GOODMAN

25   Q    Okay.  So here in the middle of the page it says, "It's

                                                                    19

Cross-Examination - J. Friedman

1   no longer unheard of to buy a site like *The New Yorker* or

2   *The Wall Street Journal* programmatically."

3           Do you see that?

4   A    Yes.

5   Q    "As well as preroll on Twitter."  Do you see that?

6   A    I do.

7   Q    "And hyperlocal mobile inventory."  Do you see that?

8   A    I do.

9   Q    Okay.  So all of those kinds of ads can be bought

10  programmatically, correct?

11  A    At that time, that's what Amanda said.

12  Q    All right.  And how about today?  Can those types of

13  inventory be bought programmatically today?

14  A    I don't believe X can be bought programmatically, but I

15  don't know specifically.  It may be available on some

16  platforms; but the others, by and large, yes.

17  Q    And programmatic advertising allows an advertiser to

18  streamline all of those buys programmatic on *The New Yorker*,

19  *The Wall Street Journal*, preroll on Twitter, and hyperlocal

20  mobile inventory into a single platform, right?

21  A    Is that specifically what it says?

22  Q    Sure.  I can refresh your recollection that that is

23  what it says.

24          If you go back to the first page at the very

25  bottom, "programmatic allows you to streamline all of that

                                                                20

Cross-Examination - J. Friedman

1   into a single platform."

2         Do you see that?

3         At the very bottom.

4   A    Oh.  But that's not referring to what you just said

5   before.  This says, "programmatic allows you to streamline

6   all of that," referring to the lines above, which are

7   traditional ad buying, negotiating a rate, signing an IO,

8   running separate formats, and trafficking multiple tags.

9   Q    Okay.  If you turn back to page 2.

10  A    Yep.

11  Q    With programmatic -- I'm sorry.  I'm in the middle of

12  the page.  It's correct, sir, that programmatic is a

13  one-stop shop to access global inventories across display,

14  mobile, and TV, correct?

15  A    Yes.  That's what it says.

16  Q    And you stand by that?

17  A    Today maybe not as entirely; but back then, I think

18  that was a reasonable thing to believe.

19  Q    In 2016 that was a reasonable thing to believe?

20  A    Yes.

21  Q    Okay.  You also testified on direct examination about

22  programmatic direct.  Do you recall that?

23  A    I do.

24  Q    Is that another way of -- another term for programmatic

25  guaranteed?

Cross-Examination - J. Friedman

1    A    Yes.

2    Q    Okay.  And it is true, sir, that programmatic direct

3    can be a mix of open auction and private deals, correct?

4    A    No, not to how I would define it.

5    Q    How would you define it?

6    A    So if programmatic direct equals programmatic

7    guaranteed, then that bucket is a direct buy with a specific

8    publisher to -- and does not -- may or may not involve

9    decisioning, but it's a guaranteed amount of money for a

10   guaranteed amount of delivery.

11   Q    Okay.  So -- but it is true, sir, that programmatic

12   direct deals and open auction deals can be a mix -- can be

13   mixed together, correct?

14   A    Yes.

15   Q    Okay.  So, for example, a programmatic direct deal

16   could offer some priority over premium ad inventory in an

17   open auction before that ad inventory is offered publicly?

18   A    At the time, that may have been the case.  I think

19   things have changed significantly.

20   Q    And when you say "at the time," which time period are

21   you referring to?

22   A    Pre-2018.

23   Q    Okay.  Now you testified on direct examination about

24   the features available in DSPs as well as in advertiser ad

25   networks.

Cross-Examination - J. Friedman

1              Do you recall that?

2    A    I do.

3    Q    I believe you testified -- I just want to make sure I'm

4    on the same page -- that you're not the person at Goodway

5    Group going in and using all of the features.  Is that

6    right?

7    A    That is correct.

8    Q    So you don't go in and use DSPs?

9    A    I don't log into the interface and run campaigns,

10   correct.

11   Q    And you don't log into the interface on advertiser ad

12   networks and run campaigns?

13   A    I do not.

14   Q    Now, another thing you said when speaking about

15   advertiser ad networks was that -- I believe in the response

16   to a question from the Court -- was that the computer is

17   figuring out how many times to show an ad?  Do you recall

18   that?

19   A    That's my understanding, yes.

20   Q    But you haven't gone into the interface to figure out

21   if that is true?

22   A    Correct.

23   Q    And so to the best of your understanding, is it true

24   that the computer who's figuring out -- or that is figuring

25   out how many times to show an ad, that that computer is also

                                                              23

Cross-Examination - J. Friedman

1  deciding whether to show the ad on the web or in a mobile

2  format or on connected TV, for example?

3  A    It depends on the kind of ad network.

4  Q    Some kinds of ad networks can do that?

5  A    Can you repeat the channels?

6  Q    Well, let's just -- for web and mobile, for example, an

7  ad network -- some ad network --

8  A    Yes.

9  Q    -- computer -- computer power can figure out whether to

10  put it on a website or on a mobile app -- mobile site --

11  A    It will make the decision.

12  Q    And although you're not the person who uses the tools,

13  you're familiar with DV360?

14  A    I'm familiar with it as a product, yes.

15  Q    And you are aware that DV360 supports multiple ad

16  formats, including display, native, in-app, CTV, video, and

17  audio?

18  A    I am.

19  Q    And although you are not the person at Goodway Group

20  going into Google Ads, for example, you are aware that

21  Google Ads supports Google's owned and operated properties,

22  including Search, YouTube, and Gmail?

23  A    Yes.

24  Q    And you are aware that some ad buyers use DV360, use

25  Google Ads, and some use both?

Cross-Examination - J. Friedman

1    A    Yes.

2    Q    And you're aware that buyers who use Google Ads are

3    free to use buying tools other than Google Ads, correct?

4    A    Yes.

5    Q    And so you would agree that buyers who use Google Ads

6    are free to conduct as much of their business as they want

7    using other buying tools?

8    A    Free to?  Yes.

9    Q    And you are aware that AdX also supports desktop,

10   mobile, and video digital advertising?

11   A    Yes.

12   Q    And you're aware that buyers who submitted bids into

13   AdX are free to submit bids into other exchanges?

14   A    Yes.

15   Q    Are you familiar with Adobe's advertising DSP?

16   A    I'm familiar that it has existed.  I don't know what

17   the current state of it is.

18   Q    Okay.  So are you aware, sitting here today, whether it

19   supports connected TV video, display, native, audio, and

20   search campaigns?

21   A    I'm not.

22   Q    And you're aware of Microsoft's DSP?

23   A    Yes.

24   Q    And sitting here today, are you aware whether or not

25   Microsoft's DSP allows buyers to buy search, display,

Cross-Examination - J. Friedman

1   native, video, CTV, digital Avocom, gaming, audio, and

2   social?

3            MS. CLEMONS:  Objection.  Foundation.

4            THE COURT:  Well, it's not foundation.  It's a

5   compound question.

6            But are you able to answer that question or not?

7            THE WITNESS:  I can say that that's a reasonable

8   belief.  I don't know exactly each single one.

9            THE COURT:  Which one of those are you more

10  confident in as to the Microsoft DSP?

11           THE WITNESS:  For the Microsoft DSP, the two that

12  I'm not -- I don't know -- familiar or as familiar with

13  would be connected TV and streaming audio.

14  BY MS. GOODMAN

15  Q    But your best understanding is that Microsoft's DSP

16  permits ad buyers to buy search, correct?

17  A    Technically, yes.

18  Q    And display?

19  A    Yes.

20  Q    Native?

21  A    Yes.

22  Q    Video?

23  A    Yes.

24  Q    Digital out-of-home?

25  A    I believe so.

Cross-Examination - J. Friedman

1    Q     Gaming?

2    A     I believe so.

3    Q     And social?

4    A     That, I don't know.

5    Q     LinkedIn?

6    A     I would guess, yes.

7    Q     Now, you have advised advertisers that Google and its

8    channel partners' rates are very competitive for a

9    full-stack product with an integrated DSP, correct?

10   A     I may have said that.

11   Q     Okay.  Let's look at Tab 29 in your binder.  And this

12   is another Quora post.

13   A     Okay.

14   Q     And if you look at the third paragraph on the post --

15   A     Yep.

16   Q     -- does that refresh your recollection that you have

17   publicly said, "Google and its channel partners' rates are

18   very competitive for a full-stack product with an integrated

19   DSP"?

20   A     I did write that.

21   Q     And you wrote that nine years ago?

22   A     Yep.

23   Q     So roughly 2015?

24   A     Yes.

25   Q     And you also wrote nine years ago, in 2015, that "There

27

Cross-Examination - J. Friedman

1   is so much more benefit to being on DVM than just AdX

2   access," correct?

3   A     I did write that.

4   Q     And DVM there refers to DV360 or it's the same thing?

5   A     I believe that's a consecutive naming.

6   Q     Okay.  And that was your belief nine years ago, right?

7   A     Yes.

8   Q     I want to talk about another ad tech tool called

9   supply-side platforms.

10              You're familiar with that tool?

11  A     Yes.

12  Q     It's a digital system that ad publishers use to make

13  their properties available for bidding and ad placements?

14  A     Yes.

15  Q     And it's your view that a sell-side platform or

16  supply-side platform business model resembles that of an ad

17  network, correct?

18  A     In part.

19  Q     And the way that it resembles an ad network is that it

20  aggregates ad impression inventory, correct?

21  A     Correct.

22  Q     And do you agree that supply-side platforms are

23  sometimes called ad exchanges and sometimes ad exchanges are

24  called supply-side platforms?

25  A     I do.

Cross-Examination - J. Friedman

1   Q    And as to ad exchanges, it is your view that their

2   business model and practices may also include features which

3   are similar to those offered by ad networks?

4   A    There might be overlap, yes.

5   Q    And an ad exchange is similar to an ad network in that

6   it can provide aggregated inventory to advertisers?

7   A    Yes.

8   Q    And it is correct, sir, that ad exchanges can sell to

9   buyers directly, correct?

10  A    That has changed at various times, but today the answer

11  is yes.

12  Q    Okay.  And that was the answer in 2016, correct?

13  A    I don't remember exact ons and offs.  It's gone on and

14  off.

15  Q    Okay.  If you --

16  A    At some point, historically, yes.

17  Q    All right.  And so to refresh your recollection, please

18  turn to Tab 22 in your binder at page 61.  This is another

19  excerpt of your book 30 Days?

20  A    Yep.

21  Q    Eighth edition.

22       First, second full paragraph under "Sales Strategy

23  and Approach."  Do you see where I am?

24  A    I do.

25  Q    And you see that the second sentence in that paragraph

                                                              29

Cross-Examination - J. Friedman

1    reads, "Exchanges do sell to buyers directly but typically

2    only through a self-service interface," correct?  That's

3    what the book says?

4    A    That's what the book says.

5    Q    And that's what you wrote in 2016?

6    A    Yes.

7    Q    And that was true then?

8    A    Typically, that is true.  And that's what I wrote,

9    "typically."

10   Q    Through a self-service interface?

11   A    Typically, yes.

12   Q    Okay.  So the typical way that exchanges sell to buyers

13   directly is through a self-service interface?

14   A    That's what I wrote.  I don't remember the state of the

15   industry at that time.

16   Q    Understood.  But my question, sir, is really just to

17   make clear, your testimony is that the "typically" only

18   talks to the method of buying directly in your book,

19   correct?

20   A    Yeah.

21   Q    All right.  Now let's go to ad networks.

22   A    Oh, I'm sorry.  Can I restate?

23   Q    If you wish to reclarify, you may do so.

24            THE COURT:  That can be done on redirect.

25            THE WITNESS:  Okay.

30

Cross-Examination - J. Friedman

1   BY MS. GOODMAN

2   Q    It is also your view that ad networks, advertiser ad

3   networks, provide a means to aggregate inventory and

4   audiences from multiple sources into a single buying

5   opportunity for media buyers?

6   A    Yes.

7   Q    And it's also your view that ad network business models

8   may include features that are similar to those offered by ad

9   exchanges?

10  A    Do you have any examples?

11  Q    Well, I can refresh your recollection with your book

12  again, sir.  Tab 22.

13  A    Okay.

14  Q    And let's look at page 59, 58 over to 59.

15  A    Okay.

16  Q    And if you look at the last sentence of that little

17  section titled "Ad Network," the last sentence reads, "Ad

18  networks' business models and practices may include features

19  similar to those offered by ad exchanges."

20       Did I read that right?

21  A    Yes, you did.

22  Q    And that was true when you wrote it?

23  A    That's what I believed, yes.

24  Q    And that was in 2016?

25  A    I believe so, yes.

Cross-Examination - J. Friedman

1   Q    And so when ad networks provide a means to aggregate

2   inventory in audiences from numerous sources into a single

3   buying opportunity for media buyers, what you're saying

4   there in your book is that the ad network compiles publisher

5   inventory, right?

6   A    Yes.

7   Q    And you're not saying that there are unique advertisers

8   available in ad networks; is that right?

9   A    Advertisers or publishers?

10  Q    Advertisers.

11  A    There are not unique advertisers available -- no.

12  Q    So you are not saying that?

13  A    I don't, no.

14  Q    Now, in 2016 your belief was that ad networks were put

15  out of business by SSPs and ad exchanges, correct?

16  A    I think that their business model was made far less

17  relevant.

18  Q    Okay.

19           THE COURT:  Again, Mr. Friedman, please keep your

20  voice up.

21           THE WITNESS:  Oh, I'm sorry.

22           MS. GOODMAN:  All right.  Matt, can you put up

23  Tab 24, which is another excerpt from Mr. Friedman's book.

24  And go to the second page of the document and blow up that

25  second paragraph, please.

Cross-Examination - J. Friedman

1   BY MS. GOODMAN

2   Q    See in the middle of the page you wrote, "Ad networks

3   were then largely put out of business by SSPs/ad exchanges,

4   who automated this same process for significantly lower

5   fees."

6            Did I read that right?

7   A    You did.

8   Q    And that's what you wrote at the time?

9   A    I did.

10  Q    And that was your view in 2016?

11  A    Yes.

12  Q    Okay.

13           You can take that down, Matt.

14           It was also your view in 2016 that ad networks had

15  been obsolete for at least four years, correct?

16  A    Ad networks themselves, I don't know.  Most of the

17  practices coming at the time, yes.

18  Q    Okay.  Well, let's look at Tab 27 in your binder.

19           And, Matt, you can put this one up on the screen

20  too, please.  I'm sorry.  Yes, 27.

21           Okay.  And this is another Quora post that you

22  wrote eight years ago in 2016, right?

23  A    Yeah.

24  Q    All right.

25  A    Yes.

33

Cross-Examination - J. Friedman

1   Q    And the question asked, "How does an ad network get

2   publishers and advertisers?"

3          And in response you wrote, "The problem with ad

4   network questions and why you probably don't get good

5   answers is that ad networks have been obsolete for at least

6   four years."

7          You wrote that?

8   A    I did.

9   Q    You believed it at the time?

10  A    There's more nuance, but if it's yes or no, yes.

11  Q    Okay.  And so as of 2016, when you wrote this post, it

12  was your view that ad networks had been obsolete since 2012,

13  correct?

14  A    Yes.

15  Q    You mentioned on direct examination that Trade Desk --

16  that's a DSP, or that is a company that has a DSP?

17  A    Correct.

18  Q    And you know its chief revenue officer Jed Dederick?

19  A    I've met him, yes.

20  Q    Would you agree with me that The Trade Desk competes

21  with Google?

22  A    Yes.

23  Q    And you know, sir, that The Trade Desk provides

24  complete access to the open internet, evaluating millions of

25  impressions every second, powering comprehensive

Cross-Examination - J. Friedman

 1   cross-channel digital buys and digital out-of-home audio,

 2   native, connected TV, mobile, and display?

 3            MS. CLEMONS:  Objection.  Compound.

 4            THE COURT:  Yeah.  Break it apart.  Sustained.

 5            MS. GOODMAN:  Okay.

 6   BY MS. GOODMAN

 7   Q    So you are aware that The Trade Desk provides complete

 8   access to open internet, correct?

 9   A    Yes.

10   Q    And that it evaluates millions of impressions every

11   second, correct?

12   A    Yes.

13   Q    And you are aware that it powers comprehensive

14   cross-channel digital buys, correct?

15   A    It sounds like marketing speak, but yes.

16   Q    Okay.  And by cross-channel digital buys, that means

17   across multiple channels, such as digital out-of-home,

18   correct?

19   A    Yes.

20   Q    And audio, correct?

21   A    Yes.

22   Q    And native, correct?

23   A    Yes.

24   Q    And connected TV, correct?

25   A    Yes.

Cross-Examination - J. Friedman

1    Q    Mobile, correct?

2    A    Yes.

3    Q    Display, correct?

4    A    Yes.

5    Q    Okay.  So all of those channels I named, are those part

6    of the open internet?

7    A    I believe, by and large, yes.

8    Q    And in March 2022, your company, the Goodway Group,

9    became The Trade Desk's first certified service partner,

10   correct?

11   A    Yes.

12   Q    And what that meant is that that partnership allowed

13   small- and medium-size business models to use a demand-side

14   platform, right?

15   A    Yes.

16   Q    And I believe you mentioned on direct that some of your

17   customers are local and regional brands, correct?

18   A    Yes.

19   Q    Are those similar to small- or medium-size businesses?

20   A    Yes, they can be.

21   Q    Now, are you aware, sir, that plaintiffs in this case

22   alleged that advertiser ad networks are, as a practical

23   matter, the only viable option for smaller advertisers?

24            MS. CLEMONS:  Objection.  Relevance.  Foundation.

25            MS. GOODMAN:  I can lay a foundation.

Cross-Examination - J. Friedman

1          THE COURT:  I'm going to permit it.  Overruled.

2    BY MS. GOODMAN

3    Q    So are you aware, sir, that plaintiffs allege in this

4    case that advertiser ad networks, as a practical matter, are

5    the only viable option for smaller advertisers?

6    A    No, I'm not aware that that's what they're alleging.  I

7    haven't read that in the complaint.

8    Q    Have you read the complaint?

9    A    I have read parts of it, but I have not read it in

10   full.

11   Q    But you're fairly well-versed in the suit?

12   A    I think so.

13   Q    Okay.  And so your customers, like regional brands or

14   local brands who are small- and medium-size businesses,

15   could use, through your partnership with The Trade Desk, a

16   demand-side platform, correct?

17   A    Yeah, I think we're probably operating on two different

18   definitions of "small."

19   Q    What's your definition of "small"?

20   A    I think at the tier that we service, then I would say

21   small is -- I don't know.  I don't want to specify a certain

22   dollar amount per month.  But small might be a set of five

23   or ten banks -- or a bank with five or ten branches for

24   example, whereas small in the ad network sense can be $2,000

25   a month or whatever it may be.  It would be much smaller

                                                              37

Cross-Examination - J. Friedman

1   than what we would consider small on a professional level.

2   Q    Okay.  And you don't know what plaintiffs in this case

3   consider to be smaller advertisers, do you?

4   A    I don't, no.

5   Q    And so would you agree with me that accessing The Trade

6   Desk DSP through the Goodway Group through the certified

7   partnership is a viable option for smaller advertisers?

8   A    Capital S small, no.  But smaller larger advertisers,

9   yes.

10  Q    Okay.  But you can't really quantify what you mean by

11  small, smaller, and larger with specificity, can you?

12  A    I don't know that there's a hard cutoff.

13  Q    Are you familiar with something called "variable price

14  floors"?

15  A    I am.

16  Q    And you're aware with variable price floors, publishers

17  can set different floors across exchanges, correct?

18  A    Yes.

19  Q    And it was your view that that was an unfortunate

20  practice in 2016, right?

21  A    From a buy-side perspective, yes.  I did not like it.

22  Q    Right.  So from a buy-side perspective, you did not

23  like that publishers set variable price floors, right?

24  A    Yeah, of course not.

25  Q    And you thought that was unfortunate?

Cross-Examination - J. Friedman

1   A    For my clients, yes.

2   Q    You said "of course not."  Can you explain?

3   A    Yeah.  As a buyer, we want everything as low priced as

4   possible.  And so the fact that there were certain buying

5   paths that might have cost more money was not desirable.

6            On the flip side, there were some paths that cost

7   less money, and it just took a lot of effort to figure that

8   out.  And that was beneficial.

9            But, yeah, as a buyer, we prefer less games.

10  Q    You said you prefer less games as a buyer?

11  A    Yeah.

12  Q    And variable price floors was a game in your view from

13  the buy side that publishers engaged in?

14  A    It was a way of playing or gaming the system, yes.

15  Q    You're also familiar with header bidding?

16  A    I am.

17  Q    And you've advised advertisers that a major downside of

18  header bidding is that it can cause increased page latency

19  and page load times?

20  A    I may have said that.  I don't know how accurate I now

21  believe that to be.

22  Q    Okay.  Let's turn to Tab 31 in your binder.

23  A    Sure.

24  Q    This is a blog post on your company's website from 2018

25  titled "Header Bidding Trends."

39

Cross-Examination - J. Friedman

1   A    Uh-huh.

2            MS. GOODMAN:  And, Matt, you can put this one on

3   the screen.  It is also really hard to read.

4            And if you go down to the section on the first

5   page, "Three header bidding containers are standard."

6            Can you blow that up, Matt?

7   BY MS. GOODMAN

8   Q    On the second sentence on your blog on your website

9   says, on this particular page, "One major downside is that

10  it can cause increased latency and page load time, which can

11  then negatively impact the user experience."

12           That was true in 2018 when your company published

13  this blog post?

14  A    It was my belief.  I don't know whether or not it was

15  true.

16  Q    Okay.  You don't state it here as a belief.  You state

17  it as true, yeah?

18  A    Stated as such, yes.

19  Q    And let's go to the section on client-side wrappers a

20  little bit further down.

21           And a client-side wrapper just means putting the

22  header bidding functionality on the client side versus the

23  service side, right?

24  A    I believe so.

25  Q    Okay.  And when the header bidding functionality is on

                                                              40

Cross-Examination - J. Friedman

1   the client-side wrapper, you advised advertisers that "In

2   that circumstance, page latency and slow page load times can

3   still be a big issue if many demand sources are included,"

4   correct?

5   A     That's what I said at the time.

6   Q     And that was accurate at the time?

7   A     I believed it was.

8   Q     If we go to the next page under "New money-making

9   practices are in play."  Here, your blog post says, "Though

10  questionable, here are a few header bidding practices you

11  should be aware of and understand."

12         That's something you told advertisers?

13  A     Yes.

14  Q     And one of those questionable header bidding practices

15  was bid cashing.

16         Do you see that?

17  A     Yes.

18  Q     And here you told advertisers that bid cashing has

19  "ruffled the digital media industry because it's not a

20  transparent practice."

21         Do you see that?

22  A     Yes.

23  Q     And you told advertisers that "sometimes bid cashing is

24  done without buyers' knowledge."  Do you see that?

25  A     Yes.

Cross-Examination - J. Friedman

1   Q    And that was accurate at the time?

2   A    Yes.

3   Q    And you also said that bid cashing -- sorry.  That

4   impressions, one, from bid cashing can hurt buyers' ad

5   campaign performance if they are off-strategy or not brand

6   safe.  That was true at the time?

7   A    Yes.

8   Q    You're familiar with a Google product feature called

9   enhanced dynamic allocation?

10  A    Yes.

11  Q    Okay.  And enhanced dynamic allocation enabled

12  real-time bidding to compete with buyers who had direct

13  guaranteed deals as well as demand sources in the

14  advertising waterfall?

15  A    I don't know if I would say "compete."  I would

16  probably choose a different verb, but...

17  Q    What verb would you choose?

18  A    Play in the same space.

19  Q    Okay.  And you believe that enhanced dynamic

20  allocation, when it was in effect, was not stopping Google's

21  competitors from innovating, correct?

22  A    Yeah.  I don't think that practice alone stopped

23  Google's competitors from innovating.

24  Q    And you believed that enhanced dynamic allocation was

25  not stopping Google's competitors from creating ways they

Cross-Examination - J. Friedman

1   perceived to serve the publisher better?

2   A    Correct.

3   Q    You're familiar with supply path optimization?

4   A    I am.

5   Q    Basically, that concept identifies the right path to

6   bid and win ad inventory at the best price?

7   A    Yeah.  There's multiple benefits of -- but price is

8   one.

9   Q    Okay.  And supply path optimization gives greater

10  control over the supply chain to advertisers?

11  A    It does, yes.

12  Q    And that's a good thing for advertisers, in your view?

13  A    I think, generally, yes, more control is good.

14  Q    Okay.  And supply path optimization actually also cuts

15  the clutter between media buyers and publishers, correct?

16  A    It can, yeah.

17  Q    That's what your website says, correct?

18  A    I believe you if you're telling me it's in the exhibit

19  here.

20  Q    Okay.  You can look at Tab 34 just to refresh your

21  recollection that this is on your website.

22        THE COURT:  I think at this point he hasn't -- you

23  don't need to do this.  He's --

24        MS. GOODMAN:  Okay.  I'll move on.

25  BY MS. GOODMAN

                                                            43

Cross-Examination - J. Friedman

1   Q    And Goodway Group has a supply path optimization
2   arrangement with PubMatic, correct?
3   A    I believe so, yes.
4   Q    And under that arrangement, PubMatic lowers its fees to
5   Goodway Group as Goodway Group increases its spending
6   through PubMatic's buy-side tool -- I'm sorry -- sell-side
7   tool?
8   A    That's the general structure, yes.
9   Q    And you instruct the DSPs you're using to bid higher on
10  PubMatic inventory under this arrangement, correct?
11  A    That, I don't -- I don't know if that's currently true.
12  Q    Okay.  Let's look at Tab 35.
13  A    Okay.
14  Q    This is an article about your partnership with
15  PubMatic, yes?
16  A    Yep.
17  Q    Okay.  And if you turn to page 3 --
18  A    Yes.
19  Q    -- of this article under the ad exchanger ad --
20  A    Yep.
21  Q    -- it says, "In order to route more spend to PubMatic,
22  Goodway Group will instruct its DSP to bid higher on
23  PubMatic inventory using a bid factor tool."
24       Is that accurate?
25  A    Yes.

44

Cross-Examination - J. Friedman

1          MS. CLEMONS:  Objection.  Hearsay in this article.

2          MS. GOODMAN:  I'm using it to refresh his

3     recollection as to how his arrangement works with PubMatic.

4          THE COURT:  I'm overruling that objection.

5     BY MS. GOODMAN

6     Q     And this arrangement you have with PubMatic, it's your

7     belief that, if other ad agencies and exchanges followed the

8     model, the industry would end up with healthy competition

9     among top exchanges, correct?

10    A     Most top exchanges, yes.

11    Q     And you believe that, if other agencies and exchanges

12    follow this model, the industry will end up with -- will

13    eliminate the hangers-on that don't provide real value?

14    A     In large part, yes.

15    Q     And you also believe that, if advertisers or ad

16    agencies and exchanges did more deals like the one you have

17    with PubMatic, that everybody could shut off 60 or more of

18    75 some-odd exchanges, meaning those hangers-on who don't

19    provide real value?

20    A     I do.

21    Q     And you believe that, if they shut off 60 of those 75

22    exchanges, they would not lose an ounce of scale, correct?

23    A     I don't know that I would say an ounce, but I would say

24    they would not lose significant scale.

25    Q     Okay.  Let's keep looking at Tab 35 just under the

                                                              45

Cross-Examination - J. Friedman

 1 | next -- the next paragraph on page 3 where you're quoted.
 2 | Do you see that?
 3 | A    Yep.
 4 | Q    And you said, "Everyone can shut off 60 of those 75
 5 | exchanges and not lose an ounce of scale."  Is that
 6 | accurate?
 7 | A    In marketing speak, yes.
 8 | Q    And you agree that company -- that PubMatic competes
 9 | with Google?
10 | A    There are -- there is some competitive overlap.
11 | Q    And with your partnership with PubMatic, the Goodway
12 | Group is trying to help PubMatic win every auction they can,
13 | right?
14 | A    When it's beneficial to both of us, yes.
15 | Q    Okay.  Lets look at Tab 43.
16 |          THE COURT:  Well, is there an inconsistent
17 | statement?  I mean, he answered yes.
18 |          MS. GOODMAN:  Well, the statement in this news
19 | article is slightly inconsistent.  But I will move on, Your
20 | Honor.
21 |          THE COURT:  All right.
22 | BY MS. GOODMAN
23 | Q    Now, I believe you said that you have read parts of the
24 | complaint in this case, correct?
25 | A    Yes, limited parts.

Cross-Examination - J. Friedman

1   Q    And after the Department of Justice and plaintiffs in

2   this case filed this lawsuit, you agreed to speak with them?

3   A    Yes.

4   Q    In February of 2023 you spoke, in fact, with the

5   Department of Justice lawyers?

6   A    I believe that's when it was, yes.

7   Q    And you told Department of Justice attorneys, quote,

8   I'm fairly well versed in the suit, correct?

9   A    Yes.

10  Q    And you told Department of Justice lawyers that "If

11  there are any specific parts of the case that you'd like me

12  to know well, please let me know"?

13  A    Yes.

14  Q    Okay.  And you told the Department of Justice attorneys

15  that you would keep to what's legally relevant and

16  beneficial, correct?

17  A    Yes.

18  Q    And so did you tell the DOJ, when you spoke with them

19  also, that competition is fierce in digital advertising?

20  A    That's something I -- sounds like I would have said.

21  Q    Do you recall, in fact, telling DOJ that competition is

22  fierce in digital advertising?

23  A    No, I don't recall.

24  Q    Okay.

25           THE COURT:  Well, do you believe that?

47

Cross-Examination - J. Friedman

1        THE WITNESS:  Yes, in -- can I be nuanced?

2        THE COURT:  Well, what do you believe?  From your

3   experience, is that the case?

4        THE WITNESS:  That parts of digital advertising

5   are fiercely competitive.

6        THE COURT:  All right.

7   BY MS. GOODMAN

8   Q    Okay.  And let's turn to the Tab 47 in your binder.

9   A    Okay.

10  Q    This is an excerpt from your book "Prove Your

11  Advertising Works."

12  A    Okay.

13       THE COURT:  Is there a question?

14       MS. GOODMAN:  I'm sorry, Your Honor.  Let me ask

15  one more question while my colleague provides the page I'm

16  looking for.

17  BY MS. GOODMAN

18  Q    Did you also tell the Department of Justice, when you

19  spoke with them in February 2023, that the programmatic and

20  social evolution is not even 15 years old and that we're

21  only in the beginning innovative phases for digital

22  advertising with a lot more to come?

23  A    That sounds like something that I would say.

24  Q    Do you recall, in fact, telling them that?

25  A    No.

Redirect Examination - J. Friedman

1    Q    But that's your belief?

2    A    Yes.

3            MS. GOODMAN:  I'll pass the witness.

4            THE COURT:  All right.  Any redirect?

5                      REDIRECT EXAMINATION

6    BY MS. CLEMONS

7    Q    Mr. Friedman, on cross, Google's counsel asked you

8    about a statement you made in a book where you said all

9    media is just media.  Do you recall that?

10   A    I do.

11   Q    Could you explain what you mean or meant by "all media

12   is just media"?

13   A    Yeah.  Media is a vehicle for advertisers to reach

14   consumers.  And there are many marketers who have an

15   emotional affinity for one channel or another.

16            And so that was written in order to convey to

17   marketers that having an emotional affinity -- and I think I

18   may have even stated something about looking at the data or

19   simply valuing the results -- that it's important to look at

20   the medium for the performance and not for the sake of

21   having a nonstatistical preference.

22   Q    And when you say "look at the media for the

23   performance," what are you referring to?

24   A    If the campaign objective is to create awareness or

25   brand equity or create sales, it's important to look at what

49

Redirect Examination - J. Friedman

1    channels will perform in the best way and, really, what mix

2    of channels, what will perform in the best way.

3    Q    And does that mean that, if two channels both increase

4    awareness, for example, that they are essentially the same

5    for that advertiser?

6    A    No, it doesn't mean they're the same; it means they may

7    have similar value.  But I think -- again, depending on the

8    objective of the advertiser as well as the kind of user that

9    they're seeking to be with, there's certain content that

10   will be more effective.

11   Q    And this kind of strategic consideration of various

12   channels, is that something that you implement at the

13   channel planning stage or later on?  Can you explain a

14   little bit about how those considerations would come into a

15   media plan.

16   A    Yeah.  Channel tends to come toward the end once we

17   define audience.  We try to consider the message, the

18   moment, and the mindset of the user, and then the channel

19   that best accomplishes -- or best fits those foundational

20   elements.

21   Q    And so once you've decided what -- between you and a

22   client -- once you've decided what channels would be good

23   for a particular campaign, do you still believe at that

24   point that all media is just media?

25   A    Can I be illustrative?

Redirect Examination - J. Friedman

1   Q     Sure.

2   A     Okay.  I think if two channels are going to yield the

3   exact same outcome, numerator-over-denominator outcome,

4   different media, for example, social media, may be something

5   that someone -- you know, depending on the data, but

6   primarily is browsed on the phone, potentially along with

7   consumption of another medium, for instance, TV.

8         Whereas TV at the right time could be more of a

9   lean back; social could be lean forward.  So it's very much

10  moment-oriented.  So even if the performance is equal,

11  marketers unemotionally still may have reasonable reason to

12  want their ad in one channel over another.

13        Does that help?

14  Q     Yeah.

15  A     Or is that accurate?

16  Q     Could you tell us whether the substitutability of a

17  given set of media channels for a particular purpose, is

18  that specific to campaigns? more general? specific to

19  brands?

20        If you could elaborate a little bit, I think that

21  would be helpful.

22  A     Yeah, I think depending on the advertiser's goals,

23  advertisers that are extremely performance-oriented,

24  performance in this respect typically tends to mean as long

25  as we're talking about a funnel, lower funnel, and very

51

Redirect Examination - J. Friedman

1    e-commerce- or sales-oriented.

2                I think channels can become more substitutable,

3    although not necessarily fully substitutable; whereas, when

4    there are strategic reasons to use a channel, the

5    substitutability is lessened.

6    Q    And once you've decided to use a particular media

7    channel, like display advertising, for example, are the

8    tools that you use to purchase that media interchangeable?

9    A    I think they each have -- I mean, that's like saying is

10   Schwab and E*TRADE interchangeable?  I mean, I guess to

11   accomplish the goal potentially, but there are certain

12   features that much more strongly benefit certain users.

13   Q    And if display is important to a campaign, can Goodway

14   use social media buying tools to purchase those display

15   advertisements?

16   A    No.

17   Q    And if social media is particularly important to a

18   campaign, can Goodway use programmatic display buying tools

19   to purchase their social media advertisements?

20   A    Generally, no.

21   Q    If you could -- you were asked about a specific

22   article.  Turn to Tab 7.  Now, this is an excerpt from your

23   book, I believe.

24               And am I right this was in 2016, you said?

25   A    That's what I've been told.

Redirect Examination - J. Friedman

1   Q    When you advise that marketers should look at -- go

2   after users and not websites, can you explain a bit more

3   about what you mean by that.

4   A    Yeah.  I think, at the time, the ability to target and

5   to essentially pluck individual users was probably at its

6   peak right around then.  The amount of available data, the

7   lack of legislation around data, and -- all contributed

8   toward, I think, the value of a user being greater than the

9   site that it was on.  And that was a trending belief.

10  Q    Is that still your belief?

11  A    My belief is still that getting a message in front of

12  the right user is the single most important fact -- well,

13  equal to creative, equal to the message, but that's the

14  heart and brain component.

15  Q    And does that mean that all media is essentially the

16  same if its purpose is to get a message to the user?

17  A    Well, no, because message being an equal component can

18  only be delivered in certain ways on certain platforms or

19  certain channels.

20  Q    Can you give an example of an advertiser that might

21  value display advertising more than, for example, CTV

22  advertising?

23  A    So I don't know if -- the premise of that.  I think it

24  depends on the objective and depends on the channel mix

25  being targeted.  So yeah, that one is a hard one to isolate.

53

Redirect Examination - J. Friedman

1  Q    During Google's cross-examination, they put up a

2  demonstrative exhibit showing the marketing funnel.  Do you

3  recall that?

4  A    I do.

5  Q    And there was a red box toward the top of the marketing

6  funnel and put a number of things in that box.  Do you

7  recall?

8  A    Yes.

9  Q    Do you agree that all of the things that were listed in

10  that red box are top-of-funnel strategies or channels?

11  A    I think this was a very oversimplified way of doing it.

12  And based on my ability to mostly say yes or no, I didn't

13  argue with it.

14  Q    Given the opportunity now to explain, can you tell us a

15  little bit more about why that's oversimplified and how that

16  affects your business and how you look at marketing?

17  A    Yeah.  I think, if I recall correctly, there was online

18  video and display or open web display or something like that

19  all, and it was listed upper funnel.  And it was made to

20  look exclusively upper funnel, and that's just not the case.

21       Most channels can be used across different parts

22  of the funnel, just in different ways.  So there's a little

23  more -- each channel can have different uses, depending.

24  Q    And what does that depend on?

25  A    Depending on the performance goals.  So I'll give you

54

Redirect Examination - J. Friedman

1    an example.

2            If Heinz Ketchup wants to maintain or increase

3    awareness, that red bottle is so recognizable that it could

4    probably do so with a display ad.  Put the red bottle.

5    Consumer says, "Oh, I've seen that Heinz bottle a thousand

6    times; I remember Heinz Ketchup now."

7            If someone was launching a new brand of vodka, I

8    would not recommend a display ad to create or increase

9    awareness because vodka is a cluttered category with a lot

10   of what I would call sea of sameness, and it's -- consumer

11   choice in that case is more fickle.

12           And I think that in order to establish relevancy

13   for the brand to the consumer, that is where, for instance,

14   sight and sound can be very valuable.  Sight, sound, and

15   motion can be very valuable by using CTV or some sort of

16   video.

17   Q    So do the spaces that a channel occupies in the

18   marketing funnel depend to some degree on the purpose of a

19   campaign?

20   A    Very much so.

21   Q    Do they depend to some degree on the type of

22   advertiser?

23   A    Yeah.  The category -- the advertiser's position within

24   the category.

25   Q    Do they depend on audience or target market?

Redirect Examination - J. Friedman

1   A    Certainly.  Yes, that play a role.  I think, as the

2   other attorney pointed out, Facebook has a broad audience.

3   And so while they may help -- well, they say they help find

4   the right users -- and maybe they do -- there are other

5   channels where we're able to select those user bases more

6   carefully ourselves.

7   Q    To your awareness, are there audiences that are less

8   available on social media platforms than others?

9   A    I would posit that, yes, I'm sure -- I don't know

10  exactly what they would be, but I can imagine there are

11  certain professions or -- for example, it could be highly

12  rural or, you know, somewhere that lacks -- there's places I

13  drive sometimes there's no cell signal.  I figure if there's

14  no cell signal, it's really hard to browse social media.

15  Q    Can you think of an example where display could be

16  lower funnel?

17  A    Yeah.  So in retargeting, which -- do I need to define?

18  Q    Yeah.  If you could define retargeting.  I'm not sure

19  the Court has heard about that.

20  A    So, typically, retargeting will be if -- well, just to

21  make it highly simplistic.  Please, this is not an exact.

22        But we've all gone to a page and seen a product.

23  And then, two minutes later, we see that product in an ad.

24  And we go, "Wait.  It's following me."  That's very, very

25  simple and illustrative of all retargeting.

                                                          56

Redirect Examination - J. Friedman

1          But, by and large, retargeting is showing an ad to

2    a user who has already engaged with a brand in some

3    meaningful way or another.  And in that case, again, if it's

4    a pair of shoes and we're later reminding people to buy a

5    pair of shoes, that has been proven relatively effective for

6    a lower funnel.

7    Q    Okay.  So when those shoes follow me from website to

8    website, that is an example of display being used in the

9    lower funnel?

10   A    Correct.  I've forever ruined retargeting, but yes.

11   Q    All right.  Google's counsel asked you a number of

12   questions about excerpts from your book or several articles

13   that were written around 2016.

14   A    Yes.

15   Q    Do you view the display advertising landscape the same

16   now as you did in 2016?

17   A    No.  And I even have probably -- if asked specific

18   questions -- I don't know what they would be, but I probably

19   have revised beliefs of that time as well having learned

20   since then.

21   Q    Specifically, you were asked about advanced TV.  Do you

22   recall that?

23   A    I do.

24   Q    What is advanced TV?

25   A    Well, there was a time where a connected TV -- an

Redirect Examination - J. Friedman

1   advanced TV and settop box -- as the space was emerging,

2   there were different ways of defining the space.  I think

3   we've settled on connected TV, but advanced TV at the time

4   might have included video on demand through a cable or

5   satellite provider.  I don't recall specifically.

6   Q    And do you still agree that CTV is usually an upper

7   funnel channel?

8   A    Usually, yes.  But like any TV, if you turn it on at

9   the right time and you see infomercials, those are very

10  specifically lower funnel.

11  Q    And for connected TV, does the purpose of the channel

12  and its effectiveness also depend on the things you talked

13  about earlier, audience and a purpose of the campaign?

14  A    Yes.

15  Q    Another excerpt from your book that counsel asked you

16  about was the -- that in previous editions of your book

17  you'd outlined targeting approaches channel by channel.

18         Do you recall that?

19  A    I remember them saying that, yes.

20  Q    What do you mean by targeting approaches?  If you can

21  recall what you meant or if you know -- if you want to say

22  what you mean now.

23  A    Yeah.  I think, within social media, there are going to

24  be different ad formats, different audience composition

25  within display and within CTV.  So there are going to be --

Redirect Examination - J. Friedman

1   there's different ways to use it, as I just stated around

2   different categories and brands and objectives.

3          And so I think -- well, I think I've answered your

4   question.  I don't want to keep going.

5          THE COURT:  This is taking a little long.  Let's

6   move this along.

7          MS. CLEMONS:  Okay.

8   BY MS. CLEMONS

9   Q   When you then said that you did not -- that outlining a

10  channel-by-channel approach would be outdated, were you

11  trying to say anything about whether the channels are

12  combined or should otherwise be looked at together?

13         THE COURT:  Sustained.

14  BY MS. CLEMONS

15  Q   Could you explain the channel-by-channel approach to

16  explain in your book would be outdated.

17  A   I think there's a significant difference between a book

18  that we write and self-publish for marketing purposes and

19  "whole truth and nothing but the truth" testimony.

20         And so that's not to say that there was

21  overmagnification, but there's certainly reason to say

22  things for effect and then to follow up with more detail

23  later in marketing publications.

24         And so I think that what would have been accurate

25  at the time was not necessarily that channel by channel was

59

Redirect Examination - J. Friedman

1  completely and utterly useless; it's that things had changed
2  such that that was not what marketers should focus on first.
3  And so there was an attempt to change mindset as much or
4  more than to get literal.
5          If my books looked like your legal briefs, nobody
6  would read them.
7  Q    I will try not to take that personally.
8  A    No, not your -- that was a royal "you."  That was
9  everybody here.  That was not you personally.
10         THE COURT:  You realize that's going to be on the
11 front page, you know, tomorrow.
12         THE WITNESS:  I'm known to say things occasionally
13 that -- I don't know --
14         MS. CLEMONS:  This may not be the right audience
15 for that.
16 BY MS. CLEMONS
17 Q    So has anything else changed between 2016 and now that
18 influences how you look at different marketing channels in
19 the digital media space?
20 A    Well, yeah.  I think in 2016, I don't think most of
21 those charges were available programmatically.  And,
22 frankly, I don't think a lot of CTV advertising was
23 available, period.  I mean, Netflix just launched ads in the
24 last two years or whatever it may be.
25         So -- but I think for -- well, yeah, I think

60

Redirect Examination - J. Friedman

1   social media, for instance, has evolved dramatically.  It's

2   my understanding that, when you go into Meta's platform, you

3   can -- I think you can specify, but it's expected that you

4   might run across Instagram and Facebook, and they might try

5   to balance a budget for you.

6              And then within the display -- so I covered CTV,

7   social.

8              Within the display space, I think the biggest

9   changes happened -- I think it was 2016, '17, '18, which

10  was, as opposing counsel mentioned, EBDA or -- I don't

11  remember what it was called.  But open bidding, where header

12  bidding really increased competition in the exchange space

13  and, as a result, helped publishers make more money.  For

14  some advertisers, it cost more; some it cost less.  Then

15  that all ended up as a first-price auction.

16             I've got to say, probably in display the last

17  eight years, moving from second price to first price was the

18  biggest -- I would say it was the biggest change.

19  Q    Why?

20  A    When we initially looked over that time period, we

21  started to see 15 to 20 percent increases in price because

22  the strategy, when it was second price, was -- could be

23  defined as bid your maximum.  So if you want to bid $10 for

24  something but you're pretty confident the second-highest

25  bidder will be $3, then you're going to pay $3.01.  And all

Redirect Examination - J. Friedman

1   of a sudden, it's a first-price auction.  And now, if you

2   bid $10, you're going to pay $10.

3          And so we mobilized very quickly during that time

4   to manually reduce bids, which I don't think is good for

5   publishers.  But, again, I'm on the buy side.  We protect

6   our clients.

7          And, eventually, we built into an algorithm a way

8   to adjust bids to that first-price environment.  But that

9   time -- other than, I think, when DSPs were created in the

10  early '10s or the late '00s, I think other than that, that

11  was pretty significant.

12  Q    A little bit of a follow-up on header bidding.

13         Did you view header bidding as good, bad, or

14  indifferent for advertisers, for your clients at least?

15  A    So the benefit to advertisers was the ability to --

16  assuming a fair auction and landscape, to bid into and buy

17  any slot on the page as opposed to slots that were

18  previously just reserved for overflow or remnant inventory.

19  So that part of theory was good.

20  Q    Counsel asked you a number of questions about all of

21  the various channels that you can purchase programmatically.

22         Do you recall that?

23  A    I do.

24  Q    Does the ability to purchase a number of different

25  types of media programmatically, has that caused you to look

Redirect Examination - J. Friedman

1    at those as one programmatic media channel?

2    A    No.

3    Q    Why not?

4    A    No.  I mean, again, when I log into Schwab, there are

5    mutual funds and ETFs and stocks and -- there's eight

6    different categories.  I don't view them as interchangeable,

7    but they are available through one platform.

8    Q    Counsel also asked you about the similarities between

9    ad networks and SSPs.

10            Do you recall that?

11   A    Yes.

12   Q    Do you consider PubMatic to be the same as an ad

13   network?

14   A    I don't.

15   Q    Why not?

16   A    Because there's much more -- really, through the DSP in

17   general but even dealing directly with PubMatic, I guess.

18   There's the ability to opt in and out of many more variables

19   than is traditional in an ad network.

20   Q    And when you are negotiating with ad exchanges or SSPs

21   on behalf of Goodway's customers to get lower take rates,

22   are you able to leverage negotiations with ad networks

23   against those SSPs?

24   A    No.  Ad networks typically don't have disclosed --

25   typically don't have disclosed take rates.

                                                              63

Redirect Examination - J. Friedman

1   Q    And you talked about with -- The Trade Desk counsel

2   asked you if all of the channels that The Trade Desk deals

3   in are part of the open internet.

4             Do you recall that?

5   A    I do.

6   Q    Why -- what did you mean or what did you mean when you

7   agreed that they were all part of the open internet?

8   A    I think, by and large, most of the -- most of the

9   publishers, properties, channels, whatever you want to call

10  it, within those channels are available to be bought in

11  multiple places.

12  Q    And does that mean that the channels are essentially

13  interchangeable because they are all part of the open

14  internet?

15  A    No.

16            MS. GOODMAN:  Leading.

17            THE COURT:  Sustained.

18  BY MS. CLEMONS

19  Q    Can you explain whether and how those all being part of

20  open internet has an impact on how you look at channels?

21  A    I don't -- I don't think it does.  Channels are one

22  thing, being part of the open internet is another, and I

23  guess one could be true and not the other and vice versa.

24  Q    There were some questions on cross about the size of

25  Goodway's customers.  And without getting into any

Redirect Examination - J. Friedman

1    competitively sensitive details, can you describe some

2    characteristics of the kinds of advertiser customers that

3    Goodway has?

4    A    Yeah.  Everything from large enterprise global clients

5    down to individual tractor dealers.

6    Q    Would you characterize any of your customers as, like,

7    mom-and-pop small businesses?

8    A    Mom and pop?  No.  What I will say is, for the tractor

9    dealer, for example, on their own, I don't think they would

10   have any route to use a DSP.  But because we run a hundred

11   of them, we're able to aggregate and create efficiencies

12   that allow all 100 at a time to run on a DSP.  But each in

13   and of itself, my guess would be way too small.

14   Q    Do all of your customers have the resources to hire an

15   ad agency?

16   A    I mean, outside of the ad agencies that hire us

17   themselves, yeah, I -- I think they do broadly.  Again,

18   there are some individual dealerships, whether it's

19   automotive or farm equipment, that may not.

20   Q    You were asked some questions about variable price

21   floors, and you mentioned you didn't like any attempts by

22   SSPs to game the system.

23        Can you explain what you meant by that?

24   A    Yeah.  It's like when the opposing tennis player

25   develops a new kind of serve.  It is like, darn it.  That's

Redirect Examination - J. Friedman

1   a good one.  It doesn't mean I like it.

2            And so I guess game the system, yeah, I mean, they

3   were putting different prices on different ad exchanges or,

4   you know, assigning different prices.  And it just made more

5   work for us temporarily to figure out where to buy the --

6   what the cheapest route would be.

7   Q    And setting aside the additional work to figure out

8   which was the cheapest route, would it be good or bad for

9   Goodway's customers if the lowest price floor was on a less

10  expensive exchange?

11            MS. GOODMAN:  Leading.

12            THE COURT:  Sustained.

13            THE WITNESS:  I didn't hear.  I'm sorry.

14            THE COURT:  Rephrase the question.

15  BY MS. CLEMONS

16  Q    Are there circumstances under which it might be

17  beneficial for your customers to have lower price floors?

18            MS. GOODMAN:  Leading.

19            THE COURT:  Look, that's almost obvious, isn't it?

20  Let's move on.

21            MS. CLEMONS:  May I ask one more question, Your

22  Honor, about that?

23            THE COURT:  No.  Let's move on.

24            MS. CLEMONS:  All right.

25  BY MS. CLEMONS

Redirect Examination - J. Friedman

1    Q    You mentioned, when we were talking about the article
2    behind Tab 35, "Healthy competition among most top exchanges
3    is what you thought would come from increased supply path
4    optimization."
5            Do you recall that?
6    A    I do.
7    Q    What did you mean by "most top exchanges"?
8    A    Yeah.  That's the nuance that I didn't get into is I
9    meant everybody but AdX at the time.
10           THE COURT:  You need to speak up.
11           THE WITNESS:  Oh, I'm sorry.  I meant everybody
12   other than AdX.  So when I said most top exchanges, I meant
13   the other leading exchanges in the market.  I didn't
14   anticipate that AdX would change its pricing strategies.
15   BY MS. CLEMONS
16   Q    Why is that?
17   A    Because previously, when we had asked to speak to them
18   about, A, transparency, and B, negotiated rates, we were
19   told that was not an option.
20   Q    And when you said that competition is fierce in digital
21   advertising, can you explain a little bit more about what
22   parts of digital advertising you feel are competitive?
23   A    Sure.  I think competition among publishers.  I mean,
24   you know, with the internet, local news is not only local
25   news anymore.  I mean, I think *The Washington Post* probably

67

Redirect Examination - J. Friedman

1   has quite broad coverage, as does *New York Times*, etc.  So I

2   think competition among publishers, among mobile apps is

3   very competitive.  And I think in certain parts of the

4   industry, there are, I think among -- again, among all of

5   the exchanges other than AdX, it can be pretty competitive.

6              And then -- yeah, I think with connected TV or

7   video today, that can be fairly competitive.  I mean, even

8   YouTube has to compete with Netflix and others.

9   Q    I just have one last question for you.

10             You had mentioned that EDA alone didn't prevent

11  innovation in the marketplace.  Could you explain whether

12  EDA in combination with anything else --

13  A    Well, if I recall, there was a charge for outside

14  exchanges to use EDA.  There was a surplus, which really

15  just didn't make sense to me at the time because they were

16  all available without a charge before.  And the charge, I

17  believe, was 5 or 10 percent.  I'm sure Google knows more

18  precisely.  But it seemed like a significant premium to

19  access what prior was the same inventory and too much of

20  premium for the downsides of header bidding.

21             MS. CLEMONS:  Thank you very much.  No further

22  questions.

23             THE COURT:  Any recross?

24             MS. GOODMAN:  No, Your Honor.

25             THE COURT:  All right.  Does anyone anticipate

Redirect Examination - J. Friedman

1   calling this witness again?

2          MS. CLEMONS:  We'd like to keep it open for

3   rebuttal, Your Honor.

4          THE COURT:  All right.  Mr. Friedman, then, I

5   can't let you stay in the court to watch the proceedings.

6   You'll have to say in contact so that they know what --

7   you'll know if you have to come back.  All right?

8          THE WITNESS:  Okay.  Someone will explain to me

9   exactly what that means.

10         THE COURT:  It means -- the rest of this week,

11  you're not going to get on recall this week.

12         THE WITNESS:  Ah, got it.

13         THE COURT:  You can go home.  After that, I don't

14  know how the schedule will go.  But you're not permitted to

15  discuss your testimony with any witness who has not yet

16  testified.  Thank you.

17         THE WITNESS:  Thank you, Your Honor.

18         THE COURT:  All right.  We're going to go to

19  deposition designations.

20         Now, I actually see from a list of witnesses

21  "deposition designations."  So do we have more than one

22  witness?  What are we doing now?

23         MS. WOOD:  Yes, Your Honor.  We have one read-in

24  for Mr. Creput, and then there would be a second read-in --

25  it's actually quite short -- from Mr. Lipkovitz, and then

69

Redirect Examination - J. Friedman

1   there would be a video of Mr. Lipkovitz.

2           THE COURT:  All right.  Are there any issues about

3   these depositions?  The designations have been agreed to?

4           MS. RHEE:  All but really a handful of

5   designations, and we have the agreement with respect to

6   those, Your Honor.

7           THE COURT:  But, I mean, the two that have just

8   been mentioned, are there any issues as to the two?

9           MS. RHEE:  Yes.  For the two, I think for the

10  second one --

11          Your Honor, with respect to the second of the two

12  designations, Google has no objections.  For the first one,

13  there are only a handful of objections.  And what we would

14  propose to do is just at the time that the question is

15  posed, you can see what the answer is and we can lodge our

16  objection.

17          THE COURT:  Fine.  All right.  So I need copies of

18  whatever it is that's going to be read, one for my clerk,

19  who's going to read the witness's answers.

20          MS. WOOD:  May I have one moment to confer?

21          THE COURT:  Yes.

22          MS. WOOD:  So, Your Honor, just as a logistical

23  matter, we have -- what we've done is printed the full

24  deposition in a binder, but obviously only portions are

25  going to be read.  We can indicate the portions that will be

                                                          70

Redirect Examination - J. Friedman

1   read or we, alternatively, have just the edited portion to

2   give you.  But I believe we may have a mistake in one area.

3              THE COURT:  All right.  The main thing -- let's

4   get them out.  I don't care which version you do.  If it's

5   the whole thing, just say page 17, line 14.  That will get

6   my clerk right to it.

7              MS. WOOD:  Understood.

8              THE COURT:  Okay.  I assume the sections are

9   highlighted somehow.  Are they yellow? green? pink? blue?

10  What?

11             MR. TEITELBAUM:  I'll confirm that now, Your

12  Honor.

13             MS. WOOD:  Your Honor, actually, I believe the

14  full transcript copy is downstairs.  So we just need to

15  bring that up.  I apologize for that.  We can start with a

16  different version, or we can take an afternoon break.

17             THE COURT:  I want to keep this moving until 4:00.

18  So whatever we've got, let's do it.

19             MS. WOOD:  Okay.  I apologize for that, Your

20  Honor.

21                           (Binders are submitted.)

22             THE COURT:  Since I don't have any highlighting in

23  this, I'm assuming --

24             MR. TEITELBAUM:  We are attempting to sort that

25  out right now, Your Honor.  I'm sorry for the delay.

Direct Examination - E. Lipkovitz

1          THE COURT:  Most important -- we just need one

2    copy that's highlighted for the reader.  I can jump around,

3    but he can't.

4          MR. TEITELBAUM:  Understood, Your Honor.

5          MS. WOOD:  We'll just use these paper clipped.  I

6    apologize.  We'll put them in binders for you properly.

7          THE COURT:  For the record, this is excerpts of

8    the deposition of Eisar Lipkovitz.  He was under oath when

9    he gave his testimony.  So let's go.

10                    DIRECT EXAMINATION

11   BY MS. WOOD

12   Q    Could you provide your full name for the record?

13   A    Sure.  It is Eisar Lipkovitz.

14   Q    Okay.  I'd like to discuss your time being employed at

15   Google.  When did you join Google?

16   A    August 2, 2004.

17   Q    You remember it pretty clearly.  Is that a -- does that

18   date stick out in your mind?

19   A    I have an affliction of having an extremely good

20   memory.  I'm not bragging, but, you know, it's actually

21   different for me to -- not to remember stuff, you know;

22   so...

23   Q    Yeah.  I appreciate that.

24          So what were your -- what was your initial job

25   when you joined Google?

Direct Examination - E. Lipkovitz

1  A    I have joined what was later called search

2  infrastructure team.  I was working on the search engine,

3  and I was managing a team initially that was in charge of

4  what was called Google Web Server, and pretty quickly

5  thereafter, it expanded to sort of managing the crawling and

6  indexing team.  And, you know, over time it became sort of a

7  larger scope, all of it.

8           And so the infrastructure is what makes search

9  possible.

10 Q    So, Mr. Lipkovitz, are you an engineer?  Correct?

11 A    I am by trade.

12 Q    And what does that -- I mean, so what does that mean

13 that -- your day-to-day responsibilities, what are the -- I

14 should ask, what are the general responsibilities of an

15 engineer at Google?  What types of projects might you work

16 on?

17 A    You know, it's just all over the place, and all of it

18 changed over time.  And in my case, because I start at a

19 manager, it's a little bit different.  But in general, it's

20 writing code, reviewing code, maintaining systems, writing

21 design --

22           THE LAW CLERK:  I have a duplicate.  I have a

23 bunch of --

24           MS. WOOD:  You have page 3 of 26?

25           THE LAW CLERK:  I have -- oh, here we are.  Sorry.

Direct Examination - E. Lipkovitz

1   A    So as I said, writing, design, documents, participating

2   in meetings and so forth.

3   Q    Are engineers at Google involved in strategic

4   decisions?

5   A    It changed over time.  When I joined, quite a bit, yes.

6   Q    When you talk about programmatic, what do you mean by

7   "programmatic"?

8   A    You know, it's a buzz word that I don't know, you know,

9   who made it up.  And it was a pretty important one,

10  especially when I joined.

11          The industry was moving away -- or "away" is not

12  the right word.  Prior to programmatic, the vast majority of

13  ads, you know, being sold online, at least by dollars, I

14  should say, were direct sold.  An advertiser and a publisher

15  would have a relationship, and they would agree, you know,

16  to a contract and buy units, roughly how TV advertising is

17  sold today.

18          And programmatic was an attempt to sort of get it

19  more efficient and sort of automated and, you know, use

20  technology to minimize the number of people needed to talk

21  and salespeople and martinis and, you know, all that stuff.

22  That's probably the highest level.

23          MS. WOOD:  This is later.

24  BY MS. WOOD

25  Q    Okay.  That makes sense.  So after 2016, summer 2016,

Direct Examination - E. Lipkovitz

1   you were the lead engineer for the display and video team

2   for Google?

3   A    That is correct.

4   Q    You had responsibility for all Google's display

5   business on the engineering side; is that correct?

6   A    It is correct.

7   Q    How many people were in the display and video

8   organization all together?

9   A    It changed over time, but I would like to say somewhere

10  between 2,500 to 3,500-ish.

11  Q    Okay.  And were you sitting on the top of that org

12  chart?

13  A    As I mentioned, we had, you know, multiple partners,

14  depending on the time.  I was probably -- by head count, I

15  had the majority of them because engineers is the bulk of

16  that organization from head count.

17  Q    What is a publisher, as you understand it?

18  A    I mean, you know, it starts with a generic definition

19  of publisher, which was a commonplace in media.  But in the

20  context of ads, it is an entity that is trying to monetize,

21  make money for media by placing ads next to their content.

22  And they use technology or, you know, some sort of online

23  ability to do that, to do so.

24  Q    Okay.  And what types of technology might a publisher

25  use?

Direct Examination - E. Lipkovitz

1  A     You kind of have to start with an ad server, which is
2  effectively a piece of software that lets you manage the
3  inventory of slots on, you know, your webpage.  So that's
4  probably the most important aspect.
5  Q     Do publishers use an ad server for both direct and
6  remnant sales?
7  A     Yes, they do.
8  Q     Okay.  Are you familiar with the terms "buy side" and
9  "sell side"?
10 A     Yes.  So, traditionally speaking, buy side is referring
11 to the advertiser-facing products and sell side to the
12 publisher-selling product -- facing products.
13 Q     Did Google have ad tech tools which it offered to the
14 sell side?
15 A     Yes.
16 Q     And did you have ad tech tools which you offered to the
17 buy side?
18 A     Yes, we did.
19 Q     Okay.  Did you -- I guess after summer 2016, did you
20 have responsibility for Google's products on both the buy
21 and sell sides?
22 A     I did.
23 Q     If I'm a small advertiser spending $1,000 a month with
24 DVM --
25           MS. WOOD:  And, Your Honor, I'll just represent to

Direct Examination - E. Lipkovitz

1    the Court, that is DV360 --

2    BY MS. WOOD

3    Q       -- would DVM be an option for me?

4    A       "Option" meaning what?  Like where is the decision?

5    Q       Would it make sense for me to work on DVM?

6    A       I would not advise it.

7    Q       Why not?

8    A       Because, like, all the benefits exist on DVM would be

9    extremely useless for you.

10   Q       How so?

11   A       You know, if we have to charge you for support, you'll

12   spend more money on that than whatever you spend on media.

13   Q       Does the ad server business have substantial fixed

14   cost?

15   A       Yeah.  I think it is -- you know, the biggest one is

16   probably the technology R&D team, right, and payroll for

17   that.  You know, you may need some sales and support to

18   support the customers, and then you have some infrastructure

19   costs, you know, to have the actual ad server.  Right?  It's

20   usually software as a service, you know.

21           The ad tech company hosted everything and had the

22   production assistants.  They have to have ops people.

23   Sometimes they have data centers, whatever.

24           THE LAW CLERK:  Do I continue?

25           MS. WOOD:  Go ahead.

77

Direct Examination - E. Lipkovitz

1   A    Okay.  That's a good question.  It was a debate, right?

2   I think there were sort of multiple reasons.  Right?  One

3   is, you know, we had a team.  Right?  And you get into this

4   dynamic that I see everywhere that Google probably works

5   where, you know, it's hard to cancel a thing and the team

6   would advocate for it.  Right?  And you know, some type of

7   job security.

8        And to be clear, these people would not lose their

9   job, you know.  It's hard to lose your job at Google.  It's

10  just literally their vested interest, right, one.

11       Two, a lot of the customers of DFP were large

12  publishers.  Many of them are large media companies.  Right?

13  So you know, Google did not want the anger pissing them off.

14       And I think, three, you know, it is providing

15  value.  And, you know, we tried so sort of contain the cost.

16  I don't think we are making any profit of that.  Right?  But

17  it's some sort of a public service, you know, to continue

18  kind of boosting the ecosystem.  It's just hard, you know,

19  when you're a large company, to stop doing something.

20  Q    Was there value specifically to Google in running the

21  ad server?

22  A    Yeah.  So the team -- there were people, you know, when

23  I was referring back to the first argument.  Right?  The

24  team wasn't just, you know -- when we are doing job security

25  or self-preservation, right, they would argue that's a

78

Direct Examination - E. Lipkovitz

1   strategic value of having access to inventory.

2   Q    What do you mean by "access to inventory"?

3   A    So, you know, I think our goal was to give

4   advertisers -- you know, we had multiple constituents,

5   right, at a super high level, right, advertisers, users, and

6   publishers.

7           My point of view was always that advertisers sort

8   of have the highest allegiance because they're actually

9   paying.  And what advertisers want is they want to have

10  access to users, right?  And we wanted to give them the best

11  product, which means, you know, it's easy to use and it

12  gives the best performance.  But, you know, you still need

13  to have access to as many users as possible.  So in that

14  regard, yes, DFP was helpful.

15  Q    How was it helpful in providing access to users?

16  A    Yeah.  So I think there is two ways to think about

17  access to users or impressions, right?

18          One is having a relationship, right, with every

19  publisher to the extent it is possible and having an

20  opportunity to compete on every impression of that

21  particular publisher.  And, you know, first one is easy,

22  right?

23          So you want to have a relationship whether you are

24  returning a network or you're running an SSP with all

25  publishers, right?  So you don't want to anger them.  You

Direct Examination - E. Lipkovitz

1   want to offer them a product that they will be happy with.

2          And secondly is having some influence over the

3   decisioning, right?  So at the end of the day, the ad

4   server -- because at the end of the day, somebody has to

5   show the ad, right?  And the ad server is making the final

6   decision, right?

7          And our goal is to compete at every potential

8   auction that exists, which we felt is good in two ways.

9          One is, you know, give our advertisers access.

10  And two, by definition, increases the publisher revenue,

11  right, because every impression you won -- if you didn't

12  win, right, the publisher would make less money.

13  Q    Are you familiar with last look?

14  A    I heard this expression being used, yes.

15  Q    What do you understand last look to refer to?

16  A    I think what people were referring to is some

17  opportunity, kind of at the end after everybody else bid on

18  the impression, to try to beat the -- you know, the best

19  price or whatever.

20  Q    While you were in -- from 2014 to 2018, did Google

21  offer AdX last look in DFP?

22  A    I think that -- I think it's a publisher-friendly

23  feature, right, because if you give anybody, no matter who

24  it is, an opportunity to match whatever price, like any

25  auction, right, at the end of the day, the seller will make

Direct Examination - E. Lipkovitz

1    more money, right?

2          Because I just think it's more problematic from an

3    advertiser standpoint, depending on how it's being done, and

4    it gets complicated who is actually benefiting from this.

5    When user with preferential treatment, you know, it is a

6    very complex topic.

7          So I really, A, first don't remember all the

8    details.  B, I think it's very hard to say exactly whether

9    it's good or bad, right?  It just felt somewhat asymmetric.

10   I wasn't excited about it.

11   Q    And did DFP offer any other SSPs --

12         MS. WOOD:  SSPs being another term for exchanges,

13   Your Honor.

14   BY MS. WOOD

15   Q    -- did DFP offer any other SSPs last look?

16   A    I do not know.

17   Q    When you first joined Google's display team in 2014, am

18   I right that GDN --

19         MS. WOOD:  Which we're calling at this trial, Your

20   Honor, Google Ads.

21   BY MS. WOOD

22   Q    -- am I right that GDN, or Google Ads, was not

23   permitted to buy inventory offered by third-party SSPs?

24         MS. WOOD:  I'm adding "or exchanges."  That's what

25   we're referring them to in this trial.

Direct Examination - E. Lipkovitz

1          THE WITNESS:  That is correct.

2    BY MS. WOOD

3    Q    So GDN, meaning Google Ads, was not permitted to buy

4    inventory from programmatic, correct?

5    A    I'm not a fan of the words "permitted" because it did

6    become a debate while I was there.  But it did not, yes.

7    Q    Okay.  Why?

8    A    Well, you know, there is some -- they are somewhat, I

9    consider, religion, which, you know, maybe was justified by

10   supposedly business reasons.  And there was some actual

11   arguments that were, you know, fairly objective, right, but

12   just harder to quantify.

13         Like, let me start with the second one.  GDN was

14   especially, you know, a fairly simple product for, you know,

15   advertisers that don't need a lot of control.  I understand

16   that you mentioned earlier smaller, but it's difficult

17   because it's -- some -- a large advertiser don't need

18   control.

19         However, there were concerns that if those

20   advertisers placed ads on third-party SSPs, they may end up

21   being shown into, you know, like, in context, those are the

22   types that we don't want.  And then spam.

23         So let me explain these two issues, right?  So,

24   you know, if you're Coca-Cola, you know, you might not want

25   to be a place where your ads are showing on some porn site

                                                              82

Direct Examination - E. Lipkovitz

1    or whatever or -- you know, or some websites that have some

2    political point of view you don't agree with, you know.  All

3    these things become a real issue.

4            You know, a few years back, right -- oh, yeah.

5    And there were people on the GDN team who felt this is an

6    incredible, important thing.  And the only way to ensure,

7    because we know who the publisher is, is to make sure

8    through our -- you know, the Google network, including AdX,

9    where we have a direct relationship with these publishers,

10   right?  So we know who they are.  We can authenticate which

11   pages they are, what they look like, and stuff like that.

12           Spam is another issue.  It's, again, an

13   advertiser-friendly position that -- you know, by spam, I

14   mean it's a case where the impression actually was not shown

15   to anybody like a real person, right?  So there's some types

16   of middleman that would manufacture impressions, right, to

17   collect revenue and essentially to advertisers of money,

18   right?

19           And AdX and, you know, other Google technologies

20   had a little bit better SDKs and some special JavaScripts

21   that will be better at detecting this sort of -- type of

22   activity, right?  That's what the genesis of that.

23           The counterargument was, well, you know, some

24   advertisers are willing to take risks.  Why can't we offer

25   that?  And that was getting into some internal debate.  But

Direct Examination - E. Lipkovitz

1   that's sort of, you know, how things evolve.

2              And to be honest, you know, it was the way things

3   just sort of evolved, right?  So at some point, this became

4   a topic of debate.  So it's not that anything was

5   prohibited, but that's sort of how we got there.

6   Q    Were there financial considerations in GDN or Google

7   Ads bidding on third-party exchanges?

8   A    Yes.  I think that when Google bids on a third-party

9   exchange, they would not make sell-side margin.

10  Q    What do you mean by "sell-side margin"?

11  A    So when the impression was bought through AdX, AdX took

12  a cut of the payout from the advertisers to the publisher.

13  It's considered sell-side margin.

14  Q    Was there concern that GDN or Google Ads bidding on

15  third-party exchanges would make third-party exchanges more

16  attractive partners for publishers?

17  A    There are often people that express that concern, yes.

18  Q    Who in particular expressed that concern?

19  A    Generally speaking, people that were on the sales, you

20  know, the sort of -- the partnership sales team that worked

21  with those publishers.

22  Q    Would Jonathan Bellack express those concerns?

23  A    He did.

24  Q    What did -- if you recall, what specific concerns did

25  Jonathan Bellack raise?

84

Direct Examination - E. Lipkovitz

1  A    You know, what you just said.  And, you know, I think

2  we talked about it earlier, right?  Like the exclusivity in

3  core of GDN or AdWords and in AdX.

4  Q    Can you explain that concept -- that last concept about

5  the exclusivity of GDN or Google Ads and AdX a little bit

6  more.

7          THE LAW CLERK:  Do I start with the "he said"

8  quote that's before the A?

9          MS. WOOD:  Yes.

10 A    Okay.  He said, quote, he likes and -- you know, and I

11 think the people and the sort of partnership team were even

12 stronger in that respective to make the claim that AdX is

13 the -- in quote, the only place where GDN or AdWords demand

14 is exposed.

15 Q    Why was that important?

16 A    Because it's some sort of like, in quote, a winning

17 argument with the publisher.  I didn't agree with that.

18 Q    Had GDN or Google Ads bid on third-party exchanges,

19 would it have increased their auction pressure?

20 A    It would, yes.  By definition, any additional buyer

21 would have this impact.

22 Q    Would it have increased the clearing price of those

23 third-party exchanges?

24 A    It could.

25 Q    What is capital A, capital WBid, one word.  What is

Direct Examination - E. Lipkovitz

1   AWBid?

2   A    So I think it stands for AdWords bidding.  And the idea

3   was to extend AdWords' ability to buy on other exchanges,

4   which is a topic we discussed, you know, in the last ten

5   minutes at length.

6   Q    Were there proponents of AWBid within Google?

7   A    Yes.

8   Q    Who were the proponents of AWBid?

9   A    So it's effectively -- I mean, the biggest one was Oren

10  Zamir, who reported to me at the time.  And he was sort of

11  the head of the remarketing -- you know, we called it

12  remarketing; here, it's called retargeting -- where he

13  felt -- and I agree with him -- that that's an area where

14  the benefit for advertisers is actually quite clear.

15  Q    Why was there significant benefits for advertisers?

16  A    Yeah.  We -- because, you know, fundamentally,

17  advertisers have a budget, right?  And so there is a limit

18  to how many impressions they are actually going to buy,

19  right?  And most impressions are similar with one exception.

20           For retargeting advertisers, they had all the

21  data.  And, you know, our technology supported it.  That

22  shows that anyplace you can catch a user, right, that is

23  subject to retargeting increases your chance of a click and

24  a conversion.

25           So it is a type of advertising where more is

Direct Examination - E. Lipkovitz

1    better, much more than, you know, any other type of

2    targeting.

3    Q    Is -- so are you saying remarketing was a small part of

4    GDN or Google Ads demand?

5    A    If counted by number of impressions, yes.

6    Q    Was AWBid limited to remarketing targeting?

7    A    Yes.

8    Q    Who was --

9              MS. WOOD:  And skipping pages.

10   BY MS. WOOD

11   Q    Who was using header bidding technology?

12   A    That was a mix of -- so publishers were using the

13   technology, but how they got introduced to that was sort of

14   all over the place.  So sometimes Criteo would come in and,

15   you know, say I want to put my tag on the page.  And the

16   publishers are like, well, why should we give you exclusive

17   access?  Fine, put the header bidding there.

18             Sometimes -- could be one of the SSPs that you

19   mentioned or a network.  I mean, Criteo is a network that

20   would come and say, you know, like, why are you giving all

21   these impressions just for one SSP?  Could be Google or

22   anybody else.  We would like to -- right.  So they would go

23   and introduce.

24             At some point, there were some vendors that were,

25   like, selling header bidding technology, right, because

Direct Examination - E. Lipkovitz

1   there's some configuration you can do with that and whatnot.

2   Q    So in some way, was the publisher directly calling the

3   SSP or exchange via the header bidding code?

4   A    Yes.  You can say calling usually multiple SSPs, yes.

5   Q    Did header bidding allow that call to happen without

6   DFP being involved?

7   A    I believe there was a possibility that can happen, yes.

8            MS. WOOD:  And then there's some skipped pages.

9   BY MS. WOOD

10  Q    Well, why would publishers adopt the technology if it

11  was so crappy?

12  A    So let's talk about what's crappy about it first, and

13  then I think it will help you understand the question -- the

14  answer, right?

15           The worst part of it, in my opinion, was the fact

16  that it made the page render a lot slower because it had to

17  execute the sequence.  It was very inefficient.  It was

18  complicated.  So it slowed down your browser even, right?

19           And because it was a bargain, people, they feel

20  like -- they make mistakes sometimes.  You didn't get any

21  ads, right?  So the user experience was pretty bad.  Some

22  publishers -- and what I mean by that is, like, the page

23  would reload.  It would take a very long time for the page

24  to render or you would get, like, broken links.

25           Some publishers didn't care about, right, or at

Direct Examination - E. Lipkovitz

1    least -- let me be more specific.  The person who put the

2    header bidding tag was somebody trying to show their boss

3    they're making more money, you know.  And the person that

4    was in charge of the content or the CEO of the publisher

5    didn't even realize what was going on.

6             The second issue was -- that's one dimension.  The

7    second one is around fraud and billing.  So this is

8    something we didn't talk about, but it's an important one.

9             You know, a publisher needs to know how they are

10   owed because they sold their impression.  If you're working

11   with an exchange or an SSP in general, you know, your ad

12   server knows who you sold an impression to.  And then you

13   can go work with that party to make sure how much you owe.

14            With header bidding, there was a lot done with the

15   client.  There was no paper trail.  So you had to have a lot

16   of trust.  So it's one of those things where you think

17   you're making more money, but then, when you tried to

18   collect it, you realize you're not.  That was another big

19   factor.

20            So those two in particular were ones where the

21   people making decision didn't even have enough visibility.

22   And all they focus about is the fact that they have

23   increased the auction pressure by having more buyers.

24            Now, the last point, which is very subtle, has to

25   do with what is the actual value prop of having another SSP.

89

Direct Examination - E. Lipkovitz

1   Some of them had -- were running auctions that were not

2   clean, either first-class auction or something you don't

3   even understand.  It wouldn't be clear with their margin,

4   and the net effect was that it was trying to deal with that,

5   right, whether they're Google advertisers or other DSP

6   advertisers.

7            Initially, it worked.  But then advertisers became

8   more sophisticated.  They started bidding against

9   themselves.  They start realizing what DSP do what things.

10  And I think the value of header bidding diminished over

11  time.

12  Q    Given that, why did header bidding adoption grow so

13  rapidly?

14  A    I think the concept of having multiple parties compete

15  in the impression is actually pretty good.  And I think

16  publishers were sort of desperate forever.  They'll try it.

17  Q    Did it also -- this will be a more complicated

18  question.

19  A    Sure.

20  Q    Did it increase the amount of inventory third-party

21  SSPs, meaning exchanges, were seeing?

22  A    It must have, yes.

23  Q    Why must it have?

24  A    Because anyplace that you put a header bidding tag

25  prior to that, there was only one SSP getting it.  Now, more

Direct Examination - E. Lipkovitz

1   than one.  So definitionally add more impression for every

2   SSP.

3   Q    Is there a value in seeing more inventory for SSPs or

4   exchanges?

5   A    There is.

6   Q    What is that value?

7   A    I mean, firstly, you know, you would have a larger

8   denominator, right?  So you might increase your numerator so

9   you get more revenue.

10          Second, you can tell your buyers on the exchange

11  that you have more inventory or you have access to publisher

12  X, Y, Z.

13  Q    So let me just make sure I understand.  Was the

14  argument that publishers -- header bidding made it easier

15  for publishers to switch to other SSPs or exchanges?  Am I

16  understanding your testimony right?

17  A    I think in the long run -- and when you say "switch,"

18  switch what, right?  You need to be more specific.  I think

19  what header bidding did is it exposed them, made it easier

20  for them to work with multiple SSPs at the same time, which

21  can then lead to discovering some things that they like more

22  about a particular product or a more aggressive sales

23  strategy that will eventually lose because Google caused

24  Google to lose the entire account.

25  Q    It's the SSPs, meaning exchanges, that are competing

Direct Examination - E. Lipkovitz

1   with AdX, correct?

2   A    Correct.

3   Q    And the header bidding is allowing those SSPs or

4   exchanges to have more access to inventory, correct?

5   A    That is correct, yes.

6   Q    It's allowing those SSPs or exchanges to develop direct

7   relationships with publishers, correct?

8   A    Yeah.

9   Q    Sorry.  I was answering Julie.  I'll restate the

10  question.

11         And header bidding is allowing SSPs or exchanges

12  to develop direct relationships with publishers, correct?

13  A    It lowers the barriers of entry, yes.

14  Q    Could header bidding have ultimately allowed non-Google

15  SSPs or exchanges to see as many impressions as AdX?

16  A    Theoretically speaking, yes.

17  Q    What is it about access to inventory that increases the

18  competitiveness of the SSP or exchange?

19  A    You know, it's pretty simple, right?  Like, you can

20  compete on different things if you're an SSP.  Having the

21  most impressions is -- you know, is pretty easy for people

22  to measure even, right?

23  Q    But I guess I'm struggling to understand how that

24  translates into competitiveness.  Does it make AdX a better

25  place to buy?

Direct Examination - E. Lipkovitz

1   A    Yes.

2   Q    Why does that make AdX a better place to buy?

3   A    I mean, at some level because you don't need to buy in

4   other places, right?  Because you get everything you need

5   there.  Let me give you an analogy, right?

6          So Amazon has the Marketplace, right?  They send

7   the products from Amazon.  Sometimes they allow other

8   merchants to put their products on Amazon, right?  So you,

9   as the consumer, at some point, like -- you know, I'm just

10  going to go to Amazon.  Why would I even go to Google or go

11  into other websites and do comparison shopping?  It's not

12  just worth my time because I know Amazon has everything, or

13  whatever.

14  Q    So I'm just trying to understand SSP or exchange

15  competition a little bit better being a lawyer, not somebody

16  that deals with this every day.

17  A    No, I get it.

18  Q    Earlier we talked about SSPs or exchanges compete on

19  the amount of demand on the -- the amount of demand buying

20  on their SSP, correct?

21          So the demand you have on your exchange --

22  A    Yeah.

23  Q    -- the more -- I'm sorry.

24          So the more demand you have on your exchange --

25  A    Yeah.

Direct Examination - E. Lipkovitz

1    Q     -- the more competitive your exchange is, is that
2    correct?
3    A     It's more competitive for publishers, but yes.
4    Q     Is it -- is your testimony that there's also
5    competition for access to inventory?  Let me start again.
6            Do SSPs compete for access to inventory?
7    A     They do.
8            Okay.  Let me make maybe a slight suggestion,
9    right?  If we go back to the marketplace -- could be eBay,
10   Amazon.  It doesn't actually matter, right?
11           It's always a two-sided marketplace.  There are
12   buyers and sellers.  And you get into this sort of virtual
13   cycle thing where, if you find a way to make it more
14   attractive to buyers, now you're competitive towards buyers.
15   You will then use that to go to tell sellers you should sell
16   here because I have more buyers.
17           And then you're going to go back to buyers and say
18   I just got more sellers; you should buy here and shouldn't
19   buy anywhere else.
20           So you get the dynamic that, you know, more
21   parties -- doesn't matter if it's buyers and sellers -- have
22   this virtual cycle that makes the whole thing sort of more
23   competitive.
24   Q     And header bidding here is undermining the network
25   effects of offering more inventory to advertisers, correct?

94

Direct Examination - E. Lipkovitz

1   A     Let me think about it.

2            Yeah, you can say that.  It is essentially back to

3   commoditization.  Yeah, it is reduced to the network effect,

4   you can say.

5   Q     Is it lowering AdX's differentiated value proposition

6   for advertisers?

7   A     Yes, it could.

8   Q     Is it increasing other SSPs', meaning exchanges', value

9   proposition to advertisers?

10  A     Yes, it could.

11  Q     Is it increasing other networks' value to advertisers?

12  A     It could.

13  Q     And together it's commoditizing the SSP or exchange

14  level of the stack, correct?

15  A     It does.  But it does create a lot of new products.

16  Q     Okay.  I mean, is it fair to say that the network

17  effects -- AdX no longer has differentiated network effects

18  compared to its competitors due to header bidding?

19  A     I wouldn't say "any longer."  I think it will have --

20  Q     I didn't get your answer.

21  A     Yeah.  Let me repeat myself.

22            I wouldn't say it no longer has a network effect.

23  I think it weakens it.

24  Q     Okay.  But it strengthens other SSPs' or exchanges'

25  network effect?

Direct Examination - E. Lipkovitz

1   A    Yes.  But you also have the opposite scenario, right,

2   where somebody was exclusively, you know, sort of speak with

3   one SSP and, because of header bidding, now AdX has access.

4   Q    Does it also put pricing pressure on AdX?

5   A    What do you mean by "pricing pressure"?  Pricing of

6   what?

7   Q    Did it put pressure on AdX to reduce its revenue share?

8   A    We have not lowered the rev shares, to my knowledge.

9   So I don't know.  I mean, I can speculate.

10  Q    Was a concern that the commoditization of the SSP or

11  exchange would lead to a pricing war?

12  A    I think we were in some sort of pricing war that we

13  refused to participate in, right?  That probably made it

14  worse.

15  Q    How did you refuse to participate in a pricing war?

16  A    You know, you just lose customers instead of lowering

17  prices.

18  Q    Did Google lose shares as a result?

19  A    I don't know.

20  Q    Why -- first of all, did you understand GDN or Google

21  Ads to have differentiated demand?

22  A    Yes.

23  Q    And why was its demand differentiated?

24  A    Because primarily -- because primarily, of all the

25  technology that essentially Bamen and Ali's team build,

                                                              96

Direct Examination - E. Lipkovitz

1   right, to produce ROI you know the advertisers want, right?

2   And, you know, we don't -- we don't buy *USA Today*.  We don't

3   care, you know, where -- from a GDN lens where you buy the

4   things.

5          We just look at based on availability of signals

6   and based on some of technologies, right, and based on some

7   restrictions we have and where we want to buy and whatnot,

8   right?  So yes, in that regard, it is a differentiated

9   demand.

10  Q    And I know that we keep going over this point, but is

11  there a group of advertisers that only buys on GDN or Google

12  Ads and don't buy anywhere else?  I mean -- oh, sorry.

13  A    And don't buy where else?  I mean, that's a very broad

14  question.

15  Q    On the DSPs.

16  A    I believe there is a large category of usually small

17  advertisers don't buy on DSPs.  I do believe those,

18  especially now, would buy on FAN and Amazon.  Why wouldn't

19  they?

20  Q    Okay.  That's helpful.

21          Is there anyone else those small advertisers could

22  buy other than FAN and Amazon?

23  A    I think some of the networks probably offer

24  self-service products, you know, like in Amobee or Criteo is

25  still in business, right?  And I don't think, you know --

                                                              97

Direct Examination - E. Lipkovitz

1   wait.

2            And I don't know what, you know, the reason Criteo

3   doesn't have small advertisers is because of the complexity

4   of what I told you earlier, but probably have a long-tail

5   product.

6            MS. WOOD:   Thank you very much.   I appreciate your

7   assistance.

8            THE COURT:   All right.   Now I'll take the

9   afternoon break until 4:30.

10           MS. WOOD:   Thank you.

11                          (Brief recess taken.)

12           THE COURT:   Ms. Wood.

13           MS. WOOD:   All right.   Yes, Your Honor.   So now

14  we -- the litigation deposition of Mr. Lipkovitz was

15  actually videotaped unlike the investigation deposition,

16  which is why we read that one in.   So now we're prepared to

17  play the video of Mr. Lipkovitz's deposition.   I believe the

18  run time is approximately an hour and 16 minutes.

19           THE COURT:   Is it repetitive of what we just had

20  read in?

21           MS. WOOD:   It should not be, no, Your Honor.

22           THE COURT:   All right.

23           MS. WOOD:   There are two limited instances where I

24  believe Google wants to maintain an objection.   So we'll

25  just pause the video at that point.   You should have in

                                                            98

1    front of you the binder, and we'll note the page and the

2    line number where the question was asked.  I don't believe

3    there was an objection at the time.  I think there's an

4    objection now.

5           THE COURT:  Just so I know, what's the page we're

6    talking about?

7           MS. RHEE:  Actually, Your Honor.  To make

8    everything efficient and not to have to pause, the first one

9    is on page 127 of the deposition, and it's lines 12 through

10   14.

11          THE COURT:  The question is, "Did you think it was

12   part of the culture in the group at that time?"

13          MS. RHEE:  Correct, and the answer is, "Correct."

14          THE COURT:  Well, it's simply his opinion about

15   the culture at Google.  It's one person's opinion.  I don't

16   think that's enough to add much to the case one way or the

17   other, and it really is not appropriate.  So I will strike

18   lines 12 through 14.

19          MS. WOOD:  Your Honor, may I respond?

20          THE COURT:  Very quickly.

21          MS. WOOD:  I would just, again, underscore that

22   this is the director of engineering who was the head of

23   display at the time.  So I don't believe it would be

24   appropriate to characterize it as just one person at Google.

25   This was the person in charge of the display group and

1    engineering at Google.

2              THE COURT:  But you've already said it was

3    intellectually dishonest in my opinion.  You're getting in

4    with --

5              MS. RHEE:  Of course, we're not objecting to that

6    line.  So we understand.

7              THE COURT:  Right.

8              MS. RHEE:  And then similarly, we have a very

9    similar objection to page 196, Your Honor, lines 13 through

10   15.

11             THE COURT:  That's all right because I think he --

12             MS. RHEE:  Correct, Your Honor.  We're not

13   objecting to that.

14             THE COURT:  Well, you have to read above that.  So

15   his answer, "Well, you know, I think it's within our right

16   to do that, but it's not a solution would propose."

17             Then the question was, "Why is it not a decision

18   that you would propose a solution you would propose?"

19             And he said, "It's sort of lazy."

20             I mean, that's all right because I think he's --

21             MS. RHEE:  Correct, Your Honor.  We're not

22   objecting to that.  It's then just the add-on point where it

23   really just goes to the --

24             MS. WOOD:  Are you at 196, line 8, Your Honor?

25             THE COURT:  I'm sorry.  I was at 195.  196,

1    line 8?

2              MS. WOOD:  Yes, Your Honor.  It's obviously

3    responsive to the things discussed on 195.

4              THE COURT:  Well, I am letting 195 in.

5              MS. RHEE:  Well, we didn't object, Your Honor, to

6    195.

7              THE COURT:  I'm sorry.  What is your objection to?

8              MS. RHEE:  Page 196, Your Honor, lines 13 through

9    15.

10             THE COURT:  I'm allowing that in.

11             Okay.  Let's go.

12             MS. WOOD:  They're in your binder, Your Honor.

13             THE COURT:  All right.

14                            (Video played.)

15             MS. WOOD:  Okay.  We pause here.  It's just

16   pausing to take out the objection.

17                            (Video played.)

18             MS. WOOD:  It's PTX 399.

19                            (Video played.)

20             MS. WOOD:  That's PTX 1520.

21                            (Video played.)

22             MS. WOOD:  This is PTX 395.

23                            (Video played.)

24             MS. WOOD:  This is PTX 3467.

25             THE COURT:  Thank you.

Video Testimony Played - E. Lipkovitz

1                    (Video played.)

2                    (Video ended.)

3           THE COURT:  Perfect timing.

4           MS. WOOD:  Your Honor, may I just move a few

5    exhibits in?  Or I'm happy to do that in the morning as

6    well.

7           THE COURT:  I think we need to do it in the

8    morning because I am concerned.  My view is, if we're not

9    using all of an exhibit, only those portions that we're

10   actually using should be going into the permanent record of

11   the case.  So several of these exhibits, you were only

12   taking portions of them.

13          So what I'm going to ask you to do, again, because

14   I'm not formally admitting them at this time so you don't

15   have the 10:00 tomorrow morning problem.  Okay?

16          MS. WOOD:  Thank you, Your Honor.

17          THE COURT:  But these exhibits that we've talked

18   about during this deposition -- we'll do that other stuff in

19   a second -- I want you to make sure, first of all, that

20   Ms. Rhee agrees with what you're doing.  Redact them.  All

21   right?  And then we'll put the redacted ones into the formal

22   record.

23          MS. WOOD:  So redact everything that was not

24   discussed?

25          THE COURT:  Exactly.

                                                            102

1          MS. WOOD:  Understood, Your Honor.

2          THE COURT:  All right.  However, I think there are

3    some other exhibits that were admitted today.

4          MS. WOOD:  Yes, Your Honor.

5          THE COURT:  Actually we still have a problem with

6    something as well.  Remember there was one -- where is it?

7          MS. WOOD:  PTX 754?

8          THE COURT:  I think that's it.

9          So Katie is going to read to you the exhibits

10   other than the ones we discussed during this deposition.

11   We're going to read the exhibits that we believe have been

12   admitted.  And there's one that I think only a portion of it

13   comes in.  All right?

14         MS. WOOD:  The only other question I have, and I'm

15   happy to do it in the morning instead, but we had talked

16   about Mr. Lipkovitz was one of the individuals that we had

17   agreed would not need to come in person; and, in exchange

18   for that, we would, obviously, play his deposition.

19         But we also have some additional exhibits that

20   were not played at his deposition.  These have not been

21   objected to by defense counsel, is my understanding.  And I

22   would like to move those into evidence.  But I can do that

23   in the morning.

24         THE COURT:  No.  Let's get that done tonight.

25         Hold on a second.

1          All right.  Well, first, let's have Katie read the

2    ones that we believe are in.  Okay?

3          THE COURTROOM DEPUTY:  PTX 754, DTX 404, DTX 382,

4    DTX 655.

5          MS. WOOD:  Yes.  And I have in my notes, Your

6    Honor, for PTX 754, only the laser email comes in, not the

7    top email.

8          THE COURT:  Correct.  Okay.  Thank you.

9          So those are the exhibits that were admitted

10   today.

11         Were there any new demonstratives, or yesterday

12   did you upload all the demonstratives?

13         MS. WOOD:  There were no demonstratives for

14   plaintiff.

15         MS. RHEE:  No new demonstratives for Google.

16         THE COURT:  All right.

17         MR. ISAACSON:  Martha Goodman had the one where

18   the red box went around.

19         MS. RHEE:  Oh, sorry.  Apologies.  There was the

20   additional --

21         THE COURT:  That was done actively in court.

22         MS. RHEE:  Correct.

23         THE COURT:  Have you got a screenshot of that?

24         MS. RHEE:  Yes, we have a screenshot, Your Honor.

25         THE COURT:  What number is that?

1          MS. RHEE:  That will be Friedman Demonstrative 1.

2          THE COURT:  Okay.  So that needs to be put on the

3    web tonight.  All right.

4          MS. RHEE:  It will.  And I thank my colleagues for

5    reminding me.

6          THE COURT:  That's great.  So that takes care of

7    that piece of housekeeping.

8          So tomorrow the first thing we'll do is get the

9    exhibits worked out.

10          Then are you still -- I have on my list Arnaud

11    Creput.  That's to be a reading; is that correct?

12          MS. WOOD:  So, Your Honor, tomorrow morning is one

13    of those mornings where we accommodated a Google former

14    employee for a specific start time.  So that will be at

15    9:00, first thing, Brad Bender.

16          THE COURT:  All right.  And he is a government

17    witness.  So --

18          MS. WOOD:  Yes, he is, Your Honor.  He's an

19    adverse witness, but yes.  And so that will be at 9:00.

20          And then what I think we will do is defer the

21    Creput read-in to a later time, which we can negotiate with

22    Google.  It's ready to go, but we also have other -- a live

23    witness, Professor Ravi.  We may be calling Mr. Zeng.  We'll

24    let Google's counsel know tonight a final decision on

25    whether we're calling Mr. Zeng or saving him for rebuttal.

1        THE COURT:  All right.

2        MS. WOOD:  Then we do have some additional videos.
And then later in the afternoon, Mr. Dederick will be the
first live witness for tomorrow.

5        THE COURT:  Again.  I just want a list.  Tomorrow
morning is fine.

7        MS. WOOD:  Thank you, Your Honor.

8        THE COURT:  Tomorrow is Wednesday.  Let me just
give you a heads-up.  Wednesday and Thursday normal start
time, 9:00.  We'll go all day.

11       Friday morning, because I have now a couple of
matters on my civil docket, we're going to start at 9:30.
All right.  So you can go to the bank on that.

14       Right now it looks as though Monday and Tuesday of
next week, we can definitely start at 9:00.  I'll let you
know if something changes, but right now we're keeping it
under control.

18       All right.  I think that takes care of everything.

19       MS. WOOD:  Do you want me to move the Lipkovitz
additional ten in or do that in the morning?

21       THE COURT:  There's no objection at all?

22       MS. RHEE:  No.

23       THE COURT:  All right.  Let's get them in, then;
then you can just post them tonight.  All right.

25       MS. WOOD:  So there are six exhibits that relate

106

 1   to the subject of the tie between Google Ads and AdX.

 2            THE COURT:  All right.

 3            MS. WOOD:  The first one is PTX 183.

 4            THE COURT:  Go ahead.

 5            MS. WOOD:  The second one is PTX 264.

 6            THE COURT:  Okay.

 7            MS. WOOD:  PTX 290, PTX 330, PTX 443, PTX 1510.

 8            Then there are two exhibits that relate to the AdX

 9   take rate.  They are PTX 417, PTX 562.

10            The next relates to header bidding, PTX 533.  And

11   the last in association with Mr. Lipkovitz relates to

12   barriers of entry to the advertiser ad network, and that's

13   PTX 195.

14            THE COURT:  All right.  All of those exhibits are

15   also in evidence at this point.  All right.  So they will

16   also be posted before 10:00 tomorrow morning.  Correct?

17            MS. WOOD:  Thank you, Your Honor.

18            THE COURT:  Anything further on this case?  If

19   not, we'll recess Court for the evening.

20            MS. WOOD:  Thank you.

21            (Proceedings adjourned at 6:02 p.m.)
           ----------------------------------
22        I certify that the foregoing is a true and

23    accurate transcription of my stenographic notes.

24

                      _____
25                         /s/
                      Rhonda F. Montgomery, CCR, RPR

                                                            107