```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3    --------------------------x
      UNITED STATES, et al.,     :    Civil Action No.:
 4                               :    1:23-cv-108
                  Plaintiffs,    :
 5         versus                :    Wednesday, September 11, 2024
                                 :    Alexandria, Virginia
 6    GOOGLE LLC,                :    Day 3 p.m.
                                 :    Pages 1-180
 7                Defendant.     :
      --------------------------x
 8

 9         The above-entitled bench trial was heard before the
      Honorable Leonie M. Brinkema, United States District Judge.
10    This proceeding commenced at 8:59 a.m.

11                       A P P E A R A N C E S:

12    FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                             OFFICE OF THE UNITED STATES ATTORNEY
13                           2100 Jamieson Avenue
                             Alexandria, Virginia  22314
14                           (703) 299-3700

15                           JULIA TARVER WOOD, ESQUIRE
                             AARON TEITELBAUM, ESQUIRE
16                           JEFFREY VERNON, ESQUIRE
                             MICHAEL FREEMAN, ESQUIRE
17                           DAN GUARNERA, ESQUIRE
                             MICHAEL WOLIN, ESQUIRE
18                           UNITED STATES DEPARTMENT OF JUSTICE
                             ANTITRUST DIVISION
19                           450 Fifth Street, NW
                             Washington, D.C.  20530
20                           (202) 894-4266

21    (State of VA)          JONATHAN HARRISON, ESQUIRE
                             OFFICE OF THE ATTORNEY GENERAL
22                           OFFICE OF THE SOLICITOR GENERAL
                             202 North Ninth Street
23                           Richmond, Virginia  23219
                             (804) 786-7704

24

25         COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1                        A P P E A R A N C E S:

2   FOR THE PLAINTIFFS:      ELLIOTT DIONISIO, ESQUIRE
    (State of CA)            OFFICE OF THE CALIFORNIA ATTORNEY
3                            GENERAL
                             300 South Spring Street
4                            Suite 1700
                             Los Angeles, California  90013
5                            (213) 269-6681

6   FOR THE DEFENDANT:       CRAIG REILLY, ESQUIRE
                             LAW OFFICE OF CRAIG C. REILLY
7                            209 Madison Street
                             Suite 501
8                            Alexandria, Virginia  22314
                             (703) 549-5354
9
                             JEANNIE RHEE, ESQUIRE
10                           WILLIAM ISAACSON, ESQUIRE
                             BRYON BECKER, ESQUIRE
11                           PAUL, WEISS, RIFKIND,
                             WHARTON & GARRISON LLP
12                           2001 K Street, NW
                             Washington, D.C.  20006
13                           (202) 223-7300

14  COURT REPORTER:          RHONDA F. MONTGOMERY, CCR, RPR
                             Official Court Reporter
15                           United States District Court
                             401 Courthouse Square
16                           Alexandria, Virginia  22314
                             (703) 299-4599
17                           RMontgomery@courtreport.net

18

19

20

21

22

23

24

25

                                                             2

1                        TABLE OF CONTENTS

2                            WITNESSES

3    On behalf of the Plaintiff:

4    RAMAMOORTHI RAVI

5    Cross-examination by Mr. Issacson ........4
     Redirect examination by Mr. Vernon  .......66
6    Recross examination by Mr. Isaacson .......83

7    JOHN DEDERICK

8    Direct examination by Mr. Guarnera .......87
     Cross-examination by Ms. Dunn ............144

9

10                          MISCELLANY

11   Proceedings September 11, 2024 ............4
     Certificate of Court Reporter .............181

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  All right.  Do we have an exhibit list

3    from the defense?

4              MR. ISAACSON:  Yes, Your Honor.

5              THE COURT:  You may be seated.

6              MR. ISAACSON:  Thank you, Your Honor.

7                      CROSS-EXAMINATION

8    BY MR. ISAACSON

9    Q    Dr. Ravi, it's Bill Isaacson.  I'll be asking questions

10   this afternoon.

11             Just to fill out a little bit about your

12   background, due to your past work, you also consider

13   yourself an expert in some aspects of digital advertising,

14   correct?

15   A    I do.

16   Q    And you have designed and taught courses that involve

17   aspects of digital advertising and marketing to graduate

18   students for over a decade?

19   A    Yes.

20   Q    You have written or cowritten many papers that talk

21   about your research in digital advertising, correct?

22   A    Yes.  Some of my papers do that, yeah.

23   Q    In 2011 you worked for Microsoft working up product

24   quality for a pricing tool for digital advertising, correct?

25   A    Yes, I was a consultant doing that.

Cross-Examination - R. Ravi

1  Q    And you helped on-board that tool?

2  A    No.  I just helped them evaluate that tool.

3  Q    Did you -- oh, you helped on-board a tool for selling

4  display ads?

5  A    Display advertising, yes.

6  Q    Okay.  And in 2018, you started working for a company

7  called InMobi, right?

8  A    I don't work for them.  I do some research with them.

9  Q    And InMobi is a company that helps procure advertising

10  in mobile apps, correct?

11  A    Yes.

12  Q    You understand InMobi to be one of Google's

13  competitors, correct?

14  A    Yes, I do.

15  Q    All right.  I want to make sure we understand the

16  conduct that you're discussing today.  You've given the

17  opinion that certain conduct advantaged Google and

18  disadvantaged its rivals.

19  A    Yes.

20  Q    And that conduct includes what's been called for

21  shorthand first look, lost -- last look by itself and

22  through its interactions with sell-side dynamic revenue

23  sharing, or DRS, and with reserve price optimization, RPO.

24       Do I have that right?

25  A    Reserve price optimization *per se* is not a conduct that

Cross-Examination - R. Ravi

1    I --

2    Q    You talked about its interaction with --

3    A    It's interactions with that, yes.

4    Q    -- with last look, right.  You are not giving

5    independent opinions about sell-side dynamic revenue sharing

6    or reserved price optimization; you're only speaking with

7    respect to that interaction with last look, correct?

8    A    So price optimization with Project Poirot, yes.

9    Q    Project Poirot.  Okay.

10         And then, as you said, you've given opinions about

11   Project Poirot, right?

12         I've now described the conduct that you have

13   reached the opinion advantaged Google and disadvantaged

14   their rivals, right?

15   A    You've described some of the conducts that I --

16   Q    Well, I want to make sure I have the complete list that

17   you've talked about today.

18   A    Yes.

19   Q    Is that the complete list?

20   A    Along with UPR.

21   Q    I'm sorry.  You're right.  I left out UPR.  That's why

22   I ask these questions.  Right.

23         So along with UPR, that's the complete list?

24   A    Yes.

25   Q    Okay.  Now, just to get the chronology straight, some

6

Cross-Examination - R. Ravi

1    of this happened.

2                Okay.  Now, first look and last look were part of

3    something called dynamic allocation, right?

4    A    First look was simply the advantage of the first

5    position in the waterfall.  It was -- it interacted with

6    dynamic allocation.  We didn't speak about that today very

7    much.

8    Q    Right.  But I'm trying to get some background here.

9                So first look interacted with dynamic allocation,

10   and last look was a function of dynamic allocation; is that

11   correct?

12   A    No.  The last look is just another characterization of

13   that first position in the waterfall.  So, again, it also

14   interacted with dynamic allocation.

15   Q    Okay.  We'll come back to that.

16   A    Yeah.

17   Q    Now, the first look, as you said, ended in sometime --

18   stopped having any meaningful impact sometime in 2015,

19   correct?

20   A    It's hard to characterize it.  First look was in effect

21   when the static bids were used as floors.  So that's what we

22   can say about it.  When the floors were replaced by the

23   header bidding bids, that's when first look became last

24   look.  So we cannot quite date that.

25   Q    Right.  I think in your testimony, though, you

                                                                    7

Cross-Examination - R. Ravi

1    estimated it stopped having any meaningful impact by 2015,

2    that is, first look?

3    A    By 2015, that first look advantage transitioned to last

4    look.

5    Q    Okay.  And last look ended in 2019, right?

6    A    Yes.

7    Q    So did reserve price optimization, right?

8    A    Yes, reserve price optimization.

9    Q    So did sell-side dynamic revenue share, right?

10   A    Sell-side dynamic revenue share also ended in 2019,

11   yes.

12   Q    Right.  And Project Poirot also stopped -- by 2019,

13   Project Poirot did apply to AdX, right?

14   A    Yes, from 2019 onwards.

15   Q    Right.  So the only conduct that you have given

16   opinions on today that advantaged Google and disadvantaged

17   rivals after 2019, five years ago, the only conduct in the

18   last five years that you've reached an opinion on about

19   advantaging Google and disadvantaging rivals is UPR, uniform

20   price reserves, right?

21   A    The only one among those five that's in effect today is

22   UPR, but we talked about the time impact of these conducts

23   as well in my direct.

24   Q    Right.  So you've read the other expert reports.

25   You've read the complaint.  You know we're an alleged

8

Cross-Examination - R. Ravi

1    monopolist, right?

2    A    Yes, I believe that's right.

3    Q    So what's happened here, in your view, is the alleged

4    monopolist engaged in conduct that advantaged Google and

5    disadvantaged rivals and, except with respect to UPR, it

6    ended that conduct five years ago?

7    A    There was a conduct that lasted from 2009 to 2019,

8    various conducts that I describe in my report, and they

9    ended and UPR began in 2019.  And these conducts that

10   stretched over a decade, I also write and opine, have this

11   effect via the feedback loops we were talking about, yes.

12   Q    Let's try answering my question, sir.

13   A    Okay.

14   Q    The pieces of conduct that you say Google implemented

15   to advantage itself and disadvantage rivals by this alleged

16   monopolist, they ended five years ago except for UPR.  I'm

17   right, aren't I?

18   A    Yes, you're right about that.

19   Q    And in the last five years, there's been developments

20   in display advertising, hasn't there?

21   A    Yes, there have been.

22            MR. ISAACSON:  Can I look at, Matt, DTX 1828.

23   BY MR. ISAACSON

24   Q    Now, this is a chart from Professor Israel's report.

25            THE COURT:  I assume there's no objection to this

9

Cross-Examination - R. Ravi

1   from the expert's report, right?

2           MR. VERNON:  It's a little beyond the scope, but

3   no objections yet.

4           THE COURT:  It's in.

5   BY MR. ISAACSON

6   Q    And you've seen this before, right?

7   A    Yes, I've seen this chart, I believe.

8   Q    And the data comes from something called EMARKETER.

9   That's a public source of data that you use, right?

10  A    I have used EMARKETER data, yes.

11  Q    And since 2019, would you agree with me there has been

12  a remarkable increase in display ad spending?

13  A    Yes, that's what the chart shows.

14  Q    And do you know what Google's share of that ad spending

15  is?

16  A    I did not analyze that; so I don't know exactly the

17  number.

18  Q    You know it's gone down, don't you?

19  A    I wouldn't actually know that.

20  Q    Okay.  Since 2019 -- if we could look at DTX 1915.

21          MR. VERNON:  This is beyond the scope.  Professor

22  Ravi didn't testify about EMARKETER at all.

23          THE COURT:  Well, I've already indicated I'm

24  relaxing the rules on scope because it can be corrected on

25  redirect.

Cross-Examination - R. Ravi

1            Is that the only objection to 1915?

2            MR. VERNON:  Yes, Your Honor.

3            THE COURT:  All right.  It's in.  Overruled.

4   BY MR. ISAACSON

5   Q    All right.  In the last five years, right, social media

6   spending for display ads has risen from about 37 billion to

7   $65 billion and, during that period, has been just under

8   half of all display ad spending.

9            You knew that, right?

10  A    That's what the chart says.

11  Q    All right.  DTX 1926, one more chart.

12            THE COURT:  Any objection?

13            MR. VERNON:  No objection, Your Honor.

14            THE COURT:  All right.  It's in.

15  BY MR. ISAACSON

16  Q    This is, again, EMARKETER data, sir.  Amazon, since

17  2019, has almost quadrupled in display ad spending.

18            You know that Amazon has been taking off display

19  ads.  You know that, right?

20  A    I knew that broadly, yes.

21  Q    And you know that happened since 2019, right?

22  A    Yes, I knew that happened in the recent past.

23  Q    And what happened in 2019, when this conduct you were

24  describing Google got rid of, that was when Google went to a

25  unified first-price auction, right?

11

Cross-Examination - R. Ravi

1   A    It did go to that in 2019, yes.

2   Q    Right.  And you don't have any issues with the unified

3   first-price offer.  You've not said it's inefficient or

4   harming rivals, right?

5   A    No, I haven't given that opinion.  Yes.

6   Q    All right.  Now, you have described the combination of

7   ad tech products as being across the buy and sell side of an

8   ad tech ecosystem, and you call that an ad tech stack,

9   right?

10  A    Yes.  That's what it's usually referred to as.

11  Q    Right.  The ad tech stack usually consists of,

12  according to you, first publisher ad servers, correct?

13  A    Yes.

14  Q    Second, ad exchanges, correct?

15  A    Yes.

16  Q    And, third, buying bidding tools, including DSPs and

17  advertiser ad networks, correct?

18  A    That's correct, yeah.

19  Q    And, now, you have given opinions that Google's conduct

20  disadvantaged rivals.  I want to understand what you mean by

21  "rivals."  All right?

22       Now, you've written an article that's in your

23  binder.  This is -- it's a tab with the date 2021 on it.  It

24  says Exhibit 3 because it was the Exhibit 3 to your

25  deposition.

Cross-Examination - R. Ravi

1   A    Yes, I see it.

2   Q    Okay.  Now, this is an article that you wrote -- or

3   cowrote in 2021 called "First-Price Auctions in Online

4   Display Advertising," correct?

5   A    Yes, correct.

6   Q    Okay.  And what you say in 2021 to begin this article

7   is that "Advertising via online display ads has risen

8   dramatically in the last decade," right?

9   A    Yes, that's the first line.

10  Q    And when you've been writing about that, you've been

11  looking at EMARKETER data for that, right?

12  A    Yes.  I think the EMARKETER data we cite is not from

13  2021; it is probably from when that paper was submitted.

14  Q    All right.  Then in the right-hand column of page 1,

15  the title of that section of the article is "Evolution of

16  the Display Advertising Market."

17       It says, "The display advertising, with an

18  estimated market share of 54 percent in the United States,

19  has gown to be a significant proportion of the digital

20  advertising market."

21       So you're referring to a digital advertising

22  market and a display advertising market.

23       Now, when you are saying that Google was

24  disadvantaging its rivals, were you referring to the digital

25  advertising market?

13

Cross-Examination - R. Ravi

1   A    I wasn't -- first of all, this paper and its use of the

2   word "markets" has nothing to do --

3   Q    Sir, I'm asking you a question about your testimony.   I

4   am asking you, when you used the term "rivals," "Google's

5   rivals," were you referring to rivals in a digital

6   advertising market?

7   A    The rivals are clear from context.   The rival of an ad

8   exchange are other exchanges --

9   Q    Sir --

10  A    -- the rival of a bidding tool are the other bidding

11  tools.

12  Q    Sir, were you referring to rivals in a digital

13  advertising market?

14  A    Again, when I talked about the conducts in these

15  different locations in the ad stack, I was talking about the

16  rival of that particular product.

17  Q    Were you talking about rivals in the ad stack?

18  A    When I was talking about rivals in my report, I was

19  talking about the rivals of that corresponding product that

20  I was analyzing.

21  Q    So you were just looking at a corresponding product?

22  That's it?

23  A    Maybe I should just make this clear.

24       Let's take any one of these conducts.   We

25  should -- we could take first look, last look, set aside the

14

Cross-Examination - R. Ravi

1    others.   These were conducts that were carried out by the

2    DFP and AdX combination.

3              So the rival there would be the other companies

4    that were providing the other products that were providing

5    the same functionality.   So in this case, it would be an ad

6    exchange.

7    Q    So when you were giving opinions about hurting rivals,

8    you were not applying that to any market definition; is that

9    correct?

10   A    That's right.   I wasn't talking about market

11   definitions in my characterization.

12   Q    So you have not given any opinions in this case that

13   Google has hurt rivals in any ad tech market for open web

14   display advertising.   Is that correct?

15   A    These rivals in these exchanges, yes.   I mean, broadly

16   speaking, that is correct.   But my -- these are the

17   exchanges that transact open web display advertising.

18   That's why it is relevant to this case.

19   Q    Right.   In fact, this term "open web display

20   advertising," at the time of your report and your

21   deposition, you understood open web display advertising to

22   refer to open auctions versus private auctions, correct?

23   A    I recall, when you asked me about that in the

24   deposition, that was the first association I made, yes.

25   Q    Right.   So when I asked you in your deposition about

                                                              15

Cross-Examination - R. Ravi

1   open web display advertising, with all of your background

2   and all of your work on these reports, the first association

3   you made was to the distinction between open auctions and

4   closed auctions.  Is that right?

5   A    Yes, I think that's what I recall saying then.

6   Q    Right.  And just to be clear, open auctions refer to

7   auctions available to many buyers as opposed to closed

8   auctions, which are available to a selected group, correct?

9   A    Yes, private auctions which are, yeah, right.

10  Q    And even though you teach courses on digital

11  advertising and you've published articles about digital

12  advertising and you've worked as a consultant in the

13  industry and after your two reports, you did not understand

14  that open web display advertising had the meaning that

15  plaintiffs had given it in this case.  Isn't that right?

16  A    Would you explain what that meaning is that I did not

17  understand it to be?

18  Q    Okay.  You don't know what the plaintiffs' meaning of

19  "open web display advertising" is?

20  A    No, I do know that.

21  Q    And the meaning that you gave when I asked you about it

22  was not the meaning the plaintiffs give it in this case,

23  right?

24            MR. VERNON:  Objection.  Improper impeachment.

25            THE COURT:  I'm going to sustain that objection.

Cross-Examination - R. Ravi

1          From your experience, is -- the term "open web

2   display advertising," is that a term of art in your field?

3          THE WITNESS:  No.  That particular combination of

4   four words is not used commonly, but it is well understood

5   that "open web ads" means these ads that are sold on open

6   auctions.

7          THE COURT:  On the web?

8          THE WITNESS:  On the web, yeah.  So when you put

9   the "web" qualifier with it, it would mean open auction

10  impressions sold on the web.

11  BY MR. ISAACSON

12  Q    And there are also closed auctions on the web, aren't

13  there?

14  A    Yes.  And they are of two types, yeah.

15  Q    So just to be clear again --

16         MR. ISAACSON:  And I'll stop this, Your Honor, if

17  I've made this clear.

18  BY MR. ISAACSON

19  Q    -- but the open auction just refers to the number of

20  buyers; there's many buyers.  In the closed auction, you

21  have a select group of buyers.  It has nothing to do with

22  whether the ad is on a web or on an app or a connected TV,

23  right?

24  A    So open -- the closed just means that it's closed to a

25  set of private buyers.  But I agree.  When you add the "web"

17

Cross-Examination - R. Ravi

1  qualification with it, it would --

2  Q    Okay.  You said you didn't do any quantitative

3  analysis.  You have done a lot of computer monitoring as

4  part of your past work, right?

5  A    Yes.  Broadly speaking, yeah.

6  Q    You didn't do any computer modeling of your own, in

7  this case, your own work to reach your opinions about any

8  effects on rivals, right?

9  A    Yes.

10  Q    You did not run any experiments with data to support

11  your opinions about effects on rival, right?

12  A    Yes.

13  Q    You didn't do any quantitative analysis of your own --

14  well, let me just say.  When you were walking through those

15  charts and talking about potential effects, those were all

16  theoretical, right?  You haven't done any qualitative

17  analysis showing that there are any of those effects?

18           MR. VERNON:  Objection.  Compound.

19           THE COURT:  Overruled.

20           THE WITNESS:  The charts I was showing

21  demonstrated numbers from quantitative analysis done by

22  other reliable sources, yes.

23           MR. ISAACSON:  I'm sorry.  I didn't -- could you

24  read that back for me.  I didn't understand the answer.

25                    (Answer read back.)

Cross-Examination - R. Ravi

1    BY MR. ISAACSON

2    Q     Did you hear my question?  I was asking about any work

3    you did.  All right?  You have not done any quantitative

4    work to show that those potential effects you were

5    describing on your charts happened?

6    A     Yes.  I did not work with data to show that, yes.

7    Q     And so with respect to what happened in 2019, the

8    unified pricing rules, so you do agree that establishing

9    consistent price floors for these auctions minimizes bidder

10   error, correct?  Bidder error, error by bidders.

11   A     Broadly speaking, that is the case, yes.

12   Q     All right.  And it also, broadly speaking, is true that

13   establishing consistent price floors improves bidder

14   decision-making?

15   A     I mean, having a -- having the knowledge of the floor

16   helps the bidders with their decisions, yes, that is true.

17   Q     And at least by the time of your deposition, you were

18   unaware of whether other AdX tools or companies have similar

19   rules to unified pricing rules of Google?

20   A     Yes, I wasn't clear about that.

21   Q     In your binder, there should be something, DTX 1539.

22             THE COURT:  Any objection to 1539?

23             MR. VERNON:  I object to this as hearsay.

24             MR. ISAACSON:  This is from what Xandr promotes as

25   seller best practices.  I don't think truth or falsity is an

19

Cross-Examination - R. Ravi

1    issue here.  These are standards in the field according to

2    Xandr.

3                MR. VERNON:  It's still a statement by someone not

4    in the box.

5                THE COURT:  I'll sustain the objection.

6    BY MR. ISAACSON

7    Q    And you agree you do not know enough about what

8    Google's competitors are doing with respect to uniform price

9    floors to have an opinion about whether Google's uniform

10   price rules are appropriate?

11   A    Was that two questions?

12   Q    I think it was one.  It was an attempt at one.

13               THE COURT:  Well, break it apart.

14               MR. ISAACSON:  Sure.

15   BY MR. ISAACSON

16   Q    You do not -- given what you've said about your lack of

17   knowledge about what Google's competitors are doing about

18   unified pricing rules, you don't have an opinion about

19   whether unified pricing rules are appropriate or not, right?

20   A    I have an opinion about whether Google's unified

21   pricing rules were appropriate or not.  That's what I just

22   said in my opinions, yes.

23               THE COURT:  The question is do you have any

24   opinion as to what other --

25               THE WITNESS:  No, I do not have any opinion about

Cross-Examination - R. Ravi

1    the others because I'm not aware of a lot of them, yeah.

2    BY MR. ISAACSON

3    Q    All right.  Would you agree that, with respect to

4    Google, that because you don't know about what those other

5    companies are doing, you lack sufficient context to

6    understand whether Google's rules were appropriate or not?

7    A    My opinions were about what those rules did to the

8    publisher customers.  So that's what my opinion was about.

9    So whether it was appropriate, I don't have that comparative

10   analysis with the other exchanges of what they were doing.

11   Q    All right.  The -- you suggest in your testimony, I

12   believe, that "Uniform pricing rules successfully help shift

13   business to AdX from rival exchanges."  Is that right?  Is

14   that your opinion?

15   A    Yes.

16   Q    Okay.  And in your report, you cited two Google

17   documents for this point, right?

18   A    Yes, I think.

19   Q    That's what you're relying on.  You are relying for

20   this conclusion on two documents?

21   A    Yes.  Among many that I have examined, these are the

22   two that I might have cited, yes.

23   Q    Well, that's an interesting point.

24        How many documents have you reviewed in this case?

25   It's a lot, right?

Cross-Examination - R. Ravi

1    A     Wow, that's a lot, yes.

2    Q     And you found two on this point, right?

3    A     I was trying to be careful about putting the right

4    documents there.  That's why they're selective, yeah.

5    Q     Now, the first one has to do with the Rubicon project.

6    Do you remember that?

7    A     I do remember that.

8    Q     Okay.  If you could look at your binder at DTX 774,

9    which is cited in your report --

10             THE COURT:  Any objection to 774?

11             MR. VERNON:  No objections.

12             THE COURT:  All right.  It's in.

13   BY MR. ISAACSON

14   Q     All right.  This document -- if you look at page 3 of

15   9, the data in this document is data that Rubicon sent to

16   Google, right?

17   A     Yes.  That's my understanding.

18   Q     Okay.  And you did not discuss or evaluate the

19   methodology behind Rubicon's figures, right?

20   A     I could not, yeah.

21   Q     Yeah, exactly.  You could not.  You talked about your

22   ability to look at certain documents and understand the

23   validity of the data.  This is not one of them.  You don't

24   know how Rubicon got these numbers?

25   A     Yes.  That's correct, yeah.

                                                              22

Cross-Examination - R. Ravi

1   Q    And then if you look at DTX 768, which is the second

2   document you cited.  Now we're talking about --

3                THE COURT:  I'm sorry.

4                Any objection to 768?

5                MR. VERNON:  No objections, Your Honor.

6                THE COURT:  All right.  It's in.

7   BY MR. ISAACSON

8   Q    All right.  This is from August 2019.  You recognize

9   this as the second document you relied on, right?

10  A    Yes, I do.

11  Q    Okay.  And then it says in the second paragraph

12  underneath a reference -- well, under -- well, it's hard to

13  count the paragraphs.  The paragraph that begins "with UPR"

14  towards the top.

15  A    Yes, I see.

16  Q    All right.  It says in the middle, "On 3PE" --

17  third-party exchanges -- "there's a slight (1 to 3 percent)

18  decrease in impressions and revenue," right?

19  A    Yes.

20  Q    Okay.  And so the effect that you're describing on

21  other exchanges is this slight 1 to 3 percent decrease,

22  right?

23  A    Yes.  This is the one I cite in my report.

24  Q    And this is August 2019, right?  You have no other

25  information after August 2019 of any effect on rivals from

23

Cross-Examination - R. Ravi

1   the uniform pricing rules, right?

2   A    Yes, I do not have any more.  Yeah.

3   Q    All right.  With respect to first look, you refer to

4   the waterfall.  Now, we've looked at a charts of the

5   waterfall.  So as background, from 2000 to 2010, you agree

6   the waterfall was something that was generally being used by

7   SSPs, including DFP DoubleClick Publishers?

8   A    Yes.

9   Q    The waterfall was prevalent from 2000 to 2010, correct?

10  A    Yes, it was prevalent.  Yeah.

11  Q    It was a traditional way of accessing demand from

12  several sources.  This is not something that was exclusive

13  to Google?

14  A    No.  Google did not invent the waterfall.

15  Q    Okay.  In fact, then what happened in 2009, Google

16  relaunched AdX with real-time bidding, right?

17  A    With real-time bidding on AdX, yes.

18  Q    Yeah.  And Google, as you know, was one of a few

19  companies during the period 2008 to 2010 that launched

20  real-time bidding, right?

21  A    Yes.  Yeah.  That would be true, roughly, yeah.

22  Q    Okay.  Now, you agree -- we've talked about this term

23  "dynamic allocation."  But you agree that dynamic allocation

24  was an existing feature of DoubleClick for Publishers when

25  Google acquired DoubleClick in 2008, correct?

24

Cross-Examination - R. Ravi

1    A    Yes.  Dynamic allocation was not invented by Google.

2    Q    Google didn't invent this technology or -- this is what

3    they acquired?

4    A    I agree.  Dynamic allocation existed before Google

5    acquired DFP.

6    Q    And DoubleClick had a nascent exchange, as people have

7    said, but that exchange did not have real-time bidding,

8    right?

9    A    That's my understanding, yes.

10   Q    Right.  It was Google that, after that acquisition,

11   that built out real-time bidding along with a few other

12   companies?

13   A    Yes, that's my understanding too.  With a few other

14   companies, yeah.

15   Q    Okay.  And the preferential position of AdX over other

16   exchanges that you say occurred in the waterfall was part of

17   the DoubleClick technology that Google acquired, correct?

18   A    It was part of the reimplementation of Google, as you

19   described it, yeah, of that technology, yeah.

20   Q    That was -- what you called first look was an existing

21   feature of DoubleClick for Publishers when Google acquired

22   it, right?

23   A    I'm not sure that DoubleClick had a preferential

24   position before Google acquired it for one particular

25   exchange.

Cross-Examination - R. Ravi

1    Q     But you agree product changes would have been necessary

2    to the technology acquired from DoubleClick to remove the

3    disadvantage to rivals that you described from first look?

4    A     I do not see that.

5    Q     All right.  If we can look at your deposition -- I

6    believe there's one in your binder and we've given you a

7    copy as well.

8              THE COURT:  Is this the one from February 20?

9              MR. ISAACSON:  Yes.  There's only one deposition

10   of this gentleman.

11             THE WITNESS:  Could you point me to...

12   BY MR. ISAACSON

13   Q     So page 131 at line 1.

14   A     Thank you.

15   Q     And I think, based on your answer, I'm using this to

16   refresh your recollection.

17             You see there I asked you the question, "In order

18   to get rid of the effect on rivals from the preference

19   you've been describing, do you assume that that preference

20   existed in DoubleClick for Publishers prior to acquisition?

21   Google, upon acquiring it, would have had to redesign the

22   system in some manner in order to get rid of that

23   preference; is that correct?"

24             MR. VERNON:  Objection.  I don't know what he's

25   refreshing here.  I don't know what my colleague is

26

Cross-Examination - R. Ravi

1    refreshing here because the answer just says, "If we

2    assume."

3             MR. ISAACSON:  No, no, not the relevant part of

4    the answer.  He's assuming that AdX had a preferential

5    position, and he's testified it does.

6             He says, "If we assume that AdX had a preferential

7    position before Google acquired DFP, some product changes

8    would be necessary in DFP."

9             MR. VERNON:  That doesn't sound to me like he's

10   saying that's the case.  It sounds like --

11            THE COURT:  Well, I'm overruling the objection.

12   Let's go.

13            THE WITNESS:  Yeah, the way I read this, line 10

14   says, "If we assume."

15   BY MR. ISAACSON

16   Q    Well, let me put it this way.

17   A    Yes.

18   Q    Do you know whether first look was something that was

19   in place due to the technology from DoubleClick for

20   Publishers and whether Google, in order to get rid of that,

21   would have had to redesign the system?  Do you know?

22   A    I don't, but the waterfall is -- there is no technology

23   that locks in that first position in any way.  The waterfall

24   is just an ordering.  So I don't understand what technology

25   you'd be referring to.

27

Cross-Examination - R. Ravi

1    Q    Okay.  You used the term "Google is advantaging

2    itself."  Now, when you say Google is advantaging or

3    preferencing Google, for example, by winning bids in AdX,

4    you were referring to Google customers who are being

5    advantaged because Google customers either win bids or

6    Google publishers sell ads on their space, right?

7    A    What was the question?

8    Q    All right.  When you used the phrase "Google

9    preferenced itself," "Google advantaged itself," the ones

10   who got the advantage were the Google customers, right?

11   A    Not always.

12   Q    Okay.  When you say that there were more -- that Google

13   advantaged itself because it took business away from rivals,

14   that's because Google customers won bids, for example, on

15   AdX?

16   A    That is true.  That's a consequence.  That's one of the

17   consequences of its advantaging itself, yes.

18   Q    Right.  And so you consider it self-preferencing of

19   Google when it helps its customers win, right?

20   A    In the cases that it helped it win, yes, it did.  Yes.

21   Q    And that's part of your opinion.  When you are saying

22   that Google has preferenced itself, it's because it's

23   helping its customers?

24   A    Among others, among -- not just its customers.  What I

25   was saying, it was preferencing itself to help some of its

Cross-Examination - R. Ravi

1    own products and its customers.

2    Q    All right.  The -- with regard to the first look, you

3    mentioned sponsorship, I think.  You agree that, as of 2014,

4    publishers could configure the priorities to put other

5    exchanges, and they could put them in front of AdX, correct?

6    A    I do remember something like that from the -- yeah.

7    Q    All right.  Well, let me make sure we've locked this

8    in.

9         Could we look at page 41 and page 42 of his

10   report, Note 145.

11   A    Of the deposition?

12   Q    Of your report.

13   A    Of my report.

14   Q    You buried in this Footnote 145; so I apologize for the

15   small print.  But at the bottom of the paragraph -- well,

16   I've only got this on a page; so I want to make sure I'm

17   looking at it in the report so I know what everybody else is

18   looking at.

19        All right.  It's going to continue on to the next

20   page.  Yes.  There we are.

21        Right above -- at the bottom of the page of

22   page 41, there's a sentence that says "As of 2014."  Do you

23   see that?

24   A    Yes, I see that.

25   Q    Right.  It says, "As of 2014, there was also a way for

Cross-Examination - R. Ravi

 1   publishers to configure priorities to put certain remnant

 2   line items which may represent changes in front of AdX,"

 3   right?

 4   A    Yes.  I read that, yeah.

 5   Q    And in the next paragraph there's something you call

 6   "configurable priorities."  AdX exchange line items can be

 7   set to any priority, right?

 8   A    Yes.  I see that, yeah.

 9   Q    So could we look at Ravi Exhibit B, the demonstrative.

10          So when you put this waterfall on this slide,

11   publishers could configure this waterfall in the order they

12   wanted it?  They could put this in any order, right?

13   A    Using that configurable priorities we were talking

14   about, yes.  But it was not very common.

15   Q    Well, sir, you haven't done any work to determine what

16   publishers were doing back in 2014 about how they were

17   configuring these things, right?  You don't know that?

18   A    It's clear from the documents I examined that

19   publishers were trying to find a way to do just that.

20   Q    You didn't see a survey of publishers.  You didn't

21   see -- you don't know what all these -- how many publishers

22   are we talking about, sir?

23   A    Hundred, maybe thousands.

24   Q    Right.  You don't know what they were doing, do you?

25   A    In 2014, no, yeah.

Cross-Examination - R. Ravi

1   Q    All right.  Now, this waterfall, before dynamic

2   allocation and before the so-called first look, the way this

3   worked was the publisher would set a floor price, right?

4   A    The publisher would set a floor price, yes.

5   Q    And the publisher could also set an expected value and

6   then arrange the waterfall based on their expectations of

7   value, correct?

8   A    The publisher is not arranging anything; but yes,

9   that's how the logic would be implemented.  Yeah.

10  Q    Right.  And so before dynamic allocation and first

11  look, whoever got the first opportunity that if someone else

12  wanted to bid more, that person lost out?

13  A    There were no bids here.  These were just static bids,

14  yeah.

15  Q    Right.  Static bids, right.

16  A    Static bids.

17  Q    They were static bids, right.

18  A    Yes.

19  Q    It was just static bidding, right.

20       All right.  Then, after this period -- I think you

21  said 2009 -- of first look and that's about when dynamic

22  allocation was happening, right?

23  A    Dynamic allocation, as you mentioned yourself, started

24  before that.

25  Q    Okay.  First look is around 2009.  Is that what you

Cross-Examination - R. Ravi

1  said?

2  A     2009 with the reimplementation, the waterfall.

3  Q     All right.  And then the publisher still set the price

4  floor, right?

5  A     The original price floor, yes.  That's not even in this

6  picture.

7  Q     Well, there's a price floor there.

8  A     That price floor for the AdX auction is determined by

9  the historical bids.

10  Q    I see.  So what's missing from this chart is, before

11  you get to DFP, the publisher has set a price floor that

12  could be different from all the numbers on this chart,

13  right?

14  A    Yes.  That's just a filter, as we were talking about,

15  in a second-price auction, yeah.

16  Q    Right.  And the publisher had the choice to set that

17  price floor as high as they wanted?

18  A    Sure.  Yeah.

19  Q    The -- so, for example -- well, I'll come back to this

20  example.

21         So then you said that the publisher -- you said

22  then the waterfall there, you said, would be determined

23  by -- I think you said historical values.  Is that right?

24  A    Historical revenues, yeah.

25  Q    Okay.  Let's understand what that means.  Okay.  So,

32

Cross-Examination - R. Ravi

1    first of all, historical revenues, does that mean the day

2    before? the week before? the month before?

3    A    The recommendation within the Google help site -- I'm

4    just trying to answer that question.

5    Q    And I apologize for interrupting.  I'm not looking for

6    recommendations; I'm look for what was actually happening.

7    And if you don't know, please tell me.

8         Do you know whether -- when you said historical

9    averages, do you know what historical period was being

10   applied?

11   A    No, I don't.

12   Q    And the historical period being applied would be chosen

13   by the publisher.  The publisher -- if they were using

14   historical averages, the publishers would be doing that

15   calculation, right?

16   A    Correct.

17   Q    So the publisher is choosing the reserve price floor.

18   The publisher is choosing the historical average if they

19   apply that, right?

20   A    The publisher is choosing a value for each of those

21   exchanges.

22   Q    And Google doesn't do that, right?  That's not Google

23   controlling the publisher; that's the publisher making up

24   their own mind, right?

25   A    Correct.  Yeah.

Cross-Examination - R. Ravi

1    Q    And so then -- and then the historical averages, as

2    you've done here, there could be different historical

3    averages for each firm in the waterfall?

4    A    Yes.  For each exchange in the waterfall, yeah.

5    Q    And when AdX was first in line, in order to win the

6    impression, it had to beat the publisher's reserve price

7    floor and it had to beat the publisher's highest historical

8    average, correct?

9    A    Highest among all the other exchanges that were

10   eligible, yes.

11   Q    Right.  And the publisher could -- just like they could

12   put any reserve price floor they want -- could put any

13   historical average that they wanted in there, right?

14   A    Yes.  As you mentioned, it is their choice.

15   Q    Okay.  And if AdX did not win -- if AdX said no, we're

16   not paying what you say is the highest historical average

17   price, then the next bidder only had to beat the reserve

18   price, right?

19   A    The next bidder is not running an auction.

20   Q    So let me make sure I'm clear with you.

21   A    Yes, please.

22   Q    Okay.  It was Google who took on the responsibility of

23   saying we will say yes if we pay more than your reserve

24   price floor.  If we pay more, then the publisher has

25   calculated the highest possible historical average or any

                                                                34

Cross-Examination - R. Ravi

1   other number they put in there.

2          And then if Google said no, okay, all that

3   PubMatic in this example had to do was beat the original

4   reserve price.  It didn't have to beat any of the historical

5   averages, did it?

6   A    It had to fetch at least 1.06 in this example.

7   Q    That -- I -- PubMatic did not have to beat any

8   historical average in this example, did it?

9   A    What do you mean by "beat historical averages"?  It is

10  other averages or --

11  Q    Yeah, these -- I thought we had established this; so

12  let's go over it again.

13         Each firm in this waterfall has an historical

14  average on this chart.  That historical average is set by

15  the publisher.

16  A    Correct.

17  Q    Google has to beat the highest historical average in

18  order to win the impression.  Google says no.  The next one

19  in the waterfall, PubMatic, no longer has to beat the

20  highest historical average, does it?

21  A    The highest historical average is set by PubMatic.  So

22  it has to beat that, yeah.

23  Q    No, it doesn't have to beat its own --

24         THE COURT:  Wait.  Don't argue.

25         MR. ISAACSON:  I'm not -- I don't -- I'm sorry if

                                                              35

Cross-Examination - R. Ravi

1   I sound like I'm arguing.  I'm trying to get the facts here.

2   BY MR. ISAACSON

3   Q    Okay.  Does PubMatic have to beat its historical

4   average, or does it have to beat the reserve price?

5   A    It has to beat the historical average.  It has to

6   accept the 1.06.

7   Q    And then if PubMatic says no, does Index Exchange have

8   to beat PubMatic's historical average?

9   A    It has to bring 1.04.

10  Q    Right.  So --

11  A    That's right.

12  Q    Okay.  So Index Exchange doesn't have to beat the

13  PubMatic historic average, but Google does?

14  A    Index Exchange is after PubMatic?  That's the point of

15  the waterfall.

16  Q    Right.  I think we've understood how this works now.

17        Now, you believe -- I think you said that header

18  bidding was a competitive response to dynamic allocation,

19  correct?

20  A    To this first look advantage we were just talking

21  about.

22  Q    You referred in your report that publishers felt locked

23  in by dynamic allocation which gave AdX the ability to

24  compete; so header bidder -- so header bidding was born.

25  Let me rephrase that question.

36

Cross-Examination - R. Ravi

1          You've said in your report publishers felt locked
2    in by dynamic allocation, and so header bidding was born,
3    right?
4    A    That's a quote from a Google document, yes.  I didn't
5    say that.
6    Q    And header bidding didn't emerge till around 2014,
7    right?
8    A    Yes, around that time.
9    Q    And you agree that the technical design of DFP with
10   first look, as you have described it, made Google more
11   attractive to advertisers who wanted to bid on the exchange,
12   right?
13   A    Yes.  I did write that, yeah.
14   Q    Okay.  So, in other words, first look was something
15   that Google's advertiser customers wanted?
16   A    I don't know that for a fact.  I don't know what their
17   advertisers want.
18   Q    Well, that's fair.
19          You agree that -- but you agree that it made the
20   product, DFP, more attractive to the advertiser customers?
21   A    The advertiser customers were able to win impressions
22   for cheaper because of what we just talked about.  So they
23   would have -- they would have liked that aspect of it.
24   Q    All right.  Now, you agree with me that if Google was
25   going to stop disadvantaging its rivals in the way that

                                                             37

Cross-Examination - R. Ravi

1   you've described, that Google would stop -- would also have

2   to stop favoring its own advertisers?

3   A    No, I would not agree with that.

4   Q    Well, to get rid of first look, Google would have had

5   to design a product that was less attractive to advertisers,

6   correct?

7   A    Getting rid of first look will make AdX less attractive

8   to its advertisers.  That's a fact.

9   Q    Do you still -- PTX 551 was an exhibit that your

10  counsel used during your examination.

11          Now, in the second paragraph it begins, "I would

12  be remiss" -- it says in the last sentence, "Our buyers

13  enjoy a competitive advantage from dynamic allocation

14  because they receive first look on the inventory, which

15  inherently provides higher CPMs from which Google benefits

16  on the revenue share."

17          Higher CPMs means that more revenues are being

18  generated for publishers, right?

19  A    Yes.  These are the more valuable impressions we were

20  talking about, yes.

21  Q    Right.  So in order to have designed a system without

22  first look, you would have to design a system where

23  publishers make less money?

24  A    It was exactly the opposite.  Publishers would make

25  more money without first look.

Cross-Examination - R. Ravi

1  Q    Okay.  The -- all right.  Now, let's talk about last
2  look.  Depending on the publisher's preferences under last
3  look -- well, let me back up.
4        So for last look, what we're talking about is a
5  publisher runs a header bidding auction and then decides to
6  submit it to DoubleClick for Publisher to see if it can get
7  a higher bid from AdX, correct?
8  A    That was the typical way it was done.
9  Q    So there's already been an auction through the header
10 bidding.  There's a result.  And instead of just taking the
11 highest bid from the header bidding auction, the publisher
12 says let's send it to DFP to see if AdX will give us more?
13 That's what's happening?
14 A    That's how they had to do it.
15 Q    Right.  So depending on the publisher's preferences,
16 they could either send the impression to AdX for another
17 real-time auction or they could send it to DFP as a
18 guaranteed deal saying we're done.  This is a guaranteed
19 amount; we're taking the header bid?
20 A    That is the sponsorship way of implementing header
21 bidding, yes.  That's a guaranteed way of doing that, yes.
22 Q    Right.  So the publisher, again, is choosing?  The
23 publisher has run a header bid and is choosing whether to
24 give it over to Google to see if it can make more money,
25 correct?

Cross-Examination - R. Ravi

1   A    In the typical way of doing it, yes.

2   Q    And the typical way of doing it, bottom line, no header

3   bidding auction result is submitted to AdX unless the

4   publisher chooses to do it?

5   A    Again, that was a typical way that publishers could

6   implement header bidding.

7   Q    All right.  And the other choice the publisher had was,

8   when it submitted it to DFP, right, it didn't have to say

9   here's the result of the header bidding auction.  Can you

10  beat it?  They could set a reserve price higher than the

11  result of the header bidding auction, correct?

12  A    This is in the typical way of doing it?

13  Q    Yes.

14  A    Yes, they could set a reserve price that they wanted in

15  the --

16  Q    Publishers got to choose what price to put into

17  DoubleClick for Publishers following the header bidding

18  auction, right?

19  A    Yes.

20  Q    And you agree that publishers could and sometimes did

21  inflate the header bids they put in DFP.  You just don't

22  know how often that happened, right?

23  A    Yes.  I do have some citations in my rebuttal report

24  about that.

25  Q    Right.  And because of the way this worked, because the

Cross-Examination - R. Ravi

1   publisher -- the result of one auction now was asking if

2   Google could beat that, last look made publishers more

3   money, right?

4   A    I just want to make sure I understand your question.

5        If publishers took the highest header bidding

6   value that came in and inflated that --

7   Q    No.  I'm sorry.  I confused you then.  So more

8   simplistically than that --

9   A    Okay.

10  Q    -- if a publisher submitted the results of its header

11  bidding to Google and Google beat the results of that header

12  bidding auction, the publisher made more money, right?

13  A    If it gave it a higher price, yes, it made more money.

14  Q    And so you've been giving the opinion that last look is

15  not the most efficient system.  It is a system that made

16  publisher customers of Google more money, right?

17  A    Not as much as a unified first-price auction that came

18  later.

19  Q    Uh-huh.  So that's a unified first-price auction that

20  Google, the monopolist, did in 2019 getting rid of first

21  look and last look and all these other things, right?

22  A    Yes.  That was the last exchange to move to the

23  first-price auction, yes.

24  Q    And that was the next stage in this technology, and it

25  made even more money for publishers.  That's what you're

Cross-Examination - R. Ravi

1   saying?

2   A    Many exchanges were already adopting first-price

3   auctions, as we were saying, from 2015.  So...

4   Q    But let's go back to my question.  Okay?

5   A    Yes.

6   Q    Last look was making publishers money, and unified

7   price auction, which Google then moved to, made publishers

8   even more money?

9            MR. VERNON:  Objection.  Compound.

10           THE COURT:  It is.  Make it simpler.

11           MR. ISAACSON:  Okay.

12   BY MR. ISAACSON

13   Q    You agree that last look made publishers more money,

14   right?

15   A    Than what?

16   Q    Than if there was no last look, if there was just the

17   result of the header bidding.

18           If Google didn't give publishers the opportunity

19   to submit the header bidding result for a last look --

20   that's what I'm talking about.  If they hadn't given that

21   opportunity, publishers would have made less money?

22   A    Yes.  When allowing more bids from AdX after that

23   auction, it does make more money than not soliciting bids at

24   all, yes.

25   Q    And then you said unified price auction, which Google

                                                              42

Cross-Examination - R. Ravi

1    implemented in 2019, made publishers even more money.

2    That's what you said, right?

3    A    Yes.  That is making more money than last look, yes.

4    Q    And so when you're talking about giving an opinion that

5    last look was not the most efficient system, you were saying

6    that Google should have done all the technological work

7    that --

8              THE COURT:  Counsel, stop hitting the lectern.

9              MR. ISAACSON:  Huh?

10             THE COURT:  You are hitting the lectern.

11             MR. ISAACSON:  I'm sorry.  That doesn't help the

12   microphone at all.

13   BY MR. ISAACSON

14   Q    So when you are saying that first -- last look was not

15   the most efficient system and then pointed to unified

16   first-price auction, you are saying that all technological

17   work from unified first-price auction should have been

18   implemented some years earlier.

19             Is that what you're saying?

20   A    No, I'm not saying anything about what they should have

21   done.

22   Q    Do you know how much technological work went into

23   building unified first auction --

24   A    No, I don't.

25   Q    You know it was a lot, don't you?

Cross-Examination - R. Ravi

1   A    No, I don't know how much it was.  Yeah.

2   Q    Now, when you talked about last look being a response

3   to header bidding, right, you agree that header bidding was

4   a competitive threat to Google's ad server, right?

5   A    I gathered that from the documents, yes.

6   Q    So it's a competitive threat to Google's server ads

7   over DFP.  It's also a competitive threat to the ad

8   exchange, right?

9   A    Yes.  I understood that as well, yeah.

10  Q    And if your report, you did no analysis to show that

11  Google stopped or slowed the growth of header bidding,

12  right?

13  A    The growth of header bidding by others?

14  Q    Yes.

15  A    I have several citations about what they tried to do.

16  Q    Exactly.  But what they tried to do.  You didn't do any

17  work that anything Google tried to do stopped or slowed

18  header bidding, right?

19  A    They have their own analysis of it in the various

20  documents we even saw earlier today.

21  Q    You think they have analysis that shows that header

22  bidding was stopped or slowed down?

23  A    So I don't know what you exactly mean by stopped or

24  slowed down.  Is it publishers stopping doing header

25  bidding?

44

Cross-Examination - R. Ravi

1    Q    Let me put it this way:  Did you do any analysis
2    quantifying the effect of any Google conduct on header
3    bidding?
4    A    Google did not do header bidding.  So there is no
5    conduct on header bidding.
6    Q    Did you do any work quantifying the effect of Google's
7    conduct by header bidding by others?
8    A    They characterized some of the conducts I examined,
9    like Poirot in particular, as one of their defenses against
10   header bidding by other publishers.
11   Q    But you don't know if Poirot succeeded, do you?
12   A    Succeeded in?
13   Q    In doing anything to header bidding.
14   A    Their analysis suggests that it did partially.
15   Q    Do you know how much?
16   A    I have to look at the report, but I do have a citation
17   about how much Poirot was able to, you know, win away from
18   other exchanges, things like that.
19   Q    And what year was that?
20   A    I don't recall.  It must be after Poirot was deployed.
21   Around 2017.
22   Q    All right.  Do you have any -- are you aware of any
23   evidence that Google's conduct has had any effect on header
24   bidding since 2019?
25   A    2019, no.

45

Cross-Examination - R. Ravi

1  Q    And you were in the courtroom when Mr. Casale said that

2  the exchange market is hypercompetitive because of header

3  bidding.  You agree with that, don't you?

4  A    Do I agree with Mr. Casale?

5  Q    Yes.

6  A    No.

7  Q    Okay.

8        MS. WOOD:  Your Honor, I'll just object.

9  Obviously, the testimony of Mr. Casale can speak for itself.

10       THE COURT:  He is not your witness.

11       MS. WOOD:  Okay.  Mr. Casale was my witness.

12       THE COURT:  No.  But --

13       MS. WOOD:  Understood.

14  BY MR. ISAACSON

15  Q    In your report, you also say that you looked at Google

16  documents where Google determined that header bidding did

17  not actually inflate header bidder amounts into DFP.

18       Do you remember that?

19  A    Yes, probably in my rebuttal report.

20  Q    Yes.  So if you look -- you cite two documents for

21  that, right?

22       So look at your rebuttal report.  This would be at

23  footnote -- or this would be paragraph 48.  You wrote, "For

24  example, while Google was aware of the possibility that

25  publishers could theoretically inflate their header bidder

46

Cross-Examination - R. Ravi

1  amounts, they entered into DFP in 2015 to determine

2  publishers did not do so."

3            And for that determination in 2015, in

4  Footnote 133 you cited a document, right?

5  A    Yes.

6  Q    And then in Footnote 135 you cite an Amazon document?

7  A    Yes, I see that.

8  Q    All right.  And what Amazon says in that document is,

9  as you quoted, "Learned about some gimmicks that other

10  header wrappers employ to advantage themselves, e.g.,

11  inflating bids in order to force AdX to pay a premium and

12  not just one cent more than the highest bid from other

13  buyers since AdX pays second price."

14            In the documents that you were reviewing, Amazon

15  was reporting about this -- that this inflation of bids was

16  going on, right?

17  A    Yes.  I think this was a document where Amazon was

18  reporting that, among 19 publishers, only one of them was

19  attempting to do that.  That is in the next footnote, I

20  think.

21  Q    All right.  Sell-side dynamic revenue share.  All

22  right.  Sell-side dynamic -- you describe sell-side dynamic

23  revenue share.  You did not calculate the effect of

24  sell-side dynamic revenue on rival exchanges, correct?

25  A    Not directly, yeah.

Cross-Examination - R. Ravi

1  Q    Well, you didn't do it directly or indirectly, right?
2  You didn't attempt to quantify the effect of sell-side
3  dynamic revenue on rivals?
4  A    Just sell-side dynamic revenue sharing, no.
5  Q    And you agree that competing ad tech companies also
6  have sell-side features that bury revenue shares, right?
7  A    Yes.  Some of them do, yeah.
8  Q    Like Xandr, right?
9  A    Yes, I think Xandr does that.
10  Q    Like Meta?
11  A    Meta probably does that, yeah.
12  Q    And you agree that sell-side dynamic revenue share
13  could increase matches between advertisers and publishers,
14  matches that would not otherwise have happened?
15  A    Yes.  In the situations where the bid would have gone
16  unsold, yes.
17  Q    You agree that sell-side dynamic revenue share,
18  something implemented by Google, expands output when it
19  causes AdX bidders to clear floor prices at an auction that
20  would not otherwise have been cleared, right?
21  A    Yeah.  I was just saying, if that floor would not have
22  been met without sell-side dynamic revenue sharing, then
23  sell-side DRS does increase the amount that got one.
24  Q    I'm sorry.  I didn't mean to interrupt.
25  A    All right.

48

Cross-Examination - R. Ravi

1    Q    You agree that documents that you reviewed show that

2    sell-side dynamic revenue increase the overall match rate

3    for publishers using AdX, correct?

4    A    Yes, in some cases it did.

5    Q    The document --

6                   (Off-the-record discussion.)

7              MR. ISAACSON:   PTX 697 was admitted at the end of

8    his examination.   So I'm hopeful it's in the binder that

9    plaintiffs gave you.

10                  (A binder is given to the witness.)

11   BY MR. ISAACSON

12   Q    And would that document -- oh, I'm sorry.   Tell me when

13   you're there.

14   A    697?

15   Q    Yes.   So on the first page you see background and

16   summary?

17   A    Yeah.

18   Q    And you see the first bullet point?   And it's referring

19   to dynamic revenue share up above.   Do you see that?

20   A    Yes.   Yeah, I see that.

21   Q    And it says, "Brings more revenue lift for publishers."

22   A    Yes.

23   Q    "Even while charging the reserve price instead of first

24   price in the dynamic region," right?   That's the Google

25   documents show that dynamic revenue share was increasing

Cross-Examination - R. Ravi

1    revenue for publishers, right?

2    A    Yes.  In some cases it did, yeah.

3    Q    Right.  In terms of the impact on the ecosystem, which

4    is page 3 -- that's a subtitle there at the bottom, "Impact

5    on the Ecosystem," it says, "AdX is in competition with

6    other exchanges, and both publishers and buyers have an

7    option to go to other exchanges.  The exchanges should care

8    about both sides of the market and provide more features to

9    both sides to thrive in face of competition with other

10   exchanges."

11        Do you agree that sell-side dynamic revenue

12   sharing was good for the ecosystem?

13   A    I -- I mean, broadly speaking, dynamic revenue sharing

14   at auction by any of the participants is good for the

15   ecosystem.

16   Q    All right.  Now, return to -- so that was -- just in

17   terms of Google's customers -- publishers and advertisers,

18   right -- you did not reach an opinion about whether there

19   were more losers or winners as a result of the uniform price

20   rules, correct?

21   A    No, I did not do analysis about whether there were more

22   of winners or losers with respect to UPR.

23   Q    So let's just go over those terms.

24        You've generally said that, as a result of these

25   different conducts, there were some winners and losers

Cross-Examination - R. Ravi

1    amongst the customers?

2    A    I believe I used that in the context of buy-side

3    dynamic revenue share.

4    Q    And that's also true for uniform pricing rules.   For

5    the customers, there were some winners and losers, and

6    you've not done any analysis about whether there was a net

7    gain or a net loss?

8    A    No, I have not done that analysis.

9    Q    In fact, for any of the conduct in your report, you

10   have not attempted to quantify the harm or gain to

11   advertisers or publishers as to whether there were more

12   winners or losers?

13   A    No, I have not done that analysis.

14   Q    So when you are giving the opinion that Google's

15   conduct advantaged itself and disadvantaged rivals, you are

16   doing no analysis of whether Google's customers won or lost

17   from this conduct, right?

18   A    I would not characterize my report as doing no

19   analysis.

20   Q    You have reached no opinions about whether the Google

21   conduct you described was good or bad for the customers,

22   right?

23   A    I would not characterize my opinions that way either.

24   Q    You would agree that you have not given any opinions in

25   your reports that the Google conduct that you described made

51

Cross-Examination - R. Ravi

1   any of the customer -- made the customers net winners or net
2   losers?
3   A    Any of the customers net winners?
4   Q    The totality of the customers.
5   A    The totality of the conducts' net winners or net
6   losers?
7   Q    Yeah.
8   A    Yeah, I did not do that kind of analysis.  Yes.  I was
9   looking at each conduct and then laying out its effects.
10  Q    All right.  It wasn't relevant to you in determining
11  whether Google's conduct -- in your analysis of Google's
12  conduct about whether it was helping its customers or not,
13  right?
14  A    It was relevant.  In fact, I was talking about harm to
15  its customers.
16  Q    Okay.  But then you never quantified it, right?
17  A    Again, I wouldn't say I did not quantify these effects,
18  but I don't have I think what you're trying to get at, that
19  whole some win versus lose.
20  Q    All right.  Let's talk about Project Poirot.  Project
21  Poirot, named after Hercule Poirot, if that helps everybody
22  with the spelling, the -- so you know the term.  A
23  second-price auction that was not running a clean
24  second-price auction was sometimes called a dirty auction,
25  right?

Cross-Examination - R. Ravi

1   A    Some people have characterized it that way.

2   Q    And Project Poirot determined amounts to reduce or

3   shape bids, as you've described, for dirty auctions, right?

4   A    That was the stated purpose, yeah.

5   Q    And it did that for DV3 -- in DV360, right?

6   A    DV360 is what did it, yeah.

7   Q    Right.  Project Poirot was in DV360.  Project

8   Poirot was not in Google Ads, right?

9   A    It was not in Google Ads.

10  Q    It was not in AdX, correct?

11  A    No.

12  Q    It wasn't in DoubleClick for Publishers?

13  A    Yes.  It was in DV360, yeah.

14  Q    And you agree that the documents show that Project

15  Poirot increased advertiser surplus, right?

16  A    Yes.  For some of the advertisers, yes.

17  Q    Well, you agree that, in general, the Poirot documents

18  and experiments show an increase in surplus for some of the

19  advertisers?

20  A    Yes, I agree.

21  Q    Right.  And that was benefiting the advertisers,

22  correct?

23  A    Yes, those advertisers for whom it did increase the

24  surplus.

25  Q    Right.  And you agree that bid shading programs like

Cross-Examination - R. Ravi

1   Poirot are needed when facing auctions that don't run clean

2   second-price auctions, right?

3   A    Yes, bid shading is appropriate in non-second-price

4   auctions.

5   Q    Right.  Because, for example, bidders if there's not --

6   if you don't have the clean second-price auctions, bidders

7   have to run experiments themselves trying to figure what's

8   going on?

9   A    Yes, that would typically be how they would try to go

10  about doing this, yeah.

11  Q    And you also agree that DV360 tested AdX for the

12  applicability -- whether to apply Project Poirot to AdX,

13  right?

14  A    Yes.  AdX did go through the test as well.

15  Q    Right.  And so that test, which was run -- that test

16  was run on multiple exchanges, right?

17  A    Yes.

18  Q    Okay.  And that test determined that the shaded bids on

19  AdX would not increase advertiser surplus by more than a 10

20  percent threshold, right?

21  A    That is correct.  10 percent was the margin.

22  Q    And that was the test that Google was running.  It was

23  running tests against auctions, looking for dirty auctions;

24  and if that test didn't show that shaded bids would increase

25  advertiser surplus by more than 10 percent, it wouldn't run

54

Cross-Examination - R. Ravi

1    Poirot; and if it did show 10 percent or over, it would run

2    Poirot.  Is that right?

3    A    That's correct, yeah.

4    Q    And the effect of Project Poirot varied with respect to

5    the rival auctions, correct?

6    A    Yes.

7    Q    Okay.  You said that it had an adverse effect on some

8    auctions, right?  But it had a positive effect on other

9    auctions, on other exchanges, right?

10   A    Yes, in terms of the amount that they won by.  I assume

11   that's what you are referring to.

12   Q    The number of wins, yeah.

13   A    Yes, yeah.  It shifted things around, yeah.

14   Q    It shifted things around because Project Poirot would

15   shade bid if it thought you were a dirty auction, and they

16   could lose some wins.  But if you were running a clean

17   auction, you -- the other exchanges could win more bids,

18   right?

19   A    Yeah.  Sometimes that was true, yeah.

20   Q    And that's what the documents that you saw showed,

21   right?

22   A    Yes, it did show some exchanges with both effects.

23   Q    Right.  For example, DTX 615 in your binder at 644,

24   this is a document you've seen before, right, sir?  Do you

25   remember seeing this at your deposition?

Cross-Examination - R. Ravi

1  A    Yes.  Yeah.

2  Q    And on 644, there's a chart of one of -- one day of the

3  impact of Poirot.

4         THE COURT:  Hold on a second.  Is there any

5  objection to 615 once we find it?

6         MR. VERNON:  No objection.

7         THE COURT:  All right.  615 is in.

8  BY MR. ISAACSON

9  Q    All right.  And you see this was very early on in

10  Poirot.  It's launched through June, completed in July.

11  A    Yes, I see it.

12  Q    And you can see the spin change for certain exchanges.

13  And some went down and some went up.  Improved Digital went

14  up 6.7 percent, and AdX and AdSense went up 7 percent,

15  right?

16  A    Yes, correct.

17  Q    It also says that very few customers, less than

18  1 percent, opted out.  The customers had the option of

19  saying don't run Poirot, correct?

20  A    I believe that was the case for publishers -- wait --

21  for some advertisers, yes.

22  Q    All right.  And you agree that other ad tech companies

23  had bid shading features like Poirot trying to respond to

24  the problem of dirty auctions, right?

25  A    Yes.  Other ad tech companies facing first-price

Cross-Examination - R. Ravi

1   auctions did bid shading as well.

2   Q    All right.  Now, you mentioned optimized reserve

3   prices.

4          You agree that sellers are incentivized to set

5   higher reserve prices -- high reserve prices because that

6   can lead to higher auction revenues, right?

7   A    That could potentially lead to higher revenues.

8   Q    But if the seller sets the reserve price too high,

9   fewer auctions will be cleared because there might not be

10  any bidder above the reserve price.

11  A    That's correct.

12  Q    So for reserve prices, there's a trade-off between

13  increasing revenue and risking unsold auctions?

14  A    Exactly, yeah.

15  Q    Reserve price optimization was a feature that was

16  seeking to raise the publisher's floor to a revenue optimal

17  reserve price based on data from prior bidding, right?

18  A    That's correct, yeah.

19  Q    And you've seen Google documents showing that -- that

20  the effect of reserve price optimization was to increase

21  revenues for AdX buyers on -- for AdX publishers, right?

22  A    Yes.  It did increase the revenue for some publishers.

23  Q    All right.  In fact -- so just using that as an

24  example, reserve price optimization increased revenues to

25  publishers.

Cross-Examination - R. Ravi

1          Anytime Google successfully designed its
2    technology to incentivize customers to choose AdX over
3    rivals, that would give Google scale advantages, right?
4    A    Anytime Google has more impressions going through its
5    pipes, yes, it has higher scale.
6    Q    So when Google makes better products, when more
7    customers like its products, it will have scale advantages?
8    A    Yes.  It would accrue scale that way too, yes.
9    Q    It's just true of any ad tech company.  Anytime an ad
10   tech company implements a quality improvement that customers
11   like, that's going to be a win for that company and a loss
12   for somebody else?
13   A    Precisely.  Quality improvements increase scale.
14   That's why scale matters as well.
15   Q    Now, when you gave the opinions that Google took action
16   to hurt rivals, you were looking at specific Google conduct
17   and not all of Google's ad tech or products at issue in this
18   case, right?
19   A    I think I might have touched all the products at issue
20   in this case.
21   Q    You think -- well, you think that the only Google
22   products that happened from 2009 to 2019 were first look,
23   last look, sell-side DRS, Project Poirot, and reserve price
24   optimization?
25   A    I'm sorry.  I misunderstood the word "product."  I

58

Cross-Examination - R. Ravi

1  meant by product DFP, AdX, DV360, Google Ads.  They are

2  products.

3  Q   There's a lot of changes going on in all of those

4  projects, aren't there?

5  A   Indeed, yeah.

6  Q   And you weren't looking at all the changes going on to

7  determine whether -- to look at Google's conduct as a whole,

8  were you?

9  A   I don't know what you mean by "whole," but I definitely

10 could not look at all the changes going on.

11 Q   Well, how did you pick the ones you did?  Why did you

12 just -- why that handful of things -- first look, last look,

13 uniform pricing rules.  I'm forgetting one, but --

14 A   Project Poirot, yeah.

15 Q   Yeah, Project Poirot.  Why did you just look at those?

16 A   It's huge design choices.  When you design an auction,

17 the first thing you look at is how are the people put in

18 position?

19      Well, first look and last look resulted from that

20 fixed first position of AdX.  So I think anyone looking at

21 these conducts would easily zone in on the same set of

22 features that I did highlight.

23 Q   Did you do an analysis of the other important changes

24 that Google made during those years?

25 A   These were not changes; these were inherent features,

Cross-Examination - R. Ravi

1   right?  First look and last look was not a change of

2   anything; it was just something that existed over the whole

3   period.  Project Poirot was not a change; it was a new

4   project for bid sharing.

5   Q    I think of a new project as a change, but okay.

6   A    But, you know, it is a totally new change in the way

7   the auctions are run.  So that's how I thought about it, you

8   know.  I --

9   Q    Okay.  Were you given the Google system and then looked

10  and said, oh, look, Project Poirot, or did -- were you given

11  a list?

12  A    No.  I -- it didn't work that way.  I started by

13  examining the complaint, thinking about the conducts that

14  would be relevant, and then reading the PRDs.  So I went

15  down that way to try and narrow my list of things to

16  carefully look at.

17  Q    That makes perfect sense.  You started with the

18  complaint, looked at the conduct there, and picked some

19  items from the complaint?  That's what you did for your

20  report?

21  A    I picked the conducts that I think would impact -- the

22  optimization features that would impact these conducts, and

23  I looked at that list, yeah.

24  Q    Right.  You also looked at other conduct that helped

25  customers of Google, didn't you?

Cross-Examination - R. Ravi

1    A    Oh, yes, I did.  Yeah.

2    Q    For example, you looked at enhanced dynamic allocation.

3    Enhanced dynamic allocation allows advertisers to compete

4    for direct impressions, right?

5    A    Enhanced dynamic allocation does -- yeah, it does

6    increase the number of things that are sold at a higher

7    price, right.

8    Q    So that was the first change implemented by Google that

9    allowed advertisers to compete for impressions that were

10   being sold through direct deals at the same time as indirect

11   deals, correct?

12   A    That's right.  They were taking some from the direct

13   deals and making them available for auction.

14   Q    And you agree that enhanced dynamic allocation caused

15   publishers to earn additional revenue, right?

16   A    Yes, I do.  Yeah, enhanced dynamic allocation might

17   potentially make more revenue, yeah.

18   Q    Right.  And you also looked at something called Project

19   Bell, right?

20   A    Project Bell was one in a sequence of many, yeah.

21   Q    And I think a topic sort of came up in response to a

22   question from the judge, multicalling.  You were talking

23   about multiple calls at different times.  What's

24   multicalling?

25   A    Multicalling has -- there are two aspects here; so I

                                                              61

1  don't want to confound them.  What I was telling Your Honor

2  was about the same impression being available for sale from

3  different channels.  And I think she was asking me about

4  second-pricing yourself, if I remember correctly.

5  Q    Yeah.

6  A    The multicalling that I talk about in my report is one

7  where the impression is sent again and again.  So these are

8  all different requests one after the other.  But the

9  difference is that you start with the high reserve price.

10 It didn't get you that; so you go one below.  That's the

11 multicalling that I think you are referring to in the

12 report.

13 Q    Right.  So multicalling is bad for the whole system,

14 publishers and advertisers, right?

15 A    Truly, yeah.  That is, broadly speaking, correct, yeah.

16 Q    It tends to raise prices -- because you're sort of

17 fishing for a higher price and seeing if someone will fall

18 for it?

19 A    Also, it slows things down, yeah.  And it -- like, it

20 adds more overhead in the whole ecosystem.

21 Q    And it's also overhead for the whole system because

22 people have to figure out that there's multiple calls going

23 on for the same impression?

24 A    If they wanted to, yes.

25 Q    Yeah.  And you agree that Project Bell implemented by

Cross-Examination - R. Ravi

1  Google successfully reduced multicalling?

2  A    I didn't -- yes, I mean, I did -- yes, I would agree

3  with that.  Yeah.

4  Q    And then there was something called Project Bernanke,

5  which was another type of dynamic revenue share, right?

6  A    Yes.  That was a dynamic revenue sharing on the other

7  side.  That was the buy side now.

8  Q    But it's the same principle.  You're adjusting bids up

9  and down to win more impressions for your customers?

10  A    Yes, to -- yeah, to get more to clear through your

11  exchange, if you will, yeah.

12  Q    Right.  And Google implemented Project Bernanke.  And

13  that increased publisher revenue, right?

14  A    In some cases, it did, yeah, just like the other

15  sell-side version, yes.

16  Q    And it also increased matches between advertisers and

17  publishers, right?

18  A    I'm trying to think through this because it's a little

19  involved.  Buy-side dynamic revenue sharing, did it improve

20  the amount of matches?

21  Q    Well, you did review experimental documents from Google

22  that showed that buy-side dynamic revenue share, global

23  Bernanke, increased matches.  Do you recall that?

24  A    Yes, I do now recall.  Yes.  Yeah.

25          MR. VERNON:  Objection, Your Honor.  I know Your

63

Cross-Examination - R. Ravi

 1  Honor said it's a matter of -- but we asked zero questions
 2  on Bernanke.
 3            THE COURT:  That's true.  It's the first time it's
 4  come up.
 5            MR. ISAACSON:  Yes, Your Honor.  But it goes to
 6  the point of Google's conduct as a whole.  He's looked at
 7  certain conduct and wants to isolate --
 8            THE COURT:  I understand.  You're making holistic
 9  argument.
10            So on redirect, if you want to go into Bernanke,
11  you can.  All right?
12  BY MR. ISAACSON
13  Q    All right.  And on issue of scale, you said that you
14  refer to Google ad demand being available in AdX.  Do you
15  remember that?
16  A    Yes, yeah.  Yeah.
17  Q    And you define Google demand as Google -- as being from
18  Google Ads and DV360, right?
19  A    I'm not exactly sure of the context, but if I was
20  talking about near exclusivity, that would have been Google
21  Ads.
22  Q    But Google advertiser demand -- we're talking about
23  advertiser demand, right?
24  A    Yes, we are.  Yeah.
25  Q    And Google advertiser demand would include Google Ads

Cross-Examination - R. Ravi

1    and DV360, right?

2    A    Yeah.  Probably that's true.

3    Q    And you agree that Google's buying tool, DV360, has

4    historically been one of the major bidders into third-party

5    exchanges, right?

6    A    Yes.  That's a sentence from my report, yeah.

7    Q    It's also a major bidder into third-party ad networks,

8    correct?

9    A    Yes.  That is true as well, yeah.

10   Q    So when you were talking about the effect on scale from

11   Google Ads demand as opposed to the other demand, you

12   weren't looking at the totality of sharing of demand that

13   Google does with its rivals, were you?

14   A    No, I was not considering the totality of Google Ads

15   and DV360 demand.

16   Q    Right.  Google -- if -- sharing advertiser demand is

17   going to increase scale for rivals, in your opinion, right.

18   A    Yes.  Broadly speaking, that would be the case, yeah.

19   Q    And that's what Google is doing with one product,

20   DV360, right?

21   A    Yes, it is doing that with DV360.

22   Q    Right.  And DV360 are some of the largest advertisers

23   in this country, right?

24   A    Yes.  They include some of them, yeah.

25   Q    And you've heard it said that Google Ads has made small

Redirect Examination - R. Ravi

1   and medium size --

2   A    Yes.

3   Q    And so what Google is doing is it's sharing the demand

4   from the largest customers but not the smallest customers,

5   right?

6   A    That is the characterization of DV360 versus Google

7   Ads, yes.

8   Q    And did you do any analysis of how much scale Google

9   has contributed to its rivals by sharing the demand from its

10  largest customers?

11  A    That would just be the flip side of the coin.  What it

12  did not win for itself is what was shared.  So I think each

13  one implies the other.  So...

14          MR. ISAACSON:  I don't have any further questions.

15          THE COURT:  All right.

16          Redirect?

17                    REDIRECT EXAMINATION

18  BY MR. VERNON

19  Q    Okay.  I'm going to try to go in order.

20          Did you offer any opinions at all in your direct

21  or your reports about market definition?

22  A    No.

23  Q    Do you recall that counsel asked you some questions

24  about market definition and a paper that you wrote?  I think

25  it was titled "First-Price Auctions in Online Display."

Redirect Examination - R. Ravi

1              Do you remember that?

2     A    Yes, I recall that.   Yeah.

3     Q    In that paper, did you define any relevant markets for

4     antitrust purposes or competition purposes or any other

5     purpose?

6     A    I did not define markets in that paper.   That was not

7     the point of that paper.

8     Q    Did any of the conclusions in that paper depend upon

9     the precise definition of the markets that you were

10    reviewing?

11    A    No, they do not.

12    Q    And why is that?

13    A    That paper was just trying to study the question of why

14    so many exchanges were moving around 2015 from second-price

15    auctions to first-price auctions.   It was happening very

16    rapidly in the industry.   And that paper put forward the

17    explanation that the cause was header bidding.   That was the

18    point of the paper.

19    Q    And did that conclusion depend in any way on market

20    definition?

21    A    No, they do not.

22    Q    Counsel asked you about quantitative analysis.   Do you

23    remember that?

24    A    Yes, I do.

25    Q    What quantitative analysis did you rely upon?

Redirect Examination - R. Ravi

1    A    As I mentioned earlier, I relied upon analysis done by

2    Google in its own documents that I cite.

3    Q    And why did you rely on that analysis?

4    A    Because I found it to be quite reliable because they

5    were results of experiments that were trying to determine

6    the effectiveness of these conducts.  So I found that to be

7    a reliable source to rely on.

8    Q    Counsel asked you about DTX 768, which is in the middle

9    of the black binder.

10           Let me know when you're there.

11   A    Yeah.

12           I'm there.

13   Q    Counsel asked you about the message in the middle from

14   Nirmal Jayaram.  Do you see that?

15   A    Yes.  The 123 percent.

16   Q    If you look at the third line, Mr. Jayaram writes, "If

17   my interpretations are correct, it seems like the benefit

18   of UPR is rather marginal."

19           Do you see that?

20   A    Yes, I do see that.

21   Q    Can you go two messages down from Nitish Korula.

22   A    Yes.

23   Q    Do you know who Nitish Korula is?

24   A    Yes.  I think he is one of the engineers involved with

25   the sell side, yeah.

Redirect Examination - R. Ravi

1   Q    Mr. Korula responds to Mr. Jayaram, "That's
2   misleading."  Do you see that?
3   A    Yes, I see that.
4   Q    "A lot of the value for DBM comes from high-CPM PG and
5   PD candidates, to which rules are not applied.  If you look
6   at DBM on AdX when restricted to open auction and private
7   auction, you see plus 40.3 percent impressions, plus
8   10.6 percent value, plus 7.5 percent revenue."
9           Do you see that?
10  A    Yes, I see that.
11  Q    So there are two numbers in these two different
12  messages.  The top number is 1 to 3 percent in Jayaram.
13          Do you see that?
14  A    Yes, I see that.  Yeah.
15  Q    And then you see 40.3, 10.6, and 7.5?
16  A    Yes, I see that too.
17  Q    Which is larger?  40 or 1 to 3?
18  A    40.
19  Q    Counsel also asked you if you'd reviewed other
20  documents showing the potential size of the effects of UPR.
21          Do you remember that?
22  A    Yes.
23  Q    Do you recall the tree document that we looked at on
24  your direct?
25  A    Yes, I do.  Yeah.

69

Redirect Examination - R. Ravi

1  Q     And that was the document that had 40 percent

2  multiplied by another 40 percent?

3  A     Yes.   42 percent multiplied by 40 percent.

4  Q     And that equals?

5  A     About 16 percent.

6  Q     And which is higher?   16 or 1 to 3?

7  A     16 is.

8  Q     Counsel also asked you about self-preferencing.   Do you

9  remember that?

10 A     Yes, if you will remind me what context it was in.

11 Q     I think counsel asked you whether some of Google's

12 conduct provides -- allows some of Google's customers to win

13 an impression it might not have otherwise won.

14        Do you remember that?

15 A     Yes.   I do remember that part, yeah.

16 Q     Does that mean the Google conduct that you examined is

17 good for customers overall, meaning publishers overall or

18 advertisers overall?

19 A     Not necessarily.

20 Q     And why is that?

21 A     There were some conducts that I described.   Like, a

22 good example would be sell-side DRS with that last look

23 advantage.   That was a case when the publisher would have

24 got the exact same amount of money.   It was just shifting

25 the winner from a header bidder to an AdX bidder.

Redirect Examination - R. Ravi

1          So that's an example where there would be no, like

2     zero, benefit to the publisher.  And that's an example where

3     it does not increase the surplus for anybody.

4     Q    And why does it not increase the surplus for anybody?

5     A    Because the publisher would have sold that same

6     impression for exactly the same price anyway.

7     Q    Let's take first look as another example.  First look

8     would allow an advertiser bidding through AdX to win some

9     impressions that that advertiser would not have otherwise

10    won; is that right?

11    A    First look would let AdX win an impression that

12    potentially might just go down the pipe with no bidders.

13    That is possible.

14          But the point in first look is that it only

15    fetches at a price that is equal to that average price and

16    not anything much higher.  Not all of the time, just to be

17    clear.

18    Q    Does the fact that first look allows an advertiser

19    buying through AdX to win an impression mean that first look

20    is good for advertisers overall?

21    A    No, that's definitely not the case.  As I pointed out,

22    the highest -- the advertiser willing to pay the highest

23    price may not get it as a result of first look, yeah.

24    Q    Counsel for Google also asked you about something

25    called configurable priority.  Do you remember that?

Redirect Examination - R. Ravi

1  A    Yes, I do.

2  Q    Do you remember we discussed a document on your direct

3  that provided some percentages for how often AdX won within

4  the first look?

5  A    Yes.  I think the 53 percent that AdX was winning from

6  DFP, yes.

7  Q    What conclusion do you draw from the fact that AdX was

8  winning 50 percent of the time through first look about how

9  prevalent this configurable priority workaround was?

10 A    I concluded from that percentage that it was not very

11 prevalent.  And just -- maybe I should just say more

12 broadly, the fact that the publishers are trying hard to go

13 outside of this ecosystem and get header bids itself

14 indicates to me that it was not easy for them to implement

15 these so-called workarounds to try and get ahead of AdX.

16        They weren't getting these real-time bids; so they

17 went outside and got them with header bidding.  So that's

18 more broadly the point I want to make, yeah.

19 Q    Counsel also asked you about who set the floors within

20 first look.  Do you remember that?

21 A    Yes, I do.

22 Q    Who set up the system under which AdX would bid first?

23 A    DFP.

24 Q    And who owns DFP?

25 A    Google, of course.

Redirect Examination - R. Ravi

1   Q    Who set up the system under which AdX would submit

2   real-time bids against a floor based on static bids?

3   A    AdX.  Again, owned by Google, yeah.

4   Q    And what was your testimony on direct about which

5   company obtains the advantage from first look in winning the

6   impressions with the highest value?

7   A    AdX.

8   Q    Counsel also asked you about how, under this first look

9   system, AdX sometimes passes on or does not win an

10  impression.  Do you remember that?

11  A    Yes, I remember that.

12  Q    Why did you conclude that AdX has the advantage for the

13  highest value impressions even though there are some cases

14  where AdX passes?

15  A    Well, when AdX passes, that's an indication that,

16  first, there was no bidder above that floor.  That also is a

17  likely indication it was not a very valuable impression.

18  That's why I concluded that AdX has the advantage with the

19  more valuable impressions.

20  Q    Counsel for Google also asked you about first look

21  making AdX more attractive for advertisers.  Do you remember

22  that?

23  A    Yes, I do remember that.

24  Q    Did first look make AdX more attractive to advertisers

25  because first look made AdX a better product?

Redirect Examination - R. Ravi

1  A    No.

2  Q    Why not?

3       MR. ISAACSON:   Objection, Your Honor.   He's not a

4  quality product expert.

5       THE COURT:   I'm going to sustain the objection.

6  BY MR. VERNON

7  Q    Why did you say that first look allowed AdX to win some

8  impressions that it wouldn't have otherwise won?

9  A    Because of its first position in the waterfall that DFP

10 set up.

11 Q    And is that good for customers overall?

12 A    Not overall, only for AdX's customers.

13 Q    Counsel also asked you about bid inflation.   Do you

14 remember that in the context of last look?

15 A    Yes, I do.

16 Q    In response to counsel's questions, you said that you

17 did have some discussion in your rebuttal report about how

18 common bid inflation was.   Do you remember that?

19 A    Yes, I do remember that.

20 Q    What were you referring to there?

21 A    I was trying to find and quote evidence about the

22 prevalence of bid inflation in the rebuttal report.   And

23 what I did find was, while it was discussed in that Amazon

24 document that, you know, 19 publishers were being discussed,

25 only one of them really was even thinking about trying to do

74

Redirect Examination - R. Ravi

1   the bid inflation.

2          And, if I recall, I think this came up also

3   yesterday in Ms. Layser's deposition that there was not --

4          MR. ISAACSON:   I would object, Your Honor.

5   Ms. Layser's testimony was not in his report by

6   chronological definition.

7          MR. VERNON:   Your Honor, just to address this

8   briefly.   My understanding is experts can attend the trial

9   and listen to what they hear at the trial and then have that

10  inform their opinions.

11         THE COURT:   Well, no.   Under the discovery rules,

12  you're supposed to have gotten any opinions from the expert

13  articulated ahead of time.   Otherwise, that would be expert

14  opinions by surprise.

15         They are allowed to stay in court and listen,

16  usually to just perhaps explain away some of the other

17  testimony based upon what's in their expert report.   But it

18  can't be some new opinion that was not in it.

19         MR. VERNON:   That's what I was trying to get to.

20  This isn't a new opinion that he didn't disclose.   As he was

21  discussing, his rebuttal report does discuss this issue, bid

22  inflation.   And I think Professor Ravi was about to comment

23  on Ms. Layser's testimony on this same issue.

24         THE COURT:   I'm not permitting that.

25         MR. VERNON:   We'll move on.

Redirect Examination - R. Ravi

1          THE COURT:   That will run for both sides with the

2   experts.

3   BY MR. VERNON

4   Q    Absent bid inflation, how much additional revenue does

5   last look return to publishers?

6   A    Could you rephrase.  I don't -- absent bid inflation?

7   Q    If the publishers do not inflate bids, how much

8   additional revenue does last look give to publishers?

9   A    Nothing.  Nothing more, yeah.

10  Q    And what was your conclusion -- again, based on your

11  reports -- about how common bid inflation actually was?

12  A    Again, not very prevalent.

13  Q    And what was your conclusion overall about whether last

14  look was good for publishers in terms of revenue?

15  A    Last look for publishers in terms of revenue -- well,

16  it was not the best way, as I was discussing in the cross,

17  to get the highest revenue for the publishers.

18  Q    And the best way was?

19  A    The unified first-price auction that we were talking

20  about, yeah.

21  Q    And if you were to compare a unified first-price

22  auction on the one hand and a last look plus bid inflation

23  on the other hand, which one would lead to more revenue for

24  publishers?

25  A    The unified first-price auction.

Redirect Examination - R. Ravi

1   Q     And why is the comparison between a unified first-price

2   auction on the one hand and the last look plus bid inflation

3   on the other hand relevant?

4   A     Well, if you took -- if you moved away from last look,

5   the place you would get to is a unified first-price auction.

6   And that's what happened when Google gave up first look --

7   last look.  It moved to the unified first-price auction.  So

8   it's direct chronological comparison of what happened, yeah.

9   Q     Counsel also asked you about UPR.  Do you remember

10  that?

11  A     Yes, I do.

12  Q     And counsel also asked you if you had no opinions on

13  whether UPR was good for customers overall, and you

14  disagreed.  Do you remember that?

15  A     Yes, I do.

16  Q     Why did you disagree?

17  A     Because the effect of UPR for publishers, for example,

18  is I do talk about why they did want more control.  And so

19  that was one reason I disagreed.

20  Q     Counsel also asked you about sell-side dynamic revenue

21  share, or sell-side DRS.  Do you remember that?

22  A     Yes.

23  Q     And I think you discussed whether sell-side DRS

24  increases publisher revenue in isolation, not as part of

25  last look.  Do you remember that?

Redirect Examination - R. Ravi

1   A     Yes, I do remember that.

2   Q     In what situations does sell-side DRS increase

3   publisher revenue?

4   A     When sell-side DRS allows the sale of an impression

5   that would otherwise go unsold because the floor was high,

6   but if Google reduced its take rate, it would be able to

7   meet that floor.  Then, as a result, that impression will be

8   sold because of sell-side DRS.  That would actually increase

9   the number of sold impressions.

10  Q     And does that situation relate to last look at all?

11  A     It is completely disjoined from last look.  Last look

12  is when you already have someone who is willing to pay a

13  certain price.  And last look is a case where we already

14  have a way of selling that impression.  So when you insert

15  that and let AdX buy it for essentially the same price,

16  you're not increasing the number of impressions.  So these

17  are two different situations.

18  Q     Let me ask you about that second situation.  When last

19  look applies, what effect does sell-side DRS have on

20  publisher revenue?

21  A     Again, nothing.  It just based the same price, but the

22  impression goes to AdX.

23  Q     In your direct, what opinion did you express about

24  sell-side DRS?

25  A     Sell-side DRS, in and of itself, nothing particularly.

1    Q    And what opinion did you express about sell-side DRS in

2    connection with last look?

3    A    In connection with last look, I highlighted the

4    advantage that it gave to AdX without this increase in the

5    revenue for publishers necessarily.

6    Q    Let me turn briefly to DTX 615, which is the one we had

7    a hard time finding in defendant's binder there.  It's

8    Number 4, approximately.

9              I'm sorry.  In your binder.

10             Please turn to page 644.

11   A    Yes.

12   Q    This is a slide about the launch impact Rasta from

13   Project Poirot; is that right?

14   A    Yes.

15   Q    What is a launch impact?

16   A    It is a result of launching the project.

17   Q    And you'll see there's a chart on the right-hand side

18   that how exchanges and spend change.

19   A    Yes, I see it.

20   Q    What does this chart show?

21   A    It shows the impact on different exchanges by the

22   launch of this project, and that would be Poirot, from the

23   mustache.

24             And so you can see that -- yeah, as we were

25   discussing, some of the publishers had a reduction in the

Redirect Examination - R. Ravi

1   amount that they spent compared to before launch, and the
2   others increased down the line.
3   Q    So I won't go through all of these, but what does this
4   show about the impact of Poirot on PubMatic?
5   A    Pretty at worst.
6   Q    And then there's additional rows for OpenX and Rubicon;
7   is that right?
8   A    Yes.  OpenX looks bad too.
9   Q    And then the effect on United and Improved Digital is
10  positive?
11  A    Yes, it is.
12  Q    Do you know, other than AdX, what the other largest
13  exchanges are?
14  A    Well, the others are mostly here.  We don't have Xandr
15  here, but that's one that is not here I can think of.  Yeah.
16  Q    So you're referring to PubMatic, OpenX, Rubicon, and
17  Xandr?
18  A    Yeah, those are some that I could think of.
19          Again, you have to be careful of what the timing
20  of this document, yeah.
21  Q    Do you know how the size of Improved Digital compares
22  to the size of PubMatic, OpenX, or Rubicon?
23  A    I don't know off the top of my head, but my guess is
24  probably much smaller.
25  Q    One other question on this document.  Can you turn to

80

Redirect Examination - R. Ravi

1    the title slide, which is in the back of the very first

2    page.  The title slide says "Bidding in Adversarial

3    Auctions."

4    A     Yes, I see.

5    Q     And there is a mustache and cookie?

6    A     Yes, I see that.

7    Q     What do the lines say at the bottom of this slide?

8    A     Are you talking about privileged and confidential or --

9              MR. ISAACSON:  Your Honor, I object.  An expert

10   witness talking about privileged and confidential

11   designations in documents is improper.

12             THE COURT:  I don't think this goes anywhere.

13             MR. VERNON:  I'll move on.

14   BY MR. VERNON

15   Q     Counsel asked you about the fact had you expressed an

16   opinion, at least that we discussed in your direct, about

17   four conducts.

18             Do you remember that?

19   A     Yes, I do.

20   Q     I think it was last look, first look, UPR, and Poirot?

21   A     Yes, that's correct.

22   Q     And then also sell-side DRS in connection with last

23   look.

24   A     Yes.  And if you want to be complete, the sell price

25   optimization.

1    Q     In connection with?

2    A     In connection with Project Poirot, I believe.

3    Q     Counsel asked you about the fact that you only focused

4    on those four conducts with the additional conducts?

5    A     Yes, I remember that exchange.

6    Q     And you mentioned that those conducts involve

7    optimization?

8    A     Yes.  All of them involve either optimization or the

9    design off a system through which actions are conducted.

10   Q     And why was that relevant to the question of why you

11   focused on these conducts.

12   A     As I was saying before, those were the very significant

13   conducts that had the chance to affect the impact on revenue

14   and on rivals.

15   Q     Counsel asked you about the fact that you didn't

16   examine all of Google's conduct across the entire Google

17   company.

18          Do you remember that?

19   A     Yes, I do.

20   Q     Were you offering any opinion at all about whether

21   Google's conduct in other businesses, like search, was

22   either good or bad or neutral?

23   A     No.

24   Q     Why did you focus on these four conducts?

25   A     Again, because they are very relevant to the issues in

Recross-Examination - R. Ravi

1   the original complaint, and they also have a very important

2   optimization component where I could offer my opinion.

3           MR. VERNON:   Thank you.

4           Pass the witness.

5           THE COURT:   Any recross?

6           MR. ISAACSON:   Very briefly, Your Honor.

7                    RECROSS-EXAMINATION

8   BY MR. ISAACSON

9   Q    Just to clarify -- my colleagues have offered to give

10  me a note.  Go to the podium.

11          Your testimony just now was that first look and

12  last look give publishers nothing more if an AdX bidder

13  beats the floor.

14          Do you remember that?

15  A    I do remember that.

16  Q    Okay.  Now, the context here is a second-price auction.

17  So if there's one AdX bidder who beats the floor, then they

18  pay -- the second price is the floor, right?

19  A    I agree, yes.

20  Q    And what's why you say, if the AdX bidder beats -- bids

21  more, then the publisher still does not get more?

22  A    Yes.  If there was exactly one AdX bidder on all the

23  floor, then AdX pays exactly the floor.

24  Q    But if there's two AdX bidders, both above the floor,

25  the publisher does get paid for them because the second

Recross-Examination - R. Ravi

1    price becomes the price of the second bidder?

2    A    Yes.  I believe I mentioned that earlier, yeah.

3    Q    Okay.  And just looking at PTX 615, this was the Poirot

4    document again.  DTX 615 at 44.  It's on your screen too I

5    think.

6    A    Okay.  Thank you.

7              MR. ISAACSON:  At 21 of 48, Matt.

8              THE WITNESS:  Yes, it's familiar now.

9    BY MR. ISAACSON

10   Q    Right.  And you were looking at the individual

11   companies.  What it also says is -- over on the exchange

12   impact bullet, the third bullet on the left.

13   A    Yes.

14   Q    "Overall spend, neutral.  Spend in CPM on dirty auction

15   exchanges dropped by approximately 10 percent.  Spent up by

16   6 percent on second-price auction exchanges."

17             Those would be the clean second-price auction

18   exchanges, right?

19   A    Yes.

20   Q    Right.  And in your opinion, if spend was going on on

21   dirty auctions and going up on clean auctions, that's an

22   improvement in the ecosystem, isn't it?

23   A    Broadly speaking, yes, that is the case, yeah.

24   Q    In your article -- you were asked about what you wrote

25   about in your article.  One of your conclusions in the

84

Recross-Examination - R. Ravi

1   articles where you did a lot of analysis is that "When all

2   exchanges moved to first-price auctions, each exchange faces

3   stronger competition from other exchanges," right?

4   A    Yes.  In the model in my article, that is the

5   discussion, yeah.

6   Q    That's what happened when Google moved to the united

7   first-price auction in 2019, right?

8   A    My article was not an accurate model of what happened

9   in the real world.

10  Q    Right.  But when Google moved to first -- to a unified

11  first-price auction, it would be your opinion that, after

12  that, the exchanges faced stronger competitions from other

13  exchanges.

14  A    My article -- just to support that statement, my

15  article argues that the fees of ad exchanges would drop to

16  0 percent.  I don't think we see a 0 percent fee today.

17          MR. ISAACSON:  All right.  No more further

18  questions.

19          THE COURT:  All right.  Does anybody intend to

20  call this witness again?

21          MR. VERNON:  Your Honor, we do want to reserve the

22  right to call Professor Ravi in rebuttal.

23          THE COURT:  All right.  Again, you're still

24  permitted to stay in the courtroom, but do not discuss your

25  testimony with any witness who has not yet testified.

1          All right.  I think we might as well -- give me a

2   sense as to what the rest of the afternoon is going to look

3   like.

4          We have Mr. Zeng on the --

5          MS. WOOD:  No.  We are reserving Mr. Zeng for

6   rebuttal.  We're going to move, in the interest of

7   efficiency, to Mr. Dederick.  And so he will start after the

8   break.  And then if we have time left, we have some

9   video/read-ins.

10         THE COURT:  Read-ins?

11         MS. WOOD:  One read-in, and then I think that

12  read-in will take us to the end of the day; but if not,

13  there's a video after that read-in.  The read-in will be

14  Mr. Creput that we attempted to start yesterday.

15         THE COURT:  In terms of tomorrow, which is

16  Thursday, are you going to need any read-ins tomorrow?

17         MS. WOOD:  I believe Mr. Creput is our last

18  read-in.

19         THE COURT:  Excellent.  That's what I need to

20  know.

21         All right.  We'll take our break until ten after.

22  I have a couple of things I've got to do in chambers.

23              (The time is 3:53 p.m.)

24              (Brief recess taken.)

25         MR. GUARNERA:  Good afternoon, Your Honor.  Daniel

Direct Examination - John Dederick

1   Guarnera on behalf of the United States and plaintiff

2   states.

3           The plaintiffs call Jed Dederick to the stand.

4           THE COURT:  All right.  Mr. Dederick.

5   Thereupon,

6                   JOHN DEDERICK,

7   Having been called as a witness on behalf of the plaintiffs

8   and, having been first duly sworn by the Deputy Clerk, was

9   examined and testified as follows:

10              (Time noted:  4:11 p.m.)

11          MR. GUARNERA:  May I proceed, Your Honor?

12          THE COURT:  Yes, sir.

13                  DIRECT EXAMINATION

14  BY MR. GUARNERA

15  Q    Good afternoon, Mr. Dederick.  Would you please spell

16  your first and last name for the record.

17  A    Sure.  The first name is John, J-O-H-N; last name

18  Dederick, D-E-D-E-R-I-C-K.

19  Q    Mr. Dederick, who is your current employer?

20  A    The Trade Desk.

21  Q    What kind of company is The Trade Desk?

22  A    The Trade Desk is a demand-side platform.

23  Q    At a very high level, what is a demand-side platform?

24  A    A demand-side platform is a software that ad buyers use

25  to buy and place advertising.  So it explicitly sits on the

                                                              87

Direct Examination - John Dederick

1    buy side of the advertising industry.  Our company

2    exclusively represents the interests of advertisers and ad

3    buyers.

4            So, really, our clients -- advertising agencies,

5    advertisers -- come to us to help them pick which ads to buy

6    and to buy and place those ads.

7    Q    What does the "demand" in demand-side platform refer

8    to?

9    A    It refers to being an ad buyer.  It refers to creating

10   demand.  Really, a lot like economics, the conversation in

11   our industry around the supply side and the demand side is

12   the same.  Supply side relates to the ad inventory; demand

13   side relates to the ad buyers.

14   Q    Do demand-side platforms interact with ad exchanges at

15   all?

16   A    Yes.  I'm happy to explain.

17   Q    Please.

18   A    Okay.  Demand-side platforms plug into ad exchanges,

19   supply-side platforms, which have really merged into being

20   the same tools, typically.  Those are our principal

21   inventory suppliers that we buy from.

22           So, you know, in that we are a media- and

23   advertising-buying platform, what we're doing is we're

24   assessing the supply landscape and the principal sources

25   that we are buying from and placing ads and doing billing

Direct Examination - John Dederick

1  transactions with, building integrations with are those ad

2  exchanges in supply-side platforms.

3  Q    Is The Trade Desk a customer of ad exchanges?

4  A    You could certainly say that.  I mean, we are -- we are

5  typically one of their biggest buyers.  So we are buying a

6  lot from the various ad exchanges.

7  Q    Does The Trade Desk bid into Google's ad exchange, AdX?

8  A    Yes.

9  Q    I'd like to pull up Plaintiffs' Demonstrative A.

10        Mr. Dederick, you can either look in your binder

11  or on the screen there.

12        Mr. Dederick, do you see the blue box that says

13  "demand-side platform"?

14  A    Yes.

15  Q    Is that where The Trade Desk fits in the context of

16  this diagram?

17  A    Yes.  I would say that is the only place that The Trade

18  Desk fits into this diagram.

19  Q    And what is DV360, which is listed just below the

20  demand-side platform box?

21  A    So DV360 refers to Google's demand-side platform, which

22  is a similar technology service that Google offers to The

23  Trade Desk, the demand-side platform.

24        MR. GUARNERA:  We can pull down the demonstrative.

25  BY MR. GUARNERA

Direct Examination - John Dederick

1   Q    Mr. Dederick, what is your current role at The Trade

2   Desk?

3   A    I'm the chief revenue officer at The Trade Desk.

4   Q    What does your role as chief revenue officer entail?

5   A    I am overseeing company revenue.  I am managing the

6   global sales organization at The Trade Desk, managing

7   revenue operations.  I sit on our executive team, which

8   means we do, you know, business strategy, product strategy,

9   partnership strategy.

10            But in addition, it means I spend a lot of time

11  talking to advertisers, I mean our customers.  I'm often the

12  sort of escalation point and the face of The Trade Desk for

13  our customers.

14            So they're, like, ad agencies, who are typically

15  responsible for buying advertising.  I'll talk to their

16  executive teams and their management.  Marketing

17  organizations, big advertisers, their chief marketing

18  officers, their marketing organizations.  I spend lots and

19  lots of time talking to them, advising them on buying

20  advertising.

21            I mean, that's really all we do, is assess the

22  supply landscape, and we offer advisory and technology to

23  help pick and buy ads for those companies.

24  Q    Can you give some examples of topics that you discuss

25  with The Trade Desk's advertiser and ad agency clients?

Direct Examination - John Dederick

1  A    Sure.  We talk about -- we talk about their businesses

2  a lot.  We talk about how to help them build successful

3  resilient businesses as, you know, advertising for them, if

4  you're a big marketer as a gross driver.

5       So we're helping them try to build strong ads,

6  businesses by buying the right ads.  Is this ad worth it?

7  We're trying to help them find the right ad opportunity for

8  the right cost.  We want the most value out of any given

9  transaction.  That's -- different variations of that

10  conversation.  How you should think about buying your

11  connected television ads, your digital audio ads, your open

12  web display ads.

13       We are having those -- we buy across all of those

14  channels, and so we are advising them and consistently sort

15  of evaluating how they're doing it and helping them look at

16  things like the supply chain behind it.  Is it as efficient

17  and valuable as possible?

18       We're really just trying to get them buying and

19  placing the most effective advertising to power their

20  businesses.

21  Q    When did you become chief revenue officer?

22  A    January of this year.

23  Q    What was your role before becoming chief revenue

24  officer?

25  A    Chief client officer.

Direct Examination - John Dederick

1   Q    And how long did you serve as chief client officer?

2   A    I believe it was about two years.

3   Q    What did your role as chief client officer entail?

4   A    As chief client officer, similarly, I spent time

5   talking to our senior clients, but my management

6   responsibility was a bit different.

7         I didn't oversee all of company revenue.  I

8   oversaw -- I sort of helped launch what is a large client

9   sales organization or our first -- it's called sales

10  overlays in our industry.  So, like, senior overlays that

11  would talk to the executive teams of our clients to build

12  strategic relationships.

13        So I had a small -- much smaller, more senior

14  team.  And I would spend a lot more time in the field and

15  with our clients in person.

16        So it's really the difference of managing all of

17  company revenue and all of the sales and business operations

18  versus a subset that was focused on the largest agencies and

19  advertisers.

20  Q    And just to be clear, are the clients that you worked

21  with as chief client officer were what kind of companies?

22  A    They're companies that are buying advertising.  So

23  advertising agencies and advertisers.  We only represent ad

24  buyers.

25  Q    Does The Trade Desk have any clients that are not

Direct Examination - John Dederick

1   advertisers or agencies?

2   A     To the extent that other companies have come to us to

3   buy advertising, it represents a much smaller part of our

4   business.   I wouldn't want to say that there are none, but

5   far and away, almost all of our clients are advertisers and

6   ad agencies.

7   Q     And why has The Trade Desk focused its business on

8   representing advertisers and ad agencies?

9   A     We are -- our fundamental belief is that, you know,

10  the -- if -- our ecosystem has a buy side and a supply side

11  who have distinct interests and, in many cases, opposing

12  interests.

13            And so in order to service the interests of our

14  clients effectively, we need to really declare and tell

15  everyone what we're in it for.   And we feel we're able to

16  build more trust and credibility but also just build better

17  product and service as a result of being really clear about

18  what our interests are and who our clients are.

19            So that's been a pretty clear distinction for us

20  from the beginning.   We're not a company that wants to own

21  content.   We're not a company that wants to help publishers

22  drive higher CPMs.   We're a company that wants to help ad

23  buyers and advertisers and ad agencies buy and place

24  valuable advertising, figure out what it's worth.

25            Yeah.   So it's really been about business

                                                              93

Direct Examination - John Dederick

1   strategy, go to market, but also how we think the industry

2   should work.

3   Q    How long have you been at The Trade Desk all together?

4   A    About 12 years.

5   Q    Did you work in digital advertising before joining The

6   Trade Desk?

7   A    Yes.

8   Q    What did you do prior to joining The Trade Desk?

9   A    I worked for two web publishers.  I worked for the

10  wallstreetjournal.com; I worked for webmd.com.  In those

11  jobs I was in various roles in their sales departments.  I

12  was sort of an account manager and transitioned into sales.

13       We principally just sold open web display

14  advertising, those two publishers.  And I went from there to

15  The Trade Desk.

16  Q    Overall, how many years have you worked in the ad tech

17  industry?

18  A    About -- about -- a little under 20.

19  Q    Mr. Dederick, you used the phrase "open web display

20  ads" a moment ago.

21       What does "open web display" mean?

22  A    Open web display refers mostly to the banner ads that

23  appear on desktop websites.  So a lot of -- a lot of the

24  people in our industry refer to it as display, but we're

25  talking about a standardized series of ad formats that many

Direct Examination - John Dederick

1    of the sort of web publishers rely on.  So the 300-by-250s,

2    the 728-by-90s.  The standardized series of formats that are

3    mostly still or slightly animated banner ads.

4    Q    And, Mr. Dederick, you just used some numbers.  Can you

5    explain to the Court what those numbers refer to?

6    A    Sure.  Those are ad specifications, so like pixel

7    sizing.  So in order to do advertising at scale, you need to

8    have specifications so that you have some level of

9    standardization.  So an ad creative can work in lots of

10   different formats and publishers, and so that's what I was

11   referring to.

12   Q    Can advertisers use demand-side platforms to purchase

13   open web display advertising?

14   A    Yes.

15   Q    Do demand-side platforms help advertisers determine how

16   much to bid for an open web display impression?

17   A    Yes.

18   Q    At a high level, what factors affect how much an

19   advertiser bids for a given open web display ad impression?

20   A    There's really a lot of metadata that we're assessing.

21   But easy examples are going to be things like what site is

22   the ad on?  What time of day is it?  What device is the ad

23   appearing on?  Is this traditionally a highly viewable ad

24   placement?  What kind of targeting is associated with this

25   ad placement?

Direct Examination - John Dederick

1          These are all variables that we use to value how
2   much we think it's worth for an advertiser.  But we're also
3   having to build a lot of technology to constantly assess the
4   marketplace and add a level of artificial intelligence to,
5   you know, automate because there's just so much metadata
6   that we're assessing all of the time to help figure out what
7   an advertiser should bid.
8   Q    What are some of the most commonly used demand-side
9   platforms in the market today?
10  A    The -- I would say the two most commonly used
11  demand-side platforms are DV360, Google's demand-side
12  platform, and The Trade Desk.
13  Q    Are there other on demand-side platforms as well?
14  A    Yes.
15  Q    How do -- excuse me.
16         Can one advertiser use more than one demand-side
17  platform at a time?
18  A    They can.  It requires resourcing.  I mean, using a
19  demand-side platform is largely a self-service enterprise,
20  or that's certainly how most of our clients use us and what
21  most clients want.
22         It requires training.  It requires contractual
23  relationships.  It requires an ongoing, you know,
24  implementation of a software at a business is what -- it's a
25  B2B software, essentially.  And so, you know, almost all of

Direct Examination - John Dederick

1   our clients do use multiple demand-side platforms.

2   Q    Why is that?

3   A    Every one of our clients has a contract with Google.

4   Q    So do The Trade Desk --

5   A    To the best of my knowledge.

6   Q    Do The Trade Desk's clients use DV360 as an alternative

7   or simultaneously use DV360 with The Trade Desk?

8   A    Yes, a lot of them do.

9   Q    Do some advertisers use The Trade Desk as their only

10  demand-side platform?

11  A    Typically, no.  We don't have access to major pools of

12  inventory that advertisers really need to show up on or it's

13  usually critical for them.  YouTube is one.  There's

14  inventory on Amazon that's exclusively available through

15  their DSP.

16          So, typically, an advertiser who works with The

17  Trade Desk will also work with those other demand-side

18  platforms to have access to this highly valuable inventory,

19  like YouTube.

20  Q    And just to be clear, Mr. Dederick, what is YouTube?

21  A    YouTube, user-generated content video site, largest

22  video ad network that I'm aware of.  And owned by Google.

23  You know, most advertisers and agencies that I work with buy

24  ads on YouTube.

25  Q    And can The Trade Desk buy advertising on YouTube?

97

Direct Examination - John Dederick

1    A     No.

2    Q     Why not?

3    A     Google has restricted the access of The Trade Desk and

4    third-party demand so that the only demand-side platform

5    that has access to YouTube is DV360.

6    Q     And DV360 is Google's demand-side platform?

7    A     Yes.

8    Q     Can The Trade Desk buy ad inventory on Google's search

9    engine?

10   A     No.

11   Q     Why not?

12   A     It's the same reason.  Search is bought exclusively

13   directly from Google.  You know, the -- I'm happy to say

14   more about this, but I don't need to.

15   Q     If you could explain a little bit more about why The

16   Trade Desk can't buy search ad advertising on Google's

17   search engine.

18   A     Sure.

19          So search advertising is really exclusively

20   available directly from Google.  So -- and, you know, it

21   really is the most sought-after ad placement.  It's probably

22   the only place in the whole ad industry where there's more

23   demand than there is supply in search.

24          I mean, if you think about it from the perspective

25   of an advertiser, you know, you have a prospective customer

Direct Examination - John Dederick

1    typing in "I want to buy a TV."  And so Samsung, LG, they

2    want to show up at that moment.  That's, like, the very

3    final moment before a purchase, often.

4           So, you know, search is almost always the

5    cornerstone of a client media plan.  And so they're going to

6    go -- they're going to have to go directly to Google,

7    really, to participate in search.

8    Q    Can The Trade Desk purchase open web display ads

9    through ad exchanges?

10   A    Yes.

11   Q    Does Google's DV360 demand-side platform have any

12   advantages over The Trade Desk with respect to buying open

13   web display ads?

14   A    Yes.

15   Q    What are some of those advantages?

16   A    Well, there's a major data advantage.  I mean, Google

17   arguably sits on the most valuable data asset in the world.

18   They have, like, 2 billion log-ins.  Increasingly in the

19   advertising industry, log-in data is the most valuable data.

20   And so, you know, Google search data and various forms of

21   data are available for free for use of -- in targeting in

22   the DV360 DSP.

23          And then there's, you know, the connectivity

24   across exclusively owned inventory sources like YouTube.

25   And while YouTube is a video network, the ability to do

Direct Examination - John Dederick

1    things like target across multiple control frequency or

2    measure across both open web display and other formats is a

3    major advantage.  And, you know, when there's resourcing

4    involved, clients want to do -- they want to work with as

5    few platforms as possible, for sure.

6    Q    How would you describe The Trade Desk's strength in

7    open web display ad buying versus other types of digital

8    ads?

9    A    I would say that it's -- we've needed to invest in

10   other channels, really, to find growth.  We have not been as

11   competitive in the display landscape as we have been in

12   other channels like connected television, for example.

13   Q    Why is that?

14   A    The display marketplace is very much typically accessed

15   through either Google directly, through GDN, their ad

16   network, or DV360.  They are far and away, typically, the

17   most sought-after and most -- best-performing in open web

18   display.

19         And a lot of that really comes from the position

20   that they have with the publisher-side ad server where, you

21   know, there's just a lot of advantage to owning

22   publisher-side ad server, owning the AdX ad exchange.

23         MS. DUNN:  Your Honor, I'm going to object based

24   on Your Honor's ruling in the motion in limine.  I think

25   we're getting close to the line; maybe we're over the line

100

Direct Examination - John Dederick

1    with respect to his opinion about Google's position.

2          THE COURT:  I don't think he's crossed the line

3    yet.

4          MS. DUNN:  Thank you, Your Honor.

5          THE COURT:  So overruled.

6    BY MR. GUARNERA

7    Q    You can finish your answer, Mr. Dederick.

8    A    Okay.  So we have not seen nearly the kind of growth in

9    display advertising, while it has been a channel that we've

10   bought for a long time.  But we've seen -- from what we hear

11   from our clients, from my experience listening to our

12   clients and participating in the investments --

13         MS. DUNN:  Objection, Your Honor.

14         THE COURT:  That's sustained.  That's going to be

15   hearsay.  Let's move on.

16         MR. GUARNERA:  Okay.

17   BY MR. GUARNERA

18   Q    Mr. Dederick, in the last five years has The Trade Desk

19   tried to improve its performance in the open web display

20   space?

21   A    Yes.

22   Q    Have those efforts been successful?

23   A    Not meaningfully, no.

24   Q    Why not?

25   A    We haven't been able to -- we haven't been able to grow

                                                              101

Direct Examination - John Dederick

1  in display at the rates that we have in other channels we've

2  invested in.  Our clients are typically working with Google

3  on open web display.

4  Q    You mentioned a moment ago that Google's DV360

5  demand-side platform was performant or best-performing in

6  open web display.  Is that because DV360 is a better quality

7  demand-side platform than independent DSPs?

8  A    No, I don't think so.

9  Q    And so why is DV360 best-performing?

10 A    Well, I did mention that it's both the GDN ad network

11 placements, where it's not all bought directly through

12 DV360.  Open web display can be bought from Google in a

13 magnitude of ways.

14         And so the combination of having all of the

15 associated metadata from the publisher side, from the search

16 side, and having the placement as the publisher ad server

17 and ad exchange, it just -- it gives tremendous advantage to

18 buying and placing online display ads if you're working

19 directly with Google.

20 Q    Mr. Dederick, we've been talking about demand-side

21 platforms.  Can advertisers also buy open web display ads

22 through ad networks?

23 A    Yes.

24 Q    What is an ad network?

25 A    An ad network is typically a combination of websites

Direct Examination - John Dederick

1    that's put together to create more ad liquidity or more

2    supply.  It's typically not programmatic -- or RTB spec is

3    sometimes a part of ad networks, but it's not a defining

4    characteristic.

5            Typically, ad networks are going to be based on

6    arbitrage pricing models, where there's some level of

7    packaging of inventory that meets some targeting criteria

8    for a buyer.  And typically it's going to be priced on a

9    flat -- on a fixed basis, either a fixed outcome like a

10   click or a fixed CPM basis.  And so usually, if you're a

11   buyer, you don't know how much is going to the publishers

12   from an ad network and how much is going to whoever owns the

13   ad network.

14   Q    Does Google have an ad network?

15   A    Yes.

16   Q    Is Google's ad network sometimes called Google Ads?

17   A    Yes, or GDN.

18   Q    What are some examples of advertiser ad networks other

19   than Google Ads?

20   A    There used to be many more.  There -- you know, I think

21   there are companies who are arguably ad networks today, like

22   Criteo.  But, you know, there was a time not long ago when

23   there were companies like Rocket Fuel or AdRoll who were

24   large ad networks who operated in the open web display space

25   a lot.  There are many fewer now.

Direct Examination - John Dederick

1    Q    Are advertiser ad networks and demand-side platforms

2    the same thing?

3    A    Not at all.

4    Q    Why not?

5    A    An ad network, as I said, is really a -- it's an

6    accumulation of ad inventory from multiple -- from multiple

7    publishers, from multiple sources.  And typically, it's

8    characterized by those arbitrage pricing models that I

9    mentioned.  They are thought of as, you know, typically

10   sitting on the supply side.  I mean, those ad networks are

11   not buy-side tools or technology, typically.

12         And so a demand-side platform is really -- in our

13   view, explicitly a set of buy-side tools that ad buyers use

14   to decide which ads to pick that demand-side platform

15   shouldn't care, shouldn't have an interest in which ad an

16   advertiser or an agency picks beyond wanting to represent

17   their interests, in our view.

18         And so, you know, an ad network will typically not

19   have that same setup, that same pricing model.  They won't

20   abide, often, by the RTB standards that a demand-side

21   platform does.  So they're different.

22   Q    And to be clear, advertisers can buy ads through ad

23   networks, correct?

24   A    Yes, they can go directly to ad networks to buy ads.

25   Q    Are there differences in the types of advertisers that

104

Direct Examination - John Dederick

1    use demand-side platforms versus ad networks?

2    A    Yes.  I mean, largely because a demand-side platform,

3    as I mentioned, is -- it requires some investment.  It

4    requires some expertise.  Usually it's a self-service buying

5    tool.

6            A demand-side platform is about an advertiser

7    coming in with certain knowledge of their business and

8    applying that to what ads they choose to buy.  That usually

9    requires a robust marketing department.  Often it requires

10   agency relationships where they'll employ people who are

11   capable of using demand-side platforms.

12           So most demand-side platform use is being done by

13   what I think of as larger advertisers or the Fortune 500

14   advertisers.  Ad networks are often much more sort of

15   simple.  Put in a budget, put in very brief targeting

16   criteria, and hit go.  And it's much more -- it doesn't

17   require the same investment level.

18           So I would say that often smaller advertisers buy

19   from ad networks more than that they would use demand-side

20   platforms.

21   Q    Are there differences in how demand-side platforms and

22   ad networks use data to buy ads?

23   A    Yes.

24   Q    What are some of those differences?

25   A    Well, again, a demand-side platform is about leveraging

Direct Examination - John Dederick

1  buy-side interests and deploying buy-side data.  An

2  advertiser is going to come to us and tell us about their

3  most valuable customers.  They're going to expose a lot

4  about their business so that we can help them formulate a

5  strategy about what to buy.  And then we're going to put

6  that data to work for them in a way that they can trust

7  won't come back to bite them.  It will represent their

8  interests.

9       Usually, in an ad network, the data that is being

10 applied is derived from the supply side.  And it's typically

11 being used to create whatever targeting is available on that

12 ad network.  But, you know, you're not usually going to see

13 advertiser data being used or buy-side data being used to do

14 targeting in an ad network.  Again, it very much sits on the

15 supply side, in my view.

16 Q   When The Trade Desk pitches its demand-side platform to

17 potential advertiser clients, does it consider itself to be

18 competing against ad networks for that business?

19 A   No.

20 Q   Does The Trade Desk consider itself to be competing

21 with advertiser ad networks for those advertisers' business?

22 A   I'm sorry.  I didn't understand that question.

23 Q   I'm sorry.  I'll repeat it.

24      Does The Trade Desk consider itself to be

25 competing with advertiser ad networks for advertisers'

Direct Examination - John Dederick

1    business?

2    A    No.

3    Q    So we've talked, Mr. Dederick, about DSPs and ad

4    networks.  And I'd like to ask a few questions now about ad

5    exchanges.

6              Do DSPs bid into ad exchanges to buy open web

7    display advertising on the open web?

8    A    Yes.

9    Q    Does The Trade Desk offer its own ad exchange?

10   A    No.

11   Q    Does The Trade Desk bid into multiple ad exchanges?

12   A    Yes.

13   Q    Does The Trade Desk buy open web display advertising on

14   Google's AdX ad exchange?

15   A    Yes.

16   Q    Does The Trade Desk view ad exchanges as competitors to

17   its demand-side platform?

18   A    Absolutely not.

19   Q    Why not?

20   A    Again, I mean, this is -- we are very clear about whose

21   interests we serve.  We serve the interests of buyers.  An

22   ad exchange and a supply-side platform should be

23   representing interests of the publishers.  They're there to

24   help optimize yields.  And they should be there, I think, to

25   help represent the interests of publishers.

Direct Examination - John Dederick

1        These are opposing interests; so it's very

2   important to me that -- and how we go about our business

3   that we don't betray the interests of the clients that we

4   serve.  But it also helps us have trusting relationships

5   across the industry.  And it matters in our relationships

6   with publishers that we're honest and open about what we're

7   after.

8   Q    From your perspective as someone who helps advertisers

9   carry out digital ad campaigns, what characteristics are

10  important for you in evaluating an ad exchange?

11  A    I'm sorry.  Would you repeat that question.

12  Q    From your perspective as someone who helps advertisers

13  carry out their digital ad campaigns, what are some

14  characteristics of ad exchanges that are important to you?

15  A    Well, what -- what we want on the buy side and what

16  the -- I talk to the most -- many of the most sophisticated

17  advertisers and ad buyers, I think, in the world.  And they

18  want a fair and transparent auction.  They want transparency

19  into their supply chain, meaning where are their media costs

20  going?  They want to know what they're buying, put simply.

21       And so when it comes to what is happening in an

22  auction environment being hosted by an exchange or how costs

23  are being taken from the supply chain by an ad exchange or

24  an SSP, we want to understand how to transact.  We want to

25  know what the rules are.  And so those would be the

Direct Examination - John Dederick

1    qualities that we would want in a fair marketplace.

2    Q    Has The Trade Desk raised concerns with Google about

3    the fairness of AdX's auctions?

4    A    Yes.

5    Q    What were some of those concerns?

6    A    The Trade Desk has raised concerns over a number of

7    issues.  I mean, there's a longstanding history in the

8    relationship between The Trade Desk.  And AdX is really a

9    critical supply partner for us.  So I wouldn't begin to

10   characterize every one of the requests.

11           But I would say that auction transparency, I would

12   say that, you know, when -- especially with regard to the

13   conversation around open bidding and header bidding, we had

14   a lot of conversations with Google about what we thought

15   would be fair and transparent practices in how The Trade

16   Desk could participate in auctions.  So, typically, it's

17   around auction integrity and it's around supply path

18   transparency.

19   Q    We'll come back, Mr. Dederick, to header bidding and

20   open bidding in a few minutes.

21           Did anything change about the AdX auction as a

22   result of your conversations with Google?

23   A    No.

24   Q    Is The Trade Desk able to avoid bidding into AdX

25   altogether?

Direct Examination - John Dederick

1  A    No.

2  Q    Why not?

3  A    Well, we want to be a competitive demand-side platform.

4  And if you don't have access to some critical scale, which

5  AdX has critical scale, especially with open web display,

6  right.

7         So if we're trying to be a competitive demand-side

8  platform, we would not be competitive without access to AdX.

9  Q    Based on your experience, which ad exchange offers the

10  most open web display ad inventory for sale?

11  A    AdX.

12  Q    Does the volume of display ad inventory offered on an

13  exchange matter to The Trade Desk?

14  A    Absolutely.

15  Q    Why?

16  A    Well, for a buyer, having the most choice possible is

17  an advantage.  So you want to have as many options with as

18  much metadata as possible.  And so, you know, we will

19  prioritize our connectivity with supply-side platforms and

20  ad exchanges.

21         One of the most important criteria that we'll

22  evaluate is size and scale, which we often talk about in

23  forms of queries per second.  How many do they have?  How

24  many unique publisher relationships or how many publisher

25  relationships do they have?  So yes, scale is critical.

Direct Examination - John Dederick

1  Q    I think you mentioned this a moment ago, but just to be

2  clear.

3           Is there a relationship between the scale of an ad

4  exchange and the data that that exchange has access to?

5  A    Yes.

6  Q    And can you expand on that.

7  A    Well, an ad exchange and a supply-side platform should

8  be seeing and hosting information about publisher ad

9  opportunities and passing data that's associated with that;

10 so the more publishers and ad opportunities and ad exchange

11 an SSP has.

12          But, significantly, if there are other aspects of

13 a connected stack that associate more data with those same

14 users, same publishers, or same opportunities, you begin to

15 create an incredible data advantage.  So, you know, data is

16 currency in many aspects of our industry.

17          THE COURT:  I'm just curious.  If scale is

18 critical and if, as a result of this litigation, Google were

19 blown apart -- so you had no longer one great big mega point

20 where all this data is collected, but it's spread out among

21 10, 15, 20, 30 little entities -- would that make it more

22 difficult?

23          THE WITNESS:  For a buyer?

24          THE COURT:  Yeah.

25          THE WITNESS:  You know, it's hard to -- it's hard

Direct Examination - John Dederick

 1    to say.  I don't think that the open web publishers would

 2    let their ads go unsold.  And so the hardest thing would be

 3    the lack of a publisher ad server as a viable alternative to

 4    DFP.  I don't know of any.  And so that is just, in direct

 5    answer to your question, the thing that I would wonder what

 6    would happen.

 7         But as it relates to AdX, there are other SSPs.

 8    And so I don't think that open web display publishers would

 9    sit around for long before they began leveraging alternative

10    technology.

11         THE COURT:  Okay.

12    BY MR. GUARNERA

13    Q    Mr. Dederick, does The Trade Desk have to do any

14    technical work in order to be able to bid into an ad

15    exchange?

16    A    Yes.

17    Q    And at a high level, what does that entail?

18    A    Integration work, ongoing support, technical support of

19    integration, partnership support.  But, I think, importantly

20    we need to license data centers and we need to support all

21    of the data that comes in through the ad requests that we're

22    getting from SSPs.

23         So, you know, the more ad requests we get, the

24    more expensive it is for us because we're not necessarily

25    buying ads at the same rate that we're getting more

                                                            112

Direct Examination - John Dederick

1    requests.  So it is costly for us to evaluate as many

2    impressions as we do.

3    Q    Is the scale of an ad exchange something The Trade Desk

4    considers when deciding whether to integrate with an ad

5    exchange?

6    A    Yes.

7    Q    Does The Trade Desk integrate with exchanges that fall

8    below a certain threshold of scale?

9    A    Well, there are multiple vectors that we would

10   evaluate.  Scale is among the most critical.  But if we're

11   not seeing unique value and we're seeing low scale in --

12   there are a number of supply partners that we're not

13   integrated with for those reasons, yeah.

14   Q    Do ad exchanges charge fees to the advertisers that use

15   The Trade Desk to bid into ad exchanges?

16   A    I'm sorry.  Say that question again.

17   Q    Do ad exchanges charge fees to the advertisers that use

18   The Trade Desk to bid on ads?

19   A    So ad exchanges do charge fees that come out in the

20   digital -- in the supply chain of an ad.  So you could say

21   that they charge that fee to a publisher or you could say

22   they charge that fee to the advertiser.  At the end of the

23   day, it's a part of that supply chain for a given ad.  But

24   yes, they do charge a fee within that supply chain.

25   Q    How do those exchange fees affect The Trade Desk's

Direct Examination - John Dederick

1   advertiser clients?

2   A    They will -- well, that aspect of their supply chain is

3   important.  So, you know, the easy answer is we want the

4   most efficient, most effective supply change possible behind

5   every ad opportunity.

6            So if the costs that are coming in from the ad

7   exchange or the SSP are either too high or they're not

8   creating value, that is -- that is harming the advertiser's

9   ability to create value with the ads they buy, to create --

10  to do better targeting, to buy more ads that would create

11  growth for their business.

12           So, for me, the question is really is the fee in

13  the supply chain taken by an ad exchange or an SSP worth it

14  in the supply chain.  So, you know, the advertiser has to

15  account for that.

16  Q    Do ad exchanges offer ad fraud protection as part of

17  their services?

18  A    Sometimes they do.

19  Q    Are there tools in the market that help advertisers

20  address the risk of ad fraud?

21  A    Yes.

22  Q    At a high level, what are -- how do those tools work?

23  A    There are a host of companies who do different kinds of

24  integrations.  If they're going to work explicitly with an

25  ad exchange or an SSP, what they'll do is they'll typically

114

Direct Examination - John Dederick

1    vet their inventory for different forms of invalid or

2    low-quality traffic and try to sort through those.

3           There's different controls applied by demand-side

4    platforms to do the same thing.  The Trade Desk applies a

5    set of standards across SSPs and exchanges where we've

6    effectively eliminated invalid traffic from what we buy.

7           And then there are also -- you know, some

8    advertisers will deploy additional tools and services after

9    the fact.  So that would be called more like postbid tools

10   that would be more appended on the creative tagging side.

11   Q    And typically these tools are offered by companies

12   other than ad exchanges?

13   A    Yes.

14   Q    How would you compare the ad fraud protections on

15   Google's ad exchange, AdX, versus ad fraud protections on

16   other ad exchanges?

17   A    Well, I mean, in that ad fraud for me is a broad topic

18   that includes things like invalid traffic but also

19   low-quality made-for-advertising sites.

20   Made-for-advertising sites are a huge problem in open web

21   display advertising.

22           Effectively, it's the idea that some websites will

23   just ram more ads on a page that aren't viewable or aren't

24   seen or they'll rotate them quickly.  And advertisers will

25   buy them.  And they won't get any value, but they will never

115

Direct Examination - John Dederick

1    know.

2            So we see -- and this has been validated by

3    third-party research from companies like Atalytics, that

4    Google and AdX are the worst purveyors of MFA advertising in

5    the ecosystem.  The Atalytics study showed that that was the

6    case by a factor of 5.

7            MS. DUNN:  Your Honor, objection to the hearsay.

8            THE COURT:  Sustained.

9            MS. DUNN:  Thank you.

10   BY MR. GUARNERA

11   Q    Mr. Dederick, does The Trade Desk offer a service

12   called Open Path?

13   A    Yes.

14   Q    What is Open Path?

15   A    Open Path is The Trade Desk's program to plug directly

16   into, typically, the publisher ad server.  So Open Path is a

17   direct line into publisher -- typically ad server for an

18   advertiser.

19           So we're offering that service -- you know,

20   usually Open Path will be applicable to larger -- it's

21   really a pretty small number of larger publishers who have

22   the sophistication to manage their own yield practices.  And

23   so it's another attempt from The Trade Desk to create a more

24   efficient supply chain for advertisers.

25           THE COURT:  So that bypasses an exchange?

116

Direct Examination - John Dederick

1          THE WITNESS:  It does.  That's right.  What it

2   will do is plug into an ad server.  So most of the time, and

3   almost all the time, it basically plugs directly into DFP,

4   the Google publisher ad server, but bypasses the exchange.

5   BY MR. GUARNERA

6   Q     Is Open Path an ad exchange?

7   A     No.

8   Q     Why not?

9   A     It -- we don't offer -- it's not a service offered to

10  publishers to help serve their interests or optimize yields.

11  It's explicitly there to serve the interests of our buyers

12  to create a better supply chain.

13          To the extent that publishers are interested in

14  participating, it's because they know The Trade Desk

15  represents demand.  But we don't offer tools to publishers

16  to help them increase sell-through rates or increase CPMs.

17  We are there to get the best cost for the buyer and to get

18  the most value for the buyer.

19          So, you know, in that the sell side of our

20  industry should be there to service the interests of

21  publishers, absolutely not.

22  Q     Does Open Path conduct auctions for ad inventory?

23  A     No.

24  Q     How does the volume of ad impressions available through

25  Open Path compare to the volume of ad impressions available

Direct Examination - John Dederick

1    through ad exchanges?

2    A    It's not -- we -- it's somewhat confidential

3    information, but I'll share that it's much more -- it's

4    minimal by comparison.

5    Q    In the Trade Desk's experience, do advertisers consider

6    Open Path a viable alternative to bidding through ad

7    exchanges for open web display ads?

8    A    No.  Absolutely not.

9    Q    Why not?

10   A    It's too small.

11   Q    Have any of The Trade Desk's advertiser customers

12   decided to use Open Path exclusively to buy their digital

13   open web display ads?

14   A    No.

15   Q    Mr. Dederick, I'd like to ask you a few questions now

16   about the auction process.

17   A    Yep.

18   Q    Does The Trade Desk take into account the rules of an

19   auction when it helps an advertiser determine how much to

20   bid for an ad?

21   A    Yes.

22   Q    How does it do that?

23   A    Well, we assess everything we know about the supply

24   path behind an ad, including what are the auction mechanics

25   that we've seen from a given publisher to a given exchange,

Direct Examination - John Dederick

1   different auction dynamics, changing auction dynamics.

2           It feels like so much of sort of the arms race of

3   our industry has been around changes to the auction dynamics

4   from the supply side of our industry; so we're having to

5   constantly assess and build capabilities to -- yeah, to

6   address those auction dynamics.

7   Q    Is it always the best strategy for an advertiser to bid

8   the highest price it's willing to pay for an ad?

9   A    No.

10  Q    Why not?

11  A    Well, simply, it's because the advertiser might be able

12  to get that for less.  So relative to a given ad

13  opportunity, there -- you know, we may believe that an

14  advertiser can get an ad for less than they are willing to

15  pay.  Part of what we do is help them pay less if they can,

16  serving their interests.

17          And things like first-price auction dynamics make

18  it such that you need to be careful because, under

19  first-price auction dynamics, you're going to pay what you

20  bid.  And that's the understanding that we have of

21  first-price auctions.

22  Q    Even in second-price auctions, does The Trade Desk

23  advise advertisers categorically to bid their highest

24  maximum willingness to pay?

25  A    No.

Direct Examination - John Dederick

1  Q    Why not?

2  A    Because, again, we may find the opportunity to pay less

3  for that ad than the advertiser is willing to pay.

4  Q    Is the practice of bidding less than an advertiser's

5  full willingness to pay called bid shading?

6  A    That's one of the terms that has been used for that,

7  yes.

8  Q    Are there other terms?

9  A    That's the most popular term.  We haven't -- yeah, we

10  have a tool called predictive clearing, which is our form of

11  that at The Trade Desk.

12  Q    In your experience as an ad buyer, are publishers able

13  to change their price floors from one auction to another?

14  A    So, typically, that would be an ad exchange or an SSP

15  that would be changing price floors, but yes.  So dynamic

16  price floors are associated with the ad exchange or the SSP

17  responding to the bid dynamics coming from DSPs in the

18  demand side and shifting the price floor; so the minimum

19  amount that a publisher is willing to sell the ad for.  So

20  it's typically a supply-side technology that exchanges or

21  SSPs would offer.

22  Q    And under dynamic price floors, can the SSP change its

23  price floor in response to bids it's received in the past?

24  A    Yes.  I mean, they're looking at historical data and

25  often seeing how much buyers are willing to pay for similar

Direct Examination - John Dederick

1   or the same ad impressions.

2           So if they see The Trade Desk willing to buy an ad

3   for more than the price floor, they can respond by raising

4   the price floor to try to, again -- you know, ideally what

5   they're doing is they're trying to optimize yield for a

6   publisher.  But whether or not that money ends up going to a

7   publisher, I think, is sometimes -- is one of the things

8   that we assess when we think about the value of a supply

9   chain.

10  Q    And so is dynamic price flooring something The Trade

11  Desk takes into account when determining whether and how

12  much to bid shade?

13  A    Yes.

14  Q    Changing gears, Mr. Dederick, for a moment, apart from

15  open web display, what other types of ads are available for

16  purchase through The Trade Desk?

17  A    The Trade Desk tries to plug into all available ad

18  formats that are connected via RTB standards.  So connected

19  television is a major channel for The Trade Desk.  Digital

20  audio, digital out-of-home, mobile display ads, mobile

21  video, online video are some of the channels that we operate

22  in.

23  Q    When you advise advertisers on their digital ad

24  campaigns, do you discuss the pros and cons of using

25  different types of digital ads?

Direct Examination - John Dederick

1    A     Yes.

2    Q     What kind of factors do you consider in advising

3    advertisers to choose one kind of digital ad over another

4    kind?

5    A     Well, they're very different.  A connected television

6    ad is -- we think of it as the living room, large format.

7    It's extremely expensive.  You'll have 30 seconds to tell

8    your story.  So that's a very different format than an open

9    web display ad, which is more often static or a slightly

10   animated box on a screen.

11            So depending on what the advertiser's goal or

12   their position is, sometimes an advertiser wants to optimize

13   toward getting efficient visits to their website.  And so

14   being able to click on a banner ad and get to the website

15   quickly is important.  You can't click on a television ad,

16   right?

17            So depending on an advertiser's goals, interests,

18   what's behind their campaign, you know, and the vastly

19   different costs and creative specifications across those

20   channels, we talk about optimal channel mix.  I mean, media

21   mix modeling.  Channel planning in advertising is a massive

22   conversation.

23   Q     Can advertisers use The Trade Desk to buy ads on social

24   media platforms?

25   A     No.

Direct Examination - John Dederick

1   Q    Why not?

2   A    At this point, the social media platforms -- the major

3   social media platforms typically sell their ads directly.

4   So the largest social media platforms have not started to

5   participate in the RTB standards and the programmatic

6   ecosystem -- the open programmatic ecosystem that The Trade

7   Desk operates in.  So we've focused and invested in the

8   channels that have.

9   Q    When you're advising advertisers on their digital ad

10  campaigns, do you distinguish between social media ads and

11  open web display ads?

12  A    Certainly.

13  Q    What are some of the distinguishing features between

14  them?

15  A    Social media ads are different creative specifications.

16  Again, the context of a social media ad is extremely

17  different.  They're appearing in user-generated content.

18  You need to anticipate the mindset of a consumer in social

19  media.

20        Open web display advertising is really not

21  typically associated with that, nor are the creative specs

22  the same.  So, you know, I think -- I don't know any

23  advertisers that would think of those as interchangeable, I

24  don't think.

25  Q    When you're advising advertisers, do you distinguish

123

Direct Examination - John Dederick

1    between in-app ads on one hand and open web display ads on

2    the other?

3    A     Yes.

4    Q     What are some of the differences between them in your

5    conversations with advertisers?

6    A     Well, in-app advertising typically refers to,

7    again, small -- smaller creative specifications for in-app

8    ads.  The experience for a consumer seeing an in-app ad is

9    very different from an open web display ad, for example, on

10   a desktop computer or a laptop.

11              So the price point is different.  The targeting

12   options are different.  Yeah, so they're different.

13   Q     Why do you say that in-app ads have smaller specs than

14   open web display?

15   A     Well, the most popular in-app ad format -- you know,

16   just the pixel sizing is smaller than most of the most

17   popular open web display ad formats.

18   Q     Is that because --

19   A     It's an app.

20   Q     -- app ads typically are on a phone?

21   A     Yes.

22   Q     In your experience, do advertisers distinguish between

23   in-stream video ads and open web display ads?

24   A     Yes.

25   Q     What are some of the differences between them?

Direct Examination - John Dederick

1   A    In-stream video, again, it's just a different price

2   point.  It is a different format that you need to anticipate

3   the mindset of a consumer seeing your ad.  You need to

4   anticipate the creative specifications and investment.

5        I mean, it's -- again, it's a completely different

6   format than an open web display.

7   Q    When you say video ads have different price points,

8   what do you mean?

9   A    Video ads are typically more expensive than open web

10  display.

11  Q    Mr. Dederick, are you familiar with a digital

12  advertising company called Admeld?

13  A    Yes.

14  Q    Does Admeld still exist?

15  A    No.

16  Q    What was Admeld?

17  A    Admeld was an early supply-side platform in

18  programmatic.

19  Q    And when you say "programmatic," what do you mean?

20  A    They -- in the -- in some of the early years of the

21  programmatic ecosystem, as in ad exchanges beginning to

22  operate on real-time bidding standards and demand-side

23  platforms doing the same, Admeld was one of the most popular

24  supply-side platforms used by --

25        MS. DUNN:  Your Honor, we object on foundation

125

Direct Examination - John Dederick

1    basis which has not been laid as to the --

2            THE COURT:  I'll sustain the objection.

3            Lay your foundation.

4            MR. GUARNERA:  Sure.

5    BY MR. GUARNERA

6    Q    Mr. Dederick, were you at The Trade Desk at the time --

7    I'll withdraw that.

8            Did The Trade Desk buy digital ads through Admeld

9    prior -- well, did The Trade Desk buy digital ads through

10   Admeld?

11   A    Yes.

12   Q    Were you at The Trade Desk around the time that Admeld

13   was acquired?

14   A    Yes.

15   Q    Did The Trade Desk observe any effects following

16   Google's acquisition of Admeld?

17   A    Well, the -- what was previously a separate supply-side

18   platform and a separate source of demand became part of a

19   different -- so yes.  I mean, yes.

20   Q    So what used to be two separate supply-side platforms

21   became one?

22   A    Yes.

23   Q    Can you expand on that.

24   A    So the AdX Google supply-side platform -- you know, I

25   think it's important here --

Direct Examination - John Dederick

1          MS. DUNN:  Your Honor, I -- we're going to go

2    ahead and object again on foundation basis because the dates

3    are a little unclear here with respect to when he began at

4    The Trade Desk and when the Admeld acquisition happened.

5    And so if the dates could be ironed out correctly, it may be

6    not an objection.

7          THE COURT:  You need to be more specific about

8    this.  All right?

9          MR. GUARNERA:  Sure, Your Honor.

10   BY MR. GUARNERA

11   Q    Mr. Dederick, when did you start at The Trade Desk?

12   A    2012.

13   Q    Are you aware of when Admeld was acquired by Google?

14   A    I believe it was right around the same time period.  I

15   don't know the exact dates of the acquisition.

16   Q    When you were at The Trade Desk early on in your tenure

17   there, was the Admeld acquisition something that was

18   significant to The Trade Desk?

19   A    Yes.  It was frequently discussed.  And what I would

20   say -- I mean, our work --

21          THE COURT:  Wait.  There's no question pending.

22          Did you yourself, while you were working at Trade

23   Desk, do any direct work with Admeld?

24          THE WITNESS:  No.  I wouldn't have -- I mean, I

25   have sat on the sales side predominantly.  So I would have

Direct Examination - John Dederick

1   been talking to the other employees of The Trade Desk who

2   interacted directly with Admeld.

3                THE COURT:  But you yourself did not?

4                THE WITNESS:  No.

5   BY MR. GUARNERA

6   Q    But in advising your advertiser customers, was it

7   important for your job to understand Admeld's role as a

8   supply-side platform?

9   A    Yes.  It's what we do.  We assess the supply side.

10               MS. DUNN:  Same basis of the objection.

11               THE COURT:  I'm going to sustain the objection.

12  And you should be able to have another witness who can do

13  that.

14  BY MR. GUARNERA

15  Q    Mr. Dederick, are you familiar with the term "header

16  bidding"?

17  A    Yes.

18  Q    And the Court has heard about header bidding a number

19  of times; so I think we can skip some of the preliminaries.

20               Does The Trade Desk bid into header bidding

21  auctions?

22  A    Yes.

23  Q    When header bidding was introduced, what was The Trade

24  Desk's perspective on header bidding?

25  A    We were extremely excited about header bidding.  I

Direct Examination - John Dederick

1  mean, what it meant for The Trade Desk was the capacity to

2  access significantly more ads that were previously sort of

3  blocked from access by publisher waterfall and DFP.

4       And, you know, we were so excited, we actually had

5  our -- when we went public in 2016, we asked the prospective

6  investors to watch an explainer video about what header

7  bidding was before they invested in the company.

8       We thought it was really critical to the growth of

9  our company, that we had the potential to gain access to the

10  ads that were previously -- you know, we didn't have access

11  to because of the publisher waterfall in DFP.

12       And so when we saw header bidding arise, we saw

13  increased competition among exchanges.  We saw the potential

14  for competition in publisher-side ad servers.  And we felt

15  that there was the opportunity to compete meaningfully in

16  channels like open web display in a way that there hadn't

17  been and there wouldn't be without it.

18  Q   You mentioned a moment ago that The Trade Desk didn't

19  have access to certain inventory before header bidding.

20       What did you mean by that?

21  A   If you think of -- if you think of DFP, the publisher

22  ad server, as the switchboard of ad selection on the supply

23  side, the publisher waterfall will enable different sources

24  of demand to either have access to publisher ad inventory or

25  not.

Direct Examination - John Dederick

1         And so often the publisher waterfall would look

2    like direct sold by the publisher sales team or

3    sponsorships -- AdX, ad networks, the Trade Desk.  And only

4    if all of those other guys passed did The Trade Desk ever

5    have a chance, even if we were willing to pay more.  And so

6    that's why.

7    Q    Mr. Dederick, I'd like to show you a document that's in

8    your binder labeled PTX 1650.

9         Mr. Dederick, does The Trade Desk regularly give

10   employee trainings in the course of running its business?

11   A    Yes.

12   Q    Is it important to The Trade Desk's business that its

13   employees have accurate information about digital

14   advertising technology?

15   A    Yes.

16        THE COURT:  All right.  Ms. Dunn, is there any

17   objection to 1650?

18        MS. DUNN:  No objection, Your Honor.

19        THE COURT:  All right.  It's in evidence.

20        MR. GUARNERA:  Thank you, Your Honor.

21        Plaintiffs move 1650 into evidence.

22        THE COURT:  Yes.  It's in.

23   BY MR. GUARNERA

24   Q    Mr. Dederick, what is Palooza '17?

25   A    Palooza is an event where The Trade Desk brings all of

                                                              130

Direct Examination - John Dederick

1    its employees together for the purposes of education and

2    morale-building.

3            So this would have been a presentation given to

4    the whole company in 2017, it looks like by Akhil Savani,

5    who's the head of our supply-side -- one of the heads of our

6    supply-side partnerships at this time.

7    Q    Would Akhil Savani be a subject matter expert in header

8    bidding at The Trade Desk at this time?

9    A    Yes.

10   Q    And who from The Trade Desk would have been in

11   attendance at Palooza '17?

12   A    All employees at the company were invited.

13   Q    When did header bidding become popular?

14   A    Header bidding became popular in -- I believe 2016 and

15   '17 were really the years where it was popularized and

16   made -- you know, innovations by other ad exchanges began to

17   create a lot more competition in header bidding.

18   Q    Mr. Dederick, I'd like to direct your attention to

19   page 6.  And we'll put it on the screen as well if that's

20   easier.  It ends in Bates Number 3044.

21           Do you see the title of the slide is "Google's

22   Position Before Header Bidding"?

23   A    Yes.

24   Q    And then there's a top box that says, "Google's ad

25   server is used by almost all publishers, 77 percent of

Direct Examination - John Dederick

1   market share in 2015."

2   A    Yes.

3   Q    And the middle box says, "Google's SSP was tightly

4   integrated with its ad server, allowing preferential access

5   to ad inventory before other SSPs."

6   A    Yes.

7   Q    What do you understand that middle box to be referring

8   to?

9   A    Well, that's that waterfall, the idea that, if you

10  control the ad server, you control when different sources of

11  demand will see an ad opportunity.  And so it's -- the DFP

12  ad server in this case would be giving AdX access to an

13  impression before other SSPs.

14  Q    And the final box on that slide says, "As a result,

15  Google had a significant competitive advantage in the

16  programmatic ad market."

17        Do you agree with that statement?

18  A    Yes.

19  Q    Mr. Dederick, I notice there's a diagram that says

20  "Googlopoly" on the slide.

21        What do you understand that to mean?

22  A    You know, it's a reference to the dominant position

23  that Google had in these areas of the supply side of our

24  industry.

25        MS. DUNN:  Objection, Your Honor.  I think we

132

Direct Examination - John Dederick

1   crossed the line there.

2           THE COURT:  It's too close to the line, yes.

3   BY MR. GUARNERA

4   Q    Mr. Dederick, could you turn to page 7, which is Bates

5   Number 3045.  And the title of this slide is "Header Bidding

6   Levels the Playing Field."

7           Do you see that?

8   A    Yep.

9   Q    Can you describe what this diagram conveys.

10  A    Yeah.  This is the DFP waterfall just laid out, you

11  know, more in a different format, where you're seeing the

12  direct sales slot within the waterfall would be first, all

13  the way on the left.  So, again, that's the publisher

14  selling ads directly.  The Google ad exchange, AdX, would

15  have the next ability to bid.  And so what header bidding

16  did was put all of these -- instead of in a waterfall, put

17  them next to each other.

18          So previously, before header bidding, SSP 1 would

19  have never had the opportunity to see the impression.  With

20  header bidding, where specifically all of these ads were

21  submitted within the header wrapper before the ad server is

22  called on a website, all of these different SSPs would be --

23  and in-demand sources would be called at the same time.

24          So if SSP 3 bid the highest -- which, in this

25  case, they did, $4 -- they would actually have the

Direct Examination - John Dederick

1   opportunity to pay more.  And whatever buyer behind that

2   would have the opportunity to buy the impression if it was

3   the most valuable for them.  And whatever publisher sat

4   behind it would have the opportunity to have the best CPM

5   price and the highest CPM price.

6   Q    So using Slide 7 here, what was the advantage of header

7   bidding to advertisers?

8   A    Access to all impressions in -- at the same time in a

9   more liquid market with significantly more price discovery.

10  Q    Mr. Dederick, please turn the presentation to Slide 14,

11  which ends in 3025.  The title of this slide is "How Header

12  Bidding impacts Advertisers."

13          Do you see that?

14  A    Yep.

15  Q    There a green upward arrow and three bullets that say,

16  first of all, "access higher quality programmatic

17  inventory."

18          Is that along the lines of what you were just

19  describing?

20  A    Yes.  I mean, often in the early days of programmatic,

21  the demand sources were below direct sales.  Right?  So the

22  high-quality inventory would have been associated with

23  direct sales teams from publishers.  And regardless of

24  whether or not a programmatic demand source, like a DSP,

25  would be willing to pay more, it would never have the

134

Direct Examination - John Dederick

1   opportunity to do it.

2           What this meant was the demand-side platforms now

3   saw those ad impressions, and they had the opportunity to

4   say I'm willing to pay more than your insertion order or

5   your direct sales tactic.  So as a result of this, we had

6   access to a tremendous amount of unique supply that we

7   didn't before header bidding.

8   Q    And the second bullet, Mr. Dederick, says, "Better

9   forecasts of available inventory."

10          Can you explain what that means.

11  A    Sure.

12          Forecasting is one of the hardest and most

13  important jobs for a demand-side platform.  And the more

14  data that we see of available impressions, again, we can

15  really say how much ad inventory is there on a given

16  publisher.  We're not just locked into one position that

17  we're occasionally called on from a publisher ad server.

18  Q    And, finally, Mr. Dederick, the last bullet says,

19  "Campaigns can have greater scale."

20          What does that mean?

21  A    It means that you have access to significantly more

22  inventory through programmatic channels for all of these

23  reasons.  Previously, many impressions were never made

24  available to competing exchanges or demand-side platforms

25  like The Trade Desk because they were below the top

Direct Examination - John Dederick

1    positions of the waterfall.

2    Q    And I see, Mr. Dederick, there's red downward arrow

3    that has one bullet, "Higher CPMs."

4         What does higher CPMs mean?

5    A    It means we anticipated and we saw more quality

6    inventory come in, which our buyers were -- you know, in

7    some cases, they were willing to pay, but they wanted to

8    know it was worth it.

9         So, naturally, paying more for a buyer isn't the

10   most palatable thing; but if the ads were quality, the

11   buyers were there.

12   Q    Were there any other challenges that header bidding

13   raised for advertisers?

14   A    I mean, not for advertisers.  For us on the demand-side

15   business, we saw significantly more volume of supply which

16   was more expensive to process.  And, again, like, we didn't

17   grow demand necessarily in a way that was correlated.  So it

18   was much more expensive for us to evaluate so much more

19   supply, sometimes being duplicative supply.

20        But, again, I mean, we went public, and we forced

21   investors to watch this video because we thought it was

22   critical to the future of our company that this was

23   happening.  So we were more than willing to deal with some

24   of that added expense for the opportunity.

25   Q    And I'm sorry, Mr. Dederick.  What video are you

                                                              136

Direct Examination - John Dederick

1   describing?

2   A    We produced an educational video for investors on our

3   IPO roadshow that was focused on the impact of header

4   bidding on the advertising industry.

5   Q    And why did The Trade Desk consider header bidding to

6   be so important for its future?

7   A    Well, previously, so much of the ad supply, the

8   advertising supply, especially in open web display, just

9   wasn't available to us to bid on because of our position in

10  DFP, DFP being the ad server used by most publishers.  If

11  DFP never chose to show us an ad, we never had an

12  opportunity to buy it.

13         Suddenly, because of competition across exchanges,

14  we had an opportunity to buy the ads that we had never seen

15  before.  So it meant, for the first time, there was a chance

16  that The Trade Desk would be able to look at everything and

17  help a buyer really make the right decision across

18  everything.

19  Q    Do you consider the risk of bid duplication to be a

20  reason not to use header bidding?

21  A    No.  That's what I referred to earlier with, you know,

22  increased costs for a demand-side platform.  Bid duplication

23  really means that a publisher might choose to have multiple

24  SSPs implemented on its page.  So we might see the same ad

25  impression from multiple exchanges.  That's just added cost

Direct Examination - John Dederick

1    for us.  So that was one of the impacts of this.  But,

2    again, very worth it for the access to the supply.

3    Q    Given your experience at The Trade Desk, do you view

4    the risk of ad fraud with header bidding to be a reason

5    advertisers shouldn't use header bidding?

6    A    Absolutely not.

7    Q    Why not?

8    A    We didn't see any correlation between header bidding --

9    I mean, as it says on this page, we were getting access to

10   higher-quality programmatic inventory than we ever had.

11   Q    Was the risk of malware a reason not to use header

12   bidding?

13   A    No.  And same reason.

14   Q    What is latency as that term is used in digital

15   advertising?

16   A    Latency refers to a delay, some form of delay.

17           MS. DUNN:  Your Honor, I'm just going to object on

18   the basis of whether these questions are about what the

19   advertisers were thinking or what The Trade Desk was

20   thinking.  It's a little unclear.

21           And I think if it's just what his view is or The

22   Trade Desk view, that would not be objectionable.

23           THE COURT:  All right.  I had assumed that was how

24   the answer was coming in.  This is a concern for The Trade

25   Desk.  That's what he can testify to.

138

Direct Examination - John Dederick

1        MR. GUARNERA:  Your Honor, I think given the

2   foundation that Mr. Dederick described about his daily work

3   with --

4        THE COURT:  We've already had latency discussed

5   anyway.  Is he going to say something else about latency?

6        MR. GUARNERA:  Only from the perspective of a DSP,

7   Your Honor, because he's the first DSP that's testified.

8   And so with just one question about whether latency affects

9   DSPs' ability to use header bidding, I think that would be

10  sufficient.

11       THE COURT:  That one question is all right.

12  BY MR. GUARNERA

13  Q    Mr. Dederick, as a DSP, does The Trade Desk view

14  latency as a reason not to use header bidding?

15  A    No.

16  Q    Mr. Dederick, did you observe any changes in Google's

17  policies after header bidding became popular?

18  A    Yes.

19  Q    What were -- what was -- was or were those changes?

20  A    We started to see the -- an alternative sort of to

21  emerge in what was their open bidding product, where,

22  instead of having competitive exchanges independently in the

23  header of a website, they would be routed through Google's

24  technology.

25            And, effectively, we began to -- at first we were

Direct Examination - John Dederick

1    very confused, honestly, because what we saw was that

2    impressions were coming through open bidding and open -- I

3    don't know how much you've all already talked about what

4    this is.  But open bidding is AdX, the Google SSP, giving

5    access to these other exchanges to impressions.

6              And we started seeing that impressions were coming

7    through open bidding.  And it appeared that they were coming

8    through at costs that were lower than we were willing to pay

9    through AdX directly.  And it just made no sense, honestly,

10   because we are -- we were then and we're now a pretty big

11   source of demand.  So it would be the equivalent of, like,

12   Coca-Cola selling their product to the corner bodega for 70

13   cents and to Walmart for a dollar.  It didn't make any sense

14   that this was happening.

15             MS. DUNN:  Objection also on foundation.

16             THE COURT:  Well, no, he's saying what his company

17   experienced.  That certainly is personal firsthand

18   information.

19             Overruled.

20   BY MR. GUARNERA

21   Q    You can finish your answer, Mr. Dederick.

22   A    Okay.

23             But, yeah, just from the interest as a buyer, it

24   didn't make sense why if -- again, if we're willing to pay

25   more, why are these ads going through multiple hops?  Why

140

Direct Examination - John Dederick

1    are we seeing two exchanges in a given bid request when we

2    would -- we think it would be a more efficient supply chain

3    to buy it from one.

4              So, you know, we didn't understand.  You know, it

5    didn't and wouldn't make sense to us unless there was

6    something else happening.

7    Q    As a demand-side platform that facilitates digital ad

8    buying, do you see any benefits to open bidding?

9    A    No.

10   Q    Are there costs associated with open bidding?

11   A    Well, there's a cost of 5 percent, but that's nothing

12   compared to the cost of adding control over what was

13   previously -- what was previously broken out of complete

14   visibility and advantage from the Google publisher ad

15   server.  I mean, that's really the cost.

16             So, yes, they added 5 percent to the supply chain.

17   But, more importantly, they took back the disruption that

18   created price discovery and access for advertisers by having

19   the header bidding implementation.

20             And so, yes, we -- and eventually The Trade Desk

21   decided to shut off the open bidding pipe because we didn't

22   see value for our advertisers in continuing to buy it.

23   Q    In your experience working with advertisers buying

24   digital ad inventory, what effect has open bidding had on

25   header bidding?

141

Direct Examination - John Dederick

1   A    Well, there was a time, you know, you'd go to industry
2   events and they're like -- the publisher sales teams from
3   competing exchanges would be there in full effect.  And
4   there was often conversations about competing publisher ad
5   servers in our industry and articles being written --
6              MS. DUNN:  Your Honor.
7              THE COURT:  Wait, wait, wait.
8              MR. GUARNERA:  Your Honor, he's not -- he's
9   repeating -- he's describing the number and presence of
10  sales representatives at conferences.  He's not repeating
11  out-of-court statements.
12             MS. DUNN:  Same objection, Your Honor.
13             THE COURT:  Well, if he's not repeating a
14  statement, if he was there and he saw how many people were
15  present, that's firsthand.
16             MS. DUNN:  I think he can testify to the number of
17  people.  I think when he says there were conversations about
18  that --
19             THE COURT:  I agree.  At that point, that's
20  hearsay.
21             MR. GUARNERA:  I think he had already stepped back
22  from that, yes.
23             THE WITNESS:  I read a lot of articles about
24  this --
25             THE COURT:  That would be the same problem.

142

Direct Examination - John Dederick

1            THE WITNESS:  Okay.

2  BY MR. GUARNERA

3  Q    Mr. Dederick, just based on your firsthand experience

4  working at The Trade Desk, what effect have you observed

5  open bidding to have on header bidding?

6  A    It's decimated header bidding.

7  Q    Why do you say that?

8  A    There's no competition -- it -- pre-ad server anymore.

9  The idea that the industry had a way to submit bids prior to

10  having complete oversight from Google is no longer there.

11  Q    Mr. Dederick, are you familiar with a policy known as

12  last look?

13  A    Yes.

14  Q    What is last look?

15  A    Last look refers to the idea that -- it would be like

16  if -- it's another -- this is -- we're talking about

17  auctions.  We're talking about auction mechanics.

18            Last look would be the equivalent of a silent

19  auction where everybody puts in their bid, no one is allowed

20  to see it, except the last person gets to look at everybody

21  else's bid and then decide what to bid.  That's what last

22  look advantage is in the advertising auction marketplace.

23  Q    Has last look had any effect on the advertisers that

24  use The Trade Desk to buy digital ads?

25  A    Yes.

143

Cross-Examination - J. Dederick

1    Q    What effect is that?

2    A    If Google has the opportunity to buy an ad for whatever

3    purpose when The Trade Desk advertiser is willing to pay

4    more for that ad to buy it and let's say Google sells it to

5    their ad network for -- an advertiser comes in saying I'm

6    willing to pay $5 for this, Google would rather sell it

7    through their ad network, that same impression, for 75 -- or

8    to their ad network for 75 cents but then mark it up to $5.

9           In our example, the publisher and the advertiser

10   had a clear exchange, and the other -- both parties lost out

11   and didn't have the opportunity to benefit from a clean,

12   transparent supply chain and, I think, most importantly, a

13   fair auction.

14          MR. GUARNERA:  Thank you, Mr. Dederick.  No more

15   questions.

16          THE COURT:  All right.

17          Ms. Dunn?

18          MS. DUNN:  Thank you, Your Honor.  We'd like the

19   hand out the binders, if that's okay.

20          THE COURT:  Yes, ma'am.

21          MS. DUNN:  Thank you.

22          May I proceed?

23          THE COURT:  Yes, ma'am.

24          MS. DUNN:  Thank you.

25                        CROSS-EXAMINATION

Cross-Examination - J. Dederick

1   BY MS. DUNN:

2   Q    Good afternoon, Mr. Dederick.   My name is Karen Dunn.

3   I'm going to be asking you some questions.   We've not met;

4   so I wanted to introduce myself.

5   A    Nice to meet you.

6   Q    Good to meet you.

7         I'm going to ask Mr. Spalding to put up

8   Plaintiffs' Demonstrative A that they used in their exam.

9   You should be able to see it on the screen.

10        So the first thing I want to ask about this is you

11  see the red rectangles?

12  A    Uh-huh.

13  Q    Okay.   So you had testified that the only place here

14  that The Trade Desk belongs in the box called demand-side

15  platform.

16        Do you remember that?

17  A    Yes.

18  Q    And you'll notice that this doesn't have a red

19  rectangle around it, right?

20  A    The demand-side platform box?

21  Q    Correct.

22  A    Yes.

23  Q    Right.   And I'll just represent to you that's because

24  plaintiffs are arguing that The Trade Desk is not in the

25  market in this case.

Cross-Examination - J. Dederick

1              Are you aware of that?

2   A    I didn't understand.  I'm sorry.  Will you repeat that

3   question.

4   Q    So the plaintiffs have not circled "demand-side

5   platforms" with a red rectangle because they don't believe

6   that The Trade Desk is even in the market that they're

7   talking about.

8              Are you aware of that?

9              MR. GUARNERA:  Your Honor, we object for

10  relevance.  Mr. Dederick's understanding of what is or is

11  not in the market in this case doesn't affect his testimony.

12             THE WITNESS:  I haven't read this --

13             THE COURT:  Wait just a second.

14             I'm going to sustain the objection.

15  BY MS. DUNN:

16  Q    Okay.  So to be clear, when The Trade Desk bids into

17  AdX auctions -- well, first of all, let's establish that.

18             You testified that The Trade Desk, which is in

19  that box, demand-side platform, bids into AdX, which is

20  marked ad exchange here, right?

21  A    Yes.

22  Q    Okay.  And when The Trade Desk bids into AdX, it

23  competes with Google Ads, correct?

24  A    When The Trade Desk -- I'm sorry.  Will you repeat

25  that.

Cross-Examination - J. Dederick

1    Q    It competes with Google Ads, correct?

2    A    When we bid into AdX?

3    Q    Correct.

4    A    I wouldn't characterize that as competing with --

5    Q    Well, let me put it to you this way:  You're bidding

6    into AdX.  Is Google Ads also bidding into AdX?

7    A    From our understanding, GDN, their ad network, does bid

8    into AdX.

9    Q    Right.  And you testified that GDN and Google Ads are

10   the same just a second ago, right?

11   A    Yes.  So their ad network is going to bid into their ad

12   exchange.

13   Q    Right.  So you're bidding into AdX.  And GDN, or Google

14   Ads, is also bidding into AdX, you just testified, right?

15   A    Yes.

16   Q    And Google's DV360 is also bidding into AdX, correct?

17   A    Yes.

18   Q    And other authorized buyers are also bidding into AdX,

19   right?

20   A    Yes.

21   Q    And there are a good number of authorized buyers that

22   are also bidding into AdX, correct?

23   A    Yes.

24   Q    And they're competing with you, right?

25   A    In the context of the auction?

Cross-Examination - J. Dederick

1   Q    Yeah.

2   A    We have the opportunity often to bid on the same ads,

3   but that would be subject to the placement in the publisher

4   ad server.  I mean, that's the obvious caveat.

5   Q    Understood.  But everybody is bidding into the same

6   auction, right?

7   A    Yes.  Whether the bids are seen or not is the question.

8   Q    I understand.  I want to just be clear.  Everybody we

9   just talked about is bidding into the same auction in AdX?

10  A    Bidding into the same ad exchange.

11  Q    Yes.

12  A    (Nods head up and down.)

13  Q    We agree?

14  A    Yes.

15  Q    And when The Trade Desk bids into AdX, it's bidding on

16  ads that appear on websites, right?

17  A    Yes.  Among other formats, yes.

18  Q    Right.  It's bidding on ads that appear on apps, right?

19  A    At times, yes.

20  Q    Right.  And it's bidding on ads that appear on

21  connected TV, right?

22  A    I'm not familiar with AdX's position in connected

23  television; so I'm not qualified to answer that part.

24  Q    Okay.  So you don't even know AdX -- how AdX functions

25  with regard to connected TV?

Cross-Examination - J. Dederick

1   A    I don't think AdX has a very meaningful presence in

2   connected television, but I believe they're building their

3   presence in connected television.  So I believe that we do.

4   Q    Okay.  But that's not something you know much about?

5   A    I -- if AdX doesn't have a meaningful presence in

6   connected television, there's a lot of things about the

7   supply landscape I need to know a lot about.  So, yeah,

8   that's not something I've spent much time with.

9   Q    Your specialty is not the supply landscape?

10  A    My specialty is helping buyers assess the supply

11  landscape.  So that's essentially all we do, is we look at

12  the supply landscape and we help buyers decide, based on

13  what's available, what the best thing is to buy for them.

14  So I would say, yeah, I have a lot of experience assessing

15  the supply landscape.

16  Q    Okay.  But we agree that, with respect to AdX and

17  connected TV, that is not something you know very much

18  about?

19  A    That's not what I said.  I haven't spent a lot of time

20  with that.

21  Q    Okay.  And when The Trade Desk bids into AdX, it also

22  bids on static display ads, right?

23  A    Yes.

24  Q    And out-stream video ads, right?

25  A    Yes.

149

Cross-Examination - J. Dederick

1   Q    And in-stream video ads, right?

2   A    Yes.

3   Q    And native ads, right?

4   A    Yes.

5   Q    Okay.  And so you're just focused on the tool.  The

6   demand-side platform, or AdX, there is an interaction with

7   respect to each of those tools in all of those categories of

8   ads that we just discussed, right?

9   A    There's -- what do you mean by "interaction"?

10  Q    Yeah, I agree.  It's a bad question.

11       So when the demand-side platform is bidding into

12  AdX, you and I just talked about seven ad formats.  And you

13  agreed with me that the demand-side platform is bidding

14  into -- Trade Desk is bidding into ad exchange with respect

15  to all of those ad formats, right?

16  A    Yes.  Most exchanges try to represent multiple

17  channels, as The Trade Desk does.

18  Q    Right.  So if you are only focused on the tool itself,

19  you are only focused on, let's say, the ad exchange, you

20  would say that that ad exchange was -- had functions with

21  respect to all of those ad formats, right?

22  A    As in the -- okay.  I think I don't understand what you

23  mean by "functions."

24  Q    Would it help if I said "functionality"?  Right?  The

25  ad exchange has to have functionality with respect to all

150

Cross-Examination - J. Dederick

1    those seven types of ads that we just discussed in order to

2    receive the bids from The Trade Desk?

3    A    Yeah.  I mean, there's significant context to how much

4    market presence it would have, but yes, functionality.

5    Q    Right.  And the demand-side platform we just discussed

6    also has functionality.  So The Trade Desk has functionality

7    with respect to those seven kinds of ads that we just

8    discussed, correct?

9    A    Yes.

10   Q    And is there a tool that you see on the slide in front

11   of you that does not have functionality for multiple ad

12   formats?

13   A    These are really broad buckets.  So, you know, there

14   will be advertiser ad networks that are explicitly open web

15   display or video.  So it really would depend on the

16   individual company, is the reality.

17   Q    Right.  So you can't just look at the tool and know, is

18   what you're saying?

19   A    That's correct.

20   Q    Okay.  And you just said these are very broad buckets.

21   Is that another way of saying -- I'm just trying to

22   understand.

23        Is that another way of saying that there are other

24   things in the ecosystem that don't appear on this slide?

25   A    What I -- what I was intending to say is that there's a

151

Cross-Examination - J. Dederick

1  lot of advertisers in the world, for example.

2  Q   Right.  Right.  But I think the advertisers in the

3  world could really fit in the bucket advertisers, right?

4  A   Yes.

5  Q   My question is more about the tools in the middle.

6       So does the ecosystem, you know, that's comprised

7  of the sell side and the buy side, does that include more

8  tools than you can see on this slide?

9  A   These are most of the major tools.  There's a few major

10  tools missing, but these are most of the major tools.

11  Q   Okay.

12       THE COURT:  Just so I'm not confused, though,

13  could there not be another arrow that goes from both the

14  advertiser ad network or the demand-side platform, put it

15  underneath the ad exchange, and go right to the publisher ad

16  server?

17       THE WITNESS:  Could -- oh, so you're saying could

18  the demand-side platform go --

19       THE COURT:  You can bypass the exchange?

20       THE WITNESS:  Yes.  So that would be open path,

21  what you've described.

22       THE COURT:  And you could also even bypass, I

23  guess, the server and go right to the publisher.

24       THE WITNESS:  You can't.

25       THE COURT:  Why can't you?

Cross-Examination - J. Dederick

1          THE WITNESS:  You can do that if the publisher --

2     there are no other publisher ad servers available -- or

3     there are no competitive publisher ad servers available.  So

4     some publishers, the largest in the world in connected

5     television, are building their own ad servers.

6          THE COURT:  Well, there's the old-fashioned way.

7     You could hire a person.  A human being could go over, knock

8     on the door, talk to them.

9          THE WITNESS:  When a publisher thinks about

10    integrating an ad server, when they integrate Google's ad

11    server, they gain the benefit of millions of advertisers

12    obtained by Google search.

13         THE COURT:  All right.  So you're saying once

14    somebody has the server, they're not going to any longer do

15    what I call the old-fashioned approach?

16         THE WITNESS:  Well, if you use the old-fashioned

17    approach, you don't get access to the greatest source of

18    demand in the history of advertising, which is Google search

19    advertisers.

20         THE COURT:  Okay.

21         THE WITNESS:  That's what DFP comes with, out of

22    the box, millions of advertisers excited to buy your ads,

23    free checks in the mail.

24         THE COURT:  All right.  Go ahead.

25    BY MS. DUNN:

                                                            153

Cross-Examination - J. Dederick

1  Q    Also, I just want to make clear.  I don't know if

2  you're aware of this, that search is not part of the case.

3  Do you know that?

4         MR. GUARNERA:  Objection, Your Honor.  Again, it

5  is not relevant whether it's part of case.

6         THE COURT:  Well, we've had search discussed.  It

7  needs to be there.  Overruled.

8         THE WITNESS:  This ecosystem would not exist

9  without the dominant position in search where -- again, I

10  mentioned what we're talking about, Google built the most

11  incredible search --

12  BY MS. DUNN

13  Q    Sir, I'd ask you just to answer the question that I

14  asked.  Your counsel will have time to follow up with you if

15  he would like.

16         So my question is are you aware that search is not

17  part of this case?

18  A    I think of this case as highly related to search,

19  but -- or I think of this conversation as highly related.

20  So no, I wasn't aware.

21  Q    Okay.  Thank you.

22         Okay.  So we just talked about -- and I think,

23  actually, I heard you talk to your counsel about a lot of

24  tools.  You were mentioning, like, many, many tools.

25         MR. GUARNERA:  Objection, Your Honor.  I'm not

154

Cross-Examination - J. Dederick

1    Mr. Dederick's counsel.

2         MS. DUNN:  Oh, I'm so sorry.  That's very fair.

3    BY MS. DUNN

4    Q    You were talking to plaintiffs' counsel, and you

5    mentioned numerous tools.

6         Do you remember that?

7    A    I don't.  Remind me.  What were we talking about?

8    Q    He was asking about malware, other things like that.

9    And you started talking about additional tools.

10   A    I do remember that conversation.

11   Q    Okay.  Are those tools on this slide?

12   A    To the extent they're integrated in demand-side

13   platforms or publisher ad exchanges, yes.  I mean,

14   there's -- these -- so, for example, within a demand-side

15   platform, we will have a marketplace of tools.  Those tools

16   include data for buying -- for targeting measurement tools.

17   These are verification tools.  So for the most part, those

18   tools fit into the demand-side platform or the ad exchange

19   buckets on this slide.

20   Q    Okay.  So those tools you just talked about could be

21   either, you said, in the demand-side platform box or the ad

22   exchange box.  Is that what you said?

23   A    Us.  Some of those third parties sell themselves

24   directly to ad exchanges.  For the most part, they're going

25   to exist in the demand-side platform box.

Cross-Examination - J. Dederick

1    Q    So there's some functionality that you've testified
2    about could be in the demand-side box or one of the other
3    boxes.  That's what we just talked about, right?
4    A    Yes.  To the extent that a verification company goes to
5    an ad exchange and says, "Hey, we will help you clean your
6    inventory using our verification technology and charge you a
7    fee," that limited use case would be what I'm talking about.
8    Q    I just want to see if you agree with this statement:
9    This is a very complex industry, and this is a very simple
10   slide.  Agree or disagree?
11   A    I think our industry uses complexity as a shield.
12            MR. GUARNERA:  Your Honor.
13            THE COURT:  I'm sorry.
14            What's the objection?
15            MR. GUARNERA:  The question is vague and --
16            THE COURT:  No.  I have it's a very
17   straightforward question.  It is a yes or a no answer.
18   BY MS. DUNN
19   Q    Yes or no, sir?
20   A    No.
21   Q    Okay.  All right.  You also mentioned in your testimony
22   that ad networks are on the sell side.
23            Do you remember that?
24   A    Uh-huh.
25   Q    Do you see that here, advertiser ad networks on the

Cross-Examination - J. Dederick

1    sell side?

2    A    I see advertiser ad network being represented on the

3    buy side in this slide.

4    Q    I do too.  My understanding of a network is that -- in

5    case it's helpful, is that it is on the buy side and the

6    sell side because it's a network.

7         Is that your understanding?

8    A    When we think about ad networks -- when I talk to

9    buyers about ad networks, you're usually talking about a

10   company that you can go to that would sell you ads.  A

11   demand-side platform, I think of as a company you go to to

12   help you buy ads.

13        I know this may sound like semantics.  But that's

14   why, from The Trade Desk lens, from the lens of our

15   customers, we think of an ad network as something that

16   exists on the supply side.

17   Q    Okay.  So this -- so from your perspective, putting the

18   advertiser ad network on the buy side is not accurate given

19   that you just testified it's on the sell side, right?

20   A    From my lens -- again, I represent a buying platform,

21   and I talk to advertisers and marketers all day -- they

22   think of ad networks typically as more akin to working with

23   a publisher than they do a demand-side platform.  And so

24   that's really just my lens.

25   Q    I understand.  One last thing on this, and then I'll

157

Cross-Examination - J. Dederick

1    move on.  You testified a moment ago that The Trade Desk

2    operates on the buy side, right?

3    A    Yes.

4    Q    Okay.  The buy side of what?

5    A    Of the advertising industry.

6    Q    Of -- excuse me?

7    A    The advertising ecosystem.

8    Q    Okay.  So this -- as you would call this, the

9    advertising ecosystem, and you're on the buy side?

10   A    Again, we just had an interesting conversation on ad

11   networks, but yes.  I mean, a demand-side platform is -- I

12   can't imagine anyone arguing that a demand-side platform is

13   not on the buy side of our industry.

14   Q    Right.  No disagreement there.  I'm trying to

15   understand the buy side of what?  Because there are two

16   sides here.  There's a buy side and a sell side.  I'm trying

17   to figure out what they are the sides of.

18   A    An advertising industry.  There are sellers of

19   advertising and buyers of advertising.  It's pretty clear.

20   Q    And this is an industry to match them together?

21   A    I mean, in that we're transacting advertising, we have

22   ad buyers and ad -- I don't understand your question or

23   where it comes from.

24   Q    You don't need to know where it comes from; you just --

25              THE COURT:  Let's move this along.

Cross-Examination - J. Dederick

 1          MS. DUNN:  I'll move on.

 2          So let's show Mr. Dederick The Sellers and

 3   Publishers Report from May 2024.

 4   BY MS. DUNN

 5   Q    It should be in the black binder in front of you.

 6          THE COURT:  Do you have an exhibit number for this

 7   or no?

 8          MS. DUNN:  It is towards the back.  It's not

 9   marked as an exhibit because it is very recent.

10          THE COURT:  All right.  So what date in '24?

11          MS. DUNN:  It is May 2024, 0500.

12          THE COURT:  Way at the back.

13          MS. DUNN:  Thank you, sir.

14          THE WITNESS:  I don't know.  Is it -- can you pull

15   it up.

16          MS. DUNN:  We will pull it up.  It should be in

17   the black binder.

18   BY MS. DUNN

19   Q    Do you have the black binder?

20   A    Yeah.  It's pretty big.

21   Q    Yeah, it is.  Towards the back.  And we'll also show

22   you on the screen.

23          Okay.  You've got it there?

24   A    Okay.  I got it.

25   Q    All right.  Thank you, sir.

Cross-Examination - J. Dederick

1              So The Trade Desk puts out a biannual report to

2    clients, partners, and investors.

3              You recognize this?

4    A    I do recognize this report.

5    Q    Right.  This is the biannual report from May 2024, just

6    earlier this year, correct?

7    A    Yes.

8    Q    Okay.  So please direct your attention to page 2.  This

9    is a letter from your CEO, Jeff Green, to the clients,

10   partners, and investors.

11             Do you see that?

12   A    Yes.

13   Q    Do you see the sentence that begins "the open internet

14   is at a tipping point"?  Do you see that?

15   A    Yes.

16   Q    Okay.  The second sentence there states, "In 2022

17   Facebook and Google accounted for less than half of all

18   digital advertising spending for the first time in a decade,

19   a trend that accelerated in 2023."

20             Do you see that?

21   A    I see those words, yes.

22   Q    Okay.  The next sentence says that "Consumers now spend

23   the majority of their time outside these big-tech walled

24   gardens, increasingly preferring the best of the open

25   internet."

160

Cross-Examination - J. Dederick

1          So is it fair to read this that, when it says

2     "these big-tech walled gardens," your CEO is referring to

3     Google and Facebook?

4     A     Yes.

5     Q     Okay.  Then if you read a little bit along -- well,

6     actually, is it also fair to infer from that sentence, when

7     it says that "Consumers increasingly prefer the best of the

8     open internet," that your CEO is not including Google as

9     part of the open internet?

10          MR. GUARNERA:  Your Honor, we have to object

11    because this document, firstly, is not an exhibit.  It was

12    not on the exhibit list, and it's being read into evidence

13    as if -- it's an out-of-court statement being read into

14    evidence for the truth of the matter.

15          THE COURT:  Do you want to move it in?

16          MS. DUNN:  I would love to move it in.  We

17    actually know -- 2526 would be the next number, Your Honor.

18          MR. GUARNERA:  Your Honor, the exhibit list was

19    due in May 2024 -- after May 2024.  It's simply too late to

20    admit as an exhibit.

21          MS. DUNN:  Your Honor, this witness was the

22    30(b)(6) on behalf of the company.  This is a very recent

23    document that came right at the end of the period before the

24    exhibit list was due.  This is -- this report is also

25    referred to in earning statements by the company.

Cross-Examination - J. Dederick

1          I'm happy to examine the witness on it, but we do

2     think it is proper evidence for the Court.  If the Court

3     does not wish for us to admit it, we would like to still

4     question the witness because it's cross-examination.

5          MR. VERNON:  Your Honor, this would have been due

6     in July 2024.

7          THE COURT:  Remind me.  Was the agreement that

8     exhibits to be used during cross-examination were to have

9     been revealed ahead of time?

10          MS. DUNN:  No.

11          THE COURT:  This is being used during cross.

12          MR. GUARNERA:  It's also an out-of-court hearsay

13     statement, Your Honor, that's being read for the truth.

14     Mr. Green is not here.

15          THE COURT:  But this is the 30(b)(6)

16     representative of the corporation.

17          MS. DUNN:  And --

18          THE COURT:  Wait.

19          MS. DUNN:  And the witness just testified on

20     behalf of the company, "We were very excited.  We this.  We

21     that."

22          MR. GUARNERA:  Your Honor, he's testifying here in

23     his personal capacity.  Obviously, he's not a 30(b)(6)

24     representative.

25          THE COURT:  No.  All right.  He can testify about

Cross-Examination - J. Dederick

1   his reaction.  But I'm going to sustain the objection.  The

2   exhibit will not come in.  All right.

3            MS. DUNN:  Understood, Your Honor.

4   BY MS. DUNN

5   Q    Okay.  Mr. Dederick, still in the same paragraph

6   highlighted for you, when you read the sentence about

7   consumers preferring to spend the majority of their time on

8   the open internet and not these big-tech walled gardens, do

9   you understand these big-tech walled gardens to refer to

10  Google and Facebook?

11           THE WITNESS:  I'm sorry, Judge.  I need further

12  direction.  I didn't understand at what -- would you give me

13  direction about how I should be testifying to this?

14           THE COURT:  Were you present at this -- have you

15  read this document?

16           THE WITNESS:  Yes.

17           THE COURT:  All right.  Does it reflect your view

18  of the ad tech industry in May of 2024?

19           THE WITNESS:  This is -- this came from the

20  company, not me personally.  So no, I didn't write it, and I

21  didn't contribute to writing it.

22           THE COURT:  All right.  Then he can't answer it.

23  Let's move this along.

24           MS. DUNN:  Okay.  Your Honor, am I permitted to

25  continue to examine him on the document on certain parts of

Cross-Examination - J. Dederick

1   it?

2           THE COURT:  No.

3           MS. DUNN:  This is a statement to investors and

4   clients and all the partners from the company.

5           MR. GUARNERA:  Your Honor, it should have been

6   admitted as an exhibit in this case.

7           THE COURT:  Yeah, it really should have been.  I

8   mean, you had it since May or maybe June or maybe July.

9           MS. DUNN:  We did not, Your Honor.  We did not.

10           THE COURT:  Well, how did you get it?

11           MS. DUNN:  It was referred to in an -- the

12   August 8th earning statement by -- the company CEO refers to

13   this document.

14           MR. GUARNERA:  That's fine, Your Honor.  It is

15   dated on its face May --

16           THE COURT:  All right.  It's late in the day, and

17   you've done very well so far about real disputes over

18   issues.

19           I'm going to sustain the objection.  You need the

20   move on to something else.  All right?

21           MS. DUNN:  Thank you, Your Honor.

22   BY MS. DUNN:

23   Q    Mr. Dederick, you are chief revenue officer at The

24   Trade Desk, correct?

25   A    Yes.

Cross-Examination - J. Dederick

1   Q    At the time of your deposition, you were the chief

2   client officer, correct?

3   A    Yes.

4   Q    Okay.  And we can agree, can't we, that The Trade Desk

5   views itself as a competitor to Google?

6   A    No.  We compete with DV360.

7            THE COURT:  I'm sorry.  It's late in the day.  You

8   need to speak up.

9            THE WITNESS:  Oh, I'm sorry.

10            No.  We compete with DV360, their DSP.

11  BY MS. DUNN

12  Q    DV360 is a Google tool, correct?

13  A    Yes.

14  Q    So would you say that The Trade Desk is a competitor to

15  Google, the company?

16  A    No.

17  Q    Okay.  All right.  And your testimony is that The Trade

18  Desk does not compete with the Google display network,

19  correct?

20  A    We complete with DV360 as a demand-side platform.

21  Q    My question was whether you compete with the Google

22  display network.

23  A    I mean, no.  We compete with DV360, the DSP.

24  Q    If you could turn in your binder, sir, to Defense

25  Exhibit 122.

Cross-Examination - J. Dederick

1           THE COURT:  Is there any objection to 122?

2           MR. GUARNERA:  Your Honor, we object on hearsay

3    grounds.

4           THE COURT:  Well, it's an email sent to

5    Mr. Dederick.

6           MR. GUARNERA:  Your Honor, it's not actually

7    email -- oh, excuse me, Your Honor.  There's an email, but

8    it's attaching a presentation that it does not appear

9    Mr. Dederick authored.

10           MS. DUNN:  Your Honor, this document is cited in

11    the plaintiffs' findings of fact.

12           THE COURT:  I'm going to allow it in.  All right.

13    So 1022 is in.

14           MS. DUNN:  122.

15           THE COURT:  1022.

16           MS. DUNN:  No, 122.  No zero.

17           MR. GUARNERA:  Your Honor, this exhibit is under

18    seal also.

19           THE COURT:  Well, the one I have has a DTX 1022.

20           MS. DUNN:  There's also a 1022.  This is 0122.

21           THE COURT:  I'm sorry.  Hold on a second.

22           MS. DUNN:  Apologies, Your Honor.

23           THE COURT:  All right.  Now, I am assuming that

24    the seal on this is because -- whose document is this?  A

25    Google document or a --

166

Cross-Examination - J. Dederick

1          MR. GUARNERA:  It is a Trade Desk document, Your

2    Honor.  They moved for it to be put under seal, and the

3    Court granted that motion.

4          THE COURT:  Then if you are going to question him

5    on this, we have to excuse everybody out of the courtroom.

6          MS. DUNN:  Your Honor, it's -- I apologize that

7    this is all coming up late in the day because it's the last

8    thing anybody wants to talk about.

9          There are quite a lot of Trade Desk documents that

10   The Trade Desk -- and counsel maybe here in the courtroom --

11   have asked to be under seal.  So this will be an issue that

12   more or less pervades this examination.  So maybe we --

13         THE COURT:  Everyone who's not connected to the

14   case must leave at this point.

15         A MALE SPEAKER:  Your Honor, may I approach?

16         THE COURT:  No.

17             (People exit the courtroom.)

18         MS. DUNN:  One other thought, Your Honor, is that

19   we can meet and confer overnight to the extent that we run

20   up against the Court's outer limit of the day and hope that

21   we can find --

22         THE COURT:  Everyone needs to leave the courtroom

23   right now.

24         All right.  Mr. Mene, have you checked the only

25   attorneys who are left in here are attorneys who are working

                                                            167

Cross-Examination - J. Dederick

1   on the case?

2           MS. DUNN:  I think the media are seeking to object

3   is what's happening.

4           THE COURT:  Well, the media can object all they

5   want out in the hall.  I have to get this case moving.  Go

6   on.

7           MS. WOOD:  Your Honor, I would just note -- I

8   don't know if people from Google who are not able to see

9   highly confidential information are still in the courtroom.

10          MS. RHEE:  They have left the courtroom, Your

11  Honor.

12          MS. WOOD:  Okay.

13              (People exit the courtroom.)

14          THE COURT:  Everybody out.

15          All right.  I am putting the burden on counsel to

16  ensure that the only people who are left in the courtroom

17  are authorized to be here.

18          MS. WOOD:  I don't know any of these folks, but I

19  can vouch for these folks.

20          THE COURT:  All right.

21          MS. DUNN:  We can vouch for the remainder of the

22  folks.

23          MS. RHEE:  Actually, no, Your Honor.  We can vouch

24  for the first row here.  We don't know who --

25          MS. PREWITT:  Elizabeth Prewitt, Your Honor, of

                                                              168

Cross-Examination - J. Dederick

1    Latham & Watkins and The Trade Desk in-house counsel as

2    well --

3           THE COURT:  You have to be at the lecturn when

4    you're speaking.

5           Let's have counsel for Trade Desk.

6           MS. PREWITT:  Thank you, Your Honor.  Elizabeth

7    Prewitt of Latham & Watkins for The Trade Desk.

8           THE COURT:  Yes, ma'am.

9           MS. PREWITT:  I also have cocounsel here, Aaron

10   Chiu, Lauren Sun, as well as Guy Petrillo.  And we also have

11   in-house counsel with us, Ian Eisner, Julie Kleeman, and

12   then another representative of The Trade Desk.

13          THE COURT:  All right.  What is it about these

14   documents that is so sensitive that they cannot be

15   discussed?

16          MS. PREWITT:  Your Honor, I'll have to look at

17   this.  I'll look at the documents.  There are confidential

18   strategic -- there's confidential strategic information

19   contained in the documents.  There were a number of

20   documents that fell within that category.  We placed

21   objections in connection with these documents in particular.

22          My understanding is Your Honor has ruled on that.

23   It's actually a complete surprise to us for that reason,

24   that we weren't notified in advance of Mr. Dederick's

25   testimony that he would be cross-examined on documents that

169

Cross-Examination - J. Dederick

1    were subject to sealing.  So...

2          THE COURT:  Well, he can be -- it may have to be

3    in a sealed courtroom, but we're going to get an objection

4    from the media.  So we're going to have to address that

5    issue.

6          So I want to make sure that there aren't ways of

7    redacting these documents such that they can be discussed.

8    They don't necessarily have to be entered into evidence.

9          So how many of these documents do you --

10         MS. DUNN:  We will count them now, Your Honor.

11   There are quite a number, but most of the documents are

12   under seal.

13         I do -- we are, you know, very willing and think

14   it would be a great solution to meet and confer overnight on

15   how to redact the documents to The Trade Desk's satisfaction

16   so that we can proceed quickly with the examination.

17         In the meantime, we are counting up the documents.

18         In addition, Mr. Dederick's deposition has been

19   designated as highly confidential as well.

20         MS. PREWITT:  Your Honor, I'd just like to add

21   that we were available to meet and confer with counsel on

22   this.  We would have preferred to have done this in a less

23   theatrical setting than sending reporters out of the

24   courtroom.

25         So we remain available to have discussions with

Cross-Examination - J. Dederick

1    counsel for Google on the subject.  We would have rather had

2    this discussion prior to open court.

3            THE COURT:  Well, we have the evening.  We're

4    going to have to shut this down in a second.

5            But my quick look at this is that some of these

6    issues -- GDN is an ad network instead of a DSP. It's not

7    built on RTB technology.  I mean, some of these are your

8    quick -- I'm looking at this quickly -- your evaluations of

9    Google.  I don't know how that really is something that is

10   so proprietary.

11           So I really want you to look carefully because I

12   may be reviewing my decision about keeping them totally

13   under seal.  My practice has always been if the seal request

14   is legitimate -- obviously, there are real business reasons

15   to keep certain information under seal.  But if it's been

16   too broadly used --

17           Again, the law in the Fourth Circuit under the

18   *Ashcroft* case is that as much of a court's proceedings as

19   possible should be transparent.  And we are going to have

20   the media yelling and screaming first thing tomorrow

21   morning.  So it's important to reevaluate exactly what has

22   to be used.  Again, I will leave that with you-all.

23           But we start tomorrow morning at 9:00.  I think to

24   avoid any problems -- you're not going to like this, but I

25   think I would want you -- unless you solve it overnight, in

                                                              171

Cross-Examination - J. Dederick

1   which case -- I think we should probably start at 8:30

2   tomorrow morning.  All right?

3            If there are no problems, you can email me this

4   evening -- you've got my law clerk's email -- and we won't

5   want to see you until 9:00.

6            If there are problems, then in a sealed context,

7   I'll address it.  And we'll let the media have an

8   opportunity, after I've addressed it, to lodge their

9   complaints.  All right.

10           MS. DUNN:  Your Honor, that makes good sense.  I

11  am informed -- and I need my colleagues for this -- that

12  there may be some agreement to call one of the former Google

13  witnesses first thing tomorrow.  So I want to make sure

14  that -- what Your Honor said makes complete sense, but I

15  want to make sure we're not creating a different problem.

16           MS. WOOD:  That's why I rose, Your Honor.  You may

17  recall that, with respect to some of the former employees,

18  at your request, we had agreed to accommodate them for

19  specific a start time on a specific day.

20           So Mr. Srinivasan is scheduled to started at

21  9:00 a.m. tomorrow.

22           THE COURT:  How long do you anticipate his

23  testimony taking?

24           MS. WOOD:  I would expect around the length that

25  we've been seeing.  Two hours would be my estimate, but I

Cross-Examination - J. Dederick

1   really don't know the length of the cross.

2          THE COURT:  You think their direct is two hours?

3          MS. WOOD:  No, no, no.  I think the direct is an

4   hour to an hour and a half.

5          THE COURT:  Mr. Dederick, don't tell me your home

6   address, but where are you from?  What area?

7          THE WITNESS:  Brooklyn, New York.

8          THE COURT:  You don't have an accent.

9          Counsel, you're from Latham's.  I assumed you're

10  from DC?

11         MS. PREWITT:  No, your Honor.  I'm also from New

12  York.

13         THE COURT:  I hope you have hotel reservations.

14         MS. PREWITT:  I will have a place to sleep, Your

15  Honor.  Thank you, ma'am.

16         THE COURT:  Okay.  All right.  So I think that's

17  what we're going to do.  Hopefully, you can work it out

18  overnight.  If not, at 8:30 in a sealed courtroom, we'll

19  address the issue.  I'll let the media have -- at some

20  point, they can come in and say something.  We might start

21  your witness a little after 9:00, but he will definitely be

22  the first person we call.

23         So, Mr. Dederick, you're going to get a break.

24  You don't have to be here at 9:00 tomorrow morning.

25         THE WITNESS:  Okay.

173

Cross-Examination - J. Dederick

1          THE COURT:  In fact, if you're telling me for

2    certain you're sure your witness will be at least two hours?

3          MS. WOOD:  I can't be certain because I don't know

4    exactly --

5          THE COURT:  How long do you think your direct will

6    take?

7          MS. WOOD:  I think the direct will be somewhere

8    between an hour and an hour and a half.  That's my best

9    estimate.

10         THE COURT:  All right.  So that Mr. Dederick can

11   kind of plan -- I don't like to have people have to sit

12   around unnecessarily.  I think it's safe to say we wouldn't

13   need him back here until 11:30, 12:00?

14         MS. WOOD:  11:30.  And, Your Honor, we can always

15   fill in with some -- you know, there was a read-in we didn't

16   get to today.  So if we have time to fill and we want to

17   give him a time certain --

18         THE COURT:  Time certain.  2:00?  After lunch?

19         MS. WOOD:  That would be fine, Your Honor.

20         THE COURT:  All right.  That gives you the morning

21   to relax.

22         MS. WOOD:  I'm not sure --

23         THE COURT:  We can't get you in any sooner than

24   that.  That's the problem.

25         But, Ms. Dunn, how long do you anticipate your

Cross-Examination - J. Dederick

1    cross taking with Mr. Dederick?

2              MS. DUNN:  At this point, I think an hour, but I

3    need to really look because I only just heard his direct.

4    And I'll try to --

5              THE COURT:  An hour.  There will probably be a

6    little bit of redirect, probably a little recross.

7              So, Counsel, for planning purposes, Mr. Dederick

8    will likely be back on the stand between 1:00, maybe 2:00 --

9    I doubt it -- in that time frame.  All right?

10             THE WITNESS:  One to two hours at 2:00?

11             THE COURT:  That's what we're anticipating, yeah.

12             MS. DUNN:  Your Honor, this probably goes without

13   saying, but we'd ask just -- we've already handed out our

14   cross material to the counsel.  So if the rule on witnesses

15   can apply.

16             THE COURT:  Well, counsel can speak to their own

17   client.  So his counsel can -- Mr. Dederick's counsel can

18   speak with him.

19             MS. DUNN:  Well, the problem is they have all of

20   our cross material.  So...

21             THE COURT:  There shouldn't be that much of a

22   problem.  I'm not going to worry about that.  All right?

23             MS. DUNN:  Okay.

24             THE COURT:  All right.  Is there anything else we

25   need to address, then?

175

Cross-Examination - J. Dederick

1           Ms. Wood?

2           MS. WOOD:  The only thing I might note, Your

3    Honor, just -- we're trying to wrangle a lot of witnesses.

4    We do have witnesses who have come in from California

5    specifically to go tomorrow afternoon, one at 1:00 and one

6    at 3:00 -- well, actually --

7           THE COURT:  Not at 1:00; we're at lunch.

8           MS. WOOD:  Right.  He will be here at 1:00.  So my

9    only suggestion is if Mr. Dederick is available at 11:30, if

10   we were to finish with Mr. Srinivasan by then, perhaps

11   Mr. Dederick could go and we wouldn't disadvantage the other

12   folks who are also coming in from California but didn't file

13   a motion to quash.  I feel like they're being -- their

14   cooperation has resulted in them being treated --

15          THE COURT:  Well, there's a lot of overlap of

16   testimony that we're starting to hear.  So there may be a

17   way of tailoring everybody's testimony.

18          MS. WOOD:  Understood.  And we did drop Mr. Zeng

19   for that purpose, Your Honor.  I hope you understand we are

20   trying to be as efficient as possible.

21          THE COURT:  I have the impression that you'd like

22   to get out of here as soon as possible.

23          THE WITNESS:  Did I give that -- I didn't mean to

24   give that impression.

25          THE COURT:  So how about 11:30 tomorrow morning?

                                                            176

Cross-Examination - J. Dederick

1          THE WITNESS:  Okay.

2          THE COURT:  So if we can get you out before lunch,

3   then you can go back to Brooklyn.

4          THE WITNESS:  Okay.  I'll work on the accent.

5          THE COURT:  Counsel, you need to be ready by 11:30

6   tomorrow morning.

7          MS. DUNN:  Yes, Your Honor.

8          THE COURT:  All right.  Very good.

9          MS. WOOD:  Thank you, Your Honor.

10         THE COURT:  I think since it is getting late --

11  there weren't that many exhibits.  Let's get the exhibits

12  done for tonight so we have that matter --

13         MS. DUNN:  Your Honor, we also -- with the Court's

14  indulgence -- understand Your Honor's ruling about the

15  exhibit that we tried to use for cross-examination.

16         Because it is a statement by the company that has

17  gone out widely to investors and partners and clients and

18  publicly, we would like an opportunity just to write the

19  Court a letter explaining why we would like to use it for

20  cross-examination.  It's very relevant to the market

21  definition in the case.

22         THE COURT:  I think you're going to be able to get

23  that evidence in other ways than this way.  I'm going to

24  stay with my ruling.  I don't do a lot of second-guessing.

25  If I'm wrong, I'm wrong, but it keeps the case moving.  So

Cross-Examination - J. Dederick

1    we've finished that issue.  All right?

2              MS. DUNN:  Understood.

3              THE COURT:  If there are any media people out

4    there, they can come in to hear us read the evidence into

5    the record.  All right?

6              And, Mr. Dederick, you can step down.

7              THE WITNESS:  Okay.

8              (Mr. Dederick exits the courtroom.)

9              THE COURT:  Okay.  We are going to now read into

10   the record -- for the record, the courtroom is unsealed, and

11   I think media people are coming back in.

12             All right.  We're going to read into the record

13   those exhibits that have been entered into evidence today.

14             THE COURTROOM DEPUTY:  PTX 1814, PTX 587,

15   PTX 1736, DTX 1508, DTX 549, DTX 259, DTX 129, PTX 1780.

16             THE COURT:  I'm sorry.  17 what?

17             THE COURTROOM DEPUTY:  80.

18             PTX 551; PTX 542, but only Bates Number 335; PTX

19   705; PTX 697; PTX 1040; DTX 1828; DTX 1915; DTX 1926; DTX

20   774; DTX 768; DTX 615; and PTX 1650.

21             MS. WOOD:  Could I just ask one clarification?

22   The 1828 --

23             THE COURTROOM DEPUTY:  28?

24             MS. WOOD:  That was a PTX?

25             THE COURTROOM DEPUTY:  DTX.

1          MS. WOOD:  DTX.  And that was through Mr. Ravi?

2          THE COURTROOM DEPUTY:  Yes.  That was the first

3    one on cross.

4          MS. WOOD:  I don't have that one either.  I'll be

5    honest.  But I can check my notes and --

6          MS. HIBBLER:  I didn't have it.

7          MS. WOOD:  1828?

8          THE COURTROOM DEPUTY:  Yes, 1828.

9          THE COURT:  1828, it's a chart from 2019.  It

10   shows a great increase in display ads only.  Is that

11   consistent now with what you think you've put in?

12         MS. WOOD:  Yes, Your Honor.

13         THE COURT:  It was Defense Exhibit 1828.  That's

14   consistent with Google's records or not?

15         MR. SPALDING:  Yes.

16         THE COURT:  Yes.  Okay.

17         MR. ISAACSON:  1828 is what we're talking about.

18         THE COURTROOM DEPUTY:  That was the CV of

19   Mr. Ravi.

20         MS. WOOD:  We're good, Your Honor.

21         THE COURT:  All right.  So the plaintiffs agree

22   that all the exhibits that you think you entered today are

23   in?

24         MS. WOOD:  Yes, Your Honor.

25         THE COURT:  And Google is satisfied that all the

1    exhibits you feel were accepted by the Court are in?

2             MS. DUNN:  Yes, Your Honor.

3             THE COURT:  Okay.  Just for a minute.  I know some

4    of the media people returned.  There are documents that were

5    deemed under seal that the Court previously ruled on.

6             What's going to happen tonight is counsel for

7    Trade Desk is going to meet with counsel -- trial counsel to

8    see if they can work out redactions of those exhibits so

9    that the questioning can occur tomorrow.

10            The schedule for tomorrow morning is, if there are

11   no problems, if they've worked it out overnight, the trial

12   will start in open court at 9:00.

13            If there are issues involving sealing matters,

14   they have to be done under seal.  I will be holding court at

15   8:30, and the public will not be permitted while we're

16   working that out.

17            We're going to try to keep the amount of sealed

18   material to an absolute minimum, but the law is quite clear

19   that companies have a right -- and this is a third party.

20   This is not an entity that is -- it's not Google.  This is a

21   third party who's provided information -- documents.  Some

22   of the documents may have proprietary business information

23   that is not appropriate for public disclosure.

24            That's the situation right now.

25            At 9:00 tomorrow morning, assuming we're not

                                                          180

1    having any problems, the first witness will not be

2    Mr. Dederick but will be one of the witnesses who's coming

3    in under an agreement we had with some of the --

4              He's a former Google person, correct?

5              MS. WOOD:  Yes, Your Honor.  Mr. Srinivasan.

6              THE COURT:  Mr. Srinivasan.  He'll be the first

7    witness on deck.  And so that's what the schedule looks like

8    for tomorrow morning.  All right?

9              We'll recess court until tomorrow morning.

10             (Proceedings adjourned at 6:14 p.m.)

11             ----------------------------------

12

13

14

15

16

17

18

19

20

21

22        I certify that the foregoing is a true and

23    accurate transcription of my stenographic notes.

24

25                              _____
                                        /s/
                              Rhonda F. Montgomery, CCR, RPR

181