```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3  -------------------------x
    UNITED STATES, et al.,     :   Civil Action No.:
 4                             :   1:23-cv-108
               Plaintiffs,     :
 5      versus                 :   Thursday, September 12, 2024
                               :   Alexandria, Virginia
 6  GOOGLE LLC,                :   Day 4 p.m.
                               :   Pages 1-179
 7             Defendant.      :
    -------------------------x
 8
           The above-entitled bench trial was heard before the
 9  Honorable Leonie M. Brinkema, United States District Judge.
    This proceeding commenced at 9:00 a.m.
10
                     A P P E A R A N C E S:
11
    FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
12                         OFFICE OF THE UNITED STATES ATTORNEY
                           2100 Jamieson Avenue
13                         Alexandria, Virginia  22314
                           (703) 299-3700
14
                           JULIA TARVER WOOD, ESQUIRE
15                         AARON TEITELBAUM, ESQUIRE
                           TIMOTHY LONGMAN, ESQUIRE
16                         KATHERINE CLEMONS, ESQUIRE
                           DANIEL GUARNERA, ESQUIRE
17                         MICHAEL WOLIN, ESQUIRE
                           UNITED STATES DEPARTMENT OF JUSTICE
18                         ANTITRUST DIVISION
                           450 Fifth Street, NW
19                         Washington, D.C.  20530
                           (202) 894-4266
20
    (State of VA)          JONATHAN HARRISON, ESQUIRE
21                         OFFICE OF THE ATTORNEY GENERAL
                           OFFICE OF THE SOLICITOR GENERAL
22                         202 North Ninth Street
                           Richmond, Virginia  23219
23                         (804) 786-7704

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES


           Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599
```

```
 1                      A P P E A R A N C E S:

 2   FOR THE PLAINTIFFS:    ELLIOTT DIONISIO, ESQUIRE
     (State of CA)          OFFICE OF THE CALIFORNIA ATTORNEY
 3                          GENERAL
                            300 South Spring Street
 4                          Suite 1700
                            Los Angeles, California  90013
 5                          (213) 269-6681

 6   FOR THE DEFENDANT:     CRAIG REILLY, ESQUIRE
                            LAW OFFICE OF CRAIG C. REILLY
 7                          209 Madison Street
                            Suite 501
 8                          Alexandria, Virginia  22314
                            (703) 549-5354
 9
                            KAREN DUNN, ESQUIRE
10                          MARTHA GOODMAN, ESQUIRE
                            JESSICA PHILLIPS, ESQUIRE
11                          WILLIAM ISAACSON, ESQUIRE
                            PAUL, WEISS, RIFKIND,
12                          WHARTON & GARRISON LLP
                            2001 K Street, NW
13                          Washington, D.C.  20006
                            (202) 223-7300
14
                            JUSTINA SESSIONS, ESQUIRE
15                          FRESHFIELDS BRUCKHAUS DERINGER, LLP
                            855 Main Street
16                          Redwood City, California  94063
                            (212) 277-4000
17
     THE TRADE DESK:        ELIZABETH PREWITT, ESQUIRE
18                          LATHAM & WATKINS LLP
                            1271 Avenue of the Americas
19                          New York, New York  10020
                            (212) 906-1200
20
                            AARON CHIU, ESQUIRE
21                          LATHAM & WATKINS LLP
                            505 Montgomery Street
22                          Suite 2000
                            San Francisco, California  94111
23                          (415) 646-7839

24

25


          Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599
```

```
 1  COURT REPORTER:          RHONDA F. MONTGOMERY, CCR, RPR
                             Official Court Reporter
 2                           United States District Court
                             401 Courthouse Square
 3                           (703) 299-4599
                             RMontgomery@courtreport.net
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    TABLE OF CONTENTS

2                       WITNESSES

3   On behalf of the Plaintiff:

4   JOHN DEDERICK

5   Cross-examination by Ms. Dunn ............5
    Redirect examination by Mr. Guarnera ......48
6   Recross-examination by Ms. Dunn ..........54

7   RAJEEV KUMAR GOEL

8   Direct examination by Ms. Wood ............55
    Cross-examination by Ms. Rhee .............109
9   Redirect examination by Ms. Wood ..........152

10  TOM KERSHAW

11  Direct examination by Ms. Garcia ..........158

12                      MISCELLANY

13  Certificate of Court Reporter ............179

14

15

16

17

18

19

20

21

22

23

24

25

Cross-Examination - J. Dederick

1           THE COURT:  All right.

2           Ms. Dunn?

3           MS. DUNN:  Thank you, Your Honor.

4                 CROSS-EXAMINATION (Resumed)

5  BY MS. DUNN:

6  Q    Mr. Dederick, right before the break you had testified

7  that you listened to the earnings announcement on August 8

8  of 2024.

9           Do you recall that?

10 A    Yes.

11 Q    Okay.  And then I had asked you whether the increase in

12 consumer time spent on connected TV and digital audio was

13 due to the global pandemic, and you said you couldn't

14 remember whether that was said on the earnings call.

15          Do you recall that?

16 A    What I remember saying is I don't -- I don't remember

17 the words on that earnings call, you know, from a month ago.

18 Q    Okay.  I'd like to refresh your recollection.  If you

19 would turn to the tab in your binder.  I think you were at

20 it before.  It's the one labeled 20240808.

21          Do you have that in front of you, Mr. Dederick?

22 A    Yes.

23 Q    Okay.  Can you please turn to page 6 and look at the

24 top of the page, first paragraph.

25 A    First paragraph?

                Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Cross-Examination - J. Dederick

1   Q    Yes.  And please read the first paragraph to yourself.

2        You got it?

3   A    Uh-huh.

4   Q    Does reading that paragraph refresh your recollection

5   that your CEO told investors and analysts that the massive

6   shift over the last four years in terms of where consumers

7   are spending their digital time was the global pandemic?

8   A    It does.  It's helpful to read through this.  That

9   shift --

10  Q    My question is --

11  A    -- was happening before the pandemic.  The pandemic

12  accelerated it.

13          THE COURT:  The question -- wait.  The question

14  was simply does it refresh your memory?  The answer would be

15  yes or no.

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.

18  BY MS. DUNN

19  Q    And yes or no?  Did your CEO say that?

20  A    This appears to be the earning transcript, so yes.

21  Q    And do you now also recall that your CEO said that what

22  the pandemic also reversed was that consumers used to spend

23  60 percent of their time --

24          THE COURT:  Again, Ms. Dunn, we're going to get an

25  objection, and I don't want this to continue.  Just ask the

Cross-Examination - J. Dederick

1  question first.

2          MS. DUNN:  I understand, Your Honor, and I

3  apologize.  I'm trying to do this quickly, and it's

4  challenging.

5          Okay.

6  BY MS. DUNN:

7  Q    Do you recall, having listened to this earnings

8  announcement, it was announced to investors and analysts

9  that consumers used to spend over 60 percent of their time

10  within walled gardens and 40 percent on the open internet

11  but that that trend was completely reversed?

12          MR. GUARNERA:  Your Honor, we object.  It's

13  hearsay.

14          THE COURT:  More than that, do you know from your

15  position at the company whether that kind of a change has

16  occurred?

17          And the answer is yes or no.  You know or you

18  don't know.

19          THE WITNESS:  Yes, I do know.

20          THE COURT:  Okay.

21          MS. DUNN:  Okay.

22          THE COURT:  Why don't you get away from this

23  presentation and just ask the questions directly.

24          MS. DUNN:  I will do so, Your Honor.

25  BY MS. DUNN:

Cross-Examination - J. Dederick

1  Q    Mr. Dederick --

2           MS. DUNN:  With the Court's indulgence, Your

3  Honor, it is -- the question is in part about what the

4  company is communicating to the investment community about

5  the market and to analysts.  If -- I can say "do you

6  remember" --

7           THE COURT:  I don't think it makes any difference

8  who the audience is.  All right?

9           MS. DUNN:  Okay.

10 BY MS. DUNN:

11 Q    Mr. Dederick, are you -- in your position, are you

12 aware that The Trade Desk view is that Google's interest in

13 the network business is shrinking?

14 A    We don't know what's happening inside of Google's

15 walls.

16           THE COURT:  That's perfect.  Just stop.  That's a

17 good answer.

18           Go ahead.

19 BY MS. DUNN:

20 Q    All right.  And are you aware and have you ever heard

21 it communicated at The Trade Desk that Google's downgrade on

22 their focus on the open internet creates an opportunity for

23 The Trade Desk?

24 A    Will you repeat the beginning of your question.

25 Q    Yes.

Cross-Examination - J. Dederick

1          Have you ever heard it communicated by anyone at

2   The Trade Desk that Google's downgrade of their focus on the

3   open internet creates an opportunity for The Trade Desk?

4   A    Yes.   There's a lot of context to that.

5   Q    Okay.   But you've heard that said?

6   A    Variations on that idea.

7   Q    Okay.   And have you heard your CEO say that?

8   A    Again, variations on that idea, yes.

9   Q    Okay.   Okay.   And have you ever heard it said by anyone

10  at The Trade Desk that, because of the increase in

11  popularity of CTV and digital audio, The Trade Desk is

12  solidifying its position as the default DSP of the open

13  internet?

14          MR. GUARNERA:   Your Honor, objection.

15          THE COURT:   I don't know why this is important to

16  the case.   I'm going to sustain the objection.

17          MS. DUNN:   Okay.   To answer the Court's question,

18  it goes to market definition; but I'm happy to move on.

19  BY MS. DUNN:

20  Q    Okay.   Mr. Dederick, have you ever -- are you aware of

21  statements by The Trade Desk about Amazon -- public

22  statements by The Trade Desk about Amazon?

23  A    That's very broad.   You -- will you give me more of

24  what you're referring to?

25  Q    Sure.   Have you ever heard --

Cross-Examination - J. Dederick

1          THE COURT:  Ms. Dunn, that's really a problematic

2   question that's going to just draw one objection after

3   another.  "Have you heard" invites a hearsay objection at

4   the very least.  All right.

5          MS. DUNN:  Okay.

6          THE COURT:  But in this man's position, he could

7   be -- I'm sure, of his own knowledge, talk about Amazon.

8   All right?

9   BY MS. DUNN

10  Q    Do you view Amazon to be a competitor to The Trade

11  Desk?

12  A    As Amazon operates a DSP, we compete with Amazon's DSP.

13  Q    Okay.  And do you view Amazon to have a conflict of

14  interest?

15  A    Yes.

16  Q    Okay.  And what's the conflict of interest that you

17  view Amazon to have?

18  A    Well, there's a lot of examples in our industry of a

19  content owner then trying to introduce a demand-side

20  platform.  A demand-side platform, the idea is you're

21  representing the interests of your buyers.  If you are going

22  to be incentivized to direct spend toward your owned and

23  operated, more profitable areas, we view that as a conflict

24  of interest.

25  Q    Okay.  And even though you view Amazon to have a

Cross-Examination - J. Dederick

1  conflict of interest, your testimony is that you compete

2  with Amazon, correct?

3  A    We compete with Amazon's DSP.

4  Q    And that's true even though, as you testified, you

5  believe Amazon has a conflict of interest?

6  A    Yes.

7  Q    Right.  In other words, what you perceive to be a

8  conflict of interest is not standing in the way of

9  competition with Amazon?

10 A    No, that's not what I said.  Their conflict of interest

11 and the exclusive access that they offer to their inventory

12 is a challenge.

13 Q    Who are the other companies that you believe have this

14 conflict of interest?

15 A    At this point, there are no -- there really aren't

16 meaningful demand-side platforms other than those three.

17 But to -- so yeah, there aren't meaningful other demand-side

18 platforms at this point.

19 Q    And when you say "those three," who are you talking

20 about?

21 A    Amazon DSP, DV360, and The Trade Desk.

22 Q    Okay.  Do you view Microsoft to have a conflict of

23 interest?

24      MR. GUARNERA:  Objection, Your Honor.  Vague.

25      THE COURT:  No, that's pretty straightforward.

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

Cross-Examination - J. Dederick

1          THE WITNESS:  It's a lot -- we don't really

2    compete with Microsoft's DSP anymore.  You don't see them

3    much.

4    BY MS. DUNN

5    Q    Okay.  So when Microsoft -- Microsoft did acquire a DSP

6    when it acquired Amazon.  You're aware of that, right?

7    A    Microsoft did not acquire Amazon.

8    Q    Apologies to Microsoft and Amazon.

9          Microsoft has a DSP after it acquired Xandr.

10   You're aware of that, right?

11   A    Yes.

12   Q    And do you believe that Microsoft's acquisition of a

13   DSP created for them a conflict of interest?

14   A    We had such little competition that it was hard to

15   assess how that product works.  We really never came across

16   their positioning in market.  So it's really hard for me to

17   comment.

18   Q    Okay.  So your view of whether a company has a conflict

19   of interest is based on your perception of your experience

20   with that company?

21   A    My view of whether a company has a conflict of interest

22   is -- whether a demand-side platform is lying to its

23   advertisers when it says they want to represent their best

24   interests and place ads wherever it's best for the

25   advertiser.

Cross-Examination - J. Dederick

1    Q    Okay.  All right.  So yesterday you recall that you

2    said The Trade Desk does not compete with Google, that the

3    companies do not compete.  Do you remember saying that?

4    A    Yes.  I said The Trade Desk competes with DV360,

5    Google's DSP.

6    Q    Right.  But I just want to be clear.  You're saying the

7    Trade Desk company does not compete against Google, the

8    company?

9    A    No.  We compete with their DSP.  Obviously, there's a

10   much larger advertising ecosystem at play.

11   Q    All right.  And you also testified yesterday that The

12   Trade Desk does not compete with the Google display network

13   or Google Ads.  Do you remember that?

14   A    Yes.

15   Q    Okay.  I'll ask you to turn in your binder to DTX 122.

16   And I have only one question about this document.

17           I'm not seeking to admit it.

18           THE COURT:  Okay.  Hold on.  Is there an

19   objection?

20           MR. GUARNERA:  Your Honor, there is an objection.

21           THE COURT:  Well, she's not admitting it; so it's

22   all right.

23           MS. DUNN:  I'm not seeking to admit this document.

24   BY MS. DUNN

25   Q    It's DTX 122, which would be in the very front of your

Cross-Examination - J. Dederick

1  binder.

2  A     Okay.

3  Q     Okay.  Do you see that this is a document that is a

4  competitive intelligence document from The Trade Desk

5  evaluating competition with the Google display network?

6  A     No.

7  Q     Okay.  If you look at the top of the document where it

8  says "Competitive Intel Framework," do you see that?

9  A     I think there's a misunderstanding here.  I mean --

10         THE COURT:  No.  The question that's on the floor

11  is do you see that heading?  And the answer is yes or no.

12         THE WITNESS:  Yes.

13  BY MS. DUNN

14  Q     Okay.  And do you see that under that heading,

15  "Competitive Intel Framework," it talks about the Google

16  Display Network?

17  A     Those words are in this document.

18  Q     Right.  And then it goes on to talk about various

19  attributes of the Google Display Network, correct?

20  A     It also talks about their ad exchange and their DSP --

21  Q     Sir, that wasn't my question.  My question is whether,

22  after competitive intelligence framework, it talks about GDN

23  and various attributes of the Google Display Network.

24  A     Among other things, yes.

25  Q     Okay.  Mr. Dederick, have you in your position been

Cross-Examination - J. Dederick

1   part of discussions at The Trade Desk about the target

2   addressable market, also called TAM?

3   A     That is very broad.  There's a lot of different target

4   addressable markets; so we do talk about them frequently,

5   yes.

6   Q     Okay.  And you're involved in those discussions in your

7   position as CRO?

8   A     There's thousands of people across The Trade Desk use

9   that frame frequently.  So yes, I'm one of them.

10  Q     And you're one of them, right?  You just said that?

11  A     Uh-huh.

12  Q     All right.  Are you -- in your position, are you aware

13  that The Trade Desk considers there to be a target

14  addressable market over $200 billion?

15  A     I don't know what you're referring to.

16  Q     Okay.  If you could turn in your binder to DTX 1398.

17          MS. DUNN:  And, again, here I'm using to refresh

18  recollection; I'm not seeking to admit, Your Honor.

19          THE COURT:  All right.

20  BY MS. DUNN

21  Q     Mr. Dederick, is this a document that you recognize?

22  It is a -- it's an email chain with a deck from

23  November 2022, and it talks about The Trade Desk target

24  addressable market, and it has various other C-suite

25  executives on the communication.

Cross-Examination - J. Dederick

1   A    No.  I don't think I'm on this email.

2   Q    Have you ever seen it before?

3   A    Not that I recall.

4   Q    Okay.  If you'll direct your attention to page 9 of

5   this document.

6        Are you there?

7   A    How do I know it's page 9?

8   Q    There are page numbers at the bottom of the exhibit.

9   A    I see them now.  Thank you.

10       Okay.

11  Q    And does looking at page 9 refresh your recollection

12  that The Trade Desk projects open web TAM, target

13  addressable market, to be over $200 billion?

14  A    You know, I just really don't -- I'm not familiar with

15  the context or the data that this document is pulled on.  So

16  I see the numbers on the document.  I would have to

17  understand where those numbers came from; so... I see those

18  numbers on this document.

19  Q    Okay.  So is it your testimony that that is not

20  something you've ever heard before?

21  A    We've had so many conversations -- and, to me, this

22  really gets into the heart of the confusion.  Ford Motor

23  Company and Delta --

24  Q    That wasn't my question.  My question was only --

25  A    -- Air Lines both compete for my travel budgets, but I

Cross-Examination - J. Dederick

1  wouldn't call them competitors.

2           THE COURT:  Wait.  Excuse me.  There's no question

3  pending.  We're not going to have speeches.  All right?

4           But, again, the questions are problematic.

5           Have you discussed TAMs during your work at your

6  company?

7           THE WITNESS:  All the time.

8           THE COURT:  All the time.  All right.

9           And in those discussions, are you addressing the

10 projected revenue that may be generated from TAMs?

11          THE WITNESS:  Yeah.  There's many different TAMs.

12          THE COURT:  All right.  The answer is yes or no.

13          THE WITNESS:  Yes.  We are assessing how that may

14 or may not affect our company.

15          THE COURT:  All right.

16          Go ahead.

17 BY MS. DUNN:

18 Q    And what's -- when you say "there are many different

19 TAMs," is there a TAM for the global advertising market?

20 A    Yes.

21 Q    Okay.  And what is that number?

22 A    We refer to it as approaching a trillion-dollar

23 advertising market.

24 Q    Okay.  And the approaching-trillion-dollar advertising

25 market, that includes video display, social, digital

Cross-Examination - J. Dederick

1   out-of-home; is that correct?

2   A    It's all advertising everywhere around the world.

3   Q    Okay.

4        All right.  Switching gears slightly, advertisers

5   have sort of a -- however much budget that they have, and

6   there are different platforms and channels that compete for

7   the overall ad budget of the advertiser?

8   A    I wouldn't frame it that way.

9   Q    Okay.  I will direct your attention, then, to your

10  deposition.

11       THE COURT:  I don't think we have that.  Do we?

12  Wait.  Wait.  Maybe we do.  Hold on.

13       MS. DUNN:  Apologies, Your Honor.  Okay.

14       THE COURT:  Yep, I've got it.

15  BY MS. DUNN

16  Q    Okay.  So if you'll turn, sir, to page 220, line 17.

17       And you were asked the question, "To what extent

18  does The Trade Desk compete with ad networks like the Google

19  Display Network?"

20       And you said, "So the DSP category does not

21  include those ad networks.  However, you know, of course,

22  there's a broader picture at play where an advertiser has

23  however much budget, and many different channels and

24  platforms will compete for the overall ad budget of the

25  advertiser.

Cross-Examination - J. Dederick

1          "And so to the extent that The Trade Desk wants to

2   compete for performance display dollars, unfortunately,

3   performance display dollars are almost entirely dominated by

4   AdWords or DV360."

5          Do you see that?

6          MR. GUARNERA:  Your Honor, I object.  I'm not sure

7   what the impeachment is based on.

8          THE COURT:  I agree.  Sustained.  That wasn't --

9   that's not related to the question that was before it.

10          MS. DUNN:  So the question was whether he views

11   that advertisers have however much budget, and many

12   different platforms and channels compete for the overall ad

13   budget of the advertiser.

14          THE COURT:  I don't believe that was the question,

15   unless I'm missing things.  All right?

16          So I'm sustaining the objection.  Move this along.

17   BY MS. DUNN

18   Q    All right.  Okay.  And, Mr. Dederick, when you pitch

19   against other companies in the market, The Trade Desk does

20   emphasize its ability to buy across channels, including both

21   display and connected TV, correct?

22   A    We talk frequently about being able to buy across

23   multiple channels, yes.

24   Q    And that's a pitch that you make when you go out into

25   the market and compete, correct?

Cross-Examination - J. Dederick

1   A    That is how we talk about our company.

2   Q    Right.  All right.  Can you look, please, in your book

3   at Defense Exhibit 319.

4   A    Okay.

5   Q    Okay.  So this is email where you're cc'd.  It's from

6   Tim Smith to multiple recipients at The Trade Desk.  And the

7   subject line talks about an RFP.  I'll keep the company name

8   confidential, but it's a very large company being discussed.

9   Do you see that?

10  A    Yep, I do.

11           MS. DUNN:  Your Honor, we move to admit DTX 319.

12           MR. GUARNERA:  Your Honor, we object.  That's

13  hearsay.

14           THE COURT:  I don't think it's offered for the

15  truth of its contents.  I'm going to allow it in.  319 is

16  in.

17           MS. DUNN:  Thank you, Your Honor.

18  BY MS. DUNN:

19  Q    All right, sir.  If you'll direct your attention to

20  page 11, do you see the executive summary?

21  A    Yes.

22  Q    Okay.  And do you see where it says, "The Trade Desk

23  has become the fastest-growing demand-side platform in the

24  industry by offering advertisers best-in-class technology to

25  manage cross-channel advertising campaigns in display,

Cross-Examination - J. Dederick

1   video, social, and mobile"?

2           Do you see that?

3   A   Will you tell me where that is written.

4   Q   It's in the -- it's highlighted on your screen, to make

5   life just a little easier.

6   A   I just want to read the full paragraph, please.

7           Okay.  I do see the words that you've highlighted.

8   Q   Okay.  And so you can agree, looking at this document

9   which is discussing a pitch to a very large company and

10  selling itself, one of the things that The Trade Desk is

11  emphasizing is its ability to buy across multiple channels,

12  including display, video, mobile, and also it refers in this

13  paragraph to connected TV?

14  A   Yes, we buy across those channels.

15  Q   All right.  And also in the same document at page 11,

16  there's a mention of The Trade Desk scale.  Do you see that?

17          Do you see the sentence that -- where it says --

18  I'm going to skip the company name.  But "We have been able

19  to drive massive success in the United States and Canada for

20  paid media across display, video, mobile, cross-device, and

21  connected TV."

22          Do you see that?

23  A   I see those words.

24  Q   Right.  And then you also see it says, "Our ability to

25  buy inventory across all channels at scale and all over the

Cross-Examination - J. Dederick

1  globe positions us as a leader in the space and an ideal DSP

2  for large global brands."

3       Do you see that?

4  A    I see those words, yeah, with the context of the pitch

5  document.

6  Q    And so one of the things that you emphasize in your

7  pitch document is the scale of your company, correct?

8  A    Yes.  In 2016 this appears to be a part of a pitch

9  document.

10       THE COURT:  All right.  A housekeeping matter.

11  The name of the company is mentioned in here.  Does that

12  need to be redacted before this goes out on a public

13  website?

14       THE WITNESS:  Yes.  I mean --

15       MS. DUNN:  This has been agreed to.  I just wasn't

16  going to mention it publicly, but there was no objection.

17       THE COURT:  No, but my point is Exhibit 319,

18  although it may be going in, it does reference the client.

19       MS. PREWITT:  There will be no objection, Your

20  Honor.

21       THE COURT:  So what I'll need to hear from -- and

22  just speak up loudly, ma'am -- from the counsel.

23       MS. PREWITT:  On behalf of The Trade Desk,

24  Elizabeth Prewitt.  We have no objection, Your Honor.

25       THE COURT:  No objection to what?  Being redacted

Cross-Examination - J. Dederick

1   or going out straight?

2          MS. PREWITT:  Going out.

3          THE WITNESS:  Well, this has confidential

4   information in it.

5          THE COURT:  Well, wait a minute.  Your attorney

6   and you are saying two different things.

7          MS. PREWITT:  Can we confer with counsel?

8          THE COURT:  You have to do it quickly.  This trial

9   needs to get moving.  Get with Ms. Dunn right now.  All

10  right.

11                     (Counsel confer.)

12         MS. DUNN:  We're happy to redact this in the

13  interest of time.

14         THE COURT:  All right.  So the name of the clients

15  will be out?

16         MS. DUNN:  Yes.

17         THE WITNESS:  There's pricing information in here.

18         MS. DUNN:  Your Honor, the pricing information

19  that the witness is referring to is already redacted; so...

20         THE COURT:  My concern is it's not from the

21  edition I have.  So as long as whatever is going out

22  publicly has been taken care of, I strongly recommend,

23  before you put it on the website tonight, that you have met

24  with counsel and you're sure the right thing is going out.

25  All right?

Cross-Examination - J. Dederick

1          MS. DUNN:  Yes.  We will take care of it, Your

2  Honor.

3          THE WITNESS:  Whose counsel?  Our counsel?

4          THE COURT:  Yes.

5          THE WITNESS:  Okay.

6          THE COURT:  But the exhibit is in evidence with

7  those redactions.

8                    (Defendant's Exhibit Number **319**

9                    **admitted into**

10                   **evidence.**)

11         MS. PREWITT:  Your Honor, may I confer with

12  counsel for a moment?

13         THE COURT:  Yes.

14                   (Counsel confer.)

15         MS. DUNN:  We just want to communicate to the

16  witness that we are going to take care of his concerns in

17  the redaction.

18         THE COURT:  That's fine.

19         THE WITNESS:  Great.  Thank you.

20  BY MS. DUNN:

21  Q    So, sir, you just testified that in 2016 The Trade Desk

22  had scale?

23  A    I don't think I testified that.

24  Q    Okay.  You made the point that this document is from

25  2016, and in 2016 The Trade Desk was pitching itself to

Cross-Examination - J. Dederick

1  customers based on the fact that you had scale, right?

2  A    Yes.  I see that that's in this document, yes.

3  Q    Okay.  And The Trade Desk has grown quite

4  substantially, actually, since 2016; isn't that correct?

5  A    Yes.

6  Q    Okay.  All right.  If you could turn in your binder to

7  Defense Exhibit 1484.

8          MS. DUNN:  This is a 10K filing with the SCC.  So,

9  therefore, based on the Court's earlier statement about

10  SCC -- or government filings, I don't anticipate an

11  objection.  But we'd like to use this document.

12          THE COURT:  All right.  This is a publicly filed

13  document, I'm assuming.  So there shouldn't be any problem

14  with sealing.  These are made under the penalty of perjury.

15  So I assume there's no objection.  Correct?

16          MR. GUARNERA:  No objection, Your Honor.

17          THE COURT:  All right.  Then 1484 is in evidence,

18  Defense 1484.

19                          (Defendant's Exhibit Number

20                          **1484 admitted into**

21                          **evidence.)**

22          MS. DUNN:  Thank you, Your Honor.

23  BY MS. DUNN:

24  Q    All right.  So, Mr. Dederick, if you can direct your

25  attention to page 5 of 90, you will see a paragraph entitled

Cross-Examination - J. Dederick

1  "Summary of Risk Factors."

2          Do you see that?

3  A    Yes.

4  Q    Okay.  And do you see in the sixth bullet at the

5  bottom, it says, "The market in which we participate is

6  intensely competitive, and we may not be able to compete

7  successfully with our current or future competitors."

8          Do you see that?

9  A    I see those words.  Significant context.

10 Q    You understand, sir, this is an SCC filing by the

11 company, as the Court just said, made under penalty of

12 perjury, right?

13 A    Yes.

14 Q    Okay.  So there's no reason to think that that bullet

15 is inaccurate, is there?

16 A    We're informing the investment community of -- no.  I

17 mean, this is very important part of how we're communicating

18 to the investment community around risks to our business.

19 So yes.

20 Q    Okay.  And then if you look at the fourth bullet,

21 you'll see it says, "The market for programmatic buying for

22 advertising campaigns is relatively new and evolving."

23          Do you see that?

24 A    I see those words, yes.

25 Q    Okay.  And so the market being referred to in the last

Cross-Examination - J. Dederick

1 bullet as the market in which The Trade Desk participates is

2 the market for programmatic buying for advertising campaigns

3 that is two bullets above that, correct?

4 A    I will need to just read these for context in order to

5 answer your question.

6 Q    Sure.

7         Sir, are you set?

8 A    Well, I'm still reading.

9         THE COURT:  Well, it speaks for itself.  We don't

10 really need an answer to that.

11 BY MS. DUNN

12 Q    All right.  Sir, if you turn to page 7 --

13 A    Okay.

14 Q    Okay.  Do you see where it says, "The Trade Desk offers

15 a self-service cloud-based ad-buying platform that empowers

16 our clients to plan, manage, optimize, and measure more

17 expressive data-driven digital advertising campaigns.  Our

18 platform allows clients to execute integrated campaigns

19 across ad formats and channels, including video (which

20 includes connected TV), display, audio, digital out-of-home,

21 native, and social on a multitude of devices such as

22 computers, mobile devices, televisions, and streaming

23 devices."

24         Do you see that?

25 A    Yes, I see those words.

Cross-Examination - J. Dederick

1  Q     You understand integrated to mean that a client can

2  design one campaign across all of those ad formats if they

3  chose?

4  A     Remind me.  Where is the word "integrated"?

5  Q     It is highlighted on the screen.

6  A     So what this means is, if a client has creative assets

7  available across different channels, they can use them in

8  the same platform.

9  Q     And this includes ads that appear in apps, correct?

10  A     I don't know what year -- I forget what year this is

11  from, but today, yes, we do buy ads that appear in apps.

12  Q     This is from 2022.

13  A     Okay.  Yes.

14  Q     Okay.  And you're also aware that multiple ad formats,

15  like those mentioned here and including traditional banner

16  ads, native ads, and out-stream video, can compete to fill a

17  single slot, right?

18  A     I don't think I understand what you mean.

19  Q     If you're bidding on a single slot for an ad, there is

20  competition between traditional banner ads, native ads, and

21  out-stream video ads.  That's true, correct?

22  A     What do you mean by "slot"?

23  Q     A square on a webpage, for example.

24  A     A square on a webpage is a standardized format.  So if

25  it calls for an open web display ad, you can't serve a video

Cross-Examination - J. Dederick

1   ad in it.

2   Q    All right.  We'll come back to that in a second.

3           If you turn to page 19 of this document.

4   A    Okay.

5   Q    Are you there?

6   A    I'm here.

7   Q    So if you look at the bold and italics line, it says,

8   "We operate in a highly competitive and rapidly changing

9   industry.  We expect competition to persist and intensify in

10  the future, which could harm our ability to increase revenue

11  and maintain profitability."

12          Do you see that?

13  A    Yeah, I see those words.

14  Q    Okay.  Then it says, "New technologies and methods of

15  buying advertising present a dynamic competitive challenge

16  as market participants develop and offer new products and

17  services and at capturing advertiser spend or disrupting the

18  digital marketing landscape."

19          Do you see that?

20  A    Yes, I see those words.

21  Q    Okay.  So it's fair to say The Trade Desk competes with

22  new technologies and methods of buying advertising, correct?

23  A    That's a broad statement.  What do you mean by we

24  compete with new technologies and methods of buying

25  advertising?

Cross-Examination - J. Dederick

1   Q    Well, it says here, "New technologies and methods of

2   buying advertising prevent [sic] a dynamic competitive

3   challenge."

4           So I'm just asking you whether it's fair to say

5   The Trade Desk competes with new technologies and methods of

6   buying advertising.

7   A    Yeah.  Our DSP competitors are constantly coming out

8   with new technologies and ways to buy advertising.  So, yes,

9   that happens in our category.

10  Q    But you would agree you don't see here any mention of

11  just only DSP, right?

12  A    This whole document is about a DSP.

13  Q    Are you able to predict what is going to happen

14  competitively to The Trade Desk within the next five years?

15  A    No.

16  Q    How about in the next two years?

17  A    No.

18  Q    Ten?

19  A    No.

20  Q    Okay.  All right.  With respect to -- actually, can you

21  turn to DTX 1022.  All right.  This is an email with a deck

22  attached.  And the email says, "Thank you for joining Jed's

23  session on JPBs [sic]."

24           Do you see that?

25  A    I'm sorry.  I don't have the -- where is it?  1022 you

Cross-Examination - J. Dederick

1  said?

2  Q     1022.

3            THE COURT:  Is there any objection to 1022?

4            Are you moving it in?

5            MS. DUNN:  Yes, Your Honor.

6            THE COURT:  Any objection?

7            MR. GUARNERA:  We have hearsay objection, Your

8  Honor.  If there is a business records exception, we think a

9  foundation would need to be laid.

10           MS. DUNN:  This is a presentation --

11           THE COURT:  Well, wait.  Ask the question again.

12           MS. DUNN:  All right.

13  BY MS. DUNN

14  Q    Mr. Dederick, do you recognize this document?  And what

15  is it?

16  A    I can tell what it is.  I don't remember it exactly

17  from 2020, but this looks like an internal educational

18  document.

19  Q    Okay.  Do you see where it says, "Hello, all.  Thank

20  you for joining Jed's session on JBP's."

21           Do you see that?

22  A    Yes, I see those words.

23  Q    And Jed is you, right?

24  A    Last I checked.

25  Q    Okay.  And what's a JBP?

Cross-Examination - J. Dederick

1 A    Honestly, the discussions of our commercial

2 relationships with our clients gets into pretty confidential

3 territory.  But what I'll say is it's commercial agreements

4 with our clients.

5 Q    And do you see it attaches a deck?  And it says, "If

6 you have any questions, please feel free to email me and

7 Jed."

8          You see that, right?

9 A    I see those words, yes.

10          MS. DUNN:  Okay.  Your Honor, I move to admit

11 1022.

12          And for the benefit of the witness, everything

13 after page 4 is redacted.

14          MR. GUARNERA:  Your Honor, I don't think that the

15 proper foundation for this has been established.

16          THE COURT:  No.  I'm letting it in.

17          THE WITNESS:  This has confidential information in

18 it before page 4.  This is about our pricing models with

19 clients and how they work.

20          THE COURT:  Again, Trade Desk is not a party to

21 this case; it's just a third party.  I think this is going

22 beyond what we need.  You better be more specific.

23          MS. DUNN:  Okay.

24          THE COURT:  All right.

25 BY MS. DUNN:

Cross-Examination - J. Dederick

1   Q    Mr. Dederick, if you could, just look at page 3 of this

2   document.

3              THE COURT:  No.  There's nothing on this page

4   that's appropriate.

5              THE WITNESS:  Your Honor, I feel uncomfortable.

6              THE COURT:  I've ruled.  I don't see any basis for

7   this exhibit going in.

8              MS. DUNN:  I'm sorry, Your Honor?

9              THE COURT:  The exhibit is out.  It doesn't add

10  anything.

11  BY MS. DUNN:

12  Q    Mr. Dederick, have you ever given a presentation at The

13  Trade Desk where you talked about winning media share from

14  Google, Facebook, and Amazon?

15  A    I don't -- can you be more specific?

16  Q    Sure.  Did you give such a presentation in 2020?

17  A    I don't remember.

18  Q    Okay.  Do you recall at your deposition testifying that

19  The Trade Desk has very -- really consistent take rate

20  trends?  Do you recall that?

21             MR. GUARNERA:  Your Honor --

22             THE COURT:  Well, we haven't even heard the full

23  question.  You're on your feet before she even finishes.

24  All right?

25             How much longer are -- you are not getting very

Cross-Examination - J. Dederick

1  far with this.  You've already established that they

2  compete.  All right?  You've established that Google is one

3  of the competitors.  I mean, you've established many things.

4          How much more are you trying to get out? because

5  this is getting tedious and not going very far.

6          MS. DUNN:  So, Your Honor, I'm glad to hear we

7  have established many things.  I do think a lot of this goes

8  directly to market definition in this case, which is

9  obviously an extremely important issue that the Court is

10  going to need to consider.  We have worked very hard --

11          THE COURT:  Well, then, go right to the market

12  definition issue.  I think you're already somewhat there.

13          MS. DUNN:  Well, the Court is the fact finder; so

14  I'm going to move along.

15  BY MS. DUNN:

16  Q    All right.  Sir, you testified yesterday about the lens

17  through which The Trade Desk views the advertising

18  ecosystem.

19          Do you recall that?

20  A    We -- that sounds like a lot of what I talked about.

21  Remind me what you're referring to from that testimony.

22  Q    Well, yesterday, you testified that The Trade Desk has

23  raised concerns with Google about the terms of the AdX

24  auctions.

25          Do you recall that?

Cross-Examination - J. Dederick

1  A    Yes, I recall saying that on calls with Google, The

2  Trade Desk has communicated that we feel that the -- we

3  don't trust the AdX auction dynamics.

4  Q    Okay.  And you took issue with the terms and conditions

5  of dealing with Google, correct?

6  A    I don't recall saying that.

7  Q    Okay.  But isn't that the case?

8  A    That's very broad.  I don't --

9  Q    Is the answer no?

10 A    Will you repeat.

11 Q    Yeah.  In your testimony, are you taking issue with the

12 terms and conditions of dealing with Google?

13 A    "Terms and conditions" sounds like a legal term.  They

14 have been draconian and absolutist, and they haven't

15 accepted our feedback when we've given it.

16 Q    Okay.  And you said you had conversations with Google.

17       When were those meetings that you're referring to?

18 A    I mean, we would meet with our -- because we buy from

19 AdX, we would meet on a regular basis with the AdX

20 partnerships teams.

21 Q    And who did you meet with in particular?  Do you

22 recall?

23 A    No, I don't recall.

24 Q    And do you recall when these meetings were?

25 A    They happen frequently.  I mean, they -- frankly, there

Cross-Examination - J. Dederick

1   are many fewer of them now.  But you would typically do a

2   quarterly QVR.  So I would say in the state of a healthy

3   partnership, you would have probably a quarterly review, and

4   I would have sat in or seen the documentation from some of

5   those quarterly reviews.

6   Q    Okay.  I'm just trying to pin down.  When you're saying

7   that you had meetings with Google and you're testifying

8   about those meetings, I'm just trying to pin down the time

9   frame you're talking about.

10  A    We've been buying from AdX since, I think, 2011.  So

11  there's been a lot of meetings.  It's not an isolated case

12  providing feedback that's not, you know -- so I would say

13  that it's happened frequently over the years.

14  Q    Okay.  But the concerns that you're talking about

15  expressing, has that been in every meeting you've expressed

16  those concerns?

17  A    We obsess over supply chain transparency.  We obsess

18  over fair options.  So at all times, when we are talking to

19  SSPs and those who oversee the auctions, is what are the

20  rules?  Do I know about them?  Are you providing data that's

21  auditable so that I know you're telling me the truth?

22           That's an always-on conversation.

23  Q    Okay.  So earlier we talked about whether multiple ad

24  formats can compete to fill the same ad slot.

25           Can you look in your binder at Defense

Cross-Examination - J. Dederick

1   Exhibit 1139.

2   A    All right.  I'm sorry.  I don't see it.  1139?

3   Q    Correct.

4   A    I don't see it.

5        Okay.  I've got it.  Sorry.

6   Q    Okay.  Can you direct your attention to page 1.

7   There's an email from Stacy Kim, senior director of

8   inventory partnership at The Trade Desk.

9        Do you see that?

10  A    My 11 -- oh.  Yes, I see that this email is from Stacy

11  Kim.

12  Q    Okay.  Do you see where she says, "We are able to

13  process two-plus formats in a single AdX bid request?"

14       Do you see that?

15       MR. GUARNERA:  Your Honor, we object to the use of

16  this exhibit in this way.  Mr. Dederick does not appear to

17  be on it.  Counsel is just reading from the email and

18  reading from email into evidence in open court.

19       THE COURT:  Again, you could phrase your question

20  differently and still get this out, it seems to me.

21       MS. DUNN:  Your Honor, I asked this question.  He

22  said no.  I'm showing him a document, and I will ask him

23  whether he, having looked at the document to refresh his

24  recollection, whether this is the case.  He believes this is

25  not the case.  This is -- I mean, it's quite relevant.

Cross-Examination - J. Dederick

1          MR. GUARNERA:  Your Honor, how could it refresh

2    his recollection if he --

3          THE COURT:  I'm sorry?

4          MR. GUARNERA:  How could it refresh his

5    recollection if he's not on the email?

6          THE COURT:  Well, it can.  You can use a cigar

7    wrapper to refresh memory, if I remember law school

8    correctly.

9          You have to first lay the foundation question.

10   You ask the question.  If the person says I can't remember

11   or I don't know, "Would something refresh your memory?" and

12   then you show it.  And you can show them anything.  That's

13   not a good objection.

14         THE WITNESS:  This is a document about the

15   technical integrations between The Trade Desk and SSP

16   partners, you know.  So I really am not familiar with what's

17   being discussed in this email.

18   BY MS. DUNN:

19   Q    Okay.  My question is is it accurate that The Trade

20   Desk is able to process two-plus formats in a single AdX bid

21   request?

22   A    The concept of a bid request is a webpage or any

23   publisher, someone's watching, and there's an opportunity to

24   show an ad.  You need standardization in order to understand

25   what ad that's going to be.

Cross-Examination - J. Dederick

```
 1              So that's what I was referring to.  So --
 2   Q    So is the answer to my question yes?
 3   A    What was your question?
 4   Q    Whether it is possible for The Trade Desk to process
 5   two-plus formats in a single AdX business request.
 6   A    You know, this technical integrations language appears
 7   to be just in a different context from the conversation we
 8   were having earlier; so I don't know what this refers to.
 9   Q    Sir, I'm just asking whether, yes, what I said is true,
10   no, it's not, or you don't know.
11              THE COURT:  I'm going to move this along because I
12   don't think a single bid request is specific enough.  All
13   right.
14              MS. DUNN:  Okay.  Can I ask about specific kinds
15   of ads?
16              THE COURT:  Yeah.  But we've had a lot about that
17   already from other people in this case.
18              MS. DUNN:  Okay.
19   BY MS. DUNN:
20   Q    All right.  Let's talk about something you talked about
21   yesterday, Open Path.
22              Do you recall talking about that yesterday?
23   A    Yes.
24   Q    Okay.  And Open Path is part of the inventory
25   partnership's team which, before you were CRO, reported to
```

Cross-Examination - J. Dederick

1  the then-CRO Tim Sims, correct?

2  A    I don't know what you mean by Open Path is part of a

3  partnership's team.

4  Q    Okay.  Yesterday you testified about Open Path, and

5  that is described as The Trade Desk's supply path

6  optimization offering, right?

7  A    Open Path is The Trade Desk's capacity to plug directly

8  into, typically, a publisher ad server, bypassing an

9  exchange.

10 Q    Okay.  All right.  Can you take a look at DTX 1794.

11 A    Okay.

12 Q    This is a document produced by The Trade Desk.  It's

13 called "Open Path Training."

14        Have you seen this before?

15 A    Is that a question?  I'm sorry?  Were you asking me --

16 Q    Have you seen this before?

17 A    I don't recall seeing this exact document.

18        MS. DUNN:  Your Honor, this document does contain

19 schematics that visually depict what Open Path is.

20        THE COURT:  Why don't you have the witness

21 describe his understanding of how Open Path operates.

22        MS. DUNN:  Okay.

23        THE COURT:  All right.

24        MS. DUNN:  He has described it, and it is

25 contradicted by the company documents.  I think that's the

Cross-Examination - J. Dederick

1  problem we're having.

2        THE COURT:  Well, that's more subtle than I'm able

3  to handle right now.  So have him describe it again, and

4  we'll see whether there's an inconsistency.  All right?

5  BY MS. DUNN:

6  Q    Mr. Dederick, can you please describe your

7  understanding about how Open Path works.

8  A    Open Path is a connection where The Trade Desk tries to

9  establish a more direct supply path toward buying publisher

10 inventory on behalf of advertisers and agencies.

11 Q    And you said that Open Path enables bypass of the

12 exchange, correct?

13 A    Typically, that's the case.

14 Q    Okay.  But it's also possible that Open Path can bypass

15 the publisher ad server as well, correct?

16 A    The publisher needs an ad server.  How else would it

17 select an ad?

18 Q    Right.  Are you familiar with something called Prebid?

19 A    Yes.

20 Q    Okay.  So you know that Prebid enables publishers to

21 put code directly on their websites to connect with

22 different ad tech demand sources, right?

23 A    And then passes them to an ad server.

24 Q    Right.  But you are aware that publishers can use

25 Prebid without an ad server, right?

Cross-Examination - J. Dederick

1   A    I'm not sure what you're referring to.  I mean, an ad

2   server is the functionality that enables a publisher to

3   actually serve, display, and track the ads on its site.  So

4   I'm not sure what you're referring to.

5   Q    My question is whether you're aware that a publisher

6   running Prebid can do so without an ad server?

7   A    Your question suggests that a publisher can display

8   banner ads without an ad server.  I don't understand how

9   that would work.

10  Q    My question is whether you're aware that Prebid can run

11  without an ad server?

12  A    And I've answered your question.

13  Q    And your answer is no, that's not something you're

14  aware of?

15  A    I don't understand the foundation of your question.

16  Q    All right.  Now, another way that a third-party ad

17  server can be cut out through Open Path integration is if

18  the company -- the publisher has its own ad server; isn't

19  that correct?

20  A    I'm sorry.  A third-party ad server is typically

21  something that refers to the advertiser's ad server.

22  There's an ad server on the buy side.  Are you referring to

23  the publisher ad server?

24  Q    Yes.  I'm saying that a way -- well, we just discussed

25  Prebid.  We didn't agree on that.

Cross-Examination - J. Dederick

1           Another way to cut out the third-party ad server

2    is if the publisher has its own ad server?

3    A    You just said that you could cut out an ad server if

4    they have an ad server.  I don't understand what you mean.

5    Q    Okay.

6    A    I mean, if they build an ad server, yes, they have an

7    ad server.  It's theirs.  They built it.

8    Q    Okay.  That's a fair clarification.

9           So you would need to use, for example, GAM, or

10   Google's ad server, if the publisher had its own ad server?

11   That's what we're talking about.

12   A    Yeah.  If the publisher has enough demand to not

13   require the millions of advertisers that come with a GAM

14   implementation -- so if you're the very biggest in the

15   world, you might not need all of the demand that comes from,

16   frankly, Google search.

17   Q    Okay.  So, for example, Disney, right?  Disney, you're

18   aware, has its own ad server, right?

19   A    Yes.

20   Q    And Open Path has a connection to Disney, for example?

21   A    I'm not sure the status of our conversations with

22   Disney relative to Open Path.

23   Q    Okay.  But you understand Disney is a major player in

24   connected TV, right?

25   A    Yes.

Cross-Examination - J. Dederick

1  Q    Okay.  And, therefore, it would be possible for Open

2  Path to allow bypass of the ad exchange.  You don't need to

3  use Google's ad server because Disney, just for example, has

4  its own ad server in that circumstance?

5  A    As long as Disney has their own built-in ad server and

6  they -- yes.

7  Q    Okay.  Sitting here, off the top of your head, are you

8  aware of other companies that have their own ad servers?

9  A    I can only think of ad servers that I think are in

10 production.  I don't know that they own them or that they're

11 out.

12 Q    Okay.  What are the ad servers you're aware of that are

13 in production?

14 A    You know, I wouldn't want to speculate.  I've

15 understood and heard about that interest across the

16 industry; but, frankly, some of those conversations would

17 have been confidential to those companies.  So it's too

18 speculative for me to talk about that.

19 Q    Okay.  But just for our record, you've had

20 conversations across the industry about companies making

21 their own proprietary in-house ad server?

22 A    Maybe one or two.

23 Q    Okay.  And just also for the record, when were those

24 conversations?

25 A    I don't recall when.

Cross-Examination - J. Dederick

1    Q    All right.  Open Path is functionality that can be used

2    across the web, across CTV, and in-app, correct?

3    A    Open Path product functionality is -- I am not aware of

4    where Open Path functionality -- you know, I believe that

5    that is at least -- whether or not we support all of those

6    today, that's what we expect.

7              MS. DUNN:  We're nearing the end of --

8              THE COURT:  All right.  Go ahead.

9              MS. DUNN:  All right.

10   BY MS. DUNN:

11   Q    And you agree, sir, that in order to have inventory for

12   your advertiser customers to buy through Open Path, you need

13   to have supply partnerships with publishers, correct?

14   A    Yes, very small.

15   Q    And you've entered into contracts with publishers that

16   specify those terms and conditions, correct?

17   A    Yes.  There would be contracts with those publishers.

18   Q    Okay.  And you've announced in press releases that

19   through Open Path, for example, The Trade Desk is partnering

20   with Reuters, *The Washington Post*, Gannett, *USA Today*, *Condé*

21   *Nast*, BuzzFeed, *The L.A. Times*, and *Forbes*.  Do you know

22   that?

23   A    If you have the press releases, I'll take your word for

24   it.  It sounds right.

25   Q    All right.  You testified yesterday a little bit about

Cross-Examination - J. Dederick

1  open bidding.   Do you remember that?

2  A    Uh-huh.

3  Q    Okay.   In connection with introducing Open Path, The

4  Trade Desk stopped buying inventory through Google's open

5  bidding, correct?

6  A    Those -- we made those two announcements around the

7  same time.

8  Q    Which two announcements are you talking about?   The

9  announcement of Open Path and the announcement that you were

10 going to stop buying on Google's open bidding?

11 A    Yes.

12 Q    Okay.   And what time was that, roughly?   2022?   Does

13 that sound right?

14 A    Yeah, that sounds right.

15 Q    Okay.   All right.   You testified yesterday that open

16 bidding, you said, decimated header bidding.   Are you aware

17 that the percentage of indirect web impressions won by

18 header bidding within DFP has actually risen substantially

19 over the past four years?

20 A    I would challenge your definition of header bidding

21 relative to the conversation we had yesterday.   We spoke

22 about a very specific header bidding implementation that was

23 popularized in 2016 and 2017.   So I think what you're

24 referring to is a different implementation.   It has similar

25 words.

Cross-Examination - J. Dederick

1 Q    Okay.  But thinking now about the -- what you consider

2 to be a different implementation of header bidding, you

3 wouldn't disagree that that has risen substantially?

4 A    The implementation and work stream I discussed

5 yesterday has not risen substantially.

6 Q    Okay.  All right.  So -- so you've now mentioned that

7 there are -- the current implementation of header bidding is

8 different from the implementation of header bidding you

9 discussed yesterday, which you said was around 2017.

10       Can you explain for the Court what is the

11 difference between the current implementation and the

12 implementation you testified about yesterday?

13 A    So all header -- these words, "header bidding," what

14 they refer to is putting code in the website that's called

15 prior to the ad server.  And so any kinds of code that are

16 called prior to the ad server today you could fit into the

17 terminology of header bidding.  Our industry loves to do

18 that kind of thing.

19       But the implementation that I discussed yesterday

20 was specifically a way that multiple exchanges could compete

21 on a more level playing field and then know where the

22 highest bid came from before it went into the ad server.

23 That work stream is not happening that way today.

24 Q    Okay.  One last question on this.

25       Can header bidding be used for video ads on

Redirect Examination - J. Dederick

1  websites?

2  A    Again, with the acknowledgment of the very broad

3  terminology, I mean, yes.

4  Q    How about display ads on websites?

5  A    With the broad definition, yes.

6  Q    How about native ads on websites?

7  A    Yes.

8  Q    Okay.

9         MS. DUNN:  Your Honor, no further questions.

10        THE COURT:  All right.

11        Redirect?

12        MR. GUARNERA:  May I proceed, Your Honor?

13        THE COURT:  Yes, sir.

14                REDIRECT EXAMINATION

15 BY MR. GUARNERA

16 Q    Mr. Dederick, yesterday counsel for Google asked you a

17 few questions about Google search.  Do you remember that?

18 A    Yes.

19 Q    And I think you started to give an answer but weren't

20 able to finish it.  So I wanted to make sure you had the

21 opportunity to answer the question.

22        What effect do you see Google search having on the

23 buying and selling of open web display ads?

24 A    There's really direct correlation.  I mentioned

25 yesterday Google built an incredible product and changed the

Redirect Examination - J. Dederick

1    front door of the internet from the browser to the search

2    bar.

3              THE COURT:  You need to move closer, please, to

4    the microphones.

5              THE WITNESS:  Okay.

6              Google changed the -- they created an incredible

7    search product.  The front door to information on the

8    internet became the search bar, and they amassed millions of

9    search advertisers, the most successful, you know, ads

10   business and ad product ever.

11             Those millions of advertisers were wanting more

12   and more.  They had one place in our industry where there's

13   more demand than there is supply is in search.  And the

14   natural extension was to take that demand that was generated

15   from search -- it's millions of advertisers -- and find

16   places where there was more supply than there was demand.

17   And those were obviously a few places, the websites that

18   Google search linked out to which would call open web

19   display banner ad opportunities.

20             And so the initial implementation of Google's

21   publisher ad server said do you want the demand from

22   millions of search advertisers and implement this?  That

23   foundational sort of connection is central to why that DFP

24   publisher ad server is dominant today.

25   BY MR. GUARNERA

Redirect Examination - J. Dederick

1   Q    What is the relationship between Google search and DFP,

2   Google's ad server?

3   A    It was the Google search demand that Google built up

4   with millions of advertisers that enabled them to offer that

5   demand to open web publishers if they implement that ad

6   server.

7        MS. DUNN:   Your Honor, I'm just going to object on

8   foundation grounds at a certain point.

9        THE COURT:   Well, at a certain point -- object

10  when the point comes.

11  BY MR. GUARNERA

12  Q    You can finish your answer, Mr. Dederick.

13  A    Okay.  That fundamentally is why it's impossible to say

14  no to implementing DFP unless you're Disney, which we talked

15  about earlier.

16  Q    Mr. Dederick, I think you also were asked a few

17  questions about TAM, target addressable markets.

18        Do you remember that?

19  A    Yes.

20  Q    And I think you were about to give an example or

21  provide additional context for how The Trade Desk thinks

22  about target addressable markets.  Do you remember that?

23  A    Yeah, I do.

24  Q    What additional context do you think the Court should

25  know about how The Trade Desk thinks about target

Redirect Examination - J. Dederick

1  addressable markets?

2  A    Well, the global ads market is massive.   There's a

3  tremendous amount of spend outside of the United States that

4  The Trade Desk -- you know, there's a tremendous amount

5  of -- outside the United States.   There's a tremendous

6  amount in small to medium businesses.   So we are always

7  looking at the impacts/trends of the global ad spend.

8          We specifically compete within the DSP category.

9  And, you know, not all of that trillion dollars, I think, is

10  immediately available to compete for in the DSP category.

11          So the analogy I was using was -- you know, it's

12  similar to if you think about Ford Motor Company and Delta

13  Air Lines.   Both of them are potential and in some sense

14  compete for our travel expenses and budgets, but I wouldn't

15  call the two companies competitors.

16          That was what I was trying to get out.

17  Q    Mr. Dederick, you were asked a few questions about what

18  is or is not a dynamic market in ad tech.

19          Do you recall that?

20  A    Yes.

21  Q    Do you consider ad exchanges to be a dynamic market?

22  A    No.

23  Q    Why not?

24  A    You know, the -- because of the correlation that I

25  described between search and DFP, the same correlation

Redirect Examination - J. Dederick

1  carried over between DFP and AdX.  If you want this search

2  demand, these millions of advertisers, use AdX.

3         So that exact same chain of events is -- really

4  explains the rise of AdX, in my view.

5  Q   Do you believe publisher ad servers are a dynamic

6  market?

7  A   No.

8  Q   Why not?

9  A   I can -- I don't think I can think of another publisher

10 ad server as I sit here now that has any meaning.

11 Q   Mr. Dederick, we talked a little bit about ad

12 networks -- or you spoke with Google's counsel about ad

13 networks on the cross-examination.

14        Do you recall that?

15 A   Yes.

16 Q   And you talked about how there's a publisher-facing

17 element of many ad networks, correct?

18 A   I talked about that buyers would look at an ad network

19 as the opportunity to send in insertion orders and buy ads

20 similar to the way they would look at, like, a publisher.

21 Q   Do ad networks also offer advertiser-facing tools that

22 would allow advertisers to buy ads?

23 A   Yes.

24 Q   For example, would an advertiser ad network like Google

25 Ads have to allow advertisers to enter an ad budget?

Redirect Examination - J. Dederick

1  A    Yes.

2  Q    Does there have to be some way for an advertiser to

3  upload an ad into an ad network?

4  A    If it's self-service, which Google's ad network is,

5  then yes, that's possible.

6  Q    And advertisers are on the buy side of the ad tech --

7  on the buy side of ad tech, correct?

8  A    Yep.

9  Q    Mr. Dederick, does Facebook offer an ad exchange that

10 conducts auctions for open web display advertising?

11 A    No.

12 Q    Does Amazon offer an ad exchange that conducts auctions

13 for open web display advertising?

14 A    No.

15 Q    Does Facebook offer a publisher ad server that allows

16 publishers to sell open web display ads?

17 A    No.

18 Q    Does Amazon offer a publisher ad server that allows

19 publishers to sell open web display ads?

20 A    No.

21        MR. GUARNERA:  May I have just one moment, Your

22 Honor?

23        THE COURT:  Yes, sir.

24               (Counsel confer.)

25        MR. GUARNERA:  No more questions, Your Honor.

Recross-Examination - J. Dederick

1          THE COURT:  All right.

2          Ms. Dunn, that was a very short redirect.  Do you

3    have anything for recross?

4                    RECROSS-EXAMINATION

5    BY MS. DUNN

6    Q    Mr. Dederick, you testified Amazon doesn't offer an ad

7    exchange for open web display advertising.  Does it offer a

8    header bidding solution for open web display advertising?

9    A    Again, there's -- I know what you're -- I think I know

10   what you're referring to where there's code that can be

11   called in -- you know, on the page ahead of an ad server

12   that Amazon developed.  So I think I know what you're

13   referring to.  It's very different from the header bidding

14   implementation that we talked about yesterday.

15   Q    Right.  But the answer is yes, they have developed such

16   a product, correct?

17   A    They have technology that can sit in the header of

18   websites.

19   Q    And that can call other exchanges, correct?

20   A    I'm really not familiar with the header technology that

21   Amazon developed.

22   Q    Okay.  What you described as a foundational

23   relationship between search and banner ads, what time period

24   were you talking about?

25   A    Around the last -- well, I mean, the last sort of 10 to

          Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

Direct Examination - R. Goel

1   15 years.

2           MS. DUNN:  Your Honor, no further questions for

3   this witness.

4           THE COURT:  All right.

5           Does either side think they're going to call

6   Mr. Dederick again?

7           MR. GUARNERA:  Your Honor, we would like to

8   reserve the option of calling Mr. Dederick.

9           THE COURT:  All right.

10          So, Mr. Dederick, you can leave now.  I don't know

11  when, if at all, you'll be needed back here.  You'll have to

12  stay in touch with counsel.  But you'll have to return if

13  they request your reappearance.  All right?

14          But you're free to go.  You can't discuss your --

15  you can't watch the trial and you can't discuss your

16  testimony with any witness that has not yet testified.

17          Okay.  Next witness.

18          MS. WOOD:  Yes, Your Honor.  Plaintiffs call

19  Rajeev Goel.

20  Thereupon,

21                  RAJEEV KUMAR GOEL,

22  Having been called as a witness on behalf of the plaintiffs

23  and having been first duly sworn by the Deputy Clerk, was

24  examined and testified as follows:

25                  (Time noted: 3:15 p.m.)

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

Direct Examination - R. Goel

1           THE COURT:  Are you all set, Ms. Wood?

2           MS. WOOD:  Sorry.  We're looking for my copy of

3    the binder.  One second, Your Honor.  Apologies.

4           I'll go ahead and get started.  I'm confident

5    they'll find it for me.  Thank you.

6                    DIRECT EXAMINATION

7    BY MS. WOOD

8    Q    Good afternoon, Mr. Goel.  Can you please state your

9    full name and spell it for the record.  My name is Julia

10   Wood.

11   A    Rajeev Kumar Goel, R-A-J-E-E-V, K-U-M-A-R, G-O-E-L.

12   Q    Okay.  And can you please tell the Court where are you

13   currently employed?

14   A    PubMatic.

15   Q    And what is your position at PubMatic?

16   A    Cofounder and CEO.

17   Q    And if you could just move your chair a little bit

18   forward closer to that microphone, I think that would help.

19   A    You got it.

20   Q    I'm sorry.  Your position at PubMatic?

21   A    Cofounder and CEO.

22   Q    Okay.  Great.  And when was PubMatic founded?

23   A    Founded in 2006.

24   Q    2006.  Okay.  What is PubMatic?

25   A    PubMatic is a sell-side platform or exchange technology

Direct Examination - R. Goel

1  provider helping publishers generate more revenue from their

2  ad inventory.

3          THE COURT:  You need to keep your voice up.

4          THE WITNESS:  Okay.  You got it, Your Honor.

5          THE COURT:  All right.  You're a seller-side what?

6          THE WITNESS:  Yeah, sell-side platform or ad

7  exchange that helps publishers generate more yield or

8  revenue for their ad inventory.

9  BY MS. WOOD

10  Q    Now, you indicated that PubMatic was founded in 2006.

11  Who was involved in that?

12  A    Myself and a couple of other cofounders.

13  Q    And who were the cofounders?

14  A    One is my brother, Amar Goel, and the other is Mukul

15  Kumar.

16  Q    Okay.  And can you describe at a high level your

17  professional background before you and your brother

18  cofounded PubMatic?

19  A    Sure.  My background is in entrepreneurship and

20  software companies, software building.  So PubMatic is the

21  third company that I've started.  And in addition to that, I

22  worked a SAP, a large German software company, as well as in

23  technology strategy consulting.

24  Q    Okay.  And what about your brother, Mr. Amar Goel?  Can

25  you tell me a little bit about what his professional

Direct Examination - R. Goel

1  background was prior to your founding of PubMatic together.

2  A    Sure.  Yeah, PubMatic was also his third start-up.  The

3  other two, we did together.  And he worked at McKinsey and

4  Microsoft in ad sales.

5  Q    In ad sales?

6  A    In ad sales at Microsoft, yes.

7  Q    Now, if you can describe to the Court, what led you and

8  your brother to found PubMatic in 2006?

9  A    Sure.  As we were thinking about starting our next

10  company, our third company, we discovered that there's a

11  significant opportunity to help publishers better monetize

12  their ad inventory and audiences.

13        And what we saw is that the digital advertising

14  ecosystem, while still in its infancy at that time, we

15  thought would grow to be pretty significant.  We saw how

16  advertising was bought and sold as the industry transitioned

17  from analog -- things like print magazines or radio -- to

18  digital would change and that there were not systems or

19  technology tools in particular to help publishers navigate

20  that shift.  And so that was the starting of PubMatic, which

21  is publisher and automatic combined.

22  Q    Sorry.  So PubMatic is the word "publisher" and

23  "automatic" combined?

24  A    That's correct, yeah.

25  Q    Understood.  Now, let's talk a little bit about the

Direct Examination - R. Goel

1  market environment in 2006.  How was online advertising

2  conducted at that time generally?

3  A    Generally, there were two main methods of selling ad

4  space.  One was through insertion orders or direct sales; so

5  a publisher's sales team would sell ad inventory directly to

6  an advertiser or an agency.  And then the second method was

7  through unsold ad inventory, sometimes called remnant ad

8  inventory.  And that would be sold via ad networks.

9  Q    And what is remnant inventory in this context?

10 A    Yeah.  So in this context, remnant simply refers to any

11 inventory that a publisher's sales team could not sell

12 directly.  So it would be the leftover inventory, which is

13 in some cases could be a very significant portion of the

14 inventory.  In some cases, there may be no remnant

15 inventory.

16 Q    And why would an online publisher have remnant or

17 leftover inventory?  Why couldn't they just sell it all

18 directly?

19 A    Sure.  So a publisher would typically try to sell all

20 of their ad inventory directly, but there may not be enough

21 buyers.  They may not have enough time to find buyers in a

22 given quarter or in a given year.

23        Inventory forecasting can also be challenging.

24 So, for instance, if we think about live sports and ad

25 inventory, that might go against live sports or a large news

Direct Examination - R. Goel

1   event.

2          I remember when Michael Jackson passed away, that

3   was a very large day on the internet.  It was a record for

4   us at that time.  This was many years ago.  But many news

5   publishers had unforecasted amounts of ad inventory, and so

6   the primary way for them to sell that would being this

7   remnant ad network approach.

8   Q    And so explain.  Why would a big news day generate more

9   ad inventory?

10  A    Sure.  Because consumers are reading news stories more.

11  They're trying to find out.  Another example of that would

12  be, let's say, a weather event, a storm or a hurricane.

13  People are checking the news.  They're checking the

14  headlines.  They're, you know, looking for information from

15  the government.  And so that generates more ad inventory.

16  And often those types of events would be inventory that a

17  publisher did not forecast to have, which would then

18  generate this kind of remnant ad inventory.

19  Q    Okay.  Now, what was the primary method by which

20  remnant inventory was sold in this 2006 time period?

21  A    Yeah.  At that time the primary method was to monetize

22  it via ad networks in a waterfall method or approach in

23  which a publisher would sequence a number of ad networks --

24  ad network A, ad network B, ad network C -- and flow that

25  inventory that they could not sell directly first to the ad

Direct Examination - R. Goel

1 network A.  And if ad network A could monetize that ad

2 impression, then they would.  If not, the ad network would

3 default or pass it back to the publisher.  And the publisher

4 would route that ad impression to ad network B and so on

5 until, hopefully, they could sell that ad space.

6 Q     And what was the name of that process by which multiple

7 ad networks were called?

8 A     The waterfall process.

9 Q     Okay.  And what were the ad networks that were

10 prominent in that time period in, let's say, 2006 to 2009?

11 A     Sure.  Some of the larger ad networks were

12 advertising.com, Tribal Fusion, ValueClick, and Google.

13 Q     Okay.  Now, what was it about the system that was in

14 place at that time that you and your brother decided you

15 could make a new business out of?

16 A     So there's a number of challenges with this remnant or

17 waterfall approach.

18      First of all, there's no guarantee that the

19 highest bidder will purchase the ad inventory.  So the

20 publisher had to make a determination of what sequence of ad

21 networks to call in the waterfall.  And if they chose

22 incorrectly -- you know, of course, there's no way to know

23 in real time who is going to pay the most -- then a buyer

24 could purchase that ad inventory for a price that's below

25 the market value or the price that some other buyer wanted

Direct Examination - R. Goel

1    to pay.

2            Another challenge is around latency or the speed

3    by which an ad can be served.  So all of this needs to

4    happen very quickly as the consumer is looking at content or

5    waiting for the content to load, so that is to say in a

6    fraction of a second.  And by going from one ad network to

7    the next to the next, that could take time and cause loss of

8    ad inventory.

9            And then third is that ad networks typically, when

10   they did not want to monetize the impression and they would

11   pass it back to the publisher before it was routed to a

12   subsequent ad network, a lot of the data about the ad

13   impression would be removed.  And that would damage the

14   value of the inventory.

15   Q    All right.  So we've talked about some of the

16   inefficiencies of the waterfall.  I want to talk about the

17   ad network model itself.

18           What was the economic model of ad networks at that

19   time?

20   A    So very simply, the model of an ad network is to buy

21   inventory as cheaply as it can and then sell it at as high a

22   price as possible and usually transforming the inventory

23   between the purchase and the sale.

24   Q    Do some people refer to that as an arbitrage model?

25   A    Yes, that's correct.

Direct Examination - R. Goel

1  Q     Why is that?

2  A     In this case, an ad network is not an agent of the

3  buyer; they are a principal.  So they are taking ownership

4  of that ad inventory.  So they are buying it, again, as

5  cheaply as they can, taking ownership of it, and then

6  selling it.

7           So they're taking on risk, and their revenue or

8  their profit is derived from their ability to manage that

9  arbitrage.

10  Q    And so what incentives are there for an advertiser ad

11  network when they are bidding for inventory?

12  A    One of the incentives is to buy the inventory as

13  cheaply as possible in order to drive their revenue and

14  their margin up.

15  Q    And how did that economic model impact publishers in

16  this early days of digital advertising, let's say, again,

17  2006 to 2009?

18  A    So at that time ad networks claimed to serve both the

19  publisher and the advertiser.  And one of the key

20  observations that we had is that -- well, claiming that ad

21  networks were, in fact, focused on the needs of the

22  advertiser.

23           And so we thought that we could build a business

24  helping publishers by breaking up the waterfall or changing

25  the approach to managing the waterfall in order to drive the

Direct Examination - R. Goel

1  price of inventory up and drive yield for publishers.

2  Q    And so what was your perspective on the desire for ad

3  networks with respect to driving the price of inventory on

4  publishers' websites?

5  A    Ad networks did not enjoy that process.

6  Q    Okay.  Now, what was the first software that you -- was

7  it you or you and your brother wrote in 2006?

8  A    Yeah.  So I wrote the original spec, specification, for

9  PubMatic, and we had a team of engineers that built it.  And

10 we launched it in the fall of 2007.

11 Q    And can you describe at a high level -- please, no

12 source code -- but at a high level, what was the name of the

13 software spec that you wrote at the time?

14 A    Sure.  So what we set out to do is to allow publishers

15 to have multiple waterfalls and actually to change the

16 sequencing of the waterfall on an hourly basis as opposed

17 to, back then, typically a publisher would change their

18 waterfall on a weekly or maybe monthly basis.  And they

19 would have typically one waterfall.

20       So we would organize waterfalls.  Could be by ad

21 format or ad size, could be by geography, just various

22 different ways in which we could describe an ad.  So we

23 could have multiple ways to optimize that sequencing of ad

24 networks.

25       And then the other thing that we would do is log

Direct Examination - R. Goel

1    into ad network user interfaces in an automated way and pull

2    pricing data from those ad networks.  There was no notion of

3    real-time bidding back then.  But by pulling pricing on a

4    frequent basis -- let's say every 30 minutes or every

5    hour -- we could see changes in reporting and then compute

6    or estimate how much an ad network was paying for a

7    particular type of impression, and then we sequence the ad

8    network on a much more frequent basis -- sorry -- the

9    waterfall on a much more frequent basis.

10   Q    So you talked about the waterfall being sequenced.

11   What were the parameters by which most publishers set up

12   their waterfall in this time period?

13   A    Yeah.  So in 2006 when we started PubMatic, we talked

14   with a number of publishers to figure out how did they

15   optimize the selling of their remnant ad inventory?  And

16   many publishers told us the same, which is that they would

17   try to reorder that waterfall on a weekly or monthly basis,

18   but they found it very cumbersome to do so, very difficult

19   to do so.  So usually they would just set it and forget it.

20   Q    And what are they actually setting?

21   A    So what they're setting is in their ad server a

22   sequence of which ad networks to call via a tag on what --

23   you know, linear or sequential or...

24   Q    Okay.  When you say they're setting it, they're setting

25   that in their publisher ad server?

Direct Examination - R. Goel

1  A    That's correct.   They're setting it in the publisher ad

2  server.

3  Q    Did you view that publisher ad server as a different

4  product?

5  A    We did, yes.   We view that as a different product.

6  Q    So did you ever feel at any point in time that you were

7  competing -- you know, in this time period, competing

8  against publisher ad servers?

9  A    No, we did not, not in the 2006, 2007, 2008 time frame.

10 Q    Okay.   Now, when did PubMatic launch publicly?

11 A    We launched in fall of 2007.

12 Q    And where did you launch?

13 A    At the TechCrunch40 Conference.

14 Q    And what is TechCrunch?

15 A    TechCrunch -- I don't know if it's -- I guess it is

16 still around.   But it was a leading technology -- online

17 technology publication at the time, and that was the -- they

18 did this conference series launching startups for about ten

19 years, I think.   The TechCrunch40 Conference in 2007 was

20 their first such conference.

21 Q    What was the reaction of the marketplace to your launch

22 through the TechCrunch conference in the fall of 2007?

23 A    Yeah.   For the launch we did a live demo and a

24 30-minute presentation, and I think there was a panel as

25 well.   And then I went to bed that night, and I woke up in

Direct Examination - R. Goel

1   the morning, and there were over a thousand publishers that

2   had signed up.

3           And so that told me that, whether or not our

4   product, you know, solved the problem we were trying to

5   solve, it told me that we had found a meaningful problem in

6   the industry for many players.

7   Q    Now, and then when PubMatic was launched in the fall of

8   2007, what were its main competitors at that time?

9   A    So there were no competitors that had launched at that

10  time.  Within about six to twelve months, there were a

11  couple of other competitors that appeared.

12  Q    What were those competitors?

13  A    One was called Rubicon Project, which is now Magnite,

14  and the other was Admeld.

15  Q    Admeld?

16  A    Correct.

17  Q    At this period of time in the fall of 2007, had Google

18  acquired DoubleClick?

19  A    They had not.

20  Q    And at this period of time, to your knowledge, was

21  Google operating an ad exchange?

22  A    Not to my knowledge.

23  Q    Okay.  Now, are you familiar with real-time bidding in

24  the context of open web display ads?

25  A    Yes, I am.

Direct Examination - R. Goel

1  Q    What is real-time bidding?

2  A    Real-time bidding is a protocol through which

3  publishers and buyers of ad inventory can communicate in

4  order to auction ad space or ad impressions in a fraction of

5  a second in real-time.

6  Q    And when did real-time bidding come into place?

7  A    So it came into place around 2009.  We were among the

8  first, if not the first, to work on a specification with

9  certain buyers to move this ad network waterfall process

10 towards this real-time bidding capability or technology.

11 Q    And was real-time bidding considered an innovation at

12 that time?

13 A    Yes, it was.

14 Q    And what was innovative about it?

15 A    So the couple of things that were innovative about it,

16 we talked earlier about some of the challenges with the

17 waterfall where it's difficult to update the sequencing and,

18 therefore, maximize publisher yield.  There's a high degree

19 of latency, and the defaulting process for when ad network

20 passes the impression back to the publisher, it removes a

21 lot of the data that can destroy value.  Real-time bidding

22 solves all of those problems.

23 Q    And you indicated that you worked with others in the

24 industry.  Can you tell us who else was involved in working

25 with you on real-time bidding protocols?

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

Direct Examination - R. Goel

1   A    Sure.  I recall working specifically with a couple of

2   companies, Invite Media and MediaMath, in developing the

3   specification.  I think they were also focused on trying to

4   solve the same problem from the advertiser or the ad agency

5   perspective, which is more inventory, more data about the

6   inventory in order to drive more for advertisers in solving

7   the latency problem so that there could be a good user

8   experience around the ads.

9   Q    And subsequent to you working with Invite Media on

10  real-time bidding protocols, did Invite Media get acquired?

11  A    They did, yes.

12  Q    Who acquired them?

13  A    Google acquired them, I believe in 2009.

14  Q    Did that become part of Google's DV360 product?

15  A    Yes, it did.

16  Q    Now, were there any industry organizations involved in

17  the development of protocols for real-time bidding?

18  A    Not at that time, but later the IAB, Interactive

19  Advertising Bureau, which is one of the standards-setting

20  bodies in our industry, did take over the real-time bidding

21  protocol and standardize it across the industry.

22  Q    So as of the time that Google acquired DoubleClick and

23  then relaunched AdX as an ad exchange, were you and other

24  participants in the industry using real-time bidding?

25  A    Yes, we were.

Direct Examination - R. Goel

1  Q    And was there a period of time when the real-time

2  bidding that you used was proprietary?

3  A    Yes.

4  Q    And when did real-time bidding become -- when and how

5  did real-time bidding become subject to open source?

6  A    Yeah.  I don't recall exactly the time frame, but it

7  would have been a couple of years after we did the first

8  real-time bidding transactions in 2009.

9  Q    Okay.  And why did you make the decision to make the

10  real-time bidding open source?

11  A    Yes.  So we decided to move to an industry standard

12  protocol for real-time bidding for a couple of reasons.

13        One is when we had a proprietary specification, or

14  API, with each buyer, it became expensive and cumbersome to

15  maintain that.  So if we wanted to make an upgrade, offer

16  some new data or a new ad format, we had to do that in a

17  variety of different proprietary implementations.

18        Second, we felt that, by standardizing the

19  protocol, there would be a significant growth in volume,

20  which would create opportunity for ourselves and many others

21  in the industry.

22  Q    And do you know when the open RTB protocol was

23  launched?

24  A    I do not remember exactly when.

25  Q    Are you familiar with the term "open web" as it refers

Direct Examination - R. Goel

1   to digital advertising?

2   A    I am, yes.

3   Q    And what does "open web" mean?

4   A    "Open web," to me, means the sector of the industry or

5   ecosystem that is distinct from walled gardens where a

6   publisher and advertiser in the open web can choose the

7   technology systems, technology components that they want to

8   use, both to interact with consumers and to deliver

9   advertising.

10  Q    And are you familiar with the term "display ad"?

11  A    Yes.

12  Q    What's a display ad?

13  A    A display ad is a type of ad that is shown to

14  consumers, typically a banner or graphical ad of some sort.

15  Q    Now, you've been in this industry since approximately

16  2006; is that right?

17  A    That's right, yes.

18  Q    Okay.  So in your more than 20 years in this industry,

19  can you tell us, based on your experience, how is the market

20  for open web display ads different from the market for

21  display ads that might appear on social media?

22  A    Sure.  So from a publisher's perspective, in the open

23  web the publisher has a direct relationship with the

24  consumer.  So the consumer is typically coming to the

25  publisher's properties; the publisher would get to know who

Direct Examination - R. Goel

1    that consumer is, which is important for them in building

2    their business.  And then, second, the publisher gets to

3    decide which types of advertising technologies they would

4    use to deliver ads to the consumer.

5             In a walled garden, the walled garden is making

6    those choices.  So the content is served typically through

7    the walled garden's platform.  The publisher would not

8    interact directly with the consumer.  And then the

9    technology for delivering ads is decided by the walled

10   garden provider.

11   Q    And what about from an advertiser's perspective?  How

12   are open web display ads different from display ads on

13   social media?

14   A    So similar to the publisher from an advertiser

15   perspective, the advertiser does not have control over the

16   advertising technology components that are used.  They use

17   the walled gardens technology, which is typically a

18   proprietary spec that is involved.  Little to no data comes

19   out of the walled garden, so data about how the consumer

20   interacted with ads.

21            And then, third, the advertiser would not have the

22   ability to know who is the consumer, typically, that is

23   interacting with the ad.

24   Q    I want to turn now to the subject of ads on mobile

25   apps.  Even if the ad looks identical to the ad on a

Direct Examination - R. Goel

1  website, how, if at all, is the market for display ads on an

2  open website different from a display ad on an application

3  on your mobile phone?

4  A    So there's a couple of ways that they are distinct.

5  First of all, the ad formats are generally different.  We

6  have a very different size of physical screen, which

7  typically requires a different size of ad.

8         The data available for targeting the ad is quite

9  different because we're in an app environment rather than in

10 a browser environment.

11        And then, third, the rendering of the ad -- so the

12 drawing of the ad on the screen -- is also different.

13 Q    And you said the data available for targeting is

14 different.

15        Can you explain why that is?

16 A    Sure.  So the browser environment is just a physically

17 different environment than the app environment, and the app

18 environment tends to be controlled by a couple of large app

19 providers, like Apple or Google -- or sorry -- I should say

20 hardware and software providers, so operating system and

21 device providers, like an Apple or a Google.

22 Q    Now, let's again talk about it from the advertiser's

23 perspective.  How, from their prospective, is advertising a

24 display ad on the open web different from advertising a

25 display ad on a mobile app?

Direct Examination - R. Goel

1  A    So similar in the ways that it's different for a

2  publisher, the data that they would use to target and the ad

3  formats that they are purchasing typically or in many cases,

4  the objective of a mobile app ad is different than it is in

5  open web, which is to say many mobile app advertising

6  campaigns have the primary goal to be app installer app

7  downloads.  So they want the consumer to download an app.

8       So if you think about, like, a gaming app, for

9  instance, that might be advertising, their goal is to get

10  the consumer to download an app.  That is usually not the

11  case or almost never the case in the open web.

12  Q    Now, let's talk about in-stream video ads.  What's the

13  difference between an in-stream and an out-stream video ad?

14  A    So an in-stream video ad sits within a stream of video

15  content.  So it could be at the beginning, which is called a

16  preroll ad; in the middle, which is called a midroll ad; or

17  at the end, which is a postscroll ad; or some combination of

18  all of those.

19       That in-stream ad is an interruptive ad

20  experience, meaning the consumer has to wait on the ad to

21  get access to the contents.

22       In contrast, an out-stream ad would be a video ad

23  that is in between texts, and so it's noninterruptive.  The

24  consumer can simply scroll right past the ad.

25       And then a third way that it's different is the

Direct Examination - R. Goel

1    engagement level with the ad is typically different.  So an

2    out-stream ad, typically, is sound is off, whereas an

3    in-stream ad, by definition, needs to have sound on.  So the

4    sound combined with interruptive and combined with the video

5    canvas means it's a much higher engagement ad opportunity,

6    and advertisers typically pay significantly more.

7    Q    In your experience, how is the market for open web

8    display ads different for these in-stream video ads we've

9    just been talking about?

10   A    Yeah.  As I said, the ad engagement is typically quite

11   different, and so the price point that is demanded for that

12   type of ad or that advertisers are willing to pay is

13   typically 2 to 4 x what they're willing to pay for an open

14   web display ad.

15   Q    How, if at all, is the market for tools necessary to

16   display or show -- I shouldn't say display -- show in-stream

17   video ads different than the tools needed to sell open --

18   buy or sell open web display ads?

19   A    So some of the tools are similar, and some of the tools

20   are different.  For instance, the creation of the ad

21   creative, that is, of course, quite different for a video ad

22   versus a display ad.

23         The buying and selling tools.  So a demand-side

24   platform or an exchange, those tools, the specific

25   technology for a video ad versus a display ad are different.

Direct Examination - R. Goel

1  Sometimes they're provided by similar or the same providers.

2  Q    Now, I want to talk now.  We talked a little bit about

3  Google's DV360.  Is that referred to as a demand-side

4  platform?

5  A    That is correct.

6  Q    And what is a demand-side platform?

7  A    A demand-side platform is a software platform that

8  advertisers or agencies use to bid on ads, typically in real

9  time.

10  Q    And in your experience, what is the difference between

11  a demand-side platform and an advertiser ad network?

12  A    So from a business model perspective, the DSP is almost

13  always an agent for the buyer, for the advertiser or the ad

14  agency.  So they are operating a software platform or

15  allowing the advertiser or agency to operate a software

16  platform to buy ads, whereas the ad network model is a

17  principal model or arbitrage base model.  As a result of

18  that, then the technology evolves different.

19  Q    And based on your experience, do different advertisers

20  tend to gravitate more toward one or the other, the DSP or

21  the advertiser ad network?

22  A    Yes.

23  Q    And can you describe that phenomenon?

24  A    Typically, larger advertisers will gravitate towards

25  demand-side platforms.  So advertisers that are spending

Direct Examination - R. Goel

1  significant amounts of money, tens to hundreds of millions

2  of dollars a year; whereas smaller advertisers will

3  typically use an ad network.

4  Q     And why is that?

5  A     Because there are differences in the technology and the

6  sophistication of users behind that technology.  So if you

7  spend a lot of money on advertising -- let's say a Fortune

8  100 advertiser -- they would typically invest in building

9  out a team, building out processes, building out workflow,

10 data stores, databases in order to operate the software and

11 optimize it on their own behalf.

12          A small advertiser -- so think about like a local

13 retailer or a sandwich shop -- they do not have that type of

14 sophistication, and they're looking really for ease of use.

15 So they will use a larger technology company that provides

16 them with a different set of technology tools.

17 Q     Okay.  And are Google's advertiser ad network, Google

18 Ads, and Google's DSP, DV360, are those -- do those entities

19 use your index, your exchange, PubMatic?

20 A     Yes, they do.  They're integrated into the PubMatic

21 exchange.

22 Q     So how would you characterize PubMatic's overall

23 relationship with Google, looking all the way across the ad

24 tech products?

25 A     They're both partner and competitor.  So Google Ads and

Direct Examination - R. Goel

1   DV360, as you mentioned, they integrate in and they buy

2   inventory on our platform.  So they're an important partner

3   for us.

4           Their bids, ultimately, after we run an auction,

5   we submit into the publisher's ad server, and DFP or

6   DoubleClick for publishers -- or Google Ad Manager, as I

7   believe it's called now -- is the primary ad server across

8   our customer base.

9           So in that layer of the technology, we compete

10  with Google.

11  Q    And do you compete against Google's ad exchange?

12  A    Correct, yes.

13  Q    Now, are there any challenges associated with working

14  with an entity that's both a partner on one side and a

15  competitor in a different product?

16  A    Yes, there are significant challenges with that.

17  Q    Can you give us some examples of those?

18  A    Sure.  So on the one hand in the area of the business

19  with which we partner with Google, we want to share

20  information, share insights, talk about what's working well

21  or maybe innovation ideas.

22          On the other hand, we would not want those ideas

23  or that insight to flow into the competitive areas of the

24  PubMatic-Google relationship.

25  Q    And to your knowledge, what entity owns or operates the

Direct Examination - R. Goel

1  largest publisher ad server used to transact open web

2  display ads?

3  A    Google.

4  Q    And how many publishers who use PubMatic also use

5  Google as their publisher ad server?

6  A    We estimate it's roughly 80 to 90 percent.

7  Q    Now, how do you -- how does PubMatic receive bid

8  information from Google's two buy-siding products, the

9  buy-side products, the DV360 product and the Google Ads

10 product?

11 A    So we have a single integration or API with Google, and

12 we send a bid request to Google.  And they can respond with

13 a bid from either Google Ads or DV360.

14 Q    And so that's one API.  What is an API?

15 A    An API is an application programming interface.  It is

16 a language or protocol through which two or more computer

17 systems can interact.

18 Q    Okay.  And so your computer system at PubMatic

19 interacts with Google's computer system through an API?

20 A    That's correct.

21 Q    And the Google Ads advertisers can bid through that

22 API; is that right?

23 A    That's right.

24 Q    And the DV360 advertisers can also bid through that

25 API; is that right?

Direct Examination - R. Goel

1    A    That's right.

2    Q    Okay.  Can Google -- can PubMatic -- does PubMatic have

3    an API that connects to Google's publisher ad server, DFP?

4    A    We do not.

5    Q    Why not?

6    A    We have asked Google for an API, but they have not

7    granted us an API or access to such an API.

8    Q    All right.  We'll talk more about that in a bit.

9              Approximately how many open web display

10   transactions does -- from Google Ads does PubMatic see in a

11   given year or a given time period?

12   A    Sure.  So in a recent month, we sent about -- we sent

13   over 10 trillion ad -- or bid requests to Google in a month.

14   Q    You sent 10 trillion bid requests in one month?

15   A    That's correct.

16   Q    Okay.  And approximately how many impressions did

17   PubMatic -- did Google's buy-side products purchase using

18   PubMatic?

19   A    The Google win rate was below 1 percent.

20   Q    And why do you think that is?

21   A    It's not uncommon, I think, due in part to header

22   bidding.  Publishers use multiple SSPs or exchanges.  And so

23   there's a proliferation of ad impressions and ad inventory

24   as a result.

25   Q    Okay.  So how would you characterize the number of

Direct Examination - R. Goel

1  impressions that PubMatic gets from Google Ads -- actually,

2  won impressions from Google Ads in a given time period?

3  A    It's a small percentage of the total.  So DV360 is the

4  vast majority.

5  Q    Okay.  DV360 is the vast majority of the --

6  A    Sorry.  Of the total Google pie, that is one, yes.

7  Q    Okay.  Understood.

8         And was there a period of time in which Google

9  Ads, based on your experience, refused to purchase any open

10 web display ads on PubMatic?

11 A    Yes, there was.

12 Q    And when was that?

13 A    Up until about 2014.

14 Q    Now, if Google Ads stopped purchasing open web display

15 transactions on PubMatic, could PubMatic turn to Amazon or

16 Facebook instead?

17 A    No, we could not.

18 Q    Why not?

19 A    Facebook is not integrated into PubMatic.  So they do

20 not buy on our platform.  They do not buy ads in the open

21 web generally.  Amazon primarily buys its own supplier, its

22 own inventory, not exclusively but primarily.  So, for

23 instance, Amazon -- ads that appear on Amazon.com or some of

24 their other properties.

25 Q    And based on your experience in the industry, do you

Direct Examination - R. Goel

1  have an understanding as to how AdX's take rates for open

2  auction display compared to PubMatic's take rates for open

3  auction display?

4  A    I don't have certainty as to Google AdX's take rate,

5  but my belief is that it's higher than PubMatic's.

6            THE COURT:  I'm sorry.  It's what?

7            THE WITNESS:  Higher than PubMatic.

8            MS. WOOD:  So, Your Honor, for confidentiality

9  reasons, I don't believe we need to close the courtroom at

10  all, but I would just ask that counsel, the Court, and

11  witness look at a document but it not be displayed.

12            THE COURT:  All right.  What's the exhibit number?

13            MS. RHEE:  Your Honor, if it's what's in this

14  binder, there's going to be an objection for lack of

15  foundation.

16            THE COURT:  Let me take a look.

17            MS. WOOD:  Well, let me attempt a foundation here

18  before you -- you've already decided I'm not going to lay a

19  foundation?

20            THE COURT:  What's the exhibit number?

21            MS. RHEE:  If I see the document, Your Honor.

22            MS. WOOD:  PTX 1241.

23  BY MS. WOOD

24  Q    And, Mr. Goel, can you indicate -- do you recognize in

25  this document, without saying it out loud, a trend line that

Direct Examination - R. Goel

1   represents the open auction take rates for PubMatic?

2           THE COURT:  Well, wait.  We have no idea where

3   this came from.

4           MS. RHEE:  Objection, Your Honor.

5           THE COURT:  All right.  So we got to lay a better

6   foundation than that.

7           MS. WOOD:  Okay.  I can represent to the Court

8   that this came from Professor Lee's report.  And you'll be

9   hearing from Professor Lee, and he'll be describing how this

10  came about.

11          THE COURT:  Then he's the one who will testify to

12  it.

13          MS. WOOD:  Okay.  I just wanted this witness,

14  while he was here, to confirm the take rate amount.  But if

15  it comes in through Lee, that's fine.

16          THE COURT:  If it's part of his work as an expert,

17  that's a different situation.

18          So move on.

19          MS. WOOD:  Okay.  Understood.

20  BY MS. WOOD

21  Q   Now, we talked a little bit about this before.  Google

22  launched its AdX product after PubMatic launched its,

23  correct?

24  A   I believe so, yes.

25  Q   And how would you characterize AdX's size in the market

Direct Examination - R. Goel

1  for open web display compared to PubMatic's, in your own

2  words?

3  A    We estimate that Google has a roughly 50 to 55 percent

4  market share, whereas our market share is in the 4 to 4

5  1/2 percent range.

6  Q    Okay.  Can you describe to the Court in your own words,

7  what is it like to compete against Google's ad exchange in

8  the market for open tools that buy and sell open web display

9  transactions?

10  A    It's certainly a challenge.  It keeps us on our toes in

11  terms of pace of innovation, speed, nimbleness, customer

12  service.  The biggest challenge, of course, is that Google

13  has more demand flowing through its platform than anybody

14  else, in my opinion.  And publishers really care about

15  revenue or monetization.

16  Q    Now, based on your knowledge and experience in the

17  industry and your regular communications with publishers, do

18  you have an understanding of any superior features or

19  functionalities that AdX offers that PubMatic does not?

20  A    I do not hear from our publishers that there are

21  certain feature sets that AdX has that we do not have.

22  There are no features on our road map -- on our product road

23  map that are designed to close feature or functionality gaps

24  relative to AdX.

25        But, again, I would say that, for publishers, the

Direct Examination - R. Goel

1    number one, two, and three priority is driving revenue or

2    driving monetization for their ad inventory, which, of

3    course, Google is in a superior position to do given their

4    market size.

5    Q    Now -- so based on your experience in the industry,

6    what do you think accounts for Google's larger size in the

7    market for ad tech tools for open web display relative to

8    PubMatic?

9    A    Well, I think many publishers that use DFP are using it

10   certainly in part because of the demand that comes from

11   Google.

12   Q    And the demand you're referring to is demand from

13   Google Ads ad network?

14   A    Correct.  So we talked earlier about the share of

15   monetization that we see from Google that is Google Ads

16   versus DV360.  Many years ago it used to be about half and

17   half.  So the share that Google Ads represents has reduced

18   significantly over the years.

19   Q    Now, we talked a little bit about the waterfall method

20   and -- was that waterfall method continued to be the primary

21   means by which open auction, remnant, or indirect open web

22   display transactions were sold prior to the advent of header

23   bidding?

24   A    Yes.

25   Q    And are you familiar with the term "first look"?

Direct Examination - R. Goel

1  A    Yes, I am.

2  Q    Can you describe to the Court what first look is?

3  A    Sure.  First look is an approach to monetization where

4  a single party has the ability to evaluate a piece of

5  inventory and purchase it before any other party has an

6  opportunity to evaluate it.

7  Q    And from your perspective as an industry participant,

8  was first look a positive or a negative for publishers?

9  A    From a publisher's perspective, in every scenario, I

10 believe it would be a negative.

11 Q    Why?

12 A    Well, because it's not giving the publisher a fair or

13 competitive price.  There may be another buyer that's

14 willing to pay more for the inventory, and the publisher

15 would have no way of finding that out or discovering that or

16 generating that revenue.

17 Q    And what about from an advertiser's perspective?  Would

18 you say that first look was good, bad, or indifferent?

19 A    Bad in that it would lead to an inefficient market

20 where an advertiser that wanted to pay more for a particular

21 ad impression because they believed they could generate

22 higher ROI from that ad inventory would be unable to

23 purchase that inventory.

24 Q    Why would they be unable?

25 A    Only if they were working exclusively with the owner of

Direct Examination - R. Goel

1  the first look capability would they be able to purchase

2  that inventory.

3  Q    And from your perspective as an industry participant,

4  was first look good or bad for competition in the market for

5  ad exchange tools for open web display?

6  A    It suppressed competition.

7  Q    Why do you say that?

8  A    Well, anybody without the first look capability would

9  be unable to build a liquid market against that inventory.

10 Q    Are you familiar with -- I think you indicated before.

11 Are you familiar with Admeld?

12 A    Yes.

13 Q    Was Admeld sometimes referred to as Yield Manager?

14 A    Yes, it was.

15 Q    And are you familiar with the fact that Google acquired

16 Admeld?

17 A    Yes.

18 Q    I want to turn now to a document that has been marked

19 for identification as PTX 36.  You can look at it in your

20 binder.  It may also come up on the screen next to you.

21 Whatever is more convenient.

22 A    Okay.

23        THE COURT:  Is there any objection to 36?

24        MS. RHEE:  No objection, Your Honor.

25        THE COURT:  All right.  I assume you're moving it

Direct Examination - R. Goel

1  in?

2          MS. WOOD:  Yes, Your Honor.

3          THE COURT:  It's in.

4          MS. RHEE:  Your Honor, I think no objection

5  particularly for purposes of just establishing the fact of

6  the communication rather than for the truth of the matter

7  asserted.  Otherwise, it would be hearsay and out-of-court

8  statement.

9          MS. WOOD:  Your Honor, I would agree with the

10  respect to the bottom email.  The top email is a statement

11  of a party opponent.  It was a statement by Mr. Mohan of

12  Google.  So I do believe the top email comes in for the

13  truth of the matter, whereas the bottom email is an effect

14  on the hearer or the fact that the communication was made.

15          MS. RHEE:  And, again, no objection, but certainly

16  at the top of the email, Mr. Goel is nowhere to be found on

17  that.  And that's an internal Google communication.

18          MS. WOOD:  I still think it can come in for the

19  truth of the matter for the Court.

20          THE COURT:  What's Mr. Mohan's position at Google?

21          MS. WOOD:  Shall I answer?

22          THE COURT:  Ms. Rhee?

23          MS. RHEE:  At that point in time in 2009, he had

24  come over as part of the DoubleClick acquisition to have a

25  role in the display and video ads business.  He eventually

Direct Examination - R. Goel

1    arose -- I don't know exactly what time in that period -- to

2    run the video and ads display business.

3                    MS. WOOD:  Your Honor, I'll note two things.

4                    One, Mr. Mohan will be here in person Monday

5    morning.

6                    And, two, he was a senior executive.

7                    But also, three, I believe under clear Fourth

8    Circuit precedent, an employee of any rank within an

9    organization, as long as they're acting within their

10   employment, it's still a statement of the party opponent.

11   It doesn't matter on the rank.

12                   THE COURT:  I'm going to overrule the objection,

13   especially because he's going to be here.

14                   MS. WOOD:  Thank you, Your Honor.

15   BY MS. WOOD

16   Q    Do you recognize the bottom email from Mr. Amar Goel?

17   Is that your brother?

18   A    Yes, it is.

19   Q    Okay.  And you see you're copied there as well?

20   A    Correct.  Yes.

21   Q    He writes to Neal Mohan.  Did you know Neal Mohan in

22   January 2009?

23   A    Yes, I did.  I knew him actually from his DoubleClick

24   days.

25   Q    And how did you know him?

Direct Examination - R. Goel

1    A     I knew him professionally, and I know him personally as

2    well.

3    Q     Okay.  And your brother knows him as well?

4    A     That's correct.

5    Q     Okay.  And it says, "Neal, hi.  How's it going?"

6          And this would have been right after the

7    DoubleClick merger, correct, or acquisition?

8    A     I believe that's right.

9    Q     Okay.  "Neal, hi.  How's it going?  We were wondering

10   if there might be some ways to integrate PubMatic into

11   DoubleClick via your APIs."

12         Do you see that?

13   A     Yes.

14   Q     Those are the same APIs we talked about before, a

15   connection between one computer system and another computer

16   system?

17   A     That's correct.

18   Q     And why was PubMatic interested in connecting to

19   DoubleClick's APIs at this time in January 2009?

20   A     Well, part of our vision to deliver yield optimization

21   or yield management to publishers was to be able to see the

22   direct sold inventory that's sitting in the ad server, ads

23   that are sold via an insertion order, and combine that with

24   the remnant ad inventory and give publishers the opportunity

25   to optimize or manage yield across both sets of inventory.

Direct Examination - R. Goel

1  Q    And, ultimately, in response to this email, did you

2  ever get a response back from Mr. Mohan about whether

3  DoubleClick and Google would be willing to connect to

4  PubMatic via an API?

5  A    We were not granted access.

6  Q    You were not granted access.  Were you given a reason?

7  A    No.

8  Q    Was this the only time you ever sought API access to

9  Google's DFP product?

10  A    No.  We sought access a number of times.

11  Q    Approximately how many times?

12  A    Probably a half dozen.

13  Q    And were you ever given access on an API basis to

14  Google's DoubleClick for Publisher product?

15  A    No.

16  Q    Why not?

17  A    I don't know.

18  Q    How would have that access between PubMatic and

19  Google's DFP helped PubMatic?

20  A    Well, at that time, as programmatic advertising was

21  increasing as a share of total digital advertising, there

22  was no way to fully yield optimize or yield manage across

23  direct sold and unsold inventory.  And that was our goal,

24  was to be able to deliver that to publishers.

25          And so not having that ability meant that we could

Direct Examination - R. Goel

1   not manage 100 percent of the inventory of a publisher,

2   which limited the scope of our business as a result.

3   Q    And was it your expectation that having an API between

4   PubMatic and Google's DFP publisher ad server product would

5   have benefited publishers?

6   A    Yes.

7   Q    How so?

8   A    Well, it would have give them the ability to optimize

9   the yield across all of that inventory.  So, for instance, a

10  publisher might sell, on a direct basis via an insertion

11  order, a $10 CPM campaign; but they might have, via an ad

12  network or programmatically via real-time bidding, a $15 CPM

13  bid from an advertiser.

14          And, historically, the way a publisher would

15  manage that in the waterfall is the $10 IO would serve

16  before the $15 bid ever materialized.  And that meant that

17  publishers were leaving money on the table.

18          And so our goal was to help publishers see that,

19  realize that, and grow the value of their inventory.

20  Q    And at that time period in 2009, would PubMatic have

21  been able to offer real-time bids into DFP's publisher ad

22  server.

23  A    At some point in 2009, yes.  I don't recall exactly

24  when.  This email is dated in January; so it may have been a

25  little bit later that year.

Direct Examination - R. Goel

1   Q    But it would have been in 2009?

2   A    Yes.

3   Q    And how you would you characterize to the Court the

4   level of technical difficulty, if any, required to have an

5   API between DSP and PubMatic?

6   A    I would rate the level of difficulty as low to

7   moderate.

8   Q    And can you describe what's involved in developing an

9   API between PubMatic as an exchange and a DFP like -- a

10  publisher ad server like DFP?

11  A    Sure.  There's definitely effort involved to build the

12  API, build the documentation, to test it and to scale it.

13  So it's not without effort, but it's not a complicated

14  effort.  In fact, we have API integrations and access into

15  several other ad servers.  Typically, it takes us three to

16  six months to integrate and test such an integration.

17  Q    And how you would you characterize the cost associated

18  with doing that?

19  A    Yeah, that would be three to six months for a handful

20  of engineers, maybe five to seven.  So we're talking about

21  less than half a million dollars.

22  Q    And then are there circumstances in which, when you

23  want an API with another computer system that's part of the

24  ad tech ecosystem, that you as the person that's seeking the

25  API pays for their costs to do the API as well?

Direct Examination - R. Goel

1   A    That is a possibility, yes.

2   Q    Okay.

3          MS. WOOD:  Your Honor, I'm conscious of the time.

4   I'm happy to go on.  I've got about another 15 to 20

5   minutes, but we could also take our break.  I'd ask the

6   Court's --

7          THE COURT:  Let's go till quarter after.

8          MS. WOOD:  Okay.  Great.

9   BY MS. WOOD

10  Q    Was there a time in which PubMatic decided to offer its

11  own publisher ad server?

12  A    Yes.

13  Q    Why did you do that?

14  A    We were focused on the mobile app -- growth in the

15  mobile app market.  And so we acquired a company called

16  Mocean Mobile with the intent of offering a mobile app ad

17  server.  We did not focus on the display market because we

18  did not think that we could make inroads into having

19  publishers switch their ad server.

20  Q    Why did you think you couldn't break into the open web

21  display market but you could break into the mobile app

22  market?

23  A    So Google, with the acquisition of DoubleClick, had,

24  you know, clearly built a level of dominance in the display

25  ad market.  And given the ad exchange monetization tie-in,

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

Direct Examination - R. Goel

1  we did not think we would be successful in having publishers

2  replace DFP with a PubMatic ad server.

3       However, in the mobile app ad space, that was a

4  new and burgeoning space.  Mobile app devices came much

5  later -- or mobile devices, including then-app interfaces

6  came much later than, you know, browser-based internet

7  advertising.  And so we felt that there was greenfield

8  opportunity in the mobile app space.

9  Q    And what was the name of the mobile app publisher ad

10 server you launched?

11 A    Unified ad server.

12 Q    And did you view that to be a competitor of DFP?

13 A    On some level, yes, although we didn't see that DFP

14 was -- or DoubleClick was significantly focused on the

15 mobile app market in particular at that time.

16 Q    And, ultimately, is unified ad server still operating

17 today?

18 A    No, it is not.

19 Q    How long was it operating?

20 A    It was operating for a couple of years.  We were not

21 successful, and so we shut down that initiative.

22 Q    Okay.  Now, did PubMatic ever try to use AdX direct to

23 try to connect to a dual ad server system?

24 A    I don't recall.

25 Q    Okay.  Now, I want to turn now to PTX 1677.

Direct Examination - R. Goel

1           Do you recognize PTX 1677?

2    A    I do, yes.

3           THE COURT:  Any objection?

4           MS. RHEE:  Your Honor, it would be hearsay insofar

5    as it's being admitted for the truth of the matter.

6           MS. WOOD:  I can lay a foundation for the hearsay

7    exception.

8           THE COURT:  All right.  Go ahead.

9    BY MS. WOOD

10   Q    What do you recognize PTX 1677 to be?

11   A    It is a white paper that we put out to existing

12   customers and to prospects.

13   Q    And was this prepared at PubMatic at or around the time

14   by persons with knowledge of its content?

15   A    Yes.

16   Q    And was it prepared in the normal course of PubMatic's

17   business?

18   A    Yes.

19          MS. WOOD:  We believe this meets the standard for

20   a business record of PubMatic and would ask for its

21   admission for the truth.

22          THE COURT:  And the audience for this was

23   potential customers or current customers?

24          THE WITNESS:  Both.  So both potential and current

25   customers.

Direct Examination - R. Goel

1      THE COURT:  Well, I'm going to let it in with the

2  caveat that a lot of these have a certain degree of puffery

3  because they're open.  So, you know, it is what it is.  All

4  right?

5      MS. WOOD:  Understood, Your Honor.

6      THE COURT:  Go ahead.

7  BY MS. WOOD

8  Q   What is this announcement or this white paper

9  discussing?

10 A   This white paper is discussing or attempting to educate

11 publishers about the opportunity for header bidding and how

12 they could use header bidding to generate more revenue than

13 the then-current methods of monetizing unsold ad inventory.

14 Q   And if you turn to the page -- page 4 of the actual

15 slide deck, do you see the numbers?

16 A   I do, yes.

17 Q   Do you see there on the left-hand side the numbers 1,

18 2, 3?

19 A   Yes, I do.

20 Q   And what are these describing to your customers or

21 potential customers?

22 A   Sure.  So prior to header bidding or -- to set a little

23 bit of context, the reason for header bidding to come into

24 being is that publishers wanted to use auctions with other

25 exchanges other than AdX while also not losing access to the

Direct Examination - R. Goel

1  demand that flows through AdX.

2          And so header bidding came into being as a

3  technical approach to allow parallel auctions where a

4  publisher could flow the same ad impression into multiple ad

5  exchanges, which would allow the publisher to bring demand

6  in from non-Google ad exchange in addition to availing

7  themselves of Google ad exchange demand.

8  Q    And do you see the title here?  It says, "Many

9  third-party solutions have set out to solve for the

10  efficiency and control issues in waterfalling, which often

11  lead to lost revenue."

12          Do you see that?

13  A    Yes, I do.

14  Q    Okay.  And then below that are some of the reasons why

15  the waterfall is inefficient and there's no control and

16  there's lost revenue?

17  A    Correct, and some of the points that we discussed

18  earlier.

19  Q    Exactly.  So in the interest of moving on, let's go to

20  the next page, page 7.  And if you see the big blue box,

21  underneath that, in small print, it reads, "While EDA may be

22  effective for many publishers, it favors AdX, which reduces

23  the competition on a publisher's inventory."

24          And then it says, "This creates inefficiencies in

25  yield monetization in a couple of significant ways."

Direct Examination - R. Goel

1              And then they are described below.  Do you see

2    that?

3    A    I do, yes.

4    Q    Can you explain what that's referring to.

5    A    Sure.  So EDA refers to enhanced dynamic allocation,

6    which is a iteration or second release from Google on top of

7    dynamic allocation.

8              And what it did is it allowed Google's AdX to

9    submit a real-time bid into the publisher ad server via

10   enhanced dynamic allocation, or EDA, but no other exchange

11   could do such a thing.

12             And so the result is that EDA would perform

13   better, all things being equal, than any other exchange.

14   Q    And then under Number 1 it says, "AdX gets first look

15   and right to win."  Do you see that?

16   A    I do, yes.

17   Q    Can you describe what that refers to.

18   A    Sure.  So AdX gets the right to monetize the ad

19   impression if they have a buyer regardless of the price --

20   maybe there's a price floor that a publisher could set --

21   but without the publisher being able to look at bids from

22   other exchanges.

23   Q    And what, if anything, was significant about that fact?

24   A    Well, I think there's two things of significance.

25   Number one is that publishers were not able to maximize the

Direct Examination - R. Goel

1  revenue or yield for their inventory.

2          And then second, it built an advertiser dependence

3  on Google's stack because advertisers knew that if they were

4  not bidding inside of AdX, then they were not getting the

5  first look.  And the first look often performs best from an

6  advertiser's objectives.

7  Q    And then you see on the right-hand side there's some

8  text in blue.  And the last sentence reads, "AdX is also

9  able to submit a real-time bid with EDA so historical CPMs

10 can be matched in real time."

11         Do you see that?

12 A    I do, yes.

13 Q    Now, at the time this document was created, PubMatic

14 could certainly do real-time bids as well, correct?

15 A    Yes.  We had been for five to six years at that point.

16 Q    Okay.  So if Google had allowed an API into DFP,

17 PubMatic could have also had a real-time bid; is that right?

18 A    That's correct.

19         THE COURT:  Speaking of time, I think now we'll

20 take our afternoon break until 4:30.

21                          (The time is 4:14 p.m.)

22                          (Brief recess taken.)

23         MS. WOOD:  May I proceed, Your Honor?

24         THE COURT:  Yes, ma'am.

25 BY MS. WOOD:

Direct Examination - R. Goel

1  Q    Before the break we were talking about first look and

2  the waterfall system and the advent of header bidding.

3         After header bidding came into play, are you

4  familiar with the phenomenon referred to as last look with

5  respect to header bidding auctions and the DFP publisher ad

6  server's connection to AdX?

7  A    Yes.

8  Q    Can you describe what that is?

9  A    Yeah.  Last look, in this context, is Google's ability

10 to look at all of the other bids that are coming in for

11 publisher's inventory in AdX and then submit their own bid

12 after looking at all of the other bids.

13 Q    And did you believe, based on your experience in the

14 inventory, that last look was good for publishers?

15 A    No.

16 Q    Why not?

17 A    It's hard to imagine any scenario where last look would

18 be good for publishers.  Typically, a bidder for inventory

19 would submit the highest bid that they felt comfortable

20 paying in order to win inventory.  So a last look, an

21 ability to see all the other bids, would afford the party

22 with the last look with the opportunity to just bid 1 cent

23 more, which would clearly harm publishers.

24 Q    What about from the perspective as a competitor ad

25 exchange to AdX?  Did you feel that Google's last look was

Direct Examination - R. Goel

1  fair competition?

2  A    No.  I think it affords two significant advantages --

3  one is scale and the other is margin.

4         So from a scale perspective, any party with last

5  look will win more auctions, and that creates a dependency

6  from an advertiser and a publisher perspective or perceived

7  dependency on that technology platform.  So those buyers and

8  publishers will tend to use that platform more because it's

9  viewed to monetize a greater proportion of inventory.

10         And then second, with respect to margin, depending

11  on how the last look is implemented, if the platform

12  implementing last look is able to pocket the difference

13  between the 1 cent over the next highest bid and what the

14  advertiser was willing to bid, they could increase their

15  margin significantly.

16  Q    And those concepts you just discussed, scale in

17  particular, how would you characterize the endurance of

18  scale in the ad tech ecosystem?

19  A    I think to be relevant, scale is important.  Scale

20  begets data.  Data begets performance.  And performance, in

21  turn, begets more scale.  So there's a virtual cycle that

22  one can establish and that one needs to establish in order

23  to cement publisher and advertiser relationships.

24  Q    And how would you describe the enduring effect of

25  scale, if at all?

Direct Examination - R. Goel

1  A     Can you clarify?  What context?

2  Q     Yeah.  Is scale, in your mind, temporary?  You have

3  scale for a while and then it just goes away?  Or can the

4  scale effects in the ad tech market endure past the conduct

5  at issue?

6  A     I think scale is always something that any provider in

7  our industry has to focus on, you know, continuously growing

8  their scale, managing their scale, and making sure they have

9  enough scale of ad impressions, of data, of advertiser bids

10  in order to stay relevant.

11  Q     Have you ever heard the term "network effects"?

12  A     Yes.

13  Q     What are network effects as they apply in the ad tech

14  ecosystem?

15  A     Sure.  A network effect in the ad tech ecosystem is an

16  effect where the more parties use a particular platform or

17  system, the more value or utility all users get from that

18  platform.

19         So in this case, when I referred to scale

20  begetting data, data begetting performance, that's an

21  example of a network effect.

22  Q     Okay.  Now, are you familiar with Google's open bidding

23  program?

24  A     Yes.

25  Q     Was that also called exchange bidding at some point?

Direct Examination - R. Goel

1  A     I believe so, yes.

2  Q     And does PubMatic participate in Google's open bidding?

3  A     We do.

4  Q     And does Google charge a fee for exchanges like

5  PubMatic to participate in open bidding?

6  A     They do charge a fee.

7  Q     And what is it?

8  A     I believe it's in the 5 to 10 percent range, depending

9  on the ad format.

10  Q     And from PubMatic's perspective, what disadvantages are

11  there, if any, from participating in open bidding versus,

12  let's say, a header bidding auction?

13  A     We often participate in multiple auctions with the same

14  publisher.  It could be a Prebid header bidding auction as

15  well as an open bidding auction.

16          There are some advertisers that will not bid into

17  Google open bidding.  So it's important that we have more

18  than just open bidding.

19  Q     And how does Google's imposition of a 5 percent fee on

20  PubMatic in connection with open bidding impact open

21  bidding -- PubMatic's ability to compete in the open bidding

22  market?

23  A     So it reduces the net bid.  So, for instance, if we

24  have a $1 bid, we have to subtract out Google's open bidding

25  fee, so 5 to 10 cents, if I recall correctly.  So that would

Direct Examination - R. Goel

1  mean the bid that we provide to the publisher is 90 cents or

2  95 cents.  I do not believe that Google assesses this own

3  fee on their demand.

4  Q    And so what does that do to your bid relative to the

5  AdX bid?

6  A    It disadvantages our bid, which means we win less.

7  Q    Now, are you familiar with Google's implementation of

8  unified pricing rules on publishers and the DFP product?

9  A    Yes.

10 Q    And what was unified pricing rules, as you understand

11 it?

12 A    As I understand it, unified pricing rules, or UPR, is a

13 limitation that Google introduced some years ago where a

14 publisher could not put a higher price floor on Google AdX

15 demand than they did on other SSPs or exchanges.

16 Q    What impact, if any, did Google's UPR rule have on

17 PubMatic's ability to compete?

18 A    It lowered our revenue somewhere in the range of 6

19 to 8 percent.

20 Q    And why was that?

21 A    Well, publishers either knew or believed they knew that

22 Google had certain unfair advantages, and they would,

23 therefore, put a higher price floor on Google AdX.

24        Some of the advantages you mentioned already,

25 things like first look and last look.  I know some

Direct Examination - R. Goel

1  publishers that would not put the CPM pricing for insertion

2  orders inside of DFP because they believed that Google would

3  use that pricing against them.

4          And so a publisher would typically put a higher

5  price floor on Google AdX.

6  Q    Now, let me show you what we've marked for

7  identification as PTX 1621.

8              THE COURT:  Is there any objection to 1621?

9              MS. RHEE:  No, Your Honor.

10             THE COURT:  All right.  It's in.

11             MS. RHEE:  Actually, Your Honor, no objection

12  insofar as this is not being admitted for the truth of the

13  matter asserted therein, because otherwise it would be an

14  out-of-court statement.

15             MS. WOOD:  Well, I can lay a foundation for the

16  out-of-court statement, Your Honor.

17             THE COURT:  Go ahead.

18  BY MS. WOOD:

19  Q    What is PTX 1621?

20  A    It's an internal email assessing the impact of UPR on

21  our business.

22  Q    And does this email -- was it prepared in the normal

23  course of business at PubMatic?

24  A    Yes.

25  Q    And was it prepared by individuals with knowledge of

Direct Examination - R. Goel

1   the subject matter?

2   A    Yes.

3   Q    And was it prepared in the normal course?

4   A    Yes.

5        MS. WOOD:  Your Honor, I believe we've laid a

6   foundation to admit the document.

7        THE COURT:  I'm letting it in in part because also

8   this witness is on the distribution list.  Companies do do

9   this sort of thing.  I'm permitting it.  Go ahead.

10  BY MS. WOOD:

11  Q    Okay.  Do you see the top line, the subject of the

12  email is UPR impact.  What is that referring to?

13  A    The impact of the rollout of Google's unified pricing

14  rules on our business.

15  Q    And the summary line says, "UPR is in the range" -- UPR

16  impact is in the range of negative 10 to negative 3 percent

17  of overall PS."

18       What is PS?

19  A    PS is platform spend or the media spend on our

20  platform.

21  Q    And it says, "My best guess is negative 6 to negative

22  7 percent."

23       Do you see that?

24  A    Yes.

25  Q    And who is Samsuddin Ahmed?

Direct Examination - R. Goel

1    A    He's a data analyst at PubMatic.

2    Q    And was it his responsibility do the data analysis that

3    led to this result?

4    A    Yes.

5    Q    Okay.  Then if you see below, under "Other Points of

6    Interest" -- do you see that at the bottom?

7    A    I do, yes.

8    Q    And number one says, "UPR impact on different

9    wrappers."

10           Do you see that?

11   A    That's correct, yes.

12   Q    And it says, "EB declined by negative 18 to negative

13   28 percent."

14           What does that mean?

15   A    That means the impact of UPR on publishers where we're

16   bidding through exchange bidding was a decline of 18 to

17   28 percent in platformed spend.

18   Q    I'm sorry.  I missed the last?

19   A    In platform spend.

20   Q    In platform spend.

21           And is platform spend important?

22   A    It is, yes.  It's the value of the media flowing

23   through our platform, and our revenue is a derivative of

24   that number.

25   Q    Okay.  And then other -- under B, 1B says, "Custom

Cross-Examination - R. Goel

1    wrappers on other GAM publishers."

2            What does that refer to?

3    A    So some publishers may have built their own wrapper.

4    So that would be an example of a custom wrapper, where a

5    publisher is using the Google Ad Manager or DFP ad server.

6    Q    And it says, "For those publishers, the custom wrappers

7    on other GAM publishers declined by negative 16 to negative

8    26 percent."

9    A    That's correct.

10   Q    And what -- negative 16 percent to negative 26 percent

11   of what?

12   A    Also of platform spend.

13   Q    Okay.

14           MS. WOOD:   I'll pass the witness.

15           THE COURT:   All right.

16           Ms. Rhee, go ahead.

17           MS. RHEE:   Thank you, Your Honor.

18                   CROSS-EXAMINATION

19   BY MS. RHEE:

20   Q    Mr. Goel, my name is Jeannie Rhee.  I represent Google.

21   We've never met before, but I'm going to spend a little bit

22   of time now asking you some follow-up questions to the

23   government's examination.   Okay?

24   A    Great.

25   Q    Okay.  Now, Mr. Goel, you talked about back in the day

Cross-Examination - R. Goel

1  in 2007 essentially setting up a booth with a video in order

2  to sell your software spec that became PubMatic; is that

3  right?

4  A    We weren't selling the spec, but to demonstrate the

5  software, yes.

6  Q    And it was prelaunch a demonstration of what you

7  believed the company PubMatic came to be could do; is that

8  right?

9  A    That's correct.

10 Q    Okay.  And in 2007 you testified on direct examination

11 there was no notion of RTB, or real-time bidding, back then

12 in that time frame; is that right?

13 A    I do not believe it existed then, correct.

14 Q    In fact, your words on direct examination was "There

15 was no notion of real-time bidding back then," correct?  You

16 just testified.

17 A    Okay.

18       MS. WOOD:  Objection, Your Honor.  Obviously, the

19 transcript will speak for itself as to his exact words.

20       THE COURT:  Let's not object on such things.

21       MS. WOOD:  Okay.

22 BY MS. RHEE:

23 Q    Correct?

24 A    I don't recall every word that I said on direct, but

25 that sounds accurate.

Cross-Examination - R. Goel

1  Q    You just testified.  So okay --

2         THE COURT:  You don't need to worry about it.

3  BY MS. RHEE:

4  Q    All right.  Now, when you launched, you said the brain

5  child or the genesis of what became PubMatic was to manage

6  or optimize yield across both publishers insertion orders,

7  or their direct deals, and the remnant inventory, the

8  remnant sets of their inventory.

9         Is that right?

10  A    Our initial focus was on remnant, and that later grew

11  to also include the direct inventory.

12  Q    And this was for publishers to manage their yield

13  across their inventory that was at that point in time

14  primarily being sold to ad networks insofar as it pertained

15  to remnant inventory.

16         That was your testimony, correct?

17  A    That's correct.

18  Q    Now, you remember on direct examination being asked

19  about a company called Admeld, correct?

20  A    Yes.

21  Q    And you testified on direct that you called them a

22  yield manager, correct?

23  A    Correct.

24  Q    And, in fact, what PubMatic was back in that time

25  period when you launched was a yield manager as well,

Cross-Examination - R. Goel

1    correct?

2    A    That's correct.

3    Q    Now, fast-forward to 2009, and you had been in business

4    for approximately two or so years at that point; is that

5    right?

6    A    That's right.

7    Q    You were asked on direct examination about PTX 36.

8         And if I could get Mr. Spalding's assistance to

9    pull up the bottom of that email.

10        Now, this date on the email is January 31, 2009,

11   correct?

12   A    Correct.

13   Q    And, again, you testified on direct examination that

14   real-time bidding, at least as a recent technology even

15   then, did not come online until later in 2009; is that

16   right?

17   A    That's right.

18   Q    Okay.  So when you reached out to Mr. Mohan in January

19   of 2009 -- actually, I apologize.  It was your brother who

20   reached out, correct?

21   A    That's correct, yes.

22   Q    When your brother reached out in January of 2009 to

23   Mr. Mohan, the ask was that PubMatic wanted access through

24   an API integration to DFP, or DoubleClick for Publishers; is

25   that right?

Cross-Examination - R. Goel

1    A    That is right.

2    Q    And you never had access to DoubleClick for Publishers

3    via any kind of integration, correct?

4    A    The only way to integrate was a tag.  So we could give

5    a tag to a publisher that they could put into their ad

6    server like any other tech.

7    Q    And what you wanted was API integration, correct?

8    A    That's correct.

9    Q    And you never got API integration; is that right?

10   A    I do not believe we did, correct.

11   Q    Well, why do you say you do not believe you did?

12   You're the founder and CEO, correct?

13   A    Yes.

14   Q    And you sit on the board, correct?

15   A    I do.

16   Q    So you would know whether or not you ever had API

17   integration with DFP for publishers, correct?

18   A    I don't recall every fact of the last 18 years.

19   Q    So this is not a significant fact?

20   A    It's certainly significant today.

21           THE COURT:  Just so we're clear, did you -- to

22   your knowledge, did your company ever get API connectivity

23   to the system?

24           THE WITNESS:  To my knowledge, no.

25           THE COURT:  Okay.

Cross-Examination - R. Goel

1  BY MS. RHEE:

2  Q    And it's not the case where PubMatic once had API

3  access to DoubleClick for Publishers and then had it pulled

4  away.   PubMatic never had API access to DoubleClick for

5  Publishers, correct?

6  A    I believe that's right, yes.

7  Q    Not during the DoubleClick days and not when Google

8  acquired DoubleClick, correct?

9  A    Correct.

10 Q    And your testimony on direct examination is after that

11 January 2009 request, you or your brother or someone else at

12 PubMatic sought access at least a half a dozen more times;

13 is that right?

14 A    That's right.

15 Q    And the words that you used was "sought access through

16 an API integration."   Is that right?

17 A    That's right.

18 Q    Now, you also testified on direct examination that

19 technical integration would be required in order to have

20 that kind of API access, correct?

21 A    Correct.

22 Q    Now, you testified on direct that it was your opinion

23 that the difficulty of such technical integration was, in

24 your opinion, low to moderate.   That was your testimony?

25 A    Yes.

Cross-Examination - R. Goel

1  Q    But baked into that testimony was the fact that that

2  kind of API integration required technical resources,

3  correct?

4  A    Correct.

5  Q    And required work on Google's part in order to make

6  that access through API possible; is that right?

7  A    Yes, it would require work by Google.

8  Q    Now, you were also asked on direct examination about

9  PTX 1677.  So if we could pull that up on the screen and in

10  particular to page 1 that you testified about on direct.

11        So I'm going to try to do this roughly

12  chronologically.  So we're moving in time.  And this is a

13  2015 document, if I recall correctly, right?

14  A    I believe that's right, yes.  It's copyrighted 2015.

15  So around that time.

16        MS. RHEE:  So now if we could go to -- I'm sorry.

17  It's page 7 with the Figure 2.

18        Sorry, Mr. Klein.  Could I get your assistance?

19        Thank you, Mr. Klein, for your assistance.

20        And also, while we're just waiting for it to load

21  up, actually, that's not Figure 2, Mr. Klein.  If you go to

22  page 7, there's a Figure 2.  The pretty blue box.  Thank

23  you.

24        And, Your Honor, apologies, but if I may, just

25  with the Court's indulgence, acknowledge my second chair,

Cross-Examination - R. Goel

1   Annalise Corriveau, who is here assisting.

2          THE COURT:  Very good.

3          MS. RHEE:  Thank you.

4   BY MS. RHEE:

5   Q    Okay.  Now, Mr. Goel, you see this Figure 2 in front of

6   you that you talked about on your direct examination,

7   correct?

8   A    I do, yes.

9   Q    Okay.  Now, you talked about how dynamic allocation and

10  enhanced dynamic allocation were Google features, correct?

11  A    Correct.

12  Q    Now, here, what this talks about is, through dynamic

13  allocation and enhanced dynamic allocation, Google -- I

14  apologize -- Google basically found a way to address the

15  inefficiencies of the waterfall method that you talked about

16  on direct exam, correct?

17  A    I don't know that it was designed to address the

18  inefficiencies of the waterfall.

19  Q    But it did address the inefficiencies of the waterfall,

20  correct?

21  A    Like I said, I don't know that it was designed or did

22  address --

23  Q    That's not my question, Mr. Goel.  The question is not

24  whether it was intended to do something, but it did address

25  the inefficiencies of the waterfall, correct?

Cross-Examination - R. Goel

1    A    I do not believe it addresses all of the --

2    Q    That's not my question --

3    A    -- inefficiencies of the waterfall.

4    Q    -- about all of the inefficiencies.  Let's try this

5    again.

6         The question is you testified on direct

7    examination --

8         THE COURT:  We don't need the preface about you

9    testified on direct.  Let's get this going.

10   BY MS. RHEE:

11   Q    It addressed -- it's a fact, was to address the

12   inefficiencies of the waterfall, correct?

13   A    No.  I described three inefficiencies in particular of

14   the waterfall, and I do not believe EDA addresses all three

15   of those.

16   Q    That's not the question.  It addresses some of the

17   inefficiencies of the waterfall, correct?  At least some of

18   them.

19   A    Yes.  That's a different question, just to be clear,

20   than what you asked.

21   Q    Actually -- we don't need to argue.  You'll have an

22   opportunity to expound all you want.

23   A    I am not trying to argue.  I am just trying to be

24   precise because I know this is important.

25   Q    Okay.  Let's go to the next point here.

Cross-Examination - R. Goel

1          At the bottom, even in this document that the

2    Court admonished all of us may contain a little bit of

3    fluff, the bottom says, "While EDA may be effective for many

4    publishers, it favors AdX."

5          That's in this PubMatic 2015 publication, correct?

6    A    Correct.

7    Q    So in other words, EDA may be effective for many

8    publishers, correct?

9    A    Correct.

10   Q    And the complaint that PubMatic had, as set forth in

11   this document, is that it favors AdX and AdX customers,

12   correct?

13   A    Correct.

14   Q    Okay.  Now, zipping along in time, let's talk about

15   the UPR discussion that you had with the government attorney

16   on direct examination.

17          Do you remember that?

18   A    I do, yes.

19   Q    Okay.  Now, PubMatic itself at around the time that

20   Google went to a first-price auction also went to a

21   first-price auction, correct?

22   A    I believe that's correct.  I don't recall exactly when

23   we went to a first-price auction.

24   Q    But you agree, do you not, Mr. Goel, that PubMatic

25   before, back in some period of time around the whole

Cross-Examination - R. Goel

1    industry shift toward a first-price auction, ran a

2    second-price auction; is that right?

3    A    That is right.

4    Q    And then sometime close in time to when Google went to

5    a first-price auction, PubMatic announced that it was going

6    to a first-price auction, correct?

7    A    That's correct.

8    Q    Now, in the announcement that it was moving to a

9    first-price auction, PubMatic stated that its reason was

10   "There's inconsistency across auctions and a lack of

11   transparency into how each auction operates where that's

12   created an environment where buyers don't have visibility

13   into whether the auctions are being closed at first price or

14   second price."

15        Sounds familiar, right?

16   A    It does, yes.

17   Q    And PubMatic, in announcing its move to a first-price

18   auction, talked about how this lack of visibility makes it

19   difficult for buyers to simultaneously maintain access to

20   impressions and consistently increase spend.

21        Does that sound right?

22   A    That does, yes.

23   Q    And PubMatic represented that, after listening

24   carefully to customers, it would now run first-price

25   programmatic auctions on all multilevel inventory, yeah?

Cross-Examination - R. Goel

1   A    Yes.

2   Q    And PubMatic further represented that customers and

3   potential customers understood that the changes it made

4   reflect a larger effort by both publishers and buyers to

5   identify partners who they can trust, yes?

6   A    Correct.

7   Q    Now, again, you testified on direct examination that

8   PubMatic -- well, you're not a publisher, right?

9   A    We are not, no.

10  Q    Your customers or clients are publishers, right?

11  A    That's right.

12  Q    And to the extent that you were talking on direct

13  examination about what publishers think or what publishers

14  feel, that's because and only because you got that

15  information from publishers, right?

16  A    That's right.

17  Q    Now, finally, in announcing the change that PubMatic

18  made to a first-price auction, PubMatic told its

19  customers -- publishers, right? -- and potential

20  customers -- again, publishers -- we made this decision to

21  meet the demands of the evolving landscape and address

22  requests from our demand partners.

23       Is that right?

24  A    That's right.

25  Q    Now, in connection with the move not just by you but

Cross-Examination - R. Goel

1   many others, including Google, to a first-price auction,

2   you're aware, are you not, that Google deprecated last look?

3          Do you remember?

4   A    I do remember they announced that, yes.

5   Q    Okay.  And so it's now been many, many, many years that

6   what you talked about on direct examination with respect to

7   last look has been in effect or in place, correct?

8          MS. WOOD:  I object, Your Honor.  I do have to

9   object.  Many, many, many, many years, like 2019?

10          THE COURT:  That can be a long four or five years.

11          MS. RHEE:  Amen, Your Honor.  It's been a long

12   three days.

13          THE COURT:  Four.

14          MS. RHEE:  And you make my point.

15          And now I've lost my train of thought.

16   BY MS. RHEE:

17   Q    Okay.  Marching forward in time -- I believe that is

18   what the objective is of this examination -- you went public

19   as a company in 2020; is that right?

20   A    That's correct.

21   Q    That's when PubMatic had its initial public offering;

22   is that right?

23   A    That's right.

24   Q    And since going public in 2020, PubMatic files yearly

25   10-Ks with the U.S. Securities and Exchange Commission,

Cross-Examination - R. Goel

1  correct?

2  A    Correct.

3  Q    And it also files quarterly 10-Qs with the United

4  States Exchange Commission, correct?

5  A    Correct.

6  Q    And as the CEO of PubMatic, you have signed each and

7  every one of those filings that are filed with the U.S.

8  Securities and Exchange Commission, correct?

9  A    Correct.

10  Q    And, as the judge helpfully noted, those signed filings

11  come with the penalty of perjury.  You understand that,

12  correct?

13  A    Yes.

14  Q    Now, in addition, with each quarterly filing of your

15  documents with the U.S. Securities Exchange Commission, like

16  every other public company, you release those results in an

17  earnings call to accompany those SEC filings, correct?

18  A    That is correct.

19  Q    And, as the CEO, you participate in all of those

20  earnings calls, correct?

21  A    Yes.

22  Q    And, oftentimes -- maybe all the time, but we only have

23  so many overnight hours -- those earnings calls are often

24  accompanied by earnings presentations that you walk the

25  investment community and the public through, correct?

Cross-Examination - R. Goel

1  A    Yes.

2  Q    Okay.  So now jumping ahead -- and now we're going to

3  work backwards in time perhaps -- the latest quarterly

4  filing and the earnings presentation and call that you had

5  was in August of 2024, this year, right?

6  A    That's correct.

7  Q    Just about a month ago, yes?

8  A    That's right.

9  Q    Okay.  And when you did that filing, you also presented

10  an earnings presentation, a deck, correct?

11  A    That's correct.

12  Q    Okay.  So let's turn to that deck.

13         MS. RHEE:  And at this point in time, Your Honor,

14  we would seek to admit -- well, actually, we can just go to

15  the various slides and we can introduce them as

16  demonstratives.

17         THE COURT:  Just as demonstratives?

18         MS. RHEE:  Yes, Your Honor.

19         THE COURT:  Okay.

20         MS. WOOD:  Is there a tab?

21         MS. RHEE:  Oh, yes.  Tab 4.

22         MS. WOOD:  And, Your Honor, the only thing I would

23  offer from an efficiency standpoint, which I think we would

24  all support, is, to the extent they just want to have him

25  read into the record things that are made in public

124

Cross-Examination - R. Goel

1   statements by PubMatic, the United States is prepared to

2   stipulate to that.  I don't know that we need to have him

3   just read public statements.

4            THE COURT:  Well, it may be a lot faster.  Let's

5   just see how much time you plan to spend on this.  All

6   right.

7            MS. RHEE:  Yes, Your Honor.

8            If we could please publish that and go to the

9   slide that is page 5.

10  BY MS. RHEE:

11  Q    You recognize this slide in the earnings presentation,

12  yes?

13  A    I do, yes.

14  Q    Okay.  And now the big blue box in the middle

15  represents PubMatic's offerings, yes?

16  A    Correct.

17  Q    Okay.  And at the bottom of its offerings, PubMatic

18  represents, right, in a investings earning call, that it

19  transacts and is capable of transacting CTV, correct?

20  A    Yes.

21  Q    Online video?

22  A    Yes.

23  Q    Okay.  Mobile app?

24  A    Yes.

25  Q    Desktop?

Cross-Examination - R. Goel

1   A    Yes.

2   Q    Mobile web?

3   A    Yes.

4   Q    Native?

5   A    Yes.

6   Q    Now, similarly, if we could then go to that same

7   earnings presentation and go to Slide 8.

8            MS. RHEE:  And in order to just keep this clean

9   for the record, Your Honor, this will be Goel Demonstrative

10  2.

11           THE COURT:  All right.

12  BY MS. RHEE:

13  Q    Okay.  You recognize this slide in the earnings

14  presentation, correct?

15  A    I do, yes.

16  Q    Okay.  And what you represent here is about the growth

17  of mobile app, yes?

18  A    Yes, the growth in the mobile app market on the left,

19  yes.

20  Q    And what you've said about this is that what this slide

21  shows is that mobile app continues to drive revenue growth

22  and differentiation for PubMatic; is that right?

23  A    That is correct.

24  Q    Okay.  And what this also shows is that mobile app

25  spending was up 13 percent in just the previous year from

Cross-Examination - R. Goel

1   2023 to 2024?

2   A    That's right, in terms of the market, yes.

3   Q    Okay.  And then in terms of your revenue, it's up

4   20 percent year over year, right, into this second quarter

5   of 2024, yes?

6   A    Yeah, for Q2 year over year, over 20 percent, yes.

7   Q    Okay.  That's a 2X of year-over-year increase, yeah?

8   A    The 2X refers to the revenue flowing through our mobile

9   app wrapper solution, which is OpenWrap SDK.

10  Q    Okay.  Apologies.

11       And then you also have represented in your

12  earnings presentation that mobile app revenue was up

13  20-plus percent; is that right?

14  A    Our mobile app revenue, yes, in Q2 was up over

15  20 percent year over year.

16  Q    Okay.  And then in the end of fiscal year 2021, mobile

17  and video had already represented, I think, 67 percent of

18  PubMatic revenue.  Is that right?

19  A    That sounds accurate.  I don't recall specifically, but

20  that sounds accurate.

21  Q    Okay.  And I take it it's inched up a bit?

22  A    It has been growing, yes.

23       MS. WOOD:  Your Honor, I would just renew my

24  cumulativeness objection and relevance.

25       THE COURT:  Overruled.

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

Cross-Examination - R. Goel

1  BY MS. RHEE:

2  Q    Okay.  And marching right along here, I think that we

3  can stand down now on that earnings presentation.  Okay?

4        Now, you testified on direct examination about

5  PubMatic's take rate.  Do you remember that?

6  A    Yes.

7  Q    And you said you didn't actually know what Google's

8  take rate was, but you offered an opinion about how your

9  take rate compared, right?

10  A    Correct.

11  Q    Okay.  So now this is a document that's marked highly

12  confidential and it's under seal, but I think I can do this

13  without actually talking about any of the numbers.  But I do

14  think this is important, given the scope of the direct

15  examination.

16        THE COURT:  All right.  Is there an exhibit that's

17  related to that?

18        MS. RHEE:  Yes, there is.  This is Tab 21, DTX

19  0665.  And we are not going to show it, but we're going to

20  go -- we're going to do it old-fashioned.

21  BY MS. RHEE:

22  Q    And you can see it in the binder, correct?

23  A    Yes.

24        MS. WOOD:  Is there a page?

25        MS. RHEE:  I'm going to lay a foundation; so just

Cross-Examination - R. Goel

1  indulge me.

2  BY MS. RHEE:

3  Q    Okay.  So you see Tab 21, right?  DTX 0665, right?

4  A    Yes, I do.

5  Q    Okay.  And this is a deck that is prepared for the

6  board meeting of January 2019, correct?

7  A    Correct.

8  Q    And you were on the board, correct?

9  A    Yes.

10  Q    And you basically have always been on the board,

11  correct?

12  A    Yes.

13  Q    And, God willing, you will remain on the board.

14  A    Yes.

15  Q    Okay.  Now, we're going to direct your attention to

16  page 39 of this exhibit.

17        MS. RHEE:  And, Your Honor, at this point in time,

18  we would seek to admit -- and, again, given the highly

19  confidential nature of this -- just page 39 with respect to

20  the take rate and keep it under seal or redacted.

21        THE COURT:  This has the 170 as the Bates-stamp

22  number; is that right?

23        MS. RHEE:  Court's indulgence.

24        THE COURT:  You said page 39.  Mine is completely

25  black.

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Cross-Examination - R. Goel

1              MS. RHEE:  I think if you go to the blue divider

2    is the redacted version.  Do you see that, Your Honor?

3              THE COURT:  I'm getting there.

4    BY MS. RHEE:

5    Q    And, Mr. Goel, do you see that?

6    A    I am attempting to navigate here.  You said it's page

7    numbered 39?

8    Q    Yes.

9    A    Slide No. 39?

10   Q    Yes.

11             THE COURT:  All right.  Bates stamp is 170?

12             MS. RHEE:  Yes, Your Honor.

13             THE COURT:  All right.  I've got it.

14   BY MS. RHEE:

15   Q    I can --

16   A    I think I'm on the wrong page.

17   Q    Hold on one second.  PubMatic's counsel is seeking to

18   get a copy.

19             MS. WOOD:  I think the practice has been to give

20   the third-party counsel --

21             MS. RHEE:  I apologize.  And, again, to assure

22   PubMatic's counsel, it is this one slide presentation.  And

23   we seek to admit it under seal or highly redacted so there

24   are no figures.

25             MR. ZAUR:  On behalf of PubMatic, we appreciate

Cross-Examination - R. Goel

1    that.  And ask that great care be exercised with respect to

2    the testimony.

3                MS. RHEE:  Clearly.

4                THE COURT:  All right.  Let's ask the question.

5    BY MS. RHEE:

6    Q    Now, you're familiar with this chart, yes?

7    A    Yes.

8    Q    Okay.  And what it shows is, for the fiscal year ending

9    2018 -- because that's what we had available in the

10   production set -- the take rates that PubMatic offers are

11   dependent on the nature of the customer, correct?

12   A    Correct.

13   Q    Okay.  So, for example, what's labeled the VIP pubs --

14   and I take pubs to be publishers here, right?

15               The VIP publishers, for example, may get a better

16   take rate than the other publisher categories; is that

17   right?

18   A    I'm uncomfortable speaking to that.

19               MS. WOOD:  I'm going to object because without a

20   meet-and-confer with counsel --

21               MS. RHEE:  I will withdraw the objection.  The

22   document is now in evidence; so I will not ask the question.

23   I withdraw it.

24               THE COURT:  All right.  Now, hold on.

25               Exhibit-- this Exhibit 655, I'm at this point only

Cross-Examination - R. Goel

1   admitting page 72.  The redacted version is completely

2   black.  This -- what I'm looking at right now will go under

3   seal --

4           MS. RHEE:  Correct.

5           THE COURT:  -- in the record.  It speaks for

6   itself.  Just ask general questions.  No mention of any

7   entity or any amount.  That should solve the problem?

8           MS. WOOD:  Page 30 --

9           MR. ZAUR:  Yes.  Thank you, Your Honor.  May I ask

10  that counsel cease recitation of the text and the exhibit be

11  stricken?

12          THE COURT:  It's already done.  All right?

13          MS. RHEE:  One last question.

14  BY MS. RHEE:

15  Q    Does the box in the very far right-hand column

16  represent the total company take rate?

17  A    On which row are you referring to?  The bottom row?

18  Q    Yeah, the bottom right-hand corner.

19  A    Yes.

20  Q    Okay.  And your testimony on direct examination was,

21  even though you had no actual knowledge of Google's take

22  rate, but I believe in the record on direct examination you

23  said you believed Google's take rate to be 20 percent.  Is

24  that right?

25  A    That's correct.

Cross-Examination - R. Goel

1    Q     Okay.

2          Now, moving right along, CTV has been a key area

3    of growth for PubMatic, right?

4    A     Yes, it is.

5    Q     And there's been shift to advertising on those formats,

6    correct?

7    A     Correct.

8    Q     And in 2023 you reported that CTV was expected to be a

9    $65 billion market?

10   A     I don't recall the number specifically.

11   Q     Does that sound familiar?  Roughly in the ballpark?

12   A     Roughly, yes.

13   Q     Give or take a billion?

14   A     Maybe give or take more than that, but yes, roughly.

15   Q     And you reported that PubMatic CTV revenue was up over

16   50 percent year over year in Q1 2023, right?

17         MS. WOOD:  Objection, relevance.  The growth or

18   lack of growth in a product outside of the product markets

19   brought here, I just don't believe there is an articulable

20   relevance, much less one that merits this amount of time.

21         MS. RHEE:  Your Honor --

22         THE COURT:  I think this goes, if I understand it,

23   to the concept of what is the market we're talking about.

24         MS. RHEE:  Bingo, Your Honor.

25         THE COURT:  And if there are viable markets -- I

Cross-Examination - R. Goel

1  understand why you're objecting, but I'm going to overrule

2  the objection.  It's within the scope of the case.  It is

3  one of the issues that has to be --

4              MS. WOOD:  I'm not sure the growth of the market

5  is in the case.  Whether it is part of the market is one of

6  their attempted defenses to market definition, but the

7  growth in the market doesn't reflect on market definition,

8  Your Honor.

9              THE COURT:  No, but it goes to -- well, if a

10  market is disappearing or shrinking, I think it does.  So

11  I'm overruling the objection.

12             Go ahead.

13             MS. RHEE:  Thank you, Your Honor.

14             THE COURT:  We don't need a lot of time on this.

15             MS. RHEE:  No.  We are zipping along, Your Honor.

16             THE COURT:  Okay.

17  BY MS. RHEE:

18  Q    Again, the question posed to you was you reported that

19  PubMatic's CTV revenue was up 50 percent year over year,

20  yes?

21  A    That sounds right.

22  Q    Okay.  And that's the reason why PubMatic is

23  accelerating the pace of its new innovation and attention to

24  CTV, yes?

25  A    That's correct.

Cross-Examination - R. Goel

1  Q     And you reported that you're succeeding because

2  PubMatic saw a percentage increase in its CTV publisher

3  customer base, correct?

4  A     Correct.

5  Q     And you attributed customer growth to the recognition,

6  right, within the industry to the advantages of programmatic

7  CTV?

8  A     Yes.

9  Q     All right.  Now, again, because you file with the

10 Securities and Exchange Commission on both a quarterly basis

11 as well as an annual basis, one of the standard discussions

12 in those filings is your competition, right?

13 A     Yes.

14 Q     Okay.  And you talk about how your competition is

15 competitive and complex due to a variety of factors, right?

16 A     Yes.

17 Q     And, in fact, what you say is right under the section,

18 you know, called "Our Competition."

19        "The digital advertising ecosystem is competitive

20 and complex due to a variety of factors," correct?

21 A     Correct.

22 Q     Okay.  And you've made that representation since you've

23 gone public in 2020.  And you say the same thing about the

24 state of competition in the industry every successive

25 quarter and year, yeah?

135

Cross-Examination - R. Goel

1   A    I think that's right, yes.

2   Q    And then you further state that you, PubMatic -- or the

3   way that the filing reads, it's the we, right? -- "face

4   intense competition in the marketplace and are confronted by

5   rapidly changing technology, evolving industry standards,

6   and consumer preferences."

7        Sound familiar?

8   A    It does.

9   Q    Okay.  And, again, since you've gone public, those are

10  the representations that you make quarter over quarter, year

11  over year about the state of competition, yes?

12  A    Yes.

13  Q    Now, you also make representations about market share

14  growth, right, in order to tell your investors or potential

15  investors about why they should invest with you, yes?

16  A    That's correct.

17  Q    But again, in filings, you need to be accurate and

18  honest about what those representations are, right?

19  A    Yes.

20  Q    Okay.  And you have talked about how, if you look at

21  PubMatic's growth relative to the market, you've been

22  growing roughly at twice the rate of growth in the market,

23  yeah?

24  A    That's right.

25  Q    Okay.  So, in other words, PubMatic has increased its

Cross-Examination - R. Goel

1    share of the pie, yes?

2    A    Yes.

3    Q    That's what market share growth is, yeah?

4    A    Yes.

5    Q    Similarly, you talk about scale, yes?

6    A    Yes.

7    Q    Okay.  And you -- again, this is in the context of

8    earning statements and representations where you're going to

9    get in a lot of trouble with a whole lot of different set of

10   regulators if you're not honest and accurate, yeah?

11   A    I'm aware, yes.

12   Q    Okay.  And you tell investors, potential investors, and

13   analysts about how PubMatic is global-scaled and profitable,

14   yeah?

15   A    Yes.

16   Q    Okay.  And you similarly say that you have global omni

17   channel scale, right?

18   A    Yes.

19   Q    Okay.  And by omni channel here, that goes back to that

20   earnings presentation visual where omni channel means across

21   all of those different ad formats that we already walked

22   through, yeah?

23   A    That's correct.

24   Q    Okay.  And, in fact, even -- and I guess we have a

25   disagreement about how long is a long time ago.  But even

Cross-Examination - R. Goel

1  when you went public in 2020 in your S-1 filing, right --

2  again, with the Securities Exchange Commission -- there's a

3  very, very lengthy filing submission that you have to put in

4  if you want to have an initial public offering, correct?

5  A    Correct.

6  Q    And you remember that was a lot of work to put that

7  together, yeah?

8  A    Yes.

9  Q    Okay.  And in that filing, you talked about how you

10  were able to harness your massive data asset.  Do you

11  remember that?

12  A    Yes.

13  Q    And your sophisticated machine-learning algorithms,

14  correct?

15  A    Yes.

16  Q    In order to increase publisher revenue, yeah?

17  A    Yes.

18  Q    And advertiser return on investment?

19  A    Yes.

20  Q    Okay.

21        MS. RHEE:  Again, moving right along, Your Honor.

22  BY MS. RHEE:

23  Q    We're going to now talk about header bidding.  You

24  remember being asked questions about header bidding on the

25  direct examination?

Cross-Examination - R. Goel

1   A    I do.

2   Q    Okay.  Now, you will agree -- and I believe you already

3   testified -- header bidding came into prominence starting

4   around 2016?

5   A    Yeah, 2015, 2016, roughly.

6   Q    Okay.  And, again, in your initial public offering

7   where you took a lot of care to make accurate statements,

8   remember, you talked about header bidding, yes?

9   A    I don't recall specifically, but probably we did, yes.

10  Q    Would it surprise you that, in your public filing --

11  because, again, I just want to move this along -- you

12  represented that header bidding, which came to prominence

13  starting in 2016, further increased the complexity of

14  programmatic advertising?  Yes?

15  A    Sounds right, yes.

16  Q    And you talked about in your IPO and the S1 that header

17  bidding has fundamentally transformed programmatic

18  advertising, yes?

19  A    Yes.

20  Q    And you wrote in your IPO public filing, "As a result,

21  there is greater demand for each ad impression and increased

22  publisher revenue."

23         Does that sound familiar?

24  A    That does, yes.

25  Q    And you agree, right?

Cross-Examination - R. Goel

1  A    Yes.

2  Q    And "header bidding has now been adopted" -- and again,

3  remember this is November 2020.  But in your IPO, you

4  stated, "Header bidding has now been adopted by over

5  60 percent of digital publishers in the United States."

6  Yes?

7  A    Yes.

8  Q    And you represented in your IPO, again back in 2020,

9  "PubMatic is a leading provider of technology solutions that

10 enable and improve header bidding for its customers."  Yes?

11 A    Correct.

12 Q    And, in fact, header bidding had developed its own

13 header bidding solution marketed as Open Wrap in 2016,

14 correct?

15 A    Yes.

16 Q    And Open Wrap, which is your market offering or your

17 header bidding solution, it's built on Prebid; is that

18 right?

19 A    It is, yes.

20 Q    Okay.  In fact, PubMatic is on the board of Prebid; is

21 that right?

22 A    We are, yes.

23 Q    Now, both of -- well, let's make this not compound.

24 Let me start with:  Google also built a header wrapping

25 solution that is on the market, correct?

Cross-Examination - R. Goel

1  A     I believe so, yes.

2  Q     And you testified about it on direct examination.  It's

3  exchange bidding or open bidding, correct?

4  A     Correct.

5  Q     So not an "I believe so."  You know this, correct?

6  A     Well, there's some dispute in the industry if it's, in

7  fact, header bidding.

8  Q     It is a header bidding offering, correct?

9  A     Like I said, there's some dispute in the industry as

10 whether or not it is header bidding.

11 Q     Now, Google's open bidding or exchange bidding offering

12 is not built on the open source Prebid API; is that right?

13 A     That's right.

14 Q     Instead, what Google built was its own proprietary

15 header bidder offering, correct?

16 A     Correct.

17 Q     Now, Google is not the only one.  Let's take Amazon,

18 for example.

19        You're aware that Amazon also has a header bidding

20 offering in the market, correct?

21 A     Yes, that's right.

22 Q     And that's TAM, right?

23 A     Yep, transparent ad marketplace.

24 Q     Thank you for that.

25        Now, similarly, Amazon built its header bidding

Cross-Examination - R. Goel

1    offering on its own proprietary code and not the open source

2    Prebid API; is that right?

3    A    That's right.

4    Q    And you-all compete for the same publisher customer

5    base with respect to the various header bidding offerings,

6    yeah?

7    A    That is correct.

8    Q    And even though you all compete, you have publicly

9    represented that you are able to integrate or that

10   PubMatic's other offering, the cloud infrastructure

11   offering, is able to integrate with Google's open bidding,

12   yeah?

13   A    That's correct.

14   Q    Now, similarly, in earnings calls and presentations,

15   you've represented that PubMatic has seen a surge in the

16   adoption of its wrapper solution -- that's another word for

17   header bidding offering, right?

18   A    Yes.

19   Q    -- as publishers increasingly abandon their home-grown

20   Prebid wrappers or alternative solutions for PubMatic's Open

21   Wrap, correct?

22   A    That's correct.

23   Q    Okay.  And you've given examples of basically getting

24   customers to switch, yeah?

25   A    Yes.

Cross-Examination - R. Goel

1    Q    Now, moving on to yet another innovation or evolution

2    in this industry, you have, again, represented in various

3    earnings calls and statements that supply path optimization

4    is an important trend in the industry, yes?

5    A    Yes.

6    Q    Okay.  And you have characterized supply path

7    optimization as when publishers and advertisers seek to find

8    the most efficient supply path to facilitate matches, yes?

9    A    Yes.

10   Q    And one way that that is accomplished is by

11   disintermediating the other ad tech tools or players that

12   are in the middle between the buyer and the publisher; is

13   that right?

14   A    Yes.

15   Q    And starting in 2019 of so, PubMatic has entered into

16   agreement directly with some of the largest agencies and

17   advertisers in the world to offer your supply path

18   optimization offering, yes?

19   A    That is correct.

20   Q    And SPO, or supply path optimization, has become a

21   growth area of PubMatic's business; is that right?

22   A    That's right.

23   Q    And it continues to grow as a share of PubMatic's

24   overall business; is that right?

25   A    That's right.

Cross-Examination - R. Goel

1   Q     And, in fact, just in the last Q1 2023 to Q1 2024, SPO

2   as a percentage of PubMatic's activity on platform went from

3   35 percent to 50 percent.

4          Does that sound right to you?

5   A     That does sound right.

6   Q     Now, in May of 2023, PubMatic announced Activate.

7          You're familiar with Activate, right?

8   A     I am, yes.

9   Q     That's the market name for an SPO solution that

10  leveraged an acquisition that you made in order to gain

11  market share in the SPO space, correct?

12  A     Correct.

13  Q     And the way that you've characterized Activate, again,

14  in earnings presentations and calls is that it's an

15  end-to-end SPO solution that enables buyers to execute

16  nonbidded direct deals -- direct deals -- on PubMatic's

17  platform accessing CTV, premium video, at scale, and

18  unlocking unique demand for PubMatic's publishers.  Yeah?

19  A     That's correct.

20         MS. RHEE:  And one more earnings presentation,

21  Your Honor.  And, here, we would seek to introduce as a

22  demonstrative -- and this will be Goel Demonstrative 3 --

23  what you can find on Tab 18.

24  BY MS. RHEE:

25  Q     And now, Mr. Goel, this is the Q1 2023 earnings

Cross-Examination - R. Goel

1  presentation, and this was shortly after you basically

2  integrated the acquisition, yes?

3  A    Yes.

4  Q    Okay.  Now, I want to direct your attention to 472.

5  Okay.  Because I think we all find the visuals helpful.

6           You're familiar with this, correct?

7  A    I am, yes.

8  Q    It's a visual depiction of what supply path

9  optimization does, right?

10 A    Correct.

11 Q    And in particular, what you told the investing

12 community and your would-be investors about how Activate

13 works, yeah?

14 A    Yes.

15 Q    And here you can see -- it's a great graphic -- what

16 Activate does and what supply path optimization does is it

17 creates, as you put it on this slide, a single technology

18 layer between the buyer and the publisher.  Is that right?

19 A    That's correct.

20 Q    And it disintermediates all the stuff in between.

21 A    Specifically for programmatic direct transactions, not

22 all programmatic transactions.

23 Q    All right.  Now --

24           THE COURT:  Now, this is your Demonstrative

25 Number --

Cross-Examination - R. Goel

1          MS. RHEE:  3, Your Honor.

2          THE COURT:  Right.

3          MS. RHEE:  The first one was --

4          THE COURT:  No, I know.

5          MS. RHEE:  Great.

6   BY MS. RHEE:

7   Q    And you've represented again to the investing community

8   that this kind of SPO offering creates a growing moat and

9   flywheel to attract new customers, new publishers, who want

10  to access the unique demand available only on PubMatic,"

11  correct?

12  A    Correct.

13  Q    And you have represented that you anticipate over the

14  next several years there's potential for SPO activity to be

15  75 percent of PubMatic's total buyer activity.  Yes?

16  A    That's correct.

17  Q    Okay.  Now, similarly, again, not in fluff, but in

18  earnings calls and in statements to the investing public in

19  conjunction with your Qs and Ks, you've talked about unique

20  demand, correct?

21  A    Yes.

22  Q    And you've made multiple statements and representations

23  about PubMatic's access to unique demand, correct?

24  A    Yes.

25  Q    Now, just quickly moving in time, you remember being

Cross-Examination - R. Goel

1   asked and shown this document, PTX 1621, about PubMatic's

2   internal assessment or experiments with respect to UPR

3   impact.

4             Do you remember that?

5   A    I do, yes.

6   Q    Okay.  And at the bottom, when you look at B, "Custom

7   wrappers on other GAM publishers," those are Google's own

8   customers, yeah?

9   A    Those are what?  Sorry.

10  Q    Those are Google's own customers, correct?

11  A    Because they are using GAM, Google Ad Manager, yes,

12  their ad server customer.

13  Q    They're an ad server customer; is that right?

14  A    Of Google, yes.

15  Q    And you can see, at least in your own internal

16  assessment, a decline there that's comparable to the decline

17  that you were noting in exchange bidding; is that right?

18  A    That's right.

19  Q    And then in contrast, in D, when you say "Other

20  wrappers seem to be in affected," TAM there would be the

21  Amazon wrapper offering, correct?

22  A    That's right.

23  Q    Okay.  And then you note some others, correct?

24  A    Correct.

25  Q    Those would be Google's competitors, right?

Cross-Examination - R. Goel

1    A    Yes.

2    Q    Okay.  And even in your own internal experimentation

3    and assessment, Google's competitors seem to be unaffected

4    by this UPR change; is that right?

5    A    That's correct.

6    Q    Okay.  Now, I think --

7    A    Just to be clear, though, that's where they're not

8    using Google's ad server, not necessarily Google's open

9    bidding --

10   Q    But they are not affected by UPR; is that right?

11   A    But they're not using the ad server, yes.

12   Q    Correct?

13   A    Yes.

14   Q    But -- but --

15   A    Because they are not using --

16   Q    -- there's another exchange, correct?

17   A    UPR wouldn't be relevant for them if they are not using

18   Google's ad server.

19   Q    Now, when you finally -- last set of questions,

20   Mr. Goel, because I'm mindful of the time.

21        From the time that you had this demonstration,

22   this booth at the tech fair in 20 -- or, I'm sorry -- in

23   2007 to 2024, today, that's approximately 17 years or so, if

24   I've done the math right.  Is that right?

25   A    That's right.

Cross-Examination - R. Goel

1   Q    Okay.  And even in the span of both your direct

2   examination and the cross today, you've testified to a lot

3   of changes in this display advertising or digital

4   advertising ecosystem, right?

5   A    Yes.

6   Q    Okay.  Now, even before we get to 2007, you testified

7   on direct examination about search, right?  But, now,

8   search, that existed well before this 2007 period, right?

9   A    Yeah.  Although I don't recall talking about search

10  under direct examination.

11  Q    Now, because by 2007, I mean, the internet had been

12  around for the greater part of a decade plus, yeah?

13  A    Yes.

14  Q    So that's in the kind of pre-era.  But starting in

15  2007, since you started PubMatic, you saw the creation, the

16  rise, and the adoption of RTB as an industry standard

17  protocol, yes?

18  A    Yes.

19  Q    Okay.  You saw the demise of the waterfall as a very

20  inefficient means of selling digital ad space, at least

21  remnant or -- digital ad space, yes?

22  A    Yes.

23  Q    Okay.  And you testified about -- well, you didn't

24  testify to it, but the documents are replete with references

25  to the creation, the adoption, and growth of social media,

Cross-Examination - R. Goel

1    yes?

2    A    Yes.

3    Q    Also, the creation of mobile phones, correct?

4    A    Yes.

5    Q    Because in 2007, they were maybe brand-new?

6    A    They didn't exist.

7    Q    They didn't exist.  Thank you very much.

8         Okay.  And similarly, the explosion of mobile

9    apps, yes?

10   A    Yes.

11   Q    Okay.  You talked about, as you put it, the

12   transformation of header bidding, correct?

13   A    Yes.

14   Q    Both the creation, the adoption, the explosion, and the

15   transformation of header bidding, yes?

16   A    Yes.

17   Q    The consolidation of a whole bunch of one-off

18   individual publisher header bidding solutions to

19   consolidation in the header bidding space where lots of

20   players, like you, have consolidated with competing

21   offerings, yes?

22   A    Yes.

23   Q    And you've talked about or we've covered the creation

24   of streaming video, yes?

25   A    Yes.

Cross-Examination - R. Goel

1  Q    Connected television, yes?

2  A    Yes.

3  Q    And we just ended with supply path optimization, yes?

4  A    Yes.

5  Q    Okay.  So now that's in the last 17 years, yes?

6  A    Yes.

7  Q    And now certainly, Mr. Goel, are you able to predict

8  what's next in this digital ecosystem, what's going to

9  happen in the next five years?

10  A    Not accurately.

11  Q    Even wildly speculatively?

12  A    I mean, I'm sure we all have predictions.  But, like I

13  said, they may not be accurate.

14  Q    In 2007 did we ever believe that, like, we'd be able to

15  walk around watching TV?

16         THE COURT:  All right, Counsel.  That's enough.

17  BY MS. RHEE:

18  Q    Can you predict what's happening in ten years?

19  A    I thought you were asking about the next five years.

20  Q    Well, now I'm asking about the next ten years.

21  A    I can make predictions, sure.

22  Q    That's all they would be, right?

23  A    Yes.

24  Q    And certainly, you can't predict what's going to happen

25  17 years from now, right?

Cross-Examination - R. Goel

1    A    Correct.

2              MS. WOOD:  Objection, relevance.  Cumulative.

3              THE COURT:  Well, it's not necessary.  It's

4    cumulative.  It's not that relevant.  Let's move on.

5    BY MS. RHEE:

6    Q    Because in digital advertising, as in all tech, a

7    single year is like dog years in terms of technological

8    advancement and innovation, yes?

9    A    I don't have a dog year metric for the pace of

10   innovation.

11             MS. RHEE:  And with that, I pass the witness, Your

12   Honor.

13             THE COURT:  Ms. Wood.

14             MS. WOOD:  Thank you, Your Honor.  First, let me

15   return -- and again, mindful of the redactions, I am going

16   to return to DTX 665.  And I think to the extent the Court

17   is going to --

18             THE COURT:  All right.  What's the tab number?

19             MS. WOOD:  It is Tab 24 of the cross-examination

20   binder.

21             I think I got that wrong.

22             THE COURT:  Yeah, you have it wrong.

23             MS. WOOD:  Sorry.

24             Do you know what tab it is?

25             MS. RHEE:  21.

Redirect Examination - R. Goel

1          MS. WOOD:  21.  All right.  Thank you.

2          THE COURT:  All right.  21.

3          MS. RHEE:  Is it the thing under seal?

4          MS. WOOD:  The DTX 656.

5          THE COURT:  Okay.  Yes.  It's DTX 665.

6          MS. WOOD:  Does the witness have that in front of

7   him?

8          THE WITNESS:  I do have that tab.  Which page?

9                    REDIRECT EXAMINATION

10  BY MS. WOOD:

11  Q    So let's first go to the page you were shown, which I

12  believe was page 39 of 72.

13  A    Okay.  Yes, I have it.

14  Q    And the only question I have is whether the number that

15  you previously referenced on cross-examination relates to

16  open auction open web display only.

17  A    It does not.

18  Q    Okay.  And then I'd like you to look at page 40, the

19  next page.

20  A    Yes.

21  Q    Do any of those numbers relate to open auction open web

22  display only?

23  A    No.

24          MS. WOOD:  Okay.  That's all.

25          Oh, I would ask 40 be kept under seal to the

Redirect Examination - R. Goel

1  extent 39 is going to be kept under seal.  But I don't

2  really see the relevance of 39 in light of that testimony.

3          THE COURT:  All right.  Well, we've talked about

4  it.  It's part of the record.  All right.  But 39 and 40,

5  the redacted versions are the ones that will be on public

6  view.

7          MS. WOOD:  I don't think there's any redactions.

8  They would just be filed under seal with the Court, pages 39

9  and 40 of DTX 665.

10          THE COURT:  They're pure black.  I mean, for

11  purpose of having access --

12          MS. WOOD:  Oh, I see.

13          THE COURT:  So 39 and 40 need to be uploaded,

14  redacted.  And then the two that are under seal will be part

15  of the permanent record for the court under seal.  All

16  right?

17  BY MS. WOOD:

18  Q    All right.  I'd like to return to Goel Demonstrative 1,

19  Tab 4A, page 5.

20          Do you see that?

21  A    I do, yes.

22          MS. WOOD:  Can we have it up on the screen,

23  please.

24          Thank you.

25  BY MS. WOOD:

Redirect Examination - R. Goel

1   Q    Do you remember Ms. Rhee showed you the formats and

2   devices at the bottom?

3   A    I do, yes.

4   Q    Do all publishers sell CTV ad inventory?

5   A    No, they do not.

6   Q    Do all publishers sell online video ad inventory?

7   A    No, they do not.

8   Q    Do all publishers have mobile apps?

9   A    No.

10  Q    Do all publishers sell native ads?

11  A    No.

12        MS. WOOD:  And could I get Demonstrative 3,

13  please.  It looks like this, Tab 18.  Thank you.  It's

14  page 8, I believe.

15  BY MS. WOOD:

16  Q    And you were talking here about a new product for

17  supply path optimization.  I just wanted to make sure I

18  heard you correctly.  Is this a product for programmatic

19  open web display?

20  A    No.

21  Q    This is a product for direct only?

22  A    For direct and focused on CTV and online video.

23  Q    CTV and online video and direct only?

24  A    Correct.

25  Q    Okay.  Now, you talked -- you were shown some documents

Redirect Examination - R. Goel

1   about how various aspects of the market were growing, and I

2   think that you were shown PubMatic, in fact, had a two-times

3   rate of growth in market share.

4              Do you recall that?

5   A    I do, yes.

6   Q    Do you believe that you are facing fair competition in

7   the market for ad tech tools and open web display?

8   A    No.

9   Q    And do you believe that ad tech tools, specifically the

10  ad exchange, is a relevant product market for open web

11  display?

12             MS. RHEE:  Your Honor, one, leading; and two, that

13  assumes the relevant market, which is at issue here.

14             THE COURT:  Well, ultimately, the Court is going

15  to determine what the relevant market is.  But we've been

16  allowing some testimony from people in the industry to give

17  us their views, not on the ultimate issue.

18             MS. WOOD:  Correct, Your Honor.

19  BY MS. WOOD:

20  Q    In a lay sense, do you believe that is a relevant

21  market in which there is competition and people compete

22  against each other?  Do you believe ad exchanges for open

23  web display compete against each other?

24             MS. RHEE:  Your Honor, leading.

25  BY MS. WOOD:

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Redirect Examination - R. Goel

1  Q    How would you characterize -- you were shown on

2  cross-examination various statements about how digital

3  advertising is competitive and complex.

4         Do you recall that?

5  A    Yes.

6  Q    Can you please explain what those statements mean.

7  A    Sure.  There are multiple ad exchanges or sell-side

8  platforms that compete in the software market for being the

9  platform of choice for publishers and buyers.

10 Q    Okay.  And do you believe -- do you believe that you,

11 as in PubMatic, as an ad exchange compete against DSPs, for

12 example?

13 A    No.

14 Q    Do you believe that you compete against ad networks?

15 A    No.

16 Q    Do you believe that you compete against publisher ad

17 servers?

18 A    No.

19         MS. WOOD:  No further questions.

20         THE COURT:  All right.  Any recross?

21         MS. RHEE:  Mercifully, no, Your Honor.

22         THE COURT:  All right.

23         Does anybody anticipate calling this witness

24 again?

25         MS. WOOD:  No, Your Honor.

Redirect Examination - R. Goel

1          THE COURT:  How about the defense?

2          MS. RHEE:  No, Your Honor.

3          THE COURT:  All right.  Mr. Goel, you can stay in

4    court and watch the proceeding or you may leave, but you're

5    not to discuss your testimony with any witness who has not

6    yet testified.  Thank you.

7          THE WITNESS:  Thank you.

8          THE COURT:  All right.  We can start with the next

9    witness.

10         MS. WOOD:  I think that would be -- yeah, let's

11   get at least a little underway, Your Honor.

12         Your Honor, I'm reminded of one thing.  We had

13   agreed that Mr. LaSala, the former employee -- somehow the

14   Google former employees pulled the good card because all the

15   other three Ps are not at certain times.

16         I'm wondering if it's worthwhile to get 15 minutes

17   of testimony, given that tomorrow morning he will then have

18   to wait for Mr. LaSala.  Or could we ask for LaSala to wait

19   for Mr. Kershaw, who's in from California?

20         THE COURT:  How long did you anticipate

21   Mr. Kershaw's direct to take?

22         MS. WOOD:  Much shorter than Mr. LaSala's, I'll

23   tell you that.

24         THE COURT:  All right.  We'll start with

25   Kershaw. Mr, and then LaSala will testify after we finish

Direct Examination - T. Kershaw

1   with Kershaw tomorrow morning.  All right?

2                    DIRECT EXAMINATION

3            MS. WOOD:  Thank you very much, Your Honor.

4   Thereupon,

5                    TOM KERSHAW,

6   Having been called as a witness on behalf of the plaintiffs

7   and having been first duly sworn by the Deputy Clerk, was

8   examined and testified as follows:

9                (Time noted: 5:43 p.m.)

10           THE COURT:  Mr. Kershaw, you're very tall, which

11  is great, but it may be a problem.  That's the microphone in

12  front of you, that black box.  You're going to have to lean

13  over.

14           THE WITNESS:  Should I lean now?

15           THE COURT:  I don't want you to hurt your back.

16  Or speak up in a good loud voice so we can hear you.  It's

17  the end of the day.

18           All right.  Do we have the books?

19           MS. GARCIA:  We don't have any, Your Honor.

20           THE COURT:  Excellent.  All right.  Let's go.

21           MS. GARCIA:  And this is Kelly Garcia for the

22  United States.

23                    DIRECT EXAMINATION

24  BY MS. GARCIA:

25  Q    Good evening, Mr. Kershaw.  Please introduce yourself

Direct Examination - T. Kershaw

1    to the court.

2    A    My name is Tom Kershaw.

3    Q    And where do you work?

4    A    Currently, I'm in the music industry.  Prior to that, I

5    worked at a travel company.  And before that, I was in the

6    advertising industry for about six years, partly with

7    Rubicon Project and partly with Google.

8              THE COURT:  All right.  You are too soft.  So

9    you're either going to have to lean in close to that

10   microphone or just speak up.

11             THE WITNESS:  Okay.  Should I repeat that?

12             THE COURT:  Just talk like that, and you'll be

13   fine.

14   BY MS. GARCIA:

15   Q    Would you please repeat that.  That would be --

16             THE COURT:  I heard it.

17   BY MS. GARCIA:

18   Q    Thank you, Mr. Kershaw.  So what is your current title?

19   A    I'm chief technology officer.  I have been chief

20   technology officer at various companies for over a decade.

21   So I'm an engineer, a software engineer.

22   Q    And prior to your current role, where did you work?

23   A    Prior to currently, I worked at a company called

24   Travelport.  It was a travel software company that let you

25   find air tickets and hotel rooms and various travelly stuff.

Direct Examination - T. Kershaw

1  Q    And what about before that?

2  A    Before that, I was at Rubicon Project, which was also

3  called Magnite at one point in its career.  It was an

4  independent advertising exchange that brought buyers and

5  sellers of online advertising together.

6  Q    You called that an independent exchange.  Why is it an

7  independent exchange?

8  A    Because it's not affiliated with one of the, like,

9  walled gardens or large players in the industry such as

10 Google.  We called it independent to stress the fact that we

11 were -- we didn't have any conflicts of interest.  We were

12 related simply to buying and selling for publishers and

13 buyers.

14 Q    Approximately when were you at Rubicon?

15 A    I want to say I started in early -- sorry.  In Rubicon?

16 That would be October of 2016.

17 Q    Okay.  And when did you leave Rubicon?

18 A    About four years later, five years later.  It would

19 have been 2021-ish.

20 Q    During that period of time, what ad tech tools did

21 Rubicon offer?

22 A    We offered an exchange that allowed publishers to route

23 inventory to us.  We then -- and when that inventory came to

24 us, we'd call a bunch of buyers, run an auction.  We had 250

25 milliseconds to do it; so you had to do it quite quickly,

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - T. Kershaw

1  and we did it billions of times an hour.

2          So we ran a set of technology that, every time

3  someone opens a webpage or opens an app or does anything on

4  the internet, that starts an auction.  So that publisher or

5  webpage called via some other technology to us.  We would

6  see that impression.  We would call as many buyers as we

7  can, get all the bids, pick the winner, and send that back

8  to the ad server, which would you then place that on the

9  page if we won.

10          So it was a set of technology that found a bunch

11  of buyers and ran auctions in real time.  And, again, that

12  thing that was important about it was that you only had 250

13  milliseconds to do it.  So it was very, very -- latency was

14  a -- delay was a very important part of what we were doing.

15  So a lot of the technology we did, we were developing, was

16  to be as fast as possible.

17  Q    And you called that tool an ad exchange; is that right?

18  A    I call it an ad exchange, yeah.

19  Q    Did Rubicon offer any other ad tech tools during your

20  time there from 2016 to 2021?

21  A    Not of any significance from a revenue perspective.  We

22  were -- I think we were in the ad server business for about

23  five minutes before that failed.  And I think we also

24  attempted some managed prebid type of services.  But these

25  were less than 1 percent of revenue.  It was relatively

Direct Examination - T. Kershaw

1    small.  All the money and all the transaction volume came

2    from the core exchange.

3    Q    And if you could just please slow down a little bit for

4    the sake of the record, that would be fantastic.  Thank you,

5    sir.

6         So did Rubicon at that time offer an advertiser ad

7    network?

8    A    An advertising ad network?  No, we were an open

9    exchange, not what we would consider -- an advertising ad

10   network is considered a closed group which is not open to

11   general bidding.  Rubicon was focused on the open exchange,

12   what we call the open market for advertising.

13   Q    Did Rubicon -- did Rubicon offer a DSP?

14   A    We had a DSP that we were building when I arrived.  I

15   ended up killing that project because there was no chance of

16   it being successful.

17   Q    Why not?

18   A    It's a very difficult market.  And, you know, we had

19   limited resources.  We wanted to focus on the exchange part

20   of the business.  And so we were -- we didn't want to put

21   all our eggs all over the place.  It takes a substantial

22   investment to build a business, especially on the buy side

23   when you're anchored on the sell side, as Rubicon was.  So I

24   had made the decision -- it was my decision -- to kill that

25   business.

Direct Examination - T. Kershaw

1  Q    And so could you explain to the Court what were some of

2  your responsibilities when you were chief technology officer

3  at Rubicon?

4  A    Well, I ran the software development process.  So all

5  of the software that we developed was on my team.  I was

6  also in charge of product management, the products we built,

7  operations, security.  And I fixed laptops, you know, and

8  did all of that stuff too, made sure the email servers were

9  critical.  Fun stuff.

10 Q    Could you describe a day -- an example of a day in the

11 life of a CTO at Rubicon?

12        THE COURT:  Let's move this along.  This is not

13 helping.

14        MS. GARCIA:  Sure.  Sure.

15 BY MS. GARCIA:

16 Q    Did you sit on any boards while you were at Rubicon?

17 A    Yes.  I was on the board and was a cofounder of

18 Prebid.org, which was an open-source technology to bring

19 header bidding to the industry in a standardized way and to

20 create an open, transparent environment for software.

21 Because prior to that time, most software in the industry

22 was opaque.  You couldn't tell how it worked.  It was all

23 hidden in what we would call black boxes.

24        And the purpose of Prebid was to create an open

25 environment where nothing was hidden, everything was

Direct Examination - T. Kershaw

1  transparent, and everything was visible by all participants.

2  Q    Let me just take a step back there.  You mentioned

3  Prebid.org.  What is Prebid?

4  A    Prebid -- well, it's -- well, Prebid, the technology,

5  is a set of software that publishers can use to run their

6  own -- take control over the auction process that previously

7  had been determined by what was called the ad server.  So it

8  was a set of technologies for publishers to run large-scale

9  ad systems in their -- on their pages.

10 Q    And what about Prebid, the organization?

11 A    The organization was a group of industry

12 representatives that came together, and we collectively

13 owned the assets.  So the software, the JavaScript that ran

14 on pages, the servers that supported that was collectively

15 and community owned.

16        And whenever we made a decision, it was done

17 publicly.  The arguments were published.  All of the

18 software was published in open servers so anyone can see it.

19 So it was an organization that started with some exchanges

20 and publishers -- about, you know, 20 or 30 of them -- but

21 eventually ballooned into thousands of participants.  And

22 it's viewed as a community asset for running large-scale

23 advertising networks.  I said "networks," but "systems" is

24 probably a better word.

25 Q    Briefly, could you please describe how you founded

Direct Examination - T. Kershaw

1  Prebid?

2  A    How I founded Prebid -- well, at the time header

3  bidding was just starting, and it was not taking off because

4  of the complexities of publishers to run that environment

5  because everyone had a different solution for header

6  bidding.  There was ten different solutions, and they all

7  worked differently.

8        And so we -- at Rubicon, I decided it didn't

9  matter what software we ran as long as we had the publishers

10 running header bidding so we could all get access to that

11 inventory and compete for it, because we didn't see most of

12 the inventory that was out there.  We saw a small sliver of

13 the inventory.

14       So what -- in order to start Prebid, I went to

15 another company in the industry, a company called AppNexus.

16 And they had a Prebid wrapper, and we decided can we -- are

17 we willing to work together and use one common wrapper if we

18 have an organization that governs it?  So it's not owned by

19 any one company, that is not controlled by any one company,

20 and there's no secrets or lies or, you know, obtuse business

21 practices.

22       So I went to AppNexus and suggested we do that.

23 They laughed at me and told me to leave.  Three days later,

24 they called and said maybe it's not such a bad idea, and we

25 formed Prebid as a result.  And soon after, dozens of

Direct Examination - T. Kershaw

1  publishers joined that group.

2  Q    Approximately what year was that?

3  A    It would have been 2017-ish, like, mid to late 2017.

4  Q    And you mentioned AppNexus.  Is that known as Xandr

5  today?

6  A    I don't know what they're known as today.  I think

7  they're part of Microsoft today or something like that.  But

8  it was AppNexus, and then yeah, it was Xandr for a while.

9  Then they were in AT&T.  I don't know.  I can't keep track.

10 Q    So the Court has heard a lot about header bidding, and

11 I want to streamline this a little bit.  You mentioned a

12 header bidding wrapper.  Could you describe from your

13 vantage point as a technology-focused individual at Rubicon,

14 what is a header bidding wrapper?

15 A    It is a set of code that runs on the web page.  So if

16 you're on CNN, it runs code on that webpage to conduct

17 auctions.  That was a substantial difference from how things

18 had heretofore worked.

19       The way it used to work is there's a webpage.  And

20 when it has an ad slot, it calls an ad server.  There's one

21 ad server, really, in the market.  That ad server then calls

22 the demand sources.  So when we were called, we would always

23 be called via the ad server, and the rules would be on the

24 ad server.

25       The header bidding set is let's not rely entirely

Direct Examination - T. Kershaw

1    on the ad server.  Let's run script on the page itself so

2    the publisher can be in control of who's bidding on our

3    inventory, not the ad servers.  That was the innovation that

4    header bidding brought was the ability to give the

5    publishers control over who bid, when they bid, what floors

6    were bid, instead of having that controlled by and

7    configured inside of the ad server.

8    Q    Okay.  When you're referring to the ad server there,

9    just to be clear, that's a publisher ad server?

10   A    The publisher would contract with an ad server company

11   and decide which ad server to use.  That was usually done

12   prior to programmatic.  That was done based on their direct

13   ad sales when they would sell direct -- you know, *The New*

14   *York Times* would sell a banner at the top to Proctor &

15   Gamble.

16          The ad server existed as a piece of technology

17   long before Prebid even existed.  So it's a piece of

18   infrastructure that the publisher connects to their system,

19   but it's typically controlled by and lives in the ad server

20   provider's network.

21   Q    And can you give me an example of a publisher ad

22   server?

23   A    There's only one that I'm intimately familiar with, and

24   that's Google's DFP, as we called it.  They changed its name

25   later.  But Google DFP was the ad server in 95 percent of

Direct Examination - T. Kershaw

1  the customers we dealt with in North America and in Europe

2  as well.

3  Q    I'm sorry.  I didn't catch the end.

4  A    In Europe as well.  I said North America, then I

5  realized, you know, it's pretty much everywhere.  DFP was

6  the dominant ad server in the market.

7  Q    And when did Rubicon begin participating in header

8  bidding?

9  A    Well, because we didn't have access to inventory.  Like

10 I said, the way it worked in the early days is we saw maybe

11 10 percent of the web pages out there would come to us.  We

12 had a good chance of winning when we saw it, but 90 percent

13 of the time we never saw the inventory.  That was controlled

14 by the ad server.

15      So what we wanted to do was let the publishers

16 decide who to call instead of the ad server deciding who to

17 call.  So that's why we created header bidding was for a way

18 for us to get access to that inventory and bid on it because

19 you can't win if you don't bid.

20      So that -- that was the purpose of what header

21 bidding was.  Publishers were -- you know, publishers wanted

22 to call us.  They didn't have the ability to do it with the

23 old environment.  So by putting header bidding into place,

24 it allowed us to see that inventory and compete for that

25 publisher's -- for their business.

Direct Examination - T. Kershaw

1              And the thinking is -- the way auctions work, the

2   more people bid, the higher the prices go.  And when you're

3   the only bidder, you tend to bid pretty low.  But when

4   you're competing with other bidders, bids go up.  It's kind

5   of a -- we call it the tide that rises all boats.  It

6   improves the overall liquidity in the market by having more

7   bidders.

8   Q    And you mentioned publishers.  For the record,

9   publishers were customers of Rubicon?

10  A    Correct.  The publisher was -- it could be -- anyone

11  who operates a website or a mobile app on the internet was

12  what we would consider to be a publisher.

13  Q    And what were some of the benefits of header bidding

14  for Rubicon specifically?

15  A    Well, it allowed us to see inventory and bid on

16  inventory we would not have otherwise seen.  It allows --

17  and the more inventory you see, the better you get.  Because

18  there's, like, this thing called scale, right?

19              So when you're bidding in a blind auction a

20  billion times an hour, what price you bid is quite difficult

21  to calculate.  And, ironically, the best way to get good at

22  bidding is to lose a lot.  So if you lose a lot of auctions,

23  you can understand what prices are too low and you can start

24  to raise your bids and find the optimal level.

25              If you only see that piece of inventory once a

Direct Examination - T. Kershaw

1    day, you're guessing.  But if you saw it ten times in the

2    last five minutes, your ability to bid accurately goes up

3    dramatically.

4            So that's what header bidding helped us to do was

5    to get some scale and to see inventory we just didn't see

6    before so that we could start to optimize and get to a

7    better -- a more competitive bid.

8    Q    You just used the term "bid accurately."  Can you

9    explain what you mean by that.

10   A    Well, I mean, the way programmatic advertising works is

11   you're buying an empty box on *The New York Times*.  And in

12   the old days, you bought that box regardless of who was

13   reading it.  It could be me; it could be you; it could be

14   anyone.

15           But in programmatic advertising, you're buying

16   that box for that specific individual user.  And so it takes

17   a lot of mathematical calculation to figure out what is Nike

18   shoes willing to pay to reach you, the individual, in this

19   context?  It's a much different problem than how much is it

20   worth to buy, you know, this ad for all users.

21           So that's what programmatic advertising on the

22   internet did that was unique is advertising or buying

23   specific individuals and specific profiles, not generic

24   advertising like you'd see on TV, where you could be reading

25   it and -- or you could be watching it, and so could a

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

Direct Examination - T. Kershaw

1  thousand others.

2  Q     Would you call that a specific kind of data?

3  A     We would call it first-party data or third-party data.

4  Q     Sorry?

5  A     First- or third-party data, depending on where that

6  information came from.  But it's user profile information.

7  It allows you to create -- understand preferences.

8        It's why, if you have a 3-year-old kid, seeing a

9  diaper ad is probably a good thing.  If you don't, seeing a

10 diaper ad is not such a good thing.  So it gives you the

11 ability to provide relevant information to people, the

12 theory being you're more likely to click on an ad or value

13 an ad if you care about that topic.

14 Q     And just so we're clear, why was it that Rubicon didn't

15 have access to that information before header bidding?

16 A     Well, the way it was set up before is it was configured

17 in the ad server in this thing called the line item.  So

18 inside of the ad server there's a hierarchical sequence that

19 says first call this person, then call this person, then

20 call that person.

21        And that is determined by ad server placement that

22 was largely controlled within the ad server.  And there were

23 specific rules in Google's ad server that decided who could

24 get called when.  And we didn't want that.  We wanted to see

25 all the inventory and bid on all of the impressions, which

Direct Examination - T. Kershaw

1   is why Prebid and header bidding started to happen to open

2   up and democratize access to publisher inventory, especially

3   the most valuable publisher inventory.

4          THE COURT:  Okay.  Now, it is 6:00, and we have a

5   couple of housekeeping matters to address.  So we have to

6   stop this.

7          So, Mr. Kershaw, we need you back here tomorrow

8   morning.  We're going to put you on first.  And we're

9   starting tomorrow morning at 9:30 because I have other

10  matters I need to address.  But you're free to leave at this

11  time.  Please be back here at 9:30.  We're going to give you

12  a little badge.  Make sure you have that with you because

13  that will get you through the line a bit faster.  All right?

14         THE WITNESS:  Thank you, Your Honor.

15         THE COURT:  All right.  In terms of the

16  housekeeping matters, number one, I do want to read the

17  exhibits into the record that we introduced today.

18         But there's another matter.  I don't think I need

19  counsel.  But just so you know, we had a motion filed by the

20  media today, a motion on behalf of Bloomberg, *The New York*

21  *Times*, and *The Washington Post*, requesting that they be

22  heard tomorrow morning on the need for advance notice to the

23  media before closing the courtroom for sealed proceedings in

24  the above-captioned case.

25         I mean, yesterday, you know, we had the problem

1    arise.  So what they want is -- and I'll put the burden -- I

2    am going to grant that request so we don't have this same

3    problem arise in the future.

4         I don't know whether they'll come in tomorrow

5    morning or 8:30 or this will get the word out to them.  I'll

6    do an order tonight, but it may not be able to get out

7    tonight.

8         If -- you both know what exhibits you're planning

9    to use tomorrow with whatever witnesses are on the list.  If

10   you believe that there is going to be an issue with the

11   sealing matters, I want to know about that now.  Do you

12   think there are going to be any issues that are going to

13   arise tomorrow given the nature of the witnesses that you

14   should know are on deck?

15        MS. WOOD:  Your Honor, I do not believe that will

16   be an issue for the plaintiffs.

17        THE COURT:  All right.  Well, it arose, actually,

18   during cross-examination.

19        So all right.  Ms. Rhee?

20        MS. RHEE:  Yeah.  I was just going to say --

21   wanted to have confirmation about who the witnesses are

22   tomorrow.

23        With respect to Mr. Boland, we will quickly confer

24   to confirm that there's going to be no confidential

25   information.

 1            MS. WOOD:  At least with respect to the direct

 2   exam of the United States, Mr. Boland -- there is

 3   confidential information.  It's been redacted, and we'll be

 4   able to manage the exam without needing to close the

 5   courtroom because we'll do what we've done elsewhere where

 6   we just ask the Court and the witness to look at something

 7   and it's not otherwise displayed --

 8            THE COURT:  All right.

 9            MS. WOOD:  -- if I'm understanding you correctly.

10   So I don't -- to the extent -- there will be no need, as far

11   as I anticipate, for direct examination to close the

12   courtroom for Mr. Boland.

13            THE COURT:  All right.

14            What about from -- Ms. Rhee?

15            MS. RHEE:  I just need to be able to

16   double-confirm with my colleagues, Your Honor, because there

17   are, again, third-party witnesses tomorrow.  But I think,

18   consistent with what happened today, we should be able to

19   work it out.

20            THE COURT:  Well, you're going to have to because

21   we're not going to seal the courtroom tomorrow.  All right?

22            MS. RHEE:  And we understand that, Your Honor.

23   But I just needed an opportunity to confer because we just

24   wanted confirmation about what the schedule was tomorrow.

25            THE COURT:  All right.  The attorney who filed

1    this, Mr. Mills, happens to already be on my docket.  Maybe

2    that's why he raised the motion.  So he is going to be in

3    court tomorrow morning at 8:30.  Any of you who want to be

4    there are welcome, but you don't have to be because I think

5    I've resolved it.  All right?

6            So that's the first housekeeping matter.

7            The second housekeeping matter is I looked during

8    the lunch break at the litigation holds.  I do agree that

9    the amount of detail that's in those holds -- first of all,

10   I can assure the government, they were very through.  They

11   said everything, everything, everything needs to be turned

12   over.  I think it would get into attorney-client

13   communications such that they are entitled to be redacted at

14   this point.

15           All right?

16           MS. WOOD:  May I make one statement, Your Honor?

17   And I'm happy to submit a brief if that would be helpful to

18   Your Honor's decision.

19           But my understanding is there is precedent.  I can

20   cite some District of Delaware cases as well as some

21   District of New Jersey cases.

22           But the District of Delaware case from 2012 notes

23   a, quote, growing trend among courts to find the

24   attorney-client privilege is lost when spoliation has

25   occurred.

 1          And so I would just -- I'm not sure these are even

 2  attorney-client privilege as opposed to work product, which

 3  is what I understood to be claimed.

 4          But even if they were attorney-client, I think,

 5  given the evidence that we have shown in this case, we

 6  believe that we're entitled to see the unredacted litigation

 7  holds.

 8          I would also remind the Court that, when we were

 9  litigating the sanctions motion or the motion for an adverse

10  inference, there was material revision to testimony that had

11  been given to us in response to a 30(b)(6) notice, where

12  literally 60 or more custodians lit hold information had to

13  be revised.  That, again, makes us wary of simply trusting

14  the defendant and their records about when people received

15  notices about what.

16          So given that and given the case law, we would be

17  happy to submit further briefing on this.  We do believe

18  that -- not seeking a waiver of the entire privilege across

19  the entire case, but the waiver with respect to the

20  litigation hold materials we do seek, Your Honor.

21          THE COURT:  All right.  Well, I'm not going to

22  hear extensive argument on this issue now.  Frankly, I don't

23  need to resolve it at this point.  I'll give you an

24  opportunity to brief it, and then Google can file a

25  response.  But at this point, I'm not requiring them to be

1  turned over.  All right.

2          MS. WOOD:  Thank you.

3          THE COURT:  All right.  That was the second

4  housekeeping matter.

5          The third one, then, is let's read into the record

6  those exhibits that we believe have been entered.

7          And, again, the protocol has been any

8  demonstrative that was discussed during the trial, that gets

9  published.  All right.  So each side that used

10  demonstratives, make sure they are properly published before

11  10:00 tomorrow.  And then we've made crystal clear as to the

12  redactions.  So the burden is on you all to do that

13  correctly.

14          And so listen to what my courtroom deputy has on

15  this.

16          MS. WOOD:  And, Your Honor, just one

17  clarification.  I believe on September 10, which was day 2

18  of the trial, we didn't read in the certain exhibits

19  concerning the Lipkovitz deposition.  I'm happy to read them

20  now.

21          I think we just -- for that one particular day, we

22  deferred the read-in at least with respect to those.  We did

23  the read-in first of what had already previously been

24  entered for the rest of the day, and then I read in some

25  additional ones for Mr. Lipkovitz.  So we didn't have a

1   second read-in of that, if that makes sense.

2           So I'm happy to do that now or submit something in

3   writing, whatever would be --

4           THE COURT:  But they're all up on the website?

5           MS. WOOD:  Yes, they're all up on the website.

6           MS. SESSIONS:  We don't have the list on hand for

7   the Lipkovitz deposition.  So it sounds like this is maybe

8   something we should resolve tomorrow so that we can make

9   sure.

10          THE COURT:  Just send it to us.  Okay?

11          MS. WOOD:  Of course.

12          THE COURT:  That's fine.  All right.

13          THE COURTROOM DEPUTY:  PTX 426, PTX 469, PTX 534,

14  PTX 609, PTX 611, PTX 625, PTX 698, PTX 699, PTX 715, PTX

15  1853, PTX 1854, PTX 751, PTX 748, PTX 762, PTX 784, PTX 763,

16  PTX 768, PTX 819, PTX 884, PTX 850, DTX 701, DTX 829, DTX

17  319 with the redactions, DTX 1484, PTX 36, PTX 1677, PTX

18  1621, PTX 65 under seal, only pages 39 and 40.

19          That's all.

20          THE COURT:  Is that consistent with what your

21  records are showing?

22          MS. WOOD:  I believe it is, Your Honor.  We'll let

23  you know in the morning if it's not, but I believe it is.

24          MS. SESSIONS:  It's consistent with ours, and then

25  we had three demonstratives with Mr. Goel as well.

1           THE COURT:  All right.  You will have those on the
2   web.
3           Okay.  Now, we do have other matters.  So you
4   don't have to remove the boxes, but you are going to have to
5   clear your tables before tomorrow for tomorrow morning.  All
6   right?
7           And you all don't have to be back here until 9:30
8   unless you want to see what we're going to do.  I'm probably
9   going to call the media motion first just to put it on the
10  record.
11          MS. WOOD:  That will be at 8:30, Your Honor?
12          THE COURT:  8:30.  We'll recess court until
13  tomorrow.
14              (Proceedings adjourned at 6:10 p.m.)
15          ------------------------------------
16
17
18
19
20
21
22      I certify that the foregoing is a true and
23   accurate transcription of my stenographic notes.
24
                                    /s/
25                      Rhonda F. Montgomery, CCR, RPR

          Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599