```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                   ALEXANDRIA DIVISION

 3    --------------------------x
      UNITED STATES, et al.,       :   Civil Action No.:
 4                                 :   1:23-cv-108
                   Plaintiffs,     :
 5         versus                  :   Friday, September 13, 2024
                                   :   Alexandria, Virginia
 6    GOOGLE LLC,                  :   Day 5 p.m.
                                   :   Pages 1-161
 7                 Defendant.      :
      --------------------------x

 8

 9         The above-entitled bench trial was heard before the
      Honorable Leonie M. Brinkema, United States District Judge.
      This proceeding commenced at 9:28 a.m.
10

11                    A P P E A R A N C E S:

12    FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                             OFFICE OF THE UNITED STATES ATTORNEY
13                           2100 Jamieson Avenue
                             Alexandria, Virginia  22314
14                           (703) 299-3700

15                           JULIA TARVER WOOD, ESQUIRE
                             AARON TEITELBAUM, ESQUIRE
16                           KELLY GARCIA, ESQUIRE
                             DAVID TESLICKO, ESQUIRE
17                           DANIEL GUARNERA, ESQUIRE
                             MICHAEL WOLIN, ESQUIRE
18                           UNITED STATES DEPARTMENT OF JUSTICE
                             ANTITRUST DIVISION
19                           450 Fifth Street, NW
                             Washington, D.C.  20530
20                           (202) 894-4266

21    (State of VA)          TYLER HENRY, ESQUIRE
                             OFFICE OF THE ATTORNEY GENERAL
22                           OFFICE OF THE SOLICITOR GENERAL
                             202 North Ninth Street
23                           Richmond, Virginia  23219
                             (804) 786-7704

24

25         COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES


           Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599
```

1                      P R O C E E D I N G S

2    FOR THE PLAINTIFFS:     ELLIOTT DIONISIO, ESQUIRE
     (State of CA)          OFFICE OF THE CALIFORNIA ATTORNEY
3                           GENERAL
                            300 South Spring Street
4                           Suite 1700
                            Los Angeles, California   90013
5                           (213) 269-6681

6    FOR THE DEFENDANT:      CRAIG REILLY, ESQUIRE
                            LAW OFFICE OF CRAIG C. REILLY
7                           209 Madison Street
                            Suite 501
8                           Alexandria, Virginia   22314
                            (703) 549-5354
9
                            ERIC MAHR, ESQUIRE
10                          WILLIAM ISAACSON, ESQUIRE
                            TINA LARITZ, ESQUIRE
11                          PAUL, WEISS, RIFKIND,
                            WHARTON & GARRISON LLP
12                          2001 K Street, NW
                            Washington, D.C.   20006
13                          (202) 223-7300

14   COURT REPORTER:         RHONDA F. MONTGOMERY, CCR, RPR
                            Official Court Reporter
15                          United States District Court
                            401 Courthouse Square
16                          Alexandria, Virginia   22314
                            (703) 299-4599
17                          RMontgomery@courtreport.net

18

19

20

21

22

23

24

25

            Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

3

1                          TABLE OF CONTENTS

2                             WITNESSES

3     On behalf of the Plaintiffs:

4     CHRIS LASALA

5     Cross-examination by Mr. Isaacson .........4
      Redirect examination by Mr. Teslicko ......14
6     Recross-examination by Mr. Isaacson .......20

7     LUKE LAMBERT

8     Direct examination by Ms.Clemons ..........24
      Cross-examination by Ms. Phillips ........44
9     Redirect examination by Ms. Clemons .......56

10    ARNAUD CREPUT (Read)

11    Direct examination by Ms. Clemons ........62

12    BRIAN BOLAND

13    Direct examination by Ms. Wood ............95
      Cross-examination by Mr. Justus ..........133
14    Redirect examination by Ms. Wood ..........146

15    BRIAN O'KELLEY (Video)

16

17                           MISCELLANY

18    Proceedings September 13, 2024 ............4
      Certificate of Court Reporter ............161
19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE COURT:  Mr. Isaacson, how much longer are you

3  anticipating for this cross?

4          MR. ISAACSON:  10 or 15 minutes.

5          THE COURT:  Perfect.  That's fine.

6          MR. ISAACSON:  It may not be perfect, but --

7                    CROSS-EXAMINATION

8  BY MR. ISAACSON:

9  Q    Mr. LaSala, we were talking about DTX 463.

10 A    Yes.

11 Q    This was the sell-side competitive review.  And just

12 turning to page 2, the purpose there is that Facebook and

13 Amazon have been winning more mind and market share from our

14 top partners due to the growing array of publisher

15 solutions.

16          And then if you just turn to page 4 -- and I'm not

17 going to bother you with everything that's in here.  Every

18 page is about the competition issues.

19          But page 4 of 10 is our competitive focus is

20 shifting to Facebook and Amazon as they gain momentum in

21 three key areas relevant to DRX.

22          And DRX is also another name for AdX, right?

23 A    Yes.

24 Q    And going to -- and the initiatives are listed there.

25 I won't -- they sort of speak for themselves.  And so on

Cross-Examination - C. LaSala

1   page 10 there's also a list where Facebook and Amazon have

2   increasingly launched new initiatives and products to help

3   publishers gain new users and grown revenue.

4           In general, looking at this competitive review,

5   how does it compare to other competitive reviews that you

6   were doing as competition as part of what you were seeing at

7   Google?

8   A    I mean, the content is always different, but this is,

9   you know, relatively similar.  Like, we just understand what

10  our competitors are doing and make sure we're documenting it

11  and analyzing it.

12  Q    All right.  Why don't you move to DTX 695, which should

13  be next in your binder.

14  A    Yep.

15  Q    All right.  This is titled "Google Display and Video

16  Ads Market Share."

17          THE COURT:  Is there any objection to this

18  exhibit?

19          MR. TESLICKO:  Objection on hearsay grounds, Your

20  Honor.

21          THE COURT:  It's overruled for the same reason.

22    (Defendant's Exhibit Number **695 admitted into evidence.**)

23  BY MR. ISAACSON

24  Q    All right.  It says "global GTM."  GTM is what?

25  A    The go-to-market teams.

Cross-Examination - C. LaSala

1  Q    All right.  And what was your role in this document?

2  A    I was a reviewer.  It was presented to me.

3  Q    All right.  And it's titled -- there's -- market share

4  is used in the title.  What type of reports were you seeing

5  or reviewing about market share while you were at Google?

6  A    Well, we looked at different slices of our business in

7  different ways.

8  Q    Okay.

9  A    I'm not sure I understand your question.

10  Q    Well, can we look at page 3 of 7.

11  A    All right.  Yes.

12  Q    All right.  I'm not going to ask you about the chart on

13  the left.  The chart was in a previously admitted exhibit.

14         MR. ISAACSON:  Your Honor, we believe that's

15  worldwide statistics, which was one of your questions.

16         THE COURT:  All right.

17  BY MR. ISAACSON:

18  Q    The bullets at the left are different in this document,

19  at least the top two.  It says, "Facebook has become the

20  dominant player, 35 percent share in 2017, and is expected

21  to continue to grow faster than the market through 2020.

22  Google has been in second place since 2014, and the gap is

23  expected to continue to widen."

24         What do you recall about conversations about being

25  in second place to Facebook?

Cross-Examination - C. LaSala

1          MR. TESLICKO:  Objection, Your Honor.  It calls

2   for hearsay.

3          THE COURT:  It's not being offered for the proof

4   of its contents.  It's his impression on him.  So overruled.

5          THE WITNESS:  Can you repeat the question.

6   BY MR. ISAACSON

7   Q    Right.  What do you recall about internal conversations

8   at Google as part of your work about being in second place

9   to Facebook?

10  A    Yeah, so this is an analysis of, like, the buyers --

11  like, where the buyers -- it looks like buyers buy

12  everywhere, not just through our ad tech.

13         So my buy-side counterparts were closer to this,

14  but I just remember them worrying about losing share to

15  Facebook.

16  Q    All right.  Then if we can look at the next exhibit,

17  which would be DTX 754.

18         THE COURT:  Any objection to 754?

19         MR. TESLICKO:  Same hearsay objection.

20         THE COURT:  All right.  The same ruling.

21  Overruled.  It's in.

22    (Defendant's Exhibit Number **754 admitted into evidence.)**

23  BY MR. ISAACSON

24  Q    And what was your role in -- this is titled

25  "Competitive Analysis, Amazon Advertising Display."

Cross-Examination - C. LaSala

1          Your name is on the slide on the first page.

2   Would you tell me what your role was in this document?

3   A     It was presented to me.

4   Q     And there's a number of pages about Amazon.  Just

5   looking at page 4, what is Amazon really up to?  There's a

6   discussion of business risks to Google, including

7   advertisers shifting budgets.

8          Would you explain what your understanding is about

9   what the concern was of advertisers shifting budgets to

10  Amazon?

11  A     Well, practically speaking, advertisers have limited

12  budgets, and they spend them in lots of different places.

13  They tend to multihome.  They tend to buy in multiple

14  platforms.  So -- but budgets are limited.  So they'll spend

15  more here versus more here based on the efficacy of the ad

16  campaign.

17  Q     All right.  It says right below that Amazon pitching

18  ROI -- which we've heard is return on investment -- to brand

19  buyers with unique measurement capabilities.

20         Would you explain about how pitching about return

21  on investment relates to the issues of advertisers shifting

22  budgets.

23  A     Well, the better the ROI they get from that buying

24  platform, the more money they'll spend.

25  Q     All right.  And then Amazon's offering -- the fourth

Cross-Examination - C. LaSala

1   bullet, Amazon is offering a lower-cost header bidding

2   wrapper to publishers, easily connecting them to incremental

3   demand sources.

4           I believe you referred to this in your testimony,

5   but maybe just tie that back in to what you were saying

6   before.

7   A    Yeah, I did.  Well, this is what I was referring to

8   before, that this low-cost header bidder wrapper was -- I

9   believe was inevitably named TAM or UAM.  And this was my

10  concern, that they were, you know, going to do this,

11  essentially offer it for free or close to free without all

12  of the protections that a really quality exchange would

13  have.

14  Q    All right.  If you turn to page 9 of 17, the title is

15  "Amazon has a competitive offering to GDN and DBM."

16          I think we -- DBM is DV360, right?

17  A    Yes.

18  Q    And GDN, does that include Google Ads?

19  A    Yes.

20  Q    Turning to page 15, do you remember this discussion

21  about Amazon creating an Amazon Prime for Publishers and

22  what the concern was there?

23  A    I'm not remembering the details of that word "Amazon

24  Prime."

25  Q    Okay.  In the second paragraph of the speaker notes,

Cross-Examination - C. LaSala

1  there's a reference to a partnership with FAN, between

2  Amazon and FAN.  Do you have a recollection of that topic?

3  A    I don't -- I don't recall the specifics.

4  Q    Okay.  And what about -- up above in the slide, it

5  says, "Amazon offers a nearly free server-side header

6  bidding wrapper.  Partnership with Facebook Audience Network

7  allows pubs to easily integrate Facebook demand.  Publishers

8  are reporting 20 to 30 percent yield lift, as high as two to

9  three times in isolated cases, unknown fill rate."

10         Does that help you remember anything about the

11  integration between Facebook Audience Network and Amazon?

12  A    I mean, this is suggesting that Facebook would be a

13  buyer alongside Amazon in that product.  So it would make

14  sense to me that yield would increase and it would deliver

15  good ROI.

16  Q    All right.  If you look at DTX 758, which would be the

17  next document in your binder --

18         THE COURT:  Any objection?

19         MR. TESLICKO:  The same hearsay objection, Your

20  Honor.

21         THE COURT:  All right.  Again, I'm going to deny

22  it.  It's in.  758 is in.

23   (Defendant's Exhibit Number **758 admitted into evidence.**)

24  BY MR. ISAACSON

25  Q    This is titled "Facebook GTM" -- which you said was

Cross-Examination - C. LaSala

1  go-to market -- "Competitive Intelligence."

2           What was your role in this document?

3  A    A reviewer.

4  Q    Okay.  And what is a GTM competitive intelligence?

5  What does that mean to you?

6  A    This was a group within our go-to-market teams that did

7  a competitive analysis of Facebook.

8  Q    Okay.  It says on page 3 under the speaker notes,

9  "Facebook is one of our largest diverse competitors."  Then

10  it talks about regions in the world, including North

11  America.

12           "We will walk through their emerging strategy and

13  overview of how they compete directly with and present a

14  threat to Google."

15           And then there are pages and pages on Facebook.

16           Is this the type of competitive analysis that you

17  were seeing about Facebook while you were at Google?

18  A    Yes.

19  Q    All right.  If we turn to page 27 in this document --

20  well, actually, 26.

21           We're beginning a section of this competitive

22  analysis called "Evolution of Facebook's Full Stack."

23           And then there's a slide on the next page,

24  "Evolution of Facebook Ad Technology Ambitions."

25           And there's a row with Google's logo at the left

Cross-Examination - C. LaSala

1  and a row with Facebook's Google [sic] at the left.

2          And what are those two rows comparing at a high

3  level?

4  A    The different ad tech products that each company

5  offers.

6  Q    The last document in your binder is DTX 801.

7          THE COURT:  Any objection?

8          MR. TESLICKO:  Your Honor, hearsay objection to

9  this document as well.  And I don't see any indication that

10 Mr. LaSala is on this document.

11         THE COURT:  See if you can lay a foundation.

12         MR. ISAACSON:  Sure.

13 BY MR. ISAACSON

14 Q    The document is titled "Web 2020 Product and Business

15 Strategy, last updated October 2019."

16         Do you recognize this document?

17 A    Yeah.  My team would update this every year at my

18 direction.

19         THE COURT:  I'm sorry.  And so your team produced

20 this?

21         THE WITNESS:  My team produced this every year at

22 my direction.

23         THE COURT:  It's in.  Overruled.

24   (Defendant's Exhibit Number **801 admitted into evidence.**)

25 BY MR. ISAACSON

Cross-Examination - C. LaSala

1   Q     And who at Google was involved in this type of strategy

2   document?

3   A     Excuse me.  Repeat the question.

4   Q     It says, "Strategy Document."  Who at Google was

5   involved in this type of strategy document?

6   A     In the creation of it?

7   Q     Yeah, creation, reviewing --

8   A     So me and my team with the go-to-market teams, we would

9   create it.  And then it would be reviewed with the

10  cross-functional sales team.  It was primarily a document

11  that was used to help get our global sales teams aligned on

12  our go-to-market strategy.

13  Q     For example, page 5, you see there's a section called

14  "Competition, Own the Tag."  And there's AT&T, Time Warner,

15  and AppNexus.  And just turning to the next page, there's

16  competition circumventing our tag.  And you see Amazon on

17  page 6, Facebook on page 7, 8, Index Exchange, Rubicon,

18  OpenX.

19          Is that information that was being provided by

20  that go-to-market team that you said was providing

21  competitive information?

22  A     Yes.

23          MR. ISAACSON:  All right.  Thank you for your

24  time.

25          THE COURT:  All right.  Any redirect?

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Redirect Examination - C. LaSala

1      MR. TESLICKO:  Briefly, Your Honor.

2      If we could bring back up DTX 758, page 27.  DTX

3  758, page 27.

4                    REDIRECT EXAMINATION

5  BY MR. TESLICKO

6  Q    Mr. LaSala, Google's counsel was just asking you

7  questions about this document, right?

8  A    Yes.

9  Q    I want to look at the Facebook row on this chart.

10 Starting with "DSP," you see that Atlas DSP is crossed out.

11 A    Yeah.

12 Q    What does that mean?

13 A    I don't know what it means, but my recollection is that

14 Facebook bought a company called aQuantive or Atlas.  I

15 think the company's name was aQuantive, A-Q-U-A-N-T-I-V-E.

16 It might have been named Atlas, but Atlas might have been a

17 product.  But it's sort of irrelevant.

18      And they -- that company had different --

19 different tools, ad tech tools.  And then Facebook decided

20 to exit some of them and keep some of them.

21 Q    And that's what the cross-out means here, right?

22 Facebook shut down the Atlas DSP?

23 A    I would assume so, but I don't know.  But it's a

24 reasonable assumption.

25 Q    Do you know -- I'll ask a different question.  Looking

Redirect Examination - C. LaSala

1   over to the exchange column, do you see the exchange column,

2   Mr. LaSala?

3   A    Yes.

4   Q    And there's another cross-out in that exchange column

5   for Facebook.  What's that cross-out mean?

6   A    Yeah, I would assume that they exited that business in

7   favor of just doubling down on the audience network, which

8   is a network.

9   Q    If we move over to the SSP column, LiveRail is in that

10  row for Facebook, and it's crossed out again.  What's that

11  mean?

12  A    I would assume it means the same thing.

13  Q    The same thing for LiveRail in the publisher ad server

14  column.  That means Facebook exited the market for that --

15  A    That's my recollection.

16  Q    And so looking at this chart as a whole, the only place

17  where Facebook offered a product was for ad networks,

18  correct?

19  A    Well, this would suggest for the buy-side ad server and

20  the ad network.

21  Q    Okay.  Fair correction.

22       The only two places on this chart, according to

23  this chart, that Facebook competes with Google is the Atlas

24  marketer ad server and the Facebook audience ad network,

25  right?

Redirect Examination - C. LaSala

1  A     Yes.

2  Q     And just to be clear, since we haven't talked about it

3  much in this case, the marketer ad server is completely

4  different from a publisher ad server, right?

5  A     Yes.  Yes.

6  Q     Okay.  Now, you were asked a number of questions about

7  Amazon and Facebook more generally.  You mentioned that

8  Amazon had lots of resources, right?

9  A     Yes.

10 Q     And you were shown documents from 2019 about Amazon as

11 a competitive threat?

12 A     Yes.

13 Q     Amazon has never launched an ad exchange to your

14 knowledge, right?

15 A     Well, the UAM and TAM is a pseudo ad exchange.

16 Q     TAM is not a replacement for the AdX ad exchange, for

17 example, right?

18 A     Not in my opinion.

19 Q     Okay.  And Amazon, since 2019, in the last five years,

20 has not launched a publisher ad server, right?

21 A     I have no idea.

22 Q     You're not aware that they've launched one, right?

23 A     No.

24 Q     Okay.  And your concern -- I just want to make sure I

25 understand what the concern was.

Redirect Examination - C. LaSala

```
 1          Your concern was that Amazon would introduce TAM,
 2   a header bidder wrapper, right?
 3   A     Yep.
 4   Q     And give it away for free, right?
 5   A     Or close to.
 6   Q     Close to.  And that's what they did, at least
 7   originally, correct?
 8   A     Yes.
 9   Q     And, by contrast, Google offered exchange bidding or
10   open bidding, right?
11   A     Yes.
12   Q     That's the equivalent of a TAM, for example?
13   A     It was our response to header bidding, yes.
14   Q     And Google charged 5 percent for its product?
15   A     I don't remember the amount, but that sounds right.
16   Q     And Amazon charged -- almost free for its competing
17   product, correct?
18   A     Yes.
19   Q     And you were concerned that by Amazon offering TAM for
20   almost free, almost giving it away, to use your words,
21   Google would be forced to reduce its prices, right?
22   A     Well, not forced to reduce its prices, that they would
23   win the exchange game.
24   Q     I thought we talked -- you testified earlier,
25   Mr. LaSala, Amazon does not offer an ad exchange that is
```

Redirect Examination - C. LaSala

1  competitive with the AdX ad exchange, correct?

2  A    No.   What I testified was that it provides similar

3  functionality; it's just not as good as.   I wouldn't call it

4  a replacement to even if others did.

5  Q    And to use TAM, a publisher still needs a publisher ad

6  server, right?

7  A    Yes.

8  Q    That's not offered by Amazon?

9  A    It was not at the time.

10  Q    And TAM runs an auction amongst ad exchanges, right?

11  A    Ad exchanges and other demand sources, networks as

12  well, maybe DSPs.

13  Q    If we could pull up DTX 695 and go to page 3.  Do you

14  remember Google's counsel asking you about this slide?

15  A    Yes.

16  Q    And you said it related to where buyers buy; is that

17  right?

18  A    Yes.

19  Q    And just to be clear, this chart does not show where

20  open web publishers sell their inventory, right?

21  A    This is a buyer view only, yes.

22  Q    Okay.   You were asked a number of questions about what

23  advertisers do and how they buy.  Do you remember that?

24  A    I don't, even though it was a few minutes ago.

25  Q    Just to be clear, Mr. LaSala, you never spoke with

Redirect Examination - C. LaSala

1 advertisers as part of your job at Google, right?

2 A    Very rarely.

3 Q    Very rarely.  Okay.

4         And -- sorry.  Oh, in DTX 801 -- we don't have to

5 pull up the document, but you were asked questions about

6 "own the tag."  Do you remember that testimony?

7 A    I was asked today?

8 Q    Yes.  We could go to --

9         THE COURT:  Without the prefix that "you were

10 previously asked," just ask the question.  All right?

11         MR. TESLICKO:  Understood.

12         THE COURT:  It shortens things.

13 BY MR. TESLICKO

14 Q    Mr. LaSala, own the tag is a reference to a publisher

15 using the DFP publisher ad server, right?

16 A    Yes.

17 Q    One more set of questions.

18         Mr. LaSala, during your time at Google, you never

19 conducted any study to compare brand -- fraud protections or

20 privacy protections on Google's ad exchange versus any other

21 competing ad exchange, correct?

22 A    Me personally?

23 Q    Uh-huh.

24 A    No.

25 Q    And you recall testifying at your deposition that you

Recross-Examination - C. LaSala

1  also couldn't remember any study conducted by anybody else

2  at Google comparing fraud or privacy protections on AdX

3  versus other ad exchanges, right?

4  A    I don't recall making that statement, but I believe

5  it's true.

6  Q    You don't recall -- you don't believe Google ever

7  conducted such a study, correct?

8  A    No.  I actually would've -- I would expect that it

9  would have been conducted even if that's not what my

10  deposition testimony said.

11  Q    Okay.  Do you recall any particular study that was

12  conducted by Google that compared privacy and fraud

13  protections on AdX versus another ad exchange?

14  A    No, not a specific analysis.

15         MR. TESLICKO:  Okay.  And with that, we have no

16  further questions, Your Honor.

17         One administrative matter --

18         MR. ISAACSON:  If I may?

19         MR. TESLICKO:  Oh, sorry.

20         THE COURT:  Recross?

21         MR. ISAACSON:  Just very briefly on those two

22  documents, Your Honor.

23                  RECROSS-EXAMINATION

24  BY MR. ISAACSON:

25  Q    DTX 758, if we turn to page 27.

Recross-Examination - C. LaSala

1    A    What page?

2    Q    Page 27 of 86, the chart.

3    A    Yes.

4    Q    You went through the blue boxes.  The first speaker

5    note says, "Facebook aims to provide solutions to all of the

6    above with a closed ad ecosystem offering similar scale and

7    cost efficiencies coupled with zero fraud, full

8    transparency, and robust ROI tracking, introducing new ad

9    formats for top-of-funnel brand objectives."

10              Right?

11   A    Yes.

12   Q    And this competitive analysis in comparing Google to

13   Facebook, were you concerned about your entire ad stack?

14   A    That's what this suggests; so I don't --

15   Q    All right.  And then it was -- they said, well, look,

16   the blue boxes disappeared for publishers.

17              If we look to page 31 of 86, the slide titled

18   "Continued efforts on securing the tag with premium pubs,"

19   publishers.

20              And the first speaker note says, "Facebook can no

21   longer offer a full stack, but they are still aggressively

22   pursuing publisher relationships through their key points of

23   differentiation."

24              And it includes -- the key selling points include

25   the ability to use Facebook targeting data, high RPMs in

Recross-Examination - C. LaSala

1  performance, demand, user experience and monetization

2  options, and server parity pricing.

3         Were you concerned about these competitive efforts

4  on the sell side from Facebook?

5  A    Yes.  They're reasonable.

6  Q    All right.  And then DTX 695, page 3, you were asked --

7  and you explained that this had to do with the advertiser

8  side and not supply inventory.

9  A    Yes.

10 Q    If you turn to page 5, which only requires you to turn

11 one page, "Inventory view of market.  Since 2012, Google

12 hasn't meaningfully increased its share of inventory."

13        This is referring to inventory for advertising,

14 correct?

15 A    Yes.  Yes.

16 Q    And included in this chart -- can you see Amazon there?

17 A    Yes.

18 Q    You're starting to chart back then Amazon supply

19 inventory, and you're also including within this -- you see

20 AdMob?

21 A    Yes.

22 Q    This is more than open web.  It includes at least apps,

23 doesn't it?

24 A    It includes only apps.

25 Q    Okay.  It's only apps.  Okay.

Recross-Examination - C. LaSala

1  A    AdMob, I'm saying specifically.

2  Q    Yes, yes, AdMob.

3           And I'll let the rest of the document speak for

4  itself.   Thank you.

5           THE COURT:  All right.  Does anybody anticipate

6  calling this witness again?

7           MR. TESLICKO:  No, Your Honor.

8           MR. ISAACSON:  No, Your Honor.

9           THE COURT:  All right.  Sir, you're now excused as

10  a witness.  You can stay in court and watch the proceedings

11  or go back to, I guess, New York.

12           THE WITNESS:  You know what I'm going to do.

13           Thank you, Your Honor.

14           THE COURT:  You're not to discuss your testimony

15  with any witness who has not yet testified.  Thank you.

16           THE WITNESS:  I understand.

17           THE COURT:  All right.  Your next witness.  I

18  understand you've changed the order.  Is that correct?  You

19  are going to go with Mr. Lambert?

20           MS. WOOD:  Yes, Your Honor.

21           THE COURT:  All right.

22           MR. TESLICKO:  Your Honor, while we change

23  witnesses, we have one brief housekeeping matter.

24           THE COURT:  Yes.

25           MR. TESLICKO:  That is, under the arrangement

Direct Examination - L. Lambert

1    discussed with the Court previously, we want to move in 21

2    documents that relate to Mr. LaSala's testimony.  These were

3    disclosed to Google's counsel Tuesday night.  There's 21

4    documents in total.  12 of them are covered by the

5    stipulation between the parties.  I can read those off or --

6            MR. ISAACSON:  Can I confer with my colleagues

7    before we do this? because I'm not up to date.

8            THE COURT:  Let's do this at the end of the trial

9    or do it Monday morning.  Okay?

10            MR. TESLICKO:  Yes, Your Honor.

11            THE COURT:  Okay.

12            MS. CLEMONS:  Good afternoon, Your Honor.  I'm

13    Katherine Clemons.  The United States calls Luke Lambert to

14    the stand.

15            THE COURT:  All right.

16    Thereupon,

17                    LUKE LAMBERT,

18    Having been called as a witness on behalf of the plaintiffs

19    and having been first duly sworn by the Deputy Clerk, was

20    examined and testified as follows:

21                    (Time noted:  2:18 p.m.)

22            MS. CLEMONS:  We have no documents, Your Honor.

23            THE COURT:  All right.

24                    DIRECT EXAMINATION

25    BY MS. CLEMONS

Direct Examination - L. Lambert

1  Q    Good afternoon, Mr. Lambert.  Could you please state

2  your name for the record.

3  A    Luke Lambert.

4  Q    Where are you employed?

5  A    OMD USA.

6  Q    What type of business is OMD?

7  A    OMD is a marketing and advertising firm.

8  Q    And how long have you worked at OMD?

9  A    Just under eight years.

10 Q    What is your current title?

11 A    Chief innovation and product solutions officer.

12 Q    And how long have you been working in some capacity in

13 advertising overall?

14 A    My entire career, which is just under 20 years.

15 Q    And can you describe your current role at OMD?

16 A    Yes.  My current role focuses on our product solutions,

17 effectively what we do for our clients across the board.

18 Our products are ultimately services, so laying out how we

19 provide the service for everything from planning through

20 activation and optimizations.

21 Q    And did you say media planning?

22 A    Yeah, media planning.

23 Q    Okay.  And what do you mean by optimizations?

24 A    Optimizations are real-, near-, and far-time ways of

25 allocating investments or dollars that our clients have in

                     Direct Examination - L. Lambert
1  the market at any given time.

2  Q    And who are OMD's customers, clients?

3  A    Specific clients?

4  Q    No.  Just who are your customers?

5            THE COURT:  You mean generically?

6            MS. CLEMONS:  Yeah.

7  BY MS. CLEMONS

8  Q    What types of --

9  A    Big brands, blue-chip brands.  I'm sure you guys all

10 know who they are.  You'd know their names for sure.

11 Q    Advertisers?

12 A    Advertisers, yeah.

13 Q    Mr. Lambert, have you heard the term "open web display

14 advertising"?

15 A    Yes, absolutely.

16 Q    Is that a term that you've heard commonly in the

17 industry?

18 A    Yes.

19 Q    And does that include prior to this case?

20 A    Absolutely.

21 Q    So is part of the media planning work that you do for

22 your advertiser clients, do you also do channel planning?

23 A    Yeah.  Channel planning is a critical stage.

24 Q    And could you describe for the Court OMD's channel

25 planning process at a high level?

Direct Examination - L. Lambert

1  A    Yeah.  Channel planning is ultimately the allocation of

2  an investment across a channel mix.  Our process starts with

3  media mix models.  Media mix models are typically delivered

4  annually, possibly biannually, to look back and tell us how

5  any individual channel has performed towards the overall

6  business goals at the time.

7         We ingest client-specific models, but we also have

8  models that have been built by vertical across our broad

9  landscape of clients within those verticals.  So we use

10  those models to, ultimately, give us a starting point on

11  which channels we're going to use in the future campaign.

12  Q    Okay.  And you mentioned a channel mix.  Why did you

13  recommend a mix?

14  A    Every channel ultimately has a role to play in

15  delivering the final outcome, which is ultimately a business

16  outcome, not just a marketing key performance indicator.  So

17  we need more than one channel to deliver on those things

18  across the entire marketing funnel.

19  Q    And just to clarify, when you use the word "channels,"

20  can you give some examples of what you're referring to as

21  channels?

22  A    Yeah.  Media channels are everything from your linear

23  or broadcast television, what we all grew up with.  CTV.

24  Social is a broad umbrella term for a channel.  Within that,

25  we of course, have the channels of individual platforms.

Direct Examination - L. Lambert

1 Audio, both terrestrial radio and streaming audio as you

2 know it.  Open web display, one you've already referenced.

3 And search.  How could I forget search?

4 Q    And how do you decide how to allocate a client's media

5 budget among channels in the channel mix?

6 A    Again, it's based on kind of three key indicators that

7 we track with the media mix model, which you typically tie

8 back to reach and ROI.

9 Q    What's ROI?

10 A    Return on investment.  So for every dollar I put it,

11 it's beneficial to get at least $1.01 out.

12 Q    What do you mean by putting a dollar in and getting a

13 dollar out with respect to advertising?

14 A    Yeah.  For every dollar I spend for my client, that

15 channel, and its purpose to deliver on its purpose,

16 hopefully can be tied back to revenue, and that revenue has

17 to be greater than the dollar that I spent on their behalf.

18 Q    And have you heard of a concept called "attribution"?

19 A    Yes.

20 Q    And what is attribution as you use that in your

21 business?

22 A    Attribution is a way of allocating a -- sort of a

23 credit to any individual channel to say that it delivered on

24 that key performance indicator.

25 Q    Can you explain a little bit more about what you mean

Direct Examination - L. Lambert

1  by credit?  Is it money or -- what is it that you are

2  attributing to a channel in attribution?

3  A     So it depends on the attribution model we're using.

4  What we're ultimately saying is, across your experience as a

5  consumer with our brand, no matter where you've seen it,

6  whether it's a billboard, a television show, in your

7  Instagram feed, each of those plays a role to move that

8  audience through the funnel and ultimately become a client

9  of my clients.

10          So I want to be able to give credit where credit

11 is due.  That last touch didn't necessarily drive all of

12 their experience with my brand.

13 Q     Okay.  I want to break down a little bit of that and

14 ask you some more clarifying questions.

15          When you say "our brand," who is it that's looking

16 at attribution?

17 A     We are.  The agency is.  But we do share with our

18 clients.  We are incredibly transparent.  A lot of times

19 they have access to the same platforms or we're maybe even

20 using theirs.

21 Q     And why are you looking at which channels you can

22 attribute an outcome to?

23 A     It's really critical for my team to be able to be

24 prepared to maybe channel the channel mix, but more

25 importantly to understand all of those places that we've

Direct Examination - L. Lambert

1  kind of interacted with a consumer.

2          And so the attribution of one channel is not

3  necessarily easily tied to the attribution of the other

4  channel.  So the model itself helps us understand across the

5  entire stage of interaction how much I should be giving

6  credit to any individual channel.

7  Q    Could you give, like, an example of how an OMD would

8  look at attribution in the context of a campaign?

9  A    Yeah.  So my client Acme makes anvils.  I'm sure you

10 guys know Acme, a popular brand.  So the anvils that we're

11 trying to ultimately sell, we will show them on television;

12 and so consumers saw it on TV.

13          From there, we integrated an ad campaign across

14 social platforms.  So they saw it in Instagram, but they

15 didn't see it on Facebook.

16          From there, they made a search.  And that search

17 ultimately brought them to Acme's website, where they made a

18 purchase of that anvil.

19          Historically, the only thing that would get credit

20 would be that final touch point, that last click, the search

21 itself, whereas the story I just told you clearly shows that

22 there are other places that made that person make those

23 decisions from previous interactions.

24 Q    And when you say the only thing that would get credit

25 would be that final click, what is the credit?  Why is --

Direct Examination - L. Lambert

1  why is anyone giving credit to a particular channel?

2  A    Yeah.  So credit is really like your Webster's

3  dictionary version of it where we're saying that, in the

4  last-touch model that we're talking about, that last click,

5  all of it went to search, they would get 100 percent credit

6  for driving that transaction and/or acquisition performance

7  of that campaign, right?

8         In a multi-touch attribution model, though, I'm

9  able to now see and say, okay, that last touch was critical

10 and maybe it's going to get 70 percent of the credit for

11 driving the outcome of that campaign; then, of course, you'd

12 break out those -- the model breaks out the credit across

13 the other touch points.

14 Q    You mentioned multi-touch attribution, and I'd like to

15 ask you a bit more about that.  But before we do, it would

16 be helpful, I think, to understand a little bit more about

17 what the purpose of all of this is, why is -- why is OMD

18 looking at attribution and sort of which channel was

19 responsible for a user buying an anvil, in your example?

20 A    Yeah.  So for Acme, it's important to know the role of

21 the channel to deliver on our goal.  Ultimately, there are

22 plenty of KPIs out there.  We try and align those KPIs to

23 business outcomes, in most cases a sale.  And sales don't

24 happen to anything other than people.

25         So for us, knowing the attribution or the credit

Direct Examination - L. Lambert

1   that we're giving to any individual channel helps us to sort

2   of identify how people interact with that channel.

3            So while it may not be driving as much of the

4   performance, we now understand the role of that channel to

5   move that consumer through their journey.

6   Q     You mentioned KPI.  What is a KPI?

7   A     A key performance indicator.

8   Q     What kinds of key performance indicators are you

9   tracking with an attribution model?

10  A     They're going to be digital in name.  So cost per

11  click.  CPM is, of course, in there.  Cost per completed

12  view.  CPA, cost per acquisition.  It's upper funnel, mid

13  funnel, lower funnel.

14  Q     And you mentioned that they would be digital.  Is --

15  are attribution models only about digital channels or

16  something else?

17  A     Yeah.  So when we talk about attribution, we're

18  typically talking about only digital channels.

19  Q     Okay.  You mentioned multi-touch attribution.  What is

20  multi-touch attribution, and how is that different from

21  other forms of attribution?

22  A     Yeah.  So it's really important that we understand the

23  value of every one of those touch points.  Every time you

24  experience our Acme anvil ad in the wild -- the wild being

25  somewhere on the internet -- we want to understand how many

Direct Examination - L. Lambert

1  times we had to do that on that channel, what messaging we

2  used on that channel, which individual audience is

3  responding within that channel, and then understanding the

4  value of that channel to do that job that we've assigned to

5  it to do at that stage in the funnel.

6         So attribution is also pretty critical to what we

7  do.

8  Q    Okay.  And you look at attribution outside of the

9  digital world as well?

10 A    That's where the media mix models come in.  As I

11 mention, they are annual typically, biannually if you're

12 lucky.  And they provide that look-back over the previous

13 set at the same time line, effectively, so you can plan for

14 the future.

15 Q    You mentioned touch point earlier.  What do you mean by

16 "touch point"?

17 A    Yeah.  Every time you see an ad, that picture of the

18 product or that audio of the product or that video of the

19 product, that is an opportunity for that advertiser, Acme,

20 to hit a touch point with you in your journey.

21 Q    Okay.  So if you have, you know, attributed that touch

22 point or that sale, let's say, to all of those various touch

23 points, how does OMD use that information, if at all?

24 A    Yeah.  So with Acme, we try to make really informed

25 decisions for future campaigns with the models.  Any current

Direct Examination - L. Lambert

1   live campaign, we're not typically moving budgets between

2   channels; rather we're looking at the attribution space and

3   the tool we are using for attribution and then using that as

4   maybe a source of truth.

5           That helps me, then, optimize where I can actually

6   pull levers more -- you only have two -- more/less, on/off.

7   Those are your levers for optimization.  There's a lot of

8   them.

9           And so those happen exclusively within the

10  individual platforms through which we're buying and

11  activating.  That can be Meta for Instagram and Facebook.

12  It can be a demand-side platform, like DV360 or The Trade

13  Desk.  That's where my levers are.

14          And those are not necessarily directly connected

15  to attribution models for some truth; they have their own

16  sources of truth that have to optimize in real time with an

17  algorithm in near time with people.

18  Q    Okay.  You just provided a lot of information.  I want

19  to follow up on some of that.

20          What do you mean when you say "source of truth"?

21  So if something is a source of truth for the attribution

22  model, what is the truth that's being sourced?

23  A    The attribution itself, right?  So we rely on that to

24  be the kind of end point that says this is the performance

25  of this campaign.

Direct Examination - L. Lambert

1        And we, typically, can see this, you know, every

2   day, but we're not making active decisions based on that

3   attribution day to day.

4   Q    Okay.  So in your Acme anvil model, could you just walk

5   me through.  If you have an attribution -- you have

6   attribution information about the -- about how a channel

7   contributed to a sale.

8        What would, then, you use that information for

9   when advising your clients?

10  A    Yeah.  So when I find a channel that's performing in

11  the attribution model, I can then go into the channels that

12  are performing and underperforming to make those, then,

13  nuanced adjustments in those individual consoles or

14  platforms.

15       That's really the critical role in any sort of

16  real- or near-time nature, is that it helps me identify

17  what's not doing its job.  Right?  So if any individual

18  channel is not delivering on that performance, doing its job

19  against the key performance indicator it's been assigned in

20  its stage of the funnel, that's where I have an opportunity

21  to go back to those levers and start to pull them.

22  Q    And you mentioned a channel in its stage in the funnel.

23       Do channels have particular stages in the funnel

24  that they're associated with?

25  A    The short answer is yes, but the longer answer is

Direct Examination - L. Lambert

1  there's a job to be done, and every channel has a role to

2  deliver that job.  And that job is how you speak to and

3  leverage that channel to move an audience, to get a person

4  down through that funnel.

5           So a channel can live in any position in the

6  funnel.  They're not exclusive to one or the other.

7  Q    When you talk about channel or a multi-touch

8  attribution model or an attribution model generally, are you

9  talking about across all channels, all advertising, all

10 clients or something more specific than that?  Would you

11 elaborate?

12 A    It is very specific.  It is to that campaign that is

13 currently being bought or activated.  It is not that

14 campaign to broader across all of that client's campaigns,

15 let alone to my other clients.

16 Q    You have talked a lot about optimizing.  In practical

17 terms, in real-world terms, what auctions might you take or

18 advise a client to take as part of optimizing a campaign?

19 A    So let's stay with Acme.  Every channel within the

20 position in the funnel you can liken to a baseball team.

21 They all have a role to play.  They have a position to play

22 on the field, to deliver.  Right?

23           And so if one channel is my pitcher, another

24 channel is my catcher, their jobs are different, but both of

25 them as a team are going to deliver on my awareness goal.

Direct Examination - L. Lambert

1        So if I find that my pitcher channel is not

2  performing for my client, I'm probably going to go to them

3  and say we may want to change the way we're compensating our

4  pitcher and maybe pay a little bit more money to the catcher

5  or we take the pitcher out of the game and we put a new one

6  in.

7  Q    And so do you view -- to what extent do you view

8  channels in a channel mix as interchangeable?

9  A    Limited.  For the most part, I would say a channel in

10  its role in the funnel is its role alone.  If it's not

11  delivering on its job, then I'm looking at other channels in

12  that position in the funnel, and I'm understanding kind of

13  their role and their difference in a role.

14        Again, the role is more often than not about

15  people.  Right?  We are advertising to people to get them to

16  do something that they didn't know they wanted to do.  And

17  if I have an audience that I'm only reaching in an awareness

18  play through linear television but they're not moving, my

19  optimization is not to take the linear dollar and move it

20  into another channel to reach that same audience because my

21  insights tell me that they are not there; they're in linear.

22  I just have to figure out to optimize within linear.

23  Q    So what's a way that you would optimize within a

24  channel?

25  A    So these are my letters, right?  And not all channels

Direct Examination - L. Lambert

1   are built the same.  For the most part, your linear

2   television is an option window where you book that

3   inventory -- your ad space in advance, and then you have an

4   opportunity to get out of it.  That's kind of your

5   optimization for a broadcast or linear television.

6           Digital channels, though, the most nuanced, I

7   would say, is your programmatically activated media.  So

8   those happen through a demand-side platform or a DSP.  This

9   is where I have levers of audience, creative, all the nuance

10  within the creative, right?  The message itself, where it

11  is, the shape of the size, the placement, placement being

12  where you saw it, where that square shows up for you or

13  where you hear it.  Time of day, if I didn't say that.

14  Location.  It could be hyperlocal, down ZIP+4.  It can be

15  regional.  I mean, these -- they go on and on.

16  Q    You mentioned linear television.  Just very briefly,

17  can you explain what linear television is.

18  A    Yeah.  It's the classic TV that we all kind of grew up

19  with.

20  Q    And so are you -- are you optimizing across channels

21  and within channels?

22  A    Can you define -- can you define "optimizing" the way

23  you're using it?

24  Q    No.  I'm just wondering the way you're using it.  Are

25  you optimizing?  You said you're pulling all the levers.

Direct Examination - L. Lambert

1   Are those levers inside of a channel? outside of a channel?

2   A     They're inside the channel.  I apologize.  Yeah.

3   Q     No problem.

4         And what, if anything -- could you explain a

5   little bit how -- a little bit more about what multi-touch

6   attribution is?  You mentioned this earlier, and I'd like to

7   get a little bit more information about what multi-touch

8   attribution is.

9   A     Sure.  I speak in a lot of analogies; so I'm going to

10  use another one.

11        You're headed into the woods, and every plant in

12  there is different and every plant in there has those burrs

13  that stick to you.  You don't like those, nobody does, but

14  they stick to you as you go through the woods.  The first

15  burr you pick up and every burr along your journey until you

16  exit the woods and get that very last burr can be associated

17  back to that plant.

18        That plant is a publisher.  It is the thing

19  subchannel sometimes.  So I can give credit to that last

20  burr you picked up and say this is the burr that brought you

21  here, when the reality is all those burrs along the way

22  maybe made me move along my path.  I don't want this -- this

23  burr is pushing me this way, this burr is pushing me this

24  way to get to the end.

25        And so attribution allows me to know how many of

Direct Examination - L. Lambert

1   those burrs actually moved me as I made my journey to that

2   sale.

3   Q    Can you apply that -- explain through an example

4   specifically sort of how that would work.  If I'm a customer

5   of shoes and I buy shoes, what would a multi-touch

6   attribution model tell you about why I bought those shoes?

7   A    Why is not what it could tell me.  It would tell me why

8   I'm using a channel to deliver on you buying those shoes.

9            So in these models, in the media mix models where

10  you have a broader reach, we can see things like the value

11  of an out-of-home placement, aka a billboard.  I could see

12  the value of that TV.  But multi-touch in particular starts

13  to go and get limited pretty quickly to digital channels.

14           So what Acme would be doing is saying, okay, I

15  showed them an ad on YouTube, and they didn't click through

16  and buy that.  But then I showed up and -- in front of them

17  on Instagram, but they didn't buy it there either.  But then

18  they saw an open web display ad, and they came right to my

19  website.  They didn't click on the ad, though.  Right?

20           And so I would look at Acme and say open web

21  display is delivering what we call a view-through

22  conversion.  They saw it; they didn't click on it.  There's

23  value to that, but we know it didn't do it on its own,

24  right, because I'm looking back and saying we gave a lot of

25  credit to this, but look at these other touch points we had.

Direct Examination - L. Lambert

1  Let's make sure that that credit is attributed

2  appropriately.

3          And the thing that we now know because of the

4  attribution model isn't going to work on its Own.  Right?

5  The attribution model just tells me what's working.  It

6  doesn't actually go and deliver work for me.  I have to do

7  that work.

8  Q    Okay.  And so what would you then do with that

9  information if you found that a user had -- you know,

10 10 percent, say, of the reason why they ultimately clicked

11 where they were supposed to click was because of display

12 advertising?  Would you then shift money from display into a

13 channel that had been 70 percent responsible for the

14 outcome?

15 A    In campaign, very unlikely.  Rather, I'm going to go

16 and look at why my cost is so much higher within that

17 10 percent.  I'm more often than not pretty aware of what's

18 driving things, but there's still value because it has a job

19 to be done.  The funnel is not going to fill itself.

20         So while it may be earlier in the funnel and broad

21 reach and not ultimately delivering the credit of the

22 transaction at the end, without it, there is no one moving

23 down the funnel.  And so I'm not going to move those dollars

24 out; I'm going to optimize within and make sure I'm talking

25 to the right people at the right time with the right message

Direct Examination - L. Lambert

1  in the right place.

2  Q    And what are some of the factors -- strike that.

3         To what extent do you view the different channels

4  that are being optimized following, you know, a multitouch

5  attribution report?  To what extent do you view them to be

6  interchangeable with one another?

7  A    I really kind of don't.  And I don't think most agency

8  folk do.  Rather, we'll see that attribution and we'll

9  understand that we may want to increase investment there,

10 but it's not replacing the role of that other channel.

11         THE COURT:  Yes, ma'am?

12         MS. RHEE:  Objection and move to strike.  He's

13 speaking on behalf of other agencies.

14         THE COURT:  Well, more than that, I think we want

15 to get this now focused to the issues in this case.  This is

16 just sort of a generalized discussion of optimization.

17 Let's see how it plays into this case.  All right?

18         MS. CLEMONS:  Yes, Your Honor.  I actually only

19 have one more question.

20 BY MS. CLEMONS

21 Q    If you are shifting money, though, between those

22 channels as a result of this optimization process, can you

23 explain a little bit more about why that is -- why you're

24 saying that that doesn't mean that they are interchangeable

25 with one another and doing the same thing.

Direct Examination - L. Lambert

A    Yeah.  Awareness is the game that the team is playing.

It may come down to the audience of one channel is

unreachable on the other, and so I need to maintain my

position in that channel even though it's underperforming.

It's just underperforming on the whole, not necessarily on

the individual audience that I'm trying to reach.  So I need

to stay live in that channel.

        MS. CLEMONS:  And, Your Honor, just to clarify

this, all of these questions go to market definition and --

        THE COURT:  I understand that, but let's get to

it.

BY MS. CLEMONS

Q    Yeah.  Last one.

        So if the price of open web display were to

increase during a campaign, does that mean that you would

drop display and move ad buying away to social, for example?

A    Open web display is notoriously expensive when it's

done right, when it's done right.  It's expensive because

the CPM, that expense on the surface is low, but its ability

to deliver a conversion is where that KPI expense is high.

It doesn't mean it doesn't have value.

        So if the price increases, it tells me that my

competitor, Beta Anvils, is now in the market trying to talk

to that same audience, and I need to compete to win.

Q    And just to understand how you're using the term, what

Cross-Examination - L. Lambert

1  do you mean by "conversion," just so that we understand what

2  you were referring to?

3  A    Conversion is anything that I'm measuring that I wanted

4  them to do.  It can be a landing page, a site visit.  It can

5  be a transaction.  It can be walking into a store.  Those

6  are all conversions.

7           MS. CLEMONS:  Okay.  That is all that I have.  I

8  pass the witness.

9           MS. PHILLIPS:  Your Honor, we have binders, if we

10  may pass those out.

11           THE COURT:  Yes.

12           MS. PHILLIPS:  Thank you.

13           May I begin, Your Honor?

14           THE COURT:  You may.

15           MS. PHILLIPS:  Thank you.

16                CROSS-EXAMINATION

17  BY MS. PHILLIPS

18  Q    Mr. Lambert, it's nice to meet you.  My name is Jessica

19  Phillips.  I'm here on behalf of Google.  I'll be asking you

20  a few questions.  And I will do my very best to make sure

21  that you make your flight back to California.

22           You would agree that the channels through which

23  advertisers reach consumers -- those have changed over time,

24  right?

25  A    They sure have.

Cross-Examination - L. Lambert

1  Q    And, in fact, in the last 15 years, the ad industry has

2  seen a migration from what I think you've called legacy

3  media channels to digital media channels like social media,

4  video, digital display, apps, CTV, those kinds of things,

5  right?

6  A    Yes.

7  Q    Okay.  And the channels through which content can reach

8  consumers, those continue to evolve and change even now?

9  A    Yes.

10 Q    Okay.  For example, all major publishers at this point

11 are available in a CTV environment?

12 A    I don't think I can answer that.

13 Q    Okay.  You have your deposition transcript.  Do you

14 recall being deposed in this case August 28 of last year?

15          You were asked --

16          THE COURT:  Wait.  What page?

17          MS. PHILLIPS:  Sure.  Page 46, lines 2 through 5.

18 BY MS. PHILLIPS

19 Q    You were asked, "Who else is in the CTV category that

20 sells programmatically besides Hulu?"

21          You said, "All major publishers at this point are

22 available in a CTV environment."

23          Do you see that?

24 A    I do.

25 Q    Okay.  And you agree that some channels grow and

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Cross-Examination - L. Lambert

1  shrink, like, for example, digital out-of-home?

2  A    Yes.

3  Q    Okay.  And digital out-of-home is display or video that

4  is digital and outside of your home.  So, for example, those

5  videos you see in an elevator or if you're walking along --

6             THE COURT:  What is taking too long in this

7  trial -- and I'm going to say this across the board.  These

8  questions have to be much shorter.

9             MS. PHILLIPS:  No problem, Your Honor.

10            THE COURT:  I may say down the road "no leading"

11  if this continues.  All right?  You're not to testify; the

12  witness testifies.

13            MS. PHILLIPS:  I hear you.  Okay.

14  BY MS. PHILLIPS

15  Q    Okay.  So digital out-of-home had a moment of scale,

16  and then it shrunk and contracted, yes?

17  A    Yes.

18  Q    And digital out-of-home might be on the rise again; is

19  that right?

20  A    Yes.

21  Q    And in your view, current trends show growth across the

22  digital spectrum?

23  A    Yes.

24  Q    Okay.  And you're familiar with something called

25  cross-media planning?

Cross-Examination - L. Lambert

1  A    Yes.

2  Q    Okay.  That's a process of evaluating where advertisers

3  should invest their advertising budget by goal and then what

4  channel will deliver against that goal?

5  A    That's correct.

6  Q    Okay.  And all media channels can be used to fulfill a

7  goal in cross-media planning, correct?

8  A    That's correct.

9  Q    Search, social, programmatic, those are all examples of

10 media channels?

11 A    I would say programmatic is not a channel.

12         THE COURT:  I'm sorry?

13         THE WITNESS:  I would argue programmatic is not a

14 channel.

15 BY MS. PHILLIPS

16 Q    Okay.

17 A    I think it's a way of buying.  It is a lower-case P

18 with an LY at the end.  It's programmatically.

19 Q    Okay.  You would agree advertisers seek to target an

20 audience through multiple channels, correct?

21 A    Correct.

22 Q    Okay.  And when one of your -- when one of Omnicom's

23 agencies is working with an advertiser, that agency monitors

24 the success of an advertiser's campaign, right?

25 A    We do.

Cross-Examination - L. Lambert

1  Q    Okay.  And if one channel is performing worse than

2  another channel, Omnicom, on behalf of that client, can

3  shift spend to a better-performing channel, right?

4  A    Yes, over time.

5  Q    Okay.  And Omnicom considers costs when considering

6  which channels to use?

7  A    Can you define cost in this --

8          THE COURT:  It's bad when the witness has to ask

9  the attorney a question.  All right?  That means it was not

10 a good question.

11         MS. PHILLIPS:  I understand, Your Honor.  Thank

12 you.

13 BY MS. PHILLIPS

14 Q    Let me ask you this:  Omnicom can shift spend from a

15 channel that costs more, right, where there's more spend and

16 not returning a lot of benefit, to a more efficient channel,

17 yes?

18 A    I can do that.

19 Q    Yes.  Okay.  And, in fact, Omnicom activates its media

20 buys against specific audiences and fluently reallocates its

21 clients' budgets to the channels and tactics that are

22 delivering, right?

23         MS. CLEMONS:  Objection, Your Honor.  She's asking

24 about Omnicom and the witness works for OMD, and the

25 question was compound.

Cross-Examination - L. Lambert

1          THE COURT:  Sustained.

2   BY MS. PHILLIPS

3   Q    Sir, you work with OMD, which is the initial and

4   largest agency within OMG, the Omnicom Media Group; is that

5   correct?

6   A    That's correct.

7   Q    So that's the umbrella above OMD, and then Omnicom is

8   the holding company above that; is that correct?

9   A    That is correct.

10  Q    And you work with agencies, correct?  You are an

11  agency?  OMD is an agency, the original and largest?

12  A    OMD is an agency.

13  Q    OMD, excuse me.  Distinction between OMD and OMG,

14  right?

15  A    Well, a distinction between me and OMD.

16  Q    Okay.  Got it.

17          Going back to my question, Omnicom tells potential

18  clients in pitches that it activates media buys against

19  specific audiences and fluidly reallocates its clients'

20  budgets to the channels and tactics that are delivering; is

21  that right?

22  A    Yes.

23  Q    Okay.  And one of those clients is the United States

24  Army, correct?

25  A    It is.

Cross-Examination - L. Lambert

1  Q    Okay.  If you look in your binder at DTX 1172, please.

2            THE COURT:  Any objection to 1172?

3            MS. CLEMONS:  No objection, Your Honor.

4            THE COURT:  All right.  It's in.

5    (Defendant's Exhibit Number **1172 admitted into evidence.**)

6  BY MS. PHILLIPS

7  Q    Mr. Lambert, Omnicom prepared a mix modeling review for

8  the U.S. Army in December 2021.  Do you remember that?

9  A    Yes.

10  Q    And a mix modeling review is a review of performance of

11  all media channels used by a client?

12  A    Yes, it is.

13  Q    Okay.  And Omnicom prepares these reports for the U.S.

14  Army on a quarterly basis?

15  A    It's pretty good.

16  Q    Is that a yes?

17  A    That's a yes.

18  Q    Okay.  And the mix modeling review informs Omnicom and

19  the client, the U.S. Army in this case, what publishers or

20  platforms are driving their advertising goals, yes?

21  A    Yes.

22  Q    Okay.  Could you please turn to page 6 of DTX 1172.

23            At the very top you'll see, "Recommended COA,

24  course of action 1 as it maintains current plans with

25  channel optimizations based on full 2021 MMM learnings."

Cross-Examination - L. Lambert

1              MMM learnings is the total performance of

2    channels; is that right?

3    A     Media mix model.

4    Q     Yes.  If you can just look at the column on the left in

5    the lightest gray, FY22, COMPO 1, 3.  And if you go down to

6    digital display, do you see that?

7    A     Yes.

8    Q     Okay.  And Omnicom -- nowhere in here underneath the

9    title "Channel" does Omnicom have any sort of recommended

10   specific budget for open web display, does it?

11   A     It does not.

12   Q     And it doesn't have a specific budget for native ads,

13   right?

14   A     It does not.

15   Q     And it doesn't have a recommended specific budget for

16   in-app advertising, does it?

17   A     It doesn't explicitly say it, no.

18   Q     I'm sorry.  The answer is no?

19   A     YouTube would be an app.

20   Q     Okay.  But in-app advertising is not listed other than

21   YouTube?

22   A     Correct.

23   Q     Okay.  And digital display, you see there it includes

24   direct deals and programmatic display in the parenthetical

25   underneath the channel for digital display?

Cross-Examination - L. Lambert

1   A    Yes.  I see it.

2   Q    Okay.  And here, Omnicom recommended reducing Army's

3   digital display budget from 16.5 million to 5.2 million.

4              Do you see that?

5   A    Yes.

6   Q    And Omnicom recommended increasing the Army's budget

7   for online video.  Do you see that?

8              Second to the top.

9   A    Yeah, I see it.

10  Q    For YouTube, right under there?

11  A    Yes.

12  Q    For streaming audio?

13  A    Yes.

14  Q    And for paid social, Reddit.  Do you see that?

15             And sorry, sir.  Just to follow up on one thing

16  you said.  You said YouTube is an app.  You're aware that

17  YouTube is also a website, right?

18  A    Yes.

19  Q    You can go to www.youtube.com?

20  A    Yeah.

21  Q    Okay.  And then search discovery, there was a

22  recommended increase in the Army's budget there, correct?

23  A    Yes.

24  Q    Okay.  And Omnicom recommended a shift in spend to

25  these other channels based on performance, right?

                    Cross-Examination - L. Lambert

1   A     Yes.

2   Q     Okay.

3               You can put that down.  Thank you, sir.

4               If you can turn in your binder to 1151, please.

5               THE COURT:  Any objection?

6               MS. CLEMONS:  I object -- this is hearsay, Your

7   Honor.

8               MS. PHILLIPS:  Your Honor, this is a presentation

9   that he previously testified about in his deposition.  He

10  said it was a business record for Omnicom.  He had seen it

11  before.

12              THE COURT:  Lay a foundation.

13              MS. PHILLIPS:  Sure.  No problem.

14              THE WITNESS:  I'm sorry.  What page, ma'am?

15              THE COURT:  It's Exhibit 1151.

16  BY MS. PHILLIPS

17  Q     Just 1151, DTX 1151, in the binder.

18              Are you there?

19  A     Yeah.

20  Q     Okay.  Great.

21              So Omnicom prepared a national media --

22              THE COURT:  No.  Ask the question.

23              Have you seen this before?

24              THE WITNESS:  I don't know yet, but it looks

25  familiar.

Cross-Examination - L. Lambert

1            THE COURT:  Well, take a 30-second look and see if

2   you can be more sure.

3            THE WITNESS:  Yes, I'm familiar with this.

4            THE COURT:  That's enough foundation.  It's in.

5    (Defendant's Exhibit Number **1151 admitted into evidence.**)

6            MS. PHILLIPS:  Thank you, Your Honor.

7    (Plaintiffs' Exhibit Number **1151 admitted into evidence.**)

8   BY MS. PHILLIPS

9   Q    So Omnicom prepared a national medial tactical

10  recommendation for the U.S. Army dated October 25, 2021,

11  right?

12  A    That's correct.

13  Q    And the tactical recommendation is to gain alignment

14  with the U.S. Army on their business goals, correct?

15  A    Correct.

16  Q    And the channels that Omnicom will activate, correct?

17  A    Correct.

18  Q    And the purpose of those activated channels, yes?

19  A    Correct.

20  Q    All right.  If you can turn your attention, please, to

21  page 8 in this deck.  So you talked about the funnel

22  approach.  The funnel approach helps Omnicom align the

23  advertiser's goals, correct?

24  A    Yes.

25  Q    Okay.  And you see here the mid-lower funnel, that's

55

Cross-Examination - L. Lambert

1  sort of in gray, light gray, the top box that includes

2  digital display.  Do you see that?

3  A    I do.

4  Q    Okay.  And digital display includes banner ads,

5  correct?

6  A    It does.

7  Q    Digital display includes native ads, correct?

8  A    It includes -- yes.

9  Q    Digital display includes rich media, correct?

10 A    Yes.

11 Q    Digital display ads run on publisher websites, correct?

12 A    Yes.

13 Q    They run on YouTube, correct?

14 A    Correct.

15 Q    They run on Amazon, correct?

16 A    Correct.

17 Q    And they run on social platforms; is that right?

18 A    That's correct.

19 Q    And there's no separate line in this chart for open web

20 display advertising, is there?

21 A    There's not.

22 Q    So staying with the mid-lower funnel, you see paid

23 social is in the same part of the funnel as digital display?

24 A    I sure do.

25 Q    Okay.  If you can turn to page 10 of this document,

Redirect Examination - L. Lambert

1  sir, you'll see another funnel.  Sorry.  And do you see the

2  mid-lower funnel that's in gray, middle box again, it

3  includes digital display?

4  A    It does.

5  Q    Okay.  And also in the mid-lower funnel is online

6  video.  Do you see that?

7  A    Yes.

8  Q    And paid social is also in that mid-lower funnel?

9  A    Correct.

10  Q    And digital display and paid video are also in the

11  upper funnel here?

12  A    Correct.

13  Q    Okay.  So different channels can actually be in

14  different parts of the funnel at the same time?

15  A    Absolutely.

16  Q    Okay.

17          MS. PHILLIPS:  Your Honor, I'm done.

18          THE COURT:  Very good.  You don't have to

19  apologize for that.

20          All right.  Is there any redirect?

21          MS. CLEMONS:  Just briefly, Your Honor.

22                    REDIRECT EXAMINATION

23  BY MS. CLEMONS

24  Q    Mr. Lambert, why, if you know, is open web display not

25  listed as a separate -- a separate channel in the Army

Redirect Examination - L. Lambert

1  documents that you were just reviewing?

2  A    I mean, it could have just said "display."

3            THE COURT:  I'm sorry?

4            THE WITNESS:  It very well could have just said

5  "display."  I mean, this is semantics.  This is semantics.

6  They're the same thing.

7  BY MS. CLEMONS

8  Q    And how long ago -- just to be clear, how long ago did

9  you first hear or start using the term "open web display

10 advertising"?

11 A    The dawn of what was called interactive advertising.

12 Q    And do you have, like, a rough time period?

13 A    2008.

14           MS. CLEMONS:  Thank you.  That's all that I have.

15           THE COURT:  Any recross?

16           MS. PHILLIPS:  No.  Pardon me.  No, Your Honor.

17           THE COURT:  And I'm assuming that Mr. Lambert is

18 going to be released as a witness.  Is that correct?

19           MS. CLEMONS:  Yes, ma'am.

20           THE COURT:  Nobody is recalling you, sir.  So

21 you're now free to go.  You can stay in court and watch the

22 proceedings if you wish, but you're not to discuss your

23 testimony with any witness that has not yet testified.

24           THE WITNESS:  Understood, Your Honor.

25           THE COURT:  All right.  Is the next witness

Redirect Examination - L. Lambert

1  Mr. Boland?

2          MS. WOOD:  Yes, Your Honor.

3          THE COURT:  All right.

4          THE COURT SECURITY OFFICER:  Who are we looking

5  for?

6          MS. WOOD:  Mr. Boland.

7          THE COURT:  Brian Boland.

8          MS. WOOD:  His flight is not this early, I

9  promise.  I thought he was waiting in the anteroom.

10         Why don't I go ahead and at least pass out the

11  binders, Your Honor?

12         THE COURT:  Yes.

13         Is he not there?

14         THE COURT SECURITY OFFICER:  I checked the

15  hallway, Your Honor.  I can't find him.  There's no

16  response.

17         THE COURT:  Well, you have the next witness as a

18  read-in.  Should we switch to Mr. Creput?

19         MS. WOOD:  He is physically here.  He was in the

20  building at lunch.

21         THE COURT:  Well, he's not here now.  How long is

22  the Creput read-in going to take?

23         MS. WOOD:  Approximately an hour.

24         THE COURT:  Well, Mr. Boland can just wait until

25  that's done, then.  All right?

Redirect Examination - L. Lambert

1              You're going to need a law clerk for that, right?

2              MS. WOOD:  Yes, Your Honor.

3              THE COURT:  All right.  Could you get him.

4              MR. TEITELBAUM:  Your Honor, I do have one option

5    for us to make use of this time while we're waiting.  I

6    could offer some additional documents into evidence base on

7    what Mr. Teslicko had referenced previously, or we can do it

8    at the end of day, as the Court previously suggested.

9              THE COURT:  Let's read them in.  Come on.

10             MR. ISAACSON:  Your Honor, we're going to need to

11   meet and confer --

12             THE COURT:  I'm sorry?

13             MR. ISAACSON:  We're going to need to meet and

14   confer on these.  It's about 25 exhibits.  We were told that

15   they may be used to supplement an undefined witness.

16             THE COURT:  We'll do it Monday morning, then.  All

17   right?  You're not resting tonight, are you?

18             MR. TEITELBAUM:  No, Your Honor.

19             THE COURT:  Wishful thinking.  All right.  No one

20   has found Mr. Boland; is that correct?  We're going to

21   start, and we're going to read this deposition.  All right?

22   We'll need copies of the deposition.

23             MS. CLEMONS:  Your Honor, while we're passing

24   those out, I just want to let you know a few process things

25   about how we propose to do this read-in because there is

Redirect Examination - L. Lambert

1  confidential information in the transcript.  And because

2  there are -- it's significant errata in the transcript,

3  we've done a couple of things.

4        So the first is that all of the confidential

5  portions are surrounded in a red box.  And so what we would

6  propose to do to keep as much of this in open court as

7  possible is to -- we will read everything that is not

8  red-boxed and, when we get to a red box, stop reading and

9  give a few moments for Your Honor to read the red-boxed

10  portion to yourself and then move on to the next

11  nonconfidential portion.

12        And I'm happy to note for the record when we are,

13  you know, skipping or omitting a confidential section.

14        THE COURT:  That's fine.

15        MS. CLEMONS:  Okay.  The other thing is there was

16  substantial errata in this transcript.  And so what we've

17  done is we've underlined the original passages that were

18  replaced by the errata and actually put next to them in the

19  margin a photograph of the errata replacement, the

20  correction.

21        And so whenever you reach a -- an underlined

22  section, instead of reading that, read instead the box to

23  the right.

24        THE COURT:  I am looking very quickly at my copy.

25  I'm seeing the red boxes.  Are there many of these errata?

Redirect Examination - L. Lambert

1  I am not seeing any in my copy.

2          MS. CLEMONS:  So it's the very first tab, Your

3  Honor.

4          THE COURT:  No.  No.  I have got the transcript.

5          MS. CLEMONS:  It's not a transcript.  It's one

6  that starts with -- it looks like this.  And then at the top

7  of the subsequent pages, it says "Text map annotation digest

8  report."  It's the very first tab of the binder, Your Honor.

9          THE COURT:  I understand.  How is that reflected

10  in the transcript that my law clerk is going to be reading?

11         MS. CLEMONS:  So this is a -- this is an export of

12  the digital transcript, essentially, that we get from the

13  court reporter service.  And we've done that so that we can

14  just read the excerpts instead of skipping pages and finding

15  new pages to read.

16         THE COURT:  All right.  Let's get this started and

17  see how it goes.

18         MS. RHEE:  All right.  Just as a housekeeping

19  matter or really about how the logistics should go during

20  this read-in, Your Honor, unlike the last read-in, Google

21  does have a few objections.  We're happy to go through them

22  with the Court now.  The DOJ is aware.

23         THE COURT:  So you'll make the objection when the

24  question is --

25         MS. RHEE:  That's what I wanted to understand.

Direct Examination - A. Creput

1  Thank you, Your Honor.

2          THE COURT:  And this is taken down by the court

3  reporter; so you don't have to worry about that.  All right.

4          MS. CLEMONS:  Okay.

5          THE COURT:  All right.

6          MS. CLEMONS:  Okay.  And this is the deposition of

7  Arnaud Creput.

8                        ARNAUD CREPUT

9                      DIRECT EXAMINATION

10  BY MS. CLEMONS

11  Q    Can you describe Equativ's business at a high level?

12  A    We are an ad tech company.  So advertising technology

13  company.  Until 2015, we were operating in the ad server

14  business only.

15          THE COURT:  I'm sorry.  Hold on.  What page are

16  you on in the transcript?  I think I have the wrong one or

17  is this only -- what am I reading?

18          MS. CLEMONS:  It does look a bit messy, Your

19  Honor.  Apologies.  It's sort of the nature of this

20  particular beast.

21          THE COURT:  All right.  I have got it now.  Yes.

22          THE WITNESS:  So we were on a server.  Our formal

23  name was SmartServer, and we were a standalone ad server

24  operating only in this business.  Since 2014 or 2015, we

25  started to operate both in the ad server and in the SSP

Direct Examination - A. Creput

1  business.  So we are today an ad server and an SSP.

2  BY MS. CLEMONS

3  Q    And I think you work and live in France.  Is that

4  right?

5  A    The headquarters are in France.  We have positions

6  globally.  So we have offices in 18 different countries,

7  including U.S.

8  Q    I think you said -- well, when did Equativ start

9  operating in the publisher ad server business?

10  A    We started -- actually, the ad server of Equativ was a

11  solution for the needs of the mother company at the start.

12  So it started in 2005.  We started to sell the solution to

13  publisher groups in 2005.  So this is 18 years ago.  So the

14  start of the business around ad server solutions was 2005.

15  Q    In the last ten years, how many large media publisher

16  ad server clients has Equativ lost to Google's DFP?

17  A    So, actually, this is half of the publishers working

18  with us over the past ten years moved to have ad server, and

19  I would say 95 percent of them moved to Google Ad Manager,

20  Google DFP.

21  Q    Can you list some of the large media publisher ad

22  server clients that Equativ has lost to DFP?

23  A    I can list a few ones.  If you want -- actually, what

24  you need to understand is that we started our business in

25  New York at the time where it was -- it was not easy, but it

Direct Examination - A. Creput

1  was feasible or possible to sell our serving solution.  So

2  most of the publishers with us are based out in New York.

3  The core countries, we started earlier than the U.S.

4           MS. CLEMONS:  We are omitting a confidential

5  portion.

6           THE COURT:  Does he go to line 12?  Is that where

7  he's going to now?

8           MS. CLEMONS:  He would read line 10.  We would

9  skip again and then line 12.

10          THE WITNESS:  And we come to this case later;

11  so...

12          MS. CLEMONS:  Omitting a confidential portion.

13          THE WITNESS:  I was listing some of the publishers

14  we lost over the past ten years.  So there was a big wave of

15  publisher losses in 2015, '16, and '17.

16          So I mentioned a few names.  There are many.  I

17  don't have all of them in mind.  So this is the one the

18  translator listed a few seconds ago.

19          What I was saying as well is that we started in

20  the U.S. in 2014.  So we started to operate in the U.S. in

21  2014.  It was at the time where it was already almost

22  impossible to sign a new publisher on the ad server side.

23          So at the time we signed a few ones with very

24  specific cases, use cases, with very specific requirements.

25  But we didn't lose significant publishers in the U.S. in

                   Direct Examination - A. Creput
1 || favor of Google.

2 ||        For one reason is that we didn't sign them.  We

3 || pitched them but didn't sign them.  It was at the time where

4 || it was already extremely hard to make a publisher moving

5 || from Google DFP, Google ad server to a rival ad server.

6 || BY MS. CLEMONS

7 || Q    Let me ask you, what was the main reason Equativ lost

8 || large media publisher ad server clients to Google's DFP?

9 || A    The main reason is that -- actually, it was the

10 || beginning of the programmatic sale, so indirect sales, you

11 || know, the automated sales which are going through the SSP.

12 ||        So since 2010 and later on, programmatic sales

13 || became significantly -- started to become significant for

14 || the breakdown of the news.

15 ||        So at that time the reason why most of the

16 || publishers working with us left for Google is a hard kind of

17 || all -- all in the records.  They didn't have access to

18 || Google AdX.

19 ||        So Google AdX is the SSP of Google, which owns a

20 || very significant market shares and this ad exchange, or

21 || Google AdX, wasn't at that time and still not fully

22 || available with ad server.

23 ||        So when you work with a rival ad server such as

24 || Equativ, you accept to not to have access to a significant

25 || part of the market and of the ad spend.

Direct Examination - A. Creput

1          Google AdX --

2          THE LAW CLERK:  Oh, no.  I'm sorry.

3          THE WITNESS:  So this is all the expense of not

4   going to Google AdX.  Google AdX has a market share, which

5   is estimated about 50 percent.  So we cause a very

6   significant impact on the publisher's revenues.  There is

7   the main reasons.

8   BY MS. CLEMONS

9   Q    Okay.  In the past five years, has Equativ tried to

10  convince large U.S. media publishers to switch from DFP to

11  Equativ's publisher ad server?

12  A    In 2018 we launched, I would say -- which is called

13  Google replacement program.  So the Google was -- the goal

14  was to replace Google DFP with Google Ad Manager at scale on

15  the ad server side.

16          So we invested a lot in terms of resources,

17  especially in the U.S., to convince publishers to move from

18  Google to Equativ.  At that time we hired a sole strategy

19  advertiser.  His name is Greg Coleman.  He is the former

20  president of BuzzFeed.  So very well known and close to

21  large publishers.

22          MS. CLEMONS:  Skipping a confidential portion.

23          THE WITNESS:  So we had more than 25 shots and --

24          MS. CLEMONS:  Skipping a confidential portion.

25          THE WITNESS:  In the demonstration in the test we

Direct Examination - A. Creput

1    performed with the publishers.  Each time, this was a no-go.

2    For one reason, it was never about product features.  It was

3    never about level of service, which are considered by our

4    clients as much better than the one of Google.  But it was

5    always for two reasons.

6             Number one, switching costs.  Google makes it

7    very -- actually, to switch costs from -- switch from their

8    solution to other solutions.  And number two is the fear of

9    losing revenues, the fear not to have access to Google

10   demand.

11            So first to Google AdX.  Google AdX is not

12   available with the rival ad servers except with a

13   workaround, which is very imperfect, which is called AdX

14   Mediation.  It's totally imperfect, and it's not working the

15   same way with other SSPs to be integrated with publishers.

16            And second is the fact that a large part of Google

17   demands -- so from DSPs and Google Ads and DV360 -- is not

18   accessible the same way by other SSPs.

19            So if a publisher switched to a rival ad

20   exchanger, he accepts actually to lose a significant part of

21   its digital advertising revenues.

22   BY MS. CLEMONS

23   Q    One of the things you mentioned was switching costs,

24   meaning the cost of switching publisher ad servers.

25            Can you explain what those switch costs are?

Direct Examination - A. Creput

1   A    So the migration costs are linked to the complexity of

2   the integration of the Google ad server on the website of

3   the publisher.

4           So indeed, the Google ad server does not propose

5   portability.  In other words, there are lines of code which

6   are integrated which cannot -- which have to be replicated.

7           So you don't have the same degree of

8   transportability that you might have if you switch cell

9   phones or you change insurance companies.

10          On our side, for Equativ, the integration is easy.

11  It's easy to change for the publisher, but that's not true

12  for Google ad server.

13          Overall, the migration requires several months for

14  the provider -- in this case, Equativ -- and for our

15  clients, our prospects on the publishing side.

16  Q    Over the last five years how easy or difficult has it

17  been for Equativ to compete with DFP for media publishers?

18  A    Over the last five years, it was practically impossible

19  to engage in competition with Google on ad serving.

20  Q    Why has it been practically impossible for Equativ to

21  compete with Google for publisher ad serving?

22  A    Two reasons.  One is the lost programmatic turnover

23  invoicing for the publisher, the lack of demand for -- lack

24  of access to the Google demand and the noninteroperability

25  with a rival ad server.

Direct Examination - A. Creput

1         Point number two is what we just -- in the second

2    point was what we just said, the cost and risks linked to

3    the migration.

4    Q    I think you said before that, when Equativ lost media

5    publisher ad server clients, it lost about 95 percent of

6    them to Google's DFP.  Is that right?

7    A    Yes.  Right.

8    Q    What is your understanding of -- what is your

9    understanding of the market share of Google's DFP as a

10   publisher ad server among media publishers?

11        MS. RHEE:  Objection, Your Honor.  Lacks

12   foundation.  Calls for speculation.

13        MS. CLEMONS:  Your Honor, he has testified that he

14   is operating a business in the publisher ad server market.

15        THE COURT:  I'm going to permit it just as his

16   impression.  It doesn't establish that's the reality.

17        THE WITNESS:  So on the publisher ad server,

18   Google's share is estimated at 90 percent.

19   BY MS. CLEMONS

20   Q    How would you characterize Google DFP's position in the

21   publisher ad server business?

22        MS. RHEE:  Objection, Your Honor, with respect to

23   the Court's last ruling about the ultimate question.

24        THE COURT:  I'm going to sustain that objection.

25   BY MS. CLEMONS

Direct Examination - A. Creput

1   Q    Overall in terms of just the product, which publisher

2   ad server is better, in your opinion?  Equativ's or Google's

3   or are they equal?

4   A    It is difficult to say whether an ad server is better

5   than the other.  They each have their own operating -- their

6   own way of operating.  We had never lost any clients on

7   issues of products or functionality, and we've never lost

8   any clients on issues of quality service and support.

9   Q    And in terms of service, how does Google's DFP compare

10  to Equativ's publisher ad server?

11  A    All right.  So we were talking about the service.  Now,

12  regarding Google, I'm not here to talk about Google's

13  service.  They can express themselves as to the level of

14  service they provide their clients.

15       But I would say that they provide less customized

16  service and they do not maintain or support certain client

17  behaviors, and I have given the example of the native

18  advertising campaign as an example.

19  Q    Okay.  You said earlier that Google's demand is not

20  fully available to publishers unless publishers use DFP as

21  their publisher ad server.

22       Do you remember that?

23  A    Indeed.  Google's demands, specifically Google's SSP,

24  is not directly accessible via a rival ad server.  That

25  requires a workaround, which is called Google mediation.

Direct Examination - A. Creput

1  That requires a specific investment on the part of rival ad

2  servers.

3         And this still is extremely imperfect in terms of

4  accessing Google's SSP.  It forces the publisher to keep, to

5  maintain two ad serving contracts, one, for example, with

6  Equativ and the other with GAM, Google DFP.

7  Q    I think it's Google Ad Manager, GAM.  Is that right?

8  A    Yes.

9         In addition to this, the access to the Google

10 demand ad exchange is a lot weaker.  The Google SSP market

11 share is much lower than what it was when the publisher was

12 working directly with the Google ad server.

13        And, lastly, this forces the ad server to

14 guarantee a last-look system for Google.

15        So in a word, through the other SSPs, the

16 publisher can work with other SSPs but all of them -- well,

17 none of them will have access to Google's DSP in the same

18 way.

19 Q    What impact, if any, is there on competition from the

20 fact that Google's demand and AdX are not fully available to

21 publishers unless the publisher uses DFP as their publisher

22 ad server?

23 A    The first impact is that this seriously weakens

24 competition.  Since this weakens competition both in terms

25 of rival ad servers and rival SSPs, it substantially limits

Direct Examination - A. Creput

1  the capacity to innovate.

2       The second effect is that this weakens,

3  substantially limits, the capacity of competitors to lower

4  their prices, specifically as regards the SSP part.  Today

5  the SSP fees are considered too high, and Google is the

6  party that should -- Google is the party that could and

7  should show the way by lowering the price and the SSP

8  commissions in view of its size.

9  Q    One of the things that you said, you talked about

10 limits on innovation.

11      Can you explain what you meant by that?

12 A    All of Google's competitors are extremely small

13 compared to Google itself.  There are numerous competitors,

14 but none have a market share in excess of 10 percent of the

15 SSP market.

16      This is derived from Google's behavior, which

17 advantages its SSP and has in this market a dominant

18 position.

19 Q    A minute ago I think you said Google's SSP is dominant.

20 Did I hear that right?

21 A    Yes.

22 Q    And Google's SSP is sometimes called AdX; is that

23 right?

24 A    Yes.

25 Q    Why do you view Google's AdX as being dominant?

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

Direct Examination - A. Creput

1          MS. RHEE:  Objection for the same reasons, Your

2   Honor, just for the record, with respect to calling for

3   testimony that lacks foundation.

4          THE COURT:  All right.  Again, he's a competitor

5   in the business.  He can explain his understanding or view.

6   So overruled.

7          THE WITNESS:  So the Google SSP or AdX has a

8   50 percent market share, which means that you can't get

9   around it.  And this position is not determined by the

10  product itself or the functionality of Google.  And this is

11  determined by the self-preferencing behavior, both on the

12  supply side for the advertisers and the demand side for the

13  DSP.

14  BY MS. CLEMONS

15  Q    One of the things that you said was you can't get

16  around AdX.

17          Can you explain what you meant by that?

18  A    A publisher cannot work with AdX without losing

19  substantial amount of revenues.

20  Q    So I think you said something slightly different.

21  A    Yes.  I'm sorry.  I meant cannot work without AdX.

22  Q    So a publisher cannot work without AdX without losing a

23  substantial amount of revenues.  Is that what you said?

24  A    Exactly.

25  Q    Okay.  You also said Google's AdX's position is

Direct Examination - A. Creput

1  determined by its self-preferencing.

2          Can you explain what you meant by that?

3  A    In the first stage, the self-preferencing behavior of

4  the ad server does not give access to data -- to other SSP.

5  It does not give access to data that the other SSPs don't

6  have access to.

7          An example system is that the Google SSP has

8  access to all the auction data from the SSPs, the other

9  SSPs, but the SSPs don't have access to this data.

10          The second point is that Google AdX has access to

11  all Google Ads exclusively while other SSPs do not have

12  access to Google Ads -- or AdX.  I apologize.

13  Q    Google Ads?

14  A    Google Ads.  Yes, Google Ads.

15          And this third point is that Google AdX has

16  preferential access to DV360.

17          One example that illustrates this is that Google

18  AdX allows the synchronization of data -- of user data from

19  DV360.  The other SSPs do not have access to this.  This

20  functionality in English is called consumer match.

21          So, for example, the advertisers will input email

22  addresses in the DV360, and Google AdX is capable of

23  synchronizing all of these emails with all of Google's

24  data -- all of Google data.  So this gives an extremely

25  powerful competitive advantage to Google AdX.

Direct Examination - A. Creput

1          This is illustrated by the fact that this

2    competitive advantage means that the advertisers can target

3    much better with AdX than with SSP.

4          So this is not a result of better functionality

5    but rather the lack of interoperability between DV360 and

6    rival SSPs.

7    Q    So you mentioned that Google's publisher ad server does

8    not share as much auction data with other SSPs as it shares

9    with AdX; is that right?

10   A    So exactly.  So the Google ad server has access to the

11   best bid to win and has access to all the auction data of

12   the other SSPs, which allows it to be in the best position

13   in terms of fixing the price for the auction.  So Google

14   uses a system which is called dynamic allocation, which

15   allows it to know all of the data so that it can position

16   itself at the best price.

17         So this allows for a dynamization, which is done

18   through machine learning, in order to position itself at the

19   best price and potentially to reduce the fee in order to win

20   the bid.

21   Q    What impact on competition is there, if any, from the

22   fact that Google's publisher ad server does not provide

23   minimum-bid-to-win data equally to all SSPs?

24         MS. RHEE:  Objection, Your Honor.  The answer is

25   outside of direct knowledge and without foundation.

Direct Examination - A. Creput

1          MS. CLEMONS:  Your Honor, Google did not preserve

2    this objection during our meet-and-confer process and during

3    the depo designation process.

4          MS. RHEE:  I don't believe that's the case.

5          THE COURT:  I'm going to let it go.  I'm going to

6    sustain the objection because this has to do with another

7    agency.  Let's move on.

8          MS. CLEMONS:  So, Your Honor, the second sentence

9    is not about another agency.

10          THE COURT:  But it makes no sense without the

11   first.  So let's move on.

12   BY MS. CLEMONS

13   Q    A few minutes ago, you referred to Google ads demand as

14   only being available on Google AdX.

15          How does that impact competition among SSPs, if at

16   all?

17   A    First of all, the impact is one of covering demand and

18   having a much weaker access to the available demand on the

19   market for the other SSPs.  And this translates into a much

20   lower performance on the part of all of the SSPs that

21   compete with Google.

22   Q    I think you mentioned Google's DV360 self-preferencing

23   in favor of AdX over other exchanges.

24          How does that impact competition among SSPs, if at

25   all?

Direct Examination - A. Creput

1  A     DV360 has a market share which is calculated between 50

2  and 60 percent.  The DV360 market share in our SSP --

3           MS. CLEMONS:  Omitting confidential portion.

4           THE WITNESS:  This comes from the

5  self-preferencing behavior of DV360 towards Google AdX.

6           A certain number of DV360 functionalities are not

7  interoperable with the other SSPs.  Let me give you two

8  examples.

9           The first would be the consumer match, which I

10 mentioned earlier.  And the second would be the guaranteed

11 or the programmatic guaranteed that doesn't work on all

12 subjects with competitors -- with competing SSPs.

13          Another example stems from the fact that the

14 agencies that use DV360 have volume discounts with Google.

15 And that only works if the campaigns go through Google AdX.

16          So Google, then, not only incentivizes the

17 agencies to use DV360 but also to have their campaign go

18 through Google AdX.  And this makes no difference to the

19 agencies.

20 BY MS. CLEMONS

21 Q    How does Google's DV360 self-preferencing in favor of

22 AdX affect competition among SSPs?

23 A     Yeah.  The impact is a very significant loss of income

24 for all -- the impact is a very substantial, very

25 significant loss of income for all the SSPs because the

Direct Examination - A. Creput

1  DV360 market share is above 50 percent.  And this prevents

2  competing SSPs from achieving a critical size to lower

3  prices and innovate.

4  Q    Overall, how easy or difficult is it for Equativ's SSP

5  to compete with Google AdX?

6  A    The Equativ SSP's market share --

7              MS. CLEMONS:  Omitting confidential portion.

8              THE WITNESS:  This situation comes about because

9  of all of the anticompetitive behaviors that I mentioned

10 earlier.  Equativ and the other SSPs are not competing on a

11 level playing field with Google's SSP.

12 BY MS. CLEMONS

13 Q    A minute ago you mentioned that SSPs other than Google

14 are not able to reach an effective level of scale.

15              Do you remember that?

16 A    Yes.

17 Q    And what did you mean by that?

18 A    The single largest SSP on the market -- the single

19 largest independent SSP on the market is Magnite, which has

20 something around $550 million of revenue.  The turnover

21 invoicing for Google ad network is around $30 billion for --

22 yeah, in ad revenue.

23              It's not just the SSP, but this gives you an idea

24 of the gap in size and investment capacity between Google

25 and its most -- and its most important competitor.

Direct Examination - A. Creput

1  Q    Okay.  So I think earlier you named an SSP called

2  McKnight.  I think that probably what the witness said was

3  Magnite.  Is that right?  Correct?

4  A    Yes.  Magnite, yes.  M-A-G-N-I-T-E.

5  Q    If Equativ had more scale as an SSP, how would that

6  affect Equativ's ability to compete with AdX, if at all?

7  A    So Equativ has made a profit.

8           MS. CLEMONS:  Omitting confidential portion.

9           THE WITNESS:  Equativ has always reinvested its

10  profits into technology and international expansion.  So if

11  Equativ would have been able to increase its growth on the

12  ad server in addition to growth on the SSP, Equativ could

13  have invested much more and quicker both in technology and

14  service to its clients and in its international expansion.

15           Equativ has always been an extremely innovative

16  company.  Equativ could have reached the scale so as to

17  maintain and to increase its investments.  This in order to

18  offer its clients a viable alternative to Google to its ad

19  server and also to the SSP.  And the publishers could have

20  chosen their technological partners on their service, which

21  is not the case today.

22  BY MS. CLEMONS

23  Q    Why was Equativ not able to get to this level of scale

24  that you've been discussing?

25  A    So between 2015 and 2022, the sales revenue of

Direct Examination - A. Creput

1  Equativ's ad server went --

2          MS. CLEMONS:  Omitting confidential portion.

3          THE WITNESS:  Uh-huh.  In 2015, the ad server was

4  Equativ's only product, and this product was profitable and

5  allowed Equativ to invest into new products such as the SSP.

6          So the number one problem was the stop in the

7  growth of our sales revenue from the ad server in 2014 to

8  2015.  During a long period between 2014 and 2020, the

9  profits did not evolve.  This was the time that we needed to

10  transform our business model from an ad server model to an

11  SSP model.  If we had not transformed this business model,

12  we would not exist today.

13          Does this answer your question?

14  BY MS. CLEMONS

15  Q    I think at one point you said that rival SSPs that are

16  rivals to Google are not able to get to the effective level

17  of scale, and I think the question is why.  What is stopping

18  them from getting to that effective level of scale?

19  A    I think it's everything that I said concerning Google's

20  anticompetitive behavior.

21  Q    A few minutes ago, you said publishers cannot choose

22  their ad server partners today.  Did I get that right?

23  A    In reality, the publishers don't have a real choice

24  when it comes to their technological partners.

25  Q    Why do you say that in reality publishers don't have a

Direct Examination - A. Creput

1  real choice when it comes to their technical partners?

2  A    There are alternative solutions, but it is impossible

3  for a publisher to choose one of these alternatives without

4  losing a significant portion of their sales revenue.

5  Q    Are you referring to publisher ad servers?

6  A    Yes.

7  Q    Earlier in the day you mentioned mediation for Google's

8  AdX.  Do you remember that?

9  A    Yes.

10  Q    Why was -- why was that Google AdX mediation set up?

11  A    This was a workaround solution that competing ad

12  servers came up with, specifically Xandr, which is spelled

13  X-A-N-D-R, and Equativ to allow their ad server clients to

14  have access to Google SSP.  This involved an investment from

15  Xandr and Equativ, and it also involved time in order for

16  this to work.  Today -- today, we can't consider this

17  solution to be working in a normal fashion.

18  Q    One thing you mentioned before was that when Equativ

19  has lost media publisher ad server clients, 95 percent of

20  them have gone to DFP.

21        Do you remember that?

22  A    Yes.

23  Q    Why has Equativ not lost more publisher ad server

24  clients -- more media publisher ad server clients to media

25  publishers just making their own ad server?

Direct Examination - A. Creput

1  A    If you take a look at the media publishers that still

2  work with Equativ, first of all, these are small.  These

3  media publishers are small in size or these are publishers

4  with constraints or with very specific constraints or

5  behaviors.

6  Q    Today, why do more large media publishers not choose to

7  make their own publisher ad server instead of using Equativ?

8  A    A certain number of media publishers tried that or did

9  so in the past, but this requires an extremely major

10  investment.  The ad server is the part of ad technology

11  which is the most strategic and the part which is most

12  complex in terms of its maintenance.

13       The ad server manages all the complexity of

14  digital advertising, the differences in format, in operating

15  systems, in terms of devices which are constantly evolving.

16       The majority of independent competing ad servers

17  stopped.  For example, OpenX, O-P-E-N-X, and Verizon media.

18  As far as Equativ is concerned --

19       MS. CLEMONS:  Omitting confidential portion.

20  BY MS. CLEMONS

21  Q    What impact, if any, did Google's last look have on

22  competition among exchanges?

23  A    This gives Google the exact level of the bid to

24  position itself or not position itself in the competition.

25  And this allows Google to know with great precision whether

Direct Examination - A. Creput

1  it's going to win or not.  And this allows Google to decide

2  whether it's going to lower its fee to win the auction or

3  not.

4          Overall, this translates into a win rate at the

5  auctions which is much more significant for Google than for

6  all the other SSPs.  This allows Google to optimize in a

7  very significant way, for example, the cost of these

8  infrastructures.

9  Q    Overall, do you view Google's last look as being good

10 for competition or bad for competition, or how do you see

11 it?

12         MS. RHEE:  Objection, Your Honor, with respect to

13 the answer calling for the ultimate conclusion.

14         THE COURT:  Sustained.

15         MS. CLEMONS:  Omitting confidential portion.

16 BY MS. CLEMONS

17 Q    As its publisher ad server; is that right?

18 A    Yes.  This is a tier 1 publisher, the second-largest

19 publisher in Spain, which used Google Ad Manager and, a year

20 ago, decided to migrate to Equativ.  In actuality, this is

21 the most important migration that we have conducted over the

22 last five years.

23         MS. CLEMONS:  Omitting confidential portion.

24         THE WITNESS:  Decide to carry out this migration.

25         MS. CLEMONS:  Omitting confidential portion.

Direct Examination - A. Creput

1            THE WITNESS:  -- our server to be sure that they

2   were at par with Google.

3            The migration took six months, with a significant

4   amount of effort both --

5            MS. CLEMONS:  Omitting confidential portion.

6            THE WITNESS:  -- commercial conditions that were

7   extremely disadvantageous for Equativ.  The objective was to

8   show all the publishers that an alternative solution could

9   exist besides Google.

10           MS. CLEMONS:  Omitting confidential portion.

11           THE WITNESS:  -- go back to Google.  This was last

12  June.

13           MS. CLEMONS:  Omitting confidential portion.

14           THE WITNESS:  -- to the anticompetitive behavior

15  of Google.  In particular, the maintenance of two ad servers

16  is counterproductive.  The AdX mediation, in spite of all

17  our efforts, does not work as well as it should.

18           And as I said earlier, certain types of campaigns,

19  especially the programmatic guaranteed, do not work

20  properly.  And this stems from the lack of interoperability

21  of DV360 with competing ad servers.  The programmatic

22  guaranteed works well with competing DSPs such as The Trade

23  Desk.

24  BY MS. CLEMONS

25  Q    You mentioned having to offer --

Direct Examination - A. Creput

1              MS. CLEMONS:   Omitting confidential portion.

2   BY MS. CLEMONS

3   Q    -- Equativ that you viewed as disadvantageous.  Can you

4   just quickly list what those terms were?

5   A    So, for example, we provided free access to our ad

6   server for a long --

7              MS. CLEMONS:   Omitting confidential portion.

8              THE WITNESS:   -- migration fees.  The migration

9   cost concerning the -- so concerning the migration cost

10  relative to the time needed by the teams or the crews to

11  conduct this migration, and there was also the guarantee of

12  minimum revenue.

13             MS. CLEMONS:   Omitting confidential portion.

14             THE COURT:   I think it's your question.

15             MS. CLEMONS:   It is.  I was giving Your Honor an

16  opportunity to read.

17             THE COURT:   I read it.

18  BY MS. CLEMONS

19  Q    Did you meet with the DOJ at any point concerning that

20  investigation?

21  A    Yes, with representatives of the DOJ.  The answer is

22  yes.

23  Q    How many times?

24  A    I think it's two times.

25  Q    Is Google's DFP ad server a competitor to Equativ's ad

Direct Examination - A. Creput

1  server?

2  A    Yes.

3  Q    Is Google's AdX ad exchange a competitor to Equativ's

4  SSP?

5  A    Yes.

6  Q    Did you want the Department of Justice to file a

7  lawsuit against Google?

8  A    Not exactly.  On the other hand, having the antitrust

9  authorities look into the functioning of this market was

10 something I wanted.

11 Q    Do you hope that the Department of Justice prevails in

12 its lawsuit against Google?

13 A    I simply hope that the functioning of this market can

14 become fair and transparent.

15 Q    Does Equativ also own a DSP?

16      MS. CLEMONS:  Omitting confidential portion.

17      THE WITNESS:  -- revenue in the self-serve DSP.

18 BY MS. CLEMONS

19 Q    Do you agree that Equativ represents both advertising

20 buyers and publishers selling advertising?

21 A    In a certain sense, yes, but the primary client of

22 Equativ are the publishers.  The activity we have on the

23 demand side is weak too in order to bring a little bit more

24 demand to our publishers.

25 Q    So currently Equativ does operate both a DSP, an SSP,

Direct Examination - A. Creput

1  and an ad server?

2  A    Yes.

3  Q    What are the benefits of having a demand-side platform,

4  a supply-side platform, and an ad server at Equativ?

5  A    The goal is to offer solutions so that our clients, the

6  publishers, can buy directly.  The goal is to offer the

7  publishers direct access and to reduce the cost and to

8  increase the transparency in purchasing -- I'm sorry --

9  advertisers.

10 Q    What is Equativ's standard take rate from publishers

11 for open auctions conducted through Equativ's SSP?

12        MS. CLEMONS:  Omitting confidential portion.

13 BY MS. CLEMONS

14 Q    -- take rate?

15 A    Yes.

16 Q    Is that rate discounted if a publisher agrees to also

17 use Equativ's ad server?

18 A    It depends.  These are business terms that are

19 negotiated with the client.  So it depends.

20 Q    Sometimes does Equativ offer a lower rate, a lower take

21 rate, if a publisher agrees to also use the Equativ ad

22 server?

23        MS. CLEMONS:  Omitting confidential portion.

24 BY MS. CLEMONS

25 Q    How has Equativ's revenue changed over the last three

Direct Examination - A. Creput

1  years?

2  A    Over the last three years, Equativ's --

3           MS. CLEMONS:   Omitting confidential portion.

4  BY MS. CLEMONS

5  Q    In 2022, did Equativ report record net recurring

6  revenue?

7  A    Equativ made an announcement that the sales revenue was

8  92 million euros.  This was a record.  This was the record.

9  Q    How many daily auctions does Equativ SSP conduct

10  roughly?

11          MS. CLEMONS:   Omitting confidential portion.

12  BY MS. CLEMONS

13  Q    Over the last year, has Equativ increased the number of

14  employees that it has?

15  A    Yes.  In 2022, the answer is yes in a significant way.

16  And in 2023, this has stabilized.

17  Q    What was the employee increase in 2022?

18  A    A little over 100.

19  Q    I'm sorry.  Do you know what a walled garden is?

20  A    Yes.

21  Q    What is it?

22  A    A walled garden is an environment in which all revenues

23  are closed and are not accessible to third parties.

24  Q    Does Equativ compete with those to attract revenue?

25  A    Today we do not consider that walled gardens are

Direct Examination - A. Creput

1  competitors.

2  Q     Bring up Tab 12.

3           So we're going to mark this as Creput Exhibit 2.

4           MS. CLEMONS:  Your Honor, we're not actually

5  seeking to enter this into evidence, just here for

6  completeness.

7           And then the transcript says, "Exhibit 2, printout

8  of webpage from Equativ, was remotely introduced and

9  provided electronically to the reporter as of this date."

10 BY MS. CLEMONS

11 Q     So this is Creput Exhibit 2.  Do you recognize this as

12 a printout of a webpage from the Equativ website?

13 A     Yes, probably so.

14 Q     Do you see where it says "tired of working with walled

15 gardens?  We're the independent alternative"?

16          Did I read that right?

17 A     Yes.  This flows from a different logic because walled

18 gardens represent a significant advertising expense.  So

19 when we pitch advertisers, we pitch for them to spend more

20 on the open web as opposed to -- and less on the walled

21 gardens.

22 Q     Does Equativ offer its ad server and SSP as a single

23 integrated platform?

24 A     So today these two products are integrated one into the

25 other.  However, there are still two contracts.

Direct Examination - A. Creput

1  Q    What are the benefits of that integration?

2  A    We share the same infrastructure, and we optimize the

3  integration so that it's totally natural.

4  Q    What I'm asking you is, is it your view that selling

5  the SSP integrated with the ad server produces a better

6  experience for publishers?

7  A    Yes.  Basically, yes.  But we also sell them

8  separately.  We have standalone ad server clients and we

9  have standalone SSP clients.  And we're very proud to have

10  full stack clients, SSP and ad server.

11  Q    Can a publisher that is using the DFP ad server also

12  have header bidding on their inventory if they want to?

13  A    Yes.  Yes.  Sorry.  I didn't understand your question.

14  The answer is yes.

15  Q    In response to questions from counsel for Google, I

16  think you said something about customers were leaving

17  Equativ for reasons other than quality of Equativ's

18  products.  What did you mean by that?

19  A    That's everything that I've explained in any testimony

20  up to this point regarding anticompetitive practices,

21  self-preferencing, et cetera.

22  Q    Also, in response to -- go ahead.

23  A    So if I have to have sum it up, I would say that the

24  main reason is access to Google demand, specifically Google

25  Ads and DV360.

Direct Examination - A. Creput

1  Q    In the past three years, how have Equativ's display

2  ads, publisher ad serving revenue, changed?  Have they gone

3  up or down or stayed the same?

4  A    So what I was saying was that --

5           MS. CLEMONS:  Omitting confidential portion.

6           THE WITNESS:  -- million this year.

7  BY MS. CLEMONS

8  Q    How easy or difficult would it be for a publisher to

9  create a publisher ad server that could compete effectively

10  with Google?

11  A    Today it would be very difficult because very few

12  publishers have ad servers.  When Aufeminin did it, it was

13  at the beginning of the digital era, and this was the

14  biggest native provider in France.  It was the top digital

15  publisher.

16  Q    Are you aware of whether advertising agencies have

17  different personnel who buy display ads compared to

18  different personnel who buy social media ads or other types

19  of ads?

20  A    Yes, absolutely, because they use very different

21  technologies and the expertise is very different.  It is

22  much harder to buy from the open web than it is from the

23  social networks.

24  Q    What other differences, if any, from the advertising

25  side are there between display and social?

Direct Examination - A. Creput

1  A    The difference is in the nature of the content and the

2  quality of data, and these are the two principal

3  differences.

4  Q    Between Equativ and Google, which one is more

5  transparent, in your view?

6  A    So, from my point of view, Google is not transparent

7  when it comes to the value chain.  And it's a little bit

8  like a black box.

9  Q    Why do you say that Google is not transparent?

10 A    Google does not communicate the log-level data to both

11 ends of the market.

12 Q    Why does it matter that Google does not communicate the

13 log-level data to both ends of the market?

14 A    If Google were to communicate the log-level data to

15 advertisers and publishers, that would create transparency

16 regarding the fees that Google takes on the entire value

17 chain.

18 Q    How do Equativ's open auction SSP take rates compare to

19 Google's?

20 A    As far as I know, Google is --

21          MS. CLEMONS:  Omitting confidential portion.

22 BY MS. CLEMONS

23 Q    And I think you said you wanted competition to be fair

24 and transparent.  Do you remember that?

25 A    Yes.

Direct Examination - A. Creput

1  Q     Why do you want competition to be fair and transparent?

2  A     First of all, because that is how all markets should

3  function.

4          And, secondly, because, as I mentioned earlier, it

5  is a hindrance to competition and consequently to

6  innovation, and because we are in a market where the take

7  rate, as I said before -- where the take rates, as I said

8  before, are too high.

9  Q     Do you think competition for Google -- I'm sorry.  Let

10  me back up.

11          When you said that take rates are too high, what

12  did you mean by that?

13  A     A few years ago, Google communicated a take rate, an

14  average rate, for each advertising transaction on the order

15  of 32 percent.  That includes supply-side fees and

16  demand-side fees.  Just imagine the New York Stock Exchange

17  if it took a 32 percent commission on every market

18  transaction.

19          The functioning of a digital programmatic

20  advertising system is very similar to the functioning of a

21  market such as the New York Stock Exchange.

22  Q     Do you think Google competes in a fair and transparent

23  manner in the display advertising technology business today?

24  A     I think everything I said so far shows that I don't

25  believe that at all.

                     Direct Examination - A. Creput
1              THE COURT:  That's it, right?

2              MS. CLEMONS:  That's it.  Thank you, Your Honor.

3              THE COURT:  All right.  Now, just so I know

4    whether my law clerk needs to stay, O'Kelley and other

5    video, is that also --

6              MS. WOOD:  That's video, Your Honor.

7              THE COURT:  It's video.  All right.

8              Evan, thank you.

9              All right.  Is Mr. Boland here now?

10             MS. WOOD:  Yes, he is, Your Honor.

11             THE COURT:  All right.  Call Mr. Boland.

12             MS. WOOD:  Should we take the break or call him

13   directly?

14             THE COURT:  No.  We can get him started.

15             MS. WOOD:  Okay.

16             THE COURT:  Do we need exhibit books for this

17   witness?

18             MS. WOOD:  We passed them up before.

19             THE COURT:  Oh.

20             MS. WOOD:  May I proceed, Your Honor?

21             THE COURT:  Yes, ma'am.

22   Thereupon,

23                       BRIAN BOLAND,

24   Having been called as a witness on behalf of the plaintiffs

25   and having been first duly sworn by the Deputy Clerk, was

## Direct Examination - Brian Boland

1  examined and testified as follows:

2            (Time noted: 3:59 p.m.)

3                 DIRECT EXAMINATION

4  BY MS. WOOD

5  Q    Good afternoon.  Can you please introduce yourself to

6  the Court and spell your first and last name for the court

7  reporter.

8  A    Sure.  It's Brian, B-R-I-A-N, Boland, B-O-L-A-N-D.

9  Q    And can you please describe to the Court at a high

10  level your professional background.

11  A    I spent a number of years in technology focusing on

12  advertising technologies both at -- with a focus on

13  owned-and-operated practices as well as advertising

14  technology practices.

15            I began my career at a early-stage services agency

16  that focused on search ads.  From there, I moved to

17  Microsoft for four years.  After four years at Microsoft

18  working the search ads platform, I then spent the next 11

19  years at Facebook working on advertising for the majority of

20  my time there.  Towards the very end, I transitioned into

21  focusing on products and engineering around our partnerships

22  organization.

23  Q    And when did you leave Facebook?

24  A    I left Facebook in November of 2020.

25  Q    Okay.  If we refer to it as Facebook today, you

Direct Examination - Brian Boland

1  understand that's the company that now operates under Meta?

2  A    I do, yes.

3  Q    Okay.

4        Can you describe some of the projects that you

5  worked on while at Facebook from 2009 to approximately 2019.

6  A    Yes.  Happy to.

7        I worked on a number of different disciplines and

8  a number of different teams reported into my organization.

9  At the beginning, I focused on our direct response

10 advertising, so helping advertisers find sales for their

11 businesses and whether we could build that as a viable

12 advertising business at Facebook.

13       I continued to work and add more teams to my

14 organization that focused on how we would build out a more

15 robust ad solution, so the full complete owned-and-operated

16 ad solution for Facebook.  So how we'd expand into news feed

17 advertising, how we'd expand into video advertising,

18 eventually how we would look at building our advertising

19 technology strategies, including acquisitions of Atlas and

20 LiveRail.  And in that capacity served as a bridge between

21 the chief revenue officer's organization and the chief of

22 engineering's organization.

23 Q    Did you have a title at Facebook in that time period?

24 A    I did.  I had a handful of different titles.

25 Q    And what were they?

Direct Examination - Brian Boland

1  A    I had a director of product marketing title.  I had the

2  vice president of advertising and product marketing.  I had

3  the vice president of advertising and product marketing and

4  Atlas.  I had a title of vice president of advertising

5  technology, vice president of publisher solutions.  And then

6  the last one -- I apologize for the length -- vice president

7  of product marketing, partner engineering marketing

8  analytics.

9          Yeah.

10 Q    Okay.  And what were the ad technology products that

11 Facebook operated while you were there for that decade

12 between 2009 and 2019?

13 A    We had a range of products that focused on a couple of

14 key areas, one, Atlas, which was an acquisition from

15 Microsoft focused on measurement and ad serving.

16         The second was the Audience Network, which was

17 designed to provide publisher monetization for businesses

18 that were building their apps on Facebook and around

19 Facebook.

20         And then LiveRail, which was an acquisition that

21 was focused on how to help publishers to monetize first

22 their video supply but ultimately their general supply.

23 Q    And you mentioned you worked on Audience Network.  Is

24 that sometimes referred to by third parties as Facebook

25 Audience Network or FAN?

Direct Examination - Brian Boland

1  A    Yes.  From the beginning, we had called it Facebook

2  Audience Network.  FAN became a short term that people used

3  for Facebook Ad Network.  But they are synonymous, the same

4  exact thing.

5  Q    What type of ad technology was FAN?

6  A    FAN would have been an ad network that connected the

7  demand that was on Facebook.  So advertisers come to

8  Facebook and they want to place their ads, and then they

9  could extend them via the Audience Network into third-party

10 placements, whether that was an app -- we thought about apps

11 being a place where Audience Network could show ads; we

12 thought about open web display as a place where Audience

13 Network should show advertisers' ads; and we thought about

14 video as a place where Audience Network could show those

15 people's ad.

16        So across those different areas is where we'd

17 extend those ads.

18 Q    And at the time you were at Facebook, did Google offer

19 an advertiser ad network of its own?

20 A    Yes, they did.

21 Q    What was that referred to?

22 A    I believe at the time it was AdX.

23 Q    AdX or -- well, was it an ad exchange or advertiser ad

24 network?

25 A    They had an advertiser exchange.  There were a number

Direct Examination - Brian Boland

1  of components of the Google advertising technology stack

2  over the course of my time.  They had acquired a series of

3  companies that they brought into creating an operating

4  system, if you will, around advertising technology.

5          Some of the names are challenging.  I feel like

6  they changed quite a bit during my time there.  So I do have

7  a little bit of a hard time keeping track of all the

8  different exact products and services.

9          THE COURT:  Mr. Boland, I'm going to ask you to

10 slow down a little bit.

11          THE WITNESS:  Sure.

12          THE COURT:  Okay.

13 BY MS. WOOD

14 Q    So if I refer to Google's advertiser ad network as

15 Google Ads, will you know what I'm referring to?

16 A    Yes, I will.

17 Q    Okay.  With respect to open web display ads, how large

18 was the Google Ads ad network compared to FAN?

19 A    "Incomparable" is probably not the right word.  I am

20 trying to seek the right word.  Significantly larger.  So

21 the opportunity for the Facebook Ad Network, or FAN, was to

22 try to extend into open web display ads.

23          We didn't really have a footing there.  Google, we

24 knew, was the dominant player and the technologies that they

25 had built and the inventory they were running at the time

Direct Examination - Brian Boland

1  that we were trying to launch FAN.

2  Q    Now, by the time you left FAN and went to another group

3  within Facebook, did FAN -- was FAN still transacting in

4  open web display ads?

5  A    We were trying to transact in open web display ads.  So

6  we needed to both gain access to supply so that we could run

7  advertising.

8           And at that time we were still trying to figure

9  out whether we could or couldn't successfully run an open

10  web display network.

11  Q    Ultimately, did FAN stop transacting open web display

12  ads?

13  A    Yes, they did.

14  Q    Approximately when was that?

15  A    I believe it was around 2019 is when that decision was

16  made.

17  Q    So to be clear, today to the best of your

18  understanding, does FAN offer open web display inventory?

19  A    To my knowledge, they do not.

20  Q    Okay.  Has Facebook ever had a publisher ad server that

21  competed with Google's DSP for open web display advertising?

22  A    We did not.  We were looking at how we could build the

23  LiveRail acquisition into a publisher-side solution but were

24  never able to successfully build or launch that.

25  Q    And to your knowledge, has Facebook ever had an ad

Direct Examination - Brian Boland

1  exchange, or some people refer to it as a supply-side

2  platform or SSP, that competes with Google's ad exchange?

3  A    For open web display, no.  For video, LiveRail was a

4  video SSP when we acquired it.

5  Q    And has Facebook -- as of the time you left, did

6  Facebook have a demand-side platform, or DSP, that competed

7  with Google's DV360?

8  A    In the sense that DV360 is separate than Google Ads, we

9  did not.  We had Facebook ads, which would enable the

10  Audience Network.  But that is, in my mind, a different

11  beast than a standalone DSP, demand-side platform.

12  Q    All right.  We'll talk a little bit about that in a

13  minute, the distinctions between ad networks and DSPs.

14        Let me start by showing you a document that's

15  previously been marked for identification as PTX 1536.  If

16  you can turn to it in your binder, it will also be on that

17  computer screen right near you, whatever is easier for you.

18        THE COURT:  Any objection?

19        MR. JUSTUS:  No objection, Your Honor.

20        THE COURT:  All right.  It's in.

21   (Plaintiffs' Exhibit Number **1536 admitted into evidence.**)

22  BY MS. WOOD

23  Q    Do you recognize PTX 1536?

24  A    I do.

25  Q    And if you turn to the second page of the document, in

102

## Direct Examination - Brian Boland

1  the middle of the page, there's an email from you on

2  August 9, 2016, with the subject line "DFP mediation for

3  mAPP native."

4          Do you see that?

5  A    I do.

6  Q    And is this generally discussing the app part of the

7  FAN business?

8  A    That is correct.

9  Q    And you write in the email, "Erwin, thanks for raising

10 this question.  We've been worried about the strategic issue

11 that arises once Google sits between the publisher and

12 Facebook.  We have historically seen them take very

13 aggressive steps once they have a footprint.  I would hate

14 for DCLK" -- is that a reference to DoubleClick?

15 A    That is.

16 Q    And that was the company acquired by Google?

17 A    That is.

18 Q    And that's where Google got its publisher ad server?

19 A    Yes.

20 Q    "I would hate for DCLK to use AN to gain a strong

21 mediation foothold and then bias their system against us,

22 much like they do on desktop, where dynamic allocation gives

23 Google the opportunity to cherry-pick the best supply."

24          So there's a lot in there.  Let me take it one

25 step at a time.

Direct Examination - Brian Boland

1        When you were worried about, in the beginning,

2   Google sitting between the publisher and Facebook, can you

3   describe what you meant by that?

4   A    Yes.  So the way that advertising technology had

5   evolved to this point is that Google had developed a

6   operating system that was used for open web display that had

7   become the dominant player in the space.  Advertisers and

8   publishers were on that platform.

9        And operating as the operating system, if you

10  will, the server, their system, gets to look at all of the

11  supply and inventory that is in that publisher's sites and

12  then make decisions around what happens for a partner who

13  then wants to transact or work with that supplier, that

14  inventory.

15       So our concern was -- knowing that there would be

16  a layer between us, some of the things we had seen elsewhere

17  were a concern.

18  Q    And then you say at the end -- you say, "much like they

19  do on desktop."

20       What does "desktop" mean there?

21  A    "Desktop" is shorthand for display ads, open web

22  display ads.  When we think about desktop, we generally

23  think about browsers and we generally think about the

24  websites that show up on a web browser.

25  Q    Okay.  And then where it says that "cherry-pick the

Direct Examination - Brian Boland

1   best supply," what is that a reference to?

2   A    This refers to some of the policies that were in place,

3   technological -- actually, technological solutions that were

4   in place inside of Google's ad stack, which referred to

5   things like first look, where Google would have the

6   opportunity to take the very first look at all the supply

7   and then choose to remove an impression by buying that

8   impression.

9           It would refer to last look.  So after a waterfall

10  or other bidding process would run, they would get a last

11  look to have a second bite at the apple and choose again to

12  remove an impression from supply.

13  Q    And the AN in that paragraph, that refers to FAN,

14  Facebook's Audience Network?

15  A    That refers to Facebook's Audience Network.

16  Q    Okay.  Let me turn to the next exhibit, PTX 1710.

17          THE COURT:  Any objection to 1710?

18          MR. JUSTUS:  No, Your Honor.

19          THE COURT:  It's in.

20   (Plaintiffs' Exhibit Number 1710 admitted into evidence.)

21  BY MS. WOOD

22  Q    Do you recognize this document?

23  A    I do.

24  Q    And what is the format of this document?

25  A    The format of this document is an update post that was

Direct Examination - Brian Boland

1  made in -- and, again, I recognize how difficult it is to

2  parse all these abbreviations and everything.  AN, Audience

3  Network.  Bidding FYI, for your information.  So we had

4  very -- a version of Facebook for employees.  And in those

5  groups, people could post information updates.

6          This is an Audience Network update from the FYI

7  group from somebody who was leading our work on part of the

8  Audience Network.

9  Q    Was that Asaf Hochman?

10  A    Yes, it was Asaf.

11  Q    And do you see the date of the document is April 4,

12  2017?

13  A    I do.

14  Q    Mr. Hochman begins, "The folks over at Google have

15  moved to defense mode."

16          Do you see that?

17  A    I do.

18  Q    And then he's talking about the response to Facebook's

19  launching a header bidding product.

20          Is that right?

21  A    That is correct.

22  Q    And then a few sentences down he writes, "Here's a

23  quick overview of the situation.  Why is Google concerned?"

24          And he answers his own question.

25          "Header bidding benefits everyone but Google.  It

Direct Examination - Brian Boland

1  takes away the unfair advantage which granted only AdX full

2  viewability of publishers' entire inventory and the

3  opportunity to cherry-pick the impressions it wanted."

4          Can you explain what that is a reference to?

5  A    Yes.  So header bidding was innovated in the industry

6  as a workaround to the practices that different ad tech

7  vendors and publishers were seeing and were concerned about

8  with the way that they felt that auctions were occurring

9  that would limit their success as both a publisher and an

10  advertiser.

11          And we joined that movement around header bidding.

12  We didn't create the movement, but we saw it as a very

13  viable path forward, and we saw that in header bidding that

14  we could work around those limits that I described earlier

15  of Google removing impressions from the auction either with

16  first look or last look or removing some of the challenges

17  with a waterfall, which is a different type of way to sell

18  supply, that also would limit the ability for other partners

19  to participate.

20          And the results, when you actually move towards

21  header bidding, are significantly positive to publishers and

22  to advertisers.

23  Q    And do you see the next sentence he writes, "Header

24  bidding, therefore, threatened Google's monopoly, which

25  ensured AdX always won the great majority of impressions,

Direct Examination - Brian Boland

1  generating 15.6 billion in annual gross revenue"?

2          Do you see that?

3  A    I do.

4  Q    So what is that referring to, the fact that, according

5  to -- from Facebook's perspective, Google's monopoly ensured

6  AdX always won the great majority of impressions?

7          THE COURT:  I think that speaks for itself.  Plus,

8  we've heard a lot about header.  This is all so far

9  cumulative.

10          We are going to take our break now.  We'll be back

11  by 4:30.

12          MS. WOOD:  Understood, Your Honor.

13          THE COURT:  All right.

14                  (The time is 4:16 p.m.)

15                  (Brief recess taken.)

16          THE COURT:  All right.  Ms. Wood.

17          MS. WOOD:  Your Honor, just two more documents.

18          THE COURT:  All right.

19          MS. WOOD:  I'd like to show the witness what has

20  been marked for identification as PTX 1709.

21          THE COURT:  Any objection?

22          MR. JUSTUS:  No, Your Honor.

23          THE COURT:  All right.  It's in.

24   (Plaintiffs' Exhibit Number 1709 admitted into evidence.)

25  BY MS. WOOD

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

Direct Examination - Brian Boland

1  Q    Mr. Boland, do you recognize PTX 1709?

2  A    I do.

3  Q    What do you recognize it to be?

4  A    A document that we produced in the course of our work,

5  trying to summarize and frame up the different options that

6  we have and the strategies that we take moving forward for

7  our Audience Network.

8  Q    The "we" again being Facebook.

9  A    "We" being Facebook, yes.

10 Q    Do you know -- it's very small, but in the upper

11 right-hand corner, it's dated July 5, I believe, 2017?

12 A    Yes, that's what I read.

13 Q    And the title is "Charting a Different Course:

14 Audience Network Vision" at the top.

15       Do you see that?

16 A    I do.

17 Q    Okay.  About two-thirds of the way down, there's an

18 expression that I've come to learn, TLDR.

19       What does that mean?

20 A    Yes.  That stands for "too long; don't read," which is

21 the summary of what's in the document.  So if you want to

22 know, without reading the document, the most important

23 things in it, we would summarize that with TLDR.

24 Q    Okay.  And the first bullet point under TLDR reads,

25 "Google sits between us and the impressions we want to buy."

Direct Examination - Brian Boland

1           Do you see that?

2    A    Yes.

3    Q    And can you describe generally what that means?

4    A    Yes.  That is the fact that, as the operating system,

5    there's a layer between Facebook's Audience Network and then

6    a third-party provider -- the dominant one was Google --

7    that we would have to work between to get to the impressions

8    that a publisher would have.

9           So we always had a set of technologies that were

10   in between us and the supply, the inventory, that we wanted

11   to get to.

12   Q    And the supply or the inventory you're talking about

13   here is, among other things, the display of ad impressions

14   on open web websites; is that right?

15   A    That is correct.  That's one of the main categories we

16   thought about.

17   Q    Okay.  And then if you look a few bullet points later,

18   it says, "Google has monopolistic power.  It uses its power

19   to manipulate the market its favor and disadvantage

20   competition."

21          Do you see that?

22   A    I do.

23   Q    Was that view widely held, based on your experience, at

24   Facebook at that time?  Was it widely held at Facebook?

25   A    At Facebook that was a widely held view, yes.

Direct Examination - Brian Boland

1 Q    And then below that, it says, "Google's Market Share.

2 Google is the dominant technology provider for publishers.

3 They control the lion's share of the ad-serving market."

4         Do you see that?

5 A    I do.

6 Q    And then below that -- I'm not going to refer to

7 anything and you should not refer to anything that appears

8 in a red box.  Do you understand that?

9 A    I understand.

10 Q    Okay.  Do you see that there are three different types

11 or categories listed there?

12 A    I see those.

13 Q    And were those three categories ways in which Facebook

14 viewed the possible visions for Audience Network?

15 A    Yes.

16 Q    Okay.  And do you see the first --

17         MS. WOOD:  Well, I would just ask the Court to

18 take note of the first category.

19 BY MS. WOOD

20 Q    Is that an estimate of Google's market share in that

21 category?

22 A    That is what that is.

23 Q    Okay.  And the third red box, is that Facebook's

24 estimate of Google's market share in that other category?

25 A    That is.

Direct Examination - Brian Boland

1  Q    And then the unredacted, the 40 percent, is an estimate

2  of Facebook's market -- of Facebook's estimate of Google's

3  market share in video; is that right?

4  A    That's right.

5  Q    And, again, these are referring to market shares for

6  the tools used to provide those different ad types; is that

7  right?

8  A    That is correct.

9  Q    Okay.  If you turn to the second page of the document,

10 there's a question in the middle that says, "What's the

11 outlook (trend) for Google's publisher market share?"

12       Do you see that?

13 A    I do.

14 Q    And the document reads, "In short, it's going to

15 increase.  Google has monopoly power in four key forms."

16       Do you see that?

17 A    I see it.

18 Q    Were these views widely held at Facebook at the time,

19 that Google's monopoly power came in four key forms?

20 A    Yes.

21       MR. JUSTUS:  Your Honor, I think it really does

22 strain his personal knowledge to say are the views widely

23 held in a company as big as Facebook.

24       MS. WOOD:  I'll rephrase, Your Honor.

25       THE COURT:  Sustained.

Direct Examination - Brian Boland

1  BY MS. WOOD

2  Q    How many people worked in the Audience Network group

3  with you at Facebook at this time?

4  A    In Audience Network specifically, 100, 200 at that

5  time.

6  Q    And how many direct reports did you have in that group?

7  A    I -- well, my overall group was 500 people.

8  Q    How many people reported directly to you without

9  someone else in between?

10 A    Six.

11 Q    Okay.  Let's narrow it to you and the six people that

12 reported directly to you.

13        Were those widely held beliefs based on your

14 information between you and six people who reported directly

15 to you?

16 A    Yes.

17 Q    And did you have a reason to believe that people

18 outside that group held different views on that subject?

19 A    No, no reason to believe.

20        MR. JUSTUS:  The same objection, which requires

21 him to have knowledge about what everyone at Facebook

22 believed to answer that question.

23        THE COURT:  I don't think this is going very far.

24 All right.  Sustained.

25 BY MS. WOOD

Direct Examination - Brian Boland

1  Q    Okay.  Do you see the first bullet point under the

2  "Monopoly power in four key forms" is the capital

3  requirement to build a competing product is a barrier to

4  entry"?

5           Do you see that?

6  A    I do.

7  Q    Can you explain what that refers to?

8  A    That refers to the decade-long process that Google

9  undertook to both acquire companies that provided

10 advertising technology services and then continued ongoing

11 engineering investment to connect and to continue to

12 modernize and improve those services.

13          So our view is that, in order to recreate the

14 decades' worth of acquisitions and the resulting product, it

15 was significant -- just -- significant, significant

16 investment that was a barrier for us to be able to invest

17 commensurately.

18 Q    Now, the next one is "Their technological superiority

19 is a barrier to entry" and then "Substitute goods are

20 scarce."

21          Do you see that?

22 A    I do.

23 Q    What does "substitute goods are scarce" refer to?

24 A    This refers to our view of the market at that time,

25 that there were not competing products that would be a

Direct Examination - Brian Boland

1 viable alternative to Google's technology stack.

2 Q    Okay.  And then the next bullet point says, "Network

3 externality.  If you were to think about Google's ad serving

4 capabilities as a modus operandi for all businesses selling

5 ads.  Once enough publishers are on board, advertisers are

6 induced to buy and adopt Google's protocols and processes.

7 As more advertisers buy in, additional publishers are

8 induced to join.  The cycle continues."

9        Can you explain what that refers to?

10 A    Yeah.  I might even simplify that down to the concept

11 of critical mass.  So we viewed that there were two sides of

12 this marketplace.  There were publishers; there were

13 advertisers.  And as you acquire more advertisers, that is a

14 way that you can incent more publishers to join on to your

15 product.  As more publishers are there, advertisers have to

16 buy into that platform in order to have access to that

17 supply.

18        So it was a reinforcing cycle, where as more of

19 the footprint grew on the publisher side, it would reinforce

20 more growth on the advertiser's side and vice versa, running

21 everything through the ad tech platform at Google.

22 Q    And then do you see below that?  It says, "What does it

23 mean for competing players in the market?  Their economic

24 viability is diminished.  Google has commoditized the ad

25 server.  We can expect independent resource-poor competitors

Direct Examination - Brian Boland

1  to exit the business."

2          Do you see that?

3  A    I do.

4  Q    Were you aware of independent competitors that exited

5  the publisher ad server business while you were at Facebook?

6  A    I do.

7  Q    It says, "Publishers looking for an alternative will be

8  less likely to consider a competitor if the long-term

9  viability of potential vendors are in question."

10          What is that a reference to?

11  A    For a publisher, when you install an ad server, when

12  you make a decision to integrate one into your site or your

13  app or your video experience, it's a very significant

14  technological investment and a process investment.

15          So changing an ad server is a very, very difficult

16  task.  So if you are going to make the decision to bet on a

17  company to be your partner for ad serving, you're going to

18  want to know that they are going to be a viable company that

19  can last so that you're not stuck trying to change something

20  against your will.

21  Q    And then do you see below that it talks about some

22  companies at risk are Fibr, Switch (phonetic), Smart

23  AdServer, and IronSource.  Do you see that?

24  A    I do.

25  Q    And then it says AppNexus has all but exited the

Direct Examination - Brian Boland

1   business in favor of its exchange.  Do you see that?

2   A    I do.

3   Q    And then AOL is a holdout mainly for its O&O.  Do you

4   see that?

5   A    I do.

6   Q    Are those all references to other competing publisher

7   ad servers?

8   A    Yes.

9   Q    And then it says, "Why does it matter if Google offers

10  a superior product?"

11          Do you see that?

12  A    I do see that.

13  Q    And then below that there's a statement, "Google uses

14  their market power to promote anticompetitive practices.

15  Therefore, we are missing out on the inventory we want to

16  buy and have in our network even when we sign up a new

17  publisher."

18          Can you explain what that refers to?

19  A    Because of the way that the Google system would make

20  inventory available, it would selectively provide that

21  inventory to third parties like Facebook based on the rules

22  like first look, last look, whether it was a waterfall, or

23  whether it was another mechanism.

24          Our issue was that we believed that all

25  opportunities to show an ad should just be hypercompetitive,

### Direct Examination - Brian Boland

1  that a broad array of third parties should be able to bid on

2  any individual who shows up at their webpage, at their app,

3  or in a video experience, and that without that experience

4  being limited by first look or last look, that it would --

5  it would necessarily reduce the number of impressions that

6  are available.

7           And it's not just the number that get removed;

8  there's a quality issue.  So if you think about a basket of

9  apples and if somebody gets to come along and take out the

10 30 best apples out of this basket of 100 apples, well,

11 everyone else gets to kind of choose which of the remaining

12 apples that they want.

13          But if they're all kind of blemished or rotten or

14 not that great, your experience of what you can then provide

15 as a service is greatly diminished because you're left with

16 the leftovers.

17 Q    In that analogy, would the competing SSPs be left with

18 the reputation that they only have bad apples?

19 A    We would be left with the reputation that we can't

20 deliver results for advertisers, which would be either costs

21 or a lack of conversions or those bad apples.

22 Q    All right.  If you turn to the next page, there's

23 another somewhat rhetorical question.  "Wait.  Wasn't header

24 bidding going to fix this?"

25          Do you see that?

Direct Examination - Brian Boland

1  A     I do.

2  Q     And then the document reads, "Yes, but," and it says,

3  "Header bidding has been great because it tackled the

4  waterfall, an efficient" -- I think it should be

5  "inefficient" -- "way to create a market for a given piece

6  of inventory.  It has meant that we get called on every

7  impression and are not subject to where a third party puts

8  us in the waterfall.  But header bidding has not removed

9  AdX's last advantage."

10          Do you see that?

11 A     I do.

12 Q     And the Court has heard a bit about this, but can you

13 just very briefly describe what you're referring to as AdX's

14 last look advantage.

15 A     Yeah, the concern is that you're allowing an auction to

16 run with header bidding, and then at the last moment, after

17 a very fair process has occurred, there still is the

18 opportunity for Google, for any number of reasons, to choose

19 to take an impression away from the bidder who won.

20 Q     Now --

21          MS. WOOD:  And I would just ask the Court to read

22 what is in the red box below that.

23          And just ask the witness to confirm that that was

24 Facebook's belief at the time.

25          THE WITNESS:  That was.

Direct Examination - Brian Boland

1          MR. JUSTUS:  Sorry.  Objection.  I move to strike

2    for him saying what Facebook's view was at the time for

3    reasons --

4          MS. WOOD:  I apologize, Your Honor.  I'll

5    rephrase.

6          THE COURT:  All right.

7    BY MS. WOOD

8    Q    Was that the view of you and your group who prepared

9    this document at that time?

10   A    Yes.

11   Q    Okay.  And do you see also below that it says, "Header

12   bidding doesn't work in app because app cannot be hacked

13   using a key value pair"?

14   A    Yes.

15   Q    Was that one way in which the app market was different?

16   A    Yes.

17   Q    Are there other ways in which the app market was

18   different?

19   A    Yes.

20   Q    And then it then says, "Google is looking for FB" -- I

21   assume that's Facebook?

22   A    Yes.

23   Q    -- "to pay 15 percent of working media cost in order to

24   remove this last look advantage."

25          Do you recall what that's a reference to?

Direct Examination - Brian Boland

1  A     That -- my understanding is that's a reference to my

2  team and their conversations and work to try to look at what

3  an integration could look like.

4              MR. JUSTUS:  Objection, Your Honor.  Hearsay.

5              MS. WOOD:  I think he's indicated that's what his

6  understanding is based on his communications with the team.

7              THE COURT:  Is it being offered for the truth of

8  its contents?

9              MS. WOOD:  No.  It's being offered for his

10 understanding of what is required to --

11             THE COURT:  No.

12             MS. WOOD:  -- enable last look to be removed.

13             MR. JUSTUS:  I'm not sure that explanation is any

14 different from saying it's been offered for its truth

15 because I think that answer was here is what is required to

16 do X, and that's the reason for the statement.

17             MS. WOOD:  May I respond, Your Honor?

18             THE COURT:  Yes.

19             MS. WOOD:  I believe what he's indicating is it

20 was Facebook's understanding at the time that, in order to

21 get rid of the last look advantage, Google would require

22 them to pay 15 percent of working media costs, that it was

23 his understanding.

24             It's not being offered for the truth of the matter

25 but for what he believe --

Direct Examination - Brian Boland

1          THE COURT:  And do we have any idea where that's

2   coming from?

3          Do you have any understanding of where that number

4   came from?

5          THE WITNESS:  Yes.  My team provided it.

6          THE COURT:  No.  But, I mean, do you have any

7   understanding as to how your team came up with that number?

8          THE WITNESS:  I don't recall that.

9          THE COURT:  I think that I'm sustaining the

10  objection.  That's not good enough.

11  BY MS. WOOD

12  Q    During this time period, was Facebook considering

13  entering into an agreement with Google?

14  A    Yes, we were.

15  Q    And what kind of agreement was Facebook considering

16  entering into?

17         MR. JUSTUS:  Objection again, Your Honor.  I think

18  he can answer on --

19         THE COURT:  Don't you have another person coming?

20         MS. WOOD:  No.

21         THE COURT:  This is the only Facebook person

22  you've got?

23         MS. WOOD:  Yes.

24         THE COURT:  Only if he actually knows, knows, not

25  just, you know --

Direct Examination - Brian Boland

1          Were you involved in any negotiations with Google?

2          THE WITNESS:  My team was, and I oversaw the

3    negotiations.

4          THE COURT:  You oversaw the negotiations?

5          THE WITNESS:  My team reporting in to me handled

6    the direct conversations that I directed my team around.

7          MS. WOOD:  May I lay a foundation, Your Honor?

8          THE COURT:  See if you can lay a foundation.

9    BY MS. WOOD

10   Q    Did you oversee the negotiations between Google and

11   Facebook in connection with the network bidding agreement?

12   A    Yes.

13   Q    And were you responsible for presenting the proposed

14   network bidding agreement to upper-level executives at

15   Facebook at the time?

16   A    Yes.

17   Q    Because you were presenting the network bidding

18   agreement to senior executives at Facebook, did you have

19   occasion to understand the status of those negotiations and

20   the terms of those agreements?

21   A    Yes.

22         THE COURT:  How much back-and-forth was there in

23   the negotiation process?  Do you know?  In other words, how

24   many times did your folks either meet -- never mind.

25         Did they meet in person with people from Google,

Direct Examination - Brian Boland

1  or was this all done by email or electronically?

2           THE WITNESS:  It was both.

3           THE COURT:  It was both?

4           THE WITNESS:  Yes.

5           THE COURT:  Okay.  Do you have a sense as to --

6  how long did the negotiations go on?

7           THE WITNESS:  It was over a period of months.

8           THE COURT:  Over 30 months?

9           THE WITNESS:  No.  I'm sorry.  Over a period of

10 months.  I would say six or seven months.

11          THE COURT:  All right.  Had you given your team

12 some parameters, some things for which you wanted them to

13 achieve in the negotiating process?

14          THE WITNESS:  Yes.

15          THE COURT:  And what was the reporting arrangement

16 you had with them in terms of how -- what feedback were they

17 to give you?

18          THE WITNESS:  They were to clear any milestones

19 that they were signaling to Google that we would be

20 comfortable taking in the process.

21          MR. JUSTUS:  Your Honor --

22          THE COURT:  He can answer these questions.

23          And on cross-examination, you can probe.

24          But I'm going to overrule the objection.

25          Go ahead, Ms. Wood.

## Direct Examination - Brian Boland

1  BY MS. WOOD

2  Q    And then it goes on to say, "What does this mean for

3  market dynamics?"

4         And the first bullet point says, "It is killing

5  alternatives for open markets.  Anyone who does not

6  participate in AdX is effectively setting the market for AdX

7  (last look)."

8         What does that refer to?

9  A    It refers to the fact that, because of the last look

10 opportunity for AdX, that they have perfect information when

11 they are choosing whether to purchase an impression or not.

12        So all of the other bidders are bidding against

13 each other with a very limited set of information.  AdX gets

14 one last look, understanding the outcome of the full

15 auction, including the number of participants and bids,

16 before submitting a last impression -- last look impression.

17 Q    You can put that document aside.  And let me show you

18 what's been marked for identification as PTX 1572.

19        THE COURT:  Any objection to 1572?

20        MR. JUSTUS:  No, Your Honor.

21        THE COURT:  All right.  It's in.

22  (Plaintiffs' Exhibit Number **1572 admitted into evidence.**)

23 BY MS. WOOD

24 Q    Do you recognize this document?

25 A    I do.

Direct Examination - Brian Boland

1    Q    What do you recognize it to be?

2    A    This is work product of a strategy document of how we

3    develop scale or large volume inside of the Audience

4    Network.

5    Q    And why is scale important to an ad tech company like

6    Facebook?

7    A    There are a couple of reasons for why it's important.

8    We took a different path from a lot of different advertising

9    companies in that our value that we were promising to

10   advertisers was around advertiser value.

11         So if they needed to generate sales, we would help

12   them generate more sales.  And in order to deliver more of

13   that value for advertisers, we needed to see a lot of

14   impressions to have significant scale to be able to find

15   those outcomes for businesses that were important to them

16   and that our ad system could deliver.

17   Q    And does this relate back to the network effects you

18   were talking about before?

19   A    It does.

20   Q    Okay.  Can you see -- again, very tiny in the upper

21   right corner -- it says -- this is dated December 18, 2017?

22   A    I do.

23   Q    And it reads at the top, "This document is the second

24   of a two-part series on audience network strategy.  In order

25   for AN" -- that's FAN, Facebook Audience Network?

Direct Examination - Brian Boland

1  A     It is.

2  Q     -- "to be successful, we need to be -- deliver

3  advertiser value and scale."

4           Do you see that?

5  A     I do.

6  Q     And it says, "This doc addresses scale."

7           Do you see that?

8  A     Yes.

9  Q     Okay.  Now, do you see the key decision listed there?

10 A     Yes.

11 Q     It says, "Do we move forward with our ad tech

12 partnership strategy and partner with Google?"

13           Do you see that?

14 A     I do.

15 Q     And that was a reference to the network bidding

16 agreement; is that right?

17 A     That is correct.

18 Q     And then if you look under that, it says, "What's in

19 this document?"

20           And the fourth bullet point reads, "The challenge

21 of this strategy and where the ad tech market is today."

22           Do you see that?

23 A     I do.

24 Q     All right.  Now, much of this material has been

25 redacted, but I want to turn to the third page of the

Direct Examination - Brian Boland

1  document that ends in Bates Stamp 689.

2  A    Okay.

3  Q    And do you see at the top of the document it says --

4  it's talking about reaching scale with this strategy.

5          Do you see that?

6          Do you see the title, "Challenge of reaching scale

7  with this strategy"?

8  A    Yes.

9  Q    And it says, "Whenever Audience Network wins an

10  impression in our publisher ecosystem, the transaction is

11  facilitated by a third-party ad tech vendor.  The business

12  model of these vendors has been to provide advantages to

13  their own sources of demand, the most obvious being Google

14  DFP and AdMob providing their own demand via AdX with

15  preferential treatment."

16          Do you see that?

17  A    I do.

18  Q    And was that a concern that Facebook had with respect

19  to competing against Google in open web display ads?

20  A    Yes.

21          MR. JUSTUS:  Again, Your Honor, another objection

22  asking him to speak on behalf of Facebook regarding the

23  concern they had competing against Google generally in open

24  web display ads.  I just don't think there's any foundation

25  for him to be able to generally speak on behalf of Facebook

Direct Examination - Brian Boland

1  for that.

2             MS. WOOD:  May I respond?

3             THE COURT:  I think, given the nature of the

4  longevity of this witness's connection to Facebook and the

5  different roles he played, he has a sufficient connection to

6  the company.

7             I'm allowing this to go forward.  Overruled.

8  BY MS. WOOD

9  Q    Were you responsible for driving Facebook Audience

10  Network in this time period?

11  A    Yes.

12  Q    Now, do you see it says, "Currently" -- well, sorry.

13  Let me get the answer to my other question.

14             What does that refer to when it says, "The concern

15  about building scale when Google provides their own demand

16  via AdX with preferential treatment"?

17  A    It's referring to our concerns over the same practices

18  I had highlighted earlier, is that if we participated in the

19  ecosystem, in that specific Google tech platform, that we

20  could face those same issues if the deal ran out.

21  Q    And then it says, "Currently, we don't have a strategy

22  to build our own ad tech and compete, having been burnt

23  twice trying."

24             Do you see that?

25  A    I do see that.

## Direct Examination - Brian Boland

1  Q     What is that a reference to?

2  A    It's a reference to ad server efforts that we had tried

3  to build.  One was Atlas, which was a set of technologies

4  that we acquired from Microsoft that was focused on

5  advertiser ad serving and measurement.  We built it out to

6  try to win over advertisers to replace their ad server and

7  ended up sunsetting that product.  We were unable to get

8  market traction.  And we turned it into -- we folded the

9  measurement components into the Facebook ad system.

10         The second was the LiveRail acquisition that I had

11  mentioned earlier, which was designed to be a publisher-side

12  ad server that we had tried unsuccessfully to build into

13  play.

14  Q    And, again, why were you unsuccessful in building and

15  deploying that publisher ad server?

16  A    We determined that it would be unfeasible to build the

17  market-comparable set of features for what Google had

18  established with their portion of the technology stack as

19  well as the aspects where they were able to bring their own

20  demand through AdX into their ad server and that we were --

21  that we feared we would not be able to get access to.

22  Q    Now, Facebook runs very popular social media platforms;

23  is that right?

24  A     Yes.

25  Q     Even with the popularity of those social media

Direct Examination - Brian Boland

1  platforms and that advertiser demand associated with that,

2  did Facebook have concerns about having sufficient scale to

3  compete against Google in open web display?

4  A     Yes, we did.

5  Q     Do you see the next sentence?

6         Well, it's redacted.  Sorry.  So can you read that

7  just to yourself, the box in red.

8               THE COURT:  Can you read it?

9               THE WITNESS:  Yes.  It is testing my glasses, but

10 I can.

11              Yes.

12 BY MS. WOOD

13 Q     And is that another challenge that Facebook faced in

14 competing against Google in open web display?

15 A     That is.

16 Q     And then it says, "What are the trends?  Where are we

17 today?"

18              And the first bullet, again, says, "Google

19 dominates the market."

20              Do you see that?

21 A     I do.

22 Q     And then there's a red box there.

23 A     I can see that.

24 Q     And then below that there's a very large red box.  And,

25 again, without referencing any of the material in the red

Direct Examination - Brian Boland

1  box, are there three different categories described?

2  A    Yes.

3  Q    And how do those three categories reflect how Facebook

4  viewed the competitive conditions for ad technology at that

5  time?

6  A    Those are the categories that teams working in

7  advertising -- advertising technology as well as my

8  leadership and company leadership understood to be areas

9  where we could compete.

10  Q    Okay.  And if you look down at the bottom, it says,

11  "Where the market is headed."

12          And do you see it reads, "Without an alternative

13  market force, Google will increase their dominant position

14  across all formats"?

15          Do you see that?

16  A    I do.

17  Q    And then it says, "Although publishers want an

18  alternative, no other opportunities are emerging to replace

19  DFP/AdMob black box."

20          Do you see that?

21  A    I do.

22  Q    Was Facebook hearing from publisher customers of

23  Facebook that they wanted an alternative to Google's DFP?

24          MR. JUSTUS:  Objection, Your Honor.  Hearsay.

25          MS. WOOD:  It's not for the truth of the matter,

## Direct Examination - Brian Boland

1   Your Honor; it's for what Facebook was hearing from their

2   customers and how that informed their strategy for competing

3   against Google.

4           THE COURT:   I overrule the objection.

5           Again, I know the difference between the two.

6           THE WITNESS:   I heard it directly from customers.

7   BY MS. WOOD

8   Q    And it says, "No other opportunities are emerging to

9   replace DFP/AdMob black box mediation monopoly."

10          What does black box mediation monopoly refer to?

11  A    It refers to the fact that we had some understanding of

12  what types of ways that we felt that Google was playing to

13  their advantage in the auction with first look and last

14  look, but we didn't have a complete understanding of other

15  things that Google might be doing behind the scenes that

16  were not public, not transparent to us or to others.

17  Q    Now, ultimately, Facebook Audience Network stopped

18  competing altogether in open web display; is that right?

19  A    That's correct.

20  Q    And did you recommend that decision?

21  A    I didn't.  I was not a part of that decision.  It was

22  after my time.

23  Q    Okay.  Prior to the time you left, was it your view

24  that Facebook's Audience Network should not attempt to

25  compete against Google in open web display?

Cross-Examination - B. Boland

1  A    Based on the trend that I had seen, I had expressed

2  that I was concerned about the direction of lack of growth

3  and access to the team.

4         MS. WOOD:  I'll pass the witness.

5         THE COURT:  All right.  Do you have a book?

6  Counsel, do you have a book of exhibits?

7         MR. JUSTUS:  We do, Your Honor.  We're going to

8  ask some questions from the plaintiffs' exhibit binder.

9  Then we'll hand out our binder.

10        Oh, we'll go ahead and hand them all out.

11        THE COURT:  And then just for the record, the

12 redacted versions of these exhibits are what are being

13 publicly available, and the unredacted versions of these

14 exhibits will be part of the permanent court record which

15 will be under seal?

16        MS. WOOD:  Yes, Your Honor.

17        THE COURT:  Okay.

18                    CROSS-EXAMINATION

19 BY MR. JUSTUS

20 Q    Thanks for coming in today, Mr. Boland.  I'm Bradley

21 Justus.  I have my colleague Ali Vissichelli with me.

22 A    Nice to meet you.

23 Q    I wanted to start, if you're settled over there,

24 actually going back to a document that Ms. Wood showed you.

25 It's PTX 1709.  If you will flip to that in your binder, and

Cross-Examination - B. Boland

1  maybe the government will even helpfully pull it up.

2          So do you see on the first page where it says --

3  and can we go to where it says "Google's market share."  Do

4  you see that at the bottom of the page?

5  A    Oh, yes, I do.

6  Q    And Ms. Wood asked you about that.  And it says,

7  "Google is the dominant technology provider for publishers."

8          Do you see that?

9  A    I do.

10 Q    Now, if you look at the bottom, it says, "How Google

11 achieved this position."

12          Do you see that?

13 A    Yes, I do see that.

14 Q    Now, the next page it says, "Google achieved that

15 position first because they have offered a best-in-class

16 product and they continually invest in product

17 improvements."

18          Do you see that?

19 A    Yes, I do.

20 Q    And you agree with that?

21 A    Yes, I do.

22 Q    And then second, it says that "Google achieved that

23 position because they have invested heavily in servicing

24 their customers."

25          Do you see that?

Cross-Examination - B. Boland

1  A    Yes, I do.

2  Q    And you agree with that?

3  A    Yes.

4  Q    And then third it says, "Google has achieved this

5  position by aggressively pricing this tool."

6         Do you see that?

7  A    Yes, I do.

8  Q    And you agree with that?

9  A    Yes.

10  Q    Okay.  Let's look at another part of this plaintiffs'

11  exhibit.  If you go to the page labeled 935.  And then

12  Ms. Wood spoke to you about this section a lot.  It says,

13  "Wait.  Wasn't header bidding going to fix this?"

14         Do you see that?

15  A    I do.

16  Q    And then if you go down, it says, "What does this mean

17  for market dynamics?"

18         Do you see that?

19  A    I do.

20  Q    And do you see where it says, "It is pushing the market

21  towards programmatic direct deals"?

22  A    Yes.

23  Q    So people were substituting away from Google's open

24  auctions to programmatic direct deals.  Is that what that's

25  all about?

Cross-Examination - B. Boland

1  A     That's my understanding, yes.

2  Q     Okay.  So you can put that document aside.  And then

3  we're going to look briefly at 1572.

4          And then if we could go to 689 in that document.

5  And I'm sorry for small text I'm about to ask about.

6  A     It is a good test.

7  Q     So you see where it says, "Our POV on the ad tech

8  market."

9          Do you see that?

10 A     Can you tell me roughly where it is on the page?

11 Q     Yeah.  It's like three-quarters of the way down.

12 A     Yes, I do.

13 Q     And then it says, "Google's market share will continue

14 to grow across app, video, web regardless of whether we

15 partner."

16          Do you see that?

17 A     I do.

18 Q     And then can you read the next sentence there, the next

19 two sentences that explain the reason for that?

20 A     "They are the only company still investing heavily in

21 both technology and services.  They have the most compelling

22 feature-rich products for every segment of the market."

23 Q     Do you agree with that?

24 A     I do.

25 Q     Okay.  You can put this document aside.

Cross-Examination - B. Boland

1          All right.  The last one of these.

2          Let's go to 1536.  Let's go to page 405 on that

3   document.  It's email from Mr. Boland.

4          Mr. Boland, do you see your email that Ms. Wood

5   asked you about from Tuesday, August 9?

6   A     I do, yes.

7   Q     And then you said, "I would hate for DoubleClick to use

8   AN to gain a strong mediation foothold and then bias their

9   system against us, much like they do on desktop where

10  dynamic allocation gives Google the opportunity to

11  cherry-pick the best supply."

12         Do you see that?

13  A     I do.

14  Q     You said this was your -- expressing your general

15  concern and dislike of dynamic allocation and the related

16  features first look and last look?

17  A     That's correct.

18  Q     Okay.  So we can put this document aside.  We can put

19  this whole binder aside.  Then let's open up the black

20  binder.  And this --

21         MR. JUSTUS:  You're just going to have to give me

22  one second.

23         THE COURT:  Yes.

24  BY MR. JUSTUS

25  Q     Mr. Boland, you haven't always thought that dynamic

Cross-Examination - B. Boland

1   allocation was a bad thing, right?

2   A    It's quite possibly that I didn't.  I'm not sure.

3   Q    So you previously, didn't you -- didn't you previously

4   praise Google's dynamic allocation feature?

5   A    That's entirely possible.

6   Q    Okay.  And do you agree that dynamic allocation made it

7   easier for targeted ads to be delivered and should raise

8   CPMs for publishers?

9   A    It sounds like you are quoting something that I said.

10  I don't recall whether I did or didn't say that.  But it's

11  possible.

12  Q    Let's look at a document and see if we can refresh your

13  recollection.

14  A    That would be super helpful.

15  Q    Let's go to Tab 17.

16        THE COURT:  Now, this does not have an exhibit

17  number on it.

18        MR. JUSTUS:  Yes, Your Honor.  This is purely

19  offered for refreshing.  We're not seeking to put it into

20  evidence.

21        THE COURT:  All right.

22  BY MR. JUSTUS

23  Q    So if you go -- do you have Tab 17 open?

24  A    Yes, I do.

25  Q    And then if you go to the second page --

Cross-Examination - B. Boland

1  A    This is the email?  Is that where we are?

2  Q    Yes.

3  A    Okay.

4  Q    And you see "integration web."  Do you see that?

5  A    Yes.

6  Q    So why don't you read those first two paragraphs and

7  tell me when you're done.  Not out loud, just to yourself.

8  A    I wasn't sure from earlier, but I get it.  Thank you.

9         Got it.

10  Q    All right.  So you agree that, at least in 2010, you

11  thought dynamic allocation was a good feature, right?

12  A    Yes, I definitely wrote that.

13  Q    You agree that it would -- at least in 2010, you

14  thought that it would make it easier for targeted ads to be

15  delivered and should raise CPMs for publishers, right?

16  A    Yeah, in 2010 I thought that.

17  Q    In fact, you thought it was such a great feature, it

18  would be devastating for Microsoft, right?

19  A    That's correct.

20  Q    Okay.  I want to talk for a second about LiveRail.

21         So LiveRail was Facebook's -- was the publisher ad

22  server at SSP that Facebook acquired, right?

23  A    We acquired it as a video SSP when we purchased it.

24  Q    Okay.

25  A    Yeah.

Cross-Examination - B. Boland

1  Q     And you were in charge of the integration process for

2  that product, correct?

3  A     Correct.

4  Q     And, eventually, a couple of years later, Facebook shut

5  down LiveRail right?

6  A     That's correct.

7  Q     Is your testimony today that anything Google did caused

8  Facebook to need to shut down LiveRail?

9  A     Not directly, no.

10  Q     Okay.  In fact, LiveRail faced huge problems with

11  integration into Facebook, correct?

12  A     Yeah.  There were a number of challenges with LiveRail.

13  Q     For example, even years into the initial integration,

14  you had trouble determining things like what was LiveRail's

15  sales pipeline?  Correct?

16  A     That sounds consistent.

17  Q     And you also, a year after the purchase, still didn't

18  even know whether the LiveRail product worked well, right?

19  A     I'd love a refresher, but that sounds possible.

20  Q     Okay.  Let's refresh your recollection.

21  A     I'm sorry to ask for the refresher.  It's been a long

22  time.

23  Q     No, I understand.  Let's go to Tab 4.

24          So, Mr. Boland, again, I won't read this out loud,

25  and you shouldn't read this out loud either.

Cross-Examination - B. Boland

1  A    Okay.

2  Q    But if you go to Tab 4 and you go to your email from

3  May 26 -- tell me when you're there.

4  A    26.  Sorry.  Sorry.  Sorry.

5  Q    It is on the page labeled 195.

6  A    Thank you.

7           195 you said?

8  Q    Yeah.

9  A    Okay.  Yeah.

10  Q    And you see where it says "overall visibility"?

11  A    I do.

12  Q    All right.  Read that to yourself but not out loud.

13  A    I see it, yep.

14  Q    So you agree with me that a year after the purchase,

15  you still didn't even know whether the LiveRail product

16  worked well, right?

17  A    How much clarification can I give on this document?

18  This is not entered or --

19  Q    I think you have to answer my question.

20  A    Okay.  That's not what the -- that's not what this is

21  saying.

22  Q    So you say, no, you do not agree that a year after

23  purchase, you did not even know whether the LiveRail product

24  worked well?  That's your testimony?

25  A    I'm trying to figure out how to answer.

Cross-Examination - B. Boland

1  Q    Well --

2           MS. WOOD:  Your Honor, I believe --

3           THE COURT:  Did it meet your expectations at that

4  time?

5           THE WITNESS:  No, it didn't.

6           THE COURT:  Let's move on.

7           MS. WOOD:  May I have a clarification?  I think

8  the witness may be concerned about what he can say whether

9  the document is redacted or not.

10          THE COURT:  But he's answered the question.

11          MS. WOOD:  Okay.

12          THE COURT:  All right.

13 BY MR. JUSTUS

14 Q    Facebook asked the engineers working on LiveRail to

15 relocate to London from Romania, didn't they?

16 A    Yes.

17 Q    In trying to relocate those engineers from Romania to

18 London, that didn't go very well, did it?

19 A    That's correct.

20 Q    And then another hurdle to LiveRail being a successful

21 product was a culture clash between LiveRail employees and

22 other employees at Facebook, right?

23 A    That's correct.

24 Q    Do you recall that some LiveRail employees -- in fact,

25 are you aware that one LiveRail employee referred to the

Cross-Examination - B. Boland

1  integration as more Survivor than Game of Thrones?

2          MS. WOOD:  Objection, Your Honor.  I believe this

3  witness has already testified he's not saying that Google

4  directly did anything that caused them to have a problem

5  with LiveRail.

6          THE COURT:  I agree.  I think we need to move this

7  along.

8          MR. JUSTUS:  All right.  Okay.

9  BY MR. JUSTUS

10  Q    One more question on LiveRail, and then I'll move on.

11          Isn't it true that, after the acquisition, you

12  discovered that the vast majority of LiveRail inventory was

13  not quality supply?

14  A    Yes.

15  Q    And then following all of this, Facebook shut down

16  LiveRail?  That's how it went?

17  A    It happened after that, yes.

18  Q    Okay.  So I want to talk for a second about what you

19  were saying about the exit of the Facebook Ad Network from

20  web.  And just give me one second.

21          So, Mr. Boland, in your experience, over the last

22  ten years, users increasingly have spent time accessing

23  content on mobile devices, right?

24  A    Yes.

25  Q    And as users have moved to mobile devices, advertisers

Cross-Examination - B. Boland

1  have shifted too.  Is that also right?

2  A    Advertisers have invested in mobile advertising, mobile

3  app advertising, yes.

4  Q    And leading up to the shutdown of Audience Network on

5  the web, Audience Network was seen growing demand for mobile

6  app ads, right?

7  A    That's correct.

8  Q    And shutting down web cells was a strategic move to

9  better serve customers seeking mobile app ads, right?

10 A    They would definitely benefit from that decision, yes.

11 Q    I'm sorry, Mr. Boland.  I couldn't hear you.

12 A    Oh, sorry.  They would benefit from that decision, yes.

13 Q    In fact, Audience Network was incredibly successful at

14 attracting app publishers to its platform, right?

15 A    Yes.

16 Q    And Audience Network was also very successful selling

17 mobile app ads to advertisers, wasn't it?

18 A    Yes.

19 Q    In fact, when you were in charge, Audience Network was

20 one of the fastest growing businesses at Facebook, right?

21 A    That's correct.

22 Q    And as of 2017, the Audience Network served ads to 1

23 billion people each month.  Is that right?

24 A    You'd have to refresh me on the number, but that sounds

25 credible.

Cross-Examination - B. Boland

1  Q     Let's do that.  Can we go to Tab 15.

2  A     I'm sorry I keep asking for the refreshers on this.

3  Q     Oh, no, Mr. Boland.  No problem.

4         So this -- well, I shouldn't read that out loud.

5         So there's a quote from you here.  If you go to

6  the second page of this article, first paragraph, there's a

7  quote from you.  So read it to yourself, and then I'll ask

8  you a question.

9  A     Great.  Yes.

10 Q     Tell me when you're ready, but no rush.

11 A     Yeah, I'm ready.

12 Q     Okay.  As of 2017, the Audience Network served ads to 1

13 billion people each month, right?

14 A     That is correct.

15 Q     Is it fair to call that a lot of scale?  Is it fair to

16 refer to that as having a lot of scale?

17 A     Yes, it's a lot of scale in app advertising.

18 Q     Okay.  All right.  Mr. Boland, let me ask you about one

19 more thing, but it's going to take me one second.

20        Okay.  During the time you were in charge of

21 Facebook ads, Facebook was providing the full funnel of

22 outcomes to advertisers, correct?

23 A     That is correct.

24 Q     And Google was also providing the full funnel of

25 outcomes to advertisers.  Is that also correct?

                    Redirect Examination - B. Boland

1   A     That is correct.

2   Q     So Facebook and Google, they were competing to provide

3   that full funnel to advertisers, right?

4   A     That's correct.

5              MR. JUSTUS:  I think I'll pass the witness.

6              THE COURT:  All right.  Any redirect?

7              MS. WOOD:  Very brief, Your Honor.

8                        REDIRECT EXAMINATION

9   BY MS. WOOD

10  Q     If you could pull back up PTX 1709.

11  A     It's in the other binder, yes?

12  Q     It's in the white binder.  It's also on your screen, if

13  that helps.  And if we could turn to the bottom of page 1

14  that opposing counsel just showed you, "How Google Achieved

15  This Position."

16            Do you see that?

17  A     I do.

18  Q     And if you turn to the next page among the bullet

19  points, they didn't read out loud was "aggressive market

20  tactics."

21            Do you see that?

22  A     I do.

23  Q     "Rebating publisher cost of DFP if they use AdX."

24            Do you see that?

25  A     I do.

Redirect Examination - B. Boland

1  Q    Okay.  And then if you turn to the next page, opposing

2  counsel showed you the reference to programmatic direct

3  deals.

4           Do you recall that?

5  A    Yes.

6  Q    It's under "What does this mean for market dynamics?"

7  It's the second bullet point.

8  A    Yes.

9  Q    Can you talk to me about the size of the market for

10 programmatic direct deals versus the size for open auction

11 deals?

12 A    I don't -- I don't recall the exact numbers, but it was

13 a significantly smaller market than the open web market.

14 Q    Okay.  And opposing counsel also spoke to you about

15 LiveRail not having quality supply.

16           Do you recall that?

17 A    I do.

18 Q    And supply in this context is publishers?

19 A    Yes.

20 Q    And based on your experience in the industry, where

21 were most good publishers?  Who did they use for their

22 publisher ad server?

23 A    My experience and my team's experience was that they

24 used Google's ad server.

25 Q    Okay.  And opposing counsel also spoke to you about

Redirect Examination - B. Boland

1   Audience Network sometime in 2007 reaching a billion people.

2            Do you recall that?

3   A    The date was different, but yes.  I think it was 2016.

4   I'd have to look at the document.

5   Q    Right.  The article was in 2017, reporting that

6   sometime in 2016 Facebook Audience Network reached a billion

7   people?

8   A    That is correct.

9   Q    And despite that achievement, you still recommended

10  that they leave open web display; is that right?

11  A    That's correct.

12           MS. WOOD:  No further questions.

13           THE COURT:  Any recross?

14           MR. JUSTUS:  No, Your Honor.

15           THE COURT:  All right.  Does anybody anticipate

16  calling this witness again?

17           MS. WOOD:  Reluctantly, I'll reserve it for

18  rebuttal.  I don't think we'll need to, but I don't want to

19  be sorry.

20           THE COURT:  All right.  Then you're free to leave,

21  and it will be a few days before we get to rebuttal.  Make

22  sure you've kept your contact information accurate.  You

23  cannot discuss your testimony with any witness who has not

24  yet testified.

25           Thank you.

Redirect Examination - B. Boland

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  All right.  Your next witness, or do

3   you want to go to the video?

4          MS. WOOD:  We can go to the video, Your Honor.

5          THE COURT:  Fine.

6          MS. WOOD:  So it is a two-volume set, Your Honor.

7   The first has the transcript -- or the excerpts of the

8   transcript that are the depo designations, then the full

9   deposition transcript if, for any reason, that's necessary

10  for context.

11         And Binder 2 of 2 are the exhibits for reference.

12  So, unfortunately, it is a lot of paper.  I apologize for

13  that.  So each one is a set of two.

14         THE COURT:  And how long do you anticipate this

15  taking?

16         MS. WOOD:  The video count, as I understand it, is

17  approximately one hour, 23 minutes.

18         THE COURT:  We won't finish it tonight.

19         MS. WOOD:  I wish we could offer the Court some

20  popcorn.

21         THE COURT:  But I am concerned.  It better not be

22  cumulative or it may get cut.  All right?

23         MS. WOOD:  Understood, Your Honor.

24         THE COURT:  I mean, we've heard a lot of this.  I

25  don't have to keep hearing the same things over and over

Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599

1   again.

2          MS. WOOD:  Your Honor, we'd be happy to further

3   narrow it.  We did attempt to narrow it substantially from

4   its original designation, but I will say, because we are

5   attempting to provide Google multiple days' notice, these

6   were narrowed on, I believe, Monday or so.

7          So we haven't had a chance to narrow to reflect

8   the last few days of testimony.  So I apologize in advance

9   about that.

10          THE COURT:  All right.

11          MS. WOOD:  But we will be very mindful of that

12   going forward.

13          THE COURT:  Good.

14                          (Video is played.)

15          THE COURT:  I think this is a good place to stop

16   for tonight because I want to make sure we get the exhibits

17   that were entered today into the record.  Okay.

18          MS. WOOD:  I actually have a few more in

19   connection with Mr. Boland's examination.  I think I

20   indicated there's agreement on these four exhibits.

21          THE COURT:  All right.

22          MS. WOOD:  PTX 524 [sic}.

23          THE COURT:  Go ahead.

24          MS. WOOD:  PTX 1540, PTX 1577, and PTX 0581.

25          THE COURT:  All right.  So again, Google is not

151

```
 1   objecting to those four going in, correct?

 2              MR. BECKER:  No, Your Honor.

 3              THE COURT:  All right.

 4   (Plaintiffs' Exhibit Numbers 1524, 1540, 1577, and 581 are

 5                      admitted into evidence.)

 6              MS. WOOD:  And I believe we were also going to

 7   clarify some exhibits that were entered in connection with

 8   the Lipkovitz testimony from a few days ago.

 9              My colleague, Mr. Teitelbaum.

10              MR. TEITELBAUM:  Just with the Court's indulgence,

11   the very last item of business on Tuesday after --

12              THE COURT:  Right.

13              MR. TEITELBAUM:  -- after we had already read out

14   the exhibits that were entered into evidence, it was after

15   that that we offered some additional documents related to

16   Mr. Lipkovitz.

17              So the transcript reflects that the Court admitted

18   them, but I just want to make sure that they also made it

19   onto everybody's list of exhibits that are in.

20              THE COURT:  All right.

21              MR. BECKER:  So I can read out those numbers now,

22   if that would be helpful, or whatever is best for the Court.

23              THE COURT:  Well, hold on a second.

24              Can you do that, Katie?

25              THE COURTROOM DEPUTY:  Yes.  I have a list that
```

1  was read.

2          Do you want me to verify from Lipkovitz that it's

3  the same?

4          MR. TEITELBAUM:  Sure.  And I don't even need to

5  do this on the record, if that's easier for the Court.

6          THE COURT:  I'd like it on the record just in

7  case.

8          Go ahead, Katie.

9          THE COURTROOM DEPUTY:  I have PTX 183, PTX 264,

10 PTX 290, PTX 330, PTX 443, PTX 1510, PTX 417, PTX 562, PTX

11 553, and PTX 195.

12         MR. TEITELBAUM:  Great.  That's consistent with

13 our list.

14         Thank you, Your Honor.

15         THE COURT:  All right.  Excellent.  All right.

16         Were there some previously entered defense

17 exhibits that you're concerned about?

18         MR. ISAACSON:  No.  This is completely separate --

19 a completely separate housekeeping matter.

20         THE COURT:  Well, wait.  Let's finish the exhibits

21 first.

22         MR. ISAACSON:  Oh, I thought we had.

23         THE COURT:  No.  So we're going to now read in

24 those exhibits that were entered into evidence today.  All

25 right.

1              MR. ISAACSON:  It is about four of those exhibits,

2    just so that you understand.  The -- you'll remember the

3    exhibits that had the blue sheets with the better-looking

4    visuals behind them.  There's four of them.  We've agreed

5    that we will replace the current exhibit and have the

6    original exhibit plus the native version so that the Court

7    and everybody will be able to read the small charts.  So we

8    just -- we will be submitting substitute versions for four

9    exhibits.

10             THE COURT:  Just for the record, what are those?

11             MR. ISAACSON:  DTX 463, DTX 695, DTX 754, and DTX

12    758.

13             THE COURT:  All right.  So those four exhibits

14    that are already in evidence, we talked about today?

15             MR. ISAACSON:  Yes.  And we've agreed that where

16    exhibits are very hard to read, both sides may do this

17    occasionally going forward.

18             THE COURT:  All right.  For purposes of the

19    Court's record that stays with the Fourth Circuit down the

20    road, okay, I have to have the actual exhibit.  So make sure

21    that you've worked with Katie about that.

22             MR. ISAACSON:  Yes.

23             THE COURT:  And, again, for purposes of getting

24    them on the website so that the public can see them, I think

25    they only need to see the easy one -- all right? -- the

1  visible one.  All right.

2            Let's proceed then with today's list.

3            THE COURTROOM DEPUTY:  PTX 549, PTX 624, PTX 612,

4  PTX 719, PTX 864, PTX 114, PTX 118, PTX 433, PTX 254, PTX

5  238, PTX 444, PTX 613, PTX 317, PTX 1857, PTX 925, PTX 927,

6  PTX 1777, PTX 992, PTX 1818, PTX 590.

7            DTX 463, DTX 695, DTX 754, DTX 758, DTX 801, DTX

8  1172, DTX 1151.

9            PTX 1536, PTX 1710, PTX 1709, PTX 1572.

10           And the Boland ones that were just admitted are

11  PTX 524, PTX 1540, PTX 1577, and PTX 581.

12           THE COURT:  All right.

13           MS. WOOD:  Just one correction, Your Honor.  I

14  think the Boland one was 1524, not 524, PTX 1524.

15           THE COURT:  Okay.

16           MS. WOOD:  I may have misspoken.

17           THE COURT:  You misspoke because I also only had

18  524.

19           All right.  1524, 1540, 1577, and just 581, right?

20           MS. WOOD:  Yes, Your Honor.

21           THE COURT:  All right.  So the Government is

22  satisfied those were the exhibits that came in today?

23           MS. WOOD:  Yes, Your Honor.  Thank you.

24           THE COURT:  All right.  I believe there were only

25  two -- I may be wrong on that -- that had the redactions.

1   So just make sure that, again, for the Court's permanent

2   record, we have those.  And then for the public's record,

3   they get the redacted.

4             If there are more than just those two, just be

5   careful about how that's done.

6             MS. WOOD:  Yes, Your Honor.  We have both the --

7   only the redacted versions of both those exhibits as well as

8   the deposition transcript will appear on the public website,

9   but the Court will have unredacted versions under seal.

10            THE COURT:  All right.  Yes, sir?  Mr. Isaacson?

11            MR. ISAACSON:  One other separate housekeeping

12  matter.  So next week there will be expert witnesses whose

13  reports occasionally quote third-party documents or they

14  have relied on third-party documents.  And so those are

15  generally marked under seal or confidential.

16            The way we were planning to proceed with that is,

17  on occasion when this comes up, is just to say this document

18  was something you relied on and indicate the general subject

19  without going into a discussion of the document.  There may

20  be times when there's a segment of the report we may move in

21  to -- just a segment as an exhibit because that would be

22  under seal.

23            And then we would go talk to those third parties

24  about whether these things can be in the public record or

25  not.  So there would be no issues about sealing the

courtroom or anything like that, but we just wanted to describe what we thought would be our approach.  There's not going to be a lot of that, but occasionally third-party documents are at issue during the experts.

THE COURT:  I recognize that.

So, Ms. Wood, let me have you back.  I want to get a sense of what next week is looking like.

For the record, we don't anticipate -- I don't anticipate any change in our schedule looking at what my calendar looks like for next week until possibly Friday.

And so right now Monday, Tuesday, Wednesday, and Thursday, you're not going to have to unset your space. We'll start at 9:00; we'll finish at 6:00, same lunch hour. It's the following week when we have perhaps a few changes.

Where are we in terms of where you thought we would be at this point?  Are we behind, about where you expected, or ahead?

MS. WOOD:  We are very far ahead of where we thought we would be, Your Honor.  We believe, at least relative to our estimate of approximately three weeks, we are half of that, I would say.  I would hope that sometime next week we would be able to close our affirmative case in chief.  I don't want to make promises about which day.

THE COURT:  Frankly, that's what I'm expecting.

MS. WOOD:  We are on track for that.

1              THE COURT:  All right.  And so the defense needs

2    to be ready to get going next week.

3              Again, I've spent a whole week on this case, and

4    we've listened carefully.  And, again, a lot of it's

5    becoming repetitious.  So I'm hoping over the weekend there

6    can be further tailoring of the case.  All right?

7              MS. WOOD:  Absolutely, Your Honor.

8              THE COURT:  All right.  We're going to start

9    Monday morning with a witness, Ms. Wood, correct?

10             MS. WOOD:  Yes.  Monday morning -- as I --

11             THE COURT:  I'm sorry.  We'll interrupt the

12   deposition, the video.  We'll take the witness who we need

13   to take Monday morning.  All right?

14             MS. WOOD:  Yes.

15             THE COURT:  And how long do you think that witness

16   is going to take?

17             MS. WOOD:  I don't have a time estimate for that

18   witness, Your Honor.

19                          (Counsel confer.)

20             MS. WOOD:  Best estimate is a little less than an

21   hour on direct examination.

22             THE COURT:  All right.  That's fine.

23             MS. WOOD:  And I do believe Monday through

24   Thursday, is my understanding, we have a scheduled current

25   or former Google employee in that special reserved spot at

1  the beginning of the day each of Monday, Tuesday, Wednesday,

2  and Thursday of next week.

3           THE COURT:  Well, maybe not Monday.

4           MS. WOOD:  Monday, Mr. Mohan -- meaning Monday

5  is -- we are calling Mr. Mohan in our case in chief, but we

6  have agreed with Google that he will have a set-aside time

7  because he is coming in from California.  On Tuesday, the

8  same applies to Mr. Jayaram; on Wednesday, to Mr. Spencer;

9  and on Thursday, to Mr. Bellack.

10          THE COURT:  Right.  Okay.  And then you have

11  experts you're expecting next week as well?

12          MS. WOOD:  We have experts and a few -- not many,

13  but a few -- remaining third-party lay witnesses and

14  experts, and then some additional videos or read-ins that we

15  will again spend the weekend trying to narrow even further.

16          THE COURT:  All right.  Great.

17          All right.  Anything further on this case?

18          Anything from Google?

19          MR. BECKER:  Sorry.  Your Honor, Bryon Becker on

20  behalf of Google.

21          THE COURT:  Yes.

22          MR. BECKER:  Just one minor housekeeping item.

23  PTX 1040 was admitted with the comments in the document

24  redacted, and we just wanted to confirm that that was

25  admitted with the comments redacted so we are complying with

159

1  the Court's order.

2          THE COURT:  I'm sorry.  PTX 1040?

3          MR. BECKER:  Correct.

4          MS. WOOD:  What day was that, Your Honor?

5          THE COURT:  It wasn't today.

6          MS. WOOD:  No.

7          MR. BECKER:  No.  Sorry.  It was...

8          THE COURT:  All right.  We --

9          MS. WOOD:  It was on the 11th.  I have it on the

10 11th through Professor Ravi's examination.

11         THE COURT:  Right.  And my understanding is that

12 the actual exhibit needs to have some corrections made to

13 it.  Right?

14         MR. BECKER:  Yes, Your Honor.  The comments need

15 to be redacted from the exhibit.  There are comment bubbles

16 on the exhibit that were being redacted.

17         THE COURT:  Right.  Has that been done yet?

18         MR. BECKER:  Correct.  We just wanted to make --

19 on the record, it wasn't specifically noted; so we just

20 wanted to make sure when it was admitted that --

21         THE COURT:  All right.  Number one, when you

22 posted it publicly, it did not have the bubbles.

23         MR. BECKER:  Correct.  The bubbles had been

24 redacted.

25         THE COURT:  And you've given to my courtroom

1   deputy the de-bubbled exhibit?  She's shaking --

2          MR. BECKER:  She's shaking her head no, which

3   isn't a good sign.  But we'll make sure she gets that.

4          THE COURT:  All right.  Make sure we get that.

5          MR. BECKER:  Yes, ma'am.

6          THE COURT:  All right.  Anything else?

7          Yes, ma'am?

8          MS. CLEMONS:  One very quick matter, Your Honor.

9   In the Creput deposition that was read in earlier, there

10  were the redacted portions, the red box portions where we

11  omitted those from the trial transcript.  And in the

12  interest of making sure that the record is complete, we just

13  want to officially submit either the papers that Your Honor

14  was reading from that we were reading from as part of the

15  actual record under seal for the red box portions.

16         THE COURT:  That should be part of the permanent

17  record, yes.

18         MS. CLEMONS:  Okay.

19         THE COURT:  All right.

20         MR. BECKER:  Sorry, Your Honor.  Not to postpone

21  the end of court on a Friday, but --

22         THE COURT:  You don't want to start the weekend?

23         MR. BECKER:  No, no, the -- just with regard to

24  the O'Kelley deposition, there are a number of exhibits that

25  we would like to admit into evidence.  We understand the

1  government has objections but just wanted to make sure if

2  you wanted to resolve those objections now or wait until the

3  deposition is over.

4           THE COURT:  Well, let's get them in context.  And

5  maybe over the weekend, you can work out some of that as

6  well.

7           MR. BECKER:  Thank you, Your Honor.

8           MS. WOOD:  Yeah.  I think we can resolve that when

9  we finish the O'Kelley deposition.

10          THE COURT:  That's fine, because that will give me

11 context as well.

12          All right.  Anything further?

13                      (No response.)

14          THE COURT:  All right.  Then we'll recess court

15 until 9:00 Monday morning.

16          (Proceedings adjourned at 6:02 p.m.)
           ----------------------------------

17

18

19

20

21

22

      I certify that the foregoing is a true and
23
    accurate transcription of my stenographic notes.
24
                              /s/
25                  Rhonda F. Montgomery, CCR, RPR


        Rhonda F. Montgomery  OCR-USDC/EDVA  (703) 299-4599