1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
2                 ALEXANDRIA DIVISION

3    ------------------------------x
     UNITED STATES, et al.,      :   Civil Action No.:
4                                :   1:23-cv-108
                  Plaintiffs,    :
5         versus                 :   Wednesday, September 18, 2024
                                 :   Alexandria, Virginia
6    GOOGLE LLC,                 :   Day 8 p.m. (second part)
                                 :   Pages 1-61
7                 Defendant.     :
     ------------------------------x
8

9         The above-entitled bench trial was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
     This proceeding commenced at 4:15 p.m.
10

11                    A P P E A R A N C E S:

12   FOR THE PLAINTIFFS:    GERARD MENE, ESQUIRE
                            OFFICE OF THE UNITED STATES ATTORNEY
13                          2100 Jamieson Avenue
                            Alexandria, Virginia  22314
14                          (703) 299-3700

15                          JULIA TARVER WOOD, ESQUIRE
                            AARON TEITELBAUM, ESQUIRE
16                          KELLY GARCIA, ESQUIRE
                            JEFFREY VERNON, ESQUIRE
17                          MICHAEL WOLIN, ESQUIRE
                            UNITED STATES DEPARTMENT OF JUSTICE
18                          ANTITRUST DIVISION
                            450 Fifth Street, NW
19                          Washington, D.C.  20530
                            (202) 894-4266
20
     (State of VA)          TYLER HENRY, ESQUIRE
21                          OFFICE OF THE ATTORNEY GENERAL
                            OFFICE OF THE SOLICITOR GENERAL
22                          202 North Ninth Street
                            Richmond, Virginia  23219
23                          (804) 786-7704

24

25        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

                                                              1

```
 1                        A P P E A R A N C E S

 2    FOR THE DEFENDANT:       CRAIG REILLY, ESQUIRE
                               LAW OFFICE OF CRAIG C. REILLY
 3                             209 Madison Street
                               Suite 501
 4                             Alexandria, Virginia  22314
                               (703) 549-5354
 5
                               KAREN DUNN, ESQUIRE
 6                             JEANNIE RHEE, ESQUIRE
                               ANITA LIU, ESQUIRE
 7                             AMY MOUSER, ESQUIRE
                               WILLIAM ISAACSON, ESQUIRE
 8                             PAUL, WEISS, RIFKIND,
                               WHARTON & GARRISON LLP
 9                             2001 K Street, NW
                               Washington, D.C.  20006
10                             (202) 223-7300

11                             JUSTINA SESSIONS, ESQUIRE
                               FRESHFIELDS BRUCKHAUS DERINGER, LLP
12                             855 Main Street
                               Redwood City, California  94063
13                             (212) 277-4000

14                             LAUREN VACA, ESQUIRE
                               FRESHFIELDS BRUCKHAUS DERINGER, LLP
15                             3 World Trade Center,
                               175 Greenwich Street
16                             51st Floor, New York, New York  10007
                               (212) 277-4000
17
      COURT REPORTER:          RHONDA F. MONTGOMERY, CCR, RPR
18                             Official Court Reporter
                               United States District Court
19                             401 Courthouse Square
                               Alexandria, Virginia  22314
20                             (703) 299-4599
                               RMontgomery@courtreport.net
21

22

23

24

25
```

1                          TABLE OF CONTENTS

2                              WITNESSES

3      On behalf of the Plaintiffs:

4      BRYAN ROWLEY (video).......................4

5      TIMOTHY SINCOE

6      Direct examination by Ms. Wood ...........4
       Cross-examination by Ms. Dunn ............37

7

8                              MISCELLANY

9      Proceedings September 18, 2024 ...........4
       Certificate of Court Reporter ............61

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Direct Examination - T. Simcoe

| | |
|---|---|
| 1 | <u>P R O C E E D I N G S</u> |
| 2 | MS. WOOD:  May we proceed with the rest of the |
| 3 | video? |
| 4 | THE COURT:  Yes, ma'am. |
| 5 | (Video played.) |
| 6 | MS. WOOD:  All right.  With that, Your Honor, the |
| 7 | plaintiffs call Professor Tim Simcoe. |
| 8 | THE COURT:  All right.  Mr. Simcoe, let me hear |
| 9 | you speak a little bit.  I want to see if we're going to |
| 10 | give you the lapel or have you talk into the microphone. |
| 11 | THE WITNESS:  Hello, my name is Tim Simcoe. |
| 12 | THE COURT:  It's getting late in the day, and I |
| 13 | want to definitely be able to hear you.  So please speak up |
| 14 | loudly.  If I am having trouble, I am going ask you to wear |
| 15 | the lapel but not right now. |
| 16 | All right. |
| 17 | MS. WOOD:  You might want to move your chair up a |
| 18 | little bit closer, as close you can.  Okay. |
| 19 | TIMOTHY SIMCOE, PLAINTIFFS' WITNESS, SWORN |
| 20 | DIRECT EXAMINATION |
| 21 | BY MS. WOOD |
| 22 | Q    Good afternoon, Professor Simcoe.  How are you? |
| 23 | A    Very good.  Thanks. |
| 24 | Q    Can you please introduce yourself briefly to the Court, |
| 25 | and again, please try to keep your voice up. |

4

Direct Examination - T. Simcoe

1   A    Sure.  Good afternoon, Your Honor.  My name is Tim

2   Shawn (phonetic) Simcoe.  I'm a professor at the Boston

3   University Questrom School of Business where I am the chair

4   of the Strategy and Innovation Department and faculty

5   director of the Technology Policy Research Initiative.

6   Q    And can you describe at a high level your educational

7   background?

8   A    Yes.  I have an undergraduate degree in Applied Math

9   with Economics from Harvard.  I worked in consulting for

10  around five years.  Then I went to graduate school at the

11  University of California at Berkeley where I earned a

12  Master's in Economics with fields in industrial organization

13  and econometrics and a PhD in business administration.

14  Q    And what is your primary field of academic research?

15  A    I would say my research sits at the intersection of

16  innovation and economics and industrial organization.  What

17  that means is I research how economic policy affects the way

18  that firms compete, including through innovation.  Much of

19  my research is empirical, which means that I use large

20  datasets to estimate how economic policies have effects.

21        MS. WOOD:  And if we could, put in front of the

22  witness what's been marked for identification as PTX 1782.

23  BY MS. WOOD

24  Q    That should be in one of your smallest binders in front

25  of you.

5

Direct Examination - T. Simcoe

1              MS. WOOD:  If we could have that up on the screen.

2              THE COURT:  That's Professor Simcoe's CV.  I don't

3    need to have it discussed.  I assume he is being accepted as

4    an expert.

5              Specifically, Ms. Wood, in exactly what area?

6              MS. WOOD:  He is being offered as an expert in

7    econometrics and industrial organization.

8              THE COURT:  Any objection?

9              MS. DUNN:  No objection.

10             THE COURT:  He is so qualified.

11   BY MS. WOOD

12   Q    Now, Professor Simcoe, when you were first retained in

13   this matter --

14             MS. WOOD:  The Court may recall this was

15   originally a damages case on behalf of the federal agency

16   advertisers.

17   BY MS. WOOD

18   Q    Is that correct?

19   A    Yes.

20   Q    And can you describe at that time what were your

21   assignments in this case?

22   A    Well, my assignment was to estimate an overcharge for

23   Google AdX's advertising exchange and to apportion that

24   overcharge between publishers and advertisers, but obviously

25   focusing on advertisers at that point in time.

6

Direct Examination - T. Simcoe

1           Apportion means to divide the harm caused by the

2    overcharge between the two parties.

3    Q    And you mentioned an overcharge.  Can you explain to

4    the Court what you mean by an overcharge?

5    A    An overcharge is the difference between the price that

6    AdX charges in the real world and the price that it would

7    charge in a competitive market.

8    Q    Okay.  And what is the purpose of an overcharge

9    analysis in a case such as this one?

10   A    An overcharge is a quantitative measure of the harm to

11   a specific set of parties.  In this case, the users of the

12   ad exchange, the publishers and the advertisers.

13   Q    And based on your work in this matter, did you reach a

14   conclusion as to whether Google overcharged its customers

15   for AdX?

16   A    Yes.

17   Q    What conclusion did you reach in that regard?

18   A    My estimates of the overcharge on AdX range from 19 to

19   27 percent, meaning that AdX charges between 19 and

20   27 percent more for AdX users than they would in a

21   competitive market.

22   Q    Now, can you explain:  What do you mean by that?  What

23   is the 19 to 27 percent, and what is a competitive market?

24   A    What I mean is that the 19 to 27 percent is the

25   difference between the take rate that Google would charge in

7

Direct Examination - T. Simcoe

1   this competitive market and its actual take rate of 19.8

2   percentage points.  So in percentage terms, there's an

3   increase in the take rate of 19 to 27 percent.

4   Q    Okay.  We'll go over that in a bit.

5        And can you describe in broad terms:  What do you

6   mean by a competitive market, what they would have charged

7   in a competitive market?

8   A    In my analysis, I am considering a market where there

9   is no exclusivity between Google Ads and the AdX exchange,

10  no exclusivity between the ad exchange and the publisher ad

11  server in terms of real-time bidding, and where there is no

12  Unified Pricing Rules such that publishers could set

13  floors -- differential floors in the auction for different

14  exchanges and demand sources.

15  Q    Okay.  Now, as you go about as an economist in the

16  field of econometrics embarking on this process of

17  estimating an overcharge, is it necessary to make

18  assumptions?

19  A    Every analysis has some assumptions, yes.

20  Q    And part of those assumptions are about what is a

21  but-for take rate?

22  A    I would say the but-for take rate is the outcome of the

23  analysis.  You make some assumptions along the way in order

24  to estimate that.

25  Q    And how would you characterize the types of assumptions

8

Direct Examination - T. Simcoe

1    you've made in connection with your work on this matter?

2    A    Well, there are different types of assumptions you have

3    to make.  I would maybe put them in two categories.  In the

4    first category, there are assumptions that don't have any

5    obvious impact on what way the estimates would turn out, and

6    then that would make what I think of as standard economic

7    assumptions.  I would just do what's standard in the field.

8         There are some kinds of assumptions that you can

9    tell would have an impact on the outcome of the analysis.

10   In that case, I would try to be conservative.  I would make

11   assumptions that are favorable to Google in the sense that

12   they lead to a lower estimate of the overcharge.

13   Q    And why did you make conservative assumptions or

14   assumptions that would favor Google?

15   A    Because I think that that lends credibility to the

16   analysis and makes it reliable.  It's conservative.

17   Q    Now, is your overcharge analysis intended to identify

18   all harm relating to Google's conduct at issue in this case?

19   A    No.  An overcharge is a specific type of harm.  It's

20   harm to the customers, here the advertisers and the

21   publishers.  But there are other types of harm that are not

22   captured by an overcharge.

23        So, for example, when prices are higher than they

24   would be in a competitive market, that leads to reductions

25   in output.  That reduction in output is not something that I

9

Direct Examination - T. Simcoe

1    try to measure.  It's a different kind of harm.

2              Another example might be when one firm charges

3    above competitive prices, that can produce incentives for

4    other firms operating in the same market to also raise their

5    prices.  That type of harm would be incurred by the

6    customers of other exchanges, but I don't try to estimate

7    that type of harm either.

8    Q    Now, you also indicated that you examined the

9    apportionment -- or your estimated apportionment of the harm

10   between AdX's customers, publishers and advertisers.  Did

11   you reach a conclusion as to the apportionment of harm?

12   A    Yes.

13   Q    And what was that conclusion?

14   A    I estimated that between 70 and 80 percent of the harm

15   caused by the overcharge is incurred by publishers who use

16   the exchange and between 20 and 30 percent of the harm

17   caused by the overcharge is incurred by advertisers on the

18   AdX exchange.

19   Q    Now, when you approached this assignment, how did you

20   approach estimating the amount of the AdX overcharge?  What

21   methodologies did you use?

22   A    I used two different methodologies.  One is called an

23   event study, and the other is called a comparables approach.

24   Q    All right.  I want to take each one in turn.  Let's

25   start with the event study.  What materials did you rely

Direct Examination - T. Simcoe

1    upon in performing your work?

2    A    For both methodologies, I relied on my review of

3    documents, both public documents and documents produced by

4    parties in this case.  I relied on data produced by

5    third-party exchanges and by Google, and I relied on expert

6    reports that I reviewed by experts retained by both parties.

7    I relied on my own background and experience.

8    Q    And you said that you conducted an event study.  What

9    is, in broad terms, an event study?

10   A    At a high level, an event study is really just a before

11   and after comparison.  It's taking some outcome that you

12   want to understand what is the effect of an event on that

13   outcome.  You measure the outcome before the event and after

14   the event, and you attribute differences in the outcome to

15   the event.

16   Q    And are event studies, such as the one you conducted

17   here, common in the field of econometrics?

18   A    Yes, event studies are commonly applied by economists.

19   Q    And how often have you performed event studies in your

20   professional work?

21   A    Many times.

22        THE COURT:  I'm sorry.  When you do an event

23   study, you have to make sure you're not including extraneous

24   information.  I mean, for example, the COVID epidemic has

25   influenced all sorts of things in the economy.  You filter

11

Direct Examination - T. Simcoe

1    out those types of extraneous matters, or do you not?

2           THE WITNESS:  Yes, you do.

3           MS. WOOD:  We will get to that, Your Honor.  I'm

4    happy to jump to that now, or we can lay a foundation first.

5           THE COURT:  No.  That's fine.

6    BY MS. WOOD

7    Q    You said that you performed an event study.  What was

8    the event that you studied in connection with your work

9    here?

10   A    So the event I will focus on is the simultaneous

11   adoption of a set of changes to the auctions that Google

12   runs.

13   Q    And that simultaneous event occurred in the fall of

14   2019; is that right?

15   A    That's correct.

16   Q    And what were the changes that occurred at that time,

17   in the fall of 2015?

18   A    There were three at the same time.  So, first, the

19   transition from a second-price to a first-price auction

20   format; second, the removal of the last look advantage on

21   AdX; and third, the adoption of Unified Pricing Rules that

22   removed publishers' abilities to set different floors for

23   different exchanges or demand sources in the auction.

24   Q    And you looked at -- the one event, these three changes

25   were made at that one time; is that right?

                                                          12

Direct Examination - T. Simcoe

1   A    Yes, they all occurred at the same time.

2   Q    Okay.  And what were you measuring before and after the

3   event?

4   A    The outcome that I am focused on is the number of

5   impressions won by each of a set of eight exchanges in a

6   particular month.  So it's the number of impressions that

7   I'm focused on before and after.

8   Q    And what did you observe as to the number of

9   impressions for each of those eight exchanges before and

10  after the event?

11  A    In the data, the number of impressions won by AdX

12  increased relative to the number of impressions won by other

13  exchanges.

14  Q    Now, you indicated that there were three changes

15  happening simultaneously.  I want to talk about each.  As an

16  economist, what impact, if any, would you expect to see from

17  Google's move from a second-price to a first-price auction?

18  A    If we take that in isolation, I would expect to see no

19  change in the number of impressions won by different

20  exchanges.  The reason for that is like the basic standard

21  auction model that we teach in economics suggests that the

22  party that wins the auction is just the bidder willing to

23  pay the most for the item.  That willingness to pay doesn't

24  depend on whether the auction is conducted using a

25  second-price or first-price format.  So the expectation is

13

Direct Examination - T. Simcoe

1    no change as a result of that.

2    Q    So let's talk about that for a second.   In a

3    first-price auction, what winner wins the auction?

4    A    In a standard first-price auction, the winner is the

5    bidder who has the highest willingness to pay.

6    Q    And what winner wins the auction in a second-price

7    auction?

8    A    It's the same answer.

9    Q    Okay.  And is that part of why economists expect to see

10   no change based on the shift from a second-price to a

11   first-price auction?

12   A    Holding all else equal, that's exactly why.

13   Q    Now, let's talk about this second simultaneous change

14   that was made when this event occurred, and that is Google's

15   removal of last look.  The Court has heard a fair amount

16   about last look, so we won't go into that in detail.  But

17   can you tell us, based on your experience and training as an

18   economist, what would you expect to see in terms of a shift

19   of impressions associated with Google's removal of last

20   look?

21   A    From the removal of last look, I would expect to see

22   the number of impressions won on AdX decrease relative to

23   other exchanges.

24   Q    Why would you expect to see the AdX impressions

25   decrease as a result of removal of last look?

Direct Examination - T. Simcoe

1   A    Because last look provided an informational advantage

2   to the bidders on AdX relative to other exchanges.

3   Q    And what is about the removal of that informational

4   advantage that makes you expect to see a reduction in

5   impressions going to AdX?

6   A    Well, if you take away an advantage for AdX that helped

7   it win more auctions, you would expect to see the number of

8   auctions it wins decline.  So I would expect to see fewer

9   impressions on AdX compared to the other exchanges from

10  dropping last look holding all else equal.

11  Q    And then the third simultaneous change that occurred in

12  connection with this event was Google's imposition of

13  Unified Pricing Rules.  As an economist, what would you

14  expect to see in terms of a shift of impressions based on

15  Google's imposition of Unified Pricing Rules?

16  A    For this change, the answer is it depends.  It depends

17  on whether publishers are able to choose an alternative ad

18  server that allows them to continue setting differential

19  price floors if they want to.  So in a more competitive

20  environment, you might expect to see no change or perhaps a

21  slight decline as publishers switch away from the Google

22  product because the feature that they were using was

23  degraded.

24       In a market where the publishers can't switch,

25  however, what I would expect to see is the adopting Unified

Direct Examination - T. Simcoe

1   Pricing Rules leads to an increase in the number of

2   impressions won on AdX.

3   Q    So based on these three changes happening

4   simultaneously as part of one event, what would you expect

5   to see?

6   A    It depends on which of the three factors is the most

7   important.  As it stands in the data, we saw an increase in

8   the number of impressions won on AdX, and that tells me that

9   the key driving factor was the Unified Pricing Rules.

10   Q    And why is that?  Why does that tell you that the

11   Unified Pricing Rules were the key factor in these three

12   simultaneous changes?

13   A    Because that's the only one under which we would expect

14   to see or predict to see an increase in the number of

15   impressions won on AdX.  And in fact, it leads to a

16   conservative before or after estimate because if we are

17   estimating both the effects of removing last look and the

18   effects of adopting Unified Pricing Rules at the same time,

19   the net effect is the combined two.  And last look is a

20   negative impact and UPR has to be larger than the negative

21   impact of last look to generate a total positive increase in

22   impressions.

23   Q    And I think you just said that you view that to be a

24   conservative estimate.  Why do you say that?

25   A    Because ultimately when I use the event study analysis

Direct Examination - T. Simcoe

1    to calculate a but-for take rate, an important piece of the

2    analysis is the estimated impact of the event, which I will

3    attribute to UPR.  But if we attribute the actual change to

4    UPR, it's smaller than the true effect of UPR because last

5    look is shifting things in the other direction.

6    Q    And what does that mean in terms of your overall result

7    of your event study analysis?

8    A    In the end, what it means is that the overcharge that I

9    estimate you can think of as a lower bound on the actual

10   over charge.  The true overcharge would be larger than the

11   numbers I'm providing.

12   Q    Now, did you employ any econometric tools as part of

13   your event study analysis?

14   A    Yes.

15   Q    And what were those?

16   A    I used a regression.

17   Q    And what is a regression?

18   A    A regression is a way of understanding -- well,

19   allowing data to tell you about the relationships between

20   different variables.  Typically, with a regression, you have

21   an outcome variable.  That will be the number of

22   impressions, as we were talking about, and then you have a

23   set of explanatory variables, which those accomplish some of

24   the holding other things constant that the Court was talking

25   about.

Direct Examination - T. Simcoe

1    Q    And are regressions commonly used in your field?

2    A    Yes, all the time.

3    Q    Okay.  And what data did you rely on to perform your

4    regression analysis?

5    A    I used data for a set of eight exchanges.  These are

6    all the exchanges that produced data that will allow me to

7    calculate the variables that I need for the analysis.  So

8    all the exchanges that produce usable data.  And I have

9    monthly information on the number of impressions won by each

10   exchange, as well as the take rate charged by that exchange.

11   Q    And you said you used data from eight exchanges, the

12   ones that produced usable data.  What do you mean by that?

13   A    Well, it just -- I mean, they produced information that

14   was reliable and allowed me to calculate the variables that

15   I need to use in the regression.

16   Q    Now, did other exchanges produce data in the case that

17   you did not use as part of your regression analysis?

18   A    Yes, but not enough data to calculate the variables

19   that I need for this regression analysis.

20   Q    Can you explain?

21   A    Well, there were some exchanges that produced data that

22   wasn't sufficient to calculate the take rate.  It didn't

23   have both net and gross revenues for the exchange, which I

24   would need to perform that calculation, or there was missing

25   data or, in one case, data that just seemed like nonsense.

18

Direct Examination - T. Simcoe

1   Q    And why is it important to select and use only data
2   that you considered useful for that purpose?
3   A    It's just -- it's standard, you know.  So you can't run
4   a regression without having the data, and you would always,
5   in my experience, clean it carefully and try to understand
6   that it accurately reflects what economist call the
7   data-generating process, which is the underlying reality.
8   Q    Now, did you exclude any firms or exchanges for which
9   the usable data was available?
10  A    No.
11  Q    Over what period of time did you run the regression
12  analysis?
13  A    For the event study, I used what's called an event
14  window, which began one year before the set of changes to
15  Google's auctions.  I think in October 2018.  And then it
16  ran for two years after the event.  So ending, I think, in
17  September 2021.
18  Q    And did you explore whether a different time period of
19  analysis would have led to a materially different result?
20  A    Yes.  I did some robustness checks where I varied the
21  size of the event window, and it did not produce meaningful
22  differences in my results.
23            MS. WOOD:  Now, finally, Your Honor, we'll get to
24  your point.
25

Direct Examination - T. Simcoe

1   BY MS. WOOD

2   Q    Did the regression model control for other factors that

3   might impact the number of impressions won by a given

4   exchange?

5   A    Yes.

6   Q    And can you please describe how that works?

7   A    Well, there's sort of three sets I would think of.  So

8   one we already talked about, the take rate.  So my

9   regression model will have in it the take rate, which is the

10  price charged by each exchange, which is an important

11  variable to control for.

12          The second --

13  Q    Before you move on, why is that an important variable

14  to control for?

15  A    Well, because in economics, we think prices and

16  quantities are linked.  This is an example of estimating

17  demand.  Demand curve is the relationship between price and

18  quantity.  And because price helps explain -- price here

19  being the take rate -- it helps explain the number of

20  impressions that different exchanges end up wining.  It's a

21  variable I include in the analysis.

22  Q    And is that part of why you could only use data from

23  firms that actually produce take-rate data?

24  A    Yes.

25  Q    Okay.  So sorry I interrupted you.  You said there were

20

Direct Examination - T. Simcoe

1   three sets of data, one related to take rate.  Please go on.

2   A    Well, the second set of controls, ways that I can hold

3   other things fixed, I use a set of what are called exchange

4   fixed effects.  So this is a very flexible way that

5   economists account for differences between the different

6   exchanges.  Those differences could be in terms of costs, or

7   they could be in terms of features.  But they are -- they

8   control or account for just a wide variety of different

9   characteristics of the exchanges themselves.

10  Q    And would those exchange fixed effects control for any

11  perceived quality differences among and between exchanges?

12  A    Yes.  When I say features, you know, sort of the way I

13  think of it is that quality is potentially an outcome of

14  features.  And the fixed effects control for any differences

15  in features across the exchanges.

16  Q    So if, for example, one firm had much, much better

17  malware protection or much better spam protection, would

18  that be something that your regression model would control

19  for?

20  A    Yes.

21  Q    And that would be controlled for through the exchange

22  fixed effects?

23  A    Correct.

24  Q    Okay.  And then, again, I promise I'll let you finish.

25  What was the third control that your regression allowed you

21

Direct Examination - T. Simcoe

1  to control for?

2  A     The third are what I call time fixed effects.  It's

3  similar methodologically to the exchange fixed effects, but

4  time fixed effects are just a set of variables that allow

5  for underlying changes in the environment.  So for instance,

6  the internet is growing over the time period or interest

7  rates are changing.  So things that affect all of the

8  exchanges collectively or have the same effect on the

9  exchanges, those are absorbed by the inclusion of these time

10  fixed effects.

11  Q     And as you indicated, the time period over which you

12  ran the regression analysis did include COVID; is that

13  right?

14  A     Yes.

15  Q     So would that be part of the sort of time fixed effects

16  that your regression model controlled for?

17  A     Yes.

18  Q     And so if, for example, display advertising as a

19  general type of advertising grew or declined over that time

20  period, again, would your model control for that as well?

21  A     Yes.

22  Q     Now, you described earlier how -- what you were

23  studying before and after the event was a shift in

24  impressions among various exchanges.  Do I have that right?

25  A     Correct.  So the event study piece captures this change

22

Direct Examination - T. Simcoe

1   in the number of impressions of one exchange relative to

2   another.

3   Q    And how do you translate that shift of impressions to

4   an estimated take rate as part of your overcharge analysis?

5   A    So this brings us back to that net effect of the three

6   simultaneous changes.  So one part of the regression

7   estimates the shift or the before or after change that we

8   see in impressions on Google relative to other exchanges.

9        Another part of the regression estimates the

10  relationship between the take rate and impressions or take

11  rates and quantities.  And I can put those two things

12  together to calculate how much an exchange would need to

13  reduce its take rate to have the same effect as UPR.   In

14  other words, how much would you need to lower your take rate

15  to win as many impressions as Google won by imposing the UPR

16  rules within AdX.

17  Q    And how does that allow you to arrive at an estimated

18  but-for take rate or overcharge?

19  A    Well, that is a -- by putting those two things together

20  in that way, I have an estimate of the effect of Google's

21  exercise in market power only expressed in terms of a change

22  in take rate.  So the amount of the overcharge is equal to

23  the thing I just described, the amount you would need to

24  reduce your take rate to win that many impressions.  To get

25  a but-for take rate, I can subtract that difference from

Direct Examination - T. Simcoe

1  Google's 19.8 percent actual take rate.

2  Q    All right.  And ultimately -- let me show you what's

3  been marked as Plaintiffs' Demonstrative T, as in Tom.  And

4  it's on the screen, or it's in your binder.  Do you

5  recognize Plaintiffs' Demonstrative T, as in Tom?

6  A    Yes.

7  Q    And does this material -- except for the percent

8  increase in red on the right-hand side, does the rest of

9  this data come from your report, Figure 16?

10 A    I think that's the right number, yes.

11 Q    Okay.  So let's just go through this.  What does

12 Plaintiffs' Demonstrative T show?

13 A    It summarizes the overcharge for four different

14 versions of my event study analysis.

15 Q    So let's start with the column on the far left.  The

16 title above it reads AdX Take Rate.  What is that?

17 A    That is the 19.8 percentage point take rate that AdX is

18 actually charging users of AdX.

19 Q    And where did that number come from?

20 A    That came from the data provided by Google.

21 Q    Okay.  And then out to the left, you see All Exchanges

22 OLS.  Can you describe to the Court what that is?

23 A    So this describes two ways of describing my analysis.

24 So all exchanges says that this is based on data from all

25 exchanges that provided usable information.

Direct Examination - T. Simcoe

1   Q    So those are the eight exchanges you refer to?

2   A    Yes.

3   Q    Okay.  And what does OLS refer to?

4   A    Ordinary least squares.  That's a type of regression.

5   Q    Oh, dear.

6          Can you describe at a high level what ordinary

7   least squares means?

8   A    It's ordinary because it's the most standard type of

9   regression.  It's the one that we teach first.

10  Q    Oh, dear.

11  A    I'll go into least squares if you like, but I think it

12  might be sufficient to simply say it's based on -- well,

13  it's based on minimizing the sum of the squared errors.

14          THE COURT:  Economics 101.

15          MS. WOOD:  I hope in advanced economics, but we'll

16  see.

17          THE WITNESS:  Maybe 102.

18          MS. WOOD:  102.

19  BY MS. WOOD

20  Q    What is all exchanges?  Is that IV or Roman IV?  I'm

21  not even sure.

22  A    It's IV.

23  Q    Okay.  And what is that short for, IV?

24  A    Instrumental variables.

25  Q    And generally, at a high level, what does that mean?

Direct Examination - T. Simcoe

1   A    It's different -- so IV is different from OLS.  OLS is

2   one method of estimation.  IV is another method of

3   estimation that accounts for different views of causality

4   here.  It's related to how I estimate the relationship

5   between the take rate and the quantities.  So in an IV model

6   or instrumental variables model, we use other variables to

7   remove what's called simultaneity between price and

8   quantity.  You can think of it as just another estimation

9   method.

10  Q    Okay.  And then below that are two boxes where we still

11  see OLS and IV, but we have -- should that be all exchanges

12  and large exchanges?  I think there might be a typo in --

13  oh, no.  Both are large exchanges.  Sorry.  Large exchanges

14  and large exchanges but now for OLS and IV; is that right?

15  A    Correct.

16  Q    And what do you mean by large exchanges in the bottom

17  two boxes?

18  A    Here the sample that -- the data that I used changes

19  slightly.  Instead of using all eight exchanges, I used six.

20  I removed two that are smaller within the set of non-AdX

21  exchanges.  There are, I think, exchanges that account for

22  less than 10 percent of the number of impressions sold

23  across that set of seven non-AdX exchanges.

24  Q    And why did you run the regression both across all

25  eight exchanges and then limited to just six exchanges?

Direct Examination - T. Simcoe

1  A    It's another type of robustness test.  It's useful to

2  see if changing your assumptions produces dramatic changes

3  in your results.  It's also the case that here, in these

4  regressions, you can think of exchanges as getting equal

5  weight in some sense and even though they're not similarly

6  sized.  And so as a robustness test, I just wanted to see

7  whether it produces a large change in the final results if I

8  drop the smallest of the non-AdX exchanges.

9  Q    And again, when you dropped the two smallest, how did

10 you define what constituted the two smallest versus the

11 remaining six largest?

12 A    They are substantially smaller.  I think the way I

13 characterized it in my report was that they are less than 10

14 percent -- they are each less than 10 percent of the non-AdX

15 impressions.

16 Q    So with that understanding of the left-hand columns,

17 what do you show in the estimated take rate column?

18 A    The estimated take rate is the results of the analysis

19 that we walked through.  So after applying the regression

20 model -- or estimating the regression model and performing

21 the calculations that I described, that is my estimate of

22 what Google would charge in a competitive market.

23 Q    So somewhere depending on which -- whether you're using

24 all exchanges or large exchanges and depending on whether

25 you're using OLS or IV, the estimated but-for take rate is

Direct Examination - T. Simcoe

1    between 15.7 and 16.6 percent?

2    A    That's correct.

3    Q    And that would be compared against the actual AdX take

4    rate of 19.8 percent?

5    A    Yes.  Those comparisons are in the next two columns.

6    Q    Okay.  So the percentage point increase, what is that?

7    A    That's the difference between 19.8 and the number in

8    the second column, the estimated take rate.

9    Q    Okay.  And then, finally, the numbers in red, what do

10   those show?

11   A    That expresses the overcharge as a percent of the

12   competitive price.  So it's the amount that my analysis

13   indicates the percentage changed in between a competitive

14   take rate and the actual take rate on AdX.

15   Q    Okay.  So I want to turn now briefly to your

16   comparables analysis.  What is a comparables analysis?

17   A    A comparables analysis is a direct comparison of prices

18   for transactions that may be affected by some type of

19   anticompetitive conduct and transactions that have not.

20          Here it's just -- it's a comparison of the average

21   take rate for open-web display transactions on AdX compared

22   to the average take rate charged by four transactions on

23   other exchanges.

24   Q    And why did you perform a comparables analysis in this

25   case after you've done an extensive regression?

Direct Examination - T. Simcoe

1    A     There's a few reasons.   One, it provides a different

2    estimate of the overcharge.   I mean, second, is that I think

3    it's something that almost any economist would do.  So you

4    have prices.  There's a question of whether there is

5    evidence of anticompetitive effects in the market.  You look

6    to see if the prices on AdX are higher than the average

7    prices elsewhere.  That's kind of a commonsense step.

8              And I think that the event study and the

9    comparables approach are complements of one another.  The

10   event study is maybe a little harder to understand but

11   provides for a more sophisticated approach to controlling

12   for other factors.  The comparables analysis is

13   straightforward because it works directly with prices.

14   Q     And how did you go about conducting the comparables

15   analysis here?

16   A     I considered what transactions to include and decided

17   to include all of the open-web display advertising

18   transactions, again, where I had usable data, and then I

19   calculated a weighted average take rate for all of the

20   non-AdX exchanges.  And I compared that directly to the AdX

21   take rate.

22   Q     And was this the same data you used with your

23   regression analysis?

24   A     It's the same underlying data, but the time period is

25   different.  Here I don't use the event window that I

                                                              29

Direct Examination - T. Simcoe

1   discussed.  I used a different and longer time span.

2   Q    And was that longer time span consistent with the

3   damages time period for the FAAs?

4   A    It starts with the damages period for the FAAs and

5   continues for as long as I had data.

6   Q    And you said that you calculated a weighted average

7   price of all open-web display transactions that did not go

8   through AdX.  Did you calculate a weighted average of each

9   exchange's take rate, or did you do something else?

10  A    So yes and no.  So it's a -- mathematically, by using a

11  weighted average of the take rate of the exchanges, I can

12  calculate the average across all of the transactions on

13  those exchanges.

14  Q    Okay.  So you didn't say Firm A had weighted average

15  take rate of, you know, Amount A; Firm B had a weighted

16  average take rate of a different take rate.  You calculated

17  the take rate of all non-AdX exchanges as one number.  Am I

18  understanding that?

19  A    That's correct.  The weights are by exchange, and I'm

20  calculating an average over all of them.  That's right.

21       THE COURT:  When of you say all, you mean all

22  eight of these exchanges?

23       THE WITNESS:  It would be seven because AdX is one

24  in that eight number.  So I take AdX out.

25       THE COURT:  Right.  Okay, those seven?

                                                        30

Direct Examination - T. Simcoe

1          THE WITNESS:  Yes.

2          THE COURT:  All right.

3   BY MS. WOOD

4   Q    Okay.  And how many impressions total were included in

5   this comparable analysis that you ran?

6   A    The transactions run into the trillions.

7   Q    And so you took out the AdX impressions and ran the

8   data over trillions of impressions to reach a weighted

9   average take rate that did not go through AdX; is that

10  right?

11  A    Yes, that's right.

12  Q    Okay.  And how would you characterize the level of

13  conservatism embedded in this approach to an overcharge?

14  A    You could characterize it as conservative for various

15  reasons.  I think the main reason it's potentially a

16  conservative benchmark is that the -- there's an idea in --

17  well, it's because if Google's take rate is above what it

18  would charge in a competitive market, that provides

19  incentives for other exchanges to also increase their take

20  rates.

21          And so since those take rates are elevated

22  relative to a competitive level, the benchmark I'm using is

23  higher than the benchmark that you would get by averaging

24  the take rates that those exchanges were charge in a

25  competitive world.

31

Direct Examination - T. Simcoe

1    Q    And does that have a name in economic literature?

2    A    It does.  The jargon in economics is strategic

3    complementarity.  That's the idea that when one firm raises

4    its price, so do the others.

5    Q    And if we can, take a look at Plaintiffs' Demonstrative

6    U.  Can you tell us what Plaintiffs' Demonstrative U shows?

7    A    This is the results of the comparables analysis

8    presented in a similar format to what we walked through in

9    the case of the event study.

10   Q    And again, all exchanges would be all seven excluding

11   AdX; is that right?

12   A    That's correct.

13   Q    And large exchanges would be excluding the two that

14   each constitute less than 10 percent of AdX?

15   A    Less than 10 percent of the non-AdX exchanges, yes.

16   Q    Okay.  And so what result did you reach in connection

17   with your comparables analysis?

18   A    I can see from the comparables analysis that the

19   weighted average take rates of the comparable exchanges are

20   between 15.6 and 16.2 percent.

21   Q    Now, unlike your regression analysis, is the

22   comparables analysis able to factor in or factor out quality

23   differences?

24   A    I did -- I considered quality differences.  You can't

25   account for quality differences in exactly the same way in a

32

Direct Examination - T. Simcoe

1    comparables analysis as you do in an event study.

2              One reason to do the event study is that the kind

3    of quality adjustment you might perform directly on price

4    requires some very strong kinds of economic assumptions that

5    often you wouldn't want to make.  So instead, you turn to

6    event study or something like it.  But I mean, I guess the

7    answer is no.

8    Q    And is that why you called these two approaches as

9    complementary to each other?

10   A    Yes.

11   Q    Okay.  So let me turn now to your apportionment

12   analysis.  What analysis did you conduct to determine how

13   the AdX overcharge was felt by advertiser versus publisher

14   customers of AdX?

15   A    I used something called a tax incidence model.

16   Q    And what is a tax incidence model?

17   A    A tax incidence model is an economic model that is used

18   to provide a quantitative estimate of who pays the burden of

19   a tax, the buyer or the seller.

20   Q    And how is it that both buyers and sellers both pay a

21   tax?

22   A    Well, a tax, which here is sort of equivalent to the

23   take rate because they have a similar structure, affect both

24   buy buyers and sellers because buyers end up paying more for

25   the item and sellers end up receiving less after tax money.

                                                              33

Direct Examination - T. Simcoe

1    The tax is an amount that's collected between when the buyer

2    pays and when the seller receives.  And sort of the inside

3    of the tax incidence model is that both sides are harmed.

4    Q    Now, given that the tax is taking out of what the buyer

5    pays before the money reaches the seller, what impact, if

6    any, does that have on the buyer's ability to purchase?

7    A    I think the way to think about it is to sort of

8    consider that when the seller receives less money, some

9    sellers will be unwilling to sell the item.  In an auction

10   context, that's like the bid falling below the floor after

11   the take rate is increased.

12         And when there's fewer items available for sale,

13   economics teaches us that the price goes up.  There's less

14   supply, and that leads to an increase in price.  And that

15   affects the buyer.  You can think of it also as the buyer

16   having less money for future transactions.  But at the level

17   of the market, prices increase to the buyer and they

18   decrease for the seller.

19   Q    And are tax incidence models, such as the one you used

20   here, well accepted in the field of economics?

21   A    The idea of tax incidence has been around for over a

22   hundred years.  It's kind of a celebrated idea within

23   economics, and the tool is widely applied.  We teach it, and

24   we use it across many different fields in economics.

25   Q    So can you describe to the Court:  How did you go about

34

Direct Examination - T. Simcoe

1    applying the tax incidence model in this case?

2    A    Well, you can think of the model as providing a

3    formula, and the formula needs a couple of inputs.

4         The key inputs are the price sensitives of the

5    buyer and the price sensitives of the seller.  And then when

6    you take those inputs and you put them into the formula,

7    what you get as an answer is what is the share of the tax or

8    the share of the increase in the take rate that is paid on

9    the buyer's side -- in this application, that's going to be

10   advertisers -- and what is the share that's incurred on the

11   seller's side here, the publishers.

12   Q    And how did you determine the price sensitivities of

13   buyers and sellers here?

14   A    So those key inputs are price sensitivities, what

15   economists sometimes call elasticities.  I was able to

16   estimate those using data from auctions, millions of

17   auctions that the Google produced.  These were auctions from

18   the summer of 2023, and the data that they provided has

19   information on all the bids submitted by different bidders

20   to purchase individual open-web display impressions.

21        And by simulating small changes in the bids of

22   either AdX bidders are non-AdX bidders, I could estimate

23   those price sensitivities or demand-and-supply elasticities

24   and put those into the tax incidence formula.

25   Q    What checks, if any, did you perform on whether your

                                                            35

Direct Examination - T. Simcoe

1  price sensitivity estimates were reliable?

2  A    Well, to understand if the price sensitivity estimates

3  were reasonable, I relied on experiments that Google

4  conducts in the ordinary course of business.  So I reviewed

5  a number of Google experiments, and I identified several

6  that would allow me to calculate an implied elasticity of

7  supply or an implied seller price sensitivity or implied

8  buyer price sensitivity.

9         And after I performed those calculations, I could

10 seed that my own estimates based on the auction data fell

11 within the range of the calculations that I did based on

12 Google's experiments.  That made me think that my estimates

13 were more reliable.

14 Q    So what was the result that you concluded based on your

15 tax incidence model that you used for apportionment?

16 A    The bottom-line result is that the advertisers incur

17 between 20 and 30 percent of the harm from the overcharge

18 and the publishers incur between 70 and 80 percent of the

19 harm from the overcharge.

20 Q    And as an economist, can you explain why it is that

21 publishers bear a larger burden of the AdX overcharge than

22 advertisers?

23 A    Well, what's reflected in those price sensitivities is

24 really the availability of alternatives or better options

25 than the transaction at hand.  So to the extent that

36

Cross-Examination - T. Simcoe

1     advertisers have more other things that they can do with the

2     spend, they are going to be less harmed by the overcharge

3     than a publisher who has fewer alternatives.

4              MS. WOOD:  I'll pass the witness.

5              THE COURT:  All right.

6              MS. DUNN:  With the Court's indulgence, Your

7     Honor, we would like to hand out the binders.

8              THE COURT:  Yes.

9              MS. DUNN:  I would also like to introduce the

10    Court to my colleague, Bryon Becker, who is with us at

11    counsel table.

12             THE COURT:  All right.  Go ahead.

13             MS. DUNN:  Thank you, Your Honor.

14                      CROSS-EXAMINATION

15    BY MS. DUNN

16    Q    Professor Simcoe, my name is Karen Dunn.  I'm a lawyer

17    on behalf of Google, and I'm going to ask you some questions

18    this afternoon.

19             I will not start with tax incidence because it's

20    after 5:00.  I try not to talk about tax incidence after

21    5:00.

22             Okay.  So you testified on direct about your

23    opinion in this case, which just simply put is an estimate

24    of the proportion the fees that Google's AdX platform you

25    find attributable to the exclusionary conduct at issue in

                                                            37

Cross-Examination - T. Simcoe

1   this case.  Is that simply put your opinion?

2   A    I think it's broadly correct; although, you could think

3   of Google's market power as arising from a wide variety of

4   different conduct.  So it depends on what you mean by

5   exclusionary conduct.

6   Q    Okay.  Well, we can talk about that.  But essentially,

7   you're offering the Court a proportion of the fees that you

8   say is attributable to the exclusionary conduct, correct?

9   That's what you've taken out in your but-for world?

10  A    It's the same question I think, so the same answer,

11  yes.

12  Q    Okay.  And in particular, you compute a percent

13  overcharge for open-web display ad impressions via real-time

14  bidding on the AdX platform, correct?

15  A    Yes.

16  Q    Okay.  And you also offered an opinion -- you talk a

17  little bit in your report about the federal agency

18  advertisers.  Do you recall that?

19  A    Yes.

20  Q    And you refer to them as representative advertisers of

21  other advertisers with respect to supply and demand?

22          MS. WOOD:  Objection.  Irrelevant, 403, and also

23  beyond the scope given Google's dismissal of those claims

24  involuntarily.

25          THE COURT:  I don't see any relevance at all of

                                                              38

Cross-Examination - T. Simcoe

1    the government buyers in this case, the military.

2              MS. DUNN:  We think the relevance will become

3    clear, Your Honor.  We can move on, and we'll --

4              THE COURT:  Move on.

5              MS. DUNN:  And the Court can see the relevance to

6    Professor Simcoe's opinions, specifically with respect to

7    his but-for world.  But we'll prove it up as we go forward.

8              THE COURT:  All right.

9    BY MS. DUNN

10   Q    Okay.  But just to be clear at the outset, what you're

11   opining on and what you're not opining on, you're relying on

12   Professor Lee for the definition of the relevant antitrust

13   markets in this case, correct?

14   A    Yes.

15   Q    And you also rely on Professor Lee's conclusions that

16   Google's conduct was exclusionary, correct?

17   A    I would say I reviewed Professor Lee's report, the

18   methods that he used, the data sources that he relied upon,

19   and I agree with it, yes.

20   Q    Okay.  But you're not offering any independent opinions

21   related to Professor Lee's conclusions, correct?

22   A    Which conclusions?

23   Q    With respect to what Professor Lee finds is

24   exclusionary conduct and with respect to his relevant

25   market.

Cross-Examination - T. Simcoe

1    A    I'm relying on Professor Lee's market definition.   I

2    believe we agree on the question of exclusionary conduct as

3    well.   My analysis focuses on effects.   I think you could

4    make an inference from some of the effects that I estimate

5    that Google has market power that's attributable to the

6    exclusionary conduct.

7    Q    Do you recall being asked in your deposition whether

8    it's accurate that you do not offer any independent opinions

9    related to Professor Lee's conclusions, and you responded,

10   "I believe that's correct"?   Do you recall that?

11   A    Not specifically, but I take your word for that.

12   Q    Okay.   All right.   And then you said that your opinions

13   are based on reviewing Google documents and third-party

14   documents in this case --

15   A    Yes.

16   Q    -- in part?

17        And so out of -- you may not know this, but the

18   Court is aware that over 6 million Google documents were

19   produced in this case.   And you reviewed 48 of those in

20   preparation of your opening report; do I have that right?

21   A    I haven't tried to count, but I certainly reviewed more

22   than I cited in footnotes.   I'm not sure where you get the

23   48.

24   Q    Well, sir, if you -- you have your report up there, and

25   if you look at Appendix B, materials relied on, produced

Cross-Examination - T. Simcoe

 1  documents?

 2        MS. WOOD:  Do you have a page number?

 3        MS. DUNN:  Appendix B.  Let me find the page.

 4  It's page 5.

 5  BY MS. DUNN

 6  Q    Professor Simcoe, just let us know when you're there.

 7  A    I think so.

 8  Q    And do you see the list of produced documents in your

 9  materials relied upon?

10  A    Yes.

11  Q    Okay.  And you see -- I might spare you from counting

12  them, but it should be relatively obvious that there are

13  only 53 documents on this list and several belong to

14  third-parties.  And so we did count, and you reviewed 48

15  Google documents for this report.

16  A    I don't think that's correct.  If I could clarify, it's

17  not the number that I reviewed.  This is the number that I

18  relied upon, which I believe is simply the number that are

19  cited in my opening report.

20  Q    Okay.  To the extent that you form opinions, you would

21  have relied upon only these documents, correct?

22  A    I guess that's -- you know, the way I think of it is

23  these are sufficient.

24        THE COURT:  All right.  Just so I'm clear, we're

25  looking at page 5?

Cross-Examination - T. Simcoe

1          MS. DUNN:  We are looking at page 5, Your Honor.

2          THE COURT:  It says produced documents.  They all

3   seem to have footnote numbers on them too.

4          MS. DUNN:  Those are numbers just listing the

5   relied-upon materials.  They actually do not correspond to

6   footnotes.  The numbers that precede this are articles, for

7   example.

8          THE COURT:  All right.

9   BY MS. DUNN

10  Q    Okay.  All right.  So we can agree this is what's in

11  your materials relied upon, correct?

12  A    Yes.

13  Q    Okay.  And then I don't know if you want to go through

14  this exercise, but your materials relied upon for your

15  rebuttal report include five additional Google documents; is

16  that fair?

17  A    I don't know, but I will take your word for that.

18  Q    Okay.  And these documents were selected for you by

19  plaintiffs' counsel, right?

20  A    Again, I think I asked for documents and was provided

21  various types of documents to review.  Presumably, they came

22  through plaintiffs' counsel.

23  Q    Right.  Okay.

24          All right.  So now let's talk about the substance

25  of your opinions, sir.  You are comparing an as-is take

                                                          42

Cross-Examination - T. Simcoe

1    rate, which is the take rate in the real world, to a but-for

2    take rate.  And when you do that, you conclude that Google

3    charges a super competitive price for open-web display

4    advertising purchased via real-time bidding on Google's ad

5    exchange called AdX.  That's correct, right?

6    A    All right.  So I think it's important to just be clear

7    that we're talking about the AdX tool.  But maybe that's

8    what you meant with that, or maybe I wrote it and that's

9    what I meant.

10   Q    Well, you can call it the AdX tool because Professor

11   Lee does his markets by tool, right?

12   A    Professor Lee's market definition -- one of the markets

13   is exchanges, which is one of the tools in the ad tech

14   stack.

15   Q    Okay.  And you rely on that, and otherwise, what I said

16   is accurate, right?

17   A    Well, would you say it again?

18   Q    I think the Court understands.

19          But the point I'm trying to make is you're not

20   offering an opinion on super competitive pricing across the

21   ad tech stack, right?

22   A    No, that's not something I would try to do.

23   Q    Right.  And you do not assess, therefore -- just to put

24   a fine point on this -- whether Google's price across the ad

25   tech stack is super competitive, correct?

Cross-Examination - T. Simcoe

1   A    To the extent I'm not sure what the price across the ad

2   tech stack means -- you mean the sum of the take rates for

3   different tools?

4   Q    I mean that if you're talking about the tools that

5   connect publishers to advertisers across the ad tech stack

6   that Google offers, you're not opining that those take rates

7   for that full stack are super competitive.  Your focus is

8   only on the AdX tool, correct?

9   A    I focus on the AdX tool, that's correct.

10  Q    Okay.  And you remember that Professor Sinaniyev

11  (phonetic), who the Court will hear from later in this

12  trial, responded to your report, right?

13  A    Yes.

14  Q    Okay.  And she does do analysis comparing or assessing

15  the stackwide take rate.  You recall that, right?

16  A    I do recall Professor Sinaniyev's analysis, yes.

17  Q    Okay.  And you say that that improperly combines fees,

18  right?  That was your opinion?

19  A    I think it's better understood as it improperly

20  combines products that are not substitutes for each other

21  but rather complements.

22  Q    Okay.  And you say that Professor Sinaniyev's approach

23  is analogous to adding the price of apples and oranges sold

24  by one fruit producer and comparing that sum to the combined

25  price of apples and oranges from another fruit producer in

44

Cross-Examination - T. Simcoe

 1   order to suggest that the first fruit producer is charging a

 2   competitive price for apples?  You say that?

 3   A    I think I offered that analogy in my rebuttal report,

 4   yes.

 5   Q    And I'm going to ask what I hope is any easy question,

 6   which is you don't need an apple to eat an orange, right?

 7   A    No, you don't.

 8   Q    All right.  I'd like to show you, sir, what's been

 9   marked as Plaintiffs' Exhibit 1199.  This is Figure 4 from

10   your report in this case.

11            MS. WOOD:  No objection.

12            THE COURT:  I'm sorry?

13            MS. WOOD:  No objection.

14            THE COURT:  All right.  It's in.

15            MS. DUNN:  And, Your Honor, we are going to show

16   the redacted version of this figure because, as Your Honor

17   may remember because you've seen this chart before at our

18   main hearing, we've just redacted the firm names.

19            THE COURT:  That's fine.

20            MS. DUNN:  Thank you.

21   BY MS. DUNN

22   Q    Okay.  So --

23            MS. WOOD:  And, Your Honor, just to be clear,

24   presumably, the unredacted will be under seal as we've been

25   doing with the other exhibits.

Cross-Examination - T. Simcoe

1          THE COURT:  Correct.  So the only one that goes on

2   the website tomorrow will be this one that we're looking at

3   right now, which doesn't have the names.

4          MS. DUNN:  Yes, Your Honor.  Thank you.

5   BY MS. DUNN

6   Q    Okay.  So the first thing, Professor Simcoe, is that

7   I'd like to direct your attention just to the title of your

8   Figure 4.  It says, Effective Take Rate for Worldwide

9   Open-Web Display + Video Outstream Impressions.  Do you see

10  that?

11  A    Yes.

12  Q    Okay.  And you calculated -- to get what we see on this

13  chart, you calculated the average take rate for several ad

14  exchanges on a monthly basis.  You took net revenue divided

15  by gross revenue.  Do I have that right?

16  A    Yes.  For each exchange, I divided net revenue by gross

17  revenue to get a take rate.

18  Q    Right.  And your analysis is based on worldwide data,

19  not U.S. specific data, correct?  It seems fair from the

20  title, right?

21  A    Yes.

22  Q    And just to be clear, your analysis is limited only to

23  open-web display advertising as defined by Professor Lee,

24  correct?

25  A    The impressions are open-web display and video

                                                              46

Cross-Examination - T. Simcoe

1  outstream, that's correct.

2  Q    Okay.  Now, I'd like to -- we'll come back to this

3  Figure 4, but I'd like to look at how you define display

4  advertising.  And so we'll show you on the screen, but

5  you're free to look in your report at paragraph 20.

6         All right.  Do you need to -- can you look at the

7  screen, or do you want to look at your report?

8  A    I can see.

9  Q    It's up to you.  Okay.

10        All right.  So you say here in your report that

11  display advertising refers to various types of

12  advertisements that may be served to users who browse

13  websites or use mobile apps.

14        Do you see that?

15  A    Yes.

16  Q    And that's in your report under this title Display

17  Advertising Basics, right?

18  A    Correct.

19  Q    Not to belabor the obvious, but you include apps?

20  A    Okay.

21  Q    It says apps, right?

22  A    It does, yes.

23  Q    Okay.

24  A    But this --

25  Q    Okay.  So then you move along in this paragraph, and

Cross-Examination - T. Simcoe

1   you also talk about what is an impression.  And do you see

2   there's a Footnote 8 after the word "impression."  And maybe

3   Mr. Spalding can highlight that for you.  Do you see that?

4   A    Yes.

5   Q    All right.  Let's go to Footnote 8 of your report.  And

6   here you cite both the Lee report and you cite an article.

7   The article is entitled *What is an Ad Impression?  All you*

8   *need to know.*  Do you see that?

9   A    Yes.

10  Q    And you say that an ad impression occurs when an

11  advertisement is successfully displayed to a user on a

12  website, mobile app, or any digital platform.  You see that,

13  correct?

14  A    Yes, I see it.

15  Q    All right.  And then if you look at the next paragraph

16  of your report, you hone in specifically on what display ads

17  are, and you say, "Display ads may consist of images, texts,

18  interactive elements, audio, or some combination of these."

19          Do you see that?

20  A    I see it.

21  Q    And then you cite -- at Footnote 10, you cite a Google

22  document, one of the ones that you reviewed and relied on,

23  called Google Display Network Presentation.

24          Do you see that?

25  A    Yes.

48

Cross-Examination - T. Simcoe

1  Q    Okay.  And it says, "When it comes to ad creatives,

2  there are several that you could run on the Google display

3  network," and then you list text ads, responsive ads, native

4  ads, image ads, dynamic ads, light box ads, video ads, and

5  Gmail ads.  Do you see that?

6  A    Yes, I see it.

7  Q    I don't know what a light box ad is.  Do you?

8  A    No.

9  Q    Okay.  All right.  Staying with Footnote 10, you then

10  cite a blog for your opinion that reads, "Display ads are

11  graphic adverts that appear online on websites, mobile apps,

12  and social media."

13           Do you see that?

14  A    Yes, I see it.

15  Q    Okay.  So let's return to Figure 4.  And just to be

16  clear, notwithstanding the fact that you define display

17  ads -- all of these kinds of display ads under basics, they

18  are not taken into account in your Figure 4, correct?

19  A    So at the very beginning of my report, when I describe

20  some --

21  Q    Sir, this is really just a yes-or-no question, and

22  plaintiffs' counsel can ask you to expand when they get up

23  on redirect.

24           So is the answer yes or no?

25  A    Would you please repeat the question.

49

Cross-Examination - T. Simcoe

1   Q    Sure.  Notwithstanding the fact that you listed all of
2   those kinds of ads under display basics, any data from that
3   is not reflected in your Figure 4, correct?
4   A    I am not -- so I'm not sure I understand the question.
5   Any data from what is not reflected in Figure 4?
6   Q    So Figure 4 doesn't have data from in-app ads, from
7   native ads, from all the things that we listed, video,
8   instream video.  You do have outstream video.  But that list
9   that we went over, there are types of ad formats that are
10  not reflected in the data that you put in Figure 4; am I
11  right?
12  A    The report defines open-web display impressions, which
13  does exclude many of the types of ads that you read, and the
14  chart is based on open-web display impressions.
15  Q    Okay.  But, sir, in this case, we are having a lot of
16  discussion about what display ads mean.  You have defined
17  display ads in your report.  Okay.  And there are ads in
18  your report under basics that are not -- for example, in-app
19  ads, not in this Figure 4, correct?
20  A    Yes.
21  Q    Native ads not in this Figure 4, correct?
22  A    Yes.
23  Q    All kinds of video not in Figure 4, correct?
24  A    Well, there's instream and outstream.  I believe
25  outstream is in the figure, but instream is out of the

Cross-Examination - T. Simcoe

1    figure.

2    Q    Okay.  But you appreciate that there are ads not in

3    your Figure 4, right?

4    A    Yes, some of the formats that you described from the

5    basic section of my report.

6    Q    All right.  So let's look at the redline on your

7    Figure 4.

8              MS. DUNN:  Your Honor may recall that the redline

9    represents, in this Figure 4, what Professor Simcoe calls

10   Google's effective take rate for open-web display

11   impressions on AdX worldwide.

12   BY MS. DUNN

13   Q    Right?

14   A    Yes.

15   Q    Okay.  And you say in your report that you do not mean

16   to imply that AdX charges 20 percent for every publisher or

17   every transaction.  Do you recall that?

18   A    Yes.

19   Q    Right.  And that's because there's sometimes

20   negotiation and deals made, right?

21   A    Well, it's because there can be variation across

22   impressions in the take rate charged.

23   Q    Right.  So this -- but I'm just trying to make clear

24   that there -- it's not the same rate for every publisher and

25   every impression, correct?

51

Cross-Examination - T. Simcoe

1    A    Yes.

2    Q    Okay.  All right.  Now -- and we could agree,

3    presumably, that the redline stays more or less the same

4    over the time period that you have here, correct?

5    A    Yes.  A striking feature of the graph is that the

6    redline is very constant relative to the take rates of the

7    other exchanges.

8    Q    Yes.  So you reviewed the Lee report, and you know,

9    therefore, that Professor Lee says Google attained

10   substantial market power in what he calls the ad exchange

11   market in 2015.  Do you recall reading that?

12   A    I recall reading Professor Lee's report, yes.

13   Q    Do you recall that he said -- I mean, you said you

14   were -- that you had opinions -- or, I, guess that you

15   relied on Professor Lee about market power.  So my question

16   to you, sir, is whether you remember that he says Google

17   attained substantial market power in the ad exchange market

18   in 2015.  Do you recall that?

19   A    The preface to your question was not correct.  I don't

20   rely on Professor Lee for market power as you put it.

21   Q    Okay.  But you don't disagree with me that Professor

22   Lee said he concluded that AdX had substantial market power

23   in what he calls the ad exchange market since 2015?

24   A    No, I don't disagree.

25   Q    Okay.  And it's fair to say that in your Figure 4, both

                                                              52

Cross-Examination - T. Simcoe

1   before, during, and after 2015 -- at this point, defined by

2   Professor Lee -- the redline remains, you know, more or less

3   the same.  You agree with that, right?

4   A    A firm can choose to exercise its market power in

5   various ways, but it's true that the redline is constant.

6   Q    Right.  So whatever else we know, we know that Google

7   did not jack up its price after this time where Professor

8   Lee says we had market power, right?

9   A    Google's price in the ad exchange market is constant

10  over time.  That's true.

11  Q    Okay.  So the answer to my question is no?

12  A    I don't know what you mean by jack up its price, but I

13  think I understand.  The answer is the price is constant.

14  Q    Right.  The answer to my question is no.

15        All right.  So if you look at -- let's look at

16  another aspect -- another what you call startling feature of

17  Figure 4, which is the vast majority of exchanges are

18  between 15 and 20 percent for an average take rate.  You can

19  see that, right?

20  A    I'm sorry.

21  Q    Your Figure 4 shows that the vast majority of exchanges

22  that you have here, the eight, are between 15 and 20 percent

23  for their average take rate; isn't that correct?

24  A    Well, in the time period -- it depends on the time

25  period, but the exchanges -- the other exchanges -- well, in

Cross-Examination - T. Simcoe

1   fact, we know, as I testified on direct, the average take

2   rate charged by the other exchanges for a long period of

3   time was about 16.2 percent.

4   Q    Right.  We'll talk about the 16.2.  And maybe where

5   we're having a departure is after a certain time, they're

6   between 15 and 20 percent.  But before that, they're

7   actually higher than that; is that fair?

8   A    Some are above and some are below, yes.  There's a

9   downward trend over time, it looks like, for the other

10  exchanges.  I think most of the time they're between 15 and

11  20 percent.

12          MS. DUNN:  Okay.  All right.  Now, I'm going to

13  use colors and not names, Your Honor.

14  BY MS. DUNN

15  Q    One exchange, the gray line, maintains an effective

16  take rate above 30 percent and has never been below Google's

17  AdX, right?

18  A    That's a -- the point I would like to make without --

19  well --

20  Q    I think you can make that point on redirect, but we

21  agree that just you're looking at the line, right?

22  A    That line is above 25 percent.

23  Q    Okay.  And the purple line we see is consistently below

24  average of 15 percent, right?

25  A    Yes.

Cross-Examination - T. Simcoe

1    Q    And these four other exchanges have take rates that at

2    certain points during the period were actually above AdX,

3    correct?

4    A    There were points in time where other exchanges have an

5    average take rate above AdX.

6    Q    Okay.  And I'm going to ask you another yes-or-no

7    question.  At those points in time where those other

8    exchanges had take rates above the average and above AdX,

9    you are not opining that those ad exchanges were charging

10   super competitive prices, correct?

11   A    I am not alleging that other exchanges are charging

12   super competitive prices, but I am not doing a comparables

13   analysis for those exchanges either.

14   Q    Right.  You didn't do comparables analyses for those

15   other exchanges either, right?

16   A    The --

17   Q    That's what you just said, yes?

18   A    That's correct.

19   Q    Okay.  And can we also agree that Google has never had

20   the highest price on this chart?

21   A    Among these exchanges, yes.

22   Q    Okay.  But those were the ones you included, though,

23   right?

24   A    Yes.

25   Q    Okay.  All right.  So I want to now talk about your

55

Cross-Examination - T. Simcoe

1   16.2, and you testified on direct that both of your

2   approaches, the comparables study and the event study, they

3   both resulted in a but-for AdX take rate of 16.2 percent.

4   Do I have that right?

5   A    On direct, I offered a range of estimates based on

6   different ways of conducting the two analyses.

7   Q    That's fair.  But the one overlapped number is your

8   16.2, right?

9   A    No.  I mean, there's ranges -- the ranges overlap.

10  Q    Okay.  And the 16.2 is with respect to -- you have

11  large exchanges and all exchanges, right, and the 16.2 is

12  the all, right?

13  A    For the comparables analysis, yes.

14  Q    Okay.  And so I'm going to just briefly ask

15  Mr. Spalding to bring back up what's been marked -- I'm

16  sorry -- what we just discussed, your Figure 4.  And I just

17  want to ask Mr. Spalding to put a line at the 16.2, which is

18  the but-for take rate that you calculated.

19        And just to be clear, first of all, you calculated

20  the 16.2 percent only for the period from January 2019 to

21  March 2023, right?

22  A    Yes, starting with the damages period and extending

23  through 2023 when the data -- the end of the data I have.

24  Q    Understood.  Totally fair is the damages period.  But I

25  just want to be clear that the comparables approach is using

Cross-Examination - T. Simcoe

1    the data just from that period, January 2019 to March 2023,

2    right?

3    A    Yes.

4    Q    Okay.  And so we can agree that between 2017 and 2019,

5    the period you did not use, that there are some pretty high

6    numbers on this chart with respect to the green, orange,

7    blue, gray, and yellow lines, right?

8    A    It depends on what you mean by pretty high, but the

9    weighted average would reflect also the weights, which

10   depends on the scale of the other exchanges.

11   Q    We're going to talk about scale.  Right now I'm just --

12   I feel like this is -- this has been a prominent figure in

13   our discussions with the Court.  So I want to make sure that

14   we see what's going on on this figure.

15        Okay.  But we agree that most of the lines on the

16   chart, the actual vast majority of all of these exchanges

17   are above the 16.2, correct?

18   A    It depends on what time period you look.  I guess in

19   the yellow time period, it looks like three or four are

20   below the black line and one, two, three are above the black

21   line.

22        MS. DUNN:  Your Honor, we'd offer -- we'd ask to

23   admit -- and we can mark this --

24        THE COURT:  You want this version with the --

25        MS. DUNN:  Yes, Your Honor.

```
 1              MS. WOOD:  No objection.

 2              THE COURT:  All right.  Why don't we call that

 3     1199A.

 4              MS. DUNN:  Yes, Your Honor.

 5              THE COURT:  All right.

 6              MS. WOOD:  Just, Your Honor, there may be an A

 7     already for the sealed version with the actual firm names.

 8     So maybe B perhaps.

 9              THE COURT:  1199B.

10              MS. DUNN:  Sold.

11              MS. WOOD:  Thank you, Your Honor.

12              THE COURT:  All right.  And I think at this point,

13     it's time to stop because we need to read in our exhibits

14     that were introduced to.

15              So, Professor, we will need you back here

16     tomorrow.

17              I have -- tomorrow is Thursday.

18              Are you starting with somebody else tomorrow?

19              MS. WOOD:  Well, I was going to ask, with the

20     Court's indulgence, if we could finish this exam and then

21     start with the next witness that is a Google adverse

22     witness.

23              THE COURT:  That's fine.

24              MS. WOOD:  Okay.

25              THE COURT:  So, Professor, you can move out of the
```

1    hot seat there.  All right.  We will see you back here
2    tomorrow morning at 9:00.
3                MS. DUNN:  Your Honor --
4                THE COURT:  Wait.
5                I'm hoping we can start at 9:00 on the dot.  I
6    have three pretrials at 8:30.  They should clear by quarter
7    of 9:00.  You're going to have to clean your desks again
8    tonight unfortunately.  But that's the plan for tomorrow
9    morning.
10               Yes, Ms. Dunn.
11               MS. DUNN:  I apologize, Your Honor.
12               Give that Professor Simcoe is not a third-party,
13   he's an expert, we would ask that plaintiffs' counsel not
14   discuss his testimony because his cross has already begun.
15               MS. WOOD:  Of course, Your Honor.
16               THE COURT:  That's fine.
17               MS. DUNN:  Thank you.
18               THE COURT:  All right.  Katie, are you ready to
19   read them?
20               THE COURTROOM DEPUTY:  Yes.
21               PTX 66 --
22               THE COURT:  Wait.  Hold an a second because that
23   door makes so much noise.  Let's get everybody who is going
24   to move out out so that we can do this.
25               (People exit.)

                                                              59

1          THE COURT:  Okay.

2          THE COURTROOM DEPUTY:  PTX 66, PTX 198, PTX 116,

3  PTX 124, PTX 997, PTX 208, PTX 333, PTX 686, PTX 421, PTX

4  499, PTX 578, PTX 832, PTX 485, PTX 1517, PTX 284, PTX 971,

5  PTX 128, PTX 209, PTX 326, PTX 847, PTX 141, PTX 159, PTX

6  1265, PTX 1265A, PTX 1266, PTX 1266A, DTX 85, PTX 1717, PTX

7  1633, DTX 2530, PTX 618, PTX 572, PTX 373, PTX 851, PTX

8  1033, PTX 144, PTX 174, PTX 445, PTX 604, PTX 759, PTX 767,

9  PTX 792, PTX 953, PTX 978, PTX 993, PTX 1017, PTX 1728, PTX

10  1782, PTX 1199, and PTX 1199B.

11          THE COURT:  1199A and B, right?

12          MS. WOOD:  Yes, Your Honor.

13          THE COURT:  All right.  A is going to be the --

14  1199 is the unredacted that stays with the Court.  1199A is

15  the redacted version, and B is the redacted version with the

16  nice black stripe through it.

17          MS. DUNN:  Yes.  Thank you, Your Honor.

18          THE COURT:  All right.  Were there any that either

19  side feels we've missed or any that's there that you didn't

20  think were entered?

21          MS. WOOD:  PTX 1782, can I just ask who that came

22  in through?

23          THE COURTROOM DEPUTY:  That was Simcoe, his CV.

24          MS. WOOD:  Oh, great.  Thank you.  Sorry I didn't

25  write it down.  Sorry.

 1              THE COURT:  All right.  Are there any other

 2    housekeeping matters we need to address?

 3              MS. WOOD:  No, Your Honor.

 4              MS. DUNN:  No, Your Honor.

 5              THE COURT:  And the website, I haven't been

 6    checking it.  There are no problems with the exhibits and

 7    the portions of the depositions and all of that stuff is

 8    coming out?

 9              MS. DUNN:  Yes, Your Honor.

10              THE COURT:  I have not heard any complaints from

11    the media folks.  So I assume they're satisfied.

12              MS. DUNN:  Yes.

13              THE COURT:  All right.  Very good.

14              We'll recess court, then, until 8:30 tomorrow

15    morning.

16                   (Proceedings adjourned at 6:00 p.m.)

17                   -----------------------------------

18

19

20

21

22

23        I certify that the foregoing is a true and

24     accurate transcription of my stenographic notes.

          _____
25                        /s/
            Rhonda F. Montgomery, CCR, RPR

                                                              61